# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>COMMONWEALTH OF PUERTO RICO,<br><br>                              Debtor. | Title III<br><br>Case No. 17-_____  (____) |

## STATEMENT OF OVERSIGHT BOARD
## IN CONNECTION WITH PROMESA TITLE III PETITION

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), on behalf of the Commonwealth of Puerto Rico ("Puerto Rico" or the "Commonwealth") in the above-captioned title III case, respectfully submits this statement (the "Statement") in connection with the Commonwealth's petition under Title III of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA").  Title III is a specific statutory vehicle that allows Puerto Rico and other U.S. territories to restructure their debt.  This Statement is submitted to provide the Court with information regarding the crisis and fiscal emergency surrounding Puerto Rico that led to the filing of its Title III petition.

## I.     INTRODUCTION AND SUMMARY

### A.     The Current State of the Puerto Rican Economy

1.     In PROMESA, Congress recognizes the crisis in the Commonwealth and its instrumentalities, and explains the fiscal emergency that renders the Commonwealth unable to provide its citizens effective services, while suffering the outmigration of residents and businesses.[1]     Congress points to lack of financial transparency, excessive borrowing,

---

[1] PROMESA § 405(m)–(n).

management inefficiencies, and a severe economic decline as having created the crisis.[2]   The fiscal distress Congress declared is about to worsen exponentially due to the elimination of approximately $850 million in Affordable Care Act funds in fiscal year 2018 and increasing substantially year-over-year,[3] and the exhaustion of all public pension funding, the shortfall of which could cost the Commonwealth approximately $1.5 billion per year.[4]   Negative economic growth has persisted for nine of the last ten years along with population diminution highlighted by exiting young doctors and other professionals.[5]   From current revenues, the Commonwealth and its instrumentalities cannot satisfy their collective $74 billion debt burden and $49 billion pension burden and pay their operating expenses.[6]   Before Congress enacted PROMESA, the Obama Administration[7] and a dozen United States Senators concluded Puerto Rico faced a "humanitarian crisis."[8]   Furthermore, the Commonwealth, across different Administrations, has

---

[2] *Id.*

[3] The loss of Affordable Care Act funding is projected to cost the Commonwealth over $16 billion in fiscal years 2018-2019.   *See* GOV'T OF P.R., P.R. FISCAL AGENCY AND FIN. ADVISORY AUTH., FISCAL PLAN FOR PUERTO RICO, at 11 (2017), attached hereto as **Exhibit A**.

[4] Nick Brown, *In Puerto Rico, pensions' decline pits retirees against lenders*, REUTERS (Feb. 26, 2017, 11:55 AM), http://www.reuters.com/article/us-puertorico-debt-pensions-analysis-idUSKBN1650GZ.

[5] CONGRESSIONAL TASK FORCE ON ECONOMIC GROWTH IN PUERTO RICO, 114TH CONG., at 9 (2016); ANNE O. KRUEGER ET AL., PUERTO RICO – A WAY FORWARD (2015) at 7.

[6] *See* An Update on the Competitiveness of Puerto Rico's Economy by the Federal Reserve Bank of New York (July 31, 2014) at 16 (Figure 12); *Wal-Mart P.R., Inc. v. Zaragoza-Gomez*, 174 F. Supp. 3d 585, 592 (D.P.R. 2016) ("The Commonwealth of Puerto Rico is insolvent and no longer able to pay its debts as they become due."); COMMONWEALTH OF P.R., FINANCIAL INFORMATION AND OPERATING DATA REPORT, at 222 (2016).

[7] Jeffrey Zients, *Puerto Rico's Fiscal Crisis: What You Need to Know*, THE WHITE HOUSE (June 7, 2016, 1:40 PM), https://obamawhitehouse.archives.gov/blog/2016/06/07/puerto-ricos-fiscal-crisis-what-you-need-know.

[8] Letter from Richard Blumenthal et al. to Charles Grassley, Chair, S. Judiciary Comm. (Sept. 30, 2015), http://www.puertoricoreport.com/wp-content/uploads/2015/10/Letter-to-Grassley-re-Puerto-Rico-9-30-15.pdf.

declared a state of fiscal emergency and that it lacks sufficient resources to protect the health, safety, and welfare of the people of Puerto Rico.[9]  And just last week, the Commonwealth enacted the "Fiscal Plan Compliance Law," which declares that the island faces a "fiscal and socioeconomic crisis without precedent" in its history.[10]

The numbers are staggeringly grim:

- GNP Decline since 2007:  from 2007–2016, Puerto Rico's Gross National Product ("GNP") declined by over 14%,[11] while total employment in Puerto Rico fell from 1.25 million to fewer than 1 million;[12]

- Unemployment Rate:  In October 2016, Puerto Rico's unemployment rate was 12.1%, and only 987,606 persons were employed, down 23% from 1,277,559 employed persons in December 2006;[13]

- Labor Participation Rate:  the labor participation rate has plummeted to 40%, two-thirds of the level on the U.S. mainland;[14]

- Drop in Economic Activity Index:  the Economic Activity Index composed of four factors (payroll employment, electric power generation, cement sales, and gasoline consumption) fell from 160.0 to 124.1 between August 2005 and August 2016;[15]

- Population Decline:  since 2007, Puerto Rico's population has declined approximately 10% down to less than 3.41 million people in 2016;[16]

- Poverty and Unemployment:  according to the U.S. Census Bureau's 2015 community survey, 46.1% of Puerto Rico's residents live below the federal poverty level compared to the national average of 14.7%, and 36% of the residents of Detroit, whose financial distress was viewed by many as uniquely devastating.  Puerto Rico's is more so.  For Puerto Rico children under age 5, 63.7% live under the federal poverty level, compared

---

[9] *See* Act No. 21-2016 and Act No. 3-2017.

