# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| *In re*<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>**Re: Docket Nos. 41, 43, & 60**<br><br>**Hearing date: May 17, 2017 at 9:30 a.m.** |
| *In re*<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284<br><br>**Hearing date: May 17, 2017 at 9:30 a.m.** |

## AMBAC ASSURANCE CORPORATION'S OMNIBUS OBJECTION TO CERTAIN OF DEBTORS' FIRST DAY MOTIONS

Ambac Assurance Corporation ("Ambac"), a holder and/or insurer of approximately $2.7 billion of bonds issued by the Commonwealth of Puerto Rico (the "Commonwealth"), the Puerto Rico Sales Tax Financing Corporation ("COFINA" and, together with the Commonwealth, the "Debtors"), and other Commonwealth instrumentalities, hereby submits this objection (the "Objection") to the (i) Motion of Debtors Pursuant to PROMESA Section 304(g) and Bankruptcy Rule 1015(b) for Entry of Order Directing Joint Administration of Title III Cases and Granting Related Relief (D.I. 41) (the "Joint Administration Motion"); (ii) Motion of Debtors for Order (A) Imposing and Rendering Applicable Local Bankruptcy Rules to

1

these Title III Cases, (B) Authorizing Establishment of Certain Notice, Case Management, and Administrative Procedures, and (C) Granting Related Relief (D.I. 43) (the "Case Management Motion"); and (iii) Motion of Debtors Pursuant to Bankruptcy Code Section 105(a) for Entry of Order Confirming Authority of Banks to Continue Honoring Instructions and Payment Instruments with Respect to the Debtors' Bank Accounts (D.I. 60) (the "Bank Release Motion" and, together with the Joint Administration Motion and the Case Management Motion, the "Motions").  In support of its Objection, Ambac respectfully submits as follows:

## PRELIMINARY STATEMENT

1.       In ordinary circumstances, the relief requested in the Motions would be the type of housekeeping measure that could hardly be claimed to pose a threat to the substantive rights of affected creditors.  But these are not ordinary circumstances.  Assuming that the Debtors' request for joint administration is motivated by judicial and procedural efficiency objectives, it nonetheless raises a number of substantive concerns, including:   (i) failure to abide by PROMESA's directive to maintain separateness between various entities; (ii) creeping consolidation; (iii) providing standing arguments to parties who would not otherwise have standing; (iv) granting inappropriate rights to a "yet-to-be-formed" official committee of unsecured creditors; and (v) inoculating certain creditors against harm from complying with unlawful directives of the Commonwealth.

2.       The Commonwealth and the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") have occasionally stated that they will respect and honor relative lawful priorities and liens applicable to different Puerto Rico issuers of debt.  Recently, however, the Commonwealth and the Oversight Board have been operating as if various lawful priorities and ring-fenced assets can be ignored and the funds within certain structures can be

made available to them in direct disregard of lawful priorities and rights.  It is against this backdrop that the requested relief must be reviewed and tailored.

3.      If the Motions are granted, COFINA, a solvent entity with no genuine need for restructuring, will potentially be reorganized under the influence of parties whose interests are opposed to those of COFINA and its creditors.  And while COFINA would be the first issuer subjected to this improper approach to Title III, it would almost certainly not be the last.

4.      The Motions thus present a unique opportunity, at the outset of these historic bankruptcy cases, to restore respect for the "relative lawful priorities [and] lawful liens . . . in the constitution, other laws, or agreements" of the Commonwealth, as intended by Congress in passing the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). 48 U.S.C. § 2141(b)(1)(N).

5.      In 2006, in response to what was then an unprecedented fiscal crisis, the Commonwealth created COFINA as a means of accessing capital markets at affordable rates. The Commonwealth achieved that goal by transferring legal ownership of a portion of certain sales and use taxes ("SUT Revenues") to COFINA, protecting the SUT Revenues from "clawback" by the Commonwealth for any purpose, and granting COFINA's creditors unique structural protections not offered to creditors of the Commonwealth or its other instrumentalities. The market recognized these distinctions, extending credit to COFINA at rates far lower than those applicable to the Commonwealth's general obligation ("GO") debt.

6.      As the Commonwealth's fiscal and economic difficulties have intensified, however, the Commonwealth, and now the Oversight Board, have turned their backs on the promises the Commonwealth made to COFINA and its creditors.  It has premised its 10-year fiscal plan (the "Fiscal Plan," D.I. 1-3) on the assumption that all debt owed and revenue earned

by any Commonwealth instrumentality belongs to the Commonwealth without regard to property, contract, or constitutional law; it has advanced a restructuring proposal based on the same unlawful conflation of revenue streams and debt obligations; and it has passed legislation, styled as a "Fiscal Plan Compliance Law," that routes all monies generated by Commonwealth legislation, including those belonging by statute to COFINA, through the Commonwealth's general fund, apparently to be allocated at the discretion of Puerto Rico's Secretary of the Treasury, in violation of Puerto Rico law and PROMESA.

7.     Ambac does not contest that joint administration of restructuring proceedings can result in significant convenience and economies.  However, the Federal Rules of Bankruptcy Procedure are clear that joint administration is inappropriate if it fails to protect creditors from actual or potential conflicts of interest.  The conflicts here are substantial.

8.     As an issuer of debt, the Commonwealth has interests that are diametrically opposed to COFINA's.  COFINA has dedicated property to pay its obligations.  If it is somehow deprived of that property, it will lack the wherewithal to pay those obligations.  The Commonwealth appears to view COFINA's money as a means to satisfy its own obligations, and is now implementing a Fiscal Plan that not only envisions, but appears to *require*, the use of COFINA's SUT Revenues for Commonwealth purposes, as confirmed in subsequent restructuring proposals and legislation.  COFINA is not the Commonwealth's piggybank.  The Commonwealth's GO bondholders have pursued the same aim through litigation, both during and after the PROMESA litigation stay, seeking the diversion of the SUT Revenues to the Commonwealth for payment of GO debt.

