IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | ) PROMESA |
| | ) Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO | ) |
| | ) |
| | ) No. 17 BK 3283-LTS |
| | ) |
| as representative of | ) |
| | ) |
| THE COMMONWEALTH OF PUERTO RICO., | ) |
| | ) |
| Debtor. | ) |
| | ) |
| In re: | ) PROMESA |
| | ) Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO | ) |
| | ) |
| | ) |
| | ) No. 17 BK 3284 |
| as representative of | ) |
| | ) Joint Administration Requested |
| PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"), | ) |
| | ) |
| | ) |
| Debtor. | ) |
| | ) |

**OBJECTION OF THE PUERTO RICO FUNDS TO
DEBTORS' MOTION FOR ENTRY OF AN ORDER
DIRECTING JOINT ADMINISTRATION OF TITLE III CASES**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 4

ARGUMENT ................................................................................. 6

I.      Joint Administration is Only Proper After  Consideration of All Potential Conflicts of Interest ................................................................................. 7

II.     Conflicts of Interest Render the  Joint Administration of These Cases Improper ............. 8

        A.      The Oversight Board Seeks to Use the Commonwealth's Title III Case to Violate PROMESA. ................................................................. 8

        B.      The Oversight Board Decided to Press Forward with the Fiscal Plan Despite The Fact That It Is Not In COFINA's Best Interests. .......................................... 10

        C.      Joint Administration of the Cases Will Improperly Give the Appearance that No Conflicts of Interest Exist. ...................................................... 11

III.    In the Alternative, the Court Should Schedule a Final Hearing  to Allow Discovery and an Evidentiary Hearing ................................................................. 11

CONCLUSION ................................................................................. 12

Americas 92818641

Creditors holding certain senior and subordinated bonds issued by the Puerto Rico Sales Tax Financing Corporation (the "Puerto Rico Funds"),[1] by and through their undersigned counsel, hereby file this objection (the "Objection") to the motion of the Commonwealth of Puerto Rico (the "Commonwealth") and the Puerto Rico Sales Tax Financing Corporation ("COFINA," and together with the Commonwealth, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") as the Debtors' representative, for entry of an order directing joint administration of the above captioned Title III cases (the "Cases") [Docket No. 41][2] (the "Motion").  In support of the Objection, the Puerto Rico Funds respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     The Puerto Rico Funds are Puerto Rico-based mutual funds that hold approximately $625 million in bonds issued by COFINA (the "COFINA Bonds").  Our shareholders consist primarily of individual retirees (and near retirees) that reside in Puerto Rico. These shareholders have invested their savings through the Puerto Rico Funds, and many of them depend on COFINA's principal and interest payments to survive.

2.     The Puerto Rico Funds object to the joint administration of the Cases because the Commonwealth and COFINA have opposing interests, and it is a conflict for the

---

[1]     The Puerto Rico Funds are the following Puerto Rico-based funds that, as of April 30, 2017, held approximately $405 million in senior secured COFINA bonds and $218 million in subordinated secured COFINA bonds: Puerto Rico AAA Portfolio Bond Fund II, Inc.; Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico Fixed Income Fund VI, Inc.;  Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.;  Puerto Rico Investors Bond Fund I; Puerto Rico Investors Tax-Free Fund, Inc.; Puerto Rico Investors Tax-Free Fund, Inc. II; Puerto Rico Investors Tax-Free Fund III, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; Puerto Rico Investors Tax-Free Fund V, Inc.; Puerto Rico Investors Tax-Free Fund VI, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; and UBS IRA Select Growth & Income Puerto Rico Fund.

[2]     Unless stated otherwise, all docket references are with respect to Case No. 17 BK 3283-LTS.

Oversight Board to act for the Debtors in both.  While a motion for joint administration is a routine motion, this is not a routine case.

3.      Under PROMESA (as defined below), the Oversight Board has total control over the restructuring of the Commonwealth and its instrumentalities.  With respect to Title III, the Oversight Board certifies the debtor's eligibility for filing a Title III case, and it serves as the debtor's representative in the Title III case, which includes filing all of the debtor's pleadings. Here, the Oversight Board has elected to initiate Title III cases for both the Commonwealth and COFINA. Because PROMESA expressly prohibits substantive consolidation, see PROMESA § 304, the Oversight Board owes separate and distinct duties to each of the Debtors to act in the best interest of each estate and its creditors.

4.      Since its inception, the Oversight Board's stated purpose has been to review, approve, and certify a fiscal plan that alleviates the Commonwealth's financial crisis, stabilizes its economy, and creates a path for fiscal growth.  While this is a laudable goal, it must be achieved in compliance with the law.

5.      The Fiscal Plan (as defined below) that the Oversight Board seeks to impose through these Cases does not comply with federal or Puerto Rico law.  The Fiscal Plan purports to seize COFINA's money to pay the Commonwealth's debts. Yet PROMESA explicitly mandates that fiscal plans of the Commonwealth and its instrumentalities (i) ensure the assets of one instrumentality are not transferred to the Commonwealth for its use and (ii) respect lawful liens of creditors, see PROMESA §§ 201(b)(1)(M), (N). PROMESA also prohibits substantive consolidation, see id. § 304.  Simply put, the Fiscal Plan and its stated purpose to confiscate COFINA's property and turn it over to the Commonwealth are patently illegal under

2

PROMESA, federal and Puerto Rico law.  The Oversight Board does not hide the fact that its prosecution of these Title III cases is to carry out the Fiscal Plan.[3]

6.      Puerto Rico law clearly provides COFINA with a dedicated revenue stream that belongs to COFINA alone, and not the Commonwealth.  In seeking to implement the Fiscal Plan through these Cases, the Oversight Board is advancing the interests of the Commonwealth at the expense of COFINA's legal rights.  This is the definition of conflict of interest.  Indeed, it is clear that the only reason COFINA is in Title III is to facilitate the looting of its assets for the benefit of the Commonwealth and its creditors.  There is no other explanation.  COFINA is solvent with no existing payment default under its debt obligations and has a robust, dedicated, and secure revenue stream that ensures payment of its future debt service.  The Oversight Board's decision to certify COFINA for Title III is clearly not in the best interests of COFINA or its creditors.

7.      Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") expressly states, "Prior to entering an order [approving joint administration] order **the court shall give consideration to protecting creditors of different estates against potential conflicts of interest**."  (emphasis added).  The Board's clear conflict of interest in overseeing the Cases for both the Commonwealth and COFINA makes joint administration improper.  To be clear, the Puerto Rico Funds do not object to the Cases being called jointly for the purposes of first-day proceedings or to have the record created in one Case imported into the other Case.  But that is not the same as joint administration under Bankruptcy Rule 1015(b).

---

[3]      See Statement of Oversight Board in Connection with Title III Protection [Docket 1], at ¶ 7 ("Given the massive debt load to be addressed, as well as the need to attain  pension and operational reform in accordance with the fiscal plan, it was determined that the best path forward was to commence a Title III case to protect Puerto Rico and its citizens.")

Americas 92818641

## FACTUAL BACKGROUND

8.       On June 30, 2016, Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Pub. L. 114-188 codified at 48 U.S.C. § 2101 et seq, to address the financial crisis in Puerto Rico.  Title II of PROMESA charges the Oversight Board with the responsibility of reviewing, approving, and certifying a fiscal plan that will put Puerto Rico on the road to fiscal stability.  See, e.g., PROMESA § 201(b), (c)(3), and (c)(e).

9.       Section 201(b) of PROMESA lays out the threshold requirements that must be met in order for the Oversight Board to certify a fiscal plan.  See PROMESA 201(c)(3).  In pertinent part, under section 201(b)(1)(M), a fiscal plan shall "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory."   And under section 201(b)(1)(N), a fiscal plan shall "respect the relative lawful priorities or lawful liens, as  may be  applicable, in  the constitution, other laws, or agreements of a covered territory  or covered territorial instrumentality in effect prior to the  date of enactment of this Act."

10.       Additionally, PROMESA also seeks to maintain the separateness of the various instrumentalities' assets by prohibiting inter-instrumentality transfers and substantive consolidation.  Section 407(a) provides that, while the Oversight Board is in existence, there is transferee liability for any property transferred in "violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors. . . ."  Additionally,

4

section 304 provides "nothing in this title shall be construed as authorizing substantive consolidation of the cases of affiliated debtors."

11.     On March 13, 2017, with expiration of the automatic stay under PROMESA approaching and no consensual resolution with creditors on the horizon, the Oversight Board hastily certified the Commonwealth's revised proposed fiscal plan (the "Fiscal Plan"). <u>See</u> Resolution for Fiscal Plan Certification, Fin. Oversight & Mgmt. Bd. (adopted Mar. 13, 2017). A copy of the Fiscal Plan, as corrected, is attached hereto as **<u>Exhibit A</u>**.

12.     The Fiscal Plan immediately drew harsh criticism and objections from creditors because it blatantly violated many key PROMESA provisions, Puerto Rico law, and creditors' constitutional rights.  Not surprisingly, several bondholder groups and monoline insurers immediately instituted actions (the "Creditor Actions") challenging the certification of the Fiscal Plan upon expiration of the automatic stay.  <u>See, e.g.</u>, <u>Rodriguez-Perello et al. v. Rosello-Nevarez</u>, No. 3:17-cv-01566 (D.P.R. May 2, 2017) (hereinafter <u>Rodriguez-Perello</u>); <u>Ambac Assurance Corp. v. Commonwealth of P.R.</u>, No. 3:17-cv-01567 (D.P.R. May 2, 2017) (hereinafter <u>Ambac I</u>); <u>Ambac Assurance Corp v. Commonwealth of P.R.</u>, No. 3:17-cv-01568 (D.P.R. May 2, 2017) (hereinafter <u>Ambac II</u>); <u>Assured Guaranty Corp. et al. v. Commonwealth of P.R., (In re Commonwealth of P.R.)</u>, Title III Case No. 17-03284, Adv. No. 3:17-cv-01584 (D.P.R. May 3, 2017) (hereinafter <u>Assured</u>).

13.     These Creditor Actions challenge, among other things, the fact that the Fiscal Plan "consolidates available cash resources" from the instrumentalities, <u>see</u> Fiscal Plan at 5, 11, and transfers such resources into the Commonwealth's pool of general funds to be used by the Commonwealth to pay its obligations.

