## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | |
| | ) | |
| as representative of | ) | No. 17 BK 3283-LTS |
| | ) | |
| THE COMMONWEALTH OF PUERTO RICO, | ) | |
| | ) | |
| Debtor. | ) | |
| In re: | ) | |
| | ) | PROMESA |
| THE FINANCIAL OVERSIGHT AND | ) | Title III |
| MANAGEMENT BOARD FOR PUERTO RICO, | ) | |
| | ) | |
| as representative of | ) | No. 17 BK 3567-LTS |
| | ) | |
| PUERTO RICO HIGHWAYS & | ) | |
| TRANSPORTATION AUTHORITY, | ) | |
| | ) | |
| Debtor. | ) | |
| Peaje Investments LLC, | ) | |
| | ) | Adversary Proceeding |
| Plaintiff, | ) | |
| | ) | No. 17-_____ |
| -against- | ) | |
| | ) | |
| Puerto Rico Highways & Transportation Authority, | ) | |
| Hon. Carlos Contreras Aponte, | ) | |
| The Commonwealth of Puerto Rico, | ) | |
| Hon. Ricardo Rosselló, | ) | |
| Hon. Raúl Maldonado Gautier, | ) | |
| Hon. José Iván Marrero Rosado, | ) | |
| Puerto Rico Fiscal Agency and Financial Advisory | ) | |
| Authority, Hon. Gerardo Portela Franco, | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT FOR DECLARATORY
## JUDGMENT AND INJUNCTIVE RELIEF

Plaintiff Peaje Investments LLC ("Plaintiff"), by and through its attorneys, Dechert LLP and Monserrate Simonet & Gierbolini, LLC, for its Verified Complaint against Defendants Puerto Rico Highways & Transportation Authority ("HTA") and its Executive Director, currently the Hon. Carlos Contreras Aponte (the "Executive Director"), the Commonwealth of Puerto Rico (the "Commonwealth") and its Governor, currently the Hon. Ricardo Rosselló (the "Governor"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") and its Executive Director, currently the Hon. Gerardo Portela Franco (the "AAFAF Director"), and Hon. Raúl Maldonado Gautier and Hon. José Iván Marrero Rosado, who are Commonwealth officials (together with the Governor and AAFAF Director, the "Officials," and collectively with HTA, its Executive Director, the Commonwealth, and AAFAF, "Defendants"), alleges on knowledge as to its own acts, and otherwise on information and belief, as follows:

**NATURE OF THE ACTION**

1.      This is an adversary proceeding filed in the above-captioned case of Defendant HTA, which case was commenced under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. 114-187 ("PROMESA").  In accordance with the Court's anticipated case management procedures, a companion adversary proceeding is also being filed in the case of the Commonwealth, also commenced under Title III of PROMESA, No. 17 BK 3283-LTS.

2.      This action concerns HTA's and its Executive Director's ongoing taking and dissipation of Plaintiff's collateral in violation of applicable law.  Plaintiff is the holder of certain bonds secured by a valid, enforceable, first-priority lien on certain toll revenues that HTA collects in its operations (the "Toll Revenues").[1]  Under the terms of the resolution governing

---

[1] In addition to the Toll Revenues, Plaintiff's bonds are secured by a lien on the gross receipts of certain excise taxes and vehicle license fees (collectively, the "Tax Revenues") allocated to HTA by Puerto Rico

Plaintiff's bonds (the "1968 Resolution"), HTA is required to deposit the Toll Revenues with a fiscal agent (the "Fiscal Agent")[2] for purposes of paying the bonds.  Critically, the bonds are "limited recourse" obligations, meaning that, ordinarily, they are payable solely from the collateral securing them.  For over a year, HTA and its Executive Director have been unlawfully diverting the Toll Revenues, causing HTA to fail to deposit those revenues with the Fiscal Agent as required under the 1968 Resolution and applicable law.

3.      As a result of this ongoing diversion, the Fiscal Agent has insufficient funds to satisfy the entire payment of principal and interest due on Plaintiff's bonds in July 2017.  Moreover, HTA and its Executive Director have indicated that they have no intention of depositing the Toll Revenues with the Fiscal Agent as required under the 1968 Resolution and applicable law.  Instead, HTA and its Executive Director have made clear that they intend to continue diverting the funds for other purposes, leaving the bonds unpaid after the Fiscal Agent exhausts the bondholders' collateral account to partially satisfy the next installment of principal and interest due on the bonds in July 2017.  As a result, Plaintiff is suffering and will continue to suffer irreparable harm in the form of the destruction of its lien rights, the taking of its collateral, and the impairment of its bonds.

4.      This is an action to require HTA and its Executive Director, currently the Hon. Carlos Contreras Aponte, to resume depositing the Toll Revenues with the Fiscal Agent as required under the 1968 Resolution and applicable law.  It is also an action to stop the Commonwealth, AAFAF, and their respective Officials from interfering with the obligation of HTA and its Executive Director to deposit the Toll Revenues with the Fiscal Agent.

---

statute.  Plaintiff does not seek relief through this Verified Complaint with respect to the Tax Revenues, and instead reserves its right to ensure the proper application and use of that additional collateral.

[2] The Fiscal Agent is presently Bank of New York Mellon.

Specifically, Plaintiff seeks a judgement and order:

(a)     determining and declaring that the Toll Revenues serving as collateral for the payment of Plaintiff's bonds qualify as "pledged special revenues" under Section 922(d) of the Bankruptcy Code;

(b)     determining and declaring that, pursuant to Section 922(d) of the Bankruptcy Code, the stays provided for under Sections 362 and 922(a) of the Bankruptcy Code do not apply to Plaintiff's efforts to prevent Defendants from diverting the Toll Revenues, or prevent Plaintiff from otherwise enforcing rights and remedies with respect to its bonds;

(c)     to the extent the stays under Sections 362 and 922 apply, directing HTA to provide Plaintiff with adequate protection pursuant to Section 361 of the Bankruptcy Code in the form of HTA depositing a sufficient amount of Toll Revenues with the Fiscal Agent to ensure the timely payment of principal and interest on Plaintiff's bonds, or failing that, lifting the bankruptcy stays to allow Plaintiff to enforce its rights and remedies with respect to its bonds;

(d)     determining and declaring that Section 922(d) of the Bankruptcy Code requires HTA and its Executive Director to turn over the Toll Revenues to the Fiscal Agent in the manner provided under the 1968 Resolution governing Plaintiff's bonds;

(e)     determining and declaring that neither Section 552(a) nor Section 928(b) of the Bankruptcy Code apply to Plaintiff's bonds because, among other things, those bonds are secured by a statutory lien on the Toll Revenues;

(f)     determining and declaring that, to the extent Section 928(b) applies to Plaintiff's bonds, the expropriation of the bondholders' lien on the Toll Revenues to pay the "necessary operating expenses" of HTA violates the Fifth Amendment of the U.S. Constitution, or, in the alternative, that the bondholders' lien can only be subordinated to the expenses necessary to preserve the "project or system" that generates the specific collateral securing the bonds—*i.e.*, the toll roads generating the Toll Revenues;

(g)     determining and declaring that the "special revenue" protections of the Bankruptcy Code—in particular, Section 922(d)—preempt the Fiscal Plan Implementation (as defined below), the former Governor's unlawful Executive Orders (as defined below) (insofar as they have not expired), and Section 208(e) of the Puerto Rico Financial Emergency and Fiscal Responsibility Act of 2017 (the "Fiscal Responsibility Act");

(h)     lifting the stays provided for under Sections 362 and 922 of the Bankruptcy Code (to the extent applicable) to allow Plaintiff to commence and prosecute an action challenging on constitutional grounds, among other things, the

4

unlawful diversion of the Toll Revenues under color of the Commonwealth
Fiscal Plan (as implemented by the Fiscal Plan Act) (each as defined below),
the unlawful Executive Orders, and Section 208(e) of the Fiscal
Responsibility Act;

(i)     enjoining HTA and its Executive Director from continuing to divert the Toll
        Revenues in violation of Section 922(d) of the Bankruptcy Code and other
        applicable law, and otherwise prohibiting the Commonwealth, AAFAF, and
        their respective Officials from interfering with the obligation of HTA and its
        Executive Director to deposit the Toll Revenues with the Fiscal Agent;

(j)     directing HTA and its Executive Director to resume depositing the Toll
        Revenues as required under Section 922(d) of the Bankruptcy Code and other
        applicable law, and otherwise prohibiting the Commonwealth, AAFAF, and
        their respective Officials from interfering with Plaintiff's execution of that
        judgment; and

(k)     directing HTA and its Executive Director to deposit sufficient funds with the
        Fiscal Agent in advance of the semi-annual debt service payment dates under
        the 1968 Resolution to ensure the timely payment of all principal and interest
        on Plaintiff's bonds, and otherwise prohibiting the Commonwealth, AAFAF,
        and their respective Officials from interfering with Plaintiff's execution of that
        judgment.

5.      Plaintiff is the beneficial owner of $65 million in uninsured bonds issued by HTA

under the terms of the 1968 Resolution adopted as a binding municipal law in conjunction with

the issuance of the bonds (collectively, the "1968 Bonds").  Pursuant to Act No. 74-1965 (the

"Enabling Act") and the 1968 Resolution, the 1968 Bonds are, among other things, secured by a

pledge of and lien on the Toll Revenues, consisting of certain tolls and other charges derived

from HTA's operation of highways PR-20, PR-52, and PR-53, along with certain other traffic

facilities.  The 1968 Resolution explicitly requires HTA to deposit the pledged revenues on a

monthly basis into a collateral account maintained with the Fiscal Agent for the 1968 Bonds.

*See* 1968 Resolution § 401.  Because the 1968 Bondholders benefit from a "gross lien" on the

Toll Revenues, HTA must ***first*** deposit sufficient funds into the 1968 Bondholders' collateral

account to meet the debt service and reserve requirements under the 1968 Resolution ***before*** it

can spend the funds elsewhere.  Notably, the grant of Plaintiff's lien rights predate, among other

things, the enactment of PROMESA and the various laws passed by the Commonwealth in the

wake of its fiscal crisis—*e.g.*, the "Moratorium Act," the Fiscal Responsibility Act, and the

Fiscal Plan Act—and Plaintiff's lien rights are constitutionally protected with respect to

legislation enacted after such grant.

6.      Typical of a "special revenue" financing, the 1968 Bonds are, as noted, "limited-

recourse" obligations, meaning they are ordinarily payable **solely** from the pledged revenues, and

no other source.  Aside from its obligation to deposit the pledged revenues, HTA covenanted in

the 1968 Resolution that "it will promptly pay the principal of and the interest on every bond

issued under the provisions of this Resolution at the places, on the dates and in the manner

provided herein…."  *See* 1968 Resolution § 601.

7.      In May 2016, the Commonwealth enacted a law known as the "Moratorium Act,"

which purportedly authorized the Governor of the Commonwealth to issue executive orders to:

(a) declare various Commonwealth entities in a "state of emergency"; and (b) stop payment of

those entities' debt obligations.  In June of that year, then-Governor Alejandro García Padilla

declared HTA in a state of emergency, and directed HTA and various Commonwealth officials

to retain the Toll Revenues pledged to payment of the 1968 Bonds, instead of turning those

revenues over to the Fiscal Agent as required under the 1968 Resolution.  *See* Commonwealth of

Puerto Rico, Administrative Bulletin No. OE-2016-018; Administrative Bulletin No. EO-2016-

30; Administrative Bulletin No. EO-2016-31.  While the Commonwealth has since repealed the

portions of the Moratorium Act that authorized then-Governor García Padilla to issue these

executive orders (and the executive orders further have expired by their terms), HTA and its

Executive Director have refused to resume depositing the pledged revenues into the 1968

Bondholders' collateral account.  As a result of the limited-recourse nature of the 1968 Bonds, the diversion of the pledged revenues reduces the limited pool of collateral available to satisfy those Bonds.  To the extent the diversion continues (as HTA and its Executive Director have indicated that it will), Plaintiff will not be paid in full on its Bonds.

