# **EXHIBIT C**

## **(Fiscal Plan Act)**

**(Copy of Original Version – Spanish)**

ORIGINAL

## GOBIERNO DE PUERTO RICO

18va. Asamblea
Legislativa

1ra. Sesión
Ordinaria



# CÁMARA DE REPRESENTANTES

# P. DE LA C. 938

## INFORME POSITIVO

27 de abril de 2017

A LA CÁMARA DE REPRESENTANTES DE PUERTO RICO:

La Comisión de Hacienda, Presupuesto y de Supervisión, Administración y Estabilidad Económica de Puerto Rico, PROMESA, previo estudio y consideración del **Proyecto de la Cámara 938** tiene a bien recomendar a este Augusto Cuerpo la aprobación de esta medida, con las enmiendas del entirillado electrónico que se acompaña junto al presente.

## ALCANCE DE LA MEDIDA

El **P. de la C. 938** tiene el propósito de crear la "Ley de Cumplimiento con el Plan Fiscal", a los fines de tomar las medidas necesarias para atemperar el marco legal y jurídico existente para dar el más fiel cumplimiento al Plan Fiscal aprobado por la Junta de Supervisión Fiscal creada al amparo de la Ley Federal PROMESA[1]; Por tratarse de un

---

[1] Según el texto radicado, a continuación, el título completo del proyecto de ley:
Para crear la "Ley de Cumplimiento con el Plan Fiscal", a los fines de tomar las medidas necesarias para atemperar el marco legal y jurídico existente para dar el más fiel cumplimiento al Plan Fiscal aprobado por la Junta de Supervisión Fiscal creada al amparo de la Ley Federal PROMESA; establecer un sistema uniforme de beneficios marginales, incluyendo el bono de navidad y aportación al plan médico, para todos los funcionarios y empleados públicos de las agencias, instrumentalidades y corporaciones públicas del Gobierno de Puerto Rico, con excepción de la Universidad de Puerto Rico; enmendar la Sección 4.3 inciso 2 (a) (e) (m) del Artículo 4, la Sección 5.2 del Artículo 5, la Sección 6.4 inciso 1 (d) y 4 (1) , 6.8 inciso 2 (b) y 6.9 del Artículo 6, la Sección 7.2

asunto medular para el análisis de la medida procederemos a señalar el cuadro fiscal y económico que atraviesa Puerto Rico según expuesto por la exposición de motivos de la medida. Ésta indica lo siguiente, y citamos:

"Al presente, Puerto Rico atraviesa una crisis fiscal y social monumental sin precedentes históricos. Dicha crisis fue causada, en parte, porque faltaron controles sobre el gasto, medidas de desarrollo sustentable y sistemas de información gerencial que promuevan claridad y transparencia en la gestión gubernamental.

Según datos provistos por el Departamento del Tesoro federal, Puerto Rico sufre una contracción económica cumulativa de 14.6% en el Producto Estatal Bruto (PEB real) con una predicción de una contracción adicional de 3% para los próximos dos

inciso 3 y 5 del Artículo 7, derogar el artículo 9 y la sección 10.2 de la Ley 8 – 2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico"; reenumerar los actuales artículos 10 al 20 como artículos 9 al 19; derogar la Ley 89-2016, conocida como "Ley de Empleo Temporal en el Servicio Público"; enmendar los Artículos 3, 6 y 7 de la Ley 253-1995, según enmendada, conocida como la "Ley de Seguro de Responsabilidad Obligatorio para Vehículos de Motor"; a los fines de ampliar la cubierta del seguro de responsabilidad obligatorio de cuatro mil dólares ($4,000) a cuatro mil quinientos dólares ($4,500); facultar para la revisión de las primas antes del 30 de junio de 2017; permitir la declaración de un dividendo extraordinario a los miembros de la Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio, así como la aplicación de una contribución incentivada a dicho dividendo; disponer la distribución de los ingresos obtenidos a través de la contribución incentivada y el ajuste en la prima para que entre al Fondo General; autorizar al Gobierno a utilizar sobrantes de las corporaciones públicas como "fondos disponibles" para contribuir al Fondo General; autorizar a un Comité compuesto por los directivos de la Autoridad de Asesoría Financiera y Agencia Fiscal, la Oficina de Gerencia y Presupuesto y el Departamento de Hacienda a modificar las tarifas de las corporaciones públicas para cumplir con las métricas del Plan Fiscal; establecer las normas y principios que deben regir el proceso de venta de propiedades inmuebles del Gobierno de Puerto Rico; crear el Comité de Evaluación y Disposición de Propiedades Inmuebles; para declarar la política pública relacionada a la venta de propiedades inmuebles; enmendar los Artículos 3, 7 y 8 de la Ley Núm. 230 de 23 de julio de 1974, según enmendada y conocida como "Ley de Contabilidad del Gobierno de Puerto Rico"; a los fines de establecer que las asignaciones y los fondos sin año económico determinado, que hayan permanecido en los libros sin movimiento de desembolso u obligación por un (1) año se considerarán como que han cumplido sus propósitos, por lo que se cerrarán e ingresarán al Fondo General; disponer que aquellos fondos especiales creados por Ley para fines específicos se acreditarán al Fondo General del Tesoro Estatal y se depositarán en la cuenta bancaria corriente del Secretario de Hacienda para que éste tenga pleno dominio de los mismos; enmendar los Artículos 2 y 6 de la Ley 129-2005, según enmendada, conocida como "Ley de Reservas en las Compras del Gobierno del Estado Libre Asociado de Puerto Rico"; a fin de disponer que el aumento escalonado en la partida asignada a compras del presupuesto general para ser otorgado a microempresas, pequeñas y medianas empresas se dará si la situación fiscal del Gobierno así lo permite; añadir una nueva Sección 3020.05A y Sección 3020.15, y enmendar la Sección 3020.05, Sección 3020.13, Sección 3020.14, Sección 3030.14, Sección 3030.18, Sección 3050.01, Sección 4030.07, Sección 6042.08 y Sección 6042.15 de la Ley 1 - 2011, según enmendada, mejor conocida como "Código de Rentas Internas para un Nuevo Puerto Rico", a los fines de modificar el arbitrio aplicable a cigarrillos y productos derivados del tabaco para obtener mayor liquidez, atajar la crisis económica y fiscal que enfrenta Puerto Rico, y evitar que los sectores más vulnerables se afecten, así como para desalentar el uso de cigarrillos; enmendar el Artículo 2 de la Ley Núm. 91 de 21 de junio de 1966, según enmendada, para disponer que hasta el Año Fiscal 2020-2021 la aportación anual al Fondo de Emergencia será por la cantidad de diez millones de dólares ($10,000,000) y que a partir del Año Fiscal 2020-2021, dicha aportación será no menor de cero punto cinco por ciento (0.5%) del estimado de rentas netas sometido por el Departamento de Hacienda para la preparación del Presupuesto Recomendado con cargo al Fondo General y para otros fines relacionados."

años. Por años, el Gobierno de Puerto Rico ha operado con un déficit estructural el cual ha sido financiado con emisiones de bonos y préstamos al Banco Gubernamental de Fomento. Hace más de un año que el Gobierno de Puerto Rico carece de liquidez y se utilizaron los reintegros, pagos de los contratistas, el dinero de los pensionados y préstamos intra-gubernamentales para sustituir las fuentes de liquidez y gastar más dinero que los fondos disponibles. El Banco Gubernamental de Fomento incumplió sus obligaciones con los bonistas desde el 1 de mayo de 2016 y ya no cumple su rol de proveer liquidez ni tampoco contamos con acceso al mercado debido a las políticas de la administración pasada que le restó credibilidad al Gobierno de Puerto Rico. Los sistemas de retiro están insolventes.

Como un ejemplo de las políticas que nos trajeron aquí, puede observarse que desde el 2001 al 2008 ocurrió un aumento de 64% en los gastos de nómina y, luego de una reducción de 33% entre 2009 y 2012, hubo otro aumento sustancial en el cuatrienio 2013-2016. Para financiar ese gasto desmedido, entre 2000 y 2008 la deuda pública aumentó en 134%. Por otro lado, el cuatrienio pasado se implementaron medidas bajo la filosofía de "primero impago, luego impuestos y después recortes". Esta filosofía propició la continuación del gasto desmedido y el rechazo a políticas públicas que hubiesen permitido manejar eficientemente los asuntos fiscales del Gobierno de Puerto Rico. Esto, sin haberse concretado las acciones necesarias para lograr una mayor eficiencia operacional en el Gobierno, ni recortes al excesivo gasto gubernamental. Además, mientras se precipitaban los valores y la debacle económica, el Gobierno Central fue incapaz de generar la información financiera necesaria para comprender la profundidad del problema y presentar información certera ante el Congreso, y ante otras entidades con interés en el asunto. A raíz de todo lo antes expuesto, se materializaron varias degradaciones de las clasificaciones de la deuda del Gobierno de Puerto Rico y se ha desencadenado un impacto adverso a través de todos los sectores de la economía.

Esta crisis ha golpeado muy fuerte a las familias puertorriqueñas. Los sacrificios más severos han recaído sobre los más vulnerables en nuestra sociedad y ha provocado que miles de puertorriqueños abandonen la Isla buscando mejores oportunidades. La consecuente reducción poblacional se convierte en uno de los retos para encaminarnos hacia la recuperación.

### La Situación Colonial en Puerto Rico

La situación colonial ha afectado nuestra capacidad para afrontar y resolver esta crisis pues carecemos de los poderes soberanos que tiene un estado para regular sus asuntos locales bajo la Enmienda X de la Constitución de los Estados Unidos. "[P]ara el Tribunal Supremo federal, la adopción de la Constitución no representó un cambio en la base fundamental de las relaciones constitucionales entre Puerto Rico y Estados Unidos. El Tribunal Supremo siguió tratando a Puerto Rico como un

4

ente político sujeto a la cláusula territorial de la Constitución federal." Véase Pueblo
v. Sánchez Valle y otros, 192 D.P.R. 594, 631 (2015). "[N]unca hubo una cesión de
soberanía, lo que hubo fue una delegación de poderes." Id. a la pág. 635. "Esa
delegación de poder no constituye una renuncia irrevocable ni una terminación del
poder del Congreso. El Pueblo de Estados Unidos le otorgó al Congreso, por medio
de la Constitución, un poder amplio para administrar los territorios. Por esa razón,
el Congreso no puede renunciar de manera irrevocable a un poder que le fue
conferido por el Pueblo de Estados Unidos". Id. a la pág. 638.

Así pues, "el Congreso puede permitir que el Estado Libre Asociado
permanezca como sistema político de forma indefinida, o por el contrario, tiene la
autoridad constitucional para enmendar o revocar los poderes de administración
interna que ejerce el Gobierno de Puerto Rico. Dicho de otro modo, el sistema de
gobierno que rige internamente en Puerto Rico está sujeto por completo a la
voluntad política y la autoridad legal del Congreso." Id. a la pág. 641.

La triste realidad es que la situación colonial nos coloca en un estado de
indefensión tal que ni la ciudadanía americana que hemos atesorado desde 1917
está garantizada. El Congreso tiene la discreción legislativa para conceder
privilegios a los ciudanos nacidos en los territorios, incluyendo la ciudadanía
americana, pero ese derecho puede ser revocado en cualquier momento. De hecho,
el Gobierno Federal ha sostenido ante los tribunales que en los territorios no existe
un derecho a la ciudadanía sino que se trata, más bien, de una gracia legislativa del
Congreso. Véase, por ejemplo, Tuaua v. United States, 788 F.3d 300, (D.C. Cir. 2015).

En cuanto al asunto particular que nos ocupa, como ejemplo de las limitaciones
que la situación colonial nos impone, tenemos que señalar que los estados pueden
obtener las protecciones de la Ley federal de quiebras pero Puerto Rico fue excluido
de dichas protecciones y, por no tener representación plena en el congreso, es poco
o nada lo que podemos hacer al respecto. Tampoco podemos legislar una quiebra
local pues la misma ley federal que no nos protege ocupa el campo y previene la
legislación local. Véase Puerto Rico v. Franklin Cal. Tax-Free Tr., 136 S. Ct. 1938
(2016) (declarando inconstitucional la "Ley para el Cumplimento con las Deudas y
para la Recuperación de las Corporaciones Públicas de Puerto Rico" Ley 71-2014
mejor conocida como la "Ley de Quiebra Criolla").

### El resultado directo de nuestra situación colonial: PROMESA

Las políticas del pasado, junto a nuestra indefensión colonial, llevaron al
Congreso de los Estados Unidos a promulgar la ley denominada *Puerto Rico
Oversight, Management, and Economic Stability Act*, conocida como PROMESA (por
sus siglas en inglés), Pub. L. 114-187, y delegó amplísimos poderes en una Junta de
Supervisión Fiscal (en adelante "Junta de Supervisión"). Nuevamente, por no tener
representación plena en el Congreso, dicha Ley se aprobó sin una verdadera

particpación de nuestro Pueblo. Conforme a PROMESA, las continuas acciones de planificación fiscal, las acciones presupuestarias, legislativas y ejecutivas de Puerto Rico, así como las reestructuraciones de deuda, consensuales o no, y la emisión, garantía, intercambio, modificación, recompra o redención de deuda están sujetas a supervisión.

En su Sección 4 PROMESA dispone claramente que sus disposiciones "prevalecerán sobre cualquier disposición específica o general de las leyes territoriales, estatales o reglamentos territoriales o estatales que sea incompatible con esta Ley." De esta manera, el Congreso de forma expresa hizo manifiesta su intención de que dicha Ley desplazaría cualquier legislación estatal que choque con PROMESA. Esto queda igualmente reconocido en la Sección 8 (2) que establece que el Gobierno de Puerto Rico no puede adoptar, implementar o hacer cumplir cualquier estatuto, resolución, política o regla que pueda menoscabar o anular los propósitos de PROMESA, según lo determine la Junta de Supervisión. Así pues, estamos imposibilitados de promulgar legislación que deje sin efecto a PROMESA o que menoscabe sus disposiciones y su alcance.

En esta coyuntura, precisa resaltar que bajo la décima enmienda, el Gobierno Federal, no puede imponerle a un estado lo que la ley federal PROMESA permite para los territorios. El Congreso le impuso una Junta a Washington DC que no es estado y que está bajo la jurisdicción directa del Congreso. La Junta de la ciudad de New York fue una creación de su propia legislatura estatal y no del Congreso. Detroit, que es una ciudad y no un estado, participó de un proceso voluntario de quiebra. En fin, no puede perderse de vista que la situación que atravesamos y la imposición de la Junta de Supervisión es otra de las consecuencias del colonialismo que ha limitado nuestro desarrollo por los pasados 119 años.

Lamentablemente, nuestra situación colonial y consustancial carencia de poderes políticos, exacerba la realidad de que nos han impuesto una Ley Federal en el Congreso que es suprema a toda legislación local, incluso nuestra Constitución, sin que tuviéramos la oportunidad de votar sobre la misma ni votar por el Presidente que la aprobó. Esto pone de manifiesto que para poder salir del atolladero económico en el que nos encontramos es imprescindible solucionar el problema del estatus político. Sin embargo, también es un hecho irrefutable que tenemos que trabajar dentro de los parámetros de PROMESA para iniciar la recuperación económica y fiscal de Puerto Rico.

El 30 de octubre de 2016, la Junta de Supervisión designó al Gobierno de Puerto Rico, al Sistema de Retiro de los Empleados del Gobierno, al Sistema de Retiro de la Judicatura, al Sistema de Retiro para Maestros, a la Universidad de Puerto Rico y 21 corporaciones públicas de Puerto Rico como "entidades cubiertas" sujetas a supervisión fiscal a tenor con PROMESA. La Sección 405(b) de PROMESA impone además una paralización temporera de los litigios y las reclamaciones contra Puerto

Rico y sus instrumentalidades sobre distintos asuntos, con la esperanza de que el Gobierno de Puerto Rico, a nombre propio y a nombre de sus instrumentalidades, entable negociaciones voluntarias con sus acreedores para reorganizar y transigir el repago de sus obligaciones de deuda y simultáneamente emprenda una reestructuración responsable del Gobierno de Puerto Rico y sus instrumentalidades que reajuste los servicios esenciales requeridos para la salud, seguridad y bienestar de los residentes de Puerto Rico con el repago puntual de sus obligaciones de deuda.

Luego de invertir millones de dólares en consultores especializados, la pasada administración presentó un plan fiscal deficiente que fue rechazado por la Junta de Supervisión de forma inmediata pues no resolvía los problemas fiscales provocados por la pasada administración.

Esta Ley, dividida en Capítulos, dispone diferentes medidas que esta Administración está tomando para cumplir con el Plan Fiscal impuesto conforme a las disposiciones de PROMESA. Los asuntos atendidos en esta Ley son germanos entre sí, toda vez que todos van dirigidos a dar cumplimiento al Plan Fiscal. Por tal razón, promulgamos esta Ley, que atiende varios temas dirigidos a cumplir con el Plan Fiscal.

### Un Nuevo Gobierno: Responsabilidad ante la Junta de Supervisión

Como resultado de todo lo anterior, cuando asumimos las riendas del Gobierno, nos encontramos con un déficit en caja de más de $7,600 millones según certificado por el Tesoro Federal y la Junta de Supervisión. Se trataba de un gobierno sin acceso a los mercados de capital, con un crédito de categoría chatarra, sin liquidez, sin transparencia en las finanzas públicas, con un gasto gubernamental inflado y con deudas de miles de millones de dólares. Además, el Gobernador enfrentaba la titánica tarea de recuperar la credibilidad ante el mercado y ante la Junta de Supervisión. Debemos garantizar un Gobierno donde los gastos respondan a la realidad de los ingresos.

Desde el 2 de enero hemos estado implementando un plan concertado para controlar el gasto gubernamental, reactivar nuestra economía y facilitar las condiciones para la creación de más y mejores empleos en el sector privado. Estamos demostrándole al mundo que Puerto Rico está abierto para hacer negocios en un ambiente de seguridad y estabilidad gubernamental.

Las medidas presentadas por el Gobernador y aprobadas por esta Asamblea Legislativa durante estos primeros tres (3) meses de mandato han cambiado el rumbo de Puerto Rico a uno de responsabilidad fiscal.

El pasado 28 de febrero de 2017, el Gobernador presentó un Plan Fiscal completo, abarcador, real y, a la misma vez, sensible a las necesidades de nuestro Pueblo y de los más vulnerables. Luego de semanas de incertidumbre, la razón y la sensatez prevalecieron. El 13 de marzo de 2017, la Junta de Supervisión aceptó y certificó nuestro Plan Fiscal acompañado de una serie de contingencias que garantizan que no habrá despidos de empleados públicos, sin afectar la jornada laboral, manteniendo el acceso a servicios de salud a nuestro Pueblo y protegiendo las pensiones de los más vulnerables. Este Plan Fiscal es la única alternativa para evitar el despido de empleados públicos, la eliminación del derecho a la salud y mantener la solvencia de nuestros sistemas de retiro manteniendo un gobierno operacional y que cumpla con los parámetros para evitar medidas más severas que son parte de las contingencias del Plan aprobadas por la Junta de Supervisión Fiscal como la eliminación total del bono de navidad a todos los empleados públicos y decretar una reducción de jornada laboral que haría inoperante al gobierno.

Las medidas del Plan Fiscal aprobadas están enmarcadas en cumplir con los objetivos fiscales; pero también en promover el desarrollo económico, en nuestra capacidad de restablecer la credibilidad; en que el cambio se traduzca no tan solo un mero recorte, si no en un beneficio a largo plazo, y, sobre todo, en velar que los sectores más vulnerables y los que trabajan duro, día a día, tengan una mejor calidad de vida.

La validación del Plan Fiscal representa un reconocimiento a la credibilidad del nuevo Gobierno. Demostramos que pasamos de los tiempos de la incoherencia e improvisación, a los tiempos de trabajar en equipo, y tener resultados por el bien de Puerto Rico. Pasamos del "me vale" y la falta de credibilidad; a tener un Plan Fiscal y de desarrollo socioeconómico que cumple con el objetivo de reducción de gasto, pero más importante que ello, que nos permita edificar una mejor sociedad.

Los cambios que estamos encaminando no serán fáciles y tomarán tiempo, pero también tendrán sus resultados en los primeros dos años. Bajo el Plan Fiscal certificado, lograremos balancear los ingresos con los egresos para el año fiscal 2019. Ahora nos compete ejecutar. Las contingencias que acompañan al Plan Fiscal le requieren al Gobierno cumplir. Debemos asegurar que tengamos el dinero líquido para no afectar el salario de los empleados públicos, la salud del Pueblo y los ingresos de los pensionados.

Esta Ley, se promulga para atemperar el marco legal y jurídico para poder cumplir con las exigencias que nos hiciera la Junta de Supervisión en el Plan Fiscal aprobado en virtud de la Ley Federal PROMESA. En atención a lo anterior, en virtud del poder de razón de Estado y de conformidad con el Artículo II, Secciones 18-19, y el Artículo VI, Secciones 7-8, de la Constitución de Puerto Rico, ante la existencia de una situación de urgencia económica y fiscal grave en Puerto Rico se hace necesaria la aprobación de la presente Ley para que el Estado pueda contar con

la liquidez suficiente para poder pagar la nómina de los empleados públicos y sufragar los servicios esenciales que ofrece a sus ciudadanos. Ejercemos este poder de razón de Estado, para tomar las medidas necesarias para dar cumplimiento al Plan Fiscal y colocar a Puerto Rico en el camino de la recuperación económica. Cumplir con este Plan constituye un interés apremiante del Estado para mantener sus operaciones y proteger a los más vulnerables.

Según definido por el Tribunal Supremo de Puerto Rico, el poder de razón de Estado es "aquel poder inherente al Estado que es utilizado por la Legislatura para prohibir o reglamentar ciertas actividades con el propósito de fomentar o proteger la paz pública, moral, salud y bienestar general de la comunidad, el cual puede delegarse a los municipios". Domínguez Castro v. E.L.A., 178, D.P.R. 1, 36 (2010).

Nuestro más Alto Foro recientemente dispuso que eran válidas las medidas tomadas para atender una emergencia que sean necesarias y razonables para adelantar el interés gubernamental importante. Véase, Trinidad v. E.L.A., 188 D.P.R. 828 (2013) y Domínguez Castro v. E.L.A., supra, págs. 88-89. De igual forma, el Tribunal Supremo reconoció que "la precariedad de la economía como una realidad que necesariamente pesa en la definición del ámbito de la acción gubernamental bajo el poder de razón de Estado" y que en el ejercicio de dicho poder, "la Legislatura goza de amplia facultad para aprobar reglamentación económica dirigida a promover el bienestar de la comunidad". Domínguez Castro v. E.L.A., supra, pág. 37. Por voz del Juez Asociado, señor Kolthoff Caraballo, el Tribunal llamó la atención a que tanto nuestra jurisdicción como el resto del mundo "vive momentos muy convulsos en el aspecto económico y financiero. Parecería que las economías de los países del mundo se encuentran entrelazadas y atadas al rabo de una chiringa que no consigue finalmente elevarse." Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 415 (2010) certiorari denegado, Domínguez Castro v. Puerto Rico, 131 S.Ct. 152 (2010). De ese modo, este Tribunal reconoció que debía ser consciente que existía una realidad que describió como "dura y antipática". Confrontado con tal escenario histórico, este Tribunal estimó que resultaba necesario aspirar a un interés altruista en el que se persiguió el "bienestar económico colectivo, a expensas del bienestar individual." Además, este Tribunal reiteró el reconocimiento en torno a una crisis económica en nuestra jurisdicción en el caso Herrero y otros v. E.L.A., 179 D.P.R. 277 (2010) y destacó, en el contexto de la provisión de un remedio que implicaba desembolso de fondos públicos a fin de restituir dinero a contribuyentes, que no estaba "ajeno al difícil estado de las finanzas públicas en nuestro país". Id. a la pág. 309.

El Tribunal Supremo validó la Ley 3-2013 sobre el Sistema de Retiro de los Empleados Públicos en el caso Trinidad Hernández v. E.L.A., supra, entendiendo que la Legislatura había ejercido el poder de razón de Estado para detener la insolvencia del Sistema de Retiro de Empleados Públicos. El Tribunal Supremo

razonó que "de la exposición de motivos... se desprende que las medidas adoptadas
son necesarias y razonables para atender de forma adecuada la crisis financiera que
atenta contra la solvencia actuarial de este sistema". Añadió que, "ello ciertamente
constituye un interés público importante pues, al garantizar la solvencia económica
del sistema, se beneficia a todos sus participantes y se atiende, en parte, la crisis
fiscal que enfrenta el País en protección del bienestar de todos los puertorriqueños".
Trinidad Hernández v. E.L.A., *supra*, pág. 837. Concluyó que la norma es
constitucional "porque, a pesar de que existe un menoscabo sustancial de las
obligaciones contractuales en controversia, las medidas implantadas son razonables
y necesarias para salvaguardar la solvencia actuarial del Sistema de Retiro, y no
existen medidas menos onerosas para lograr ese fin". Íd., pág. 839.

Del mismo modo, recientemente, en el caso Asociación de Maestros de Puerto
Rico v. Sistema de Retiro de Maestros de Puerto Rico, 190 D.P.R. 854 (2014), el
Tribunal Supremo pasó juicio sobre las medidas aprobadas mediante la Ley 160-
2013 para solventar la crisis del Sistema de Retiro de Maestros y determinó que la
ley no adelantaba el interés estatal importante requerido por nuestro ordenamiento
constitucional en casos de reformas de sistemas de retiro: garantizar la solvencia del
mismo sistema. Por ello, resolvió que la Ley 160-2013, en lo que respecta al
menoscabo de obligaciones contractuales, es irrazonable y, por lo tanto,
inconstitucional. Íd., pág. 12. En esa ocasión, el Tribunal fue enfático al destacar que
las medidas aprobadas serán constitucionales si son razonables y necesarias "para
adelantar su solvencia actuarial y no existen medidas menos onerosas para lograr
ese fin". Íd., pág. 8.

Usando como base el marco legal antes discutido, esta Asamblea Legislativa
entiende que las medidas que se toman en esta Ley, son necesarias y razonables
para atender de forma adecuada la crisis fiscal, económica y presupuestaria por la
que atraviesa Puerto Rico. Así mismo, se tratada de una medida exigida para lograr
implementar el Plan Fiscal certificado por la Junta de Supervisión de conformidad
con la Ley federal PROMESA. Dicho Plan establece ajustes de índole fiscal para
estabilizar las finanzas del Gobierno en tiempos que no existe acceso al mercado
financiero. De no implementar estas medidas, el bienestar social y económico de
Puerto Rico sufrirá daños irreparables por lo que implementar el Plan Fiscal
constituye un interés apremiante del Estado para velar por el bienestar del interés
público.

## Reestructuración Gubernamental

Por otro lado, el Plan para Puerto Rico que impulsa esta Administración y que
fue refrendado por el pueblo de Puerto Rico en las pasadas elecciones generales por
medio del ejercicio democrático del voto, propone implementar una nueva
estructura de gobierno que baje significativamente el gasto público y mejore

sustancialmente sus funciones. Para lograr esto, se requiere la evaluación concienzuda de los servicios que provee el gobierno, a fin de determinar cuáles pueden ser consolidados, delegados al sector privado o eliminados porque ya no son necesarios. Todo ello, sin que conlleve despidos de empleados públicos, sino la movilización de los mismos, acorde con la necesidad de servicios de nuestros ciudadanos.

Cónsono con lo anterior y, como parte de las primeras medidas tomadas por esta Administración para atajar la crisis fiscal mediante la reingeniería de la estructura gubernamental, se aprobó la Ley 8-2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico". Esta Ley, convierte al Gobierno en un Empleador Único para que así los funcionarios públicos pasen a ser empleados del Gobierno y no de sus diferentes entidades, permitiendo así la mejor utilización de los recursos humanos donde exista una necesidad apremiante mediante el mecanismo de movilidad, sin que el empleado tenga que renunciar al puesto que ocupa y comenzar de nuevo en otra instrumentalidad gubernamental. Mediante la movilidad, se pretende reforzar el entendimiento de lo que significa el equilibrio entre la fuerza laboral y la prestación de servicios públicos. De esta manera, obtenemos una distribución eficiente del recurso humano del Gobierno y creamos una estructura gubernamental ágil, basada en la evaluación continua de necesidades y ayudando a los servidores públicos a realizar los ajustes y adaptaciones requeridas por la actual crisis fiscal y los retos futuros.

Durante el pasado cuatrienio, se aprobó la Ley 89-2016, conocida como la "Ley de Empleo Temporal en el Servicio Público", bajo el supuesto de corregir la disparidad en el trato de los empleados con carácter temporal en el servicio público y forzar a las agencias a ser diligentes en la creación o solicitud de creación de puestos. También, se promulgó la misma bajo el razonamiento de que clasificar correctamente a los empleados ayudaría en la administración de los recursos humanos del servicio público y evitará la erogación de fondos innecesarios. Asimismo, mediante dicha Ley, se le concedió estatus de empleado regular a aquellos empleados transitorios que llevaban dos (2) años o más realizando funciones de necesidad permanente, sujeto a ciertos requisitos de elegibilidad.

No obstante, dicha Ley ha tenido el efecto de acrecentar la nómina gubernamental en momentos donde las finanzas públicas atraviesan una crisis fiscal sin precedentes. El reclutamiento de empleados temporales, fueran estos catalogados como: irregulares, transitorios o por contrato, no debe utilizarse como subterfugio para la posterior creación de puestos regulares de necesidad permanente sobrecargando así los fondos del Estado y sin medir la efectividad de esos recursos en la prestación de los servicios que merece el Pueblo.

11

Por lo cual, encaminar a Puerto Rico hacia la ruta correcta requiere un cambio de paradigma, como el que propone esta Administración a través del Modelo para la Transformación Socioeconómica de Puerto Rico, expuesto en el Plan para Puerto Rico. La misión es establecer un nuevo gobierno que facilite el desarrollo económico y cuya visión sea la de un gobierno basado en un modelo científico, donde la evidencia y los resultados importen y la colaboración ciudadana sea el eje principal de su validación. Para lograr esta meta el gobierno debe convertirse en un facilitador del desarrollo económico, implementando reformas reales y contundentes; la estructura gubernamental debe ser costo-efectiva, eficiente y transparente y; el servicio público debe estar fundamentado en la integridad, excelencia, responsabilidad y rendición de cuentas."

## TRASFONDO

Según está demostrado en la Exposición de Motivos antes reseñada, estamos en este momento en la administración pública puertorriqueña, luchando para salvar a nuestros empleados públicos, principalmente, **por la irresponsabilidad de la pasada administración**. El Gobierno anterior nunca entendió ni atendió el asunto fiscal; jamás controló el gasto público.

El ejemplo más concreto de la poca responsabilidad fiscal del pasado gobierno está en el gasto presupuestario: sus cuatro presupuestos promediaban alrededor de $10,632 millones, estos son alrededor de $1,000 millones más que el último que la administración del ex Gobernador, Honorable Luis G. Fortuño, les dejó en el 2012.

La pasada administración gubernamental, con su 'me vale', sus guerras internas, su patente inmovilismo en el tema del status político, y total falta de transparencia, logró el récord histórico de problemas de crédito, desmoronamiento de nuestras instituciones y falta de credibilidad global. Basta con recordar que el Senador (R-Utah) Orin Hatch, en la evaluación de la legislación que terminó aprobando el Congreso (PROMESA) tuvo que exigirle los estados financiaros auditados en una vista congresional, pues ni al Gobierno Federal le presentaban la información de manera correcta; la pasada administración destruyó la credibilidad del gobierno.

Esto nos trajo la Junta de Supervisión Fiscal, a la cual el partido político de la mayoría parlamentaria se opuso y se opone. No obstante, la realidad política puertorriqueña, a la

cual la pasada administración le huyó 'como el diablo a la Cruz' nos obliga a tener esta imposición colonial, y nos enfrenta a una coyuntura política incuestionable: tenemos que atender el asunto del status a la misma vez, y con la misma seriedad, con que atendemos la monumental deuda pública y la costumbre política puertorriqueña (anquilosada en la filosofía colonialista) a que nos había acostumbrado el Partido Popular de "tributa y gasta".

Pero esos tiempos se acabaron, desde ahora y para siempre en Puerto Rico.

## ANÁLISIS DE LA MEDIDA

Para examinar el impacto de la presente medida, solicitamos los comentarios de las agencias con el peritaje necesario sobre esta materia. Habiendo examinado los comentarios sometidos por dichas agencias entendemos que los mismos deben ser incluidos en el presente informe con el fin de establecer claramente lo que persigue la medida. Debe quedar claro que, teniendo presente la política pública administrativa de la Cámara de Representantes de Puerto Rico, abrimos dos procesos de vistas públicas para poder tomar el sentir de nuestra gente, del sector público y privado, con respecto a la aprobación de esta Ley.

Por lo tanto, Comisión de Hacienda, Presupuesto y PROMESA de la Cámara de Representantes tuvo la oportunidad de evaluar el P. de la C. 938, en vistas públicas celebradas los días 20 y 25 de abril de 2017.

En la primera vista se evaluaron los memoriales explicativos recibidos por parte del Banco Gubernamental de Fomento ("BGF"), la Oficina de Gerencia y Presupuesto ("OGP"), el Departamento de Hacienda y la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico ("AFFAF"), quienes respaldaron la aprobación de la medida. De igual forma, esta comisión recibió el memorial explicativo del Departamento de Justicia, quienes fueron excusados de comparecer a la vista.

En resumen, los memoriales explicativos de las agencias de la Rama Ejecutiva que comparecieron a la primera vista expusieron con datos empíricos, que la presente medida atiende la necesidad de cumplir con el Plan Fiscal del Gobierno, aprobado de forma unánime por la Junta de Supervisión Fiscal ("JSF") el 13 de marzo de 2017, esto a tenor

con lo dispuesto por la legislación federal *Puerto Rico Oversight, Management, and Economic Stability Act*, conocida como PROMESA (por sus siglas en inglés), Pub. L. 114-187. Destacan que con la aprobación de esta medida se contribuirá grandemente a dicho objetivo, permitiendo de esta forma encaminar la recuperación fiscal y económica de Puerto Rico, mientras se protegen los sectores más vulnerables. A su vez, esta medida abona de manera significativa a evitar la implementación de las medidas contingentes del Plan Fiscal Certificado, según propuestas por la JSF, las cuales implicarían reducción de jornada laboral, reducción del veinte (20) por ciento del sueldo de los empleados públicos, eliminación del bono de navidad, reducción del diez (10) por ciento a TODAS las pensiones, así como un impacto directo y nefasto sobre la protección que reciben sobre 700,000 beneficiarios del programa Mi Salud, entre otras.

Sobre el contenido específico de este proyecto de ley, expusieron su parecer y respaldo a cada una de las disposiciones contenidas en el mismo.

En primer lugar, discutieron lo relacionado al interés apremiante que existe en uniformar los beneficios marginales de los empleados y funcionarios públicos, sean parte del Gobierno Central, una Agencia o una Corporación Pública, según contemplado en el Capítulo 2 de la medida.[2] La aplicación de estas disposiciones de Ley relacionadas a los beneficios marginales tiene el resultado uniformar los beneficios marginales que reciben los empleados de las corporaciones públicas a los que reciben los empleados públicos del Gobierno Central, esto a su vez produce ahorros y facilita la movilidad bajo el Empleador Único[3].

Surge del Memorial Explicativo, que, según el texto radicado, la licencia de vacaciones se acumulará a razón de 1.25 días por mes de servicio, lo cual resulta ser igual a los 15 días de vacaciones que existen en el sector privado desde antes de la Reforma Laboral. A su vez, las licencias de enfermedad, maternidad, paternidad y lactancia se quedan tal y como aplican para el Gobierno Central al presente, extendiéndose en su aplicación

---

[2] Se excluye de la aplicación de estas disposiciones relacionadas a beneficios marginales a los empleados y funcionarios de la Universidad de Puerto Rico ("UPR") y los Municipios. Los Municipios quedan facultados para acogerse a sus disposiciones mediante Ordenanza Municipal.

[3] Véase Ley Núm. 8-2017.

uniforme a los demás empleados y funcionarios gubernamentales, incluyendo a aquellos que laboran en Corporaciones Públicas, sujeto a las excepciones antes expuestas. En cuanto a las licencias especiales, o sea aquellas que se rigen por leyes especiales se mantienen inalteradas y aplican de la misma forma en que han aplicado al presente en el Gobierno Central. La acumulación de licencias por vacaciones y enfermedad se realizarían del mismo modo en que hoy sucede en el Gobierno Central, entiéndase, hasta 60 y 90 días respectivamente. Al momento de una separación de empleo, el empleado tendrá derecho a la liquidación de los balances acumulados en cuanto a la licencia de vacaciones exclusivamente, tal y como ocurre al día de hoy en el sector privado.

Por otra parte, los días feriados se uniforman a los mismos que tienen actualmente los empleados del Gobierno Central, los cuales totalizan 15 anualmente. En cuanto a la aportación patronal al plan médico se establece que la AAFAF elaborará un plan para determinar la aportación patronal uniforme entre empleados del Gobierno Central y las Corporaciones Públicas. Sobre el particular, señalan en su memorial que existen aportaciones fluctuantes entre $100 y $800. Se destaca, además, que el bono de navidad será el único bono a concederse en el Gobierno Central y las Corporaciones Públicas por una cantidad de $600. Finalmente, se uniforma lo relacionado al tiempo extra, ajustándose a lo actualmente aplicable al Gobierno Central.

Queremos informar a este Augusto Cuerpo que estas disposiciones son enmendadas de manera considerable en el entirillado electrónico, según explicaremos más adelante.

En su análisis integral de las disposiciones de ley sobre los beneficios marginales, los deponentes exponen la gran incidencia que han tenido las Corporaciones Públicas en la deuda pública que hoy tiene sumido a Puerto Rico en la grave crisis fiscal y económica que conocemos. Datos muy reveladores, elaborados en el año 2016 por el Banco Gubernamental de Fomento y la Junta de Planificación de Puerto Rico, apuntan a que las Corporaciones Públicas son responsables por alrededor de un 72.9% de la deuda pública total de Puerto Rico. Se estima que la deuda de las Corporaciones Públicas se duplicó para el año fiscal 2016 con respecto a lo que era en el año fiscal 2004. Por otra parte, se señala que en las Corporaciones Públicas se gasta en beneficios marginales un promedio

de $10,840 por empleado, mientras que en el Gobierno Central se gasta un promedio de $2,523 por empleado.

