# Exhibit B

CERTIFIED TRANSLATION

[faded handwritten and ink text]

(H.B. 938)

LAW

To create the "Fiscal Plan Compliance Act," in order to take the necessary measures to adjust the existing

legal and juridical framework to ensure full compliance with the Fiscal Plan approved by the Fiscal Oversight Board created under the protection of the Federal PROMESA Act; to establish a uniform system of fringe benefits, including the Christmas bonus and health plan contribution, for all officials and public employees of the agencies, instrumentalities, and public corporations of the Government of Puerto Rico, with the exception of the University of Puerto Rico; amend Section 4.3 subsection 2 (a) (e) (m) of Article 4, Section 5.2 of Article 5, Section 6.4 subsection 1(d) and 4 (1), 6.8 subsection 2 (b), and 6.9 of Article 6, Section 7.2 subsection 3 and 5 of Article 7, to add a new Article 2.11(a) in order to amend Article 3 of Law 125 of June 10, 1967, as amended, suspend the validity of Article 9 and Section 10.2 of Law 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act"; renumber the current Articles 10 through 20 as Articles 9 through 19; repeal Law 89-2016, known as the "Public Service Temporary Employment Act"; amend Articles 3, 6, and 7 of Law 253-1995, as amended known as the "Motor Vehicle Compulsory Liability Insurance Act"; in order to expand coverage of the compulsory liability insurance from four thousand dollars ($4,000) to four thousand five hundred dollars ($4,500); to allow for the revision of premiums before June 30, 2017; to allow the statement of an extraordinary dividend to the members of the Compulsory Liability Insurance Joint Underwriting Association, as well as the application of an incentivized tax to said dividend; provide for the distribution of the revenue obtained through the incentivized tax and the adjustment in the premium to enter the General Fund; to authorize the government to use surpluses from the public corporations as "available funds" to contribute to the General Fund; to authorize a Committee made up of the heads of the Fiscal Agency and Financial Advisory Authority, the Management and Budget Office, and the Department of the Treasury to modify the rates of public corporations to comply with the metrics of the Fiscal Plan; to establish the standards and principles that should govern the process of selling real estate properties of the Government of Puerto Rico; to create the Real Estate Assessment and Disposal Committee; to state the public policy related to the sale of real estate properties; to amend Articles 3, 7, and 8 of Law 230 of July 23, 1974, as amended, known as the "Government of Puerto Rico Accounting Act"; in order to establish that allocations and funds without any determined financial year, that have remained on the books without movement to disbursement or obligation for one (1) year shall be considered as having met

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

2

their purposes, wherefore they shall be closed and entered into the General Fund; to provide that those special funds created by Law for specific purposes shall be credited to the General Fund of the State Treasury and shall be deposited in the checking account of the Secretary of the Treasury so that he may have full power over them; amend Articles 2 and 6 of Law 129-2005, as amended, known as the "Government of the Commonwealth of Puerto Rico Procurement Reserve Act"; in order for the tiered increase in the amount assigned to procurements from the general budget to be issued to microenterprises, small and medium-sized businesses shall occur if the fiscal situation of the Government allows for such; to add a new Section 3020.05A and Section 3020.15, and amend Section 305.01, Section 6042.08, and Section 6042.15 of Law 1-2011, as amended, better known as the "Internal Revenue Code for a New Puerto Rico," in order to modify the excise tax applicable to cigarettes and tobacco products to obtain greater liquidity, tackle the economic and financial crisis faced by Puerto Rico, and prevent the most vulnerable sectors from being affected, as well as to discourage the use of cigarettes; amend Article 2 of Law 91 of June 21, 1966, as amended, to provide that until Fiscal Year 2020-2021, the annual contribution to the Emergency Fund shall be for the amount of ten million dollars ($10,000,000) and that as of Fiscal Year 2020-2021 onward, said contribution shall be no less than zero point five percent (0.5%) of the estimated net revenue submitted by the Department of the Treasury for the preparation of the Recommended Budget charged to the General Fund; and for other related purposes.

PRELIMINARY RECITALS

Introduction

At present, Puerto Rico is going through a monumental fiscal and social crisis without historical precedent. Said crisis was caused, in part, because there was a lack of controls on spending, sustainable development measures, and management information systems that promote clarity and transparency in government management.

According to data provided by the Federal Department of the Treasury, Puerto Rico is suffering a cumulative economic contraction of 14.6% in the Gross State Product (real GSP) with a forecast of an additional 3% contraction for the next two years. For years, the Government of Puerto Rico has operated with a structural deficit which has been financed by issuing bonds and loans to the Government Development Bank. For over a year the Government of Puerto Rico has lacked liquidity and tax returns, payments to contractors, the money of retirees, and intragovernmental loans were used to substitute the sources of liquidity and spend more money that the available funds. The Government Development Bank defaulted on its obligations to bondholders as of May 1, 2016 and it no longer fulfills its role of providing liquidity nor do we

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

3

have access to the market due to the policies of the past administration that undermined the credibility of the Government of Puerto Rico. The retirement systems are insolvent.

As an example of the policies that brought us to this point, it can be observed that from 2001 to 2008, a 64% increase in payroll expenses occurred, and, after a 33% reduction between 2009 and 2012, there was another substantial increase in the 2013-2016 election cycle. In order to finance that excessive expense, between 2000 and 2008, public debt increased by 134%. On the other hand, during the last election cycle measures were implemented under the philosophy of "first nonpayment, then taxes and more cuts." This philosophy fostered the continuation of excessive spending and the rejection of public policies that would have allowed for efficiently managing the fiscal affairs of the Government of Puerto Rico. This, without the necessary actions to achieve greater operational efficiency in Government or cuts to the excessive government spending having taken place. Furthermore, while stock plummeted and the economic debacle [was taking place], the Central Government was unable to generate the necessary financial information to understand the extent of the problem and present precise information to Congress, and to other entities with interest in the matter. Stemming from all of the foregoing, several downgrades of the ratings of the debt of the Government of Puerto Rico materialized and an adverse impact has reverberated through all sectors of the economy.

This crisis has hit Puerto Rican families very hard. The most severe sacrifices have fallen on the most vulnerable in our society and this has led many Puerto Ricans to leave the Island in search of better opportunities. The resulting decline in population has become one of the challenges for steering us toward recovery.

<u>The Colonial Situation in Puerto Rico</u>

The colonial situation has affected our capacity to deal with and resolve this crisis, given that we lack the sovereign powers that a state has to regulate its local affairs under the Tenth Amendment of the United States Constitution. "[F]or the federal Supreme Court, the adoption of the Constitution did not represent a change in the fundamental basis of the constitutional relationships between Puerto Rico and the United States. The Supreme Court continued treating Puerto Rico as a political entity subject to the territorial clause of the federal Constitution." See <u>People v. Sánchez Valle et al.</u>, 192 D.P.R. 594, 631 (2015). "[T]here was never any granting of sovereignty, what took place was a delegation of powers." *Id.* on pg. 635. "That delegation of power does not constitute an irrevocable surrendering or a termination of the power of Congress. The People of the United States bestowed upon Congress, by way of the Constitution, broad power to oversee the territories. Therefore, Congress cannot irrevocably surrender a power that was bestowed upon it by the People of the United States." *Id.* on pg. 638.


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

4

Hence, "Congress may allow the Commonwealth to remain as an indefinite political system, or to the contrary, it has the constitutional authority to amend or revoke the powers of internal administration exercised by the Government of Puerto Rico. In other words, the system of government that governs internally in Puerto Rico is fully subject to the political will and legal authority of Congress." *Id.* on pg. 641.

The sad reality is that the colonial situation places us in a state of defenselessness, such that not even the American citizenship that we have treasured since 1917 is guaranteed. Congress has the legislative discretion to grant privileges to the citizens born in the territories, including American citizenship, but that right may be revoked at any moment. In fact, the Federal Government has sustained before the courts that in the territories no right to citizenship exists, but rather it is an issue of a legislative grace by Congress. See, *for example*, <u>Tuaua v. United States</u>, 788 F.3d 300, (D.C. Cir. 2015).

With regard to the particular matter at hand, as an example of the limitations that the colonial situation imposes on us, we must point out that the states may obtain the protections of the federal Bankruptcy Act but Puerto Rico was excluded from said protections, and, due to not having full representation in Congress, there is little or nothing that we can do with regard to such. Nor are we able to legislate a local bankruptcy, given that the same federal law that does not protect us occupies the field and prevents local legislation. *See* <u>Puerto Rico v. Franklin Cal Tax-Free Tr.</u>, 136 S. Ct. 1938 (2016) (declaring the "Puerto Rico Debt Compliance and Public Corporation Recovery Act", Law 71-2014, better known as the "Creole Bankruptcy Act," unconstitutional).

<u>The Direct Result of Our Colonial Situation: PROMESA</u>

The policies of the past, along with our colonial defenselessness, led the United States Congress to pass the law called the *Puerto Rico Oversight, Management, and Economic Stability Act*, known as PROMESA (for its English acronym), Pub. L. 114-187, and delegated extremely broad powers to a Fiscal Oversight Board (hereinafter "Oversight Board"). Again, due to not having full representation in Congress, said Law was passed without any true participation by our People. Pursuant to PROMESA, the ongoing fiscal planning actions, budgetary actions, legislative actions, and executive actions of Puerto Rico, as well as the restructuring of debt, consensual or not, and the issuance, securing, exchange, modification, repurchase, or redemption of debt are subject to oversight.

In Section 4, PROMESA clearly provides that its provisions "shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act." In



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

5

this way, Congress expressly made it evident that its intention was that said Law would replace any state legislation that goes against PROMESA. This is equally recognized in Section 8 (2), which establishes that the Government of Puerto Rico may not adopt, implement, or enforce any statute, ruling, policy, or rule that could undermine or annul the purposes of PROMESA, as determined by the Oversight Board. Thus, we are prevented from passing legislation that overrides PROMESA or that undermines its provisions and its scope.

At this juncture, it is necessary to underscore that under the tenth amendment, the Federal Government may not impose on a state what the federal PROMESA act allows for the territories. Congress imposed a Board on Washington, D.C., which is not a state and which is under the direct jurisdiction of Congress. The Board of New York City was a creation of its own state legislature and not that of Congress. Detroit, which is a city and not a state, participated in a voluntary bankruptcy proceeding. In the end, sight cannot be lost of the fact that the situation that we are experiencing and the imposition of the Oversight Board is yet another consequence of the colonialism that has limited our development for the past 119 years.

Unfortunately, our colonial situation and consubstantial lack of political powers, exacerbates the reality of the fact that they have imposed a Federal Law upon us in the Congress that prevails over all local legislation, including our Constitution, without us having had the opportunity to vote on such or to vote for the President that approved it. This makes it clear that in order to be able to get out of the economic quagmire in which we find ourselves it is essential to solve the problem of our political status. However, it is also an irrefutable fact that we must work within the parameters of PROMESA to initiate the economic and fiscal recovery of Puerto Rico.

On October 30, 2016, the Oversight Board named the Government of Puerto Rico, the Government Employee Retirement System, the Judiciary Retirement System, the Teachers' Retirement System, the University of Puerto Rico, and 21 public corporations of Puerto Rico as "covered entities" subject to fiscal oversight pursuant to PROMESA. Section 405(b) of PROMESA moreover imposes a temporary stay on lawsuits and claims against Puerto Rico and its instrumentalities regarding various matters, in the hopes of the Government of Puerto Rico, on its own behalf and on behalf of its instrumentalities, entering into voluntary negotiations with its creditors to reorganize and settle the repayment of its debt obligations and simultaneously undertake a responsible restructuring of the Government of Puerto Rico and its instrumentalities that readjusts the essential services required for the health, safety, and welfare of the residents of Puerto Rico with the timely repayment of its debt obligations.

After investing millions of dollars on specialized consultants, the past administration presented a deficient fiscal plan that was immediately rejected by the


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

6

Oversight Board given that it did not solve the fiscal problems caused by the past administration.

This law, divided into Chapters, provides different measures that this Administration is taking to comply with the Fiscal Plan imposed pursuant to the provisions of PROMESA. The matters attended to in this Law are germane to one another, given that they are all aimed at enforcing the Fiscal Plan.

Section 17 of Article III of the Constitution of Puerto Rico provides in that pertaining to this matter that "[n]o bill shall become a law... that contains more than one subject, which shall be clearly expressed in its title, and any part of an act whose subject has not been expressed in the title shall be void." Said cited section establishes the rule of only one subject, which requires all laws passed by the Legislature to regulate only one subject or matter. Regarding this particular matter, the Supreme Court of Puerto Rico has stated that said provision "does not require the title to constitute a detailed index of the content of the law, but rather merely for it to be an indicative marker of the matter covered by it." Herrero v. Emmanuelli, 179 D.P.R. 277, 295 (2010); Rodríguez v. Corte, 60 D.P.R. 919, 922 (1942).

Furthermore, the jurisprudence has been consistent in establishing that only in the presence of a clear and decisive case is it justified to nullify a law due to violating said constitutional provision. Dorante v. Wrangler of P.R., 145 D.P.R. 408, 429-431 (1998) and cases cited therein. Our highest judicial forum has "adopted an understandably lax stance in order to not tie legislators' hands. Herrero v. Emmanuelli, supra. See also J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos ["Constitutional Law of Puerto Rico and Constitutional Relations with the United States"], Bogata, Editorial Temis S.A., 2009, pg. 244. In this sense, the Supreme Court has defined that "**a strict interpretation of the constitutional provision could impede and hinder the legislative process, given that it would compel legislators to pass multiple laws to regulate a single general issue or matter.**" Herrero v. Emmanuelli, supra. (Emphasis ours.) See also M.H. Ruud, No Law Shall Embrace More than One Subject, 42 Minn. L. Rev. 389, 393-394 (1958). That is to say, "the requirement is not designed as subterfuge to destroy valid legislation, but rather as a guarantee that the legislative process is performed in a transparent manner, so that every bill is discussed and analyzed fully prior to being passed." Herrero v. Emmanuelli, supra, pp. 295-296.

Therefore, when examining the validity of a law in light of the rule of only one subject, it is necessary to assess all of its provisions in order to determine whether they are related to one another and are pertinent to the main subject and all of the means that may be fairly considered as accessory and necessary or appropriate to carrying out the

CERTIFIED TRANSLATION

purposes that are strictly comprised within the general matter." Id. See also R.E. Bernier & J.A. Cuevas Segarra, *Aprobación e Interpretación de las Leyes en Puerto Rico* ["Passage and Interpretation of Laws in Puerto Rico"], Second Edition, San Juan, Publicaciones JTS, 1987, pg. 81.

This Law pursues only one matter: to enforce faithful compliance with the Fiscal Plan certified by the Board. Therefore, we pass this Law, which covers several topics aimed at complying with the Fiscal Plan.

A New Government: Liability to the Oversight Board

As a result of all of the foregoing, when we assumed the reins of the Government, we found ourselves with a cash deficit of more than $7.6 billion as certified by the Federal Treasury and the Oversight Board. It was a government without access to capital markets, with credit with a junk rating, without liquidity, without transparency in public finances, with inflated government spending, and with billions of dollars in debt. Moreover, the Governor faced the titanic task of regaining credibility with the market and the Oversight Board. We must guarantee a Government in which spending responds to the reality of the revenues.

Since January 2, we have been implementing a concerted plan to control government spending, reactivate our economy, and facilitate the conditions for the creation of more and better jobs in the private sector. We are showing the world that it is open for business in an environment of government security and stability.

The measures presented by the Governor and passed by this Legislative Assembly during these first three (3) months in power have changed the direction of Puerto Rico to one of fiscal responsibility.

On February 28, 2017, the Governor presented a Fiscal Plan that is complete, comprehensive, real, and at the same time, sensitive to the needs of our People and of the most vulnerable. After weeks of uncertainty, reason and sensibility prevailed. On March 13, 2017, the Oversight Board accepted and certified our Fiscal Plan accompanied by a series of contingencies that guarantee that there shall not be any terminations of public employees, without affecting the workday, maintaining access to the healthcare services of our People and protecting the pensions of the most vulnerable. This Fiscal Plan is the only option for avoiding the termination of public employees, the elimination of the right to healthcare, and maintaining the solvency of our retirement systems, maintaining an operational government, and complying with the parameters to avoid more severe measures that are part of the contingencies of the Plan approved by the Fiscal Oversight Board, such as the total elimination of the Christmas bonus for all public employees and decreeing a reduced workday that would render the Government inoperative.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

8

The approved measures of the Fiscal Plan are geared toward complying with the fiscal objectives; but also toward promoting economic development, our capacity to regain credibility; toward change translating not only into mere cutting, but rather in a long-term benefit, and, above all, toward ensuring that the most vulnerable sectors and those that work hard, day after day, have a better quality of life.

The validation of the Fiscal Plan constitutes an acknowledgement of the credibility of the new Government. We showed that we have moved on from the times of incoherency and improvisation to times of working as a team, and having results for the good of Puerto Rico. We went from "I don't care" and the lack of credibility; to having a Fiscal Plan and socioeconomic development that meets the objective of cutting spending, but more importantly, that allows us to build a better society.

The changes that we are enacting will not be easy and will take time, but they will also produce results in the first two years. Under the certified Fiscal Plan, we will manage to balance the revenues with the expenditures for Fiscal Year 2019. Now it is up to us to execute. The contingencies that accompany the Fiscal Plan require the Government to follow through. We must ensure that we have the liquid money to not affect the wages of public employees, the healthcare of the People, and the incomes of retirees.

This Law, is passed to adjust the legal and juridical framework to be able to meet the demands that the Oversight Board made of us in the Fiscal Plan approved by virtue of the Federal PROMESA Act [sic]. With regard to the foregoing, by virtue of the power of reason of State and pursuant to Article II, Sections 18-19, and Article VI, Sections 7-8, of the Constitution of Puerto Rico, in the face of a situation of serious economic and fiscal urgency in Puerto Rico the passing of this Law has become necessary in order for the State to be able to have the sufficient liquidity to be able to pay the payroll of public employees and fund the essential services that it provides to its citizens. We exercise this power of reason of State to be able to take the necessary measures to enforce the Fiscal Plan and place Puerto Rico on the path toward economic recovery. Complying with this Plan constitutes an urgent interest of the State to maintain its operations and protect the most vulnerable.

As defined by the Supreme Court of Puerto Rico, the power or reason of State is "that inherent power of the State that is used by the Legislature to prohibit or regulate certain activities in order to foster or protect public peace, morale, health, and general welfare of the community, which may be delegated to the municipalities." Domínguez Castro v. Commonwealth, 178, D.P.R. 1, 36 (2010).

