EXHIBITS

1. Complaint and Request For Declaratory Judgment of October 14, 2015 filed at the HTFI-SCSJ.

2. Complementary Motion To Motion To Intervene And Requesting Declaratory Judgment in the Lex Claims civil action, 16-02374(FAB) of March 15, 2017.

1.Complaint and Request For Declaratory Judgment of October 14, 2015 filed at the HTFI-SCSJ.

ESTADO LIBRE ASOCIADO DE PUERTO RICO
*FREE ASSOCIATED STATE OF PUERTO RICO*
TRIBUNAL DE PRIMERA INSTANCIA
*Tribunal of First Instance*
SALA SUPERIOR DE SAN JUAN
*Superior Court of San Juan*

Ángel Ruiz Rivera Y Otros (*and others*)

Demandantes (*Plaintiffs*)

V.

Civil Num. _____
Daños Y Perjuicios (*Torts*)
Derechos Constitucionales
(*Constitutional Rights*)

Honorable Rafael Hernández Colon,
Honorable Pedro Roselló González.
Honorable Sila María Calderón,
Honorable Aníbal Acevedo Vila
Honorable Luis Fortuño Burset;
Honorables Senadores (*Senators*);
Honorables Representantes (*Representatives*);
Honorables Secretarios de Justicia (*Secretaries of Justice*) y (*and*)
Secretarios de Hacienda (*Treasury Secretaries*) de (*from*) 1985-2012; los (*the*)
Directores y Oficiales (*Directors and Officers*) de la Junta del (of the Board of)
Banco Gubernamental de Fomento (BGF); de la (*of the*)
Autoridad de Acueductos y Alcantarillados (AAA); de la (*of the*)
Autoridad de Energía Eléctrica (AEE); de la (*of the*)
Autoridad de Carreteras (AC); de la (*of the*) Autoridad de Puertos (AP); de la  (*of the*) Autoridad para el Financiamiento de la Vivienda de P.R. (AFV); del (*of the*)
Fondo Para El Desarrollo de P.R. (FDPR); de la (*of the*)
Corporación para el Financiamiento Publico de P.R.(CFP); de la (*of the*)
Agencia de Financiamiento Municipal de P.R. (AFM); de la (of the)
Autoridad Para Las Alianzas Publico-Privadas de P.R. (AAPP); de la (*of the*)
Autoridad Para El Financiamiento de la Infraestructura de P.R.(AFI); de la (*of the*)
Autoridad de P.R. para el Financiamiento de Facilidades Industriales,
Turísticas, Educativas, Medicas y de Control Ambiental (AFICA); de la (*of the*)
Corporación de Financiamiento Municipal (COFIM); de la (*of the*)
Corporación del Fondo De Interés Apremiante de P.R.(COFINA); de (*of*)
Cualquier otra agencia, autoridad, corporación, o entidad  o
fondo desconocido que haya emitido deuda en violación de la Constitución;
(*Any other agency, authority, Corporation or entity or unknown fund that may had issued debt in violation of the Constitution*);
Las Compañías de Seguros de tod@s las Juntas de Directores y Oficiales y los
Directores y Oficiales de todas las entidades anteriores;

*(The insurance companies of all the Boards of the Directors and Officers and the Directors and Officers of all the previous entities)*
Todas las Firmas de corretaje de valores que suscribieron las obligaciones del Gobierno de P.R, y sus entidades en exceso de los límites prescritos en la Constitución de P.R.;
*(All the brokerage firms that issued the obligations of the Government of P.R. in excess of the constitutional limits prescribed in the Constitution)*;
Compañías de Seguros y las de sus Juntas y los Directores y Oficiales de estas;
*(The insurance companies and their Boards and their Directors and Officers)*
Las Firmas de Seguros de las emisiones de bonos y de los Bonos y Cualquier otro instrumento financiero cuando fueron emitidos;
*(The insurance firms of the Bonds issuances and the Bonds issued and any other financial instrument issued )*
Todas los Bufetes de abogados y los abogados de todas las entidades anteriores que otorgaron los contratos en violación de la Constitución de P.R. y las Compañías de seguros de estos; tanto de las entidades del gobierno como su contraparte y
*(All the law firms and lawyers of all the above entibies that suscribied the contracts in violation of the Constitution and their insurance companies; of all the government entities as well as their counterpart)*
otr@s Demandados desconocidos
*(other unknown Defendants)*

Demandados *(Defendants)*

---

## DEMANDA Y SOLICITUD DE SENTENCIA DECLARATORIA
### *Complaint and Request for Declaratory Judgment*

AL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA (HTPI):
*(To The Honorable First Instance Tribunal (HFIT):*

Comparece el Demandante, Por Se e In Forma Pauperis (IFP) y respetuosamente Expone, Alega y Solicita como sigue.

*Comes now, the Plaintiff, Pro Se and In Forma Pauperis (IFP) and respectfully States, Alleges and Prays as follows.*

### I.   Breve Introducción – *Brief Introduction*

1. Esta es una Demanda donde los Demandados principales son varios de l@s pasad@s Honorables Gobernadores(as) del archipiélago de Puerto Rico, también conocido como (t/c/c) el Estado Libre Asociado (ELA) de P.R. y t/c/c, el territorio no incorporado a los Estados Unidos de America (EUA); nombrados en el epígrafe; todos los Honorables Senadore(a)s, tod@s l@s Representantes de todas las respectivas administraciones del Gobierno del Pueblo de P.R. de 1985-2012 por virtud de la voluntad de dicho Pueblo en los sufragios universales que le

otorgaron el derecho y privilegio de representar al mismo Pueblo que los eligió democráticamente mediante proceso eleccionario con participación de la mayoría del los electores legalmente registrados para ello. También se incluye a tod@s los Secretarios de Justicia y de Hacienda de todas las administraciones bajo los gobernadores desde el año 1985 hasta el 2012 que parecen en el epígrafe.

*This is a complaint where the principal Defendants are various of the past governors of the archipelago of Puerto Rico, a/k/a the Free Associated State of P.R., (Commonwealth) a//k/a the unincorporated territory of the United States of America, named in the caption. All the Honorable Senators and Representatives of all the respective administrations of the Government of the People from 1985-2012 by virtue of the will of same People in the universal suffrages that gave them the right and privilege to represent same People that lected them democratically through electoral processes with participation of the majority of the electorate legally registered to vote. The Secretaries of Justice and of the Treasury of all the administrations from 1985 until 2012 of the governors that appear in the caption are also included.*

2. Esta Demanda está basada en que todos los Demandados violaron la Constitución de Puerto Rico tal y como legalmente aprobada y refrendada en el 1952 mediante los procesos que contaron con el aval expreso del Congreso de los E.U.A. y ratificados por el Pueblo de Puerto Rico. Todos los Demandados juraron obedecer y hacer cumplir dicha Constitución y a base de esa representación el Pueblo confió en que cumplirían con los preceptos prescritos en la Constitución del 1952.

*This Complaint is based in that all the Defendants violated the P.R. Constitution as legally approved and and ratified in 1952 through the processes that counted with the express approval of the U.S. Congress and ratified by the People of Puerto Rico. All the Defendants swore to obey and make comply same Constitution and on the basis of that representation the People trusted that they would comply with the precepts prescribed in the 1952 Constitution.*

3. Ahora resulta evidente, como consecuencia de los hechos a los que se enfrenta nuestro Pueblo, harto conocidos por haberse ventilado en los medios de comunicación en masa, digitales y redes sociales por el Internet, de que los habitantes residentes de Puerto Rico estamos alegadamente obligados contractualmente a pagar sobre setenta billones de dólares $70,000,000,000.00 a acreedores que contrataron con los Demandados en abierta violación de nuestra Constitución y que todos estos funcionarios violaron la misma Constitución que representaron y juraron ante este mismo Pueblo, obedecer y defender y que los otros Co-Demandados contrataron con los Demandados teniendo que haber sabido ellos y/o sus compañías de seguros, las de los Directores y Oficiales de sus Juntas, y/o sus Juntas y /o sus abogad@s; que dichas obligaciones estaban prohibidas expresamente por la Constitución; razón por la cual dichos contratos son nulos ab initio y como tal no deben ser ratificados por este HTPI o por cualquier tribunal de Justicia que termine evaluando esta controversia.

3

*Now it results to be evident, as a consequence of the facts that our People confront, known ad nauseam for having been ventilated in the mass communications media, digital and social networks, that the inhabitants of Puerto Rico, are allegedly obliged contractually to pay over seventy billion dollars ($70,000,000,000.00) to creditors that contracted with the Defendants in overt violation of our Constitution and that all these functionaries violated the same Constitution they represented and swore before this same People, to obey and defend and that the other Co-Defendants contracted with the Defendants having them known and their insurance companies, and their Directos and Officers, and their Boards and their lawyers; that same obligations were expressly proscribed by the Constitution, reason why those contracts are null ab initio, and as such, they should not be ratified by this HFIC or any justice tribunal that may end evaluating this controversy.*

4. Por un lado, respetuosamente radicamos esta Demanda ante el hecho consumado de que ninguno de los Demandados cumplió con su deber ministerial y fiduciario de obedecer y hacer cumplir nuestra Constitución.

*On one side, we respectfully file this Complaint because of the fait accompli that none of these Defendants complied with their ministerial and fiduciary duties of boeing and making sure that our Constitution was complied with.*

5. Por otro lado, tod@s los Co-demandados representan a las entidades que contrataron con los Demandados anteriores, y/o sus companias de seguros, las de sus Juntas y las de los Directores y Oficiales de sus Juntas y/o sus abogados; quienes sabían o debieron haber sabido que los contratos y obligaciones que se otorgaron en exceso de los límites prescritos en la Constitución son legalmente nulos ab initio y por ende inexistentes todas las obligaciones que emanan de ellos.

*On the other side, all the Co-Defendants represent entities that contracted with the above mentioned first Defendants and their insurance companies, those of their Boards and those of their Directors and Officers of their Boards and/or their lawyers, knowing or having to know that the contracts and obligations that were subscribed in excess of the limits prescribed in the Constitution are legally null ab initio and ergo, all the obligations that emanate from the, are inexistent.*

## II.   Las Partes – *The Parties*

### Demandantes- *Plaintiffs*

6. El Demandante es ciudadano de Puerto Rico, y de los E.U.A., mayor de edad, nacido y criado en Puerto Rico, y residente de Bayamón, Puerto Rico, soltero y desempleado. El Demandante sufre y padece un daño económico personal ("injury in-fact") cada vez que adquiere o compra un alimento, comida, artículo de primera necesidad, medicina, pieza de ropa, servicio o cualquier otra cosa porque todos los anteriores están gravados con impuestos sobre el consumo como fuente de ingreso para que el Gobierno de P.R. pueda tener una fuente de pago para tratar

4

de cumplir con las obligaciones contraídas inconstitucionalmente por los Demandados principales y los Co-Demandados.

*Plaintiff is a citizen of Puerto Rico and the U.S. of A., of legal age, born and raised in Puerto Rico, and resident of Bayamon, Puerto Rico, single and unemployed. The Plaintiff suffers and is damaged by a personal injury-in-fact every time he buys food, groceries, basic staples, medicines, clothing, or any goods and services, since all of the above are taxed with consumer taxes as a source of income so that the Government of P.R. may have a source of repayment for the unconstitutional obligations incurred into by the Principal Defendants and Co-Defendants.*

7. Los otros Demandantes que sufren y padecen igual que el Demandante principal, se irán uniendo al pleito a medida de que el mismo vaya tomando su curso en tanto y en cuanto esta Demanda está prevista como un pleito de clase que oportunamente se solicitará se certifique como tal.

*The other Plaintiffs that suffer and are equally damaged as the principal Plaintiff, will be joining this civil action in due course and time, since this Complaint is intended to be converted into a class action suit that eventually will be asjed to be certified as such.*

### Demandados - *Defendants*

8. Los Demandados principales son los exgobernadores de P. R., los Senadores, y los Representantes y los Secretarios de Justicia. Los primeros promovieron legislación conducente a que se violara la Constitución de Puerto Rico en cuanto a los limites de deuda que el Pueblo les había autorizado a contraer; los segundos la avalaron y endosaron con su voto; y los terceros condonaron con su inacción, sabiendo que dichas legislaciones promovidas por el Poder Ejecutivo (los Gobernadores) y aprobadas por los Senadores y Representantes del Poder Legislativo y quienes debían representar al Pueblo en vez violaron la Constitución. L@s Secretarios de Justicia son co-responsables del daño porque siendo los mas responsables de hacer cumplir la Constitución, miraron para el otro lado tampoco cumpliendo con su deber ministerial.

*The principal Defendants are the ex-Governors of P.R., its Senators and Representatives and the Secretaries of Justice. The first ones promoted legislation conducive to the violation of the P.R. Constitution with respect to the debt levels that the People had authorized them to incur; the second ones approved and endorsed same with their votes; and the third one condoned same with their inactions knowing that the legislations promoted by the Executive Power ( the Governors), and approved by the Senators and Representatives of the Legislative Power, and who had the duty of representing the People, instead violated the Constitution. The Secretaries of Justice are co-responsible of the damages because being the ones responsible for assuring the compliance with the Constitution, instead, looked the other way and also did not comply with their ministerial duty.*

5

9. Los Co-Demandados, son las Juntas de Directores en si, y los Directores y Oficiales de las Juntas de Directores con autoridad en ley para tomar las decisiones, junto con todos sus abogados para todos los años envueltos de la Autoridad de Acueductos y Alcantarillados (AAA), la Autoridad de Energía Eléctrica (AEE), la Autoridad de Carreteras (AC), la Autoridad de Puertos (AP), el Banco Gubernamental de Fomento (BGF); la Autoridad para el Financiamiento de la Vivienda de P.R. (AFV); el Fondo Para El Desarrollo de P.R. (FDPR); la Corporación para el Financiamiento Publico de P.R.(CFP); la Agencia de Financiamiento Municipal de P.R. (AFM); la Autoridad Para Las Alianzas Publico-Privadas de P.R. (AAPP); la Autoridad Para El Financiamiento de la Infraestructura de P.R.(AFI); la Autoridad de P.R. para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Medicas y de Control Ambiental (AFICA); la Corporación de Financiamiento Municipal (COFIM); La Corporación del Fondo De Interés Apremiante de P.R. (COFINA); y los Secretarios de Hacienda; quienes se encargaron de aprobar e implantar las políticas y medidas inconstitucionales aprobadas por los Demandados principales y quienes faltaron a su deber ministerial de defender la Constitución sabiendo que dichas políticas y medidas la violentaban; por ende actuando de forma totalmente ultra vires o mas allá de su autoridad legal.

*The Co-Defendants are the Boards of Directors per se, and the Directors and Officers of the Board of Directors, and their lawyers of the Autoridad de Acueductos y Alcantarillados (AAA), the Autoridad de Energía Eléctrica (AEE), la Autoridad de Carreteras (AC), the Autoridad de Puertos (AP), the Banco Gubernamental de Fomento (BGF); the Autoridad para el Financiamiento de la Vivienda de P.R. (AFV); the Fondo Para El Desarrollo de P.R. (FDPR); the Corporación para el Financiamiento Publico de P.R.(CFP); the Agencia de Financiamiento Municipal de P.R. (AFM); the Autoridad Para Las Alianzas Publico-Privadas de P.R. (AAPP); the Autoridad Para El Financiamiento de la Infraestructura de P.R.(AFI); the Autoridad de P.R. para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Medicas y de Control Ambiental (AFICA); la Corporación de Financiamiento Municipal (COFIM); the Corporación del Fondo De Interés Apremiante de P.R. (COFINA); and the Secretaries of the Treasury that were in charge of approving and implementing the unconstitutional policies and measures approved by the principal Defendants and that were derelict in their ministerial ruties of defending the Constitution knowing that those policies and measures violated same, ergo, acting totally ultra vires or beyond the scope of their legal authority.*

10. Las Co-Demandadas; compañías de seguros desconocidas. son las compañías de seguros proveyendo la cubierta de la póliza de responsabilidad publica que dieron cubierta y/o cubren a todas las entidades arriba incluidas como Co-Demandadas y a sus Juntas de Directores y a sus Directores y Oficiales por sus actuaciones culposas y negligentes en el ejercicio de sus deberes ministeriales o discrecionales.

*The Co-Defendants, unknown insurance companies are the insurance companies providing the public liability insurance coverage that covered and/or cover all the entities above mentioned included as Co-Defendants and their Board of Directors and their Directors and Officers for their fault, wrongs and negligence in their dereliction of the exercise of their ministerial or discretional duties*

11. Las Co-Demandadas compañías de corretaje son aquellas desconocidas por conducto de las cuales se realizaron las emisiones de deuda inconstitucionales [1] mediante venta de bonos y otros instrumentos financieros negociables en los mercados de valores en violación de la Constitución. Estos Co-Demandados son co-causantes de los daños y perjuicios causados a los Demandantes puesto que contrataron con los funcionarios Demandados principales teniendo que haber sabido ellos y/o sus abogados que dichos contratos se otorgaron en violación de la proscripción expresa en la Constitución de P.R.. Esto los hace co-responsables solidariamente por los daños y perjuicios por su culpa y/o negligencia concurrente.

*The Co-Defendants Brokerage firms are those unknown firms through which the unconstitutional debt issuances were channeled, as bonds and other negotiable financial instruments in the stock markets in violation of the Constitution. These Co-Defendants are co=responsible for the torts caused to the Plaintiffs since they contracted with the functionaries of the principal Defendants having them known or their lawyers that those contracts were subscribed against the express proscription in violation of the  P.R> Constitution. This makes them co-responsible jointly or severally for the damages caused by their fault, wrongs and negligence.*

12. Las Co-Demandadas firmas de seguros que aseguraron las emisiones de los bonos y otros instrumentos financieros otorgados en exceso de los límites prescritos en la Constitución de P.R.. Estas Co-Demandadas son co-causantes de los daños y perjuicios causados a los Demandantes puesto que contrataron con los funcionarios Demandados teniendo que haber sabido ellos y/o sus firmas de abogados y las firmas aseguradoras de est@s abogad@s, que dichos contratos se otorgaron en violación de la proscripción expresa en la Constitución de P.R.. Esto los hace co-responsables solidariamente por los daños y perjuicios por su culpa y/o negligencia concurrente.

*The Co-Defendants insurance firms that insured the Bonds and other financial instruments in excess of the limits prescribed by the Constitution. These Co-Defendants are co-responsible of the damages caused to the Plaintiffs since they contracted with functionaries for the Defendants knowing or having to know that themselves and their attorneys and the insurance firms of same layers knew that the contracts were suscribed in violation of the express proscription in the P.R. Constitution. This makes them jointly and/.or severally co-responsible for the damages caused for this fault, wrongs and negligence.*

---

[1] Llamadas eufemísticamente "extraconstitucionales". *Euphimistically calles "extraconstitutional".*

13. Las Co-Demandadas Juntas de Directores y los Directores y Oficiales de las Juntas de las firmas de seguros que aseguraron la emisión de los bonos y otros instrumentos financieros y la compañía de seguros de estos.

The Co-Defendants Board of Directors and Directors and Officers of the Boards of the insurance firms that insured the bonds and other financial instruments issuances and the insurance companies of the above.

14. Las firmas de abogad@ y abogad@s que aprobaron, redactaron y otorgaron los contratos de todas las obligaciones en exceso del limite en la Constitución tanto por el lado del Gobierno y sus entidades como por el lado de las firmas de corretaje de valores y las firmas de seguros que aseguraron la emisión de los bonos y/o las Juntas de Directores y/o los Directores y Oficiales de dichas Juntas de tod@s las entidades que compraron bonos u otros instrumentos financieros en exceso de lo permitido por nuestra Constitucion y/o los abogad@s de tod@s las anteriores son co-responsables por haberlos otorgado en violación de la Constitución de P.R.

*The law firms and lawyers that approved, subscribed and submitted the contracts of all the obligations in excess of the limits in the Constitution both on the side of the Government and its entities and for the brokerage and insurance firms that insured the issuance of the bonds and/or the Board of Directors and/or the Directors and Officers of same Boards, of all the entities that bought bonds and other financial instruments in excess of the limits allowed by our Constitution and/or the lawyers of all the preceding ones are co-responsible for having suscribed them in violation of the Constitution.*

15. Las compañías de seguros de las firmas de abogad@ que otorgaron los contratos de las obligaciones del Gobierno de P.R., en contra de la Constitución de P.R., tanto los de las entidades del Gobierno como los de las entidades que contrataron con estas.

*The insurance firms of the lawyers firms that suscribed the contracts of the obligations of the Government of P.R, contrary to the P.R. Constitution both of the Government entities and the entities that contracted with them.*

### III.   Derecho Aplicable- *Applicable Law*

16. La Constitución de Puerto Rico, que fue lograda después de décadas de esfuerzo, sudor, sangre y lagrimas por parte del Pueblo de Puerto Rico, hasta el punto de que tuvo que legislarse una medida en el Congreso de los E.U.A. para que sirviera de base legal para que por medio de un Referéndum del Pueblo De Puerto Rico fuera aprobada; manda y ordena como sigue en cuanto a lo que es pertinente para efectos de esta Demanda:

The Constitution of P.R., that was achieved after decades of effort, blood, sweat and tears, form the Puerto Rican People, to the point where a measure was legislated in the U.S. Congress that served as its legal basis so that as a a result of a referendum of the Puerto Rican People it was approved, mandated and ordered, as follows:

## ARTICULO VI DISPOSICIONES GENERALES

Sección 2. Poder para imponer contribuciones; para contraer deudas. El poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios se ejercerá según se disponga por la Asamblea Legislativa, y nunca será rendido o suspendido. El poder del Estado Libre Asociado de Puerto Rico para contraer y autorizar deudas se ejercerá según se disponga por la Asamblea Legislativa, pero ninguna obligación directa del Estado Libre Asociado de Puerto Rico por dinero tomado a préstamo directamente por el Estado Libre Asociado de Puerto Rico evidenciada mediante bonos o pagarés para el pago de la cual la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico fueren empeñados será emitida por el Estado Libre Asociado de Puerto Rico si el total de (i) el monto del principal de e intereses sobre dichos bonos y pagarés, junto con el monto del principal de e intereses sobre la totalidad de tales bonos y pagarés hasta entonces emitidos por el Estado Libre Asociado y en circulación, pagaderos en cualquier año económico y (ii) cualesquiera cantidades pagadas por el Estado Libre Asociado en el año económico inmediatamente anterior al año económico corriente en concepto de principal e intereses correspondientes a cualesquiera obligaciones evidenciadas mediante bonos o pagarés garantizadas por el Estado Libre Asociado, excediere el 15% del promedio del monto total de las rentas anuales obtenidas de acuerdo con las disposiciones de las leyes del Estado Libre Asociado e ingresadas en el Tesoro de Puerto Rico en los dos años económicos inmediatamente anteriores al año económico corriente; y ninguno de dichos bonos o pagarés emitidos por el Estado Libre Asociado para cualquier fin que no fuere facilidades de vivienda vencerá con posterioridad a un término de 30 años desde la fecha de su emisión y ningún bono o pagaré emitido para fines de vivienda vencerá con posterioridad a un término de 40 años desde la fecha de su emisión; y el Estado Libre Asociado no garantizará obligación alguna evidenciada mediante bonos o pagarés si el total de la cantidad pagadera en cualquier año económico en concepto de principal e intereses sobre la totalidad de las antes referidas obligaciones directas hasta entonces emitidas por el Estado Libre Asociado y en circulación y las cantidades a que se hace referencia en la cláusula (ii) excediere el 15 por ciento del promedio del monto total de dichas rentas anuales.

For the translation, please see Motion at pages 2-4, footote 3.

### IV.   Los Hechos –*The Facts*

17. Todos los Demandados violaron la Constitución de Puerto Rico al promover los primeros, (los Gobernadores) aprobar los segundos (los Representantes y Senadores) y condonar los terceros, (los miembros del Ejecutivo de Justicia y Hacienda) la violación de la Constitución de Puerto Rico, como resultado de toda la comisión y omisión antes denunciada y como nexo causal mas próximo, permitir que el Pueblo de Puerto Rico quedara por varias generaciones endeudado, hipotecado, y obligado a pagar deudas contraídas por sus administraciones en contra de la Constitución de Puerto Rico, de los limites que le impone dicha Constitución, y de los principios mas básicos y elementales de   sana administración pública.

*All the Defendants violated the P.R. Constitution when the first ones (the Governors) promoted, the second ones (the Representatives and Senators) approved, and the third ones (the Secretaries of Justice and the Treasury), condoned  the Constitution of P.R., as a result of which all their commissions and omissions denounced before led as their most causal nexus,, allow that the People of Puerto Rico remained left for generations to live in debt, hypothecated and obliged to pay debts incurred into by administration contrary to the Constitution of P.R. and of the lliits imposed by same Constitution and the most basic and elementary principles of public administration.*

18. Que como nexo causal mas próximo de las actuaciones culposas y negligentes por comisión y/o omisión de los Demandados, en evidentemente obvia violación de la Constitución de Puerto Rico, millones de puertorriqueños estamos por generaciones como consecuencia directa de ello, supuestamente obligados legalmente a pagar una deuda inconstitucional en la que los Demandados incurrieron, sin autoridad legal para ello, por lo tanto nula ab initio.

*That as the most proximate causal nexus of the faulty, wrong and negligent actions of the Defendants dur to their commissions and omissions, in an evidently obvious violation of the Constitution of Puerto Rico, millions of Puerto Ricans are indebted for generations as a direct consequence of the conduct of the Defendants, without legal authority and ergo, null ab initio.*

19. Que los todos los Co-Demandados son co-causantes por ende co-responsables de los daños y perjuicios causados a los Demandantes por haber contratado obligaciones que ellos y sus firmas de seguros y sus Juntas de Directores y sus Directores y Oficiales y sus firmas de abogados sabían o debieron haber sabido que eran inconstitucionales y por ende no susceptibles de poderse contratar legalmente.

*That all the Co-Defendants are co-actors, ergo, co-responsable for the damages caused to the Plaintiffs for having contracted obligations that they and their insurance firms and their Board of Directors and their law firms knew or should had*

known  that were unconstitutional and ergo, not susceptible of being legally contracted.

### V.    Reclamaciones- Claims

20. Que este HTPI declare ha lugar esta Demanda y Solicitud de Sentencia Declaratoria en cuanto a todos su extremos y encuentre personal y solidariamente responsable a todos los Demandados por los daños y perjuicios que han sufrido los Demandantes por las actuaciones culposas y negligentes por la violación de los Demandados de la Constitución de Puerto Rico al haber promovido, aprobado, condonado y endosado la aprobación de contratación de deuda en forma de emisión de bonos y otros instrumentos financieros negociables en la bolsa de valores por cantidades en exceso de y como consecuencia en violación a los limites que la Constitución de P.R. permitían y permiten.

That this HFIT grants this Complaint and Declaratory Judgment Petition in all its extremes and that it rules that all the Defendants are jointly and/or severally responsible to all the Plaintiffs for all the damages they have suffered as a result of their wrongful and negligent actions for the violation of the Defendants of the Constitution of P.R, when having promoted, condoned and endorsed the approval of contracts of debt in the form of bonds issuances and other negotiable dinancial instruments in the stock markets for amounts in violation of the limits that the Constitution of PR. allowed and permitted.

21. Que este HTPI determine que los Demandados no pueden legalmente estar cobijados por inmunidad cualificada por estos haber tenido conocimiento de la Constitución al punto de que inclusive juraron defenderla para ostentar los cargos que ocuparon y como consecuencia no podrían siquiera alegar de que desconocían que la misma prohibía expresamente el que se emitiera deuda o se tomara prestado por encima de los límites prescritos en la Constitución. Véase criterios del U.S. Court of Appeals for the First Circuit (USCA1C) para determinar si un oficial del gobierno demandado tiene derecho a inmunidad cualificada. [2]

---

[2] "Officials are entitled to qualified immunity unless (1) 'the facts that a plaintiff has alleged or shown make out a violation of a constitutional right' and (2) 'the right at issue was "clearly established" at the time of [the defendants'] alleged misconduct.'" **Walden**, 596 F.3d at 52 (quoting **Pearson**, 129 S. Ct. at 816). In light of **Pearson**, we may now address the second prong of the qualified immunity test first. **See** 129 S. Ct. at 818. We follow that course here.
This second prong has "two aspects": (1) "whether, based on the 'clarity of the law at the time of the alleged civil rights violation,' '"[t]he contours of the right . . . [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right,"'" **Walden**, 596 F.3d at 52 (alteration in original) (quoting **Maldonado v. Fontanes**, 568 F.3d 263, 269 (1st Cir. 2009) (quoting **Anderson v. Creighton**, 483 U.S. 635, 640,[ F.3d Page 36 ]107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987))), and (2) "whether, based on the 'facts of the particular case,' a 'reasonable defendant would have understood that his conduct violated the plaintiffs'

*That this HFIT determines that the Defendants cannot legally be shielded by the defense of qualified immunity since they had knowledge of the Constitution to the point where they inclusively swore to defend same on order to maintain the positions they enjoyed and as a consequence they cannot even allege that they did not know that same expressly prohibited the debt was issued or that loans were taken in excess of the limits prescribed by same Constitution. See the criteria of the U.S. Court of Appeals for the First Circuit (USCA1C) to determine if these government officers Defefendats may be entitled to qualified immunity.*

22. Que esta causa de acción no esta prescrita por haber mediado dolo y vicio en el consentimiento, en otras palabras, fraude en la contratación.

*That this cause of action is not affected by any statute of limitations since there was fraud in the consent of the obligations.*

23. Que este HTPI  determine que los Co-Demandados son co-causantes y por ende co-responsables de los daños causados a los Demandantes y les ordene a pagar mancomunada o solidariamente la cantidad que este HTPI entienda que es justa y razonable.

*That this HFIT rules that the Co-Defendants are co-agents and ergo, co-responsible for the damages caused to the Plaintiffs, and that it orders them to pay jointly and/.or severally whatever amount this HFIT may deem just and reasonable under the circumstances.*

## VI. Súplica  - *Prayer*

24. Se solicita que este HTPI mediante Sentencia Declaratoria declare nulos todos los contratos de todas las obligaciones contraídas en exceso de lo que ordena y manda nuestra Constitución. Que para ello tome en consideración todos los contratos firmados después de la fecha en la que ya se habia alcanzado los limites de deuda para cada año en cuestión.

*It is prayed to this HFIT that through its prayed Declaratory Judgment declares null and void all the  obligations  contracted in excess of what is ordered and mandated by our Constitution. That is so doing it takes into consideration the date by when the issuance of the Constitutional debt was reached.*

---

constitutional rights.'" **Id**. (quoting **Maldonado**, 568 F.3d at 269). The '"relevant, dispositive inquiry'" in determining whether a right was "clearly established" is '"whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" **Id**. at 53 (quoting **Saucier**, 533 U.S. at 201). <u>Melendez Garcia v. Sánchez Et Al</u>, 629 F.3d 25 (2010).

25. Se ordene a los Demandados y Co-Demandados a resarcir a los Demandantes con la cantidad que este HTPI estime justa y razonable por los daños y perjuicios sufridos una vez se determine judicialmente su cuantía mediante los mecanismos procesales que provee nuestro ordenamiento jurídico que se estiman en no menos de cincuenta billones de dólares ($50,000,000,000.00), que incluyen los pagos ya realizados por todas las obligaciones inconstitucionales desde el 1985 al presente y los efectos de estas obligaciones y contratos inconstitucionales y fraudulentos pagos en los Demandantes en forma de los impuestos sobre el consumo que se impusieron con este propósito desde que se aprobó el IVU.

*That the Defendants and the Co-Defendants are ordered to redress the Damages that this HFIT may deem just and reasonable, for the damages suffered once it is judicially determined its quantum, through the procedural mechanisms that our juridical order provides that are estimated to be in no less than fifty billion dollars ($50,000,000,000.00 00) which include the payments already made for all the unconstitutional obligations that since 1985 to the present and the effects of these unconstitutional and fraudulent obligations and contracts payments in form of taxes over the consumption which were imposed since the IVU was approved.*

26. Se le ordene a las firmas de seguros que aseguraron las emisiones de bonos y otros instrumentos financieros inconstitucionales y fraudulentamente y a las firmas de seguros de estas a su vez, a pagarle a los bonistas por sus bonos e inversiones.

