EXHIBIT

1. Article by Hedge Clippers on the conflict of interest by Gonzalez and Garcia.
2. Article by Hedge Clippers on the conflict of interest by Gonzalez and Garcia.
3. Article in El Nuevo Dia, P.R.'s main newspaper about ex-Judge Gerardo Carlo, Esq., opinion on this matter.

1, Article by Hedge Clippers on the conflict of interest by Gonzalez and Garcia.

# PIRATES OF THE CARIBBEAN

## How Santander's Revolving Door with Puerto Rico's Development Bank Exacerbated a Fiscal Catastrophe for the Puerto Rican People

# EXECUTIVE SUMMARY

Former Santander executives José Ramon Gonzalez and Carlos M. Garcia served as heads of Puerto Rico's Government Development Bank (GDB) and Santander[1] in Puerto Rico. Garcia and Gonzalez were recently appointed to 2 of the seven seats of the PROMESA Fiscal Control Board. Together, these men built Santander Securities, the bank's municipal bond business, which established itself as a leading bond underwriter coinciding with the growth in Puerto Rican public debt. This business brought in substantial fee income for the bank.



Carlos M. Garcia established a team of current or former Santander executives to run the GDB between 2009 and 2012.

Carlos M. Garcia was appointed to head the GDB in 2009 by Governor Luis Fortuño, who implemented an austerity plan when he took office in Puerto Rico, laying off tens of thousands of public employees, privatizing public assets, and attempting to provide economic stimulus through targeted tax cuts and public private partnerships.

To run the GDB, Garcia established a team of current or former Santander executives that maintained its grip on the GDB throughout the Fortuño administration. In 2011, Garcia left the GDB to return to Santander, while Santander executive Juan Carlos Batlle moved to replace Garcia as head of the GDB. At the same time, Juan Carlos' brother Fernando Batlle left the GDB to become CEO of Santander Securities – creating a virtual revolving door of brothers.

As GDB President, Garcia moved swiftly to reassure the bond market and maintain Puerto Rico's credit ratings by relying on a new category of municipal debt, secured by regressive Puerto Rican sales and use taxes. These "safe" bonds, known by their Spanish language acronym, COFINA, are "extra-constitutional,"[2] and were issued mainly as refinancing bonds, which diverted Puerto Ricans' sales tax revenue to paying bondholders instead of funding public programs. Fortuño had a law passed in January 2009 that doubled the amount of sales tax revenue set aside for COFINA bonds, enabling Garcia's GDB to issue more debt underwritten by Santander and other banks. Public Law 7, passed March 2009, permitted the Treasury Secretary to refinance debt without considering whether it would actually save Puerto Rico money.



José Ramon Gonzalez established Santander Securities, the bank's municipal bond business, in Puerto Rico.

During the Fortuño years, as Puerto Rico fell deeper into debt and Santander and other banks elicited demand for Puerto Rico's triple tax-exempt bonds, the GDB became increasingly reliant on questionable financial engineering techniques. Santander helped the Commonwealth issue risky debt deals that relied on controversial features such as capital appreciation bonds, capitalized interest, and interest rate swaps. These generated more fee income for Santander's underwriting business.

In one case, Santander helped underwrite a bond issue in 2011 to raise money to pay a $400 million interest rate swap termination, which could have been used to fund healthcare or infrastructure. In another example, Santander and other banks earned at least $35.7 million in underwriting fees in three Employee Retirement System (ERS) debt deals worth $2.9 billion that used employers' contributions as collateral, virtually unheard of for public pension funds. This debt added to the pension fund's liability and it is forecasted to run out of money in two years.



The PROMESA Fiscal Control Board, colloquially known as "the Junta."

We examined 90 debt deals that Santander participated in underwriting, from general obligation bonds to the extra-constitutional COFINA bonds, to the GDB's affiliates and subsidiaries. We found the total amount of the debt issued where Santander played an underwriting role to be $61.2 billion dollars—almost as much as the figure currently used as an estimate of the Commonwealth's total outstanding debt load of more than $70 billion. More than $1 billion from these bond deals went to fees paid to Santander and other banks. We also examined Puerto Rican bond deals that Santander underwrote to see if they contained features such as CABs, capitalized interest, interest rate swaps, and whether the bonds were issued by special purpose entities.

As the U.S.'s largest unincorporated territory without legal authority to restructure its debt equal to other U.S. municipalities, Puerto Rico is facing both a fiscal catastrophe and an unprecedented humanitarian crisis. Wall Street saw the debt crisis as an opportunity, and yet bankers have been able to seize on it both as a business and policymaking opportunity. A key question all Puerto Ricans must ask – should banks like Santander be held accountable for their role in Puerto Rico's debt crisis?



For its role in advising the government and facilitating the issuance of questionable debt that led to a fiscal catastrophe, we call on Santander to refund all the underwriting fees and discounts it received from the Puerto Rican government. Much of this debt relied on controversial financial engineering, and was underwritten when the bank had conflicted relationships with the government. Second, José Ramon Gonzalez and Carlos Garcia should resign from the PROMESA Fiscal Control Board. As architects of the debt crisis, they should not be put in positions of power to adjudicate its outcome. Third, the Puerto Rico Commission for the Comprehensive Audit of the Public Credit (the Audit Commission) should continue to be funded and empowered to complete its investigation of the debt and its legitimacy, so that the Puerto Rican people are provided with real answers.

Puerto Rico's ambiguous political situation and inability to restructure its debt has left it vulnerable to interlopers from Wall Street and banks.

# INTRODUCTION

Banks bear responsibility for exacerbating Puerto Rico's debt crisis. Current analysis rightfully sheds light on the role of entities like hedge funds, but banks' role in eliciting demand and understating risk[3] for the island's tax free municipal bonds has been sorely neglected. Santander, an important bank operating in Puerto Rico since 1976, played a crucial role in structuring and profiting off Puerto Rican debt through a revolving door with Puerto Rico's Government Development Bank ("GDB").[4] Two former Santander executives, José Ramon Gonzalez and Carlos M. Garcia, served as heads of the GDB and Santander Securities, which advised Puerto Rico on municipal debt and underwrote many of its troubled bond offerings. Garcia went directly from Santander to the GDB and back again.



In a striking irony, Garcia and Gonzalez, who helped devise and market the bonds that helped bring Puerto Rico to its knees, were recently appointed by U.S. politicians to 2 of the seven seats on the PROMESA Fiscal Control Board (colloquially known as "the Junta"). The Junta has broad powers to address the Puerto Rican debt crisis. It has authority to decide how to restructure Puerto Rico's debt, which bondholders will be repaid and how much they will receive. In essence, the Junta has Puerto Rico's future in its hands.

José Ramon Gonzalez and Carlos M. Garcia, heads of Puerto Rico's GDB and Santander Securities, were recently appointed to the Junta.

During the administration of Luis Fortuño, Puerto Rico's governor from 2009 until 2012, Carlos Garcia and a group of former Santander executives were appointed to run the GDB and instituted a massive bond issuance program[5] that lies at the root of the solvency crisis facing Puerto Rico today. This group also facilitated the creation and distribution of bond deals that contained features such as capital appreciation bonds and interest rate swaps that some experts have termed "predatory" and which Santander profited from as an underwriter and broker-dealer.[6]



Carlos M. Garcia was appointed
to Puerto Rico's GDB in 2009

Puerto Rico is the largest unincorporated territory in the U.S. subject to federal law, yet citizens lack full voting rights and democratic representation in Congress. Over a century, the U.S. has imposed tax policies on Puerto Rico that serve U.S. corporate interests first, like IRS Section 936, which provided a tax benefit to U.S. corporations, and was phased out over a ten-year period beginning in 1996. The dominant public narrative that usually portrays Puerto Rico as a dependent, irresponsible and costly stepchild to its generous mainland U.S. benefactor is dangerously shortsighted when applied to the island's situation today. Puerto Rico's ambiguous political status has made it vulnerable to the influence of interlopers from banks and Wall Street, as Congress has not given Puerto Rico legal authority equal to that of U.S. municipalities to restructure its debt.[7]

*We estimate Santander has participated in the underwriting of $61 billion in Puerto Rican bonds, and as part of these bond issues, $1.1 billion was paid to Santander and others in issuance fees.*

Because of its fiscal catastrophe, Puerto Rico now faces a humanitarian crisis. Almost half of Puerto Ricans live in poverty, 37% of children live in extreme poverty, and unemployment is over 12%.[8] Six hundred of the island's 1,400 schools are expected to be closed in the next few years. Hospitals are struggling to staff operations and pay utility bills, and over a quarter of the population is expected to be infected with the Zika virus by the end of 2016.[9]



Puerto Rico is facing an unprecedented humanitarian crisis

As the urgency of this crisis grows, banks like Santander that facilitated and profited from its creation must step forward, accept responsibility and make financial amends to the people of Puerto Rico. The former Santander executives who were appointed to the Junta should resign because of their role in helping create the crisis and their conflicts of interest in setting policies to adjudicate disagreements between creditors about debt they helped manufacture.

This report is the first of three looking into Santander and its business enterprises in Puerto Rico, which profited off of the public debt that has caused such misfortune for the Puerto Rican people.

# A BIRD'S EYE VIEW OF SANTANDER'S CRITICAL ROLE IN UNDERWRITING PUERTO RICAN DEBT

In our analysis of Puerto Rican public debt, we found at least 90 instances in which Santander participated in underwriting municipal bond issues, from general obligation bonds to the extra-constitutional COFINA bonds highlighted below, to the GDB's affiliates or subsidiaries— including the electric utility, the public pension plan, the Employee Retirement System; and housing, hotel and tourism, sewer and aqueducts, public buildings, infrastructure financing and other Puerto Rican authorities.

Municipal debt underwriters purchase newly issued securities from the governmental issuer and then sell those securities to investors. They receive a discount on the bonds or a fee—called the issuance fee— from the government as compensation. They also work to structure municipal bond offerings and to determine their offering price.

