**Hearing Date:** June 28, 2017, at 9:30 a.m.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## OBJECTION OF THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS TO MOTION OF DEBTORS FOR ORDER APPROVING PROCEDURE TO RESOLVE COMMONWEALTH-COFINA DISPUTE

---

[1]      The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); and (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474).

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

      A.     Constitutional Debt ......................................................................... 3

      B.     COFINA ......................................................................................... 4

      C.     PROMESA ...................................................................................... 6

      D.     Lex Claims ..................................................................................... 7

      E.     The Fiscal Plan ............................................................................... 8

      F.     These Title III Cases ...................................................................... 8

      G.     The Board Procedure ...................................................................... 9

ARGUMENT ..................................................................................................................... 10

I.     THE COURT SHOULD REJECT THE OVERSIGHT BOARD'S PROPOSAL
THAT THE BOARD ALONE MAY APPOINT THE COMMONWEALTH'S
AGENT ................................................................................................................... 10

      A.     Due Process Requires That The Commonwealth's Agent Adequately
Represent The Commonwealth's Creditors .......................................... 11

      B.     The Board Procedure Does Not Ensure Adequate Representation Of The
Commonwealth's Creditors ................................................................. 12

      C.     The Court Should Not Adopt Any Version Of The Board Procedure Until
It Has Appointed The Commonwealth Agent ....................................... 15

II.    THE COURT SHOULD REJECT THE OVERSIGHT BOARD'S PROPOSAL
TO MAKE ITSELF THE SOLE ARBITER OF ANY SETTLEMENT ......................... 17

III.   THE COURT SHOULD REJECT THE BOARD'S UNSUPPORTED CLAIMS
OF A LIQUIDITY CRISIS ....................................................................................... 18

IV.   SHOULD THE COURT AUTHORIZE ANY VERSION OF THE BOARD
PROCEDURE, IT SHOULD CLARIFY THAT THE BOARD PROCEDURE
DOES NOT AFFECT RIGHTS OF JOINDER AND APPEAL ................................... 20

## <u>TABLE OF CONTENTS—CONTINUED</u>

**Page**

V.      THE COURT SHOULD NOT ENDORSE THE BOARD'S SPECULATION
ABOUT THE RECOVERIES OF THE COMMONWEALTH'S CREDITORS IN
ANY PLAN OF ADJUSTMENT ...................................................................................... 21

CONCLUSION ............................................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ........................................................................ 12

*Duling v. Gristede's Operating Corp.*,
    267 F.R.D. 86 (S.D.N.Y. 2010) .................................................................... 12

*Hansberry v. Lee*,
    311 U.S. 32 (1940)........................................................................................ 11

*In re Commodore Int'l Ltd.*,
    262 F.3d 96 (2d Cir. 2001) ...................................................................... 16, 17

*In re Gibson Grp., Inc.*,
    66 F.3d 1436 (6th Cir. 1995) ....................................................................... 17

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    827 F.3d 223 (2d Cir. 2016) ........................................................................ 12

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016)......................................................... 18

*Lex Claims, LLC v. Fin. Oversight & Mgmt. Bd.*,
    853 F.3d 548 (1st Cir. 2017)........................................................................ 7

*Lex Claims, LLC v. García-Padilla*,
    --- F. Supp. 3d ---, 2017 WL 657432, (D.P.R. Feb. 17, 2017) ................... 7

*Lorber v. Vista Irrigation Dist.*,
    127 F.2d 628 (9th Cir. 1942) ...................................................................... 24

*Taylor v. Sturgell*,
    553 U.S. 880 (2008)............................................................................... 11, 15

**Constitutional Provisions**

P.R. Const. art. VI, § 2 ................................................................................. 4, 25

P.R. Const. art. VI, § 6 ..................................................................................... 4

P.R. Const. art. VI, § 7 ..................................................................................... 4

P.R. Const. art. VI, § 8 ..................................................................................... 3

# TABLE OF AUTHORITIES—CONTINUED

Page(s)

**Statutes and Rules**

11 U.S.C. § 362 ............................................................................................................. 8

11 U.S.C. § 1102(a)(4) ................................................................................................. 16

11 U.S.C. § 1109(b) ..................................................................................................... 17

11 U.S.C. § 1129(b)(1) ................................................................................................. 24

11 U.S.C. § 1129(b)(2) ................................................................................................. 24

48 U.S.C. § 2121 ........................................................................................................... 7

48 U.S.C. § 2141(b)(1)(B) ........................................................................................... 23

48 U.S.C. § 2141(b)(1)(N) ....................................................................................... 6, 22

48 U.S.C. § 2161(a) .......................................................................................... 8, 17, 24

48 U.S.C. § 2164(a) ....................................................................................................... 7

48 U.S.C. § 2166(e) ................................................................................................ 21, 25

48 U.S.C. § 2170 ......................................................................................................... 17

48 U.S.C. § 2174(b) ........................................................................................... 8, 18, 23

48 U.S.C. § 2174(b)(6) ............................................................................................. 6, 23

48 U.S.C. § 2175(a) ....................................................................................................... 7

48 U.S.C. § 2175(b) ....................................................................................................... 7

13 L.P.R.A. § 12 ............................................................................................................ 5

23 L.P.R.A. § 104(c)(1) ................................................................................................. 4

23 L.P.R.A. § 104(c)(3) ................................................................................................. 4

Fed. R. Civ. P. 19 ........................................................................................................ 25

Fed. R. Civ. P. 19(a)(1) ............................................................................................... 21

Fed. R. Civ. P. 23(c)(1) ............................................................................................... 16

## <u>TABLE OF AUTHORITIES—CONTINUED</u>

**Page(s)**

Fed. R. Civ. P. 23.1(a) ................................................................................. 16

Fed. R. Civ. P. 24 ........................................................................................ 25

Fed. R. Civ. P. 24(a) .................................................................................... 21

Fed. R. Bankr. P. 7019 ................................................................................. 21

Fed. R. Bankr. P. 7024 ................................................................................. 21

Fed. R. Bankr. P. 9019(a) ............................................................................. 17

Jones Act, Pub. L. No. 64-368, 39 Stat. 951 (1917) ....................................... 4

**Other Authorities**

6 *Collier on Bankruptcy* ¶ 943.03[1][f][i][A] ............................................... 24

6 *Collier on Bankruptcy* ¶ 943.03[1][f][i][B] ............................................... 24

7C Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1833 ................... 12

*AAFAF Says Title III Won't Touch Supplier Payments as Treasury Sends out $70M in
Checks This Week*, Reorg Research (May 5, 2017) ................................. 14

