# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

       as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*

       Debtors.[1]

---------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

*[Caption continued on next page]*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); and (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474).

-------------------------------------------------------------x

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO
      as representative of
THE COMMONWEALTH OF PUERTO RICO, *et al.*
          Movants,[2]

v.

International Union, United Automobile, Aerospace
and Agricultural Implement Workers of America
(UAW), *et al.*
          Respondents.[3]

-------------------------------------------------------------x

PROMESA
Title III

This Document Relates to:[4]
17 BK 3283; 17 BK 3284

---

[2] The Movants to the Motion include in the Commonwealth of Puerto Rico and the Puerto Rico Sales Tax Financing Corporation ("COFINA").

[3] The Respondents to the Motion (the "Respondents") include: The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) ("UAW"), Service Employees International Union ("SEIU"), American Federation of State, County & Municipal Employees ("AFSCME"), Goldman Sachs Asset Management, L.P. ("GSAM"), Financial Guaranty Insurance Company ("FGIC"), the Mutual Fund Group (which consists of mutual funds managed by Oppenheimer Funds, Inc., Franklin Advisers, Inc., and the First Puerto Rico Family of Funds), the Puerto Rico Funds (which are the following Puerto Rico-based funds: Puerto Rico AAA Portfolio Bond Fund II, Inc.; Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico Fixed Income Fund VI, Inc.; Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.; Puerto Rico Investors Bond Fund I; Puerto Rico Investors Tax-Free Fund, Inc.; Puerto Rico Investors Tax-Free Fund, Inc. II; Puerto Rico Investors Tax-Free Fund III, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; Puerto Rico Investors Tax-Free Fund V, Inc.; Puerto Rico Investors Tax-Free Fund VI, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; and UBS IRA Select Growth & Income Puerto Rico Fund), National Public Finance Guarantee Corporation ("National"), the COFINA Senior Bondholders' Coalition (which includes José F. Rodríguez Perelló and the following institutional holders of the COFINA senior bonds: Aristeia Horizons, L.P.; Camino Cipres LLC; Camino Roble LLC; Canary SC Master Fund, L.P.; Canyon Capital Advisors LLC (on behalf of its participating clients); River Canyon Fund Management LLC (on behalf of its participating clients); Crescent 1, L.P.; CRS Master Fund, L.P.; Cyrus Opportunities Master Fund II, Ltd.; Cyrus Select Opportunities Master Fund, Ltd.; Cyrus Special Strategies Master Fund, L.P.; Decagon Holdings 1, L.L.C.; Decagon Holdings 2, L.L.C.; Decagon Holdings 3, L.L.C.; Decagon Holdings 4, L.L.C.; Decagon Holdings 5, L.L.C.; Decagon Holdings 6, L.L.C.; Decagon Holdings 7, L.L.C.; Decagon Holdings 8, L.L.C.; Decagon Holdings 9, L.L.C.; Decagon Holdings 10, L.L.C.; Merced Partners Limited Partnership; Merced Partners IV, L.P.; Merced Partners V, L.P.; Pandora Select Partners, L.P.; SB Special Situation Master Fund SPC, Segregated Portfolio D; Scoggin International Fund Ltd.; Scoggin Worldwide Fund Ltd.; Taconic Master Fund 1.5 L.P.; Taconic Opportunity Master Fund L.P.; Tilden Park Investment Master Fund LP; Värde Credit Partners Master, L.P.; Värde Investment Partners, L.P.; Värde Investment Partners (Offshore) Master, L.P.; The Värde Skyway Master Fund, L.P; Whitebox Asymmetric Partners, L.P.; Whitebox Institutional Partners, L.P.; Whitebox Multi-Strategy Partners, L.P.; and Whitebox Term Credit Fund I L.P.), Ambac Assurance Corporation ("AMBAC"), Ad Hoc Group of General Obligation Bondholders ("GO Group"), and Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (f/k/a Financial Security Assurance Inc.) (together, "Assured").

[4] Pursuant to Paragraph 5 of the Joint Administration Order entered in lead Case No. 17 BK 3283-LTS [ECF No. 242], this pleading will be filed in both the lead Case No. 17 BK 3283-LTS and in Case No. 17 BK 3284-LTS.

## <u>TABLE OF CONTENTS</u>

**Page**

The Debtors and Respondents Agree on Several Aspects of the Procedures ............................. 3

Respondents Inappropriately Attack the Certified Fiscal Plan .................................................. 8

There is No Article III Standing Issue ..................................................................................... 9

The Procedures Comply with PROMESA ............................................................................. 10

Respondents Seek to Usurp PROMESA's Grant of Exclusivity to the Debtors .................... 14

There are No Issues of Due Process ...................................................................................... 15

Notice ................................................................................................................................... 18

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Charleston Sav. Bank v. Martin* (*In re Colonial Realty Inv. Co.*),
516 F.2d 154 (1st Cir. 1975) .......................................................................................8

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
Corp. v. Chinery,*
330 F.3d 548 (3d Cir. 2003)........................................................................................14

*United States v. Johnson,*
319 U.S. 302 (1943).....................................................................................................17

*Wellness Int'l Network, Ltd. v. Sharif,*
135 S. Ct. 1932 (2015) (Roberts, C.J., dissenting) ...................................................10

