## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

(*caption continued on next page*)

**STATEMENT OF THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS, AMBAC ASSURANCE CORPORATION, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., THE MUTUAL FUND GROUP, NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION, AND THE PUERTO RICO FUNDS IN RESPONSE TO DEBTORS' STATUS REPORT REGARDING (A) FINANCIAL DISCLOSURES TO CREDITORS AND (B) STATUS OF SETTLEMENT DISCUSSIONS**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474).

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO ("ERS"),

      Debtor.[2]

PROMESA
Title III

No. 17 BK 3566-LTS

(Joint Administration
Requested)

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY ("HTA"),

      Debtor.[3]

PROMESA
Title III

No. 17 BK 3567-LTS

(Joint Administration
Requested)

---

[2]    The last four (4) digits of ERS's federal tax identification number are 9686.

[3]    The last four (4) digits of HTA's federal tax identification number are 3808.

## TABLE OF CONTENTS

**Page**

DISCUSSION ................................................................................................................ 4

    A.   The Oversight Board Is Not Above The Law ................................................. 4

    B.   The Fiscal Plan Is A Proper Subject Of Discovery, And Disclosures By The Commonwealth And The Board To Date Have Been Woefully Inadequate .............. 12

    C.   The Board's Refusal To Engage In Settlement Discussions Will Make A Consensual Resolution Of These Title III Cases Impossible ...................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Lorber v. Vista Irr. Dist.*,
   127 F.2d 628 (9th Cir. 1942) ................................................................. 7

*In re Recoton Corp.*,
   307 B.R. 751 (Bankr. S.D.N.Y. 2004)................................................... 12

*In re Washington Mutual, Inc.*,
   408 B.R. 45 (Bankr. D. Del. 2009) ....................................................... 12

**Statutes and Constitutional Provisions**

11 U.S.C. § 1129(b)(1) ............................................................................ 6

11 U.S.C. § 1129(b)(2) ............................................................................ 7

48 U.S.C. § 2104(10) ............................................................................... 6

48 U.S.C. § 2104(22) ............................................................................... 6

48 U.S.C. § 2141(b)(1)(B) ....................................................................... 4

48 U.S.C. § 2141(b)(1)(N) ....................................................................... 5

48 U.S.C. § 2146(a)(2)(B) ..................................................................... 13

48 U.S.C. § 2161(a) .......................................................................... 6, 13

48 U.S.C. § 2174(b) ................................................................................. 8

48 U.S.C. § 2174(b)(1)-(7) .................................................................. 3, 6

48 U.S.C. § 2174(b)(6) ............................................................................ 7

48 U.S.C. § 2231(f) ............................................................................... 13

P.R. Const. art. VI, § 2 .......................................................................... 10

13 L.P.R.A. § 12 .................................................................................... 17

32 L.P.R.A. § 1781 ................................................................................ 14

**Miscellaneous**

6 *Collier on Bankruptcy* (16th ed.) ........................................................ 7

## TABLE OF AUTHORITIES—CONTINUED

**Page(s)**

*After Puerto Rico's Debt Crisis, Worries Shift to Virgin Islands*, N.Y. Times (June 25, 2017) .................................................................................................................... 19

*Commonwealth Government General Fund Net Revenues*, http://www.aafaf.pr.gov/assets/t28_ae-2016.xlsx ..................................................... 8

*Commonwealth Report Forecasts $1.15B Treasury FY2017 Closing Balance*, Reorg Research (June 13, 2017) ............................................................................... 11

Ernst & Young Puerto Rico LLC, *Financial Bridge Analysis* (March 7, 2017) ........................... 9

*Fiscal Plan for Puerto Rico* (March 13, 2017) ............................................................................. 5

*Governor 'Surprised' by PROMESA Board Questions on Essential Services*, Reorg Research (June 19, 2017) ................................................................................. 5

H.R. Rep. No. 686, 94th Cong., 1st Sess. (1977) ......................................................................... 7

International Monetary Fund, *Factsheet: The Joint World Bank-IMF Debt Sustainability Framework for Low-Income Countries* (March 2016) .............................................. 10

OpenGov, *CivicDashboards* .......................................................................................................... 10

*Oversight Board Resolution (Fiscal Plan Certification)*, March 13, 2017.................................... 10

*The New $1.15 Billion . . . And More*, El Vocero (June 15, 2017) ............................................... 11

World Bank, *Interest payments (% of revenue)* ............................................................................ 10

TO THE HONORABLE COURT:

The Responding Creditors (as defined below) hereby submit this joint statement in response to *Debtors' Status Report Regarding (A) Financial Disclosures to Creditors and (B) Status of Settlement Discussions* (No. 17 BK 3283 Dkt. 350) (the "Status Report"), filed by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "Board") on June 15, 2017.[1]  This statement is submitted jointly by the following Responding Creditors:

- The Ad Hoc Group of General Obligation Bondholders ("GO Group"),[2] which holds approximately $3 billion of bonds issued or guaranteed by the Commonwealth of Puerto Rico (the "Commonwealth").

- Ambac Assurance Corporation ("Ambac"), which holds and/or insures approximately $1.3 billion of bonds issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA"), $564 million of bonds issued by the Puerto Rico Infrastructure Financing Authority, $494 million of bonds issued by the Puerto Rico Highways and Transportation Authority ("HTA"), $187 million of bonds issued or guaranteed by the Commonwealth, and $137 million of bonds issued by the Puerto Rico Convention Center District Authority.

-  Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured"), which insure approximately $5.4 billion of debt issued by Puerto Rico government entities, including approximately $1.75 billion of debt issued or guaranteed by the COFINA, and approximately $1.5 billion of debt issued by HTA.

- The Mutual Fund Group,[3] which holds approximately $3.4 billion in accreted principal amount of COFINA bonds, $1.8 billion of bonds issued or guaranteed by the Commonwealth, and more than $3.6 billion of other bonds issued by Puerto Rico instrumentalities.

