CERTIFIED TRANSLATION

Burgos Andujar v. State Elections Commission, 2017 WL 1656332 (2017)
2017 TSPR 57

2017 WL 1656332 (P.R.), 2017 TSPR 57

Norma E. BURGOS ANDÚJAR, Electoral Commissioner of the New Progressive Party *(Partido Nuevo Progresista)*, Appellant

v.

STATE ELECTION COMMISSION, through its President, Liza García Vélez; Interim Electoral Commissioner of the Democratic Popular Party *(Partido Popular Democrático)*, Miguel Ríos Torres; Designated Electoral Commissioner of the Puerto Rican Independence Party *(Partido Independista Puertorriqueño)*. María de Lourdes Santiago, Appellants

Commonwealth of Puerto Rico through its Secretary of Justice, Hon. Wanda Vázquez Garced, Appellant Senate of Puerto Rico, through its President the Hon. Thomas Rivera Schatz and its Secretary Manuel Torres Nieves; House of Representatives of Puerto Rico, through its President the Hon. Carlos Méndez Nuñez and its Secretary Ayleen Figueroa Vázquez, Petitioners

In the Supreme Court of Puerto Rico.
No. CT – 2017 – 2
In San Juan, Puerto Rico, April 19, 2017

*Intra-jurisdictional certification*

Attorneys for Petitioners Atty. Israel Roldán González, Atty. Carlos Santiago Tavarez, Atty. Eliezer Aldarondo Ortiz, Atty. Maria Elena Vázquez Graziani, Atty. Claudio Aliff Ortiz, Atty. Rosa Campos Silva, Atty. Hamed Santaella Carlo

Attorneys for Appellants Atty. Manuel Izquierdo Encarnación, Atty. Héctor E. Pabón Vega, Atty. Gerardo De Jesus Annoni, Atty. Luis Enrique Romero, Atty. Liany Vega Nazario, Atty. Nelson Rodríguez Vargas

Office of the Attorney General Atty. Luis Román Negrón, Atty. Isaías Sánchez Báez

Subject: Constitutional Law. Reversal of the decision in *P.P.D. v. Gobernador II*, 136 DPR 916 (1994). It is not appropriate to apply the electoral silence provided in the Electoral Act of 2011 to the referendum that will be held according to the Puerto Rico Immediate Decolonization Act, Act No. 7 of 2017.

PER CURIAM

**\*1** If in order to arrive at a correct decision of this case it is necessary to modify the opinions issued previously by this Court, they ought to be modified in any manner, or vacated, if necessary. Error can never be made into truth, no matter how much one insists on it; if the wrong path has been followed, let us retrace our steps before we get lost in the labyrinth of deceit; let us dare to proceed correctly. *Giménez et al. v. Brenes,* 10 DPR 128 (1906) (Dissenting opinion by former Associate Justice MacLeary).

The writ of inter-jurisdictional certification before our consideration, in which we are requested to determine whether the electoral silence provided in Article 12.001 of the Electoral Act of 2011, *infra,* is applicable to election scenarios different from the ones set up by the Legislative Assembly brings us the opportunity to re-examine the erroneous pronouncements made in the case *P.P.D. v. Gobernador II,* 136 DPR 916 (1994), and to correct them.

In said case, a majority of this Court violated the most basic principles of hermeneutics, judicial self-restraint and separation of powers when they interpreted Article 8.001 of the Electoral Law of 1977, *infra,*

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

and extended the governmental electoral silence provided in it, to election scenarios not contemplated by the Legislative Assembly.

For that reason and for the grounds that we will present hereafter, we revoke the standard set in *P.P.D. v. Gobernador II,* supra, and we resolve, under a thorough analysis of the statues, that neither plebiscites nor referendums are included in the concept of "general election" set forth in Article 12.001 of the Electoral Act of 2011,*infra.*

With that in mind, we will proceed to delineate the facts that gave genesis to the controversy in this case.

**I**

**\*2**   On February 3, 2017, the Legislative Assembly approved the *Puerto Rico Immediate Decolonization Act* (Decolonization Act), Law No. 7-2017. In virtue of that statute the celebration of a Plebiscite was authorized on June 11, 2017, to choose among various political status alternatives. Also, the aforementioned law

1

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Burgos Andujar v. State Elections Commission, 2017 WL 1656332 (2017)
2017 TSPR 57

provides for the celebration of a referendum on October 8, 2017, if one of those said alternatives prevails.[1]

On February 13, 2017, the State Election Commission (*CEE* for its Spanish initials) held an ordinary meeting. In that meeting, the Electoral Commissioner of the Popular Democratic Party *(Partido Popular Democrático, PPD)* submitted a request for the activation of the Advertising Examiners Board *(Junta Examinadora de Anuncios, JEA)*, while the plebiscite process was completed. The Electoral Commissioner of the New Progressive Party *(Partido Nuevo Progresista, PNP)*, opposed that request, because as she understood it, according to Article 12.001 of the *Puerto Rico Electoral Act* (Electoral Act of 2011), Law No. 78-2011, 16 LPRA sec. 4231, electoral silence and the *JAE* were only applicable during general elections and not in plebiscites or referendums.

In the absence of unanimity among the Electoral Commissioners, the controversy was submitted for the consideration of the president of the *CEE*, whom on March 1, 2017, issued Resolution No. CEE-RS-17-01. In it, she held that Article XIII of the Decolonization Act, *supra,* provided that the prohibitions contained in Chapter XII of the Electoral Act of 2011, *supra,* applied to the Plebiscite and acknowledged that among them was the prohibition of public government advertising set forth in the referred Article 12.001, *supra,* also known as electoral silence. Based on that interpretation, the Puerto Rican Constitution and the decision of this court in *P.P.D v. Gobernador II,* supra, she activated electoral silence and ordered the formation of the *JEA*. According to the Resolution, the prohibition would remain until June12, 2017 and, if a Referendum needed to be held, until October 9, 2017.

After a timely motion to reconsider was denied, the Commissioner of the *PNP* filed an appeal for judicial review before the Court of First Instance, in which she reiterated that the provisions contained in Article 12.001 of the Electoral Act of 2011, *supra,* were only applicable to general elections. Further, she filed a motion in aid of jurisdiction, with the purpose of staying the effects of the contested resolution until the petition for judicial review was dealt with. Lastly, she included, as indispensable parties in the litigation, the Government of Puerto Rico and the two legislative chambers.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

While the case was pending in the primary forum, the Senate of Puerto Rico and the House of Representatives, through their corresponding presidents and secretaries (jointly, petitioners), filed the writ of intra-jurisdictional certification before us. They requested that we resolve, as a matter of law, whether the electoral silence provided in Article 12.001 of the Electoral Act of 2011, *supra*, can be applied to the plebiscite process to be held on June 11, 2017. On the same date, the Electoral Commissioner of the *PNP* appeared before the court to join the filed certification appeal.

On March 30, 2017, we issued the writ and ordered the parties to present their respective arguments.

**\*3**    In their argument, the petitioners reiterated that the President of the CEE had over-reached her powers since electoral silence only applied to general elections. They based their contention on the difference that existed among the different election processes, namely: "general election", "plebiscite" and "referendum," as defined by the Electoral Act of 2011, *supra*. They argued that both the text of Article 12.001 of the Electoral Act of 2011, *supra*, as well as the text of the Regulation for The Control of Public Dissemination by the Government *(Reglamento para el Control de Gastos de Difusión Pública del Gobierno)* only alluded to the term "general election." In this light, they insisted that both "referendums" as well as "plebiscites" were outside the scope of the application of the referred Article.

For her part, the Commissioner of the *PNP* added, among other things, that the Decolonization Act, *supra*, provided that the prohibitions and offenses of the Electoral Act of 2011, *supra*, would apply to the plebiscite except when they were incompatible or inappropriate according to said Law. Thus, she concluded that the prohibition for public advertising by the government provided in Article 12.001 of the Electoral Act of 2011, *supra*, could not be applied to the Plebiscite, since it was improper and incompatible with the Decolonization Act, *supra*.

Similarly, the Attorney General appeared in court to represent the Government of Puerto Rico. In the first place, he indicated that the government has the duty to inform the citizenship, especially when it dealt with issues of great public concern. He argued that the duty to inform, which the President of the *CEE* was trying to undermine, was intrinsically linked to the exercise of freedom of expression by the citizens. Secondly, he stressed the electoral silence contained in Article 12.001 of the Electoral Act of 2011, *supra*, applied only to general elections. He emphasized that the

2

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Burgos Andujar v. State Elections Commission, 2017 WL 1656332 (2017)
2017 TSPR 57

Electoral Act of 2011, *supra*, itself defined as "election" that which included "general elections," "plebiscites" and "referendums," *inter alia*. Therefore, he maintained that when the Legislative Assembly limited the text of Article 12.001 of the Electoral Act of 2011, *supra*, to "general election", it unequivocally had excluded from its scope of application both plebiscite consultations as well as referendums.

Furthermore, the attorney general posited that what was resolved in *P.P.D. v. Gobernador II*, supra, was inapplicable to this case. In the alternative, he argued that this Court should reevaluate the analysis scope over the norm laid out there, in order to prevent the perpetuation of a doctrinal error. Lastly, he indicated that the fact that electoral silence would not apply to the plebiscite did not mean that the government could spend the funds unrestrictedly. He highlighted that under Section 9 of Article VI of the Constitution

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

of Puerto Rico, *infra,* any party with active standing, who believed that the Government of Puerto Rico was using public funds for non-public ends could go to the courts to vindicate their rights.

For their part, the opponents of the petition, namely, the *CEE,* the Electoral Commissioner of the *PPD* and the Electoral Commissioner of the Puerto Rican Independence Party, defended the appropriateness of the *CEE* Resolution in all its parts. First, they argued that Section 1 of Article XIII of the Decolonization Act, *supra,* incorporated by reference the Section on Offences and Prohibitions of the Electoral Act of 2011, *supra,* in its totality. Second, they emphasized that what had been resolved by this Court in *P.P.D. v. Gobernador II, supra,* settled the controversy. They concluded that the constitutional principle of economic equality among the parties justified the decreed electoral silence.

**\*4**   Having examined the position of all the parties around the controversy at hand, we proceed to enter a ruling.

## II

The doctrine of *stare decisis* provides that, as a general rule, a Court must follow its own decisions in later cases, in order to achieve stability and legal certainty. *Pueblo v. Díaz De León,* 176 DPR 913, 921 (2009); *Am. R.R. Co. of P.R. v. Comision Indus. De P.R. y Angueira,* 61 DPR 314, 326 (1943). However, said doctrine "does not arrive at the extreme of declaring that the opinion of a court has the reach of a dogma that must be followed blindly even when the court becomes later convinced that their prior decision was in error." *Am. R.R. Co. of P.R. v. Comision Indus. De P.R. y Angueira, supra.* See, in addition, *Pueblo v. Sánchez Valle,* 192 DPR 594, 645 (2015). "The inspiring purpose of the doctrine of *stare decisis* is to achieve stability and certainty in the law, **but never to perpetuate errors."** *Am. R.R. Co. of P.R. v. Comision Indus. De P.R. y Angueira,* supra, page 326. (Emphasis supplied). Thus, when the reasoning for one of our decisions **no longer withstands a careful analysis,** we are not obligated to follow it. *Rivera Ruiz v. Mun. de Ponce,* 2016 TSPR 197, 196 DPR ---- (2016); *Pueblo v. Díaz De León,* supra, page 922. Accordingly, we have identified three circumstances that, as an exception, justify setting aside a precedent: "(1) if the prior decision was clearly in error; (2) if its effects on the rest of the judicial system are adverse, and (3) if the number of people that relied on it is limited." *Rivera Ruiz v. Mun. de Ponce,* supra; *Pueblo v. Díaz De León,* supra, pages 645-646.

**"The first of these principles settles the question raised."** *Pueblo v. Sánchez Valle,* supra, page 646. Without doubt, the case *P.P.D v. Gobernador II,* supra, is clearly in error. We will demonstrate so, following.

## III

**\*5**   On August 1994, the Legislative Assembly approved the Law Enabling the Referendum About Amendments to the Constitution of Puerto Rico of 1994 *(Ley Habilitadora del Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994)* (Law Enabling the Referendum), Law No. 49-1994, 16 LPRA sec. 956 (Abolished). Through it, the holding of a Referendum was authorized so that registered voters could express their approval or rejection of various proposed amendments to the Constitution of Puerto Rico.

In order to contest the constitutionality of said Law and to request that the Governor of Puerto Rico at the time, the Hon. Pedro Rosselló González, be ordered to stop the publicity campaigns in the country's news media, several suits were filed against the Government of Puerto Rico and the Governor at the time.

After several procedural incidents, the Court of First Instance ruled that Article 8.001 of the *Puerto Rico Electoral Act of 1977* (Electoral Law of 1977), Law No. 4 of December 20, 1977, 16 LPRA sec. 3351 (ed. 2009) – which prohibited governmental agencies from utilizing funds for public dissemination "from January first of the year an

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

3

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Burgos Andujar v. State Elections Commission, 2017 WL 1656332 (2017)
2017 TSPR 57

**election** is to be held and until the day following the date on which said election is held"-, was to be applied to the Referendum. Thus, it ordered the *CEE* to appoint the *JEA,* in order to evaluate the need for publication of every government announcement until the day of the referendum. It based its reasoning on the fact that the Law Enabling the Referendum provided that the Electoral Act of 1977*, supra,* would apply supplementarily, to everything necessary, pertinent and compatible with its objectives. Further, it relied on the principle of economic equality presumably embedded in the Constitution of Puerto Rico.

Unsatisfied, the Government of Puerto Rico and the Tourism Company appealed to this court and posited, among other things, that the primary forum erred in applying electoral silence provided in the referred Article 8.001 of the Electoral Act of 1977*, supra,* to the referendum, because in that manner the legislative intent was undermined.

With that in mind, the following controversy was submitted for the consideration of this Court: **whether it was the will and the intention of the Legislative Assembly** to apply to the Referendum the electoral silence established in the referred Article 8.001*, supra,* for the general elections. For the attainment of that objective, the Court should have to make an exhaustive analysis of both, the Law Enabling the Referendum*, supra,* and the Electoral Act of 1977*, supra.* That, since it is an acknowledged principle of hermeneutics that to learn the legislative intention it is necessary to analyze the law, and "in analyzing it **one should turn first** to the very text, because if the language is clear and without ambiguity, it should not be underestimated under the pretext of complying with its spirit". *Mun. de San Sebastián v. QMC Telecom,* 190 DPR 652, 668 (2014). See, also, *S.L.G. Sola-Maldonado v. Bengoa Becerra,* 182 DPR 675, 691 (2011); *Morell Corrada v. Ojeda,* 151 DPR 864, 877 (2000); Article 14 of the Civil Code of Puerto Rico, 31 LPRA sec. 14.

Nevertheless, in the case *P.P.D. v. Gobernador II, supra,* a majority of the court omitted making a profound analysis of the legal provisions in controversy. Instead, and without any of the petitioners disputing the constitutionality of the referred provisions, is confirmed the determination of the primary forum under an exclusively constitutional analysis. Specifically and on what is pertinent, it expressed the following:

> **\*6**   Recapping, under the constitutional principle of economic equality that permeates every suffrage –that the State is called to guarantee, and that this court must protect under Sec. 2 of the Constitution of the Commonwealth of Puerto Rico*, supra,* it is appropriate that we extend the prohibition contained in Article 8.001 of the Electoral Act of Puerto Rico*, supra,* and that we apply it to this case, to avoid that the State, through government announcements may have an influence on the free expression of the citizens in the vote, with the economic power it has, through the use of public funds. *P.P.D. v. Gobernador II*, supra, pages 926-927.

From the above it arises that this Court did not listen to the intention of the Legislative Assembly, answered in the Constitution of Puerto Rico for the foundations to resolve what it deemed appropriate. That analysis was incorrect.

To begin, that course of action infringed upon the norm of judicial self-restraint that "when it is possible to resolve an issue through an analysis of the statute, it is not necessary to consider the constitutional aspect." *P.P.D v. Admor. Gen. de Elecciones,* 111 DPR 199, 243, esc. 32 (1981). See, also, *Pacheco v.*

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Srio. Instrucción Pública,* 108 DPR 592, 601 (1979) (there it was reasoned but when the parties do not present the aspect of the constitutional validity of a statute, the Court is not justified in making a pronouncement on the particular). The fact that the Court is the highest interpreter of the Constitution of Puerto Rico does not give it carte blanche to resort to it without limit, without the corresponding petition from the parties.

Furthermore, the proceedings of the Court infringed upon the doctrine of separation of powers. On this particular, the scholars Bernier and Cuevas Segarra have expressed the following:

4

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Burgos Andujar v. State Elections Commission, 2017 WL 1656332 (2017)
2017 TSPR 57

> Under a system of separation of powers like the one in Puerto Rico, the Legislative Assembly has the power to approve the laws. The Judicial Power exercised by the courts consists in the exercise of the power to resolve litigations through the interpretation of the law. In the normal discharge of its duties, the courts are obligated to respect the legislative will even if the magistrates personally disagree with the wisdom of the legislative acts. **To interpret a law in a way that is contrary to the intent of the legislator implies the usurpation by the Judicial Branch of the prerogatives of the Legislative Branch.** Therefore, the interpreter must abstain from substituting the legislative criteria **with its own concepts of what is just, reasonable or desirable.** R.E Bernier and J.A. Cuevas Segarra, Approval and Interpretation of the laws of Puerto Rico, 2nd Ed. San Juan, Publicaciones JTS, 1987, Vol I, Page 299.[2] (Emphasis supplied).

On the other hand, not only did this Court resort to the Constitution of Puerto Rico when it should not have, but it performed a very misguided constitutional analysis, which we discuss hereafter in two parts.

