**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| ACP MASTER, LTD., AURELIUS CAPITAL MASTER, LTD., AURELIUS CONVERGENCE MASTER, LTD., AURELIUS INVESTMENT, LLC, AURELIUS OPPORTUNITIES FUND, LLC, AUTONOMY MASTER FUND LIMITED, CORBIN OPPORTUNITY FUND, L.P., FCO SPECIAL OPPORTUNITIES (A1) LP, FCO SPECIAL OPPORTUNITIES (D1) LP, FCO SPECIAL OPPORTUNITIES (E1) LLC – MASTER SERIES 1, FUNDAMENTAL CREDIT OPPORTUNITIES MASTER FUND LP, JACANA HOLDINGS I LLC, JACANA HOLDINGS II LLC, JACANA HOLDINGS III LLC, JACANA HOLDINGS IV LLC, JACANA HOLDINGS V LLC, LEX CLAIMS, LLC, LMAP 903 LIMITED, MCP HOLDINGS MASTER LP, MONARCH ALTERNATIVE SOLUTIONS MASTER FUND LTD, MONARCH CAPITAL MASTER PARTNERS II LP, MONARCH CAPITAL MASTER PARTNERS III LP, MONARCH CAPITAL MASTER PARTNERS IV LP, MONARCH DEBT RECOVERY MASTER FUND LTD, MONARCH SPECIAL | Adv. Proc. No. _____<br><br><br>**COMPLAINT** |

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); and (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474).

OPPORTUNITIES MASTER FUND LTD, MPR
INVESTORS LLC, P MONARCH RECOVERY LTD,
P STONE LION IE, A FUND OF PERMAL
MANAGED ACCOUNT PLATFORM ICAV,
PERMAL STONE LION FUND LTD., PINEHURST
PARTNERS, L.P., PRISMA SPC HOLDINGS LTD.—
SEGREGATED PORTFOLIO AG, RRW I LLC,
SENATOR GLOBAL OPPORTUNITY MASTER
FUND LP, SL LIQUIDATION FUND L.P., SL
PUERTO RICO FUND II L.P., and SL PUERTO RICO
FUND L.P.

                Plaintiffs,

v.

THE COMMONWEALTH OF PUERTO RICO and
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

                Defendants.

Plaintiffs, as creditors and/or parties in interest in the above-captioned case, by and through their undersigned counsel, allege as follows:

## **NATURE OF THE ACTION**

1.      This action seeks a declaratory judgment and related equitable relief recognizing and enforcing  Plaintiffs' rights and interests in, and Defendants' obligations with respect to, certain revenues committed by the Puerto Rico Constitution, by statute, and by contract, to payment of public debt.

2.      Plaintiffs are beneficial owners of substantial amounts of general obligation bonds issued by the Commonwealth of Puerto Rico (the "Commonwealth," and together with its instrumentalities, "Puerto Rico") and bonds issued by certain of the Commonwealth's public corporations and guaranteed by the Commonwealth, which together constitute "public debt."  Unique among all of the Commonwealth's debt obligations, public debt

is secured by an absolute and enforceable first claim and lien on all of the Commonwealth's

"available resources," P.R. Const. art. VI, § 8, in addition to, and complemented by, a pledge of

the Commonwealth's good faith, credit, and taxing power.[2]  Because these protections are

specifically and uniquely enshrined in interlocking provisions of the Puerto Rico Constitution,

and reinforced by statutory and contractual obligations, public debt is known as "Constitutional

Debt."

   3.  In addition to the constitutional protections that provide a first claim and

lien on all of the Commonwealth's available resources, Plaintiffs enjoy unique property interests

in two separate and specific streams of revenues: (1) proceeds of certain taxes and fees that,

although conditionally earmarked for payment of certain obligations of Commonwealth

instrumentalities, are required by Puerto Rico law to be "clawed back" for the express and sole

purpose of paying Constitutional Debt when other available resources are insufficient to do so

(collectively, the "Clawback Revenues"); and (2) certain proceeds of property taxes that Puerto

Rico statutory law requires be levied and collected for the benefit of Constitutional Debtholders

and segregated in a trust for the express and sole purpose of paying Constitutional Debt (the

"Special Property Tax Revenues," and together with the Clawback Revenues, the "Restricted

Revenues").  In fiscal year 2017, Puerto Rico collected approximately $940 million in Restricted

Revenues, and an equal or greater amount will be collected in fiscal years 2018 and beyond.

   4.  Under Puerto Rico law, neither the Commonwealth nor any other person

other than Constitutional Debtholders (and potentially Clawback bondholders) has *any* equitable

or beneficial property interest in the Restricted Revenues, which by operation of the Puerto Rico

---

[2] With respect to Plaintiffs' liens as Constitutional Debtholders, this Complaint seeks only determinations
regarding Plaintiffs' liens on the Restricted Revenues, as opposed to all available resources of the
Commonwealth.  However, nothing herein is intended or shall be deemed to waive Plaintiffs' liens on other
available resources.

Constitution, Puerto Rico statutes, and applicable contract, are required to be segregated and held

in trust for the benefit of Constitutional Debtholders.  The Clawback Revenues constitute

"special revenues" pursuant to 11 U.S.C. § 902(2), and Constitutional Debtholders hold

enforceable statutory liens and other equitable and beneficial property interests in the Restricted

Revenues.  If these revenues were applied as required by law, the Commonwealth would be

paying a significant portion of the amount due annually on Constitutional Debt.  The

Commonwealth, however, has chosen to ignore its laws.

5.      Following the passage of the Puerto Rico Oversight, Management, and

Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 ("PROMESA") (codified at 48

U.S.C. §§ 2101-2241) on June 30, 2016, Puerto Rico immediately defaulted on its Constitutional

Debt, and has refused to make nearly all debt service payments ever since.  Even as it defaulted

on its Constitutional Debt, Puerto Rico continued to collect approximately $940 million in

Restricted Revenues in fiscal year 2017, and projects a similar or higher amount of Restricted

Revenues in fiscal year 2018.  But having collected these revenues, the Commonwealth—now

acting under the control of the Financial Oversight and Management Board (the "Oversight

Board")—refuses to use the Restricted Revenues for their only lawful purpose, or even segregate

them for the benefit of Constitutional Debtholders.  Instead, the Commonwealth and the

Oversight Board have chosen to take the Restricted Revenues, in which they have no equitable or

beneficial interest, and spend them however they see fit, in clear violation of Puerto Rico law and

the rights of Constitutional Debtholders.

6.      Quite simply, Puerto Rico law requires that, when available resources are

insufficient to pay Constitutional Debt in full, the only lawful use of Clawback Revenues is the

payment of Constitutional Debt.  The Commonwealth has defaulted on its obligations to pay

4

Constitutional Debtholders for almost a year.  It has issued executive orders authorizing the

clawback of Clawback Revenues on the express basis that the Commonwealth lacks sufficient

resources to pay Constitutional Debtholders for even longer.  The Oversight Board has certified a

fiscal plan that ensures that the Commonwealth will continue to default on its obligations to pay

Constitutional Debtholders for years to come.  On these facts alone, the Court should declare that

Constitutional Debtholders are the only parties with any interest in the Clawback Revenues.

       7.     Similarly, Puerto Rico law requires the Commonwealth to levy Special

Property Tax Revenues for the sole purpose of paying Constitutional Debtholders and requires

that these revenues be held in trust subject to the lien of Constitutional Debtholders.  On this

basis alone, the Court should likewise declare that Constitutional Debtholders are the only parties

with any interest in the Special Property Tax Revenues.

       8.     The Oversight Board and Commonwealth have nevertheless refused to

acknowledge Plaintiffs' interests and rights in the Restricted Revenues.  They mistakenly assert

that Congress's decision to enact PROMESA bestowed unprecedented rights on the

Commonwealth that permit it to disregard all of its obligations under Puerto Rico law.  Based on

that misconception, the Commonwealth and the Oversight Board have certified a fiscal plan and

proposed a budget premised on the notion that the Commonwealth can spend $18 billion in

average annual revenues in any manner it wants, and without any regard to existing statutes

governing the allocation of revenues, or creditors' rights or interests in particular revenues.

Having declared themselves free from the nettlesome obligations of Puerto Rico law, the

Oversight Board and the Commonwealth propose massive 80% cuts to bondholders, while

leaving untouched more politically favored creditors such as trade creditors and pension

creditors.

9.     PROMESA, however, does not countenance the wholesale disregard of decades of Puerto Rico law.  To the contrary, Congress expressly required that fiscal plans and budgets, among other requirements, account for revenues "based on applicable laws" and that they "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory," as such laws existed before PROMESA was enacted.  PROMESA §§ 201(b)(1)(A) and (N).  That a municipal debtor remains subject to applicable state law restrictions on funds is also consistent with well-settled law under Chapter 9 of the Bankruptcy Code.  Congress did not wipe clean all pre-PROMESA requirements under Puerto Rico law and empower the Oversight Board to aggregate all revenues in one pot and distribute them however the Oversight Board deems fair.  Instead, Congress required the Oversight Board to impose fiscal discipline on Puerto Rico and work to resolve Puerto Rico's challenges within the existing legal framework.

10.     Emboldened by the misconception that they no longer have to comply with Puerto Rico law, the Oversight Board and the Commonwealth have confiscated and misappropriated the Restricted Revenues as part of an ongoing campaign to pay everyone but bondholders, including Constitutional Debtholders.  The Commonwealth—with the Oversight Board's blessing—has pledged to pay pension claims in full, and repeatedly increased the amount appropriated to pensions in the Commonwealth's budget and fiscal plan.  The Commonwealth's fiscal year 2018 budget, for example, allocates more than $2 billion to pensions, an amount sufficient to ensure that pension liabilities will not be impaired at all. Likewise, the Commonwealth has pledged to pay trade creditors in full, recently disclosing that—since PROMESA was enacted on June 30, 2016—the Commonwealth has reduced outstanding trade debt by approximately $1.2 billion.  The constituency that the Oversight Board

and Commonwealth ask to make by far the greatest sacrifice is bondholders, including

Constitutional Debtholders who are entitled to be paid before all other expenses under the plain

terms of the Puerto Rico Constitution and applicable laws.

11.     In addition to paying politically favored creditors, the Commonwealth

shows no signs that it will rein in its long-standing history of profligate spending.  According to

the Commonwealth's fiscal plan, expenses will *increase* over the next 10 years when the

Commonwealth should be cutting costs.  The Commonwealth's fiscal year 2018 budget reveals

hundreds of millions of dollars in non-essential spending, including—as only one example—

$75 million in appropriations for arts, recreation and lifestyle programs.  In addition to hundreds

of millions of dollars in questionable spending choices, the most recent budget proposal includes

$750 million in non-budgeted expenses; *i.e.*, "reserve funds" or other budgetary cushions not

based on identified expenses.

12.     On top of all of this, the Governor recently announced his desire to enact

sweeping tax cuts for the people of the Commonwealth, all the while continuing to

misappropriate the Restricted Revenues.

13.     The Commonwealth's and Oversight Board's actions create a self-

fulfilling prophecy:  they confiscate hundreds of millions of dollars per year in Restricted

Revenues on the basis that there are insufficient available resources to pay Constitutional Debt,

and then illegally squander those resources on impermissible expenditures, thereby exacerbating

their claimed lack of available resources to pay Constitutional Debt.

14.     The Oversight Board's and Commonwealth's well-documented history of

confiscating Restricted Revenues, misappropriating them for unlawful purposes, and using

whatever funds the Commonwealth can find to pay lower priority but politically favored

creditors irreparably harms Plaintiffs.  As a result of Defendants' conduct, Plaintiffs seek, in addition to declaratory relief determining their rights and interests in the Restricted Revenues, equitable relief requiring Defendants to segregate the Restricted Revenues for the exclusive benefit of Constitutional Debtholders and prohibiting them from using the Restricted Revenues for any purpose other than repayment of Constitutional Debt.

15.     Accordingly, an actual, ripe, and justiciable controversy has arisen between the parties regarding the scope of Plaintiffs' rights and interests in, and Defendants' obligations with respect to, the Restricted Revenues.

16.     In particular, in Counts One and Two, Plaintiffs seek declaratory judgments that, under Puerto Rico law, the Restricted Revenues are restricted by law and cannot be used by the Commonwealth for any purpose except to satisfy the Commonwealth's payment obligations with respect to outstanding Constitutional Debt.  In Counts Three and Four, Plaintiffs seek declaratory judgments that the Commonwealth lacks any equitable or beneficial property interest in the Restricted Revenues, and Plaintiffs, as Constitutional Debtholders, have equitable and beneficial property interests in the Restricted Revenues.  In Counts Five and Six, Plaintiffs seek declaratory judgments that Plaintiffs, as Constitutional Debtholders, have a statutory lien on the Restricted Revenues.  In Count Seven, Plaintiffs seek a declaratory judgment that the Clawback Revenues are special revenues as defined in the Bankruptcy Code.  In Count Eight, Plaintiffs seek a declaratory judgment that the Defendants' diversion of the Restricted Revenues without just compensation is an unlawful taking under the Fifth Amendment to the United States Constitution.  In Counts Nine and Ten, Plaintiffs seek declaratory judgments that, under Puerto Rico law, the Restricted Revenues must be segregated and deposited into a designated account for the exclusive benefit of Constitutional Debtholders and not commingled with other funds of

the Commonwealth or used for any purpose other than repayment of Constitutional Debt.  In Count Eleven, Plaintiffs seek injunctive relief enjoining Defendants from continuing to divert the Restricted Revenues, and directing Defendants to segregate and preserve the Restricted Revenues for payment of the Constitutional Debt.

## PARTIES

17.     Plaintiffs ACP Master, Ltd., Aurelius Capital Master, Ltd., Aurelius Convergence Master, Ltd., Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, Autonomy Master Fund Limited, Corbin Opportunity Fund, L.P., FCO Special Opportunities (A1) LP, FCO Special Opportunities (D1) LP, FCO Special Opportunities (E1) LLC – Master Series 1, Fundamental Credit Opportunities Master Fund LP, Jacana Holdings I LLC, Jacana Holdings II LLC, Jacana Holdings III LLC, Jacana Holdings IV LLC, Jacana Holdings V LLC, Lex Claims, LLC, LMAP 903 Limited, MCP Holdings Master LP, Monarch Alternative Solutions Master Fund Ltd, Monarch Capital Master Partners II LP, Monarch Capital Master Partners III LP, Monarch Capital Master Partners IV LP, Monarch Debt Recovery Master Fund Ltd, Monarch Special Opportunities Master Fund Ltd, MPR Investors LLC, P Monarch Recovery Ltd, P STONE LION IE, a fund of Permal Managed Account Platform ICAV, Permal Stone Lion Fund Ltd., Pinehurst Partners, L.P., Prisma SPC Holdings Ltd.—Segregated Portfolio AG, RRW I LLC, Senator Global Opportunity Master Fund LP, SL Liquidation Fund L.P., SL Puerto Rico Fund II L.P., and SL Puerto Rico Fund L.P. are the beneficial owners of a substantial amount of Constitutional Debt, as further defined below.[3]

18.     Defendant the Commonwealth of Puerto Rico is a territory of the United States.

---

[3]     Plaintiffs file this Complaint exclusively on their own behalves and do not assume any fiduciary or other duties to any other creditor or person.

19.     Defendant the Financial Oversight And Management Board for Puerto Rico was created under Section 101(b)(1) of PROMESA (48 U.S.C. § 2121(b)(1)) and purports to be an "entity within the [Commonwealth] government." 48 U.S.C. § 2121(c)(1).

## JURISDICTION & VENUE

20.     This is an adversary proceeding under Federal Rules of Bankruptcy Procedure 7001(2) and (9), made applicable to this case by 48 U.S.C. § 2170.

21.     This Court has jurisdiction over this action pursuant to 48 U.S.C. § 2166.

22.     As described in greater detail herein, there exists an actual case or controversy under 28 U.S.C. § 2201(a).

23.     Plaintiffs request relief only with respect to their rights and interests in, and Defendants' obligations with respect to, the Restricted Revenues.  Because the Commonwealth has no equitable or beneficial property interest in the Restricted Revenues, Section 305 of PROMESA (48 U.S.C. § 2165) is not implicated by this Complaint, and this Court has the constitutional and statutory authority to award the relief requested herein.  To the extent Section 305 applies to some portion of Plaintiffs' requested relief, Section 305 does not prohibit the Court from granting the requested declaratory relief, which does not compel any use or disposition of the Restricted Revenues and thus does not "interfere[]" with any property or revenues of the Commonwealth under Section 305.

24.     Venue is proper in this district pursuant to 48 U.S.C. § 2167(a)(2).

## FACTUAL AND STATUTORY BACKGROUND

25.     The Factual and Statutory Background section of this Complaint is organized as follows:  First, in Part One, we describe the interlocking constitutional, statutory and contractual protections that afford Plaintiffs an absolute first claim and lien on all of the Commonwealth's "available resources."  We then set forth the constitutional, statutory and

10

contractual provisions granting Plaintiffs specific property interests in the Restricted Revenues, and the characterization of those interests as, among other things, statutory liens and the characterization of the Clawback Revenues as "special revenues" under the Bankruptcy Code.

26.     Second, in Part Two, we describe Defendants' pattern of unlawful conduct beginning the day PROMESA was enacted and continuing to the Commonwealth's recent announcement of sweeping tax cuts.  In particular, Part Two recounts Defendants' disregard of Plaintiffs' property interests in the Restricted Revenues, as well as Defendants' broader campaign of impermissibly using PROMESA as a pretext to pay politically favored creditors in full at the expense of Plaintiffs.  As detailed in Part Two, Defendants' stated intention to continue confiscating Restricted Revenues and refusing to apply them to their only authorized purpose—the payment of Constitutional Debt—causes irreparable harm to Plaintiffs and warrants the relief sought herein, including without limitation, the segregation and accounting of Restricted Revenues.

**PART ONE: Constitutional Debtholders' Interests in the Restricted Revenues**

**I.     The Constitutional Debt**

27.     Plaintiffs are beneficial owners of bonds issued or guaranteed by the Commonwealth entitled to unique protections under the Puerto Rico Constitution and backed by a pledge of the Commonwealth's good faith, credit, and taxing power (the "Constitutional Debt" and, the holders thereof, "Constitutional Debtholders").  The Constitutional Debt is "public debt" within the meaning of the Puerto Rico Constitution, and is therefore senior to, and set apart from, all other debt issued by Puerto Rico by an interlocking series of constitutional, statutory, and contractual commitments that make it the Commonwealth's highest priority obligation, assure Constitutional Debtholders full and timely payment even (and especially) in times of economic scarcity, and grant Constitutional Debtholders an absolute first claim and lien on all of the

Commonwealth's "available resources" and a pledge of the Commonwealth's good faith, credit,

and taxing power.

    A.    **Article VI, Section 8 Constitutional Protections**

        28.    The Puerto Rico Constitution is explicit in its absolute protection for the

Commonwealth's Constitutional Debt.  Section 8 of Article VI of the Constitution provides that:

> In case the available resources including surplus for any fiscal year
> are insufficient to meet the appropriations made for that year,
> ***interest on the public debt and amortization thereof shall first be
> paid***, and other disbursements shall thereafter be made in
> accordance with the order of priorities established by law.

P.R. Const. art. VI, § 8 (emphasis added).  This provision provides the foundation for

Constitutional Debtholders' absolute first claim and lien on available resources of the

Commonwealth.

