# Exhibit B



# DIARIO DE SESIONES

## PROCEDIMIENTOS Y DEBATES DE LA
## ASAMBLEA LEGISLATIVA

ESTADO LIBRE ASOCIADO DE PUERTO RICO

| Vol. XIV | SAN JUAN, P. R.—Martes, 5 de septiembre de 1961 | Núm. 27 |

## SENADO

(Sesión del lunes 4 de septiembre de 1961)

A las doce del día, el Senado continúa sus trabajos, bajo la presidencia del señor Rivera Colón, designado al efecto por el Presidente, señor Quiñones.

Sr. Colón Velázquez: Señor Presidente.
Presidente Acc. (Sr. Rivera Colón): Señor senador Colón Velázquez.
Sr. Colón Velázquez: Para proponer que volvamos al turno de Informes de Comisiones Permanentes.
Presidente Acc. (Sr. Rivera Colón): Adelante.

### INFORMES DE COMISIONES PERMANENTES

La Comisión Especial que interviene en la consideración de las enmiendas a la Constitución, propone al Senado que se apruebe, sin enmiendas, la siguiente resolución concurrente:

R. Conc. del S. 3

"Para proponer enmiendas a la Sección 2 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico."

### PROYECTOS Y RESOLUCIONES RECIBIDOS DE LA CAMARA DE REPRESENTANTES Y REFERIDOS A COMISIONES

El Secretario informa que ha sido recibido de la Cámara de Representantes y referido a comisiones, el siguiente proyecto de ley:

P. de la C. 385.—(Por el señor Méndez).—"Para autorizar a los jefes de departamentos, agencias, instrumentalidades o corporaciones públicas del Estado Libre Asociado de Puerto Rico, previa la autorización expresa del Gobernador de Puerto Rico, a concertar convenios con cualquier subdivisión política, ciudad, agencia o instrumentalidad del Gobierno de los Estados Unidos de Norte América o de los gobiernos de los Estados de dicha Unión, a los fines de proveerles servicios y facilidades." (Gobierno Estatal y Municipal) (Trabajo)

### COMUNICACIONES DE TRAMITE LEGISLATIVO

El Secretario informa que la Cámara de Representantes remite, firmada por su Presidente, la siguiente resolución conjunta:

R. C. de la C. 936

"Asignando a la Universidad de Puerto Rico la suma de doce mil (12,000) dólares para la compra e instalación de un microscopio electrónico, cantidad que podrá ser pareada con fondos federales para los propósitos de este proyecto, y la cual cantidad podrá ser traspasada a la Junta Provisional del Centro Médico a fin de que dicho microscopio forme parte de dicho Centro."

El Secretario informa que el señor Presidente del Senado ha firmado dicha resolución conjunta y dispone su devolución a la Cámara de Representantes.

### COMUNICACIONES VARIAS

El Secretario da lectura a la siguiente comunicación:

"a c Nenadich 26 (Este—Mayagüez, Puerto Rico—3 de septiembre de 1961—Honorables Miembros del Senado de Puerto Rico—Capitolio Insular—San Juan, Puerto Rico—Estimados señores:

El Movimiento Estudiantil Pro Monumento a José de Diego tiene el placer de invitar a todos los miembros del Senado de Puerto Rico y a sus distinguidas familias al acto de develación del monumento a don José de Diego, fundador del Colegio de Agricultura y Artes Mecánicas, nuestro Colegio.
Día: domingo 10 de septiembre—Hora: 10:30 A.M.—Sitio: frente a la entrada del Colegio.

Cordialmente, (Fdo.) Loida Figueroa, Profesora Loida Figueroa—(Consejera)—(Fdo.) J. A. González-González, Miembro)."

El Senado se da por enterado.

### EXCUSAS

Sr. Colón Velázquez: Señor Presidente.
Presidente Acc. (Sr. Rivera Colón): Señor senador Colón Velázquez.
Sr. Colón Velázquez: Para solicitar que se excuse al compañero Bauzá, que no puede asistir a la sesión de hoy, por encontrarse enfermo.
no hay objeción, así se acuerda.
Presidente Acc. (Sr. Rivera Colón): Si
Es llamado a presidir, y ocupa la presidencia, el señor Reyes Delgado.

### MOCION

El Secretario da lectura a la siguiente moción, formulada por escrito por el señor Carrasquillo:

"Para que se designe una comisión Especial que estudie el problema que se ha creado en las islas de Vieques y Culebra con motivo de la transportación de pasaje y carga.

Por cuanto: los habitantes de dichas islas vienen clamando desde hace mucho tiempo en sentido de que tanto el costo del pasaje de personas como el de carga constituyen un enorme gravamen para los habitantes de aquellas islas.

Por cuanto: los artículos de primera necesidad en dichas islas se están vendiendo a precios exhorbitantes debido ello a los altos costos de transportación de los mismos.

