# Exhibit F

# Feature

By Cate Long

# Developing: Puerto Rico Enters Bankruptcy on May 3
## Faithful to PROMESA and Congressional Intent?

**Cate Long**
Puerto Rico Clearinghouse
Rhinebeck, N.Y.

Cate Long is one of the nation's leading municipal analysts and predicted Puerto Rico's insolvency in 2012. She has worked closely with congressional staff as they crafted PROMESA, and she holds two U.S. patents related to fixed-income market data.

**Editor's Note:** *The developments in Puerto Rico are ongoing, and the information in this article was current as of May 19, 2017. Stay informed by visiting ABI's "Puerto Rico in Distress" website at abi.org/PR-crisis.*

Facing increasing fiscal disarray in Puerto Rico and pressure from the U.S. Treasury, numerous pieces of legislation were drafted in the U.S. Congress to address the problems of America's largest territory. Six pieces of legislation were filed in the U.S. Senate and three pieces in the House of Representatives between December 2015 and May 2016 before Rep. Sean Duffy (R-Wis.) filed H.R. 5278, the Puerto Rico Oversight, Management and Economic Stability Act (PROMESA), on May 18, 2016.[1]

PROMESA, with amendments, passed the House in a vote of 297-127 on June 9, 2016, and was essentially waved through the Senate without debate or amendment as S. 2328 by a vote of 68-30 on June 29, 2016. President Barack Obama signed PROMESA into law on June 30, 2016.

Although modeled in part on the federal law that created an oversight board for the District of Columbia, PROMESA created an entirely new approach to righting the finances of the bankrupt territory and creating a framework for consensual debt negotiations and court-supervised restructuring. PROMESA's Title VI created a framework for consensual debt negotiations based on sovereign debt restructurings by inserting a "cramdown" provision that would allow the ability of a supermajority of creditors to bind holdout creditors. PROMESA's Title III, for court-supervised debt restructuring, incorporated, by reference, various sections of the U.S. Bankruptcy Code. Because PROMESA is a uniquely crafted law examining the legislative history of H.R. 5278, this will help illustrate Congress's intent. When Natural Resources Committee Chairman Rep. Rob Bishop (R-Utah) introduced H.R. 5278 on the House floor for debate, he stated:

> The bill is structured into seven titles. The first two establish an Oversight Board that will oversee the development of fiscal plans and budgets, which act as the foundational documents for returning Puerto Rico to fiscal responsibility.
>
> The third title permits Puerto Rico debts to be restructured if certain criteria are met in the Oversight Board's discretion. For instance, the entity seeking restructuring must have completed good-faith debt negotiations with its creditors, as well as have a board-approved fiscal plan in place and be on the path towards producing audited financials.[2]

Although PROMESA was written for a U.S. subsovereign, there are fundamental differences between Title III of the law and chapter 9 bankruptcy. PROMESA was not incorporated into the Bankruptcy Code but was written under the Territorial Clause of the U.S. Constitution. Unlike chapter 9, where the debtor retains control over its finances and proposes an adjustment plan, the Oversight Board controls any plan of adjustment under Title III, among other differences. In § 101, Congress delineated the primary purpose of the Oversight Board:

> (a) PURPOSE. — The purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets.

## Title II

Title II charges the Oversight Board with the powers to approve, for territory governments or instrumentalities of those governments (such as public corporations or municipal governments), the following: fiscal plans, budgets, voluntary agreements with bondholders, debt-restructuring plans and critical projects eligible for expedited permitting processes.

## Fiscal Plan

The keystone to the PROMESA process is the development of a five-year fiscal plan for commonwealth entities as outlined in § 201. The Oversight Board chose to require the development of a 10-year plan by the Puerto Rico government instead of the five-year plan specified in law. Congress was explicit about what elements the fiscal plan must contain. Section 201(b) reads in part:

> A Fiscal Plan developed under this section shall, with respect to the territorial govern-

---

[1] See H.R. 5278, available at naturalresources.house.gov/uploadedfiles/promesa_hr_5278.pdf (unless otherwise specified, all links in this article were last visited on May 17, 2017).

[2] Chairman Rob Bishop, PROMESA Floor Statement, June 9, 2016, available at drive.google.com/file/d/0BwUldNJ-sOg_aHNPRVJWU0xFckU/view?usp=sharing.

ment or covered territorial instrumentality, provide a method to achieve fiscal responsibility and access to the capital markets, and—
- (A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on —
   - (i) applicable laws; or (ii) specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;
- (B) ensure the funding of essential public services;
- (C) provide adequate funding for public pension systems;
- (D) provide for the elimination of structural deficits;
- (E) for fiscal years covered by a Fiscal Plan in which a stay under Titles III or IV is not effective, provide for a debt burden that is sustainable;
- (F) improve fiscal governance, accountability, and internal controls; [and] …
- (N) respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act.

Congress clearly intended for Puerto Rico to pay their debts stating: "PROMESA ensures that Puerto Rico is unable to repudiate its debts. Instead it institutes fiscal and economic reforms to guarantee the island regains access to capital markets."[3] The language in § 201 was the subject of intense discussion in Congress in the months leading up to PROMESA's passage. Debate centered around subsections regarding funding for essential services, adequate funding for pension systems, providing for a debt burden that is sustainable, and respect for the "relative lawful priorities or lawful liens."

Some creditors argued for legislation to specifically outline the priority of competing bonded debt claims by inserting language that required payment of constitutionally protected general obligation (GO) debt prior to all other expenses of the Puerto Rico government. Congress indirectly incorporated this recommendation in § 201(b)(1)(N), which states that the fiscal plan "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act." Congress also incorporated by reference §§ 361, 362 and 364(c)-(f) of the Bankruptcy Code to ensure adequate protection of secured creditors, as well as §§ 922, 927 and 928.

Establishing the priority between unsecured classes of Puerto Rico GO bondholders and public pensions was a primary issue raised by the chair of the U.S. Senate Committee on Finance, Sen. Orrin Hatch (R-Utah), in a letter to former Puerto Rico Gov. Alejandro García Padilla prior to PROMESA's passage.[4] Sen. Hatch requested clarification because U.S. Treasury officials were attempting to codify the priority of pensions over GO debt rather than the less- preferential treatment that pensions received in the final legislative language. Then-Gov. García Padilla did not respond.

