```
1                        UNITED STATES BANKRUPTCY COURT

2                          DISTRICT OF PUERTO RICO

3
     In Re:                         )         Docket No. 3:17-BK-3283(LTS)
4                                   )
                                    )         Title III
5    The Financial Oversight and )
     Management Board for           )
6    Puerto Rico,                   )         (Jointly Administered)
                                    )
7    as representative of           )
                                    )
8    The Commonwealth of            )
     Puerto Rico, et al.,           )         June 28, 2017
9                                   )
                Debtors.            )
10
     _____
11
     In Re:                         )
12                                  )
     The Financial Oversight and )           Docket No. 3:17-BK-3566(LTS)
13   Management Board for           )
     Puerto Rico,                   )         (Joint Administration
14                                  )          Requested)
     as representative of           )
15                                  )
     Employees Retirement           )
16   System of the Government       )
     of the Commonwealth of         )
17   Puerto Rico,                   )
                                    )
18              Debtor.             )
     _____
19
     In Re:                         )
20                                  )
     The Financial Oversight and )           Docket No. 3:17-BK-3567(LTS)
21   Management Board for           )
     Puerto Rico,                   )         (Joint Administration
22                                  )          Requested)
     as representative of           )
23                                  )
     Puerto Rico Highways and       )
24   Transportation Authority,      )
                                    )
25              Debtor.             )
     _____
```

1

2
_____

3                          OMNIBUS HEARING

4      BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

5                    UNITED STATES DISTRICT COURT JUDGE.

6        _____

7

8    PRESENT IN THE OMNIBUS HEARING:

9    The Honorable U.S. Chief Bankruptcy Judge Barbara Houser

10   The Honorable U.S. Magistrate Judge Judith Dein

11
     APPEARANCES:
12
     For the U.S. Trustee
13   Region 21:               Ms. Monsita Lecaroz Arribas,
                                   AUST
14
     For The Commonwealth
15   of Puerto Rico, et al.:  Mr. Steven Weise, PHV
                              Mr. Martin Bienenstock, PHV
16                            Mr. Paul Possinger, PHV
                              Mr. Timothy Mungovan, PHV
17
     For AFSCME:              Ms. Sharon Levine, PHV
18
     For Peaje
19   Investment, LLC:         Mr. Allan S. Brilliant, PHV

20   For Stericycle of
     Puerto Rico:             Mr. Adrian Linares Palacios, Esq.
21
     For Ad Hoc Group of
22   General Obligation
     Bondholders:             Mr. Andrew N. Rosenberg, PHV
23                            Mr. Walter Reiman, PHV

24   For Glendon
     Opportunities, et al.,   Mr. Bruce Bennett, PHV
25

```
1    APPEARANCES, Continued:

2    For Ambac Assurance
     Corporation:            Mr. Dennis F. Dunne, PHV
3
     For Assured Guaranty
4    Corp.:                  Ms. Ellen M. Halstead, PHV

5    For Puerto Rico AAA
     Portfolio Bond
6    Fund II, Inc., et al.:  Mr. Jason N. Zakia, PHV

7    For Puerto Rico Fiscal
     Agency and Financial
8    Advisory Authority:     Mr. John Rapisardi, PHV
                             Ms. Suzzanne Uhland, PHV
9                            Mr. Peter Friedman, PHV

10   For Official Committee
     of Unsecured Creditors:  Mr. Luc Despins, PHV
11
     For Financial Guaranty
12   Insurance Company:      Mr. Martin Sosland, PHV

13   For Interamericas
     Turnkey Co., Inc.:      Mr. Maximiliano Trujillo, Esq.
14
     For United Auto Workers
15   International Union
     and Service Employees
16   International:          Mr. Peter DeChiara, Esq.

17   For Mutual Fund Group:  Mr. Philip Bentley, PHV
                             Mr. Thomas Moers Mayer, PHV
18
     For Ad Hoc Retiree
19   Committee:              Mr. Robert Gordon, PHV

20   For Canyon Balanced
     Master Fund Ltd.,
21   et al.:                 Mr. Susheel Kirpalani, PHV

22   For National Guaranty:  Mr. Jonathan Polkes, PHV

23

24   Proceedings recorded by stenography.  Transcript produced by
     CAT.
25
```

```
1                          I N D E X

2    WITNESSES:                                    PAGE

3         None offered.

4

5    EXHIBITS:

6         None offered.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                  San Juan, Puerto Rico

 2                                  June 28, 2017

 3                                  At or about 9:30 AM

 4                         *      *      *

 5          THE COURT:  Good morning to the parties at interest,

 6   attorneys, members of the public, and press gathered here in

 7   the court.

 8          Oh, I think we may have lost a phone line.  Can

 9   someone check?

10          COURTROOM DEPUTY:  17C just lost --

11          THE COURT:  Bear with me a moment so we can make sure

12   we are up.

13          Can you hear me in New York?

14          Again, everyone, I'm just grateful for your patience

15   for a few minutes while we work out the technical difficulty.

16   We'll just be a little while longer.

17          Thank you all for your patience.  We can continue

18   now.   There.  Now my microphone's working, too.

19          So once again, good morning to parties of interest,

20   attorneys, members of the public and press gathered here and

21   in New York, as well as those listening on the phone for this

22   second Omnibus hearing in these PROMESA Title III cases.

23          I thank the parties and their attorneys for their

24   candid and thoughtful submissions in advance of this hearing.

25          The litigation process and the progress in these
```

1  matters over the past few weeks has been rapid, and my staff

2  and I will continue to attend diligently to the issues that

3  are presented.

4          We have been joined by Magistrate Judge Judith Dein

5  of the District of Massachusetts who will be overseeing

6  aspects of these cases and related adversary proceedings

7  pursuant to referrals that I will enter from time to time.

8          The ability to partner with Judge Dein will help to

9  ensure prompt and appropriate attention to the many issues

10  that arise in the course of these proceedings.  And I will

11  introduce Judge Dein to you shortly.

12          I was gratified by the positive reception of my

13  appointment of the mediation team of distinguished judges.  I

14  am hopeful that their involvement will help to put

15  negotiations on a more productive track, and I am pleased that

16  I will be able to introduce chief bankruptcy Judge Barbara

17  Houser, the leader of the mediation team, to you in a few

18  minutes.

19          Before turning to these introductions, I will take a

20  moment to address a disclosure issue that has arisen as the

21  number of participants and lawyers involved in these

22  proceedings continues to grow.

23          I understand that Debevoise and Plimpton, LLP, which

24  I refer to as Debevoise, attorneys filed pro hoc vice

25  applications yesterday indicating that they represent Syncora

1    Guarantee, Inc. and Syncora Capital Assurance, Inc., which

2    I'll refer to collectively as Syncora, in connection with

3    these Title III cases.

4           One of my law clerks was formerly employed at

5    Debevoise.  His clerkship term ends in September, at which

6    time he may or may not return to Debevoise.  At this time he

7    does not have a formal offer from the firm, nor has he

8    formally committed to return to the firm.  In what may be an

9    abundance of caution, he will be screened from working on any

10   aspect of these Title III cases in which Debevoise's client,

11   Syncora, is directly involved.

12          By way of further disclosure, I, myself, was with

13   Debevoise until I left the firm to join the federal bench over

14   20 years ago.  I no longer have any financial ties to the

15   firm.

16          My other two law clerks working on these Title III

17   cases were also formerly with large law firms prior to

18   beginning their clerkships.  One was with Stroock, Stroock &

19   Lavan, LLP.  The other was with Otterbourg, PC.  That

20   individual who was with Otterbourg was employed at Proskauer

21   Rose, LLP five years ago.  At no time did any of my clerks

22   work on matters related to these Title III cases.

23          Notwithstanding the precautionary screening of my law

24   clerk from Debevoise, none of these former or possible future

25   relationships, in my view, impedes the ability of me or my law

1   clerks to be impartial or independent in any of our work on

2   any aspect of these cases.

3        If you disagree, any objections to the continuation

4   of the service of my law clerks and myself in these cases

5   should be made in writing and sent directly to the Clerk of

6   the Court for the District of Puerto Rico and not filed on the

7   docket.  I will file a written notice to this effect,

8   including the deadline and the procedures on the docket soon.

9        Now we'll turn to the items on the status portion of

10  the agenda.  I note in this connection that there are two

11  additions since the agenda was filed.  I've granted the

12  request of the Office of the United States Trustee to be heard

13  regarding interim compensation and fee procedures.

14       We will also hear from the representative of the

15  recently constituted unsecured creditors committee.  Both sets

16  of remarks I expect will be brief.

17       I now invite Chief Judge Barbara Houser of the United

18  States Bankruptcy Court for the Northern District of Texas to

19  the bench to say a few words for you.  Judge Houser is a

20  distinguished jurist and leader in the insolvency field and

21  among her fellow federal judges.

22       Her impressive biography is attached to the Order

23  preliminarily appointing the mediation team which is filed on

24  the dockets of the Title III cases posted on the PROMESA area

25  of the Court's website.  We are fortunate that she has agreed

1   to lend her considerable talents to the leadership of the

2   extraordinary team of judges who have agreed to work with you

3   and with each other to facilitate negotiated resolutions of

4   the unprecedented issues facing Puerto Rico, her creditors and

5   her people.

6            Judge Houser.

7            THE HONORABLE U.S. CHIEF BANKRUPTCY JUDGE HOUSER:

8            Thank you, Judge Swain, and good morning.  There is

9   much I want to say today to the people of Puerto Rico and also

10  the parties of interest about the mediation process that we

11  are implementing here and why we are implementing it.  I will

12  start with two preliminary points and then answer three

13  specific questions.

14           First, for those of you who may not be familiar with

15  mediation, it has many advantages to litigation.  Mediations

16  are negotiated solutions to matters that are in dispute.  They

17  are less formal than court proceedings and they save time and

18  money.

19           While not all mediations result in a successful

20  resolution of all matters in dispute, when parties decide to

21  pursue mediation and participate in that mediation process in

22  good faith, common ground is often identified.

23           The mediation team's goal here is simple:  We will

24  assist the parties in finding solutions to the extraordinarily

25  complex issues Puerto Rico and they face.  Each member of the

1    mediation team is committed to this goal, and we are

2    optimistic that significant progress can be achieved if

3    everyone comes to the mediation process with a similar goal

4    and acts with us and each other in good faith.

5         Second, I think it is important that the people of

6    Puerto Rico, and all parties in interest in these cases know

7    that the federal judiciary is committed to the successful

8    resolution of these Title III cases as expeditiously as

9    possible, and to that end, has committed the talents and

10   expertise of five distinguished sitting federal judges from

11   across the United States to mediate disputes in these cases.

12        Members of the mediation team were designated to

13   serve in Puerto Rico through the intercircuit assignment

14   procedure of the judicial conference of the United States, the

15   national policy-making body for the federal court system.  And

16   each team member has specific and relevant experience that

17   makes him or her uniquely qualified to serve here.

18        Our tenure on the federal bench spans from 17 to 29

19   years.  We have mediated hundreds of cases; headed bankruptcy

20   and mediation practices at nationally known law firms; taught

21   alternative dispute resolution, litigation, bankruptcy, and

22   other courses at top law schools; and have been recognized by

23   various organizations and respected professional groups for an

24   assortment of achievements.  We are here to serve the people

25   of Puerto Rico and you as best we are able.

1          In speaking with you today, I will answer three

2     specific questions:  First, why is a mediated resolution of

3     these cases preferable; second, why were these particular five

4     judges selected to be members of the mediation team; and

5     third, how will the mediation process in these cases work.

6          Returning to the first case, why is a mediated

7     solution preferable?  A mediated resolution of the many

8     complex novel issues presented in these Title III cases is

9     ideal because a negotiated resolution can save the parties a

10    significant amount of time and money and eliminate much of the

11    uncertainty associated with litigating issues of first

12    impression under PROMESA.

13         These cases have already presented novel, complex

14    legal and factual issues to Judge Swain for resolution.  And,

15    of course, these cases are in their infancy, with many more

16    interesting, complex issues inevitable, and perhaps other

17    cases with equally challenging issues to be filed.

18         Many of these legal issues either are or will likely

19    be a first impression as PROMESA is a new statute enacted to

20    address the financial crisis Puerto Rico faces.  The novelty

21    of the issues and the fact that many of them have never before

22    been considered by a trial court, let alone an appellate

23    court, will add to the length of time that will be required to

24    litigate these issues to a final judgment Order.

25         Huge insolvency cases like these are always

```
1    expensive.  The administration of these Title III cases will

2    be no exception.  And the longer the case is pend -- no one's

3    ever had a problem hearing me before so --

4              THE COURT:  The other rooms are having a little

5    difficulty hearing us, so we've been asked to speak quite

6    directly into the microphone.

7              THE HONORABLE U.S. CHIEF BANKRUPTCY JUDGE HOUSER:

8    All right.  I'll do that.  Thank you, Judge Swain. Again, this

9    is a first, at least for me, about not being heard.

10             As I was saying, the longer these cases pend, the

11   more expensive they will be.  A consensual resolution or a

12   substantially consensual resolution of the complex, novel

13   issues presented here should shorten the time the debtors

14   spend in their respective Title III cases, which should, in

15   turn, reduce the expense attendant to the cases.  And, of

16   course, the lower the cost of administration of these cases,

17   the more value that will be available to distribute to

18   creditors and other parties entitled to distribution under a

19   plan or plans of arrangement.

20             Moreover, a negotiated resolution of the complex

21   issues that have arisen or will arise in these cases and

22   related proceedings will eliminate the uncertainty associated

23   with that litigation.  Judge Swain's decision on contested

24   matters and in adversary proceedings will be but the first

25   step in a time-consuming appellate process, first to the Court
```

1   of Appeals for the First Circuit and then perhaps to the

2   United States Supreme Court.

3          The outcome of litigation and any attendant appeal is

4   always uncertain and risky for the parties and, of course, a

5   negotiated resolution will eliminate this uncertainty and

6   risk.

7          Given these obvious benefits of a consensual or a

8   substantially consensual resolution of these cases to the

9   people of Puerto Rico and all other parties of interest, it

10  makes perfect sense that a team of distinguished sitting

11  federal judges should be appointed to assist the parties in

12  their efforts to negotiate a consensual resolution here, if at

13  all possible, which brings me to why these five judges were

14  selected.

15         The short answer is that each is uniquely qualified

16  to serve as a member of the mediation team, as I will briefly

17  highlight.  Judge Tom Ambro is on the Third Circuit Court of

18  Appeals.  Judge Ambro was an insolvency lawyer before he took

19  the bench and is one of the most well-respected circuit judges

20  in the United States.  The opinions he has authored in the

21  insolvency area are always thoughtful and well reasoned.

22         Moreover, Judge Ambro is held in high regard by both

23  his peers and by the lawyers who argue cases on appeal to him.

24  In fact, just this past March, Judge Ambro received the

25  distinguished service award from the American College of

1    Bankruptcy Lawyers, which is the highest award that

2    organization bestows upon a person who has contributed

3    mightily to the betterment of the bankruptcy system.

4          Judge Nancy Atlas is a senior district judge from the

5    Southern District of Texas and just happens to be one of my

6    former law partners in our prior lives.  Before taking the

7    bench, Judge Atlas and I practiced law at a firm nationally

8    known for its insolvency expertise.

9          While at the firm, Judge Atlas was an accomplished

10   litigator and mediator.  She is now a highly-respected jurist

11   and has tried many cases involving complex financial

12   structures such as those presented here.  Given her extensive

13   mediation practice before taking the bench, she is the most

14   experienced mediator on my team.

15         Judge Victor Marrero is a senior district judge from

16   the Southern District of New York.  Judge Marrero is Puerto

17   Rican and brings a deep knowledge of Puerto Rico to our team.

18         Moreover, Judge Marrero brings significant knowledge

19   of the innerworkings of federal, state and city governmental

20   units from, among other things, his prejudgeship experiences

21   as assistant to the mayor of New York City, as the executive

22   director to the Department of City Planning of New York City,

23   as special counsel to the comptroller of New York City, as the

24   first assistant counsel to the governor of the State of New

25   York, and as undersecretary of the Department of Housing and

1     Urban Development.

2             These experiences give Judge Marrero unique insight

3     into the challenges being faced by the various governmental

4     entities of Puerto Rico.

5             Judge Chris Klein is one of my bankruptcy judge

6     colleagues from the Eastern District of California.  He's a

7     very experienced bankruptcy judge, having been appointed to

8     the bench in 1988.

9             As relevant here, Judge Klein presided over the City

10    of Stockton bankruptcy case under Chapter Nine of the

11    Bankruptcy Code, which gives him a unique insight into many of

12    the issues that we will face in these Title III cases.

13            Finally, let me explain what our mediation process

14    will look like.  First, and perhaps most important, our

15    mediation process will be confidential on all sides.  This

16    will allow parties to have open and frank conversations with

17    the mediators and each other.

18            Parties must be free to speak to the mediators and

19    each other without fear that what is said will be reported in

20    the press, posted online, or used against them in a hearing

21    before Judge Swain.

22            Second, parties who wish to participate in our

23    mediation process must agree to participate in good faith.

24    This will help ensure that the mediators and other parties who

25    have also agreed to participate in the process in good faith

1    are not wasting their time.

2           Only through each party agreeing to participate in

3    good faith can the mediators and all other parties be assured

4    that the dialogue that will occur among the parties in

5    mediation will be open, candid and hopefully productive.

6           Third, our mediation process will require that

7    throughout clients be present at each mediation session.

8    Having clients present at all mediation sessions is

9    extraordinarily important so that parties with a financial

10   stake in the outcome can be heard, and equally importantly,

11   can hear from other parties and the mediators regarding the

12   issues being addressed in mediation.

13          Finally, our mediation process will be voluntary so

14   that parties can choose to participate or not participate as

15   they determine to be in their respective best interest.  Our

16   core of voluntariness is that the mediators will not attempt

17   to force the parties to accept a resolution that they do not

18   find acceptable.

19          Parties with a financial stake in the outcome of the

20   issues being addressed in mediation are in the best position

21   to determine if a proposed resolution is in their respective

22   best interest.  If it is, presumably they will agree.  If it

23   isn't, they must be free to pursue another alternative,

24   including litigation, if they believe that alternative is

25   truly better for them.

1          Just a few additional points about our mediation

2     process before I conclude.  Our mediation process will be both

3     facilitative and evaluative.  A facilitated mediation process

4     is one in which the mediator facilitates the parties' ideas

5     for how the issues being presented in mediation can be

6     resolved.

7          An evaluative mediation process is one in which the

8     mediator evaluates the position being taken by the parties in

9     hope of assisting them to understand both the strengths and

10    weaknesses of their respective positions.

11         By combining both processes here, I believe we

12    enhance the prospects for a consensual or substantially

13    consensual resolution of these cases.  Because our mediation

14    process will be both facilitative and evaluative, I believe

15    sitting federal judges are ideal mediators.

16         Having an experienced sitting federal judge serve as

17    a mediator can help the parties and their respective

18    professionals understand why a litigated solution may not be

19    in their respective interests.

20         In short, an experienced judge mediator can help a

21    party understand how that judge evaluates that party's legal

22    position.  Of course, no member of my mediation team can speak

23    for Judge Swain.  She will be the judge who will rule on

24    disputed issues if our mediation process is unsuccessful.

25         Moreover, no member of my mediation team will speak

1  to Judge Swain about any substantive issue that is being

2  addressed in mediation, nor will we have any insight into her

3  analysis of those issues.  But as experienced judges

4  ourselves, we are particularly well suited to provide the

5  parties with our insights into how we would rule on the issues

6  being mediated if we were the judge who could rule on those

7  issues.  Hopefully those insights will be useful to the

8  parties and may facilitate a consensual or substantially

9  consensual resolution of those issues.

10      Next, I want to give notice of the first formal

11  mediation meeting in these cases.  So lawyers, sharpen your

12  pencils.

13      Parties who have been actively participating in these

14  cases to date by filing motions or adversary proceedings, or

15  by opposing motions filed by other parties, must attend a

16  meeting with me and two other members of the mediation team on

17  July 12 in New York City.  This meeting will be held in the

18  ceremonial courtroom at the Federal District Courthouse

19  starting at 9:30 AM.

20      The office of the United States Trustee has appointed

21  two official committees in these cases, and committee counsel

22  must also attend this first meeting.  Other parties at

23  interest in the cases who wish to attend this meeting may

24  request the opportunity to do so by following the procedures

25  that will be explained further in a notice and Order entered

1    by me in these cases later this week.

2              I will review your request and attempt to accommodate

3    as many of them as possible.  To the extent you request the

4    opportunity to attend, but I cannot accommodate your request,

5    please be assured that other opportunities to meet with me or

6    other members of the mediation team will be provided to you,

7    as we truly want to understand the position of all parties in

8    interest in these cases.  For those of you required to attend,

9    please do mark your calendars with this date and time.

10             Finally, in closing, while much of the mediation

11   team's work in these cases must be done behind the scenes and

12   out of the public's eye, and thus will not be readily visible,

13   I ask all involved or affected by these cases to trust me when

14   I tell you that members of my mediation team and I will work

15   tirelessly to assist you in finding consensual solutions or

16   substantially consensual resolutions of the many complex

17   issues Puerto Rico and you face so that plans of adjustment

18   can be confirmed for the debtors.

19             This is a challenging task that will require the

20   cooperation, ingenuity and diligence of all involved.  I know

21   I speak for my entire mediation team in saying that serving as

22   judge mediators in these cases is an honor and responsibility

23   that we shoulder with great dedication and determination.  We

24   look forward to beginning our work in these cases.

25             Thank you, Judge Swain.

```
 1              THE COURT:  Thank you, Judge Houser.

 2              A number of requests were filed by attorneys wishing

 3    to speak regarding the mediation team, but since our agenda

 4    today is full and the mediation status item was included

 5    simply for the introduction of Judge Houser and her statements

 6    about the organizational plans of the team, I do not plan to

 7    call on individuals to make remarks at this time unless

 8    someone rises now and indicates that their issue is urgent.

 9              Is there anyone who wishes to make such an urgent

10    statement regarding the mediation process?

11              Sir, please come to the podium.

12              MR. DESPINS:  Good morning, Your Honor.  My name is

13    Luc Despins.  I'm sorry.  My local counsel should introduce

14    me.

15              THE COURT:  Good morning.

16              MR. O'NEILL:  Good morning, Your Honor, distinguished

17    colleagues, judges.  Patrick O'Neill as local counsel for the

18    Committee of Unsecured Creditors.

19              THE COURT:  Good morning.

20              MR. DESPINS:  So, Your Honor, we absolutely have no

21    concerns with respect to the mediation process except for one

22    issue, which is an issue that I wanted to address with respect

23    to other matters in the case as mentioned in the motion we

24    filed yesterday with the Court, and that is the issue of

25    timing.
```

1          As you know, we were appointed -- we were just

2     retained two days ago.  The parties in this case have been at

3     this for, in some cases, years, and in other cases, months.

4     And if the July 12 first meeting is intended to be substantive

5     in terms of presenting position statements and all that, there

6     is -- it would be very hard for the committee to participate

7     in that short time frame.

8          THE COURT:  I think I can speak for Judge Houser

9     here, and she'll signal me if I've got this wrong, but the

10    July 12 meeting is an organizational meeting.  It is not

11    anticipated to be one that involves substantive discussions.

12    And indeed, the schedule for making mediation submissions will

13    be -- and the content of such submissions will be the

14    principal subject of that meeting.

15         MR. DESPINS:  Thank you.  So later on in the hearing

16    at a time that you'll determine, I'd like to be heard on

17    general relief from deadlines pending in the case, but that

18    deals with our issue in mediation, Your Honor.  Thank you.

19         THE COURT:  Thank you.

20         And now I invite Magistrate Judge Judith Dein to say

21    a few words and introduce herself to you.

22         Judge Dein is a very distinguished and well-respected

23    jurist who practiced commercial litigation before taking the

24    bench, and served on the prominent Federal Court in Boston for

25    many years, overseeing management of litigation and discovery

1    disputes among a wide range of judicial duties.

2           It is fortunate that since PROMESA requires oversight

3    by a federal district judge, the federal statute that permits

4    district judges to partner with magistrate judges for

5    referring issues and areas of case management responsibility

6    to magistrate judges applies here, so that Judge Dein and I

7    will be able to work together as needed on pretrial matters

8    that arise in these cases and adversary proceedings.

9           Judge Dein's impressive biography is included in the

10   notice of appointment that is posted on the docket and in the

11   PROMESA section of the Court website.

12          Judge Dein.

13          THE HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:

14   No one has ever said they couldn't hear me either.

15          Thank you, Judge Swain.

16          Thank you everyone.  Those listening in as well.

17          I know for many of you this may be the first time

18   that you are working with a magistrate judge.  Just chalk that

19   up to one of the first times of a lot of things that are

20   happening in this litigation.

21          And my bio, as Judge Swain has said, is posted on the

22   website.  I hate being old enough to have a bio, but after 20

23   years in private practice, I was appointed to the bench in

24   2000.  Since then, I've been reappointed twice as a magistrate

25   judge.

1          I have extensive experience handling all types of

2    case management and pretrial matters, including complex

3    discovery matters.  My caseload includes referrals from both

4    the district judges as well as a docket of my own.

5          I am very much looking forward to assisting Judge

6    Swain, handling the matters referred to me, and helping move

7    these matters along as expeditiously and fairly as possible.

8          I gather we're supposed to introduce ourselves, so

9    I'd like to tell you a little bit about my personal style.

10   Well, very little.  Several years ago, Mass Lawyers Weekly

11   solicited input from the Bar who had tried cases in front of

12   various judges to give an evaluation.  I had just finished a

13   month long -- presiding over a month-long securities fraud

14   case and counsel felt the need to write in.  They did write

15   that it was a very positive experience, but they also wrote in

16   language which I have hanging on my wall.

17         Judge Dein, quote, has no particular quirks or

18   foibles that counsel appearing before her should consider.

19         I have no idea how to translate quirks or foibles

20   into Spanish, and I leave that to you.  And I'm curious as to

21   whether you will all agree when this matter is over.  My

22   family does not.  But I personally do not think of myself as

23   having quirks or foibles.  But anyway, what you see is what

24   you get.

25         You have my dedication, and you have my full-time

1    commitment.  And I am very much looking forward to working

2    with Judge Swain and all of you for an expeditious and fair

3    resolution of these historic matters.  Thank you.

4         THE COURT:  Thank you, Judge Dein.

5         I now invite counsel for the Oversight Board to come

6    to the podium to speak to the current status of the bank

7    authority motion which remains under advisement pending the

8    anticipated submission of the consent order.

9         MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

10   Bienenstock with Proskauer Rose, LLP, for the Oversight

11   Board.

12        THE COURT:  Good morning, Mr. Bienenstock.

13        MR. BIENENSTOCK:  Good morning.  The bottom line is

14   that after the last hearing, we circulated a proposal that we

15   thought would garner the support of all the parties who spoke

16   up at the last hearing.  It had a lot of support, but not

17   unanimous support.

18        Since then, the passage of time has caused us to

19   believe that we can ask the Court to let us withdraw the

20   motion without prejudice.  If the need arises, we might come

21   back to Your Honor with a slightly different bank motion, but

22   for now, with the Court's permission, we'd like to withdraw it

23   without prejudice.

24        And we've consulted with the Commonwealth about this

25   obviously before making the suggestion.

```
1            THE COURT:  And so will you file a motion to withdraw
2   or do you want me to rule now on the record and enter an Order
3   terminating that motion without prejudice?
4            MR. BIENENSTOCK:  Preferably the latter, Your Honor.
5   I don't think parties would object.  If they do, we can file a
6   motion.
7            THE COURT:  I see no hands indicating an objection to
8   this oral motion, and so the motion to withdraw the bank
9   authority motion without prejudice is granted and an Order
10  linking it with the appropriate docket numbers will be
11  entered.
12           MR. BIENENSTOCK:  Thank you, Your Honor.  And if I
13  might just insert one tidbit of positive news.  Two items on
14  the second agenda in the contested column have moved to the
15  uncontested column, those being the joint admin motion and the
16  stay motion.
17           THE COURT:  Thank you.  That is very good news
18  indeed.
19           MR. BIENENSTOCK:  Thank you, Your Honor.
20           THE COURT:  All right.  And so now I would invite the
21  representative of the United States Trustee to come to the
22  podium who requested to speak about interim compensation and
23  fee procedures.
24           Ms. Lecaroz.
25           U.S. TRUSTEE LECAROZ ARRIBAS:  Good morning, Your
```

1    Honor, Judges.  May it please, the Court.

2            Monsita Lecaroz Arribas, Assistant U.S. Trustee on

3    behalf of Guy Gebhardt, Acting U.S. Trustee for Region 21.

4    With me is Sean Cowley, an attorney with our Detroit office.

5            Since the hearing on May 17, the United States

6    Trustee has worked with counsel for the Oversight Board to

7    develop an appropriate procedures order for these proceedings,

8    including the appointment of an independent fee examiner.

9            We have reached an agreement in principle on the

10   terms of such an order, and drafts have been exchanged for

11   comment.  We anticipate that a consensual fee procedures order

12   will be filed for consideration by the Court no later than the

13   next omnibus hearing date.

14           THE COURT:  I'm sorry, ma'am.  May I ask you to speak

15   a little bit slower so that we can be sure we get everything

16   down accurately?  Thank you.

17           U.S. TRUSTEE LECAROZ ARRIBAS:  I'm sorry, Your Honor.

18   Do you need me to repeat?

19           THE COURT:  No, just go forward a bit more slowly.

20           U.S. TRUSTEE LECAROZ ARRIBAS:  I'm done, Your Honor.

21   Thank you.

22           THE COURT:  All right.  Then thank you for the

23   submission.

24           And so now I recall the representative of the

25   Unsecured Creditors Committee.  Is this when you wanted to

1    speak to your issue or do you want to wait?

2                MR. DESPINS:  If we could, Your Honor, we will do it

3    now.

4                THE COURT:  Very well.

5                MR. DESPINS:  Your Honor, again, for the record, Luc

6    Despins for Paul Hastings, counsel for the Unsecured Creditors

7    Committee.

8                THE COURT:  And you need to talk slower also.  Thank

9    you.

10                MR. DESPINS:  That is not the first time I've heard

11    that.

12                Your Honor, I think -- and the people who know me

13    know that generally I'm a man of few words.  And in this case,

14    I would ask the Court for your indulgence this morning.  I'll

15    try to be brief, but there are some key points that need to be

16    made.

17                First, we want to thank the Court for allowing us to

18    be here today and be heard on the various motions, despite the

19    fact the deadlines we have had passed on the responsive

20    pleadings.

21                In the motion we filed, however, we had said we

22    wanted prospective relief in the various deadlines that are

23    coming in the case, and we are in discussions with parties in

24    the case.  And we had left this part of the --

25                THE COURT:  May I interrupt you for a moment?

1          As you know, I crossed out that part of your Order.

2     I did that because it wasn't clear to me at that time what

3     deadlines you had in mind and what particular matters you

4     might want to try to become involved in.  So I thought it best

5     to take it up in context, which is apparently what you're

6     trying to do.

7          MR. DESPINS:  Correct.  And I'm glad you crossed it

8     out for that reason.

9          And Your Honor, basically, I want to address the

10    Court, before we get into the exact relief we're seeking, to

11    give you a bit of background on the committee.  The committee

12    is a very diverse committee with trade creditors, with an

13    entity that is owed millions of dollars for tax refunds that

14    were not paid, labor unions, et cetera, et cetera.  It's a

15    very broad group.

16         But more importantly, it is a committee that is a

17    fiduciary for all unsecured creditors, and that means the GO

18    bonds as well, Your Honor, and in particular the thousands of

19    creditors on the island that hold those bonds.  And that's a

20    very important part.  I mean by that the retail holders.  And

21    that's a very important point.

22         Even though they're not on our committee, we owe them

23    a fiduciary duty as we owe other creditors.  And the reason

24    I'm focusing on this unrepresented creditor group, Your Honor,

25    is because this case is like no other.  If we're dealing with

1   a private company, Chapter 11, generally it should have

2   complete discretion -- I shouldn't say complete discretion,

3   but it's their money.  We don't care.

4          In this case, however, the people who are actually

5   creditors also live on the island.  Everything has an impact

6   on them.  And that's why it's a critical point here.

7          The process, we all know, needs to be fair, but needs

8   to be perceived to be fair by those people.  And this is where

9   the committee comes in.  We need a meaningful apportionment to

10  be heard.  And that means, in some cases, more time.  And I

11  will get to exact relief in a second.

12         And I know Your Honor's reaction initially may be,

13  well, join the club.  I was just appointed to this case a

14  month and a half ago, and I'm in the same boat you are, except

15  you have hundreds of lawyers and I only have three clerks --

16  or two clerks.  And I would understand that, except that in

17  our case we have different roles.

18         And one of the roles that -- and I'm not saying that

19  our rules are more important.  Clearly the crucial role here

20  is that of the Court.  But the committee has a communication

21  role on the island that is critical here, and we cannot

22  accomplish that role unless we have some time to analyze the

23  issues and communicate with these creditors.  And that means

24  also our financial advisor, which was retained yesterday, Saul

25  Cooper.

1           And I know that in this case, you probably have the

2    best firms in the world, but as I said initially, these firms

3    have been in this some cases for a year, year and a half.

4    Even the retiree committee counsel was involved from before

5    the case.  So we are at a distinct disadvantage here and, you

6    know, it's very important.

7           And let me point out one issue in particular, which

8    is the issue of the fiscal plan.  Your Honor has probably seen

9    through the pleadings that this has become sort of a holy war

10   for some creditors describing the fiscal plan as an illegal

11   fiscal plan, et cetera, et cetera.

12          The committee's view on the fiscal plan is, I would

13   say, key.  And I'm not promising this, I don't want

14   Mr. Bienenstock to get too excited, but if the committee

15   concluded that the fiscal plan was appropriate, I think it

16   would be a very important data point.

17          We're not saying that's the case.  We're saying we

18   need to be given the time, the time, not only us, but our

19   financial advisors to do this analysis.  So that's one of the

20   elements.

21          The other element, Your Honor, it goes back to the

22   retail holders.  There's a section of PROMESA, 104,

23   subparagraph O, as in Oscar, that was put in there that says

24   that investigation with respect to the practices, with respect

25   to the sale of bonds, disclosure practices and sales practices

1    with respect to the sale of bonds to retail holders should be

2    or could be conducted.  To our knowledge, that has not

3    occurred.

