1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF PUERTO RICO
 2

 3    In Re:                          )
                                      )
 4    THE FINANCIAL OVERSIGHT AND      )
      MANAGEMENT BOARD FOR PUERTO RICO, )
 5                                     )
          as representatives of        )   No. 17 BK 3283-LTS
 6                                     )
      THE COMMONWEALTH OF PUERTO RICO,  )
 7    et al,                           )
                                      )
 8              Debtors               )
      ------------------------------  )   Pages 1 - 100
 9                                     )
      THE BANK OF NEW YORK MELLON,      )
10                                     )
                Plaintiff             )
11                                     )
           v.                          )   Adv. Proc.
12                                     )   No. 17-133-LTS in
      PUERTO RICO SALES TAX FINANCING   )   17 BK 3284-LTS
13    CORPORTION (COFINA), et al,       )
                                      )
14              Defendants            )

15

16                          HEARING

17          BEFORE THE HONORABLE JUDITH GAIL DEIN
                UNITED STATES MAGISTRATE JUDGE

18

19

20                          United States District Court
                            1 Courthouse Way, Courtroom 18
21                          Boston, Massachusetts  02210
                            July 5, 2017, 10:43 a.m.
22

23       LEE A. MARZILLI and KELLY MORTELLITE
                OFFICIAL COURT REPORTERS
24          United States District Court
            1 Courthouse Way, Room 7200
25              Boston, MA  02210
                  (617)345-6787
```

A P P E A R A N C E S:

     SUSHEEL KIRPALANI, ESQ., Quinn Emanuel Urquhart &
Sullivan, for COFINA Senior Bondholders' Coalition.

     RAFAEL ESCALERA, ESQ., Reichard & Escalera, for COFINA
Senior Bondholders' Coalition.

     BRANT DUNCAN KUEHN, ESQ., Quinn Emanuel Urquhart &
Sullivan, for COFINA Senior Bondholders' Coalition.

     ANDREW M. LEBLANC, ESQ. and GRANT R. MAINLAND, ESQ.,
Milbank Tweed Hadley & McCloy, for Ambac Assurance
Corporation.

     DAVID M. SCHLECKER, ESQ. and C. NEIL GRAY, ESQ.,
Reed Smith, for Bank of New York Mellon.

     SALVATORE A. ROMANELLO, ESQ. and JARED R. FRIEDMAN, ESQ.,
Weil Gotshal & Manges, for National Public Finance Guarantee
Corporation.

     LUC A. DESPINS, ESQ., Paul Hastings, LLP, for Official
Committee of Unsecured Creditors of the Commonwealth of
Puerto Rico.

     KENNETH R. DAVID, ESQ., Kasowitz Benson Torres, for the
Whitebox Funds.

     MR. RANDALL OPPENHEIMER, ESQ., PETER FRIEDMANN, ESQ.,
and DANIEL L. CANTOR, ESQ., O'Melveny & Myers, for the
Non-Debtor Governmental Actors.

     ELLEN M. HALSTEAD, ESQ., Cadwalader Wickersham & Taft,
for Municipal Corp.

     TIMOTHY W. MUNGOVAN, ESQ., Proskauer Rose, for the
Financial Oversight and Management Board for Puerto Rico
(FOMB).

1          P R O C E E D I N G S

2          THE CLERK:  You may be seated.  The United States

3    District Court for the District of Puerto Rico is now in

4    session.  The United States Magistrate Judge Judith Gail

5    Dein is presiding in Massachusetts in the matters of In Re:

6    The Financial Oversight and Management Board for Puerto

7    Rico, as representative of the Commonwealth of Puerto Rico,

8    et al, Bankruptcy No. 17-3283-LTS, and also in the matter of

9    In re:  The Financial Oversight and Management Board for

10   Puerto Rico, as representatives of Puerto Rico Sales Tax

11   Financing Corporation, also known as COFINA, Bankruptcy

12   No. 17-3284-LTS, and also in the matter of the Bank of New

13   York Mellon as Trustee Plaintiff v. Puerto Rico Sales Tax

14   Financing Corporation, COFINA, et al, Adversary

15   Proceeding 17-133-LTS.

16          THE COURT:  Good morning, everyone.  Welcome to

17   the latest location for sitting of the Court of Puerto Rico,

18   and welcome to those who are listening in various locations.

19          I hope everybody is here ready to work today, all

20   right, because I have all your pleadings.  I know you had a

21   nice relaxing weekend -- I did not -- but I've been through

22   all of it, but now we're getting down to some real work on

23   some real cases that need to be resolved.  The summary

24   judgment deadlines are real, these are real disputes, and

25   we're going to need to figure out how to get from here to

1    there in a short amount of time.

2         I think, just scheduling things, we're going to

3    break at 12:00 to 1:00 for lunch to accommodate the schedule

4    in Puerto Rico.  I ask everybody to talk in their

5    microphones, and it's probably easiest, at least at the

6    beginning, to use the podium, and then we'll see.  And I

7    will ask my standard discovery question:  Has everybody

8    resolved all their disputes over the weekend?  And I see no

9    one raising their hands.  I do see a lot of laughter.

10        Okay, so I think it makes the most sense for me,

11   actually, to start with the bank's dispute with the COFINA

12   Senior Bondholders' Coalition, and just, as usual, identify

13   yourself when you speak.

14        MR. KIRPALANI:  Thank you, your Honor.  Nice to

15   see you again.  Susheel Kirpalani of Quinn Emanuel Urquhart

16   & Sullivan on behalf of the COFINA Seniors Bondholder

17   Coalition.

18        THE COURT:  And wait.  Who's from the bank?

19        MR. SCHLECKER:  Your Honor, David Schlecker from

20   the law firm Reed Smith representing the Bank of New York

21   Mellon.

22        THE COURT:  Okay, do you want to go first?

23        MR. SCHLECKER:  I think it makes more sense.

24        THE COURT:  Let me hear from him first.

25        MR. SCHLECKER:  Thank you, your Honor.  The

1  discovery motion that the Bank of New York Mellon has -- and

2  just let me say at the outset that we have been successful

3  in resolving all discovery disputes with all other parties

4  except for the Senior Bondholder Coalition, and the

5  discovery dispute that we have with them is very specific

6  and straightforward.

7          THE COURT:  So does that mean Ambac has been

8  resolved?

9          MR. SCHLECKER:  Yes, your Honor.  As of just, I

10  think it was yesterday, last night, the dispute with Ambac

11  has been resolved, which leaves only one dispute.

12          THE COURT:  All right, I'm one for one.  Go.

13          MR. SCHLECKER:  The dispute concerns the

14  Coalition's refusal to produce documents in its possession

15  that pertain to the Whitebox entities, et al.  They simply

16  refuse to do so on the grounds that we perhaps should be

17  able to get those documents from Whitebox itself directly.

18          The other aspect of the dispute concerns our

19  request that the Senior Bondholder Coalition turn over

20  documents relating to Ambac, another defendant in this case.

21  The Coalition, however, has taken the position that it would

22  only produce Ambac documents from May 1, 2017, to date; in

23  other words, from two months ago to date.  The reason they

24  claim not to produce Ambac documents is because they believe

25  that the only relevant dispute concerns the events of May 1,

1     2017, and therefore they're not willing to produce documents

2     prior to that time pertaining to Ambac.

3             Your Honor, in terms of these arguments, we've

4     cited cases to the Court in terms of how it is perfectly

5     appropriate to request similar documents from different

6     parties in this case.  Indeed, doing so insures that we get

7     a fulsome production with respect to the Whitebox documents

8     as well as the Ambac documents.  With respect to --

9             THE COURT:  But let me ask, did you go directly to

10    Whitebox?  Have you received documents from them?

11            MR. SCHLECKER:  Well, we certainly have requested

12    documents from Whitebox.  They have responded, but we have

13    resolved any dispute we have with Whitebox.  We haven't seen

14    their production yet, and we hope that it's all there is,

15    but we don't know for sure.

16            THE COURT:  And you've agreed on parameters with

17    them?

18            MR. SCHLECKER:  Oh, yes, yes.

19            THE COURT:  Okay.  And so you're seeking the same

20    types of documents through the Coalition?

21            MR. SCHLECKER:  Yes.  What we're seeking is

22    certainly the communications between members of the

23    Coalition and Whitebox, communications between the members

24    of the Senior Bondholder Coalition and Ambac, as well as,

25    you know, whatever other documents that might pertain to the

1   requests that we have provided, the document requests that

2   we have served on them.  And we do believe -- we're

3   producing documents from January 1 of 2015 to date.  We

4   think it's appropriate for the Senior Bondholder Coalition

5   to do a search that spans that period of time, particularly

6   since other defendants, including Whitebox and Ambac, they

7   have taken the position that events going as far back as

8   2015 are relevant to these proceedings.

9          THE COURT:  So that's one of the issues that we're

10  going to need to resolve today is sort of how far back it

11  goes for everyone.  Let me deal with them separately,

12  though.  On the repeat documents, is what you're asking for,

13  do you expect the Coalition to produce documents from other

14  members of the Coalition besides Whitebox for these Whitebox

15  communications?  Is that the issue?

16         MR. SCHLECKER:  Well, we're expecting them to

17  produce the documents -- the members of the Coalition should

18  produce documents in their possession to the extent that

19  there are communications between those members and Whitebox,

20  between those members and Ambac, and obviously among

21  themselves that pertain to the particular requests.

22         THE COURT:  Okay.  And for the timing, I recognize

23  that you've agreed to produce back to 2015, but I'm actually

24  not sure that's the right scope, so let me make that clear.

25  But I'm assuming that you don't really care, provided that

1    it's uniform.

2              MR. SCHLECKER:  Correct, your Honor.  I mean, all

3    I can say is, other parties have claimed that events

4    starting as far back as 2015 are relevant and have sought

5    discovery from Bank of New York Mellon as well as other

6    parties, and therefore, you know, whether it's relevant is

7    not for our determination obviously.  It's ultimately the

8    Court's determination as to what constitutes documents that

9    will eventually be heard and relevant, but we're prepared to

10   do that.

11             THE COURT:  The bank itself didn't take the

12   position that 2015 events or 2016 events constituted events

13   of default?

14             MR. SCHLECKER:  That's correct.  Indeed, we

15   certainly did not take that position.

16             THE COURT:  Okay.

17             MR. SCHLECKER:  Thank you.

18             THE COURT:  Now...

19             MR. KIRPALANI:  Thank you, your Honor.  Again,

20   Susheel Kirpalani for the record on behalf of the COFINA

21   Senior Bondholder Coalition.  My colleague, Brant Kuehn, is

22   going to address the discovery disputes today, and my

23   cocounsel from Puerto Rico would like to have some one-minute

24   opportunity to address the Court on just some Puerto Rico

25   transparency issues that are germane really to our motion,

1   not this motion.  But to try to address, I want to

2   contextualize what the Bank of New York's position is with

3   respect to our Coalition before Mr. Kuehn can address the

4   specifics of our position on the discovery because your

5   Honor is maybe a bit new to this.  I'm sure you had a very

6   busy weekend reading and catching up, but with respect to

7   Bank of New York's position, the COFINA Senior Bondholder

8   Coalition began in the spring of 2015 with a handful of

9   holders holding a couple hundred million dollars of COFINA

10  senior bonds.  Today we're eleven institutions, asset

11  managers, with over $100 billion of assets, so just to give

12  you a sense of scale of how large these institutions are.

13  Among them -- and we hold in excess of or approximately

14  $2.5 billion of the COFINA senior bonds.  Among the eleven

15  institutions is Whitebox, and our Coalition works with other

16  senior bondholder representatives like Ambac and National

17  trying to coordinate efforts and things of that nature.

18          For purposes of the Bank of New York litigation,

19  this piece of the Title III case, Whitebox is separately

20  represented by counsel, and our Coalition disagrees with

21  some of the things that Whitebox has advanced in terms of

22  issues in dispute.  And so what the Bank of New York I think

23  may be confusing is, the remaining ten institutions who do

24  not take certain positions are willing to provide discovery

25  on the positions that we are taking, which are germane to

1   the event of default in this phase of the litigation; but

2   beyond that is a scope issue that in fairness and in

3   proportionality to the other ten institutions that we

4   represent who have internal counsel, regulatory counsel,

5   their own computer servers to search, it's just a huge

6   burden.  But if I could defer to Mr. Kuehn on the specifics

7   of the back-and-forth with Mr. -- I think it's Schlecker on

8   behalf of the Bank of New York, I think that might be

9   illuminating.

10          THE COURT:  All right, I don't need all of your

11  details of how you've communicated this, all right, back and

12  forth.  I do need to know sort of where you are, and I need

13  to understand, given that there are these ten other

14  institutions, is it your understanding that you would be

15  producing communications from each one of them, or is there

16  a central organization that sort of gets copied on

17  everything?

18          MR. KUEHN:  Your Honor, Brant Kuehn.  There is no

19  central organization that's copied on all of these emails.

20  As such, we need to search the emails of each of the

21  clients.  I just want to put something in context here, and

22  that is that the Coalition has already agreed to run a

23  substantial list of search terms across documents in

24  response to the Bank of New York's request for the more

25  limited time frame that we have agreed upon.  So the dispute

1    is really only about these narrow two terms, which

2    Mr. Kirpalani has already explained the additional burden.

3              The other point I would like to make is that what

4    we're talking about here is Phase 2 of the litigation,

5    Phase 2 of this proceeding; and I'm sure you're well aware

6    that the issues in Phase 2 are whether there has been an

7    event of default, whether that has been cured, and whether

8    the bonds can be accelerated.  In addition, there's Phase 3

9    that's coming in the future which relates to whether Bank of

10   New York should have accelerated, should have declared an

11   event of default earlier.  It's my position that the

12   documents that the Bank of New York seeks with respect to

13   the Ambac communications and the Whitebox communications

14   really relate at their heart to Phase 3 and not to Phase 2.

15             THE COURT:  Because of the timing or because of

16   the content?

17             MR. KUEHN:  Because of the content.  An event of

18   default occurs based on what the government parties do, not

19   based on what the creditors do.  So to the extent that we're

20   discussing whether there's been an event of default and we

21   need to litigate that, what's relevant are documents that

22   are created and come from the government parties.

23             THE COURT:  But presumably he's asked you for

24   documents that say:  Have you discussed this?  What's your

25   position on, has there been a default in 2017?  I assume

1     that the event of default that's being discussed are sort of

2     this failure to defend and otherwise safeguard these assets.

3            MR. KUEHN:  Correct.  And with respect to the

4     documents dated from May 1, 2017, to date, which we believe

5     are the key documents for the purposes of Phase 2, we have

6     agreed to produce those.  The issue is the earlier time

7     frames.

8            THE COURT:  All right, so tell me why May 1 as

9     opposed to January 1, 2017, in the 2017 context.  I

10    understand the 2015, 2016, and we'll talk about that in the

11    context of the other motions, but why May 1?

12           MR. KUEHN:  That was the result of negotiation

13    with the Bank of New York, who agreed on that date with us.

14    The date was selected because, again, our position is that

15    creditor documents --

16           THE COURT:  I truly have never been told to be

17    louder, never ever.

18           MR. KUEHN:  Our position is that creditor

19    documents have limited relevance to the questions of whether

20    there's been an event of default, but out of a good-faith

21    effort to come to an agreement with Bank of New York, again,

22    we agreed to produce substantial documents from a later

23    date, which is the events of default that we believe are

24    most relevant.  And once those events of default had been

25    noticed, that's where we believe that creditor documents

1    could become more relevant.  And, again, that date was one

2    that the Bank of New York agreed to with respect to every

3    other search term and every other document request other

4    than Ambac and Whitebox documents.  And, again, those are

5    the two parties that have filed lawsuits against Bank of New

6    York, which we believe is why those documents are relevant

7    to Phase 3, the question of Bank of New York's potential

8    liability, not the question of whether there's been an event

9    of default.

10          THE COURT:  All right.  And what about the claim

11   that they're repetitive or they get them straight from

12   Whitebox?

13          MR. KUEHN:  That really comes down to

14   proportionality.  I would agree that it is not a de facto

15   rule that simply because you can obtain documents from one

16   party you can't obtain them from another.  That's really not

17   the core of why we think it's unnecessary to produce those

18   documents.  It's just part of the analysis of why we think

19   it's not proportional.

20          THE COURT:  But you are running the search terms,

21   so I don't have anything here that says adding the Whitebox

22   search term substantially increases the burden.

23          MR. KUEHN:  It's simply a matter of the additional

24   date range.

25          THE COURT:  Okay, so we're focusing on the date

 1      range, not on the --

 2              MR. KUEHN:  Correct.

 3              THE COURT:  Okay.  All right, do you want to be

 4      heard on just the date range?

 5              MR. SCHLECKER:  Sure.  Shall I do it from here?

 6              THE COURT:  Yes, and you can remain seated if

 7      you --

 8              MR. SCHLECKER:  Thank you, your Honor.  Just very

 9      briefly, with respect to the date range, I will read to you

10      the scheduling order that was put in place in this case.

11      The very first paragraph specifically states, "The following

12      deadlines shall apply to the stage of this adversary

13      proceeding in which the Court will determine the parties'

14      respective interests in the disputed funds, including

15      whether, and if so when, an event of default occurred on

16      government resolution."

17              The fact that Judge Swain indicated when, not just

18      whether, to me indicates that it is quite unclear as to

19      whether she believes that events prior to May 1, 2017, are

20      at issue.  And I think it's not appropriate for the Senior

21      Bondholder Coalition to unilaterally say that because they

22      take the position that it's only as of May 1, 2017, is the

23      relevant date, that that's all they're going to search, and

24      especially since we know that other parties in this case

25      have taken the position that facts prior to that are

1    absolutely in dispute and at issue in this Phase 2 proceeding.

2         THE COURT:  So this is the question that I have,

3    and maybe you can help me with it.  It seems to me we need

4    to limit in this Phase 2 the events of default that we're

5    talking about because otherwise we will never get to summary

6    judgment, so let's make that clear.  It also seems to me

7    that if there is an event of default in 2017, then that is

8    critical; and whether there were other events of default

9    earlier may relate to the bank's failure or decision not to

10   call an event of default, but as far as the allocation of

11   funds isn't going to matter.  I mean, the 2017 is really the

12   core issue.

13        What I don't get a sense of is whether there's a

14   difference between sort of January 1, 2017, or March 30,

15   2017, you know, the fiscal plan.  Is that the critical date?

16   Does it make sense to go back to January 1, 2017, sort of

17   for everything here?  The May I don't really understand.

18        MR. SCHLECKER:  Your Honor, certainly the Bank of

19   New York doesn't take the position that anything prior to

20   May 1 or May 4 of 2017 has any bearing at all on any of

21   these matters.

22        THE COURT:  Okay.

23        MR. SCHLECKER:  So if your Honor wants to get

24   clarification as to why the earlier date ought to be

25   appropriate in terms of Phase 2, I really suggest that some

