**Hearing Date:  August 9, 2017 at 9:30 a.m. AST**
**Objection Deadline:  July 28, 2017 at 4:00 p.m. EDT**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>           Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## MOTION OF THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS TO RECONSTITUTE THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 105(a) AND 1102(a)(4)

---

[1] The Debtors in these title III cases (collectively, the "Title III Cases"), along with each Debtor's respective Title III Case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).  (Title III Case numbers are listed as bankruptcy case numbers due to software limitations).

## Table of Contents

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTION AND VENUE ............................................................................... 5

BACKGROUND .................................................................................................... 5

ARGUMENT ......................................................................................................... 7

I.      Constitutional Debtholders Are Not Adequately Represented On The Committee .......... 9

      A.      Adequate Representation Requires That Different Types Of Creditors Have A Voice On The Committee.......................................................................... 9

      B.      The Commonwealth Has Three Different Types of Creditors............................. 12

            1.      Constitutional Debtholders ........................................................ 12

            2.      Commonwealth Employees And Retirees ................................. 13

            3.      Trade Creditors And Tax Refund Claimants ........................... 14

      C.      The Committee Does Not Adequately Represent Constitutional Debtholders........................................................................................................ 16

            1.      The Composition Of The Committee ....................................... 16

            2.      Whether Different Classes Will Be Treated Differently Under Plan ....... 19

            3.      The Standing And Desires Of The Various Constituencies..................... 20

            4.      The Nature Of The Case ........................................................... 22

            5.      The Ability Of The Committee To Properly Function And Tasks The Committee Is To Perform .................................................. 24

II.      The Court Should Exercise Its Discretion To Reconstitute The Committee To Include Substantial Constitutional Debtholder Participation............................................. 28

      A.      The Delay And Additional Costs.................................................................... 28

      B.      Ability To Participate Without Official Committee ............................................. 29

      C.      Motivation Of The Movants ......................................................................... 29

i

III.    Unique Rights Of Constitutional Debtholders Are Not A Basis To Exclude Them From The Committee .................................................................................................... 30

IV.    The Court Should, In The Alternative, Appoint An Additional Committee Of Constitutional Debtholders Under Section 1102(a)(2) Of The Bankruptcy Code ........... 34

CONCLUSION ...................................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Budd Co.*,
512 B.R. 910 (Bankr. N.D. Ill. 2014) ...................................................................22

*In re Caesars Entm't Operating Co., Inc.*,
Case No. 15-01145, *Notice of Appointment of Official Committee of Second
Priority Noteholders* (Bankr. N.D. Ill. Feb. 5, 2015)...............................................34

*In re Churchill Coal Corp.*,
31 B.R. 115 (Bankr. S.D.N.Y. 1983) .....................................................................33

*In re City of Detroit, Michigan*,
Case No. 13-53846, *Order Granting the City's Motion to Vacate the
Appointment of the Official Committee of Unsecured Creditors* (Bankr. E.D.
Mich. Feb. 28, 2014)...........................................................................................24

*In re City of Stockton*,
Case No. 12-32118.............................................................................................23

*In re City Vallejo*,
Case No. 08-26813.............................................................................................23

*In re Daig Corp.*
17 B.R. 41 (Bankr. D. Minn. 1981) ................................................................10, 33

*In re Dana Corp.*,
344 B.R. 35 (Bankr. S.D.N.Y. 2006) .......................................................... passim

*In re Dewey & LeBoeuf LLP*,
No. 12-12321 MG, 2012 WL 5985325 (Bankr. S.D.N.Y. Nov. 29, 2012) .............9

*In re Dow Corning Corp.*,
194 B.R. 121 (Bankr. E.D. Mich. 1996) ....................................................... passim

*In re Drexel Burnham Lambert Grp., Inc.*,
118 B.R. 209 (Bankr. S.D.N.Y. 1990) ...........................................................16, 19

*In re Enron Corp.*,
279 B.R. 671 (Bankr. S.N.D.Y. 2002) .......................................................... passim

*In re Garden Ridge Corp.*,
No. 04-10324 (DDS), 2005 WL 523129 (Bankr. D. Del. Mar. 2, 2005)...............10, 21, 29, 33

*In re Grynberg*,
  10 B.R. 256 (Bankr. D. Colo. 1981) ...................................................................33

*In re Hills Stores Co.*,
  137 B.R. 4 (Bankr. S.D.N.Y. 1992) ........................................................... passim

*In re Jefferson County, Alabama*,
  Case No. 11-05736, *Order Regarding Recommendation of Appointment of
  Unsecured Creditors' Committee* (Bankr. N.D. Ala. Jul. 13, 2012).....................24

*In re Laclede Cab Co.*,
  145 B.R. 308 (Bankr. E.D. Mo. 1992) ................................................................32

*In re Microboard Processing, Inc.*,
  95 B.R. 283 (Bankr. D. Conn. 1989) ..................................................................32

*Mirant Americas Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of
  Enron Corp.*,
  No. 02 CIV. 6274 (GBD), 2003 WL 22327118 (S.D.N.Y. Oct. 10, 2003) .................... passim

*In re Ne. Dairy Co-op. Fed'n, Inc.*,
  59 B.R. 531 (Bankr. N.D.N.Y. 1986) ............................................................11, 18

*In re Park W. Circle Realty, LLC*,
  No. 10-12965 (AJG), 2010 WL 3219531 (Bankr. S.D.N.Y. Aug. 11, 2010)................. passim

*In re Plabell Rubber Prods.*,
  140 B.R. 179 (Bankr. N.D. Ohio 1992) ..............................................................30

*In re Residential Capital, LLC*,
  480 B.R. 550 (Bankr. S.D.N.Y. 2012) .................................................................8

*In re Richmond Tank Car Co.*,
  93 B.R. 504 (Bankr. S.D. Tex. 1988) .................................................................33

*In re Salant Corp.*,
  53 B.R. 158 (Bankr. S.D.N.Y. 1985) .................................................................18

*In re Seaescape Cruises, Ltd.*
  131 B.R. 241 (Bankr. S.D. Fla. 1991) ................................................................32

*In re Sharon Steel Corp.*,
  100 B.R. 767 (Bankr. W.D. Pa. 1989) ....................................................9 , 11, 31

**STATUTES**

23 L.P.R.A. § 104(c) ...................................................................................13, 14, 15

11 U.S.C. § 105(a) .............................................................................................1, 35

11 U.S.C. § 1102(a) ................................................................................ passim

11 U.S.C. § 1102(b) ......................................................................................10

28 U.S.C. § 1331 .............................................................................................5

28 U.S.C. § 1391(b) ........................................................................................5

48 U.S.C. §§ 2101-2241 .................................................................................1

48 U.S.C. § 2166(a) ........................................................................................5

48 U.S.C. § 2167(a) ........................................................................................5

Puerto Rico Constitution ......................................................................... passim

PROMESA § 201(b)(1)(N) ...........................................................................13

PROMESA § 301(a) ........................................................................................2

PROMESA § 301(e) .................................................................................19, 33

**OTHER AUTHORITIES**

6 Collier on Bankruptcy ¶ 1102.02[2][a][i] (Alan J. Resnick & Henry J. Sommer
    eds., 16th ed.) ...........................................................................................32

6 Collier on Bankruptcy ¶ 1102.02[2][b][i] (Alan J. Resnick & Henry J. Sommer
    eds., 16th ed.) ...........................................................................................12

The Ad Hoc Group of General Obligation Bondholders (the "GO Group"),[2] by and through its undersigned counsel, hereby moves this Court pursuant to sections 105(a), 1102(a)(2), and 1104(a)(4) of title 11 of the United States Code (the "Bankruptcy Code"), made applicable in these Title III Cases pursuant to section 301(a) of the *Puerto Rico Oversight, Management, and Economic Stability Act*, Pub. L. No. 114-187, 130 Stat. 549 ("PROMESA") (codified at 48 U.S.C. §§ 2101-2241), for an order (i) directing the United States Trustee to change the membership of the Official Committee of Unsecured Creditors of the Commonwealth (the "Committee"), or (ii) in the alternative, appointing an additional committee of Constitutional Debtholders.  In support hereof, the GO Group states as follows:

## PRELIMINARY STATEMENT

1.      The GO Group seeks to rectify an obvious and unprecedented anomaly.  The Oversight Board and Commonwealth assert that Constitutional Debtholders are the ***largest*** class of unsecured creditors in these Title III Cases.[3]  The Committee concedes that although Constitutional Debtholders are a "very important" group to which the Committee owes fiduciary duties, they remain "unrepresented."  The United States Trustee has nonetheless refused to appoint a single Constitutional Debtholder to the Committee, despite several holders, including two members of the GO Group, being willing to serve.  The GO Group is unaware of any case where the largest purportedly unsecured creditor was purposefully excluded from the official unsecured creditors' committee.  Rather, the Bankruptcy Code and the overwhelming weight of

---

[2]     The members of the GO Group filing this Motion are certain funds or entities managed or advised by Aurelius Capital Management, LP, Autonomy Capital (Jersey) LP, FCO Advisors LP, Monarch Alternative Capital LP, Senator Investment Group LP, and Stone Lion L.P.  These entities file this Motion exclusively on their own behalf and do not assume any fiduciary or other duties to any other creditor or person.  The GO Group collectively holds approximately $3.2 billion of bonds issued or guaranteed by the Commonwealth (collectively, the "Constitutional Debt" and holders thereof, the "Constitutional Debtholders").

