# Exhibit C

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON  (1946-1991)
RANDOLPH E. PAUL   (1946-1956)
SIMON H. RIFKIND   (1950-1995)
LOUIS S. WEISS     (1927-1950)
JOHN F. WHARTON    (1927-1977)

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

WRITER'S DIRECT DIAL NUMBER
212-373-3158

WRITER'S DIRECT FACSIMILE
212-373-2122

WRITER'S DIRECT E-MAIL ADDRESS
arosenberg@paulweiss.com

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
JOHN F. BAUGHMAN
J. STEVEN BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
ROSS A. FIELDSTON
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
MEREDITH J. KANE

JONATHAN S. KANTER
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
DAVID M. KLEIN
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
ALVARO MEMBRILLERA
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

July 11, 2017

**VIA CERTIFIED MAIL AND EMAIL**

U.S. Department of Justice
Office of the United States Trustee
Attn: Guy G. Gebhardt, Acting United States Trustee for Region 21
75 Ted Turner Drive, S.W., Room 362
Atlanta, GA 30303

Re: <u>In re Commonwealth of Puerto Rico, et al.</u>, Case No. 17-03283 (Bankr. D.P.R.)

Dear Mr. Gebhardt:

   We are counsel to the Ad Hoc Group of Puerto Rico General Obligation Bondholders (the "<u>GO Group</u>"), holders of approximately $3.2 billion of bonds issued or guaranteed by the Commonwealth of Puerto Rico (collectively, the "<u>Constitutional Debt</u>" and holders thereof, the "<u>Constitutional Debtholders</u>") in the above-captioned cases under Title III of PROMESA.[1]

---

[1] The GO Group submits this letter exclusively on its own behalf and does not assume any fiduciary or other duties to any other creditor or person.

Exhibit C Page 3 of 11

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

We write to request that you reconstitute the Official Committee of Unsecured Creditors (the "Committee"), which you appointed on June 15, 2017. *See Appointment of Official Committee of Unsecured Creditors in the Commonwealth of Puerto Rico* [ECF No. 338]. As appointed, the seven-member Committee does not adequately represent creditors of the Commonwealth. In particular, the Committee does not include *any* Constitutional Debtholders, or any other financial creditors for that matter. Instead, the Committee is composed entirely of non-financial creditors that the Commonwealth has continued to pay, or promises to pay, in full or nearly in full, plus two employee unions that may not have any claims at all. Far from being representative of the Commonwealth's creditors at large, the Committee represents solely the interests of those creditors that the Commonwealth has already singled out for favored treatment, *i.e.*, those creditors with the least skin in the game.

We hope that raising these issues now will enable the United States Trustee to reconsider the Committee's composition in light of the facts and circumstances of these Title III cases discussed below. If the United States Trustee will not act to reconstitute the Committee on or before July 18, 2017, the GO Group intends to ask the Court for similar relief pursuant to Section 1102(a)(4) of the Bankruptcy Code, made applicable pursuant to Section 301(a) of PROMESA.

### THE COMMONWEALTH'S CREDITORS

The Commonwealth's creditors fall into three primary categories.

*First*, the Commonwealth has issued or guaranteed approximately $18.2 billion in principal amount of Constitutional Debt, including $12.5 billion in general obligation bonds issued by the Commonwealth and $5.7 billion in bonds guaranteed by the Commonwealth. The Commonwealth asserts that Constitutional Debtholders are the single largest *unsecured* creditor constituency in the Title III cases. *See Notice of Filing of Amended Schedule B to Title III Petition – List of Creditors Who Have the 20 Largest Unsecured Claims* [ECF No. 3].[2] The Commonwealth has defaulted on its obligations to pay Constitutional Debtholders for over a year, with missed payments totaling more than $2.3 billion. As a result, the current claim amount of Constitutional Debtholders is approximately $19.6 billion, including amounts for overdue interest and interest on overdue principal and overdue interest.[3]

---

[2] The GO Group disputes the Commonwealth's assertion that Constitutional Debtholders are general unsecured creditors. In due course, the GO Group will establish that Constitutional Debt is also protected by a statutory lien on all "available resources" or certain subsets of those resources. So long as the Commonwealth takes the position that Constitutional Debtholders are unsecured, however, the GO Group's position should not disqualify Constitutional Debtholders from serving on the Committee.

