Hearing Date:  August 9, 2017 at 9:30 a.m. AST
Objection Deadline:  July 28, 2017 at 4:00 p.m. EDT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## NOTICE OF HEARING ON MOTION OF THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS TO RECONSTITUTE THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 105(a) AND 1102(a)(4)

**PLEASE TAKE NOTICE** that a hearing on the annexed *Motion of the Ad Hoc Group of General Obligation Bondholders to Reconstitute the Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. §§ 105(a) and 1102(a)(4)* [ECF No. 694] (the "Motion")[2] filed on July 21, 2017 in the above captioned Title III Cases will be held before the Honorable Laura Taylor Swain, United States District Court Judge, at the United States District Court for the District of Puerto Rico (the "District Court"), in Room 3, 150 Carlos Chardón Street, Federal Building, Office 150, San Juan, Puerto Rico 00918-1767 on **August 9, 2017 at 9:30 a.m. (Prevailing Atlantic Time)** (the "Hearing").

---

[1] The Debtors in these title III cases (collectively, the "Title III Cases"), along with each Debtor's respective Title III Case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).  (Title III Case numbers are listed as bankruptcy case numbers due to software limitations).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Motion.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections ("Objections")
to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure
and the Local Bankruptcy Rules for the District of Puerto Rico, shall be filed with the District
Court (a) by attorneys practicing in the District Court, including attorneys admitted *pro hac vice*,
electronically in accordance with rule 5 of the Local Rules for the District of Puerto Rico, and (b)
by all other parties in interest, on a CD-ROM, in text-searchable portable document format
(PDF), to the extent applicable, and shall be served in accordance with the *First Amended Notice,
Case Management and Administrative Procedures* [ECF No. 262-1], so as to be so filed and
received no later than **July 28, 2017 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection
Deadline").

**PLEASE TAKE FURTHER NOTICE** that if an Objection to the Motion is not
received by the Objection Deadline, the relief requested shall be deemed unopposed, and the
District Court may enter an order granting the relief sought without a Hearing.

[*Signature page to follow.*]

2

Dated: July 21, 2017

Respectfully submitted,

/s/ Ramón Rivera Morales
J. Ramón Rivera Morales
USDC-PR Bar No. 200701
JIMÉNEZ, GRAFFAM & LAUSELL
P.O. Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com

/s/ Mark T. Stancil
Lawrence S. Robbins (admitted *pro hac vice*)
Gary A. Orseck (admitted *pro hac vice*)
Kathryn S. Zecca (admitted *pro hac vice*)
Mark T. Stancil (admitted *pro hac vice*)
Ariel N. Lavinbuk (admitted *pro hac vice*)
Donald Burke (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411-L
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
Email: mstancil@robbinsrussell.com

/s/ Andrew N. Rosenberg
Andrew N. Rosenberg (admitted *pro hac vice*)
Richard A. Rosen (admitted *pro hac vice*)
Walter Rieman (admitted *pro hac vice*)
Kyle J. Kimpler (admitted *pro hac vice*)
Karen R. Zeituni (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: arosenberg@paulweiss.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*

**Hearing Date:  August 9, 2017 at 9:30 a.m. AST**
**Objection Deadline:  July 28, 2017 at 4:00 p.m. EDT**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>               Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## MOTION OF THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS TO RECONSTITUTE THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 105(a) AND 1102(a)(4)

---

[1] The Debtors in these title III cases (collectively, the "Title III Cases"), along with each Debtor's respective Title III Case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).  (Title III Case numbers are listed as bankruptcy case numbers due to software limitations).

## Table of Contents

PRELIMINARY STATEMENT ............................................................................ 1

JURISDICTION AND VENUE .......................................................................... 5

BACKGROUND .............................................................................................. 5

ARGUMENT .................................................................................................. 7

I.      Constitutional Debtholders Are Not Adequately Represented On The Committee .......... 9

        A.      Adequate Representation Requires That Different Types Of Creditors
                Have A Voice On The Committee ................................................................. 9

        B.      The Commonwealth Has Three Different Types of Creditors ............................ 12

                1.      Constitutional Debtholders .......................................................... 12

                2.      Commonwealth Employees And Retirees ........................................ 13

                3.      Trade Creditors And Tax Refund Claimants ................................... 14

        C.      The Committee Does Not Adequately Represent Constitutional
                Debtholders ........................................................................................ 16

                1.      The Composition Of The Committee .............................................. 16

                2.      Whether Different Classes Will Be Treated Differently Under Plan ....... 19

                3.      The Standing And Desires Of The Various Constituencies .................. 20

                4.      The Nature Of The Case ............................................................. 22

                5.      The Ability Of The Committee To Properly Function And Tasks
                        The Committee Is To Perform ...................................................... 24

II.     The Court Should Exercise Its Discretion To Reconstitute The Committee To
        Include Substantial Constitutional Debtholder Participation ............................... 28

        A.      The Delay And Additional Costs ................................................................ 28

        B.      Ability To Participate Without Official Committee ......................................... 29

        C.      Motivation Of The Movants ..................................................................... 29

i

III.    Unique Rights Of Constitutional Debtholders Are Not A Basis To Exclude Them
        From The Committee ......................................................................................................... 30

IV.     The Court Should, In The Alternative, Appoint An Additional Committee Of
        Constitutional Debtholders Under Section 1102(a)(2) Of The Bankruptcy Code ............ 34

CONCLUSION ............................................................................................................................ 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Budd Co.*,
   512 B.R. 910 (Bankr. N.D. Ill. 2014) .................................................................22

*In re Caesars Entm't Operating Co., Inc.*,
   Case No. 15-01145, *Notice of Appointment of Official Committee of Second
   Priority Noteholders* (Bankr. N.D. Ill. Feb. 5, 2015)...............................................34

*In re Churchill Coal Corp.*,
   31 B.R. 115 (Bankr. S.D.N.Y. 1983) .................................................................33

*In re City of Detroit, Michigan*,
   Case No. 13-53846, *Order Granting the City's Motion to Vacate the
   Appointment of the Official Committee of Unsecured Creditors* (Bankr. E.D.
   Mich. Feb. 28, 2014).......................................................................................24

*In re City of Stockton*,
   Case No. 12-32118...........................................................................................23

*In re City Vallejo*,
   Case No. 08-26813...........................................................................................23

*In re Daig Corp.*
   17 B.R. 41 (Bankr. D. Minn. 1981) ...........................................................10, 33

*In re Dana Corp.*,
   344 B.R. 35 (Bankr. S.D.N.Y. 2006) ........................................................ passim

*In re Dewey & LeBoeuf LLP*,
   No. 12-12321 MG, 2012 WL 5985325 (Bankr. S.D.N.Y. Nov. 29, 2012) ..............................9

*In re Dow Corning Corp.*,
   194 B.R. 121 (Bankr. E.D. Mich. 1996) .................................................... passim

*In re Drexel Burnham Lambert Grp., Inc.*,
   118 B.R. 209 (Bankr. S.D.N.Y. 1990) .......................................................16, 19

*In re Enron Corp.*,
   279 B.R. 671 (Bankr. S.N.D.Y. 2002) ....................................................... passim

*In re Garden Ridge Corp.*,
   No. 04-10324 (DDS), 2005 WL 523129 (Bankr. D. Del. Mar. 2, 2005)..............10, 21, 29, 33

*In re Grynberg*,
    10 B.R. 256 (Bankr. D. Colo. 1981) ...................................................................33

*In re Hills Stores Co.*,
    137 B.R. 4 (Bankr. S.D.N.Y. 1992) ........................................................... passim

*In re Jefferson County, Alabama*,
    Case No. 11-05736, *Order Regarding Recommendation of Appointment of
    Unsecured Creditors' Committee* (Bankr. N.D. Ala. Jul. 13, 2012)........................................24

*In re Laclede Cab Co.*,
    145 B.R. 308 (Bankr. E.D. Mo. 1992) ...................................................................32

*In re Microboard Processing, Inc.*,
    95 B.R. 283 (Bankr. D. Conn. 1989) ......................................................................32

*Mirant Americas Energy Mktg., L.P.* v. *Official Comm. of Unsecured Creditors of
    Enron Corp.*,
    No. 02 CIV. 6274 (GBD), 2003 WL 22327118 (S.D.N.Y. Oct. 10, 2003) ..................... passim

*In re Ne. Dairy Co-op. Fed'n, Inc.*,
    59 B.R. 531 (Bankr. N.D.N.Y. 1986) ...............................................................11, 18

*In re Park W. Circle Realty, LLC*,
    No. 10-12965 (AJG), 2010 WL 3219531 (Bankr. S.D.N.Y. Aug. 11, 2010)................. passim

*In re Plabell Rubber Prods.*,
    140 B.R. 179 (Bankr. N.D. Ohio 1992) ..................................................................30

*In re Residential Capital, LLC*,
    480 B.R. 550 (Bankr. S.D.N.Y. 2012) .....................................................................8

*In re Richmond Tank Car Co.*,
    93 B.R. 504 (Bankr. S.D. Tex. 1988) .....................................................................33

*In re Salant Corp.*,
    53 B.R. 158 (Bankr. S.D.N.Y. 1985) .....................................................................18

*In re Seaescape Cruises, Ltd.*
    131 B.R. 241 (Bankr. S.D. Fla. 1991) ....................................................................32

*In re Sharon Steel Corp.*,
    100 B.R. 767 (Bankr. W.D. Pa. 1989) .......................................................9 , 11, 31

**STATUTES**

23 L.P.R.A. § 104(c) ...........................................................................13, 14, 15

11 U.S.C. § 105(a) ....................................................................................1, 35

11 U.S.C. § 1102(a) ................................................................................................. passim

11 U.S.C. § 1102(b) ........................................................................................................10

28 U.S.C. § 1331 ...............................................................................................................5

28 U.S.C. § 1391(b) ...........................................................................................................5

48 U.S.C. §§ 2101-2241 ....................................................................................................1

48 U.S.C. § 2166(a) ...........................................................................................................5

48 U.S.C. § 2167(a) ...........................................................................................................5

Puerto Rico Constitution ............................................................................................ passim

PROMESA § 201(b)(1)(N) ..............................................................................................13

PROMESA § 301(a) ...........................................................................................................2

PROMESA § 301(e) ...................................................................................................19, 33

**OTHER AUTHORITIES**

6 Collier on Bankruptcy ¶ 1102.02[2][a][i] (Alan J. Resnick & Henry J. Sommer
    eds., 16th ed.) .............................................................................................................32

6 Collier on Bankruptcy ¶ 1102.02[2][b][i] (Alan J. Resnick & Henry J. Sommer
    eds., 16th ed.) .............................................................................................................12

The Ad Hoc Group of General Obligation Bondholders (the "<u>GO Group</u>"),[2] by and through its undersigned counsel, hereby moves this Court pursuant to sections 105(a), 1102(a)(2), and 1104(a)(4) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), made applicable in these Title III Cases pursuant to section 301(a) of the *Puerto Rico Oversight, Management, and Economic Stability Act*, Pub. L. No. 114-187, 130 Stat. 549 ("<u>PROMESA</u>") (codified at 48 U.S.C. §§ 2101-2241), for an order (i) directing the United States Trustee to change the membership of the Official Committee of Unsecured Creditors of the Commonwealth (the "<u>Committee</u>"), or (ii) in the alternative, appointing an additional committee of Constitutional Debtholders.  In support hereof, the GO Group states as follows:

## **<u>PRELIMINARY STATEMENT</u>**

1.      The GO Group seeks to rectify an obvious and unprecedented anomaly.  The Oversight Board and Commonwealth assert that Constitutional Debtholders are the ***largest*** class of unsecured creditors in these Title III Cases.[3]  The Committee concedes that although Constitutional Debtholders are a "very important" group to which the Committee owes fiduciary duties, they remain "unrepresented."  The United States Trustee has nonetheless refused to appoint a single Constitutional Debtholder to the Committee, despite several holders, including two members of the GO Group, being willing to serve.  The GO Group is unaware of any case where the largest purportedly unsecured creditor was purposefully excluded from the official unsecured creditors' committee.  Rather, the Bankruptcy Code and the overwhelming weight of

---

[2]      The members of the GO Group filing this Motion are certain funds or entities managed or advised by Aurelius Capital Management, LP, Autonomy Capital (Jersey) LP, FCO Advisors LP, Monarch Alternative Capital LP, Senator Investment Group LP, and Stone Lion L.P.  These entities file this Motion exclusively on their own behalf and do not assume any fiduciary or other duties to any other creditor or person.  The GO Group collectively holds approximately $3.2 billion of bonds issued or guaranteed by the Commonwealth (collectively, the "<u>Constitutional Debt</u>" and holders thereof, the "<u>Constitutional Debtholders</u>").

[3]      The GO Group disputes the Commonwealth's assertion that Constitutional Debtholders are general unsecured creditors.  In due course, the GO Group will establish that Constitutional Debt is protected by a statutory lien on all "available resources" or certain subsets of those resources.

decisions interpreting the Bankruptcy Code provide that the Committee must adequately represent all of the Commonwealth's allegedly unsecured creditors, and must specifically represent the **different kinds** of the Commonwealth's allegedly unsecured creditors.

2.     Section 1102 of the Bankruptcy Code requires a creditors' committee to adequately represent a debtor's creditors.  Where a creditors' committee fails to adequately represent the debtor's creditors, section 1102(a)(4) empowers the Court to change the membership of the official committee.  "Adequate representation" requires that various different types of creditors—including, in particular, creditors with diverse and even conflicting interests—have a meaningful voice on and participation in the Committee.  The mere acknowledgment of the existence of duties to the Constitutional Debtholders does not suffice for adequate representation.  While a creditors' committee is not required to precisely reflect the makeup of the debtor's creditors, adequate representation does require that creditors have a voice that is commensurate with their importance in the case.

3.     The Committee, as currently constituted, falls far short of any conceivable standard of adequate representation.  Rather than including a single Constitutional Debtholder— allegedly the largest class of unsecured creditors in these Title III Cases—the Committee instead exclusively comprises employee unions (which may not have any claims at all), trade creditors, and a tax refund claimant.  While the aggregate amount of Constitutional Debt outstanding is more than **fifty times** larger than the aggregate claims of trade and tax refund creditors, those creditors outnumber Constitutional Debtholders **five-to-zero** on the Committee.

4.     Instead of including diverse interests on the Committee that could synthesize the interests of creditors broadly and expedite the consensual resolution of these Title III Cases, the Committee reflects only the narrow views of politically favored constituencies that the

2

Commonwealth has already paid in full or pledged to pay in full.  The Commonwealth has

pledged not to reduce employee headcount, has promised to continue paying suppliers in full,

and has continued to pay tax refunds as they come due.  In contrast, the Commonwealth proposes

massive cuts to bondholders, including Constitutional Debtholders, seeking to reduce all

bondholder claims by an average of approximately 80%.  Against this backdrop, the failure to

include any Constitutional Debtholders on the Committee ensures that the Committee will not

advocate zealously on behalf of all creditors.  This was confirmed by a press release issued by

one of the Committee members upon its appointment to the Committee:

> We are glad to serve on the unsecured creditors committee and
> believe any decision regarding bankruptcy needs to put the people
> of Puerto Rico first—not Wall Street financiers and hedge funds.
> Austerity has already led to the closure of 164 schools and to
> millions of dollars of cuts and the erosion of services to the public
> education system and the University of Puerto Rico.  Instead, the
> government must work with teachers and the entire community to
> preserve the public services the island needs to prosper.

June 28, 2017, Am. Fed'n of Teachers, Asociación de Maestros de Puerto Rico and AFT on

Puerto Rico Bankruptcy Proceedings (June 28, 2017), attached hereto as **Exhibit A**.  Without a

diverse selection of members with competing views, the Committee is constructed to "preserve

the public services," even at the cost of other creditors such as Constitutional Debtholders.

Adequate representation of Constitutional Debtholders would provide a much needed check and

balance.

     5.     The lack of adequate representation afforded Constitutional Debtholders on the

Committee is highlighted by the ongoing COFINA validity dispute, which the Oversight Board

states "will likely be ***dispositive*** as to the relative recoveries of the ***debt holders*** of COFINA and

the Commonwealth."[4]   The Oversight Board, however, has nominated the Committee to serve as the Commonwealth "agent" to challenge the validity of COFINA, yet the Committee does not include the debt holders (i.e., Constitutional Debtholders) purportedly most affected by the outcome of that dispute.   The purpose of adequate representation under section 1102 of the Bankruptcy Code is to ensure that one group of creditors, which lack a significant stake in the outcome of a particular dispute, is not entrusted with overseeing an issue that is allegedly "dispositive as to the relative recover[y]" of another group of creditors.  Unless the membership of the Committee is altered, that is precisely the situation Constitutional Debtholders face here.

6.      The United States Trustee acknowledges that it actively sought to exclude Constitutional Debtholders from the Committee.   Its rationale was that Constitutional Debtholders—and the GO Group in particular—claim to be entitled to first priority treatment under the Puerto Rico Constitution and to be secured by a statutory lien on all available resources.  Neither position, however, creates a disqualifying conflict.  To the contrary, creditors' committees routinely include *both* senior and subordinated creditors, and courts encourage this type of diverse composition so that the creditors' committees may adequately represent all unsecured creditors and thereby facilitate consensual resolutions.   And so long as the Commonwealth and Committee take the position that Constitutional Debtholders are unsecured, the GO Group's arguments to the contrary cannot be the sole grounds for excluding Constitutional Debtholders from the Committee.  Creditors are entitled to advance positions in their individual capacity notwithstanding their participation on a creditors' committee and, if appointed to the Committee, Constitutional Debtholders would not—in fact, could not—use that position to argue they were secured.  Moreover, the United States Trustee and Court retain the

---

4        *See Motion of Debtors For Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [ECF No. 303] at 12 (emphasis added).

ability to remove Constitutional Debtholders from the Committee if the Court determines that Constitutional Debtholders are secured creditors.

7.        In short, Constitutional Debtholders are not adequately represented by the Committee.  Section 1102(a)(4) of the Bankruptcy Code empowers the Court to reconstitute the Committee to fix this anomaly.

## JURISDICTION AND VENUE

8.        This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1331 and 48 U.S.C. § 2166(a).  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 48 U.S.C. § 2167(a).

## BACKGROUND

9.        On May 3, 2017, the Oversight Board filed a petition in this Court under title III of PROMESA on behalf of the Commonwealth.  Shortly thereafter, on May 5, 2017, the Oversight Board filed a petition in this Court under title III of PROMESA on behalf of COFINA.

10.        On May 5, 2017, the Pre-Petition Ad Hoc Retiree Committee filed a motion seeking the appointment of an official retiree committee.  *See Motion for Entry of an Order Pursuant to 48 U.S.C. § 2161 and 11 U.S.C. § 1102 Directing Appointment of an Official Retiree Committee and Appointing the Pre-Petition Ad Hoc Retiree Committee as the Official Retiree Committee* [ECF No. 8].

11.        The United States Trustee responded on May 19, 2017, and indicated that it intended to appoint three official committees in these Title III Cases: (i) an official unsecured creditors' committee in the Commonwealth Title III Case; (ii) an official retiree committee in the Commonwealth Title III Case (the "Official Retiree Committee"); and (iii) an official unsecured creditors' committee in the COFINA Title III Case.  *See Response of United States Trustee to Motion for Entry of Order Pursuant to 48 U.S.C. § 2161 and 11 U.S.C. § 1102 Directing the*

*Appointment of an Official Retiree Committee and Appointing Pre-Petition Ad Hoc Retiree Committee as the Official Committee* [ECF No. 192].  By letter dated May 23, 2017, the United States Trustee solicited interest in membership to such committees.

12.     The GO Group sent a letter to the United States Trustee on June 6, 2017 stating that an official unsecured creditors' committee in the Commonwealth's Title III Case was neither appropriate nor necessary and urging the United States Trustee to reconsider its decision to solicit interest in such committee.  *See* Letter from A. Rosenberg to Guy G. Gebhardt, Acting United States Trustee for Region 21 (June 6, 2017), attached hereto as **Exhibit B**.  To the extent the United States Trustee decided to appoint an unsecured creditors' committee in the Commonwealth Title III Case, the GO Group advised that it should be primarily, if not entirely, composed of Constitutional Debtholders, or that a separate official committee of Constitutional Debtholders should be appointed.  *Id.* at 2.  The GO Group did not take a position on the formation of a retiree committee in the Commonwealth Title III Case.  *Id.*

13.     The United States Trustee held committee formation meetings on June 9, 2017, in San Juan, Puerto Rico.  Two members of the GO Group expressed willingness to serve on the Committee in response to the United States Trustee's solicitation of interest and attended the Committee formation meeting.

14.     On June 15, 2017, the United States Trustee appointed the Committee and an Official Committee of Retirees in the Commonwealth Title III Case.  *See Appointment of Official Committee of Unsecured Creditors in the Commonwealth of Puerto Rico* [ECF No. 338]; *Appointment of Official Committee of Retirees in the Commonwealth of Puerto Rico* [ECF No. 340].  No official committees were appointed in the COFINA Title III Case.

15.     The Committee comprises the following seven members: (i) The American Federation of Teachers ("AFT"); (ii) Doral Financial Corporation, (iii) Genesis Security, (iv) Puerto Rico Hospital Supply, (v) Service Employees International Union, (vi) Total Petroleum Puerto Rico Corp., and (vii) Unitech Engineering.  No Constitutional Debtholder was appointed to the Committee.

16.     On July 11, 2017, the GO Group sent a letter to the United States Trustee requesting that it reconstitute the Committee to include Constitutional Debtholders.  *See* Letter from A. Rosenberg to Guy G. Gebhardt, Acting United States Trustee for Region 21 (July 11, 2017), attached hereto as **Exhibit C**.

