**Hearing Date**: August 9, 2017 at 9:30 a.m. (prevailing Eastern Time)
**Objection Deadline**: July 28, 2017 at 4:00 p.m. (prevailing Eastern Time)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------------ x
              :

In re:              :

              :

THE FINANCIAL OVERSIGHT AND  :  PROMESA

MANAGEMENT BOARD FOR PUERTO RICO,  :  Title III

              :

      as representative of  :  Case No. 17-BK-3283 (LTS)

              :

THE COMMONWEALTH OF PUERTO RICO *et al.*,  :  (Jointly Administered)

              :

      Debtors.[1]  :

------------------------------------------------------------------------ x

## NOTICE OF HEARING ON MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ORDER, UNDER BANKRUPTCY RULE 2004, AUTHORIZING DISCOVERY PROGRAM WITH RESPECT TO CERTAIN CAUSES OF PUERTO RICO FINANCIAL CRISIS

**PLEASE TAKE NOTICE** that a hearing on the *Motion of Official Committee of Unsecured Creditors for Entry of Order Under Bankruptcy Rule 2004 Authorizing Discovery Program With Respect to Certain Causes of Puerto Rico Financial Crisis* (filed July 21, 2017) (the "Motion"), will be held before the Honorable Laura Taylor Swain, United States District Court Judge, at the United States District Court for the District of Puerto Rico, in Room 3, 150 Carlos Chardón Street, Federal Building, Office 150, San Juan, Puerto Rico 00918-1767 on **August 9, 2017 at 9:30 a.m. (Prevailing Eastern Time)** (the "Hearing").

      **PLEASE TAKE FURTHER NOTICE** that any responses or objections ("Objections") to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure

---

[1]    The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474).

and the Local Bankruptcy Rules for the District of Puerto Rico, shall be filed with the Court (a) by attorneys practicing in the District Court, including attorneys admitted *pro hac vice*, electronically in accordance with rule 5 of the Local Rules for the District of Puerto Rico (the "Local District Court Rules"), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF), to the extent applicable, and shall be served in accordance with the First Amended Case Management Procedures (Docket No. 262-1), so as to be so filed and received no later than **July 28, 2017 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that if an Objection to the Application is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the District Court may enter an order granting the relief sought without a hearing pursuant to the First Amended Case Management Procedures.

Dated:  July 21, 2017
       San Juan, Puerto Rico

*/s/ G. Alexander Bongartz*

PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
James B. Worthington, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com
alexbongartz@paulhastings.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

- and –

2

*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Proposed Replacement Local Counsel to the Official
Committee of Unsecured Creditors*

**Hearing Date**: August 9, 2017 at 9:30 a.m. (prevailing Eastern Time)
**Objection Deadline**: July 28, 2017 at 4:00 p.m. (prevailing Eastern Time)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------------ x

|  |  |
|---|---|
| In re: | : |
|  | : |
| THE FINANCIAL OVERSIGHT AND | : PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | : Title III |
|  | : |
| as representative of | : Case No. 17-BK-3283 (LTS) |
|  | : |
| THE COMMONWEALTH OF PUERTO RICO *et al.*, | : (Jointly Administered) |
|  | : |
| Debtors.[1] | : |

------------------------------------------------------------------------ x

### MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR ORDER, UNDER BANKRUPTCY RULE 2004, AUTHORIZING DISCOVERY PROGRAM WITH RESPECT TO CERTAIN CAUSES OF PUERTO RICO FINANCIAL CRISIS

Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to the above-captioned cases by section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[2] the Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico (and other title III debtor(s) (if any) for which it acts as the official committee of unsecured creditors) (the "Committee") hereby requests authorization to pursue a program of investigation with respect to certain causes of the Puerto Rico Financial crisis, and in particular the role of public and private financial institutions in the structuring, underwriting, repackaging, and selling of the debt obligations that are now burdening Puerto Rico (the "Discovery Program"), beginning with

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474).

[2] PROMESA has been codified at 48 U.S.C. § 2101-2241.

1

targeted document requests (collectively, the "Document Requests"[3]) to Santander Securities LLC ("Santander Securities"), Santander Asset Management LLC ("Santander Asset Management"), Banco Santander Puerto Rico ("Banco Santander Puerto Rico," and, collectively with Santander Asset Management and Santander Securities, the "Santander Entities"), Popular, Inc. ("Popular"), Popular Securities LLC ("Popular Securities"), and Banco Popular de Puerto Rico ("Banco Popular," and, collectively with Popular and Popular Securities, the "Banco Popular Entities") and the Government Development Bank for Puerto Rico (the "GDB") (the GDB, Santander Entities and Banco Popular Entities are referred to herein as the "Puerto Rico Financial Institutions").  Until 2015, the GDB served as the fiscal agent and financial advisor to the Commonwealth of Puerto Rico (the "Commonwealth") and its agencies.  The Discovery Program is not targeted at the current activities of the GDB and/or its successor, AAFAF.

