Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 1 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 1 of 22



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

CENTRO DE PERIODISMO
INVESTIGATIVO

    Plaintiff

v.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR
PUERTO RICO

    Defendant

CIVIL NO. 2017-

COMPLAINT FOR DECLARATORY
RELIEF;  PRELIMINARY AND
PERMANENT INJUNCTION;
MANDAMUS

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

"To permit the government to manage public affairs under the mantle of secretiveness is to invite arbitrary actions, poor administration, governmental indifference, public irresponsibility and corruption.  A citizenry which is alert and militant against these potential evils of all government machinery can perform its fiscalizing function only if it has possession of the information which will permit it to discover the potential dangers in a timely manner and demand responsible action.  To deprive the citizenry of this information is equivalent to producing an aggravated collective paralysis attributable to civil myopia of a citizenry which knows only part of the actions of its government or knows only half-truths related thereto."

> Efrén Rivera Ramos, *La libertad de información: Necesidad de su reglamentación en Puerto Rico,* 44 REV. JUR. UPR 67, 69 (1975) (translation provided)

**TO THE HONORABLE COURT:**

    **NOW    COMES    the    plaintiff    CENTRO    DE    PERIODISMO INVESTIGATIVO,** (*hereinafter "CPI"*) represented by the undersigned attorneys and respectfully states and prays as follows:

1

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 2 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 2 of 22

# I. <u>INTRODUCTION</u>

1.1 This action for declaratory, injunctive and mandamus relief seeks access to information necessary to inform the citizenry of the workings of the government of Puerto Rico and to allow citizens to make informed decisions about their future.

1.2 This **action is** brought before this court pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201 and the All Writs Act, 28 U.C. §1651, well as the specific jurisdictional provisions of the "Puerto Rico Oversight, Management and Economic Stability Act of 2016.

1.3 Plaintiff **Centro de Periodismo Investigativo ("CPI")** is a non-profit organization dedicated to investigative reporting, access to information litigation and journalist's training, as ways to obtain information necessary for the people of Puerto Rico to make informed decisions and better understand the realities of the current climate, wherein determinations are being made behind closed doors, or by people who have not been elected by the people of Puerto Rico.

1.4 Through this action, the **CPI** seeks access to documents which are within the power and possession of the **Financial Oversight and Management Board of Puerto Rico** (hereinafter, *the Junta,* for its Spanish first name), an organism promulgated by the United States Congress, which granted *the Junta* plenary powers in Puerto Rico, including the power to supersede many actions taken by

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 3 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 3 of 22

Puerto Rico officials elected by the citizenry.

    1.5 **CPI** has previously made requests to the **Junta** for the documents sought through this action, but the **Junta** has either ignored the requests or provided inadequate or incomplete documentation through its website.

    1.6 The actions of the **Junta** violate the Constitution of Puerto Rico, which guarantees access to government documents and information.

    1.7 The granting of the relief sought herein will advance the interest of the people of Puerto Rico, who have a right to know the events which will affect their daily lives and the future of Puerto Rico.

    1.8 The plaintiff is seeking solely declaratory, injunctive and mandamus relief, requesting access to information.  No damages are sought herein.

    1.9 Accordingly, the current action bears no relationship to the recent "Petition for Covered Territory or Covered Instrumentality," presented by the Commonwealth of Puerto Rico on May 3, 2017 pursuant to Title III of the "Puerto Rico Oversight Management and Stability Act" or "PROMESA," hereinafter referred to as the "Law Creating the Junta."  *See, Case No. 17-01578, before Judge Laura Taylor Swain, appointed by the Chief Judge of the United States of America.*

## II. JURISDICTION

    2.1 The jurisdiction of this court is invoked pursuant to Law Creating the

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 4 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 4 of 22

Junta, which in its Section 106, 48 U.S.C. §2126, provides in relevant part that "...
any action against the Oversight Board .... shall be brought in a United States
district court for the covered territory..." (i.e Puerto Rico).

2.2 This is an action "against the Oversight Board" (otherwise known as the
"Junta").

2.3  Jurisdiction is also founded on the All Writs Act, 28 U.S.C. §1651(a),
which provides for all courts established by Act of Congress to issue writs
necessary or appropriate in aid of their respective jurisdictions and agreeable to
the usages and principles of law, including the Writ of Mandamus.

2.4 Venue is proper in this court pursuant to the above-cited Section 106.

### III. PARTIES

**The Centro de Periodismo Investigativo**

3.1 The plaintiff **Centro de Periodismo Investigativo ("CPI")** is a non-profit
organization which was founded in 2007.

3.2 It is a news organization which engages in investigative journalism and
has won more than 15 national awards for its work in this field.

3.3 The **CPI** has a website, www.periodismoinvestigativo.com, where
citizens *inter alia* can access its investigative pieces, and which is visited by some
500,000 unique users on an annual basis.

4

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 5 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 5 of 22

3.4 Since its inception, the **CPI** has published articles which are available for free to interested readers and which have been reproduced by more than 25 other news media outlets in Puerto Rico, the United States and beyond.

3.5 In addition to its work as a news medium, the **CPI** has two other important missions: to assure that the citizens of Puerto Rico have access to the information they require to exercise their basic rights as citizens, and to monitor "fiscalizar" those governmental bodies which make decisions affecting the rights and the future of the public.

3.6 These two areas of work are related to litigation to assure proper access to information, and education and training of both professionals in the field of journalism and lay-people as to the right to access to information and the methods for assuring compliance with these rights.

3.7 Among the employees, contractors and Board members of the **CPI** are dedicated journalists and attorneys who engage in work designed to assuring that the citizenry in Puerto Rico has access to the information necessary to the exercise of democratic rights.

3.8 As stated on its website, "the **CPI** recognizes that the fundamental requirement for a true democracy is that the citizenry be well informed ..." The CPI engages in work to avoid the citizens being "ill informed, unaware of

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 6 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 6 of 22

important truths, and limited in their capacity to democratically monitor those who hold power.  Being convinced that these tendencies have to be combated, this is the vision that nourishes the **CPI** and all of its work." (Translation supplied)

3.9 "With this vision in mind, [the **CPI**] was organized as an autonomous non-profit entity, which allows it to act with independence from political and commercial interests."  *(Id., Translation supplied).*

### The Financial Oversight and Management Board for Puerto Rico

3.10 The Financial Oversight and Management Board for Puerto Rico ("the **Junta**") was created by virtue of the provisions of the "Puerto Rico Oversight, Management, and Economic Stability Act," Public Law 114-187, approved by the 114th Congress of the United States on June 30,2016, and signed by then President Barack Obama. *48 U.S.C. §2121(b)(1).*

3.11 The **Junta** was established pursuant to Congress's invocation of its power under Article IV §3 of the Constitution of the United States, commonly known as the Territorial Clause.  This Clause grants plenary power to the Congress of the United States to dispose of and make all "needful Rules and Regulations" for the territory held by the United States.

3.12 According to Public Law 114-187, "the purpose of the Oversight Board is to provide a method for [Puerto Rico] to achieve fiscal responsibility and access

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 7 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 7 of 22

to the capital markets." *48 U.S.C §2121(a).*

3.13 Public Law 114-187 provides that the **Junta** is to be considered "an entity within the territorial government for which it is established..." (i.e. Puerto Rico), *48 U.S.C §2121(c)(1),* and all expenses of the Junta are paid for by the Government of Puerto Rico. *48 U.S.C §2127(b).*

3.14 Congress has provided that the **Junta** "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government." *48 U.S.C §2121(c)(2).*

3.15 The seven members of the **Junta** were all appointed by the President of the United States. Two members of the **Junta** were selected from a list submitted by the Speaker of the House of Representatives, Paul Ryan. Two were selected from a list submitted by the Majority Leader of the Senate, Mitch McConnell. Two others were selected from a list submitted by the Minority Leader of the House of Representatives, Nancy Pelosi, and two were selected from a list submitted by the Minority Leader of the Senate of the United States, Harry Reid. The final member was selected by then President Barack Obama. *See, 48 U.S.C §2121(e)*

3.16 The Governor of Puerto Rico is an *ex officio* member of the Junta, without any voting rights. *48 U.S.C §2121(e)(3).*

3.17 Among other things, the **Junta** has the power to "secure copies,

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 8 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 8 of 22

whether written or electronic, of such records, documents, information, data or metadata from the territorial government (Puerto Rico) necessary to enable the Oversight Board to carry out its responsibilities ... At the request of the Oversight Board [it[ shall be granted direct access to such information systems, records, documents, information or data as will enable [it] to carry out its responsibilities under this Act." *48 U.S.C §2124(c ).*

## IV. FACTS

4.1 For the first several months after Public Law 114-187 was passed, there was a lengthy process of selecting the members of the **Junta**.

4.2. After the **Junta's** members were selected, it held its first meeting in the City of New York on September 30, 2016, where the President of the **Junta** was selected and its By-laws were adopted.

4.3 Although the September 30th meeting was open to the public, the determinations reached therein had been previously agreed to by the **Junta.**

4.4 As part of the first public meeting of the **Junta** on September 30, 2016, the President of the Junta, José Carrión stated during the press conference that the members of the Junta had gone through a "rigorous process" with the United States Department of the Treasury, prior to their selection as members of the Junta, during which they submitted financial disclosure and conflict of interest

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 9 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 9 of 22

documents.

4.5 During that same meeting, the **Junta** requested the Government of Puerto Rico a number of documents, including the following:

a. Weekly cash flow reports, including all revenues received and all expenses paid (including any debt service) and broken down by main categories;

b. Monthly downloads of bank account data and statements of all principal banking accounts (provided directly to the Board of each bank);

c. Monthly and year to date report of compliance with the current approved budget by budgetary fund and by agency (including local special funds and federal funds);

d. Monthly and year to date detailed report on revenues and a narrative about collection efforts and main initiatives of the Puerto Rico Treasury Department;

e. Monthly detailed payroll reports by agency;

f. Monthly reports on federal funds received and disbursed by area and by agency;

g. Monthly reports of all debt obligations due this current fiscal year and which have been paid; and

h. Quarterly report on each agency's productivity and performance with

Case:17-03283-LTS  Doc#:740-1  Filed:07/25/17  Entered:07/25/17 11:39:17  Desc:
Exhibit Exhi. A - Complaint CPI v. Board  No. 17-1743 Exh. B - Soto v. Gimenez  Page 10 of 53
Case 3:17-cv-01743  Document 1  Filed 06/01/17  Page 10 of 22

appropriate metrics and a narrative description.

i. Quarterly report on key Puerto Rico economic, financial, social and labor statistics.

4.6  On October 24, 2017, the **Junta** contracted the services of **Forculus PR** (also known as **Forculus Strategic Communications**), a firm specializing in communications, public relations and media management services, with a Resident Agent in the Beverly Hills sector in Puerto Rico.

4.7 This firm, whose employees and/or contractors include Edward Zayas and José Cedeño, was hired by the Junta to *inter alia* develop and market the "reputation (branding) of the **Junta** and its members." (Parenthesis in the original).

4.8 As set forth in the website for **Forculus PR,** this firm has performed communications, public relations and media management services for the Government of Puerto Rico, including the Government Development Bank of Puerto Rico, and its "Public-Private Partnership Arm, the Puerto Rico Industrial Development Company" (Fomento), as well as "the Office of the Governor of Puerto Rico and the Office of Management and Budget."

4.9 In communications with José Cedeño, the **CPI** was informed that all press requests had to be made through Forculus, PR using official emails jcedeno@forculuspr.com and ezayas@forculuspr.com.

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 11 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 11 of 22

4.10 At all times relevant to this complaint and as to the matters set forth herein, **Forculus PR,** and its agents, including employees and/or contractors Edward Zayas and José Cedeño, acted as agents of the Junta.

4.11 On November 16, 2016, Joel Cintrón Arbasetti, a reporter with the **CPI,** made a request to Edward Zayas, of **Forculus, PR,** to be given to access to any and all of the documents listed in ¶4.5 above, which were supposed to be provided by the Government of Puerto Rico to the Junta.

4.12 Since September 30, 2016, Carla Minet, a veteran journalist who is the Executive Director of the **CPI,** requested the federal Office of Government Ethics (OGE) to provide the **CPI** with all financial disclosure and conflict of interest documents which the seven members of the Junta were supposed to submit during their evaluation process. Ms. Minet also submitted the request to the United States Department of Treasury and to The White House, as suggested by **Junta** President Carrión and the OGE.

4.13 Ms. Minet was informed by the OGE on a follow-up phone conversation that the documents had to be requested from the **Junta**, rather than from the federal agencies.

4.14 On December 12, 2016, Ms. Minet directed an email to Edward Zayas and José Cedeño of **Forculus PR,** in which, on behalf of the **CPI,** she requested all

11

Case:17-03283-LTS Doc#:740-1 Filed:07/25/17 Entered:07/25/17 11:39:17 Desc:
Exhibit Exhi. A - Complaint CPI v. Board No. 17-1743 Exh. B - Soto v. Gimenez Page 12 of 53
Case 3:17-cv-01743 Document 1 Filed 06/01/17 Page 12 of 22

financial disclosure and conflict of interest documents which the seven members of the Junta submitted to the United States Department of Treasury, as stated by Junta President Carrión during the September 30th meeting referenced at ¶¶4.2 – 4.4 above.