[10] *See* House Bill No. 938 (signed into law on April 29, 2017).

[11] CONGRESSIONAL TASK FORCE ON ECONOMIC GROWTH IN PUERTO RICO, *supra* note 5, at 9.

[12] Joseph E. Stiglitz & Martin Guzman, *From Bad to Worse for Puerto Rico*, PROJECT SYNDICATE (Feb. 28, 2017), https://www.project-syndicate.org/commentary/puerto-rico-debt-plan-deep-depression-by-joseph-e--stiglitz-and-martin-guzman-2017-02.

[13] CONGRESSIONAL TASK FORCE ON ECONOMIC GROWTH IN PUERTO RICO, *supra* note 5, at 11.

[14] *From Bad to Worse for Puerto Rico, supra* note 12.

[15] CONGRESSIONAL TASK FORCE ON ECONOMIC GROWTH IN PUERTO RICO, *supra* note 5, at 10.

[16] *Population Estimates by Year*, U.S. CENSUS BUREAU, https://www2.census.gov/programs-surveys/popest/datasets/2010-2016/national/totals/ (last visited Apr 27, 2017).

to the national average of 22.8%. Median household income in Puerto Rico was $18,626 in 2015, as compared to $56,515 in the United States, and to $27,862 in Detroit in 2011;[17] and

- Public Debt as a Percentage of Income: Puerto Rico has approximately $74 billion of bond debt and $48 billion of unfunded pension liabilities. As of 2012, Puerto Rico's public debt as a percentage of aggregate income was 100.7%, as compared to 29% for New York, which has the highest ratio of public debt to income in the United States (the average is 16.8%).[18]

Compounding matters is that these grim economic conditions will continue to spur out-migration, which will in turn reduce production and demand for goods and services and thus drive further economic contraction. A bleak spiral has begun.

2. All the while, Puerto Rico has been financing its fiscal deficits by issuing debt. The total public sector debt for Puerto Rico stands at approximately $74 billion.[19] Total pension liabilities of Puerto Rico's three principal retirement systems as of June 30, 2015 were $49.562 billion and were only approximately 1.57% funded at such date.[20] These three main retirement systems are projected to deplete their liquid assets between July and December of 2017.[21] The result is that Puerto Rico can no longer fully pay its debt and pay for government services. Nor can Puerto Rico refinance its debt—it no longer has access to the capital markets. In short, Puerto Rico's crisis has reached a breaking point.[22]

---

[17] Congressional Task Force on Economic Growth in Puerto Rico, *supra* note 5, at 10–11.

[18] An Update on the Competitiveness of Puerto Rico's Economy, *supra* note 6, at 16 (Figure 12).

[19] Fiscal Plan for Puerto Rico, *supra* note 3, at 27.

[20] Commonwealth of P.R., Financial Information and Operating Data Report, at 222 (2016).

[21] *Id.* at 225.

[22] According to investor and public policy analyst Robert Rosenkranz, "Puerto Rico is on its way to one of the largest debt defaults in history, right up there with Greece and Argentina." Nathaniel Parish Flannery, *How Bad Is Puerto Rico's Economic Crisis?*, Forbes (June 29, 2015, 9:04 AM), https://www.forbes.com/sites/nathanielparishflannery/2015/07/29/how-bad-is-puerto-ricos-economic-crisis/#21c47645577e.

**B.**     **PROMESA was Enacted to Make Sure Puerto Rico Emerges from its Fiscal Crisis for its Residents, Creditors, and Businesses**

3.     In 2016, the U.S. Congress passed PROMESA, which, among other things, created the Oversight Board and imposed an automatic stay on creditor lawsuits against the government, which stay was extended to May 1, 2017,[23] but has now expired.

4.     According to PROMESA, "[t]he purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets."[24]  PROMESA provides the Oversight Board with the critical tools necessary to satisfy its mandate, including the ability to certify a fiscal plan for the Commonwealth and "covered entities,"[25] as well as two different processes (Title III and Title VI) that can be used to restructure the Commonwealth's debts.

**C.**     **The Members of the Oversight Board**

5.     As described further below, the members of the Oversight Board were appointed by President Obama from a bipartisan list of nominees.  Each member is independent and impartial, and though they serve with no compensation (and are separately employed), each member has devoted hundreds of hours to this challenging and often daunting endeavor.  The Oversight Board has been tasked with the mission of making the difficult decisions politicians avoided and creditors oppose.  Not surprisingly, this task has exposed the Oversight Board to criticism from all sides.

**D.**     **Commencement of this Title III Case**

6.     From December 2016 through March 2017, the Oversight Board and the Commonwealth held more than thirty meetings with creditor representatives to better understand

---

[23] *See* PROMESA § 405(d).