9.     The Case Management Motion's contemplation of the formation of an unsecured creditors' committee ("UCC") is a case in point.  COFINA's bonds were issued exclusively on a

4

secured basis.  Thus, the formation of a UCC and the granting of notice and procedural consent rights to such a committee, as contemplated by the proposed "Case Management Procedures" (attached as Exhibit 1 to Exhibit A of the Case Management Motion), would permit the **Commonwealth's** unsecured creditors to exercise rights for which they lack standing—*i.e.*, to vote on or consent to actions taken in the COFINA proceedings.  The Commonwealth UCC should have no rights (or standing) in COFINA's Title III case by operation of a case management order.  However procedural in appearance, joint administration should not be permitted to further this type of creeping substantive consolidation, nor to create a presumption of a plan of adjustment covering both entities.

10.     The efficiencies adverted to in the Joint Administration Motion do not compel a contrary result.  As an initial matter, while judicial efficiency is a worthy goal, it is an inappropriate basis on which to ignore the substantial conflicts of interest at issue here.   In any event, joint administration will actually **disserve** efficiency interests, as a joint docket will likely cause confusion among the two creditor bases, who will be forced to wade through a deluge of filings to determine which concern them and which do not.  Rejecting the Joint Administration Motion will thus protect creditors while causing no harm to judicial economy.

11.     Finally, the Bank Release Motion is objectionable for the same reason.  While administrative (and therefore seemingly harmless) in nature, it seeks an order that would potentially shield unlawful payments.  The Commonwealth has already stated its intent to allocate money in a manner that numerous creditors, including Ambac, have alleged violate Puerto Rico and federal law, including by requiring COFINA's money to be applied to general Commonwealth purposes.  The Bank Release Motion seeks an *ex ante* judicial blessing that a bank's compliance with any such unlawful directives is immune from liability.  And the request

is unnecessary:  by the Debtors' own admission, section 363 of the Bankruptcy Code does not apply to these proceedings, and thus the Commonwealth has no need to seek judicial authorization of this sort.  The Debtors' extraneous request for the Court's exculpation of the Commonwealth's banks from all future liability, including liability for any transfers that may constitute a clear breach of law, contract, or property rights, should accordingly be rejected.

12.    A guiding principle of PROMESA is that each debtor stands on its own for purposes of Title III proceedings.  Ambac respectfully submits that the Court should take this opportunity to reaffirm this important statutory principle and recognize that these are separate cases with significant actual conflicts of interest between the Debtors and, more importantly, between their respective creditors.  To do otherwise would contravene the letter and spirit of PROMESA, and could signal to creditors that the core principles of separateness and respect for lawful priorities and liens that guided Congress in crafting PROMESA may be undercut.

## RELEVANT FACTUAL AND LEGAL BACKGROUND

## I.    Ambac Owns and Insures Bonds Issued by the Commonwealth and its Instrumentalities

13.    Ambac provides financial guaranty insurance covering approximately $2.7 billion in net par accreted value of bonds issued by the Commonwealth or its instrumentalities—a figure that increases to $9.7 billion in gross principal and interest at maturity.  Although Ambac's largest exposure relates to bonds issued by COFINA, of which it insures approximately $1.3 billion in net par accreted value, it also insures:[1]

- $493 million in bonds issued by the Puerto Rico Highways and Transportation Authority ("PRHTA");

- $564 million in bonds issued by the Puerto Rico Infrastructure Financing Authority ("PRIFA");

---

[1]  All dollar amounts reflect the net par accreted value of the insured bonds.

- $137 million in bonds issued by the Puerto Rico Convention Center District Authority ("PRCCDA");

- $187 million in bonds directly issued or guaranteed by the Commonwealth and backed by the full faith, credit, and taxing power of the Commonwealth (known as general obligation ("GO") or general obligation-guaranteed bonds, collectively, "GO Bonds").

14.     The majority of these bonds are long-dated, and Ambac enjoys significant voting and consent rights with respect to them.  In addition, Ambac directly owns approximately $268 million in bonds issued by COFINA, PRHTA, PRIFA, and the Puerto Rico Public Buildings Authority.[2]  Thus, Ambac not only has a unique perspective on the financial difficulties facing Puerto Rico and a deep investment in its long-term success, it is also a critical participant in any solutions to the current fiscal situation.

## II.    Puerto Rico's Debt Obligations and Priority Scheme

15.     The Commonwealth and its instrumentalities have issued a variety of bonds and other obligations to meet their borrowing needs.  In addition to bonds issued by COFINA, discussed *infra*, the two primary categories of bonds outstanding are GO Bonds and bonds issued by Commonwealth-owned public corporations like PRIFA, PRHTA, and PRCCDA.  The latter category of bonds (the "Revenue Bonds") are secured by specific revenue streams—rum taxes with respect to PRIFA, toll revenues, gas taxes, and motor vehicle license fees with respect to PRHTA, and hotel occupancy taxes with respect to PRCCDA.[3]

16.     The Constitution of the Commonwealth of Puerto Rico (the "Puerto Rico Constitution") and Commonwealth statutes contain a number of provisions that, when read

---

[2]  A majority of the bonds directly held by Ambac are subject to certain financial guaranty insurance policies issued by Ambac.

[3]  Ambac does not waive, and expressly reserves its right to argue, at the appropriate time, that the revenues securing the bonds issued by PRHTA, PRIFA, PRCCDA, and COFINA are "special revenues" under section 902(2) of the Bankruptcy Code and are accordingly exempt from impairment.  11 U.S.C. § 902(2); 48 U.S.C. § 2161(a).

together, create a detailed priority scheme with varying levels of protections for these different types of bonds.

17.     First, the Puerto Rico Constitution contains provisions designed to ensure that general obligation debt ("GO Debt") is repaid in full out of the resources available to the Commonwealth.  Article VI, Section 8 creates what is frequently referred to as a "constitutional priority" for GO Debt (the "GO Priority"), which provides the GO Debt with a first claim on "available resources"—*i.e.*, resources "covered into the Treasury of Puerto Rico" (*id.* § 2)—in the event of a revenue shortfall in a given fiscal year.

18.     Second, in the event the GO Priority is triggered, Article VI, Section 8 of the Puerto Rico Constitution provides that, following payment of GO Debt, "other disbursements shall thereafter be made in accordance with the order of priorities established by law."  *Id.* § 8. That "order of priorities" was established by Section 4(c) of the Management and Budget Office Organic Act (Act No. 147 of June 18, 1980, the "OMB Act"), which sets certain "priority guidelines" for the disbursement of public funds in furtherance of Article VI, Section 8.