5

14.     This prejudices COFINA by unlawfully treating its cash as available resources.  Puerto Rico law provides that a specified portion of the Commonwealth's sales and use tax is "**hereby transferred to and shall be the property of COFINA**" (the "Pledged SUT") in exchange for COFINA's commitment to pay the COFINA Bonds.   13 L.P.R.A. § 12 (emphasis added); see also 13 L.P.R.A. §§ 11a(c), 13(b), 13(c).  Puerto Rico law further protects COFINA's Pledged SUT by requiring that the SUT be directly deposited into a dedicated fund upon receipt and declaring that it "**shall not be deposited in the General Fund of the Commonwealth . . . , nor shall it constitute resources available to the Commonwealth . . . , nor shall it be available for the use by the Secretary of the Treasury of Puerto Rico**."  Id. (emphasis added).  Further, COFINA bondholders, including the Puerto Rico Funds, have a lien against the Pledged SUT, and the Pledged SUT serves as their sole source of repayment.  See 13 L.P.R.A. § 13(b); see also COFINA Resolution at 501.[4]  Investors purchased more than $16 billion of COFINA Bonds in reliance on COFINA's carve-out structure, and today COFINA Bonds are the most widely held-on island of all bonds issued by the Commonwealth and its instrumentalities.

15.     Fully cognizant of the Fiscal Plan's deficiencies and faced with the Creditors' Actions, the Commonwealth and the Oversight Board rushed to file the Commonwealth's Title III case on May 3, 2017.  COFINA's Title III case was filed on May 5, 2017.

## ARGUMENT

16.     Section 304(g) of PROMESA grants the Court discretion to enter an order for joint administration of the Cases.   As the First Circuit recognized, "joint administration is

---

[4]         Available at: http://www.gdbpr.com/investors_resources/documents/COFINA-AMENDEDANDRESTATEDBONDRESOLUTION.PDF

Americas 92818641

designed in large part to promote procedural convenience and cost efficiencies <u>which do not</u> <u>affect the substantive rights of claimants or the respective debtor estates</u> . . . ."  <u>In re Hemingway</u> <u>Transp.</u>, 954 F.2d 1, 11 (1st Cir. 1992) (emphasis added); <u>see also</u> <u>In re Manuel Mediavilla</u>, 13-2802 (MCF), 2015 Bankr. LEXIS 1958, at *26 (Bankr. D.P.R. June 16, 2015) (explaining that the "substantive rights of creditors are not affected by joint administration").

## I.     Joint Administration is Only Proper After <u>Consideration of All Potential Conflicts of Interest</u>

17.     Bankruptcy Rule 1015(b), which is incorporated by section 310 of PROMESA, specifically requires:  "Prior to entering an order [approving joint administration,] the court <u>shall</u> give consideration to protecting creditors of different estates against potential conflicts of interest."  Fed. R. Bankr. P. 1015(b); <u>see also</u> <u>In re Ben Franklin Retail Stores</u>, 214 B.R. 852, 857 (Bankr. N.D. Ill. 1997) ("[T]he court may not even order joint administration until after it has considered 'protecting creditors of different estates against potential conflicts of interest.'") (quoting Fed. R. Bankr. P. 1015(b)).  The burden of disclosing all facts relating to possible conflicts in the application for joint administration rests upon the applicant.  <u>In re BH &</u> <u>P, Inc.</u>, 103 B.R. 556, 569 (Bankr. D. N.J. 1989), <u>aff'd</u>, 119 B.R. 35 (D. N.J. 1990), <u>rev'd in part</u> <u>on other grounds</u>, 949 F.2d 1300 (3d Cir. 1991).

18.     The Debtors' Motion makes no attempt to deal with the obvious conflict that arises from jointly administering two estates that are at odds over the right to the same revenue stream.  The Debtors simply assert that joint administration will save time and expense, and they make boilerplate assertions that joint administration "will not adversely affect the Debtor's respective constituencies . . . ."  Motion at ¶¶ 15-16.  Such conclusory allegations fall

far short of the Debtors' burden to show that joint administration will not prejudice COFINA or its creditors.

## II.   Conflicts of Interest Render the Joint Administration of These Cases Improper

### A.   The Oversight Board Seeks to Use the Commonwealth's Title III Case to Violate PROMESA.

19.     PROMESA is clear that a fiscal plan must ensure that assets of one instrumentality are not used for the benefit of another.  <u>See, e.g.</u>, PROMESA § 201(b)(1)(M) (stating a fiscal plan <u>shall</u> "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory"); § 201(b)(1)(N) ("a fiscal plan <u>shall</u> "respect the relative lawful priorities or lawful liens, as may be  applicable, in  the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act.").  Congress charged the Oversight Board with the duty to ensure compliance with this mandate.  PROMESA § 201(c)(3).

20.     The Fiscal Plan proposed by the Commonwealth and certified by the Oversight Board fails to meet such requirements because it "consolidates available cash resources."  Fiscal Plan at 5, 11.  This includes transferring <u>into</u> the Commonwealth's pool of general funds the dedicated sales and use taxes that the Puerto Rico legislature had expressly carved <u>out</u> from that pool and transferred to COFINA.

21.     The COFINA statutes clearly provide that that the Pledged SUT is property solely of COFINA and is specifically not "resources available to the Commonwealth." <u>See</u> 13 L.P.R.A. § 12; <u>see also</u> 13 L.P.R.A. §§ 11a(c), 13(b), 13(c).  Additionally, the COFINA Resolution explicitly granted holders of COFINA Bonds, including the Puerto Rico Funds, a

8

security interest in the Pledged SUT.  See COFINA Resolution at 501; see also 13 L.P.R.A. § 13(b).

22.    By transferring the Pledged SUT into the Commonwealth's general pool of funds, the Fiscal Plan unlawfully reverses the transfer of these funds to COFINA and violates the lien granted to holders of COFINA Bonds.  It robs COFINA to pay the Commonwealth.  This is precisely what Congress forbade in sections 201(b)(1)(M) and 201(b)(1)(N) of PROMESA. See, e.g., Rodriguez-Perello, [Docket No. 1] at ¶¶ 6-13, 55-58, 66-70, 87, 91-96, 153-58; Ambac I, [Docket No. 1] at ¶¶ 4-12, 62-66, 85-95, 115-21, 141-44; Ambac II, [Docket No. 1] at ¶¶ 7-14, 152-163, 227-30; Assured, [Docket No. 1] at ¶¶ 4-5, 55-67, 84-95, 117-22.

23.    The Fiscal Plan also violates additional PROMESA provisions that are in place to protect creditors of one debtor from taking assets from another debtor.  See, e.g., PROMESA § 304 (stating "nothing in this title shall be construed as authorizing substantive consolidation of the cases of affiliated debtors."); § 407 (imposing transferee liability for any property transferred in "violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors. . . .").

24.    By requiring the Commonwealth to pool together all of the available resources from all of its instrumentalities and then transferring those funds to the Commonwealth for its use, the Fiscal Plan effectuates the very transfers that section 407(a) prohibits and effectively substantively consolidates all of the assets of the instrumentalities in violation of section 304.  See, e.g., Rodriguez-Perello, [Docket No. 1] at ¶¶ 10-13, 19j, 153-58; Ambac I,

[Docket No. 1] ¶¶ at 11, 61, 115-21, 141-44; Ambac II, [Docket No. 1] at ¶¶ 13,104, 196-200,

227-30.

**B.     The Oversight Board Decided to Press Forward with the Fiscal Plan
Despite The Fact That It Is Not In COFINA's Best Interests.**

25.     The Oversight Board must issue a restructuring certification for any debtor

to be eligible for filing a Title III case.  PROMESA § 206.  It acts as the debtor's representative,

which includes the filing the Title III petition on debtor's behalf, submitting the debtor's filings,

and proposing a plan of adjustment.  Id. at § 315.  The Oversight Board has full control over the

debtor entity, just as a board of directors has over any debtor company.  Because section 304 of

PROMESA specifically prohibits substantive consolidation, the Oversight Board has duties to

act in the best interest of each debtor's estate.  Thus, the Oversight Board must simultaneously

act in the best interest of the Commonwealth and COFINA.

26.     By certifying a Fiscal Plan that violates PROMESA and commencing the

Title III case for COFINA in order to access COFINA's Pledged SUT, the Oversight Board is

putting the interests of the Commonwealth ahead of COFINA.

27.     To be clear, COFINA is solvent, has not defaulted on the payment of its

debt, and has a dedicated, secured revenue stream that is more than sufficient to meet its debt

service.[5]  Meanwhile, the Commonwealth's well has run dry, and it is looking to drill into

COFINA's revenue stream.  The Fiscal Plan is its blueprint for doing just that.  COFINA has

nothing to gain and everything to lose by the implementation of this Fiscal Plan, and, knowing

this, the Oversight Board nevertheless filed this Title III case to force that plan on COFINA and

its creditors.

---

[5]     To the extent the Commonwealth and the Oversight Board contend that COFINA's Title III case was
necessary because of the litigations commenced against COFINA, such litigation were commenced as a result of the
Oversight Board's certification of the Fiscal Plan.

Americas 92818641

### C.      Joint Administration of the Cases Will Improperly Give the Appearance that No Conflicts of Interest Exist.

28.     Bankruptcy Rule 1015(b) requires that the Court consider "protecting creditors of different estates against potential conflicts of interest." Fed. R. Bankr. P. 1015(b). As described above, both the Fiscal Plan and the Title III filings pose actual conflicts between the two Debtors, and the Oversight Board that is charged with overseeing both cases.    While joint administration is appropriate where affiliated debtors are working together to achieve an objective in their common interest, it is not appropriate where a direct conflict exists.  See, e.g., In re Avery, 377 B.R. 264, 271 (Bankr. D. Alaska 2007) (denying joint administration because a potential conflict existed through potential claims for inter-company debt); see also In re BH&P, Inc., 103 B.R. at 569 (vacating the orders authorizing joint administration because the applications did not disclose all facts relating to possible conflicts, and therefore the court did not have the "opportunity to fulfill its obligation under Rule 1015(b)").

29.     Moreover, the COFINA and Commonwealth Cases have nothing in common.  They are very different entities.  Unlike the Commonwealth, COFINA has no trade creditors, pension obligations, or business operations.  The only creditors of COFINA are its bondholders.  Accordingly, the potential administrative efficiencies and cost savings that joint administration is designed to achieve are virtually nonexistent.