8.      On June 30, 2016, President Obama signed into law PROMESA.  PROMESA was intended to authorize a process for the reorganization of the Commonwealth's financial affairs, and created an Oversight Board to facilitate that process.  Among other things, the enactment of PROMESA initiated an interim stay of certain creditor actions as specified under Section 405 of PROMESA, 48 U.S.C. § 2194(b), which interim stay could have been lifted "for cause shown" during the stay's effective period, *see* 48 U.S.C. § 2194(e)(2), but in any event the interim stay expired on May 1, 2017, *see* 48 U.S.C. § 2194(d)(2).  In contrast, the debtor's filing of a Title III case initiates the stays normally applicable in a Chapter 9 bankruptcy proceeding. These bankruptcy stays are provided for in Sections 362 and 922 of the Bankruptcy Code and are incorporated into a Title III case under Section 301 of PROMESA, 48 U.S.C. § 2161.

9.      Once a Title III petition is filed, creditors have markedly greater protections under the bankruptcy stays as compared to the interim stay.  First, as the First Circuit found in connection with prior litigation on the now-expired interim stay, creditors have a much lower burden to lift the stay for "cause" in a bankruptcy case, as there is "an express-burden shifting framework" in bankruptcy whereby the debtor has the burden of proof on all issues other than "the debtor's equity in property."  *See Peaje Investments LLC v. Alejando García-Padilla*, 845 F.3d 505, 513 (1st Cir. 2017) (citing 11 U.S.C. § 362(g)).  Second, Section 922(d) of the Bankruptcy Code affords special protection to "special revenue" bonds, largely exempting the holders of those bonds from the bankruptcy stays and providing that the debtor must turnover

"pledged special revenues in a manner consistent with Section 928 of [the Bankruptcy Code] to payment of indebtedness secured by such revenues."  11 U.S.C. § 922(d).[3]

10.     The Toll Revenues pledged to secure Plaintiff's Bonds are "special revenues" within the meaning of Section 922(d).  Moreover, the 1968 Bondholders' lien results from both the Enabling Act that created HTA and the binding municipal resolution governing Plaintiff's Bonds.  Thus, that lien is a "statutory lien" within the meaning of Section 101(53) of the Bankruptcy Code, 11 U.S.C. § 101(53).  As a result, Section 552 of the Bankruptcy Code does not apply to Plaintiff's Bonds, as the application of that provision is limited to "lien[s] resulting from any security agreement…[,]" *see* 11 U.S.C. § 552(a).  In any event, even if Section 552 would otherwise apply, it is inapplicable in this case under Section 928(a) because the collateral in question here constitutes "special revenues."  *See* 11 U.S.C. § 928(a).  Nor does Section 928(b) of the Bankruptcy Code apply to those Bonds.  That provision in some instances subordinates a bondholder's lien on "special revenues" to the "necessary operating expenses" of the "project or system" that generates those revenues, but is also limited in application to "lien[s] resulting from any security agreement…[,]  *see* 11 U.S.C. § 928(b).  In any event, Section 928(b) does not apply in this instance to Plaintiff's Bonds because such application would constitute a retroactive destruction of Plaintiff's lien rights in violation of the U.S. Constitution.

11.     Under PROMESA, the Commonwealth and any of its instrumentalities that are "designated" by the Oversight Board must submit a fiscal plan to the board that "provide[s] a method to achieve fiscal responsibility and access to the capital markets," among several other requirements.  *See* 48 U.S.C. § 2141(b)(1).   In many cases, the fiscal plan is intended to serve as

---

[3] Section 922(d) refers to Section 927 of the Bankruptcy Code, but this is a scrivener's error, and should instead be read as a cross-reference to Section 928.  *See* 6-922 COLLIER ON BANKRUPTCY ¶ 922.05, at n.20.

the framework for a reorganization under Title III of PROMESA, which provides for a
judicially-supervised reorganization by way of a plan of adjustment, subject to court approval.
As a "designated" instrumentality, HTA developed its own fiscal plan and submitted it to the
Oversight Board.

12.     On April 28, 2017, the Oversight Board approved and certified HTA's fiscal plan
after making several modifications to it.  *See* Resolutions Adopted at the Seventh Public Meeting
of the Financial Oversight and Management Board for Puerto Rico Held on April 28, 2017 in
New York, New York (the "Oversight Board Resolutions"), a copy of which is attached hereto
as **Exhibit A**.  Subsequently, the Oversight Board posted to its website the amended version of
HTA's fiscal plan (the "HTA Fiscal Plan").[4]  A copy of the HTA Fiscal Plan is attached hereto
as **Exhibit B**.

13.     While the HTA Fiscal Plan outlines several measures to increase HTA's revenues
and reduce operating expenses, the plan nonetheless takes the position that HTA "has insufficient
cash flows to service its debt."  *See* HTA Fiscal Plan, at 32.  Another section of the HTA Fiscal
Plan is even more explicit with respect to the intention of HTA and its Executive Director not to
make payment on Plaintiff's Bonds, while continuing to divert Plaintiff's collateral, stating:

> Bondholders of the PRHTA would cease to receive money for debt
> repayment by July 2017, when the reserve funds that have been
> used until now run out.  Although PRHTA stopped remitting
> payments to the trust, the trustee has been using a reserve fund to
> comply with bondholder payments.

*See* HTA Fiscal Plan, at 20.

---

[4] Plaintiff submits that the HTA Fiscal Plan is fatally flawed because it does not comply with PROMESA.
Nonetheless, Plaintiff does not seek relief with respect to the HTA Fiscal Plan at this time, and instead
reserves it right to challenge the plan.

14.     This represents a remarkable change of position on the part of Defendants.  Only a few months earlier in litigation between the parties addressing whether the interim stay provided under PROMESA should be lifted, HTA and its former Executive Director, as well as the Commonwealth and certain of its officials (including the former Governor), represented to the Court that Plaintiff's interest in the Toll Revenues was "adequately protected" because there will be sufficient Toll Revenues in the future to pay Plaintiff's Bonds.  *See Peaje Investments*, 845 F.3d at 514 ("[T]he Commonwealth responded that '[a]ny particular toll revenue not allocated to the…bonds today could simply be made up for by toll revenues collected tomorrow.'"); *Peaje Investments LLC v. García-Padilla*, 3:16-cv-02365-FAB, [Dkt. No. 60] (motion of HTA and its former Executive Director to join the Commonwealth's brief opposing Plaintiff's motion to lift the interim stay).

15.     On April 29, 2017, the Commonwealth enacted the Fiscal Plan Compliance Law (P. de la C. 938, the "Fiscal Plan Act").[5]  This statute is meant to effectuate the Commonwealth's fiscal plan (the "Commonwealth Fiscal Plan").[6]  The implementation of the Commonwealth Fiscal Plan through the Fiscal Plan Act is referred to throughout this Verified Complaint as the "Fiscal Plan Implementation".

16.     Among other things, the Commonwealth Fiscal Plan prioritizes the Commonwealth's general expenses over the payment of debt service on Plaintiff's Bonds, disregarding 1968 Bondholders' lien on the Tax Revenues and the priority of such lien under applicable law.  In implementing this scheme, the Fiscal Plan Act also purportedly authorizes the Commonwealth to take "surplus" revenues from HTA after payment of its operating expenses,

---

[5] A copy of the Fiscal Plan Act, along with a certified translation of Chapters 4 and 6 of that act, is attached hereto as **Exhibit C**.

[6] A copy of the Commonwealth Fiscal Plan is attached hereto as **Exhibit D**.

without making payment or provision for payment of debt service to the Bondholders out of the Toll Revenues. *See* Fiscal Plan Act, art. 4.01, 4.02. The Fiscal Plan Act establishes a committee comprised of Commonwealth officials, and purportedly gives them discretion to determine the extent to which bondholder collateral will be taken as "surplus" revenues. *See id.* at art. 4.02.

17.     On May 3, 2017, the Commonwealth and the Puerto Rico Sales Tax Financing Corporation ("COFINA") filed petitions for relief under Title III of PROMESA in this Court. On May 21, 2017, HTA filed its own Title III petition in this Court. The filing of HTA's petition, as noted, initiated the bankruptcy stays—incorporated into Title III under Section 301 of PROMESA, 48 U.S.C. § 2161—with respect to certain creditor actions against HTA and its Executive Director, but not as to the enforcement of "special revenue" pledges under Section 922(d) of the Bankruptcy Code.

18.     Through this adversary proceeding, Plaintiff seeks to enforce and protect its lien and other rights in the pledged Toll Revenues in the manner provided under PROMESA and other applicable law. The immediate relief sought herein, however, is limited to what is necessary to protect Plaintiff's rights. Among other things, Plaintiff submits that the Executive Orders and the Fiscal Plan Implementation are preempted under the Supremacy Clause of the U.S. Constitution and various conflicting federal laws in addition to Section 922(d) of the Bankruptcy Code (the subject of Count 3 of this Verified Complaint)—particularly, Section 903(1) of the Bankruptcy Code, Sections 4, 303(1), 303(3), and 204(c)(3)(A) of PROMESA, and the Bankruptcy Clause of the U.S. Constitution. Further, the unlawful diversion of the Toll Revenues at the direction of HTA and its Executive Director violates Plaintiff's rights secured under the Fifth Amendment of the U.S. Constitution. To the extent it may be determined, however, that HTA is required under PROMESA to deposit sufficient funds to pay Plaintiff's

11

Bonds from Plaintiff's collateral (and an appropriate order may be entered directing the same), without addressing these additional claims, Plaintiff submits that the Court need not reach the additional claims at this time, or perhaps at all.  Otherwise, Plaintiff reserves its rights with respect to these (and all other) claims pending the Court's ruling on the application of the bankruptcy stays to Plaintiff's Bonds and the obligation of HTA and its Executive Director to use Plaintiff's collateral to pay Plaintiff's Bonds.

19.      Finally, while Plaintiff is the beneficiary of additional liens on the proceeds of certain Tax Revenues pledged to payment of the 1968 Bonds, this adversary proceeding only seeks relief with respect to the Toll Revenues, and Plaintiff further reserves its right to ensure the transfer and proper use of the pledged Tax Revenues.

## **THE PARTIES**

20.      Plaintiff is a Delaware limited liability company with its principal place of business in New York, New York.  It is the beneficial owner of $65 million in uninsured 1968 Bonds, presently consisting of Bonds in the following series:

| Resolution | Series | Amount |
|---|---|---|
| 1968 Resolution | Series AA | $30.2 million |
|  | Series CC | $12.0 million |
|  | Series CC Capital Appreciation | $22.8 million |

21.      Defendant HTA is a public corporation and government instrumentality of the Commonwealth created by the Enabling Act.

22.      Defendant Hon. Carlos Contreras Aponte is the Executive Director of HTA. Plaintiff sues the Executive Director in his official capacity.

23.      Defendant the Commonwealth of Puerto Rico is a territory of the United States.

24.      Defendant Hon. Ricardo Rosselló is the Governor of the Commonwealth of

12

Puerto Rico.  Plaintiff sues the Governor in his official capacity.