Arguyen que ante el crítico cuadro económico y fiscal imperante en Puerto Rico, no se justifica de modo alguno la disparidad abismal existente en beneficios marginales entre el Gobierno Central y las Corporaciones Públicas, máxime cuando no realizar los mencionados ajustes, provocaría la necesidad de despedir empleados públicos, reducción de jornada laboral, reducción de hasta un veinte (20) porciento en el sueldo de los empleados, eliminación total del bono de navidad, entre otros males. Por otra parte, señalan el interés apremiante existente en la aprobación de estas disposiciones legales, las cuales permitirán reducir gastos del gobierno sin eliminar el Bono de Navidad, **sin despedir empleados públicos y sin reducción de jornada laboral**. Por último, representantes de AFFAF le informaron a esta Comisión en la reseñada vista pública que el equiparar los beneficios marginales entre los empleados públicos de las corporaciones públicas y los del Gobierno Central conllevara el ahorro de 130 millones de dólares.

La segunda medida señalada como necesaria para la implementación y cumplimiento con las métricas del Plan Fiscal Certificado son una serie de enmiendas a la Ley Núm. 253-1995, según enmendada, conocida como la "Ley de Seguro de Responsabilidad Obligatorio para Vehículos de Motor". Estas enmiendas autorizan el aumento en cubierta del seguro de responsabilidad obligatorio de $4,000 a $4,500, así como un cargo por utilización para que aquellos clientes que hagan más reclamaciones, reciban un ajuste en su prima. A su vez, dispone para que el sobrante de prima adicional se transfiera al Fondo General. *Véase* Capítulo 3 del **P. de la C. 938**.

Además de esto, se autoriza a la Asociación de Suscripción Conjunta ("ASC") a declarar un dividendo extraordinario de $70 millones con su correspondiente contribución incentivada, el cual será destinado al Fondo General. Por ello, los miembros de la ASC tendrán cuatro años para reclamar un crédito contributivo que podrá alcanzar hasta $35 millones. Nos informaron que, según su opinión, este lenguaje no afectará los ingresos del gobierno, ni su flujo de caja. Por el contrario, permitirá una inyección

considerable de recursos con miras a lograr la implementación del Plan Fiscal certificado, en consecución de la recuperación económica y fiscal de Puerto Rico.

El Capítulo 4 este Proyecto de Ley autorizará al gobierno a usar sobrantes de las corporaciones públicas, como fondos disponibles para gastos de servicios esenciales y para el pago de pensiones y empleados públicos. La cantidad a ser aportada por cada corporación sería determinada por un comité compuesto por tres de los cuatro suscribientes del memorial explicativo, siendo estos los jefes de AAFAF, Hacienda y OGP. Se autoriza al Comité a modificar las tarifas de estas corporaciones para cumplir con las métricas del Plan Fiscal certificado. Cabe destacar, que se excluyen de la aplicación de esta medida la UPR y a Corporación Pública para Supervisión y Seguro de Cooperativas de Puerto Rico ("COSSEC").

Esta medida resulta en sintonía con la Ley Núm. 5-2017, también conocida como Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico, la cual encomienda al Gobernador actuar mediante órdenes ejecutivas para proteger la salud, seguridad y bienestar de los residentes de Puerto Rico y establecer normas de prioridad para el desembolso de fondos públicos, siendo estos los fines por los cuales se propone la presente medida.

El Capítulo 5, del **P. de la C. 938** establece normas y principios para regir el proceso de manejo y transferencia de propiedad inmueble del gobierno.

Además, se crea el Comité de Evaluación y Transferencia de Propiedades Inmuebles, compuesto por la AAFAF, OGP y el Departamento de Desarrollo Económico y Comercio ("DDEC"). El referido comité establecerá un procedimiento uniforme y eficiente de transferencia de propiedades inmuebles excedentes del gobierno, mediante procesos competitivos de subasta pública o mediante venta directa.

Esta medida contempla el establecimiento de un proceso de transferencia de propiedades inmuebles que deberá preservar y salvaguardar el interés público, siendo posible la transferencia de las propiedades a otra agencia, municipio, entidad sin fines de lucro o al sector privado.

El propósito de esta medida radica en allegar fondos al gobierno, mientras se utilizan las propiedades del gobierno con mayor eficiencia, permitiendo de este modo la transferencia de titularidad y/o participación en fideicomisos para el interés público.

Al presente se observa que este proceso no se realiza de forma coordinada, mientras en otras instancias se realiza por varias entidades sin uniformidad.

El resultado proyectado atraerá recursos para la implementación del Plan Fiscal Certificado, en beneficio de los sectores más vulnerables de nuestro Pueblo, al tiempo en que estimula el mercado de bienes raíces con oferta de propiedades inmuebles con ubicación estratégica y espacios atractivos.

El Capítulo 6 de la Ley Núm. 230 de 23 de julio de 1974, según enmendada y conocida como "Ley de Contabilidad del Gobierno de Puerto Rico", reduce de 3 años a 1 año el periodo de tiempo que las asignaciones y los fondos sin año económico determinado deban permanecer en los libros, no habiendo ocurrido movimiento de desembolso u obligación, revirtiendo ante estas circunstancias al Fondo General. La mencionada reducción de periodo de tiempo, no aplica a los fondos asignados para mejoras permanentes, instancias en las que continuarán estando disponibles por los 3 años dispuestos actualmente.

Esta congelación ya se encuentra vigente por virtud de la Orden Administrativa de AAFAF. A su vez, ésta aplicará prospectivamente a nuevas asignaciones especiales multianuales. Además, se incluye una disposición para transferir los recaudos de fondos especiales para la realización de pagos del gobierno conforme el orden de prioridad establecido en el Plan Fiscal Certificado, en el cual los gastos por servicios esenciales ocupan el lugar primario.

El Capítulo 7 enmienda la "Ley de Reservas en las Compras del Gobierno del Estado Libre Asociado de Puerto Rico".

Esta medida persigue establecer como requisito para que proceda el aumento sobre el 20% de reserva, el que la situación fiscal lo permita o produzca ahorros al fisco. Por ello busca mantener su participación en este importante sector, sin limitar la capacidad de alcanzar ahorros en el gobierno, al momento de determinarse gastos, permitiendo que la

libre competencia, redunde en beneficios económicos para el gobierno y por consiguiente al Pueblo. El 20% fijo propuesto no representa un tope, sino una garantía de consumo en este sector, sin limitar la capacidad decisional del gobierno al momento de incurrir en gastos que redunden en un saldo costo-beneficioso y positivo.

Por su parte, el Capítulo 8 de la medida contiene enmiendas al "Código de Rentas Internas para un Nuevo Puerto Rico" ("CRIPNP"), a los fines de modificar el arbitrio aplicable a cigarrillos y productos derivados del tabaco para obtener mayor liquidez, atajar la crisis económica y fiscal que enfrenta Puerto Rico, y evitar que los sectores más vulnerables se afecten, así como para desalentar el uso de cigarrillos.

A pesar de que recomendamos enmiendas al texto propuesto, todos estos propósitos permanecen inalterados en la versión que recomendamos aprobar, según el entirillado electrónico.

Sobre el particular el memorial explicativo presentado por las entidades antes señaladas el propósito de esta legislación es dual. Por un lado, aumenta los recaudos, mientras que a su vez promueve la salud pública y una mejor calidad de vida, al desalentar el uso de estos productos nocivos para la salud. El impacto no es sólo para quienes consumen estos productos, sino que ha sido demostrado un serio impacto a la salud de quienes aspiran humo de cigarrillo siendo utilizado a su alrededor.

Añaden que ciertamente esta medida es integralmente positiva para el Pueblo de Puerto Rico y su gobierno. Esto resaltando que cada cajetilla de cigarrillos paga $3.40 en arbitrios, representando un recaudo de $156 millones para el año fiscal 2014-2015. Por su parte, el gobierno gasta aproximadamente $19.16 en costos de salud y pérdida de productividad por cada cajetilla de cigarrillos consumida, lo que se traduce en $924 millones. La brecha existente de $768 millones de impacto negativo, puede ser cerrada sustancialmente mediante la aprobación de esta medida en beneficio del Pueblo. El **P. de la C. 938**, ajustará los derechos de licencias para quienes venden cigarrillos y productos del tabaco. Estos derechos se modificarán estableciendo a los mayoristas una cuantía de $750, en lugar de $200 como es actualmente; en el caso de los detallistas la cuantía será de $300, en lugar de los $100 actuales.

Por último, el Capítulo 9 propone una enmienda a la Ley Núm. 91-1966, según enmendada, para para establecer que hasta el Año Fiscal 2020-2021 la aportación anual al Fondo de Emergencia será por la cantidad de diez millones de dólares ($10,000,000) y que a partir del Año Fiscal 2020-2021, dicha aportación será no menor de cero punto cinco por ciento (0.5%) del estimado de rentas netas sometido por el Departamento de Hacienda para la preparación del Presupuesto Recomendado con cargo al Fondo General.

Se resalta, que durante la última década se ha legislado reiteradamente para que el fondo no se nutra durante determinados años. Ante la realidad fiscal de Puerto Rico y con miras a que no se continúe legislando para detener las aportaciones al fondo, se establece una metodología que permitirá comenzar a allegar recursos al fondo, a un ritmo apropiado con respecto a la situación fiscal actual.

Por su parte, el Departamento de Justicia expuso en su memorial explicativo que, tras examinar la medida propuesta, entendemos que se ajusta a los precedentes establecidos por el Tribunal Supremo de Puerto Rico ante legislaciones de índole similar a la que nos ocupa, las cuales fueron avaladas por ese foro judicial. Véase, *Domínguez Castro v. ELA*, 8 DPR 1 (2010). De igual forma, establecen que en esta ocasión se trata de una medida legislativa con propósitos similares. Resaltan que surge de la exposición de motivos del **P. de la C. 938** que esta Administración tuvo que comprometerse con la JSF, mediante el plan fiscal aprobado, con implementar ciertas medidas para controlar los gastos del gobierno. Manifiestan que no podemos obviar que PROMESA contiene una cláusula de supremacía que establece que sus disposiciones prevalecen sobre cualquier ley o reglamento territorial que sea inconsistente con esta.[4] Se indica que si el gobierno no logra reducir los gastos y lograr una reserva de efectivo de $200 millones para el 30 de junio de 2017, consecuencias nefastas serían inminentes para Puerto Rico. Entre ellas, los empleados públicos verían su jornada laboral reducida en un 20%, lo que conllevaría claramente, una reducción en su salario.

---

[4] Sec. 1 de la Puerto Rico *Oversight, Management, and Economic Stability Act.*

Por último, establecen que la posición del Departamento de Justicia es que el proyecto propuesto es cónsono con las prioridades que JSF ha remarcado como imprescindibles para lograr los cambios deseados de crecimiento económico para Puerto Rico.[5] Sabemos que la creación y aprobación de política pública para proteger la vida, la salud y el bienestar del Pueblo es tarea inherente de la Asamblea Legislativa como respuesta a los cambios sociales y económicos que de tiempo en tiempo se susciten. Nuestra función como parte de esa labor legislativa, nos dicen, "se circunscribe únicamente a comentar sobre cuestiones de derecho que puedan surgir".[6] Analizada la presente pieza legislativa, el Departamento de Justicia reitera que la misma representa una acción cobijada por el poder amplio que tiene la Rama Legislativa, otorgado por nuestros constituyentes, para establecer leyes conducentes a establecer política pública.

Pero la Cámara de Representantes de Puerto Rico, teniendo como norte poder presentar legislación que atienda las necesidades de nuestros representados, tuvo a bien atender las peticiones de audiencias que hicieron numerosos sindicatos, gremios y otros grupos del sector privado, para que se les escuchara. De hecho, esta vista pública,

---

[5] Las prioridades identificadas por la Junta de Supervisión Fiscal, que deben ser incluidas en un plan de crecimiento económico para Puerto Rico fueron:

*1. Restore economic growth and opportunity through fundamental structural reforms that create a more competitive economy. In the short-term, the focus of structural reforms should be liberalizing the labor market, lowering the cost of reliable energy, rationalizing and optimizing taxation and streamlining the permitting processes to enable investment.*

*2. Achieve sustainable, balanced fiscal budgets by substantially restructuring the Government while preserving essential services for the People of Puerto Rico.*

*3. Restructure Puerto Rico's debt to a sustainable level and reform pensions, in each case respecting the process and requirements established under PROMESA, and re-establish access to the capital markets.*

Comunicación enviada por la "Junta de Supervisión Fiscal" al Gobierno de Puerto Rico el 20 de diciembre de 2016.

[6] *Véase:* Ley Núm. 205-2004, según enmendada, conocida como "Ley Orgánica del Departamento de Justicia", Art. 6.

celebrada el pasado 25 de abril, se realizó en conjunto con la Comisión de Hacienda del Senado, convirtiendo el Salón de Audiencias 1, Severo Colberg Ramírez, en una gran "plaza pública" donde discutimos a profundidad las posiciones de los deponentes. En ésta se atendieron las ponencias de los participantes, se contestaron numerosas preguntas de legisladores, y se esgrimieron argumentos a favor y en contra, de la aprobación del P. de la C. 938. Vuestra Comisión se ve en la obligación de aclarar que en ningún momento se ha negado entrada a persona alguna al Capitolio, ni se ha afectado el derecho de las personas con respecto a su libertad de expresión con respecto a ésta, u otras medidas[7]. Queremos dejar claro que en esta 18va. Asamblea Legislativa no abre las puertas de manera simbólica y luego aplasta la disidencia y la libre expresión. Siempre que los ciudadanos vengan a la Casa de las Leyes a expresarse con respeto, con decoro y con el comportamiento adecuado -sin violencia y sin destrucción de la propiedad- se les permite a todas y todos, venir a presenciar los trabajos y ejercer su derecho a la expresión.

Las uniones **TUAMA, UIE-ACCA y HEO-AMA** comparecieron de manera presencial y por medio de ponencia escrita a una Vista Pública celebrada el 25 de abril de 2017 por las Comisiones de Hacienda de la Cámara de Representantes y del Senado, para expresar sus puntos de vista sobre el Proyecto de la Cámara Núm. 938.

Éstos, comenzaron su ponencia expresando que para marzo de 2017, la inflación en Puerto Rico alcanzó su punto más alto en los últimos cinco años. Según indicaron, el Índice de Precios al Consumidor aumentó en un 2.1%, mientras que el poder adquisitivo del dólar se redujo a .86 centavos. Además, indicaron que según el Negociado de Estadísticas de Puerto Rico, el salario promedio de un trabajador en el Servicio Público al 2013 era de $26,935, esto traduciéndose en un salario promedio por hora de $12.94.

---

[7] Como cuestión de hecho, incluso la Oficina de Participación Ciudadana de la Cámara de Representantes ha recibido decenas de llamadas telefónicas, correos electrónicos y cartas de personas que se expresan con libertad, en referencia a la consideración del Proyecto de la Cámara 938.

Utilizando como base las estadísticas antes mencionadas, procedieron a calcular en cuanto se han reducido los salarios de los trabajadores del sector público en Puerto Rico desde la ejecución de la Ley 66 de 2014. El resultado que obtuvieron fue que los trabajadores del sector público han visto reducidos sus salarios en $2.03 la hora, lo que se traduce en una reducción de $351.87 al mes, o $4,222.40 al año, desde la ejecución de la antes mencionada Ley. Asimismo, expresaron que, si se multiplica dicha cifra por los 213,420 empleados públicos activos al año 2015, se puede decir que el servidor público perdió, como colectivo, la suma anual de $901,144.60.

La ponencia continúa exponiendo que ya los trabajadores no tienen más nada que dar u ofrecer. Según expresan, ya sus salarios no les alcanzan para satisfacer sus necesidades, y no están dispuestos a que ahora se pretenda arrebatarles su plan médico, entre otros beneficios marginales.

Por último, estos emplazan a la Cámara de Representantes a cumplir con su obligación de representar a los trabajadores. Además, exigen que se le comunique los miembros de la Junta de Supervisión Fiscal, que si quieren la sangre de los trabajadores para entregarla a los bonistas, que vengan ellos mismos a buscarla. Culminan su ponencia expresando: "Díganle a la Junta de Control Fiscal que cuando vengan a buscar nuestra sangre los esperaremos en la calle."

Por su parte el señor **Pedro Irene Maymí, Presidente de la Central Puertorriqueña de Trabajadores y de la Unión Independiente Auténtica de Empleados de la Autoridad de Acueductos y Alcantarillados (UIA)**, compareció a la vista pública conjunta sobre el P. de la C. 938, celebrada el martes, 25 de abril de 2017, por las Comisiones de Hacienda de los respectivos Cuerpos Legislativos. Este deponente compareció además, en representación de la **Coordinadora Unitaria de Trabajadores del Estado**. Estas entidades expresan su más firme oposición a la Medida, particularmente a su Capítulo 2 sobre Beneficios Marginales.

En primera instancia, manifiestan que el P. de la C. 938 persigue anular el derecho a la negociación colectiva, que es reconocido a nivel mundial y por la Organización Internacional del Trabajo como un instrumento esencial para el progreso constante;

además dicho derecho constituir una salvaguarda fundamental para fomentar el bienestar común. Disponiendo, que aunque se menciona que el objetivo de la Medida es igualar los beneficios de los trabajadores del sector público, realmente reduce dichos beneficios para después "igualarlos" a todos, pero hacia abajo; es decir, que el P. de la C. 938 está dirigido de manera que hayan menos beneficios laborales.

Así las cosas, la Medida pretende:

• Disminuir los beneficios de licencia de vacaciones a la mitad; y reducir en un 50% la licencia de enfermedad para los nuevos trabajadores;

• Limitar el pago de Bono de Navidad a $600;

• Eliminar cualquier otro tipo de bonificación que haya sido negociada;

• Eliminar el pago de horas extras en las corporaciones públicas y reemplazarlo por el tiempo compensatorio;

• Limitar las licencias que pueden disfrutar los trabajadores; y

• Eliminar licencias adicionales que hayan sido negociadas, tales como la licencia sindical.

De otra parte, afirman que durante años la negociación colectiva estuvo orientada a mejorar los derechos y beneficios establecidos por ley. Sin embargo, con el P. de la C. 938, se busca establecer el máximo de derechos y beneficios de los trabajadores, arrebatándole a estos el derecho a negociar mayores derechos y beneficios. Se aduce que lo anterior no es aceptable para los trabajadores del sector público porque no son responsables por la presente crisis fiscal.

También se declara que empobrecer la clase obrera no es la solución, debido a que todas las medidas contenidas en el Capítulo 2 del P. de la C. 938 están dirigidas a ese propósito en particular. Indican que diariamente el costo de vida aumenta mientras que los salarios de los trabajadores del sector público unionados y no unionados no han recibido aumentos salariales que compensen tal aumento.

Indicaron que por ejemplo, en cuanto al beneficio de plan médico, los trabajadores se ven en la obligación de pagar por los servicios de planes médicos que son cada día más caros. Ante dicha realidad, las Uniones han negociado aportaciones patronales más altas que las fijadas por ley, hasta incluso el pago total de los planes médicos. En contraposición, se señala que la Medida provee que a partir del 1 de enero de 2018, la Autoridad de Asesoría Financiera y Agencia Fiscal (AAFAF) va a determinar la cuantía de la aportación patronal para el pago del plan médico, la cual no será menos de $100. En atención a ello, se alega que los trabajadores tendrán que pagar la cantidad no cubierta por la aportación patronal, provocando que éstos se queden sin plan médico por no poder pagar el remanente; lo cual afirman que atenta contra la salud de los trabajadores y sus familias.

Finalmente, se exponen las dos (2) alternativas como soluciones a los problemas del país, considerando la segunda como la más importante:

1. Se expresa que debe pagar quien puede pagar. En vez de buscar el dinero necesario para atender la crisis fiscal en los bolsillos del pueblo pobre y trabajador, plantean:

*la necesidad de aumentar las contribuciones a las empresas foráneas multimillonarias que solamente aportan el 4% de sus ganancias, para que éstas en vez paguen el 10%. Disponiendo que tal aumento haría más para resolver la crisis fiscal si se compara con la propuesta reducción de días de vacaciones a los trabajadores o quitarles su plan médico.

*la revisión de todos los decretos de exención contributiva para comprobar si han cumplido y cumplen con los objetivos para los cuales fueron provistos.

*que la carga fiscal sea ajustada a los ingresos, de manera que aporte más quien más tiene.

*que la Legislatura no se deje engañar por el Ejecutivo. Mientras se propone eliminar derechos a los trabajadores, quedan contratos multimillonarios con empresas privadas que hacen el trabajo de los empleados públicos. A manera de ejemplo, existen

subcontratistas que realizan el trabajo de unionados de la Autoridad de Acueductos, así duplicando el costo de los servicios.

2. Disponen que la Asamblea Legislativa debe cumplir con su compromiso de proteger la Constitución, especialmente su Carta de Derechos, la cual fue establecida para salvaguardar los derechos fundamentales del Pueblo. Entre estos, el derecho de los trabajadores a organizarse sindicalmente y a negociar colectivamente. Consideran que existe una tendencia de menoscabar los derechos del pueblo basándose en la última oración de la Sección 19 de la Carta de Derechos de la Constitución: "Tampoco se entenderá como restrictiva [la enumeración de derechos que antecede] de la facultad de la Asamblea Legislativa para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo." Amparado en esta facultad, indican que se ha convertido en costumbre declarar "emergencias" para luego atacar y recortar los derechos de los trabajadores; y que esta práctica debe eliminarse porque si no, Puerto Rico será una colonia donde no se habrá de respetar los derechos fundamentales del Pueblo.

Por todo lo antes expresado, esta Comisión entiende que para poder trabajar con el plan fiscal que ha sido certificado y las disposiciones de PROMESA, este gobierno tiene que actuar con premura para recuperar la salud fiscal y económica en beneficio de nuestro Pueblo. Esta pieza legislativa propuesta resulta esencial para los fines de cumplimiento contemplados en el Plan Fiscal certificado, evitando la imposición de las antes referidas medidas contingentes establecidas por la JSF.

Estamos seguros de que, como producto de una revisión exhaustiva de las legislaciones con impacto económico en el fisco, tanto a nivel de ahorro en gastos, aumento de ingreso y maximización en la utilización de los recursos disponibles, las medidas propuestas en este **Proyecto de la Cámara 938**, según enmendado, resultan ser las óptimas para enfrentar nuestra crisis fiscal actual, actuando en concordancia con lo establecido y certificado en el Plan Fiscal. Estas medidas se suman a los Proyectos de la

Cámara 849 y 939 (en consideración ante ambos cuerpos en estos días de abril), en el esfuerzo de corregir la ruta desalentadora con la que ha tenido que lidiar la presente administración. En conjunto, estas medidas permiten un avance significativo hacia un ruta de recuperación económica y fiscal para Puerto Rico, con el beneficio de evitar que las repercusiones de la crisis recayeran sobre los más vulnerables y evitando la activación de medidas contingentes consideradas por la JSF para ser implementadas en caso de inacción y falta de ejecución por parte del gobierno, entre las cuales como hemos destacado se incluyen reducción de jornada, reducción de hasta un veinte (20) por ciento del sueldo de los empleados, eliminación del bono de navidad, reducción un diez (10) por ciento a las pensiones de TODOS los pensionados y perdida de cobertura para cientos de miles de personas que necesitan la protección del programa Mi Salud.

Queremos, a modo de resumen, dejar para la posteridad los cambios más significativos de las enmiendas que estamos introduciendo al entirillado, y que, desde nuestra perspectiva, permiten un balance entre los intereses de las numerosas partes afectadas por esta legislación.

- Después de haber escuchado a todas las partes esta Comisión está convencida de que el P. de la C. 938 NO elimina el derecho de éstos a negociar condiciones de trabajo, salarios y otras condiciones no económicas no contenidas en la presente legislación.

- La medida tendrá un principio, pero también tiene un final. Sabemos que Puerto Rico va saldrá de esta crisis. Con fe, con valor, y con el trabajo de nuestra gente nos levantaremos. Esa es la apuesta que hacemos en el servicio público. Por eso modificamos el proyecto para:

  Crear un Comité Cumplimiento con el Plan Fiscal compuesto por 1 representante del Gobernador, uno del Senado y uno de la Cámara. De esta forma, tendremos representación de los funcionarios electos en la toma de decisiones administrativas en cuanto al cumplimiento con la JSF.

- El Comité antes mencionado. está autorizado a realizar una determinación de que la situación fiscal se ha estabilizado y sí el fisco lo permite, a aumentar los

beneficios de esta ley y dejar sin efecto las medidas de responsabilidad fiscal en el Capítulo 2.

- Se establece que las disposiciones de los Artículos 2.04 (beneficios marginales), 2.05 (días feriados), 2.08 (bonificaciones), 2.09 (horas extras), 2.10 (liquidaciones vacaciones y enfermedad), 2.11 (liquidación final licencias vacaciones acumuladas en caso de separación) serán temporeras y que cesarán durante el año fiscal siguiente luego que superemos la crisis. Esto crea justo balance en atender la crisis y coloca un tiempo para que se devuelvan los mismos, cuando Comité determine. La vigencia Comité es hasta que se acabe la crisis.

- Las disposiciones de sobre la Licencia Vacaciones NO les aplicaran a los empleados docentes del Departamento de Educación (maestros), empelados docentes de cualquier entidad del gobierno y los agentes del orden público de la Policía de Puerto Rico. Le hacemos justicia a quienes nos educan, y a quienes tienen la importante labor de velar por el orden y la seguridad pública.

- El P. de la C. 938 aumenta las licencias con paga para que nuestros hijos asistan a las escuelas de sus hijos, de 4 a 8 horas divididas entre los dos semestres escolares. En vez de 2 horas laborales al comienzo de cada semestre y dos al final, serán ahora 4 al comienzo y 4 al final, sin reducción de paga.

- Todo empleado cuyo hijo o hija este cursando en el Programa de Educación Especial tendrán 10 horas por semestre, pagas, para hacer gestiones con estos. Esto no estaba en el proyecto según radicado. Es una necesidad identificada luego del proceso de apertura y vistas públicas, y que, teniendo presentes las necesidades de nuestra gente, atendemos con alegría y sensibilidad humana.

- Teniendo presente la importancia de un seguro médico, de hecho, la Junta quiere dejar 700,000 sin cubierta médica, por eso enmendamos la medida para:

   Darle al Gobierno de Puerto Rico un año para buscar ahorros del Plan Fiscal para evitar afectar estas aportaciones ($135.8 millones, aprox.). Ya hemos identificado cerca de $30 millones y continuaremos en eso.  No claudicaremos ante nuestra responsabilidad con mantener la salud fiscal del Pueblo de Puerto Rico.
   Si esto se logra, es entonces que igualamos las aportaciones en el gobierno, lo que comenzaría el 1 de julio de 2018.

- Pero dejamos claro que lo descrito en el párrafo anterior es únicamente para los 26,537 empleados de corporaciones públicas. No se afectarán los otros 101,000 empleados públicos.

- A pesar de lo anterior, en toda circunstancia, un o empelado, o familiar de éste, que tenga una enfermedad catastrófica, crónica o terminal preexistente mantendrá el mismo nivel de la aportación durante todo el tiempo que permanezca en el servicio público. Creemos en un Gobierno responsable fiscalmente, pero con el corazón para mantener la salud de nuestra gente, y los recursos para ésta, de forma constante.

- Además, dejamos claro que es esta Asamblea Legislativa la que termina con las lujosas compensaciones a jefes de agencia o empleados de confianza. Todos tenemos que aportar. Empleados de confianza nombrados por el Gobernador, incluyendo jefes de agencias, tendrán esta restricción de manera prospectiva. Hasta ahora, la compensación final ha sido de hasta 6 meses del sueldo. Ahora, con el lenguaje del P. de la C. 938 según enmendado, el límite será de 2 meses de salario.

## CONCLUSIÓN

El **Proyecto de la Cámara Número 938** es parte de una nueva política pública de responsabilidad fiscal, incremento de eficiencia en la administración de recursos y de reducción de gastos. Este dramático cambio en la política pública del Pueblo de Puerto Rico, que antes operaba en el marco teórico del "me vale", es un mandato obtenido con meridiana claridad en las urnas. Las medidas que incluye le dan al Gobierno de Puerto Rico una disponibilidad de recursos mediante mecanismos adecuados para preservar una calidad de vida apropiada como Pueblo. A través de la correcta implementación de estas medidas, podremos continuar acercándonos a la estabilización de nuestra crisis fiscal actual, actuando en cumplimiento con el Plan Fiscal certificado conforme la ley federal PROMESA y la JSF[8].

---

[8] Dejamos claro que bajo ningún concepto la consideración de este proyecto de ley, las negociaciones con los acreedores del Gobierno, ni con la JSF representan una abdicación de esta Asamblea Legislativa a su responsabilidad, moral y jurídica, de presentar y aprobar legislación que nos saque del marasmo económico que representa nuestra condición territorial. *Véase* Ley 7-2017, según enmendada.

Por lo antes expuesto, la Comisión de Hacienda, Presupuesto y de Supervisión, Administración y Estabilidad Económica de Puerto Rico, PROMESA, tiene a bien recomendar a este Augusto Cuerpo la aprobación del P. de la C. 938, con las enmiendas establecidas en el entirillado electrónico que se acompaña junto al presente informe.

Respetuosamente sometido

**Antonio Soto Torres**
Presidente
Comisión de Hacienda, Presupuesto
y de Supervisión, Administración y
Estabilidad Económica de Puerto Rico,
"PROMESA"

(ENTIRILLADO ELECTRÓNICO)

GOBIERNO DE PUERTO RICO

18ᵛᵃ   Asamblea                                                    1ʳᵃ   Sesión
        Legislativa                                                       Ordinaria

# CÁMARA DE REPRESENTANTES

# P. de la C. 938

## 18 DE ABRIL DE 2017

Presentado por los representantes y las representantes *Méndez Núñez, Torres Zamora, Ramos Rivera, Rodríguez Aguiló, Hernández Alvarado, Alonso Vega, Aponte Hernández, Banchs Alemán, Bulerín Ramos, Charbonier Chinea, Charbonier Laureano, del Valle Colón, Franqui Atiles, González Mercado, Lassalle Toro, Lebrón Rodríguez, Mas Rodríguez, Meléndez Ortiz, Miranda Rivera, Morales Rodríguez, Navarro Suárez, Pagán Cuadrado, Parés Otero, Peña Ramírez, Pérez Cordero, Pérez Ortiz, Quiñones Irizarry, Rivera Guerra, Rivera Ortega, Rodríguez Hernández, Rodríguez Ruiz, Santiago Guzmán, Soto Torres y Torres González*

Referido a la Comisión de Hacienda, Presupuesto y de la Supervisión, Administración y Estabilidad Económica de Puerto Rico, "PROMESA"

## LEY

Para crear la "Ley de Cumplimiento con el Plan Fiscal", a los fines de tomar las medidas necesarias para atemperar el marco legal y jurídico existente para dar el más fiel cumplimiento al Plan Fiscal aprobado por la Junta de Supervisión Fiscal creada al amparo de la Ley Federal PROMESA; establecer un sistema uniforme de beneficios marginales, incluyendo el bono de navidad y aportación al plan médico, para todos los funcionarios y empleados públicos de las agencias, instrumentalidades y corporaciones públicas del Gobierno de Puerto Rico, con excepción de la Universidad de Puerto Rico; enmendar la Sección 4.3 inciso 2 (a) (e) (m) del Artículo 4, la Sección 5.2 del Artículo 5, la Sección 6.4 inciso 1 (d) y 4 (1) , 6.8 inciso 2 (b) y 6.9 del Artículo 6, la Sección 7.2 inciso 3 y 5 del Artículo 7, *se añade un nuevo Artículo 2.11(a) a los fines de enmendar el Artículo 3 de la Ley 125 de 10 de junio de 1967, según enmendada,* ~~derogar el artículo 9 y la sección~~ *suspender la vigencia del Artículo 9 y Sección* 10.2 de la Ley 8 –

2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico"; reenumerar los actuales artículos 10 al 20 como artículos 9 al 19; derogar la Ley 89-2016, conocida como "Ley de Empleo Temporal en el Servicio Público"; enmendar los Artículos 3, 6 y 7 de la Ley 253-1995, según enmendada, conocida como la "Ley de Seguro de Responsabilidad Obligatorio para Vehículos de Motor"; a los fines de ampliar la cubierta del seguro de responsabilidad obligatorio de cuatro mil dólares ($4,000) a cuatro mil quinientos dólares ($4,500); facultar para la revisión de las primas antes del 30 de junio de 2017; permitir la declaración de un dividendo extraordinario a los miembros de la Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio, así como la aplicación de una contribución incentivada a dicho dividendo; disponer la distribución de los ingresos obtenidos a través de la contribución incentivada y el ajuste en la prima para que entre al Fondo General; autorizar al Gobierno a utilizar sobrantes de las corporaciones públicas como "fondos disponibles" para contribuir al Fondo General; autorizar a un Comité compuesto por los directivos de la Autoridad de Asesoría Financiera y Agencia Fiscal, la Oficina de Gerencia y Presupuesto y el Departamento de Hacienda a modificar las tarifas de las corporaciones públicas para cumplir con las métricas del Plan Fiscal; establecer las normas y principios que deben regir el proceso de venta de propiedades inmuebles del Gobierno de Puerto Rico; crear el Comité de Evaluación y Disposición de Propiedades Inmuebles; para declarar la política pública relacionada a la venta de propiedades inmuebles; enmendar los Artículos 3, 7 y 8 de la Ley Núm. 230 de 23 de julio de 1974, según enmendada y conocida como "Ley de Contabilidad del Gobierno de Puerto Rico"; a los fines de establecer que las asignaciones y los fondos sin año económico determinado, que hayan permanecido en los libros sin movimiento de desembolso u obligación por un (1) año se considerarán como que han cumplido sus propósitos, por lo que se cerrarán e ingresarán al Fondo General; disponer que aquellos fondos especiales creados por Ley para fines específicos se acreditarán al Fondo General del Tesoro Estatal y se depositarán en la cuenta bancaria corriente del Secretario de Hacienda para que éste tenga pleno dominio de los mismos; enmendar los Artículos 2 y 6 de la Ley 129-2005, según enmendada, conocida como "Ley de Reservas en las Compras del Gobierno del Estado Libre Asociado de Puerto Rico"; a fin de disponer que el aumento escalonado en la partida asignada a compras del presupuesto general para ser otorgado a microempresas, pequeñas y medianas empresas se dará si la situación fiscal del Gobierno así lo permite; añadir una nueva Sección 3020.05A y Sección 3020.15, y enmendar la Sección 3020.05, Sección 3020.13, Sección 3020.14, Sección 3030.14, Sección 3030.18, Sección 3050.01, Sección 4030.07, Sección 6042.08 y Sección 6042.15 de

la Ley 1 - 2011, según enmendada, mejor conocida como "Código de Rentas Internas para un Nuevo Puerto Rico", a los fines de modificar el arbitrio aplicable a cigarrillos y productos derivados del tabaco para obtener mayor liquidez, atajar la crisis económica y fiscal que enfrenta Puerto Rico, y evitar que los sectores más vulnerables se afecten, así como para desalentar el uso de cigarrillos; enmendar el Artículo 2 de la Ley Núm. 91 de 21 de junio de 1966, según enmendada, para disponer que hasta el Año Fiscal 2020-2021 la aportación anual al Fondo de Emergencia será por la cantidad de diez millones de dólares ($10,000,000) y que a partir del Año Fiscal 2020-2021, dicha aportación será no menor de cero punto cinco por ciento (0.5%) del estimado de rentas netas sometido por el Departamento de Hacienda para la preparación del Presupuesto Recomendado con cargo al Fondo General y para otros fines relacionados.

## EXPOSICIÓN DE MOTIVOS

### Introducción

Al presente, Puerto Rico atraviesa una crisis fiscal y social monumental sin precedentes históricos. Dicha crisis fue causada, en parte, porque faltaron controles sobre el gasto, medidas de desarrollo sustentable y sistemas de información gerencial que promuevan claridad y transparencia en la gestión gubernamental.

Según datos provistos por el Departamento del Tesoro federal, Puerto Rico sufre una contracción económica cumulativa de 14.6% en el Producto Estatal Bruto (PEB real) con una predicción de una contracción adicional de 3% para los próximos dos años. Por años, el Gobierno de Puerto Rico ha operado con un déficit estructural el cual ha sido financiado con emisiones de bonos y préstamos al Banco Gubernamental de Fomento. Hace más de un año que el Gobierno de Puerto Rico carece de liquidez y se utilizaron los reintegros, pagos de los contratistas, el dinero de los pensionados y préstamos intra-gubernamentales para sustituir las fuentes de liquidez y gastar más dinero que los fondos disponibles. El Banco Gubernamental de Fomento incumplió sus obligaciones con los bonistas desde el 1 de mayo de 2016 y ya no cumple su rol de proveer liquidez ni tampoco contamos con acceso al mercado debido a las políticas de la administración pasada que le restó credibilidad al Gobierno de Puerto Rico. Los sistemas de retiro están insolventes.

Como un ejemplo de las políticas que nos trajeron aquí, puede observarse que desde el 2001 al 2008 ocurrió un aumento de 64% en los gastos de nómina y, luego de una reducción de 33% entre 2009 y 2012, hubo otro aumento sustancial en el cuatrienio 2013-2016. Para financiar ese gasto desmedido, entre 2000 y 2008 la deuda pública aumentó en 134%. Por otro lado, el cuatrienio pasado se implementaron medidas bajo la filosofía de "primero impago, luego impuestos y después recortes". Esta filosofía propició la continuación del gasto desmedido y el rechazo a políticas públicas que hubiesen

permitido manejar eficientemente los asuntos fiscales del Gobierno de Puerto Rico. Esto, sin haberse concretado las acciones necesarias para lograr una mayor eficiencia operacional en el Gobierno, ni recortes al excesivo gasto gubernamental. Además, mientras se precipitaban los valores y la debacle económica, el Gobierno Central fue incapaz de generar la información financiera necesaria para comprender la profundidad del problema y presentar información certera ante el Congreso, y ante otras entidades con interés en el asunto. A raíz de todo lo antes expuesto, se materializaron varias degradaciones de las clasificaciones de la deuda del Gobierno de Puerto Rico y se ha desencadenado un impacto adverso a través de todos los sectores de la economía.

Esta crisis ha golpeado muy fuerte a las familias puertorriqueñas. Los sacrificios más severos han recaído sobre los más vulnerables en nuestra sociedad y ha provocado que miles de puertorriqueños abandonen la Isla buscando mejores oportunidades. La consecuente reducción poblacional se convierte en uno de los retos para encaminarnos hacia la recuperación.