Our Highest Court recently provided that the measures taken to attend to an emergency that are necessary and reasonable to advance important government interest were valid. See, Trinidad v. Commonwealth, 188 D.P.R. 828 (2013) and Domínguez Castro v. Commonwealth, *supra*, pp. 88-89. Likewise, the Supreme Court

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

9

recognized "the precariousness of the economy as a reality that necessarily carries weight in the definition of the realm of government action under the power of reason of State" and that in the exercise of said power, "the Legislature enjoys broad power to pass economic regulations aimed at promoting the welfare of the community." Domínguez Castro v. Commonwealth, *supra*, pg. 37. As stated by Associate Justice Kolthoff Caraballo, the Court called attention to the fact that both our jurisdiction as well as the rest of the world "goes through very shaky times in the economic and financial aspect. It would seem that the economies of the countries of the world are intertwined and tied to the tail of a kite that ultimately cannot seem to rise up." Domínguez Castro et al. v. Commonwealth I, 178 D.P.R. 1, 415 (2010) writ of certiorari denied, Domínguez Castro v. Puerto Rico, 131 S.Ct. 152 (2010). In this way, the Court recognized that it must be aware of the fact that a reality that it described as "hard and unpleasant" existed. Dealith with such a historic scenario, this Court deemed that it was necessary to aspire to an altruistic interest in which the "collective economic welfare, at the expense of individual welfare" was pursued." Moreover, this Court reiterated the recognition of an economic crisis in our jurisdiction in the case Herrero et al. v. Commonwealth, 179 D.P.R. 277 (2010) and underscored, within the context of the provision of a remedy that entailed the disbursement of public funds in order to return money to taxpayers, that it was not "unaware of the difficult state of public finances in our country." *Id.* on pg. 309.

The Supreme Court validated Law 3-2013 regarding the Public Employee Retirement System in the case Trinidad Hernández v. Commonwealth, *supra*, understanding that the Legislature had exercised the power of reason of State to put an end to the insolvency of the Public Employee Retirement System. The Supreme Court reasoned that "in the preliminary recitals... it is shown that the measures adopted are necessary and reasonable to properly attend to the financial crisis that threatens the actuarial solvency of this system." It added that, " this certainly constitutes an important public interest, given that, by guaranteed the financial solvency of the system, all of its participants are benefitted and, in part, the fiscal crisis faced by the Country in protection of the welfare of all Puerto Ricans." Trinidad Hernández v. Commonwealth, *supra*, pg. 837. It concluded that the standard is constitutional "because, despite the fact that a substantial impairment of the contractual obligations in dispute exists, the measures implemented are reasonable and necessary to safeguard the actuarial solvency of the Retirement System, and less onerous measures to not exist to achieve that purpose." Id., pg. 839.

In the same way, recently, in the case Puerto Rico Teachers' Association v. Puerto Rico Teachers' Retirement System, 190 D.P.R. 854 (2014), the Supreme Court rendered judgment on the measures passed by way of Law 160-2013 to solve the crisis of the Teachers' Retirement System and determined that the law did not advance the important state interest required by our constitutional system in cases of retirement system reforms: to guarantee the solvency of that very system. As such, it ruled that Law 160-2013, in that regarding the impairment of contractual



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

10

obligations, it is unreasonable, and, therefore, unconstitutional. Id. pg. 12. On that occasion, the Court was emphatic in underscoring that the approved measures will be constitutional if they are reasonable and necessary "to advance its actuarial solvency and no less onerous measures exist to achieve that purpose." Id., pg. 8.

Using the aforesaid legal framework as a basis, this Legislative Assembly understands that the measures that are taken in this Law are necessary and reasonable to properly attend to the fiscal, economic, and budgetary crisis that Puerto Rico is experiencing. Likewise, it is a matter of a series of measures required to manage to implement the Fiscal Plan certified by the Oversight Board pursuant to the federal PROMESA Act [sic]. Said Plan establishes adjustments of a fiscal nature to establish the finances of the Government in times at which no access to the financial market exists. Should these measures not be implemented, the social and economic welfare of Puerto Rico will suffer irreparable damages, wherefore implementing this Fiscal Plan constitutes an urgent interest of the State to ensure the welfare of the public interest.

## Government Restructuring

Alternatively, the Plan for Puerto Rico promoted by this Administration and which was endorsed by the people of Puerto Rico in the past general elections by way of the democratic exercise of voting, proposes implementing a new government structure that significantly reduces public spending and substantially improves its functions. In order to achieve this, the conscientious evaluation of the services provided by the government is required, in order to determine which can be consolidated, delegated to the private sector, or eliminated because they are no longer necessary. All of this, without entailing terminations of public employees, but rather their mobilization in accordance with our citizens' need for services.

Consonant with the foregoing, and as part of the first measures taken by this Administration to tackle the fiscal crisis by way of the reengineering of government structure, Law 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," was passed. This Law converts the Government into a Sole Employer so that public officials become employees of the Government and not of its different entities, thereby allowing for better use of human resources wherever an urgent need exists through the mechanism of mobility, without the employee having to resign from the position that they hold and to begin all over again at another government instrumentality. Through mobility, it is sought to reinforce the understanding of what the balance between the workforce and the provision of public services means. This way, we obtain an efficient distribution of the human resources of the Government and we create an agile government structure, based on the continuous evaluation of needs and aiding public servants to perform the adjustments and adaptations required by the current fiscal crisis and future challenges.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

11

During the past election cycle, Law 89-2016, known as the "Public Service Temporary Employment Act," was passed, under the supposition of correcting the disparity in the treatment of employees of a temporary nature in public service and forcing the agencies to be diligent in the creation or request for the creation of jobs. Also, it was passed under the reasoning that correctly classifying employees would aid in the administration of human resources in public service and will prevent the outgo of unnecessary funds. Likewise, by way of said Law, the status of regular employee was granted to those transitory employees that had two (2) years or more performing permanent-need duties, subject to certain eligibility requirements.

Nevertheless, said Law has had the effect of expanding the government payroll at times when the public finances are experiencing an unprecedented fiscal crisis. The recruitment of temporary employees, whether they be classified as: irregular, transitory, or by contract, it should not be used as subterfuge for the subsequent creation of regular permanent-need positions, thus overburdening the funds of the State and without measuring the effectiveness of those resources in the provision of services that the People deserve.

Therefore, steering Puerto Rico toward the right path requires a paradigm shift, such as the one proposed by this Administration through the Model for the Socioeconomic Transformation of Puerto Rico, stated in the Plan for Puerto Rico. The mission is to establish a new government that facilitates economic development and whose vision is that of a government based on a scientific model, in which evidence and results matter and citizen involvement is the main axis of its validation. In order to achieve this goal, the government must become a facilitator of economic development, implementing real and convincing reforms; the government structure must be cost-effective, efficient, and transparent, and; public service must be founded on integrity, excellence, responsibility, and accountability.

<u>Equity in Fringe Benefits for All Public Employees</u>

Alternatively, as we have indicated and as everyone knows, our Island is experiencing a severe fiscal crisis and the resources to attend to all of the government's commitments are limited. In the midst of a novel situation such as the imposition of a Fiscal Oversight Board and in the face of the nonpayment of assumed debts, the Government of Puerto Rico finds itself forced to restructure the entire government component and channel the resources to those areas that most deserving of such.

Puerto Rico is facing a historical moment in which it needs the collaboration of all sectors in the adoption of immediate solutions that contribute to its economic recovery. This Law responsibly and fairly attends to the absence of uniformity among our public employees with regard to the fringe benefits that they will be able to enjoy during this critical period of the local economy.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

14

[tr. note: page 13 missing]

the viability of the public corporations as well as their finances. The precarious fiscal situation of the Government, its General Fund, and its Public Corporations makes it necessary to establish controls on spending on payroll in excess of that budgeted in order to safeguard the viability of the public corporations and at the same time the workday of public employees and their wages.

Likewise, through this Law, it is established what the fringe benefits will be that all public employees will enjoy during the period of the fiscal crisis regardless of the agency or public corporation where they work. This way, parity is established in the fringe benefits that the public employees of the different agencies of the Government receive and those received by the public employees that work in the different public corporations, who, depending on the corporation at which they are, currently enjoy different fringe benefits. Likewise, unionized public employees at the different agencies and public corporations, depending on the collective bargaining agreement, have different fringe benefits even being at the same agency or public corporation. There is no reason that justifies, while the fiscal crisis experienced by Puerto Rico and in the face of the threat of the Oversight Board to eliminate the Christmas bonus of all public employees and reduce their workday; to perpetuate a disproportionate and unreasonable inequality in fringe benefits agreed to at times when the fiscal situation of Puerto Rico was different and was not in a crisis of the proportions that we now have.

Just as we stated before, in the past, our illustrious Supreme Court has upheld the validity of statutes of an economic nature passed in order to deal with times of crisis or urgency in Puerto Rico and has recognized "the possibility that, in circumstances of emergency related to economic aspects, the Legislative Assembly may make use of its broad powers." Domínguez Castro, *supra*, on pg. 49 (2010) (citations omitted). Recently, that Honorable Court was also aware of the structural crisis of the Public Employee Retirement System and upheld the constitutional validity of the statute that, in order to attend to said crisis, amended the Public Employee Retirement Act, Law 3-2013. See Trinidad Hernández v. Commonwealth, *supra*.

For its part, Article II, Section 7, of our Constitution provides that: "No laws impairing the obligation of contracts shall be enacted." Art. II, Sec. 7, Const. Commonwealth, L.P.R.A. Volume 1. Said clause does not establish any absolute prohibition that prevents the State's power of regulation in benefit of the public interest. Bayrón Toro, 119 D.P.R. on pg. 619.

The constitutional guarantee against the impairment of contractual obligations is only activated when the modification adversely affects the essential terms or conditions of the agreement that principally motivated its execution, ins such a way that the reasonable expectations of the parties are frustrated. Domínguez Castro, *supra*.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

15

See also <u>Allied Structural Steel Co. v. Spannaus</u>, 438 U.S. 234 (1978); <u>El Paso v. Simmons</u>, 379 U.S. 497 (1965). The reasonability of the law is determined considering principally the substantiality of the public interest promoted by the statute and the magnitude of the impairment caused by its retroactive application. <u>Warner Lambert Co. v. Superior Court</u>, 101 D.P.R. 378, 396 (1973). If the impairment occurs as a consequence of a reasonable and necessary modification to advance a public interest, the court shall uphold its validity. <u>Bayrón Toro</u>, *supra*.

Even if the impairment is substantial, the constitutional prohibition is not absolute. It must be accommodated to the power of reason of state. <u>Bayrón Toro</u>, *supra*. When considering the validity of statutes under the impairment clause, the applicable criterion is that of reasonableness. <u>Warner Lambert v. Superior Court</u>, *supra*. Consequently, the function of the court consists of establishing a reasonable balance between the social interest of promoting the common good and the interest, also social, of protecting contractual transactions against the arbitrary and unreasonable application of laws. *Id.*

Once it is determined that the impairment is substantial, then the proper next step is to assess whether the modification seeks to advance an important interest in benefit of the general welfare. If the impairment arises as a consequence of a reasonable and necessary modification aimed at advancing a significant and legitimate public interest, the validity of the law shall be upheld. <u>Bayrón Toro</u>, *supra*.

In <u>Buffalo Teachers Union v Tobe</u>, 464 F.3d 362, 365 (2d Cir. 2006), the Second Circuit stated the following with regard to the examination that an adjudicative forum must perform when comes in to appraise a lawsuit in which the constitutional clause regarding the impairment of contractual relations is invoked:

> When a state is sued for allegedly impairing the contractual obligations... <u>the state will not be held liable for violating the Contracts Clause of the United States Constitution unless plaintiffs produce evidence that the state's self-interest rather than the general welfare of the public motivated the state's conduct</u>. On this issue, <u>plaintiffs have the burden of proof</u> because the record of what and why the state has acted is laid out in committee hearings, public reports, and legislation, making what motivated the state not difficult to discern. (Underlining ours.)

Alternatively, as a corollary of the doctrine of the separation of powers, when evaluating the necessity or reasonableness of the measure for the purposes of the clause on the impairment of contractual obligations, the Supreme Court of Puerto Rico has established that, despite the fact that the proper course of action is not to give complete deference to Legislators, "this does not mean that the judicial forum should not give any deference to the determination of necessity and reasonableness that the legislators made in the exercise of their constitutional power, especially when it is a matter of socioeconomic regulations." <u>Domínguez</u>, *supra*.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

16

Nor is it appropriate to perform a *de novo* determination "regarding the existence of other alternatives for the solution of the problem" *Id.*, on pg. 89. Recently, this Court reiterated that "deference must be given to the determination of the Legislative Assembly regarding the necessity and reasonableness of the measure." <u>Trinidad Hernández v. Commonwealth</u>, *supra.* Moreover, regarding the reasonableness of the measure, "it is an established standard that it does not correspond to the courts to make a *de novo* determination regarding the existence of other alternatives to solve the problem. The determination of the Legislative Assembly with regard to the measures passed constitutes an exercise of public policy that merits [...] deference in this system of separation of powers." <u>Trinidad Hernández v. Commonwealth</u>, *supra.*

Let us remember that, should it be understood that an impairment to a contractual relationship exists, a court should analyze whether the legislation in question serves a <u>legitimate public interest</u>. <u>Home Bldg. & Loan Ass'n</u>, *supra*, <u>U.S. Trust</u>, 431 U.S. at 25. The concept of *legitimate public purpose* has been defined as one whose purpose is that of remedying "an important general, social, or economic problem rather than providing a benefit to special interests." <u>Buffalo Teachers' Federation</u>, *supra.* Note that it has been upheld that the economic and financial health of a state is a legitimate interest of importance. See, <u>Baltimore Teachers' Union v. City Council of Baltimore et al.</u>, 6 F.3d 1012, 1017 (4th Cir. 1993) (ruling that a piece of legislation that reduced wages to balance state budgets did not violate the contractual impairment clause); <u>In re Subway-Surface Supervisors Ass'n v. New York City Transit Auth.</u>, 375 N.E.2d 384 (1978) (upholding the constitutional validity of a statute that froze municipal wages in view of the fiscal emergency that plagued the state of New York); <u>Buffalo Teachers</u>, *supra* (the freezing of teachers' wages in the face of a fiscal crisis was upheld).

In the face of this situation, the Government of Puerto Rico had to pledge through the Fiscal Plan approved by the Oversight Board to implement certain measures in order to be able to safeguard the work of thousands of Puerto Ricans, which does not reduce the workdays of our employees with the consequence of having a reduction in their monthly wages of up to twenty (20%) percent and the total elimination of the Christmas bonus. Among the measures that the Government pledged to implement is, as we have indicated, standardizing the fringe benefits of all public employees; standardizing the payment of overtime at Public Corporations of the Central Government, equalizing the fringe benefits of employees of the Central Government and Public Corporations; eliminating the liquidation of excesses of accumulated vacation and sick days; and specifically putting the vacation time of public employees at the same level as that which employees in the private sector currently have.

In order to manage to achieve the objectives of this Law and do so in the least onerous manner for our public employees, it is established that the provisions applicable to leaves of absence and fringe benefits shall be for a temporary period of time.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

17

They shall be reinstated as certified by the members of the Fiscal Plan Compliance Committee.

In order to be able to comply with the certified Fiscal Plan, by way of this Law, the fringe benefits provisions established in Law 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," are repealed and are incorporated into this Law, extending their application to employees of the Public Corporations. This way, as previously provided, the fringe benefits are equalized as well as the compensation for overtime that all public employees may enjoy, regardless of where they work. Likewise, the number of days that may be accumulated per month for vacation is reduced and likened to those that are currently enjoyed by workers in the private sector, reducing the number of vacation days to fifteen (15) days. Lastly, payment for excess vacation and sick days is eliminated. Nevertheless, the implementation of measures by supervisors to ensure that our employees do not lose the accrued days and that they may enjoy them is obligatorily established.

We cannot overlook the fact that, had the reduction of the workday entered into effect immediately as was proposed by the Oversight Board, the economy of Puerto Rico would have suffered a devastating blow upon eliminating the Christmas bonus and reducing the wages of all public employees by 20%. It was in the face of this situation that the aforesaid alternative channels were established to be able to obtain the required funds without disrupting the workday of employees and their wages.

### PROMESA and the Supremacy Clause

Alternatively, it is important to emphasize the application and mandate that the United States Congress, by virtue of its full powers over the Territory of Puerto Rico, imposed upon us when it passed the PROMESA Act [sic], which creates an Oversight Board to whom, among a series of duties, granted it that of approving and overseeing the execution of a Fiscal Plan for the economic stabilization of Puerto Rico.

Said rule passed on May 4, 2016 establishes a supremacy clause, which we cite:

Sec. 1 "Puerto Rico Oversight, Management, and Economic Stability Act" or "PROMESA". (SEC. 4. SUPREMACY **The provisions of this Act shall prevail over any general or specific provisions of territory law,** State law, **or regulation that is inconsistent with this Act.** (Emphasis ours.)

Pursuant to Art. 101 of PROMESA, the Oversight Board, at its full discretion, whenever it deems appropriate, may name any


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

18

territorial instrumentality as a territorial instrumentality covered by and subject to the obligations of the aforesaid Law. At this time, the Oversight Board has named all of the public corporations as covered entities. Alternatively, pursuant to Article 205 of PROMESA, the Oversight Board may at any time submit recommendations to the Governor or the Legislature regarding actions that the territorial government should take in order to guarantee compliance with the fiscal plan or in any other way to promote financial stability, economic growth, administrative responsibility, and efficiency in the provision of services. With these recommendations having been made, the Governor must submit a statement indicating whether the government will adopt the recommendation. If it does not adopt it, the Governor must explain to the President of the United States and the Congress his reasons for not adopting them.

As such, we must review the duties that are assigned to the Fiscal Oversight Board to provide oversight and ensure that the provisions of the approved Fiscal Plan are complied with.

Let us remember that PROMESA enjoys supremacy over any legislation of the territory of Puerto Rico that is incompatible with the reasons, responsibilities, duties, and objectives of that the federal rule has and the Oversight Board as the entity charged with its execution. In that regarding this Law, the Board established that if the government does not achieve spending cuts that generate enough funds and an additional cash reserve of $200 million by way of the implementation of other measures, as of June 30, 2017, a workday reduction program for all public employees will enter into effect, effective July 1, 2017, which would represent a reduction in the wages of our employees of up to twenty (20%) percent in their monthly wages. Likewise, they establish that the total elimination of the Christmas bonus would be implemented for all public employees. The alternative of the Oversight Board to reduce the workday in the government is equivalent to four (4) days per month for the majority of the employees of the Executive Branch and two (2) days per month for teachers and front-line personnel in institutions that operate 24 hours a day. Likewise, the Oversight Board has established that there could be reductions comparable to these savings by partial reduction of the workday of the Executive Branch for other entities throughout the entire government, including the public corporations and instrumentalities and the Legislative and Judiciary branches. Just as our Governor has mentioned in multiple forums, the reduction of the workday is NOT an option. Therefore, we are taking these cautious measures to not have to reach that contingency imposed by the Oversight Board.

Using this legal framework as a basis, this Legislative Assembly is convinced that the measures that are taken in this Law are necessary and reasonable in order to properly attend to the fiscal, economic, and budgetary crisis that Puerto Rico is experiencing and that they constitute a valid exercise of legislative power.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

19

The actions that are taken in this Law and their application to all unionized and non-unionized public employees that work in the Central Government and in the Public Corporations are not taken lightly. When performing a balance of interests, at these times of crisis, we understand that the fringe benefits must be adjusted to the needs of the times and the fiscal and structural crisis faced by the Government of Puerto Rico. In light of the new state of Law created by the passing of PROMESA and the arrival of the Oversight Board, this Law constitutes a reasonable, fair, uniform, and necessary means of dealing with the current crisis and is the sole option that the Government of Puerto Rico has to be able to comply with the Fiscal Plan certified by the Oversight Board and to avoid imposing a reduction in the workday of our public employees that would be equivalent to reducing their monthly wages by twenty (20%) percent and at the same time the total elimination of the Christmas bonus. This Law is enacted under the protection of the power of this Legislative Assembly to pass and enact economic legislation aimed at promoting the welfare of the Puerto Rican community.