*That this HFIT orders the insurance firms that insured the unconstitutional and fraudulent bonds issuance and of other financial instruments, to pay the bond holders for their investments.*

## CERTIFICADO DE NOTIFICACIÓN

Yo, Ángel Ruz Rivera, compareciendo Pro Se e IFP, por la presente certifico que una vez este HTPI declare ha lugar mi comparecencia IFP, enviaré copia de esta Demanda junto con la Notificación de Demanda y Solicitud de Renuncia al Emplazamiento a la dirección-e y/o dirección física y/o postal conocida de todos los Demandados y Co-Demandados.

*I, Angel Ruiz Rivera, appearing Pro Se and IFP, hereby certify that once this HFIT grants my IFP application, I will send copy of this Complaint together with the Notification of a Complaint and the Request for Waiver of Summons to the known e-mail addresses and/or physical addresses and/or postal addresses of all the Defendants and Co-Defendants.*

Respetuosamente sometido, hoy 13 de octubre de 2015.

Respectfully submitted, today October 13, 2015.

Ángel Ruiz Rivera
Demandante-Pro Se-IFP
Calle Santa Rita AA-27
Ext. Villa Rica
Bayamón, P.R. 00959.
787-779-9222
auizrivera@aol.com
angelruizrivera@gmail.com
EXHIBITS

1. Información sobre algunas de las Co-Demandadas agencias, bancos, corporaciones y fondos del Gobierno.

   *Information about some of the Co-Defendants, government agencies, banks, corporations and funds.*

2. Información sobre las compañías aseguradoras de los bonos emitidos.

   *Information about the insurance companies of the bonds issued.*

Case:17-03283-LTS   Doc#:321-1   Filed:06/13/17   Entered:06/13/17 17:33:01   Desc:
Banco Gubernamen    : Fomento Exhibit bierto Page 17 of 128                 Page 1 of 1
Case 3:16-cv-01037-FAB   Document 51-1   Filed 09/01/16   Page 10 of 52





**Subsidiarias Principales**

Autoridad para el Financiamiento de la Vivienda de Puerto Rico (AFV)

Contactos

Alexander Estee
Ave. Barbosa 606
Edif. Juan C. Cordero
Río Piedras PR 00919-6215

Dirección postal:
PO Box 7165
San Juan PR 00936-8461

Tel (787) 765-7577
Fax (787) 620-7521

**José A. Sierra Morales**
Director Ejecutivo
Tel. (787) 765-7577 x1374
Fax (787) 620-7521

Myrna Díaz Marrero
Directora Ejecutiva Auxiliar de Negocios
Tel. (787) 765-7577 x2482

CPA José O. Reyes Portalatín
Director Ejecutivo Auxiliar de Servicios Legales,
Contralor y Cumplimiento
Tel. (787) 765-7577 x1555

Osvaldo L. Padilla Díaz
Director Ejecutivo Auxiliar de Operaciones
Tel. (787) 765-7577 x1508

Lcda. Carol Colberg Ríos
Directora de Servicios Legales
Tel. (787) 765-7577 x1550
Fax (787) 620-7501

Sylvia I. Martínez Colimann
Asesora del Director Ejecutivo
Tel. (787) 765-7577 x4518

Cleto M. Marrero Torres
Ayudante de Director Ejecutivo
Tel. (787) A-                x1505
Fax (787) 620-7521

Derechos reservados © 2008-2015 Banco Gubernamental de Fomento para Puerto Rico
Mapa del Sitio | Aviso Legal | Contáctenos

http://www.gdb-pur.com/sna/principalsubsidiaries/housing-finance-authority.html          7/12/2015

Case:17-03283-LTS   Doc#:321-1   Filed:06/13/17   Entered:06/13/17 17:33:01   Desc:
Exhibit   Page 20 of 128

Banco Gubernamental (      ) mento para Puerto Rico                    Page 1 of 2
Case 3:16-cv-01037-FAB   Document 51-1   Filed 09/01/16   Page 13 of 52

## Para Inversionistas

### Para Inversionistas

**Autoridad para el Financiamiento de la Vivienda de Puerto Rico (AFV)**

(Una subsidiaria del DDF creada a raíz de la fusión entre el Banco de la Vivienda de Puerto Rico y la Corporación para el Financiamiento de la Vivienda de Puerto Rico)

Página web: www.afv.gobierno.pr

**Instrumentos Certificados**

| | | | |
|---|---|---|---|
| Mortgage-Backed Certificates 2000 Serie A: $100,663,717 | | — | AAA |
| Affordable Housing Mortgage Subsidy Program-Single Family Mortgage Revenue Bonds/Portfolio XI - $200,000,000 | | — | AAA |

☒ Fitch Ratings™ July 21, 2010

**Garantía**

Todos los préstamos hipotecarios financiados por los Bonos de Renta y Pagarés Hipotecarios de Vivienda Unifamiliar deben estar asegurados por la Administración de Vivienda Federal, la Administración de Veteranos o Desarrollo Rural.

**Fiduciario**

La Autoridad tiene uno de los mejores bancos de la Vivienda, entre otras cosas, al poder dar otorgar préstamos directos, asegurar préstamos y comprar préstamos en propiedades privadas para la compra de Vivienda de interés social y para subsidiar préstamos hipotecarios.

**Operado bajo el Contrato de Fideicomiso**

Banco Popular de Puerto Rico, San Juan, PR

**Clasificaciones Crediticias**

| | | | |
|---|---|---|---|
| Collateralized Mortgage Obligations Mortgage Trust III | | — | AA+ |

☒ Standard & Poor's - August 26, 2011
☒ Standard & Poor's - July 21, 2011
☒ Standard & Poor's - February 27, 2003

**Garantía**

Case:17-03283-LTS Doc#:321-1 Filed:06/13/17 Entered:06/13/17 17:33:01 Desc:
Banco Gubernamental omento Publ Rage 21 of 128 Page 2 of 2
Case 3:16-cv-01037-FAB Document 51-1 Filed 09/01/16 Page 14 of 52



Banco Gubernamental de _mento para Puerto Rico

(Commonwealth Appropriation Bonds)
July 27, 2012

Puerto Rico Public Finance Corporation - $437,645,000
2011 Series B Bonds
(Commonwealth Appropriation Bonds)
8 de diciembre de 2011

Supplement to Official Statement dated July 15, 2011 relating to $263,330,000 Puerto Rico
Public Finance Corporation
2011 Series A Bonds
(Commonwealth Appropriation Bonds)
16 de agosto de 2011

Puerto Rico Public Finance Corporation - $742,320,000
2011 Series A Bonds
(Commonwealth Appropriation Bonds)
13 de julio de 2011

Puerto Rico Public Finance Corporation - $148,825,000
2004 Series H Bonds
(Commonwealth Appropriation Bonds)
11 de junio de 2004

Puerto Rico Public Finance Corporation - $1,220,715,000
2004 Series A Bonds
(Commonwealth Appropriation Bonds)
11 de junio de 2004

Puerto Rico Public Finance Corporation - $384,730,786.55
$47,935,000 2003 Series A Bonds
$275,404,000 2003 Series B Refunding Bonds
$61,791,786.55 2003 Series C Refunding Bonds
(Commonwealth Appropriation Bonds)
5 de junio de 2003

Puerto Rico Public Finance Corporation - $600,073,932.40
2002 Series A Bonds
(Commonwealth Appropriation Bonds)
21 de junio de 2002

Puerto Rico Public Finance Corporation - $771,374,200.05
2001 Series C Bonds
(Commonwealth Appropriation Bonds)
Supplement to Official Statement
11 de enero de 2002

Puerto Rico Public Finance Corporation - $1,006,045,000
2001 Series E Bonds
(Commonwealth Appropriation Bonds)
13 de diciembre de 2001

Puerto Rico Public Finance Corporation - $771,374,200.05
2001 Series C Bonds
(Commonwealth Appropriation Bonds)
13 de diciembre de 2001

Contacto del DGF:
Ana E. Torres
Vicepresidente
Directora de Financiamiento de Obligaciones Generales
Departamento Obligaciones Generales
Tel. (787) 722-2525 x-15267
Fax (787) 721-0560
Email: ana.torres@bgf.gobierno.pr

Contacto de la Corporación:
José V. Pagán Beauchamp
Directora Ejecutiva de la Corporación
Tel. (787) 721-2525 x-15442
Fax (787) 728-0975

Derechos reservados © 2005-2015 Banco Gubernamental de Fomento para Puerto Rico
Términos y Uso | Aviso Legal | Confidencialidad

Case:17-03283-LTS    Doc#:321-1    Filed:06/13/17    Entered:06/13/17 17:33:01    Desc:
Banco Gubernamental    omento Exhibito R Page 24 of 128    Page 1 of 1
Case 3:16-cv-01037-FAB    Document 51-1    Filed 09/01/16    Page 17 of 52



2. Información sobre las compañías aseguradoras de los bonos emitidos.

Case:17-03283-LTS   Doc#:321-1   Filed:06/13/17   Entered:06/13/17 17:33:01   Desc:
Municipal Bond Insura        Exhibit    Page 26 of 128              Page 1 of 3
Case 3:16-cv-01037-FAB   Document 51-1   Filed 09/01/16   Page 19 of 52



Bond Insurance

## History of Bond Insurance

Issuers that meet certain credit criteria can purchase municipal bond insurance policies from private companies. The insurance guarantees the payment of principal and interest on a bond issue if the issuer defaults. Bond ratings are based on the credit of the insurer rather than the underlying credit of the issuer. A municipal bond insurance policy is intended to result in significant interest cost savings, depending upon the issuer's underlying credit and market conditions at the time of the bond sale. Interest cost savings are attributable to the higher bond rating as well as enhanced liquidity for insured bonds.

Triple-A municipal bond insurance emerged in 1971. From 1971 to 2007 the number of insured issues grew astronomically. In 1980, only 3% of bond issues were insured compared to approximately 60% in 2007. In 2008, there was an estimated $2.5 trillion of municipal bonds of which more than half were insured. With growing popularity of insurance, the number of insurers also increased. AMBAC, the first insurer, was later joined by other triple-A rated insurers. In addition, insurance companies with claims paying ability lower than triple-A entered the market to provide opportunities for insuring bond issues that were too small, unusual or had credit conditions that did not meet AAA insurers' criteria.

In addition to insuring municipal bonds, many of the Municipal Bond Insurers insured collateralized debt obligations. Beginning in 2007 insurers' credit ratings came under review due to subprime mortgage exposure. This exposure threatened the insurers claims paying ability and resulted in rating downgrades. In 2007, there were seven insurers rated triple-A by the three major rating agencies. Today none of the insurers are triple-A rated.

In 2009 Assured Guaranty Corp. and Financial Security Assurance had the highest ratings of the bond insurers. On July 1, 2009, Assured Guaranty Corp completed an acquisition of Financial Security Assurance. (See ratings below.)

In July 2012, Build America Mutual Assurance Company ("BAM") was licensed. BAM intends to insure only essential public purpose issues. BAM is rated "AA" by Standard & Poors.

## How Bond Insurance is Acquired

Historically, bond insurance is purchased through a one time payment of a premium at the time of the bond closing. (Depending on the issue BAM may have both upfront and annual premiums.) Not all issues qualify for insurance. Each insurer has its own credit criteria, although the categories reviewed are essentially the same as those used by the rating agencies (see Bond Rating). The process of insuring a new issue begins with the issuer submitting documentation for review (such as the official statement, financial statements and bond documents). If the issue qualifies for insurance, the policy may be purchased by "direct purchase" or "elective bidding". In a direct purchase, the issuer purchases the insurance policy directly from an insurer. Elective bidding allows bidders to choose whether or not to insure an issue at the time the bonds are competitively sold. In an elective bid, each bond dealer submitting a bid assesses whether the acquisition of insurance will result in a better bid. If the winning bidder submits a bid with insurance, the bidder pays for the insurance policy.

## Who Are The Bond Insurers

The following table sets forth the websites for the bond insurers that were triple-A rated in 2007 and their current bond ratings:

| Claims Paying Ability Moody's/S&P/Fitch | Insurer |
| --- | --- |
| Caa2/R/na | Ambac Assurance Corporation |

Page 2 of 3

| | |
|---|---|
| A3/AA/na | Assured Guaranty Corp. (AGC) |
| A2/AA/na | Assured Guaranty Municipal Corp. (Formerly FSA) |
| na/AA/na | Municipal Assurance Corp. (Assured Guaranty's municipal only insurer) |
| na/AA/na | Build America Mutual Assurance Company (BAM) |
| na/na/na | CIFG Assurance North America, Inc. |
| na/na/na | Financial Guaranty Insurance Company (FGIC) |
| A3/AA-/na | National Public Finance Guarantee Corp. (MBIA's public finance subsidiary) |
| na/na/na | Syncora Guarantee (Formerly XL Capital Assurance ) |

In addition to the foregoing insurers is Berkshire Hathaway Assurance. Formed in 2008, the company has Aa1 stable rating from Moody's Investors Service and a AA+ stable rating from Standard & Poor's. (The company has a minimum new issue size of $100 million and has not insured any issues since 2009.)

## Ratings

The ratings noted in the above table reflect the claims paying ability of the bond insurer. Insured bonds do not automatically receive these ratings. Generally, insurers do not recommend or require ratings from any particular rating agency. The issuer must determine which, if any, ratings it will purchase for the insured bonds. The issuer is also responsible for paying the rating fee to each rating agency that assigns ratings to the bond issue. While a bond issue may be insured by only one rating agency, if the insurer's rating is reduced by any rating agency, the market value of the bonds could be affected.

## Assessing Feasibility

In a direct purchase, the issuer determines the feasibility of acquiring insurance. This requires an analysis of the projected interest cost differential for uninsured bonds compared to insured bonds. The interest cost savings should be more than sufficient to offset the cost of the insurance premium. Furthermore, since the premium is paid at the time of the bond closing and interest cost savings (if any) are realized over the term of the bonds, a present value analysis is the preferred approach for determining whether insurance results in cost savings.

## Role of WM Financial Strategies

For your municipal bond issue, WM Financial Strategies will explore the feasibility of obtaining a municipal bond insurance policy. WM Financial Strategies begins with an analysis of your credit condition, the issue structure and current market trends. If, the acquisition of insurance appears to be feasible, WM Financial Strategies applies for a municipal bond insurance policy from one or more of the insurers listed above that maintains a high credit rating. If the issue qualifies for insurance, a recommendation whether to buy insurance is made based on the analysis described above (see "Assessing Feasibility").

## Recent Rating Actions

Since 2007, Moody's Investors Service, Standard & Poor's and Fitch have been reviewing bond insurers to determine their subprime exposure and whether their capital remains adequate to maintain their present ratings. Due to the loss of demand for bond insurance, insurers that do not have subprime exposure have also come under review. The table below is a summary of recent credit rating actions relating to insurers that were AAA rated prior to December 2007. (For a more detailed description of actions taken since October 2007 see Standard & Poor's Rating and History, below).

Municipal Bond Insuran                                                    Page 3 of 3

Case 3:16-cv-01037-FAB   Document 51-1   Filed 09/01/16   Page 21 of 52

| Insurer | Rating Agency | Date | Action |
|---|---|---|---|
| Ambac | Moody's | 3/26/2010 | Cua2 on Review for Possible Upgrade |
| Ambac | Standard & Poor's | 3/25/2010 | R – Regulatory Supervision |
| Ambac | Fitch | 6/25/2008 | Rating Withdrawn |
| Assured Guaranty | Moody's | 1/17/2013 | A3 Rating with Stable Outlook |
| Assured Guaranty | Standard & Poor's | 3/18/2014 | AA Rating with a Stable Outlook |
| Assured Guaranty | Fitch | 2/24/2010 | Rating Withdrawn |
| Assured Guaranty Municipal Corp. (FSA) | Moody's | 1/17/2013 | A2 Rating with Stable Outlook |
| Assured Guaranty Municipal Corp. (FSA) | Standard & Poor's | 3/18/2014 | AA Rating with a Stable Outlook |
| Assured Guaranty Municipal Corp. (FSA) | Fitch | 2/24/2010 | Rating Withdrawn |
| Build America Mutual Assurance | Standard & Poor's | 7/23/2012 | AA Assigned |
| CIFG | Moody's | 11/11/2009 | Rating Withdrawn |
| CIFG | Standard & Poor's | 2/18/2010 | Rating Withdrawn |
| CIFG | Fitch | 10/22/2008 | Rating Withdrawn |
| FGIC | Moody's | 3/25/2009 | Rating Withdrawn |
| FGIC | Standard & Poor's | 4/22/2009 | Rating Withdrawn |
| FGIC | Fitch | 11/24/2008 | Rating Withdrawn |
| Municipal Assurance Corp. | Standard & Poor's | 3/18/2014 | AA Rating with a Stable Outlook |
| MBIA (National Public Finance Guaranty Corp) | Moody's | 5/22/2013 | A3 with a Stable Outlook |
| MBIA (National Public Finance Guaranty Corp) | Standard & Poor's | 3/18/2014 | AA- Rating with a Stable Outlook |
| MBIA (National Public Finance Guaranty Corp) | Fitch | 8/25/2008 | Rating Withdrawn |
| Syncora Guarantee | Moody's | 11/12/2012 | Rating Withdrawn |
| Syncora Guarantee | Standard & Poor's | 7/28/2010 | Rating Withdrawn |
| Syncora Guarantee | Fitch | 9/05/2008 | Rating Withdrawn |

## More Information

Visit the Association of Financial Guaranty Insurers for additional information relating to municipal bond insurance.

Muni Financial Strategies
11710 Administration Drive
Suite F
St. Louis, Missouri 63146
Phone: (314) 426-2122
Fax: (314) 422-2055
MuniBondAdvisor@MuniBondAdvisor.com

Centro de Periodismo Investigativo (https://periodismoinvestigativo.com/2015/07/mapa-de-los-protagonistas-del-juego-de-la-deuda-de-puerto-rico-y-cuales-son-sus-posiciones)

# Mapa de los protagonistas del juego de la deuda de Puerto Rico y cuáles son sus posiciones

por JOEL CINTRÓN ARBASETTI Y CARLA MINET | 23 de julio 2015



Las firmas de inversión que poseen bonos del gobierno de Puerto Rico se han agrupado en diferentes clanes para defender sus intereses en el proceso de negociación de la deuda que impulsa la administración de Alejandro García Padilla.

En la isla hay muchos tipos de deudas con diferentes fechas de pago (http://formulas17.investigativa-testbed.org/deuda/PR/GAZ/NAVL/SCIENCE-OCTUBRE-REPORT.php) y que están en manos de varias firmas de inversión, algunas con intereses en común y otras con diferencias en cuanto a cuáles son las posiciones políticas que les convienen para ganar.

Quienes intentan cobrar su parte de la deuda, que son tanto los grandes complejos de fondos de cobertura, como los fondos mutuos y las aseguradoras de bonos, ya han comenzado a bufetes de abogados que tienen experiencia en quiebras y reestructuración de gobierno en otra.

Fuentes del sector financiero interpretan los movimientos de bufetes como un mensaje al gobierno de Puerto Rico: van a ejercer presión agresiva para cobrar el total de la deuda con intereses.

Se han configurado al menos cuatro clanes de firmas de los fondos de cobertura y de los fondos mutuos que tienen bonos del gobierno. En ese contexto, la posibilidad de una negociación del conjunto de las deudas del gobierno se torna muy compleja. Pero Melba Acosta, presidenta del Banco Gubernamental de Fomento (BGF), asegura que confía en que lo lograrán.

Viendo cómo se han configurado estas firmas en otros países en crisis como Grecia, Argentina o en la ciudad de Detroit, ¿usted tiene alguna expectativa real de que esta negociación sea posible? "Bueno, ahora mismo en PREPA (Autoridad de Energía Eléctrica) se están dando reuniones. Ellos (los bonistas) son difíciles, bien difíciles. Pero está pasando. Nos estamos moviendo poco a poco. No hemos terminado, pero... Asediado de que a ellos lo que les importa es recibir todo lo que les invirtieron. Lo único que pueden hacer los bonistas de PREPA en el tribunal es pedir un síndico", apuntó la funcionaria, quien insistió en que el proceso de negociación de la AEE sería el modelo a seguir con las demás bonistas.

Por su parte, el representante del interés público en la AEE, Carlos Gallisá, lo ve distinto. "La negociación de PREPA puede dar un indicio de qué puede pasar en la negociación de Puerto Rico. Es cierto. Porque hay acreedores que están en los dos lados, en PREPA y en la deuda del gobierno central. Pero no hay ningún indicio en PREPA ahora mismo que diga que se ha adelantado bastante en esa negociación o que se ha cerrado la posibilidad de llegar pronto a un acuerdo. No creo que se lo va resolver muy pronto, por lo menos al nivel que están ahora mismo esas negociaciones. Puede tomar

meses). Por lo menos un corto momentos la extensión del contrato que se le hizo a Lisa Donahue (sézté de reestructuración de la AEE) es de cuatro
meses, así que los que favorecieron con contrato y lo fijaron, quizá están reconociendo que (lugar a un acuerdo) puede tardar cuatro meses", dijo el
Centro de Periodismo Investigativo (CPI).

# EN CONTRA DE LA QUIEBRA
# PARA PUERTO RICO

Las firmas que se oponen a cualquier tipo
de quiebra y reestructuración de la deuda

**Oppenheimer Funds**
**Franklin Templeton**

- Son fondos mutuos
- Son dueños de $10,800 mil millones de la deuda de Puerto Rico
- Tienen deuda de la AEE; están en el grupo ad hoc de la AEE
- Son dueños de $4,100 mil millones de la deuda de COFINA
- Quieren cobrar la totalidad de su deuda

Marathon Asset
Blue Mountain
Angelo Gordon
Knighthead
D.E. Shaw



Infográfica por Laura Moscoso.

8/4/2015

Case:17-03283-LTS  Doc#:321-1  Filed:06/13/17  Entered:06/13/17 17:33:01  Desc:
Exhibit Page 31 of 128
Mapa de los protagoi... del juego de... deuda... y...les son su...sición...  Page 3 of 5

Case 3:16-cv-01037-FAB  Document 51-1  Filed 09/01/16  Page 24 of 52

**Los clanes y sus bufetes**

Las firmas de inversión se han dividido por clanes según las deudas que intentan cobrar. Por ejemplo, hay firmas que tienen bonos del BGF, bonos de Obligación General (GO's), bonos de la Corporación del Fondo de Interés Apremiante (COFINA) o de la Autoridad de la Energía Eléctrica (AEE). Hay otras que tienen bonos de varias de estas entidades al mismo tiempo y por lo tanto pertenecen a más de un clan. Esto también ha provocado que haya conflicto de interés entre firmas que pertenecen a un mismo grupo.

Las firmas se dividen, además, entre las que apoyan una reestructuración de la deuda y las que no la apoyan.

Algunos fondos de cobertura confían en que si se logra un proceso de reestructuración en las corporaciones públicas, el gobierno podrá usar dinero del fondo general para pagar los GO's que ellos poseen y cuyo pago está garantizado por la constitución. También apuestan a que ese proceso provocaría un alza en el precio de los bonos de Puerto Rico en el mercado financiero. Por eso apoyan una reestructuración en las corporaciones públicas, según fuentes del GPI.

Pero quienes poseen bonos de las corporaciones, como otros fondos de cobertura y los fondos mutuos, se oponen a la reestructuración, pues una reorganización de la deuda podría implicar retrasos y recortes en los pagos que esperan recibir.

La principal disputa legal que se anticipa podría ser la que ocurra entre los bonistas de GO's y los de COFINA, cuya fuente de pago es el IVU. El conflicto estaría en si los ingresos de COFINA pueden ser usados para pagar GO's, aseguró una fuente al GPI.

**El Ad Hoc Group de la AEE**

Uno de los clanes, que es el único que actualmente está sentado en la mesa de negociación, es el ad hoc group de la AEE (http://www... ). Lo componen fondos de cobertura como Angelo Gordon & Company (http://www... ), BlueMountain Capital (http://www... ), D.E. Shaw Galvanin Portfolios (http://www... ), Knighthead Capital (http://www... ), Marathon Asset Management (http://www... ) y el fondo mutuo Franklin Advisors (http://www... ). Este grupo contrató (http://www... ) como asesor financiero al bufete de abogados Venable (http://www... ). Por su parte, BlueMountain además reclutó a la firma Gibson Dunn (http://www... ). Ambos bufetes han estado cabildeando en contra del proyecto HR-870, radicado por el comisionado residente Pedro Pierluisi, y que busca extender el Capítulo 9 de la ley federal de quiebras a Puerto Rico.

El fondo Franklin también ha cabildeado (http://www... ) en contra del HR-870 de Pierluisi junto a también fondo mutuo Oppenheimer, representados por el bufete Kramer Levin Naftalis and Frankel (http://www... ). Entre ambos fondos poseen $10,500 mil millones de la deuda (el gobierno (Oppenheimer tiene $7,400 mil millones y Franklin $3,400 mil millones). Los datos sobre la cantidad de deuda que poseen las firmas no son oficiales y fueron publicados por The Wall Street Journal (http://www... ), luego de un análisis de la transacción disponible en la plataforma especializada Morningstar (http://www... ).

Los fondos mutuos Oppenheimer y Franklin llevan alrededor de 20 años invirtiendo a largo plazo en Puerto Rico y los que impulsan en la negociación de la AEE es que quieren cobrar todo, pues pagaron mucho más que otros inversionistas por sus bonos, cerca de 100 centavos del dólar antes del 2013.

Mientras que un grupo que al parecer está más inclinado a negociar es el de los fondos de cobertura que comenzaron a invertir a corto plazo en 2013, compraron bonos a 40 o 50 centavos del dólar y podrían obtener ganancias incluso si el gobierno fuera capaz de conseguir un descuento de la deuda de, por ejemplo, 10 o 20 por ciento, indican fuentes de la industria el GPI.

A la reestructuración se resisten además las compañías aseguradoras de bonos de la AEE y de otras entidades, ya que tendrían que compensar por cualquier retraso o pago disminuido. Las principales aseguradoras de bonos (monoline insurers) de Puerto Rico son Assured Guaranty (http://www... ), National Public Finance Guarantee y Ambac Assurance. Algunos de estos aseguradores han contratado (http://www... ) a los bufetes Cadwalader, Wickersham & Taft (http://www... ); Weil, Gotshal & Manges (http://www... ) y Debevoise & Plimpton (http://www... ) para que los representen.

**Ad Hoc Group de Puerto Rico**

El Ad Hoc Group de Puerto Rico posee $4.5 mil millones en GO's, bonos del BGF y de COFINA, según se ha divulgado por la prensa financiera. Liderado por los fondos Fir Tree Partners, Monarch, Perry Capital, Brigade Capital, Centerbridge Capital, Stone Lion y Davidson Kempner, este grupo lleva operando un año en la isla y un mayo contrató al bufete Robbins, Russell, Englert, Orseck, Untereiner & Gauber (http://www... ).

Este firma de abogados tiene como clientes a compañías que forman parte de las empresas Fortune 500 (http://www... ), que está lista tiene en las primeras posiciones a Walmart, la petrolera Exxon Mobil y Apple. El bufete anuncia en su página web que entre sus clientes habituales se encuentran también los fondos de cobertura.

Mapa de los protago...es del juicio... de Guerra Cubo y cuáles son su...osicion... Page 4 of 5

El bufete ha representado...

[texto ilegible]

[texto ilegible]

[texto ilegible]

### Ad Hoc Group del BGF

[texto ilegible]

### Ad Hoc Group de COFINA

[texto ilegible]

El 27% de la deuda de COFINA está en poder de los fondos mutuos Oppenheimer y Franklin, quienes conjuntamente poseen $4.1 mil millones de la deuda total de alrededor de $15 mil millones de esa corporación, según el análisis de The Wall Street Journal de los datos del set-Arlo Morningstar.

*Infográfica por Laura Moscoso*



   

Mapa de los protagonistas del juego de la deuda de Puerto Rico y cuáles son su posición    Page 5 of 52










Case:17-03283-LTS   Doc#:321-1   Filed:06/13/17   Entered:06/13/17 17:33:01   Desc:
Ambac Comments on       nt Puerto Rico Events Page 34 of 128   Page 1 of 3
Case 3:16-cv-01037-FAB   Document 51-1   Filed 09/01/16   Page 27 of 52

July 2, 2015

## Ambac Comments on Recent Puerto Rico Events

### Hosting Conference Call on July 2, 2015 at 8:30am

NEW YORK, July 2, 2015 (GLOBE NEWSWIRE) -- Ambac Financial Group, Inc. (Nasdaq:AMBC) ("Ambac" or the "Company"), a holding company whose subsidiaries, including Ambac Assurance Corporation ("Ambac Assurance"), provide financial guarantees and other financial services, today commented on recent concerns and events in Puerto Rico.

Ambac Assurance confirms that all July 1, 2015 payments due on its insured Puerto Rico bonds have been paid in full by the relevant issuer. Ambac did not receive any claims from policyholders for non-payment of interest or principal on any outstanding debt issued by the Commonwealth.

In response to recent comments from Puerto Rico officials, Nader Tavakoli, Interim President and Chief Executive Officer, said, "We continue to believe the Commonwealth is far better served by meeting its obligations rather than considering any default scenarios. Our team of professionals in New York, Puerto Rico and Washington are actively engaged in the situation. We will not tolerate any actions that could impair our interests and Ambac Assurance is ready to fully exercise all of its rights and remedies, if needed. If it were to become necessary, we are confident in our ability to pay timely principal and interest."

As of March 31, 2015, Ambac had $5.8 billion of Total Claims-Paying Resources (see below), including its wholly-owned subsidiary Ambac Assurance UK Limited ("Ambac UK"). Total Claims-Paying resources are net of Ambac's statutory subrogation recoveries including $2.3 billion of estimated representation and warranty ("R&W") subrogation recoveries.

Ambac insures a total of $2.4 billion net par of Puerto Rico bonds as follows: PR Commonwealth General Obligation (GO) bonds; PR Public Buildings Authority Revenue (GO Guaranty) bonds; PR Highways and Transportation Authority ("HTA") Highway Revenue bonds (1968 Resolution); HTA Transportation Revenue bonds (1998 Resolution); PR Infrastructure Financing Authority Special Tax Revenue (Rum Tax) bonds; PR Convention Center District Authority Revenue (Hotel Occupancy Tax) bonds; and PR Sales Tax Financing Corporation (COFINA) Senior lien Sales Tax Revenue bonds. The Company does not have exposure to PR Electric Power Authority (PREPA) or the Government Development Bank (GDB). Net par includes capital appreciation bonds ("CABS") which are reported at the par amount at the time of issuance of the insurance policy. Ambac Assurance's policies do not allow for any acceleration of Ambac Assurance's obligation. Details on Ambac's Puerto Rico exposures can be found at ████████████████ ████.

### Conference Call and Webcast

On July 2, 2015 at 8:30am (ET), Nader Tavakoli, Interim President and Chief Executive Officer, and David Trick, Chief Financial Officer and Treasurer, will address topics related to matters in this press release during a live conference call. Ambac's conference call will be accessible via telephone and webcast. The dial-in number for Ambac's conference call is (855) 427-4389 (Domestic) or (484) 756-4251 (International). Webcast participants may access the call through the Investor Relations section of Ambac's website, ████ ████ ██████ ████. A replay of the call will be available for one week at (855) 859-2056 (Domestic) or (404) 537-3406 (International); conference ID # 70864359. The webcast will be archived on Ambac's website for approximately 30 days.

### About Ambac

Ambac Financial Group, Inc., ("Ambac"), headquartered in New York City, is a holding company whose subsidiaries, including its principal operating subsidiary, Ambac Assurance Corporation ("Ambac Assurance"), Everspan Financial Guarantee Corp., and Ambac Assurance UK Limited, provide financial guarantees and other financial services to clients in both the public and private sectors globally. Ambac Assurance, including the Segregated Account of Ambac Assurance (in rehabilitation), is a guarantor of public finance and structured finance obligations. Ambac is also selectively exploring opportunities involving the acquisition and/or development of new businesses. Ambac's common stock trades on the NASDAQ Global Select Market under the symbol "AMBC". The Amended and Restated Certificate of Incorporation of Ambac contains substantial restrictions on the ability to transfer Ambac's common stock. Subject to limited exceptions, any attempted transfer of common stock shall be prohibited and void to the extent that, as a result of such transfer (or any series of transfers of which such transfer is a part), any person or group of persons shall become a holder of 5% or more of Ambac's common stock. Ambac is committed to providing timely and accurate information to the investing public, consistent with our legal and regulatory obligations. To that end, we use our website to convey information about our businesses, including the anticipated release of quarterly financial results, quarterly financial, statistical and business-related information, and the posting of updates to the status of certain primary residential mortgage backed securities litigations. For more information, please go to ████ ████████.