We found the total amount of the debt issued in which Santander played an underwriting role, to be $61.2 billion dollars—almost as much as the figure currently used as an estimate of the Commonwealth's total debt load of more than $70 billion.[10] More than $1 billion was diverted from these bond deals as issuance fees and for Santander and other banks underwriters' discount, legal, printing, and other fees. Among the Puerto Rican bond issues in our analysis, Santander was a lead or joint lead underwriter of over $18.3 billion in debt issued, of which over $236 million in fees were put into the hands of Santander and other banks.



As Puerto Rico fell deeper into debt, municipal bond underwriters like Santander advised the Commonwealth on increasingly risky debt deals. Bond deals more often began to feature controversial financial engineering techniques, including capital appreciation bonds (CABs), capitalized interest, interest rate swap agreements, and special purpose entities that issued "extra-constitutional debt".[11]

We examined bond deals that Santander underwrote to see if they contained features such as CABs, capitalized interest, interest rate swaps, and whether the bonds were issued by special purpose entities.

| A Footprint of Issuance Fees, Excessive Returns, Swap Fees and Sales-Tax Backed Bonds* | |
|---|---|
| Total Bond Deals | $61.2 billion |
| Total Issuance Fees | $1.1 billion |
| Lead or Co-Lead Deals | $18.3 billion |
| Lead or Co-Lead Issuance Fees | $236 million |
| Total CABs | $14.4 billion |
| CABs Principal to Interest Ratio | 433% |
| Total Capitalized Interest Payments | $1.5 billion |
| Swap Termination Payments | $735 million |
| Total COFINA Deals | $15.3 billion |

*See Methodology footnote.

**CAPITAL APPRECIATION BONDS** are long-term bonds in which the borrower does not pay interest or principal until the bonds come due. As the bonds mature, interest is added and compounded, which results in an unusually large payout to the borrower. CABs are associated with municipal debt loads that some experts have labeled "abusive," and recent legislation in California and Texas has restricted their use.[12] In most CABs, the amount borrowed is not to be paid back over a substantial period of time. Of the $61.2 billion in total debt reviewed, we found Santander participated in underwriting 20 deals that had CABs totaling $14.4 billion, 9 of which were COFINA deals.[13] In the cases where the bonds' Official Statements reported the CABs' worth at maturity and thus the future interest due, we found $2.3 billion in principal was borrowed with $10.2 billion in interest at maturity: a principal to interest ratio of 433%. By contrast, a traditional ten-year bond paying 5% simple interest on $10 million will yield $5 million in interest payments over the life of the bond, an interest to principal ratio of 50%.

**CAPITALIZED INTEREST** is borrowing in order to make interest payments – the profits due to bondholders. In Puerto Rico, bonds and refunding bonds were issued partly to cover interest payments, which turned older debts' interest into new principal, increasing the amount owed.[14] In our analysis, we found a third of Santander-underwritten deals contained capitalized interest payments totaling $1.5 billion of payments that are essentially interest on interest.[15]



While the child poverty rate in Puerto Rico is 37%, banks like Santander helped the Commonwealth issue increasingly risky debt deals.

**SWAP TERMINATION PAYMENTS** are fees paid to banks or other Wall Street firms to cancel interest rate swaps. Interest rate swaps are periodic exchanges of money between holders of fixed-rate and variable-rate debt. The exchange amount is based on an agreed-upon notional amount and movement of interest rates.[16] Although these swaps were meant to lower Puerto Rico's borrowing costs if interest rates rose, they were, in fact, sometimes costlier for the government as interest rates remained near record lows.[17] When bonds were downgraded by rating agencies, some of the swaps accelerated to default rates at a high cost to Puerto Rico.[18] Of the 90 bonds we examined in which Santander was a lead or participating underwriter, we found a total of $735 million was paid from Puerto Rico's public coffers just to cancel interest rate swaps.[19]



**SPECIAL PURPOSE ENTITIES** (SPE's) were created by the Puerto Rican government as corporate and political entities independent of the Commonwealth of Puerto Rico, in some cases to enable the government to borrow more money. We will focus on an SPE called COFINA, that was set up to issue bonds to pay or refinance certain debts of the Commonwealth.[20] We found that Santander participated as underwriter in over $15 billion of COFINA bond issues between 2007 and 2011.

COFINA bond issues diverted sales taxes that could have been used for economic development in order to pay off bondholders.[21]

Banks like Santander facilitated municipalities' use of interest rate swaps with the belief they'll save money, but termination clauses have a high price.

# ORIGINS OF THE DEBT CRISIS

Puerto Rico's debt crisis has its roots in multiple factors, including the phasing out of IRS Section 936 that provided a tax benefit to U.S. corporations, over a 10-year period beginning in 1996. According to a former President of the GDB Melba Acosta-Febo, "this crisis is the culmination of decades of ill-advised public policy – both in San Juan and in Washington – coupled with a persistent stagnating economy, seemingly unlimited access to easy credit, and a market willing to lend."[22]

In 2006, Puerto Rico went into a recession from which it has not recovered. Public debt grew from a sustainable 63% of GNP to just over 100% of GNP by 2015.[23] This was fueled by budget deficits and U.S. investors' demand for the Commonwealth's tax-free municipal bonds, which have historically been popular because they are exempt from federal, state, and local taxes and are constitutionally guaranteed by the Puerto Rican government.



Banks like Santander drove demand for Puerto Rico's triple tax exempt bonds, for example with its series of mutual funds, First Puerto Rico.

The growth of Puerto Rican debt for the past 10 years provided enormous profits for the banks selected by the GDB to underwrite its bonds. These included global banks such as Citigroup, Goldman Sachs, and Merrill Lynch, but also local banks such as Popular, Oriental and Santander. The Wall Street Journal estimated in 2013 that Puerto Rico had issued $61 billion in bonds since 2006, paying Wall Street securities firms, lawyers and others about $1.4 billion in fees.[24] Banks like Santander exacerbated the debt crisis by structuring Puerto Rican bond deals and finding the buyers to scoop them up, for which they received generous fees from the government.

# SANTANDER SECURITIES BECOMES ONE OF THE PRINCIPAL BANKERS TO THE GOVERNMENT

Santander bank was well positioned to benefit from the explosion of public debt in Puerto Rico. In 1996 Santander hired José Ramon Gonzalez to run its investment brokerage start-up, called Santander Securities. Gonzalez, who had served as head of the GDB between 1986 and 1989, built Santander Securities' business in the Commonwealth, and closely tied its fortunes to the Puerto Rican municipal debt market. While serving as CEO of Santander Securities from 1996-2001, Gonzalez also established a series of mutual funds known as First Puerto Rico, managed in-house by a subsidiary known as Santander Asset Management, which mainly invested in Puerto Rican debt securities.

In 2002, Gonzalez became CEO of the bank's holding company, known as BanCorp, where he served until 2008, even as he continued to serve as chairman of Santander Securities. His replacement as CEO of Santander Securities was Carlos M. "Kako" Garcia. Garcia joined Santander Securities in 1997 to help Gonzalez create an investment banking operation to do municipal debt underwriting. At Santander Securities, Garcia helped Gonzalez with the acquisition of Merrill Lynch's island-based brokerage and asset management business and, in his own words, "structured, advised and/or managed debt, equity and M&A transactions… including acting as one of the principal bankers of the Government of Puerto Rico."[25]



Garcia and Gonzalez built Santander Securities, the bank's municipal bond business.

Under the direction of Gonzalez and Garcia, Santander Securities quickly established itself as a leading bond underwriter, coinciding with the growth in Puerto Rican public debt. In 2004 Santander helped issue over $6.1 billion in new securities, including a $1.2 billion bond issue for the Puerto Rico Public Finance Corporation. By 2005 Santander's underwriting business generated nearly 50% of parent BanCorp's fee income, with most of that coming from Puerto Rican public debt. As the Commonwealth fell into recession in 2006 and borrowed more, Santander Securities participated in the underwriting and structuring of $32 billion in government sponsored debt (between 2006-2009). Fee income alone at Santander Securities rose from $51 million in 2004 to $75 million in 2008 (and $60 million in 2009).[26]

# GOVERNOR FORTUÑO ENACTS AUSTERITY AND APPOINTS SANTANDER EXECUTIVES TO GDB TO MANAGE THE FISCAL CRISIS

In 2008, the third year of recession in Puerto Rico, the New Progressive Party (NPP) won a landslide election, handing the Governor-elect, Luis Fortuño, super majorities in the Commonwealth's Legislative Assembly. Fortuño, who caucused with Republicans during his four years as Puerto Rico's representative to U.S. Congress, campaigned on a program of cutting taxes and shrinking government.

Within months of becoming governor Fortuño got a series of laws passed to implement an austerity program for Puerto Rico called the Fiscal and Economic Recovery Plan. Fortuño's goal was to stabilize Puerto Rico's Wall Street credit rating, and provide some economic stimulus through tax cuts and public private partnerships for infrastructure development. At the same time, the government moved to lay off tens of thousands of public employees and to privatize public assets such as the San Juan airport. The economic plan did not lift Puerto Rico out of recession however, and tax revenues continued to decline.



When Governor Luis Fortuño was elected, he implemented an austerity plan and appointed Carlos M. Garcia to lead the GDB.

To handle the fiscal crisis, Fortuño brought in Santander's Carlos M. Garcia to lead the GDB as its Chairman, CEO and President. In turn, Garcia asked Fortuño to establish a private-sector board of directors for the GDB. To run the GDB, Garcia brought in several current or former Santander executives: Jesús F. Méndez, a former Managing Director of Santander Securities; David Alvarez, an analyst at Santander Securities; William Lockwood Benet, former advisor to Santander; George Joyner, former president of Santander Mortgage Corp.; and Fernando L. Batlle, [27] whose brother, Juan Carlos Batlle, replaced Jesús Méndez as managing director of Santander Securities. Among other managers who joined the GDB under Garcia was Ignacio Canto, who arrived in 2010 with experience structuring Puerto Rican public debt deals for Santander Securities.