*CivicDashboards*, OpenGov, http://www.civicdashboards.com/state/rhode-island-
04000US44/debt_service_ratio ........................................................... 25

*CivicDashboards*, OpenGov, https://www.civicdashboards.com/state/colorado-
04000US08/debt_service_ratio ........................................................... 25

*CivicDashboards*, OpenGov, https://www.civicdashboards.com/state/louisiana-
04000US22/debt_service_ratio ........................................................... 25

*Commonwealth Report Forecasts $1.15B Treasury FY2017 Closing Balance*, Reorg
Research (June 13, 2017) ..................................................................... 19

Factsheet: The Joint World Bank-IMF Debt Sustainability Framework for Low-Income
Countries, International Monetary Fund (March 2016),
http://www.imf.org/external/np/exr/facts/pdf/jdsf.pdf ............................. 25

H.R. Rep. No. 94-686, 94th Cong., 2d Sess. 32-33 (1976) ............................. 24

Restatement (Second) of Judgments § 42 cmt. b .......................................... 16

## <u>TABLE OF AUTHORITIES—CONTINUED</u>

**Page(s)**

*Tax Haul Misses Mark in May, Outpaces 11-Month Estimate by $228.3M*, Reorg
Research (June 20, 2017)........................................................................................................ 19

*The New $1.15 Billion . . . And More*, El Vocero (June 15, 2017) ............................................... 19

## <u>INTRODUCTION</u>

The Ad Hoc Group of General Obligation Bondholders ("<u>GO Group</u>")[2] submits this objection to the *Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (Dkt. 303) (the "<u>Board Procedure Motion</u>"), in which the Financial Oversight and Management Board for Puerto Rico (the "<u>Oversight Board</u>") proposes a procedure (the "<u>Board Procedure</u>") for resolving what it calls the "Commonwealth-COFINA Dispute," which we have previously referred to as the "<u>COFINA Validity Dispute</u>."

With the Board Procedure Motion, the Oversight Board proposes a radical—and quite unnecessary—deviation from normal practice. The Board seeks to make itself the plaintiff, the defendant, and—in certain respects—the judge in the COFINA Validity Dispute. But PROMESA nowhere authorizes such a sweeping arrogation of power. To the contrary, in PROMESA, Congress subjected these cases to established legal procedures. The Court should use those procedures to resolve the COFINA Validity Dispute and, accordingly, deny the Board Procedure Motion.

First, the Court should not permit the Oversight Board to make itself the plaintiff and the defendant. The Board is, as the Court put it (and the Board's counsel agreed), "fundamentally and irretrievably conflicted." 5/17/17 Tr. (Dkt. 207) at 19. If the Commonwealth and COFINA are to litigate the COFINA Validity Dispute, they need representatives other than the Board. For that very reason, the Board should be the last person to choose those representatives. Yet, consistent with its pattern of broad assertions of unilateral authority ever since its appointment, the Board refuses to relinquish control over a dispute it acknowledges it is too conflicted to

---

[2]    The members of the GO Group filing this objection are certain funds or entities managed or advised by Aurelius Capital Management, LP, Autonomy Capital (Jersey) LP, FCO Advisors LP, Monarch Alternative Capital LP, Senator Investment Group LP, and Stone Lion L.P.

litigate.  Thus, under the Board Procedure, the Oversight Board would select representatives for the Commonwealth and COFINA.  And it gets worse:  The Board would choose representatives without review by the Court.  That is not right.  Instead, consistent with due process principles, and with procedure in related contexts, the Court should choose the representatives after considering the nominations and arguments of all interested parties.

Second, the Court should not permit the Oversight Board to make itself the judge.  The Board Procedure would enable the Board, in its sole discretion, to approve any settlement reached by the representatives it picked.  Once again, the Board would retain authority over the resolution of the COFINA Validity Dispute, notwithstanding its acknowledged conflict of interest.  That usurps a key judicial role.  In bankruptcy proceedings, settlements are paramount.  They can also be hotly contested.  That is why bankruptcy law requires courts to approve settlements, after considering the arguments of all interested parties.  The Court should impose the same requirement here, rejecting the Board's call to make *itself* the sole arbiter of any settlement.

Third, the Court should not permit the Board to set the rules of procedure for litigating the COFINA Validity Dispute.  The Board's claim that a resolution of the dispute must be reached by November 1 is based only on the Board's unsupported say-so, and all available evidence suggests that the liquidity difficulties the Board predicts will not come to pass on that date.  In line with ordinary practice, this sort of procedural question should be left to the parties to the litigation.  The Board has no appropriate role to play.

For these reasons, the Court should deny the Board Procedure Motion.  At the very least, should it grant the motion, the Court should clarify that the Board Procedure does not affect any party's right of joinder or appeal (which the Board Procedure does not purport to do).

## BACKGROUND

### A.     Constitutional Debt

The GO Group is composed of beneficial holders of approximately $3 billion of bonds issued or guaranteed by the Commonwealth and backed by a pledge of its good faith, credit, and taxing power.   Accordingly, these bonds qualify as "public debt" under Puerto Rico's Constitution, which triggers a series of interlocking constitutional and statutory protections.   Due to these protections, these bonds are known as "Constitutional Debt."

Constitutional Debt is entitled to an absolute first-priority claim on all of the Commonwealth's "available resources."   Article VI, Section 8, of the Puerto Rico Constitution provides that, "[i]n case the available resources[3] including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the [Constitutional Debt] and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."   This protection expressly places Constitutional Debt above all other expenditures of the Commonwealth.[4]

Given the constitutional mooring of this protection for Constitutional Debt, it cannot be waived or abrogated by legislation.   That the Commonwealth's political branches cannot escape this limitation is confirmed by the history of its Constitution.   Before the adoption of the Constitution, Puerto Rico was governed by the Jones Act, Pub. L. No. 64-368, 39 Stat. 951

---

[3]     The Constitution in English reads "revenues"; in Spanish, it reads "recursos."   The Commonwealth has acknowledged that "recursos" in this context is more accurately translated as "resources."   See, *e.g.*, Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A, at 28 (2014).

[4]     In due course, the GO Group will also establish that the Constitutional Debt is also protected by a statutory lien on all "available resources" and/or certain subsets of those resources.   The Court need not address that issue in connection with this objection, because the Constitutional Debt's status as a secured claim does not bear on the proper disposition of the Board Procedure Motion.