STATUTES

11 U.S.C. § 1109...................................................................................................................4

Act No. 91-2006, § 2..............................................................................................................8

PROMESA § 101(a) ..............................................................................................................2

PROMESA § 101(g) ..............................................................................................................2

PROMESA § 104(b) ..............................................................................................................2

PROMESA § 106(e) ..............................................................................................................9

PROMESA §§ 201, 202 .........................................................................................................2

PROMESA § 306(b) ..........................................................................................................8, 15

PROMESA § 312(a) ..............................................................................................................2

PROMESA § 315(a) ............................................................................................................10

PROMESA § 315(b)...................................................................................................1, 2, 10, 12

OTHER AUTHORITIES

162 CONG. REC. H3600-01 (daily ed. June 9, 2016) (statement of Rep. Velazquez)...................11

*Financial and Economic Challenges in Puerto Rico*, U.S. Senate Comm. on
Finance, at 23 (Sept. 29, 2015) (statement of Ms. Acosta) ....................................................11

Claire Hill and Brett McDonnell, *Sanitizing Interested Transactions*, 36 DEL. J.
CORP. L. 903 (2011), at http://scholarship.law.umn.edu/faculty_articles/81.........................12

FED. R. CIV. P. 19...........................................................................................................................3

U.S. CONST. art. IV § 3, cl. 2 .......................................................................................................10

**OMNIBUS REPLY OF DEBTORS TO RESPONSES
TO MOTION OF DEBTORS FOR ORDER APPROVING
PROCEDURE TO RESOLVE THE COMMONWEALTH-COFINA DISPUTE**

To the Honorable United States District Court Judge Laura Taylor Swain:

      The Commonwealth of Puerto Rico (the "Commonwealth") and the Puerto Rico Sales

Tax Financing Corporation ("COFINA," and together with the Commonwealth, the "Debtors"),

by and through the Financial Oversight and Management Board for Puerto Rico the ("Oversight

Board"), as the Debtors' representative pursuant to section 315(b) of the *Puerto Rico Oversight,

Management, and Economic Stability Act* ("PROMESA"),[5] respectfully submit this omnibus

reply (the "Omnibus Reply") to the responses (the "Responses")[6] filed to the *Motion of Debtors

for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [ECF No. 303]

(the "Motion"), and respectfully represent as follows:

---

[5] PROMESA has been codified in 48 U.S.C. §§ 2101–2241.

[6] *See* (i) *Response and Reservation of Rights of International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Service Employees International Union, and American Federation of State, County & Municipal Employees to Debtors' Motion for an Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "Unions Response") [ECF No. 357]; (ii) *Opposition of Goldman Sachs Asset Management, L.P. to Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "GSAM Response") [ECF No. 360]; (iii) *Response in Opposition of Financial Guaranty Insurance Company to Puerto Rico Funds and Mutual Fund Group's Motion for Relief from the Automatic Stay and Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "FGIC Response") [ECF No. 369]; (iv) *Objection of Mutual Fund Group and the Puerto Rico Funds to Debtors' Motion for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "Mutual Fund Group Response") [ECF No. 372]; (v) *National Public Finance Guarantee Corporation's Objection to the Financial Oversight and Management Board for Puerto Rico's Motion for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "National Response") [ECF No. 373]; (vi) *Objection of COFINA Senior Bondholders' Coalition to Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "COFINA Senior Bondholders Response") [ECF No. 374]; (vii) *AMBAC Assurance Corporation's Objection to Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "AMBAC Response") [ECF No. 375]; (viii) *Objection of the Ad Hoc Group of General Obligation Bondholders to Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "GO Group Response") [ECF No. 408]; and (ix) *Limited Objection of Assured Guaranty Corp. and Assured Guaranty Municipal Corp. to Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "Assured Response") [ECF No. 411].

**Omnibus Reply**

1.    Responses to the Motion overlook two undisputed critical facts.  First, the Oversight Board is not a for-profit holding company or group of controlling shareholders looking to profit.  Indeed, its members are completely uncompensated.[7]  The Oversight Board has no reason to favor creditors of the Commonwealth over creditors of COFINA or the reverse.  Its statutory and only mission is to provide a method to achieve fiscal responsibility and access to capital markets.[8]  Accordingly, its selection of agents to act for the Commonwealth and COFINA in litigation and negotiations is not tainted by any bias or motive prejudicial to the Commonwealth or COFINA or their respective creditors.  Second, all relief the Oversight Board requests is authorized by PROMESA.  PROMESA (a) renders the Oversight Board the title III representative of both the Commonwealth and COFINA,[9] (b) authorizes the Oversight Board to act through agents,[10] (c) grants the Oversight Board the exclusive right to file a plan of adjustment for each of the Commonwealth and COFINA,[11] and (d) grants the Oversight Board the exclusive power to control the fiscal plan and budget of the Commonwealth and COFINA, among the other sixty-one covered entities.[12]

2.    It is inconceivable that when Congress put the Oversight Board in charge of every Title III debtor, it did not know there were all kinds of relationships and claims between and among the Commonwealth and its instrumentalities.  Moreover, one can only imagine the chaos

---

[7] PROMESA § 101(g).

[8] PROMESA § 101(a).

[9] PROMESA § 315(b).