- National Public Finance Guarantee Corporation (as reinsurer to, and administrative agent for, MBIA Insurance Corporation, "National"), insurer of (i) over $690 million

---

[1]   By submitting this joint response, the Responding Creditors do not waive their right to file a separate or supplemental response to the Oversight Board's Status Report.

[2]   The members of the GO Group filing this objection are certain funds or entities managed or advised by Aurelius Capital Management, LP, Autonomy Capital (Jersey) LP, FCO Advisors LP, Monarch Alternative Capital LP, Senator Investment Group LP, and Stone Lion L.P.

[3]  The Mutual Fund Group consist of funds managed by OppenheimerFunds, Inc. and Franklin Advisers, Inc., and the First Puerto Rico Family of Funds.

of general obligations bonds issued by the Commonwealth; (ii) over $1.1 billion of bonds issued by COFINA; and (iii) approximately $706 million of bonds issued by the HTA.

- The Puerto Rico Funds,[4] which as of May 31, 2017, held approximately $617 million of bonds issued by COFINA and approximately $717 million of bonds issued by the Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

Because the Responding Creditors occupy different positions in the capital structure of the Commonwealth and its instrumentalities, their interests are diverse and, in certain respects, in conflict with one another.  But all are united in their rejection of certain fundamentally misguided and misleading positions set forth by the Oversight Board in its Status Report.

The Oversight Board's Status Report rests on a breathtakingly overbroad conception of the Oversight Board's authority under the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").[5]  In the Board's view, PROMESA confers upon the Board a unilateral—and unreviewable—power to dictate the amount of revenues that will be available to service the debts of the Commonwealth and its instrumentalities, through the certification of a Fiscal Plan.  All that is left for creditors to do, the Oversight Board asserts, is "negotiate to divide up the money available for debt service under the fiscal plan."  Status Report ¶ 24.  The

---

[4] The Puerto Rico Funds are the following Puerto Rico-based funds: Puerto Rico AAA Portfolio Bond Fund II, Inc.; Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico Fixed Income Fund VI, Inc.; Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.;  Puerto Rico Investors Bond Fund I; Puerto Rico Investors Tax-Free Fund, Inc.; Puerto Rico Investors Tax-Free Fund, Inc. II; Puerto Rico Investors Tax-Free Fund III, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; Puerto Rico Investors Tax-Free Fund V, Inc.; Puerto Rico Investors Tax-Free Fund VI, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; and UBS IRA Select Growth & Income Puerto Rico Fund.

[5] PROMESA has been codified at 48 U.S.C. §§ 2101-2241.

Oversight Board therefore contends that creditors may not even obtain discovery regarding the analyses, judgments, and projections that underlie the certified Fiscal Plan. *Id.* ¶ 28.

As we explain below, the Oversight Board's position fundamentally misunderstands PROMESA. Even if the Board were correct that the statutory requirements for certifying a Fiscal Plan are not subject to judicial review—a position that the Responding Creditors do not concede—it would not follow that the Board's proposed debt-service amounts are shielded from transparency to creditors and judicial scrutiny. To the contrary, in order for any plan of adjustment premised on the Fiscal Plan to be confirmed under Title III of PROMESA, the Board must demonstrate that it satisfies a number of separate confirmation requirements drawn from the Bankruptcy Code (but in certain key respects more protective of creditors than the analogous Code provisions). See 48 U.S.C. § 2174(b)(1)-(7). There is no question that, at confirmation, creditors will be entitled to challenge the assumptions, projections, and analyses that underlie the Board's proposed debt-service amounts. And it is this Court—not the Oversight Board—that will be responsible for resolving these challenges.

For this reason, the Fiscal Plan is plainly a proper subject of discovery. Access to information about the projections, assumptions, and analyses that underlie the Fiscal Plan is necessary for creditors to understand and challenge any plan of adjustment premised on the Fiscal Plan, which they are entitled to do. The Board's disclosures to date—which obfuscate, rather than reveal, this key information—are woefully inadequate, contrary to the misleading suggestions set forth in the Oversight Board's Status Report. What is more, public reports continue to show that the Commonwealth's finances are far better than reflected in the Fiscal Plan. Yet the Oversight Board has refused to make appropriate corrections to the Fiscal Plan; this money apparently disappears into the ether as the Oversight Board clings to its take-it-or-

3

leave-it stance toward financial creditors.  To make matters worse, Commonwealth officials have been engaging in a mad dash to pay certain creditors before a restructuring plan is proposed—trade creditors, tax refund claimants, and others are being paid in full at a rapid rate, without any regard for lawful liens or priorities.

The Oversight Board's insistence that it may dictate to creditors, rather than negotiate with them, also dooms any possibility for a consensual resolution of these Title III cases.  Unless the Board abandons this destructive course, the result may be prolonged and costly litigation that is not in the interests of Puerto Rico or any of its stakeholders.

## DISCUSSION

### A.      The Oversight Board Is Not Above The Law

The central theme of the Status Report is that, in the Oversight Board's view, the Board is above the law.  As the Board sees things, once the Board has certified a Fiscal Plan, the amounts it has proposed for debt service are set in stone.  No creditor may object—no matter how blatantly unlawful the Fiscal Plan may be, or how obviously counterfactual are the assumptions on which it rests.  Even this Court, the Board asserts, lacks authority to "second guess[]" the Board's judgments.  Status Report ¶ 26.  That is an oddly pejorative label for judicial review.