**A.**

*7   First, the Court made reference to Section 2 of Article II of the Constitution of Puerto Rico, which provides that "the laws will guarantee the expression of the will of the people through equal, direct, secret and universal suffrage, and will protect the citizen against any coercion in the exercise of the electoral prerogative." Article II, Sec 2, Const. PR LPRA, Vol. 1. Specifically, it reasoned that "in protection of the constitutional right to a free selection translated into the right to vote," it should apply electoral silence to the Referendum. *P.P.D v. Gobernador II,* supra, page 926. With said reasoning, this court presumed, **without proof of any Government announcement**, that the Government of Puerto Rico would coerce voters during the referendum through public dissemination. Because we consider them completely right, we echo the expressions issued by the former Associate Justice Rebollo López in his dissenting opinion in the case *P.P.D. v. Gobernador II:*

We are the first ones to admit that there always will exist *the possibility* that the Executive Branch of the Government of Puerto Rico—*in a determinate moment of our people's history, present or future, and related to an electoral event*—could *attempt* to violate the referred axiom of equality and coerce the citizenship in their electoral prerogative.

However, *the Judicial Branch cannot presume that; that is, we are obligated to start from the premise that the Executive Branch, of any Government administration, acts correctly and in accordance to the pertinent dictates of the Constitution and the laws applicable to the issue before our consideration. In other words,

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

the party that alleges that the Executive Branch has not done so, has the burden to prove it in a plenary court hearing. *Id., Page 936.* (Emphasis on the original).

That is to say, the Court could not speculate about future government actions. Certainly, we do not deny that the rights enshrined in Section 2 of Article II of the Constitution of Puerto Rico, *supra,* exist and must be protected equally in the general elections, as well as in referendums and plebiscites. However, that does not justify that there be an attempt to protect those rights prematurely and without proof that indicates they were violated. The parties did not present that proof in this case, consequently this Court erred when it untimely vindicated the aforementioned rights.

**B.**

On the other hand, the majority of the Court in *P.P.D v. Gobernador II,* supra, relied on the "axiom of equality [Economic among the parties] presumably embedded in the Constitution." However, **said axiom does not exist in the Constitution.** On this particular, professor Luis M. Villaronga expressed quite rightly the following:

5

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Burgos Andujar v. State Elections Commission, 2017 WL 1656332 (2017)
2017 TSPR 57

> As it is known, "axiom" means an "[a]ffirmation so evident that it is acknowledged by all without need of proof." 1 María Moliner, Dictionary of Spanish Usage 318 (1986). **Neither the Constitution of Puerto Rico nor the Constitution of the United States contains such [principle of economic equality] with respect to persons in general and much less with respect to political parties.** L.M. Villaronga, Constitutional Law, 66 Rev. Jur. UPR 391, 402, esc. 48 (1997) (Emphasis supplied).

**\*8**   This Court recognized as such in *Marrero v. Mun. de Morovis,* 115 DPR 643, 646 (1984),[3] when expressing the following:

> Presently, in electoral matters, the postulate of equality embedded in our Constitution is not seriously questioned. Historically that ideal has gained traction within the integrated financial framework outlined by the Legislative Assembly in order to achieve economic parity among political parties and candidates. Delegate Mr. Padrón Rivera originally described this plan in the Constitutional Assembly. He advocated for the day in which 'if we want fundamentally democratic elections—we have to arrive at the conclusion that the political parties must be placed at the same level of economic power so the candidates have the same opportunity to reach power… And the State must have the obligation to place all the candidates in the same economic conditions so that the electoral process purely embodies the democratic principle'. (Emphasis supplied). 2 Journal of Sessions of the Constitutional Convention 1401 (1952). **Even though this aspiration did not acquire constitutional pedigree,** subsequently, in virtue of Law No. 110 of June 30, 1957 – abrogated to date – **it had birth in the statutes.** (Emphasis supplied).

In this sense, it is pertinent to point out that Associate Justice Negrón García, who issued that opinion of the Court, in which, for the first time, reference was made to the badly named "axiom",[4] subsequently admitted the following in his concurrent opinion in the case *P.S.P. v.*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Srio. de Hacienda,* 110 DPR 313, 321 (1980) (Opinion) which was joined by former Associate Justices Dávila and Irizarry Yunqué:

> Having resolved these preliminary questions and having cleared the procedural path, we direct our attention to the core of the petition: the validity of Article 3.017.

> By way of introduction, this precept forms an integral part of the legislative financial framework outlined to achieve economic parity among the country's political parties. Delegate Mr. Padrón Rivera originally described this plan in the Constitutional Assembly. He advocated for the day in which 'if we want fundamentally democratic elections—we have to arrive at the conclusion that the political parties must be placed at the same level of economic power so the candidates have the same opportunity to reach power… And the State must have the obligation to place all the candidates in the same economic conditions so that the electoral process purely embodies the democratic principle'. Journal of Sessions, Page 1401. **Even though this aspiration did not acquire constitutional pedigree,** subsequently, in virtue of Law No. 110 of June 30, 1957 – abrogated to date – **it had birth in the statutes.** (Emphasis supplied).

That is to say, there is no doubt the principle of economic equality among the parties does not have constitutional lineage. In that case, it is ours to question whether, through Law No. 110 of June 30, 1957, (1957 Laws of Puerto Rico 535-541), which was approved to establish the Elections Fund, the Legislative Assembly established a universal principle which would apply, not only to the very Law No. 110, *supra,* but to all the laws that would be approved in the future. The answer to that question is in the negative.

**\*9**   The Legislative Assembly, in the Explanatory Memorandum for Law No. 110, *supra,* expressed **only its reasons to establish the Electoral Fund.** Specifically and in what is pertinent, it indicated:

> It is a universally recognized principle that political parties are necessary instruments of democracy so that through them the people can support programs and express mandates regarding their government. All the democratic parties, majority and minority, fulfill these functions: the ones in the majority in support of work of the government that represents the majority opinion, but which must be carried out for the benefit of all the people, without partisan distinction; the ones in the minority so that they express the point of view of the other side of the people with a view to try to convince a majority of certain different purposes in certain different ways, and

6

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

> to ensure that the program supported by the majority is in effect administered equally for all.

> For those reasons, it is of great public interest that the parties can be free of control by private or governmental economic forces that, in making themselves necessary for the financing of the normal legitimate activities of the political parties, could acquire over them control or influence, contrary to the democratic idea, the political freedom of the people in general and the genuine functioning of democracy.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

> It is for that reason that the legislative assembly considers wise that on the one hand, large financial contributions to the political parties are prohibited, and, on the other, these democratic organisms are provided some adequate funds for the fulfillment of their most essential functions, independently from the duty that each citizen has to contribute to the support of his political collective with a small quantities compatible with his income and with the norms that each party adopts within the purposes and aims of this law.

What is transcribed shows only the Legislative Assembly's concern that the political parties would be at the mercy of economic forces, which it addressed with the creation of the Electoral Fund. The principle that all parties should be equal in economic matters does not arise from anywhere. Therefore, it is not correct to continue applying a **universal and unlimited** principle of economic equality among political parties, which was not established in so many words by the Legislative Assembly when it approved Law No. 100, *supra.*

Nevertheless, this Court in *P.P.D. v. Gobernador II*, supra, applied said principle automatically and raised it to constitutional rank. That is because "throughout the years a tendency has emerged to view the Constitution not in its own terms, but to transform it into a political document to support a position." R. Martínez Torres, *Originalism as a Method to Interpret the Constitution and the Principle of Separation of Powers,* 49 Rev. Jur. UIPR 249, 249 (2015). Certainly, "the power of the Judicial Branch to be the highest interpreter of the Constitution has been used to unduly extend the meaning of that great document, **with the purpose to invent nonexistent rights,** without having to approve a law for that purpose or to amend the Constitution." #Id., Pages 249-250. (Emphasis supplied).

**\*10**     Lastly, besides unduly constitutionalizing the alleged "principle", the majority of the Court in *P.P.D. v. Gobernador II,* supra, it constitutionalized electoral silence and the *JEA,* even though these are of statutory creation. That is to say, it created the constitutional right to the application of the ban and to the activation of the *JEA* in electoral processes different from what the Legislative Assembly considered in Article 8.001 of the Electoral Act of 1977, *supra.* This, to prevent that the Government, through the use of public funds in governmental announcements, could exert influence on the citizens' vote during the Referendum.

That said, this Court did not have to raise statutory norms to constitutional rank to address the bad use of government public funds outside of the year in which general elections are held. Certainly, the court ignored the existence of Section 9 of Article VI of the Constitution of Puerto Rico, which provides that "property and public funds will only be available for public purposes and for the support and a functioning of the State institutions and in all cases under authority of law." Article VI, Sec. 9, Const. de PR, *supra.* Through that norm, our constitutional assembly addressed the concern about bad use of the government public funds dear and the whole four-year term. In that sense and in since Article 8.001 of the Electoral Act of 1977, *supra,* only applied to the general elections, the parties in the case *P.P.D. v. Gobernador II, supra,* should have presented, if they had proof, an injunction to vindicate their rights under the referred Section 9 of the Constitution of Puerto Rico, *supra.*

### IV

From the prior analysis, it emerges with total clarity that the norm established in *P.P.D. v. Gobernador II,* supra, is clearly in error and must be revoked. Nevertheless, the dissenting opinion of this court pretends to evade this result because of "the difficult fiscal situation." This differs from what should motivate the revocation of a norm. If the norm is erroneous, we should not "hesitate to rectify and leave it without effect," since we are not invested with the gift of infallibility." *Rondón v. The Aetna Cas. & Sur. Co.*, 56 DPR 439, 456 (1940). "To persist in the error in order to highlight the consistency of what has been decided would constitute an abdication of the

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

7

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Burgos Andujar v. State Elections Commission, 2017 WL 1656332 (2017)
2017 TSPR 57

duty we have, us an appeals court, to impart justice and to regulate the law." *Reyes Corano v. Dir. Ejecutivo,* 110 DPR 40, 42 (1980).

In virtue of said duty, we proceed to examine whether it was the intention of the **Legislative Assembly** – not ours-, that the norms in Article 12.001 of the Electoral Act of 2011, *supra,* would apply to the status consultation that the Decolonization Act, *supra,* authorizes. To achieve that objective, we will apply what corresponds in law, without being subjected to the erroneous precedent.

## V

### A.

**\*11**   In accordance with the doctrine of separation of powers, we cannot lose perspective that our function is to determine what the legislator wanted to say and not what we would have wanted it to say. *Aquino González v. AEELA,* 182 DPR 1, 39 (011); R.E Bernier and J.A. Cuevas Segarra, *op. cit.,* Page 241. To fulfill that function, "the courts must interpret the law as a harmonious entity, giving logical sense to its different sections." *Aquino González v. AEELA,* supra, Page 40. Thus, we must interpret the provisions of the law integrally and not in an isolated manner. *Id.;* R.E. Bernier and J.A. Cuevas Segarra, *op. cit.,* Page 315. **The interpretation that we finally give the legal norm cannot involve the absurdity of leaving without effect –or without coherent meaning other provisions in the law before our consideration.** See Cabassa v. Bravo, 21 DPR 185, 186 (1914) ("we must interpret the law giving effect to all its provisions without omitting any"); see, further, *López Rosas v. CEE,* DPR 527, 535-536 (2004). This norm is predicated on the harmony that the provisions in the law and the law itself before our consideration must present. After all, we cannot presume that the Legislative Assembly enacted a law with inconsistent provisions.

On the other hand, it is known that the clear and unequivocal text of the law constitutes the expression par excellence of the intent of the legislator. *Romero Barceló v. ELA,* 169 DPR 460, 476-477 (2006); *Alejandro Rivera v. ELA,* 140 DPR 538, 544-545 (1996). When we are before a law that complies with this characteristic, we cannot undermine the expression of the Legislative Assembly, under pretext to comply with the legislative intent. Article 14 of the Civil Code of Puerto Rico, *supra.* ("When the law is clear and free of all ambiguity, its letter must not be undermined under pretext to comply with its spirit"); *Romero Barceló v. ELA,* supra, Page 477 ("when a law is clear and is not ambiguous, *there is no need to look beyond the letter in search of the legislative intent*"); *Atlantic Pipe Corp. v. FSE* 132 DPR 1026, 1030 (1993). Before this postulate, we cannot include scenarios in the statute that are not within the reasoning for the provision in question. R.E. Bernier and J.A. Cuevas Segarra, *op. cit.,* Page 246.[5] Therefore, "[we must discover and give effect to that intention expressed through the letter of the law". *Romero Barceló v. ELA,* supra, Page 477.

Similarly, "when the language of the law is clear and unequivocal, our responsibility is to respect the legislative will, independently from our personal criteria." *Delgado Hernández, Ex Parte,* 165 DPR 170, 192 (2005), making reference to *Alonso García v. SLG,* 155 DPR 91 (2001); *LaSalle v. Junta Dir. ACAA,* 140 DPR 694 (1994); *Silva v. Adm. Sistemas de Retiro,* 128 DPR 256 (1991). That is to say, when interpreting the law, courts must abstain from substituting the legislative criteria for their own concepts of what is just, reasonable and desirable." *Aquino González v. AEELA,* supra, Page 40. "This requires from

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

the justice courts the highest degree of discipline in applying a law." *Sánchez Díaz v. ELA,* 181 DPR 810, 822 (2011). After all, the Legislative Assembly is the one that is called to "determine what should be the public policy that our laws embody." *Delgado Hernández, Ex Parte,* supra, Page 192. Consequently the trier cannot substitute his sense of justice for the clear letter of the statute." *Delgado Hernández, Ex Parte,* supra, Page 193; *Berrocal v. Tribunal de Distrito,* 76 DPR 38, 92 (1954). We, the Judges, must even avoid the bad practice of turning to constitutional precepts as a foundation to amend the laws. In the exercise of our function, we must keep ourselves "always within the judicial environment, without undue incursions into the legislative sphere." *Caguas Bus Line, Inc. v. Sierra, Comisionado,* 73 DPR 743, 750 (1952); R.E. Bernier and J.A. Cuevas Segarra, *op. cit.,* Page 299.

**\*12**    In this case, the clear and unequivocal language of the statute posits only one meaning and, consequently, "a thorough sense of humility and self-discipline requires the application of the legislative will" as established in the very legal precept. *Alejandro Rivera v. ELA, supra,* Page 545. See, further, *Cotto v. Depto. de Educación,*

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Burgos Andujar v. State Elections Commission, 2017 WL 1656332 (2017)
2017 TSPR 57

138 DPR 658, 662 (1995); *Atlantic Pipe Corp. v. FSE, supra.* Let us see.

**B.**

Article XIII of the Decolonization Act, *supra,* provides that

> [t]he prohibitions and offences related to the holding of this consultation, shall be governed by the provisions laid out in Law 78-2011, as amended, known as the 'Puerto Rico Electoral Act' and by Law 222-2011, known as 'Law for the Oversight of Political Campaign Finance in Puerto Rico', **except when they are inapplicable or incompatible with the provisions of this Law or when this Law provides specific offenses or penalties.** (Emphasis supplied).

Even though the provision that establishes electoral silence is contained among the prohibitions and offenses provided by the Electoral Act of 2011, *supra,* that, in itself, does not make it automatically applicable to the plebiscite process or to the referendum authorized by the Decolonization Act, *supra.* As the dissenting opinion of Associate Justice Mr. Colón Pérez apparently ignores, **note that the application of the statutory norm that imposes the electoral silence is subject to it not being incompatible or inapplicable to the holding of the plebiscite, or if necessary, the referendum.**[6] Thus it is appropriate that we analyze this precept.

**\*13**    Article 12.001 of the Electoral Act of 2011, *supra,* through which the Legislative Assembly incorporated into our judicial system the so-called electoral silence, prescribes it in the following manner:

> **During the year in which a general election is held and until the day following the date on which it is held,** it is prohibited to the agencies of the government, the Legislative Assembly and the Judicial Branch of Puerto Rico to incur expenditures for the purchase of time and space in the media, as well as the purchase and distribution of propagandistic or promotional materials **with the purpose of presenting their**

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**programs, projects, accomplishments, achievements, projections or plans.** Those notices and press announcements expressly required by law are exempt from this regulation; the campaigns of the Tourism Company for the promotion of internal tourism, promotional campaigns outside of Puerto Rico by the Puerto Rico Tourism Company or the District Authority of the Puerto Rico Convention Center promoting the island of Puerto Rico as a tourist destination, or the Puerto Rico Industrial Development Company promoting foreign investment in Puerto Rico, **as long as they do not include reports of the achievements of the administration or corporation or highlights of the profile of any official.** Furthermore, the notices or convocations for public legislative or administrative hearings that are published and circulated without using the paid mass media are exempt.

**Similarly, those announcements that are used to disseminate information of public interest, urgency or emergency are exempt from the previous provision. The Commission will only allow them with prior authorization.**

**[ … ]**

Violation of this Article will carry, for the agency or government entity, an administrative fine of up to $10,000 for the first infraction and up to $25,000 for subsequent infractions. The funds obtained under this rubric will become part of the Special Fund for the financing of expenses for the automation of the electronic processes, as prescribed in Article 3.001 of this Law. 16 LPRA sec. 4231. (Emphasis supplied).

Particularly, the first part of Article 12.001, *supra,* was the subject of alteration in the legislative proceeding.[7] After being approved by the House of Representatives, in the Senate, the following expression was added to its text: "During the year in which a general election is held and until the day following the date on which it is held".[8] See *Report Special Commission on the Governmental Reform of the Senate: Overview of the Report issued November 10, 2010.* With this addition the Electoral Act of 2011, *supra,* was finally approved.

**\*14**   From a reading of the aforementioned article, we can notice that in it, there is express reference to the "year in which it general election is held." Therefore, our principal function in this case used to determine whether the Legislative Assembly included within the concept of "general elections" the holding of a plebiscite or a referendum like the one established by the Decolonization Act, *supra,* so that, in this manner, it is appropriate to apply

9

Burgos Andujar v. State Elections Commission, 2017 WL 1656332 (2017)
2017 TSPR 57

Article 12.001 of the Electoral Act of 2011, *supra,* to that consultation of status.