        29.    Section 8 was adopted from a provision of the Jones Act, Pub L. No. 64-

368, 39 Stat. 951 (1917), which governed the Commonwealth prior to the adoption of its

Constitution in 1952.  Section 34 of the Jones Act provided a default prioritization of

expenditures, listing "interest on any public debt" in the first-priority position along with the

"ordinary expenses" of the insular government.  *Id.* § 34.  Unlike the prior provision in the Jones

Act, however, Section 8 of the Puerto Rico Constitution provides Constitutional Debt *sole and

absolute* first priority; Constitutional Debt does not share that position with "ordinary expenses"

of government.  Likewise, whereas the Jones Act provided only a default prioritization of

government spending that was subject to revision by the governor, Section 8 does not

countenance any override by the governor or the Legislative Assembly.  Accordingly, adoption

of Section 8 of the Puerto Rico Constitution was a deliberate choice to strengthen the protections

afforded to Constitutional Debtholders.

30.     As Chief Justice Trías Monge (himself a delegate to the Puerto Rico
Constitutional Convention) explained, these absolute protections were no accident.  Rather,
Section 8 was adopted to "place[] in absolute first term, and beyond the scope of the power of
the Governor, the payment of interests and the amortization" of the Constitutional Debt.[4]

31.     The Constitutional Debt's first claim and lien on all available resources
has been further acknowledged for decades in the Puerto Rico statute that defines the remaining
"order of priorities" referenced in Article VI, Section 8 of the Puerto Rico Constitution.
Section 4(c) of the Office of Management and Budget Organic Act (the "OMB Act") recognizes
that Constitutional Debt must be paid first before all other expenditures, even (and especially)
when resources are scarce.  23 L.P.R.A. § 104(c)(1).  The OMB Act provides that, "[i]n tune
with Section 8, Article VI," of the Constitution, the Commonwealth must follow a hierarchy of
priorities governing the "disbursement of public funds . . . when resources available for a fiscal
year are insufficient to cover the appropriations made for that year."

32.     The OMB Act specifically enumerates the hierarchy of priorities that the
Commonwealth must follow in disbursing available resources.  In particular:

- **First**:  "[T]he payment of interest and amortizations corresponding to the public debt."  *Id.* § 104(c)(1).

- **Second**:  "commitments entered into by virtue of legal contracts in force, judgments of the courts in cases of condemnation under eminent domain, and binding obligations to safeguard the credit, reputation, and good name of the Government of the Commonwealth of Puerto Rico," *id.* § 104(c)(2);

- **Third**:  "[r]egular expenses" related to government operations, such as "[c]onservation of public health," "[p]rotection of persons and property," "[p]ublic education programs," and "[p]ublic welfare programs," *id.* § 104(c)(3)(A)-(D);

---

[4]     3 José Trías Monge, Historia Constitucional de Puerto Rico 225 (1982), attached hereto as **Exhibit A.**

- **Fourth**: "construction of capital works or improvements," *id.* § 104(c)(4); and

- **Fifth**: "contracts and commitments contracted under special appropriations," *id*. § 104(c)(5).

As set forth above, one—and only one—expense is granted first priority under the OMB Act: the payment of Constitutional Debt.  The OMB Act therefore reinforces the constitutional requirement that available resources be used for repayment of the Constitutional Debt before any other purpose.

### B. Article VI, Section 2 Constitutional Protections

33. Article VI, Section 2 of the Puerto Rico Constitution, added by amendment in 1961, authorizes Constitutional Debtholders to compel the Secretary of the Treasury to "apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof."  P.R. Const. art. VI, § 2.  This provision of the Constitution confirms that Constitutional Debtholders have an absolute, judicially enforceable property interest in all of the Commonwealth's available resources and a right to recover against them, including, without limitation, the Restricted Revenues.

34. A special commission involved in the consideration of the 1961 amendments that added Section 2 explained that this constitutionally enshrined remedy would "give[] reality to what is provided in Section 8, Article VI which commits the Government's revenues to the preferential payment of the capital and interest of the public debt."[5]

### C. Other Significant Constitutional Protections

35. Other provisions of the Puerto Rico Constitution bolster the Constitutional Debt's first claim and lien by providing further safeguards that ensure full and timely payment of

---

[5] Senate Report accompanying R. Conc. del S. 3 (Sept. 4, 1961) at Vol. 14, No. 27, Diario de Sesiones de la Asamblea Legislativa 222 (Extraordinaria) (1961), attached hereto as **Exhibit B.**

Constitutional Debt.  For example, Section 6 of Article VI overrides any non-compliant budgets, such as the fiscal year 2017 budget and the recently proposed budget for fiscal year 2018, that fail to appropriate funds for payment of the Constitutional Debt.  Section 6 states:

> If at the end of any fiscal year the appropriations necessary for the ordinary operating expenses of the government and for the payment of interest on and amortization of the public debt shall not have been made, the several sums appropriated in the last appropriation acts for the objects and purposes therein specified, so far as the same may be applicable, shall continue in effect item by item, and the Governor shall authorize the payments necessary for such purposes until corresponding appropriations are made.

P.R. Const. art. VI, § 6.  This provision ensures that if the government does not appropriate funds for the payment of interest and principal on Constitutional Debt when due, these payments will nonetheless be automatically appropriated in the next fiscal year.  Section 6 therefore imposes an express and non-discretionary limit on the Legislative Assembly's authority to selectively appropriate for debt service on Constitutional Debt.  Section 6 of Article VI is reinforced by the Puerto Rico statutes authorizing issuance of Constitutional Debt, which have provided, at least since 1942, for continuous appropriations to fund payments owed to holders of that debt.[6]

36.     Article VI, Section 7 provides, in turn, that the Commonwealth must have a balanced budget and that, if the budget is not balanced, the Commonwealth must raise taxes sufficient to cover any excess appropriation.  It provides that "[t]he appropriations made for any fiscal year shall not exceed the total resources, including available surplus, estimated for said fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law."  P.R. Const. art. VI, § 7.  The Constitution thus prohibits any effort by the Commonwealth to deprive itself of resources to fund payment of the Constitutional Debt by spending funds on

---

[6]     *See, e.g.*, Act of Dec. 7, 1942, No. 33-1942, 1942 P.R. Laws 175.

other expenses, and complements the Commonwealth's pledge of taxing power to support

repayment of the Constitutional Debt.

37.     The Puerto Rico Constitution also includes limitations on the

Commonwealth's incurrence of Constitutional Debt.  Section 2 of Article VI states that Puerto

Rico may not issue or guarantee new Constitutional Debt if doing so would cause anticipated

debt payments on Constitutional Debt issued by the Commonwealth in any future fiscal year—

plus any amounts actually paid by the Commonwealth on constitutionally guaranteed bonds in

the previous fiscal year—to exceed 15% of the Commonwealth's average revenue over the

previous two fiscal years.  P.R. Const. art. VI, § 2.  The debt limit, which is measured

prospectively upon the issuance of new public debt, thus:  (1) assures Puerto Rico's citizens that

their government may not imprudently pledge away the Commonwealth's future revenues for the

benefit of creditors; and (2) simultaneously protects Constitutional Debtholders by ensuring that

the Commonwealth will not overextend itself through binding commitments enjoying similar

protections.

    D.     **Contractual Protections**

38.     The Commonwealth also has committed itself by contract to make timely

payments of principal and interest on its Constitutional Debt before using available resources for

any other purpose.  These contractual promises further confirm Constitutional Debtholders'

absolute first claim and lien on all of the Commonwealth's "available resources."

39.     For example, the 2014 resolution issuing general obligation bonds (such

resolution the "2014 GO Bond Resolution" and such bonds the "2014 GO Bonds")[7] states that

---

[7]     *See* Commonwealth of P.R., Bond Resolution Authorizing and Securing $3,500,000,000 Commonwealth of
Puerto Rico General Obligation Bonds of 2014, Series A § 19 (2014); *see also* Act of Mar. 4, 2014, No. 34-
2014, 2014 P.R. Laws 76 (authorizing issuance of 2014 GO Bonds).

the 2014 GO Bonds are protected by the Constitutional Debt's first claim and lien on available

resources:

> The Bonds constitute public debt, as described in and for the
> purposes of Section 2 and Section 8 of Article VI of the
> Constitution of the Commonwealth of Puerto Rico (the
> "Constitution").  The Secretary is authorized and directed to pay
> the principal of and the interest on the Bonds as the same shall fall
> due from any funds in the Treasury of the Commonwealth
> available for such purpose in the fiscal year for which said
> payment is required.

Consistent with this understanding, when the Commonwealth approached the capital markets in

late 2013 to issue additional general obligation bonds, then-Governor García Padilla

acknowledged that "[o]ur Constitution gives first priority over all revenues to payments on our

general obligation debt."[8]

40.     The Commonwealth has recognized the absolute and binding nature of the

Constitutional Debt's first claim and lien in other contexts as well.  For example, the Official

Statement associated with a 2006 issuance of bonds by the Puerto Rico Infrastructure Finance

Authority informed purchasers of those bonds that "[t]he Constitution of Puerto Rico provides

that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes

and revenues," and made clear that funds otherwise pledged to the repayment of those bonds

were subject to being applied first to the payment of debt service on the Constitutional Debt, as

discussed in more detail below.[9]

41.     As recently as June 29, 2016, well after the Commonwealth indicated it

was in financial distress, then-Governor Alejandro García Padilla left no doubt about the

---

[8]    *See* Alejandro García Padilla, *An Open Letter from Governor Alejandro García Padilla*, Wall St. J., Oct. 23,
2013, at A5.

[9]    *See* Official Statement for PRIFA Special Tax Revenue Bonds, Series 2006, at 10 (Sept. 19, 2006); *see also*
Official Statement for PRCCDA Hotel Occupancy Tax Revenue Bonds (Series A), at 21 (Mar. 15, 2006)
(same).

continuing validity of the Constitutional Debt's first claim to and lien on available resources

when he reaffirmed that "general obligation bonds" are "the island's senior credits protected by a

constitutional lien on revenues."[10]

## II.    Plaintiffs Have Property Interests In Restricted Revenues

42.    While Constitutional Debtholders are entitled to an absolute first claim to

and lien on all of the Commonwealth's available resources, the Commonwealth has granted

Plaintiffs additional and specific property interests in certain subsets of available resources.  In

particular, under Puerto Rico law, Plaintiffs—and not the Commonwealth—have equitable and

beneficial interests in certain property tax revenues collected under statutory levy specifically for

the benefit of Constitutional Debtholders, and certain specific tax proceeds and other revenues

that have been "clawed back," or are subject to being "clawed back," for payment of

Constitutional Debt.   For fiscal year 2017, the aggregate amount of the Restricted Revenues

dedicated to the payment of Constitutional Debt is at least $940 million.  In contrast, scheduled

interest due in respect of Constitutional Debt in fiscal year 2017 is approximately $931 million.

### A.    Special Property Tax Revenues

43.    Puerto Rico law requires that a special property tax be levied for the

benefit of Constitutional Debtholders, and further requires that these Special Property Tax

Revenues be held in trust subject to the lien of Constitutional Debtholders.

44.    Pursuant to Act 83 of 1991 ("Act 83"), the Legislative Assembly

authorized a "special tax" of 1.03% on the appraised value of all personal and real property in

Puerto Rico, which is "in addition to all other taxes imposed by virtue of other laws in effect."

---

[10]    *See* Alejandro García Padilla, *There's No Choice: Puerto Rico Will Default on More Than $1Billion in Debt on
Friday*, CNBC (June 29, 2016, 10:00 AM ET), http://www.cnbc.com/2016/06/29/puerto-ricos-governor-warns-
of-imminent-default-on-more-than-1-billion-in-debt-commentary.html.

21 L.P.R.A. § 5002.[11] Act 83 provides a strict process for demarcating these Special Property

Tax Revenues from other tax revenues collected and used for the Commonwealth's operating

expenses or general purposes.  The "Municipal Revenues Collection Center" (known by its

Spanish acronym "CRIM") is required to collect the Special Property Tax Revenues and deposit

them into the "Commonwealth Debt Redemption Fund" by the 15th working day after payment

has been made by the taxpayer.  *Id.* §§ 5002, 5004.  The Commonwealth Debt Redemption Fund

is "a trust" held by the Government Development Bank (the "GDB") that was specifically

established to hold these special tax proceeds.  *Id.*

       45.    Act 83 expressly provides that the Commonwealth's obligation to apply

the Special Property Tax Revenues to payment of Constitutional Debt "***will be considered to be***

***a prior lien bond*** and the same will constitute sufficient authorization for the Government

Development Bank for Puerto Rico to carry out the corresponding [distributions]."  *Id.* § 5005

(emphasis added).  Further, Act 83 requires that Special Property Tax Revenues "shall remain"

in the Commonwealth Debt Redemption Fund and "shall be applied . . . ***solely*** for the payment of

the principal and interest on the existing and future general obligations of the Commonwealth of

Puerto Rico evidenced by bonds or notes, or to the early redemption of said obligation, including

the payment of any premium that is required for said early redemption."  *Id.* at § 5004(a)

(emphasis added).

       46.    Act 83 thus authorizes a special tax that is levied specifically for the

payment of Constitutional Debt, and establishes a trust account for Special Property Tax

Revenues to be deposited into subject to a statutory lien in favor of Constitutional Debtholders.

---

[11]    The term "appraised value" assumes an appraisal at a "real and current value."  *See* 21 L.P.R.A. § 5052.
However, the Commonwealth continues to appraise some real property at values that are outdated by more than
half a century, resulting in artificially diminished collections.

47.    For fiscal year 2017, the amount of Special Property Tax Revenues required to be held in trust for Constitutional Debt is at least $101 million.[12]

**B.    Clawback Revenues**

48.    Puerto Rico law also explicitly requires that certain tax and fee revenues conditionally earmarked for the payment of bonds issued by certain Commonwealth instrumentalities constitute "available resources" and be "clawed back" for the express and sole purpose of paying Constitutional Debt.  In particular, "Clawback Revenues" include: (1) certain excise taxes and vehicle fees conditionally pledged to support the payment of bonds issued by, or obligations of, the Puerto Rico Highways and Transportation Authority ("PRHTA") or the Metropolitan Bus Authority ("MBA"); (2) hotel occupancy taxes conditionally pledged to support the payment bonds issued by Puerto Rico Convention Center District Authority ("PRCCDA"); and (3) federal excise taxes imposed on rum and other items produced in the Commonwealth and sold in the United States that are conditionally pledged to support the payment of bonds issued by the Puerto Rico Infrastructure Financing Authority ("PRIFA"), as well as certain revenues from excise taxes on non-diesel petroleum products pledged to support certain PRIFA bonds.

**(i)    *PRHTA***

49.    PRHTA is a public corporation created by Act 74-1965 to assume responsibility for the construction of highways and other transportation systems in the Commonwealth.  *See* 9 L.P.R.A. § 2002.  The Commonwealth has conditionally earmarked two

---

[12]    CRIM recently proposed to sell a portfolio of delinquent tax debts, including delinquent Special Property Tax Revenues.  *See* Centro de Recaudación de Igresos Municipales, Requests for Qualifications, Financial Advisor for the Sale of Property Tax Debts and Associated Tax Liens (Apr. 25, 2017), *available at* http://www.aafaf.pr.gov/assets/rfq-crim-april-25-2017.pdf.  To the extent any delinquent Special Property Tax Revenues are monetized or collected, such revenues should be placed in the Commonwealth Debt Redemption Fund and held in trust for the benefit of Constitutional Debtholders.

sets of tax proceeds, which constitute "available resources," for payment of bonds issued by

PRHTA (the "PRHTA Bonds"): gasoline, diesel, crude oil, cigarette, and other excise taxes

levied by the Commonwealth pursuant to Act 34-1997, Act 1-2011, and Act 1-2015 (the "Excise

Taxes"); and motor vehicle license fees imposed under Act 22-2000 (the "Vehicle Fees").  These

revenues are placed in trust each month so as to be rendered unavailable for other expenses.

      50.     The statutes under which the PRHTA Bonds were issued expressly set

forth that the proceeds from the Excise Taxes and Vehicle Fees are available resources that are

subject to clawback for the sole purpose of paying Constitutional Debt.  With respect to the

Excise Taxes conditionally earmarked for payment of PRHTA Bonds, the statute provides:

> ***The proceeds of said collection shall be solely used for the payment of interest and amortization of the public debt, as provided in said Section 8 of Item VI of the Constitution***, until the other resources available to which reference is made in said section are insufficient for such purposes.  Otherwise, the proceeds of said collection, in the amount that may be necessary, shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority and to comply with any stipulations agreed to by the latter with the holders of said bonds or other obligations.

13 L.P.R.A. § 31751(a)(1)(C) (emphasis added); *see also* 9 L.P.R.A. § 2004(1) (expressly

subjecting the bondholders' lien on the Excise Taxes "to the provisions of § 8 of Art. VI of the

Constitution of the Commonwealth").[13]  With respect to the Vehicle Fees conditionally

earmarked for payment of PRHTA Bonds, the statute provides:

> [S]aid pledge or pignoration shall be ***subject to the provisions of § 8 of Article VI of the Constitution of Puerto Rico***; Provided, however, That ***the proceeds of said collection shall only be used for the payment of interest and the amortization of the public debt, as provided in said § 8***, until the other resources available, referred to in said section, are insufficient for such purposes, otherwise, the proceeds of said collection in the amount that is necessary shall be used solely for

---

[13]   With respect to cigarette tax revenues, the first $20 million in revenues are conditionally earmarked for the PRHTA, and the next $10 million in cigarette tax revenues are conditionally earmarked for the payment of obligations of the MBA.  Pursuant to statute, the cigarette tax revenues conditionally earmarked for MBA obligations must also be transferred monthly to a segregated account and are also subject to clawback for the sole purpose of paying Constitutional Debt.  *See* 13 L.P.R.A. § 31751(a)(4)(A)-(C).

the payment of the principal and interest on bonds and other obligations of the
Authority, and to meet whatever other stipulations are agreed upon between the
Authority and the holders of said bonds or other obligations.

9 L.P.R.A. § 2021(emphasis added); *see also* 9 L.P.R.A. § 5681.

51.     Disclosures issued by PRHTA when offering bonds to the public make
clear that the proceeds from Excise Taxes and Vehicle Fees are subject to clawback.  The
Official Statement provides:

> The proceeds of the gasoline tax, the gas oil and diesel oil tax, the petroleum
> products tax and the motor vehicle fees allocated to [PRHTA] by the Puerto Rico
> Internal Revenue Code and Act No. 9 are available Commonwealth resources
> under the Constitution. ***Accordingly, if needed, they are subject to being applied
> first to the payment of debt service on the public debt of the Commonwealth***.

Official Statement for PRHTA Series AA Refunding Bonds (June 17, 2010), at 19 (emphasis
added).  The Official Statement acknowledges that the PRHTA Bondholders' lien on the
dedicated tax proceeds "is subject to the Constitution of Puerto Rico, which permits the
Commonwealth to apply such taxes to payment of certain Commonwealth bonds to the extent
other Commonwealth moneys are insufficient thereof."  *Id.* at 24.

**(ii)     *PRCCDA***

52.     PRCCDA is a public corporation that was created by Act No. 351 of
September 2, 2000, for the purpose of developing and operating a convention center located in
San Juan, Puerto Rico, and related improvements and facilities.  The Commonwealth has
conditionally earmarked for payment of bonds issued by PRCCDA (the "PRCCDA Bonds")
revenue from certain hotel occupancy taxes that are imposed by the Commonwealth and
collected by the Puerto Rico Tourism Company pursuant to Act 272-2003 ("Hotel Taxes").  The
Commonwealth is statutorily required each month to place the revenue derived from the Hotel
Taxes into a trust account held by the GDB.  13 L.P.R.A. § 2271v.