Por cuanto: estos altos precios tanto en la transportación de personas como en los de mercadería encarecen la vida de todos los habitantes de dichas islas, y muy especialmente al de clase pobre que a menudo se encuentra desempleada.

Por tanto, resuélvese que por este Senado; se proceda al nombramiento de una Comisión Especial para que estudie, recomiende e informe para la próxima sesión ordinaria de este Alto Cuerpo sobre todo lo que tenga que ver con la transportación de personas y cargo en las islas de Vieques y Culebra."

Sometida a votación, la referida moción es aprobada.

### CALENDARIO DE ORDENES ESPECIALES DEL DIA

Como único asunto en el Calendario de Ordenes Especiales del Día, el Secretario da lectura a la R. Conc. del S. 3, como sigue:

Para proponer enmiendas a la Sección 2 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico.

Resuélvese por la Asamblea Legislativa de Puerto Rico:

Artículo 1.—Se propone enmendar la Sección 2 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico para que lea de la manera siguiente:

"Sección 2.—El poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios se ejercerá según se disponga por la Asamblea Legislativa, y nunca será rendido o suspendido. El poder del Estado Libre Asociado de Puerto Rico para contraer y autorizar deudas se ejercerá según se disponga por la Asamblea Legislativa, pero ninguna obligación directa del Estado Libre Asociado de Puerto

219

tamente por el Estado Libre Asociado de Puerto Rico por dinero tomado a préstamo directamente por el Estado Libre Asociado de Puerto Rico evidenciada mediante bonos o pagarés para el pago de la cual la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico fueren empeñados será emitida por el Estado Libre Asociado de Puerto Rico si el total de (i) el monto del principal e intereses sobre dichos bonos y pagarés, junto con el monto del principal de e intereses sobre la totalidad de tales bonos y pagarés hasta entonces emitidos por el Estado Libre Asociado y en circulación, pagaderos en cualquier año económico y (ii) cualesquiera cantidades pagadas por el Estado Libre Asociado en el año económico inmediatamente anterior al año económico corriente en concepto de principal e intereses correspondientes a cualesquiera obligaciones evidenciadas mediante bonos o pagarés garantizados por el Estado Libre Asociado, excediere el 15 por ciento del monto total de las rentas obtenidas de acuerdo con las disposiciones de las leyes del Estado Libre Asociado e ingresadas en el Tesoro de Puerto Rico en el año económico inmediatamente anterior al año económico corriente; y ninguno de dichos bonos o pagarés emitidos por el Estado Libre Asociado para cualquier fin que no fuere facilidades de vivienda vencerá con posterioridad a un término de 30 años desde la fecha de su emisión y ningún bono o pagaré emitido para fines de vivienda vencerá con posterioridad a un término de 40 años desde la fecha de su emisión; y el Estado Libre Asociado no garantizará obligación alguna evidenciada mediante bonos o pagarés si el total de la cantidad pagadera en cualquier año económico en concepto de principal de intereses sobre la totalidad de las antes referidas obligaciones directas hasta entonces emitidas por el Estado Libre Asociado y en circulación y las cantidades a que se hace referencia en la cláusula (ii) excediere el 15 por ciento de dicho monto total de rentas.

La Asamblea Legislativa fijará límites para la emisión de obligaciones directas por cualquier municipio de Puerto Rico por dinero tomado a préstamo directamente por dicho municipio evidenciadas mediante bonos o pagarés para el pago de las cuales la buena fe, el crédito y el poder para imponer contribuciones de dicho municipio fueren empeñados; disponiéndose, sin embargo, que ninguno de dichos bonos o pagarés será emitido por municipio alguno en una cantidad que, junto con el monto de la totalidad de tales bonos y pagarés hasta entonces emitidos por dicho municipio y en circulación, exceda el por ciento determinado por la Asamblea Legislativa, el cual no será menor del cinco por ciento (5) ni mayor del diez por ciento (10%) del valor total de la tasación de la propiedad situada en dicho municipio.

El Secretario de Hacienda podrá ser requerido para que destine los recursos disponibles incluyendo sobrantes al pago de los intereses sobre la deuda pública y la amortización de la misma en cualquier caso al cual fuere aplicable la Sección 8 de este Artículo VI mediante demanda incoada por cualquier tenedor de bonos o pagarés emitidos en evidencia de la misma".

Artículo 2.—Esta enmienda entrará en vigor al ser ratificada por la mayoría de los electores que voten sobre la misma en un referédum celebrado con ese propósito.

"Estado Libre Asociado de Puerto Rico
Senado de Puerto Rico

San Juan, Puerto Rico
4 de septiembre de 1961

Informe

Al Senado de Puerto Rico:

La Comisión Especial designada para estudiar y considerar la P. Conc. del S. 3 tiene el honor de informar a este Alto Cuerpo que recomienda la aprobación de la medida sin enmiendas.