### Fiscal Adjustments

The Oversight Board certified a 10-year fiscal plan[5] for the commonwealth's government that reduced consolidated government spending by approximately 5 percent, and it appears to have reduced pension costs by 10 percent and reduced debt service by 78 percent (an amendment to the March 13 fiscal plan made by the Oversight Board affecting pensions does not quantify as expense savings). The fiscal plan increases spending from $17.872 billion to $18.030 billion for fiscal years 2017 to 2018 (see Figure 1). Prof. **David A. Skeel, Jr.** (University of Pennsylvania Law School; Philadelphia), a member of the Oversight Board and past ABI Resident Scholar, said that the fiscal plan "aims to boost revenues with tax reforms, increase tax compliance and increase fees and taxes; tighten government spending with a wage freeze until 2020 and cut subsidies and operational expenditures; extract economies in health care spending and pension plans; and invest in infrastructure projects along with support from public/private partnerships."[6]

The certified fiscal plan retains all payroll employees but reduces paid public holidays from 30 to 15 days, and reduces several other employee benefits. Government spokesman Ramón Rosario said that the purpose of Puerto Rico's "80 percent cut to debt-service payments" is "precisely to save public employees and services provided by the government."[7] The consolidated central government budget is $18 billion (including federal funds). The fiscal plan and proposed budget will have $851 million in expense cuts for fiscal year 2018:
- $411 million in reduced subsidies to the University of Puerto Rico (UPR), municipalities and private companies;

---

3   PROMESA Package, House Committee on Natural Resources, May 18, 2016, p. 7, *available at* drive.google.com/file/d/0B1sjx-sk-u_DVkNJLW1ZaGM1d3c/view?usp=sharing.
4   "Hatch Pushes for Current Financial Statements from Puerto Rico," Senate Committee on Finance, Feb. 10, 2016, at p. 5, *available at* finance.senate.gov/chairmans-news/hatch-pushes-for-current-financial-statements-from-puerto-rico.
5   "Fiscal Plan for Puerto Rico," Puerto Rico Fiscal Authority and Financial Advisory Authority, March 13, 2017, *available at* drive.google.com/file/d/0BwUIdNJ-sOg_YVBMbUVsUVNFcXc/view?usp=sharing.
6   "Perils in Puerto Rico: Is Bankruptcy the Answer?," Knowledge@Wharton, May 9, 2017, *available at* knowledge.wharton.upenn.edu/article/puerto-rico-can-recover.
7   Luis J. Valentín, "La Fortaleza Stands Firm Regarding Fiscal Adjustments," *Caribbean Business*, May 1, 2017, *available at* caribbeanbusiness.com/la-fortaleza-stands-firm-regarding-fiscal-adjustments.

*continued on page 77*



**Figure 1: Projected Puerto Rico Central Government Revenues and Expenses (Excludes Debt Service; Includes Zero Federal Funds for Medicaid)**

*Fiscal year — Source: March 13 fiscal plan.*

## Developing: Puerto Rico Enters Bankruptcy on May 3
from page 13

- $250 million reduction in marginal employee benefit payments (*i.e.*, elimination of sick leave payouts, Christmas bonus reduction, reduction of paid public holidays, etc.); and
- $190 million of savings achieved by outsourcing nonessential services via public/private alliances.[8]

The fiscal plan projects a $100 million reduction in fiscal year 2018 health care spending through the capping of payments to health care providers. UPR is receiving the largest subsidy cut in an effort to rationalize their operations with private higher-education institutions (the fiscal plan does not specify the dollar amount of specific subsidy reductions). UPR's finance director said that they currently intend to pay their bonded debt and do not intend to file a Title III petition.[9]

An amendment made to the fiscal plan for public pensions states that all retirees will have their pensions adjusted to the poverty level but does not specify the amount of savings to the central government for fiscal years 2018-26. The unamended fiscal plan projected savings on pension costs of $83 million per year beginning in 2020, achieved by capping public pensions at $2,000 per month including Social Security payments.

On May 12, 2017, current Puerto Rico Gov. Ricardo Rosselló signed Executive Order 2017-033 to consolidate supervision of spending in three agencies: the Financial Advisory Authority and Fiscal Agency (AAFAF), the Department of Finance (DH) and the Office of Management and Budget (OGP). Gov. Rosselló stated:

> The current situation of our island requires the prompt intervention of the AAFAF, the DH and the OGP, according to their respective powers in law.... Appointed personnel will be able to review invoices, reconcile debts and recommend reductions in contract costs so that contracting reductions are achieved and additional savings are generated to those already projected by the government. No new contracting will be allowed that is not essential.[10]

Three days prior to executive order 2017-033, the AAFAF issued contract number 2017-000052 for $250,000 to KOI Americas for advertising expenses in Gov. Rosselló's campaign for governor. Since he took office on Jan. 2, 2017, various government entities have issued more than 950 contracts for advertising and public relations, according to the Office of the Comptroller's Contracts Registration database. It is unclear why government entities would contract for paid advertising and public relations, or how rigorously the government intends to identify essential services and rein in spending.

### Revenue Increases

Revenue enhancements in the fiscal plan rely primarily on the extension of the reform of corporate taxes (approximately 60 percent of revenue increases), the extension of the current sales tax to internet purchases, increases in excise taxes on tobacco products, a 10 percent increase in the cost of traffic fines and driver's licenses, and 5 percent premium increases on insurance offered by the government.[11] The fiscal plan also relies on improved tax compliance; Puerto Rico has had a historic problem with collecting taxes at a rate commensurate with U.S. states.

The plan does not project any revenue from asset sales, although PROMESA explicitly gives the Oversight Board the authority to sell assets. For example, the government intends to close approximately 170 public schools and consolidate students and teachers with nearby schools. The government has projected $7 million in savings from the consolidation. Gov. Rosselló campaigned on a pledge to turn the closed facilities into homeless shelters, senior centers and animal rescue facilities, and has made no mention of selling these properties.

The fiscal plan projects zero federal funding for Medicaid, although Congress appropriated $295 million for Puerto Rico in May 2017,[12] and House Speaker Paul Ryan (R-Wis.) has stated that he will address Puerto Rico's Medicaid funding in September as part of the state Children's Health Insurance Program. The fiscal plan projects an increasing loss of Medicaid funds up to $2.382 billion in 2026.[13] The assumption of zero federal dollars for Medicaid means that the Puerto Rico government will fund the entire expense for the next 10 years. No U.S. state government proposed budget assumes zero funds for Medicaid.[14] At a Heritage Foundation meeting earlier this year, Gov. Rosselló discussed cutting taxes once Title III is complete.[15]

KBRA recognizes that the eventual outcome of any restructuring and longer-term fiscal plan must protect the funding of essential services to the citizens of Puerto Rico. However, the certified fiscal plan does not reflect any meaningful effort, in KBRA's view, to identify and eliminate or substantially reduce the costs of nonessential services. For example, the financial bridge analysis prepared by Ernst & Young (EY), a document designed to fill gaps in the commonwealth's financial reporting, states that "total operating expenditures have increased from" fiscal years 2014-16.[16] This suggests limited financial restraint during a period when the commonwealth was defaulting on debt payments.