4              You might say, okay, interesting, but so what.  How

5    does that affect, for example, the motion you have to lift the

6    stay in the ERS case this afternoon?  And probably in that

7    case, it does not.  But in the context of global case issues,

8    this is something that the committee needs to look at.  And

9    that's a very important point.

10             So what I'm saying is the relief we're seeking may

11   not be one size fits all.  For certain matters, for example,

12   the ERS motion to lift the stay, I think we can probably deal

13   with going forward and going forward today.  But for other

14   matters, I mentioned mediation, that's a global case issue.

15   The committee needs some time to deal with that.

16             So what are we asking?  There are various deadlines

17   coming up, Your Honor.  For example, deadlines to intervene on

18   various proceedings and all that.

19             For the nonglobal matters, and by that I mean putting

20   aside the mediation for now, because I think we have some

21   comfort that the July meeting is organizational at this point.

22   We need a period of 20 days to -- relief of 20 days to file

23   whatever pleadings we decide to file, intervention, objection,

24   et cetera.

25             And I know that this may be disruptive to the

1    process, and we -- it may very well be that we will not file

2    responsive pleadings or intervention pleadings in a number of

3    these matters.  But initially, in order to be constructive and

4    to give, you know, to make sure that the creditors on the

5    island feel that the committee is playing a constructive role,

6    we need that short breathing spell, Your Honor, of 20 days.

7            For the mediation, I guess we'll deal with Judge

8    Houser on that, but it will be a longer period because the

9    issues there are monumental in terms of importance, but also

10   in terms of complexity.

11           THE COURT:  And so thank you for that very well

12   contextualized statement and request.  I am sure that the

13   mediation team, which literally wants and needs to meet

14   parties and groups where they are in order to engage

15   appropriately in mediation will take the issues that you've

16   raised into account in scheduling.

17           Perhaps because I don't have a perfect universal

18   memory, it's still -- of all of the deadlines that are in

19   place, it's still a bit unclear to me that there are deadlines

20   that have been set which directly implicate concerns that you

21   might want to engage with.

22           For instance, in the pending Bank of New York Mellon

23   COFINA interpleader, there was a deadline for complaints in --

24   for motions to intervene.  There is pending a motion to

25   intervene by the GO bondholders.  And there is a schedule for

1    cueing up what is principally in focus intraCOFINA bondholder

2    disputes.

3         There I might suggest that you await my determination

4    on the GO bondholders intervention motion, which is fully

5    briefed, and if you feel the need to make a request, to

6    make -- to intervene, to make an intervention application for

7    the committee, it can be a more informed, targeted application

8    rather than simply reopening that deadline.

9         There is also a litigation schedule in place for a

10   preliminary injunction motion in the HTA case by Peaje, and

11   there are insurer adversaries in that case.  And then there is

12   a proceeding, a summary judgment proceeding cueing up toward a

13   September hearing date.

14        So all of this is to say that from my perspective, I

15   would rather that in the short term, you take the time over

16   the next few days or a couple of weeks to look at what's there

17   on the table in terms of deadlines, and I'm sure that

18   Oversight Committee counsel will help you with that.  And

19   everything, of course, is on the docket.

20        And then to the extent you feel a need to make a

21   targeted immediate request for some different deadline to make

22   some sort of submission or seek to intervene, I can respond to

23   that in a more informed way and we can do it in a way that's

24   more efficient.

25        MR. DESPINS:  So yes, if we do it on a case-by-case

```
 1   basis, I agree it will probably be more efficient.  And we're

 2   getting ahead of ourselves, but there's a motion, for example,

 3   to set up a procedure on the issue of GO bond -- or the

 4   Commonwealth versus COFINA.  And Your Honor --

 5          THE COURT:  We will be talking about that motion.

 6          MR. DESPINS:  Exactly.  So I think that that may --

 7   but I know, for example, that there's a deadline to file a

 8   motion to intervene in the Peaje investment case of June 29,

 9   which is tomorrow.

10          So that's the kind of deadline we're concerned of

11   getting defaulted.  But if we can come back to the Court on a

12   case-by-case basis and not be deemed to be time barred for

13   these things, then we're fine with that.

14          THE COURT:  That application is correct.

15          MR. DESPINS:  Okay.  Thank you.

16          THE COURT:  Thank you.

17          Yes, sir.

18          MR. ROSENBERG:  Good morning, Your Honor.  Andrew

19   Rosenberg, Paul, Weiss, Rifkind, Wharton & Garrison LLP for

20   the GO bondholder group.  I'll be very brief.

21          I, too, admit that I cannot possibly remember all of

22   the deadlines and all of the various pleadings to be filed in

23   the blizzard of papers that has been bestowed upon the Court.

24   I just have two quick remarks.  One was counsel for the

25   committee mentioned that we are looking out for the GO
```

1    bondholders, retail GO bondholders.  Love the fact on the one

2    hand that they are -- the unsecured committee is looking out

3    for us or them.  On the other hand, I want to make sure the

4    record is clear to make it known the GO bondholders know we

5    have various liens.  I did want to mention that since that

6    might be forgotten in the context of the unsecured committee

7    looking out for us.

8         And second, just in terms of the mediation, the one

9    thing I would hope is that all other deadlines aside, that the

10   mediation hopefully can proceed as quickly as possible.  I

11   think one only need look around the courtroom here to see the

12   number of parties and the number of issues and the incredible

13   expense being incurred, that the sooner the mediation

14   involving all of the relevant issues in this case can be

15   commenced, I think that probably would be hopefully the best

16   for everybody.  Thank you.

17        THE COURT:  Thank you.

18        MR. DUNNE:  Your Honor, may it please the Court.

19   Dennis Dunne for Milbank Tweed on behalf of Ambac Assurance

20   Corporation.  I'll be less than two minutes on this.

21        I just wanted to pick up on one hypothetical that

22   Your Honor raised, which was the interpleader action on

23   COFINA.  I was a little unsure of what the last comment meant

24   in terms of Mr. Despins may be able to come back at some point

25   in time and ask to intervene in that.

1          I think we should see where we are at the end of the

2     day, as Your Honor was saying with respect to that, because

3     we're dealing with the creditors committee.  That's not a

4     creditors committee of COFINA.

5          They already have one representative from the

6     Commonwealth, the GOs, who are trying to come into that

7     litigation.  The creditor, the creditor arguments are all

8     going to be the same with respect to Mr. Despins as they are

9     with Mr. Rosenberg.  And Your Honor's going to decide that

10    intervention motion and presumably give us some guidance

11    today.

12         THE COURT:  I am not intending to make my ruling on

13    that orally today, but I do expect that it will be issued

14    soon.

15         MR. DUNNE:  And we believe that that issue, the

16    waterfall, the default acceleration rights within COFINA, the

17    credit issue is a paramount issue of importance here because

18    it guides settlement and informs a bunch of other pieces of

19    litigation.

20         That what we don't want to do is slow that down as a

21    result of 20 days from now finding we have to relitigate an

22    intervention motion that may be decided in the next couple of

23    days.

24         So all I'm saying today is I'd like to reserve my

25    right to have that discussion, if they aren't announced, on

1    that issue, because depending on which way you come out, it

2    could be more or less relevant for me on that issue -- we may

3    need to know sooner than 20 days if litigation issues comes

4    up.

5           THE COURT:  Thank you.  It's basically the structure

6    that I had in mind.  I will be making my ruling on the motion

7    that is fully briefed.  And I expect that Mr. Despins'

8    decision on whether he wants to seek to intervene would be

9    informed by and responsive in a way to whatever ruling I make.

10   And it would be -- I am giving him permission to re-raise in

11   that context his application for an extended period to seek to

12   intervene.

13          So there are a couple of steps there, and there are

14   discussions and determinations that can and should be had in

15   that context.

16          MR. DUNNE:  Thank you, Your Honor.

17          One last point, just a factual one.  And

18   Mr. Rosenberg touched on this.  Mr. Despins said that the

19   creditors committee for the Commonwealth is a fiduciary for

20   all the unsecureds, including the GOs.  On a factual note, I

21   know that a number of Mr. Rosenberg's clients sought to serve

22   on that committee, as well as a number of insurers who insure

23   general obligation bonds.  They were not appointed to that

24   creditors committee.

25          So the notion that they were not appointed to the

1    committee to potentially provide some representation or voice

2    for the GOs -- we get the committee is fully charged with that

3    representation.  I think the conclusion is the opposite.  I

4    think it's more likely the U.S. Trustee decided for the reason

5    that Mr. Rosenberg said, that because of their constitutional

6    priority above the unsecured creditor class, that they were

7    not appropriate appointees to, or members of, the creditors

8    committee for purposes of discharging a duty to the general

9    unsecured class at the Commonwealth.

10            THE COURT:  Clearly that is an issue.

11            MR. DUNNE:  Yes.  Thank you, Your Honor.

12            THE COURT:  Thank you.

13            All right then.  I think at this point we get to turn

14    to the uncontested matters part of the agenda, which are

15    action items.  As we move into these items, we have some new

16    technology here.  I'll be using the light system on the podium

17    to help us all stay within the time allocations that were

18    proposed on the agenda.

19            I'm hopeful that we can stay well under those time

20    allocations, and I still retain some hope that we'll be able

21    to address everything on the agenda today without having to

22    reconvene tomorrow.

23            So we will set the timer for the time allotment on

24    the agenda.  The yellow light will go on when half of that

25    time has elapsed, and the red light will go on when the time

1    has run out.  And there is a lighted display on the podium for

2    which the person at the podium can see how much time is left.

3         So please be brief and nonduplicative in remarks

4    concerning any contested matters.  And try to focus on truly

5    contested material issues, as the agenda is long.  And bear in

6    mind that I have reviewed your submissions.

7         So Mr. Bienenstock.

8         MR. BIENENSTOCK:  Your Honor, if it's okay, my

9    partner, Paul Possinger, will present the uncontested

10   motions.

11        THE COURT:  Very well.  Thank you, Mr. Possinger.

12        MR. POSSINGER:  Thank you, Your Honor.  Paul

13   Possinger, Proskauer Rose, on behalf of the Oversight Board.

14        Your Honor, I will be addressing the Epiq employment

15   application, the joint administration motion, and the motion

16   to apply to confirm application of the stay in these cases.

17   As Mr. Bienenstock indicated, the latter two are now

18   uncontested.  We filed updated Orders yesterday on the joint

19   administration and stay motions.

20        So I think because all three of those motions are now

21   uncontested, it may be most efficient to simply ask if Your

22   Honor has any questions or concerns regarding the motions or

23   any proposed Orders on those three matters.

24        THE COURT:  I do not believe I do, but let me just

25   check my notes.  So we have the Epiq motion, the joint

1    administration, and the stay confirmation motion.

2          So on the Epiq motion, that is granted, and I will

3    enter an Order in the form of docket entry number 299-3, which

4    was filed in the 17-3283 master docket.

5          MR. POSSINGER:  Thank you, Your Honor.

6          THE COURT:  The joint administration motion -- so

7    just to confirm, the Peaje and ERS secured creditors

8    objections are withdrawn.

9          MR. POSSINGER:  I believe that is the case, Your

10   Honor.  Peaje's counsel is present.

11         MR. BRILLIANT:  Yes, Your Honor.  Pursuant to the

12   agreement we had with the modified Order, we withdraw our

13   position.

14         THE COURT:  Thank you, Mr. Brilliant.

15         MR. BRILLIANT:  Yes, Your Honor.  I'm sorry.  Allen

16   Brilliant on behalf of Peaje.

17         THE COURT:  Thank you.

18         And the ERS secured creditors.

19         MR. BENNETT:  Bruce Bennett on behalf of the ERS

20   secured creditors.  Yes, we have reached an agreement on the

21   form of the creditors.

22         THE COURT:  Thank you, Mr. Bennett.  Therefore, the

23   joint administration -- I'm sorry.

24         MR. DECHIARA:  Your Honor, I'm here to speak on the

25   stay application.

1          THE COURT:  All right.  So there's someone who wants

2    to speak on the stay application, and we'll get to that in a

3    moment.

4          So the joint administration motion is granted.  And

5    the Court will enter the proposed Order that was filed as to

6    docket entry number 513 in 17-3283.  Let me just make sure I

7    don't have -- 513-1 in 17-3283.  That was filed on the 27th of

8    June at 6:30 in the afternoon.

9          So is that the one I should be talking about?

10         MR. POSSINGER:  That's correct, Your Honor.

11         I'm also looking at docket number 150 in case number

12   17-3566.  That is the ERS case.  They are identical.

13         THE COURT:  So as long as I file an identical Order

14   in each of the cases, it doesn't matter which filing I take

15   up; is that correct?

16         MR. POSSINGER:  That's correct.

17         THE COURT:  Thank you very much.

18         So now with respect to the extension of the automatic

19   stay, you indicated it's your understanding that it's

20   uncontested, but there are two people standing in the aisle,

21   which suggests to me that they may have some differences.  But

22   first, will you explain why you state it's uncontested?

23         MR. POSSINGER:  Yes, Your Honor.  There were eight

24   objections filed to this motion.  We then engaged with each of

25   the objecting parties and made significant revisions to the

1   Order, really just to make it clear that the Order is

2   confirming the application of the stays as they exist on 362

3   and 922 of the Bankruptcy Code; that they don't apply to

4   adversary proceedings; that the stays don't apply to adversary

5   proceedings in this case.  They don't apply to discovery in

6   those adversary proceedings in these cases.

7        And so we made extensive provisions.  Late yesterday

8   we made the final round of provisions based on comments that

9   we received from Peaje to resolve the eighth objection.

10        At the time we filed on Saturday, we had resolved

11   seven of the eight.  So it's my understanding that the updated

12   Order that we filed last night at docket number 516-1 resolves

13   all of the objections to this motion.

14        THE COURT:  All right.  And so I ask you to step

15   aside so that the gentleman who's standing there can introduce

16   himself and speak.

17        MR. DECHIARA:  Good morning, Your Honor.  Peter

18   DeChiara from the law firm of Cohen, Weiss and Simon, LLP.  We

19   are counsel for the Service Employees International Union and

20   the United Auto Workers Union.  I will be brief, Your Honor.

21        These two unions together represent about 23,000

22   employees of the Commonwealth of Puerto Rico.  They include

23   school cafeteria workers, janitors, people who get up and go

24   to work each morning and allow the offices, and schools,

25   hospitals and government offices of this island to function.

1    They are modestly paid, some barely above the poverty level.

2           It's through these unions that they seek to have

3    their voices heard in these proceedings.  These two unions,

4    the UAW and SEIU, we don't object to the stay motion, and we

5    don't have any issues with the revised proposed Order.  But we

6    do rise to raise an issue that is a critical one for our

7    members, and we wanted to alert the Court to the issue.

8           At the core of every collective bargaining

9    relationship is a grievance arbitration machinery that allows

10   disputes to be resolved expeditiously and out of court.  The

11   Supreme Court has ruled again and again that a smoothly

12   functioning grievance procedure is critical to maintaining

13   labor peace and productive labor relations, and the courts of

14   the Commonwealth have recognized that same principle.

15          The Commonwealth's unionized workforce, like any

16   large unionized workforce, generates as a matter of course a

17   substantial number of disputes, grievances over matters such

18   as employee discharge, employee discipline, alleged violations

19   by management.  At any given time, there are dozens, if not

20   hundreds, of grievances pending.

21          Some concededly involve relatively minor matters, but

22   some, like unjust discharge of an employee, are grave matters

23   to the employee involved and his or her family.

24          THE COURT:  I understand.  So are you asking me to do

25   something in particular at this time, or are you asking that

1  the Oversight Board hear that you are going to come to them

2  with some sort of a streamlining proposal for applications to

3  lift stay on grievance matters?  I'd ask you to cut to the

4  chase.

5         MR. DECHIARA:  Let me get right to the chase, Your

6  Honor.  Thank you.

7         We have a legal disagreement, let me put it that way,

8  with the Oversight Board.  We believe that under PROMESA, the

9  automatic stay does not bar the processing of the grievances

10  and arbitrations.

11        I understand the Oversight Board disagrees with our

12  position.  I am not here today to argue that position.  The

13  debtors have indicated a willingness to meet with us to

14  discuss a process for allowing -- to talk about the

15  possibility of allowing grievances and arbitrations to go

16  forward, and we appreciate that from the debtors and we intend

17  to work with them in good faith to get that done.

18        So to conclude, I hope, Your Honor, never have to

19  appear before this Court to argue the issue, but we thought it

20  was important, because it's just a critical issue, to alert

21  the Court that there is a potential dispute which we hope we

22  can resolve and you'll never have to rule on it.  Thank you.

23        THE COURT:  Thank you.

24        MS. LEVINE:  Good morning, Your Honor.  Very briefly,

25  Sharon Levine on behalf of the American Federation of State

1     and Municipal Employees.  We joined in response and dialogue

2     with counsel for the Oversight Board and appreciate that

3     conversation.

4              We met with members yesterday, some last night, and

5     obviously this is just a very stressful situation, so just the

6     idea that there is a dialogue has been helpful.  Thank you.

7              THE COURT:  Thank you.  And I am glad to hear it.

8              MR. POSSINGER:  Paul Possinger again for the

9     Oversight Board.  Yes, we had those discussions.  As Your

10    Honor may have seen, there are many lift stay motions already

11    coming in on sort of an ordinary course on operational matters

12    such as automobile repossession, things like that.

13             THE COURT:  Yes.

14             MR. POSSINGER:  Including these employment matters.

15    And rather than having to address these as they arise

16    piecemeal, because there could be hundreds of them --

17             THE COURT:  The Court would appreciate that.

18             MR. POSSINGER:  Understood.

19             THE COURT:  So as they come in and until I am given

20    notice of some agreed global protocol, as you've seen when a

21    lift stay motion comes in, I enter an Order setting a

22    timetable that's within the Section 362 timetable, provided

23    it's on submission, unless someone asks for a hearing, and

24    then in the very ordinary course, things that have happened so

25    far, it's turned out to be unopposed.  And then I go ahead and

1   I file my Order.

2        So it would be nice if I didn't have to do that

3   motion by motion, but until I find out that I don't, I'll do

4   it motion by motion.

5        MR. POSSINGER:  And we appreciate that it would be

6   nice if the employees don't have to do it motion by motion.

7        THE COURT:  Yes.

8        MR. POSSINGER:  And I think Your Honor has already

9   seen, we've done this on an automobile case that didn't

10  require a motion.  So we'll work with them.

11       THE COURT:  Yes.  Thank you.

12       And so the extension of automatic stay 105 motion is

13  granted to the extent embodied in the proposed revised Order,

14  which was filed as 516-2 in case 17-3283, which grants a

15  narrower and more focused scope of relief than the original

16  motion had sought.

17       MR. POSSINGER:  That's correct, Your Honor.

18       THE COURT:  And I thank you all for working to

19  resolve all of the objections.

20       MR. POSSINGER:  Thank you, Your Honor.

21       THE COURT:  Thank you.

22       MR. POSSINGER:  I believe the utilities motion is

23  next, and that's a motion of AAFAF.

24       THE COURT:  Thank you.

25       MS. UHLAND:  Good morning, Your Honor, Suzanne

```
 1   Uhland of O'Melveny & Myers on behalf of AAFAF, representing
 2   the debtor entities.
 3            THE COURT:  Good morning, Ms. Uhland.
 4            MS. UHLAND:  Good morning.  I believe we have a
 5   consensual arrangement.  We had one objector, Stericycle, that
 6   did not confirm its agreement to our revised form of Order,
 7   although we do believe that our revised form of Order did
 8   address all of their objections.
 9            THE COURT:  Is there anyone here who wishes to speak
10   for Stericycle?  A gentleman has just risen.
11            MR. LINARES:  Good morning, Your Honor.
12            THE COURT:  Good morning.
13            MR. LINARES:  Adrian Linares on behalf of
14   Stericycle.
15            THE COURT:  May I just ask you to say your name once
16   more slowly?
17            MR. LINARES:  Yes, ma'am.
18            THE COURT:  And spell it.
19            MR. LINARES:  Adrian, A-d-r-i-a-n.  My last is
20   Linares, L-i-n-a-r-e-s.
21            THE COURT:  Thank you, Mr. Linares.  Please
22   proceed.
23            MR. LINARES:  Thank you, Your Honor.  We don't have
24   an answer in a definite way, because our clients have been
25   traveling and we haven't discussed the final proposal of the
```

 1   motion.  But as of today, it appears to me that it's quite

 2   fine, so I believe in the next five days we will have a formal

 3   response to that.

 4           THE COURT:  Well, let me ask you this:  If I were to

 5   grant the motion today, given the deadlines that had been set,

 6   this Order sets up a procedure for identifying a particular

 7   issue with respect to a particular service provider.  And so

 8   your client would be able to invoke that procedure, I suppose,

 9   you know, if there is currently an issue.

10           MR. LINARES:  Yes.

11           THE COURT:  And so is there any real impediment that

12   you can identify for me today to signing the Order as --

13   entering the Order as proposed?

14           MR. LINARES:  Honestly, no.

15           The COURT:  Thank you for your candor.

16           MR. LINARES:  Okay.

17           MS. UHLAND:  Thank you, Your Honor.  The proposed

18   Order does have one date to be filled in.

19           THE COURT:  So I have document 442 filed in 3283.

20           MS. UHLAND:  Yes.

21           THE COURT:  So would you point me to --

22           MS. UHLAND:  Paragraph seven.

23           THE COURT:  Yes.  And what is your suggestion as to

24   the request deadline, assuming that I don't actually enter

25   this Order until tomorrow or thereabouts?

1          MS. UHLAND:  I would like to give people a sufficient

2  -- I guess working backwards from the next Omnibus hearing, if

3  we had two weeks prior to that hearing to address anything

4  requested, I think that would be fine.

5          THE COURT:  Would it make sense to express this in

6  terms of a formula that sort of renews and applies itself with

7  respect to each Omni going forward rather than a particular

8  date that would then require me to enter a superseding Order

9  in the event that issues come up --

10          MS. UHLAND:  Yes.

11          THE COURT:  -- before the next Omni?

12          MS. UHLAND:  Yes.  So maybe we could rewrite it so

13  it's noticed in accordance with the motion, timing for a

14  regular matter.

15          THE COURT:  I think that makes sense.  And so I will

16  look to you to file a notice of presentment on -- we'll call

17  it five days notice, I think that's what we looked at last

18  time, for a revised Order that incorporates a formula here

19  rather than a specific date.

20          MS. UHLAND:  Okay.  We will do so.

21          THE COURT:  With that caveat, the motion is granted,

22  and I will look forward to the revised proposed Order.

23          MS. UHLAND:  All right.  Thank you, Your Honor.

24          THE COURT:  Thank you.

25          And so I believe that the next agenda item is the

1    Mutual Fund Group's Lift Stay motion.

2           MR. BENTLEY:  Good morning, Your Honor.

3           THE COURT:  Good morning.

4           MR. BENTLEY:  Philip Bentley of Kramer, Levin,

5    Naftalis and Frankel for the Mutual Funds Group.

6           We've agreed with our co-defendants in the Puerto

7    Rico Funds that I'll be taking the lead on this morning's

8    argument.  My co-counsel, Jason Zakia, from the Puerto Rico

9    Funds will be adding a few brief comments after I'm done.

10          THE COURT:  Just to reiterate how we're doing the

11   lights, we've just set the light for 30 minutes, and it will

12   go yellow at 15 minutes.  And I will expect within that half

13   hour, everyone who wants and needs to be heard on this will

14   have an opportunity to speak.

15          MR. BENTLEY:  And I have a proposal on how to deal

16   with that.

17          I would ask if the Court sees fit, that the two of us

18   be given a total of 15 minutes, including brief rebuttal, and

19   that the objectors themselves divide up the remaining 15

20   minutes.

21          THE COURT:  Can the objectors live with that?  I hear

22   yes.

23          So how much time do you want to reserve for rebuttal?

24          MR. BENTLEY:  If Your Honor wouldn't mind, I would

25   like to leave the balance of my time, but if you want me to

1   carve it up in advance, I would say three minutes.

2          THE COURT:  If you mean the balance and --

3          MR. BENTLEY:  The balance that remains after

4   Mr. Zakia and I are done.

5          THE COURT:  Right.  So I'm going to -- we're going to

6   look at 12 minutes as you go along now, and we'll warn you at

7   12 minutes, or you look at 12 minutes and we'll stop you there

8   if you want to have three left at least.

9          MR. BENTLEY:  That's great, Your Honor.  I appreciate

10  it.

11         THE COURT:  All right.  Please proceed.

12         MR. BENTLEY:  The motion we've filed presents Your

13  Honor with a fundamental choice, which court should decide the

14  issue of whether the Puerto Rico Statutes that created the

15  COFINA structure are valid or not under the Puerto Rico

16  Constitution.

17         Should it be a federal court, meaning this court,

18  subject to, in all likelihood, an appeal by whichever party

19  loses, or a court up in Boston, or should it be a Commonwealth

20  court, and specifically the Puerto Rico Supreme Court to whom

21  the Court can certify its issues directly.

22         I'm going to present three points in support of our

23  motion this morning.  The first one which I'll spend most of

24  my time on is we believe the arguments for certifying this

25  matter to the Puerto Rico Supreme Court are overwhelmingly

```
 1   strong.  I'll return to that in a moment.

 2           My second point is time, we think, is of the essence.

 3   Your Honor has heard from the Oversight Board, from AAFAF that

 4   by November 1, they believe they may run out of cash.  The

 5   Commonwealth may run out of cash and may need access to

 6   COFINA's funds in order to continue their operations.

 7           We don't believe that November 1 is a real deadline.

 8   I won't go into the details of that, but one -- just one

 9   detail is there's recently been mention of 800 million dollars

10   being available that hadn't previously been identified.

11   That's a large sum that could effect the timing quite a bit.

12           But the point that's relevant for this motion is at

13   some point, and we don't know when, at some point, suddenly

14   and perhaps unexpectedly, Your Honor will find herself within

15   another urgent motion in front of you, perhaps by the

16   Oversight Board, perhaps by AAFAF, saying Your Honor, we now

17   need COFINA's money and we need a ruling within X days.  And X

18   is probably not going to be a lot longer than maybe 30 days.

19           If and when that happens, it will be too late for

20   Your Honor, if you were inclined at that time, to send the

21   matter to the Puerto Rico Supreme Court.  Your Honor would

22   probably be put in a position where you would be forced to

23   rule, perhaps on a preliminary basis, perhaps on a final

24   basis, as to this fundamental issue of Puerto Rico

25   constitutional law.  Because that will be at the heart of the
```

1   issue that you may be asked to decide on an expedited basis,

2   can COFINA's cash be taken?

3          And so we believe that Your Honor really needs to

4   decide today, do you want to send that issue to the Puerto

5   Rico Supreme Court.

6          THE COURT:  Now, I believe in the papers filed by the

7   Oversight Board and AAFAF, one response to your urgency, and

8   let's avoid a midnight call argument, is that in the event

9   that they need help or support from COFINA, the first step

10  would be some, you know, borrowing from COFINA as opposed to

11  an assertion of the right to permanently alienate from COFINA

12  whatever the funds are that they feel are needed at that

13  particular moment.

14         And I see Mr. Bienenstock nodding, so I've got it

15  mostly right, at least.

16         So that, both the express message there and the

17  urtext is that if this problem does need to be managed in

18  context, it doesn't need a final decision overnight, because

19  it would be set up as a loan.

20         So do you have a response to that?

21         MR. BENTLEY:  I do, Your Honor.  I understand that

22  that's what they've said.  We have concerns about whether a

23  loan could adequately secure COFINA's entitlement to the

24  funds, given the Commonwealth in this scenario would say we

25  think we're going to be running out of cash.

1          We think in that circumstance, there would be a risk

2   of COFINA getting not the cash we think it's entitled to, but

3   rather a loan that doesn't provide it with adequate security

4   for those funds.

5          THE COURT:  Thank you.  You can continue.

6          MR. BENTLEY:  The third of my three big picture

7   points is we heard Judge Houser's introduction to the

8   mediation team, the mediation process.  Everybody in this

9   courtroom, I think, hopes that the mediation will be

10  successful.  That will be the best for everybody and for the

11  island.

12         A mediator needs tools.  A mediator needs the parties

13  to be incentivized to settle.  And Your Honor is very familiar

14  with the technique of setting a trial date to force the

15  parties to settle, to force them to make the difficult

16  decisions that they won't make until they really have a gun to

17  their head.

18         In this case, we think what's most akin to a gun to

19  the head or a trial date is an upcoming ruling, an expected

20  ruling by the Puerto Rico Supreme Court.  That's the ruling,

21  that's the one ruling that cannot be appealed except by the

22  longshot mechanism of seeking cert from the U.S. Supreme

23  Court, which might be difficult given that the key issues

24  there are issues of Puerto Rico law.

25         Whereas if Your Honor -- if the gun to the parties'

1   head were an expected ruling by Your Honor on this issue of

2   Puerto Rico law, it might have less -- might be less

3   threatening to the parties because it would be expected that

4   the losing party would appeal.  And so the ultimate

5   decision -- and then the First Circuit might itself send the

6   case back to the Puerto Rico Supreme Court, as circuit courts

7   often do.

8          So that would be not an imminent gun to the head.  It

9   would be perhaps a gun with soft bullets.  So that's our

10  second pitch, Your Honor.  We think setting this process in

11  motion of getting the issue to the Supreme Court now will give

12  the mediators the strongest tools to work with to fully get

13  the parties' attention.

14         THE COURT:  Now, I noted reading your papers that you

15  were not arguing lack of adequate protection.  You are arguing

16  cause in the form of these various efficiency dispute

17  resolution promotion considerations; is that correct?

18         MR. BENTLEY:  As to the lift stay matter, that is

19  correct.  With respect to the protocol motion and some of the

20  procedures that are proposed here, we're very certainly

21  arguing adequate protection, but that's a separate matter.

22         THE COURT:  Thank you.

23         And do you have any further response to the

24  objections that the Supreme Court of Puerto Rico at the end of

25  the day isn't likely to accept the certified questions because

1     they arise in the context of PROMESA and therefore, at least

2     possibly involve mixed questions of federal and state law?

3          You've cited the 2003 Judiciary Act in your papers,

4     but as we read them, the Puerto Rico Supreme Court Rule 25(B)

5     still says that the Court would not except certification of a

6     mixed question of federal and local law.

7          So do you have any further -- anything further for me

8     than what's in your papers about why you feel so sure that if

9     we allow Judge Besosa to decide whether he wants to certify

10    and then certifies, they'd be likely to take it?

11    MR. BENTLEY:  Yes.  As we say in our papers, the

12    rules have been relaxed a lot since the cases decided by the

13    other side were handed down.  And yes, the Puerto Rico Supreme

14    Court has a lot of discretion.  And yes, it will come down to

15    their discretion here.

16         And for the reasons I'm going to get to in a moment,

17    we think that they will agree that the reasons for having them

18    decide this issue are overwhelmingly strong.  And that would

19    overcome, we believe, any concern they may have about mixed

20    questions of law.

21         The one other thing I would say, Your Honor, is we

22    think the notion that there are federal laws here is just not

23    founded.  And very briefly on that, first, as we say in our

24    papers, for the past 40 years it's been clear First Circuit

25    Supreme Court authority that a debtor's interest in property

1    is determined by state law, here Commonwealth law, not by

2    federal law.

3        The only case cited by the Oversight Board contrary

4    to that is 42 years old.  It's superseded by those more recent

5    cases.

6        As for PROMESA 305 and 306, we think they clearly

7    don't apply.  I won't repeat the arguments in our papers

8    unless Your Honor has questions.

9        But I'd just add one brief point, and that is even if

10   Your Honor thought there was some ambiguity in 305 and 6 such

11   that they might apply, we think the clincher would be the

12   Fifth Amendment.  The Fifth Amendment says once property

13   rights have been created, a later statute can't later be

14   enacted that takes away those property rights.

15       Here if we're right that these property rights were

16   created and were valid ten years ago when COFINA was set up,

17   PROMESA can't take away those property rights because it was

18   clear back then and up until the time -- until PROMESA was

19   enacted, Puerto Rico hadn't been subject to the bankruptcy

20   law.  Puerto Rico had been treated like a state.

21       That's why Puerto Rico felt the need to enact its

22   bankruptcy reform.  It's the DERA Act, Debt Enforcement and

23   Recovery Act, which the Surpreme threw out.  It's because

24   Congress had never allowed Puerto Rico to use the bankruptcy

25   laws.  So PROMESA fundamentally changes that.  And if PROMESA

 1   were read to take away our property rights, that would be a

 2   take.

 3           THE COURT:  Thank you.

 4           MR. BENTLEY:  I'll turn that, if I may, to the main

 5   point, and I'll try to cover that briefly.  And that is if

 6   there ever were a case that warrants a certification to a

 7   state Supreme Court here at the Commonwealth Supreme Court, we

 8   think this is it for a number of reasons.  First --

 9           THE COURT:  I think you're running on one minute to

10   your 12.  Is that -- okay.

11           MR. BENTLEY:  Okay.  I may cut a little bit into my

12   rebuttal time, but let me try to be brief.

13           First, it's not only an unsettled issue of Puerto

14   Rico law.  There's not a single Puerto Rico precedent, so the

15   Court would be starting from scratch.

16           Second, we're not talking about Puerto Rico common

17   law or statute, we're talking about the Commonwealth's

18   foundational document, the Constitution.

19           And third, this is a matter of just overwhelming and

20   practical importance to the island for several reasons.  It's

21   the cornerstone for any restructuring.  I think most parties

22   in this courtroom agree, it's the issue that needs to be

23   resolved first.

24           And second, if the Court, whether it's Your Honor or

25   the First Circuit or the Puerto Rico Supreme Court were to

1    strike down COFINA and say no, under Puerto Rico's

2    institution, you can't securitize tax revenues, that could

3    have a devastating impact going forward on the ability of the

4    Commonwealth to issue new bonds that were -- that gave us a

5    security interest in tax revenues.

6           A Federal Court, Your Honor, the First Circuit,

7    shouldn't be put in a position of making a decision of that

8    monumental of an impact on Puerto Rico.