```
 1    of the other parties need to be involved in the discussion.

 2               THE COURT:  All right, so why don't --

 3               MR. SCHLECKER:  Specifically Whitebox and Ambac.

 4               THE COURT:  All right, I don't want them to talk

 5    yet.

 6               MR. SCHLECKER:  Okay.

 7               THE COURT:  Do you want to respond?

 8               MR. KUEHN:  I suppose I can speak here?

 9               THE COURT:  Yes.

10               MR. KUEHN:  Your Honor, if it would simplify the

11    proceeding, I think that we would agree to produce the

12    Ambac- and Whitebox-related documents going back to a date

13    before May 1, and we think that the appropriate date, if

14    we're working on these date issues, for the creditor

15    production, for our production, could be the date that the

16    fiscal plan was announced, which would be in March, 2017.

17               THE COURT:  Let's do that.

18               MR. KUEHN:  Thank you.

19               THE COURT:  All right, so as I understand it,

20    there's really no question of this duplicative issue.  That

21    seems to have faded away.  So for Ambac and Whitebox, you'll

22    go back to -- what did I say, March 13?

23               MR. KUEHN:  Sure, March 13.

24               THE COURT:  2017, okay?  Am I two for two?  There

25    you go.
```

1           All right, so then I guess we're up to the Senior

2     Bondholders' requests.  Who's doing that?

3           MR. KUEHN:  Your Honor, at root, the government

4     parties' refusal to produce documents in response to the

5     COFINA senior parties' request is really just an attempt to

6     relitigate the Court's June 6 discovery order setting the

7     scope of discovery or setting the process for resolving the

8     issues in this Phase 2 of the interpleader action.  On

9     June 1 and June 2, the government parties submitted motions

10    to the Court asking the Court to avoid discovery altogether

11    and simply move directly to dispositive motions, arguing

12    that the question of whether there had been an event of

13    default, which is the key portion of Phase 2 of this

14    litigation, could be decided exclusively on public

15    documents.  Obviously four days later the Court decided that

16    that wasn't the case and ordered document discovery as well

17    as depositions.

18           In order to justify the refusal to produce

19    documents, the government parties have offered several

20    excuses or several reasons why they think it's not

21    necessary:  First, they've argued that the documents that

22    the COFINA senior parties have requested are not relevant.

23    That's simply not the case, and I'll explain why.  Second,

24    they've argued that the documents the COFINA senior parties

25    have sought are privileged, particularly under the

1    deliberative process privilege.  Again, we believe that is

2    not the case, and I will explain why.  And, third, they have

3    refused entirely to produce any electronically stored

4    information, emails, text messages, anything.  They've also

5    refused to produce any sort of log of those documents with

6    respect to the documents they claim are privileged.

7            So if I may, I'd like to go through those three

8    issues.  First off, with respect to relevance, again, my

9    position is that the Court has already decided that

10   documents beyond publicly available materials are relevant

11   to this proceeding, and that's why the Court ordered

12   discovery.

13           THE COURT:  All right, but help me out here.

14   You've made the statement that the government parties have

15   put their intent at issue, and they may turn around and say,

16   "No, we haven't."  Flesh that out for me.

17           MR. KUEHN:  Sure, absolutely.  So the government

18   parties have made an argument in their briefing, in

19   particular on Monday, that there's no ambiguity about the

20   resolution, and I would agree with that; and obviously we're

21   not seeking documents related to the meaning of the

22   contract, the drafting of the resolution.  What is ambiguous

23   is what the government acts mean with respect to their

24   obligations under the resolution.  And what I'm getting at

25   is that there have been several acts, in particular over the

1   last six months, which indicate that the government parties

2   do actually intend to take COFINA's dedicated sales tax from

3   COFINA, which is clearly a violation of the covenants in the

4   resolution.  However, those acts are ambiguous.

5           On March 13, of course, the government parties

6   proposed and approved a fiscal plan which mathematically

7   indicates that they intend to take COFINA's dedicated sales

8   tax and use it for other purposes, simply by virtue of the

9   fact that it doesn't allow enough debt service to cover even

10  COFINA's dedicated sales tax for the year 2018, amongst

11  other years.  Now, again, the document itself doesn't

12  specifically say, "We're taking COFINA's dedicated sales

13  tax," but it's clearly the implication.

14          Later, one of the government parties, Mr. Elias

15  Sanchez, who is the representative of the Oversight Board,

16  or the representative of the Commonwealth for the Oversight

17  Board, stated publicly that the intent of the fiscal plan

18  was to pool all the resources, including COFINA's dedicated

19  sales tax, which, again, we take the position is not within

20  their control.  It's not within the hands of the

21  Commonwealth.  They've indicated then that that's the intent

22  of the fiscal plan.  Subsequently they passed the compliance

23  law, which by its own terms empowers AAFAF to take the

24  dedicated sales tax from COFINA.  On the same day, the

25  Governor issued an explanatory statement which said that's

1    not really the intent, but I don't know what any of this

2    means.  It seems to me that it's ambiguous what the actual

3    intent and what the actual meaning of these statements are,

4    what the actual meaning of the law is, what the actual

5    meaning of the structure that the Commonwealth government

6    parties have put in place is; and in order to understand

7    what that means, we need to have access to the documents

8    that explain what those parties really intend to do and what

9    those statements really mean because I think they're

10   ambiguous.

11            The second point with respect to relevance is that

12   we do actually have a disagreement, I think, with the

13   government parties on what their obligations are under the

14   resolution.  My position is that committing acts that set in

15   motion the process of taking COFINA's dedicated sales tax is

16   itself a breach of the covenants.  By way of illustration,

17   COFINA is obligated under Section 705 of the resolution to

18   protect and defend the pledge of the dedicated sales tax.

19   If other parties within the government are setting up the

20   structure which allows that dedicated sales tax to be

21   confiscated and taken back from COFINA and if COFINA does

22   nothing, that's a violation of that covenant, whether or not

23   it's public or not.

24            THE COURT:  But if I said to the government

25   entities, "If you don't produce a document in this, you

1    can't use it, period," what argument would you make on your

2    summary judgments?  Like, what do you need the documents

3    for?  Because it seems to me you have some fundamental legal

4    issues that need to be resolved.  You need to know the scope

5    of their duties.  You need to know, is it an affirmative

6    obligation to stop something or not?  Is leaving it

7    ambiguous a violation of their obligations?  But what

8    somebody thought about what the fiscal plan is going to do,

9    I don't know what that adds to your summary judgment.

10        MR. KUEHN:  Because the messages so far are mixed.

11   We've heard that we're not going to take the dedicated sales

12   tax and the structure is not designed to take the dedicated

13   sales tax.  We've heard that it is designed to cool the

14   resources and take the dedicated sales tax.  And so we need

15   to be able to resolve that factual ambiguity.  Regardless of

16   what the duties actually are -- and again I agree that

17   that's eventually going to be a legal question as to how you

18   interpret the duties under the resolution -- but the factual

19   matter of whether they've complied with those duties is not

20   clear from the face of the documents that are publicly

21   available.

22        THE COURT:  So let's say you end up with

23   communications that are split, that you have some people

24   saying, "This is what I intended when I put a fiscal plan

25   forward," and then somebody else says, "But that's not what

 1    I intended when I put it forward," does that preclude you

 2    from moving for summary judgment?

 3             MR. KUEHN:  No, I don't believe it would, but we

 4    would argue that depending on what the facts show, depending

 5    on who intends what, that we will be able to show that the

 6    party that intended to take the dedicated sales tax speaks

 7    on behalf of AAFAF and thus has violated the terms of the

 8    resolution, has breached that covenant.

 9             THE COURT:  The other problem that I have here is,

10    I have both extremes.  I have you asking for everything, and

11    I have the government refusing to produce anything, which

12    makes it easy, or hard; I don't know which.  What are you

13    really looking for?

14             MR. KUEHN:  If this process had begun earlier, if

15    the government parties had reached out to us when we

16    initially served the document demands, and we had at that

17    point been able to create a protocol that narrowed and

18    created a way for them to review the documents in time to

19    produce them by the end of discovery, you know, I think that

20    we would be in a very different place.  The problem is that

21    there's been a pattern of delay, and I think what's really

22    happening is, they're trying to run out the clock.  You

23    know, they're hoping that if we wait long enough, they'll

24    get the result that they actually asked for on June 1 and

25    June 2, which is to produce nothing.  I think that the

1    obviously reasonable way to solve the issue right now is to

2    simply ask them to produce the documents that hit our search

3    terms that relate to, again, the issues of, you know, what

4    the parties have done, what the government parties have done

5    behind the scenes in the time leading up to today; and if

6    they want to address the deliberative process privilege on a

7    document-by-document basis after the documents have been

8    produced, we're willing to agree that the production of the

9    documents doesn't waive the deliberative process privilege.

10   That's fine.  But I think that the only real solution at

11   this point in time is to order the production of the

12   documents that hit the search terms that we proposed to them

13   ourselves.  You know, they didn't propose search terms to

14   us.  They didn't come us to and say, "Here's what we think

15   are the relevant custodians."  They never came to us with

16   custodians.

17          THE COURT:  How many custodians have you proposed?

18   Have you proposed custodians?

19          MR. KUEHN:  No, we haven't proposed custodians

20   because we don't know who are the relevant parties.

21   Obviously we've served subpoenas and asked for the specific

22   individuals we know are relevant, Mr. Elias Sanchez,

23   Governor Rossello, and Mr. Portello; but, interestingly, on

24   Monday the government parties acknowledged that they've

25   identified forty individuals, forty potential custodians who

1    have relevant documents.  At least that's my reading of

2    Paragraph 6 of their corrected motion filed Monday evening.

3            THE COURT:  And is there any reason that this,

4    from your point of view, needs to go before March 13, 2017?

5            MR. KUEHN:  From the perspective of the COFINA

6    Senior Bondholder Coalition, and for this point I'm not

7    speaking for Ambac or Whitebox or National, I think that it

8    should go earlier than March 13, but it doesn't need to go

9    significantly.  We're not talking about 2015.  The reason I

10   say that is that the fiscal plan obviously wasn't developed

11   on March 13 itself.  It took a period of months to develop

12   that fiscal plan, and the development of the fiscal plan and

13   the communications related to that development are relevant.

14           THE COURT:  But then you're going to really hit

15   the deliberative process, right?

16           MR. KUEHN:  So I agree that we would hit the

17   deliberative process privilege, but I would also point out

18   that the deliberative process privilege is qualified.  And I

19   would note that in the government parties' briefs submitted

20   last Friday, all the cases cited except for *Texaco*, the one

21   case that we actually rely on substantially, are FOIA cases.

22   And the reason that's significant is that in FOIA, the

23   deliberative process privilege is not qualified.  It's

24   absolute.  But in the litigation such as this, it is

25   qualified.  And the way that we believe these documents are

1   relevant relate to in some sense the deliberations of the

2   government itself.  It's what they are doing.  It's what

3   they're trying to do to take our sales tax.  And so I think

4   in this case, where the public interest is so great, and

5   where our interest is so great at getting at the truth, and

6   where the documents go directly to the process itself, I

7   think that the privilege must yield to these important

8   considerations.  You know, we've seen that before.  You

9   know, we cited actually one of your Honor's cases, *Williams*

10  *v. City of Boston*, and, you know --

11          THE COURT:  You will learn -- this is my word --

12  it made sense at the time.  It was fact-specific.  That's my

13  theme, and I stick with it whenever anybody cites a case to

14  me.

15          MR. KUEHN:  I think in this case it is very fact-

16  specific.  You know, we are interested in what the fiscal

17  plan really means and what the parties have done to set up a

18  structure which has the ultimate effect of taking the

19  dedicated sales tax, which is itself a breach of the

20  resolution.

21          THE COURT:  Though there have been discussions

22  afterwards.

23          MR. KUEHN:  Absolutely.

24          THE COURT:  There have been explanations or

25  purported partial explanations afterwards.

1          MR. KUEHN:  No question.  Communications that

2    occurred after the decision, under First Circuit precedent,

3    are clearly outside of the privilege.

4          THE COURT:  Okay.

5          MR. KUEHN:  What it comes down to, your Honor, the

6    government had a decision in formulating the fiscal plan.

7    They could have kept COFINA's dedicated sales tax separate

8    or they could have pooled it.  They chose to pool it.  We

9    believe that's a violation of the covenants, and we need to

10   understand why.

11         THE COURT:  Let me actually hear from the

12   government on those issues, and then we'll switch.

13         MR. CANTOR:  Good morning, your Honor.  Dan Cantor

14   on behalf of what we've called the non-debtor government

15   parties.  There were a number of things that I just heard

16   from counsel that were surprising to me.  I was surprised to

17   hear that they're not seeking documents concerning the

18   drafting of the plan or legislation.  In fact there are a

19   number of specific requests that seek just that.  I was

20   surprised that in response to your question about how we get

21   between all or nothing, their answer was that the only real

22   solution is all.  But perhaps what I was most surprised

23   about was to hear them say that somehow the issue of whether

24   there was a breach here is something that is going to be

25   based on documents that they now consider to be ambiguous;

1   that the reason that they need to get into the deliberations

2   of the government is that somehow what happened here, the

3   facts of what happened here are ambiguous. This is 180

4   degrees opposite of the position that they took when they

5   responded to the trustee's original motion in the

6   interpleader action where they said that the covenants were

7   clear and unambiguous and that the Court could determine

8   whether there had been a breach of those covenants as a

9   matter of law. And that's what we agree, your Honor, is the

10  case here. Counsel's last comment was about needing to get

11  into why things were done. No, you don't need to get into

12  why things were done. The issues here are very simple and

13  straightforward: As they said, was there a breach? Was it

14  curable? Was it cured?

15          And there is no dispute here among the various

16  parties as to what happened. The various parties have come

17  up with seven different instances of breach. Not all of

18  them agree on what breaches there were, but in total there

19  are seven different instances. But everyone agrees as to

20  what happened here, right? Everyone agrees as to what plans

21  were proposed, what laws were passed, what litigations were

22  filed, and what public actions COFINA did or did not take

23  here. This is all a matter of public record, and the only

24  question that the Court is going to have to answer on

25  summary judgment is whether any of these events are an event

1    of default, whether there's been a breach of the bond