[3]     The GO Group disputes the Commonwealth's assertion that Constitutional Debtholders are general unsecured creditors.  In due course, the GO Group will establish that Constitutional Debt is protected by a statutory lien on all "available resources" or certain subsets of those resources.

decisions interpreting the Bankruptcy Code provide that the Committee must adequately represent all of the Commonwealth's allegedly unsecured creditors, and must specifically represent the *different kinds* of the Commonwealth's allegedly unsecured creditors.

2.    Section 1102 of the Bankruptcy Code requires a creditors' committee to adequately represent a debtor's creditors.  Where a creditors' committee fails to adequately represent the debtor's creditors, section 1102(a)(4) empowers the Court to change the membership of the official committee.  "Adequate representation" requires that various different types of creditors—including, in particular, creditors with diverse and even conflicting interests—have a meaningful voice on and participation in the Committee.  The mere acknowledgment of the existence of duties to the Constitutional Debtholders does not suffice for adequate representation.  While a creditors' committee is not required to precisely reflect the makeup of the debtor's creditors, adequate representation does require that creditors have a voice that is commensurate with their importance in the case.

3.    The Committee, as currently constituted, falls far short of any conceivable standard of adequate representation.  Rather than including a single Constitutional Debtholder— allegedly the largest class of unsecured creditors in these Title III Cases—the Committee instead exclusively comprises employee unions (which may not have any claims at all), trade creditors, and a tax refund claimant.  While the aggregate amount of Constitutional Debt outstanding is more than *fifty times* larger than the aggregate claims of trade and tax refund creditors, those creditors outnumber Constitutional Debtholders *five-to-zero* on the Committee.

4.    Instead of including diverse interests on the Committee that could synthesize the interests of creditors broadly and expedite the consensual resolution of these Title III Cases, the Committee reflects only the narrow views of politically favored constituencies that the

Commonwealth has already paid in full or pledged to pay in full.  The Commonwealth has
pledged not to reduce employee headcount, has promised to continue paying suppliers in full,
and has continued to pay tax refunds as they come due.  In contrast, the Commonwealth proposes
massive cuts to bondholders, including Constitutional Debtholders, seeking to reduce all
bondholder claims by an average of approximately 80%.  Against this backdrop, the failure to
include any Constitutional Debtholders on the Committee ensures that the Committee will not
advocate zealously on behalf of all creditors.  This was confirmed by a press release issued by
one of the Committee members upon its appointment to the Committee:

> We are glad to serve on the unsecured creditors committee and
> believe any decision regarding bankruptcy needs to put the people
> of Puerto Rico first—not Wall Street financiers and hedge funds.
> Austerity has already led to the closure of 164 schools and to
> millions of dollars of cuts and the erosion of services to the public
> education system and the University of Puerto Rico.  Instead, the
> government must work with teachers and the entire community to
> preserve the public services the island needs to prosper.

June 28, 2017, Am. Fed'n of Teachers, Asociación de Maestros de Puerto Rico and AFT on
Puerto Rico Bankruptcy Proceedings (June 28, 2017), attached hereto as **Exhibit A**.  Without a
diverse selection of members with competing views, the Committee is constructed to "preserve
the public services," even at the cost of other creditors such as Constitutional Debtholders.
Adequate representation of Constitutional Debtholders would provide a much needed check and
balance.

5.     The lack of adequate representation afforded Constitutional Debtholders on the
Committee is highlighted by the ongoing COFINA validity dispute, which the Oversight Board
states "will likely be ***dispositive*** as to the relative recoveries of the ***debt holders*** of COFINA and

the Commonwealth."[4]   The Oversight Board, however, has nominated the Committee to serve as

the Commonwealth "agent" to challenge the validity of COFINA, yet the Committee does not

include the debt holders (i.e., Constitutional Debtholders) purportedly most affected by the

outcome of that dispute.   The purpose of adequate representation under section 1102 of the

Bankruptcy Code is to ensure that one group of creditors, which lack a significant stake in the

outcome of a particular dispute, is not entrusted with overseeing an issue that is allegedly

"dispositive as to the relative recover[y]" of another group of creditors.  Unless the membership

of the Committee is altered, that is precisely the situation Constitutional Debtholders face here.

6.     The United States Trustee acknowledges that it actively sought to exclude

Constitutional Debtholders from the Committee.   Its rationale was that Constitutional

Debtholders—and the GO Group in particular—claim to be entitled to first priority treatment

under the Puerto Rico Constitution and to be secured by a statutory lien on all available

resources.  Neither position, however, creates a disqualifying conflict.  To the contrary, creditors'

committees routinely include ***both*** senior and subordinated creditors, and courts encourage this

type of diverse composition so that the creditors' committees may adequately represent all

unsecured creditors and thereby facilitate consensual resolutions.   And so long as the

Commonwealth and Committee take the position that Constitutional Debtholders are unsecured,

the GO Group's arguments to the contrary cannot be the sole grounds for excluding

Constitutional Debtholders from the Committee.  Creditors are entitled to advance positions in

their individual capacity notwithstanding their participation on a creditors' committee and, if

appointed to the Committee, Constitutional Debtholders would not—in fact, could not—use that

position to argue they were secured.  Moreover, the United States Trustee and Court retain the

---

[4]     *See Motion of Debtors For Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [ECF
No. 303] at 12 (emphasis added).

ability to remove Constitutional Debtholders from the Committee if the Court determines that Constitutional Debtholders are secured creditors.

7.      In short, Constitutional Debtholders are not adequately represented by the Committee.  Section 1102(a)(4) of the Bankruptcy Code empowers the Court to reconstitute the Committee to fix this anomaly.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1331 and 48 U.S.C. § 2166(a).  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 48 U.S.C. § 2167(a).

## BACKGROUND

9.      On May 3, 2017, the Oversight Board filed a petition in this Court under title III of PROMESA on behalf of the Commonwealth.  Shortly thereafter, on May 5, 2017, the Oversight Board filed a petition in this Court under title III of PROMESA on behalf of COFINA.

10.     On May 5, 2017, the Pre-Petition Ad Hoc Retiree Committee filed a motion seeking the appointment of an official retiree committee.  *See Motion for Entry of an Order Pursuant to 48 U.S.C. § 2161 and 11 U.S.C. § 1102 Directing Appointment of an Official Retiree Committee and Appointing the Pre-Petition Ad Hoc Retiree Committee as the Official Retiree Committee* [ECF No. 8].

11.     The United States Trustee responded on May 19, 2017, and indicated that it intended to appoint three official committees in these Title III Cases: (i) an official unsecured creditors' committee in the Commonwealth Title III Case; (ii) an official retiree committee in the Commonwealth Title III Case (the "Official Retiree Committee"); and (iii) an official unsecured creditors' committee in the COFINA Title III Case.  *See Response of United States Trustee to Motion for Entry of Order Pursuant to 48 U.S.C. § 2161 and 11 U.S.C. § 1102 Directing the*

*Appointment of an Official Retiree Committee and Appointing Pre-Petition Ad Hoc Retiree Committee as the Official Committee* [ECF No. 192].  By letter dated May 23, 2017, the United States Trustee solicited interest in membership to such committees.

12.     The GO Group sent a letter to the United States Trustee on June 6, 2017 stating that an official unsecured creditors' committee in the Commonwealth's Title III Case was neither appropriate nor necessary and urging the United States Trustee to reconsider its decision to solicit interest in such committee.  *See* Letter from A. Rosenberg to Guy G. Gebhardt, Acting United States Trustee for Region 21 (June 6, 2017), attached hereto as **Exhibit B**.  To the extent the United States Trustee decided to appoint an unsecured creditors' committee in the Commonwealth Title III Case, the GO Group advised that it should be primarily, if not entirely, composed of Constitutional Debtholders, or that a separate official committee of Constitutional Debtholders should be appointed.  *Id.* at 2.  The GO Group did not take a position on the formation of a retiree committee in the Commonwealth Title III Case.  *Id.*

13.     The United States Trustee held committee formation meetings on June 9, 2017, in San Juan, Puerto Rico.  Two members of the GO Group expressed willingness to serve on the Committee in response to the United States Trustee's solicitation of interest and attended the Committee formation meeting.

14.     On June 15, 2017, the United States Trustee appointed the Committee and an Official Committee of Retirees in the Commonwealth Title III Case.  *See Appointment of Official Committee of Unsecured Creditors in the Commonwealth of Puerto Rico* [ECF No. 338]; *Appointment of Official Committee of Retirees in the Commonwealth of Puerto Rico* [ECF No. 340].  No official committees were appointed in the COFINA Title III Case.