[3] The GO Group reserves all rights with respect to interest and other amounts owing by the Commonwealth under applicable law.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3

Puerto Rico's Constitution provides that, when available resources are insufficient to cover all of the Commonwealth's obligations, Constitutional Debt shall be paid first. *See* P.R. Const. art. VI, § 8. Puerto Rico statutes further confirm that Constitutional Debt must be paid first and before all other expenditures. *See* 23 L.P.R.A. § 104(c)(1). PROMESA, in turn, requires that any fiscal plan—and therefore any plan of adjustment—respect the lawful priorities and liens set forth in the Puerto Rico Constitution and laws. *See* PROMESA § 201(b)(1)(N). PROMESA further requires the Oversight Board to consider whether "claims have priority over other claims" when classifying claims under a plan of adjustment. *Id.* § 301(e).

Notwithstanding the explicit protections granted to Constitutional Debtholders under Puerto Rico law and PROMESA, the Commonwealth and Oversight Board have proposed massive cuts to Constitutional Debt. In particular, the Fiscal Plan provides that Constitutional Debtholders' (together with other bondholders') claims will collectively be cut by 80%.

There are no Constitutional Debtholders on the Committee.

*Second*, Puerto Rico's employees and retirees have asserted claims against the Commonwealth. The Commonwealth and Oversight Board assert that the Commonwealth and its instrumentalities have approximately "$49 billion of pension liabilities." *See Statement of Oversight Board In Connection With PROMESA Title III Petition* [ECF No. 1].

Puerto Rico statutes provide that liabilities owed to public employees and retirees shall be paid *after* Constitutional Debt. In particular, welfare programs and pension contributions are accorded *third priority*, while other commitments entered into by contract (such as employment agreements) are accorded *second priority*. *See* 23 L.P.R.A. § 104(c)(2)-(3). These priorities are also incorporated into PROMESA.

Notwithstanding the lower priority afforded these claims, the Commonwealth and Oversight Board have insisted that such claims will not be cut or face only minimal impairment. The Fiscal Plan provides that pension liabilities will not be reduced at all until 2020, and even then they will be reduced by only 10%. Governor Rosselló recently announced that the fiscal year 2018 budget "includes **PAYMENT OF ALL PENSIONS**." *See* Governor Ricardo Rosselló Nevares, Address to Legislative Assembly of P.R. (May 31, 2017). The fiscal year 2018 budget in fact appropriated more than $2 billion from the general fund to ensure that pension liabilities will not be impaired at all. Similarly, the Commonwealth has pledged not to reduce the headcount of public employees, and the Fiscal Plan and fiscal year 2018 budget provide for the *full* payment of all public employees.

Nevertheless, the United States Trustee has already appointed an Official Committee of Retirees devoted entirely to representing the interests of retirees. *See Appointment of Official Committee of Retirees in the Commonwealth of Puerto Rico*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

4

[ECF No. 340]. In addition, two different employee unions were appointed to the seven-member Committee. It is unclear what, if any, claims they may have apart from potential future retiree claims that are already represented by the Official Committee of Retirees.

*Third*, the Commonwealth has various "trade" creditors consisting primarily of suppliers, service providers and tax refund claimants. As of May 26, 2017, the Commonwealth estimated that the amount of outstanding "accounts payable" was approximately $373 million. *See* Puerto Rico Department of Treasury, Treasury Single Account ("TSA") Cash Flow Actual-to-Forecast Comparison (May 26, 2017).

Puerto Rico statutes provide that all trade creditors shall be paid *after* Constitutional Debt. Depending on the type of claim and service provided, Puerto Rico statutes provide that these creditors should be afforded *second* to *fifth priority*. *See* 23 L.P.R.A. § 104(c)(2)-(5).

Notwithstanding the lower priority afforded to these claims, the Commonwealth and Oversight Board have endeavored to pay these creditors in full. For example, since PROMESA was enacted on June 30, 2016, the Commonwealth has *decreased* the aggregate amount of accounts payable by more than *$1.2 billion*. This near complete pay down of trade creditors is consistent with the Commonwealth's recent promise to pay suppliers in full. "The government has the commitment and, more importantly, the ability to pay suppliers and providers as usual. All of the government's bills will be processed under the ordinary process." *AAFAF Says Title III Won't Touch Supplier Payments as Treasury Sends out $70M in Checks This Week*, Reorg Research (May 5, 2017) (quoting Fiscal Agency and Financial Advisory Authority Executive Director Gerardo Portela). Similarly, Governor Rosselló announced that the Commonwealth would continue paying tax refunds in full, including an additional $35 million in refunds paid in June 2017 alone.[4] The Fiscal Plan and fiscal year 2018 budget also confirm that trade creditors will be paid in full in the ordinary course.

Five trade or tax refund creditors were appointed to the Committee.