17.     On July 14, 2017, the United States Trustee responded to the GO Group's July 11 letter.  *See* Letter from Guy G. Gebhardt, Acting United States Trustee for Region 21, to A. Rosenberg (July 14, 2017), attached hereto as **Exhibit D**.  In the July 14 letter, the United States Trustee stated that it had "no plans to reconstitute the Committee to add creditors claiming that their claims are secured or otherwise have full priority."

## ARGUMENT

18.     The Committee, as currently constituted, does not adequately represent the Commonwealth's creditors, and the Court should order the United States Trustee to change the membership of the Committee to ensure that Constitutional Debtholders are adequately represented.

19.     Section 1102(a)(4) of the Bankruptcy Code provides that "the court may order the United States trustee to change the membership of a committee . . . if the court determines that the change is necessary ***to ensure adequate representation of creditors*** . . . ."  11 U.S.C. § 1102(a)(4) (emphasis added).  Upon a request under section 1102(a)(4) to reconstitute the Committee, the Court "must necessarily conduct an independent review of whether there is

7

adequate representation by an existing committee." *See In re Enron Corp.*, 279 B.R. 671, 684 (Bankr. S.D.N.Y. 2002). Accordingly, the Court reviews the United States Trustee's appointment of existing Committee members de novo. *See id.*; *In re Park W. Circle Realty, LLC*, No. 10-12965 (AJG), 2010 WL 3219531, at *2 (Bankr. S.D.N.Y. Aug. 11, 2010).

20.     Courts consider a number of factors when determining whether to change the membership of a committee under section 1102(a)(4). *In re Park W.*, 2010 WL 3219531, at *2. In particular, courts consider: (1) the ability of the committee to function; (2) the nature of the case; (3) the standing and desires of the various constituencies; (4) the ability of creditors to participate in the case even without an official committee and the potential to recover expenses pursuant to § 503(b); (5) whether different classes may be treated differently under a plan and need representation; (6) the motivation of the movants; (7) the delay and additional cost of granting the motion; (8) the point in the proceeding when the motion is made; (9) the tasks the committee is to perform; and (10) any other relevant factors. *See id.*; *In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006); *In re Enron*, 279 B.R. at 685.[5] No one factor is dispositive, and courts should apply the factors on a case-by-case basis. *See In re Dana*, 344 B.R. at 38 (citing *In re Kalvar Microfilm*, 195 B.R. 599, 601 (Bankr. D. Del. 1996)).

21.     In synthesizing the above factors, courts often "employ a two-step process." *In re Residential Capital, LLC*, 480 B.R. 550, 557 (Bankr. S.D.N.Y. 2012). First, using a subset of the above factors, courts determine whether the movant "is adequately represented by an existing committee." *Mirant Ams. Energy Mktg., L.P.* v. *Official Comm. of Unsecured Creditors of Enron Corp.*, No. 02 CIV. 6274 (GBD), 2003 WL 22327118, at *4 (S.D.N.Y. Oct. 10, 2003). "If

---

[5]     Courts use the same factors to determine whether to appoint an additional official committee under section 1102(a)(2) of the Bankruptcy Code, which also requires a finding of lack of "adequate representation." *See In re Park W.*, 2010 WL 3219531, at *4 ("[T]he principle and analysis with respect to 'adequate representation' [under section 1102(a)(2)] are applicable to the considerations of that term as it applies under § 1102(a)(4)."). Accordingly, courts cite interchangeably to cases interpreting both sections of the Bankruptcy Code.

a court finds inadequate representation, it will then determine whether it should exercise its discretion under the particular circumstances of the case," using certain of the factors outlined above. *Id.*; *see also In re Dewey & LeBoeuf LLP*, No. 12-12321 MG, 2012 WL 5985325, at *3 (Bankr. S.D.N.Y. Nov. 29, 2012) ("First, a court determines whether the appointment of an additional committee is necessary to assure the movants are adequately represented. Second, if the answer to the first question is 'yes,' then the court must decide whether it should exercise its discretion and order such appointment.").

## I.   Constitutional Debtholders Are Not Adequately Represented On The Committee

### A.   Adequate Representation Requires That Different Types Of Creditors Have A Voice On The Committee

22.   An official creditors' committee should be representative of a debtor's creditors, and, in particular, a debtor's ***different kinds*** of creditors.   "The formation of a creditors' committee is purposely intended to represent the necessarily different interests and concerns of the creditors it represents."   *In re Enron*, 279 B.R. at 685 (internal quotation mark omitted). Where, as here, the Committee is not representative of the debtor's creditors, section 1102(a)(4) of the Bankruptcy Code authorizes the Court to order the reconstitution of an existing committee if "change is necessary to ensure ***adequate representation*** of creditors."   11 U.S.C. § 1102(a)(4) (emphasis added).

23.   While the Bankruptcy Code does not define "adequate representation," courts have articulated standards for what constitutes adequate representation.   *See In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997).   "The legal principle to be distilled from these cases is clear: adequate representation exists through a single committee ***as long as the diverse interests of the various creditor groups*** are represented on and have participated in that committee."   *In re Sharon Steel*

9

*Corp.*, 100 B.R. 767, 777-78 (Bankr. W.D. Pa. 1989) (emphasis added). "What is required is adequate representation of ***various creditor types***," and "[w]hat the Code requires is that ***conflicting groups of creditors*** have a voice through adequate representation on a Committee." *In re Hills Stores Co.*, 137 B.R. 4, 7 (Bankr. S.D.N.Y. 1992) (emphasis added). The guiding principle in nearly every case is that adequate representation requires different types of creditors—and creditors with conflicting interests in particular—on the committee. As the court noted in *Dow Corning*:

> For a particular group of creditors to be adequately represented by
> an existing committee, it is not necessary for the committee to be
> an exact reflection of that committee's designated constituents.
> Instead, ***adequate representation exists if the interests of that
> particular group of creditors have a meaningful voice on the
> committee in relation to their posture in the case***.

194 B.R. at 141 (emphasis added); *see also In re Garden Ridge Corp.*, No. 04-10324 (DDS), 2005 WL 523129, at *3 (Bankr. D. Del. Mar. 2, 2005) ("[A]dequate representation exists through a single committee so long as the diverse interests of the various creditor groups are represented on and have participated in that committee." (internal quotation marks omitted)); *In re Daig Corp.*, 17 B.R. 41, 43 (Bankr. D. Minn. 1981) (noting that creditors' committee "is purposely intended to represent the necessarily different interests and concerns of the creditors it represents" and "[t]here is simply no other entity established by the Code to guard those interests").[6]

---

[6] The various provisions of section 1102 of the Bankruptcy Code confirm that diverse interests must be represented on official committees. *See* 11 U.S.C. § 1102(b)(1) (recommending that an official committee of creditors "shall ordinarily consist of the persons, willing to serve, that hold the seven largest claims against the debtor of ***the kinds represented on such committee***," and contemplating appointment of a committee organized prepetition as the official committee "if such committee was fairly chosen and ***is representative of the different kinds of claims to be represented***") (emphasis added); *id.* § 1102(a)(2) (authorizing a court to order the appointment of additional official committees "if necessary to assure ***adequate representation*** of creditors") (emphasis added).

24.     Mandating that different types of creditors participate on a creditors' committee
not only ensures adequate representation of creditors, such diversity also ensures that the
creditors' committee will be better able to function and facilitate a timely and consensual
resolution of the bankruptcy cases. A committee "is a catalyst for negotiation and compromise
between the parties in the reorganization process" and therefore functions better when it includes
diverse voices. *In re Enron*, 279 B.R. at 690. Accordingly,

> [T]he ***ultimate aim is to strike a proper balance*** between the
> parties such that an effective and viable reorganization of the
> debtor may be accomplished. As in most Chapter 11 cases, there
> will be common interests among various groups of unsecured
> creditors. ***The inclusion of such groups within one committee
> may facilitate the consensual resolution of the conflicting
> priorities among the holders of unsecured claims and thereby
> facilitate the negotiation of a consensual plan***.

*In re Hills Stores*, 137 B.R. at 7 (emphasis added); *see also Mirant*, 2003 WL 22327118, at *6
(same); *In re Ne. Dairy Co-op. Fed'n, Inc.*, 59 B.R. 531, 534 (Bankr. N.D.N.Y. 1986)
("[I]nclusion of entities with differing reorganizational aspirations often are of benefit to the
debtor.").

25.     When the interests of "distinct" creditor groups are each represented on an official
committee by "active, competent, financially sophisticated and strong-willed representatives,"
then the ability of such members to "adjust their differences within the framework of the existing
Official Committee" will strengthen the prospect of consensual resolutions. *In re Sharon Steel*,
100 B.R. at 779. As the leading bankruptcy treatise sums up:

> A committee will function more effectively if the different
> categories of creditors are represented on the committee. For
> example, ***a complex case may have*** bank lenders, ***senior and
> subordinate*** debenture holders, trade creditors, union/employee
> creditors and rejected lease/executory contract claimholders.
> While it may be appropriate to have multiple committees in such a
> case, ***if the United States trustee determines only a single
> committee is warranted, that committee should reflect***

11

> *membership from different categories in order to be representative of the interests of creditors.*

6 Collier on Bankruptcy ¶ 1102.02[2][b][i] (Alan J. Resnick & Henry J. Sommer eds., 16th ed.) (emphasis added).

### B.    The Commonwealth Has Three Different Types of Creditors

26.    The Commonwealth's creditors fall into three primary categories:  Constitutional Debtholders, employees and retirees, and trade creditors and tax refund claimants.   These different types of creditors are owed different amounts, have different rights under Puerto Rico law and PROMESA, are currently being treated differently by the Commonwealth and Oversight Board, and potentially have different views on how best to resolve these Title III Cases.

### 1.    Constitutional Debtholders

27.    The Commonwealth has issued or guaranteed approximately $18.2 billion in principal amount of Constitutional Debt, including $12.5 billion in general obligation bonds issued by the Commonwealth and $5.7 billion in bonds guaranteed by the Commonwealth.   The Commonwealth asserts that Constitutional Debtholders are the single largest unsecured creditor constituency in the Commonwealth Title III Case.   *See Notice of Filing of Amended Schedule B to Title III Petition – List of Creditors Who Have the 20 Largest Unsecured Claims* [ECF No. 3]. The Commonwealth has defaulted on its obligations to pay Constitutional Debtholders for over a year, with missed payments totaling more than $2.3 billion.   As a result, the current claim amount of Constitutional Debtholders is approximately $19.6 billion, including amounts for overdue interest and interest on overdue principal and overdue interest.[7]

---

[7]    The GO Group reserves all rights with respect to any and all overdue amounts owing by the Commonwealth in respect of Constitutional Debt, including, without limitation, interest on all such overdue amounts, whether representing principal, interest, premium or other obligations, and further asserts that interest has accrued thereon, and will continue to accrue thereon until all such overdue amounts are paid in full, including interest upon interest, at the maximum rate allowed under applicable contract or applicable law, rule or regulation, and compounding on regular intervals (semiannually, quarterly or monthly, as applicable).

28.     Puerto Rico's Constitution provides that, when available resources are insufficient
to cover all of the Commonwealth's obligations, Constitutional Debt shall be paid first. *See* P.R.
Const. art. VI, § 8. Puerto Rico statutes further confirm that Constitutional Debt must be paid
first and before all other expenditures. *See* 23 L.P.R.A. § 104(c)(1). PROMESA, in turn,
requires that any fiscal plan—and therefore any plan of adjustment—respect the lawful priorities
and liens set forth in the Puerto Rico Constitution and laws. *See* PROMESA § 201(b)(1)(N).
PROMESA further requires the Oversight Board to consider whether "claims have priority over
other claims" when classifying claims under a plan of adjustment. *Id.* § 301(e).

29.     Notwithstanding the explicit protections granted to Constitutional Debtholders
under Puerto Rico law and PROMESA, the Commonwealth and Oversight Board have proposed
to cut Constitutional Debtholders' (together with other bondholders') claims collectively by
approximately 80% under the Fiscal Plan.

### 2.     Commonwealth Employees And Retirees

30.     Puerto Rico's employees and retirees assert claims against the Commonwealth.
The Commonwealth and Oversight Board assert that the Commonwealth and its instrumentalities
have approximately "$49 billion of pension liabilities." *See Statement of Oversight Board In
Connection With PROMESA Title III Petition* [ECF No. 1]. As the Commonwealth's other
largest creditor constituency, pension creditors are adequately represented by their own statutory
committee, the Official Retiree Committee.

31.     Aside from prospective pension claims that are adequately represented by the
Official Retiree Committee, it is not clear what additional claims, if any, current employees have

13

against the Commonwealth. *See, e.g.*, *In re Dow Corning*, 194 B.R. at 144 ("At present, however, the best way to describe the Union's interests is in not becoming a creditor.").[8]

32.     Puerto Rico statutes provide that liabilities owed to public employees and retirees shall be paid *after* Constitutional Debt.   In particular, welfare programs and pension contributions are accorded *third priority*, while other commitments entered into by contract (such as employment agreements) are accorded *second priority*.  *See* 23 L.P.R.A. § 104(c)(2)-(3).  These priorities are also incorporated into PROMESA.

33.     Notwithstanding the lower priority afforded these claims, the Commonwealth and Oversight Board have insisted that such claims will not be cut or face only minimal impairment. The Fiscal Plan provides that pension liabilities will not be reduced at all until fiscal year 2020, and even then they will be reduced by only 10%.  Governor Rosselló recently announced that the fiscal year 2018 budget "includes PAYMENT OF ALL PENSIONS."  *See* Governor Ricardo Rosselló Nevares, Address to Legislative Assembly of P.R. (May 31, 2017), attached hereto as **Exhibit E**. The fiscal year 2018 budget in fact appropriated more than $2 billion from the general fund to ensure that pension liabilities will not be impaired at all.  Similarly, the Commonwealth has pledged not to reduce the headcount of public employees other than through normal attrition, and the Fiscal Plan provides for the full payment of all public employees over the next ten years.

### 3.     Trade Creditors And Tax Refund Claimants

34.     The Commonwealth has various "trade" creditors consisting primarily of suppliers, service providers and tax refund claimants.  As of May 26, 2017, the Commonwealth estimated that the aggregate amount of all outstanding "accounts payable" was approximately

---

[8]     The unions' role on the Committee is particularly unclear.  If the unions are representing current and future retirees, these constituencies are already adequately represented by the Official Retiree Committee.  If the unions are representing current employees without regard to their pension claims, then it is not clear what other claims exist since the Commonwealth has continued to pay all employee wages and benefits.

$373 million.  *See* Puerto Rico Department of Treasury, Treasury Single Account ("TSA") Cash Flow Actual-to-Forecast Comparison (May 26, 2017), attached hereto as **Exhibit F**.

35.     Puerto Rico statutes provide that all trade creditors shall be paid **after** Constitutional Debt.  Depending on the type of claim and service provided, Puerto Rico statutes provide that these creditors should be afforded **second** to **fifth priority**.  *See* 23 L.P.R.A. § 104(c)(2)-(5).

36.     Notwithstanding the lower priority afforded to these claims, the Commonwealth and Oversight Board have endeavored to pay these creditors in full.  For example, when PROMESA was enacted on June 30, 2016, the Commonwealth estimated that the aggregate amount of all accounts payable was $1.6 billion.[9]  As set forth above, by May 26, 2017, the aggregate amount of those accounts payable appears to have **decreased** by more than **$1.2 billion** and now stands at approximately $373 million.  *See* **Exhibit F**.[10]  This near complete pay down of trade creditors is consistent with the Commonwealth's recent promise to pay suppliers in full. "The government has the commitment and, more importantly, the ability to pay suppliers and providers as usual.  All of the government's bills will be processed under the ordinary process." *AAFAF Says Title III Won't Touch Supplier Payments as Treasury Sends out $70M in Checks This Week*, Reorg Res. (May 5, 2017) (quoting Fiscal Agency and Financial Advisory Authority Executive Director Gerardo Portela), attached hereto as **Exhibit G**.  Similarly, Governor Rosselló announced that the Commonwealth would continue paying tax refunds in full, including

---

[9]     *See* Commonwealth of Puerto Rico, Financial Information and Operating Data Report (Dec. 18, 2016), http://www.gdb-pur.com/documents/CommonwealthofPuertoRicoFinancialInfoFY201612-18-16.pdf.

[10]    The pay down of suppliers is consistent with the Commonwealth's Fiscal Plan, which contemplated $1.3 billion in accelerated payments to suppliers over the course of 5 years starting in 2020.  Fiscal Plan at 10, 18.

$35 million in tax refund payments in June 2017 alone.  *See* **Exhibit E**.[11]  The Fiscal Plan and fiscal year 2018 budget also confirm that trade creditors will be paid in full in the ordinary course.

### C.      The Committee Does Not Adequately Represent Constitutional Debtholders

37.      To determine whether a creditors' committee adequately represents a particular group of creditors for purposes of section 1104(a)(4) of the Bankruptcy Code, courts consider the following factors, each of which demonstrates that the Committee does not adequately represent Constitutional Debtholders.

### 1.      The Composition Of The Committee

38.      Naturally, a "determination of whether there is proper balance, and thus adequate representation, on a committee requires an awareness of the committee's composition."  *In re Dow Corning*, 194 B.R. at 142; *see also In re Drexel Burnham Lambert Grp., Inc.*, 118 B.R. 209, 212 (Bankr. S.D.N.Y. 1990) ("The standard of adequate representation, however, lies not in the uniqueness of a single claim but in the nature of the case and the composition of the committee.").  While the Bankruptcy Code does not "mandate [that] a committee must faithfully reproduce the exact complexion of the creditor body," what "is required is adequate representation of various creditor types."  *In re Hills Stores*, 137 B.R. at 6-7 (finding adequate representation of subordinated bondholders that constituted 27% of the committee but 35% of debtor's total liabilities); *see also In re Park W.*, 2010 WL 3219531, at *4 ("Although committees do not necessarily need to reflect the precise composition of the creditor body, committees should adequately represent the various creditor types.").  Thus, the aim of the

---

[11]      Historically, the Commonwealth has pre-funded tax refunds out of gross revenues of the general fund to ensure that they are timely paid, and consequently there is no indication that there are substantial valid tax refund claims outstanding.

United States Trustee (and, if necessary, the Court) is to "strike a proper balance." *Mirant*, 2003
WL 22327118, at *6; *In re Enron*, 279 B.R. at 690.

39.     Here, the Committee does not include ***any*** Constitutional Debtholders—which the
Oversight Board asserts is the largest class of unsecured creditors.  Instead, the Committee is
composed entirely of only two of the three potential types of Commonwealth creditors:  unions
representing employees and trade and tax refund creditors.  Moreover, the Committee is made up
of the very types of creditors that the Commonwealth has continued to pay, or promises to pay,
in full or nearly in full, plus two employee unions that may not have any claims at all.  Far from
being balanced and representative of the Commonwealth's different types of creditors, the
Committee represents solely the narrow interests of those creditors that the Commonwealth has
already singled out for favored treatment, i.e., those creditors with the least need to improve their
proposed treatment.

40.     While the Bankruptcy Code does not require a committee to reflect the precise
composition of creditors, the Committee in this case does not even come close to "strik[ing] a
proper balance." *Mirant*, 2003 WL 22327118, at *4.  Constitutional Debt is more than ***fifty***
***times*** larger than the aggregate claim of trade and tax refund creditors, yet those creditors hold
five seats on the Committee while Constitutional Debtholders hold none.  That discrepancy alone
demonstrates that the Committee does not adequately represent the Commonwealth's creditors.
Courts have required changes to committees in similar circumstances when a large creditor class
lacks any voice on the committee.  In directing the United States Trustee to reconstitute the
unsecured creditor committee, the court in *In re Park West* noted:

> In this particular situation, a single creditor, Constantine Cannon,
> holds over 50% of the Debtors' debt with a claim of
> $2,176,872.64. The largest creditor on the Committee has a claim
> of only $139,973.91.   At nearly ***ten times the size*** of the total

17

> combined claims of all three Committee members, Constantine
> Cannon's claim dwarfs the Committee's claims, both individually
> and in the aggregate.

2010 WL 3219531, at *3 (emphasis added).

41.     Similarly, in *Dow Corning*, the court found that the creditors' committee did not
adequately represent a group of physician creditors that by dollar amount "might constitute a
sizeable percentage of total unsecured claims," when not a single physician creditor was
appointed to the committee.  194 B.R. at 145; *see also In re Ne. Dairy*, 59 B.R. at 534 (finding
"[t]he Committee is not representative as presently established, for interests critical to the
formulation of a successful plan are unrepresented" and increasing 11-member committee to 13
members); *In re Salant Corp.*, 53 B.R. 158, 161-62 (Bankr. S.D.N.Y. 1985) (finding "the present
committee is not representative of the claims of non-management employees as it has no member
having a claim of that kind" and increasing 17-member committee to 20 members).

42.     The Committee's proposed counsel has already acknowledged the absence of
Constitutional Debtholders on the Committee, while nevertheless maintaining that the
Committee was "diverse":

> The committee is a ***very diverse*** committee with trade creditors,
> with an entity that is owed millions of dollars for tax refunds that
> were not paid, labor unions, et cetera, et cetera.  It's a very broad
> group.
>
> But more importantly, it is a committee that is a ***fiduciary for all
> unsecured creditors, and that means the GO bonds as well***, Your
> Honor, and ***in particular the thousands of creditors on the island
> that hold those bonds***.  ***And that's a very important part***.  I mean
> by that the retail holders.  And that's a very important point.
>
> Even though ***they're not on our committee***, we owe them a
> fiduciary duty as we owe other creditors.  And the reason I'm
> focusing on ***this unrepresented creditor group***, Your Honor, is
> because this case is like no other.