## JURISDICTION AND VENUE

1.      The United States District Court for the District of Puerto Rico (the "Court") has subject matter jurisdiction over this matter pursuant to PROMESA section 306(a).

2.      Venue is proper pursuant to PROMESA section 307(a).

3.      Relief is requested pursuant to Bankruptcy Rule 2004, made applicable to these title III cases by PROMESA section 310.

---

[3]     Copies of the Document Requests are attached to this Motion as Exhibits B to H, as follows:  (1) Ex. B, Request for Documents from the Committee of Unsecured Creditors of the Commonwealth of Puerto Rico to Popular, Inc.; (2) Ex. C, Request for Documents from the Committee of Unsecured Creditors of the Commonwealth of Puerto Rico to Banco Popular de Puerto Rico; (3) Ex. D,  Request for Documents from the Committee of Unsecured Creditors of the Commonwealth of Puerto Rico to Popular Securities LLC; (4) Ex. E, Request for Documents from the Committee of Unsecured Creditors of Puerto Rico to Santander Securities LLC; (5) Ex. F, Request for Documents from the Committee of Unsecured Creditors of Puerto Rico to Banco Santander Puerto Rico; (6) Ex. G, Request for Documents from the Committee of Unsecured Creditors of Puerto Rico to Santander Asset Management; (7) Ex. H, Request for Documents from the Committee of Unsecured Creditors of Puerto Rico to the Government Development Bank for Puerto Rico.

## BACKGROUND

4.      On May 3, 2017, the Financial Oversight and Management Board for Puerto Rico
(the "Oversight Board") commenced a title III case for the Commonwealth of Puerto Rico by
filing a voluntary petition for relief pursuant to PROMESA section 304(a) (the "Commonwealth
Title III Case").  Thereafter, the Oversight Board commenced title III cases (together with the
Commonwealth Title III Case, the "Title III Cases") for each of COFINA, the Employees
Retirement System for the Commonwealth of Puerto Rico, the Puerto Rico Highways and
Transportation Authority, and the Puerto Rico Electric Power Authority (collectively, and
together with any other Commonwealth instrumentalities that file title III cases, the "Debtors").[4]

5.      By order dated June 29, 2017, the Court approved the joint administration of the
title III cases of the Commonwealth, COFINA, the Employees Retirement System for the
Commonwealth of Puerto Rico, and the Puerto Rico Highways and Transportation Authority
(together, the "Jointly Administered Cases") [Docket No. 537].

6.      On June 15, 2017, the Office of the United States Trustee for the District of
Puerto Rico (the "U.S. Trustee") filed a *Notice Appointing Creditors Committee for Unsecured
Creditors* [Docket No. 338].  The members of the Committee are the American Federation of
Teachers, Drivetrain, LLC as the Creditors' Trustee for Doral Financial Corporation, Genesis
Security Services, Inc., Puerto Rico Hospital Supply, Service Employees International Union,
Total Petroleum Puerto Rico Corp., and the Unitech Engineering Group, S.E.

## RELATIONSHIP AMONG SANTANDER ENTITIES, BANCO POPULAR ENTITIES, GDB, AND DEBTORS' FISCAL CRISIS

7.      As this Court is well aware, the Commonwealth and its related entities and
instrumentalities entered into hundreds of bond issuances for tens of billions of dollars which led

---

[4]     Unless otherwise indicated, references to docket numbers shall be to the docket of the Commonwealth Title III
Case.

to the current financial crisis.  These total in excess of $73 billion, including billions of dollars of debt held on the island of Puerto Rico itself.  The various governmental entities issuing this debt did not act alone.  Instead, they were aided by banks, advisors, and other financial entities which facilitated, approved of, and marketed this debt.

8.      It is the Committee's duty to shed light on at least some of the causes of the financial crisis, with a goal of determining whether any valuable causes of action exist and/or whether the facts uncovered could lead to the disallowance or subordination of certain claims. The people of Puerto Rico, and more importantly the unsecured creditors in the Title III Cases, deserve answers about what happened, and they deserve answers from an independent party with the power to shine sunlight into the darkest corners of Puerto Rico's public and private banking institutions.  Whatever the root causes of Puerto Rico's economic difficulties, the borrowing of more and more money to finance deficit spending and the payment of debt obligations with new debt offerings (a practice which has been described as "scooping and tossing") has brought Puerto Rico to the edge of an economic abyss.  Those borrowings, which relied on financing structures which have been questioned, were orchestrated by the GDB (which served as the financial advisor to the Commonwealth with regard to these borrowings and "participated in the selection of the [u]nderwriters"[5] of Commonwealth bonds) and facilitated by banks such as Santander and Popular, which pocketed enormous fees for their multiple roles in the transactions that have placed Puerto Rico under a huge debt load.