4.15 Ms. Minet indicated to Messrs. Zayas and Cedeño that a prompt response was required, since the **CPI** was working on a news article for which the information was required.

4.16 On that same day, Mr. Cedeño responded to Ms. Minet that her request would be "processed" and that a response "would be offered as soon as possible." (Translation provided).

4.17 Subsequent emails with respect to these matters yielded no response from the **Junta**.

4.18 On February 9, 2017, **CPI** Executive Director Carla Minet did additional follow-up with respect to the requests made on November 16, 2016 by **CPI** reporter Joel Cintrón Arbasetti.

4.19 At that time, Ms. Minet also followed up with respect to a separate communication which had been sent on December 12th, 2016, wherein Ms. Minet solicited additional documents and information from the **Junta**, via Edward Zayas, from **Forculus PR**.

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 13 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 13 of 22

4.20  The documents requested in the February 9th communication included the following: (a) records relating to communications, inquiries or requests for information, documents, reports or data by any member of the **Junta** and/or its staff to any agency of the federal government or federal government official, or by the federal government, its agencies or staff, to the **Junta**; (b) communications, reports, consultations, updates, documents or information provided by any member of the **Junta** and/or its staff to La Fortaleza, its officers, or any other agency or official of the Government of Puerto Rico, or by the Government of Puerto Rico to the **Junta**, its members or staff; (c) contracts granted by the **Junta** to private entities (also originally requested on November 11, 2016); (d) protocols, regulations, manuals or memorandums generated by the **Junta** to conduct its work; and (e) minutes of meetings held by the **Junta** and its committees or its members.

4.21  On or about February 28, 2017, the **Junta** published on its website certain financial information forms regarding the individual members of the **Junta**. The documents of the seven board members were dated in February 2017.

4.22  On the following day, March 1, 2017, Ms. Minet, on behalf of the CPI, directed a number of questions to the Junta regarding the documents published on the website.

13

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 14 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 14 of 22

4.23  In her March 1st email to Edward Zayas, of **Forculus PR**, Ms. Minet requested *inter alia* the following information: whether the published documents were the same ones submitted to the U.S. Department of the Treasury, as part of the "rigorous process" referred to by **Junta** President José Carrión in the meeting in New York on September 30, 2016, as set forth in ¶¶4.2 to 4.4 above; to which agency the documents were submitted; why there was missing information on the documents, including but not limited to the signatures of the Ethics official, salary information for some of the Junta member, and financial information concerning spouses of the Board members.

4.24  Ms. Minet indicated to Mr. Zayas that the inquiries were urgent, since the information was needed for a deadline for publication later that day.

4.25  To date, neither **Forculus PR** nor the Junta has provided any substantive response to the inquiries and document requests set forth at ¶¶4.5 and ¶¶4.11-4.21 above.[11]

4.26  To date, the **CPI** has received no response to the inquiries made in Ms.

---

[11] On February 10th, 2017, the CPI received from the Commonwealth of Puerto Rico certain documents, in response to similar requests for information which had been directed to the Commonwealth itself.  The documents are as follows: Letter to Governor and to newly elected Governor, December 20, 2016;  Press Communiqué of the Junta, January 18, 2017; Letter from the Junta to Governor Rosselló, January 18, 2017; Press Communiqué, January 20, 2017; Letter from Governor Rosselló a the Junta, January 21, 2017; Letter from Governor Rosselló to the Junta, January 23, 2017;  Liquidity Plan, January 28, 2017; Puerto Rico fiscal update, January 28, 2017;  Debt service payments, February 1, 2017; Letter from the Junta to Elías Sánchez, February 7, 2017.  With the exception of the document related to debt service payments, all of these documents can be found on the website of the Junta.

Case:17-03283-LTS    Doc#:740-1    Filed:07/25/17    Entered:07/25/17 11:39:17    Desc:
Exhibit Exhi. A - Complaint CPI v. Board    No. 17-1743 Exh. B - Soto v. Gimenez    Page 15 of 53
Case 3:17-cv-01743    Document 1    Filed 06/01/17    Page 15 of 22

Minet's email of March 1, 2017.

## V. CAUSE OF ACTION

5.1  In declarations made when he announced the appointment of the seven members to the **Junta**, then President Barack Obama stated that "[i]n order to be successful, the Financial Oversight and Management Board will need to establish an open process for working with the people and Government of Puerto Rico... [in order to build] a better future for all Puerto Ricans."

**5.2** Since the Junta is not considered a federal organism, but rather is "an entity within the territorial government for which it is established..." (i.e. Puerto Rico),*48 U.S.C §2121(c)(1)*, and all expenses of the Junta are paid for by the Government of Puerto Rico, *48 U.S.C §2127(b)*, the Constitution and laws of the Commonwealth of Puerto Rico apply to its operations.

5.3 Pursuant to Section 4 of the "Puerto Rico Oversight, Management, and Economic Stability Act," *48 U.S.C §2103*, Puerto Rico law applies with respect to the operation of the Junta, as long as it is not "inconsistent with [the] Act."

5.4 There is nothing inconsistent between the right of access to information and the Act establishing the Junta.

5.5  In point of fact, providing access to the requested documents would further the purpose of the Financial Oversight and Management Board, as publicly

15

stated by the then President of the United States, Barack Obama, set forth in ¶5.1 above.

5.6 Under the Constitution of Puerto Rico, there exists an undisputed right of the people to access information produced or in the power of the Government of Puerto Rico.

5.7 This right derives from the Constitution of Puerto Rico and is considered a fundamental human right. *See, for example,* Trans Ad PR v. Junta Subastas, 174 DPR 56, 67 (2008); Colón Cabrera v. Caribbean Petroleum, 170 DPR 582, 590 (2007); Ortiz v. Dir. Adm. Tribunales, 152 DPR 161, 175 (2000).

5.8 The Supreme Court of Puerto Rico has observed that this right is a critical component of the rights of free speech, free press and freedom of association set forth explicitly in the Bill of Rights, Article II of the Constitution of the Commonwealth of Puerto Rico. *See, eg.,* Soto v. Srio. Justicia, 12 P.R. Offic. Trans. 597, 607-608 (1982).

5.9 As expressed by the Puerto Rico Supreme Court, access to information constitutes an important component of a democratic society, in which the citizen can issue an informed judgment regarding the actions of the government. Colón Cabrera, 170 DPR at 590. The right to redress grievances is also implicated, in that without knowledge of the facts, one cannot judge, nor demand remedies with

16

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 17 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 17 of 22

respect to grievances against the government either through judicial or electoral processes.

5.10  Given the importance of this right under the Constitution of Puerto Rico, the Government cannot deny access to documents capriciously.

5.11 The **Junta**, as an organism "within" the government of Puerto Rico, has a ministerial duty to comply with the Constitution of Puerto Rico with respect to the public nature of the information and documents sought herein.

5.12 The critical role of the press in guaranteeing access to information has also been recognized in the Constitutional law of Puerto Rico. "[T]he press constitutes a vehicle of information and opinion to inform and educate the public, to offer criticism, to provide a forum for discussion and debate, and to act as a surrogate to obtain for readers news and information that individual citizens could not or would not gather on their own." <u>Santiago v. Bobb y El Mundo</u>, 17 P.R. Offic. Trans. 182, 190 (1986) (*citing* B. F. Chamberlain & J. Brown, *The First Amendment Reconsidered* 110, New York, Longman (1982)).

5.13 The right of access to information is also codified in Article 409 of the Código de Enjuiciamiento Civil, 32 LPRA § 1781 (2015), which provides for access to "public documents" in Puerto Rico.

5.14  To date, the Junta has held seven (7) public meetings on the following

17

Case:17-03283-LTS  Doc#:740-1  Filed:07/25/17  Entered:07/25/17 11:39:17  Desc:
Exhibit Exhi. A - Complaint CPI v. Board  No. 17-1743 Exh. B - Soto v. Gimenez  Page 18 of 53
Case 3:17-cv-01743  Document 1  Filed 06/01/17  Page 18 of 22

dates: October 14, 2016 (New York); November 18, 2016 (Fajardo, Puerto Rico); January 28, 2017 (Fajardo, Puerto Rico); March 13, 2017 (New York); March 31, 2017 (San Juan, Puerto Rico); and April 28, 2017 (New York).

5.15  Other than the brief public sessions, largely to reaffirm decisions already made, and the placement of some selected documents on its website, the **Junta** has not provided the citizenry of Puerto Rico with substantive access to the proceedings of the **Junta**, which take place behind closed doors.

5.16  The **Centro de Periodismo Investigativo** has attempted to obtain documents which are critical for providing the citizens of Puerto Rico with the access to information guaranteed under the Constitution and Laws of Puerto Rico and to allow the CPI, as an important and respected news organization, to provide information to the citizens regarding the operations of the **Junta**.

5.17  These efforts by the **CPI** have been met with stonewalling on the part of the **Junta** and its designated marketing and branding group. **Forculus PR.**

5.18  Access to the information requested by the CPI is essential to assure an informed citizenry and the validation of the rights existing under the Constitution and laws of Puerto Rico.

5.19  The aforementioned rights apply to the **Junta**, as they are not inconsistent with Law 114-187.

18

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 19 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 19 of 22

5.20 Since Congress designated the Junta not only to be paid for by the people of Puerto Rico, but also to be an entity "within" the government of Puerto Rico, the Constitution and laws of the Commonwealth of Puerto Rico apply to the Junta.

5.21   There is no adequate remedy at law to address the fundamental constitutional harms for which redress is sought herein.

5.22 The citizens of Puerto Rico and the population served by the investigative and reporting work done by the CPI will be irreparably harmed if the relief requested herein is not granted.

5.23   The public interest will be served by the granting of the relief requested herein, be it in the form of injunctive relief or through the issuance of a writ of Mandamus.

5.24   Mandamus is an appropriate writ to assure that **Junta** exercises its ministerial duty to assure compliance with the Constitution and laws of Puerto Rico.

WHEREFORE, the plaintiff **Centro de Periodismo Investigativo** hereby requests the following relief:

1. A Declaratory Judgment that the actions of the Junta in effectively denying access to the documents and information set forth in ¶¶4.4 to 4.26 above.

19

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 20 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 20 of 22

2. Issue a preliminary injunction and a permanent injunction ordering the **Junta** to deliver to the **Centro de Periodismo Investigativo** the following documents:

a. Weekly cash flow reports, including all revenues received and all expenses paid (including any debt service) and broken down by main categories;

b. Monthly downloads of bank account data and statements of all principal banking accounts (provided directly to the Board of each bank);

c. Monthly and year to date report of compliance with the current approved budget by budgetary fund and by agency (including local special funds and federal funds);

d. Monthly and year to date detailed report on revenues and a narrative about collection efforts and main initiatives of the Puerto Rico Treasury Department;

e. Monthly detailed payroll reports by agency;

f. Monthly reports on federal funds received and disbursed by area and by agency;

g. Monthly reports of all debt obligations due this current fiscal year and which have been paid; and

h. Quarterly report on each agency's productivity and performance with

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh, B - Soto v. Gimenez   Page 21 of 53
Case 3:17-cv-01743   Document 1   Filed 06/01/17   Page 21 of 22

appropriate metrics and a narrative description.

     i. Quarterly report on key Puerto Rico economic, financial, social and labor statistics.

     j. All financial statements and other financial and conflict of interest submissions made by the members of the Junta prior to their designations or subsequent thereto.

     k. Records relating to communications, inquiries or requests for information, documents, reports or data by any member of the **Junta** and/or its staff to any agency of the federal government or federal government official, or by the federal government, its agencies or staff, to the **Junta**;

     l. Communications, reports, consultations, updates, documents or information provided by any member of the Board and/or its staff to La Fortaleza, its officers, or any other agency or official of the Government of Puerto Rico, or by the Government of Puerto Rico to the **Junta**, its members or staff;

     m. Contracts granted by the **Junta** to private entities;

     n. Protocols, regulations, manuals or memorandums generated by the **Junta** to conduct its work;

     o. Minutes of meetings held by the **Junta**, its committees or its members;

     p. Complete financial disclosure forms for all **Junta** members.

Case:17-03283-LTS Doc#:740-1 Filed:07/25/17 Entered:07/25/17 11:39:17 Desc:
Exhibit Exhi. A - Complaint CPI v. Board No. 17-1743 Exh. B - Soto v. Gimenez Page 22 of 53
Case 3:17-cv-01743 Document 1 Filed 06/01/17 Page 22 of 22

3. Issue a Writ of Mandamus requiring the **Junta** to comply with its ministerial duty to provide the information and documents set forth in the previous paragraph.

4. Issue whatever other relief this court deems just and appropriate.

In San Juan Puerto Rico, this 1st day of June, 2017.

**Respectfully Submitted**

*Berkan/Mendez*
*Calle O'Neill G-11*
*San Juan, Puerto Rico 00918-2301*
*Tel.: (787) 764-0814*
*Fax.: (787)250-0986*
*bermen@prtc.net*

By: /s/ *Judith Berkan*
Judith Berkan
US DC No. 200803
*berkanj@microjuris.com*

/s/ *Steven Lausell Recurt*
Steven Lausell Recurt
USDC No. 226402
*slausell@gmail.com*
(787) 751-1912

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)
12 P.R. Offic. Trans. 597

Texto original en espanol

KeyCite Yellow Flag - Negative Treatment
Distinguished by Lopez Vives v. Policia de P.R., P.R., January 22, 1987

112 D.P.R. 477, 1982 WL 210634
(P.R.), 12 P.R. Offic. Trans. 597

Pedro Juan SOTO et al., Plaintiffs and Appellants,

v.