[24] *Id.* § 101(a).

[25] A list of covered entities under PROMESA is attached hereto as **Exhibit B**.

their perspectives and work towards achieving a consensual financial restructuring.  On March 13, 2017, after almost six months and numerous internal and external meetings between the Oversight Board and its advisors, the Oversight Board certified an amended version of the current Governor's fiscal plan.  Not happy with the result and the projected level of debt service, creditors requested the decertification of the current fiscal plan and the certification of a new fiscal plan that would have exceeded the certified fiscal plan's debt sustainability analysis.  The Oversight Board and the Commonwealth convened mediation on April 13, 2017, to find common ground and a consensual resolution.

7.     As of the termination of the PROMESA stay, no consensual agreement was reached.  Given the massive debt load to be addressed, as well as the need to attain pension and operational reform in accordance with the fiscal plan, it was determined that the best path forward was to commence a Title III case to protect Puerto Rico and its citizens.  Title III was especially compelled by the Commonwealth's need to restructure $49 billion of pension liabilities because Congress did not authorize pension restructurings in Title VI.  Utilizing the tools provided by PROMESA, and with the benefit of the automatic stay under Bankruptcy Code sections 362 and 922, the Oversight Board and the Commonwealth will continue efforts to negotiate, preferably through consensual deals with all constituencies, a comprehensive debt restructuring through a Title III plan of adjustment, which can incorporate all consensual agreements reached (including those that could otherwise form a qualifying Title VI modification).

## II.   **PUERTO RICO AND ITS INSTRUMENTALITIES**

### A.   **Organizational Structure**

8.      Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments with their focus on the health, safety, and welfare of its citizens (including, among others, education, public health and welfare programs, and economic development).   Unlike the states, however, the central government also assumes responsibility for local police and fire protection.[26]

9.      There are also many governmental and quasi-governmental functions performed by public corporations created by the Legislative Assembly with varying degrees of independence from the central government.   Public corporations may obtain revenues from rates charged for services or products, but many also receive sizable subsidies from the central government to fund operations.   Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Puerto Rico Senate.[27]

10.     Set forth below are brief descriptions of some of the Commonwealth's principal public corporations:[28]

- Puerto Rico Highways and Transportation Authority (HTA) – created to assume responsibility for the construction and maintenance of roads and highways and related transportation facilities in Puerto Rico;

- Puerto Rico Electric Power Authority (PREPA) – supplies substantially all the electricity consumed in the Commonwealth and owns all transmission and distribution facilities and most of the generating facilities that constitute Puerto Rico's electric power system;

- Puerto Rico Aqueduct and Sewer Authority (PRASA) – owns and operates Puerto Rico's public water supply and wastewater systems;

---

[26] FINANCIAL INFORMATION AND OPERATING DATA REPORT, *supra* note 20, at 9.

[27] *Id.* at 117.

[28] *Id.* at 118–148.

- <u>Government Development Bank (GDB)</u> – historically, served as (i) fiscal agent, financial advisor, and reporting agent for the Commonwealth, its instrumentalities, and municipalities, (ii) an important source of financing for various Commonwealth entities, and (iii) the principal depository of the funds of the Commonwealth entities;

- <u>Puerto Rico Health Insurance Administration (PRHIA)</u> – created to negotiate and contract for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents;

- <u>Puerto Rico Medical Services Administration (PRMSA)</u> – operates and administers certain centralized health services;

- <u>University of Puerto Rico (UPR)</u> – the only public university in Puerto Rico;

- <u>Puerto Rico Integrated Transit Authority (PRITA)</u> – created to integrate the mass transit services currently provided by HTA, MTA, and MBA;

- <u>Puerto Rico and Municipal Island Maritime Transport Authority (MTA)</u> – operates ferry services between the Municipalities of San Juan and Cataño, and Fajardo, Vieques, and Culebra;

- <u>Metropolitan Bus Authority (MBA)</u> – operates bus and paratransit services within Puerto Rico's metropolitan area;

- <u>Puerto Rico Public Buildings Authority (PBA)</u> – created to design, construct, administer, and provide maintenance to office buildings, courts, warehouses, schools, health care facilities, welfare facilities, shops, and related facilities leased to the Commonwealth or any of its departments, agencies, instrumentalities, or municipalities;

- <u>Puerto Rico Ports Authority (PRPA)</u> – owns the major airport and seaport facilities in Puerto Rico;

- <u>Puerto Rico Industrial Development Company (PRIDCO)</u> – created to promote economic development by stimulating the formation of new local firms and encouraging firms in the United States and foreign countries to establish and expand their operations in Puerto Rico;

- <u>Puerto Rico Tourism Company (PRTC)</u> – responsible for stimulating, promoting, and regulating the development of Puerto Rico's tourism industry;

- <u>Puerto Rico Infrastructure Financing Authority (PRIFA)</u> – created to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions, and municipalities authorized to develop infrastructure facilities and to establish alternate means for financing those facilities;

- <u>Agricultural Enterprises Development Administration (ADEA)</u> – created to provide a wide array of services and incentives to the agricultural sector;