19.     Those "priority guidelines" governing allocation of available resources assign a second-priority status to debt issued by Puerto Rico instrumentalities and other obligations affecting the Commonwealth's "credit, reputation and good name."  *See* 23 L.P.R.A. § 104(c)(2). Although certain of the funds securing the Revenue Bonds are subject to "clawback" to pay GO Debt in the event of a fiscal year shortfall, such clawback is permitted only when there are no other "available resources" to pay GO Debt.[4]  The clawed back funds ***must*** be applied to the GO Debt shortfall in the current fiscal year, or returned to their original lienholders.  In other words,

---

[4]  *See, e.g.*, 13 L.P.R.A. § 31751(a)(1)(C) (PRHTA funds subject to clawback only if no other funds available to pay GO Bonds); 9 L.P.R.A. § 2021 (same); 9 L.P.R.A. § 5681 (same); 3 L.P.R.A. § 1914 (PRIFA funds subject to clawback only if no other funds available to pay GO Bonds); 13 L.P.R.A. § 2271v (PRCCDA funds subject to clawback only if no other funds available to pay GO Bonds).

Revenue Bonds are afforded a priority to the Commonwealth's available resources that is second only to payment of GO Debt.

### III.  The Puerto Rico Legislative Assembly Affords COFINA Unique Legal Protections to Address a Financial and Economic Emergency

20.  In 2006, Puerto Rico faced an exigent financial and economic crisis—at the time one of the worst in the Commonwealth's history.  *See* Act of May 13, 2006, No. 91-2006, 2006 P.R. Laws 246, 247 (codified as amended at P.R. Laws Ann. tit. 13, § 12).  As a result, the Commonwealth had an urgent need for financing in difficult market conditions.  To meet this need, the Puerto Rico Legislative Assembly established COFINA, "a corporate and political entity independent and separate from the Commonwealth of Puerto Rico" created "for the purpose of issuing bonds and utilizing other financing mechanisms."  13 L.P.R.A. §§ 11a(a)-(b).

21.  COFINA was designed as a securitization structure, commonly utilized in municipal financing, to reduce the Commonwealth's cost of financing through lower borrowing costs as compared to GO Bonds, and to give investors in COFINA bonds additional protections separate and distinct from those afforded to GO Bonds or Revenue Bonds.  Specifically, COFINA's enabling legislation provided that the monies flow directly into a special fund and immediately become the property of COFINA.  In this way, the monies were removed from the control of the Secretary of the Treasury such that they are not available resources for purposes of the GO Priority provision of the Constitution.

22.  This was accomplished through the creation of a special fund known as the *Fondo de Interes Apremiante*, or "FIA."  13 L.P.R.A. § 12.  The statute provided that all funds deposited in the FIA and all future funds required to be deposited therein "are hereby transferred to, and ***shall be the property of COFINA***."  13 L.P.R.A. § 12 (emphasis added).  The funds to be deposited in the FIA are the "first revenues" of the Commonwealth's sales-and-use tax (the

"SUT Revenues") up to a certain minimum amount, with COFINA then receiving a portion of SUT Revenues generated above the minimum amount.  *Id.*

23.     The funds belonging to COFINA are to be "directly deposited in FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico."  *Id.*  The funds are first deposited in an account held by COFINA at Banco Popular de Puerto Rico, and are subsequently transferred to a trust account maintained at Bank of New York Mellon, the COFINA Trustee.

24.     In addition to flowing the SUT Revenues directly to COFINA, COFINA's enabling legislation further renders those monies unavailable as a matter of law, providing that the SUT Revenues ***shall not*** "constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico."  *Id.*  Thus, in contrast to the Revenue Bonds, which, under a limited set of circumstances could have their revenues diverted, COFINA's bonds are not subject to clawback or diversion by the Commonwealth under any circumstance.

25.     Not only were COFINA's creditors given this stark statutory assurance, but, since at least 2009, purchasers of GO Bonds have likewise been warned that the SUT Revenues would not be available to cover payment of GO debt in the event of a fiscal year shortfall or any other circumstance.  Most recently, the Official Statement accompanying the issuance of GO Bonds in 2014 expressly disclosed to potential purchasers that, under Puerto Rico law, the SUT Revenues belonging to COFINA "do not constitute 'available resources' of the Commonwealth" and that such funds are therefore "not available for the payment of principal of and interest on the [GO] Bonds."  (Cámara-Fuertes Decl.,[5] Ex. A at 29.[6])

---

[5]   References to "Cámara-Fuertes Decl." refer to the Declaration of Roberto A. Cámara-Fuertes in Support of Ambac Assurance Corporation's Omnibus Objection to Certain of Debtors' First Day Motions, filed contemporaneously herewith.

26.     Since the creation of COFINA, numerous Commonwealth officials and representatives have commented publicly about the special protections afforded COFINA and the strength of its asset base.

- A February 20, 2009 presentation by the Government Development Bank ("GDB") stated that "SUT is an 'island of stability.'" "SUT is a key revenue source **THAT WILL NOT BE ELIMINATED**," and "COFINA I has a stronger coverage than comparable programs."[7]

- During an October 15, 2013 Commonwealth investor webcast, the GDB noted that "COFINA's credit is bolstered by strong legal protections for bondholders, including being secured by a stable stream of revenues not subject to 'claw-back' by GO bondholders under the Puerto Rico Constitution." (Cámara-Fuertes Decl., Ex. B at 2.)

- During an October 31, 2013 conference call with investors and analysts, Págan Beauchamp, then interim president of the GDB, noted that "[t]he law provides that the Commonwealth agrees not to limit or restrict the rights granted by the COFINA Act or the rights of COFINA to meet its obligations to its bondholders." (Cámara-Fuertes Decl., Ex. C at 1.)

- In October 2013, Págan Beauchamp said "[t]he approved COFINA structure represents the most attractive source of financing at this time, enabling cost-effective access to capital while preserving the financial structure and health of GDB's existing credits, including its General Obligation bond." (Cámara-Fuertes Decl., Ex. D at 1.)

- In February 2015, GDB Investor Relations Chief Todd Hagerman said, "We feel quite confident that the tax reform is consistent with the current covenants. What we are communicating is that it doesn't change in any way the structure of COFINA, nor its priority or the backstop measures that are in place." (Cámara-Fuertes Decl., Ex. E at 1.)