30.     For all of these reasons, joint administration should be denied.

### III.     In the Alternative, the Court Should Schedule a Final Hearing to Allow Discovery and an Evidentiary Hearing

31.     If the Court is inclined to grant the Motion, it should do so only on an interim basis and schedule a final hearing to allow for discovery and a full evidentiary record of all potential conflicts of interest as required by Bankruptcy Rule 1015(b).  See, e.g., In re Energy

11

Future Holdings Corp., Case No. 14-10979(CSS) (Bankr. D. Del. 2014) (allowing joint administration on an interim basis).  In doing so, the Court should (1) require the Debtors to disclose how they intend to navigate the conflicts described above — as well as any other inter — Debtor issues that give rise to potential conflicts, (2) allow discovery into the potential conflicts of interest, and (3) hold an evidentiary hearing.

## RESERVATION OF RIGHTS

32.    The Puerto Rico Funds expressly reserve the right to supplement and amend this Objection, seek discovery with respect to the same, and introduce evidence at any hearing relating to the Motion and this Objection.  Further, the Puerto Rico Funds reserve the right to respond, further object, join in, or amend any objection herein with respect to any argument or objection made by any person relating to the Motion.

## CONCLUSION

Based on the foregoing, the Puerto Rico Funds respectfully request that the Court deny the Motion, or in the alternative, grant the Motion on an interim basis and schedule a final hearing to allow for discovery and an evidentiary hearing on the conflicts of interest  set forth herein.

12

**RESPECTFULLY SUBMITTED,**

We hereby CERTIFY that on May 15, 2017, we caused the foregoing Objection to be electronically filed in this case with the Clerk of Court, using the CM/ECF system, which will send notifications of such filing to all counsel of record.

By:

/s/ *Jose C. Sánchez-Castro*

José C. Sánchez-Castro
USDC-PR 213312
jsanchez@lsplawpr.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@lsplawpr.com

Maraliz Vázquez-Marrero
USDC-PR 225504
mvazquez@lsplawpr.com

LÓPEZ SÁNCHEZ & PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

*Counsel for Puerto Rico AAA Portfolio Bond Fund II,
Inc., Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto
Rico AAA Portfolio Target Maturity Fund, Inc., Puerto
Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income
Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc.,
Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico
Fixed Income Fund V, Inc., Puerto Rico Fixed Income
Fund VI, Inc.,  Puerto Rico GNMA & U.S. Government
Target Maturity Fund, Inc.,  Puerto Rico Investors Bond
Fund I, Puerto Rico Investors Tax-Free Fund, Inc.,
Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico
Investors Tax-Free Fund III, Inc., Puerto Rico Investors
Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free
Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI,
Inc.,  Puerto Rico Mortgage-Backed & U.S. Government
Securities Fund, Inc.,  Tax-Free Puerto Rico Fund, Inc.,
Tax-Free Puerto Rico Fund II, Inc., Tax-Free Puerto
Rico Target Maturity Fund, Inc. and UBS IRA Select
Growth & Income Puerto Rico Fund*

/s/ *John K. Cunningham*

Glenn M. Kurtz (*pro hac vice* pending)
John K. Cunningham (*pro hac vice* pending)
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
gkurtz@whitecase.com
jcunningham@whitecase.com

Jason N. Zakia (*pro hac vice* pending)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund
II, Inc., Puerto Rico AAA Portfolio Bond Fund,
Inc., Puerto Rico AAA Portfolio Target Maturity
Fund, Inc., Puerto Rico Fixed Income Fund, Inc.,
Puerto Rico Fixed Income Fund II, Inc., Puerto
Rico Fixed Income Fund III, Inc., Puerto Rico
Fixed Income Fund IV, Inc., Puerto Rico Fixed
Income Fund V, Inc., Puerto Rico Fixed Income
Fund VI, Inc.,  Puerto Rico GNMA & U.S.
Government Target Maturity Fund, Inc.,  Puerto
Rico Investors Bond Fund I, Puerto Rico Investors
Tax-Free Fund, Inc., Puerto Rico Investors Tax-
Free Fund, Inc. II, Puerto Rico Investors Tax-Free
Fund III, Inc., Puerto Rico Investors Tax-Free
Fund IV, Inc., Puerto Rico Investors Tax-Free
Fund V, Inc., Puerto Rico Investors Tax-Free
Fund VI, Inc.,  Puerto Rico Mortgage-Backed &
U.S. Government Securities Fund, Inc.,  Tax-Free
Puerto Rico Fund, Inc.,  Tax-Free Puerto Rico
Fund II, Inc., Tax-Free Puerto Rico Target
Maturity Fund, Inc. and UBS IRA Select Growth &
Income Puerto Rico Fund*

13

**<u>EXHIBIT A</u>**

Certified Fiscal Plan

(March 13, 2017)



## GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

# FISCAL PLAN FOR PUERTO RICO

San Juan, Puerto Rico

March 13, 2017



## Disclaimer

The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government instrumentalities the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties. The Government has had to rely upon preliminary information and unaudited financials for 2015 and 2016, in addition to the inherent complexities that are part of a government in transition, especially after a prolonged period of public finance obscurity. As such, AAFAF and the Government have made certain assumptions that may materially change once more clarity and transparency takes hold, especially after the Government issues the past due audited financials for 2015 and 2016 later this year.

The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States. Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by AAFAF, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.

This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.



## Table of Contents

I.      Introduction

II.     Financial Projections

III.    Fiscal Reform Measures

IV.     Structural Reforms

V.      Debt Sustainability Analysis

VI.     TSA Liquidity

VII.    Financial Control Reform

# I. INTRODUCTION



## What the Government's Proposed Fiscal Plan Seeks to Achieve

**Closing the Projected Baseline Fiscal Plan Deficit**

- At the direction of the Oversight Board, the Government's new administration has prepared this Fiscal Plan which supersedes the prior administration's December 2016 fiscal plan that was rejected by the Board. From the date the new administration took office, AAFAF and its advisors have earnestly worked in cooperation with the Board's input to put forth a credible and reliable Fiscal Plan that will guide Puerto Rico's fiscal and economic recovery

- **The Fiscal Plan commits to fiscal responsibility and implements specific revenue enhancements and targeted expenditure reductions to return Puerto Rico to fiscal stability and economic growth.** In particular, the Fiscal Plan averts the $67bn fiscal deficit from the prior administration's plan and achieves +$7.9bn in cumulative cash flow available for debt service through the 10 year period

**Further Improvement**

- The Government fully appreciates that despite fiscal and economic uncertainties, now is the time to set the benchmark for the needed fiscal and economic measures as outlined in the Fiscal Plan. The Government is demonstrating its commitment to correcting the mistakes of the past. The Government is also mindful that in stopping the cycle of deficit spending, it must do so without undermining economic recovery or endangering the health, welfare or safety of the 3.5 million US citizens living in Puerto Rico

**Bondholder Negotiations and Consensus**

- Per PROMESA Section 2.01(b)(1)(I), the fiscal plan must provide a debt sustainability analysis. The Government's Fiscal Plan consolidates available cash resources that can be made available for debt service payments. The Fiscal Plan as proposed does not presume cash flow for debt service for any particular bondholder constituency, including clawed back cash and special revenues, nor does it take a position with respect to asserted constitutional or contractual rights and remedies, validity of any bond structure, or the dedication or application of tax streams / available resources

- The Government believes that any fiscal plan should reflect commitment to develop and implement operational and structural improvements that demonstrate the Government's willingness to achieve maximum payment of its debt obligations as restructured. However, in achieving debt sustainability, Puerto Rico's bondholders will be called upon to share in the sacrifice needed for a feasible debt restructuring. **The Government believes communication, grounded in fiscal responsibility, can create the opportunity for maximum consensus among stakeholders and pave the way for Puerto Rico's long-term fiscal stability and economic growth**



## What the Fiscal Plan does not determine

**Major Entities Impacted by the Fiscal Plan**

- The Fiscal Plan is for the Government as a covered entity under PROMESA. The Government's various taxes, fees and other revenues are used to fund, subsidize or guarantee payments of the debt of many covered entities by various means.  Accordingly, this Fiscal Plan does provide for payment of expenses and capital investments in, among other covered entities: (1) Public Building Authority, (2) PR Sales Tax Financing Corporation ("COFINA"), (3) PR Highways and Transportation Authority ("HTA"), (4) PR Convention Center District Authority ("PRCCDA"), (5) PR Infrastructure Finance Authority ("PRIFA"), (6) Employees' Retirement System ("ERS"), (7) University of Puerto Rico ("UPR"), (8) Puerto Rico Industrial Development Company ("PRIDCO"), and (9) Government Development Bank ("GDB")

**Major Entities Not Covered by the Fiscal Plan**

- There are four entities whose revenues and expenses are not included in this Fiscal Plan: (1) Puerto Rico Electric Power Authority ("PREPA"), (2) Puerto Rico Aqueduct and Sewer Authority ("PRASA"), (3) The Children's Trust Fund and (4) Puerto Rico Housing Finance Authority ("PRHFA"). As a result, this Fiscal Plan does not take a position with respect to these entities' financial prospects or the debt sustainability of such entities

**Legal & contractual issues not determined by the Fiscal Plan**

The Fiscal Plan does not attempt to resolve, among others, the following issues:

- The mechanisms by which projected cash flow available for debt service should be allocated to different debt instruments
- What is an essential service for purposes of the exercise of the Government's police power
- The scope, timing or specific use of revenues to be frozen or redirected as 'claw back' revenue
- The value, validity and /or perfection of pledges
- Whether any particular bond or debt issuance may have been improvidently issued
- What the Government is permitted to accomplish through  the  increase or decrease of dedicated taxes, fees, tolls or other revenue sources



# II. FINANCIAL PROJECTIONS



## The Government will undertake fiscal measures that will reduce the fiscal gap by $39.6B, and create a 10 year cash flow surplus of $7.9B

- Based on the currently stated debt obligations, the 10-year budget gap is expected to reach $66.9B
  - ~$35.1B of expected principal and interest payments during the forecast period