25.     Defendant Hon. Raúl Maldonado Gautier is the Secretary of Treasury of the

Commonwealth (the "Treasurer").  Plaintiff sues the Treasurer in his official capacity.

26.     Defendant Hon. José Iván Marrero Rosado is the Executive Director of the

Commonwealth's Office of Management and Budget (the "OMB Director").  Plaintiff sues the

OMB Director in his official capacity.

27.     Defendant AAFAF is a public corporation organized under the laws of the

Commonwealth.

28.     Defendant Gerardo Portela Franco is the Executive Director of AAFAF.  Plaintiff

sues the AAFAF Director in his official capacity.

## JURISDICTION AND VENUE

29.     This is an adversary proceeding brought pursuant to Rule 7001, Federal Rules of

Bankruptcy Procedure, applicable in Title III under Section 310 of PROMESA, 48 U.S.C. §

2170.

30.     This Court has jurisdiction over the subject matter of this dispute under 28 U.S.C.

§§ 1331 and 1332, and Article III, Section 2 of the U.S. Constitution.  Section 306 of

PROMESA, 48 U.S.C. § 2166, provides an additional basis for the Court's subject matter

jurisdiction because the controversy between the parties arises under Title III of PROMESA, or

at a minimum, arises in, or is related to, a case under Title III.  Finally, to the extent any of the

issues or claims raised herein lie beyond the Court's original jurisdiction, the Court has

supplemental jurisdiction under 28 U.S.C. § 1367 because such issues or claims are so related to

the claims within the Court's original jurisdiction that they form part of the same case or

controversy under Article III of the U.S. Constitution.

31.     The Court may enter a judgment declaring the rights and other legal relations of the parties under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rule 7001, Federal Rules of Bankruptcy Procedure.  Additionally, the Court may grant temporary and preliminary injunctive relief pursuant to Rule 65, Federal Rules of Civil Procedure (applicable in Title III under Rule 7065, Federal Rules of Bankruptcy Procedure, and Section 310 of PROMESA, 48 U.S.C. § 2170).  Under the All Writs Act, 28 U.S.C. § 1651, the Court may issue any writ necessary or appropriate in aid of its jurisdiction and agreeable to the usages and principles of law.

32.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred, and continue to occur, in this District.

## FACTS

### I.     The HTA Bonds

#### a.     Issuance

33.     Defendant HTA is a public corporation and government instrumentality of the Commonwealth created to assume responsibility for the construction, operation, and maintenance of highways and other mass transportation systems in Puerto Rico.  *See* 9 L.P.R.A. § 2002.  To finance these activities, the Enabling Act authorized HTA to access the capital markets and issue bonds.  *See* 9 L.P.R.A. § 2004(g), (h), (l).  Additionally, the Enabling Act authorized HTA to "sue and be sued" and to "make contracts and to execute all instruments necessary or incidental in the exercise of any of its powers."  *See id.*

34.     Over the years, HTA issued several series of Bonds under the 1968 Resolution and a different resolution executed in 1998 (the "1998 Resolution," and together with the 1968 Resolution, the "Resolutions").  A total of approximately $4.2 billion in principal amount of

these Bonds remain outstanding, apportioned between the 1968 Bonds and bonds issued under the 1998 Resolution (collectively, the "1998 Bonds," and together with the 1968 Bonds, the "Bonds") as follows:

|  | 1968 Bonds | 1998 Bonds | All HTA Bonds |
|---|---|---|---|
| Aggregate Principal Amount Issued and Outstanding | $830 million | $3.37 billion | $4.2 billion |

**b.    Security**

35.    Pursuant to the Enabling Act and the 1968 Resolution, the 1968 Bonds are secured by a pledge of and lien on: (a) the Toll Revenues; (b) the Tax Revenues, consisting of the gross receipts of certain excise taxes and vehicle license fees imposed by the Commonwealth and allocated to HTA by statute; and (c) funds held in, and investment earnings on, deposits to the credit of certain funds and accounts established under the 1968 Resolution (clauses (a)-(c), collectively, the "1968 Revenues").  *See* 1968 Resolution §§ 401, 501, 601; 9 L.P.R.A. § 2004(l).

36.    The 1998 Bonds, on the other hand, are secured by:  (a) a separate stream of toll revenues derived from the operation of highway PR-66; (b) the proceeds of certain taxes, fees, and deposits (which are distinct from the taxes, fees, and investment earnings assigned to the 1968 Bonds); and (c) any unencumbered 1968 Revenues remaining on deposit after payment or provision for the payment of debt service and required reserves on outstanding 1968 Bonds.  *See* 1998 Resolution §§ 401, 501, 601; 9 L.P.R.A. § 2004(l).  In this way, the 1968 Bondholders enjoy priority of payment from the 1968 Revenues (including the Toll Revenues) ahead of, among other persons, the holders of the 1998 Bonds.

37.    The Resolutions explicitly require HTA to deposit the pledged revenues on a monthly basis with the Fiscal Agent acting for the Bonds.  *See* 1968 Resolution § 401, 1998

15

Resolution § 401.  Once received, the Fiscal Agent is required to allocate these funds between

certain designated accounts based on a "waterfall" payment protocol established pursuant to the

Resolutions.  *See id.*  This protocol may be depicted graphically as follows:



38.      This arrangement prioritizes distributions of the funds beginning with the highest priority category at the top of the waterfall and descending to the lowest priority category at the bottom.  Moneys deposited in the first three accounts under the waterfall provision (collectively known as the "1968 Sinking Fund") are held in trust for, and are subject to a lien and charge in favor of, the 1968 Bondholders until disbursed by the Fiscal Agent to those holders in accordance with the Resolutions.  *See* 1968 Resolution §§ 401, 406, 501.

39.      The waterfall operates in such a manner as to ensure that by the semi-annual debt service dates (January and July), sufficient funds are on deposit in the 1968 Sinking Fund to cover the entire interest payment, and by the annual principal payment date (July), the full principal installment is also available to be paid.  In addition, HTA is required to maintain a consistent collateral reserve in the "1968 Reserve Account" (depicted above) equal to the lesser of:  (a) the maximum principal and interest requirements for any fiscal year on account of the outstanding 1968 Bonds; and (b) 10% of the proceeds of each series of 1968 Bonds outstanding, as determined on the basis of those Bonds' initial offering prices to the public.  *See* 1968 Resolution § 101 (definition of "Reserve Requirement").

40.      Together, these protections are designed to ensure that the Fiscal Agent steadily accumulates enough funds to make principal and interest payments to the 1968 Bondholders in advance of the relevant due dates, and to provide a suitable reserve to cover shortfalls to the extent ordinary collections of the pledged revenues are insufficient to fund the payments.  Aside from its obligation to deposit the pledged revenues, HTA covenanted in the 1968 Resolution that "it will promptly pay the principal of and the interest on every bond issued under the provisions of this Resolution at the places, on the dates and in the manner provided herein…."  1968 Resolution § 601.  Furthermore, HTA covenanted that it "will not incur any indebtedness nor

create or cause or suffer to be created any debt, lien, pledge, assignment, encumbrance or any other charge having a priority to or being on a parity with the lien on Revenues on the Bonds, except upon the conditions and in the manner provided herein….” 1968 Resolution § 602.

41.     The 1968 Bondholders are beneficiaries of a “gross” lien on the Toll Revenues. Pursuant to that lien, HTA must **first** deposit sufficient funds into the 1968 Bondholders’ collateral account to meet the debt service and reserve requirements under the Resolutions **before** it can spend the funds elsewhere.  (By contrast, a “net lien” would permit the payment of certain items described in the financing documents before payment of debt service.)

42.     Typical of a “special revenue” financing, the Bonds are, as noted, “limited-recourse” obligations, meaning they are ordinarily payable **solely** from the pledged revenues, and no other source.  This is in contrast to a “general obligation” financing, where the bondholders have a direct claim against the municipality and its taxing power.  As a result of the limited-recourse nature of the Bonds, the unlawful diversion of the pledged revenues immediately reduces the limited pool of collateral available to satisfy the Bonds, thereby increasing the risk of non-payment.

43.     The Enabling Act provides that Bondholders such as Plaintiff may bring suit upon the Bonds, including “[b]y mandamus or other suit, action, or proceeding at law or in equity to enforce [their] rights against...[HTA], its officers, agents, and employees to perform and carry out its and their duties and obligations [under the Enabling Act] and its and their covenants and agreements with bondholders….”  9 L.P.R.A. § 2013.  Furthermore, in Section 2019 of the Enabling Act, “[t]he Commonwealth Government...pledge[s] to, and agree[s] with, any person, firm or corporation, or any federal, commonwealth or state agency, subscribing to or acquiring bonds of [HTA] to finance in whole or in part any traffic facilities or any part thereof, that it will

18

not limit or restrict the rights or powers hereby vested in [HTA] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged."  9 L.P.R.A. § 2019.

### c.      Maturity

44.     The Bonds mature on different dates depending on the series in which they were issued.  The maturity dates for the 1968 Bonds beneficially owned by Plaintiff are set forth below.

| 1968 Bond Series | Maturity Date |
|---|---|
| Series AA-2 Bonds | July 1, 2035 (unless redeemed prior to the final maturity date) |
| Series CC Serial Bonds | Maturity dates ranging between July 1, 2028 – 2030 |
| Series CC Term Bonds | July 1, 2036 |
| Series CC Capital Appreciation Bonds | Maturity  dates ranging between July 1, 2023 – 2027 |

### III.      Diversion of the Pledged Toll Revenues Under Authority of the Moratorium Act[7]

### a.      Enactment of the Moratorium Act

45.     On April 6, 2016, the Commonwealth enacted the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act No. 21-2016 (the "Moratorium Act").  The Moratorium Act directed then-Governor Alejandro García Padilla to prioritize the payment of "essential services" over the debt obligations of government entities (including HTA) during the statutorily-defined "covered period."  *See* Moratorium Act §§ 103(m), 201(a).  The statute's

---

[7] In 2015, before enactment of the Moratorium Act and diversion of the Toll Revenues, then-Governor García Padilla issued a series of executive orders directing Commonwealth officials to retain the Tax Revenues pledged as collateral to secure the payment of the 1968 Bonds, causing HTA to fail in turning those funds over to the Fiscal Agent as required under the Resolutions.  As noted, Plaintiff only seeks relief with respect to the Toll Revenues, and reserves its rights with respect to the other pledged funds.

"covered period" ran from the date of enactment until January 31, 2017 (subject to extension for up to two months by executive order of the Governor). *See id*.

46.     The Moratorium Act purported to give then-Governor García Padilla wide latitude to issue executive orders to: (a) declare a "state of emergency" with respect to the Commonwealth or any other "government entity" within the Commonwealth, defined to include HTA; and (b) suspend the payment of "covered obligations"[8] of any of the foregoing. *See* Moratorium Act § 201(a).  Additionally, the Moratorium Act imposed a blanket stay on creditor remedies against the designated entities during the emergency period, including court proceedings and rights of acceleration, termination, modification, and setoff. *See* Moratorium Act § 201(b).

### b.     Issuance of Executive Orders Diverting the Toll Revenues

47.     Beginning in May 2016 and continuing through June of that year, then-Governor García Padilla issued a series of executive orders under color of the Moratorium Act that diverted the pledged Toll Revenues away from the 1968 Bondholders, purportedly to be used for other purposes.