### La Situación Colonial en Puerto Rico

La situación colonial ha afectado nuestra capacidad para afrontar y resolver esta crisis pues carecemos de los poderes soberanos que tiene un estado para regular sus asuntos locales bajo la Enmienda X de la Constitución de los Estados Unidos. "[P]ara el Tribunal Supremo federal, la adopción de la Constitución no representó un cambio en la base fundamental de las relaciones constitucionales entre Puerto Rico y Estados Unidos. El Tribunal Supremo siguió tratando a Puerto Rico como un ente político sujeto a la cláusula territorial de la Constitución federal." Véase Pueblo v. Sánchez Valle y otros, 192 D.P.R. 594, 631 (2015). "[N]unca hubo una cesión de soberanía, lo que hubo fue una delegación de poderes." Id. a la pág. 635. "Esa delegación de poder no constituye una renuncia irrevocable ni una terminación del poder del Congreso. El Pueblo de Estados Unidos le otorgó al Congreso, por medio de la Constitución, un poder amplio para administrar los territorios. Por esa razón, el Congreso no puede renunciar de manera irrevocable a un poder que le fue conferido por el Pueblo de Estados Unidos". Id. a la pág. 638.

Así pues, "el Congreso puede permitir que el Estado Libre Asociado permanezca como sistema político de forma indefinida, o por el contrario, tiene la autoridad constitucional para enmendar o revocar los poderes de administración interna que ejerce el Gobierno de Puerto Rico. Dicho de otro modo, el sistema de gobierno que rige internamente en Puerto Rico está sujeto por completo a la voluntad política y la autoridad legal del Congreso." Id. a la pág. 641.

La triste realidad es que la situación colonial nos coloca en un estado de indefensión tal que ni la ciudadanía americana que hemos atesorado desde 1917 está garantizada. El Congreso tiene la discreción legislativa para conceder privilegios a los ciudadanos nacidos en los territorios, incluyendo la ciudadanía americana, pero ese

derecho puede ser revocado en cualquier momento. De hecho, el Gobierno Federal ha sostenido ante los tribunales que en los territorios no existe un derecho a la ciudadanía sino que se trata, más bien, de una gracia legislativa del Congreso. *Véase, por ejemplo,* Tuaua v. United States, 788 F.3d 300, (D.C. Cir. 2015).

En cuanto al asunto particular que nos ocupa, como ejemplo de las limitaciones que la situación colonial nos impone, tenemos que señalar que los estados pueden obtener las protecciones de la Ley federal de quiebras pero Puerto Rico fue excluido de dichas protecciones y, por no tener representación plena en el congreso, es poco o nada lo que podemos hacer al respecto. Tampoco podemos legislar una quiebra local pues la misma ley federal que no nos protege ocupa el campo y previene la legislación local. *Véase* Puerto Rico v. Franklin Cal. Tax-Free Tr., 136 S. Ct. 1938 (2016) (declarando inconstitucional la "Ley para el Cumplimiento con las Deudas y para la Recuperación de las Corporaciones Públicas de Puerto Rico" Ley 71-2014 mejor conocida como la "Ley de Quiebra Criolla").

El resultado directo de nuestra situación colonial: PROMESA

Las políticas del pasado, junto a nuestra indefensión colonial, llevaron al Congreso de los Estados Unidos a promulgar la ley denominada *Puerto Rico Oversight, Management, and Economic Stability Act,* conocida como PROMESA (por sus siglas en inglés), Pub. L. 114-187, y delegó amplísimos poderes en una Junta de Supervisión Fiscal (en adelante "Junta de Supervisión"). Nuevamente, por no tener representación plena en el Congreso, dicha Ley se aprobó sin una verdadera participación de nuestro Pueblo. Conforme a PROMESA, las continuas acciones de planificación fiscal, las acciones presupuestarias, legislativas y ejecutivas de Puerto Rico, así como las reestructuraciones de deuda, consensuales o no, y la emisión, garantía, intercambio, modificación, recompra o redención de deuda están sujetas a supervisión.

En su Sección 4 PROMESA dispone claramente que sus disposiciones "prevalecerán sobre cualquier disposición específica o general de las leyes territoriales, estatales o reglamentos territoriales o estatales que sea incompatible con esta Ley." De esta manera, el Congreso de forma expresa hizo manifiesta su intención de que dicha Ley desplazaría cualquier legislación estatal que choque con PROMESA. Esto queda igualmente reconocido en la Sección 8 (2) que establece que el Gobierno de Puerto Rico no puede adoptar, implementar o hacer cumplir cualquier estatuto, resolución, política o regla que pueda menoscabar o anular los propósitos de PROMESA, según lo determine la Junta de Supervisión. Así pues, estamos imposibilitados de promulgar legislación que deje sin efecto a PROMESA o que menoscabe sus disposiciones y su alcance.

En esta coyuntura, precisa resaltar que bajo la décima enmienda, el Gobierno Federal, no puede imponerle a un estado lo que la ley federal PROMESA permite para los territorios. El Congreso le impuso una Junta a Washington DC que no es estado y que está bajo la jurisdicción directa del Congreso. La Junta de la ciudad de New York fue una creación de su propia legislatura estatal y no del Congreso. Detroit, que es una ciudad y

no un estado, participó de un proceso voluntario de quiebra. En fin, no puede perderse
de vista que la situación que atravesamos y la imposición de la Junta de Supervisión es
otra de las consecuencias del colonialismo que ha limitado nuestro desarrollo por los
pasados 119 años.

Lamentablemente, nuestra situación colonial y consustancial carencia de poderes
políticos, exacerba la realidad de que nos han impuesto una Ley Federal en el Congreso
que es suprema a toda legislación local, incluso nuestra Constitución, sin que tuviéramos
la oportunidad de votar sobre la misma ni votar por el Presidente que la aprobó. Esto
pone de manifiesto que para poder salir del atolladero económico en el que nos
encontramos es imprescindible solucionar el problema del estatus político. Sin embargo,
también es un hecho irrefutable que tenemos que trabajar dentro de los parámetros de
PROMESA para iniciar la recuperación económica y fiscal de Puerto Rico.

El 30 de octubre de 2016, la Junta de Supervisión designó al Gobierno de Puerto
Rico, al Sistema de Retiro de los Empleados del Gobierno, al Sistema de Retiro de la
Judicatura, al Sistema de Retiro para Maestros, a la Universidad de Puerto Rico y 21
corporaciones públicas de Puerto Rico como "entidades cubiertas" sujetas a supervisión
fiscal a tenor con PROMESA. La Sección 405(b) de PROMESA impone además una
paralización temporera de los litigios y las reclamaciones contra Puerto Rico y sus
instrumentalidades sobre distintos asuntos, con la esperanza de que el Gobierno de
Puerto Rico, a nombre propio y a nombre de sus instrumentalidades, entable
negociaciones voluntarias con sus acreedores para reorganizar y transigir el repago de
sus obligaciones de deuda y simultáneamente emprenda una reestructuración
responsable del Gobierno de Puerto Rico y sus instrumentalidades que reajuste los
servicios esenciales requeridos para la salud, seguridad y bienestar de los residentes de
Puerto Rico con el repago puntual de sus obligaciones de deuda.

Luego de invertir millones de dólares en consultores especializados, la pasada
administración presentó un plan fiscal deficiente que fue rechazado por la Junta de
Supervisión de forma inmediata pues no resolvía los problemas fiscales provocados por
la pasada administración.

Esta Ley, dividida en Capítulos, dispone diferentes medidas que esta
Administración está tomando para cumplir con el Plan Fiscal impuesto conforme a las
disposiciones de PROMESA. Los asuntos atendidos en esta Ley son germanos entre sí,
toda vez que todos van dirigidos a dar cumplimiento al Plan Fiscal. Por tal razón,
promulgamos esta Ley, que atiende varios temas dirigidos a cumplir con el Plan Fiscal.

*La sección 17 del Artículo III de la Constitución de Puerto Rico, dispone en lo pertinente
que "[n]o se aprobará ningún proyecto de ley…que contenga más de un asunto, el cual deberá ser
claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido
expresado en el título será nula. Dicha citada sección establece la regla de un solo asunto que exige
que toda ley aprobada por la Legislatura regule un solo asunto o materia. Sobre este particular el*

*Tribunal Supremo de Puerto Rico ha señalado que dicha disposición "no requiere que el título constituya un índice detallado del contenido de la ley, sino meramente que sea un hito indicador del asunto cubierto por la misma." Herrero v. Emmanuelli, 179 D.P.R. 277, 295 (2010); Rodríguez v. Corte, 60 D.P.R. 919, 922 (1942).*

*Además, la jurisprudencia ha sido consistente al establecer que sólo ante un caso claro y terminante se justifica anular una ley por violar dicha disposición constitucional. Dorante v. Wrangler of P.R., 145 D.P.R. 408, 429-431 (1998) y casos allí citados. Nuestro máximo foro judicial ha "adoptado una postura comprensiblemente laxa para no maniatar al legislador". Herrero v. Emmanuelli, supra. Véase también J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos, Bogotá, Editorial Temis S.A., 2009, pág. 244. En ese sentido, el Tribunal Supremo ha acotado que "una interpretación estricta de la disposición constitucional podría impedir u obstaculizar el proceso legislativo, pues obligaría al legislador a aprobar múltiples leyes para regular un sólo asunto o materia general." Herrero v. Emmanuelli, supra. (Énfasis nuestro.) Véase además M.H. Ruud, No Law Shall Embrace More Than One Subject, 42 Minn. L. Rev. 389, 393-394 (1958). Es decir, "el requerimiento no está diseñado como subterfugio para destruir legislación válida, sino como garantía de que el proceso legislativo se realice de forma transparente, de manera que cada proyecto de ley se discuta y se analice a cabalidad antes de ser aprobado." Herrero v. Emmanuelli, supra, págs. 295-296.*

*Por lo tanto, al examinarse la validez de una ley a la luz de la regla de un sólo asunto, es necesario auscultar todas sus disposiciones para determinar si éstas se relacionan entre sí y son afines con el asunto que se expresa en su título. Id. Lo que comprende "un solo asunto" se interpreta liberalmente, sin dejar de lado el propósito y objetivo de la exigencia constitucional. En ese tenor, "un estatuto puede comprender todas las materias afines al asunto principal y todos los medios que puedan ser justamente considerados como accesorios y necesarios o apropiados para llevar a cabo los fines que están propiamente comprendidos dentro del asunto general". Id. Véase además R.E. Bernier & J.A. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, Segunda Edición, San Juan, Publicaciones JTS, 1987, pág. 81.*

*Esta Ley persigue un solo asunto: dar fiel cumplimiento al Plan Fiscal certificado por la Junta. Por tal razón, promulgamos esta Ley, que atiende varios temas dirigidos a cumplir con el Plan Fiscal.*

## Un Nuevo Gobierno: Responsabilidad ante la Junta de Supervisión

Como resultado de todo lo anterior, cuando asumimos las riendas del Gobierno, nos encontramos con un déficit en caja de más de $7,600 millones según certificado por el Tesoro Federal y la Junta de Supervisión. Se trataba de un gobierno sin acceso a los mercados de capital, con un crédito de categoría chatarra, sin liquidez, sin transparencia en las finanzas públicas, con un gasto gubernamental inflado y con deudas de miles de millones de dólares. Además, el Gobernador enfrentaba la titánica tarea de recuperar la

credibilidad ante el mercado y ante la Junta de Supervisión. Debemos garantizar un Gobierno donde los gastos respondan a la realidad de los ingresos.

Desde el 2 de enero hemos estado implementando un plan concertado para controlar el gasto gubernamental, reactivar nuestra economía y facilitar las condiciones para la creación de más y mejores empleos en el sector privado. Estamos demostrándole al mundo que Puerto Rico está abierto para hacer negocios en un ambiente de seguridad y estabilidad gubernamental.

Las medidas presentadas por el Gobernador y aprobadas por esta Asamblea Legislativa durante estos primeros tres (3) meses de mandato han cambiado el rumbo de Puerto Rico a uno de responsabilidad fiscal.

El pasado 28 de febrero de 2017, el Gobernador presentó un Plan Fiscal completo, abarcador, real y, a la misma vez, sensible a las necesidades de nuestro Pueblo y de los más vulnerables. Luego de semanas de incertidumbre, la razón y la sensatez prevalecieron. El 13 de marzo de 2017, la Junta de Supervisión aceptó y certificó nuestro Plan Fiscal acompañado de una serie de contingencias que garantizan que no habrá despidos de empleados públicos, sin afectar la jornada laboral, manteniendo el acceso a servicios de salud a nuestro Pueblo y protegiendo las pensiones de los más vulnerables. Este Plan Fiscal es la única alternativa para evitar el despido de empleados públicos, la eliminación del derecho a la salud y mantener la solvencia de nuestros sistemas de retiro manteniendo un gobierno operacional y que cumpla con los parámetros para evitar medidas más severas que son parte de las contingencias del Plan aprobadas por la Junta de Supervisión Fiscal como la eliminación total del bono de navidad a todos los empleados públicos y decretar una reducción de jornada laboral que haría inoperante al gobierno.

Las medidas del Plan Fiscal aprobadas están enmarcadas en cumplir con los objetivos fiscales; pero también en promover el desarrollo económico, en nuestra capacidad de restablecer la credibilidad; en que el cambio se traduzca no tan solo en un mero recorte, si no en un beneficio a largo plazo, y, sobre todo, en velar que los sectores más vulnerables y los que trabajan duro, día a día, tengan una mejor calidad de vida.

La validación del Plan Fiscal representa un reconocimiento a la credibilidad del nuevo Gobierno. Demostramos que pasamos de los tiempos de la incoherencia e improvisación, a los tiempos de trabajar en equipo, y tener resultados por el bien de Puerto Rico. Pasamos del "me vale" y la falta de credibilidad; a tener un Plan Fiscal y de desarrollo socioeconómico que cumple con el objetivo de reducción de gasto, pero más importante que ello, que nos permita edificar una mejor sociedad.

Los cambios que estamos encaminando no serán fáciles y tomarán tiempo, pero también tendrán sus resultados en los primeros dos años. Bajo el Plan Fiscal certificado, lograremos balancear los ingresos con los egresos para el año fiscal 2019. Ahora nos compete ejecutar. Las contingencias que acompañan al Plan Fiscal le requieren al

Gobierno cumplir. Debemos asegurar que tengamos el dinero líquido para no afectar el salario de los empleados públicos, la salud del Pueblo y los ingresos de los pensionados.

Esta Ley, se promulga para atemperar el marco legal y jurídico para poder cumplir con las exigencias que nos hiciera la Junta de Supervisión en el Plan Fiscal aprobado en virtud de la Ley Federal PROMESA. En atención a lo anterior, en virtud del poder de razón de Estado y de conformidad con el Artículo II, Secciones 18-19, y el Artículo VI, Secciones 7-8, de la Constitución de Puerto Rico, ante la existencia de una situación de urgencia económica y fiscal grave en Puerto Rico se hace necesaria la aprobación de la presente Ley para que el Estado pueda contar con la liquidez suficiente para poder pagar la nómina de los empleados públicos y sufragar los servicios esenciales que ofrece a sus ciudadanos. Ejercemos este poder de razón de Estado para tomar las medidas necesarias para dar cumplimiento al Plan Fiscal y colocar a Puerto Rico en el camino de la recuperación económica. Cumplir con este Plan constituye un interés apremiante del Estado para mantener sus operaciones y proteger a los más vulnerables.

Según definido por el Tribunal Supremo de Puerto Rico, el poder de razón de Estado es "aquel poder inherente al Estado que es utilizado por la Legislatura para prohibir o reglamentar ciertas actividades con el propósito de fomentar o proteger la paz pública, moral, salud y bienestar general de la comunidad, el cual puede delegarse a los municipios". Domínguez Castro v. E.L.A., 178, D.P.R. 1, 36 (2010).

Nuestro más Alto Foro recientemente dispuso que eran válidas las medidas tomadas para atender una emergencia que sean necesarias y razonables para adelantar el interés gubernamental importante. Véase, Trinidad v. E.L.A., 188 D.P.R. 828 (2013) y Domínguez Castro v. E.L.A., supra, págs. 88-89. De igual forma, el Tribunal Supremo reconoció "la precariedad de la economía como una realidad que necesariamente pesa en la definición del ámbito de la acción gubernamental bajo el poder de razón de Estado" y que en el ejercicio de dicho poder, "la Legislatura goza de amplia facultad para aprobar reglamentación económica dirigida a promover el bienestar de la comunidad". Domínguez Castro v. E.L.A., supra, pág. 37. Por voz del Juez Asociado, señor Kolthoff Caraballo, el Tribunal llamó la atención a que tanto nuestra jurisdicción como el resto del mundo "vive momentos muy convulsos en el aspecto económico y financiero. Parecería que las economías de los países del mundo se encuentran entrelazadas y atadas al rabo de una chiringa que no consigue finalmente elevarse." Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 415 (2010) certiorari denegado, Domínguez Castro v. Puerto Rico, 131 S.Ct. 152 (2010). De ese modo, este Tribunal reconoció que debía ser consciente que existía una realidad que describió como "dura y antipática". Confrontado con tal escenario histórico, este Tribunal estimó que resultaba necesario aspirar a un interés altruista en el que se persiguió el "bienestar económico colectivo, a expensas del bienestar individual." Además, este Tribunal reiteró el reconocimiento en torno a una crisis económica en nuestra jurisdicción en el caso Herrero y otros v. E.L.A., 179 D.P.R. 277 (2010) y destacó, en el contexto de la provisión de un remedio que implicaba desembolso de fondos

públicos a fin de restituir dinero a contribuyentes, que no estaba "ajeno al difícil estado de las finanzas públicas en nuestro país". *Id.* a la pág. 309.

El Tribunal Supremo validó la Ley 3-2013 sobre el Sistema de Retiro de los Empleados Públicos en el caso <u>Trinidad Hernández v. E.L.A.</u>, *supra*, entendiendo que la Legislatura había ejercido el poder de razón de Estado para detener la insolvencia del Sistema de Retiro de Empleados Públicos. El Tribunal Supremo razonó que "de la exposición de motivos... se desprende que las medidas adoptadas son necesarias y razonables para atender de forma adecuada la crisis financiera que atenta contra la solvencia actuarial de este sistema". Añadió que, "ello ciertamente constituye un interés público importante pues, al garantizar la solvencia económica del sistema, se beneficia a todos sus participantes y se atiende, en parte, la crisis fiscal que enfrenta el País en protección del bienestar de todos los puertorriqueños". <u>Trinidad Hernández v. E.L.A.</u>, *supra*, pág. 837. Concluyó que la norma es constitucional "porque, a pesar de que existe un menoscabo sustancial de las obligaciones contractuales en controversia, las medidas implantadas son razonables y necesarias para salvaguardar la solvencia actuarial del Sistema de Retiro, y no existen medidas menos onerosas para lograr ese fin". Íd., pág. 839.

Del mismo modo, recientemente, en el caso <u>Asociación de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de Puerto Rico</u>, 190 D.P.R. 854 (2014), el Tribunal Supremo pasó juicio sobre las medidas aprobadas mediante la Ley 160-2013 para solventar la crisis del Sistema de Retiro de Maestros y determinó que la ley no adelantaba el interés estatal importante requerido por nuestro ordenamiento constitucional en casos de reformas de sistemas de retiro: garantizar la solvencia del mismo sistema. Por ello, resolvió que la Ley 160-2013, en lo que respecta al menoscabo de obligaciones contractuales, es irrazonable y, por lo tanto, inconstitucional. Íd., pág. 12. En esa ocasión, el Tribunal fue enfático al destacar que las medidas aprobadas serán constitucionales si son razonables y necesarias "para adelantar su solvencia actuarial y no existen medidas menos onerosas para lograr ese fin". Íd., pág. 8.

Usando como base el marco legal antes discutido, esta Asamblea Legislativa entiende que las medidas que se toman en esta Ley, son necesarias y razonables para atender de forma adecuada la crisis fiscal, económica y presupuestaria por la que atraviesa Puerto Rico. Así mismo, se trata de unas medidas exigidas para lograr implementar el Plan Fiscal certificado por la Junta de Supervisión de conformidad con la Ley federal PROMESA. Dicho Plan establece ajustes de índole fiscal para estabilizar las finanzas del Gobierno en tiempos que no existe acceso al mercado financiero. De no implementar estas medidas, el bienestar social y económico de Puerto Rico sufrirá daños irreparables por lo que implementar el Plan Fiscal constituye un interés apremiante del Estado para velar por el bienestar del interés público.

<u>Reestructuración Gubernamental</u>

Por otro lado, el Plan para Puerto Rico que impulsa esta Administración y que fue refrendado por el pueblo de Puerto Rico en las pasadas elecciones generales por medio del ejercicio democrático del voto, propone implementar una nueva estructura de gobierno que baje significativamente el gasto público y mejore sustancialmente sus funciones. Para lograr esto, se requiere la evaluación concienzuda de los servicios que provee el gobierno, a fin de determinar cuáles pueden ser consolidados, delegados al sector privado o eliminados porque ya no son necesarios. Todo ello, sin que conlleve despidos de empleados públicos, sino la movilización de los mismos acorde con la necesidad de servicios de nuestros ciudadanos.

Cónsono con lo anterior y, como parte de las primeras medidas tomadas por esta Administración para atajar la crisis fiscal mediante la reingeniería de la estructura gubernamental, se aprobó la Ley 8-2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico". Esta Ley, convierte al Gobierno en un Empleador Único para que los funcionarios públicos pasen a ser empleados del Gobierno y no de sus diferentes entidades, permitiendo así la mejor utilización de los recursos humanos donde exista una necesidad apremiante mediante el mecanismo de movilidad, sin que el empleado tenga que renunciar al puesto que ocupa y comenzar de nuevo en otra instrumentalidad gubernamental. Mediante la movilidad, se pretende reforzar el entendimiento de lo que significa el equilibrio entre la fuerza laboral y la prestación de servicios públicos. De esta manera, obtenemos una distribución eficiente del recurso humano del Gobierno y creamos una estructura gubernamental ágil, basada en la evaluación continua de necesidades y ayudando a los servidores públicos a realizar los ajustes y adaptaciones requeridas por la actual crisis fiscal y los retos futuros.

Durante el pasado cuatrienio, se aprobó la Ley 89-2016, conocida como la "Ley de Empleo Temporal en el Servicio Público", bajo el supuesto de corregir la disparidad en el trato de los empleados con carácter temporal en el servicio público y forzar a las agencias a ser diligentes en la creación o solicitud de creación de puestos. También, se promulgó la misma bajo el razonamiento de que clasificar correctamente a los empleados ayudaría en la administración de los recursos humanos del servicio público y evitará la erogación de fondos innecesarios. Asimismo, mediante dicha Ley, se le concedió estatus de empleado regular a aquellos empleados transitorios que llevaban dos (2) años o más realizando funciones de necesidad permanente, sujeto a ciertos requisitos de elegibilidad.

No obstante, dicha Ley ha tenido el efecto de acrecentar la nómina gubernamental en momentos donde las finanzas públicas atraviesan una crisis fiscal sin precedentes. El reclutamiento de empleados temporales, fueran estos catalogados como: irregulares, transitorios o por contrato, no debe utilizarse como subterfugio para la posterior creación de puestos regulares de necesidad permanente sobrecargando así los fondos del Estado y sin medir la efectividad de esos recursos en la prestación de los servicios que merece el Pueblo.

Por lo cual, encaminar a Puerto Rico hacia la ruta correcta requiere un cambio de paradigma, como el que propone esta Administración a través del Modelo para la Transformación Socioeconómica de Puerto Rico, expuesto en el Plan para Puerto Rico. La misión es establecer un nuevo gobierno que facilite el desarrollo económico y cuya visión sea la de un gobierno basado en un modelo científico, donde la evidencia y los resultados importen y la colaboración ciudadana sea el eje principal de su validación. Para lograr esta meta el gobierno debe convertirse en un facilitador del desarrollo económico, implementando reformas reales y contundentes; la estructura gubernamental debe ser costo-efectiva, eficiente y transparente y; el servicio público debe estar fundamentado en la integridad, excelencia, responsabilidad y rendición de cuentas.

### Equidad en Beneficios Marginales para todos los empleados públicos

De otra parte, como hemos indicado y es de todos conocidos, nuestra Isla atraviesa por una severa crisis fiscal y los recursos son limitados para atender todos los compromisos del gobierno. En medio de una situación novel como lo es la imposición de una Junta de Supervisión Fiscal y ante el impago de las deudas contraídas, el Gobierno de Puerto Rico se encuentra forzado a reestructurar todo el componente gubernamental y dirigir los recursos a aquellas áreas que más lo ameriten.

Puerto Rico enfrenta un momento histórico en el que necesita la colaboración de todos los sectores en la adopción de soluciones inmediatas que contribuyan en su restauración económica. La presente Ley atiende de manera responsable y justa la ausencia de uniformidad entre nuestros empleados públicos en cuanto a los beneficios marginales de los que podrán disfrutar. *Durante este periodo crítico de la economía local.* No existe justificación alguna para *mantener, durante estos próximos años previos a la recuperación fiscal,* ~~tener~~ una brecha tan profunda entre los beneficios marginales que disfrutan los empleados públicos de algunas agencias del gobierno y los que disfrutan los empleados públicos de las corporaciones públicas. En algunas corporaciones públicas sus empleados se benefician del doble y del triple de los beneficios que ostentan los empleados del gobierno central sin que ello responda a la realidad económica que vive Puerto Rico. Peor aún, al así actuar se crea una desigualdad entre los empleados públicos beneficiando a unos pocos al costo de otros muchos. Además, los costos de estas medidas dispares hacen insostenible su cumplimiento *en este periodo* y el mantenimiento de los empleos públicos. Por ello, esta Legislatura entiende prudente tomar acciones que conlleven ahorros y nos permitan mantener a todos los empleados públicos sin despidos.

Para que tengamos una idea de los gastos que se generan en las Corporaciones Públicas por el pago de todos los beneficios marginales, incluyendo el bono de navidad y aportaciones de salud, el presupuesto recomendado para el año fiscal 2017 presentado ante la Junta de Supervisión establece que estas partidas tendrían un gasto presupuestado ascendente a $171.877 millones de dólares, esto sin contar a la Universidad de Puerto Rico, la Autoridad de Energía Eléctrica de Puerto Rico y la Autoridad de Acueductos y

Alcantarillados. En cuanto al pago de horas extras, se presupuestó la cantidad de $23.618 millones de dólares y en la liquidación de días por enfermedad y vacaciones la cantidad de $9.906 millones de dólares. El efecto de esto, es una disparidad entre los beneficios marginales que reciben los empleados del Gobierno Central *vis a vis* los empleados o funcionarios de las instrumentalidades o corporaciones públicas. En las Corporaciones Públicas se gasta en beneficios marginales un promedio de $10,840 por empleado, mientras que en el Gobierno Central se gasta en promedio $2,523 por empleado. *Mientras no se recupere la economía local, no se puede justificar dicha disparidad.*

De igual forma, según estadísticas provistas por el Banco Gubernamental de Fomento y la Junta de Planificación de Puerto Rico, en el año fiscal 2016, las corporaciones públicas fueron responsables de una deuda de $46,861.6 millones lo que representó 72.9% de la deuda pública total del Gobierno de Puerto Rico, la cual se estimó en $64,254 millones. Las corporaciones públicas han aumentado su participación en la deuda de un 68.9% en el año fiscal 2004 a un 72.9% en el año fiscal 2016. En términos absolutos, el aumento de la deuda pública total de las corporaciones públicas fue de $23,484 millones lo que, a su vez, representó un aumento de 100.5%. De esta forma, en el año fiscal 2016, la deuda de las corporaciones públicas se estimó en más del doble de lo que era en el año fiscal 2004.

La realidad que ha imperado por años en ~~la~~ *las* corporaciones públicas es que las cláusulas económicas negociadas en algunos convenios colectivos sobrepasaron por mucho lo que por ley estaba establecido, comprometiendo de esta forma la estabilidad fiscal del gobierno y a su vez poniendo en riesgo los empleos de los servidores públicos al crear una inestabilidad fiscal insostenible *en este momento crítico fiscal*. Por ejemplo, muchas corporaciones se comprometieron, aun sin contar los recursos para ello, al pago de horas extras a razón del doble y del triple del sueldo de sus empleados. De igual forma, muchas bajaron la cantidad de horas que debían ser acumuladas para poder recibir compensación económica y no de tiempo compensatorio.

En Puerto Rico, el derecho a compensación por horas extras de trabajo está contemplado en la Sección 16 del Art. II, Carta de Derechos de la Constitución. Allí se expresa que:

Se reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella, a recibir igual paga por igual trabajo, a un salario mínimo razonable, a protección contra riesgos para su salud o integridad personal en su trabajo o empleo, y a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordinaria que nunca será menor de una vez y media el tipo de salario ordinario, según disponga por ley.

Mediante la presente Ley derogamos la sección 10.2 de la Ley 8-2017, que establece el método de remuneración del trabajo en exceso que será aplicable a los empleados públicos, para integrarla en esta Ley y extender su aplicación a las corporaciones públicas.

El método establecido para la remuneración del trabajo en exceso establecido en la presente ley establece que los empleados tendrán derecho a recibir el pago de horas extras a razón de tiempo y medio. De esta forma, se cumple cabalmente con lo establecido en nuestra Constitución y con la Ley Federal que rige el pago de horas extras.

Por otra parte, la Ley Federal de Normas Razonables del Trabajo (FLSA), 29 U.S.C.S. secs. 201-219, regula entre otros asuntos el pago de horas extras y aplica a los empleados públicos del Gobierno de Puerto Rico. Nuestro Tribunal Supremo ha resuelto que, en tanto y en cuanto una ley estatal sea más beneficiosa para el empleado que las disposiciones del FLSA, la ley federal no impide la aplicación de aquélla por no estar en conflicto. Los propósitos de ambas leyes son, en dichas circunstancias, perfectamente armonizables. Vega v. Yiyi Motos, Inc., 146 D.P.R. 373 (1998).

La FLSA, estableció que a los empleados se les paga a razón de tiempo y medio (1.5) de la tasa regular por el periodo trabajado en exceso de las cuarenta (40) horas semanales. La FLSA, asimismo, provee para que los empleados de una agencia pública reciban tiempo compensatorio a tiempo y medio (1.5) de la tasa regular en lugar del pago de horas extras.

La presente Ley tiene como parte de sus propósitos lograr que el gasto operacional de las corporaciones públicas se realice de manera eficiente, responsable y prudente, con la finalidad de reducir gastos de manera permanente. El Gobierno de Puerto Rico tiene un interés apremiante en controlar los gastos de nóminas para salvaguardar los empleos, la viabilidad de las corporaciones públicas así como sus finanzas. La situación fiscal precaria del Gobierno, su Fondo General y sus Corporaciones Públicas obliga a establecer controles en el gasto en nómina en exceso a lo presupuestado para salvaguardar la viabilidad de las corporaciones públicas y a su vez la jornada laboral de los empleados públicos y el salario de los mismos.

De igual forma, a través de la presente Ley se establecen cuáles serán los beneficios marginales que disfrutarán todos los empleados públicos *durante el periodo de crisis fiscal* irrespectivamente de la agencia o corporación pública donde trabajen. De esta forma, se igualan los beneficios marginales que reciben los empleados públicos de las diferentes agencias del Gobierno y los que reciben los empleados públicos que trabajan en las diferentes corporaciones públicas, quienes dependiendo de la corporación en que estén, actualmente disfrutan diferentes beneficios marginales.   Asimismo, los empleados públicos unionados en las diferentes agencias y corporaciones públicas, dependiendo del convenio colectivo, ostentan diferentes beneficios marginales aun estando en la misma agencia o corporación pública. No existe razón alguna que justifique en medio *mientras se mantenga* de la crisis fiscal que vive Puerto Rico y ante la amenaza por parte de la Junta de Supervisión de eliminar el bono de navidad de todos los empleados públicos y reducirles la jornada laboral; perpetuar una desigualdad desproporcionada e irrazonable de beneficios marginales pactados en momentos en que la situación fiscal de Puerto Rico era otra y no se encontraba en una crisis de las proporciones que hoy tenemos.

Tal como indicamos anteriormente, en el pasado, nuestro ilustre Tribunal Supremo ha sostenido la validez de estatutos de naturaleza económica aprobados para lidiar con momentos de crisis o urgencia en Puerto Rico y ha reconocido "la posibilidad de que, en circunstancias de emergencia relacionadas con aspectos económicos, la Asamblea Legislativa puede hacer uso de sus amplios poderes". Domínguez Castro, *supra*, a la pág. 49 (2010) (citas omitidas). Recientemente, ese Honorable Tribunal también fue consciente de la crisis estructural del Sistema de Retiro de los Empleados Públicos y sostuvo la validez constitucional del estatuto que, para atender dicha crisis, enmendó la Ley de Retiro de los Empleados Públicos, Ley Núm. 3-2013. *Véase* Trinidad Hernández v. ELA, *supra*.

Por su parte, el Artículo II, Sección 7, de nuestra Constitución dispone que: "No se aprobarán leyes que menoscaben las obligaciones contractuales". Art. II, Sec. 7, Const. E.L.A., L.P.R.A. Tomo 1. Dicha cláusula no establece una prohibición absoluta que impida el poder de reglamentación del Estado en beneficio del interés público. Bayrón Toro, 119 D.P.R. a la pág. 619.

La garantía constitucional contra el menoscabo de obligaciones contractuales sólo se activa cuando la modificación afecta adversamente los términos o condiciones esenciales del contrato que principalmente dieron motivo a la celebración del mismo, de modo que se frustren las expectativas razonables de las partes. Domínguez Castro, *supra*. Véase además Allied Structural Steel Co. v. Spannaus, 438 U.S. 234 (1978); El Paso v. Simmons, 379 U.S. 497 (1965). La razonabilidad de la ley se determina considerando principalmente la sustancialidad del interés público promovido por el estatuto y la magnitud del menoscabo causado por su aplicación retroactiva. Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 396 (1973). Si el menoscabo ocurre como consecuencia de una modificación razonable y necesaria para adelantar un interés público, el tribunal sostendrá su validez. Bayrón Toro, *supra*.

Aún si el menoscabo es sustancial, la prohibición constitucional no es absoluta. La misma tiene que acomodarse al poder de razón de estado. Bayrón Toro, *supra*. Al considerar la validez de estatutos bajo la cláusula de menoscabo, el criterio aplicable es de razonabilidad. Warner Lambert v. Tribunal Superior, *supra*. Por consiguiente, la función del tribunal consiste en establecer un balance razonable entre el interés social de promover el bien común y el interés, también social, de proteger las transacciones contractuales contra la aplicación arbitraria e irrazonable de las leyes. Id.

Una vez se determina que el menoscabo es sustancial, entonces procede auscultar si la modificación persigue adelantar un interés importante en beneficio del bienestar general. Si el menoscabo surge como consecuencia de una modificación razonable y necesaria dirigida a adelantar un interés público significativo y legítimo, se sostendrá la validez de la ley. Bayrón Toro, *supra*.

En Buffalo Teachers Union v Tobe, 464 F.3d 362, 365 (2do Cir. 2006), el Segundo Circuito expresó lo siguiente en torno al examen que debe realizar un foro adjudicativo

al adentrarse a justipreciar una demanda en que se invoque la cláusula constitucional
sobre el menoscabo de relaciones contractuales:

> When a state is sued for allegedly impairing the contractual obligations . . .
> the state will not be held liable for violating the Contracts Clause of the
> United States Constitution unless plaintiffs produce evidence that the
> state's self-interest rather than the general welfare of the public motivated
> the state's conduct. On this issue, plaintiffs have the burden of proof
> because the record of what and why the state has acted is laid out in
> committee hearings, public reports, and legislation, making what
> motivated the state not difficult to discern. (Subrayado nuestro).

Por otra parte, como corolario a la doctrina de separación de poderes, al evaluar la
necesidad o razonabilidad de la medida para efectos de la cláusula sobre el menoscabo
de obligaciones contractuales, el Tribunal Supremo de Puerto Rico ha establecido que, a
pesar de que no procede dar completa deferencia al Legislador, "esto no significa que el
foro judicial no deba dar alguna deferencia a la determinación de necesidad y
razonabilidad que hizo el legislador en el ejercicio de su poder constitucional,
especialmente cuando se trata de regulaciones socioeconómicas." Domínguez, *supra*.
Tampoco corresponde realizar una determinación "*de novo* sobre la existencia de otras
alternativas para la solución del problema" Id, a la pág. 89. Recientemente, este Tribunal
reiteró que se debe "dar deferencia a la determinación de la Asamblea Legislativa
respecto a la necesidad y razonabilidad de la medida." Trinidad Hernández v. ELA,
*supra*. Además, respecto a la razonabilidad de la medida "es norma establecida que no
corresponde a los tribunales hacer una determinación de *novo* sobre la existencia de otras
alternativas para solucionar el problema. La determinación de la Asamblea Legislativa
en torno a las medidas aprobadas constituye un ejercicio de política pública que merece
[…] deferencia en este sistema de separación de poderes." Trinidad Hernández v. ELA,
*supra*.



Recordemos que, de entenderse que existe un menoscabo a una relación
contractual, un tribunal debe analizar si la legislación en cuestión sirve un interés público
legítimo. Home Bldg. & Loan Ass'n, *supra*, U.S. Trust, 431 U.S. at 25. Se ha definido el
concepto de "legitimate public purpose" como uno cuyo fin sea remediar "an important
general, social or economic problem rather than providing a benefit to special interests."
Buffalo Teacher's Federation, *supra*. Nótese que se ha sostenido que la salud económica y
financiera de un estado es un interés legítimo de importancia pública. Véase, Baltimore
Teacher's Union v. City Council of Baltimore et al., 6 F.3d 1012, 1017 (4to Cir. 1993)
(resolviendo que no violaba la cláusula de menoscabo contractual una legislación que
redujo salarios para cuadrar las finanzas estatales); In re Subway-Surface Supervisors
Ass'n v. New York City Transit Auth., 375 N.E.2d 384 (1978) (sosteniendo la validez
constitucional de un estatuto que congeló los salarios municipales en vista de la
emergencia fiscal que aquejaba el estado de Nueva York); Buffalo Teachers, *supra* (se
sostuvo la congelación de salarios de maestros ante una crisis fiscal).

Ante esta situación, el Gobierno de Puerto Rico tuvo que comprometerse mediante el Plan Fiscal aprobado por la Junta de Supervisión con implementar ciertas medidas en aras de poder salvaguardar el trabajo de miles de puertorriqueños, que no se les reduzca la jornada laboral a nuestros empleados con la consecuencia de tener una reducción en su sueldo mensual de hasta un veinte (20%) por ciento y la eliminación total del bono de navidad. Entre las medidas que el Gobierno se comprometió a implementar se encuentra, como hemos indicado, el uniformar los beneficios marginales de todos los empleados públicos; uniformar el pago de horas extras de las Corporaciones Públicas al Gobierno Central, igualar los beneficios marginales de los empleados del Gobierno Central y los de las Corporaciones Públicas; eliminar la liquidación de los excesos de días acumulados por vacaciones y enfermedad; y equiparar específicamente la licencia de vacaciones de los empleados públicos a lo que actualmente tienen los empleados en el sector privado.