<u>Extraordinary Dividend to the Compulsory Liability Insurance Joint
Underwriting Association</u>

The Compulsory Liability Insurance Joint Underwriting Association (ASC, for its Spanish initials) was created by way of Law 253-1995, as amended, as part of the system of compulsory liability insurance for motor vehicles that was established at that time in Puerto Rico. The purpose of said insurance was to provide a viable solution to the problem of damages caused to motor vehicles of third parties as a result of a traffic accident, pursuant to the applicable claim requirements.

In its origin, the coverage of the compulsory insurance that said law established had a cap of three thousand dollars ($3,000). Said cap was increased in the year 2009 by virtue of Law 201-2009, to four thousand dollars ($4,000). It is worth pointing out that despite this thirty-three percent (33%) increase in coverage, the insurance premiums, which has a value of ninety-nine dollars ($99) for private passenger vehicles and one hundred forty-eight ($148) for commercial vehicles, remained unchanged.

Since the increase in coverage in 2009, the cost of goods and services in general has continued to increase and the auto industry has not been exempt from these increases. Therefore, the cost of vehicle parts and repairs today is greater than eight (8) years ago. Therefore, this administration finds it pertinent for the compulsory insurance coverage to be increased to four thousand five hundred dollars ($4,500). Consistently with this increase, the ASC is authorized to revise the cost of premiums on or before June 30, 2017.

Alternatively, the conditions under which the ASC operated since its creation entailed a substantial increase in its capital. Given that the ASC was the sole provider


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

20

of compulsory liability insurance for motor vehicles, it was necessary for it to maintain a significant capital reserve to cover its operations and comply with the reserve required by the Insurance Code. As such, by way of Law 60-2013, the declaration of an extraordinary dividend was authorized, accompanied with an incentivized tax, which allowed for generating additional revenue of one hundred million dollars ($100,000,000). In the same way, by virtue of Law 157-2015 the declaration of another extraordinary dividend of forty-tow million dollars ($42,000,000), equally accompanied by a special tax. However, as a result of the opening of the market to competition for other insurance companies to be able to provide service, at the driver's choosing, it is unnecessary for the ASC to maintain such a high amount of capital on reserve and which cannot be accessed by members of the ASC, who are the same companies that compete with this entity to provide the compulsory insurance service.

By way of this Law, the declaration of an extraordinary dividend is authorized, accompanied by the corresponding incentivized tax. Once the dividend has been declared by the members of the ASC, the government would receive the amount of seventy million dollars ($70,000,000).

In contrast to the past administration, which used the funds obtained by way of laws similar to this one to distribute among some entities that, although many pursued laudable purposes, others entailed the unnecessary wasting of funds, by way of this Law we seek to attend to the lack of liquidity of the Government of Puerto Rico to protect the services that are provided to the citizens, employees in the public sector, the incomes of the members of the retirement systems, among other similar purposes.

Due to all of the foregoing, this legislative Assembly authorizes the ASC to declare an extraordinary dividend of seventy million dollars ($70,000,000) from its capital reserve accompanied by a special tax of fifty percent (50%). This way, the ASC shall remit the sum of thirty-five million dollars ($35,000,000) that will be assigned to the General Fund of the Government of Puerto Rico.

### Transfer of Profits from the Public Corporations to the General Fund

One of the most transcendent measures that this administration has managed to pass is the "Puerto Rico Financial Emergency and Fiscal Responsibility Act," Law 5-2017. It declares as public policy of the Government of Puerto Rico "to take all of the required measures for Puerto Rico to establish the necessary fiscal responsibility within the Government and its instrumentalities to satisfy its obligations and guarantee that those essential government services for the health, safety, and welfare of the residents of Puerto Rico are provided." Likewise, the cited Law declares that the government may "exercise its power of reason of State in such a manner that


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

21

acknowledges the responsibility to satisfy the financial obligations of the Government of Puerto Rico and its instrumentalities, while it continues providing essential government services for the health, safety, and welfare of the residents of Puerto Rico in light of the limited available resources of the Government of Puerto Rico and its instrumentalities. In other words, the government will take all of the necessary measures to ensure that the needs of the people are duly attended to.

Law 5-2017 points out that as a result of the ongoing financial emergency and the passing of PROMESA, the Legislative Assembly holds the responsibility to exercise its power of reason of state. In this sense, it points out that the responsibility of satisfying the financial obligations of the Government of Puerto Rico and its instrumentalities must be recognized, while continuing to provide essential government services to safeguard the health, safety, and welfare of the residents of Puerto Rico, given the limited available resources of the Government of Puerto Rico and its instrumentalities, all of this in congruency with PROMESA.

Taking into account the foregoing, Law 5-2017 empowers the Governor to issue executive orders to require the use of the available resources to pay for essential services as the Governor deems necessary to protect the health, safety, and welfare of the residents of Puerto Rico and to establish standards of priority for the disbursement of public funds when the available resources for the fiscal year are insufficient to cover the allocations made for that fiscal year, among other measures. This, keeping in mind the limitation of resources that the State possesses.

In the presence of the aforesaid fiscal and economic situation, it is evident that the Government of Puerto Rico must take measures to comply with the Fiscal Plan without affecting the essential services that the citizenry receives. This requires maximizing the use of the available resources of the State, including the resources that the public corporations have. It is for this reason that this legislation orders the public corporations and instrumentalities of the Government of Puerto Rico to transfer the necessary funds to the Department of the Treasury to guarantee the liquidity of the government.

The determination of the amount that shall be contributed by each one of the public corporations shall be determined by a committee made up of the Executive Director of the Fiscal Agency and Financial Advisory Authority (AAFAF, for its Spanish acronym), the Secretary of the Department of the Treasury (Treasury), and the Executive Director of the Office of Management and Budget (OGP, for its Spanish initials). In doing such, the committee shall take into account the surpluses that each corporation has after having covered their operational expenses and without affecting the services that these entities provide. Said funds shall be deposited in the General Fund of the Government of Puerto Rico to thereby have the liquidity required by the Fiscal Plan.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

22

Due to all of the foregoing, in attending to the situation of fiscal and economic emergency that Puerto Rico is experiencing, in the exercise of its power of reason of state, this Legislative Assembly recognizes the necessity of remedying the financial emergency, wherefore it promotes the mechanisms that are established in this Law to ensure the liquidity of the Government of Puerto Rico, using the available resources in the public corporations, without this constituting a disproportionate burden for the citizens, or affecting the essential services that the government provides.

<u>Disposal of Real Estate Properties of the Executive Branch</u>

Alternatively, the economic and fiscal crisis faced by the Government has had repercussions for the entire spectrum of our infrastructure, including our real estate property. The Executive Branch composed of its agencies, entities, and public corporations has countless real estate properties in disuse that can be sold off to the private sector for diverse purposes. Many of the properties have had no public use for several years. However, they have ample spaces in strategic locations that may be maximized by industry or private business to develop their activities. Some properties may even be used to build or remodel a residence or for nonprofit entities.

Unfortunately, in Puerto Rico there is no coherent and uniform public policy that fosters the efficient, effective, and coordinated sale of the real estate assets of the State. Given such, it is necessary to establish a legal framework that facilitates moving the state real estate market and provides certainty to the transactions of these assets. The benefit would be multiple: on the one hand, the Government may amass more money as a result of the disposal of the inventory of real estate properties and have more liquidity to alieve the fiscal crisis that it faces; inject an ingredient of economic activity into the market by allowing for the private sector to become involved in the purchase of properties of the State for commercial or residential uses and may serve to generate jobs; foster social welfare in the face of the possibility of the properties being able to be purchased by nonprofit entities to provide social services, etc. Ultimately, the possibilities are limitless.

Therefore, it is important to have an adequate paradigm that fosters the disposal of real estate property within a framework of fair competence in which the public welfare and interest are placed as the standard-bearer of each transaction. Therefore, this Law creates the Real Estate Property Assessment and Disposal Committee and empowers it to carry out all of the necessary actions to achieve the disposal of real estate assets. This in balance with the best interests of the State as seller, the buyer, and the citizenry in general. By way of this Law, the general precepts that will guide the approval of regulations and standards that provide for uniform real estate sales processes and lend greater certainty to the transactions are established.


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

23

This measure represents yet another step in the direction of rescuing our People and overcoming the bad decisions of the past. We have an unbreakable commitment to strengthen the component of economic activity. We are sure that with the plan established herein, the necessary mechanisms are provided to strengthen the real estate market and provide more resources to the State in order to face the crisis and comply with the Fiscal Plan. That is our guiding principle and nothing will stop us.

### Government Accounting and Special Funds Act

The financial policy of the Government of Puerto Rico established in Law 230 of July 23, 1974, as amended and known as the "Puerto Rico Government Accounting Act," with regard to the control and accounting of public funds and property requires the accounting of the Government of Puerto Rico to clearly reflect the results of its financial operations, provide the necessary financial information for the administration of government operations, and for the preparation and execution of the budget, and constitute an effective control over the revenue, disbursements, funds, property, and other activities of the government. Likewise, it is established as public policy that no special funds or exclusive sources of repayment for particular purposes may be established without considering the public welfare. This will allow us to carry out government programs examining the essential services, for the allocation of funds for the different programs of the government to be limited to attending to only one financial year; and for all of the revenue of the Government to be entered into the general fund of the state treasury to be used to finance the programs of the Government to the extent and scope in which the Legislative Assembly deems such to be necessary and in accordance with the amounts established in the approved Fiscal Plan. Unfortunately, over the years, a series of measures have been adopted that have overlooked the foregoing and have created multiple special funds for different programs, undermining the mandate of the Accounting Act.

It is the commitment of this Administration to take all of the necessary actions for the Government to be able to attend to its obligations and comply with this public policy. The fiscal situation which we find ourselves experiencing requires us to exercise greater transparency and fiscal responsibility in our expenses, in such a way that we achieve fiscal stability and a balanced budget, all of which will lead us toward our economic recovery.

Within the analysis of the finances of the Government, special allocations have been found for a determined purpose or activity and for which the time period of more than one (1) year has elapsed without making use of them. Allocations have also been found without designation for any determined year, but with annual recurrence without any legal basis. This leads to expenses that are charged against those allocations in future fiscal years, the cash flow of the Department of the Treasury is destabilized, without having control over the time and use that is granted to such


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

24

allocations and, moreover, it is against the public policy established in Law 230, cited above.

In light of the serious fiscal situation faced by the government, it is fundamental to implement a new methodology for the development, preparation, and execution of the government budget, which allows for notably reducing the spending of the State without reducing the amount and quality of the services provided, eliminating inefficient services and inadequate or obsolete programs. In this sense, the Zero-based Budgeting is a budgetary strategy and fiscal policy, the fundamental objective of which is to manage for the government not to be able to spend more than it collects, thus limiting the increase in public debt and guaranteeing the sustainability of short-term and long-term public finances. With the Zero-based Budgeting implemented by this Administration, each department, agency, or instrumentality of the Government of Puerto Rico must document and justify each program that is going to be incorporated and be funded from the Government budget, based on the social and economic benefit and in consideration of the available funds. This mechanism entails annually reviewing all of the programs and expenses of the departments, agencies, or instrumentalities of the Government based on zero without taking into consideration the allocations of previous years. This facilitates the seeking out of new ways of providing more efficient and effective services that allow for an improvement in the quality of the services, the elimination of duplication in the offering of services, and a reduction in expenses.

Likewise, there are countless special funds created by Law for particular purposes. Said funds are unorganized and under the control of the government dependencies to which they were allocated. In this scenario, the Secretary of the Treasury currently has direct access to only 65% of the funds of the Government of Puerto Rico, since the other special funds are in accounts in each executive dependency without going through the fiscal oversight of the Secretary of the Treasury. This lacks clarity, results in poor oversight on the part of the fiscal agencies of the Government to have full control over the Treasury. With this Law, we provide that the special funds be transferred to the General Treasury and not to individual accounts for particular purposes, to thereby have greater control and control on the part of the Secretary of the Treasury and be able to apply the priority of payment that begins with the essential services to our People.

Pursuant to the foregoing, this Legislative Assembly deems it necessary to amend Law 230 of July 23, 1974, as amended, and known as the "Government of Puerto Rico Accounting Act" in order to adjust it to the best fiscal practices that have been developed in the past years in the continental United States and around the rest of the world. To those effects, we find it to be important to clarify the meaning of a special allocation and limit the use of such to the period of one (1) year. Once this fulfills its purpose, or if it were not claimed during its effective period, this allocation shall be returned to the General Fund. This



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

25

way, we manage to continue improving the services of our citizenry and revitalize the economy of Puerto Rico while we comply with the mechanisms of fiscal control required by the Certified Fiscal Plan.

## Government Procurement Reserve Act

In acknowledgement of the fact that the strengthening of our economy and job creation are fundamental objectives of the public policy of the Government of Puerto Rico, different pieces of legislation have been passed aimed at stimulating the development of the local economy. As part of said legislation, is Law 129-2005, which created the Government Procurement Reserve Act, which was adopted as a mechanism in order for the components of the local economy to be able to effectively participate in the government procurement market and to stimulate job creation and local investment. This Law, seeks to preferentially do business in Government purchases with the extremely important sector of small and medium-sized enterprises ("SMEs") helping them to increase their sales as an efficient economic development and job creation strategy.

Nevertheless, in light of the serious fiscal situation faced by the government, we understand it to be fundamental to make adjustments to the development, preparation, and execution of the government budget, that allows for notably reducing the spending of the State without reducing the number and quality of services provided. With this in mind, we have evaluated all of the economic legislation that has an impact on the general budget of the agencies of the Executive Branch, in order to establish the necessary measures to adjust it to our current economic reality.

To such effects, this Legislative Assembly finds it necessary to amend Law 129-2015 in order to adjust it to the fiscal situation experienced by the public finances. To those effects, we must fix the amount of the general budget of the instrumentalities of the Government of Puerto Rico allocated to procurements for purchases from microenterprises, small and medium-sized enterprises at twenty percent (20%), until the fiscal situation of Puerto Rico allows for the increase to be applied. Our intention is to continue contributing to this important sector at the same time that we responsibly deal with our fiscal reality and comply with the goals established in the Fiscal Plan approved by the Board so that we can steer us toward financial recovery.

## Taxes on Cigarettes and Tobacco Products

In light of the need to amass more revenue in order to comply with the Fiscal Plan, protect public employees our most vulnerable sectors, we propose a reconfiguration of the taxes applicable to cigarettes, smokeless tobacco, tobacco products, as well as electronic cigarettes. With this reconfiguration of the


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

26

taxes applicable to these products, the base subject to excise taxes is increased and the current rates are increased to fulfill a dual purpose: in addition to generating funds for managing to balance the budget and comply with the parameters set forth in the Fiscal Plan, we also manage to discourage the consumption of cigarettes and the purchase of tobacco, which, as is known, is detrimental to public health and is linked to the increased incidence of respiratory illnesses and different types of cancer.

One of the most worrisome causes of death among the population is due to tobacco use. However, this cause is highly preventable. The report of the United States Surgeon General regarding the "Consequences of Smoking on Health" confirms that smoking is related to twenty-nine (29) chronic diseases such as: gallbladder, cervical, throat, kidney, larynx, lung, oral, pancreatic, and stomach cancer, leukemia, cardiovascular diseases, among many others. Likewise it is stated that tobacco smoke may cause blood clots, heart attacks, and sudden strokes. Recently more diseases have been found to be caused by the use of cigarettes such as liver and colorectal cancer, diabetes, arthritis, inflammation, and deterioration of the immune response. See Executive Summary of the Report of the United States Surgeon General, The Health Consequences of Smoking—50 Years of Progress, pg. 2 (2014).

In fact, in the period from 2005-2009, tobacco use was the cause of over 480,000 premature deaths per year in people 35 years of age or older in the United States. In turn, more than 87% of lung cancer deaths, 61% of lung disease deaths, and 32% of coronary disease deaths were attributable to tobacco use and exposure to second-hand smoke. *Id.*, pg. 3.

For its part, the Center for Disease Control and Prevention (CDC) points out that in 2016, the greatest cause of death, disabilities, and preventable diseases in the United States is a consequence of tobacco use. Every year, nearly half a million Americans die prematurely due to smoking or being exposed to cigarette smoke, and another 16 million live with serious illnesses caused by smoking cigarettes. Moreover, cigarette smokers must miss work more, visit their doctors more, be hospitalized with greater frequency, and die 10 to 12 years before people who are non-smokers. The foregoing without counting that to treat illnesses related to cigarette use, the United States spends nearly 170 million dollars annually. See https://www.cdc.gov/chronicdisease/resources/publicationsaag/tobacco-use.htm.

The indirect impact of cigarette use is also highly detrimental for health. Specifically, exposure to second-hand smoke has a toxic effect on children. It has been linked to sudden infant death syndrome,



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

27

acute respiratory illnesses, ear infections, and asthma attacks. What is most concerning is that around 25% of people who do not smoke in the United State (approximately 58 million) are exposed to second-hand cigarette smoke, including 15 million children between the ages of 3 and 11 years. *Id.*

According to the CDC, in 2015 in the United States nearly 15.1% of the population over the age of 18 years smoked cigarettes, which is estimated at 36.5 million people. Of these, 16.7% are men and 13.6% women. In Puerto Rico, although the percentage is lower, it still enters double digits. The statistics of the Puerto Rico Department of Health show that in 2015, 10.7% of the general population 18 years of age and older smoke cigarettes regularly. Of these, 15.7% are men and 7.4% are women. It is a significant percentage if we take into consideration the effect that second-hand smoke has. To the foregoing it must be added that the government must incur significant expenses produced by the health consequences that smoking entails.

At present, each pack of cigarettes pays $3.40 in excise taxes, which, for Fiscal Year 2014-2015, translated to a collection of $156 million for said excise tax. However, our government spends $19.16 in health costs and loss of productivity for every pack of cigarettes consumed, which translates to $924 million. That is to say, the Government spends $15.76 more than what it collects, for every pack of cigarettes sold to attend to the consequences that cigarette use causes, which signifies an overall difference of $768 million. As a result, the increase in taxes on tobacco is considered as an extremely cost-effective measure to improve public health and to obtain short-term and long-term fiscal revenue.

On the other hand, the Scientific Advisory Committee on Tobacco Product Regulation of the World Health Organization has stated that smokeless tobacco consumption is an important part of the overall tobacco problem in the world. In its report on smokeless tobacco it states that the following potential harms exists: a) use may encourage individuals to consume said products, in addition to smoking; b) the consumption of smokeless tobacco products increases the possibility of subsequently starting to consume tobacco products for smoking; c) children that have not yet started smoking may begin to consume tobacco through the easy access to smokeless tobacco; d) the possibility of smokeless tobacco producing considerable long-term harm to the health of its consumers such as the  increased risk of developing mouth cancer is not discarded; and e) the risks of creating addiction are considerable given that in their majority they contain harmful components such as nicotine and nitrosamines. Likewise, the United States Surgeon General has determined that the use of "smokeless tobacco" may cause, in addition to mouth cancer, diseases and conditions related to the gums. According to the report entitled The Health Consequences of Using Smokeless Tobacco: A report of the Advisory Committee to the Surgeon General, prolonged use of "smokeless tobacco" results in

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

28

a greater risk of suffering from oral lesions such as leukoplakia both in adolescents as well as in adults.