### Forward-Looking Statements

This press release contains statements that may constitute "forward-looking statements" within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Words such as "estimate," "project," "plan," "believe," "anticipate," "intend," "potential" and similar expressions, or future or conditional verbs such as "will," "should," "would," "could," and "may," or the negative of those expressions or verbs, identify forward-looking statements. We caution readers that these statements are not guarantees of future performance. Forward-looking statements are not historical facts but instead represent only our expectations regarding future events, which may by their nature be inherently uncertain and some of which may be outside our control. These statements may relate to plans and objectives with respect to the future, among other things which may change. We are alerting you

7/12/2015

Case:17-03283-LTS   Doc#:321-1   Filed:06/13/17   Entered:06/13/17 17:33:01   Desc:
Ambac Comments on Joint Puerto Rico documents (Page 35 of 128   Page 2 of 3
Exhibit Page 35 of 128
Case 3:16-cv-01037-FAB   Document 51-1   Filed 09/01/16   Page 28 of 52

to the possibility that our actual results may differ, possibly materially, from the expected objectives of anticipated results that may be suggested, expressed or implied by these forward-looking statements. Important factors that could cause our results to differ, possibly materially, from those expressed in the forward-looking statements include, among others, those discussed under "Risk Factors" in the most recently filed quarterly or annual report with the SEC.

Ambac Assurance
Claims-Paying Resources [1] and Statutory Financial Ratios

| ($ Thousands, Except Ratios) | March 31, 2015 | December 31, 2014 |
|---|---|---|
| Contingency reserve | $109,765 | $109,313 |
| Policyholders' surplus [2][3] | 156,500 | 101,200 |
| Qualified statutory capital | 266,265 | 266,513 |
| Unearned premiums | 646,846 | 652,683 |
| Loss and loss adjustment expenses | 2,331,578 | 2,469,932 |
| Surplus notes classified as a liability | 932,492 | 932,422 |
| Estimated impairment losses on subsidiary guarantees | 1,548 | 4,906 |
| Segregated account liabilities [5] | (26,169) | (140,482) |
| Policyholders' reserves | 4,385,685 | 4,419,778 |
| Present value of future installment premiums [4] | 371,787 | 391,472 |
| Ambac Assurance claim-paying resources | 4,757,232 | 4,811,280 |
| Ambac UK claims-paying resources [5] | 1,031,374 | 1,063,272 |
| Total claims-paying resources | $5,788,106 | $5,874,522 |
| Net financial guarantees in force [2] | | |
| Ambac Assurance | $186,881,287 | $197,669,387 |
| Ambac UK | 28,405,905 | 31,280,722 |
| Total net financial guarantees in force | $214,787,202 | $228,950,109 |
| Total claims paying ratio [6] | 37 : 1 | 39 : 1 |

1) Total claims-paying resources quantifies total resources available to pay claims, including guarantees on subsidiary obligations.

2) Pursuant to a prescribed practice by the State of Wisconsin Office of the Commissioner of Insurance, Ambac Assurance is not obligated to make payments to the Segregated Account if Ambac Assurance's surplus is less than $100,000 (the "Minimum Surplus Amount"). Accordingly, $26,169 and $140,482 of liabilities in the Segregated Account did not reduce Ambac Assurance's surplus at March 31, 2015 and December 31, 2014, respectively. Refer to Ambac's filings with the Securities and Exchange Commission for further discussion of the Segregated Account of Ambac Assurance.

3) Junior surplus notes with a par value of $378,039 is included in the capital and surplus for March 31, 2015 and December 31, 2014, respectively, subject to limitations due to the Minimum Surplus Amount.

4) Present value of future installment premiums includes premiums on installment financial guarantee insurance contracts (excluding Ambac UK) and credit derivatives. Present value calculations are discounted at 5.1%.

5) Ambac UK's claims-paying resources will become available to Ambac Assurance only to the extent Ambac UK receives approval from its regulator to dividend monies to Ambac Assurance. Components of Ambac UK's claims-paying resources are discounted at Ambac UK's projected investment rate of return. Ambac UK's claims-paying resources primarily consist of the present value of future installment premiums of approximately $424,287 at March 31, 2015.

5) Financial guarantees in force represents the amount of principal and interest outstanding on a guaranteed obligation.

6) Claims-paying ratio is net financial guarantees in force divided by total claims-paying resources.

Contact: Lisa A. Kellenberg, CFA
Managing Director, Investor Relations and Corporate Communications
(212) 208-3222

Source: Ambac Financial Group, Inc.

7/12/2015

Case:17-03283-LTS   Doc#:321-1   Filed:06/13/17   Entered:06/13/17 17:33:01   Desc:
Assured Guaranty Pa...pates in Bond Purchase Agreement Allowing PREPA... Make It... Page 1 of 2
Case 3:16-cv-01037-FAB   Document 51-1   Filed 09/01/16   Page 29 of 52

Published on *Assured Guaranty News* (http://assuredguaranty.newshq.businesswire.com) on 7/1/15
12:50 pm EDT

# Assured Guaranty Participates in Bond Purchase Agreement Allowing PREPA to Make Its Full Payment to Bondholders on July 1

**Release Date:**
Wednesday, July 1, 2015 12:50 pm EDT

**Dateline City:**
HAMILTON, Bermuda

HAMILTON, Bermuda--(BUSINESS WIRE)--Bond insurance subsidiaries of Assured Guaranty Ltd. (NYSE:AGO)(together with its subsidiaries, Assured Guaranty) and other bond insurers will purchase $128 million of interest bearing bonds from the Puerto Rico Electric Power Authority (PREPA). The bond proceeds will replenish a portion of PREPA operating funds used to make the full $416 million payment of principal and interest due to its bondholders on July 1, 2015.

"This interim solution allows PREPA to make the scheduled principal and interest payments due July 1, giving all parties time to negotiate a permanent, consensual restructuring," said Dominic Frederico, President and CEO. "Regardless of future developments, debt service payments to holders of Assured Guaranty-insured PREPA bonds remain protected by our guaranty."

The participating bond insurers will fund the bond purchase on a pro rata basis, based on the par amount of the PREPA revenue bonds coming due on July 1, 2015 that each has insured, which is approximately $113 million for Assured Guaranty. Assured Guaranty's pro rata cost to purchase the new bonds before the impact of Assured Guaranty's approximately 35% reinsurance will be $72.6 million. The Assured Guaranty purchase will be made through Assured Guaranty Municipal Corp. and Assured Guaranty Corp.

The final principal payment on the bonds, along with interest, is payable on January 1, 2016.

Any forward-looking statements made in this press release reflect Assured Guaranty's current views with respect to future events and are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Such statements involve risks and uncertainties that may cause actual results to differ materially from those set forth in these statements. These risks and uncertainties include, but are not limited to, those resulting from adverse developments in Puerto Rico or at PREPA, an inability or failure of creditors to negotiate and implement a consensual restructuring, litigation that has already been initiated or may be initiated in the future, governmental or legislative actions by Puerto Rico or the United States, other risks and uncertainties that have not been identified at this time, management's response to these factors, and other risk factors identified in Assured Guaranty's filings with the Securities and Exchange Commission. Readers are cautioned not to place undue reliance on these forward-looking statements, which are made as of July 1, 2015. Assured Guaranty undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

Case:17-03283-LTS   Doc#:321-1   Filed:06/13/17   Entered:06/13/17 17:33:01   Desc:
Assured Guaranty Partic....es in Bond Purchase Agreement Allowing PREPA to....e I... Page 2 of 2
Case 3:16-cv-01037-FAB   Document 51-1   Filed 09/01/16   Page 30 of 52

Assured Guaranty Ltd. is a publicly traded (NYSE: AGO) Bermuda-based holding company. Its operating subsidiaries provide credit enhancement products to the U.S. and international public finance, infrastructure and structured finance markets. More information on Assured Guaranty Ltd. and its subsidiaries can be found at AssuredGuaranty.com.

Assured Guaranty Ltd.
Robert Tucker, 212-339-0861
Managing Director, Investor Relations and Corporate Communications
rtucker@assuredguaranty.com
or
Media:
Ashweeta Durani, 212-408-6042
Vice President, Corporate Communications
adurani@assuredguaranty.com

**Ticker Slug:**
*Ticker:* AGO
*Exchange:* NYSE

Source URL: http://assuredguaranty.newshq.businesswire.com/press-release/transactions/assured-guaranty-participates-bond-purchase-agreement-allowing-prepa-make

Case:17-03283-LTS   Doc#:321-1   Filed:06/13/17   Entered:06/13/17 17:33:01   Desc:
S&P Affirms Assured Guaranty's AA... Exhibit Strategy for Profitable Outl...   A... Page 1 of 2
Case 3:16-cv-01037-FAB   Document 51-1   Filed 09/01/16   Page 31 of 52

### New Report Highlights Assured Guaranty's Very Strong Capital and the Proven Track Record of its Well-Established Business Model

Monday July 6, 2015 10:33 am EDT

HAMILTON, Bermuda-- ... ---June 26 (joint) report on Assured Guaranty Ltd. (NYSE:AGO) and its operating subsidiaries (collectively "Assured Guaranty"), Standard & Poor's Ratings Services (S&P) affirmed its AA Stable Outlook that the strength ratings of U.S. bond insurers Assured Guaranty Municipal Corp (AGM), Municipal Assurance Corp (MAC) and Assured Guaranty Corp. (AGC); European (Spanish) guarantor Assured Guaranty (Europe) Ltd. (AGE); and inbound Assured Guaranty Re Ltd. (AG Re). The AA rating is the highest S&P currently assigns to any financial guarantor

In the report, S&P notes Assured Guaranty's

  • Very strong capital adequacy

  • Strong competitive position, built on a proven track record of deals leadership and risk leadership

  • Strong operating performance as a result, in part, of the long-term earnings power of the U.S. public finance business

  • Strong liquidity, with conservative investment strategy

  • Strong, well-diversified underwriting strategy, with a global footprint and low country risk

  • Strong enterprise risk management

  • Strong underwriting of the very low risks the company faces by an experienced management team

In response to the report "Dominic Frederico, President and CEO said:

"The S&P report highlights our capital strength, disciplined risk management, strategic flexibility and market wisdom to. Specifically, based on our understanding of S&P's capital adequacy model, we estimate that Assured Guaranty had $1.9 billion of capital in excess of the AAA requirement at year-end 2014. This is $400 million higher than the approximately 31.5 billion of year-end 2013 that S&P reported in its July 2, 2014 ratings report. Additionally, we continue to concentrate our market leadership—we guaranteed approximately 54% of the insured U.S. municipal par that came to market in the second quarter of 2015

We have a proven and trusted business model and provide outstanding mutual liquidity for investors in our insured municipal bonds. They have $600 million of daily trading volume that multiple underwriting platforms support strong operating performance by allowing us to move across all sectors and investor segments. And with our $12 billion in claims-paying resources, and approximately $400 million in annual income from investments alone, we are well positioned to support solid, conservative high-transactions"

With regard to Assured Guaranty's Puerto Rico exposure, S&P confirmed the level of analysis by multiple stories in Puerto Rico over a risk. Two, of Puerto's total have netted" and concluded there were no no charge in Assured Guaranty's capital adequacy score based company on such default. S&P noted the "If Assured Guaranty pays any claims, the payments would be made over time based on each insured issue's payment schedule.

"S&P has taken a hard look at all of our exposures, including those in Puerto Rico, and reiterated that the outlook for our AA ratings is stable," said Mr. Frederico

Any forward looking statements made in this press release reflect Assured Guaranty's current views with respect to future events and are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Such statements involve risks and uncertainties that may cause actual results to differ materially from those set forth in these statements. These risks and uncertainties include, but are not limited to, risks relating from changes in rating agency models or opinions, adverse credit developments in Assured Guaranty's insured portfolio and other risk and uncertainties that have not identified as of this time. A description of these factors, risks and factors identified in Assured Guaranty's filings with the Securities and Exchange Commission. Readers are cautioned not to place undue reliance on these forward-looking statements, which are made as of July 6, 2015. Assured Guaranty undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

Assured Guaranty Ltd. is a publicly traded (NYSE: AGO) Bermuda-based holding company. Its operating subsidiaries provide credit enhancement products to the U.S. and international public finance, infrastructure and structured finance markets. More information on Assured Guaranty Ltd. and its subsidiaries can be found at.

S&P Affirms Assured Guaranty "AA" Financial Strength Ratings with Stable Outlook  09/01/15  Page 2 of 2

Assured Guaranty Ltd
Robert Tucker, 212-339-0861
Managing Director, Investor Relations and Corporate Communications

or

Media:
Ashweeta Durani, 212-408-6042
Vice President, Corporate Communications

NYSE AGO

© 2015 Assured Guaranty Ltd

2, Complementary Motion To Motion To Intervene And Requesting Declaratory Judgment in the Lex Claims civil action, 16-02374(FAB) of March 15, 2017.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

LEX CLAIMS, LLC,
JACANA HOLDINGS I, LLC,                    16-02374 (FAB)
JACANA HOLDINGS II LLC,
JACANA HOLDINGS III LLC,
JACANA HOLDINGS IV LLC,                    COMPLAINT AND
JACANA HOLDINGS V LLC,                     DECLARATORY AND
MPR INVESTORS LLC,                         INJUNCTIVE RELIEF
ROLSG, LLC, AND
SL PUERTO RICO FUND II L.P.

PLAINTIFFS

V.

RICARDO ROSELLO NEVAREZ*
in his official capacity as Governor of the
Commonwealth of Puerto Rico.

RAUL MALDONADO GAUTIER*
in his official capacity as Secretary of the
Treasury of the Commonwealth of Puerto Rico.

JOSE I. MARRERO ROSADO*
In his official capacity as Director of the
Office of Management and Budget of the
Commonwealth of Puerto Rico.

* presently holding these positions

THE PUERTO RICO SALES TAX
FINANCING CORPORATION (COFINA)

JUAN VAQUER
In his Official capacity as Executive Director
Of the Puerto Rico Sales Tax Corporation and

BANK OF NEW YORK MELLON CORP.

DEFENDANTS

COMPLEMENTARY MOTION TO MOTION TO INTERVENE AND
REQUESTING DECLARATORY JUDGMENT

TO THE HONORABLE U.S. DISTRICT COURT FOR THE DISTRICT OF P.R.
(HUSDCDPR):

Comes now, the Intervenor, Angel Ruiz Rivera, appearing here Pro Se (PS) and *In Forma Pauperis* (IFP) and respectfully States, Alleges and Prays as follows:

I.    Introduction

In order for this HUSDCDPR or any court that may end deciding upon the claims and counterclaims by the scores and scores of parties in this and related civil actions (regardless of whether they may end being consolidated or not), same must be in an informed position so that it can rule with judicial knowledge of the historical background, the facts, the applicable laws, the controlling jurisprudence, the evidence and all the factors that are needed to make an intelligent, equitable and just decision.

In order to aid this HUSDCDPR reach such an informed position by acquiring the judicial knowledge it needs in order to become able to make that intelligent, equitable and just decision, I am sharing the historical background of section 2 of Article VI of the Constitution of P.R., (P.R. Constitution) which I invoked as the basis of my Motion To Intervene And Requesting Declaratory Judgment (MTIARDJ) so that it may rule with the correct and proper perspective.

We all know there is a complex classification, or taxonomy  among the P.R. Government debt creditors ranging from the so-called government obligations (go's) creditors; the financial guaranty ("Ambac" and others) insurance companies creditors; the COFINA creditors, which are sub-classified in "Major" and "Senior" and  "Subordinate", the Puerto Rico Funds creditors, the banks creditors, public corporations creditors, the municipalities creditors,  the cooperatives creditors and independent individual creditors.

2

II.     Historical Background of Article VI section 2 of the Puerto Rican
Constitution (P.R. Constitution) constitutional amendment

The first law that provided for the main issue of all the ones here, which
undoubtedly is the hierarchical order of prelation or rank among creditors of the
P.R. Government debt when it comes to decide who legally is above or before
the other creditors at the juncture of legally deciding at the time to be paid,
who's who among the creditors of the P.R. Government, was the **Foraker Act
of 1900**. This federal law provided for this issue as follows:

> Sec. 38. That no export duties shall be levied or collected on exports
> from Porto Rico; but taxes and assessments on property, and license
> fees for franchises, privileges, and concessions may be imposed for the
> purposes of the insular and municipal governments, respectively, as may
> be provided and defined by act of the legislative assembly; and where
> necessary to anticipate taxes and revenues, bonds and other obligations
> may be issued by Porto Rico or any municipal government therein as
> may be provided by law to provide for expenditures authorized by law,
> and to protect the public credit, and to reimburse the United States for
> any moneys which have been or may be expended out of the emergency
> fund of the War Department for the relief of the industrial conditions of
> Porto Rico caused by the hurricane of August eighth, eighteen hundred
> and ninety-nine: Provided, however, **That no public indebtedness of
> Porto Rico or of any municipality thereof shall be authorized or
> allowed in excess of seven per centum of the aggregate tax
> valuation of its property**. See Exhibit 1 here.

The next expression from the U.S. Congress regarding this issue was found in
the Jones-Shafroth Act of 1917. This is what this federal law provided with
regards to this issue. See Exhibit 2 here.

SIXTY-FOURTH CONGRESS. Sess. II. Ch. 145. 1917. 953

SEC. 3. That no export duties shall be levied or collected on exports from Porto Rico, but taxes and assessments on property, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments, respectively, as may be provided and defined by the Legislature of Porto Rico; and when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Porto Rico or any municipal government therein as may be provided by law, and to protect the public credit: *Provided, however,* That no public indebtedness of Porto Rico or of any subdivision or municipality thereof shall be authorized or allowed in excess of seven per centum of the aggregate tax valuation of its property, and all bonds issued by the government of Porto Rico, or by its authority, shall be exempt from taxation by the Government of the United States, or by the government of Porto Rico or of any political or municipal subdivision thereof, or by any State, or by any county, municipality, or other municipal subdivision of any State or Territory of the United States, or by the District of Columbia. In computing the indebtedness of the people of Porto Rico, bonds issued by the people of Porto Rico secured by an equivalent amount of bonds of municipal corporations or school boards of Porto Rico shall not be counted.

*[Marginal notes: Revenues. Export duties forbidden. General taxes. Bonds. Proviso. Indebtedness limited. Exemption from tax. Secured bonds.]*

Special attention should be given to the last sentence of this section which mandated or ordered: "**In computing the indebtedness of the people of Porto Rico, bonds** issued by the people of Porto Rico secured by an equivalent amount of bonds **of municipal corporations or school boards of Porto Rico shall not be counted.**"

The other section of this Jones-Shafroth federal law that is clearly applicable and pertinent to the key legal issue of the prelation among the creditors that this HUSDCDPR faces is section 34, last paragraph of page 962 and first paragraphs of page 963, included here as Exhibit 3 and cited below.

**In case the available revenues** of Porto Rico for any fiscal year including available surplus in the insular treasury, **are insufficient** to meet all the appropriations made by the legislature for such year, **such appropriations shall be paid in the following order,** unless otherwise directed by the governor:

SIXTY-FOURTH CONGRESS. Sess. II. Ch. 145. 1917.          963

First class. The ordinary expenses of the legislative, executive, *Classification.*
and judicial departments of the State government, and interest on
any public debt, shall first be paid in full.

Second class. Appropriations for all institutions, such as the peni-
tentiary, insane asylum, industrial school, and the like, where the
inmates are confined involuntarily, shall next be paid in full.

Third class. Appropriations for education and educational and
charitable institutions shall next be paid in full.

Fourth class. Appropriations for any other officer or officers,
bureaus or boards, shall next be paid in full.

Fifth class. Appropriations for all other purposes shall next be
paid.

That in case there are not sufficient revenues for any fiscal year, *Application to classes.*
including available surplus in the insular treasury, to meet in full the
appropriations of said year for all of the said classes of appropriations,
then said revenues shall be applied to the classes in the order above
named, and if, after the payment of the prior classes in full, there
are not sufficient revenues for any fiscal year to pay in full the appro-
priations for that year for the next class, then, in that event, what-
ever there may be to apply on account of appropriations for said
class shall be distributed among said appropriations pro rata according
as the amount of each appropriation of that class shall bear to the
total amount of all of said appropriations for that class for such fiscal
year.

No appropriation shall be made, nor any expenditure authorized *Expenditures not to
by the legislature, whereby the expenditure of the Government of*  exceed revenue pro-
Porto Rico during any fiscal year shall exceed the total revenue then *vided for.*
provided for by law and applicable for such appropriation or expendi-
ture, including any available surplus in the treasury, unless the *Levy of tax author-
legislature making such appropriation shall provide for levying a*  ized.
sufficient tax to pay such appropriation or expenditure within such
fiscal year.

As anyone can see, this federal law expressly provided for a specific order of

prelation when it came to deciding what or who was to be paid first once and if

the "Government of Porto Rico" fell into a deficitarial scenario.

The Jones-Shafroth Act suffered several amendments until the

enactment of the next applicable federal law, the Public Law 81-600 in 1950.

Below I include the significant and pertinent ones for this discussion.

SIXTY-SIXTH CONGRESS. Suss. III.. Cns. "34, 35. **1921.**
CHAP. 34 .-An Act To amend an Act entitled "An Act to
provide a civil government for Porto Rico, and for other
purposes," approved March 2, 1917 .
Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled, That
paragraph 19 of section 2 of the Act entitled "An Act to
provide a civil government for Porto Rico, and for other
purposes," approved March 2, 1917, is hereby amended to
read as follows :
"That no public money or property shall ever be
appropriated, applied, donated, used, directly or

5

indirectly, for the use, benefit, or support of any sect,
church, denomination sectarian institution, or
association, or system of religion, or for the use,
benefit, or support of any priest, preacher, minister, or
other religious teacher or dignitary as such. Contracting
of polygamous or plural marriages hereafter is prohibited."
SEC.2. That section 3 of said Act to provide a civil
government for Porto Rico is hereby amended to read as
follows:
"SEC.3. **That no export duties shall be levied or collected
on exports from Porto Rico, but taxes and assessments on
property, internal revenue, and license fees, and royalties
for franchises, privileges, and concessions may be imposed
for the purposes of the insular and municipal governments,
respectively, as may be provided and defined by the
Legislature of Porto Rico;** and, **when necessary to
anticipate taxes and revenues, bonds and other obligations
may be issued by Porto Rico or any municipal government
therein as may be provided by law, and to protect the
public credit: Provided however, That no public
indebtedness of Porto Rico or of any subdivision or
municipality thereof shall be authorized or allowed in
excess of 10 per centum of the aggregate tax valuation of
its property,** and all bonds issued by the government of
Porto Rico, or by its authority, shall be exempt from
taxation by the Government of the United States or
by the government of Porto Rico or of any political or
municipal subdivision thereof, or by any State, or by any
county, municipality, or other municipal subdivision of any
State or Territory of the United States, or by the District
of Columbia. **In computing the indebtedness of the people of
Porto Rico, bonds issued by the people of Porto Rico
secured by an equivalent amount of bonds of municipal
corporations or school boards of Porto Rico shall not be
counted.**" Approved, February 3, 1921. See Exhibit 4 here.

The Jones-Shafroth Act of 1917 was also amended in 1921 according to the

Office of the Law Revision Counsel of the U.S. House of Representatives with

regards to the key issue here. See Exhibits 5 and 6 here.

**48 USC 741: Export duties, taxes, etc.; bonds to anticipate revenues** Text contains
those laws in effect on March 12, 2017
**From Title 48-TERRITORIES AND INSULAR POSSESSIONS**CHAPTER 4-PUERTO
RICOSUBCHAPTER I-GENERAL PROVISIONS

## §741. Export duties, taxes, etc.; bonds to anticipate revenues

No export duties shall be levied or collected on exports from Puerto Rico, **but taxes
and assessments on property, income taxes, internal revenue, and license fees,
and royalties for franchises, privileges, and concessions may be imposed for the
purposes of the insular and municipal governments, respectively, as may be**

6

provided and defined by the Legislature of Puerto Rico; and when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Puerto Rico or any municipal government therein as may be provided by law, and to protect the public credit.

(Mar. 2, 1917, ch. 145, §3, 39 Stat. 953 ; Feb. 3, 1921, ch. 34, §2, 41 Stat. 1096 ; Mar. 4, 1927, ch. 503, §1, 44 Stat. 1418 ; Aug. 26, 1937, ch. 831, 50 Stat. 843 .)

48 USC 745: Tax exempt bonds Text contains those laws in effect on March 12, 2017
**From Title 48-TERRITORIES AND INSULAR POSSESSIONS**CHAPTER 4-PUERTO RICOSUBCHAPTER I-GENERAL PROVISIONS

## §745. Tax exempt bonds

**All bonds issued by the Government of Puerto Rico, or by its authority, shall be exempt from taxation** by the Government of the United States, or by the Government of Puerto Rico or of any political or municipal subdivision thereof, or by any State, Territory, or possession, or by any county, municipality, or other municipal subdivision of any State, Territory, or possession of the United States, or by the District of Columbia.

(Mar. 2, 1917, ch. 145, §3, 39 Stat. 953 ; Feb. 3, 1921, ch. 34, §2, 41 Stat. 1096 ; Mar. 4, 1927, ch. 503, §1, 44 Stat. 1418 ; Aug. 26, 1937, ch. 831, 50 Stat. 844 ; Aug. 17, 1950, ch. 731, 64 Stat. 458 ; Pub. L. 87–121, §1, Aug. 3, 1961, 75 Stat. 245 .)

The Jones-Shafroth Act of 1917 was also amended in 1927 according to the

Office of the Law Revision Counsel of the U.S. House of Representatives, see

Public Law No.797, of March 4, 1927, Sixty-ninth Congress, Session II, Chapter

503, page 1418, et seq. For the entire amendment see Exhibit 7 here.  With

regards to the key legal issue under discussion here see the following.

SEC.3. That no export duties shall be levied or collected on exports from Porto Rico, **but taxes and assessments on property, income taxes, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments, respectively, as may be provided and defined by the Legislature of Porto Rico; and when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Porto Rico or any municipal government therein as may be provided by law, and to protect the public credit:** Provided, however, That **no public indebtedness of Porto Rico, and the municipalities of San Juan and Ponce shall be allowed, in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Porto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any subdivision or municipality,** and all bonds issued by the government of Porto Rico, or by its

7

authority, shall be exempt from taxation by the Government of the United States, or by the government of Porto Rico or of any political or municipal subdivision thereof, or by any State, Territory, or possession, or by any county, municipality, or other municipal subdivision of any State, Territory, or Existing secured bonds not computed possession of the United States, or by the District of Columbia. **In computing the indebtedness of the people of Porto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Porto Rico has heretofore been pledged and bonds issued by the people of Porto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Porto Rico shall not be counted, but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Porto Rico is pledged shall be counted.**

"And it is further provided, That the internal-revenue taxes levied Collection, by the Legislature of Porto Rico in pursuance of the authority granted by this Act on articles, goods, wares, or merchandise may be levied and collected as such legislature may direct, on the articles subject to said tax, as soon as the same are manufactured, sold, used, or brought into the island : Provided, That no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Porto Rico. The officials of the Customs and Postal Services of the United States are hereby directed to assist the appropriate officials of the Porto Rican government in the collection of these taxes."

On May 17, 1932, the Jones-Shafroth Act of 1917 was amended again but those amendments are not pertinent to the key legal issue in discussion here. [1]

---

[1] **§731. Territory included under name Puerto Rico**

The provisions of this chapter shall apply to the island of Puerto Rico and to the adjacent islands belonging to the United States and waters of those islands; and the name Puerto Rico, as used in this chapter, shall be held to include not only the island of that name, but all the adjacent islands as aforesaid.

(Mar. 2, 1917, ch. 145, §1, 39 Stat. 951; May 17, 1932, ch. 190, 47 Stat. 158.)

**§731a. Change of name; Puerto Rico**

From and after May 17, 1932, the island designated "Porto Rico" in the Act entitled "An Act to provide a civil government for Porto Rico, and for other purposes," approved March 2, 1917, as amended, shall be known and designated as "Puerto Rico." All laws, regulations, and public documents and records of the United States in which such island is designated or referred to under the name of "Porto Rico" shall be held to refer to such island under and by the name of "Puerto Rico."

On August 3, 1935, and August 13, 1935 the Jones-Shafroth Act of 1917 was amended again. The following amendments are pertinent to the key legal issue under discussion here.

### §745a. Public improvement bonds sold to United States or agency thereof excluded from public indebtedness

Bonds or other obligations of Puerto Rico or any municipal government therein, payable solely from revenues derived from any public improvement or undertaking (which revenues may include transfers by agreement or otherwise from the regular funds of the issuer in respect of the use by it of the facilities afforded by such improvement or undertaking), **and issued and sold to the United States of America or any agency or instrumentality thereof, shall not be considered public indebtedness of the issuer within the meaning of section 745 of this title.**

(Aug. 13, 1935, ch. 516, 49 Stat. 611.) See Exhibit 8 here.

### §745b. Refunding bonds excluded temporarily in computing indebtedness

Any bonds or other obligations of Puerto Rico issued after August 3, 1935, for the purpose of retiring previously outstanding bonds or obligations shall not be included in computing the public indebtedness of Puerto Rico under section 745 of this title, **until six months after their issue.** (Aug. 3, 1935, ch. 435, 49 Stat. 516.) See Exhibit 9 here.

---

(May 17, 1932, ch. 190, 47 Stat. 158.)

### §733. Citizens; former Spanish subjects and children; body politic; name

All inhabitants continuing to reside in Puerto Rico who were Spanish subjects on the 11th day of April 1899, and then resided in Puerto Rico, and their children born subsequent thereto, shall be deemed and held to be citizens of Puerto Rico, and as such entitled to the protection of the United States, except such as shall have elected to preserve their allegiance to the Crown of Spain on or before the 11th day of April 1900, in accordance with the provisions of the treaty of peace between the United States and Spain entered into on the 11th day of April 1899; and they, together with such citizens of the United States as may reside in Puerto Rico, shall constitute a body politic under the name of the People of Puerto Rico, with governmental powers as hereinafter conferred, and with power to sue and be sued as such.

(Apr. 12, 1900, ch. 191, §7, 31 Stat. 79; May 17, 1932, ch. 190, 47 Stat. 158.)

### §733a. Citizens; residence in island of citizens of United States

All citizens of the United States who have resided or who shall after March 4, 1927, reside in the island for one year shall be citizens of Puerto Rico.

(Mar. 2, 1917, ch. 145, §5a, as added Mar. 4, 1927, ch. 503, §2, 44 Stat. 1418; amended May 17, 1932, ch. 190, 47 Stat. 158.)

On August 26, 1937, the Jones-Shafroth Act of 1917 was amended again.[2] The following amendment is pertinent to the key legal issue under discussion here.

### §741a. Internal-revenue taxes; levy and collection; discrimination

The internal-revenue taxes levied by the Legislature of Puerto Rico in pursuance of the authority granted by this chapter on articles, goods, wares, or merchandise may be levied and collected as such legislature may direct, on the articles subject to said tax, as soon as the same are manufactured, sold, used, or brought into the island: *Provided,* That no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico. The officials of the Customs and Postal Services of the United States are directed to assist the appropriate officials of the Puerto Rican government in the collection of these taxes. (Mar. 2, 1917, ch. 145, §3, 39 Stat. 953; Mar. 4, 1927, ch. 503, §1, 44 Stat. 1418; Aug. 26, 1937, ch. 831, 50 Stat. 844.) Exhibit 10 here.

The next applicable federal law was Public Law 81-600 of July 3, 1950 which authorized the people of P.R. to adopt their own Constitution. It also served to amend all the sections in the Jones-Shafroth Act of 1917, hereinafter called the Federal Relations Act, that were considered to become duplicative, superfluous or unnecessary, once the new Constitution of P.R. became effective. See Exhibit 11 here.