The Santander team maintained its grip on the GDB throughout the Fortuño administration. In 2011 Juan Carlos Batlle moved from a senior role at Santander to replace Carlos Garcia as the head of the GDB while his brother Fernando left the GDB to become CEO of Santander Securities. This amounted to a virtual revolving door of brothers, rotating between the bond underwriter and the government agency charged with selecting bond underwriters. When Carlos Garcia left the GDB, he returned to Santander where he became executive vice president of the U.S. bank holding company. [28]



Juan Carlos Batlle and his brother were a virtual revolving door of brothers between Santander Securities and the GDB

# THE SANTANDER-LED GDB AGGRESSIVELY PURSUES QUESTIONABLE COFINA BONDS TO MAINTAIN PUERTO RICO'S CREDIT RATINGS

With his team in place at the GDB, Garcia moved swiftly to reassure the bond market. In order to maintain Puerto Rico's credit ratings, Garcia relied on issuance of a new category of municipal debt, secured by regressive Puerto Rican sales and use tax receipts. These "safe" bonds, known by their Spanish language acronym, COFINA, were issued mainly to refund outstanding interest and principal on previously issued government debt, and also provide deficit financing for the Commonwealth.[29]

The legality of COFINA as a separate governmental structure with a dedicated revenue stream to exclusively to pay bondholders has never been determined by a court, although it is the subject of an ongoing federal lawsuit between rival groups of COFINA and General Obligation (GO) bondholders.[30]

Fortuño then had a law passed in January 2009 that doubled the amount of sales tax revenue set aside for COFINA bonds, enabling the Garcia's GDB to issue more debt underwritten by Santander and other banks. Law 7, passed in March 2009, permitted the Treasury Secretary to refinance debt without considering whether it would actually save Puerto Rico money.[31]



Mass protests in Puerto Rico over layoffs and Public Law 7.

# GARCIA ISSUES MORE DEBT TO REPAY BONDHOLDERS, EARNING MORE FEE INCOME FOR SANTANDER

With the new laws in place, Garcia was able to sell $5.3 billion in COFINA bonds with two issues during 2009. Santander participated as underwriter in both issues, and acted as the lead bank in one. The bonds were used primarily to refinance existing debt, both extending the length and increasing the amounts that would ultimately need to be repaid by Puerto Rico with sales tax revenues.

Each bond issue was also subject to risky financial provisions. For example, COFINA entered into interest rate swap agreements with undisclosed "counterparties," which are typically Wall Street banks. When Puerto Rico's bonds were downgraded, it ended up paying termination fees to these parties because the credit downgrade caused it to be in a state of technical default, which caused interest rates swaps to accelerate to default rates. One COFINA bond issuance in 2011 raised money to make a $400 million interest rate swap termination payment, instead of being used to fund Puerto Rico's healthcare, education or infrastructure development. Santander helped underwrite this bond issue.[32]



Santander helped underwrite a bond issue to raise money to pay a $400 million interest rate swap termination, which could have been used to fund healthcare or infrastructure.

COFINA debt also featured capital appreciation bonds or CABs. To cite one example in Puerto Rico, the COFINA 2009A First Subordinate Series issue underwritten by Santander contained CABs that raised $139 million for the government, but the amount due at maturity -- compounded at interest rates of between 6.875% and 7.125% -- was $730 million, over five times the amount borrowed.[33] If the $139 million borrowed at the same rates would be paid back using simple, not compounded interest, the amount due at maturity would have been only $371 million.

Some of these debt deals borrowed even more money to pay the interest on the amount owed. This is called capitalized interest. Traditionally, capitalized interest is used to pay bondholders during the construction phase of a project, before it can generate revenue. Once the project is complete, bondholders are paid with the revenue generated from the project. In the case of COFINA bonds however, the only source of income to pay interest would be an increase in sales and use taxes. The use of capitalized interest created more fee income for bond underwriters like Santander who participated in numerous COFINA and other deals that borrowed to pay interest.



Capitalized interest generated more fee income for bond underwriters like Santander who participated in underwriting COFINA and GDB debt deals worth over $18.8 billion.

In total, COFINA debt deals put together by the GDB under Carlos Garcia and Juan Carlos Batlle were just over $10.8 billion. The GBD also issued $8 billion of its own notes at the direction of Garcia and Batlle, with Santander participating as an underwriter in all of them. The GDB paper has since been downgraded to junk and the bank has defaulted on some of its payments.[34]

# GARCIA AND BATLLE'S COFINA DEALS SADDLED PUERTO RICO WITH ADDITIONAL DEBT

Analysis of a specific COFINA bond issue from 2011[35] demonstrates how reliant on questionable financial engineering the GDB had become during the Fortuño years. Although the Puerto Rico Constitution says the Commonwealth cannot issue public debt with a maturity of more than 30 years,[36] most of the COFINA 2011A Subordinate Series Bonds mature in 32 to 39 years. The bonds raised $734 million, including $35.2 million for interest. Some of these proceeds were used to retire – prior to maturity – COFINA bonds issued in 2009 and to make separate interest payments on other 2009 COFINA bonds. Santander was an underwriter of these 2009 bonds.

In addition, $337 million of the 2011A First Subordinate Series bonds were issued as CABs and were purchased by the Puerto Rican Infrastructure Finance Authority and the Puerto Rican Employees Retirement System (ERS). These CABs don't mature for 35-37 years, accrue interest at 7% and have an approximate value of $2.4 billion at maturity, over 13 times the amount borrowed.



Bond underwriters, including Santander, helped sell these bonds. In turn, Santander received a share of the $2.7 million underwriters discount. The bonds were approved by the GDB headed by Juan Carlos Batlle, who joined the GDB from Santander Securities and who also was serving as Vice Chairman of the COFINA corporation when the bonds were issued. His brother was CEO of Santander Securities at the time of this issue.

The GDB became increasingly reliant on questionable financial engineering during the Fortuño years.

# SANTANDER ALSO UNDERWROTE RISKY PENSION DEALS – DID IT KNOW BETTER?

When the recession hit Puerto Rico, the underfunded Employee Retirement System (ERS) pension plan issued its own bonds at the direction of the governor, Acevedo Vila, involving Santander and other banks. In 2008 Santander helped underwrite three bond issues using employer contributions as collateral— virtually unheard of for a public pension plan.[37]

The idea was to leverage up to $7 billion so that it could be invested and the interest earned would provide payouts to the plan's beneficiaries. The bonds were only marketed to Puerto Rican investors due to an alleged lack of international appetite.[38]

Three ERS bond issues raised $2.9 billion, while UBS, Santander and other banks shared $35.7 million in issuance fees. When Fortuño became governor, he declined to allow the ERS to issue more debt, and hired a consultant to analyze his predecessor's handling of the pension's finances. The consultant concluded that the bond deals were so "obviously flawed and not logical" that it "could imply a lack of understanding" of the deal by island officials.[39] However, these pension fund bonds were underwritten by Santander Securities when Carlos Garcia was there in a senior role. According to Reuters the consultant's report was understood by many as a political maneuver.

Nonetheless, this borrowing added to the pension fund's liability as money is now going to pay off bondholders who will be paid before pensioners.

ERS and Puerto Rico's Teachers' Retirement System, covering 330,000 workers and retirees, have liabilities totaling $43.2 billion, while their assets are worth $1.8 billion—a 96% shortfall, reportedly the largest ever for a U.S. state pension. The pensions are forecasted to run out of money in two years.[40]



Santander and other banks earned at least $35.7 million in underwriting fees in three ERS debt deals that used employers' contributions as collateral, virtually unheard of for public pension funds.

# COULD SANTANDER AND ITS EXECUTIVES HAVE BELIEVED ALL THIS DEBT WAS AFFORDABLE?

The GDB's refinancing, growth and extension of debt under Garcia and Batlle, especially using COFINA bonds, on top of the budget cuts carried out by the Fortuño administration did not save Puerto Rico from catastrophe. It only pushed it out a few years, by massively increasing the amount owed to creditors.

A key question all Puerto Ricans must ask – and banks like Santander should be held accountable for answering – is how did the Commonwealth's debt grow so much and become so onerous that it became unpayable? For many years now, investment banks and municipal bond advisors like Santander Securities have advised governments like Puerto Rico that issued debt with non-traditional and toxic borrowing structures.

The lure of these structures, including CABs, interest rate swaps, capitalized interest, and establishing off balance sheet corporations like COFINA with separate revenue streams to borrow more from, is that they allow banks and governments to act as if nothing is amiss, permitting the banks to profit from an ever increasing number of transactions under ever more problematic terms and conditions.

# CONCLUSION

A crushing debt burden was placed on the Puerto Rican people with the assistance of bankers like Santander—making economic growth for the island almost impossible without some debt cancellation. Santander advised, structured and arranged much of this debt that linked investors eager for tax-free profits with desperate governments that were facing ruin.

Santander should refund all the underwriting fees and discounts it received from the government, including its public corporations and instrumentalities like COFINA. Too much of the debt Santander underwrote was questionable or underwritten when the bank had conflicted relationships with the government. José Ramon Gonzalez and Carlos Garcia should resign from the Fiscal Control Board. As architects of the debt crisis, they should not be put in positions of power to adjudicate its outcome.

Last but not least, many questions remain about the creation of Puerto Rico's debt and whether it all the debt is legitimate. We support the ongoing work of the Puerto Rico Commission for the Comprehensive Audit of the Public Credit (Audit Commission). The Audit Commission should be funded and empowered to complete its investigation of the debt, so that Puerto Rican people are provided with answers.