(1917).  The Jones Act permitted Puerto Rico's governor to override the priority given to Puerto Rico's general obligation debt.  *Id.* § 34, 39 Stat. at 962-63.  The framers of Puerto Rico's Constitution intentionally omitted the override clause.

The "order of priorities established by law" to which Section 8 refers is set forth in a Puerto Rico statute.  That statute provides that "the payment of interest and amortizations corresponding to the [Constitutional Debt]" comes first.  23 L.P.R.A. § 104(c)(1).  Consistent with the Constitutional Debt's absolute first claim on all available resources, other obligations of the Commonwealth, including "[p]rotection of persons and property," "[p]ublic education programs," and "retirement systems and payment of pensions," have a lower priority.  *Id.* § 104(c)(3).

Other provisions of the Puerto Rico Constitution reinforce the Constitutional Debt's first-priority claim on all of the Commonwealth's "available" resources, including Article VI, Section 2, which grants holders of the Constitutional Debt the immediate right to compel disposition of the Commonwealth's available resources for payment of their bonds.  See also, *e.g.*, P.R. Const. art. VI, § 7 (requiring a balanced budget); *id.* § 6 (overriding any budget that fails to provide funds for payment of Constitutional Debt); *id.* § 2 (limiting the amount of Constitutional Debt the Commonwealth may guarantee or issue, thereby protecting the Commonwealth's creditworthiness); *id.* (providing that the Commonwealth's power "to impose and collect taxes" shall never be "surrendered or suspended").  In short, Constitutional Debt must be paid first and in full, no matter what.

### B.   COFINA

COFINA is a statutory instrumentality of the Commonwealth.  Its sole purpose is to issue bonds to support the Commonwealth's general public needs and to repay those bonds with certain Commonwealth tax revenue.

COFINA does not have any operations of its own or provide any services to the Commonwealth's citizens.  Instead, the Commonwealth has permitted COFINA to issue vast amounts of bonded indebtedness "off book"—that is, purportedly without regard to the interlocking protections and limitations in the Puerto Rico Constitution described above.  Unlike the Constitutional Debt, bonds issued by COFINA are not backed by a pledge of the Commonwealth's good faith, credit, and taxing power; indeed, COFINA bonds are not indebtedness of the Commonwealth at all.  Instead, the Commonwealth has provided by statute that hundreds of millions of dollars derived each year from the Commonwealth's Sales and Use Tax (the "Pledged Sales Tax") would not be considered property of the Commonwealth and permitted COFINA to pledge such property to support payment of its bonds.  13 L.P.R.A. § 12.  The Commonwealth's statute asserts that these funds are not "available resources" of the Commonwealth.  *Id.*

In this respect, the COFINA structure attempts a blatant evasion of the Constitutional Debt's priority rights.  Although Constitutional Debt is unquestionably the Commonwealth's highest priority obligation, the COFINA structure purports to nullify that priority by exempting broad swaths of core tax revenues from the Constitutional Debt's claim.  Put simply, the COFINA structure rests entirely on the premise that the legislature is free to declare that general revenues "don't count" and are thus outside the constitutional framework.

The GO Group maintains that the Commonwealth's Constitution cannot be so easily evaded.  If the "available resources" provisions of the Puerto Rico Constitution are to have their intended effect as a constraint on the Commonwealth's legislative and executive branches, it must mean that the Commonwealth may not simply assign away its core tax revenue and declare it "unavailable" in this way.  Numerous, mutually reinforcing provisions of the Constitution

require that the Constitutional Debt be paid first and in full from all of the Commonwealth's resources. Those crucial provisions would mean nothing if they left the Commonwealth free to declare "unavailable" its core tax revenue. Indeed, under the theory underlying the COFINA structure, the Commonwealth could assign *all* of its revenues away, leaving *nothing* to pay for its Constitutional Debt.

Any law purporting to render the Commonwealth's core tax revenues unavailable in this manner represents a transparent effort to evade the protections for Constitutional Debt established in the Puerto Rico Constitution, and is thus unconstitutional. Accordingly, it is the position of the GO Group that the first-priority claim of Constitutional Debt has recourse to the Pledged Sales Tax, because it is property of the Commonwealth. The Pledged Sales Tax thus remains an "available resource" of the Commonwealth under the Puerto Rico Constitution despite the COFINA legislation's assertion to the contrary.

### C.   PROMESA

On June 30, 2016, the President signed into law the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 ("PROMESA"). PROMESA establishes mechanisms for restructuring the obligations of the Commonwealth and its instrumentalities.

PROMESA requires that any court-supervised restructuring of certain Commonwealth obligations respect the protections provided to the Constitutional Debt by the Puerto Rico Constitution. *E.g.*, 48 U.S.C. § 2141(b)(1)(N) (requiring that any fiscal plan "respect the relative lawful priorities or lawful liens, as may be applicable, in the *constitution*, other laws, or agreements of" Puerto Rico as of June 30, 2016 (emphasis added)); *id.* § 2174(b)(6) (requiring this Court to consider, in ruling on any plan of adjustment under PROMESA, "whether available

remedies under the non-bankruptcy laws and *constitution* of the territory would result in a greater recovery for the creditors than is provided by such plan" (emphasis added)).

PROMESA also established the Oversight Board.  48 U.S.C. § 2121.  The Oversight Board has sole authority to file petitions for relief under Title III of PROMESA.  *Id.* § 2164(a). Once the Oversight Board has filed such a petition for the Commonwealth or one of its instrumentalities, the Oversight Board becomes "the representative of" the debtor and "may take any action necessary on behalf of" it.  *Id.* § 2175(b), (a).

### D.    *Lex Claims*

On July 20, 2016, certain members of the GO Group sued certain Commonwealth officials in their official capacities, in *Lex Claims, LLC v. García Padilla*, No. 16-cv-2374 (D.P.R.) (the "*Lex Claims* Action").  On November 4, 2016, the *Lex Claims* plaintiffs filed a second amended complaint, naming additional defendants and seeking additional relief.  *Lex Claims* Action Dkt. 78.

The second amended complaint sought, among other relief, a judgment declaring that the executive order pursuant to which the Commonwealth had defaulted on its Constitutional Debt was preempted by PROMESA, because it did not cease the ongoing diversion of the Pledged Sales Tax to COFINA or to beneficial holders of bonds issued by COFINA.  Accordingly, the court permitted the Oversight Board, as well as certain insurers and beneficial holders of COFINA bonds, to intervene as defendants.  *Lex Claims, LLC v. García-Padilla*, --- F. Supp. 3d ---, 2017 WL 657432, at *11-*15 (D.P.R. Feb. 17, 2017).