[10] PROMESA § 104(b).

[11] PROMESA § 312(a).

[12] PROMESA §§ 201, 202.

Congress would have created if it had created multiple, independent chiefs to control the different entities.  Accordingly, Respondents' allegations of conflict have no substance, and are objections to PROMESA as opposed to the Oversight Board's statutory entitlement to the relief the Motion requests.  Indeed, some Responses go so far as to ask the Court to override PROMESA by endowing certain entities with powers Congress granted solely to the Oversight Board.

3.   Although Congress designated the Oversight Board as representative of title III debtors with full awareness that claims may exist among them, the Oversight Board has proposed additional procedures, in compliance with PROMESA, to resolve the Commonwealth-COFINA Dispute[13] fairly, efficiently, and transparently (the "Procedures").  While most Respondents embrace some aspects of the Procedures, many denigrate the Oversight Board's efforts to appoint two independent agents of the Oversight Board to represent each of the Commonwealth and COFINA.  As demonstrated below, the Procedures are plainly authorized by and consistent with PROMESA and are thoughtfully formulated to provide the fairest possible method to procure a resolution of this gating issue.

***The Debtors and Respondents Agree on Several Aspects of the Procedures***

4.   Among the Responses received, common ground emerges.

5.   <u>Intervention</u>.  Respondents, such as the UAW and AFSCME, do not object to the Procedures but only reserve their rights to intervene and participate in any litigation commenced by the Agents.[14]  Other Respondents voiced concerns regarding their right to intervene.[15]  The Procedures encroach neither on Federal Rules of Civil Procedure Rule 19, nor Bankruptcy Code

---

[13] Capitalized terms used but not otherwise defined shall have the same meaning given to them in the Motion.

[14] Unions Response at 2.

[15] *See, e.g.*, Mutual Funds Group Response at 11; COFINA Senior Bondholders Response at 7.

section 1109, nor any right of intervention. The Court can rule on intervention motions and rights to appear under Bankruptcy Code section 1109, as they arise and once litigation commences. The only difference between the Oversight Board and Respondents in regard to intervention is that many Respondents demand they be granted intervention now, while the Oversight Board believes intervention motions should be determined after the litigation exists and the Court has the benefit of the facts and circumstances. The same issue arose in connection with the joint administration motion, and on May 17, 2017, the Court agreed intervention should not be considered before it is ripe.

6.    <u>Mediation</u>. Various Respondents note the mediation process that began prior to the commencement of these Title III Cases and highlight the Court's appointment of an esteemed panel of jurists to mediate significant issues.[16] They request that such mediation promptly resume using a mediator selected from the Court-appointed mediation team. The Motion expressly requires that the Agents attempt to negotiate a resolution. That negotiation can certainly take place in mediation. Additionally, because the Agents will only be litigating whether the Commonwealth or COFINA own the Pledged Sales Tax, the Oversight Board is willing to participate in the mediation with the Agents and creditors so creditors' treatment under the plans of adjustment can be negotiated. It is frequently easier to settle when a party knows what it will get, as opposed to knowing only what assets will be property of the debtor.

7.    <u>Court Approval of Settlement</u>. Other Respondents raise concerns regarding court approval of any settlement that emerges as a result of the Procedures.[17] To the extent the Motion and its Proposed Order did not make clear that any settlement will be subject to court approval,

---

[16] *See, e.g.*, FGIC Response at 3; National Response at 3; *see also Order Appointing Mediation Team* [ECF No. 430].

[17] *E.g.* COFINA Senior Bondholders Response at 6; Assured Response at 7.

4

the Debtors agree it should be and will be.  Any proposed settlement may be submitted for court approval as a standalone settlement or as part of the confirmation hearing if the settlement is proposed in a plan of adjustment.  Interested parties will have the opportunity to object to any settlement.

8.   <u>Fiduciary Duties</u>.  As explained above, many Respondents contend the Agents should be deemed to have fiduciary duties to COFINA and the Commonwealth, respectively. The Debtors contend that Agents' duties should not be shoehorned into a fiduciary duty.  Rather, each Agent has all the duties imposed by PROMESA on the Oversight Board as representative of COFINA or the Commonwealth, as the case may be.  We submit the Court should not change the duties imposed by PROMESA by limitation or extension.

9.   <u>November 1 Deadline</u>.  Some Respondents take issue with the November 1, 2017 deadline to resolve the Commonwealth-COFINA Dispute, and yet suggest that very deadline in their proposed order.[18]   Notably, while many Respondents question whether projected cash flow issues support the November 1, 2017 deadline, no Respondents challenge the fact that the Commonwealth-COFINA Dispute is a gating issue in these Title III cases.[19]   Negotiations of plans of adjustment for both the Commonwealth and COFINA cannot be meaningful without knowing which entity owns the Pledged Sales Tax.   That reason alone substantiates the November 1, 2017 deadline.

10.   The November 1 deadline also remains an important constraint for financial reasons.  Contrary to many Respondents' assertions that the Oversight Board had no evidence of

---

[18] *See, e.g.*, National Response at 10 & Exh. A at 3; AMBAC Response at 12 & Exh. 2 at 3.