The Board's strident insistence that the Fiscal Plan's lawfulness may never be challenged or reviewed is a tacit concession that the Fiscal Plan disregards PROMESA's requirements and is indefensible on its merits.  The Board appears to believe that it *must* be above the law, because if the law is brought to bear on the Fiscal Plan then the Fiscal Plan will not survive.  And that is no surprise: The Fiscal Plan is invalid *on its face*, because it acknowledges that the Commonwealth has made *no effort at all* to differentiate essential expenditures from non-essential ones despite Congress's directive that a Fiscal Plan endeavor to "ensure the funding of *essential* public services," 48 U.S.C. § 2141(b)(1)(B) (emphasis added), not whatever level of public services the

Commonwealth's public officials may desire.  See *Fiscal Plan for Puerto Rico* 6 (March 13, 2017) (corrected version), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/ 58f614473f619.pdf.  The Fiscal Plan also effectively acknowledges that the Commonwealth and the Board have not even attempted to comply with the statutory obligation to "respect . . . relative lawful priorities or lawful liens."  48 U.S.C. § 2141(b)(1)(N); see *Fiscal Plan for Puerto Rico* 6.

Indeed, only recently—more than three months *after* certifying the Fiscal Plan—did the Oversight Board press the Commonwealth for an explanation of how it defines "essential services."  See Letter from Oversight Board to Governor Rosselló, June 16, 2017, at p. 3 (Ex. 1).  Governor Rosselló quickly stated that he was "surprised" by the Oversight Board's inquiry, stating that the Fiscal Plan had already been certified and that the Oversight Board had "in essence passed judgment on this on two different occasions."  *Governor 'Surprised' by PROMESA Board Questions on Essential Services*, Reorg Research (June 19, 2017) (Ex. 2).  This exchange—and the Oversight Board's belated recognition of the significance of the "essential services" issue to the Commonwealth's treatment of its various debt obligations—are emblematic of the fundamentally flawed process underlying the Oversight Board's certification of the Fiscal Plan.

The Board's confidence that such blatant statutory violations cannot be challenged is misplaced.  But even if the Oversight Board were correct that PROMESA's requirements *for certification* of a Fiscal Plan are not subject to judicial review, that would not shield from

judicial inquiry the amounts proposed for debt service in the Fiscal Plan or the assumptions underlying that calculation.[6]

For any plan of adjustment to be confirmed, it must satisfy each of the statutory confirmation requirements under Section 314(b) of PROMESA. See 48 U.S.C. § 2174(b)(1)-(7). The Board must propose a plan of adjustment that satisfies each confirmation requirement. If it fails to do so, then these Title III cases ultimately will be dismissed. As this Court has observed, PROMESA does not create a structure in which the "fiscal plan as it exists could be implemented with [creditors] unable to do anything about it." See 6/5/17 Tr. (No. 17-ap-151 Dkt. 50) at 21; see also id. (observing that the Board is "going to have to propose an adjustment plan that will either work or not work, and if it doesn't work and the Title III fails" then the automatic stay will be lifted and creditors may pursue their pre-existing remedies).

Prominent among Section 314(b)'s safeguards is the requirement, incorporated from the Bankruptcy Code, that a plan be "fair and equitable" in order to be confirmed over the objections of an impaired, non-accepting class (colloquially, a "cramdown" plan). 11 U.S.C. § 1129(b)(1); see also 48 U.S.C. § 2161(a) (incorporating Section 1129(b)(1) by reference). In addition to importing the "absolute priority" rule, under which a senior class of claims must receive the

---

[6] The Board's position also rests on a mischaracterization of the adversary proceeding brought by Assured and National, describing it as an attempt to seek judicial review of the certification of the Fiscal Plan. See Status Report ¶¶ 25, 29 (referring to *Assured Guar. Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-00125-LTS) (the "Assured/National Adversary"). Contrary to characterizations in the Status Report, the Assured/National Adversary does not seek review of the certification of the Fiscal Plan nor dismissal of the petition. Instead, the Assured/National Adversary seeks to stay any plan of adjustment in the Title III case until the Board submits a Fiscal Plan "in accordance with" Section 201(b) of PROMESA. See 48 U.S.C. § 2104(10), (22). Moreover, the Assured/National Adversary also alleges claims for violations of the Contracts, Takings, and Due Process Clauses of the U.S. Constitution, each based on the Commonwealth's unlawful Fiscal Plan Compliance Law, and, in the Status Report, the Board concedes, as it must, that Section 106(e) does not apply to claims based on "rights under the United States constitution." See Status Report ¶ 27.

value of its claims before any junior class of claims may receive any distribution under the plan, see 11 U.S.C. § 1129(b)(2), the fair and equitable requirement is also understood to have additional "important content" in municipal bankruptcy cases.    6 *Collier on Bankruptcy* ¶ 943.03[1][f][i][A] (16th ed.).    In particular, a municipal debtor's plan of adjustment may be approved only upon a factual finding that the recovery proposed for creditors is "the maximum that the [debtor] could reasonably pay."    *Lorber v. Vista Irr. Dist.*, 127 F.2d 628, 639 (9th Cir. 1942); see also 6 *Collier on Bankruptcy* ¶ 943.03[1][f][i][A] ("A plan under chapter 9 is fair and equitable if the amount to be received by the bondholders is all that they can reasonably expect in the circumstances.") (citation omitted); H.R. Rep. No. 686, 94th Cong., 1st Sess. 32-33 (1977) (noting that the debtor "must exercise its taxing power to the *fullest extent possible* for the benefit of its creditors") (emphasis added).    Such an inquiry would necessarily analyze not only the revenue side of the equation but also expenses.[7]

Nothing in PROMESA overrides the requirement that the Commonwealth do all that is reasonably possible to maximize creditor recoveries if any proposed plan of adjustment is to be confirmed.    To the contrary, this requirement is expressly incorporated.    Nor does PROMESA commit that determination to the Oversight Board.    Rather, *this Court* will determine based on the evidence adduced before it—not the Board's *ipse dixit*—whether the confirmation

---

[7] Our discussion of the Oversight Board's obligation to maximize creditor recoveries in any plan of adjustment should not be taken as minimizing the importance of the other confirmation requirements imposed by Section 314(b) of PROMESA.    Indeed, any plan of adjustment premised on the current Fiscal Plan would fail under multiple confirmation requirements, including the requirement that the plan be "in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan," 48 U.S.C. § 2174(b)(6), and the absolute priority rule imposed by 11 U.S.C. § 1129(b)(2).    It is the Board's obligation to maximize creditor recoveries, however, that most starkly demonstrates the fallacy of the Board's assertion of an unreviewable authority to dictate a fixed amount for debt service that must be divided among creditors.

requirements set forth in Section 314(b) have been satisfied.  See 48 U.S.C. § 2174(b) (providing that "*[t]he court* shall confirm the plan if" the specified requirements are satisfied) (emphasis added).