When making an interpretation of what constitutes a "general election," we cannot presume that the legislators included useless provisions or words in the law. R.E. Bernier and J.A. Cuevas Segarra, *op. cit.,* Page 333. That is to say, we cannot start from the premise that the Legislative Assembly made expressions or clarifications that do not have any sense or function in this statute they promulgated.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

In the exercise of our function and in the fulfillment of our duty, we cannot ignore that the Electoral Act of 2011 itself, *supra,* contains a provision in which various concepts that the legislators considered important to define, are defined. In particular, the Legislative Assembly took its time to determine the meaning of "general elections." By doing so, it made it clear that when they refer to them in the Electoral Act of 2011, *supra,* it should be understood that it was talking about the "process through which **every four years the electors choose the officials who will occupy elected public office** in the Government of Puerto Rico, including Governor, Resident Commissioner, State Legislators, Mayors and Municipal Legislators". Article 2.003 of the Electoral Act of 2011, *supra.* (Emphasis supplied).[9] In this manner, the Legislative Assembly prevented us from utilizing our own criteria or having to turn to alternative or exterior sources to find the meaning of what it meant to say. Because of its relevance we are prevented from disregarding this Article. See *ACAA v. Yantín,* 103 DPR 59, 62 (1974).

We must note that the Electoral Act of 2011, *supra,* expressly sets forth that in the general elections "the electors choose the officials who will occupy elected public office in the Government of Puerto Rico." *Id.* Likewise we must point out, also, that the law expressly limits general elections to the electoral process that is held **"every four years,"** unlike its predecessor, the Puerto Rico Electoral Act of 1977. The corresponding meaning and effect, when interpreting the law, must be given to this definition and the clarification made by the legislature.

As we indicated previously, we cannot presume that the Legislative Assembly included useless expressions and clarifications in the laws. In fact, if we substitute the expression "general election" for the definition provided by the very legislator, the first sentence of Article 12.001 of the Electoral Act of 2011, *supra,* it would read as follows:

> **\*15** During a year in which a [process through which **every four years the electors choose the officials who will occupy elected public office in the Government of Puerto Rico, including Governor, Resident Commissioner, State Legislators, Mayors and Municipal Legislators**] is held, and until the day following the date on which it is held, it is prohibited for government agencies, the Legislative Assembly and the Judicial Branch of Puerto Rico to incur expenditures for the purchase of time and space in the media, as well as the purchase and distribution of propagandistic or promotional materials with the purpose of presenting their programs, projects, accomplishments, achievements, projections or plans.

On the other hand, the Legislative Assembly had available a concept that it would utilize through the Electoral Act of 2011, *supra,* for those occasions in which it would refer both to the general elections as well as plebiscites, referendums, consultations to the voters, special elections and primaries. See Article 2.003 (29) of the Electoral Act of 2011, *supra,* 16 LPRA sec. 4003 (29). In that scenario it provided that it would refer to them only as "election" or "elections." *Id.* Furthermore it included a distinct and separate definition of "plebiscite" and of "referendum." It established that a plebiscite is that "method by which the alternative of choosing their preference of the various options about the same item of the political system, including, but not limited to, the political relationship between Puerto Rico on the United States of America is put to a vote by the electorate of Puerto Rico, in electoral consultation". *%21 Id.,* subparagraph (82). For its part, it stated that referendum was the process "through which the approval or rejection of one or several specific proposals over public policies to be enacted or legislation to be made effective

10

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

about issues of general interest is put to a vote by the electorate of Puerto Rico, in direct electoral consultation." *Id.,* subparagraph (86).

If the intention of the Legislative Assembly had been to include the plebiscites within the prohibition contained in Article 12.001 of the Electoral Act of 2011, *supra,* it would have been enough to refer to the "election" or "elections." This, since as defined in the law, that because it includes, among other things, referendums and plebiscites. As can be noticed, such was the distinction the date Legislative Assembly made that, when establishing the meaning of each concept, the mere addition of one word would alter its meaning.

It is not a matter of a scenario in which one could point out that the Legislative Assembly could not foresee the use of a certain word and inadvertently omitted its inclusion in the legal provision. In the Electoral Act of 2011, *supra,* the legislator included express reference to plebiscites and referendums in several of its provisions.[10] Nevertheless, in Article 12.001 of the Electoral Act of 2011, *supra,* there is no mention of them. Evidently, the Legislative Assembly only referred to the "general election." The specific reference to this electoral event excludes other events not included in the referred concept by the Legislative Assembly itself.

**\*16**   Furthermore, a thorough reading of Article 12.001 of the Electoral Act of 2011 itself, *supra,* demonstrates that the intent of legislative assembly was to prevent that the government in power could take advantage in the year in which in general elections held, to promote its **accomplishments, projects, programs, achievements, projections or plans** to obtain a victory of its officials. To this conclusion points even the exception contained in Article 12.001 of the law; specifically when it provides that the agencies named in the article are exempt "as long as they do not include reports of the achievements update administration or corporation or highlights of the profile of any official." See 16 LPRA sec. 4231.

Similarly, to conclude that the expression "general election" includes the holding of a plebiscite would be to leave without effect several of the provisions in the Electoral Act of 2011 itself, *supra.* In particular, Article 9.004 provides that "the purpose of the General Elections is the election of all the officials in the Government of Puerto Rico which conform to the Constitution of Puerto Rico and other special laws." 16 LPRA sec 4144. Likewise, Article 9.001 provides that the general election is the one that is held every four years. *Id.,* sec. 4141. For that reason, to extend the plebiscite or if necessary the referendum within the reference to the "general election" would result in a contradiction.[11]

What is the most logical and reasonable, accordingly, arises clearly from the Decolonization Act, *supra,* and the Electoral Act of 2011, *supra,* -- interpreted integrally, harmoniously and without leaving without effect any of its provisions that the prohibitions and offenses that apply to the consultation for status are those that result compatible and applicable because they were not established for a general election or another electoral event different from a plebiscite or a referendum.[12]

As we mentioned, in our interpretive function we cannot ignore the clear and express language of the law. We cannot either ignore the meaning that the Legislative Assembly gave each word we must interpret. The Electoral Act of 2011, *supra,* clearly provides that electoral silence is **only** applicable in the year in which a general election is held, and for that matter, as defined, the electoral event held every four years in which the electors elect the officials that will occupy the elected public offices of the Government of Puerto Rico.

**VI**

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**\*17**   Regarding the dissenting opinion of Associate Justice Mr. Colón Pérez, it is necessary to make the following points.

Regrettably, the dissenting opinion of Associate Justice Mr. Colón Pérez attempts to repeat the error we made more than two decades ago. Instead of conducting a correct analysis of the provision that was called to be interpreted, he relies on the Constitution - and on the erroneous precedent, which did the same to reach that result that appears convenient to him.

Even though the text of Article 12.001 of the Electoral Law, *supra,* is clear, the dissenting opinion of Associate Justice Mr. Colón Pérez decides to ignore it. Specifically, it concludes that "activation of electoral silence for the dissemination of governmental announcements contained in the Article 12.001 of Law No. 78-2011, is not only limited to the holding of general elections, **as it pretends to follow its text**". In that way, it omits

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Burgos Andujar v. State Elections Commission, 2017 WL 1656332 (2017)
2017 TSPR 57

use of the basic principle of hermeneutics that establishes that when the law is clear, its letter **must not be undermined** under the pretext of complying with its spirit. Article 14 of the Civil Code of Puerto Rico, *supra.*

Not only does he set aside the text of Article 12.001 of the Electoral Act of 2011, *supra*, but he also discards it under the badly named constitutional axiom of economic equality among the parties. As we discussed, said axiom is not of constitutional lineage and we cannot continue perpetuating it as such. Certainly we have knowledge that after "having been in force for many years, constitutions and statutes and having been interpreted by the courts in various cases, the tendency is, inevitably, to read the cases and not the Constitution or statute itself when a question arises about their scope". *Pérez v. Tribunal de Distrito and Puig. Interventores,* 69 DPR 4, 12 (1948). However, that cannot be reason for us to immortalize errors.

Definitely, we are precluded from using the Constitution to recognize inexistent rights. R. Martínez Torres, *op. cit.,* Page 249. Nevertheless, in the dissenting opinion of Associate Justice Mr. Colón Pérez, committing the same error as in *P.P.D. v. Gobernador II*, supra, not only does he constitutionalized the principle of economic electoral equality, but as a result the *JEA* is constitutionalized, which as we discussed, is of creation by statute. Furthermore, it goes farther and attempts to give *JEA* powers it does not have. Specifically, the dissenting opinion of Associate Justice Mr. Colón Pérez expresses the following: "the *J.E.A.* should be activated as a filter to determine whether the agencies attached to the Executive Power can or cannot incur expenditures of public funds in the publication of announcements; in addition to verify that the referred announcements are not tinged with political or party stands". In that sense, it tries to incorporate, through jurisprudence, **a Board to control the fiscal spending in the publication of announcements,** in view of the economic situation of Puerto Rico. That is improper. The *JEA* is only empowered to evaluate the announcements and not the expenditures incurred by the government of Puerto Rico.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Certainly, the economic situation of Puerto Rico is concerning. However, it corresponds to the Government of Puerto Rico and the Legislative Assembly to address said situation. It only corresponds to us to apply the law. If the Legislative Assembly understands that electoral silence should apply to the plebiscite process that approaches, it corresponds to it to amend Article 12.001 of the Electoral Act of 2011, *supra*. This Court cannot, by judicial fiat, extend said application because it appears just. The doctrine of separation of powers precludes us from it.

## VII

**\*18**    On the grounds set forth previously, we determine that it is inappropriate to activate the electoral silence contained in Article 12.001 of the Electoral Act of 2011, *supra*, before the status consultation which the Decolonization Act, *supra*, allows. In consequence, we revoke Resolution No. CEE-RS-17-07 issued by the *CEE*.

Judgment will be issued accordingly.

## OPINION

On the grounds set forth in the preceding Opinion *Per Curiam*, we determine that it is inappropriate to activate the electoral silence contained in Article 12.001 of the Puerto Rico Electoral Act of 2011, Law No. 78-2011, before the status consultation which the *Law for the Immediate Decolonization of Puerto Rico*, Law No. 7-2017, allows. In consequence, we revoke Resolution No. CEE-RS-17-07 issued by the *CEE*.

Notice is given immediately via electronic mail and via normal procedures.

It is thus ruled and ordered by the Court and certified by the Secretary of the Supreme Court.

Chief Justice Oronoz Rodríguez issued a Dissenting Opinion. Associate Justice Mrs. Rodríguez Rodríguez issued a Dissenting Opinion. Associate Justice Mr. Estrella Martínez issued a Dissenting Opinion. Associate Justice Colón Pérez issued a Dissenting Opinion.

Juan Ernesto Dávila Rivera

Secretary of the Supreme Court

Dissenting Opinion issued by Chief Justice ORONOZ RODRÍGUEZ

*"A Constitution does not establish nor should establish norms for the passing hour, but principles for a future that expands."* [13]

12

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Burgos Andujar v. State Elections Commission, 2017 WL 1656332 (2017)
2017 TSPR 57

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

A doctrine resolved by this Court "should not be varied unless it is so manifestly erroneous that it cannot be sustained without violating reason and justice."

> Capestany v. Capestany, 66 DPR 764, 767 (1946). Apparently, a majority of this Court considers that the constitutional axiom of electoral equality enshrined in our jurisprudence violates its obscure notions of reason and justice. Under that battered impression of what a truly democratic and egalitarian society means, they revoke a ban on advertising that applied to the case before us and deserved the most vigorous support of this forum. I cannot be in greater disagreement and, therefore, I dissent.

**I**

## A. The constitutional axiom of electoral equality

The Constitution of Puerto Rico establishes a democratic order according to which political power emanates from the participation of the people in collective decisions. Pmbl., Const. PR, LPRA, Volume 1. To this end, the right to vote constitutes one of the most basic and paradigmatic guarantees of our society. Hence, our Bill of Rights provides that "[t]he laws must guarantee the expression of the will of the people through universal, equal, direct and secret suffrage, and must protect the citizen against all coercion in the exercise of electoral prerogative." Art. II, sect. 2, Const. PR, LPRA, Vol. 1.

\***19** The provision cited imposes a dual responsibility on the State. *PPD v. Gobernador I* (PPD v. Governor I), 139 DPR 643, 670 (1995). First, the State must *refrain* from interfering with the free exercise of voting by its citizens and, second, it has an *affirmative duty* to protect the citizen against any coercion that seeks to interfere with the exercise of his/her electoral prerogative. *Id*.

According to a democratic system in which the equal right to vote is guaranteed and its protection is demanded by means of concomitant and affirmative duties on the part of the State, a series of cases recorded until today what was denominated the *constitutional axiom of electoral equality*. See *PPD v. Gobernador I, supra* (PPD v. Governor I, supra)*; Marrero v. Mun. de Morovis (Municipality of Morovis),* 115 DPR 643 (1984); *PRP v. ELA [Commonwealth of Puerto Rico]*, 115 DPR 631 (1984); *PNP v. Electoral Tribunal*, 104 DPR 741 (1976). In the scope of this praiseworthy axiom, this Court interpreted that our Constitution requires certain rights and guarantees additional to the formal act of the vote. That is, with the passing of time, we understood that the full exercise of the equal right to vote needs specific circumstances and even prohibitions.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

This Court ruled that the electoral equality axiom requires, among other conditions, equal access of political parties to government electoral funds, *PSP v. Srio. de Hacienda* (Secretary of the Treasury), 110 DPR 313 (1980) (Judgment), and equal participation of political parties in the affairs of the State Election Commission and the Permanent Registration Board, *PRP v. ELA [Commonwealth of Puerto Rico]*, 115 DPR 631 (1984); *PSP v. Com. Estatal de Elecciones* (State Elections Commissioner), 110 DPR 400 (1980).14 In addition, this Court also interpreted the electoral equality axiom as prohibiting, among other practices, the use of public resources for the benefit of political campaigns. See *Miranda v. Com. Estatal de Elecciones* (State Elections Commission), 141 DPR 775 (1996) and, *PPD v. Gobernador I supra* (PPD v. Governor I, supra), (prohibiting government advertising with political-partisan connotations); see also *Marrero v. Mun. de Morovis* (Municipality of Morovis), 115 DPR 643 (1984) (prohibiting the use of public vehicles in political campaigns).15

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

## B. Restrictions on the faculty to inform of the government

\***20** One of the prohibitions or limitations required by the electoral equality axiom relates to the government's ability to communicate certain information to the citizenry. *PPD v. Gobernador I supra* (PPD v. Governor I, supra), p. 681-82. To this end, the jurisprudence of this Court recognized at least two types of limitations as far as government information or publicity is concerned.

On the one hand, there is the prohibition of governmental publicity of political-partisan content, which arises both from the axiom of electoral equality and Article IV, section 9, of our Constitution. *Id.*, p. 701 (determining that the use of certain "symbols and flags of a political-partisan nature ... [was] contrary to the public end that our constitutional order requires in the administration of the treasury and the axiom of economic parity among the electoral forces that serves as the north ").16 This prohibition of advertising with political-partisan content applies at any time, even outside the electoral cycles. *Id.,* p. 692.

On the other hand, we recognized an additional limitation on government advertising, even though its content was not political-partisan in nature. This additional limitation is commonly known as the electoral ban and it existed until today to avoid the influence that, in general terms, can have the governmental publicity that the party in the government promotes before an electoral event of near date. *PPD v. Gobernador II supra* (PPD v. Governor II, supra)*,* pp. 926-27 (explaining that the electoral ban on that occasion sought to "prevent that the State, through government announcements, could have an influence on the free expression of citizens in the voting event").

The latter case, *PPD v. Gobernador II supra* (PPD v. Governor II, supra), was the precedent applicable to the dispute before us, which a majority of this Court refused to apply and therefore revoked. On that occasion, the Court wondered whether the electoral equality axiom required the application of an electoral ban on a referendum process, even when the Electoral Act at that time only applied that electoral ban to the *general election*. We answered that question affirmatively.

According to *PPD v. Gobernador II supra* (PPD v. Governor II, supra), government propaganda on the part of the party in the government represents an undue advantage that allows that party to promote its actions and postures in the face of an electoral process. The electoral ban then operates as a measure to prevent this advantage from occurring at the expense of public funds and through government propaganda of various kinds. *Id.*, pp. 926-27. In the absence of a statutory measure to that effect in an electoral referendum process, it was imposed in *PPD v. Gobernador II supra* (PPD v. Governor II, supra), "as an imperative of the equality axiom immersed in the Constitution." *Id.*, p. 926.

Since the then Article 8.001 of the Electoral Act provided that the electoral ban would apply only to general elections, this Court relied on the aforementioned constitutional imperative to extend the applicability of Article 8.001 to the then referendum. Id. In doing so, it resorted to Article 5 of the Referendum Enabling Act in question, which provided that the articles of the Electoral Act would be supplementary to the Referendum Enabling Act in all that was necessary, pertinent and compatible. *Id*., p. 924. In this way, the Court concluded that the prohibition established in the Electoral Act, for being a constitutional imperative, was a compatible and consistent provision with the *Ley Habilitadora del Referendum* (Referendum Enabling Act). *Id.*, p. 926.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

## II

*21 In what constitutes a true legal *déjà vu*, the case before us today raised the same question that we addressed in *PPD v. Gobernador II supra* (PPD v. Governor II, supra). The Court was asked whether a ban on government advertising during election procedures, in particular a Plebiscite and a Referendum, for which the law did not contemplate such prohibition expressly. Although according to *PPD v. Gobernador II supra* (PPD v. Governor II, supra), it should had been replied affirmatively, the majority responds in the negative.

### A.    Statutory provisions in controversy

Through Act No. 7-2017, the Legislative Assembly arranged a series of electoral consultations on the political status of Puerto Rico to be held in 2017. It did not establish an electoral prohibition specifically applicable to these events, although it recognized that "prohibitions and offenses related to the holding of the consultation shall be governed by the provisions established in the [Electoral Act and the Act for the Control of the Financing of Political Campaigns]. "Article XIII, sect. 1 (a), Act No. 7-2017. In this way, it can be interpreted that Article XIII had the effect of incorporating into Act No. 7-2017 the section on Prohibitions and Electoral Offenses of the Electoral Act, 16 LPRA secs. 4231-4255, except in everything that was incompatible or unfounded.