53.     The statute under which the PRCCDA Bonds were issued expressly sets

forth that the revenues from the Hotel Taxes are available resources that are subject to clawback

for the sole purpose of paying Constitutional Debt.  The statute provides:

> ***The product of the collection of the tax shall be used solely for the payment of
> the interest and the amortization of the public debt, as provided in Section 8 of
> Article VI of the Constitution of the Commonwealth of Puerto Rico***, but only to
> the degree to which the other available resources to which reference is made in
> said Section are insufficient for such purposes.  Otherwise, the product of said
> collection, in the amount necessary, shall be used solely for the payment of the
> principal and interest on the bonds, notes or other obligations and the obligations
> under any bond related financing agreement contemplated herein, and to comply
> with any stipulations agreed to with the bondholders, noteholders or holders of
> other obligations or the providers under bond related financing agreements.

*Id.* (emphasis added).

54.     Disclosures issued by PRCCDA when offering bonds to the public

confirm that the revenues from the Hotel Taxes are subject to clawback.  The Official Statement

provides:

> Hotel Occupancy Tax revenues are available revenues under the Constitution.
> ***Accordingly, if needed, they may be applied first to the payment of debt service
> on the public debt of the Commonwealth***.

Official Statement for PRCCDA Hotel Occupancy Tax Revenue Bonds, Series A, at 22 (Mar. 15,

2006) (emphasis added).

55.     The Official Statement acknowledges that, while the PRCCDA Bonds are

"secured by a lien on" the pledged tax proceeds, *id.* at 19, the "Constitution of the

Commonwealth provides that the public debt of the Commonwealth constitutes a first lien on

available Commonwealth taxes and revenues," *id.* at 21.

**(iii)     *PRIFA***

56.     PRIFA is a public corporation created by Act 44-1988 for the purpose of

providing financial and other types of assistance to political subdivisions, public agencies, and

instrumentalities of the Commonwealth.  PRIFA has issued certain bond anticipation notes (the

"PRIFA BANs") and other series of bonds (excluding the PRIFA BANs, the "PRIFA Bonds").

The Commonwealth has conditionally earmarked:  (i) revenues from a federal excise tax

imposed on rum and other items produced in the Commonwealth and sold in the United States

("Rum Taxes") for the payment of PRIFA Bonds, and (ii) revenues from certain excise taxes on

non-diesel petroleum products for the payment of PRIFA BANs.  The proceeds received from

these taxes are to be placed in a special fund, set apart from the other tax revenues of the

Commonwealth.  3 L.P.R.A. § 1914; Act 1-2015.

      57.     The statute under which the PRIFA Bonds were issued sets forth that the

revenues from the Rum Taxes are available resources that are subject to clawback for the sole

purpose of paying Constitutional Debt.  The statute provides:

> [PRIFA] is hereby empowered to segregate a portion of said Funds into one (1) or
> more sub-accounts, ***subject to the provisions of Section 8 of Article VI of the
> Constitution of the Commonwealth of Puerto Rico*** for the payment of the
> principal and interest on bonds and other obligations of the Authority, or for the
> payment of bonds and other obligations issued by a benefited entity, or for any
> other legal purpose of the Authority.  ***The moneys of the Special Fund may be
> used for the payment of interest and for the amortization of the public debt of
> the Commonwealth, as provided in said Section 8***, only when the other resources
> available referred to in said Section are insufficient for such purposes.

3 L.P.R.A. § 1914 (emphasis added).

      58.     Disclosures issued by PRIFA when offering the PRIFA Bonds to the

public acknowledge that the revenues from the Rum Taxes are subject to clawback.  The Official

Statement provides:

> Prior to their application to pay principal of and interest on the Bonds, the Special
> Tax Revenues are available revenues under the Constitution. ***Accordingly, if
> needed, they are subject to being applied first to the payment of debt service on
> the public debt of the Commonwealth.***

Official Statement for PRIFA Special Tax Revenue Bonds, Series 2005A-C, at 10 (June 2, 2005)

(emphasis added).

59.     Moreover, the Official Statement acknowledges that, while the PRIFA

Bonds are "secured by a pledge of . . . the first proceeds received by the Commonwealth of

Puerto Rico of federal excise taxes imposed on rum and other articles produced in Puerto Rico

and sold in the United States," "[s]uch federal excise taxes, however, are subject to being applied

first to the payment of general obligation debt of and debt guaranteed by the Commonwealth."

*Id.* at 1.  The holders of the Constitutional Debt's absolute senior interest in the Rum Taxes is

consistent with the Official Statement's recognition that the "Constitution of Puerto Rico

provides that public debt of the Commonwealth constitutes a first lien on available

Commonwealth taxes and revenues" and PRIFA Bonds "do not constitute public debt of the

Commonwealth."  *Id.* at 10.

60.     In addition, pursuant to Act 1-2015, the Commonwealth has conditionally

earmarked for payment of PRIFA BANs revenues from an excise tax on non-diesel petroleum

products imposed by Section 3020.07A(a)(i) of the Puerto Rico Internal Revenue Code.  The Act

provides:

> Such pledge or encumbrance shall be subject to the provisions of Section 8 of
> Article VI of the Constitution of Puerto Rico. The revenues derived from such
> collection ***shall only be used for the payment of interest on and the amortization
> of the public debt as provided in Section 8 of Article VI of the Constitution,
> insofar as all other available resources mentioned in said Section are
> insufficient for such purposes.***

Act 1-2015 (emphasis added).

61.     Disclosures issued by PRIFA when offering the PRIFA BANs to the

public confirm that the revenues from the excise tax on non-diesel petroleum products are

subject to clawback.  For example, the offering memorandum for PRIFA's Dedicated Tax Fund

Revenue Bond Anticipation Notes, Series 2015, stated:

> **The revenues pledged** to the payment of the Series 2015 Notes **could be applied
> to pay general obligation debt of the Commonwealth of Puerto Rico** (the
> "Commonwealth") **if its available resources are insufficient to cover all
> approved appropriations**.

Limited Offering Memorandum for Puerto Rico Infrastructure Financing Authority Dedicated

Tax Fund Revenue Bond Anticipation Notes, Series 2015 (Mar. 17, 2015) (emphasis added).

### C.    Permitted Uses of Clawback Revenues Under Puerto Rico Law and PROMESA

62.    According to Commonwealth estimates prepared in connection with the

March Fiscal Plan (as defined below), as well as the fiscal plan for PRHTA, the Commonwealth

will collect approximately $841 million in Clawback Revenues during fiscal year 2017.[14]  In

particular, the Commonwealth projects that it will collect:

- $605 million in Excise Taxes[15]

- $93 million in Vehicle Fees

- $30 million in Hotel Taxes

- $113 million in Rum Taxes

63.    Under Puerto Rico law, the payment of the Constitutional Debt is the

specific and only purpose for which these Clawback Revenues may be applied when the

Commonwealth's available resources are insufficient to satisfy its obligations.  The

Commonwealth is statutorily prohibited from clawing back these revenues for any other purpose,

---

[14]    PRHTA, Government of Puerto Rico, PRHTA Fiscal Plan 2017-2026, at 22 (Apr. 28, 2017); Puerto Rico Fiscal Agency and Financial Authority, Government of Puerto Rico, Fiscal Plan for Puerto Rico 28 (Mar. 13, 2017); Puerto Rico Fiscal Agency and Financial Advisory Authority, Government of Puerto Rico, Fiscal Plan 131 (Feb. 28, 2017); December Revised Baseline at 11, attached hereto as **Exhibit C**.

[15]    Composed of $411 million in crude oil ("crudita") taxes, $151 million in gasoline taxes, $13 million in oil and diesel excise taxes, and $30 million in cigarette taxes.

including to provide an additional source from which the Commonwealth can fund government

operations or other expenditures, even in times of financial distress. *See, e.g.,* 13 L.P.R.A.

§ 31751(a)(1)(C), 31751(a)(4); 9 L.P.R.A. § 2021; 9 L.P.R.A. § 5681; 13 L.P.R.A. § 2271v; Act

1-2015.

64.     The Commonwealth has repeatedly recognized that Clawback Revenues

conditionally earmarked for PRHTA, PRCCDA, and PRIFA are available resources over which

Constitutional Debtholders have an absolute senior property interest.  For example, in the

Commonwealth's quarterly financial report, dated November 6, 2015, the Commonwealth stated:

> Certain revenues assigned to Puerto Rico Highways and
> Transportation Authority, Puerto Rico Infrastructure Financing
> Authority and Puerto Rico Convention Center District Authority
> are stated by existing law to be available Commonwealth resources
> for purposes of the payment of public debt.

Commonwealth of Puerto Rico, Financial Information and Operating Data Report 45 (Nov. 6,

2015).

65.     In this regard, as discussed more fully below, the Governor has issued

various executive orders clawing back the revenues conditionally earmarked for payment of the

PRHTA, PRCCDA, PRIFA Bonds, PRIFA BANs and MBA debt obligations.  *See, e.g.*, Exec.

Order No. 2015-46 (Nov. 30, 2015) (the "December 2015 Executive Order"), attached hereto as

**Exhibit D**.  In these executive orders, the Commonwealth recognized that Clawback Revenues

must be segregated and devoted to the payment of Constitutional Debt.  *Id.* (providing that

clawed back funds "shall be kept in a separate account and shall be used only to make public

debt payments as they become due").

66.     Under Puerto Rico law, the Commonwealth and Oversight Board have

two options regarding the proper use of Clawback Revenues:  paying Constitutional Debtholders

*or* paying the holders of bonds or other debt obligations issued by the PRHTA, PRCCDA,

PRIFA, or MBA.  There is no third option, and no provision of PROMESA empowers the

Commonwealth or Oversight Board to do otherwise.

       67.      Moreover, the Commonwealth's filing for relief under Title III of

PROMESA does not empower it to disregard applicable Puerto Rico law.  In almost all of the

recent high profile chapter 9 cases, the court (or the debtor) has acknowledged that a chapter 9

filing does not authorize the debtor to disregard applicable state laws regarding restrictions on

revenue uses.  *See, e.g., In re City of San Bernardino*, 499 B.R. 776, 789 (Bankr. C.D. Cal. 2013)

(holding that the California Constitution precluded the city from using restricted funds for

general fund purposes); *In re City of Vallejo*, No. 08-26813-A-9, 2008 WL 4180008, at *5

(Bankr. E.D. Cal. Sept. 5, 2008), *aff'd*, 408 B.R. 280 (9th Cir. BAP 2009) (holding that cash and

investments restricted by law or dedicated to specific uses were not available to cover the

operating expenses of the city, and could not be considered in determining the city's solvency);

*In re City of Detroit, Mich.*, No. 13-53846 (SWR) (Bankr. E.D. Mich. Jan. 16, 2014), Bench

Opinion at 25–27, [ECF No. 2521] (holding that certain casino revenues must be used in

accordance with the Michigan Gaming Control Act); *In re City of Stockton*, No. 12-32118

(Bankr. E.D. Cal. Nov. 21, 2013), Modified Disclosure Statement with Respect to First Amended

Plan for the Adjustment of Debts of City of Stockton, California (November 15, 2013), at 3:7-10

("The Plan does not alter the obligations of those City funds that are restricted by grants, by

federal law, or by California law; pursuant to the Tenth Amendment to the United States

Constitution and the provisions of the Bankruptcy Code that implement the Tenth Amendment,

such funds cannot be impacted in the Chapter 9 Case."); *see also In Matter of Sanitary Imp. Dist.

No. 7 of Lancaster Cnty, Neb.*, 96 B.R. 967, 972 (Bankr. D. Neb. 1989) ("[t]he Code does not

override state law concerning the use debtor may make of its property . . . neither the Code nor

the Nebraska statute authorize a Chapter 9 debtor to pay [] expenses out of a restricted fund.").
In short, there is no basis for the view that PROMESA authorizes the Oversight Board or the
Commonwealth to disregard applicable Puerto Rico law regarding the Restricted Revenues.

**D.    Plaintiffs Have Equitable And Beneficial Property Interests In, And
Statutory Liens On, The Restricted Revenues, Which Constitute Special
Revenues.**

68.     Plaintiffs have a first claim and lien on the Restricted Revenues due to
their constitutional first claim and lien on all "available resources."  In addition, Plaintiffs enjoy
three sets of specific interests in the Restricted Revenues: (i) Plaintiffs hold equitable and
beneficial property interests in the Restricted Revenues; (ii) Plaintiffs are secured by statutory
liens in the Restricted Revenues; and (iii) Plaintiffs are entitled to, with respect to Clawback
Revenues, the protections afforded creditors secured by "special revenues" within the meaning
of 11 U.S.C. § 902(2).

**i.    Plaintiffs, And Not The Commonwealth, Have Equitable And
Beneficial Interests In The Restricted Revenues**

69.     As explained above, Puerto Rico law provides that Clawback Revenues
must be segregated and used only as prescribed in the statutes authorizing their collection and
allocation.  *See, e.g.*, 3 L.P.R.A. § 1914; 9 L.P.R.A. §§ 2021, 5681; 13 L.P.R.A. §§ 2271v,
31751(a)(1)(C), 31751(a)(4); Act 1-2015.  Pursuant to these statutes, Clawback Revenues are
immediately demarcated for payment of PRHTA, PRCCDA, and PRIFA bonds; no provision of
any law (including PROMESA) permits the Commonwealth to appropriate Clawback Revenues
to fund general government operations.

70.     But if available resources are insufficient to pay outstanding
Constitutional Debt—as the Commonwealth has asserted must be the case, since it has defaulted
on its Constitutional Debt obligations—then Constitutional Debtholders have a vested interest in

Clawback Revenues, and these revenues *must* be transferred to Constitutional Debtholders.  The

PRHTA, PRCCDA, PRIFA and MBA bondholders and lenders consented to this requirement as

the terms of purchasing these bonds or making such loans, thereby disclaiming any title to,

possession of, or control over, the Clawback Revenues upon satisfaction of such condition.

71.    When the Commonwealth exercises its constitutional and statutory right to

redirect Clawback Revenues to Constitutional Debtholders, the Commonwealth acts as a mere

conduit for transferring Clawback Revenues from PRHTA, PRCCDA, PRIFA and MBA to

Constitutional Debtholders.  Although Puerto Rico law requires the Commonwealth to transfer

these funds (and to collect or receive them in the first place), no provision of Puerto Rico law (or

PROMESA) vests the Commonwealth with any equitable or beneficial property interest in the

Clawback Revenues.

72.    The only purpose for which Clawback Revenues may be clawed back is

the payment of Constitutional Debt.  Accordingly, any control the Commonwealth exercises by

segregating and transferring Clawback Revenues to Constitutional Debtholders is for the

exclusive benefit of Constitutional Debtholders.  Therefore, Plaintiffs, and not the

Commonwealth, hold equitable and beneficial property interests in the Clawback Revenues.

73.    Likewise, pursuant to Act 83, the Legislative Assembly established a

special tax on property for the sole purpose of paying Constitutional Debt.  *See* 21 L.P.R.A.

§§ 5002, 5004.  In so doing, the Commonwealth disclaimed any title to, possession of, or control

over the Special Property Tax Revenues.

74.    Act 83 requires that Special Property Tax Revenues be immediately and

strictly segregated in a trust, prohibiting access to, and use of, the revenues by the

Commonwealth for any purpose other than payment of Constitutional Debt.  *Id.* § 5004.  No

provision of Puerto Rico law (or PROMESA) vests the Commonwealth with any equitable or
beneficial property in the special tax proceeds.

75.     Any control the Commonwealth exercises by maintaining the
Commonwealth Debt Redemption Fund and transferring the Special Property Tax Revenues is
for the exclusive benefit of Constitutional Debtholders.  Accordingly, Plaintiffs, and not the
Commonwealth or taxpayers, hold equitable and beneficial property interests in the Special
Property Tax Revenues.

### ii.     The Restricted Revenues Are Encumbered By Statutory Liens

76.     The enabling statutes for the bonds and obligations issued by PRHTA,
PRCCDA, PRIFA and MBA provide that specific revenues—the Excise Taxes and Vehicle Fees,
the Hotel Taxes, and the Rum Taxes—secure the payment of Constitutional Debt.  *See, e.g.*,
3 L.P.R.A. § 1914; 9 L.P.R.A. §§ 2021, 5681; 13 L.P.R.A. §§ 2271v, 31751(a)(1)(C),
31751(a)(4)(C); Act 1-2015.  Constitutional Debtholders, as a discrete class, enjoy these superior
rights in identifiable revenues, and the Commonwealth is restricted from using Clawback
Revenues for any other purpose.  Accordingly, Constitutional Debtholders have liens on the
Clawback Revenues within the meaning of 11 U.S.C. § 101(37), in addition to their first claim
and lien on all available resources.

77.     These specific liens arise solely by force of the statutes authorizing the
bonds and obligations issued by PRHTA, PRCCDA, PRIFA and MBA, though they are
consistent with Constitutional Debtholders' first claim to, and lien on, all available resources.
The liens automatically vest upon two conditions: creation of the specific economic relationship
of "public debt," and insufficiency of the Commonwealth's other available resources to satisfy
payment of that public debt during the fiscal year.  *See, e.g.*, 3 L.P.R.A. § 1914; 9 L.P.R.A. §§

31

2021, 5681; 13 L.P.R.A. §§ 2271v, 31751(a)(1)(C), 31751(a)(4); Act 1-2015.  Both conditions

have been satisfied.  The Commonwealth has issued "public debt" which is held by Plaintiffs,

and the Commonwealth has already declared, by executive order and by its subsequent failure to

pay Constitutional Debtholders, that it has insufficient available resources to pay Constitutional

Debt.

>78.    Accordingly, Plaintiffs hold fully vested statutory liens on the Clawback

Revenues within the meaning of 11 U.S.C. § 101(53).

>79.    Likewise, Act 83 provides that the Commonwealth's obligation to apply

the Special Property Tax Revenues to payment of Constitutional Debt "will be considered to be a

prior lien bond," and that Special Property Tax Revenues must be placed in trust in the

Commonwealth Debt Redemption Fund for the sole purpose of securing Constitutional Debt.

*See* 21 L.P.R.A. §§ 5002, 5004-5005.  By levying and dedicating Special Property Taxes solely

for the purpose of paying Constitutional Debt, Act 83 grants superior and exclusive rights to

these revenues to a single class of claims, Constitutional Debtholders.  Accordingly,

Constitutional Debtholders have a lien on Special Property Tax Revenues and the

Commonwealth Debt Redemption Fund within the meaning of 11 U.S.C. § 101(37), in addition

to their first claim and lien on all available resources.

>80.    This specific lien arises solely by force of Act 83 and is consistent with

Constitutional Debtholders' first claim and lien on all available resources.  Act 83 automatically

vests Constitutional Debtholders' property interests in the Special Property Tax Revenues and

the Commonwealth Debt Redemption Fund upon creation of the specific economic relationship

of "public debt."  21 L.P.R.A. §§ 5004, 5005.  Issuance of Constitutional Debt to Plaintiffs

satisfied this condition.

81.     Accordingly, Plaintiffs hold a fully vested statutory lien, within the meaning of 11 U.S.C. § 101(53), on the Special Property Tax Revenues and the Commonwealth Debt Redemption Fund.