Vuestra Comisión celebró audiencias conjuntamente con la Comisión Especial designada por la Cámara de Representantes durante los días 21, 22, 23, 24, 25, 28 y 29 de agosto de 1961. En estas vistas declararon los señores José Ramón Noguera, Secretario de Hacienda; Rafael Picó, Presidente del Banco Gubernamental de Fomento para Puerto Rico; Francis Bowen, primer vicepresidente de dicho Banco, y Ramón García Santiago, presidente de la Junta de Planificación, todos éstos funcionarios públicos. Además, prestaron testimonio las siguientes personas particulares: Lcdo. Rodolfo Aponte, vicepresidente del Banco Popular; Esteban Bird, vicepresidente ejecutivo del Banco Crédito y Ahorro Ponceño, quien compareció también a nombre de la Asociación de Banqueros; César Vizcarrondo y S. L. Descartes, quienes comparecieron a nombre de la Cámara de Comercio de Puerto Rico; Webster Pullen, vicepresidente del First National City Bank of New York a cargo de los negocios de Puerto Rico; Roberto de Jesús, presidente del Banco de Ponce; Francisco de Jesús, vicepresidente del Chase Manhattan Bank en Puerto Rico; Leandro Cabranes, director ejecutivo de la Asociación de Alcaldes de Puerto Rico; Emiliano Pol, contador público autorizado; y Juan Diez de Andino, en calidad de ciudadano particular. La Comisión tuvo ante sí, además, memoriales escritos en apoyo de la resolución, del Sr. José R. Noguera, Secretario de Hacienda; del Sr. Francis Bowen, primer vicepresidente del Banco Gubernamental de Fomento; del Dr. Rafael Picó, presidente de dicho Banco; y del Sr. Ramón García Santiago, Presidente de la Junta de Planificación.

Tanto los funcionarios públicos como las personas particulares mencionadas que comparecieron a nombre de las instituciones relacionadas o en su carácter personal, favorecieron, con excepción del señor Diez de Andino, el principio envuelto en la enmienda constitucional bajo consideración de fijar el límite prestatario del Estado Libre Asociado a base de una relación con los ingresos del Gobierno en lugar del sistema actual que se basa en un por ciento del valor de tasación de la propiedad.

Por la Resolución Conjunta número 1 aprobada el 23 de junio de 1958, la Asamblea Legislativa de Puerto Rico solicitó del Congreso de los Estados Unidos que se suprimiesen de la Sección 3 de la Ley de Relaciones Federales con Puerto Rico las disposiciones relativas a la fijación de un límite prestatario al Estado Libre Asociado y a los municipios de Puerto Rico.

A tenor con dicha solicitud, el Congreso de los Estados Unidos aprobó la Ley Pública número 87-121, la cual fue sancionada por el Presidente el 3 de agosto de este año. Esta Ley provee que se suprima de la Sección 3 de la Ley de Relaciones Federales con Puerto Rico el siguiente lenguaje:

"Disponiéndose, sin embargo, que ninguna deuda pública de Puerto Rico y de los municipios de San Juan, Ponce, Mayagüez, Arecibo y Río Piedras, será autorizada si excediere del 10 por ciento del valor total de la tasación de sus propiedades, y ninguna deuda pública de ninguna otra subdivisión o municipio de Puerto Rico se autorizará en lo sucesivo si excediera del 5 por ciento de la valoración total de la propiedad existente en cualquiera de esas subdivisiones o municipios... Al computar la deuda de el Pueblo de Puerto Rico, no se contarán los bonos municipales para el pago de cuyo capital e intereses se hubiere hasta la fecha empeñado la buena fe del Pueblo de Puerto Rico, ni los bonos emitidos por el Pueblo de Puerto Rico garantizados por una suma equivalente de bonos de las corporaciones municipales o juntas escolares de Puerto Rico; pero sí se contarán todos los bonos que en lo sucesivo emitiere cualquier municipio o subdivisión dentro del 5 por ciento que por la presente se autoriza, para los cuales se pignore la buena fe del Pueblo de Puerto Rico."

Provee además dicho estatuto federal, que las disposiciones del mismo entrarán en vigor tan pronto los electores capacitados de Puerto Rico hayan votado en un referéndum de acuerdo con la Sección 1 del Artículo VII de la Constitución del Estado Libre Asociado de Puerto Rico para que se incluyan en dicha Constitución disposiciones que sustituyan las disposiciones pertinentes de la Sección 3 de la Ley de Relaciones Federales con Puerto Rico arriba transcritas, limitando la capacidad prestataria del Estado Libre Asociado y sus municipios, a tenor con lo propuesto en una Resolución Concurrente aprobada por la Asamblea Legislativa.