### Essential Services

The certified fiscal plan deviates substantially from PROMESA's requirements because it does not identify "essential services" as required in § 201(b)(1)(B). The fiscal plan also appears to assume that all current spending and

---

8  Damaris Suárez, "$851 Million Decrease in PR Government Expenses," *Noticel*, May 10, 2017, *available at* noticel.com/noticia/202891/asoma-reduccion-de-851-millones-en-gastos-del-gobierno-de-pr.html.
9  Cynthia López Cabán, "UPR Does Not Think for Now to Restructure Its Debt," *El Nuevo Día*, May 13, 2017, *available at* elnuevodia.com/noticias/locales/nota/lauprnopondera-porahora-reestructurarsudeuda-2320546.
10  Rebecca Banuchi, "Rosselló Imposes More Controls on Public Spending," *El Nuevo Día*, May 13, 2017, *available at* elnuevodia.com/noticias/locales/nota/roselloimponemascontrolesalgastopublico-2320606.

11  *See* Fiscal Plan, p. 19, *supra* fn.6.
12  Robin Respaut and Nick Brown, "U.S. Congress to Give Puerto Rico Short-Term Medicaid Help," Reuters, May 1, 2017, *available at* reuters.com/article/us-puertorico-debt-healthcare-idUSKBN17X285.
13  *See* Fiscal Plan, p. 13, *supra* fn.6.
14  *See* "States' Proposed and Enacted Budgets," National Association of State Budget Officers, *available at* nasbo.org/resources/proposed-enacted-budgets.
15  "Moving Puerto Rico Forward: A Conversation with Governor Ricardo Rosselló of Puerto Rico," Heritage Foundation, April 26, 2017, *available at* heritage.org/budget-and-spending/event/moving-puerto-rico-forward-conversation-governor-ricardo-rossello-puerto.
16  "Puerto Rico: Is It Doing Enough to Regain Capital Market Access?," Kroll Bond Rating Agency, April 20, 2017, *available at* drive.google.com/file/d/0BwUldNJ-sOg_ZjhDQm9KYzRMekE/view?usp=sharing.

continued on page 78

## Developing: Puerto Rico Enters Bankruptcy on May 3
*from page 77*

employees are essential. The fiscal plan explicitly states that it "does not attempt to resolve, among others, the following issues: What is an essential service for purposes of the exercise of the Government's police power."[17]

It is unclear why the Oversight Board certified a fiscal plan that does not comply with PROMESA. The federal government must regularly identify essential services when continuing appropriations expire and the government is shut down. Although Congress has not specified what it considers to be "essential services," a 2014 report lists what services were deemed essential by the Office of Management and Budget.[18]

In addition, the fiscal plan includes an annual expense line of approximately $600 million, termed a "Reconciliation Adjustment," and the 10-year total for this expense is $6.175 billion. PROMESA § 203(a)(1)(B) instructs the Oversight Board to require reductions in spending to align with the adopted budget, so it is unclear why the Oversight Board would approve such a large recurring expense for unspecified purposes.

The stated explanation for this spending buffer was three weeks of contract work by EY,[19] which had not previously audited any Puerto Rico entity for at least five years. The EY contract stated that they were retained to "assess the completeness of the financial bridge between the Government of Puerto Rico audited financial statements of June 30, 2014, and the Government's 2017 fiscal plan baseline.... The Financial Bridge has been prepared by the Government and its advisors."

PROMESA does not allow a judicial challenge to the fiscal plan certification, although bond insurers Assured Guaranty and National have already filed an adversary complaint. A group of bondholders wrote to the Oversight Board regarding the fiscal plan:

> As many of us have informed you, we have fundamental issues with and questions regarding the March 13 Fiscal Plan's underlying assumptions. We also are concerned by the fact that the Fiscal Plan was constructed without respecting the various legal rights of Puerto Rico's financial creditors, among other things.[20]

A Puerto Rico legislator and spokesman for former Gov. García Padilla stated in an opinion column[21] that the fiscal plan funds 87 public agencies that do not provide essential services (and cited budget figures, including revenues of the central government and public corporations such as state-owned electric utility Puerto Rico Electric Power Authority (PREPA)):

> Finally, an analysis of the current budget shows that 36 public entities that offer essential services, including municipalities and UPR, would receive $21.3 billion, or 81.7 percent, of the consolidated budget. If these figures are ordered by a cut of 15 percent, the Government, in that group alone, would have [a] savings of $3.2 billion. In addition, there are another 87 entities that do not offer essential services and receive another $4.1 billion. If applied the same rod, would leave another $800 million that would be sufficient resources to pay interest and to repay the principal of the public debt. The situation requires us all to make adjustments, but certainly, protecting the areas of services most important to our people and those that will help us get up as soon as possible [are priorities]. There is no longer room for spectacle and ambivalence.

Bond insurer Assured Guaranty wrote to the Oversight Board asking that they formally revoke certification of the March 13, 2017, fiscal plan on the grounds of material noncompliance with PROMESA.[22] U.S. Sens. Tom Cotton (R-Ark.) and Thom Tillis (R-N.C.) asked the Oversight Board to explain how the fiscal plan was compliant with PROMESA,[23] and Oversight Board Chair José Carrión responded, obfuscating about compliance:

> Whether the Fiscal Plan Legally Complies with a Statute Is a Legal Question: Your Letter states that during the House Subcommittee on Indian, Insular, and Alaska Native Affairs' March 22 hearing, I was asked where the certified fiscal plan complies with PROMESA. I said it does, because that is my belief. When it appeared [that] the same question was being repeated, I believed [that] the subcommittee might be referring to the COFINA-GO dispute, and I responded that the FOMB had not taken a position on that dispute. But, your Letter asserts my response was "unsatisfactory," and that I did not explain why the fiscal plan is compliant. While I am not a lawyer, I am advised that PROMESA section 201(b) governs the compliance requirements, and that it has [14] subdivisions, which would make it difficult for me to a give a complete explanation in the context of a hearing even if I had fully appreciated the focus of the question.[24]

The certified fiscal plan projects $183 billion of revenues and allocates $7.87 billion of debt service over 10 years.[25]

### Fiscal Plan Funds Available for Debt Service

The fiscal plan proposes minimal debt service compared to contractual debt service. Funds available for debt service would increase considerably if the fiscal plan projected more than $0 for Medicaid for the next 10 years. Figure 2 on p. 79 compares debt service as a percentage of locally collected central government revenues (excludes federal funds).

---

17 *See* Fiscal Plan, p. 5, *supra* fn.6.
18 "Shutdown of the Federal Government: Causes, Processes and Effects," Congressional Research Service at p. 29, available at fas.org/sgp/crs/misc/RL34680.pdf.
19 EY Contract of Feb. 15, 2017, available at drive.google.com/file/d/0BwUldNJ-sOg_cnBEd3VEeE5LMIU/view?usp=sharing.
20 *See* Joint Creditor Letter to FOMB, March 30, 2017, available at drive.google.com/file/d/0BwUldNJ-sOg_OTcxQTBWWVIIUHM/view.
21 Jesús Manuel Ortiz, "Omissions that Hinder Rescue of Puerto Rico," *El Nuevo Día*, May 9, 2017, available at elnuevodia.com/opinion/columnas/omisionesqueentorpecenrescatarapuertorico-columna-2319321.