9           Thank you, Your Honor.

10          THE COURT:  Thank you.

11          MR. ZAKIA:  Mr. Bentley made the point, and I won't

12   repeat them, but just one thing I'd like to emphasize on a

13   question Your Honor asked.  No one is proposing certifying the

14   Puerto Rico Supreme Court and -- issues of Puerto Rico law.

15   The issue that is proposed to be certified is whether COFINA,

16   the structure is valid under the Commonwealth law.  The issue

17   raised, which they believe and we disagree, that under the

18   Commonwealth institution, these statutes which provide for the

19   title of these funds to go to COFINA are intact.  That is

20   purely a question of Commonwealth law.

21          As Mr. Bentley explained, it is a critically

22   important question.  So the one, I guess, point I would add to

23   that is a matter of comity, in addition to efficiency, and

24   he's actually right.

25          One thing Judge Houser said is when Your Honor makes

1   decisions, that's one step in the process to resolution, but

2   there are additional steps.  In this particular instance,

3   going directly to the Supreme Court of Puerto Rico let's us do

4   that one step.

5          So if there are going to be courthouse steps in which

6   to settle this case, that's the proper courthouse we would

7   submit.  But there is no proposal to certify, and I think that

8   needs to be clear.

9          THE COURT:  Thank you.

10          So I will -- there's one minute and five seconds left

11   in the movant's time, so will the first opponent please come

12   to the podium as quickly as possible.

13          Mr. Bienenstock, please.

14          MR. BIENENSTOCK:  Thank you, Your Honor.  And I will

15   be as -- Martin Bienenstock with Proskauer Rose for the

16   Oversight Board.  I'll be as quick as possible.

17          Following points.  First, the issue that is to be

18   determined in this case is whether under PROMESA Section

19   306(b), the sales and use taxes at issue are property of the

20   debtor.  That is a federal question arising under federal

21   statute.  It may or may not be informed, under territory law,

22   that the taxes are subject to being available resources of the

23   Commonwealth.

24          Two, they don't like Colonial Realty.  We made our

25   argument.  I won't pursue that.  We think we're right, but I

 1   don't want to use the time on that.  Let me take a much more

 2   classic, federal bankruptcy question issue that this involves,

 3   finality.

 4         If a debtor files a Chapter 7 liquidation case, an

 5   individual, and says that there's a million dollars in trust

 6   for the debtor's daughter that's not property of the estate

 7   because debtor put it in trust a long time before bankruptcy,

 8   no issues for transfer, the debtor would be right unless the

 9   debtor reserved the power to revoke the trust.

10         If it has the power to revoke the trust, then what's

11   in the trust is part of the bankruptcy estate.  Here, the

12   Puerto Rico legislature passed a law saying the sales and use

13   taxes are not available resources of the Commonwealth.  Puerto

14   Rico legislature can pass another statute saying they are,

15   with that terminus.

16         Does that make this property of the debtor for

17   purposes of 306(b) of PROMESA?  That's the issue.  There are

18   arguments on both sides.  But it is a federal question, and

19   that's the question that needs to be certified.

20         Second, the Commonwealth and COFINA own that question

21   and that cause of action, not creditors who are litigating

22   before these cases started based on their interest as secured

23   creditors of COFINA.  They're only secured by what COFINA has.

24   The question is, what does COFINA have.  Is it property of

25   COFINA or is it property of the Commonwealth?

```
 1              Your Honor, those are really the basic questions.  I
 2    could tell from Your Honor's comments that Your Honor fully
 3    absorbed our pleadings, so I'll defer to the next person.
 4              THE COURT:  Thank you.
 5              Mr. Kirpalani.
 6              MR. KIRPALANI:  Good morning, Your Honor.  For the
 7    record, Susheel Kirpalani of Quinn Emanuel on behalf of the
 8    COFINA Senior Bondholders Coalition.
 9              I'll also be very careful with the time, because we
10    want to get through this, and there's other people who deserve
11    the time to speak.
12              This is a very limited motion and a limited question.
13    I feel a little bit like the mutual funds have tried to hijack
14    the process and the important question that the Court, this
15    Court will have to determine at some point, and that is do you
16    need, does Your Honor need advice or instruction or guidance
17    from the Puerto Rico Supreme Court.
18              This motion does not need to reach that issue.  This
19    motion is a motion to lift the stay, frankly, in a case where
20    the plaintiffs themselves have opposed the motion where the
21    plaintiff's themselves lack standing because of the
22    intervention of the Title III cases.
23              It's a point that I made to the First Circuit that
24    once we get to a Title III case, only the Trustee in
25    bankruptcy will have standing on behalf of the Commonwealth to
```

1    bring the potential challenge to COFINA.  And it was us that

2    filed the certification motion to the Supreme Court, not the

3    mutual funds.

4         So when they asked us if we would join in this, our

5    reaction was this was entirely premature and Lex Claims is

6    simply the wrong vehicle.  Mr. Bienenstock and the Oversight

7    Board filed a motion for a protocol, which we'll address when

8    that issue is up before Your Honor later today.

9         But there will be come a time Your Honor may notice

10   that in the proposed order that we submitted in connection

11   with the protocol, we struck the word "this Court" would

12   determine the issues, and instead we said the "appropriate

13   court."

14        Because Your Honor, even if it's filed before you,

15   may decide, I want to certify certain questions to the Puerto

16   Rico Supreme Court.  That doesn't need to be decided in the

17   context of this motion to lift the stay.

18        This motion to lift the stay is defective because the

19   plaintiffs themselves lack standing and, therefore, the action

20   lacks Article III case or controversy.

21        With respect to the issue that Mr. Bienenstock just

22   raised, federal question issues relating to the property of

23   the estate, as we point out, there is no estate under Section

24   541 in PROMESA's property of the debtor.

25        And I don't agree that it will be a mixed question of

1    federal and state law and territory law.  I do believe the

2    issues will ultimately be those of Puerto Rico law, unless we

3    can settle them.

4          And with respect to the right or reversionary

5    interest to revoke, we filed a lawsuit in Federal Court citing

6    the U.S. and Puerto Rico Constitutions contracts clause

7    because what Mr. Bienenstock did not remind the Court is that

8    along with that right to revert, revoke or change the laws,

9    there was also a nonimpairment covenant that was given by the

10   Commonwealth that they will never do exactly that.  And so

11   there is a hierarchy and analysis under Constitutional

12   jurisprudence of what that means.

13         We filed a lawsuit to explain what that means on May

14   2nd.  It has been stayed.  All of these issues will get

15   resolved at some point, but this particular motion is

16   defective on the procedural basis that the Lex Claims lawsuit

17   is just the improper vehicle to resolve it.

18         And the Court does not need to reach the issue in

19   connection with denying this motion to lift the stay, rather

20   Your Honor may one day or the First Circuit may one day ask

21   the Puerto Rico Supreme Court for legal advice.

22         Thank you, Your Honor.

23         THE COURT:  Thank you.

24         MR. DUNNE:  Dennis Dunne from Milbank Tweed on behalf

25   of Ambac.  I'm not going to repeat what you heard already from

1    the objectors.  I'll just make a couple points.

2             THE COURT:  But you do have to talk a little slower.

3             MR. DUNNE:  Yes.  But the green light hasn't turned

4    yellow yet, so I guess I have no excuse for the speed.

5             I want to get to two points, really.  One is I think

6    it's odd and kind of telling at the same time that the movants

7    here are seeking to direct the prosecution of a claim that

8    they were not the plaintiffs for pre-petition and that we

9    believe is now not capable of being prosecuted by that

10   plaintiff group because it's an asset of the Commonwealth.

11            So why are they doing it?  They're doing it because I

12   think they really dislike what's on the next docket item,

13   which is the protocol motion with respect to the Oversight

14   Board.

15            And they hope if you granted this, that would

16   completely obviate the need for any litigation on the issue

17   here.  But that's not a reason to do this, Your Honor.  We

18   think that as we put in our paper here, it's the

19   constitutional -- principle of avoidance.  There are a number

20   of threshold issues there that could resolve that litigation,

21   failure to state claim, some other preliminary issues.  And I

22   think the case was pretty clear that it's only when a

23   constitutional issue remains left standing that you should

24   deal with it.

25            And maybe as Mr. Kirpalani said, at that point in

1   time you might decide to certify it.  And I do want to be

2   clear on that, Ambac, we're not saying it's never ripe for

3   certification.  It might be, but we have to go through the

4   procedures and requirements.  And when we get to the place

5   where the circumstance is warranted, we should.

6           Last point.  I disagree with the notion that

7   certification would somehow catalyze settlement.  And this

8   could be a theme you hear from me, and I suspect others, on a

9   number of points.  Settlement is unlikely to occur here in

10  this litigation, in other litigations, without development of

11  the fiscal plan.

12          As Judge Houser and her mediation team is going to

13  hear, I suspect from a number of parties on July 12, we need

14  transparency, accountability and more importantly, an open

15  attitude of engagement with respect to the fiscal plan.

16  Before we have the cornerstone of the size of the pie that

17  usually precedes dividing up the pie.

18          Right now we want to jump to divvying up the pie when

19  we don't know what the pie is.  We'll hear more about that

20  later, but there's a little bit of a sequencing issue here.

21  The issue has come to the forefront because of the nature of

22  what happens once we have Title III cases, and we're losing

23  sight of kind of the underlying financial predicates that we

24  need to develop more.

25          Thank you, Your Honor.

```
1              THE COURT:  Thank you.

2          The gentleman in the front row who was standing up

3    before, and the gentleman coming up now will come up after.

4    I'm sorry.  I'll let the gentleman with the blue tie speak

5    first and then the gentleman with the purple tie speak after

6    that.

7              MR. RIEMAN:  Thank you, Your Honor.  Walter Rieman,

8    Paul Weiss, Rifkind, Wharton & Garrison for the Ad Hoc Group

9    of General Obligation Bondholders in opposition to the motion.

10             As has been noted, my clients are the plaintiffs in

11   the Lex Claims litigation.  And while we do not agree that we

12   lack standing to raise the underlying disputed issue as a

13   result of the Title III filing, as has been said, we do agree

14   that the Lex Claims litigation is not an appropriate vehicle

15   for certification of this issue.

16             Lifting the stay as the movants request would

17   inappropriately remove from this Court's control the question

18   of whether and how to certify issues to the Supreme Court of

19   Puerto Rico, and again would remove from this Court the

20   ability to define those issues.

21             The motion is a motion to lift the stay.  It's not a

22   motion for certification.  So the consequence of granting a

23   motion would be that Judge Besosa who's presiding over the Lex

24   Claims litigation prior to its being stayed would be asked to

25   decide whether certification should occur.
```

1          Presumably, he wouldn't be told that certification

2    would be useful to resolve any issue pending before him.  No

3    one contends that the stay should be lifted in Lex Claims with

4    respect to any other issue.  And indeed, the claims as framed

5    in the Lex Claims amended complaint have been entirely

6    overtaken by events.

7          So instead, Judge Besosa would confront the

8    completely puzzling question of whether to certify an issue to

9    the Supreme Court of Puerto Rico, not because it would be

10   useful to resolve Lex Claims, but instead because it would be

11   useful to resolve issues pending before Your Honor in these

12   Title III proceedings.

13         With respect, that's just crazy.  And then if

14   certification were to occur, which we think it would not, the

15   Supreme Court of Puerto Rico would then be required to apply

16   its jurisprudence considering whether to accept certification

17   to a request emanating from Judge Besosa, but implicating

18   issues pending the Title III proceedings before Your Honor.

19         That seems to us as similarly crazy and similarly

20   likely to result in the objection of a request for

21   certification at that level.  Your Honor's about to hear the

22   COFINA procedures motion.

23         There will be opportunities for parties to request

24   certification of issues to the Supreme Court of Puerto Rico in

25   an orderly way, pursuant to whatever procedures Your Honor

1  decides to put in place for resolution of the issues

2  implicated by the COFINA procedures motion.

3        Opportunities may arise in the context of the

4  interpleader proceeding involving the Bank of New York, or

5  from adversary proceedings that have yet to be filed.  But it

6  is Your Honor that should remain in control of these issues.

7  Your Honor may want to consider if a request for certification

8  is made from this Court, the effect certification would have

9  on the pace of and scheduling of the action before this Court,

10 and on the prospects for settlement.  We do not agree that

11 granting this motion would advance the settlement process and

12 we think that it will throw resolution of this issue into

13 procedural chaos.

14        Thank you, Your Honor.

15        THE COURT:  Thank you.

16        And the gentleman in the purple tie.

17        MR. GORDON:  Thank you and good morning, Your Honor.

18 For the record, my name is Robert Gordon of Jenner & Block on

19 behalf of the Official Committee of the Retired Employees of

20 Puerto Rico.

21        THE COURT:  There's a total of just under two minutes

22 left in this segment, so --

23        MR. GORDON:  Which feeds right into what I was going

24 to say, which is in the interest of efficiency, we choose to

25 just rely upon the pleading we filed.  I realize we did file

1    something with respect to this matter, but I think all the

2    other counsel have articulated the issues very well in

3    opposition of the motion and maintaining the matters before

4    this Court.

5            Thank you, Your Honor.

6            THE COURT:  Thank you, Mr. Gordon.

7            MR. SOSLAND:  Thank you, Your Honor.  Martin Sosland

8    of Butler Snow on behalf of Financial Guarantee Assurance

9    Corporation.

10           THE COURT:  Good morning.

11           MR. SOSLAND:  Although Mr. Dunne and I may be on

12   opposite sides of the underlying substantive dispute, but we

13   oppose this motion for exactly the same reasons that Mr. Dunne

14   articulated, so I won't repeat them, only to say that we are

15   against the motion.

16           THE COURT:  Thank you.

17           MR. TRUJILLLO:  Good morning, Your Honor.

18   Maximiliano Trujillo.  I represent a very small creditor.

19   It's an eminent domain creditor.  But my motion to appear here

20   today is for just one point, that any motion to lift the stay,

21   unless the Honorable Court changes these rulings, is subject

22   to local rule 4001-B supporting that.

23           Who is the owner?  What is the agreement?  Was the

24   lien effectively perfected?  And we don't have those documents

25   in this and other matters of stay of proceedings.  So this is

1  a threshold issue that the Honorable Court should decide in

2  this and the other areas.

3       Now, there has been questions of Constitutionality

4  and the Fifth Amendment, and we -- possibly the retroactive

5  effect of Puerto Rican law. But there is a -- there are

6  Puerto Rican laws that predate all contracts here that would

7  be able to be used by this Honorable Court if that happens to

8  PROMESA or whatever. And that's the civil code of Puerto Rico

9  and the law of judicial procedures, because the civil code is

10 from 1890, and the laws of judicial procedures pertaining to

11 the composition of debts is of 1885.

12      THE COURT: Thank you, Mr. Trujillo.

13      MR. DESPINS: Ten seconds, Your Honor. Just the

14 committee supports the denial of the motion on the basis that

15 it's premature at this time.

16      THE COURT: Thank you.

17      MR. BENTLEY: Three quick questions, Your Honor.

18 Mr. Bienenstock cited PROMESA 306(b). That's a provision that

19 says this Court, the Title III Court has exclusive

20 jurisdiction. As we point out in our reply at pages five and

21 six, the Bankruptcy Code has an identical exclusive

22 jurisdiction provision. The First Circuit nevertheless has

23 felt free to certify issues of state law to state courts.

24 This Court can do the same.

25      Secondly, the gentleman with the blue tie, Mr. Rieman

1    for the GOs said it would be crazy to ask Judge Besosa to make

2    a certification decision that really hinges heavily on issues

3    of the cases before Your Honor.

4         Your Honor, we believe there is a lot to be said for

5    you to make that decision and not Judge Besosa for that

6    reason.  So we would not object if Your Honor is inclined to

7    transfer the Lex Claims case to this Court, pursuant to

8    Section 306(d)(3) of PROMESA.  We would have no objection to

9    that.

10        Finally, we have heard no reason, we have heard no

11   rebuttal, no answer to why it's not urge -- no one's explained

12   why it's not urgent to get a ruling on this pivotal issue

13   soon.  Why it's not urgent to the effective management of

14   these cases, to avoiding a Federal Court having to rule on

15   this issue or the effectiveness of the mediation.

16        We've heard technical issues raised by parties who

17   appear to be afraid of how the Puerto Rico Supreme Court may

18   rule.  We've heard nothing Your Honor cannot take care of and

19   resolve if Your Honor agrees that that's the best path

20   forward.

21        THE COURT:  Thank you.

22        MR. BENTLEY:  Was I under a minute?  Almost.

23        THE COURT:  Yes.  You got there.  All right.  Thank

24   you.

25        I have considered carefully the submissions that were

1   made before today and listened carefully to the argument made

2   here today.

3            For the following reasons, the motion for partial

4   lift of the stay of the Lex Claims litigation is denied.

5   Title 11, Section 362(d) of the United States Code made

6   applicable in these proceedings by PROMESA, Section 301 as

7   codified at Title 48, Section 2161 of the United States Code

8   permits this Court to lift the automatic stay imposed by the

9   filing of these Title III cases in a separate -- in a separate

10  action for cause.  Citing In Re:  Sonnax Industries, Inc., 907

11  F.2d 1280 at 1286, a Second Circuit decision from 1990, the

12  movants rely on four factors to show that there is cause to

13  lift the stay.

14           First, whether relief would result in a partial or

15  complete resolution of the issues.

16           Second, the interests of judicial economy and the

17  expeditious and economical resolution of litigation.

18           Three, whether the parties are ready for trial in the

19  other proceedings.

20           And four, the impact of the stay on the parties and

21  the balance of harms.  Similar factors are used to evaluate

22  lift stay motions in the First Circuit, see Unanue,

23  U-n-a-n-u-e, hyphen, Casal, C-a-s-a-l, 159 B.R. 90, District

24  of Puerto Rico, 1993, affirmed 23 F3d 395, First Circuit,

25  1994.

1          Having carefully considered all of the submissions

2     and arguments, the Court concludes that cause to lift the stay

3     has not been shown in this case.

4          The premise of the Mutual Fund Group's motion is that

5     there is a need for speedy determination of whether COFINA's

6     SUT revenues are available resources of the Commonwealth under

7     the Constitution of Puerto Rico.  That this determination

8     should be made by the Supreme Court of Puerto Rico in the

9     first instance, and that the stay of the Lex Claims

10    litigations should be lifted solely as to that aspect of the

11    pending motion, which requests certification of a question to

12    the Supreme Court of Puerto Rico to allow that to occur.

13         This premise suffers from inherent problems that make

14    it speculative at best, that the relief sought would result in

15    a partial or complete resolution of the issues raised in these

16    Title III proceedings.

17         The result that the Mutual Fund Group seeks to

18    achieve a ruling by the Supreme Court of Puerto Rico on the

19    status of COFINA's revenues is not a certain outcome of the

20    lifting of the stay.

21         Judge Besosa would first have to grant the pending

22    certification motion, which would require that he address

23    first the question of whether the Lex Claims plaintiffs still

24    have standing sufficient to support subject matter

25    jurisdiction in the litigation following the commencement of

1  these Title III proceedings.

2          The objectors here argue that there will be a

3  significant and colorable challenge to the Lex Claims

4  plaintiffs' standings to proceed with their suit, in light of

5  the fact that the Oversight Board is now the sole

6  representative of the Commonwealth and any property of the

7  Commonwealth, including its legal claims.

8          This argument is not a frivolous one, and the federal

9  court is always obligated to determine whether it has subject

10  matter jurisdiction.  Even were Judge Besosa to conclude that

11  the Court still has subject matter jurisdiction over the Lex

12  Claims litigation, the question of -- the issue of whether the

13  question presented by the certification motion is a pure

14  question of Puerto Rico law is a complicated one that's

15  highlighted by several objectors.

16          Following the filing of the Title III cases, PROMESA

17  governs the property of the debtors, including both the

18  Commonwealth and COFINA.  It is not at all clear that the

19  question that the Mutual Fund Group seeks to have asked and

20  answered is one that would be susceptible to a determination,

21  as a pure matter of Puerto Rico constitutional law.

22          But rather is one that certainly arguably, and

23  possibly likely, involves the interplay of federal law, namely

24  PROMESA, and provisions of the Puerto Rico Constitution.

25          The mixed nature of the question at issue highlights

1    a further potential road block, whether the Supreme Court of

2    Puerto Rico would accept the certified question.   Rule 25(b)

3    of the Supreme Court of Puerto Rico makes clear that the Court

4    is unlikely to accept a mixed question on certification.

5         Thus, if the Supreme Court of Puerto Rico were to

6    view the certified question as one that could not be answered

7    solely by looking to Puerto Rico law for any reason, it would

8    decline to accept the question.

9         That rule, 25(b), states plainly that the Court would

10   not accept a mixed question that involves aspects of federal

11   law and aspects of Puerto Rico's local law.   The objectors

12   made clear that the Supreme Court of Puerto Rico would, at the

13   very least, be confronted with arguments that the certified

14   question is exactly such a mixed question.

15        Accordingly, the Court concludes that the movants

16   have not shown that the relief requested would likely result

17   in a partial or complete resolution of the issues, nor do the

18   remaining factors movants identify counsel in favor of lifting

19   the stay.

20        The interests of judicial economy do not favor

21   piecemeal litigation of issues that are central to these Title

22   III proceedings in a variety of courts.

23        This Court has pending numerous adversary proceedings

24   and motion practice that seek, in various ways, to address the

25   very issue raised in the certification question, and this

1  Court is fully capable of engaging the issue in an appropriate

2  manner at an appropriate time.

3      Furthermore, the Lex Claims parties have not fully

4  briefed the certification motion and are not better positioned

5  to litigate that issue than the parties to the Title III

6  proceedings, and so the speedy resolution argument for cause

7  is one that is not terribly persuasive.

8      Finally, the balance of harms does not tilt in favor

9  of the movants.  The movants have not demonstrated a

10 particular harm that they are likely to suffer in the absence

11 of their requested relief and acknowledgement that they are

12 not contending that adequate protection is an issue in their

13 argument for relief from the stay.

14     Accordingly, the Court concludes that there is no

15 cause to lift the stay on that aspect of -- on any aspect of

16 the Lex Claims litigation and the motion is denied.

17     Now, in passing, the movants raised in their papers

18 and did just now a request to transfer the Lex Claims

19 litigation into the Title III proceedings as an adversary

20 proceeding.

21     That request is denied at this time without prejudice

22 to motion practice on regular notice or a stipulation seeking

23 such relief.  In this connection, the parties are directed to

24 consider the issue of subject matter jurisdiction and whether

25 and to what extent the motion practice pending in Lex Claims,

```
 1    if it were to become an adversary proceeding, would need to be

 2    modified or withdrawn in light of the changed circumstances.

 3    So once again, that motion is denied.   Thank you.

 4           And so now let us move to the Commonwealth COFINA

 5    procedures.

 6           I'm sorry.  Hold on just one second.

 7           So we will do the timer here in 15 minute segments

 8    with the yellow light at seven and a half minutes, rather than

 9    30 minute segments.

10           Do I gather that we're going to start with opposition

11    to the motion?

12           MR. MOERS MAYER:  Yes, Your Honor.  Tom Mayer on for

13    Kramer Levin.  After discussing with Mr. Bienenstock I believe

14    just about every other party that has to be heard on this

15    matter, the thought was the objectors would go first.  Since

16    the Mutual Fund Group's objections was the most vehement of

17    the objections, I would start, and then the objectors would

18    follow.  And then Mr. Bienenstock and other supporters of the

19    motion would go last.

20           THE COURT:  Very well.  Go ahead, sir.

21           MR. ROSENBERG:  Andrew Rosenberg from Paul, Weiss,

22    Rifkind, Wharton & Garrison.  In terms of the 15 minutes, I

23    think we can certainly try, and everyone will be brief, but I

24    think there's eight oppositions to this.  And we have come up

25    with an order.
```

1          We're toward the end.  My remarks are probably only

2    three minutes or so, but we do want to make sure that

3    everybody is given an opportunity to be heard, which may be

4    difficult in 15 minutes with eight parties.

5          THE COURT:  I will bear that in mind.  I'm going to

6    keep the clock set for 15 minutes.  And, you know, that is an

7    incentive to be nonduplicative and considerate of each other,

8    and I will also be considerate of the overall circumstances

9    when the light reaches red.

10          MR. ROSENBERG:  Brevity is our forte.

11          THE COURT:  Thank you.  Mr. Mayer.

12          MR. MOERS MAYER:  Thank you, Your Honor.  The Mutual

13   Fund Group objects to the Oversight Board's own procedural

14   motion, to cut straight to the chase, because it is designed

15   to give away dedicated sales tax that would otherwise pay us

16   in full, and I will show why that is.

17          First, let's deal with the Oversight Board's retained

18   control.  Assume that the COFINA agent does a great job.  It

19   goes out, whoever he or she is, and it litigates and

20   negotiates and brings back a settlement of 90 percent goes to

21   COFINA.

22          Does that settlement become effective?  No, it does

23   not, because the Oversight Board can veto it.  And that

24   settlement does not fund the Oversight Board's fiscal plan, so

25   of course the Oversight Board will veto it.  So this, quote,

1    settlement procedure is a one-way ratchet.

2         If the settlement that is reached works, the

3    settlement will get approved by the Oversight Board, and if it

4    doesn't, it won't.  And then the Order originally submitted --

5    Oversight Board approval is game over.  There wasn't even a

6    way to get to this Court for somebody to object if the

7    settlement was good, bad or indifferent.

8         Second, let's look at what the COFINA agent does.

9    And our papers talk about the limits on the COFINA agent's

10   situation.  What incentive does the COFINA agent have to do a

11   good job?  It doesn't get paid more or less.

12        What compulsion does the COFINA agent have to do a

13   good job?  Well, the Court orders the COFINA agent to do a

14   good job.  That's basically what the proposed Order does.  It

15   says -- the Court signs where it says, each agent shall

16   endeavor, to the best of the agent's ability, to litigate and

17   negotiate.

18        And that is the spark, if you will, of -- well, Your

19   Honor, that's a receiver.  A receiver is an officer of the

20   Court that does what the Court tells the receiver to do.  It's

21   not responsible to anybody else.

22        And that's what the Oversight Board is asking this

23   Court to appoint in its Order appointing this agent, and

24   that's something that this Court cannot do under Section

25   105(b), which is incorporated in connection with PROMESA.

1          The only response the Oversight Board has to that is,

2     well, no, it's not a receiver because a receiver receives

3     revenues.  Well, that's not true.

4          Your Honor's been on the bench 20 plus years, I

5     think, and I suspect you've seen more than one receiver

6     receiving property and responsible for property that receives

7     revenue.  This is a receiver, and the Court retains no

8     authority for this Court to appoint it.

9          Now, finally, I want to talk about denial of adequate

10    protection.  This is the counter example.  Let's assume that

11    the COFINA agent determines that it has only a 25 percent

12    chance of winning.

13         Now, we think that's crazy.  We do think we're going

14    to win.  We don't think there's a federal issue.  We just

15    argued that.  We obviously hope that the Puerto Rico issues

16    would be determined our way, otherwise we wouldn't be here to

17    get to the Puerto Rican support.

18         But let's assume the COFINA agent says that in its

19    judgment, it's a 25 percent chance of winning.  So COFINA

20    starts out with a five percent interest in the sales tax.

21    That's all it's got.  So the COFINA agent gives away its five

22    percent, then it gives away all of the sales tax and it gives

23    away a big chunk of sales tax that goes to pay the seniors.

24    And under the settlement procedures, this is all sanctified in

25    advance because the Order commands, directs, approves the use

1  of the Credit Lyonnais standard for determining when to settle

2  and when not.

3          And again, of course if its 25 percent goes to COFINA

4  and 75 goes to Commonwealth, the Oversight Board will love

5  that.  That's probably good enough -- I don't know, I haven't

6  done the numbers -- to make their fiscal plan work.  That's

7  the agenda of the settlement procedure.

8          It's to settle the litigation mostly, if not

9  entirely, with sales tax that would otherwise pay junior

10  bondholders in full.  And Credit Lyonnais did not deal with

11  this situation at all.  Credit Lyonnais ruled on the fiduciary

12  duties of the Board of a for-profit corporation with respect

13  to a lawsuit that hadn't been pledged to anybody.

14          It didn't deal with a lawsuit that had been pledged

15  or where the pledger's interest was minimal and any settlement

16  will be zero.  And it doesn't provide any support or guidance

17  as to how an agent for a municipal pass-through entity with no

18  duties to anyone should behave.

19          Because that is all COFINA is, a pass-through entity,

20  it is set up to secure the COFINA seniors and COFINA juniors.

21  So this agenda of creating a settlement procedure to fund the

22  Commonwealth's budget with COFINA's tax revenues under a

23  procedure, which makes it difficult to impossible to challenge

24  the parties with real money at stake, that denies us adequate

25  protection.  We can't accept that an agent would give away our

1    credit collateral on a Credit Lyonnais standard.

2            And it's also the agenda of the seniors.  The seniors

3    have objected to the settlement procedures, but they're okay

4    so long as they control who does the settlement, whether it is

5    their agent who does it.  And I expect that you're going to

6    hear that they're senior, we're junior, we lose.  That's the

7    way the world works.

8            Well, that's not true.  As we stand here today, we

9    believe we have a lien that will pay us in full, that will be

10   validated, and we are entitled to adequate protection of that

11   lien.

12           And as -- Your Honor, a long time ago ran into a very

13   odd case involving similar questions in West Point Stevens.

14   As the 2nd Circuit said in West Point Stevens, adequate

15   protection is a statutory right that is taken very seriously,

16   and a secured creditor will not be found to have waived its

17   right to adequate protection unless there is more than an

18   ambiguous waiver of that right.

19           Well, Your Honor, in the trust agreement, there is no

20   way to rule that adequate protection is not even mentioned.

21   With respect to our lien, Article 10 of the trust agreement,

22   which is not subject to the seniors, says the lien can be

23   waived on the grounds of consent.

24           So it isn't constitutional, and we don't think it's

25   fair to empower an agent under a Credit Lyonnais standard to

1    give away collateral and leave COFINA juniors with nothing in

2    order to fund the Commonwealth's budget.

3           So we urge the Court for those reasons and others set

4    forth in our papers, including the case in controversy

5    requirement, which the Oversight Board does not believe even

6    applies, to deny approval of those procedures, which in our

7    view sets up a fake litigation with fake fiduciaries as a

8    pretext for taking collateral, which would otherwise pay us in

9    full.

10          Thank you.

11          THE COURT:  Before you sit down, I have one question

12   to you.  It seems to me that one possible reading of the

13   construct proffered by the Oversight Board insofar as it

14   purports to focus on the agent maximizing the amount of money

15   that comes to COFINA, as opposed to serving the interests of

16   particular interest holders in COFINA bonds, is that the issue

17   of how whatever money is collected for COFINA would be

18   determined -- the issue of how it would be divided among the

19   COFINA bondholders would be determined either by settlement or

20   by resolution of the legal issues.

21          It's just a pot that might be smaller or bigger.  And

22   so I think I hear you saying that unless the pot is the

23   maximum pot, that would certainly leave money under the

24   ordinary application of the waterfall for your clients.  Your

25   clients are necessarily out of the money under this proposal.

1          So long-winded question, not as clear as I'd like it

2     to have been, but am I -- do you think that I'm reading it

3     inappropriately where I read it to say if there's a pot of X,

4     then there's a separate exercise in settlement or litigation

5     as among the COFINA bondholders to determine whether the

6     junior COFINA bondholders get their --

7          MR. MOERS MAYER:  I think you're reading their

8     position correctly, Your Honor, but I think it's quite

9     disingenuous.  If, in fact, as we fully expect will play out,

10     should the Settlement Procedures Order be granted and should

11     matters evolve as they clearly are engineered to evolve --

12     let's keep it simple.  Let's assume it's half juniors and half

13     seniors, and the COFINA agent says, I'm going to settle for 50

14     percent.  The result of that settlement is going to be a de

15     minimis recovery for the juniors.  But it may fund the

16     Commonwealth's budget, so that works for the Commonwealth,

17     works for the Oversight Board, works for everybody except the

18     people who have a lien on that last 50 percent.

19          And the way the determination is made, does it make

20     sense to give it up or not, it has nothing to do with

21     protecting our 50 percent.  It has to do with a corporate

22     fiduciary standard that has nothing to do with protecting our

23     collateral.

24          And I submit, there's a difference between telling a

25     board how to exercise its fiduciary duties to an entity and

1    protecting someone's collateral, especially when the entity

2    itself has no economic interest in what is being settled.

3              THE COURT:  Thank you.

4              Again, let's aim for nonduplicative.  You see there's

5    four minutes on the clock.  We'll manage the clock, but let's

6    try to be as efficient as possible.

7              MR. POLKES:  I appreciate it, Your Honor.  We have a

8    very different position.  This is Jonathan Polkes from Weil,

9    Gotshal for National Guarantee.  And I can tell Your Honor on

10   behalf of us, and I speak for the other senior holders, we

11   actually did view the suggestion as one of the agents as a

12   positive development overall in connection with this.  Our

13   issue concerns the independence of that agent for COFINA in

14   particular.

15             You can't be -- this is the camel's nose in the tent.

16   The fact of the matter is, is that whatever the Oversight

17   Board says in terms of they're not a not-for-profit

18   institution and have everybody's best interest at heart, there

19   is a very fundamental conflict here.

20             The fiscal plan is the conflict.  The fiscal plan

21   that was submitted by the Oversight Board on behalf of both in

22   this Title III, the Commonwealth in its Title III presupposes

23   raiding COFINA funds.  And the Oversight Board simply can't be

24   in a position to control what happens with regard to both of

25   those things if it is going to satisfy its duties with each

1    separate debt.  And we take it they're acknowledging that

2    effect is good for them.

3         The same needs to be with an appointment of an agent,

4    but the agent, it has to zealously protect COFINA's interest

5    and has to zealously protect COFINA's interest and maximize

6    the return for that particular debtor.  And the Oversight

7    Board can't do that and at the same time work to get the best

8    for the Commonwealth.

9         The specific issue that we have in mind really, the

10   most important one is the retained veto right of settlement.

11   That was raised already.  There are really very specific

12   issues in disagreement here.  They can't have that.  They

13   can't say, we're going to give -- appoint an agent who can

14   zealously protect the interest of COFINA, but at the same time

15   we get to torpedo the agent.  That makes the agent really just

16   cosmetic.  And it's not okay.  They have to be really

17   independent.

18        For the same reason, they shouldn't have any right to

19   appoint or nominate or name in any other way appoint an agent.