2    resolution, and this is a pure question of law that does not

3    require discovery.

4            Let me also say, your Honor, that your Honor made

5    a comment about the fact that it's all or nothing.  We're

6    not saying nothing.  We actually have in fact agreed to

7    produce a variety of types of documents.  We have agreed to

8    produce documents, hard-copy documents.  Non-email documents

9    that exist on the computers of relevant custodians, we've

10   produced some of that.  We would have produced more if the

11   confidentiality order was in place, and when it is, we will

12   be in a position to produce --

13           THE COURT:  What kinds of documents are you

14   producing?

15           MR. CANTOR:  We're going to be producing bank

16   statements, financial statements.  We would produce

17   non-email correspondence with third parties.  I would also

18   note that the parties have available to them everything

19   that's in the data room that was created in connection with

20   the fiscal plan, which is a huge amount of information

21   about, you know, how the fiscal plan was created and how the

22   fiscal plan works.  So they've got an enormous amount of

23   information available to them, and, as I said, we are

24   willing to search for certain documents and produce certain

25   documents.  We draw the line at the email because the email

1  is just so over the top in terms of how broad it is, how

2  burdensome it will be.

3         But the bottom line is, the issues in this case

4  that need to be decided on whether there's been a breach, a

5  cure, et cetera, they're issues that can be phrased in terms

6  of questions beginning with "what."  What happened here?

7  What does it mean for the bond resolution?  And the

8  discovery they're seeking, as you heard counsel say, is

9  almost exclusively addressed to questions of "why," and

10  "why" is not an issue here:  Why did the government do this?

11  Why did the government decide to do one thing versus

12  another?  That's not the question here.  The covenants at

13  issue are black and white:  Either something happened or

14  something didn't happen.  There's no state-of-mind issue

15  here.  It doesn't matter whether a covenant was breached

16  negligently, recklessly, maliciously, whatever.  None of

17  that matters.  The only question is, under the clear and

18  unambiguous terms, as they've told you, under the clear and

19  unambiguous terms of the resolution, and based on the clear

20  and unambiguous terms of the acts that were passed or the

21  plan, has there been a breach of one of these covenants?

22         THE COURT:  Let me ask you this:  Am I

23  oversimplifying things if I say to you, is really the issue

24  here what all of these things, the fiscal plan, the

25  resolutions, the compliance law, what happens to the

1    dedicated sales tax?  I mean, that's the issue, right?

2              MR. CANTOR:  I think that's right.

3              THE COURT:  And that's a "what" question, though,

4    and what he's saying to me, I think --

5              MR. CANTOR:  Right.

6              THE COURT:  -- is that there's mixed messages

7    coming out of the government as to what happens to this

8    sales tax under these plans.  And if we were able to limit

9    discovery to that issue -- in addition, you know, you've

10   produced that you have that room, and it's got some drafts

11   and it's got some financial data, and I think that a lot of

12   that is beyond the scope of really this proceeding -- but if

13   we were able somehow to limit discovery to what does the

14   government say happens to this dedicated sales tax

15   throughout these proceedings, doesn't that move it forward?

16             MR. CANTOR:  Well, but you don't need to get into

17   the emails of the government and into the deliberative

18   discussions of the government in order to answer that

19   question.  The government acts through public acts and

20   pronouncements.  If their claim is that notwithstanding what

21   has been said, the government might do something different

22   in the future, then essentially they're admitting that

23   there's been no breach yet, just that there might be a

24   breach in the future.  But in terms of what has actually

25   happened here -- and, as I said, there is no dispute as to

1    what has actually happened in the public realm here --

2    that's what is at issue in this lawsuit, in the interpleader

3    action, is, what has actually happened?  Is it a default?

4    Can it be cured?  Has it been cured?  You don't need to get

5    into all of the deliberations that went on behind scene as

6    to what they may or may not do or what they may or may not

7    have meant.  It's been said over and over that these

8    provisions are clear on their face.  If they're a breach,

9    they're a breach.  If they're not, they're not, but that's a

10   legal question to be decided.

11          THE COURT:  But it sounds like -- what I don't

12   want to do is say to you, "If you haven't produced it, you

13   can't use it," and then you end up in a summary judgment

14   fight, and you want to use these documents that explain the

15   actions that were taken.  I mean, unless you're going to sit

16   here and tell me you're not going to put in any witnesses or

17   any documents --

18          MR. CANTOR:  Right.  Your Honor, unless I'm

19   mistaken, I don't believe that it's us that will be

20   defending the action.

21          MR. FRIEDMANN:  Your Honor, it's Peter Friedmann

22   from O'Melveny & Myers.  Is it okay if I --

23          THE COURT:  Speak into the mic.

24          MR. FRIEDMANN:  It's Peter Friedmann from

25   O'Melveny & Myers.  So just to provide a little

1    background --

2              THE COURT:  And who are you?

3              MR. FRIEDMANN:  I also represent AAFAF and the

4    non-government actors.  We did not file an answer.  The

5    answer was filed by COFINA represented by the Oversight

6    Board.  So we aren't going to be putting forward any

7    documents, and I think Mr. Mungovan on behalf of the

8    Oversight Board would be well positioned to respond to the

9    question of whether or not there would be anything -- that

10   COFINA would in any way be hampered by not producing

11   documents.  I'm sorry for interrupting my colleague.

12             MR. CANTOR:  It's not our place to make that

13   argument at the hearing, so I can't -- I can't speak to that

14   issue.

15             THE COURT:  Okay, fair enough.

16             MR. CANTOR:  What I can speak to is that as

17   currently crafted, the burden on the non-debtor governmental

18   parties to respond to what sounds like is, you know, ninety

19   odd requests that are not going to get narrowed in any way

20   certainly by the propounding parties, perhaps by your Honor,

21   but the burden, you know, associated with that is immense.

22   And that's if you just limit it to the nongovernmental

23   parties.  They've also asked for production from advisors

24   and attorneys, which we haven't even done the math on what

25   that adds to this in terms of cost and time, but you've got

1    multiple different law firms and multiple advisors involved.

2    What they are asking for is just way, way over the top.  And

3    I sympathize with your Honor's attempt to try and get it

4    down to a nugget, and we're not opposed to coming up with

5    some sort of rational approach to discovery here, but, you

6    know, we're talking about, you know, two government agencies

7    and three individuals, you know, who are spending, you know,

8    every waking moment dealing with an unprecedented financial

9    crisis, and they're now being told to turn over every

10   document essentially that they've created since 2015.  I

11   think part of the problem we have here is, as I said, there

12   are multiple requests here.  It sounds like counsel was not

13   wedded to going back to 2015.  I'm not so sure that his

14   colleagues would necessarily agree with that.  Those who

15   strenuously believe that there were defaults as early as

16   September of 2015, I'm not sure that they're ready to give

17   up on that.  I guess we'll need to hear from them.

18            THE COURT:  Well, we'll hear from them, but what

19   I'm doing, where my thoughts are for now is that whether

20   there were or were not earlier defaults is just not critical

21   for this Stage 2 proceeding, so I don't see -- I'm certainly

22   not asking anybody to waive any of their claims now or

23   ruling that they're not applicable.  It's just that

24   everybody seems to agree, who is putting forward that there

25   was a default, believes that it occurred in 2017, at a

34

1    minimum, so I think that's where our efforts need to be

2    focused right now.

3            I would like to figure out a way to limit

4    discovery to the critical question of what is to happen to

5    this dedicated sales tax under these proposed fiscal plan

6    and compliance.

7            MR. CANTOR:  I think to do that, your Honor, and

8    I'm certainly not going to be able to quote you back the

9    discovery request that we should have going forward, and

10   especially if we're going to get this done in a way that is

11   not burdensome, both in terms of effort and expense,

12   recognizing, in my view, the limited relevance of what we're

13   talking about here.  But, also, if we're going to get it

14   done within the time frame that the Court has set -- and I'm

15   fairly confident that Judge Swain was not expecting them to

16   serve ninety odd requests on non-debtor parties and their

17   advisors and their attorneys and expect that all to be

18   complied with by July 21.  I don't think that was at all

19   what she had in mind.  So what we need to do is, they need

20   to be realistic in terms of identifying a very limited

21   number of custodians and a very focused set of search terms.

22   And, you know, if they can do that, we are absolutely

23   willing to have a discussion with them about, you know, how

24   we get from Point A to Point B.  But where we are now

25   doesn't help anyone who's interested in actually moving this

35

1     case forward rather than just merely beating up the

2     government.

3             THE COURT:  So let me make it clear, to the extent

4     it needs to be made clear, and I hope it doesn't, that it is

5     not the Court's goal to run up bills and to have unnecessary

6     discovery or other legal fees, which will be huge in this

7     case, we recognize; but the Court, and I won't be

8     presumptuous to speak for Judge Swain, but I will speak for

9     me, and I believe she agrees, that we are trying to keep

10    this as streamlined and efficient as possible, recognizing

11    that it is expensive and it is money that's hard fought for,

12    so there's lots of uses for this money other than supporting

13    the legal community.

14            That having been said, I want to make sure that we

15    at least move this along efficiently.  There is some factual

16    issues that will need to be fleshed out.  I am not making a

17    ruling right now on whether there's going to be a limitation

18    to just the public speaking, the public laws on whether or

19    not that's sufficient to establish a default or not.  I

20    don't know.  I mean, it seems to me you have a problem, if

21    you have a lot of different people speaking, of proving that

22    there's a default, and I'm assuming that the people who are

23    pushing that there was a default will take that into

24    consideration when they formulate their summary judgments.

25    I mean, I don't know.  I don't know how it will be limited.

1    I'm assuming it's going to be focused, but hope springs

2    eternal.

3            What I'm inclined to do right now and what I'd

4    like to do is get into the other areas of the electronic

5    discovery and the like, but right now what I'm thinking is

6    limiting the time frame, and I will hear from Ambac and

7    Whitebox on that, but I'm inclined to limit the time frame

8    to the March, 2017, forward, limiting the scope to what

9    happened, what is intended to happen to this dedicated sales

10   tax.  I think there needs to be an agreement on a limited

11   number of custodians, and then we do need to talk about

12   electronic discovery because I can't believe that -- you

13   can't just eliminate that search.  In today's world, it's

14   just not possible to pretend that the communications didn't

15   take place on electronic discovery; but I think we need to

16   really focus on custodians, the time frame, and the scope of

17   the search.

18           MR. CANTOR:  Yes, and, your Honor, our arguments

19   are dealing with what was in front of us, which was a

20   massive request.  We're not going to say that never ever

21   should there be electronic discovery in this case, clearly

22   not, but there are issues of burden and of who we're making

23   bear this burden, a government that obviously is not in

24   great financial shape, to say the least.

25           THE COURT:  That much I've picked up on.

1          MR. CANTOR:  Yes, I figured as much.

2          Your Honor, I haven't specifically addressed the

3     deliberative process privilege.  I don't know if that's

4     something you want to hear at this point.  If so, my

5     colleague, Mr. Friedmann, is prepared to address that.  I'm

6     not sure if we --

7          THE COURT:  I think we need to address it, but we

8     need to address it in the context of what is being withheld.

9     I mean, I have here -- everybody actually can cite to me all

10     the parameters of deliberative process.  If you all agree on

11     it, it's really nice.  I've read articles.  I've written

12     decisions.  But it's not practical.  So maybe what we need

13     to figure out is sort of within the scope of the discovery

14     that's going to be allowed, you need to then recognize that

15     if the deliberative process is being claimed at that point,

16     it needs to be disclosed.

17          MR. CANTOR:  And before I turn it over to my

18     colleague, I guess the other thing I will say is that there

19     is then a functional issue of whether we have to log that

20     stuff because the privilege I believe is extensive in this

21     context, not to mention attorney-client issues that arise,

22     and the logging alone, as we indicated in our papers,

23     involves substantial effort and cost.

24          THE COURT:  So I don't think it makes sense to log

25     specific documents.  I think it does make sense and needs to

1    have at least the categories of documents that are not being

2    produced.  For example, I don't have anything here that

3    identifies even the parties, you know, "I'm not producing

4    such-and-such's documents because he is legal counsel or she

5    is legal counsel, and everything that's been done with her

6    is privileged."  I mean, I don't have anything to work off

7    of right now, and I don't think that that's viable.  So you

8    need to at least have descriptions of what the issues are so

9    that we can then deal with whether that group makes sense.

10           MR. CANTOR:  And I think the reason for that, your

11   Honor, is, for better or for worse, this process did very

12   quickly go down an all-or-nothing route, so there weren't

13   discussions about, okay, well, do Ms. Jones's documents need

14   to be searched?  We just never got there with them.

15           THE COURT:  So that's why we schlep all of you

16   here to court so that we actually join the real issue.  I

17   mean, sometimes that needs to happen, but it does -- I don't

18   know how to say this any clearer.  You've all agreed on what

19   the deliberative process is.  I mean, everybody is quoting

20   me the same cases, give or take FOIA.  You know what the law

21   is, so we need to apply it to the reality here.  I'm not

22   making novel rulings of law here.  So I'll hear from

23   counsel, but let's figure out sort of what's the best way to

24   tackle that in the actual discovery process.

25           MR. FRIEDMANN:  Actually, your Honor, given how

1    you've laid it out, I just don't think it adds much for me

2    to speak at this point.

3              THE COURT:  Wow.  Thank you.  All right, so why

4    don't -- let me hear -- does it make sense for me to hear

5    about the dates first, and then we'll move on from that?

6    All right, so who wants to talk about that?  And you hear

7    the theme.

8              MR. LEBLANC:  I do, your Honor.  Andrew Leblanc

9    from Milbank Tweed Hadley & McCoy on behalf of Ambac, your

10   Honor.  And, your Honor, I certainly hear the theme, and I'm

11   not going to belabor the point.  I just want to make a few

12   points with respect to the timing.  We and Whitebox, and I

13   won't speak for them, but we have alleged breaches that

14   occurred prior to 2017, going back as far as 2015; and, your

15   Honor, it's relevant, in our view, to the current

16   proceeding, this Phase 2 proceeding.  It's certainly

17   relevant to Phase 3 when we get there, but it's relevant, in

18   our view, to Phase 2 as well because in addition to the

19   existence of a default, there's also a question of cure,

20   whether or not the defaults are curable.  And I think

21   ultimately there will be a question as to whether or not the

22   default had ripened prior to the petition date; and, in our

23   view, to the extent that there were defaults going back as

24   far as 2015 that were uncured, we think that evidence is the

25   lack of ability to cure at this point in time.  And that's