6

15.     The Committee comprises the following seven members: (i) The American Federation of Teachers ("AFT"); (ii) Doral Financial Corporation, (iii) Genesis Security, (iv) Puerto Rico Hospital Supply, (v) Service Employees International Union, (vi) Total Petroleum Puerto Rico Corp., and (vii) Unitech Engineering.  No Constitutional Debtholder was appointed to the Committee.

16.     On July 11, 2017, the GO Group sent a letter to the United States Trustee requesting that it reconstitute the Committee to include Constitutional Debtholders.  *See* Letter from A. Rosenberg to Guy G. Gebhardt, Acting United States Trustee for Region 21 (July 11, 2017), attached hereto as **Exhibit C**.

17.     On July 14, 2017, the United States Trustee responded to the GO Group's July 11 letter.  *See* Letter from Guy G. Gebhardt, Acting United States Trustee for Region 21, to A. Rosenberg (July 14, 2017), attached hereto as **Exhibit D**.  In the July 14 letter, the United States Trustee stated that it had "no plans to reconstitute the Committee to add creditors claiming that their claims are secured or otherwise have full priority."

## ARGUMENT

18.     The Committee, as currently constituted, does not adequately represent the Commonwealth's creditors, and the Court should order the United States Trustee to change the membership of the Committee to ensure that Constitutional Debtholders are adequately represented.

19.     Section 1102(a)(4) of the Bankruptcy Code provides that "the court may order the United States trustee to change the membership of a committee . . . if the court determines that the change is necessary ***to ensure adequate representation of creditors*** . . . ."  11 U.S.C. § 1102(a)(4) (emphasis added).  Upon a request under section 1102(a)(4) to reconstitute the Committee, the Court "must necessarily conduct an independent review of whether there is

adequate representation by an existing committee." *See In re Enron Corp.*, 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002).    Accordingly, the Court reviews the United States Trustee's appointment of existing Committee members de novo.  *See id.*; *In re Park W. Circle Realty, LLC*, No. 10-12965 (AJG), 2010 WL 3219531, at *2 (Bankr. S.D.N.Y. Aug. 11, 2010).

20.    Courts consider a number of factors when determining whether to change the membership of a committee under section 1102(a)(4).  *In re Park W.*, 2010 WL 3219531, at *2. In particular, courts consider: (1) the ability of the committee to function; (2) the nature of the case; (3) the standing and desires of the various constituencies; (4) the ability of creditors to participate in the case even without an official committee and the potential to recover expenses pursuant to § 503(b); (5) whether different classes may be treated differently under a plan and need representation; (6) the motivation of the movants; (7) the delay and additional cost of granting the motion; (8) the point in the proceeding when the motion is made; (9) the tasks the committee is to perform; and (10) any other relevant factors.  *See id.*; *In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006); *In re Enron*, 279 B.R. at 685.[5]  No one factor is dispositive, and courts should apply the factors on a case-by-case basis.  *See In re Dana*, 344 B.R. at 38 (citing *In re Kalvar Microfilm*, 195 B.R. 599, 601 (Bankr. D. Del. 1996)).

21.    In synthesizing the above factors, courts often "employ a two-step process."  *In re Residential Capital, LLC*, 480 B.R. 550, 557 (Bankr. S.D.N.Y. 2012).  First, using a subset of the above factors, courts determine whether the movant "is adequately represented by an existing committee."  *Mirant Ams. Energy Mktg., L.P.* v. *Official Comm. of Unsecured Creditors of Enron Corp.*, No. 02 CIV. 6274 (GBD), 2003 WL 22327118, at *4 (S.D.N.Y. Oct. 10, 2003).  "If

---

[5]    Courts use the same factors to determine whether to appoint an additional official committee under section 1102(a)(2) of the Bankruptcy Code, which also requires a finding of lack of "adequate representation." *See In re Park W.*, 2010 WL 3219531, at *4 ("[T]he principle and analysis with respect to 'adequate representation' [under section 1102(a)(2)] are applicable to the considerations of that term as it applies under § 1102(a)(4)."). Accordingly, courts cite interchangeably to cases interpreting both sections of the Bankruptcy Code.

a court finds inadequate representation, it will then determine whether it should exercise its discretion under the particular circumstances of the case," using certain of the factors outlined above. *Id.*; *see also In re Dewey & LeBoeuf LLP*, No. 12-12321 MG, 2012 WL 5985325, at *3 (Bankr. S.D.N.Y. Nov. 29, 2012) ("First, a court determines whether the appointment of an additional committee is necessary to assure the movants are adequately represented. Second, if the answer to the first question is 'yes,' then the court must decide whether it should exercise its discretion and order such appointment.").

## I.     Constitutional Debtholders Are Not Adequately Represented On The Committee

### A.     Adequate Representation Requires That Different Types Of Creditors Have A Voice On The Committee

22.     An official creditors' committee should be representative of a debtor's creditors, and, in particular, a debtor's ***different kinds*** of creditors.  "The formation of a creditors' committee is purposely intended to represent the necessarily different interests and concerns of the creditors it represents."  *In re Enron*, 279 B.R. at 685 (internal quotation mark omitted). Where, as here, the Committee is not representative of the debtor's creditors, section 1102(a)(4) of the Bankruptcy Code authorizes the Court to order the reconstitution of an existing committee if "change is necessary to ensure ***adequate representation*** of creditors."  11 U.S.C. § 1102(a)(4) (emphasis added).

23.     While the Bankruptcy Code does not define "adequate representation," courts have articulated standards for what constitutes adequate representation.  *See In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997).   "The legal principle to be distilled from these cases is clear: adequate representation exists through a single committee ***as long as the diverse interests of the various creditor groups*** are represented on and have participated in that committee."  *In re Sharon Steel*

*Corp.*, 100 B.R. 767, 777-78 (Bankr. W.D. Pa. 1989) (emphasis added).  "What is required is adequate representation of ***various creditor types***," and "[w]hat the Code requires is that ***conflicting groups of creditors*** have a voice through adequate representation on a Committee." *In re Hills Stores Co.*, 137 B.R. 4, 7 (Bankr. S.D.N.Y. 1992) (emphasis added).  The guiding principle in nearly every case is that adequate representation requires different types of creditors—and creditors with conflicting interests in particular—on the committee.  As the court noted in *Dow Corning*:

> For a particular group of creditors to be adequately represented by an existing committee, it is not necessary for the committee to be an exact reflection of that committee's designated constituents. Instead, ***adequate representation exists if the interests of that particular group of creditors have a meaningful voice on the committee in relation to their posture in the case***.

194 B.R. at 141 (emphasis added); *see also In re Garden Ridge Corp.*, No. 04-10324 (DDS), 2005 WL 523129, at *3 (Bankr. D. Del. Mar. 2, 2005) ("[A]dequate representation exists through a single committee so long as the diverse interests of the various creditor groups are represented on and have participated in that committee." (internal quotation marks omitted)); *In re Daig Corp.*, 17 B.R. 41, 43 (Bankr. D. Minn. 1981) (noting that creditors' committee "is purposely intended to represent the necessarily different interests and concerns of the creditors it represents" and "[t]here is simply no other entity established by the Code to guard those interests").[6]

---

[6]    The various provisions of section 1102 of the Bankruptcy Code confirm that diverse interests must be represented on official committees.  *See* 11 U.S.C. § 1102(b)(1) (recommending that an official committee of creditors "shall ordinarily consist of the persons, willing to serve, that hold the seven largest claims against the debtor of ***the kinds represented on such committee***," and contemplating appointment of a committee organized prepetition as the official committee "if such committee was fairly chosen and ***is representative of the different kinds of claims to be represented***") (emphasis added); *id.* § 1102(a)(2) (authorizing a court to order the appointment of additional official committees "if necessary to assure ***adequate representation*** of creditors") (emphasis added).

24.     Mandating that different types of creditors participate on a creditors' committee

not only ensures adequate representation of creditors, such diversity also ensures that the

creditors' committee will be better able to function and facilitate a timely and consensual

resolution of the bankruptcy cases.  A committee "is a catalyst for negotiation and compromise

between the parties in the reorganization process" and therefore functions better when it includes

diverse voices.  *In re Enron*, 279 B.R. at 690.  Accordingly,

> [T]he ***ultimate aim is to strike a proper balance*** between the
> parties such that an effective and viable reorganization of the
> debtor may be accomplished.  As in most Chapter 11 cases, there
> will be common interests among various groups of unsecured
> creditors.  ***The inclusion of such groups within one committee
> may facilitate the consensual resolution of the conflicting
> priorities among the holders of unsecured claims and thereby
> facilitate the negotiation of a consensual plan***.

*In re Hills Stores*, 137 B.R. at 7 (emphasis added); *see also Mirant*, 2003 WL 22327118, at *6

(same); *In re Ne. Dairy Co-op. Fed'n, Inc.*, 59 B.R. 531, 534 (Bankr. N.D.N.Y. 1986)

("[I]nclusion of entities with differing reorganizational aspirations often are of benefit to the

debtor.").