### THE APPOINTMENT OF THE COMMITTEE

On June 15, 2017, the United States Trustee appointed a seven-member Committee.[5] It comprises five trade or tax refund creditors, two employees unions, and

---

[4] Historically, the Commonwealth has pre-funded tax refunds out of gross revenues of the general fund to ensure that they are timely paid, and consequently there is no indication that there are substantial valid tax refund claims outstanding.

[5] By letter dated June 6, 2017, the GO Group advised the United States Trustee that general unsecured creditors' committees were not often appointed in large scale municipal bankruptcies, but that if the United States Trustee elected to appoint a creditors' committee *in addition* to the Official Committee of Retirees, then such committee should consist largely of Constitutional Debtholders.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

5

no Constitutional Debtholders. In other words, the Committee is composed entirely of creditors that the Oversight Board and Commonwealth have already paid in full or already pledged to pay in full (or, in the case of pensions, nearly in full). The one constituency that the Oversight Board and Commonwealth have not paid or pledged to pay in full—Constitutional Debtholders—does not have a single seat on the Committee. Although the Constitutional Debtholders' claim is more than *fifty times* larger than the aggregate claim of trade and tax refund creditors, those creditors outnumber Constitutional Debtholders five-to-zero on the Committee.

Despite its best spin, the Committee's proposed counsel has already acknowledged the elephant in the room:

> The committee is a very diverse committee with trade creditors, with an entity that is owed millions of dollars for tax refunds that were not paid, labor unions, et cetera, et cetera. It's a very broad group.
>
> But more importantly, it is a committee that is a fiduciary for all unsecured creditors, and that means the GO bonds as well, Your Honor, and in particular the thousands of creditors on the island that hold those bonds. ***And that's a very important part***. I mean by that the retail holders. And that's a very important point.
>
> Even though ***they're not on our committee***, we owe them a fiduciary duty as we owe other creditors. And the reason I'm focusing on ***this unrepresented creditor group***, Your Honor, is because this case is like no other.

June 28, 2017 Hr'g Tr. 28:11-25 (L. Despins) (emphasis added).

That the Committee believes it owes a fiduciary duty to such a "very important" and "unrepresented creditor group"—and that the Committee deemed it necessary to inform the Court of these facts at the very first hearing after it was appointed— underscores the reason why Constitutional Debtholders ***should have significant representation*** on the Committee. Absent that representation, the Committee—despite its assertions to the contrary—will not speak for all Commonwealth creditors; rather, it will speak only for those on-island and politically favored creditors that currently make up the Committee.

In addition, without changes to the Committee's membership, it is not clear that the Committee will represent ***creditors*** at all. Two Committee members—the American Federation of Teachers and the Service Employees International Union—do not appear to have ***any*** direct claims against the Commonwealth. Instead, their primary interest in serving on the Committee appears to be ensuring that the debtor spends ***more*** money to

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

6

the detriment of existing creditors. Upon its appointment to the Committee, the American Federation of Teachers ("AFT") issued a press release announcing that very goal:

> ***We are glad to serve on the unsecured creditors committee and believe any decision regarding bankruptcy needs to put the people of Puerto Rico first—not Wall Street financiers and hedge funds.*** Austerity has already led to the closure of 164 schools and to millions of dollars of cuts and the erosion of services to the public education system and the University of Puerto Rico. Instead, the government must work with teachers and the entire community to preserve the public services the island needs to prosper.

Press Release, June 28, 2017, *available at* https://www.aft.org/press-release/asociacion-de-maestros-de-puerto-rico-and-aft-puerto-rico-bankruptcy (emphasis added). While promoting prosperity is a laudable goal, AFT's statement underscores that its interest is not that of a creditor of the Commonwealth. Rather, AFT's interests are perfectly aligned with those of the Commonwealth itself: AFT wants increased government spending that benefits Commonwealth employees even if that spending reduces creditor recoveries. Having been retained for less than two days, the Committee's counsel already signaled that while "some creditors" wished to wage a "holy war" over the Commonwealth's Fiscal Plan, the Committee's view would be "key" and if the Committee ultimately determined the Fiscal Plan was "appropriate" then that "would be a very important data point." June 28, 2017 Hr'g Tr. 30:7-16 (L. Despins). Simply put, there is a significant risk that the Committee, as currently constituted, will not zealously advocate for the interest of creditors, but will instead use its official status to undermine the interests of creditors.