18

June 28, 2017 Hr'g Tr. 28:11-25 (emphasis added) (L. Despins).[12]   That the Committee believes

it owes a fiduciary duty to such a "very important" and "unrepresented creditor group"—and that

the Committee deemed it necessary to inform the Court of these facts at the very first hearing

after it was appointed—underscores that Constitutional Debtholders do not have adequate

representation on the Committee.  Absent adequate representation of Constitutional Debtholders,

the Committee—despite its assertions to the contrary—cannot speak for all types of

Commonwealth creditors; rather, it can speak only for those "on the island" and politically

favored creditors that currently make up the Committee.

<strong>2.      Whether Different Classes Will Be Treated Differently Under Plan</strong>

43.      The "chief concern of adequacy of representation is whether it appears that

different classes of debt may be treated differently under a plan." *In re Dow Corning*, 194 B.R.

at 145 (citing *In re Drexel*, 118 B.R. at 212).  This concern is connected to the role that a

creditors' committee often plays in assisting the formulation of a plan of reorganization:  if

unsecured creditors will be placed in different classes, then it is imperative that the creditors'

committee be attuned to the different interests of those classes.  *Id.*

44.      This "chief concern" is critically important in these Title III Cases and strongly

supports including Constitutional Debtholders on the Committee.  Section 301(e) of PROMESA

compels the Oversight Board to place Commonwealth creditors with "priority over other claims"

in a different class than creditors with non-priority or lower-priority claims in any plan of

adjustment.[13]      Accordingly, regardless of whether Constitutional Debtholders are secured

---

[12]    Official committees always owe fiduciary duties to other similarly situated creditors.  If owing a fiduciary duty to other types of creditors—on its own—sufficed to ensure "adequate representation," then section 1102(a)(4) would be superfluous.  Moreover, the Committee's focus on creditors "on the island" is misplaced since all Constitutional Debtholders are entitled to the same treatment.

[13]    Section 301(e) is one of many notable provisions of PROMESA that has no analogue under chapter 9 of the Bankruptcy Code and demonstrates Congress's intent to preserve priorities under Puerto Rico law.

19

creditors, Constitutional Debtholders will be placed into a different class and subject to different treatment under the plan of adjustment because they have priority over all other creditors.  To the extent the Committee is involved in plan negotiations, its lack of Constitutional Debtholders will render it unable to weigh-in on the treatment of the Constitutional Debtholder class.  In ordering that physician creditors be added to the creditors' committee in *Dow Corning*, the Court explained:  "since the posture of the physicians is so different from the other non-tort unsecured creditors, it is likely that any plan will treat the claims differently.  ***The [creditors' committee] is in no position to negotiate for the physicians' special treatment***."  194 B.R. at 145 (emphasis added).

45.     Without significant Constitutional Debtholder participation on the Committee, the Committee may purport to negotiate a plan of adjustment on behalf of all classes of unsecured creditors, but will comprise only a subset of creditors whose interests may diverge from those creditors lacking a meaningful voice on the Committee.

### 3.     The Standing And Desires Of The Various Constituencies[14]

46.     Although they share certain common overlapping interests, the Commonwealth's various creditor constituencies have different interests and desires.  Constitutional Debtholders' primary goal is to maximize recoveries on their claims.  That objective, of course, is entirely consistent with the primary objective of any creditors' committee.  In seeking to maximize recoveries, Constitutional Debtholders would seek to invalidate the unlawful COFINA structure

---

[14]  Some courts interpret this factor as requiring an evaluation of the differing interests of creditors, *see In re Dana*, 344 B.R. at 39, while other courts perform a more perfunctory review of whether the creditors have standing and whether other creditors support or oppose the relief sought, *see In re Park W.*, 2010 WL 3219531, at *2.  To the extent the Court adopts the latter approach, Constitutional Debtholders are creditors of the Commonwealth with standing to serve on the Committee.  Moreover, since the Oversight Board, Commonwealth, and Committee assert that Constitutional Debtholders are the largest class of unsecured creditors or are a "very important" group of unsecured creditors, there is no principled basis for them to support excluding all Constitutional Debtholders from having a voice on the Committee.

and to rectify the substantial flaws in the Fiscal Plan, actions that would benefit *all*
Commonwealth creditors.  Constitutional Debtholders would also seek to enforce their first
priority status under Puerto Rico law and PROMESA.  As discussed more fully *infra*, while
Constitutional Debtholders' interests may diverge from the interests of lower-priority creditors in
certain regards, that potential conflict is not a basis to exclude Constitutional Debtholders from
the Committee.   To the contrary, competing interests are to be expected on any creditors'
committee and the inclusion of differing perspectives on one committee is a benefit, not a
hindrance.  "As in most Chapter 11 cases, there will be common interests among various groups
of unsecured creditors.  The inclusion of such groups within one committee may facilitate the
consensual resolution of the conflicting priorities among the holders of unsecured claims and
thereby facilitate the negotiation of a consensual plan."  *In re Hills Stores*, 137 B.R. at 7; *see also
In re Garden Ridge*, 2005 WL 523129, at *4 ("A committee of unsecured creditors often consists
of creditors with a variety of viewpoints, and thus conflicts are not uncommon, especially when
creditors are acting individually to protect their separate business interests.").

47.    In addition, Constitutional Debtholders are not the only creditors with interests
that may not be aligned with the interests of other creditor constituencies.  Two Committee
members—the AFT and the Service Employees International Union—do not appear to have *any*
direct claims against the Commonwealth.   Instead, their primary interest in serving on the
Committee appears to be ensuring that the debtor spends *more* money to the detriment of
existing creditors.   Upon its appointment to the Committee, the AFT issued a press release
announcing that very goal:

> *We are glad to serve on the unsecured creditors committee and
> believe any decision regarding bankruptcy needs to put the
> people of Puerto Rico first—not Wall Street financiers and hedge
> funds*.  Austerity has already led to the closure of 164 schools and

> to millions of dollars of cuts and the erosion of services to the
> public education system and the University of Puerto Rico.
> Instead, the government must work with teachers and the entire
> community to preserve the public services the island needs to
> prosper.

Press Release, Am. Fed'n of Teachers, **Exhibit A** (emphasis added).   While promoting

prosperity is a laudable goal, AFT's statement underscores that its interest is not that of a creditor

of the Commonwealth.   Rather, AFT's interests are perfectly aligned with those of the

Commonwealth itself:   AFT wants increased government spending that benefits Commonwealth

employees, even if that spending reduces creditor recoveries.

### 4.    The Nature Of The Case

48.    Courts evaluating the nature of the case often consider the size of the creditor

requesting relief relative to the overall composition of the creditor body.   *See, e.g.*, *In re Park W.*,

2010 WL 3219531, at *3 (noting the "size of Constantine Cannon's claim relative to the claims

of other unsecured creditors in these cases"); *In re Budd Co.*, 512 B.R. 910, 913 (Bankr. N.D. Ill.

2014) (comparing size of asbestos-related claims to total liabilities of debtor).   As set forth

above, the Oversight Board asserts that Constitutional Debtholders are the largest unsecured

creditors in these Title III Cases.   *See Notice of Filing of Amended Schedule B to Title III

Petition – List of Creditors Who Have the 20 Largest Unsecured Claims* [ECF No. 3].

49.    Courts also consider the circumstances surrounding a debtor's filing for

bankruptcy when evaluating whether creditor representation is adequate.   Thus, where a

particular type of claim did not precipitate a debtor's bankruptcy filing, the court is less inclined

to consider necessary that creditor's representation on the committee.   As one court noted:

> Unlike the *Johns–Manville* and *Owens Corning* cases, these
> Debtors were not driven into bankruptcy by the magnitude of its
> asbestos liability.   In this case, the Debtors' petition lists six factors
> that contributed to the Debtors' need to file.   Asbestos claims were
> not mentioned in the affidavit filed with the Debtors' Chapter 11

> petitions.   The Official Committee's calculation that asbestos
> claims make up less than three percent of all unsecured claims
> against the Debtors is further support for the assertion that asbestos
> liability was not a factor in the Debtors' decision to file its petition.

*In re Dana*, 344 B.R. at 40.  On the other hand, where a particular type of creditor precipitated a

debtor's bankruptcy filing, courts are more likely to conclude that those creditors should be on

the creditors' committee.  *See In re Park W.*, 2010 WL 3219531, at *4 ("The single outstanding

debt owed to Constantine Cannon was the primary contributor to the Debtors' filing of the

Chapter 11 petition. . . .  Thus, all of these facts and circumstances combined favor a finding that

Constantine Cannon's interests are not adequately represented.").  Here, the Oversight Board and

Commonwealth have repeatedly claimed that bond indebtedness and pension liabilities were the

primary contributors to Puerto Rico's financial distress, whereas they claim that trade debt was

manageable and would continue to be paid in the ordinary course of business.  *See generally*

*Statement of Oversight Board In Connection With PROMESA Title III Petition* [ECF No. 1].

While pension creditors are solely represented by the Official Retiree Committee, Constitutional

Debtholders have no such representation.

50.     The particular nature of these Title III Cases provides even further evidence that

the Committee does not adequately represent Constitutional Debtholders.  The Commonwealth

has already declared that it intends to continue paying trade creditors and tax refund claimants in

full in the ordinary course of business.  *See* **Exhibit G**.[15]  The Commonwealth has also proposed

---

[15]     For these same reasons, official unsecured creditors' committees are not usually formed in most chapter 9
cases because a municipal debtor will often endeavor to pay unsecured trade creditors in full.  In the few
municipal bankruptcies where unsecured creditors may be impaired, official committees of retirees have been
appointed in lieu of more general unsecured creditor committees with broader mandates.  *See e.g.*, *In re City of
Stockton*, Case No. 12-32118, *Appointment of Official Committee of Retirees*, (Bankr. E.D. Cal. Apr. 1, 2013)
[ECF No. 846]; *In re City Vallejo*, Case No. 08-26813, *Appointment of Official Unsecured Creditors
Committee of Retirees* (Bankr. E.D. Cal. Oct. 7, 2008) [ECF No. 286].   In the two largest municipal
restructurings that preceded these Title III Cases, *Jefferson County, Alabama* and *City of Detroit*, official
unsecured creditor committees, while considered, were ultimately abandoned (in the case of Jefferson County)
or promptly disbanded (in the case of Detroit).  *See In re Jefferson County, Alabama*, Case No. 11-05736,

a fiscal plan that doesn't reduce pension liabilities until 2020, and even then only reduces them by 10%. In contrast, the Oversight Board and Commonwealth propose to reduce debt-service payments by approximately 80%. Notwithstanding these starkly different proposed treatments, the Committee is composed entirely of employees, trade creditors and tax refund claimants, while Constitutional Debtholders have no voice on the Committee. The Commonwealth's attempt to provide favorable treatment to these politically favored constituencies highlights the lack of adequate representation afforded Constitutional Debtholders by their exclusion from the Committee.

### 5.   The Ability Of The Committee To Properly Function And Tasks The Committee Is To Perform

51.   "The final factor to consider when determining whether a committee is adequately representative is the ability of the committee to properly perform its functions. The word 'function' obviously refers to the committee's role in a chapter 11 proceeding as set forth in § 1103(c)." *In re Dow Corning*, 194 B.R. at 142. In light of the role the Committee might play in these Title III Cases, its current composition will hinder its ability to function properly. For example, the Committee seeks to play a significant role in two important disputes in these Title III Cases—the Commonwealth-COFINA dispute and the Fiscal Plan—and its current composition impairs its ability to function properly in either dispute.

52.   The Oversight Board claims it has sought to create a "fair, transparent, and efficient structure for resolving the Commonwealth-COFINA Dispute."[16] The Oversight Board has asserted that "the outcome of the Commonwealth-COFINA Dispute will likely be ***dipositive***

---

*Order Regarding Recommendation of Appointment of Unsecured Creditors' Committee* (Bankr. N.D. Ala. Jul. 13, 2012) [ECF No. 1127]; *In re City of Detroit, Michigan*, Case No. 13-53846, *Order Granting the City's Motion to Vacate the Appointment of the Official Committee of Unsecured Creditors* (Bankr. E.D. Mich. Feb. 28, 2014) [ECF No. 2784].

[16]   *See Motion of Debtors For Order Approving Procedure to Resolve Commonwealth-COFINA Dispute*, 11-12 [ECF No. 303].

*as to the relative recoveries of the debt holders* of COFINA and the Commonwealth." *Id.* (emphasis added). The Oversight Board explained that, if COFINA were found valid, "almost the entirety of the funds *available for debt service*" to Constitutional Debtholders under the Fiscal Plan may evaporate, leaving virtually nothing to pay Constitutional Debtholders. *Id.*[17] Under the Fiscal Plan, "debt service" refers solely to payments to bondholders, and does not refer to payments to employees, pension creditors, trade creditors or tax refund claimants. Despite the significant interest that Constitutional Debtholders therefore have in the COFINA dispute, the Oversight Board intends to appoint the Committee—which does not include any Constitutional Debtholders—as the Commonwealth's agent to litigate the validity of the COFINA structure. Putting aside any possibility of conflicts of interest created by that appointment, the very notion of adequate representation requires that a committee entrusted with overseeing such an important dispute be representative of the constituency that, under the Oversight Board's flawed Fiscal Plan, would be most affected by the resolution of that dispute.

53.    The lack of Constitutional Debtholders on the Committee necessarily impairs the Committee's ability to zealously pursue the Commonwealth-COFINA Dispute. The Oversight Board itself acknowledged that a committee consisting of creditors that stand to be paid in full or nearly in full cannot adequately represent the Commonwealth's creditors in the COFINA litigation. In explaining why the Oversight Board believed that the Official Committee of Retirees should not act as the Commonwealth's agent, the Oversight Board's counsel stated:

> The reason that we opted for the general creditors committee as opposed to the retirees committee is that the fiscal plan says that on average, we think that the retirees need to be paid 90 percent of their pensions . . . *we didn't think people who were starting out with 90 cents in their pocket would be looked at as being as*

---

[17]    The GO Group disputes the Oversight Board's characterization that the Commonwealth would have insufficient funds to pay Constitutional Debtholders if COFINA were determined valid.

> > *aggressive* as a committee that is representing creditors who are
> > faced with potentially far less than that.

June 28, 2017 Hr'g Tr. 115:20-116:8 (emphasis added) (M. Bienenstock).  But the very reason

why the Retiree Committee cannot adequately represent the Commonwealth's interest applies

equally to a Committee made up of employee unions, trade creditors and tax refunds claimants

that the Commonwealth similarly promises to pay in full.  If the Committee included significant

Constitutional Debtholder participation—a constituency that the Oversight Board seeks to impair

(with all other bondholders) by approximately 80%—then the Committee would be more likely

to actively pursue the COFINA litigation.

54.      Similarly, a Committee that does not include Constitutional Debtholders will be

less effective in arguing the *constitutional* defects of COFINA.  The premise of the constitutional

challenge to COFINA is that Article VI, Section 8, of the Puerto Rico Constitution provides

Constitutional Debtholders an absolute first-priority claim on all of the Commonwealth's

"available resources," and that Puerto Rico cannot evade this constitutional requirement by

enacting legislation that purports to declare certain core tax revenues exempt from the claim of

Constitutional Debtholders.  A Committee composed entirely of non-Constitutional Debtholders

will be less inclined to advance these constitutional arguments, thus impairing the Committee's

role as the Commonwealth's agent.  Constitutional Debtholders have the first claim to the

Commonwealth's "available resources" and are therefore best placed to defend their

constitutional rights.

55.      The Committee may also play a significant role in addressing the numerous flaws

that virtually every creditor group has raised with the Fiscal Plan.  The Committee will be ill-

equipped to meaningfully participate in these discussions when it comprises only creditors that

the Commonwealth has promised to pay in full or nearly in full under the same offending Fiscal

Plan.  As Committee member AFT already noted, decisions must "put the people of Puerto Rico first—not Wall Street financiers and hedge funds," and "the government must work with teachers and the entire community to preserve the public services the island needs to prosper." *See* Press Release, Am. Fed'n of Teachers, **Exhibit A**.  It is unlikely that a Committee consisting entirely of views consistent with AFT's would meaningfully (and appropriately) push for changes to the Fiscal Plan that would provide creditors such as Constitutional Debtholders an increased recovery.

56.     The risk that the Committee will "bless" the Fiscal Plan rather than advocate on behalf of creditors whose interests diverge from AFT's is not mere speculation.   The Committee's counsel already signaled that while "some creditors" wished to wage a "holy war" over the Commonwealth's Fiscal Plan, the Committee's view would be "key" and if the Committee ultimately determined the Fiscal Plan was "appropriate" then that "would be a very important data point."  June 28, 2017 Hr'g Tr. 30:7-16 (L. Despins).

57.     Finally, even if the Committee is "functioning" as currently constituted, that does not demonstrate that the Committee is adequately representing Constitutional Debtholders.

> The problem is that a committee may function just fine, reaching consensus on all issues, and still not adequately represent a particular group of creditors.  ***This can occur, for instance, if the committee is so dominated by one group of creditors that a separate group has virtually no say in the decision-making process***.  Consequently, courts look to see whether conflicts of interest on the committee ***effectively disenfranchise*** particular groups of creditors.

*In re Enron*, 279 B.R. at 686 (emphasis added) (internal quotation marks omitted); *In re Dow Corning*, 194 B.R. at 142 (same); *see also In re Park W.*, 2010 WL 3219531, at *3 ("A functioning committee, alone, does not necessarily ensure that all creditors groups are adequately

27

represented.").  Constitutional Debtholders have no say at all in the decision making process of the Committee and are not adequately represented by the Committee.

## II.     The Court Should Exercise Its Discretion To Reconstitute The Committee To Include Substantial Constitutional Debtholder Participation

58.     "If a court finds inadequate representation, it will then determine whether it should exercise its discretion under the particular circumstances of the case." *Mirant*, 2003 WL 22327118, at *4.  To determine whether, upon a finding of inadequate representation, a court should exercise its discretion to reconstitute a committee, courts consider the following factors, each of which supports granting Constitutional Debtholders adequate representation on the Committee.

### A.     The Delay And Additional Costs

59.     Changing the membership of the Committee will not cause any significant delay or additional costs to these Title III Cases.  The Committee was formed on June 15, 2017, retained advisors a few weeks ago, and is still generally getting up to speed.  *See* June 28, 2017 Hr'g Tr. 21:1-2.  Because the Committee was only recently formed, and these Title III Cases have only recently begun, changing the membership of the Committee will not lead to any significant delays.  Similarly, because certain Constitutional Debtholders (including the members of the GO Group) have been analyzing the Commonwealth's state of affairs for many years, it is possible to reconstitute the Committee with members that are very familiar with these Title III Cases and will therefore expedite the Committee's work.  *See In re Park W.*, 2010 WL 3219531, at *4 (finding that creditor's knowledge of the debtor's business would benefit the committee). Nor would changing the membership of the Committee impose any additional costs on the Commonwealth, since the Committee could continue to use one set of advisors.

28

### B.    Ability To Participate Without Official Committee

60.    In contrast to many other bondholders in these Title III Cases, there is no indenture trustee to speak on behalf of all Constitutional Debtholders.  Thus, while large holders such as the members of the GO Group are able to participate in these proceedings on their own behalf, currently many other smaller Constitutional Debtholders are unable to meaningfully participate.  Indeed, as counsel for the Committee has already noted, there are "thousands of creditors on the island that hold" Constitutional Debt, and these creditors are "not on our Committee" and are therefore an "unrepresented creditor group."  June 28, 2017 Hr'g Tr. 28:11-25 (L. Despins).

### C.    Motivation Of The Movants

61.    The GO Group seeks to change the membership of the Committee so that the Committee will adequately represent all Commonwealth creditors, including Constitutional Debtholders.  A Committee that reflects the views of different types of creditors will be better able to function and better motivated to maximize the assets available for distribution.  *See In re Garden Ridge*, 2005 WL 523129, at *3 ("The chief purpose of an official committee is to maximize distribution to this class.").

62.    Moreover, Constitutional Debtholders' outsized economic interests in these Title III Cases ensure that they would invest significant time and resources into assisting the Committee in fulfilling its statutory duties.  *See In re Park W.*, 2010 WL 3219531, at *4 ("[W]ith such a substantial claim, [creditor] has a greater incentive to invest time and effort to make a positive contribution to the Committee.").

### III.    Unique Rights Of Constitutional Debtholders Are Not A Basis To Exclude Them From The Committee

63.    The Commonwealth asserts that the Constitutional Debt represents the largest unsecured claim, and the Committee acknowledges it owes a duty to represent the interests of Constitutional Debtholders.  Despite this, the United States Trustee purposely *chose* to exclude Constitutional Debtholders from the Committee.  In explaining its refusal to reconstitute the Committee, the United States Trustee stated that "the general unsecured creditors I appointed to the Committee do not assert that their claims are either in some manner secured or entitled to priority treatment."  **Exhibit D**.

64.    Constitutional Debtholders' first priority status under the Puerto Rico Constitution, Puerto Rico laws, and PROMESA is not a sufficient basis to exclude Constitutional Debtholders from the Committee.  There is, of course, no rule that priority creditors may not serve on a creditors' committee.  *See In re Plabell Rubber Prods.*, 140 B.R. 179 (Bankr. N.D. Ohio 1992) (court ordered appointment of union as voting member of creditors' committee despite union holding only priority claims).  Indeed, creditors' committees often include representatives of both *senior* bonds and *subordinated* bonds, whose interests are no different than Constitutional Debtholders (i.e., senior bondholders) and other junior Commonwealth creditors.  *See, e.g.*, *In re Hills Stores*, 137 B.R. at 5 (noting that 15 member committee consisted of "three banks, two holders of *senior notes*, five trade creditors, one factor and *four representatives of the four separate tranches of subordinated debt, each tranche with different priorities from the other*" (emphasis added)).  Likewise, it is not uncommon for an official committee in a multi-debtor corporate bankruptcy to be comprised of creditors of both the parent and its subsidiaries—a situation in which the subsidiary creditors would enjoy structural (as opposed to payment) priority over the parent's creditors.