9.      Questions abound:  What role did conflicts of interest (involving the GDB, Santander, and Banco Popular) play in these debt transactions?  Were certain transactions structured to evade constitutional debt limits?  What did the GDB and banks such as Santander

---

[5]      Official Statement for $3,500,000,000 in General Obligation Bonds of 2014, Series A, issued by Commonwealth of Puerto Rico, p. 36 (March 11, 2014), available at http://www.gdbpr.com/investors_resources/documents/CommonwealthPRGO2014SeriesA-FinalOS.PDF.

and Popular know regarding the risks associated with these transactions, and when did they know it?  Did banks such as Santander and Popular knowingly or recklessly misrepresent the risks associated with the Puerto Rico bonds they were selling to retail and other investors?  Were bonds foisted through improper means on Puerto Rico institutions such as the "cooperativas"?  Did banks such as Santander and Popular sell Puerto Rico bonds as a means of unloading risk from their own balance sheets?  Puerto Rico's restructuring will never be complete if activities by the island's most important public and private financial institutions are not thoroughly investigated and exposed to the light of day.  **In the famous words of Louis Brandeis, "sunlight is said to be the best of disinfectants."[6]**

### The Growth of Puerto Rico's Debt Burden

10.     Puerto Rico's public debt has nearly tripled since 2000, swelling from $24 billion to $74 billion as successive administrations borrowed money to cover budgeted expenses that the Commonwealth did not have the revenues to pay.[7]  With the onset of the recession in 2006, Puerto Rico's debt grew faster than the economy.

### The Increasing Use of Financing Structures Which Have Been Questioned

11.     As Puerto Rico's debt burden grew, so did the use of financing structures incorporating features which have been questioned, such as capital appreciation bonds and capitalized interest.  Capital appreciation bonds are bonds in which no principal or interest is paid until maturity, resulting in a higher principal-to-interest ratio than traditional bonds, while capitalized interest is interest paid with borrowed funds.

---

[6]     Louis D. Brandeis, OTHER PEOPLE'S MONEY AND HOW THE BANKERS USE IT (1914).

[7]     Nathaniel Flannery, *Will Puerto Rico Find A Way To Survive Its Debt Crisis?*, FORBES (June 1, 2017); Michael Fletcher, *Puerto Rico, With At Least $70 Billion in Debt, Confronts a Rising Economic Misery*, WASH. POST (Nov. 30, 2013).

12.     But the development that may have contributed the most to Puerto Rico's exploding debt burden was the creation in 2006 of a special purpose entity, known by its Spanish acronym as "COFINA," which was purportedly independent of the Commonwealth but yet "attached" to the GDB, officers of which serve as COFINA's officers and directors.  COFINA was authorized by statute to issue bonds backed by a portion of the revenues generated by a newly imposed Commonwealth sales and use tax (the "SUT") and then use the proceeds of the bonds to pay the Commonwealth's "extraconstitutional debt" (bonds for which payment is subject to annual appropriation by the legislature).  Over time, COFINA's enabling statute was amended to authorize the issuance of additional bonds, the proceeds of which could be used to pay general Commonwealth expenses.

13.     Unlike the typical issuer of municipal "revenue bonds" such as a state transportation or power authority, COFINA exists for no other purpose than to pay the Commonwealth's own debts and expenses with the proceeds of bonds secured with the Commonwealth's own tax revenues.  Effectively, in creating the COFINA structure, the Commonwealth may have "securitized" a portion of its general tax revenues using an "off-balance sheet" entity.  The bonds issued by COFINA represent $17.88B (as of February 2017) of Puerto Rico's debt burden.  Constitutional questions have been raised concerning the COFINA structure, including whether the structure was created to evade Puerto Rico's constitutional limits on direct Commonwealth debt and the maturity of issued debt (COFINA debt had, in some cases, maturity dates up to 40 years after issuance while the Puerto Rico constitution only permits 30 years for debt issued by the Commonwealth entities).[8]

---

[8]     Although bond counsel and the Puerto Rico Secretary of Justice issued letters opining that the COFINA structure was legal, the validity and circumstances of those opinion letters remains to be investigated – the Document Requests aim in part to begin this investigation.