Miguel Giménez Muñoz, SECRETARY OF
JUSTICE et al., Defendants and Appellees.

Supreme Court of Puerto Rico.
No. 0-79-215.
Decided March 31, 1982.

1. CONSTITUTIONAL LAW -- PERSONAL, CIVIL
AND POLITICAL RIGHTS -- FREEDOM OF
SPEECH AND OF THE PRESS -- IN GENERAL.
The First Amendment to the Constitution of the
United States protects the right of any person to freely
communicate his ideas without the State's restriction of
the form and contents of said communication except
in those socially urgent situations tolerated by the very
Constitution.

2. ID. -- ID. -- RIGHT OF ACCESS TO
INFORMATION ON PUBLIC UNDERTAKINGS.
The State, as keeper of the functions stemming from the
sovereignty of the people, cannot whimsically and without
apparent justification deny access to information gathered
through its public undertakings.

3. ID. -- ID. -- ID.
The State is not free to decide which papers and
documents resulting from its public function are not
subject to the scrutiny of those who are, essentially, the
very source of sovereignty. The Government may only
invoke the secrecy cloak for its own actions in cases of an
overriding public interest.

4. ID. -- ID. -- ID.
Just as it happens with other rights, the right of access to
gather information cannot be absolute.

5. ID. -- ID. -- ID.

Although it is true that the State may limit the citizen's
rights of access to Government investigatory records, it
is also true that it cannot absolutely bar such access by
merely invoking that they are police records.

*598 6. ID. -- ID. -- ID.
The Legislature of Puerto Rico may pass legislation to
withhold from public scrutiny certain documents and
reports linked to the investigatory or preventive phase
of crime, and that because of their very nature they
unnecessarily endanger the results of an investigation in
process, the life of the informers and witnesses, as well as
that of the very government officers and employees, or
that in any way truly affect public safety.

7. STATUTES, CUSTOMS AND EQUITY
-- CONSTRUCTION AND OPERATION --
PARTICULAR CLASSES OF STATUTES --
LIBERAL OR STRICT CONSTRUCTION AS
AFFECTED BY NATURE OF ACT -- PROHIBITORY
PROVISIONS.
All legislation tending to hide information from a citizen
under a confidentiality cloak, as the exception it really is,
should be strictly construed in favor of the people's right
to be informed.

8. CONSTITUTIONAL LAW -- PERSONAL, CIVIL
AND POLITICAL RIGHTS -- RIGHT OF ACCESS TO
INFORMATION ON PUBLIC UNDERTAKINGS.
All legislation tending to hide information from a citizen
under a confidentiality cloak must be fully justified,
and must contain clear and precise rules allowing for
an adequate identification of the material and the
circumstances where the accessibility rule will be applied.

9. ID. -- ID. -- FREEDOM OF SPEECH AND OF THE
PRESS -- IN GENERAL.
No legislation devoid of the adequate standards for
determining the type of document or information
that shall be subject to public scrutiny, and that,
contrariwise, establishes an absolute confidentiality rule,
may overcome the stringency of the constitutional clause
which guarantees the freedom of speech.

10. ID. -- ID. -- ID.
The balance that should exist between the citizen's right
of access to public documents and the Government's

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)
12 P.R. Offic. Trans. 597

interest in protecting investigatory and police records is adequately satisfied if the government regulation (*a*) falls within the Government's constitutional power; (*b*) it furthers an overriding or compelling government interest; (*c*) the government interest is not related with the suppression of the freedom of speech; and **\*599** (*d*) the incidental effect of the limitation of the freedom of speech is not greater than what is essential to further such interest.

11. ID. -- ID. -- ID.

The State is empowered to restrict the people's access to documents, papers or reports generated in the course of investigations on the corruption of public officers and employees, on organized crime, and on terrorism.

12. STATUTES, CUSTOMS AND EQUITY -- CONSTRUCTION AND OPERATION -- PARTICULAR CLASSES OF STATUTES -- LIBERAL OR STRICT CONSTRUCTION AS AFFECTED BY NATURE OF ACT -- PROHIBITORY PROVISIONS.

An examination of the constitutionality of a law that affects the freedom of speech and the free interchange of ideas requires a strict judicial scrutiny analysis.

13. ID. -- ID. -- ID. -- ID. -- ID.

When, as in the case at bar, the law that decrees the absolute confidentiality of certain government documents bears no standards to govern the exercise of the discretion recognized by the law itself for the disclosure of some of the documents comprised thereunder, such statutory scheme permits and encourages an arbitrary and discriminatory enforcement of the same.

14. ADMINISTRATIVE LAW -- POWERS AND PROCEEDINGS OF ADMINISTRATIVE AGENCIES, OFFICERS AND AGENTS -- IN GENERAL -- DUE PROCESS -- ADMINISTRATIVE PROCEEDINGS.

The exercise of administrative powers, based on case by case considerations and not on a statute or regulation which affects the freedom of speech, is flawed by the constitutional defect of vagueness.

15. ID. -- ID. -- RULES AND REGULATIONS -- PURPOSE.

An administrative agency cannot make individual determinations without first passing rules which give meaning to any vagueness in the statute it applies or regulates.

16. CONSTITUTIONAL LAW -- CONSTRUCTION, OPERATION, AND ENFORCEMENT OF CONSTITUTIONAL PROVISIONS -- CONSTITUTIONALITY OF STATUTES -- IN GENERAL.

Article 13 of Act No. 38 of July 13, 1978--which imposes a thirty-year gag over **\*600** documents resulting from any investigation carried out by the Special Investigations Bureau of the Department of Justice--is unconstitutional from its face.

JUDGMENT of *Carmen Sonia Zayas,* Judge (San Juan), denying a petition for injunction and dismissing a petition to examine some documents. *The judgment appealed is reversed, and the issuance of the injunction is ordered, subject to the trial court's in camera determination of which documents shall be made available to plaintiffs-appellants according to the tests established in the opinion.*

*Héctor A. Colón Cruz, Solicitor General,* and *Federico Cedó Alzamora, Assistant Solicitor General,* for defendants-appellees. *Pedro J. Varela* and *Antonio Fernós López-Cepero* for plaintiffs-appellants.

**\*601 Appeal from the Superior Court, San Juan Part**

**Injunction, Declaratory Judgment, and Damages**

MR. JUSTICE NEGRON GARCIA delivered the opinion of the Court.

The excessive and broad vagueness of the statute on which the Government has based its position, and the absence of reasonable parameters and guidelines prevents us from applying the respectable traditional rule by which the Judicial Power explores other avenues to avoid an unconstitutionality decree. The right to freedom of speech and free access to information would be unnecessarily sacrificed if we adopted such course of action.

Once we have set this clear, let us examine the judgment of the Superior Court, San Juan Part, which, based on art. 13

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)
12 P.R. Offic. Trans. 597

of Act No. 38 of July 13, 1978 (3 L.P.R.A. § 138 *I*), upheld the constitutionality of the *confidential* classification of the investigation carried out by the Special Investigations Bureau of the Department of Justice with regard to the events that took place on July 25, 1978, at Cerro Maravilla, Toro Negro State Forest, in the jurisdictions of Jayuya and Ponce. This task **\*602** requires us to briefly examine the basic background of said facts, as they were partially distilled by the Judicial Power. [1]

# I

## FACTUAL AND PROCEDURAL BACKGROUND

Early in the morning of July 25, 1978, Alejandro González Malavé, an undercover agent working for the Puerto Rico Police with seven (7) years experience, informed his supervisors--officers Cruz and Quiles-- that some members of the Movimiento Revolucionario Armado (Armed Revolutionary Movement) where he had infiltrated himself, were planning to assault a vehicle, take its driver as hostage, threaten him, and force him to take them to the installation site of the communication towers at Cerro Maravilla. Said agent did not suggest, nor did his supervisors instruct him, to have these persons, whom he had seen the day before bearing weapons in violation of art. 8 of the Weapons Law, arrested.

This was the situation when, on that same date, around noon, while public carrier Julio Ortiz Molina was driving his motor vehicle along the Ponce to Juana Díaz road, he stopped near the Ponce District Hospital to take in three young men. They threatened him with firearms and took his vehicle by force. Two of the youngsters **\*603** were pro-independence advocates Carlos Enrique Soto Arriví and Arnaldo Darío Rosado Torres. The other one was undercover agent Alejandro González Malavé, performing the duties of his position. González Malavé sat at the wheel and, while the other two aimed their guns at Ortiz, he drove towards the communication towers at Cerro Maravilla. Once there, they parked their vehicle next to a chain-link fence and ordered Ortiz to remain inside. Immediately, guns in hand, they went to the back of the car. While Ortiz "was looking up front, he saw that several persons dressed alike were coming out from the shrubbery surrounding the place, with rifles in their hands. These persons walked towards the place where the youngsters were. Apparently, the latter had not become aware of the presence of said persons. When he saw that the persons coming out of the shrubs, who were later qualified as 'agents,' were raising their weapons as if for shooting, the plaintiff [Ortiz] ducked out of sight in the front of the car."

At that moment, a shoot-out broke out behind the vehicle, but Ortiz cannot say exactly who fired the first shot. The vehicle received eight bullet shots.

That day González Malavé had a pistol with him, which he conveniently used, as well as an official revolver that he did not shoot. When the shoot-out ceased "two persons-- whom the plaintiff calls agents--opened both front doors of his vehicle. The one who opened the right door told the plaintiff [Ortiz]: 'Get out or I'll blow your brains out,' and he answered: 'I'm just a victim.' The other person opened the driver's door and pulled the **\*604** plaintiff by the shirt's shoulder. One of the 'agents' tried to hit plaintiff's head with the butt of his rifle, plaintiff instinctively covered himself with his left hand receiving the blow on the ring finger of that hand. Then, they kicked him once, and ordered him to throw himself to the ground next to the two youngsters who had taken his vehicle by force and who laid wounded on the ground near his automobile. The plaintiff observed that the young men were wounded and bleeding; this notwithstanding, they yelled at the 'agents' 'that this man' (the plaintiff) was an 'innocent victim.' Right after this, 'the agents' placed the plaintiff inside a car and took him to another tower in that same area, about four minutes away, by car, from the first tower. While the plaintiff was there, officers and members of the Puerto Rico Police force came in and out and questioned him. He was detained in the second tower, under the custody of a uniformed policeman surnamed Quiñones. Fifteen or twenty minutes later, the plaintiff heard a second volley of shots coming from the first tower, which elicited the following comment from policeman Quiñones: 'It seems that the Western is still going on down there.'"

Later that afternoon, Ortiz was taken, under custody, to the Ponce Police Station where he was questioned by prosecuting attorney Hernán Nigaglioni while a Police Lieutenant surnamed Ortiz typed his statement. After this, plaintiff Ortiz partially denied the contents of said statement. This moved some prosecution officers to warn

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)
12 P.R. Offic. Trans. 597

him that he could be accused of perjury. As a **\*605** consequence of this skirmish, the young men Soto Arriví and Rosado Torres lost their lives, and agent González Malavé was wounded.

The Cerro Maravilla incident was widely publicized throughout the news media of the country. Several public opinion sectors made serious accusations as to the way the authorities had handled the situation, referring in particular to the previous knowledge some Executive Power officers could have had of the facts and whether the killing of the two young men could have been avoided.

With the purpose of clarifying the facts, disclosing information, and making recommendations as to the conduct of the police force and of other agencies, the *Comité Soto-Rosado Contra la Represión* (*Soto-Rosado Committee Against Repression*) was founded by a group of leaders and religious, labor, and intellectual figures of the country, and by Pedro Juan Soto and Angeles Rivera Castillo, father and widow, respectively, of each of the dead youngsters.

Meanwhile, and through an order of the Secretary of Justice, the Special Investigations Bureau and the Investigations and Criminal Prosecution Division of the Department of Justice carried out an investigation--where information and documents were gathered that remained under the exclusive control of the Secretary of Justice-- which served as basis for a report made public *on August 29, 1978,* and which *exonerated the policemen who took part in the events at Cerro Maravilla, and which concluded that no criminal charge would be pressed against any person.*

**\*606** The following month, Pedro Juan Soto, father of Carlos E. Soto Arriví, requested permission from the Special Investigations Bureau to examine the documents they had in their files, related to the events. His petition was denied because, pursuant to the aforementioned art. 13 of Act No. 38, said information was confidential.

Standing under the protection of the Civil Rights Act of Puerto Rico--Act No. 12 of August 8, 1974 (32 L.P.R.A. § 3524)--Pedro Juan Soto, Angeles Rivera Castillo, and the other members of the *Comité Soto-Rosado Contra la Represión,* filed an action for Declaratory Judgment, Damages, and Injunction against the Secretary of Justice, the Commonwealth of Puerto Rico, and others, praying

the court to order the examination of the documents, adducing that a refusal to that effect injured "the plaintiffs' constitutional and statutory rights, and was contrary to the public interest in general because it did not allow that the facts and circumstances dealing with this matter, which were of vital importance to the country, be fully known and divulged." The defendants agreed to give them a copy of the *Cerro Maravilla Report,* prepared on August 29, 1978.