- <u>Puerto Rico Housing Finance Authority (PRHFA)</u> – created to provide public and private housing developers with interim and permanent financing through mortgage loans for the construction, improvement, operation, and maintenance of rental housing for low and moderate-income families;

- Puerto Rico Tourism Development Fund (TDF) – created to facilitate the development of Puerto Rico's hotel industry by working with private-sector financial institutions in structuring financings for new hotel projects and hospitality related projects;

- Puerto Rico Development Fund – established to provide an alternate source of financing to private enterprises;

- Puerto Rico Public Finance Corporation (PFC) – established to provide agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements;

- State Insurance Fund (SIF) – in charge of managing and regulating the Commonwealth workers' insurance system that covers occupational injuries, diseases, and deaths, to which all employers must be subscribed under law; and

- Puerto Rico Sales Tax Financing Corporation (COFINA) – created, among other things, to raise money for the Commonwealth in exchange for the Commonwealth's transfer to COFINA of certain sales and use taxes.

### B.    Allocation of Puerto Rico's Debt Obligations

11.    A table showing how Puerto Rico's public sector debt is allocated among the Commonwealth, its municipalities, and its public corporations as of February 2017 can be found on page 21 of the Fiscal Plan, attached hereto as **Exhibit A**.  In summary, the Commonwealth and its instrumentalities owe approximately $74 billion in the aggregate.  Of that amount, $13.3 billion is on account of general obligation bonds issued by the Commonwealth and another $4.5 billion reflects debt guaranteed by the Commonwealth, all of which is backed by the Commonwealth's full faith and credit.  Further, there is approximately $17.6 billion of notes issued by COFINA and backed by a sales and use tax.  The amounts owed by other covered entities are equally staggering: (i) PREPA has approximately $9 billion of debt; (ii) HTA has approximately $4.1 billion of debt; (iii) PRASA has approximately $4.6 billion of debt; (iv) GDB has approximately $4.1 billion of debt; (v) ERS has approximately $3.2 billion of debt; (vi) PRIFA has approximately $2.2 billion of debt; (vii) Children's Trust has approximately $1.5 billion of debt; and (viii) PFC has approximately $1.2 billion of debt.[29]   Critically, the total

---

[29] *See* FISCAL PLAN FOR PUERTO RICO, *supra* note 3, at 27.

public sector debt figure does not account for the $49 billion of pension liabilities, only approximately 1.57% of which were funded as of June 30, 2015.[30]

## III.   **PUERTO RICO'S FISCAL CRISIS**

12.   As shown below, the widespread impact of Puerto Rico's fiscal crisis and the crisis itself can be traced to events occurring over the past century.  Flaws in Puerto Rico's governance and fiscal controls have combined to create the financial problems the Commonwealth faces today.  Some of the major institutional problems that led to the widespread impact or to the fiscal crisis are identified below:

- A 1917 Law Authorizes Puerto Rico to Issue "Triple Tax Free" Bonds – in 1917, Congress passed the Jones-Shafroth Act (Pub. L. 64-368, 39 Stat. 951).  Section 3 of the Act barred federal, state and local governments from taxing any bonds issued by Puerto Rico or its municipalities.  39 Stat. 951, 953 (codified as amended at 48 U.S.C. § 745).  The "triple tax free" status of Puerto Rico's bonds caused them to become extremely attractive to U.S. investors;[31]

- A New Constitution Loosens Balanced Budget Restrictions in 1952 – the Puerto Rico Constitution, approved on July 25, 1952, altered the balanced budget provision by encompassing non-revenue resources, including federal assistance and funds obtained through the sale of bonds.  This amendment opened the door to recurring operating deficits;[32]

- Public Debt Limits Were Revised to Near Irrelevance – when it was originally enacted, the Puerto Rico Constitution contained a debt limit measured by a percentage of property value.  In 1961, the constitution was amended such that the debt limit was now measured by a percentage of revenue.  Notably, this revision allowed for additional debt to be issued that didn't count towards the debt limit;[33]

- Repeal of Section 936 Tax Credits – in 1996, certain federal legislation phased out tax benefits (over a 10-year period) for income earned by Puerto Rico-based subsidiaries of U.S. corporations.  Once these tax credits were eliminated, many capital-intensive businesses chose to relocate elsewhere;[34]

---

[30] *See* FINANCIAL INFORMATION AND OPERATING DATA REPORT, *supra* note 20, at 222.

[31] *See* Marc D. Joffe and Jesse Martinez, *Origins of the Puerto Rico Fiscal Crisis*, Mercatus Research, Apr. 2016, at 6.

[32] *See id.* at 1011.

[33] *See id.* at 1213.

[34] KRUEGER ET AL., *supra* note 5, at 4.