- In opposing the restructuring of Puerto Rico's debt, Chairman of the Puerto Rico Treasury and Budget Committee, Rafael Hernández Montañez said, on February 26, 2016, "You cannot offer a general

---

[6]  The Official Statements accompanying other issuances of GO Bonds contain substantially identical language. *See, e.g.*, Official Statement regarding $415,270,000 of General Obligation Bonds, Series 2012 B, dated March 7, 2012, at 12 (available at http://www.gdb-pur.com/investors_resources/commonwealth.html); Official Statement regarding $93,835,000 of General Obligation Bonds, Series 2007 A-4, dated Sept. 11, 2009, at 10 (available at http://www.gdb-pur.com/investors_resources/commonwealth.html).

[7]  Presentation titled "Puerto Rico Credit Conference: The Road to Fiscal and Economic Reconstruction," dated February 20, 2009, at 95, 97, 98 (emphasis in original) (available at www.gdb-pur.com/pdfs/CREDCONFFEB-20-09.pdf).

message to a market where everyone gets the same treatment, as if all debts were the same. . . . COFINA has its protection and it must be respected." (Cámara-Fuertes Decl., Ex. F at 2.)

- In early March 2017, Puerto Rico Senate President Thomas Rivera Schatz and House Speaker Carlos Méndez backed COFINA and pointed out that the entity was lawfully created with the endorsement of both main political parties. (Cámara-Fuertes Decl., Ex. G at 2.)

- On March 17, 2017, Resident Commissioner Jenniffer González signaled that the government should take a firm position backing COFINA's legality, adding that COFINA is "legal, constitutional and the perfect vehicle to protect people who invest in Puerto Rico." (Cámara-Fuertes Decl., Ex. H at 1.)

27.    Importantly, bonds issued by COFINA "***shall not constitute a debt or obligation of the Commonwealth of Puerto Rico nor of its other instrumentalities***" and are not backed by a pledge of the Commonwealth's full faith, credit, and taxing power.  13 L.P.R.A. § 13(d) (emphasis added).  Rather, COFINA's bonds are payable solely from the revenue stream belonging to COFINA under its enabling legislation or any similar or comparable security that may be substituted in accordance therewith.

## IV.    Ambac Issues Financial Guaranty Insurance on Certain Senior COFINA Bonds

28.    In 2007, COFINA issued approximately $2.7 billion in senior capital appreciation bonds ("CABs") and current interest bonds.  Ambac agreed to insure senior CABs in an amount of $808.5 million par at issuance.  The current net accreted value of the CABs insured by Ambac is approximately $1.3 billion.

29.    The CABs were issued pursuant to a resolution (as supplemented and amended, the "COFINA Resolution"), which is a contract between COFINA, as the bond issuer, COFINA bondholders, and all other "Beneficiaries."  Ambac is a Beneficiary, as that term is defined in the COFINA Resolution, and therefore a party to the COFINA Resolution.

30. Under the COFINA Resolution, COFINA pledged its property interest in the SUT Revenues to the COFINA Trustee for the payment of, and as security for, any bonds issued by COFINA, including the CABs. COFINA likewise covenanted to "defend, preserve and protect" the COFINA securitization structure and the rights of COFINA's creditors against any challenge to the COFINA structure. (*See* Cámara-Fuertes Decl., Ex. I § 705.) Moreover, the Commonwealth itself covenanted, both in the COFINA Resolution and in COFINA's enabling legislation, not to take any action that would interfere with COFINA's ability to meet its obligations or harm COFINA's creditors. (*See id.* § 706; 13 L.P.R.A. § 14(c).)

## V. The Puerto Rico Oversight, Management, and Economic Stability Act and the Fiscal Plan Requirement

31. On June 30, 2016, in response to the Commonwealth's continuing financial and economic difficulties, President Obama signed PROMESA into law. PROMESA established the Oversight Board, an entity charged with approving and certifying nearly all actions of the Commonwealth relating to its finances. *See* 48 U.S.C. § 2121(b)(1). PROMESA also provided for, *inter alia*, an out-of-court, voluntary restructuring process ("Title VI"), *see id.* §§ 2231-2232, a court-supervised restructuring process akin to Chapter 9 of the Bankruptcy Code ("Title III"), *see id.* §§ 2161 et seq., and an automatic stay (the "PROMESA Stay") of nearly all litigation concerning the Commonwealth's liabilities, *see id.* § 2194.

32. Among other obligations, section 201 of PROMESA requires that the Commonwealth submit to the Oversight Board a fiscal plan that "shall . . . provide a method to achieve fiscal responsibility and access to the capital markets[.]" *Id.* § 2141(b)(1). The proposed fiscal plan must also satisfy fourteen additional requirements, including that it "respect the relative lawful priorities or lawful liens . . . in the constitution, other laws, or agreements" of the Commonwealth. *Id.* § 2141(b)(1)(N).

33.     Once certified, the fiscal plan forms the basis for all actions taken and all determinations made by the Oversight Board, including certifications and actions related to restructuring in Title III.  Compliance with the fiscal plan is the overarching guidepost governing the Oversight Board's responsibilities under PROMESA.

34.     Indeed, pursuant to section 104(j) of PROMESA, the Oversight Board must certify "the submission or modification of a plan of adjustment" and it may only do so if it determines that such plan of adjustment "is consistent with the applicable certified Fiscal Plan." *Id.* § 2124(j)(1)-(3).   Consistency with the fiscal plan is also an independent confirmation requirement:  in order for any plan of adjustment to be confirmed, this Court must make a finding that the plan is consistent with the fiscal plan.  *See id.* § 2174(b)(7).

## VI.    The Commonwealth Takes Aim at the COFINA Structure

### A.    The Commonwealth Proposes and then Operationalizes a Certified Fiscal Plan

35.     On March 11, 2017, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" by its Spanish acronym),[8] on behalf of the Commonwealth, COFINA, and several other Commonwealth instrumentalities, submitted the Fiscal Plan to the Oversight Board.[9]   In total, the Commonwealth or the instrumentalities covered by the Fiscal Plan owe bondholders nearly $30 billion between FY2018 and FY2026.[10]  *See* Fiscal Plan (D.I. 1-3) at 28.