- The Fiscal Plan estimates cash flows available for debt service. The chart below shows the key components of the forecast, including:
  - Base fiscal gap of $66.8B which includes full cost of debt service and does not include the impact of revenue and expense measures
  - Revenue and expense measures of $13.9B and $25.7B[1]
    - Revenue Measures: stabilizing corporate tax revenue through tax reform positively affects cash flows by $7.9B
    - Expense Measures: $19.2B of $25.7B (79%) due to Government right-sizing initiatives[2]



($MM)

Accumulated ACA funding loss of $16.1B

+39,580

7,873

-66,836

35,129

-31,708

13,897

25,683

| Base Financial Cash Flows | Debt Service[3] | Cash Flow pre-Measures | Revenue Measures | Expense Measures | Cash Flows Post Measures Excluding Debt Service |



[1] See Section IV, Fiscal Reform Measures for full detail   [3] Includes $1,415 of past due P&I (Aug 1, 2015 to July 1, 2016), and $277 in Other Adjustments.   8
[2] See government right-sizing section

# The current fiscal plan is a significant departure from the version presented in October, as it commits to higher revenue and expense measures of $4.4B and $16.4 B, respectively

- The October proposed Fiscal Plan estimated negative cumulative cash flows pre-debt service over the projection period ('17-'26) of ($4.9B) vs. the Current Fiscal Plan projections estimating positive cumulative cash flows pre-debt service of $7.92B. The change is comprised primarily of:
  - Negative net impact on cash flows available for debt service, pre-Measures of -$8.0B
    - Decrease in total revenues of $1.7B
    - Decreased expenses of $6.3B
  - Enhanced revenue measures of $4.4B
  - Additional savings from Expense Measures of $16.4B



**($MM)**

| October Fiscal Plan cum. Cash Flows pre Debt Service | Changes to Revenue Baseline | Changes to Expenses Baseline | Revenue Measures | Expense Measures | Cash Flows Post Measures Excluding Debt Service |
|---|---|---|---|---|---|
| -4,947 | 1,658 | 6,301 | 4,352 | 16,427 | 7,873 |



FINANCIAL PROJECTIONS

# A summary of financials for the 10-year projection period shows positive cash flows post-measures, before debt service of $7.9B

## ($MM)

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *PR Nominal GNP Growth* | (2.2%) | (2.8%) | (2.4%) | (0.5%) | (0.4%) | 0.3% | 1.0% | 1.6% | 2.1% | 2.6% | |
| **Revenues before Measures** [1] | $18,952 | $17,511 | $16,407 | $16,434 | $16,494 | $16,590 | $16,746 | $16,953 | $17,204 | $17,509 | $170,799 |
| **Noninterest Exp. before Measures** [1] | ($17,872) | ($18,981) | ($19,233) | ($19,512) | ($19,950) | ($20,477) | ($20,884) | ($21,310) | ($21,973) | ($22,316) | ($202,507) |
| **Cash flows pre-Measures** | $1,080 | ($1,470) | ($2,826) | ($3,077) | ($3,456) | ($3,886) | ($4,139) | ($4,357) | ($4,769) | ($4,807) | ($31,708) |
| **Measures** | | | | | | | | | | | |
| Revenue measures | -- | 924 | 1,381 | 1,384 | 1,531 | 1,633 | 1,740 | 1,752 | 1,766 | 1,785 | 13,897.1 |
| Expense measures | -- | 951 | 2,012 | 2,415 | 2,983 | 3,156 | 3,255 | 3,357 | 3,724 | 3,830 | 25,683.3 |
| **Net impact of measures** | -- | 1,875 | 3,393 | 3,799 | 4,515 | 4,789 | 4,995 | 5,108 | 5,491 | 5,615 | 39,580 |
| **Cash flows post-Measures, before Debt Service** | $1,080 | $404 | $567 | $722 | $1,059 | $903 | $857 | $751 | $722 | $808 | $7,873 |

Cash flows post-measures, before debt service trends:

▪ FY 2017 estimate of $1.1B, declining to a low of $0.4B in FY 2018, driven by GNP contraction and ERS Paygo contributions of $1.0B in FY 2018

▪ Forecast peaks at $1.1B in FY 2021 before declining to $0.8B by FY 2026.  Decline is primarily driven by Affordable Care Act ("ACA") funding expiration that increase steadily from ~$0.9B in FY 2018 to ~$2.4B in FY 2026

▪ Expense measures include $1.3B in supplier payment pay downs through the projection period



1   Full details in Appendix
2   This addback is illustrative, and is not reflected in the amounts available for debt service elsewhere in this Plan

FINANCIAL PROJECTIONS

# Revenues Before Measures

## ($MM)

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *PR Nominal GNP Growth* | *(2.2%)* | *(2.8%)* | *(2.4%)* | *(0.5%)* | *(0.4%)* | *0.3%* | *1.0%* | *1.6%* | *2.1%* | *2.6%* | |
| **Revenues** | | | | | | | | | | | |
| General Fund Revenues: | | | | | | | | | | | |
| Individual Income Taxes | $1,892 | $1,760 | $1,718 | $1,709 | $1,703 | $1,708 | $1,725 | $1,752 | $1,789 | $1,836 | $17,592 |
| Corporate Income Taxes | 1,515 | 1,473 | 1,437 | 1,430 | 1,424 | 1,429 | 1,443 | 1,466 | 1,497 | 1,536 | 14,649 |
| Non-Resident Withholdings | 685 | 666 | 650 | 647 | 644 | 646 | 652 | 663 | 677 | 694 | 6,624 |
| Alcoholic Beverages | 268 | 260 | 254 | 253 | 252 | 253 | 255 | 259 | 265 | 272 | 2,591 |
| Cigarettes | 112 | 109 | 106 | 106 | 105 | 106 | 107 | 108 | 111 | 114 | 1,083 |
| Motor Vehicles | 330 | 321 | 313 | 311 | 310 | 311 | 314 | 319 | 326 | 335 | 3,191 |
| Excises on Off-Shore Shipment Rum | 206 | 173 | 175 | 176 | 178 | 179 | 180 | 182 | 183 | 184 | 1,816 |
| Other General Fund Revenue | 391 | 386 | 377 | 375 | 373 | 374 | 378 | 384 | 392 | 402 | 3,833 |
| **Total** | **5,399** | **5,148** | **5,030** | **5,007** | **4,989** | **5,005** | **5,055** | **5,134** | **5,239** | **5,372** | **51,378** |
| General Fund Portion of SUT (10.5%) | 1,718 | 1,655 | 1,596 | 1,553 | 1,511 | 1,484 | 1,472 | 1,474 | 1,487 | 1,512 | 15,463 |
| Net Act 154 | 2,075 | 1,556 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 11,931 |
| **General Fund Revenue** | **$9,192** | **$8,360** | **$7,664** | **$7,598** | **$7,538** | **$7,527** | **$7,565** | **$7,646** | **$7,764** | **$7,921** | **$78,773** |
| Additional SUT (COFINA, FAM & Cine) | 850 | 877 | 906 | 936 | 968 | 1,003 | 1,039 | 1,078 | 1,118 | 1,161 | 9,936 |
| Other Tax Revenues | 1,337 | 1,396 | 1,401 | 1,411 | 1,423 | 1,429 | 1,436 | 1,445 | 1,455 | 1,467 | 14,199 |
| Other Non-Tax Revenues | 579 | 576 | 582 | 594 | 622 | 630 | 635 | 642 | 649 | 666 | 6,174 |
| **Adj. Revenue before Measures** | **$11,958** | **$11,208** | **$10,552** | **$10,539** | **$10,550** | **$10,588** | **$10,675** | **$10,810** | **$10,986** | **$11,215** | **$109,082** |
| Federal Transfers | 6,994 | 7,168 | 7,372 | 7,477 | 7,623 | 7,835 | 8,023 | 8,212 | 8,469 | 8,675 | 77,847 |
| Loss of Affordable Care Act ("ACA") Funding | -- | (865) | (1,516) | (1,582) | (1,680) | (1,833) | (1,953) | (2,069) | (2,251) | (2,382) | (16,130) |
| **Revenues before Measures** | **$18,952** | **$17,511** | **$16,407** | **$16,434** | **$16,494** | **$16,590** | **$16,746** | **$16,953** | **$17,204** | **$17,509** | **$170,799** |