48.     On May 17, 2016, then-Governor García Padilla signed an executive order—Administrative Bulletin No. OE-2016-018 (the "May 2016 Executive Order")[9]—declaring HTA in a state of emergency through June 30, 2016 and suspending the authority's obligation to deposit the pledged Toll Revenues with the Fiscal Agent during that period. *See* May 2016 Executive Order, clauses "One", "Two", & "Nine".   The May 2016 Executive Order also

---

[8] The Moratorium Act defined "covered obligations" to include, among other things, "any interest obligation, principal obligation or enumerated obligation of a government entity that is due or becomes due during the emergency period in respect of such government entity."  *See* Moratorium Act § 103(l).

[9] A copy and certified translation of the May 2016 Executive Order is attached as **Exhibit E** hereto.

purported to bar court proceedings relating to HTA debt, stating: "[p]ursuant to [Section] 201(b) of the Law, no actions shall be commenced and no claims or proceedings shall be initiated or continued in any court of any jurisdiction that is related to or arises under a Covered Obligation of the HTA…." *See* May 2016 Executive Order, clause "Four".   The May 2016 Executive Order was set to expire on or before June 30, 2016.   *See* May 2016 Executive Order, clause "Nine".

49.     On June 30, 2016, then-Governor García Padilla issued two additional executive orders:  (a) Administrative Bulletin No. EO-2016-30 (the "First June 2016 Executive Order"); and (b) Administrative Bulletin No. EO-2016-31 (the "Second June 2016 Executive Order," and together with the First June 2016 Executive Order, the "June 2016 Executive Orders").[10]  The First June 2016 Executive Order suspended "the payment of all debt obligations" of HTA that came due during the statute's "covered period," which ran through January 31, 2017.  *See* First June 2016 Executive Order, clause "Second".  The Second June 2016 Executive Order was intended to renew the May 2016 Executive Order before it expired, providing that the May 2016 Executive Order shall "continue in effect" through the same "covered period" as the Second June 2016 Executive Order, which similarly expired on January 31, 2017.  *See* Second June 2016 Executive Order, clause "Fifth".  Like the May 2016 Executive Order, the June 2016 Executive Orders contained broad prohibitions on creditor litigation.  *See* First June 2016 Executive Order, clause "Seventh"; Second June 2016 Executive Order, clause "Twelfth".

50.     Finally, the June 2016 Executive Orders contained identical termination clauses providing that the orders would terminate on or before expiration of the "Covered Period," which

---

[10] Copies of the First and Second June 2016 Executive Orders are attached hereto as **Exhibits F** and **G**, respectively.

was defined with reference to the "date certain" expiration of the covered period under the

Moratorium Act—January 31, 2017.[11]  More specifically, the June 2016 Executive Orders

respectively provided that:

> TERMINATION.  This Executive Order shall remain in full force
> and effect until the earlier of (i) expiration of the Covered Period
> or (ii) revocation of this Executive Order as provided by the
> Governor in writing.  Any suspension of payment, transfer, or
> otherwise directed by this Executive Order shall remain in effect
> until the termination of this Executive Order according to this
> paragraph or the revocation by the Governor in writing of the
> particular suspension.

First June 2016 Executive Order, clause "Twelfth"; Second June 2016 Executive Order, clause

"Seventeenth".  Thus, the May and June 2016 Executive Orders (collectively, the "2016

Executive Orders") expired by their own terms on January 31, 2017.

## IV.    Enactment of PROMESA

51.    On June 30, 2016, President Obama signed PROMESA into law.

52.    PROMESA was intended to authorize a process for the reorganization of the

Commonwealth's financial affairs, and created an Oversight Board to facilitate that process.

PROMESA provides two alternatives for the Commonwealth and its instrumentalities to

restructure their debts.  The first option—"Title VI—Creditor Collective Action"—is a largely

out-of-court process that relies on a collective action mechanism to bind dissenting creditors to

an agreement reached by the debtor and a supermajority of its creditors on the terms of a

restructuring of the debtor's obligations.  The second option—"Title III—Adjustment of

Debts"—is the route the Commonwealth and HTA (among other Commonwealth

---

[11] The first "WHEREAS" clause in the June 2016 Executive Orders each provided that "[c]apitalized
terms used herein and not otherwise defined shall have the meanings assigned to them in the
[Moratorium] Act."

instrumentalities) chose here, which provides for the possibility of a judicially-supervised

reorganization by way of a plan of adjustment, subject to court approval.

53.     Among other things, the enactment of PROMESA initiated, as noted, an interim

stay of certain creditor actions as specified under Section 405 of PROMESA, 48 U.S.C. §

2194(b), which could have been lifted "for cause shown" during the stay's effective period, *see*

48 U.S.C. § 2194(e)(2), but in any event the interim stay expired on May 1, 2017, *see* 48 U.S.C.

§ 2194(d)(2).

## V.     Pre-Title III Litigation

54.     On July 18, 2016, Plaintiff filed an action in the District Court for the District of

Puerto, captioned *Peaje Investments LLC v. García-Padilla*, 3:16-cv-02365-FAB, which was

assigned to U.S. District Judge Francisco Besosa.  In that action, Plaintiff sought to lift the

interim stay under Section 405 of PROMESA "for cause shown" so that it could file a complaint

challenging on constitutional grounds, among other things, the unlawful diversion of the pledged

Toll Revenues under color of the Moratorium Act, and the constitutionality of the Act itself.  *See*

*generally Peaje Investments*, 3:16-cv-02365-FAB, [Dkt. No. 1].  Plaintiff argued that "cause"

existed to lift the interim stay because Plaintiff lacked "adequate protection" of its collateral as a

result of respondents' ongoing taking of the Toll Revenues.  *See id.*[12]  Respondents countered,

among other things, that Plaintiff's interest in the Toll Revenues was adequately protected

because "[a]ny particular toll revenue not allocated to the movant's bonds today could simply be

---

[12] The respondents in that action were Hon. Alejandro García Padilla (the then-Governor), Hon. Juan C.
Zaragoza Gomez (the then-Treasurer), Hon. Luis G. Cruz Batista (the then-OMB Director), Hon. Carmen
Villar Prado (the then-Executive Director of HTA), and HTA.  García-Padilla, Zaragoza Gomez, Cruz
Batista, and Villar Prado have since left office.

made up for by toll revenues collected tomorrow." *Id.* at [Dkt. No. 30]; *see also id.* at [Dkt. No. 60].

55.    Judge Besosa denied without prejudice the requested relief in *Peaje Investments LLC v. García-Padilla*, No. 16-02365, 2016 U.S. Dist. LEXIS 153711, at *25 (D.P.R. Nov. 2, 2016).  While Judge Besosa agreed with Plaintiff that a secured creditor's lack of "adequate protection" with respect to its collateral constitutes cause to lift the interim stay, he found that Plaintiff's interest in the Toll Revenues was adequately protected.  *Id.*  In reaching this conclusion, Judge Besosa largely relied on respondents' assertions that future Toll Revenues will be sufficient to pay Plaintiff's Bonds, reasoning in part:

> …because []HTA's pledged revenues are constantly replenished by an ongoing stream of toll payments, [Plaintiff] continues to hold a security interest in a stable, recurring source of income that will eventually provide funds for the repayment of the…bonds. Though it will not receive the pledged revenues during the stay period, this enduring security interest means that it faces only a delay in recouping such funds, not a permanent loss of them.

*See id.* at *23.

56.    In issuing the ruling, Judge Besosa cancelled the evidentiary hearing that had been scheduled in the case (in which Plaintiff intended to call an expert witness on the issue of adequate protection), and instead ruled on the papers without a hearing.  Plaintiff appealed.

57.    The U.S. Court of Appeals for the First Circuit affirmed in *Peaje Investments LLC v. Alejando García-Padilla*, 845 F.3d 505 (1st Cir. 2017), but on different grounds.  Once again, respondents' brief argued that future Toll Revenues will be sufficient to make up for the current diversion of Plaintiff's collateral, asserting that "…appellants are adequately protected for the full value of their interest in the revenues that serve as their collateral, as they are being paid now, and they will continue to be paid in the future."  Brief for Respondents-Appellees at *45,

*Peaje Investments LLC v. Alejando García-Padilla*, No. 16-2377 (1st Cir. Dec. 27, 2016), available at: 2016 WL 7438090. The Court of Appeals, however, did not address whether Plaintiff's interest was adequately protected. Instead, the First Circuit held that Judge Besosa did not err in ruling without an evidentiary hearing because Plaintiff's claim was "facially insufficient" for the reason that Plaintiff did not plead the lack of an "equity cushion" in its collateral, meaning that Plaintiff did not properly allege that the present value of its remaining collateral, including future collections, was insufficient to cover the obligations owed to Plaintiff. *See Peaje Investments LLC*, 845 F.3d at 514. The First Circuit pointed out that, while in a bankruptcy case the debtor has the burden of proof on all issues other than "the debtor's equity in property…[,]" *see* 11 U.S.C. §§ 362(g) & 922(b), the interim stay under Section 405 PROMESA is different because it does not expressly allocate burdens of proof, the implication being that the entire burden of showing "cause" was on Plaintiff, *see Peaje Investments LLC*, 845 F.3d at 513. Judge Besosa subsequently entered a judgment dismissing the action without prejudice. *See Peaje Investments*, 3:16-cv-02365-FAB, [Dkt. No. 86].

## VI. Partial Repeal of the Moratorium Act and Enactment of the Fiscal Responsibility Act

58.    On January 27, 2017, the Commonwealth enacted the Fiscal Responsibility Act. The Fiscal Responsibility Act was passed shortly after the Puerto Rico election. It was meant to signal a "changing of the guard" to the new administration of Governor Ricardo Rosselló, which said it intended to encourage negotiations with creditors on a voluntary debt restructuring outside of Title III. *See* REORGRESEARCH, *Governor Rosselló Signs New Moratorium Law*, Jan. 29, 2017, a copy of which is attached hereto as **Exhibit H**. Indeed, one of the stated purposes of the act was to remove significant impediments to negotiations arising under the Moratorium Act. *See* Fiscal Responsibility Act, "Statement of Intent". Additionally, the Puerto Rico Legislative

Assembly found that the repeal of portions of the Moratorium Act was necessary to bring the law

into compliance with PROMESA.  In particular, the Puerto Rico legislature concluded that

PROMESA "established processes and timelines for the resolution of the Government's financial

situation that preempt and supersede provisions of the Moratorium Act."  *See id.*

59.     The Fiscal Responsibility Act repealed Chapters 1 and 2 of the Moratorium Act,

which had served as the foundation for then-Governor García Padilla's 2016 Executive Orders

directing the diversion of the Toll Revenues.  *See* Fiscal Responsibility Act § 301.  The statute

set forth an "Emergency Period" that was set to expire on May 1, 2017, unless extended by the

Governor for "one additional period of three (3) months."  *See* Fiscal Responsibility Act § 103.

During this "Emergency Period," the Fiscal Responsibility Act purportedly authorizes Governor

Rosselló to "issue executive orders…regarding the disbursement or disposition of funds held

by…[a] government entity…."  *See* Fiscal Responsibility Act § 206.  But, the Governor at the

time declined to issue new executive orders regarding the Toll Revenues.  And while Section

208(e) of the Fiscal Responsibility provides that executive orders issued under the former

Moratorium Act "shall continue in full force and effect until amended, rescinded, or

superseded…[,]" s*ee* Fiscal Responsibility Act § 208(e), that provision does not amend the "date

certain" expiration date for those orders.  On January 31, 2017, the 2016 Executive Orders issued

by the former Governor therefore expired by their terms.

60.     Notwithstanding this fact, HTA and its Executive Director have not resumed

depositing the Toll Revenues.  On April 30, 2017, Governor Rosselló issued an executive order

extending the Fiscal Responsibility Act's "Emergency Period" for an additional three months.