*En aras de lograr la consecución de los objetivos de la presente Ley y hacerlo de la forma menos onerosa para nuestros empleados públicos, se establece que las disposiciones aplicables a licencias y beneficios marginales serán de duración temporera. Se restituirán los mismos conforme sea certificado por los miembros del Comité de Cumplimiento con el Plan Fiscal.*

Para poder cumplir con el Plan Fiscal certificado, mediante la presente Ley se derogan las disposiciones de beneficios marginales establecidas en la Ley 8-2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", y se incorporan en esta Ley, extendiendo su aplicación a los empleados de las Corporaciones Públicas. De esta forma, *según anteriormente dispuesto* se igualan los beneficios marginales y la remuneración del trabajo en exceso de la jornada regular que podrán disfrutar todos los empleados públicos, independiente de donde laboren. De igual forma, se reducen los días que se podrán acumular al mes por concepto de vacaciones y se equiparan a los que actualmente tienen los trabajadores en el sector privado, bajando la licencia de vacaciones a quince (15) días. Por último, se elimina el pago por concepto del exceso de días vacaciones y enfermedad. No obstante, se establece de forma obligatoria la implementación de medidas por parte de los supervisores para asegurar que nuestros empleados no pierdan los días acumulados y puedan disfrutar los mismos.

No podemos pasar por alto que, de haber entrado de inmediato en vigor el recorte a la jornada laboral como propuso la Junta de Supervisión, la economía de Puerto Rico hubiese sufrido un golpe devastador al eliminarse el bono de navidad y reducírsele en un 20% el sueldo de todos los empleados públicos. Ante esta situación fue que se establecieron las vías alternas antes indicadas para poder obtener los fondos requeridos sin trastocar la jornada laboral de los empleados y el salario de los mismos.

<u>PROMESA y la Cláusula de Supremacía</u>

Por otra parte, es importante recalcar la aplicación y el mandato que el Congreso de los Estados Unidos de América, en virtud de sus poderes plenarios sobre el Territorio

18

de Puerto Rico, nos impuso cuando aprobó la Ley PROMESA que crea una Junta de Supervisión a quien, dentro de una serie de encomiendas, le confirió la de aprobar y supervisar la ejecución un Plan Fiscal para la estabilización económica de Puerto Rico.

Dicha norma aprobada el 4 de mayo de 2016 establece una cláusula de supremacía que citamos:

> Sec. 1 "Puerto Rico Oversight, Management, and Economic Stability Act" or "PROMESA". (SEC. 4. SUPREMACY. **The provisions of this Act shall prevail over any general or specific provisions of territory law,** State law, **or regulation that is inconsistent with this Act.** (Énfasis nuestro).

Conforme el Art. 101 de la Ley PROMESA, la Junta de Supervisión, a su plena discreción, en el momento que considere apropiado, podrá designar a cualquier instrumentalidad territorial como una instrumentalidad territorial cubierta y sujeta a las obligaciones de la referida Ley. A este momento, la Junta de Supervisión ha designado todas las corporaciones públicas como entidades cubiertas. Por otro lado, conforme al Artículo 205 de PROMESA, la Junta de Supervisión podrá someter en cualquier momento recomendaciones al Gobernador o a la Legislatura sobre acciones que el gobierno territorial deba tomar para garantizar el cumplimiento del plan fiscal o para promover de alguna otra manera la estabilidad financiera, el crecimiento económico, la responsabilidad administrativa y la eficiencia en la prestación de servicios. Hechas las recomendaciones, el Gobernador tendrá que someter una declaración indicando si el gobierno adoptará la recomendación. Si no la adopta, el Gobernador deberá explicar al Presidente de los Estados Unidos y al Congreso sus razones para no adoptarlas.

Siendo así, debemos repasar las encomiendas que se le asignan a la Junta de Supervisión Fiscal para fiscalizar y asegurar que las disposiciones del Plan Fiscal aprobado se cumplan.

Recordemos que PROMESA goza de supremacía sobre cualquier legislación del territorio de Puerto Rico incompatible con los motivos, responsabilidades, encomiendas y objetivos que tiene la norma federal y la Junta de Supervisión como ente encargado de su ejecución. En lo que respecta a la presente Ley, la Junta estableció que si el gobierno no logra mediante la implantación de otras medidas reducciones en los gastos que generen los fondos suficientes y una reserva de efectivo adicional de $200 millones, para el 30 de junio de 2017 entrará en vigor, efectivo el 1 de julio de 2017, un programa de reducción de jornada laboral para todos los empleados públicos, lo que representaría una disminución en el sueldo de nuestros empleados de hasta un veinte (20%) por ciento del sueldo mensual. De igual forma, establecen que se implementaría la eliminación total del bono de navidad para todos los empleados públicos. La alternativa de la Junta de Supervisión para reducir la jornada laboral en el gobierno es equivalente a cuatro (4) días al mes para la mayoría de los empleados de la Rama Ejecutiva y dos (2) días al mes para maestros y personal de primera línea en instituciones que operan 24 horas al día. De

igual forma, la Junta de Supervisión ha establecido que podrían darse reducciones comparables a estos ahorros por reducción parcial de jornada de la Rama Ejecutiva para otras entidades a través de todo el gobierno, incluyendo las corporaciones e instrumentalidades públicas y las ramas Legislativa y Judicial. Tal y como nuestro Gobernador ha mencionado en múltiples foros, la reducción de jornada laboral NO es una opción.  Por tal razón, estamos tomando estas medidas cautelares para no tener que llegar a esa contingencia impuesta por la Junta de Supervisión.

Usando como base este marco legal, esta Asamblea Legislativa está convencida que las medidas que se toman en esta Ley son necesarias y razonables para atender de forma adecuada la crisis fiscal, económica y presupuestaria que atraviesa Puerto Rico y representan un ejercicio legislativo válido.

Las acciones que se toman en la presente Ley y su aplicación a todos los empleados públicos unionados o no unionados que laboran en el Gobierno Central y en las Corporaciones Públicas no se toman de forma liviana. Al realizar un balance de intereses, en estos momentos de crisis entendemos que los beneficios marginales tienen que ser atemperados a las necesidades de los tiempos y a la crisis fiscal y estructural que enfrenta el Gobierno de Puerto Rico. Ante el nuevo estado de Derecho creado por la aprobación de la Ley PROMESA y la llegada de la Junta de Supervisión, la presente Ley constituye un medio razonable, equitativo, uniforme y necesario para afrontar la crisis actual y es la única opción que tiene el Gobierno de Puerto Rico para poder cumplir con el Plan Fiscal certificado por la Junta de Supervisión y evitar que se imponga una reducción de jornada laboral a nuestros empleados públicos que equivaldría a reducirles el veinte (20%) por ciento de su sueldo mensual y a su vez la eliminación total del bono de navidad. Esta Ley se promulga al amparo de la facultad de esta Asamblea Legislativa para aprobar y promulgar legislación económica dirigida a promover el bienestar de la comunidad puertorriqueña.

### Dividendo Extraordinario a la Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio

La Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio ("ASC") fue creada mediante la Ley 253-1995, según enmendada, como parte del sistema de seguro de responsabilidad obligatorio para vehículos de motor que se estableció desde entonces en Puerto Rico. El propósito de dicho seguro fue viabilizar una solución al problema de daños causados a vehículos de motor de terceros como resultado de un accidente de tránsito, conforme a los requisitos de reclamación aplicables.

En su origen, la cubierta del seguro obligatorio que estableció dicha ley tenía un tope de tres mil dólares ($3,000). Dicho tope fue aumentado en el año 2009 por virtud de la Ley Núm. 201-2009, a cuatro mil dólares ($4,000). Cabe destacar que a pesar de este aumento en cubierta de un treinta y tres por ciento (33%), las primas del seguro, que tiene

un valor de noventa y nueve dólares ($99) para vehículos privados de pasajeros y ciento cuarenta y ocho dólares ($148) para vehículos comerciales, continuaron inalteradas.

Desde el aumento en cubierta en el año 2009, el costo de los bienes y servicios en general ha continuado aumentando y la industria automotriz no ha estado exenta de estos aumentos. Por eso, el costo de las piezas y reparaciones de vehículos hoy es mayor que hace ocho (8) años. Es por ello que esta administración entiende pertinente que la cubierta del seguro obligatorio se aumente a cuatro mil quinientos dólares ($4,500). Consistentemente con este aumento, se autoriza a la ASC a revisar el costo de las primas en o antes del 30 de junio de 2017.

Por otro lado, las condiciones bajo las cuales operaba la ASC desde su creación, conllevó un incremento sustancial en su capital. Dado que la ASC era el único proveedor de seguro de responsabilidad obligatorio para vehículos de motor, era necesario que mantuviese una reserva de capital significativa para cubrir sus operaciones y cumplir con la reserva requerida por el Código de Seguros. Por ello, mediante la Ley Núm. 60-2013 se autorizó la declaración de un dividendo extraordinario, acompañada de una contribución incentivada, lo que permitió generar ingresos adicionales de cien millones de dólares ($100,000,000). Del mismo modo, por virtud de la Ley Núm. 157-2015 se autorizó la declaración de otro dividendo extraordinario de cuarenta y dos millones de dólares ($42,000,000.00), igualmente acompañada de una contribución especial. Sin embargo, como resultado de la apertura del mercado a competencia para que otras compañías de seguro pudieran ofrecer el servicio, a elección del conductor, resulta innecesario que la ASC mantenga una cantidad tan alta de capital en reserva y a la cual no pueden acceder los miembros de la ASC, quienes son las mismas compañías que compiten con esta entidad para ofrecer el servicio de seguro obligatorio.

Mediante esta ley se autoriza la declaración de un dividendo extraordinario, acompañado de la correspondiente contribución incentivada. Una vez declarado el dividendo por los miembros de la ASC, el gobierno recibiría la cantidad de setenta millones de dólares ($70,000,000).

A diferencia de la pasada administración, que utilizó los fondos obtenidos mediante leyes similares a la presente para distribuir entre algunas entidades que, aunque muchas perseguían fines loables otras conllevaban un malgasto innecesario de fondos, mediante esta Ley pretendemos atender la falta de liquidez del Gobierno de Puerto Rico para proteger los servicios que se ofrecen a la ciudadanía, los empleos en el sector público, los ingresos de los miembros de los sistemas de retiro, entre otros fines similares.

Por todo lo anterior, esta Asamblea legislativa autoriza a la ASC a declarar un dividendo extraordinario de *setenta millones de dólares ($70,000,000) de* su reserva de capital *acompañado de una contribución especial de un cincuenta por ciento (50%)*. A su vez, *De este modo,* la ASC remitirá la suma de setenta millones de dólares ($70,000,000) *treinta y cinco millones de dólares ($35,000,000)* que nutrirán el Fondo General del Gobierno de

Puerto Rico. ~~Por su parte, los miembros de la ASC podrán reclamar hasta un total de treinta y cinco millones de dólares ($35,000,000.00) en créditos sobre su contribución de ingresos por los próximos 4 años, los cuales servirán como una inyección a la economía de Puerto Rico. Esto no afectará los ingresos del gobierno, ni su flujo de caja.~~

### Transferencia de ganancias de las corporaciones públicas al fondo general

Una de las medidas de mayor trascendencia que esta administración ha logrado aprobar es la "Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico", Ley 5-2017. La misma declara como política pública del Gobierno de Puerto Rico "tomar todas las medidas requeridas para Puerto Rico establecer la responsabilidad fiscal necesaria dentro del Gobierno y sus instrumentalidades para satisfacer sus obligaciones y garantizar que se provean aquellos servicios gubernamentales esenciales para la salud, seguridad y bienestar de los residentes de Puerto Rico." Del mismo modo, la citada Ley declara que el gobierno podrá "ejercer su poder de razón de Estado de una manera que reconozca la responsabilidad de satisfacer las obligaciones financieras del Gobierno de Puerto Rico y sus instrumentalidades, mientras continúa proveyendo servicios gubernamentales esenciales para la salud, seguridad y bienestar de los residentes de Puerto Rico a la luz de los limitados recursos disponibles del Gobierno de Puerto Rico y sus instrumentalidades". Dicho de otro modo, el gobierno tomará todas las medidas necesarias para asegurarse que las necesidades de la gente sean debidamente atendidas.

La Ley Núm. 5-2017 puntualiza que como resultado de la continua emergencia financiera y de la aprobación de PROMESA, la Asamblea Legislativa tiene a su haber la responsabilidad de ejercer su poder de razón de estado. En ese sentido, señala que se tiene que reconocer la responsabilidad de satisfacer las obligaciones financieras del Gobierno de Puerto Rico y sus instrumentalidades, mientras se continúan proveyendo servicios gubernamentales esenciales para salvaguardar la salud, seguridad y el bienestar de los residentes de Puerto Rico dados los limitados recursos disponibles del Gobierno de Puerto Rico y sus instrumentalidades, todo esto de manera congruente con PROMESA.

En atención a lo anterior, la Ley 5-2017 faculta al Gobernador a emitir órdenes ejecutivas para requerir el uso de los recursos disponibles para pagar por servicios esenciales según el Gobernador estime necesario para proteger la salud, seguridad y bienestar de los residentes de Puerto Rico y establecer normas de prioridad para el desembolso de fondos públicos cuando los recursos disponibles para el año fiscal sean insuficientes para cubrir las asignaciones hechas para ese año fiscal, entre otras medidas. Esto, en atención a la limitación de recursos que posee el Estado.

Ante la situación fiscal y económica antes indicada, resulta evidente que el Gobierno de Puerto Rico tiene que tomar medidas para cumplir con el Plan Fiscal sin afectar los servicios esenciales que recibe la ciudadanía. Esto requiere maximizar el uso de los recursos disponibles del Estado, incluyendo los recursos que tienen las corporaciones públicas. Es por ello que la presente legislación ordena a las corporaciones

públicas e instrumentalidades del Gobierno de Puerto Rico a transferir al Departamento de Hacienda los fondos necesarios para garantizar la liquidez del gobierno.

La determinación de la cantidad que será aportada por cada una de las corporaciones públicas será determinada por un comité compuesto por el Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF), el Secretario del Departamento de Hacienda (Hacienda) y el Director Ejecutivo de la Oficina de Gerencia y Presupuesto (OGP). Para ello, el comité tomará en consideración los sobrantes con los que cuente cada corporación luego de haber sido cubiertos sus gastos operacionales y que los servicios que ofrecen estas entidades no se afecten. Dichos fondos serán depositados en el Fondo General del Gobierno de Puerto Rico para así contar con la liquidez requerida en el Plan Fiscal.

Por todo lo anterior, en atención a la situación de emergencia fiscal y económica que atraviesa Puerto Rico, en el ejercicio de su poder de razón de estado, esta Asamblea Legislativa reconoce la necesidad de remediar la emergencia financiera por lo que promueve los mecanismos que se establecen en la presente Ley para asegurar la liquidez del Gobierno de Puerto Rico, utilizando los recursos disponibles en las corporaciones públicas, sin que esto represente una carga desproporcional para los ciudadanos, ni afecte los servicios esenciales que el gobierno provee.

### Disposición de Propiedades Inmuebles de la Rama Ejecutiva

Por otra parte, la crisis económica y fiscal que afronta el Gobierno ha repercutido en todo el espectro de nuestra infraestructura, incluyendo nuestra propiedad inmueble. La Rama Ejecutiva compuesta por sus agencias, entidades y corporaciones públicas tiene un sin número de propiedades inmuebles en desuso que pueden venderse al sector privado para diversos propósitos. Muchas de las propiedades llevan años sin ninguna utilidad pública. Sin embargo, cuentan con espacios amplios en lugares estratégicos que muy bien pueden ser maximizadas por la industria o comercio privado para desarrollar sus actividades. Incluso, algunas propiedades podrían servir para construir o habilitar una residencia o para entidades sin fines de lucro.



Lamentablemente en Puerto Rico no existe una política pública coherente y uniforme que fomente la venta eficiente, eficaz y coordinada de los bienes inmuebles del Estado. En ese tenor, es necesario establecer un marco jurídico que facilite mover el mercado de bienes raíces estatales y le dé certeza a las transacciones de estos activos. El beneficio sería uno múltiple: por un lado el Gobierno podrá allegar mayor dinero producto de la disposición del inventario de bienes inmuebles y disponer de mayor liquidez para paliar la crisis fiscal que enfrenta; inyectar al mercado un ingrediente de actividad económica al permitir que el sector privado se envuelva en la adquisición de propiedades del Estado para usos comerciales o residenciales y pueda fungir como generador de empleos; fomentar el bienestar social ante la posibilidad de que las

propiedades puedan ser adquiridas por entidades sin fines de lucro para ofrecer servicios sociales, etc. En fin, las posibilidades son infinitas.

Por eso, es importante tener un paradigma adecuado que propicie la disposición de la propiedad inmueble dentro de un marco de competencia justa donde se coloque el bienestar y el interés público como portaestandarte de cada transacción. Por eso, esta Ley crea el Comité de Evaluación y Disposición de Propiedades Inmuebles y le faculta a llevar a cabo todas las acciones necesarias para lograr la disposición de los bienes inmuebles. Esto en balance con los mejores intereses del Estado como vendedor, el comprador y la ciudadanía en general. Por medio de esta Ley se establecen los preceptos generales que guiarán la aprobación de reglamentos y normas que uniformen los procesos de venta de inmueble y le den mayor certeza a las transacciones.

Esta medida representa un paso más en la dirección del rescate de nuestro Pueblo y de superar las malas decisiones del pasado. Tenemos un compromiso inquebrantable por fortalecer el componente de la actividad económica. Estamos seguros que con el esquema aquí establecido se proveen los mecanismos necesarios para fortalecer el mercado de bienes raíces y proveerle más recursos al Estado en aras de afrontar la crisis y cumplir con el Plan Fiscal. Ese es nuestro norte y nada nos detendrá.

## Ley de Contabilidad del Gobierno y Fondos Especiales

La política financiera del Gobierno de Puerto Rico establecida en la Ley Núm. 230 de 23 de julio de 1974, según enmendada y conocida como "Ley de Contabilidad del Gobierno de Puerto Rico", en relación con el control y la contabilidad de los fondos y propiedad pública requiere que la contabilidad del Gobierno de Puerto Rico refleje claramente los resultados de sus operaciones financieras, provea la información financiera necesaria para la administración de las operaciones gubernamentales y para la preparación y ejecución del presupuesto, y constituya un control efectivo sobre los ingresos, desembolsos, fondos, propiedad y otros activos del gobierno. De igual forma, se establece como política pública que no se establezcan fondos especiales o fuentes de repagos exclusivas para unos fines particulares sin considerar el bienestar público. Esto nos permitirá llevar a cabo programas de gobierno examinando los servicios esenciales, que las asignaciones de fondos para los diferentes programas del gobierno se limiten a las atenciones de un sólo año económico; y que todas las recaudaciones del Gobierno ingresen al fondo general del tesoro estatal para con ellas costear los programas del Gobierno en la medida y alcance en que la Asamblea Legislativa lo estime necesario y  conforme a las partidas establecidas en el Plan Fiscal aprobado. Desafortunadamente, a través de los años, se han adoptado una serie de medidas que han pasado por alto lo anterior y han creado múltiples fondos especiales para distintos programas desvirtuándose el mandato de la Ley de Contabilidad.

Es el compromiso de esta Administración tomar todas las acciones necesarias para que el Gobierno pueda atender sus obligaciones y cumplir con esta política pública. La situación fiscal por la que nos encontramos atravesando requiere que ejerzamos una mayor transparencia y responsabilidad fiscal en nuestros gastos, de forma tal que

logremos la estabilidad fiscal y un presupuesto balanceado, todo lo cual nos llevará hacia nuestra recuperación económica.

Dentro del análisis de las finanzas del Gobierno se han encontrado asignaciones especiales para determinado propósito o actividad y para las cuales se ha excedido el periodo de tiempo de más de un (1) año sin hacerse uso de las mismas. También se han identificado asignaciones sin designación de año determinado, pero con recurrencia anual sin una base legal. Esto conduce a que los gastos que se carguen contra esas asignaciones en futuros años fiscales, se desestabilice el flujo de la caja del Departamento de Hacienda, sin que se tenga un control sobre el momento y uso que se le confiere a tales asignaciones y, además, está en contravención con la política pública establecida en la Ley Núm. 230, antes citada.

Ante la grave situación fiscal que confronta el gobierno, es fundamental implementar una nueva metodología para el desarrollo, preparación y ejecución del presupuesto gubernamental, que permita reducir notablemente el gasto del Estado sin disminuir la cantidad y calidad de los servicios prestados, eliminando servicios ineficaces y programas inadecuados u obsoletos. En este sentido, el Presupuesto Base Cero es una estrategia presupuestaria y de política fiscal, cuyo objetivo fundamental es lograr que un gobierno no pueda gastar más de lo que recauda, limitando así el incremento de la deuda pública y garantizando la sostenibilidad de las finanzas públicas a corto y largo plazo. Con el Presupuesto Base Cero implantado por esta Administración, cada departamento, agencia o instrumentalidad del Gobierno de Puerto Rico tiene que documentar y justificar cada programa que se vaya a incorporar y nutrir del presupuesto del Gobierno, a base del beneficio social y económico y en consideración de los recursos disponibles. Este mecanismo conlleva revisar anualmente todos los programas y gastos de los departamentos, agencias o instrumentalidades del Gobierno partiendo de cero sin tomar en consideración las asignaciones de años anteriores. Esto facilita la búsqueda de nuevas formas de ofrecer servicios más eficientes y efectivos que permitan una mejora en la calidad de los servicios, la eliminación de duplicidad en los ofrecimientos de servicios y una reducción en los gastos.

De igual forma, existen un sinnúmero de fondos especiales creados por Ley para fines particulares. Dichos fondos, se encuentran desorganizados y bajo el control de las dependencias gubernamentales a las que se les asignaron. Ante este marco, el Secretario de Hacienda en la actualidad tiene acceso directo a solo 65% de los fondos del Gobierno de Puerto Rico, toda vez que los demás fondos especiales están en cuentas en cada dependencia ejecutiva sin pasar por la supervisión fiscal del Secretario de Hacienda. Esta falta de claridad, redunda en una pobre supervisión por parte de las agencias fiscales del Gobierno para tener pleno dominio del Tesoro. Con esta Ley, disponemos que los fondos especiales pasan al Tesoro General y no a cuentas individuales para unos fines particulares, para así tener un mejor dominio y fiscalización por parte de Secretario de Hacienda y poder aplicar la prioridad de pago que comienza con los servicios esenciales a nuestro Pueblo.

Conforme todo lo anterior, esta Asamblea Legislativa considera necesario enmendar la Ley Núm. 230 de 23 de julio de 1974, según enmendada y conocida como "Ley de Contabilidad del Gobierno de Puerto Rico" con el propósito de atemperar la misma a las mejores prácticas fiscales que se han desarrollado en los pasados años en los Estados Unidos continentales y en el resto del mundo. A esos efectos, entendemos importante aclarar el significado de una asignación especial y limitar el uso de las mismas al periodo de un (1) año. Una vez que esta cumpla su propósito, o si no fuese reclamada durante su periodo de vigencia, esta asignación revertirá al Fondo General. De esta manera, logramos continuar mejorando los servicios a nuestra ciudadanía y revitalizar la economía de Puerto Rico mientras cumplimos con los mecanismos de control fiscal requeridos por el Plan Fiscal Certificado.

## Ley de Reservas en las Compras del Gobierno

En reconocimiento de que el fortalecimiento de nuestra economía y la creación de empleos son objetivos fundamentales de la política pública del Gobierno de Puerto Rico, se han aprobado diferentes piezas legislativas dirigidas a estimular el desarrollo de la economía local. Como parte de dicha legislación, se encuentra la Ley 129-2005, que creó la Ley de Reservas en las Compras del Gobierno, la cual se adoptó como un mecanismo para que los componentes de la economía local puedan participar efectivamente en el mercado de compras del gobierno y para estimular la creación de empleos y la inversión local. Esta Ley, procura patrocinar de manera preferencial en las compras del Gobierno, al importantísimo sector de las pequeñas y medianas empresas ("Pymes") ayudando a estas a aumentar sus ventas como una estrategia eficaz de desarrollo económico y creación de empleos.

No obstante, ante la grave situación fiscal que confronta el gobierno, entendemos fundamental hacer ajustes en el desarrollo, preparación y ejecución del presupuesto gubernamental, que permita reducir notablemente el gasto del Estado sin disminuir la cantidad y calidad de los servicios prestados. Con esto en mente, hemos evaluado toda la legislación económica que tiene impacto en el presupuesto general de las agencias de la Rama Ejecutiva, a fin de establecer las medidas necesarias para atemperar la misma a nuestra actual realidad económica.

A tales efectos, esta Asamblea Legislativa considera necesario enmendar la Ley 129-2015 con el propósito de atemperar la misma a la situación fiscal que atraviesan las finanzas públicas. A esos efectos, debemos fijar en un veinte por ciento (20%) la partida del presupuesto general de las instrumentalidades del Gobierno de Puerto Rico asignada a compras para compras a microempresas, pequeñas y medianas empresas, hasta que la situación fiscal de Puerto Rico permita que se aplique el aumento. Nuestro propósito es seguir contribuyendo con este importante sector al mismo tiempo que afrontamos de forma responsable nuestra realidad fiscal y cumplimos con las metas establecidas en el Plan Fiscal aprobado por la Junta de manera que podamos encaminarnos hacia la recuperación económica.

## Arbitrios a cigarrillos y productos del tabaco

Ante la necesidad de allegar más ingresos con miras a cumplir con el Plan Fiscal, proteger los empleos públicos y a nuestros sectores más vulnerables, proponemos una reconfiguración de los arbitrios aplicables a los cigarrillos, tabaco sin humo, productos derivados del tabaco, así como cigarrillos electrónicos. Con esta reconfiguración de los arbitrios aplicables a estos productos se aumenta la base sujeta a arbitrios y se aumentan las tasas actuales para cumplir con un propósito dual: además de allegar fondos para lograr balancear el presupuesto y cumplir con los parámetros consignados en el Plan Fiscal, también logramos desalentar el consumo de cigarrillos y la compra de tabaco, lo cual, como es conocido, resulta en detrimento a la salud pública y está asociado al incremento en la incidencia de enfermedades en las vías respiratorias y de distintos tipos de cáncer.

Una de las causas más preocupantes de muerte entre la población se debe al uso de tabaco. Sin embargo, esta causal es altamente prevenible. El informe del Cirujano General de los Estados Unidos sobre "Las Consecuencias de Fumar en la Salud" confirma que el fumar está relacionado a veintinueve (29) enfermedades crónicas tales como: cáncer en la vesícula, cervical, esófago, riñones, laringe, pulmones, oral, páncreas, estómago, leucemia, enfermedades cardiovasculares, entre muchas otras. Asimismo se indica que el humo del tabaco puede producir coágulos sanguíneos, ataques cardiacos y accidentes cerebrovasculares repentinos. Recientemente se han encontrado más enfermedades causadas por el uso de cigarrillos tales como cáncer de hígado y color rectal, diabetes, artritis, inflamación y deterioro de la función inmunitaria. *Véase* Resumen Ejecutivo del Informe de la Dirección General de Servicios de Salud de los Estados Unidos, Las Consecuencias del Tabaquismo en la Salud - 50 años de Progreso, pág. 2 (2014).

De hecho, en el período 2005–2009, el tabaquismo fue el causante de más de 480,000 muertes prematuras anuales en personas de 35 años de edad o más en los Estados Unidos. A su vez, más del 87% de las muertes por cáncer de pulmón, 61% de las muertes por enfermedad pulmonar y 32% de las muertes por enfermedad coronaria, fueron atribuibles al tabaquismo y a la exposición al humo de segunda mano. *Id.*, pág. 3.

Por su parte el Center for Disease Control and Prevention (CDC) señala que para el 2016, la mayor causa de muerte, discapacidades y de enfermedades prevenibles en Estados Unidos es a consecuencia del uso del tabaco. Cada año casi medio millón de americanos muere prematuramente por fumar o por estar expuesto al humo del cigarrillo, y otros 16 millones viven con enfermedades serias causadas por fumar cigarrillos. Además, los fumadores de cigarrillos se tienen que ausentar más a sus trabajos, visitar más a sus doctores, ser hospitalizados con mayor frecuencia, y mueren 10 o 12 años antes que las personas que no son fumadores. Lo anterior sin contar que para tratar enfermedades relacionadas al uso del cigarrillo, los Estados Unidos gastan casi 170 millones de dólares anualmente. *Véase* https://www.cdc.gov/chronicdisease/resources/publications/aag/tobacco-use.htm.

El impacto indirecto del cigarrillo también es altamente detrimental para la salud. En específico, la exposición al humo de segunda mano tiene un efecto nocivo en los niños. Se ha relacionado con el síndrome de la muerte repentina de infantes (sudden infant death syndrome), enfermedades respiratorias agudas, infecciones de oído y ataques de asma. Lo más inquietante es que alrededor del 25% de las personas que no fuman en Estados Unidos, (58 millones aproximadamente) están expuestos el humo de segunda mano, incluyendo 15 millones de niños entre las edades de 3 a 11 años. *Id.*

Según los datos del CDC, para el 2015 en Estados Unidos cerca de 15.1% de la población mayor de 18 años de edad fumaba cigarrillos, lo que se estima en 36.5 millones de personas. De estos, 16.7% son hombres y 13.6% mujeres. En Puerto Rico, aunque el porciento es menor, todavía sobre pasa el doble dígito. Las estadísticas del Departamento de Salud de Puerto Rico demuestran que para el 2015 el 10.7% de la población general de 18 años o más fuman cigarrillos con regularidad. De estos, 15.7% son hombres y 7.4% mujeres. Se trata de un porciento significativo si tomamos en consideración el efecto que tiene el humo de segunda mano. A lo anterior hay que añadir que el gobierno tiene que incurrir en costos significativos producidos por las consecuencias a la salud que conlleva fumar.

Al presente, cada cajetilla de cigarrillos paga $3.40 en arbitrios, lo que, para el año fiscal 2014-2015, se tradujo en un recaudo de $156 millones por concepto de dicho arbitrio. Sin embargo, nuestro gobierno gasta $19.16 en costos de salud y pérdida de productividad por cada cajetilla de cigarrillos consumida, lo que se traduce en $924 millones. Es decir, el Gobierno gasta $15.76 más de lo que recauda, por cada cajetilla de cigarrillo vendida para atender las consecuencias que ocasiona el uso de cigarrillos, lo que significa una diferencia global de $768 millones. Como resultado, el aumento a los impuestos sobre el tabaco se considera como una medida sumamente costo-efectiva para mejorar la salud pública y para obtener recaudos fiscales a corto y largo plazo.

Por otro lado, el Comité Científico de Asesoramiento sobre la Reglamentación de los Productos del Tabaco de la Organización Mundial de la Salud ha dicho que el consumo de tabaco no fumable es una parte importante del problema general del tabaco en el mundo. En su informe sobre el tabaco sin humo expresa que existen los siguientes daños potenciales: a) el uso puede alentar a los individuos a consumir dichos productos, además de seguir fumando; b) el consumo de productos no fumables del tabaco incrementa la posibilidad de iniciarse posteriormente en el consumo de tabaco fumado; c) los niños que aún no han comenzado a fumar podrían empezar a consumir tabaco mediante el fácil acceso al tabaco no fumable; d) no se descarta la posibilidad de que el "smokeless tobacco" produzca daños considerables a largo plazo en la salud de sus consumidores como el aumento del riesgo a desarrollar cáncer oral; y e) los riesgos de crear adicción son considerables ya que en su mayoría tienen componentes peligrosos como la nicotina y las nitrosaminas. Asimismo, el Cirujano General de Estados Unidos de América ha determinado que el uso del "tabaco sin humo" puede ocasionar, además del cáncer oral, enfermedades y condiciones relacionadas a la encía. Según el reporte titulado The Health

Consequences of Using Smokeless Tobacco: A Report of the Advisory Committee to the Surgeon General, el uso prolongado del "tabaco sin humo" resulta en un riesgo mayor de padecer lesiones orales como la leukoplakias tanto en adolecentes como en adultos.

Es y ha sido la política pública del Gobierno de Puerto Rico tomar medidas para promover la prevención y la cesación del uso del tabaco. Una de las modalidades que propician la prevención y la cesación del uso del tabaco son las medidas relacionadas con la implantación de impuestos a productos derivados del tabaco, sea fumable o no.

A tono con lo anteriormente expuesto, esta Asamblea Legislativa entiende meritorio que por la lucha contra la adicción a la nicotina, por los gastos de servicios médicos a pacientes por enfermedades relacionadas y creadas por la adicción a productos derivados del tabaco, por el evidente costo y pérdidas en la productividad laboral y en la economía en general y por la necesidad de hacer llegar más ingresos al erario para cumplir con el Plan Fiscal y evitar recortes que puedan afectar a nuestros sectores más vulnerables, se aumente el arbitrio actual al tabaco sin humo y a los cigarrillos.

### Fondo de Emergencia

La Ley Núm. 91 de 21 de junio de 1966, según enmendada, crea el Fondo de Emergencia, con el propósito de reunir los recursos necesarios para afrontar las necesidades públicas inesperadas e imprevistas, causadas por calamidades, tales como guerras, huracanes, terremotos, sequías, inundaciones, plagas, y con el fin de proteger las vidas y propiedades de las gentes, y el crédito público.

Entre otras disposiciones, la Ley Núm. 91, ante citada, establece que con los recursos asignados al Fondo de Emergencia podrían financiarse los gastos de funcionamiento de la Agencia Estatal para el Manejo de Emergencias y Administración de Desastres; que el mencionado Fondo será capitalizado anualmente por una cantidad no menor de un quinto del uno por ciento (0.2%) del total de la Resolución Conjunta del Presupuesto; que la referida aportación será de una cantidad no menor del uno por ciento (1%) del total de las rentas netas del año fiscal anterior; y que el balance del mismo nunca exceda de ciento cincuenta millones (150,000,000) de dólares, lo que sea mayor. Sin embargo, en esta última década reiteradamente se ha legislado para que el Fondo de Emergencia no se nutra durante determinados años fiscales. Lo que comenzó como una medida de carácter transitorio iniciada en el Año Fiscal 2006-2007, se convirtió en una medida que desde entonces se ha repetido de forma continua en la mayoría de los años fiscales.

Esta Administración reconoce que, ante la grave situación fiscal que confronta el gobierno, es fundamental implementar una nueva metodología para el desarrollo, preparación y ejecución del presupuesto gubernamental, que permita reducir notablemente el gasto del Estado sin disminuir la cantidad y calidad de los servicios prestados, eliminando servicios ineficaces y programas inadecuados u obsoletos. En este sentido, es importante establecer y mantener una reserva líquida para atender

necesidades públicas inesperadas e imprevistas, como las inicialmente descritas, pero considerando que la aportación a dicho Fondo debe realizarse acorde la situación fiscal. Ante ello, se establece que la aportación al Fondo de Emergencia por la cantidad de diez millones de dólares ($10,000,000) se mantendrá fija hasta el Año Fiscal 2020-2021. Además, a partir del Año Fiscal 2020-2021, dicha aportación será no menor de cero punto cinco por ciento (0.5%) del estimado de rentas netas sometido por el Departamento de Hacienda para la preparación del Presupuesto Recomendado con cargo al Fondo General.

Conforme a lo anterior, esta Asamblea Legislativa considera necesario enmendar la Ley Núm. 91 de 21 de julio de 1966, según enmendada y conocida como "Fondo de Emergencia" para alcanzar un uso más eficiente de los recursos disponibles y garantizar la disponibilidad de los mismos para atender situaciones de emergencia o desastre que afecten a la Isla durante este período de años.

<u>El camino a la recuperación comenzó</u>

Aunque son muchos los obstáculos que debemos superar en el camino hacia la recuperación definitiva, hay esperanza y optimismo en nuestra gente. Hay un nuevo amanecer en nuestra patria y no podemos defraudar a Puerto Rico. Tenemos que aprovechar este momento para enfrentar los retos, y procurar los grandes cambios que Puerto Rico necesita. Debemos enfrentar la crisis como un gran reto, que podemos traducir en grandes oportunidades. Ese es el desafío que nos puede llevar a edificar una sociedad más justa, digna y progresista. Por ello, la Ley 7-2017 realiza el más importante paso para la recuperación económica, social y política de Puerto Rico al encaminar un proceso de descolonización inmediata de la Isla.

Ahora damos inicio a un proceso para transformar el Gobierno en uno más eficiente, rehabilitando sus finanzas y recobrando la confianza y la credibilidad perdida. Nos encaminamos a tener un Gobierno que elimine los gastos perdidosos. Un gobierno más ágil, que te pueda rendir cuentas. Un gobierno donde cada dólar de contribución se vea en acción y servicios al Pueblo. Ahora nos levantamos con más fuerza que nunca, para vivir en una sociedad donde las oportunidades estén accesibles para cada hijo de esta tierra y donde todos estemos orgullosos de haber cumplido con nuestra patria.

*DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

1        CAPÍTULO 1.- DISPOSICIONES INICIALES

2        Artículo 1.01- Título.

3        Esta Ley se conocerá y podrá ser citada como "Ley de Cumplimiento con el Plan

4    Fiscal".

1      Artículo 1.02.-Primacía de esta Ley

2      Esta Ley en su totalidad se aprueba en el ejercicio del poder de razón del Estado,

3 así como en la facultad constitucional que tiene la Asamblea Legislativa, reconocida en el

4 Artículo II, Secciones 18 y 19 de la Constitución de Puerto Rico, de aprobar leyes en

5 protección de la vida, la salud y el bienestar del pueblo, así como en casos de grave

6 emergencia cuando estén claramente en peligro la salud, la seguridad pública o los

7 servicios gubernamentales esenciales, así como al amparo de la Secciones 7 y 8 del

8 Artículo VI de la Constitución de Puerto Rico.  De igual forma, esta ley se aprueba en

9 virtud de las acciones que se le requieren a Puerto Rico como territorio de los Estados

10 Unidos bajo el palio de la Ley Federal *"Puerto Rico Oversight Management and Economic*

11 *Stability Act"* (PROMESA) y del Plan Fiscal aprobado por la Junta de Supervisión Fiscal.