It is and has been the public policy of the Government of Puerto Rico to take measures to promote the promotion and cessation of tobacco use. One of the modes that foster the prevention and cessation of tobacco use are measures related to the implementation of taxes on tobacco products, whether for smoking or not.

In consonance with the foregoing, this Legislative Assembly understands it to be meritorious that in the fight against nicotine addiction, due to the expenses of medical services to patients for illnesses related to and created by addiction to tobacco products, due to the evident cost and losses in work productivity and in the economy in general and due to the need to generate more revenue for the public coffers in order to comply with the Fiscal Plan and avoid cuts that may affect our most vulnerable sectors, the current excise tax on smokeless tobacco and cigarettes is increased.

<u>Emergency Fund</u>

Law 91 of June 21, 1966, as amended, creates the Emergency Fund, in order to amass the necessary resources to deal with unexpected or unforeseen public needs, caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods, plagues, and in order to protect the lives and property of the people, and public credit.

Among other provisions, Law 91, cited above, establishes that with the resources allocated to the Emergency Fund the expenses of the functioning of the State Agency for the Management of Emergencies and Administration of Disasters may be financed; that the aforementioned Fund shall be capitalized annually by an amount of no less than one-fifth of one percent (0.2%) of the total of the Budgetary Joint Resolution; that the aforesaid contribution shall be of an amount no less than one percent (1%) of the total net revenue of the previous fiscal year; and that the balance of the same shall never exceed one hundred fifty million (150,000,000) dollars, whichever is greater. However, in this past decade it legislation has been repeatedly passed in order for the Emergency Fund not to be funded during determined fiscal years. What started out as a measure of a transitory nature initiated in the Fiscal Year 2006-2007, became a measure that since then has been repeated continuously in the majority of the fiscal years.

This Administration recognizes that, in the face of the serious fiscal situation faced by the government, it is fundamental to implement a new methodology for the development, preparation, and execution of the government budget, which allows for notably reducing the spending of the State without reducing the number and quality of the services provided, eliminating inefficient services and inadequate or obsolete programs.


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

29

In this sense, it is important to establish and maintain a liquid reserve to attend to unexpected or unforeseen public needs, such as those initially described, but considering that the contribution to said Fund must be made in accordance with the fiscal situation. As such, it is established that the contribution to the Emergency Fund for the amount of ten million dollars ($10,000,000) shall remain fixed until Fiscal Year 2020-2021. Moreover, as of Fiscal Year 2020-2021, said contribution shall not be less than zero point five percent (0.5%) of the estimated net revenue submitted by the Department of the Treasury for the preparation of the Recommended Budget paid out of the General Fund.

Pursuant to the foregoing, this Legislative Assembly deems it necessary to amend Law 91 of July 21, 1966, as amended, known as the "Emergency Fund" to achieve a more efficient use of the available funds and guarantee their availability to attend to emergency situations or disasters that affect the Island during this period of years.

<u>The Path to Recovery Has Begun</u>

Although there are many obstacles that we must overcome on the path toward definitive recovery, there is hope and optimism in our people. There is a new dawn in our homeland and we cannot let Puerto Rico down. We must take advantage of this moment to face the challenges, and seek out the great changes that Puerto Rico needs. We must face the crisis like a great challenge that we can translate into great opportunities. That is the challenge that can lead to building a more just, dignified, and progressive society. As such, Law 7-2017 takes the most important step for the economic, social, and political recovery of Puerto Rico by guiding a process of the immediate decolonization of the Island.

Now we set out on a process to transform the Government into one that is more efficient, rehabilitating its finances and regaining lost confidence and credibility. We set out to have a Government that eliminates wasteful spending. A more agile government that you can hold accountable. A government in which every tax dollar is seen in action and services to the People. We now rise up stronger than ever, to live in a society where opportunities are accessible to for every child of this land and where we are all proud to have fulfilled our duty to our homeland.

*LET IT BE DECREED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:*

CHAPTER 1.-INITIAL PROVISIONS

Article 1.01.-Title



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

30

This Law shall be known and may be cited as the "Fiscal Plan Compliance Act."

Article 1.02.-Supremacy of this Law

This Law is passed in its entirety in the exercise of the power of reason of State, as well as in the constitutional power held by the Legislative Assembly, recognized in Article II, Sections 18 and 19 of the Constitution of Puerto Rico, to pass laws in protection of the life, health, and welfare of the people, as well as in cases of serious emergency whenever the public health, safety, or essential government services are in jeopardy, as well as under the protection of Sections 7 and 8 of Article VI of the Constitution of Puerto Rico. Likewise, this Law is passed by virtue of the actions that are required of Puerto Rico as a territory of the United States under the Federal *Puerto Rico Oversight, Management, and Economic Stability Act* (PROMESA) and the Fiscal Plan approved by the Fiscal Oversight Board. For this reason, this Law shall have supremacy over any other law.

As of the date of the passing of this Law, any organic law, general or special law, article or section of a law, guideline, clauses, and/or provisions of collective agreements, agreements, supplementary agreements, administrative orders, policies, employment manuals, circular letters, certifications, regulations, rules, and conditions of employment, normative letters, classification or compensation plans, contractual letters, and/or provisions exclusively applicable to the fringe benefits that the officials or unionized or non-unionized public employees of the Government of Puerto Rico may enjoy, including all unionized or non-unionized employees of the Public Corporations of the Government of Puerto Rico, that goes against the provisions of this Law is hereby annulled. This does not eliminate the right of labor unions to negotiate working conditions, wages, and other non-financial conditions not contained in this legislation in accordance with the current legal system.

Article 1.03.-Termination of Fiscal Measures

The Fiscal Plan Compliance Committee is hereby authorized, upon making a determination that the fiscal situation has been stabilized and that the condition of the treasury allows for such, to increase the benefits in this Law granted and nullify fiscal responsibility measures contained in Chapter 2.

CHAPTER 2.-FRINGE BENEFITS OF THE OFFICIALS AND
PUBLIC EMPLOYEES OF THE GOVERNMENT OF PUERTO RICO

Article 2.01.-Applicability

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

31

All of the provisions contained in this Law shall be applicable to the Entities of the Executive Branch of the Government of Puerto Rico, except when any particular provision expressly excludes an entity. For the purposes of this Law, it shall be understood that the term "Entity of the Executive Branch" includes all of its agencies, as well as the instrumentalities and public corporations of the Government of Puerto Rico, regardless of the degree of fiscal or budgetary autonomy that their organic law or other applicable legislation otherwise grants them. The University of Puerto Rico shall be exempt from the application of this Law.

Article 2.02.-Municipalities

The municipalities shall be exempt from the application of this Chapter. Nevertheless, the remain empowered to benefit from its provisions by way of the prior passing of a Municipal Ordinance to those effects.

Article 2.03.-Statement of Public Policy

The Statement of Public Policy of Law 3-2017, known as the "Law to Attend to the Economic, Fiscal, and Budgetary Crisis to Guarantee the Functioning of the Government of Puerto Rico," is reaffirmed, in which it is established that fiscal responsibility is the key to Puerto Rico regaining its credibility before investors and the financial markets, reestablishing its credit, and returning to the path of responsible management of its debt and finances, achieving an efficient restructuring of the same.

The discipline, control, and reduction of spending in the agencies, instrumentalities, departments, and public corporations of the Government of Puerto Rico are hereby established as the public policy of the Government of Puerto Rico.

The Government of Puerto Rico recognizes the disparity that exists between the fringe benefits that employees of the Central Government receive and those that work in the public corporations. In order to maintain public jobs without terminations, it is necessary to make adjustments in fringe benefit expenses, while Puerto Rico finds itself immersed in the financial crisis that plagues it. To such effects, by way of this Law the equality and uniformity of the fringe benefits that all public officials and employees may enjoy is promoted. All of the agencies and instrumentalities comprised by the Government of Puerto Rico have the responsibility to ensure that the enjoyment of fringe benefits responds to the legislative interest that justified their concession and that a proper balance between the needs of employees and the optimal use of available funds is carried out, in attending to the historic moment in which we find ourselves.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

32

The public policy adopted by this Law guarantees the continuity of public management in essential areas of healthcare, safety, education, social work, and development, among others, as well as the provision of necessary and essential services for the citizenry and protects the employment of thousands of public officials and employees of the Government of Puerto Rico, while protecting the most vulnerable citizens. For this reason, and in compliance with the Fiscal Plan approved pursuant to the Federal PROMESA Act [sic], the fringe benefits of public employees are standardized in order to achieve greater savings.

In order to attain the achievement of the objectives of this Law and do so in the least onerous way for our public employees, it is established that the provisions of Articles 2.04, 2.05, 2.08 to 2.11, and 2.18 shall be for a temporary period of time and their effectiveness shall cease during the next fiscal year after the Government of Puerto Rico has achieved a balanced budget and overcome the economic crisis. It is our understanding that this consideration creates a fair balance between the objectives of complying with the certified Fiscal Plan and the interest of preserving the social justice that enshrines the protection of benefits that our workers in the public sector receive.

For the purposes of this Law, the Fiscal Plan Compliance Committee shall be composed by one representative named by the Governor, one representative named by the Speaker of the House of Representatives, and one representative named by the President of the Senate of Puerto Rico. Said Committee shall establish its rules and internal functioning by way of a set of regulations.

Article 2.04.-Fringe Benefits

The Government of Puerto Rico is responsible for ensuring the enjoyment of the fringe benefits that are granted to employees and that they may be enjoyed in accordance with a plan that maintains a proper balance between the service needs, the needs of employees, and the responsible use of available funds. In order to maintain a uniform, responsible, reasonable, fair, and just administration of human resources, the fringe benefits that the public officials or employees, unionized or non-unionized, of the Government of Puerto Rico, including the public corporations, are established below, subject to that provided in Article 2.03 of this Law.

The fringe benefits of the employees of the Executive Branch shall be the following:

1.   Vacation Leave

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

33

a.  As of the effectiveness of this Law, all public employees shall be entitled to accumulate vacation leave, at a rate of one and one-fourth (1 1/4) days for every month of service. Due to being excluded from the Single Employer system created pursuant to Law 8-2017, this provision shall not be applicable to educational employees and school principals, with the exception of the managerial and administrative personnel of the Department of Education, the educational employees of any educational entity of the Government of Puerto Rico and the law enforcement officers of the Puerto Rico Police Department, who shall continue to accumulate the vacation leave that they enjoyed prior to the passing of this Law.

b.  Vacation leave shall begin to accumulate once the employee has completed three (3) months on the job and shall be retroactive to the employment start date. Regular employees with reduced hours or regular part-time employees shall accumulate vacation leave in a manner proportionate to the number of hours for which they regularly provide service.

c.  Vacation leave may accumulate up to a maximum of sixty (60) workdays at the end of any natural year.

d.  Vacation leave is granted to employees to provide them with a reasonable annual period of rest. As a general standard, it must be enjoyed during the natural year in which it was accumulated. Each public agency or instrumentality is obligated to formulate a vacation plan, for each natural year, in coordination with the supervisors and employees, that establishes the period in which each employee shall enjoy their vacation time, in the manner most compatible with the service needs. Said plan must be established no later than December 31 of each year so that it may go into effect on January first of each following year. It shall be the responsibility of the agencies, public instrumentalities, and all employees to strictly comply with the aforesaid plan. Exceptions may only be made due to clear and unpostponable, duly certified, service needs.

e.  The agency or public instrumentality is obligated to formulate and manage, diligently and in strict compliance with that established in this Law, the vacation plan so that the employees do not lose vacation time at

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

34

the end of the natural year and enjoy their regular vacation leave.

f.   All employees shall be entitled to enjoy their vacation leave for a period of fifteen (15) workdays during each natural year, of which no less than ten (10) days must be enjoyed in a consecutive manner.

g.   Employees that are unable to enjoy their vacation leave during the determined natural year due to service needs, evidenced in writing and at the request of the agency or public instrumentality, are exempted from the provisions of subsection (e) of this Article. In this case, the agency or public instrumentality is obligated to make the necessary adjustments for the employee to enjoy at least the excess of accumulated leave over the limit of sixty (60) days, on the nearest possible date, within the term of the first three (3) months of the following natural year.

h.   The agency or public instrumentality is obligated to provide for the enjoyment of the accumulated vacation leave, prior to the processing of any severance that constitutes a total and absolute disassociation from service and the processing of a transfer to provide services in another agency or public instrumentality.

i.   Normally, vacation leave shall not be granted for a period greater than fifteen (15) workdays for each natural year. Nevertheless, the agency or public instrumentality may grant vacation leave in excess of fifteen (15) workdays, up to a maximum of fifty (50) days, in any natural year, to those employees who have accumulated leave. When granting said leave, the service needs and other factors such as the following shall be taken into consideration:

   1   the use of said leave for personal improvement activities of the employee, such as trips, studies, etc.;

   2   prolonged illness of the employee after having exhausted the balance for sick leave;

   3   personal problems of the employee that require their personal attention;

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

35

4   if a cancellation of the enjoyment of leave has existed due to service needs and at the request of the agency;

5   total accumulated leave that the employee has.

j.   Due to special circumstances, vacation leave can be given in advance to regular employees who have provided services to the Government of Puerto Rico for more than one (1) year, when it is certain that the employee will work back the service. Vacation leave given in advance this way shall in any case require the prior approval in writing of the Nominating Authority. All employees who have been given advance vacation leave and are separated from service, voluntarily or involuntarily, before providing services for the necessary period required to accumulate the entirety of the leave that was given in advance, they shall be required to reimburse the Government of Puerto Rico for any amount of money that has been paid to them for such advance leave.

k.   In the event that an employee is granted leave without pay, it shall not be necessary for them to use the vacation leave that they have accumulated before beginning to use the unpaid leave.

l.   When the enjoyment of accumulated or advance vacation leave is authorized for an employee, the advance payment of the wages corresponding to the period of leave may be authorized, as long as the employee requests such sufficiently in advance. Such authorization must be made immediately after the approval of the leave.

m.   One or more public employees may assign, exceptionally, another public employee that works in the same government entity accumulated vacation days, up to a maximum of five (5) days, as provided in Law 44-1996, as amended, known as the "Vacation Leave Assignment Act," when:

1   The employee assignee has worked continuously, at minimum one (1) year, with any government entity;

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

36

2    The employee assignee has not engaged in a pattern of unjustified absences, breaking the rules of the government entity;

3    The employee assignee has exhausted the entirety of the leaves of absence to which they are entitled, as a consequence of an emergency;

4    The employee assignee or their representative provides reliable evidence of the emergency and need to be absent for days in excess of the already exhausted leaves of absence;

5    The assigning employee has accumulated a minimum of fifteen (15) days of vacation leave in excess of the number days of leave to be assigned;

6    The assigning employee has submitted an authorization in writing to the government entity where they work agreeing to the assignment, specifying the name of the assignee;

7    The employee assignee or their representative accepts the proposed assignment in writing.

2.  Sick Leave

    a.  All employees who have been hired by the Government of Puerto Rico prior to Law 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," entered into effect shall be entitled to accumulating sick leave at the rate of one (1) day for every month of service.

    b.  All employees that have been hired by the Government of Puerto Rico after Law 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," entered into effect shall be entitled to accumulating sick leave at the rate of one (1) day for every month of service.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

37

c.  Regular employees with reduced hours or regular part-time employees shall accumulate sick leave in proportion to the number of hours that they regularly provide service.

d.  Sick leave shall be used when the employee is sick, disabled, or exposed to a contagious illness that requires their absence from work for the protection of their own health and that of other individuals.

e.  All employees may dispose of up to a maximum of five (5) days per year of the accumulated sick days, as long as they maintain a minimum balance of twelve (12) days, to request a special leave of absence in order to use such on:

1  Caring for and attending to their children due to illness.

2  Illness or affairs of elderly or disabled individuals within the family unit, to be understood as fourth degree of blood relation, second by marriage, or individuals that live under the same roof or individuals of whom custody or legal guardianship is held.

a)  "Elderly individual" shall mean any person who is sixty (60) years of age or older;

b)  "Disabled individuals" shall mean any person who has a physical, mental, or sensorial disability that substantially limits one or more essential activities of their life.

3  First appearance of any petitioner, victim, or complainant in administrative and/or judicial proceedings before any Department, Agency, Corporation, or Public Instrumentality of the Government of Puerto Rico, in cases of child support requests, domestic violence, sexual harassment in the workplace, or gender discrimination. The employee shall present evidence issued by the competent authority attesting to such appearance.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

38

f.   Sick leave may be accumulated up to a maximum of ninety (90) workdays at the end of any natural year. Sick leave shall begin to accumulate once the employee has completed three (3) months of employment and shall be retroactive to the employment start date.

g.   The agency or public instrumentality is obligated to make all of the necessary adjustments, diligently and in strict compliance with that established in this Law, in order for the employee to be able to make use of the entirety of the sick leave that they have accumulated during any natural year at the time at which they need it. The employee may make use of the entirety of the sick leave that they have accumulated during any natural year.

h.   When an employee is absent from work due to illness for more than three (3) days, a medical certificate may be required of them, attesting:

1   that they were truly sick, exposed to a contagious illness, or prevented from working during the period of absence;

2   regarding the illness of their children;

3   regarding the illness of elderly or disabled individuals within the family unit, to be understood as fourth degree of blood relation, second by marriage, or individuals that live under the same roof or individuals of whom custody or legal guardianship is held.

In addition to the medical certificate, the employee's inability to go to work due to reasons of illness may be corroborated by any other appropriate means. The foregoing shall not apply or be interpreted in such a way that undermines ADA or the "Family and Medical Leave Act of 1993" (FMLA).

i.   In cases of illness in which the employee does not have any accumulated sick leave, up to a maximum of eighteen (18) workdays may be granted in advance to any regular employee who has provided services to the Government of Puerto Rico for a period of no less than one (1) year, when there is reasonable certainty that they will work back the service. Any employee to whom

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

39

advance sick leave has been granted and is separated from service, voluntarily or involuntarily, before providing services for the necessary period required to accumulate the entirety of the leave that was given in advance shall be required to reimburse the Government of Puerto Rico for any unsettled amount of money that has been paid to them for such advance leave.

j.  In cases of prolonged illness, once the sick leave has been exhausted, employees may make use of the entire vacation leave that they have accumulated, upon authorization of the immediate supervisor. If the employee were to exhaust both leaves of absence and remains ill, they may be granted unpaid leave.

3.  Maternity Leave

a.  Maternity leave shall comprise a prenatal and post-partum rest period to which all pregnant female employees are entitled. It shall equally comprise the period to which a female employee is entitled to adopt a minor, pursuant to the applicable legislation.

b.  All female employees in a state of pregnancy shall be entitled to a rest period of four (4) weeks prior to the delivery and four (4) weeks after. With the provision that the employee may enjoy four (4) additional weeks for the attention and care of the minor.