SEC. 4. Except as provided in section 5 of this Act, the Act entitled "An Act to provide a civil government for Porto Rico, and for other purposes", approved March 2, 1917, as amended, **is hereby continued in force and effect** and may **hereafter be cited as the "Puerto Rican Federal Relations Act"** .

---

[2] On August 17, 1950, [Public Law 708] was enacted to amend the Jones-Shafroth Act of 1917.
To amend section 3 of the Organic Act of Puerto Rico.
Be it enacted by the Senate and House o f Representatives of the United States of America in Congress assembled, That section 3 of the Act entitled "An Act to provide a civil government for Porto Rico, and for other purposes", approved March 2, 1917, as amended, is hereby amended by inserting in the first proviso after the word "Ponce" a comma and the words "Arecibo, Rio Piedras". Approved August 17, 1950.

Sec. 5. At such time as the constitution of Puerto Rico becomes effective, the following provisions of such Act of March 2, 1917, as amended, shall be deemed repealed:

(1) Section 2, except the paragraph added thereto by Public Law 362, Eightieth Congress, first session, approved August 5, 1947.

(2) Sections 4, 12, 12a, 13, 14, 15, 16, 17, 18, 18a, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 39, 40, 49, 49b, 50, 51, 52, 53, 56, and 57.

(3) The last paragraph in section 37.

(4) Section 38, except the second paragraph thereof which begins with the words "The Interstate Commerce Act" and ends with the words "shall not apply in Puerto Rico".

Sec. 6. All laws or parts of laws inconsistent with this Act are hereby repealed.

Approved July 3, 1950.

The most significant aspect of this federal law (Public Law 81-600) for what is pertinent to the gist of our discussion here is that **section 3 of the Jones Shafroth Act of 1917 was not repealed.** **"In computing the indebtedness of the people of Porto Rico, bonds issued by the people of Porto Rico secured by an equivalent amount of bonds of municipal corporations or school boards of Porto Rico shall not be counted."**

On August 17, 1950 the Jones-Shafroth Act of 1917 suffered another amendment but a very minor one not relevant to this discussion.[3] The next applicable law that came into being was the Constitution of P.R. which as already seen had been authorized by a federal law (Public Law 81-600),[4] which

---

[3] 64 STAT. 81ST CONG. 2D SESS.-CHS. 731-734-AUG. 17, 1950
To amend section 3 of the Organic Act of Puerto Rico.
*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled:* That section 3 of the Act entitled "An Act to provide a civil government for Porto Rico, and for other purposes", approved March 2, 1917, as amended, is hereby amended by inserting in the first proviso after the word "Ponce" a comma and the words "Arecibo, Rio Piedras". Approved August 17, 1950. Exhibit 16.

[4] [CHAPTER 446]
AN ACT July 3, 1950
To provide for the organization of a constitutional government by the people of Puerto Rico.
Whereas the Congress of the United States by a series of enactments has progressively recognized the right of self-government of the people of Puerto Rico ; and

was approved by the People of P.R. in a referendum on June 4, 1951, drafted

by members of a Constitutional Convention, submitted to the U.S. Congress for

approval [that amended two (2) clauses-see underlined clauses in footnote 3],

ratified by another federal law, Public Law 447 (July 3, 1952-Exhibit 12 here)[5]

---

Whereas under the terms of these congressional enactments an
increasingly large measure of self-government has been achieved:
Therefore Be it enacted by the Senate and House of
Representatives of the United States of America in Congress
assembled, **That, fully recognizing the principle of government
by consent, this Act is now adopted in the nature of a compact
so that the people of Puerto Rico may organize a government
pursuant to a constitution of their own adoption.**
SEC. 2 . **This Act shall be submitted to the qualified voters of
Puerto Rico for acceptance or rejection through an island-wide
referendum** to be held in accordance with the laws of Puerto
Rico. Upon the approval of this Act, by a majority of the voters
participating in such referendum, **the Legislature of Puerto Rico
is authorized to call a constitutional convention to draft a
constitution for the said island of Puerto Rico.** The said
constitution shall provide a republican form of government and
shall include a bill of rights.
SEC. 3. **Upon adoption of the constitution by the people of
Puerto Rico, the President of the United States is authorized to
transmit such constitution to the Congress of the United States**
if he finds that such constitution conforms with the applicable
provisions of this Act and of the Constitution of the United
States. **Upon approval by the Congress the constitution shall
become effective in accordance with its terms.**

[5] **66 S T A T .] PUBLIC LAW 447-JULY 3, 1952**
Public Law 447 CHAPTER 567 JOINT RESOLUTION Approving the constitution of the
Commonwealth of Puerto Rico which was [H.J.Res. 430] adopted by the people of Puerto Rico
on March 3, 1952.
Whereas the Act entitled "**An Act to provide for the organization of a constitutional
government by the people of Puerto Rico", approved July 3, 1950, was adopted by the
Congress as a compact with the people of Puerto Rico**, to become operative upon its
approval by the people of Puerto Rico: and Whereas **the people of Puerto Rico
overwhelmingly approved such Act in a referendum held on June 4, 1951**, and a
constitution for the Commonwealth of Puerto Rico was drafted by a constitutional convention
held as provided by such Act from September 17, 1951, to February 6, 1952; and
Whereas **such constitution was adopted by the people of Puerto Rico, by a vote of three
hundred seventy-four thousand six hundred and forty-nine to eighty-two thousand nine
hundred and twenty-three, in a referendum held on March 3, 1952**; and
Whereas the President of the United States has declared that the constitution of the
Commonwealth of Puerto Rico conforms fully with the applicable provisions of such Act of
July 3, 1950, and of the Constitution of the United States, that it contains a bill of rights,
and provides for a republican form of government, and has transmitted the constitution of the
Commonwealth of Puerto Rico to the Congress for its approval; and

12

and adopted by the Constitutional Convention members as amended by the U.S. Congress, finally approved by the People of P.R. in another referendum on March 3, 1952, (with 374,649 or 81.9%; yes: to 82,923 or 18.1%; no with a total vote of 457,572) and proclaimed by the Government of P.R. on July 25, 1952. The pertinent part of the P.R. Constitution for this discussion is section 2 of Article VI which stated:

Section 2. The power of the Commonwealth of Puerto Rico to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. **The power of the Commonwealth of Puerto Rico to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly, but no direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith credit and taxing power of the Commonwealth shall be pledged shall be issued by the Commonwealth if the total of (i) the amount**

---

Whereas the Congress has considered the constitution of the Commonwealth of Puerto Rico and has found it duly to conform to the above requirements:
Therefore be it *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled^*
That the constitution of the Commonwealth of Puerto Rico which was drafted by the selected delegates to the Constitutional Convention of Puerto Rico and adopted by the people of Puerto Rico in a referendum of March 3, 1952, in accordance with the Act entitled "An Act to provide for the organization of a constitutional government by the people of Puerto Rico", approved July 3, 1950 (64 Stat. 319; 48 U. S. C, sees. 731b^73 1 e ) , is hereby approved by the Congress of the United States, except section 20 of article II of said constitution: *Provided^* That section 5 of article II thereof shall have no force and effect until amended by the people of Puerto Rico under the procedure prescribed by article VII of the constitution of the Commonwealth of Puerto Rico by adding to such section 5 the following declaration: "Compulsory attendance at elementary public schools to the extent permitted by the facilities of the state as herein provided shall not be construed as applicable to those who receive elementary education in schools established under nongovernmental auspices": *Provided further^* That except for the purpose of adopting the amendments to section 5 of article II and to section 3 of article VII as herein provided, article VII of said constitution likewise shall have no force and effect until amended by the people of Puerto Rico under the terms of said article by adding to section 3 of article VII the following new sentence: "Any amendment or revision of this constitution shall be consistent with the resolution enacted by the Congress of the United States approving this constitution, with the applicable provisions of the Constitution of the United States, with the Puerto Rican Federal Relations Act, and with Public 39 stat. 951. Law 600, Eighty-first Congress, adopted in the nature of a compact": 48use'731 note, *And provided further^* That the constitution of the Commonwealth 73ib.73ie. of Puerto Rico hereby approved shall become effective when the Constitutional Convention of Puerto Rico shall have declared in a formal resolution its acceptance in the name of the people of Puerto Rico of the conditions of approval herein contained, and when the Governor of Puerto Rico, being duly notified by the proper officials of the Constitutional Convention of Puerto Rico that such resolution of acceptance has been formally adopted, shall issue a proclamation to that effect. Approved July 3, 1952. - **Puerto Rico.** 328 PUBLIC LAW 448-JULY 3, 1952 [66 STAT.]

of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, **shall exceed 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year; and no such bonds or notes issued by the Commonwealth for any purpose other than housing facilities shall mature later than 30 years from their date and no bonds or notes issued for housing facilities shall mature later than 40 years from their date; and the Commonwealth shall not guarantee any obligations evidenced by bonds or notes if the total of the amount** payable in any fiscal year on account of principal of and interest **on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues.**

The Legislative Assembly shall fix limitations for the issuance of direct obligations by any of the municipalities of Puerto Rico for money borrowed directly by such municipality evidenced by bonds or notes for the payment of which the full faith, credit and taxing power of such municipality shall be pledged; **provided, however, that no such bonds or notes shall be issued by any municipality in an amount which, together with the amount of all such bonds and notes theretofore issued by such municipality and then outstanding, shall exceed the percentage determined by the Legislative Assembly, which shall be not less than five per centum (5%) nor more than ten per centum (10%) of the aggregate tax valuation of the property within such municipality.**

The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof. See Exhibit 13 here.

This section 2 of Article VI of the P.R. Constitution is the one upon which I base my main allegations in my timely filed MTIARDJ, claiming that this HUSDCDPR should declare that all of the debt issued and sold above the limits prescribed here was unconstitutional, and consequentially illegal and null ab initio as its most proximate legal concomitant. This section was amended as a result of a referendum held on December 10, 1961[6] which was ordered by Law Num. 1 of

---

[6] The referendum results were 385,369 "Yes's" for 82.8% to 80,224 "No's" for 17.2% representing a total of 465,593 voters. These results reveal 8,021 more voters than in

September 29, 1961(Exhibit 14) and which had been previously authorized by

the U.S. Congress in Public Law 87-121 of August 3, 1961 (Exhibit 15), through

House Joint Resolution 124.

"To provide for amending section 3 of the Puerto Rico Federal Relations Act
(64 Stat. 319) as amended (64 Stat. 458)."

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 3 of the Puerto Rican Federal Relations Act (64 Stat. 319), as amended (64 Stat. 458), is amended by deleting therefrom the following language: "*Provided, however,* That no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Rio Piedras and Mayaguez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality," and "In computing the indebtedness of the people of Puerto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds heretofore issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Puerto Rico is pledged shall be counted."

SEC. 2. Section 1 of this Act shall take effect upon a majority of the qualified electors of Puerto Rico having voted in a referendum pursuant to section 1 of article VII of the constitution of the Commonwealth of Puerto Rico, to include provisions in the Commonwealth constitution, in lieu of the provisions of section 3 of the Puerto Rican Federal Relations Act specified herein, limiting the debt-incurring capacity of the Commonwealth and of its municipalities (as proposed in the concurrent resolution of the legislative assembly of the Commonwealth).

Approved August 3, 1961.

*[margin notes: Puerto Rican Federal Relations Act, amendment. 50 Stat. 843. 48 USC 745.]*

*[margin notes: Effective date. Public referendum. 48 USC 731d note.]*

In summary, section 2 of Article VI of the P.R. Constitution, establishing the

debt limit that could be incurred by the Commonwealth, was approved in the

referendum held on December 10, 1961, authorized my Law Num 1 of

September 29, 1961 that had been explicitly, expressly, specifically and

approved by Congress of August 3, 1961 in Public Law 87-121.

---

the 1952 referendum approving the Constitution with 10,720 more yes's and 2,699 less
No's. Source: DISPOSICIONES SOBRE LA DEUDA PUBLICA EN LA
CONSTITUCION DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO: BREVE
REFLEXION HISTORICA-CONSTITUCIONAL PONENCIA Lcdo. CARLOS E. RAMOS
GONZALEZ* Catedrático de la Facultad de Derecho de la Universidad Interamericana
de Puerto Rico. 85 Rev. Jur. U.P.R. 705 2016.

This unique history gives this section 2 of article VI more relevance and significance since it was and has remained, as the only amendment to the P.R. Constitution pre-approved by Congress. Not only that, but Congress pre-approved that same amendment to the P.R. Constitution was to amend section 3 of the Jones-Shafroth Act which had not been repealed by the subsequent amendments of that law nor my the Public Law 600 of July 3, 1950 which amended same Jones-Shafroth Act and changed its name to Puerto Rican Federal Relations Act. In anticipation of the probable approval of the section 2 Article VI amendment to the P.R. Constitution in the December 10, 1961 referendum to those effects, Congress went as far as on August 3, 1961, ordering, as we have seen, that it became part of the Puerto Rican Federal Relations Act "in lieu of the provisions of section 3 specified herein, limiting the debt-incurring capacity of the Commonwealth and all of its municipalities (as proposed in the concurrent resolution of the legislative assembly of the Commonwealth)".

As anyone can see, it is difficult to even fathom a clause of the P.R. Constitution with more force and effect than section 2 Article VI given the fait accompli that it was specifically pre-approved by Congress as proposed by the P.R. legislature subject to an anticipated approval by the People of P.R. in a referendum for those specific effects. Congress went even further, Congress eliminated clauses in the Puerto Rican Federal Relations Act that had been in effect since the Jones Act of 1917, (although with certain amendments through time) in deference and respect to the amendment proposed by the Government of P.R. to establish constitutional limits to the amount of debt level that could be issued.

Now if you look into the clause itself you must agree that it made perfect sense. First it restricted the debt limit subject to the revenues collected which constitute the source of repayment. Since there could be one good year and another bad year it did not restrict the debt limit to the previous fiscal year revenues but allowed and provided for the previous two fiscal years and the average of the revenues collected in both of them years. Not only that, but in order to provide some flexibility and leeway in order not to straitjacket the investment needed for the development and economic growth the Archipelago of P.R. was then undergoing, it provided for a generous fifteen (15%) percent margin of overdraft over the average of the revenues collected in the previous two years.

III. Summary Of Argument

For all the above reasons, this HUSDCDPR does not have any reason in law not to issue a declaratory judgment ruling that this section 2 of Article VI of the P.R. Constitution, approved by the December 10, 1961 referendum, and explicitly, expressly, and specifically approved by Congress of August 3, 1961 in Public Law 87-121, is applicable and controlling here. Once this HUSDCDPR issues the granting of this declaratory judgment petitioned in my timely filed MTIARDJ and reiterated here, all the debt that was issued in excess of the limits in same section 2 Article VI should be declared and ruled null ab initio as requested.

Obviously, which bonds and other obligations, for what amounts, and when were issued in excess of the limits prescribed by this section 2 of Article VI of the P.R. Constitution, will be subject to and object of subsequent allegations, arguments, discovery, evidence, expert witnesses, and testimonies,

17

by the Plaintiffs, Defendants and all intervenors. This HUSDCDPR will have the historical position and responsibility of considering, determining and ruling accord all of the above, depending upon the evaluation of all of the above and thy judicial discretion, which criteria or standard is going to be utilized in order to determine which portion of the debt was incurred into unconstitutionally and which consequentially must be legally voided and who or which parties are going to pay for this wrongful and negligent conduct.

One criteria or standard could be merely quantitative in nature using the old first come –first served basis as the rule, which would accordingly approve of all the debt issued each year until the cap or top was reached and rule all the one in excess as void, regardless of its category, class or type.

Other criteria or standard could be establishing a qualitative rule and considering the general obligations (go's) first; the municipalities obligations, second; the public corporations obligations, third; and the COFINA obligations, fourth, or whichever prelation order this HUSDCDPR may elect based upon its judicial discretion. Of course, there is no limit to the legal authority and judicial discretion of this HUSDCDPR in terms of deciding what order of prelation it will decide in order to resolve this controversy among so many classes of creditors.

The same principle applies to what percentage of the civil legal public liability this HUSDCDPR is going to impose upon all the parties that; consciously or unconsciously, intentionally or non-intentionally, violated Section 2 of Article VI of the P.R. Constitution, making millions of dollars in profit and expecting to continue to bilk billions of dollars from the residents of P.R., like myself and all those similarly situated that have been pre-paying and are expected to continue pre-paying for the next forty (40) years, the scores and

scores of taxes that have been unjustly imposed over us during the past years and that are planned to be imposed for the future years, to pay for unconstitutional and illegal debt incurred into by government officers, bankers, brokers, and directors and officers of the Government Development Bank, public corporations, insurance companies, banks and financial firms, law firms, and others who I timely named in the Complaint I integrated as part of my timely MTIARDJ in the Assured Guaranty Corp. Et Al. action [16-01037(FAB)] and the instant one, who were derelict in their ethical, fiduciary and ministerial duties.

III.     Final Note

I have done my best to try to persuade thy Honor, that by granting my timely file MTIARDJ in related civil action 16-01037 (FAB) and the instant one, consequentially thou benefit from them because they place thou in an advantageous, unique and almost utopian position to provide for Justice to all the parties involved, which will allow you to make each responsible party pay the proportional corresponding price for its errors and administer and manage Justice in such a way that the disadvantaged, poor and vulnerable People of Puerto Rico, including our grand children and our great grandchildren do not have to pay for the errors of their parents and grandparents who were unconstitutionally negligent.

IV.     Conclusion

For all the above stated reasons, I pray that this HUSDCDPR grants my timely filed MTIARDJ and issues the declaratory judgment petitioned therewith and reiterated here, that the evidence produced here more than justifies. In the alternative, I pray that this Motion is considered and taken as a Notice of Appeal if this HUSDCDPR decides to the contrary and denies same.

So I State, Allege and Pray. Respectfully submitted, today, March 15, 2017.

### CERTIFICATE OF SERVICE

I, Angel Ruiz Rivera, putative Intervenor, appearing here *Pro Se* and *In Forma Pauperis* (IFP) hereby certify that I have sent a copy of this Motion To Intervene by e-mail to all the appearing attorneys of record for all the parties according to the docket record.

Angel Ruiz Rivera
Intervenor
Pro Se and IFP
Ext. Villa Rica AA-27
Calle Santa Rita
Bayamon, P.R. 00959.
angelruizrivera@gmail.com
787-779-9222.

No export duties.
Legislature may tax, etc.

**Sec. 38.** That no export duties shall be levied or collected on exports from Porto Rico; but taxes and assessments on property, and license fees for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments, respectively, as may be provided and defined by act of the legislative assembly; and where necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Porto Rico or any municipal government therein as may be provided by law to provide for expenditures authorized by law, and to protect the public credit, and to reimburse the United States for any moneys which have been or may be expended out of the emergency fund of the War Department for the relief of the industrial conditions of Porto Rico caused by the hurricane of August eighth, eighteen hundred and ninety-nine: *Provided, however,* That no public indebtedness of Porto Rico or of any municipality thereof shall be authorized or allowed in excess of seven per centum of the aggregate tax valuation of its property.

Bond issues, etc.

*Proviso.*
—limit.

Resident commissioner to United States.

**Sec. 39.** That the qualified voters of Porto Rico shall, on the first Tuesday after the first Monday of November, anno Domini nineteen hundred, and every two years thereafter, choose a resident commissioner to the United States, who shall be entitled to official recognition as such by all Departments, upon presentation to the Department of State of a certificate of election of the governor of Porto Rico, and who shall be entitled to a salary, payable monthly by the United States, at the rate of five thousand dollars per annum: *Provided,* That no person shall be eligible to such election who is not a bona fide citizen of Porto Rico, who is not thirty years of age, and who does not read and write the English language.

*Proviso.*
—qualifications.

Commission to report on permanent system of government, etc.

**Sec. 40.** That a commission, to consist of three members, at least one of whom shall be a native citizen of Porto Rico, shall be appointed by the President, by and with the advice and consent of the Senate, to compile and revise the laws of Porto Rico; also the various codes of procedure and systems of municipal government now in force, and to frame and report such legislation as may be necessary to make a simple, harmonious, and economical government, establish justice and secure its prompt and efficient administration, inaugurate a general system of education and public instruction, provide buildings and funds therefor, equalize and simplify taxation and all the methods of raising revenue, and make all other provisions that may be necessary to secure and extend the benefits of a republican form of government to all the inhabitants of Porto Rico; and all the expenses of such commissioners, including all necessary clerks and other assistants that they may employ, and a salary to each member of the commission at the rate of five thousand dollars per annum, shall be allowed and paid out of the treasury of Porto Rico as a part of the expenses of the government of Porto Rico. And said commission shall make full and final report, in both the English and Spanish languages, of all its revisions, compilations, and recommendations, with explanatory notes as to the changes and the reasons therefor, to the Congress on or before one year after the passage of this Act.

—expenses.

—to report within a year.

Effect.

**Sec. 41.** That this Act shall take effect and be in force from and after the first day of May, nineteen hundred.

Approved, April 12, 1900.

April 17, 1900.

**CHAP. 192.**—An Act Making appropriations for the legislative, executive, and judicial expenses of the Government for the fiscal year ending June thirtieth, nineteen hundred and one, and for other purposes.

Legislative, executive, and judicial expenses appropriations.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums be, and the same are hereby, appropriated, out of any money in the Treasury not otherwise appropriated, in full compensation for the service

SEC. 3. That no export duties shall be levied or collected on exports from Porto Rico, but taxes and assessments on property, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments, respectively, as may be provided and defined by the Legislature of Porto Rico; and when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Porto Rico or any municipal government therein as may be provided by law, and to protect the public credit: *Provided, however*, That no public indebtedness of Porto Rico or of any subdivision or municipality thereof shall be authorized or allowed in excess of seven per centum of the aggregate tax valuation of its property, and all bonds issued by the government of Porto Rico, or by its authority, shall be exempt from taxation by the Government of the United States, or by the government of Porto Rico or of any political or municipal subdivision thereof, or by any State, or by any county, municipality, or other municipal subdivision of any State or Territory of the United States, or by the District of Columbia. In computing the indebtedness of the people of Porto Rico, bonds issued by the people of Porto Rico secured by an equivalent amount of bonds of municipal corporations or school boards of Porto Rico shall not be counted.

SEC. 4. That the capital of Porto Rico shall be at the city of San Juan, and the seat of government shall be maintained there.

SEC. 5. That all citizens of Porto Rico, as defined by section seven of the Act of April twelfth, nineteen hundred, "temporarily to provide revenues and a civil government for Porto Rico, and for other purposes," and all natives of Porto Rico who were temporarily absent from that island on April eleventh, eighteen hundred and ninety-nine, and have since returned and are permanently residing in that island, and are not citizens of any foreign country, are hereby declared, and shall be deemed and held to be, citizens of the United States: *Provided*, That any person hereinbefore described may retain his present political status by making a declaration, under oath, of his decision to do so within six months of the taking effect of this Act before the district court in the district in which he resides, the declaration to be in form as follows:

"I, _____, being duly sworn, hereby declare my intention not to become a citizen of the United States as provided in the Act of Congress conferring United States citizenship upon citizens of Porto Rico and certain natives permanently residing in said island."

In the case of any such person who may be absent from the island during said six months the term of this proviso may be availed of by transmitting a declaration, under oath, in the form herein provided within six months of the taking effect of this Act to the executive secretary of Porto Rico: *And provided further*, That any person who is born in Porto Rico of an alien parent and is permanently residing in that island may, if of full age, within six months of the taking effect of this Act, or if a minor, upon reaching his majority or within one year thereafter, make a sworn declaration of allegiance to the United States before the United States District Court for Porto Rico, setting forth therein all the facts connected with his or her birth and residence in Porto Rico and accompanying due proof thereof, and from and after the making of such declaration shall be considered to be a citizen of the United States.

SEC. 6. That all expenses that may be incurred on account of the government of Porto Rico for salaries of officials and the conduct of their offices and departments, and all expenses and obligations contracted for the internal improvement or development of the island, not, however, including defenses, barracks, harbors, lighthouses, buoys, and other works undertaken by the United States,

*Marginal notes:*
Revenues.
Export duties forbidden.
General taxes.
Bonds.
*Proviso.* Indebtedness limited.
Exemption from tax.
Secured bonds.
Capital at San Juan.
United States citizenship.
Persons entitled to.
Vol. 31, p. 79.
*Proviso.* Retention of foreign status.
Declaration.
By absentees.
*Proviso.* Persons of alien parentage.
All expenses from island revenues.
United States works excepted.

*Proviso.*
*Discharge of committees.*

bers: *Provided,* That either house may by a majority vote discharge a committee from the consideration of a measure and bring it before the body for consideration.

*Subject of bills restricted.*

No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject shall be embraced in any act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed.

*Amendments, etc.*

No law shall be revived, or amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revived, amended, extended, or conferred shall be reenacted and published at length.

*Signing during session.*

The presiding officer of each house shall, in the presence of the house over which he presides, sign all bills and joint resolutions passed by the legislature, after their titles shall have been publicly read, immediately before signing; and the fact of signing shall be entered on the journal.

*Officers and employees.*

The legislature shall prescribe by law the number, duties, and compensation of the officers and employees of each house; and no payment shall be made for services to the legislature from the treasury, or be in any way authorized to any person, except to an acting officer or employee elected or appointed in pursuance of law.

*No extra pay for services, etc.*

No bill shall be passed giving any extra compensation to any public officer, servant or employee, agent or contractor, after services shall have been rendered or contract made.

*Restriction on terms, pay, etc., of officers.*

Except as otherwise provided in this Act, no law shall extend the term of any public officer, or increase or diminish his salary or emoluments after his election or appointment, nor permit any officer or employee to draw compensation for more than one office or position.

*Revenue bills.*

All bills for raising revenue shall originate in the house of representatives, but the senate may propose or concur with amendments, as in case of other bills.

*Appropriation bills.*

The general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the executive, legislative, and judicial departments, interest on the public debt, and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.

*Approval of governor to orders, etc.*

Every order, resolution, or vote to which the concurrence of both houses may be necessary, except on the question of adjournment, or relating solely to the transaction of business of the two houses, shall be presented to the governor, and before it shall take effect be approved by him, or, being disapproved, shall be repassed by two-thirds of both houses, according to the rules and limitations prescribed in case of a bill.

*Punishment for bribery of officials.*

Any person who shall, directly or indirectly, offer, give, or promise any money or thing of value, testimonial, privilege, or personal advantage to any executive or judicial officer or member of the legislature to influence him in the performance of any of his public or official duties, shall be deemed guilty of bribery, and be punished by a fine not exceeding $5,000, or imprisonment not exceeding five years, or both.

*Corrupt legislative practices to be defined, etc., by legislature.*

The offense of corrupt solicitation of members of the legislature, or of public officers of Porto Rico, or of any municipal division thereof, and any occupation or practice of solicitation of such members or officers to influence their official action, shall be defined by law, and shall be punished by fine and imprisonment.

*Apportionment of appropriations if expenses not met by revenues.*

In case the available revenues of Porto Rico for any fiscal year, including available surplus in the insular treasury, are insufficient to meet all the appropriations made by the legislature for such year, such appropriations shall be paid in the following order, unless otherwise directed by the governor:

First class. The ordinary expenses of the legislative, executive, and judicial departments of the State government, and interest on any public debt, shall first be paid in full.

Second class. Appropriations for all institutions, such as the penitentiary, insane asylum, industrial school, and the like, where the inmates are confined involuntarily, shall next be paid in full.

Third class. Appropriations for education and educational and charitable institutions shall next be paid in full.

Fourth class. Appropriations for any other officer or officers, bureaus or boards, shall next be paid in full.

Fifth class. Appropriations for all other purposes shall next be paid.

That in case there are not sufficient revenues for any fiscal year, including available surplus in the insular treasury, to meet in full the appropriations of said year for all of the said classes of appropriations, then said revenues shall be applied to the classes in the order above named, and if, after the payment of the prior classes in full, there are not sufficient revenues for any fiscal year to pay in full the appropriations for that year for the next class, then, in that event, whatever there may be to apply on account of appropriations for said class shall be distributed among said appropriations pro rata according as the amount of each appropriation of that class shall bear to the total amount of all of said appropriations for that class for such fiscal year.

No appropriation shall be made, nor any expenditure authorized by the legislature, whereby the expenditure of the Government of Porto Rico during any fiscal year shall exceed the total revenue then provided for by law and applicable for such appropriation or expenditure, including any available surplus in the treasury, unless the legislature making such appropriation shall provide for levying a sufficient tax to pay such appropriation or expenditure within such fiscal year.

Sec. 35. That at the first election held pursuant to this Act the qualified electors shall be those having the qualifications of voters under the present law. Thereafter voters shall be citizens of the United States twenty-one years of age or over and have such additional qualifications as may be prescribed by the legislature of Porto Rico: *Provided*, That no property qualification shall ever be imposed upon or required of any voter.

Sec. 36. That the qualified electors of Porto Rico shall at the next general election choose a Resident Commissioner to the United States, whose term of office shall begin on the date of the issuance of his certificate of election and shall continue until the fourth of March, nineteen hundred and twenty-one. At each subsequent election, beginning with the year nineteen hundred and twenty, the qualified electors of Porto Rico shall choose a Resident Commissioner to the United States, whose term of office shall be four years from the fourth of March following such general election, and who shall be entitled to receive official recognition as such Commissioner by all of the departments of the Government of the United States, upon presentation, through the Department of State, of a certificate of election of the Governor of Porto Rico. The Resident Commissioner shall receive a salary, payable monthly by the United States, of $7,500 per annum. Such Commissioner shall be allowed the same sum for stationery and for the pay of necessary clerk hire as is now allowed to Members of the House of Representatives of the United States; and he shall be allowed the sum of $500 as mileage for each session of the House of Representatives and the franking privilege granted Members of Congress. No person shall be eligible to election as Resident Commissioner who is not a bona fide citizen of the United States and who is not more than twenty-five years of age, and who

Classification.

Application to classes.

Expenditures not to exceed revenue provided for.

Levy of tax authorized.

Qualifications of voters.

Proviso.
Property qualification forbidden.
Resident Commissioner to the United States.

Election for term of four years.

Salary and allowances.

Eligibility, etc.

February 3, 1921.
[H. R. 11769.]
[Public, No. 301.]

**CHAP. 34.—An Act** To amend an Act entitled "An Act to provide a civil government for Porto Rico, and for other purposes," approved March 2, 1917.

Porto Rico civil government.

Bill of rights.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That paragraph 19 of section 2 of the Act entitled "An Act to provide a civil government for Porto Rico, and for other purposes," approved March 2, 1917, is hereby amended to read as follows:

Use of public funds for religious sects, etc., forbidden.
Vol. 39, p. 952, amended.
Education, etc., omitted.

"That no public money or property shall ever be appropriated, applied, donated, used, directly or indirectly, for the use, benefit, or support of any sect, church, denomination sectarian institution, or association, or system of religion, or for the use, benefit, or support of any priest, preacher, minister, or other religious teacher or dignitary as such.  Contracting of polygamous or plural marriages hereafter is prohibited."

Polygamy prohibited.

Revenues.
Vol. 39, p. 953, amended.
Export duties forbidden.
General taxes.

SEC. 2. That section 3 of said Act to provide a civil government for Porto Rico is hereby amended to read as follows:

"SEC. 3. That no export duties shall be levied or collected on exports from Porto Rico, but taxes and assessments on property, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments, respectively, as may be provided and defined by the Legislature of Porto Rico; and, when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Porto Rico or any municipal government therein as may be provided by law, and to protect the public credit: *Provided, however,* That no public indebtedness of Porto Rico or of any subdivision or municipality thereof shall be authorized or allowed in excess of 10 per centum of the aggregate tax valuation of its property, and all bonds issued by the government of Porto Rico, or by its authority, shall be exempt from taxation by the Government of the United States or by the government of Porto Rico or of any political or municipal subdivision thereof, or by any State, or by any county, municipality, or other municipal subdivision of any State or Territory of the United States, or by the District of Columbia.  In computing the indebtedness of the people of Porto Rico, bonds issued by the people of Porto Rico secured by an equivalent amount of bonds of municipal corporations or school boards of Porto Rico shall not be counted."