# WHO ARE THE HEDGE CLIPPERS?

Every day, the most unscrupulous hedge fund managers, private equity firms and Wall Street speculators impact the lives of Americans. They play an outsized role in our political process, our education system, and our economy. Hedge Clippers is a national campaign focused on unmasking the dark money schemes and strategies the billionaire elite uses to expand their wealth, consolidate power and obscure accountability for their misdeeds. Through hard-hitting research, war-room communications, aggressive direct action and robust digital engagement, Hedge Clippers unites working people, communities, racial justice organizations, grassroots activists, students and progressive policy leaders in a bold effort to expose and combat the greed-driven agenda that threatens basic fairness at all levels of American society.

The Hedge Clippers campaign includes leadership and collaborative contributions from labor unions, community groups, coalitions, digital activists and organizing networks around the country, including the Strong Economy for All Coalition, New York Communities for Change, Alliance for Quality Education, VOCAL-NY, Long Island Progressive Coalition and Citizen Action of New York; Make the Road New York and Make the Road Connecticut; New Jersey Communities United; the Alliance of Californians for Community Empowerment (ACCE) and Courage Campaign; the Grassroots Collaborative in Illinois; the Ohio Organizing Collaborative; ISAIAH in Minnesota; Organize Now in Florida; Rootstrikers, Every Voice, Color of Change, 350.org, Greenpeace, the ReFund America Project and United Students Against Sweatshops; the Center for Popular Democracy and the Working Families Party; the United Federation of Teachers and New York State United Teachers; the American Federation of Teachers, the National Education Association, and the Communication Workers of America.

# WHO IS THE COMMITTEE FOR BETTER BANKS?

The Committee for Better Banks is a coalition of bank workers, community and consumer advocacy groups, and labor organizations coming together to improve conditions in the bank industry. We work for just wages, career paths and job security for front-line bank workers. Organizations involved include: Make the Road New York, New York Communities for Change (NYCC), Minnesotans for Fair Economy, Missourians Organizing for Reform and Empowerment, Jobs with Justice and local affiliates, the Communications Workers of America union (CWA) and UNI Global Union.

# FOOTNOTES

1. *We use Santander to mean Banco Santander, SA, and all its affiliates. In Puerto Rico, for much of the period of time covered in this report, Santander BanCorp was the parent bank holding company for Banco Santander Puerto Rico, which had several subsidiaries including Santander Securities Corp., Santander Asset Management, Santander Mortgage Corp., Santander Insurance Agency, Santander International Bank, Santander Financial Services (also known as Island Finance), Island Insurance Corp., and Santander Puerto Rico Capital Trust I.*

2. *The legality of COFINA as a separate governmental structure with a dedicated revenue stream to exclusively to pay bondholders has never been determined by a court.*

3. *For example, in October 2015, Financial Industry Regulatory Authority (FINRA), the securities industry's self-regulator, found that Santander didn't accurately reflect the dangers associated with the Puerto Rican bonds in its risk-classification tool. FINRA fined Santander $6.4 million, which was comprised of a $2 million fine and $4.4 million in restitution to customers that purchased Puerto Rican bonds. See: http://www.finra.org/newsroom/2015/finra-sanctions-santander-64-million-pr-bond-supervisory-failures*

4. *The GDB is bank, fiscal agent and acts as financial advisor for the Commonwealth of Puerto Rico, and its instrumentalities (public corporations and municipalities) in connection with all their borrowings. All such borrowings are subject to approval by GDB. The GDB also selects bond underwriters in connection with issuing bonds.*

5. *See "GDB locks up the piggy bank," Caribbean Business, 01-29-2009.*

6. *See for example Refund America, "Puerto Rico's Payday Loans." See also Tom Sgouros, "Predatory Public Finance," The Journal of Law in Society, Vol. 17:1 (2014).*

7. *See Diane Lourdes-Dick, "U.S. Tax Imperialism," The Seattle University School Digital Law Commons (2015). According to Lourdes-Dick, Puerto Rico's ambiguous political status and inability to restructure its debt (even though Puerto Rico attempted to give itself that authority with legislation in 2016) are partly responsible for the fiscal crisis, and Wall Street saw the crisis as an opportunity. These two conditions have created a Puerto Rican debt problem that is unique, cyclical, and unresolvable, yet one in which Wall Street bankers have seized on the crisis as both a business opportunity and as policymakers.*

8. *Nazario, ed. "Poverty in Puerto Rico: A socioeconomic and demographic analysis with data from the Puerto Rico Community Survey (2014)."*

9. *See https://www.whitehouse.gov/sites/default/files/docs/puerto_rico_hill_update_0419.pdf*

10. *We analyzed bond issues' Official Statements taken from EMMA and the GDB website, 2000 to present, in which Santander was lead or participating underwriter, with the addition of several Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority (AFICA) bonds from the late 1990s. Each bond was examined for the listed underwriters on the cover, whose role and importance are generally denoted by the size of font and order in which they're listed. If Santander was listed first or among the first three underwriters listed, we determined this was a lead or co-lead underwriting role. If Santander was listed anywhere else, we determined them to be a participating underwriter. On the second page, tranches in the bond issue are generally listed which denote whether the issue contained CABs, the amount of CAB principal, and usually their worth at maturity and yield rate. Bonds' Official Statements were then scanned for their sources and uses of funds or plans of financing which generally list underwriting fees, costs of issuances and underwriters' discounts as well as other fees, capitalized interest, or interest rate swap termination payments. Usually this section is called "Sources and Uses of Funds," "Plan of Financing," or is in "Underwriting."*

11. *The 2006 law establishing COFINA limited its legal purpose to issuing bonds or other financial mechanisms to pay or refinance Puerto Rico's extra-constitutional debt. In our analysis of 90 bonds we found the use of these techniques to peak in: CABs (2008), capitalized interest (2011-2012), and swap agreements payments (2012).*

12. *See: https://medium.com/@mtnilass/how-state-and-local-governments-use-financial-engineering-to-game-their-debt-burdens-the-new-68a155e7ab31#.wqv0h5gud*

13. *COFINA (9), ERS (3), PRPFC (3), PRHFA (2), PRIDCO (1), PRASA (1) and GDB (1).*



HEDGE CLIPPERS   COMMITTEE FOR BETTER BANKS

14. *ReFund America, "Scooping and Tossing Puerto Rico's Future," p. 6.*

15. *PREPA (8), COFINA (6), GDB (4), PRASA (3), PRPBA (3), PRPFC (3), AFICA (1), ERS (1), PRIFA (1).*

16. *This is a useful example of an interest rate swap is provided from moneycrashers.com: "ABC Company and XYZ Company enter into one-year interest rate swap with a nominal value of $1 million. ABC offers XYZ a fixed annual rate of 5% in exchange for a rate of LIBOR plus 1%, since both parties believe that LIBOR will be roughly 4%. At the end of the year, ABC will pay XYZ $50,000 (5% of $1 million). If the LIBOR rate is trading at 4.75%, XYZ then will have to pay ABC Company $57,500 (5.75% of $1 million, because of the agreement to pay LIBOR plus 1%). Therefore, the value of the swap to ABC and XYZ is the difference between what they receive and spend. Since LIBOR ended up higher than both companies thought, ABC won out with a gain of $7,500, while XYZ realizes a loss of $7,500. Generally, only the net payment will be made. When XYZ pays $7,500 to ABC, both companies avoid the cost and complexities of each company paying the full $50,000 and $57,500.*

17. *Wall Street Journal, "Banks Rack Up Big Fees from Puerto Rico Bond Deals", 10-23-2013.*

18. *Puerto Rico Commission for the Comprehensive Audit of the Public Credit Pre-Audit Survey Report, p. 13.*

19. *COFINA (2), GDB (4), PRASA (1), PRIFA (1), PRPBA (1).*

20. *Standard and Poor's, Global Credit Portal Ratings Direct, "Puerto Rico Sales Tax Financing Corp.; Sales Tax," June 28, 2007 p. 2*

21. *See for example Garcia's presentation at the Puerto Rican Credit Conference in 2009, http://www.gdb-pur.com/pdfs/CRED-CONFFEB-20-09.pdf, pp 94-95. A law increased the amount of sales and use tax went to COFINA to refinance debt.*

22. *Statement of Melba Acosta-Febo, on behalf of the Government Development Bank for Puerto Rico, before the U.S. Senate Finance Committee, 9-29-2015.*

23. *Krueger, Teja and Wolfe, "Puerto Rico: A Way Forward," 6-29-2015, p. 9.*

24. *Wall Street Journal, "Banks Rack Up Big Fees from Puerto Rico Bond Deals", 10-23-2013.*

25. *See Garcia's resume here: http://democrats-naturalresources.house.gov/imo/media/doc/garcia_testimony_updated_2_3_16.pdf*

26. *Information provided by Santander BanCorp annual reports. In 2010 Santander BanCorp became a wholly-owned subsidiary of Banco Santander, S.A. and ceased filing annual reports with the S.E.C.*

27. *See "GDB locks up the piggy bank," Caribbean Business, 01-29-2009.*

28. *See Garcia's resume: http://democrats-naturalresources.house.gov/imo/media/doc/garcia_testimony_updated_2_3_16.pdf. It says he was responsible for strategic projects to develop the U.S. banking franchise including a rebranding to Santander from Sovereign in 2013.*

29. *Detailed in Garcia's presentation at the Puerto Rican Credit Conference in 2009, http://www.gdb-pur.com/pdfs/CREDCONFFEB-20-09.pdf.*

30. *The lawsuit is Lex Claims, LLC et.al. v. the Commonwealth of Puerto Rico, U.S. District for Puerto Rico, Case 3:16-cv-02374-FAB.*

31. *Law 7, Chapter IV, Section 47. Refinancing bonds were exempted from the requirements of Section 3 (f)(3) of 13 L.P.R.A. § 141b, which states that "no refinancing bonds shall be issued unless the Secretary of the Treasury shall have first determined that the present worth of the aggregate principal and interest on the refinancing bonds is less than the present worth of the aggregate principal and interest on the outstanding bonds to be refinanced; for the purposes of this limitation…"*

32. *See Puerto Rico Commission for the Comprehensive Audit of the Public Credit Pre-Audit Survey Report, p. 13, and for COFINA interest rate swap termination payment see http://emma.msrb.org/ER535765-ER414252-ER816052.pdf, pp 39, for another example, see http://emma.msrb.org/ER536037-ER414248-ER816051.pdf, pp 43-44.*



33. See http://emma.msrb.org/EA283776-EA2574-EA571322.pdf. See description of Capital Apprecia-
    tion Bonds here, the author estimates that 63% of Puerto Rico's total CAB debt belongs to COFINA.