On April 4, 2017, the court of appeals stayed the *Lex Claims* Action.  *Lex Claims, LLC v. Fin. Oversight & Mgmt. Bd.*, 853 F.3d 548 (1st Cir. 2017) (per curiam).

### E.    The Fiscal Plan

On March 13, 2017, the Oversight Board certified, subject to certain required amendments, a joint fiscal plan that had been proposed by the Commonwealth.   See http://bit.ly/2rMph7s (the "Fiscal Plan").   Under Title III of PROMESA, consistency with the certified Fiscal Plan is one of seven independent requirements for confirmation of a plan of adjustment.   See 48 U.S.C. § 2174(b).

### F.    These Title III Cases

On May 3, 2017, the Oversight Board filed a petition for relief for the Commonwealth under Title III of PROMESA.   Board Procedure Motion ¶ 7.   Two days later, the Oversight Board filed a petition for relief for COFINA under Title III of PROMESA.   *Id.* ¶ 8.   On June 1, the Court entered an order granting the joint administration of these two cases.   Dkt. 242.   As a result of the filing of these cases, the *Lex Claims* Action continues to be stayed.   See 11 U.S.C. § 362 (made applicable here by 48 U.S.C. § 2161(a)).

On May 16, 2017, The Bank of New York Mellon, as trustee for bonds issued by COFINA ("BNYM"), filed a complaint for interpleader in COFINA's Title III case.   *Bank of New York Mellon v. Puerto Rico Sales Tax Fin. Corp.*, Adv. Proc. No. 17-133-LTS (D.P.R.) (the "Interpleader Action").   BNYM there asserted that it was subject to competing claims regarding funds it holds to make payment on bonds issued by COFINA.   On May 30, the Court ordered BNYM to interplead the funds at issue (the "Interpleaded Funds").   Interpleader Action Dkt. 110.

The GO Group has moved to intervene in the Interpleader Action.   Interpleader Action Dkt. 16.   The GO Group seeks intervention on the basis that (i) the Pledged Sales Tax is the property and "available resources" of the Commonwealth, and therefore (ii) the Interpleaded Funds, which derive from the Pledged Sales Tax, are held in constructive trust for the benefit of

the Commonwealth and its creditors.  *Id.*  The GO Group's motion to intervene is fully briefed and pending resolution.

On June 7, certain holders of COFINA bonds filed in the Commonwealth's Title III case a motion for relief from the automatic stay.  Dkt. 270 (the "Stay Relief Motion").  The Stay Relief Motion asks the Court to lift the automatic stay to permit the *Lex Claims* court to determine whether the questions of Puerto Rico law posed in the *Lex Claims* Action—including whether the Pledged Sales Tax revenues are "available resources" within the meaning of the Puerto Rico Constitution—should be certified to the Supreme Court of Puerto Rico.  The GO Group is filing its objection to the Stay Relief Motion today.

### G.    The Board Procedure

On June 9, 2017, the Oversight Board filed the Board Procedure Motion.  The Motion requests that the Court enter an order prescribing a procedure—the Board Procedure—for resolving what the Board terms the Commonwealth-COFINA Dispute and the GO Group has termed the COFINA Validity Dispute.    The Board Procedure Motion defines the Commonwealth-COFINA Dispute as "whether, after considering all procedural and substantive defenses, the Pledged Sales Taxes are either (a) property of the Commonwealth within the meaning of PROMESA section 301(c)(5), or (b) subject to an allowable claim of the Commonwealth having priority over all claims of COFINA."  Board Procedure Motion ¶ 17.

The Board Procedure contemplates that the Oversight Board would select one agent each for the Commonwealth and COFINA (the "Commonwealth Agent" and the "COFINA Agent," together, the "Agents").  The Board would make its selections from (i) nominations made by creditors specified by the Board, and (ii) any official committees of unsecured creditors.  *Id.* ¶ 38.a-e.  If the specified creditors could not agree on nominees, then two Board members (Arthur J. Gonzalez and David A. Skeel) would select any Agents they wish.  *Id.*  The Agents

9

would commence litigation to resolve the COFINA Validity Dispute within ten days of their selection.  *Id.* ¶ 38.g.  The Agents then would litigate, in this Court, the COFINA Validity Dispute on behalf of the Commonwealth and COFINA.  *Id.* ¶ 38.h.

The Oversight Board, however, would control any settlement.   In particular, the Oversight Board "may participate in" settlement negotiations and would be required to approve any settlement.  *Id.* ¶ 38.i-j.  Moreover, the Board Procedure contemplates that the Board could approve a settlement without approval by the Court, and could impose a settlement without the approval of (or even consultation with) the Agents as part of a plan of adjustment under Title III of PROMESA.  *Id.*

## ARGUMENT

## I.   THE COURT SHOULD REJECT THE OVERSIGHT BOARD'S PROPOSAL THAT THE BOARD ALONE MAY APPOINT THE COMMONWEALTH'S AGENT

The Board Procedure Motion concerns only how the *Commonwealth* may assert its claim to resolve the COFINA Validity Dispute.  The Commonwealth needs an agent to represent it because the Oversight Board faces an insurmountable conflict—it is the representative of both the Commonwealth and COFINA, whose interests are opposed in the COFINA Validity Dispute.

The Board Procedure Motion properly does *not* concern how *creditors*, such as the GO Group, may assert their independent claims to resolve the COFINA Validity Dispute.  The GO Group has asserted its own claim to resolve the COFINA Validity Dispute by moving to intervene in the Interpleader Action.  Should the Court deny intervention, the GO Group may seek to assert its claim in another way.

The Board Procedure Motion implies that resolution of the Commonwealth's claim would be binding on creditors, including the GO Group.  It implies, in other words, that the Commonwealth (through its Agent) will get its "day in court" and that creditors will not.

The Board Procedure Motion thus must protect creditors' due process rights. But it does not. Any procedure that would bind creditors must ensure that creditors' interests are adequately represented. The Board Procedure would allow the Oversight Board (or two of its members) to appoint, without judicial review, an inadequate representative. To protect creditors' rights, the Court should reject the Board Procedure unless and until the Court—not the Board—determines who the Commonwealth Agent will be.[5]

### A.  Due Process Requires That The Commonwealth's Agent Adequately Represent The Commonwealth's Creditors

Due process sets important limits on "representative litigation." In such litigation, representative parties may litigate claims, and the outcome of that litigation bars (through principles of preclusion and res judicata) other parties from litigating similar claims. Because of this bar, the representative parties effectively litigate on behalf of the other parties. The other parties therefore do not receive their "day in court." Their due process rights must be protected in some other way.