[19] With the exception of Assured and AMBAC, who, notwithstanding this Court's previous exhortations to avoid "issue creep," took an opportunity to criticize the Certified Fiscal Plan in its response.  Assured Response at 1; AMBAC Response at 3.  AMBAC also argued that the real gating issue is the intra-COFINA dispute.  AMBAC Response at 9.  But resolution of that dispute is irrelevant here, as the COFINA Agent will maximize return to the COFINA estate no matter which bondholders prevail in the intra-COFINA dispute.

the need for a November 1 deadline, the Commonwealth had furnished the Oversight Board with data that demonstrated, at the time, that the Commonwealth would have a negative cash balance before the end of November 2017.[20]

11.     Some Respondents assert that actual cash collections have surpassed projections by $850 million.  The Oversight Board has learned from the Commonwealth that what appears to be an improved liquidity position is largely the result of certain measures,[21] including deferred expenses, which will lead to higher expenses going forward.  Significantly, however, the cash projections have assumed, among other things, that (a) all savings contemplated in the Certified Fiscal Plan will be realized on schedule, and (b) none of the creditors attempting to procure revenues (i.e., the HTA and ERS litigations, among others) will succeed.  Moreover, the cash projections need to be reduced by approximately $400 million representing the cash allocated for debt service in the new fiscal year.  It is possible that the cash situation on November 1, 2017 will be better or worse than currently projected, and the Oversight Board will certainly undertake to keep the Court and creditors apprised of all material changes in projections as it obtains

---

[20] As explained in the paragraph below, we understand the liquidity forecast has since been adjusted to reflect certain recent events and more current data.  However, the Oversight Board is still informed, for reasons explained below, that the overall conclusion that the November 1, 2017 deadline is important to the Commonwealth's cash situation remains unchanged.

[21] The measures include: (i) the non-payment of principal and interest payable to the State Insurance Fund Corporation, the Automobile Accident Compensation Administration, and the Temporary Non-Occupational Disability Insurance otherwise due in June 2017 and deferred until May 2018, which increased liquidity by $423 million; and (ii) the adjustment of payments to suppliers the Fiscal Plan, which resulted in a liquidity increase of $150 million.

In addition to the deferred expenses, there was some liquidity improvement due to increased revenues.  These include: (i) $46 million of revenues primarily related to claw back retained from the Highway and Transportation Administration; (ii) General Fund collections improved by $74 million; (iii) collections of $90 million, including $20 million of *Crudita* revenue subject to claw back and other revenue not projected, that was received by various agencies, including the Office of Insurance Commissioner, the Department of Labor, and the Administration for Child Support; (iv) allocations from federal funds programs surpassed the amount forecasted by $33 million; and (v) there was positive variance in other miscellaneous net inflows of $43 million.  Certain of these payments were projected to occur in later periods, and others were extraordinary revenues not expected to recur.  *See* Press Release, AAFAF, The PR Government Effectively Faced the Expiration of Medicaid Funds (June 14, 2017).

information from the Commonwealth.  Currently, however, November 1 remains the date that cash issues may negatively impact the Commonwealth.

12.     For these reasons, an expedited litigation schedule is both necessary and reasonable. As a preliminary matter, the fact that an expedited schedule has been requested inures to the benefit of such Respondents as it will give them clarity as to their rights while reducing the expense and time involved in a hotly contested litigation.  The Commonwealth and COFINA implicate the monies available to pay approximately 55% of all the bond debt in all the actual and potential Title III Cases.  Based on this alone, it must be resolved expeditiously for progress to be made.  Ten (10) days is not too short a timeline for the Agents to commence litigation.[22]  The entities vying for the privilege of representing the Commonwealth or COFINA are likely already preparing, and once appointed, the Agents can retain anyone appropriate to get up-to-speed as quickly as possible.

13.     <u>No Certification to Supreme Court of Puerto Rico</u>.  Finally, the Oversight Board refers the Court to the Debtors' separate objection[23] and to the objection of FGIC to the *Puerto Rico Funds and Mutual Fund Group's Motion for Relief from the Automatic Stay* [ECF No. 270], in which creditors seek to pursue at least partial resolution of the Commonwealth-COFINA Dispute in the Puerto Rico Supreme Court.  The Debtors explain in their own objection that certification should not be granted because, among other things, (a) the ultimate question is whether the Pledged Sales Tax is property of the debtor under PROMESA, as opposed to being exclusively a question of Commonwealth law, (b) the Puerto Rico Supreme Court does not

---

[22]  National asks that a request to expedite the litigation come from the Commonwealth's Agent themselves. National Response at 10.  But the Agent's role is pursuing the claims subject to the Procedures, not representing the Commonwealth in its Title III case.  Surely, National cannot intend the agent make every decision the Commonwealth makes moving forward.