Thus, in any contested confirmation proceeding, the Board will have to demonstrate to the Court's satisfaction that the proposed plan of adjustment does all that is reasonably possible to maximize creditor recoveries.  If the Board proposes a plan of adjustment premised on the current Fiscal Plan, then creditors will be entitled to challenge the assumptions, projections, and analyses that underlie the Fiscal Plan's proposed debt-service figures.

For example, creditors can be expected to challenge the Fiscal Plan's unduly pessimistic economic assumptions, which produce a dramatic contraction in projected governmental revenues—notwithstanding the fact that the Commonwealth's general fund revenues have been trending upwards since 2011, and today are at an all-time high.  See *Commonwealth Government General Fund Net Revenues*, http://www.aafaf.pr.gov/assets/t28_ae-2016.xlsx.  Likewise, if the Oversight Board contends that no expenditure reductions beyond the illusory "cuts" that are proposed in the Fiscal Plan are reasonably possible, creditors will be entitled to challenge the assumptions and analyses that form the basis for that conclusion.[8]

For instance, creditors will certainly challenge the Fiscal Plan's inclusion of a $600 million "reconciliation adjustment," an amount that grows each year and totals $6.2 billion over the Fiscal Plan's 10-year term (the "Reconciliation Adjustment").  Puerto Rico has not released audited financials beyond fiscal year 2014, and therefore the stated purpose of the Reconciliation Adjustment is to capture the claimed historical understatement of Puerto Rico's expenses.  In

---

[8] In fact, there are no true expenditure reductions contemplated in the Fiscal Plan.  The purported "cuts" are measured against hypothesized increases in future spending, rather than actual past spending.

particular, on February 15, 2017, the Oversight Board retained Ernst & Young ("E&Y") to "bridge" Puerto Rico's audited fiscal year 2014 financial statements to projected revenues and expenses for fiscal year 2017.  On March 7, 2017—only three weeks after being retained, and one week before the March Fiscal Plan was certified—E&Y issued a report concluding that a "hypothetical extrapolation of historical general fund expenditures" suggested "a potential understatement of general fund expenditures" of $360 million to $810 million for fiscal year 2017.[9]  The Oversight Board quickly adopted these conclusions, and added $585 million (the midpoint of the range) of as-yet unidentified expenses for the fiscal year 2017 projection—an amount that is then assumed to grow faster than the Puerto Rico economy (on a nominal basis) throughout the ten-year baseline projection, suggesting that the Commonwealth's historical lack of financial control will persist under the watch of the Oversight Board.  The Reconciliation Adjustment is an "expense" that is somehow "essential," but not for any identifiable expenditure.  The sole justification for the "expense" is the assumption that the cost of running Puerto Rico's government cannot be reliably estimated by the government itself.  In truth, this Reconciliation Adjustment is nothing more than a $600 million annual slush fund that serves only to artificially increase the Commonwealth's expenses and reduce the funds purportedly available for debt service.

More broadly, the current Fiscal Plan allocates only $787 million to average annual cash available for debt service (intended to cover all issuers included in the Fiscal Plan) over the next 10 years, which amounts to approximately a mere 6.4% of local revenues.[10]  The evidence will

---

[9] Ernst & Young Puerto Rico LLC, *Financial Bridge Analysis* 9 (March 7, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58c03d8708398.pdf.

[10] The $787 million figure for average annual debt service corresponds to the numbers reported in the Commonwealth's March 13, 2017 Fiscal Plan, but it does not take into account

show that this proposed debt-service ratio is anomalously low by reference to other jurisdictions in the United States and abroad,[11] guidance from international institutions,[12] and the 15% ceiling that the framers of the Puerto Rico Constitution deemed sustainable for general obligation debt. P.R. Const. art. VI, § 2.  The Oversight Board will have to defend its contrary conclusion—a task that we believe will prove impossible.

Recent events clearly demonstrate the falsity of the crisis narrative that underlies the Board's defense of the Fiscal Plan.  To be sure, the inadequate state of the Commonwealth's financial disclosures makes any fully reliable assessment of the Commonwealth's financial

---

additional reforms required by the Board in the form of amendments to the Fiscal Plan.  See *Oversight Board Resolution (Fiscal Plan Certification)*, March 13, 2017, https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58c6e140a43d4.pdf.  These amendments have not—even more than three months later—been incorporated into a revised Fiscal Plan.  But the Board's counsel has acknowledged in open court that, once they are taken into account, the debt-service amounts yielded even by the Board's flawed approach would reach approximately $900 million annually.  5/17/2017 Tr. (No. 17 BK 3283 Dkt. 207) at 22.  Even so, in an apparent effort to bolster its crisis narrative, the Oversight Board has continued to reference the $787 million figure in its pleadings.  See No. 17 BK 3283 Dkt. 303, at ¶ 30.

[11]    For example, publicly available sources report that the ratio of debt service to revenues is 20.78% in Rhode Island, 14.7% in Connecticut, 11.63% in Louisiana, and 10.27% in Colorado.  See OpenGov, *CivicDashboards*, http://www.civicdashboards.com/state/rhode-island-04000US44/debt_service_ratio;  http://www.civicdashboards.com/state/connecticut-04000US09/debt_service_ratio;  https://www.civicdashboards.com/state/louisiana-04000US22/debt_service_ratio;  https://www.civicdashboards.com/state/colorado-04000US08/debt_service_ratio.  Debt service levels for similarly situated sovereign borrowers are significantly higher than what is proposed in the Fiscal Plan, with recent publicly available statistics for interest expense to revenues reporting 11.0% in Costa Rica, 10.5% in El Salvador, 14.1% in the Dominican Republic, and 24.2% in Jamaica.  See World Bank, *Interest payments (% of revenue)*, http://data.worldbank.org/indicator/GC.XPN.INTP.RV.ZS.  Although various economic and structural differences exist between U.S. States, various countries, and Puerto Rico, the magnitude of the differences in debt-service metrics is noteworthy.