The section on Prohibitions and Electoral Offenses of the Electoral Act establishes the following in its Article 12.001:

> During the year in which a *general election* is held and until the day following the date of its conclusion, the Government agencies, the Legislative Assembly and the Judicial Branch of Puerto Rico are prohibited from incurring expenses for the purchase of time and space in the media, as well as for the purchase and distribution of propagandistic or promotional materials with the purpose of exposing their programs, projects, achievements, implementations, projections or plans...
>
> [...]
>
> *22 Those advertisements that are used to disseminate information of public interest, urgency or emergency are exempt from the previous provision. These advertisements will only be allowed with prior authorization from the Commission.16 LPRA sect. 4231 (emphasis supplied).

Again, the controversy brought to our consideration is whether this prohibition also applies to the Plebiscite and Referendum election events set forth in Act No. 7-2017.

### B. The sudden abandonment of a constitutional imperative

As discussed previously, the constitutional axiom of electoral equality limits the government's ability to disclose information. This Court established in *PPD v. Gobernador II supra* (PPD v. Governor II, supra), that the electoral ban was a constitutional imperative in order to avoid that the government publicity directly or indirectly influences the citizenry in its right to freely exercise its vote. Evidently, this precedent governed the controversy before our consideration.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

It is worth remembering that as long as this Court does not revoke or modify a precedent, it constitutes the established doctrine that the inferior forums must follow. *Capestany v. Capestany*, 66 DPR 764, 767 (1946). Likewise, a jurisprudential rule "should not be varied unless it is so manifestly erroneous that it cannot be sustained without violating reason and justice." *Id*. In electoral matters, the consistent implementation of the precedents of this Court is even greater, since it affects the credibility of this Court and the democratic order itself.

Hence, with reference to the Court's interpretation of the constitutional axiom of electoral equality, the well-known constitutionalist José Julián Álvarez González suggested that the courts should consistently apply said rules or, otherwise, "abandon the enterprise." In a serious misrepresentation of the dichotomy suggested by the distinguished professor, a majority of this Court could not opt for consistency and instead chose to leave the enterprise. Regrettably, abandoning the enterprise in this case involves perverting our democratic order and discarding what we had previously termed a constitutional imperative.

According to the majority, what was ruled in *PPD v. Gobernador II supra* (PPD v. Governor II, supra), is wrong since it had the effect of constitutionalizing the advertising ban mechanism beyond the electoral processes contemplated by the legislator in the Electoral Act. Majority Op., pp. 20-21. In this sense, the elevation to constitutional rank of the so-called electoral ban represents an invention of non-existent rights that unduly extends the meaning of the Constitution. Id. Under this logic, and without a clear expression of the legislator imposing the electoral ban on electoral processes such as those provided in Act No. 7-2017, the electoral ban results unfounded.

With the little time that the majority of this Court granted us to express ourselves, we outline at least three substantial problems with the stance of the majority. Let us see.

###### i.       The well-established electoral equality axiom

*23 In clear disdain for previous jurisprudence, a majority of this Court overturns a component of the electoral equality axiom, that is, the electoral ban, without noticing that it thereby puts the axiom as a whole is put at risks as well. As mentioned above, the precedents of this Court not only had resolved that the equality axiom prevented an electoral disadvantage product of the government publicity, but also outlawed other practices incompatible with a democratic system. As Professor Álvarez González sums up, this Court rested on the axiom of electoral equality to provide the following:

> (1) equal participation of the parties in the Electoral Fund, without being subject to their previous electoral strength; (2) equality in the participation of the parties by request together with the principal parties in the administration of the State Election Commission; (3) prohibition of the use of vehicles in political campaigns; (4) ban on the use of public funds for government campaigns prior to a referendum to amend the Constitution; (5) prohibition of the use of public funds for government campaigns that benefit the party in power; (6) unconstitutionality of aa Act to vote for the President of the United States. Álvarez González, *op. Cit.*, p. 965 (citations omitted).

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Despite the extensive history of this constitutional axiom, the majority inform us today that the "so-called" electoral equality axiom "does not exist in the Constitution." Majority Op., pp. 16-17.

So, it informs us that the expressions of this Court are dead letter in that "[t]he **equality is a core ingredient of the ideal of justice that constantly beats in the Constitution** [and] [f]or its dynamic nature it is capable of manifesting itself in various dimensions." *PRP v. ELA* [Commonwealth of Puerto Rico], supra, p. 633 (emphasis supplied). Also, dead letter are those expressions in which the Court stated that "[to] the extent a political-partisan campaign is subsidized with public funds, an advantage is allowed to one party (or political candidate) over another. This undermines the electoral equality axiom and the pillars of the electoral scheme in our country." *PPD v. Gobernador I supra* (PPD v. Governor I, supra), p. 671 (emphasis supplied).

It is unacceptable to assume with such lightness the weight of these words and our precedents, especially when this judicial attitude reduces the protection of constitutional rights, rather than extending it. The doctrine of precedent, and its respective exceptions, cannot and should not serve, as they do today, mere legal labels to conceal personal whims.18 Such use undermines the core purpose of that doctrine of providing legal stability and damages the already weak credibility of this Court.

### ii.        The role of courts in modern constitutionalism

*24 It should also be noted that the majority of this Court assumes a minimalist notion of our Constitution, according to which this forum is prevented from extending the meaning of our constitutional order beyond the text of the master document. Majority Op., pp. 20-21 (citing R. Martínez Torres, *Originalism as a method of constitutional interpretation and the principle of separation of powers*, 49 Inter American University Law Journal 249, 249 (2015)). That understanding is unsustainable when we consider the extensive role that this Court has previously assumed in the protection of constitutional rights of a political, social, labor and criminal nature.19 It is also foreign to the development of the modern constitutionalism of which our democratic order forms part.

In a democratic state of law, the judiciary branch functions precisely as a guarantor of constitutional rights and the conditions necessary for their enjoyment. See E. Rivera Ramos, *Los derechos y la democracia: ¿conflicto o complementariedad?* (Rights and democracy: Conflict or complementarity?) in *Los derechos fundamentals* (The fundamental rights), R. Saba ed., 2001. That role is not a mere choice or theoretical preference, but a deontological function inserted in the Constitutional law scaffold that assigns to the judiciary branch the interpretation of the Constitution itself. *Id.* ("[T]he role of guarantor of the pre-conditions of democracy can be assigned to the judiciary branch in the Constitution itself, by majority will, as in some modern constitutions"); J.J. Álvarez González, *La protección de los derechos humanos en Puerto Rico* (Protection of human rights in Puerto Rico), 57 Rev. Jur. UPR (Law Journal of the University of Puerto Rico) 133, 174 (1988) ("[T]he judicial review is the most well-known form [...] that exists in the [United States and Puerto Rico constitutional systems] to make reality the guarantees that their Constitutions promise").

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

In that sense, the duty as the last interpreter of the Constitution was assigned to this Court, with the corresponding faculty to declare unconstitutional those rules or practices in which other branches of government incur. Article V, sect. 4, Const. of PR, LPRA, Vol. 1; see *Santa Aponte v. Srio. de Hacienda* (Secretary of the Department of the Treasury), 105 DPR 750, 759 (1977) ("The function of being the final interpreter of the Constitution corresponds exclusively to a single power, to the Judiciary Branch. The Constitution confers certain powers on the Legislative and Executive Branches, but the definition of its contours and the determination of the validity of its exercise are matters carefully reserved to the courts").

The work of judicial review also includes the faculty of this Court to remedy a constitutional deficiency where the State ruins or fails to fulfill its respective duty to guarantee through legislation the constitutional rights of citizenry. See Article II, sects. 1-2, Const. of PR, LPRA, Vol. 1 ("Both the laws and the system of public instruction will embody these principles of essential human equality," "The laws will guarantee the expression of the will of the people through universal, equal, direct and secret suffrage, and will protect the citizen against all coercion in the exercise of the electoral prerogative"); see also *García v. Aljoma*, 162 DPR 572, 580-82 (2004).

As I mentioned earlier, in terms of electoral equality, there is an affirmative duty on the part of the State to guarantee the actual exercise of those rights through specific prohibitions and limitations. *PPD v. Gobernador I supra* (PPD v. Governor I, supra), p. 670; see E. Rivera Ramos, *El estado de derecho: aproximación al concepto* (The rule of law: Approach to the concept), 81 Rev. Jur. UPR (legal journal of the University of Puerto Rico) 1113, 1119-1120 (2012) (mentioning the importance of normative and institutional guarantees for the protection of fundamental rights). To abdicate the constant vigilance of these rights, as well as their necessary conditions, is to ignore that the "mere equality before the law does not guarantee the real enjoyment of the rights of many people." E. Rivera Ramos, *La igualdad una vision plural* (Equality a plural visión), 69 Rev. Jur. UPR 1, 12-13 (2000). It is also to reduce our Constitution to a formality, instead of granting it the binding force and social value it deserves.

### iii.        The importance of the advertising ban in electoral processes

*25 The electoral ban, as a necessary mechanism for the equal exercise of the electoral process and the right to vote, seeks to legitimize the fully democratic character of our government system. For our government to be based on the will of the people, that will must be free of coercion and undue influence on the part of the government itself. Otherwise, the democratic essence of the electoral mandate and, therefore, the legitimacy of governmental power is in question. See E. Ziegler, Government Speech and the Constitution: The Limits of Official Partisanship, 21 B.C.L.Rev. 578, 579-80 (1980) ("It is a truism that, if a governing structure based upon a given genuine citizen opinions is to survive the viable democracy, it must place legal restraints on the government's ability to manipulate the formulation and expression of that opinion "); see also *PPD v. Gobernador I supra* (PPD v. Governor I, supra), p. 701 (citing S. Shiffrin, *Government Speech*, 27 UCLA L.Rev. 565, 612 (1980)) ("To allow the government, armed with the greatest campaign treasure - the public treasury - to attempt to dominate an electoral process, attempts against the basic integrity of the democratic process").

Hence the stance taken by this Court more than twenty years ago was the wisest and consonant with our Constitution. The unlimited and excessive propaganda by the government during any

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

electoral process "constitutes an open and veiled form of electoral coercion in order to benefit the party that controls the Executive Branch," *PPD v. Gobernador II supra* (PPD v. Governor II, supra), p. 929 (Op. of Conformity, J. Hernández Denton); see *Stern v. Kramarsky*, 84 Misc.2d 447, 375 N.Y.S.2d 235, 239 (1975) ("It would be establishing a dangerous and untenable precedent to permit the government or any agency thereof, to use public funds to disseminate propaganda in favor of or against any issue or candidate. This may be done by totalitarian, dictatorial or autocratic governments but cannot be tolerated, directly or indirectly, in these democratic United States of America"). Today more than ever, in an era of mass communication by the most diverse, immediate and effective means, it was appropriate to limit the influence of government advertising to manipulate the citizen's will.

The majority of the Court dismisses our earlier pronouncements as an invention; as an illegitimate constitutionalisation. Surprisingly, it does not express any justification for abandoning the so-called axiom of electoral equality, but reduces its analysis to the absence of constitutional bases in this regard. It thus ignores potential foundations at the federal level, such as those pointed out by Professor Nelson Tebbe, who argues that unrestricted government propaganda also contravenes principles of due law process, equal protection of laws and freedom of expression. N. Tebbe, *Government nonendorsement,* 98 Minn. L.Rev. 648, 668-76, 712 (2013) ("[O]fficial speech is limited by a principle of government nonendorsement that cuts across various constitutional provisions and that brings them together to protect full and equal citizenship in a free society"); see S. Shiffrin *Government Speech*, 27 U.C.L.A. L.R. 565, 617-22, 655 (1980) (Government speech relating to ballot questions raises serious first amendment problems, and general rules need to be formulated that limit government departures from electoral neutrality").20

*26 Anyway, the majority errs by alienating itself from all these considerations and thus reduce the advertising ban in the face of an electoral process to a mere preference at the mercy of the prerogatives of the legislative body in power. The precedents of this Court and the awareness of the social reality in which our constitutional system operates dictates otherwise.

### III

As in *PDD v. Gobernador II, supra* (PDD v. Governor II, supra), the article that currently establishes the electoral ban in the Electoral Act only refers to a "general election." 16 LPRA sect. 4241. Hence, the majority opinion emphasizes that its language is punctual when it provides that the electoral ban will apply to the general elections, a term that the Electoral Act itself defines as "[p]rocess by which voters select one or more officials within a geographical area to cover one or more vacancies in a public elective service position in the Commonwealth of Puerto Rico." 16 LPRA sec. 4003 (31). In his opinion, whether we turn to Article 12.001 of the Electoral Act itself or to the reference made in Law No. 7-2017 to the prohibitions and offenses of the Electoral Act itself, [21] the terminology used by the legislator is equally limited to the general election.

However, in our thorough analysis of the text of Article 12.001 of the Electoral Act, the electoral events contemplated in Act No. 7-2017 suffered from a significant constitutional deficiency considering what was said in *PDD v. Gobernador II, supra* (PDD v. Governor II, supra). However, in our legal system "laws are presumed to be constitutional until a competent court declares otherwise." *Brau v. ELA* (Commonwealth of Puerto Rico), 190 DPR 315, 337 (2014).

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

From this perspective, "the courts must strive to achieve consistent and compatible interpretations that advance the constitutionality of laws." *% 21Id.* Thus, "when the validity of a law is questioned or if there is any doubt as to its constitutionality, the courts must ensure that there is no other possible reasonable interpretation of the law." *Id.*, p. 338.

That is why, although I recognize that an isolated reading of the provisions suggests that the electoral ban does not apply to the electoral processes before our consideration, it corresponds an integral reading of the law to sound out its constitutionality according to *PDD v. Gobernador II, supra* (PDD v. Governor II, supra). I believe that Article 11.001 of the Electoral Act itself advanced that task. This article establishes that "[a]ny referendum, consultation or plebiscite held in Puerto Rico shall be governed by the special law that is approved for this purpose and *by the provisions of this subtitle in all that is necessary or pertinent for which said special act sets no provision."* 16 LPRA sec. 4211 (emphasis supplied).

*27 In an effort to interpret the Electoral Act and Act No. 7-2017 in line with the current constitutional precepts, I believe that Article 11.001 allowed the most reasonable interpretation of the legal framework of these acts, while supporting their constitutionality. That is, it was not enough to insist in that Article 12.001 of the Electoral Act refers only to the general elections, but it was necessary to also note the knowledge that the legislator has and should have of the applicable constitutional law, and of the jurisprudence of this Court in this regard. See the Explanatory Memorandum, Act No. 78 of June 1, 2011 (recognizing that the Electoral Act has been subject to extensive interpretations by the courts). In this sense, and precisely because it is a constitutional imperative, the electoral ban was a necessary and pertinent aspect of the Plebiscite and Referendum cases in dispute, for which its special law did not set provisions. 22

In conclusion, a reasonable interpretation of the dilemma before this Court would have been that, through Article 11.001 of the Electoral Act, the legislator applied to the electoral events contemplated in Act No. 7-2017 those provisions of the Electoral Act that were necessary and relevant. Thus, it was necessary to apply the advertising ban of the Electoral Act to the Plebiscite and Referendum established by Act No. 7-2017 as a necessary and pertinent provision in accordance with the constitutional imperative of *PDD v. Gobernador II, supra* (PDD v. Governor II, supra) that today is ruled out.

## IV

*PDD v. Gobernador II, supra* (PDD v. Governor II, supra), represented a constitutional norm of great democratic value that applied perfectly to the case before our consideration. Our constitutional order should repudiate any kind of electoral advantage paid with public funds in order to ensure that all ideological preferences are presented to the electorate in the highest level of equality that the State is able to guarantee. I consider that, as constitutional imperative, the advertising ban established by the Electoral Act applies to the Plebiscite and Referendum provided in Act No. 7-2017. For that reason, I strongly disagree with the majority of this Court that today determines the contrary, in a way that weakens the doctrine of precedent in our rule of law and collapses one of the pillars of our democratic order.

Maite D. Oronoz Rodríguez

*28 Judge President

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Dissenting opinion issued by ASSOCIATED JUDGE MRS. RODRÍGUEZ RODRÍGUEZ

The "[u]nsuitable time to vote" continues. José Saramago, Essay on lucidity

This coming plebiscitary process and the incidents in this Court could very well be called - with the pardon, of course, of Don Gabriel García Márquez, *chronicles of a tricking plebiscite*.23 It all began in 2009, when the waves unleashed by the judicial tide caused a majority of this Court in *Suárez Cáceres v. EEC* (State Election Commission), *176 DPR 31 (2009),* a case about counting votes under the Law of Minorities, to decide without any legal explanation, to revoke an old precedent, namely: *Sánchez and Colón v. ELA* (Commonwealth of Puerto Rico), 134 DPR 445 (1993).

As you will recall, in *Sánchez and Colón*, this Court complied with its duty to ensure that the legislation promulgated for the holding of the plebiscite of status of November 14, 1993 complied with those constitutional guarantees that ensure the fundamental and pre-eminent condition of the right to vote. Therefore, the adjudication of blank ballots was validated as a vote that did not favor any of the definitions of status proposed by the political parties for that plebiscite.

We should refresh our memory of what we said in *Suárez Cáceres*, in our dissenting vote, because it helps us understand how this *Chronicle* has been written. There we said, and we quote extensively:

> [T]he revocation of *Sánchez and Colón v. ELA* (Commonwealth of Puerto Rico) I, is revealed as a totally unnecessary determination by what is set forth in this case and *whose reality masks other intentions*.
>
> In a strict judicial character, the controversy we had before us in Sánchez and Colón, is dissimilar to the one raised in this case. In Sánchez and Colón, the constitutionality of Act No. 22 of July 4, 1993 (1993 Laws of Puerto Rico 101) was questioned. This act authorized the holding of a status referendum with the following formulas: Commonwealth, Statehood and Independence. The plaintiffs claimed that they were duly registered voters that were not affiliated with any of the three political parties. They also claimed that they did not agree with the definitions of the formulas of status that were collected in the ballot. Therefore, the law did not grant them an opportunity to vote for the alternatives of their choice. They finally claimed that their right to vote, to free expression and association, and to equal protection of the laws, both under the Constitution of the Free State Associate of Puerto Rico as the United States of America were violated.