### iii.     The Clawback Revenues Constitute Special Revenues On Which Plaintiffs Have A Lien

82.     The Clawback Revenues constitute special revenues within the meaning of 11 U.S.C. § 902(2)(B) (defining special revenues as "special excise taxes imposed on particular activities or transactions").  As discussed above, the Commonwealth has pledged these special revenues to payment of the Constitutional Debt.

83.     The Clawback Revenues derive directly from Excise Taxes, Vehicle Fees, Hotel Taxes, and Rum Taxes that are distinguishable and separate from other taxes the Commonwealth levies for its general or operating purposes.  Such taxes and fees constitute special excise taxes imposed on particular transactions, and therefore constitute "special revenues."

84.     The Clawback Revenues constitute special revenues, and Plaintiffs are not prohibited from enforcing their rights in the Clawback Revenues in accordance with 11 U.S.C. § 922(d).

**PART TWO: Defendants' Disregard Of Plaintiffs' Rights And Ongoing Campaign To Pay Politically Favored Creditors In Violation Of Puerto Rico Law And PROMESA**

85.     Since June 2015 the Commonwealth—at first through its elected leaders, and now through the Oversight Board—has engaged in a consistent pattern of unlawful conduct designed to avoid their obligations to Constitutional Debtholders for the benefit of more politically favored causes and creditors.   At all times, the Commonwealth has ignored Plaintiffs'

33

property interests in the Restricted Revenues and unlawfully diverted available resources, including the Restricted Revenues, to purposes other than repayment of the Constitutional Debt.

86.     This Part Two details Defendants' well-documented campaign of illegal conduct.  First, we describe the Commonwealth's efforts to illegally divert available resources, including Restricted Revenues, immediately upon the enactment of PROMESA, and the Oversight Board's subsequent failure to review or rescind those actions.  Second, we detail Defendants' disregard of Puerto Rico law and PROMESA by certifying a fiscal plan that, in addition to disregarding Plaintiffs' rights in Restricted Revenues, pays pension claims in full and other lower priority creditors almost entirely in full while imposing large (nearly 80%) cuts on debt service.  Finally, we describe Defendants fiscal year 2018 budget, which exemplifies Defendants' campaign to continue illegally diverting Restricted Revenues as part of an ongoing plan to default on Constitutional Debt for the purpose of paying politically favored creditors and avoiding politically unpopular expense reductions.

87.     The existence of this longstanding and ongoing plan to divert available resources, including the Restricted Revenues, justifies immediate relief from this Court, including an order to segregate the Restricted Revenues during the Commonwealth's Title III proceeding as required under Puerto Rico law.

## I.      The Commonwealth's Initial Abuse Of PROMESA

### A.      The Enactment Of PROMESA

88.     On June 29, 2015, the Commonwealth's Governor delivered a television address in which he declared that Puerto Rico's debts were unpayable and that "Puerto Rico is not capable of paying under the current terms" of its debt.  The Governor went on to assert that bondholders must accept a "sacrifice" and that Puerto Rico should not be "forced to choose"

between paying bondholders and competing financial priorities.[16]  Over the next 12 months,
Puerto Rico spent millions of dollars on advisors and lobbyists who urged the Commonwealth
not to honor its Constitutional Debt (or most of its other debt), but instead seek shelter in federal
legislation.

89.    On November 30, 2015, Governor García Padilla issued the December
2015 Executive Order instructing the Commonwealth to claw back the Clawback Revenues.  The
December 2015 Executive Order stated that "any funds retained by the Department of Treasury
***shall be held in a segregated account and shall only be used***" for the payment of Constitutional
Debt.   December 2015 Executive Order (emphasis added).  Pursuant to this order, the
Commonwealth clawed back approximately $164 million in Clawback Revenues and used these
revenues to make a debt service payment on Constitutional Debt due on January 1, 2016.
However, the Commonwealth would go on to claw back approximately $289 million in
*additional* Clawback Revenues in fiscal year 2016 that it later refused to apply to repayment of
Constitutional Debt.

90.    Meanwhile in Washington D.C., Congress debated the terms of legislation
to address Puerto Rico's fiscal distress, with six different bills proposed between December 2015
and May 2016.[17]  Congressional debate focused on, among other things, two key aspects of the
proposed legislation.

---

[16]    *Mensaje del Gobernador Alejandro García Padilla Sobre Situación Fiscal de Puerto Rico*, El Nuevo Día (June
29, 2015 6:00 PM),
https://www.elnuevodia.com/noticias/politica/nota/mensajedelgobernadoralejandrogarciapadillasobresituacionfi
scaldepuertorico-2066574/, attached hereto as **Exhibit E**.

[17]    Cate Long, *Developing: Puerto Rico Enters Bankruptcy on May 3*, Am. Bankr. Inst. J., June 2017, at 12,
attached hereto as **Exhibit F**.

91.     *First,* unlike chapter 9 of the Bankruptcy Code, Congress insisted on the appointment of an oversight board, whose purpose was "to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets."  PROMESA § 101.

92.     *Second*, Congress debated the relative treatment of public pensions vis-à-vis bondholders.  In an initial draft of proposed legislation supported by the Commonwealth's then-Governor, public pensioners were explicitly required to be paid in full *before* bondholders, including Constitutional Debtholders.[18]  This language concerned members of Congress, prompting amendments to the legislation.[19]  Ultimately, Congress included a "requirement" that any fiscal plan "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory . . . in effect prior to the date of enactment of [PROMESA]."  PROMESA § 201(b)(1)(N).  Congress added this language to "ensure fiscal plans keep intact the structural hierarchy of prioritized debt."[20]

93.     Section 201(b)(1)(N) crystalized preexisting entitlements, and other provisions of PROMESA were included to buttress the respect of lawful priorities and liens and to prohibit the Commonwealth from subsequently altering those entitlements.  For example, Section 301(e) requires the Oversight Board to consider whether "claims have priority over other claims" when classifying claims under a plan of adjustment, Section 204(c)(3)(B) prohibited the Commonwealth from "alter[ing] pre-existing priorities of creditors in a manner outside the ordinary course of business or inconsistent with the territory's constitution," and Section 303(3) prohibits "executive orders that alter, amend, or modify rights of holders of any debt of the

---

[18]   *See e.g.*, United States Senate Committee on Finance, *Hatch Pushes for Current Financial Statements from Puerto Rico* (Feb. 10, 2016), https://www.finance.senate.gov/chairmans-news/hatch-pushes-for-current-financial-statements-from-puerto-rico.

[19]   *Id.*

[20]   Memorandum from Majority Comm. Staff, Comm. on Nat. Res., to All Nat. Res. Comm. Members (May 23, 2016), http://naturalresources.house.gov/uploadedfiles/markup_memo_--_h.r._5278_05.24.16__05.25.16.pdf.

territory."   Each of these provisions—which have no analogue under Chapter 9 of the

Bankruptcy Code—express Congress' desire that preexisting priorities and liens be enforced

under PROMESA.

94.    Moreover, before any plan of adjustment can be confirmed, Congress

required that it meet the separate requirements of Section 314(b) PROMESA.  Prominent

among Section 314(b)'s safeguards is compliance with provisions of the Bankruptcy Code made

applicable to PROMESA.  *See* PROMESA § 314(b)(1).  These include the "absolute priority"

rule, under which a senior class of claims must receive the full value of its claims before any

junior class of claims may receive any distribution under a plan of adjustment.  *See* 11 U.S.C.

§ 1129(b)(2).  A plan of adjustment must  also be "in the best interests of creditors, which shall

require the court to consider whether available remedies under the non-bankruptcy laws and

constitution of the territory would result in a greater recovery for the creditors than is provided

by such plan."  PROMESA § 314(b)(6).  Again, Congress paid particular focus on remedies

under the *constitution* of a territory.

95.    Although Congress also required that fiscal plans "provide adequate

funding for public pension systems," Congress stated that this provision "should not be

interpreted to reprioritize pension liabilities ahead of the lawful priorities or liens of bondholders

as established under the territory's constitution, laws, or other agreements."[21] That intent is borne

out by the many provisions that Congress included in PROMESA requiring the Oversight Board

and Commonwealth to respect lawful liens and priorities.  Additionally, Congress'

characterization of the competing interests of "pension liabilities" and bondholders demonstrates

---

[21]    H.R. Rep. No. 114-602, pt. 1, at 45 (2016) (internal quotation marks omitted).

that, as is the case in most Chapter 9 bankruptcy cases, Congress believed that pension liabilities would be restructured under PROMESA.

96.     The President signed PROMESA into law on June 30, 2016.  The enactment of PROMESA imposed a litigation stay solely against bondholders until February 15, 2017 (subject to further extension by the Oversight Board).  PROMESA § 405.  Puerto Rico immediately commenced a series of actions in violation of Puerto Rico law and PROMESA.

### B.     The Commonwealth's Immediate Default On Constitutional Debt

97.     On July 1, 2016, the Commonwealth defaulted on approximately $817 million due on its Constitutional Debt—almost the entirety of what it owed.[22]  In the press release announcing the default, the GDB openly admitted that there were hundreds of millions of dollars in cash on hand "available to pay GO and Commonwealth-guaranteed indebtedness expected to be payable on July 1."[23]  The Commonwealth simply chose default, apparently preferring to divert those available resources to other purposes.

98.     In choosing to default, the Commonwealth ignored Plaintiffs' specific property interests in the Restricted Revenues.  Despite having clawed back hundreds of millions of dollars in Clawback Revenues under the December 2015 Executive Order and continuing to collect Special Property Tax Revenues, the Commonwealth chose not to devote one penny of these dedicated revenues to the payment of Constitutional Debt.  The Commonwealth's financial disclosures stated that it had clawed back $289 million during the second half of fiscal year 2016

---

[22]   The defaulted amounts stated herein do not include amounts for overdue interest or interest on overdue principal or overdue interest.  Plaintiffs reserve all rights with respect to interest and other amounts owing by the Commonwealth under applicable law.

[23]   Press Release, Government Development Bank for Puerto Rico & Puerto Rico Fiscal Agency and Financial Advisory Authority, *Government Development Bank for Puerto Rico and Puerto Rico Fiscal Agency and Financial Advisory Authority Statement on Implementation of Emergency Measures Under Act 21* (July 1, 2016) ("July 2016 Press Release"), attached hereto as **Exhibit G**.

alone (*i.e.*, from January 1, 2016 through June 30, 2016).[24]  Roughly half of these Clawback Revenues were deposited with the insolvent GDB, from which the Commonwealth later restricted withdrawals.  Approximately $150 million more was held at a commercial bank and indisputably available for the July 1, 2016 payment.[25]  Likewise, on July 1, 2016, the GDB was required by law to hold millions of dollars of Special Property Tax Revenues in trust for Constitutional Debtholders.

### C. The Commonwealth's Opportunistic Use Of The PROMESA Litigation Stay To Violate Puerto Rico's Constitution And Laws

99.     Shielded by the litigation stay under Section 405 of PROMESA, holding hundreds of millions of dollars that belonged to Constitutional Debtholders, and waiting for the Oversight Board to be appointed and operational, the Commonwealth—led by a lame-duck Governor—embarked on a transparent campaign to siphon funds to politically favored causes in violation of the Puerto Rico Constitution and PROMESA.

100.     The Commonwealth's July 1, 2016 default coincided with the beginning of fiscal year 2017, which runs from July 1, 2016 through June 30, 2017.  The Commonwealth's fiscal year 2017 budget (the "FY17 Budget") failed to account for any of the Restricted Revenues, and instead—in violation of Puerto Rico's Constitution—allocated $0 to the payment of Constitutional Debt.  Although the Commonwealth exercised its right to redirect the Clawback Revenues from the PRHTA, PRCCDA, PRIFA and MBA bondholders and lenders in fiscal year 2017, it chose—again in violation of Puerto Rico law—not to apply those revenues, totaling approximately $841 million, to the payment of Constitutional Debt, the only lawful use.  Similarly, despite projecting more than $100 million in Special Property Tax Revenues in fiscal

---

[24]     Conway MacKenzie, Inc., *Commonwealth of Puerto Rico, Current Liquidity Situation and Implications*, at 29 (Nov. 18, 2016), attached hereto as **Exhibit H**.

[25]     *See* July 2016 Press Release.

year 2017, the FY17 Budget failed to allocate those funds to the payment of Constitutional Debt,
their only lawful purpose.

101.    The Commonwealth's FY17 Budget also provided for substantial transfers
outside the ordinary course of business and the diversion of vast resources to politically favored
parties.  In particular, the FY17 Budget provided for over $800 million—roughly $150 million
more than the Commonwealth appropriated in fiscal year 2016—in contributions to Puerto
Rico's public employee pension systems.  The Commonwealth took these actions, in addition to
dozens of other legislative actions that improperly elevated lower priority creditors, while
defaulting on Constitutional Debt, its most senior obligation.

### D.    Plaintiffs' Action To Stop The Commonwealth's Unlawful Diversions Of Available Resources

102.    In light of the Commonwealth's unlawful diversion of available resources,
including the Restricted Revenues, immediately following PROMESA's enactment, certain
Plaintiffs brought an action in the U.S. District Court for the District of Puerto Rico on July 20,
2016 seeking declaratory and injunctive relief.  *See Lex Claims LLC* v. *Puerto Rico*, No. 16-cv-
02374 (D.P.R. July 20, 2016) [Dkt. No. 1].

103.    PROMESA prohibited the Commonwealth from declaring a moratorium
on debt payments, transferring funds or assets in a manner inconsistent with the constitution and
laws of the territory, or otherwise impairing creditors' lawful rights.  *See, e.g.*, PROMESA §§
204(c)(3), 207, 303(1), 303(3).   Nevertheless, the same day that PROMESA became law, the
Commonwealth issued Executive Order 2016-30, directly violating PROMESA and the Puerto
Rico Constitution by announcing a moratorium on the Commonwealth's obligation to repay its
Constitutional Debt, even while the Commonwealth continued to spend funds for other purposes
and had hundreds of millions of dollars in cash on hand to pay Constitutional Debtholders.

104.    On August 31, 2016, President Obama purported to appoint the members of the Oversight Board.  By early October, the Oversight Board had held its first meeting, adopted bylaws, and retained counsel.  Under Section 204(c)(3) of PROMESA, the Oversight Board is specifically empowered to review and rescind any law passed during the "gap period" from May 4, 2016 until the appointment of the Oversight Board that "alters pre-existing priorities of creditors in a manner outside the ordinary course of business or inconsistent with the territory's constitution . . . ."  Despite the clear statutory authority to address previous misconduct—a provision Congress found necessary to include in the case of Puerto Rico—the Oversight Board refused to take any position and instead sought to stay the *Lex Claims* litigation.

105.    To date, the Oversight Board has failed to take any action to address the Commonwealth's actions identified in the *Lex Claims* litigation, which were a small subset of offending legislative actions.  Moreover, the Oversight Board has failed to account for the Restricted Revenues under the FY17 Budget, or the unlawful dissipation of these revenues since the enactment of the FY17 Budget.  To the contrary, the Oversight Board has overseen the continued misappropriation of Restricted Revenues and the continued violation of Puerto Rico law and PROMESA.

## II.    The Oversight Board's And Commonwealth's Continued Abuse of PROMESA

106.    The Commonwealth's systematic plan to impair Constitutional Debt while paying certain other, less senior but politically favored, obligations has continued since the Oversight Board was appointed.  Moreover, the Commonwealth—now with the blessing of the Oversight Board—has signaled its intent to continue disregarding Plaintiffs' property rights in the Restricted Revenues in clear violation of Puerto Rico law and PROMESA.

A.    The New Rosselló Administration

107.    Governor Rosselló campaigned on the promise of restoring the rule of law
and honoring Puerto Rico's debts.  Then-candidate Rosselló gained prominence by offering a
different vision for Puerto Rico:  "He said Puerto Rico had to maintain credibility with the
international community and investors.  And that Puerto Rico, despite its mounting troubles,
should pay its debts."[26]  In the gubernatorial primary, candidate Rosselló "propose[d] a new path
forward for Puerto Rico; one that begins with the basic premise that the Puerto Rican
government *can and should pay its debts* and that it does not need any type of bailout from
Washington to meet the responsibilities it has assumed."[27]  Before taking office, he criticized the
fiscal year 2017 budget for its failure to follow the Puerto Rico Constitution and appropriate for
the payment of Constitutional Debt.[28]  In his inaugural address, Governor Rosselló proclaimed
"[t]o regain the people's confidence in government institutions, there should be absolute
transparency in the administration of public finances, and there cannot be any impunity for those
who have acted outside the law."[29]

108.    After taking office on January 2, 2017, Governor Rosselló continued
saying he would respect the rule of law, but his actions soon painted a different picture.  For
example, on February 15, 2017, Governor Rosselló announced the Commonwealth's intention to

---

[26]    Eric Platt, *Ricardo Rosselló, Puerto Rico's Young Governor*, Fin. Times (May 5, 2017),
https://www.ft.com/content/5f9cefc4-3004-11e7-9555-23ef563ecf9a.

[27]    Ricardo Rosselló, *A New Path for Puerto Rico – Which Doesn't Include a Washington Bailout*, Forbes
(October 22, 2015 6:00 AM), https://www.forbes.com/sites/realspin/2015/10/22/a-new-path-for-puerto-rico-
which-doesnt-include-a-washington-bailout/#4140bde244ff (emphasis added).

[28]    Andrew Scurria, *Rosselló Promises to Challenge Puerto Rico's Enacted FY17 Budget*, Debtwire (Oct. 13, 2016
5:15 PM), attached hereto as **Exhibit I**.

[29]    Rebecca Banuchi, *Rosselló Charts His Course*, El Nuevo Día (Jan. 3, 2017 8:36 AM),
https://www.elnuevodia.com/english/english/nota/rossellochartshiscourse-2277648/ (internal quotation marks
omitted).

segregate Clawback Revenues in a trust account dedicated to the payment of Constitutional Debt.[30]  At that time, despite having defaulted on Constitutional Debt since July 1, 2016, the Commonwealth continued to hold nearly $300 million in Clawback Revenues in the GDB and Banco Popular from fiscal year 2016, and projected the collection of approximately $841 million in Clawback Revenues in fiscal year 2017.

109.    The Commonwealth, however, failed to follow through on the Governor's promise, a recurrent theme.  Although the Commonwealth made limited debt-service payments totaling less than $5 million on certain series of Constitutional Debt from March to June 2017, the fiscal year 2018 budget (discussed below) demonstrates that the Commonwealth and Oversight Board will *not* segregate Clawback Revenues (either for the existing revenues collected in fiscal years 2016 and 2017 or the additional revenues that will be collected in fiscal year 2018) and will undoubtedly choose to default on the large semi-annual debt service payment due July 1, 2017.  At the time of its Title III filing—three months after the Governor's announcement—the Commonwealth continued to hold nearly $300 million in Clawback Revenues it had collected in fiscal year *2016*.

### B.    An Overview Of Fiscal Plans Under PROMESA

110.    Pursuant to PROMESA, the Commonwealth, in conjunction with and under the supervision of the Oversight Board, must develop a fiscal plan designed to "provide a method to achieve fiscal responsibility and access to the capital markets."  PROMESA § 201(b)(1), (2).  Rather than providing a path toward fiscal responsibility, the Oversight Board and Commonwealth have used PROMESA as an excuse to ignore Plaintiffs' rights in the

---

[30]    *Sánchez Provides Update on $146M GO Payment Trust Fund*, Reorg Res. (Feb. 15, 2017 6:32 AM), attached hereto as **Exhibit J**.