La Resolución Concurrente del Senado número 3 y la Resolución Concurrente de la Cámara número 5, las cuales son idénticas y están ahora ante la consideración de la Asamblea Legislativa, contienen disposiciones para cumplir total y cabalmente con las disposiciones de la Ley Pública número 87-121 del Congreso de los Estados Unidos. Al ser aprobadas por la Asamblea Legislativa y por los electores capacitados de Puerto Rico en un referéndum, tendrán el efecto de suprimir las disposiciones ya transcritas de la Ley de Relaciones Federales con Puerto Rico e incluir en nuestra Constitución disposiciones adecuadas fijando el límite de la capacidad prestataria del Estado Libre Asociado y de los municipios de Puerto Rico.

Actualmente, bajo las disposiciones de la Ley de Relaciones Federales, el límite prestatario del Estado Libre Asociado y de los municipios de San Juan, Ponce, Mayagüez y Arecibo se establece en términos de un 10 por ciento del valor de tasación de la propiedad y un 5 por ciento de dicha valoración para el resto de los municipios. Esta fórmula, aunque flexible, ya que la capacidad prestataria aumenta con el incremento de la propiedad y el aumento en la tasación de la misma, ha dejado de proveer el medio adecuado en la contratación de la deuda pública del Estado en vista del gran auge económico de Puerto Rico en los últimos años y la necesidad correlativa de tener que ofrecer mayores y mejores servicios públicos al pueblo de Puerto Rico. La necesidad de ampliar el margen prestatario de Puerto Rico se hace imperativamente evidente al confrontarnos con el hecho de que al 31 de julio de 1961 sólo le quedaba disponible al Estado Libre Asocia-

do un margen prestatario de alrededor de $3,000,000. Conscientes de esta situación, la cual fue prevista hace ya unos cuantos años, las Resoluciones Concurrentes actualmente ante la consideración de la Asamblea Legislativa recogen disposiciones que han de ser incluidas en nuestra Constitución, fijando el margen prestatario del Estado Libre Asociado y de los municipios de Puerto Rico en una forma más flexible, realista y a tono con sanos principios económicos. Las disposiciones propuestas usan como base para fijar el margen prestatario del Estado Libre Asociado el monto de los ingresos recaudados por el Gobierno provenientes de fuentes internas durante el año fiscal anterior al que se haya de contratar una deuda. No se incluyen en los ingresos las recaudaciones provenientes de aportaciones federales, derechos de aduana y arbitrios sobre embarques, por no estar la imposición de estas rentas públicas bajo el control de la Asamblea Legislativa de Puerto Rico. Esto hace que la fórmula sea más conservadora, ya que dichos ingresos pueden utilizarse también para el pago de la deuda.

La limitación se fija en términos de requerimientos de pago de capital e intereses más alto en cualquier año de vencimiento de la deuda existente y la que se contempla autorizar en ese momento, más cualquier pago que el Estado haya tenido que hacer en el año fiscal anterior por concepto de bonos garantizados por el Estado emitidos por agencias o corporaciones públicas. Cuando los requerimientos de pago mencionados más la cantidad que el Gobierno haya tenido que pagar por concepto de bonos garantizados ascienda a un 15 por ciento de los ingresos de fuentes estatales durante el año económico anterior, el Gobierno no podrá incurrir en más obligaciones directas ni podrá garantizar más bonos de instrumentalidades públicas. Por ejemplo, asumiendo que los ingresos del Gobierno provenientes de fuentes internas en el año fiscal anterior al que se intente vender determinada cantidad de bonos autorizados sea $200 millones, el 15 por ciento de esta cantidad sería $30 millones. Suponiendo que los requerimientos de pago de capital e intereses más altos en los años de vida que le quedan a los bonos ya emitidos fuese de $15 millones, restarían $15 millones adicionales para asumir el pago de los requerimientos anuales de futuras obligaciones.

Se notará, por lo tanto, que bajo la fórmula propuesta el límite de la deuda en que puede incurrirse se expresa en términos de la cantidad de dinero disponible para amortizar la deuda, en lugar de expresarse como actualmente, en términos de la cantidad de dinero total que puede tomarse a préstamo en determinado momento. Bajo las disposiciones de ley actuales, el margen prestatario es de aproximadamente $190 millones, o sea un 10 por ciento del valor de tasación de la propiedad, que es aproximadamente de $1,900 millones.

Si se desease traducir este margen prestatario de $30 millones (15 por ciento de $200 millones de ingresos) a una suma más o menos fija, podría calcularse históricamente a base del tipo de interés promedio y el patrón de vencimientos de la deuda existente o, si se desea una base más exacta, podría usarse el patrón de vencimiento y el tipo de interés pagado en la más reciente emisión de bonos. Basándonos en la última emisión de bonos del Estado Libre Asociado por $40 millones vendida en marzo de este año, y usando un patrón de vencimientos por un máximo de veinte años y un tipo de interés de 4 por ciento anual, podríamos decir que el margen prestatario disponible actualmente del Gobierno sería de $212.4 millones, con ingresos disponibles en el año fiscal 1960-61 de $204 millones. Al hacer este cálculo asumimos que habría un margen libre de $15 millones para la contratación de deuda nueva, y que el remanente del 15 por ciento de $204 millones (sobre $15 millones) estaría ya comprometido para el pago de capital e intereses de los bonos en circulación.