22 "Request to Revoke Certification of Fiscal Plan for Non-Compliance with PROMESA," April 5, 2017, available at drive.google.com/file/d/0BwUldNJ-sOg_S2tMY0xaM0JKUFU/view?usp=sharing.
23 *See* Letter Dated April 7, 2017, available at drive.google.com/file/d/0BwUldNJ-sOg_Y1R0Zk9WMEVoMHM/view?usp=sharing.
24 *See* Letter Dated April 25, 2017, p. 11, available at drive.google.com/file/d/0BwUldNJ-sOg_QzIvUTlSX3lxa0E/view?usp=sharing.
25 *See* Fiscal Plan, p. 29, *supra* fn.6.

### Federal Funds to Puerto Rico

Many essential services for Puerto Rico's citizens are substantially paid for with federal funds. The government and citizens receive grants and transfers for primary and higher education, health care, public safety, retirement and disability, and other services. Puerto Rican workers pay Social Security taxes but are currently exempt from federal income taxes for income earned on the island. Federal grants and transfers to Puerto Rico are approximately twice the amount of locally collected revenues, according to a 2015 report.[26]

### Financial Statements

Puerto Rico has yet to provide audited Comprehensive Annual Financial Reports (CAFRs) for Fiscal Years 2015 and 2016. Puerto Rico's audited Fiscal Year 2014 CAFR (the latest available) was released at midnight on June 30, 2016, the same day on which PROMESA was enacted. The financials were prepared by KPMG and released more than a year after the May 2015 deadline. There has been, however, a parade of financial documents that purport to represent the financial condition of the Puerto Rico government, including the following:

1. a debt-sustainability analysis prepared by Dr. Anne Krueger and other former IMF economists;[27]
2. a detailed liquidity analysis prepared at the request of creditors by Conway MacKenzie;[28]
3. a fiscal and economic growth plan, which contains detailed 10-year revenue and expenditure projections;[29] and
4. a data report that provides a general overview of the commonwealth's financial condition and its outstanding debt-service obligations.[30]

These earlier financial documents generally provide for less spending and more debt service. Given the contradictions and irregularities presented in numerous financial documents, it is not yet clear that the Puerto Rico government and Oversight Board are "on the path towards producing audited financials," as required in PROMESA.

### History of False Financial Documents

Puerto Rico has a long history of falsifying its financial documents, according to public officials. At a Politico event, Gov. Rosselló admitted that the government had operated as a "giant Ponzi scheme"[31] and regularly misrepresented its financial condition. The *New York Times* previously reported on how former Gov. García Padilla testified to Congress that former governments had falsified financial reports:

> It's a historical problem in Puerto Rico.... We inherited such a mess there, too. It was part of the different governments, in the past, to hide information from the market, so they were able to have more access to the market.[32]

Puerto Rico's Center for Investigative Journalism wrote how expenses were falsely misrepresented in budgets and the government made no midyear budget reductions even though a 2006 budget law required it to do so:

> Faced with questions, [Government Development Bank (GDB) President Melba Acosta Febo] acknowledged that the Legislature left out of the current budget those items corresponding to agency debt payments with the GDB, affecting the already delicate liquidity of the GDB. The presumed "reserve" created by the chairman of the Finance Committee, Rafael "Tatito" Hernández, is actually the payment of local debt that is being pushed into the future, the CPI found.
> Contrary to the provisions of the Fiscal Reform Law of 2006, the budget does not include agency consolidation or significant expenditure cuts. The OGP director acknowledged in an interview with the CPI that in the current budget no structural changes were made to the government, nor pay cuts. He said the changes will be part of the plan drawn up by the Fiscal Board appointed by the governor following the recommendations of the Krueger Report and should be ready by August 30.[33]

Unfortunately, KPMG has been unable to complete audited financial statements for fiscal years 2015 or 2016.

### Title VI: Consensual Negotiations

Congress repeatedly stated its preference for consensual negotiations between the Oversight Board, acting on behalf of the government, and creditors. A memo by the Majority Staff of the Committee on Natural Resources for an oversight hearing to be held Feb. 25, 2016, stated:

> Much of the debt restructuring proposed by the Administration may occur through consensual agree-

---

26 See "Federal Funds Management Office: Commonwealth of Puerto Rico," Federal Funds Management Office for the Commonwealth of Puerto Rico, available at drive.google.com/file/d/0BwUldNJ-sOg_SUhmdnRjS3lwbGM/view?usp=sharing.
27 Anne Krueger, Ranjit Teja and Andrew Wolf, "Puerto Rico: A Way Forward," June 29, 2015, available at bgfpr.com/documents/FinalUpdatedReport7-13-15.pdf.
28 "Liquidity Update, Commonwealth of Puerto Rico," Conway MacKenzie, Aug. 25, 2015, available at drive.google.com/file/d/0BwUldNJ-sOg_dWU1TU4zTUFrYWc/view.
29 Puerto Rico Fiscal and Economic Growth Plan, dated Sept. 9, 2015 (updated on Jan. 18, 2016), available at bgfpr.com/documents/PuertoRicoFiscalandEconomicGrowthPlan9.9.15.pdf.
30 Commonwealth of Puerto Rico Financial Information and Operating Data Report, Nov. 6, 2015, available at emma.msrb.org/EP885653-EP685527-EP1087218.pdf.



**Figure 2: Proposed Puerto Rico Debt Service in March 13, 2017, Fiscal Plan Compared to Contractual DS as a Percentage of Central Government Revenues (Not Including Federal Funds)**



*Source: GBD data, March 13 fiscal plan.*

---

31 Politico Live Video, Twitter (Feb. 24, 2017, 6:32 a.m.), available at twitter.com/POLITICOLive/status/835135373483388931.
32 Mary Williams Walsh, "Puerto Rico's Debt Crisis and the 1975 Law Complicating Matters," *New York Times*, Nov. 4, 2015, available at nytimes.com/2015/11/05/business/puerto-ricos-debt-crisis-and-the-1975-law-complicating-matters.html.
33 Omaya Sosa Pascual, "Impunity in the Fiscal Debacle of Puerto Rico," Centro de Periodismo Investigativo, Aug. 13, 2015, available at periodismoinvestigativo.com/2015/08/impunidad-en-la-debacle-fiscal-de-puerto-rico.

*continued on page 80*

## Developing: Puerto Rico Enters Bankruptcy on May 3
from page 79

ments between the creditors and Puerto Rico, if a strong, independent oversight authority exists to advocate for the development of such voluntary agreements.[34]

A further possible solution would be to promote voluntary agreements between creditors and Puerto Rican debtors. Exemplifying this notion is the restructuring agreement reached between PREPA and 70 [percent] of its bondholders. This agreement provided PREPA with five-year debt-service relief of [more than] $700 million, a principal debt reduction of more than $600 million, and a refund to PREPA of $115 million of the January 1, 2016, interest payment. Consensual agreements such as this could obviate the need for forced debt restructuring and provide viable paths forward for much of Puerto Rico's debt.[35]

Rep. Bishop described the importance of consensual negotiations in the Committee markup memorandum dated May 23, 2016:

> H.R. 5278 ... is the second iteration of legislation with the express purpose of bringing fiscal responsibility and access to capital markets to ... Puerto Rico. The bill establishes an Oversight Board to supervise the development of Fiscal Plans, which act as road maps to revitalize Puerto Rico's economy, and budgets. Furthermore, the Oversight Board will work to ensure transparency and efficiency in the island's finances, as well as facilitate private capital to invest in the island's infrastructure.
>
> PROMESA provides Puerto Rico with potential access to debt restructuring overseen by a district court and driven by the Oversight Board acting in place of the debtor. Such restructuring access, however, is conditioned on the Oversight Board's determination that the debtor has met specific criteria, including whether the debtor has undertaken good-faith voluntary negotiations to reach a consensual restructuring agreement.