20   It's inappropriate atmospherically.  It's inappropriate in

21   terms of appropriate process, inappropriate as a practical

22   matter.  This agent has to -- we need, the creditors need a

23   debtor representative whose sole independent position is to

24   zealously try to maximize recovery for that estate.

25        And I must say that even after the fact that's been

1   agreed to by the Oversight Board, they've agreed that the duty

2   of this agent will be to maximize the recovery on behalf of

3   the debtor.  But the only way that can happen is if the agent

4   is not beholding in any way to the Oversight Board with this

5   agreement.

6         And I just want to emphasize one thing and I'll

7   finish with this actually.  This conflict is very real.  The

8   fiscal plan presupposes raiding COFINA's funds, otherwise, it

9   doesn't work.  It doesn't make sense.  I must say there's a

10  crisis of confidence on our side of the table.  We don't

11  believe that.  We don't believe that.  I don't think anyone up

12  here does.  And that's going to become an issue in the

13  mediation.

14        Judge Houser, I think that's something you will hear

15  very often.  And we have filed an interpleader action,

16  discovery request, plan of work, fiscal plan, and have been

17  completely rebuffed.  The objections are based on executive

18  privilege, understanding that the Oversight Board submits a

19  fiscal plan stating we need emergency relief, but we're not

20  going to let you look into any of the assumptions of the

21  fiscal plan.

22        So this conflict couldn't be more real.  The only way

23  this agent process works is if people have faith in the

24  integrity of the agent.  And in that regard, the Oversight

25  Board should have no say in who is selected and should not

1      retain any settlement veto rights at all.

2              Thank you.

3              THE COURT:  But how do you get past case or

4      controversy if the Oversight Board, wearing its COFINA hat,

5      doesn't have to own at least the litigation position?  I can

6      see there are lots of issues with this proposal.  One of them

7      that I see is that maybe litigation with the specific brief is

8      one thing that binds COFINA and the other binds the

9      Commonwealth, the opposite position.  It might be something

10     that needed to be handled differently from the pool of

11     participants in a settlement negotiation and from authority to

12     approve or disapprove a settlement.

13             Is there any -- do you see any daylight there, and

14     how would you -- how do I have a case or controversy if I'm

15     appointing litigants and telling them what to argue?

16             MR. POLKES:  Fair enough.  First of all, I think that

17     question, it's pointed to -- into the Oversight Board, a

18     question for them as much as us.

19             THE COURT:  Yes.

20             MR. POLKES:  Second, PROMESA -- in the statute, we

21     will have to try and figure it out as we go forward.  I think

22     third of all, the authority of PROMESA does help.  I mean,

23     this is for -- I understand this has been foreseen.  I can't

24     imagine why else there's the ability or -- having foreseen,

25     you could appoint an agent and give them whatever authority

1    the Oversight Board itself has.

2          And the fourth thing is perhaps the Oversight Board

3    could continue to have a voice.  In other words, it's not like

4    they have to be fully recused from these proceedings as we go

5    forward.  They can file briefs, can have a seat at the table.

6          To us, the important thing is that the debt, the

7    COFINA debtor itself have a truly dedicated representative

8    whose sole concern is preserving the assets of the COFINA

9    estate.

10          THE COURT:  Thank you.

11          MR. POLKES:  Thank you, Your Honor.

12          THE COURT:  Okay.  We're sort of at 17 minutes.

13    We're going to reset the clock at ten minutes and ask that

14    everyone who remains, try to stay in those ten minutes.

15          MR. KIRPALANI:  Thank you, Your Honor.  Susheel

16    Kirpalani from Quinn Emanuel on behalf of the COFINA Seniors

17    Bondholder Coalition.

18          As Mr. Polkes mentioned on behalf of National, we

19    worked very hard in the face of this motion to try to organize

20    ourselves, at least among the COFINA senior representatives.

21    And the Coalition, along with National, along with Ambac, did

22    provide independent objections, but that -- all proposed the

23    exact same proposed order that we believe would resolve our

24    objections.

25          Yesterday, after everything else had been filed, I

1    took some time to go through it.  I'm sure what your team and

2    staff has done.  If you read everything that was filed, and

3    there is a way to synthesize, so I'm going to do my best to

4    try to do that, the Oversight Board says November 1st is a

5    real issue for the Commonwealth and COFINA.  There are a lot

6    of creditors in this courtroom who dispute that.   We frankly

7    don't have any idea, which is why we took a slightly different

8    approach in terms of what our concerns are with respect to the

9    fiscal plan.

10           Mr. Despins stood up earlier and said the official

11   unsecured creditors committee is just getting involved and he

12   just got hired two days ago.  He needs time to weigh in on

13   that.  So what we put in our proposed Order list that November

14   1st is the date.  That was the date that was requested by the

15   Oversight Board.

16           Your Honor will have the opportunity to control its

17   own Order and revisit them based on subsequent events if

18   someone brings to the Court's attention evidence that, in

19   fact, that allegation of November 1st need was not

20   well-founded or if circumstances have changed.  So we don't

21   think that's really a gating issue with our proposed Order.

22           The mutual funds and UBS said forcing litigation to

23   be commenced within ten days in this court is a bit of a

24   manufactured process, and that raised Article III concerns.

25   Your Honor may notice that again, we've changed where the

1   court is.  It says the appropriate court.

2        And we also would eliminate the ten-day period that

3   also addresses the unsecured creditors committee's concern

4   that this is moving too fast and they can't catch up to the

5   train.

6        I think for purposes of the protocol, what the

7   Oversight Board did was take what Congress gave them and said

8   you have legal authority over two distinct entities, and you

9   have legal authority under federal law to appoint agents.  But

10  after that, the agents should decide when they will be ready

11  to bring the litigation.

12       They have the November 1 date as a ticking clock,

13  unless they determine that that's not a real date.  And they

14  can't do that.  You don't need to prewire, if you will, every

15  single issue of when litigation has to be commenced and what

16  court will ultimately decide that.  And we think that all of

17  those issues can be addressed with our proposed Order.

18       We do believe the COFINA senior representatives

19  should have a say as to who the agent for COFINA is.  With all

20  due respect to Mr. Mayer, they are the subordinated

21  bondholders.  Their documents are clear, that following the

22  amendment, the senior bondholders control all remedies, and

23  this would fall within that context, Your Honor.

24       And with that, I would pass the podium to others for

25  more time to speak.

1           THE COURT:  Thank you.

2           MR. DUNNE:  May it please the Court.  Dennis Dunne on

3   behalf of Ambac.  I'm not going to repeat anything that was

4   said.  I just want to be clear that Ambac filed an objection,

5   because we do believe that the proposed procedures are legally

6   infirm.

7           The Oversight Board seems to ignore an asymmetry of

8   rights between the Commonwealth and COFINA.  On the

9   Commonwealth side, you clearly have a contingent litigation

10  claim that is an asset of the Commonwealth.  It's kind of

11  valueless until proven up.

12          On the other side, in the COFINA box, you have

13  legislation that granted property rights in the SUT, granted

14  liens to creditors who are all up here.  There's actually

15  legislation that says the SUT shall not constitute available

16  resources.

17          So on the COFINA side, people are happy with the

18  legal landscape that exists today, and those secure creditors

19  are capable of defending themselves from any attack by the

20  Commonwealth.

21          But not withstanding the fact we believe the proposed

22  procedures are legally infirm, we support the proposals that

23  are set out in the proposed Order we attached, which are the

24  same ones that Mr. Kirpalani referenced and counsel for

25  National referenced as well.

1        But that's primarily the one which we would be in

2   support, as we believe otherwise, as the proposed procedures

3   were originally reflected in the motion, they're legally

4   infirm and should not be approved.

5        Thank you, Your Honor.

6        THE COURT:  Thank you.

7        MS. HALSTEAD:  Good morning, Your Honor.  Ellen

8   Halstead for Cadwalader, Wickersham & Taft on behalf of the

9   Assured Guaranty Corporation, Assured Municipal Corporation.

10        We made two limited objections to this motion.  The

11  first, I believe that I've resolved with Mr. Bienenstock, was

12  asking for notice and approval by the Court of any settlement.

13  And I believe that Mr. Bienenstock has agreed to include what

14  we suggested in our proposed order in paragraph J.

15        THE COURT:  Yes.  That does seem to be reflected in

16  the Reply.

17        MS. HALSTEAD:  Thank you, Your Honor.

18        Our second objection is that the Commonwealth and

19  COFINA dispute does not need to be resolved by November 1st.

20  And all that we would suggest in order to resolve that

21  objection would just be to strike that from paragraph 2-G.

22        That's an artificial deadline for resolution of the

23  dispute.  And as set forth in our papers, there are much more

24  dominant and larger issues in these cases that need to be

25  resolved before a plan of adjustment can be confirmed.

```
 1              And I think other people have mentioned the
 2   Commonwealth's recent liquidity projections by the
 3   Commonwealth show they have 850 million dollars of surplus,
 4   and that just highlights there that there's no need for this
 5   November 1st deadline.
 6              And I just want to address one other point that the
 7   debtors raised in their reply.  Mr. Polkes and Mr. Dunne have
 8   already addressed points regarding the fiscal plan.  In their
 9   reply, the debtor said, in relying on Section 106(e), and they
10   argue that the fiscal plan cannot be challenged by any
11   creditor or reviewed by the Court.
12              And this position by the debtors is a complete
13   obstacle to any consensual resolution of these various
14   litigations that we have and could result in years of
15   litigation.  And the essence of this position is no matter how
16   blatantly the debtors ignore PROMESA requirements, no court
17   can ever review what they did in the fiscal plan.
18              THE COURT:  I understand that there's a fight about
19   the significance and impact of that provision.  I really do
20   want to focus right now, and there are many people lined up
21   behind you, on the specific objections to the proposals.  And
22   I think you've spoken to the principal ones that you've
23   raised.
24              And so unless there's something else that is
25   essential to this issue, I ask that you cede the podium.
```

1        MS. HALSTEAD:  Thank you, Your Honor.  I was just

2   replying to what they put in their Reply.  Thank you.

3        THE COURT:  Thank you.

4        MR. ROSENBERG:  Andrew Rosenberg, Paul, Weiss,

5   Rifkind, Wharton & Garrison, Your Honor.  I will try to be

6   brief.  I will point out that we're the first pure GO holder,

7   and there's at least a couple of points that I do want to

8   make.

9        One is just to conclude possibly the discussion of

10  the artificial November 1 deadline.  All that I think that

11  you've seen so far, Your Honor, is that there has been,

12  through the Center of Investigative Journalism, found certain

13  papers in litigation that revealed there was an additional 850

14  million dollars, and that certainly suggests that November 1

15  is an artificial deadline.

16       The only response that we have from the Oversight

17  Board before the Court I think is a footnote that the

18  Commonwealth told us they need that money, they're going to

19  spend it for something else.  I don't think that's evidence in

20  any way, shape or form justifying the date.

21       Second, and I think more directly to the point about

22  the process here, however this is resolved, whether it's

23  through litigation or whether it's resolved from settlement,

24  there's ultimately going to be an inquiry in terms of the

25  settlement as to the fairness and litigation as to the ability

1    to bind everyone.

2           And this is ultimately going to look at adequacy of

3    representation.  It's going to look at due process issues.

4    And what you've seen from the combined pleadings, and I looked

5    at them both together at the Oversight Board and AAFAF, and I

6    think they do need to be considered somewhat together because

7    one is the representative of the Commonwealth and one is the

8    Commonwealth.

9           They say three things:  First, we have no fiduciary

10   duty to creditors whatsoever.  Our only duty is to the people

11   of Puerto Rico.  Whether that's true or not, that's their

12   position.

13          Two, they say they're free to violate contracts,

14   they're free to violate the Constitution.  That's their

15   position, whether right or wrong.

16          Finally, their position, which you have certainly

17   heard enough of today, is that the debt service number in the

18   fiscal plan is unreviewable.  It is what it is.

19          So the question is how does that square with adequacy

20   of representation and due process in this context?  And I

21   think essentially what you find is that it fails the test.

22   You have a conflicted entity, and it says it's conflicted, the

23   Oversight Board, but it also appears to have no stake in the

24   outcome of how the creditors do, because it says it has no

25   duties to them.

 1          And it says that they're going to divide up the debt
 2  service number, whatever it is.  Yet, that entity that has no
 3  interest as to which creditor gets what, nevertheless is
 4  picking their representative.  It can veto any settlement that
 5  they arrive at because the settlement can only come through
 6  this Court with their motion, the way I read the pleadings.

 7          And they get to determine the litigation schedule or
 8  whatever works, I guess is best for the Commonwealth, for the
 9  Board, but having nothing to do with the proper solution for
10  the creditors as to this money.

11          By now, in similar circumstances in bankruptcy, when
12  the Court approves a litigant for so-called estate causes of
13  action, it's not the conflicted debtor that, for obvious
14  reasons, that gets to pick the litigant, set the schedule, et
15  cetera.  It's usually somebody else.  And the Court ultimately
16  determines whether that's the right person and whether it
17  should go ahead, et cetera, not the conflicted debtor entity.

18          Here we have the control board picking the party that
19  litigates and reserving the right to essentially do the
20  settlement themselves or over their objection.  The result of
21  this has to be whether there's a litigated outcome or a
22  settlement outcome, that there's going to be a cloud of
23  uncertainty.

24          The exact thing that they want to achieve, some type
25  of finality in all of this process in an artificially short

1    time will have the opposite effect, because there will be a

2    cloud, a due process cloud, an adequate state of

3    representation cloud over any result that arrives as a result

4    of this protocol.

5           We believe a lot of the sins, not all, but a lot of

6    the sins can be done by -- resolved certainly by greater Court

7    involvement and having the Court ultimately approve who the

8    representative is.

9           In our case, just to quickly mention, we believe it

10   has to be the GO Group.  It's not, Your Honor, that we're

11   looking for more work.  We have plenty to do already here.

12   But we are the only truly unconflicted party.  This is no

13   disrespect to any of the insureds, but they wrap -- some of

14   them are more GO than others, but they all wrap other things.

15          And as to the official creditors committee, it is

16   largely composed of suppliers.  Someone who has been mentioned

17   has a large tax refund.  The Commonwealth has said over and

18   over again in public, and we intend to pay the suppliers in

19   full.  We intend to pay the tax refunds in full.

20          The laboring units have a continuing relationship

21   with the Commonwealth.  They depend on them for their

22   livelihood and jobs.

23          The one person they haven't said is -- they certainly

24   have not said they don't have intention to pay the GOs.  We

25   are the ones who are not being paid.  We have the greatest

1   interest in having this resolved properly.

2          Finally, and I'll conclude with this, Your Honor,

3   we've been studying this issue, I hate to say it, for two

4   years now.  I think this is doubly important, given the

5   newness of other parties to this, that if you're going to have

6   any type of schedule suggested by the Oversight Board or the

7   Commonwealth to resolve this, quote, quickly, it certainly

8   makes sense to have the input of the parties that have been

9   looking at this for years as opposed to someone who's looking

10  at it for days, weeks, or not at all.

11         Thank you, Your Honor.

12         THE COURT:  Thank you.

13         MR. ZAKIA:  Your Honor, Jason Zakia, White & Case on

14  behalf of the Puerto Rico Funds this morning.

15         Two points in less than one minute.  First, the legal

16  authorities cited by the Board for the appointment of this

17  agent is the agency delegation of PROMESA.

18         The Board has admitted, I think forthrightly, the

19  conflict of interest that they have standing on both sides.

20  And we do submit that it is impossible to cure that conflict

21  of interest by delegating to one of their agents as proposed

22  here.

23         Mr. Mayer used the term "fake fiduciary" -- I don't

24  think he used it lightly -- to set up a so-called fiduciary

25  and then tell them what to do, give them the time frame in

```
 1   which to do it, and then say come back to me and we will
 2   either bless or not what you do.  It is no fiduciary at all.
 3   So we would agree with Mr. Mayer and Mr. Dunne and others that
 4   that is legally improper.
 5          Also agreeing with Mr. Mayer and Mr. Dunne, it is not
 6   necessary.  The secured creditors on the COFINA side are able
 7   and willing to protect their own interest.  There is no need
 8   for an artificial construct of a fake fiduciary to act
 9   accordingly on our behalf.
10          But if Your Honor disagrees and decides -- this is
11   the second point I'd like to make.  If Your Honor disagrees
12   and decides there is to be an agent, we would respectfully
13   disagree with the suggestion of several of the other COFINA
14   holders that you can somehow artificially exclude parties,
15   including my clients, from having a say on anything including
16   the appointment of that.
17          We set out in our argument and in our papers, and I
18   won't repeat it, but the bases put forth for excluding us from
19   the nomination process are spurious allegations made against
20   an affiliate of the manager of the funds that we represent,
21   which have been debunked and certainly do not provide any
22   legal basis for excluding us from this process, should Your
23   Honor decide to.
24          Thank you.
25          THE COURT:  Thank you.
```

1          MR. GORDON:  Thank you.  Again, for the record,

2    Robert Gordon on behalf of Jenner & Block on behalf of the

3    Official Committee of Retired Employees of Puerto Rico.  I

4    will be very brief, Your Honor.

5          The committee is a representative of the interests of

6    approximately 160,000 retirees in Puerto Rico.  And according

7    to papers filed by the Commonwealth commencing these cases, it

8    indicates that the underfunding liability owed to public

9    pension holders is approximately 49 billion dollars, and that

10   does not include claims related to other post employment

11   benefits.  As a result, the retiree committee is arguably the

12   largest single creditor constituency in this entire case.

13         With that background, Your Honor, we do not rise to

14   object, especially to a procedural motion or to the inclusion

15   of various parties in the process of selecting an agent or

16   engaging in litigation in a similar process.  We only object

17   to the inexplicable omission of the retiree committee from

18   that process.  The resolution of the Commonwealth COFINA

19   dispute could have a significant impact on the Commonwealth's

20   overall restructuring.  As a representative of the single

21   largest creditor constituency in the Commonwealth's

22   restructuring, we submit it's simply inappropriate to exclude

23   the retiree committee from the process engaged and the other

24   processes proposing the motion.

25         The retiree committee on behalf of the retirees

1    absolutely should not be included in this process.  This is so

2    not only because of the size of the claims, but also because

3    most of the 160,000 retirees are also residents of the island.

4         If the ultimate goal of this process is a legal

5    rehabilitation of a community known as Puerto Rico, it is

6    again, we submit, improper to exclude such a significant

7    constituency of that community in this process.

8         The proposed motion contemplates the inclusion of the

9    unsecured creditors committee and the selection of the agent

10   in the other processes.  We do not object to their inclusion,

11   but again, we question the contrasting, the exclusion of the

12   retiree committee from this process.

13        THE COURT:  Yes.

14        MR. GORDON:  Considering also the fact the claims of

15   the retirees in the aggregate are significantly larger than

16   those comprised by the unsecured creditors committee, and the

17   interest of the retirees are certainly very compelling.

18   Therefore, Your Honor, our request is simple and straight

19   forward.  If the Court grants the motion or is inclined to

20   grant the motion, we simply ask that the retirees committee be

21   included in the process of the Commonwealth agent, involved in

22   litigation and settlement processes as proposed in the motion.

23        THE COURT:  Thank you.

24        There is one other person who wants to speak.

25        MR. DESPINS:  Yes, Your Honor.

```
 1              THE COURT:  Each of you, one and a half minutes
 2   because --
 3              MR. DESPINS:  Okay.  Thank you, Your Honor.
 4              THE COURT:  Thank you.
 5              MR. DESPINS:  Luc Despins for the creditors
 6   committee.  I will address the key issue here, which is the
 7   committee supports the procedures subject to the date of issue
 8   that has been discussed, but on the basis that the committee
 9   would be the Commonwealth representative.
10              There's been a suggestion by the Paul Weiss group
11   that somehow they should be the agent for the Commonwealth.
12   And, Your Honor, it is -- I'm saying this as politely as I
13   can, it's heresy to suggest that private parties should be
14   given essentially derivative standing to bring a claim on
15   behalf of the estate.  That's never done, as you know.  You
16   need fiduciaries.
17              And the fact that there are no GO bondholders on the
18   committee as of the moment, we owe a duty to all of them, and
19   therefore there is only one fiduciary which has the broadest
20   mandate, which is the creditors committee.  And that's why we
21   should be the agent.
22              Thank you.
23              THE COURT:  Thank you.
24              MR. SOSLAND:  Your Honor, Martin Sosland with Butler
25   Snow on behalf of FGAC.  FGAC's objection is slightly
```

 1   different than what's been articulated by the other objecting

 2   parties.  We accept that.  We believe that the real problem

 3   with the procedure is it misdefines the issue.  It misdefines

 4   the problem.

 5         The GO COFINA dispute is not, as Mr. Bienenstock

 6   would suggest, a dispute between which one of these debtor's

 7   property lies.  This is a dispute about the rights of

 8   bondholders that are derived both from underlying documents

 9   and statutes, and under PROMESA itself, which provides in

10   201(b)(1)(n) what the fiscal climate is with respect to

11   relevant lawful priorities or lawful liens to the parties.

12         Now, whether you're a COFINA holder or GO holder, you

13   don't think the fiscal plan does that, which is why everyone

14   is objecting.  The rights for the GO holders, which is where

15   FGAC is, as with Mr. Rosenberg's clients, our rights derive

16   not only from that statute, but in the COFINA Statute 16(b),

17   which we cited in our papers, which says that COFINA shall not

18   underline the rights of the holders in the GO debt.  Not the

19   Commonwealth, the holders of the debt.  Section 11 of RNB

20   adopted by PROMESA from Title 11 gives any party in interest a

21   right to be heard.  We should be heard.

22         In this context, there are a lot of people involved.

23   The parties with the economic interest will not slow down the

24   resolution, but will actually speed up the resolution.  And

25   we're all going to have to vote on the plans for adjustments.

1          Thank you.

2          THE COURT:  Mr. Bienenstock, I will set the clock

3    initially for 20 minutes, but I want to make some remarks

4    before I start this clock that may or may not help to bring

5    this part of the discussion to a close earlier.

6          I believe that many of the points that have been made

7    are salient ones.  I'm not convinced that they can't be

8    overcome, but I am and was, based on the submissions, fairly

9    well persuaded before coming in here today that the current

10   proposal has some fundamental problems.

11         And those include this question of what the real

12   relationship is between the debtors and the person of the

13   Oversight Board and these agents, the degree to which the

14   Oversight Board can instruct or preempt particularly on the

15   settlement side.

16         On the litigation side, and this goes to the case in

17   controversy issue, what the litigation brief of the agent is,

18   and whether the agent having been given a core principle to

19   pursue and defend to the death binds the debtor for all

20   purposes and all of the implications of those positions.

21         And going back to just the basic proposition that an

22   agent is authorized by PROMESA, I have a concern about the

23   language of 104(b).

24         Your proposal, and many of the variations on that,

25   that accept the notion that an agent is an appropriate

1    vehicle, seems to read 104(b) to say that it authorizes any

2    agent to take any action that the Oversight Board is

3    authorized to take by PROMESA.

4         But that provision of the statute says to take any

5    action the Oversight Board is authorized to take by this

6    section, which if it refers to 104 itself, doesn't intuitively

7    or clearly pick up all of the authority of the Oversight Board

8    under Title III.

9         There are other provisions in 104.  There's one about

10   making contracts for people to do what the Oversight Board can

11   do.  There's provisions about filing actions.  But I would

12   invite some rethinking and perhaps -- well, anyway, some more

13   information about that.

14        And so to truly cut to the chase, as I've urged other

15   people to do, my intention today is to deny without prejudice

16   this particular application to urge the parties to work

17   together to come up with a different sort of proposal or

18   structure that deals with -- more clearly with the relational

19   issues, that deals with whether the same person or combination

20   of people should be at the settlement table as at the

21   litigation table, that deals with the statutory authority

22   point.

23        And I'm happy to be able to offer into this that the

24   mediation team is willing and available to facilitate those

25   efforts and discussions among the parties.  So I figured it

 1   was only fair to give you a preview, given the time and what's

 2   been said.

 3          MR. BIENENSTOCK:  Thank you, Your Honor.

 4          THE COURT:  With gifts like this, you don't need

 5   enemies, right?

 6          MR. BIENENSTOCK:  Martin Bienenstock of Proskauer

 7   Rose for the Oversight Board.

 8          In view of Your Honor's comments, which I do

 9   appreciate, I'm trying to very quickly figure out what I can

10   say that would move things forward as opposed to simply find

11   out when Judge Houser is first available.

12          THE COURT:  That's an important ingredient.

13          MR. BIENENSTOCK:  But I think it's important to

14   respond to some of the issues, and also especially the issues

15   Your Honor raised so that there's an understanding on

16   everyone's behalf of the issues we have to solve.

17          First, in terms of choosing the agent, talking about

18   it in theory has been done today, and in the pleadings, is

19   much more difficult than talking about actual facts.  And the

20   actual facts, as far as the Commonwealth's side, are that as

21   much as the statutory creditors committee for the unsecured

22   claim holders needs more time on a bunch of things, they real

23   fast determine that they should be the agent.  And this was

24   Mr. Despins lucky day, because the Oversight Board agrees.

25          It's a natural -- it's certainly a natural happening

1    of events in bankruptcy to turn over something like this to a

2    statutory committee chosen by the U.S. Trustee, obviously with

3    excellent counsel and other professionals.

4        So that leaves who should be the agent on the COFINA

5    side, which doesn't have a statutory committee for good

6    reasons.  They're all saying they're secured, et cetera.

7        Now, there, Mr. Kirpalani has suggested to me four

8    choices, any one of which are people of spectacular

9    reputation, both for integrity and legal ability with their

10   law firms.  I think maybe 11 didn't make suggestions to me,

11   because they were pursuing their stay motion.

12       But it really shouldn't be too hard to choose -- for

13   them to all come up with a bunch of potential agents and to

14   choose one.  I mean, Mr. Kirpalani's list is a great start.

15       Now, we've agreed, as Your Honor saw in our reply,

16   we've agreed that any settlement would be subject to Court

17   approval.  And that was our intention from the start, although

18   we understand how the parties read the proposed Order to see

19   that as a possibility and not a requirement, but we have

20   confirmed it's a requirement.

21       THE COURT:  But is it true, though, that whether a

22   settlement proposal advances to the request for Court approval

23   is entirely in the control of the Oversight Board?

24       MR. BIENENSTOCK:  Okay.  That's exactly what I was

25   going to address, yes.

```
 1              If the settlement is a pure, simple settlement, let's

 2    say 50, 50, COFINA, Commonwealth, they split up the sales and

 3    use taxes, we weren't worried about that type of settlement.

 4    That would not be something that we would oppose or veto.  We

 5    just deal with it.

 6              What the contemplation was --

 7              THE COURT:  Mr. Mayer says you deal with it because

 8    it works for you.  It works for the fiscal plan.

 9              MR. BIENENSTOCK:  It could be 90/10 in his favor, but

10    I'm saying we're not going to a pure settlement.  How much for

11    one side, how much for the other is not what we were thinking

12    we needed a veto right for.

13              What we were thinking was there's going to be very

14    creative people on both sides and on the mediation side, and

15    it may not be a pure settlement in a couple of ways.

16              First, it's hard to settle simply how much money will

17    go into the estate and get creditor support, if you want

18    creditor support along with it, which would be nice, unless

19    the creditors know how that -- the money in the estate is

20    going to be distributed to them.

21              That's particularly on the COFINA side, the documents

22    may make that pretty clear.  On the Commonwealth side, it also

23    may be clear, but still everyone would want to know what type

24    of plan of adjustment would go along with a particular

25    settlement.
```

1         That's number one, why our motion said that the

2    Oversight Board would participate in the mediation, because we

3    might be able to facilitate settlements that otherwise

4    couldn't be done.  People just don't want to say 50/50 or some

5    other ratio.

6         Second, even if they're not asking for the Oversight

7    Board to add in terms of a plan of adjustment to a settlement

8    as to who owns the sales and use taxes, they might come up

9    with a -- with some other scheme of settlement that might or

10   might not be compatible with the fiscal plan and the

11   satisfaction of the Oversight Board's statutory missions.

12        And if that's the case, we would want to be able to

13   tell them, if we do this settlement, we can't succeed in our

14   mission, so please change it one way or the other.

15        Not to make it better or worse for one side or the

16   other, but simply to let the settlement be compatible with the

17   overall goals we're supposed to achieve.  That is the only

18   reason why we put it there.

19        And frankly, you know, that could be resolvable, you

20   know.  Perhaps members of the mediation team could be the

21   monitors as to whether we're appropriately exercising some

22   influence on the settlement for that reason.

23        We just need a settlement.  We can't afford to have a

24   settlement that makes it impossible to succeed in the overall

25   mission of PROMESA.  That was the only reason we did.

1          As far as the concern that was voiced that we would

2     nix something simply if it were very much in favor of COFINA,

3     absolutely not.

4          The Oversight Board acts as representative of COFINA

5     in the COFINA case, and its duties would preclude it from

6     doing that.  And it knows that.  And similarly on the

7     Commonwealth side.

8          And as far as the comment that was made that the

9     fiscal plans raids COFINA, that's just not true.  The fiscal

10    plan shows the expenses that need to be paid for the overall

11    Commonwealth and the amount available for debt service.  And

12    it's only going to be done under a plan of adjustment legally.

13    No one's going to take money in violation of PROMESA from one

14    entity and put it in another in some kind of raid.

15         That was never our intent.  We never said that.  I

16    understand that advocates are trying to attack us by saying

17    that's how they read it, but it doesn't say that, and that

18    is -- there's no way the Oversight Board would ever do that.

19         As far as the issue of adequate protection that's

20    been raised, Your Honor, this is not an issue of adequate

21    protection.  This is an issue of determining what's to be --

22    what is the collateral in the first place, not adequately

23    protecting the collateral.

24         The secured creditors at COFINA are just that,

25    they're secured by whatever COFINA has.  This dispute is what

1  does COFINA have, not how it's going to be protected.

2          The reason why the Oversight Board was going to

3  select the agents was it's the Oversight Board's agents.  We

4  are not in PROMESA anywhere expressly.  It says you can give

5  away your duties in prosecuting these cases and coming up with

6  plan adjustment to other people.

7          They're our agents.  And we were trying to protect

8  against the notion that we would abuse that by choosing agents

9  beyond reproach.  I think a statutory committee is one way and

10 selections from creditors is another way.  How could -- how

11 could we be abusing that if we're taking selections from the

12 creditors?  It's impossible.

13         And, you know, we know that if people are concerned

14 about how the settlement finally gets done that is presented

15 to the Court, there's a concept of heightened scrutiny that if

16 the Oversight Board has told the sides, you know, your

17 settlement doesn't work, but you have to change it for the

18 following reasons, the Court can impose heightened scrutiny on

19 whether it wants to approve that settlement.

20         We're only going to do something to enable the

21 mission of PROMESA to be carried out, and we need to be able

22 to do that.  But there are those protections because of the

23 Court process that will make sure that's the only objective

24 that the Oversight Board was trying to carry out.

25         As far as the November 1 deadline, we explained that

1    there are two reasons for that deadline.  The first is as is

2    crystal clear, and I think to everyone in the courtroom, this

3    is a gating issue.

4            It is impossible to do a plan of adjustment for

5    COFINA or for the Commonwealth without knowing what assets are

6    available to be distributed.  And this is 55 percent of the

7    bond debt.

8            November 1 is a reasonable date to try to accomplish

9    that goal, regardless of cash flow problems.  When we filed

10   the motion, the cash projections we had from the Commonwealth

11   were that they would have negative cash by the end of

12   November.  A small positive balance at the beginning, negative

13   by the end.  That's why we said November 1.

14           As we explained in our reply, this 853 million

15   dollars Your Honor has heard about is not all good news.  Some

16   of it is just not paying payables, accelerated collections,

17   others things.  On balance, they're probably better off.  And

18   maybe the date for a squeeze on cash is later, and we're happy

19   when there's solid data to keep the Court advised.  But even

20   if the date is later, we still think everyone should try to

21   get this done by November 1.

22           Your Honor, at the first hearing we had, made a big

23   point about the fact that this should be done as expeditiously

24   as possible for the people of Puerto Rico and for all kinds of

25   other reasons.  And we think that is actually reason enough to

1    pick a date.

2           If November 1 bothers the Court or other parties,

3    then let's say let's pick something as quick and as practical.

4    And as Your Honor noted before, if there's a cash need, we

5    will try to resolve that need by borrowing.

6           We have not admitted that by seeking to have agents,

7    the Oversight Board is conflicted.  The Oversight Board is

8    given a statutory role.  It's not a lot different from the

9    holding company of a large Chapter 11 corporation with a lot

10   of subsidiaries and affiliates.  The same management

11   represents all of them as Chapter 11 debtors.

12          Here, we are less conflicted than the Chapter 11

13   situation, if conflicted at all, which we don't think we are,

14   because we're not for profit.  We're not trying to get

15   something for the Board as a whole, as an entity.  It's just a

16   judicial, Congressional negotiation.

17          It's not for profit.  It's just trying to do the

18   right thing.  And it knows how to carry out its duties as

19   representative of different entities.

20          The reason that we opted for the general creditors

21   committee as opposed to the retirees committee is that the

22   fiscal plan says that on average, we think that the retirees

23   need to be paid 90 percent of their pensions.  That was for

24   lots of reasons.

25          A lot of them are not eligible for Social Security.

1    A lot of them will barely be at the poverty level with that

2    payout.  They are on the island and they spend money on the

3    island.  There are all kinds of reasons for that.  But given

4    that the goal is 90 percent on average, we didn't think people

5    who were starting out with 90 cents in their pocket would be

6    looked at as being as aggressive as a committee that is

7    representing creditors who are faced with potentially far less

8    than that.

9           We have the greatest respect, sympathy and admiration

10   for the retirees and their committee and their professionals.

11   Just for those reasons, we thought choosing between the two

12   committees, the more general committee was the appropriate,

13   with the more appropriate agent.

14          I guess it's obvious that we disagree with FGAC that

15   the issue is not property ownership.  It is property

16   ownership.

17          I hope I've answered Your Honor's questions about the

18   relationship between the agent and the Oversight Board in

19   explaining the only situations we would really want to impose

20   ourselves on settlement.  And we could perhaps, as I

21   mentioned, use the mediation judges or one of them or whatever

22   to help in that degree.