```
 1    one of the issues that we understand the Court had teed up

 2    for this Phase 2 proceeding, the summary judgment

 3    proceeding.  And, your Honor, the relevance of that -- and I

 4    think it's important to step back, and it was interesting to

 5    hear the comments from AAFAF saying that the question is,

 6    maybe it's not even a breach; yet today, because they don't

 7    know what's going to happen with the sales tax in the

 8    future, that's not at all the issue.  And your Honor had

 9    noted, the issue here as we loosely define it is, there's a

10    series of covenants that obligate COFINA to defend and

11    protect its structure.  So the question is, what did they do

12    to defend and protect the structure in 2015, in 2016, in

13    2017?  They clearly, in our view, there's no question, in

14    our view -- and we agree with you, your Honor, that whether

15    or not there exists a default today is an easier question.

16    The facts are more clear.  We think there is, however, that

17    we can show, and it may not be a summary judgment argument,

18    but we could show that they failed to defend the structure

19    going back as far as 2015, and that the failure -- and I

20    will say, your Honor, that this is not necessary for us to

21    prove to establish that it is incurable today, but it would

22    certainly be sufficient for us to show that there was a

23    default starting as early as 2015 that was left uncured for

24    a two-year period of time.  That's the gravamen of why we

25    think it's relevant to go back to 2015.  And to be clear,
```

1    your Honor, what we've asked for, we served five requests

2    going back to 2015.  We are satisfied with all of the other

3    requests that are part of our joint set of requests

4    beginning at a later period of time, but we served five

5    requests that go back to 2015 relating specifically to the

6    acts that we allege in our complaint and that we challenge

7    are default as of 2015.

8            And, your Honor, you're absolutely right that the

9    critical dates, the more significant dates, and the easier

10   question, in our view, is whether or not a default exists

11   today, but we think that that prior period is also relevant

12   to whether or not it's curable and whether or not a default

13   existed prior to the petition date.  That's the gravamen of

14   why we have sought and why we think it's important to have

15   this narrowly tailored limited discovery that we served

16   going back as far as 2015.

17           THE COURT:  Okay.

18           MR. LEBLANC:  Your Honor, I could comment on other

19   issues about it, but I think it's all been covered at this

20   point, and I'll just leave it at that on the timing, unless

21   your Honor has any questions for us.

22           THE COURT:  No.  I think I'm good.

23           MR. LEBLANC:  Thank you, your Honor.

24           MR. ROMANELLO:  Your Honor, Salvatore Romanello

25   from Weil Gotshal & Manges on behalf of National Public

1   Guarantee Corporation.  We insure $1.1 billion in created

2   value of COFINA bonds.  We joined in the joint requests.

3   You've heard from Mr. Kuehn.  We have little to add other

4   than, with respect to the date range, we would request the

5   date be slightly before that March time frame, perhaps

6   February 15.  And the question, again, Mr. Leblanc referred

7   to the duty to defend and preserve what were the parties,

8   what was AAFAF, who in open court has said that they're the

9   representative of COFINA, what was AAFAF doing to defend and

10  preserve?  And what were the other entities that had an

11  obligation, what did COFINA do to defend and preserve?  We

12  think that's very important to prove a breach.  It's not

13  that we couldn't prove it without it.  Perhaps we could on

14  the law.  But if we get those facts to show that nothing was

15  done, well, that supports our case, and that's why we think

16  you have to go back to a period slightly before when the

17  fiscal plan was announced, so we would suggest February of

18  2017.  Thank you, your Honor.

19            THE COURT:  Thank you.

20            MR. DAVID:  Good morning, your Honor.  Kenneth

21  David from Kasowitz Benson Torres on behalf of Whitebox, and

22  I'll be very brief.  I certainly heard your Honor's view on

23  the time frame.  One point we wanted to hit in particular

24  was, we think that the 2015, 2016 events of default are

25  relevant to Phase 2, and in particular the asset allocation

1    of the disputed funds, because if there was an event of

2    default, then, in our view, and as we've alleged in our

3    answer and cross-claims, that affects who can be paid.  Even

4    on the June and July payments that are in dispute right now

5    in the Phase 2, we think that that would affect whether or

6    not payments would be accelerated on the filing of the

7    Title III and whether or not the sub-bonds could be paid

8    after an event of default.  So we think it in fact does get

9    to the issues that are ripe for Phase 2.

10             THE COURT:  But is there any difference in the

11    order of payments, assuming the default in 2015 or assuming

12    the default in 2017?  Like, it's going to be the same

13    acceleration, right?

14             MR. DAVID:  Not necessarily.  It depends on the

15    timing, your Honor, and what payments we're talking about.

16    So if there was --

17             THE COURT:  Well, because in Phase -- like, right

18    now we're talking about the payments that are from June 1

19    forward, right?

20             MR. DAVID:  Correct.

21             THE COURT:  Right?  So we're not going back to

22    what -- whether the payments were appropriate before then it

23    seems to me is Phase 3, Stage 3.

24             MR. DAVID:  I mean, it is certainly part of

25    Phase 3, your Honor.  It could be part of Phase 2 if it was

1    extended, but I certainly agree that Phase 2 is focused on

2    the June and July and going forward.

3            THE COURT:  So if you are able to establish a

4    default in 2017, do you get a different result for the

5    June 1 forward payments than you would if you also

6    established a default in 2015?

7            MR. DAVID:  It depends on the timing, your Honor,

8    I think, with respect to when that 2017 default will have

9    happened because there is a cure period, even though we

10   argue that it was incurable, but there are folks who say

11   there was a cure period up until -- I think today is the

12   date that it can be cured, and so if it's an event of

13   default as of today --

14           THE COURT:  Is anything happening today that I

15   should know about?

16           MR. DAVID:  No.  I don't think it's going to be

17   cured, and in fact, as we're alleging and argue that it's

18   not curable.  But the question is whether that would cover

19   June payments or even the July payments because it's now

20   after those dates, so whether the event of default happens

21   today or tomorrow could impact what should have happened on

22   June 1 and July 1.  But even more importantly, your Honor,

23   what if the 2017 event of default is not found to have been

24   an event of default?  We obviously think it is and like

25   others feel strongly about that, but then our view is, if

1    for some reason that is not an event of default, we have

2    these other four or five that we rely on and feel quite

3    strongly about, and so we think that we're entitled to

4    discovery about that.  I certainly hear your Honor about the

5    burden and time frame.  We, like Bank of New York referenced

6    earlier, we reached that resolution going back that far, and

7    we'll produce it if that's what everyone else is doing, and

8    certainly Bank of New York is.  So we appreciate the burden,

9    but unfortunately we think it's a necessary burden to get at

10   the facts, because here the government entities and the

11   nongovernment entities are not admitting that there was a

12   default or even a breach of the covenants.  They've either

13   denied information or denied sufficient information to form

14   a belief, or they've denied it outright.  And so we have to

15   prove that, and we need to be able to get to the facts, if

16   they're going to have explanations similar to the compliance

17   law and the fiscal plan of 2017.  If they have a similar

18   answer for what happened in 2015 and then 2016, we should be

19   entitled to the same view, the same facts and evidence that

20   your Honor mentioned about what it is was intended and what

21   it is that the government intended to do with the tax funds

22   based on these fiscal plans and proposals.

23           THE COURT:  All right, so what I'm inclined to do,

24   and which always gives you an opportunity to tell me I'm way

25   out of line, but what I'm inclined to do is to say that this

1    Stage 2 is limited to potential defaults from January 1,

2    2017, forward, or I guess March, the March date, the March

3    date forward.  It's without waiver of a claim that there was

4    earlier defaults.  You may want to exchange that discovery

5    now if you think it's going to be relevant to Stage 3 and

6    it's easier to do it, you know, now than divide it.  But my

7    understanding, which I admit is probably limited, but it

8    seems to me that the 2017 events are cleaner than the 2015

9    events, so that if you are unable to establish a default in

10   2017, you have a weaker case for the events that took place

11   in 2015.  I don't know enough -- I'm not prejudging it at

12   all, nor do I get to judge it at all, so it's easy for me to

13   say, but the events in 2017 are very concrete and specific,

14   and I think that we do better to move forward on those,

15   especially since we're dealing with the funds now and this

16   is just the one adversary proceeding.  So I think that's how

17   I'm going to address the earlier claim, the earlier time

18   frame.

19           I hear you.  I'm not hearing that the order would

20   be remarkably different.  If there's an event of default in

21   2017 and it's not cured, it seems to me the consequences as

22   far as what happens to these payments is the same.  You

23   know, you have the same priorities as if there had been a

24   default in 2015.

25           MR. DAVID:  Well, respectfully, your Honor, I

1    don't think that's necessarily the case.  Again, I would go

2    back to my point about the timing because the timing is

3    important here for the June and July payments that haven't

4    been made and are at the center of the dispute.  And in

5    fact, your Honor, if we eliminate the pre-2017 allegations

6    of event of default, that's in essence granting summary

7    judgment against us at this stage because we're then not

8    allowed to argue those and certainly aren't being given

9    discovery about those, and in fact it seems like a

10   preclusion of some sort against us.  I understand that the

11   burden is there, but I think it's a necessary one that we

12   have to go through.

13        At the very least, we think that there should be

14   limited discovery, and we've been open to negotiating the

15   type of discovery that we get and certainly can try to

16   narrow the burden as much as possible.  We appreciate that

17   it's two years, and emails from two years, even from a few

18   individuals, can be quite burdensome.  So respectfully, your

19   Honor, that's what I have to say about that but certainly

20   hear your point.

21        THE COURT:  What you can do is propose a different

22   stage to deal with these if you think that it needs to be

23   addressed after this schedule.  If you think that these

24   summary judgments -- I'm limiting these summary judgments to

25   these events.  If you want to propose another phase that

1    would deal with the earlier ones, you can do that, but I

2    think that I'm not hearing an argument that is persuading me

3    that we need to move all the discovery earlier to address

4    the critical issues in the short time frame that are marked

5    up for this round of summary judgments.

6              MR. DAVID:  Well, and, your Honor, I appreciate

7    that, and the one thing I would say to that:  That new phase

8    that you're suggesting as a possibility certainly could be

9    something we could discuss, but I'm not sure that all the

10   other parties would agree with that because I think everyone

11   is looking for resolution on the June and July payments and

12   soon to be the August payments when we have those summary

13   judgments in the fall, and as are we, of course.  And if the

14   2017 events of default are not successful, then you're going

15   to have parties saying that the pre-event of default

16   waterfall payment priority should be applied, and then you'd

17   have at least Whitebox -- I don't want to speak for Ambac --

18   that would be saying, "Hold on.  We still have these

19   pre-2017 events of defaults that we think are applicable and

20   prevent the old waterfall from applying."

21             THE COURT:  So I think, and I'll hear from parties

22   if you want, but I think that the 20 -- as teed up now, you

23   will have presented the legal rulings as to the scope of

24   obligations, and you will have addressed some factual

25   issues.  Some of those are going to affect your analysis of

1     the strength of your claim of earlier default, so you will

2     have some information at that time that you don't have now.

3     For example, some of the discussions about what were the

4     obligations and what is an event of default is failing to

5     affirmatively take a step, an event of default, you know,

6     those kind of things, and I think those will be defined in

7     the context of this summary judgment.  And I think that at

8     that point Ambac and Whitebox need, you know, need to take a

9     look at what their claims are about their earlier defaults

10    and see if it's worth pursuing.  And, you know, at that

11    point we're dealing with a finite period, and if it needs to

12    stall things for another month or so, it will; but I think

13    it's more important to get this done than it is to open up

14    the discovery back to 2015 at this point.

15         MR. DAVID:  And I appreciate that, your Honor.

16    The last thing I'll say, I promise, is that unfortunately I

17    don't think it would be a month at that point if we had to

18    then reopen discovery on certain issues from whether it's

19    2015 or 2016.  I think we'd be right back in front of your

20    Honor dealing with these disputes, which I would love to get

21    done in a month, if we possibly could, but I don't

22    anticipate that happening, and so I think we would be

23    ultimately delaying things even further if we went down that

24    road.  Hopefully we don't have to.  Hopefully the 2017

25    events will resolve this and we can move forward.  We're

1    just concerned, and we don't want to prejudice our rights

2    and our allegations and positions by not pushing for what we

3    think is appropriate discovery going back to 2015.  But with

4    that, I certainly hear your Honor.  Thank you.

5           THE COURT:  Is there anybody here who wants to

6    convince me that going back to 2015 isn't going to take any

7    effort?  That having been said, I'm going to stand by my

8    dates, but I need to figure out when the beginning of the

9    2017 date is, and I need to figure out how we make this

10    happen.  So do I tell you to spend your lunch hour doing

11    that?

12           MR. CANTOR:  Your Honor, I think we're heading in

13    the same direction, but I think, in order to make this

14    process work well, what we need to come out of here today

15    with is a very specific identification of the issue on which

16    discovery is going to be permitted.  If we're focusing on

17    the alleged March default, what is it that's not in the

18    public realm that is the issue that they need discovery on

19    to be explored?  Because otherwise I can foresee us being

20    back here, you know, in a week saying, you know, "We thought

21    this was going to be a very narrow issue, and yet here are

22    all of these document requests again."  So I really think we

23    need some, you know, clear definition of what it is that

24    we're going to be having discovery on, in addition to

25    obviously figuring out who the right people are and the

1    right terms.

2          MR. KUEHN:  Your Honor, we need clarity as to what

3    these government statements and acts mean.  It's that

4    simple.  It's that simple.  We need --

5          THE COURT:  So it's the statements regarding what

6    is intended to be done with the dedicated sales tax?

7          MR. KUEHN:  Correct.  Correct, your Honor.

8          THE COURT:  So you guys talk about that over

9    lunch, all right?  But that's going to be my order.

10          Oh, there's somebody I haven't heard from.

11          MR. MUNGOVAN:  Good morning, your Honor.  Timothy

12    Mungovan from Proskauer Rose for the Financial Oversight and

13    Management Board for Puerto Rico, both on behalf of the

14    Oversight Board and the Oversight Board as representative of

15    the Commonwealth and COFINA.

16          I think that's an important distinction, your

17    Honor.  You've heard a little bit about that from AAFAF's

18    counsel already.  And just to clarify, on the date that the

19    Title III cases were commenced with respect to both the

20    Commonwealth and COFINA, the Oversight Board became the

21    representative of those two entities on that date under

22    PROMESA.  I think it's important to recognize the

23    distinction of that date because prior to that date, of

24    course, the Oversight Board was engaged in its duties in the

25    context or under the auspices of PROMESA.  Prior to the

1    dates that the Title III cases were commenced, of course,

2    the government was in charge of and managing the affairs of

3    the Commonwealth, and the Government Development Bank was

4    managing or AAFAF was managing the affairs of COFINA.  And

5    so with respect to discovery issues related to the Oversight

6    Board versus the Commonwealth versus COFINA, prior to the

7    date that the Title III cases were commenced, that

8    information truly does reside within the control

9    functionally, the day-to-day aspects of AAFAF.  And the

10   Oversight Board, while we are the representative of those

11   two entities, does not have control over -- day-to-day we

12   don't have possession of the actual documents.

13           What's important I think to recognize is that when

14   we're talking about discovery going forward, your Honor,

15   specifically with respect to the discovery requests,

16   including a subpoena that was served on the Oversight Board,

17   many of the requests seek information from the Oversight

18   Board prior to the date that the Title III cases were

19   commenced, and we think that that information is, as we've

20   set forth in our papers, irrelevant.  And so what I would

21   ask is, as we're framing a process for a resolution of these

22   discovery issues, that we distinguish and clarify between

23   the documents that are at COFINA, if you will, and the

24   documents that are at the Commonwealth versus the

25   deliberations and the certification deliberations of the

1    Oversight Board, which PROMESA indicates are not subject to

2    the jurisdiction of this Court, at least challenges with

3    respect to those certification determinations.  And so

4    discovery related to those certification determinations we

5    would suggest to the Court are off-limits.  We can have a

6    discussion certainly about what we would consider to be

7    public communications from the Board, or communications

8    outside of the Board to Banco Popular, or to Bank of New

9    York Mellon with respect to these issues, but the internal

10   communications and discussions at the Board we would suggest

11   are not relevant to the purposes of this interpleader

12   proceeding and whether or not an event of default has

13   occurred.  Thank you, your Honor.

14         THE COURT:  Thank you.  So I guess I need to hear

15   from the Coalition just on that point first.

16         MR. KUEHN:  Your Honor, I think that we can

17   certainly work with the Oversight Board.  We understand the

18   Oversight Board's position with respect to the documents

19   they have and who represents COFINA at different time

20   frames.  I think it's important, however, that if that is

21   the case, that we obtain the necessary documents from AAFAF

22   and the government parties.

23         THE COURT:  All right, so this is what I'm

24   thinking that I would like to think about more and I'll do

25   during lunch, but I think we need to come up with a limited

1   definition of the types of documents that we want, and I

2   think that has to do with defining the scope being, what do

3   these events mean with respect to the use of the dedicated

4   sales tax?  I think we need to figure out how to come to

5   terms with a limited number of custodians.  Somehow you've

6   got to work that out.  Otherwise I could pick a random

7   number; nobody will be happy with it.  And the search term

8   protocol, like, at least a schedule for that.  And I am

9   inclined to do the time frame of February 15, 2017, forward.

10  I recognize that there's going to be a claim of deliberative

11  process before then probably, but that needs to be logged.

12  You know, it needs to be described so we can do it, and it's

13  not to stop the later discovery.  Okay?

14          MR. FRIEDMANN:  Your Honor, Peter Friedmann from

15  O'Melveny & Myers.  Just to be clear so there are no

16  surprises later, I think it is our view, under the First

17  Circuit's decision I think in the *Planned Parenthood* case,

18  that we believe that execution, comment, et cetera, that

19  occurred, A, post-decision can remain during the

20  deliberative process; and, B, our very strong-held view is

21  that the deliberative process here relates to the entire

22  financial emergency identified by Congress in Section 404.

23  It can't be atomized to certification of the fiscal plan

24  because certification of the fiscal plan leads into the

25  filing of Title III and formulation of a plan of adjustment.

1    So I just want to be clear that that's our view.

2          THE COURT:  All right, and I'm hoping that I'm

3    being clearer.  I always think I'm clear.  Not everybody

4    agrees, but I think that the discovery is factual discovery.

5    Most of the information requested here is factual, so the

6    deliberative process is not going to be a defense to the

7    request for facts, okay?

8          MR. LEBLANC:  Your Honor, again, Andrew Leblanc,

9    Milbank Tweed, on behalf of Ambac.  Your Honor, just one

10   point of clarification when we do confer.  We think one area

11   of exploration through discovery is, what steps, if any,

12   were taken to defend and protect the COFINA structure?  And

13   I just don't want to go into a break where we're conferring

14   with the other parties, and they say, no, no, no, you didn't

15   mention that.  That to us is sort of the central question

16   here, and so we think we're entitled to documents reflective

17   of steps, if any, that were taken to defend and protect the

18   COFINA structure, both by the Commonwealth, who has their

19   own obligations not to interfere with it, and by COFINA

20   through AAFAF, which was its representative which had the

21   affirmative duty to defend that structure.  So that to us,

22   understanding and accepting your Honor's view as to what I

23   think would be a Stage 2-A with respect to the timing of a

24   potential default, that to us is entirely relevant to what

25   we should be doing for 2017 forward.