25.     When the interests of "distinct" creditor groups are each represented on an official

committee by "active, competent, financially sophisticated and strong-willed representatives,"

then the ability of such members to "adjust their differences within the framework of the existing

Official Committee" will strengthen the prospect of consensual resolutions.  *In re Sharon Steel*,

100 B.R. at 779.  As the leading bankruptcy treatise sums up:

> A committee will function more effectively if the different
> categories of creditors are represented on the committee.  For
> example, ***a complex case may have*** bank lenders, ***senior and
> subordinate*** debenture holders, trade creditors, union/employee
> creditors and rejected lease/executory contract claimholders.
> While it may be appropriate to have multiple committees in such a
> case, ***if the United States trustee determines only a single
> committee is warranted, that committee should reflect***

11

*membership from different categories in order to be representative of the interests of creditors.*

6 Collier on Bankruptcy ¶ 1102.02[2][b][i] (Alan J. Resnick & Henry J. Sommer eds., 16th ed.) (emphasis added).

### B.     The Commonwealth Has Three Different Types of Creditors

26.     The Commonwealth's creditors fall into three primary categories: Constitutional Debtholders, employees and retirees, and trade creditors and tax refund claimants. These different types of creditors are owed different amounts, have different rights under Puerto Rico law and PROMESA, are currently being treated differently by the Commonwealth and Oversight Board, and potentially have different views on how best to resolve these Title III Cases.

### 1.     Constitutional Debtholders

27.     The Commonwealth has issued or guaranteed approximately $18.2 billion in principal amount of Constitutional Debt, including $12.5 billion in general obligation bonds issued by the Commonwealth and $5.7 billion in bonds guaranteed by the Commonwealth. The Commonwealth asserts that Constitutional Debtholders are the single largest unsecured creditor constituency in the Commonwealth Title III Case. *See Notice of Filing of Amended Schedule B to Title III Petition – List of Creditors Who Have the 20 Largest Unsecured Claims* [ECF No. 3]. The Commonwealth has defaulted on its obligations to pay Constitutional Debtholders for over a year, with missed payments totaling more than $2.3 billion. As a result, the current claim amount of Constitutional Debtholders is approximately $19.6 billion, including amounts for overdue interest and interest on overdue principal and overdue interest.[7]

---

[7]     The GO Group reserves all rights with respect to any and all overdue amounts owing by the Commonwealth in respect of Constitutional Debt, including, without limitation, interest on all such overdue amounts, whether representing principal, interest, premium or other obligations, and further asserts that interest has accrued thereon, and will continue to accrue thereon until all such overdue amounts are paid in full, including interest upon interest, at the maximum rate allowed under applicable contract or applicable law, rule or regulation, and compounding on regular intervals (semiannually, quarterly or monthly, as applicable).

28.     Puerto Rico's Constitution provides that, when available resources are insufficient to cover all of the Commonwealth's obligations, Constitutional Debt shall be paid first.  *See* P.R. Const. art. VI, § 8.  Puerto Rico statutes further confirm that Constitutional Debt must be paid first and before all other expenditures.  *See* 23 L.P.R.A. § 104(c)(1).  PROMESA, in turn, requires that any fiscal plan—and therefore any plan of adjustment—respect the lawful priorities and liens set forth in the Puerto Rico Constitution and laws.  *See* PROMESA § 201(b)(1)(N). PROMESA further requires the Oversight Board to consider whether "claims have priority over other claims" when classifying claims under a plan of adjustment.  *Id.* § 301(e).

29.     Notwithstanding the explicit protections granted to Constitutional Debtholders under Puerto Rico law and PROMESA, the Commonwealth and Oversight Board have proposed to cut Constitutional Debtholders' (together with other bondholders') claims collectively by approximately 80% under the Fiscal Plan.

### 2.     Commonwealth Employees And Retirees

30.     Puerto Rico's employees and retirees assert claims against the Commonwealth. The Commonwealth and Oversight Board assert that the Commonwealth and its instrumentalities have approximately "$49 billion of pension liabilities."  *See Statement of Oversight Board In Connection With PROMESA Title III Petition* [ECF No. 1].  As the Commonwealth's other largest creditor constituency, pension creditors are adequately represented by their own statutory committee, the Official Retiree Committee.

31.     Aside from prospective pension claims that are adequately represented by the Official Retiree Committee, it is not clear what additional claims, if any, current employees have

13

against the Commonwealth.  *See, e.g.*, *In re Dow Corning*, 194 B.R. at 144 ("At present, however, the best way to describe the Union's interests is in not becoming a creditor.").[8]

32.     Puerto Rico statutes provide that liabilities owed to public employees and retirees shall be paid *after* Constitutional Debt.   In particular, welfare programs and pension contributions are accorded *third priority*, while other commitments entered into by contract (such as employment agreements) are accorded *second priority*.  *See* 23 L.P.R.A. § 104(c)(2)-(3).  These priorities are also incorporated into PROMESA.

33.     Notwithstanding the lower priority afforded these claims, the Commonwealth and Oversight Board have insisted that such claims will not be cut or face only minimal impairment. The Fiscal Plan provides that pension liabilities will not be reduced at all until fiscal year 2020, and even then they will be reduced by only 10%.  Governor Rosselló recently announced that the fiscal year 2018 budget "includes PAYMENT OF ALL PENSIONS."  *See* Governor Ricardo Rosselló Nevares, Address to Legislative Assembly of P.R. (May 31, 2017), attached hereto as **Exhibit E**. The fiscal year 2018 budget in fact appropriated more than $2 billion from the general fund to ensure that pension liabilities will not be impaired at all.  Similarly, the Commonwealth has pledged not to reduce the headcount of public employees other than through normal attrition, and the Fiscal Plan provides for the full payment of all public employees over the next ten years.

### 3.      Trade Creditors And Tax Refund Claimants

34.     The Commonwealth has various "trade" creditors consisting primarily of suppliers, service providers and tax refund claimants.  As of May 26, 2017, the Commonwealth estimated that the aggregate amount of all outstanding "accounts payable" was approximately

---

[8]     The unions' role on the Committee is particularly unclear.  If the unions are representing current and future retirees, these constituencies are already adequately represented by the Official Retiree Committee.  If the unions are representing current employees without regard to their pension claims, then it is not clear what other claims exist since the Commonwealth has continued to pay all employee wages and benefits.

$373 million.  *See* Puerto Rico Department of Treasury, Treasury Single Account ("TSA") Cash Flow Actual-to-Forecast Comparison (May 26, 2017), attached hereto as **Exhibit F**.

35.      Puerto Rico statutes provide that all trade creditors shall be paid *after* Constitutional Debt.  Depending on the type of claim and service provided, Puerto Rico statutes provide that these creditors should be afforded *second* to *fifth priority*.  *See* 23 L.P.R.A. § 104(c)(2)-(5).

36.      Notwithstanding the lower priority afforded to these claims, the Commonwealth and Oversight Board have endeavored to pay these creditors in full.  For example, when PROMESA was enacted on June 30, 2016, the Commonwealth estimated that the aggregate amount of all accounts payable was $1.6 billion.[9]  As set forth above, by May 26, 2017, the aggregate amount of those accounts payable appears to have *decreased* by more than *$1.2 billion* and now stands at approximately $373 million.  *See* **Exhibit F**.[10]  This near complete pay down of trade creditors is consistent with the Commonwealth's recent promise to pay suppliers in full. "The government has the commitment and, more importantly, the ability to pay suppliers and providers as usual.  All of the government's bills will be processed under the ordinary process." *AAFAF Says Title III Won't Touch Supplier Payments as Treasury Sends out $70M in Checks This Week*, Reorg Res. (May 5, 2017) (quoting Fiscal Agency and Financial Advisory Authority Executive Director Gerardo Portela), attached hereto as **Exhibit G**.  Similarly, Governor Rosselló announced that the Commonwealth would continue paying tax refunds in full, including

---

[9]      *See* Commonwealth of Puerto Rico, Financial Information and Operating Data Report (Dec. 18, 2016), http://www.gdb-pur.com/documents/CommonwealthofPuertoRicoFinancialInfoFY201612-18-16.pdf.

[10]     The pay down of suppliers is consistent with the Commonwealth's Fiscal Plan, which contemplated $1.3 billion in accelerated payments to suppliers over the course of 5 years starting in 2020.  Fiscal Plan at 10, 18.

$35 million in tax refund payments in June 2017 alone.  *See* **Exhibit E**.[11]  The Fiscal Plan and

fiscal year 2018 budget also confirm that trade creditors will be paid in full in the ordinary

course.

### C.    The Committee Does Not Adequately Represent Constitutional Debtholders

37.    To determine whether a creditors' committee adequately represents a particular

group of creditors for purposes of section 1104(a)(4) of the Bankruptcy Code, courts consider the

following factors, each of which demonstrates that the Committee does not adequately represent

Constitutional Debtholders.