### THE COMMITTEE SHOULD BE RECONSTITUTED

A creditors' committee should fairly reflect the various interests of the debtor's different categories of creditors. *See In re Sharon Steel Corp.,* 100 B.R. 767, 777–78 (Bankr. W.D. Pa. 1989) ("[A]dequate representation exists through a single committee as long as the diverse interests of the various creditor groups are represented on and have participated in that committee."); 6 *Collier on Bankruptcy* ¶ 1102.02[2][b][i] (16th ed.) ("A committee will function more effectively if the different categories of creditors are represented on the committee."). Creditors are adequately represented when their interests "have a meaningful voice in the committee relative to their posture in the case." *In re Garden Ridge Corp.*, No. 04-10324, 2005 WL 523129 at *3 (Bankr. D. Del. March 2, 2005) (quoting *In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (Bankr. E.D. Mich. 1997)).

Where the official committee does not adequately represent a debtor's various creditors, Section 1102(a)(4) of the Bankruptcy Code authorizes the Court to reconstitute

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

7

the membership of the committee. *See* 11 U.S.C. § 1102(a)(4) ("On request of a party in interest and after notice and a hearing, the court may order the United States trustee to change the membership of a committee appointed under this subsection, if the court determines that the change is necessary to ensure adequate representation of creditors . . . ."); *see also In re Shorebank Corp.*, 467 B.R. 156, 162 (Bankr. N.D. Ill. 2012) ("The plain language of [Section 1102(a)(4)] calls for [the court's] independent determination of whether a change in committee composition is necessary.").

There is no bright line test to determine whether an official committee adequately represents a debtor's creditors. *See In re Dow Corning Corp.*, 194 B.R. 121 (Bankr. E.D. Mich. 1996) (existence of adequate representation will always require a case by case determination). In analyzing whether a committee provides adequate representation, courts may consider the following factors:

> (1) the ability of the committee to function;
>
> (2) the nature of the case;
>
> (3) the standing and desires of the various constituencies;
>
> (4) the ability for creditors to participate in the case even without an official committee and the potential to recover expenses pursuant to § 503(b);
>
> (5) whether different classes may be treated differently under a plan and need representation;
>
> (6) the motivation of the movants;
>
> (7) the delay and additional cost of granting the motion;
>
> (8) the point in the proceeding when the motion is made;
>
> (9) the tasks the committee is to perform; and
>
> (10) any other relevant factors.

*See In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006); *In re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.N.D.Y. 2002). No one factor is dispositive, and courts should apply the factors on a case-by-case basis. *See Dana*, 344 B.R. at 38 (citing *In re Kalvar Microfilm*, 195 B.R. 599, 601 (Bankr. D. Del. 1996)).

The current composition of the Committee does not adequately represent the Commonwealth's various creditor constituencies, and the above factors strongly support reconstitution to appoint Constitutional Debtholders.

First, the Committee cannot function properly if it includes only a subset of creditors who are largely being paid and have little incentive to advocate for greater Commonwealth creditor recoveries. As the Fiscal Plan makes clear, no creditor group has a greater stake in the outcome of these Title III cases than bondholders, and Constitutional Debtholders in particular. While the Commonwealth and Oversight Board

have pledged to pay employees, retirees, tax refund claimants, and trade creditors nearly in full, they propose massive cuts to bondholder payments. Excluding the very creditors most affected by a potential plan of adjustment impairs the Committee's ability to zealously advocate for the interests of all creditors. *See In re ParkWest Circle Realty, LLC*, No. 10-12965 (AJG), 2010 WL 3219531, at *4 (Bankr. S.D.N.Y. Aug. 11, 2010) (noting that a "type of creditor . . . is not currently adequately represented by the Committee since there are no other unsecured creditors who hold a personal guarantee against the Debtors' principals and no other unsecured creditors who hold as substantial a claim").

Significantly, the Oversight Board has already acknowledged that a committee consisting of creditors that stand to be paid in full or nearly in full cannot adequately represent the Commonwealth's creditors. In explaining why the Oversight Board believed the Committee, as opposed to the Official Committee of Retirees, should act as the Commonwealth's agent in the ongoing dispute with COFINA, counsel stated:

> The reason that we opted for the general creditors committee as opposed to the retirees committee is that the fiscal plan says that on average, we think that the retirees need to be paid 90 percent of their pensions. . . we didn't think people who were starting out with 90 cents in their pocket would be looked at as being as aggressive as a committee that is representing creditors who are faced with potentially far less than that.

June 28, 2017 Hr'g Tr. at 115:20-116:8 (M. Bienenstock). That same logic demonstrates why the Committee—in its current form—cannot adequately represent all Commonwealth creditors.