30

65.     More fundamentally, and as set forth in greater detail above, the very purpose of a creditors' committee—and the overarching test of adequate representation—is to ensure that creditors with different kinds of claims and interests are able to participate.  *See In re Enron*, 279 B.R. at 685 ("The formation of a creditors' committee is purposely intended to represent the necessarily different interests and concerns of the creditors it represents." (internal quotation mark omitted)).  Accordingly, the "principal purpose of creditors' committees is not to advocate any particular creditor class's agenda, but rather to strike a proper balance between the parties such that an effective and viable reorganization of the debtor may be accomplished." *Mirant*, 2003 WL 22327118, at *6 (internal quotation mark omitted).  Striking the "proper balance" necessarily includes creditors with conflicting interests and priorities.  "What the Code requires is that ***conflicting groups*** of creditors have a voice through adequate representation on a Committee." *In re Hills Stores*, 137 B.R. at 7 (emphasis added).  The inclusion of different viewpoints "within one committee may facilitate the consensual resolution of the ***conflicting priorities*** among the holders of unsecured claims and thereby facilitate the negotiation of a consensual plan." *Id.* (emphasis added).

66.     The wholesale exclusion of Constitutional Debtholders from the Committee in order to avoid a conflict is contrary to long-standing bankruptcy practice.  "It is universally recognized that intercreditor conflicts inhere in any committee." *In re Sharon Steel*, 100 B.R. at 777-78; *see also In re Dana*, 344 B.R. at 38 ("Creditor committees often contain creditors having a variety of viewpoints."); *In re Enron*, 279 B.R. at 689 ("Conflicts among creditors and among the members of a creditors' committee are not uncommon.  The question is whether such conflict hinders adequate representation."); *In re Hills Stores*, 137 B.R. at 6 ("Indeed, creditors' committees often contain creditors having a variety of viewpoints.  Conflicts are not unusual in

31

reorganization and in most cases can be expected among creditors who are acting to protect their separate business interests.").  As the Third Circuit noted in *In re Altair Airlines, Inc.*:

> [Union] members may be interested in a plan of reorganization which preserves both their jobs and their collective bargaining agreement, while other creditors may be interested in a liquidation, or a reorganization involving a merger with a [third party]. ***Such conflicts of interests are not unusual in reorganizations***. Materialman creditors, for example, may sometimes prefer to forego full payment for past sales in hopes of preserving a customer, while lenders may prefer liquidation and prompt payment.

727 F.2d 88, 90 (3d Cir. 1984) (emphasis added).  Here, the United States Trustee's unfounded concern for potential conflicts of interest posed by Constitutional Debtholders has resulted in a Committee that does not adequately represent the Commonwealth's creditors.  The United States Trustee's attempt to avoid conflicts has in fact created a host of other conflicts.

67.     Nor does the GO Group's assertion that Constitutional Debt is secured by a statutory lien on all available resources justify excluding Constitutional Debtholders from the Committee.  *See, e.g.*, *In re Seaescape Cruises, Ltd.*, 131 B.R. 241, 243 (Bankr. S.D. Fla. 1991) (finding "Debtor's concerns that members of the Committee assert secured rather than unsecured claims are premature" where Debtor listed creditors asserting maritime liens as unsecured on schedules filed in the case).  The Oversight Board, Commonwealth, and Committee have each taken the position that Constitutional Debtholders are unsecured creditors.  The disputed secured status of Constitutional Debt is therefore akin to a creditor holding a disputed claim, and "courts have been nearly unanimous in holding that holders of disputed claims are eligible to serve on creditors' committees."  6 Collier on Bankruptcy ¶ 1102.02[2][a][i]; *see also In re Laclede Cab Co.*, 145 B.R. 308 (Bankr. E.D. Mo. 1992) (holder of disputed claim may serve on creditors' committee); *In re Microboard Processing, Inc.*, 95 B.R. 283 (Bankr. D. Conn. 1989) (creditor who filed proof of claim allowed to remain on committee despite debtor's assertion that it was

32

not indebted to creditor); *In re Richmond Tank Car Co.*, 93 B.R. 504 (Bankr. S.D. Tex. 1988) (same); *In re Churchill Coal Corp.*, 31 B.R. 115 (Bankr. S.D.N.Y. 1983) (same); *In re Daig Corp.*, 17 B.R. 41 (Bankr. D. Minn. 1981) (same); *In re Grynberg*, 10 B.R. 256 (Bankr. D. Colo. 1981) (same).

68.     Until the dispute over the secured status of Constitutional Debt is finally resolved, nothing should prevent Constitutional Debtholders from both serving on the unsecured creditors' committee and asserting, in their individual capacities, their rights to the fullest extent permitted by law.  *See In re Garden Ridge*, 2005 WL 523129, at *4 ("It is important to keep in mind that each member of the Official Committee is free to represent its own interests in an individual capacity apart from membership in the Official Committee.").   Of course, Constitutional Debtholders would not use their position on the Committee to advance claims that Constitutional Debt is secured.  Moreover, if the Court determines that Constitutional Debtholders are in fact secured by a statutory lien on a final basis, then the United States Trustee may reconstitute the Committee to remove Constitutional Debtholders.

69.     Finally, Constitutional Debtholders' assertion they are secured does not create any greater conflict of interest than their assertion of first priority status under Puerto Rico law.  As discussed above, Section 301(e) of PROMESA provides that creditors "with priority over other claims" should be classified separately under a plan of adjustment, and therefore Constitutional Debtholders will be placed in their own class either because they are secured or because they have priority over other claims.   And regardless of whether Constitutional Debtholders are secured by a statutory lien on all available resources or entitled to a first priority claim against all available resources, the Constitutional Debtholder class will be entitled to payment before other

unsecured or lower priority Commonwealth creditors. The economic effect—and therefore the potential conflict—is no different under either scenario.

70.     Constitutional Debtholders' unique rights under the Puerto Rico Constitution, Puerto Rico law and PROMESA do not justify excluding them from the Committee. To the contrary, the principles of adequate representation embedded in section 1102 of the Bankruptcy Code compel that Constitutional Debtholders be included on the Committee because of their unique rights and interests.

**IV.     The Court Should, In The Alternative, Appoint An Additional Committee Of Constitutional Debtholders Under Section 1102(a)(2) Of The Bankruptcy Code**

71.     In the alternative, if the Court finds that Constitutional Debtholders are not adequately represented by the Committee but should not be appointed as members of the Committee, the GO Group respectfully requests that the Court appoint an additional official committee of Constitutional Debtholders pursuant to section 1102(a)(2) of the Bankruptcy Code. *See, e.g.*, *In re Caesars Entm't Operating Co., Inc.*, Case No. 15-01145, *Notice of Appointment of Official Committee of Second Priority Noteholders* (Bankr. N.D. Ill. Feb. 5, 2015) [ECF No. 266]. Section 1102(a)(2) of the Bankruptcy Code provides that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary ***to assure adequate representation of creditors*** or of equity security holders." 11 U.S.C. § 1102(a)(2) (emphasis added). The standard to appoint an additional committee under section 1102(a)(2) is the same as the standard for reconstituting an existing committee under section 1102(a)(4). *In re Park W.*, 2010 WL 3219531, at *4.

<u>**CONCLUSION**</u>

For the foregoing reasons, the GO Group respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit H**, (a) directing the United States

Trustee to change the membership of the Committee pursuant to sections 105(a) and 1102(a)(4)

of the Bankruptcy Code and appoint Constitutional Debtholders to the Committee in a manner

that is commensurate to the Constitutional Debtholders' position in these Title III Cases and that

ensures adequate representation of Constitutional Debtholders on the Committee, (b) in the

alternative, appointing an additional official committee of Constitutional Debtholders pursuant to

sections 105(a) and 1102(a)(2) of the Bankruptcy Code, and (c) granting such other and further

relief as this Court deems fair and just.

Dated: July 21, 2017                         Respectfully submitted,

/s/ Ramón Rivera Morales                     /s/ Mark T. Stancil
J. Ramón Rivera Morales                      Lawrence S. Robbins (admitted *pro hac vice*)
USDC-PR Bar No. 200701                       Gary A. Orseck (admitted *pro hac vice*)
JIMÉNEZ, GRAFFAM & LAUSELL                   Kathryn S. Zecca (admitted *pro hac vice*)
P.O. Box 366104                              Mark T. Stancil (admitted *pro hac vice*)
San Juan, PR 00936                           Ariel N. Lavinbuk (admitted *pro hac vice*)
Telephone: (787) 767-1030                    Donald Burke (admitted *pro hac vice*)
Facsimile: (787) 751-4068                    ROBBINS, RUSSELL, ENGLERT, ORSECK,
Email: rrivera@jgl.com                       UNTEREINER & SAUBER LLP
                                             1801 K Street, N.W., Suite 411-L
                                             Washington, DC 20006
                                             Telephone: (202) 775-4500
                                             Facsimile: (202) 775-4510
                                             Email: mstancil@robbinsrussell.com

                                             /s/ Andrew N. Rosenberg
                                             Andrew N. Rosenberg (admitted *pro hac vice*)
                                             Richard A. Rosen (admitted *pro hac vice*)
                                             Walter Rieman (admitted *pro hac vice*)
                                             Kyle J. Kimpler (admitted *pro hac vice*)
                                             Karen R. Zeituni (admitted *pro hac vice*)
                                             PAUL, WEISS, RIFKIND, WHARTON
                                             & GARRISON LLP
                                             1285 Avenue of the Americas
                                             New York, NY 10019
                                             Telephone: (212) 373-3000
                                             Facsimile: (212) 757-3990
                                             Email: arosenberg@paulweiss.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*

# Exhibit A

Case:17-03283-LTS    Doc#:696    Filed:07/21/17    Entered:07/21/17 15:39:32    Desc: Main
Document    Page 46 of 101



**Member Benefits** | **Find your Local** | **How to Join**

Search

Press Release

# Asociación de Maestros de Puerto Rico and AFT on Puerto Rico Bankruptcy Proceedings

**For Release:**

**Wednesday, June 28, 2017**

**Contact:**

**Andrew Crook**

**202-393-8637**

**acrook@aft.org**

**http://www.aft.org (http://www.aft.org)**

**SAN JUAN**—Asociación de Maestros de Puerto Rico President Aida Diaz and AFT President Randi Weingarten issued the following joint statement on the bankruptcy proceedings and on serving as a member of the unsecured creditors committee, which has just met for the first time in San Juan, Puerto Rico.

"There is deep pain being felt right now across Puerto Rico. Standing united, AMPR and the AFT are working to secure a bright future for Puerto Rico's families by building a vibrant economy while preserving the teaching and learning conditions that create opportunity. We are glad to serve on the unsecured creditors committee and believe any decision regarding bankruptcy needs to put the people of Puerto Rico first—not Wall Street financiers and hedge funds. Austerity has already led to the closure of 164 schools and to millions of dollars of cuts and the erosion of services to the public education system and the University of Puerto Rico. Instead, the government must work with teachers and the entire community to preserve the public services the island needs to prosper."

# # # #

The AFT represents 1.6 million pre-K through 12th-grade teachers; paraprofessionals and other school-related personnel; higher education faculty and professional staff; federal, state and local government employees; nurses and healthcare workers; and early childhood educators.

## PRESS CENTER

Press Releases (/press/releases)

New York Times columns (/press/nyt)

Blog (http://www.aft.org/blog/262)

Speeches (/press/speeches)

Media Kits (/press/media-kits)



(http://www.twitter.com/rweingarten)

Case:17-03283-LTS    Doc#:696    Filed:07/21/17    Entered:07/21/17 15:39:32    Desc: Main
Document       Page 48 of 101

# Exhibit B

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON   (1946-1991)
RANDOLPH E. PAUL   (1946-1956)
SIMON H. RIFKIND   (1950-1995)
LOUIS S. WEISS   (1927-1950)
JOHN F. WHARTON   (1927-1977)

WRITER'S DIRECT DIAL NUMBER

212-373-3158

WRITER'S DIRECT FACSIMILE

212-373-2122

WRITER'S DIRECT E-MAIL ADDRESS

arosenberg@paulweiss.com

UNIT 3601 OFFICE TOWER A BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR HONG KONG CLUB BUILDING
3A CHATER ROAD CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU   U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU TOKYO 100-0011 JAPAN
TELEPHONE (81-3) 3597 8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST SUITE 3100
PO BOX 226
TORONTO ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET NW
WASHINGTON DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE SUITE 200
POST OFFICE BOX 32
WILMINGTON DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
JOHN F. BAUGHMAN
J. STEVEN BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
ROSS A. FIELDSTON
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
ALAN S. HALPERIN
JUSTIN S. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
MEREDITH J. KANE
JONATHAN S. KANTER

ROBERTA A. KAPLAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
DAVID M. KLEIN
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
ALVARO MEMBRILLERA
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG H. OH
BRAD R. OKUN
KELLEY D. PARKER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. RICK RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI JR.

NOT ADMITTED TO THE NEW YORK BAR

June 6, 2017

## VIA CERTIFIED MAIL AND EMAIL

U.S. Department of Justice
Office of the United States Trustee
Attn: Guy G. Gebhardt, Acting United States Trustee for Region 21
75 Ted Turner Drive, S.W., Room 362
Atlanta, GA 30303

Re:   *In re Commonwealth of Puerto Rico, et al.*, Case No. 17-03283 (Bankr. D.P.R.):
      Appointment of Official Committees

Dear Mr. Gebhardt:

        We are counsel to the Ad Hoc Group of Puerto Rico General Obligation Bondholders (the "GO Group"), holders of approximately $3 billion of bonds issued or guaranteed by the Commonwealth (collectively, the "GO Bonds" and holders thereof, the "GO Bondholders") in the above-captioned cases under Title III of PROMESA. We have carefully reviewed your *Response of United States Trustee to Motion for Entry of Order Pursuant to 48 U.S.C. § 2161 and 11 U.S.C. § 1102 Directing the Appointment of an Official Retiree Committee and Appointing Pre-Petition Ad Hoc Retiree Committee as the Official Committee* (the "Response") [Docket No. 192] in which you indicated that the United States Trustee intends to appoint three official committees in these Title III

cases: (i) an unsecured creditors committee in the Commonwealth's case; (ii) a retiree committee in the Commonwealth's case; and (iii) an unsecured creditors committee in the COFINA case.  The GO Group does not take a position for or against the formation of an official retiree committee in the Commonwealth's case; however, the GO Group is sensitive to the fee burn associated with a potential committee operating beyond the issues for which it was formed.  For the reasons set forth below, however, the GO Group does not believe appointing official unsecured creditor committees in either the Commonwealth's case or the COFINA case is appropriate and respectfully requests that the United States Trustee reconsider its decision to solicit interest in such committees.  However, to the extent that any such committee is appointed in the Commonwealth's case, for the additional reasons set forth below, it should be primarily, if not entirely, composed of GO Bondholders.[1]

The appointment of a committee in a Title III proceeding, similar to a chapter 9 proceeding and unlike a chapter 11 proceeding, is entirely discretionary.  Although section 301 of PROMESA incorporates all of section 1102 of the Bankruptcy Code, by its terms, section 1102 only requires appointing an unsecured creditors committee "after the order of relief under chapter 11".  *See In re City of Detroit, Michigan*, Case No. 13-53846, *Order Granting the City's Motion to Vacate the Appointment of the Official Committee of Unsecured Creditors*, at 1 (Bankr. E.D. Mich. Feb. 28, 2014) [Docket No. 2784] (holding that there is no statutory requirement to appoint a committee in a chapter 9 case and disbanding the appointed official unsecured creditors committee).  Moreover, in most chapter 9 cases, official unsecured creditor committees are not formed due to the lack of necessity (unsecured creditors are paid in full) and/or the cost associated with such an additional (often duplicative) committee for creditors.  Even in the rare municipal bankruptcy situations where it appears that unsecured creditors will be impaired, official committees of retirees have been appointed in lieu of more general unsecured creditor committees with broader mandates.  *See e.g. In re City of Stockton*, Case No. 12-32118, *Appointment of Official Committee of Retirees*, (Bankr. E.D. Cal. Apr. 1, 2013) [Docket No. 846]; *In re City Vallejo*, Case No. 08-26813, *Appointment of Official Unsecured Creditors Committee of Retirees* (Bankr. E.D. Cal. Oct. 7, 2008) [Docket No. 286].  In the two largest municipal restructurings that preceded the Title III filing, *Jefferson County, Alabama* and *City of Detroit*, official unsecured creditor committees, while considered, were ultimately abandoned (in the case of Jefferson County) or promptly disbanded (in the case of Detroit).  *See In re Jefferson County, Alabama*, Case No. 11-05736, *Order Regarding Recommendation of Appointment of Unsecured Creditors' Committee* (Bankr. N.D. Ala. Jul. 13, 2012) ) [Docket No. 1127]; *In re City of Detroit, Michigan*, Case No. 13-53846, *Order Granting the City's Motion to Vacate the*

---

[1]    If the United States Trustee is not inclined to recommend that at least a majority of a duly comprised official committee of unsecured creditors consist of GO Bondholders, then inasmuch as a retiree committee is to be appointed, so should an official committee of GO Bondholders.

*Appointment of the Official Committee of Unsecured Creditors* (Bankr. E.D. Mich. Feb. 28, 2014) [Docket No. 2784].

Here, there are essentially three primary creditor groups in the Commonwealth's Title III case: pensioners, trade creditors and GO Bondholders. *See Petition for Relief by the Financial Oversight and Management Board of Puerto Rico on Behalf of the Commonwealth of Puerto Rico Pursuant to Title III of PROMESA Against All Parties, Schedule B* [Docket No. 1]. Let's assume a retiree committee is in fact appointed. That leaves trade creditors and GO Bondholders. According to the Commonwealth and Oversight Board's interpretation of certain provisions of PROMESA, trade creditors have been and will continue to be paid in the ordinary course. *See* 48 U.S.C. § 2163 ("[T]his title does not limit or impair . . . the political or governmental powers of the [Commonwealth], including expenditures for such exercise . . . ."); *Id.* at § 2165 ("[T]he court may not . . . interfere with—(1) any of the political or governmental powers of the debtor . . . .").[2]  Representatives of the Commonwealth have stressed this point since filing for relief under Title III of PROMESA. *See e.g., AAFAF Says Title III Won't Touch Supplier Payments as Treasury Sends out $70M in Checks This Week*, REORG RESEARCH (May 5, 2017), quoting statement of Fiscal Agency and Financial Advisory Authority Executive Director Gerardo Portela ("The government has the commitment and, more importantly, the ability to pay suppliers and providers as usual. All of the government's bills will be processed under the ordinary process"). Hence, to the extent that the United States Trustee is considering forming a traditional official unsecured creditors committee comprised primarily of trade and other unsecured creditors, such an exercise is unnecessary under the circumstances and such a committee should not be appointed.

The final major Commonwealth creditor group is the GO Bondholders. In contrast to other Commonwealth creditors, GO Bondholders have *not* been paid since July 1, 2016. As of today, the GO Bondholder claim is more than $19.5 billion in principal amount and overdue interest, interest on overdue interest and principal, and accrued interest – a number that will only continue to grow throughout the pendency of the Title III case. The GO Bonds represent a very substantial percentage of the Commonwealth's total claims and are widely held by retail and institutional investors. Significantly, unlike most other bonds issued by instrumentalities, GO Bonds do not have a trustee; there is no official representative to vigorously defend holders' rights and interests. Those rights and interests are unique and are set forth in Puerto Rico's Constitution, laws and PROMESA itself. Puerto Rico's Constitution clearly provides that, when available resources are insufficient to cover all of the Commonwealth's obligations, GO Bonds shall be paid *first*. *See* P.R. Const. Art. VI, Sec. 8. That Constitutional priority is further codified in Puerto Rico's Management and Budget

---

[2]   While this is not for today, the GO Group disagrees that the Commonwealth has authority under these provisions or otherwise to pay such creditors without paying GO Bondholders.

Office Organic Act, 23 L.P.R.A. 104(c).  That Act recognizes the constitutional requirement that payment on GO Bonds shall come *first*, and specifies that payments or disbursements related to contracts, public health, safety, education, welfare, pensions, and capital works and improvements shall only be made *after* payments on GO Bonds.  PROMESA further requires that any fiscal plan must "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements" of Puerto Rico.  *See* PROMESA § 201(b)(1)(N).  The combination of (i) the GO Bondholders' $19.5 billion plus claim size, (ii) unique Constitutional and other legal rights, and (iii) the real possibility that other Commonwealth creditors will simply be paid off during the pendency of this case necessitates that if the United States Trustee remains inclined to appoint another official committee, that committee should consist primarily of GO Bondholders.  We have several members willing to serve and other GO Bondholders not in the GO Group may be willing to serve as well.[3]

Finally, we do not believe that the GO Group's opinion that the GO Bonds are secured by a statutory lien over the Commonwealth's available resources should disqualify GO Bondholders from serving on an official unsecured committee if one is formed.  The validity of the GO Bondholders' statutory lien is disputed by the Oversight Board[4] and hence should not preclude their service.  In any event, the unique nature of the GO Bondholders' rights vis-à-vis other creditors and sheer size of their $19.5 billion plus claim compel substantial representation by them on any official committee that may be formed.

Although this is not really our concern, we note that an unsecured creditors committee is unnecessary in the COFINA case.  Unlike the Commonwealth, the COFINA petition does not even list trade creditors, pension obligations, or other business type creditors.  In fact, in its petition for relief under Title III of PROMESA, COFINA only listed *two* unsecured creditors.  *See In re Puerto Rico Sales Tax Financing Corporation*, Case No. 17-03284 (Bankr. D.P.R. May 5, 2017) [Docket No. 1] (Schedule B listing creditors who have the largest unsecured claims).  In the Response, you also recognized that an unsecured creditors committee in the COFINA case may not be appropriate.  *See Response* at 5 (acknowledging that "there may be an insufficient number of unsecured creditors qualified or willing to serve").