### The Relationship Between COFINA and the GDB

14.      Notably, the structuring of COFINA means that it is closely intertwined with the GDB—meaning that potential conflicts of interest which may have infected the GDB have direct relevance to the legitimacy of COFINA-issued debt.  For example, as noted in the 2009 amendments to Act 91 (which created COFINA in 2006), "COFINA shall be attached to the [GDB]," the Board of Directors of COFINA shall be the Board of Directors of the GDB," and "COFINA shall have the same powers, rights and faculties granted to the GDB pursuant to the provisions of its Constitutional Charter[.]"  Similarly, COFINA bond resolutions from 2007, 2009, and 2011 all provide that notice to COFINA shall be sent "c/o" the GDB.  Because the legitimacy of COFINA-issued debt is one of the central issues in the Title III Cases, the Document Requests aim to examine, among other things, potential conflicts of interest of individuals at the GDB with responsibility over COFINA debt issuances.

### The Continued Issuance of General Obligation Bonds

15.      Up until 2014, the Commonwealth also continued to issue general obligation ("GO") bonds backed by a pledge of the Commonwealth's full, faith, credit, and taxing power. Although the authorization to issue the 2014 GO bonds was accompanied by a certification of compliance with Puerto Rico's constitutional debt limits, allegations have been made that the calculation of the debt-service limit should have included principal and interest payable on PBA bonds, and that if amounts payable on the PBA bonds are included in the calculation, the constitutional debt service limit would have been exceeded in 2011 and the 2014 GO bonds, which added $3.5 billion to Puerto Rico's debt burden, would have been illegally issued.[9]  The Discovery Requests call for the production of documents and communication concerning the

---

[9]      *Lex Claims, LLC v. Commonwealth of Puerto Rico*, No. 16-2374 (D.P.R. March 18, 2017) [Docket # 219].

Puerto Rico Financial Institutions' understanding, analysis and calculation of the debt limit, among other subjects.

### Sales of Puerto Rico Bonds to Local Investors

16.     Of course, borrowing money through the issuance of bonds would not have been possible without investors to buy them.  Over the last two years, information has come to light that raises questions regarding the bond sales practices of banks such as Santander and Popular. For example, in 2015, Santander settled with the Financial Industry Regulatory Authority ("FINRA") allegations that it failed to change its internal risk assessment tool to account for the downgrade of Puerto Rico's GO bonds to "one notch above junk" in 2012.[10]  This risk assessment tool was used by Santander's sales representatives in making recommendations to customers based on their risk tolerance.[11]  Santander continued to sell large volumes of these bonds after the downgrade, including approximately $180 million to retail customers directly and another $101 million through closed-end funds.[12]  At the same time that it was selling them to customers, it has been alleged that Santander appeared eager to limit its own market exposure to these bonds through an accelerated unloading of its inventory.[13]  As the FINRA press release announcing the settlement noted:

> Most notably, Santander did not review or assess the tool's [Puerto Rico Municipal Bond] PRMB risk classifications following significant market events such as the December 13, 2012, Moody's downgrade of certain PRMBs to one level above junk. **The day after the Moody's downgrade, Santander stopped purchasing PRMBs that its Puerto Rican**

---

[10]   Mary Williams Walsh, *Santander to Pay $6.4 Million in Puerto Rico Bond Settlement*, N.Y. TIMES (Oct. 13, 2015).  FINRA noted that "Santander's systems and procedures were inadequate because [] they did not require the Firm to review or assess that its proprietary product risk-classification tool took into account the unique and changed risks of investing in [Puerto Rico Municipal Bonds]."  FINRA Letter of Acceptance, Waiver, and Consent Case No. 20141355501, available at http://disciplinaryactions.finra.org/Search/ViewDocument/63590.

[11]   FINRA, Letter of Acceptance Waiver and Consent No. 201404135501, at 3.

[12]   Walsh, *supra*.

[13]   *Id.*

**customers wanted to sell and accelerated its efforts to reduce the firm's inventory of PRMBs.**[14] (emphasis added)

As part of the same settlement agreement with FINRA, Santander also settled allegations that it failed to monitor whether costumers were adequately notified of potential conflicts of interests arising when brokers filled "buy" orders for Puerto Rico bonds from personal portfolios.[15]

17.     Further, in 2014, Banco Popular settled with FINRA allegations that it "failed to establish, maintain, and enforce a supervisory system and procedures reasonably designed to identify and review concentrated securities purchases, including Puerto Rico municipal bonds and Puerto Rico closed-end funds."[16]  As FINRA found with respect to Banco Popular, "During the Relevant Period, customers of Popular purchased concentrated positions of [Puerto Rico] securities.  Between December 2012, when the Puerto Rico general obligation bond rating was downgraded, and June 2013, the Firm's customers continued purchasing concentrated positions of [Puerto Rico] Securities."[17]  With the onset of the Commonwealth's fiscal crisis, it is the residents of Puerto Rico who have borne a portion of the ultimate burden of this risk.