In due time, the Superior Court, San Juan Part, rendered judgment ordering the Secretary of Justice--after payment of the corresponding fees--to deliver a copy of the autopsy protocols of the two young men, and any photograph taken during the autopsy process, although it denied access to other reports, recordings, and documents. [2]

**\*607** On appeal, the plaintiffs contend that the Superior Court erred in: (1) refusing to give them copies of the documents and recordings, thus violating their freedom of speech; (2) in holding that the loss of said right does not constitute an irreparable damage; (3) in giving access to some documents, and not to others, having no "reasonable grounds therefor"; (4) in strictly construing the citizen's right to inspect and to copy public documents in this case under art. 47 of the Law of Evidence, 32 L.P.R.A. § 1781; (5) in deeming that a previous unconstitutionality decree was necessary to issue the injunction requested; and (6) in upholding the constitutionality of art. 13 of Act No. 38 of July 1978.

## II

### *THE CONSTITUTIONAL SPHERE*

#### A. *The importance of the right*

For the sake of methodology, we will first of all examine the nature of the right involved.

The truly democratic ideal on which our Constitution is based conceives freedom of speech, freedom of the press, the right peaceably to assemble, and to petition the government for redress of grievances "within the most ample" [3] view. That is why the Bill of Rights expressly **\*608** provides that "[n]o law shall be made abridging" such freedoms. Art. II, Sec. 4. Hence, it is logical to conclude that there is a close relationship between the freedom of speech and the freedom of information. The

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)

12 P.R. Offic. Trans. 597

premise is simple. It is impossible to pass judgment on something without knowledge of the facts; neither may redress from government damages be claimed through judicial proceedings or at the polls every four (4) years.

In Puerto Rico we had already intimated the preponderance of the right to know in *Dávila v. Gen'l Supervisor of Elections*, 82 P.R.R. 257, 272 (1960). In construing the statutory right of every citizen to inspect and to copy any public document--under the Law of Evidence--we stated in that case that "It is not enough merely to recognize the important political justification for freedom of information. *Citizens of a self-governing society must possess the legal right to examine and investigate the conduct of its affairs, subject only to those limitations imposed by the most urgent public necessity. This right must be elevated to a position of highest sanctity if it is to constitute an effective bulwark against unresponsive leadership.*" (Underscore supplied.)

Twenty years later, the very passage of time has shown the need to recognize the constitutional dimension of the press' and general public's right of access to information. If it were to survive, our democracy must nurture itself in this vital area of liberal currents. [4] **\*609** If a strict construction prevails, it would be difficult to enforce and make sure that "the will of the people is the source of public power, the political order is subordinate to the rights of man, and the free participation of the citizen in collective decisions is assured."

**B. *North American Case Law Development***
Bearing in mind its instructive value, let us briefly examine the development of the North American case law.

The question of whether or not the public has a First Amendment constitutional right of access to government information has not been expressly settled by the United States Supreme Court. In general terms, authors and commentators **\*610** tend to suggest that said right should be recognized as part of the freedom of speech system based on the said First Amendment. Emerson, *Legal Foundations of the Right to Know*, 1976 Wash. U. L. Q. 1, 14; Comment, *The Public's Right of Access to Government Information Under the First Amendment*, 51 Chi.-Kent L. Rev. 164 (1974); Comment, *Access to Official Information: A Neglected Constitutional Right*, 27 Ind. L. J. 209 (1952);

Cross, *The People's Right to Know,* Columbia University Press, New York, 1953.

Neither have the different states of the Union recognized the general constitutional lineage of this right, even though, nowadays, nobody can deny the existence of a common law right of access to public documents under the Government's control. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597-98 (1978). [5]

**\*611** This notwithstanding, the federal jurisdiction has a penchant for favoring the gradual recognition of said right in the following situations: (a) it has consistently decreed that laws abridging the citizen's right to receive religious literature are unconstitutional, *Martin v. City of Struthers,* 319 U.S. 141 (1943); (b) receipt of foreign communist propaganda, *Lamont v. Postmaster General,* 381 U.S. 301 (1965); and (c) receipt of pornographic material, *Stanley v. Georgia,* 394 U.S. 557 (1969). This last case considered as a well-rooted principle the fact that the Constitution *also* protects the right to receive information and ideas. See also *Kleindienst v. Mandel,* 408 U.S. 753, 762-63 (1972). [6]

[1] Other cases have established that the nature of the right arising from the freedom of speech system presupposes a *bilateral relation deserving integral protection.* The First Amendment protects the right of any person to freely communicate his ideas without the State's restriction of the form and contents of said communication, except, of course, in those socially urgent situations tolerated by the very Constitution. *But protection does not end there, it covers the very communication and the passive subject's right to receive it. Va. Pharmacy Bd. v. Va. Consumer Council,* 425 U.S. 748 (1976).

**\*612** In *Procunier v. Martinez,* 416 U.S. 396 (1974)-- where the prison authorities' censorship of inmates' mail was questioned--the Court did not have to pass on the prisoners' First Amendment right, because such censorship infringed the constitutional rights of noninmates. The court made similar pronouncements in other cases. *Vide, e.g., Red Lion Broadcasting Corp. v. F.C.C.,* 395 U.S. 367, 390 (1969); *Griswold v. Connecticut,* 381 U.S. 479, 482 (1965).

The cases examined above show the dynamics present in the scope of this right. The passive subject's right to receive

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)

12 P.R. Offic. Trans. 597

the communication has been protected, which necessarily presupposes the existence of a willing speaker available to offer the communication. *Va. Pharmacy Bd., supra* at 757. It is in these circumstances that case law has left its mark as to the recognition of the passive subject's *right of access.* Now then, accessibility to government information may raise a different issue in those situations where a public officer does not want to disclose official data or is enjoined therefrom by law. In those circumstances we may not find an available willing speaker, because there is none. Hence, the structural binomial presupposed by the so-called right of access is destroyed.

[2–3] The aforementioned unavailability may be overcome. In the case at bar, we are dealing with a speaker that represents the social structure proper: the State. We would be oversimplifying the matter if we attributed to the Government conditions or animic and volitive states of mind characteristic of private individuals and other *\*613 private entities. *The Government, as keeper of the functions stemming from the sovereignty of the people, cannot whimsically and without apparent justification deny access to information gathered through its public undertakings.* Hence, though the bilateral scheme of the constitutional right of access to available information and ideas cannot be strictly applied to a social subject--which at times may be unwilling to open the communication required by the passive subject--the scheme works and may be used if we conclude that when the State received the governmental function from the sovereign People, it was not free to decide which papers and documents resulting from its public function would not be subject to the scrutiny of those who are, essentially, the very source of sovereignty. The Government may invoke the secrecy cloak for its own actions only in cases of an overriding public interest.

Recently, in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555 (1980), a plurality of justices agreed on the fact that the press and the public in general have the right to be present during a criminal prosecution even though this right of access is not listed in the Constitution nor is expressly stated in the First and Fourteenth Amendments.

In the opinion delivered by Chief Justice Burger, with whom Justices White and Stevens joined, he stated that the First Amendment, in conjunction with the Fourteenth, bars the government from abridging the freedom of

speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress *\*614 of grievances. "These expressly guaranteed freedoms share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." At 575. And citing from *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 783 (1978), the Court affirmed that the First Amendment goes beyond protection of the press and the self-expression of individuals *and prohibits the government from limiting the stock of information from which members of the public may draw.* It is not important to denominate the right of the press to be present at a criminal prosecution as a "right of access" or as a "right to gather information" because, as the Chief Justice states, the Court has already recognized that without some protection for seeking out the news, freedom of the press could be eviscerated. When faced with the Government's argument that the press has no express First Amendment right to be present at criminal prosecutions, the Court points out that this has never precluded recognition of important rights not enumerated:

> Notwithstanding the appropriate caution against reading into the Constitution rights not explicitly defined, the Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees. For example, the rights of association and of privacy, the right to be presumed innocent, and the right to be judged by a standard of proof beyond a reasonable doubt in a criminal trial, as well as the right to travel, appear nowhere in the Constitution or Bill of Rights. Yet these important but unarticulated rights have nonetheless been found to share constitutional protection in common with explicit guarantees. The concerns expressed by Madison and others have thus been resolved; fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined. (Footnotes deleted.) (Pp. 579-580.)

*\*615 In his concurrent opinion, Mr. Justice Stevens stressed that in the decision of that case "for the first time, the Court unequivocally holds that an arbitrary interference with access to important information is an abridgment of the freedoms of speech and of the press protected by the First Amendment." He added that

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)

12 P.R. Offic. Trans. 597

said amendment "protects the public and the press from abridgment of their rights of access to information about the operation of their government. . . ." Pp. 582-584.

Mr. Justice Brennan, with whom Mr. Justice Marshall joined, stated:

> The Court's approach in right-of-access cases simply reflects the special nature of a claim of First Amendment right to gather information. Customarily, First Amendment guarantees are interposed to protect communication between speaker and listener. When so employed against prior restraints, free speech protections are almost insurmountable. . . . But the First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a *structural* role to play in securing and fostering our republican system of self-government. . . . Implicit in this structural role is not only "the principle that debate on public issues should be uninhibited, robust, and wide-open," . . . but also the antecedent assumption that valuable public debate--as well as other civic behavior--must be informed. The structural model links the First Amendment to that process of communication necessary for a democracy to survive, and thus entails solicitude not only for communication itself, but also for the indispensable conditions of meaningful communication.

> However, because "the stretch of this protection is theoretically endless," . . . it must be invoked with discrimination and temperance. For so far as the participating citizen's need for information is concerned, "[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow." . . . An assertion of the prerogative to gather information must accordingly be assayed by considering the information sought and the opposing interests invaded. (Pp. 586-88.)

**\*616**  On the other hand, Mr. Justice Blackmun concurred with the fact that the public certainly has a constitutional right of access to criminal prosecutions, and stated that ". . . the public has an intense need and a deserved right to know about the administration of justice in general; about the prosecution of local crimes in particular; about the conduct of the judge, the prosecutor, defense counsel, police officers, other public servants, and

all the actors in the judicial arena; and about the trial itself." 448 U.S. at 604.

Please note that even when this case does not have an opinion of the court upon which to base the statement that the right of access and information has been expressly recognized, at least it may be used to conclude that a majority of the justices of said court concurs with the idea that the freedom of speech system embodied in the First Amendment protects other important citizen's rights. This, by itself, is sufficient. The fact that the justices of said high court could not reach a consensus as to the way of stating the formula does not defeat its very existence.

The recent history of the United States, tinged by serious political tribulations, has shown the urgency of recognizing such a preeminent right of modern life. In fact, the United States Congress as well as the different state legislatures have been gradually recognizing said right by enacting laws on the citizen's freedom of information ("Freedom of Information Act" and "Sunshine Laws").

Professor Emerson advocates for the courts' recognition that the people's right to know stems from the freedom of speech system implicit in the First Amendment.

**\*617**  In my judgment the greatest contribution that could be made in this whole realm of law would be explicit recognition by the courts that the constitutional right to know embraces the right of the public to obtain information from the government. . . . The public, as sovereign, must have all information available in order to instruct its servants, the government. As a general proposition, if democracy is to work, there can be no holding back of information; otherwise ultimate decisionmaking by the people, to whom that function is committed, becomes impossible. Whether or not such a guarantee of the right to know is the sole purpose of the first amendment, it is surely a main element of that provision and should be recognized as such. Emerson, *op. cit.* at 14.

### C. *Limitations and Exceptions to the Right of Access and Information*

[4]  Just as it happens with other rights, the right of access and to gather information cannot be absolute. *Kleindienst v. Mandel, supra.* On previous occasions, the

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)
12 P.R. Offic. Trans. 597

United States Supreme Court has drawn standards for analyzing legislation or regulatory provisions that affect the freedom of speech. In *United States v. O'Brien*, 391 U.S. 367, 377 (1968), the court held that a government regulation is sufficiently justified: (1) if it is within the constitutional power of the government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. A similar standard was used in *Procunier v. Martínez, supra* at 413-414.

Undoubtedly, one of the most important functions of government is to guarantee public order and to apprehend and prosecute those who violate it. This social safety function could not be adequately discharged if the Government **\*618** could not count on an investigatory apparatus capable of solving crimes committed in an isolated although rutinary manner, and also capable of deciphering the sometimes perfectly tuned machinery of organized crime and modern terrorism. No democracy-based civilized society may ensure its survival without laws that govern it and without a minimal coercive apparatus to enforce compliance therewith.

That is why a general restriction to the right to inspect public documents has been recognized. "There is no general right of inspection of records which, although of public nature, must be kept secret and free from common inspection, such as diplomatic correspondence and letters and dispatches in the detective police service, or otherwise relating to the apprehension and prosecution of criminals." Cross, *op. cit.* at 78. However, the same author immediately adds: "This rule, which has been stated by way of *dicta* much more often than it has been actually applied, is pockmarked by exceptions in decisions, and even more riddled in actual practice, which is in tune with the facts of life."

[5] Although it is true that the Government may limit the citizen's right of access to investigatory records, it is also true that it cannot bar said access by merely invoking that it is a police record.