- <u>Massive Pension Liabilities</u> – the Commonwealth had recognized that even after reforms to reduce future benefits, the Commonwealth and other participating employers would still need to make additional contributions to maintain sufficient system assets to make benefits payments when due.  But, all three principal retirement systems for public employees in Puerto Rico are severely underfunded as the Commonwealth and other employers did not fund their contributions;[35]

- <u>Poor Reporting and Management of Financial Information</u> – (i) comprehensive annual reports are completed months late, (ii) for years, the Commonwealth's budget was based on extremely optimistic revenue projections that overestimated revenue by 15% annually, (iii) the Office of Budget Management had no power to implement spending cuts, and (iv) Puerto Rico struggles with tax collection, often accepting less money than is owed in exchange for quick payment in order to meet near-term cash shortfalls;[36]

- <u>Understatement of Government's True Deficit</u> – the government's accounting system, which relies on the Treasury's General Fund accounts, greatly understates the government's true deficit.  In other words, the actual deficit facing the Commonwealth is far greater than had previously been anticipated;[37]

- <u>Collapse in Housing and Investment</u> – a fall in housing prices reduced the ability to borrow, which led to less investment;[38]

- <u>Recession on the U.S. Mainland</u> – the Great Recession on the U.S. mainland—Puerto Rico's largest trading partner and investor—had a negative effect on the Commonwealth;[39]

- <u>Bank Distress and Credit Crunch</u> – with the drop in real estate values, commercial bank assets have fallen by 30% since 2005, and the FDIC had to intervene to backstop several banks;[40]

- <u>Low Employment and High Labor Costs</u> – only 40% of the adult population in Puerto Rico is employed or looking for work (as opposed to 63% on the mainland);[41]

- <u>Emigration and Population Loss</u> – Puerto Rico's population declined for the first time in 2006 and has continued to fall to approximately 3.5 million people today.  The loss of approximately 1% of the population each year decreases potential growth as the labor force and consumer demand shrink;[42]

---

[35] FINANCIAL INFORMATION AND OPERATING DATA REPORT, *supra* note 20, at 17–18.

[36] KRUEGER ET AL., *supra* note 5, at 9–10.

[37] *Id.* at 10–11.

[38] *Id.* at 4.

[39] *Id.* at 5.

[40] *Id.*

[41] *Id.* at 6.

[42] *Id*. at 7.

- Energy Costs – energy costs are several times higher than on the U.S. mainland.  PREPA produces and distributes electricity using archaic oil-based facilities and technology;[43]

- Transport Costs – Puerto Rico's import costs are at least double those of neighboring island countries because of the federal Jones Act of 1920;[44] and

- Barriers to Competition and Business Activity – certain local laws and regulations hamper business competition and investment.[45]

## IV.   THE COMMONWEALTH GOVERNMENT ATTEMPTS TO ADDRESS PUERTO RICO'S FISCAL CRISIS

13.    The Puerto Rico government attempted to address some of the problems described above.  For various reasons, however, comprehensive reform proved elusive.

### A.    Moratorium Act

14.    As the fiscal crisis worsened, Puerto Rico enacted the Emergency Moratorium and Financial Rehabilitation Act on April 6, 2016, as amended (the "Moratorium Act"), which recognized that "the Government of Puerto Rico does not have sufficient resources to comply with debt service obligations as originally scheduled and, additionally, to continue providing essential services to the people[.]"[46]

15.    The Moratorium Act authorized the Governor to declare (by executive order) a moratorium on debt service payments for a limited period of time for the Commonwealth, GDB, and other governmental instrumentalities of Puerto Rico.[47]  Such a declaration would also stay any creditor remedies that could result from a moratorium on such payments.[48]  Finally, the Moratorium Act also created a new instrumentality—the Puerto Rico Fiscal Agency and

---

[43] *Id*. at 8.

[44] *Id*.

[45] *Id*.

[46] Moratorium Act, Preamble at 1.

[47] *Id.* at 6–7.

[48] *Id.* at 7.

Financial Advisory Authority (generally known by its Spanish acronym, "<u>AAFAF</u>").  Under the statute, AAFAF assumed the fiscal agency and financial advisory responsibilities previously exercised by GDB.[49]

16.     The Governor would go on to issue several executive orders in 2016 that declared payment moratoriums on various debt, implemented a new regulatory framework for GDB operations and liquidity, and related matters.[50]  As of September 30, 2016, the Commonwealth and its instrumentalities had missed nearly $1.5 billion in debt service payments.[51]

### B.     PROMESA

17.     On June 30, 2016, President Barack Obama signed PROMESA into law.[52] Starting immediately upon enactment, PROMESA imposed an automatic stay on all litigation against Puerto Rico and its instrumentalities, as well as any other judicial or administrative actions or proceedings to enforce or collect claims against the government.[53]  This stay initially was effective until February 15, 2017, but was extended by the Oversight Board until May 1, 2017.[54]  PROMESA also created the Oversight Board with the stated purpose of "provid[ing] a method for a covered territory to achieve fiscal responsibility and access to the capital markets"[55] and established Title III and Title VI to provide a restructuring process for Puerto Rico given the prior absence of access to the Bankruptcy Code.

---

[49] FINANCIAL INFORMATION AND OPERATING DATA REPORT, *supra* note 20, at 9.

[50] *Id.* at 37.

[51] *Id.* at 35.

[52] Heather Long, *President Obama signs Puerto Rico rescue bill*, CNNMONEY (June 30, 2016, 5:00 PM), http://money.cnn.com/2016/06/29/investing/puerto-rico-debt-promesa/.

[53] *See* PROMESA § 405(b).

[54] *See id.* § 405(d).

[55] *See id.* § 101(a).