---

[8]  AAFAF is a Commonwealth agency created by the Puerto Rico Legislative Assembly in April 2016 to act as the Commonwealth's fiscal agent, financial advisor, and reporting agent.  In January 2017, the Commonwealth expanded AAFAF's powers, making it "the only entity authorized to renegotiate, restructure and or reach agreements with creditors related to all of part of the public debt or any other debt issued by any Governmental entity, including but not limited to agencies, boards, commissions, instrumentalities, public corporations or applicable political subdivision[.]"  Act No. 2017-2 at 1.

[9]  AAFAF had previously submitted a fiscal plan on February 28, 2017 (the "February 28 Fiscal Plan"), but the Oversight Board rejected the February 28 Fiscal Plan on the ground that it understated the Commonwealth's expenditures.

[10]  The Fiscal Plan does not address the debt owed by certain significant Puerto Rico issuers—most notably, the Puerto Rico Electric Power Authority ("PREPA") and Puerto Rico Aqueduct and Sewer Authority ("PRASA").  The

The Fiscal Plan allocates a total of $6.79 billion to debt service across the same period, representing a ***77.4% impairment of the applicable debt obligations***.  *See id.* at 29.

36.     In addition to imposing these draconian, unilateral cuts to the debt obligations of the Commonwealth and its instrumentalities, including COFINA, the Fiscal Plan disregards the relative lawful priorities and liens provided for by Puerto Rico law.  In particular, the Fiscal Plan fails to distinguish between revenues deposited in the general fund of the Commonwealth (the "General Fund") and controlled by the Secretary of the Treasury and the SUT Revenues belonging to COFINA, instead treating the entirety of the sales and use tax, including the portion that was made COFINA's property and required to be segregated from the General Fund by statute in 2006, as if it is a general Commonwealth revenue source flowing through the General Fund.  *See* Fiscal Plan at 11.[11]

37.     On March 13, 2017, two days after the Fiscal Plan was submitted, the Oversight Board certified the Fiscal Plan.

38.     Late in the evening on April 27, 2017, Puerto Rico's House of Representatives and Senate passed identical versions of the "Fiscal Plan Compliance Law."  The Governor signed the legislation into law on April 29, 2017.

39.     As indicated by its title, the Fiscal Plan Compliance Law purports to operationalize the mandate set forth in the Fiscal Plan.  Indeed, following passage of the Fiscal Plan Compliance Law, Elías Sánchez, the Governor's representative on the Oversight Board, stated that the statute was "very consistent" with the Fiscal Plan.

---

Fiscal Plan is objectionable not only because it disregards important legal and structure distinctions among various Puerto Rico issuers, but also because it does so ***selectively***, exempting issuers such as PREPA and PRASA.

[11]  The numerous other material deficiencies in the Fiscal Plan are not catalogued here.  To date, the Oversight Board and its advisors have failed to provide any information supporting those deficiencies.

40.     At the center of the statute are provisions that unlawfully appropriate the SUT Revenues belonging to COFINA for the Commonwealth's general purposes.   Specifically, Chapter 4 of the Fiscal Plan Compliance Law provides that all public corporations, including COFINA, shall transfer any revenue "surpluses" to the Commonwealth Treasury, and that such funds shall be considered "available revenues" for the Commonwealth and would be deposited in the General Fund to meet the liquidity requirements contemplated in the Fiscal Plan.[12]   Chapter 6 of the Fiscal Plan Compliance Law further requires that all public corporations, including COFINA, deposit their funds with the Commonwealth Treasury, whether "surplus" funds or otherwise.[13]   These and other provisions of the Fiscal Plan Compliance Law are directly at odds with COFINA's enabling legislation and the Commonwealth's contractual commitments to COFINA bondholders and Ambac.

## B.     AAFAF Proposes a Dramatic Restructuring of the Debt Owed by the Commonwealth and its Instrumentalities

41.     On April 28, 2017, AAFAF publicly disclosed a proposed Title VI plan of adjustment (the "Proposal").   The Proposal called for a dramatic restructuring of the debt obligations and priority scheme of the Commonwealth and its instrumentalities, including COFINA.

42.     Two core aspects of the Proposal were aimed directly at the COFINA structure. First, the Proposal treats GO Bonds as having priority over COFINA bonds, despite the fact that the SUT Revenues pledged to the COFINA bonds are explicitly made unavailable for the payment of GO Bonds.   The Proposal further reinforces the premise of the Fiscal Plan that SUT

---

[12]   As of this writing, a certified translation of the Fiscal Plan Compliance Law is not yet available.   References in this Objection to specific provisions of the Fiscal Plan Compliance Law rely on an unofficial translation of the statute's text.

[13]   Although Governor Rosselló subsequently issued an "explanatory declaration"—akin to a "signing statement"— claiming that the Fiscal Plan Compliance Act is not intended to provide access to COFINA's SUT Revenues, the explanatory declaration is at odds with the statutory text and is of questionable legal significance.

Revenues pledged to COFINA will no longer be segregated and devoted solely to the payment of COFINA bonds, a structure the Commonwealth has covenanted to respect; instead, all sales and use tax revenues will be pooled into the General Fund, in violation of legislative and contractual provisions.

43.     Second, the Proposal purports to treat senior COFINA bonds *pari passu* with junior COFINA bonds in violation of express contractual subordination provisions.  Utilizing a tool commonly referred to as a "death trap," the Proposal would distribute either (i) $6.9 billion in newly-issued Senior Bonds and $3.3 billion in Senior Cash Flow Bonds to all COFINA senior and subordinated bonds *pari passu* if the COFINA creditors consent to such treatment, or (ii) $450 million of newly-issued Short Term Notes only to COFINA senior bonds, reflecting a 2.5% recovery on the COFINA debt outstanding, if the COFINA creditors do not consent to the treatment in (i).