FINANCIAL PROJECTIONS

# Non-Interest Expenses Before Measures

## ($MM)

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Expenses** | | | | | | | | | | | |
| General Fund Expenditures: | | | | | | | | | | | |
| Direct Payroll | ($3,271) | ($3,309) | ($3,342) | ($3,375) | ($3,413) | ($3,458) | ($3,509) | ($3,563) | ($3,619) | ($3,675) | ($34,532) |
| Direct Operational Expenses | (907) | (918) | (926) | (936) | (946) | (959) | (973) | (988) | (1,003) | (1,019) | (9,574) |
| Utilities | (260) | (332) | (352) | (360) | (373) | (372) | (369) | (374) | (387) | (395) | (3,575) |
| Special Appropriations | (3,890) | (4,037) | (4,068) | (4,068) | (4,209) | (4,140) | (4,143) | (4,136) | (4,250) | (4,147) | (41,087) |
| **General Fund Expenses** | **(8,329)** | **(8,596)** | **(8,688)** | **(8,738)** | **(8,941)** | **(8,929)** | **(8,993)** | **(9,060)** | **(9,259)** | **(9,236)** | **(88,768)** |
| Other: | | | | | | | | | | | |
| Paygo Contributions in Excess of Asset Balance | -- | (989) | (1,014) | (985) | (964) | (1,151) | (1,177) | (1,217) | (1,251) | (1,278) | (10,026) |
| Run-Rate Capital Expenditures | (283) | (400) | (407) | (415) | (422) | (429) | (437) | (445) | (453) | (462) | (4,154) |
| **Total other** | **(283)** | **(1,389)** | **(1,421)** | **(1,400)** | **(1,386)** | **(1,581)** | **(1,614)** | **(1,662)** | **(1,704)** | **(1,739)** | **(14,180)** |
| Component Units, Non-GF Funds and Ent. Funds: | | | | | | | | | | | |
| Net Deficit of Special Revenue Funds | (110) | (130) | (146) | (154) | (162) | (169) | (173) | (176) | (176) | (174) | (1,571) |
| Independently Forecasted Non-Enterprise CUs | (452) | (380) | (433) | (558) | (639) | (752) | (859) | (963) | (1,109) | (1,210) | (7,356) |
| HTA Operational Expenses | (246) | (234) | (236) | (238) | (239) | (243) | (246) | (250) | (254) | (258) | (2,444) |
| Other | (44) | (41) | (30) | (30) | (30) | (31) | (31) | (32) | (32) | (33) | (335) |
| **Total** | **(853)** | **(785)** | **(845)** | **(980)** | **(1,071)** | **(1,194)** | **(1,310)** | **(1,420)** | **(1,572)** | **(1,675)** | **(11,705)** |
| Disbur. of Tax Revenues to Entities Outside Plan | (335) | (302) | (304) | (307) | (313) | (314) | (316) | (319) | (322) | (334) | (3,168) |
| **Adj. Expenses before Measures** | **($9,800)** | **($11,071)** | **($11,259)** | **($11,425)** | **($11,712)** | **($12,018)** | **($12,234)** | **($12,461)** | **($12,857)** | **($12,984)** | **($117,822)** |
| Federal Programs | (6,994) | (7,168) | (7,372) | (7,477) | (7,623) | (7,835) | (8,023) | (8,212) | (8,469) | (8,675) | (77,847) |
| Reconciliation Adjustment | (585) | (592) | (598) | (604) | (610) | (618) | (627) | (637) | (647) | (657) | (6,175) |
| Other non-recurring | (493) | (150) | (5) | (5) | (5) | (5) | -- | -- | -- | -- | (663) |
| **Total** | **(8,072)** | **(7,910)** | **(7,975)** | **(8,086)** | **(8,238)** | **(8,458)** | **(8,650)** | **(8,849)** | **(9,116)** | **(9,332)** | **(84,685)** |
| **Noninterest Exp. before Measures** | **($17,872)** | **($18,981)** | **($19,233)** | **($19,512)** | **($19,950)** | **($20,477)** | **($20,884)** | **($21,310)** | **($21,973)** | **($22,316)** | **($202,507)** |



FINANCIAL PROJECTIONS

# Assumptions and Methodology: Revenue

| Category | Description | '17 Revenue $MM | '26 Revenue $MM | 2017 – 2026 Growth Methodology |
|---|---|---|---|---|
| **1 Taxes** | • Individual Income Taxes <br> • Corporate Income Taxes | 3,407 | 3,371 | • Grows with PR Nominal GNP Growth Factor <br> • Excludes corporate tax reform and compliance impact which is included within fiscal measure reform analyses |
| **2 Other General Fund Revenue** | • General Fund | 391 | 402 | • Grows with PR Nominal GNP Growth Factor |
| **3 Act 154** | • Act 154 <br> • Act 154 / Foreign Company Tax Losses | 2,075 | 1,038 | • Act 154 revenue is sustained at 2017 levels until 2026 <br> • Losses equal (519) in 2018, double in 2019, and sustained at 2019 levels |
| **4 SUT** | • General Fund Portion of SUT (10.5%) <br> • Additional SUT (COFINA, FAM, & Cine) | 2,568 | 2,673 | • Total SUT grown at PR Nominal GNP growth <br> • Allocation proportions grow at historical levels |
| **5 ACA Loss** | • Loss of Affordable Care Act ("ACA") Funding | 0 | -2,382 | • Initial decrease from (865) in 2018 to (1,516) in 2019 <br> • Annual growth in loss of 6.7% from 2019 to 2026 |
| **6 Component Units** | • Other Tax Revenues <br> • Other Non-Tax Revenues | 1,916 | 2,132 | • Grows with PR Nominal GNP Growth Factor & Elasticity |

FINANCIAL PROJECTIONS

## Assumptions and Methodology: Expenses (1/2)

| Category | Description | 2017 $MM | 2026 $MM | 2017 – 2016 Growth Methodology |
|---|---|---|---|---|
| **1 Direct Payroll** | • Payroll and Operational Expenses<br>• Education Payroll<br>• Police Payroll | -3,271 | -3,675 | • Growth based on previous year multiplied by PR Inflation and Inflation pass-through to payroll |
| **2 Direct Operational Expenses** | • Legislature<br>• Department of Education<br>• Other Agencies | -907 | -1,019 | • Growth based on previous year multiplied by PR Inflation and Inflation pass-through to payroll |
| **3 Utilities** | • Power and Water<br>• PBA Operating Subsidy (Rent)<br>• Insurance Premiums | -260 | -396 | • PBA Operating Subsidy maintains<br>• Power and water have initial increase due to subsidy reduction with steady year-over-year growth until 2026 |
| **4 Special Appropriations** | • UPR<br>• Judicial and Municipalities<br>• Retirement Systems<br>• Health Insurance | -3,890 | -4,147 | • UPR, Judicial and Municipalities increase in 2018, maintain steady-state following initial growth |
| **5 Paygo Contributions in Excess of Asset Balance** | • Required Pay-go contribution: ERS, TRS and JRS | 0 | -1,278 | • Paygo program for ERS, TRS and JRS is initiated in 2018 with initial expenses of $989MM<br>• Steady growth in expenses starting in 2020 |
| **6 Run-Rate Capital Expenditures** | • Non-Growth Capital Expenditures in the Base (Run-Rate)<br>• Growth Capex | -284 | -462 | • Initial increase in 2018 to $400MM and steady growth in following years based on previous year multiplied by PR Inflation following |

FINANCIAL PROJECTIONS

# Assumptions and Methodology: Expenses (2/2)

| Category | Description | 2017 $MM | 2026 $MM | 2017 – 2026 Growth Methodology |
|---|---|---|---|---|
| **7** **Reconciliation Adjustment** | • Reconciliation Adjustment | -585 | -657 | • Initial increase in 2018 to $592MM with steady increase until 2026<br>• Reconciliation adjustment based on midrange estimate provided by E&Y analysis and audit |
| **8** **Other Non-Recurring** | • Payment of Past-Due Tax Refunds<br>• Transition and restructuring costs | -493 | 0 | • Initial decline in tax refunds in 2018 from $493MM to $150MM, decline in 2019 from $150MM to $5MM, and elimination of non-recurring expenses in 2023<br>• Costs to implement restructuring ($370MM over 10 years) |
| **9** **Component Units** | • Net Deficit of Special Revenue Funds<br>• Independently forecasted non-enterprise<br>• HTA Operational Expenses | -853 | -1,675 | • Net Deficit of Special Revenue Funds growth is based on previous year multiplied by PR Inflation<br>• Non-enterprise expenses include ASEM, ASES, ADEA, PRCCDA, PRIDCO, PRITA, Tourism, and UPR deficits<br>• PBA and the Port Authority run a surplus in 2017 that transitions towards deficit beginning in 2018<br>• Initial HTA decline in expenses due to a reduction in Past Due AP costs |



# Assumptions and Methodology: Macroeconomic Factors



| Category | Description, % | 2017 – 2026 Growth Methodology |
|---|---|---|
| **1 PR Nominal GNP Growth Factor** | -2.2, -2.8, -2.4, -0.5, -0.4, 0.3, 1.0, 1.6, 2.1, 2.6 | • Initial decrease to 97.2% in 2019<br>• Increase in 2020 to 99.5%<br>• Steady, minimal growth until 2026 |
| **2 PR Inflation** | -0.2, 1.2, 1.0, 1.0, 1.1, 1.3, 1.5, 1.5, 1.6, 1.6 | • Initial negative inflation of -0.2% in 2017 increasing to 1.2% in 2018, 1.0% in 2019 with steady, minimal growth in Inflation until 2026 |
| **3 PR Population Growth Factor** | -0.2, -0.2, -0.2, -0.2, -0.2, -0.2, -0.2, -0.2, -0.2, -0.2 | • Maintenance of 2017 PR Population Growth Factor of 99.8% |
| **4 US Population Growth** | 0.8, 0.8, 0.8, 0.8, 0.8, 0.8, 0.8, 0.7, 0.7, 0.7 | • Maintenance of 2017 US Population Growth of 100.8% until 2024, where it drops to 100.7% |

2017  2018  2019  2020  2021  2022  2023  2024  2025  2026



# III. FISCAL REFORM MEASURES



## Fiscal Reform measures reduce the 10-year financing gap by $39.6B

**Estimated Impact,** $MM



| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 10-year Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **A** Revenue Enhancement | 924 | 1,381 | 1,384 | 1,531 | 1,633 | 1,740 | 1,752 | 1,766 | 1,785 | 13,897 |
| **B** Government Right-sizing | 851 | 1,713 | 2,094 | 2,414 | 2,543 | 2,597 | 2,651 | 2,706 | 2,758 | 20,329 |
| **C** Reducing Healthcare Spending | 100 | 299 | 500 | 750 | 795 | 842 | 892 | 945 | 1,001 | 6,123 |
| **D** Pension Reform | 0 | 0 | 83 | 81 | 80 | 78 | 76 | 73 | 70 | 541 |
| **TOTAL** | 1,875 | 3,393 | 4,061 | 4,777 | 5,051 | 5,257 | 5,370 | 5,491 | 5,615 | 40,890 |

Excludes $1,310MM in supplier pay downs



Note: Values may not add up due to rounding; Excludes expenditures related to rehabilitation of trade terms with local suppliers

18

REVENUE ENHANCEMENT

# Hacienda will embark in a multi-year transformation process to reduce leakage, improve revenue collections and adjust fees

**Revenue Enhancement Measures,** $MM



| Reform Measures | Description | 2018 Impact |
|---|---|---|
| **Corporate Tax Reform** | ▪ The Government will use the breathing room provided by the extension of Act 154 to seek a more stable, consistent corporate tax policy that implements a broad-based regime with fewer exemptions by no later than January 2019 |  |
| **Tax Compliance** | ▪ Reduce leakage by increasing electronic SUT tax collections at the point of sale, including internet sales<br>▪ Improve revenue collections by using advanced analytics, expanding capacity and conducting targeted interventions |  |
| **Adjust Taxes and Fees** | ▪ Increase tobacco-related products excise tax and implement new property tax regime<br>▪ Revise fees including licenses, traffic fines, insurance fees and other charges for services to keep up with market trends |  |



# The Government must embark on a transformative journey in order to provide core services to citizens in an efficient and fiscally responsible manner