*See* Administrative Bulletin No. EO-2017-031 (the "April 2017 Executive Order," and together

with the 2016 Executive Orders, the "Executive Orders").[13]  The extension ostensibly allows

Governor Rosselló to continue issuing executive orders under the auspices of the Fiscal

Responsibility Act through August 1, 2017.  Nonetheless, the Governor has refrained from

issuing new executive orders regarding the Toll Revenues.  And while the April 2017 Executive

Order paraphrases Section 208(e) of the Fiscal Responsibility Act in providing that executive

orders issued under the former Moratorium Act "shall continue in force and with full force until

amended, terminated, or replaced[,]" the fact remains that the 2016 Executive Orders already

terminated on January 31, 2017 by their own terms.

## VII.    The Oversight Board Certified the HTA Fiscal Plan

61.    On April 28, 2017, the Oversight Board approved and certified HTA's fiscal plan

after making several modifications to it.  *See* Oversight Board Resolutions, at 4.  On May 3,

2017, the Oversight posted to its website the HTA Fiscal Plan incorporating those modifications.

62.    In marked contrast to Defendants' representations that the future Toll Revenues

will be sufficient to pay Plaintiff's Bonds, the HTA Fiscal Plan contends that HTA "has

insufficient cash flows to service its debt."  *See* HTA Fiscal Plan, at 32.  This is despite the

plan's forecast that HTA can increase revenues and reduce operating expenses through several

to-be-implemented measures.  As reflected in the table below, the HTA Fiscal Plan projects

significant negative cash flows available for debt service through 2025, and only $800,000 in

cash available for debt service in 2026, which results in a cumulative shortfall of approximately

$487.3 million over the 10-year projection period.

---

[13] A copy of the April 2017 Executive Order is attached hereto as **Exhibit I**.

| Cash flow available for debt service ($ in millions) | | | | | | | | | | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 5 Yr | 10 Yr |
| Total Revenues After Federal Fund Transfers[1] | $851.0 | $916.9 | $982.6 | $1,049.3 | $781.8 | $777.3 | $773.9 | $771.3 | $769.7 | $770.0 | $4,581.5 | $8,443.6 |
| Clawback to Central Government | ($531.0) | ($456.6) | ($454.8) | ($456.1) | ($458.1) | ($453.1) | ($448.1) | ($442.9) | ($437.9) | ($433.9) | ($2,356.5) | ($4,572.5) |
| Revenues net of Clawback | $320.0 | $460.3 | $527.8 | $593.2 | $323.7 | $324.2 | $325.8 | $328.3 | $331.8 | $336.1 | $2,224.9 | $3,871.1 |
| Total expenses | ($445.5) | ($585.5) | ($638.0) | ($702.5) | ($433.7) | ($433.7) | ($433.8) | ($433.9) | ($434.0) | ($434.0) | ($2,805.3) | ($4,974.8) |
| 1 Cash Flow available for Debt Service (pre-measures) | ($125.5) | ($125.3) | ($110.2) | ($109.3) | ($110.0) | ($109.5) | ($108.0) | ($105.6) | ($102.2) | ($97.9) | ($580.4) | ($1,103.6) |
| Total Measures | $0.0 | $22.9 | $34.6 | $51.9 | $66.7 | $76.6 | $83.2 | $88.3 | $93.4 | $98.7 | $176.1 | $616.3 |
| 2 Cash Flow available for Debt Service (post-measures) | ($125.5) | ($102.4) | ($75.7) | ($57.4) | ($43.3) | ($32.9) | ($24.9) | ($17.3) | ($8.8) | $0.8 | ($404.3) | ($487.3) |

*See* HTA Fiscal Plan, at 32.

63.     The HTA Fiscal Plan states the intention of HTA and its Executive Director to avoid payment on the Bonds, stating that Bondholders will "cease to receive money for debt repayment by July 2017, when the reserve funds that have been used until now run out…."  *See* HTA Fiscal Plan, at 20.  As noted, Plaintiff submits that the HTA Fiscal Plan is fatally flawed because it does not comply with PROMESA.  Regardless of the HTA Fiscal Plan, Plaintiff seeks relief in the form of requiring the proper and lawful use of Plaintiff's collateral to pay its Bonds.

**VIII.   Public Dissemination of Commonwealth Restructuring Proposal**

64.     On the evening of April 28, 2017, the Commonwealth publicly disclosed its proposal for a voluntary restructuring under Title VI of PROMESA (the "Restructuring Proposal"), which had apparently been delivered to other creditor groups beforehand, but not to Plaintiff.  A copy of the Commonwealth's Restructuring Proposal is attached hereto as **Exhibit J**.

65.     The Restructuring Proposal offers holders of HTA debt approximately $1.223 billion principal amount in new "Junior Cash Flow Bonds" to satisfy a pool of approximately $4.2 billion in existing claims—representing a "haircut" of over 70% in full satisfaction of not only the Commonwealth's "claw back" of the pledged Tax Revenues, but also the diversion of the Toll Revenues at the direction of HTA and its Executive Director.  Despite the fact that the 1968 and 1998 Bonds are secured by and payable from different collateral packages, the treatment offered by the Restructuring Proposal makes no distinction between these Bonds.

66.     Per a waterfall payment protocol outlined in the Restructuring Proposal, the
Junior Cash Flow Bonds would be heavily subordinated to the Commonwealth's other debt.  In
particular, the Junior Cash Flow Bonds would be subordinated not only to the payment of debt
service on approximately $16.75 billion initial principal amount of new "Senior Bonds" offered
to holders of the Commonwealth's existing "general obligation" and COFINA bonds, as well as
debt service on future issuances of general obligation debt and the Commonwealth's expenses,
but would also be partially subordinated to payment of debt service on $8 billion principal
amount of new "Senior Cash Flow Bonds."  *See* Restructuring Proposal, at 3.

67.     The priority of the Junior Cash Flow Bonds in the Commonwealth's proposed
capital structure is particularly important because "[a]ny remaining [Cash Flow] Bond balances
[will be] automatically forgiven on the 40 year anniversary of issuance."  *See* Restructuring
Proposal, at 6.  Thus, unless the Commonwealth significantly outperforms the projections in its
Commonwealth Fiscal Plan, the Junior Cash Flow Bonds would almost certainly not be paid in
full before being cancelled at the end of their 40-year lifetime.

## IX.    Enactment of the Fiscal Plan Act

68.     On April 29, 2017, the Commonwealth enacted the Fiscal Plan Act, which
attempts to effectuate the Commonwealth Fiscal Plan.  Among other things, the Commonwealth
Fiscal Plan, in turn, prioritizes the Commonwealth's general expenses over the payment of debt
service, disregarding the 1968 Bondholders' lien on the Toll Revenues and the priority of the
Bonds.  In implementing this scheme, Article 4.01 of the Fiscal Plan Act allows the
Commonwealth to take "surplus" revenues from its public corporations and their bondholders,
stating:

> Article 4.01.- Transfer of Surplus
>
> Public corporations, agencies and instrumentalities of the Government of Puerto Rico are hereby directed to transfer to the Department of the Treasury the surplus of the income produced. These funds will be considered as available resources of the State and deposited by the Department of the Treasury in the General Fund of the Government of Puerto Rico to meet the liquidity requirements set out in the Fiscal Plan adopted under the provisions of *"Puerto Rico Oversight, Management and Economic Stability Act of 2016"* Public Law 114-187, also known as PROMESA.

Fiscal Plan Act, art. 4.01.

69.     Article 4.02 of the Fiscal Plan Act, in turn, establishes a committee comprised of Commonwealth officials, and purportedly gives them discretion to decide the extent to which bondholder collateral will be taken as "surplus" revenues.  In particular, Article 4.02 states:

> Article 4.02.-Committee
>
> The amount of funds that each of the corporations and instrumentalities will provide will be determined by a committee composed of the [AAFAF Director], the [Treasurer] and the [OMB Director], who may establish the necessary tariffs to comply with the provisions of the Fiscal Plan approved for the Government of Puerto Rico and the one which will rule its corporations. This committee will ensure that the transfer of funds as provided in Article 4.01 of this Act do not affect the services provided by public corporations and instrumentalities, and only consist of the available surplus after the operating expenses and obligations of these entities have been covered in accordance with the budgeted expenses approved by the Office of Management and Budget for each fiscal year….

Fiscal Plan Act, art. 4.02.

70.     Articles 4.01 and 4.02 of the Fiscal Plan Act make no provision for the payment of instrumentality debt such as the HTA Bonds.  Further, Article 4.02 defines the revenues that the Commonwealth may expropriate as the surplus left after the payment of all "operating expenses and obligations" of the relevant instrumentality that have been budgeted by the Office of Management and Budget for that fiscal year.  In this way, the Fiscal Plan Act turns the 1968

Bondholders' "gross" lien on its head, essentially providing that operating expenses and other budgeted obligations of HTA have first priority status over all of its other obligations, evidently including the Bonds.  Finally, Article 4.01 provides that "surplus" pledged revenues generated by the government instrumentality itself (*e.g.*, the Toll Revenues) (as distinct from revenues assigned by the Commonwealth to the instrumentality as "special funds") will become "available resources" of the Commonwealth.  The Toll Revenues, however, are not "available resources" under the Puerto Rico Constitution, nor have they ever been validly subject to a constitutional "clawback."  Thus, viewed together, the Commonwealth Fiscal Plan and Fiscal Plan Act substantially impair the lien and other property rights under Plaintiff's Bonds.[14]

## X.   Expiration of the Interim Stay; Plaintiff Files an Action Against HTA and its Executive Director

71.     As noted, the interim stay provided for under Section 405 of PROMESA expired by its terms on May 1, 2017.  *See* 48 U.S.C. § 2194(d).  Shortly thereafter, on May 9, 2017, Plaintiff filed an action—captioned *Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority*, 3:17-cv-01612-FAB (D.P.R.)—in the District Court for the District of Puerto Rico against HTA and its Executive Director for declaratory and injunctive relief in

---

[14] In addition, the Fiscal Plan Act amends Act No. 230 of July 23, 1974—known as the Government Accounting Act of Puerto Rico"—to, among other things, redirect monies held in various "special funds" at the Commonwealth treasury by requiring that those monies be deposited into the "State Treasury General Fund."   *See* Fiscal Plan Act, ch. 6.  Once commingled in the general fund, the Fiscal Plan Act provides that the misappropriated funds "will be used for those purposes for which they were assigned by Law in accordance with the Budget recommended by the Office of Management and Budget **and with the [Commonwealth] Fiscal Plan**…." *Id.* (emphasis added).  Moreover, "if there is any inconsistency between the law and the use of funds with the [Commonwealth] Fiscal Plan, the purpose provided in the Fiscal Plan…shall prevail."  *Id.*

Under Puerto Rico law, the proceeds of the Tax Revenues pledged to payment of Plaintiff's Bonds are required to be held in "special funds" at the Commonwealth treasury until transferred to HTA for eventual payment of the 1968 Bonds.  As noted, while Plaintiff does not seek relief with respect to the Tax Revenues at this time, it reserves its rights to ensure the proper transfer and use of this additional collateral.

connection with Plaintiff's Bonds.  In that action, Plaintiff filed a motion for a temporary

restraining order and a preliminary injunction to require HTA and its Executive Director to

resume depositing the Toll Revenues with the Fiscal Agent.

72.     Judge Besosa did not schedule a hearing in the prior action.  Instead, the prior

action remained pending without any activity until May 22, 2017, when the Oversight Board

filed a statement claiming the case was stayed in light of HTA's Title III filing.  *See id.* at [Dkt.