12 Por esta razón, esta Ley tendrá primacía sobre cualquier otra ley.

13      A partir de la fecha de aprobación de esta Ley, se deja sin efecto toda ley orgánica,

14 ley general o especial, artículo o sección de ley, normativa, *cláusulas y/o disposiciones de*

15 convenios colectivos, acuerdos, acuerdos suplementarios, órdenes administrativas,

16 políticas, manuales de empleo, cartas circulares, certificaciones, reglamentos, reglas y

17 condiciones de empleo, cartas normativas, planes de clasificación o retribución, cartas

18 contractuales, y/o disposiciones aplicables exclusivamente a los beneficios marginales

19 que podrán disfrutar los funcionarios o empleados públicos unionados o no unionados

20 del Gobierno de Puerto Rico, incluyendo a todo empleado unionado o no unionado de

21 las Corporaciones Públicas del Gobierno de Puerto Rico, que vaya en contra de las

22 disposiciones de esta ley. *Esto no elimina el derecho de los sindicatos de negociar condiciones*

1  *de trabajo, salarios y otras condiciones no económicas no contenidas en la presente legislación*

2  *conforme al ordenamiento jurídico vigente.*

3  *Artículo 1.03.- Terminación de las medidas fiscales*

4  *Se autoriza al Comité de Cumplimiento con el Plan Fiscal, tras hacer una determinación*

5  *de que la situación fiscal se ha estabilizado y que la condición del fisco lo permite, a aumentar los*

6  *beneficios en esta ley concedidos y dejar sin efecto medidas de responsabilidad fiscal contenidas en*

7  *el Capítulo 2.*

8  CAPÍTULO 2.- BENEFICIOS MARGINALES DE LOS FUNCIONARIOS O

9  EMPLEADOS PÚBLICOS DEL GOBIERNO DE PUERTO RICO

10  Artículo 2.01.-Aplicabilidad

11  Todas las disposiciones contenidas en esta Ley, serán aplicables a las Entidades de

12  la Rama Ejecutiva del Gobierno de Puerto Rico, excepto cuando alguna disposición

13  particular excluya expresamente a una entidad. Para propósitos de esta Ley, se entenderá

14  que el término "Entidad de la Rama Ejecutiva" incluye a todas sus agencias, así como a

15  las instrumentalidades y corporaciones públicas del Gobierno de Puerto Rico,

16  irrespectivo del grado de autonomía fiscal o presupuestaria que de otra forma le

17  confiriere su ley orgánica u otra legislación aplicable. La Universidad de Puerto Rico

18  estará exenta de la aplicación de la presente Ley.

19  Artículo 2.02. – Municipios

20  Los municipios estarán exentos de la aplicación de este Capítulo. No obstante,

21  quedan facultados para acogerse a sus disposiciones mediante previa aprobación de una

22  Ordenanza Municipal a esos efectos.

1    Artículo 2.03. – Declaración de Política Pública

2    Por la presente se reafirma la Declaración de Política Pública de la Ley Núm. 3-

3    2017, conocida como "Ley para Atender la Crisis Económica, Fiscal y Presupuestaria para

4    Garantizar el Funcionamiento del Gobierno de Puerto Rico", en donde se establece que

5    la responsabilidad fiscal es la clave para que Puerto Rico recupere su credibilidad ante

6    los inversionistas y mercados financieros, restablezca su crédito y regrese al camino del

7    manejo responsable de la deuda y de sus finanzas, logrando una eficiente restructuración

8    de la misma.

9    Se establece como política pública del Gobierno de Puerto Rico la disciplina,

10   control y reducción de gastos en las agencias, instrumentalidades, departamentos y

11   corporaciones públicas del Gobierno de Puerto Rico.

12   El Gobierno de Puerto Rico reconoce la disparidad que existe entre los beneficios

13   marginales que reciben los empleados del Gobierno Central con aquellos que laboran en

14   corporaciones públicas.  Para mantener los empleos públicos sin despidos es necesario

15   hacer ajustes en gastos de beneficios marginales, *mientras Puerto Rico se encuentre inmerso*

16   *en la crisis fiscal que lo aqueja*. A tales efectos, mediante esta Ley se promueve la igualdad

17   y uniformidad de los beneficios marginales que podrán disfrutar todos los funcionarios

18   y empleados públicos. Todas las agencias e instrumentalidades comprendidas en el

19   Gobierno de Puerto Rico tienen la responsabilidad de procurar que el disfrute de los

20   beneficios marginales responda al interés legislativo que justificó su concesión y que se

21   lleva a cabo conforme a un adecuado balance entre las necesidades del empleado y la

1   óptima utilización de los recursos disponibles, *atendiendo el momento histórico en que nos*

2   *encontramos.*

3        La política pública adoptada por la presente Ley garantiza la continuidad de la

4   gestión pública en áreas esenciales de salud, seguridad, educación, trabajo social y

5   desarrollo, entre otros, así como la prestación de los servicios necesarios e indispensables

6   para la ciudadanía y protege el trabajo de miles de funcionarios y empleados públicos del

7   Gobierno de Puerto Rico, mientras se protege a los ciudadanos más vulnerables. Por tal

8   razón, y en cumplimiento con el Plan Fiscal aprobado conforme a la Ley Federal

9   PROMESA, se uniforman los beneficios marginales de los empleados públicos con fines

10   a lograr economías adicionales.

11        *En aras de lograr la consecución de los objetivos de la presente Ley y hacerlo de la forma*

12   *menos onerosa para nuestros empleados públicos, se establece que las disposiciones de los Artículos*

13   *2.04, 2.05, 2.08 al 2.11 y 2.18 serán de duración temporera y su vigencia cesará durante el próximo*

14   *año fiscal luego  de que el Gobierno de Puerto Rico haya logrado un presupuesto balanceado y*

15   *superado la crisis económica. Esta consideración entendemos crea el justo balance entre los*

16   *objetivos de cumplir con el Plan Fiscal certificado y el interés de preservar la justicia social que*

17   *enmarcan la protección de los beneficios que reciben nuestros trabajadores del sector público. Se*

18   *restituirán los mismos conforme sea certificado por los miembros del Comité de Cumplimiento con*

19   *el Plan Fiscal.*

20        *Para propósito de esta ley el Comité de Cumplimiento con el Plan Fiscal estará compuesto*

21   *por un representante nombrado por el Gobernador, un representante nombrado por el Presidente*

1  *de la Cámara de Representantes y un representante nombrado por el Presidente del Senado de*

2  *Puerto Rico. Dicho Comité establecerá mediante reglamento sus normas y funcionamiento interno.*

3  Artículo 2.04.-Beneficios Marginales

4  El Gobierno de Puerto Rico es responsable de velar por el disfrute de los beneficios

5  marginales que se les otorgan a los empleados y que los mismos se disfruten conforme a

6  un plan que mantenga un adecuado balance entre las necesidades de servicio, las

7  necesidades del empleado y la utilización responsable de los recursos disponibles. A fin

8  de mantener una administración de recursos humanos uniforme, responsable, razonable,

9  equitativa y justa, se establecen a continuación los beneficios marginales que podrán

10  disfrutar los funcionarios o empleados públicos, unionados o no unionados, del Gobierno

11  de Puerto Rico, incluyendo las corporaciones públicas*, sujeto a lo dispuesto en el Artículo*

12  *2.03 de esta Ley*.

13  Los beneficios marginales de los empleados de la Rama Ejecutiva serán los siguientes:

14  1.  Licencia de vacaciones

15      a.  A partir de la vigencia de esta Ley, todo empleado público tendrá

16          derecho a acumular licencia de vacaciones, a razón de uno y un

          cuarto (1 1/4) días por cada mes de servicio. *Por estar excluidos del*

18          *sistema de Empleador Único creado conforme a la Ley 8-2017, esta*

19          *disposición no será de aplicación a los empleados docentes, a excepción del*

20          *personal gerencial y administrativo del Departamento de Educación, a los*

21          *empleados docentes de cualquier entidad educativa del Gobierno de Puerto*

22          *Rico y a los agentes del orden público de la Policía de Puerto Rico que*

1   *seguirán acumulando la licencia por vacaciones que disfrutaban antes de*

2   *aprobarse la presente ley.*

3   b.  La licencia por vacaciones se comenzará a acumular una vez el

4   empleado cumpla los tres (3) meses en el empleo y será retroactiva

5   a la fecha de comienzo del empleo. Los empleados a jornada regular

6   reducida o a jornada parcial acumularán licencia de vacaciones de

7   forma proporcional al número de horas en que presten servicios

8   regularmente.

9   c.  La licencia por vacaciones se podrá acumular hasta un máximo de

10   sesenta (60) días laborables al finalizar cualquier año natural.

11   d.  La licencia de vacaciones se concede al empleado para

12   proporcionarle un período razonable de descanso anual. Como

13   norma general, deberá ser disfrutada durante el año natural en que

14   fue acumulada. Cada agencia o instrumentalidad pública viene

15   obligada a formular un plan de vacaciones, por cada año natural,

16   en coordinación con los supervisores y los empleados, que

17   establezca el período dentro del cual cada empleado disfrutará de

18   sus vacaciones, en la forma más compatible con las necesidades del

19   servicio.  Dicho plan deberá establecerse no más tarde del 31 de

20   diciembre de cada año para que entre en vigor el primero de enero

21   de cada año siguiente. Será responsabilidad de las agencias,

22   instrumentalidades públicas y de todos los empleados dar

1                cumplimiento estricto al referido plan. Sólo podrá hacerse

2                excepción por necesidad clara e inaplazable del servicio,

3                debidamente certificada.

4      e.     La agencia o instrumentalidad pública viene obligada a, de forma

5                diligente y con estricto cumplimiento de lo establecido en la

6                presente Ley, formular y administrar el plan de vacaciones de

7                modo que los empleados no pierdan licencia de vacaciones al

8                finalizar el año natural y disfruten de su licencia regular de

9                vacaciones.

10     f.     Todo empleado tendrá derecho a disfrutar de su licencia de

11              vacaciones por un período de quince (15) días laborables durante

12              cada año natural de los cuales no menos de diez (10) días deberán

13              ser disfrutados de manera consecutiva.

14     g.    Los empleados que no puedan disfrutar de licencia de vacaciones

15              durante determinado año natural por necesidades del servicio,

16              evidenciada de forma escrita y a requerimiento de la agencia o

17              instrumentalidad pública, están exceptuados de las disposiciones

18              del inciso (e) de este Artículo. En este caso, la agencia o

19              instrumentalidad pública viene obligada a realizar los ajustes

20              necesarios para que el empleado disfrute de por lo menos, el exceso

21              de licencia acumulada sobre el límite de sesenta (60) días, en la

22              fecha más próxima posible, dentro del término de los primeros tres

1        (3) meses del siguiente año natural.

2    h.  La agencia o instrumentalidad pública vendrá obligada a proveer

3        para el disfrute de la licencia de vacaciones acumulada, previo al

4        trámite de cualquier separación que constituya una desvinculación

5        total y absoluta del servicio y al trámite de un cambio para pasar a

6        prestar servicios en otra agencia o instrumentalidad pública.

7    i.  Normalmente, no se concederá licencia de vacaciones por un

8        período mayor de quince (15) días laborables por cada año natural.

9        No obstante, la agencia o instrumentalidad pública podrá conceder

10       licencia de vacaciones en exceso de quince (15) días laborables,

11       hasta un máximo de cincuenta (50) días, en cualquier año natural, a

12       aquellos empleados que tengan licencia acumulada. Al conceder

13       dicha licencia, se tomarán en consideración las necesidades del

14       servicio y otros factores tales como los siguientes:

15           1.   la utilización de dicha licencia para actividades de

16                mejoramiento personal del empleado, tales como

17                viajes, estudios, etc.;

18           2.   enfermedad prolongada del empleado después de

19                haber agotado el balance de licencia de enfermedad;

20           3.   problemas personales del empleado que requieran su

21                atención personal;

22           4.   si ha existido cancelación del disfrute de licencia por

1                        necesidades del servicio y a requerimiento de la

2                        agencia;

3              5.     total de licencia acumulado que tiene el empleado.

4    j.     Por circunstancias especiales, se podrá anticipar licencia de

5          vacaciones a los empleados regulares que hayan prestado servicios

6          al Gobierno de Puerto Rico por más de un (1) año, cuando se tenga

7          la certeza de que el empleado se reintegrará al servicio. La licencia

8          de vacaciones así anticipada no excederá de quince (15) días

9          laborables. La concesión de licencia de vacaciones anticipada

10         requerirá en todo caso aprobación previa por escrito de la Autoridad

11         Nominadora. Todo empleado a quien se le hubiere anticipado

12         licencia de vacaciones y se separe del servicio, voluntaria o

13         involuntariamente, antes de prestar servicios por el período

14         necesario requerido para acumular la totalidad de la licencia que le

15         fue anticipada, vendrá obligado a reembolsar al Gobierno de Puerto

16         Rico cualquier suma de dinero que le haya sido pagada por concepto

17         del tal licencia anticipada.

18    k.     En el caso en que a un empleado se le conceda una licencia sin

19         sueldo, no será menester que éste agote la licencia de vacaciones que

20         tenga acumulada antes de comenzar a utilizar la licencia sin sueldo.

21    l.     Cuando se autorice el disfrute de licencia de vacaciones acumulada

22         o anticipada a un empleado, se podrá autorizar el pago por

adelantado de los sueldos correspondientes al período de licencia, siempre que el empleado lo solicite con suficiente anticipación. Tal autorización deberá hacerse inmediatamente después de la aprobación de la licencia.

m.    Uno o más empleados públicos podrán ceder, excepcionalmente, a otro empleado público que trabaje en la misma entidad gubernamental días acumulados de vacaciones, hasta un máximo de cinco (5) días, según lo dispuesto en la Ley 44-1996, según enmendada, conocida como "Ley de Cesión de Licencia por Vacaciones", cuando:

1.    El empleado cesionario haya trabajado continuamente, el mínimo de un (1) año, con cualquier entidad gubernamental;

2.    El empleado cesionario no haya incurrido en un patrón de ausencias injustificadas, faltando a las normas de la entidad gubernamental;

3.    El empleado cesionario hubiere agotado la totalidad de las licencias a que tiene derecho, como consecuencia de una emergencia;

4.    El empleado cesionario o su representante evidencie, fehacientemente, la emergencia y la necesidad de ausentarse por días en exceso a las licencias ya

1            agotadas;

2        5.   El empleado cedente haya acumulado un mínimo de

3            quince (15) días de licencias por vacaciones en exceso

4            de la cantidad de días de licencia a cederse;

5        6.   El empleado cedente haya sometido por escrito a la

6            entidad gubernamental, en la cual trabaja, una

7            autorización accediendo a la cesión, especificando el

8            nombre del cesionario;

9        7.   El empleado cesionario o su representante acepte, por

10            escrito, la cesión propuesta.

11   2.   Licencia por enfermedad

12        a   Todo empleado que haya sido contratado en el Gobierno de Puerto

13            Rico antes de entrar en vigor la Ley 8-2017, conocida como "Ley

14            para la Administración y Transformación de los Recursos

15            Humanos en el Gobierno de Puerto Rico" tendrá derecho a

16            acumular licencia por enfermedad a razón de un día y medio (1

17            1/2) por cada mes de servicio.

18        b   Todo empleado que haya sido contratado en el Gobierno de Puerto

19            Rico después de entrar en vigor la Ley 8-2017, conocida como "Ley

20            para la Administración y Transformación de los Recursos

21            Humanos en el Gobierno de Puerto Rico" tendrá derecho a

22            acumular licencia por enfermedad a razón de un (1) día por cada

1    mes de servicio.

2    c.   Los empleados a jornada regular reducida o a jornada parcial

3         acumularán licencia por enfermedad en forma proporcional al

4         número de horas que presten servicios regularmente.

5    d.   La licencia por enfermedad se utilizará cuando el empleado se

6         encuentre enfermo, incapacitado o expuesto a una enfermedad

7         contagiosa que requiera su ausencia del trabajo para la protección

8         de su salud o la de otras personas.

9    e.   Todo empleado podrá disponer de hasta un máximo de cinco (5)

10        días al año de los días acumulados por enfermedad, siempre y

11        cuando mantenga un balance mínimo de doce (12) días, para

12        solicitar una licencia especial con el fin de utilizar la misma en:

13                   1.   El cuidado y atención por razón de enfermedad de sus

14                        hijos o hijas.

15                   2.   Enfermedad o gestiones de personas de edad

16                        avanzada o con impedimentos dentro del núcleo

17                        familiar, entiéndase cuarto grado de consanguinidad,

18                        segundo de afinidad, o personas que vivan bajo el

19                        mismo techo o personas sobre las que se tenga

20                        custodia o tutela legal.

21                        Disponiéndose que las gestiones a realizarse deberán

22                        ser cónsonas con el propósito de la licencia de

enfermedad; es decir, al cuidado y la atención relacionada a la salud de las personas aquí comprendidas.

a)   "Persona de edad avanzada" significará toda aquella persona que tenga sesenta (60) años o más;

b)   "Personas con impedimentos" significará toda persona que tiene un impedimento físico, mental o sensorial que limita sustancialmente una o más actividades esenciales de su vida.

3.   Primera comparecencia de toda parte peticionaria, víctima o querellante en procedimientos administrativos y/o judiciales ante todo Departamento, Agencia, Corporación o Instrumentalidad Pública del Gobierno de Puerto Rico, en casos de peticiones de pensiones alimentarias, violencia doméstica, hostigamiento sexual en el empleo o discrimen por razón de género. El empleado presentará evidencia expedida por la autoridad competente acreditativa de tal comparecencia.

f.   La licencia por enfermedad se podrá acumular hasta un máximo de

1    noventa (90) días laborables al finalizar cualquier año natural. La

2    licencia por enfermedad se comenzará a acumular una vez el

3    empleado cumpla los tres (3) meses en el empleo y será retroactiva

4    a la fecha de comienzo del empleo.

5    g.   La agencia o instrumentalidad pública viene obligada a, de forma

6         diligente y con estricto cumplimiento de lo establecido en la

7         presente Ley, realizar todos los ajustes necesarios para que el

8         empleado pueda hacer uso de la totalidad de la licencia por

9         enfermedad que tenga acumulada durante cualquier año natural en

10        el momento en que la necesite. El empleado podrá hacer uso de toda

11        la licencia por enfermedad que tenga acumulada durante cualquier

12        año natural.

13   h.   Cuando un empleado se ausente del trabajo por enfermedad por

14        más de tres (3) días, se le podrá exigir un certificado médico,

15        acreditativo:

16             1.   que estaba realmente enfermo, expuesto a una

17                  enfermedad contagiosa o impedido para trabajar

18                  durante el periodo de ausencia.

19             2.   sobre la enfermedad de sus hijos o hijas.

20             3.   sobre la enfermedad de personas de edad avanzada o

21                  con impedimentos dentro del núcleo familiar,

22                  entiéndase cuarto grado de consanguinidad, segundo

1        de afinidad, o personas que vivan bajo el mismo techo

2        o personas sobre las que se tenga custodia o tutela

3        legal.

4        Además del certificado médico, se podrá corroborar la

5        inhabilidad del empleado para asistir al trabajo por razones de

6        enfermedad por cualquier otro medio apropiado. Lo anterior no se

7        aplicará o interpretará de forma que se vulnere la Ley ADA ni la

8        "Ley de Licencia Familiar y Médica de 1993" (LLFM).

9    i.   En casos de enfermedad en que el empleado no tenga licencia por

10       enfermedad acumulada, se le podrá anticipar hasta un máximo

11       de dieciocho (18) días laborables, a cualquier empleado regular que

12       hubiere prestado servicios al Gobierno de Puerto Rico por un

13       periodo no menor de un (1) año, cuando exista certeza razonable de

14       que éste se reintegrará al servicio.  Cualquier empleado a quien se

15       le hubiera anticipando licencia por enfermedad y se separe del

16       servicio, voluntaria o involuntariamente, antes de haber prestado

17       servicios por el periodo necesario requerido para acumular la

18       totalidad de la licencia que le fue anticipada, vendrá obligado a

19       reembolsar al Gobierno de Puerto Rico cualquier suma de dinero

20       que quedare al descubierto que le haya sido pagada por concepto

21       de dicha licencia.

22   j.   En casos de enfermedad prolongada, una vez agotada la licencia

1                        por enfermedad, los empleados podrán hacer uso de toda licencia

2                        de vacaciones que tuvieren acumulada, previa autorización del

3                        supervisor inmediato. Si el empleado agotase ambas licencias y

4                        continuare enfermo, se le podrá conceder licencia sin sueldo.

5    3.     Licencia de maternidad

6            a.     La licencia de maternidad comprenderá el periodo de descanso

7                        prenatal y post-partum a que tiene derecho toda empleada

8                        embarazada. Igualmente comprenderá el periodo a que tiene

9                        derecho una empleada que adopte un menor, de conformidad con

10                      la legislación aplicable.

11           b.     Toda empleada en estado grávido tendrá derecho a un periodo de

12                        descanso de cuatro (4) semanas antes del alumbramiento y cuatro

13                        (4) semanas después. Disponiéndose que la empleada podrá

14                        disfrutar consecutivamente de cuatro (4) semanas adicionales para

15                      la atención y el cuido del menor.

16                      Alumbramiento significará el acto mediante el cual la criatura

17                      concebida es expelida del cuerpo materno por vía natural, o

18                      extraída legalmente de éste mediante procedimientos quirúrgicos-

19                      obstétricos. Comprenderá asimismo, cualquier alumbramiento

20                      prematuro, el malparto o aborto involuntario, inclusive en este

21                      último caso, aquellos inducidos legalmente por facultativos

22                      médicos, que sufriere la madre en cualquier momento durante el

1          embarazo.

2      c.    La empleada podrá optar por tomar hasta sólo una (1) semana de

3           descanso prenatal y extender hasta siete (7) las semanas de

4           descanso post-partum a que tiene derecho o hasta once (11)

5           semanas, de incluirse las cuatro (4) semanas adicionales para el

6           cuido y atención del menor.  En estos casos, la empleada deberá

7           someter a la agencia una certificación médica acreditativa de que

8           está en condiciones de prestar servicios hasta una semana antes del

9           alumbramiento.

10     d.    Durante el periodo de la licencia de maternidad la empleada

11          devengará la totalidad de su sueldo.

12     e.    En el caso de una empleada con status transitorio, la licencia de

13          maternidad no excederá del periodo de nombramiento.

14     f.    De producirse el alumbramiento antes de transcurrir las cuatro (4)

15          semanas de haber comenzado la empleada embarazada a disfrutar

16          de su descanso prenatal, o sin que hubiere comenzado a disfrutar

17          éste, la empleada podrá optar por extender el descanso posterior al

18          parto por un período de tiempo equivalente al que dejó de disfrutar

19          de descanso prenatal.

20     g.    Cuando se estime erróneamente la fecha probable del

21          alumbramiento y la mujer haya disfrutado de las cuatro (4)

22          semanas de descanso prenatal, sin sobrevenirle el alumbramiento,

1                    tendrá derecho a que se extienda el periodo de descanso prenatal,

2                    a sueldo completo, hasta que sobrevenga el parto. En este caso, la

3                    empleada conservará su derecho a disfrutar de las cuatro (4)

4                    semanas de descanso posterior al parto a partir de la fecha del

5                    alumbramiento y las cuatro (4) semanas adicionales para el cuido y

6                    atención del menor.

7        h.      En casos de parto prematuro, la empleada tendrá derecho a

8                    disfrutar de las ocho (8) semanas de licencia de maternidad a partir

9                    de la fecha del parto prematuro y las cuatro (4) semanas adicionales

10                 para el cuido y atención del menor.

11       i.      La empleada que sufra un aborto podrá reclamar hasta un máximo

12                 de cuatro (4) semanas de licencia de maternidad. Sin embargo, para

13                 ser acreedora a tales beneficios, el aborto debe ser de tal naturaleza

14                 que le produzca los mismos efectos fisiológicos que regularmente

15                 surgen como consecuencia del parto, de acuerdo al dictamen y

16                 certificación del médico que la atiende durante el aborto.

17       j.      En el caso que a la empleada le sobrevenga alguna complicación

18                 posterior al parto (post-partum) que le impida regresar al trabajo al

19                 terminar el disfrute del periodo de descanso post-partum y las

20                 cuatro (4) semanas adicionales para el cuido y la atención del

21                 menor, la agencia deberá concederle licencia por enfermedad.

22                    En estos casos, se requerirá certificación médica indicativa

1             de la condición de la empleada y del tiempo que se estime durará

2             dicha condición. De ésta no tener licencia por enfermedad

3             acumulada, se le concederá licencia de vacaciones. En el caso de

4             que no tenga acumulada la licencia por enfermedad o de

5             vacaciones, se le podrá conceder licencia sin sueldo por el término

6             que recomiende su médico.

7      k.     La empleada que adopte a un menor de edad preescolar, entiéndase

8             un menor de cinco (5) años o menos, que no esté matriculado en

9             una institución escolar, a tenor con la legislación y procedimientos

10            legales vigentes en Puerto Rico o cualquier jurisdicción de los

11            Estados Unidos, tendrá derecho a los mismos beneficios de licencia

12            de maternidad a sueldo completo de que goza la empleada que

13            tiene un alumbramiento. En el caso que adopte a un menor de seis

14            (6) años en adelante, tendrá derecho a la licencia de maternidad a

15            sueldo completo por el término de quince (15) días. Esta licencia

16            comenzará a contar a partir de la fecha en que se reciba al menor en

17            el núcleo familiar, lo cual deberá acreditarse por escrito.

18      l.     La licencia de maternidad no se concederá a empleadas que estén

19            en disfrute de cualquier otro tipo de licencia, con o sin sueldo. Se

20            exceptúa de esta disposición a las empleadas a quienes se les haya

21            autorizado licencia de vacaciones o licencias por enfermedad y a las

22            empleadas que estén en licencia sin sueldo por efecto de

1        complicaciones previas al alumbramiento.

2   m.   La empleada embarazada o que adopte un menor tiene la

3        obligación de notificar con anticipación a la agencia sobre sus

4        planes para el disfrute de su licencia de maternidad y sus planes de

5        reintegrarse al trabajo.

6   n.   La agencia podrá autorizar el pago por adelantado de los sueldos

7        correspondientes al periodo de licencia de maternidad, siempre que

8        la empleada lo solicite con anticipación correspondiente. De la

9        empleada reintegrarse al trabajo antes de expirar el período de

10       descanso posterior al parto, vendrá obligada a efectuar el

11       reembolso del balance correspondiente a la licencia de maternidad

12       no disfrutada.

13   o.   En caso de muerte del recién nacido previo a finalizar el periodo de

14        licencia de maternidad, la empleada tendrá derecho a reclamar

15        exclusivamente aquella parte del periodo post-partum que

16        complete las primeras ocho (8) semanas de licencia de maternidad

17        no utilizada. Disponiéndose que el beneficio de las cuatro (4)

18        semanas adicionales para el cuido del menor, cesará a la fecha de

19        ocurrencia del fallecimiento del (de la) niño(a). En estos casos, la

20        empleada podrá acogerse a cualquier otra licencia a la cual tenga

21        derecho.

22   p.   La empleada podrá solicitar que se le reintegre a su trabajo antes de

1    expirar el periodo de descanso post-partum, siempre y cuando

2    presente a la agencia certificación médica acreditativa de que está

3    en condiciones de ejercer sus funciones. En este caso se entenderá

4    que la empleada renuncia al balance correspondiente de licencia de

5    maternidad sin disfrutar al que tendría derecho.

6    4.    Licencia de paternidad

7    a.    La licencia por paternidad comprenderá el periodo de quince (15)

8    días laborables a partir de la fecha del nacimiento del hijo o hija.

9    b.    Al reclamar este derecho, el empleado certificará que está

10    legalmente casado o que cohabita con la madre del menor y que no

11    ha incurrido en violencia doméstica. Dicha certificación se realizará

12    mediante la presentación del formulario requerido por la agencia a

13    tales fines, el cual contendrá además, la firma de la madre del

14    menor.

15    c.    El empleado solicitará la licencia por paternidad y a la mayor

16    brevedad posible someterá el certificado de nacimiento.

17    d.    Durante el periodo de la licencia por paternidad, el empleado

18    devengará la totalidad de su sueldo.

19    e.    En el caso de un empleado con status transitorio, la licencia por

20    paternidad no excederá del periodo de nombramiento.

21    f.    La licencia por paternidad no se concederá a empleados que estén

22    en disfrute de cualquier otro tipo de licencia, con o sin sueldo. Se

1    exceptúa de esta disposición a los empleados a quienes se les haya

2    autorizado licencia de vacaciones o licencia por enfermedad.

3    g.   El empleado que, junto a su cónyuge o persona con quien cohabita,

4        adopte a un menor de edad, a tenor con la legislación y

5        procedimientos legales vigentes en Puerto Rico o cualquier

6        jurisdicción de los Estados Unidos, tendrá derecho a una licencia de

7        paternidad que comprenderá el periodo de quince (15) días, a

8        contar a partir de la fecha en que reciba al menor en el núcleo

9        familiar, lo cual debe acreditarse por escrito. Al reclamar este

10       derecho, el empleado certificará que está legalmente casado, en los

11       casos en que aplique, y que no ha incurrido en violencia doméstica,

12       delito de naturaleza sexual o maltrato de menores. Dicha

13       certificación se realizará mediante la presentación del formulario

14       requerido por la agencia a tales fines, el cual contendrá, además, la

15       firma de su cónyuge.

16       Aquel empleado que individualmente adopte a un menor de edad

17       preescolar, entiéndase un menor de cinco (5) años o menos que no

18       esté matriculado en una institución escolar, a tenor con la

19       legislación y procedimientos legales vigentes en Puerto Rico o

20       cualquier jurisdicción de los Estados Unidos, tendrá derecho a una

21       licencia de paternidad que comprenderá el periodo de ocho (8)

22       semanas, a contar a partir de la fecha en que se reciba al menor en

1              el núcleo familiar, lo cual debe acreditarse por escrito. En el caso

2              que adopte a un menor de seis (6) años en adelante, tendrá derecho

3              a la licencia de paternidad a sueldo completo por el término de

4              quince (15) días.

5              Al reclamar este derecho el empleado certificará que no ha

6              incurrido en violencia doméstica, ni delito de naturaleza sexual, ni

7              maltrato de menores.

8              Los sub incisos (d), (e) y (f) del presente inciso serán de igual

9              aplicación en los casos en que el empleado solicite los beneficios de

10            la licencia establecida en los párrafos anteriores.

11      h.    El empleado podrá solicitar que se le reintegre a su trabajo antes de

12            expirar el período de licencia de paternidad a la que tiene derecho.

13            En este caso, se entenderá que el empleado renuncia al balance

14            correspondiente de licencia de paternidad sin disfrutar al que

15            tendría derecho.

16  5.    Licencia especial con paga para la lactancia

17      a    Se concederá tiempo a las madres lactantes para que después de

18            disfrutar su licencia de maternidad tengan oportunidad para lactar

19            a sus criaturas, durante una (1) hora dentro de cada jornada de

20            tiempo completo, que podrá ser distribuida en dos (2) periodos de

21            treinta (30) minutos cada uno o en tres (3) periodos de veinte (20)

22            minutos, para acudir al lugar en donde se encuentra la criatura a

1    lactarla, en aquellos casos en que la empresa o el patrono tenga un

2    centro de cuido en sus facilidades o para extraerse la leche materna

3    en el lugar habilitado a estos efectos en su taller de trabajo. Dichos

4    lugares deberán garantizar a la madre lactante privacidad,

5    seguridad e higiene. El lugar debe contar con tomas de energía

6    eléctrica y ventilación. Si la empleada está trabajando una jornada

7    de tiempo parcial y la jornada diaria sobrepasa las cuatro (4) horas,

8    el periodo concedido será de treinta (30) minutos por cada periodo

9    de cuatro (4) horas consecutivas de trabajo.

10    b.    Dentro del taller de trabajo, el periodo de lactancia tendrá una

11    duración máxima de doce (12) meses, contados a partir de la

12    reincorporación de la empleada a sus funciones.

13    c.    Las empleadas que deseen hacer uso de este beneficio deberán

14    presentar al patrono una certificación médica, durante el periodo

15    correspondiente al cuarto (4to.) y octavo (8vo.) mes de edad del

16    infante, donde se acredite y certifique que está lactando a su bebé.

17    Dicha certificación deberá presentarse no más tarde de cinco (5)

18    días antes de cada periodo. Disponiéndose que el patrono

19    designará un área o espacio físico que garantice a la madre lactante

20    privacidad, seguridad e higiene, sin que ello conlleve la creación o

21    construcción de estructuras físicas u organizacionales, supeditado

22    a la disponibilidad de recursos de las entidades gubernamentales.

1          Las agencias, instrumentalidades, departamentos y corporaciones

2          públicas del Gobierno de Puerto Rico deberán establecer un

3          reglamento sobre la operación de estos espacios para la lactancia.

4   6. <u>Licencias sin paga</u>

5      a.   En el caso que cese la causa por la cual se concedió la licencia, el

6           empleado deberá reintegrarse inmediatamente a su empleo o

7           notificar a la agencia o instrumentalidad pública sobre las razones

8           por las que no está disponible, o su decisión de no reintegrarse al

9           empleo que ocupaba.

10     b.   Además de las licencias sin paga que puedan otorgarse por cada

11          agencia o instrumentalidad pública mediante reglamento, se podrán

12          conceder las siguientes:

13         1.   A empleados de carrera con status regular, para prestar

14             servicios en otras agencias del Gobierno de Puerto Rico o

15             entidad privada.

16         2.   A empleados de carrera con status regular, para proteger el

17             status  o los derechos a que pueden ser acreedores en casos

18             de:

19             a)   Una reclamación de incapacidad ante el Sistema de

20                 Retiro del Gobierno de Puerto Rico u otra entidad, y

21                 el empleado hubiere agotado su licencia por

22                 enfermedad y de vacaciones.

b)    Haber sufrido el empleado, un accidente de trabajo y estar bajo tratamiento médico con la Corporación del Fondo del Seguro del Estado o pendiente de cualquier determinación final respecto a su accidente, y éste hubiere agotado su licencia por enfermedad y licencia de vacaciones.

3.    A empleados que así lo soliciten luego del nacimiento de un(a) hijo(a). Disponiéndose que ese tipo de licencia sin paga podrá concederse por un periodo de tiempo que no excederá de seis (6) meses, a partir de que ésta sea autorizada.

4.    A empleados con status regular que pasen a prestar servicios como empleado de confianza en la Oficina del Gobernador o en la Asamblea Legislativa, mientras estuviese prestando dichos servicios.

5.    A empleados con status regular que han sido electos en las elecciones generales o sean seleccionados para cubrir las vacantes de un cargo público electivo en la Rama Ejecutiva o Legislativa, incluyendo los cargos de Comisionado Residente en los Estados Unidos y Alcalde, mientras estuviere prestando dichos servicios.

7.    <u>Licencias especiales</u>

1   Se concederán a los funcionarios o empleados públicos, sean unionados o no

2   unionados, las siguientes licencias especiales por causa justificada, con o sin paga, según

3   fuera el caso. Disponiéndose que las referidas licencias se regirán por las leyes especiales

4   que las otorgan.

5           a. licencia para servir como testigo- Se prohíbe a todo patrono que

6               pueda descontar del salario o de la licencia de vacaciones o por

7               enfermedad de sus empleados, los días y horas que un empleado

8               debidamente citado por el Ministerio Fiscal o por un tribunal,

9               emplee en comparecer como testigo en un caso criminal.

10          b. licencia para servicio de jurado - Toda empleado que sea citado a

11              comparecer como jurado tendrá derecho a disfrutar de una licencia

12              con paga y a recibir compensación de su patrono por alimentación

13              y millaje, conforme a la reglamentación establecida en cada agencia,

14              instrumentalidad o corporación pública, como si se tratara de una

15              gestión oficial de tal empleado o funcionario.

16          c. fines judiciales - Todo empleado citado oficialmente para

17              comparecer ante cualquier Tribunal de Justicia, Fiscalía, organismo

18              administrativo, gubernamental o agencias de gobierno, tendrá

19              derecho a disfrutar de licencia con paga, por el tiempo que estuviese

20              ausente de su trabajo con motivo de tales citaciones.

21          d. licencia para donar sangre – Se concede una licencia con paga, por

22              un periodo de cuatro (4) horas al año para acudir a donar sangre, a

1    todo empleado del Gobierno de Puerto Rico, sus instrumentalidad y

2    corporaciones públicas.

3    e. licencia para asistir a la escuela de sus hijos (as) – Todo empleado del

4    Gobierno de Puerto Rico, sus intrumentalidades y corporaciones

5    públicas, tendrá derecho a ~~dos (2)~~ *cuatro (4)* horas laborables, sin

6    reducción de paga ni de sus balances de licencias, durante el

7    comienzo ~~y final~~ de cada semestre escolar, *y cuatro (4) horas laborables*

8    *al final de cada semestre escolar* para comparecer a las instituciones

9    educativas donde cursan estudios sus hijos y conocer sobre el

10   aprovechamiento escolar de éstos. *No obstante a lo anterior, todo*

11   *empleado cuyos hijos formen parte del Programa Educativo Individualizado*

12   *tendrá hasta diez (10) horas por semestre para que puedan acudir a realizar*

13   *gestiones relacionadas con sus hijos.*

14   f. licencia deportiva sin sueldo – Se concede una licencia deportiva

15   sin sueldo para todo empleado público que esté debidamente

16   seleccionado y certificado por la Junta para el Desarrollo del Atleta

17   Puertorriqueño de Alto Rendimiento a Tiempo Completo como

18   atleta en entrenamiento y entrenador para juegos Olímpicos,

19   Paralímpicos, Panamericanos, Centroamericanos y Campeonatos

20   Regionales o Mundiales. Esta licencia tendrá una duración de hasta

21   un (1) año con derecho a renovación siempre y cuando tenga la

22   aprobación de la Junta y le sea notificado al patrono en o antes de

1   treinta (30) días de su vencimiento. Mediante esta licencia los atletas

2   y entrenadores elegibles podrán ausentarse de sus empleos sin

3   pérdida de tiempo y garantizándole el empleo sin que se le afecten

4   los beneficios y derechos adquiridos durante el periodo en que

5   estuviera participando en dichos entrenamientos y/o

6   competencias.

7   Durante el periodo de la licencia la Junta será responsable de los

8   salarios de los participantes. Por lo tanto, vendrá obligada a hacer

9   llegar al patrono aquella cantidad correspondiente a las

10   deducciones legales que hasta ese momento se le hacía al empleado

11   de manera que el patrono pueda continuar cubriendo los pagos

12   correspondientes a dichas aportaciones.