Delivery shall signify the act through which the conceived child is expelled from the mother's body naturally, or legally extracted from the body through obstetric surgical procedures. It shall also comprise any premature birth, stillbirth, or miscarriage, including this latter case, those legally induced by medical doctors, that the mother suffers at any time during the pregnancy.

c.  The employee may opt to take up to only one (1) week of prenatal rest and extend up to seven (7) weeks of post-partum rest to which she is entitled or up to eleven (11) weeks, should the additional four (4) weeks for the caring for and attending to the minor be included. In these cases, the employee must submit a medical certificate to the agency attesting that her

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

40

condition allows her to provide services up until one week before the delivery.

d.   During the maternity leave period, the employee shall earn her full wages.

e.   In the case of an employee with transitory status, the maternity leave shall not exceed the appointment period.

f.   Should the delivery take place before the four (4) weeks of the employee having begun to enjoy her prenatal rest period have elapsed, or without having begun to enjoy it, the employee may opt to extend the post-partum rest for a period of time equivalent to that which she ceased to enjoy for prenatal rest.

g.   When the due date is misestimated and the woman has enjoyed the four (4) weeks of prenatal rest, without having given birth, she shall be entitled to extend the prenatal rest period, with full pay, until she goes into labor. In this case, the employee shall retain the right to enjoy the four weeks of post-partum rest from the date of the delivery and the four (4) additional weeks to care for and attend to the minor.

h.   In cases of premature birth, the employee shall be entitled to enjoy the eight (8) weeks of maternity leave from the date of the premature birth and the four (4) additional weeks to care for and attend to the minor.

i.   Any employee who suffers a miscarriage may claim up to a maximum of four (4) weeks of maternity leave. However, in order to receive such benefits, the miscarriage must be of such a nature that it produces the same physiological effects that regularly arise as a consequence of childbirth, according to the opinion and certification of the doctor that attends to her during the miscarriage.

j.   In the event that the employee experiences any complication after childbirth (post-partum) that prevents her from returning to work upon ending the enjoyment of the post-partum rest period and the four (4) additional weeks to care for and attend to the minor, the agency must grant her sick leave.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

41

In these cases, medical certification indicating the condition of the employee and the time that said condition is estimated to last shall be required. Should she not have any accumulated sick leave, she shall be granted vacation leave. In the event that she does not have any accumulated sick leave or vacation time, she may be granted unpaid leave for the term recommended by her doctor.

k. Any employee who adopts a preschool age minor, understood to be a minor five (5) years or younger, that is not enrolled in an educational institution, pursuant to the legislation and current legal procedures in Puerto Rico or any jurisdiction of the United States, shall be entitled to the same maternity leave benefits with full pay as enjoyed by employees that give birth. In the event that she adopts a minor aged six (6) years or older, she shall be entitled to maternity leave with full pay for a period of fifteen (15) days. This leave shall begin to be counted as of the date on which the minor is received in the family unit, which must be attested to in writing.

l. Maternity leave shall not be granted to employees that are enjoying any other type of leave of absence, with or without pay. Excluded from this provision are female employees who have been authorized for vacation leave or sick leave and female employees that are on unpaid leave due to complications prior to the delivery.

m. Pregnant employees or female employees adopting a minor have the obligation to notify the agency in advance of their plans for the enjoyment of their maternity leave and their plans to return to work.

n. The agency may authorize the advance payment of the wages corresponding to the maternity leave period, as long as the employee requests such correspondingly in advance. Should the employee return to work prior to the expiration of the post-partum rest period, she shall be obligated to reimburse the balance corresponding to the unenjoyed maternity leave.

o. In the event of the death of the newborn before the end of the maternity leave period, the employee shall be entitled to claim

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

42

exclusively that part of the post-partum period that completes the eight (8) weeks of unused maternity leave. With the provision that the benefit of the four (4) additional weeks to care for and attend to the minor shall cease on the date on which the death of the child occurs. In these cases, the employee may benefit from any other leave of absence to which she is entitled.

p.  The employee may request to return to work prior to the expiration of the post-partum rest period, as long as she presents medical certification to the agency attesting that her condition allows her to perform her duties. In this case, it shall be understood that the employee foregoes the corresponding unenjoyed maternity leave balance to which she would be entitled.

4.  Paternity Leave

a.  Paternity leave shall comprise the period of fifteen (15) workdays as of the date of the child's birth.

b.  When claiming this right, the employee shall certify that he is legally married or cohabitates with the child's mother and that he has not engaged in domestic violence. Said certification shall be performed by way of the filing of the form required by the agency for such purposes, which shall also contain the child's mother's signature.

c.  The employee shall request paternity leave and as soon as possible shall submit the birth certificate.

d.  During the paternity leave period, the employee shall earn his full wages.

e.  In the case of an employee with transitory status, the paternity leave shall not exceed the appointment period.

f.  Paternity leave shall not be granted to employees who are enjoying any other type of leave of absence, with or without pay. Employees who have been authorized for vacation leave or sick leave shall be exempted from this provision.

g.  Any employee who, along with his spouse or person with whom he lives, adopts a minor, pursuant to the current legislation and legal procedures in Puerto Rico or any

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

43

jurisdiction of the United States, shall be entitled to a paternity leave that shall comprise the period of fifteen (15) days, counted from the date on which the minor is received in the family unit, which must be accredited in writing. When claiming this right, the employee shall certify that he is legally married, in applicable cases, and that he has not engaged in domestic violence, any sex crime, or child abuse. Said certification shall be made by presenting the form required by the agency for such purposes, which shall also contain the signature of his spouse.

Any employee who individually adopts a pre-school age minor, understood as a minor of 5 years of age or younger, pursuant to the current legislation and legal procedures in Puerto Rico or any jurisdiction of the United States, shall be entitled to a paternity leave that shall comprise the period of eight (8) days, counted from the date on which the minor is received in the family unit, which shall be accredited in writing. In the event that he adopts a minor aged 6 years or older, he shall be entitled to fully paid paternity leave for a term of fifteen (15) days.

When claiming this right, the employee shall certify that he has not engaged in domestic violence, or any crime of a sexual nature, or child abuse.

Items (d), (e), and (f) of this subsection shall be equally applied in cases in which the employee requests the benefits of leave of absence established in the foregoing paragraphs.

h.  The employee may request to return to work prior to the expiration of the paternity leave period to which he is entitled. In this case, it shall be understood that the employee foregoes the corresponding unenjoyed paternity leave balance to which he would be entitled.

5.  Special Paid Breastfeeding Leave

a.  Time for lactating mothers shall be granted to them so that after their maternity leave they have the opportunity to breastfeed their children, for one (1) hour within each full-time work day, which may be distributed into two periods



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case:17-03283-LTS   Doc#:278-2   Filed:06/08/17   Entered:06/08/17 16:02:40   Desc:
Exhibit B: Certified Translation of Fiscal Plan Compliance Act   Page 43 of 89

CERTIFIED TRANSLATION

of thirty (30) minutes each or into three (3) periods of twenty (20) minutes each, to go to the place where the child is to breastfeed him or her, in those cases in which the company or the employer has a daycare center at their facilities or to pump breastmilk in the place reserved for such in the workplace. Said locations must guarantee the lactating mother's privacy, safety, and hygiene. The location must have electrical outlets and ventilation. If the employee is working a part-time workday and the daily workday exceeds four (4) hours, the period granted shall be thirty (30) minutes for every four-hour (4) period of consecutive work.

b.  Within the workplace, the breastfeeding period shall have a maximum duration of twelve (12) months, counted from the date on which the employee returns to work.

c.  Employees who wish to make use of this benefit must present medical certification to the employer, during the period corresponding to the fourth (4th) and eighth (8th) month of age of the infant, in which it is accredited and certified that she is breastfeeding her baby. Said certification must be presented no later than five (5) days prior to each period. With the provision that the employer shall designate an area of physical space that guarantees the lactating mother's privacy, safety, and hygiene, without such entailing the creation or construction of physical or organizational structures, subject to the availability of resources of the government entities. The agencies, instrumentalities, departments, and public corporations of the Government of Puerto Rico must establish a set of regulations regarding the operation of these spaces for breastfeeding.

6.  Unpaid Leave

a.  In the event that the cause for which the leave was granted ceases to exist, the employee shall return to work immediately or notify the agency or public instrumentality of the reasons for which they are not available, or their decision not to return to the position that they held.

b.  In addition to the unpaid leaves of absence that may be granted by each agency or public instrumentality by way of regulations, the following may be granted:

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

45

1   To career-track employees with regular status, to provide services at other agencies of the Government of Puerto Rico or a private entity.

2   To career-track employees with regular status, to protect the status or rights that they merit in cases of:

    a)  A disability claim with the Government of Puerto Rico Retirement System or another entity, and the employee has exhausted their sick leave and vacation leave.

    b)  The employee having suffered a workplace accident and undergoing medical treatment with the State Insurance Fund Corporation or pending any final determination with regard to their accident, and they have exhausted their sick leave and vacation leave.

3   To employees that request such after the birth of a child. With the provision that that type of unpaid leave shall be granted for a period of time that shall not exceed six (6) months, as of the date on which such is authorized.

4   To employees with regular status that go on to provide services as patronage employees in the Office of the Governor or the Legislative Assembly, while they are providing said services.

5   To employees with regular status that have been elected in the general elections or are selected to cover vacancies of an elected public office in the Executive or Legislative Branch, including the offices of Resident Commissioner in the United States and Mayor, which they are providing said services.

7.  Special Leaves of Absence

Public officials or employees, unionized or non-unionized, shall be granted the following special leaves of absence for justified reasons, with or without pay, as the case may be. With the provision that said leaves of absence shall be governed by the special laws that grant them.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

46

a.  leave of absence to serve as a witness – All employers are prohibited from being able to deduct the days and hours that an employee duly summoned by the District Attorney or by a court spends to appear as a witness in a criminal case from their wages or vacation or sick leave.

b.  leave of absence for jury duty – All employees that are summoned to appear as a jury member shall be entitled to enjoy a paid leave of absence and receive compensation from their employer for meals and mileage, pursuant to the regulations established by each agency, instrumentality, or public corporation, as if it were a matter of official business for such employee or official.

c.  legal purposes – Any employee officially summoned to appear before any Court of Justice, District Attorney, administrative or government body, or government agencies, shall be entitled to enjoy paid leave of absence for the time that they are absent from work for such summons.

d.  leave of absence to donate blood – A paid leave of absence is granted for a period of four (4) hours per year to go to donate blood, to all employees of the Government of Puerto Rico, its instrumentalities, and public corporations.

e.  leave of absence to attend the school of their children – All employees of the Government of Puerto Rico, its instrumentalities, and public corporations shall be entitled to four (4) work hours, without deductions from their wages or their leave balances, during the beginning of each school semester and four (4) work hours at the end of each school semester to go to the educational institutions where their children are enrolled in studies and learn of their academic performance. Notwithstanding the foregoing, any employee whose children are registered in the Special Education Program of the Department of Education shall have up to ten (10) hours per semester to be able to go and perform procedures related to their children.

f.  unpaid sporting leave – An unpaid sporting leave is granted to any public employee that is duly selected and certified by the Puerto Rican Full-time High-performance Athlete Development Board as an athlete in training an coach for the Olympic, Paralympic, Pan-American, and Central American games and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

47

Regional or World Championships. This leave of absence shall have a duration of up to one (1) year with the right to renewal as long as the employee has the approval of the Board and it is notified to the employer on or before thirty (30) days before its expiration. By way of this leave of absence, eligible athletes and coaches may be absent from their jobs without loss of time and guaranteeing them employment without affecting their benefits or rights acquired during the period in which they were participating in said training sessions and/or competitions.

During the period of the leave of absence, the Board shall be responsible for the wages of the participants. Therefore, it shall be obligated to send the employer that amount corresponding to the legal deductions that until that time were being withheld from the employee so that the employer may continue covering the payments corresponding to said contributions.

g. special sporting leave – A special leave of absence is established for any public employee that is duly certified by the Puerto Rico Olympic Committee as an athlete to represent Puerto Rico in the Olympic Games, Paralympic Games, Pan-American Games, Central American Games or in regional or world championships. The special sporting leave shall have an accumulative duration of no greater than thirty (30) workdays per natural year.

h. leave of absence to renew driver's license – All employees may use up to two (2) hours from their workday, without any charge to leave time and with pay, to renew their driver's license, as long as holding it is essential to their work due to its nature.

i. voluntary emergency services leave – Any employee who is a certified disaster relief service volunteer of the American Red Cross may be absent from work with a paid leave of absence for a period that shall not exceed thirty (30) calendar days in a period of twelve (12) months to participated in specialized disaster relief services of the American Red Cross.

The Leave of absence shall be granted as long as the official's services are requested by the American Red Cross and upon approval by the agency, instrumentality, or public

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

48

corporation where the official works. The American Red Cross shall issue a certification of the services rendered to the employee and the time of the duration of said provision of services. The employee shall present said certification to the agency, instrumentality, or public corporation where they work.

j.  military leave – Any employee who belongs to the Puerto Rico National Guard or the Organized Reserves of the United States Armed Forces shall be entitled to be granted up to a maximum of thirty (30) days of paid leave every year when they are performing military service, as part of training or to attend the camps and exercises that are required of them.

k.  leave of absence to vaccinate children – Up to a maximum of two (2) hours is granted to every employee that requests such  to vaccinate their child(ren) at a government or private institution, every time that the vaccination of their child is necessary. The employee must present a certification of the location, date, and time at which their child(ren) were vaccinated, in order to justify the time used, as is established for this type of leave. Otherwise, the time used shall be charged to compensatory time, vacation leave, or shall be deducted from their wages.

l.  None of that provided in this Law shall affect the rights of the *Federal* [sic] *and Medical Leave Act* [FMLA] of the public employees that by federal law are currently protected by its provisions.

Article 2.05.-Holidays.

All public officials or employees of the Government of Puerto Rico shall be entitled only to the holidays declared as such by the Governor of Puerto Rico or by Law. The days that are listed below shall be the holidays that all public employees shall enjoy:

1.  New Year's Day, which shall be celebrated on January 1.

2.  Three King's Day, which shall be celebrated on January 6.

3.  Martin Luther King, Jr. Day, which shall be celebrated on the third Monday of January.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

49

4. George Washington Day, Presidents' Day, and Puerto Rican Forefathers' Day: Eugenio María de Hostos, José de Diego, Luis Muñoz Rivera, José Celso Barbosa, Ramón Emeterio Betances, Román Baldorioty de Castro, Luis Muñoz Marín, Ernesto Ramos Antonini, and Luis A. Ferré, which shall be celebrated on the third Monday of February.

5. American Citizenship Day, which shall be celebrated on March 2.

6. Abolition of Slavery Day, which shall be celebrated on March 22.

7. Good Friday, the celebration of which shall be on varying dates.

8. Memorial Day, which shall be celebrated on the last Monday in May.

9. United States Independence Day, which shall be celebrated on July 4.

10. Labor Day, which shall be celebrated on the first Monday of September.

11. La Raza Day (Discovery of America), which shall be celebrated on the second Monday in October.

12. Veterans' Day, which shall be celebrated on November 11.

13. Puerto Rican Culture and Discovery of Puerto Rico Day, which shall be celebrated on November 19.

14. Thanksgiving Day, which shall be celebrated on the fourth Thursday of November.

15. Christmas Day, which shall be celebrated on December 25.

Article 2.06.-Daycare Centers:

All officials or employees of the Government of Puerto Rico, its instrumentalities, and public corporations where areas exist that are duly habilitated to operate as Daycare Centers and/or to be used to care for pre-school age children, shall be entitled to the use of such. The users of the service shall financially contribute to the better functioning of the Center; with the provision that each agency, instrumentality, or public corporation shall determine what the reasonable payment for using such facilities and services shall be.


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

50

Article 2.07.-Uniform Employer Contribution to the Health Insurance Plan for Employees of Public Corporations:

The Executive and Legislative Branches shall identify savings and additional resources to avoid affecting the contributions of the employees for the payment of health insurance plans. If unable to achieve the savings projected in the Fiscal Plan, the difference shall be achieved through a program to match the contributions of the Government to the health insurance plan. Only then, as of July 1, 2018, all public officials or employees, unionized or non-unionized, that work for any Public Corporation, excluding the University of Puerto Rico, shall be entitled to an employer contribution that shall be determined by the Fiscal Plan Compliance Committee using as a basis the metrics established in the Fiscal Plan, but which shall never be less than the minimum employer contribution of one hundred dollars ($100) established by Law for the employees of the Central Government. AAFAF may negotiate and reach agreements on more affordable insurance coverages with private insurers or under public coverage for the selection of the employee in the Government as Single Employer or by agency or groups of agencies. Any reduction to the employer contribution to the health insurance plan shall require AAFAF to offer a more affordable health insurance plan coverage for those public employees. Nevertheless, any public corporation employee or dependent that is currently enrolled in the health insurance plan and suffers from a preexisting catastrophic, chronic, or terminal illness shall maintain the current employer contribution for their health insurance in an unaltered manner, during the entire time that they remain in public service.

Article 2.08.-Bonuses.

As of the entering into effect of this Law, the only financial bonus that shall be granted to the public employees of the Central Government and its public corporations shall be for the Christmas bonus. The amount that the employees shall be entitled to receive shall be six hundred dollars ($600.00) each year in which they have provided services to the Government of Puerto Rico for a period of at least six (6) months.

Article 2.09.-Compensation for Work in Excess of the Regular Workday:

1. The work schedule of each agency or public instrumentality shall be formulated in such a way that the need to work over the regular workday established at each agency or public instrumentality for employees shall be reduced to a minimum. Nevertheless, due to the special nature of the services to be provided, the need for services to protect and preserve the life and property of the citizens, due to any emergency situation, due to events of force majeure, weather disturbances, unforeseen situations, or necessary maintenance to ensure continuity of an essential service, employees may be required



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

51

to provide services in excess of their daily or weekly work schedule, or on any day on which services are suspended without deducting from leave by the Governor. In these cases, there must be a prior authorization by the employee's supervisor or by that official delegated by said supervisor. Supervisors must take measures so that whenever an employee remains working it is always by virtue of an express authorization.

2. Employees shall be entitled to receive compensatory time, at a rate of time and a half, for the services provided in excess of their regular daily or weekly schedule, meal time, and for services provided on holidays, on days of rest, or on the days on which services are suspended by the Governor without deductions from leave. The compensatory time must be enjoyed by the employee within a period of six (6) months from the date on which they have performed the extra work. If due to service needs this is not possible, they may accumulate the compensatory time up to a maximum of two hundred forty (240) hours. In the cases of employees that perform public safety activities, emergency response activities, or seasonal activities, as these terms are defined in the federal "Fair Labor Standards Act," except for that provided in Article 10 of Law 53-1996 and Article 2.09 of Law 20-2017, up to four hundred eighty (480) hours may be accumulated. Overtime compensation in compensatory time is not applicable for hours that the employee accumulates in excess of said limits. Nevertheless, in the case of the police, as provided in Article 2.09 of Law 20-2017, they may be paid time and a half and shall have the option of selecting the payment of these hours without have to accumulate such as compensatory time and said payment for overtime shall not be included in the gross income and shall not be taxable. This shall not apply to the public corporations, which shall have the right to the payment of overtime hours at a rate of time and a half from the first accumulated hour at the time established in this Law, unless the applicable collective agreement provides for the accumulation of compensatory time.

3. Any employee that performs duties of an administrative, executive, or professional nature is excluded from the provisions of the preceding subsection (2), pursuant to the definitions of these terms in the federal "Fair Labor Standards Act."