*Proviso.*
Indebtedness limitation extended.

Exemption from tax.

Secured bonds.

Approved, February 3, 1921.

February 5, 1921.
[H. R. 14122.]
[Public, No. 302.]

**CHAP. 35.—An Act** To authorize the sale of a portion of the Copper Harbor Range Lighthouse Reservation, Michigan, to Houghton and Keweenaw Counties, Michigan.

Copper Harbor Range Lighthouse Reservation, Mich.
Sale of portion to Houghton and Keweenaw Counties.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of Commerce for and on behalf of the United States is hereby authorized and directed, in his discretion, to sell and convey to Houghton and Keweenaw Counties, in the State of Michigan, for the sum of $2,000, that certain piece or parcel of the Copper Harbor Range Lighthouse Reservation, Michigan, with the improvements thereon, which is that portion of lot two, section thirty-three, township fifty-nine north, range twenty-eight west, Michigan, lying east of the creek that drains Lake Fanny Hooe, and on which portion is located Fort Wilkins (abandoned), no longer required for lighthouse purposes: *Provided,* That said counties shall forever maintain the site and structures thereon as an historic landmark or as a public park; that said counties shall construct and forever maintain a bridge suitable to the Lighthouse Service across the creek from Lake Fanny Hooe in the rear of the rear range light and station buildings; that the road which now

*Provisos.*
Conditions.

48 USC 741: Export duties, taxes, etc.; bonds to anticipate revenues
Text contains those laws in effect on March 12, 2017

From Title 48-TERRITORIES AND INSULAR POSSESSIONS
    CHAPTER 4-PUERTO RICO
    SUBCHAPTER I-GENERAL PROVISIONS
Jump To:
    **Source Credit**
    **Codification**
    **Prior Provisions**
    **Amendments**

## §741. Export duties, taxes, etc.; bonds to anticipate revenues

No export duties shall be levied or collected on exports from Puerto Rico, but taxes and assessments on property, income taxes, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments, respectively, as may be provided and defined by the Legislature of Puerto Rico; and when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Puerto Rico or any municipal government therein as may be provided by law, and to protect the public credit.

(Mar. 2, 1917, ch. 145, §3, 39 Stat. 953 ; Feb. 3, 1921, ch. 34, §2, 41 Stat. 1096 ; Mar. 4, 1927, ch. 503, §1, 44 Stat. 1418 ; Aug. 26, 1937, ch. 831, 50 Stat. 843 .)

### CODIFICATION

Section is comprised of first part of section 3 of act Mar. 2, 1917, down to the proviso clause. The remainder of section 3 is classified to sections 741a and 745 of this title.

### PRIOR PROVISIONS

Provisions similar to those in this section were contained in act Apr. 12, 1900, ch. 191, §38, 31 Stat. 86 .

### AMENDMENTS

**1937**-Act Aug. 26, 1937, reenacted section without substantive change.
**1927**-Act Mar. 4, 1927, inserted imposition of income taxes.
**1921**-Act Feb. 3, 1921, reenacted section without change.

# 48 U.S. Code § 741 - Export duties, taxes, etc.; bonds to anticipate revenues

Current through Pub. L. 114-38 (http://www.gpo.gov/fdsys/pkg/PLAW-114publ38/html/PLAW-114publ38.htm). (See
Public Laws for the current Congress (http://thomas.loc.gov/home/LegislativeData.php?n=PublicLaws).)

**US Code (/uscode/text/48/741?qt-us_code_temp_noupdates=0#qt-us_code_temp_noupdates)**

**Notes (/uscode/text/48/741?qt-us_code_temp_noupdates=1#qt-us_code_temp_noupdates)**

prev (/uscode/text/48/740) | next (/uscode/text/48/741a)

No export duties shall be levied or collected on exports from Puerto Rico, but taxes and assessments on
property, income taxes, internal revenue, and license fees, and royalties for franchises, privileges, and
concessions may be imposed for the purposes of the insular and municipal governments, respectively, as may
be provided and defined by the Legislature of Puerto Rico; and when necessary to anticipate taxes and
revenues, bonds and other obligations may be issued by Puerto Rico or any municipal government therein as
may be provided by law, and to protect the public credit.

(Mar. 2, 1917, ch. 145, § 3, 39 Stat. 953 (http://uscode.house.gov/statviewer.htm?volume=39&page=953); Feb.
3, 1921, ch. 34, § 2, 41 Stat. 1096 (http://uscode.house.gov/statviewer.htm?volume=41&page=1096); Mar. 4,
1927, ch. 503, § 1, 44 Stat. 1418 (http://uscode.house.gov/statviewer.htm?volume=44&page=1418); Aug. 26,
1937, ch. 831, 50 Stat. 843 (http://uscode.house.gov/statviewer.htm?volume=50&page=843).)

# 48 U.S. Code § 741 - Export duties, taxes, etc.; bonds to anticipate revenues

Current through Pub. L. 114-38 (http://www.gpo.gov/fdsys/pkg/PLAW-114publ38/html/PLAW-114publ38.htm). (See Public Laws for the current Congress (http://thomas.loc.gov/home/LegislativeData.php?n=PublicLaws).)

**US Code (/uscode/text/48/741?qt-us_code_temp_noupdates=0#qt-us_code_temp_noupdates)**

**Notes (/uscode/text/48/741?qt-us_code_temp_noupdates=1#qt-us_code_temp_noupdates)**

### CODIFICATION

Section is comprised of first part of section 3 of act Mar. 2, 1917, down to the proviso clause. The remainder of section 3 is classified to sections 741a (/uscode/text/48/741a) and 745 (/uscode/text/48/745) of this title.

### PRIOR PROVISIONS

Provisions similar to those in this section were contained in act Apr. 12, 1900, ch. 191, § 38, 31 Stat. 86 (http://uscode.house.gov/statviewer.htm?volume=31&page=86).

### AMENDMENTS

1937—Act Aug. 26, 1937, reenacted section without substantive change.

1927—Act Mar. 4, 1927, inserted imposition of income taxes.

1921—Act Feb. 3, 1921, reenacted section without change.

the United States upon articles of merchandise coming from Puerto Rico, shall be paid into the treasury of Puerto Rico to be expended as required by law for the government and benefit thereof, and the Secretary of the Treasury shall designate the several ports and subports of entry in Puerto Rico and shall make such rules and regulations and appoint such agents as may be necessary to collect the duties and taxes authorized to be levied, collected, and paid in Puerto Rico by the provisions of this Act, and he shall fix the compensation and provide for the payment thereof of all such officers, agents, and assistants as he may find it necessary to employ to carry out the provisions of law.

(Apr. 12, 1900, ch. 191, §4, 31 Stat. 78; May 17, 1932, ch. 190, 47 Stat. 158.)

REFERENCES IN TEXT

This Act, referred to in text, means act Apr. 12, 1900, ch. 191, 31 Stat. 77, as amended, popularly known as the Foraker Act, which, insofar as is classified to the Code, enacted sections 733, 736, 738 to 740, 743, 744, 755, 864, and 866 of this title and amended sections 1 and 11 of former Title 11, Bankruptcy. For complete classification of this Act to the Code, see Tables.

CODIFICATION

Additional provisions of act Apr. 12, 1900, §4, directing the payment of duties and taxes into a separate fund in the Treasury of the United States until the organization of a local civil government, have been omitted.

Section was not enacted as part of the Puerto Rican Federal Relations Act which comprises this chapter.

CHANGE OF NAME

"Puerto Rico" substituted in text for "Porto Rico" pursuant to act May 17, 1932, which is classified to section 731a of this title.

TRANSFER OF FUNCTIONS

All offices of collector of customs, comptroller of customs, surveyor of customs, and appraiser of merchandise of Bureau of Customs of Department of the Treasury to which appointments were required to be made by President with advice and consent of Senate ordered abolished, with such offices to be terminated not later than December 31, 1966, by Reorg. Plan No. 1, of 1965, eff. May 25, 1965, 30 F.R. 7035, 79 Stat. 1317, set out in the Appendix to Title 5, Government Organization and Employees. All functions of offices eliminated were already vested in Secretary of the Treasury by Reorg. Plan No. 26 of 1950, eff. July 31, 1950, 15 F.R. 4935, 64 Stat. 1280, set out in the Appendix to Title 5.

EXPENDITURES FOR GOVERNMENTAL AND PUBLIC PURPOSES

The amount of customs revenue received by the United States on importations from Puerto Rico since its evacuation by the Spanish forces together with all that should thereafter be collected under the existing law were placed at the disposal of the President to be used for governmental and public purposes in Puerto Rico, by act Mar. 24, 1900, ch. 91, 31 Stat. 51.

§741. Export duties, taxes, etc.; bonds to anticipate revenues

No export duties shall be levied or collected on exports from Puerto Rico, but taxes and assessments on property, income taxes, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments, respectively, as may be provided and defined by the Legislature of Puerto Rico; and when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Puerto Rico or any municipal government therein as may be provided by law, and to protect the public credit.

(Mar. 2, 1917, ch. 145, §3, 39 Stat. 953; Feb. 3, 1921, ch. 34, §2, 41 Stat. 1096; Mar. 4, 1927, ch. 503, §1, 44 Stat. 1418; Aug. 26, 1937, ch. 831, 50 Stat. 843.)

CODIFICATION

Section is comprised of first part of section 3 of act Mar. 2, 1917, down to the proviso clause. The remainder of section 3 is classified to sections 741a and 745 of this title.

PRIOR PROVISIONS

Provisions similar to those in this section were contained in act Apr. 12, 1900, ch. 191, §38, 31 Stat. 86.

AMENDMENTS

1937—Act Aug. 26, 1937, reenacted section without substantive change.
1927—Act Mar. 4, 1927, inserted imposition of income taxes.
1921—Act Feb. 3, 1921, reenacted section without change.

§741a. Internal-revenue taxes; levy and collection; discrimination

The internal-revenue taxes levied by the Legislature of Puerto Rico in pursuance of the authority granted by this chapter on articles, goods, wares, or merchandise may be levied and collected as such legislature may direct, on the articles subject to said tax, as soon as the same are manufactured, sold, used, or brought into the island: Provided, That no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico. The officials of the Customs and Postal Services of the United States are directed to assist the appropriate officials of the Puerto Rican government in the collection of these taxes.

(Mar. 2, 1917, ch. 145, §3; Mar. 4, 1927, ch. 503, §1, 44 Stat. 1418; Aug. 26, 1937, ch. 831, 50 Stat. 844.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning act Mar. 2, 1917, ch. 145, 39 Stat. 951, as amended, known as the Puerto Rican Federal Relations Act and also popularly known as the Jones Act, which is classified principally to the chapter. For complete classification of this Act to the Code, see Short Title note set out under section 731 of this title and Tables.

CODIFICATION

Section is comprised of last part of section 3 of act Mar. 2, 1917, as added by act Mar. 4, 1927. The first two parts are classified to sections 741 and 745 of this title.

AMENDMENTS

1937—Act Aug. 26, 1937, reenacted section without substantive change.

§742. Acknowledgment of deeds

Deeds and other instruments affecting land situate in the District of Columbia, or any other

territory or possession of the United States, may be acknowledged in Puerto Rico before any notary public appointed therein by proper authority, or any officer therein who has ex officio the powers of a notary public. The certificate by such notary shall be accompanied by the certificate of the executive secretary of Puerto Rico to the effect that the notary taking such acknowledgment is in fact such notarial officer.

(Mar. 2, 1917, ch. 145, §54, 39 Stat. 968; May 17, 1932, ch. 190, 47 Stat. 158.)

### PRIOR PROVISIONS

Provisions similar to those in this section were contained in act Mar. 22, 1902, ch. 273, 32 Stat. 88, except that that act required the certificate of the attorney general of Puerto Rico, rather than of the executive secretary of Puerto Rico as required by this section.

### CHANGE OF NAME

"Puerto Rico" substituted in text for "Porto Rico" pursuant to act May 17, 1932, which is classified to section 731a of this title.

### § 743. Repealed. July 1, 1944, ch. 373, title XI, § 1113, 58 Stat. 714

Section, acts Apr. 12, 1900, ch. 191, § 10, 31 Stat. 80; Aug. 14, 1912, ch. 288, 37 Stat. 309; May 17, 1932, ch. 190, 47 Stat. 158, provided for quarantine stations in Puerto Rico. See section 267 of Title 42, The Public Health and Welfare.

### RENUMBERING OF REPEALING ACT

Section 611 of act July 1, 1944, which repealed this section, was renumbered §711 by act Aug. 13, 1946, ch. 958, § 5, 60 Stat. 1049, §713 by act Feb. 28, 1948, ch. 83, § 9(b), 62 Stat. 47, §813 by act July 30, 1956, ch. 779, § 3(b), 70 Stat. 720, §913 by Pub. L. 86–581, § 4(b), Sept. 4, 1964, 78 Stat. 919, §1013 by Pub. L. 89–239, § 3(b), Oct. 6, 1965, 79 Stat. 931, and §1113 by Pub. L. 91–572, § 6(b), Dec. 24, 1970, 84 Stat. 1506.

### § 744. Coasting trade laws

The coasting trade between Puerto Rico and the United States shall be regulated in accordance with the provisions of law applicable to such trade between any two great coasting districts of the United States.

(Apr. 12, 1900, ch. 191, § 9, 31 Stat. 79; May 17, 1932, ch. 190, 47 Stat. 158.)

### CODIFICATION

Additional provisions of section 9 of act Apr. 12, 1900, authorizing the making of regulations for the nationalization of all vessels owned by inhabitants of Puerto Rico on April 11, 1889, and which continued to be so owned up to the date of that nationalization and for the admission of the same to all the benefits of the coasting trade of the United States, have been omitted.

Section was not enacted as part of the Puerto Rican Federal Relations Act which comprises this chapter.

### CHANGE OF NAME

"Puerto Rico" substituted in text for "Porto Rico" pursuant to act May 17, 1932, which is classified to section 731a of this title.

### § 745. Tax exempt bonds

All bonds issued by the Government of Puerto Rico, or by its authority, shall be exempt from taxation by the Government of the United States, or by the Government of Puerto Rico or of any political or municipal subdivision there-

of, or by any State, Territory, or possession, or by any county, municipality, or other municipal subdivision of any State, Territory, or possession of the United States, or by the District of Columbia.

(Mar. 2, 1917, ch. 145, § 3, 39 Stat. 953; Feb. 3, 1921, ch. 34, § 2, 41 Stat. 1096; Mar. 4, 1927, ch. 503, § 1, 44 Stat. 1418; Aug. 26, 1937, ch. 831, 50 Stat. 844; Aug. 17, 1950, ch. 731, 64 Stat. 458; Pub. L. 87–121, § 1, Aug. 3, 1961, 75 Stat. 245.)

### CODIFICATION

Section is comprised of second part of section 3 of act Mar. 2, 1917, commencing with proviso clause. The first and last parts of section 3 are classified to sections 741 and 741a, respectively, of this title.

### PRIOR PROVISIONS

Provisions similar to those in this section were contained in act Apr. 12, 1900, ch. 191, § 38, 31 Stat. 86.

### AMENDMENTS

1961—Pub. L. 87–121 struck out "no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Rio Piedras, and Mayaguez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality," before "All bonds issued" and also struck out "In computing the indebtedness of the people of Puerto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Puerto Rico is pledged shall be counted" after "District of Columbia".

1950—Act Aug. 17, 1950, made section applicable to municipalities of Arecibo and Rio Piedras.

1937—Act Aug. 26, 1937, made section applicable to municipality of Mayaguez and substituted "August 26, 1937" for "March 4, 1927" wherever appearing.

1927—Act Mar. 4, 1927, made section applicable to municipalities of San Juan and Ponce, limited public indebtedness of San Juan and Ponce or municipalities of Puerto Rico to 5 per centum, and inserted in last sentence two clauses, the first relating to the non-inclusion of municipal bonds for the payment of interest and principal, and the second reading "but all bonds after August 26, 1937, issued by any municipality or subdivision within the 5 per centum authorized for which the good faith of the people of Porto Rico is pledged shall be counted."

1921—Act Feb. 3, 1921, increased allowable public indebtedness from 7 to 10 per centum of aggregate tax valuation of property.

### EFFECTIVE DATE OF 1961 AMENDMENT

Section 2 of Pub. L. 87–121 provided that: "Section 1 of this Act [amending this section] shall take effect upon a majority of the qualified electors of Puerto Rico having voted in a referendum pursuant to section 1 of article VII of the constitution of the Commonwealth of Puerto Rico, to include provisions in the Commonwealth constitution, in lieu of the provisions of section 3 of the Puerto Rican Federal Relations Act [this section] specified herein, limiting the debt-incurring capacity of the Commonwealth and of its municipalities (as proposed in the concurrent resolution of the legislative assembly of the Commonwealth)."

[Referendum held Dec. 10, 1961, and debt limitation amendment to Article VI, § 2, of Constitution of Com-

48 USC 745: Tax exempt bonds
Text contains those laws in effect on March 12, 2017

From Title 48-TERRITORIES AND INSULAR POSSESSIONS
    CHAPTER 4-PUERTO RICO
    SUBCHAPTER I-GENERAL PROVISIONS
Jump To:
    **Source Credit**
    **Codification**
    **Prior Provisions**
    **Amendments**
    **Effective Date**

## §745. Tax exempt bonds

All bonds issued by the Government of Puerto Rico, or by its authority, shall be exempt from taxation by the Government of the United States, or by the Government of Puerto Rico or of any political or municipal subdivision thereof, or by any State, Territory, or possession, or by any county, municipality, or other municipal subdivision of any State, Territory, or possession of the United States, or by the District of Columbia.

(Mar. 2, 1917, ch. 145, §3, 39 Stat. 953 ; Feb. 3, 1921, ch. 34, §2, 41 Stat. 1096 ; Mar. 4, 1927, ch. 503, §1, 44 Stat. 1418 ; Aug. 26, 1937, ch. 831, 50 Stat. 844 ; Aug. 17, 1950, ch. 731, 64 Stat. 458 ; Pub. L. 87–121, §1, Aug. 3, 1961, 75 Stat. 245 .)

### CODIFICATION

Section is comprised of second part of section 3 of act Mar. 2, 1917, commencing with proviso clause. The first and last parts of section 3 are classified to sections 741 and 741a, respectively, of this title.

### PRIOR PROVISIONS

Provisions similar to those in this section were contained in act Apr. 12, 1900, ch. 191, §38, 31 Stat. 86 .

### AMENDMENTS

**1961**-Pub. L. 87–121 struck out "no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Rio Piedras, and Mayaguez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality," before "All bonds issued" and also struck out "In computing the indebtedness of the people of Puerto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Puerto Rico is pledged shall be counted" after "District of Columbia".

**1950**-Act Aug. 17, 1950, made section applicable to municipalities of Arecibo and Rio Piedras.

**1937**-Act Aug. 26, 1937, made section applicable to municipality of Mayaguez and substituted "August 26, 1937" for "March 4, 1927" wherever appearing.

**1927**-Act Mar. 4, 1927, made section applicable to municipalities of San Juan and Ponce, limited public indebtedness of other subdivisions or municipalities of Puerto Rico to 5 per centum, and inserted in last sentence two clauses, the first relating to the non-inclusion of municipal bonds for the payment of interest and principal, and the second reading "but all bonds after August 26, 1937, issued by any municipality or subdivision within the 5 per centum

authorized for which the good faith of the people of Porto Rico is pledged shall be counted."
1921-Act Feb. 3, 1921, increased allowable public indebtedness from 7 to 10 per centum of aggregate tax valuation of property.

## EFFECTIVE DATE OF 1961 AMENDMENT

Pub. L. 87–121, §2, Aug. 3, 1961, 75 Stat. 245 , provided that: "Section 1 of this Act [amending this section] shall take effect upon a majority of the qualified electors of Puerto Rico having voted in a referendum pursuant to section 1 of article VII of the constitution of the Commonwealth of Puerto Rico, to include provisions in the Commonwealth constitution, in lieu of the provisions of section 3 of the Puerto Rican Federal Relations Act [this section] specified herein, limiting the debt-incurring capacity of the Commonwealth and of its municipalities (as proposed in the concurrent resolution of the legislative assembly of the Commonwealth)."

[Referendum held Dec. 10, 1961, and debt limitation amendment to Article VI, §2, of Constitution of Commonwealth of Puerto Rico ratified by a majority of voters.]

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

TITLE 48 - TERRITORIES AND INSULAR POSSESSIONS
  CHAPTER 4 - PUERTO RICO
    SUBCHAPTER I - GENERAL PROVISIONS

## § 745. Tax exempt bonds

All bonds issued by the Government of Puerto Rico, or by its authority, shall be exempt from taxation by the Government of the United States, or by the Government of Puerto Rico or of any political or municipal subdivision thereof, or by any State, Territory, or possession, or by any county, municipality, or other municipal subdivision of any State, Territory, or possession of the United States, or by the District of Columbia.

(Mar. 2, 1917, ch. 145, § 3, 39 Stat. 953; Feb. 3, 1921, ch. 34, § 2, 41 Stat. 1096; Mar. 4, 1927, ch. 503, § 1, 44 Stat. 1418; Aug. 26, 1937, ch. 831, 50 Stat. 844; Aug. 17, 1950, ch. 731, 64 Stat. 458; Pub. L. 87–121, § 1, Aug. 3, 1961, 75 Stat. 245.)

### Codification

Section is comprised of second part of section 3 of act Mar. 2, 1917, commencing with proviso clause. The first and last parts of section 3 are classified to sections 741 and 741a, respectively, of this title.

### Prior Provisions

Provisions similar to those in this section were contained in act Apr. 12, 1900, ch. 191, § 38, 31 Stat. 86.

### Amendments

1961—Pub. L. 87–121 struck out "no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Rio Piedras, and Mayaguez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality," before "All bonds issued" and also struck out "In computing the indebtedness of the people of Puerto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum herein authorized for which the good faith of the people of Puerto Rico is pledged shall be counted" after "District of Columbia".

1950—Act Aug. 17, 1950, made section applicable to municipalities of Arecibo and Rio Piedras.

1937—Act Aug. 26, 1937, made section applicable to municipality of Mayaguez and substituted "August 26, 1937" for "March 4, 1927" wherever appearing.

1927—Act Mar. 4, 1927, made section applicable to municipalities of San Juan and Ponce, limited public indebtedness of other subdivisions or municipalities of Puerto Rico to 5 per centum, and inserted in last sentence two clauses, the first relating to the non-inclusion of municipal bonds for the payment of interest and principal, and the second reading "but all bonds after August 26, 1937, issued by any municipality or subdivision within the 5 per centum authorized for which the good faith of the people of Porto Rico is pledged shall be counted."

1921—Act Feb. 3, 1921, increased allowable public indebtedness from 7 to 10 per centum of aggregate tax valuation of property.

### Effective Date of 1961 Amendment

Section 2 of Pub. L. 87–121 provided that: "Section 1 of this Act [amending this section] shall take effect upon a majority of the qualified electors of Puerto Rico having voted in a referendum pursuant to section 1 of article VII of the constitution of the Commonwealth of Puerto Rico, to include provisions in the Commonwealth constitution, in lieu of the provisions of section 3 of the Puerto Rican Federal Relations Act [this section] specified herein, limiting the debt-incurring capacity of the Commonwealth and of its municipalities (as proposed in the concurrent resolution of the legislative assembly of the Commonwealth)."

[Referendum held Dec. 10, 1961, and debt limitation amendment to Article VI, § 2, of Constitution of Commonwealth of Puerto Rico ratified by a majority of voters.]

# 48 U.S. Code § 745 - Tax exempt bonds

Current through Pub. L. 114-38 (http://www.gpo.gov/fdsys/pkg/PLAW-114publ38/html/PLAW-114publ38.htm). (See Public Laws for the current Congress (http://thomas.loc.gov/home/LegislativeData.php?n=PublicLaws).)

**US Code** (/uscode/text/48/745?qt-us_code_temp_noupdates=0#qt-us_code_temp_noupdates)

**Notes** (/uscode/text/48/745?qt-us_code_temp_noupdates=1#qt-us_code_temp_noupdates)

### CODIFICATION

Section is comprised of second part of section 3 of act Mar. 2, 1917, commencing with proviso clause. The first and last parts of section 3 are classified to sections 741 and 741a, respectively, of this title.

### PRIOR PROVISIONS

Provisions similar to those in this section were contained in act Apr. 12, 1900, ch. 191, § 38, 31 Stat. 86 (http://uscode.house.gov/statviewer.htm?volume=31&page=86).

### AMENDMENTS

1961—Pub. L. 87–121 (http://www.gpo.gov/fdsys/browse/collection.action?collectionCode=PLAW) struck out "no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Rio Piedras, and Mayaguez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality," before "All bonds issued" and also struck out "In computing the indebtedness of the people of Puerto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Puerto Rico is pledged shall be counted" after "District of Columbia".

1950—Act Aug. 17, 1950, made section applicable to municipalities of Arecibo and Rio Piedras.

1937—Act Aug. 26, 1937, made section applicable to municipality of Mayaguez and substituted "August 26, 1937" for "March 4, 1927" wherever appearing.

1927—Act Mar. 4, 1927, made section applicable to municipalities of San Juan and Ponce, limited public indebtedness of other subdivisions or municipalities of Puerto Rico to 5 per centum, and inserted in last sentence two clauses, the first relating to the non-inclusion of municipal bonds for the payment of interest and principal, and the second reading "but all bonds after August 26, 1937, issued by any municipality or subdivision within the 5 per centum authorized for which the good faith of the people of Porto Rico is pledged shall be counted."

1921—Act Feb. 3, 1921, increased allowable public indebtedness from 7 to 10 per centum of aggregate tax valuation of property.

### EFFECTIVE DATE OF 1961 AMENDMENT

Pub. L. 87–121 (http://www.gpo.gov/fdsys/browse/collection.action?collectionCode=PLAW), § 2, Aug. 3, 1961, 75 Stat. 245 (http://uscode.house.gov/statviewer.htm?volume=75&page=245), provided that:

"Section 1 of this Act [amending this section] shall take effect upon a majority of the qualified electors of Puerto Rico having voted in a referendum pursuant to section 1 of article VII of the constitution of the Commonwealth of Puerto Rico, to include provisions in the Commonwealth constitution, in lieu of the provisions of section 3 of the Puerto Rican Federal Relations Act [this section] specified herein, limiting the debt-incurring capacity of the Commonwealth and of its municipalities (as proposed in the concurrent resolution of the legislative assembly of the Commonwealth)."

[Referendum held Dec. 10, 1961, and debt limitation amendment to Article VI, § 2, of Constitution of Commonwealth of Puerto Rico ratified by a majority of voters.]

Case:17-03283-LTS   Doc#:321-1   Filed:06/13/17   Entered:06/13/17 17:33:01   Desc:
Exhibit   Page 75 of 128

U.S. Code (/uscode/text) › Title 48 (/uscode/text/48) › Chapter 4 (/uscode/text/48/chapter-4) › Subchapter I (/uscode/text/48/chapter-4/subchapter-I) › § 745

# 48 U.S. Code § 745 - Tax exempt bonds

Current through Pub. L. 114-38 (http://www.gpo.gov/fdsys/pkg/PLAW-114publ38/html/PLAW-114publ38.htm). (See Public Laws for the current Congress (http://thomas.loc.gov/home/LegislativeData.php?n=PublicLaws).)

**US Code** (/uscode/text/48/745?qt-us_code_temp_noupdates=0#qt-us_code_temp_noupdates)

**Notes** (/uscode/text/48/745?qt-us_code_temp_noupdates=1#qt-us_code_temp_noupdates)

prev (/uscode/text/48/744) | next (/uscode/text/48/745a)

All bonds issued by the Government of Puerto Rico, or by its authority, shall be exempt from taxation by the Government of the United States, or by the Government of Puerto Rico or of any political or municipal subdivision thereof, or by any State, Territory, or possession, or by any county, municipality, or other municipal subdivision of any State, Territory, or possession of the United States, or by the District of Columbia.

(Mar. 2, 1917, ch. 145, § 3, 39 Stat. 953 (http://uscode.house.gov/statviewer.htm?volume=39&page=953); Feb. 3, 1921, ch. 34, § 2, 41 Stat. 1096 (http://uscode.house.gov/statviewer.htm?volume=41&page=1096); Mar. 4, 1927, ch. 503, § 1, 44 Stat. 1418 (http://uscode.house.gov/statviewer.htm?volume=44&page=1418); Aug. 26, 1937, ch. 831, 50 Stat. 844 (http://uscode.house.gov/statviewer.htm?volume=50&page=844); Aug. 17, 1950, ch. 731, 64 Stat. 458 (http://uscode.house.gov/statviewer.htm?volume=64&page=458); Pub. L. 87–121 (http://www.gpo.gov/fdsys/browse/collection.action?collectionCode=PLAW), § 1, Aug. 3, 1961, 75 Stat. 245 (http://uscode.house.gov/statviewer.htm?volume=75&page=245).)

Relations Act and also popularly known as the Jones Act, which is classified principally to the chapter. For complete classification of this Act to the Code, see Short Title note set out under section 731 of this title and Tables.

CODIFICATION

Section is comprised of last part of section 3 of act Mar. 2, 1917, as added by act Mar. 4, 1927. The first two parts are classified to sections 741 and 745 of this title.

AMENDMENTS

1937—Act Aug. 26, 1937, reenacted section without substantive change.

## § 742. Acknowledgment of deeds

Deeds and other instruments affecting land situate in the District of Columbia, or any other territory or possession of the United States, may be acknowledged in Puerto Rico before any notary public appointed therein by proper authority, or any officer therein who has ex officio the powers of a notary public. The certificate by such notary shall be accompanied by the certificate of the executive secretary of Puerto Rico to the effect that the notary taking such acknowledgment is in fact such notarial officer.

(Mar. 2, 1917, ch. 145, § 54, 39 Stat. 968; May 17, 1932, ch. 190, 47 Stat. 158.)

PRIOR PROVISIONS

Provisions similar to those in this section were contained in act Mar. 22, 1902, ch. 273, 32 Stat. 88, except that that act required the certificate of the attorney general of Puerto Rico, rather than of the executive secretary of Puerto Rico as required by this section.

CHANGE OF NAME

"Puerto Rico" substituted in text for "Porto Rico" pursuant to act May 17, 1932, which is classified to section 731a of this title.

## § 743. Repealed. July 1, 1944, ch. 373, title XI, § 1113, 58 Stat. 714

Section, acts Apr. 12, 1900, ch. 191, § 10, 31 Stat. 80; Aug. 14, 1912, ch. 288, 37 Stat. 309; May 17, 1932, ch. 190, 47 Stat. 158, provided for quarantine stations in Puerto Rico. See section 267 of Title 42, The Public Health and Welfare.

RENUMBERING OF REPEALING ACT

Section 611 of act July 1, 1944, which repealed this section, was renumbered § 711 by act Aug. 13, 1946, ch. 958, § 5, 60 Stat. 1049, § 713 by act Feb. 26, 1948, ch. 83, § 9(b), 62 Stat. 47, § 813 by act July 30, 1956, ch. 779, § 3(b), 70 Stat. 720, § 913 by Pub. L. 88–581, § 4(b), Sept. 4, 1964, 78 Stat. 919, § 1013 by Pub. L. 89–239, § 3(b), Oct. 6, 1965, 79 Stat. 931, and § 1113 by Pub. L. 91–572, § 6(b), Dec. 24, 1970, 84 Stat. 1506.

## § 744. Coasting trade laws

The coasting trade between Puerto Rico and the United States shall be regulated in accordance with the provisions of law applicable to such trade between any two great coasting districts of the United States.

(Apr. 12, 1900, ch. 191, § 9, 31 Stat. 79; May 17, 1932, ch. 190, 47 Stat. 158.)

CODIFICATION

Additional provisions of section 9 of act Apr. 12, 1900, authorizing the making of regulations for the nationalization of all vessels owned by inhabitants of Puerto

Rico on April 11, 1889, and which continued to be so owned up to the date of that nationalization and for the admission of the same to all the benefits of the coasting trade of the United States, have been omitted.

Section was not enacted as part of the Puerto Rican Federal Relations Act which comprises this chapter.

CHANGE OF NAME

"Puerto Rico" substituted in text for "Porto Rico" pursuant to act May 17, 1932, which is classified to section 731a of this title.