34. "Puerto Rico plays brinksmanship with historic debt default," Institutional Investor, 05-04-2016.

35. For a description of the bonds discussed in the following two paragraphs, see http://
    emma.msrb.org/ER536037-EP457350-EP857362.pdf.

36. Audit commission report, page 23.

37. See Senior Pension Funding Bonds Series A http://www.gdb-pur.com/pdfs/public_corp/PensionBondsOS-Jan08-final.
    pdf, Series B http://www.gdb-pur.com/investors_resources/documents/2012-04-09-FinalOS-POBSeriesB.pdf, and Se-
    ries C http://www.gdb-pur.com/investors_resources/documents/ERSSeniorPensionFundingBonds-SeriesC_000.pdf.

38. http://www.reuters.com/investigates/special-report/usa-puertorico-pensions/

39. Ibid.

40. Ibid.



2, Article by Hedge Clippers on the conflict of interest by Gonzalez and Garcia.

3.Article in El Nuevo Dia, P.R.'s main newspaper about ex-Judge Gerardo
Carlo, Esq., opinion on this matter.



# PARTNER PAPER NO. 5: THE LOOTING OF PUERTO RICO'S INFRASTRUCTURE FUND: CARLOS M. GARCIA'S DESTRUCTIVE FISCAL POLICIES HURT PUERTO RICO ONCE, COULD IT HAPPEN AGAIN?

16 MAY 2017 • BUDGET CUTS, CARLOS GARCIA, HEDGEPAPERS, LUIS FORTUÑO, PRIVATIZATION, PUERTO RICO, SANTANDER





Yownlond ns PYF or rend below

**129**
SHARES

Twitter        Facebook        Reddit

Email

Yownloay Syanish version Here

## EXECUTIVE SUMMARY

Carlos M. Garcia is profoundly conflicted as a former Santander[i] banking executive in his current role on the PROMESA control board, or the "Junta." In the years preceding Governor Luis Fortuño's election in 2008, Garcia built Santander Securities—the bank's municipal bond business—while Jose Ramon Gonzalez, another Junta member, was at the head of the bank.[ii] With Fortuño's election, Garcia was given vast powers over fiscal policy as President of the Government Development Bank ("GDB"), Chair of the local control board (a special board comprised of five cabinet-level officials with ministerial responsibility for Puerto Rico's fiscal matters and restructuring powers conferred by the Puerto Rico Legislature), and head of Puerto Rico's new Public Private Partnerships Authority (PPPA).[iii]

A previous report, Pirates of the Caribbean, documented the role Garcia and Santander played in Puerto Rico's public finance disaster and the virtual revolving door former bank executives had with the GDB from 2009 to 2012. This report details how one of Garcia's first steps at the GDB was to liquidate Puerto Rico's infrastructure fund, called the Corpus Account, and leave it with only an expensive IOU payable in the distant future.

The liquidation of the Corpus Account left Puerto Rico without capacity to modernize its water and sanitation systems.[iv] These systems are vital to protecting the public's health against mosquito-born virus epidemics and other diseases.[v] Garcia promoted public-private partnerships, which have failed to adequately meet Puerto Rico's infrastructure needs. While Garcia headed the PPPA, the only water infrastructure project launched sought private sector investment to improve PRASA's revenue collections, to counter "water theft."[vi]

> # The liquidation of the Corpus Account left Puerto Rico without capacity to modernize its water and sanitation…   CLICK TO TWEET

The Corpus Account had more than $1 billion dedicated to essential water and sewer projects, which under Garcia, the GDB diverted into a series of financial transactions that were intended to bolster the island's credit rating, but which became tied up in the issuance of billions in new debt. This debt ultimately helped push the GDB into insolvency.

The GDB borrowing was part of a larger fiscal restructuring carried out under Garcia that has saddled Puerto Rico with debt on unfavorable terms. For example, Puerto Rico's debt today includes billions in capital appreciation

bonds secured by sales tax revenue (known by Spanish acronym COFINA, "COFINA Cabs"), which accrue and compound interest over decades. This means the amounts due when the bonds mature can be ten times or more than the amount originally borrowed.[vii] Even partial repayment of this debt would redirect desperately needed funds to wealthy banks and Wall Street, and would represent a catastrophic burden for Puerto Rico's people and its economy.

While Garcia directed the issuance of billions in COFINA bonds as well as GDB notes from 2009 to 2011, his former employer, Santander, earned millions as a lead or participating underwriter in these transactions. Santander is a major COFINA bondholder and has publicly petitioned the Junta asking that Puerto Rico not be forgiven its toxic debts. Santander's revolving door with the GDB in the crucial years leading up to the island's bond defaults have created major conflicts of interest with the Puerto Rican government.

The conflicts of interest now extend to Carlos M. Garcia in his role on the PROMESA control board. Garcia's relationship with Santander and his role at the GDB under the Fortuño administration compromise his ability to implement a fair fiscal program that addresses the humanitarian needs of the Puerto Rican people. Sadly, Garcia has been given another opportunity to help address the debt crisis with the same failed formula that he used to exacerbate it: divert Puerto Rico's public resources to Wall Street creditors, cut critical public spending, and put private interests in control of infrastructure projects vital to the public's wellbeing. Garcia must step down from the Junta, and Puerto Rico must be forgiven of its toxic debt that he helped to create.

## PRIVATIZATION OF TELEPHONE COMPANY CREATES INFRASTRUCTURE FUND AND PAYS BIG FOR INVESTORS

to pay when due the principal of, and interest on, the 2000 Series Bonds."[xvii]
Proceeds from the bond issue went to fund PRASA projects throughout Puerto
Rico, consistent with the mission of the Corpus Account.

Over the next eight years, investment income from the Corpus Account was
applied to pay principal and interest on the 2000 Series Bonds. Most of the
bonds, which carried interest rates between 4.1% and 5.5%, were set to mature
in 25 to 40 years with about 5% of the bond principal tied to variable interest
rates. As these bonds were paid off, the $1 billion in the Corpus Fund was
intended to secure borrowing for additional water and sewer projects.[xviii]

Meanwhile, the privatization of the phone company proved very profitable for
the private investors. The lead investor, GTE merged with Bell Atlantic to
become Verizon, which sold its 52% stake in the Puerto Rican telephone
company to Carlos Slim's America Movil in 2007 for $980 million, booking a
pre-tax gain of $120 million.[xix]

## GARCIA AND SANTANDER'S RISE IN PUBLIC FINANCE IN PUERTO RICO

On November 4, 2008, Luis Fortuño was elected governor of Puerto Rico as
the New Progressive Party (NPP) was swept into power. Nine days later
Fortuño tapped Carlos M. Garcia, the President and COO of Banco Santander
de Puerto Rico, to run the island's GDB. At the same time, Fortuño tapped
former Santander executive Jose Ramon Gonzalez to serve on his Economic
Reconstruction and Fiscal Advisory Committee, which was tasked with
creating a plan to resolve the island's cash-flow problem and setting
parameters for public-private partnerships (PPPs).[xx]

Even before leaving his position at Santander, Garcia began to work for
Fortuño's transition government. Garcia accompanied Fortuño on a visit to

Wall Street in December 2008 to meet with rating agencies and bond investors. There, Garcia and Fortuño tried to reassure the bond market that they had a plan to address the island's fiscal situation.[xxi] Days later, Garcia received a $1.25 million payment from Grupo Santander as part of a severance agreement.[xxii]

As they took power on January 2, 2009, Governor Fortuño and Garcia moved swiftly to implement dramatic changes to the island's fiscal policy, which included liquidating the infrastructure fund. The new administration helped enact numerous laws that tied government cuts to questionable financial engineering techniques.[xxiii] Law No. 3, passed less than two weeks after Fortuño took office and Garcia took control of the GDB, enabled one of the most important new policies. Law No. 3 overturned a previous statute that had established the $1.2 billion Corpus Account. The new law authorized the sale of the infrastructure fund's securities.[xxiv]

## AUSTERITY AND PRIVATIZATION IN 2009

The liquidation of the infrastructure fund was part of a larger fiscal overhaul of Puerto Rico, driven by the local control board, the GDB and the Fortuño administration. Together they enacted policies that laid of tens of thousands of public employees and that privatized public assets. In March 2009, Law No. 7 created a "local control board" to execute a fiscal stabilization plan that included "measures to provide the liquidity required to guaranty the essential services to the people of Puerto Rico and to fund the extra-constitutional debt."[xxv] To provide that liquidity, the administration took steps like unilaterally suspending union contracts, overriding labor laws to dismiss public employees, and denying job protections to union workers.[xxvi]

Garcia's GDB also began to aggressively promote public-private partnerships (PPPs) in lieu of the public fund for infrastructure development.[xxvii] PPPs

typically involve entering into long-term contracts with a private company to induce the company to finance, build, or operate a public service. The private company gets paid through charges paid by users, or from payments from the public authority, or a combination of both.[xxviii] Vast arrays of experiences in infrastructure development projects through PPPs over decades have shown their potential risks and expense to governments. PPPs can expose the public to the possibility of incomplete contracts, the likelihood of renegotiations, and to liabilities in case of bankruptcy or default by the private company.[xxix]

Garcia was appointed head of Puerto Rico's new Public-Private Partnerships Authority (PPPA) while at the GDB. The Authority privatized the Luis Muñoz Marín International Airport, and launched school modernization, toll and many other initiatives.[xxx] According to his resume, Garcia chaired the implementation of five major infrastructure projects while at the PPPA. The only water-related infrastructure project he headed, called "Implementation of Advanced Technologies for the Reduction of Non-Revenue Water in Puerto Rico," sought private sector support to improve PRASA's revenue collections to counter "water theft."[xxxi]

## LOOTING THE INFRASTRUCTURE FUND

The infrastructure fund was liquidated after the enactment of Law No. 3, which allowed the GDB under Garcia to sell all the securities in the Corpus Account.  According to a presentation Garcia gave to Puerto Rican creditors in 2010, the sale "took advantage of market dislocations and provided a significant one-time gain to the Government."[xxxii]

This gain from the sale of securities however was not used to fund water and sewer projects needed by Puerto Rico. Instead the amount raised was $1.95 billion in cash, of which $1.2 billion went to pay off the original PRIFA bondholders from 2000. After paying the bondholders $766 million remained,

from which approximately $310 million was siphoned off to cover Commonwealth budget deficits and $155 million was used to recapitalize the GDB.[xxxiii] That left $300 million for the original Corpus Account. This amount was deposited with the GDB and the GDB in return provided the infrastructure fund with a "guaranteed investment contract," which was supposed to have the GDB pay back the Corpus Account approximately $1.2 billion by 2040.