To protect the rights of out-of-court parties in representative litigation, due process requires adequate representation. The Supreme Court has "reject[ed]" approaches to representative litigation that do not respect "limitations attending nonparty preclusion based on adequate representation." *Taylor v. Sturgell*, 553 U.S. 880, 900 (2008); see *id.* at 901 (noting that "[t]hese protections" are "grounded in due process"); see also *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940) ("It is familiar doctrine of the federal courts that members of a class not present as parties to the litigation may be bound by the judgment [only] where they are in fact adequately represented by parties who are present.").

---

[5]   The GO Group takes no position at this time on the selection of the COFINA Agent, but reserves all rights to object if necessary.

The requirements of adequate representation are at least "twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Duling v. Gristede's Operating Corp.*, 267 F.R.D. 86, 99 (S.D.N.Y. 2010) (Swain, J.) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)).  Courts (including *Duling*) apply these requirements most often in the context of Federal Rule of Civil Procedure 23(a)(4), which requires adequate representation in class actions.  But the requirements are not peculiar to Rule 23(a)(4); that rule merely encapsulates what due process requires.  See *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016); 7C Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1833 (regarding derivative actions).

Insofar as the Board Procedure would bind creditors—as the Board Procedure Motion implies, though it does not say so directly—adequate representation would be required here. Thus, due process would require the Commonwealth Agent to be able, at the least, to litigate the Commonwealth's position vigorously and without conflicts.

### B. The Board Procedure Does Not Ensure Adequate Representation Of The Commonwealth's Creditors

Because the Board Procedure includes no mechanism to ensure adequate representation, it is invalid.  The Board Procedure provides that the Oversight Board, in its sole and unreviewable discretion, shall choose the Commonwealth Agent.  Board Procedure Motion ¶ 38.a.  No safeguards would ensure that the Oversight Board's choice would be an adequate representative.

Indeed, there are at least two reasons to suspect that the Board's choice of Commonwealth Agent would not be an adequate representative.  First, the whole point of the Board Procedure Motion is that the Oversight Board faces an insurmountable conflict of interest.

12

It represents both the Commonwealth and COFINA.  Hence, in choosing the Commonwealth Agent, the Oversight Board can be expected to take COFINA's interests into account.  The Board thus has reason not to choose a Commonwealth Agent that would zealously advocate, as the Commonwealth Agent should, for cutting off COFINA's sole source of revenue.

Second, most creditors that, in the Oversight Board's view, represent the Commonwealth's interest in the COFINA Validity Dispute are not fit to ensure adequate representation.  The Board Procedure authorizes certain Commonwealth creditors to nominate candidates for Commonwealth Agent.  Board Procedure Motion ¶ 38.b.  If those creditors cannot agree, two Board members would have unfettered discretion to choose the Commonwealth Agent, *id.* ¶ 38.e, underscoring the extent to which the Board is putting itself in charge.  And even if the specified creditors could agree, the agreement would be tainted:  Each Commonwealth creditor the Board has specified, other than the GO Group, is incapable of looking after the Commonwealth's interests in the COFINA Validity Dispute.

- Assured Guaranty insures debt of COFINA as well as debt of the Commonwealth and is therefore conflicted.  Assured also insures other debt issued by Commonwealth instrumentalities that is subject to "clawback" provisions.  This, too, is a conflict, because certain constitutional arguments against COFINA may also undermine the rights of the "clawback" debt.  Assured Guaranty would have no incentive to raise such arguments, and its representation of the Commonwealth's interests would suffer accordingly.

- Financial Guaranty insures both Constitutional Debt and "clawback" debt.  As with Assured, Financial Guaranty's exposure to clawback debt creates a conflict.

13

- Syncora likewise insures both Constitutional Debt and other Commonwealth debt that lacks the protections provided to Constitutional Debt.  Syncora also insures a relatively small amount of Constitutional Debt—just $169 million in net principal amount.  Syncora, *1st Quarter 2017 Operating Supplement (Statutory - Basis)* at 16, http://bit.ly/2tLpHru.

- The UCC appears not to include holders or insurers of Commonwealth bonds of any kind.  Dkt. 338.  The COFINA Validity Dispute is less likely to affect such creditors (such as unions and trade creditors), because the Commonwealth and the Oversight Board appear to be committed to paying them regardless of the outcome of the COFINA Validity Dispute.[6]

The only Commonwealth creditor that could ensure adequate representation—and, we submit, the only adequate Commonwealth Agent—is the GO Group.  The GO Group is free of conflicts:  It represents only the interests of Constitutional Debt, which is the Commonwealth obligation most directly affected by the COFINA Validity Dispute.  The GO Group is also uniquely positioned to litigate the Commonwealth's interests vigorously.  It is, to date, the only entity that has initiated any process to resolve the COFINA Validity Dispute.  And it has been working on that process since last fall, when it filed its second amended complaint in the *Lex Claims* Action.  Thus, it alone has mastered the issues well enough to initiate litigation within ten days of being selected, as the Board Procedure envisions.  Moreover, the GO Group holds

---

[6]   See, *e.g.*, Ex. A, *AAFAF Says Title III Won't Touch Supplier Payments as Treasury Sends out $70M in Checks This Week*, Reorg Research (May 5, 2017), quoting statement of Fiscal Agency and Financial Advisory Authority Executive Director Gerardo Portela ("The government has the commitment and, more importantly, the ability to pay suppliers and providers as usual. All of the government's bills will be processed under the ordinary process.").  All references to "Ex." are to exhibits to the Declaration of Donald Burke in support of this objection, filed herewith.

approximately $3 billion of Constitutional Debt, a stake in the outcome that is more than sufficient to ensure that it would provide the resources necessary to litigate vigorously.  And there is no bond trustee for the Constitutional Debt.  Despite all of this, the Oversight Board has not committed to appointing the GO Group as the Commonwealth Agent.

### C.   The Court Should Not Adopt Any Version Of The Board Procedure Until It Has Appointed The Commonwealth Agent

There is a simple solution to the Board Procedure's due-process defect:  The Court, not the Oversight Board, should appoint the Commonwealth Agent.  By doing so, the Court could ensure up front that the Commonwealth Agent would provide adequate representation.