[23]  *See Opposition of the Financial Oversight and Management Board for Puerto Rico to the Motion for Relief From the Automatic Stay Filed by the Puerto Rico Funds and Mutual Fund Group* [ECF No. 407].

accept for certification issues turning on both Commonwealth and federal law, and (c) the question to be certified is a cause of action belonging to the Commonwealth and COFINA, and not to the creditors.  The Procedures, in contrast, provide for this federal title III court to decide a federal question, namely whether the Pledged Sales Taxes are property of COFINA or the Commonwealth within the meaning of PROMESA section 306(b).  That question may be informed by whether the SUT are "available resources" of the Commonwealth under the Puerto Rico Constitution, but that is not dispositive of the issue, as demonstrated by *Charleston Sav. Bank v. Martin* (*In re Colonial Realty Inv. Co.*), 516 F.2d 154, 158 (1st Cir. 1975) (internal citations omitted).[24]  Moreover, the Procedures, which provide for resolution of the central issue in these title III cases by Agents of the Debtors in this title III court, are far preferable to litigation of this dispute by creditors in other courts, because the likelihood of settlement is materially greater if the dispute is under the control of two designated Agents, each representing the best interests of their respective Debtor, rather than multitudes of diversely situated, and diversely motivated, creditors.

### *Respondents Inappropriately Attack the Certified Fiscal Plan*

14.    AMBAC, National, and Assured raise their recurring issue of whether the Certified Fiscal Plan is subject to litigation or negotiation.  They have each commenced separate litigation attempting to litigate the Certified Fiscal Plan.[25]  The Certified Fiscal Plan, however, is

---

[24] In *Colonial Realty*, local Massachusetts law provided a mortgagee, not the debtor, owns the mortgaged property because it holds the deed. *Id.* at 158.  Here, the Commonwealth's statute provides the sales and use taxes are not "available resources" of the Commonwealth.  Act No. 91-2006, § 2.  *Colonial Realty*, however, ruled the debtor owned the mortgaged property for purposes of bankruptcy law, notwithstanding the idiosyncratic Massachusetts law providing the mortgagee owned the property.  *In re Colonial Realty Inv. Co.*, 516 F.2d at 158.  The question here is whether the Commonwealth law providing taxes are not its available resources are nevertheless its property for purposes of PROMESA section 306(b) because it enacted the taxes, the taxes arise from Commonwealth transactions, the Commonwealth retains the power to alter or repeal them, and the Commonwealth collects them.

[25] *Ambac Assurance Corp. v. Commonwealth of P. R.*, No. 3:17-ap-159-LTS; *Assured Guar. Corp. v. Commonwealth of P. R.*, No. 3:17-ap-125-LTS (listing both Assured and National as plaintiffs).

8

subject to neither for reasons provided in the *Debtors' Status Report Regarding (a) Financial Disclosures to Creditors and (b) Status of Settlement Discussions* [ECF No. 350].   In short, PROMESA section 106(e) provides that no district court has subject matter jurisdiction over a challenge to the certification of the fiscal plan.[26]   Section 106(e) carries out the policy of insulating the FOMB from pressure and temptation to increase the amounts it believes are realistic to pay creditors and to provide vital services to the people of Puerto Rico.

15.     National gratuitously charges that the Oversight Board did not mediate in good faith and did not negotiate.   National neglects to disclose that National is breaching the confidentiality provisions of the mediation agreement by making such charges.   The Debtors invite National to negotiate how the available moneys are allocated among creditors and how any net revenues in excess of the Oversight Board's projections can be transferred to creditors.[27]   The Certified Fiscal Plan merely shows how much money is available for debt service.   Nothing prevents that money from being allocated to COFINA creditors to the extent COFINA owns the Pledged Sales Tax.   Thus, nothing in the Certified Fiscal Plan is harmful to COFINA.   It is neutral.   If the Commonwealth needs money before or after litigation is resolved, it would borrow from COFINA.

### *There is No Article III Standing Issue*

16.     A dispute between COFINA and the Commonwealth over which entity owns the Pledged Sales Tax is an actual case and controversy.   That the proposed representative of COFINA would be an agent of the Oversight Board in its capacity as representative of COFINA,

---

[26] PROMESA section 106(e) provides "There shall be no jurisdiction, in any United States district court to review challenges to the Oversight Board's certification determinations under this Act."

[27] National's remark that the Oversight Board has "repeatedly ignored… requests for information" likewise has no basis in fact.   National Response at 3.   The Oversight Board sent responses to creditors' letters of June 2, 2017, and June 5, 2017, detailed the voluminous financial disclosures the Oversight Board has already made available and is further forthcoming.

and the proposed representative of the Commonwealth would be an agent of the Oversight Board in its capacity as representative of the Commonwealth, does nothing to eliminate the actual case and controversy.

17.     Moreover, the "case or controversy" requirement only applies to the exercise of Article III power.  But no such requirement exists under Article I, which provides Congress with the authority to establish bankruptcy laws, nor does it exist under the Territory Clause.  Indeed, identifying "property of the estate" has long been a central feature of bankruptcy adjudication resolved by Article I bankruptcy judges, which is "inescapably central to the restructuring of the debtor-creditor relationship."[28]  Therefore, even though an Article III judge is presiding over the COFINA Title III case, the determination of whether COFINA or the Commonwealth owns the Pledged Sales Tax does not require the exercise of Article III judicial power.  Rather, Article I bankruptcy judges make those determinations routinely.  Even if the dispute over which debtor owns the Pledged Sales Tax required Article III judicial power, the Procedures proposed in the Motion enable the dispute to be litigated at arm's length.