[12]    World Bank and International Monetary Fund guidelines provide that 18% to 22% of government revenues is a sustainable debt-service ratio level even for "low income countries" (*i.e.*, the poorest countries in the world, whose economies are not as developed as Puerto Rico's).  See International Monetary Fund, *Factsheet: The Joint World Bank-IMF Debt Sustainability Framework for Low-Income Countries* (March 2016), http://www.imf.org/external/np/exr/facts/pdf/jdsf.pdf.

position impossible.  But, as creditors have been explaining to the Oversight Board for months, the Board's claims are flatly contradicted by what little information has made its way into public view.  In recent weeks, records from the Puerto Rico Department of Treasury, obtained only through litigation brought by the Center for Investigative Journalism, have revealed that the Commonwealth has a projected cash position of $1.15 billion as of the end of this fiscal year (June 30, 2017), compared to $291 million as forecast by the Fiscal Plan.  See *Commonwealth Report Forecasts $1.15B Treasury FY2017 Closing Balance*, Reorg Research (June 13, 2017) (Ex. 3); see also *The New $1.15 Billion . . . And More*, El Vocero (June 15, 2017) (reporting projected liquidity of $1.545 billion, including "contingency" funds) (Ex. 4).  Thus, the true liquidity picture—which has emerged only by happenstance, rather than through any transparency on the part of the Board—represents an improvement of more than $850 million above what was forecasted.  Yet the Board continues to insist that its Fiscal Plan is infallible and requires no correction.

So too with federal healthcare funds appropriated by Congress.  The Fiscal Plan assumed (unrealistically) that the federal government would provide zero incremental dollars for Puerto Rico's Medicaid program to replace expiring funding under the Affordable Care Act.  Congress has in fact appropriated approximately $296 million in incremental funding for Puerto Rico.  Nonetheless, the proposed debt-service amounts in the Fiscal Plan have not been corrected to reflect this reality.[13]  Rather, this money has disappeared into the budgetary ether, and creditors are again told that the Fiscal Plan is not subject to discussion.[14]

---

[13] On June 2, 2017, the Oversight Board made public its re-certification of the Fiscal Plan's revenue projection for fiscal year 2018.  Among other things, the Board's adjustments to the revenue projections account for the incremental $296 million of federal healthcare funding.  The

\* \* \*

In sum, PROMESA forecloses the Board's position that, entirely free from judicial review, it may ignore the requirements that PROMESA imposes on the Fiscal Plan, and may dictate an amount available for debt service that must be treated as a fixed economic pie, to be divided up among creditors. And all available evidence suggests that the true size of the pie is much larger than the Board and the Commonwealth will acknowledge. No matter how hard the Board may strive to insulate its indefensible decisions from judicial review, the Fiscal Plan will be the subject of vigorous litigation if these Title III cases are not resolved through a consensual agreement.

### B. The Fiscal Plan Is A Proper Subject Of Discovery, And Disclosures By The Commonwealth And The Board To Date Have Been Woefully Inadequate

1. Creditors are entitled to discovery regarding the projections, assumptions, and analyses that underlie the Fiscal Plan. As a general matter, discovery in bankruptcy cases is exceedingly broad. Under Bankruptcy Rule 2004, creditors may obtain discovery into any matter regarding the "nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); see also, *e.g.*, *In re Washington Mutual, Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009). As discussed above, moreover, this information will be critical to the confirmation inquiry regarding any plan of adjustment premised on the Fiscal Plan. And given

---

Oversight Board has not, however, corrected the proposed debt-service amounts in the Fiscal Plan.

[14] To be sure, the Oversight Board can be expected to produce reasons that these developments, and others highlighted by creditors, do not require corrections to the Fiscal Plan. But that only highlights the need for full discovery into the projections, assumptions, and analyses that underlie the Fiscal Plan. See pp. 12-15, *infra*. Creditors will not have any fair opportunity to respond to such arguments if the Fiscal Plan remains a black box.

the Oversight Board's insistence that the Fiscal Plan's proposed debt-service amounts are set in stone, there is no basis to delay transparency on these items.

Likewise, full transparency regarding the Fiscal Plan and the Commonwealth's financial information is absolutely necessary if there is to be any of hope of reaching a consensual resolution in advance of such confirmation proceedings, including through the mediation framework established by this Court.  Indeed, at the very first hearing in these cases, the Court emphasized that "transparency is important in these proceedings" and expressed hope that the Debtors would make "progress on issues relating to the disclosure of information to creditors." 5/17/17 Tr. (No. 17 BK 3283 Dkt. 207) at 63, 147.  Without such transparency, creditors cannot be assured that the recovery proposed under any consensual plan in fact represents a fair settlement of their claims.  Settlement will accordingly be impossible.

Moreover, contrary to the Oversight Board's invocation of PROMESA to shield itself from creditors' information requests, creditor access to information is actually a fundamental tenet of PROMESA.  Creditors are entitled to information that enables them to make informed decisions about potential restructurings; accordingly, both Titles III and VI of PROMESA ensure creditors access to such information.  See, *e.g.*, 48 U.S.C. § 2146(a)(2)(B) (providing that the issuance of restructuring certification and, consequently, Title III eligibility, requires that an entity has "made public draft financial statements and other information sufficient for any interested person to make an informed decision with respect to a possible restructuring"); *id.* § 2161(a) (incorporating the disclosure requirements of Section 1125 of the Bankruptcy Code to a Title III plan of adjustment); *id.* § 2231(f) (requiring delivery of certain information to creditors prior to soliciting votes on a bond modification under Title VI of PROMESA).  In addition, as

public entities—and not private enterprises—the Debtors and the Oversight Board should never withhold information from creditors absent a compelling reason.[15]

The Oversight Board, however, has made clear that it will seek to stymie the critical discovery process.  Based on its mistaken assumption that the amounts proposed for debt service in the Fiscal Plan must be taken as a given, the Board denies that creditors are entitled to any discovery that would support a challenge to these proposed amounts.  Status Report ¶¶ 24-28.