Faced with this controversy, we recognized that in matters of constitutional hermeneutics, when we face statutes that suffer from unconstitutionality by sub inclusion, we have the faculty to extend statutory benefits to those excluded groups or classes. *Sánchez and Colón*, p. 450. In accordance with this principle and considering the particular facts of that case, and as a mechanism to "overcome the serious constitutional objections raised by the plaintiffs," we ordered the State Elections Commission to award "ballots deposited in blank as a vote that does not favor any of the definitions of *status* proposed by the parties." *Sánchez and Colón*, pp. 450-451.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

\***29** Thus, expressions related to blank ballots are given in the context of configuring a remedy that would avoid declaring unconstitutional the coming electoral event. In other words, in view of the unconstitutionality by sub inclusion of Act No. 22, we had to choose between two alternatives: to declare null the electoral process or to set up a remedy that would solve the problem of sub inclusion of the act. Naturally, the second path was chosen. [...]

***What we did solve in Sánchez and Colón, and about which the majority says nothing, was that in a referendum of "status" we must provide a place on the ballot for those groups or classes that are excluded from the definitions of "status," so that their expression is collected. [...] That is the rational of Sánchez v. Colón. That is the importance of that case that bothers the majority. Obviously, Sánchez and Colón have little to do - not to say it has nothing to do - with how the votes are counted for purposes of the "Minorities Act", which is the controversy in this case in the opinion of the majority.*** Undoubtedly, to arrive at the conclusion reached by the Court today, in a correct adjudicative methodology, the Court did not have to revoke Sánchez and Colón.

It draws attention on the fact that nowhere in the sixty-four pages of opinion does the Court explain what we have resolved in *Sánchez and Colón*, and why it is now necessary to revoke it in the context of this case. This silence is resonant and deafening. Without much trouble, it seems reasonable to conclude that the controversy between Jorge Suárez Cáceres and Ángel Rodríguez Otero is secondary, ***that the controversy is merely the pretext used to blur the constitutional norm which requires that, in a referendum process, like a plebiscite, space must be provided on the ballot for those groups or classes of citizens who do not favor the proposed definitions on which they will be voted. Sánchez and Colón, p. 451. Thus understood, the course of action of the majority constitutes a blatant assault on democracy.***

***[...]***

\***30** That is to say, the rationale of today's opinion is not what we are told in the Court's opinion, namely, how to apply the "Minorities Act", but rather **to pave the way for [...] a future referendum or plebiscite of status.** *Suárez Cáceres*, 178 DPR 112, pp. 115-117 (2009) (Rodríguez Rodríguez, J., Dissident op.). (Emphasis in original and ours.)

The passing of time has corroborated what we proposed as an explanation for what seemed inexplicable at that time. *Suárez Cáceres*, is the first chapter of this *Chronicle* written by the judicial tide.

Today, the tide is again scourging our coasts, writing what appears to be the last chapter of the *Chronicles of a tricking plebiscite*, when revoking the case *P.P.D. v. Gobernador II* (P.P.D. v. Governor II), 136 D.P.R. 916 (1994). On that occasion, we extended the electoral ban for the dissemination of government adverts of the general elections contained in the *Electoral Act* of 1977, Act No. 4 of December 20, 1977, 16 LPRA sect. 3351, to the electoral consultation on certain amendments to the Constitution of the Commonwealth of Puerto Rico through a referendum. This determination was based on the axiom of economic equality of our Constitution and the right to suffrage as an element shared by the general elections and the referendum. Nowadays, a majority exiles the principle of electoral economic equality from our country without considering, or giving the importance of, its effects on the legitimacy of democracy.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

On this occasion, after using an alleged "textualistic analysis," which was laconic, the majority concluded that the axiom of electoral economic equality is nonexistent, since the Constitution of the Commonwealth of Puerto Rico does not expressly provide for it. The opinion subscribed by the majority completely disregards that suffrage is an intrinsic right of democracy, whose cornerstone, in turn, is equality for the achievement of justice. This right, like all rights, is nothing but a conquest of liberty, which unfortunately today is broken because today, it is not convenient.

Historically, the ideal of equality in the electoral context has been erected on schemes for the financing of political parties and electoral processes. One of the mechanisms adopted in Puerto Rico, and in much of the world, is the public financing of electoral processes and political parties. This scheme aims at, first, combating political "investment" and, second, to ensure an equal distribution of direct and indirect goods or subsidies. In the present case, the electoral ban - like other prohibitions contained in the Puerto Rico Electoral Act, Act No. 78-2011, 16 LPRA sect. 4231- creates preventive measures aimed at avoiding embezzlement, corruption and the aforementioned political "investment."

In addition, it should be noted that the majority revokes *P.P.D. v. Gobernador II* (P.P.D. v. Governor II), *motu proprio*; nobody asked for it, no one argued! On the contrary, the petitioners on several occasions, both in their request for certification and in their plea, acknowledge the validity of the case as existing jurisprudence. However, they distinguish it to maintain that the rule set forth therein does not apply to the situation raised in this case. **They never state that it should be revoked or why.** With their procedure, the majority violates the right of the respondents to refute this approach with their foundations. Moreover, the majority adopts a course of action identical to the one that they criticize from the Court that signed *P.P.D. v. Gobernador II* (P.P.D. v. Governor II). [24] We are, frankly, before slow-witted arguments or foundations.

In addition, it should be noted that the majority revokes *P.P.D. v. Gobernador II* (P.P.D. v. Governor II), *motu proprio*; nobody asked for it, no one contested it! On the contrary, the petitioners on several occasions, both in their request for certification and in their plea, acknowledge the validity of the case as existing jurisprudence. However, they distinguish it to maintain that the rule set forth therein does not apply to the situation raised in this case. **They never set out that it should be revoked or why it should be revoked.** With their procedure, the majority violates the right of the respondents to refute this approach with their foundations. Moreover, the majority adopts a course of action identical to the one that they criticize from the Court that signed *P.P.D. v. Gobernador II* (P.P.D. v. Governor II). 24 We are, frankly, before arguments or foundations that are lacking reason and discourse.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)**

2017 TSPR 57

**\*31** But there is more, the majority opinion indicates that in *P.P.D. v. Gobernador II,* this Court affirmed the decision of the lower court without any of the petitioners calling into question the constitutionality of the *Enabling Act for the Referendum Concerning Amendments to the Constitution of Puerto Rico of 1994,* Law No. 49 from August 2, 1994. Thus the Majority concludes that the Court applied an "inappropriate" analysis which infringed the judicial self-limitation rule. However, this statement is false. The original file for *P.P.D. v. Gobernador II* shows that the complaint filed by the Puerto Rico Independent Party on August 3, 1994 challenged the constitutionality of said act.[25] Specifically, allegation number 27 of the aforementioned complaint, which raised arguments that were reiterated before this Court, indicated the following:

> In light of the fact that the 1194 referendum financing structure violates freedom of expression, freedom of association, the right to vote, due process of law, equal protection of law, and several provisions of the Electoral Act, it seeks an illegitimate purpose and therefore violates Article IV, Section 9 of the Constitution of the Commonwealth of Puerto Rico regarding the use of public funds for strictly legitimate purposes. See Appendix, CE–1994–588, *Annex II,* p. 15.

Moreover, this alleged textual reasoning shows a troubling lack of awareness of the constitutional text that it is interpreting. Section 19 of Article II of the Constitution of the Commonwealth of Puerto Rico states that "[t]he above list of rights **shall not be deemed to be restrictive or to exclude other rights belonging to a democratic nation which are not specifically mentioned."** Const. P.R. Art. II, Sec. 19 (Emphasis added). Therefore, our constitutional text contains its own interpretive rule in the Bill of Rights. Specifically, our constituents placed in Section 2 – second in importance to the value of dignity and equality of human beings –the suffrage described above so that it would be "universal, **equal,** direct and secret ...". Const. P.R. Art. II, Sec. 2.

Mr. Jaime Benítez explained, when submitting the Report concerning the Bill of Rights to the Constitutional Convention, that these constitutional articles brought together two rules of interpretation. The first, which we are concerned with, had the following goal:

> **\*32** ... ***to protect the rights of the individual against a restrictive interpretation or an interpretation based on the rule of inclusio unius, exclusio alterius. According to the latter principle of interpretation, the act of listing entails the act of excluding, such that anything that is not mentioned is thereby rejected.*** We do not believe that a constitution should incorporate such a principle of inflexibility [ ... ] An interpretation whereby anything that is not derived literally from each of the words used is thereby excluded from constitutional protection would be contrary to the basic attitude that has governed the Committee by preferring the brief language of great principles instead of a

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

detailed formulation of inexhaustible details. (Emphasis added). *Congressional Record of the Constitutional Convention,* Volume IV, p. 2576 (1961).

The constituent left it abundantly clear that this section of the Bill of Rights was **precisely** intended to avoid interpretations like the one the majority supports. In other words, the textualists/ "originalists" etc. ignore the clear text of the constitution or the clear intention of the constituent. As used by the majority, concepts such as "originalism" and "textualism" are devoid of any true meaning.

Mr. Benítez, the delegate, stated that our Bill of Rights enshrines the "*most liberal protection of the rights of the individual...*" *Id.* As I have stated in the past, it is up to us, **Puerto Rican** judges, to make the constitutional mandate of our highest document, making individual rights current, comply with our constitutional duty to provide the most open and **tolerant** protection "of the rights of the individual." *Id.* We are interpreting the Constitution of the Commonwealth

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.        21

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)**

2017 TSPR 57

of Puerto Rico, not any other, therefore we must abide by the interpretive rule imposed by its drafters. We may not like it, but while it is in effect, we must follow it.

This leads me to the conclusion that invoking the theory of "textualist analysis" is nothing more than a subterfuge to mask a judicial ideological activism, which leads the majority to undermine our Constitution, limit the rights of our citizens, and abandon established precedents, to obtain temporary advantage in ideological electoral processes. **What a shame!**

Furthermore, we should emphasize that the value of electoral economic equality has been extensively studied, and it has been established that "an extremely unequal distribution of resources can create the appearance of inequity that may affect the legitimacy of the electoral result." Kevin Casas– Zamora & Daniel Zovatto, *El costo de la democracia: Apuntes sobre la regulación del financiamiento político en América Latina,* Latin America Intiative Foreign Policy (July 2015), available at: https://www.brookings.edu/wp-content/uploads/2016/07/The–Cost–of–Democracy–CasasZamora–Zovatto–Spanish.pdf (*last visited on April 17, 2017*).

With this in mind, the principle of electoral economic equality has the fateful effect of undermining the legitimacy of electoral processes. Especially when the plebiscite process that approaches has raised great suspicion in the federal government itself. As we know, a few days ago the United States Department of Justice refused to endorse this plebiscite in light of serious doubts caused by the ballots designed to be used next June 11, 2017. The deputy secretary of the Department of Justice, Mr. Dana J. Boente, in a letter from April 13, 2017, indicated that the language contained in the plebiscite ballot contains "several ambiguous and potentially deceitful statements." See *United States Department of Justice review of plebiscite ballot, voter education materials, and expenditure plan,* p. 2. (Our translation).

**\*33** In light of the above, and the context of fiscal crisis that threatens us, there is no logic whatsoever to justify the course of action of the majority of this Court. On the contrary, the ruling of this Supreme Court show that the desire to enable a specific electoral result is very much present.

For the above reasons, I am forced to dissent from the decision of the majority of this Court which only serves to create loopholes which threaten our system of government and the fundamental principles of democracy. The opinion that is issued today sets an unfortunate path for democracy in our nation which strangles and drowns our struggles for our liberties. Today, we are not a greater nation than we were yesterday.

Anabelle Rodríguez Rodríguez

Associate Judge

Dissenting Opinion by ASSOCIATE JUDGE ESTRELLA MARTÍNEZ

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Acknowledgment of the right of equality in all fundamental and constitutional dimensions requires that I dissent above any other consideration.

The economic equality aspect of the axiom of electoral equality[26] is clearly recognized, not only by our Constitutional Law, it is one of the pillars of equality in electoral processes in terms of International Law,[27] which as judges we are required to acknowledge by mandate of the Federal Constitution. Art. IV, U.S. Const., LPRA, Volume 1. Specifically, with regards to the Universal Declaration of Human Rights and the International Pact of Political and Civil Rights enacted on December 16, 1966 the following was established: "[T]he foundational documents in question are imbued with influential notions of freedom, equality, accountability, and State obligations. These rights and the notions surrounding them are the primary representations of democratic norms and political values at the international level. Money in politics must first pass through these filters". T.K. Kuhner, *The Democracy to Which We Are Entitled: Human Right and the Problem of Money in Politics,* 26 Harv. Hum. Rets. J. 39, 58 (2013). Both international rules are binding and contain unshirkable duties that apply to the government of the United States. Thus, it should be noted that economic electoral equality imposes obligations on the State directly and is not limited to political contributors or parity for political parties, as erroneously decided by the Majority of this Court.

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.
22

**Burgos Andujar v. Comision Estatal de Elecciones, 2017 1656332 (2017)**

2017 TSPR 57

It should also be noted that in the context of International Law, *Actual Equality* and participation in electoral matters is not limited to general elections, they extend to participation in public matters. The economic aspect of electoral equality has been a key part of the struggle for self determination of Colonized nations. In light of the reality of Puerto Rico, it would make no sense for the economic aspect of electoral equality to be excluded from the process of self-determination of a Nation and that it be merely limited to elected positions. In that regard, theorists of International Law have argued the following:

> **\*34** Consider that the democratic entitlement requires "access, on general terms of equality, to public service in [one's] country," protects "the right and the opportunity without ... distinctions [as to property, fortune, or economic status] ... [t]o take part in the conduct of public affairs ...," and requires all States to provide "[t]ransparent and accountable government institutions". Kuhner, *supra,* p. 40 (notations omitted).

Similarly, we cannot ignore that this axiom of equal electoral treatment is what puts into practice the constitutional protection of the right of universal, equal, direct, and secret suffrage, and of the freedom of expression of voters in Puerto Rico. Art. II, Sec. 2, Const. ELA, LPRA, Volume 1. Said principle protects

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

citizens from any sort of coercion in any electoral process, whether it be general elections, plebiscites, or referendums.

The reality of Constitutional Law and International Law in the subject of electoral equality may not be defeated by the intention of the local legislator. However, even following the argumentative thread of the Majority, a cursory examination of the Statement of Purposes of Law No. 7–2017 reveals that the Puerto Rico Legislative Assembly is aware of the parameters of neutrality in the message and use of public funds which the Federal Government, in turn, acknowledged when it enacted the *Consolidated Appropriations Act, 2014,* Pub.L. No. 113–76, 128 Stat. 5. Specifically, the following was expressly acknowledged:

> After over a century of colonial disadvantages and years of having carried out the Puerto Rico Plebiscite, Congress and the President approved an allotment of $2.5 M in the "Consolidated Appropriations Act (2014)", Public Law 113–76 (2014), to propose an electoral consultation as to ratification of the Statehood result of the Plebiscite of 2012, now, at the discretion of the Government of Puerto Rico and finance a campaign of ***"objective and party-neutral education for voters in a Plebiscite"*** ... "as to the options that settle the future political status.["] (Emphasis added).

In light of the legislative background of Law No. 7–2017, not to mention the express acknowledgment of the legislature in including the prohibitions of the Electoral law, it is clear that in accordance with federal legislation and local legislation, application of the economic equality aspect of the constitutional axiom of electoral equality is obligatory, even though the Majority does not want to acknowledge its constitutional nature. That is, under its own reasoning, it would have to conclude that there is a federal mandate and an acknowledgment by the local legislature as to its applicability.

Despite that reality, the precedent of *PPD v. Gobernador II,* 136 DPR 916 (1994) is unnecessarily revoked and the acknowledgment of the case law issued by this court is thrown out of the window.[28] As to this, in the past we stated the following:

> **\*35** [W]e have acknowledged that the constitutional axiom of electoral equality "may manifest itself in different dimensions". *PRP v. ELA,* 115 DPR 631, 633 (1984). See *PPD v. Gobernador I,* 139 DPR 643, 667 (1995). While in the past it has been invoked in the context of controversies that involve political parties, it is not exclusive to that context. The electoral alternatives on occasion transcend the margins of political parties. They expand; and with them the scenarios in which the constitutional axiom of equal treatment should be applied. We cannot restrain its scope. Expanding it is correct. In the face of "party-ocracy" democracy must prevail. *Guadalupe Tirado v. CEE,* 165 DPR 106, 116 (2005).

Unfortunately, the course of action that the Majority of this Court takes today restricts the scope of this important and fundamental constitutional principle.

Paradoxically, while analyzing legislation that seeks to address the problem of *Inequality,* this Court restricts the scope of the concept of *Equality.*

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.
23

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)**

2017 TSPR 57

Now it is in the hands of the political party that controls the Political Branches to establish the parameters, if any, as to use of public funds related to electoral events. The electoral administrative body – the State Election Committee – may not include in the responsible exercise of its *expertise* constitutional protections that are in addition to the universal suffrage right which are not contemplated textually and written in stone in the Constitution. What is worse, citizens may not have the timely protection of the Judiciary. Previously I noted that this reading of Constitutional Law turns the guarantees for citizens that arise from the constitution into a mere graveyard of words. Today, *Equality* gets closer to the coffin of the constitutional graveyard with acts like these. As an aggravating factor, the possibility of challenging regulatory rules and decisions of the sort that we are reviewing on their face is eliminated, and citizens will have to wait and prove that they suffered specific harm in the electoral event in order to have any success in the *Equality* claim.

These are some of the multiple consequences entailed in revoking a precedent that has been firmly established over more than two decades, and surprisingly, weakening the constitutional principles innate to the existence of democracy itself.