Restricted Revenues and as a blueprint for paying politically favored creditors at the expense of Constitutional Debtholders.

111.    Congress included 14 different "***requirements***" that any fiscal plan must satisfy.  PROMESA § 201(b).  Congress authorized the Oversight Board to certify a fiscal plan only if the fiscal plan "satisfies such ***requirements***."  *Id.* § 201(c)(3)(A) (emphasis added).  If a fiscal plan "does not satisfy such ***requirements***," then the "Board ***shall*** provide to the Governor a ***notice of violation***."  *Id*. § 201(c)(3)(B) (emphasis added).  Most relevant to this Complaint, a fiscal plan must satisfy the following requirements:

- "provide for estimates of revenues and expenditures . . . ***based on applicable laws***;" *id.* § 201(b)(1)(A) (emphasis added),
- "ensure the funding of ***essential*** public services;" *id.* § 201(b)(1)(B) (emphasis added),
- "provide for the elimination of structural deficits;" *id.* § 201(b)(1)(D),
- "***respect the relative lawful priorities or lawful liens***, as may be applicable, ***in the constitution***, other laws, or agreements of a covered territory or covered territorial instrumentality ***in effect prior to the date of enactment of this Act***."  *id.* § 201(b)(1)(N) (emphasis added).

112.    Once a fiscal plan is certified by the Oversight Board, the Commonwealth is required to pass annual budgets that follow the certified fiscal plan.  *See* PROMESA § 202. Congress provided that in the event the Commonwealth is in violation of its approved budget, the Oversight Board shall "make appropriate reductions in ***nondebt expenditures*** to ensure that the actual quarterly revenues and expenditures for the territorial government are in compliance with the applicable certified Territory Budget."  PROMESA § 203(d)(1) (emphasis added).

## C.    Oversight Board Sets Fiscal Plan Targets

113.    On December 20, 2016, the Oversight Board sent a letter to Governor Padilla and Governor-elect Rosselló outlining a framework of proposed measures and priorities

for the Commonwealth's fiscal plan.[31]  Although the Oversight Board discussed many of

PROMESA's requirements for a fiscal plan, it nowhere mentioned that a fiscal plan must respect

lawful liens and priorities under the Puerto Rico Constitution and applicable laws.  Rather, the

Oversight Board expressed optimism that in collaboration with the Commonwealth they could,

among other things, "[i]mprove vital health statistics," "[b]uild a modern, efficient and cost-

effective infrastructure," and even "[c]reate a vibrant entrepreneurial sector."[32]

114.    On January 18, 2017, the Oversight Board sent another letter to Governor

Rosselló "to provide . . . more detailed information on the specific goals and objectives . . . to be

incorporated into a viable fiscal plan" and setting forth its requirements for certification.[33]  At

that time, the Oversight Board had not yet engaged Ernst & Young to provide a "reconciliation"

of recent spending and expenditure levels, the Oversight Board's financial professionals had just

been retained, no formal analysis of pension liabilities had been commissioned, and the newly

elected Rosselló administration had just taken office and not provided the Oversight Board with

revenue or expense projections.

115.    Nonetheless, the Oversight Board told the Commonwealth, with

mathematical precision, that it would certify a fiscal plan that provided only $800 million in

annual debt service (representing an 80% reduction in total debt service) and a 10% reduction in

pension liabilities (that will not take effect for years).[34]  The Oversight Board's "model" to

calculate these values assumed an unprecedented 16.2% *contraction* in real GNP in fiscal year

2018, and a further 1.2% contraction in fiscal year 2019, notwithstanding that nominal GNP had,

---

[31]   Letter from Fin. Oversight & Mgmt Bd. for P.R. to Alejandro García Padilla, Governor of P.R., and Ricardo
Rosselló Nevares, Governor-Elect of P.R. (Dec. 20, 2016), attached hereto as **Exhibit K**.

[32]   *Id*. at 2.

[33]   Letter from Fin. Oversight & Mgmt Bd. for P.R. to Ricardo Rosselló Nevares, Governor of P.R. (Jan. 18,
2017), attached hereto as **Exhibit L**.

[34]   *Id*. at 3-4.

with one exception, increased in Puerto Rico in each of the previous 30 years.[35]  Although the

Oversight Board would later adjust these macro-economic assumptions upward, the March Fiscal

Plan (as defined below) and other subsequent changes to that fiscal plan would always result in

approximately $800 million in annual average debt service.

116.    The lack of foundation for the Oversight Board's initial determination that

$800 million was the appropriate amount of debt service and the Oversight Board's actions ever

since evince a determination to prevent debt service from inching above $800 million, regardless

of whether the facts on the ground support that determination.  As part of its contrived effort to

keep debt service at the $800 million mark they settled on months before Governor Rosselló

even presented his draft fiscal plan, the Oversight Board and the Commonwealth have engaged

in numerous accounting gimmicks, obfuscation, and excessive spending, perpetuating the

wrongs PROMESA was designed to remedy.

### D.    The Oversight Board Rejects Initial Rosselló Fiscal Plan

117.    The Rosselló administration submitted its initial fiscal plan to the

Oversight Board for certification on February 28, 2017 (the "February Fiscal Plan").  The

February Fiscal Plan allocated $1.2 billion to debt-service annually for fiscal years 2017 through

2026—$400 million more than suggested by the Oversight Board—representing an

approximately 67% reduction in total debt service, moderately less severe than the 80%

reduction proposed by the Oversight Board.[36]  On March 9, 2017, the Oversight Board rejected

the February Fiscal Plan, declaring, among other things, that despite the substantial impairment

to annual debt-service, it "fail[ed] to provide for the scale of expenditure reduction required to

---

[35]    *Id.* at 3 n.1.

[36]    February Fiscal Plan at 89.

achieve medium-term structural balance and near-term liquidity."[37]  The Oversight Board

demanded a revised fiscal plan with lower revenue estimates and increased expense projections

to be submitted within two days.[38]

### E.    The Oversight Board Certifies March Fiscal Plan

118.    On March 13, 2017, the Oversight Board certified a revised fiscal plan (as

amended, the "March Fiscal Plan") subject to two amendments.[39]  The March Fiscal Plan

provided an average of approximately $787 million in annual debt service, yet again remarkably

close to the $800 million initially sought by the Oversight Board.  This $787 million was for the

Constitutional Debt issued by the Commonwealth as well as tens of billions of debt issued by

other instrumentalities, including COFINA.  The $787 million of annual average debt service

prescribed by the March Fiscal Plan represented only 22% of the originally scheduled debt

service (before taking into account the accrual and compounding of interest as prescribed by

contract or statute).  Even if the entire $787 million went to pay Constitutional Debt, only

approximately 56% of Constitutional Debt service over the life of the March Fiscal Plan would

be paid.  In contrast, non-debt liabilities are getting a full or near full recovery in violation of the

Constitutional and statutory protections afforded Constitutional Debt.

### F.    March Fiscal Plan Violates Puerto Rico Law And PROMESA

119.    The March Fiscal Plan revealed the Oversight Board's and

Commonwealth's mistaken belief that PROMESA empowered them to disregard any aspect of

---

[37]    Letter from Fin. Oversight & Mgmt. Bd. for P.R. to Ricardo Rosselló Nevares, Governor of P.R. (Mar. 9, 2017), attached hereto as **Exhibit M**.

[38]    *Id*. at 5.

[39]    Oversight Board Resolution Adopted on March 13, 2017 (Fiscal Plan Certification), attached hereto as **Exhibit N**. The amendments proposed by the Oversight Board included:  (i) a furlough program and removal of Christmas bonuses; and (ii) a reduction in pension outlays by 10% that would not take effect until fiscal year 2020.  *Id*. at 2-4.  The March Fiscal Plan numbers cited herein do not include the effect of these amendments because the Oversight Board has not released such information.

Puerto Rico law that interfered with their preferred use of funds.  Rather than consider how

particular funds must be used under Puerto Rico law, the Oversight Board and Commonwealth

instead treated the entirety of Puerto Rico's resources as one piggy bank they could use for any

purpose they found desirable, with general Commonwealth revenues and Restricted Revenues

simply pooled together.  Further, the March Fiscal Plan projected unprecedented revenue

reductions yet authorized rampant spending, thereby guaranteeing that the Commonwealth could

claim that it lacked the available resources to pay Constitutional Debt.  Despite the March Fiscal

Plan's projections that the Commonwealth will have insufficient available resources to pay

Constitutional Debt, the Commonwealth's unlawful confiscation and misappropriation of

Restricted Revenues will continue indefinitely under the March Fiscal Plan.

120.    Both before and after the Oversight Board certified the March Fiscal Plan,

Plaintiffs repeatedly advised the Oversight Board and Commonwealth that they were unlawfully

diverting the Restricted Revenues and that the March Fiscal Plan (and earlier drafts thereof)

violated Puerto Rico law and PROMESA.[40]   Neither the Oversight Board nor the

Commonwealth ever responded.

### (i)    Failure To Respect Lawful Priorities And Liens

121.    The March Fiscal Plan ignored two of the requirements Congress imposed

on any fiscal plan, namely, that it "respect the relative lawful priorities or lawful liens, as may be

applicable, in the constitution, other laws, or agreements of a covered territory or covered

territorial instrumentality in effect prior to the date of enactment of this Act," and that estimates

---

[40]   *See, e.g.*, Letter from the Ad Hoc Group of GO Bondholders to José B. Carrión III, Chairman, Fin. Mgmt. &
Oversight Bd. of P.R., and Gerardo Portela Franco, Exec. Dir., P.R. Fiscal Agency & Fin. Advisory Auth. (Mar.
22, 2017); Letter from the Ad Hoc Group of GO Bondholders to José B. Carrión III, Chairman, Fin. Mgmt. &
Oversight Bd. of P.R. (Mar. 10, 2017); Letter from the Ad Hoc Group of GO Bondholders to Gerardo Portela
Franco, Exec. Dir., P.R. Fiscal Agency & Fin. Advisory Auth. (Feb. 15, 2017); Response of the Ad Hoc Group
of GO Bondholders, *Survey for the Government of Puerto Rico's Fiscal Plan as Presented to the Financial
Oversight and Management Board for Puerto Rico* (Nov. 16, 2016).

of revenues and expenditures be based on "applicable laws." PROMESA § 201(b)(1)(A), (N).

The Commonwealth openly acknowledged that it had not complied with Section 201(b)(1)(N),

but the Oversight Board certified the March Fiscal Plan anyway.[41]   Accordingly, the March

Fiscal Plan provides for the payment of *every* non-debt expenditure, and then allocates any

"remainder" to debt service.  Moreover, rather than consider if particular revenues, such as the

Restricted Revenues, were restricted, encumbered or otherwise pledged to particular creditors,

under applicable law and developing their projections accordingly, the Oversight Board

disregarded all applicable (or, at least, inconvenient) law.

### (a)        Failure to Respect Lawful Liens on Restricted Revenues

122.    The March Fiscal Plan failed to account for Constitutional Debtholders'

priority claim to, and lien on, available resources, and lien on Restricted Revenues in particular.

Despite the constitutional and statutory provisions granting a lien on Restricted Revenues, and

placing these revenues in trust to secure Constitutional Debt, the March Fiscal Plan failed to

acknowledge Constitutional Debtholders' property interest in the Restricted Revenues.  Rather,

by allocating total debt service for all bonds that is *less* than the aggregate amount of Restricted

Revenues, the March Fiscal Plan guaranteed that these revenues will be used unlawfully.  The

March Fiscal Plan failed to account for *any* liens held by any creditors, and instead provides

$787 million annually to all bondholders, irrespective of their varying rights and remedies.

### (b)        Failure to Respect Lawful Priorities

123.    As set forth in Part One, Puerto Rico's Constitution—expressly referenced

in Section 201(b)(1)(N) as well as the OMB Act—requires that Constitutional Debt be paid

---

[41]    *See* February Fiscal Plan at 9 (noting that compliance with Section 201(b)(1)(N) was "ongoing"); *see also*
March Fiscal Plan at 6 (noting that the "mechanisms by which projected cash flow available for debt service
should be allocated to different debt instruments" was a "[l]egal and contractual issue[] not determined by the
Fiscal Plan").

before all other expenditures. The March Fiscal Plan, however, ignored Puerto Rico's Constitution and the OMB Act, and in doing so also violated PROMESA. The March Fiscal Plan provided, in the first instance, for the full payment of every non-debt expenditure, and left the "remaining" revenues for the payment of debt service, including—without any distinction— Constitutional Debt and other debt. Using fiscal year 2018, as an example, the Oversight Board certified that the Commonwealth could spend over $11.7 billion of local revenues on non-debt expenditures, and then allocate the remaining $404 million in projected surplus for debt service.

124.     Any fiscal plan that endeavored to "respect the relative lawful priorities or lawful liens" under Puerto Rico law would have first budgeted the payment of Constitutional Debt, segregated revenues subject to lawful liens, and then considered the remaining revenues and desired spending.   If the Oversight Board had followed the law as Congress intended, the Commonwealth could meet its Constitutional Debt obligations and still have an average of $10.9 billion of local revenues per year to provide services to its citizens.  However, the Oversight Board chose to develop the March Fiscal Plan in the precise opposite manner, thereby ignoring Constitutional Debt's unique status as the Commonwealth's most senior obligation, violating the plain language of Section 201(b)(1)(N), and guaranteeing that the Commonwealth could claim that it did not have sufficient available resources to pay Constitutional Debt.

125.     In response to criticisms from Senators Tom Cotton and Thom Tillis that the March Fiscal Plan failed to properly respect lawful priorities and liens, the Oversight Board claimed that the word "respect" was somehow intended to "provide[] flexibility" to the Oversight Board.[42]  Based on that semantic folly, the Oversight Board has ignored Plaintiffs'

---

[42]    Letter from Fin. Oversight & Mgmt. Bd. for P.R. to U.S. Senators Tom Cotton and Thom Tillis 12 (Apr. 25, 2017) (the "April 25th Letter"), attached hereto as **Exhibit O**.

property interests in Restricted Revenues, as well as Plaintiffs' lawful priority under the Puerto

Rico Constitution and OMB Act.

**(c)      Impermissible Payment of Lower Priority Creditors**

126.    Because the Oversight Board believes that Section 201(b)(1)(N) provides

it "flexibility" to ignore binding Puerto Rico law, the March Fiscal Plan endeavors to pay junior

creditors in a manner that is inconsistent with Puerto Rico's Constitution and laws.  For example,

in contrast to the March Fiscal Plan's proposed 80% reduction in debt-service, the March Fiscal

Plan proposes paying trade creditors 100% and paying pension creditors 100% for the next three

years, while imposing no more than a 10% reduction in aggregate pension liabilities beginning in

fiscal year 2020.  Although Congress directed that PROMESA "should not be interpreted to

reprioritize pension liabilities ahead of the lawful priorities or liens of bondholders," that is

precisely what the Oversight Board and Commonwealth have proposed.[43]

127.    Recent disclosures by the Commonwealth underscore the extent to which

the Commonwealth and Oversight Board have used PROMESA as a justification for paying

expenses in violation of Puerto Rico law.  As of June 30, 2016—the same day PROMESA

became law—the Commonwealth reported that "[o]utstanding third-party accounts payable of

funds managed by the Commonwealth . . . are estimated at approximately $1.6 billion."[44]   More

recently, however, the Commonwealth reported that total accounts payable, as of May 26, 2017,

had been reduced to $373 million, representing a $1.2 billion decrease in accounts payable since

---

[43]    H.R. Rep. No. 114-602, pt. 1, at 45 (2016).

[44]    Commonwealth of Puerto Rico, Financial Information and Operating Data Report (December 18, 2016),
*available at* http://www.gdb-pur.com/documents/CommonwealthofPuertoRicoFinancialInfoFY201612-18-
16.pdf; *see also* Puerto Rico Fiscal Agency and Financial Advisory Authority, Liquidity Plan 12 (Jan. 28, 2017)
(stating that accounts payable as of June 30, 2016 were estimated to be $1.556 billion).

PROMESA was passed on June 30, 2016.[45]   The Commonwealth—again with the Oversight

Board's blessing—has therefore apparently spent more than $*1.2 billion* to pay down various

accounts payable (*i.e.*, junior creditors) during fiscal year 2017, while simultaneously failing to

honor its obligations to its most senior creditors—Constitutional Debtholders—in direct violation

of Puerto Rico law and PROMESA.

### (ii)   Failure to Identify "Essential" Expenses

128.   The March Fiscal Plan provides for the confiscation of the Restricted

Revenues and their utilization to pay hundreds of millions of dollars in non-essential spending.

PROMESA states that a fiscal plan shall "ensure the funding of *essential* public services."

PROMESA § 201(b)(1)(B) (emphasis added).  The March Fiscal Plan, however, did not define

what expenses are for essential services and what expenses may be considered non-essential.[46]

Rather, it listed this issue as one of the "legal and contractual issues not determined by the Fiscal

Plan."[47]  As certified, the March Fiscal Plan provides that all Commonwealth (and, in certain

cases, component unit and public corporation) non-debt expenses would be paid *before* any

payments were made for debt service.  As a result, the March Fiscal Plan remarkably presumed

that approximately $18 billion in annual average non-debt expenditures were somehow

necessary to maintain an essential service.[48]  The Commonwealth and Oversight Board's

position that every single dollar in an $18 billion budget is necessary to provide an essential

---

[45]   Puerto Rico Department of Treasury, Treasury Single Account ("TSA") Cash Flow Actual-to-Forecast
Comparison (May 26, 2017), attached hereto as **Exhibit P**.

[46]   March Fiscal Plan 6; *see also* Letter from Fin. Oversight & Mgmt. Bd. for P.R. to Ricardo Rosselló Nevares,
Governor of P.R. (June 16, 2017) (the "June 16th Letter") (acknowledging that March Fiscal Plan did not define
"essential" services and asking Commonwealth to define essential services *after* the March Fiscal Plan had been
certified), attached hereto as **Exhibit Q**.

[47]   March Fiscal Plan 6.

[48]   This total amount includes average annual federal transfers.  Removing federal transfers results in average
annual *local* expenses of approximately $11.5 billion that the Commonwealth asserts are entirely used to
maintain essential services.

service, results, in turn, in the Commonwealth's claimed inability to pay Constitutional

Debtholders.

### (iii) The So-Called "Reconciliation Adjustment"

129.    The March Fiscal Plan not only considered all expenses to be "essential,"

but it then artificially inflated the Commonwealth's "expenses" by including a so-called

"Reconciliation Adjustment" of $585 million in the Fiscal Plan for fiscal year 2017 (the amount

grows each year and totals $6.2 billion over the March Fiscal Plan's 10-year term).  The

Reconciliation Adjustment is a line item in the March Fiscal Plan for unidentified expenses

based on the assumption that Puerto Rico will spend more than its FY17 Budget allows.  Not

only is the Reconciliation Adjustment antithetical to any concept of fiscal discipline, but the

methodology the Oversight Board (and its advisors) used to determine the amount of the

Reconciliation Adjustment was illogical and deeply flawed.