Deseamos recalcar, sin embargo, que usamos estos ejemplos con el solo propósito de demostrar en la práctica cómo funcionaría la mecánica de la fórmula propuesta para fijar el límite prestatario a través de la enmienda constitucional bajo consideración. La verdadera limitación estriba en la capacidad para pagar el dinero tomado a préstamo, expresada en términos de un por ciento fijo (15 por ciento) de los ingresos anuales disponibles para pagar el capital y los intereses de las obligaciones directas emitidas por el Estado. Una vez la cantidad reflejada por dicho por ciento se encuentre comprometida para pagar anualmente los requerimientos de la deuda evidenciada a través de bonos y pagarés emitidos directamente por el Estado la capacidad prestataria estará agotada.

Según podrá verse por este análisis, la fórmula propuesta para fijar el margen prestatario del Estado es más flexible y realista que la usada actualmente. La misma se basa en los recursos disponibles del Gobierno que es la verdadera fuente para afrontar las obligaciones del Estado y no en un por ciento del valor de tasación de la propiedad, que no es un verdadero índice de la capacidad para pagar. Conviene anotar que la fórmula propuesta está en realidad en armonía con la Sección 8 del Artículo VI de nuestra Constitución, que en síntesis provee que los recursos disponibles del Estado se usarán en primer término para el pago de intereses y amortización de la deuda pública. Aunque actualmente, como cuestión de hecho, se usan las contribuciones sobre la propiedad para atender el pago de la deuda pública, la verdad es que por los términos de la disposición constitucional referida todos los recursos del Gobierno están comprometidos para dichas atenciones. El producto de la contribución sobre la propiedad representa hoy en día para el Gobierno solamente el 7 por ciento de los ingresos.

Bajo el actual sistema, el margen prestatario aumenta con el incremento en la propiedad y el aumento en el valor de tasación de la misma. Estos factores no están necesariamente bajo el control de la Asamblea Legislativa. Sin embargo, bajo la fórmula propuesta la Asamblea Legislativa tendría un control más absoluto sobre el margen prestatario.

El principio de la fórmula propuesta de fijar el margen prestatario en un por ciento de los recursos disponibles del Estado, aunque parece ser novel en el ámbito de la política pública fiscal, ha sido usado sin embargo como base por bastante tiempo para autorizar emisiones de bonos de rentas por corporaciones públicas y privadas. Por lo general la capacidad para emitir este tipo de bonos se basa en un por ciento de los ingresos o de los requerimientos de pago de la deuda de dichas corporaciones. Además, los estados de Connecticut y Mississippi adoptaron recientemente legislación fijando el límite prestatario del Estado en un por ciento de los ingresos anuales del mismo. Aunque el sistema usado en dichos estados no es igual a la fórmula propuesta en la enmienda constitucional bajo consideración, sigue, sin embargo, el principio general de relacionar la deuda pública con los ingresos del Gobierno.

Al hablar de bonos de rentas, conviene aclarar que los bonos emitidos y que emitan las corporaciones públicas del Estado Libre Asociado de Puerto Rico no se tendrán en cuenta al calcular el margen prestatario del Estado, ya que para el pago de los mismos no está comprometida la buena fe del Pueblo de Puerto Rico y se seguirán pagando solamente de las rentas derivadas por dichas corporaciones. Unicamente en el caso de que el Estado garantice alguno de estos bonos, cosa que no ha hecho hasta el presente, y que tenga que pagar en determinado año una deficiencia de los requerimientos de deuda de los mismos, es que se contará la cantidad así pagada contra el margen prestatario del Estado Libre Asociado.

La enmienda constitucional propuesta circunscribe la deuda pública a obligaciones del Estado Libre Asociado evidenciadas únicamente por bonos y pagarés emitidos directamente por el Estado. Por bonos y pagarés se entiende el tipo de obligación clásica y negociable que se vende en el mercado de valores de Estados Unidos. No incluye las obligaciones o deudas corrientes o contingentes del Estado en que se incurre normalmente para atender el funcionamiento del Gobierno. El lenguaje usado en la enmienda aclara la norma que se ha seguido en la práctica hasta el presente.