The Congressional Research Service wrote in a July 1, 2016, report on PROMESA:

> Title VI: Creditor Collective Action: The first section of Title VI (§ 601) would establish a process for creditor collective action that could retroactively change individual creditor rights for a portion of Puerto Rico's outstanding bonded debt. "Collective action clauses" (CACs) are a feature of sovereign bonds that, while long-standing in London-issued sovereign debt, became more common for debt issued under New York law around 15 years ago.
>
> The second section (§ 602) states that the process would be governed by U.S. law, without regard to any foreign or international law. CACs have been used to expedite the restructuring of sovereign debt. CACs allow a supermajority of bondholders (usually 75%) to agree to a debt restructuring that is legally binding on all bondholders. Without CACs, some bondholders may have incentives to try to hold out for better terms, slowing down the negotiations. CACs describe a procedure a country may use once it decides it must restructure its debt.[36]

Unfortunately, the Puerto Rico government and Oversight Board consistently refused consensual negotiations with creditors. After they certified the fiscal plan on March 13, 2017, the government and Oversight Board stalled for one month and left a very short window for any consensual deals.

The Ad Hoc GO Bondholder Group wrote to Carrión[37] requesting negotiations to begin with meetings on March 27-31, 2017. The letter stated:

> On March 18, 2017, the Oversight Board moved before the First Circuit Court of Appeals to stay the pending litigation in *Lex Claims, LLC, et al. v. Alejandro Garcia Padilla, et al.*, No. 3:16-cv-02374 (D.P.R.). In seeking a stay, the Oversight Board argued that it "has approximately 45 days left before the PROMESA stay will end and, absent a Title III filing, the Commonwealth will then be inundated with creditor lawsuits. The Oversight Board requests that it be given these six weeks to negotiate with the Commonwealth and its creditors...." The Board further stated that it would suffer irreparable harm if ongoing litigation interfered with the negotiation process contemplated by PROMESA.
>
> The First Circuit Court of Appeals agreed, stating that the Board's participation in litigation "would take valuable time and resources away from the Board's crucial work of negotiating voluntary resolutions between the Commonwealth and its creditors," and cause "irreparable harm to the Oversight Board's PROMESA negotiations."

Another large group of creditors wrote to the Oversight Board on March 30, 2017,[38] pleading to begin negotiations. The Oversight Board did not respond, and instead insisted on supervised mediation beginning on April 13, 2017. This left only 17 days to consensually negotiate approximately $50 billion of debt prior to the May 1, 2017, expiration of the stay imposed by Congress.

### Consensual Negotiations by Debt Class

Sens. Cotton and Tillis wrote to the Oversight Board on April 7, 2017, expressing concern that the fiscal plan did not comply with PROMESA's requirements and that the Oversight Board was refusing to consensually negotiate with creditors[39] (see Figure 3 on p. 81). On April 25, 2017, the Oversight Board responded, asserting that creditors believed that the assumptions of the fiscal plan created an "econom-

---

34 Committee on Natural Resources Memo, dated Feb. 22, 2016, at p. 1, *available at* drive.google.com/file/d/0BwUIdNJ-sOg_UDJCTVQyVUQ2cU0/view?usp=sharing.
35 *Id.* at p. 3.
36 D. Andrew Austin, "The Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA; H.R. 5278, S. 2328)," Congressional Research Service at p. 31, *available at* fas.org/sgp/crs/row/R44532.pdf.
37 GO Letter to Commonwealth, dated March 22, 2017, *available at* drive.google.com/file/d/0BwUIdNJ-sOg_OU9Wa0cwcXMzbzQ/view?usp=sharing.
38 *See* Joint Creditor Letter to FOMB, *supra* fn.21.
39 *See* Letter Dated April 7, 2017, *supra* fn.24.

ic pie" that was too small to pay more debt service.[40] The Oversight Board also asserted that maximum expense cuts had been made in the plan and that they had responded to all creditor requests to consensually negotiate. A Puerto Rico business reporter wrote on the paucity of the negotiations:

> Prior to filing Title III, Puerto Rico and their creditors exchanged 5 offers and counteroffers and none were completed. According to three ENDI sources, one of the GO offers made by Ad Hoc Group of GO Bondholders remained alive until the morning hours of May 3, hours before Governor Rosselló stated he would be filing Title III.
>
> The Board opposed everything, forced the Fiscal Plan, refused to make changes to that plan, denied all offers that were made and now also forced the Government to file Title III, said one of the sources. The sources say that although there was the impression that between April 13 and 28, there were two weeks of talks in fact during that period hardly three meetings were held with mediator, ex federal judge **Allan L. Gropper**.[41]

The Oversight Board, in filing their Title III petition, asserted:

> 6. From December 2016 through March 2017, the Oversight Board and the Commonwealth held more than thirty meetings with creditor representatives to better understand their perspectives and work towards achieving a consensual financial restructuring. On March 13, 2017, after almost six months and numerous internal and external meetings between the Oversight Board and its advisors, the Oversight Board certified an amended version of the current Governor's fiscal plan. Not happy with the result and the projected level of debt service, creditors requested the decertification of the current fiscal plan and the certification of a new fiscal plan that would have exceeded the certified fiscal plan's debt sustainability analysis. The Oversight Board and the Commonwealth convened mediation on April 13, 2017, to find common ground and a consensual resolution.
>
> 7. As of the termination of the PROMESA stay, no consensual agreement was reached. Given the massive debt load to be addressed, as well as the need to attain pension and operational reform in accordance with the fiscal plan, it was determined that the best path forward was to commence a Title III case to protect Puerto Rico and its citizens.[42]

### Title VI Offers Made to Creditors

The Puerto Rico government and Oversight Board published two offers made to GO and COFINA bondholders on the Municipal Securities Rulemaking Board website (the April 24, 2017, offer and May 1, 2017, counteroffer). The offer had the following provisions:

- Puerto Rico's government presented a debt-restructuring offer that could repay as much as 77 percent of GO bonds and 58 percent of tax-backed bonds, but both bondholder groups quickly rejected it;
- Puerto Rico's proposal would appear to treat GO debt more favorably, threatening COFINA holders with much smaller recoveries if they reject the plan;
- Under its proposal, Puerto Rico would issue $16.75 billion of new senior bonds and $10 billion in "cash flow bonds," essentially a growth bond, payable only if the island exceeds fiscal targets;
- GO holders would get $9.8 billion of the senior bonds, recouping them a guaranteed 52 cents on the dollar, as