23          THE COURT:  And are you bound by the litigation

24   positions that are -- is it the intention to give the COFINA

25   agent a core brief that says, you know, you must litigate to

1    the death the question of COFINA ownership of the SUT revenues

2    and to frame a particular question?

3          Right now the proposal that you gave me says, you

4    know, there are these issues and there'll be one champion,

5    there'll be another champion.  And it's very vague.  And it's

6    not clear to me that the -- at least the debtors, at the end

7    of the day, need to own certain legal positions.

8          The ultimate plan of adjustment may propose to

9    compromise those legal positions for other reasons, but I need

10   to see the debtor's position that's going to be litigated

11   before me.

12         MR. BIENENSTOCK:  Okay.  The issue that we intended

13   to put in each agent's hand and which we think our citations

14   to Credit Lyonnais were designed to support really what Your

15   Honor said.  The COFINA agent is supposed to maximize sales

16   and use taxes, being the property of COFINA.  The Commonwealth

17   agent is supposed to maximize sales and use taxes being

18   property of the Commonwealth, and they're supposed to litigate

19   that issue simultaneously with efforts to settle as part of

20   the -- and they should use the mediation team to try to

21   settle.  But they should be doing both simultaneously.

22         THE COURT:  Given the time, I don't want to belabor

23   this, but I can perceive, and I perceive in the fiscal plan

24   the potential for a determination that on the settlement side,

25   maximizing the ultimate benefit of, you know, COFINA

1    bondholders, for instance, might be tied up in the notion that

2    Puerto Rico needs to be healthy in the out years and not

3    solely a question of the ability to grab everything that's on

4    the table now under a lien.  And so those could be different

5    positions depending on the context.

6         So, yeah, I am going to give it all back to you to

7    reformulate, but that's the best I can do to articulate that

8    concern.

9         MR. BIENENSTOCK:  That's a very interesting concern,

10   if I understood correctly.  Your Honor was suggesting that if

11   COFINA could have it all, is that really in its interest if it

12   would so impair the Commonwealth that there wouldn't be as

13   much sales and use tax in the future because the economy would

14   be so injured.  We would totally leave that up to the agent.

15   As far as we're concerned --

16        THE COURT:  But would you permit the agent's decline

17   to litigate vigorously the proposition that COFINA is entitled

18   to everything, or do you want this agent to litigate

19   vigorously that proposition so that it's from a point of

20   knowledge, leverage, power, or lack thereof that COFINA then

21   makes its decision as to what the plan of adjustment should

22   look like?  That's the distinction I'm trying to make.

23        MR. BIENENSTOCK:  I think we would want the COFINA

24   agent to litigate to the death what they believe is in the

25   best interest of COFINA.  That may take into account what I

```
 1   think Your Honor just articulated, and I think I just did, but
 2   we wouldn't tell it what's in the best interest.  We leave
 3   that completely up to them.
 4          Really, as I explained at the outset, our only desire
 5   to have influence on the settlement is if someone comes up
 6   with something that just doesn't work.  And work -- when I say
 7   work, I mean from the viewpoint of we wouldn't be able to have
 8   plans of adjustment that would enable the mission of PROMESA
 9   to get fiscal responsibility and access to capital markets if
10   that settlement were -- that was the only motivation for that.
11          And finally, we explained partly so, I wouldn't do it
12   here in any length, in our status report, what we called the
13   recurring issue on the fiscal plan.  We totally get all the
14   creditors would like us to say there's more available to go to
15   them.  We wish there were.
16          We're working every day.  The Board tries to come up
17   with things to improve the prospects of the Commonwealth.  But
18   Congress put some pretty extraordinary things into PROMESA.
19   So unlike in Chapter 11, where if it doesn't work, you go to
20   Chapter 22 or 33, and it's not the end of the world
21   necessarily, but Congress clearly said here it wants it done
22   once right, and it doesn't want the Oversight Board subject
23   being jawboned and saying look, you'll have other revenues and
24   make everyone happy.  That's a very, very serious issue.  I'm
25   sure, you know, the mediation team and Your Honor -- it will
```

 1   speed up the litigation already.  Your Honor is going to hear

 2   it, and the mediation team is going to hear it, but I can't

 3   emphasize enough what a critical, important issue that is.

 4   And that's just so we can carry out the mission we're supposed

 5   to carry out.

 6          So Your Honor, I will reach out, the Oversight Board

 7   will reach out to the mediation team.  But I'd like to know,

 8   can we -- it's hard to get anonymity in this crowd.

 9          Based on if we get something that we think is as good

10   as we can do, but it's not unanimous, I'd like to know that

11   the Oversight Board, on a prompt timetable, can bring it back

12   to the Court, because this really has to get done for the

13   reasons I mentioned.

14          THE COURT:  Yes.  The motion practice can be renewed.

15   I am asking you to try to make it unanimous and certainly make

16   it responsive to my concerns and the sorts of concerns that

17   have been raised here.

18          But if it's not unanimous, then cue up a motion with

19   a suggested timetable that doesn't necessarily coincide with

20   an Omni.  And there'll be an opportunity to file opposition

21   papers, and we'll go from there.

22          MR. BIENENSTOCK:  All right.  Thank you.

23          MR. RAPISARDI:  Your Honor, may I be heard?

24          THE COURT:  Mr. Rapisardi, yes.

25          MR. RAPISARDI:  John Rapisardi on behalf of AAFAF.

1           Your Honor, we filed papers in support of the

2    Oversight Board's motion.  And in just listening to the

3    dialogue, what convinced the government to go along with the

4    Oversight Board's motion was not that it was premised upon the

5    concept of conflicts, but they were endeavoring to create not

6    only a transparency to allow the parties access to a

7    litigation strategy pursued by the COFINA side and both the

8    Commonwealth side, the government was, at the outset,

9    concerned about yet another line of -- lawyers being lined up,

10   one representing the agent for COFINA, one representing the

11   agent for the Commonwealth, and a potential for the litigation

12   spinning out of control.

13          What gave us comfort was the Board retaining control

14   over the process in terms of if the litigation reaches

15   impasse.  And I think that's why I think the mediation will be

16   very helpful, that the Board could still intervene, and

17   consistent with your observations, Your Honor, with respect to

18   Section 104, it does -- the Board may designate its agent

19   within the section.  And under those provisions under 104,

20   they are more mechanical in nature.

21          I don't believe the Board can just carte blanche

22   delegate power that goes to the heart of PROMESA, for example,

23   proposing a plan or proposing a settlement -- I'm sorry,

24   ceding to the agents or otherwise and propose a settlement

25   that's inconsistent with the fiscal plan that is certified.

1          So the government does have concerns that if the

2    Board somehow grants these agents power or authority to

3    litigate endlessly without any road to breaking the impasse --

4    and it was Your Honor who threw out there the idea that there

5    should be a parallel plan process where working through a

6    mediation process, that there's a straw-man plan on the table

7    that advises the parties of their down side risk.

8          We heard now for over a month each of the

9    constituencies talking about that they're statutory

10   lienholders and they're special revenue bondholders.  Well,

11   there's a countervailing view that they are not statutory

12   lienholders.  They are not special revenue bondholders.  They

13   are just ordinary creditors whose rights in Section 552 with

14   respect to future sales and use taxes are cut off.

15         I'm not arguing that point, but that is a real

16   possibility that could be presented under a plan of

17   adjustment, given the COFINAs, or on the other side, the GOs,

18   who assert they have a statutory lien to available resources.

19         Well, there are some really good case laws, including

20   an article written by a member on the Oversight Board which

21   suggests that they may not have a lien, and so they're an

22   ordinary general unsecured creditor.

23         Everyone in this room is an experienced lawyer, and

24   they know what the power of cramdown has and what it can do.

25   And what I would suggest is that during the mediation process,

1    that we have a plan in process so the parties are negotiating

2    PROMESA, because up until now, we saw the Lex Claims

3    litigation go forward, that didn't bring parties to

4    settlement.

5            The rationale, even for this motion, was, you know,

6    I'd asked originally what would drive the parties to settle,

7    and the answer is, well, fear of losing.

8            Your Honor, the parties in this entire matter, each

9    of the constituencies have had a winner-take-all mentality.

10   And I think that's going to be very important in terms of

11   breaking through that.  In the original mediation that we had

12   in March, that's a problem we confronted.

13           The GOs are very -- you know, represented by very

14   capable counsel.  COFINA's represented by very capable

15   counsel.  And they believe very strongly in their positions.

16   And that's going to be a challenge for the mediation, Your

17   Honor.

18           And I believe there has to be some thread of

19   influence that brings parties together that strikes real fear

20   into them that if they don't at some point come to a consensus

21   and they continue to litigate the impasse, that the Board will

22   move forward with its own plan.

23           The Board has an exclusive right and discretion to

24   file a plan of adjustment, and its hands should not be tied by

25   any settlement or agreement where agents are running off

1    pursuing a course of action that's contrary to what's

2    contained in PROMESA.

3              Thank you, Your Honor.

4              THE COURT:  Thank you.  We will now break for 45

5    minutes.  I hope that at least some of you can find some lunch

6    here.  We will resume at 1:30.  And on the ERS lift of stay

7    motion, I'll hear opponents first.

8              Thank you.  We are adjourned.

9              All rise.

10             (At 12:41 PM, recess taken.)

11             (At 1:34 PM, proceedings reconvened.)

12             THE COURT:  So just for clarity, the ruling on the

13   final motion of the morning, which was the GO COFINA

14   procedures motion, is that the motion is denied without

15   prejudice to renewal with a reformulated proposal addressing

16   the issues that were raised, and I expect that there will be

17   work with the mediators in aid of the reformulation of the

18   proposal.

19             And one logistical issue, it appears that people in

20   the remote rooms are having some difficulty hearing the people

21   who speak from the podium.  And so Counsel, as you come to the

22   podium, please make sure that the microphone is pointing

23   toward your mouth and project as if you were at the opera, and

24   then the people in the remote locations and on the telephone

25   should be able to hear more clearly.  And I thank you for that

1    on my behalf and theirs.

2              (Proceedings concluded.)

3                              *     *     *

1  U.S. DISTRICT COURT     )

2  DISTRICT OF PUERTO RICO)

3

4      I certify that this transcript consisting of 126 pages is

5  a true and accurate transcription to the best of my ability of

6  the proceedings in this case before the Honorable United

7  States District Court Judge Laura Taylor Swain on June 28,

8  2017.

9

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25

< Dates >
July 12 18:17,
  21:10, 66:13
July 12 first 21:4
June 28, 2017 1:16,
  5:2, 126:7
June 29 34:8
May 17 26:5
May 2nd 64:13
may one 64:20
November 1 52:4,
  52:7, 92:12,
  96:10, 96:14,
  113:25, 114:8,
  114:13, 114:21,
  115:2
November 1st 91:4,
  91:13, 91:19,
  94:19, 95:5


< 1 >
10 83:21
104 30:22, 107:6,
  121:19, 121:20
104(b 106:23, 107:1
104. 107:9
105 46:12
105(b 80:25
106(e 95:9
11 29:1, 73:5,
  105:19, 105:20,
  109:10, 115:9,
  115:11, 115:12,
  119:20
12 51:6, 51:7
12. 58:10
126 126:4
1280 73:11
1286 73:11
12:41 124:11
15 50:12, 50:18,
  50:19, 78:7,
  78:22, 79:4, 79:6
150 41:11
159 73:23
16(b 105:16
160,000 102:6, 103:3
17 10:18, 90:12
17-3283 40:4, 46:14

17-3283. 41:6, 41:7
17-3566. 41:12
17-BK-3283(LTS 1:6
17-BK-3566(LTS 1:24
17-BK-3567(LTS 1:40
17C 5:10
1885. 71:11
1890 71:10
1988. 15:8
1990 73:11
1993 73:24
1994. 73:25
1:30. 124:7
1:34 124:12


< 2 >
2-G 94:21
20 7:14, 22:22,
  31:22, 32:6,
  36:21, 37:3, 81:4,
  106:3
2000. 22:24
2003 56:3
201(b)(1)(n 105:10
21. 26:3
2161 73:7
21: 2:16
22 119:21
23 73:24
23,000 42:21
25 81:11, 81:19,
  82:3
25(b 56:4, 76:2,
  76:9
27th 41:7
29 10:18
299-3 40:3
2nd 83:14


< 3 >
30 50:11, 52:18,
  78:9
301 73:6
305 57:6, 57:10
306 57:6
306(b 60:19, 61:17,
  71:18
306(d)(3 72:8

3283 48:19
33 119:21
362 42:2, 45:22
362(d 73:5
3799 126:14
395 73:24
3: 1:6, 1:24, 1:40


< 4 >
40 56:24
4001-B 70:22
42 57:4
442 48:19
45 124:5
48 73:7
49 102:9


< 5 >
50 85:13, 85:18,
  85:21, 110:2
50/50 111:4
513 41:6
513-1 41:7
516-1 42:12
516-2 46:14
541 63:24
55 114:6
552 122:14


< 6 >
6 57:10
6:30 41:8


< 7 >
7 61:4
75 82:4


< 8 >
800 52:9
850 95:3, 96:13
853 114:14


< 9 >
90 73:23, 79:20,

115:23, 116:4,
116:5
90/10 110:9
907 73:10
922 42:3
9:30 5:3, 18:19

< A >
A-d-r-i-a-n 47:19
AAA 3:9
AAFAF 46:23, 47:1,
52:3, 52:16, 53:7,
97:5, 121:1
ability 6:8, 7:25,
59:3, 67:20,
80:16, 89:24,
96:25, 109:9,
118:3, 126:5
able 6:16, 10:25,
22:7, 35:24,
38:20, 48:8, 71:7,
101:6, 107:23,
111:3, 111:12,
113:21, 119:7,
125:1
above 38:6, 43:1
absence 77:10
absolutely 20:20,
103:1, 112:3
absorbed 62:3
abundance 7:9
abuse 113:8
abusing 113:11
accelerated 114:16
acceleration 36:16
accept 16:17, 55:25,
68:16, 76:2, 76:4,
76:8, 76:10,
82:25, 105:2,
106:25
acceptable 16:18
access 52:5, 119:9,
121:7
accommodate 19:2,
19:4
accomplish 29:22,
114:22
accomplished 14:9
accordance 49:13

according 102:6
Accordingly 76:15,
77:14, 101:9
account 32:16,
118:25
accountability 66:14
accurate 126:5
accurately 26:16
achieve 74:18,
98:24, 111:17
achieved 10:2
achievements 10:24
acknowledgement
77:11
acknowledging 87:1
across 10:11
Act 56:3, 57:22,
57:23, 101:8
Acting 26:3
action 35:22, 38:15,
61:21, 63:19,
69:9, 73:10,
88:15, 98:13,
107:2, 107:5,
124:2
actions 107:11
actively 18:13
acts 10:4, 112:4
actual 108:19,
108:20
actually 29:4,
48:24, 59:24,
86:11, 88:7,
93:14, 105:24,
114:25
Ad 2:33, 3:36, 67:8
add 11:23, 57:9,
59:22, 111:7
adding 50:9
addition 59:23
additional 17:1,
60:2, 96:13
additions 8:11
address 6:20, 11:20,
20:22, 28:9,
38:21, 45:15,
47:8, 49:3, 63:7,
74:22, 76:24,
95:6, 104:6,
109:25

addressed 16:12,
16:20, 18:2,
92:17, 95:8
addresses 92:3
addressing 39:14,
124:16
adequacy 97:2, 97:19
adequate 54:3,
55:15, 55:21,
77:12, 81:9,
82:24, 83:10,
83:14, 83:17,
83:20, 99:2,
112:19, 112:20
adequately 53:23,
112:22
adjourned 124:9
adjustment 19:17,
94:25, 110:24,
111:7, 112:12,
113:6, 114:4,
117:8, 118:21,
119:8, 122:18,
123:25
adjustments 105:25
admin 25:15
Administered 1:11
Administration 1:26,
1:42, 12:1, 12:16,
39:15, 39:19,
40:1, 40:6, 40:23,
41:4
admiration 116:9
admit 34:21
admitted 100:18,
115:6
adopted 105:20
Adrian 2:31, 47:13,
47:19
advance 5:24, 51:1,
69:11, 81:25
advances 109:22
advantages 9:15
adversaries 33:11
adversary 6:6,
12:24, 18:14,
22:8, 42:4, 42:6,
69:5, 76:23,
77:19, 78:1
advice 62:16, 64:21

advised 114:19
advisement 24:7
advises 122:8
advisor 29:24
advisors 30:19
Advisory 3:15
advocates 112:16
affect 31:5
affected 19:13
affiliate 101:20
affiliates 115:10
affirmed 73:24
afford 111:23
afraid 72:17
AFSCME 2:25
afternoon 31:6, 41:8
Agency 3:14, 100:17
agenda 8:10, 8:11,
  20:3, 25:14,
  38:14, 38:18,
  38:21, 38:24,
  39:5, 49:25, 82:7,
  82:21, 83:2
agents 86:11, 92:9,
  92:10, 100:21,
  106:13, 109:13,
  113:3, 113:7,
  113:8, 115:6,
  121:25, 122:3,
  124:1
aggregate 103:15
aggressive 116:6
ago 7:14, 7:21,
  21:2, 23:10,
  29:14, 57:16,
  83:12, 91:12
agree 15:23, 16:22,
  23:21, 34:1,
  56:17, 58:22,
  63:25, 67:11,
  67:13, 69:10,
  101:3
agreed 8:25, 9:2,
  15:25, 45:20,
  50:6, 88:1, 94:13,
  109:15, 109:16
agreeing 16:2, 101:5
agreement 26:9,
  40:12, 40:20,
  47:6, 70:23,

83:19, 83:21,
  88:5, 124:1
agrees 72:19, 108:24
ahead 34:2, 45:25,
  78:20, 98:17
aid 124:18
aim 86:4
aisle 41:20
akin 54:18
al 1:16, 2:20, 2:39,
  3:11, 3:41
alert 43:7, 44:20
alienate 53:11
Allan 2:28
allegation 91:19
allegations 101:19
alleged 43:18
Allen 40:15
allocations 38:17,
  38:20
allotment 38:23
allow 15:16, 42:24,
  56:9, 74:12, 121:7
allowed 57:24
allowing 27:17,
  44:14, 44:15
allows 43:9
Almost 72:22
alone 11:22
already 11:13, 36:5,
  45:10, 46:8,
  64:25, 87:11,
  95:8, 99:11, 120:2
alternative 10:21,
  16:23, 16:24
Although 47:7,
  70:11, 109:17
Ambac 3:3, 35:19,
  64:25, 66:2,
  90:21, 93:3, 93:4
ambiguity 57:10
ambiguous 83:18
Ambro 13:17, 13:18,
  13:22, 13:24
amended 68:5
Amendment 57:12,
  71:4, 92:22
American 13:25,
  44:25
among 8:21, 14:20,

16:4, 22:1, 84:18,
  85:5, 90:20,
  107:25
amount 11:10, 84:14,
  112:11
Amy 126:13, 126:14
analysis 18:3,
  30:19, 64:11
analyze 29:22
Andrew 2:35, 34:18,
  78:21, 96:4
announced 36:25
anonymity 120:9
answer 9:12, 11:1,
  13:15, 47:24,
  72:11, 123:8
answered 75:20,
  76:6, 116:17
anticipate 26:11
anticipated 21:11,
  24:8
anybody 80:21, 82:13
anyway 23:23, 107:12
apparently 28:5
appeal 13:3, 13:23,
  51:18, 55:4
appealed 54:21
Appeals 13:1, 13:18
appear 44:19, 70:19,
  72:17
APPEARANCES 2:13,
  3:1
appearing 23:18
appears 48:1, 97:23,
  124:20
appellate 11:22,
  12:25
applicable 73:6
application 33:6,
  33:7, 34:14,
  37:11, 39:15,
  39:16, 40:25,
  41:2, 42:2, 84:24,
  107:16
applications 6:25,
  44:2
applies 22:6, 49:6,
  84:6
apply 39:16, 42:3,
  42:4, 42:5, 57:7,

57:11, 68:15
appoint 80:23, 81:8, 87:13, 87:19, 89:25, 92:9
appointed 13:11, 15:7, 18:20, 21:1, 22:23, 29:13, 37:23, 37:25
appointees 38:7
appointing 8:23, 80:23, 89:15
appointment 6:13, 22:10, 26:8, 87:3, 100:16, 101:16
apportionment 29:9
appreciate 44:16, 45:2, 45:17, 46:5, 51:9, 86:7, 108:9
approach 91:8
appropriate 6:9, 25:10, 26:7, 30:15, 38:7, 63:12, 67:14, 77:1, 77:2, 87:21, 92:1, 106:25, 116:12, 116:13
appropriately 32:15, 111:21
approval 80:5, 84:6, 94:12, 109:17, 109:22
approve 89:12, 99:7, 113:19
approved 80:3, 94:4
approves 81:25, 98:12
approximately 102:6, 102:9
arbitration 43:9
arbitrations 44:10, 44:15
area 8:24, 13:21
areas 22:5, 71:2
arguably 75:22, 102:11
argue 13:23, 44:12, 44:19, 75:2, 89:15, 95:10
argued 81:15
arguing 55:15,

55:21, 122:16
argument 50:8, 53:8, 60:24, 60:25, 73:1, 75:8, 77:6, 77:13, 101:17
arguments 36:7, 51:24, 57:7, 61:18, 74:2, 76:13
arise 6:10, 12:21, 22:8, 45:15, 56:1, 69:3
arisen 6:20, 12:21
arises 24:20
arising 60:20
around 35:11
arrangement 12:19, 47:5
ARRIBAS 2:16, 25:25, 26:2, 26:17, 26:20
arrive 98:5
arrives 99:3
Article 63:20, 83:21, 91:24, 122:21
articulate 118:7
articulated 70:2, 70:14, 105:1, 119:1
artificial 94:22, 96:10, 96:15, 101:8
artificially 98:25, 101:14
aside 31:20, 35:9, 42:15
asks 45:23
aspect 7:10, 8:2, 74:10, 77:15
aspects 6:6, 76:10, 76:11
assert 122:19
assertion 53:11
asset 65:10, 93:10
assets 90:8, 114:5
assignment 10:13
assist 9:24, 13:11, 19:15
Assistant 14:21, 14:24, 26:2
assisting 17:9, 23:5

associated 11:11, 12:22
assortment 10:24
Assume 79:18, 81:10, 81:18, 85:12
assuming 48:24
assumptions 88:20
Assurance 3:3, 7:1, 35:19, 70:8
Assured 3:6, 16:3, 19:5, 94:9
asymmetry 93:7
Atlas 14:4, 14:7, 14:9
atmospherically 87:20
attached 8:22, 93:23
attack 93:19, 112:16
attempt 16:16, 19:2
attend 6:2, 18:15, 18:22, 18:23, 19:4, 19:8
attendant 12:15, 13:3
attention 6:9, 55:13, 91:18
attitude 66:15
attorney 26:4
attorneys 5:6, 5:20, 5:23, 6:24, 20:2
AUST 2:17
authored 13:20
authorities 100:16
Authority 1:47, 3:15, 24:7, 25:9, 56:25, 81:8, 89:11, 89:22, 89:25, 92:8, 92:9, 107:7, 107:21, 122:3
authorized 106:22, 107:3, 107:5
authorizes 107:1
Auto 3:28, 42:20
automatic 41:18, 44:9, 46:12, 73:8
automobile 45:12, 46:9
available 12:17, 52:10, 60:22,

61:13, 74:6,
93:15, 107:24,
108:11, 112:11,
114:6, 119:15,
122:19
average 115:22,
116:4
avoid 53:8
avoidance 65:19
avoiding 72:14
await 33:3
award 13:25, 14:1
away 57:14, 57:17,
58:1, 79:15,
81:21, 81:22,
81:23, 82:25,
84:1, 113:5


< B >
back 24:21, 30:21,
34:11, 35:24,
55:6, 57:18,
79:20, 101:1,
106:21, 118:6,
120:12
background 28:11,
102:13
backwards 49:2
bad 80:7
balance 50:25, 51:2,
51:3, 73:21, 77:8,
114:12, 114:17
Balanced 3:39
Bank 24:6, 24:21,
25:8, 32:22, 69:4
Bankruptcy 1:1,
2:10, 6:16, 8:18,
9:7, 10:19, 10:21,
12:7, 14:1, 14:3,
15:5, 15:7, 15:10,
15:11, 42:3,
57:19, 57:22,
57:24, 61:2, 61:7,
61:11, 62:25,
71:21, 98:11,
109:1
Bar 23:11, 44:9
Barbara 2:10, 6:16,
8:17

barely 43:1, 116:1
bargaining 43:8
barred 34:12
Based 42:8, 61:22,
88:17, 91:17,
106:8, 120:10
bases 101:18
basic 62:1, 106:21
basically 28:9,
37:5, 80:14
basis 34:1, 34:12,
52:23, 52:24,
53:1, 64:16,
71:14, 101:22,
104:8
Bear 5:11, 39:5,
79:5
become 28:4, 30:9,
78:1, 79:22, 88:12
beginning 7:18,
19:24, 114:12
behalf 26:3, 35:19,
39:13, 40:16,
40:19, 44:25,
47:1, 47:13, 62:7,
62:25, 64:24,
69:19, 70:8,
86:10, 86:21,
88:2, 90:16,
90:18, 93:3, 94:8,
100:14, 101:9,
102:2, 102:25,
104:15, 104:25,
108:16, 121:1,
125:2
behave 82:18
behind 19:11, 95:21
beholding 88:4
belabor 117:22
bench 7:13, 8:19,
10:18, 13:19,
14:7, 14:13, 15:8,
21:24, 22:23, 81:4
benefit 117:25
benefits 13:7,
102:11
Bennett 2:39, 40:19,
40:22
BENTLEY 3:33, 50:2,
50:4, 50:15,

50:24, 51:3, 51:9,
51:12, 53:21,
54:6, 55:18,
56:11, 58:4,
58:11, 59:11,
59:21, 71:17,
72:22
Besosa 56:9, 67:23,
68:7, 68:17, 72:1,
72:5, 74:21, 75:10
best 10:25, 16:15,
16:20, 16:22,
28:4, 30:2, 35:15,
54:10, 72:19,
74:14, 80:16,
86:18, 87:7, 91:3,
98:8, 118:7,
118:25, 119:2,
126:5
bestowed 34:23
bestows 14:2
better 16:25, 77:4,
111:15, 114:17
betterment 14:3
beyond 113:9
big 54:6, 81:23,
114:22
bigger 84:21
billion 102:9
bind 97:1
binds 89:8, 106:19
bio 22:21, 22:22
biography 8:22, 22:9
bit 23:9, 26:15,
26:19, 28:11,
32:19, 52:11,
58:11, 62:13,
66:20, 91:23
blanche 121:22
blatantly 95:16
bless 101:2
blizzard 34:23
Block 69:18, 76:1,
102:2
blue 67:4, 71:25
boat 29:14
body 10:15
Bond 3:10, 34:3,
114:7
Bondholder 33:1,

34:20, 90:17
Bondholders 2:35,
  32:25, 33:4, 35:1,
  35:4, 62:8, 67:9,
  82:10, 84:19,
  85:5, 85:6, 92:21,
  92:22, 104:17,
  105:8, 118:1,
  122:11, 122:13
bonds 28:18, 28:19,
  30:25, 31:1,
  37:23, 59:4, 84:16
borrowing 53:10,
  115:5
Boston 21:24, 51:19
bothers 115:2
bottom 24:13
bound 116:23
box 93:12
break 124:5
breaking 122:4,
  123:12
breathing 32:6
Brevity 79:10
brief 8:16, 27:15,
  34:20, 39:3,
  42:20, 50:9,
  50:18, 57:9,
  58:12, 78:23,
  89:7, 96:6, 102:4,
  106:17, 116:25
briefed 33:5, 37:7,
  77:4
briefly 13:16,
  44:24, 56:23, 58:5
briefs 90:5
Brilliant 2:28,
  40:11, 40:14,
  40:15, 40:16
bring 63:1, 92:11,
  104:14, 106:4,
  120:12, 123:4
brings 13:13, 14:17,
  14:18, 79:20,
  91:18, 123:20
broad 28:15
broadest 104:19
Bruce 2:39, 40:19
budget 82:22, 84:2,
  85:16

bullets 55:9
bunch 36:18, 108:22,
  109:13
Butler 70:8, 104:24


< C >
C-a-s-a-l 73:23
Cadwalader 94:8
cafeteria 42:23
calendars 19:9
California 15:6
call 20:7, 49:16,
  53:8
called 119:13
camel 86:15
candid 5:24, 16:5
candor 48:15
Canyon 3:39
capable 65:9, 77:1,
  93:19, 123:15
Capital 7:1, 119:9
care 29:3, 72:18
careful 62:9
carefully 72:25,
  73:1, 74:1
carried 113:21
carry 113:24,
  115:18, 120:5,
  120:6
carte 121:22
carve 51:1
Casal 73:23
case-by-case 33:25,
  34:12
caseload 23:3
cash 52:4, 52:5,
  53:2, 53:25, 54:2,
  114:9, 114:10,
  114:11, 114:18,
  115:4
CAT 3:48
catalyze 66:7
catch 92:4
cause 55:16, 61:21,
  73:10, 73:12,
  74:2, 77:6, 77:15
caused 24:18
causes 98:12
caution 7:9

caveat 49:21
cede 95:25
ceding 121:25
Center 96:12
central 76:21
cents 116:5
ceremonial 18:18
cert 54:22
certain 31:11,
  63:15, 74:19,
  96:12, 117:7
certainly 55:20,
  75:22, 78:23,
  84:23, 96:14,
  97:16, 99:6,
  99:23, 100:7,
  101:21, 103:17,
  108:25, 120:16
certification 56:5,
  58:6, 63:2, 66:3,
  66:7, 67:15,
  67:22, 67:25,
  68:1, 68:14,
  68:16, 68:21,
  68:24, 69:7, 69:8,
  72:2, 74:11,
  74:22, 75:13,
  76:4, 76:25, 77:4
certified 55:25,
  59:15, 61:19,
  76:2, 76:6, 76:13,
  122:1
certifies 56:10
certify 51:21, 56:9,
  60:7, 63:15, 66:1,
  67:18, 68:8,
  71:23, 126:4
certifying 51:24,
  59:13
cetera 28:14, 30:11,
  31:24, 98:15,
  98:17, 109:6
chalk 22:18
challenge 63:1,
  75:3, 82:23,
  123:17
challenged 95:10
challenges 15:3
challenging 11:17,
  19:19

champion 117:4,
    117:5
chance 81:12, 81:19
change 64:8, 111:14,
    113:17
changed 78:2, 91:20,
    91:25
changes 57:25, 70:21
chaos 69:13
Chapter 15:10, 29:1,
    61:4, 115:9,
    115:11, 115:12,
    119:20, 119:21
charged 38:2
chase 44:4, 44:5,
    79:14, 107:14
check 5:9, 39:25
CHIEF 2:10, 6:16,
    8:17, 9:7, 12:7
choice 51:13
choices 109:8
choose 16:14, 69:24,
    109:12, 109:14
choosing 108:17,
    113:8, 116:11
chosen 109:2
Chris 15:5
chunk 81:23
Circuit 13:1, 13:17,
    13:19, 55:5, 55:6,
    56:24, 58:25,
    59:6, 62:23,
    64:20, 71:22,
    73:11, 73:22,
    73:24, 83:14
circulated 24:14
circumstance 54:1,
    66:5
circumstances 78:2,
    79:8, 91:20, 98:11
citations 117:13
cited 56:3, 57:3,
    71:18, 100:16,
    105:17
Citing 64:5, 73:10
City 14:19, 14:21,
    14:22, 14:23,
    15:9, 18:17
civil 71:8, 71:9
claim 65:7, 65:21,

93:10, 104:14,
    108:22
Claims 63:5, 64:16,
    67:11, 67:14,
    67:24, 68:3, 68:4,
    68:5, 68:10, 72:7,
    73:4, 74:9, 74:23,
    75:3, 75:7, 75:12,
    77:3, 77:16,
    77:18, 77:25,
    102:10, 103:2,
    103:14, 123:3
clarity 124:13
class 38:6, 38:9
classic 61:2
clause 64:6
clear 28:2, 35:4,
    42:1, 56:24,
    57:18, 60:8,
    65:22, 66:2,
    75:18, 76:3,
    76:12, 85:1,
    92:21, 93:4,
    110:22, 110:23,
    114:2, 117:6
Clearly 29:19,
    38:10, 57:6,
    85:11, 93:9,
    107:7, 107:18,
    119:22, 125:1
Clerk 7:24, 8:5
clerks 7:4, 7:16,
    7:21, 8:1, 8:4,
    29:15, 29:16
clerkship 7:5
clerkships 7:18
client 7:10, 48:8
clients 16:7, 16:8,
    37:21, 47:24,
    67:10, 84:24,
    84:25, 101:15,
    105:15
climate 105:10
clincher 57:11
clock 79:6, 86:5,
    90:13, 92:12,
    106:2, 106:4
close 106:5
closing 19:10
cloud 98:22, 99:2,

99:3
club 29:13
co-counsel 50:8
co-defendants 50:6
Co. 3:26
Coalition 62:8,
    90:17, 90:21
Code 15:11, 42:3,
    71:8, 71:9, 71:21,
    73:5, 73:7
codified 73:7
Cofinas 122:18
Cohen 42:18
coincide 120:20
collateral 83:1,
    84:1, 84:8, 85:23,
    86:1, 112:22,
    112:23
colleagues 15:6,
    20:17
collected 84:17
collections 114:16
collective 43:8
collectively 7:2
College 13:25
colorable 75:3
column 25:14, 25:15
combination 107:19
combined 97:4
combining 17:11
comes 10:3, 29:9,
    37:3, 45:21,
    84:15, 119:5
comfort 31:21,
    121:14
coming 27:23, 31:17,
    45:11, 67:3,
    106:9, 113:5
comity 59:23
commands 81:25
commenced 35:15,
    91:23, 92:15
commencement 74:25
commencing 102:7
comment 26:11,
    35:23, 112:8
comments 42:8, 50:9,
    62:2, 108:8
commercial 21:23
commitment 24:1

committed 7:8, 10:1,
  10:7, 10:9
committees 18:21,
  116:12
common 9:22, 58:16
communicate 29:23
communication 29:20
community 103:5,
  103:7
Company 3:23, 29:1,
  115:9
compatible 111:10,
  111:16
compelling 103:17
compensation 8:13,
  25:22
complaint 68:5
complaints 32:23
complete 29:2,
  73:15, 74:15,
  76:17, 95:12
completely 65:16,
  68:8, 88:17, 119:3
complex 9:25, 11:8,
  11:13, 11:16,
  12:12, 12:20,
  14:11, 19:16, 23:2
complexity 32:10
complicated 75:14
composed 99:16
composition 71:11
comprised 103:16
compromise 117:9
comptroller 14:23
compulsion 80:12
concededly 43:21
concept 113:15,
  121:6
concern 56:19, 90:8,
  92:3, 106:22,
  112:1, 118:8,
  118:9
concerned 34:10,
  113:13, 118:15,
  121:10
concerning 39:4
concerns 20:21,
  32:20, 39:22,
  53:22, 86:13,
  91:8, 91:24,