```
 1              MR. CANTOR:  Your Honor, that is a Texas-sized
 2    loophole in what we've been discussing this morning, and I
 3    think, quite frankly, we can take a step back from it and
 4    separate it from the discussions that we've been having this
 5    morning because it goes back to the original point about
 6    what is the proper scope of discovery here and what
 7    questions are relevant to the issues that need to be decided
 8    here.  The description of this duty to defend is some sort
 9    of an open-ended duty to defend that exists at all times and
10    for all purposes and goes to -- what, you know, these folks
11    do on a daily basis in their job is entirely divorced from
12    the language of Section 705 of the bond resolution, which
13    talks about a duty to defend against claims or demands.  In
14    our view, a claim or demand is by necessity some sort of
15    public act that has occurred, and thus the duty to defend
16    against that also involves public acts.  It does not involve
17    what went on in the day-to-day operations of the government,
18    and certainly doesn't give rise to a right to -- some sort
19    of open-ended inquiry into, what did they do to defend?
20    Either they took a public act in defense against a claim or
21    demand, which in and of itself requires some specificity as
22    to what we're talking about, or they didn't take action to
23    defend.  It has nothing to do with what goes on within the
24    walls of the government that the public doesn't see.
25              THE COURT:  I promised Puerto Rico that I would
```

```
 1    break at noon for lunch, so let's break.  Let's actually
 2    come back -- why don't I give you a little longer than an
 3    hour so that you can spend some time talking, an hour and a
 4    half, all right?  Come back at 1:30.  This will be a topic
 5    of discussion this afternoon, but let's see if you can make
 6    some progress on the other issues.
 7              MR. KIRPALANI:  Your Honor, if I could just add
 8    one statement in 30 seconds.  I'm a little concerned by what
 9    AAFAF's counsel just said in terms of their understanding of
10    what they think is a relevant fact, and I just want to give
11    you a real-world example.  If AAFAF reaches out to COFINA's
12    agent, which is Banco Popular that collects the sales tax
13    every day for the benefit of the bondholders, and says,
14    "We'd like to discuss with you a way to change the payment
15    streams and surrender your agency back to the Commonwealth,"
16    we believe that document would be highly relevant to whether
17    they've defended and protected; and the way that counsel for
18    AAFAF is envisioning this unfolding seems to be that he
19    wouldn't have to produce that email, if it exists.
20              THE COURT:  So the problem, I think, comes from
21    this "all or nothing."  We're back in that circle.  I mean,
22    if there is specific levels of communication that you want
23    them to search for, then we have a specific fight.
24              MR. KIRPALANI:  Okay.
25              THE COURT:  All right?
```

```
 1                    MR. KIRPALANI:  That's doable.

 2                    THE COURT:  So think about that.

 3                    MR. KIRPALANI:  Thank you, your Honor.

 4                    THE COURT:  All right?  We're going to break now

 5      till 1:30.

 6                    THE CLERK:  Court is in recess.

 7                    (Noon Recess, 12:06 p.m.)

 8                    (Resumed, 1:35 p.m.)

 9                    THE COURT:  All right.  I gave you a long lunch

10      hour, so I'm sure you solved all the world's problems,

11      right?

12                    All right.  Where are we?

13                    MR. KUEHN:  Good afternoon, your Honor.  If I may,

14      I'd like to give the court an overview of what we discussed

15      throughout lunch.  During the lunch period, the COFINA

16      Senior parties, including our COFINA Senior Bondholder

17      Coalition, along with Ambac, National and Whitebox,

18      discussed a proposal that we think could alleviate some of

19      the government parties' concerns about burden as well as

20      address our concerns.  We've presented that proposal to the

21      government parties during lunch.  And we don't have an

22      agreement, but I'd like to set out what we proposed.