### 1.    The Composition Of The Committee

38.    Naturally, a "determination of whether there is proper balance, and thus adequate

representation, on a committee requires an awareness of the committee's composition."  *In re*

*Dow Corning*, 194 B.R. at 142; *see also In re Drexel Burnham Lambert Grp., Inc.*, 118 B.R. 209,

212 (Bankr. S.D.N.Y. 1990) ("The standard of adequate representation, however, lies not in the

uniqueness of a single claim but in the nature of the case and the composition of the

committee.").  While the Bankruptcy Code does not "mandate [that] a committee must faithfully

reproduce the exact complexion of the creditor body," what "is required is adequate

representation of various creditor types."  *In re Hills Stores*, 137 B.R. at 6-7 (finding adequate

representation of subordinated bondholders that constituted 27% of the committee but 35% of

debtor's total liabilities); *see also In re Park W.*, 2010 WL 3219531, at *4 ("Although

committees do not necessarily need to reflect the precise composition of the creditor body,

committees should adequately represent the various creditor types.").  Thus, the aim of the

---

[11]    Historically, the Commonwealth has pre-funded tax refunds out of gross revenues of the general fund to ensure
that they are timely paid, and consequently there is no indication that there are substantial valid tax refund
claims outstanding.

United States Trustee (and, if necessary, the Court) is to "strike a proper balance." *Mirant*, 2003 WL 22327118, at \*6; *In re Enron*, 279 B.R. at 690.

39.     Here, the Committee does not include *any* Constitutional Debtholders—which the Oversight Board asserts is the largest class of unsecured creditors.  Instead, the Committee is composed entirely of only two of the three potential types of Commonwealth creditors:  unions representing employees and trade and tax refund creditors.  Moreover, the Committee is made up of the very types of creditors that the Commonwealth has continued to pay, or promises to pay, in full or nearly in full, plus two employee unions that may not have any claims at all.  Far from being balanced and representative of the Commonwealth's different types of creditors, the Committee represents solely the narrow interests of those creditors that the Commonwealth has already singled out for favored treatment, i.e., those creditors with the least need to improve their proposed treatment.

40.     While the Bankruptcy Code does not require a committee to reflect the precise composition of creditors, the Committee in this case does not even come close to "strik[ing] a proper balance." *Mirant*, 2003 WL 22327118, at \*4.  Constitutional Debt is more than *fifty times* larger than the aggregate claim of trade and tax refund creditors, yet those creditors hold five seats on the Committee while Constitutional Debtholders hold none.  That discrepancy alone demonstrates that the Committee does not adequately represent the Commonwealth's creditors.  Courts have required changes to committees in similar circumstances when a large creditor class lacks any voice on the committee.  In directing the United States Trustee to reconstitute the unsecured creditor committee, the court in *In re Park West* noted:

> In this particular situation, a single creditor, Constantine Cannon, holds over 50% of the Debtors' debt with a claim of $2,176,872.64. The largest creditor on the Committee has a claim of only $139,973.91.   At nearly *ten times the size* of the total

combined claims of all three Committee members, Constantine
Cannon's claim dwarfs the Committee's claims, both individually
and in the aggregate.

2010 WL 3219531, at *3 (emphasis added).

41.   Similarly, in *Dow Corning*, the court found that the creditors' committee did not

adequately represent a group of physician creditors that by dollar amount "might constitute a

sizeable percentage of total unsecured claims," when not a single physician creditor was

appointed to the committee.  194 B.R. at 145; *see also In re Ne. Dairy*, 59 B.R. at 534 (finding

"[t]he Committee is not representative as presently established, for interests critical to the

formulation of a successful plan are unrepresented" and increasing 11-member committee to 13

members); *In re Salant Corp.*, 53 B.R. 158, 161-62 (Bankr. S.D.N.Y. 1985) (finding "the present

committee is not representative of the claims of non-management employees as it has no member

having a claim of that kind" and increasing 17-member committee to 20 members).

42.   The Committee's proposed counsel has already acknowledged the absence of

Constitutional Debtholders on the Committee, while nevertheless maintaining that the

Committee was "diverse":

> The committee is a ***very diverse*** committee with trade creditors,
> with an entity that is owed millions of dollars for tax refunds that
> were not paid, labor unions, et cetera, et cetera.  It's a very broad
> group.
>
> But more importantly, it is a committee that is a ***fiduciary for all
> unsecured creditors, and that means the GO bonds as well***, Your
> Honor, and ***in particular the thousands of creditors on the island
> that hold those bonds***.  ***And that's a very important part***.  I mean
> by that the retail holders.  And that's a very important point.
>
> Even though ***they're not on our committee***, we owe them a
> fiduciary duty as we owe other creditors.  And the reason I'm
> focusing on ***this unrepresented creditor group***, Your Honor, is
> because this case is like no other.

June 28, 2017 Hr'g Tr. 28:11-25 (emphasis added) (L. Despins).[12]   That the Committee believes

it owes a fiduciary duty to such a "very important" and "unrepresented creditor group"—and that

the Committee deemed it necessary to inform the Court of these facts at the very first hearing

after it was appointed—underscores that Constitutional Debtholders do not have adequate

representation on the Committee.  Absent adequate representation of Constitutional Debtholders,

the Committee—despite its assertions to the contrary—cannot speak for all types of

Commonwealth creditors; rather, it can speak only for those "on the island" and politically

favored creditors that currently make up the Committee.

### 2.      Whether Different Classes Will Be Treated Differently Under Plan

43.      The "chief concern of adequacy of representation is whether it appears that

different classes of debt may be treated differently under a plan." *In re Dow Corning*, 194 B.R.

at 145 (citing *In re Drexel*, 118 B.R. at 212).  This concern is connected to the role that a

creditors' committee often plays in assisting the formulation of a plan of reorganization:  if

unsecured creditors will be placed in different classes, then it is imperative that the creditors'

committee be attuned to the different interests of those classes.  *Id.*

44.      This "chief concern" is critically important in these Title III Cases and strongly

supports including Constitutional Debtholders on the Committee.  Section 301(e) of PROMESA

compels the Oversight Board to place Commonwealth creditors with "priority over other claims"

in a different class than creditors with non-priority or lower-priority claims in any plan of

adjustment.[13]      Accordingly, regardless of whether Constitutional Debtholders are secured

---

[12]    Official committees always owe fiduciary duties to other similarly situated creditors.  If owing a fiduciary duty to other types of creditors—on its own—sufficed to ensure "adequate representation," then section 1102(a)(4) would be superfluous.  Moreover, the Committee's focus on creditors "on the island" is misplaced since all Constitutional Debtholders are entitled to the same treatment.

[13]    Section 301(e) is one of many notable provisions of PROMESA that has no analogue under chapter 9 of the Bankruptcy Code and demonstrates Congress's intent to preserve priorities under Puerto Rico law.

creditors, Constitutional Debtholders will be placed into a different class and subject to different treatment under the plan of adjustment because they have priority over all other creditors.  To the extent the Committee is involved in plan negotiations, its lack of Constitutional Debtholders will render it unable to weigh-in on the treatment of the Constitutional Debtholder class.  In ordering that physician creditors be added to the creditors' committee in *Dow Corning*, the Court explained:  "since the posture of the physicians is so different from the other non-tort unsecured creditors, it is likely that any plan will treat the claims differently.  ***The [creditors' committee] is in no position to negotiate for the physicians' special treatment***."  194 B.R. at 145 (emphasis added).

45.     Without significant Constitutional Debtholder participation on the Committee, the Committee may purport to negotiate a plan of adjustment on behalf of all classes of unsecured creditors, but will comprise only a subset of creditors whose interests may diverge from those creditors lacking a meaningful voice on the Committee.

### 3.     The Standing And Desires Of The Various Constituencies[14]

46.     Although they share certain common overlapping interests, the Commonwealth's various creditor constituencies have different interests and desires.  Constitutional Debtholders' primary goal is to maximize recoveries on their claims.  That objective, of course, is entirely consistent with the primary objective of any creditors' committee.  In seeking to maximize recoveries, Constitutional Debtholders would seek to invalidate the unlawful COFINA structure

---

[14]     Some courts interpret this factor as requiring an evaluation of the differing interests of creditors, *see In re Dana*, 344 B.R. at 39, while other courts perform a more perfunctory review of whether the creditors have standing and whether other creditors support or oppose the relief sought, *see In re Park W.*, 2010 WL 3219531, at *2.  To the extent the Court adopts the latter approach, Constitutional Debtholders are creditors of the Commonwealth with standing to serve on the Committee.  Moreover, since the Oversight Board, Commonwealth, and Committee assert that Constitutional Debtholders are the largest class of unsecured creditors or are a "very important" group of unsecured creditors, there is no principled basis for them to support excluding all Constitutional Debtholders from having a voice on the Committee.

and to rectify the substantial flaws in the Fiscal Plan, actions that would benefit *all*
Commonwealth creditors. Constitutional Debtholders would also seek to enforce their first
priority status under Puerto Rico law and PROMESA. As discussed more fully *infra*, while
Constitutional Debtholders' interests may diverge from the interests of lower-priority creditors in
certain regards, that potential conflict is not a basis to exclude Constitutional Debtholders from
the Committee. To the contrary, competing interests are to be expected on any creditors'
committee and the inclusion of differing perspectives on one committee is a benefit, not a
hindrance. "As in most Chapter 11 cases, there will be common interests among various groups
of unsecured creditors. The inclusion of such groups within one committee may facilitate the
consensual resolution of the conflicting priorities among the holders of unsecured claims and
thereby facilitate the negotiation of a consensual plan." *In re Hills Stores*, 137 B.R. at 7; *see also*
*In re Garden Ridge*, 2005 WL 523129, at *4 ("A committee of unsecured creditors often consists
of creditors with a variety of viewpoints, and thus conflicts are not uncommon, especially when
creditors are acting individually to protect their separate business interests.").