Second, not only does the absence of Constitutional Debtholders limit the Committee's ability to adequately represent all creditor interests, but the current composition of the Committee creates a conflict of interest that disenfranchises Constitutional Debtholders. Because payments to employees, retirees, tax refund claimants, and trade creditors are afforded *lower priority* treatment under Puerto Rico law, the Committee will be incentivized to argue that Constitutional Debtholders' first priority rights under the Puerto Rico Constitution and laws are unenforceable in these Title III cases. As noted above, Section 301(e) of PROMESA instructs the Board to place creditors "with priority over other claims" in different classes. Thus, despite the Committee's assertions that it will represent Constitutional Debtholders, its composition could very well lead to it taking positions contrary to the interests of Constitutional Debtholders, and representing the interests of one class of claims over another class. Constitutional Debtholders' differing rights compared to other Commonwealth creditors is a reason to *include* them on the Committee so that it may truly represent the diverse interests of creditors and not favor certain classes of creditors over others. *See In re Enron Corp.*, 279 B.R. at 686 ("[C]ourts look to see whether conflicts of interest on the committee effectively disenfranchise particular groups of creditors.").

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

9

Excluding Constitutional Debtholders *because* they are entitled to different treatment under Puerto Rico law heightens the substantial risk that the Committee will not advocate on behalf of all creditors. Moreover, excluding Constitutional Debtholders on this basis is contrary to long standing practice under the Bankruptcy Code (and particularly in large cases), where official creditors' committees routinely include creditors with differing priorities, such as indenture trustees representing both subordinated and senior noteholders, or creditors with differing claims against a parent or subsidiary corporation that result in one group being structurally subordinated to the other. The United States Trustee has traditionally included creditors with differing rights and interests to promote a healthy discourse within the committee and prevent the committee from focusing on intra-creditor disputes. The Committee's representation of diverse creditor interests (including Constitutional Debtholders) is critically important in these Title III cases.

Third, the size of Constitutional Debtholders' claims against the Commonwealth—especially in contrast to the aggregate size of employees', trade creditors', and taxpayers' claims—demonstrates the need to include Constitutional Debtholders on the Committee. "Although committees do not necessarily need to reflect the precise composition of the creditor body, committees should adequately represent the various creditor types." *ParkWest*, 2010 WL 3219531, at *4; *In re Schatz Fed. Bearings Co., Inc.,* 5 B.R. 543 (Bankr. S.D.N.Y. 1980) (appointing union to the committee where the employees of the debtor had a "substantial claim for unpaid pension benefits"). Here, the Oversight Board asserted that Constitutional Debtholders were the single largest unsecured creditor group in the entire case. On that basis alone, Constitutional Debtholders should have equal or greater representation than trade creditors and employees. Moreover, Constitutional Debtholders' outsized economic interests in these Title III cases ensures that they would invest significant time and resources into assisting the Committee in fulfilling its statutory duties. *See ParkWest*, 2010 WL 3219531, at *4 ("[W]ith such a substantial claim, [creditor] has a greater incentive to invest time and effort to make a positive contribution to the Committee."). The need for representation on the Committee is heightened further because there is no indenture trustee or other official committee to vigorously defend Constitutional Debtholders' rights and interests.

Fourth, reconstituting the Committee to include Constitutional Debtholders will not delay the Title III cases or add any additional costs. The Committee was formed only a few weeks ago and its counsel is just getting up to speed. June 28, 2017 Hr'g Tr. 21:1-2 ("As you know, we were appointed -- we were just retained two days ago. The parties in this case have been at this for, in some cases, years, and in other cases, months. . . it would be very hard for the committee to participate in that short time frame.") (L. Despins); *see also ParkWest*, 2010 WL 3219531, at *5 ("Because the Motion was filed approximately two and half weeks after the appointment of the Committee, the Court finds that the Motion was filed in a timely manner."). Similarly, because certain Constitutional Debtholders (including the members of the GO Group) have been analyzing the Commonwealth's state of affairs for many years, it is possible to reconstitute the Committee with members that are deeply familiar with these Title III

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

10

cases and will therefore expedite the Committee's work. *See ParkWest*, 2010 WL 3219531, at *4 (noting the creditor's knowledge of the debtor's business and the benefits that knowledge could bring to the committee).

For these reasons, we respectfully request that the United States Trustee act to reconstitute the Committee so that it is representative of Constitutional Debtholders. We appreciate your attention to this matter and are available at your convenience to discuss these important issues. We kindly ask that you respond to this request by no later than July 18, 2017 so that, if necessary, we may seek timely and appropriate relief before the Court.

Very truly yours,

Andrew N. Rosenberg