Our primary reason for opposing the COFINA committee is that the potential formation of a COFINA committee raises a larger issue.  Since the COFINA Title III petition was filed, several other Commonwealth instrumentalities have filed for Title III protection.  There should be not be separate official committees for each jointly

---

[3]   When considering membership among GO Bondholders, the United States Trustee should be mindful of holders with significant cross-holdings.

[4]   *See In re Commonwealth of Puerto Rico, et al.*, Case No. 17-03283 (Bankr. D.P.R. May 3, 2017) [Docket No. 1] (Schedule B listing creditors who have the 20 largest unsecured claims).

administered case. *See In re McLean Industries, Inc.*, 70 B.R. 852, 862 (Bankr. S.D.N.Y. 1987) (court appointed one committee for four cases that were jointly administered but not consolidated and noted "[t]here is no indication that Congress gave any thought to jointly administered cases and intended to require a committee for each case. The cost could be extreme.").

Lastly, assuming an official retiree committee is appointed, the GO Group submits that an agreement should be reached specifically delineating the roles and functions performed by such official committee and imposing an initial budgetary cap for the duration of the Title III cases. A retiree committee is by its very nature limited in scope. If the retiree committee gets involved in every matter arising in these Title III cases, the debtors' estates – and in turn the funds available for the Commonwealth's residents and its creditors – will be greatly diminished. This is particularly true here where the debtors' estates are already bearing the professional fees and costs incurred by both the Oversight Board and AAFAF. Such an outcome is neither necessary nor prudent and can be avoided if the retiree committee only participates in those instances where it can demonstrate that its interests require involvement.

In an effort to minimize costs and inefficiencies, courts have placed limitations on the functions that additional committees could perform. *See In re Pilgrim's Pride Corp.*, 407 B.R. 211, 221 (Bankr. N.D. Tex. 2009) (court requested, without imposing the formal limitation that it felt it had the power to impose, that the equity committee limit its involvement to those matters where its interests were at odds with those of the unsecured creditors committee, and court set quarterly budget for the equity committee for all purposes, including the fees of its counsel and financial advisor); *In re DPH Holdings Holdings Corp. (f/k/a Delphi Corp.)*, Case No. 05-44481, *Order Pursuant to 11 U.S.C. § 1102(a)(2) Directing the United States Trustee to Appoint an Equity Committee* at ¶ 5 (Bankr. S.D.N.Y. Mar. 30, 2006) [Docket No. 3024] (court order appointing equity committee stated that equity committee should not inject itself into negotiations between or among the debtors, the unions and General Motors Corporation); *In re Cumberland Farms, Inc.*, 142 B.R. 593, 594 (Bankr. D. Mass. 1992) (holding that that a second committee of secured lenders could not retain counsel because such counsel's efforts largely duplicate those of the debtors' counsel and the unsecured creditors' committee counsel); *In re Beker Indus. Corp.*, 55 B.R. 945, 951 (Bankr. S.D.N.Y. 1985) ("[T]he cost of the official unsecured creditors, equity and debenture committees does cry out for some prospective management. These committees can and should determine their joint interests and address them jointly; steps to minimize duplication can and should be taken; fees and expenses are to be closely monitored by committee members so that this Court is not presented with matters that have run out of hand and is faced with a plethora of objections."). Similarly, here, narrowly construing the retiree committee's mandate and

holding it to a budget will prevent the unnecessary diversion of the debtors' limited
resources.[5]

---

[5] In that same vein, the GO Group strongly opposes the relief sought by certain unions
seeking a separate official employee committee in addition to the official retiree
committee. *See In re Commonwealth of Puerto Rico, et al.*, Case No. 17-03283,
*Response of United Auto Workers International Union and Service Employees
International Union to Motion of Ad Hoc Retiree Committee for Appointment of an
Official Retiree Committee* (Bankr. D.P.R. May 26, 2017) [Docket No. 222]. While
the interests of active employees may in certain instances be somewhat divergent
from those of retirees, that is not a sufficient basis for the formation of an additional
official committee. *See In re Residential Capital, LLC*, 480 B.R. 550, 558 (Bankr.
S.D.N.Y. 2012) ("the mere presence of a conflict of interest does not necessitate an
additional committee"). Official committees will often have up to seven members,
whose interests are not always aligned. The members, however, must balance the
potentially diverging interests and formulate a middle ground position that works for
all constituents of the official committee. *See Mirant Ams. Energy Mktg., L.P.* v.
*Official Comm. of Unsecured Creditors of Enron Corp.*, 2003 U.S. Dist. LEXIS
18149 (S.D.N.Y. Oct. 9, 2003) ("The principal purpose of creditors' committees is
not to advocate any particular creditor class's agenda, but rather to strike a proper
balance between the parties such that an effective and viable reorganization of the
debtor may be accomplished.") (internal quotations omitted). To require that official
committees be made up of stakeholders whose interests never diverge is not necessary
and must be avoided to prevent depleting the debtor's estate. *See In re Sharon Steel
Corp.*, 100 B.R. 767, 778 (Bankr. W.D. Pa. 1989) ("separate committees impose
additional administrative expenses on the debtor's estate which adversely affect the
debtor's ability to reorganize and ... separate teams of professionals rarely contribute
to the spirit of compromise that is intended as the guiding star of chapter 11."); *In re
Baldwin-United Corp.*, 45 B.R. 375, 376 (Bankr. S.D. Ohio Nov. 11, 1983)
("Conflicts among creditors are inherent in all bankruptcy cases. In a case as complex
as this one, they are inevitable. Yet, we do not believe, and decline to rule, that a
separate committee for each equity security interest will engender harmony or
alleviate conflict among creditors. We believe the opposite would result, and at an
astronomical cost to the bankruptcy estates."). Indeed, the creation of additional
committees is an "extraordinary remedy" – the facts here simply do not warrant such
relief. *See In re Residential Capital, LLC*, 480 B.R. at 557. Further, and to avoid any
confusion, the unions may represent and defend their constituents' rights and interests
in the Title III cases without having to be part of any official committee. In any case,
the unions are not the proper parties to sit on a committee; active employees –
unionized and salaried employees alike – would be the appropriate members.

7

We appreciate your attention to this matter.  I'm available at your convenience to discuss these important issues and look forward to your response.

Very truly yours,

Andrew N. Rosenberg

# Exhibit C

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON    (1946-1991)
RANDOLPH E. PAUL    (1946-1956)
SIMON H. RIFKIND    (1950-1995)
LOUIS S. WEISS    (1927-1950)
JOHN F. WHARTON    (1927-1977)

WRITER'S DIRECT DIAL NUMBER
212-373-3158

WRITER'S DIRECT FACSIMILE
212-373-2122

WRITER'S DIRECT E-MAIL ADDRESS
arosenberg@paulweiss.com

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
DANIEL J. BELLER
J. STEVEN BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
ROSS A. FIELDSTON
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
CATHERINE L. GONZALEZ*
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
MEREDITH J. KANE

JONATHAN S. KANTER
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
DAVID M. KLEIN
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
ALVARO MEMBRILLERA
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG H. OH
BRAD R. OKUN
KELLEY D. PARKER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

July 11, 2017

<u>**VIA CERTIFIED MAIL AND EMAIL**</u>

U.S. Department of Justice
Office of the United States Trustee
Attn: Guy G. Gebhardt, Acting United States Trustee for Region 21
75 Ted Turner Drive, S.W., Room 362
Atlanta, GA 30303

Re:    *In re Commonwealth of Puerto Rico, et al.*, Case No. 17-03283 (Bankr. D.P.R.)

Dear Mr. Gebhardt:

We are counsel to the Ad Hoc Group of Puerto Rico General Obligation
Bondholders (the "GO Group"), holders of approximately $3.2 billion of bonds issued or
guaranteed by the Commonwealth of Puerto Rico (collectively, the "Constitutional Debt"
and holders thereof, the "Constitutional Debtholders") in the above-captioned cases under
Title III of PROMESA.[1]

---

[1]    The GO Group submits this letter exclusively on its own behalf and does not assume any fiduciary or
other duties to any other creditor or person.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

We write to request that you reconstitute the Official Committee of Unsecured Creditors (the "Committee"), which you appointed on June 15, 2017. *See Appointment of Official Committee of Unsecured Creditors in the Commonwealth of Puerto Rico* [ECF No. 338]. As appointed, the seven-member Committee does not adequately represent creditors of the Commonwealth. In particular, the Committee does not include *any* Constitutional Debtholders, or any other financial creditors for that matter. Instead, the Committee is composed entirely of non-financial creditors that the Commonwealth has continued to pay, or promises to pay, in full or nearly in full, plus two employee unions that may not have any claims at all. Far from being representative of the Commonwealth's creditors at large, the Committee represents solely the interests of those creditors that the Commonwealth has already singled out for favored treatment, *i.e.*, those creditors with the least skin in the game.

We hope that raising these issues now will enable the United States Trustee to reconsider the Committee's composition in light of the facts and circumstances of these Title III cases discussed below. If the United States Trustee will not act to reconstitute the Committee on or before July 18, 2017, the GO Group intends to ask the Court for similar relief pursuant to Section 1102(a)(4) of the Bankruptcy Code, made applicable pursuant to Section 301(a) of PROMESA.

### THE COMMONWEALTH'S CREDITORS

The Commonwealth's creditors fall into three primary categories.

*First*, the Commonwealth has issued or guaranteed approximately $18.2 billion in principal amount of Constitutional Debt, including $12.5 billion in general obligation bonds issued by the Commonwealth and $5.7 billion in bonds guaranteed by the Commonwealth. The Commonwealth asserts that Constitutional Debtholders are the single largest *unsecured* creditor constituency in the Title III cases. *See Notice of Filing of Amended Schedule B to Title III Petition – List of Creditors Who Have the 20 Largest Unsecured Claims* [ECF No. 3].[2] The Commonwealth has defaulted on its obligations to pay Constitutional Debtholders for over a year, with missed payments totaling more than $2.3 billion. As a result, the current claim amount of Constitutional Debtholders is approximately $19.6 billion, including amounts for overdue interest and interest on overdue principal and overdue interest.[3]

---

[2]   The GO Group disputes the Commonwealth's assertion that Constitutional Debtholders are general unsecured creditors. In due course, the GO Group will establish that Constitutional Debt is also protected by a statutory lien on all "available resources" or certain subsets of those resources. So long as the Commonwealth takes the position that Constitutional Debtholders are unsecured, however, the GO Group's position should not disqualify Constitutional Debtholders from serving on the Committee.

[3]   The GO Group reserves all rights with respect to interest and other amounts owing by the Commonwealth under applicable law.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3

Puerto Rico's Constitution provides that, when available resources are insufficient to cover all of the Commonwealth's obligations, Constitutional Debt shall be paid first. *See* P.R. Const. art. VI, § 8. Puerto Rico statutes further confirm that Constitutional Debt must be paid first and before all other expenditures. *See* 23 L.P.R.A. § 104(c)(1). PROMESA, in turn, requires that any fiscal plan—and therefore any plan of adjustment—respect the lawful priorities and liens set forth in the Puerto Rico Constitution and laws. *See* PROMESA § 201(b)(1)(N). PROMESA further requires the Oversight Board to consider whether "claims have priority over other claims" when classifying claims under a plan of adjustment. *Id*. § 301(e).

Notwithstanding the explicit protections granted to Constitutional Debtholders under Puerto Rico law and PROMESA, the Commonwealth and Oversight Board have proposed massive cuts to Constitutional Debt. In particular, the Fiscal Plan provides that Constitutional Debtholders' (together with other bondholders') claims will collectively be cut by 80%.

There are no Constitutional Debtholders on the Committee.

*Second*, Puerto Rico's employees and retirees have asserted claims against the Commonwealth. The Commonwealth and Oversight Board assert that the Commonwealth and its instrumentalities have approximately "$49 billion of pension liabilities." *See Statement of Oversight Board In Connection With PROMESA Title III Petition* [ECF No. 1].

Puerto Rico statutes provide that liabilities owed to public employees and retirees shall be paid *after* Constitutional Debt. In particular, welfare programs and pension contributions are accorded *third priority*, while other commitments entered into by contract (such as employment agreements) are accorded *second priority*. *See* 23 L.P.R.A. § 104(c)(2)-(3). These priorities are also incorporated into PROMESA.

Notwithstanding the lower priority afforded these claims, the Commonwealth and Oversight Board have insisted that such claims will not be cut or face only minimal impairment. The Fiscal Plan provides that pension liabilities will not be reduced at all until 2020, and even then they will be reduced by only 10%. Governor Rosselló recently announced that the fiscal year 2018 budget "includes PAYMENT OF ALL PENSIONS." *See* Governor Ricardo Rosselló Nevares, Address to Legislative Assembly of P.R. (May 31, 2017). The fiscal year 2018 budget in fact appropriated more than $2 billion from the general fund to ensure that pension liabilities will not be impaired at all. Similarly, the Commonwealth has pledged not to reduce the headcount of public employees, and the Fiscal Plan and fiscal year 2018 budget provide for the *full* payment of all public employees.

Nevertheless, the United States Trustee has already appointed an Official Committee of Retirees devoted entirely to representing the interests of retirees. *See Appointment of Official Committee of Retirees in the Commonwealth of Puerto Rico*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

4

[ECF No. 340].  In addition, two different employee unions were appointed to the seven-member Committee.  It is unclear what, if any, claims they may have apart from potential future retiree claims that are already represented by the Official Committee of Retirees.

*Third*, the Commonwealth has various "trade" creditors consisting primarily of suppliers, service providers and tax refund claimants.  As of May 26, 2017, the Commonwealth estimated that the amount of outstanding "accounts payable" was approximately $373 million.  *See* Puerto Rico Department of Treasury, Treasury Single Account ("TSA") Cash Flow Actual-to-Forecast Comparison (May 26, 2017).

Puerto Rico statutes provide that all trade creditors shall be paid *after* Constitutional Debt.  Depending on the type of claim and service provided, Puerto Rico statutes provide that these creditors should be afforded *second* to *fifth priority*. *See* 23 L.P.R.A. § 104(c)(2)-(5).

Notwithstanding the lower priority afforded to these claims, the Commonwealth and Oversight Board have endeavored to pay these creditors in full.  For example, since PROMESA was enacted on June 30, 2016, the Commonwealth has *decreased* the aggregate amount of accounts payable by more than *$1.2 billion*.  This near complete pay down of trade creditors is consistent with the Commonwealth's recent promise to pay suppliers in full.  "The government has the commitment and, more importantly, the ability to pay suppliers and providers as usual.  All of the government's bills will be processed under the ordinary process." *AAFAF Says Title III Won't Touch Supplier Payments as Treasury Sends out $70M in Checks This Week*, Reorg Research (May 5, 2017) (quoting Fiscal Agency and Financial Advisory Authority Executive Director Gerardo Portela).  Similarly, Governor Rosselló announced that the Commonwealth would continue paying tax refunds in full, including an additional $35 million in refunds paid in June 2017 alone.[4]  The Fiscal Plan and fiscal year 2018 budget also confirm that trade creditors will be paid in full in the ordinary course.

Five trade or tax refund creditors were appointed to the Committee.

### THE APPOINTMENT OF THE COMMITTEE

On June 15, 2017, the United States Trustee appointed a seven-member Committee.[5]  It comprises five trade or tax refund creditors, two employees unions, and

---

[4]   Historically, the Commonwealth has pre-funded tax refunds out of gross revenues of the general fund to ensure that they are timely paid, and consequently there is no indication that there are substantial valid tax refund claims outstanding.

[5]   By letter dated June 6, 2017, the GO Group advised the United States Trustee that general unsecured creditors' committees were not often appointed in large scale municipal bankruptcies, but that if the United States Trustee elected to appoint a creditors' committee *in addition* to the Official Committee of Retirees, then such committee should consist largely of Constitutional Debtholders.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

5

no Constitutional Debtholders.   In other words, the Committee is composed entirely of
creditors that the Oversight Board and Commonwealth have already paid in full or
already pledged to pay in full (or, in the case of pensions, nearly in full).  The one
constituency that the Oversight Board and Commonwealth have not paid or pledged to
pay in full—Constitutional Debtholders—does not have a single seat on the Committee.
Although the Constitutional Debtholders' claim is more than *fifty times* larger than the
aggregate  claim  of  trade  and  tax  refund  creditors,  those  creditors  outnumber
Constitutional Debtholders five-to-zero on the Committee.

Despite  its  best  spin,  the  Committee's  proposed  counsel  has  already
acknowledged the elephant in the room:

> The committee is a very diverse committee with trade
> creditors, with an entity that is owed millions of dollars for
> tax refunds that were not paid, labor unions, et cetera, et
> cetera. It's a very broad group.
>
> But more importantly, it is a committee that is a fiduciary
> for all unsecured creditors, and that means the GO bonds as
> well, Your Honor, and in particular the thousands of
> creditors on the island that hold those bonds.  ***And that's a
> very important part***.  I mean by that the retail holders.  And
> that's a very important point.
>
> Even though ***they're not on our committee***, we owe them a
> fiduciary duty as we owe other creditors.  And the reason
> I'm focusing on ***this unrepresented creditor group***, Your
> Honor,  is  because  this  case  is  like  no  other.

June 28, 2017 Hr'g Tr. 28:11-25 (L. Despins) (emphasis added).

That the Committee believes it owes a fiduciary duty to such a "very important"
and "unrepresented creditor group"—and that the Committee deemed it necessary to
inform  the  Court  of  these  facts  at  the  very  first  hearing  after  it  was  appointed—
underscores  the  reason  why  Constitutional  Debtholders  ***should  have  significant
representation*** on the Committee.   Absent that representation, the Committee—despite
its assertions to the contrary—will not speak for all Commonwealth creditors; rather, it
will speak only for those on-island and politically favored creditors that currently make
up the Committee.

In addition, without changes to the Committee's membership, it is not clear that
the Committee will represent ***creditors*** at all.  Two Committee members—the American
Federation of Teachers and the Service Employees International Union—do not appear to
have ***any*** direct claims against the Commonwealth.  Instead, their primary interest in
serving on the Committee appears to be ensuring that the debtor spends ***more*** money to

the detriment of existing creditors.  Upon its appointment to the Committee, the American Federation of Teachers ("AFT") issued a press release announcing  that very goal:

> *We are glad to serve on the unsecured creditors committee and believe any decision regarding bankruptcy needs to put the people of Puerto Rico first—not Wall Street financiers and hedge funds.* Austerity has already led to the closure of 164 schools and to millions of dollars of cuts and the erosion of services to the public education system and the University of Puerto Rico. Instead, the government must work with teachers and the entire community to preserve the public services the island needs to prosper.

Press Release, June 28, 2017, *available at* https://www.aft.org/press-release/asociacion-de-maestros-de-puerto-rico-and-aft-puerto-rico-bankruptcy (emphasis added).    While promoting prosperity is a laudable goal, AFT's statement underscores that its interest is not that of a creditor of the Commonwealth.  Rather, AFT's interests are perfectly aligned with those of the Commonwealth itself:  AFT wants increased government spending that benefits Commonwealth employees even if that spending reduces creditor recoveries. Having been retained for less than two days, the Committee's counsel already signaled that while "some creditors" wished to wage a "holy war" over the Commonwealth's Fiscal Plan, the Committee's view would be "key" and if the Committee ultimately determined the Fiscal Plan was "appropriate" then that "would be a very important data point."  June 28, 2017 Hr'g Tr. 30:7-16 (L. Despins).  Simply put, there is a significant risk that the Committee, as currently constituted, will not zealously advocate for the interest of creditors, but will instead use its official status to undermine the interests of creditors.

### THE COMMITTEE SHOULD BE RECONSTITUTED

A creditors' committee should fairly reflect the various interests of the debtor's different categories of creditors.  *See In re Sharon Steel Corp.,* 100 B.R. 767, 777–78 (Bankr. W.D. Pa. 1989) ("[A]dequate representation exists through a single committee as long as the diverse interests of the various creditor groups are represented on and have participated in that committee."); 6 *Collier on Bankruptcy* ¶ 1102.02[2][b][i] (16th ed.) ("A committee will function more effectively if the different categories of creditors are represented on the committee.").   Creditors are adequately represented when their interests "have a meaningful voice in the committee relative to their posture in the case." *In re Garden Ridge Corp.*, No. 04-10324, 2005 WL 523129 at *3 (Bankr. D. Del. March 2, 2005) (quoting *In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (Bankr. E.D. Mich. 1997)).

Where the official committee does not adequately represent a debtor's various creditors, Section 1102(a)(4) of the Bankruptcy Code authorizes the Court to reconstitute

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

7

the membership of the committee.  *See* 11 U.S.C. § 1102(a)(4) ("On request of a party in interest and after notice and a hearing, the court may order the United States trustee to change the membership of a committee appointed under this subsection, if the court determines that the change is necessary to ensure adequate representation of creditors . . . ."); *see also In re Shorebank Corp.*, 467 B.R. 156, 162 (Bankr. N.D. Ill. 2012) ("The plain language of [Section 1102(a)(4)] calls for [the court's] independent determination of whether a change in committee composition is necessary.").

There is no bright line test to determine whether an official committee adequately represents a debtor's creditors.  *See In re Dow Corning Corp.*, 194 B.R. 121 (Bankr. E.D. Mich. 1996) (existence of adequate representation will always require a case by case determination).  In analyzing whether a committee provides adequate representation, courts may consider the following factors:

(1) the ability of the committee to function;

(2) the nature of the case;

(3) the standing and desires of the various constituencies;

(4) the ability for creditors to participate in the case even without an official committee and the potential to recover expenses pursuant to § 503(b);

(5) whether different classes may be treated differently under a plan and need representation;

(6) the motivation of the movants;

(7) the delay and additional cost of granting the motion;

(8) the point in the proceeding when the motion is made;

(9) the tasks the committee is to perform; and

(10) any other relevant factors.