18.     Through the Discovery Requests, the Committee seeks to probe these and other vital questions concerning the marketing of the Commonwealth's Bonds, particularly to the residents of Puerto Rico.

**Transaction Fees**

19.     The sheer magnitude of the fees paid in connection with Puerto Rico's bond deals is alone enough to warrant scrutiny.  In its issuance of bonds since 2006, **Puerto Rico**

---

[14]   FINRA News Release, *FINRA Sanctions Santander Securities LLC $6.4 Million for Supervisory Failures Related to Sales of Puerto Rican Bonds* (October 13, 2015).

[15]   Walsh, *supra.*

[16]   FINRA, Letter of Acceptance Waiver and Consent No. 2013035309401, available at http://disciplinaryactions.finra.org/Search/ViewDocument/38192.

[17]   *Id.*

reportedly **"paid Wall Street securities firms, lawyers, and others $1.4 billion."**[18]  The

securities firms in these deals "were able to charge underwriting fees higher than those assessed

on other financially troubled U.S. states and cities, including Detroit."[19]  In particular, the gross

spread charged to Puerto Rico for debt deals after 2006 was reportedly 31% higher than those

charged to the city of Detroit.[20]  According to one report, Santander participated in the

underwriting of an estimated $61 billion in Puerto Rico bond issues, generating $1.1 billion in

fees for Santander and others.[21]  The Discovery Requests seek information about the origins and

basis for these fees.

### Conflicts of Interest Involving the GDB, Santander, and Banco Popular

20.     At the same time that it was helping the Commonwealth and its related

instrumentalities issue more and more debt, Santander Securities and its related affiliates—

including Banco Santander Puerto Rico and Santander Asset Management—earned substantial

fees by packaging the very same debt into funds and selling it on the open market to customers

on the island of Puerto Rico.   A number of Banco Popular entities similarly played multiple

roles in the issuance and selling of the Commonwealth's bonds.

21.     The possible role of conflicts of interest in fueling Puerto Rico's economic crisis

looms large as a potentially significant issue.  The multiple and potentially conflicting roles of

Santander and Banco Popular in Puerto Rico bond deals require careful examination, particularly

---

[18]   Michael Corkey & Mike Cherney, *Banks Rack Up Big Fees From Puerto Rico Bond Deals*, WALL ST. J. (Oct. 22, 2013).

[19]   *Id.*

[20]   *Id.*

[21]   HEDGE CLIPPERS, *Pirates of the Caribbean: How Santander's Revolving Door with Puerto Rico's Development Bank Exacerbated a Fiscal Catastrophe for the Puerto Rican People*, available at http://hedgeclippers.org/wp-content/*uploads*/2016/12/20161025_HedgeClippers_ReportPR_v3-3.pdf (describing in detail the various ties between GDB executives and financial institutions, including Santander, which profited from underwriting fees associated with the issuance of debt by Commonwealth entities)

in light of weaknesses in these firms' supervisory procedures and controls documented in the

FINRA proceedings described above.  For example, publicly available information indicates

that:

- Santander Securities provided advice for "the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances."[22]

- Santander Securities acted as the underwriter for Commonwealth bonds and as a broker-dealer for those same bonds and funds holding those bonds;

- Banco Santander Puerto Rico played roles as the issuing, paying and transfer agent, and  administrator and custodian for funds holding Commonwealth debt;

- Santander Asset Management provided investment advisory, management, and administrator services to the funds holding Commonwealth debt;

- Popular Securities acted as the underwriter for Commonwealth bonds and as a broker-dealer for those same bonds and funds holding those bonds; and

- Banco Popular de Puerto Rico served as the paying agent and registrar for Commonwealth bonds.

22.     Also, as has been publicly reported,[23] scrutiny of these various roles has been

limited by a specific carve-out for Puerto Rico entities in the Investment Company Act of 1940.

*See* 15 U.S.C. § 80a-6(a)(1) ("The following investment companies are exempt . . . . [a]ny

company organized or otherwise created under the laws of and having its principal office and

place of business in Puerto Rico[.]").  The Committee is entitled to examine whether, by taking

advantage of this exemption, Santander and Banco Popular Entities (and others who will be the

subjects of subsequent discovery requests) harmed the Commonwealth's estate by facilitating the

issuance of an unreasonable amount of debt in return for substantial fees.

---

[22]     *See* Official Statement for $1,796,980,000 in Senior Notes (2011 Series H and Series I) issued by Government Development Bank for Puerto Rico, p. 55 (December 21, 2011), available at http://www.gdb-pur.com/investors_resources/documents/2011-12-21-PRGovDevBank06a-FIN-1.pdf.