[6-9] Hence, we think that the Legislature may pass legislation to withhold from public scrutiny certain documents and reports linked to the investigatory or preventive phase of crime, and that because of their very nature they unnecessarily endanger the results of an investigation **\*619** in progress, the life of the informers and the witnesses, as well as that of the very government officers and employees, or that in any way truly affect public safety. This notwithstanding, and as an exception, all legislation tending to hide information from a citizen under a confidentiality cloak, should be strictly construed in favor of the people's right to be informed. Just as any other statute affecting fundamental rights, such legislation must be fully justified, and must contain clear and precise rules allowing for an adequate identification of the material and the circumstances where the accessibility rule will be applied. *In other words, no legislation devoid of the adequate standards for determining the type of document or information that shall be subject to public scrutiny, and that, contrariwise, establishes an absolute confidentiality rule, may overcome the stringency of the constitutional clause under discussion.*

[10-11] Based on the foregoing analysis, we deem that the judicial standard adopted in *O'Brien* and in *Procunier, supra,* adequately strikes the balance that should exist between the citizen's right of access to public documents and the Government's interest in protecting investigatory and police records. In this sense, we should stress that, insofar as investigations on the corruption of public officers and employees, on organized crime, and on terrorism are concerned, we must recognize *ab initio* the Government's power to limit access to documents, papers, or reports generated in the course of an investigation of this nature. We need not strain our minds in order to understand the Government's legitimate and essential interest regarding public administration and safety. What we should bear in **\*620** mind is if, actually, the incidental effect of the limitation of the right of access is really greater than is essential to further the legitimate purpose of the legislation challenged, in view that the Government's interest is closely linked to the rule of inaccessibility to police records.

### III

### *CONSTITUTIONAL ANALYSIS OF ART. 13 OF ACT NO. 38*

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)
12 P.R. Offic. Trans. 597

The learned trial court after circumscribing the controversy before it, strictly one of law, "to determining whether the documents requested by the plaintiffs--sworn statements, autopsy protocols, photographs, recordings containing statements by witnesses, and laboratory reports--are public documents, and therefore susceptible of inspection and copying by citizens so requesting it," *correctly* concluded in the affirmative, but, save for the autopsy protocols and related photographs, denied access by virtue of art. 13 of Act No. 38 of July 13, 1978--privilege of official information--the constitutionality of which it upheld. The article reads:

> *All information in custody of the Bureau shall be classified as confidential for a term of thirty (30) years, establishing the "confidential" category as a minimum. Only the Director, with the approval of the Secretary [of Justice] or the Governor, may authorize the release of information related to functions, operations or activities of this Bureau.* Any employer, functionary or official, or person, who by carelessness or omission, or deliberately, offers information, gives publicity to or publicly comments on any action, activity, investigation or official act of the Bureau, shall be guilty of a felony and if convicted, shall be punished by imprisonment for a minimum term of two (2) years and a maximum of five (5) years. (Underscore supplied.) 3 L.P.R.A. § 138*l*.

**\*621** [12] In view of this provision's close relationship with the right of freedom of speech and free interchange of ideas, the analysis of the constitutionality of this provision should be guided by a strict judicial scrutiny. *Zachry International v. Tribunal Superior,* 104 D.P.R. 267 (1975).

The first thing that strikes the eye is that art. 13 classifies *all the information under the custody* of the S.I.B. as *confidential.* Said confidentiality category extends for thirty years. Only the Director of the Bureau, with the approval of the Secretary of Justice or the Governor of Puerto Rico, may authorize the disclosure of information.

The appellants contend that the phrase "all information" is excessively broad and vague. It is excessively broad insofar as it extends the confidentiality seal to *all* the information *under the custody* of the S.I.B., and it is vague because it does not define what the statute meant to include under the term *information.* With this in mind, the trial court concluded:

The nature of the language employed by the law is excessively broad and we believe that we should limit its scope. In our opinion, only such information entered in the Bureau's records by virtue of an investigation carried out by said agency should be deemed confidential.

It is not hard to agree with the fact that such language is really overbroad and vague. The Government, however, maintains that insofar as the lower court-- pursuant to its pronouncement in the above-copied judgment--ordered S.I.B. to produce several autopsy protocols and related photographs, it cured any vice the legislation might have had with said "simple judicial construction." We do not agree.

**\*622** The best argument that the statute challenged is *excessively broad and vague* is the fact that said language necessarily places the court, and not the agency, in the position to decide that where it says "all" it should read "some," and that where it says "information" it does not say "autopsy protocol," and this, of course, based on rules to be applied case by case. Our appellate function should not go beyond the *clear* and limiting text of the law, in order to delve into ad hoc considerations as to which information is available for inspection, and which is not. Our guiding function is to decide whether certain information is covered by the secrecy cloak, and if it were, if it is compatible with the exercise of protected constitutional rights. In this case, it is not a matter of filling in the gaps in the law but, rather, of performing a prosthesis. Note that even the rule adopted by the trial court, devoid of parameters of time, purpose, and use, as well as of other factors, cannot overcome the unnecessary danger of being vague: "information entered in the Bureau's records by virtue of an investigation carried out by said agency." This viewpoint raises the following questions: How to justify the restriction of investigatory matter once it has been used in the proceeding or for the purposes it was gathered? How to maintain the legislative imprimatur of absolute *confidentiality* that can only be released by the Governor's action without any other consideration?

The overbreadth and vagueness of the language is not cured either by the unlimited discretion that the statute grants to the Secretary of Justice and to the **\*623**

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)

12 P.R. Offic. Trans. 597

Governor for approving the dissemination of information classified a priori as "confidential."

Constitutionality is not saved by the argument that the legal language stating that the powers and functions "shall be carried out with the greatest *prudence* and *moderation* and within the *reasonable* and strictly necessary limits"-- pursuant to the purposes of the act--provides limiting standards. Art. 4 (3 L.P.R.A. § 138c). First of all, no great effort is required to see that these, per se, are not limiting standards. The fact that the Government discharges its functions with *prudence and moderation within the limits and objectives of a statute* is a premise implied in all legislative mandates. A legislative mandate ordering that a law be enforced in an imprudent, immoderate or unreasonable manner, is very hard to imagine. The fact that this has been expressly stated does not alter this possibility; neither does it overcome any legal stumbling block. In the second place, prudence, moderation, and reasonableness are rather synonyms--as far as semantics is concerned--of certain attributes. They are certainly insufficient for serving as restrictive legislative parameters or guidelines for an absolute prohibition like the one before our consideration.

[13–14] When, as in the case at bar, *there are no standards* governing the exercise of the discretion granted by the law, the scheme permits and encourages an arbitrary and discriminatory enforcement of the same. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972). The officers in question have not yet drawn any guidelines whatsoever to regulate the exercise of such discretion, *624 thus being able to maintain that the absence of adequate parameters has been cured by adequate regulations. As we all know, the exercise of administrative powers, based on case by case considerations and not on a statute or regulation, is flawed by the constitutional defect of vagueness. *Pennsylvania State Board of Pharmacy v. Cohen*, 292 A.2d 277, 282 (1972).

[15] The foregoing does not mean that an administrative agency cannot pass certain regulations under a law whose standards are vague. It rather means that an agency cannot make individual determinations without first passing rules which give meaning to any vagueness in the statute. Professor Davis states it as follows:

The court may permit the agency to do its rulemaking under the vague statutory standard, but the court may forbid the agency to make individual determinations without first doing what it reasonably can do, by rulemaking or otherwise, to give specific meaning to the vague statutory standard. 1 *Administrative Law Treatise* 182, 2d ed., San Diego, K.C. Davis Pub. Co. (1978).

The judgment below heavily leans on the State's power to withhold from public scrutiny some types of public records and it cites, as an example, the nine exceptions contained in the Federal Freedom of Information Act--5 U.S.C. § 552--which set forth the only circumstances where the federal government is not bound to disclose certain information. One of these exceptions excludes disclosure of information denominated confidential by a special statute. We cannot agree with said approach. Contrary to our art. 13--where absolute secrecy can only give in to discretional disclosure--sec. 552(b)(3) of the federal *625 statute is based on relativity and reasonableness. To such ends, it withholds those documents specifically exempted from disclosure by statute "provided that such statute (A) requires that the matters be withheld from the public in such a manner as to *leave no discretion on the issue,* or (B) *establishes particular criteria for withholding* or refers to particular types of matters to be withheld." We see, then, that the above-mentioned federal provision contains adequate and precise standards that exclude almost any risk of caprice and arbitrariness on the part of the corresponding agencies for refusing to grant or for granting the information.

Insofar as the particular exception of "investigatory records" is concerned, the very sec. 552(b)(7) makes this very important provision:

[I]nvestigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)

12 P.R. Offic. Trans. 597

national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel. . . .

Although it grants to administrators an ample discretion in the expressly mentioned areas, the scheme contained in the federal statute again provides more or less specific standards to in some way guide such discretion so that exercise thereof be not the product of whim but of a pondered balance between the interests in conflict. *626 Although we admit that nobody can expect a statute to be a minute catalogue of all the documents subject either to inspection or to reserve--task which we cannot impose on the Legislative Power, *FAA Administrator v. Robertson,* 422 U.S. 255 (1974)--this does not mean that we validate a statute placed precisely on the opposite extreme and which lacks the minimim general rules to govern administrative discretion.

On the other hand, we see that art. 13 of the challenged statute does not contain either the adequate procedural guarantees for reviewing administrative decisions affecting fundamental citizen's rights. Contrary to the federal statute in question, our statute does not even provide for the court's control of the administrative discretion that could be arbitrarily or whimsically exercised. There is no legal design for the court's "in-chambers" inspection of the documents or objects whose disclosure has been requested and is denied. The rule established by the aforementioned art. 13 is to the effect that the decision of the administrators--the Governor or the Secretary of Justice, as the case may be--be final and unappealable, and be exempt from any possible intervention by the courts.

The secrecy cloak covering the statutorily protected documents for thirty (30) years bears no proportion either with the alleged purpose of the legislation. An examination of its lean legislative history sheds no light on its purpose. The least we can say is that the thirty (30) years are an excessive and unreasonably long period of time because it is hard to imagine--bearing in mind the periods *627 of limitation for filing criminal actions-- a situation where the confidentiality's utility is extended for a period longer than several years. This, of course,

does not mean that there are documents that should not be included in a special category where, for exceptional and extraordinary reasons, the value and usefulness of the information shall not be damaged by the passage of time. Now then, this possibility cannot give rise to unjustifiedly long general categories of secrecy. To uphold them as such would be tantamount to tolerating a scheme where the citizen shall have only an eventual access, granted by the mere passage of time. In other words, the citizen shall have right of access through "extraordinary prescription" and not by virtue of the right stemming from the freedom of speech system proclaimed in the Bill of Rights of our Constitution.

A final reflection is necessary. As far as this case is concerned, we cannot ignore the fact that the information requested from the Government is related to an investigation carried out by a public agency concerning some facts that, due to the ample coverage it has had and the civil judicial proceedings it has generated, has called the attention not only of the petitioners who filed this action but of other citizen groups, some of which have politico-partisan affiliations.

We have seen that a private individual sued the Government for damages for the events investigated by the S.I.B. The Superior Court, Utuado Part, held the Government liable based on the argument that the action of the police agents was negligent insofar as they could *628 have prevented the bloody event, and did not do so. The Government did not take appeal from said decision. Likewise, both reports prepared under the jurisdiction of the Department of Justice exonerated the policemen and concluded that no person would be subject to criminal prosecution.

In these circumstances, we think that no statute on absolute confidentiality may be invoked vis-à-vis the citizen's constitutional right to obtain from the government any information that could reveal a questionable conduct subject to redress.

Our democracy proclaims to have one of the most advanced and complete constitutional schemes in the modern world, a scheme that tolerates and nurtures from the diversity and divergence of ideas. Although imperfect, we aspire to a democratic form of government whose essential objective should be that of guaranteeing that all

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)
12 P.R. Offic. Trans. 597

of man's fundamental rights come true. In our country, the Constitution and the laws not only protect the model citizen, but also he who violates the law, regardless of political views. Although sometimes the mobility of the situations requires that the police, in furtherance of life or property protection, react in the most vigorous manner possible, the Constitution recognizes that every defendant is entitled to a presumption of innocence and to trial by jury, even if he is taken *in fraganti.* That is why, immediately after there is a suspicion tainting the democratic reputation of a civilized country, the duty of the Government is to expedite the way for those citizens-- including critics and adversaries--interested **\*629** in learning the truth, and not hamper the way for them. In view of the Government's hermetic refusal to aid the right of access and information, it is the courts' duty to clean the way, taking into consideration, of course, the public and private interests at stake, and adopting all the measures necessary to achieve the legitimate purposes sought by the legislation the State has invoked.

[16] We decree that art. 13 of Act No. 38 of July 13, 1978, is unconstitutional from its face. Consequently, we issue the injunction requested subject to the trial court's determination to make an in-chambers examination of whether the disclosure of some of the documents requested is not justified pursuant to the rules laid down in this opinion.