18.     As for the Oversight Board, it is composed of seven members chosen by the President from lists presented to him by the Speaker of the House and the majority and minority leaders of the Senate, as well as by the minority leader of the House of Representatives.  The Governor of Puerto Rico was designated an ex-officio member without voting rights.[56]  The Oversight Board has within its control the fiscal plan and budget of the Government of Puerto Rico and each covered instrumentality.[57]  If the Oversight Board concludes the Governor's fiscal plan is unacceptable, the Oversight Board may impose its own fiscal plan at its sole discretion.[58]  The Oversight Board also has the power to approve restructuring agreements with creditors, file petitions for restructuring, set up a more efficient electronic system for the collection of taxes, and enforce existing laws to prevent strikes by public employees.[59]  The Oversight Board has subpoena powers and access to the courts to enforce its actions.[60]

19.     On August 31, 2016, the President announced the appointment of the seven members of the Oversight Board:  (i) Andrew G. Biggs, (ii) José B. Carrión III, (iii) Carlos M. Garcia, (iv) Arthur J. González, (v) José R. González, (vi) Ana. J. Matosantos, and (vii) David A. Skeel Jr.  The seven Oversight Board members, collectively, have experience in law, public finance, public budgeting, insurance, retirement funding, and public policy.[61]  The Oversight Board members do not receive any compensation for their services according to the strict terms

---

[56] *See id.* § 101(e).

[57] *See id.* §§ 201, 202.

[58] *See id.* §§ 201(d)(2), 106(e).

[59] *Id.* §§ 104(m), (h), 206.

[60] *Id.* §§ 104(f), (k).

[61] *See* About Us, FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, https://juntasupervision.pr.gov/index.php/en/home/ (last visited May 1, 2017).

of PROMESA.[62]  The Oversight Board has hired as advisors, Proskauer Rose LLP and O'Neill & Borges LLC as legal counsel, McKinsey & Co. as strategic consultant, Citigroup Global Markets as municipal investment banker, and Ernst & Young, as financial advisor.[63]

20.     Since its inception, the Oversight Board has worked to understand the facts and realities prevalent in Puerto Rico, the options available to the government, and the implications of different approaches to addressing the financial and economic crisis facing the island.  After hiring its advisors, the Oversight Board accelerated its process of meeting with creditors and other stakeholders, building a relationship with the current and former Governors and their staffs, and beginning to review the fiscal plan for the Commonwealth.  From the end of January through the middle of February, the Oversight Board and its advisors held over twenty due diligence sessions to better understand the positions, concerns, and priorities espoused by the various creditor constituencies.  AAFAF also met with creditors and other stakeholders to understand their perspectives.  On January 18, 2017, Governor Rosselló Nevares enacted legislation to further increase AAFAF's power to include overseeing debt restructuring efforts.[64]

21.     As noted, the Oversight Board had the power to extend the automatic stay to May 1, 2017, and did so on January 28, 2017.  On February 28, 2017, Governor Rosselló Nevares and

---

[62] *See* PROMESA § 101(g) ("Members of the Oversight Board shall serve without pay, but may receive reimbursement from the Oversight Board for any reasonable and necessary expenses incurred by reason of service on the Oversight Board.").

[63] Press Release, Fin. Oversight and Mgmt. Bd. for P.R., Fin. Oversight and Mgmt. Bd. Selects Outside Legal Counsel and Strategic Consultant (Nov. 27, 2016), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/49/583c7b5797f1e.pdf; Press Release, Fin. Oversight and Mgmt. Bd. for P.R., Oversight Bd. Meets in P.R. Again (Jan. 28, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/49/588ce77e0d748.pdf; Ernst & Young Puerto Rico LLC Contract, https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58b61338a2ea7.pdf.

[64] About FAFAA, PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, http://www.aafaf.pr.gov/aboutfafaa.html (last visited May 1, 2017).

his administration released a fiscal plan that the Oversight Board rejected, and the Governor submitted a new fiscal plan on March 13, 2017. With amendments it imposed on pensions and conditions it imposed for cancelling public employees' Christmas bonus and imposing a furlough program, the Oversight Board voted unanimously to certify the new fiscal plan.

### C.    Creditor Lawsuits

22.    Not surprisingly, with approximately $74 billion of debt and insufficient resources to satisfy it, there have been many lawsuits filed against the Commonwealth (and in some instances, the Oversight Board) before the filing of this Title III case. A list of the known litigation proceedings that have been filed against the Commonwealth or one of its instrumentalities is attached hereto as **Exhibit C**.

## V.    **THE OVERSIGHT BOARD CERTIFIED THE GOVERNMENT'S FISCAL PLAN**

### A.    Fiscal Plan Evaluation

23.    To fulfill its mission of achieving for the Commonwealth fiscal responsibility and market access, the Oversight Board evaluated the macroeconomic framework underlying the fiscal plans proposed by the Governor. Thus, starting as early as September 2016, the Oversight Board alongside its economists, municipal consultants, and financial advisors spent hundreds of hours in research and working sessions understanding the dire situation in Puerto Rico. The board also held numerous internal as well as external meetings with the government officials and the various creditor groups. The Oversight Board got up to speed on the many fiscal challenges that Puerto Rico faces and within only a few months was in a position to formulate its own fiscal plan or evaluate the Government fiscal plan.