**VII.   The PROMESA Stay Expires**

44.     On May 2, 2017, immediately following the expiration of the PROMESA Stay, Ambac initiated four separate lawsuits to protect itself against, *inter alia*, the Commonwealth's unlawful efforts to dissipate the collateral securing the bonds Ambac insures.  Of relevance here are two lawsuits filed in this Court seeking, among other relief, a declaration that the Fiscal Plan and Fiscal Plan Compliance Law are unconstitutional and unlawful; an injunction against any future legislation, rules, budgets, or restructuring plans premised on the Fiscal Plan; and an injunction against the filing of any Title III petitions premised on the Fiscal Plan.[14]

45.     That same day, certain senior COFINA bondholders brought suit against the Governor of Puerto Rico, among others, seeking "a declaratory judgment that Defendants have

---

[14]  Those litigations are captioned *Ambac Assurance Corp. v. Puerto Rico, et al.*, 17-cv-01567 (D.P.R.) and *Ambac Assurance Corp. v. Puerto Rico, et al.*, 17-cv-01568 (D.P.R.).

breached their constitutional, statutory, and contractual obligations to COFINA bondholders, and injunction relief against Defendants' continuation of those breaches." *Rodriguez Perelló, et al. v. Rosselló Nevares, et al.*, 17-cv-01566 (D.P.R.) (ECF No. 1).

46.     Also on May 2, 2017, certain GO bondholders filed a complaint in New York Supreme Court seeking injunctive relief compelling the Secretary of the Treasury of the Commonwealth to apply all available resources, including (unlawfully) SUT Revenues, to pay amounts that are or become due on the plaintiffs' GO Bonds. *Aurelius Investment, LLC, et al. v. Puerto Rico*, Index No. 652357/2017 (N.Y. Sup. Ct.).

47.     On May 3, 2017, the Oversight Board filed a voluntary petition for relief under Title III on behalf of the Commonwealth (the "<u>Commonwealth Petition</u>").

48.     On May 5, 2017, the Oversight Board filed a voluntary petition for relief under Title III on behalf of COFINA (the "<u>COFINA Petition</u>").

## **OBJECTION**

## I.      **The Joint Administration and Case Management Motions Should be Denied Due to Conflicts of Interest Between and Among the Debtors and Their Creditors**

49.     The Debtors claim that parties in interest "will not be harmed" by joint administration, and that joint administration is "in the best interests of the Debtors, their creditors, and all other parties in interest." (Joint Admin. Mot. ¶ 16.)  The Debtors' assertions are demonstrably false.

50.     PROMESA permits, but does not mandate, a joint administration of Title III cases of multiple affiliated debtors. *See* 48 U.S.C. § 2164(g).  Neither PROMESA nor the Bankruptcy Code define what is meant to be accomplished by joint administration.  Instead, joint administration is a creature of the Bankruptcy Rules, which are applicable to these cases pursuant to section 310 of PROMESA. *Id.* § 2170.

51.    Bankruptcy Rule 1015(b) provides that "[p]rior to entering an order the court *shall* give consideration to *protecting creditors of different estates against potential conflicts of interest*." Fed. R. Bankr. P. 1015(b) (emphasis added). Indeed, "the court may not even order joint administration until *after it has considered* 'protecting creditors of different estates against potential conflicts of interest.'" *In re Ben Franklin Retail Stores, Inc.*, 214 B.R. 852, 857 (Bankr. N.D. Ill. 1997) (quoting Fed. R. Bankr. P. 1015(b)); *see also In re BH & P, Inc.*, 103 B.R. 556, 569 (Bankr. D.N.J. 1989) ("The court cannot fulfill the duty imposed by [Bankruptcy Rule 1015(b)] to consider potential conflicts before authorizing joint administration . . . unless there is complete disclosure of all facts relevant to the issue.").

52.    Although these Title III cases are less than two weeks old, myriad conflicts of interest are not only "potential," but extant. Most glaring is the conflict that exists between COFINA and the Commonwealth. As described above, COFINA is contractually obligated to "defend, preserve and protect" its bondholders' rights, and the Commonwealth has agreed not to interfere with COFINA's ability to meet its obligations. (Cámara-Fuertes Decl., Ex. I §§ 705-706.) But the Commonwealth has proposed, and the Oversight Board has certified, a Fiscal Plan that *requires* violation of both covenants.

53.    The Fiscal Plan—which was a condition precedent to this Title III filing, and which must serve as the basis for any plan of reorganization approved by this Court (PROMESA § 314(b)(7))—and the Fiscal Plan Compliance Law fundamentally impair the COFINA structure in a number of respects.[15] Chief among them is that the Fiscal Plan and the Fiscal Plan Compliance Law fail to distinguish between General Fund revenues and the SUT Revenues belonging to COFINA. The Fiscal Plan treats the entirety of the sales and use tax, including the

---

[15]  Ambac does not purport to identify in this Objection all of the various ways in which the Fiscal Plan and Fiscal Plan Compliance Law unlawfully impair the COFINA structure. Ambac reserves its right to advance those arguments at the appropriate time.

percentage that was made COFINA's property and required to be segregated from the General Fund by statute in 2006, as if it is a general Commonwealth revenue source flowing through the General Fund. *See* Fiscal Plan at 11. The Fiscal Plan Compliance Law then purports to put into effect the unlawful assumption of the Fiscal Plan—that the SUT Revenues belong to the Commonwealth instead of COFINA and can simply be taken from COFINA—by requiring that all funds generated by Commonwealth legislation flow directly into the General Fund, to be disbursed according to priorities determined by the Secretary of the Treasury.

54.     If and when the Commonwealth unlawfully diverts SUT Revenues, as the Fiscal Plan and Fiscal Plan Compliance Law purport to allow it to do, COFINA will be legally obligated to bring suit against the Commonwealth. That dispute between COFINA and the Commonwealth is fundamental to the resolution of these Title III cases. Whatever efficiencies joint administration would promote—and, as discussed *infra*, few are apparent—it would be inappropriate to jointly administer the Title III cases of two entities whose interests are diametrically opposed.

55.     Perhaps not surprisingly, in addition to the dispute between the two Debtors, their creditors are also at loggerheads and their conflict of interest is actual, not potential. Through the *Aurelius* action, and a similar lawsuit that was filed before PROMESA's enactment but stayed under the PROMESA Stay,[16] GO bondholders are actively seeking to cripple the COFINA structure and increase the pool of "available resources" for payment of GO Debt.