**Government Right-Sizing Measures[1],** $MM



| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|
| | 851 | 1,713 | 2,094 | 2,414 | 2,543 | 2,597 | 2,651 | 2,706 | 2,758 |
| Personnel Related | 250 | 505 | 602 | 695 | 785 | 796 | 808 | 820 | 832 |
| Non-Personnel Related | 190 | 459 | 668 | 819 | 830 | 842 | 855 | 868 | 882 |
| Reduction of Subsidies | 411 | 750 | 825 | 900 | 929 | 960 | 989 | 1,018 | 1,044 |

| Reform Measures | Description | 2018 Impact |
|---|---|---|
| **Personnel Related** | ▪ Freeze on payroll increases for fiscal years 2018 to 2020<br>▪ Improve employee mobilization across government, uniform fringe benefits and eliminate vacation and sick day liquidations to produce higher attrition rates or other payroll-related savings | <br>**$250MM** |
| **Non-Personnel Related** | ▪ Freeze on operational cost increases for fiscal years 2018 to 2020<br>▪ Re-design the way the Government works by reducing non-core expenses, externalizing services to private entities, centralizing services to eliminate duplication, achieve procurement savings or other cost-cutting measures | <br>**$190MM** |
| **Reduction of Subsidies** | ▪ Gradually reduce general fund subsidies to the University of Puerto Rico, municipalities and other direct subsidies to the private sector<br>▪ Proactively engage with the University of Puerto Rico, municipalities, as well as industry partners, to mitigate the economic development impact of subsidy removal | <br>**$411MM** |



Note: To meet fiscal plan objectives, the Government may consider additional measures.
1) Post 2018, the relative distribution of savings between personnel and non-personnel related expenses will be decided as part of updates to the Fiscal Plan and the annual budget

REDUCING HEALTHCARE SPENDING

## The Government will focus on improving efficiencies, adjusting benefits and developing a new healthcare model in order to achieve savings in healthcare spend

**Reducing Healthcare Spending Measures,** $MM



| Reform Measures | Description | 2018 Impact |
|---|---|---|
| **Pay for Value** | ▪ Establish uniformed fee schedules and limit reimbursement rates for providers<br>▪ Replace current profit sharing arrangement with MCOs and replace with a Medical Loss Ratio | $38MM |
| **Improve Payment Integrity** | ▪ Establish partnerships to increase the scrutiny of premium payments for beneficiaries that have left the system or have another health insurance plan<br>▪ Establish Medicaid Fraud Control Unit and implement the Medicaid Management Information System to reduce waste, fraud and abuse | $25MM |
| **Reduce Drug Cost** | ▪ Reduce outpatient drug spending by increase pharmacy discounts on branded drugs, enforce mandatory dispensing of generic drugs, updating the preferred formulary and establishing shared-savings initiatives | $38MM |
| **Modify Benefits Package** | ▪ Evaluate services that could be capped and/or eliminated from the current benefit package without adversely affecting access for Mi Salud beneficiaries | $0 |
| **New Healthcare Model** | ▪ Develop a new healthcare model in which the Government pays for basic, less costly benefits and the patient pays for premium services selected resulting in cost reductions attributed to greater competition along with the capped PMPM amount | $0 |



Note: To meet fiscal plan objectives, the Government may consider additional measures.

# Segmentation of the defined contribution structure will protect the retirement savings of government employees

**Pension Reform Measures,** $MM



| Reform Measures | Initiative | 2018 Impact |
|---|---|---|
| **Contribution Segregation and New Benefit Plans** | ▪ Switch to pay-as-you-go model, segregate prospective employee contributions, facilitate Social Security enrollment and improve investment alternatives |  |
| **Adjust Retirement Benefits** | ▪ Protect benefits for lowest pension income earners. Progressive strategy to reduce retirement benefit costs including other post-employment benefits. |  |



# IV. STRUCTURAL REFORMS



STRUCTURAL REFORM MEASURES

# Implementing the package of structural reforms will provide a cumulative 2.0% increase in GNP growth

**1** Improve Ease of Business Activity

**2** Improve Capital Efficiency

**3** Energy Reform

**1a Increase Labor Participation**
- Institute public policy measures aimed to attract new businesses, create new employment opportunities, and foster private sector employment growth to increase labor demand
- Change welfare and labor incentives to encourage greater sector participation thus increasing labor supply

**1b Permitting Process Reform**
- Centralize, streamline, and modernize and expedite permitting processes; increase business friendly environmental and economic growth

**1c Tax Reform**
- Lower marginal tax rates and broaden the tax base; simplify and optimize the existing tax code to achieve gains in efficiency, ease of doing business and reducing tax evasion

**1d Regulatory Reform**
- Reduce unnecessary regulatory burdens to reduce the drag of government on the private sector

**2a Infrastructure Reform**
- Augmenting competitiveness by investing in critical infrastructure and quality of public services in roads, ports, telecommunications, water and waste, knowledge services, and other strategically important sectors

**2b Public-Private Partnerships**
- Leverage key public assets through long term concessions to optimize quality of public infrastructure, services to public and sustainable operations and maintenance

**2c Critical Projects**
- Implement management system to boost development of critical projects through expedited processes

**3a Energy Reform**
- Leverage and facilitate expedited private sector investments in modern, cost-efficient, and environmentally compliant energy infrastructure; reform PREPA operations and services to clients; and allow for greater competition in energy generation

**4** Promoting Economic Development

**4a Enterprise Puerto Rico**
- Promote productivity growth, attract FDI & incentivize investments in technology through collaboration with the private sector

**4b Destination Marketing Organization**
- Externalize the overseeing of marketing efforts & continuity under a single brand and as a unified front representing all of Puerto Rico's tourism components



# The initial stage of the P3 program includes launching of ~$5B of projects during the 2017-2019 calendar years that have been identified and are in project preparation

**P3 Project Identification**

- Identified initial list of priority projects with P3 potential
- Assessed project business cases and impacts on priority infrastructure needs, the economy, and efficient delivery of public services
- Split into 3 groups based on projected sequencing, **designed to launch in 2017, 2018 and 2019**

**Key Considerations in the Overall P3 Implementation**

- Project sequencing is designed to **effectively progress the advancement of projects and avoid major obstacles in the shortest timeline possible** (i.e., progression from easily executable/advanced permitting to more difficult/less advanced projects)
- Need to **promote and improve funding models to use private funds**, where relevant, as leverage to maximize the unused federal funds current available

**P3 Key Target Areas %**



- Water
- Other 0
- 8
- Energy 43
- Waste mgmt 20
- Social infra 7
- Transport 22



| | 10-Year Impact | → Capital Improvement Investment: ~$5B | Jobs Created: ~100,000 |

**(Project timeline includes P3 concessions included in Externalization measures)**



# V. DEBT SUSTAINABILITY ANALYSIS



# Debt summary

- Below is a summary of the debt (excluding pension liabilities) considered in the fiscal plan
- Note: Amounts are estimated as of February 2017 and based upon preliminary unaudited numbers provided to AAFAF by issuer agencies and from publicly available information. On behalf of the Board, Ernst & Young is conducting an assessment of the debt outstanding to confirm these figures. Estimated amounts are subject to further review and may change

## Summary of debt outstanding as of February 2017 ($MM)

| Issuers included in Fiscal Plan | Bond principal | CAB | Unpaid P&I[1] | Private Loans | Total Bonds & Private loans | Loans from GDB/MFA Entities | Total Debt Service FY 17-19 | DSRF Balance |
|---|---|---|---|---|---|---|---|---|
| GO | $12,013 | $84 | $1,146 | $24 | $13,267 | $169 | $3,284 | -- |
| COFINA | 11,425 | 6,155 | -- | -- | 17,580 | -- | 2,121 | -- |
| HTA[2] | 3,983 | 135 | 6 | -- | 4,124 | 1,734 | 997 | 101 |
| PBA | 3,980 | -- | 117 | -- | 4,097 | 182 | 782 | 6 |
| GDB[3,4] | 3,182 | -- | 742 | 203 | 4,126 | -- | 1,863 | -- |
| ERS | 2,658 | 498 | -- | -- | 3,156 | -- | 500 | 44 |
| PRIFA[5] | 1,566 | 409 | 232 | -- | 2,207 | 49 | 464 | 2 |
| PFC | 1,025 | -- | 172 | -- | 1,197 | -- | 257 | -- |
| UPR[6] | 496 | -- | -- | 0 | 496 | 76 | 145 | 61 |
| PRCCDA | 386 | -- | -- | -- | 386 | 145 | 91 | 9 |
| PRIDCO | 145 | 11 | -- | -- | 156 | 78 | 54 | 19 |
| AMA | -- | -- | -- | 28 | 28 | -- | -- | -- |
| Other Central Gov't Entities | 197 | -- | 29 | 413 | 639 | 3,975 | -- | -- |
| **Total** | **$41,056** | **$7,293** | **$2,444** | **$668** | **$51,461** | **$6,409** | **$10,558** | **$242** |
| **Debt Issuers not incl. in Fiscal Plan** | | | | | | | | |
| PREPA | 8,259 | -- | -- | 697 | 8,956 | 36 | 2,775 | 6 |
| PRASA[7] | 3,943 | 28 | 13 | 584 | 4,568 | 229 | 995 | 93 |
| Children's Trust | 847 | 613 | -- | -- | 1,460 | -- | 140 | 85 |
| HFA | 542 | -- | -- | -- | 542 | 85 | 134 | 33 |
| PRIICO | -- | -- | -- | 98 | 98 | -- | -- | -- |
| Municipality Related Debt[8] | 556 | -- | -- | 1,140 | 1,696 | 2,036 | n.a. | 59 |
| **Total** | **$14,147** | **$641** | **$13** | **$2,520** | **$17,320** | **$2,386** | **$4,044** | **$276** |
| **Total** | **$55,203** | **$7,933** | **$2,457** | **$3,188** | **$68,781** | **$8,795** | **$14,602** | **$518** |
| *Less: GDB Bonds (excl. TDF)* | | | | | (3,766) | | | |
| *Plus: Loans from GDB/MFA Entities* | | | | | 8,795 | | | |
| **Public Sector Debt** | | | | | **$73,810** | | | |