No. 15].  Judge Besosa entered an order the very next day staying the case until further court

order, without providing Plaintiff an opportunity to first respond.  *See id.* at [Dkt. No. 16].

**XI.     The Commonwealth and HTA File Petitions Under Title III of PROMESA**

73.     On May 3, 2017, the Commonwealth and COFINA filed petitions for relief under

Title III of PROMESA in this Court.  As noted, on May 21, 2017, HTA filed its own Title III

petition in this Court.

74.     These petitions form part of a larger effort by the Commonwealth and several of

its instrumentalities to restructure their debts through one or more plans of adjustment, which

ultimately will be subject to this Court's approval.  To date, and since May 2016, the Toll

Revenues have been diverted continuously from the collateral account maintained for the holders

of the 1968 Bonds in violation of the Resolutions and applicable law.

**SECTION 922(d) OF THE BANKRUPTCY CODE REQUIRES
HTA AND ITS EXECUTIVE DIRECTOR TO DEPOSIT THE
TOLL REVENUES WITH THE FISCAL AGENT**

75.     Section 922(d) of the Bankruptcy Code provides that, notwithstanding the

bankruptcy stays applicable in a Title III case, "a petition filed under this chapter does not

operate as a stay of application of pledged special revenues in a manner consistent with section

928 of this title to payment of indebtedness secured by such revenues."[15]  That section is part of

a set of amendments to the Bankruptcy Code intended to protect a bondholder's lien on "pledged

special revenues" in the event the debtor becomes bankrupt, and mandates that the debtor turn

over those revenues to the bondholder during the bankruptcy case.

76.     In this case, that directive applies to HTA and its Executive Director because the

Toll Revenues securing the payment of Plaintiff's Bonds undoubtedly qualify as "pledged

special revenues" under the statute.  Section 902(2) of the Bankruptcy Code defines "special

revenues" as **any** of the following:

> (A) receipts derived from the ownership, operation, or disposition of projects or
> systems of the debtor that are primarily used or intended to be used primarily to
> provide transportation, utility, or other services, including the proceeds of
> borrowings to finance the projects or systems;
>
> (B) special excise taxes imposed on particular activities or transactions;
>
> (C) incremental tax receipts from the benefited area in the case of tax-increment
> financing;
>
> (D) other revenues or receipts derived from particular functions of the debtor,
> whether or not the debtor has other functions; **or**
>
> (E) taxes specifically levied to finance one or more projects or systems, excluding
> receipts from general property, sales, or income taxes (other than tax-increment
> financing) levied to finance the general purposes of the debtor[.]

11 U.S.C. § 902(2) (emphasis added).

77.     The Toll Revenues fit within clause (A)'s definition of "special revenues" as

"receipts derived from the ownership [or] operation of projects or systems of the debtor that are

primarily used or intended to be used primarily to provide transportation, utility, or other

services…."  11 U.S.C. § 902(2)(A).  That is because the Toll Revenues are derived from HTA's

---

[15] As noted, Section 922's reference to Section 927 is a scrivener's error, and should instead be read as a
cross-reference to Section 928 of the Bankruptcy Code.

operation of several highways and roads, which clearly constitute a "project or system of the debtor" that is primarily used for "transportation," among other "services." Likewise, the Toll Revenues qualify under clause (D) as "other revenues or receipts derived from particular functions of the debtor" (*i.e.*, the collection of Toll Revenues by HTA), "whether or not the debtor has other functions…." *See* 11 U.S.C. § 902(2)(D).

### SECTIONS 928(b) AND 552 OF THE BANKRUPTCY CODE DO NOT APPLY TO THE 1968 BONDHOLDERS' LIEN ON THE TOLL REVENUES

78. Although Section 552 of the Bankruptcy Code in some instances limits the applicability of lien rights, Section 552 does not apply to Plaintiff's Bonds, as the application of that provision is limited to "lien[s] resulting from any security agreement…[,]" *see* 11 U.S.C. § 552(a). In this matter, Plaintiff's lien rights arise by statute under the Enabling Act and the binding municipal resolution of HTA governing Plaintiff's Bonds—the 1968 Resolution. Further, Section 552 does not apply because Plaintiff's lien rights predate the enactment of PROMESA and the application of Section 552 to Plaintiff's lien rights, which were not previously subject to Section 552, would constitute a retroactive destruction of Plaintiff's rights in violation of the U.S. Constitution. In any event, even if Section 552 would otherwise apply, it is inapplicable in this case under Section 928(a) because the collateral in question here constitutes "special revenues." *See* 11 U.S.C. § 928(a).

79. Section 922(d) of the Bankruptcy Code further provides that the application of "pledged special revenues" must be done in a manner consistent with Section 928 of the Bankruptcy Code. *See* 11 U.S.C. § 922(d). While Section 928(b) provides that certain liens on "special revenues… derived from a project or system shall be subject to the necessary operating expenses of such project or system…." (*see* 11 U.S.C. § 928(b)), that provision also does not apply here.

34

80.     Whereas Section 922(d) applies broadly to "pledged special revenues," *see* 11

U.S.C. § 922(d)—meaning it reaches liens of any type—the application of Section 928(b) is

limited to liens "resulting from any security agreement entered into by the debtor before the

commencement of the case," *see* 11 U.S.C. § 928(b).   In this instance, the 1968 Bondholders'

lien on the Toll Revenues is unaffected by Section 928(b) because that lien does not result from a

security agreement within the meaning of the provision.   Instead, the lien results from the

Enabling Act that created HTA and the binding 1968 Resolution governing the Bonds, which

makes that lien a "statutory lien" within the meaning of Section 101(53) of the Bankruptcy Code.

*See* 11 U.S.C. § 105(53).   That section makes clear that "statutory liens" are distinct from

"security interests" created under a "security agreement," explicitly providing that a statutory

lien "does not include [a] security interest or judicial lien…."   *See* 11 U.S.C. § 101(53).

81.     Further, Section 928(b) does not apply because its application in this matter

would be unconstitutional under the Fifth Amendment.   As noted, the 1968 Bondholders are the

beneficiaries of a "gross" lien on the Toll Revenues.   In accordance with the terms of that lien,

HTA must *first* deposit sufficient funds into the 1968 Bondholders' collateral account to meet

the debt service and reserve requirements under the Resolutions *before* it can spend the funds

elsewhere.   Expropriating the 1968 Bondholders' lien to pay the "necessary operating expenses"

of HTA would effectively convert that lien from a "gross" lien into a "net" lien, and thereby

drastically change the nature of the security.   That would result in a taking of Plaintiff's property

without just compensation, and is thus prohibited under the U.S. Constitution, because the lien

was already in place before the relevant legislation was enacted.   More specifically, the 1968

Bondholders' lien was granted before the enactment of PROMESA and Puerto Rico was

ineligible for Chapter 9 relief during the relevant period before PROMESA was enacted.

Consequently, the application of Section 928(b) would violate the Fifth Amendment by retroactively defeating otherwise valid lien rights.

82.     Accordingly, Section 922 of the Bankruptcy Code requires HTA and its Executive Director to deposit the Toll Revenues in the manner provided under the 1968 Resolution, without any adjustment for HTA's expenses.  Alternatively, to the extent the Court finds that Section 928(b) applies and is not unconstitutional (which would be in error), the 1968 Bondholders' lien on the Toll Revenues can only be subordinated to the expenses necessary to preserve the "project or system" that generates the specific collateral securing the Bonds—*i.e.*, the toll roads generating the Toll Revenues.[16]

## PLAINTIFF LACKS ADEQUATE PROTECTION

83.     Plaintiff lacks "adequate protection" of its interest in the Toll Revenues and other pledged funds—in which Plaintiff is the beneficiary of a valid, enforceable, first-priority lien—as a result of the continued diversion of those revenues.

84.     Section 362(d) of the Bankruptcy Code provides that, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—(1) for cause, including the lack of adequate protection of an interest in property of such party in interest…."  *See* 11 U.S.C. § 362(d).   The party opposing such relief has the burden of proof on all issues other than "the debtor's equity in property…."  *See* 11 U.S.C. § 362(g).

---

[16] HTA projects that the expenses for toll highway maintenance and administration will range from approximately $33.3 million to $34.7 million on an annual basis for the next 10 years.  *See* HTA Fiscal Plan, at 22.  The HTA Fiscal Plan, however, attempts to subordinate debt service to "total expenses," which on a yearly basis HTA projects will range from a staggering $433 million to $702.5 million during the same 10-year period.  *Id.*  Those figures include "STIP" capital improvements for extensions on highways that are subject to concession agreements, as well as operating expenses for Tren Urbano— neither of which generate the Toll Revenues.  *See id.* at 21-22.  Plaintiff reserves its right to challenge the foregoing assumptions.

Subsections (d) and (g) of Section 362 apply to requests for relief from the stay provided for

under Section 922(a) "the same as such subsections apply to a stay under Section 362(a) [of the

Bankruptcy Code]." *See* 11 U.S.C. § 922 (b).

85.     The Court may condition the continuation of the stays provided for under Sections

362 and 922 of the Bankruptcy Code on the debtor providing the secured creditor with adequate

protection of the creditor's property interest.  Section 361 of the Bankruptcy Code (incorporated

into Title III under Section 301 of PROMESA, 48 U.S.C. § 2161) states that the debtor may

provide adequate protection in one of three ways: (a) current cash payments to the secured

creditor to compensate for any decrease in the value of the creditor's collateral position; (b) a

replacement lien to substitute for what is being taken; or (c) other relief that will afford the

secured creditor the "indubitable equivalent" of what is being stripped away.  *See* 11 U.S.C. §

361.

86.     As noted, Plaintiff benefits from a "gross" lien on the Toll Revenues, as well as

certain other revenues pledged to payment of its Bonds.  The 1968 Resolution explicitly requires

HTA to deposit the pledged revenues on a monthly basis into a collateral account maintained

with a Fiscal Agent for the 1968 Bonds.  *See* 1968 Resolution § 401.  Instead of respecting these

provisions, HTA and its Executive Director have been taking the Bondholders' collateral and

purportedly spending the monies to pay for the Commonwealth's and HTA's operating expenses,

without making payment or provision for payment on Plaintiff's Bonds.  This has left the 1968

Bondholders' collateral account nearly depleted—and soon to be completely depleted—as most

of the funds that were on deposit before the diversion have already been used to make past

payments of principal and interest on the Bonds.  As a result, the monies remaining on deposit in

the 1968 Bondholders' collateral account will be insufficient to satisfy the entire payment of

principal and interest due on the 1968 Bonds in July 2017.

87.    It is clear from the HTA Fiscal Plan that HTA and its Executive Director intend to continue disregarding the 1968 Bondholders' "gross" lien on the Toll Revenues.  Among other things, the HTA Fiscal Plan indicates that HTA and its Executive Director no longer intend to pay the Toll Revenues to the Fiscal Agent, but instead intend to use those revenues first for all of HTA's operating expenses, including for the operation and maintenance of non-toll roads and other transportation systems such as Tren Urbano.  This has the effect of fundamentally altering the nature of Plaintiff's Bonds by, among other things, destroying Plaintiff's lien rights and rendering Plaintiff effectively an unsecured creditor.