13   g. licencia deportiva especial - Se establece una licencia especial para

14   todo empleado público que esté debidamente certificado por el

15   Comité Olímpico de Puerto Rico como deportista para representar

16   a Puerto Rico en Juegos Olímpicos, Juegos Paralímpicos, Juegos

17   Panamericanos, Centroamericanos o en campeonatos regionales o

18   mundiales. La licencia deportiva especial tendrá una duración

19   acumulativa que no será mayor de treinta (30) días laborables por

20   año natural.

21   h. licencia para renovar la licencia de conducir – todo empleado podrá

22   utilizar hasta dos (2) horas de su jornada de trabajo, sin cargo a

1    licencia alguna y con paga, para renovar su licencia de conducir,

2    siempre que la posesión de ésta sea indispensable para su trabajo

3    por la naturaleza del mismo.

4    i.   licencia voluntaria de servicios de emergencia – Todo empleado

5    que sea un voluntario certificado en servicios de desastres de la

6    Cruz Roja Americana, podrá ausentarse de su trabajo con una

7    licencia con paga por un período que no exceda treinta (30) días

8    calendario en un período de doce (12) meses para participar en

9    funciones especializadas de servicios de desastre de la Cruz Roja

10   Americana.

11   La Licencia se otorgará siempre y cuando los servicios del

12   funcionario sean solicitados por la Cruz Roja Americana y luego de

13   la aprobación de la agencia, instrumentalidad o corporación

14   pública donde se desempeñe el funcionario. La Cruz Roja

15   Americana expedirá al empleado una certificación de los servicios

16   prestados y el tiempo de duración de esa prestación. Esa

17   certificación la presentará el empleado a la agencia,

18   instrumentalidad o corporación pública donde trabaja.

19   j.   licencia militar - Todo empleado que pertenezca a la Guardia

20   Nacional de Puerto Rico o a las Reservas Organizadas de las

21   Fuerzas Armadas de los Estados Unidos tendrá derecho a que se le

22   conceda hasta un máximo de treinta (30) días de licencia con sueldo

1               cada año cuando estuvieren prestando servicio militar, como parte

2               de entrenamiento o para que asista a los campamentos y ejercicios

3               que le sean requeridos.

4          k. licencia para vacunar a sus hijos - Se concede hasta un máximo de

5               dos (2) horas a todo(a) empleado(a) que así lo solicite, para vacunar

6               a sus hijos(as) en una institución gubernamental o privada, cada

7               vez que sea necesaria la vacunación, según se indica en la tarjeta de

8               inmunización del (de la) hijo(a). El (la) empleado(a) debe presentar

9               una certificación del lugar, fecha y hora en que sus hijos(as) fueron

10              vacunados, con el fin de justificar el tiempo utilizado, según se

11              establece para este tipo de licencia. De lo contrario, el tiempo

12              utilizado se cargará a tiempo compensatorio, licencia de vacaciones

13              o se descontará del sueldo.

14         l. *Nada de lo dispuesto en esta Ley afectará los derechos del Federal and*

15              *Medical Leave Act (FMLA) de los empleados públicos que por ley federal*

16              *estén cobijados por sus disposiciones en la actualidad.*

17      Artículo 2.05.- Días Feriados.

18        Todo funcionario o empleado público del Gobierno de Puerto Rico tendrá derecho

19    sólo a los días feriados declarados como tales por el (la) Gobernador(a) de Puerto Rico o

20    por Ley. Los días que se enumeran a continuación serán los días feriados que disfrutarán

21    todos los empleados públicos:

22        1. Día de Año Nuevo, que se celebrará el 1 de enero.

1    2. Día de Reyes, que se celebrará el 6 de enero.

2    3. Natalicio de Martin Luther King, Jr., que se celebrará el tercer lunes de

3        enero.

4    4. Día de Jorge Washington, Día de los Presidentes y el Día de los Próceres

5        Puertorriqueños: Eugenio María de Hostos, José de Diego, Luis Muñoz

6        Rivera, José Celso Barbosa, Ramón Emeterio Betances, Román Baldorioty

7        de Castro, Luis Muñoz Marín, Ernesto Ramos Antonini y Luis A. Ferré, que

8        se celebrará el tercer lunes de febrero.

9    *5. Día de la Ciudadanía Americana, que se celebrará el 2 de marzo.*

10   5. 6. Día de Abolición de la Esclavitud, que se celebrará el 22 de marzo.

11   6. 7. Viernes Santo, cuya celebración es en fechas movibles.

12   7. 8. Día de la Conmemoración de los Muertos en la Guerra (Memorial Day)

13   que se celebrará el último lunes de mayo.

14   8. 9. Día de la Independencia de los Estados Unidos, que se celebrará el 4 de

15   julio.

16   9. Día de la Constitución de Puerto Rico, que se celebrará el 25 de julio.

17   10. Día del Trabajo, que se celebrará el primer lunes de septiembre.

18   11. Día de la Raza (Descubrimiento de América), que se celebrará el segundo

19   lunes de octubre.

20   12. Día del Veterano, que se celebrará el día 11 de noviembre.

21   13. Día de la Cultura Puertorriqueña y el Descubrimiento de Puerto Rico, que

1    se celebrará el 19 de noviembre.

2    14. Día de Acción de Gracias, que se celebrará el cuarto jueves de noviembre.

3    15. Día de Navidad, que se celebrará el 25 de diciembre.

4    Artículo 2.06.- Centros de Cuidado Diurno:

5    Todo funcionario o empleado del Gobierno de Puerto Rico, sus intrumentalidades

6    y corporaciones públicas donde existan áreas que estén debidamente habilitadas para

7    operar como Centro de Cuidado Diurno y/o ser utilizado para cuido de niños en edades

8    pre-escolares, tendrá derecho a la utilización de las mismas. Los usuarios del servicio

9    aportarán económicamente para el mejor funcionamiento del Centro; disponiéndose, que

10   cada agencia, instrumentalidad o corporación pública determinará cual será el pago

11   razonable por el uso de tales facilidades y servicios.

12   Artículo 2.07.- Aportación patronal uniforme para plan *médico para los empleados de*

13   *las corporaciones públicas:*

14   *Las Ramas Ejecutiva y Legislativa identificarán ahorros y recursos adicionales para evitar*

15   *afectar las aportaciones de los empleados para el pago de los planes médicos. De no poder llegar a*

16   *los ahorros proyectados en el Plan Fiscal, la diferencia se logrará mediante un programa para*

17   *igualar las aportaciones del Gobierno al plan médico. Solo entonces, a partir del* ~~Comenzando el~~

18   1 de *julio* ~~enero~~ de 2018, todo funcionario o empleado público, unionado o no unionado,

19   que trabaje para ~~el Gobierno Central o~~ alguna ~~de sus Corporaciones Públicas,~~ *Corporación*

20   *Pública,* excluyendo a la Universidad de Puerto Rico, tendrá derecho a una aportación

21   patronal que será determinada por ~~la AAFAF~~ *el Comité de Cumplimiento con el Plan Fiscal*

22   utilizando como base las métricas establecidas en el Plan Fiscal, pero que nunca será

1    menor de la aportación patronal mínima de cien dólares ($100) establecida por Ley para

2    los empleados del Gobierno Central. *AAFAF podrá negociar y acordar cubiertas de seguros*

3    *más económicas con aseguradoras privadas o bajo cubierta pública para la elección del empleado*

4    *en el Gobierno como Empleador Único o por agencia o grupos de agencias. Cualquier reducción a*

5    *la aportación patronal del plan médico requerirá que AAFAF ofrezca una cubierta de plan médico*

6    *más económica a esos empleados públicos. No obstante, todo empleado de corporación pública o*

7    *dependiente que actualmente se encuentre inscrito en el plan médico y que padezca de una*

8    *enfermedad catastrófica, crónica o terminal prexistente mantendrá la aportación patronal vigente*

9    *para su seguro médico de manera inalterada, durante todo el tiempo que permanezca vinculado en*

10   *el servicio público.*

11          Artículo 2.08.-Bonificaciones.

12          A partir de la vigencia de esta Ley, la única bonificación económica que se le

13   otorgará a los empleados públicos del Gobierno Central y sus corporaciones públicas será

14   por concepto del bono de navidad. La cantidad que los empleados tendrán derecho a

15   recibir será de seiscientos dólares ($600.00) en cada año en que haya prestado servicios al

16   Gobierno de Puerto Rico durante por lo menos seis (6) meses.

17          Artículo 2.09.- Remuneración del Trabajo en Exceso a la Jornada Regular:

18   1.     El programa de trabajo de cada agencia o instrumentalidad pública se

19          formulará de tal manera que se reduzca al mínimo la necesidad de trabajo

20          en exceso de jornada regular establecida en la agencia o instrumentalidad

21          pública para los empleados. No obstante, por razón de la naturaleza

22          especial de los servicios a prestarse, la necesidad de los servicios para

1      proteger y preservar la vida y propiedad de los ciudadanos, por cualquier

2      situación de emergencia, por eventos de fuerza mayor, disturbios

3      atmosféricos, situaciones imprevistas o de mantenimiento necesarias para

4      dar continuidad a un servicio esencial, se podrá requerir a los empleados

5      que presten servicios en exceso de su jornada de trabajo, diaria o semanal,

6      o en cualquier día en que se suspendan los servicios sin cargo a licencia

7      por el Gobernador. En estos casos, deberá mediar una autorización previa

8      del supervisor del empleado, la cual deberá ser aprobada por la autoridad

9      nominadora o por aquel funcionario en quien éste delegue. Los

10      supervisores deberán tomar medidas para que cuando un empleado

11      permanezca trabajando sea siempre a virtud de una autorización expresa.

12    2.    Los empleados tendrán derecho a recibir tiempo compensatorio, a razón

13      de tiempo y medio, por los servicios prestados en exceso de su jornada

14      regular, diaria o semanal, hora de tomar alimentos y por los servicios

15      prestados en los días feriados, en los días de descanso, o en los días en que

16      se suspendan los servicios sin cargo a licencia por el Gobernador. El

17      tiempo compensatorio deberá ser disfrutado por el empleado dentro del

18      período de seis (6) meses a partir de la fecha en que haya realizado el

19      trabajo extra. Si por necesidad del servicio esto no fuera posible, se le podrá

20      acumular el tiempo compensatorio hasta un máximo de doscientas

21      cuarenta (240) horas. En los casos de empleados que ejerzan funciones de

22      seguridad pública, respuestas a emergencia o actividades de temporadas,

1   según estos términos se definen en la Ley Federal de Normas Razonables

2   del Trabajo, salvo por lo dispuesto en el Art. 10 de la Ley 53-1996 y el Art.

3   2.09 de la Ley 20-2017, se podrán acumular hasta cuatrocientas ochenta

4   (480) horas. La compensación de tiempo extra en tiempo compensatorio

5   no procede para las horas que el empleado acumule en exceso de los

6   límites mencionados. No obstante, en el caso de los policías, según dispone

7   el Art. 2.09 de la ley 20-2017, a estos se les pagará a tiempo y medio y

8   tendrán la opción de escoger la paga de estas horas sin tener que

9   acumularla como tiempo compensatorio y dicho pago por horas extras no

10   estará incluido en el ingreso bruto y no tributará. *Esto no aplicará a los*

11   *empleados de las corporaciones públicas quienes tendrán derecho al pago de horas*

12   *extras a razón de tiempo y medio desde la primera hora acumulada al tiempo*

13   *establecido en esta ley, salvo el convenio colectivo aplicable disponga para la*

14   *acumulación de tiempo compensatorio.*

15   3.   Está excluido de las disposiciones del apartado (2) precedente cualquier

16   empleado que realice funciones de naturaleza administrativa, ejecutiva o

17   profesional, conforme estos términos se definen en la Ley Federal de

18   Normas Razonables del Trabajo.

19   Artículo 2.10.- Liquidación de días en exceso de vacaciones y licencia por

20   enfermedad:

21   Cada agencia, instrumentalidad o corporación pública tiene que reconocerle a

22   todo empleado público, unionado y no unionado, los balances de licencias por vacaciones

1    y enfermedad acumuladas a la fecha de vigencia de esta Ley pero no podrá liquidar en

2    efectivo los excesos acumulados antes de la vigencia de esta Ley.

3          Las agencias o instrumentalidades públicas están obligadas a establecer de forma

4    inmediata un plan para agotar el exceso de los balances acumulados para los empleados,

5    tanto unionados como no unionados, de manera tal, que al 31 de diciembre del 2017, no

6    hayan acumulaciones en exceso de lo permitido en licencias de enfermedad o vacaciones;

7    disponiéndose además, que después de esa fecha se perderá el balance en exceso que no

8    haya sido utilizado.

9          A partir de la vigencia de esta Ley, ningún empleado público, sea unionado o no

10   unionado, que trabaje para el Gobierno de Puerto Rico en alguna de sus agencias,

11   instrumentalidades o corporaciones públicas tendrá derecho al pago de la liquidación de

12   días en exceso por concepto de vacaciones o enfermedad.

13         Artículo 2.11.- Liquidación final de licencia de vacaciones acumulada en caso de

14   desvinculación del empleado del servicio público:

15         A partir de la vigencia de esta Ley, cualquier empleado público, sea unionado o

16   no unionado, solamente tendrá derecho al pago de una liquidación final de los días que

17   tenga disponibles en concepto de licencia de vacaciones al momento del cese de servicios,

18   lo cual nunca podrá ser mayor de sesenta (60) días. *El empleado podrá autorizar para que se*

19   *destine dicho balance a su Sistema de Retiro para que cotice como tiempo trabajado.*

20   *Artículo 2.11(a).- Se enmienda el Artículo 3 de la Ley Núm. 125 de 10 de junio de 1967,*

21   *según enmendada, para que lea como sigue:*

1    *El Gobernador reglamentará todo lo relativo a la concesión y disfrute de licencias y la*

2    *cuantía del pago de compensación final, incluyendo el pago a los beneficiarios en caso de muerte, a*

3    *los funcionarios nombrados por él, con excepción de los miembros de la Judicatura, los fiscales,*

4    *procuradores y registradores de la propiedad. A los efectos del pago de compensación final, que en*

5    *ningún caso excederá el equivalente a [seis (6)] dos (2) meses de sueldo, el Gobernador tomará en*

6    *consideración, entre otros, factores tales como las necesidades del servicio, tiempo durante el cual*

7    *ejerció el cargo y situación fiscal de la agencia o entidad gubernamental, la naturaleza de las*

8    *funciones desempeñadas y los créditos de licencia de vacaciones acumuladas en empleos anteriores*

9    *en el Gobierno y no disfrutada al pasar a ocupar puestos de nombramiento por el Gobernador.*

10   ~~*Aquellos funcionarios nombrados por el Gobernador que hayan servido por un término menor a*~~

11   ~~*un cuatrienio podrán recibir una compensación final autorizada por esta Ley que no exceda de dos*~~

12   ~~*(2) meses por año de servicio hasta un máximo de (6) meses.*~~ *Aquellas personas que hayan recibido*

13   *el pago por una compensación final, según las disposiciones de esta Ley, vendrán obligadas a*

14   *devolver la cantidad recibida si, por actos que acontecieron durante el ejercicio de su función*

15   *pública, son convictas por los delitos de apropiación ilegal, malversación o robo, de fondos públicos;*

16   *delitos contra el erario o la función pública, según tipificados en el Código Penal de [1974] de*

17   *Puerto Rico.*

18       ...

19       Artículo 2.12. - Se enmienda la sección 4.3 del Artículo 4 de la Ley 8 – 2017,

20   conocida como "Ley para la Administración y Transformación de los Recursos Humanos

21   en el Gobierno de Puerto Rico", para que lea como sigue:

22       "Sección 4.3.-Funciones y Facultades de la Oficina y del (de la) Director(a)

1    Además de las funciones y facultades que se confieren en otras

2    disposiciones de esta Ley, la Oficina y el (la) Director(a) tendrán las siguientes:

3         1.    . . .

4         2.    Funciones y facultades de la Oficina:

5               a.    Centralizar aquellas funciones del Sistema de Administración

6                     y *Transformación* de Recursos Humanos del Gobierno de

7                     Puerto Rico que sean compatibles con lo que se ordena en la

8                     presente Ley.

9               b.    . . .

10              c.    . . .

11              d.    . . .

12              e.    Asesorar en el área laboral a las agencias de la Rama Ejecutiva

13                    ~~regidas por el~~ ["**Plan de Reorganización de la**

14                    **Administración de Servicios Generales de Puerto Rico de**

15                    **2011"**] *~~Plan de Reorganización Núm. 2 2010 de la Comisión~~*

16                    *~~Apelativa del Servicio Público~~*, en todo lo relacionado con los

17                    procedimientos de elección y certificación de organizaciones

18                    sindicales, en cuanto a la negociación y administración de

19                    convenios colectivos y en todas aquellas áreas relacionadas

20                    con los asuntos laborales *que dispone la Ley 45-1998.* de las

21                    agencias.  En el descargo de las funciones de asesoramiento

22                    en torno a la negociación colectiva conforme a la Ley 45-1998,

1           la Oficina coordinará y supervisará la creación y

2           funcionamiento de un Comité de Negociación compuesto por

3           su personal y aquel que designe la Oficina de Gerencia y

4           Presupuesto. La Oficina realizará estudios comparativos de

5           convenios colectivos y ofrecerá adiestramientos en el área

6           laboral a aquellas agencias que lo soliciten.

7     f.    . . .

8     g.    . . .

9     h.    . . .

10    i.    . . .

11    j.    . . .

12    k.    . . .

13    l.    . . .

14    m.    Administrar y mantener actualizado el Registro Central de

15          Convocatorias para Reclutamiento, Ascenso y

16          Adiestramiento en el Servicio Público. De igual manera, se

17          mantendrá un registro en línea; disponiéndose que las

18          agencias, instrumentalidades públicas, así como las

19          corporaciones públicas, con excepción de la Oficina *propia* del

20          Gobernador, de los Municipios, del Tribunal Supremo, de las

21          Oficinas del Juez Presidente y del Administrador de los

22          Tribunales, de las Cámaras Legislativas, y de las Legislaturas

1          Municipales, deberán cumplir con la obligación de remitir

2          mensualmente a la Oficina de Administración y

3          Transformación de los Recursos los Humanos del Gobierno

4          de Puerto Rico las oportunidades de reclutamiento y ascenso.

5          La Oficina remitirá para entrevista candidatos del listado que

6          mantendrá dicha Oficina. Todas las solicitudes para

7          adiestramiento serán referidas a la Oficina de Administración

8          y Transformación de los Recursos Humanos del Gobierno de

9          Puerto Rico, con por lo menos treinta (30) días de anticipación

10         a la fecha del adiestramiento. La Oficina evaluará la necesidad

11         y conveniencia del adiestramiento y procederá a aprobar o

12         rechazar el mismo.

13                n.     . . .

14                o.     . . .

15                p.     . . .

16                q.     . . .

17                r.     . . .

18                s.     . . .

19                t.     . . .

20               . . . "

1        Artículo 2.13. - Se enmienda la Sección 5.2 del Artículo 5, de la Ley 8 – 2017,

2    conocida como "Ley para la Administración y Transformación de los Recursos Humanos

3    en el Gobierno de Puerto Rico", para que lea como sigue:

4        "Artículo 5.- Sistema de Administración *y Transformación* de los Recursos

5    Humanos [del Servicio Público] *en el Gobierno de Puerto Rico*

6                Sección 5.1.-  ...

7                Sección 5.2.-Exclusiones

8                Las disposiciones de esta Ley no *le* serán aplicables a las siguientes

9                agencias del Gobierno e instrumentalidades gubernamentales:

10                    1.    . . .

11                    . . .

12                    5.    Oficina *Propia* del Gobernador.

13                    . . .

14                    8.    . . .

15        **[En el caso de las corporaciones públicas o público privadas, agencias**

16    **que funcionan como empresas o negocios privados como las Alianzas Público**

17    **Privadas Participativas (APP+P) y los municipios, les aplicará el mecanismo de**

18    **la movilidad y los municipios. De igual forma, deberán adoptar Reglamentos**

19    **de personal que incorporen el principio de mérito para la administración de sus**

20    **recursos humanos, conforme lo dispone esta Ley, y someterán copia de los**

21    **mismos a la Oficina. La Oficina queda facultada para realizar auditorías de**

22    **cumplimiento en cuanto a las áreas esenciales al principio de mérito.]**

1    *No obstante, en el caso de las corporaciones públicas o público privadas, éstas*

2    *deberán adoptar reglamentos de personal que incorporen el principio de mérito a la*

3    *administración de sus recursos humanos, conforme lo dispone esta Ley y someterán copia*

4    *de los mismos a la Oficina. La Oficina queda facultada para realizar auditorías de*

5    *cumplimiento en cuanto a las áreas esenciales al principio de mérito.*

6    *De igual forma, el concepto de la movilidad y el mecanismo establecido por la*

7    *Oficina para implementar el movimiento de los empleados públicos aplicará en las*

8    *corporaciones públicas o público privadas, agencias que funcionan como empresas o*

9    *negocios privados como las Alianzas Público Privadas Participativas (APP+P) y los*

10   *municipios."*

11   Artículo 2.14.- Se enmienda la Sección 6.4, inciso 1 (d) e inciso 4 (1), y se añade un

12   inciso 5 al Artículo 6 de la Ley 8 – 2017, conocida como "Ley para la Administración y

13   Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", para que lea

14   como sigue:

15   "Sección 6.4.-Disposiciones sobre Ascensos, Traslados, Descensos y Movilidad

16       . . .

17           1.    . . .

18                 a.    . . .

19                 b.    . . .

20                 c.    . . .

21                 d.    . . .

1        Por otro lado, por las cualificaciones especiales de los

2        empleados se entenderá la experiencia adicional; los

3        estudios académicos adicionales a los requisitos mínimos y

4        los resultados obtenidos del Sistema de Evaluación

5        adoptado por las Agencias y *desarrollado por la Oficina*.

6            e.    . . .

7    2. . . .

8    3. . . .

9    4. Movilidad

10        . . .

11    1.    La Oficina de Administración y Transformación de los Recursos

12        Humanos del Gobierno de Puerto Rico, en conjunto con la Oficina de

13        Gerencia y Presupuesto tendrán un (1) año a partir de la aprobación

14        de la presente Ley para crear los planes de movilidad, los cuales

15        deben corresponder a las necesidades inmediatas en la prestación de

16        servicios [esenciales] en el Gobierno de Puerto Rico.

17    2.    . . .

18    3.    . . .

19    4.    . . .

20    5.    . . .

21    6.    . . .

22    7.    . . .

1        8.    . . .

2        9.    . . .

3        10.   …

4        11,   . . .

5        12.   . . .

6        13.   …

7    *5.  Otras Acciones*

8    *(a) Destaque – se autoriza la asignación temporal de un funcionario o empleado de*

9    *una agencia de la Rama Ejecutiva o municipio y viceversa, para brindar*

10   *servicios mutuos en alguna de dichas jurisdicciones. El funcionario o empleado*

11   *destacado continuará ocupando el mismo puesto y conservará todos sus*

12   *derechos como funcionario o empleado de dicha agencia. El destaque es una*

13   *acción administrativa que permite la maximización en la utilización de los*

14   *recursos humanos de una manera costo efectiva y en atención al Principio de*

15   *Mérito.   Bajo circunstancias excepcionales, es permisible el uso de este*

16   *mecanismo entre funcionarios y empleados de la Rama Ejecutiva y demás*

17   *Ramas de Gobierno, siempre que se restituya la retribución pagada al*

18   *funcionario en destaque por la Rama que lo utiliza conforme a las directrices*

19   *que a esos efectos emita la Oficina de Gerencia y Presupuesto. El destaque podrá*

20   *ser utilizado por el término de un (1) año el cual podrá ser prorrogable de existir*

21   *la necesidad.*

1        *(b) Designación o Asignación Administrativa – es la designación formal y*

2        *temporal que hace una autoridad nominadora a un empleado para que brinde*

3        *servicios de igual naturaleza o similar, en otra dependencia de la misma*

4        *agencia."*

5        Artículo 2.15.- Se enmienda la Sección 6.8 inciso 2 (b) del Artículo 6 de la Ley 8 –

6  2017, conocida como "Ley para la Administración y Transformación de los Recursos

7  Humanos en el Gobierno de Puerto Rico", para que lea como sigue:

8        "Sección 6.8.-Habilitación en el Servicio Público

9           . . .

10          1.   . . .

11          2.   . . .

12               a   . . .

13               b.   Todo empleado público convicto a quien se le conceda una

14                    sentencia suspendida o el beneficio de libertad bajo palabra

15                    que cumpla su sentencia en la libre comunidad bajo aquellas

16                    limitaciones impuestas por los organismos del Sistema

17                    Correccional Gubernamental, podrá someter su solicitud de

18                    habilitación en cualquier momento al Departamento del

19                    Trabajo y Recursos Humanos o en su defecto, la Agencia para

20                    la cual presta servicios vendrá obligada a someterla. El

21                    empleado continuará desempeñándose en su puesto hasta

22                    tanto el **[Director(a) determine lo contrario, conforme lo**

1       **dispone la Ley 481-2004, según enmendada]** *Secretario del*

2       *Trabajo y Recursos Humanos determine lo contrario.*

3       c   . . .

4       d   . . . "

5   Artículo 2.16. - Se enmienda la Sección 6.9 del Artículo 6 de la Ley 8 – 2017,

6   conocida como "Ley para la Administración y Transformación de los Recursos Humanos

7   en el Gobierno de Puerto Rico", para que lea como sigue:

8       "Sección 6.9.-Prohibición

9       A los fines de asegurar la fiel aplicación del Principio de Mérito en el

10      Servicio Público durante períodos pre y post eleccionarios, las Autoridades

11      Nominadoras *de las agencias, instrumentalidades y corporaciones públicas del*

12      *Gobierno de Puerto Rico* se abstendrán de efectuar cualquier transacción de

13      personal que incluya las áreas esenciales al Principio de Mérito, tales como

14      nombramientos, ascensos, descensos, traslados; tampoco podrán efectuar

15      cambios o acciones de retribución, ni cambios de categoría de puestos, ni se

16      utilizará la movilidad de empleado durante la veda electoral. Disponiéndose

17      que durante dicho período tampoco pueda tramitarse ni registrarse en los

18      expedientes de personal cambios o acciones de personal de ninguna índole

19      con efecto retroactivo. Se exceptúan de la veda los cambios como resultado

20      de la terminación del periodo probatorio y la imposición de medidas

21      disciplinarias. El incumplimiento de esta disposición conllevará la nulidad

22      de la transacción efectuada. Esta prohibición comprenderá el período de dos

1      (2) meses antes y dos (2) meses después de la celebración de las Elecciones

2      Generales de Puerto Rico.

3              Previa aprobación de la Oficina, se podrá hacer excepción de esta

4      prohibición por necesidades urgentes e inaplazables del servicio

5      debidamente evidenciado y certificado conforme a las normas que sobre este

6      particular emita la Oficina. *Para efectos de este Artículo, necesidad urgente e*

7      *inaplazable se entiende como aquellas acciones esenciales o indispensables que son*

8      *menester efectuar en forma apremiante para cumplir con las funciones de la agencia,*

9      *instrumentalidad o corporación pública. No incluye aquellas acciones que resulten*

10     *meramente convenientes o ventajosas, cuya solución puede aplazarse hasta que se*

11     *realice el trámite ordinario. "*

12     Artículo 2.17. - Se enmienda la Sección 7.2 inciso 3 y 5 del Artículo 7 de la Ley 8 –

13     2017, conocida como "Ley para la Administración y Transformación de los Recursos

14     Humanos en el Gobierno de Puerto Rico", para que lea como sigue:

15     "Sección 7.2.-Normas Generales de Retribución

16     Las siguientes guías son aplicables a todas las agencias gubernamentales bajo

17     esta Ley:

18            1.      . . .

19            2.      . . .

20            3.      **[Las agencias administrarán]** *La Oficina administrará* el plan

21                    de retribución en relación con las áreas esenciales al principio

22                    de mérito.  Estas no podrán efectuar ninguna acción que

1                              atente o sea contraria al principio de mérito en las

2                              transacciones de personal en el servicio público de carrera.

3                     4.      ...

4                     5.      Ninguna enmienda o modificación al sistema de evaluación

5                              o valoración de puestos **[seleccionados por la agencia,]** podrá

6                              afectar negativamente el salario base del empleado.

7                     ..."

8         Artículo 2.18. - Se ~~deroga el~~ *suspende la vigencia del* Artículo 9 y la Sección 10.2 del

9 Artículo 10 de la Ley 8 – 2017, conocida como "Ley para la Administración y

10 Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", ~~y se~~

11 ~~reenumeran los actuales Artículos 10 al 20 como Artículos 9 al 19~~., *sujeto a las disposiciones*

12 *establecidas en el Artículo 2.03 de esta Ley.*

13         Artículo 2.19. - Nulidad

14         A partir de la vigencia de la presente Ley será nulo e ineficaz ~~todo~~ *toda cláusula o*

15 *disposición de un* convenio colectivo, acuerdo, acuerdo suplementario, reglamento, orden

16 administrativa, carta circular y/o carta contractual, *en las disposiciones en* que otorgue a

17 los funcionarios o empleados públicos unionados o no unionados del Gobierno,

18 incluyendo a todo empleado unionado o no unionado de las Corporaciones Públicas del

19 Gobierno de Puerto Rico, mayores beneficios marginales a los autorizados en la presente

20 Ley. *La adopción de cualquier medida autorizada para cumplir con lo anterior por cualquier*

1   *agencia o corporación pública del Gobierno de Puerto Rico no constituirá una violación a los*

2   *convenios colectivos existentes. Tampoco constituirá una práctica ilícita.*

3   Artículo 2.20.-Relación con otras leyes

4   Se mantienen en pleno vigor las siguientes leyes en relación a las disposiciones

5   que no entren en conflicto con la presente Ley:

6   a. Ley 62 de 23 de junio de 1969, según enmendada, conocida como "Código Militar

7   de Puerto Rico".

8   b. Ley 122-1996, según enmendada, conocida como "Ley de comparecencia de

9   empleados como testigos en casos criminales".

10   c. Ley 44-1996, según enmendada, conocida como Ley de Cesión de Licencias por

11   Vacaciones".

12   d. Ley 203-2007, según enmendada, conocida como "Carta de Derechos del

13   Veterano Puertorriqueño del Siglo XXI".

14   e. Ley 58-1994, según enmendada, conocida como "Ley de Licencia Voluntaria de

15   Servicios de Emergencias".

16   f. Ley 122 del 12 de julio de 1986, según enmendada, conocida como "Ley de

17   comparecencia de empleados como testigos en casos criminales".

18   g. Ley 281-2003, según enmendada, conocida como "Ley para la Administración

19   del Servicio de Jurado de Puerto Rico".

20   h. Ley 24- 2002, según enmendada.

21   i. Ley 49 de 27 de junio de 1987, según enmendada.

22   j. Ley. 134 - 1998, según enmendada.

1    k. Ley 154 - 2000, según enmendada.

2    l. En lo relativo a los Municipios, continúa en pleno vigor y sin menoscabo alguno

3       las disposiciones de la Ley 81-1991, según enmendada, conocida como "Ley de

4       Municipios Autónomos de Puerto Rico". Las disposiciones de la presente Ley

5       le aplicaran a cualquier Municipio que así lo determine al aprobar una

6       Ordenanza Municipal a esos efectos.

7    Artículo 2.21.-Derogación

8    Se deroga la Ley Núm. 89-2016, mejor conocida como "Ley de Empleo Temporal en

9    el Servicio Público".

10   CAPÍTULO 3.-ASOCIACIÓN DE SUSCRIPCIÓN CONJUNTA DEL SEGURO DE

11       RESPONSABILIDAD OBLIGATORIO

12   Artículo 3.01.- Se enmienda el inciso (m) del Artículo 3 de la Ley 253 - 1995, según

13   enmendada, para que lea como sigue:

14   "Artículo 3. — Definiciones.

15   Para fines de esta Ley, los siguientes términos y frases tendrán el significado que

16   se expresa a continuación:

17   (a)…

18   …

19   (m) Seguro de responsabilidad obligatorio. — Significa el seguro que exige esta

20   Ley y que responde por los daños causados a vehículos de motor de terceros como

21   resultado de un accidente de tránsito, por los cuales es legalmente responsable el dueño

22   del vehículo asegurado por este seguro, y a causa de cuyo uso se ocasionan dichos daños,

1   conforme al sistema para la determinación inicial de responsabilidad creado al amparo

2   de esta Ley. El seguro tendrá un límite de cubierta de **[cuatro mil dólares ($4,000)]** *cuatro*

3   *mil quinientos dólares ($4,500)* por accidente. El Comisionado, a solicitud de los

4   aseguradores que proveen el seguro de responsabilidad obligatorio o motu proprio,

5   podrá revisar y modificar el límite y la tarifa del seguro de responsabilidad obligatorio

6   cada dos (2) años, conforme a las disposiciones aplicables del Capítulo 12 del Código, que

7   tomen en consideración a todo asegurador en el mercado del Seguro de Responsabilidad

8   Obligatorio. No obstante, el límite de la cubierta nunca será menor de **[tres mil dólares**

9   **($3,000)]** *tres mil quinientos dólares ($3,500).*

10      ..."

11      Artículo 3.02.- Se enmiendan los incisos (f) y (h) del Artículo 6 de la Ley 253-1995,

12   según enmendada, mejor conocida como "Ley de Seguro de Responsabilidad Obligatoria

13   para Vehículos de Motor", para que lean como sigue:

14      "Artículo 6. — Asociación de Suscripción Conjunta—Creación.

15      (a) . . .

16      . . .

17      (f) Las aseguradoras que suscriban el seguro de responsabilidad obligatorio,

18   incluyendo a la Asociación de Suscripción Conjunta, una vez reciban las primas que les

19   correspondan luego de deducido el cargo establecido en el Artículo 7(b) (1), descontarán

20   el cinco por ciento (5%) de las mismas, según establecido en el Artículo 7(b) (2). Cada

21   aseguradora y la Asociación de Suscripción Conjunta será responsable de remitir al

22   Departamento de Hacienda la cantidad que corresponda al cargo sobre el total de primas

1    suscritas durante un mes, no más tarde del día cinco (5) del mes siguiente. El

2    Departamento de Hacienda establecerá mediante reglamento la manera en que se

3    realizará este pago y podrá diseñar y acordar otros métodos para el cobro por este

4    concepto, siempre que el cambio redunde en un recaudo efectivo y constante. *En la misma*

5    *fecha, cada aseguradora y la Asociación de Suscripción Conjunta será responsable de remitir al*

6    *Departamento de Hacienda la cantidad que corresponda al cargo establecido en el Artículo 7(b)*

7    *(3). El Departamento de Hacienda establecerá mediante reglamento la manera en que se realizará*

8    *este pago y podrá diseñar y acordar otros métodos para el cobro por este concepto, siempre que el*

9    *cambio redunde en un recaudo efectivo y constante.*

10        ...

11        (h)    Todos los miembros de la Asociación de Suscripción Conjunta participarán

12    anualmente en las ganancias y pérdidas de ésta, determinadas conforme al Estado Anual

13    requerido a tenor con el Artículo 3.310 del Código, en el porciento que las primas netas

14    directas suscritas en Puerto Rico durante el año anterior por cada uno de dichos

15    aseguradores, para el seguro contra cualquier pérdida, gastos o responsabilidad por la

16    pérdida o los daños causados a personas o la propiedad, resultantes de la posesión,

17    conservación o uso de cualquier vehículo terrestre, aeronave o animales de tiro o de

18    montura, o incidentales a los mismos, todo ello de conformidad con el Artículo 4.070 del

19    Código, represente del total de las primas netas directas suscritas en Puerto Rico durante

20    dicho año para esa clase de seguro.

21        (1) ...

22        (2) ...

1   (3) *Dividendo Extraordinario y Pago Especial 2017:*

2   (i) *Se autoriza a la Asociación de Suscripción Conjunta a declarar un dividendo*

3   *extraordinario antes del 30 de junio de 2017 a sus miembros, sujeto a las*

4   *disposiciones de este inciso, de una cantidad de setenta millones (70, 000, 000)*

5   *de dólares sujeto a la imposición de una contribución especial y única de*

6   *cincuenta   por ciento (50%). Los dividendos que reciban los aseguradores*

7   *privados miembros de la Asociación de Suscripción Conjunta no estarán sujetos*

8   *a ninguna otra contribución. Los recaudos obtenidos a través de la contribución*

9   *especial y única aquí dispuesta, no serán considerados como parte del cómputo*

10  *de ninguna de las fórmulas existentes para el cálculo de asignaciones*

11  *presupuestarias a ser consignadas como parte del proceso presupuestario*

12  *constitucional.*

13  (ii) ~~*La Junta de Directores de la Asociación de Suscripción Conjunta declarará el*~~

14  ~~*dividendo conforme su autoridad y procedimientos determinando que no existe*~~

15  ~~*impacto adverso a la solvencia y capital de la Asociación de Suscripción*~~

16  ~~*Conjunta y el pago deberá ser ratificado por el voto de los miembros con una*~~

17  ~~*participación proporcional combinada de más de cincuenta por ciento (50%)*~~

18  ~~*conforme a la más reciente determinación hecha por la Oficina del Comisionado*~~

19  ~~*de Seguros.*~~ *En un término que no excederá de quince (15) días de aprobada esta*

20  *Ley, la Junta convocará una asamblea y someterá para aprobación de todos los*

21  *miembros de la Asociación de Suscripción Conjunta la declaración del*

22  *dividendo extraordinario autorizado.  Se dispone que el dividendo podrá ser*

1  *aprobado con el voto de los miembros con una participación proporcional*

2  *combinada de más de cincuenta por ciento (50%) conforme a la más reciente*

3  *determinación hecha por la Oficina del Comisionado de Seguros. La*

4  *determinación de la Asamblea será vinculante.*

5  (iii)   *En consideración al beneficio público de esta medida y su autorización*

6  *legislativa, aplicará aquí lo dispuesto en el inciso (j) de este Artículo a las*

7  *acciones tomadas por la Junta, miembros y personal de la Asociación.*

8  (iv)   *De avalarse la declaración del dividendo en la asamblea, la* ~~La~~ *Asociación de*

9  *Suscripción Conjunta, en un término que no excederá de noventa (90) días,*

10  *realizará un pago especial de* ~~setenta~~ *treinta y cinco millones de dólares*

11  ~~($70,000,000)~~ *($35,000,000) al Departamento de Hacienda, quien depositará*

12  *los fondos en el Fondo General del Gobierno de Puerto Rico. Durante ese mismo*

13  *término la Asociación de Suscripción Conjunta desembolsará a sus miembros*

14  *los dividendos autorizados a tenor con la participación proporcional de cada*

15  *miembro.*

16  ~~(v) Los miembros de la Asociación de Suscripción Conjunta podrán utilizar un~~

17  ~~crédito de hasta treinta y cinco millones de dólares ($35,000,000), por concepto~~

18  ~~del pago especial aquí dispuesto como crédito contributivo contra su~~

19  ~~Contribución sobre Ingresos impuesta por las Secciones 1022.01 a 1022.03 del~~

20  ~~Código de Rentas Internas de Puerto Rico de 2011.~~

21  ~~(vi)   El crédito mencionado en el inciso anterior tendrá que ser utilizado por los~~

22  ~~miembros de la Asociación de Suscripción Conjunta dentro de un periodo de~~

1     ~~cuatro (4) años contributivos contados a partir del 31 de diciembre de 2016. De~~

2     ~~quedar algún remanente luego de los cuatro (4) años, la Asociación de~~

3     ~~Suscripción Conjunta podrá utilizar el crédito."~~

4     ..."