   Article 2.10.-Liquidation of Excess Vacation and Sick Days:

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

52

Each agency, instrumentality, or public corporation must recognize the balances of every public employee, unionized or non-unionized, for vacation and sick leave that have been accumulated as of the effective date of this Law but may not liquidate the excesses accumulated in cash before the this Law takes effect.

The agencies or public instrumentalities are obligated to immediately establish a plan to use up the excess of the balances accumulated by the employees, both unionized as well as non-unionized, in such a manner that as of December 31, 2017, there are no accumulations in excess of that permitted for sick leave or vacation; with the further provision that after that date, any unused excess balance shall be lost.

As of the effective date of this Law, no public employee, unionized or non-unionized, that works for the Government of Puerto Rico in any of its agencies, instrumentalities, or public corporations shall be entitled to the payment of liquidation of excess vacation or sick days.

Article 2.11.-Final Liquidation of Accumulated Vacation Leave in the Event of the Employees Severance from Public Service:

As of the effective date of this Law, any public employee, unionized or non-unionized, shall only be entitled to the payment of a final liquidation of the days that they have available to them for vacation leave at the time of the cessation of services, which may never be greater than sixty (60) days. The employee may authorize for said balance and/or excess preexisting the passing of this Law to their account in the Retirement System so that it appears as time worked.

Article 2.11(a).-Article 3 of Law 125 of June 10, 1967 is Amended to read as follows:

"The Governor shall regulate all of that which pertains to the granting and enjoyment of leaves of absence and the amount of the payment of final compensation, including the payment of the beneficiaries in the event of death, to the officials appointed by him, with exception to the members of the Judiciary, district attorneys, and property registrars. To the effects of the payment of final compensation, which in no case may exceed the equivalent of two (2) months of wages, the Governor shall take into consideration, among others, factors such as the service needs, time during which the office was held, and fiscal situation of the agency or government entity, the nature of the duties performed, and the vacation leave credits accumulated at past positions in the Government and unenjoyed upon going on to hold the offices appointed by the Governor. Those individuals that have received payment for a final compensation, pursuant to the provisions of this Law, shall be obligated to return the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

53

amount received if, due to acts that took place during the performance of their public duty, they are convicted of the crimes of illegal misappropriation, embezzlement, or theft of public funds; crimes against the public treasury or public duty, as classified in the Puerto Rico Penal Code.

..."

Article 2.12.-Section 4.3 of Article 4 of Law 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is amended to read as follows:

"Section 4.3.-Duties and Powers of the Office of the Director

In addition to the duties and powers that are granted in other provisions of this Law, the Office of the Director shall have the following:

1. ...
2. Duties and Powers of the Office:

    a. Centralize those functions of the Government of Puerto Rico Human Resources Administration and Transformation System that are compatible with that which is ordered in this Law.

    b. ...

    c. ...

    d. ...

    e. Advise in the labor area of the agencies of the Executive Branch, with regard to all of that which pertains to the election and certification procedures of union organizations, with regard to the negotiation and management of collective agreements and in all those areas related to labor affairs provided by Law 45-1998 of the agencies. In the performance of the advisory duties with regard to collective bargaining pursuant to Law 45-1998, the Office shall coordinate and supervise the creation and functioning of a Bargaining Committee composed of its personnel and that designated by the Office of Management and Budget. The Office shall conduct comparative studies of collective agreements and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

54

shall provide training sessions in the area of labor to those agencies that request such.

f.   ...

g.   ...

h.   ...

i.   ...

j.   ...

k.   ...

l.   ...

m.   Manage and update the Central Registry of Calls for Recruitment, Promotion, and Training in Public Service. Likewise, an online registry shall be maintained; with the provision that the agencies, public instrumentalities, as well as the public corporations, with the exception of the Office of the Governor itself, the Municipalities, the Supreme Court, the Offices of the Chief Justice and the Court Administrator, the Legislative Houses, and the Municipal Legislatures, must comply with the obligation to send monthly to the Government of Puerto Rico Human Resources Administration and Transformation Office all job and promotion opportunities. The office shall send out candidates for interviews from the list that said Office shall maintain. All requests for training shall be referred to the Government of Puerto Rico Human Resources Administration and Transformation Office, at least thirty (30) days prior to the date of the training. The Office shall evaluate the need and convenience of the training and shall proceed to either approve or deny it.

n.   ...

o.   ...



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

55

      p.  ...

      q.  ...

      r.  ...

      s.  ...

      t.  ...

...”

Article 2.13.-Section 5.2 of Article 5 of Law 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is amended to read as follows:

"Article 5.-Government of Puerto Rico Human Resources Administration and Transformation System

Section 5.1.- ...

Section 5.2.-Exclusions

The provisions of this Law shall not be applicable to the following agencies of the Government or  government instrumentalities:

1.  ...

...

5.  Office of the Governor itself.

...

8.  ...

Nevertheless, in the case of public or public-private corporations, they must adopt personnel regulations that incorporate the merit principle in the administration of their human resources, pursuant to that provided by this Law and shall submit a copy of the same to the Office. The Office is empowered to perform compliance audits with regard to the areas essential to the merit principal.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

56

Likewise, the concept of mobility and the mechanism established by the Office to implement the movement of public employees shall apply in the public or public-private corporations, agencies that function as companies or private businesses such as the Participatory Public-Private Alliances (APP+P, by its Spanish initials) and the municipalities."

Article 2.14.-Section 6.4, subsection 1 (d) and subsection 4 (1) are amended, and a subsection 5 is added to Article 6 of Law 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," to read as follows:

"Section 6.4.-Provisions regarding Promotions, Transfers, Demotions, and Mobility

...

1.  ...

    a.   ...

    b.   ...

    c.   ...

    d.   ...

       On the other hand, due to the special qualifications of the employees, additional experience; academic studies beyond the minimum requirements; and the results obtained from the Evaluations System adopted by the Agencies and developed by the Offices shall be considered.

    e.   ...

2.  ...

3.  ...
4.  Mobility

    ...

    1   The Government of Puerto Rico Human Resources Administration and Transformation Office, in conjunction

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

57

with the Office of Management and Budget shall have one (1) year as of the passing of this Law to create the mobility plans, which must correspond to the immediate needs in the provision of services in the Government of Puerto Rico.

2 ...

3 ...

4 ...

5 ...

6 ...

7 ...

8 ...

9 ...

10 ...

11 ...

12 ...

13 ...

5. Other Actions

(a) Secondment – the temporary assignment of an official or employee of an agency of the Executive Branch or municipality or vice versa is authorized to provide mutual services in any of said jurisdictions. The official or employee on assignment shall continue to hold the same position and shall conserve all of their rights as an official or employee of said agency. Secondment is an administrative action that allows for maximization in the use of human resources in a cost-effective manner and in consideration of the Merit Principal. Under exceptional circumstances, the use of this mechanism is permissible among officials and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

58

employees of the Executive Branch and other Branches of Government, as long as the compensation paid to the official on assignment is restituted by the Branch that uses it pursuant to the guidelines issued to those effects by the Office of Management and Budget. Secondment may be used for the term of one (1) year, which shall be extendable should the need exist.

(b) Administrative Designation or Assignment – is the formal and temporary designation that a nominating authority makes to an employee to provide services of an equal or similar nature, in another dependency of the same agency."

Article 2.15.-Section 6.8 subsection 2 (b) of Article 6 of Law 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is amended to read as follows:

"Section 6.8.-Public Service Clearance

...

1. ...

2. ...

   a. ...

   b. Any convicted public employee who is granted a suspended sentence or the benefit of parole that serves their sentence in the free community under those limitations imposed by the bodies of the Government Corrections System may submit their request for clearance at any time to the Department of Labor and Human Resources or otherwise, the Agency for which they provide services shall be obligated to submit it. The employee shall continue performing their duties until the Secretary of Labor and Human Resources determines otherwise.

   c. ...

   d. ..."

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

59

Article 2.16.-Section 6.9 of Article 6 of Law 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is amended to read as follows:

"Section 6.9.-Prohibition

In order to ensure faithful compliance with the Merit Principal in Public Service during the pre-election and post-election periods, the Nominating Authorities in the agencies, instrumentalities, and public corporations of the Government of Puerto Rico shall abstain from making any personnel transaction that includes the areas essential to the Merit Principle, such as appointments, promotions, demotions, transfers; nor shall they be permitted to make changes or actions of compensation, or position category changes, or use employee mobility during the electoral ban. With the provision that during said period no changes or actions may be processed or recorded in the personnel files of any nature with any retroactive effect. Exempted from the ban are changes as a result of the termination of the probationary period and the imposition of disciplinary measures. Failure to comply with this provision shall result in the annulment of the transaction made. This prohibition shall comprise the period of two (2) months before and two (2) months after the holding of the Puerto Rico General Elections.

Upon the Office's approval, exceptions to this prohibition may be made due to urgent and unpostponable service needs duly evidenced and certified pursuant to the standards issued regarding this matter by the Office. For the purposes of this Article, urgent and unpostponable need shall be understood as those essential or indispensable actions that must be taken urgently to fulfill the duties of the agency, instrumentality, or public corporation. It does not include those actions that are merely convenient or advantageous, the solution to which may be postponed until the ordinary procedure is performed."

Article 2.17.-Section 7.2 subsections 3 and 5 of Article 7 of Law 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is amended to read as follows:

"Section 7.2.-General Compensation Standards

The following guidelines are applicable to all government agencies under this Law:

1.  ...

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

60

2.  ...

3.  The Office shall manage the compensation plan with regard to the areas essential to the merit principal. These may not affect any action that threatens or is contrary to the merit principal in personnel transactions in career-track public service.

4.  ...

5.  No amendment or modification to the position evaluation or assessment system may negatively affect the base pay of the employee.

...”

Article 2.18.-The validity of Article 9 and Section 10.2 of Article 10 of Law 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is suspended, subject to the provisions established in Article 2.03 of this Law.

Article 2.19-Nullity.

As of the date on which this Law takes effect, any clause or provision of a collective agreement, agreement, supplementary agreement, set of regulations, administrative order, circular letter, and/or contractual letter shall be null and void, in the provisions in which it grants unionized or non-unionized public officials or employees of the Government, including all unionized or non-unionized employees of the Public Corporations of the Government of Puerto Rico, greater fringe benefits than those authorized by this Law. The adoption of any authorized measure to comply with the foregoing by any agency or public corporation of the Government of Puerto Rico shall not constitute a violation of the existing collective agreements. Nor shall such constitute an illicit practice.

Article 2.20.-Relation to Other Laws

The following laws remain in full effect in relation to the provisions that do not enter into conflict with this Law:

a.  Law 62 of June 23, 1969, as amended, known as the "Puerto Rico Military Code."

b.  Law 122-1996, as amended, known as the "Employee Appearance as Witnesses in Criminal Cases Act."

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

61

c. Law 44-1996, as amended, known as the "Vacation Leave Assignment Act."

d. Law 203-2007, as amended, known as the "Twenty-first Century Puerto Rican Veterans Bill of Rights."

e. Law 58-1994, as amended, known as the "Voluntary Emergency Service Leave Act."

f. Law 122 of July 12, 1986, as amended, known as the "Employee Appearance as Witnesses in Criminal Cases Act."

g. Law 281-2003, as amended, known as the "Puerto Rico Jury Duty Administration Act."

h. Law 24-2002, as amended.

i. Law 49 of June 27, 1987, as amended.

j. Law 134-1998, as amended.

k. Law 154-2000, as amended.

l. In that pertaining to the Municipalities, Law 81-1991, as amended, known as the "Puerto Rico Autonomous Municipalities Act," remains in full effect and without any impairment to its provisions. The provisions of this law shall apply to any Municipality that determines so by passing a Municipal Ordinance to those effects.

Article 2.21.-Repeal

Law 89-2016, better known as the "Temporary Public Service Employment Act," is repealed.

## CHAPTER 3.-COMPULSORY LIABILITY INSURANCE JOINT UNDERWRITING ASSOCIATION

Article 3.01.-Subsection (m) of Article 3 of Law 253-1995, as amended, is amended to read as follows:

"Article 3.-Definitions.


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

62

For the purposes of this Law, the following terms and phrases shall have the meaning stated below:

(a) ...

...

(m) Compulsory liability insurance. – Means the insurance that is required by this Law and responds to the damages caused to the motor vehicles of third parties as a result of a traffic accident, for which the owner of the vehicle insured by this insurance is legally liable, and as a result of its use said damages are caused, according to the system for initial determination of liability created under the protection of this Law. The insurance shall have a coverage limit of four thousand five hundred dollars ($4,500) per accident. The Commissioner, at the request of the insurers that provide the compulsory liability insurance or *motu proprio*, may revise or modify the limit and the compulsory liability insurance rate every two (2) years pursuant to the applicable provisions of Chapter 12 of the Code, which take into consideration every insurer in the Compulsory Liability Market. Nevertheless, the coverage limit may never be less than three thousand five hundred dollars ($3,500).

..."

Article 3.02.-Subsections (f) and (h) of Article 6 of Law 253-1995, as amended, better known as the "Motor Vehicle Compulsory Liability Insurance Act," are amended to read as follows:

"Article 6.-Joint Underwriting Association—Creation.

(a) ...

...

(f) The insurers that underwrite the compulsory liability insurance, including the Joint Underwriting Association, once they receive the premiums that correspond to them after deducting the fee established in Article 7(b)(1), shall deduct five percent (5%) of them, as established in Article 7(b)(2). Each insurer and the Joint Underwriting Association shall be responsible for sending the amount corresponding to the fee on the total premiums underwritten during a month to the Department of the Treasury, no later than the fifth (5) day of the following month.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

63

The Department of the Treasury shall establish by way of a set of regulations the manner in which this payment shall be made and may design and agree to other methods for the collection of this amount, as long as the change results in an effective and constant collection. On the same date, each insurer and the Joint Underwriting Association shall be responsible for sending the Department of the Treasury the amount that corresponds to the fee established in Article 7(b)(3). The Department of the Treasury shall establish by way of a set of regulations the manner in which this payment shall be made and may design and agree to other methods for the collection of this amount, as long as the change results in an effective and constant collection.

...

(h) All members of the Joint Underwriting Association shall share its profits and losses annually, determined in accordance with the Yearly Statement required pursuant to Article 3.310 of the Code, in the percentage that the direct net premiums underwritten in Puerto Rico during the previous year for each one of said insurers, for insurance against any loss, expenses, or liability for the loss or damages caused to persons or property, resulting in the possession, conservation, or use of any land vehicle, aircraft, or draft or riding animals, or incidental to such, all of this pursuant to Article 4.070 of the Code, represents the total direct net premiums underwritten in Puerto Rico during said year for that type of insurance.

(1) ...

(2) ...

(3) 2017 Extraordinary Dividend and Special Payment:

(i.) The Joint Underwriting Association is authorized to declare an extraordinary dividend before June 30, 2017 to its members, subject to the provisions of this subsection, for an amount of seventy million (70,000,000) dollars subject to the imposition of a special one-time tax of fifty percent (50%). The dividends received by the private insurers members of the Joint Underwriting Association shall not be subject to any other tax. The revenue obtained through the special one-time tax provided for herein shall not be considered as part of the calculation of any of the existing formulas for the calculation of budgetary

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

64

allocations to be made as part of the constitutional budgetary process.

(ii.) Within a term that shall not exceed fifteen (15) days from the passing of this Law, the Board shall call an assembly and shall submit the declaration of the authorized extraordinary dividend for the approval of all of the members of the Joint Underwriting Association. It is provided that the dividend may be approved with the vote of the members with a combined proportional participation of more than fifty percent (50%) pursuant to the most recent determination made by the Office of the Insurance Commissioner. The determination of this Assembly shall be binding.

(iii.)   In consideration of the public benefit of this measure and its legislative authorization, subsection (j) of this Article shall be applicable that provided herein to the actions taken by the Board, members, and personnel of the Association.

(iv.)   Should the declaration of the dividend be approved at the assembly, the Joint Underwriting Association, within a term that shall not exceed ninety (90) days, shall make a special payment of thirty-five million dollars ($35,000,000) to the Department of the Treasury, which will deposit the funds in the General Fund of the Government of Puerto Rico. During that same term, the Joint Underwriting Association shall disburse the authorized dividends to its members in accordance with the proportional share of each member.

...".

Article 3.03.-Subsections (a), (b), and (d) of Article 7 of Law 253 of December 27, 1995, as amended, are amended to read as follows:

"Article 7.-Premiums.-

(a) The initial uniform premium of the compulsory liability insurance shall be ninety-nine dollars ($99) for each private passenger vehicle and one hundred forty-eight dollars ($148) for each commercial vehicle. The revision and adjustment of the premium on or before June 30, 2017 is authorized, pursuant to that provided in subsection (e) of this Article.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

65

The Commissioner may set a different premium than those established in this subsection for the compulsory liability insurance of those vehicles to which the Department of Transportation and Public Works issues transitory or provisional licenses.

(b) Service Fees

1) ...

2) ...

3) An additional administrative fee is established, which shall be proportional to the increase in revenue from the adjustments in the uniform premium, pursuant to that provided in subsections (a) and (e) of this Article. The applicable percentage for determining the corresponding amount in cases of an increased premium shall be calculated by dividing the net increase in the premium according to the amount established in subsection (a) of this Article, by the total adjusted cost of the premium. The resulting percentage shall be applied to the revenue generated by the insurers, including the Joint Underwriting Association, after deducting the administrative expenses and costs related to the production of the premium. The balance the results from applying the percentage as established in this formula shall be transferred to the General Fund of the Government of Puerto Rico. This fee does not constitute a tax on the premium.

4) These charges shall not apply to those policies issued by way of the traditional insurance and shall be considered part of the premium of the compulsory liability insurance and must be guaranteed within the premium dollar distribution.

(c) ...

(d) Any insurer of the compulsory liability insurance may present for the approval of the Commissioner rules and rate plans that contain standards for the application of fees on the uniform premium of private passenger vehicles or commercial vehicles that are insured with them, correspondingly, subject to the provisions of Chapter 12 of the Code using the frequency and severity of the losses of its insureds as a basis.

(e) ...

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

66

...".

## CHAPTER 4.-TRANSFER FROM PUBLIC CORPORATIONS, AGENCIES, AND INSTRUMENTALITIES TO THE GENERAL FUND; CREATION OF THE COMMITTEE AND ADJUSTMENTS TO FEES, DUTIES, AND RATES.

Article 4.01.-Transfer of Surpluses

The public corporations, agencies, and instrumentalities of the Government of Puerto Rico are ordered to transfer to the Department of the Treasury the surpluses of the revenues generated. Said funds shall be considered as available resources of the State and deposited by the Department of the Treasury in the General Fund of the Government of Puerto Rico in order to comply with the liquidity requirements set forth in the Fiscal Plan adopted under the protection of the provisions of the *Puerto Rico Oversight, Management, and Economic Stability Act of 2016*, Public Law 114-187, also known as PROMESA.

Article 4.02.-Committee

The amount of the funds that each one of the corporations and instrumentalities shall contribute shall be determined by a committee composed by the Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority, the Secretary of the Department of the Treasury, and the Executive Director of the Office of Management and Budget which may establish the necessary rates to comply with that provided in the Fiscal Plan approved for the Government of Puerto Rico and which governs its corporations. This committee shall ensure that the transfer of the funds pursuant to that provided in Article 4.01 of this Law do not affect the services that the public corporations and instrumentalities provide and that they are the surpluses available after having covered the operational expenses and obligations of said entities pursuant to the expense budget recommended by the Office of Management and Budget for each fiscal year.