## § 745. Tax exempt bonds

All bonds issued by the Government of Puerto Rico, or by its authority, shall be exempt from taxation by the Government of the United States, or by the Government of Puerto Rico or of any political or municipal subdivision thereof, or by any State, Territory, or possession, or by any county, municipality, or other municipal subdivision of any State, Territory, or possession of the United States, or by the District of Columbia.

(Mar. 2, 1917, ch. 145, § 3, 39 Stat. 953; Feb. 3, 1921, ch. 34, § 2, 41 Stat. 1096; Mar. 4, 1927, ch. 503, § 1, 44 Stat. 1418; Aug. 26, 1937, ch. 831, 50 Stat. 844; Aug. 17, 1950, ch. 731, 64 Stat. 458; Pub. L. 87–121, § 1, Aug. 3, 1961, 75 Stat. 245.)

CODIFICATION

Section is comprised of second part of section 3 of act Mar. 2, 1917, commencing with proviso clause. The first and last parts of section 3 are classified to sections 741 and 741a, respectively, of this title.

PRIOR PROVISIONS

Provisions similar to those in this section were contained in act Apr. 12, 1900, ch. 191, § 38, 31 Stat. 86.

AMENDMENTS

1961—Pub. L. 87–121 struck out "no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Rio Piedras, and Mayaguez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality," before "All bonds issued" and also struck out "In computing the indebtedness of the people of Puerto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Puerto Rico is pledged shall be counted" after "District of Columbia."

1950—Act Aug. 17, 1950, made section applicable to municipalities of Arecibo and Rio Piedras.

1937—Act Aug. 26, 1937, made section applicable to municipality of Mayaguez and substituted "August 26, 1937" for "March 4, 1927" wherever appearing.

1927—Act Mar. 4, 1927, made section applicable to municipalities of San Juan and Ponce, limited public indebtedness of other subdivisions or municipalities of Puerto Rico to 5 per centum, and inserted in last sentence two clauses, the first relating to the non-inclusion of municipal bonds for the payment of interest and principal, and the second reading "but all bonds after August 26, 1937, issued by any municipality or subdivision within the 5 per centum authorized for which the good faith of the people of Porto Rico is pledged shall be counted."

1418    SIXTY-NINTH CONGRESS. Sess. II. Ch. 503. 1927.

March 4, 1927.
[S. 4247.]
[Public, No. 797.]

**CHAP. 503.**—An Act To amend and reenact sections 3, 20, 31, 33, 38, and 48 of the Act of March 2, 1917, entitled "An Act to provide a civil government for Porto Rico, and for other purposes," as amended by an Act approved June 7, 1924, and for the insertion of a new section in said Act between sections 5 and 6 of said Act, to be designated as "5a" of said Act.

*Porto Rico Civil Government. Revenues. Vol. 39, p. 953. Vol. 41, p. 1096, amended.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 3 of an Act entitled "An Act to provide a civil government for Porto Rico, and for other purposes, approved March 2, 1917, as amended by an Act approved February 3, 1921, be, and the same is hereby, amended to read as follows:

*Export taxes forbidden. General taxes, as provided by legislature, income added.*

"Sec. 3. That no export duties shall be levied or collected on exports from Porto Rico, but taxes and assessments on property, income taxes, internal revenue, and license fees, and royalties for franchises, privileges, and concessions may be imposed for the purposes of the insular and municipal governments, respectively, as may be provided and defined by the Legislature of Porto Rico; and when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Porto Rico or any municipal government therein as may be provided by law, and to protect the public credit: *Provided, however,* That no public indebtedness of Porto Rico and the municipalities of San Juan and Ponce shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Porto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality, and all bonds issued by the government of Porto Rico, or by its authority, shall be exempt from taxation by the Government of the United States, or by the government of Porto Rico or of any political or municipal subdivision thereof, or by any State, Territory, or possession, or by any county, municipality, or other municipal subdivision of any State, Territory, or possession of the United States, or by the District of Columbia. In computing the indebtedness of the people of Porto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Porto Rico has heretofore been pledged and bonds issued by the people of Porto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Porto Rico shall not be counted, but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Porto Rico is pledged shall be counted.

*Provisos. Indebtedness limited of Porto Rico, and San Juan and Ponce.*

*Other municipalities.*

*Bonds exempt from Federal, etc., taxes.*

*Existing secured bonds not computed in limitation.*

*Internal revenue taxes. Collection.*

"*And it is further provided,* That the internal-revenue taxes levied by the Legislature of Porto Rico in pursuance of the authority granted by this Act on articles, goods, wares, or merchandise may be levied and collected as such legislature may direct, on the articles subject to said tax, as soon as the same are manufactured, sold, used, or brought into the island: *Provided,* That no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Porto Rico. The officials of the Customs and Postal Services of the United States are hereby directed to assist the appropriate officials of the Porto Rican government in the collection of these taxes."

*Proviso. No discrimination against imports.*

*Federal officials to assist in collection.*

Sec. 2. That a new section is hereby inserted between sections 5 and 6 of the Act entitled "An Act to provide a civil government for Porto Rico, and for other purposes," approved March 2, 1917, as amended, as follows:

*Citizenship. Vol. 39, p. 953, amended.*

"Sec. 5a. That all citizens of the United States who have resided or who shall hereafter reside in the island for one year shall be citizens of Porto Rico: *Provided,* That persons born in Porto Rico

*One year's residence of American citizens.*

*Provisos.*

SEC. 2. To accomplish the purposes of this Act, the Secretary of War is authorized to accept, on behalf of the United States, free of encumbrances and without cost to the United States, the title in fee simple to such lands as he may deem necessary or desirable for new permanent Air Corps stations and depots and/or the extension of or addition to existing Air Corps stations or depots; or, with the written approval of the President, to exchange for such lands existing military reservations or portions thereof; or, if it be found impracticable to secure the necessary lands by either of these methods, to purchase the same by agreement or through condemnation proceedings.

*Acquisition of sites.*

SEC. 3. The Secretary of War is further authorized and directed to construct, install, and equip, or complete the construction, installation, and equipment, inclusive of bomb-proof protection as required, at each of said stations and depots, such buildings and utilities, technical buildings and utilities, landing fields and mats, and all utilities and appurtenances thereto, ammunition storage, fuel and oil storage and distribution systems therefor, roads, walks, aprons, docks, runways, sewer, water, power, station and aerodrome lighting, telephone and signal communications, and other essentials, including the necessary grading and removal or remodeling of existing structures and installations. He is authorized, also, to direct the necessary transportation of personnel, and purchase, renovation, and transportation of materials, as in his judgment may be required to carry out the purposes of this Act. The Secretary of War is further authorized to acquire by gift, purchase, lease, or otherwise, at such locations as may be desirable, such bombing and machine-gun ranges as may be required for the proper practice and training of tactical units.

*Construction of buildings and utilities.*

*Transportation of personnel and materials.*

*Acquisition of bombing and machine-gun ranges.*

SEC. 4. There is hereby authorized to be appropriated, out of any money in the Treasury of the United States not otherwise appropriated, such sums of money as may be necessary, to be expended under the direction of the Secretary of War for the purposes of this Act, including the expenses incident to the necessary surveys, which appropriation shall continue available until expended: *Provided,* That the provisions of section 1136, Revised Statutes (U. S. C., title 10, par. 1339), shall not apply to the construction of the aforesaid stations and depots.

*Appropriation authorized.*
*Post, pp. 1640, 1641.*

*Proviso.*
*R. S., sec. 1136, p. 206; U. S. C., p. 293.*

Approved, August 12, 1935.

[CHAPTER 516.]

AN ACT

To authorize the issuance and sale to the United States of certain bonds of municipal governments in Puerto Rico, and for other purposes.

August 13, 1935.
[S. 1227.]
[Public, No. 264.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That bonds or other obligations of Puerto Rico or any municipal government therein, payable solely from revenues derived from any public improvement or undertaking (which revenues may include transfers by agreement or otherwise from the regular funds of the issuer in respect of the use by it of the facilities afforded by such improvement or undertaking), and issued and sold to the United States of America or any agency or instrumentality thereof, shall not be considered public indebtedness of the issuer within the meaning of section 3 of an Act approved March 2, 1917, entitled "An Act to provide a civil government for Porto Rico, and for other purposes", as amended.

*Puerto Rico.*
*Sale of bonds of municipal governments.*

*Vol. 39, p. 953; U. S. C., p. 2163.*

Approved, August 13, 1935.

## §745a. Public improvement bonds sold to United States or agency thereof excluded from public indebtedness

Bonds or other obligations of Puerto Rico or any municipal government therein, payable solely from revenues derived from any public improvement or undertaking (which revenues may include transfers by agreement or otherwise from the regular funds of the issuer in respect of the use by it of the facilities afforded by such improvement or undertaking), and issued and sold to the United States of America or any agency or instrumentality thereof, shall not be considered public indebtedness of the issuer within the meaning of section 745 of this title.

(Aug. 13, 1935, ch. 516, 49 Stat. 611.)

### CODIFICATION

Section was not enacted as part of the Puerto Rican Federal Relations Act which comprises this chapter.

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

TITLE 48 - TERRITORIES AND INSULAR POSSESSIONS
  CHAPTER 4 - PUERTO RICO
    SUBCHAPTER I - GENERAL PROVISIONS

### § 745a. Public improvement bonds sold to United States or agency thereof excluded from public indebtedness

Bonds or other obligations of Puerto Rico or any municipal government therein, payable solely from revenues derived from any public improvement or undertaking (which revenues may include transfers by agreement or otherwise from the regular funds of the issuer in respect of the use by it of the facilities afforded by such improvement or undertaking), and issued and sold to the United States of America or any agency or instrumentality thereof, shall not be considered public indebtedness of the issuer within the meaning of section 745 of this title.

(Aug. 13, 1935, ch. 516, 49 Stat. 611.)

**Codification**

Section was not enacted as part of the Puerto Rican Federal Relations Act which comprises this chapter.

Contracts for sale of bonds.

SEC. 6. The city of Anchorage is hereby authorized to enter into contracts with the United States of America or any agency or instrumentality thereof under the provisions of the National Industrial Recovery Act and Acts amendatory thereof and Acts supplemental thereto, and revisions thereof, and the regulations made in pursuance thereof, and under any further Acts of the Congress of the United States to encourage public works, for the relief of unemployment, or for any other public purpose, including the Emergency Relief Appropriation Act of 1935, for the sale of bonds issued in accordance with the provisions of this Act, or for the acceptance of a grant of money to aid said municipality in financing any public works; or to enter into contracts with any persons or corporations, public or private, Terms and conditions. for the sale of such bonds; and such contracts may contain such terms and conditions as may be agreed upon by and between the common council of said city of Anchorage and the United States of America or any agency or instrumentality thereof, or any such purchaser.

SEC. 7. This Act shall take effect immediately.

Approved, August 3, 1935.

---

[CHAPTER 435.]

AN ACT

August 3, 1935.
[H. R. 8209.]
[Public, No. 236.]

Temporarily to exempt refunding bonds of the Government of Puerto Rico from the limitation of public indebtedness under the Organic Act.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any bonds Puerto Rico; bonds. Exemption from inclusion in computing public indebtedness. or other obligations of Puerto Rico hereafter issued for the purpose of retiring previously outstanding bonds or obligations shall not be included in computing the public indebtedness of Puerto Rico under Vol. 39, p. 953. U. S. C., p. 2163. section 3 of the Organic Act approved March 2, 1917, as amended, until six months after their issue.

Approved, August 3, 1935.

---

[CHAPTER 436.]

AN ACT

August 3, 1935.
[H. R. 8270.]
[Public, No. 237.]

To enable the Legislature of the Territory of Hawaii to authorize the issuance of certain bonds, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Legis- Hawaii. Authority of Legislature to permit bond issues. lature of the Territory of Hawaii may cause to be issued on behalf of the Territory and may authorize any political or municipal corporation or subdivision of the Territory (including the board of water supply of the city and county of Honolulu, and the board of harbor commissioners) to issue of its own behalf bonds and other obligations payable solely from the revenues derived from a public improvement or public undertaking (which revenues may include transfers by agreement or otherwise from the regular funds of the issuer in respect of the use by it of the facilities afforded by such improvement or undertaking). The issuance of such revenue bonds shall not constitute the incurrence of an indebtedness within the meaning of the Hawaiian Organic Act, and shall not require the approval of the President of the United States.

Confirmation of prior acts authorizing issues.

All Acts of the Legislature of Hawaii heretofore authorizing the issuance of revenue bonds on behalf of the Territory or by any political or municipal corporation or subdivision thereof are hereby confirmed and ratified.

### CODIFICATION

Section was not enacted as part of the Puerto Rican Federal Relations Act which comprises this chapter.

## § 745b. Refunding bonds excluded temporarily in computing indebtedness

Any bonds or other obligations of Puerto Rico issued after August 3, 1935, for the purpose of retiring previously outstanding bonds or obligations shall not be included in computing the public indebtedness of Puerto Rico under section 745 of this title, until six months after their issue.

(Aug. 3, 1935, ch. 435, 49 Stat. 516.)

### CODIFICATION

Section was not enacted as part of the Puerto Rican Federal Relations Act which comprises this chapter.

## § 746. Public lands and buildings; reservations; rights prior to July 1, 1902

All public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in the island of Puerto Rico and not reserved by the President of the United States prior to July 1, 1903, pursuant to authority vested in him by law, are granted to the government of Puerto Rico, to be held or disposed of for the use and benefit of the people of said island. Said grant is upon the express condition that the government of Puerto Rico, by proper authority, release to the United States any interest or claim it may have in or upon the lands or buildings reserved by the President as mentioned herein. Nothing herein contained shall be so construed as to affect any legal or equitable rights acquired by the government of Puerto Rico or by any other party, under any contract, lease, or license made by the United States authorities prior to the 1st day of May 1900.

(July 1, 1902, ch. 1383, §1, 32 Stat. 731; May 17, 1932, ch. 190, 47 Stat. 158.)

### CODIFICATION

Section was not enacted as part of the Puerto Rican Federal Relations Act which comprises this chapter.

### CHANGE OF NAME

"Puerto Rico" substituted in text for "Porto Rico" pursuant to act May 17, 1932, which is classified to section 731a of this title.

### LAW LIBRARY

Section 2 of act July 1, 1902, made an appropriation for the purchase of a law library for the use of the United States District Court for Puerto Rico.

### EXPENSES AND TERM OF RESIDENT COMMISSIONER

Section 3 of act July 1, 1902, related to allowance of traveling expenses in addition to salary to the resident commissioner from Puerto Rico, and to the commencement of his term.

## § 747. Public property transferred; "control" defined

All property which may have been acquired in Puerto Rico by the United States under the cession of Spain in the treaty of peace entered into on the 10th day of December 1898, in any public bridges, road houses, water powers, highways, unnavigable streams and the beds thereof, subterranean waters, mines or minerals under the surface of private lands, all property which at the time of the cession belonged, under the laws of Spain then in force, to the various harbor works boards of Puerto Rico, all the harbor shores, docks, slips, reclaimed lands, and all public lands and buildings not reserved by the United States for public purposes prior to March 2, 1917, is placed under the control of the government of Puerto Rico, to be administered for the benefit of the people of Puerto Rico; and the Legislature of Puerto Rico shall have authority, subject to the limitations imposed upon all its acts, to legislate with respect to all matters, as it may deem advisable. Notwithstanding any other provision of law, as used in this section "control" includes all right, title, and interest in and to and jurisdiction and authority over the aforesaid property and includes proprietary rights of ownership, and the rights of management, administration, leasing, use, and development of such property.

(Mar. 2, 1917, ch. 145, §7, 39 Stat. 954; May 17, 1932, ch. 190, 47 Stat. 158; Pub. L. 96–205, title VI, §606(b), Mar. 12, 1980, 94 Stat. 91.)

### CODIFICATION

Section is comprised of that part of section 7 of act Mar. 2, 1917, preceding the proviso clause. The remainder of section 7 is classified to section 748 of this title.

### PRIOR PROVISIONS

Provisions similar to those in this section were contained in act Apr. 12, 1900, ch. 191, §13, 31 Stat. 80.

### AMENDMENTS

1980—Pub. L. 96–205 inserted provisions defining "control".

### CHANGE OF NAME

"Puerto Rico" substituted in text for "Porto Rico" pursuant to act May 17, 1932, which is classified to section 731a of this title.

### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 749 of this title.

## § 748. Conveyance by President to people of lands, buildings, etc.

The President may, from time to time, in his discretion, convey to the people of Puerto Rico, such lands, buildings, or interests in lands, or other property now owned by the United States, and within the territorial limits of Puerto Rico as in his opinion are no longer needed for purposes of the United States. And he may from time to time accept by legislative grant from Puerto Rico any lands, buildings, or other interests or property which may be needed for public purposes by the United States.

(Mar. 2, 1917, ch. 145, §7, 39 Stat. 954; May 17, 1932, ch. 190, 47 Stat. 158.)

### CODIFICATION

Section is comprised of proviso clause of section 7 of act Mar. 2, 1917. The text preceding the proviso clause of section 7 is classified to section 747 of this title.

### CHANGE OF NAME

"Puerto Rico" substituted in text for "Porto Rico" pursuant to act May 17, 1932, which is classified to section 731a of this title.

1921—Act Feb. 3, 1921, increased allowable public indebtedness from 7 to 10 per centum of aggregate tax valuation of property.

#### EFFECTIVE DATE OF 1961 AMENDMENT

Section 2 of Pub. L. 87–121 provided that: "Section 1 of this Act [amending this section] shall take effect upon a majority of the qualified electors of Puerto Rico having voted in a referendum pursuant to section 1 of article VII of the constitution of the Commonwealth of Puerto Rico, to include provisions in the Commonwealth constitution, in lieu of the provisions of section 3 of the Puerto Rican Federal Relations Act [this section] specified herein, limiting the debt-incurring capacity of the Commonwealth and of its municipalities (as proposed in the concurrent resolution of the legislative assembly of the Commonwealth)."

[Referendum held Dec. 10, 1961, and debt limitation amendment to Article VII, §2, of Constitution of Commonwealth of Puerto Rico ratified by a majority of voters.]

### §745a. Public improvement bonds sold to United States or agency thereof excluded from public indebtedness

Bonds or other obligations of Puerto Rico or any municipal government therein, payable solely from revenues derived from any public improvement or undertaking (which revenues may include transfers by agreement or otherwise from the regular funds of the issuer in respect of the use by it of the facilities afforded by such improvement or undertaking), and issued and sold to the United States of America or any agency or instrumentality thereof, shall not be considered public indebtedness of the issuer within the meaning of section 745 of this title.

(Aug. 13, 1935, ch. 516, 49 Stat. 611.)

#### CODIFICATION

Section was not enacted as part of the Puerto Rican Federal Relations Act which comprises this chapter.

### §745b. Refunding bonds excluded temporarily in computing indebtedness

Any bonds or other obligations of Puerto Rico issued after August 3, 1935, for the purpose of retiring previously outstanding bonds or obligations shall not be included in computing the public indebtedness of Puerto Rico under section 745 of this title, until six months after their issue.

(Aug. 3, 1935, ch. 435, 49 Stat. 516.)

#### CODIFICATION

Section was not enacted as part of the Puerto Rican Federal Relations Act which comprises this chapter.

### §746. Public lands and buildings; reservations; rights prior to July 1, 1902

All public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in the island of Puerto Rico and not reserved by the President of the United States prior to July 1, 1903, pursuant to authority vested in him by law, are granted to the government of Puerto Rico, to be held or disposed of for the use and benefit of the people of said island. Said grant is upon the express condition that the government of Puerto Rico, by proper authority, release to the United States any interest or claim it may have in or upon the lands or buildings reserved by the President as mentioned herein. Nothing herein contained shall be so construed as to affect any legal or equitable rights acquired by the government of Puerto Rico or by any other party, under any contract, lease, or license made by the United States authorities prior to the 1st day of May 1900.

(July 1, 1902, ch. 1383, §1, 32 Stat. 731; May 17, 1932, ch. 190, 47 Stat. 158.)

#### CODIFICATION

Section was not enacted as part of the Puerto Rican Federal Relations Act which comprises this chapter.

#### CHANGE OF NAME

"Puerto Rico" substituted in text for "Porto Rico" pursuant to act May 17, 1932, which is classified to section 731a of this title.

#### LAW LIBRARY

Section 2 of act July 1, 1902, made an appropriation for the purchase of a law library for the use of the United States District Court for Puerto Rico.

#### EXPENSES AND TERM OF RESIDENT COMMISSIONER

Section 3 of act July 1, 1902, related to allowance of traveling expenses in addition to salary to the resident commissioner from Puerto Rico, and to the commencement of his term.

### §747. Public property transferred; "control" defined

All property which may have been acquired in Puerto Rico by the United States under the cession of Spain in the treaty of peace entered into on the 10th day of December 1898, in any public bridges, road houses, water powers, highways, unnavigable streams and the beds thereof, subterranean waters, mines or minerals under the surface of private lands, all property which at the time of the cession belonged, under the laws of Spain then in force, to the various harbor works boards of Puerto Rico, all the harbor shores, docks, slips, reclaimed lands, and all public lands and buildings not reserved by the United States for public purposes prior to March 2, 1917, is placed under the control of the government of Puerto Rico, to be administered for the benefit of the people of Puerto Rico; and the Legislature of Puerto Rico shall have authority, subject to the limitations imposed upon all its acts, to legislate with respect to all matters, as it may deem advisable. Notwithstanding any other provision of law, as used in this section "control" includes all right, title, and interest in and to and jurisdiction and authority over the aforesaid property and includes proprietary rights of ownership, and the rights of management, administration, leasing, use, and development of such property.

(Mar. 2, 1917, ch. 145, §7, 39 Stat. 954; May 17, 1932, ch. 190, 47 Stat. 158; Pub. L. 96–205, title VI, §606(b), Mar. 12, 1980, 94 Stat. 91.)

#### CODIFICATION

Section is comprised of that part of section 7 of act Mar. 2, 1917, preceding the proviso clause. The remainder of section 7 is classified to section 748 of this title.

#### PRIOR PROVISIONS

Provisions similar to those in this section were contained in act Apr. 12, 1900, ch. 191, §13, 31 Stat. 80.

<< Previous   TITLE 48 / CHAPTER 4 / SUBCHAPTER I / § 741a   Next
>>

[Print]   [Print selection]                                    [OLRC Home]   Help

48 USC 741a: Internal-revenue taxes; levy and collection; discrimination
Text contains those laws in effect on March 13, 2017
**From Title 48-TERRITORIES AND INSULAR POSSESSIONS**
    CHAPTER 4-PUERTO RICO
    SUBCHAPTER I-GENERAL PROVISIONS
Jump To:
    Source Credit
    References In Text
    Codification
    Amendments

## §741a. Internal-revenue taxes; levy and collection; discrimination

The internal-revenue taxes levied by the Legislature of Puerto Rico in pursuance of the authority granted by this chapter on articles, goods, wares, or merchandise may be levied and collected as such legislature may direct, on the articles subject to said tax, as soon as the same are manufactured, sold, used, or brought into the island: *Provided*, That no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico. The officials of the Customs and Postal Services of the United States are directed to assist the appropriate officials of the Puerto Rican government in the collection of these taxes.

(Mar. 2, 1917, ch. 145, §3, 39 Stat. 953 ; Mar. 4, 1927, ch. 503, §1, 44 Stat. 1418 ; Aug. 26, 1937, ch. 831, 50 Stat. 844 .)

"AUTHORITY TO ORDER RESERVE COMPONENTS TO ACTIVE FEDERAL SERVICE

"SEC. 21. Until July 9, 1951, and subject to the limitations imposed by section 2 of the Selective Service Act of 1948, as amended, the President shall be authorized to order into the active military or naval service of the United States for a period of not to exceed twenty-one consecutive months, with or without their consent, any or all members and units of any or all Reserve components of the Armed Forces of the United States and retired personnel of the Regular Armed Forces."

62 Stat. 605.
50 U. S. C., Sup. III, app. § 452.

SEC. 3. So much of section 10 (b) (4) of the Selective Service Act of 1948 (62 Stat. 604) as precedes the second proviso is hereby amended to read as follows: "(4) to appoint, and to fix, in accordance with the Classification Act of 1949, the compensation of such officers, agents, and employees as he may deem necessary to carry out the provisions of this title: *Provided,* That the compensation of employees of local boards and appeal boards may be fixed without regard to the Classification Act of 1949:".

62 Stat. 620.
50 U. S. C., Sup. III, app. § 460 (b) (4).
*Post,* p. 1074.
63 Stat. 954.
5 U. S. C., Sup. III, §§ 1071–1153.
*Ante,* pp. 232, 262; *post,* p. 1100.

SEC. 4. This Act may be cited as the "Selective Service Extension Act of 1950".

Approved June 30, 1950.

[CHAPTER 446]

## AN ACT

To provide for the organization of a constitutional government by the people of Puerto Rico.

July 3, 1950
[S. 3336]
[Public Law 600]

Whereas the Congress of the United States by a series of enactments has progressively recognized the right of self-government of the people of Puerto Rico; and
Whereas under the terms of these congressional enactments an increasingly large measure of self-government has been achieved: Therefore

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, fully recognizing the principle of government by consent, this Act is now adopted in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption.

Puerto Rico.
Organization of constitutional government.

SEC. 2. This Act shall be submitted to the qualified voters of Puerto Rico for acceptance or rejection through an island-wide referendum to be held in accordance with the laws of Puerto Rico. Upon the approval of this Act, by a majority of the voters participating in such referendum, the Legislature of Puerto Rico is authorized to call a constitutional convention to draft a constitution for the said island of Puerto Rico. The said constitution shall provide a republican form of government and shall include a bill of rights.

Referendum.

Constitutional convention.

SEC. 3. Upon adoption of the constitution by the people of Puerto Rico, the President of the United States is authorized to transmit such constitution to the Congress of the United States if he finds that such constitution conforms with the applicable provisions of this Act and of the Constitution of the United States.

Transmittal of constitution to Congress.

Upon approval by the Congress the constitution shall become effective in accordance with its terms.

SEC. 4. Except as provided in section 5 of this Act, the Act entitled "An Act to provide a civil government for Porto Rico, and for other purposes", approved March 2, 1917, as amended, is hereby continued in force and effect and may hereafter be cited as the "Puerto Rican Federal Relations Act".

Puerto Rican Federal Relations Act.

39 Stat. 951.
48 U. S. C. § 731 note.
*Post,* p. 320.

Repeals.

39 Stat. 951.
48 U. S. C. §§ 732,
735, 736, 751-765, 773,
774, 778, 780-785, 787-
795, 796, 799, 811-819,
821-837, 839-846, 861,
873; Sup. III, §§ 750,
771, 771a, 772, 775, 776,
786, 797, 798, 820, 835.

SEC. 5. At such time as the constitution of Puerto Rico becomes effective, the following provisions of such Act of March 2, 1917, as amended, shall be deemed repealed:

(1) Section 2, except the paragraph added thereto by Public Law 362, Eightieth Congress, first session, approved August 5, 1947.

(2) Sections 4, 12, 12a, 13, 14, 15, 16, 17, 18, 18a, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 39, 40, 49, 49b, 50, 51, 52, 53, 56, and 57.

(3) The last paragraph in section 37.

(4) Section 38, except the second paragraph thereof which begins with the words "The Interstate Commerce Act" and ends with the words "shall not apply in Puerto Rico".

SEC. 6. All laws or parts of laws inconsistent with this Act are hereby repealed.

Approved July 3, 1950.

---

[CHAPTER 449]

July 6, 1950
[H. R. 4295]
[Public Law 601]

AN ACT

To provide certain benefits for annuitants who retired under the Civil Service Retirement Act of May 29, 1930, prior to April 1, 1948.

Civil Service Retirement Act, 1930, amendment.
46 Stat. 475.
5 U. S. C. § 736c;
Sup. III, § 736c.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 8 of the Civil Service Retirement Act of May 29, 1930, as amended, is amended by inserting "(a)" after the section number, by striking out the word "paragraph" and inserting in lieu thereof the word "section", and by adding at the end thereof a new subsection as follows:

"(b) (1) In the case of any retired officer or employee mentioned in the first paragraph of subsection (a) who did not elect a survivor's annuity in accordance with the proviso in such subsection, there shall be payable upon his or her death, to his or her wife or husband to whom the annuitant was married before April 1, 1948, an annuity equal to one-half of his or her present annuity (excluding the increase therein under subsection (a)), but not to exceed $600 per annum, during the remainder of the life of such survivor. The provisions of this paragraph shall apply in the case of any such annuitant who died subsequent to April 30, 1948.

"(2) Any such retired officer or employee who elected a survivor's annuity in accordance with the proviso in subsection (a) shall be paid an increase in his annuity of 25 per centum or $300 whichever is the lesser."

Effective date.

SEC. 2. Subsection (b) of section 8 of the Civil Service Retirement Act of May 29, 1930, as added by this Act, shall become effective on the first day of the second month following the date of enactment of this Act, and no survivor's annuity or increase in annuity under such subsection shall accrue for any period prior to the effective date of such subsection.

Approved July 6, 1950.

---

[CHAPTER 452]

July 7, 1950
[S. 2348]
[Public Law 602]

AN ACT

To increase the annual authorization for the appropriation of funds for collecting, editing, and publishing of official papers relating to the Territories of the United States.

Papers relating to Territories of United States.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Act of July 31, 1945 (59 Stat. 510; 5 U. S. C. 168d), is hereby amended by

66 Stat.]   PUBLIC LAW 447–JULY 3, 1952                                327

Public Law 447                                      CHAPTER 567
JOINT RESOLUTION
Approving the constitution of the Commonwealth of Puerto Rico which was
adopted by the people of Puerto Rico on March 3, 1952.

July 3, 1952
[H. J. Res. 430]

Whereas the Act entitled "An Act to provide for the organization of
a constitutional government by the people of Puerto Rico", approved
July 3, 1950, was adopted by the Congress as a compact with the
people of Puerto Rico, to become operative upon its approval by
the people of Puerto Rico; and
Whereas the people of Puerto Rico overwhelmingly approved such
Act in a referendum held on June 4, 1951, and a constitution for the
Commonwealth of Puerto Rico was drafted by a constitutional con-
vention held as provided by such Act from September 17, 1951, to
February 6, 1952; and
Whereas such constitution was adopted by the people of Puerto Rico,
by a vote of three hundred seventy-four thousand six hundred and
forty-nine to eighty-two thousand nine hundred and twenty-three,
in a referendum held on March 3, 1952; and

*374,649 Yes*
*82,923 No*

Whereas the President of the United States has declared that the con-
stitution of the Commonwealth of Puerto Rico conforms fully with
the applicable provisions of such Act of July 3, 1950, and of the
Constitution of the United States, that it contains a bill of rights,
and provides for a republican form of government, and has trans-
mitted the constitution of the Commonwealth of Puerto Rico to the
Congress for its approval; and
Whereas the Congress has considered the constitution of the Common-
wealth of Puerto Rico and has found it duly to conform to the above
requirements: Therefore be it
*Resolved by the Senate and House of Representatives of the United
States of America in Congress assembled,* That the constitution of
the Commonwealth of Puerto Rico which was drafted by the selected
delegates to the Constitutional Convention of Puerto Rico and
adopted by the people of Puerto Rico in a referendum of March
3, 1952, in accordance with the Act entitled "An Act to provide for the
organization of a constitutional government by the people of Puerto
Rico", approved July 3, 1950 (64 Stat. 319; 48 U. S. C., secs. 731b–
731e), is hereby approved by the Congress of the United States,
except section 20 of article II of said constitution: *Provided,* That sec-
tion 5 of article II thereof shall have no force and effect until amended
by the people of Puerto Rico under the procedure prescribed by article
VII of the constitution of the Commonwealth of Puerto Rico by add-
ing to such section 5 the following declaration: "Compulsory attend-
ance at elementary public schools to the extent permitted by the facili-
ties of the state as herein provided shall not be construed as applicable
to those who receive elementary education in schools established under
nongovernmental auspices": *Provided further,* That except for the
purpose of adopting the amendments to section 5 of article II and to
section 3 of article VII as herein provided, article VII of said con-
stitution likewise shall have no force and effect until amended by the
people of Puerto Rico under the terms of said article by adding to
section 3 of article VII the following new sentence: "Any amendment
or revision of this constitution shall be consistent with the resolution
enacted by the Congress of the United States approving this constitu-
tion, with the applicable provisions of the Constitution of the United
States, with the Puerto Rican Federal Relations Act, and with Public
Law 600, Eighty-first Congress, adopted in the nature of a compact":
*And provided further,* That the constitution of the Commonwealth
of Puerto Rico hereby approved shall become effective when the Con-

*Puerto Rico.*

39 Stat. 951.
64 Stat. 319.
48 USC 731 note,
731b–731e.

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

stitutional Convention of Puerto Rico shall have declared in a formal resolution its acceptance in the name of the people of Puerto Rico of the conditions of approval herein contained, and when the Governor of Puerto Rico, being duly notified by the proper officials of the Constitutional Convention of Puerto Rico that such resolution of acceptance has been formally adopted, shall issue a proclamation to that effect.