This transaction was, as Law No. 3 stated without irony, "consistent with the original purpose of said Act No. 92, since they both share the objective of protecting the Corpus Fund so that in 2040, said Fund shall have $1.2 billion for the benefit of the People of Puerto Rico."[xxxiv] However, the remaining $300 million could not be used for infrastructure development as it was tied up in a GDB contract, not unlike how a purchaser of a Certificate of Deposit (CD) account cannot spend their investment while it is deposited with the bank.

## GARCIA GDB GOES ON BORROWING AND REFINANCING BINGE

During Garcia's tenure the GDB moved from its previous role as an agent for infrastructure lending and economic development to taking a lead role in deficit financing among the Commonwealth and its related entities.[xxxv] With the profits from the sale of the Corpus Account securities, Garcia's GDB was able to recapitalize itself and go on a borrowing and refinancing binge. Between December 2008 and 2009, the GDB sold $2.8 billion in notes and it sold another $2.8 billion in the same period between 2009 and 2010.[xxxvi] In total the GDB issued roughly $11 billion in notes, mostly during Fortuño's administration, and half of that remained outstanding by 2013.[xxxvii]

Santander Securities and other local banks took the lead in underwriting these notes, earning underwriting fees and profits by selling them to their customers and placing them elsewhere in the secondary market. For example, Santander acted as a lead underwriter of four GDB bond issues worth $4.6 billion between December 2008 and 2011, sharing in over $43 million in underwriter's discount and fees.[xxxviii]

While these GDB notes were marketed all over the world, about half were sold in Puerto Rico by Santander and other banks to local investors.[xxxix] Many Santander customers held and continue to hold the notes indirectly through their purchase of shares in the bank's "First Puerto Rico" closed-end mutual funds. The investments are now worth a small fraction of their initial value and local investors have lost millions as the GDB has declined into insolvency. [xl]

## THE INFRASTRUCTURE AND PENSION FUNDS GET STUCK WITH "COFINA CAB" IOU'S

Even the Corpus Account's remaining $300 million on deposit at the GDB proved too tempting for the financial engineers in the Fortuño administration. In 2011, the legislature passed Law No. 96, which took $162.5 million of money left in the Corpus Account and applied it to shore up the public employees' pension plan,[xli] which in turn, had been previously leveraged in 2008 through several bond issues that Santander and other banks had helped underwrite and profited from.[xlii]

The $162.5 million was not actually made available to the pension fund to pay benefits, instead, it was invested in a COFINA capital appreciation bond series [xliii] that would accrete interest at 7% but would not be mature until 2043 through 2048.[xliv] The accreting interest on these bonds meant that at

maturity they would be worth $1.65 billion, representing a gain of more than ten times their initial amount.[xlv]

Law No. 96 also obliged the remaining $165 million left in the Corpus Account to be invested in the same COFINA capital appreciation bonds; noting "it is projected that the maturity value of each one of these COFINA bonds shall be of approximately $1.2 billion, thus achieving the purpose of protecting the Fund's Corpus Account."[xlvi] In reality, Law No. 96 allowed the GDB to leave the Corpus Account with nothing but an expensive IOU payable in the distant future.

It is difficult to imagine that the GDB genuinely believed toxic COFINA Cabs assigned to the Corpus Account and the pension fund would be repaid at maturity.[xlvii] This should raise questions about why the GDB stuck the infrastructure and the public employees pension funds with these dubious IOUs. It's possible that the GDB may have calculated that it would be able to refund these high cost bonds as early as 2016,[xlviii] but Puerto Rico has now defaulted on its debt and the GDB has become insolvent.

In summary, the bulk of proceeds from the privatization of a profitable, publicly owned telephone company, earmarked for crucial Puerto Rican water projects, has been turned into paper dust. The Corpus Account no longer funds infrastructure development, but consists of a bond notes due in 2043 that are obligations of COFINA and ultimately, the Puerto Rican sales and use taxpayers.

## AUSTERITY AND PRIVATIZATION IN 2017, A CASE OF DÉJÀ VU

Early in 2016, Garcia testified to Congress in favor of creating another control board to address Puerto Rico's fiscal crisis. In his testimony he asserted that the

"continued service" of his previous local control board (2009-2011) would have averted the "re-enacted Puerto Rico crisis." He said it had failed in two areas, to reform and overhaul Puerto Rico's labor law and its government agencies, implying that he favored further attacks on collective bargaining, pensions and privatization of public assets.[xlix] Within months of this testimony the Obama White House announced the appointment of seven individuals including Garcia to a new PROMESA control board that would supervise Puerto Rico's fiscal affairs and restructure its debt.

Since the Junta has been established, Puerto Ricans have been subjected to new austerity measures, which have been designed in part to appease Wall Street creditors. Under current-Governor Ricky Rosselló, Law No. 4 or the Labor Transformation and Flexibility Act was enacted. This Act dramatically weakens existing labor rules, including working time, compensation and benefits for Puerto Rican workers.[l] House Bill No. 938, signed into law April 29, 2017, nullifies collective bargaining agreements and permanently limits employee benefits in the public sector.[li]

The Junta has pushed harder for austerity than Governor Rosselló, requesting $3 billion in spending reductions over two years, half of which are aimed essential services: $1 billion in healthcare cuts, $300 million in education cuts, and $200 million in cuts to the pension system.[lii] The Junta has called for even deeper budget cuts by 2021 that include $1.3 billion in personnel spending and gutting nearly half of the University of Puerto Rico's budget: $450 million. The Junta has all but ignored stimulus, with the exception of including spending on public-private partnerships in its fiscal plan.[liii] This is more bad news for Puerto Ricans, who need higher wages and good jobs to deal with skyrocketing costs.

## SANTANDER PRESSURES JUNTA TO ENSURE COFINA DEBT IS PAID

Meanwhile, Santander has become an activist in pressuring the Junta to order repayment of the COFINA bondholders. In March 2017, Santander joined all major creditors of Puerto Rican debt in writing to the PROMESA control board, complaining that its fiscal plan did not take their concerns into account. Santander signed onto the letter as one of three major COFINA bondholders through its First Puerto Rico family of closed-end mutual funds, which held in $3.65 billion in bonds issued by COFINA and $1.8 billion in GO bonds issued or guaranteed by the Commonwealth of Puerto Rico.[liv]

As members of the Junta, former Santander executives Carlos Garcia and Jose Ramon Gonzalez will play a significant role in the negotiations that will determine whether and how these debts have to be repaid.[lv]  They should not be repaid—even in part. The Junta should ignore the pleas of conflicted creditors like Santander. Instead, the COFINA bonds and GDB notes held and managed by Santander on behalf of its Puerto Rican customers should be canceled and the customers should be repaid in full, directly from Santander, which as a global concern earned $1.8 billion Euros in the first quarter of 2017 alone.

## CONCLUSION

Partner Paper No. 5: The Looting of Puerto Rico's Infrastructure Fund. Class 03 Page 4 of 24
Case 3:17-cv-02831 Document 1-9 Filed 03/13/17 Page 4 of
Exhibit Articles   Page 37 of 52

Garcia's GDB directed the issuance of billions in notes and COFINA bonds, diverting funds originally intended for vital sewer and water treatment projects into unpayable high-cost debt. As a result, Puerto Rico's capacity to deal with Zika and other mosquito-born virus epidemics has been diminished and it is being told to rely on the private sector.[lvi] Puerto Rico has also been prevented from funding other crucial public services by the diversion of sales taxes to secure and repay bad debt deals like COFINA Cabs. As stated earlier, even partial repayment of COFINA bonds amounts to a catastrophic burden for the people and the economy of Puerto Rico.

Santander must be held accountable for its role in promoting and profiting from Puerto Rico's troubled transactions. The bank served as lead underwriter of four GDB bond issues worth $4.6 billion between December 2008 and 2011, earning over $43 million in underwriter's discount and fees.[lvii] Garcia has also personally profited from his close relationship with Santander, where he worked immediately before and after his tenure at the GDB, receiving a $1.25 million severance payment from the bank prior to joining the Fortuño administration.[lviii]

> ## Santander must be held accountable for its role in promoting and profiting from Puerto Rico's troubled…
>
> CLICK TO TWEET

Like Santander, Garcia appears to strongly support the segregation of the COFINA bond obligations, much of which is held in costly capital appreciation bonds, and the continuing use of sales tax revenue to pay the COFINA bonds back, as noted in his PROMESA testimony on Capitol Hill in 2016.[lix] Santander is a major COFINA bondholder petitioning the Junta to ensure that it recovers its investments. Garcia's conflicts of interest raise troubling

questions about whether the very individuals involved in creating and profiting off of the debt should be allowed to insist that others must now pay it off.