Indeed, the Court should determine who the Commonwealth Agent would be before it adopts any version of the Board Procedure.  In practical terms, the merits of the Board Procedure are inextricably bound to the identity of the Commonwealth Agent.  The Commonwealth Agent will determine which arguments to make, when and how to make them, and how mediation and settlement negotiations should proceed.  These critical choices would shape how the Board Procedure unfolds.  It thus would serve the Court and the parties to identify the Commonwealth Agent before embarking on the Board Procedure.  If it proves impracticable to choose the Commonwealth Agent before adopting the Board Procedure, the Court should adopt only a version of the Board Procedure that would allow it—not the Oversight Board—to appoint the Commonwealth Agent.

Due process does not generally require the court to appoint the representative in representative litigation.  See *Taylor*, 553 U.S. at 900 (holding that representation is adequate if, among other things, "either the [representative] understood herself to be acting in a representative capacity *or* the original court took care to protect the interests of the nonparty"

(emphasis added)).   Nonetheless, several reasons dictate that the Court should appoint the Commonwealth Agent after considering the nominations and arguments of all interested parties.

First, the alternative is extremely inefficient.  The alternative is this:  (i) the Oversight Board is allowed to appoint an inadequate Commonwealth Agent; (ii) the inadequate Commonwealth Agent litigates the COFINA Validity Dispute to resolution; (iii) the Oversight Board seeks to bind creditors to that resolution (through principles of preclusion and res judicata); and (iv) creditors object, on due process grounds, that they must be allowed to litigate the COFINA Validity Dispute themselves and reach a different resolution.  It is much more efficient to appoint an adequate representative *ex ante* than to litigate about adequate representation *ex post*.  See Restatement (Second) of Judgments § 42 cmt. b ("The purpose of offering opportunity to dispute the fitness of the representative is to permit anticipation of the possibility of subsequent attack on his authority and thus to assure as far as possible that the judgment in the action will have conclusive effects.").

Second, in every arguably analogous situation, the Court appoints the representative.  In a Chapter 11 bankruptcy, for example, a creditors' committee may pursue claims on behalf of the debtor with the consent of the trustee.  *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001).  But the court ensures adequacy of representation twice over: (i) the court "ensure[s]" that the creditors' committee provides "adequate representation" in general, 11 U.S.C. § 1102(a)(4), and (ii) the court "approv[es] and supervis[es]" the committee's pursuit of the debtor's claims, *Commodore*, 262 F.3d at 100.  Courts likewise supervise representation in class actions and derivative cases.  Fed. R. Civ. P. 23(c)(1), 23.1(a).

Third, as noted above, the Oversight Board faces an insurmountable conflict of interest.  Consequently, any appointment it makes should be subject to judicial scrutiny.  See *Commodore*,

16

262 F.3d at 100 ("A debtor-in-possession often acts under the influence of conflicts of interest and may be tempted . . . to favor certain creditors over others." (quoting *In re Gibson Grp., Inc.*, 66 F.3d 1436, 1441 (6th Cir. 1995)).

## II. THE COURT SHOULD REJECT THE OVERSIGHT BOARD'S PROPOSAL TO MAKE ITSELF THE SOLE ARBITER OF ANY SETTLEMENT

No matter who is appointed the Commonwealth Agent and how, the Board Procedure is unacceptable for a separate reason: It permits the Oversight Board, acting alone, to approve any settlement of the Commonwealth-COFINA litigation it contemplates. See Board Procedure Motion ¶ 38.j ("Any settlement negotiated by the Agents shall only be effective upon (i) consent of the Oversight Board, [or] (ii) an order of the Court granting an Oversight Board motion requesting approval of such settlement."). The Board Procedure would also allow the Oversight Board to dictate a settlement of the COFINA Validity Dispute, without the approval of (or even input from) the Agents. *Id.* ¶ 38.k ("[T]he Oversight Board . . . may, at any time, propose a title III plan of adjustment for the Commonwealth and/or COFINA that incorporates a settlement of the Commonwealth-COFINA Dispute developed . . . by the Oversight Board."). Thus, the Board's refusal to relinquish authority, despite its acknowledged conflict, would lead to an elaborate charade: The COFINA Validity Dispute would take on the trappings of litigation between independent Agents, but the conflicted Oversight Board would remain in the driver's seat.

The bankruptcy law incorporated into PROMESA does not allow this. Under Federal Rule of Bankruptcy Procedure 9019(a) (made applicable by 48 U.S.C. § 2170), a settlement may be approved only by the Court, and only after "notice and a hearing." Moreover, any party in the bankruptcy—not just the parties to the settlement—must be heard. 11 U.S.C. § 1109(b) (made applicable by 48 U.S.C. § 2161(a)) ("A party in interest, including . . . a creditor . . . , may raise

and may appear and be heard on any issue in a case under this chapter.").  Thus, even if the debtor settles a claim with a third party, the Court must consider objections by the debtor's creditors before approving the settlement.  See, *e.g.*, *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 202 (Bankr. S.D.N.Y. 2016).  These procedures are mandatory, but the Board Procedure does not include them.  It instead permits the Oversight Board alone to approve a settlement.

The Oversight Board may argue that Rule 9019 does not apply here.  Even if Rule 9019 does not apply, however, the Court still should require notice, a hearing, and Court approval of any settlement reached under the Board Procedure.  Even without Rule 9019, creditors still could object to any settlement insofar as it is implemented through a plan of adjustment.  Here, if the Oversight Board approves a settlement that creditors oppose, creditors are sure to raise their objections at confirmation.  See 48 U.S.C. § 2174(b) (establishing requirements for confirmation under PROMESA).  Requiring court approval of any settlement would allow the Court to settle those objections before confirmation.  That would facilitate negotiations about the plan of adjustment and streamline confirmation.

## III.  THE COURT SHOULD REJECT THE BOARD'S UNSUPPORTED CLAIMS OF A LIQUIDITY CRISIS

In yet another attempt by the Oversight Board to retain control over the litigation of a question it purports to wash its hands of, the Board insists that litigation of the COFINA Validity Dispute must be structured so that it will produce a dipositive ruling by November 1, 2017. Board Procedure Motion ¶ 38.g.  "Time is of the essence," the Board contends, because the Commonwealth will "face acute cash management issues shortly after" that date, and will need to use or borrow proceeds of Pledged Sales Tax.  *Id.* ¶ 31.  But that assertion is utterly unsupported and, from all appearances, false.  The Court should therefore reject the Oversight

Board's request that the Court establish an expedited timeline for resolving the COFINA Validity Dispute.