***The Procedures Comply with PROMESA***

18.     Congress is entitled to control its territories as it desires pursuant to the Territory Clause in the United States Constitution.  U.S. CONST. art. IV § 3, cl. 2.  In crafting PROMESA, Congress was careful to ensure that the Oversight Board controls the reorganization efforts of the Commonwealth and its instrumentalities.  PROMESA section 315(b) specifically designates the Oversight Board, and no other party, as the representative of Commonwealth and COFINA for purposes of these Title III Cases.  As such, the Oversight Board "may take any action necessary on behalf of the debtor to prosecute the case of the debtor…."  PROMESA § 315(a).  Congress

---

[28] *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1952 (2015) (ROBERTS, C.J., dissenting).

established this procedure with full awareness of the complex web of claims and other relationships between and among the Commonwealth and its instrumentalities.[29]   Indeed, Congress was specifically aware of the Commonwealth-COFINA Dispute when it enacted PROMESA.[30]  Congress nevertheless proceeded to name the Oversight Board as representative of all title III debtors.

19.     Among the numerous powers bestowed on the Oversight Board by Congress is the power to appoint its own agents to undertake actions on its behalf.  PROMESA section 104(b) enables the Oversight Board to authorize an agent to take any action the Oversight Board is authorized to take—which includes litigating and negotiating the Commonwealth-COFINA Dispute.

20.     The Mutual Fund Group attacks the appointment of the Agents as inconsistent with PROMESA because the Agent would represent COFINA *independent* of the Oversight Board.[31]  However, no inconsistency exists.  An agent is defined as "someone who is authorized to act for or in place of another; a representative."[32]  As the Oversight Board is entitled to represent COFINA, it can appoint an Agent as representative to do the same.  PROMESA expressly confirms this authority.

21.     Utilizing its power to appoint agents and its authority to "take any action necessary on behalf of the debtor to prosecute the case of the debtor," the Oversight Board has

---

[29] "The island has issued 18 different classes of debt—from general obligation to COFINA, to GDB [Government Development Bank], to utility bonds.  Various local and State laws are involved, and the result is a web of confusion."  162 Cong. Rec. H3600-01, at H3632 (daily ed. June 9, 2016) (statement of Rep. Velazquez).

[30] "We need to have a solution soon, because we are running out of money.  As the Governor mentioned, we are starting this process, and the idea is to respect the differences between the General Obligation bonds and COFINA." *Financial and Economic Challenges in Puerto Rico*, U.S. Senate Comm. on Finance, at 23 (Sept. 29, 2015) (statement of Ms. Acosta).

[31] Mutual Fund Group Response at 8 (emphasis in original).

[32] *Agent*, Black's Law Dictionary (10th ed. 2014).

taken meticulous care to ensure a fair and orderly process to resolve the Commonwealth-COFINA Dispute and to give the creditors a voice in this process. The Procedures provide the respective creditors of the Commonwealth and COFINA the opportunity to nominate independent Agents to represent their respective Debtors in pursuing a settlement or final adjudication of the Commonwealth-COFINA Dispute. The Oversight Board, in turn, must select from among the creditors' nominees and the statutory creditors' committee to serve as the Oversight Board's *independent* agent. Moreover, to provide a swift resolution to this gating issue, the Agents must commence litigation to resolve the Commonwealth-COFINA Dispute by no later than ten (10) days after their appointment and must further construct litigation schedule that enables the Court to rule, on a final basis, on the Commonwealth-COFINA Dispute on or before November 1, 2017. This structure parallels similar structures undertaken by corporations whereby corporations establish special committees comprised of independent directors to assess the fairness of or negotiate transactions. Such structures have been repeatedly utilized by corporations and blessed by courts for their ability to create arm's length bargains.[33]

22.    In spite of the clarity of the Oversight Board's authority to appoint agents to carry out any of its powers under PROMESA, National claims the Oversight Board, by filing the Motion, concedes that it and its counsel have an irreconcilable conflict and therefore cannot represent COFINA.[34] National's claim, and AMBAC's similar claim, is wrong. They each ignore that Congress requires in PROMESA section 315(b) that the Oversight Board serve as COFINA's representative and the Commonwealth's representative. National advances this argument while it insures $690 million of GO Bonds and $1.1 billion of COFINA Senior

---

[33] *See generally* Claire Hill and Brett McDonnell, *Sanitizing Interested Transactions*, 36 DEL. J. CORP. L. 903 (2011), at http://scholarship.law.umn.edu/faculty_articles/81.

[34] National Response at 1.

Bonds.[35]  By its reasoning, National should have nothing to say in this matter, just as it alleges

the Oversight Board should not.  Yet National requests that it be given veto power over the

selection of the COFINA Agent by advocating the Agent must be unanimously selected by

COFINA senior bondholders, including itself.  National asserts the Oversight Board should have

no role (including the roles assigned by Congress in PROMESA), while it reserves rights for

itself.[36]

23.     Despite Respondents' contentions to the contrary, it is clear from the Procedures

that the Agents wield no more power than what the Oversight Board may grant them through

PROMESA section 104(b).  Similarly, the Agents should have the same obligations to the

Debtors as their principal—*i.e.*, the Oversight Board.  The creditors' request to amend the

Proposed Order to impose fiduciary duties on the COFINA Agent,[37] is unnecessary and changes

PROMESA.  All duties that PROMESA imposes on the Oversight Board in serving as

COFINA's representative in litigation and negotiation are automatically duties of the Agent.