The breadth of the Oversight Board's position is illustrated by the June 13, 2017 response of the Board and AAFAF to informal discovery requests made by the GO Group and Assured shortly after the first-day hearing in these cases.  For example, in response to a request for a "functional version of the macroeconomic growth model" employed to develop the Fiscal Plan, the Board agreed to provide underlying "raw data" but otherwise refused disclosure on the grounds (among others) that "certification of the proposed Fiscal Plan is not reviewable by any court."  Letter from Martin J. Bienenstock to Gary A. Orseck, June 13, 2017, at p. 4 (Ex. 5).  The Board provided the same answer in response to requests for documents relating to growth rates for expenditure line items in the Fiscal Plan.  See id. at 11-12.

These are not peripheral items.  They go directly to the governmental revenues and expenditures that are projected in the Fiscal Plan—two core pillars of any fiscal analysis.  Yet the Board insists that creditors should have no opportunity to understand and diligence the key assumptions that the Commonwealth and the Board relied upon in formulating the Fiscal Plan.

---

[15] The Puerto Rico legislative and executive branches have gone to great lengths to ensure that citizens have access to information.  For example, with certain exceptions, Puerto Rico law grants every citizen the right to inspect and copy any public document.  See 32 L.P.R.A. § 1781. Recently, in Executive Order 2017-10, the Governor reinforced the Commonwealth's public policy in favor of access to information, and outlined a procedure by which citizens can obtain such information.

That position is incorrect, and the Responding Creditors are confident that it will not prevail in these Title III cases.

The Board also has sought to limit disclosure on the ground that it will not "provide proprietary models created by outside consultants." *E.g.*, Ex. 5, at p. 4. That limitation, too, is indefensible. The fact that the Commonwealth or the Board retained an outside consultant to formulate key assumptions for the Fiscal Plan—such as the macroeconomic growth estimates that flow through any number of revenue and expense line items in the Fiscal Plan—does not render them immune from discovery. If there is any legitimate "proprietary" interest at stake, it could be addressed through a standard protective order.

2. Given the Board's crabbed view of its discovery obligations, it is perhaps unsurprising that the Board's positive spin on the status of financial disclosures to creditors is just that—spin. While the Board maintains that "extensive financial information" has been provided to creditors through the Dataroom, the limited materials that have been provided are insufficient to allow creditors to diligence the Fiscal Plan. In fact, AAFAF has produced just 50 documents in the Dataroom, most of which consist of hardcoded Excel or PDF documents that do not reveal the underlying calculations. Additionally, many of the projected numbers in the Fiscal Plan lack any apparent backup. And while the Board states that a "live" version of the Fiscal Plan was provided to creditors on June 6, 2017 (Status Report ¶ 13), that document does little to remedy the Board's inadequate disclosures.

Critically, the "live" model is incomplete and does not appear to be the Commonwealth's working model. The "live" model is in fact 10 tabs of primarily summary output information, and includes links to other excel models that have either not been provided or, if provided, are in fact also hardcoded. The "live" model does not contain the information necessary for one to

determine how its numbers were calculated.  As a result, the numbers and calculations are not auditable.  In addition, prior to the "live" model, every Excel document that AAFAF provided contained only hardcoded figures, with no actual functionality.  The effect of removing the functionality is to obfuscate the underlying assumptions that drive the Fiscal Plan's projections.

For example, financial professionals would expect a true live model to permit an evaluation of the impact and reasonableness of the inputs that drive the cash flows projected in the Fiscal Plan.  The "live" model provided to creditors by AAFAF falls far short of enabling this process.  For instance, within the General Fund, income taxes, non-resident withholding taxes, alcoholic beverage taxes and motor vehicle taxes are all projected using a nominal GNP growth factor that is a hardcoded value in the "live" model.  And while the Dataroom contains a PDF document that summarizes the general methodology used to project the GNP growth factor, it does not provide sufficient detail to allow the calculation of this crucial element to be recreated or even audited.  Indeed, even if a financial professional were to attempt to recreate a calculation of the GNP growth factor based on this document, these efforts would be thwarted because it omits key details, such as how the baseline real GNP growth is derived for each fiscal year or the quantification of the impact of fiscal measures in the initial years of the Fiscal Plan.

Finally, the calculation of most purported expense-reduction measures proposed in the Fiscal Plan is inadequately explained.  For the most part, the Fiscal Plan's projections remain a black box, even within the "live" model, due to a combination of insufficient or missing supporting documents.  Again, without the underlying backup for these projections, there is no way for creditors to diligence the Fiscal Plan's proposal.

* * *

In sum, the Board's Status Report paints a misleading picture of the status of financial disclosures to creditors.  The truth is that the Board is nowhere close to providing the sort of detailed and complete transparency that creditors are entitled to.  If the Board does not reconsider its position, creditors will be forced to pursue costly litigation over their legitimate discovery requests.

### C.    The Board's Refusal To Engage In Settlement Discussions Will Make A Consensual Resolution Of These Title III Cases Impossible

Although the Oversight Board was ordered to provide the Court with an update regarding "the status of settlement discussions" with creditors, No. 17 BK 3283 Dkt. 213, its Status Report discusses only the status of a restructuring support agreement for the Government Development Bank for Puerto Rico, an entity that is not before the Court as a debtor.  See Status Report ¶¶ 33-34.  The Status Report says literally nothing about settlement negotiations with the creditors of the Title III debtors.  Nor could it, because there are no ongoing settlement negotiations—only mounting litigation fostered by the Board's insistence that its Fiscal Plan is above the law and immune from scrutiny.