I cannot lose sight of the Rule of Law that has governed electoral events in modern history, as well as our rulings and the protections that we have granted when the main ideological movements in Puerto Rico have invoked the economic equality aspect of the constitutional axiom of electoral equality, with regards to "status" and not just to general elections, as it has been restricted today. As an example, the New Progressive Party (PNP, acronym in Spanish) has made claims focused on questioning the use of public funds to campaign against statehood. To do so, the PNP's legal representation, as well as its leadership, consequently invoked the prohibition of inappropriate use for non-public purposes and the axiom of economic equality. See, e.g., *Recurso de Certificación Intrajurisdiccional, PNP v. ELA,* CT–2016–11; *PNP v. Hon. Sila M. Calderón,* 162 DPR 239 (2004) (Decision).

**\*36** From my study of Law, as an attorney and as a judge, I have known, acknowledged and applied the economic equality aspect of the axiom of electoral equality as one of the pillars of the concept of *Equality* and as a guarantee of International and Constitutional Law. This was to guarantee the self-determination of the People and to avoid inequality in related electoral processes, not limited to public position elections. It was right in the past, is right today, and shall always be right in Law, therefore I dissent and, instead, I would have strengthened and not weakened the economic equality aspect of the axiom of electoral equality in accordance with the aforementioned international and constitutional legal grounds.

Luis F. Estrella Martínez

Associate Judge

Dissenting Opinion of ASSOCIATE JUDGE COLÓN PÉREZ.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

*Do the rolling waves once again blanket our understanding and give rise to a zigzagging and malleable legal interpretation?*

Dissenting Opinion Associate Judge Rodríguez Rodríguez in *Asoc. Fotoperiodistas v. Rivera Schatz,* 180 DPR 920, 974 (2011).

Today, blanketed again by the uncontrolled and excessive waves and crests that some members of this Court stated eight (8) years ago was the "*normal flow of the judicial tide*", this Court lost the unique opportunity to reiterate its ruling, of over two (2) decades, as to electoral equality during a referendum. This time, extending said rule to the context of a plebiscite.

Specifically, we had to determine whether, in light of a plebiscite to be held on June 11, 2017, and the potential referendum to be carried out in the same year, the prohibitions established in Art. 12.001 of the Puerto Rico Electoral Act, *infra*, extended to the agencies of the Commonwealth of Puerto Rico. These prohibitions have the effect of preventing said agencies from incurring in expenses for purchase of time and space in the Nation's media, as well as purchase or distribution of propaganda or promotional materials for the purpose of describing their programs, projects, achievements, realization, projections and/or plans,

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.
24

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)**

2017 TSPR 57

unless expressly authorized by the Advertisement Examination Board ("J.E.A.", acronym in Spanish). The above, with the exception, obviously, of notices and press advertisements expressly required by law, certain campaigns of the Tourism Company, as well as any ads used to disseminate public interest, urgent or emergency information, which shall only be allowed upon appropriate authorization from the State Election Committee ("C.E.E.", acronym in Spanish).

Contrary to what is stated by a majority of this Court – and in accordance with the electoral equality axiom contained in the Constitution of the Commonwealth of Puerto Rico and what was decided by this Court in the cases of *P.P.D. v. Gobernador I, infra, and P.P.D. v. Gobernador II, infra*, in the context of electoral events to be held in the months of June and possibly October 2017, said prohibition was valid and in harmony with the constitutional protection of the right to secret, direct, equal and universal suffrage, and to freedom of expression of our nation's voters.

**\*37** Since this is not the course of action followed by a majority of this Court, **we dissent.**

The position taken by the majority, based on an incorrect, literal, and positivist reading of the applicable legal provisions and of the protections contained in the Commonwealth of Puerto Rico, leads to overruling one of our most well-thought out and structured *stare decisis* in the subject of electoral law. As if this were not enough, said decision indubitably and unequivocally entails an attack on the fundamental right of each Puerto Rican to vote free from coercion by the State.

This disastrous action shall allow the agencies of the state to arrogate public funds in the context of holding electoral events. With this action, a majority of this Court authorizes the political party in power to use public funds to intentionally interfere with the free right to vote of Puerto Ricans, to be deposited in the ballot boxes of democracy, thus undermining the pillars of the electoral framework of our Nation. Our conscience prevents us from approving of this action.

## I.

The controversy that we are considering arises in light of the enactment of Law No. 7 from February 3, 2017, known as the *Law for the Immediate Decolonization of Puerto Rico* (hereinafter, "Law No. 7–2017"). In accordance with the aforementioned statute, the Puerto Rico Legislative Assembly authorized the following two electoral events to be held: (1) a *plebiscite*, to be held on June 11, 2017, in which appropriately registered voters could vote between "Statehood" and "Commonwealth/Independence" as political status options (hereinafter, "Plebiscite"); and (2) if the "Commonwealth/Independence" option prevailed, a *referendum*, to be held on October 8, 2017, to select the type of sovereign relationship, be it "Commonwealth" or "Independence" (hereinafter, "Referendum").

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

In light of the above, the Puerto Rico State Election Committee ("C.E.E." acronym in Spanish) held an ordinary meeting in which the Acting Electoral Commissioner of the Democratic Popular Party, Mr. Miguel Ríos Torres (hereinafter, "Electoral Commissioner of the PPD"), submitted a request for— in light of the electoral events mentioned above— the J.E.A. to be activated. The above in accordance with Art. 12.001 of Law No. 78 enacted on June 1, 2011, as amended, Puerto Rico Electoral Act, *infra* (hereinafter, "Law No. 78–2011").

The Electoral Commissioner of the New Progressive Party, Ms. Norma E. Burgos Andújar (hereinafter "Electoral Commissioner of the PNP") was opposed to said request. She alleged that Law No. 7–2017 was silent as to activation of the J.E.A. and that Art. 12.001 of Law No. 78–2011, *infra*, only applied to general elections, therefore she believed that activating said entity was not appropriate in the context of the Plebiscite to be held.

**\*38** In light of the lack of unanimity of the Electoral Commissioners[29] and in accordance with the procedure established under Law No. 78–2011, *infra*, the controversy was submitted to the consideration of the President of the C.E.E., who timely issued Resolution C.E.E.–RS–17–07 (hereinafter, "Resolution of the C.E.E.") and decided the controversies submitted. In said document, the President of the C.E.E. activated the electoral ban for dissemination of governmental advertisements contained in Art. 12.001 of Law No. 78–2011, *infra*, through June 12 of the current year; the day after the Plebiscite. Furthermore, she provided that in the event

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.
25

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)**

2017 TSPR 57

that it were necessary to hold the Referendum, the aforementioned prohibition would be in effect until October 9, 2017. Lastly, and in accordance with the above, she ordered that the J.E.A. be established as the entity responsible for enforcing the provisions of Art. 12.001 of Law No. 78–2011, *infra.*

After timely filing a motion for reconsideration before the President of the C.E.E.,— which was denied— the Electoral Commissioner of the PNP filed a Motion for *Judicial Review* before the Court of First Instance, challenging the decision of the C.E.E. In summary, the Electoral Commissioner of the PNP requested that the decision be revoked based on the argument that the provisions contained in Art. 12.001 of Law No. 78–2011, *infra,* only apply to general elections, not to the Plebiscite and/or Referendum.

While the case was pending before the Court of First Instance, the Puerto Rico Senate, through its President, Hon. Thomas Rivera Schatz, and its Secretary, Manuel Torres Nieves, along with the House of Representatives of Puerto Rico, through its President, Hon. Carlos Méndez Núñez, appeared before this Court through a petition for certification. Therein, they requested that we certify this case, so that this Court could hear, in first instance, the matters raised before the lower court.

That same day, the PNP Electoral Commissioner appeared before us joining the aforementioned request and adopting the grounds raised by the Senate of Puerto Rico, its President and Secretary, the House of Representatives of Puerto Rico, and its President.

After this Court granted the motion for certification, and upon the appropriate legal proceedings, the parties filed their respective briefs. Therein, the C.E.E. alleges that, since it is the entity appointed by law to decide electoral matters, it was authorized to regulate anything related to the electoral process in the Nation, to protect citizens' right to vote. It also argued that the provisions of Law No. 7– 2017 were compatible with Law No. 78–2011, *infra,* as regards the electoral ban. Specifically, it states that previously this Court had already decided a controversy that is identical to this one, and therein it decided that the electoral ban on dissemination of advertisements by the State and paid for using public funds applied to a referendum event.

**\*39** The Electoral Commissioner of the PNP, for her part, argued that activating the electoral ban for referendums and plebiscites would "*paralyze*" the capacity of the Commonwealth of Puerto Rico to communicate its public policies and inform its citizens. Consequently, she argued that the prohibition contained in Art. 12.001 of Law No. 78–2011, *infra,* only applied to general elections in the Nation.

The Electoral Commissioner of the PPD, in summary, believes that the matter submitted for our review is not a novel issue, and that it had already been decided by this Court years ago. Thus, he stated that in harmony with the decision in *P.P.D. v. Gobernador II, infra,* and according to the clear text of Law No. 7–2017, the electoral ban applies to electoral matters to be held on June 11 and October 8, 2017, if the latter were necessary. Therefore, he argued for the appropriateness of establishing the J.E.A.

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

The Electoral Commissioner of the Puerto Rican Independence Party, Ms. María de Lourdes Santiago Negrón (hereinafter, "the Electoral Commissioner of the PIP"), also appeared before us. In her brief, and as relevant, she argues that Law No. 7–2017 incorporated, in a literal manner, the provisions of Law No. 78–2011, *infra,* as to offenses and prohibitions. Therefore, she believes that the electoral ban contained in Art. 12.001 of our current electoral statute, *infra,* since it is a type of prohibition, applies to the electoral events to be held in June and October of this year. Additionally, she alleges that this Court has already decided situations such as this one under the principle of electoral economic equality.

The Attorney General of the Commonwealth of Puerto Rico (hereinafter, "Attorney General") filed an opposition to the Resolution of the C.E.E. In essence, the Commonwealth of Puerto Rico argues that our rule of law contains a faculty that is delegated on the State to communicate and inform the citizens of the Nation as to governmental programs and that, while he acknowledges that it does not have a right to freedom of expression, any limit on this faculty should be viewed with caution. Furthermore, he argues that nothing decided by this Court supports the activation of the J.E.A. in periods in which a general election is not held.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)**

2017 TSPR 57

In a separate brief, the Puerto Rico Senate, its President and Secretary, alleged, in summary, that the provisions of Law No. 7–2017 were incompatible with the prohibition contained in Art. 12.001 of Law No.78–2011, *infra,* and therefore the former preempted, as it is a special law. Additionally, they held that in *P.P.D. v. Gobernador II, infra,* this Court decided that the prohibition contained in the electoral statute that was in effect at the time did not extend to years in which a general election was not held.

**\*40** Lastly, the House of Representatives of Puerto Rico, its President and its Secretary, also filed a brief. Therein they argued, in relevant part, that to determine whether or not the electoral ban contained in Law No. 78–2011, *infra,* applied, it was not only necessary to make a distinction between the different electoral events- to wit, a general election, a plebiscite and a referendum – but that additionally, the nature of the referendum had to be taken into account. Thus he argued that what was decided by this Court on other occasions in similar contexts did not apply.

## II.

To start, it must be clarified that, contrary to what the majority of this Court seeks to suggest, this Court- as final arbiter of the Constitution of the Commonwealth of Puerto Rico – can and should turn to its text in any circumstances in which it is warranted. When carrying out said reviewing power and interpreting the boundaries of our Constitution, "*we must guarantee its vigorousness and its relevance in light of current social, economic and political problems.*" (Emphasis added). *Misión Ind. P.R. v. J.P.,* 146 DPR 64, 91 (1998). *See* also, *Nogueras v. Hernández Colón I,* 127 DPR 405 411 (1990); *P.I.P. v. C.E.E.,* 120 DPR 580, 613 (1988); *López Vives v. Policía de P.R.,* 118 DPR 219, 227 (1987). A contrary argument, to the effect that we cannot exercise said duty "*without an appropriate request by the parties,"* Op. p. 13, leads to an anomaly in our role as court of last resort. Having clarified the above, we shall discuss the law that applies to the controversy before us, which was ignored by the majority.

## III.

As is well known, and as relevant to this controversy, the Constitution of the Commonwealth of Puerto Rico, like the Constitution of the United States of America,[30] establishes the right to equality and equal protection of law as a fundamental principal in our National Life. In this regard, Art. II, Sec. 1, of our Constitution states the following:

> The dignity of human beings is inviolable. All men are equal before the Law. There may be no discrimination by race, color, sex, birth, social condition or origin, or political or religious ideas. Both the laws and the public education system shall embody those principles of essential human equality. Sec. 1, Art. II, Const. E.L.A., LPRA, Volume 1, ed.2016, p. 275.

**\*41** As provided in the *Congressional Record of the Constitutional Convention,* the principles that inspired the founders of our Constitution when drafting said constitutional clause included:

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[ ... ] to clearly establish as an innate foundation of everything sought by the principle of dignity of human beings, and, as a consequence thereof, the essential equality of all persons in our Constitutional system. Equality before the law is above accidents or differences, whether they arise from nature or culture. Any discrimination or privilege that is contrary to this essential equality is repugnant to the Puerto Rican legal system. Our legal organization is strengthened as appropriate by this constitutional provision, and required to expand its provision to fully enforce the provisions contained herein. *Report of the Committee of the Bill of Rights, Congressional Record of the Constitutional Convention,* Volume 4, p. 2561, Equity (1962).

In harmony with the above, and in order to give meaning and life to the aforementioned constitutional provision, and in the

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.      27

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)**

2017 TSPR 57

context of the controversies that we have before us, we have established that equality *"[b]y its dynamic nature is susceptible to manifesting itself in different dimensions"*. *P.P.D. v. Gobernador I,* 139 D.P.R. 643, 666–667 (1995), citing *P.R.P. v. E.L.A.,* 115 DPR 631, 633 (1984). **One of these manifestations is electoral equality.**

The principle of electoral equality is zealously protected in our constitutional law in Art. II, Sec. II of the Constitution of the Commonwealth of Puerto Rico. *See* Art. II, Sec. 2, Const. E.L.A., LPRA, Volume I, ed.2016, p. 283. Said articles guarantee the expression of the will of the People through secret, direct, equal, and universal suffrage, and protects citizens against any coercion in the exercise of their electoral prerogative. *Id.*

As can be appreciated, it can be easily said that in its content Art. II, Sec. 2 of our Constitution, *Id.,* establishes the fundamental principle that political power in our constitutional law emanates from the will and consent of the Nation's citizens. This constitutional precept imposes on the Government a dual responsibility: *"to abstain from interfering with the exercise of secret, direct, equal and universal suffrage, and to protect citizens against any coercion in the exercise of this electoral prerogative."* *P.P.D. v. Gobernador I,* 139 DPR in p. 670 (1995); *Sánchez and Colón v. E.L.A. I,* 134 DPR 445, 449–450 (1993).

Specifically, this Court, when discussing said principles, established the following:

> **\*42 These constitutional principles protect and guarantee the right of universal suffrage, both in general elections and in referendums and plebiscites.** Although it is not an absolute right and the Legislature has a broad faculty to regulate it, **courts have the responsibility of ensuring that legislation that is enacted complies with constitutional guarantees.** When performing this responsibility we have to engage in a delicate balance between the fundamental right of suffrage and the interest of the State in regulating its exercise so that the process is carried out in an orderly manner with the greatest participation of voters in equal conditions. ***Each decision must be made carefully, taking the specific circumstances of each case into account. As a general principle, any legislation that substantially affects and places a burden on the suffrage right is subject to a constitutional challenge.*** *(Emphasis added). Id.*

In this sense, it is important to point out that one of the tools that historically has been used to guarantee electoral equality in our Nation is Art. 12 .0001 of Law No. 78-2011, 16 LPRA sec. 4231, previously known as Art. 8.0001 of the Electoral Law of Puerto Rico of 1977, Law No. 4 from December 20, 1977, 16 LPRA sec. 3351 (hereinafter, "Electoral Law of 1977")[31]. As relevant to the present controversy, said legal provision establishes the following:

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

During the year in which a general election is held until the day after the date in which it is held, Government agencies, the Legislative Assembly, and the Judiciary of Puerto Rico are prohibited from incurring in expenses for purchase of time and space in mass media, as well as purchase and distribution of propaganda or promotional materials for the purpose of describing their programs, projects, achievements, realization, projections and/or plans. This provision does not include notices and press advertisements that are required by law; campaigns of the Tourism Company for promotion of local tourism, promotional campaigns outside of Puerto Rico by the Puerto Rico Tourism Company or the Puerto Rico Convention Center District Authority promoting the island of Puerto Rico as a tourist destination, or the Industrial Development Company promoting foreign investment in Puerto Rico, as long as they do not include descriptions of the corporation's or the administration's achievements or highlight any employee. Additionally, notices for administrative or legislative public hearings that are published and circulated without using paid mass media are also excluded.

Similarly [sic], ads that are used to disseminate urgent, emergency or public interest information shall be excluded, and they shall only be allowed upon prior authorization by the Committee.

**\*43** As to notices or ads that are legally required for Government Agencies, the Legislative Assembly and the Judiciary of Puerto

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.
28

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)**

2017 TSPR 57

Rico and the municipalities, the Committee shall have a period of two (2) working days to express in writing its approval or reservations as to the notice or ad for which authorization was sought. Said period shall start to run from the moment the request for authorization was made to the Committee, and in the event that it expires before the Committee expresses its authorization or reservations, the message, notice or ad in question shall be deemed authorized; and the Board's issuance of approval documents shall not be required.

The provisions of this section shall not apply to the position of the Resident Commissioner, which will be governed by the provisions of the Federal Election Law 2 U.S.C. § 441(a)(1)(A) et seq.

Violating this section shall entail an administrative fine of up to ten thousand (10,000) dollars for the first infraction and up to twenty-five thousand (25,000) dollars for subsequent infractions. Funds obtained from said fines shall be deposited in the special fund for financing automation expenses for electoral processes, as provided in sec. 4011 of this title.