130.    Much of the March Fiscal Plan, which includes revenue and expense

projections for fiscal years 2017 through 2026, is built on fiscal year 2017—the "base" year—

and the Commonwealth's FY17 Budget projected $8.987 billion in general fund expenditures.[49]

However, the Oversight Board was purportedly concerned that the Commonwealth's budgeted

expenses for fiscal year 2017 were understated.  To address this concern, the Oversight Board

retained Ernst & Young ("EY") to "bridge" Puerto Rico's audited fiscal year 2014 financial

statements to projected expenses for fiscal year 2017.[50]

---

[49]    Luis F. Cruz Batista, Presupuesto Aprobado AF2017, Estado Libre Asociado de Puerto Rico, *available at*
https://www2.pr.gov/presupuestos/PresupuestoAprobado2016-
2017/PresentacionPresupuestoAprobadoAF2017/Radiograf%C3%ADa%20Presupuesto%20Aprobado%20AF1
7.pdf

[50]    Ernst & Young Puerto Rico LLC, Financial Bridge Analysis (Mar. 7, 2017) (the "EY Report"), attached hereto
as **Exhibit R**.

131.    Only three weeks after being retained, and one week before the March

Fiscal Plan was certified, EY issued a report concluding that a "hypothetical extrapolation of

historical general fund expenditures" suggested "a potential understatement of general fund

expenditures" of $360 million to $810 million for fiscal year 2017.[51]  The Oversight Board

quickly incorporated these conclusions, and added $585 million (the midpoint of the range) in

"expenses" for fiscal year 2017.  As a result, although the Commonwealth's FY17 Budget

projected only $8.987 billion in general fund expenditures, the Oversight Board projected that

the Commonwealth would spend an incremental $585 million from its general fund in fiscal year

2017.  Further, because fiscal year 2017 was the "base" year for the March Fiscal Plan, the

Oversight Board included a similar (but increasing) amount of "Reconciliation Adjustment"

expenses throughout the ten year projection period, totaling $6.2 billion in such "expenses."

132.    The Oversight Board's and EY's methodology for determining the proper

amount of the Reconciliation Adjustment, however, was arbitrary relative to their stated concerns

and goals.  Although they were concerned with the "historical" "understatement of general fund

expenditures," they failed to actually analyze historical budgeted versus actual spending amounts

and apply those results to the FY17 Budget.  Rather, the Oversight Board and EY considered

only growth in actual expenses from fiscal year 2014 to fiscal year 2015 (without regard to

budgeted amounts) and reversed the year over year decrease from actual unaudited expenses in

fiscal year 2016 to the FY17 Budget.  In other words, rather than calculate the rate at which the

Commonwealth's expenses historically exceeded its budget, the Oversight Board and EY instead

took for granted that the Commonwealth's expenses would *always* increase, and sought merely

to quantify *how much* expenses increased over the past two or three years.

---

[51]    *Id.* at 13.

133.    Because fiscal year 2017 was the base year for the March Fiscal Plan, the Oversight Board's flawed methodology infects the expense projections for the next 10 years, at a cost of $6.2 billion.  Moreover, the Oversight Board has set these future "expenses" in stone, despite not even knowing if the Commonwealth's actual expenses in fiscal year 2017 will in fact exceed the FY17 Budget, something they will not know until the Commonwealth releases its audited financials for fiscal year 2017.  For example, if the Commonwealth adheres to its FY17 Budget, then there will be no need for the "Reconciliation Adjustment" at all, although the Fiscal Plan will have $6.2 billion of "expenses" embedded in it.  Similarly, if the Commonwealth exceeds its FY17 Budget by less than the $585 million assumed by the Oversight Board and EY, then the Reconciliation Adjustment, to the extent it is permissible at all, will be significantly overstated throughout the ten year projection.

134.    Simply put, the Oversight Board insisted on including the full $6.2 billion Reconciliation Adjustment for years 2017 through 2026 before even knowing if the Commonwealth will meet its FY17 Budget.  As a result, the Oversight Board authorizes and encourages the Commonwealth to spend these amounts for as yet unidentified (and therefore non-essential) expenses during that period.  In fact, the fiscal year 2018 budget does just that, appropriating at least $545 million in "Reconciliation Adjustments" to fund new expenses before fiscal year 2017 even concludes.  The Reconciliation Adjustment is therefore a *fait accompli,* guaranteeing that the Commonwealth will spend *billions of dollars* in the future on the unproven assumption that it overspent in fiscal year 2017.  In reality, the Reconciliation Adjustment is an "expense" that is somehow "essential," but not for any identifiable expenditure:  an "essential" $600 million annual cushion fund.

55

135.     PROMESA does not countenance such gimmicks or spendthrift ways.
Rather, PROMESA requires the Commonwealth to pass and meet annual budgets, and if it does
not, PROMESA requires the Oversight Board to make necessary budgetary adjustments from
"nondebt expenditures."  PROMESA § 203(d)(1).  Further, PROMESA requires the elimination
of "structural deficits," which the Reconciliation Adjustment also violates. *Id.* § 201(b)(1)(D).

### (iv)     Unexplained Assumptions in March Fiscal Plan

136.     In contrast to the February Fiscal Plan, the March Fiscal Plan—certified
only four days after the Oversight Board rejected the February Fiscal Plan—***increased*** baseline
payroll expenses by more than $1.5 billion and ***increased*** baseline operational expenses by more
than $400 million over ten years.  Neither the Oversight Board nor Commonwealth offered any
explanation as to how these expense projections increased so significantly in four days.
Similarly, the deficits of various Commonwealth-affiliates increased—again without
explanation—by $715 million between the two fiscal plans.

### (v)     Uncommonly Low Debt Burden

137.     Because the Oversight Board and Commonwealth believe they no longer
need to respect applicable Puerto Rico law concerning Restricted Revenues or the payment of
Constitutional Debt, the March Fiscal Plan leaves the Commonwealth with an extraordinarily
low debt burden.

138.     Rather than attempt to resolve Puerto Rico's challenges within the
confines of existing Puerto Rico law, the Oversight Board has decided instead to ignore it.
Accordingly, as the very last expense, the March Fiscal Plan allocates only $787 million to
average annual debt service (for all debt) over the next 10 years, which amounts to

56

approximately 6.4% of local revenues (after measures).[52]  As a percentage of revenues, this is

significantly lower than several U.S. states with comparable populations.  For example, the ratio

of debt service to revenues is 20.8% in Rhode Island, 14.7% in Connecticut, 11.6% in Louisiana

and 10.3% in Colorado.[53]  Debt service ratios for similarly situated sovereign borrowers are also

significantly higher, with interest expense to revenues reported to be 10.5% in El Salvador, 11%

in Costa Rica, 14.1% in the Dominican Republic and 24.2% in Jamaica.[54]   Moreover, the Puerto

Rico Constitution itself reflects the judgment that 15% of revenues is a sustainable debt burden

for Constitutional Debt.  *See* P.R. Const. art. VI, § 2.

139.    In addition, Joint World Bank/International Monetary Fund guidelines

provide that, even for "low-income countries" (*i.e.*, the poorest countries in the world, whose

economies are far less developed than Puerto Rico's), 18% to 22% of government revenues

constitutes a sustainable debt service burden.[55]

140.    Section 201(b)(1)(I) of PROMESA requires a fiscal plan to "include a

debt sustainability analysis."  Had the Oversight Board and Commonwealth conducted a

bottoms-up analysis—as opposed to simply calculating the amount "left over" after all other

expenses were paid—it would have concluded that, like all other comparable sovereigns, the

Commonwealth could allocate significantly more than approximately 6.4% of its total local

---

[52]   "Measures" refers to various revenue and expense adjustments mandated by the Oversight Board under the
       March Fiscal Plan.

[53]   *See CivicDashboards*, OpenGov, http://www.civicdashboards.com/state/rhode-island-
       04000US44/debt_service_ratio; http://www.civicdashboards.com/state/connecticut-
       04000US09/debt_service_ratio; http://www.civicdashboards.com/state/louisiana-
       04000US22/debt_service_ratio; and http://www.civicdashboards.com/state/colorado-
       04000US08/debt_service_ratio (last visited June 20, 2017).

[54]   *Interest payments (% of revenue)*, World Bank, http://data.worldbank.org/indicator/GC.XPN.INTP.RV.ZS (last
       visited June 20, 2017).

[55]   *See* Factsheet: The Joint World Bank-IMF Debt Sustainability Framework for Low-Income Countries,
       International Monetary Fund 2 (Mar. 2016), http://www.imf.org/external/np/exr/facts/pdf/jdsf.pdf.

revenues (after measures) to debt service.  Instead, the Defendants have chosen to ignore Puerto

Rico's Constitution and Plaintiffs' rights in the Restricted Revenues and in doing so also violated

PROMESA.

### III.     The Commonwealth Files A Title III Petition

141.     On May 2, 2017, Governor Rosselló sent a letter to the Oversight Board

expressing a desire for relief under Title III of PROMESA.[56]  On May 3, 2017, the Oversight

Board approved the Commonwealth's request for a Title III filing and commenced this Title III

case.  The Commonwealth proclaimed that the Title III filing would not affect the Government's

payment of any governmental services other than payment of debt service.  For example, the

Governor's office press release issued in connection with the Title III filing stated the purpose

was "to ensure the essential services of the public, the payment of the government payroll and

suppliers."[57]  Fiscal Agency and Financial Advisory Authority Executive Director Gerardo

Portela also declared "[t]he government has the commitment and, more importantly, the ability

to pay suppliers and providers as usual.  All of the government's bills will be processed under the

ordinary process."[58]

### IV.     The Fiscal Year 2018 Budget and Amendments to the March Fiscal Plan

142.     On May 31, 2017, the Commonwealth released its proposed budget for

fiscal year 2018 (as amended, the "FY18 Budget"), incorporating lowered revenue forecasts and

---

[56]   Letter from Ricardo Rosselló Nevares, Governor of P.R., to Fin. Mgmt. & Oversight Bd. of P.R. (May 2, 2017),
attached hereto as **Exhibit S**.

[57]   Press Release, P.R. Fed. Affairs Admin., Gov. of P.R., Governor Rosselló Announces Prot. under Title III of
PROMESA to Ensure Essential Servs. (May 3, 2017), attached hereto as **Exhibit T**.

[58]   *AAFAF Says Title III Won't Touch Supplier Payments as Treasury Sends out $70M in Checks This Week*, Reorg
Res. (May 5, 2017 3:22 PM) (internal quotation marks omitted), attached hereto as **Exhibit U**.

other significant changes from the March Fiscal Plan.[59]  Also on May 31, 2017, the

Commonwealth requested that the Oversight Board amend the March Fiscal Plan to reflect

certain revenue changes included in the FY18 Budget.[60]  The Oversight Board, subject to vague

and unarticulated "concerns" and the prospect of unspecified modifications, approved the

proposed revenue revisions to the March Fiscal Plan.[61]  Despite approving these amendments,

which relate solely to projected revenues, the Oversight Board has not released an updated

version of the March Fiscal Plan showing the effect of these changes on the $404 million

provided for debt service in fiscal year 2018, or disclosing whether additional revisions have

been made to the *expense* projections for fiscal year 2018 under the March Fiscal Plan.

143.     The FY18 Budget compounds the errors in the March Fiscal Plan and

further highlights the Oversight Board's and Commonwealth's disregard for Puerto Rico law and

PROMESA.  The FY18 Budget would continue wild spending on politically favored causes,

while continuing to violate Plaintiffs rights in the Restricted Revenues and ignoring the

Constitutional priority and liens afforded to Constitutional Debtholders.

> **A.     Continued Failure to Respect Lawful Lien and Priorities**

144.     Because it provides more detail than the March Fiscal Plan, the FY18

Budget amplifies the numerous ways in which the Oversight Board and Commonwealth have

entirely discarded Sections 201(b)(1)(A) and (N) of PROMESA, which require projections based

on "applicable laws" and budgets that demonstrate "respect for lawful liens and lawful

---

[59]   The Puerto Rico House of Representatives passed the FY18 Budget, with certain amendments from the version
initially proposed by Governor Rosselló, on June 23, 2017, and the Puerto Rico Senate passed the same version
on June 24, 2017.

[60]   Letter from Gerardo J. Portela Franco, Exec. Dir., P.R. Fiscal Agency & Fin. Advisory Auth., to Natalie A.
Jaresko, Exec. Dir., Fin. Oversight & Mgmt. Bd. for P.R. (May 31, 2017) (the "May 31ˢᵗ Letter"), attached
hereto as **Exhibit V**.

[61]   Financial Oversight and Management Board for Puerto Rico, Unanimous Written Consent Approving Certified
Fiscal Plan, as Corrected (May 31, 2017), attached hereto as **Exhibit W**.

priorities."  As a result, the FY18 Budget confirms that the Commonwealth and Oversight Board will continue to confiscate Restricted Revenues while simultaneously ensuring that the Commonwealth will claim to have insufficient resources to pay Constitutional Debt.

### (i)    Continued Failure to Respect Lawful Liens on Restricted Revenues

145.    The FY18 Budget continues to ignore Plaintiffs' interests in the Restricted Revenues.  There is no reference in the FY18 Budget to Clawback Revenues or Special Property Tax Revenues, no suggestion that they are being segregated for the benefit of Constitutional Debtholders, and no explanation of how these revenues will be spent in fiscal year 2018. Because, pursuant to the March Fiscal Plan, total debt service in fiscal year 2018 is only $404 million and Restricted Revenues are likely to be double that amount, it is evident that the Commonwealth and Oversight Board intend to spend the Restricted Revenues in violation of Puerto Rico law and Section 201(b)(1) of PROMESA.

146.    In addition, although the March Fiscal Plan provides that the Commonwealth will allocate $404 million for debt service in fiscal year 2018, the FY18 Budget does not allocate any funds specifically for debt service, in violation of the March Fiscal Plan.

### (ii)    Continued Impermissible Payment of Lower Priority Creditors

147.    The Commonwealth proclaims that they will not reduce pension liabilities. In his address to the Legislative Assembly announcing the FY18 Budget, Governor Rosselló repeatedly touted that the FY18 Budget would pay pension claims in full:[62]

- ▪ "Another significant difference is that the new budget includes PAYMENT OF ALL PENSIONS."  (emphasis in original).

- ▪ "[I]t has been necessary to protect one of the most vulnerable sectors of our population:  our pensioners …"

---

[62]    Governor Ricardo Rosselló Nevares, Address to Legislative Assembly of P.R. (May 31, 2017) (the "Legislative Assembly Address"), attached hereto as **Exhibit X**.

▪ "This budget includes payments for pensions of over $2 billion.  Thus, we are taking a difficult step for the budget, but we are guaranteeing the pensions of all of our retirees."

▪ "[W]e again request protection under Title III of PROMESA.  By taking this timely action, we guarantee the Puerto Rican government will continue to operate and pay its pensions."

▪ "[I]n this budget we will assume all pension payments for the retirement systems.  Payment to our pensioners are guaranteed in this budget."

148.    In addition to promising to pay pension claims in full, the Governor also announced that he intended to lower taxes on pensioners by increasing exemptions approximately 66.67%:  "we will increase the exemption for pensioners from $15,000 to $25,000, thus again reaffirming our commitment to retirees."[63]

149.    Consistent with the Governor's promises, the FY18 Budget appears to contemplate, for fiscal year 2018 alone, a $285 million *increase* in pension expenses (gross of any asset sales or other income to the retirement systems) compared to the fiscal year 2018 projections contained in the March Fiscal Plan.  As a result, consolidated aggregate pension costs for fiscal year 2018 now total $2.552 billion, in contrast to the $2.267 billion assumed under the March Fiscal Plan.[64]

150.    Further, in fiscal year 2017, the Commonwealth allocated $804 million from its general fund to the payment of pension claims.  In fiscal year 2018, the Commonwealth proposes to appropriate $2.038 billion from the general fund for pension liabilities.  Pension claims therefore account for approximately 20% of all general fund appropriations for fiscal year

---

[63]   *Id.*

[64]   The most recent public actuarial reports for the ERS, TRS and JRS pension systems were prepared by Milliman, Inc. for fiscal year 2015.  These reports indicate a projected "pay go" burden (projected benefits plus administrative costs) for fiscal year 2018 of $2.267 billion.  Upon information and belief, the Oversight Board and Commonwealth adopted the estimates set forth in the Milliman report to determine the projected pension liabilities under the March Fiscal Plan.

2018.  Had the FY18 Budget appropriated $404 million of debt service (as called for under the March Fiscal Plan), it would represent only 4% of all general fund appropriations for fiscal year 2018.

151.    Finally, while the Oversight Board told Senators Cotton and Tillis that the March Fiscal Plan "reduces pension payments" by "an average [of] 10% . . . amounting to approximately $250 million per year,"[65] the purported 10% reduction in pension payments is not scheduled to commence until fiscal year 2020.  Accordingly, the Commonwealth will continue to appropriate over 20% of its general fund budget to pension claims for the foreseeable future.  Moreover, given that the Commonwealth hopes (as do Plaintiffs) to exit Title III by fiscal year 2020, and given the political calculations involved, the Commonwealth may nonetheless attempt to pay pension creditors in full in fiscal year 2020 and beyond.

152.    The Oversight Board's unabashed elevation of pension claims over debt service is a flagrant violation of PROMESA, which Congress warned "should not be interpreted to reprioritize pension liabilities ahead of the lawful priorities or liens of bondholders as established under the territory's constitution, laws, or other agreements."[66]

153.    The Oversight Board's and Commonwealth's unlawful favoritism to junior creditors is not limited to pension creditors.  For example, Governor Rosselló announced that the Department of Finance has, to date, paid $140 million in tax refunds and was "pleased to inform" that an additional $35 million in refunds would be paid in June 2017.[67]

154.    Jose Ivan Marrero, the Director of the Office of Management and Budget, reportedly said that the Reconciliation Adjustment in the FY18 Budget "could be used to

---

[65]    April 25th Letter at 6, 8.

[66]    H.R. Rep. No. 114-602, pt. 1, at 45 (2016).

[67]    Legislative Assembly Address.

amortize bills left pending from previous budgets."[68]  The FY18 Budget appropriates $16 million for "legal judgments against" Puerto Rico, further demonstrating that the Oversight Board and Commonwealth intend to, among other things, use the Restricted Revenues to pay certain other prepetition junior claims ahead of Constitutional Debt.

>    **B.**      **FY18 Budget Includes $750 Million Budgetary Cushion**

155.    Spread throughout the FY18 Budget is at least $750 million in "expenses" that serve no purpose other than covering non-budgeted expenses.  This amount is only moderately less than the total amount of Restricted Revenues dedicated to Constitutional Debt, indicating that the Commonwealth's illegal confiscation of Restricted Revenues is being used to fund non-specified, lower priority and non-essential expenditures.  These "expenses" in fact comprise approximately 8% of all expenses in the FY18 Budget.

156.    Governor Rosselló promised a new era of fiscal discipline premised on a bottoms-up "zero based budgeting."  During his May 31 Budget Address to the Legislative Assembly, the Governor proclaimed:

>    In the past, money was taken from areas, budgeted expenses were increased and the debt was hidden.  That is over.
>
>    This budget will be very structured and include components from the zero-based budgeting method so that all fiscal transactions in the government's operations are transparent and justified.[69]

157.    The premise of zero based budgeting is that the Commonwealth starts at a "zero base" and then builds its budget up based solely on identifiable and justifiable expenditures.  The inclusion of hundreds of millions of dollars of "cushion" is antithetical to the

---

[68]    *See Budget Includes Significant Funding for Unspecified 'Other Operational Costs,'* Reorg Res. (June 8, 2017 6:29 AM), attached hereto as **Exhibit Y**.

[69]    Legislative Assembly Address.

very purpose of a zero based budget. [70] Despite its commitment to zero based budgeting, the

FY18 Budget is more business-as-usual and includes significant "cushions."