La propuesta enmienda a la Constitución no afectará en forma alguna el crédito y la venta de los bonos del Estado Libre Asociado de Puerto Rico. Al contrario, una encuesta hecha por el Secretario de Hacienda y el Presidente del Banco Gubernamental de Fomento para Puerto Rico en el mercado de valores de los Estados Unidos con prominentes figuras de la banca, revela que la fórmula propuesta no sólo tiene el visto bueno y la aceptación de todos ellos, sino que en su opinión mejorará el crédito y la viabilidad en la venta de los bonos de Puerto Rico. El buen crédito que tiene Puerto Rico en el mercado de valores de los Estados Unidos se basa principalmente en su puntualidad a través de toda su historia en el pago de sus obligaciones, en el buen juicio que ha ejercido en la contratación de la deuda pública y en el no hacer uso de subterfugios para evadir las limitaciones impuestas a la misma. En el récord hay interesantes testimonios de distintas personalidades del mundo financiero norteamericano endosando franca y abiertamente la propuesta enmienda constitucional. No ha habido una sola fuente de crédito de las principales que usa el Pueblo de Puerto Rico en la venta de sus bonos que se haya manifestado en contra de la nueva fórmula. Algunos de ellos creen que se le presenta a Puerto Rico la oportunidad de hacer una valiosa aportación en el campo de la ciencia político-fiscal con la aprobación de esta enmienda.

Otra disposición de la enmienda constitucional propuesta que se estima ayudará sustancialmente en la venta y clasificación de los bonos de Puerto Rico es la que concede el derecho a los tenedores de bonos de demandar al Estado en caso de incum-

plimiento en el pago de la deuda. Esta disposición le dá realidad a lo dispuesto en la Sección 8, Artículo VI que compromete los ingresos del Gobierno al pago preferente del capital e intereses de la deuda pública. El Estado de Nueva York, así como otros estados de la Unión, tienen disposiciones análogas incluidas en sus Constituciones. Esta renuncia a la inmunidad del Estado a ser demandado, ha de redundar en una mejor aceptación y clasificación de nuestras obligaciones.

En cuanto a los municipios, la enmienda constitucional provee que se siga usando el mismo método que se usa actualmente bajo la Ley de Relaciones Federales con Puerto Rico para fijar el margen prestatario de los mismos. La única diferencia consiste en que en lugar de fijarle un límite del 10 por ciento sobre el valor de tasación de la propiedad a los municipios de San Juan, Ponce, Mayagüez y Arecibo y un 5 por ciento al resto de los municipios, se dispone en términos generales que la Legislatura fijará los límites prestatarios, los cuales no podrán ser menor del 5 por ciento ni mayor del 10 por ciento. Naturalmente, se podrá fijar cualquier límite entre un 5 y un 10 por ciento.

Es la intención usar el valor de toda la propiedad tasada en los distintos municipios con excepción de aquella que no está sujeta al pago de contribuciones. Al calcular el margen prestatario de los distintos municipios, se incluirá, sin embargo, el valor de tasación de aquellas propiedades que se usan como vivienda de sus dueños y que por acción legislativa se haya reducido o se reduzca en el futuro la contribución a pagar sobre las mismas hasta determinada cantidad del valor de tasación. Se hace esta distinción entre la propiedad exenta totalmente del pago de contribuciones y la propiedad usada por sus dueños como hogares, toda vez que ésta última hay que conservarla en las listas de propiedades sujetas a contribución, ya que si la misma está tasada para efectos contributivos en una cantidad mayor que la cantidad exenta para contribuciones, se cobrará sobre el remanente, y además porque si deja de ser usada como hogar del dueño está sujeta de nuevo al pago de contribuciones. Existe otra razón, además, para incluir esta clase de propiedad al calcular el margen prestatario de los municipios, y es el hecho de que éstos no sufrirán merma en sus ingresos por motivo de la legislación reduciendo las contribuciones a las propiedades que sean usadas por sus dueños como su vivienda, ya que la Asamblea Legislativa ha tomado medidas para reembolsar a los municipios la cantidad que dejen de recibir con motivo de tal reducción.

Este tipo de propiedad estaría disponible en el futuro para el pago de contribuciones en caso de que la Asamblea Legislativa lo estime aconsejable y necesario para afrontar el pago de la deuda pública.

La Comisión Especial, al recomendar que se apruebe favorablemente esta medida, está consciente de que su aprobación es indispensable para el desarrollo económico de nuestro Pueblo.

Respetuosamente sometido

Yldefonso Solá Morales,
Secretario.

Cruz Ortiz Stella,
Presidente."