---

40 See Letter Dated April 25, 2017, supra fn.26.
41 Joanisabel Gonzalez, "The Night Before Title III," El Nuevo Día, May 8, 2017, available at elnuevodia.com/negocios/economia/nota/lanocheantesdeltituloiii-2318810.
42 See "Title III Petition for Covered Territory or Covered Instrumentality" at p. 24, available at drive.google.com/file/d/0BwUldNJ-sOg_UkRvQXRtZHZuSEE/view?usp=sharing.

continued on page 82

### Figure 3: Consensual Negotiations by Debt Class

| Debt Serviced from General Fund | Fiscal Plan Certification | Title 6 Negotiations Commence(d) | Debt to Be Renegotiated | Days Since Fiscal Plan Was Approved | Days Puerto Rico Government Allotted for Negotiations as of April 30, 2017 |
|---|---|---|---|---|---|
| General Obligation | March 13 | Forced Mediation, April 14-23 | $13.257 Billion | 48 | 17 |
| Government Development Bank | April 27 | Ducera/Coops in Voluntary Mediation with Gropper | $4.126 Billion | 3 | Unknown |
| Highway and Transportation Authority | April 27 | None | $4.124 Billion | 3 | None |
| Puerto Rico Sales Tax Financing Corp. | March 13 | Forced Mediation, April 14-23 | $17.58 Billion | 48 | 17 |
| Public Building Authority | March 13 | None | $4.097 Billion | 48 | None |
| Employee Retirement System | March 13 | None - Judge Besosa Req. Interest Set Asides | $3.156 Billion | 48 | None |
| Public Finance Corp. | March 13 | None | $1.197 Billion | 48 | None |
| Puerto Rico Infrastructure Financing Authority | March 13 | None | $2.207 Billion | 48 | None |
| University of Puerto Rico | None | Fiscal Plan Deadline April 30 | $496 Million | 48 | None |
| Puerto Rico Convention Center Authority | March 13 | None | $386 Million | 48 | None |
| Puerto Rico Infrastructure Development Co. | March 13 | None | $156 Million | 48 | None |
| **Total Debt Serviced from General Fund** | | | **$51.461 Billion** | | |

***Developing: Puerto Rico Enters Bankruptcy on May 3***
from page 81

well as $4.7 billion of the conditional cash flow bond, which could up their recoveries to 77 cents; and

• COFINA holders would get $6.9 billion of the senior bond and $3.3 billion of the cash-flow bond (a recovery of up to 58 percent) but only if they accepted the deal; otherwise, Puerto Rico would repay senior COFINA holders with $450 million in short-term notes, while junior COFINA holders would get nothing.[43]

The Puerto Rico government made a counteroffer to GO bondholders[44] of 70 cents cash and 20 cents of a "hope" or "growth" bond that would only pay out if certain fiscal targets were met. In the offer, the government also proposed to litigate against COFINA creditors.

### Treatment of Local Bondholders

The April 24, 2017, offer contained a placeholder for a "convenience class" of bondholders, which is assumed to represent a special class dedicated to on-island bondholders. According to a former Puerto Rico advisor:

> It is ... imperative that any restructuring proposal incorporates a restructuring solution that addresses the needs of local holders. Such a solution could take many forms, including a long-dated instrument that maintains the same par value as the old bonds (but with a lower interest rate and little or no amortizations) for those holders who are focused on capital preservation or estate planning; transferable tax credits for lost principal that offset local taxes owed (calculated to not materially erode in any given year government revenues for such year), which could enable local holders to monetize or offset some of the losses they may experience; options to swap discounted debt for "equity" in new public vehicles set up to hold assets that are expected to be privatized; a government-sponsored support mechanism to protect the viability of local credit unions (cooperativas) and help them offset losses from discounted debt that otherwise might harm some of the most vulnerable residents of Puerto Rico; and/or the establishment in Title III of a convenience class of local individual, retail holders to mitigate their losses up to an agreed maximum amount of discounted debt.[45]

Giving preferential treatment to local bondholders appears to directly contradict Congress's intent. Rep. Bishop stated at a House Rules Committee hearing on June 9, 2016, regarding his manager's amendment:

> Furthermore, the amendment grants the Oversight Board the authority to review and rescind any laws passed by the territory between May 4, 2016, and the date of the full appointment of the membership of the Board. This date would capture some of the more controversial amendments made to the debt moratorium bill on May 5, which prioritized local (territorial) bondholders over bondholders off the island.[46]

Although politically advantageous to preference local bondholders, it seems clear that Congress wants mainland and island bondholders to be treated equally in the restructuring.

### Oversight Board Title III Filing for Puerto Rico

On May 3, 2017, on Puerto Rico's behalf, the Oversight Board filed for bankruptcy protection under Title III of PROMESA in the U.S. District Court for the District of Puerto Rico. The Title III case was filed after the expiration of a PROMESA litigation stay at midnight on May 1, 2017, and followed the filing of multiple litigations by several creditors on May 2, 2017.

Title III provides a means for the commonwealth that is in financial distress to work with its creditors in order to adjust its debts. To that end, certain sections of the U.S. Bankruptcy Code are incorporated and become applicable to cases under Title III.

In Title III, the commonwealth will remain in possession and control of its property, and will continue to maintain its functions and provide services for the benefit of its citizens. The commonwealth intends to propose a plan for the adjustment of commonwealth debts, although they claim that this intention will not exclude efforts to implement agreed-upon debt restructurings if possible.[47]

### Mutual Funds Holding Puerto Rico Debt

More than two dozen mutual funds hold approximately $15 billion of uninsured Puerto Rico bonds.[48] OppenheimerFunds, a unit of Massachusetts Mutual Life Insurance, is the biggest mutual fund holder with $6.3 billion. Franklin Resources Inc., the second-largest holder, has about $3.1 billion. UBS Asset Managers of Puerto Rico funds hold $1.4 billion, followed by Goldman Sachs Asset Management, which holds about $1.2 billion.

### Bond Insurers

First, Ambac Financial Group reported an exposure of $9.7 billion to Puerto Rico debt, mainly of COFINA bonds (net accrued exposure equals $2.7 billion: $1.3 billion in COFINA, $493 million in Highways and Transportations Authority (HTA) bonds, $56 million in PRIFA, $137 million in CDA and $187 million of GO). Ambac is a plaintiff

---

43 See "Municipal Secondary Market Disclosure Information Cover Sheet," Puerto Rico Fiscal Agency and Financial Advisory Authority, *available at* drive.google.com/file/d/0BwUldNJ-sOg_NGxHWm1UTnNEMHc/view?usp=sharing.

44 See "GO Counter Proposal," Puerto Rico Fiscal Agency and Financial Advisory Authority, May 1, 2017, *available at* emma.msrb.org/ES1027603-ES803731-ES1205100.pdf.