120:17, 122:2
conclude 17:2,
  44:18, 75:10,
  96:9, 100:2
concluded 30:15
concluded. 125:3
concludes 74:2,
  76:15, 77:14
conclusion 38:3
conducted 31:2
conference 10:14
confidence 88:10
confidential 15:15
confirm 39:16, 40:7,
  47:6
confirmation 40:1
confirmed 19:18,
  94:25, 109:20
confirming 42:2
conflict 86:19,
  86:20, 88:7,
  88:22, 100:19,
  100:20
conflicted 97:22,
  98:13, 98:17,
  115:7, 115:12,
  115:13
conflicts 121:6
confront 68:7
confronted 76:13,
  123:13
Congress 57:24,
  92:7, 119:19,
  119:22
Congressional 115:16
connection 7:2,
  8:10, 63:10,
  64:19, 77:23,
  80:25, 86:12
consensual 12:11,
  12:12, 13:7, 13:8,
  13:12, 17:12,
  17:13, 18:8, 18:9,
  19:15, 19:16,
  26:11, 47:5, 95:13
consensus 123:21
consent 24:8, 83:23
consequence 67:22
consider 23:18,
  69:7, 77:24

considerable 9:1
considerate 79:7,
  79:8
consideration 26:12
considerations 55:17
considered 11:22,
  72:25, 74:1, 97:6
Considering 68:16,
  103:14
consistent 121:18
consisting 126:4
constituencies
  122:10, 123:10
constituency 102:12,
  102:21, 103:7
constitute 93:15
constituted 8:15
Constitution 51:16,
  58:18, 74:7,
  75:24, 97:14
Constitutional 38:5,
  52:25, 64:11,
  65:19, 65:23,
  75:21, 83:24
Constitutionality
  71:3
Constitutions 64:6
construct 84:13,
  101:8
constructive 32:3,
  32:5
consulted 24:24
contained 124:3
contemplates 103:8
contemplation 110:6
contending 77:12
contends 68:3
content 21:13
contested 12:23,
  25:14, 39:4, 39:5
context 28:5, 31:7,
  35:6, 37:11,
  37:15, 53:18,
  56:1, 63:17, 69:3,
  92:23, 97:20,
  105:22, 118:5
contextualized 32:12
contingent 93:9
continuation 8:3
continue 5:17, 6:2,

52:6, 54:5, 90:3,
  123:22
Continued 3:1
continues 6:22
continuing 99:20
contracts 64:6,
  71:6, 97:13,
  107:10
contrary 57:3, 124:2
contrasting 103:11
contributed 14:2
control 67:17, 69:6,
  79:18, 83:4,
  86:24, 91:16,
  92:22, 98:18,
  109:23, 121:13,
  121:14
controversy 63:20,
  84:4, 89:4, 89:14,
  106:17
conversation 45:3
conversations 15:16
convinced 106:7,
  121:4
Cooper 29:25
cooperation 19:20
core 16:16, 43:8,
  106:18, 116:25
cornerstone 58:21,
  66:16
Corp. 3:7
corporate 85:21
Corporation 3:4,
  35:20, 70:9,
  82:12, 94:9, 115:9
Correct 28:7, 34:14,
  41:10, 41:15,
  41:16, 46:17,
  55:17, 55:19
correctly 85:8,
  118:10
cosmetic 87:16
cost 12:16
Counsel 14:23,
  14:24, 18:21,
  20:13, 20:17,
  23:14, 23:18,
  24:5, 26:6, 27:6,
  30:4, 33:18,
  34:24, 40:10,

42:19, 45:2, 70:2,
  76:18, 93:24,
  109:3, 123:15,
  123:16, 124:22
counter 81:10
countervailing
  122:12
couple 33:16, 36:22,
  37:13, 65:1, 96:7,
  110:15
course 6:10, 11:15,
  12:16, 13:4,
  17:22, 33:19,
  43:16, 45:11,
  45:24, 79:25,
  82:3, 124:2
courses 10:22
court. 63:13
Courthouse 18:18,
  60:5, 60:6
COURTROOM 5:10,
  18:18, 35:11,
  54:9, 58:22, 91:6,
  114:2
courts 43:13, 55:6,
  71:23, 76:22
covenant 64:9
cover 58:5
Cowley 26:4
cramdown 122:25
crazy 68:13, 68:19,
  72:1, 81:13
create 121:6
created 51:14,
  57:13, 57:16
creating 82:21
creative 110:14
Credit 36:17, 82:1,
  82:10, 82:11,
  83:1, 83:25,
  117:14
creditor 28:24,
  36:7, 38:6, 70:18,
  70:19, 83:16,
  95:11, 98:3,
  102:12, 102:21,
  110:17, 110:18,
  122:23
crisis 11:20, 88:10
critical 29:6,

29:21, 43:6,
  43:12, 44:20,
  120:4
critically 59:21
crossed 28:1, 28:7
crowd 120:9
crucial 29:19
crystal 114:2
CSR 126:14
cue 120:19
cueing 33:1, 33:12
cure 100:20
curious 23:20
current 24:6, 106:9
currently 48:9
cut 44:3, 58:11,
  79:14, 107:14,
  122:15


< D >
data 30:16, 114:19
date 18:14, 19:9,
  26:13, 33:13,
  48:18, 49:8,
  49:19, 54:14,
  54:19, 91:14,
  92:12, 92:13,
  96:20, 104:7,
  114:8, 114:18,
  114:20, 115:1
daughter 61:6
day 36:2, 55:25,
  64:20, 108:24,
  117:7, 119:17
daylight 89:13
days 21:2, 31:22,
  32:6, 33:16,
  36:21, 36:23,
  37:3, 48:2, 49:17,
  52:17, 52:18,
  91:12, 91:23,
  100:10
de 85:14
deadline 8:8, 32:23,
  33:8, 33:21, 34:7,
  34:10, 48:24,
  52:7, 94:22, 95:5,
  96:10, 96:15,
  113:25, 114:1

deadlines 21:17,
    27:19, 27:22,
    28:3, 31:16,
    31:17, 32:18,
    32:19, 33:17,
    34:22, 35:9, 48:5
deal 31:12, 31:15,
    32:7, 50:15,
    65:24, 79:17,
    82:10, 82:14,
    110:5, 110:7
dealing 28:25, 36:3
deals 21:18, 107:18,
    107:19, 107:21
death 106:19, 117:1,
    118:24
Debevoise 6:23,
    6:24, 7:5, 7:6,
    7:10, 7:13, 7:24
Debt 57:22, 87:1,
    90:6, 97:17, 98:1,
    105:18, 105:19,
    112:11, 114:7
Debtor 1:35, 1:49,
    47:2, 56:25,
    60:20, 61:4, 61:6,
    61:7, 61:8, 61:9,
    61:16, 63:24,
    87:6, 87:23, 88:3,
    90:7, 95:9, 98:13,
    98:17, 105:6,
    106:19, 117:10
Debtors 1:18, 12:13,
    19:18, 44:13,
    44:16, 75:17,
    95:7, 95:12,
    95:16, 106:12,
    115:11, 117:6
debts 71:11
debunked 101:21
DECHIARA 3:31,
    40:24, 42:17,
    42:18, 44:5
decide 9:20, 31:23,
    36:9, 51:13, 53:1,
    53:4, 56:9, 56:18,
    63:15, 66:1,
    67:25, 71:1,
    92:10, 92:16,
    101:23

decided 36:22, 38:4,
    56:12, 63:16
decides 69:1,
    101:10, 101:12
decision 12:23,
    37:8, 53:18, 55:5,
    59:7, 72:2, 72:5,
    73:11, 118:21
decisions 54:16,
    60:1
decline 76:8, 118:16
dedicated 79:15,
    90:7
dedication 19:23,
    23:25
deemed 34:12
deep 14:17
default 36:16
defaulted 34:11
defective 63:18,
    64:16
defend 106:19
defending 93:19
defer 62:3
define 67:20
definite 47:24
degree 106:13,
    116:22
Dein 2:11, 6:4, 6:8,
    6:11, 21:20,
    21:22, 22:6, 22:9,
    22:12, 22:13,
    23:17, 24:4
delegate 121:23
delegating 100:21
delegation 100:17
demonstrated 77:9
denial 71:14, 81:9
denied 73:4, 77:16,
    77:21, 78:3,
    124:15
denies 82:24
Dennis 3:4, 35:19,
    64:24, 93:2
deny 84:6, 107:15
denying 64:19
Department 14:22,
    14:25
depend 99:21
depending 37:1,

118:5
DEPUTY 5:10
DERA 57:22
derivative 104:14
derive 105:15
derived 105:8
describing 30:10
deserve 62:10
designate 121:19
designated 10:12
designed 79:14,
    117:14
desire 119:4
Despins 3:20, 20:12,
    20:13, 20:20,
    21:15, 27:2, 27:5,
    27:6, 27:10, 28:7,
    33:25, 34:6,
    34:15, 35:24,
    36:8, 37:7, 37:18,
    71:13, 91:10,
    103:25, 104:3,
    104:5, 108:24
despite 27:18
detail 52:9
details 52:8
determination 19:23,
    33:3, 74:5, 74:7,
    75:20, 85:19,
    117:24
determinations 37:14
determine 16:15,
    16:21, 21:16,
    62:15, 63:12,
    75:9, 85:5, 92:13,
    98:7, 108:23
determined 57:1,
    60:18, 81:16,
    84:18, 84:19
determines 81:11,
    98:16
determining 82:1,
    112:21
Detroit 26:4
devastating 59:3
develop 26:7, 66:24
Development 15:1,
    66:10, 86:12
dialogue 16:4, 45:1,
    45:6, 121:4

difference 85:24
differences 41:21
different 24:21,
    29:17, 33:21,
    86:8, 91:7, 105:1,
    107:17, 115:8,
    115:19, 118:4
differently 89:10
difficult 54:15,
    54:23, 79:4,
    82:23, 108:19
difficulty 5:15,
    12:5, 124:21
diligence 19:20
diligently 6:2
direct 65:7
directed 77:23
directly 7:11, 8:5,
    12:6, 32:20,
    51:21, 60:3, 96:21
director 14:22
directs 81:25
disadvantage 30:5
disagree 8:3, 59:17,
    66:6, 101:13,
    116:14
disagreement 44:7,
    87:12
disagrees 44:11,
    101:10, 101:11
disapprove 89:12
discharge 43:18,
    43:22
discharging 38:8
discipline 43:18
disclosure 6:20,
    7:12, 30:25
discovery 21:25,
    23:3, 42:5, 88:16
discretion 29:2,
    56:14, 56:15,
    123:24
discuss 44:14
discussed 47:25,
    104:8
discussing 78:13
discussion 36:25,
    96:9, 106:5
discussions 21:11,
    27:23, 37:14,

45:9, 107:25
disingenuous 85:9
dislike 65:12
display 39:1
dispute 9:16, 9:20,
    10:21, 44:21,
    55:16, 70:12,
    91:6, 94:19,
    94:23, 102:19,
    105:5, 105:6,
    105:7, 112:25
disputed 17:24,
    67:12
disputes 10:11,
    22:1, 33:2, 43:10,
    43:17
disrespect 99:13
disruptive 31:25
distinct 30:5, 92:8
distinction 118:22
distinguished 6:13,
    8:20, 10:10,
    13:10, 13:25,
    20:16, 21:22
distribute 12:17
distributed 110:20,
    114:6
distribution 12:18
District 1:3, 2:5,
    2:6, 6:5, 8:6,
    8:18, 14:4, 14:5,
    14:15, 14:16,
    15:6, 18:18, 22:3,
    22:4, 23:4, 73:23,
    126:1, 126:2,
    126:7
diverse 28:12
divide 50:19, 98:1
divided 84:18
dividing 66:17
divvying 66:18
Docket 1:6, 1:24,
    1:40, 8:7, 8:8,
    22:10, 23:4,
    25:10, 33:19,
    40:3, 40:4, 41:6,
    41:11, 42:12,
    65:12
dockets 8:24
document 48:19,

58:18
documents 70:24,
    92:21, 105:8,
    110:21
doing 50:10, 65:11,
    112:6, 117:21
dollars 28:13, 52:9,
    61:5, 95:3, 96:14,
    102:9, 114:15
domain 70:19
dominant 94:24
done 19:11, 26:20,
    44:17, 46:9, 50:9,
    51:4, 82:6, 91:2,
    99:6, 104:15,
    108:18, 111:4,
    112:12, 113:14,
    114:21, 114:23,
    119:22, 120:13
doubly 100:4
down 26:16, 36:20,
    56:13, 56:14,
    59:1, 84:11,
    105:23, 122:8
dozens 43:19
drafts 26:10
drive 123:7
due 92:20, 97:3,
    97:20, 99:2
Dunne 3:4, 35:18,
    35:19, 36:15,
    37:16, 38:11,
    64:24, 65:3,
    70:11, 70:13,
    93:2, 95:7, 101:3,
    101:5
during 123:1
duties 22:1, 82:12,
    82:18, 85:25,
    86:25, 97:25,
    112:5, 113:5,
    115:18
duty 28:23, 38:8,
    88:1, 97:10,
    104:18


< E >
earlier 91:10, 106:5
Eastern 15:6

economic 86:2,
  105:23
economical 73:17
economy 73:16,
  76:20, 118:13
effect 8:7, 52:11,
  69:8, 71:5, 87:2,
  99:1
effective 72:13,
  79:22
effectively 70:24
effectiveness 72:15
efficiency 55:16,
  59:23, 69:24
efficient 33:24,
  34:1, 39:21, 86:6
efforts 13:12,
  107:25, 117:19
eight 41:23, 78:24,
  79:4
eight. 42:11
eighth 42:9
either 11:18, 22:14,
  84:19, 101:2
elapsed 38:25
element 30:21
elements 30:20
eligible 115:25
eliminate 11:10,
  12:22, 13:5, 92:2
Ellen 3:7, 94:7
emanating 68:17
Emanuel 62:7, 90:16
embodied 46:13
emergency 88:19
eminent 70:19
emphasize 59:12,
  88:6, 120:4
employed 7:4, 7:20
employee 43:18,
  43:22, 43:23
Employees 1:30,
  3:30, 42:19,
  42:22, 45:1, 46:6,
  69:19, 102:3
employment 39:14,
  45:14, 102:10
empower 83:25
enable 113:20, 119:8
enact 57:21

enacted 11:19,
  57:14, 57:19
end 10:9, 36:1,
  55:24, 79:1,
  114:11, 114:13,
  117:6, 119:21
endeavor 80:16
endeavoring 121:6
endlessly 122:4
ends 7:5
enemies 108:5
Enforcement 57:22
engage 32:14, 32:21
engaged 41:24,
  102:23
engagement 66:15
engaging 77:1,
  102:16
engineered 85:11
enhance 17:12
enough 22:22, 82:5,
  89:16, 97:17,
  114:25, 120:4
ensure 6:9, 15:24
enter 6:7, 25:2,
  40:3, 41:5, 45:21,
  48:24, 49:8
entered 18:25, 25:11
entering 48:13
entire 19:21,
  102:12, 123:9
entirely 63:5, 68:5,
  82:9, 109:23
entities 15:4, 47:2,
  92:8, 115:19
entitled 12:18,
  54:2, 83:10,
  118:17
entitlement 53:23
entity 28:13, 82:17,
  82:19, 85:25,
  86:1, 97:22, 98:2,
  98:17, 112:14,
  115:15
entry 40:3, 41:6
Epiq 39:14, 39:25,
  40:2
equally 11:17, 16:10
ERS 31:6, 31:12,
  40:7, 40:18,

40:19, 41:12,
  124:7
especially 86:1,
  102:14, 108:14
Esq 2:31, 3:26, 3:31
essence 52:2, 95:15
essential 95:25
essentially 97:21,
  98:19, 104:14
estate 61:6, 61:11,
  63:23, 87:24,
  90:9, 98:12,
  104:15, 110:17,
  110:19
et 1:16, 2:20, 2:39,
  3:11, 3:41, 28:14,
  30:11, 31:24,
  98:14, 98:17,
  109:6
evaluate 73:21
evaluates 17:8,
  17:21
evaluation 23:12
evaluative 17:3,
  17:7, 17:14
event 49:9, 53:8
events 68:6, 91:17,
  109:1
Everybody 35:16,
  54:8, 54:10, 79:3,
  85:17, 86:18
Everyone 5:14, 10:3,
  22:16, 50:13,
  78:23, 90:14,
  97:1, 105:13,
  108:16, 110:23,
  114:2, 114:20,
  119:25, 122:24
Everything 26:15,
  29:5, 33:19,
  38:21, 90:25,
  91:2, 118:3,
  118:18
evidence 91:18,
  96:19
evolve 85:11
exact 28:10, 29:11,
  90:23, 98:24
Exactly 34:6, 64:10,
  70:13, 76:14,

109:24
examiner 26:8
example 31:5, 31:11,
  31:17, 34:2, 34:7,
  81:10, 121:23
excellent 109:3
except 20:21, 29:14,
  29:16, 54:21,
  56:5, 85:17
exception 12:2
exchanged 26:10
excited 30:14
exclude 101:14,
  102:22, 103:6
excluding 101:18,
  101:22
exclusion 103:11
exclusive 71:19,
  71:21, 123:24
excuse 65:4
executive 14:21,
  88:17
exercise 85:4, 85:25
exercising 111:21
EXHIBITS 4:9
exist 42:2
exists 93:18
expect 8:16, 36:13,
  37:7, 50:12, 83:5,
  85:9, 124:17
expected 54:19,
  55:1, 55:3
expedited 53:1
expeditious 24:2,
  73:17
expeditiously 10:8,
  23:7, 43:10,
  114:23
expense 12:15, 35:13
expenses 112:10
expensive 12:1,
  12:11
experience 10:16,
  23:1, 23:15
experienced 14:14,
  15:7, 17:16,
  17:20, 18:3,
  122:24
experiences 14:20,
  15:2

expertise 10:10,
  14:8
explain 15:13,
  41:22, 64:13
explained 18:25,
  59:21, 72:11,
  113:25, 114:14,
  119:4, 119:12
explaining 116:19
express 49:5, 53:16
expressly 113:4
extended 37:11
extension 41:18,
  46:12
extensive 14:12,
  23:1, 42:7
extent 19:3, 33:20,
  46:13, 77:25
extraordinarily
  9:24, 16:9
extraordinary 9:2,
  119:19
eye 19:12


< F >
F. 3:4
F.2d 73:11
F3d 73:24
face 9:25, 15:12,
  19:17, 90:19
faced 15:3, 116:7
faces 11:20
facilitate 9:3,
  18:8, 107:24,
  111:3
facilitated 17:3
facilitates 17:4
facilitative 17:3,
  17:14
facing 9:4
fact 11:21, 13:24,
  27:19, 35:1, 75:5,
  85:9, 86:16,
  87:25, 91:19,
  93:21, 103:14,
  104:17, 114:23
factors 73:12,
  73:21, 76:18
facts 108:19, 108:20

factual 11:14,
  37:17, 37:20
fails 97:21
failure 65:21
Fair 24:2, 29:7,
  29:8, 83:25,
  89:16, 108:1
fairly 23:7, 106:8
fairness 96:25
faith 9:22, 10:4,
  15:23, 15:25,
  16:3, 44:17, 88:23
fake 84:7, 100:23,
  101:8
fall 92:23
familiar 9:14, 54:13
family 23:22, 43:23
far 45:25, 96:11,
  108:20, 112:1,
  112:8, 112:19,
  113:25, 116:7,
  118:15
fast 92:4, 108:23
favor 76:18, 76:20,
  77:8, 110:9, 112:2
fear 15:19, 123:8,
  123:20
Federation 44:25
fee 8:13, 25:23,
  26:8, 26:11
feeds 69:23
feel 32:5, 33:5,
  33:20, 53:12,
  56:8, 62:13
fellow 8:21
felt 23:14, 57:21,
  71:23
few 5:15, 6:1, 6:17,
  8:19, 17:1, 21:21,
  27:13, 33:16, 50:9
FGAC 104:25, 105:15,
  116:14
fiduciaries 84:7,
  104:16
fiduciary 28:17,
  28:23, 37:19,
  82:11, 85:22,
  85:25, 97:9,
  100:23, 100:24,
  101:2, 101:8,

104:19
field 8:20
Fifth 57:12, 71:4
fight 95:18
figure 89:21, 108:9
figured 107:25
file 8:7, 25:1,
    25:5, 31:22,
    31:23, 32:1, 34:7,
    41:13, 46:1,
    49:16, 69:25,
    90:5, 120:21,
    123:25
files 61:4
filing 18:14, 41:14,
    67:13, 73:9,
    75:16, 107:11
filled 48:18
final 11:24, 42:8,
    47:25, 52:23,
    53:18, 124:14
finality 61:3, 98:25
Finally 15:13,
    16:13, 19:10,
    72:10, 77:8, 81:9,
    97:16, 100:2,
    113:14, 119:12
Financial 1:9, 1:24,
    1:40, 3:14, 3:22,
    7:14, 11:20,
    14:11, 16:9,
    16:19, 29:24,
    30:19, 66:23, 70:8
find 16:18, 46:3,
    52:14, 97:21,
    108:10, 124:6
finding 9:24, 19:15,
    36:21
fine 34:13, 48:2,
    49:4
finish 88:7
finished 23:12
firm 7:7, 7:8, 7:13,
    7:15, 14:7, 14:9,
    42:18
firms 7:17, 10:20,
    30:2, 109:10
Fiscal 3:13, 30:8,
    30:10, 30:11,
    30:12, 30:15,

66:11, 66:15,
    79:24, 82:6,
    86:20, 88:8,
    88:16, 88:19,
    88:21, 91:9, 95:8,
    95:10, 95:17,
    97:18, 105:10,
    105:13, 110:8,
    111:10, 112:9,
    115:22, 117:23,
    119:9, 119:14,
    122:1
fit 50:17
fits 31:11
five 7:21, 10:10,
    11:3, 13:13, 48:2,
    49:17, 60:10,
    71:20, 81:20,
    81:21
flow 114:9
focus 33:1, 39:4,
    84:14, 95:20
focused 46:15
focusing 28:24
foibles 23:18,
    23:19, 23:23
follow 78:18
Following 18:24,
    60:17, 73:3,
    74:25, 75:16,
    92:21, 113:18
footnote 96:17
for-profit 82:12
force 16:17, 54:14,
    54:15
forced 52:22
forcing 91:22
forefront 66:21
foreseen 89:23,
    89:24
forgotten 35:6
form 40:3, 40:21,
    47:6, 47:7, 55:16,
    96:20
formal 7:7, 9:17,
    18:10, 48:2
formally 7:8
former 7:24, 14:6
formerly 7:4, 7:17
formula 49:6, 49:18

forte 79:10
forth 84:4, 94:23,
    101:18
forthrightly 100:18
fortunate 8:25, 22:2
forward 19:24, 23:5,
    24:1, 26:19,
    31:13, 44:16,
    49:7, 49:22, 59:3,
    72:20, 89:21,
    90:5, 103:19,
    108:10, 123:4,
    123:23
found 83:16, 96:12
foundational 58:18
founded 56:23
four 73:12, 73:20,
    86:5, 109:7
fourth 90:2
frame 21:7, 100:25,
    117:2
framed 68:4
frank 15:16
Frankel 50:5
frankly 62:19, 91:6,
    111:19
fraud 23:13
free 15:18, 16:23,
    71:23, 97:13,
    97:14
Friedman 3:17
frivolous 75:8
front 23:11, 52:15,
    67:2
full 20:4, 79:16,
    82:10, 83:9, 84:9,
    99:19
full-time 23:25
fully 33:4, 37:7,
    38:2, 55:12, 62:2,
    77:1, 77:3, 85:9,
    90:4
function 42:25
functioning 43:12
Fund 3:11, 3:33,
    3:40, 50:1, 74:4,
    74:17, 75:19,
    78:16, 79:13,
    79:24, 82:21,
    84:2, 85:15

fundamental 51:13,
    52:24, 86:19,
    106:10
fundamentally 57:25
Funds 50:5, 50:7,
    50:9, 52:6, 53:12,
    53:24, 54:4,
    59:19, 62:13,
    63:3, 86:23, 88:8,
    91:22, 100:14,
    101:20
future 7:24, 118:13,
    122:15

< G >
game 80:5
garner 24:15
Garrison 34:19,
    67:8, 78:22, 96:5
gather 23:8, 78:10
gathered 5:6, 5:20
gating 91:21, 114:3
gave 59:4, 92:7,
    117:3, 121:14
Gebhardt 26:3
General 2:34, 21:17,
    37:23, 38:8, 67:9,
    115:20, 116:12,
    122:23
generally 27:13,
    29:1
generates 43:16
gentleman 42:15,
    47:10, 67:2, 67:3,
    67:4, 67:5, 69:16,
    71:25
gets 98:3, 98:14,
    113:14
getting 34:2, 34:11,
    54:2, 55:11, 91:11
gifts 108:4
give 15:2, 18:10,
    23:12, 28:11,
    32:4, 36:10, 49:1,
    55:11, 79:15,
    82:25, 84:1,
    85:20, 87:13,
    89:25, 100:25,
    108:1, 113:4,

116:24, 118:6
Given 13:7, 14:12,
    30:18, 43:19,
    45:19, 48:5,
    50:18, 53:24,
    54:23, 64:9, 79:3,
    100:4, 104:14,
    106:18, 108:1,
    115:8, 116:3,
    117:22, 122:18
gives 15:11, 81:21,
    81:22, 105:20
giving 37:10
glad 28:7, 45:7
Glendon 2:38
global 31:7, 31:14,
    45:20
goal 9:23, 10:1,
    10:3, 103:4,
    114:9, 116:4
goals 111:17
GORDON 3:37, 69:17,
    69:18, 69:23,
    70:6, 102:1,
    102:2, 103:14
Gos 36:6, 37:20,
    38:2, 72:1, 99:24,
    122:18, 123:14
Gotshal 86:9
Government 1:31,
    42:25, 121:4,
    121:9, 122:2
governmental 14:19,
    15:3
governor 14:24
governs 75:17
grab 118:3
grant 48:5, 74:21,
    103:20
granted 8:11, 25:9,
    40:2, 41:4, 46:13,
    49:21, 65:15,
    85:10, 93:13
granting 67:22,
    69:11
grants 46:14,
    103:19, 122:3
grateful 5:14
gratified 6:12
grave 43:22

great 19:23, 51:9,
    79:18, 109:14
greater 99:6
greatest 99:25,
    116:9
green 65:3
grievance 43:9,
    43:12, 44:3
grievances 43:17,
    43:20, 44:9, 44:15
ground 9:22
grounds 83:23
Group 2:33, 3:33,
    28:15, 28:24,
    34:20, 50:1, 50:5,
    65:10, 67:8, 74:4,
    74:17, 75:19,
    78:16, 79:13,
    99:10, 104:10
groups 10:23, 32:14
grow 6:22
Guarantee 7:1, 70:8,
    86:9
Guaranty 3:6, 3:22,
    3:43, 94:9
guess 32:7, 49:2,
    59:22, 65:4, 98:8,
    116:14
guidance 36:10,
    62:16, 82:16
guides 36:18
gun 54:16, 54:18,
    54:25, 55:8, 55:9
Guy 26:3

< H >
half 29:14, 30:3,
    38:24, 50:12,
    78:8, 85:12, 104:1
HALSTEAD 3:7, 94:7,
    94:8, 94:17, 96:1
hand 35:2, 35:3,
    117:13
handed 56:13
handled 89:10
handling 23:1, 23:6
hands 25:7, 123:25
hanging 23:16
happen 88:3

happened 45:24
happening 22:20,
    108:25
happens 14:5, 52:19,
    66:22, 71:7, 86:24
happy 93:17, 107:23,
    114:18, 119:25
hard 21:6, 90:19,
    109:12, 110:16,
    120:9
harm 77:10
harms 73:21, 77:8
Hastings 27:6
hat 89:4
hate 22:22, 100:3
head 54:17, 54:19,
    55:1, 55:8
headed 10:19
healthy 118:2
hear 5:13, 8:14,
    16:11, 22:14,
    44:1, 45:7, 50:21,
    66:8, 66:13,
    66:19, 68:21,
    83:6, 84:22,
    88:14, 120:2,
    120:3, 124:8,
    125:1
heard 8:12, 12:9,
    16:10, 21:16,
    27:10, 27:18,
    29:10, 43:3,
    50:13, 52:3, 54:7,
    64:25, 72:10,
    72:16, 72:18,
    78:14, 79:3,
    97:17, 105:21,
    114:15, 120:24,
    122:9
HEARING 2:4, 2:9,
    5:22, 5:24, 12:3,
    12:5, 15:20,
    21:15, 24:14,
    24:16, 26:5,
    26:13, 33:13,
    45:23, 49:2, 49:3,
    114:22, 124:21
heart 52:25, 86:18,
    121:23
heavily 72:2

heightened 113:15,
    113:18
held 13:22, 18:17
help 6:8, 6:14,
    15:24, 17:17,
    17:20, 33:18,
    38:17, 53:9,
    89:22, 106:4,
    116:22
helpful 45:6, 121:17
helping 23:6
heresy 104:13
herself 21:21, 52:14
hierarchy 64:11
high 13:22
highest 14:1
highlight 13:17
highlighted 75:15
highlights 75:25,
    95:4
highly-respected
    14:10
Highways 1:46
hijack 62:13
hinges 72:2
hired 91:12
historic 24:3
Hoc 2:33, 3:36,
    6:24, 67:8
Hold 28:19, 78:6
holder 96:6, 105:12
holders 28:20,
    30:22, 31:1,
    84:16, 86:10,
    101:14, 102:9,
    105:14, 105:18,
    105:19, 108:22
holding 115:9
holy 30:9
Honestly 48:14
Honorable 2:5, 2:10,
    2:11, 9:7, 12:7,
    22:13, 70:21,
    71:1, 71:7, 126:6
hope 17:9, 35:9,
    38:20, 44:18,
    44:21, 65:15,
    81:15, 116:17,
    124:6
hopeful 6:14, 38:19

Hopefully 16:5,
    18:7, 35:10, 35:15
hopes 54:9
hospitals 42:25
hour 50:13
Houser 2:10, 6:17,
    8:17, 8:19, 9:6,
    9:7, 12:7, 20:1,
    20:5, 21:8, 32:8,
    54:7, 59:25,
    66:12, 88:14,
    108:11
Housing 14:25
HTA 33:10
Huge 11:25
hundreds 10:19,
    29:15, 43:20,
    45:16
hyphen 73:23
hypothetical 35:21


< I >
idea 23:19, 45:6,
    91:7, 122:5
ideal 11:9, 17:15
ideas 17:4
identical 41:12,
    41:13, 71:21
identified 9:22,
    52:10
identify 48:12,
    76:18
identifying 48:6
ignore 93:7, 95:16
II 3:11
III 1:8, 5:22, 7:3,
    7:10, 7:16, 7:22,
    8:24, 10:8, 11:8,
    12:1, 12:14,
    15:12, 62:22,
    62:24, 63:20,
    66:22, 67:13,
    68:12, 68:18,
    71:19, 73:9,
    74:16, 75:1,
    75:16, 76:22,
    77:5, 77:19,
    86:22, 91:24,
    107:8

illegal 30:10
imagine 89:24
immediate 33:21
imminent 55:8
impact 29:5, 59:3,
    59:8, 73:20,
    95:19, 102:19
impair 118:12
impartial 8:1
impasse 121:16,
    122:4, 123:22
impedes 7:25
impediment 48:11
implementing 9:11
implicate 32:20
implicated 69:2
implicating 68:17
implications 106:20
importance 32:9,
    36:17, 58:20
important 10:5,
    15:14, 16:9,
    28:20, 28:21,
    29:19, 30:6,
    30:16, 31:9,
    44:20, 59:22,
    62:14, 87:10,
    90:6, 100:4,
    108:12, 108:13,
    120:4, 123:11
importantly 16:10,
    28:16, 66:14
impose 113:18,
    116:19
imposed 73:8
impossible 82:23,
    100:20, 111:24,
    113:12, 114:4
impression 11:12,
    11:19
impressive 8:22,
    22:9
improper 64:17,
    101:4, 103:6
improve 119:18
in. 23:14, 28:4,
    29:9, 48:18
inappropriate 87:20,
    87:21, 102:22
inappropriately

67:17, 85:3
Inc. 3:11, 3:26,
    7:1, 73:10
incentive 79:7,
    80:10
incentivized 54:13
inclined 52:20,
    72:6, 103:19
include 42:22,
    94:13, 102:10,
    106:11
included 20:4, 22:9,
    103:1, 103:21
includes 23:3
Including 8:8,
    16:24, 23:2, 26:8,
    37:20, 45:14,
    50:18, 75:7,
    75:17, 84:4,
    101:15, 122:20
inclusion 102:14,
    103:8, 103:10
inconsistent 122:1
incorporated 80:25
incorporates 49:18
incredible 35:12
incurred 35:13
independence 86:13
independent 8:1,
    26:8, 87:17,
    87:23, 90:22
indicated 39:17,
    41:19, 44:13
indicates 20:8,
    102:8
indicating 6:25,
    25:7
indifferent 80:7
individual 7:20,
    61:5
individuals 20:7
indulgence 27:14
Industries 73:10
inevitable 11:16
inexplicable 102:17
infancy 11:15
infirm 93:6, 93:22,
    94:4
influence 111:22,
    119:5, 123:20

information 107:13
informed 33:7,
    33:23, 37:9, 60:21
informs 36:18
ingenuity 19:20
ingredient 108:12
inherent 74:13
initially 29:12,
    30:2, 32:3, 106:3
injunction 33:10
injured 118:14
innerworkings 14:19
input 23:11, 100:8
inquiry 96:24
insert 25:13
insight 15:2, 15:11,
    18:2
insights 18:5, 18:7
insofar 84:13
insolvency 8:20,
    11:25, 13:18,
    13:21, 14:8
instance 32:22,
    60:2, 74:9, 118:1
instead 63:12, 68:7,
    68:10
institution 59:2,
    59:18, 86:18
instruct 106:14
instruction 62:16
Insurance 3:23
insure 37:22
insureds 99:13
insurer 33:11
insurers 37:22
intact 59:19
integrity 88:24,
    109:9
intend 44:16, 99:18,
    99:19
intended 21:4,
    117:12
intending 36:12
intent 112:15
intention 99:24,
    107:15, 109:17,
    116:24
Interamericas 3:25
intercircuit 10:13
interesting 11:16,