23                    We proposed that, consistent with your Honor's

24      views on the relevant time period, that the government

25      parties would run a set of search terms, specifically those
```

1     search terms that we had previously presented to the

2     government --

3               THE COURT:  Excuse me.

4               MR. KUEHN:  -- last week, last Tuesday, against a

5     limited number of custodians.  In the filing on Monday, the

6     Commonwealth -- pardon me -- the government parties noted

7     that they had identified and run search terms across two

8     custodians but had identified 40 additional potential

9     custodians.  We would ask that the government parties run

10    those search terms across the three individuals whom the

11    four COFINA Senior parties served subpoenas on, specifically

12    Governor Rossello, Elias Sanchez and Geraldo Portello, as

13    well as the head of the GDB, which is one of the individuals

14    who the government parties have already run the search terms

15    across.

16              We also would ask that the government parties

17    produce to us or give to us the list of the 40 custodians or

18    potential custodians they have identified, along with their

19    titles and their reporting line within the government.  And

20    we would pick three additional custodians from those 40

21    against whom the government parties would also run the

22    search terms.

23              In addition, in the interests of alleviating the

24    burden of review of the documents, we would agree that the

25    government parties may apply privilege screens to the

1    documents.  In other words, they may withhold in whole

2    documents that are simply or entirely between the parties

3    and their attorneys and log those documents categorically,

4    as your Honor suggested before break.

5         We would ask that those categorical logs, however,

6    be detailed.  We would like to see when the first

7    communications on a given topic began and when the last

8    communications occurred, as well as a sufficient description

9    to understand exactly what the description -- pardon me --

10   what the conversation was.

11        We would agree that if the government produces any

12   documents that they later determine are subject to a

13   deliberative process privilege that they reserve the right

14   to argue that those documents are privileged at any point in

15   the future and that they do not waive any deliberative

16   process privileges by producing these documents.

17        We think that's a fair and reasonable way to

18   resolve the dispute.  It's a limited number of custodians, a

19   limited timeframe.  I would note also that to the extent

20   that the search terms that we have proposed produce any

21   unreasonable number of hits for particular search terms, we

22   are willing to discuss that.  We just simply haven't had any

23   response to our particular search terms at all until now, so

24   it's difficult for us to say, you know, a search term -- any

25   particular search term needs to be revised.  We would be

1    happy to discuss that, but it needs to be done quickly.

2            THE COURT:  The response to that?

3            MR. FRIEDMANN:  Yes, your Honor.  Peter Friedmann

4    from O'Melveny & Myers on behalf of AAFAF.

5            The search terms are bound to be overly broad.

6    They ask for the term "COFINA," from, for example, COFINA

7    and AAFAF.  So we think that it's not a constructive start.

8            I think what we would be prepared to do is

9    provide, we think, information, documents that go to the

10   most important issue and can be collected in an appropriate

11   timeframe.

12           THE COURT:  Will you talk into the mic?  I'm

13   having trouble hearing you.

14           MR. FRIEDMANN:  Yes.  I apologize.

15           So, for example, with respect to what I understood

16   to be the key issue of the morning, which is, are SUT

17   revenues being used under the fiscal plan, we think they may

18   already be there but are certainly willing to in a more

19   clear fashion provide documents sufficient to answer the

20   question of whether or not the proposed fiscal plan or the

21   certified fiscal plan uses SUT revenue, and not just SUT

22   revenue but essentially how much of the COFINA revenue and

23   when.

24           Just to be clear, at this point no COFINA money is

25   being used and won't be.  In fact, as you heard

1    Mr. Bienenstock say the other day in court, any money being

2    used from COFINA will be subject to court order and

3    determined in the future.  But nevertheless, we are willing

4    to provide documents sufficient to show -- and I don't think

5    it's necessary for e-mails to do that -- but we are willing

6    to provide documents sufficient to show whether or not SUT

7    revenue and COFINA money is being used and in what years.

8            THE COURT:  So is it a better phrasing to say,

9    What happens to this money, as opposed to whether it's being

10   used?

11           MR. FRIEDMANN:  Yes.  Absolutely, your Honor.  I

12   don't think there's any dispute right now that money is

13   being used.  I will say we're willing to provide information

14   as to the current fiscal plans and amendments, documents

15   sufficient to show whether they used SUT revenue and when,

16   if ultimately they become part of the public policy of

17   Puerto Rico, slash, approved by a court.  Here is what we

18   have proposed to do.

19           THE COURT:  Okay.  But I don't want to -- I think,

20   first of all, it should be the documents that reflect what

21   use is intended to be made of these monies, just where does

22   it go?  Okay.  So that's a broader -- I think that's a

23   little broader than what you're saying.

24           MR. FRIEDMANN:  Yes.

25           THE COURT:  I don't want to get into is it being

 1    used, yes or no.  I want to get into where does it go.

 2          MR. FRIEDMANN:  Your Honor, I think the answer to

 3    that really is we don't trace dollar for dollar.  We say,

 4    look at our budgets in the future or look at the fiscal plan

 5    in the future, and we have provided people with a fiscal

 6    plan backup model that's in our data room.  But to the

 7    extent we can provide, working with our financial advisor

 8    and reviewing the existing documents, something more

 9    specific, we will absolutely work to provide that

10    information.

11          THE COURT:  But I think that's also information

12    that can be the subject of e-mails.  So I understand the

13    debate on whether intent and whose intent is controlling.  I

14    think that's for down the road.  I think for discovery,

15    though, it's appropriate to get from a finite number of

16    custodians the answer to the question of what their

17    understanding is as to what is to be done with these

18    revenues.  Okay?

19          A search term like "COFINA" though is obviously

20    going to be too broad.  So you might -- my all-time favorite

21    was a case where they came in and they said, "We want one

22    word within six of the other," and the other party said, "We

23    want the same word within ten of the other.  Judge, what

24    should we do?"  I said, "Okay.  I'll pick.  I don't care."

25    I mean, me picking search terms is a problem -- or not.  I

64

1     mean, I can make up any words I want.  But what's the most

2     efficient way for us to get that information?  How do we do

3     that?  Clearly "COFINA" is going to be too broad.

4              MR. KUEHN:  Your Honor, we could sit down and go

5     through the list of search terms that we have previously

6     proposed with counsel for the government parties and agree

7     on a slightly more limited list which would, for example,

8     scratch "COFINA" and proceed from there.  We could do that

9     right now.

10             THE COURT:  Counsel?

11             MR. ROMANELLO:  Your Honor, if I may, I've done

12    this in other cases where you take a custodian, your sample

13    custodian, you run the search terms, and then they provide

14    us the hit list.  What term is generating 69,000 of the

15    70,000 terms?  What can we do then to narrow that term?

16             And so it's just a disclosure.  It's really a grid

17    that shows what term is generating all the hits.  And that's

18    an easy way at the outset to understand you're getting a lot

19    of false positives on that date.  So I would recommend

20    something along those lines.

21             Obviously, for someone whose e-mail address is

22    "COFINA," we can't put "COFINA" alone in that search because

23    it's going to come back with every document.  But there's a

24    way to do it.  We just have to share information on it and

25    come up with something that makes sense.  You can't do it in

1    the abstract without knowing who the custodians are and what

2    search terms are generating the hit.

3           THE COURT:  So I guess what I'm saying is that it

4    is going to be broader.  It is going to involve some

5    electronic discovery.  So I'm trying to figure out the most

6    efficient way to do it.  The goal of the search is to

7    determine what use if any is to be made of the revenues.

8    Okay?

9           MR. FRIEDMANN:  Your Honor, look, I think we're

10   also willing to look for external communications between

11   AAFAF or GDB and Banco Popular or some entities that, you

12   know, represent certain bondholders if we're given a list of

13   who those might be and see again how many hits come up.  It

14   may be that AAFAF has a million hits with Banco Popular

15   because there's a really broad range of issues.  But again,

16   that's something we're willing to do.

17          As to custodians, we do believe it's an enormous

18   intrusion on the governor to ask the governor to produce

19   e-mails and to have the governor's e-mail files searched.  I

20   just think it's unwarranted in light of the fact that there

21   are other individuals who apparently we will be searching

22   specifically, you know, the head of AAFAF or the head of

23   GDB.  I think it's an unwarranted and unfair intrusion on

24   the executive.  I think his e-mails will categorically be

25   addressed by executive privilege and other communications.

1    I think -- in a dispute of this nature, I submit it seems

2    unprecedented to tax the governor with that responsibility,

3    and to take the time to work with the governor personally to

4    review his e-mails to the extent he has substantial e-mails

5    I think is an unfair burden on the governor.

6          MR. KIRPALANI:  Your Honor, if I could, I have

7    been involved with searching for discovery of heads of

8    multibillion-dollar companies who have very similar concerns

9    about burden.  They have a lot they're doing, and this is

10   burdensome.  And usually the test, if I understand the law

11   correctly, is is there any scintilla of evidence that the

12   actual head of state was actually involved in the subject

13   matter, as opposed to they're just way up there.  And this

14   governor has given an interview to Reuters within the last

15   seven days saying his proposal to the GO bondholders is

16   being misunderstood by the skeptics, which is I guess the

17   people sitting on this side of the courtroom.  He's

18   personally involved in this issue.

19         So we're happy to work as narrowly as possible.

20   Nobody wants to know what the governor is doing on weekends

21   and things like that.  We're talking about a narrow issue of

22   whether our client's pledged property was the subject of use

23   under the fiscal plan.  And I think, as your Honor

24   articulated, that this individual has that information and

25   has been absolutely involved in those decisions.

1          THE COURT:  All right.  But it sounds to me like

2     what you're focusing on, though, is the governor's public

3     statements to third parties describing in some manner the

4     intent of the plans that are proposed.

5          MR. KIRPALANI:  Or a directive to his subordinate

6     to fix the fiscal plan so that we get the sales and use tax

7     to be available to the Commonwealth.

8          THE COURT:  Let's start off with limiting it.

9     Let's start off with limiting the governor to third-party

10    public statements, if you feel you need those.  If you feel

11    you can get them elsewhere, do so.  You can ask for those.

12    But then it will depend on, they need to understand the

13    potential custodians, and that's real.  Because obviously if

14    there's a directive to somebody, you can get it from the

15    somebody, if you've got the right somebody.

16          So what kind of timeframe do we really need?  I

17    want to get the search terms and the custodians done.

18          MR. FRIEDMANN:  Your Honor, we'll work with the

19    Quinn Emanuel team on custodians.  I think we've already

20    identified some.  You know, a practical issue is turnover in

21    administrations.  And so while we've identified a lot of

22    custodians, I don't know --

23          THE COURT:  But we have a very limited timeframe

24    here, right?  This is the 15th --

25          MR. FRIEDMANN:  You're actually right, your Honor.

1    Thank you for reminding me of that.  That might actually

2    reduce the number of custodians, because some of the

3    custodians who we identified were people within the two-year

4    timeframe who may have left.  So we will refresh the list of

5    people who we believe could be relevant custodians.  We'll

6    have that discussion with GDB and AAFAF hopefully later

7    today.  Our door is open to communicate on search terms.

8    Given that -- you know, to the extent there's substantial

9    volume, obviously in the first instance we need to hire

10   Spanish-speaking attorneys to review them.  And then --

11           THE COURT:  Well, you have -- don't you have

12   Spanish-speaking attorneys?

13           MR. FRIEDMANN:  We have a one-person local

14   counsel, your Honor.  Literally his firm is one lawyer.

15           THE COURT:  I'm just going to let that go.

16   There's silence in the courtroom.  I don't know what to say

17   about that.

18           MR. FRIEDMANN:  Hiring people, given the enormous

19   number of conflicts --

20           THE COURT:  As I'm saying that, I'm hearing that.

21           MR. FRIEDMANN:  It's extremely difficult, your

22   Honor.  And AAFAF was not able to hire counsel -- counsel is

23   fantastic, but we were not able to hire a large firm, given

24   how late AAFAF got involved in the process compared to many

25   of the parties which have been here for years.

1          MR. KIRPALANI:  What about the Oversight Board's

2     Puerto Rico counsel?  Could you coordinate and use the same

3     counsel?

4          MR. FRIEDMANN:  I don't know.  I'd have to

5     consider whether that's appropriate, given that they

6     represent somebody else.  We've already inquired as to the

7     process of temporary attorneys to do review.  But I don't

8     think it's, to be honest, feasible for us to make July 22nd.

9     I'll be as candid as I can about that.

10          THE COURT:  First of all, we'll deal with a

11     rolling production, so we'll see.  But I think by week-end

12     we need to have the list -- I don't need to have it.  They

13     need to, the Coalition needs to have the custodians and a

14     description of the custodians.  The Coalition needs to

15     provide a realistic set of search terms that you want.

16     Okay?

17          I mean, look at it critically and see what you

18     think is reasonable or likely to come up with reasonable to

19     answer the very limited question that I'm allowing this

20     discovery on, which is what use, if any, is made of these

21     funds, of these revenues.  Okay?

22          What do I do if there's a dispute?  Do I need

23     to -- I don't want to have to have you all come in again.

24     This doesn't make sense to me.

25          MR. FRIEDMANN:  Your Honor, Peter Friedmann from

1    O'Melveny.  I guess if there is, can we submit very short

2    letters to your Honor and have a phone conference?  Will

3    that be acceptable to your Honor?

4         THE COURT:  It's acceptable to me.  Is it

5    acceptable to everybody here who may not be party to that

6    conversation?

7         MR. FRIEDMANN:  From my end --

8         THE COURT:  I'm going to enter that as an order.

9    If anybody objects to it, I'll give you a few days to give

10   me an objection.  But otherwise, I think the most practical

11   way to deal with this would be to deal with it by letter

12   with a telephone conference with only the interested

13   parties, and I'm dealing now with custodians and search

14   terms to accomplish the discovery that I've allowed.  Okay.

15   Counsel?

16        MR. LEBLANC:  Yes, your Honor.  Andrew Leblanc

17   again with Ambac.  I just want to be clear about -- our

18   concern is the limited scope that your Honor has just

19   announced.  We do think -- we understand that there's a

20   dispute as to whether or not, the scope of the duty to

21   defend --

22        THE COURT:  You're right, you're right.

23        MR. LEBLANC:  And we believe that if the

24   government parties intend to take the position that if

25   they're wrong about the scope of the duty to defend, then

1    they aren't defending on that basis, in other words, they

2    have not complied with a duty to defend that is broader than

3    the duty to defend that they've just espoused, then that's

4    fine; we don't need the discovery.  But we expect to the

5    extent that Judge Swain agrees with us, that the duty to

6    defend goes beyond answering a claim or complaint that's

7    filed and it has broader implications against an issue where

8    like the Commonwealth here, COFINA here, I should say, then

9    there is an obligation that goes beyond simply responding to

10   a claim or complaint that's filed.

11          Then we believe we're entitled to discovery, and

12   we think the search terms that were originally proposed --

13   obviously the modifications to adjust for an outsized number

14   of hits, things like that -- that we have reviewed those

15   terms and viewed them as sufficient to cover the additional

16   questions we have with respect to whether or not they've

17   complied with the duty to defend as opposed to simply

18   actually invading the COFINA collateral, the sales and use

19   tax.

20          THE COURT:  Okay.  I'm sorry.  This is what

21   started right before we broke for lunch.  So there was a

22   discussion that I did say we would resume about the scope of

23   that discovery, like who are the right parties that should

24   be in the words for that.

25          MR. LEBLANC:  Yes, your Honor.  And Mr. Kirpalani

1   earlier, he gave an example of something that would be

2   highly relevant to whether or not there was a duty to

3   defend.  That is, if somebody at the Commonwealth had a

4   discussion with Banco Popular saying that we intend to

5   invade COFINA, we want your cooperation with it, there could

6   have been many other discussions.  Or there could be

7   internal e-mails that could reflect somebody had a telephone

8   conversation with somebody saying I'm working on a way that

9   we can invade the COFINA sales and use tax.  That would be

10  inconsistent with the duty to defend, in our view, as we

11  interpret that.

12          And that, to our mind, is what's going to be

13  adjudicated as part of this phase or this stage, I should

14  say, of the litigation.  And limiting the discovery to

15  whether they have in fact invaded the collateral assumes

16  that the duty to defend doesn't have any -- doesn't impose

17  any obligations beyond simply don't invade the collateral.

18  We think that's an incorrect reading of it.

19          So we think the original search terms or something

20  closer to that with corrections for things that obviously

21  generate an inappropriate amount of hits is more