47. In addition, Constitutional Debtholders are not the only creditors with interests
that may not be aligned with the interests of other creditor constituencies. Two Committee
members—the AFT and the Service Employees International Union—do not appear to have *any*
direct claims against the Commonwealth. Instead, their primary interest in serving on the
Committee appears to be ensuring that the debtor spends *more* money to the detriment of
existing creditors. Upon its appointment to the Committee, the AFT issued a press release
announcing that very goal:

> *We are glad to serve on the unsecured creditors committee and*
> *believe any decision regarding bankruptcy needs to put the*
> *people of Puerto Rico first—not Wall Street financiers and hedge*
> *funds*. Austerity has already led to the closure of 164 schools and

> to millions of dollars of cuts and the erosion of services to the
> public education system and the University of Puerto Rico.
> Instead, the government must work with teachers and the entire
> community to preserve the public services the island needs to
> prosper.

Press Release, Am. Fed'n of Teachers, **Exhibit A** (emphasis added).   While promoting

prosperity is a laudable goal, AFT's statement underscores that its interest is not that of a creditor

of the Commonwealth.   Rather, AFT's interests are perfectly aligned with those of the

Commonwealth itself:   AFT wants increased government spending that benefits Commonwealth

employees, even if that spending reduces creditor recoveries.

### 4.   The Nature Of The Case

48.   Courts evaluating the nature of the case often consider the size of the creditor

requesting relief relative to the overall composition of the creditor body.   *See, e.g.*, *In re Park W.*,

2010 WL 3219531, at *3 (noting the "size of Constantine Cannon's claim relative to the claims

of other unsecured creditors in these cases"); *In re Budd Co.*, 512 B.R. 910, 913 (Bankr. N.D. Ill.

2014) (comparing size of asbestos-related claims to total liabilities of debtor).   As set forth

above, the Oversight Board asserts that Constitutional Debtholders are the largest unsecured

creditors in these Title III Cases.   *See Notice of Filing of Amended Schedule B to Title III*

*Petition – List of Creditors Who Have the 20 Largest Unsecured Claims* [ECF No. 3].

49.   Courts also consider the circumstances surrounding a debtor's filing for

bankruptcy when evaluating whether creditor representation is adequate.   Thus, where a

particular type of claim did not precipitate a debtor's bankruptcy filing, the court is less inclined

to consider necessary that creditor's representation on the committee.   As one court noted:

> Unlike the *Johns–Manville* and *Owens Corning* cases, these
> Debtors were not driven into bankruptcy by the magnitude of its
> asbestos liability.   In this case, the Debtors' petition lists six factors
> that contributed to the Debtors' need to file.   Asbestos claims were
> not mentioned in the affidavit filed with the Debtors' Chapter 11

22

> petitions.  The Official Committee's calculation that asbestos
> claims make up less than three percent of all unsecured claims
> against the Debtors is further support for the assertion that asbestos
> liability was not a factor in the Debtors' decision to file its petition.

*In re Dana*, 344 B.R. at 40.  On the other hand, where a particular type of creditor precipitated a

debtor's bankruptcy filing, courts are more likely to conclude that those creditors should be on

the creditors' committee.  *See In re Park W.*, 2010 WL 3219531, at *4 ("The single outstanding

debt owed to Constantine Cannon was the primary contributor to the Debtors' filing of the

Chapter 11 petition. . . .  Thus, all of these facts and circumstances combined favor a finding that

Constantine Cannon's interests are not adequately represented.").  Here, the Oversight Board and

Commonwealth have repeatedly claimed that bond indebtedness and pension liabilities were the

primary contributors to Puerto Rico's financial distress, whereas they claim that trade debt was

manageable and would continue to be paid in the ordinary course of business.  *See generally*

*Statement of Oversight Board In Connection With PROMESA Title III Petition* [ECF No. 1].

While pension creditors are solely represented by the Official Retiree Committee, Constitutional

Debtholders have no such representation.

50.     The particular nature of these Title III Cases provides even further evidence that

the Committee does not adequately represent Constitutional Debtholders.  The Commonwealth

has already declared that it intends to continue paying trade creditors and tax refund claimants in

full in the ordinary course of business.  *See* **Exhibit G**.[15]  The Commonwealth has also proposed

---

[15]   For these same reasons, official unsecured creditors' committees are not usually formed in most chapter 9
cases because a municipal debtor will often endeavor to pay unsecured trade creditors in full.  In the few
municipal bankruptcies where unsecured creditors may be impaired, official committees of retirees have been
appointed in lieu of more general unsecured creditor committees with broader mandates.  *See e.g.*, *In re City of
Stockton*, Case No. 12-32118, *Appointment of Official Committee of Retirees*, (Bankr. E.D. Cal. Apr. 1, 2013)
[ECF No. 846]; *In re City Vallejo*, Case No. 08-26813, *Appointment of Official Unsecured Creditors
Committee of Retirees* (Bankr. E.D. Cal. Oct. 7, 2008) [ECF No. 286].   In the two largest municipal
restructurings that preceded these Title III Cases, *Jefferson County, Alabama* and *City of Detroit*, official
unsecured creditor committees, while considered, were ultimately abandoned (in the case of Jefferson County)
or promptly disbanded (in the case of Detroit).  *See In re Jefferson County, Alabama*, Case No. 11-05736,

a fiscal plan that doesn't reduce pension liabilities until 2020, and even then only reduces them by 10%. In contrast, the Oversight Board and Commonwealth propose to reduce debt-service payments by approximately 80%. Notwithstanding these starkly different proposed treatments, the Committee is composed entirely of employees, trade creditors and tax refund claimants, while Constitutional Debtholders have no voice on the Committee. The Commonwealth's attempt to provide favorable treatment to these politically favored constituencies highlights the lack of adequate representation afforded Constitutional Debtholders by their exclusion from the Committee.

### 5. The Ability Of The Committee To Properly Function And Tasks The Committee Is To Perform

51. "The final factor to consider when determining whether a committee is adequately representative is the ability of the committee to properly perform its functions. The word 'function' obviously refers to the committee's role in a chapter 11 proceeding as set forth in § 1103(c)." *In re Dow Corning*, 194 B.R. at 142. In light of the role the Committee might play in these Title III Cases, its current composition will hinder its ability to function properly. For example, the Committee seeks to play a significant role in two important disputes in these Title III Cases—the Commonwealth-COFINA dispute and the Fiscal Plan—and its current composition impairs its ability to function properly in either dispute.

52. The Oversight Board claims it has sought to create a "fair, transparent, and efficient structure for resolving the Commonwealth-COFINA Dispute."[16] The Oversight Board has asserted that "the outcome of the Commonwealth-COFINA Dispute will likely be ***dipositive***

---

*Order Regarding Recommendation of Appointment of Unsecured Creditors' Committee* (Bankr. N.D. Ala. Jul. 13, 2012) [ECF No. 1127]; *In re City of Detroit, Michigan*, Case No. 13-53846, *Order Granting the City's Motion to Vacate the Appointment of the Official Committee of Unsecured Creditors* (Bankr. E.D. Mich. Feb. 28, 2014) [ECF No. 2784].

[16] *See Motion of Debtors For Order Approving Procedure to Resolve Commonwealth-COFINA Dispute*, 11-12 [ECF No. 303].

*as to the relative recoveries of the debt holders* of COFINA and the Commonwealth." *Id.* (emphasis added).  The Oversight Board explained that, if COFINA were found valid, "almost the entirety of the funds *available for debt service*" to Constitutional Debtholders under the Fiscal Plan may evaporate, leaving virtually nothing to pay Constitutional Debtholders. *Id.*[17] Under the Fiscal Plan, "debt service" refers solely to payments to bondholders, and does not refer to payments to employees, pension creditors, trade creditors or tax refund claimants. Despite the significant interest that Constitutional Debtholders therefore have in the COFINA dispute, the Oversight Board intends to appoint the Committee—which does not include any Constitutional Debtholders—as the Commonwealth's agent to litigate the validity of the COFINA structure.  Putting aside any possibility of conflicts of interest created by that appointment, the very notion of adequate representation requires that a committee entrusted with overseeing such an important dispute be representative of the constituency that, under the Oversight Board's flawed Fiscal Plan, would be most affected by the resolution of that dispute.

53.    The lack of Constitutional Debtholders on the Committee necessarily impairs the Committee's ability to zealously pursue the Commonwealth-COFINA Dispute.  The Oversight Board itself acknowledged that a committee consisting of creditors that stand to be paid in full or nearly in full cannot adequately represent the Commonwealth's creditors in the COFINA litigation.  In explaining why the Oversight Board believed that the Official Committee of Retirees should not act as the Commonwealth's agent, the Oversight Board's counsel stated:

> The reason that we opted for the general creditors committee as opposed to the retirees committee is that the fiscal plan says that on average, we think that the retirees need to be paid 90 percent of their pensions . . . *we didn't think people who were starting out with 90 cents in their pocket would be looked at as being as*

---

[17]    The GO Group disputes the Oversight Board's characterization that the Commonwealth would have insufficient funds to pay Constitutional Debtholders if COFINA were determined valid.