*See In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006); *In re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.N.D.Y. 2002).  No one factor is dispositive, and courts should apply the factors on a case-by-case basis.  *See Dana*, 344 B.R. at 38 (citing *In re Kalvar Microfilm*, 195 B.R. 599, 601 (Bankr. D. Del. 1996)).

The current composition of the Committee does not adequately represent the Commonwealth's various creditor constituencies, and the above factors strongly support reconstitution to appoint Constitutional Debtholders.

<u>First</u>, the Committee cannot function properly if it includes only a subset of creditors who are largely being paid and have little incentive to advocate for greater Commonwealth creditor recoveries.  As the Fiscal Plan makes clear, no creditor group has a greater stake in the outcome of these Title III cases than bondholders, and Constitutional Debtholders in particular.  While the Commonwealth and Oversight Board

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

8

have pledged to pay employees, retirees, tax refund claimants, and trade creditors nearly in full, they propose massive cuts to bondholder payments. Excluding the very creditors most affected by a potential plan of adjustment impairs the Committee's ability to zealously advocate for the interests of all creditors. *See In re ParkWest Circle Realty, LLC*, No. 10-12965 (AJG), 2010 WL 3219531, at \*4 (Bankr. S.D.N.Y. Aug. 11, 2010) (noting that a "type of creditor . . . is not currently adequately represented by the Committee since there are no other unsecured creditors who hold a personal guarantee against the Debtors' principals and no other unsecured creditors who hold as substantial a claim").

Significantly, the Oversight Board has already acknowledged that a committee consisting of creditors that stand to be paid in full or nearly in full cannot adequately represent the Commonwealth's creditors. In explaining why the Oversight Board believed the Committee, as opposed to the Official Committee of Retirees, should act as the Commonwealth's agent in the ongoing dispute with COFINA, counsel stated:

> The reason that we opted for the general creditors committee as opposed to the retirees committee is that the fiscal plan says that on average, we think that the retirees need to be paid 90 percent of their pensions. . . we didn't think people who were starting out with 90 cents in their pocket would be looked at as being as aggressive as a committee that is representing creditors who are faced with potentially far less than that.

June 28, 2017 Hr'g Tr. at 115:20-116:8 (M. Bienenstock). That same logic demonstrates why the Committee—in its current form—cannot adequately represent all Commonwealth creditors.

Second, not only does the absence of Constitutional Debtholders limit the Committee's ability to adequately represent all creditor interests, but the current composition of the Committee creates a conflict of interest that disenfranchises Constitutional Debtholders. Because payments to employees, retirees, tax refund claimants, and trade creditors are afforded *lower priority* treatment under Puerto Rico law, the Committee will be incentivized to argue that Constitutional Debtholders' first priority rights under the Puerto Rico Constitution and laws are unenforceable in these Title III cases. As noted above, Section 301(e) of PROMESA instructs the Board to place creditors "with priority over other claims" in different classes. Thus, despite the Committee's assertions that it will represent Constitutional Debtholders, its composition could very well lead to it taking positions contrary to the interests of Constitutional Debtholders, and representing the interests of one class of claims over another class. Constitutional Debtholders' differing rights compared to other Commonwealth creditors is a reason to *include* them on the Committee so that it may truly represent the diverse interests of creditors and not favor certain classes of creditors over others. *See In re Enron Corp.*, 279 B.R. at 686 ("[C]ourts look to see whether conflicts of interest on the committee effectively disenfranchise particular groups of creditors.").

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

9

Excluding Constitutional Debtholders *because* they are entitled to different treatment under Puerto Rico law heightens the substantial risk that the Committee will not advocate on behalf of all creditors.  Moreover, excluding Constitutional Debtholders on this basis is contrary to long standing practice under the Bankruptcy Code (and particularly in large cases), where official creditors' committees routinely include creditors with differing priorities, such as indenture trustees representing both subordinated and senior noteholders, or creditors with differing claims against a parent or subsidiary corporation that result in one group being structurally subordinated to the other.  The United States Trustee has traditionally included creditors with differing rights and interests to promote a healthy discourse within the committee and prevent the committee from focusing on intra-creditor disputes.  The Committee's representation of diverse creditor interests (including Constitutional Debtholders) is critically important in these Title III cases.

Third, the size of Constitutional Debtholders' claims against the Commonwealth—especially in contrast to the aggregate size of employees', trade creditors', and taxpayers' claims—demonstrates the need to include Constitutional Debtholders on the Committee.  "Although committees do not necessarily need to reflect the precise composition of the creditor body, committees should adequately represent the various creditor types." *ParkWest*, 2010 WL 3219531, at *4; *In re Schatz Fed. Bearings Co., Inc.,* 5 B.R. 543 (Bankr. S.D.N.Y. 1980) (appointing union to the committee where the employees of the debtor had a "substantial claim for unpaid pension benefits").  Here, the Oversight Board asserted that Constitutional Debtholders were the single largest unsecured creditor group in the entire case.  On that basis alone, Constitutional Debtholders should have equal or greater representation than trade creditors and employees.  Moreover, Constitutional Debtholders' outsized economic interests in these Title III cases ensures that they would invest significant time and resources into assisting the Committee in fulfilling its statutory duties.  *See ParkWest*, 2010 WL 3219531, at *4 ("[W]ith such a substantial claim, [creditor] has a greater incentive to invest time and effort to make a positive contribution to the Committee.").  The need for representation on the Committee is heightened further because there is no indenture trustee or other official committee to vigorously defend Constitutional Debtholders' rights and interests.

Fourth, reconstituting the Committee to include Constitutional Debtholders will not delay the Title III cases or add any additional costs.  The Committee was formed only a few weeks ago and its counsel is just getting up to speed.  June 28, 2017 Hr'g Tr. 21:1-2 ("As you know, we were appointed -- we were just retained two days ago.  The parties in this case have been at this for, in some cases, years, and in other cases, months. . . it would be very hard for the committee to participate in that short time frame.") (L. Despins); *see also ParkWest*, 2010 WL 3219531, at *5 ("Because the Motion was filed approximately two and half weeks after the appointment of the Committee, the Court finds that the Motion was filed in a timely manner.").  Similarly, because certain Constitutional Debtholders (including the members of the GO Group) have been analyzing the Commonwealth's state of affairs for many years, it is possible to reconstitute the Committee with members that are deeply familiar with these Title III

PAUL, WLISS, RII KIND, WIIART ON & GARRISON LLP

10

cases and will therefore expedite the Committee's work. *See ParkWest*, 2010 WL
3219531, at \*4 (noting the creditor's knowledge of the debtor's business and the benefits
that knowledge could bring to the committee).

For these reasons, we respectfully request that the United States Trustee act to
reconstitute the Committee so that it is representative of Constitutional Debtholders. We
appreciate your attention to this matter and are available at your convenience to discuss
these important issues. We kindly ask that you respond to this request by no later than
July 18, 2017 so that, if necessary, we may seek timely and appropriate relief before the
Court.

Very truly yours,

Andrew N. Rosenberg

# Exhibit D



**U.S. Department of Justice**

Office of the United States Trustee

---

*362 Richard Russell Building*    *(404) 331-4437*
*75 Spring Street SW*
*Atlanta, GA 30303*    *FAX (404) 730-3534*

July 14, 2017

Andrew N. Rosenberg, Esq.    **BY REGULAR MAIL AND E-MAIL**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York   10019-6064

      Re:    Official Committee of Unsecured Creditors
             The Commonwealth of Puerto Rico
             Case No. 17-03283

Dear Mr. Rosenberg:

    Thank you for your letter dated July 11, 2017, in which you requested that I reconstitute the Official Committee of Unsecured Creditors (the "Committee") in the above-referenced case.

    On Friday, June 9, 2017, in San Juan, Puerto Rico, our staff interviewed every creditor who appeared and requested to serve on the Committee. The general unsecured creditors that I appointed to the Committee do not assert that their claims are either in some manner secured or entitled to priority treatment.

    I have no plans to reconstitute the Committee to add creditors claiming that their claims are secured or otherwise have full priority. Kind regards.

                  Very truly yours,

                  GUY G. GEBHARDT
                  ACTING UNITED STATES TRUSTEE
                  REGION 21

cc: Luc A. Despins, Esq.

# Exhibit E



**Mensaje de Presupuesto del Gobernador de Puerto Rico**

**Honorable Ricardo Rosselló Nevares**

**El Capitolio, San Juan, Puerto Rico**

31 de mayo de 2017

Conforme lo dispone la Ley federal de Supervisión, Administración y Estabilidad Económica de Puerto Rico, conocida como "PROMESA", y quedando una vez más evidenciada la condición colonial en que se encuentra Puerto Rico, el pasado 30 abril referimos a la Junta de Supervisión Fiscal el Borrador del Presupuesto que hoy someto ante la consideración de la Asamblea Legislativa.

Al primer presupuesto del nuevo gobierno le antecede la falta de controles en el gasto público; unido a las erradas políticas de improvisación contributivas, y a la irresponsable administración de las finanzas públicas durante el pasado. Afortunadamente, la política pública de nuestra Administración es precisamente lo contrario.

Este presupuesto que les presento, es uno completo, validado, que por su naturaleza contiene mucha profundidad.   Esta noche les presentare los elementos globales y fundamentales del mismo.

Durante el proceso de análisis del presupuesto, contarán con la participación del equipo fiscal y económico de nuestra Administración, a los fines de aclarar cualquier duda sobre el proyecto que hoy estamos sometiendo ante su consideración.   No obstante, les adelanto que los números reflejan lo que hemos estado discutiendo por los últimos meses y lo que fue certificado en nuestro plan fiscal.   Adicionalmente, como medida de transparencia total, nuestro presupuesto estará disponible posterior a este mensaje, para todos los ciudadanos en fortaleza.pr.gov y en nuestra plataforma de redes sociales.

La confección del proyecto de presupuesto que hoy radicamos, viene precedida de una serie de iniciativas ejecutivas que deseo resaltar, con el propósito de que se comprenda el gran esfuerzo que estamos realizando para poner en orden las finanzas y la administración del gobierno.

El Presupuesto que hoy les someto ante su consideración, forma parte de una política pública de cumplimiento con el Plan Fiscal, que evita la aplicación de contingencias que afectarían al pueblo.

Una de las diferencias más importantes de éste presupuesto, es que contrario a los anteriores, el mismo está realmente balanceado. En el pasado, simplemente se tomaba el presupuesto anterior y se añadían gastos nuevos.  En el pasado, se tomaba dinero de áreas, aumentando el gasto presupuestado y escondiendo la deuda.  Eso se acabó.

Este presupuesto será uno bien estructurado y cuenta con componentes basados en la metodología de un presupuesto base cero, para la operación de un gobierno donde todas las transacciones fiscales sean visibles y sean justificadas. Nada se estará realizando a escondidas o por debajo de la mesa.

Otra diferencia significativa es que el nuevo presupuesto asume TODO EL PAGO DE LAS PENSIONES.  Esto provoca que los números sean muy distintos a presupuestos en el pasado. Si, hemos tenido que tomar decisiones fuertes;  estamos reduciendo el gasto y en gran medida, ha sido necesario para proteger a uno de los sectores más vulnerables de nuestro pueblo: Nuestros pensionados, quienes corrían el riesgo de perder totalmente su pensión.

Antes, las pensiones eran pagadas por un fondo de activos, el cual fue defalcado en varias ocasiones, y prácticamente se quedó en cero.  De hecho, en varios meses, se quedaba sin recursos para pagarle a los pensionados.  En este presupuesto asumimos el pago de pensiones de sobre 2 billones de dólares.  Así tomamos un paso difícil para el presupuesto, pero garantizamos las pensiones de todos nuestros retirados.

En éste Presupuesto transparente, no se repetirán las transacciones oscuras que el pueblo no vio, como la utilización de sobre 580 millones de dólares de activos de los pensionados para gastos gubernamentales. Eso se acabó.

Ahora tendremos un presupuesto con visibilidad, donde no habrán partidas escondidas y donde el pueblo verá cómo y en dónde se utiliza el dinero.

Iniciamos nuestra gestión en La Fortaleza recibiendo un gobierno con un déficit superior a los siete mil quinientos millones de dólares - una cifra sin precedentes - que casi triplicaba cualquier déficit previo ante un cambio de administración.

Ante esa incuestionable realidad, respondimos con una serie de órdenes ejecutivas y medidas legislativas dirigidas a lograr las economías necesarias que nos han permitido mantener el gobierno operando, ofreciéndole los servicios esenciales al pueblo de una manera más eficiente y garantizando los empleos en el sector público. Todo esto, mientras nos dirigimos a la construcción de un gobierno innovador, basado en la ciencia, en las métricas y la tecnología; que aspira lograr más con menos.

A manera de ejemplo deseo recordarles que mediante las    órdenes ejecutivas 2017-001; la 2017-009 y la Ley 3-2017, hemos logrado hasta el momento los siguientes ahorros con cargo al Fondo General:

- o Reducciones de nómina y costos relacionados - **$5,274,000**
- o Reducciones en gastos operacionales - **$19,153,000**
- o Reducciones en gastos por servicios - **$13,838,000**

Asimismo, se proyectan los siguientes ahorros   por concepto de otros orígenes de recursos, como los son: fondos especiales estatales, e ingresos propios, que no se reducen con cargos a fondos federales:

- o Reducciones de nómina y costos relacionados - **$1,975,500**
- o Reducciones en gastos operacionales - **$102,003,000**
- o Reducciones en gastos por servicios - **$56,566,000**

Por concepto de órdenes ejecutivas y legislación aprobadas dirigidas al control de gastos y eficiencia gubernamental, nuestra Administración ha logrado economías que ascenderán a **200 millones de dólares anuales**.

No obstante a esas medidas que les indicara, las condiciones en que asumimos el gobierno han provocado otros contratiempos financieros que hemos atendido de manera urgente. Hace más de un año que el Gobierno de Puerto Rico carece de liquidez y, bajo la pasada Administración, se utilizaron los reintegros, pagos de los contratistas, el dinero de los pensionados y préstamos intra-gubernamentales para sustituir las fuentes de liquidez y gastar más dinero que los fondos que se tenían disponibles.

Es de conocimiento público que el Banco Gubernamental de Fomento incumplió sus obligaciones con los bonistas desde el 1 de mayo de 2016. El BGF, que desde el 2015 dejó de operar como un banco, ya no cumple su rol de proveer liquidez al gobierno, ni tampoco contamos con acceso a los mercados financieros.

El panorama también es crítico para los sistemas de retiro, que se encuentran insolventes y es nuestra responsabilidad defender a los más vulnerables que trabajaron toda una vida para el gobierno.

Ante esa situación y para proteger los fondos depositados en el Departamento de Hacienda, los cuales estaban expuestos a demandas de acreedores del gobierno, recurrimos a solicitar la protección del Título III de la Ley PROMESA. Con esa oportuna acción, garantizamos la continuidad del pago de las pensiones y la operación del gobierno de Puerto Rico.

Esa acción no impide, y así lo hemos comprobado, que podamos continuar renegociando los términos de la deuda de Puerto Rico, recobrando la credibilidad en el gobierno y protegiendo los fondos necesarios para continuar la prestación de los servicios al Pueblo.

Los recientes acuerdos logrados con los grupos de bonistas, entre los que se encuentra un importante sector de los puertorriqueños que depositaron sus ahorros en bonos del Banco Gubernamental de Fomento, evidencian que hay confianza y credibilidad en el nuevo gobierno de Puerto Rico.

La implementación de nuestra política pública para restablecer el orden administrativo en el gobierno no se detiene.  A esos efectos, la Autoridad de Asesoría Financiera y Agente Fiscal (AAFAF) emitió la *Orden Administrativa 2017-001*, identificando el origen de los fondos de asignaciones realizadas previo al 2017; controlando los desembolsos realizados por el Departamento de Hacienda con cargo al Fondo General. Eso, unido a otras medidas, ha tenido el efecto de mejorar el flujo de efectivo del Tesoro Estatal, facilitándose así el pago de los reintegros que les corresponden a los ciudadanos que cumplen con su responsabilidad contributiva.

Hasta el momento el Departamento de Hacienda le ha pagado al Pueblo la cantidad de 140 millones de dólares en reintegros, de los cuales, gran parte de esa cantidad correspondía a dinero que el pasado gobierno le retuvo a los ciudadanos que responsablemente cumplieron. **Si los puertorriqueños y puertorriqueñas cumplen, el gobierno también tiene que cumplir.**

Me complace informarles que durante el mes de junio el Departamento de Hacienda estará emitiendo pagos de reintegros por la cantidad de 35 millones de dólares adicionales.

De igual forma me satisface informarles que los recaudos acumulados en Hacienda para el mes de abril, superaron lo proyectado por la cantidad de 230 millones de dólares; cumpliendo además con la reserva de 200 millones requerida por la Junta de Supervisión Fiscal.  Puerto Rico tiene un nuevo gobierno; más responsable y eficiente en la administración de sus finanzas.

Cumpliendo con esa política pública y mediante la aprobación de la *Ley 26-2017*, se eliminaron las asignaciones especiales multianuales con cargo al Fondo General, para que no puedan ser utilizados fuera del año en que fueron asignados y se dispuso que los fondos especiales serán depositados y administrados bajo el control del Departamento de Hacienda.

El uso correcto de los fondos públicos se ha definido como un principio fundamental en el nuevo gobierno de Puerto Rico. Los años del despilfarro y la indolencia en la administración de los fondos del pueblo quedaron atrás. Con nuestras acciones y el resultado de las mismas, estamos recobrando la credibilidad perdida en el gobierno.

Uno de los primeros desafíos que tuvimos que superar en defensa del pueblo de Puerto Rico, fue la aprobación de un Plan Fiscal que respondiera a la situación de crisis encontrada, pero que también respondiera a nuestra política pública de proteger a los más vulnerables de nuestra sociedad.

Logramos que la Junta de Supervisión Fiscal aprobara nuestra versión de un Plan que evitó el despido de más de 45 mil empleados públicos; protegiendo además las pensiones de los más vulnerables y evitando el colapso del sistema de salud en Puerto Rico.

**Las medidas implementadas en éste Presupuesto son las que habíamos establecido en el Plan Fiscal.**

Esa batalla en defensa de los mejores intereses de nuestro pueblo es continua y sin pausa, pero debo afirmar, que lo hacemos interactuando con la Junta de Supervisión Fiscal de una manera responsable, prudente y firme en representación del pueblo de Puerto Rico. Quiero agradecer al Licenciado José Marrero, Director de OGP,  y a nuestro equipo fiscal, por el trabajo extraordinario que han hecho en esta gestión.

En ese esfuerzo no puedo pasar por alto la participación que han tenido ustedes, los legisladores y legisladoras que representan al pueblo en la cámara y el senado - a sus presidentes Johnny Méndez y Thomas Rivera Schatz - por la aprobación de importantes medidas legislativas, necesarias para que Puerto Rico pueda superar la crisis.

La ley de cumplimiento, denominada como  la *"Ley de Emergencia Financiera y Responsabilidad Fiscal de 2017"* y la Ley que define el concepto del "Empleador Único" en el gobierno, entre otras, han sido medidas que han facilitado la continuidad de las operaciones gubernamentales, logrando considerables economías, sin despedir empleados públicos y evitando la reducción de la jornada laboral. Definitivamente, hay unidad de propósitos trabajando por nuestro Pueblo. ***Hay un nuevo gobierno trabajando en Puerto Rico***.

La legislación aprobada durante estos primeros cinco meses responde a nuestros compromisos con el pueblo para reactivar nuestra economía y facilitar la creación de empleos. La base sobre la cual se producirá ese cambio favorable para Puerto Rico ya se legisló.

La reforma laboral facilita el desarrollo de mayor actividad comercial y por ende, nuevas oportunidades de empleos. La nueva ley de permisos y el uso de la tecnología en la aplicación de la misma, permite que ya se pueda sacar un permiso automático en Puerto Rico a través de una página web.  Un cambio dramático en el proceso de obtención de permisos.

Por décadas, en la búsqueda de mayores recursos, los gobiernos en Puerto Rico han alterado el sistema contributivo, convirtiendo el mismo en uno de los más complejos del mundo, e injusto para el ciudadano. Llegó el momento de simplificarlo para beneficio de la gente.

Puerto Rico no puede continuar siendo una de las jurisdicciones donde más contribuciones se pagan bajo la bandera americana. Esa es otra de las consecuencias provocadas por el injusto sistema colonial.  A esos efectos, les anuncio que estaré

sometiendo legislación para reformar el sistema contributivo y hacerle justicia a nuestro pueblo.

La reforma que estaré sometiendo ante la consideración de la Asamblea Legislativa incluirá lo siguiente:

- ○ Alivios contributivos para los individuos asalariados que totalizarán sobre 200 millones de dólares, ampliando los renglones de ingresos y reduciendo la tasa efectiva. Repito: En éste ambiente fiscal feroz, hemos encontrado la manera de bajarle la carga contributiva a la mayoría de los puertorriqueños, principalmente a la clase media y a los más vulnerables.

- ○ Con nuestra Reforma más de 400 mil contribuyentes no tendrán que radicar planillas, pues implementando una política de retención en el origen de sus salarios, quedará cubierta su responsabilidad contributiva.

- ○ Igualmente, los trabajadores por cuenta propia que rinden por servicios profesionales tendrán la posibilidad de optar por la retención en el origen, eliminando así su obligación de radicar la planilla.

- ○ Los primeros 12,500 dólares en ingresos para todo individuo no pagarán contribuciones y aumentaremos la exención para los pensionados de 15,000 a 25,000 dólares, reafirmando nuevamente nuestro compromiso con los jubilados.