[23]     Rebecca Spalding and Michelle Kaske, *Santander Becomes Target of Puerto Rican Anger Over Bond Losses*, BLOOMBERG (May 17, 2017).

23.    Likewise, publicly available information points to at least the following

individuals who were potentially conflicted during their time at the GDB because of their "back

to back" roles at the GDB, Santander, and/or Banco Popular:

- John Doe 1[24], who served as the CEO of Santander Securities and the Commercial Director of Banco Santander Puerto Rico after leaving the GDB in 2011;

- John Doe 2, who was appointed president of the GDB in 2011 after 14 years with various Santander Entities, including roles at Santander Securities, Banco Santander Puerto Rico, and Santander Asset Management;

- John Doe 3, who served as the Executive Vice President and Treasurer of the GDB after a career with Santander Asset Management and Santander Securities;

- John Doe 4, who worked as a Managing Director for Santander Securities before joining the GDB;

- John Doe 5, who joined Popular, Inc. in 2014 as Executive Vice President and General Counsel after serving as the President and Vice-Chairman of the Board of Directors of the GDB;

- John Doe 6, who was appointed to the GDB as board chairman in 2012 after spending over 30 years at Popular Inc., most recently as chief operating officer and president;

- John Doe 7, who was appointed to the board of Popular Inc. in 2010 after serving as a director for the GDB and a member of the GDB's audit and investment committees during 2009; and

- John Doe 8, who left Santander Bancorp (the parent of Banco Santander Puerto Rico and Santander Securities) in 2009 to lead the GDB and then returned to different Santander entities (Santander Holdings USA, Inc. and Santander Bank, N.A.) in 2011.  (John Doe 8 had also previously worked for Popular Securities.)

24.    Although the contours of these potential conflicts will be understood only through

discovery, it is unclear whether the multiple affiliations of these individuals and any resulting

conflicts of interest may have interfered with the GDB's role of examining the validity of Puerto

Rico debt, including the constitutionality of such debt and the ability of the Commonwealth-

---

[24]    The names of the executives involved have not been included herein as the identity of such executives is not pertinent to the relief sought at this time.

related issuers to repay their obligations.[25]  The Document Requests seek to begin the inquiry

into these essential subjects.

25.     Although the specifics of these issues have yet to be developed, the evidence

already developed in the public record demonstrates the need to investigate both the roles of the

Puerto Rico Financial Institutions in causing and profiting from the Commonwealth's current

crisis, and whether conflicts of interest involving the GDB may have facilitated their efforts or

enabled them to evade scrutiny.  The Committee is best placed to conduct this investigation.

### LEGAL STANDARD

26.     Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the

court may order the examination of any entity."  Fed. R. Bankr. P. 2004(a).  Bankruptcy

Rule 2004(b) further provides that the scope of such examination may relate to "the acts,

conduct, or property or to the liabilities and financial condition of the debtor, or to any matter

which may affect the administration of the debtor's estate, or to the debtor's right to a

discharge."  Fed. R. Bankr. P. 2004(b). Such an examination:

> may also relate to the operation of any business and the desirability
> of its continuance, the source of any money or property acquired or
> to be acquired by the debtor for purposes of consummating a plan
> and the consideration given or offered therefor, and any other
> matter relevant to the case or to the formulation of a plan.

*Id*.  In addition, "the attendance of an entity for examination and for the production of documents

... may be compelled as provided in Rule 9016 for the attendance of a witness at a hearing or

trial."  Fed. R. Bankr. P. 2004(c).

27.     The purpose of a Bankruptcy Rule 2004 examination is to assist a party in interest

in determining the nature and extent of the bankruptcy estate, revealing assets, and examining

---

[25]  Hedge Clippers, *Pirates of the Caribbean: How Santander's Revolving Door with Puerto Rico's Development Bank Exacerbated a Fiscal Catastrophe for the Puerto Rican People*, available at http://hedgeclippers.org/wp-content/uploads/2016/12/20161025_HedgeClippers_ReportPR_v3-3.pdf.

transactions.  *See In re Washington Mut.*, *Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009); *see also In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004).  Courts consistently have emphasized that the scope of a Bankruptcy Rule 2004 examination is extremely broad, broader than discovery available under the Federal Rules of Civil Procedure, and *can legitimately be in the nature of a "fishing expedition."*  *See In re Youk-See*, 450 B.R. 312, 319-20 (Bankr. D. Mass. 2011) ("The examination [] is of necessity to a considerable extent a fishing expedition.") (internal citations omitted);  *In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989) (affirming Rule 2004 discovery order; noting that "Rule 2004 is broad in nature."); *In re Pub. Serv. Co. of New Hampshire*, 91 B.R. 198, 199 (Bankr. D.N.H. 1988) ("The scope of discovery afforded under Bankruptcy Rule 2004 is "unfettered and broad."); *In re Washington Mut.*, 408 B.R. at 50 ("The scope of a Rule 2004 examination is unfettered and broad . . . [and] is commonly recognized as more in the nature of a 'fishing expedition.'") (internal citations omitted)); *see also In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("[I]t is well settled that the scope of examination allowed under Rule 2004 is broader than discovery allowed under the Federal Rules of Civil Procedure and may be in the nature of a 'fishing expedition.'").