Absent a statutory procedure for making an in-chambers inspection, we will provide the following:

(a) The Secretary of Justice, or the person on whom he delegates, shall submit before the trial court a sworn account of all the documents appearing in the records of the Special Investigations Bureau of its Department, produced or gathered in the course of the investigation of the case object of this appeal. Said account need not describe the contents of said documents, papers, photographs or other objects, but they shall be duly identified;

(b) Immediately after said account, the Secretary or his delegate shall specify which document or documents, in his opinion, should not be disclosed, and state the reasons therefor. As to the latter, the court may order the Secretary to produce them to be inspected by the **\*630** judge in private, in the absence of the parties and their attorneys;

(c) Once the examination has been made, the court shall direct the Secretary: (1) to deliver copy of the documents over which there is no objection, or of those that, despite the objection, are not found by the court to be protected by the confidentiality seal; and (2) shall deny access to the other documents, objects, or papers. In any event, the court shall have ample discretion to regulate and direct those procedures so as to guarantee that persons extraneous to the judicial function have no access to those documents, if any, that should not be disclosed. *Cf. Ray v. Turner,* 587 F.2d 1187 (1978); *Military Audit Project v. Bush,* 418 F. Supp. 876 (1976); *Vaughn v. Rosen,* 484 F.2d 820 (1973); *Cuneo v. Schlesinger,* 484 F.2d 1086 (1973).

*Judgment shall be rendered accordingly.*

Mr. Justice Martín issued a dissenting opinion. Mr. Justice Irizarry Yunqué issued an opinion concurring and dissenting in part.

**\*631 Appeal from the Superior Court, San Juan Part**

**Injunction, Declaratory Judgment, and Damages**

Mr. Justice Irizarry Yunque, concurring and dissenting in part.

The opinion of this Court has decreed that art. 13 of Act No. 38 of July 13, 1978 (3 L.P.R.A. § 138 *1*)[1] is unconstitutional on its face. It considers that said article is impermissibly vague or ambiguous. However, it recognizes that there is no absolute right to inspect the documents controlled by the Special Investigations Bureau, and ends up laying down rules for the trial court to examine the documents and determine which **\*632** documents should be shown to the plaintiffs and which should be withheld. I concur with this solution to the case in view of the lack of regulations to enforce the cited act, but I do not think that the unconstitutionality decree is justified.

The citizen's right of access to information under the Government's control has been the object of several cases decided by the Federal Supreme Court. In *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978), the Court held:

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)

12 P.R. Offic. Trans. 597

It is clear that the courts of this country recognize a general right to inspect and copy public records and documents. . . . The interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies.

In *Nixon v. Administrator of General Services,* 433 U.S. 425, 483-84 (1977), upholding the validity of the statute that limits public access to presidential documents, the U.S. Supreme Court stated:

We, of course, are not blind to appellant's plea that we recognize the social and political realities of 1974. It was a period of political turbulence unprecedented in our history. But this Court is not free to invalidate Acts of Congress based upon inferences that we may be asked to draw from our personalized reading of the contemporary scene or recent history. In judging the constitutionality of the Act, we may only look to its terms, to the intent expressed by Members of Congress who voted its passage, and to the existence or nonexistence of legitimate explanations for its apparent effect.

In *Houchins v. KQED, Inc.,* 438 U.S. 1 (1978), the Supreme Court refused to recognize an absolute First Amendment or Fourteenth Amendment right, and although there was no majority opinion, the following  **\*633** statement in the opinion of Chief Justice Burger represents the feeling of the majority: [2]

There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy. [Citing *Pell v. Procunier,* 417 U.S. 817 (1974).] The public's interest in knowing about its government is protected by the guarantee of a Free Press, but the protection is indirect. The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act.

The Constitution, in other words, establishes the contest, not its resolution. Congress may provide a resolution, at least in some instances, through carefully drawn legislation. For the rest, we must rely, as so often in our system we must, on the tug and pull of the political forces in American society. At 14-15.

In our jurisdiction, by 1959 this Court had already recognized the Government's right to withhold certain information, and we made specific reference to certain cases. In *Sierra, Sec. of Labor v. Superior Court,* 81 P.R.R. 540, 562 (1959), we held:

[T]he government as well as private citizens may avail themselves of all the privileges established by the laws of evidence. But undoubtedly, in a civil suit neither the government nor the public officers have a general privilege to withhold information of an official character. They can call for special privileges, which are ordinarily out of reach to the private litigant, as: (1) *communications made to a public officer in official confidence, when the public interest would suffer by the disclosure.* Section 40 of the Law of Evidence, 32 L.P.R.A. § 1734; (2) *secret information affecting the public safety of the state;* (3) communications made to a  **\*634** grand jury either by a plaintiff or a witness; (4) *information as to the identity of persons who have furnished evidence* to discover a violation of law. (Underscore supplied.)

Article 13 of Act No. 38 in controversy herein cannot be construed alone, unconnected from the other provisions of said act. And the absence of regulations on the different "categories of confidentiality"--where, according to said article, all the information controlled by the Bureau of Special Investigations created by said act should be classified--cannot be taken as a symptom of vagueness, nor as grounds to annul the lawmaker's will. The act cannot point out a priori all the specific cases where it is justified to classify certain information in any of the said categories. That is the duty of the Executive Power through regulation, and the ends and purposes of the act, and all the details contained in its numberless provisions as to the functions and scope of the Bureau, offer adequate parameters for the necessary regulation.

For an investigation agency--as the one created by the act in controversy--to function adequately, the information compiled by the agency must be logically classified according to its importance, and access to said information must be limited to certain persons. There shall be information lacking any value and, hence, exempted from classification. And there shall be information so sensitive for public safety that access should be limited

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)
12 P.R. Offic. Trans. 597

only to the highest-ranking officials. In each case, the classification must be made along the way. [3] The cited act delegates on the Executive **\*635** the power to promulgate the necessary regulations. The fact that no regulations have been promulgated does not mean that the act is vague.

On the other hand, this Court deems that the thirty-year term established in the aforementioned art. 13 is excessively long, and that it bears no proportion with the alleged purpose of the legislation. What would be, in the Court's opinion, a reasonable term? Is it this Court's duty to provide it? I do not think that we have the necessary elements of judgment to decide it. Furthermore, the act should be construed as is more favorable for its validity. In my opinion, the thirty-year term provided by art. 13 cannot be construed as an absolute term applicable to all confidential classifications. There can be information whose confidentiality will loose its meaning in a short period, and other information that should be withheld for a relatively long term. I construe the thirty-year term as a maximum, not as a minimum, term.

I reiterate that the absence of regulations justifies that, in this case, provision should be made for the trial court to examine the information sought by plaintiffs, and once the Secretary of Justice is heard, it determines which information may be disclosed in each case. The rules laid down in the opinion seem to me adequate to guarantee a fair balance between the Government's interests and these citizens' right to obtain information. However, I do not think it is necessary to go all the way and annul the provisions made by the Legislature.

**\*636 Appeal from the Superior Court, San Juan Part**

**Injunction, Declaratory Judgment, and Damages**

Mr. Justice Martin, dissenting.
Article 13 of the Act which creates the Special Investigations Bureau of the Department of Justice (S.I.B.), [1] provides:

All information in custody of the Bureau shall be classified as confidential for a term of thirty (30) years, establishing the "confidential" category as a minimum. Only the Director, with the approval of

the Secretary or the Governor, may authorize the release of information related to functions, operations or activities of this Bureau. Any employer, functionary or official, or person, who by carelessness or omission, or deliberately, offers information, gives publicity to or publicly comments on any action, activity, investigation or official act of the Bureau, shall be guilty of a felony and if convicted, shall be punished by imprisonment for a minimum term of two (2) years and a maximum of five (5) years.

Today the Court has decreed that art. 13 is facially unconstitutional because it is impermissible broad and vague. I dissent from such decision because I deem it constitutes an incorrect and unnecessary application of the rule of unconstitutionality on the ground that a law is excessively broad or vague. In depriving S.I.B. of the power, granted by the Legislature, to withhold **\*637** information under its custody, the Court curiously recognizes that there are circumstances justifying nondisclosure. The Court then proceeds to fill the resulting gap by substituting the invalidated legislative confidentiality concept for judicially-created confidentiality standards. In the circumstances in this case it was not necessary, nor constitutionally required, to arrive at such result.

In the first place, according to the act creating the S.I.B., said Bureau is a specialized unit in charge of investigating essentially two kinds of activities: 1) those related with "organized crime" and 2) those called "criminal" which may affect the Government, the property or the public officers, and the security of the State.

Insofar as the facts before our consideration are related to information coming from the second group of investigatory activities, *i.e.,* the criminal ones, we should limit ourselves to examine the application of art. 13, *supra,* to the investigations dealing with said activities. Hence, it is not wise to extend the unconstitutionality decree of art. 13, *supra,* to cover any other investigation that could be related with organized crime activities.

In the second place, the power granted by art. 13 to administrators for deciding if they should withhold certain information [2] or if they should disclose it, is not devoid

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)
12 P.R. Offic. Trans. 597

of limiting standards. Article 4 (3 L.P.R.A. § 138c), of Act No. 38, *supra,* provides:

> **\*638** The powers and functions of this act shall be carried out with the greatest *prudence* and *moderation* and within the *reasonable* and strictly necessary limits, according to the purposes pursued by the creation of the Special Investigations Bureau. (Underscore supplied.)

If we presume, for argument's sake, that there is a constitutional right of access to government-controlled information, the rules advising that the power to construe and examine the constitutional validity of the laws[3] should be prudently exercised, forces us to construe these statutory rules in the light of the applicable constitutional standards in order to save the constitutionality of the statute.[4] If this is not possible, I would proceed to examine if what is contrary to the Constitution is the application of the act to the specific facts and parties now before this Court.[5]

**\*639** In the case at bar, the trial court did not examine the administrative officer's decision of barring access to the information requested by plaintiffs in the light of the statutory standards provided by art. 4. Neither was the unconstitutionality of art. 13 directly raised, reason why the Government did not have the opportunity to specifically point out and show the interest that could justify the withholding of each one of the information items in controversy, regardless of the constitutional rights the plaintiffs might have.

It would be necessary to remand the case to the trial court so that, once it has made an in-chambers examination--in the absence of the parties--of each of the information items in question, if it deems it necessary,[6] it determines whether the power to withhold **\*640** or to disclose information has been prudently and moderately exercised pursuant to the statutory requirements of necessity and reasonability according to the purposes enumerated in the act. Art. 4, Act No. 38, *supra.* If it determines that even under these standards the access to certain information should be restricted, it should determine if such restriction is constitutionally permissible, bearing in mind the pertinent circumstances and standards.

In view of the foregoing, I would remand the case to the trial court for further proceedings in the manner provided above.

Footnotes

1    Judgment rendered by the Superior Court, Utuado Part, on January 26, 1981, in civil case No. CS-78-1262, *Julio Ortiz Molina y Catalina Martínez v. Estado Libre Asociado de P.R., Alejandro Gonzalez Malavé.* The plaintiffs in that case resorted to us seeking review of that decision and we denied the writ. The Government did not question said judgment. (R-81-72.)

2    After the trial court's judgment of March 16, 1979, and pending the appeal from that decision before this Court, on January 19, 1981, Prosecuting Attorney Osvaldo A. Villanueva Díaz handed in to the then Secretary of Justice, Hon. Miguel Giménez Muñoz, the results of a special investigation assigned to him, entitled *Report on the Maravilla Case.* Like the previous report, this one exonerated the policemen and recommended "the *final and definitive* dismissal of this case."

3    4 *Diario de Sesiones de la Convención Constituyente* 2564 (1961).

4    "To allow the government to manage public affairs under a secrecy cloak is to invite arbitrariness, bad administration, governmental unresponsiveness, public irresponsibility, and corruption. A citizenry alert and militant against these potential evils of any governmental machinery may carry out its controlling function only if it had within its reach the information that would allow it to discover, in time, the dangerous areas and to demand liability. To deprive the citizenry of this information is tantamount to promote a collective paralysis aggravated by the civic shortsightedness of he who has none or only partial knowledge of the government's actions.

     "A second principle, inherent to any democratic ideal, is participation. However, to be intelligent, this participation ought to be based on a constant flow of information to the public, and on the possibility to have access to all the information necessary for the responsible exercise of every person's right and duty to take part in the affairs that concern him." E. Rivera Ramos, *La Libertad de Información: Necesidad de su Reglamentación en Puerto Rico,* XLIV Rev. Jur. U.P.R. 67, 69, Nos. 1-2 (1975).

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)

12 P.R. Offic. Trans. 597

5      "It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. In contrast to the English practice, see, *e.g.*, *Browne v. Cumming*, 10 B. & C. 70, 109 Eng. Rep. 377 (K.B. 1829), American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit. The interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies, see, *e.g.*, *State ex rel. Colscott v. King*, 154 Ind. 621, 621-627, 57 N.E. 535, 536-538 (1900); *State ex rel. Ferry v. Williams*, 41 N.J. L. 332, 336-339 (1879), and in a newspaper publisher's intention to publish information concerning the operation of government, see, *e.g.*, *State ex rel. Youmans v. Owens*, 28 Wis.2d 672, 677, 137 N.W.2d 470, 472 (1965), modified on other grounds, 28 Wis.2d 685a, 139 N.W.2d 241 (1966). But see *Burton v. Reynolds*, 110 Mich. 354, 68 N.W. 217 (1896)." (Footnotes deleted.)