24.    The Oversight Board was also tasked with providing recommendations to ensure that the proposed plans comport with the requirements and goals of PROMESA. Among these

goals is that the fiscal plan provides Puerto Rico with long-term, sustainable economic growth,[65] fiscal responsibility,[66] and access to the capital markets.[67]

25.    On October 14, 2016, then-Governor Alejandro Garcia Padilla presented the Oversight Board with a fiscal plan that contemplated a budget deficit of $4.8 billion for fiscal year 2017, after the implementation of austerity measures and revenue enhancements, and before allocating money for debt service.[68]

26.    On November 10, 2016, the Oversight Board issued a public invitation to interested third parties to comment on the October 14, 2016 fiscal plan.[69]   Most of the stakeholders who responded were in consensus on the shortcomings of the proposed plan.  The majority believed that the plan did not meet the requirements of PROMESA.[70]

27.    The Oversight Board declined to certify the Governor's October 2016 fiscal plan because, among other things, the Oversight Board was not satisfied that appropriate measures were taken to rein in expenses, impose discipline on the budget, or grow revenue.  In rejecting the plan, the Oversight Board provided substantial comments and guidance, including by listing

---

[65] PROMESA § 701 ("It is the sense of the Congress that any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States.").

[66] *Id.* § 201(b)(1).

[67] *Id.*

[68] COMMONWEALTH OF P.R., FISCAL PLAN (2016), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/52/58210006a3536.pdf.

[69] Letter from Fin. Oversight and Mgmt. Bd. for P.R. to Governor Rosselló Nevares (Sept. 30, 2015), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/587fea840f998.pdf.

[70] Press Release, Fin. Oversight and Mgmt. Bd. for P.R., Oversight Bd. Holds Third Meeting in P.R., (Nov. 18, 2016), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/49/582f55851a7b7.pdf.

the five principles that would guide the Oversight Board in its decision whether to certify the next proposed fiscal plan:[71]

    a. The fiscal plan must cover at least the next 10 fiscal years, with meaningful progress in the next five, and meet the standards set forth in PROMESA, including the 14 criteria under PROMESA § 201(b).

    b. The fiscal plan must work to stabilize the current economic situation, increase the economy's resilience, shore up public finances, support long-term, durable growth, meet basic needs of the citizenry, and restore opportunity for the people of Puerto Rico.

    c. To properly establish an accurate assessment of the fiscal outlook, the base-case scenario within the fiscal plan must assume no additional federal support beyond that which is already established by law (*e.g.*, no Affordable Care Act support extension) and no reliance on unsustainable Act 154 revenues in light of the expiration of that act.

    d. The fiscal plan must include an appropriate mix of structural reform, fiscal adjustment, and debt restructuring. It must be informed by the relevant analytical tools such as a debt sustainability analysis and a detailed economic projection.

    e. The fiscal plan must be accompanied by relevant operational plans that show how the Commonwealth will achieve the changes and reforms it proposes.

28. Although the Oversight Board had requested that the prior administration submit a revised plan, the prior administration did not submit a revised fiscal plan that incorporated the Oversight Board's recommendations or that aligned with its five enumerated principles.

29. On January 2, 2017, the administration of newly elected Governor Rosselló Nevares took office. Less than two months later, on March 1, 2017, the Oversight Board confirmed receipt of a proposed fiscal plan from the new administration.[72] Again, the Oversight Board raised concerns regarding the proposed fiscal plan. After reviewing the proposed fiscal

---

[71] Letter from Fin. Oversight and Mgmt. Bd. for P.R. to Governor Rosselló Nevares, (Jan. 18, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58c6e4e543444.pdf.

[72] Press Release, Fin. Oversight and Mgmt. Bd. for P.R., Oversight Bd. Confirms Receipt of Fiscal Plan for P.R (Mar. 1, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/49/58b6db7c47c02.pdf.

plan with the Governor's representatives and analyzing and deliberating over it with the Oversight Board's members, economists, consultants, and attorneys, the Oversight Board informed the Governor on March 9, 2017, that the Oversight Board had determined the Governor's proposed fiscal plan did not satisfy PROMESA's requirements.[73]  The Oversight Board identified violations and recommended revisions.

30.    After the new administration complied with the requirements the Oversight Board specified, the Oversight Board determined the revised fiscal plan, with two amendments, would comply with the requirements for certification.  The Oversight Board voted to certify the plan, as amended, on March 13, 2017.[74]

### B.    The Major Components of the Certified Fiscal Plan

31.    The fiscal plan provides for meaningful and drastic fiscal and economic measures projected to result in an economic turnaround towards growth after six years.  The fiscal plan is a carefully calibrated solution that maintains sufficient infrastructure and governmental services to arrest negative growth after several years, and respects creditors' rights.  The Oversight Board recognizes that Puerto Rico's residents vehemently believe the Oversight Board has cut government services far too much and that creditors believe the money for debt services is far too little.  Both residents and creditors are victims of a crisis situation exponentially getting worse due to the imminent termination of approximately $850 million in Affordable Care Act funding (which will continue to increase substantially year-over-year) and the dissipation of pension funding of the annual $1.5 billion pension payments needed to save public retirees from federal poverty levels.  By focusing on the long-term benefits, and eschewing the impulse for

---

[73] Letter from Fin. Oversight and Mgmt. Bd. for P.R. to Governor Rosselló Nevares (March 9, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58c1e7d75ab33.pdf.