56.     Importantly, GO bondholders do not have standing to be heard in COFINA's Title III proceeding. Pursuant to section 1109 of the Bankruptcy Code, made applicable to these cases by section 301 of PROMESA, only "[a] party in interest, including the debtor, the trustee, a

---

[16] *Lex Claims, LLC v. Garcia-Padilla*, 16-cv-2374 (FAB) (D.P.R.).

creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue" arising under the COFINA Petition.  11 U.S.C. § 1109(b).  As described above, the COFINA Resolution and its enabling legislation pledge SUT Revenues as collateral to COFINA bondholders and likewise make clear that SUT Revenues are not "available resources" for satisfying GO, or any other, debt.

57.    Joint administration could provide GO bondholders with a means of attacking that structure in a forum in which they have no right to be heard.  While GO bondholders or other non-parties in interest may be free to bring adversary proceedings in COFINA's Title III proceedings (and vice versa), they should not be permitted to otherwise hijack the core restructuring proceedings.

58.    It is therefore notable that, in conjunction with the Joint Administration Motion, the Debtors have filed the Case Management Motion that apparently contemplates the formation of a statutory committee of unsecured creditors.  (Case Management Mot., Ex. A at 4, 7-9.) COFINA's entire creditor constituency, save for two *de minimis* unsecured claims,[17] consists of creditors with claims secured by SUT Revenues.  An unsecured creditors committee may be appropriate in the Commonwealth's Title III case, but such a committee makes little sense in the context of COFINA's Title III proceedings.  This further highlights the incongruity of the two Debtors in these cases and, to the extent the Debtors envision a committee composed of the Commonwealth's unsecured creditors being heard on, let alone consenting to, matters concerning COFINA's property, it would be entirely inappropriate for the reasons stated above.

---

[17]    COFINA has identified two unsecured creditors:  Lehman Brothers Holdings Inc., holding a claim for $3.4 million apparently arising out of a credit default swap; and KPMG, LLC, holding a claim for $218,810.56 for unpaid audit fees.  These claims amount to roughly 0.2% of the $17.6 billion of notes issued by COFINA.  *See* Statement of Oversight Board In Connection With PROMESA Title III Petition (D.I. 1-2) ¶ 11.

59.      Ultimately, the request for joint administration flows from the core conceit of the Fiscal Plan—that there is a common pool of Commonwealth debt and a common pool of money out of which it will be paid.  In reality, the Commonwealth's debt structure comprises numerous independent issuers with different legal rights and priorities.  Indeed, ***COFINA itself is entirely solvent and has no genuine need for restructuring***; the Commonwealth's purpose in seeking the Oversight Board's approval of a Title III filing for COFINA was simply to take COFINA's money and apply it to other purposes.  In furtherance of that aim, the Commonwealth has every interest in blurring the very distinctions that COFINA is duty-bound to protect.   Joint administration is another step in furtherance of this improper goal—one that defies the will of Congress in crafting PROMESA and should not be sanctioned by this Court.

## II.      Joint Administration of These Cases Will Not Aid in Expediting Their Resolution

60.      The Debtors state that joint administration will "promote judicial economies and efficiencies, reducing delay and expenses" for all parties-in-interest.  (Joint Admin. Mot. ¶ 16.) As a general matter, Ambac supports this sentiment, and in most cases brought under chapter 11 of the Bankruptcy Code, joint administration no doubt does promote judicial economies and efficiencies.   But here, given the vast differences between the Debtors and their creditor constituencies, joint administration will create more problems than it will solve.

61.      The advisory committee's note to Bankruptcy Rule 1015(c) states, in relevant part:

> Joint administration as distinguished from consolidation may include combining the estates by using a single docket for the matters occurring in the administration, including the listing of filed claims, the combining of notices to creditors of the different estates, and the joint handling of other ***purely administrative matters that may aid in expediting the cases and rendering the process less costly***.

Fed. R. Bankr. P. 1015 advisory committee's note (emphasis added).  Given that guidance, it is important to understand what efficiencies will actually be generated by joint administration.

62.     The only apparent efficiency created by joint administration relates to the fact that the Oversight Board is represented by the same law firm and financial advisor (although the Commonwealth and COFINA themselves have distinct sets of advisors).  Indeed, the primary benefit claimed in support of joint administration is that it "will save the Debtors substantial time and expense, because it will remove the need to prepare, replicate, file, and serve duplicative notices, applications, and orders in each of the Debtors' cases."  (Joint Admin. Mot. ¶ 15.)  In light of the numerous potential conflicts of interest identified above, that alone cannot be sufficient to warrant joint administration.

63.     Moreover, those concerns are purely hypothetical.  Although the Debtors warn of "duplicative orders" and "duplicative files and dockets" (Joint Admin. Mot. ¶ 15), COFINA's property and creditor constituency are distinct, and entirely separate from those of Commonwealth.  COFINA has thus far identified only two unsecured creditors, none of whom are listed on the Commonwealth's list of largest unsecured creditors.  *Compare* COFINA Petition, Schedule B *with* Commonwealth Petition, Schedule B.  On information and belief, COFINA's only additional creditors are holders or insurers of bonds issued by COFINA.  The holders of those bonds have claims for repayment against COFINA, and only COFINA.[18]  It is therefore difficult to imagine a deluge of "duplicative notices, applications, and orders in each of the Debtors' cases" necessitating joint administration.  (*See* Joint Admin. Mot. ¶ 15.)

64.     If anything, the joint administration of the Debtors' Title III cases will lead to confusion and uncertainty.   Many of the Commonwealth's residents are creditors of the

---

[18]  To the extent there is overlap in the Debtors' creditor constituencies, it is because entities have distinct claims arising under separate debt instruments.

Commonwealth, and it is likely that few of those individuals have significant experience in bankruptcy cases.  If all notices, applications, and orders are entered on a single docket despite the fact that the Commonwealth's and COFINA's creditor constituencies do not overlap in any meaningful way, individual creditors may feel obligated to file objections or other pleadings in matters that do not concern their interests.  The potential for misfilings and erroneous docket entries will increase exponentially, undermining, not promoting, judicial efficiency.