Notes:
1) Unpaid principal and interest includes debt service that has been paid by insurers and is owed by the government
2) HTA includes Teodoro Moscoso bonds
3) GDB private loans includes Tourism Development Fund ("TDF") guarantees
4) Includes GDB Senior Guaranteed Notes Series 2013-B1 ("CFSE")
5) PRIFA includes PRIFA Rum bonds, PRIFA Petroleum Products Excise Tax BANs, PRIFA Port Authority bonds and $34.9m of PRIFA ASSMCA bonds
6) UPR includes $64.2m of AFICA Desarrollos Universitarios University Plaza Project bonds
7) PRASA bonds includes Revenue Bonds, Rural Development Bonds, Guaranteed 2008 Ref Bonds
8) Municipality Related Debt includes AFICA Guyanabo Municipal Government Center and Guaynabo Warehouse for Emergencies bonds



DEBT SUSTAINABILITY

# Debt Service Schedule

**The table below summarizes the annual debt service through FY 2026 for all issuers included in the fiscal plan**

## FY 2017 – FY 2026 debt service ($MM)

| Fiscal year ending June 30, | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Interest** | | | | | | | | | | |
| GO | $733 | $714 | $699 | $680 | $658 | $641 | $621 | $597 | $571 | $545 |
| PBA | 186 | 186 | 183 | 179 | 175 | 169 | 163 | 157 | 151 | 145 |
| COFINA | 686 | 685 | 684 | 697 | 709 | 703 | 696 | 688 | 680 | 671 |
| HTA[1] | 206 | 201 | 194 | 188 | 182 | 175 | 167 | 160 | 153 | 145 |
| PRIFA[2] | 86 | 80 | 77 | 75 | 72 | 69 | 65 | 61 | 57 | 53 |
| PRCCDA | 19 | 18 | 17 | 17 | 16 | 15 | 15 | 14 | 13 | 12 |
| PFC | 56 | 55 | 54 | 53 | 51 | 50 | 48 | 47 | 44 | 42 |
| UPR[3] | 25 | 24 | 22 | 21 | 20 | 18 | 17 | 15 | 14 | 12 |
| ERS | 167 | 167 | 167 | 167 | 167 | 164 | 159 | 155 | 154 | 152 |
| GDB | 163 | 142 | 125 | 79 | 55 | 46 | 43 | 18 | 16 | 11 |
| PRIDCO | 8 | 8 | 7 | 7 | 6 | 5 | 5 | 4 | 3 | 2 |
| **Total** | **$2,333** | **$2,279** | **$2,229** | **$2,161** | **$2,109** | **$2,054** | **$1,999** | **$1,916** | **$1,857** | **$1,790** |
| **Principal** | | | | | | | | | | |
| GO | $395 | $351 | $392 | $439 | $334 | $358 | $378 | $402 | $428 | $454 |
| PBA | 91 | 66 | 70 | 74 | 100 | 102 | 96 | 103 | 107 | 100 |
| COFINA | 0 | 19 | 48 | 78 | 98 | 120 | 159 | 203 | 248 | 294 |
| HTA[1] | 131 | 140 | 126 | 136 | 142 | 150 | 146 | 155 | 164 | 169 |
| PRIFA[2] | 124 | 48 | 50 | 51 | 54 | 62 | 86 | 64 | 72 | 74 |
| PRCCDA | 12 | 12 | 13 | 14 | 14 | 15 | 16 | 17 | 17 | 18 |
| PFC | 29 | 30 | 32 | 33 | 34 | 36 | 37 | 39 | 41 | 43 |
| UPR[3] | 23 | 25 | 26 | 27 | 29 | 30 | 31 | 33 | 35 | 24 |
| ERS | (0) | 0 | -- | 0 | 50 | 70 | 80 | 19 | 22 | 29 |
| GDB | 309 | 277 | 848 | 432 | 434 | 143 | 47 | 541 | -- | 248 |
| PRIDCO | 10 | 10 | 11 | 11 | 11 | 13 | 13 | 14 | 15 | 16 |
| **Total** | **$1,124** | **$979** | **$1,614** | **$1,296** | **$1,299** | **$1,097** | **$1,091** | **$1,590** | **$1,149** | **$1,470** |
| **Total debt service** | | | | | | | | | | |
| GO | $1,128 | $1,066 | $1,090 | $1,118 | $991 | $999 | $999 | $999 | $999 | $999 |
| PBA | 277 | 253 | 252 | 253 | 274 | 270 | 259 | 260 | 258 | 245 |
| COFINA | 686 | 704 | 732 | 776 | 807 | 823 | 855 | 891 | 928 | 965 |
| HTA[1] | 337 | 340 | 320 | 324 | 324 | 325 | 314 | 315 | 317 | 314 |
| PRIFA[2] | 210 | 127 | 127 | 126 | 126 | 130 | 151 | 125 | 130 | 127 |
| PRCCDA | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| PFC | 86 | 86 | 86 | 85 | 85 | 85 | 85 | 86 | 86 | 85 |
| UPR[3] | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 36 |
| ERS | 167 | 167 | 167 | 167 | 217 | 234 | 239 | 174 | 176 | 181 |
| GDB | 472 | 419 | 973 | 512 | 488 | 189 | 91 | 559 | 16 | 259 |
| PRIDCO | 18 | 18 | 18 | 18 | 16 | 18 | 18 | 18 | 18 | 18 |
| **Total** | **$3,457** | **$3,257** | **$3,843** | **$3,457** | **$3,408** | **$3,152** | **$3,090** | **$3,506** | **$3,006** | **$3,261** |

1   HTA includes Teodoro Moscoso Bridge
2   PRIFA includes PRIFA BANs
3   UPR includes AFICA UPP



# Debt sustainability

**The table below summarizes the annual cash flow available for debt service, and calculates implied debt capacity based on a range of interest rates and coverage ratios assuming an illustrative 35 year term**

- Cash flow available for debt service incorporates (i) the payment of essential services, (ii) benefit of clawback revenues and (iii) a prudent contingency reserve
- In the Fiscal Plan summarized below, the cash flow after Measures but before Debt Service averages $787m per year during the period 2017 - 2026

## Debt sustainability sensitivity analysis ($MM)

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Baseline Projections** | | | | | | | | | | | |
| Revenues | $18,952 | $17,511 | $16,407 | $16,434 | $16,494 | $16,590 | $16,746 | $16,953 | $17,204 | $17,509 | $170,799 |
| Expenses | (17,872) | (18,981) | (19,233) | (19,512) | (19,950) | (20,477) | (20,884) | (21,310) | (21,973) | (22,316) | (202,507) |
| **Cash Flow Excl. Debt Service & Measures** | 1,080 | (1,470) | (2,826) | (3,077) | (3,456) | (3,886) | (4,139) | (4,357) | (4,769) | (4,808) | (31,708) |
| **Impact of Measures** | | | | | | | | | | | |
| Revenue Measures | -- | 924 | 1,381 | 1,384 | 1,531 | 1,633 | 1,740 | 1,752 | 1,766 | 1,785 | 13,897 |
| Expense Measures | -- | 951 | 2,012 | 2,415 | 2,983 | 3,156 | 3,255 | 3,357 | 3,724 | 3,830 | 25,683 |
| **Total Measures** | -- | 1,875 | 3,393 | 3,799 | 4,515 | 4,789 | 4,995 | 5,108 | 5,491 | 5,615 | 39,580 |
| **Cash Flow Available for Debt Service** | $1,080 | $404 | $567 | $722 | $1,059 | $903 | $857 | $751 | $722 | $808 | $7,873 |

## Illustrative Sustainable Debt Capacity Sizing Analysis

| | | Sensitivity Analysis:  Implied Debt Capacity at 10% Contingency | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Illustrative Cash Flow Available** | | **$700** | **$750** | **$800** | **$850** | **$900** | **$950** | **$1,000** | **$1,050** | **$1,100** |
| **Sensitivity Analysis:  PV Rate %** | *3.5%* | 12,600 | 13,500 | 14,400 | 15,301 | 16,201 | 17,101 | 18,001 | 18,901 | 19,801 |
| | *4.0%* | 11,759 | 12,599 | 13,439 | 14,278 | 15,118 | 15,958 | 16,798 | 17,638 | 18,478 |
| | *4.5%* | 11,000 | 11,786 | 12,572 | 13,358 | 14,143 | 14,929 | 15,715 | 16,501 | 17,286 |

| | | Sensitivity Analysis:  Implied Debt Capacity at 4% PV Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Illustrative Cash Flow Available** | | **$700** | **$750** | **$800** | **$850** | **$900** | **$950** | **$1,000** | **$1,050** | **$1,100** |
| **Sensitivity Analysis:  % Contingency** | *5.0%* | 12,412 | 13,299 | 14,185 | 15,072 | 15,958 | 16,845 | 17,731 | 18,618 | 19,505 |
| | *10.0%* | 11,759 | 12,599 | 13,439 | 14,278 | 15,118 | 15,958 | 16,798 | 17,638 | 18,478 |
| | *15.0%* | 11,105 | 11,899 | 12,692 | 13,485 | 14,278 | 15,072 | 15,865 | 16,658 | 17,451 |