88.    There is only a finite supply of Toll Revenues that can be collected during the life of the toll roads.  The diversion of the Toll Revenues to date has depleted the 1968 Bondholders' "equity cushion" in their collateral to the point that it is not sufficient to protect their interests and to ensure payment in full on the 1968 Bonds.  Every additional dollar of Toll Revenues diverted, therefore, increases the likelihood that there will not be sufficient funds to pay Plaintiff's Bonds in full.  To the extent the diversion continues, Plaintiff will not receive full payment on its Bonds, and will certainly receive far less than if Plaintiff's collateral were used to pay the Bonds.  Consequently, Plaintiff lacks "adequate protection" of its interest in the collateral securing the payment of its Bonds.

**THE EXECUTIVE ORDERS, SECTION 208(e) OF THE
FISCAL RESPONSIBILITY ACT, AND THE FISCAL PLAN
IMPLEMENTATION ARE PREEMPTED BY THE "SPECIAL
REVENUE" PROTECTIONS OF THE BANKRUPTCY CODE**

89.     The 2016 Executive Orders issued by former Governor García Padilla have

expired and are no longer in effect.  However, insofar as Section 208(e) of the Fiscal

Responsibility Act can be read as an extension of the "date certain" termination date of the 2016

Executive Orders, Section 208(e) and the Executive Orders, whether viewed separately or taken

together, are preempted by the "special revenue" protections of the Bankruptcy Code—in

particular, Section 922(d).  The Commonwealth Fiscal Plan, as implemented by the Fiscal Plan

Act, is similarly preempted under the Bankruptcy Code.

90.     The Supremacy Clause of the United States Constitution provides that federal law

"shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any

Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art.

VI, cl. 2.  Pursuant to this Clause, Congress has the power to preempt state law.

91.     Section 922(d) of the Bankruptcy Code mandates that the debtor turn over

"pledged special revenues" during the bankruptcy case for application to the secured creditor's

claim.  *See* 11 U.S.C. § 922(d).  As noted, that directive applies squarely to HTA and its

Executive Director in this matter because the Toll Revenues undoubtedly qualify as "pledged

special revenues" under the statute.

92.     Insofar as they remain in effect under Section 208(e) of the Fiscal Responsibility

Act, the Executive Orders are wholly at odds, and directly in conflict, with the specific mandate

under Section 922(d) of the Bankruptcy Code.  Among other things, the Executive Orders

purportedly authorize HTA and its Executive Director to divert the Toll Revenues away from the

1968 Bondholders' collateral account, instead of depositing those pledged special revenues with

39

the Fiscal Agent for application to Plaintiff's Bonds.  The Fiscal Plan Implementation similarly

authorizes the unlawful diversion of the Toll Revenues in violation of the Bankruptcy Code's

"special revenue" protections.  There is no way to reconcile the Executive Orders and the Fiscal

Plan Implementation, on the one hand, with the Bankruptcy Code's "special revenue"

protections, on the other hand.  Accordingly, the Executive Orders, Section 208(e) of the Fiscal

Responsibility Act, and Fiscal Plan Implementation are preempted and rendered void under the

Supremacy Clause.

## COUNT 1

(Request for Declaration That the Toll Revenues Qualify as
"Pledged Special Revenues" Under Section 922(d) of the
Bankruptcy Code and That the Bankruptcy Stays Do Not Apply)

93.     Plaintiff incorporates by reference each of the preceding paragraphs.

94.     Plaintiff seeks a declaration that the Toll Revenues pledged to secure the payment

of the 1968 Bonds qualify as "pledged special revenues" within the meaning of Section 922(d) of

the Bankruptcy Code, and that therefore this matter is not subject to any stay.

95.     As noted, the Toll Revenues pledged to secure the payment of Plaintiff's Bonds

are "pledged special revenues" within the meaning of Section 922(d) of the Bankruptcy Code.

As a result, the stays provided for under Sections 362 and 922 of the Bankruptcy Code do not

apply to Plaintiff's efforts to prevent Defendants (or any other party) from diverting the Toll

Revenues, nor do the stays prevent Plaintiff from otherwise enforcing its lien and payment rights

under the Resolutions and applicable law.

96.     A declaratory judgment is necessary to resolve the controversy between the

parties with respect to these issues and claims.

## COUNT 2

(Application for Adequate Protection or, Alternatively, to Lift the Stay for Cause)

97. Plaintiff incorporates by reference each of the preceding paragraphs.

98. To the extent the stays provided for under Sections 362 and 922 of the Bankruptcy Code apply, Plaintiff seeks an order directing HTA to provide Plaintiff with adequate protection pursuant to Section 361 of the Bankruptcy Code in the form of HTA depositing a sufficient amount of Toll Revenues with the Fiscal Agent to ensure the timely payment of principal and interest on Plaintiff's Bonds, or failing that, lift the stays to allow Plaintiff to enforce rights and remedies with respect to its Bonds.

99. As noted, Plaintiff lacks "adequate protection" of its interest in the Toll Revenues and other pledged funds as a result of the diversion of those revenues at the direction of HTA and its Executive Director. Thus, unless HTA provides Plaintiff with adequate protection of its interest in the Toll Revenues and other pledged funds, there is "cause" to lift the stays provided for under Sections 362 and 922 of the Bankruptcy Code (to the extent applicable in this matter) to permit Plaintiff to exercise rights and remedies with respect to its Bonds.

## COUNT 3

(Request for Declaration That Section 922(d) of the Bankruptcy
Code Preempts the Fiscal Plan Implementation, the Executive
Orders, and Section 208(e) of the Fiscal Responsibility Act)

100. Plaintiff incorporates by reference each of the preceding paragraphs.

101. Plaintiff seeks a declaration that the "special revenue" protections of the Bankruptcy Code—in particular, Section 922(d)—preempt and render void the Fiscal Plan Implementation, the former Governor's unlawful Executive Orders (insofar as they have not expired), and Section 208(e) Fiscal Responsibility Act.

102.     Section 922(d) of the Bankruptcy Code affirmatively requires the debtor to turn over "pledged special revenues" during the bankruptcy case for application to the secured creditor's claim.  As noted, that directive applies squarely to HTA and its Executive Director in this matter because the Toll Revenues undoubtedly qualify as "pledged special revenues" under the statute.

103.     Insofar as they remain in effect under Section 208(e) of the Fiscal Responsibility Act, the Executive Orders are wholly at odds, and directly in conflict, with the specific mandate under Section 922(d) of the Bankruptcy Code.  Among other things, the Executive Orders purportedly authorize HTA and its Executive Director to divert the Toll Revenues away from the 1968 Bondholders' collateral account, instead of depositing those pledged special revenues with the Fiscal Agent for application to Plaintiff's Bonds.  The Fiscal Plan Implementation similarly authorizes the unlawful diversion of the Toll Revenues in violation of the Bankruptcy Code's "special revenue" protections.

104.     A declaratory judgment is necessary to resolve the controversy between the parties with respect to these issues and claims.

### COUNT 4

(Request for Declaration That Section 922(d) of the Bankruptcy Code Directs HTA and its Executive Director to Deposit the Toll Revenues With the Fiscal Agent)

105.     Plaintiff incorporates by reference each of the preceding paragraphs.

106.     Plaintiff seeks a declaration that Section 922(d) of the Bankruptcy Code requires and directs HTA and its Executive Director to deposit the Toll Revenues with the Fiscal Agent in the manner provided under the Resolutions.

107.     The 1968 Resolution explicitly requires HTA to deposit the Toll Revenues (and the other pledged funds) with the Fiscal Agent on a monthly basis.  Once deposited, the Toll

Revenues are allocated between the accounts within the 1968 Sinking Fund for the benefit of the

1968 Bondholders.  Purportedly acting under color of state law, HTA and its Executive Director

have diverted the Toll Revenues away from the Fiscal Agent and purportedly toward other ends,

thereby impairing the 1968 Bondholders' lien on those revenues.

108.    As noted, Section 922(d) of the Bankruptcy Code provides that, notwithstanding

the bankruptcy stays applicable in a Title III case, "a petition filed under this chapter does not

operate as a stay of application of pledged special revenues in a manner consistent with section

928 of this title to payment of indebtedness secured by such revenues."  11 U.S.C. § 922(d).[17]

That section is part of a set of amendments to the Bankruptcy Code intended to protect the

bondholders' lien on "special revenues" in the event the debtor goes bankrupt, and mandates that

the debtor turn over those revenues to the bondholders during the bankruptcy case.  In this

matter, that directive applies squarely to HTA and its Executive Director because the Toll

Revenues undoubtedly qualify as "pledged special revenues" under the statute.

109.    A declaratory judgment is necessary to resolve the controversy between the

parties with respect to these issues and claims.

### **COUNT 5**

(Request for Declaration That Neither Section 552 nor Section 928(b)
of the Bankruptcy Code Apply to Plaintiff's Bonds Because Those
Bonds Are Secured By a Statutory Lien on the Toll Revenues)

110.    Plaintiff incorporates by reference each of the preceding paragraphs.

111.    Plaintiff seeks a declaration that Sections 552 and 928(b) of the Bankruptcy Code

do not apply to Plaintiff's Bonds because those Bonds are secured by a statutory lien on the Toll

---

[17] As noted, while the text of Section 922 refers to Section 927, this is a scrivener's error.  The cross-reference was intended to be to Section 928 of the Bankruptcy Code.

Revenues.

112.     As noted, the application of Sections 552 and 928(b) is strictly limited to liens "resulting from any security agreement entered into by the debtor before the commencement of the case," *see* 11 U.S.C. §§ 552 & 928(b).   In this instance, the 1968 Bondholders' lien on the Toll Revenues is unaffected by these provisions because that lien does not result from a security agreement, and instead is a "statutory lien" within the meaning of Section 101(53) of the Bankruptcy Code, *see* 11 U.S.C. § 105(53).  In addition, the retroactive application of these provisions to destroy Plaintiff's lien rights would violate the Fifth Amendment to the U.S. Constitution.

113.     A declaratory judgment is necessary to resolve the controversy between the parties with respect to these issues and claims.

## COUNT 6

(Request for Declaration That, to the Extent Section 928(b) of the Bankruptcy Code Applies to Plaintiff's Bonds, the Expropriation of the 1968 Bondholders' Lien to Pay the "Necessary Operating Expenses" of HTA Would Violate the Takings Clause of the U.S. Constitution)

114.     Plaintiff incorporates by reference each of the preceding paragraphs.

115.     The 1968 Bondholders are the beneficiaries of a "gross" lien on the Toll Revenues.  In accordance with the terms of that lien, HTA must **first** deposit sufficient funds into the 1968 Bondholders' collateral account to meet the debt service and reserve requirements under the Resolutions **before** it can spend the funds elsewhere.  Expropriating the 1968 Bondholders' lien to pay the "necessary operating expenses" of HTA would effectively convert that lien from a "gross" lien into a "net" lien, and thereby drastically change the nature of the security.  This would result in a taking of Plaintiff's property without just compensation, and is thus prohibited under the Fifth Amendment of the U.S. Constitution, because the lien was

44

already in place before the relevant legislation was enacted.

116.     Alternatively, the 1968 Bondholders' lien on the Toll Revenues can only be
subordinated to the expenses necessary to preserve the "project or system" that generates the
specific collateral securing the Bonds—*i.e.*, the toll roads generating the Toll Revenues.

117.     A declaratory judgment is necessary to resolve the controversy between the
parties with respect to these issues and claims.

### COUNT 7

(Application to Lift the Bankruptcy Stays (to the Extent Applicable) to Allow
Plaintiff to Commence and Prosecute an Action Challenging on Constitutional
Grounds, Among Other Things, the Unlawful Diversion of the Toll Revenues)

118.     Plaintiff incorporates by reference each of the preceding paragraphs.

119.     Plaintiff seeks an order lifting the stays provided for under Sections 362 and 922
of the Bankruptcy Code (to the extent applicable) to allow Plaintiff to commence and prosecute
an action challenging on constitutional grounds, among other things, the unlawful diversion of
the Toll Revenues under color of the Commonwealth Fiscal Plan (as implemented by the Fiscal
Plan Act), the unlawful Executive Orders, and Section 208(e) of the Fiscal Responsibility Act.