5     Artículo 3.03.- Se enmiendan los incisos (a), (b) y (d) del Artículo 7 de la Ley Núm.

6     253 de 27 de diciembre de 1995, según enmendada, para que lean como sigue:

7     "Artículo 7.- Primas.-

8     (a) La prima uniforme inicial del seguro de responsabilidad obligatorio será

9     noventa y nueve dólares ($99) por cada vehículo privado de pasajeros y ciento

10    cuarenta y ocho dólares ($148) por cada vehículo comercial. **[La prima no**

11    **podrá ser aumentada hasta transcurridos al menos tres (3) años de**

12    **establecida y conforme a los parámetros de esta Ley.]** *Se autoriza la revisión y*

13    *ajuste de la prima en o antes del 30 de junio de 2017, conforme lo dispuesto en el inciso*

14    *(e) de este Artículo.*

15    El Comisionado podrá fijar una prima diferente a las establecidas en este inciso

16    para el seguro de responsabilidad obligatorio de aquellos vehículos a los cuales el

17    Departamento de Transportación y Obras Pública les emita licencias transitorias o

18    provisionales.

19    (b) Cargos por Servicios

20    1)...

21    2)...

1        **3) [Estos cargos no aplicarán a aquellas pólizas emitidas mediante el**

2        **seguro tradicional.]** *Se establece un cargo administrativo adicional que será proporcional*

3        *al incremento en ganancias por concepto de ajustes en la prima uniforme, conforme lo*

4        *dispuesto en los incisos (a) y (e) de este artículo. El por ciento aplicable para determinar la*

5        *cuantía correspondiente en los casos de incremento de la prima será calculado dividiendo*

6        *el incremento neto de la prima conforme la cantidad establecida en el inciso (a) de este*

7        *Artículo, entre el costo total ajustado de la prima. El por ciento resultante será aplicado a*

8        *los ingresos generados por las aseguradoras, incluyendo la Asociación de Suscripción*

9        *Conjunta, luego de descontados los gastos administrativos y costos relacionados a la*

10        *producción de la prima. El balance que resulte al aplicar el por ciento según establecido en*

11        *esta fórmula será transferido al Fondo General del Gobierno de Puerto Rico. Este cargo no*

12        *constituye una contribución sobre prima.*

13        *4) Estos cargos no aplicarán a aquellas pólizas emitidas mediante el seguro*

14        *tradicional y* [**Estos cargos**] se considerarán parte de la prima del seguro de

15        responsabilidad obligatorio y deberán garantizarse dentro de la distribución del

16        dólar prima.

17        (c)…

18        (d) Todo asegurador del seguro de responsabilidad obligatorio [**a la Asociación**

19        **de Suscripción Conjunta, tomando como base la frecuencia y severidad de pérdidas de**

20        **sus asegurados,**] podrá presentar para la aprobación del Comisionado reglas y planes de

21        tarifas que contengan normas para la aplicación de recargos a la prima uniforme de los

22        vehículos privados de pasajeros o de los vehículos comerciales que se aseguren con estos,

1    según corresponda, sujeto a las disposiciones del Capítulo 12 del Código *tomando como*

2    *base la frecuencia y severidad de pérdidas de sus asegurados.* [Tales reglas y planes proveerán

3    para la pronta eliminación o modificación de dichos recargos, previa aprobación del

4    Comisionado, cuando la experiencia de primas y pérdidas así lo justifique.]

5    (e)...

6    ..."

7    CAPÍTULO 4.- TRANSFERENCIA DE GANANCIAS DE LAS CORPORACIONES

8    PÚBLICAS, *AGENCIAS E INSTRUMENTALIDADES* AL FONDO GENERAL;

9    *CREACIÓN DEL COMITÉ Y AJUSTES DE CARGOS, DERECHOS Y TARIFAS.*

10   Artículo 4.01.- Transferencia de Sobrantes

11   Se ordena a las corporaciones públicas, *agencias* e instrumentalidades del

12   Gobierno de Puerto Rico a transferir al Departamento de Hacienda los sobrantes de los

13   ingresos generados. Dichos fondos serán considerados como recursos disponibles del

14   Estado y depositados por el Departamento de Hacienda en el Fondo General del

15   Gobierno de Puerto Rico para cumplir con los requerimientos de liquidez contemplados

16   en el Plan Fiscal adoptado al amparo de las disposiciones de *"Puerto Rico Oversight,*

17   *Management and Economic Stability Act of 2016",* Public Law 114-187, también conocida

18   como PROMESA.

19   Artículo 4.02.-Comité

20   La cantidad de fondos que aportará cada una de las corporaciones e

21   instrumentalidades será determinado por un comité compuesto por el Director Ejecutivo

22   de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico, el Secretario del

1    Departamento de Hacienda y el Director Ejecutivo de la Oficina de Gerencia y

2    Presupuesto que podrán establecer las tarifas necesarias para cumplir con lo dispuesto

3    en el Plan Fiscal aprobado para el Gobierno de Puerto Rico y el que rija a sus

4    corporaciones. Este comité velará porque la transferencia de los fondos según se dispone

5    en el Artículo 4.01 de la presente Ley no afecten los servicios que ofrecen las

6    corporaciones públicas e instrumentalidades y que sean los sobrantes disponibles luego

7    de haber sido cubiertos los gastos operacionales *y obligaciones* de dichas entidades,

8    *conforme con el presupuesto de gastos recomendado por la Oficina de Gerencia y Presupuesto para*

9    *cado año fiscal.*

10   Además, se faculta a este comité a revisar las fuentes de ingresos de las

11   corporaciones públicas, *agencias* e instrumentalidades y ajustar, *aumentar o disminuir,*

12   cualquier cargo, *derecho,* tarifa, arancel, honorario, prima o cualquier ingreso de similar

13   naturaleza, con el fin de cumplir con las métricas dispuestas en el Plan Fiscal del Gobierno

14   de Puerto Rico. *Además, el comité podrá imponer un cargo administrativo adicional a aquellas*

15   *contribuciones que entienda necesaria que podrá ser de cinco por ciento (5%) hasta un diez por*

16   *ciento (10%), para cumplir con las métricas del Plan Fiscal certificado por la Junta de Supervisión*

17   *Fiscal.*

18   *Esta Ley tendrá supremacía sobre cualquier ley que establezca cualquier cargo, derecho,*

19   *tarifa, arancel, honorario, prima o cualquier ingreso de similar naturaleza y se le autoriza al comité*

20   *a revisar, aumentar o disminuir la cuantía aun cuando la misma esté dispuesta en Ley. El comité*

21   *tendrá facultad de revisar, aumentar o disminuir estos ingresos sin sujeción a las disposiciones de*

1   *cualquier Ley, reglamento u orden administrativa que establezca una cuantía particular a estos*

2   *ingresos*.

3        Cualquier disposición de ley, reglamento, orden administrativa, resolución

4   corporativa, o cualquier otro documento de similar naturaleza, que restrinja o reduzca

5   los fondos que puedan ser transferidos por una corporación pública, *agencia* o

6   instrumentalidad del Gobierno de Puerto Rico al Fondo General según dispuesto en ~~el~~

7   ~~Artículo 4.01 de esta Ley~~ *este Capítulo* queda suspendida.

8        Se faculta al comité a promover cualquier orden administrativa, carta circular o

9   reglamento necesario para su operación y para el cumplimiento con las disposiciones de

10   la presente Ley.

11        Artículo 4.03.- Exclusiones

12        Se excluyen de las disposiciones de este Capítulo a la Universidad de Puerto Rico,

13   creada por virtud de la Ley Núm. 1 del 20 de enero de 1966, según enmendada, conocida

14   como "Ley de la Universidad de Puerto Rico", y a la Corporación Pública para la

15   Supervisión y Seguro de Cooperativas de Puerto Rico, creada por virtud de la Ley Núm.

16   114-2001, según enmendada, mejor conocida como "Ley de la Corporación Pública para

17   la Supervisión y Seguro de Cooperativas de Puerto Rico~~, Ley del Fondo de Interés~~

18   ~~Apremiante, mejor conocida como COFINA, Ley Número 9 de 13 de mayo de 2006 según~~

19   ~~enmendada,~~ *Ley de la Corporación de Financiamiento Municipal, mejor conocida como COFIM,*

20   *Ley Núm. 19 de 24 de enero de 2014, según enmendada, Ley de la Comisión Especial Sobre Fondos*

21   *Legislativos para Impacto Comunitario, ley Núm. 20-2015 y Ley de la Comisión Conjunta Sobre*

22   *Informe especiales del Contralor, Ley Núm. 83 de 23 de junio de 1954, según enmendada*".

1    *En cuanto a la Ley del Fondo de Interés Apremiante, mejor conocida como COFINA, Ley*

2    *Número 9 de 13 de mayo de 2006 según enmendada, el Ejecutivo quedará autorizado para utilizar*

3    *los Fondos de COFINA, de manera ocasional, únicamente como última alternativa y sujeto a la*

4    *presentación de una certificación juramentada sometida a la Asamblea Legislativa. No se entenderá*

5    *por la presentación de dicha certificación que el Ejecutivo tendrá uso indefinido de los fondos de*

6    *COFINA. Dicha certificación tendrá que establecer la necesidad, término y la cantidad de fondos*

7    *a utilizarse, para cubrir una deficiencia significativa ocasional en el flujo de caja para cumplir con*

8    *el Plan Fiscal del Gobierno de Puerto Rico. Dicha certificación será firmada y juramentada por el*

9    *Director Ejecutivo de AFFAF y por el Director de la Oficina de Gerencia y Presupuesto. La firma*

10   *y el juramento de estos funcionarios en la certificación será indelegable. En dicha certificación los*

11   *funcionarios acreditarán que la información es correcta, exacta y verídica conforme a la realidad*

12   *fiscal del gobierno de Puerto Rico.*

13   *Artículo 4.04.- Cláusula de Cumplimiento*

14   *Todas las transferencias realizadas en virtud de la disposiciones de este Capítulo estarán sujeta a*

15   *los requisitos de la sección 201(b)(1) (M) de la ley Pública 114-187 conocida como "Puerto Rico*

16   *Oversight, Management and Economic Stability Act or PROMESA"*

17   CAPÍTULO 5.- DISPOSICIÓN DE ~~PROPIEDADES~~ BIENES INMUEBLES DEL

18   GOBIERNO.

19   Artículo 5.01.- Política Pública.

20   Se declara como política pública del Gobierno de Puerto Rico la mejor utilización

21   de las propiedades inmuebles que no se estén utilizando por el Estado, con el propósito

22   de hacerle llegar mayores recursos al erario. Además, se propicia que aquellas

1   propiedades inmuebles que en la actualidad están en total desuso, puedan dedicarse a

2   actividades para el bienestar común, ya sean para usos sin fines de lucro, comerciales o

3   residenciales que promuevan la activación del mercado de bienes inmuebles y la

4   economía en general.

5   Para cumplir con esta política pública, se autoriza el diseño de un procedimiento

6   eficiente y eficaz de venta de propiedades inmuebles, donde imperen los principios de

7   competencia, transparencia, *desarrollo económico, creación de empleo*, bienestar e interés

8   público.

9   Artículo 5.02.- Definiciones.

10   Para fines de este Capítulo las siguientes palabras tendrán los siguientes

11   significados:

12   A. Bienes Inmuebles – Aquellos que no pueden moverse por sí mismos ni ser

13   trasladados de un lugar a otro como la tierra, los edificios, etcétera; así como

14   todos los que estén unidos a un inmueble de una manera fija, de suerte que no

15   pueda separarse de éste sin quebrantamiento de la materia o deterioro del

16   objeto; y que pertenezcan a las agencias, dependencias, instrumentalidades y

17   corporaciones públicas de la Rama Ejecutiva del Gobierno de Puerto Rico.

18   B. Comité – Se refiere al Comité de Evaluación y Disposición de Propiedades

19   Inmuebles.

20   C. Disposición – Proceso mediante el cual, el Gobierno de Puerto Rico cede el

21   título de propiedad, posesión, uso o disfrute de bienes inmuebles para su mejor

22   utilización.

1     D. Subasta Pública a Viva Voz – Proceso donde se reúnen físicamente varios

2         licitadores en un lugar y hora previamente acordada a hacer oferta directa por

3         determinada ~~propiedad~~ *bien* inmueble anunciada previa a la subasta. La oferta

4         se hace a viva voz, donde los restantes licitadores escuchan y conocen las

5         ofertas.

6     E. Subasta Pública en Sobre Sellado – Proceso de subasta donde los licitadores

7         hacen su oferta secreta en un sobre sellado, cuyo procedimiento se establecerá

8         por reglamento.

9     F. Venta Directa – Proceso para disponer de una propiedad con una parte que ha

10        cumplido con los criterios que se establezcan por reglamento.

11     Artículo 5.03.- Comité de Evaluación y Disposición de ~~Propiedades~~ *Bienes*

12     Inmuebles.

13     Se crea el Comité de Evaluación y Disposición de ~~Propiedades~~ *Bienes* Inmuebles a

14 los fines de que ejerza todas las facultades necesarias, que no sean contrarias a esta o

15 cualquier otra ley, para la disposición de bienes inmuebles de la Rama Ejecutiva del

16 Gobierno de Puerto Rico.

17     El Comité estará compuesto por los siguientes funcionarios públicos:

18     a. El Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia

19        Fiscal de Puerto Rico (AAFAF).

20     b. El Director de la Oficina de Gerencia y Presupuesto.

21     c. El Secretario del Departamento de Desarrollo Económico y Comercio.

22     El Director de Ejecutivo de la AAFAF presidirá el Comité.

1      El Comité se reunirá, por lo menos, una vez al mes, *y cuanto sea necesario de tiempo*

2 *en tiempo para agilizar los trabajos,* en el lugar y la hora que estimen conveniente.

3 Disponiéndose que los miembros del Comité no devengarán salario alguno ni

4 compensación por concepto de dietas por el ejercicio de los deberes y facultades que le

5 impone esta Ley. *Disponiéndose además, que nada de lo aquí establecido aplicará bienes*

6 *inmuebles de la compañía   De Fomento Industrial, Banco Gubernamental de Fomento,*

7 *Administración de Terrenos, Autoridad del Distrito del Centro Convenciones y sus respectivas*

8 *subsidiarias, en tanto y en cuanto tengan ya establecido a la fecha de vigencia  de esta ley  un*

9 *proceso de venta de bienes inmuebles cónsono con este Capítulo.*

10      Artículo 5.04.-Director Ejecutivo.

11      Constituido el Comité, éste designará un Director Ejecutivo, quien tendrá todos

12 aquellos poderes que le delegue el Comité relacionados con la implantación de la política

13 pública establecida en esta Ley. El Director Ejecutivo recomendará ~~a la Junta~~ *al Comité*

14 gestionar traslados interagenciales para integrar recursos humanos a la consecución de

15 los objetivos de esta Ley, de conformidad con la Ley 8-2017. La Oficina del Director

16 Ejecutivo estará ubicada en el lugar que el Comité designe para ello.

17      Artículo 5.05.- Facultades del Comité.

18      El Comité tendrá las siguientes facultades:

19        a. Aprobar las reglas, reglamentos, cartas circulares y normas que sean

20          necesarias para el ejercicio de sus funciones y deberes.

21        b. Adoptar un sello oficial y alterar el mismo a su conveniencia.

22        c. Demandar y ser demandado bajo su propio nombre.

1        d. Negociar, otorgar contratos, tramitar la disposición de propiedad

2            inmueble de la Rama Ejecutiva del Gobierno de Puerto Rico y todos

3            aquellos otros instrumentos y acuerdos con cualquier persona natural o

4            jurídica necesarios o convenientes para ejercer los poderes y funciones

5            conferidas en esta Ley.

6        e. Entablar cualquier acción judicial para proteger o poner en vigor la

7            política pública establecida en esta Ley.

8        f. Nombrar aquellos oficiales, agentes y empleados que sean necesarios

9            para el adecuado cumplimiento de los fines y propósitos para los cuales

10           se ha creado y para fijar sus poderes, facultades y deberes y los términos

11           y condiciones de trabajo que establece esta Ley. Disponiéndose que los

12           nombramientos deberán realizarse de conformidad con lo dispuesto en

13           la Ley 8-2017.

14        g. Contratar para llevar a cabo las subastas públicas a viva voz, _conforme a_

15           _las disposiciones de este Capítulo y los reglamentos a esos fines_.

16        h. Crear fideicomisos de inversión en bienes raíces de naturaleza similar a

17           los fideicomisos definidos en la sección 1082.01(a) de la Ley 1-2011, según

18           enmendada, conocida como "Código de Rentas Internas para un Nuevo

19           Puerto Rico".

20        i. ~~Contribuir~~ _Aportar_ bienes inmuebles a cualquier fideicomiso de

21           inversión en bienes raíces creado a tenor con el Artículo 5.05 (h) de esta

22           Ley. _La empresa   que aporte  conforme a este inciso el Gobierno tendrá_

1    *participación en el desarrollo que realice.*

2    Artículo 5.06.- Deberes y Obligaciones del Comité.

3    Con el fin de ejecutar la política pública aquí establecida, el Comité tendrá los

4    siguientes deberes:

5    a.  Deberá establecer mediante reglamento un procedimiento uniforme,

6    eficiente y efectivo para la disposición y transferencias de los bienes

7    inmuebles de la Rama Ejecutiva del Gobierno de Puerto Rico, ya sea

8    mediante subasta pública a viva voz, subasta pública en sobre sellado

9    o mediante venta directa. Dicho procedimiento deberá proveer un

10   sistema justo de competencia que garantice el interés público. El

11   Comité deberá disponer claramente cuándo se podrá hacer una venta

12   directa.

13   b.  Deberá coordinar, junto con la Junta Revisora de Propiedad Inmueble

14   creada en virtud de la Ley 235-2014, la preparación y/o actualización

15   de un inventario oficial de todas las propiedades inmuebles de todas

16   las agencias, dependencias, instrumentalidades, y corporaciones

17   públicas de la Rama Ejecutiva del Gobierno de Puerto Rico, excluyendo

18   las propiedades de la Universidad de Puerto Rico.

19   c.  Deberá obtener por parte de la Junta Revisora de Propiedad Inmueble,

20   una certificación en la que se incluyan todas las propiedades inmuebles

21   que están disponibles para su disposición por razón de no ser

22   necesitadas para ser habilitadas por alguna agencia, dependencia,

1    instrumentalidad o corporación pública de la Rama Ejecutiva del

2    Gobierno de Puerto Rico.

3    d. Deberá evaluar toda solicitud de compraventa, arrendamiento, u otra

4    forma de traspaso de posesión, de propiedad inmueble que le sea

5    sometida por cualquier persona natural o jurídica, con o sin fines de

6    lucro, incluyendo municipios, y asegurarse que cumpla con esta Ley y

7    todas las normas y reglamentos que sean aprobados por el Comité.

8    e. Realizar cualquier tipo de estudio, inspección, análisis, u otra gestión

9    sobre las propiedades inmuebles, incluyendo el asegurarse que estén

10    debidamente inscritas en el Registro de la Propiedad y que tengan el

11    título y cualquier otro requerimiento exigido por ley al corriente.

12    f. Tasar ~~las propiedades~~ *los bienes* inmuebles objeto de disposición. Para

13    ello podrá requerir y utilizar el personal necesario, utilizando el

14    mecanismo establecido en la Ley 8-2017.

15    Artículo 5.07.- Disposición de Bienes Inmuebles.

16    La disposición de bienes inmuebles de la Rama Ejecutiva del Gobierno de Puerto

17    Rico se regirá por un ~~sistema de competencia~~ *proceso* que sea justo y transparente en el

18    que se les brinden las mismas oportunidades a todos los participantes, salvaguardando

19    siempre el interés y bienestar público. En ese tenor, toda disposición debe estar

20    enmarcada en la consecución de los propósitos establecidos en esta Ley, manteniendo un

21    balance entre la necesidad de allegar mayores recursos al estado*, fomentar el desarrollo*

22    *económico,* ~~y~~ procurar el bienestar de la sociedad *y/o crear empleo*.

97

1    El Comité dispondrá de los bienes inmuebles utilizando como base el justo valor

2    en el mercado a ser determinado mediante el correspondiente procedimiento de

3    evaluación y tasación o velando por la utilización de la propiedad para el beneficio del

4    interés público.

5    El Director Ejecutivo del Comité o su representante podrán fungir como agente

6    autorizado para llevar a cabo cualquier transacción relacionada al título del bien

7    inmueble.

8    Artículo 5.08.- Conflicto de Interés.

9    Cualquier conflicto de interés que pueda surgir en los miembros de la Junta

10   durante el desempeño de sus funciones al amparo de esta Ley, será atendido de

11   conformidad a lo dispuesto en la Ley 1-2012, según enmendada, conocida como la "Ley

12   de Ética Gubernamental de Puerto Rico de 2011".

13   Artículo 5.09.- Cláusula de Salvedad.

14   No se podrá disponer de ningún inmueble de la Rama Ejecutiva del Gobierno de

15   Puerto Rico que esté siendo utilizado en usufructo de vivienda por cualquier persona.

16   CAPÍTULO 6.- LEY DE CONTABILIDAD DEL GOBIERNO DE PUERTO RICO.

17   Artículo 6.01.- Se enmienda el Artículo 3 de la Ley Núm. 230 de 23 de julio de 1974,

18   según enmendada y conocida como "Ley de Contabilidad del Gobierno de Puerto Rico",

19   a fin de añadir un nuevo inciso (o) que lea como sigue:

20   "Artículo 3. — Definiciones.

21   Cuando se usen en esta ley, los siguientes términos significarán:

22   (a) …

1       …

2       (o) *Asignaciones Especiales – Asignaciones aprobadas <u>mediante resoluciones conjuntas</u>*

3       *<s>por leyes especiales</s> que limitan <s>el período en que</s> <u>el uso de</u> los fondos asignados <s>pueden</s>*

4       *<s>usarse</s>."*

5       Artículo 6.02.- Se enmienda el inciso (b) y se añade un nuevo inciso (e) al Artículo

6       7 de la Ley Núm. 230 de 23 de julio de 1974, según enmendada y conocida como "Ley

7       de Contabilidad del Gobierno de Puerto Rico", para que lean como sigue:

8       "Artículo 7.- Ingresos de fondos públicos.

9       a)  …

10      Todos los fondos públicos de las dependencias [**que no estén destinados por ley**

11      **a un fin específico**] <u>que no estén destinados por ley a un fin específico</u> se acreditarán al Fondo

12      General del Tesoro Estatal y se depositarán en su totalidad en la cuenta bancaria corriente

13      del Secretario o en cualquier otra cuenta bancaria que él crea conveniente establecer<s>,</s>

14      <s>excepto los que no representen rentas netas al Fondo General, los cuales</s> <u>Asimismo, se</u>

15      <u>dispone que a partir del 1ro de julio de 2017, todos los fondos especiales estatales y otros ingresos</u>

16      <u>de las dependencias y corporaciones públicas se depositarán en su totalidad en el Tesoro Estatal,</u>

17      <u>bajo la custodia del Secretario de Hacienda o de la entidad bancaria que este determine adecuada.</u>

18      <u>El Secretario de Hacienda así también, queda facultado a determinar el orden de prioridad de los</u>

19      <u>desembolsos de pagos con cargo a los fondos especiales estatales y otros ingresos, conforme con el</u>

20      <u>presupuesto aprobado y el Plan Fiscal, sin que esto se entienda como una limitación a los poderes</u>

21      <u>conferidos al Gobernador y a la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico</u>

22      <u>en virtud de las disposiciones de la Ley 5-2017. Esta disposición tendrá supremacía sobre cualquier</u>

1  *otra que contravenga o sea inconsistente con lo aquí establecido. Para cada año fiscal, cualquier*

2  *cantidad en exceso de la presupuestada y autorizada por la Oficina de Gerencia y Presupuesto a*

3  *las dependencias y corporaciones públicas provenientes de fondos especiales estatales* ingresarán

4  al Fondo Presupuestario creado en virtud de la Ley Núm. 147 del 18 de ~~Junio~~ *junio* de

5  1980, según enmendada. *Esta disposición no será de aplicación a aquellos fondos que son*

6  *asignados a los municipios en virtud del Impuesto sobre Ventas y Uso. Esta disposición no será*

7  *aplicable a los fondos provenientes de donativos privados que reciben entidades de gobierno con*

8  *fines sociales.*

9  ...

10  *e) A partir de ~~de la vigencia de la Ley de Cumplimiento con el Plan Fiscal~~ del 1ro de julio de*

11  *2017, todos aquellos fondos especiales estatales creados por Ley para fines específicos ~~se~~*

12  *~~acreditarán al Fondo General del Tesoro Estatal y se depositarán en la cuenta bancaria~~*

13  *~~corriente del Secretario para que éste tenga pleno dominio de los mismos. Dichos fondos~~*

14  *seguirán siendo utilizados para aquellos propósitos para el cual fueron asignados por*

15  *Ley, conforme con el Presupuesto Recomendado por la Oficina de Gerencia y*

16  *Presupuesto y con ~~o en~~ el Plan Fiscal, ~~en el orden de prioridad que determine el~~*

17  *~~Secretario~~. Asimismo, se faculta a la Oficina de Gerencia y Presupuesto a crear una*

18  *reserva bajo su custodia, según establezca mediante normativa, la cual permita el*

19  *control presupuestario de toda partida de gastos con cargo a los fondos especiales*

20  *estatales y otros ingresos. De existir alguna inconsistencia entre la ley ~~o un contrato~~ y*

21  *el uso de los fondos con el Plan Fiscal, prevalecerá el propósito dispuesto en el Plan*

22  *Fiscal aprobado conforme a las disposiciones de la Ley Federal PROMESA."*

1    Artículo 6.03.- Se enmiendan los incisos (h), (l) y (m) del Artículo 8 de la Ley Núm.

2    230 de 23 de julio de 1974, según enmendada y conocida como "Ley de Contabilidad del

3    Gobierno de Puerto Rico", para que lean como sigue:

4         "Artículo 8. — Asignaciones de fondos públicos.

5    (a) …

6    …

7    (h)    Las asignaciones y los fondos sin año económico determinado, que hayan

8           permanecido en los libros sin movimiento de desembolso u obligación por [tres

9           años] *un (1) año*, se considerarán para los efectos de esta ley, como que han

10          cumplido sus propósitos **[y se aplicarán a los mismos las disposiciones sobre**

11          **cierre de saldos obligados y no obligados del inciso (g) de este Artículo]** *por lo*

12          *que se cerrarán e ingresarán inmediatamente al Fondo General,* excepto las asignaciones

13          y los fondos sin año económico determinado asignados para llevar a cabo mejoras

14          permanentes que hayan sido contabilizadas y llevadas a los libros. Estos tendrán

15          un término de tres (3) años a partir de la fecha de vigencia legal de la asignación

16          para ser desembolsados y cumplir con los propósitos para los cuales fueron

17          asignados. Transcurrido el término de tres (3) años, los saldos obligados y no

18          obligados de los fondos de mejoras permanentes se cerrarán e ingresarán al Fondo

19          301. *Esta disposición solo será de aplicación a las asignaciones hechas previo al año fiscal*

20          *2017-2018 y no será de aplicación a aquellas asignaciones hechas por la Asamblea*

21          *Legislativa mediante Donativos Legislativos o asignaciones en virtud del Impuesto Sobre*

22          *Ventas y Uso. ~~Municipal.~~*

1      En aquellos casos en los cuales la agencia u organismo receptor de los

2      fondos de mejoras permanentes entienda que debe extenderse el término de la

3      asignación por un término mayor a tres (3) años, podrá [**solicitar**] *solicitarlo*

4      *justificando* la necesidad de mantener estos recursos a la Oficina de Gerencia y

5      Presupuesto *por lo menos* tres (3) meses antes de que se venza el referido término.

6      Durante este período, la Oficina de Gerencia y Presupuesto analizará la petición y

7      determinará la necesidad de mantener vigente la asignación, el término por el cual

8      se extenderá la misma y la cantidad. ~~Si transcurre el período de tres (3) meses sin~~

9      ~~tomar determinación sobre un caso, se entenderá que la asignación ya cumplió con~~

10     ~~sus propósitos y el Secretario de Hacienda transferirá o reintegrará los recursos al~~

11     ~~Fondo 301.~~ Dichos recursos serán reprogramados por la Asamblea Legislativa~~, en~~

12     ~~proyectos y actividades de naturaleza prioritaria, previa recomendación del~~

13     ~~Gobernador.~~

14   (i) ....

15       …

16   (l) Cualquier asignación que permanezca [**tres (3) años**] *un (1) año* sin llevarse a los libros

17       se considerará, como regla general, cancelada automáticamente y se requerirá

18       nueva acción legislativa para [**poder**] usar los dineros así cancelados.  En casos

19       excepcionales *en los* que se demuestre que han mediado causas justificadas para

20       no llevar a los libros una asignación durante el período de [**tres (3) años**] *un (1) año*

21       *estipulado* [**estipulados**], tales como la tardanza en la resolución de litigios en los

22       tribunales y la imposibilidad de llevar a cabo una obra pública debido a

1    dificultades *fiscales*, técnicas o legales, podrá contabilizarse una asignación aun

2    después de transcurrido el mencionado período de **[tres (3) años]** *un (1) año*.

3    El Secretario notificará a la Asamblea Legislativa de la acción cancelando

4    asignaciones en las circunstancias que ~~co1.02ntempla~~ *contempla* este inciso, durante los

5    treinta (30) días subsiguientes a la fecha en que se dispuso dicha cancelación.

6    (m)  Periódicamente, el Secretario transferirá al sobrante del Fondo General del Tesoro

7    Estatal, de acuerdo con la ley, los balances de cuentas de depósitos que hayan

8    permanecido sin uso o movimiento alguno en los libros de contabilidad por **[tres**

9    **años o más]** *un (1) año* y que, de acuerdo con su opinión, no fueren necesarios o no

10   cumplan los fines para los cuales fueron creados.  Disponiéndose, que cualquier

11   reclamación que viniese el Secretario obligado a pagar con respecto a dichos

12   balances, después de haber sido las mismas transferidas del modo antes dispuesto,

13   será pagada de cualesquiera fondos disponibles no destinados a otras atenciones."

14   CAPÍTULO 7.- LEY DE RESERVAS EN LAS COMPRAS DEL GOBIERNO.

15   Artículo 7.01.- Se enmienda el Artículo 2 de la Ley 129-2005, según enmendada,

16   conocida como "Ley de Reservas en las Compras del Gobierno del Estado Libre

17   Asociado de Puerto Rico" para que se lea como sigue:

18   "Artículo 2.-Declaración de Política Pública.

19   Será política pública del **[Estado Libre Asociado]** *Gobierno* de Puerto Rico,

20   establecer un Programa de Reservas que requiera al Gobierno **[del Estado Libre**

21   **Asociado]** de Puerto Rico y sus instrumentalidades, asignar un veinte por ciento (20%)

22   del total de la partida asignada a compras de su presupuesto general para ser otorgado

1    a microempresas, pequeñas y medianas empresas, *siempre que la situación fiscal así lo*

2    *permita o produzca ahorros al fisco.*

3         Disponiéndose que en aras de continuar fortaleciendo al sector de las

4    microempresas, pequeñas y medianas empresas, se establece que el por ciento de

5    reserva a esos fines continuará en aumento de forma escalonada de la siguiente forma:

6              1.    Un treinta por ciento (30%) para el año fiscal 2016-2017;

7              2.    Un treinta y dos por ciento (32%) para el año fiscal 2017-2018;

8              3.    Un treinta y cinco por ciento (35%) para el año fiscal 2018-2019;

9              4.    Un treinta y ocho por ciento (38%) para el año fiscal 2019-2020;

10             5.    Un cuarenta por ciento (40%) para el año fiscal 2020-2021;

11        *Este aumento escalonado se aplicará si la Oficina de Gerencia y Presupuesto establece que*

12   *la situación fiscal permite el aumento o si produce un ahorro al fisco.* [**Disponiéndose, además,**

13   **que]** *Además,* el Secretario de Hacienda estará obligado a reservar al menos un tres por

14   ciento (3%) del flujo de efectivo que recibe para el pago de la partida de compra de

15   materiales a las micro, pequeñas y medianas empresas cuyas facturas se hayan

16   procesado correctamente por parte de los departamentos, agencias, instrumentalidades,

17   dependencias, municipios y corporaciones públicas del [**Estado Libre Asociado]**

18   *Gobierno* a las cuales le aplica esta Ley."

19        Artículo 7.02.- Se enmienda el inciso (1) del Artículo 6 de la Ley 129-2005, según

20   enmendada, conocida como "Ley de Reservas en las Compras del Gobierno del Estado

21   Libre Asociado de Puerto Rico" para que se lea como sigue:

22        "Artículo 6.- Programa de Reservas

1    (1) Se creará un nuevo objeto de gastos para colocar el veinte por ciento

2    (20%) del presupuesto de las partidas de compra de cada agencia. Disponiéndose

3    que el objeto de gastos del presupuesto de las partidas de compra de cada agencia

4    aumentará a treinta por ciento (30%) para el año fiscal 2016-2017, a un treinta y dos

5    por ciento (32%) para el año fiscal 2017-2018, a un treinta y cinco por ciento (35%)

6    para el año fiscal 2018-2019, a un treinta y ocho por ciento (38%) para el año fiscal

7    2019-2020 y a un cuarenta por ciento (40%) para el año fiscal 2020-2021, *siempre que*

8    *la situación fiscal lo permita.* La OGP establecerá por reglamento los requisitos para

9    el cumplimiento con el referido por ciento de reserva.

10   ..."

11   CAPÍTULO 8.- ARBITRIOS A LOS CIGARRILLOS Y PRODUCTOS DERIVADOS DEL

12   TABACO.

13   Artículo 8.01.- Se enmienda la Sección 3020.05 de la Ley 1-2011, según enmendada,

14   para que lea como sigue:

15   "Sección 3020.05.- Cigarrillos

16   *(a)*    Se impondrá, pagará y cobrará, un arbitrio de [once dólares con quince centavos

17   (11.15) sobre cada ciento o fracción de cien (100) cigarrillos. A partir del 1ero. de julio

18   de 2013 el arbitrio será dieciséis dólares con quince centavos (16.15) sobre cada ciento

19   o fracción de cien (100) cigarrillos. A partir del 1ero. de julio de 2015 el arbitrio será de]

20   diecisiete dólares (17.00) sobre cada ciento o fracción de cien (100) cigarrillos. A los fines

21   de [esta parte] *este Código*, el término "cigarrillo" significará cualquier [rollo de picadura

22   de tabaco natural o sintético, o picadura de cualquier materia vegetal natural o

1    sintética, o cualquier mezcla de las mismas, o picadura de cualquier otra materia o

2    sustancia sólida, que se utilice para elaborar los productos conocidos por los nombres

3    cigarrillos, cigarros y "little cigars". Quedan excluidos los cigarros o cigarrillos

4    introducidos o fabricados en Puerto Rico para exportación, sujeto a aquellos requisitos

5    o condiciones que imponga el Secretario por reglamento, así como cigarros o cigarrillos

6    artesanales hechos a mano según definido por el Secretario mediante reglamento.]