Moreover, this Committee is empowered to review the sources of revenue of the public corporations, agencies, and instrumentalities, and adjust, increase, or decrease any charge, duty, rate, tariff, professional fee, premium, or any income of a similar nature, in order to comply with the metrics provided for in the Fiscal Plan of the Government of Puerto Rico. Additionally, the Committee may impose an administrative fee in addition to those contributions that it deems necessary, which may be from five percent (5%) up to ten percent (10%), in order to comply with the metrics of the Fiscal Plan certified by the Oversight Board.

This Law shall have supremacy over any law that establishes any charge, duty, rate, tariff, professional fee, premium, or any income of a similar nature and the


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

67

committee is authorized to revise, increase, or decrease the amount even when such is provided for by Law. The committee shall have the power to revise, increase, or decrease these revenues without subjection to the provisions of any Law, regulation, or administrative order that establishes a particular amount for such revenue.

Any provision of law, regulation, administrative order, corporate resolution, or any other document of a similar nature, that restricts or reduces the funds that may be transferred by a public corporation, agency, or instrumentality of the Government of Puerto Rico to the General Fund pursuant to that provided in this Chapter is hereby suspended.

The committee is empowered to promote any administrative order, circular letter, or regulation that is necessary for its operation and for compliance with the provisions of this Law.

Article 4.03.-Exclusions

Excluded from the provisions of this Chapter are the University of Puerto Rico, created by virtue of Law 1 of January 20, 1966, as amended, known as the "University of Puerto Rico Act," and the Public Corporation for the Oversight and Security of Cooperatives of Puerto Rico, created by virtue of Law 114-2001, as amended, better known as the "Public Corporation for the Oversight and Security of Cooperatives of Puerto Rico Act," "Municipal Financing Corporation Act," better known as COFIM, Law 19-2014, as amended, the "Special Commission on Legislative Funds for Community Impact Act," Law 20-2015, and the "Joint Commission on Special Reports of the Comptroller Act," Law 83 of June 23, 1954, as amended. Excluded from the application of this Chapter are the funds of public community-oriented entities and corporations, that which are funds received by private entities.

With regard to the "Urgent Interest Fund Act," better known as COFINA, Law 9-2006, as amended, the Executive shall be authorized to use the Funds of COFINA, occasionally, solely as a final alternative and subject to the presentation of a sworn certification submitted to the Legislative Assembly. It shall not be understood by the presentation of said certification that the Executive shall use the funds of COFINA indefinitely. Said certification must establish the need, term, and the amount of funds to be used, to cover an occasional significant deficiency in the cash flow in order to comply with the Fiscal Plan of the Government of Puerto Rico. Said certification shall be signed and sworn by the Executive Director of the Fiscal Agency and Financial Advisory Authority (AAFAF, by its Spanish acronym) and by the Director of the Office of Management and Budget. The signature and oath of these officials on the certification shall be non-delegable. In said certification, the officials shall

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

68

attest that the information is correct, precise, and truthful in accordance with the fiscal reality of the Government of Puerto Rico.

Article 4.04.-Compliance Clause

All transfers made by virtue of the provisions of this Chapter shall be subject to the requirements of section 201(b)(1) (M) of Public Law 114-187, known as the *Puerto Rico Oversight, Management, and Economic Stability Act or PROMESA*.

CHAPTER 5.-DISPOSAL OF GOVERNMENT REAL ESTATE.

Article 5.01.-Public Policy.

The best use of the real estate properties that are not being used by the State is declared as the public policy of the Government of Puerto Rico, in order to generate greater resources for the public coffers. Moreover, this fosters those properties that are currently in complete disuse being able to be devoted to activities for the common welfare, whether that be for nonprofit, commercial, or residential activities that promote the activation of the real estate market and the economy in general.

In order to comply with this public policy, the design of an efficient and effective procedure for the sale of real estate properties is authorized, in which the principles of competence, transparency, economic development, job creation, and public welfare and interest prevail.

Article 5.02.-Definitions.

For the purposes of this Chapter, the following words shall have the following meanings:

A. Real Estate [Immovable Property] – That property that cannot be moved on its own or be transferred to another place such as land, buildings, etc.; as well as all property that is joined to a building in a fixed manner, in such a way that they cannot be separated from it without the breaking of the material or deterioration of the object; and which belongs to the agencies, dependencies, instrumentalities, and public corporations of the Executive Branch of the Government of Puerto Rico.

B. Committee – This refers to the Real Estate Assessment and Disposal Committee.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

69

C. Disposal – Process through which the Government of Puerto Rico transfers the title of ownership, possession, use, or enjoyment of real estate properties for their better use.

D. Public Open Outcry Auction – Process in which several bidders gather together at a previously arranged place and time to make a direct offer for a determined real estate property announced prior to the auction. The offer is made in open outcry, where the rest of the bidders hear and know the offers.

E. Public Blind Auction – Auction process in which the bidders make their secret offer in a sealed envelope, the procedure for which shall be established by regulation.

F. Direct Sale – Process for disposing of a property with one party that has met the criteria that are established by regulation.

Article 5.03.-Real Estate Assessment and Disposal Committee.

The Real Estate Assessment and Disposal Committee is created in order for it to exercise all of the necessary powers, that are not contrary to this or any other law, for the disposal of the real estate of the Executive Branch of the Government of Puerto Rico.

The Committee shall be composed of the following public officials:

a. The Executive Director of the Fiscal Agency and Financial Advisory Authority (AAFAF, for its Spanish acronym).

b. The Director of the Office of Management and Budget.

c. The Secretary of the Department of Economic Development and Commerce.

The Executive Director of AAFAF shall preside over the Committee.

The Committee shall meet, at least, once a month, and whenever necessary from time to time to streamline the projects, at the time and place that they deem convenient. With the provision that the members of the Committee shall not earn any salary or compensation for expenditures for the exercise of the duties and powers that are imposed on them by this Law. With the further provision that none of that established herein shall apply to the real estate properties of the Industrial Development Company, the Government Development Bank, the Land Administration, the Convention Center District Authority, and their respective subsidiaries, as long as they already have an established

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

70

process for the sale of real estate consonant with this Chapter as of the effective date of this Law.

Article 5.04.-Executive Director.

Once the Committee has been constituted, it shall designate an Executive Director, who shall have all of those powers that the Committee delegates to him related to the implementation of the public policy established in this Law. The Executive Director shall recommend to the Committee to carry out interagency transfers to integrate human resources into the attainment of the objectives of this Law, pursuant to Law 8-2017. The Office of the Executive Director shall be located in the place designated by the Committee for such.

Article 5.05.-Powers of the Committee.

The Committee shall have the following powers:

a. Approve the rules, regulations, circular letters, and standards that are necessary for the exercise of its functions and duties.

b. Adopt an official seal and alter such at its convenience.

c. Sue and be sued under its own name.

d. Negotiate, execute agreements, arrange the disposal of the real estate of the Executive Branch of the Government of Puerto Rico and all those other instruments and agreements with any natural or artificial person that are necessary or appropriate in order to exercise the powers and duties granted in this Law.

e. Initiate any legal action to protect or enforce the public policy of this Law.

f. Appoint those officers, agents, and employees that are necessary for the proper fulfillment of the ends and purposes for which it has been created and to enact the powers and duties and the terms and conditions of work established by this Law. With the provision that the appointments must be made pursuant to that provided in Law 8-2017.

g. Execute agreements to carry out public open outcry auctions, pursuant to the provisions of this Chapter and the regulations to those ends.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

71

h.  Create real estate investment trusts of a similar nature to those trusts defined in Section 1082.01(a) of Law 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico."

i.  Contribute real estate properties to any real estate investment trust created pursuant to Article 5.05 (h) of this Law. The enterprise that contributes pursuant to this subsection [sic] the Government shall have participation in the development that it performs.

Article 5.06.-Duties and Obligations of the Committee.

In order to execute the public policy established herein, the Committee shall have the following duties:

a.  It must establish by way of regulation a uniform, efficient, and effective procedure for the disposal and transfers of the real estate properties of the Executive Branch of the Government of Puerto Rico, whether through public open outcry auction, public blind auction, or by way of direct sale. Said procedure must provide a fair system of competition that guarantees the public interest. The Committee must clearly provide for when a direct sale may be made.

b.  It must coordinate, along with the Real Estate Review Board created by virtue of Law 235-2014, the preparation and/or updating of an official inventory of all of the real estate properties of all of the agencies, dependencies, instrumentalities, and public corporations of the Executive Branch of the Government of Puerto Rico, excluding the properties of the University of Puerto Rico.

c.  It must obtain on the part of the Real Estate Review Board, a certification in which all of the real estate properties that are available for disposal due to not being needed to be used by any agency, dependency, instrumentality, or public corporation of the Executive Branch of the Government of Puerto Rico.

d.  It must evaluate every request for real estate purchase and sale, rental, or other form of transfer of possession, that is submitted to it by any natural or artificial person, for profit or nonprofit, including municipalities, and ensure that it complies with this Law and all of the standards and regulations that are approved by the Committee.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

72

e.  Perform any type of study, inspection, analysis, or other procedure regarding the real estate properties, including ensuring that they are duly registered in the Property Registry and that they have the title and any other requirement demanded by law up to date.

f.  Appraise the real estate properties subject to disposal. For such it may request and use the necessary personnel, using the mechanism established in Law 8-2017.

Article 5.07.-Disposal of Real Estate.

The disposal of the real estate of the Executive Branch of the Government of Puerto Rico shall be governed by a process that is fair and transparent in which all participants are afforded the same opportunities, at all times safeguarding the public interest and welfare. In that vein, every disposal must be framed within the achievement of the purposes established in this Law, maintaining a balance between the need to amass greater resources for the state, fostering economic development, and pursuing the welfare of society and/or creating jobs.

The Committee shall dispose of the real estate using as a basis the fair market price to be determined by way of the corresponding assessment and appraisal procedure or ensuring the use of the property for the benefit of the public interest.

The Executive Director of the Committee or his representative may serve as an authorized agent to carry out any transaction related to the title of the real estate property.

Article 5.08.-Conflict of Interest.

Any conflict of interest that may arise among the members of the Board during the performance of their duties under the protection of this Law shall be attended to pursuant to that provided in Law 1-2012, as amended, known as the "Puerto Rico Government Ethics Act of 2011."

Article 5.09.-Saving Clause.

No real estate property of the Executive Branch of the Government of Puerto Rico that is being used in usufruct as housing by any person.

CHAPTER 6.-GOVERNMENT OF PUERTO RICO ACCOUNTING ACT.


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

73

Article 6.01.-Article 3 of Law 230 of July 23, 1974, as amended and known as the "Government of Puerto Rico Accounting Act," is amended in order to add a new subsection (o) that reads as follows:

"Article 3.-Definitions.

When they are used in this Law, the following terms shall mean:

 (a) ...

 ...

 (o) Special Allocations – Allocations approved by way of Joint Resolutions that limit the use of the allocated funds."

Article 6.02.-Subsection (b) is amended and a new subsection (e) is added to Article 7 of Law 230 of July 23, 1974, as amended, known as the "Government of Puerto Rico Accounting Act," to read as follows:

"Article 7.-Revenue from Public Funds.

a)   ...

All of the public funds of the dependencies that are not allocated by law for a specific purpose shall be credited to the General Fund of the State Treasury and shall be deposited in their entirety in the checking account of the Secretary or in any other bank account that he deems appropriate to establish. Likewise, it is provided that as of July 1, 2017, all of the special state funds and other revenues from the dependencies and public corporations shall be deposited in their entirety in the State Treasury, under the custody of the Secretary of the Treasury or the banking entity that he deems appropriate. The Secretary of the Treasury shall also thus be empowered to determine the order of priority of the disbursements of payments charged to the special state funds and other revenue, pursuant to the approved budget and the Fiscal Plan, without this being understood as a limitation on the powers granted to the Governor and the Puerto Rico Fiscal Agency and Financial Advisory Authority by virtue of the provisions of Law 5-2017. This provision shall have supremacy over any other that contravenes or is inconsistent with that established herein. For each fiscal year, any amount in excess of the budgeted amount and authorized by the Office of Management and Budget to the dependencies and public corporations originating from the special state funds shall be entered in the Budgetary Fund created by virtue of

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

74

Law 147 of June 18, 1980, as amended. This provision shall not be applicable to those funds that are allocated to the municipalities by virtue of the Sales and Use Tax. This provision shall not be applicable to funds originating from private donations received by socially-oriented government entities.

...

e) As of July 1, 2017, all those special state funds created by Law for specific purposes shall continue being used for those purposes for which they were allocated by Law, pursuant to the Budget Recommended by the Office of Management and Budget and to the Fiscal Plan. Likewise, the Office of Management and Budget is empowered to create a reserve under its custody, as it establishes by way of regulation, which allows for the budgetary control of all amounts of expenses charged to the special state funds and other revenue. Should any inconsistency exist between the law and the use of the funds with the Fiscal Plan, the purpose provided for in the approved Fiscal Plan shall prevail pursuant to the provisions of the Federal PROMESA Act."

Article 6.03.-Subsections (h), (l), and (m) of Article 8 of Law 230 of July 23, 1974, as amended, known as the "Government of Puerto Rico Accounting Act," are amended to read as follows:

Article 8.-Allocation of Public Funds.

(a) ...

 ...

(h) Allocations and funds without any determined economic year that have remained on the books without movement of disbursement or obligation for one (1) year shall be considered, for the purposes of this Law, as having fulfilled their purpose, wherefore they shall be closed and entered immediately into the General Fund, except the allocations and funds without any determined economic year allocated for carrying out permanent improvements that have been accounted and recorded in the books. These shall have a term of three (3) years as of the date of the legal effectiveness of the allocation to be disbursed and fulfill the purposes for which they were allocated. Upon having elapsed three (3) years, the obligated and unobligated balances of the permanent improvement funds shall be closed and entered into Fund 301. This provision shall only apply to the allocations made prior to Fiscal Year 2017-2018 and shall not be applicable to

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

those allocations made by the Legislative Assembly by way of Legislative Donations or allocations by virtue of the Sales and Use Tax.

In those cases in which the agency or body receiving the permanent improvement funds understands that the term of the allocation should be extended for a term greater than three (3) years, it may request such justifying the need to maintain these resources to the Office of Management and Budget at least three (3) months before the aforesaid term expires. During this period, the Office of Management and Budget shall analyze the request and shall determine the need to maintain the allocation in effect, the term for which it shall be extended, and the amount. Said resources shall be rescheduled by the Legislative Assembly.

(i)  ...

...

(l)  Any allocation that remains for one (1) year without being recorded in the books shall be considered, as a general rule, automatically cancelled and shall require new legislative action in order to use the cancelled moneys. In exceptional cases in which it is demonstrated that there have been justified causes for not recording an allocation in the books for the stipulated period of one (1) year, such as delay in the decision of lawsuits in the courts and the impossibility of carrying out a public project due to fiscal, technical, or legal difficulties, an allocation may be accounted for even after the aforesaid period of one (1) year has elapsed.

The Secretary shall notify the Legislative Assembly of the action cancelling allocations in the circumstances that are set forth in this subsection, during the thirty (30) days following the date on which said cancellation was provided for.

(m) Periodically, the Secretary shall transfer to the surplus of the General Fund of the State Treasury, pursuant to the law, the balances of deposit accounts that have remained unused or without any movement in the accounting books for one (1) year and that, in his opinion, are not necessary or do not fulfill the purposes for which they were created. With the provision that any claim that the Secretary is obligated to pay with regard to said balances, after they have been transferred in the manner provided above, shall be paid from any available funds not allocated for other purposes."

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

76

## CHAPTER 7.-GOVERNMENT PROCUREMENT RESERVE ACT.

Article 7.01.-Article 2 of Law 129-2005, as amended, known as the "Government of the Commonwealth of Puerto Rico Procurement Reserve Act," is amended to read as follows:

"Article 2.-Statement of Public Policy.

It shall be the public policy of the Government of Puerto Rico to establish a Reserve Program that requires the Government of Puerto Rico and its instrumentalities to assign twenty percent (20%) of the total amount allocated to procurement in its general budget to be given to microenterprises, and small and medium-sized enterprises, as long as the fiscal situation allows for such or it produces savings for the public treasury.

With the provision that in order to continue strengthening the sector of microenterprises and small and medium-sized enterprises, it is established that the percentage of the percentage of the reserve for such purposes shall continue to grow in tiers in the following manner:

1.   Thirty percent (30%) for fiscal year 2016-2017;

2.   Thirty-two percent (32%) for fiscal year 2017-2018;

3.   Thirty-five percent (35%) for fiscal year 2018-2019;

4.   Thirty-eight percent (38%) for fiscal year 2019-2020;

5.   Forty percent (40%) for fiscal 2020-2021;

This tiered increase shall apply if the Office of Management and Budget establishes that the fiscal situation allows for the increase or if it produces savings for the public treasury. Moreover, the Secretary of the Treasury shall be obligated to reserve at least three percent (3%) of the cash flow that he receives for the payment of the amount for procurement of materials to microenterprises and small and medium-sized enterprises whose invoices have been processed correctly by the departments, agencies, instrumentalities, dependencies, municipalities, and public corporations of the Government to which this Law applies."

Article 7.02.-Subsection (1) of Article 6 of Law 129-2005, as amended, known as the "Government of the Commonwealth of Puerto Rico Procurement Reserve Act," is amended to read as follows:



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

77

"Article 6.-Reserve Program

(1) A new expense objective shall be created to allocate twenty percent (20%) of the budget of the amounts for procurement of each agency. With the provision that the expense objective of the budget for the procurement amounts for each agency shall increase to thirty percent (30%) for Fiscal Year 2016-2017, to thirty-two percent (32%) for Fiscal Year 2017-2018, to thirty-five percent for Fiscal Year 2018-2019, to thirty-eight percent (38%) for Fiscal Year 2019-2020, and to forty percent (40%) for Fiscal Year 2020-2021, as long as the fiscal situation allows for such. The OGP shall establish by way of regulation the requirements for compliance with the aforesaid reserve percentage.

...".

CHAPTER 8.-EXCISE TAXES ON CIGARETTES AND TOBACCO PRODUCTS.

Article 8.01.-Section 3020.05 of Law 1-2011, as amended, is amended to read as follows:

"Section 3020.05.-Cigarettes

(a) An excise tax of seventeen dollars (17.00) shall be imposed, paid, and charged on every one hundred or fraction of one hundred (100) cigarettes. For the purposes of this Code, the term "cigarette" shall mean any product that contains nicotine, and that is designed to be burnt or heated under normal conditions of use, and consists of, or contains:

(1) any roll of natural or synthetic fine-cut tobacco, or any natural or synthetic finely cut plant, or any mixture of such, or any finely cut solid material or substance, rolled in paper or in any substance or material that does not contain tobacco, which due to its appearance, the type of tobacco used in the filling, its wrapping or labeling, is prone to being used, offered, or bought as a cigarette; and

(2) its length, circumference, and weight does not exceed the length, circumference, and maximum weight established by the Secretary by way of regulation, circular letter, or any other administrative determination of a general nature.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

78

(b) Cigarettes that are manufactured, introduced, sold, transferred, used, or consumed in Puerto Rico shall have a label adhered to the boxes, cartons, or packs in which they were packaged with the information and characteristics that are provided for by regulation. Each box, carton, or pack of cigarettes must have the word "tributable" or "taxable" clearly and legibly stamped in a visible place. These provisions shall not apply to cigarettes exempt pursuant to Section 3030.18 of this Code."