Approved July 3, 1952.

---

**Public Law 448**                                      CHAPTER 568

July 3, 1952
[H. R. 6578]

AN ACT

To provide for research into and development of practical means for the economical production, from sea or other saline waters, of water suitable for agricultural, industrial, municipal, and other beneficial consumptive uses, and for other purposes.

*Water research and development.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, in view of the acute shortage of water in the arid areas of the Nation and elsewhere and the excessive use of underground waters throughout the Nation, it is the policy of the Congress to provide for the development of practicable low-cost means of producing from sea water, or from other saline waters, water of a quality suitable for agriculture, industrial, municipal, and other beneficial consumptive uses on a scale sufficient to determine the feasibility of the development of such production and distribution on a large-scale basis, for the purpose of conserving and increasing the water resources of the Nation.

*Authority of Secretary of Interior.*

SEC. 2. In order to carry out the purposes of this Act, the Secretary of the Interior, acting through such agencies of the Department of the Interior as he may deem appropriate, is authorized—

(a) by means of research grants and contracts as set forth in subsection (d) of this section to conduct research and technical development work, to make careful engineering studies, to ascertain the lowest investment and operating costs, and to determine the best plant designs and conditions of operation;

(b) to study methods for the recovery and marketing of byproducts resulting from and incident to the production of water as herein provided for the purpose of ascertaining the possibilities of offsetting the costs of water production in any area by the commercial utilization of such products;

(c) to acquire, by purchase, license, lease, or donation, secret processes, technical data, inventions, patent applications, patents, licenses, land and any interest in land (including water rights, easements, and leasehold interests), plants and facilities, and other property or rights: *Provided,* That the land or other property acquired hereunder shall not exceed that necessary to carry on the experiments and demonstrations for the purposes herein provided;

(d) to engage, by noncompetitive contract or otherwise, chemists, physicists, engineers, and such other personnel as may be deemed necessary, and any educational institution, scientific organization, or industrial or engineering firm deemed suitable to do any part of the research or other work, and to the extent appropriate to correlate and coordinate the research and development work of such educational institutions, scientific organizations and industrial and engineering firms; and

Case:17-03283-LTS   Doc#:321-1   Filed:06/13/17   Entered:06/13/17 17:33:01   Desc:
Exhibit   Page 88 of 128

Art. VI § 2    CONSTITUTION

**1. Referendum.** The requirement of a referendum in the Constitution is only applicable in cases in which the result of the legislative action carries the disappearance of a municipality as a legal, social and economic body. 1986 Op. Sec. Jus. No. 51.

If the intention of the constituents would have been to hold a referendum in the cases of modification of the territorial limits of a municipality it would have been so expressed. 1986 Op. Sec. Jus. No. 51.

The only references to a referendum in the Constitution deal with the abolishment and consolidation of municipalities (this section) and with amendments to the Constitution (art. VII); unless an act provides for it expressly, there is no need to submit to referendum the repeal of an act. 1958 Op. Sec. Jus. No. 21.

**2. Committee of municipal complaints.** The Act creating the Committee for the Settlement of Municipal Complaints constitutes an exercise by the Legislative Assembly of the power vested in it by virtue of this section. Rodríguez v. Committee, etc., 84 P.R.R. 66 (1961).

**3. Delegation of power.** The term "police power of the state" is defined as that power inherent in the State and utilized by the legislature to prohibit or regulate certain activities for the purpose of protecting public order and securing the morals, health and general welfare of the community, and this power may be delegated to municipalities. [Reiterating Op. Sec. Just. No. 1966-40.] 1964 Op. Sec. Jus. No. 33.

## § 2. [Power of taxation; power to contract debts]

The power of the Commonwealth of Puerto Rico to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. The power of the Commonwealth of Puerto Rico to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly, but no direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith, credit and taxing power of the Commonwealth shall be pledged shall be issued by the Commonwealth if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed 15 percent of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year; and no such bonds or notes issued by the Commonwealth for any purpose other than housing facilities shall mature later than 30 years from their date and no bonds or notes issued for housing facilities shall mature later than 40 years

398

Art. VI § 2    GENERAL PROVISIONS

from their date; and the Commonwealth shall not guarantee any obligations evidenced by bonds or notes if the total of the amount payable in any fiscal year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues.

The Legislative Assembly shall fix limitations for the issuance of direct obligations by any of the municipalities of Puerto Rico for money borrowed directly by such municipality evidenced by bonds or notes for the payment of which the full faith, credit and taxing power of such municipality shall be pledged; Provided, however, That no such bonds or notes shall be issued by any municipality in an amount which, together with the amount of all such bonds and notes theretofore issued by such municipality and then outstanding, shall exceed the percentage determined by the Legislative Assembly, which shall be not less than five per centum (5%) nor more than ten per centum (10%) of the aggregate tax valuation of the property within such municipality.

The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by § 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof.

[As amended by the voters at a referendum held Dec. 10, 1961.]

HISTORY

**Effectiveness.**
The referendum of Dec. 10, 1961, was held pursuant to Act Sept. 29, 1961, No. 1, p. 401, eff. Sept. 29, 1961; and Proposal No. 1 contained the amendment to this section. Proposal No. 2 in the referendum provided that the amendment should take effect "upon the ratification thereof by a majority of the electors voting thereon at a referendum held for that purpose". The amendment was so ratified at said referendum.

**Cross references.**
For power to impose taxes and to contract debts, see Federal Relations Act, § 3.
See § 3 of Puerto Rican Federal Relations Act, set out herein, for 1961 amendment striking out limitations on debt-incurring liability of Puerto Rico and its municipalities.

ANNOTATIONS

1. Generally.
2. Public purpose in taxation.
3. Taxation.
4. Delegation of powers.
5. Source of income.
6. Voiding of powers.
7. Construction.

399

# LEYES

DE LA

## QUINTA SESION EXTRAORDINARIA

DE LA

## TERCERA ASAMBLEA LEGISLATIVA

Y DE LA

## PRIMERA SESION ORDINARIA

Y DE LA

## PRIMERA, SEGUNDA Y TERCERA SESIONES EXTRAORDINARIAS

DE LA

## CUARTA ASAMBLEA LEGISLATIVA

DEL

### ESTADO LIBRE ASOCIADO DE PUERTO RICO

VOLUMEN DE COPIAS CERTIFICADAS DE LOS ORIGINALES
DE DICHAS LEYES

DEPARTAMENTO DE HACIENDA,
Servicio de Compra y Suministro—División de Imprenta
SAN JUAN, P. R.
1 9 6 1

(Sust. al P. del S. 259)
(Conferencia)

[NÚM. 1]
[*Aprobada en 29 de septiembre de 1961*]

LEY

Para disponer la celebración de un referéndum en el cual se
someterá al pueblo de Puerto Rico la proposición de enmienda
a la Constitución del Estado Libre Asociado de Puerto
Rico determinada y acordada por la Asamblea Legislativa
de Puerto Rico mediante la Resolución Concurrente
núm. 3 del Senado, aprobada en la Segunda Legislatura
Extraordinaria de la Cuarta Asamblea Legislativa del Estado
Libre Asociado de Puerto Rico; para disponer todo lo rela-
tivo a dicho referéndum; para disponer que el mismo se
celebrará en 10 de diciembre de 1961; para disponer la
forma en que se han de contar los votos emitidos en dicho
referéndum y la forma de proclamar el resultado del mismo;
para asignar la suma de seiscientos setenta mil (670,000)
dólares a la Junta Estatal de Elecciones y a los partidos
políticos para llevar a cabo dicho referéndum y para ciertos
otros fines; para definir ciertos delitos en relación con el
referéndum dispuesto en esta ley y señalar las penas
correspondientes a tales delitos; para disponer que en dicho
referéndum puedan votar aquellas personas que no habían
cumplido 21 años en noviembre 8 de 1960 pero que cumplan
o hayan cumplido dicha edad el 10 de diciembre de 1961,
y fijar las condiciones y el procedimiento al efecto.

*Decrétase por la Asamblea Legislativa de Puerto Rico:*

...

...

...


Sección 28.—Antes del 1 de noviembre de 1961 el Superin-
tendente General de Elecciones ordenará la impresión de las
papeletas que se usarán en el referéndum.   Dichas papeletas
serán de tamaño uniforme e impresas con tinta negra en papel

blanco grueso de manera que lo impreso en ellas no se trasluzca al dorso. En cada una de dichas papeletas, a todo lo ancho de la misma y en su parte superior, aparecerá la siguiente expresión: REFERENDUM PARA LA RATIFICACION (ACEPTACION) O RECHAZO (NO ACEPTACION) DE LA ENMIENDA PROPUESTA POR LA ASAMBLEA LEGISLATIVA A LA SECCION 2 DEL ARTICULO VI DE LA CONSTITUCION DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO. Debajo de dicha expresión aparecerán dos columnas. En la parte superior de la primera de dichas dos columnas aparecerá la siguiente oración: "Voto a favor de que se enmiende la Sección 2 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico para que se lea según la misma aparece transcrita en la parte inferior de esta columna, en sustitución de las disposiciones para establecer el límite de la capacidad prestataria del Estado Libre Asociado de Puerto Rico y de sus municipios que aparecen en la Sección 3 de la Ley de Relaciones Federales con Puerto Rico". Debajo de esta oración aparecerá, como insignia, un cuadrado, todo en color negro, cada una de cuyas cuatro líneas tenga una pulgada y cuarto de largo, con la palabra "SI" en su centro, en letras blancas, y debajo de la insignia un espacio adecuado para la marca del elector y debajo de dicho espacio el texto en español de la enmienda a la Constitución del Estado Libre Asociado de Puerto Rico que se somete a votación mediante dicho referendum. En la parte superior de la otra columna, aparecerá la siguiente oración: "Voto en contra de que se enmiende la Sección 2 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico para que se lea según la misma aparece transcrita en la parte inferior de esta columna, en sustitución de las disposiciones para establecer el límite de la capacidad prestataria del Estado Libre Asociado de Puerto Rico y de sus municipios que aparecen en la Sección 3 de la Ley de Relaciones Federales con Puerto Rico". Debajo de esta oración aparecerá, como insignia, un círculo, de un diámetro de una pulgada y cuarto, con la circunferencia en color negro y de un espesor de un dieciséisavo de pulgada, con la palabra "NO" en su centro, en letras negras, y debajo de la insignia un espacio adecuado para la marca del elector y debajo de dicho espacio el texto en español de la enmienda a la Constitución del Estado Libre Asociado de Puerto Rico que se somete a votación mediante dicho referéndum. Dichas dos columnas estarán separadas por una raya vertical

LEYES DE PUERTO RICO

gruesa.  En la parte inferior y al dorso de dicha papeleta aparecerá impresa a todo lo ancho de la misma, en inglés, la enmienda a la Constitución del Estado Libre Asociado de Puerto Rico que se somete a votación mediante dicho referéndum.

75 STAT.]          PUBLIC LAW 87-121—AUG. 3, 1961          245

Mount Diablo base and meridian; a 1-inch iron pipe set in the ground bears south 41 degrees 40 minutes west 146.13 feet; running thence, first north 41 degrees 40 minutes east 32.41 feet; second from a tangent that bears south 49 degrees 51 minutes 05 seconds east, on a curve to the right with a radius of 1,800 feet, through a central angle of 3 degrees 08 minutes 50 seconds, a distance of 98.72 feet to a point on the southeast boundary of lot 2 in block numbered 13 of the townsite of Weaverville, Trinity County, California, which point bears south 31 degrees 43 minutes west 50.47 feet from the centerline of State highway at engineers' station 806+89.71 P.O.C.; third south 31 degrees 43 minutes west 130.63 feet on the boundary of said block numbered 13 to the southeast corner of said lot numbered 1 in block numbered 13; fourth south 89 degrees 39 minutes west 154.00 feet on the boundary of said lot 1; fifth north 41 degrees 40 minutes east 191.71 feet to the point of beginning. Containing 0.462 acre, more or less.

Approved August 3, 1961.

---

Public Law 87-121

JOINT RESOLUTION

To provide for amending section 3 of the Puerto Rican Federal Relations Act (64 Stat. 319), as amended (64 Stat. 458).

August 3, 1961
[H. J. Res. 124]

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 3 of the Puerto Rican Federal Relations Act (64 Stat. 319), as amended (64 Stat. 458), is amended by deleting therefrom the following language: "*Provided, however,* That no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Río Piedras and Mayaguez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality," and "In computing the indebtedness of the people of Puerto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Puerto Rico is pledged shall be counted."

Puerto Rican Federal Relations Act, amendment.
50 Stat. 845.
48 USC 745.

SEC. 2. Section 1 of this Act shall take effect upon a majority of the qualified electors of Puerto Rico having voted in a referendum pursuant to section 1 of article VII of the constitution of the Commonwealth of Puerto Rico, to include provisions in the Commonwealth constitution, in lieu of the provisions of section 3 of the Puerto Rican Federal Relations Act specified herein, limiting the debt-incurring capacity of the Commonwealth and of its municipalities (as proposed in the concurrent resolution of the legislative assembly of the Commonwealth).

Effective date.
Public referendum.
48 USC 731d note.

Approved August 3, 1961.

EFFECT OF TERMINATION OF INSURANCE OF MEMBER BANKS

49 Stat. 691.
*Ante,* p. 457.

SEC. 7. The last sentence of section 12B (i) (2) of the Federal Reserve Act (12 U. S. C., sec. 264 (i) (2)), is amended to read as follows: "Except as provided in paragraph (2) of subsection (e) of this section, whenever a member bank shall cease to be a member of the Federal Reserve System, its status as an insured bank shall, without notice or other action by the board of directors, terminate on the date the bank shall cease to be a member of the Federal Reserve System, with like effect as if its insured status had been terminated on said date by the board of directors after proceedings under paragraph (1) of this subsection."

CONTINUED MEMBERSHIP IN THE FEDERAL RESERVE SYSTEM

38 Stat. 259.

SEC. 8. Section 9 of the Federal Reserve Act (title 12, U. S. C., sec. 321), as amended, is amended by inserting after the first paragraph thereof the following new paragraph:

"Upon the conversion of a national bank into a State bank, or the merger or consolidation of a national bank with a State bank which is not a member of the Federal Reserve System, the resulting or continuing State bank may be admitted to membership in the Federal Reserve System by the Board of Governors of the Federal Reserve System in accordance with the provisions of this section, but, otherwise, the Federal Reserve bank stock owned by the national bank shall be canceled and paid for as provided in section 5 of this Act. Upon the merger or consolidation of a national bank with a State member bank under a State charter, the membership of the State bank in the Federal Reserve System shall continue."

SEPARABILITY CLAUSE

SEC. 9. If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act and the application of such provision to other persons or circumstances shall not be affected thereby.

Approved August 17, 1950.

---

[CHAPTER 730]

August 17, 1950
[H. R. 4117]
[Public Law 707]

AN ACT

To remove the present restriction relating to the granting of privileges within Kings Canyon National Park in order that privileges hereafter granted may be consistent with those granted in other areas of the National Park System, and for other purposes.

Kings Canyon National Park, Calif.

16 U. S. C. §§ 1–4, 22, 43.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, in order to permit the granting of privileges within Kings Canyon National Park, California, upon terms that are consistent with those granted in other national parks pursuant to the Act of August 25, 1916 (39 Stat. 535), the last sentence in section 4 of the Act of March 4, 1940 (54 Stat. 41, 44; 16 U. S. C., 1946 edition, sec. 80c), which limits the duration of such privileges to five years, is hereby repealed.

Approved August 17, 1950.

---

[CHAPTER 731]

August 17, 1950
[H. R. 5282]
[Public Law 708]

AN ACT

To amend section 3 of the Organic Act of Puerto Rico.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 3 of

the Act entitled "An Act to provide a civil government for Porto Rico, and for other purposes", approved March 2, 1917, as amended, is hereby amended by inserting in the first proviso after the word "Ponce" a comma and the words "Arecibo, Rio Piedras".

39 Stat. 953.
48 U. S. C. § 745.

Approved August 17, 1950.

---

[CHAPTER 732]

AN ACT

For expenditure of funds for cooperating with the public school board at Walker, Minnesota, for the extension of public-school facilities to be available to all Indian children in the district, and for other purposes.

August 17, 1950
[H. R. 7431]
[Public Law 709]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That there is hereby authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, an additional sum of $80,000 to be available to the Secretary of the Interior for the purpose of cooperating with Independent School District Numbered 5, Cass County, Minnesota, at Walker, Minnesota, for the construction, extension, equipment, and improvement of public school facilities at Walker, Minnesota, as authorized by the Act of July 1, 1940 (54 Stat. 707, 708), and the Act of July 24, 1947 (61 Stat. 414) : *Provided,* That in consideration of the amount heretofore appropriated and the amount which may be appropriated to carry out the provisions of this section, all Indian children residing in such district shall be admitted to the schools of the district without further cost to the United States for instructional, operation, and maintenance purposes.

Walker, Minn.
Appropriation authorized for school facilities.

Approved August 17, 1950.

---

[CHAPTER 733]

AN ACT

To amend the statute relating to certificates of trade-mark registrations.

August 17, 1950
[H. R. 8792]
[Public Law 710]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the second sentence of subsection (a) of section 7 of the Act of Congress approved July 5, 1946 (ch. 540, 60 Stat. 427; U. S. C., title 15, sec. 1057a), is amended by striking out "contain the statement of the applicant", so that said second sentence reads as follows: "The certificate shall reproduce the drawing of the mark, and state that the mark is registered on the principal register under this Act, the date of the first use of the mark, the date of the first use of the mark in commerce, the particular goods or services for which it is registered, the number and date of the registration, the term thereof, the date on which the application for registration was received in the Patent Office, and any conditions and limitations that may be imposed in the grant of the registration."

60 Stat. 430.
15 U. S. C. § 1057 (a).

Approved August 17, 1950.

---

[CHAPTER 734]

AN ACT

To provide for the conveyance of a tract of land in Kennebec County, Maine, to the town of Chelsea.

August 17, 1950
[H. R. 8846]
[Public Law 711]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Administrator of Veterans' Affairs is hereby authorized and directed to donate and convey to the inhabitants of the town of Chelsea, Maine,

Chelsea, Maine.
Conveyance.

3.Proposed Appeal Brief in 17-1337 at the HUSCA1C

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

17-1337

LEX CLAIMS LLC, ET AL, Et AL.

PLAINTIFFS-APPELLEES

V.


ANGEL RUIZ RIVERA

MOVANT-APPELLANT


FINANCIAL OVERSIGHT AND MANAGEMENT BOARD,
ET AL, ET AL, ET AL, ET AL.

DEFENDANTS

---

APPELLANT'S PROPOSED APPEAL BRIEF FOR
MOVANT-APPELLANT
PUTATIVE INTERVENOR/INTERESTED PARTY


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

Angel Ruiz Rivera
Ext. Villa Rica
AA-27 Calle Santa Rita
Bayamon, P.R. 00959.
787-799-9222
angelruizrivera@gmail.com

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26 of the Federal Rules of Appellate Procedure, appellant, Angel Ruiz Rivera, states that (i) he is not a publicly held corporation; (ii) he has no parent corporation; and (iii) he has no publicly held corporate parents, subsidiaries or affiliates.

ii

# Table of Contents

Cover Page………………………………………………………………i

Corporate Disclosure Statement………………………………………ii

Table of Contents………………………………………………………iii

Table of Authorities……………………………………………………v

Statement of Subject Matter and Appellate Jurisdiction…………………1

Statement of Issues Presented On Appeal…………………………………1

Statement of the Case……………………………………………………3

Statement of Facts Relevant To This Appeal………………………………11

Summary of Argument……………………………………………………23

Argument…………………………………………………………………24

Conclusion………………………………………………………………25

Certificate of Compliance………………………………………………26

Certificate of Service……………………………………………………26

# TABLE OF AUTHORITIES

**Federal Jurisprudence**

COMMONWEALTH OF PUERTO RICO, ET AL., PETITIONERS 15–233 *v.* FRANKLIN CALIFORNIA TAX-FREE TRUST, ET AL. MELBA ACOSTA-FEBO, ET AL., PETITIONERS 15–255 *v.* FRANKLIN CALIFORNIA TAX-FREE TRUST, ET AL. [June 13, 2016]…………..22

COMMONWEALTH OF PUERTO RICO *v.* SANCHEZ VALLE ET AL. CERTIORARI TO THE SUPREME COURT OF PUERTO RICO, No. 15–108. Argued January 13, 2016—Decided June 9, 2016…………………..22

Instituto De Educacion Universal v. U.S. Department Education, 99-1628, 209 F.3d 18 (April 12, 2000)...……………………………………..2, 9

**Federal Statutes**

28 U.S.C. §1331………………………………………………………1

28 U.S.C. §1291 ……………………………………………….......1

28 U.S. Code § 1446 …………………………………………………2

48 U.S.C. § 864………………………………………………………2

Public Law 81-600 of July 3, 1950 ..……………………………16, 20

Public Law 447 of July 3, 1952……………………………………17, 20

Public Law 87-121 of August 3, 1961……………………………18, 19, 22

**Federal Rules**

Rule 26 of the Federal Rules of Appellate Procedure……………………..1

Federal Rule of Civil Procedure (FRCP) 3………………………………..1

Rule 81. Applicability of the Rules in General; Removed Actions………2

**Constitution of P.R**

Article VI. General Dispositions, Section 2. Power to impose contributions (taxes); to contract debts……………………………………………..11

v

## Statement of Subject Matter and Appellate Jurisdiction

The Honorable U.S. District Court for the District of P.R. (HUSDCDPR) had subject matter jurisdiction pursuant to title 28 U.S.C. §1331 and Federal Rule of Civil Procedure (FRCP) 3.

This Honorable U.S. Court of Appeals for the First Circuit (HUSCA1C) has appellate jurisdiction over the instant appeal pursuant to 28 U.S.C. §1291 and Federal Rule of Appellate Procedure (FRAP) 3.

## Statement of Issues Presented On Appeal

1. The HUSDCDPR committed plain error when it first denied [although **without prejudice**, see Docket Entry, (D.E.) 191],[1] the Appellant's Motion To Intervene And Requesting Declaratory Judgment (MIRDJ) ruling that the Complaint filed at the Puerto Rico's Honorable Tribunal of First Instance (PRHTFI) Superior Court of San Juan (SCSJ) and which was incorporated as an integral part of the MTIRDJ was included only in Spanish, not complying with 48 U.S.C. § 864, when the record shows that it was included also in English, since it was included in a bilingual format.

---
[1]

| 03/03/2017 | 191 | ORDER re 188 Motion to Intervene and Motion for Declaratory Judgment: DENIED without prejudice for failure to comply with Federal Rule of Civil Procedure 24(c). Even if the complaint filed in the Court of First Instance would be considered as compliance with Local Rule 24(c), the motion would be denied without prejudice for failure to comply with 48 U.S.C. § 864, which requires that all pleadings filed in this Court be in English. Signed by Judge Francisco A. Besosa on 03/03/2017. (brc) (Entered: 03/03/2017) |

2. The HUSDCDPR incurred into clear error when it denied this Appellant's MIRDJ ruling that the Complaint filed at the PRTFI which was incorporated as an integral part of same, could not legally be incorporated as such since: "He cannot incorporate a pleading filed in a court of a different jurisdiction",[2] when that is the case in most if not all controversies that are removed from state to federal courts by way of 28 U.S. Code § 1446 - Procedure for removal of civil actions. [3] See also Rule 81. Applicability of the Rules in General; Removed Actions.[4] See also this **HUSCAIC's o**wn Opinion regarding this strictly legal procedural issue in <u>Instituto De Educacion Universal v. U.S. Department Education</u>, 99-1628, 209 F.3d 18 (April 12, 2000).

---

[2]

| 03/07/2017 | 196 | ORDER re <u>195</u> Motion to clarify and Motion for Reconsideration. Clarification and reconsideration DENIED. Putative intervenor must file a pleading in this case. He cannot incorporate a pleading filed in a court of a different jurisdiction. Mr. Ruiz-Rivera may petition the Court to appoint an attorney for him to assist him with this claim. Signed by Judge Francisco A. Besosa on 03/07/2017. (brc) (Entered: 03/07/2017) |

[3] **(a)Generally.—**

A defendant or defendants desiring to remove any civil action from a State court shall file in the district court of the United States for the district and division within which such action is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action.

[4] (c) REMOVED ACTIONS.
   (1) *Applicability.* These rules apply to a civil action after it is removed from a state court.
   **(2) *Further Pleading*. After removal, repleading is unnecessary unless the court orders it.**

3. The HUSDCDPR erred by not having issued the declaratory judgment order timely requested, judicially recognizing the incontrovertible, indisputable and irrefutable fact that the Plaintiffs in the instant and related actions all violated the P.R. Constitution and consequentially did not come to this federal *fora* with clean hands and as such they should be held judicially, ergo, financially liable for their fair and proportional share of the damages caused by their wrongful and negligent conduct in the issuance and contracting of the unconstitutional debt, since their entities and their agents all were derelict in their ethical, fiduciary, ministerial and legal duties.

### Statement of the Case

On October 2015 I filed; Angel Ruiz Rivera, Et Al, v. Rafael Hernandez Colon, Et Al, KDP-2015-1158(808) at the PRHTFI-SCSJ, a civil suit against public officials of the Government of P.R. from 1985 until 2012, including the Governors, the legislators, the Secretaries of Justice and Treasury and the Directors and Officers (D's and O's) of all the Boards of Directors of the Government Development Bank (GDB) and all the public corporations and quasi-public entities created by the Government of P.R., and the insurance companies that covered the public liability exposure of same D's and O's which issued and contracted debt in excess of the limits prescribed in the Puerto Rican Constitution for having been derelict in their ethical, fiduciary, ministerial and legal duties by having incurred

3

into deliberately, knowingly, recklessly and wantonly wrongful and negligent conduct in their handling of the funds of the People of P.R..

Besides the government Defendants, I included the D's and O's, who acted as members of the Board of Directors and the insurance companies that covered the public liability exposure of same D's and O's of all the private entities that were involved in the debt issued and contracted in violation of the P.R. Constitution. Among these non-governmental Defendants' entities I included: the brokerage firms, the financial firms and/or banking firms, the insurance firms and the law firms who participated in any way or manner in the issuance and contracting of the evidently obvious unconstitutional debt.

I filed the initial Complaint, Pro Se and IFP, but with the expectation that some law firms or lawyers would become interested in assuming legal representation of what was designed and intended to become a class action suit. Nevertheless after a first denial, upon a timely filed motion for reconsideration, I was granted my IFP application as a result of which I requested and was granted, an Order to the PRHTPI marshal's service to serve summons upon all the Defendants. The PRHTFI went as far as ordering the local marshals to serve summons upon the ex-governors. However, after this Order, the evolution of the process started to become awry.

4

Initially I notified the governmental Defendants of the lawsuit together with a waiver of summons, under the admittedly naïve hypothesis that they were going to cooperate, since after all, if my Complaint's claims come to fruition, as they should in all Justice; the People of P.R. should end saving billions of dollars that should be paid by those who deliberately, knowingly, recklessly and wantonly violated the P.R. Constitution together with the insurance companies that were paid millions of dollars in fees to cover the public liability resulting from the wrongful and negligent acts of all the D's and O's of all the Board of Directors of all the aforementioned public and private entities, who were derelict in their ethical, fiduciary, ministerial and legal duties.

When I realized this was overly naïve on my part not to say absurd, I started preparing the summons forms to be signed, sealed and delivered by the PRHTFI Clerk's office. I submitted the summons forms in batches once I found the identities and the addresses of the many Defendants. To my surprise, when I was making progress, the Honorable Judge suddenly ordered me to retain legal counsel. I immediately started making some contacts but after the thirty (30) days I was given, proved to be not enough, I timely moved for an extension of time and requested to be appointed legal counsel instead of dismissal. The Honorable Judge balked at my petition and proceeded to deny the motion and to dismiss the Complaint without prejudice.

I appealed to the P.R. Honorable Tribunal Of Appeals (PRHTA), KLAN201600523, where a panel composed of three Honorable Judges, denied for lack of jurisdiction determining that the appeal was late since I supposedly had 30 days by rule to appeal. It just happens that same determination is clearly and plainly erroneous because when the Government of P.R., its agencies or officers are a party in a civil action such as this, the statute of limitations period is 60 days. (Just as in the federal rules of engagement). I timely moved for reconsideration and the panel has simply not ruled anything over same. As a Pro Se litigant with more than twenty (20) years of experience, as this own HUSCA1C knows very well, more often than not, I have had to endure obtuse injustices like the above, simply because I am litigating Pro Se and the effects of the prose phobia by many judges.

Due to the PRHTA inaction upon my timely filed motion for reconsideration, I timely filed a Mandamus Petition to the Honorable Supreme Tribunal of P.R. (HSTPR), MD-16-002, requesting that they ordered the PRHTA to rule upon the reconsideration mentioned above but to no avail. I also timely filed a motion inviting that upper forum to consider and evaluate the Complaint in first instance, due to the importance

and relevance it has for the future of P.R. and all its present and future residents, but also to no avail. [5]

Naturally desperate because of the way our financial crisis has worsened, due to many factors such as the exclusion of P.R. from the protection of the federal bankruptcy laws; the Honorable U.S. Supreme Court's (HUSSC) decision ruling that the version of a local bankruptcy option due to the sui generis scenario provoked by the lack of preemption (whether accidental or intentional)[6] by the federal bankruptcy law was somehow repugnant to the U.S. constitution; the default in the payment of the debt; the geometrical progression in the debt as a result of the default; the lack of an adequate response by all sectors in P.R. to the degree of seriousness and graveness that the repercussions of all of the above is having and will have over our children and grandchildren, I timely moved with a MIRDJ in the Assured Guaranty Corp. Et Al. v. Alejandro Garcia Padilla, Et Al, 16-01073(FAB) civil action at the HUSDCDPR. Same

---

[5] Recently on March 28, 2017, I filed a motion at the HSTPR asking the clarification that its denial of my mandamus petition, was not a decision on the merits, and that the reconsideration of the denial of my appeal by the HTA has to be decided.

[6] From a perfunctory reading of the Congressional Record of the reenactment of the Federal Bankruptcy Act of 1984 no one can determine if the exclusion of Puerto Rico was accidental or intentional. All we know is that at the time, P.R.'s Resident Commissioner Baltasar Corrada Del Rio, Esq., our only delegate before the U.S. House of Representatives was focused in running for Governor. Apparently, not to say evidently, the omission of P.R. in the reenactment of 1984, when we had been included in all its previous enactments, seems to have been caused by an omission on his part and that of his staff who were derelict in their duties and no one in that epoch in the Puerto Rican government administration took the care to timely amend that omission.

MIRDJ was promptly denied and I timely appealed same and it is presently *sub judice* before this HUSCA1C as appeal 16-2208.

In the meantime, as soon as I learned about the instant action below, Lex Claims, LLC., Et Al, Et Al v. Alejandro Garcia Padilla, Et Al, 16-02374(FAB), I prepared and filed on March 3, 2017, a timely MIRDJ similar to the previous one except for certain amendments. This time, the Honorable Judge Besosa promptly granted my IFP application and did not rule that same MTIRDJ was frivolous as he had done with the previous one in the Assured Guaranty Corp. legal suit. Nevertheless, he proceeded to deny same MIRDJ first because the Complaint I had previously filed at the PRHTFI and which I again had incorporated as part of my MIRDJ was supposedly in Spanish only when the record shows this was a clear and plain error on his part since it was included in a bilingual both Spanish and English format. Actually, it was translated paragraph by paragraph in order to facilitate any cross-reference the reader may need to contrast the English translated version with the Spanish original version.