The Junta has subjected Puerto Ricans to many controversial austerity measures, but has been mostly silent on direct stimulus, with the exception of questionable public-private partnerships for infrastructure development.[lx] The austerity approach will fail in Puerto Rico just as similar approaches have failed in Greece and Portugal.[lxi] To help Puerto Rico recover, there must be direct economic stimulus—which appears unlikely unless banks like Santander and private bank executives like Carlos Garcia are held accountable for their role in helping drown Puerto Rico in unpayable public debt.

## FOOTNOTES

[i] We use Santander to mean Banco Santander, SA, and all its affiliates. In Puerto Rico, for much of the period of time covered in this report, Santander BanCorp was the parent bank holding company for Banco Santander Puerto Rico, which had several subsidiaries.

[ii] See "Pirates of the Caribbean: How Santander's Revolving Door with Puerto Rico's Development Bank Exacerbated a Fiscal Catastrophe for the Puerto Rican People," HedgeClippers and Committee for Better Banks.

[iii] See GDB Presentation dated June 10, 2010 about policies enacted in the previous 16 months, p. 7. The local control board had a two-year mandate. Members of the board included the chair, Carlos M. Garcia, Chairman of the GDB, the Secretary of the Treasury, The Director of the Office of Management and Budget, the Secretary of Labor, and the Secretary of Economic Development and Commerce. See Carlos Garcia testimony on February 2, 2016 before the Subcommittee on Indian, Insular and Alaska

Native Affairs of the Committee on Natural Resources of the U.S. House of Representatives, "The Need for the Establishment of a Puerto Rico Financial Stability and Economic Growth Authority." For Carlos Garcia heading PPPA, see here.

[iv] See PROMESA control board's Fiscal Plan Targets, January 28, 2017.

[v] "We wish to highlight the absolute necessity of updating the water distribution and treatment system in Puerto Rico, especially under the prospect of the imposition of a control board like the one imposed on Flint, Michigan." See Society for Medical Anthropology's Zika Interest Group Public Statement on Zika Virus in Puerto Rico.

[vi] See Study for the Project, "Implementation of Advanced Technologies for the Reduction of Non-Revenue Water for Puerto Rico Aqueduct and Sewer Authority," RFQ.

[vii] For example, the COFINA Cab bond assigned to the Corpus Account in 2011 with $165 million in principal is supposed to be worth $1.2 billion on maturity in 2048.

[viii] See PRIFA Special Obligation Bonds 2000 Series A&B, p. 3. See "Plan to Sell Puerto Rico Phone Company Leads to Strike," the New York Times, Mireya Navarro, June 19, 1998. The money from the sale ($1.8 billion) was to pay off the telephone company's current debt, finance certain retirement and health care benefits for company employees, and establish a $1 billion fund to invest in public works like sewerage and water distribution systems. "We have worked to maintain Puerto Rico Telephone at its present level and have shown ourselves to be productive workers, and the people of Puerto Rico know it," said Olga Grajales, 43, a striker who works in the billing and collections department. "The people know that really what they're doing is a theft."

[ix] See Act No. 92, p. 4.

[x] Pedro Rosselló, who served as Governor during this time, is the father of Puerto Rico's current Governor, Ricky Rosselló.

[xi] See "Puerto Rico Paralyzed by Strike over Phone Company Sale," Washington Post, Guy Gugliotta, July 8, 1998.

[xii] Telecomunicaciones de Puerto Rico, Inc., Form S-4/A as filed with the SEC 09-27-1999, pp. 25-26.

[xiii] See PRIFA issuance of 2000 Series A&B Special Obligation Bonds, p. 2.

[xiv] See Commonwealth of Puerto Rico's Series 2004 Tax and Revenue Anticipation Notes, p. I-41, and Puerto Rico Infrastructure Financing Authority Act, p. 31.

[xv] See Puerto Rico Public Financing Corporation 2004 Series B Bonds, Commonwealth Appropriation Bonds, p. I-38.

[xvi] See PRIFA Special Obligation Bonds 2000 Series A&B, p. 15

[xvii] See PRIFA Special Obligation Bonds 2000 Series A&B, p. 11.

[xviii] See PRIFA Special Obligation Bonds 2000 Series A&B, second page of filing.  Also see Act 92 for intent of the Corpus Fund.

[xix] See Fitch: TELPRI Rating Unaffected by America Movil Acquisition and Verizon Communications, Inc. 10Q for quarterly period ending March 31, 2007.

[xx] Carlos M. Garcia was appointed President and COO of Santander BanCorp on August 28, 2008, the same time when Jose Ramon Gonzalez stepped down as President and CEO. On November 13, 2008, it was

announced that Garcia would head the GDB and Gonzalez would be part of the Governor's Committee. See "Jose Ramon Gonzalez resigns from his position at Banco Santander," PR Newswire, August 29, 2008. See "Four Bankers in Fortuno's Economic Reconstruction & Fiscal Advisory Committee," Caribbean Business, Jose L. Carmona, November 13, 2008. Gonzalez was also head of the GDB in the late 80s in Puerto Rico.

[xxi] "Puerto Rico Panel Readies New Projections," The Bond Buyer, Michelle Kaske, December 19, 2008. See also profile at Revolvy.com.

[xxii] See Termination Agreement between Banco Santander and Carlos Garcia at SEC.gov.

[xxiii] Changes in policy allowed the Commonwealth's to issue more and increasingly risky debt deals that relied on controversial features such as capital appreciation bonds, capitalized interest, and interest rate swaps.  These generated more fee income for Santander's and other banks' underwriting business. See "Pirates of the Caribbean: How Santander's Revolving Door with Puerto Rico's Development Bank Exacerbated a Fiscal Catastrophe for the Puerto Rican People," HedgeClippers and Committee for Better Banks. See also Tom Sgouros, "Predatory Public Finance," The Journal of Law in Society, Vol. 17:1 (2014).

[xxiv] See Law No. 3.

[xxv] See Carlos Garcia testimony "The Need for the Establishment of a Puerto Rico Financial Stability and Economic Growth Authority," on February 2, 2016 before the Subcommittee on Indian, Insular and Alaska Native Affairs of the Committee on Natural Resources of the U.S. House of Representatives.

[xxvi] See "Puerto Rico in Crisis: Government Workers Battle Neoliberal Reform," NACLA, Yarimar Bonilla and Rafael A. Boglio Martínez.

[xxvii] See "GDB locks up the 'piggy bank,' Caribbean Business, Carlos Marquez, January 29, 2009.

[xxviii] See "WHY PUBLIC-PRIVATE PARTNERSHIPS DON'T WORK: The many advantages of the public alternative," David Hall, PSIRU, January 2014. See "Government Objectives: Benefits and Risks of PPPs," World Bank Group.

[xxix] See "WHY PUBLIC-PRIVATE PARTNERSHIPS DON'T WORK: The many advantages of the public alternative," David Hall, PSIRU, January 2014, p.46.

[xxx] See FAA Approves PPP for Airport, December 23, 2009, and other announcements on the PPPA website.

[xxxi] See Study for the Project, "Implementation of Advanced Technologies for the Reduction of Non-Revenue Water for Puerto Rico Aqueduct and Sewer Authority," RFQ.

[xxxii] See Carlos M. Garcia GDB presentation at Puerto Rico Credit Conference 2010, February 25-26, 2010, p. 14.

[xxxiii] See Carlos M. Garcia GDB presentation at Puerto Rico Credit Conference 2010, February 25-26, 2010, p. 14.

[xxxiv] Act No. 3 (H.B. 600), approved January 14, 2009, p. 2.

[xxxv] See "The Sinking of the GDB," Caribbean Business, Philipe Schoene Roura & Luis. J. Valentin, June 13, 2016.

[xxxvi] See GDB bond issuances on GDB website here.

[xxxvii] Note that when Carlos Garcia left the GDB at the end March 2011, he was replaced as President by Juan Carlos Batlle, another Santander executive.

[xxxviii] See $1.796B GDB 2011 Series H & I ($16,580,422.10 in underwriting fees, Santander lead), see $1.356B GDB 2009 Series C &D ($14,279,323.76 in underwriting fees, Santander joint lead with UBS and Popular), see $250M GDB 2009 Series A ($2,390,000 in underwriting fees, Santander joint lead with UBS and Popular), and see $1.230B GDB 2008 Series A & B ($10,301,958.16 in underwriting fees, Santander joint lead with UBS and Popular).

[xxxix] See "The Sinking of the GDB," Caribbean Business, Philipe Schoene Roura & Luis. J. Valentin, June 13, 2016.

[xl] See "The Sinking of the GDB," Caribbean Business, Philipe Schoene Roura & Luis. J. Valentin, June 13, 2016.

[xli] Act No. 96-2011 (H.B. 3336).

[xlii] See "Pirates of the Caribbean: How Santander's Revolving Door with Puerto Rico's Development Bank Exacerbated a Fiscal Catastrophe for the Puerto Rican People," HedgeClippers and Committee for Better Banks.

[xliii] See for example Refund America, "Puerto Rico's Payday Loans."

[xliv] See PRIFA Revenue Bonds (Ports Authority Project) Series 2011.

[xlv] See Commonwealth of Puerto Rico Comprehensive Annual Financial Report Year Ended June 30, 2011, Pension Reform section.

[xlvi] Act No. 96-2011 (H.B. 3336).