To be sure, the abject state of the Commonwealth's financial disclosures makes any fully reliable assessment of the Commonwealth's liquidity impossible.  But, as the GO Group and others have been explaining to the Oversight Board for months, the Board's claims are falsified by what little information has made its way into public view.  In the past week alone, records from the Puerto Rico Department of Treasury, obtained through litigation brought by the Center for Investigative Journalism, have shown that the Commonwealth has a projected cash position of $1.15 billion as of the end of this fiscal year (June 30, 2017), compared to $291 million as forecast by the Fiscal Plan.  See Ex. B, *Commonwealth Report Forecasts $1.15B Treasury FY2017 Closing Balance*, Reorg Research (June 13, 2017); see also Ex. C, *The New $1.15 Billion . . . And More*, El Vocero (June 15, 2017) (reporting projected liquidity of $1.545 billion, including "contingency" funds).  Thus, the true liquidity picture—which has emerged only by happenstance, rather than through any transparency on the part of the Board—represents an improvement of more than $850 million above what was forecasted.  That is hardly the stuff of "acute cash management issues."

The Board's broader crisis narrative is also impossible to accept.  The Commonwealth's general fund revenues have been trending upwards since 2011, and today are at an all-time high. See *Commonwealth Government General Fund Net Revenues*, http://www.aafaf.pr.gov/ assets/t28_ae-2016.xlsx.  Indeed, tax collections for the current fiscal year are running more than $228 million above projections (2.8% over the projected figure of $8.339 billion for the first 11 months of the fiscal year).  See Ex. D, *Tax Haul Misses Mark in May, Outpaces 11-Month Estimate by $228.3M*, Reorg Research (June 20, 2017).  It is perhaps for that reason that the

Board resorts to mischaracterizing the Fiscal Plan in prop of the crisis narrative:  While the $787 million in average annual debt service it quotes (Motion ¶ 30) corresponds to the numbers reported in the Commonwealth's March 13, 2017 Fiscal Plan, it does not even take account of additional reforms required by the Board in the form of amendments to the Fiscal Plan.  See *Oversight Board Resolution (Fiscal Plan Certification)*, March 13, 2017, http://bit.ly/2toq5fU. These amendments have not—even more than three months later—been incorporated into a revised Fiscal Plan.  But the Board's counsel has acknowledged in open court that, once they are taken into account, the debt service amounts yielded even by the Board's flawed approach would reach approximately $900 million annually.  5/17/2017 Tr. (Dkt. 207) at 22.  Yet, in an apparent effort to support the Board's crisis narrative, the Board Procedure Motion repeats the original, outdated figures.

In sum, the Oversight Board has failed to demonstrate any special urgency that would require expedited procedures to resolve the COFINA Validity Dispute.  Thus, if the Court adopts any version of the Board Procedure, it should decline to set an arbitrary deadline by which the litigation of the COFINA Validity Dispute should be concluded.  Questions of timing should be determined in consultation with the Agents who are charged with litigating the dispute and any other parties in interest, as would be the case in any other litigation.

## IV.    SHOULD THE COURT AUTHORIZE ANY VERSION OF THE BOARD PROCEDURE, IT SHOULD CLARIFY THAT THE BOARD PROCEDURE DOES NOT AFFECT RIGHTS OF JOINDER AND APPEAL

The Board Procedure Motion does not directly address parties' rights either to join any litigation or to appeal.  Thus, it appears that the Board Procedure preserves these rights. Nonetheless, solely for the avoidance of doubt, the Court should clarify as much should it authorize any version of the Board Procedure.

A.     The Federal Rules of Civil Procedure protect the rights of parties to join litigation affecting them.  Fed. R. Civ. P. 19(a)(1) ("A person . . . must be joined as a party if . . . that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest."); *id.* R. 24(a) ("[T]he court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.").  These rules are incorporated into the rules of bankruptcy procedure governing adversary proceedings.  Fed. R. Bankr. P. 7019, 7024.

No rule of civil or bankruptcy procedure permits the Court to suspend these rules.  Accordingly, should the Court authorize any version of the Board Procedure, it should clarify that parties may join the Board Procedure to the extent provided for in the Federal Rules of Civil Procedure and other applicable law.

B.     PROMESA protects the right of parties in Title III proceedings to appeal.  48 U.S.C. § 2166(e).  PROMESA does not permit the Court to suspend this right.  Accordingly, should the Court authorize any version of the Board Procedure, it should clarify that parties may appeal from decisions relating to the Board Procedure to the extent provided for in PROMESA and other applicable law.

## V.   THE COURT SHOULD NOT ENDORSE THE BOARD'S SPECULATION ABOUT THE RECOVERIES OF THE COMMONWEALTH'S CREDITORS IN ANY PLAN OF ADJUSTMENT

In attempting to justify its departure from ordinary procedures, the Board Procedure Motion contends that the COFINA Validity Dispute is "the dominant issue" in these cases, because it "will likely be dispositive as to the relative recoveries of the debt holders of COFINA

21

and the Commonwealth." Board Procedure Motion ¶¶ 17, 30. That assertion, in turn, is based on "an average of $787 million" annually being available to pay those debtholders. *Id.* ¶ 30. Thus, the Oversight Board asserts, "[s]hould the COFINA structure be determined to be valid, almost the entirety of the funds available for debt service may need to continue to flow to those creditors, leaving very little recovery to creditors of the Commonwealth." *Id.*

In resolving the Board Procedure Motion, the Court will have no occasion to address the Board's speculation about the recoveries of the Commonwealth's creditors in the event that the COFINA Validity Dispute were to be resolved in favor of COFINA. That question simply is not at issue at this time.

Lest there by any mistake, however, the GO Group notes its vigorous disagreement with the Board's position. True, the COFINA Validity Dispute is among the important issues that must be resolved in this case, either through litigation or a consensual settlement. But it is far from "the dominant issue."

Nor does the Board possess a unilateral authority to set an amount of "funds available for debt service" that then must be divided among competing claimants. Board Procedure Motion ¶ 30. As the Board well knows, the propriety of the certified Fiscal Plan is subject to vigorous dispute. For example, creditors, including the GO Group, contend that the Board has failed to meet its statutory obligation to "respect . . . relative lawful priorities or lawful liens." 48 U.S.C. § 2141(b)(1)(N). That contention is supported by the Fiscal Plan's treatment of the Constitutional Debt, which, despite being the Commonwealth's highest-priority obligation under its Constitution, is allocated only some undisclosed portion of what remains after the Commonwealth has satisfied all of its other spending objectives. Fiscal Plan at 29. Indeed, the Fiscal Plan acknowledges on its face that the Commonwealth has made *no effort at all* to identify

essential expenditures, *id.* at 6, despite Congress's directive that a Fiscal Plan "ensure the funding of essential public services," 48 U.S.C. § 2141(b)(1)(B), not whatever level of public services the Commonwealth's public officials may desire.