There is no valid basis to shoehorn the Agent's actual duties into a fiduciary duty sound bite.

24.     Some objectors strained to characterize the Motion as something it is not, to

create straw-man objections.  For instance, the contention that the Oversight Board is requesting

a receiver is simply inaccurate.[38]  The Agent's duty is not to receive revenues.  Its duty is to

litigate and negotiate.  Likewise, the claim the Agent is akin to a "non-statutory fiduciary" acting

---

[35] The Mutual Fund Group has a similar conflict, holding over $1.8 billion in GO Bonds, and $3.5 billion of
COFINA bonds.  *See Mutual Fund Group's Response to the Bank of New York Mellon's Urgent Motion for An
Order to Show Cause and Incorporated Memorandum of Law*, No. 3:17-ap-133-LTS [ECF. No. 20] at 4 n.3.

[36] National Response at 8.

[37] COFINA Senior Bondholders Response at 3.

[38] Mutual Fund Group Response at 6–7.

like a trustee is sheer fiction.[39]  The Motion is clear that the Agent is being appointed pursuant to PROMESA section 104(b) to exercise the same powers as the Oversight Board has.  Upon resolution of the Commonwealth-COFINA Dispute, as contemplated by the Procedures, the Commonwealth or COFINA will receive all the SUT it is entitled to receive.  There will be no receiver and no trustee.

***Respondents Seek to Usurp PROMESA's Grant of Exclusivity to the Debtors***

25.    At their core, certain of the Responses propose an inappropriate usurpation of the Oversight Board's role as representative of title III debtors and its exclusive and unlimited right to propose a plan of adjustment for each title III debtor.  *See* PROMESA § 312(a).  Indeed, in the case of the Ad Hoc Group of General Obligation Bondholders (the "GO Group"), no effort is made to hide this intention, as the GO Group claims it is "the only adequate Commonwealth Agent."[40]  Creditors' rights, such as the GO Group's rights, however, are dependent on the Debtors' property rights—a fact that has been known to all creditors from the outset.[41]  Despite arguments labelled as "due process," creditors cannot step into the shoes of the Debtors or the Oversight Board to pursue claims that belong solely to the Debtors—even if such Debtors' claims impact creditor recoveries—where the Debtors have shown every intention of fully pursuing such claims.[42]  The Court should not allow creditors to modify or go around the Procedures to commandeer the litigation of the Commonwealth-COFINA Dispute.

---

[39] *Id.* at 7.

[40] GO Group Response at 14.

[41] The GO Group concedes this fact, noting that the "analogous situation" is where a trustee consents to a creditors' committee pursuing claims derivatively on behalf of the debtor.  GO Group Response at 16.

[42] *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 553 (3d Cir. 2003) (finding creditor's committees can pursue derivate actions if a debtor-in-possession unreasonably refuses to pursue such action and is neglecting its fiduciary duty).  *Cybergenics* is the opposite of the facts here, where, regardless of the colorability of the claims of the Debtors as to the rights to the Pledged Sales Tax, the Debtors have clearly not refused to bring such claims.

26.     The Commonwealth-COFINA Dispute is limited to the question of whether, after considering all procedural and substantive defenses, the Pledged Sales Tax is either (a) property of the Commonwealth within the meaning of PROMESA section 306(b), or (b) subject to an allowable claim of the Commonwealth having priority over all claims of COFINA.  The fact that resolution of this issue has an impact on creditors is simply the nature of creditors' dependent rights and does not change the reality that the causes of action belong to the Commonwealth and COFINA, and creditors have no standing to pursue them.  To determine otherwise would mean that a creditor of a corporation would have standing in any litigation involving that corporation that may affect the value of that creditor's claim.[43]

27.     Not only should the Commonwealth and COFINA (through the appointed Agents) be drivers of the process to resolve the Commonwealth-COFINA Dispute, the Oversight Board (as representative of these Debtors for purposes of title III) must be involved.  PROMESA section 312(a) provides that "[o]nly the Oversight Board, after the issuance of a certificate pursuant to section 104(j) of this Act, may file a plan of adjustment of the debts of the debtor."  Accordingly, any settlement that arises can only be incorporated into a title III plan of adjustment through affirmative consent and cooperation of the Oversight Board.  Although creditors may want to take control of these claims and rights of the Debtors, they cannot change or ignore the statutory framework Congress enacted.

### *There are No Issues of Due Process*

28.     The GO Group's arguments relating to due process are an attempt to supplant the Oversight Board as representative of COFINA.  Their argument is based on the false premise

---

[43] For the same reasons, there is no issue of adequate protection.  The COFINA bondholders' collateral is entirely dependent on whether COFINA owns the Pledged Sales Tax.  If COFINA does not own it, then they have no collateral.  This is not a matter of taking bondholder collateral, it is a matter of finding out if they have any collateral.  At the resolution of the Commonwealth-COFINA Dispute, the funds subject to dispute will be available to the party rightfully entitled to them.

that the Procedures seek appointment of an Agent to pursue *creditors'* claims and not the *Debtors'* claims.[44]   Building on this premise, the GO Group attempts to flip this script: even though they are seeking to step into the shoes of the Commonwealth and litigate on its behalf, they make it appear as if the Commonwealth is looking to litigate as the creditors' representative. They then argue that such a representative must adequately represent creditors' interests.   This argument is incorrect.   Because creditors' rights are dependent on the Debtors' rights, and because the Commonwealth-COFINA Dispute seeks resolution of claims held by the Debtors alone, creditors lack standing to pursue these causes of action and GO Group's due process arguments fail.   As aforesaid, to whatever extent creditors have intervention rights, nothing in the Procedures deprives them of such rights.