For many months prior to the filing of these Title III cases, creditors repeatedly urged the Oversight Board to engage in good faith negotiations that might have permitted the parties to reach an out-of-court restructuring.  The Board refused these requests.  Instead, on March 23, 2017, the Oversight Board proposed a mediation session to resolve a dispute regarding the status of portions of proceeds of the Commonwealth's sales and use tax ("SUT") that have been declared by statute to be the property of COFINA.  13 L.P.R.A. § 12.[16]  Although creditors

---

[16] As the Court is aware, the status of these SUT revenues is a disputed issue in these cases, and the Responding Creditors have taken differing positions on that question.  By submitting this

17

opposed mediation on the ground that it would only delay substantive negotiations, the Oversight Board refused to hold negotiations outside of mediation.  Thus, on April 13, 2017—10 months after the enactment of PROMESA and only three weeks before expiration of the *extended* stay on creditor litigation imposed by Section 405 of PROMESA—the Oversight Board's proposed mediation finally began.  As creditors had predicted, this mediation did not lead to a resolution of the parties' disputes, in large part due to the Board's insistence that the Fiscal Plan is not subject to scrutiny or discussion.  Then, as now, the Board refused to engage in any true negotiations.[17]

That is all of a piece with the Oversight Board's overreaching view of its own authority. As the Board sees things, it has no reason to participate in good-faith negotiations:  The Board dictates, and then creditors must "negotiate to divide up the money available for debt service under the fiscal plan."  Status Report ¶ 20.

As we have explained above, the Board's position is manifestly incorrect.  If it is not abandoned, however, it will frustrate any attempt to find a consensual resolution that would avoid the necessity of prolonged and costly litigation in these Title III cases.  The Oversight Board must reach a consensual agreement with creditors, not dictate to them—and creditors must fully understand the assumptions, analyses, and rationales underlying the Fiscal Plan, so that the Government of Puerto Rico can reach an agreement with creditors and regain its desperately needed credibility with the capital markets.  Indeed, a precedent in which the Oversight Board simply dictates the terms of any restructuring will have negative ramifications not only for Puerto Rico, but for the public finance market more generally, including other territorial issuers.

---

joint response, the Responding Creditors do not waive any argument, right, or claim with respect to this issue.

[17] The Oversight Board left no opportunity for creditors to take advantage of Title VI of PROMESA and achieve consensual debt modifications outside of a Title III proceeding.

See *After Puerto Rico's Debt Crisis, Worries Shift to Virgin Islands*, N.Y. Times (June 25, 2017) (Ex. 6).

The Oversight Board also must be willing to correct the errors that creditors have identified in the Fiscal Plan.  There will be no consensual resolution with any creditors in this case if the total amount available for debt service remains unchanged.  The Oversight Board must, for the first time, be a *participant* in good-faith negotiations, and the Fiscal Plan must be put on the table.  Continuation of the Board's current approach, by contrast, will make settlement impossible.

[*Remainder of page intentionally left blank.*]

Dated: June 26, 2017

Respectfully submitted,

/s/ J. Ramón Rivera Morales

J. Ramón Rivera Morales
USDC-PR Bar No. 200701
JIMÉNEZ, GRAFFAM & LAUSELL
P.O. Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com

/s/ Mark T. Stancil

Lawrence S. Robbins (admitted *pro hac vice*)
Mark T. Stancil (admitted *pro hac vice*)
Gary A. Orseck (admitted *pro hac vice*)
Kathryn S. Zecca (admitted *pro hac vice*)
Donald Burke (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411-L
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
Email: mstancil@robbinsrussell.com

/s/ Andrew N. Rosenberg

Andrew N. Rosenberg (admitted *pro hac vice*)
Richard A. Rosen (admitted *pro hac vice*)
Walter Rieman (admitted *pro hac vice*)
Kyle J. Kimpler (admitted *pro hac vice*)
Karen R. Zeituni (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: arosenberg@paulweiss.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*

20

FERRAIUOLI LLC

By:*/s/ Roberto Cámara-Fuertes*
    Roberto Cámara-Fuertes (USDC-PR No. 219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile:  (787) 766-7001
    Email:  rcamara@ferraiuoli.com
          scolon@ferraiuoli.com

MILBANK, TWEED, HADLEY & M$^C$CLOY LLP

By:*/s/ Dennis F. Dunne*
    Dennis F. Dunne
    Andrew M. Leblanc
    Atara Miller
    Grant R. Mainland
    (admitted pro hac vice)
    28 Liberty Street
    New York, NY 10005
    Telephone: (212) 530-5000
    Facsimile:  (212) 530-5219
    Email: ddunne@milbank.com
          aleblanc@milbank.com
          amiller@milbank.com
          gmainland@milbank.com

*Attorneys for Ambac Assurance Corporation*

CASELLAS ALCOVER & BURGOS P.S.C.

By:*/s/ Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    USDC-PR 204809
    Ricardo F. Casellas-Sánchez
    USDC-PR 203114
    Diana Pérez-Seda
    USDC-PR 232014
    P.O. Box 364924
    San Juan, PR 00936-4924
    Telephone:  (787) 756-1400
    Facsimile:  (787) 756-1401
    Email: hburgos@cabprlaw.com
           rcasellas@cabprlaw.com
           dperez@cabprlaw.com

CADWALADER, WICKERSHAM & TAFT LLP

By:*/s/ Howard R. Hawkins*
    Howard R. Hawkins, Jr.
    (admitted *pro hac vice*)
    Mark C. Ellenberg
    (admitted *pro hac vice*)
    Ellen Halstead
    (admitted *pro hac vice*)
    Thomas J. Curtin
    (admitted *pro hac vice*)
    Casey J. Servais
    (admitted *pro hac vice*)
    200 Liberty Street
    New York, NY 10281
    Telephone:  (212) 504-6000
    Facsimile:  (212) 406-6666
    Email:  howard.hawkins@cwt.com
           mark.ellenberg@cwt.com
           ellen.halstead@cwt.com
           thomas.curtin@cwt.com
           casey.servais@cwt.com

*Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

**TORO, COLÓN, MULLET, RIVERA
& SIFRE, P.S.C.**

*/s/ Manuel Fernández-Bared*
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204
E-mail: mfb@tcmrslaw.com

*s/ Linette Figueroa-Torres*
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
E-mail: lft@tcmrslaw.com

*s/ Jane Patricia Van Kirk*
JANE PATRICIA VAN KIRK
USDC–PR No. 220,510
E-mail: jvankirk@tcmrslaw.com

P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

*Counsel to the Mutual Fund Group*

**KRAMER LEVIN NAFTALIS &
FRANKEL LLP**

*/s/ Amy Caton*
AMY CATON*
THOMAS MOERS MAYER*
PHILIP BENTLEY*
DOUGLAS BUCKLEY*
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Email: acaton@kramerlevin.com
          tmayer@kramerlevin.com
          pbentley@kramerlevin.com
          dbuckley@kramerlevin.com
*(admitted *pro hac vice*)

*Counsel to the Mutual Fund Group*

/s/  Eric Pérez-Ochoa

Eric Pérez-Ochoa (USDC-PR No. 206314)
Alexandra Casellas-Cabrera (USDC-Pr. No. 301010)
**ADSUDAR MUÑOZ GOYCO SEDA & PÉREZ-OCHOA, PSC, P.S.C.**
208 Ponce de León Avenue, Suite 1600
San Juan, Puerto Rico 00936
Telephone: (787) 756-9000
Facsimile: (787) 756-9010
Email:  epo@amgprlaw.com
          acasellas@amgprlaw.com


*Attorneys for National Public Finance Guarantee Corporation*

/s/ Marcia Goldstein

Marcia Goldstein (admitted *pro hac vice*)
Jonathan Polkes (admitted *pro hac vice*)
Salvatore A. Romanello (admitted *pro hac vice*)
Gregory Silbert (admitted *pro hac vice*)
Kelly DiBlasi (admitted *pro hac vice*)
Gabriel A. Morgan (admitted *pro hac vice*)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: marcia.goldstein@weil.com
          jonathan.polkes@weil.com
          salvatore.romanello@weil.com
          gregory.silbert@weil.com
          kelly.diblasi@weil.com
          gabriel.morgan@weil.com


*Attorneys for National Public Finance Guarantee Corporation*

24

/s/ José C. Sánchez-Castro

José C. Sánchez-Castro
USDC-PR 213312
jsanchez@lsplawpr.com

Alicia I. Lavergne-Ramírez
USDC-PR 215112
alavergne@lsplawpr.com

Maraliz Vázquez-Marrero
USDC-PR 225504
mvazquez@lsplawpr.com

LÓPEZ SÁNCHEZ & PIRILLO LLC
270 Muñoz Rivera Avenue, Suite 1110
San Juan, PR 00918
Tel. (787) 522-6776
Fax: (787) 522-6777

*Counsel for Puerto Rico AAA Portfolio Bond Fund II, Inc.,
Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto Rico
AAA Portfolio Target Maturity Fund, Inc., Puerto Rico
Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund
II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto
Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed
Income Fund V, Inc., Puerto Rico Fixed Income Fund VI,
Inc.,  Puerto Rico GNMA & U.S. Government Target
Maturity Fund, Inc.,  Puerto Rico Investors Bond Fund I,
Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico
Investors Tax-Free Fund, Inc. II, Puerto Rico Investors
Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free
Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V,
Inc., Puerto Rico Investors Tax-Free Fund VI, Inc.,
Puerto Rico Mortgage-Backed & U.S. Government
Securities Fund, Inc.,  Tax-Free Puerto Rico Fund, Inc.,
Tax-Free Puerto Rico Fund II, Inc., Tax-Free Puerto Rico
Target Maturity Fund, Inc. and UBS IRA Select Growth &
Income Puerto Rico Fund*

/s/ Glenn M. Kurtz

Glenn M. Kurtz (*pro hac vice*)
John K. Cunningham (*pro hac vice*)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10036
Tel. (212) 819-8200
Fax (212) 354-8113
gkurtz@whitecase.com
jcunningham@whitecase.com

Jason N. Zakia (*pro hac vice*)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, FL 33131
Tel. (305) 371-2700
Fax (305) 358-5744
jzakia@whitecase.com

*Counsel for Puerto Rico AAA Portfolio Bond Fund
II, Inc., Puerto Rico AAA Portfolio Bond Fund, Inc.,
Puerto Rico AAA Portfolio Target Maturity Fund,
Inc., Puerto Rico Fixed Income Fund, Inc., Puerto
Rico Fixed Income Fund II, Inc., Puerto Rico Fixed
Income Fund III, Inc., Puerto Rico Fixed Income
Fund IV, Inc., Puerto Rico Fixed Income Fund V,
Inc., Puerto Rico Fixed Income Fund VI, Inc.,
Puerto Rico GNMA & U.S. Government Target
Maturity Fund, Inc.,  Puerto Rico Investors Bond
Fund I, Puerto Rico Investors Tax-Free Fund, Inc.,
Puerto Rico Investors Tax-Free Fund, Inc. II,
Puerto Rico Investors Tax-Free Fund III, Inc.,
Puerto Rico Investors Tax-Free Fund IV, Inc.,
Puerto Rico Investors Tax-Free Fund V, Inc.,
Puerto Rico Investors Tax-Free Fund VI, Inc.,
Puerto Rico Mortgage-Backed & U.S. Government
Securities Fund, Inc.,  Tax-Free Puerto Rico Fund,
Inc.,  Tax-Free Puerto Rico Fund II, Inc., Tax-Free
Puerto Rico Target Maturity Fund, Inc. and UBS
IRA Select Growth & Income Puerto Rico Fund*