As evidenced, the enactment of Art. 12.001, formerly Art. 8.001 of the Special Law of 1977, had the effect of, with few exceptions authorized by the J.E.A., restricting dissemination of information by the Commonwealth of Puerto Rico while general elections were being held in the Nation. Stated otherwise, the aforementioned statute had the "*legislative intent of definitively excluding from the political process any surreptitious influence that the party in power may have using government ads.*". *P.P.D. v. Gobernador I, supra,* pp. 682–683, citing with approval *C.E.E. v. Depto. de Estado,* 134 DPR 927, 939 (1993).[32] Provisions such as this one reflect "*the interest in discontinuing during the electoral process the practice of governmental agencies making political campaigns by publishing ads as to their achievements and plans.*" *P.P.D. v. Gobernador I, supra,* p. 683, citing *C.E.E. v. Depto. de Estado, supra,* p. 939.

Thus we note that, like the framework established previously in the revoked Art. 8.001 of the Electoral Law of 1977, *supra,* the new Art. 12.001 of Law No. 78–2011, *supra,* which, in essence, promotes the same spirit of its predecessor, seeks to prevent the Commonwealth of Puerto Rico and its agencies from influencing freedom of expression and the choice of citizens who participate in electoral events in the nation in any way using public funds. As to this, *see* 1st Report of the Special Committee as to Governmental Reform provided with amendments on the Substitute of the House to the Bill of the House 1863, November 10, 2010, 4th Ordinary Session, 16th Legislative Assembly, p. 25.[33]

Thus in order to guarantee faithful compliance with the provisions of Art. 12.001 of Law No. 78–2011, *supra,* —and as was done when Art. 8.001 of the Electoral Law of 1977 was in effect, —in accordance with Sec. 2.1 of the Regulations for Control of Government Public Dissemination Expenses of the State Elections Committee of October 14, 2015, the J.E.A. was established. Said entity was tasked with

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

evaluating any request for authorization of dissemination of advertisements made by the government of Puerto Rico during general elections. *Id.,* Sec. 2.3, p. 6.

**\*44** It is important to point out that activation of the electoral ban against dissemination of governmental advertisements contained in Art. 12.001 of Law No. 78–2011, is not only limited to general elections, as its text seems to suggest. In this regard, and to understand the scope of this prohibition, we must review the interpretations, which in our opinion are correct and complete— which this Court has made as to Art. 8.001 of the Electoral Law of 1977 in the cases of *P.P.D. v. Gobernador I, supra,* and *P.P.D. v. Gobernador II,* 136 D.P.R. 916 (1994).

In *P.P.D. v. Gobernador II, Id.,* this Court considered a factual situation that was very similar to the present case. On that occasion, petitioners challenged the validity of Law No. 49 enacted on August 2, 1994, also known as the Enabling Act for Referendum as to Amendments to the Constitution of Puerto Rico of 1994 (hereinafter, "Enabling Act"), which authorized a referendum to be held for registered voters to indicate their approval or rejection of amendments proposed to several sections and articles of the Constitution of the Commonwealth of Puerto Rico, *supra.*

As relevant to this case, plaintiffs requested that the Governor of Puerto Rico

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Burgos Andújar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)**

2017 TSPR 57

and defendant public corporations, as well as the appropriate public officials, be ordered to stop advertisement campaigns that they carried out throughout the Nation's mass media, in accordance with Art. 8.001 of the Electoral Law of 1977, *supra.*

On said occasion, the lower court decided that the aforementioned article of the Electoral Law of 1977 applied with regards to the referendum scheduled in Puerto Rico, and therefore ordered the C.E.E. to appoint an Advertisement Board which would evaluate the need to publish any governmental ad until the day after the referendum. This was based on the principal of economic equality inherent to the Constitution of the Commonwealth of Puerto Rico.

This Court expressed its opinion as to the applicability of the prohibition contained in former Art. 8.001 of the Electoral Law of 1977, *supra,* to the referendum that was going to be held in the Nation, in accordance with the Enabling Act. We indicated that in accordance with Art. II, Sec. 2 of Art. II of our Constitution, Const. E.L.A., *supra,* and the intent of the Constitutional Convention in drafting it, the constitutional suffrage right is "***an element that is common to general elections and referendum[s]*** ". (Emphasis added). *P.P.D. v. Gobernador II,* 136 DPR p. 925. *See also, Sánchez and Colón v. E.L.A.,* 134 D.P.R. on p. 449. Furthermore, we established that the constitutional suffrage right "*is inherent to the very existence of democracy,*" since it involved a right that is present both in general elections and in referendums. *P.P.D. v. Gobernador II, supra.* **This common element, —the constitutional suffrage right— without a doubt, is also present in plebiscites.**

A year later, in *P.P.D. v. Gobernador I, supra*[34], petitioners alleged a violation of the most essential principles of the right to vote, in light of the use of public funds by the State or Municipality to pay for ads intended to benefit the political party in power or candidates of said party, both on a statewide and municipal level.

**\*45** As relevant herein, this Court reaffirmed the rule to the effects that the constitutional axiom of electoral equality is protected in our law. Additionally, we emphasized the protection afforded to said axiom by our Legislative Assembly, through the electoral framework established in Puerto Rico. At that time we established that Art. 3.023 of the Electoral Law of 1977, 16 LPRA sec. 3116, was intended to protect said principle of electoral equality, by affording equal treatment to political parties in the annual assignment of public funds for their operations. *See P.P.D. v. Gobernador I,* 139 D.P.R. on p. 667.

Upon evaluating the "*close relationship*" between Sec. 9 of Art. VI of our Constitution, *supra,* and the axiom of electoral equality in its economic aspect, we stated the following:

> **To the extent that a political party campaign is financed using public funds, a party (or political candidate) is given an advantage over others, which goes against the axiom of electoral equality**

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**and undermines the pillars of the electoral framework of our Country, which guarantees economic equality between parties** *without being limited to the election period.* This also detrimentally affects the right of voters to exercise their vote free from any coercion, since as essential components of political parties they are placed in the same economic disadvantage as their party compared to the entity that funded part of its political campaign with funds from the entire Nation of Puerto Rico, including voters belonging to any party in opposition to the current Government. (Emphasis added). *Id.,* p. 671.

Therefore, there is no doubt— as we decided in *P.P.D. v. Gobernador II, supra,*— that the principle of equality contained in our Constitution is manifested, among others, in electoral matters, whether it is a general election, plebiscite or referendum. Thus,

> [t]he concept of economic equality, with regards to the distribution of public funds in the electoral process, prevents the party in power at any given moment from using public funds to take inappropriate advantage in order to promote its position. Art. 8.001 [of the Electoral Law of 1977], *supra,* is precisely a measure to prevent said inappropriate practice from occurring. Therefore, said article, **by mandate of the**

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.                              30

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)**

2017 TSPR 57

> axiom of equality contained in the Constitution, as well as the protection of the constitutional right to choose freely translated in the suffrage right, is compatible and consequently applicable to the Referendum Enabling Act.
>
> In order to maintain a democratic process, **we cannot allow the governing party an inappropriate advantage to promote its position using public funds.** (Emphasis added). *P.P.D. v. Gobernador II, supra,* p. 926.

In short, if twenty (20) years ago, protecting the principle of electoral equality and economic parity of political parties- we decided that the prohibition contained in Art. 8.0001 of the Electoral Law of 1977, *supra,* applied to a referendum event to be held on the Island, we are required to extend the same guarantee to the approaching electoral events; namely the Plebiscite on June 11, 2017 and the potential Referendum on October 8 of the same year.

**\*46** It should be noted that general elections, plebiscites and referendums have a common element. Through the exercise of the vote, they seek to sound out the opinion of citizens as to different matters of vital importance. In a general election, the representatives of the People are elected; in a plebiscite, fundamental decisions as to the structure or format of the State are adopted; and in a referendum, they express themselves as to any matter submitted to them, such as for example constitutional and/or legislative matters, or issues related to political decisions. *See* Art. 2.003, sections (31), (82) and (86), respectively, of Law No. 78–2011, *supra.*

It is therefore clear that all of them have a common element: calling upon the people to express themselves as to an important matter by exercising their vote. Since they are such similar events and involve the right to vote as a means of expression, it is not appropriate to make a distinction between them in order to comply, in the plebiscite, with the constitutional mandate identified in *P.P.D. v. Gobernador II, supra.* Acting otherwise- not applying the electoral ban to the Plebiscite but, months later applying said prohibition to the Referendum – would be an anomaly, since Law No. 7–2017, *supra,* provides for both events. This would be a very convoluted reading.

**In this case, contrary to what is stated by the majority of this Court, there is no condition that should move this Court to vary the established precedent.** On the contrary. It is our responsibility as the Highest Court to grant a certain degree of certainty as to whether, in the event of electoral events mentioned, the J.E.A. should be activated as a filter to determine whether the agencies that are a part of the Executive can or cannot incur in public fund expenses for publication of ads; as well as ensuring that the aforementioned ads do not reflect political party positions.

Lastly, it should be pointed out that regarding the law in controversy, Law No. 7–2017, *supra,* this prohibition is clearer if we take into account that this law- besides establishing the details for the electoral

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

events of June 11 and October 8, 2017— in Art. XIII, Sec. 1, expressly establishes that the prohibitions and offenses related to carrying out this consultation shall be governed by the provisions established in Law No. 78–2011; that is, the current Puerto Rico Electoral Act. As to this, Art. XII, Sec. 1 states the following:

> The prohibitions and offenses related to carrying out this consultation shall be governed by the provisions established under Ley 78–2011, as amended, known as the "Puerto Rico Electoral Act" and by Ley 222–2011, known as the "Puerto Rico Political Campaign Oversight Act", except when they are inappropriate or incompatible with the provisions of this Law or when this Law provides for a specific offense or penalty. *Id.,* p. 47.

**\*47** It goes without saying that these prohibitions from Law No. 78–2011 include the prohibition from incurring in expenses for purchase of time and space in the Nation's mass media, as well as for purchase or distribution of propaganda or promotional materials for the purpose of describing the programs, projects, achievements, realizations, projections and/or plans of the agencies that are a part of the Executive. The above, as we have already mentioned, with the exception of notices and press advertisements expressly required by

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.
31

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)**

2017 TSPR 57

law and the Tourism Company campaigns, as well as ads used to disseminate urgent, emergency or public interest information, which shall only be allowed upon prior authorization of the C.E.E.

Additionally, when reviewing the aforementioned section of the law, we should also consider Art. 11.001 of Law No. 78–2011, 16 LPRA sec. 4211, which provides that "*[a]ny referendum, consultation, or plebiscite that is held in Puerto Rico shall be governed by the special law approved for said purposes and by the provisions of this subtitle as regards anything necessary or relevant for which said special law does not provide.*" That is, it is quite clear that the legislative intent was not to make Law No. 78–2011, *supra,* inoperative, rather, on the contrary, the special statute itself acknowledges its effect. *See also* Art. 18 of the Puerto Rico Civil Code, 31 LPRA sec. 18 ("*Laws that refer to the same matter or whose subject is the same shall be interpreted by referring to each other, to the extent that what is clear in one of its precepts may be taken to explain what is unclear in the other.*")

Thus in light of the aforementioned law, we decide the controversies submitted for our review.

## IV.

In this case, the main argument of the Electoral Commissioner of the P.N.P., the Attorney General, of [sic] the Puerto Rico Senate and of the Puerto Rico House of Representatives, is that, although the State does not have a right to freedom of expression, it does have the duty and authority to communicate with its citizens in order to inform them as to governmental plans and other related matters. Under this premise, they allege that, contrary to the Resolution of the C.E.E., the provisions contained in Art. 12.001 of Law No. 78–2011, *supra,* exclusively apply during the year in which a general election is held. Also, they argue that both the Referendum and the Plebiscite are events that are not defined as a "*general election*" and, therefore, the statutory provision shall not be applied during those events. They are wrong. As we have seen, similar arguments were already considered and rejected by this Court in *P.P.D. v. Gobernador II, supra,* and *P.P.D. v. Gobernador I, supra,* respectively.

The present controversy was limited to determining whether, outside of the year in which general elections are held in our Country, and in light of an event being held that is different from said general elections, due to a special law, the provisions of the electoral ban contained in Art. 12.001 of Law No. 78–2011, *supra,* enter into effect. This is in order to provide that any ad that the State seeks to disseminate using the Nation's mass media be evaluated by the entity appointed by the C.E.E., namely, the J.E.A.

**\*48** In accordance with the aforementioned law- which is correct and should not be revoked – and in light of the fact that this case does not contain additional elements to those already evaluated by this Court in the aforementioned cases, we believe that the C.E.E. acted correctly by applying the provisions of Art. 12.001 of Law No. 78–2011, *supra,* to the electoral events to be held in the Nation on June 11, 2017 and, if necessary, to the event that would be carried out on October 8 of the same year, that is, the Plebiscite and Referendum, respectively. We cannot authorize the Commonwealth of Puerto Rico to, using mass

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

media ads financed by the People, interfere with the prerogative of each of our citizens. The suffrage right is inherent to democracy itself and we must ensure that it be exercised in a free and voluntary manner in any electoral event. As such, we believe that the errors indicated were not committed.

## V.

Before we finish, and as to one of the arguments raised by the Attorney General, to the effect that applying the electoral ban would undermine his ability to communicate with the People as to governmental matters, we cite "*in extenso*" what this Court stated in *P.P.D v. Gobernador II, supra*:

> The rights contained in the Bill of Rights correspond to individuals before the State. These rights may not be extended to statements of the Government because rights are formulated in terms of what the Government cannot do as to statements of the people, and not the other way around. Therefore, the Government does not have a constitutional right of freedom of speech. The problem submitted to us implies the basic axiom that any Puerto Rican decisional process is subject in its reality to the postulate of equality contained in our Constitution, which

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.
32

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)**

2017 TSPR 57

seeks to achieve economic parity between the political parties for dissemination of ideas and messages in our nation. See: *Marrero v. Mun. de Morovis,* 115 D.P.R. 643, 646 (1984); *P.N.P. v. Tribunal Electoral,* supra, p. 753. This is why there is a broad power to limit governmental propaganda.

Furthermore, governmental ads are not completely banned, since there is a mechanism provided by the C.E.E. which shall consider the ad, and authorize it if appropriate. Said decision is subject to review by the courts. We should remember that this is a compelling interest in protecting the constitutional right to equality, that there is an interest in the State and its instrumentalities staying neutral, thus protecting the free selection of the people contained in Sec. 2 del Art. II of our Constitution, L.P.R.A., Volume 1. *P .P.D v. Gobernador II,* pp. 924–925.

## VI.

**\*49** Having established the above, and as an epilogue, today we would have decided that, **under the economic aspect of the axiom of electoral equality contained in the Constitution of the Commonwealth of Puerto Rico,** supra, Art. 12.001 of Law No. 78–2011, *supra,* fully applies both to the *Plebiscite* to be held on June 11, 2017, and, if necessary, to the *Referendum* to be carried out on October 8 of the same year. The general elections, the plebiscites and the referendum all involve the exercise of the constitutional suffrage right. It is our role, as final arbiters of the Constitution, to ensure the purity of said processes. We have done so in this Dissenting Opinion.

## VII.

For the reasons indicated above, we dissent from the decision of the majority of this Court. As such, we would have affirmed the Resolution of the C.E.E. and consequently, ordered the J.E.A. to be established

Ángel Colón Pérez

Associate Judge

## DECISION

## Nunc Pro Tunc

The dissenting opinion from April 19, 2017 of Associate Judge Rodríguez Rodríguez is amended **nunc pro tunc** in order to correct the last paragraph of page 7, which should read as follows:

Additionally it should be highlighted that the majority has overruled *P.P.D. v. Gobernador II,* without petitioners requesting this. On the contrary, on several occasions, both in the certification petition and in their briefs, they acknowledge the validity of the case as controlling, but they distinguish it to argue that the rule established therein does not apply to the situation raised in this case, **at no point do they argue that it must be overruled or why.** With its decision, the majority violates the rights of respondents to rebut said argument with their own grounds.[35] In fact, the majority adopts a course of action that is



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

identical to what it criticizes of the Court that decided *P.P.D. v. Gobernador II, ante.* We are frankly dealing with arguments or grounds that are unintelligent.

Issued by the Court and certified by the Clerk of the Supreme Court.

**\*50** Juan Ernesto Dávila Rivera

Clerk of the Supreme Court

Footnotes

1   At the time of the certification of this Per Curiam Decision, several amendments are being made to the Decolonization Act, *supra,* related to political status alternatives for Puerto Rico to be included in the Plebiscite. However, none of the foregoing affects the decision issued today by this Court in relation to the application of the electoral ban to electoral scenarios different from the one established by the Legislative Assembly on Article 12.001 of the Electoral Act of 2011, *infra.*

2   See, also, Presentation by former Chief Judge of the Supreme Court, Hon. Federico Hernández Denton, *Separation of Powers and Constitutional Interpretation in Puerto Rico*, 13th Meeting of Presidents and Judges of Constitutional Courts and Courtrooms in Latin America, México, 2006, pp. 8–9. Available

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    33

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)

2017 TSPR 57

at: http://www.scribd.com/doc/51523764/La-Separación-de —Poderes–y–la–Interpretación–Constitucional–en–Puerto– Rico–2006 (accessed, April 10, 2017).

3   Paradoxically, *Marrero v. Mun. de Morovis,* supra, *was cited by the majority of the Court in P.P.D. v. Gobernador II,* supra, to support the existence of the wrongly called constitutional axiom.

4   Professor José Julián Álvarez documents the following regarding the first appearance of the "axiom":

P.R.P. [v. ELA, 115 DPR 631 (1984) ] is one in a long list of cases in which the Court has made a reference to a **supposed** "axiom" or "postulate" of equality between the political parties. [ ... ]. It is interesting to trace the origin of said "axiom". It first appeared in an opinion of the Court issued by Judge Negrón García, *P.N.P. v. Tribunal Electoral,* 104 DPR 741 (1976). The PNP challenged an order of the Electoral Court to inspect its books and other documents related to its finances. The Court concluded that the electoral body wished to inspect the finances of all of the parties and upheld the order. To justify it, it found support in the Electoral Code and stated:

The basic axiom underlying the Electoral Code and requiring that the Puerto Rican political decisional process satisfy in its reality the mandate of equality contained in our Fundamental Law is a valid axiom; the foregoing is achieved by imposing limitations on the amount of political party contributions. The documentation, preservation and submission of data and reports regarding this matter, and timely intervention and accounting in relation to the same, are a natural and indispensable consequence to guarantee compliance with the legal limits established in relation to political finances. Obviously, the Court decided that the law was *justified* because it sought the ideal of equality, not that its precepts were *compelled* by that ideal. J.J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos,* Bogotá, Temis ed., 2009, pp. 965–966. (Emphasis in original).