### (i)   $205 Million In Rainy Day Funds

158.   The FY18 Budget treats as "expenses" $205 million in funds that the

Commonwealth will build and maintain as a sort of "rainy day fund."[71]  In particular, the FY18

Budget includes two line items that function as a rainy day fund.  *First*, the FY18 Budget

includes a "Liquidity Reserve" of $190 million.  *Second*, the FY18 Budget includes an

"Emergency Fund" of $15 million to cover unexpected and unforeseen expenses caused by

calamities such as wars or natural disasters.[72]  Together, these $205 million in cushion-funds are

not appropriated for any known or expected expenditure (essential or otherwise) that is likely to

occur in fiscal year 2018.

159.   While a "rainy day fund" is nice to have, it is impossible to see how this is

an "essential service" or how it can be justified in the face of PROMESA's direction to respect

the Constitutional Debt's lawful liens and priorities.  Nonetheless, the Commonwealth and

Oversight Board claim that these amounts will be spent in fiscal year 2018, leaving insufficient

resources to pay Constitutional Debt.

### (ii)   The So-Called "Reconciliation Adjustments"

160.   The March Fiscal Plan allocated $592 million in Reconciliation

Adjustments for fiscal year 2018, and the FY18 Budget specifies the use of at least $545 million,

---

[70]   The number of line items (35 lines totaling over $540 million in the special appropriations) in the FY18 Budget that precisely match the FY17 Budget further belies the Commonwealth's commitment to zero-based budgeting.

[71]   The Commonwealth's initial FY18 Budget included an extra $100 million in rainy day funds, raising the total amount to $305 million.  Although the House of Representatives lowered these funds to $205 million, the extra $100 million appears to have been used to increase appropriations to the University of Puerto Rico, Department of Education, and other agencies.

[72]   Act 91 of 1966, which created the present-day Emergency Fund,  provides that, if during any fiscal year there are insufficient funds to pay principal and interest on Constitutional Debt when such payments are due, a transfer from the Emergency Fund may be made to meet such government obligations. 3 L.P.R.A. §§ 460, 465.

though the remaining $47 million is likely hidden in other line items.  The $545 million in

identifiable Reconciliation Adjustments demonstrate that the Oversight Board and

Commonwealth are using the Reconciliation Adjustment to fund *new and plainly non-essential*

expenditures, and are not concerned with the historical understatement of expenses.

161.    As discussed above at paragraphs 129-135, the stated reason for the

Reconciliation Adjustment was a concern that the Commonwealth's expenses would exceed its

FY17 Budget, thereby leading to an understatement of expenses in later years under the March

Fiscal Plan.  However, before they even know if the Commonwealth's expenses will exceed the

FY17 Budget, the Oversight Board and Commonwealth are *already* using the Reconciliation

Adjustment to budget more than $500 million in extra expenses.  The very fact that the

Commonwealth is appropriating the Reconciliation Adjustment before it knows whether any

"adjustment" to fiscal year 2017 expense projections is warranted demonstrates that the

Reconciliation Adjustments is nothing more than a budgetary cushion that the Commonwealth

intends to use however it deems fit.

162.    At least $423 million of the Reconciliation Adjustment is allocated to

provide additional funding—ranging from 20% to more than 600% compared to the FY17

Budget—to departments that cannot be explained by the "historical understatement" of expenses.

For example, $22 million of the Reconciliation Adjustment is allocated to the PRHTA, which did

not receive *any* direct general fund appropriations in fiscal year 2017.  Nevertheless, the

Commonwealth—given $592 million in "Reconciliation Adjustments" to spend in fiscal year

2018 alone—used the Reconciliation Adjustment to justify increased funding to PRHTA.  As

another example, in fiscal year 2017, the Commonwealth appropriated only $2 million to the

Public Private Partnerships Authority (the "PPPA").  Under the FY18 Budget, however, $15

million in Reconciliation Adjustment funds are allocated to the PPPA, suggesting that the PPPA
historically spends *more than seven times* its total budget.  Even if this were historically accurate,
the FY18 Budget provides that, rather than impose fiscal discipline on the PPPA (or require it to
submit a zero based budget), the Oversight Board has decided instead to simply give it more
money.

163.    In order to justify these significant Reconciliation Adjustment
appropriations, the Oversight Board must have concluded either that the Commonwealth was not
adopting zero based budgeting methodologies and therefore required significant budgetary
cushions or that the relevant entities submitted zero based budgets with significant *new*
expenditures.   In either case, the Reconciliation Adjustment is being used in a manner that is
antithetical to its stated purpose, and its status as an "expense" provides an additional basis for
the Commonwealth to claim to have insufficient resources to pay Constitutional Debt.

C.    **Oversight Board Obfuscates and Negates Significant "Additional" Revenues**

164.    The FY18 Budget and May 31 amendments to the March Fiscal Plan
include *more than $1 billion in additional revenues* not set forth in the March Fiscal Plan.  Yet,
consistent with their longstanding desire to keep average annual debt service below $800 million,
the Oversight Board and Commonwealth engaged in accounting gimmicks, obfuscation, and
additional spending to negate these additional revenues.  As a further result of the Oversight
Board's and Commonwealth's contortions, they guaranteed that the Commonwealth would
continue to claim to have insufficient resources to pay Constitutional Debt.

165.    Despite claiming on April 25, 2017 to Senators Cotton and Tillis that the
March Fiscal Plan "increases revenue to the maximum extent[] possible" and that creditors
unhappy with the March Fiscal Plan were simply asking for "more frothy and optimistic
assumptions," the Oversight Board in fact identified $1.03 billion in "additional revenues" not

66

enumerated in the March Fiscal Plan.[73]   In particular, the Oversight Board and Commonwealth

identified $734 million in "additional revenue" from pension reimbursement and asset sales:

- "***Additional revenue*** of $390 million [that] should be added to the general fund due to pension reimbursements from other agencies and asset sales"; and

- "***Additional revenue*** of $344 million [that] should be added to the other income fund due to pension reimbursements from other agencies and asset sales."[74]

166.     Moreover, on May 5, 2017, President Trump signed into law the

Consolidated Appropriations Act, Pub. L. No. 115-31, pursuant to which Congress allocated

$296 million in additional Medicaid funding for Puerto Rico that was not included in the March

Fiscal Plan.  The FY18  Budget and Fiscal Plan amendments acknowledge this additional

funding: "Puerto Rico will receive an ***additional*** $295.9 million in one-time funding for its

Medicaid program."[75]

167.     However, at the same time that they identified $1.03 billion in "additional

revenues" for fiscal year 2018, the Oversight Board and Commonwealth curiously made other—

offsetting—revenue adjustments to the FY18 Budget intended to negate these additional

revenues.  *First*, without any explanation, the Oversight Board and Commonwealth decreased

fiscal year 2018 projected tax revenues by $215 million (compared to the fiscal year 2018

---

[73]   April 25th Letter 3, 10.

[74]   May 31st Letter 1 (emphasis added).  The Commonwealth's identification of more than $730 million in additional revenues from the sale of pension assets suggests that, contrary to their repeated claims, the pension systems have not fully reached pay-go thresholds.  Upon information and belief, Puerto Rico's pensions hold substantially more assets that could further reduce the Commonwealth's pension liabilities beyond fiscal year 2018.

[75]   Notably, on May 23, 2017, President Trump proposed his fiscal year 2018 budget, which includes full restoration of Medicaid funding for Puerto Rico, totaling $862 million for the U.S. fiscal year 2018.  Although this proposal has not passed, the Oversight Board and Commonwealth continue to project that the Commonwealth will not receive a single dollar beyond the $296 million allocated under the Consolidated Appropriations Act.

assumptions certified in the March Fiscal Plan).[76]  *Second*, the Oversight Board and

Commonwealth "reduced" "non-general fund Sales and Use Tax revenues . . . by $519

[million]."[77]  Together, the $215 million reduction in projected tax revenues and $519 million

reduction in sales and use tax revenues curiously resulted in $734 million of revenue reductions,

*exactly* the same amount as the $734 million in "additional revenues" generated from pension

reimbursements and asset sales.

168.    Because the additional pension-related revenues in fiscal year 2018 were

completely negated by the Oversight Board's other—unrelated—revenue reductions, total

projected revenues increased by only $296 million (from $18.435 billion to $18.731 billion),

equal to the amount of supplemental Medicaid funding.  The Oversight Board, however, refuses

to explain how this $296 million in incremental fiscal year 2018 revenue will affect the March

Fiscal Plan.  The Oversight Board's refusal appears consistent with its continual practice of

making sure that debt service remains unchanged regardless of the facts, and making new-found

funds disappear to further that end through financial gimmicks and increased spending.  For

instance, as discussed above at paragraph 149, it appears that the Oversight Board and

Commonwealth have in fact increased pension payments by $285 million in fiscal year 2018.

**D.    Continued Failure To Reduce Expenses or Identify Essential Expenses**

169.    The FY18 Budget highlights the Oversight Board's failure to identify

"essential" services, so that they can "ensure the funding of *essential* public services" under

Section 201(b)(1)(B) of PROMESA.  Despite telling Senators Cotton and Tillis that it had

---

[76]    May 31st Letter, Appendix A.

[77]    *Id.*; *see also Budget Includes Significant Funding for Unspecified 'Other Operational Costs,'* Reorg Res. (June
8, 2017 6:29 AM).  On information and belief, these funds were removed because the Oversight Board and
Commonwealth intend to interplead or otherwise segregate such funds pending resolution of disputes between
the Commonwealth and COFINA, and not because the Commonwealth will collect $519 million *less* in sales
tax revenues in fiscal year 2018.  Nevertheless, the Oversight Board's amendments to the March Fiscal Plan
account for this by *reducing revenues* by $519 million.

"reduced spending … to the maximum extent[] possible," the FY18 Budget tells a different story.

170.    *First*, general fund expenditures in fiscal year 2018 will *exceed* expenditures budgeted in fiscal year 2017.  The fiscal year 2017 budget included $8.755 billion in total non-debt expenditures.[78]  The Commonwealth therefore intends to spend $806 million *more* in fiscal year 2018 than fiscal year 2017, a 9.2% *increase* in non-debt expenditures. Similarly, in fiscal year 2014, the last year in which audited financials exist, the Commonwealth spent $8.95 billion in non-debt expenditures.  The Commonwealth will therefore spend $612 million *more* in fiscal year 2018 than fiscal year 2014, a 6.8% *increase* in non-debt expenditures.[79]  Although the population of Puerto Rico has *decreased* since 2014, the Oversight Board maintains that it is not possible to reduce overall spending levels to pre-2014 levels.

171.    *Second*, although the March Fiscal Plan called for "expense measures" that would save $950 million in fiscal year 2018, and Governor Rosselló touts making "approximately $1 billion in expenditure cuts," the FY18 Budget demonstrates that such expense reductions are largely illusory.[80]  For example, while the Commonwealth purports to reduce payroll costs by $424 million, the unexplained increase in pension funding negates this reduction significantly.  Further, the "expense reductions" are calculated *before* giving effect to the Reconciliation Adjustment expense, rainy-day funds, and other "below the line" expenses that one must ignore in order to see reductions.  Finally, despite the Commonwealth's proclaimed

---

[78]   The 2017 budget included $231.5 million in debt-service appropriations, bringing total expenditures to $8.987 billion.

[79]   The 2014 budget included $359 million in debt service appropriations, bringing total expenditures to $9.309 billion.  *See* General Fund Consolidated Budget by Expense Type and Source of Funds, Fiscal Years 2014 to 2017, http://www2.pr.gov/presupuestos/AdoptedBudget2016-2017/Tablas%20Estadsticas/02.pdf (last visited June 20, 2017); *see also* EY Report.

[80]   Letter from Ricardo Rosselló Nevares, Governor of P.R., to Fin. Oversight & Mgmt. Bd. for P.R. (June 20, 2017), attached hereto as **Exhibit Z**.

austerity, it recently "found" $40 million in revenues that it has announced it will use to reduce

proposed subsidy cuts to the University of Puerto Rico.[81]

172.    *Third*, the FY18 Budget reveals numerous expenses that, on their face,

could not possibly be characterized as "essential."  For example, $75 million is appropriated to

arts, recreation, and lifestyle programs, including appropriations for:

- Department of Sports and Recreation ($39.2 million)

- Institute of Puerto Rican Culture ($12.6 million)

- Public Broadcasting Corporation ($7.3 million)

- Musical Arts and Stagecraft Corporation ($6.2 million)

- Conservatory of Music ($4.2 million)

- Corporation of the Center for Fine Arts ($2.4 million)

- School of Visual Arts ($1.9 million)

- State Historic Preservation Office ($1.1 million)

- Photojournalism Workshop ($280,000)

- Model Forest of Puerto Rico ($223,000)

- Ballet Conceirto ($88,000)

173.    Additional expenses include $1.8 million appropriated to the Boys & Girls

Club, $1.45 million appropriated to "Horse Racing Industry and Sport," $13.72 million to the

"Office of the Governor," and $5.2 million for the creation of two *new* departments, the "Office

of the General Inspector" and the "Real Estate Property Administration."  The Chairman of the

---

[81]    *Puerto Rico Allocating Budget Resources To Ease University of Puerto Rico Funding Cuts*, Debtwire (June 16, 2017 3:12 PM), attached hereto as **Exhibit AA**.

House Treasury Committee, Antonio Soto, recently noted that the FY18 Budget included

funding for festivals and carnivals that "*maybe* aren't clearly defined as essential services."[82]

      174.    Following the Commonwealth's public release of its FY18 Budget and the

disclosure that the Commonwealth's cash position had improved by more than $859 million

compared to projections in the March Fiscal Plan,[83] the Oversight Board—for the very first

time—requested that the Commonwealth define what services constitute "essential" services:

> On that note, we must reiterate our earlier requests urging the
> administration to make and communicate as soon as possible the
> necessary public policy determinations with respect to what it
> understands constitute "essential services" in the context of
> PROMESA. As you know, in light of Puerto Rico's fiscal situation, a
> PROMESA-compliant budget needs to reflect appropriate allocations
> for the adequate funding of essential services, pension benefits,
> investments to spur growth and other PROMESA priorities. We can
> no longer afford business as usual.[84]

      175.    Despite having repeatedly certified the March Fiscal Plan as satisfying the

requirements of PROMESA, the Oversight Board's letter acknowledges that, because the

Commonwealth and Oversight Board have never defined "essential services," the March Fiscal

Plan in fact did not comply with PROMESA.  Accordingly, the Oversight Board's repeated

---

[82]   *House Treasury Committee Chief Says PROMESA Board Concerns Factored Into Budget Process*, Reorg Res. (June 9, 2017) (emphasis added) (internal quotation marks omitted), attached hereto as **Exhibit BB**.

[83]   According to a recent May 26, 2017 Department of Treasury Report, the Commonwealth's "Bank Cash Position" as of June 30, 2017 is estimated to equal $1.15 billion; *i.e.*, more than $1.1 billion in cash the Commonwealth is sitting on while it refuses to make any payments to bondholders.  *See* Puerto Rico Department of Treasury, Treasury Single Account ("TSA") Cash Flow Actual-to-Forecast Comparison (May 26, 2017).  In contrast, when certifying the March Fiscal Plan only two months earlier, the Commonwealth and Oversight Board projected that their "Bank Cash Position" on June 30, 2017 would total $291 million.  March Fiscal Plan 30.  The Commonwealth's liquidity therefore increased by $859 million from March to May 2017, demonstrating that the projections underlying the March Fiscal Plan were substantially understated, or that the Commonwealth and Oversight Board are impermissibly using Title III to build large cash deposits.  The Commonwealth's increasing cash deposits is, of course, a result of its unlawfully confiscating Restricted Revenues at the expense of Constitutional Debt, and then failing to appropriate those revenues under the fiscal year 2017 budget. Further, the Commonwealth's reported $1.15 billion in cash on hand as of June 30, 2017 is in addition to the separate $395 million in contingency deposits funded during the final weeks of fiscal year 2017, and the approximately $150 million in prior Clawback Revenues held at a commercial bank.

[84]   June 16th Letter, at 3.

admonitions that the amount available for debt service under the March Fiscal Plan could not be

revised was based on the (now) admittedly false assumption that neither the Oversight Board nor

the Commonwealth had any obligation to define "essential services."

### E.   Governor Rosselló Announces Significant Tax Cuts

176.   On May 31, 2017, Governor Rosselló announced his intention to

implement large tax cuts for the people of Puerto Rico.

> I am announcing to you that I will be submitting legislation to
> reform the tax system and do our people justice.
>
> The reform I will be submitting for the consideration of the
> Legislative Assembly will include the following: ***Tax relief for
> salaried individuals over $200 million that will increase the
> income and reduce the effective tax rate***.  I repeat: In this
> ferocious fiscal environment, ***we have found a way to lower the
> tax burden on the majority of Puerto Ricans***, primarily on the
> middle class and the most vulnerable.[85]

177.   The Governor also "found a way" to propose eliminating certain sales

taxes imposed on business-to-business ("B2B") services and transactions:

> We will establish a credit of $100 per dependent for any annual
> income up to $80,000.  By keeping our commitment, ***we will
> reduce the B2B tax by half, from 4% to 2%, as part of the first
> phase to fully eliminate this tax***.[86]

\*          \*          \*          \*

178.   The relief sought in this Complaint is ripe for adjudication by this Court

because, among other reasons, (1) the Commonwealth has not segregated Restricted Revenues,

but instead has confiscated and misappropriated Restricted Revenues in clear violation of

Plaintiffs' rights; (2) the Commonwealth has indicated in the March Fiscal Plan and FY18

---

[85]   Legislative Assembly Address (emphasis added).

[86]   Legislative Assembly Address; *see* Act of May 29, 2015, No.72-2015.

Budget that it will not segregate the Restricted Funds in the future or limit their use to payment of Constitutional Debt as required under Puerto Rico law; (3) the Commonwealth defaulted on its obligations to pay amounts owing on its Constitutional Debt, notwithstanding the collection of Restricted Revenues to pay Constitutional Debtholders; and (4) the Commonwealth intends to continue defaulting on its obligations to pay amounts owing on its Constitutional Debt, notwithstanding the continued collection of Restricted Revenues to pay Constitutional Debtholders.

<u>**COUNT ONE**</u>

**Request For A Declaratory Judgment That Under Puerto Rico Law The Special Property Tax Revenues Are Restricted And That Defendants Are Prohibited From Collecting or Using The Special Property Tax Revenues For Any Purpose Other Than <u>Paying Constitutional Debt</u>**

179.     Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

180.     An actual, ripe, and justiciable controversy has arisen between the parties regarding whether the Special Property Tax Revenues are restricted by Puerto Rico law and cannot be collected or used by Defendants for any purpose other than paying Constitutional Debt.

181.     No provision in PROMESA authorizes Defendants to disregard Puerto Rico's Constitution or applicable Puerto Rico law, as in effect prior to the enactment of PROMESA, concerning Plaintiffs' interests in, and Defendants' obligations and limitations on use with respect to, the Special Property Tax Revenues.

182.     For the reasons stated herein, Plaintiffs are entitled to a declaratory judgment that under Puerto Rico law, the Special Property Tax Revenues are restricted and

cannot be collected or used by Defendants for any purpose except to satisfy the

Commonwealth's payment obligations with respect to outstanding Constitutional Debt.

## COUNT TWO

**Request For A Declaratory Judgment That Under Puerto Rico Law The Clawback
Revenues Are Restricted And That Defendants Are Prohibited From Collecting Or Using
The Clawback Revenues For Any Purpose Other Than
Paying Constitutional Debt**

183.    Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth

herein.