Sr. García Méndez: Señor Presidente.
Presidente Acc. (Sr. Reyes Delgado): Señor Senador.
Sr. García Méndez: Queríamos llamar la atención y hacer que se consigne en el récord claramente, que este informe de la Comisión Especial designada para estudiar y considerar la Resolución Concurrente del Senado 3, no aclara que se consignó el voto en contra de los Senadores que representamos el sector minoritario del Senado, para especificar los fundamentos en la discusión de la Resolución en su fondo en el día de hoy, y queremos que quede así claro, a los fines de que no pudiera aparecer como que es un informe por unanimidad.
Sr. Ortiz Stella: Señor Presidente, tiene razón el compañero García Méndez. El informe fue aprobado por mayoría.
Presidente Acc. (Sr. Reyes Delgado): Que se haga constar.
Sr. Ortiz Stella: No tengo inconveniente en que así se haga constar.
Señor Presidente, voy a pedir un turno, para consumirlo ahora, defendiendo la resolución y el informe.
Sr. García Méndez: Señor Presidente, antes que el compañero distinguido comience a hacer uso de su turno, queremos hacer constar que tenemos dos enmiendas fundamentales, a nuestro juicio, para ofrecer al texto de la Resolución Concurrente.
Si el compañero desea hacer uso del turno de defensa del informe como está, claro que no podrá entrar en la cuestión relativa a las enmiendas que vamos a formular. La práctica normalmente ha sido discutir las enmiendas y entonces pedir turno para defender el proyecto tal como ha sido enmendado, si ha sido enmendado, o tal como está si no ha sido enmendado. Sin embargo, yo no tendría inconveniente en aceptar que el compañero exponga su tésis al través de este turno defensor del informe, pero haciendo claro que no hemos renunciado y que, por el contrario, nos reservamos el derecho a formular estas enmiendas que hemos traído para someter a la consideración del Senado.
Sr. Ortiz Stella: Voy más lejos, señor Presidente. Para que quede bien claro, o sea, que este turno mío de exposición defendiendo el informe y la resolución, tal como ha sido sometida por la Comisión Especial, deja enteramente a salvo el derecho del compañero García Méndez a formular las enmiendas que él estime convenientes a esta resolución.
Presidente Acc. (Sr. Reyes Delgado): ¿Esto es para consumirlo ahora?
Sr. Ortiz Stella: Si, señor Presidente.
Presidente Acc. (Sr. Reyes Delgado): Adelante.
Sr. Ortiz Stella: Señor Presidente y compañeros del Senado: Voy a defender el informe de la Comisión Especial a la cual fue referida la Resolución Concurrente del Senado número 3, y a pedir un voto favorable para esa resolución.
Como coautor del informe que se acaba de leer, necesariamente algunos de los conceptos ya vertidos en ese Informe, estarán necesariamente repetidos en ste turno de exposición que voy a consumir ahora.
No tengo la imaginación de Victor Hugo, para hacer un informe sobre esta Resolución y después un turno de exposición exponiendo ideas completamente nuevas. De modo, que quiero advertirle a los compañeros que lo que voy a decir, probablemente ya estará dicho en el informe.
Las disposiciones sobre la deuda pública del Estado Libre Asociado y de sus municipios, están contenidas, al presente, en el Artículo 3 de la Ley de Relaciones Federales que en lo pertinente dice de esta manera:

"Disponiéndose, sin embargo, que ninguna deuda pública de Puerto Rico y de los municipios de San Juan, Ponce, Mayagüez, Arecibo y Río Piedras, será autorizada si excediere del diez por ciento del valor total de la tasación de sus propiedades, y ninguna deuda pública de ninguna otra subdivisión o municipio de Puerto Rico se autorizará en lo sucesivo si excediera del cinco por ciento de la valoración total de la propiedad existente en cualquiera de esas subdivisiones o municipios;

"Al computar la deuda de El Pueblo de Puerto Rico, no se contarán los bonos municipales, para el pago de cuyo capital e intereses se hubiere hasta la fecha empeñado la buena fe de El Pueblo de Puerto Rico, ni los bonos emitidos por El Pueblo de Puerto Rico garantizados por una suma equivalente de bonos de las corporaciones municipales o juntas escolares de Puerto Rico; pero sí se contarán todos los bonos que en lo sucesivo emitiere cualquier municipio o subdivisión dentro del 5 por ciento que por la presente se autoriza, para los cuales se pignore la buena fe de El Pueblo de Puerto Rico".

A virtud de la ley pública número 87.121 del Congreso de Estados Unidos, esas disposiciones sobre la deuda pública quedarían eliminadas de la Ley de Relaciones Federales tan pronto los electores capacitados de Puerto Rico aprueben una enmienda a la Constitución conteniendo todo lo relativo a esa deuda pública. El Artículo 2 de dicha Ley Pública número 87.121 dice así:

"Artículo 2.—

Este es el Artículo 2 de la Resolución Conjunta de la Cámara de Representantes Federal que se convirtió en la Ley Pública 87.121.

"El Artículo 1 de esta ley empezará a regir cuando una mayoría de los electores capacitados de Puerto Rico haya votado en un referéndum de acuerdo con el Artículo VII de la Constitución del Estado Libre Asociado de Puerto Rico para incluir disposiciones en la Constitución del Estado Libre Asociado en lugar de las disposiciones del Artículo 3 de la Ley de Relaciones Federales con Puerto Rico que en la presente se especifican limitando el márgen prestatario del Estado Libre Asociado y sus municipios, según se propone en la Resolución Concurrente de la Asamblea Legislativa del Estado Libre Asociado."