45 Richard J. Cooper and Luke A. Barefoot, "What Should Puerto Rico Offer Its Creditors?," *Law360*, March 15, 2017, *available at* clearygottlieb.com/~/media/cgsh/files/bio-pdfs/what-should-puerto-rico-offer-its-creditors.pdf.

46 See Chairman Rob Bishop, Manager's Amendment Statement, *available at* drive.google.com/file/d/0BwUldNJ-sOg_MldtMGp4Rmw0UEU/view?usp=sharing.

47 "Puerto Rico Debt Restructuring Chronology," *available at* docs.google.com/document/d/1J6YxpkgYsNqbgamNhp2vzliyfb5LaeaPv-jrWzc4b9M/edit.

48 Martin Z. Braun, "Puerto Rico Menaces Mutual Funds that Resisted Market Exodus," *Bloomberg*, May 8, 2017, *available at* bloomberg.com/news/articles/2017-05-08/puerto-rico-menaces-mutual-funds-that-bucked-bond-market-exodus.

in five of the eight lawsuits related to PROMESA that were filed after the expiration of stay imposed by Congress.

Second, Assured Guaranty has an exposure of $ 5.4 billion, mainly GOs, PREPA and HTAs. They have two of the pending lawsuits against the government and the Oversight Board.

Third, National Public Finance Guaranty/MBIA reports an exposure of $4.1 billion in COFINA and PREPA bonds. National is a party to the adversary proceeding against the Oversight Board.

Fourth, Financial Guaranty Insurance Co. reports an exposure of $ 1.9 billion, mainly in GO, HTA and IFA bonds.

### Oversight Board: All Issued Debt Is Legal

Competing claims will be strongly contended, but the Oversight Board is already attempting to take one significant issue off the table by declaring in its commonwealth Title III petition that amendments to Puerto Rico's Constitution made the stated debt limit irrelevant. Two classes of senior bondholders (GOs and COFINA) have made claims against the other class that issuance of the other's debt breached limits set in the Puerto Rico Constitution and was therefore invalid.

### Challenging the Fiscal Plan

Since the Oversight Board is attempting to reduce bonded debt claims by approximately 80 percent of what is contractually due, it does not appear that the fiscal plan certified by the Oversight Board would meet Congress's requirement to "respect the relative lawful priorities or lawful liens." The fiscal plan has already been challenged by two major bond insurers, Assured Guaranty and National Public Finance, which collectively insure $9.5 billion of debt. In their adversary complaint filed May 3, 2017, they allege that the fiscal plan is illegal for numerous reasons and constitutes a taking in violation of the U.S. Constitution. In a statement by Assured attorneys, Cadwalader, Wickersham & Taft LLP said:

> On behalf of Assured, Cadwalader on May 3 filed the first major litigation in the Title III case against Puerto Rico, the Oversight Board, the Governor of Puerto Rico and other Puerto Rican officials. The litigation was filed in response to Puerto Rico's fiscal plan that violated PROMESA by totally disregarding lawful priorities and liens on special revenues pledged to secure bonds insured by Assured. The adversary complaint alleges that the fiscal plan also violates the U.S. Constitution by substantially impairing the contractual rights of Assured and other bondholders, and by depriving them of property without just compensation or due process of law.[49]

The adversary complaint challenges the fiscal plan as being "illegal" and insufficient to allow a Title III filing. The claim's basis is that although PROMESA does not allow the certification to be challenged, it does appear to allow the review and approval of the fiscal plan to be challenged. The challenge itself revolves around the mandatory language "shall" regarding the requirements for the fiscal plan in § 201(b). In addition and as a fallback argument, the plaintiffs argued that if PROMESA's language does allow the Oversight Board to disregard the requirements of § 201(b), then that portion of the law itself is unconstitutional and thus invalid.

### Lawsuits Filed After the Expiration of the PROMESA Stay on May 1, 2017

- *Aurelius, et al., Government of Puerto Rico, filed May 2, 2017, in the Supreme Court of the State of New York:* A group of hedge funds, including Aurelius, Autonomy and Monarch, claimed that the government must pay almost $ 243 million in debt service that it has not covered, plus interest. The plaintiffs own $ 1.4 billion in GO bonds issued by the government in 2014.[50]
- *Ambac v. Government of Puerto Rico (I), filed May 2, 2017, in U.S. District Court of Puerto Rico, Case No. 17-cv-1567:* COFINA bond insurer Ambac asked to override the certified fiscal plan and local law 938. They claim that both are unconstitutional and contrary to PROMESA. Ambac is trying to prevent the government from appropriating the sales and use tax (IVU) funds that guarantee the payment of COFINA's debt.[51]
- *Ambac v. Government of Puerto Rico (II), filed May 2, 2017, in U.S. District Court of Puerto Rico, Case No. 17-cv-1568:* In addition to claims made against the fiscal plan and local law 938 in 17-cv-1567, the insurer also asked to overrule the moratorium orders and legislation in effect since the end of 2015. Through them, the government retains, or can "claw back," certain sources of income — taxes, cigarette licenses and taxes, oil barrel and hotel room fees, among others — that guarantee the payment of debt of HTA, IFA and the PRCCDA. They claim that the orders are also unconstitutional and contrary to PROMESA. Ambac wants to prevent the government from using these monies for uses other than the payment of the debts they guarantee.[52]
- *Ambac v. U.S. Treasury (III), filed May 2, 2017, in U.S. District Court of Washington, D.C., case No. 17-cv-809:* Ambac also sued the U.S. Treasury regarding the money that it transfers to the Puerto Rican government for federal excise duty for rum sales. Through one of the moratorium orders, the Puerto Rico government has withheld this source of income that guarantees the payment of certain IFA bonds. The insurer requested that the U.S. Treasury cease transferring these funds to the Puerto Rico government until the clawback dispute has been resolved. In the alternative, Ambac requests retention of the funds in a segregated account.[53]
- *Aristeia Horizons, et al. v. Government of Puerto Rico, filed May 2, 2017, in U.S. District Court of Puerto Rico, Case No. 3:17-cv-1566:* A coalition of institutional funds and hedge funds that owned COFINA senior bonds sued the government in Puerto Rico's federal court. The plaintiffs requested that the court declare as invalid the fiscal plan and local law 938 as being contrary to PROMESA and for impairing the rights of these bondholders.[54]

---

49 "Cadwalader Represents Largest Insurer of Puerto Rico Bond Debt in Historic Restructuring," Press Release, May 9, 2017, *available at* cadwalader.com/news/news-release/cadwalader-represents-largest-insurer-of-puerto-rico-bond-debt-in-historic-restructuring.

50 *See* Filing, *available at* cb.pr/wp-content/uploads/2017/05/Aurelius.pdf.
51 *See* Filing, *available at* cb.pr/wp-content/uploads/2017/05/Ambac-1.pdf.
52 *See* Filing, *available at* cb.pr/wp-content/uploads/2017/05/Ambac-2.pdf.
53 *See* Filing, *available at* cb.pr/wp-content/uploads/2017/05/AmbacUSTreasury.pdf.
54 *See* Filing, *available at* cb.pr/wp-content/uploads/2017/05/Aristeia.pdf.