31:4, 118:9
interests 17:19,
    73:16, 76:20,
    84:15, 102:5
interim 8:13, 25:22
International 3:29,
    3:31, 42:19
interplay 75:23
interpleader 32:23,
    35:22, 69:4, 88:15
interrupt 27:25
intervene 31:17,
    32:24, 32:25,
    33:6, 33:22, 34:8,
    35:25, 37:8,
    37:12, 121:17
intervention 31:23,
    32:2, 33:4, 33:6,
    36:10, 36:22,
    62:22
intracofina 33:1
introduce 6:11,
    6:16, 20:13,
    21:21, 23:8, 42:15
introduction 20:5,
    54:7
introductions 6:19
intuitively 107:6
investigation 30:24
Investigative 96:12
Investment 2:28,
    34:8
invite 8:17, 21:20,
    24:5, 25:20,
    107:12
invoke 48:8
involve 43:21, 56:2
involved 6:21, 7:11,
    19:13, 19:20,
    28:4, 30:4, 43:23,
    91:11, 103:21,
    105:22
involvement 6:14,
    99:7
involves 21:11,
    61:2, 75:23, 76:10
involving 14:11,
    35:14, 69:4, 83:13
island 28:19, 29:5,
    29:21, 32:5,

42:25, 54:11,
    58:20, 103:3,
    116:2, 116:3
issued 36:13
item 20:4, 49:25,
    65:12
items 8:9, 25:13,
    38:15
itself 49:6, 55:5,
    86:2, 90:1, 90:7,
    105:9, 107:6


< J >
janitors 42:23
Jason 3:11, 50:8,
    100:13
jawboned 119:24
Jenner 69:18, 102:2
job 79:18, 80:11,
    80:13, 80:14
jobs 99:22
John 3:15, 121:1
join 7:13, 29:13,
    63:4
joined 6:4, 45:1
Joint 1:26, 1:42,
    25:15, 39:15,
    39:18, 39:25,
    40:6, 40:23, 41:4
Jointly 1:11
Jonathan 3:43, 86:8
Journalism 96:12
Juan 5:1
Judges 6:13, 8:21,
    9:2, 10:10, 11:4,
    13:11, 13:13,
    13:19, 17:15,
    18:3, 20:17, 22:4,
    22:6, 23:4, 23:12,
    26:1, 116:21
judgment 11:24,
    33:12, 81:19
judicial 10:14,
    22:1, 71:9, 71:10,
    73:16, 76:20,
    115:16
Judiciary 10:7, 56:3
Judith 2:11, 6:4,
    21:20

July 31:21
jump 66:18
June 41:8
junior 82:9, 83:6,
    85:6
juniors 82:20, 84:1,
    85:12, 85:15
jurisdiction 71:20,
    71:22, 74:25,
    75:10, 75:11,
    77:24
jurisprudence 64:12,
    68:16
jurist 8:20, 14:10,
    21:23
justifying 96:20


< K >
keep 79:6, 85:12,
    114:19
key 27:15, 30:13,
    54:23, 104:6
kind 34:10, 65:6,
    66:23, 93:10,
    112:14
kinds 114:24, 116:3
Kirpalani 3:41,
    62:5, 62:6, 62:7,
    65:25, 90:15,
    90:16, 93:24,
    109:7, 109:14
Klein 15:5, 15:9
knowing 114:5
knowledge 14:17,
    14:18, 31:2,
    118:20
known 10:20, 14:8,
    35:4, 103:5
knows 112:6, 115:18
Kramer 50:4, 78:13


< L >
L-i-n-a-r-e-s 47:20
labor 28:14, 43:13
laboring 99:20
lack 55:15, 62:21,
    63:19, 67:12,
    118:20

lacks 63:20
landscape 93:18
language 23:16,
  106:23
large 7:17, 43:16,
  52:11, 99:17,
  115:9
largely 99:16
larger 94:24, 103:15
largest 102:12,
  102:21
Last 24:14, 24:16,
  35:23, 37:17,
  42:12, 45:4,
  47:19, 49:17,
  66:6, 78:19, 85:18
Late 42:7, 52:19
later 19:1, 21:15,
  26:12, 57:13,
  63:8, 66:20,
  114:18, 114:20
latter 25:4, 39:17
Laura 2:5, 126:7
Lavan 7:19
lawful 105:11
laws 56:22, 57:25,
  64:8, 71:6, 71:10,
  122:20
lawsuit 64:5, 64:13,
  64:16, 82:13,
  82:14
lawyer 13:18, 122:24
Lawyers 6:21, 13:23,
  14:1, 18:11,
  23:10, 29:15,
  121:10
lead 50:7
leader 6:17, 8:20
leadership 9:1
least 12:9, 51:8,
  53:15, 56:1,
  76:13, 89:5,
  90:20, 96:7,
  117:6, 124:6
leave 23:20, 50:25,
  84:1, 84:23,
  118:14, 119:2
leaves 109:4
LECAROZ 2:16, 25:24,
  25:25, 26:2,

26:17, 26:20
left 7:13, 27:24,
  39:2, 51:8, 60:10,
  65:23, 69:22
legal 11:14, 11:18,
  17:21, 44:7,
  64:21, 75:7,
  84:20, 92:8, 92:9,
  93:18, 100:15,
  101:22, 103:4,
  109:9, 117:7,
  117:9
legally 93:5, 93:22,
  94:3, 101:4,
  112:12
legislation 93:13,
  93:15
legislature 61:12,
  61:14
lend 9:1
length 11:23, 119:13
less 9:17, 35:20,
  37:2, 55:2, 80:11,
  100:15, 115:12,
  116:7
level 43:1, 68:21,
  116:1
leverage 118:20
Levin 50:4, 78:13
Levine 2:25, 44:24,
  44:25
Lex 63:5, 64:16,
  67:11, 67:14,
  67:23, 68:3, 68:5,
  68:10, 72:7, 73:4,
  74:9, 74:23, 75:3,
  75:11, 77:3,
  77:16, 77:18,
  77:25, 123:3
liability 102:8
lien 70:24, 83:9,
  83:11, 83:21,
  83:22, 85:18,
  118:4, 122:19,
  122:22
lienholders 122:11,
  122:13
liens 35:5, 93:14,
  105:11
lies 105:7

Lift 31:5, 31:12,
  44:3, 45:10,
  45:21, 50:1,
  55:18, 62:19,
  63:17, 63:18,
  64:19, 67:21,
  70:20, 73:4, 73:8,
  73:13, 73:22,
  74:2, 77:15, 124:7
lifted 68:3, 74:10
Lifting 67:16,
  74:20, 76:18
light 38:16, 38:24,
  38:25, 50:11,
  65:3, 75:4, 78:2,
  78:8, 79:9
lighted 39:1
lightly 100:24
lights 50:11
likelihood 51:18
likely 11:18, 38:4,
  55:25, 56:10,
  68:20, 75:23,
  76:16, 77:10
limited 62:12, 94:10
limits 80:9
LINARES 2:31, 47:11,
  47:13, 47:17,
  47:19, 47:20,
  47:21, 47:23,
  48:10, 48:14,
  48:16
line 5:8, 24:13,
  121:10
lined 95:20, 121:10
linking 25:10
liquidation 61:4
liquidity 95:2
list 91:13, 109:14
listened 73:1
listening 5:21,
  22:16, 121:3
literally 32:13
litigant 98:12,
  98:14
litigants 89:15
litigate 11:24,
  77:5, 80:16,
  116:25, 117:18,
  118:17, 118:18,

118:24, 122:4,
  123:22
litigated 17:18,
  98:21, 117:10
litigates 79:19,
  98:19
litigating 11:11,
  61:21
litigations 66:10,
  74:10, 95:14
litigator 14:10
little 5:16, 12:4,
  23:9, 23:10,
  26:15, 35:23,
  58:11, 62:13,
  65:2, 66:20
live 29:5, 50:21
livelihood 99:22
lives 14:6
LLC 2:28
LLP 6:23, 7:19,
  7:21, 24:10,
  34:19, 42:18
loan 53:19, 53:23,
  54:3
local 20:13, 20:17,
  56:6, 70:22, 76:11
locations 124:25
logistical 124:20
long 23:13, 39:5,
  41:13, 61:7, 83:4,
  83:12
long-winded 85:1
longer 5:16, 7:14,
  12:2, 12:10, 32:8,
  52:18
longshot 54:22
look 15:14, 19:24,
  31:8, 33:16,
  35:11, 49:16,
  49:22, 51:6, 51:7,
  80:8, 88:20, 97:2,
  97:3, 118:22,
  119:24
looked 49:17, 97:4,
  116:6
looking 23:5, 24:1,
  34:25, 35:2, 35:7,
  41:11, 76:7,
  99:11, 100:9

lose 83:6
loses 51:19
losing 55:4, 66:22,
  123:8
lost 5:8, 5:10
lot 22:19, 24:16,
  52:18, 56:12,
  56:14, 72:4, 91:5,
  99:5, 105:22,
  115:8, 115:9,
  115:25, 116:1
lots 89:6, 115:24
Love 35:1, 82:4
lower 12:16
Ltd 3:40
Luc 3:20, 20:13,
  27:5, 104:5
lucky 108:24
lunch 14:6
Lyonnais 82:1,
  82:10, 82:11,
  83:1, 83:25,
  117:14


< M >
M. 3:7
ma'am 26:14, 47:17
machinery 43:9
MAGISTRATE 2:11,
  6:4, 21:20, 22:4,
  22:6, 22:13,
  22:18, 22:24
main 58:4
maintaining 43:12,
  70:3
man 27:13
manage 86:5
managed 53:17
Management 1:10,
  1:25, 1:41, 21:25,
  22:5, 23:2, 43:19,
  72:13, 115:10
manager 101:20
mandate 104:20
manner 77:2
manufactured 91:24
March 13:24, 123:13
mark 19:9
markets 119:9

Marrero 14:15,
  14:16, 14:18, 15:2
Martin 2:21, 3:23,
  24:9, 60:15, 70:7,
  104:24, 108:6
Mass 23:10
Massachusetts 6:5
Master 3:40, 40:4
material 39:5
matter 23:21, 41:14,
  43:16, 49:14,
  51:25, 52:21,
  55:18, 55:21,
  58:19, 59:23,
  70:1, 74:24,
  75:10, 75:11,
  75:21, 77:24,
  78:15, 86:16,
  87:22, 95:15,
  123:9
matters 6:1, 7:22,
  9:16, 9:20, 12:24,
  20:23, 22:7, 23:2,
  23:3, 23:6, 23:7,
  24:3, 28:3, 31:11,
  31:14, 31:19,
  32:3, 38:14, 39:4,
  39:23, 43:17,
  43:21, 43:22,
  44:3, 45:11,
  45:14, 70:3,
  70:25, 85:11
Maximiliano 3:26,
  70:18
maximize 87:5,
  87:24, 88:2,
  117:15, 117:17
maximizing 84:14,
  117:25
maximum 84:23
Mayer 3:34, 78:12,
  79:11, 79:12,
  85:7, 92:20,
  100:23, 101:3,
  101:5, 110:7
mayor 14:21
mean 28:20, 31:19,
  51:2, 89:22,
  109:14, 119:7
meaning 51:17

meaningful 29:9
means 28:17, 29:10,
    29:23, 64:12,
    64:13
meant 35:23
mechanical 121:21
mechanism 54:22
mediate 10:11
mediated 10:19,
    11:2, 11:6, 11:7,
    18:6
Mediations 9:15,
    9:19
mediator 14:10,
    14:14, 17:4, 17:8,
    17:17, 17:20,
    54:12
mediators 15:17,
    15:18, 15:24,
    16:3, 16:11,
    16:16, 17:15,
    19:22, 55:12,
    124:18
meet 19:5, 32:13,
    44:13
meeting 18:11,
    18:16, 18:17,
    18:22, 18:23,
    21:4, 21:10,
    21:14, 31:21
Mellon 32:22
member 9:25, 10:16,
    13:16, 17:22,
    17:25, 122:21
Members 5:6, 5:20,
    10:12, 11:4,
    18:16, 19:6,
    19:14, 38:7, 43:7,
    45:4, 111:20
memory 32:18
mentality 123:10
mention 35:5, 52:9,
    99:9
mentioned 20:23,
    31:14, 34:25,
    83:20, 90:18,
    95:1, 99:16,
    116:21, 120:14
message 53:16
met 45:4

microphone 5:18,
    12:6, 124:23
midnight 53:8
mightily 14:3
Milbank 35:19, 64:24
million 52:9, 61:5,
    95:3, 96:14,
    114:14
millions 28:13
mind 28:3, 37:6,
    39:6, 50:24, 79:5,
    87:9
minimal 82:15
minimis 85:15
minor 43:21
minute 58:9, 60:10,
    72:22, 78:7, 78:9,
    100:15
minutes 5:15, 6:18,
    35:20, 50:11,
    50:12, 50:18,
    50:20, 51:1, 51:6,
    51:7, 69:21, 78:8,
    78:22, 79:2, 79:4,
    79:6, 86:5, 90:12,
    90:13, 90:14,
    104:1, 106:3,
    124:6
misdefines 105:3
mission 111:14,
    111:25, 113:21,
    119:8, 120:5
missions 111:11
mixed 56:2, 56:6,
    56:19, 63:25,
    75:25, 76:4,
    76:10, 76:14
modestly 43:1
modified 40:12, 78:2
MOERS 3:34, 78:12,
    79:12, 85:7
moment 5:11, 6:20,
    27:25, 41:3, 52:1,
    53:13, 56:16,
    104:18
money 9:18, 11:10,
    29:3, 52:17,
    82:24, 84:14,
    84:17, 84:23,
    84:25, 96:18,

98:10, 110:16,
    110:19, 112:13,
    116:2
monitors 111:21
Monsita 2:16, 26:2
month 23:13, 29:14,
    122:9
month-long 23:13
months 21:3
monumental 32:9,
    59:8
mostly 53:15, 82:8
motions 18:14,
    18:15, 27:18,
    32:24, 39:10,
    39:19, 39:20,
    39:22, 45:10,
    73:22
motivation 119:10
mouth 124:24
movant 60:11
movants 65:6, 67:16,
    73:12, 76:15,
    76:18, 77:9, 77:17
move 23:6, 38:15,
    78:4, 108:10,
    123:23
moved 25:14
moving 92:4
MS 2:16, 2:25, 3:7,
    3:16, 25:24,
    44:24, 46:25,
    47:3, 47:4, 48:17,
    48:20, 48:22,
    49:1, 49:10,
    49:12, 49:20,
    49:23, 94:7,
    94:17, 96:1
Mungovan 2:23
Municipal 45:1,
    82:17, 94:9
Mutual 3:33, 50:1,
    50:5, 62:13, 63:3,
    74:4, 74:17,
    75:19, 78:16,
    79:12, 91:22
Myers 47:1
myself 7:12, 8:4,
    23:22

< N >
N. 2:35, 3:11
Naftalis 50:5
name 20:12, 47:15,
   69:18, 87:19
namely 75:23
Nancy 14:4
narrower 46:15
National 3:43,
   10:15, 86:9,
   90:18, 90:21,
   93:25
nationally 10:20,
   14:7
natural 108:25
nature 66:21, 75:25,
   121:21
necessarily 84:25,
   119:22, 120:20
necessary 101:6
needed 22:7, 53:12,
   89:10, 110:12
needs 29:7, 31:8,
   31:15, 32:13,
   50:13, 53:3,
   54:12, 58:22,
   60:8, 61:19, 87:3,
   91:12, 108:22,
   118:2
negative 114:11,
   114:12
negotiate 13:12,
   80:17
negotiated 9:3,
   9:16, 11:9, 12:20,
   13:5
negotiates 79:20
negotiating 123:2
negotiation 89:11,
   115:16
negotiations 6:15
nevertheless 71:22,
   98:3
New 5:13, 5:21,
   11:19, 14:16,
   14:21, 14:22,
   14:23, 14:24,
   18:17, 32:22,
   38:15, 59:4, 69:4

newness 100:5
news 25:13, 25:17,
   114:15
Next 18:10, 26:13,
   33:16, 36:22,
   46:23, 48:2, 49:2,
   49:11, 49:25,
   62:3, 65:12
nice 46:2, 46:6,
   110:18
night 42:12, 45:4
Nine 15:10
nix 112:2
No. 1:6, 1:24, 1:40,
   48:14
nodding 53:14
nominate 87:19
nomination 101:19
nonduplicative 39:3,
   79:7, 86:4
None 4:5, 4:11, 7:24
nonglobal 31:19
nonimpairment 64:9
nor 7:7, 18:2, 76:17
Northern 8:18
nose 86:15
not-for-profit 86:17
note 8:10, 37:20
noted 55:14, 67:10,
   115:4
notes 39:25
nothing 72:18, 84:1,
   85:20, 85:22, 98:9
notice 8:7, 18:10,
   18:25, 22:10,
   45:20, 49:16,
   49:17, 63:9,
   77:22, 91:25,
   94:12
noticed 49:13
notion 37:25, 56:22,
   66:6, 106:25,
   113:8, 118:1
Notwithstanding 7:23
novel 11:8, 11:13,
   12:12
novelty 11:20
November 114:12
number 6:21, 20:2,
   32:2, 35:12,

37:21, 37:22,
   40:3, 41:6, 41:11,
   42:12, 43:17,
   58:8, 65:19, 66:9,
   66:13, 97:17,
   98:2, 111:1
numbers 25:10, 82:6
numerous 76:23
ny 87:18


< O >
O'melveny 47:1
O'neill 20:16, 20:17
object 25:5, 43:4,
   72:6, 80:6,
   102:14, 102:16,
   103:10
objected 83:3
objecting 41:25,
   105:1, 105:14
objection 25:7,
   31:23, 42:9,
   68:20, 72:8, 93:4,
   94:18, 94:21,
   98:20, 104:25
objections 8:3,
   40:8, 41:24,
   42:13, 46:19,
   47:8, 55:24,
   78:16, 78:17,
   88:17, 90:22,
   90:24, 94:10,
   95:21
objective 113:23
objector 47:5
objectors 50:19,
   50:21, 65:1, 75:2,
   75:15, 76:11,
   78:15, 78:17
objects 79:13
obligated 75:9
Obligation 2:34,
   37:23, 67:9
observations 121:18
obstacle 95:13
obviate 65:16
obvious 13:7, 98:13,
   116:14
obviously 24:25,

45:5, 81:15, 109:2
occur 16:4, 66:9,
    67:25, 68:14,
    74:12
occurred 31:3
odd 65:6, 83:13
offer 7:7, 107:23
offered 4:5, 4:11
Office 8:12, 18:20,
    26:4
officer 80:19
offices 42:24, 42:25
Official 3:19,
    18:21, 69:19,
    91:10, 99:15,
    102:3, 126:15
often 9:22, 55:7,
    88:15
Okay 31:4, 34:15,
    39:8, 48:16,
    49:20, 58:10,
    58:11, 83:3,
    87:16, 90:12,
    104:3, 109:24,
    117:12
old 22:22, 57:4
omission 102:17
Omni 49:7, 49:11,
    120:21
Omnibus 2:4, 2:9,
    5:22, 26:13, 49:2
once 5:19, 47:15,
    57:12, 62:24,
    66:22, 78:3,
    119:23
one-way 80:1
one. 37:17, 109:14
ones 93:24, 95:22,
    99:25, 106:7
online 15:20
open 15:16, 16:5,
    66:14
opera 124:24
operational 45:11
operations 52:6
opinions 13:20
opponent 60:11
opponents 124:8
Opportunities 2:39,
    19:5, 68:23, 69:3

opportunity 18:24,
    19:4, 50:14, 79:3,
    91:16, 120:21
oppose 70:13, 110:4
opposed 53:10,
    62:20, 84:15,
    100:9, 108:10,
    115:21
opposing 18:15
opposite 38:3,
    70:12, 89:9, 99:1
opposition 67:9,
    70:3, 78:10,
    120:21
oppositions 78:24
opted 115:20
optimistic 10:2
oral 25:8
orally 36:13
orderly 68:25
Orders 39:18, 39:23,
    80:13
ordinary 45:11,
    45:24, 84:24,
    122:14, 122:23
organization 14:2
organizational 20:6,
    21:10, 31:21
organizations 10:23
organize 90:19
original 46:15,
    123:12
originally 80:4,
    94:3, 123:7
Oscar 30:23
others 66:8, 84:3,
    92:24, 99:14,
    101:3, 114:17
otherwise 79:15,
    81:16, 82:9, 84:8,
    88:8, 94:2, 111:3,
    121:25
Otterbourg 7:19,
    7:20
ourselves 18:4,
    23:8, 34:2, 90:20,
    116:20
outcome 13:3, 16:10,
    16:19, 74:19,
    97:24, 98:21,

98:22
outset 119:4, 121:9
overall 79:8, 86:12,
    102:20, 111:17,
    111:24, 112:10
overcome 56:19,
    106:8
overnight 53:18
overseeing 6:5,
    21:25
overtaken 68:6
overwhelming 58:19
overwhelmingly
    51:25, 56:18
owe 28:22, 28:23,
    104:18
owed 28:13, 102:8
own 23:4, 61:20,
    79:13, 89:5,
    91:17, 101:7,
    117:7, 123:23
owner 70:23
ownership 116:15,
    116:16, 117:1
owns 111:8


< P >
pace 69:9
PAGE 4:3
pages 71:20, 126:4
paid 28:14, 43:1,
    80:11, 99:25,
    112:10, 115:23
Palacios 2:31
paper 65:18
papers 34:23, 53:6,
    55:14, 56:3, 56:8,
    56:11, 56:24,
    57:7, 77:17, 80:9,
    84:4, 94:23,
    96:13, 101:17,
    102:7, 105:17,
    120:22, 121:2
Paragraph 48:22,
    94:14, 94:21
parallel 122:6
paramount 36:17
part 27:24, 28:1,
    28:20, 38:14,

61:11, 106:5,
  117:19
partial 73:3, 73:14,
  74:15, 76:17
participants 6:21,
  89:11
participate 9:21,
  15:22, 15:23,
  15:25, 16:2,
  16:14, 21:6, 111:2
participating 18:13
particular 11:3,
  23:17, 28:3,
  28:18, 30:7,
  43:25, 48:6, 48:7,
  49:7, 53:13, 60:2,
  64:15, 77:10,
  84:16, 86:14,
  87:6, 107:16,
  110:24, 117:2
particularly 18:4,
  106:14, 110:21
partly 119:12
partner 6:8, 22:4,
  39:9
partners 14:6
party 16:2, 17:21,
  51:18, 55:4,
  78:14, 98:18,
  99:12, 105:20
pass 61:14, 92:24
pass-through 82:17,
  82:19
passage 24:18
passed 27:19, 61:12
passing 77:17
past 6:1, 13:24,
  56:24, 89:3
path 72:19
patience 5:14, 5:17
Patrick 20:17
Paul 2:22, 27:6,
  34:19, 39:9,
  39:12, 45:8, 67:8,
  78:21, 96:4,
  104:10
pay 79:15, 81:23,
  82:9, 83:9, 84:8,
  99:18, 99:19,
  99:24

payables 114:16
paying 114:16
payout 116:2
PC 7:19
peace 43:13
Peaje 2:27, 33:10,
  34:8, 40:7, 40:10,
  40:16, 42:9
peers 13:23
pencils 18:12
pend 12:2, 12:10
pending 21:17, 24:7,
  32:22, 32:24,
  43:20, 68:2,
  68:11, 68:18,
  74:11, 74:21,
  76:23, 77:25
pension 102:9
pensions 115:23
perceive 117:23
perceived 29:8
percent 79:20,
  81:11, 81:19,
  81:20, 81:22,
  82:3, 85:14,
  85:18, 85:21,
  114:6, 115:23,
  116:4
perfect 13:10, 32:17
perfected 70:24
Perhaps 11:16, 13:1,
  15:14, 32:17,
  52:14, 52:15,
  52:16, 52:23,
  55:9, 90:2,
  107:12, 111:20,
  116:20
period 31:22, 32:8,
  37:11, 92:2
permanently 53:11
permission 24:22,
  37:10
permit 118:16
permits 22:3, 73:8
person 14:2, 39:2,
  62:3, 98:16,
  99:23, 103:24,
  106:12, 107:19
personal 23:9
personally 23:22

perspective 33:14
persuaded 106:9
persuasive 77:7
pertaining 71:10
Peter 3:17, 3:31,
  42:17
Philip 3:33, 50:4
phone 5:8, 5:21
PHV 2:20, 2:21,
  2:22, 2:23, 2:25,
  2:28, 2:35, 2:36,
  2:39, 3:4, 3:7,
  3:11, 3:15, 3:16,
  3:17, 3:20, 3:23,
  3:33, 3:34, 3:37,
  3:41, 3:43
pick 35:21, 98:14,
  107:7, 115:1,
  115:3
picking 98:4, 98:18
picture 54:6
pie 66:16, 66:17,
  66:18, 66:19
piecemeal 45:16,
  76:21
pieces 36:18
pitch 55:10
pivotal 72:12
place 32:19, 33:9,
  66:4, 69:1, 112:22
plainly 76:9
plaintiff 62:21,
  65:10
plaintiffs 62:20,
  63:19, 65:8,
  67:10, 74:23, 75:4
Planning 14:22
plans 12:19, 19:17,
  20:6, 105:25,
  112:9, 119:8
play 85:9
playing 32:5
pleading 69:25
pleadings 27:20,
  30:9, 31:23, 32:2,
  34:22, 62:3, 97:4,
  98:6, 108:18
Please 19:5, 19:9,
  20:11, 26:1,
  35:18, 39:3,

47:21, 51:11,
60:11, 60:13,
93:2, 111:14,
124:23
pleased 6:15
pledged 82:13, 82:14
pledger 82:15
plenty 99:11
Plimpton 6:23
plus 81:4
PM 124:11, 124:12
pocket 116:5
podium 20:11, 24:6,
25:22, 38:16,
39:1, 39:2, 60:12,
92:24, 95:25,
124:22, 124:23
Point 29:6, 30:7,
35:24, 37:17,
38:13, 48:21,
52:2, 52:12,
52:13, 57:9, 58:5,
59:11, 59:22,
62:15, 62:23,
63:23, 64:15,
65:25, 70:20,
71:20, 83:13,
83:14, 95:6, 96:6,
96:21, 101:11,
114:23, 118:19,
122:16, 123:21
point. 28:21, 30:16,
31:9, 31:21, 66:6,
107:22
pointed 89:17
pointing 124:23
points 9:12, 17:1,
27:15, 51:22,
54:7, 60:17, 65:1,
65:5, 66:9, 95:8,
96:7, 100:15,
106:6
policy-making 10:15
politely 104:12
Polkes 3:43, 86:7,
86:8, 89:16,
89:20, 90:11,
90:18, 95:7
pool 89:10
Portfolio 3:10

portion 8:9
position 16:20,
17:8, 17:22, 19:7,
21:5, 40:13,
44:12, 52:22,
59:7, 85:8, 86:8,
86:24, 87:23,
89:5, 89:9, 95:12,
95:15, 97:12,
97:15, 97:16,
117:10
positioned 77:4
positions 17:10,
106:20, 116:24,
117:7, 117:9,
118:5, 123:16
positive 6:12,
23:15, 25:13,
86:12, 114:12
possibility 44:15,
109:19, 122:17
possible 7:24, 10:9,
13:13, 19:3, 23:7,
35:10, 60:12,
60:16, 84:12,
86:6, 114:24
possibly 34:21,
56:2, 71:4, 75:23,
96:9
POSSINGER 2:22,
39:9, 39:11,
39:12, 39:13,
40:5, 40:9, 41:10,
41:16, 41:23,
45:8, 45:14,
45:18, 46:5, 46:8,
46:17, 46:20,
46:22
post 102:10
posted 8:24, 15:20,
22:10, 22:21
pot 84:21, 84:22,
84:23, 85:3
potential 44:21,
63:1, 76:1,
109:13, 117:24,
121:12
potentially 38:1,
116:7
poverty 43:1, 116:1

power 61:9, 61:10,
118:20, 121:23,
122:3, 122:25
practical 58:20,
87:21, 115:3
practice 14:13,
22:23, 76:24,
77:22, 77:25,
120:15
practiced 14:7,
21:23
practices 10:20,
30:24, 30:25
pre-petition 65:8
precautionary 7:23
precedent 58:14
precedes 66:17
preclude 112:5
predate 71:6
predicates 66:23
preempt 106:14
preferable 11:3,
11:7
Preferably 25:4
prejudgeship 14:20
prejudice 24:20,
24:23, 25:3, 25:9,
77:21, 107:15,
124:16
preliminarily 8:23
preliminary 9:12,
33:10, 52:23,
65:21
premature 63:5,
71:15
premise 74:4, 74:13
premised 121:5
PRESENT 2:9, 16:7,
16:8, 39:9, 40:10,
51:22
presented 6:3, 11:8,
11:13, 12:13,
14:12, 17:5,
75:13, 113:14,
122:17
presenting 21:5
presentment 49:16
presents 51:12
preserving 90:8
presided 15:9

presiding 23:13,
   67:23
press 5:6, 5:20,
   15:20
Presumably 16:22,
   36:10, 68:1
presupposes 86:22,
   88:8
pretext 84:8
pretrial 22:7, 23:2
pretty 65:22,
   110:22, 119:19
preview 108:1
previously 52:10
prewire 92:14
primarily 94:1
principal 21:14,
   95:22
principally 33:1
principle 26:9,
   43:14, 65:19,
   106:18
prior 7:17, 14:6,
   49:3, 67:24
priorities 105:11
priority 38:6
private 22:23, 29:1,
   104:13
privilege 88:18
pro 6:24
probably 30:1, 30:8,
   31:6, 31:12, 34:1,
   35:15, 52:18,
   52:22, 79:1, 82:5,
   114:17
problem 12:3, 53:17,
   105:2, 105:4,
   123:13
problems 74:13,
   106:10, 114:9
procedural 64:16,
   69:13, 79:13,
   102:14
procedure 10:14,
   34:3, 43:12, 48:6,
   48:8, 80:1, 82:7,
   82:21, 82:23,
   105:3
Procedures 8:8,
   8:13, 18:24,

25:23, 26:7,
   26:11, 55:20,
   66:4, 68:22,
   68:25, 69:2, 71:9,
   71:10, 78:5,
   81:24, 83:3, 84:6,
   85:10, 93:5,
   93:22, 94:2,
   104:7, 124:15
proceed 35:10,
   47:22, 51:11, 75:4
proceeding 33:12,
   69:4, 77:20, 78:1
processes 17:11,
   102:24, 103:10,
   103:22
processing 44:9
produced 3:47
productive 6:15,
   16:5, 43:13
professional 10:23
professionals 17:18,
   109:3, 116:10
proffered 84:13
profit 115:14,
   115:17
progress 5:25, 10:2
project 124:24
projections 95:2,
   114:10
prominent 21:24
promising 30:13
promotion 55:17
prompt 6:9, 120:12
proper 60:6, 98:9
properly 100:1
property 56:25,
   57:12, 57:14,
   57:15, 57:17,
   58:1, 60:19, 61:6,
   61:16, 61:24,
   61:25, 63:22,
   63:24, 75:6,
   75:17, 81:6,
   93:13, 105:7,
   116:15, 117:16,
   117:18
proposal 24:14,
   44:2, 47:25,
   50:15, 60:7,

84:25, 89:6,
   106:10, 106:24,
   107:17, 109:22,
   117:3, 124:16,
   124:19
proposals 93:22,
   95:21
propose 117:8,
   121:25
proposed 16:21,
   38:18, 39:23,
   41:5, 43:5, 46:13,
   48:13, 48:17,
   49:22, 55:20,
   59:15, 63:10,
   80:14, 90:22,
   90:23, 91:13,
   91:21, 92:17,
   93:5, 93:21,
   93:23, 94:2,
   94:14, 100:21,
   103:8, 103:22,
   109:18
proposing 59:13,
   102:24, 121:24
proposition 106:21,
   118:17, 118:19
prosecuted 65:9
prosecuting 113:5
prosecution 65:7
Proskauer 7:20,
   24:10, 39:13,
   60:15, 108:6
prospective 27:22
prospects 17:12,
   69:10, 119:18
protect 87:4, 87:5,
   87:14, 101:7,
   113:7
protected 113:1
protecting 85:21,
   85:22, 86:1,
   112:23
protection 55:15,
   55:21, 77:12,
   81:10, 82:25,
   83:10, 83:15,
   83:17, 83:20,
   112:19, 112:21
protections 113:22

protocol 45:20,
  55:19, 63:7,
  63:11, 65:13,
  92:6, 99:4
proven 93:11
provide 18:4, 38:1,
  54:3, 59:18,
  82:16, 90:22,
  101:21
provided 19:6, 45:22
provider 48:7
provides 105:9
provision 71:18,
  71:22, 95:19,
  107:4
provisions 42:7,
  42:8, 75:24,
  107:9, 107:11,
  121:20
public 5:6, 5:20,
  19:12, 99:18,
  102:8
pure 75:13, 75:21,
  96:6, 110:1,
  110:10, 110:15
purely 59:20
purple 67:5, 69:16
purports 84:14
purposes 38:8,
  61:17, 92:6,
  106:20
Pursuant 6:7, 40:11,
  68:25, 72:7
pursue 9:21, 16:23,
  60:25, 106:19
pursued 121:8
pursuing 109:11,
  124:2
put 6:14, 30:23,
  44:7, 52:22, 59:7,
  61:7, 65:18, 69:1,
  91:13, 96:2,
  101:18, 111:18,
  112:14, 117:13,
  119:19
putting 31:19
puzzling 68:8