22  appropriate.  And it's nothing to be done here.  It's just

23  when the parties have their discussions about what the

24  appropriate set of search terms is, I expect if the topics

25  are as limited as your Honor just said, the government

1    parties are going to say we have two or three terms and

2    that's it.  If it's more broadly, as we believe it should

3    be, then it's going to be a longer list of terms, it may or

4    may not yield a meaningful amount more.  We just can't know

5    that until those terms are run.  But I think we've said, our

6    side has said we'd work with them if that in fact occurs, if

7    there's an inappropriately large number of documents that

8    are returned.

9            We just don't think if we go into the weekend or

10   further discussions with the direction from the court that

11   it's limited to this one topic, I think we're going to have

12   a dispute that we'll need to come back to you very quickly

13   on or we'll have to be arguing to Judge Swain that we didn't

14   have the opportunity to take discovery sufficient to argue

15   the points that we have to argue for this stage too.

16           THE COURT:  This is the size of Texas.  Was that

17   the phrase?  Thank you.

18           MR. CANTOR:  I believe that was the inelegant

19   phrase that I used, your Honor.  I'll be honest with you.

20   Maybe it's the lunch break.  I'm not exactly following what

21   counsel is proposing to do differently other than what we've

22   been discussing except maybe he wants a longer list of

23   search terms.  I guess we can agree to disagree what the

24   search terms are going to look like.  We're sort of already

25   at that point anyways.

1            I think if we want to go back to the baseline

2    issue of whether the duty to defend, which is expressly in

3    the contract in the bond resolution phrased as the duty to

4    defend against a claim or demand, if that somehow -- if

5    we're going to discuss whether that somehow gives rise to

6    discovery of essentially everything that the government has

7    done in the hopes of finding something -- that's what I

8    thought I heard.  Sounds like a fishing expedition to me,

9    quite frankly -- is they have no idea what happened or they

10   don't have an allegation of anything specifically happening,

11   but they want to make sure the search terms are broad enough

12   so that something they hadn't thought of previously might

13   get snapped up if in fact it exists.  I don't know how

14   that's going to move the ball forward here.

15           THE COURT:  So obviously of all the issues that

16   were briefed I didn't see this one front and center.  But

17   anyway, I think where this gets limited is in the custodians

18   and in the search terms.  Because I think anybody's random

19   thought of what they think should have happened to COFINA

20   and the structure is just not the issue in this case; nor

21   can you bring that case.

22           So I'm assuming that you're dealing with more

23   specific directions to entities or the bank or something

24   like that.  So I'm expecting that to be actually quite a

25   limited -- I'm not going to preclude discovery on that

1    point, but you need to be focused in your questions, all

2    right?  That's going to be a very limited area of

3    communications between specific -- you know, the custodian

4    and specific parties, something like that.  Because it can't

5    be what everybody in the government thought about what maybe

6    should be happening with COFINA.  That's a ridiculous

7    exercise.  I understand that that's not what you want.

8              MR. LEBLANC:  That's not what we want.  To be

9    clear as I can possibly be, the reason I raised it is

10   because I have every confidence that had we left here with

11   your Honor saying that the topic was, only answer the

12   limited question of determining what use if any is to be

13   made of the money, that when we said we'd like to see

14   documents reflecting communications, we want to have search

15   terms for these limited set of custodians that would capture

16   documents that would reflect communications with third

17   parties, for example, or internal communications that

18   reflect discussions with third parties, that they would have

19   said no because it's beyond the scope of what the court

20   ordered.

21             I think all I'm asking for now, your Honor, and it

22   is a question of custodians and search terms, but all we're

23   asking for now is to be clear that the topics upon which we

24   can include search terms is beyond that one limited question

25   but also includes reasonable search terms to investigate

1   whether or not they've complied with a duty to defend.

2   That's the issue.

3            And we can we can deal with specifics as they

4   arise.  But having -- the one limited topic that we talked

5   about, it gets to Mr. Friedmann's I'll just give you the

6   documents sufficient to show how we're using it, and

7   therefore I'll only show you whether or not we have in fact

8   invaded the collateral, not whether we've complied with our

9   duty to defend the structure.

10            THE COURT:  The problem I'm having with -- I'm

11   recognizing that it needs to be broader than I've just

12   stated it.  The problem I'm having is with the duty to

13   defend as being too broad.  Here is my IT person.

14            MR. ROMANELLO:  Your Honor, Salvatore Romanello.

15   That's the first time anyone has ever said that to me, an IT

16   person.  On behalf of National, I think it's just the

17   language -- it's difficult to prove the duty to defend.

18   What we're concerned with is invading, right?  So it's the

19   proposed use of the funds.  It's a change of use of the

20   funds.  All right?  We are limiting the custodians.  If

21   there are e-mails that come up with the search term -- with

22   the use of the search term that show proposed changes to the

23   use, those are the types of documents where we think, yeah,

24   there's an affirmative obligation to defend.  You can

25   litigate that.  But really, you have to protect the

1    structure, and you're not protecting the structure if you're

2    saying, Hey, let's use these funds for something else.  And

3    that's what we think will come out of these narrow -- we

4    want to make sure that if we have a narrow search, those

5    types of e-mails are turned over.

6              THE COURT:  So why wouldn't that be turned over in

7    connection with a description that says discovery concerning

8    proposed use of these funds?

9              MR. CANTOR:  It sounds to me, your Honor, like

10   they could.  This may not be their intent, but it sounds to

11   me that in trying to get where they're going, you end up

12   with random statements by people that have no meaning behind

13   them and certainly no force of law.  I just -- the

14   correlation makes sense to me.  I'm not sure where we go

15   with how they're trying to change it.  I mean, is it anytime

16   anyone mentions a different use of those funds in any

17   context for any reason?  I'm not saying I agree to that, but

18   at least I'd understand what they're saying.

19             MR. KIRPALANI:  If I could try --

20             THE COURT:  Well, we have different issues here of

21   what they would actually try to argue and what's an

22   appropriate scope of discovery, right?  So if we've limited

23   the custodians to people with actual sort of authority over

24   something, then by definition you should have eliminated

25   sort of the fourth tier person who may have had a thought

1   with their friends.

2          MR. CANTOR:  I guess what I'm concerned about,

3   your Honor, is, when you get to the process, in order to

4   capture the stuff they're looking for, it sounds to me like

5   you need to look for every e-mail that has "SUT" in it.

6   Right?  And if we're going to search for that, are we -- and

7   it's not clear how the proposal works on this -- are we

8   going to first review and make sure that a document that has

9   "SUT" in it is in fact responsive to what they want, or are

10  we just turning over every document that hits on "SUT"?

11         THE COURT:  So that concern I think gets addressed

12  in the context of if you do a run and the terms are just too

13  broad.  Then you come back and you say, Look, I've got this

14  excessive number of hits here, this is crazy.

15         MR. CANTOR:  Okay.  I'm willing to go down that

16  path.  But I think if you listen to what it is they're

17  hoping to find, they only find it if they look at every

18  document that has "SUT" in it.  And the word "change," I

19  mean, is that limited --

20         THE COURT:  Well, if that's going to be their

21  approach, it's not going to be an effective one.

22         MR. KIRPALANI:  Your Honor, I don't know if we're

23  talking past each other on this side of the desks, but I

24  mean, it's pretty simple.  I think your Honor hit it on the

25  head this morning.  And Mr. LeBlanc has illuminated the

1    proper scope given what the real goal is, to determine what

2    the proposed use of the dedicated sales tax is, other than

3    for payment of the bonds issued by COFINA.  So it may not be

4    that it's specifically earmarked for one particular thing.

5    We don't think there's such a document that says, We're

6    going to take this much of the cash from COFINA and use it

7    to pay X, Y, Z expense.  It probably doesn't exist.

8            But the issue is -- and not to take the statement

9    out of context, but counsel for AAFAF just said, Well, if

10   the bondholders are asking if there's any changes to be

11   made, well, at least I kind of understand what they mean.

12   But yeah, that's exactly what we mean.  This is a

13   securitization where cash comes in and cash goes out to

14   bondholders.

15           We have statements on the record by Mr. Sanchez

16   that says, We are going to change the way COFINA works under

17   the fiscal plan; it will no longer go to COFINA and COFINA's

18   bondholders; it will now be pooled.  And we want to see

19   those statements in the proper context and how they fit with

20   the fiscal plan.  I don't know why it's invasive.

21           THE COURT:  I'm not sure we've broadened it.  I

22   mean, I think the documents have to reflect the proposed use

23   of the dedicated sales tax revenues.  That is the goal, all

24   right?

25           If the search terms that they propose are too

1    broad because it's any random thought, then you'll need to

2    tell me that.  But I think the goal is the same.  I agree

3    that they can't have this fantasy wish list of, you know,

4    what the janitor thought should be done with the funds.  But

5    I don't think they're going to waste anybody's time on that.

6    If the search terms are too broad, we're going to have to

7    figure out a different way to get there.  But I think the

8    issue is remaining the same.  It's just sort of how are you

9    using the documents.

10            MR. LEBLANC:  Your Honor, I think the issues

11   remain the same.  It's frankly the same process we do in

12   every case in every --

13            THE COURT:  But you have very little time here,

14   okay?  So you start the case in the normal course of saying,

15   Here is our broadest search terms possible, and then you

16   tell me where that ends up.  We don't have that luxury here.

17   And frankly it's a waste of money here, so let's not do it

18   that way.

19            You need to come up with a really well-thought-out

20   set of terms, all right?  And limit it -- because what I'll

21   end up doing is just cut the number of custodians, and

22   you'll end up with not what you want.  So you need to have a

23   very defined set of terms, a limited set of custodians.  You

24   need to, by Friday -- what did I say, Friday -- provide the

25   description of the potential custodians.  You need to

1    provide the list of search terms.  It needs to be

2    well-thought-out.  The next step will be I guess the

3    government filing something that says, Look, we have 40,000

4    hits on this one word and it just doesn't make any sense for

5    us to do that.

6            I don't know how else to do it, but that's the

7    limitation.  I think we've narrowed the timeframe and we've

8    narrowed the scope of the appropriate issue, and now we need

9    to figure out how to get there.  But that's a more technical

10   discussion than I know how to do from the bench right now.

11           MR. MUNGOVAN:  Good afternoon, your Honor.

12   Timothy Mungovan from Proskauer for the Oversight Board.

13   Just to clarify with respect to Elias Sanchez, to understand

14   what we're talking about in terms of what we're seeking from

15   him, he's an ex officio member of the Oversight Board.  He

16   was appointed by the governor.  What we would propose and

17   what we understand the proposal to be is that there's not

18   going to be a search for documentation -- documentation

19   concerning his communications with the Board as an ex

20   officio member are not going to be subject to production.

21   To the extent that they are developed as part of the search

22   or they are located, we would object to the production of

23   those communications with the Board by Mr. Sanchez or

24   communications between Mr. Sanchez and the governor with

25   respect to deliberations at the Oversight Board on the issue

1       of the use of the monies.

2               THE COURT:  Why would you object?

3               MR. MUNGOVAN:  To the extent that, your Honor,

4       with respect to those communications, Mr. Sanchez may have

5       direct dealings with the Board and a member of the Board

6       during the period we'll call it March when the fiscal plan

7       was being developed, those certification determinations,

8       those e-mails may well relate to certification -- excuse

9       me -- determinations that we believe are off-limits from

10      discovery and are not relevant to the issues in this case.

11              What we're hearing about is a claim that the

12      government effectively or COFINA, the entity, did not defend

13      the COFINA structure; and communications with the Board

14      about what the Board may want to do with respect to a fiscal

15      plan are not part of the issues that are in the interpleader

16      proceeding.

17              THE COURT:  Go ahead.

18              MR. KIRPALANI.  If I may be heard on that, your

19      Honor, Susheel Kirpalani.

20              We talk about the Federal Oversight and Management

21      Board by focusing on the "F" in federal.  Under PROMESA, the

22      Oversight Board -- and counsel for AAFAF was just discussing

23      this exact issue with me in the hallway during our meet and

24      confer.  The Board is a component part of the territorial

25      government under the federal law.  That's what it says, that

1   the Oversight Board will be appointed by Congress, but it

2   will actually have authority at the territory level, not at

3   the federal level, at the territory level.

4          So under PROMESA, it took over the right to

5   approve an overall budget and fiscal plan.  It is that

6   fiscal plan that is what gives the force of law in this

7   courtroom.  And so it's highly relevant if the Oversight

8   Board members are asking the representative of the

9   Commonwealth, I don't understand how you plan to implement

10  this plan, this fiscal plan you've proposed to us; where is

11  the money going to come from; and the answer goes back

12  across the transom, We're just going to take it from COFINA.

13         Under what Mr. Mungovan's proposal is, we'd never

14  see that document.  It just doesn't make any sense.  I'm not

15  sure what sort of overlord privilege is being certified

16  here, but it doesn't square with the role of the Oversight

17  Board.

18         THE COURT:  I'm just having a hard time

19  understanding what the objection is.  I apologize.  But if

20  the documents are requested from the Oversight Board and

21  they produce them, you're saying that you have the right to

22  object to their production.

23         MR. MUNGOVAN:  Not quite, your Honor.  I apologize

24  if I wasn't clear.

25         My understanding is what we're talking about is a

1    search with respect to Mr. Sanchez, and Mr. Sanchez is an ex

2    officio member.  With respect to the discussions and

3    deliberations that take place within the Board as part of

4    the certification process of the fiscal plan, under 106(e)

5    of PROMESA, we believe what they're effectively doing is

6    challenging a fiscal plan as a basis for their claim as part

7    of the interpleader proceeding.  And by looking at the

8    certification determinations of the Board or Mr. Sanchez as

9    an ex officio member of the Board, in effect that's where we

10   are headed with respect to this interpleader proceeding.

11   They're going to be challenging the Board's certification

12   determinations with respect to the uses of the sales and use

13   tax proceeds.  The fact --

14        THE COURT:  So you're assuming that they're going

15   to find that the funds were not going to be used to pay the

16   bondholders; and what you're saying is, assuming that fact,

17   they still can't challenge because of PROMESA and that the

18   decision is unreviewable.

19        MR. MUNGOVAN:  What I'm saying is that's actually

20   not part of this case but it's part of the case that either

21   they have brought or will bring as part of the Title III.

22        As a practical matter to what AAFAF counsel has

23   said, those issues are largely irrelevant.  We are producing

24   or AAFAF is prepared to produce the documentation which

25   shows the proposed uses of the sales and use tax proceeds.

1    And my understanding is the documentation that is in a data

2    room that AAFAF has prepared has that information.  And so

3    the discussions and deliberations within the Board about

4    what to do and how to do it are frankly irrelevant to the

5    issue of whether or not there has been a breach by COFINA or

6    the government in failing to defend under the resolution for

7    COFINA.

8          THE COURT:  So why is this different than the

9    deliberative process claim that either will or will not be

10   made in connection with this production?

11         MR. MUNGOVAN:  It's directly related, your Honor.

12         THE COURT:  Okay.  So it's covered somewhere?

13         MR. MUNGOVAN:  I believe it is.

14         THE COURT:  I mean, either the documents will be

15   produced because there's no claim of privilege because it's

16   post decision and it's factual, to simplify the process, to

17   simplify the privilege.  I reserve the right to do all the

18   nuances as well.

19         MR. MUNGOVAN:  That's right, your Honor.  I would

20   also say one more thing.  The ultimate decision about what

21   to do, you've said and I believe the term is "What happens,"

22   that's what you've said repeatedly, I believe.  We don't

23   know yet what will actually happen.  And part of what the

24   Oversight Board had proposed last week in connection with

25   the omnibus hearing is a process to determine what happens

1    with respect to, among other things, these sales and use tax

2    proceeds for COFINA.  It is not clear yet what will happen,

3    and so we are really predecisional in some respects with

4    respect to the discussions that are ongoing concerning the

5    use of the sales and use tax proceeds, at least from the

6    perspective of the Oversight Board.  Thank you.

7                THE COURT:  So that it seems to me deals with

8    frankly the ultimate resolution of everything --

9                MR. MUNGOVAN:  I agree with, your Honor.

10               THE COURT:  -- which is the mediation part of this

11   or the ultimate conclusion.  The issue that we have here is

12   whether the actions taken before these funds are actually

13   used constitute a default.

14               MR. MUNGOVAN:  Your Honor, I agree with you, but