> *aggressive* as a committee that is representing creditors who are
> faced with potentially far less than that.

June 28, 2017 Hr'g Tr. 115:20-116:8 (emphasis added) (M. Bienenstock).  But the very reason

why the Retiree Committee cannot adequately represent the Commonwealth's interest applies

equally to a Committee made up of employee unions, trade creditors and tax refunds claimants

that the Commonwealth similarly promises to pay in full.  If the Committee included significant

Constitutional Debtholder participation—a constituency that the Oversight Board seeks to impair

(with all other bondholders) by approximately 80%—then the Committee would be more likely

to actively pursue the COFINA litigation.

54.     Similarly, a Committee that does not include Constitutional Debtholders will be

less effective in arguing the *constitutional* defects of COFINA.  The premise of the constitutional

challenge to COFINA is that Article VI, Section 8, of the Puerto Rico Constitution provides

Constitutional Debtholders an absolute first-priority claim on all of the Commonwealth's

"available resources," and that Puerto Rico cannot evade this constitutional requirement by

enacting legislation that purports to declare certain core tax revenues exempt from the claim of

Constitutional Debtholders.  A Committee composed entirely of non-Constitutional Debtholders

will be less inclined to advance these constitutional arguments, thus impairing the Committee's

role as the Commonwealth's agent.  Constitutional Debtholders have the first claim to the

Commonwealth's "available resources" and are therefore best placed to defend their

constitutional rights.

55.     The Committee may also play a significant role in addressing the numerous flaws

that virtually every creditor group has raised with the Fiscal Plan.  The Committee will be ill-

equipped to meaningfully participate in these discussions when it comprises only creditors that

the Commonwealth has promised to pay in full or nearly in full under the same offending Fiscal

Plan.  As Committee member AFT already noted, decisions must "put the people of Puerto Rico first—not Wall Street financiers and hedge funds," and "the government must work with teachers and the entire community to preserve the public services the island needs to prosper." *See* Press Release, Am. Fed'n of Teachers, **Exhibit A**.  It is unlikely that a Committee consisting entirely of views consistent with AFT's would meaningfully (and appropriately) push for changes to the Fiscal Plan that would provide creditors such as Constitutional Debtholders an increased recovery.

56.   The risk that the Committee will "bless" the Fiscal Plan rather than advocate on behalf of creditors whose interests diverge from AFT's is not mere speculation.  The Committee's counsel already signaled that while "some creditors" wished to wage a "holy war" over the Commonwealth's Fiscal Plan, the Committee's view would be "key" and if the Committee ultimately determined the Fiscal Plan was "appropriate" then that "would be a very important data point."  June 28, 2017 Hr'g Tr. 30:7-16 (L. Despins).

57.   Finally, even if the Committee is "functioning" as currently constituted, that does not demonstrate that the Committee is adequately representing Constitutional Debtholders.

> The problem is that a committee may function just fine, reaching consensus on all issues, and still not adequately represent a particular group of creditors.  ***This can occur, for instance, if the committee is so dominated by one group of creditors that a separate group has virtually no say in the decision-making process***.  Consequently, courts look to see whether conflicts of interest on the committee ***effectively disenfranchise*** particular groups of creditors.

*In re Enron*, 279 B.R. at 686 (emphasis added) (internal quotation marks omitted); *In re Dow Corning*, 194 B.R. at 142 (same); *see also In re Park W.*, 2010 WL 3219531, at *3 ("A functioning committee, alone, does not necessarily ensure that all creditors groups are adequately

represented.").  Constitutional Debtholders have no say at all in the decision making process of the Committee and are not adequately represented by the Committee.

## II.   The Court Should Exercise Its Discretion To Reconstitute The Committee To Include Substantial Constitutional Debtholder Participation

58.   "If a court finds inadequate representation, it will then determine whether it should exercise its discretion under the particular circumstances of the case."  *Mirant*, 2003 WL 22327118, at *4.  To determine whether, upon a finding of inadequate representation, a court should exercise its discretion to reconstitute a committee, courts consider the following factors, each of which supports granting Constitutional Debtholders adequate representation on the Committee.

### A.   The Delay And Additional Costs

59.   Changing the membership of the Committee will not cause any significant delay or additional costs to these Title III Cases.  The Committee was formed on June 15, 2017, retained advisors a few weeks ago, and is still generally getting up to speed.  *See* June 28, 2017 Hr'g Tr. 21:1-2.  Because the Committee was only recently formed, and these Title III Cases have only recently begun, changing the membership of the Committee will not lead to any significant delays.  Similarly, because certain Constitutional Debtholders (including the members of the GO Group) have been analyzing the Commonwealth's state of affairs for many years, it is possible to reconstitute the Committee with members that are very familiar with these Title III Cases and will therefore expedite the Committee's work.  *See In re Park W.*, 2010 WL 3219531, at *4 (finding that creditor's knowledge of the debtor's business would benefit the committee).  Nor would changing the membership of the Committee impose any additional costs on the Commonwealth, since the Committee could continue to use one set of advisors.

### B.   Ability To Participate Without Official Committee

60.    In contrast to many other bondholders in these Title III Cases, there is no indenture trustee to speak on behalf of all Constitutional Debtholders.  Thus, while large holders such as the members of the GO Group are able to participate in these proceedings on their own behalf, currently many other smaller Constitutional Debtholders are unable to meaningfully participate.  Indeed, as counsel for the Committee has already noted, there are "thousands of creditors on the island that hold" Constitutional Debt, and these creditors are "not on our Committee" and are therefore an "unrepresented creditor group."  June 28, 2017 Hr'g Tr. 28:11-25 (L. Despins).

### C.   Motivation Of The Movants

61.    The GO Group seeks to change the membership of the Committee so that the Committee will adequately represent all Commonwealth creditors, including Constitutional Debtholders.  A Committee that reflects the views of different types of creditors will be better able to function and better motivated to maximize the assets available for distribution.  *See In re Garden Ridge*, 2005 WL 523129, at *3 ("The chief purpose of an official committee is to maximize distribution to this class.").

62.    Moreover, Constitutional Debtholders' outsized economic interests in these Title III Cases ensure that they would invest significant time and resources into assisting the Committee in fulfilling its statutory duties.  *See In re Park W.*, 2010 WL 3219531, at *4 ("[W]ith such a substantial claim, [creditor] has a greater incentive to invest time and effort to make a positive contribution to the Committee.").

### III.  Unique Rights Of Constitutional Debtholders Are Not A Basis To Exclude Them From The Committee

63.    The Commonwealth asserts that the Constitutional Debt represents the largest unsecured claim, and the Committee acknowledges it owes a duty to represent the interests of Constitutional Debtholders.  Despite this, the United States Trustee purposely ***chose*** to exclude Constitutional Debtholders from the Committee.  In explaining its refusal to reconstitute the Committee, the United States Trustee stated that "the general unsecured creditors I appointed to the Committee do not assert that their claims are either in some manner secured or entitled to priority treatment."  **Exhibit D**.

64.    Constitutional Debtholders' first priority status under the Puerto Rico Constitution, Puerto Rico laws, and PROMESA is not a sufficient basis to exclude Constitutional Debtholders from the Committee.  There is, of course, no rule that priority creditors may not serve on a creditors' committee.  *See In re Plabell Rubber Prods.*, 140 B.R. 179 (Bankr. N.D. Ohio 1992) (court ordered appointment of union as voting member of creditors' committee despite union holding only priority claims).  Indeed, creditors' committees often include representatives of both ***senior*** bonds and ***subordinated*** bonds, whose interests are no different than Constitutional Debtholders (i.e., senior bondholders) and other junior Commonwealth creditors.  *See, e.g.*, *In re Hills Stores*, 137 B.R. at 5 (noting that 15 member committee consisted of "three banks, two holders of ***senior notes***, five trade creditors, one factor and ***four representatives of the four separate tranches of subordinated debt, each tranche with different priorities from the other***" (emphasis added)).  Likewise, it is not uncommon for an official committee in a multi-debtor corporate bankruptcy to be comprised of creditors of both the parent and its subsidiaries—a situation in which the subsidiary creditors would enjoy structural (as opposed to payment) priority over the parent's creditors.

65.     More fundamentally, and as set forth in greater detail above, the very purpose of a creditors' committee—and the overarching test of adequate representation—is to ensure that creditors with different kinds of claims and interests are able to participate. *See In re Enron*, 279 B.R. at 685 ("The formation of a creditors' committee is purposely intended to represent the necessarily different interests and concerns of the creditors it represents." (internal quotation mark omitted)).  Accordingly, the "principal purpose of creditors' committees is not to advocate any particular creditor class's agenda, but rather to strike a proper balance between the parties such that an effective and viable reorganization of the debtor may be accomplished." *Mirant*, 2003 WL 22327118, at *6 (internal quotation mark omitted).  Striking the "proper balance" necessarily includes creditors with conflicting interests and priorities.  "What the Code requires is that ***conflicting groups*** of creditors have a voice through adequate representation on a Committee." *In re Hills Stores*, 137 B.R. at 7 (emphasis added).  The inclusion of different viewpoints "within one committee may facilitate the consensual resolution of the ***conflicting priorities*** among the holders of unsecured claims and thereby facilitate the negotiation of a consensual plan." *Id.* (emphasis added).