- ○ Estableceremos un crédito de 100 dólares por dependiente para aquellos ingresos hasta 80,000 dólares anuales.

- ○ Cumpliendo nuestro compromiso, reduciremos el impuesto conocido como el **B2B** por la **mitad**, de 4 a 2%, como la primera fase para la eliminación total de ese impuesto.

Con esas medidas estamos simplificando y modernizando el sistema contributivo, de manera que sea más justo para el ciudadano, y a su vez, facilite la eficiencia del Departamento de Hacienda. Con el nuevo sistema el ciudadano tendrá la opción de sustituir el tedioso proceso de llenar y radicar una planilla, por la sencilla acción de tocar un botón. *Hay un nuevo gobierno trabajando en Puerto Rico*.


La *Orden Ejecutiva 2017-005*, define los criterios para elaborar nuestro primer Presupuesto Base Cero.  Esa metodología presupuestaria  le requiere a las agencias e instrumentalidades del Gobierno evaluar con detenimiento los gastos proyectados y justificar los mismos, asegurándose de cumplir con su misión, con la política pública de la Administración y manteniendo la calidad en los servicios al pueblo.


Como parte de los esfuerzos para presentar un presupuesto consolidado balanceado - lo que hace décadas no ocurre en Puerto Rico - aprobamos legislación que nos permite reducir gastos y generar ingresos adicionales, de forma tal que nuestra Administración

pueda ejecutar el programa de gobierno que el pueblo validó en las urnas y cumplir con el Plan Fiscal certificado por la Junta.   Ejemplo de lo anterior son las siguientes medidas:

- Ley 8-2017: es una las piezas esenciales en el proceso de trasformación del gobierno de Puerto Rico, convirtiéndolo en el empleador único y permitiendo la movilidad de los recursos humanos disponibles, según las necesidades de servicio que se tenga. Mediante esa legislación se logran economías de alrededor de unos 100 millones de dólares por concepto de movilidad y "*attrition*".

- La Ley 20-2017, mediante la cual comienza el proceso de re-estructuración del Gobierno de Puerto Rico, creando el Departamento de Seguridad Pública. Esto permitirá desarrollar un sistema de seguridad más rápido, coherente y eficiente para toda la comunidad y que a su vez redundará en ahorros aproximados de sobre 25 millones de dólares.

- Ley 24-2017, la cual enmendó la Ley de Tránsito brindando mayor seguridad en las carreteras y abonando un estimado de 13 millones  de dólares adicionales.

- Ley 25-2017, la cual regulará las ventas por internet haciendo justicia a nuestros pequeños y medianos comerciantes y trayendo ingresos adicionales estimados entre unos 35 a 55 millones de dólares.

- Ley 26-2017, aprobada en cumplimiento con el Plan Fiscal, uniforma los beneficios marginales que reciben todos los empleados y servidores públicos y genera ahorros que se estiman en unos 130 millones de dólares. Cónsono con la política pública de salubridad, se lograrán ingresos adicionales al erario de unos 50 millones de dólares provenientes del aumento en el costo del tabaco y sus derivados.

- Próximamente estaremos presentando nueva legislación que propone consolidaciones en los componentes del Departamento de la Familia y del Departamento de Desarrollo Económico y Comercio (DDEC). Esto nos permitirá seguir desarrollando un gobierno más ágil y eficiente para beneficio de todo nuestro Pueblo.

El presupuesto recomendado correspondiente al Año Fiscal 2017-2018, es otro paso en el camino hacia la  estabilidad fiscal y la recuperación económica de Puerto Rico. El nuevo presupuesto, incluyendo los más de 2 mil millones para el pago de pensiones, asciende a la cantidad de  9,562 mil millones de dólares.

Nuestro primer presupuesto está enmarcado en la disciplina fiscal;  asegurando los servicios  esenciales para nuestro pueblo, y facilitando las condiciones para  activar la

económica y la generación de nuevos empleos en Puerto Rico. En el mismo se refleja una reducción de un 9.1% en los gastos de funcionamiento del gobierno.

En cumplimiento con el Plan Fiscal, en el nuevo Presupuesto se reduce en un 32% las partidas correspondientes a mercadeo y publicidad. Reducimos además un 40% en compras de materiales; un 13% en la administración de la nómina y un 47% por concepto de subsidios y donativos.

Señoras y señores legisladores: El Presupuesto que estarán analizando, no tiene marco de referencia, ya que la confección del mismo responde a criterios de transparencia y políticas públicas diferentes a las de gobiernos anteriores. Otro ejemplo que así lo evidencia, es que en éste Presupuesto asumiremos el pago de todas las pensiones de los sistemas de retiro. El pago para nuestros pensionados está garantizado en éste Presupuesto. *Hay un nuevo gobierno trabajando en Puerto Rico*.

Los exhorto a analizar el nuevo Presupuesto como una pieza adicional para lograr la transformación de un Puerto Rico moderno; más justo y progresista.

Los invito a aspirar a un Puerto Rico con una educación de calibre global, transformando el sistema deficiente actual, en uno diseñado para maximizar el aprovechamiento del estudiante. Añadiendo a las posibilidades de nuestros estudiantes, distintas opciones para ellos y para sus padres; estableciendo las escuelas de la comunidad, colaborando con organizaciones sin fines de lucro para proveer servicios y descentralizando el Departamento de Educación para que las decisiones que beneficien a los estudiantes se puedan ejecutar con agilidad y eficiencia, eliminando la excesiva burocracia.

Vamos a llevar la tecnología al salón de clases y llevar mediante recursos de educación a distancia nuevas experiencias académicas a nuestros estudiantes.

Aprovecho la ocasión para informarle a los maestros, que por iniciativa de la Secretaria de Educación, gestionamos y conseguimos los fondos federales necesarios para otorgarle un bono de **mil dólares** a los maestros en las áreas de matemáticas, ciencias, inglés y español, del grupo calificado como excedente, que de manera voluntaria acepten laborar en las receptoras y más necesitadas.

Los invito a que juntos aspiremos tener un Puerto Rico saludable, desarrollando un sistema de salud centrado en el paciente y con acceso para todos los ciudadanos a los mejores servicios disponibles. Vamos a desarrollar un sistema preventivo que eduque al paciente sobre el cuido de su salud y modernizar los servicios mediante el record médico único. Por ello, aumentaremos las partidas en nuestro sistema de salud.

Hace unos días regrese de Washington y New York, donde sostuvimos importantes reuniones, tanto en el congreso como con directores de Medicaid, reclamando mayores recursos para los programas de salud en Puerto Rico. Nos sentimos confiados en que vamos a lograr aumentos en los fondos Medicaid, pero debemos tener claro,

que la única forma de garantizar la paridad y  el trato igual que los estados en las
asignaciones de fondos para los programas de salud, es siendo un estado. NO hay otra
forma. La ruta hacia la igualdad en los programas de salud está trazada y en ese
camino nos encontramos.

Los invito a lograr un Puerto Rico seguro; donde podamos integrar de manera efectiva
los recursos del gobierno estatal con el federal, para vencer al crimen organizado y el
narcotráfico. Vamos a modernizar nuestra Policía, integrando los adelantos
tecnológicos y la capacitación a los miembros de la fuerza.

Vamos a desarrollar de manera efectiva el policía de la comunidad; integrar los
recursos de la Policía Estatal con las municipales y atender el problema de seguridad
pública de manera integrada, a través del nuevo Departamento de Seguridad que
agrupa a siete agencias del gobierno central.

Les exhorto a que colaboremos para empoderar comunidades, como se ha estado
haciendo con el esfuerzo de Fortaleza para Ti, liderado por mi esposa Beatriz;
uniendo al gobierno, al sector privado y a las organizaciones sin fines de lucro.

Los invito hacer de Puerto Rico un importante centro de innovación tecnológica y
desarrollo económico; posicionando a nuestra Isla como el puente que une las culturas
del hemisferio americano. Estamos creando las condiciones para facilitar el desarrollo
de negocios, la inversión en nuestra Isla y la creación de empleos.

Señoras y señores legisladores: Ese mejor Puerto Rico es posible y juntos lo podemos
hacer una realidad. El Proyecto de Presupuesto que hoy sometemos ante su
consideración, está fundamentado en esos objetivos. Estamos demostrando que desde
el gobierno se puede hacer más, con menos. ***Hay un nuevo gobierno trabajando en
Puerto Rico.***

No debo pasar por alto esta comparecencia ante la Asamblea Legislativa, para
expresarme sobre el futuro inmediato de nuestra patria.

Los puertorriqueños no estamos ajenos a las dificultades que viven otros pueblos del
mundo. Todos tienen sus retos; sus problemas y situaciones políticas que superar.

Un ejemplo cercano a nuestra Isla es la situación actual en Venezuela, donde se
violentan los derechos a la libertad de expresión, a la libertad de asociación y hasta
los derechos fundamentales de los seres humanos.

En Puerto Rico tendremos la oportunidad de dejar atrás las limitaciones del indigno
sistema colonial y aspirar a la igualdad de derechos en la nación que representa el
símbolo de la libertad y la democracia en el mundo.

En un esfuerzo por lograr la inclusión de todos los sectores políticos y en respuesta a
la solicitud formulada por el Departamento de Justicia federal, enmendamos la ley

que ordena la celebración del Plebiscito el 11 de junio, a los fines de incluir en la papeleta la opción de la actual condición territorial.

Ahora no hay excusa para no participar en el Plebiscito. En la democracia prevalece la mayoría que participa en los procesos electorales. Como gobernador exhorto al pueblo a participar en el Plebiscito que definirá el reclamo descolonizador que le formularemos al gobierno federal y al Congreso de los Estados Unidos.

El 11 de junio Puerto Rico tendrá la oportunidad de darse a respetar ante el gobierno federal y ante el mundo, como un pueblo que exige su autodeterminación política.

La efectividad y la seriedad de los liderazgos políticos se demuestran asumiendo posiciones claras, y defendiendo los principios en que uno cree, con firmeza y respeto hacia aquellos que no piensan de la misma forma.
Quienes a falta de votos recurran al discurso de la confusión y la promoción del desorden, se quedarán cada día más solos y alejados de la mayoría de los puertorriqueños de buena voluntad, que deseamos un mejor mañana para cada hijo de esta tierra.

Los invito a que aspiremos a la igualdad de derechos como puertorriqueños ciudadanos de los Estados Unidos, reclamando con firmeza la dignidad que nos corresponde como un pueblo noble, trabajador y comprometido con los mejores valores del ser humano.

Thomas Jefferson, uno de los principales fundadores de los Estados Unidos, dijo una vez, y lo cito, *"me gustan más los sueños del futuro, que la historia del pasado"*...

Dejemos atrás la colonia y miramos hacia el futuro con optimismo, convencidos que un mejor Puerto Rico es posible. El momento de la definición llegó. El momento de actuar llegó. El momento de votar para la descolonización de Puerto Rico llegó. El momento para el progreso de Puerto Rico, llegó.

Que Dios bendiga a nuestra Patria.

Buenas noches.

Cabo San Lucas, Baja California Sur, Mexico


I, Jason Schrier, am fluent in the Spanish and English languages. I have been translating documents for over 10 years. I am a federal Spanish/English legal interpreter certified by the Administrative Office of United States Courts. My certificate number is 10-067. I am also a NYU certified Spanish-English legal translator. I am competent to translate from Spanish into English.


I hereby certify that the following are, to the best of my knowledge and belief, true and accurate translations of the attached "Mensaje de Presupuesto del Gobernador de Puerto Rico" from Spanish into English.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Jason Schrier

Executed on this 22th day of June, 2017.

[seal:] GOVERNOR OF PUERTO RICO

**Budget Message from the Governor of Puerto Rico**

**Honorable Ricardo Rosselló Nevares**

**The Capitol Building, San Juan, Puerto Rico**

May 31, 2017

Pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") and as Puerto Rico's colonial status has become increasingly more evident, last April 30 we sent the Budget Draft to the Fiscal Oversight Board, which we today submit for the consideration of the Legislative Assembly.

The first budget of the new government was preceded by a lack of control in public spending, along with misguided improvised tax policies and irresponsible administration of public finances in the past. Fortunately, the public policy of our Administration is the complete opposite.

The budget I present you is complete, legitimate and by nature robust. Tonight I will provide you with its overall fundamental features.

During the budget analysis process, you can count on our Administration's fiscal and economic team to clear up any questions about the bill that we are submitting today for your consideration. However, I would like to inform you that the numbers reflect what we have been discussing in recent months and what was certified in our fiscal plan. In addition, as a measure of total transparency, after this message, our budget will be available for all citizens at fortaleza.pr.gov and on our social media platforms.

The prepared budget bill we are presenting today has been preceded by a series of executive initiatives that I wish to highlight in order to understand the great effort we are making to put the government's finances and administration in order.

I, Jason Schrier, USCCI # 10-067/translator, certify that the forgoing is a true and accurate translation to the best of my abilities, of the document in Spanish which I have seen.

The budget I am submitting today for your consideration is part of a public policy that complies with the Fiscal Plan, which avoids implementing contingencies that would affect the public.

One of the most important differences in this budget is that, unlike previous ones, it is truly balanced. In the past, the previous budget was simply taken and new expenses were added. In the past, money was taken from areas, budgeted expenses were increased and the debt was hidden. That is over.

This budget will be well structured and include components from the zero-based budgeting method so that all fiscal transactions in the government's operations are transparent and justified. Nothing will be hidden or done under the table.

Another significant difference is that the new budget includes PAYMENT OF ALL PENSIONS. Because of this the numbers are very different from budgets in the past. Yes, we have had to make tough decisions; we are reducing spending, and to a great extent, it has been necessary to protect one of the most vulnerable sectors of our public: our pensioners, who were running the risk of losing their pensions completely.

Before, pensions were paid for by a fund that was subject to embezzlement on several occasions and practically went bankrupt. In fact, for several months, there were no funds to pay pensioners. This budget includes payments for pensions of over $2 billion. Thus, we are taking a difficult step for the budget, but we are guaranteeing the pensions of all of our retirees.

In this transparent budget, dubious transactions that were once hidden from the public eye will not be repeated, such as using over $580 million from pension funds to pay government expenses. That is over.

Now we will have a transparent budget, where there will be no hidden entries and where the public will see how and where the money is used.

We began our administration at La Fortaleza with a deficit over seven billion, five hundred million dollars - an unprecedented figure - which was almost three times greater than any previous existing deficit during an administration change.

In view of this unquestionable reality, we responded with a series of executive orders and legislative measures aimed at achieving enough savings to allow us to keep the government operating, to offer the public essential services in a more efficient way and to guarantee public sector jobs. All of this was done while we built an innovative government based on science, metrics and technology, a government that aspires to do more with less.

I, Jason Schrier, USCCI # 10-067/translator, certify that the forgoing is a true and accurate translation to the best of my abilities, of the document in Spanish which I have seen.

As an example, I would like to remind you that through executive orders 2017-001 and 2017-009, and Act 3-2017, we have thus far achieved the following savings for the General Fund:

- o Reductions in payroll and related costs - **$5,274,000**
- o Reductions in operating costs - **$19,153,000**
- o Reductions in service costs - **$13,838,000**

In addition, the following savings are projected for other sources of funds, such as: special state funds and self-generated revenue, which do not decrease with charges to federal funds:

- o Reductions in payroll and related costs - **$1,975,500**
- o Reductions in operating costs - **$102,003,000**
- o Reductions in service costs - **$56,566,000**

In accordance with executive orders and approved legislation aimed at controlling government spending and efficiency, our Administration has achieved annual savings totaling **$200 million**.

Notwithstanding the measures I have mentioned, the conditions under which we have taken office have caused other financial setbacks that we have dealt with urgently. The Government of Puerto Rico has lacked liquidity for more than a year, and under the previous administration, tax refunds, payments for contractors, money for pensioners and intra-governmental loans were used as a substitute for the lack of liquidity and more money was spent than was available.

It is public knowledge that the Governmental Development Bank has failed to fulfill its obligations with bondholders since May 1, 2016. The GDB, which has stopped operating as a bank since 2015, no longer fulfills its role of providing liquidity to the government, nor do we have access to financial markets.

The outlook is also critical for retirement systems, which are insolvent, and it is our responsibility to defend the most vulnerable people have who worked their whole lives for the government.

In view of this situation and in order to protect the funds deposited in the Treasury Department, which were exposed to claims of government creditors, we again request protection under Title III of PROMESA. By taking this timely action, we guarantee the Puerto Rican government will continue to operate and pay its pensions.

This action does not prevent us – and we have so demonstrated – from continuing to renegotiate Puerto Rico's terms of debt, rebuilding the government's credibility and protecting the funds necessary to continue providing services to the public.

I, Jason Schrier, USCCI # 10-067/translator, certify that the forgoing is a true and accurate translation to the best of my abilities, of the document in Spanish which I have seen.

Recent agreements reached with groups of bondholders, which include an important sector of Puerto Ricans who deposited their savings in Government Development Bank bonds, prove that there is trust and credibility in the new government of Puerto Rico.

The implementation of our new public policy to reestablish administrative order in the government continues forward. For these purposes, the Fiscal Agency and Financial Advisory Authority (FAFAA) issued *Administrative Order 2017-001*, which identifies the funding source of appropriations made prior to 2017 and monitors payments made by the Treasury Department to the General Fund. This, along with other measures, has had the effect of improved cash flows at the Treasury, thus facilitating the payment of refunds corresponding to citizens who fulfill their tax obligations.

Thus far, the Treasury Department has paid the public $140 million in refunds. A large portion of this corresponds to money that the previous administration withheld from citizens who met their tax obligations. **If Puerto Ricans fulfill their duties, the government must fulfill its duties, too.**

I am pleased to inform you that during the month of June, the Treasury Department will be issuing additional refunds in the amount of $35 million.

Likewise, I am pleased to inform you that the collections made in the Treasury Department for the month of April exceeded projections by $230 million,  meeting the Fiscal Oversight Board's requirement of $200 million in reserves. Puerto Rico has a new administration that is more responsible and efficient in managing its finances.

Pursuant to this public policy, and as approved by *Act 26-2017*, the special multi-annual appropriations charged to the General Fund were eliminated to prevent them from being used outside of the year in which they were appropriated, and an order was issued directing special funds to be deposited and managed by the Treasury Department.

The correct use of public funds has been defined as a fundamental principle in the new Puerto Rican government. The years of wastefulness and neglect in managing government funds are a thing of the past. With our actions and the results thereof, we are rebuilding the credibility the government has lost.

One of the first challenges we had to overcome in defending the people of Puerto Rico was the Fiscal Plan approved in response to the crisis encountered, which also affected our public policy of protecting the most vulnerable people of our society.

I, Jason Schrier, USCCI # 10-067/translator, certify that the forgoing is a true and accurate translation to the best of my abilities, of the document in Spanish which I have seen.

We were able to convince the Fiscal Oversight Board to approve our version of a plan that avoided dismissing over 45,000 public employees, protected the pensions of the most vulnerable people and also avoided a collapse of the Puerto Rican health system.

**The measures implemented in this budget are those that we had established in the Fiscal Plan.**

This battle in defense of our people's best interests continues on uninterrupted, but I must state we are doing it by interacting with the Fiscal Oversight Board in a responsible, prudent and firm manner on behalf of the Puerto Rican people. I want to thank José Marrero, the director of the Office of Management and Budget, and our fiscal team for the extraordinary work they have done in this process.

In this effort, I cannot overlook the contributions made by you all, the legislators who represent the public in the House and the Senate - your chairmen Johnny Méndez and Thomas Rivera Schatz - for approving the important legislative measures necessary for Puerto Rico to overcome the crisis.

The regulatory law entitled the *"The Financial Emergency and Fiscal Responsibility Act of 2017"* and the law defining the concept of government as the "Sole Employer," among others, are measures that have helped keep the government operating and achieve considerable savings, while retaining public employees and avoiding reductions in the workday. Without a doubt, there are common goals working for the benefit of our people. ***There is a new government at work in Puerto Rico.***

The legislation approved during these first five months stems from our commitments to the public to reactivate our economy and facilitate job creation. The foundation for bringing about positive change in Puerto Rico has already been legislated.

The labor reform facilitates the development of greater business activity and, thus, new job opportunities. The new permits law, and the use of technology when applying for them, means that permits can be taken out in Puerto Rico from a web page automatically. This is a dramatic change in the process for obtaining permits.

For decades, in seeking greater funding, Puerto Rican governments have altered the tax system, making it into one of the world's most complex, one that is unfair to the public. The time has come to simplify it for the benefit of the people.

Puerto Rico cannot continue being one of the jurisdictions where the highest taxes under the American flag are paid. This is another of the consequences caused by an unjust colonial system. For these reasons, I am announcing to you that I will be submitting legislation to reform the tax system and do our people justice.

I, Jason Schrier, USCCI # 10-067/translator, certify that the forgoing is a true and accurate translation to the best of my abilities, of the document in Spanish which I have seen.

The reform I will be submitting for the consideration of the Legislative Assembly will include the following:

o Tax relief for salaried individuals over $200 million that will increase income and reduce the effective tax rate. I repeat: In this ferocious fiscal environment, we have found a way to lower the tax burden on the majority of Puerto Ricans, primarily on the middle class and the most vulnerable.

o With our reform, more than 400,000 taxpayers will not have to file tax returns. By implementing a policy that withholds taxes at the source of payment, their tax liability will be covered.

o Likewise, independent contractors who render professional services will have the ability to choose to have their taxes withheld at the source, thus eliminating their obligation to file tax returns.

o Individuals will not pay taxes on the first $12,500 of income, and we will increase the exemption for pensioners from $15,000 to $25,000, thus again reaffirming our commitment to retirees.

o We will establish a credit of $100 per dependent for any annual income up to $80,000.

o By keeping our commitment, we will reduce the B2B tax by **half**, from 4% to 2%, as part of the first phase to fully eliminate this tax.