28.     Where an entity is "closely connected with the bankrupt in business dealings," only a "reasonable surmise" that such an examination would discover assets or unearth misconduct is necessary to initiate an investigation.  *In re Youk-See*, 450 B.R. at 319 ("In general, a large latitude of inquiry should be allowed in the examination of persons closely connected with the bankrupt in business dealings, or otherwise, for the purpose of discovering assets and unearthing frauds, upon any reasonable surmise that they have assets of the debtor.") (internal citations omitted).

29.     Accordingly, the scope of the investigation need not be fully understood or detailed at the time it is commenced.  Indeed, courts routinely reject arguments that the exact improprieties or potential claims being examined must be laid out in advance.  For example, in *In re Sheetz*, 452 B.R. 746, 750 (Bankr. N.D. Ind. 2011), the court rejected an argument that the trustee seeking an examination "failed to provide enough specific examination concerning the discrepancies she wants to investigate[.]"  The court held that this level of detail was unnecessary because "Rule 2004 can properly be a fishing expedition and upon setting out for such an expedition one does not usually limit the fish one sets out to catch."  In fact, "***[i]t is perfectly permissible to troll for whatever might bite***."  *Id.* (emphasis added).  In this case, and at this early stage, it suffices to say that this Discovery Program could lead to both affirmative recoveries by the Commonwealth against third parties and/or the disallowance or subordination of claims asserted against the Commonwealth and its instrumentalities.

## **RELIEF REQUESTED**

30.     By this Motion, the Committee seeks entry of an order pursuant to Bankruptcy Rule 2004 permitting the Committee to initiate a broad program of investigation into the underwriting, packaging, sale, or marketing of debt issued by the Commonwealth of Puerto Rico—beginning with the service of the Document Requests, attached to this motion as Exhibits  B to H.

31.     As courts recognize, there is no need to confine the scope of such an investigation at its early stages.  Instead, the Committee is permitted to "troll for whatever might bite."  *In re Sheetz¸* 452 B.R. at 750.

32.     Here, though, the Committee is not simply requesting that it receive permission to "go fishing" for some undefined target.  Instead, as detailed above, the Committee is aware of

activities and relationships of the Puerto Rico Financial Institutions that it has a fiduciary

responsibility to investigate.

33.    The Committee thus seeks authorization of a broad investigation into a number of

matters pertaining to the issuance of debt by the Commonwealth and its related entities,

including but not limited to:

- The sources and uses of the proceeds of the Commonwealth bonds;

- Whether the Puerto Rico Financial Institutions properly analyzed the creditworthiness of the Commonwealth before engaging in dozens of debt transactions;

- Whether the GDB or related entities properly analyzed the possibility that the Commonwealth would exceed, or had exceeded, the debt limit set forth by Article VI, Sec. 2 of the Commonwealth Constitution;

- Whether the Puerto Rico Financial Institutions properly analyzed the structure and constitutionality of the Puerto Rico Sales Tax Financing Corporation (COFINA) when issuing debt on COFINA's behalf;

- Whether members of the GDB possessed actual or perceived conflicts of interest, preventing them from fulfilling their duties to Commonwealth-related issuers; and

- Whether financial entities, including underwriters such as the various Santander and Banco Popular Entities, stood to gain from the issuance of Commonwealth debt (through the sale of funds holding such debt, for example) such that they potentially violated their duties to the Commonwealth and failed to act in a manner consistent with the risk presented by that debt; and

- Any other potential improprieties and misconduct relating to the structuring, issuance, underwriting and selling of the Commonwealth's debt which may have impacted the value of the Commonwealth's Estate.

34.    The Document Requests, which are attached in Exhibits B to H, are reasonably

tailored to these concerns.  These requests are targeted at seven entities: Santander Securities,

Banco Santander Puerto Rico, Santander Asset Management, Popular, Popular Securities, Banco

Popular, and the GDB.  By no means are these the exclusive focus of the Committee's

investigation, but they are a start—targeted at parties who are all the subject of currently-

available information suggesting potential misconduct.  Moreover, the Document Requests are
targeted specifically at the practices that are at the heart of the Committee's investigation—
seeking documents, procedures, and materials pertaining to these entities' roles in the issuance,
sale, marketing, or other interactions with the bonds issued by the Commonwealth and its related
entities. *See, e.g.*, *In re Youk-See*, 450 B.R. at 323 ("reiterat[ing] its rejection of [the examinee's]
arguments as to the scope of the [trustee's] discovery requests" which were focused on, among
other things, the examinee's internal policies and procedures regarding loan modifications).