6      In this case, a group of university professors claimed that their right to receive information had been violated by the State Department's refusal to give entry into the country to a communist scholar they had invited to participate in a conference they were holding. The Court recognized the Department's power to exclude said person, grounded on public international law principles. After all, what the Department prohibited was the individual's access, and not that of his ideas which had been amply disseminated throughout the country by means of his books and publications.

1      Said article provides:

       "All information in custody of the Bureau shall be classified as confidential for a term of thirty (30) years, establishing the 'confidential' category as a minimum. Only the Director, with the approval of the Secretary or the Governor, may authorize the release of information related to functions, operations or activities of this Bureau. Any employer, functionary or official, or person, who by carelessness or omission, or deliberately, offers information, gives publicity to or publicly comments on any action, activity, investigation or official act of the Bureau, shall be guilty of a felony and if convicted, shall be punished by imprisonment for a minimum term of two (2) years and a maximum of five (5) years."

2      Seven Justices took part in the decision. This statement was taken from an article by Justice Stewart published in 26 Hastings Law Journal 631, 636 (1975) entitled "Or of the Press." Hence, this statement represents the opinion of four of the seven justices who participated.

3      As an example, compare Executive Order No. 12065, promulgated by the President of the United States on June 28, 1978 (50 U.S.C.A. § 401), on *"National Security Information."*

1      Act No. 38 of July 13, 1978 (3 L.P.R.A. § 138 *1*).

2      Although the act permits that information can be classified in different "confidentiality categories," insofar as plaintiffs are concerned, the minimum confidentiality category permited--that of "confidentiality"--is the one pertinent, because it is sufficient to bar their access to the information.

3      See *Pacheco v. Srio. de Instrucción Pública*, 108 D.P.R. 592, 601 (1979); *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250, 278 (1978); *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 271 (1975); *Mari Bras v. Warden*, 100 P.R.R. 504, 512 (1972); *People ex rel. M.G.G.*, 99 P.R.R. 898, 900 (1971); *Commonwealth v. Aguayo*, 80 P.R.R. 534, 581 (1958).

4      *Negrón Soto v. Gobernador*, 110 D.P.R. 664 (1981); *Galarza Soto v. E.L.A.*, 109 D.P.R. 179, n. 1 (1979); *Martinez v. Superior Court*, 81 P.R.R. 913, 919 (1960); *Commonwealth v. Aguayo*, 80 P.R.R. 534, 581 (1958); *People v. Mantilla*, 71 P.R.R. 35 (1950).

5      In *Bates v. State Bar of Arizona*, 433 U.S. 350, the United States Supreme Court pointed out that "[the doctrine of facial unconstitutionality of a law due to its overbreadth] has been described by this Court as 'strong medicine,' which 'has been employed . . . sparingly and only as a last resort,' *Broadrick v. Oklahoma*, 413 U.S., at 613." According to *Bates*, and to Lawrence H. Tribe, *American Constitutional Law*, §§ 12-24 and 12-25, Mineola, N.Y., The Foundation Press, Inc. (1978), the rule applies when the constitutional mandate cannot be enforced through case by case adjudication limited to the facts and the parties before the Court, because the broadness of the law produces a paralyzing effect that inhibits constitutionally protected conducts or activities, and this bars the courts from intervening and recognizing said protection unless the aggrieved parties overcome the paralyzing effect, and pretend to carry out the protected activity. In this circumstance, it is necessary that the court eliminates this paralyzing effect invalidating the law and thus extending the constitutional protection to persons not before the court. Article 13 produces no paralyzing effect whatsoever. Nothing prevents those persons who believe to have a constitutional right of access to information withheld by the S.I.B. under art. 13, to resort to the courts to claim said right.

Ayala, Lumar 6/27/2017
For Educational Use Only

Soto v. Srio. de Justicia, 112 D.P.R. 477 (1982)

12 P.R. Offic. Trans. 597

Neither can we apply the vagueness rule, under which the acts producing a paralyzing effect due to their lack of clarity as to which is the limited activity and which is the one permitted, should be invalidated. Tribe, *supra*, sec. 12-28.

6      The fact that the act provides that only the Director of the Bureau, with the consent of the Secretary of Justice or of the Governor, may authorize disclosure, cannot prevent the courts from exercising their function of examining whether the decision of the administrators has complied with the statutory and constitutional mandates. "Under our constitutional system, the Legislative Assembly cannot prevent the courts of justice, directly or indirectly, from exercising their reviewing powers in cases in which action has been taken or may be taken by the administrative agencies contrary to the mandatory constitutional provisions." *Hernández Montero v. Cuevas, Director,* 88 P.R.R. 767, 785 (1963). In order to fully exercise its function, the court must be able to examine, if necessary, such items of information on which the interest of withholding has been claimed. *Cf. United States v. Nixon,* 418 U.S. 683 (1974), where the Court held the propriety of an in-chambers examination of presidential documents over an allegation of presidential privilege or immunity "[a]bsent a claim of need to protect military, diplomatic, or sensitive national security secrets." At 706.

---

End of Document                                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 40 of 53
Case 3:17-cv-01743-JAG   Document 18   Filed 07/14/17   Page 1 of 3



**EXHIBIT**

**C**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CENTRO DE PERIODISMO
INVESTIGATIVO, INC.,

  **Plaintiff,**

    v.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO
RICO,

  **Defendant**

CIVIL NO. 17-1743 (JAG)

### MEMORANDUM & ORDER

GARCIA-GREGORY, D.J.

Before the Court is Defendant Financial Oversight and Management Board for Puerto Rico's (the "Board") Brief in Support of Application of Automatic Stay. Docket No. 13. Plaintiff Centro de Periodismo Investigativo, Inc. ("Plaintiff") filed a timely Response. Docket No. 14. The Board filed a Reply. Docket No. 15-1. For the reasons set forth below, this case is stayed pursuant to 48 U.S.C. § 2161(a) and 11 U.S.C. §§ 362(a), 922. Any request to lift or vacate the stay must be filed in the bankruptcy court in Bankruptcy Case No. 17-BK-03283 (LTS).

The Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. §§ 2101, *et seq.*, was enacted by Congress to address Puerto Rico's financial crisis. *See Peaje Investments LLC v. García-Padilla*, 845 F.3d 505, 509 (1st Cir. 2017). Title III of PROMESA provides for a bankruptcy-like procedure for the Commonwealth of Puerto Rico ("The Commonwealth") and covered territorial instrumentalities to restructure their debts. 48 U.S.C. §§ 2161-77. A Title III proceeding was filed by the Board on behalf of The Commonwealth on May 3, 2017.

Case:17-03283-LTS  Doc#:740-1  Filed:07/25/17  Entered:07/25/17 11:39:17  Desc:
Exhibit Exhi. A - Complaint CPI v. Board  No. 17-1743 Exh. B - Soto v. Gimenez  Page 41 of 53
Case 3:17-cv-01743-JAG  Document 18  Filed 07/14/17  Page 2 of 3

Civil No. 17-1743 (JAG)                                                                    2

As part of the Title III proceeding, PROMESA incorporates the Bankruptcy Code's automatic stay of actions against the debtor or against the property of the debtor. 48 U.S.C. § 2161; 11 U.S.C. §§ 362, 922. Specifically, § 362 stays "the commencement or continuation . . . of a judicial . . . action or proceeding against the debtor that was or could have been commenced before the commencement of the [Title III case], or to recover a claim against the debtor that arose before the commencement of a [Title III case]." The automatic stay is broad in its scope and it is intended to provide the debtor "a breathing spell" from creditors. 2 Norton Bankr. L. & Prac. 3d § 43:4.

Plaintiff admits that the automatic stay is "quite broad." Docket No. 14. However, Plaintiff contends that it does not apply to this lawsuit for two reasons. The Court is unconvinced.

First, Plaintiff argues that the automatic stay does not apply to this action because Plaintiff is not requesting money damages, or equitable relief "implying diminution of the property of the debtor." Docket No. 14 at 4-12. Specifically, Plaintiff points to the definition of a "claim" in the Bankruptcy Code, 11 U.S.C.§ 101, to argue that it is not asserting a "claim," and thus the stay does not apply. Docket No. 14 at 4-12. The automatic stay, however, is not limited to "claims" against the property of the debtor. *See Advanced Computer Servs. of Michigan, Inc. v. MAI Sys. Corp.*, 161 B.R. 771, 774 (E.D. Va. 1993) ("There is no merit to the argument that a suit for injunctive and declaratory relief is an equitable suit and not a 'judicial action' as to which a stay is applicable."). As the Board correctly points out, the automatic stay applies to (1) an action "against the debtor that was or could have been commenced before" the Title III proceeding, *or* (2) an action "to recover a claim against the debtor . . . ." 11 U.S.C. § 362. Since Plaintiff's suit could have been commenced prior to the Title III proceeding, it falls into the first category of actions covered by the automatic stay.

Second, Plaintiff argues that the Board is not the "debtor" in the Title III action. Docket No. 14 at 12-15. The Court disagrees. PROMESA created the Board "as an entity within the

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 42 of 53
Case 3:17-cv-01743-JAG   Document 18   Filed 07/14/17   Page 3 of 3

Civil No. 17-1743 (JAG)                                                                          3

[Commonwealth's government]." 48 U.S.C. § 2121(c)(1). Moreover, the Board's funding comes

entirely from the Commonwealth's budget. *Id.* § 2127(b). In fact, Plaintiff's basis for this lawsuit is

that the Board, as an entity within the Commonwealth's government, must guarantee the public

access to information and documents pursuant to Commonwealth's Constitution. Docket No. 1.

Under this same logic, an action against the Board is an action against the Commonwealth.

Accordingly, this case is subject to PROMESA's automatic stay. Any request to lift or

vacate the stay must be filed in the bankruptcy court in Bankruptcy Case No. 17-BK-03283 (LTS).

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 14th day of July, 2017.

S/ Jay A. Garcia-Gregory
JAY A. GARCIA-GREGORY
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

**EXHIBIT**

**D**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| HON. EDUARDO BHATIA GAUTIER, IN HIS CAPACITY AS SPEAKER OF THE POPULAR DEMOCRATIC PARTY IN THE SENATE OF PUERTO RICO,<br><br>Plaintiff,<br><br>v.<br><br>HON. RICARDO ROSSELLÓ-NEVARES, IN HIS CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF PUERTO RICO; THE COMMONWEALTH OF PUERTO RICO,<br><br>Defendants. | Adv. Proc. No: 17-136-LTS |

MEMORANDUM OPINION AND ORDER

Plaintiff Eduardo Bhatia Gautier ("Plaintiff") originally filed this action (the "Mandamus

Action") in the Commonwealth of Puerto Rico Court of First Instance, San Juan Part (the

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); and (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474).

"Commonwealth Court") seeking to compel Defendants (as defined below) to make public a copy of a draft budget (the "Draft Budget") that the Governor's office provided to the Financial Oversight and Management Board for Puerto Rico (the "Board"). Defendants removed the action to the United States District Court for the District of Puerto Rico. (Docket Entry No. 1.) The Defendants' notice of removal (the "Removal Notice") asserts that the Court has original jurisdiction of the action, pursuant to 48 U.S.C. § 2166(a)(2), because it arises "under," arises "in" or is "related to" the Title III proceeding *In re Commonwealth of Puerto Rico*, No. 3:17-bk-3283 (D.P.R. May 3, 2017) (the "Title III Proceeding") filed pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). Plaintiff now moves for entry of an order remanding this action to the Commonwealth Court, arguing that this Court lacks subject matter jurisdiction. Defendants move pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012(b) to dismiss the case, and Plaintiffs have requested that the Court hold the dismissal motion in abeyance (the "Abeyance Request") pending the determination of the remand motion. The Court has considered carefully all of the parties' submissions. For the following reasons, Plaintiff's Abeyance Request is granted, and Plaintiff's remand motion is granted. In light of its conclusion that it lacks jurisdiction of this action, the Court does not address the Defendants' motion to dismiss the complaint.

<u>BACKGROUND</u>

Except as otherwise indicated, the following facts are alleged in the Removal Notice or drawn from the documents annexed thereto. Plaintiff is the leader of the Popular Democratic Party of Puerto Rico in Puerto Rico's Senate. (Removal Notice ¶ 1.) The Defendants are the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") and the Honorable Ricardo Rosselló-Nevares, in his capacity as Governor of Puerto Rico. (Removal Notice at 1.)

Under PROMESA, Governor Rosselló may submit fiscal plans and budgets to the Board for review and certification. See 48 U.S.C. § 2141. On March 13, 2017, the Board certified Puerto Rico's fiscal plan. (Removal Notice ¶ 3.) Governor Rosselló submitted the Draft Budget to the Board for certification on April 30, 2017. (Id. ¶ 1.)

The Board, as representative of the Commonwealth, commenced the above-captioned Title III Proceeding on May 3, 2017. Case No. 17-BK-3283-LTS, Docket Entry No. 1. (D.P.R. May 3, 2017). The next day, Plaintiff filed a petition for writ of mandamus before the Commonwealth Court seeking public disclosure of the Draft Budget pursuant to Section 1781 of Puerto Rico's Code of Civil Procedure, which provides that "[e]very citizen has a right to inspect and take a copy of any public document of Puerto Rico, except as otherwise expressly provided by law." 32 L.P.R.A. § 1781. (Mot. to Dismiss at 3-4.)