[74] Letter from Fin. Oversight and Mgmt. Bd. for P.R. to Governor Rosselló Nevares (Jan. 18, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58c6e4e543444.pdf.

short term gains, an optimal outcome for all—the island and its stakeholders—can be obtained. Moreover, the Oversight Board continues to pursue initiatives to attract more investment to Puerto Rico that may enable increased debt service and government service.

32.     The fiscal plan cuts as much from government expenditures and raises revenues by as much as the Oversight Board considered feasible.  It contemplates measures that will reduce the fiscal gap by $39.6 billion and generate surplus cash flow of approximately $7.9 billion over a ten-year period.  The fiscal plan represents a significant departure from the fiscal plan proposed in October 2016, as it commits to additional revenues of $4.4 billion and additional expenditure cuts of $16.4 billion.

33.     These additional revenue and expenditure cuts, while painful in the short term, are necessary for Puerto Rico's long-term growth.  Indeed, the Puerto Rico economy is projected to contract initially as a result of these measures.  The difficult task facing the Governor and the Oversight Board is to draw the line short of revenue and expense measures so drastic that they run an unacceptable risk of preventing an economic turnaround.

34.     The fiscal plan is built upon the two pillars of fiscal reform and structural reform. Fiscal reform measures are aimed at (1) enhancing revenues, (2) right-sizing the government, (3) adjusting healthcare spending, and (4) restructuring the pension system.   Structural reform measures are aimed at increasing economic growth by (a) aiding business activity, (b) improving capital efficiency, (c) implementing energy reforms, and (d) promoting economic development. Together, these reforms are projected to reduce the ten-year financing gap by $39.6 billion and to achieve a surplus of approximately $7.9 billion over ten years that will be available for debt service.

### C.   The Oversight Board Confirmed that the Fiscal Plan Met the Requirements of PROMESA § 206(a) Prior to Issuing its Restructuring Certification

35.     In pertinent part, PROMESA provides that "[t]he Oversight Board, prior to issuing a restructuring certification regarding an entity . . . , shall determine, in its sole discretion, that—(1) the entity has made good-faith efforts to reach a consensual restructuring with creditors; [and] (2) the entity has—(A) adopted procedures necessary to deliver timely audited financial statements; and (B) made public draft financial statements and other information sufficient for any interested person to make an informed decision with respect to a possible restructuring . . . ."[75]  In the Oversight Board's sole discretion, the Oversight Board certifies that these requirements have been met by the Commonwealth.

## VI.   COMMENCEMENT OF THE COMMONWEALTH'S TITLE III CASE

36.     Promptly after certification of the fiscal plan, the Oversight Board and the government undertook a joint effort to formulate restructuring proposals for all major creditors based on the debt sustainability analysis in the certified fiscal plan.  Although the certified fiscal plan's debt sustainability analysis makes plain the funds available for debt service, creditors responded by asking the Oversight Board to certify a new fiscal plan with more frothy and optimistic assumptions, which ultimately led to an impasse.  In March 2017, the Oversight Board and the government requested holders of general obligation bonds issued by the Commonwealth and COFINA debt to participate in mediation with the Oversight Board and government commencing April 3, 2017.  Those debts together account for approximately 55% of the total bond debt to be restructured.  Ultimately, the mediation commenced on April 13, 2017, under the auspices of former Bankruptcy Judge Allan Gropper, who was nominated by a plurality of

---

[75] PROMESA § 206(a).

creditors.  Despite several mediation sessions and other private negotiations, no agreements were reached before the expiration of the PROMESA stay on May 1, 2017.

37.      In light of the expiration of the PROMESA stay, and because consensual negotiations seemed to reach an impasse, the Oversight Board and the Commonwealth decided the best path forward was to file a Title III case to protect Puerto Rico and its citizens.  The Oversight Board and the Commonwealth intend to continue pursuing consensual negotiations under the protection of the Title III automatic stay, and remain hopeful that continued negotiations (including through mediation) will lead to consensual resolutions such that Puerto Rico will once again be able to experience economic and social prosperity after this difficult process is resolved.

38.      Further information and documents filed in the Title III case are available free of charge by accessing the website maintained by Prime Clerk LLC (the "Claims and Noticing Agent") at https://cases.primeclerk.com/puertorico (the "Case Website") or by contacting the proposed Claims and Noticing Agent directly at (844) 822-9231 (toll free for United States and Puerto Rico) or (646) 486-7944 (for international callers).  Copies of any documents may also be obtained by visiting the Court's website at www.prd.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: May 3, 2017                                    Respectfully submitted,
San Juan, Puerto Rico

/s/_____

Martin J. Bienenstock
Scott K. Rutsky
Philip M. Abelson
(Admission Pro Hac Vice pending)
**PROSKAUER ROSE LLP**

Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the*
*Financial Oversight and*
*Management Board as representative*
*for the Commonwealth of Puerto Rico*


/s/ _____
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the*
*Financial Oversight and*
*Management Board as representative*
*for the Commonwealth of Puerto Rico*