65.    In truth, the real purpose of the request for joint administration is to facilitate the Commonwealth's goal of achieving—explicitly or implicitly—substantive consolidation of the Commonwealth and its instrumentalities, including COFINA.  The Debtors seek to dispel this concern by claiming that "joint administration will not adversely effect [*sic*] the Debtors' respective constituencies because the Debtors request only procedural, *not* substantive, consolidation of Debtors."  (Joint Admin. Mot. ¶ 16 (emphasis in original).)  This disclaimer is unsurprising given that PROMESA itself provides that nothing in Title III "shall be construed as authorizing substantive consolidation of the cases of affiliated debtors."  48 U.S.C. § 2164(f).  But the Fiscal Plan and Fiscal Plan Compliance Act purport to impose what is, by any definition, a substantive consolidation of the Commonwealth, COFINA, and certain non-debtor Commonwealth instrumentalities.[19]  Although joint administration is seemingly innocuous, in these cases it would be an inappropriate and unlawful step toward that "last resort" remedy[20] and should not be permitted.

---

[19]  The Fiscal Plan calls for the pooling of all revenue generated by the Commonwealth and its instrumentalities and the payment of all debt from that common pool of revenue.  Likewise, substantive consolidation "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased)."  *In re Owens Corning*, 419 F.3d 195, 205(3d Cir. 2005).

[20]  *Owens Corning*, 419 F.3d at 211 (referring to substantive consolidation as a "'rough justice' remedy [that] should be rare and, in any event, one of last resort after considering and rejecting other remedies").

III.   **The Debtors' Banks Should Not Be Preemptively Exculpated for Unlawful Transfers of the Debtors' Property**

66.    Finally, the Bank Release Motion seeks extraordinary relief:  an order that would permit the Debtors' banks to rely on the Debtors' designation of any check or payment instruction and entitle them to act without "***duty of further inquiry and without incurring any liability***."  (Bank Release Mot., Ex. A ¶ 3.)  In other words, the Bank Release Motion seeks to absolve their banks in advance for contractual, statutory, and common law liability—not only to the Debtors, but also to third parties.  And it does so in a context where the Commonwealth has brazenly admitted through the Fiscal Plan and Fiscal Plan Compliance Law that it intends to apply monies in a manner inconsistent with the priority scheme provided for by Puerto Rico law. The Debtors fail to cite ***any*** authority in support of the requested relief.  Indeed, they fail to so much as identify the banks that would be the recipients of the release, what specific duties are being waived, or what contractual rights may be abrogated by their proposed order.  The Bank Release Motion should be rejected.

67.    The Debtors themselves admit that, although chapter 11 debtors require court authorization under section 363 of the Bankruptcy Code to continue their prepetition cash management systems, there is no such requirement here as PROMESA does not incorporate section 363 (or 541) of the Bankruptcy Code.  Thus, with respect to the Debtors' need for relief to continue its standard banking practices, these cases bear no resemblance to chapter 11 bankruptcies.  Unsurprisingly, the Debtors have failed to cite a single instance of similar relief being granted in a chapter 9 case.

68.    The only statutory authority the Debtors do cite is section 105(a) of the Bankruptcy Code, which, while broad, cannot be used to alter substantive rights of parties.  *See Ameriquest Mortg. Co. v. Nosek* (*In re Nosek*), 544 F.3d 34, 44 (1st Cir. 2008) ("§ 105(a) may

not be invoked where the result of its application would be inconsistent with any other Code provision or it would alter other substantive rights set forth in the Code.").

69.     The Debtors frame the Bank Release Motion as a prophylactic exercise to prevent banks from inadvertently causing harm and as an analogue to standard "first day" relief.  As an initial matter, these are not standard proceedings—they are the first of their kind under a newly crafted federal legislative scheme, and should not be administered by rote adherence to distinguishable chapter 11 precedents.  In any event, given the absence of a statutory basis, a factual foundation, or even the identification of the parties to whom it is directed, it is clear that the Bank Release Motion is either a request for an impermissible advisory opinion or a disguised attempt to impermissibly affect the rights of third parties through Section 105(a) of the Bankruptcy Code.  *See In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 421 (3d Cir. 2013) ("Federal courts have no jurisdiction to render advisory opinions.  Put another way, they 'may not decide questions that cannot affect the rights of litigants in the case before them[.]'" (internal citation omitted)).

70.     To the extent the Debtors are in fact seeking to enjoin their banks from requiring additional approvals or consents due to their pending PROMESA cases (or are seeking a declaratory judgment regarding the same), each Debtor should commence an adversary action against its banks, seeking a narrow injunction (and not seeking any advance release for such banks).  *See* Fed. R. Bankr. P. 7001(7) (adversary proceedings including "a proceeding to obtain an injunction or other equitable relief").  Alternatively, to the extent a bank violates the automatic stay imposed by section 362 of the Bankruptcy Code, the affected Debtor should seek to remedy such stay violation in a proper motion brought before this Court.  In no case, however,

should this Court permit the Debtors to affect the rights of untold third parties through the Bank

Release Motion.

## <u>CONCLUSION</u>

For the reasons set forth herein, Ambac respectfully requests that the Court (i)

deny the Motions and (ii) grant such other and further relief as the Court deems appropriate.[21]


Dated:  May 15, 2017
      San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
     Roberto Cámara-Fuertes (USDC-PR No. 219002)
     Sonia Colón (USDC-PR No. 213809)
     221 Ponce de León Avenue, 5th Floor
     San Juan, PR 00917
     Telephone: (787) 766-7000
     Facsimile:  (787) 766-7001
     Email:  rcamara@ferraiuoli.com
          scolon@ferraiuoli.com


**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**

By: /s/ *Dennis F. Dunne*
     Dennis F. Dunne (*pro hac vice pending*)
     Andrew M. Leblanc (*pro hac vice pending*)
     Atara Miller (*pro hac vice pending*)
     Grant R. Mainland (*pro hac vice pending*)
     28 Liberty Street
     New York, NY 10005
     Telephone: (212) 530-5770
     Facsimile:  (212) 822-5770
     Email: ddunne@milbank.com
          aleblanc@milbank.com
          amiller@milbank.com
          gmainland@milbank.com

***Attorneys for Ambac Assurance Corporation***

---

[21]  By submitting this Objection, Ambac does not concede, and expressly reserves the right to contest, that either the Commonwealth or COFINA satisfied the debtor eligibility criteria established by PROMESA.  Ambac respectfully requests that any orders issued in connection with the Motions or any objections thereto, including this Objection, provide that any future orders concerning debtor eligibility shall apply *nunc pro tunc.*