# VI. TSA LIQUIDITY



# Weekly cash flow forecast through 2017FY

| Cash Flows Before Cliffs, Measures and Debt *(figures in $mm)* | Fcst - 1 3/17 | Fcst - 2 3/24 | Fcst - 3 3/31 | Fcst - 4 4/7 | Fcst - 5 4/14 | Fcst - 6 4/21 | Fcst - 7 4/28 | Fcst - 8 5/5 | Fcst - 9 5/12 | Fcst - 10 5/19 | Fcst - 11 5/26 | Fcst - 12 6/2 | Fcst - 13 6/9 | Fcst - 14 6/16 | Fcst - 15 6/23 | Fcst - 16 6/30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 General Collections | $349 | $254 | $58 | $71 | $66 | $760 | $186 | $63 | $66 | $334 | $60 | $44 | $59 | $134 | $520 | $57 |
| 2 Sales and Use Tax | 18 | 13 | 146 | 5 | 17 | 14 | 163 | 5 | 18 | 5 | 167 | 4 | 5 | 18 | 14 | 171 |
| 3 Excise Tax through Banco Popular | 64 | – | – | – | 77 | – | – | – | – | 68 | – | – | – | 57 | – | – |
| 4 Rum Tax | – | 10 | – | – | – | 11 | – | – | – | 18 | – | – | – | – | 22 | – |
| 5 Electronic Lottery | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 14 | 37 |
| 6 Subtotal | $432 | $277 | $204 | $76 | $161 | $784 | $349 | $68 | $84 | $424 | $227 | $48 | $64 | $210 | $570 | $265 |
| 7 Employee/Judiciary Retirement Admin. | – | – | – | – | 56 | – | – | – | 56 | – | – | – | – | 56 | – | – |
| 8 Teachers Retirement System | – | – | – | – | 70 | – | – | – | – | – | – | – | – | – | – | – |
| 9 Retirement System Transfers | – | – | – | $127 | – | – | – | $56 | – | – | – | – | $56 | – | – | – |
| 10 Federal Funds | 93 | 110 | 83 | 123 | 95 | 119 | 123 | 95 | 126 | 93 | 123 | 49 | 99 | 107 | 107 | 121 |
| 11 Other Inflows | 9 | – | 11 | – | – | 9 | 11 | – | – | – | – | 11 | – | – | – | 11 |
| 12 Tax Revenue Anticipation Notes | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| 13 Total Inflows | $534 | $388 | $298 | $199 | $382 | $912 | $483 | $163 | $267 | $517 | $350 | $108 | $163 | $373 | $677 | $397 |
| 14 Payroll and Related Costs | (18) | (51) | (120) | (23) | (95) | (62) | (101) | (35) | (90) | (65) | (96) | (18) | (22) | (95) | (56) | (106) |
| 15 Pension Benefits | – | – | (87) | – | (82) | – | (87) | – | (82) | – | (87) | – | – | (82) | – | (87) |
| 16 Health Insurance Administration - ASES | (53) | (53) | (55) | (53) | (53) | (53) | (60) | (53) | (53) | (53) | (53) | (7) | (53) | (53) | (53) | (55) |
| 17 University of Puerto Rico - UPR | (18) | (18) | (24) | (18) | (18) | (18) | (24) | (18) | (18) | (18) | (18) | (6) | – | (36) | (18) | (24) |
| 18 Muni. Revenue Collection Center - CRIM | (21) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | – | (15) | (8) | (8) | (26) |
| 19 Highway Transportation Authority - HTA | – | – | (16) | – | – | – | (16) | – | (19) | – | – | (19) | – | – | (19) | (19) |
| 20 Public Building Authority - PBA / AEP | (9) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | – | (4) | (4) | (4) | (4) | (4) | (4) |
| 21 Other Governmental Entities | (20) | (9) | (54) | 25 | (20) | (9) | (54) | 25 | (20) | (9) | (12) | (18) | (3) | (20) | (9) | (63) |
| 22 Subtotal - Government Entity Transfers | ($120) | ($92) | ($160) | ($57) | ($103) | ($92) | ($165) | ($57) | ($122) | ($92) | ($90) | ($54) | ($59) | ($128) | ($111) | ($191) |
| 23 Supplier Payments | (57) | (57) | (58) | (86) | (86) | (86) | (87) | (68) | (68) | (68) | (68) | (53) | (65) | (65) | (65) | (66) |
| 24 Other Legislative Appropriations | (24) | (14) | (5) | (2) | – | (38) | (5) | (6) | (22) | (10) | (5) | (4) | – | (16) | (22) | (5) |
| 25 Tax Refunds | (12) | (13) | (4) | (1) | (6) | (39) | (4) | (7) | (4) | (4) | (31) | (3) | (1) | (4) | (6) | (41) |
| 26 Nutrition Assistance Program | (30) | (70) | (22) | (35) | (40) | (54) | (36) | (22) | (43) | (56) | (36) | (16) | (37) | (30) | (70) | (20) |
| 27 Other Disbursements | – | – | – | – | – | – | – | – | – | – | – | (4) | – | – | – | (4) |
| 28 Contingency | (16) | (16) | (16) | (29) | (29) | (29) | (29) | (29) | (29) | (29) | (29) | (23) | (23) | (23) | (23) | (23) |
| 29 Tax Revenue Anticipation Notes | – | – | – | – | – | – | (152) | – | – | – | – | (137) | – | – | – | (135) |
| 30 Total Outflows | ($277) | ($313) | ($472) | ($233) | ($440) | ($399) | ($665) | ($223) | ($459) | ($324) | ($442) | ($312) | ($208) | ($443) | ($353) | ($676) |
| 31 Net Cash Flows Excluding Debt Service, Fiscal Cliffs and Measures | $257 | $75 | ($174) | ($34) | ($58) | $513 | ($182) | ($60) | ($193) | $194 | ($92) | ($204) | ($44) | ($70) | $324 | ($279) |
| 32 Bank Cash Position, Beginning (a) | $319 | $576 | $650 | $477 | $442 | $384 | $897 | $716 | $655 | $462 | $656 | $564 | $360 | $316 | $246 | $570 |
| 33 Bank Cash Position, Ending (a) | $576 | $650 | $477 | $442 | $384 | $897 | $716 | $655 | $462 | $656 | $564 | $360 | $316 | $246 | $570 | $291 |



*(a)  Excludes clawback account.*

## Liquidity Principles for FY 2018

- No external short-term financing

- Rollout of Disbursement Authorization Group in order to enforce priority of payments through defined critical services (see Section VII)

- Consolidate dispersed treasury functions and put in place oversight over accounts not centrally managed

- Refine and regularly update 13 week cash analysis with detailed forecasting of cash receipts and disbursements

- Provide detailed daily performance projections, results, and variances



1 Cash management authority is granted to AAFAF under Act 5-2017 and other relevant legislation

# VII. FINANCIAL CONTROL REFORM



## Current state of financial controls

- Cash is not centrally managed
  - No central office has visibility across all spending
  - Procurement agencies do not actively enforce terms and specifications
  - Limited coordinated effort to eliminate major cash outlays
  - Limited sweep of cash into general fund accounts
  - Cash disbursements is a manual and subjective process handled at Hacienda
  - No formal structure for reporting and release of audited financials

- Target is to improve level of detail on forecasting and specificity around assumptions
  - "Top-down" approach, based on prior year's Budget
  - Bank-to-book reconciliations are not often prepared in a timely manner
  - No tracking mechanisms exist to measure intra-year actual expenditures vs. budget on an accrual basis



## Budget certification per PROMESA § 202



**3/13:**
- Certification of Fiscal Plan

**March**

**April**

**May**

**June**

**July**

**6/30:**
- Last day for budget certification per PROMESA § 202(e)

**7/1:**
- Beginning of FY2018

**3/17:**
- Set timeline for budget certification per PROMESA § 202 (a)
- Work with Oversight Board in designing a reporting structure and reporting forms

**4/14:**
- Adopt procedures to deliver timely statements and to make public per PROMESA § 202(a)

**4/28:**
- Submit budget and implementation plan to Oversight Board

**5/22:**
- Submit revised budgets and supporting documents to Board, if necessary

**6/5:**
- Budget certification



## Quarterly budget compliance process per PROMESA § 203

| Quarterly Action | PROMESA section | Description | Proposed dates (mm/dd/yy) |
|---|---|---|---|
| **Reporting[1]** | § 203 (a) | Governor to submit a report describing: (1) the actual cash revenues, expenditures, and flows and (2) any other information requested by the Board | Q1: 10/15/17[1]<br>Q2: 1/16/18<br>Q3: 4/16/18<br>Q4: 7/16/18 |
| **External auditing** | § 203 (b) | Oversight Board to communicate the result of external auditing report to the government and identify any inconsistencies with the projected revenues, expenditures, or cash flows set forth in the certified Budget for such quarter | Q1: 11/10/17<br>Q2: 2/12/18<br>Q3: 5/10/18<br>Q4: 8/10/18 |
| **Correction of variance** | § 203 (b) | Government to provide additional information regarding any inconsistencies with the certified budget and implement remedial action to correct variances | Q1: 11/20/17<br>Q2: 2/20/18<br>Q3: 5/21/18<br>Q4: 8/20/18 |
| **Certification of variance / or Budget reductions by Board** | § 203 (c) and (d) | Board to certify that the government is at variance with the applicable certified Budget, and that the Government has initiated such measures as the Board considers sufficient to correct it<br>If the variances are not corrected, the Board shall make appropriate reductions in nondebt expenditures and may institute automatic hiring freezes in instrumentalities and prohibit them from entering in any contract in excess of $100,000 | Q1: 12/11/17<br>Q2: 3/12/18<br>Q3: 6/11/18<br>Q4: 9/10/18 |
| **Termination of budget reductions** | § 203 (e) | The Board should decide whether the government or instrumentality has made the appropriate measures to reduce expenditures or increase revenues and cancel the reductions | Ongoing |



1 Per PROMESA, these dates must be 15 days after end of each quarter

## Budget and Forecasting process

| **Define a timeline for each quarter's budget** | <ul><li>Certification process must adhere to PROMESA requirements</li><li>Should include, but not be limited to:<br>– Certification process according to PROMESA requirements<br>– Reporting, external auditing, and variance certifications</li></ul> |
|---|---|

| **Set guiding principles for budget and forecasting** | <ul><li>Budget should be prepared…<br>– Within the **confines of the overall fiscal plan**<br>– As a **positive cash balance** with sufficient safety margin, due to lack of access to capital markets</li></ul> |
|---|---|

| **Set, update, and track targets every quarter** | <ul><li>Use performance metrics, e.g.,:<br>– Status? On track / Delayed / Completed<br>– Reached target?<br>– Above / below past instances?</li><li>Implement measures to correct variances from budget</li></ul> |
|---|---|



## Disbursement process

| | |
|---|---|
| **Define disbursement process** | ▪ Set guidelines and principles<br>▪ Work to match budget to disbursement authorizations<br>▪ Identify an effective, centralized, and time-sensitive disbursement process that involves the adequate authorities<br>   – Incorporate a mechanism that confirms alignment between revenues and expenses |
| **Implement a centralized disbursement digital database** | ▪ Centralize into a single Treasury account with a corresponding database<br>▪ Update and review periodically<br>▪ Set a minimum available liquidity threshold and an alert-system |
| **Set, update, and track metrics every quarter** | ▪ Establish preventive measures<br>▪ Implement detective procedures to correct problems before they arise<br>▪ Design a process to correct variances from budget mid-year |