120.     In particular, Plaintiff seeks to challenge the Fiscal Plan Implementation and the
Executive Orders on the grounds that they are preempted under the Supremacy Clause of the
U.S. Constitution and various conflicting federal laws in addition to Section 922(d) of the
Bankruptcy Code (the subject of Count 3 of this Verified Complaint)—in particular, Section
903(1) of the Bankruptcy Code, Sections 4, 303(1), 303(3), and 204(c)(3)(A) of PROMESA, and
the Bankruptcy Clause of the U.S. Constitution.  Plaintiff also seeks to challenge the unlawful
diversion of the Toll Revenues on the grounds that such diversion violates Plaintiff's rights
secured by the Takings and Contract Clauses of the U.S. Constitution.

121.    Section 362(d) of the Bankruptcy Code provides that, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—(1) for cause, including the lack of adequate protection of an interest in property of such party in interest…."  *See* 11 U.S.C. § 362(d).   The party opposing such relief has the burden of proof on all issues other than "the debtor's equity in property…."  *See* 11 U.S.C. § 362(g). Subsections (d) and (g) of Section 362 apply to requests for relief from the stay provided for under Section 922(a) "the same as such subsections apply to a stay under Section 362(a) [of the Bankruptcy Code]."  *See* 11 U.S.C. § 922 (b).

122.    In this matter, there is "cause" to lift the bankruptcy stays because Plaintiff lacks "adequate protection" of its interest in the Toll Revenues and the other pledged funds due to the diversion of those revenues.  Plaintiff should be permitted to challenge the actions that have resulted in the dissipation of its collateral.  Moreover, "cause" exists to lift the bankruptcy stays because the diversion of the Toll Revenues and other pledged funds violates Plaintiff's constitutional rights.

## **COUNT 8**

(Application for Injunctive Relief)

123.    Plaintiff incorporates by reference each of the preceding paragraphs.

124.    Plaintiff seeks a temporary restraining order and a preliminary injunction requiring HTA and its Executive Director to resume depositing the Toll Revenues with the Fiscal Agent in accordance with the 1968 Resolution.  Additionally, Plaintiff requests that the preliminary injunction against HTA and its Executive Director be converted into a permanent injunction as soon as Plaintiff prevails on the merits of its claims.  As corollary relief, Plaintiff

requests an order enjoining the Commonwealth, AAFAF, and their respective Officials from

interfering with the obligation of HTA and its Executive Director to deposit the Toll Revenues

with the Fiscal Agent.

125.    Plaintiff will likely succeed on the merits of its claims or, alternatively, has raised

sufficiently serious questions going to the merits.  Plaintiff does not have an adequate remedy at

law and will suffer irreparable harm if HTA and its Executive Director are not enjoined from

diverting the Toll Revenues.  Moreover, the issuance of a temporary restraining order pending

the hearing on the issuance of a preliminary injunction is warranted because the harm to Plaintiff

is immediate and increases in severity as more Toll Revenues are diverted.  That is because there

is only a finite supply of Toll Revenues that can be collected during the life of the toll roads, and

because the Bonds themselves are, as noted, "limited-recourse" obligations.  The diversion of the

Toll Revenues to date has depleted the 1968 Bondholders' "equity cushion" in their collateral to

the point that it is not sufficient to protect their interests and to ensure payment in full on the

Bonds.  Every additional dollar of Toll Revenues diverted, therefore, increases the likelihood that

there will not be sufficient funds to pay Plaintiff's Bonds in full.  To the extent the diversion

continues, Plaintiff will not receive full payment on its Bonds.

126.    Furthermore, the balance of hardships tip decidedly in Plaintiff's favor because

the injury that Plaintiff faces far outweighs any injury that would be sustained by Defendants as a

result of injunctive relief.  The harm to Plaintiff is well documented.  As explained, HTA and its

Executive Director have caused and continue to cause injury to Plaintiff by removing, impairing,

and damaging its interest in the Toll Revenues and other pledged funds.  On the other side of the

ledger, Defendants will not be unduly harmed if temporarily and preliminarily enjoined from

diverting the Toll Revenues because they have no right to those revenues.  Finally, the grant of

injunctive relief is in the public interest.

## COUNT 9

(Request for Judgment Ordering HTA and its Executive
Director to Resume Depositing the Toll Revenues)

127.    Plaintiff incorporates by reference each of the preceding paragraphs.

128.    Plaintiff seeks a judgment directing HTA and its Executive Director to resume

depositing the Toll Revenues with the Fiscal Agent, consistent with the declaratory judgment

requested in Count 4 of this Verified Complaint.    As corollary relief, Plaintiff requests a

determination that the Commonwealth, AAFAF, and their respective Officials are prohibited

from interfering with Plaintiff's execution of this judgment.

## COUNT 10

(Request for Judgment Ordering HTA and its Executive Director to Ensure
the Payment of Principal and Interest on Plaintiff's Bonds When Due)

129.    Plaintiff incorporates by reference each of the preceding paragraphs.

130.    Plaintiff seeks a judgment and appropriate mandamus relief directing HTA and its

Executive Director to deposit sufficient funds with the Fiscal Agent in advance of the semi-

annual debt service payment dates under the 1968 Resolution to ensure the timely payment of all

principal and interest on Plaintiff's Bonds.  As corollary relief, Plaintiff requests a determination

that the Commonwealth, AAFAF, and their respective Officials are prohibited from interfering

with Plaintiff's execution of that judgment.

131.    In the 1968 Resolution, HTA covenanted that "it will promptly pay the principal

of and the interest on every bond issued under the provisions of this Resolution at the places, on

the dates and in the manner provided herein…."  *See* 1968 Resolution § 601.  As a result of the

diversion of the Toll Revenues (and other pledged funds) at the direction of HTA and its

Executive Director, the monies remaining on deposit in the 1968 Bondholders' collateral account

will be insufficient to make the entire payment of principal and interest due on the 1968 Bonds in

July 2017.  As noted, HTA and its Executive Director have made clear that they do not intend to

deposit the pledged revenues into the Bondholders' collateral account or pay any debt service on

the Bonds for the foreseeable future, all in violation of HTA's obligations under the Resolutions.

To the extent the diversion continues, Plaintiff will not be paid in full on its Bonds.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

a.      determine and declare that the Toll Revenues serving as collateral for the payment

of Plaintiff's Bonds qualify as "pledged special revenues" under Section 922(d) of the

Bankruptcy Code;

b.      determine and declare that, pursuant to Section 922(d) of the Bankruptcy Code,

the stays provided for under Sections 362 and 922(a) of the Bankruptcy Code do not apply to

Plaintiff's efforts to prevent Defendants from diverting the Toll Revenues, or prevent Plaintiff

from otherwise enforcing rights and remedies with respect to its Bonds;

c.      to the extent the stays under Sections 362 and 922 apply, direct HTA to provide

Plaintiff with adequate protection pursuant to Section 361 of the Bankruptcy Code in the form of

HTA depositing a sufficient amount of Toll Revenues with the Fiscal Agent to ensure the timely

payment of principal and interest on Plaintiff's Bonds, or failing that, lift the bankruptcy stays to

allow Plaintiff to enforce its rights and remedies with respect to its Bonds;

d.      determine and declare that Section 922(d) of the Bankruptcy Code requires HTA

and its Executive Director to turn over the Toll Revenues to the Fiscal Agent in the manner

provided under the 1968 Resolution governing Plaintiff's Bonds;

e.    determine and declare that neither Section 552(a) nor Section 928(b) of the Bankruptcy Code apply to Plaintiff's Bonds because, among other things, those Bonds are secured by a statutory lien on the Toll Revenues;

f.    determine and declare that, to the extent Section 928(b) applies to Plaintiff's Bonds, the expropriation of the Bondholders' lien on the Toll Revenues to pay for the "necessary operating expenses" of HTA violates the Fifth Amendment to the U.S. Constitution, or, in the alternative, that the Bondholders' lien can only be subordinated to the expenses necessary to preserve the "project or system" that generates the specific collateral securing the Bonds—*i.e.*, the toll roads generating the Toll Revenues;

g.    determine and declare that the "special revenue" protections of the Bankruptcy Code—in particular, Section 922(d)—preempt the Fiscal Plan Implementation, the former Governor's unlawful Executive Orders (insofar as they have not expired), and Section 208(e) of the Fiscal Responsibility Act;

h.    lift the stays provided for under Sections 362 and 922 of the Bankruptcy Code (to the extent applicable) to allow Plaintiff to commence and prosecute an action challenging on constitutional grounds, among other things, the unlawful diversion of the Toll Revenues under color of the Commonwealth Fiscal Plan (as implemented by the Fiscal Plan Act), the unlawful Executive Orders, and Section 208(e) of the Fiscal Responsibility Act;

i.    enjoin HTA and its Executive Director from continuing to divert the Toll Revenues in violation of Section 922(d) of the Bankruptcy Code and other applicable law, and otherwise prohibit the Commonwealth, AAFAF, and their respective Officials from interfering with the obligation of HTA and its Executive Director to deposit the Toll Revenues with the Fiscal Agent;

j.      direct HTA and its Executive Director to resume depositing the Toll Revenues as required under Section 922(d) of the Bankruptcy Code and other applicable law, and otherwise prohibit the Commonwealth, AAFAF, and their respective Officials from interfering with Plaintiff's execution of that judgment;

k.      direct HTA and its Executive Director to deposit sufficient funds with the Fiscal Agent in advance of the semi-annual debt service payment dates under the 1968 Resolution to ensure the timely payment of all principal and interest on Plaintiff's Bonds, and otherwise prohibit the Commonwealth, AAFAF, and their respective Officials from interfering with Plaintiff's execution of that judgment;

l.      award Plaintiff costs and reasonable attorneys' fees; and

m.      grant such other and further relief to Plaintiff as the Court deems just and proper.

RESPECTFULLY SUBMITTED, in San Juan, Puerto Rico, this 31st day of May 2017.

**MONSERRATE SIMONET & GIERBOLINI, LLC**


 /s/ Dora L. Monserrate Peñagarícano
Dora L. Monserrate Peñagarícano
USDC-PR No. 212612
101 San Patricio Avenue
Maramar Plaza, Suite 1120
Guaynabo, Puerto Rico 00968
Phone:     (787) 620-5300
Fax:        (787) 620-5305


**DECHERT LLP**


Allan S. Brilliant (*pro hac vice* pending)
Robert J. Jossen (*pro hac vice* pending)
Andrew C. Harmeyer (*pro hac vice* pending)
1095 Avenue of the Americas
New York, New York 10036
Phone:     (212) 698-3500
Fax:        (202) 698-3599

        - and -

G. Eric Brunstad, Jr. (*pro hac vice* pending)
90 State House Square
Hartford, Connecticut 06103
Phone:     (860) 524-3999
Fax:        (860) 524-3930

## VERIFICATION

I, Gabriel Schwartz, hereby declare under penalty of perjury as follows:

1.       I am the Vice President of Peaje Investments LLC, and I am authorized to make this verification on its behalf.

2.       I have reviewed the foregoing Verified Complaint, and the allegations contained therein are true and correct to the best of my personal knowledge, information, and belief.

_____

Gabriel Schwartz

Dated: May _31_, 2017

23369739