7    *producto que contenga nicotina, y que esté diseñado para ser quemado o calentado bajo condiciones*

8    *normales de uso, y consista de, o contenga:*

9    *(1)    cualquier rollo de picadura de tabaco natural o sintético, o picadura*

10    *de cualquier materia vegetal natural o sintética, o cualquier mezcla de los mismos,*

11    *o picadura de cualquier otra materia o sustancia sólida, envuelto en papel o en*

12    *cualquier sustancia o material que no contenga tabaco, el cual por su apariencia, el*

13    *tipo de tabaco usado en el relleno, su envoltura o rotulación, sea susceptible de ser*

14    *usado, ofrecido o comprado como un cigarrillo; y*

15    *(2)    cuya longitud, circunferencia y peso no exceda de la longitud,*

16    *circunferencia y peso máximo que establezca el Secretario mediante reglamento,*

17    *carta circular, u otra determinación administrativa de carácter general.*

18    *(b)    Los cigarrillos que se fabriquen, introduzcan, vendan, traspasen, usen o consuman

19    en Puerto Rico llevarán adherido en las cajas, paquetes o cajetillas en que fueren

20    empaquetados una etiqueta con la información y características que por reglamento se

21    disponga. Cada caja, paquete o cajetilla de cigarrillos deberá tener estampada en sitio

1    visible y en forma clara y legible la palabra "tributable" o "taxable". Estas disposiciones

2    no aplicarán a los cigarrillos exentos *conforme a la Sección 3030.18 de este Código."*

3          Artículo 8.02.- Se añade una nueva Sección 3020.05A a la Ley 1-2011, según

4    enmendada, para que lea como sigue:

5          *"Sección 3020.05A.- Cigarrillos, Cigarros, Tabaco Suelto, Papel de Cigarrillo y Tubos de*

6    *Cigarrillo*

7    *(a)      Además de cualquier otro arbitrio fijado en este Subtítulo, se impondrá, cobrará y pagará,*

8    *un arbitrio que podrá ser hasta de ocho dólares y cincuenta centavos ($8.50)* ~~hasta quince dólares~~

9    ~~y cincuenta centavos ($15.50), según determine el Secretario,~~ *sobre cada ciento o fracción de cien*

10   *(100) cigarrillos.*

11   *(b)      Se impondrá, cobrará, y pagará sobre todo cigarro, tabaco suelto, papel y tubos de cigarrillo,*

12   *el arbitrio que se dispone a continuación:*

13         *(1)      Cigarros:* ~~Cuarenta y cinco dólares con veintiocho centavos ($45.28)~~ *Veinticinco*

14         *dólares con cincuenta centavos  ($25.50) por cada libra o fracción de libra.*

15         *(2)      Tabaco Suelto:* ~~Cuarenta y cinco dólares con veintiocho centavos ($45.28)~~

16         *Veinticinco dólares con cincuenta centavos ($25.50) por cada libra o fracción de libra.*

17         *(3)      Papel de cigarrillo:* ~~veinticinco centavos (¢25)~~ *tres dólares ($3.00) por cada*

18         *cincuenta papeles o fracción que no exceda las seis pulgadas y media (6 ½''). De exceder*

19         *las seis pulgadas y media (6 ½''), cada dos y tres cuartos (2 ¾) de pulgadas, o fracción, se*

20         *considerará un (1) papel de cigarrillo.*

21         *(4)      Tubos de cigarrillos:* ~~cincuenta centavos (¢50)(50¢)~~ *tres dólares ($3.00) por cada*

22         *cincuenta tubos de cigarrillos o fracción que no exceda las seis pulgadas y media (6 ½'').*

1    *De exceder las seis pulgadas y media (6 ½''), cada dos y tres cuartos (2 ¾) de pulgadas, o*

2    *fracción, se considerará como un tubo de cigarrillo.*

3    (c)    *Definiciones.- A los efectos de esta Sección y de cualesquiera otras disposiciones aplicables*

4    *de este Subtítulo, los siguientes términos tendrán el significado que a continuación se indica:*

5          (1)    *Cigarros.- Significará cualquier producto que contenga nicotina, y*

6    *que esté diseñado para ser quemado o calentado bajo condiciones normales de uso,*

7    *y consista de, o contenga:*

8                (i)    *cualquier rollo de picadura de tabaco natural o sintético, o*

9    *picadura de cualquier materia vegetal natural o sintética, o cualquier mezcla*

10   *de las mismas, o picadura de cualquier otra materia o sustancia sólida,*

11   *envuelto en papel, hoja de tabaco o en cualquier sustancia o material, el cual*

12   *por su apariencia, el tipo de tabaco usado en el relleno, su envoltura o*

13   *rotulación, sea susceptible de ser usado, ofrecido o comprado como un*

14   *cigarro, cigarrito, 'little cigar', tabaquitos, o cualquier otro producto; y*

15               (ii)    *que no sea un cigarrillo, según este término se define en la*

16   *Sección 3020.05 de este Código.*

17         (2)    *Tabaco suelto.- Significará cualquier tipo de tabaco, mezclado o no*

18   *con cualquier otra sustancia, que no esté envuelto en material alguno y que por su*

19   *apariencia, características intrínsecas, empaque o rotulación, se preste a ser*

20   *utilizado y pueda ser ofrecido o comprado por los consumidores, como tabaco para*

21   *hacer cigarrillos 'roll your own' o para ser fumado en una pipa. Este término*

22   *también incluye las hojas tersas de tabaco.*

1         (3)     *Papel de cigarrillo.- Significará cualquier papel, o cualquier otro*

2   *material excepto tabaco, que sea utilizado para enrollar cigarrillos o cigarros.*

3         (4)     *Tubo de cigarrillo.- Significará papel de cigarrillo preparado como*

4   *un cilindro hueco para utilizarse en la confección de cigarrillos o cigarros.*

5   (d)     *Los cigarros, tabaco suelto, papel de cigarrillo, y tubos de cigarrillo que se fabriquen,*

6   *introduzcan, vendan, traspasen, usen o consuman en Puerto Rico llevarán adherido en las cajas,*

7   *paquetes o cajetillas en que fueren empaquetados una etiqueta con la información y características*

8   *que por reglamento se disponga. Cada caja, paquete, envoltura o cajetilla de cigarros, tabaco suelto,*

9   *papel de cigarrillo o tubos de cigarrillo deberá tener estampada en sitio visible y en forma clara y*

10   *legible la palabra "tributable" o "taxable". En aquellos casos donde el artículo sea vendido de forma*

11   *individual, el mismo deberá tener estampado en sitio visible y en forma clara y legible la palabra*

12   *"tributable" o "taxable" en la forma y manera que establezca el Secretario. Estas disposiciones no*

13   *aplicarán a los artículos exentos conforme a la Sección 3030.18 de este Código."*

14         Artículo 8.03.- Se enmienda la Sección 3020.13 de la Ley 1-2011, según enmendada,

15   para que lea como sigue:

16   "Sección 3020.13.- Tabaco Sin Humo

17   (a)     Se impondrá, pagará y cobrará, un arbitrio al "tabaco sin humo", o "smokeless

18   tobacco", manufacturado en o importado a Puerto Rico. A los fines de este subtítulo el

19   término "tabaco sin humo" o "smokeless tobacco" significará cualquier producto

20   derivado del tabaco que:

21         [a)] (1)     Se pretenda consumir sin crear combustión o sin ser quemado, y

1    **[b]** *(2)*    Se encuentra o se vende en empaques de aluminio, en bolsas sueltas

2    y/o en pequeñas unidades o en "discrete single-use units" en formas de pastillas,

3    tabletas, bolsas, cinta disoluble, entre otros.

4    *(b)*    El arbitrio *impuesto por esta Sección* se establecerá de la siguiente manera:

5    **[1]]** *(1)*    Tabaco de mascar: un dólar ($1.00) por cada libra o fracción de libra.

6    *A partir del 1ero de mayo de 2017, el arbitrio será de cinco dólares ($5.00) por cada libra o*

7    *fracción de libra.*

8    **[2]]** *(2)*    Tabaco en polvo ("snuff") o cualquier otro derivado del tabaco: tres

9    dólares con dos centavos ($3.02) por cada libra o fracción de libra. *A partir del 1ero*

10    *de mayo de 2017, el arbitrio será de cuatro dólares con cincuenta y tres centavos ($4.53)*

11    *por cada libra o fracción de libra.*

12    *(c)*    Los productos derivados del tabaco que se fabriquen, introduzcan, vendan,

13    traspasen, usen o consuman en Puerto Rico llevarán adherido en las cajas, paquetes o

14    cajetillas en que fueren envasados *y/o* empaquetados una etiqueta con la información y

15    características que por reglamento se disponga.   Cada caja, paquete, *envoltura* o cajetilla

16    deberá tener estampada en sitio visible y en forma clara y legible la palabra "tributable"

17    o "taxable". *Estas disposiciones no aplicarán a los artículos exentos conforme a la Sección 3030.18*

18    *de este Código."*

1    Artículo 8.04.- Se enmienda la Sección 3020.14 de la Ley 1-2011, según enmendada,

2    para que lea como sigue:

3    "Sección 3020.14.-  Asignación de Fondos

4    El Secretario de Hacienda **[separará de]** *ingresará* lo recaudado producto de la

5    Sección 3020.05 **[y]**, *la Sección 3020.05A*, la Sección 3020.13 *y la Sección 3020.15*,

6    directamente al Fondo General **[disponiéndose que punto treinta y tres (0.33) por ciento**

7    **de los recaudos se destinarán a la Escuela de Artes Plásticas de Puerto Rico, punto**

8    **treinta y tres (0.33) por ciento de los recaudos se destinarán al Conservatorio de Música**

9    **de Puerto Rico y punto treinta y cuatro (0.34) por ciento de los recaudos se destinarán**

10   **a la Corporación de las Artes Musicales. Disponiéndose que en el caso de la Escuela**

11   **de Artes Plásticas y el Conservatorio de Música, los fondos que reciben producto de**

12   **estos recaudos se destinarán para obras y mejoras en sus instalaciones].**"

13   Artículo 8.05.- Se añade una nueva Sección 3020.15 a la Ley 1-2011, según

14   enmendada, para que lea como sigue:

15   *"Sección 3020.15.- Cigarrillos Electrónicos, Cartuchos de Nicotina y Vaporizadores*

16   *(a)      Definiciones.- A los efectos de esta Sección y de cualesquiera otras disposiciones aplicables*

17   *de este Subtítulo, los siguientes términos tendrán el significado que a continuación se indica:*

18   *(1)      Cigarrillo electrónico.- Significará cualquier tipo de producto incombustible*

19   *que utilice un elemento de calefacción, fuente de energía, circuito electrónico o algún*

20   *medio electrónico, químico o mecánico, que puede ser utilizado para producir vapor de*

21   *nicotina o cualquier otra sustancia como solución o cualquier otra forma, el cual por su*

1    *apariencia, tamaño, su envoltura o rotulación, sea susceptible de ser usado, ofrecido o*

2    *comprado como un cigarrillo electrónico, cigarro electrónico o pipa electrónica.*

3    *(2)    Cartucho de nicotina.-   Significará un cartucho de vapor o cualquier otro*

4    *contenedor de nicotina en una solución líquida que esté diseñado para ser utilizado con o*

5    *en un cigarrillo electrónico o vaporizador.*

6    *(3)    Vaporizador.- Significará cualquier tipo de producto incombustible que utilice un*

7    *elemento de calefacción, fuente de energía, circuito electrónico o algún medio electrónico,*

8    *químico o mecánico, que puede ser utilizado para producir vapor de nicotina o cualquier*

9    *otra sustancia como solución o cualquier otra forma, y que no pueda ser considerado*

10   *cigarrillo electrónico conforme a la definición del inciso (1) anterior. Este término incluirá,*

11   *sin que se entienda como una limitación, el producto comúnmente conocido como hookah*

12   *y los vaporizadores utilizados para el suministro de medicamentos que no estén aprobados*

13   *por el Food and Drug Administration (FDA).*

14   *(b)    Se impondrá, pagará y cobrará, el arbitrio que a continuación se indica sobre los cigarrillos*

15   *electrónicos, cartuchos de nicotina y vaporizadores:*

16   *(1)    Cigarrillo electrónico: tres dólares ($3.00) por cada cigarrillo electrónico.*

17   *(2)    Cartuchos de Nicotina: cinco centavos ~~(¢5)~~ (5¢) por cada mililitro de solución de*

18   *nicotina, o de cualquier sustancia, contenga o no nicotina, en cada cartucho de nicotina.*

19   *Este arbitrio no será prorrateado.*

20   *(3)    Vaporizador: seis dólares ($6.00) por cada unidad.*

21   *(c)    Los cigarrillos electrónicos, cartuchos de nicotina y vaporizadores que se fabriquen,*

22   *introduzcan, vendan, traspasen, usen o consuman en Puerto Rico llevarán adherido en las cajas,*

1    *paquetes, envolturas en que fueren envasados, envueltos, o empaquetados, una etiqueta con la*

2    *información y características que por reglamento se establezca, disponiéndose que en el caso de los*

3    *cartuchos de nicotina estos deberán contener los mililitros actuales de solución de nicotina en la*

4    *forma y manera que establezca el Secretario. Cada caja, paquete, envoltura o cajetilla deberá tener*

5    *estampada en sitio visible y en forma clara y legible la palabra "tributable" o "taxable". En aquellos*

6    *casos donde el artículo sea vendido de forma individual, el mismo deberá tener estampado en sitio*

7    *visible y en forma clara y legible la palabra "tributable" o "taxable" en la forma y manera que*

8    *establezca el Secretario. Estas disposiciones no aplicarán a los artículos exentos conforme a la*

9    *Sección 3030.18 de este Código."*

10   Artículo 8.06.  Se enmienda la Sección 3030.14 de la Ley 1 2011, según enmendada,

11   para que lea como sigue:

12   "Sección 3030.14.-  Exención sobre Artículos Vendidos en Tiendas de Terminales

13   Aéreos o Marítimos a Personas que Salgan **[de Puerto Rico]** *del Territorio Aduanero de los*

14   *Estados Unidos*

15   (a)    Estarán exentos del pago de arbitrios los artículos introducidos o fabricados

16   en Puerto Rico para la venta en tiendas establecidas en los terminales aéreos o marítimos

17   que estén debidamente autorizadas a vender artículos libre del pago de arbitrios a las

18   personas que salgan fuera **[de los límites jurisdiccionales de Puerto Rico]** *del territorio*

19   *aduanero de los Estados Unidos.* Esta exención será concedida cuando la tienda que los

20   venda:

21   **[(a)] (1)** -    posea la licencia requerida para operar esta clase de negocios;

1    ~~[(b)] (2)       cumpla con los requisitos que al efecto establezca el Secretario para~~

2    ~~la venta de artículos libre del pago de impuestos y con la reglamentación que se adopte~~

3    ~~para la concesión de dicha exención; y~~

4    ~~[(c)] (3)       entregue los artículos que venda libre del pago de impuestos a bordo~~

5    ~~del avión o embarcación en que haya de viajar el adquirente o en el área o sala inmediata~~

6    ~~de espera para el abordaje de la nave aérea o marítima.~~

7    ~~*(b)      Para propósitos de este Subtítulo, el término "territorio aduanero de los Estados*~~

8    ~~*Unidos" incluye a los estados de Estados Unidos, el Distrito de Columbia y Puerto Rico.*~~

9    Artículo 8.07<u>6</u>.- Se enmienda la Sección 3030.18 de la Ley 1-2011, según

10   enmendada, para que lea como sigue:

11   "Sección 3030.18.- Exención sobre Cigarrillos, *Cigarros, Tabaco Suelto, Papel de*

12   *Cigarrillo, Tubos de Cigarrillo, Tabaco de Mascar, Tabaco en Polvo, Cigarrillos Electrónicos,*

13   *Cartuchos de Nicotina y Vaporizadores*

14   (a)   Estarán exentos del impuesto fijado en este Subtítulo, los cigarrillos, *cigarros, tabaco*

15   *suelto, papel de cigarrillo, tubos de cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos*

16   *electrónicos, cartuchos de nicotina y vaporizadores,* vendidos o traspasados a los barcos de

17   matrícula extranjera y de los Estados Unidos de América y los vendidos a los barcos de

18   guerra de países extranjeros y a los buques de países extranjeros en visita de cortesía en

19   Puerto Rico. Esta exención solamente se concederá cuando la entrega de cigarrillos,

20   *cigarros, tabaco suelto, papel de cigarrillo, tubos de cigarrillo, tabaco de mascar, tabaco en polvo,*

21   *cigarrillos electrónicos, cartuchos de nicotina y vaporizadores,* se haga de acuerdo a las reglas

22   y procedimientos que establezca el Secretario y su violación conllevará la obligación del

1   pago de los arbitrios que correspondan de parte del introductor o del distribuidor, según

2   sea el caso.  Todo introductor o distribuidor que desee acogerse a esta exención deberá

3   prestar una fianza para responder por el pago de dichos arbitrios.

4   (b)   Asimismo, estarán exentos del pago de arbitrios los cigarrillos, *cigarros, tabaco*

5   *suelto, papel de cigarrillo, tubos de cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos*

6   *electrónicos, cartuchos de nicotina y vaporizadores* que, después de haber sido retirados de

7   las fábricas o de los puertos, sean sacados del mercado por razón de encontrarse

8   impropios para el consumo normal, siempre y cuando sean destruidos bajo la supervisión

9   del Secretario.  En tal caso, el Secretario reintegrará o acreditará el impuesto a la persona

10  que lo haya pagado.

11  (c)   Además, estarán exentos del impuesto fijado en este Subtítulo los cigarrillos,

12  *cigarros, tabaco suelto, papel de cigarrillo, tubos de cigarrillo, tabaco de mascar, tabaco en polvo,*

13  *cigarrillos electrónicos, cartuchos de nicotina y vaporizadores,* cuando los mismos sean

14  vendidos o traspasados a los usuarios, según definido en la Ley Núm. 23 de 23 de junio

15  de 1991, según enmendada, de las tiendas militares, cantinas u otras facilidades operadas

16  por el Fideicomiso Institucional de la Guardia Nacional de Puerto Rico o su

17  Concesionario.

18  *(d)   Se eximen del arbitrio fijado en este Subtítulo los cigarrillos, cigarros, tabaco suelto, papel*

19  *de cigarrillo, tubos de cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos electrónicos,*

20  *cartuchos de nicotina y vaporizadores introducidos o fabricados en Puerto Rico para exportación,*

21  *sujeto a aquellos requisitos o condiciones que imponga el Secretario por reglamento, disponiéndose*

22  *que esta exención no será de aplicación a los cigarrillos, cigarros, tabaco suelto, tabaco de mascar,*

1  *tabaco en polvo, papel de cigarrillo, tubos de cigarrillo, cigarrillos electrónicos, cartuchos de*

2  *nicotina y vaporizadores que se vendan en Tiendas y Terminales Aéreos o Marítimos a personas*

3  *que no salgan del territorio aduanero de los Estados Unidos."*

4        Artículo 8.08Z.- Se enmienda el apartado (a) de la Sección 3050.01 de la Ley 1-2011,

5  según enmendada, para que lea como sigue:

6        "Sección 3050.01.- Derechos de Licencia de Traficante al Por mayor o al Detalle de

7  Ciertos Artículos

8  (a)     Todo traficante al por mayor o al detalle, en sitio fijo o ambulante, de cualesquiera

9  de los artículos que se detallan a continuación, deberá pagar un impuesto anual por

10 concepto de derechos de licencia según se establece en la siguiente tabla:

| TRAFICANTES | DERECHOS | |
|---|---|---|
| Cigarrillos- Mayoristas | | [$200] |
| | | *$750* |
| Cigarrillos- Detallistas Sitio Fijo, Ambulante y por cada máquina expendedora de cigarrillos | | [$100] |
| | | *$300* |
| Ventas al Por Mayor desde Vehículos de Motor de Cigarrillos – por vehículo | | [$100] |
| | | *$300* |
| Gasolina- Mayorista | Clase A | $6,000 |
| | Clase B | $2,500 |



116

| Gasolina- Detallista | Clase A | $900 |
|---|---|---|
| | Clase B | $100 |
| Detallista –Venta de Bebidas Alcohólicas, Cigarrillos y Partes y Accesorios de Vehículos - por local | | $200 |
| Vehículos de Motor- Traficantes | Clase A | $1,000 |
| | Clase B | $200 |
| Vehículos Partes y Accesorios al Por Mayor y al Detalle | Clase A | $2,000 |
| | Clase B | $800 |
| | Clase C | $100 |
| Traficantes al Detalle en Cigarrillos y Bebidas Alcohólicas por Tiempo Limitado (15 días) | | $25 |
| Traficantes al Detalle- "Shows Vehículos de Motor" por Tiempo Limitado (Vehículos, Partes y Accesorios) (15 días) | | $100 |
| Cemento-Fabricante o Traficante al Por Mayor | Clase A | $250,000 |
| | Clase B | $200,000 |
| | Clase C | $80,000 |
| Armeros-Traficantes en Armas y Municiones | | $200 |

1

2          (1)     ….

3          …"

1    Artículo 8.09.8- Se enmienda el apartado (a) y se añade un apartado (c) a la Sección

2    4030.07 de la Ley 1-2011, según enmendada, para que lea como sigue:

3    "Sección 4030.07.-  Exención sobre Artículos Vendidos en Tiendas de Terminales

4    Aéreos o Marítimos a Personas que Salgan **[de Puerto Rico]** *del Territorio Aduanero de los*

5    *Estados Unidos*

6    (a)    Estarán exentas del impuesto sobre ventas y uso, las partidas tributables

7    disponibles para la venta en tiendas establecidas en los terminales aéreos o marítimos a

8    personas que viajen fuera **[de los límites jurisdiccionales de Puerto Rico]** *del territorio*

9    *aduanero de los Estados Unidos.* Esta exención será concedida cuando la tienda que los

10   venda posea la licencia requerida para operar esta clase de negocios y cumpla con los

11   requisitos que al efecto establezca el Secretario para la venta de partidas tributables libre

12   del pago de impuestos, y con la reglamentación que se adopte para la concesión de dicha

13   exención.

14   (b)    …

15       (c)       *Para propósitos de este Subtítulo, el término "territorio aduanero de los Estados*

16   *Unidos" incluye a los estados de Estados Unidos, el Distrito de Columbia y Puerto Rico."*

17   Artículo 8.10.09- Se añade un nuevo apartado (d) a la Sección 6042.08 de la Ley 1-

18   2011, según enmendada, para que lea como sigue:

19   "Sección 6042.08.- Delitos Relacionados con Cigarrillos

20   (a) …

21   (b) …

22   (c) …

1       *(d)     Incurrirá en delito menos grave que será sancionado con  multa de cinco mil (5,000)*

2       *dólares toda persona que:*

3       *(1)     adquiera cigarrillos, cigarros, tabaco suelto, papel de cigarrillo, tubos de cigarrillo,*

4       *tabaco de mascar, tabaco en polvo, cigarrillos electrónicos, cartuchos de nicotina o*

5       *vaporizadores en calidad de usuario, según definido en la Ley Núm. 23 de 23 de junio de*

6       *1991, según enmendada, de las tiendas militares, cantinas u otras facilidades operadas por*

7       *el Fideicomiso Institucional de la Guardia Nacional de Puerto Rico o su Concesionario, y*

8       *que posteriormente venda o traspase los cigarrillos, cigarros, tabaco suelto, papel de*

9       *cigarrillo, tubos de cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos electrónicos,*

10       *cartuchos de nicotina o vaporizadores así adquiridos a personas que no tengan derecho a la*

11       *exención del apartado (c) de la Sección 3030.18 de este Código; o*

12       *(2)     adquiera cigarrillos, cigarros, tabaco suelto, papel de cigarrillo, tubos de cigarrillo,*

13       *tabaco de mascar, tabaco en polvo, cigarrillos electrónicos, cartuchos de nicotina o*

14       *vaporizadores en las tiendas denominadas "Post Exchanges" instaladas en*

15       *establecimientos militares de los Estados Unidos de América en Puerto Rico, y que*

16       *posteriormente venda o traspase los cigarrillos, cigarros, tabaco suelto, papel de cigarrillo,*

17       *tubos de cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos electrónicos, cartuchos de*

18       *nicotina o vaporizadores así adquiridos a personas que no tenga derecho a adquirir estos*

19       *artículos en dichos establecimientos."*

1       Artículo 8.11̶0.- Se enmienda el apartado (a) de la Sección 6042.15 de la Ley 1-2011,

2   según enmendada, para que lea como sigue:

3       "Sección 6042.15.-  Penalidad por Dejar de Rendir la Declaración de Arbitrios y

4   Planilla Mensual de Arbitrios

5   (a)     A toda persona obligada a rendir la Declaración de Arbitrios, la Planilla Mensual

6   de Arbitrios o la Declaración de Venta que dejare de rendir dicha planilla requerida por

7   las secciones 3020.08(c)(8), 3020.09(c), y 3020.10, en la forma, fecha y manera allí

8   establecidas, se le impondrá una penalidad de cien (100) dólares[.] *o del diez (10) por ciento*

9   *de la obligación contributiva establecida en dicha planilla o declaración, lo que sea mayor.*

10  (b)     ..."

11      Artículo 8.12̶1.- Disposiciones transitorias

12  (a)     ~~A la fecha de la vigencia de esta Ley, todos los importadores, distribuidores y~~

13  ~~traficantes de cigarrillos, cigarros, tabaco suelto, papel de cigarrillo, tubos de cigarrillo,~~

14  ~~tabaco de mascar, tabaco en polvo, cigarrillos electrónicos, cartuchos de nicotina y~~

15  ~~vaporizadores estarán sujetos al pago de los impuestos establecidos en este Capítulo~~

16  ~~sobre el inventario introducido a Puerto Rico previo a la vigencia de esta Ley. En el caso~~

17  ~~del tabaco de mascar y el tabaco en polvo, el arbitrio a pagar sobre el inventario será la~~

18  ~~diferencia existente entre el monto de los impuestos pagados o devengados a base de los~~

19  ~~tipos anteriores y el impuesto que le corresponde pagar sobre dichos artículos de acuerdo~~

20  ~~a los tipos establecidos en el Artículo 8.03 de esta Ley.~~

21  ~~(b)     A la fecha de la vigencia de esta Ley, los artículos para venta en tiendas de~~

22  ~~terminales aéreos o marítimos que se encuentren en inventario y que no estén cobijados~~

1    ~~por la exención establecida en el Artículo 8.06 de esta Ley, estarán sujetos a los impuestos~~

2    ~~establecidos en el Subtítulo C del Código de Rentas Internas de 2011, según enmendado,~~

3    ~~y en esta Ley. A partir del 1ro de mayo de 2017, las partidas tributables que no estén~~

4    ~~cobijadas por la exención establecida en el Artículo 8.09 de esta Ley estarán sujetas al~~

5    ~~Impuesto sobre Ventas y Uso del Subtítulo D y DDD del Código de Rentas Internas de~~

6    ~~2011, según enmendado.~~

7    ~~(c)~~*(a)*   Toda persona sujeta al impuesto anual por concepto de derechos de licencia de la

8    Sección 3050.01 de la Ley 1-2011 que al 1ro de mayo de 2017 ostente una Licencia de

9    Traficante al Por mayor o al Detalle vigente, estará sujeto a las nuevas tarifas dispuestas

10   en el Artículo 8.06~~7~~ de esta Ley a partir de la fecha de vencimiento del pago de los

11   derechos de licencias correspondiente conforme al apartado (b) de la Sección 3060.08 de

12   la Ley 1-2011.

13   ~~(d)~~*(b)*   El Secretario de Hacienda establecerá mediante reglamento, carta circular, u otra

14   determinación administrativa de carácter general, las normas necesarias para la

15   aplicación de estas disposiciones transitorias.

16                             CAPÍTULO 9.- FONDO DE EMERGENCIA

17   Artículo 9.01.- Se enmienda el Artículo 2 de la Ley Núm. 91 de 21 de julio de

18   1966, según enmendada, para que lea como sigue:

19   "Artículo 2. —

20   Comenzando en el Año Fiscal 1995-96, el Fondo de Emergencia será

21   capitalizado anualmente por una cantidad no menor de un quinto del uno por

22   ciento (0.2%) del total de la Resolución Conjunta del Presupuesto. A partir del Año

1      Fiscal 1998-99, dicha aportación será de una cantidad no menor del uno por ciento

2      (1%) del total de las rentas netas del año fiscal anterior. Disponiéndose que **[para]**

3      *hasta* el Año Fiscal **[2016-2017]** *2020-2021*, dicha aportación será por la cantidad de

4      **[veinte millones de dólares ($20,000,000)]** *al menos diez millones de dólares*

5      *($10,000,000)*. A partir del Año Fiscal **[2017-2018]** *2020-2021*, dicha aportación será

6      no menor de cero punto cinco por ciento (0.5%) del estimado de rentas netas

7      sometido por el Departamento de Hacienda para la preparación del Presupuesto

8      Recomendado con cargo al Fondo General. El Gobernador de Puerto Rico y el

9      Director de la Oficina de Gerencia y Presupuesto, por delegación de este último,

10      podrá ordenar el ingreso de cualesquiera fuentes de ingreso en el Fondo de una

11      cantidad mayor a la aquí fijada cuando así lo creyere conveniente. El balance de

12      dicho Fondo de Emergencia nunca excederá de ciento cincuenta millones de

13      dólares ($150,000,000)."

14      <u>CAPÍTULO 10.- DISPOSICIONES FINALES</u>

15      Artículo 10.01- Inmunidad en cuanto a pleitos y foros.

16      Esta Ley no afecta la inmunidad que en cuanto a pleitos y foros tiene el Estado y

17 sus funcionarios u oficiales. Nada de lo dispuesto en esta Ley autoriza las acciones por

18 daños y perjuicio contra el Estado, sus funcionarios o empleados por actos u omisiones

19 de éstos últimos, resultante del cumplimiento de esta Ley. Nada de lo aquí provisto se

20 interpretará que constituye una renuncia de la inmunidad soberana del Gobierno de

21 Puerto Rico.

22      Artículo 10.02.- Normas de Interpretación.

122

1      Las palabras y frases usadas en esta Ley se interpretarán según el contexto y el

2      significado sancionado por el uso común y corriente y las reglas de hermenéutica

3      reconocidas por nuestro ordenamiento jurídico.

4      Artículo 10.03.- Incompatibilidad.

5      Por la presente se deroga cualquier ley orgánica, general o especial, artículo o

6      sección de ley, normativa, convenios colectivos, acuerdos, acuerdos suplementarios,

7      órdenes administrativas, políticas, manuales de empleo, cartas circulares, certificaciones,

8      reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasificación o

9      retribución, cartas contractuales, y/o disposiciones aplicables que vayan en contra de las

10     disposiciones de esta ley.

11     Artículo 10.04.- Supremacía.

12     Las disposiciones de esta Ley y los reglamentos o normas que se adopten de

13     conformidad con la misma, prevalecerán sobre cualquier otra disposición de ley,

14     reglamento o norma que no estuviere en armonía con los primeros.

15     Artículo 10.05.-Separabilidad

16     Si cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo,

17     disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley

18     fuera anulada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto

19     dictada no afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha

20     sentencia quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra,

21     artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de

22     la misma que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una

123

1   persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración,

2   palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo,

3   acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución,

4   dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del

5   remanente de esta Ley a aquellas personas o circunstancias en que se pueda aplicar

6   válidamente. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los

7   tribunales hagan cumplir las disposiciones y la aplicación de esta Ley en la mayor medida

8   posible, aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional

9   alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su

10  aplicación a alguna persona o circunstancia. Esta Asamblea Legislativa hubiera aprobado

11  esta Ley sin importar la determinación de separabilidad que el Tribunal pueda hacer.

12       Artículo 10.06.-Vigencia

13       Esta Ley comenzará a regir inmediatamente después de su aprobación.

**(Certified Translation of Chapters 4 and 6)**

CERTIFIED TRANSLATION

## CHAPTER 4. TRANSFER FROM PUBLIC CORPORATIONS, AGENCIES AND INSTRUMENTALITIES TO THE GENERAL FUND; CREATION OF THE CHARGES, FEES AND TARIFFS ADJUSTMENT COMMITTEE.

Article 4.01.- Transfer of Surplus

Public corporations, agencies and instrumentalities of the Government of Puerto Rico are hereby directed to transfer to the Department of the Treasury the surplus of the income produced. These funds will be considered as available resources of the State and deposited by the Department of the Treasury in the General Fund of the Government of Puerto Rico to meet the liquidity requirements set out in the Fiscal Plan adopted under the provisions of *"Puerto Rico Oversight, Management and Economic Stability Act of 2016"* Public Law 114-187, also known as PROMESA.

Article 4.02.-Committee

The amount of funds that each of the corporations and instrumentalities will provide will be determined by a committee composed of the Executive Director of the Financial Advisory and Fiscal Agency Authority of Puerto Rico, the Secretary of the Treasury and the Executive Director of the Office of Management and Budget, who may establish the necessary tariffs to comply with the provisions of the Fiscal Plan approved for the Government of Puerto Rico and the one which will rule its corporations. This committee will ensure that the transfer of funds as provided in Article 4.01 of this Act do not affect the services provided by public corporations and instrumentalities, and only consist of the available surplus after the operating expenses and obligations of

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

these entities have been covered in accordance with the budgeted expenses approved by the Office of Management and Budget for each fiscal year.

In addition, this committee is empowered to review the sources of income of public corporations, agencies and instrumentalities and adjust, increase or lower, any charge, tariff, rate, fee, premium or any revenue of a similar nature, in order to comply with the metrics provided in the Fiscal Plan of the Government of Puerto Rico.  In addition, the committee may impose an additional administrative charge to those taxes that it deems necessary which may be from five percent (5%) up to ten percent (10%) to comply with the metrics of the Fiscal Plan approved by the Oversight Board.

This Act shall prevail over any other law which establishes any charge, tariff, rate, fee, premium or any revenue of a similar nature and the committee is authorized to review, increase and lower the amount even though the same is established by law. The committee shall have the authority to review, increase or lower these revenues without regard to the provision of any Law, regulation or administrative order que establishes and particular amount of these revenues.

Any provision of law, regulation, administrative order, corporate resolution, or any other document of a similar nature, which restricts or decreases the funds that can be transferred by a public corporation, agency or instrumentality of the Government of Puerto Rico to the General Fund as provided in this Chapter is suspended.

The committee is authorized to promote any administrative order, circular letter or regulation necessary for its operation and to comply with the provisions of this Act.

Article 4.03.- Exclusions

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

The University of Puerto Rico, created by virtue of Act No. 1 of January 20, 1966, as amended, known as the "University of Puerto Rico Act", and the Public Corporation for the Supervision and Insurance of Cooperatives of Puerto Rico, created by virtue of Act No. 114-2001, as amended, known as the "Public Corporation for the Supervision and Insurance of Cooperatives of Puerto Rico Act", the Municipal Finance Corporation Act", better known as COFIM, Law No. 19 of January 24, 2014, as amended, the "Special Commission for Community Impact  Legislative Funds Special Commission Act", Law 20-2015, and the Comptroller's Special Reports Joint Commission Act", Law No. 83 of June 23, 1954, as amended.  The funds that public corporations and entities created for community purposes receive from private entities are excluded from the provisions of this Chapter.

With regards to the "Urgent Interest Fund Act", better known as COFINA, Act No. 9 of May 13, 2006, as amended, the Executive shall be authorized to use the Funds of COFINA, occasionally, and solely as a last resort and subject to the presentation of a sworn certification issued to the Legislative Assembly.  The presentation of such certification shall not be construed that the Executive can use COFINA funds indefinitely.  Said certification shall establish the need, term and amount of the funds to be used to cover an occasional and significant deficit in cash flow to comply with the Fiscal Plan of the Government of Puerto Rico.  The certification shall be signed and sworn by the Executive Director of the Financial Advice and Fiscal Agency Authority (AAFAF) and by the Director of the Office of Management and Budget.  The signature and the oath of both officials shall not be delegated.  The officials shall attest in the


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

certification that the information is correct, exact, and truthful in accordance with the fiscal reality of the Government of Puerto Rico.

Article 4.04.- Compliance Clause

All transfers made pursuant to the provisions of this Chapter shall be subject to Section 201(b)(1) (M) of Public Act 114-187 known as *Puerto Rico Oversight,Management and Economic Stability Act or PROMESA*.

CHAPTER 6. ACCOUNTING LAW GOVERNMENT OF PUERTO RICO.

Article 6.01.- Section 3 of Act No. 230 of July 23, 1974, as amended and known as "Government Accounting Act of Puerto Rico", is amended to add a new subsection (o) which reads as follows:

"Section 3. - Definitions.

When used in this Act, the following terms shall mean:

(a)      ...

...

(o)      Special Assignments - Assignments approved by Joint Resolutions limiting the use of the assigned funds."

Article 6.02.- subsection (b) is amended and a new subsection (e) is added to Article 7 of Act No. 230 of July 23, 1974, as amended, known as "Government Accounting Act of Puerto Rico", so that it reads as follows:

"Section 7. Revenue from public funds.

a.      ...

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

b.      All public funds of dependencies which do not have a specific destined use shall be credited to the State Treasury General Fund and deposited entirely in the current bank account of the Secretary or any other bank account established as he sees fit, .  Furthermore, it is ordered that all of the state special funds and other revenues of dependencies and public corporations after July 1, 2017, shall be deposited in their totality in the State Treasury under the custody of the Secretary of the Treasury or in the banking institution that he deems adequate.  The Secretary of the Treasury also in authorized to determine the order of priority of the disbursement of payments payable from the special state funds and other revenues, in accordance with the approved budget and the Fiscal Plan, without it being understood as a limitation upon the powers conferred on the Governor or the Financial Advice and Fiscal Agency Authority under the provisions of Act No. 5-2017.  This provision shall prevail over any other which is contrary or inconsistent which what is provided herein.  Any amount in excess of the amount budgeted and authorized by the Office of Management and Budget in each fiscal year from special state funds for dependencies and public corporations shall be deposited in the Budgetary Fund created under the Act No. 147 of June 18, 980, as amended.  This provision shall not apply to thoe funds assigned to municipalities under the Sales and Use Tax.   This provision shall not apply to private donations that government entities receive for social purposes.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

...

*e)*    After July 1st, 2017, all those special state funds created by law for specific purposes will be used for those purposes for which they were assigned by Law in accordance with the Budget recommended by the Office of Management and Budget and with the Fiscal Plan.  Moreover, the Office of Management and Budget is authorized to create a fund under its custody . If there is any inconsistency between the law and the use of funds with the Fiscal Plan, the purpose provided in Fiscal Plan approved under the provisions of the Federal Law PROMESA shall prevail."

Article 6.03.- Subsections (h), (l) and (m) of Section 8 of Act No. 230 of July 23, 1974 as amended, known as "Government Accounting Act of Puerto Rico", are amended to read as follows:

"Article 8 - Allocations of public funds.

(a)  ...

...

(h)    Allocations and funds without a specific fiscal year, which have remained in the books without being disbursed on obligated for  one (1) year,  will be considered that they have fulfilled their purposes for purposes of this law  and will be closed and enter immediately into the General Fund, except assignments and funds without a specific economic year allocated to carry out capital improvements that have been recorded and carried into the books. These will have a term of three (3) years from the date the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

allocation became legally effective to be disbursed and to comply with the purposes for which they were assigned. After the three (3) years, the obligated and non obligated balances of permanent improvement funds will be closed and deposited into Fund 301. This provision shall apply only to assignments made before the 2017-2018 fiscal year and will not be apply to those appropriations made by the Legislature through Legislative Donations or assignments under the Sales and Use Tax.

In those cases in which the agency or recipient of the capital improvements funds understand that the term of the assignment should extended to a term exceeding three (3) years, it may request it justifying the need to keep these resources the Office of Management and Budget at least three (3) months before said term expires. During this period, the Office of Management and Budget will analyze the request and determine the need to maintain current allocation, and the term and amount which will be extended. These resources shall be reallocated by the Legislature in projects.

(i) ....

...

(l)    Any assignment which remains one (1) year without being recorded into the books shall be considered, as a rule, automatically canceled and new legislative action will be required to use the money thus canceled. In exceptional cases *in* which it is demonstrated that valid reasons exist for not carrying into the books the allocation during the period of one (1)

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

year, such as the delay in resolving litigation in court and failure to carry out a public work because of fiscal, technical or legal difficulties, an allocation even after expiration of the aforementioned one (1) year period can be subject to be accounted for.

The Secretary shall notify the Legislative Assembly of the actions canceling assignments in the circumstances contemplated by this subsection, within thirty (30) days following the date the cancellation was ordered.

(m)   The Secretary shall periodically transfer to the surplus of the State Treasury General Fund, in accordance with the law, the balances of deposit accounts which have remained unused or without any movement in the accounting books during one (1) year and, according to his opinion, that are not necessary or do not fulfill the purposes for which they were created. Provided, that any claim the Secretary is obligated to pay with respect to such balances, after being transferred from the manner provided above, shall be paid from any available funds not otherwise appropriated for other purposes."

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.