Article 8.02.-A new Section 3020.05A is added to Law 1-2011, as amended, to read as follows:

"Section 3020.05A.-Cigarettes, Cigars, Loose Tobacco, Rolling Paper, and Cigarette Tubes

(a) In addition to any other excise tax set in this Subtitle, an excise tax that may be up to eight dollars and fifty cents ($8.50) on every one hundred or fraction of one hundred (100) cigarettes shall be imposed, charged, and paid.

(b) The excise tax that is provided below shall be imposed, charged, and paid on every cigarette, loose tobacco, rolling paper, and cigarette tube:

(1) Cigars: Twenty-five dollars and fifty cents ($25.50) for every pound or fraction of a pound.

(2) Loose Tobacco: Twenty-five dollars and fifty cents ($25.50) for every pound or fraction of a pound.

(3) Rolling paper: three dollars ($3.00) for every fifty papers or fraction that does not exceed six and a half inches (6 ½"). Should six and a half inches (6 ½") be exceeded, every two and three-quarters (2 ¾") inches, or fraction, shall be considered one (1) rolling paper.

(4) Cigarette tubes: three dollars ($3.00) for every fifty cigarette tubes or fraction that does not exceed six and a half inches (6 ½"). Should six and a half inches (6 ½") be exceeded, every two and three-quarters (2 ¾") inches, or fraction, shall be considered one cigarette tube.

(c) Definitions.- For the purposes of this Section and any other applicable provisions of this Subtitle, the following terms shall have the meaning that is indicated below:



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

79

(1) Cigarettes.- Shall mean any product that contains nicotine and is designed to be burnt or heated under normal conditions of use, and consists of or contains:

(i.) any roll of natural or synthetic fine-cut tobacco, or any natural or synthetic finely cut plant, or any mixture of such, or any finely cut solid material or substance, rolled in paper or in any substance or material that does not contain tobacco, which due to its appearance, the type of tobacco used in the filling, its wrapping or labeling, is prone to being used, offered, or bought as a cigar, cigarillo, little cigar, small cigars, or any other product; and

(ii.)that is not a cigarette, as this term is defined in Section 3020.05 of this Code.

(2) Loose tobacco.-Shall mean any type of tobacco, mixed or not with any other substance, that is not rolled in any material and that due to its appearance, intrinsic characteristics, packaging, or labeling, is prone to be used and may be offered or bought by consumers as tobacco to make "roll your own" cigarettes or to be smoked in a pipe. This term also includes whole tobacco leaves.

(3) Rolling paper.-Shall mean any paper, or any other material other than tobacco, that is used to roll cigarettes or cigars.

(4) Cigarette tube.-Shall mean rolling paper prepared as a hollow cylinder to be used in the preparation of cigarettes or cigars.

(d) Cigarettes, loose tobacco, rolling paper, and cigarette tubes that are manufactured, introduced, sold, transferred, used, or consumed in Puerto Rico shall have a label adhered to the boxes, cartons, or packs in which they were packaged with the information and characteristics that are provided for by regulation. Each box, carton, packaging, or pack of cigars, loose tobacco, rolling paper, or cigarette tubes must have the word "tributable" or "taxable" clearly and legibly stamped in a visible place. In those cases in which the article is sold

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

80

individually, it must have the word "tributable" or "taxable" clearly and legibly stamped in a visible place and in the form and manner established by the Secretary. These provisions shall not apply to the articles exempted pursuant to Section 3030.18 of this Code."

Article 8.03.-Section 3020.13 of Law 1-2011, as amended, is amended to read as follows:

"Section 3020.13.-Smokeless Tobacco

(a) An excise tax shall be imposed, paid, and charged on "smokeless tobacco," manufactured in or imported to Puerto Rico. For the purposes of this subtitle the term "smokeless tobacco" shall mean any tobacco-derived product that:

(1) Is intended to be consumed without creating combustion or without being burnt, and

(2) Is found or sold in aluminum packaging, in loose bags, and/or small units or in "discrete single-use units" in the form of pills, tablets, bags, dissolvable strips, among others.

(b) The excise tax imposed by this Section shall be established in the following manner:

(1) Chewing tobacco: one dollar ($1.00) for every pound or fraction of a pound. As of May 1, 2017, the excise tax shall be five dollars ($5.00) for every pound or fraction of a pound.

(2) Snuff or any other tobacco derivative: three dollars and two cents ($3.02) for every pound or fraction of a pound. As of May 1, 2017, the excise tax shall be four dollars and fifty-three cents ($4.53) for every pound or fraction of a pound.

(c) Tobacco-derived products that are manufactured, introduced, sold, transferred, used, or consumed in Puerto Rico shall have a label adhered to the boxes, cartons, or packs in which they were packaged with the information and characteristics that are provided for by regulation. Each box, carton, packaging, or pack must have the word "tributable" or "taxable" clearly and legibly stamped in a visible place. These provisions shall not apply to the articles exempted pursuant to Section 3030.18 of this Code."

Article 8.04.-Section 3020.14 of Law 1-2011, as amended, is amended to read as follows:

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

81

"Section 3020.14.-Allocation of Funds

The Secretary of the Treasury shall enter that collected as a result of Section 3020.05, Section 3020.05A, Section 3020.13, and Section 3020.15, directly into the General Fund."

Article 8.05.-A new Section 3020.15 is added to Law 1-2011, as amended, to read as follows:

"Section 3020.15.-Electronic Cigarettes, Nicotine Cartridges, and Vaporizers

(a) Definitions.- For the purposes of this Section and any other applicable provisions of this Subtitle, the following terms shall have the meaning indicated below:

(1) Electronic cigarette.- Shall mean any type of noncombustible product that uses an element of heat, energy source, electronic circuit, or any electronic, chemical, or mechanical means, that may be used to produce nicotine vapor or the vapor of any other substance as a solution or in any other form, which due to its appearance, size, its packaging or labeling, is prone to being used, offered, or bought as an electronic cigarette, electronic cigar, or electronic pipe.

(2) Nicotine cartridge.- Shall mean a cartridge of vapor or any other container of nicotine in a liquid solution that is designed to be used with or in an electronic cigarette or vaporizer.

(3) Vaporizer.- Shall mean any type of noncombustible product that uses an element of heat, energy source, electronic circuit, or any electronic, chemical, or mechanical means, that may be used to produce nicotine vapor or the vapor of any other substance as a solution or in any other form, and which cannot be considered an electronic cigarette pursuant to the definition of subsection (1) above. This term shall include, without being considered as a limitation, the product commonly known as a "hookah" and the vaporizers used for the administration of medications that are not approved by the *Food and Drug Administration* (FDA).

(b) The excise tax that is indicated below shall be imposed, paid, and charged on electronic cigarettes, nicotine cartridges, and vaporizers:

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

82

(1) Electronic cigarette: three dollars ($3.00) for every electronic cigarette.

(2) Nicotine Cartridges: five cents (5¢) for every milliliter of nicotine solution, or any substance, regardless of whether or not it contains nicotine, in each nicotine cartridge. This excise tax shall not be prorated.

(3) Vaporizer: six dollars ($6.00) for every unit.

(c) Electronic cigarettes, nicotine cartridges, and vaporizers that are manufactured, introduced, sold, transferred, used, or consumed in Puerto Rico shall have a label adhered to the boxes, packages, or packaging in which they were filled, wrapped, or packaged with the information and characteristics that are provided for by regulation, with the provision that in the case of nicotine cartridges, these must contain the current milliliters of nicotine solution in the form and manner established by the Secretary. Each box, carton, or pack must have the word "tributable" or "taxable" clearly and legibly stamped in a visible place. In those cases in which the article is sold individually, it must have the word "tributable" or "taxable" clearly and legibly stamped in a visible place and in the form and manner established by the Secretary. These provisions shall not apply to the articles exempted pursuant to Section 3030.18 of this Code."

Article 8.06.-Section 3030.18 of Law 1-2011, as amended, is amended to read as follows:

"Section 3030.18.-Exemption on Cigarettes, Cigars, Loose Tobacco, Rolling Paper, Cigarette Tubes, Chewing Tobacco, Snuff, Electronic Cigarettes, Nicotine Cartridges, and Vaporizers

(a) An exemption from the excise tax established in this Subtitle shall apply to cigarettes, cigars, loose tobacco, rolling paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers, sold or transferred to ships of foreign registration or of the United States of America and sold to the warships of foreign countries and the vessels of foreign countries on a courtesy visit in Puerto Rico. This exemption shall only be granted when the delivery of cigarettes, cigars, loose tobacco, rolling paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers, in accordance with the rules and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

83

procedures established by the Secretary and their violation shall entail the obligation to pay the corresponding excise taxes on the part of the introducer or distributor, as the case may be. Any introducer or distributor who wishes to benefit from this exemption must post a bond to cover the payment of said excise taxes.

(b) Likewise, cigarettes cigars, loose tobacco, rolling paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers that, after having been removed from the factories or the ports, are taken out of the market due to being found inappropriate for normal consumption shall be exempt from the payment of excise taxes, as long as they are destroyed under the supervision of the Secretary. In such a case, the Secretary shall reimburse or credit the tax to the person who has paid it.

(c) Moreover, cigarettes cigars, loose tobacco, rolling paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers shall be exempt from the tax established in this Subtitle when they are sold or transferred to the users, as defined in Law 23-1991, as amended, of military exchanges, commissaries, or other facilities operated by the Institutional Trust of the Puerto Rico National Guard or its Assignee.

(d) Cigarettes, cigars, loose tobacco, rolling paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers introduced or manufactured in Puerto Rico for export are exempt from the excise tax established in this Subtitle, subject to those requirements and conditions imposed by the Secretary by way of regulation, with the provision that this exemption shall not apply to cigarettes, cigars, loose tobacco, rolling paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers that are sold in Airport or Maritime Stores or Terminals to individuals that do not leave the customs territory of the United States."

Article 8.07.-Item (a) of Section 3050.01 of Law 1-2011, as amended, is amended to read as follows:

"Section 3050.01.- Licensing Fees for Wholesalers and Retailers of Certain Articles

(a) Any wholesaler or retailer, in a fixed location or mobile, of any of the articles that are listed below, must pay

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

84

an annual tax for licensing fees as established in the following table:

| DEALERS | FEES | |
|---|---|---|
| Cigarettes-Wholesalers | | $750 |
| Cigarettes- Fixed Location, Mobile Retailers, and for every cigarette vending machine | | $300 |
| Wholesale of Cigarettes from Motor Vehicles – per vehicle | | $300 |
| Gasoline – Wholesaler | Class A | $6,000 |
| | Class B | $2,500 |
| Gasoline – Retailer | Class A | $900 |
| | Class B | $100 |
| Retailer – Sale of Alcoholic Beverages, Cigarettes, and Vehicle Parts and Accessories – per locale | | $200 |
| Motor Vehicles – Dealers | Class A | $1,000 |
| | Class B | $200 |
| Vehicle Parts and Accessory Wholesalers and Retailers | Class A | $2,000 |
| | Class B | $800 |
| | Class C | $100 |
| Cigarette and Alcoholic Beverage retailers for a Limited Time (15 days) | | $25 |
| Retailers – Motor Vehicle Shows for a Limited Time (Vehicles, Parts, and Accessories) (15 days) | | $100 |
| Cement – Manufacturer or Wholesaler | Class A | $250,000 |
| | Class B | $200,000 |
| | Class C | $80,000 |
| Armorers-Arms and Munitions Dealers | | $200 |

(1)  ...

...".

Article 8.08.-A new item (d) is added to Section 604.08 of Law 1-2011, as amended, to read as follows:

"Section 6042.08.-Cigarette-related Crimes

(a) ...

(b) ...

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

85

(c) ...

(d) Any person who engages in the following shall have committed a misdemeanor and shall be sanctioned with a fine of five thousand (5,000) dollars:

(1) purchases cigarettes cigars, loose tobacco, rolling paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers as a user, as defined in Law 23-1991, as amended, from the military stores, commissaries, or other facilities operated by the Institutional Trust of the Puerto Rico National Guard its Assignee, and that subsequently sells or transfers the cigarettes cigars, loose tobacco, rolling paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers, thus purchased by persons that are not entitled to the exemption of item (c) of Section 3030.18 of this Code; or

(2) purchases cigarettes cigars, loose tobacco, rolling paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers at the stores referred to as "Post Exchanges" located at military establishments of the United States of America in Puerto Rico, and that subsequently sells or transfers the cigarettes cigars, loose tobacco, rolling paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers, thus purchased by persons that are not entitled to purchase these articles in said establishments."

Article 8.09.-Item (a) of Section 6042.15 of Law 1-2011, as amended, is amended to read as follows:

"Section 6042.15.-Penalty for Failing to File the Excise Tax Declaration and Monthly Excise Tax Form

(a) Any person obligated to file the Excise Tax Declaration, Monthly Excise Tax Form, or the Sales Declaration that fails to file said form required by Sections 3020.08(c)(8), 3020.09(c), and 3020.10, in the form, date, and manner established therein shall be imposed with a fine of one hundred (100) dollars or ten (10) percent of the tax liability established in said form or declaration, whichever is greater.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

86

(b) …".

Article 8.10.-Transitory Provisions

(a) Any person subject to the annual tax for licensing fees from Section 3050.01 of Law 1-2011 that as of May 1, 2017 holds a Wholesaler's or Retailer's License, shall be subject to the new rates provided in Article 8.07 of this Law as of the due date of the corresponding licensing fees pursuant to item (b) of Section 3060.08 of Law 1-2011.

(b) The Secretary of the Treasury shall establish by way of regulation, circular letter, or any other determination of a general nature, the necessary standards for the application of these transitory provisions.

CHAPTER 9.-EMERGENCY FUND

Article 9.01.-Article 2 of Law 91 of July 21, 1966, as amended, is amended to read as follows:

"Article 2.-

Beginning in Fiscal Year 1995-96, the Emergency Fund shall be annually capitalized by an amount of no less than one-fifth of one percent (0.2%) of the total from the Joint Resolution on the Budget. As of Fiscal Year 1998-1999, said contribution shall be for an amount of no less than one percent (1%) of the entire net revenue from the preceding fiscal year. With the provision that until Fiscal Year 2020-2021, said contribution shall be for the amount of at least ten million dollars ($10,000,000). As of Fiscal Year 2020-2021, said contributions shall be no less than zero point five percent (0.5%) of the estimated net revenue submitted to the Department of the Treasury for the preparation of the Recommended Budget charged to the General Fund. The Governor of Puerto Rico and the Director of the Office of Management and Budget, by delegation of the latter, may order the entry of any sources of revenue in the Fund for an amount greater than that set herein whenever he deems such to be appropriate. The balance of said Emergency Fund shall never exceed one hundred fifty million dollars ($150,000,000)."

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

87

## CHAPTER 10.-FINAL PROVISIONS

Article 10.01.-Immunity with regard to Lawsuits and Forums.

This Law does not affect the immunity that with regard to lawsuits and forums held by the State and its officials or officers. None of that provided in this Law authorizes actions for damages against the State, its officials, or employees due to the acts or omissions of the latter, resulting from compliance with this Law. None of that provided herein shall be interpreted as constituting a waiver of the sovereign immunity of the Government of Puerto Rico.

Article 10.02.-Standards of Interpretation.

The words and phrases used in this Law shall be interpreted according to the context and meaning sanctioned by common everyday use and the rules of hermeneutics recognized by our legal system.

Article 10.03.-Incompatibility.

Any organic law, general or special law, article or section of a law, guideline, collective agreements, agreements, supplementary agreements, administrative orders, policies, employment manuals, circular letters, certifications, regulations, rules, and conditions of employment, normative letters, classification or compensation plans, contractual letters, and/or applicable provisions that go against the provisions of this Law are hereby repealed.

Article 10.04.-Supremacy.

The provisions of this Law and the regulations or standards that are adopted pursuant to it shall prevail over any other provision of law, regulation, or standard that is not consonant with the former.

Article 10.05.-Severability.

If any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Law were to be annulled or declared unconstitutional, the decision, ruling, or judgment issued to that effect shall not affect, impair, or invalidate the remainder of this Law. The effect of said judgment shall remain limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of it that has been annulled or declared unconstitutional. If the application to a person or circumstance of any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter,

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

88

heading, or part of this Law were invalidated or declared unconstitutional, the decision, ruling, or judgment to that effect would not neither affect nor invalidate the application of the remainder of this Law to those persons or circumstances in which it may be validly applied. It is the express and unequivocal will of this Legislative Assembly for the courts to enforce the provisions and application of this Law to the greatest extent possible, even if some of its parts are overruled, annulled, invalidated, impaired, or declared unconstitutional, or even if its application to any person or circumstance is overruled, invalidated, or declared unconstitutional. This Legislative Assembly would have passed this Law regardless of the determination of severability that the Court may make.

Article 10.06.-Validity

This Law shall take effect immediately upon its passage.

**DEPARTMENT OF STATE**
**Certifications, Regulations, Notary**
**Registry, and Sale of Laws**
**I hereby certify that this is a true and exact copy of the original.**
**Date: May 4, 2017**

[signature]

**SIGNATURE**
**Eduardo Arosemena Muñoz**
**Deputy Secretary**
**Department of State**
**Government of Puerto Rico**

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[seal:] *GOVERNOR OF PUERTO RICO*

## GOVERNOR OF PUERTO RICO

Ricardo Rosselló Nevares

EXPLANATORY STATEMENT OF THE GOVERNOR OF PUERTO RICO
UPON SIGNING HOUSE BILL 938

April 29, 2017

Today I signed House Bill 938 into law, by way of which the "Fiscal Plan Compliance Act" is adopted in order to take the necessary measures to ensure the fullest compliance with the Fiscal Plan approved by the Fiscal Oversight Board created under the protection of the Federal PROMESA Act and for other related purposes.

This Law shall allow the Government to operate and provide the essential services to the People pursuant to the Fiscal Plan without terminating public employees. As such, in chapter VI, this legislation allows the Government to use all special state funds as of July 1, 2017 to be deposited in the State Treasury under the custody of the Secretary of the Treasury or the banking entity determined by him. This, in order to be able to apply the standards or priority of payment to this revenue without excluding the special state funds from such. That is the scope of Chapter VI of this Law.

Alternatively, Chapter IV of this legislation is limited to [*sic*] surpluses of some dependencies and corporations as determined by the Fiscal Plan in order to amass additional funds for the general fund that originate from the rate adjustments of certain services as established in the fiscal plans certified by the Fiscal Oversight Board. This does not refer to other revenue of the public corporations except for that determined by rate adjustments of corporations specifically contained in the fiscal

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

plans. Although an exception is made in this Chapter for COFINA, the reality is that this public corporation does not generate surpluses, wherefore this chapter does not apply to said entity.

Cordially,

[signature]
Ricardo Rosselló Nevares

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.