I then filed a Motion To Clarify Order Or In The Alternative Motion For Reconsideration on March 6, 2017, D.E. 195. This time it was denied the next day, March 7, 2017, D.E. 196, with an Order where the Honorable Judge ruled that I could not "legally incorporate a pleading filed in a court of a different jurisdiction". With all due respect, this Order serves to confirm the pre-textual character of the Honorable Judge Besosa's orders in

8

an undisguised attempt to delay if not derail my genuine and legitimate attempts to have the HUSDCDPR grant my timely filed motions for intervention and requesting declaratory judgments in the civil actions involving the Puerto Rican government debt.

That the above cited order was purely pre-textual, again this expressed with all due respect, can be logically inferred from a reading of this HUSCA1C Opinion in one of my many previous appeals I have litigated before you Pro Se. From the first appeal I filed before this HUSCA1C; Instituto De Educacion Universal V. U.S. Department Education, 99-1628, where I got a favorable decision, regardless of the fact that it later became merely a pyrrhic victory, a fact which is besides the point now, I cite the following pertinent excerpt as an authority in support of the instant legal argument in the instant appeal.

> **The rule that every civil action is initiated by the filing of a complaint historically has been relaxed in actions that originate elsewhere and are then transferred to a federal district court (e.g., by removal from a state court).** We are troubled by this rigid approach to the construction of pleadings. **Its failure to do so constituted an abuse of discretion.** We believe that, given the peculiar circumstances of this case, the district court should have charted such a course before terminating the entire action (say, by issuing a show-cause order or otherwise advising the Institute that its case was at risk). In such a situation, the district court need not try to fashion a silk purse from a sow's ear by treating a paper that obviously was intended to serve a different purpose as a complaint, **but instead may direct the filing of a complaint.** See Fed.R.Civ.P. 81(c) (**eliminating the need for repleading unless the transferee court so orders**).

In the instant case, the record shows that the lower court did not order the filing of a different complaint, ergo, its second pretext to deny my justly and timely filed intervention should be judicially ruled to be clearly and plainly erroneous, that is without even getting into whether it was issued as a result of the pervasive bias and prejudice against this Pro Se and IFP litigant, the record shows that the Honorable Judge Besosa exhibited in my previous intervention in closely related civil case and which is object of appeal 16-2208, also *sub judice* before this own HUSCA1C and which I am respectfully requesting hereby that is consolidated with the instant one.

Worse than denying my timely filed motions for intervention, is the sad reality that the Honorable Judge Besosa did not issue a declaratory judgment order, which constitute a dereliction in his ministerial duties by balking and shying away reticently from his historical and unique responsibility of judicially declaring that the section 2 of Article VI of the P.R. Constitution was indeed violated by all the Defendants in my Complaint and by both all the Plaintiffs' and Defendants' in the civil actions before his consideration and evaluation as a preamble to the subsequent eventual determination of each one's fair and proportional share of civil and criminal responsibility in all this multibillionaire imbroglio.

Although I am not a lawyer and consequentially a functional illiterate in these endeavors, as far as I understand, my motion to intervene and requesting declaratory judgment are nor mutually exclusive legally

10

speaking. In other words, if for whatever reasons, the Honorable Judge Besosa did not want to have me at all involved in this fracas crossfire, (and all the others who may eventually end following me in what is probable that should become class action legal suit), the least he could and should have done, given the facts, the evidence and the Congressional letter, intent, and spirit in the Public Laws I cited in support of my motions and that I was able to discover (without the benefit of even a modicum of procedural discovery) and timely raised before him, was to issue the declaratory judgment order timely requested. This would have not only placed the Government of P.R. in a just and fair position before its scores and scores of creditors but it would have saved precious time since such a declaratory judgment order would have forced the most needed and wanted audit of this humongous debt of the P.R. Government as a prerequisite for the determination of the order of prelation or who's who among Puerto Rico's creditors and who is going to get paid how much, when and by whom, which in any event, should and will follow *a fortiori* under the *sui generis* and extraordinary circumstances of the instant and related controversies before this federal *fora*.

### Statement of Facts Relevant To This Appeal

The Constitution of Puerto Rico (P.R.), clearly establishes:
***Article VI. General Dispositions***

**Section 2. Power to impose taxes; to contract debts.**[7]

*The power of the Free Associated State of Puerto Rico
(Commonwealth) to contract and authorize debts will be exerted as
the Legislative Assembly disposes, but it will not be surrendered or
suspended. The power of the Free Associated State of Puerto Rico
(Commonwealth) to contract and authorize debt will be exerted as
the Legislative Assembly disposes, **but no direct obligation** of the
Free Associated State of Puerto Rico **for money borrowed directly**
by the Free Associated State of Puerto **Rico evidenced through
bonds or promissory notes for which obligations the good faith and
credit and the power to impose contributions** of the Free Associated
State **were committed shall be issued** by the Free Associated State of
Puerto Rico **if the total of (i) the amount for the concept of the
principal and interests over those bonds and promissory notes over
the totality of those bonds and promissory notes, until then issued***

---

[7] El poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar
su imposición y cobro por los municipios se ejercerá según se disponga por la Asamblea
Legislativa, y nunca será rendido o suspendido. El poder del Estado Libre Asociado de
Puerto Rico para contraer y autorizar deudas se ejercerá según se disponga por la
Asamblea Legislativa, **pero ninguna obligación directa del Estado Libre Asociado
de Puerto Rico por dinero tomado a préstamo directamente por el Estado Libre
Asociado de Puerto Rico evidenciada mediante bonos o pagarés para el pago de la
cual la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre
Asociado de Puerto Rico fueren empeñados será emitida por el Estado Libre
Asociado de Puerto Rico si el total de** (i) el monto del principal de e intereses sobre
dichos bonos y pagarés, junto con el monto del principal de e intereses sobre la totalidad
de tales bonos y pagarés hasta entonces emitidos por el Estado Libre Asociado y en
circulación, pagaderos en cualquier año económico y (ii) cualesquiera cantidades
pagadas por el Estado Libre Asociado en el año económico inmediatamente anterior al
año económico corriente en concepto de principal e intereses correspondientes a
cualesquiera obligaciones evidenciadas mediante bonos o pagarés garantizadas por el
Estado Libre Asociado, **excediere el 15% del promedio del monto total de las rentas
anuales obtenidas de acuerdo con las disposiciones de las leyes del Estado Libre
Asociado e ingresadas en el Tesoro de Puerto Rico en los dos años económicos
inmediatamente anteriores al año económico corriente; y ninguno de dichos bonos
o pagarés emitidos por el Estado Libre Asociado para cualquier fin que no fuere
facilidades de vivienda vencerá con posterioridad a un término de 30 años desde la
fecha de su emisión** y ningún bono o pagaré emitido para fines de vivienda vencerá con
posterioridad a un término de 40 años desde la fecha de su emisión; y el Estado Libre
Asociado no garantizará obligación alguna evidenciada mediante bonos o pagarés si el
total de la cantidad pagadera en cualquier año económico en concepto de principal e
intereses sobre la totalidad de las antes referidas obligaciones directas hasta entonces
emitidas por el Estado Libre Asociado y en circulación y las cantidades a que se hace
referencia en la cláusula (ii) excediere el 15 por ciento del promedio del monto total de
dichas rentas anuales.

*by the Free Associated State **and in circulation**, **payable in any
fiscal year immediately preceding the current fiscal year** and (ii)
**whatever amounts paid** by the Free Associated State **for the fiscal
year immediately preceding the current for the concept of principal
and interests corresponding to whatever obligations evidenced by
bonds and promissory notes guaranteed** by the Free Associated
State, **exceed 15% of the average of the total amount of the annual
collections ("rentas") obtained in accordance to the dispositions of
the laws of the Free Associated State as income in the Treasure of
Puerto Rico during the two years immediately preceding the
current fiscal year; and none of said bonds and promissory notes
issued by the Free Associated State for any purpose rather than
housing facilities shall be due after a 30 year term from the date of
its issuance;** and no bond or promissory note issued for housing
purposes shall be due after a 40 year term from the date of its
issuance; and the Free Associated State shall not guarantee any
obligation evidenced through bonds or promissory notes if the total
of the amount payable in any fiscal year for the concept of principal
and interests over the totality of the previously referred direct
obligations until then issued by the Free Associated State and in
circulation and the amounts made reference to in clause (ii)
exceeded 15 per cent of the average of the total amount of these
annual collections.*

For unknown reasons, heretofore this important, relevant and significant
clause of same Constitution have been violated since at least 1985 by all
Governors and the members of the executive and legislative branches of the
Government of P.R. and the D's and O's and all the members of the Board
of Directors of all its so-called public corporations and quasi-public entities
that the legislature and the Governors have approved from time to time to
issue and contract debt on their own, or in common words to make or take
loans. Incomprehensibly, this debt has been denominated euphemistically
as "extra-constitutional" since ex-Governor Hernandez Colon's tenure from
1985-1989.

As we all know, it is hornbook law besides so overly logical as to withstand even argumentation, that conduct is either constitutional or unconstitutional. Only in Puerto Rico where the legal and political fiction of a Free Associated State was created, believed and trusted, for decades by most Puerto Ricans and even many U.S. of A. people, can you find such admittedly creative but nonetheless demagogical term such as "extra-constitutional". It is more than ripe time for this federal system of Justice to tell it like it is and call this as what it is: unconstitutional; ergo, null and void *ab initio*.

For unknown reasons also, (although it is evidently obvious under the circumstances that it has been for very accommodating and convenient reasons) all the D's and O's of all the Boards of Directors of all the brokerage firms, the financial firms and banks, the insurance firms, and the law firms that have promoted, advertised, offered, sold, approved, granted, insured, contracted and subscribed billions of dollars in debt contrary to this clause in unashamed and unconcealed  violation of the P.R. Constitution, with reckless disregard of the Law of this Land, have heretofore gotten away with wrongful and illegal misconduct with full criminal impunity and without any or monetary civil liability whatsoever.

As a result of the above unconstitutional practices by the persons in charge of making the decisions, ergo, the persons responsible for the same decisions, both from the public sector and the private sector, they all have

been deliberately, egregiously, knowingly, recklessly and wantonly derelict in their ethical, fiduciary, ministerial and legal duties. Axiomatically then, they must be found legally responsible for their wrongful and negligent acts and illegal irresponsibilities. Each one should be jointly or severally found legally and financially responsible for an amount equivalent to the degree and extent of his/her and/or the entities they represented for their fair and proportional share of their entire civil responsibility as a whole *de minimis.*

The Constitution of P.R., regardless of how depreciated, eviscerated, truncated, underestimated and undervalued it has been in the past months, is still and remains the Law of this Land (whether a full fledged non-incorporated territory or an incorporated colony). No federal court has at least heretofore dared to rule that the P.R. Constitution is illegal, non-applicable, or totally repugnant to the U.S. Constitution as a whole or in its entirety. Consequentially, absent any legal determination contrary to the P.R. Constitution, which could be used as precedent, as long as it remains the authoritative, controlling and heretofore precedentially accepted legal status quo, in due consideration to same Constitution, the U.S. Courts Honorable Judges within the realm of this federal court system, should give the P.R. Constitution the deference, dignity and respect it is legally owed. Actually, the Honorable Judges of this federal system of Justice are in a better position to rule over these issues since you have more judicial independence since you were not appointed by the P.R. Governors

involved in the multi decade financial disaster described above named as Defendants in my Complaint incorporated as an integral part of my MIRDJ.

After all, the P.R. Constitution came about as a result of a federal law approved by the U.S. Congress; which expressly, explicitly and specifically "recognizing the principle of government by consent" and "in the nature of a compact", [Public Law 81-600 of July 3, 1950 also known as the Federal Relations Act (FRA)],[8] was signed by then President of this otherwise Great Nation, the Honorable Harry S. Truman; accepted by the immense majority of the "**Puerto Rican populace" (sic),**[9] by way of a by same law mandated referendum, held on June 4, 1951, [387,016 (76.5%) Yeas and 119,169 (23.5%) Nays for a total of 506,185 votes]; was drafted by a cadre

---

[8] **Whereas under the terms of these congressional enactments an increasingly large measure of self-government has been achieved: Therefore Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That, fully recognizing the principle of government by consent, this Act is now adopted in the nature of a compact so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption.**
SEC. 2 . **This Act shall be submitted to the qualified voters of Puerto Rico for acceptance or rejection through an island-wide referendum** to be held in accordance with the laws of Puerto Rico. Upon the approval of this Act, by a majority of the voters participating in such referendum, **the Legislature of Puerto Rico is authorized to call a constitutional convention to draft a constitution for the said island of Puerto Rico**. The said constitution shall provide a republican form of government and shall include a bill of rights.
SEC. 3. **Upon adoption of the constitution by the people of Puerto Rico, the President of the United States is authorized to transmit such constitution to the Congress of the United States** if he finds that such constitution conforms with the applicable provisions of this Act and of the Constitution of the United States. **Upon approval by the Congress the constitution shall become effective in accordance with its terms**.

[9] This was the term chosen by the majority of the Justices of the HUSSC to refer to the Puerto Rican people in Commonwealth of P.R. v. Sanchez Valle, Et Al.; 15-108 (216).

of honorable and morally solvent U.S. Citizens residents in P.R. from all
political, economic and religious ideologies who were by this same Public
Law, delegated to conform a constitutional convention (which took place
from September 17, 1951 until February 6, 1952); and who upon due
diligence in drafting same Constitution submitted it to the **Puerto Rican
populace" (sic)** which voted for it as mandated by same Public Law 600 in
another referendum held on March 3, 1952, [with 374,649; Yeas (81.18%):
to 82,923; Nays (18.12%) for a total of 457,572 votes] same drafted
Constitution was re-submitted to the President of the U.S. of A. who
transmitted it to the U.S. Congress, that amended two of its clauses[10] and
with these two amendments proceeded to approve it by way of Public Law
447 on July 3, 1952, signed by the President of the U.S. of A. who
resubmitted same amended version to the P.R. Constitutional Convention
for its acceptance by way of a resolution for its ratification after it was

---

[10] The two amendments were: *Provided*^ That section 5 of <u>article II thereof shall have
no force and effect until amended by the people of Puerto Rico under the procedure
prescribed by article VII of the constitution of the Commonwealth of Puerto Rico by
adding to such section 5 the following declaration: "Compulsory attendance at
elementary public schools to the extent permitted by the facilities of the state as herein
provided shall not be construed as applicable to those who receive elementary education
in schools established under nongovernmental auspices"</u>: *Provided further*^ That except
for the purpose of adopting the amendments to section 5 of article II and to section 3 of
article VII as herein provided, <u>article VII of said constitution likewise shall have no
force and effect until amended by the people of Puerto Rico under the terms of said
article by adding to section 3 of article VII the following new sentence: "Any
amendment or revision of this constitution shall be consistent with the resolution
enacted by the Congress of the United States approving this constitution, with the
applicable provisions of the Constitution of the United States, with the Puerto Rican
Federal Relations Act, and with Public 39 stat. 951. Law 600, Eighty-first Congress,
**adopted in the nature of a compact**"</u>

notified to the Governor of P.R for its proclamation which finally took place on July 25, 1952. See Public Law 448.[11]

Said Constitution clauses should be considered as if they were by-laws of the U.S. Congress since they were pre-authorized, pre-approved, pre-amended, pre-ratified and pre-proclaimed according to the mandates and rules of engagement of two (2) different U.S. Congresses having voted for the same Constitution in two (2) different Public Laws and then presented by the U.S. Government to the United Nations as evidence to prove that Puerto Rico was allegedly no longer a colony and to persuade that forum to exclude Puerto Rico from the list of colonies for whom their masters or imperial powers were obliged to submit yearly reports on their administration.

Notwithstanding the above, what makes section 2 of Article VI of the P.R. Constitution authoritative and controlling in terms of the main legal issue analyzed here is that it came about as a result of still another statute by the U.S. Congress, Public Law 87-121 of August 3, 1961, which expressly, explicitly and specifically pre-authorized said_amendment once

---

[11] That the constitution of the Commonwealth 73ib.73ie.of Puerto Rico hereby approved shall become effective when the Constitutional Convention of Puerto Rico shall have declared in a formal resolution its acceptance in the name of the people of Puerto Rico of the conditions of approval herein contained, and when the Governor of Puerto Rico, being duly notified by the proper officials of the Constitutional Convention of Puerto Rico that such resolution of acceptance has been formally adopted, shall issue a proclamation to that effect. Approved July 3, 1952. - Puerto Rico. 328 PUBLIC LAW 448-JULY 3, 1952 [66 STAT.]

and if the **"Puerto Rican populace" (sic)** approved it in the referendum.[12]

See the entire text of same federal statute below. Said referendum was approved by local law Num. 1 of September 29, 1961, and held on December 10, 1961.

Public Law 87-121 JOINT RESOLUTION August 3, 1961

**To provide for amending section 3 of the Puerto Rican Federal Relations Act**11, J , Res. 1241 (64 Stat . 319), as amended (64 Stat . 458). Resolved by the Senate and House of Representatives of the United States of America in Congress assembled: **That section 3 of the Puerto Rican Federal Relations Act (64 Stat. 319), as amended (64 Stat. 458), Act, is amended by** deleting **therefore** the following language: "Provided, however, That no public indebtedness of Puerto Rico and the municipalities of San Juan, Ponce, Arecibo, Rio Piedras and Mayaguez shall be allowed in excess of 10 per centum of the aggregate tax valuation of its property, and no public indebtedness of any other subdivision or municipality of Puerto Rico shall hereafter be allowed in excess of 5 per centum of the aggregate tax valuation of the property in any such subdivision or municipality," and "In computing the indebtedness of the people of Puerto Rico, municipal bonds for the payment of interest and principal of which the good faith of the people of Puerto Rico has heretofore been pledged and bonds issued by the people of Puerto Rico secured by bonds to an equivalent amount of bonds of municipal corporations or school boards of Puerto Rico shall not be counted but all bonds hereafter issued by any municipality or subdivision within the 5 per centum hereby authorized for which the good faith of the people of Puerto Rico is pledged shall be counted ."

SEC. 2. Section 1 of this Act shall take effect upon a majority of the qualified electors of Puerto Rico having voted in a referendum pursuant to section 1 of article VII of the constitution of the Commonwealth of Puerto Rico, **to include provisions in the Commonwealth constitution, in lieu**

---

[12] The referendum results were 385,369 "Yeas" for 82.8% to 80,224 "Nays" for 17.2% representing a total of 465,593 voters. These results reveal 8,021 more voters than in the 1952 referendum approving the Constitution with 10,720 more yes's and 2,699 less No's. Source: "DISPOSICIONES SOBRE LA DEUDA PUBLICA EN LA CONSTITUCION DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO: BREVE REFLEXION HISTORICA-CONSTITUCIONAL PONENCIA" written by CARLOS E. RAMOS GONZALEZ, Esq; Law Professor at the Faculty of Law of Universidad Interamericana de Puerto Rico, cite from 85 Rev. Jur. U.P.R. 705 (2016).

**of the provisions of section 3 of the Puerto Rican Federal Relations Act
specified herein, <u>limiting the debt-incurring capacity of the
Commonwealth and of its municipalities</u>** (as proposed in the concurrent
resolution of the legislative assembly of the Commonwealth), Approved
August 3, 1961 .

Hence, what we have here is an amendment to the P.R. Constitution
that was first genuinely and legitimately proposed by the Puerto Rican
legislature to the U.S. Congress,[13] who preapproved or preauthorized the
same through an express, explicit and specific law in the U.S. Congress,
(consequentially complying with the precondition required for a
constitutional amendment to be valid and binding imposed by the U.S.
Congress in Pubic Law 82-448 when it mandated that section 3 of Article
VII was amended[14]) signed by the then President of the U.S. of A. the
Honorable John F. Kennedy, subject to a ratification of the same
amendment by way of a referendum in a way and manner similar to the one
used for the approval-adoption-amendment-ratification-proclamation and

---

[13]  See "LEYES DE LA QUINTA SESION EXTRAORDINARIA DE LA TERCERA
ASAMBLEA LEGISLATIVA Y DE LA PRIMERA SESION ORDINARIA Y DELA
PRIMERA, SEGUNDA Y TERCERA SESIONES ESTRAORDINRIAS DELA
CUARTA ASAMBLEA LEGISLATIVA DEL ESTADO LIBRE ASOCIADO DE
PURTO RICO; VOLUMEN DE COPIA CERTIFICADAS DE DICHAS LEYES,
DEPARTAMENTO DE HACIENDA; Servicio de Compras y Suministros- División de
Imprenta, San Juan, P.R. 1961." Included as Exhibit 14 of my COMPLEMENTARY
MOTION TO MOTION TO INTERVENE AND REQUESTING DECLARATORY
JUDGMENT in 16-02374(FAB) dated March 15, 2017. (Please excuse me for not
having translated same due to my well known limitations. Since I am appearing here
IFP, I am respectfully praying that this HUSCA1C provides for the translation of same).

[14]  **"<u>Any amendment or revision of this constitution shall be consistent with the
resolution enacted by the Congress of the United States approving this
constitution, with the applicable provisions of the Constitution of the United States,
with the Puerto Rican Federal Relations Act, and with Public 39 stat. 951. Law
600, Eighty-first Congress, adopted in the nature of a compact</u>"**: 48use'731 note

20

evolutionary process of the P.R. Constitution in 1952 described above, except that in the case of section 2 of Article VI, the U.S. Congress went even further. First it pre-consented to the language of the amendment *per se*. Second it pre-admitted that it was going to accept same amendment to substitute section 3 of the FRA, when as we have seen above it stated *ad verbatim*; "**in lieu of the provisions of section 3 of the Federal Relations Act as specified herein**". Third and more importantly for this analysis is that it pre-recognized that its legal objective or purpose was to provide for "**limiting the debt-incurring capacity of the Commonwealth**."

For the above reasons, even if a majority of the members of this panel, or of the entire HUSCA1C judges' ensemble sitting en banc or even of the six (6) Justice of the Honorable U.S. Supreme Court (HUSSC) who voted against the letter, intent and spirit of Public Laws; 81-600 of July 3, 1950 and 82-447 of July 3, 1952;[15] approved "in the nature of a compact"

---

[15] "And contrary to petitioner's claim, Puerto Rico's trans-formative constitutional moment does not lead to a different conclusion. True enough, that the Commonwealth's power to enact and enforce criminal law now proceeds, just as petitioner says, from the Puerto Rico Constitution as "ordain[ed] and establish[ed]" by "the people." P. R. Const., Preamble; see Brief for Petitioner 28–30. But that makes the **Puerto Rican populace** only the most immediate source of such authority—and that is not what our dual-sovereignty decisions make relevant. Back of the Puerto Rican people and their Constitution, the "ultimate" source of prosecutorial power remains the U. S. Congress, just as back of a city's charter lies a state government. *Wheeler*, 435 U. S., at 320. Congress, in Public Law 600, authorized Puerto Rico's constitution-making process in the first instance; the people of a territory could not legally have initiated that process on their own. See, *e.g., Simms* v. *Simms*, 175 U. S. 162, 168 (1899). And Congress, in later legislation, both amended the draft charter and gave it the indispensable stamp of approval; popular ratification, however meaningful, could not have turned the convention's handiwork into law.[6] Put simply, Congress[6] Petitioner's own statements are telling as to the role Congress necessarily played in this constitutional process. See,

and recognizing our right to "government by consent" were again to underestimate and undervalue the P.R. Constitution and its pre and post U.S. Congress Public Laws approving the same, signed by the President, and as a result determine that this section 2 of Article VI of the P.R.

---

*e.g.,* Reply Brief 1–2 ("Pursuant to Congress' invitation, and **with Congress' consent**, the people of Puerto Rico engaged in an exercise of popular sovereignty"); *id.,* at 7 ("The Commonwealth's legal cornerstone is Public Law 600"); Tr. of Oral Arg. 19 (describing the adoption of the Puerto Rico Constitution as "pursuant to the invitation of Congress and with the blessing offered the authority to create the Puerto Rico Constitution, which in turn confers the authority to bring criminal charges. That makes Congress the original source of power for Puerto Rico's prosecutors—as it is for the Federal Government's. The island's Constitution, significant though it is, does not break the chain." <u>COMMONWEALTH OF PUERTO RICO *v*. SANCHEZ VALLE ET AL</u>. CERTIORARI TO THE SUPREME COURT OF PUERTO RICO, No. 15–108. Argued January 13, 2016—Decided June 9, 2016.

"The Federal Bankruptcy Code pre-empts state bankruptcy laws that enable insolvent municipalities to restructure their debts over the objections of creditors and instead requires municipalities to restructure such debt sunder Chapter 9 of the Code. 11 U. S. C. §903(1). We must decide whether Puerto Rico is a "State" for purposes of this pre-emption provision. We hold that it is." SUPREME COURT OF THE UNITED STATES Nos. 15–233 and 15–255 COMMONWEALTH OF PUERTO RICO, ET AL., PETITIONERS 15–233 *v*. FRANKLIN CALIFORNIA TAX-FREE TRUST, ET AL. MELBA ACOSTA-FEBO, ET AL., PETITIONERS 15–255 *v*. FRANKLIN CALIFORNIA TAX-FREE TRUST, ET AL. ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT [June 13, 2016].

In other words, in a civil controversy where the federal bankruptcy law did not apply to P.R. because it was excluded from same, reason why there was no-preemption and consequentially there was no federal question, ergo, subject matter jurisdiction, the HUSSC ruled by judicial fiat that the local bankruptcy law was repugnant to the U.S. Constitution, since for bankruptcy purposes P.R. is a State and axiomatically then, according to this counterintuitive rationalization there was pre-emption. Four (4) days before, the HUSSC decided in a criminal case, that for the double jeopardy clause purposes, P.R. is not only not a State but not even a different jurisdiction. In so deciding, the HUSSC caused a double jeopardy to P.R.. Instead of having been able to timely protect its assets through the local bankruptcy law, now more than two (2) years after, it is forced to do it anyhow (what are left of them) but under the PROMESA Act, with the conflict that the latter gave jurisdiction to P.R. and the bonds contracts that preceded it to N.Y., ergo, another unnecessary legal duplicity. In the realm of the criminal spectrum, the least P.R. needed at this historical juncture was for the HUSSC to protect convicted criminals from some modicum of just punishment as in the States, which is the net effect of Sanchez Valle.

Constitution is not legally worth an iota, they will still encounter a more complicated and formidable task here since they will have to nullify or void, not only the P.R. Constitution of their improved colony, but Public Law 87-121 **retroactively**, to 1961, in order to deny the declaratory judgment order I have respectfully and timely requested. This is an inconceivable and improbable feat I do not think any conscious, responsible and unbiased federal judge is capable of. For the above reasons the declaratory judgment order should issue.

### Summary of Argument

At least in theory we all are taught to believe that no one is above the law. All the Defendants in my Complaint incorporated as an integral part of my timely filed MIRDJ knew or should had known that at least a portion of the debt they had a participation in, was issued and contracted against the limits proscribed in the Constitution. This is reason enough for any court of law to declare null or void at least the portion of the debt in excess of the fifteen (15%) percent **and** the 30 years limits.[16]

---

[16] Under the aegis of ex-Governor Luis Fortuño Burset, he and his government executive, legislative and judicial officers, acquiesced, condoned, endorsed, issued and contracted obligations with a foreign entity (Metropistas, S.A. from Mexico) for forty (40) years when they had a mandate as a result of the electoral suffrage for only four (4) years. Is it legal for administrators of the money of the Puerto Rican people to hypothecate liquid assets that are paid by our People for forty (years) when their mandate is for only four (4)? If the laws establish that the government cannot lease anything for more than five (5) years, except with a special exemption approved by way of exception which has to be legally pre-justified for reasons of necessity and lack of alternative, how can this violation of the P.R. Constitution be validated? Why do our children and grandchildren be legally obliged to pay for debts unconstitutionally contracted and issued by public officers who were voted into office by their parents and

My timely filed MIRDJ proposes that my Complaint filed initially before the PRHTFI-SCSJ is incorporated and taken as a third party complaint of this putative intervenor and all the ones that should follow, within this the Lex Claims LLC, Et Al, Et Al. Complaint and any other(s) that have and may be consolidated with same. My position is that in the eventuality that this federal court system of Justice may accept my proposal, several law firms will come upfront interested in assuming my legal representation and those of the others that will most probably want to join as Plaintiffs in what should become in all probability a class action.

### **Argument**

The best argument I have in favor of my proposal that I should be granted my timely filed MIRDJ in this civil action has paradoxically

---

grandparents at least two scores of years before, paraphrasing President Lincoln in his all-too-famous and ergo known Gettysburg Address? What extremely sophisticated technology may a Mexican private corporation have to count the dollars in the P.R. expressways toll booths, that we Puerto Ricans may not have readily available? Why contracts like this are not given to Puerto Rican banks, corporations or entities? Why does our legislature confer the right to this foreign corporation to charge 1,500 % ($15.00 in penalty of each $1.00 of unpaid toll fee) and 4,000% of penalty ($40.00 in penalty for each $1.00 on each $1.00 dollar of unpaid toll fee) that is not paid in a toll booth? Why does a Puerto Rican Governor like the above mentioned and subsequent Governors and their respective legislatures that all are supposed to represent the People of P.R. approve of laws where their constituents end paying these usurious rates? Why no court of law judge, local, or federal has ruled that this practice violate usury laws not to mention human decency and dignity principles? Is it legal for Ex-Governor Fortuno to sit on the Board of Directors and personally profit from it, of the same foreign entity that he contracted with in violation of our Constitution? Is it legal for the Fiscal Board created by the "Puerto Rico Oversight, Management, and Economic Stability Act" or the so-called "PROMESA" federal law imposed by the present U.S. of A. government to have as its members two (2) of the GDB Presidents (Defendants in my Complaint) that issued and contracted billions of dollars against our Constitution? Is it legal for same "Junta Fiscal" be presided by the President of the insurance company that insured many of the entities whose Board's Directors and Officers issued and contracted billions of dollars in violation of our Constitution and which would be a Defendant in my Complaint? A penny for your thoughts.

nothing to do with the Constitution, the law, the jurisprudence, the rules or what have you. My best argument is that there is no other known option available where the interests of the Puerto Rican people may be protected, taken due care of, and made Justice to, and to make it more judicially justifiable, through incorporating my Complaint into the present one and all the others that may be joined, you will also have the ways and means to pay all the bondholders as they should (as innocent third party in good faith buyers) and all the ones responsible for the unconstitutionally issued and contracted debt will end up paying their own fair and proportional share of their responsibility. In any event, the gist of my argument here and now is that it is evidently obvious that the HUSDCDPR did not take into consideration and evaluated my MIRDJ on its merits and for that sole reason, without more, this HUSCAIC should grant this appeal.

### Conclusion

For all the above stated reasons, this HUSCA1C, have more than enough legal reasons to vacate and remand the HUSDCDPR order denying my timely filed MTIRDJ, or in the alternative, order the HUSDCDPR to issue the declaratory judgment order judicially determining that the Plaintiffs in the instant civil action below and related ones, violated the Constitution of P.R., when issuing and contracting debt in excess of the limits prescribed in same, and that for that reason, same debt is illegal and null *ab initio*.

So I State, Allege and Pray. Respectfully submitted, today May 5, 2017.

## Certificate of Compliance

I, Angel Ruiz Rivera, Appellant, appearing Pro Se and IFP hereby certify that this Appeal Brief complies with the Rules of this HUSCA1C.

## Certificate Of Service

I, Angel Ruiz Rivera, Movant/Appellant, Putative Intervenor/Interested Party, appearing here Pro Se and In Forma Pauperis (IFP), hereby certify that I have sent a copy of this Appeal Brief to all the appearing attorneys of record for all the parties according to the docket record.

Angel Ruiz Rivera
Movant/ Appellant
Putative Intervenor/Interested Party
Pro Se and IFP
Ext. Villa Rica
AA-27 Calle Santa Rita
Bayamon, P.R. 00959.
angelruizrivera@gmail.com
787-779-9222.