[xlvii] Puerto Rico created COFINA in 2006 when it was in desperate need of money, but unable to issue debt because it had run up against its 15%

constitutional debt limit. The sales tax revenue bond allowed the island to issue new bonds that would not count against the 15% limit. By 2011, an extraordinary amount of debt was being issued by Puerto Rico, including in COFINA capital appreciation bonds (CABs). Refund America estimates that Puerto Rico has $37.8 billion in CAB debt, for which the underlying principal is just $4.3 billion, an effective interest rate of 785%. Refund America also estimates that $36.9 billion of Puerto Rico's debt is COFINA debt, and 63% of total CAB debt belongs to COFINA. Refund also states the investors (including hedge funds) that now own CAB debt bought the debt at steep discounts on the secondary market because the previous creditors had already written in down as bad debt, meaning the current owners (including hedge funds) never expected the island to be able to repay all of it. Moreover, the sheer magnitude of the size of this debt at maturity (in the distant future) and the effective interest rate raises the question about whether the GDB expected to be able to repay it at all, as well. See "Opinion: COFINA deal is huge blow to dwindling appeal of Puerto Rico's bonds," Ivan Rivera, FoxNews, May 2, 2016 and "Puerto Rico's Payday Loans," Refund America.

[xlviii] The bond documents state that the issuer had option to redeem them as early as 2016.

[xlix] See Carlos Garcia testimony "The Need for the Establishment of a Puerto Rico Financial Stability and Economic Growth Authority," on February 2, 2016 before the Subcommittee on Indian, Insular and Alaska Native Affairs of the Committee on Natural Resources of the U.S. House of Representatives.

[l] See "Puerto Rico: Major labor law and benefit reforms aim for flexibility and competitiveness," Willis Towers Watson, March 27, 2017.

[li] "House Bill 938 Would Void Right to Collective Bargaining," Caribbean Business, Cindy Burgos Alvarado, April 26, 2017. The bill was signed into law

Partner Paper No. 5 The Looting of Puerto Rico's Infrastructure Fund, Carlos M. Garcia...
Case:17-03283-LTS Doc#:820-2 Filed:08/01/17 Entered:08/01/17 13:08:03 Page:22 of 24

Exhibit Articles    Page 45 of 52

on April 29, 2017. See footnote 10 of Statement of Oversight Board in Connection with PROMESA Title III Petition.

[lii] See "Puerto Rico Oversight Board Appears Doomed to Recycle Failed Austerity Schemes," Javier Balmaceda, Forbes DebtWire, March 22, 2017.

[liii] See "AGC-Puerto Rico Sets Eyes on Infrastructure," Caribbean Business, Philipe Schoene Roura and Eva Lloréns Vélez, March 30, 2017.

[liv] See Joint Creditor Letter to Oversight Board on Fiscal Plan for Puerto Rico, March 27, 2017. See also "Bondholders Attack Fiscal Plan," El Nuevo Dia, Joanisabel Gonzalez, March 28, 2017.  Also in November 2016 Santander joined Franklin Advisers and OppenheimerFunds in asking a federal judge to enter them as defendants in a lawsuit brought by hedge funds holding general obligation bonds. Santander, Franklin and Oppenheimer are "cross-holders in $3.6 billion in COFINA claims and $1.1 billion in GO claims."

[lv] The Junta will remain the lead negotiator with the creditors through the PROMESA debt refinancing process that was recently invoked. See "Our Bankrupt Policy for Puerto Rico," David Dayen, The American Prospect, May 8, 2017.

[lvi] "We wish to highlight the absolute necessity of updating the water distribution and treatment system in Puerto Rico, especially under the prospect of the imposition of a control board like the one imposed on Flint, Michigan." See Society for Medical Anthropology's Zika Interest Group Public Statement on Zika Virus in Puerto Rico.

[lvii] See footnote 17.

[lviii] After leaving the GDB, Garcia became a director and senior executive vice president of Santander Bank in the United States. See resume here. See

Termination Agreement between Banco Santander and Carlos Garcia at SEC.gov.

[lix] See Carlos Garcia testimony "The Need for the Establishment of a Puerto Rico Financial Stability and Economic Growth Authority," on February 2, 2016 before the Subcommittee on Indian, Insular and Alaska Native Affairs of the Committee on Natural Resources of the U.S. House of Representatives.

[lx] See PROMESA Control Board's Fiscal Plan for Puerto Rico, March 13, 2017.

[lxi] See "IMF admits: we failed to realise the damage austerity would do to Greece," The Guardian, Larry Elliott, Phillip Inman and Helena Smith, June 5, 2013.



CATEGORIES:

Budget Cuts, Carlos Garcia, HedgePapers, Luis Fortuño, Privatization, Puerto Rico, Santander

SHARE

← PREVIOUS                                    NEXT →

## WHO ARE THE HEDGECLIPPERS?

*The Hedge Clippers are working to expose the mechanisms hedge funds and billionaires use to influence government and politics in order to expand their wealth, influence and power. We're exposing the collateral damage billionaire-driven politics inflicts on our communities, our climate, our economy and our democracy. We're calling out the politicians that do the dirty work billionaires demand, and we're calling on all Americans to stand up for a government and an economy that works for all of us, not just the wealthy and well-connected.*

ENGLISH VERSION

# Former judge insists Congress must investigate debt issues

The expert sees possible violations of federal law

Tuesday, May 2, 2017 - 11:08 AM

By Joanisabel González



Former bankruptcy-specialized Puerto Rican judge Gerardo A. Carlo-Altieri. (Archive/GFR)

Former bankruptcy-specialized Puerto Rican judge Gerardo A. Carlo-Altieri said it is time for the US Congress to probe the issues of Puerto Rican debt, given the possible violations of federal law and conflicts of interest.

## Relacionados:

# Exjuez insiste en que el Congreso debe investigar las emisiones de deuda

With the end of the automatic stay on litigations provided by PROMESA, which gives rise to multiple legal battles against the Island, Carlo-Altieri said that the Congress, which gave Puerto Rico a remedy for bankruptcy without equal on US soil and created the Fiscal Oversight Board (OB), must also inquire on Puerto Rico's debt.

"I don't know why it hasn't been fully studied whether someone may be found guilty, **but there are insurance companies who insured some of the law firms that issued opinions. These alleged to have based theirs on the opinion of the secretary of Justice, but these are matters that should be litigated,"** said Carlo-Altieri when asked whether the judge who should preside over the renegotiation of Puerto Rico´s debt may request an audit on the debt to rule on the matter.

PUBLICIDAD

According to Carlo-Altieri, beyond invalidating any part of the debt, probing the matter will also serve to "clear the air" in the face of accusations of conflict of interest and inappropriate actions that involve from members of the OB to the investment banks who have structured the Island's debt.

Section 411 of PROMESA directs the General Accounting Office (GAO) to prepare a report on Puerto Rico's debt and send it to Congress, but it doesn't establish any instructions to investigate the matter.

For Carlo-Altieri, who during his career presided over the United Bankruptcy Court District of Puerto Rico and was a bankruptcy panel member of the First Circuit of Appeals, there are too many questions around the reliability of the government's figures and

2

the manner in which the debt was issued that urge investigating the matter.

As an example, Carlo-Altieri recalled that credit rating companies issued a credit rating for Puerto Rico in 2014 to issue close to $3.5 billion without financial statements, which would be contrary to federal securities' regulations.

Further, he said, that governments adopted the practice of issuing debt to pay for operating expenses, which would be forbidden by the Constitution.

"The mess existing in Puerto Rico with figures and numbers is impressive," added Carlo-Altieri.

Switching chairs

Additionally, the former judge said that the OB has given instructions for cuts to the government's operations as well as those of the University of Puerto Rico without any audited financial statements, while "inventing" the concept of "bridge report" which uses as its basis "false" numbers from fiscal years 2012 to 2014 to justify the steps that will be taken.

Above all, Carlo Altieri said that following the approval of PROMESA, they now participate in the restructuring of the debt they helped create.

**"We have professionals with conflict. Those approving the negotiations have participated in many of the issues,"** said dijo Carlo-Altieri, by indicating that in the case of PROMESA they are failing to apply the regulations on conflict of interest that apply in bankruptcy procedures.

All these matters take on a particular light since midnight, when Puerto Rico lost the protection awarded by PROMESA and which for the past eight months prevented multiple bondholders from demanding their claims from the government before a judge.

3

**El Nuevo Día** reported on Sunday that in the absence of a substantive agreement between Puerto Rico and its attorneys, the financial and economic future of the Island will fall into the hands of the federal justice system. This situation will result in an avalanche of suits against the Island or the possibility that a state government may petition for a remedy akin to the bankruptcy processes that people, companies or governments appeal to when they're unable to pay their debts. In the space of governments, notwithstanding, there applies that provided in Chapter 9 of the US Bankruptcy Code, but it only applies to municipal governments or public corporations. In this sense, the US Congress afforded Puerto Rico a unique treatment when it granted the central government the opportunity to seek a remission among constitutional bondholders.

PUBLICIDAD

According to the also academic Vice President of Ibero American Institute of Insolvency Law in Spain, in bankruptcy processes, experts are retained to understand the situation and make decisions on legal grounds, but immediately thereafter, he said that the multiple controversies regarding the conditions under which Puerto Rico has issued debt throughout the years makes it necessary to take regulatory and investigative actions.

He explained that one possibility could be a committee to audit the debt. Said claim by citizens, said the former judge, first arose in Brazil, where attempts were made to approve a law that ended nowhere after a decade. In Ecuador, the process forced creditors to sit at the negotiation table.

In the case of Puerto Rico, said Carlo-Altieri, the effort would have failed, because the make of the committee as created was flawed and the body "has no teeth."

Last year, during congressional hearings, the Securities and Exchange Commission (SEC) said it was examining the matter. El Nuevo Día reported last year that the regulator was investigating debt issues by the Puerto Rico Electric Power Authority (PREPA), but the results of that investigation are unknown. Prior to that it did

4

the same with the issue by the Pensions Systems' Administration (ASR, by its Spanish acronym), but the regulator found no reasons to intervene, according to sources of this daily.

"The other possibility would be for the SEC to investigate, but the SEC was asleep and it remains to be seen up to what point it turned a blind eye when this was happening. **What this truly deserves is a congressional probe, that investigates brokerage houses, the law firms, government officials and the companies that did the marketing of course, the accountants who issued the opinions,**" said Carlo-Altieri.