The Board, for its part, claims an absolute and unreviewable discretion to certify whatever Fiscal Plan it wishes.  See Dkt. 350 ¶¶ 24-26.  Made as it was to defend against numerous legal criticisms of the Fiscal Plan, the Board's claim amounts to an admission that the Fiscal Plan disregards PROMESA's requirements.  The GO Group will demonstrate as much in due course.  The Board's confidence that a court would countenance such blatant statutory violations is puzzling and entirely misplaced.

Moreover, even if the Board were correct that PROMESA's requirements for certification of a Fiscal Plan are not subject to review, that would not shield the debt service amounts proposed in the Fiscal Plan from searching judicial inquiry.  That is because, for a plan of adjustment to be confirmed under PROMESA, it must satisfy a number of separate confirmation requirements drawn from the Bankruptcy Code (but which are, in certain key respects, more protective of creditors than the Code's provisions).  See 48 U.S.C. § 2174(b).  And, as this Court has recently observed, the Oversight Board will have to propose a plan of adjustment that meets all of these statutory requirements; otherwise, these Title III cases will ultimately be dismissed. See 6/5/17 Tr. (No. 17-ap-151 Dkt. 50) at 21.

To take just one example, any plan of adjustment must be "in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan."  48 U.S.C. § 2174(b)(6).  This Court—not the Oversight Board—will make that determination.

The same is true of the requirement, incorporated from the Bankruptcy Code, that a plan be "fair and equitable" in order to be confirmed over the objections of an impaired, non-accepting class (colloquially, a "cramdown" plan). 11 U.S.C. § 1129(b)(1); 48 U.S.C. § 2161(a). In addition to importing the "absolute priority" rule, under which a senior class of claims must receive the value of its claims before any junior class of claims may receive any distribution under the plan, see 11 U.S.C. § 1129(b)(2), the fair and equitable requirement is also understood to have additional "important content" in municipal bankruptcy cases. 6 *Collier on Bankruptcy* ¶ 943.03[1][f][i][A]. In particular, a municipal debtor's plan of adjustment may be approved only upon a factual finding that the recovery proposed for creditors is "the maximum that the [debtor] could reasonably pay." *Lorber v. Vista Irrigation Dist.*, 127 F.2d 628, 639 (9th Cir. 1942); see also 6 *Collier on Bankruptcy* ¶ 943.03[1][f][i][B] ("A plan under chapter 9 is fair and equitable if the amount to be received by the bondholders is all that they can reasonably expect in the circumstances." (quotation marks omitted)); H.R. Rep. No. 94-686, 94th Cong., 2d Sess. 32-33 (1976) (noting that the debtor "must exercise its taxing power to the *fullest extent possible* for the benefit of its creditors") (emphasis added). Such an inquiry will necessarily, in turn, analyze not only the revenue side of the equation, but also expenses.

In a contested confirmation proceeding, these and other confirmation requirements will be the subject of vigorous litigation. For example, the current Fiscal Plan allocates only $787 million to average annual debt service (for all debt) over the next 10 years, which amounts to approximately 7% of local revenues. The GO Group expects that the evidence will show that this proposed debt-service ratio is anomalously low by reference to other jurisdictions in the

United States and abroad,[7] guidance from international institutions,[8] and the 15% ceiling that the framers of the Puerto Rico Constitution deemed sustainable for general obligation debt.  P.R. Const. art. VI, § 2.  That fact, standing alone, will preclude any credible argument that the amounts proposed in the current Fiscal Plan represent the Commonwealth's "maximum" effort to satisfy creditors' claims.  For present purposes, however, the Court should simply decline to endorse the mistaken speculation about creditor recoveries in the Board Procedure Motion.

<u>**CONCLUSION**</u>

The Court should enter an order denying the Board Procedure Motion.  In the alternative, the Court should enter an order granting the Board Procedure Motion with clarification that the order does not affect any party's rights of joinder or appeal under Federal Rules of Civil Procedure 19 and 24, 48 U.S.C. § 2166(e), or other applicable law.

---

[7]    For example, publicly available sources report that the ratio of debt service to revenues is 20.78% in Rhode Island, 11.68% in Louisiana, and 10.27% in Colorado.  See *CivicDashboards*, OpenGov, http://www.civicdashboards.com/state/rhode-island-04000US44/debt_service_ratio; *CivicDashboards*, OpenGov, https://www.civicdashboards.com/state/louisiana-04000US22/debt_service_ratio; *CivicDashboards*, OpenGov, https://www.civicdashboards.com/state/colorado-04000US08/debt_service_ratio.  Debt service levels for similarly situated sovereign borrowers are significantly higher, with recent publicly available statistics reporting 11% of revenues devoted to debt service in Costa Rica, 10.5% in El Salvador, 14.1% in the Dominican Republic, and 24.2% in Jamaica.  See Interest payments (% of revenue), The World Bank, http://data.worldbank.org/indicator/GC.XPN.INTP.RV.ZS.  Although differences in methodology may make it impossible to precisely compare these debt-service ratios to the ratio proposed in the Fiscal Plan, the magnitude of the differences is noteworthy.

[8]    World Bank and International Monetary Fund guidelines provide that 18% to 22% of government revenues is a sustainable debt service ratio level even for "low income countries" (*i.e.*, the poorest countries in the world, whose economies are not as developed as Puerto Rico's).  See Factsheet: The Joint World Bank-IMF Debt Sustainability Framework for Low-Income Countries, International Monetary Fund (March 2016), http://www.imf.org/external/np/exr/facts/pdf/jdsf.pdf.

Dated: June 21, 2017

/s/ Ramón Rivera Morales

J. Ramón Rivera Morales
USDC-PR Bar No. 200701
JIMÉNEZ, GRAFFAM & LAUSELL
P.O. Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com

Respectfully submitted,

/s/ Mark T. Stancil

Mark T. Stancil (admitted *pro hac vice*)
Gary A. Orseck (admitted *pro hac vice*)
Ariel N. Lavinbuk (admitted *pro hac vice*)
Donald Burke (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411-L
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
Email: mstancil@robbinsrussell.com

/s/ Andrew N. Rosenberg

Andrew N. Rosenberg (admitted *pro hac vice*)
Richard A. Rosen (admitted *pro hac vice*)
Walter Rieman (admitted *pro hac vice*)
Kyle J. Kimpler (admitted *pro hac vice*)
Karen R. Zeituni (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: arosenberg@paulweiss.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*