29.   Resolution of the Commonwealth-COFINA Dispute may impact creditor recoveries, but it does not *bind* creditors' rights as it pertains to their claims at the respective Debtor.[45]   While the value of a creditor's claim may be affected, the creditors' legal rights of recovery are unaltered.   Accordingly, due process does not require that the Agent represent creditors' rights because it is the Debtors' rights that each Agent represents.   Indeed, the Agents to be nominated by creditors to represent the Commonwealth or COFINA, respectively, are not agents of the creditors, but agents of the Oversight Board as representative of the respective Debtors.   The GO Group's proposed analysis that "a class representative must have an interest in vigorously pursuing the claims of the class, and must have no interest antagonistic to the interests of other class members"[46] is simply inapplicable here because the Agent does not purport to be

---

[44] This misconception is shared by a number of creditors who contend the claims to be resolved by the Procedures are *creditors'* claims.  *See, e.g.*, AMBAC Response at 8; FGIC Response at 3.

[45] *See* GO Group Response at 11.

[46] GO Group Response at 12.

(and, in compliance with PROMESA, could not purport to be) representative of the creditors.  In any event, if the GO Group is truly concerned about having its "day in court,"[47] it may seek to appear and intervene in any litigation the Agents commence.

30.     Any concern that the Agents would not vigorously pursue their respective Debtors' claims is misplaced.  The Procedures are not collusive for this very reason.[48]  While the alleged due process requirement that the agent "adequately represent" creditors' interests is inapplicable here, there is no valid concern that either Agent would not vigorously advocate on behalf of its Debtor, as the interests and incentives of the Debtors are very much aligned with those of their respective creditors.  The Procedures provide that the Oversight Board must select the Agent for the Commonwealth from the general statutory creditors' committee and at least two nominations made by creditors.  It is only if the creditors fail to agree on at least two nominations that Oversight Board members shall select the Agents *after* consulting with creditors and considering potential persons that had not been nominated.  As long as creditors nominate two representatives, the Oversight Board can only select from the statutory creditors' committee and Agents that have been deemed acceptable to such creditors.

31.     Finally, the GO Group asks that, due to alleged "due process defects," the Court, not the Oversight Board, should appoint the Commonwealth Agent.  The GO Group makes this request only after submitting its own audition for the position of Agent by stating it is the "only adequate Commonwealth Agent" and that "it alone has mastered the issues well enough to

---

[47] GO Group Response at 10.

[48] The Mutual Fund Group's citation to *United States v. Johnson*, 319 U.S. 302 (1943), is therefore wholly inapposite.  Mutual Fund Group Response at 9.  In *Johnson*, a "friendly suit" was instituted at appellee's request, and the plaintiff never even met the attorney who appeared on his behalf.  *Id.* at 303–04.  The Supreme Court found that there was no case or controversy and dismissed the suit.  *See id.* at 305.  Here, there is nothing "friendly" about a lawsuit whose determination could affect property of the Debtor's estates to the tune of hundreds of millions if not billions of dollars.

litigate within ten days of being selected."[49]  Such a request, if granted, would go directly against Congress's intent in crafting PROMESA.  PROMESA provides for the Oversight Board to appoint its own agents.  While the Oversight Board is willing to limit its selection to the statutory creditors' committee and nominations provided by groups of creditors, the Oversight Board should not be ordered to abdicate its role as representative of the Debtor or give up its ability to select its own agents.  That any settlement or plan of adjustment must be approved by the Court before becoming effective already provides the judicial check that the GO Group purportedly seeks.

*Notice*

32.     The Debtors have provided notice of this Omnibus Reply to the following parties: (a) the Office of the United States Trustee for the District of Puerto Rico; (b) the indenture trustees and/or agents, as applicable, for the Debtors' bonds; (c) the entities on the list of creditors holding the 20 largest unsecured claims against each Debtor; (d) the Office of the United States Attorney for the District of Puerto Rico; (e) counsel to the Puerto Rico Fiscal Agency and Financial Advisory Authority on behalf of the Governor of Puerto Rico; (f) the Puerto Rico Department of Justice; (g) the Other Interested Parties;[50] and (h) all parties filing a notice of appearance in these Title III Cases.

[*Remainder of Page Intentionally Left Blank*]

---

[49] GO Group Response at 14.

[50] The "Other Interested Parties" include the following: (i) counsel to certain of the insurers and trustees of the bonds issued or guaranteed by the Debtors; (ii) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the Debtors; and (iii) counsel to the Respondents.

Dated: June 24, 2017
        San Juan, Puerto Rico

Respectfully submitted,

*/s/*  Martin J. Bienenstock

Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Maja Zerjal
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

*/s/*  Hermann D. Bauer

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*