5   See *Morales Torres v. Tribunal Superior,* 99 DPR 459 (1970); *Cardona v. Com. Industrial,* 57 DPR 397, 399 (1940).

6   It is not merely that applying the electoral ban is necessary or appropriate as stated in the dissenting opinion of Associate Judge Colón Pérez when referring to Article 11.001 of the Electoral Act of 2011, 16 LPRA sec. 4211. Above-referenced Art. 11.001 establishes in a subsidiary manner that: "All referendums, consultations or plebiscites held in Puerto Rico shall be governed by the special law approved for this purpose and by the provisions of this subtitle in relation to all necessary or appropriate matters that are **not contemplated in the provisions** of said special law". *Id.* (Emphasis added).

However, as **provided** by the Legislative Assembly in the Decolonization Act, *supra,* the condition for the application of Art. 12.001 of the Electoral Act of 2011, *supra,* to be suitable is that it be **compatible and appropriate** in relation to the holding of the plebiscite or referendum. The provisions of a law cannot be read half way. Furthermore, even if the Decolonization Act, *supra,* had not provided anything, Art. 12.001 of the Electoral Act of 2011, *supra,* should not apply to the plebiscitary process since it is not a general election. As we shall explain, the lawmaker established this process in CEE only for the general elections.


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

7   The original text of the bill, as approved by the House of Representatives and sent to the Senate, stated the following in its first sentence:

> The agencies of the Government of Puerto Rico, the Puerto Rico Legislative Assembly and the Judicial Branch are prohibited from incurring expenses to purchase time and space in the media or purchase and distribute propaganda or promotional materials for the purpose of announcing their programs, projects, achievements, developments, projections or plans. House Substitute to HB 1863 of March 8, 2011, 3rd Ordinary Session, 16th Legislative Assembly, p. 188.

8   *Id.*

9   See, also, the *Puerto Rico Political Campaign Financing Oversight Act,* Law No. 222–2011, as amended, 16 LPRA sec. 621(28). This provision defines "general elections" as

> the process by which on the first Tuesday, following the first Monday of the month of November, every four years, voters elect the officials who shall occupy publicly elected positions in the Commonwealth of Puerto Rico, including governor, resident commissioner, state legislators, mayors and municipal legislators. *Id.*

10  To learn about several provisions in this regard, see: Arts. 3.003 (16 LPRA sec. 4013) (distinguishes periods of meetings of the Commission according to electoral event), Art. 3.015 (16 LPRA sec. 4025); Art. 9.003 (16 LPRA sec. 4143) (establishes holidays for a general election and distinguishes what takes place in case of referendum, plebiscite, consultation or special election); Art. 9.013 (16 LPRA sec. 4153); Art. 10.019 (16 LPRA sec. 4209); Arts. 11.001–11.010 (16 LPRA secs. 4211–4220).

11  For other provisions that would not make sense if the concept of general elections included a plebiscite or a referendum, see, also: Arts. 5.008, 6.012, 6.013, 6.016, 7.001, 7.014, 8.001, 8.004, 8.005, 8.007, 8.009, 8.012,

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.                 34

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)

2017 TSPR 57

    8.023, 9.001, 9.010, 9.011, 9.044, 10.013, 10.015 and 10.019 of the Electoral Act of 2011, *supra,* 16 LPRA sections 4048, 4072, 4073, 4076, 4091, 4104, 4111, 4114, 4115, 4117, 4119, 4122, 4133, 4141, 4150, 4151, 4184, 4203, 4205 and 4209, respectively.

12  For example, Arts. 12.003, 12.005, 12.006, 12.009, 12.024 of the Electoral Act of 2011, *supra,* 16 LPRA sections 4233, 4235, 4236, 4239, 4253a, respectively, would be applicable, among others.

13  *PIP v. CEE,* 120 DPR 580, 613 (1988)(citing B.M. Cardozo, *La naturaleza de la función judicial,* Buenos Aires, Arayú Ed., 1955, p. 64).

14  Originally, this Court had stated that the axiom of electoral equality stemmed from Article IX, section 6, of our Constitution, a temporary provision that recognized the enjoyment of the rights recognized in the Electoral Act to parties complying with the minimum requirements for registration. However, we also recognized that that principal of constitutional equality was not only contained in the above-referenced temporary provision; rather, it also stemmed from our Bill of Rights. *PRP v. ELA, supra,* p. 637. This last constitutional basis, in particular Article II, section 2, of our Constitution, has prevailed since then as the main legal source of the axiom of electoral equality.

15  See J.J. Álvarez González, *Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos,* Bogotá, Temis Ed., 2009, pp.965–67 (discussing the case law history of the axiom of electoral equality).

16  This Court has used Article VI, section 9, of our Constitution as constitutional grounds to prohibit advertising with political party content. It provides as follows: Public funds and property shall only be used for public purposes and for maintaining and operating State institutions, and in every case by legal authority". Article VI, sec. 9, PR Const., LPRA, Volume 1. See *PPD v. Gobernador I, supra,* p. 688.

17  "If our courts are not able to maintain a coherent and justifiable course regarding this subject, then they should not attempt this endeavor. The credibility of the judicial process is a much more important value." Álvarez González, *op. cit.,* page 967.

18  "[W]e have identified three circumstances which, as an exception, justify setting aside a precedent: "(1) if the prior decision was clearly wrong; (2) if its effects on the rest of the system are adverse, and (3) if the number of persons who relied on it is limited". *Pueblo v. Sánchez Valle,* 192 DPR 594, 645–46 (2015) (citing *Pueblo v. Camacho Delgado,* 175 DPR 1, 20 sch. 4 (2008)).

19  There are many examples in case law by this Court recognizing specific protections and guarantees within broader constitutional rights, such as due process of law, privacy, human dignity, equal protection of the laws, freedom of expression, right to vote, freedom of the press, and freedom of religion. See e.g. *Arroyo v. Rattan,* 117 DPR 35 (1986)(the application of the right of privacy between private parties); *Soto v. Srio de Justicia,* 112 DPR 477 (1982)(right of access to information as part of freedom of expression); *Figueroa Ferrer v. ELA,* 107 DPR 250 (1978)(right to divorce as part of right of privacy); *Pueblo v. Dolce,* 105 DPR 422 (1976)(recognizing broader protection against searches).

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

20 See also *Int'l Ass'n. of Machinists v. Street*, 367 U.S. 740, 788, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961)(Dissenting Op., J. Black) ("Probably no one would suggest that Congress could, without violating [the First] Amendment ... create a fund to be used in helping certain political parties or groups favored by the Government to elect their candidates or promote their controversial causes"); *Lathrop v. Donohue,* 367 U.S. 820, 853, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) (Concurring Op., J. Harlan) ("[A] State could not 'create a fund to be used in helping certain political parties or groups favored' by it 'to elect their candidates or promote their controversial causes' ").

21 "The prohibitions and crimes related to holding [a] consultation shall be governed by the provisions established in Law 78–2011, as amended, known as the 'Electoral Act of Puerto Rico,' and by Law 222– 2011, known as the 'Puerto Rico Political Campaign Financing Oversight Act,' except when inappropriate or incompatible with the provisions of this Law or when this Law provides a specific penalty or crime". Article XIII, sec. 1(a), Law No. 7–2017.

22 As previously mentioned, a similar interpretation was made by this Court in *PDD v. Gobernador II, supra.* The special law establishing the referendum at that time contained a provision by which everything that was necessary, relevant and compatible in the Electoral Act, and in relation to which the special referendum law did not provide anything, would apply to it in a supplementary manner. *#Id.,* p. 924. When it decided that the electoral ban constituted a constitutional imperative, this Court concluded that Article 8.001 (which regulated the electoral ban at that time) "was compatible and therefore applicable to the Referendum Enabling Act". *#Id.,* p. 926.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)

2017 TSPR 57

23  The procedure followed to certify this opinion has been very rushed even though the controversy at bar is a constitutional controversy where the majority is revoking advanced case law established by this Court. This presentation has been certified in a matter of hours without proper deliberation and in a process that, frankly, has been reckless. Let me explain.

> On April 11, 2017, a presentation draft was circulated in this case, and it was indicated that there was an interest in certifying the Opinion on Monday, April 17. On said date, the reporting Judge in the opinion that we are certifying today circulated a dissenting opinion that was approved by the majority of the members of the Court. That same afternoon the record was delivered to him, as usual, for him to reformulate his presentation and circulate it again.

> To that end, yesterday morning, the rewritten presentation was circulated and the reporting Judge indicated that it would be certified that same afternoon at 5:00 p.m. It should be noted that in the afternoon of Monday, April 17, I stated in writing that I intended to issue a dissenting opinion. Therefore, upon receiving the communication indicating that the certification would be carried out in the afternoon of the day on which the rewritten presentation was circulated, I once again requested in writing that the proposed calendar be reconsidered. This request was made at 11:12 a.m. The reporting Judge remained silent and at 3:42 p.m. circulated a memo reiterating that he intended to certify it on that same afternoon. This behavior reflects a regrettable lack of the most elemental principles of courtesy and civility and does not meet the high standards expected from a member of this Court.

> Fortunately, a member of said majority considered it prudent and reasonable to postpone said certification for 24 hours, as proposed yesterday. The 5 necessary votes to certify the presentation today were obtained in said manner.

> I honestly do not believe that the "rush" to certify it is justified. This is even clearer because we know that the law that we are evaluating is being amended at this very moment by the legislature. Even its name has been changed and after approving it, it has to be sent to the United States Department of Justice for review. What's the urgency? This course of action could lead one to think that the intention is to react against the public [interest] implied in the letter sent by the United States Department of Justice.

24  On the other hand, I believed that the law is adversarial and that arguments not made by the parties, particularly of a constitutional kind, would not be considered by this Court. See, for example, *ELA v. Northwestern Selecta,* 185 DPR 40 (2012); *Abengoa, S.A. v. American Intl. Ins.,* 176 DPR 512 (2009) (It is a firm legal principle in our system that, on appeal, we shall abstain from adjudicating matters that were not raised before the Court of First Instance); *Echandi Otero v. Stewart Title,* 174 DPR 355 (2008) (It is a current rule in our jurisdiction that on appeal we shall abstain from adjudicating matters that were not raised before the trial court); *Delgado, Ex Parte,* 165 DPR 170 (2005); *Dorante v. Wrangler of P.R.,* 145 DPR 408, 443 (1998); *Trabal Morales v. Ruiz Rodríguez,* 125 DPR 340 (1990) (We thereby adhere to the current rule requiring that on appeal we abstain from adjudicating matters that were not raised in the trial court); *Sánchez v. Eastern Air Lines, Inc.,* 114 DPR 691 (1983); *Santiago Cruz v. Hernández Andino,* 91 DPR 709, 712 (1965). At least that was the rule up to this

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

day. Unless, in the future, the turning tide requires another result when a new chapter of this *Story* is written.

25   Furthermore, the complaint filed by the Popular Democratic Party on August 12, 1994 also challenged the constitutionality of the law in question. This complaint eventually became CE–1994–588, which was consolidated when considering *P.P.D. v. Gobernador II*.

26   It is well settled that the principle of electoral equality contains multiple guarantees applicable to different contexts in a democracy, which are not limited to citizen equality to access public positions. L. Castillo González, *Los derechos de la militancia y la jurisdicción, en Democracia interna y fiscalización de los Recursos de los Partidos Políticos* 59 y 73 (IFE 2006); R. Dworkin, *Virtud Soberana* (Paidos 2003). Furthermore, it can be valued quantitatively, in vote equality. Another dimension in which we find the administration of equality is in the access to electoral justice. This principle is also used for resource equality, when studying electoral financing. J. Woldenberg, *Vida interna de los partidos políticos y fiscalización de los recursos, nuevos retos de la autoridad electoral, en* Democracia interna y fiscalización de los Recursos de los Partidos Políticos, 21 (IFE 2006). See C.M. Rosales, *Mecanismos de financiamiento político y el control de las campañas electorales,* 44 Rev. Jur. UIPR 515, 525 n. 30 and 31 (2010).

27   *See* Universal Declaration of Human Rights, A.G. Res. 217(III) A, N.U. Doc. A/RES/217(III) (December 10, 1948), art. 21, http://www.u   n.org/es/comun/docs/?symbol=A/RES/217(III); International Covenant on Civil and Political Rights, A.G. Res. 2200(XXI) A, N.U. Doc. A/RES/200 (XXI)   A   (December 16, 1966), art. 25, http://www.un.org/   es/comun/docs/?symbol=A/RES/2200(XXI) & Lang=S & Area =RESOLUTION. *See, also,* A.R. Dalla Vía, *Los derechos políticos y electorales en la jurisprudencia del Tribunal Europeo y la Corte Interamericana de Derechos*

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)

2017 TSPR 57

*Humanos,* Anales de la Academia Nacional de Ciencias Morales Y Políticas (2012), http://www.ancmyp.org.ar/user/ files/13DallavC[a12.pdf; A.R. Dalla Vía, *Derechos políticos, normativa electoral y equidad en los procesos electorales, en* Cuaderno de Capel 57, Construyendo las Condiciones de Equidad en los Procesos Electorales, Inter-American Institute of Human Rights (2012), http://www.corteidh.or.cr/tablas/r29275.pdf. For a discussion on human rights and financial affairs in political procedures at an international level, see, in general, T.K. Kuhner, *The Democracy to Which We Are Entitled: Human Right and the Problem of Money in Politics,* 26 Harv. Hum. Rets. J. 39 (2013).

28   See, for example, *Acevedo Vilá v. CEE,* 172 DPR 971 (2007); *Miranda v. CEE,* 141 DPR 775 (1996).

29   At the time at which the controversy that we are considering arose, only two Electoral Commissioners were present, namely, one from the Popular Democratic Party and one from the New Progressive Party. The foregoing stemmed from the results of the general elections held in November of 2016.

30   In its relevant part, Amendment XIV to the Constitution of the United States of America establishes as follows:

No state shall approve or enforce any law which restricts the privileges or immunities of the citizens of the United States; nor shall any state deprive any person of life, liberty or property without a due process of law, nor shall it deny to anyone, within its jurisdiction, equal protection of the laws. Amendment XIV, USA Const., LPRA, Volume I, 2016 ed., pp. 207–208.

31   Aforementioned Art. 8.001 of the Electoral Act of Puerto Rico of 1977, Law No. 4 enacted on December 20, 1977, 16 LPRA sec. 3351, repealed by Art. 12.001 of Law No. 78–2011, Electoral Act of the Commonwealth of Puerto Rico, provided the following:

The agencies of the Government of Puerto Rico, the Puerto Rico Legislative Assembly and the Judicial Branch are prohibited, from the 1st of January of the year on which general elections shall be held to the day following the date of holding of the elections, from incurring expenses to purchase time and space in the public media for the purpose of announcing their programs, projects, achievements, developments, projections or plans. Press releases and notices specifically required by law are excluded from said provision. Announcements used to disseminate information of public interest, urgency or emergency are also excluded from the aforementioned provision, but shall only be allowed following the authorization of the State Elections Commission in this regard. 16 LPRA sec. 3351.

32   Said statements, in reference to old Art. 8.001 of the Electoral Act of 1977, *supra,* repealed by current Art. 12.001 of Law No. 78–2011.

33   In it, the Special Government Reform Commission stated that the bill—eventually, after being approved and signed, turned into Law No. 78–2011—had the purpose, among others, *"[o]f guaranteeing to voters a reduction in the public expense for political campaigns, as well as reducing to a minimum the intervention with the will of voters from elements unrelated to the electoral process".* 1st Report of the Special Government Reform Commission submitted with amendments

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

regarding House Substitute to HB 1863, November 10, 2010, 4th Ordinary Session, 16th Legislative Assembly, p. 25.

34  It should be noted that, contrary to what was stated by the Government of Puerto Rico in its Brief, in *P.P.D. v. Gobernador I,* 139 DPR 643 (1995), the facts were different from the present facts. Even though using public funds to pay for publishing announcements was specifically challenged, it **did not take place in the context of holding of a general election, referendum, plebiscite or any other electoral event.** On the contrary, it took place in the context of a year on which the electoral ban contained in old Art. 8.001 of the Electoral Act of 1977 was inapplicable, since it would only be applicable during the holding of an electoral event; whether it be a general election, a plebiscite and/or referendum, for example.

35  On the other hand, I believed that the law is adversarial and that arguments not made by the parties, particularly of a constitutional kind, would not be considered by this Court. See, for example, *ELA v. Northwestern Selecta,* 185 DPR 40 (2012); *Abengoa, S.A. v. American Intl. Ins.,* 176 DPR 512 (2009) (It is a firm legal principle in our system that, on appeal, we shall abstain from adjudicating matters that were not raised before the Court of First Instance); *Echandi Otero v. Stewart Title,* 174 DPR 355 (2008) (It is a current rule in our jurisdiction that on appeal we shall abstain from adjudicating matters that were not raised before the trial court); *Delgado, Ex Parte,* 165 DPR 170 (2005); *Dorante v. Wrangler of P.R., 145 DPR 408, 443 (1998); Trabal Morales v. Ruiz Rodríguez,* 125 DPR 340 (1990) (We thereby adhere to the current rule requiring that on appeal we abstain from adjudicating matters that were not raised in the trial court); *Sánchez v. Eastern Air Lines, Inc., 114 DPR 691 (1983); Santiago Cruz v. Hernández Andino, 91 DPR 709, 712 (1965).* At least that was the rule up to this day. Unless, in the future, the turning tide requires another result when a new chapter of this *Story* is written.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.                    37

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Burgos Andujar v. Comision Estatal de Elecciones, 2017 WL 1656332 (2017)

_____

2017 TSPR 57

_____

End of Document                                      © 2017 Thomson Reuters. No claim to original U.S.
Government Works.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.                                    38

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.