184.    An actual, ripe, and justiciable controversy has arisen between the parties

regarding whether the Clawback Revenues are restricted by Puerto Rico law and cannot be

collected or used by Defendants for any purpose other than paying Constitutional Debt.

185.    No provision in PROMESA authorizes Defendants to disregard Puerto

Rico's Constitution or applicable Puerto Rico law, as in effect prior to the enactment of

PROMESA, concerning Plaintiffs' interests in, and Defendants' obligations and limitations on

use with respect to, Clawback Revenues.

186.    For the reasons stated herein, Plaintiffs are entitled to a declaratory

judgment that under Puerto Rico law, the Clawback Revenues are restricted and cannot be

collected or used by Defendants for any purpose except to satisfy the Commonwealth's payment

obligations with respect to outstanding Constitutional Debt.

## COUNT THREE

**Request For A Declaratory Judgment That Plaintiffs Have, And The Commonwealth
Lacks, Equitable Or Beneficial Property Interests In The Special Property Tax Revenues**

187.    Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth

herein.

188.    An actual, ripe, and justiciable controversy has arisen between the parties regarding Plaintiffs' equitable and beneficial property interests in the Special Property Tax Revenues and the Commonwealth's lack of equitable and beneficial property interests in these proceeds.

189.    Neither the Commonwealth nor its taxpayers have any equitable or beneficial interests in the Special Property Tax Revenues.  The Commonwealth is a mere conduit for transferring the Special Property Tax Revenues collected under Act No. 83.  The Commonwealth's collection and segregation of the Special Property Tax Revenues is for the exclusive purpose of paying Constitutional Debt and thus is for the benefit of Plaintiffs, as Constitutional Debtholders.

190.    No provision in PROMESA authorizes Defendants to disregard Puerto Rico's Constitution or applicable Puerto Rico law, as in effect prior to the enactment of PROMESA, concerning Plaintiffs' interests in, and Defendants' obligations and limitations on use with respect to, the Special Property Tax Revenues.

191.    For the reasons stated herein, Plaintiffs are entitled to a declaratory judgment that (i) the Commonwealth is a mere conduit for the Special Property Tax Revenues and lacks and equitable or beneficial property interest in the Special Property Tax Revenues and (ii) Plaintiffs, as Constitutional Debtholders, have equitable and beneficial property interests in the Special Property Tax Revenues.

## **COUNT FOUR**

**Request For A Declaratory Judgment That Plaintiffs Have, And The Commonwealth
Lacks, Equitable Or Beneficial Property Interests In The Clawback Revenues**

192.    Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

193.    An actual, ripe, and justiciable controversy has arisen between the parties regarding Plaintiffs' equitable and beneficial property interests in Clawback Revenues and the Commonwealth's lack of equitable and beneficial property interests in these proceeds.

194.    Neither the Commonwealth nor its taxpayers have any equitable or beneficial interests in the Clawback Revenues.  The Commonwealth is a mere conduit for transferring the Clawback Revenues to the Constitutional Debtholders.  The Commonwealth's collection and segregation of the Clawback Revenues is for the exclusive purpose of paying debt service for Constitutional Debt and thus is for the benefit of Plaintiffs, as Constitutional Debtholders.

195.    No provision in PROMESA authorizes Defendants to disregard Puerto Rico's Constitution or applicable Puerto Rico law, as in effect prior to the enactment of PROMESA, concerning Plaintiffs' interests in, and Defendants' obligations and limitations on use with respect to, Clawback Revenues.

196.    For the reasons stated herein, Plaintiffs are entitled to a declaratory judgment that (i) the Commonwealth is a mere conduit for the Clawback Revenues and lacks any equitable or beneficial property interest in the Clawback Revenues and (ii) Plaintiffs, as Constitutional Debtholders, have equitable and beneficial property interests in the Clawback Revenues.

## COUNT FIVE

### Request For A Declaratory Judgment That Plaintiffs Have A Statutory Lien On The Special Property Tax Revenues

197.    Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

76

198.    An actual, ripe, and justiciable controversy has arisen between the parties regarding the validity, priority, and extent of Plaintiffs' lien on or other interests in the Special Property Tax Revenues.

199.    Plaintiffs have a statutory lien, within the meanings of 11 U.S.C. §§ 101(37) and (53), on the Special Property Tax Revenues because, solely by force of the Constitution and Act 83, the Commonwealth's pledge of these special tax proceeds to pay Constitutional Debt constitutes a charge against or interest in the Special Property Tax Revenues to secure payment of the Constitutional Debt.

200.    No provision in PROMESA authorizes Defendants to disregard Puerto Rico's Constitution or applicable Puerto Rico law, as in effect prior to the enactment of PROMESA, concerning Plaintiffs' interests in, and Defendants' obligations and limitations on use with respect to, the Special Property Tax Revenues.

201.    For the reasons stated herein, Plaintiffs are entitled to a declaratory judgment that Constitutional Debt is secured by a statutory lien on the Special Property Tax Revenues.

## COUNT SIX

### Request For A Declaratory Judgment That
### Plaintiffs Have Statutory Liens On Clawback Revenues

202.    Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

203.    An actual, ripe, and justiciable controversy has arisen between the parties regarding the validity, priority, and extent of Plaintiffs' liens on or other interests in the Clawback Revenues.

204.     Plaintiffs have statutory liens on the Clawback Revenues within the meaning of 11 U.S.C. §§ 101(37) and (53).  Solely by force of the Constitution and the statutes authorizing issuance of the PRHTA, PRCCDA, PRIFA and MBA bonds and obligations, the Commonwealth's pledge of Clawback Revenues to pay Constitutional Debt constitutes a charge against or interest in the Clawback Revenues to secure payment of the Constitutional Debt.

205.     No provision in PROMESA authorizes Defendants to disregard Puerto Rico's Constitution or applicable Puerto Rico law, as in effect prior to the enactment of PROMESA, concerning Plaintiffs' interests in, and Defendants' obligations and limitations on use with respect to, Clawback Revenues.

206.     For the reasons stated above, Plaintiffs are entitled to a declaratory judgment that Constitutional Debt is secured by statutory liens on the Clawback Revenues.

## COUNT SEVEN

### Request For A Declaratory Judgment That Plaintiffs' Liens On Clawback Revenues Are Liens On Special Revenues

207.     Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

208.     An actual, ripe, and justiciable controversy has arisen between the parties regarding whether Plaintiffs' lien on the Clawback Revenues constitutes a lien on special revenues within the meaning of 11 U.S.C. §§ 902(2)(B), 922, and 928.

209.     Plaintiffs have liens on the Clawback Revenues.  These liens are statutory liens arising from the Puerto Rico Constitution and statutes as described in paragraphs 76-78 supra.

210.     The Clawback Revenues constitute special revenues because they are proceeds from special excise taxes imposed on particular activities or transactions.  *See* 11

U.S.C. § 902(2)(B) (defining special revenues as "special excise taxes imposed on particular activities or transactions").

211.    Under 11 U.S.C. § 922(d), incorporated into PROMESA by Section 301, the automatic stay does not operate as a stay of the application of the Clawback Revenues to payment of the Constitutional Debt during the Commonwealth's Title III case.

212.    Under 11 U.S.C. § 928, incorporated into PROMESA by Section 301, any Clawback Revenues acquired by the Commonwealth after the commencement of these Title III proceedings shall remain subject to any lien on the Clawback Revenues that existed before the commencement of the Title III proceedings.

213.    No provision in PROMESA authorizes Defendants to disregard Puerto Rico's Constitution or applicable Puerto Rico law, as in effect prior to the enactment of PROMESA, concerning Plaintiffs' interests in, and Defendants' obligations and limitations on use with respect to, Clawback Revenues.

214.    For the reasons stated herein, Plaintiffs are entitled to a declaratory judgment that (i) the Clawback Revenues are special revenues within the meaning of 11 U.S.C. § 902(2)(B) and must be applied in accordance with 11 U.S.C. §§ 922(d) and 928, and (ii) pursuant to 11 U.S.C. § 922(d), the automatic stay does not operate as a stay with respect to the application of the Clawback Revenues to payment of Constitutional Debt.

## COUNT EIGHT

**Request For A Declaratory Judgment That The
Commonwealth's Diversion Of The Restricted Revenues, Without Just Compensation To
Plaintiffs, Is An Unlawful Taking Under The Fifth Amendment To The United States
Constitution**

215.    Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

216.    An actual, ripe, and justiciable controversy has arisen between the parties regarding whether there has been an unlawful taking of Plaintiffs' property under the Fifth Amendment to the United States Constitution, which applies to Puerto Rico, because of the Commonwealth's use of the Restricted Revenues for purposes other than repaying Constitutional Debt.

217.    The Commonwealth has made clear to Plaintiffs that it will not segregate the Restricted Revenues and has already used, and intends to continue to use, the Restricted Revenues for purposes other than repayment of Constitutional Debt.

218.    The Commonwealth has taken and intends to continue to take these actions in derogation of Plaintiffs' property interests without providing just compensation.

219.    No provision in PROMESA authorizes Defendants to disregard Puerto Rico's Constitution or applicable Puerto Rico law, as in effect prior to the enactment of PROMESA, concerning Plaintiffs' interests in, and Defendants' obligations and limitations on use with respect to, the Restricted Revenues.

220.    For the reasons stated above, Plaintiffs are entitled to a declaratory judgment that the Commonwealth's use of Restricted Revenues for any purpose other than payment of Constitutional Debt, without just compensation, would constitute an unlawful taking of property under the Takings Clause of the Fifth Amendment to the United States Constitution, which is applicable to the Commonwealth.

### COUNT NINE

**Request For A Declaratory Judgment That Puerto Rico Law Requires The Special Property Tax Revenues To Be Segregated And Deposited Into A Designated Account And Not Commingled Or Used For Purposes Other Than Payment Of Constitutional Debt**

Document     Page 81 of 87

221.     Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

222.     An actual, ripe, and justiciable controversy has arisen between the parties regarding whether Puerto Rico law requires Defendants to segregate the Special Property Tax Revenues and prohibits their diversion for purposes other than repayment of Constitutional Debt.

223.     Puerto Rico law requires the Commonwealth to (i) impose the Special Property Tax for the payment of debt service for Constitutional Debt, (ii) collect the Special Property Tax Revenues levied to repay Constitutional Debt and deposit such revenues in a segregated debt retirement fund, and (iii) use such revenues only to repay the outstanding Constitutional Debt and for no other purpose.

224.     Defendants have made clear to Plaintiffs that they have not and will not segregate the Special Property Tax Revenues and have already used, and intend to continue to use, the Special Property Tax Revenues for purposes other than repayment of Constitutional Debt, in contravention of Puerto Rico law and in derogation of Plaintiffs' rights.

225.     No provision in PROMESA authorizes Defendants to disregard Puerto Rico's Constitution or applicable Puerto Rico law, as in effect prior to the enactment of PROMESA, concerning Plaintiffs' interests in, and Defendants' obligations and limitations on use with respect to, the Special Property Tax Revenues.

226.     For the reasons stated herein, holders of Constitutional Debt, including Plaintiffs, are entitled to a declaratory judgment that, under Puerto Rico law, Special Property Tax Revenues must be (i) segregated and deposited into a designated account, and (ii) not commingled with other funds of the Commonwealth or used for any purpose other than repaying the Plaintiffs, as Constitutional Debtholders.

## COUNT TEN

**Request For A Declaratory Judgment That Puerto Rico Law Requires The Clawback Revenues To Be Segregated And Deposited Into A Designated Account And Not Commingled Or Used For Purposes Other Than Payment Of Constitutional Debt**

227.    Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth herein.

228.    An actual, ripe, and justiciable controversy has arisen between the parties regarding whether Puerto Rico law requires Defendants to segregate the Clawback Revenues and prohibits their diversion for purposes other than repayment of Constitutional Debt.

229.    Puerto Rico law requires the Commonwealth to (i) collect and deposit Clawback Revenues in segregated trust accounts, (ii) apply the Clawback Revenues solely for the payment of Constitutional Debt when the Commonwealth's available resources are insufficient to pay Constitutional Debt in full, and (iii) use Clawback Revenues only as prescribed in the statutes authorizing their collection and allocation.

230.    Defendants have made clear to Plaintiffs that, despite their continued default on Constitutional Debt, they have not and will not segregate the Clawback Revenues and have already used, and intend to continue to use, the Clawback Revenues for purposes other than repayment of Constitutional Debt, in contravention of Puerto Rico law and in derogation of Plaintiffs' rights.

231.    No provision in PROMESA authorizes Defendants to disregard Puerto Rico's Constitution or applicable Puerto Rico law, as in effect prior to the enactment of PROMESA, concerning Plaintiffs' interests in, and Defendants' obligations and limitations on use with respect to, Clawback Revenues.

232.     For the reasons stated herein, holders of Constitutional Debt, including

Plaintiffs, are entitled to a declaratory judgment that, under Puerto Rico law, Clawback Revenues

must be (i) segregated and deposited into a designated account, and (ii) not commingled with

other funds of the Commonwealth or used for any purpose other than repaying the Plaintiffs, as

Constitutional Debtholders.

## COUNT ELEVEN

### Request For Injunctive Relief Requiring Defendants To Segregate And Preserve The Restricted Revenues

233.     Plaintiffs hereby incorporate the preceding paragraphs as if fully set forth

herein.

234.     Defendants have confiscated and misappropriated the Restricted Revenues

in violation of Puerto Rico law, PROMESA and Plaintiffs' rights thereunder.  The March Fiscal

Plan and FY18 Budget make clear that this confiscation and misappropriation are not temporary,

and that Defendants will (i) continue to confiscate the Restricted Revenues in violation of Puerto

Rico law and PROMESA, (ii) not segregate the Restricted Revenues for the purposes required

under Puerto Rico law and PROMESA, (iii) continue to misappropriate and use the Restricted

Revenues in violation of Puerto Rico law and PROMESA, and (iv) continue to default on their

obligations to pay amounts owing to Constitutional Debtholders.  Defendants' unlawful use of

the Restricted Revenues directly and irreparably harms Plaintiffs, as Constitutional Debtholders,

and Plaintiffs have no adequate remedy at law.

235.     Plaintiffs seek an injunction enjoining Defendants from continuing to

confiscate and misappropriate the Restricted Revenues, and directing Defendants to segregate

and preserve the Restricted Revenues for payment of Constitutional Debt in accordance with the

constitutional, statutory, and contractual obligations specified above.

236.    No provision in PROMESA authorizes Defendants to disregard Puerto Rico's Constitution or applicable Puerto Rico law, as in effect prior to the enactment of PROMESA, concerning Plaintiffs' interests in, and Defendants' obligations and limitations on use with respect to, the Restricted Revenues.

237.    For the reasons stated herein, Plaintiffs are entitled to such an injunction notwithstanding PROMESA.

## **REQUESTS FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request entry of a judgment:

(1)    On Count One, declaring that, under Puerto Rico law the Special Property Tax Revenues are restricted funds by law that cannot be used by the Commonwealth for any purpose except to satisfy the Commonwealth's payment obligations with respect to outstanding Constitutional Debt;

(2)    On Count Two, declaring that, under Puerto Rico law the Clawback Revenues are restricted funds by law that cannot be used by the Commonwealth while it is in default on the Constitutional Debt for any purpose except to satisfy the Commonwealth's payment obligations with respect to outstanding Constitutional Debt;

(3)    On Count Three, declaring that (i) the Commonwealth is a conduit for the Special Property Tax Revenues and lacks an equitable or beneficial property interest in the Commonwealth Debt Redemption Fund; and (ii) Plaintiffs have equitable and beneficial property interests in the Special Property Tax Revenues;

(4)    On Count Four, declaring that (i) the Commonwealth is a mere conduit for the Clawback Revenues and lacks an equitable or beneficial property interest in the

Clawback Revenues; and (ii) Plaintiffs have equitable and beneficial property interests in the Clawback Revenues;

(5)      On Count Five, declaring that Plaintiffs have a statutory lien on the Special Property Tax Revenues;

(6)      On Count Six, declaring that Plaintiffs have statutory liens on the Clawback Revenues;

(7)      On Count Seven, declaring that (i) the Clawback Revenues are special revenues within the meaning of 11 U.S.C. § 902(2)(B) and must be applied in accordance with 11 U.S.C. §§ 922(d) and 928, and (ii) pursuant to 11 U.S.C. § 922(d), the automatic stay does not operate as a stay of application of the Clawback Revenues to payment of Constitutional Debt;

(8)      On Count Eight, declaring that the Commonwealth's diversion of the Restricted Revenues, or any other impairment of Plaintiffs' property interests in the Restricted Revenues, without just compensation is an unlawful taking under the Fifth Amendment to the United States Constitution;

(9)      On Count Nine, declaring that the Special Property Tax Revenues must be segregated and deposited into a designated account and not commingled with other funds of the Commonwealth or used for any purpose other than repayment of Constitutional Debt;

(10)      On Count Ten, declaring that the Clawback Revenues must be segregated and deposited into a designated account and not commingled with other funds of the Commonwealth or, while the Commonwealth is in default on the Constitutional Debt, used for any purpose other than repayment of Constitutional Debt;

(11)     On Count Eleven, enjoining Defendants from continuing to divert the Restricted Revenues, and directing Defendants to segregate and preserve the Restricted Revenues for payment of Constitutional Debt; and

(12)     On all Counts, granting such other and further relief to Plaintiffs as the Court may deem proper.[87]

*[Remainder Of Page Intentionally Left Blank]*

---

[87] The disposition of Plaintiffs' claims in this adversary proceeding does not require this Court to determine at this time whether Plaintiffs are entitled to adequate protection, but Plaintiffs reserve the right to seek adequate protection at the appropriate time.

Dated: June 27, 2017                    Respectfully submitted,


                                        /s/ Mark T. Stancil
                                        Lawrence S. Robbins (admitted *pro hac vice*)
                                        Mark T. Stancil (admitted *pro hac vice*)
                                        Gary A. Orseck (admitted *pro hac vice*)
                                        Kathy S. Zecca (admitted *pro hac vice*)
                                        Ariel N. Lavinbuk (admitted *pro hac vice*)
                                        Donald Burke (admitted *pro hac vice*)
                                        ROBBINS, RUSSELL, ENGLERT, ORSECK,
                                            UNTEREINER & SAUBER LLP
                                        1801 K Street, NW
                                        Washington, D.C. 20006
                                        Telephone: (202) 775-4500
                                        Facsimile: (202) 775-4510
                                        Email: mstancil@robbinsrussell.com


                                        /s/ Andrew N. Rosenberg
                                        Andrew N. Rosenberg (admitted *pro hac vice*)
                                        Walter Rieman (admitted *pro hac vice*)
                                        Richard A. Rosen (admitted *pro hac vice*)
                                        Kyle J. Kimpler (admitted *pro hac vice*)
                                        Karen R. Zeituni (admitted *pro hac vice*)
                                        PAUL, WEISS, RIFKIND, WHARTON
                                            & GARRISON LLP
                                        1285 Avenue of the Americas
                                        New York, NY 10019
                                        Telephone: (212) 373-3000
                                        Facsimile: (212) 757-3990
                                        Email: arosenberg@paulweiss.com


                                        /s/ Ramón Rivera Morales
                                        J. Ramón Rivera Morales
                                        USDC-PR Bar No. 200701
                                        JIMÉNEZ, GRAFFAM & LAUSELL
                                        PO Box 366104
                                        San Juan, PR 00936
                                        Telephone: (787) 767-1030
                                        Facsimile: (787) 751-4068
                                        Email: rrivera@jgl.com

                                        *Counsel to Plaintiffs*

87