Quiérese decir, que aprobándose esta Resolución por ambas Cámaras,—siendo una Resolución Concurrente no tiene que ser firmada por el Ejecutivo,—hasta que el pueblo de Puerto Rico no apruebe esta propuesta enmienda a la Constitución, quedarían vigentes en el estatuto de Relaciones Federales las disposiciones sobre el márgen prestatario del Estado Libre Asociado y de sus municipios. Solamente cuando electores capacitados en un referéndum aprueben la propuesta enmienda, entonces es ya deja de existir la disposición en el estatuto de Relaciones Federales y entonces surte efecto la enmienda constitucional.

Dando cumplimiento a las disposiciones de dicha ley del Congreso, se radica en este Senado la Resolución Concurrente número 3, y en la Cámara la Resolución Concurrente número 5, en las cuales se propone una enmienda a la Sección 2 del Artículo VI de la Constitución del Estado Libre Aso-

COMMONWEALTH OF PUERTO RICO

# DAILY FLOOR PROCEEDINGS

## LEGISLATIVE ASSEMBLY

Vol. XIV – No. 27

San Juan, P.R. – Tuesday, September 5, 1961

# SENATE

CALENDAR OF SPECIAL ORDERS OF THE DAY

(Calendario de Ordenes Especiales del Día)

The only matter in the Calendar of Special Orders of the Day, the [Senate] Secretary reads Concurrent Senate Resolution 3, as follows:

[TEXT OF C.S.R. #3 IS TRANSCRIBED]

To the Senate of Puerto Rico:

The Special Committee appointed to study and consider the Concurrent Senate Resolution 3 has the honor of informing this High Body that it recommends the approval of this measure without amendments.

[ ****]

The need to increase the borrowing margin of Puerto Rico is imperatively evident one we are confronted with the fact that as of July 31, 1961 the Commonwealth only had left a barrowing margin of approximately $3,000,000. Conscious of this situation, which was foreseen a few years ago, the Concurrent Resolutions before the consideration of this Legislative Assembly adopt provisions that will be included in our Constitution, establishing a borrowing margin of the Commonwealth and the Municipalities of Puerto Rico in a form that is more flexible, realistic and in tune with sound economic principles.

[****]

As can be seen by this analysis, the proposed formula to set the Commonwealth's borrowing margin is more flexible and realist than the one used today. It is based on the Government resources that are available which is the true source to face the State's obligations and not through a percentage of the assessed property value, which is not a true measure of the capacity to pay. It is convenient to note that with the proposed formula is in reality in harmony with Section 8 of Article VI of our Constitution, which in synthesis provides that the State's available resources shall be used in the first place for the payment of interest and the amortization of the public debt.  Although presently, and as a matter of fact, property taxes are used to take care of the payment of the public debt, the truth is that per the terms of the referenced constitutional provision all of the resources of the Government are committed to those obligations.



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[****]

The proposed constitutional amendment limits the public debt to the Commonwealth's obligations which are evinced by bonds or notes issued directly by the State. By bonds and notes it is understood [to mean] the type of classic negotiable obligation that is sold in the securities market of the United States.

[****]

Another provision of the proposed constitutional amendment which we consider will substantially help in the selling and in the classification [*i.e.*, credit rating] of Puerto Rico's bonds is the one that grants the right to bondholders to sue the State in case of a debt payment default. This provision gives reality to what is provided in Section 8, Article VI which commits the Government's revenues to the preferential payment of the capital and interest of the public debt. The State of New York, as other states of the Union, have similar provisions included in their Constitutions. This waiver of the State's immunity to be sued will lead to a better acceptance and classification of our obligations.

[****]

I must say, additionally, that these persons related to the banking sector, who appeared before the special committees, are the ones who directly participate in the trading of bonds that the Commonwealth and its municipalities issue. In other words, the purchasers of our bonds accept, as a complete and solid guarantee for the same, the formula regarding the borrowing margin that is contained in the proposed amendment to Section 2 of article VI of the Constitution of the Commonwealth of Puerto Rico.

[****]

The method or formula for determining the limit on the borrowing capacity of the State which is contained in the Concurrent Senate Resolution no. 3 and the House's no. 5, has been in use in two States of the Union, to wit; Connecticut and Mississippi.

[****]

I have already stated that the Puerto Rican banking sector favors the Concurrent Resolution of which I am speaking and I want to add that according to information received by the Special Committees, the entities and persons in the United States that have relation with the trading of Puerto Rico bonds, all favor also said Concurrent Resolution.

[***]

I hereby transcribe the letter from Mr. John W. Demilhoo, vice-president of the Chase Manhattan Bank, and who is in charge of the bond departments of said bank, in august of this year, addressed to Mr. Bowen, Vice-president of the Government Development Bank: (Translated to Spanish)

….

"Dear mister Bowen:

I have studied the proposed amendment to Section 2, Article VI of the Constitution of the Commonwealth of Puerto Rico. I believe that the proposed limits on the debt issuance are essentially sound. I am of the opinion that the Commonwealth is protecting the investor, who can purchase its debt and at the same time it is providing a certain flexibility that is necessary for its capital investment program.

2



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.