*continued on page 84*

## Developing: Puerto Rico Enters Bankruptcy on May 3

*from page 83*

• *Assured and MBI Adversary Complaint, filed May 3, 2017, in U.S. District Court of Puerto Rico, Case No. 3:17-cv-01584:* Bond insurers Assured and National are challenging the fiscal plan:[55]

> Indeed, the obvious alternative to the approval and subsequent implementation of the Illegal Fiscal Plan would have been to approve and implement a fiscal plan that actually complied with PROMESA by providing a method for the Commonwealth to achieve fiscal responsibility. For example, the Oversight Board and the Commonwealth could have addressed the Commonwealth's economic difficulties by, among other things:
>
> • Approving and implementing a fiscal plan that required the Commonwealth to adjust its budget in accordance with the "priority guidelines" set forth in the OMB Act. Notably, the Illegal Fiscal Plan itself assumes approximately $19 billion in revenues for Fiscal Year 2017, meaning that the Commonwealth and its instrumentalities could pay their approximately $3.5 billion in annual debt service (including for PBA, the Authorities, and all other Commonwealth bond issuers) and still have approximately $15.5 billion to fund other expenses. Thus, based on a proposed nondebt expense line item of approximately $18 billion in 2017, the Commonwealth could pay all debt service if it merely undertook a modest 13 [percent] trimming of nondebt expenses. Importantly, this is a conservative analysis that gives full credence to the Commonwealth's unsubstantiated claim that the approximately $600 million per annum "Reconciliation Adjustment" included in the Illegal Fiscal Plan reflects real expenses.
>
> • Approving and implementing a fiscal plan that distinguished between essential and nonessential services, as required by Section 201(b)(1)(B) of PROMESA, and that prioritized essential over nonessential services.
>
> • Approving and implementing a fiscal plan that instead of including an illegal $6.2 billion contingency reserve to cover unbudgeted expenses, assumed that the Commonwealth would eliminate structural deficits as required by Section 201(b)(1)(D) of PROMESA.
>
> • Approving and implementing a fiscal plan that required the Commonwealth to raise additional revenues, as required by the Commonwealth Constitution in a fiscal year in which appropriations exceed estimated resources. *See* P.R. Const. art. VI, § 7.
>
> • Negotiating a consensual restructuring of the Commonwealth's debt, similar to the recently-negotiated restructuring of the debts of the Puerto Rico Electric Power Authority. Notably, PROMESA itself, through Section 104(i), encourages such voluntary agreements with creditors, and Title VI of PROMESA provides a mechanism by which they can be effectively implemented.
>
> In view of these more reasonable PROMESA-compliant alternatives, the Illegal Fiscal Plan and the Fiscal Plan Act do not constitute reasonable or necessary means of serving an important public purpose and therefore violate the Contracts Clause.

• *Peaje Investments v. Puerto Rico Highways and Transportation Authority, filed May 9, 2017, in U.S. District Court of Puerto Rico, Case No. 17-cv-01612:* HTA is required to deposit certain toll revenues in a collateral account with the fiscal agent and has not done so for one year. The toll revenues serve as a source of repayment for the HTA bonds. Peaje seeks enforcement of its lien on gross HTA revenues.[56]

### Title VI Agreements

The Puerto Rico government and its advisors have been attempting to complete two Title VI agreements. The Oversight Board has not yet approved either one as required by PROMESA.

First, PREPA bondholders have been in restructuring talks since August 2015. Creditors have signed more than 15 versions of restructuring support agreements,[57] reloaned maturity proceeds to PREPA and transitioned to an agreement under Title VI of PROMESA. Under the RSAs and Title VI agreement, approximately 70 percent of PREPA bondholders agreed to a 15 percent debt reduction, which will be paid through a bond exchange. The last RSA recognizes that in order to complete a restructuring of the utility, Title III must be invoked to address employee pensions and other non-bonded debt claims.

Next, on May 15, 2017, the Puerto Rico government announced a Title VI agreement with slightly less than a majority of creditors of the GDB.[58] GDB's assets will be split between two separate entities, according to a term sheet. The first, holding $5.3 billion in GDB assets, would issue three tranches of debt with different protections in exchange for varying principal reductions for creditors. The second entity, funded with public entity loans and $50 million in cash, would benefit all other depositors. The three tranches have varying haircuts and interest rates: A tranche (55 percent recovery and 7.5 percent coupon), B tranche (60 percent

---

55 Adversary Complaint, p. 36, *available at* drive.google.com/file/d/0BwUldNJ-sOg_VWkxd3lUTDFGUG8/view.
56 *See* Filing, *available at* drive.google.com/file/d/0BwUldNJ-sOg_aHBJLTN6QnhNanM/view?usp=sharing.
57 *See* Municipal Securities Rulemaking Board, EMMA, *available at* emma.msrb.org/IssueView/IssueDetails.aspx?id=MS201107.
58 *See* Continuing Disclosure Details, EMMA, *available at* emma.msrb.org/ContinuingDisclosureView/ContinuingDisclosureDetails.aspx?submissionId=EP779430&.

recovery and 5.5 percent coupon) and C tranche (waterfall/principal amortizes after tranches A and B repaid 75 percent recovery and 3.5 percent coupon).

### Swain Appointed as Title III Judge

On May 5, 2017, Chief Justice John Roberts appointed Hon. **Laura Taylor Swain** of the U.S. District Court for the Southern District of New York to preside over Puerto Rico's Title III cases. She previously served as a federal bankruptcy judge and as chair of the Advisory Committee on Bankruptcy Rules when the bankruptcy rules were rewritten in 2007-08.

### Swain Transfers Title III Cases from District to Bankruptcy Court

On May 11, 2017, the dockets in the Title III cases were transferred to the CM/ECF system of the U.S. Bankruptcy Court for the District of Puerto Rico. Bankruptcy Case No. 17 BK3283 has been opened and will correspond to Title III Case No. 17 CV 1578 for the Puerto Rico Government, and Bankruptcy Case No. 17 BK 3284 has been opened and will correspond to existing Title III Case No. 17 CV 1599 for the COFINA Corporation.

### Title III First-Day Motions Hearing

A hearing on the first-day motions was held on May 17, 2017, before Judge Swain at the U.S. Bankruptcy Court in San Juan. Counsel for the debtor entities were requested to provide a status report, including their expectations as to the timetable for proposing plans, whether and to what extent active settlement negotiations are proceeding, and whether the initiation of a formal mediation process in the near term would be helpful. In addition, the representative of the U.S. Trustee was requested to provide a status report, including its expectations and timetable relating to the formation of committees. **abi**

Copyright 2017
American Bankruptcy Institute.
Please contact ABI at (703) 739-0800 for reprint permission.