< Q >

qualified 10:17,
  13:15
questions 9:13,
  11:2, 39:22,
  55:25, 56:2,
  56:20, 57:8, 62:1,
  63:15, 71:3,
  71:17, 83:13,
  116:17
quick 34:24, 60:16,
  71:17, 115:3
quickly 35:10,
  60:12, 99:9,
  100:7, 108:9
Quinn 62:7, 90:16
quirks 23:17, 23:19,
  23:23
quite 12:5, 48:1,
  52:11, 85:8
quote 23:17, 79:25,
  100:7


< R >

raid 112:14
raiding 86:23, 88:8
raids 112:9
raise 43:6, 67:12
raised 32:16, 35:22,
  59:17, 63:22,
  72:16, 74:15,
  76:25, 77:17,
  87:11, 91:24,
  95:7, 95:23,
  108:15, 112:20,
  120:18, 124:17
ran 83:12
range 22:1
rapid 6:1
Rapisardi 3:15,
  120:24, 120:25,
  121:1
ratchet 80:1
rather 33:8, 33:15,
  45:15, 49:7,
  49:19, 54:3,
  64:19, 75:22, 78:8
ratio 111:5
rationale 123:6
Re 1:6, 1:22, 1:38,

73:10
re-raise 37:10
reach 62:18, 64:18,
  120:7, 120:8
reached 26:9, 40:20,
  80:2
reaches 79:9, 121:15
reaction 29:12, 63:5
read 56:4, 58:1,
  85:3, 91:2, 98:6,
  107:1, 109:18,
  112:17
readily 19:12
reading 55:14,
  84:12, 85:2, 85:7
ready 73:18, 92:10
real 48:11, 52:7,
  82:24, 88:7,
  88:22, 91:5,
  92:13, 105:2,
  106:11, 108:22,
  122:16, 123:20
realize 69:25
Really 42:1, 53:3,
  54:16, 62:1, 65:5,
  65:12, 72:2, 87:9,
  87:11, 87:15,
  87:16, 91:21,
  95:19, 109:12,
  116:19, 117:14,
  118:11, 119:4,
  120:13, 122:20
reappointed 22:24
reason 28:8, 28:23,
  38:4, 65:17, 72:6,
  72:10, 76:7,
  87:18, 111:18,
  111:22, 111:25,
  113:2, 114:25,
  115:20
reasonable 114:8
reasoned 13:21
reasons 56:16,
  56:17, 58:8,
  58:20, 70:13,
  73:3, 84:3, 98:14,
  109:6, 113:18,
  114:1, 114:25,
  115:24, 116:3,
  116:11, 117:9,

120:14
rebuffed 88:17
rebuttal 50:18,
   50:23, 58:12,
   72:11
recall 26:24
received 13:24, 42:9
receiver 80:19,
   80:20, 81:2, 81:5,
   81:7
receives 81:2, 81:6
receiving 81:6
recent 57:4, 95:2
recently 8:15, 52:9
reception 6:12
recess 124:11
recognized 10:22,
   43:14
reconvene 38:22
reconvened. 124:12
record 25:2, 27:5,
   35:4, 62:7, 69:18,
   102:1
recorded 3:47
Recovery 57:23,
   85:15, 87:24, 88:2
recurring 119:14
recused 90:4
red 38:25, 79:9
reduce 12:15
refer 6:24, 7:2
referenced 93:24,
   93:25
referrals 6:7, 23:3
referred 23:6
referring 22:5
refers 107:6
reflected 94:3,
   94:15
reform 57:22
reformulate 118:7
reformulated 124:16
reformulation 124:18
refund 99:17
refunds 28:13, 99:19
regard 13:22, 86:24,
   88:24
regarding 8:13,
   16:11, 20:3,
   20:10, 39:22, 95:8

regardless 114:9
Region 2:16, 26:3
regular 49:14, 77:22
rehabilitation 103:5
Reiman 2:36
reiterate 50:10
related 6:6, 7:22,
   12:22, 102:10
relating 63:22
relational 107:18
relations 43:13
relationship 43:9,
   99:20, 106:12,
   116:18
relationships 7:25
relatively 43:21
relaxed 56:12
relevant 10:16,
   15:9, 35:14, 37:2,
   52:12, 105:11
relief 21:17, 27:22,
   28:10, 29:11,
   31:10, 31:22,
   46:15, 73:14,
   74:14, 76:16,
   77:11, 77:13,
   77:23, 88:19
relitigate 36:21
rely 69:25, 73:12
relying 95:9
remain 69:6
remaining 50:19,
   76:18
remains 24:7, 51:3,
   65:23, 90:14
remarks 8:16, 20:7,
   34:24, 39:3, 79:1,
   106:3
remedies 92:22
remember 34:21
remind 64:7
remote 124:21,
   124:25
remove 67:17, 67:19
renewal 124:16
renewed 120:15
renews 49:6
reopening 33:8
repeat 26:18, 57:7,
   59:12, 64:25,

70:14, 93:3,
   101:18
Reply 71:20, 94:16,
   95:7, 95:9, 96:2,
   109:15, 114:14
replying 96:2
report 119:13
reported 15:19
Reporter 126:15
repossession 45:12
represent 6:25,
   42:21, 70:18,
   101:20
representation 38:1,
   38:3, 97:3, 97:20,
   99:3
representative 1:13,
   1:28, 1:44, 8:14,
   25:21, 26:24,
   36:5, 75:6, 87:23,
   90:7, 97:7, 98:4,
   99:8, 102:5,
   102:20, 104:9,
   112:4, 115:19
representatives
   90:20, 92:18
represented 123:14,
   123:15
representing 47:1,
   116:7, 121:11
represents 115:11
reproach 113:9
reputation 109:9
request 8:12, 18:24,
   19:2, 19:3, 19:4,
   32:12, 33:5,
   33:21, 48:24,
   67:16, 68:17,
   68:20, 68:23,
   69:7, 77:18,
   77:21, 88:16,
   103:18, 109:22
Requested 1:27,
   1:43, 25:22, 49:4,
   76:16, 77:11,
   91:14
requests 20:2, 74:11
require 16:6, 19:19,
   46:10, 49:8, 74:22
required 11:23,

19:8, 68:15
requirement 84:5,
   109:19, 109:20
requirements 66:4,
   95:16
requires 22:2
reserve 36:24, 50:23
reserved 61:9
reserving 98:19
reset 90:13
residents 103:3
resolutions 9:3,
   19:16
resolvable 111:19
resolve 42:9, 44:22,
   46:19, 64:17,
   65:20, 68:2,
   68:10, 68:11,
   72:19, 90:23,
   94:20, 100:7,
   115:5
resolved 17:6,
   42:10, 43:10,
   58:23, 64:15,
   94:11, 94:19,
   94:25, 96:22,
   96:23, 99:6, 100:1
resolves 42:12
resources 60:22,
   61:13, 74:6,
   93:16, 122:19
respect 20:21,
   20:22, 30:24,
   31:1, 36:2, 36:8,
   41:18, 48:7, 49:7,
   55:19, 63:21,
   64:4, 65:13,
   66:15, 68:4,
   68:13, 70:1,
   82:12, 83:21,
   91:8, 92:20,
   105:10, 116:9,
   121:18, 122:15
respected 10:23
respectfully 101:12
respective 12:14,
   16:15, 16:21,
   17:10, 17:17,
   17:19
respond 33:22,

108:14
response 45:1, 48:3,
   53:7, 53:20,
   55:23, 81:1, 96:16
responsibility
   19:22, 22:5, 119:9
responsible 80:21,
   81:6
responsive 27:19,
   32:2, 37:9, 120:17
restructuring 58:21,
   102:20, 102:22
result 9:19, 36:21,
   67:13, 68:20,
   73:14, 74:14,
   74:17, 76:16,
   85:14, 95:14,
   98:20, 99:3,
   102:11
resume 124:7
retail 28:20, 30:22,
   31:1, 35:1
retain 38:20, 89:1
retained 21:2,
   29:24, 79:17,
   87:10
retaining 121:14
retains 81:7
rethinking 107:12
Retired 69:19, 102:3
Retiree 3:36, 30:4,
   102:11, 102:17,
   102:23, 102:25,
   103:12
retirees 102:6,
   102:25, 103:3,
   103:15, 103:17,
   103:20, 115:21,
   115:22, 116:10
Retirement 1:30
retroactive 71:4
return 7:6, 7:8,
   52:1, 87:6
Returning 11:6
revealed 96:13
revenue 81:7,
   122:11, 122:13
revenues 59:2, 59:5,
   74:6, 74:19, 81:3,
   82:22, 117:1,

119:24
reversionary 64:4
revert 64:8
review 19:2, 95:17
reviewed 39:6, 95:11
revised 43:5, 46:13,
   47:6, 47:7, 49:18,
   49:22
revisions 41:25
revisit 91:17
revoke 61:9, 61:10,
   64:5, 64:8
rewrite 49:12
Rican 14:17, 71:5,
   71:6, 81:17
Rieman 67:7, 71:25
Rifkind 34:19, 67:8,
   78:22, 96:5
rights 36:16, 57:13,
   57:14, 57:15,
   57:17, 58:1, 89:1,
   93:8, 93:13,
   105:7, 105:14,
   105:15, 105:18,
   122:14
ripe 66:2
rise 43:6, 102:13,
   124:10
risen 47:10
rises 20:8
risk 13:6, 54:1,
   122:8
risky 13:4
RNB 105:19
road 76:1, 122:4
Robert 3:37, 69:18,
   102:2
role 29:19, 29:21,
   29:22, 32:5, 115:8
roles 29:17, 29:18
room 122:24
rooms 12:4, 124:21
Rose 7:21, 24:10,
   39:13, 60:15,
   108:7
Rosenberg 2:35,
   34:18, 34:19,
   36:9, 37:18,
   37:21, 38:5,
   78:21, 79:10,

96:4, 105:15
round 42:8
row 67:2
Rule 17:23, 18:5,
   18:6, 25:2, 44:22,
   52:23, 56:4,
   70:22, 72:14,
   72:18, 76:2, 76:9,
   83:20
ruled 43:11, 82:11
rules 29:19, 56:12
ruling 36:12, 37:6,
   37:9, 52:17,
   54:19, 54:20,
   54:21, 55:1,
   72:12, 74:18,
   124:13
rulings 70:21
run 39:1, 52:4, 52:5
running 53:25, 58:9,
   124:1


< S >
S. 2:28
S/ 126:13
sale 30:25, 31:1
sales 30:25, 60:19,
   61:12, 79:15,
   81:20, 81:22,
   81:23, 82:9,
   110:2, 111:8,
   117:15, 117:17,
   118:13, 122:15
salient 106:7
San 5:1
sanctified 81:24
satisfaction 111:11
satisfy 86:25
Saturday 42:10
Saul 29:24
save 9:17, 11:9
saw 109:15, 123:3
saying 12:10, 19:21,
   29:18, 30:17,
   31:10, 36:2,
   36:24, 52:16,
   61:12, 61:14,
   66:2, 84:22,
   104:12, 109:6,

110:10, 112:16,
   119:24
says 30:23, 56:5,
   57:12, 61:5,
   71:19, 80:15,
   81:18, 83:22,
   85:13, 86:17,
   91:4, 92:1, 93:15,
   97:22, 97:24,
   98:1, 105:17,
   107:4, 110:7,
   113:4, 115:22,
   116:25, 117:3
scenario 53:24
scenes 19:11
schedule 21:12,
   32:25, 33:9, 98:7,
   98:14, 100:6
scheduling 32:16,
   69:9
scheme 111:9
school 42:23
schools 10:22, 42:24
scope 46:15
scratch 58:15
screened 7:9
screening 7:23
scrutiny 113:15,
   113:18
Sean 26:4
seat 90:5
Second 5:22, 10:5,
   11:3, 15:22,
   25:14, 29:11,
   35:8, 52:2, 55:10,
   58:16, 58:24,
   61:20, 73:11,
   73:16, 78:6, 80:8,
   89:20, 94:18,
   96:21, 101:11,
   111:6
Secondly 71:25
seconds 60:10, 71:13
Section 22:11,
   30:22, 45:22,
   60:18, 63:23,
   72:8, 73:5, 73:6,
   73:7, 80:24, 95:9,
   105:19, 107:6,
   121:19, 121:20,

122:14
secure 53:23, 82:20,
   93:18
secured 40:7, 40:18,
   40:20, 61:22,
   61:23, 83:16,
   101:6, 109:6,
   112:24, 112:25
securities 23:13
securitize 59:2
Security 54:3, 59:5,
   115:25
seek 33:22, 37:8,
   37:11, 43:2, 76:24
seeking 28:10,
   31:10, 54:22,
   65:7, 77:22, 115:6
seeks 74:17, 75:19
seem 94:15
seems 68:19, 84:12,
   93:7, 107:1
seen 30:8, 45:10,
   45:20, 46:9, 81:5,
   96:11, 97:4
sees 50:17
segment 69:22
segments 78:7, 78:9
SEIU 43:4
select 113:3
selected 11:4,
   13:14, 88:25
selecting 102:15
selection 103:9
selections 113:10,
   113:11
send 52:20, 53:4,
   55:5
Senior 14:4, 14:15,
   62:8, 83:6, 86:10,
   90:20, 92:18,
   92:22
Seniors 81:23,
   82:20, 83:2,
   83:22, 85:13,
   90:16
sense 13:10, 49:5,
   49:15, 85:20,
   88:9, 100:8
sent 8:5
separate 55:21,

73:9, 85:4, 87:1
September 7:5, 33:13
sequencing 66:20
serious 119:25
seriously 83:15
serve 10:13, 10:17,
  10:24, 13:16,
  17:16, 37:21
served 21:24
Service 3:30, 8:4,
  13:25, 42:19,
  48:7, 97:17, 98:2,
  112:11
serving 19:21, 84:15
session 16:7
sessions 16:8
set 32:20, 34:3,
  38:23, 48:5,
  50:11, 53:19,
  57:16, 79:6,
  82:20, 84:3,
  93:23, 94:23,
  98:14, 100:24,
  101:17, 106:2
sets 8:15, 48:6,
  84:7
setting 45:21,
  54:14, 55:10
settle 54:13, 54:15,
  60:6, 64:3, 82:1,
  82:8, 85:13,
  110:16, 117:19,
  117:21, 123:7
settled 86:2
settlements 111:3
seven 42:11, 78:8
seven. 48:22
Several 23:10,
  58:20, 75:15,
  101:13
shall 80:15, 93:15,
  105:17
shape 96:20
Sharon 2:25, 44:25
sharpen 18:11
she'll 21:9
short 13:15, 17:20,
  21:7, 32:6, 33:15,
  98:25
shorten 12:13

shortly 6:11
shoulder 19:23
shouldn't 29:2,
  59:7, 87:18,
  109:12
show 73:12, 79:16,
  95:3
shown 74:3, 76:16
shows 112:10
side 56:13, 88:10,
  93:9, 93:12,
  93:17, 101:6,
  106:15, 106:16,
  108:20, 109:5,
  110:11, 110:14,
  110:21, 110:22,
  111:15, 112:7,
  117:24, 121:8,
  121:9, 122:8,
  122:18
sides 15:15, 61:18,
  70:12, 100:19,
  110:14, 113:16
sight 66:23
signal 21:9
significance 95:19
significant 10:2,
  11:10, 14:18,
  41:25, 75:3,
  102:19, 103:6
significantly 103:15
signing 48:12
signs 80:15
Similar 10:3, 73:21,
  83:13, 98:11,
  102:16
similarly 68:19,
  112:6
Simon 42:18
simple 9:23, 85:12,
  103:18, 110:1
simply 20:5, 33:8,
  39:21, 63:6,
  86:23, 102:22,
  103:20, 108:10,
  110:16, 111:16,
  112:2
simultaneously
  117:19, 117:21
single 58:14, 92:15,

102:12, 102:20
sins 99:5, 99:6
Sir 20:11, 34:17,
  78:20
sit 84:11
sitting 10:10,
  13:10, 17:15,
  17:16
situation 45:5,
  80:10, 82:11,
  115:13
situations 116:19
six 71:21
size 31:11, 66:16,
  103:2
slightly 24:21,
  91:7, 104:25
slow 36:20, 105:23
slower 26:15, 27:8,
  65:2
slowly 26:19, 47:16
small 70:18, 114:12
smaller 84:21
smoothly 43:11
Snow 70:8, 104:25
so-called 98:12,
  100:24
Social 115:25
soft 55:9
sole 75:5, 87:23,
  90:8
solely 74:10, 76:7,
  118:3
solicited 23:11
solid 114:19
solution 11:7,
  17:18, 98:9
solutions 9:16,
  9:24, 19:15
solve 108:16
somebody 80:6, 98:15
somehow 66:7,
  101:14, 104:11,
  122:3
Someone 5:9, 20:8,
  41:1, 45:23, 86:1,
  91:18, 99:16,
  100:9, 119:5
somewhat 97:6
Sonnax 73:10

soon 8:8, 36:14,
    72:13
sooner 35:13, 37:3
sorry 20:13, 26:14,
    26:17, 40:15,
    40:23, 67:4, 78:6,
    121:24
sort 30:9, 33:22,
    44:2, 45:11, 49:6,
    90:12, 107:17
sorts 120:17
Sosland 3:23, 70:7,
    70:11, 104:24
sought 37:21, 46:16,
    74:14
Southern 14:5, 14:16
Spanish 23:20
spans 10:18
spark 80:18
speaking 11:1
special 14:23,
    122:11, 122:13
specific 9:13,
    10:16, 11:2,
    49:19, 87:9,
    87:11, 89:7, 95:21
specifically 51:20
spectacular 109:8
speculative 74:14
speed 65:4, 105:24,
    120:2
speedy 74:5, 77:6
spell 32:6, 47:18
spend 12:14, 51:23,
    96:19, 116:2
spinning 121:13
split 110:2
spoke 24:15
spoken 95:22
spurious 101:19
square 97:19
squeeze 114:18
staff 6:1, 91:2
stake 16:10, 16:19,
    82:24, 97:23
stand 83:8
standard 82:1, 83:1,
    83:25, 85:22
standing 41:20,
    42:15, 62:21,

62:25, 63:19,
    65:23, 67:2,
    67:12, 74:24,
    100:19, 104:14
standings 75:4
start 9:12, 78:10,
    78:17, 106:4,
    109:14, 109:17
started 61:22
starting 18:19,
    58:15, 116:5
starts 81:20
State 14:19, 14:24,
    41:22, 44:25,
    56:2, 57:1, 57:20,
    58:7, 64:1, 65:21,
    71:23, 99:2
statement 20:10,
    32:12
statements 20:5,
    21:5
States 1:1, 2:6,
    8:12, 8:18, 10:11,
    10:14, 13:2,
    13:20, 18:20,
    22:13, 25:21,
    26:5, 73:5, 73:7,
    76:9, 126:7
stating 88:19
status 8:9, 20:4,
    24:6, 74:19,
    119:13
Statute 11:19, 22:3,
    57:13, 58:17,
    60:21, 61:14,
    89:20, 105:16,
    107:4
Statutes 51:14,
    59:18, 105:9
statutory 83:15,
    107:21, 108:21,
    109:2, 109:5,
    111:11, 113:9,
    115:8, 122:10,
    122:12, 122:19
stayed 64:14, 67:24
stays 42:2, 42:4
stenography 3:47
step 12:25, 42:14,
    53:9, 60:1, 60:4

steps 37:13, 60:2,
    60:5
Stericycle 2:30,
    47:5, 47:10, 47:14
Steven 2:20
Stevens 83:13, 83:14
stipulation 77:22
Stockton 15:10
stood 91:10
stop 51:7
straight 79:14,
    103:18
strategy 121:8
straw-man 122:7
streamlining 44:2
strengths 17:9
stressful 45:5
strike 59:1, 94:21
strikes 123:20
strong 52:1, 56:18
strongest 55:12
strongly 123:16
Stroock 7:18
struck 63:11
structure 37:5,
    51:15, 59:16,
    107:18
structures 14:12
studying 100:3
style 23:9
subject 21:14,
    51:18, 57:19,
    60:22, 70:21,
    74:24, 75:9,
    75:11, 77:24,
    83:22, 104:7,
    109:16, 119:23
submission 24:8,
    26:23, 33:22,
    45:23
submissions 5:24,
    21:12, 21:13,
    39:6, 72:25, 74:1,
    106:8
submit 60:7, 85:24,
    100:20, 102:22,
    103:6
submits 88:18
submitted 63:10,
    80:4, 86:21

subordinated 92:20
subparagraph 30:23
subsequent 91:17
subsidiaries 115:10
substantial 43:17
substantially 12:12,
   13:8, 17:12, 18:8,
   19:16
substantive 18:1,
   21:4, 21:11, 70:12
succeed 111:13,
   111:24
successful 9:19,
   10:7, 54:10
suddenly 52:13
suffer 77:10
suffers 74:13
sufficient 49:1,
   74:24
suggest 33:3, 94:20,
   104:13, 105:6,
   123:1
suggested 94:14,
   100:6, 109:7,
   120:20
suggesting 118:10
suggestion 24:25,
   48:23, 86:11,
   101:13, 104:10
suggestions 109:10
suggests 41:21,
   96:14, 122:22
suit 75:4
suited 18:4
sum 52:11
summary 33:12
superseded 57:4
superseding 49:8
suppliers 99:16,
   99:18
support 24:15,
   24:16, 24:17,
   51:22, 53:9,
   74:24, 81:17,
   82:16, 93:22,
   94:2, 110:17,
   110:18, 117:14,
   121:2
supporters 78:18
supporting 70:22

supports 71:14,
   104:7
suppose 48:8
supposed 23:8,
   111:17, 117:15,
   117:17, 117:18,
   120:5
surplus 95:3
Surpreme 57:23
susceptible 75:20
Susheel 3:41, 62:7,
   90:15
suspect 66:8, 66:13,
   81:5
SUT 60:24, 74:6,
   93:13, 93:15,
   117:1
Suzzanne 3:16, 46:25
Swain 2:5, 9:8,
   11:14, 12:8,
   12:23, 15:21,
   17:23, 18:1,
   19:25, 22:15,
   22:21, 23:6, 24:2,
   126:7
sympathy 116:9
Syncora 6:25, 7:1,
   7:2, 7:11
synthesize 91:3
System 1:31, 10:15,
   14:3, 38:16


< T >
table 33:17, 88:10,
   90:5, 107:20,
   107:21, 118:4,
   122:8
Taft 94:8
taken. 124:11
talents 9:1, 10:9
targeted 33:7, 33:21
task 19:19
taught 10:20
tax 28:13, 59:2,
   59:5, 79:15,
   81:20, 81:22,
   81:23, 82:9,
   82:22, 99:17,
   99:19, 118:13

taxes 60:19, 60:22,
   61:13, 110:3,
   111:8, 117:16,
   117:17, 122:15
Taylor 2:5, 126:7
technical 5:15,
   72:16
technique 54:14
technology 38:16
telephone 124:25
tells 80:20
Ten 57:16, 71:13,
   90:13, 90:14,
   91:23
ten-day 92:2
tent 86:15
tenure 10:18
term 7:5, 33:15,
   100:23
terminating 25:3
terminus 61:15
terms 21:5, 26:10,
   32:9, 32:10,
   33:17, 35:8,
   35:24, 49:6,
   78:22, 86:17,
   87:21, 91:8,
   96:24, 108:17,
   111:7, 121:15,
   123:11
terribly 77:7
territory 60:21,
   64:1
test 97:21
Texas 8:18, 14:5
theirs 125:2
theme 66:8
themselves 50:19,
   62:20, 62:21,
   63:19, 93:19,
   98:20
theory 108:18
there'll 117:4,
   117:5, 120:21
thereabouts 48:25
thereof 118:20
they've 53:22, 88:1
thinking 110:11,
   110:13
Third 11:5, 13:17,

16:6, 54:6, 58:19,
  89:22
Thomas 3:34
though 28:22, 109:21
thoughtful 5:24,
  13:21
thousands 28:18
thread 123:19
threatening 55:3
Three 9:12, 11:1,
  29:15, 39:20,
  39:23, 51:1, 51:8,
  51:22, 54:6,
  71:17, 73:18,
  79:2, 97:9
threshold 65:20,
  71:1
threw 57:23, 122:5
throughout 16:7
throw 69:12
ticking 92:12
tidbit 25:13
tie 67:4, 67:5,
  69:16, 71:25
tied 118:1, 123:25
ties 7:14
tilt 77:8
time-consuming 12:25
timer 38:23, 78:7
timetable 45:22,
  120:12, 120:20
timing 20:25, 49:13,
  52:11
Timothy 2:23
tirelessly 19:15
today 9:9, 11:1,
  20:4, 27:18,
  31:13, 36:11,
  36:13, 36:24,
  38:21, 44:12,
  48:1, 48:5, 48:12,
  53:4, 63:8, 70:20,
  73:1, 73:2, 83:8,
  93:18, 97:17,
  106:9, 107:15,
  108:18
together 22:7,
  42:21, 97:5, 97:6,
  107:17, 123:20
Tom 13:17, 78:12

tomorrow 34:9,
  38:22, 48:25
took 13:18, 91:1,
  91:7
tools 54:12, 55:12
top 10:22
torpedo 87:15
total 50:18, 69:21
totally 118:14,
  119:14
touched 37:18
toward 33:12, 79:1,
  124:24
track 6:15
trade 28:12
train 92:5
Transcript 3:47,
  126:4
transcription 126:5
transfer 61:8, 72:7,
  77:18
translate 23:19
transparency 66:14,
  121:7
Transportation 1:47
traveling 47:25
treated 57:20
trial 11:22, 54:14,
  54:19, 73:18
tried 14:11, 23:11,
  62:13
tries 119:17
true 81:3, 83:8,
  97:11, 109:21,
  112:9, 126:5
TRUJILLLO 70:17
Trujillo 3:26,
  70:18, 71:12
truly 16:25, 19:7,
  39:4, 90:7, 99:12,
  107:14
trust 19:13, 61:5,
  61:7, 61:9, 61:10,
  61:11, 83:19,
  83:21
Trustee 2:15, 8:12,
  18:20, 25:21,
  25:25, 26:2, 26:3,
  26:6, 26:17,
  26:20, 38:4,

62:24, 109:2
try 27:15, 28:4,
  39:4, 58:5, 58:12,
  78:23, 86:6,
  87:24, 89:21,
  90:14, 90:19,
  91:4, 96:5, 114:8,
  114:20, 115:5,
  117:20, 120:16
trying 28:6, 36:6,
  108:9, 112:16,
  113:7, 113:24,
  115:14, 115:17,
  118:22
turn 8:9, 12:15,
  38:13, 58:4, 109:1
turned 45:25, 65:3
turning 6:19
Turnkey 3:26
Tweed 35:19, 64:24
twice 22:24
Two 7:16, 8:10,
  9:12, 18:16,
  18:21, 21:2,
  25:13, 29:16,
  34:24, 35:20,
  39:17, 41:20,
  42:21, 43:3, 49:3,
  50:17, 60:24,
  65:5, 69:21,
  91:12, 92:8,
  94:10, 97:13,
  100:3, 100:15,
  114:1, 116:11
type 98:24, 100:6,
  110:3, 110:23
types 23:1


< U >
U-n-a-n-u-e 73:23
UAW 43:4
UBS 91:22
UHLAND 3:16, 46:25,
  47:1, 47:3, 47:4,
  48:17, 48:20,
  48:22, 49:1,
  49:10, 49:12,
  49:20, 49:23
ultimate 55:4,

103:4, 117:8,
117:25
ultimately 64:2,
92:16, 96:24,
97:2, 98:15, 99:7
unanimous 24:17,
120:11, 120:16,
120:19
Unanue 73:22
uncertain 13:4
uncertainty 11:11,
12:22, 13:5, 98:23
unclear 32:19
unconflicted 99:12
uncontested 25:15,
38:14, 39:9,
39:18, 39:21,
41:20, 41:22
underfunding 102:8
underline 105:18
underlying 66:23,
67:12, 70:12,
105:8
undersecretary 14:25
understand 6:23,
17:9, 17:18,
17:21, 19:7,
29:16, 43:24,
44:11, 53:21,
89:23, 95:18,
109:18, 112:16
understanding 41:19,
42:11, 88:18,
108:15
Understood 45:18,
118:10
unexpectedly 52:14
Union 3:29, 42:19,
42:20
unionized 43:15,
43:16
unions 28:14, 42:21,
43:2, 43:3
unique 15:2, 15:11
uniquely 10:17,
13:15
United 1:1, 2:6,
3:28, 8:12, 8:17,
10:11, 10:14,
13:2, 13:20,

18:20, 22:13,
25:21, 26:5,
42:20, 73:5, 73:7,
126:6
units 14:20, 99:20
universal 32:17
unjust 43:22
unless 20:7, 29:22,
45:23, 57:8, 61:8,
64:2, 70:21,
83:17, 84:22,
92:13, 95:24,
110:18
unlike 119:20
unlikely 66:9, 76:4
unopposed 45:25
unprecedented 9:4
unrepresented 28:24
unreviewable 97:18
Unsecured 3:20,
8:15, 20:18,
26:25, 27:6,
28:17, 35:2, 35:6,
38:6, 38:9, 91:11,
92:3, 103:9,
103:16, 108:21,
122:23
unsecureds 37:20
unsettled 58:13
unsuccessful 17:24
unsure 35:23
until 7:13, 45:19,
46:3, 48:25,
54:16, 57:18,
93:11, 123:3
upcoming 54:19
updated 39:18, 42:11
Urban 15:1
urge 72:11, 84:3,
107:16
urged 107:14
urgency 53:7
urgent 20:8, 20:9,
52:15, 72:12,
72:13
urtext 53:17
useful 18:7, 68:2,
68:10, 68:11
using 38:16
utilities 46:22

< V >
vague 117:5
valid 51:15, 57:16,
59:16
validated 83:10
value 12:17
valueless 93:11
variations 106:24
variety 76:22
various 10:23, 15:3,
23:12, 27:18,
27:22, 31:16,
31:18, 34:22,
35:5, 55:16,
76:24, 95:13,
102:15
vehement 78:16
vehicle 63:6, 64:17,
67:14, 107:1
versus 34:4
veto 79:23, 79:25,
87:10, 89:1, 98:4,
110:4, 110:12
vice 6:24
Victor 14:15
view 7:25, 30:12,
76:6, 84:7, 86:11,
108:8, 122:12
viewpoint 119:7
vigorously 118:17,
118:19
violate 97:13, 97:14
violation 112:13
violations 43:18
visible 19:12
voice 38:1, 90:3
voiced 112:1
voices 43:3
voluntariness 16:16
voluntary 16:13
vote 105:25


< W >
wait 27:1
waived 83:16, 83:23
waiver 83:18
Walker 126:13,

126:14
wall 23:16
Walter 2:36, 67:7
wanted 20:22, 26:25,
   27:22, 35:21, 43:7
wants 32:13, 37:8,
   41:1, 50:13, 56:9,
   103:24, 113:19,
   119:22
war 30:9
warn 51:6
warranted 66:5
warrants 58:6
wasting 16:1
waterfall 36:16,
   84:24
ways 76:24, 110:15
weaknesses 17:10
wearing 89:4
website 8:25, 22:11,
   22:22
week 19:1
Weekly 23:10
weeks 6:1, 33:16,
   49:3, 100:10
weigh 91:12
Weil 86:8
Weise 2:20
Weiss 34:19, 42:18,
   67:8, 78:21, 96:4,
   104:10
well-founded 91:20
well-respected
   13:19, 21:22
West 83:13, 83:14
Wharton 34:19, 67:8,
   78:22, 96:5
whatever 31:23,
   37:9, 53:12,
   68:25, 71:8,
   84:17, 86:16,
   89:25, 98:2, 98:8,
   112:25, 116:21
whatsoever 97:10
Whereas 54:25
whichever 51:18
White 100:13
whoever 79:19
whole 115:15
whom 51:20

Wickersham 94:8
wide 22:1
willing 101:7,
   107:24
willingness 44:13
win 81:14
winner-take-all
   123:10
winning 81:12, 81:19
wish 15:22, 18:23,
   119:16
wishes 20:9, 47:9
wishing 20:2
withdraw 24:19,
   24:22, 25:1, 25:8,
   40:12
withdrawn 40:8, 78:2
within 36:16, 38:17,
   45:22, 50:12,
   52:14, 52:17,
   91:23, 92:23,
   121:20
without 15:19,
   24:20, 24:23,
   25:3, 25:9, 38:21,
   66:10, 77:21,
   107:15, 114:5,
   122:4, 124:15
withstanding 93:21
WITNESSES 4:3
word 63:11
words 8:19, 21:21,
   27:13, 90:3
work 5:15, 7:22,
   8:1, 9:2, 11:5,
   19:11, 19:14,
   19:24, 22:7,
   42:24, 44:17,
   46:10, 55:12,
   82:6, 87:7, 88:9,
   88:16, 99:11,
   107:16, 113:17,
   119:6, 119:7,
   119:20, 124:18
worked 26:6, 90:19
Workers 3:28, 42:20,
   42:23
workforce 43:15,
   43:16
working 5:18, 7:9,

7:16, 22:18, 24:1,
   46:18, 49:2,
   119:17, 122:6
works 80:2, 83:7,
   85:16, 85:17,
   88:23, 98:8, 110:8
world 30:2, 83:7,
   119:21
worried 110:3
worse 111:15
wrap 99:13, 99:14
write 23:14
writing 8:5
written 8:7, 122:21
wrote 23:15


< Y >
year 30:3
years 7:14, 7:21,
   10:19, 21:3,
   21:25, 22:23,
   23:10, 56:24,
   57:4, 57:16, 81:4,
   95:14, 100:4,
   100:9, 118:2
yellow 38:24, 50:12,
   65:4, 78:8
Yesterday 6:25,
   20:24, 29:24,
   39:18, 42:7, 45:4,
   90:25
York 5:13, 5:21,
   14:16, 14:21,
   14:22, 14:23,
   14:25, 18:17,
   32:22, 69:4


< Z >
Zakia 3:11, 50:8,
   51:4, 59:11,
   100:13
zealously 87:4,
   87:5, 87:14, 87:24
zero. 82:16