15   Mr. Sanchez sits in between the Board, if you will, and the

16   government.  And all that I'm trying to do is distinguish

17   between those two roles.  If he has made statements or taken

18   actions and he happens to -- he happens to be an ex officio

19   member of the Board but he is communicating with the

20   governor about what he and the governor want to do, from my

21   perspective that's an issue for AAFAF to decide as to

22   whether or not it's subject to the deliberative privilege or

23   not.

24               We at the Board are not taking a position

25   necessarily with respect to those communications.  I'm

1    distinguishing those types of communications from his

2    communications with the Board in the development of the

3    fiscal plan, which isn't necessarily -- the Board is acting

4    as the Board.  The Board isn't a party to this proceeding.

5    The Board is a non-party that has received a subpoena, as is

6    Mr. Sanchez.  I don't know if he's a party.  I haven't gone

7    back and looked at the pleadings, your Honor, but I do know

8    that he's received a subpoena, so I assume that he's not a

9    party per se to the interpleader proceeding.

10            THE COURT:  So I have a memory that this morning

11   you said, that you indicated that you had some

12   decisionmaking about going against Mr. Sanchez's -- seeking

13   Mr. Sanchez's documents and various roles.  Did you say

14   something like that?

15            MR. KUEHN:  Correct.  Mr. Sanchez is appointed by

16   the governor, appointed by the government of Puerto Rico.

17   And while he's an ex officio member of the Board, he also

18   has a role with the government, as I understand it.  And

19   they've taken the position in the past that he is a member

20   of the government, at least for purposes of deliberative

21   process privilege, and I don't see why we should treat it

22   any differently for purposes of discovery here.

23            THE COURT:  So maybe it is the post-lunch and I

24   shouldn't do this, but it seems to me that those concerns

25   will be addressed in a claim of privilege, if appropriate,

1    okay?  And you can assert that -- I mean, you can work with

2    counsel on that.

3           MR. MUNGOVAN:  I agree, your Honor.  Thank you.  I

4    just wanted to make it clear that there wasn't any waiver on

5    the Board's part with respect to that issue.  Thank you.

6           THE COURT:  Okay.  Thank you.

7           I hate to ask if there's anything else because

8    that always opens the door.

9           MR. KUEHN:  I have one hopefully small request for

10   a little bit of guidance.  And that is, we've talked about

11   e-mails.  Another form of electronically stored information

12   is text messages.  And in this case I have personal

13   knowledge that members of the governor of Puerto Rico used

14   text messages for business purposes.

15           To the extent that counsel for the government

16   parties is able to stipulate and represent to the court that

17   their personal text messages, their phones have not been

18   used for business purposes, I don't need to get into seeing

19   text messages.  But I'm not sure if that's possible for them

20   to do.  And to the extent it's not possible, I do think

21   that's important.  I don't think there's any personal iPhone

22   privilege.  And to the extent you're using that for your

23   business purpose, government purpose, I think that's

24   relevant and really should be part of the production.

25           MR. CANTOR:  Your Honor, we believe it's -- there

1    are all the practical burden issues that we talked about in

2    addition to it just being a huge invasion of privacy here.

3            You know, I don't know which if any of these

4    officials do use their own phone text messages for

5    government business.  But the process of recovering that

6    stuff and reviewing it to find whatever there may be out

7    there is just both burdensome and as I said a huge

8    imposition on these individuals' privacy rights, quite

9    frankly.

10           THE COURT:  All right.  So we need to get the list

11   of custodians out fast.  Do you have any kind of standstill,

12   you know -- I don't mean standstill -- preservation orders

13   out or agreements on any of this?

14           MR. FRIEDMANN:  Peter Friedmann from O'Melveny.

15   Your Honor, we have certainly worked with various clients --

16           THE COURT:  I think you need to talk into the

17   microphone.

18           MR. FRIEDMANN:  Peter Friedmann from O'Melveny.

19           Yes, your Honor, we have sent preservation notices

20   to people who received subpoenas.  AAFAF has been under a

21   subpoena -- sorry -- under a document preservation notice,

22   GDB has preservation notices.  That's already been done well

23   in advance of today's hearing.

24           THE COURT:  All right.  So I think the way -- the

25   only way I know how to do this is step by step but baby

1   step -- rapid steps.

2           So if there is no exemption from private

3   communications that I'm aware of, if it's unduly burdensome

4   given what he's -- what the ultimate search looks like, then

5   we'll deal with it.  You need to categorize it, though.  You

6   need to be able to say it to me, These ten people use their

7   phones, or these three custodians use their phones, and we

8   can't search for it.  You know, I mean, texts it seems to

9   me -- I have no idea.  In my e-mail box, the texts are

10  easier to find than the e-mails, but I don't know that I use

11  my equipment, you know, electronics the same way as

12  everybody else does.

13          But I think the problem with this all or nothing

14  is that we end up talking about things that don't have

15  definition, and we're past that stage.  The litigation is

16  past that stage.

17          So if documents are being withheld, I've already

18  said that you can categorize the types of privileges you're

19  claiming.  You can categorize sort of attorney-client, but

20  you've got to identify who it is.  And if you're not

21  producing a certain type of document for a reason, you need

22  to say so, and then we can have a fight about it.

23          MR. CANTOR:  We hear you, your Honor, and we'll do

24  that.  I think your last comment raises, I apologize,

25  another potential issue, which, at least as I understand the

1    proposal in the hallway but I'm not sure how it was

2    communicated in the room, at least I don't recall it, is the

3    issue of privilege logs.  And I thought that the proposal

4    had been that we were going to run a filter, one of the

5    filters we were going to run on the e-mails was to try and

6    eliminate communications involving counsel.  Do I have that

7    correct?

8            MR. KUEHN:  Correct.

9            MR. CANTOR:  Okay.  If we're eliminating them at

10   the search stage, then I don't know how we do a detailed

11   privilege log, if we're kicking them out and not recovering

12   them.

13           MR. KUEHN:  I don't think we're asking for a

14   line-by-line privilege log.  I think we're asking for a

15   categorical privilege log, which can be performed once you

16   isolate the potentially privileged documents by setting up

17   the date range that particular topics cover.

18           MR. CANTOR:  Then there's really no advantage --

19   what was the advantage to the screen?  Because I'm still

20   going to have to go back and look at all those documents

21   anyways.

22           MR. KUEHN:  No.  You can search by the names of

23   the attorneys on each side and say, Here is the subject

24   matter of the stream of communications from Attorney X to

25   Client Y over X dates.

1          MR. CANTOR:  Okay.  I guess, like I said, I'm not

2     sure -- one of the proposals for why this wasn't so bad was

3     that you can kick out all the attorney-client stuff ahead of

4     time -- and tell me where I'm wrong, because I know I can be

5     wrong.  Don't I then have to go back and look at all the

6     attorney-client communications in order to come up with a

7     log?

8          MR. KUEHN:  You can categorize them electrically.

9     Again, you can come up with search terms to categorize your

10    withheld documents and give us some idea the categories of

11    what's being addressed in those communications.

12         THE COURT:  So instead of it doing it document by

13    document first, screen them out.  Then how about by either

14    affidavit or some form of agreed-upon narrative that says,

15    This attorney was involved in these kinds of issues; this

16    attorney was involved in those kind of issues.  To the

17    extent that -- like you would do it on a privilege log as a

18    subject but without doing it item by item at all.  Just so

19    that they have a list of the attorneys and that they have

20    sort of a very broad -- you know, they were the ones that we

21    got compliance data from or something.

22         MR. CANTOR:  I guess the answer is yes, we'll try.

23    I'm not positive this won't be a problem, but we will try.

24         THE COURT:  All right.  I'll go with trying to

25    start.

1          MR. CANTOR:  Okay.

2          THE COURT:  Then we have to succeed.  Okay?  What

3    kind of timeline do we need?

4          MS. HALSTEAD:  Your Honor, I have one -- Ellen

5    Halstead of Cadwalader, Wickersham & Taft.  We represent

6    Assured Guaranty.  Assured insures the subordinate bonds.

7    You've been hearing from the Senior bondholders as well as

8    senior insurers all day.  We did, Assure did propound

9    discovery requests upon COFINA.  COFINA's response to those

10   requests was that they'll produce but they will only produce

11   hard copies.

12         We would just ask to the extent there's meet and

13   confers regarding search terms and the custodians this week

14   that we be included in those meet and confers.  Because I

15   believe the document requests that we propounded on COFINA

16   would include what your Honor has ordered to be produced,

17   the proposed use of the sales tax revenues, that that would

18   be a subset of what we requested.

19         MR. CANTOR:  Its sounds to me like it's between

20   the seniors and subs, not between us and them.

21         MS. HALSTEAD:  Well, I think it is between us

22   because  we propounded the discovery requests on COFINA.  So

23   we're just asking that we be involved, that we be -- I

24   haven't seen a list of the search terms or proposed

25   custodians.  We just ask to be involved in those

1    communications because it's possible we may want to add one

2    or two search terms to cover our issues.  I don't know

3    that -- we may not be -- we're not trying to broaden the

4    scope of discovery in any sense.  We do have concern that

5    discovery is all going to Seniors right now.  What we

6    request is to be involved in these discussions, that's all.

7              THE COURT:  All right.  But I don't see a

8    different issue right now between the levels as far as the

9    scope of discovery.  So I mean, the scope of discovery here

10   is what is the proposed use -- proposed changes to use of

11   dedicated sales tax funds, right?

12             MS. HALSTEAD:  We just involved --

13             THE COURT:  I have no problem with you consulting

14   with this, but I don't want to make this into a 12-party

15   need to exchange.  So you need to work with the Seniors and

16   decide among yourselves that you can include those words or

17   not.  I don't want COFINA to have too many people to respond

18   to.

19             MS. HALSTEAD:  Okay.  That's fine.  Thank you,

20   your Honor.

21             THE COURT:  So the exchange of custodians and

22   search terms is going to be done by the end of the week, and

23   everybody's going to really show how much control I have

24   over this courtroom by really, really working hard to make

25   them very limited search terms, right?  Everybody's just

1    staring -- for the record, everyone is just staring at me in

2    horror.

3              Okay.  But then what happens?  If you can't by the

4    end -- by next week, next Thursday, you send me letters that

5    say we have a problem or not.  Then I'll set up a telephone

6    conference.  And I will put in this order that if anybody

7    objects to me having a private telephone conference just

8    over the search terms and the custodians, they need to file

9    something within the next four days or something like that.

10   I'll figure that out.  Okay?

11             MR. CANTOR:  Letters by the 13th, that's next --

12             THE COURT:  Is that Friday the 13th?

13             MR. CANTOR:  Thursday.

14             THE COURT:  Thursday, yeah.

15             MR. GRAY:  Your Honor, Neil Gray from Reed Smith

16   on behalf of the Bank of New York Mellon.

17             Two small points.  We're interpreting your earlier

18   ruling that February 15, 2017 will be the starting time for

19   these productions, that that applies to all parties.  Are we

20   interpreting that correctly?  All parties producing

21   documents.

22             THE COURT:  I think that makes the most sense.

23   But I leave it to you because I have left open the 2015 door

24   for, you know, post this proceeding, I leave it to you on

25   whether or not it's cheaper for you to do it all at once if

1    you want to go back to 2015 now because I know you've

2    reached agreements on some of those things.  If that's

3    easier, you're certainly free to do it.  But otherwise the

4    discovery here is limited.  I think I have two separate

5    dates, actually.  I think I have the March 17 for the --

6    right?

7              MR. KUEHN:  I'm sorry, your Honor.

8              THE COURT:  I'm sorry.  I lost track of my dates.

9              MR. LEBLANC:  I think February 15 --

10             THE COURT:  I think February 15 for the government

11   forward.

12             MR. KIRPALANI:  March 13, the date of the public

13   fiscal plan for creditor reactions to it.

14             THE COURT:  Does everybody agree that I had those

15   two dates?

16             MR. KUEHN:  Agreed.

17             THE COURT:  So yes, I believe that even if other

18   parties have agreed to go earlier, they don't need to,

19   including the bank, I gather was going to produce earlier,

20   that you don't need to.  It's without waiver of bringing in

21   the claims of dispute potential defaults preceding 2017

22   either in phase three or as an interim stage after the

23   summary judgments in the stage two.

24             MR. GRAY:  Thank you, your Honor.  The second

25   point, and this is more informative than anything, many of

1    the parties in their responses and objections asserted the

2    need for a protective order to produce confidential

3    information.  We wanted to let the court know that

4    negotiations about that language have been going on.  We're

5    hopeful that we'll be able to finalize that in the next day

6    or so, day or two, and get a signed stipulation to the court

7    to consider and so order, my preference would be by the end

8    of the week so it doesn't hold up any productions.  But

9    again, that's more informative than anything.  I don't think

10   we need anything from the court at this time.

11             THE COURT:  Okay.  If you all agree I will not

12   have an objection to it.  I don't feel the need to insert

13   anything else unless you've really tied the hands of the

14   court somehow.

15             MR. GRAY:  Thank you, your Honor.

16             MR. KUEHN:  Your Honor, Brant Kuehn.

17             I had two small requests or two small suggestions

18   with respect to the search term and custodian meet and

19   confer process.  It's difficult to efficiently propose

20   search terms until we know the custodians.  So I think it

21   may be more productive if the custodian list is produced

22   tomorrow, if possible, or Friday morning, and we are then

23   able to spend a few hours at least to look over the

24   custodians and develop the search terms after we've seen the

25   custodians.

1          MR. CANTOR:  I think we can give you a large

2    number of the custodians perhaps even tonight but certainly

3    tomorrow.  I will be quite frank, the number 40 I'm not sure

4    is as set in stone as people thought it was.  So, you know,

5    I need to know when we get to that number.  But I've got 20

6    at least we can get you.

7          MR. KUEHN:  Thank you.  The second suggestion is,

8    given the looming deadline, I wonder if it would make more

9    sense to have letters addressing any disputes next Wednesday

10   rather than next Thursday, if there are any objections.

11         MR. CANTOR:  Sure.

12         THE COURT:  Sure.  Fine.

13         I will deal with them as promptly as I can.  And

14   again, if we can do it in a smaller telephone conference,

15   that would be the easiest, but we'll see if we have any

16   objections to that procedure.

17         I feel like I probably have something else hanging

18   out there?

19         MR. DESPINS:  Your Honor, Luc Despins with Paul

20   Hastings, proposed counsel for the Creditors Committee in

21   the Commonwealth case.  I just wanted to make sure your

22   Honor was not blindsided about an issue.  It doesn't affect

23   any of the rulings you've made today.

24         THE COURT:  I think I'm doing so well on these

25   issues, and you keep kind of bringing them in.

1          MR. DESPINS:  It's just, I want to make sure your

2    Honor knows that right now you've been dealing with

3    discovery issues within COFINA which affect the issue of who

4    is Senior, is there a default, do the Seniors get all the

5    money, et cetera, et cetera.  But there's a bigger issue

6    that involves the Commonwealth v. COFINA which is coming

7    down I would say soon over whether this is COFINA's money at

8    all.

9          People don't need to comment, obviously, but we

10   are going to represent the Commonwealth in that issue, and

11   therefore I want to make sure your Honor knew that that

12   train is coming, which doesn't affect anything that has

13   happened today, but I wanted to make sure you were aware of

14   that.

15         THE COURT:  Thank you.  So as you know, the order

16   of reference was limited here.  There will be other orders

17   of reference to this session.  I do coordinate the schedule

18   with Judge Swain, working within those things.  So we have

19   her schedule.  That's not been modified at all, and she's

20   set schedules in various of the proceedings, and we just try

21   to work within those.

22         I do ask you, though, if you think I'm running

23   against a date that I lost track of in another matter, you

24   know, please let me know, because I know that you're all

25   more involved in all of the other proceedings than I am, but

1    I'm sure that will continue to evolve over time.

2              All right.  I think that ends it for me.  Anybody

3    have any other issues that they want to talk about?  The

4    weather?  No.  Okay.  Thank you very much.

5              (Adjourned, 2:34 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     CERTIFICATE OF OFFICIAL REPORTER

 2

 3               We, Lee A. Marzilli and Kelly Mortellite,

 4    Registered Merit Reporters and Certified Realtime Reporters,

 5    in and for the United States District Court for the District

 6    of Massachusetts, do hereby certify that pursuant to Section

 7    753, Title 28, United States Code that the foregoing is a

 8    true and correct transcript of the stenographically reported

 9    proceedings held in the above-entitled matter and that the

10    transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12                     Dated this 6th day of July, 2017.

13

14               /s/ Lee A. Marzilli

15          _____

16            Lee A. Marzilli, RPR, CRR

17            Official Court Reporter

18

19               /s/ Kelly Mortellite

20          _____

21            Kelly Mortellite, RMR, CRR

22            Official Court Reporter

23

24

25
```