66.     The wholesale exclusion of Constitutional Debtholders from the Committee in order to avoid a conflict is contrary to long-standing bankruptcy practice.  "It is universally recognized that intercreditor conflicts inhere in any committee." *In re Sharon Steel*, 100 B.R. at 777-78; *see also In re Dana*, 344 B.R. at 38 ("Creditor committees often contain creditors having a variety of viewpoints."); *In re Enron*, 279 B.R. at 689 ("Conflicts among creditors and among the members of a creditors' committee are not uncommon.  The question is whether such conflict hinders adequate representation."); *In re Hills Stores*, 137 B.R. at 6 ("Indeed, creditors' committees often contain creditors having a variety of viewpoints.  Conflicts are not unusual in

31

reorganization and in most cases can be expected among creditors who are acting to protect their

separate business interests.").  As the Third Circuit noted in *In re Altair Airlines, Inc.*:

> [Union] members may be interested in a plan of reorganization
> which preserves both their jobs and their collective bargaining
> agreement, while other creditors may be interested in a liquidation,
> or a reorganization involving a merger with a [third party].  ***Such
> conflicts of interests are not unusual in reorganizations***.
> Materialman creditors, for example, may sometimes prefer to
> forego full payment for past sales in hopes of preserving a
> customer, while lenders may prefer liquidation and prompt
> payment.

727 F.2d 88, 90 (3d Cir. 1984) (emphasis added).  Here, the United States Trustee's unfounded

concern for potential conflicts of interest posed by Constitutional Debtholders has resulted in a

Committee that does not adequately represent the Commonwealth's creditors.  The United States

Trustee's attempt to avoid conflicts has in fact created a host of other conflicts.

67.     Nor does the GO Group's assertion that Constitutional Debt is secured by a

statutory lien on all available resources justify excluding Constitutional Debtholders from the

Committee.  *See, e.g.*, *In re Seaescape Cruises, Ltd.*, 131 B.R. 241, 243 (Bankr. S.D. Fla. 1991)

(finding "Debtor's concerns that members of the Committee assert secured rather than unsecured

claims are premature" where Debtor listed creditors asserting maritime liens as unsecured on

schedules filed in the case).  The Oversight Board, Commonwealth, and Committee have each

taken the position that Constitutional Debtholders are unsecured creditors.  The disputed secured

status of Constitutional Debt is therefore akin to a creditor holding a disputed claim, and "courts

have been nearly unanimous in holding that holders of disputed claims are eligible to serve on

creditors' committees."  6 Collier on Bankruptcy ¶ 1102.02[2][a][i]; *see also In re Laclede Cab

Co.*, 145 B.R. 308 (Bankr. E.D. Mo. 1992) (holder of disputed claim may serve on creditors'

committee); *In re Microboard Processing, Inc.*, 95 B.R. 283 (Bankr. D. Conn. 1989) (creditor

who filed proof of claim allowed to remain on committee despite debtor's assertion that it was

not indebted to creditor); *In re Richmond Tank Car Co.*, 93 B.R. 504 (Bankr. S.D. Tex. 1988)

(same); *In re Churchill Coal Corp.*, 31 B.R. 115 (Bankr. S.D.N.Y. 1983) (same); *In re Daig*

*Corp.*, 17 B.R. 41 (Bankr. D. Minn. 1981) (same); *In re Grynberg*, 10 B.R. 256 (Bankr. D. Colo.

1981) (same).

68.     Until the dispute over the secured status of Constitutional Debt is finally resolved,

nothing should prevent Constitutional Debtholders from both serving on the unsecured creditors'

committee and asserting, in their individual capacities, their rights to the fullest extent permitted

by law.  *See In re Garden Ridge*, 2005 WL 523129, at *4 ("It is important to keep in mind that

each member of the Official Committee is free to represent its own interests in an individual

capacity apart from membership in the Official Committee.").   Of course, Constitutional

Debtholders would not use their position on the Committee to advance claims that Constitutional

Debt is secured.  Moreover, if the Court determines that Constitutional Debtholders are in fact

secured by a statutory lien on a final basis, then the United States Trustee may reconstitute the

Committee to remove Constitutional Debtholders.

69.     Finally, Constitutional Debtholders' assertion they are secured does not create any

greater conflict of interest than their assertion of first priority status under Puerto Rico law.  As

discussed above, Section 301(e) of PROMESA provides that creditors "with priority over other

claims" should be classified separately under a plan of adjustment, and therefore Constitutional

Debtholders will be placed in their own class either because they are secured or because they

have priority over other claims.   And regardless of whether Constitutional Debtholders are

secured by a statutory lien on all available resources or entitled to a first priority claim against all

available resources, the Constitutional Debtholder class will be entitled to payment before other

unsecured or lower priority Commonwealth creditors.  The economic effect—and therefore the potential conflict—is no different under either scenario.

70.     Constitutional Debtholders' unique rights under the Puerto Rico Constitution, Puerto Rico law and PROMESA do not justify excluding them from the Committee.  To the contrary, the principles of adequate representation embedded in section 1102 of the Bankruptcy Code compel that Constitutional Debtholders be included on the Committee because of their unique rights and interests.

## IV.     The Court Should, In The Alternative, Appoint An Additional Committee Of Constitutional Debtholders Under Section 1102(a)(2) Of The Bankruptcy Code

71.     In the alternative, if the Court finds that Constitutional Debtholders are not adequately represented by the Committee but should not be appointed as members of the Committee, the GO Group respectfully requests that the Court appoint an additional official committee of Constitutional Debtholders pursuant to section 1102(a)(2) of the Bankruptcy Code. *See, e.g.*, *In re Caesars Entm't Operating Co., Inc.*, Case No. 15-01145, *Notice of Appointment of Official Committee of Second Priority Noteholders* (Bankr. N.D. Ill. Feb. 5, 2015) [ECF No. 266].  Section 1102(a)(2) of the Bankruptcy Code provides that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary *to assure adequate representation of creditors* or of equity security holders."  11 U.S.C. § 1102(a)(2) (emphasis added).  The standard to appoint an additional committee under section 1102(a)(2) is the same as the standard for reconstituting an existing committee under section 1102(a)(4).  *In re Park W.*, 2010 WL 3219531, at *4.

## CONCLUSION

For the foregoing reasons, the GO Group respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit H**, (a) directing the United States

Trustee to change the membership of the Committee pursuant to sections 105(a) and 1102(a)(4) of the Bankruptcy Code and appoint Constitutional Debtholders to the Committee in a manner that is commensurate to the Constitutional Debtholders' position in these Title III Cases and that ensures adequate representation of Constitutional Debtholders on the Committee, (b) in the alternative, appointing an additional official committee of Constitutional Debtholders pursuant to sections 105(a) and 1102(a)(2) of the Bankruptcy Code, and (c) granting such other and further relief as this Court deems fair and just.

Dated: July 21, 2017                                Respectfully submitted,

/s/ Ramón Rivera Morales                            /s/ Mark T. Stancil
J. Ramón Rivera Morales                             Lawrence S. Robbins (admitted *pro hac vice*)
USDC-PR Bar No. 200701                              Gary A. Orseck (admitted *pro hac vice*)
JIMÉNEZ, GRAFFAM & LAUSELL                           Kathryn S. Zecca (admitted *pro hac vice*)
P.O. Box 366104                                     Mark T. Stancil (admitted *pro hac vice*)
San Juan, PR 00936                                  Ariel N. Lavinbuk (admitted *pro hac vice*)
Telephone: (787) 767-1030                           Donald Burke (admitted *pro hac vice*)
Facsimile: (787) 751-4068                           ROBBINS, RUSSELL, ENGLERT, ORSECK,
Email: rrivera@jgl.com                              UNTEREINER & SAUBER LLP
                                                    1801 K Street, N.W., Suite 411-L
                                                    Washington, DC 20006
                                                    Telephone: (202) 775-4500
                                                    Facsimile: (202) 775-4510
                                                    Email: mstancil@robbinsrussell.com

                                                    /s/ Andrew N. Rosenberg
                                                    Andrew N. Rosenberg (admitted *pro hac vice*)
                                                    Richard A. Rosen (admitted *pro hac vice*)
                                                    Walter Rieman (admitted *pro hac vice*)
                                                    Kyle J. Kimpler (admitted *pro hac vice*)
                                                    Karen R. Zeituni (admitted *pro hac vice*)
                                                    PAUL, WEISS, RIFKIND, WHARTON
                                                    & GARRISON LLP
                                                    1285 Avenue of the Americas
                                                    New York, NY 10019
                                                    Telephone: (212) 373-3000
                                                    Facsimile: (212) 757-3990
                                                    Email: arosenberg@paulweiss.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*

35