With these measures we are simplifying and modernizing the tax system so that it will be fairer for the public and, in turn, will facilitate efficiency in the Treasury Department. With this new system, the public will have the option to replace the tedious process of filling out and filing tax returns with the simple action of pressing a button. ***There is a new government at work in Puerto Rico.***

*Executive Order 2017-005* defines the requirements for preparing our first zero-based budget. This budgeting methodology requires government agencies and instrumentalities to carefully assess projected expenses and justify them, thus ensuring they fulfill their mission, comply with the administration's public policy and maintain the quality of public services.

As part of the efforts to present a balanced consolidated budget - which has not occurred in Puerto Rico for decades - we approved legislation that allows us to reduce spending and generate additional revenues so that our administration can implement the government program ratified by the public at the polls and comply with the Fiscal Plan certified by the Board.

I, Jason Schrier, USCCI # 10-067/translator, certify that the forgoing is a true and accurate translation to the best of my abilities, of the document in Spanish which I have seen.

The measures below are an example of this:

o Act 8-2017: An essential piece in the Puerto Rican government's transformation process, this law makes it the sole employer and allows it to move available human resources based on its service needs. Under this legislation, there are savings of around $100 million due to mobility and attrition.

o Act 20-2017, which began the Government of Puerto Rico's restructuring process, created the Department of Public Safety. This will make it possible to develop a faster, more coherent and more efficient security system for the entire community that, in turn, will result in an approximate savings of over $25 million.

o Act 24-2017, which amended the Transit Act, provides greater safety on highways and generates an estimated additional $13 million.

o Act 25-2017, which will govern internet sales, does justice for our small and medium companies and brings in additional estimated revenues of $35 to $55 million.

o Act 26-2017, approved in accordance with the Fiscal Plan, standardizes the fringe benefits received by all public servants and employees and generates savings estimated at around $130 million. In accordance with public health policy, additional revenues of around $50 million will be generated for public funds from an increase in the cost of tobacco and its derivatives.

o Soon we will submit new legislation that proposes consolidating portions of the Department of Family and the Department of Economic Development and Commerce (DEDC). This will allow us to continue developing a more agile and efficient government, to the benefit of all of our people.

The recommended budget for Fiscal Year 2017-2018 is another step on the path toward Puerto Rico's fiscal stability and economic recovery. The new budget, which includes more than $2 billion pension payments, totals $9.562 billion**.**

Our first budget is an example of fiscal discipline, ensures essential services for our people and facilitates conditions for activating the economy and generating new jobs in Puerto Rico. It shows a 9.1% decrease in the government's operating costs.

I, Jason Schrier, USCCI # 10-067/translator, certify that the forgoing is a true and accurate translation to the best of my abilities, of the document in Spanish which I have seen.

Under the Fiscal Plan, the new budget reduces marketing and advertising expenses by 32%. We also reduce materials purchases by 40%, payroll administration by 13% and subsidies and donations by 47%.

Dear legislators: The budget that you will be reviewing does not have a frame of reference, since the preparation thereof addresses transparency and public policy requirements different from those of previous administrations. Another example of this is that in this budget we will assume all pension payments for the retirement systems. Payments to our pensioners are guaranteed in this budget. ***There is a new government at work in Puerto Rico.***

I kindly ask you to consider the new budget as one more piece needed to make Puerto Rico more modern, progressive and fair.

I invite you to aim for a Puerto Rico with world-class education and transform the deficient system we have now into a system designed to maximize student performance, a system that gives students and their parents additional opportunities, a system that builds community schools, collaborates with non-profit organizations to provide services, and decentralizes the Department of Education so that decisions benefiting students can be implemented swiftly and efficiently, eliminating excessive bureaucracy.

We are going to bring technology to the classrooms and provide our students with new academic experiences using distance-learning resources.

I want to use this occasion to inform teachers that, under a Department of Education initiative, we took steps and successfully raised enough federal funds to grant a **one-thousand-dollar** bond to any math, science, English and Spanish teachers – from those qualified as surplus – who voluntarily agree to work at recipient schools most in need.

I invite you to join in making a healthy Puerto Rico, to develop a patient-focused health system that allows all citizens access to the best possible services. We are going to develop a preventative system that teaches patients to care for their health, a system that modernizes services using a single medical record. For this reason, we will be increasing spending on our health system.

I returned from Washington and New York a few days ago, where we held important meetings, both in Congress and with Medicaid directors, where I demanded greater resources for health programs in Puerto Rico. We feel confident we'll achieve increases in Medicaid funding, but we it must clearly understood that the only way to guarantee parity and the same treatment as the states receiving health program appropriations is by being a state. There is NO other way. The path toward equality in health programs has been outlined and we are on that path.

I, Jason Schrier, USCCI # 10-067/translator, certify that the forgoing is a true and accurate translation to the best of my abilities, of the document in Spanish which I have seen.

I invite you to make a safe Puerto Rico, where we can effectively integrate state and federal resources to defeat organized crime and drug trafficking. We are going to modernize our police by integrating technological advances and by training members of the police force.

We are going to effectively develop community police officers, integrate State Police resources with municipal police resources and address the problem of public safety in an integrated manner, in collaboration with the new Department of Safety, which groups together seven agencies from the central government.

I urge you to collaborate to empower communities, as has been done with the recent efforts by "Fortaleza for You," led by my wife Beatriz, which brings the government, the private sector and non-profit organizations together.

I invite you to make Puerto Rico an important center for technological innovation and economic development and position Puerto Rico as a bridge that brings cultures in the American hemisphere together. We are creating conditions to facilitate business development, investment and job creation in Puerto Rico.

Dear legislators: This better Puerto Rico is possible, and together we can make it a reality. The budget bill we are submitting today for your consideration is based on these goals. We are demonstrating that the government can do more with less. ***There is a new government at work in Puerto Rico.***

I must not forget to use this appearance before the Legislative Assembly to talk about the immediate future of our fatherland.

We Puerto Ricans are not indifferent to the problems that other people in the world are living through. Everyone has their challenges, their problems and political situations to overcome.

An example close to our Island is the current situation in Venezuela, where the right to freedom of expression, the right to freedom of association and even fundamental human rights are being violated.

In Puerto Rico, we will have the opportunity to leave behind the limitations of a shameful colonial system and aspire to equal rights in a nation that symbolizes freedom and democracy around the world.

In an effort to include all political sectors and in response to the request made by the Department of Justice, we amended the law ordering the referendum to be held on June 11, in order to include the option regarding the current territorial status on the ballot.

I, Jason Schrier, USCCI # 10-067/translator, certify that the forgoing is a true and accurate translation to the best of my abilities, of the document in Spanish which I have seen.

There is no excuse not to participate in the referendum now. In democracy, the majority that participates in the electoral process prevails. As governor, I urge the public to participate in the referendum, which will define the demand for decolonization we plan to submit to the federal government and the United States Congress.

On June 11, Puerto Rico will have the opportunity to earn the respect of the federal government, and the world, as a people who demand the right to political self-determination.

Effective and serious political leadership is demonstrated by taking clear positions and defending the principles one believes in, while firmly respecting those who do not think the same way.

Those who, in the absence of votes, resort to a discourse of confusion and promote disorder will find themselves increasingly lonely and isolated from the majority of Puerto Ricans, who, in good faith, wish for a better tomorrow for each and every child of this land.

I invite us to aspire to equal rights as Puerto Ricans, as citizens of the United States, and to firmly claim the dignity we are entitled to as noble, hard-working and committed people who possess the best of human values.

Thomas Jefferson, one of the United States' founding fathers, once said, and I quote, *"I like the dreams of the future better than the history of the past"* …

Let us leave colonialism behind and look toward a future with optimism, convinced that a better Puerto Rico is possible. The time to decide has come. The time to act has come. The time to vote for Puerto Rican decolonization has come. The time for Puerto Rican progress has come.

God bless our Fatherland.

Good night.

I, Jason Schrier, USCCI # 10-067/translator, certify that the forgoing is a true and accurate translation to the best of my abilities, of the document in Spanish which I have seen.

# Exhibit F

*Puerto Rico Department of Treasury*

*Treasury Single Account ("TSA") Cash Flow Actual-to-Forecast Comparison*

*As of May 26, 2017*

**Puerto Rico Department of Treasury**
TSA Cash Flow Actual + Re-forecast

As of May 26, 2017

### Cash Flows Before Cliffs, Measures and Debt
(figures in $mm)

| | Actual 5/26 | Fcst-1 6/2 | Fcst-2 6/9 | Fcst-3 6/16 | Fcst-4 6/23 | Fcst-5 6/30 | Total FY 2017 |
|---|---|---|---|---|---|---|---|
| 1 General Collections | $81 | $37 | $52 | $127 | $512 | $50 | $8,485 |
| 2 Sales and Use Tax | 110 | 4 | 5 | 18 | 14 | 171 | 1,703 |
| 3 Excise Tax through Banco Popular | – | – | – | 57 | – | – | 619 |
| 4 Rum Tax | – | 14 | – | – | 24 | – | 217 |
| 5 Electronic Lottery | – | – | – | – | 14 | 17 | 166 |
| 6 Subtotal | $191 | $56 | $57 | $202 | $564 | $238 | $11,191 |
| 7 Employee/Judiciary Retirement Admin. | – | – | – | 56 | – | – | 635 |
| 8 Teachers Retirement System | – | – | – | – | – | – | 272 |
| 9 Retirement System Transfers | – | – | – | $56 | – | – | $906 |
| 10 Federal Funds | 83 | 36 | 96 | 99 | 103 | 116 | 5,580 |
| 11 Other Inflows | 1 | 2 | 3 | 13 | 3 | 3 | 320 |
| 12 Tax Revenue Anticipation Notes | – | – | – | – | – | – | 400 |
| 13 Total Inflows | $275 | $93 | $156 | $370 | $670 | $356 | $18,398 |
| 14 Payroll and Related Costs | (75) | (20) | (22) | (106) | (52) | (111) | (3,575) |
| 15 Pension Benefits | (85) | – | – | (82) | (87) | (87) | (2,059) |
| 16 Health Insurance Administration - ASES | (19) | (1) | (53) | (53) | (53) | (62) | (2,608) |
| 17 University of Puerto Rico - UPR | (15) | (31) | (18) | (18) | (18) | (24) | (872) |
| 18 Muni. Revenue Collection Center - CRIM | (17) | – | (15) | (15) | (0) | (19) | (430) |
| 19 Highway Transportation Authority - HTA | (19) | – | – | – | – | (19) | (155) |
| 20 Public Buildings Authority - PBA / ASP | (7) | (6) | (4) | (4) | (4) | (4) | (162) |
| 21 Other Governmental Entities | (9) | (28) | (3) | (22) | (6) | (88) | (715) |
| 22 Subtotal - Government Entity Transfers | ($86) | ($66) | ($93) | ($112) | ($81) | ($197) | ($4,942) |
| 23 Supplier Payments | (70) | (62) | (61) | (61) | (61) | (59) | (3,284) |
| 24 Other Legislative Appropriations | (2) | (4) | (12) | (20) | (6) | (5) | (555) |
| 25 Tax Refunds | (16) | (21) | (16) | – | – | – | (651) |
| 26 Nutrition Assistance Program | (44) | (16) | (37) | (30) | (70) | (20) | (2,010) |
| 27 Other Disbursements | – | – | – | – | – | – | (16) |
| 28 Contingency | – | – | – | – | – | (65) | (395) |
| 29 Tax Revenue Anticipation Notes (a) | (71) | (65) | (65) | (65) | (65) | – | – |
| 30 Total Outflows | ($449) | ($254) | ($305) | ($476) | ($385) | ($543) | ($17,492) |
| 31 Net Cash Flows Excluding Debt Service, Fiscal Cliffs and Measures | ($174) | ($161) | ($150) | ($106) | $335 | ($187) | $905 |
| 32 Bank Cash Position, Beginning (b) | $1,591 | $1,418 | $1,257 | $1,107 | $1,001 | $1,336 | $244 |
| 33 Bank Cash Position, Ending (b) | $1,418 | $1,257 | $1,107 | $1,001 | $1,336 | $1,150 | $1,150 |

Footnotes:
(a) Per forbearance agreement signed the week of 4/28/17, repayment of TRANs has been deferred.
(b) Excludes BPPR Clawback Account (for clawback revenues prior to June 2016) of $146 million.

3

**Puerto Rico Department of Treasury**
*TSA Cash Flow Actual-to-Forecast Comparison*
(figures in $mm)

As of May 26, 2017

| | *Favorable / (Unfavorable) Variance in Cash* | Actual 5/25 | Fcst-1 6/2 | Fcst-2 6/9 | Fcst-3 6/16 | Fcst-4 6/23 | Fcst-5 6/30 |
|---|---|---|---|---|---|---|---|
| 1 | General Collections | $22 | (57) | (57) | (57) | (58) | (57) |
| 2 | Sales and Use Tax | (57) | – | – | – | – | – |
| 3 | Excise Tax through Banco Popular | – | – | – | – | – | – |
| 4 | Rum Tax | – | 14 | – | – | 2 | – |
| 5 | Electronic Lottery | – | – | – | – | – | (20) |
| 6 | Subtotal | ($35) | $8 | ($57) | ($57) | ($56) | ($57) |
| 7 | Employee/Judiciary Retirement Admin. | – | – | – | – | – | – |
| 8 | Teachers Retirement System | – | – | – | – | – | – |
| 9 | Retirement System Transfers | – | – | – | – | – | – |
| 10 | Federal Funds | (40) | (13) | (3) | (8) | (4) | (5) |
| 11 | Other Inflows | 1 | (10) | 3 | 13 | 3 | (9) |
| 12 | Tax Revenue Anticipation Notes | – | – | – | – | – | – |
| 13 | Total Inflows | ($75) | ($55) | ($58) | ($53) | ($57) | ($49) |
| 14 | Payroll and Related Costs | 21 | (1) | – | (11) | 4 | (5) |
| 15 | Pension Benefits | 2 | – | – | – | – | – |
| 16 | Health Insurance Administration – ASES | 33 | 6 | – | – | – | (8) |
| 17 | University of Puerto Rico – UPR | 3 | (26) | (18) | 18 | – | – |
| 18 | Muni. Revenue Collection Center – CRIM | (9) | – | (15) | – | 8 | 8 |
| 19 | Highway Transportation Authority – HTA | (19) | 19 | – | – | 19 | – |
| 20 | Public Buildings Authority – PBA / ASP | (7) | (2) | – | – | – | – |
| 21 | Governmental Development Bank – GDB / BGF | – | (2) | – | – | – | – |
| 21 | Medical Services Administration – PRMSA / ASEM | 5 | (7) | – | – | – | – |
| 21 | Agricultural Enterprises Development Admin. – AEDA | (2) | 2 | – | 0 | (0) | (6) |
| 21 | PR Integrated Transport Authority – PRITA / ATI | 1 | (0) | – | – | – | 1 |
| 21 | PR Fiscal Agency and Financial Advisory Authority – AAFAF | (3) | – | – | 1 | – | – |
| 21 | Automobile Accident Compensation Admin. – AACA | (3) | 3 | – | (3) | 3 | – |
| 21 | Compulsory Liability Insurance | 3 | – | – | – | – | – |
| 21 | PRIDCO | – | (6) | – | – | – | – |
| 22 | Subtotal – Government Entity Transfers | $4 | ($12) | ($33) | $16 | $30 | ($56) |
| 23 | Supplier Payments | (3) | (8) | 4 | 4 | 4 | 7 |
| 24 | Other Legislative Appropriations | 3 | (0) | (12) | (4) | 16 | – |
| 25 | Tax Refunds | 15 | (19) | (15) | 4 | 6 | 41 |
| 26 | Nutrition Assistance Program – PAN / EBT | (8) | 0 | – | – | – | – |
| 27 | Other Disbursements | – | 4 | – | – | – | 4 |
| 28 | Contingency | (42) | (42) | (42) | (42) | (42) | (42) |
| 29 | Tax Revenue Anticipation Notes (a) | – | 137 | – | – | – | 135 |
| 30 | Total Outflows | ($57) | $58 | ($98) | ($33) | $18 | ($33) |
| 31 | Net Cash Flows Excluding Debt Service, Fiscal Cliffs and Measures | ($82) | $43 | ($105) | ($36) | $11 | $93 |
| 32 | Bank Cash Position, Beginning (b) | $935 | $853 | $896 | $791 | $755 | $766 |
| 33 | Bank Cash Position, Ending (b) | $853 | $896 | $791 | $755 | $766 | $859 |

Footnotes:
(a) Per forbearance agreement signed the week of 4/28/17, repayment of TRANs has been deferred.
(b) Excludes BPPR Clawback Account (for clawback revenues prior to June 2016) of $146 million.

7

## Accounts Payable Summary

*As of May 26, 2017*

*Figures in $000s*

| | Checks in Vault (a) | Recorded AP (b) | Unrecorded AP (c) | Total AP |
|---|---|---|---|---|
| Department of Education | $3,535 | $26,627 | $115,114 | $145,276 |
| PRIFAS 7.5 | 10,984 | 57,432 | 64,491 | 132,906 |
| Department of Health | 3,000 | 24,353 | 57,056 | 84,409 |
| ASSMCA | – | 763 | 1,465 | 2,228 |
| JCA | – | 1,534 | 4,559 | 6,093 |
| Treasury Department CKS | 3 | 2,236 | – | 2,240 |
| **Total** | **$17,522** | **$112,945** | **$242,686** | **$373,152** |

Footnotes:
*(a) Refers to checks issued but kept in vault.*
*(b) Refers to invoices/vouchers approved for payment by the agencies but checks not released.*
*(c) Refers to invoices not recorded in the system for payment.*

# Exhibit G

# Reorg Research

## Puerto Rico

## AAFAF Says Title III Won't Touch Supplier Payments as Treasury Sends out $70M in Checks This Week

Fiscal Agency and Financial Advisory Authority Executive Director Gerardo Portela said Friday that the Title III filing on behalf of the commonwealth government won't affect its payments to suppliers.

"The government has the commitment and, more importantly, the ability to pay suppliers and providers as usual. All of the government's bills will be processed under the ordinary process," Portela said in an emailed statement.

Unlike in a traditional corporate bankruptcy, under Title III the government is authorized to pay suppliers and providers as contemplated in the commonwealth fiscal plan certified by the PROMESA oversight board in March.

In this manner, Title III allows the government to continue its operations without interruption regardless of whether the obligations were incurred before or after the Title III filing, according to the AAFAF chief.

"The government appreciates its suppliers and providers for their continued commitment to Puerto Rico. We will meet those payments to continue government operations as allowed under PROMESA," Portela said.

In a separate press release, Treasury Secretary Raúl Maldonado announced that $70 million in payments to suppliers went out this week.

"Our commitment is to pay suppliers as established in the fiscal plan," he said, adding that next week the Treasury expects to send out another $70 million next week, or between $14 million and $17 million per day.

The Treasury secretary said $2.5 billion in supplier payments were made through the first 10 months of fiscal 2017 (through April).

"These payments guarantee the services needed to maintain government operations," Maldonado said.

Reorg Research, Inc. makes no representation or warranty, express or implied, as to the completeness or accuracy of this information and assumes no responsibility to update this information. This information is not, and should not be construed as, an offer to sell or the solicitation of an offer to buy any securities. In addition, nothing contained herein is intended to be, nor shall it be construed as an investment advice, nor is it to be relied upon in making any investment or other decision. Reorg Research, Inc. does not act as a broker, dealer or investment adviser. Prior to making any investment decision, you are advised to consult with your broker, investment adviser, or other appropriate tax or financial professional to determine the suitability of any investment. Reorg Research, Inc. shall not be responsible or have any liability for investment decisions based upon, or the results obtained from, the information provided.

© Copyright 2012 - 2017

# Exhibit H

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>          Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**[PROPOSED] ORDER DIRECTING THE UNITED STATES TRUSTEE TO
RECONSTITUTE THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
PURSUANT TO 11 U.S.C. §§ 105(a) AND 1102(a)(4)**

THIS MATTER was brought before the Court upon the *Motion of the Ad Hoc Group of General Obligation Bondholders to Reconstitute the Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. §§ 105(a) and 1102(a)(4)* [ECF __ ] (the "Motion")[2] filed on July 21, 2017 in the above captioned Title III Cases. At a hearing on August 9, 2017, the Court considered and reviewed the Motion and other pleadings and exhibits submitted in support thereof. Any objections to the Motion that have not been withdrawn or resolved have been overruled.

After due deliberation and sufficient cause appearing therefor; due and proper notice of the Motion given to all parties entitled thereto; and the Court having jurisdiction over this matter;

---

[1]   The Debtors in these title III cases (collectively, the "Title III Cases"), along with each Debtor's respective Title III Case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686). (Title III Case numbers are listed as bankruptcy case numbers due to software limitations).

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Motion.

the Court finds that the Constitutional Debtholders are not adequately represented by the Committee as currently constituted.  Accordingly, it is hereby

ORDERED, that the Motion is granted as set forth herein;

ORDERED, that the United States Trustee is directed, pursuant to 11 U.S.C. §§ 105(a) and 1102(a)(4) made applicable in these Title III Cases pursuant to 48 U.S.C. § 2161(a), to change the membership of the Committee and appoint Constitutional Debtholders to the Committee in a manner that is commensurate to the Constitutional Debtholders' position in these Title III Cases and that ensures adequate representation of Constitutional Debtholders on the Committee; and

ORDERED, that this Court shall retain exclusive jurisdiction with respect to the enforcement, interpretation, implementation or modification of this Order.


Dated:  August __, 2017                                      SO ORDERED



                                                             _____
                                                             The Honorable Laura Taylor Swain
                                                             United States District Judge