35.      As a result, the Committee hereby requests that the Court (1) authorize the
Committee's investigation through the Discovery Program into a variety of matters associated
with the issuance, sale, and creation of Commonwealth Debt; (2) authorize the issuance of the
Document Requests contained in Exhibits B to H, (3) direct the Puerto Rico Financial
Institutions to meet-and-confer in good faith with the Committee regarding the appropriate scope
and timing of document discovery in response to the Document Requests, and (4) refer to
Magistrate Judge Dein any disputes that may arise in the course of the Discovery Program.[26]

36.      Finally, the Committee notes that the requested Proposed Order is quite narrow,
seeking only authority to issue the Discovery Requests and implementation of a framework for
resolving discovery disputes that may subsequently arise in connection with the proposed
Discovery Program.  All objections by the Puerto Rico Financial Institutions with respect to
scope, burden or privilege as to specific document requests would be reserved.

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 2004-1

37.      Pursuant to Local Rule 2004-1 of the Local Rules for the United States
Bankruptcy Court for the District of Puerto Rico, the undersigned counsel hereby certifies that

---

[26]   *See* L.Cv.R. 72(b)(1) (providing that Magistrate Judges may "exercise general jurisdiction of [] other related
pretrial proceedings").

prior to filing this motion, Paul Hastings LLP conferred concerning the Document Requests (i) with counsel for the GDB by telephone on July 12, 2017, and by email on July 17, 2017 (ii) with counsel for the Banco Popular entities by email on July 17, 2017 and July 19, 2017 and (iii) with counsel for the Santander Entities by email on July 18, 2017 and July 19, 2017.

38.    Despite these attempts to confer, no agreements have been reached, and on July 21, 2017, counsel for the GDB wrote to the undersigned counsel, broadly rejecting the GDB Document Requests on a number of grounds.  Notwithstanding, the undersigned counsel anticipates that the parties will continue to confer while this motion is pending, in an effort to narrow or remove any issues requiring adjudication by the Court in advance of the August 9, 2017 Omnibus Hearing.

39.    Under the current Order Amending Case Management Procedures, Section III (I) [Docket #262], the deadline to file an Objection to this motion is July 28, 2017.  The Committee therefore provides the following notice, as called for by Local Rule 2004-1, modified accordingly with respect to the timing to object:

## RULE 2004 NOTICE

Any party who objects to the examination shall serve and file an objection or motion for protective order with the United States Bankruptcy Court for the District of Puerto Rico within **seven** (**7**) days of service of this Motion for a Fed. R. Bankr. P. 2004 Examination. If no objection or motion for protective order is timely filed, the court may grant the motion for examination without further notice or a hearing.

## NOTICE

40.    Notice of this Motion has been provided to the following entities, or their counsel, if known: (i) the Santander Entities, (ii) the Banco Popular Entities, (iii) the GDB, (iv) the U.S. Trustee; (v) the Office of the United State Attorney for the District of Puerto Rico; (vi) the

Oversight Board; (vii) the Puerto Rico Fiscal Agency and Financial Advisory Authority; (viii)

the official committee of retirees; (ix) the insurers of the bonds issued or guaranteed by the

Debtors; (x) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the

Debtors;[27] and (xi) all parties that have filed a notice of appearance in the above-captioned

title III cases.

*[Remainder of page intentionally left blank]*

---

[27]   Which include the Mutual Fund Group, the Ad Hoc Group of General Obligation Bondholders, the COFINA
      Senior Bondholders' Coalition, and the QTCB Noteholder Group, each as such group is defined at Docket Nos.
      28, 68, 216, and 134 in the Commonwealth Title III Case, respectively.

**WHEREFORE**, the Committee respectfully requests that this Court enter an order

substantially in the form attached hereto granting the relief requested herein, and granting the

Committee such other relief as this Court deems just and proper.

Dated:  July 21, 2017
        San Juan, Puerto Rico

/s/ G. Alexander Bongartz

PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
James B. Worthington, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com
alexbongartz@paulhastings.com

*Proposed Counsel to the Official Committee of
Unsecured Creditors*

- and –

/s/ Juan J. Casillas Ayala

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Proposed Replacement Local Counsel to the Official
Committee of Unsecured Creditors*