On May 12, 2017, Defendants filed the Removal Notice, removing the action to this Court. (Docket Entry No. 1.) On May 19, 2017, Plaintiff filed an *Urgent Motion to Remand Case to the Commonwealth Court of First Instance and/or Request for Abstention* (the "Motion") arguing that this Court lacks subject matter jurisdiction. (Docket Entry No. 4.) On May 26, 2017, Defendants filed their opposition to Plaintiff's Motion (the "Opposition") and a *Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6), Fed. R. Bankr. P. 7012(b)* (the "Motion to Dismiss"). (Docket Entry Nos. 11, 12.) The Plaintiff subsequently replied to the Opposition and filed the Abeyance Request. (Docket Entry Nos. 13, 14.)

### DISCUSSION

Plaintiff's Abeyance Request is granted, insofar as the Court must always first determine whether it has jurisdiction of an action before addressing the merits of the action. See Mills v. Harmon Law Offices, P.C., 344 F.3d 42, 46 (1st Cir. 2003). Title III of PROMESA permits the

removal of a civil action pending in another court to this district court, if the district court has jurisdiction of the claim or cause of action under PROMESA's jurisdictional grant. 48 U.S.C. § 2166(d)(1). If a case is removed and the district court determines that it lacks jurisdiction over the matter, the court must order remand. 28 U.S.C. § 1447. The removal statute is "strictly construed against removal jurisdiction, and the burden of establishing federal jurisdiction falls to the party invoking the statute." <u>Rios Ortiz v. Velazquez-Ortiz</u>, No. CIV. 14-1467 JAF, 2014 WL 3734490, at *1 (D.P.R. July 28, 2014) (internal citation omitted). The Court may also remand a claim or cause of action of which it has PROMESA Title III jurisdiction "on any equitable ground." 48 U.S.C. § 2166(d)(2).

Defendants assert that this Court has jurisdiction of this action pursuant to 48 U.S.C. § 2166(a)(2), which confers on district courts "original but not exclusive jurisdiction of all civil proceedings arising under [PROMESA], or arising in or related to cases under [PROMESA]." (Removal Notice ¶¶ 7-8.) The jurisdictional language of 48 U.S.C. § 2166(a)(2) is analogous to that of 28 U.S.C. § 1334(b), which confers exclusive jurisdiction of "all civil proceedings arising under title 11, or arising in or related to cases under title 11" upon the district courts. Decisions construing Section 1334(b) thus provide persuasive authority with respect to the construction of PROMESA's jurisdictional language.

Defendants' contention that the Mandamus Action arises "in" the Commonwealth's Title III case or arises "under" PROMESA is premised on the proposition that any litigation regarding the Commonwealth's fiscal plan or budget has "no existence outside of the Title III Proceeding" because those documents are foundational to a plan of adjustment under Title III and, as such, any litigation regarding those documents would necessarily take place in the context of the Title

III Proceeding and "can have no existence outside" of the Title III Proceeding. (Removal Notice ¶ 9; Opp'n at 8). Defendants' theory is flawed.

Construing 28 U.S.C. § 1334(b) in the context of cases under title 11 of the United States Code (the "Bankruptcy Code"), the First Circuit has explained that "'arising under' proceedings are (at least) those cases in which the cause of action is created by" the Bankruptcy Code. In re Middlesex Power Equip. & Marine, Inc., 292 F.3d 61, 68 (1st Cir. 2002). The Draft Budget, and controversies concerning rights of access to it, clearly did not arise under Title III. The obligations to create and certify fiscal plans and related budgets are imposed by Title II of PROMESA, which is not addressed by the 48 U.S.C. § 2166 jurisdictional grant. Indeed, the Draft Budget was created and submitted to the Oversight Board before the commencement of the Commonwealth's Title III Proceeding. No provision of PROMESA addresses access to such draft documents. Rather, Plaintiff's claim of a right of access is premised solely on the laws of Puerto Rico. Accordingly, there is no plausible factual or legal basis for the proposition that the Mandamus Action arises "under" Title III of PROMESA. Nor, for substantially the same reasons, can the Mandamus Action be said to have arisen "in" the Commonwealth's Title III Proceeding.

"Arising in" proceedings are generally "those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." Middlesex Power, 292 F.3d at 68. It is not, however, sufficient for "arising in" jurisdiction that a claim merely arises in the context of a bankruptcy case or that it only exists because of the bankruptcy filing. Gupta v. Quincy Med. Ctr., No. 15-1183, 2017 WL 2389407, at *6 (1st Cir. June 2, 2017) (internal citation omitted). Instead, "for 'arising in' jurisdiction to apply, the relevant proceeding must have 'no existence outside of the bankruptcy.'" Id. (citation omitted).

5

"[T]he fundamental question is whether the proceeding by its nature, not its particular factual circumstance, could arise <u>only</u> in the context of a bankruptcy case." <u>Id.</u> (emphasis in original) (citation omitted).

The Mandamus Action predates the Commonwealth's Title III Proceeding and, while it is being maintained <u>during</u> the Title III Proceeding, it does not arise "in" that proceeding. Mere temporal concurrency is insufficient to bring a controversy within the scope of the jurisdictional grant for matters "arising" in a Title III Proceeding. The Mandamus Action could, and did, exist outside of the Title III context. It was brought independently, outside of PROMESA, and invokes Puerto Rican substantive and procedural law. <u>See</u> 32 L.P.R.A. § 1781.

Defendants have likewise failed to demonstrate that this action is "related to" the Commonwealth's PROMESA Title III case within the meaning of the jurisdictional statute. The First Circuit has recognized the well-established <u>Pacor</u> standard for determining whether a proceeding is "related to" a bankruptcy case. <u>In re Santa Clara Cty Child Care Consortium</u>, 223 B.R. 40, 45 (B.A.P. 1st Cir. 1998) (citing <u>In re Parque Forestal, Inc.</u>, 949 F.2d 504, 509 (1st Cir. 1991) and <u>In re G.S.F. Corp.</u>, 938 F.2d 1467, 1475 (1st Cir. 1991)). This standard, first adopted by the Third Circuit in <u>Pacor, Inc. v. Higgins</u>, 743 F.2d 984 (3rd Cir. 1984) and since followed by most Circuit Courts of Appeal, holds that "related to" jurisdiction exists when "the outcome of [the] proceeding could conceivably have any effect on the estate being administered in bankruptcy." <u>Pacor</u>, 743 F.2d at 994 (internal citations omitted). Although the proceeding "need not necessarily be against the debtor or against the debtor's property," its "outcome" must be one that "could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively)" and in some way "impact[] . . . the handling and administration of the bankruptcy estate." <u>Id.</u> "[T]he mere fact that there may be common issues of fact between a

civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope" of the provision. Id.

The Mandamus Action falls short of this conceivable effects test. Although litigation outside the Title III Proceeding, over rights of access to financial documents developed by the Commonwealth under PROMESA, could complicate the prosecution of the Title III Proceeding, there has been no showing that the outcome of the litigation regarding access to the documents could affect the Commonwealth's rights, liabilities or freedom of action, or otherwise conceivably have an effect on the adjustment of its debts or treatment of its property, in the context of this Title III Proceeding.

Furthermore, even if the conceivable effect of the Mandamus Action on this Title III Proceeding could be deemed sufficient to support "related to" jurisdiction, the Court finds that equitable remand of the issues herein, which are raised solely under Puerto Rican law, is appropriate because any such effect is greatly attenuated from the core issues on which this debt adjustment proceeding will turn. As noted above, PROMESA permits the remand of a claim or cause of action "on any equitable ground." See 48 U.S.C. § 2166(d)(2). Under the analogous statutory provision that applies to the remand of actions within the bankruptcy jurisdictional grant under 28 U.S.C. § 1452, courts in the First Circuit look to the following non-exclusive list of factors in determining whether equitable remand of a bankruptcy-related claim or cause of action is appropriate:

> (1) the effect of the action on the administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty of applicable state law; (4) comity; (5) the relatedness or remoteness of the action to the bankruptcy case; (6) the existence of the right to a jury trial; and (7) prejudice to the involuntarily removed party.

Santa Clara, 223 B.R. at 46.   These factors favor equitable remand of the Mandamus Action.  As

explained above, the Defendants have failed to articulate any plausible way in which the action

will affect the administration of the Title III Proceeding.  Plaintiff's claim exclusively involves

Puerto Rican law.  Comity considerations favor remand, as Commonwealth legal issues

substantially predominate in the Mandamus Action.  Finally, Defendants have not identified any

prejudice, other than complication of discovery issues, that would result from this action being

remanded to the Puerto Rican court.

### CONCLUSION

For the foregoing reasons, Plaintiff's Abeyance Request and Motion are granted.  The

Clerk of Court is directed to effectuate the remand and close this case.  The Court does not

address Defendants' Motion to Dismiss the complaint, which may be prosecuted in the original

forum.  This Memorandum Opinion and Order resolves Docket Entry Nos. 4, 12 and 14.

SO ORDERED.

Dated:  June 13, 2017

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 51 of 53
Case 3:17-cv-01743-JAG   Document 14-1   Filed 07/03/17   Page 1 of 31
Case 3:17-cv-01464-WGY   Document 11   Filed 06/20/17   Page 1 of 3



UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO (San Juan)

| | | |
|---|---|---|
| ABIGAIL CRUZ RODRIGUEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 3:17-01464-WGY |
| ADMINISTRACION DE CORRECCION | ) | |
| DE PUERTO RICO and | ) | |
| JUNTA DE LIBERTAD BAJO PALABRA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

YOUNG, D.J.[1]                                        June 20, 2017

### ORDER RE PURPORTED "STAY"

The Court acknowledges the filing of a Notice of Automatic Stay purportedly pursuant to sections 362(a) and 922(a) of the Bankruptcy Code, as incorporated by reference under section 301(a) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2161(a).

While it is true that this action seeks, inter alia, money damages and is thus at present an unliquidated chose in action arguably properly subject to the automatic stay,[2] a close reading of the complaint reveals that the plaintiff Abigail Rodriguez

---

[1] Of the District of Massachusetts, sitting by designation.

[2] It would also appear that, while minimally plausible, this action is vulnerable to a well pleaded motion for summary judgment.

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 52 of 53
Case 3:17-cv-01743-JAG   Document 14-1   Filed 07/03/17   Page 2 of 31
Case 3:17-cv-01464-WGY   Document 11   Filed 06/20/17   Page 2 of 3

("Rodriguez") is in fact complaining of alleged wrongful
imprisonment in violation of 28 U.S.C. § 1983, a deprivation of
liberty that is allegedly on-going.

In Puerto Rico's unique circumstances, any overbreadth in
the application of the automatic stay implicates most difficult
issues of statutory interpretation and may possibly transgress
the constitutional rights of United States citizens. Let's be
clear - the Commonwealth of Puerto Rico continues to be a viable
government. Its citizens continue to enjoy all their
constitutional rights (and it would appear they continue to
enjoy all their federal statutory rights as well), whatever may
happen to their monetary claims against the Commonwealth.

It would be premature for this Court to express any
definitive views about these important matters. Instead, the
parties shall, within 90 days of the date hereof, brief the
following issues:

-What are the precise boundaries of the automatic stay in the
present circumstances?

-Where a complaint seeks both equitable and legal relief, can the
equitable claims proceed if the legal claims are stayed? How can
this be squared with the Seventh Amendment's right to trial by
jury?

-Who decides the scope of the automatic stay - this Court or the
district judge presiding over In re: Commonwealth of Puerto Rico,
Case Nos. 3:17-cv-01578 LTS and 17-03283-LTS?

In the interim, this case is not stayed. It will proceed in the
ordinary course, with all deadlines in effect until stayed by this Court
or another court with proper jurisdiction.

[2]

Case:17-03283-LTS   Doc#:740-1   Filed:07/25/17   Entered:07/25/17 11:39:17   Desc:
Exhibit Exhi. A - Complaint CPI v. Board   No. 17-1743 Exh. B - Soto v. Gimenez   Page 53 of 53
Case 3:17-cv-01743-JAG   Document 14-1   Filed 07/03/17   Page 3 of 31
Case 3:17-cv-01464-WGY   Document 11   Filed 06/20/17   Page 3 of 3

The Court desires to make fully informed, prudential decisions. Rodriguez is a pro se prisoner who appears able to communicate with this Court only in Spanish (necessitating translation). As the Administracion de Correccion is represented by the Department of Justice, the disparity in resources is palpable. At the same time, the question of how the automatic bankruptcy stay works when the functional "bankrupt" is an operating state level government is both unique and challenging. Moreover, it is an issue likely to recur in many different contexts.

Accordingly, this Court respectfully solicits briefs amici curiae. The Clerk of the United States District Court for the District of Puerto Rico is therefore directed both to publicize this order and provide copies to the Civil Rights Division of the Department of Justice as it has responsibility for Title IX and the IDEA, the Department of Education (same), the United States Trustee for the District of Puerto Rico, the Office of the Federal Defender for the District of Puerto Rico, interested bar associations, and all entities and claimants appearing in In re: Commonwealth of Puerto Rico. Any such briefs shall be filed within the time limit specified above.

**SO ORDERED.**

_William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE

[3]