**Hearing Date**: August 9, 2017 at 9:30 a.m. (prevailing Eastern Time)

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

-----------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

      Debtors.[1]

-----------------------------------------------------------------x

AD HOC PUERTO RICO MUNICIPALITIES
COMMITTEE (the "Ad Hoc Municipalities
Committee"),

      Movant,

    v.

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

      Respondents.

-----------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

**Re: ECF No. 709**

## OBJECTION OF DEBTORS TO AD HOC
## MUNICIPALITIES COMMITTEE'S MOTION REQUESTING
## APPOINTMENT OF ADDITIONAL COMMITTEE OF MUNICIPALITIES

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# <u>TABLE OF CONTENTS</u>

**Page**

The Commonwealth and All its Instrumentalities  Must Be Integrated - Not at War with Each
Other ...................................................................................................................................... 1

Pertinent Facts ...................................................................................................................... 5

Objection .............................................................................................................................. 5

    a.   Municipalities are Not Entitled to a Committee ............................................................5

    b.   Municipalities are Adequately Represented ..................................................................7

    c.   The Costs Associated with an Additional Committee Substantially Outweigh Any
         Benefits Thereof ........................................................................................................12

    d.   PROMESA section 301(c)(3)(A) Does Not Require the Appointment of a Statutory
         Committee for Municipalities .....................................................................................13

    e.   Bankruptcy Code Section 105 Does Not Empower the Court to Override Section
         1102 ...........................................................................................................................15

    f.   An Additional Committee Would Imperil the Debtors' Restructuring Efforts ............16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re City of Detroit, Mich.*,
519 B.R. 673 (Bankr. E.D. Mich. 2014) ...............................................................................11

*In re Cty. of Orange*,
179 B.R. 195 (Bankr. C.D. Cal. 1995).................................................................................10

*In re Dana Corp.*,
344 B.R. 35 (Bankr. S.D.N.Y. 2006) .................................................................4, 7, 8, 12,13

*In re Dow Corning, Corp.*,
194 B.R. 121 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258
(E.D. Mich. 1997) .................................................................................................................12

*In re Dow Corning Corp.*,
212 B.R. 258 (E.D. Mich. 1997) .........................................................................................10

*In re Drexel Burnham Lambert Grp., Inc.*,
118 B.R. 209 (Bankr. S.D.N.Y. 1990) ..................................................................................8

*In re E. Maine Elec. Co-op, Inc.*,
121 B.R. 917 (Bankr. D. Me. 1990)....................................................................................6, 7

*In re Hills Stores Co.*,
137 B.R. 4 (Bankr. S.D.N.Y. 1992) .......................................................................................7

*In re Lehman Bros. Holdings Inc.*,
Case No. 08-13555 (Bankr. S.D.N.Y. Sep. 15, 2008) .........................................................11

*In re Lion Capital Grp.*,
44 B.R. 684 (Bankr. S.D.N.Y. 1984) .................................................................................... 9

*In re McLean Indus., Inc.*,
70 B.R. 852 (Bankr. S.D.N.Y. 1987) .....................................................................................8

*In re Spansion, Inc.*,
421 B.R. 151 (Bankr. D. Del. 2009) ....................................................................................12

*In re Wang Labs., Inc.*,
149 B.R. 1 (Bankr. D. Mass. 1992) ...................................................................................7, 12

iii

# TABLE OF AUTHORITIES

(cont'd)

*Law v. Siegel*,
  134 S. Ct. 1188 (2014) ........................................................................................................15

*Matter of Bohack Corp.*,
  607 F.2d 258 (2d Cir. 1979) ................................................................................................9

## STATUTES

11 U.S.C. § 105 ..............................................................................................................4, 15, 16

11 U.S.C. § 105(a) .............................................................................................................12, 15

11 U.S.C. § 503(b) ....................................................................................................................10

11 U.S.C. § 1102 ...........................................................................................................7, 15, 16

11 U.S.C. § 1102(a) ..................................................................................................................10

11 U.S.C. § 1102(a)(1) .........................................................................................................5, 14

11 U.S.C. § 1102(a)(2) ..................................................................................................6, 7, 12, 14

11 U.S.C. § 1102(b) ..................................................................................................................10

11 U.S.C. § 1102(b)(1) .............................................................................................................10

11 U.S.C. § 1126 ......................................................................................................................14

PROMESA § 106(e) .....................................................................................................................6

PROMESA § 201(b) ...................................................................................................................15

PROMESA § 201(c)(3) .................................................................................................................6

PROMESA § 301(c)(3)(A) .............................................................................................4, 13, 14, 15

PROMESA § 405(m)(2) ................................................................................................................1

# <u>TABLE OF AUTHORITIES</u>

(cont'd)

**OTHER AUTHORITIES**

Floyd Norris, *Orange County's Bankruptcy: The Overview*, N.Y. Times (Dec. 8,
  1994), *available at* http://www.nytimes.com/1994/12/08/business/orange-
  county-s-bankruptcy-the-overview-orange-county-crisis-jolts-bond-
  market.html ...................................................................................................................10

Fox Butterfield, *Lawsuits Lead Gun Maker to File for Bankruptcy*, N.Y. Times
  (June 24, 1999), *available at*
  http://www.nytimes.com/1999/06/24/us/lawsuits-lead-gun-maker-to-file-for-
  bankruptcy.html ..............................................................................................................10

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth"),[2] the Puerto Rico Sales Tax Financing Corporation ("COFINA"), the Puerto Rico Highways and Transportation Authority ("HTA"), and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (together with the Commonwealth, COFINA, and HTA, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Debtors' representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[3] respectfully submit this objection (the "Objection") to the *Ad Hoc Puerto Rico Municipalities Committee's Request for an Order Pursuant to 48 U.S.C. §2161 and 11 U.S.C. §1102 Directing the Appointment of an Official Puerto Rico Municipalities Committee* [ECF No. 709] (the "Motion"), and respectfully represent as follows:

### The Commonwealth and All its Instrumentalities Must Be Integrated - Not at War with Each Other

1.      Any request for an additional statutory committee must be considered in the unique and emergency circumstances faced by the Commonwealth. *First*, the Commonwealth is fighting for its life and future within a fiscal emergency declared by Congress where the Commonwealth cannot "provide its citizens with effective services." PROMESA § 405(m)(2). The emergency is now worse than when Congress declared it due to the previously unacknowledged exhaustion of pension funding and lack of renewal of Medicare funding, each adding up to $800 million of annual unanticipated expense. *Second*, to provide for its citizens,

---

[2] Capitalized terms used but not defined herein have the meanings given to them in the Motion (as defined herein).

[3] PROMESA has been codified in 48 U.S.C. §§ 2101–2241.

the Commonwealth needs all its component parts, such as municipalities, water and sewers, highways, electricity, university, and convention center, to name a few. These parts must work in harmony for the Commonwealth to exist and survive, just as a human being's arms, legs, heart, and lungs must work together for the human being to live.

2.      The Commonwealth's critical need for all its components to work together means its components cannot square off against each other like lone rangers with each fighting for its independent glory at the expense of one another. This may sound obvious, but the numerous pending requests for separate statutory committees for different entities and groups show it is not so obvious. Creation of new committees to focus on one group, entity, or issue, rather than the integrated enterprise, imperils the Commonwealth's survival, just as one would expect when a committee arms itself to pursue one parochial interest at the expense of others. Moreover, the spreading of Oversight Board time and Commonwealth time among more than the two existing committees takes precious time away from the overall effort to revitalize the Commonwealth.

3.      Put differently and succinctly, more committees mean more fighting, destruction, and expense, as each new committee carries out its narrowed fiduciary duties to one component of the Commonwealth at the expense of others. None of this is to say that any entities should be substantively consolidated or that each creditor should not be paid from its debtor. Rather, each debtor's and creditor's rights should be respected by a committee understanding how all components and entities must work together. Otherwise, the Commonwealth fails because all its parts are at war with one another in the middle of a worsening fiscal emergency.

4.      The Municipalities' Motion Defeats Itself. The instant Motion seeks the appointment of an additional committee for the Commonwealth's municipalities (the "Municipalities"). This request for a new committee should be denied on the basis of its own

rationale.  The Motion, in pertinent, part provides:  "Although the interests of the Municipalities

may align with those of the other Official Committees in some areas, in other areas they will be

completely opposed."  Motion at 12.  The Ad Hoc Municipalities Committee's admission that it

wants a statutory committee to champion, at everyone else's expense, the Municipalities' unique

parochial interests dooms the Motion for two reasons.  *First*, it demonstrates the Municipalities'

abilities to organize and to represent themselves.  *Second*, on its theory, every constituency

having unique interests will be entitled to a separate committee at everyone else's expense.

Saying it refutes it.  The Oversight Board completely respects the Municipalities' being integral

to the Commonwealth and their efforts to champion causes beneficial to their residents.  Those

attributes, however, do not warrant the divisive effects of creating a separate statutory

committee.

5.      The Ad Hoc Municipalities Committee confuses political representation and legal

representation in the Title III cases.  Dissatisfaction with political representation in the

appropriation of public funds under the Commonwealth's budget is not lack of representation in

the Title III cases.  Moreover, Congress did not establish the fiscal plan certification process to

be susceptible to negotiation by committees.  While the Ad Hoc Municipalities Committee

asserts the Municipalities do not have adequate representation in the Title III cases, the facts of

these cases demonstrate otherwise.  Indeed, the interests of the Municipalities are represented by

the Ad Hoc Municipalities Committee itself and the UCC.  It is simply incorrect that the

Municipalities are not adequately represented in the Title III cases.  Further, the law is clear that

not all shades of creditors must have a seat on a committee to be adequately represented.  *See*,

*e.g.*, *In re Dana Corp.*, 344 B.R. 35, 38–39 (Bankr. S.D.N.Y. 2006) ("Creditor committees often

contain creditors having a variety of viewpoints . . . however, these differing views do not

3

require a separate homogeneous committee unless they impair the ability to reach a consensus."). Similarly, not every subset of creditors is entitled to have its own statutory committee.

6.      The monetary costs and the time investment that Debtors' and Oversight Board's management and advisors would be required to invest with an additional committee completely overwhelm the marginal benefit, if any, such a committee would provide.  Accordingly, even assuming these circumstances, the Court should exercise its discretion by declining to appoint an additional committee.

7.      The Ad Hoc Municipalities Committee's last ditch efforts to have a committee appointed under a misreading of PROMESA section 301(c)(3)(A) and Bankruptcy Code section 105 are not persuasive.  Indeed, the committee's reading of PROMESA section 301(c)(3)(A) simply ignores its threshold requirements that the Commonwealth must control the legal, but not equitable, ownership of claims it is barred from voting and the Municipalities must be the beneficiary of such claims.  The Municipalities' citation of section 105 signals their Hail Mary pass.

8.      Appointment of an additional committee in these Title III cases, or in other Title III cases would have a substantial, negative impact on the Debtors' restructuring efforts.  In particular, the Debtors' turnaround is premised and dependent on integrated fiscal plans (as amended, the "Fiscal Plans"), which serve to end negative economic growth and end outmigration from the Commonwealth.  Each action of the Debtors and their non-Debtor instrumentalities, in and outside the Title III cases, affects the entire Commonwealth restructuring efforts.  Accordingly, it is of the utmost importance that (a) the UCC deal with the Commonwealth and other Debtors on an integrated basis and with a holistic view, as "a rising

4

tide lifts all boats," and (b) there not be individual committees seeking help for particular entities, special interest groups, or constituencies, such as the Municipalities.

## Pertinent Facts

9.        On June 15, 2017, the acting United States Trustee for Region 21 (the "U.S. Trustee") appointed the statutory committee of unsecured claimholders (the "UCC").  *See Appointment of Official Committee of Unsecured Creditors in the Commonwealth of Puerto Rico* [ECF No. 338].  On the same day, the U.S. Trustee appointed the statutory committee of retirees (the "Retiree Committee").  *See Appointment of Official Committee of Retirees in the Commonwealth of Puerto Rico* [ECF No. 340].

10.        As set forth in the Motion, the Ad Hoc Municipalities Committee previously requested the U.S. Trustee to appoint a committee comprised of the Municipalities.  *See* Motion at 6.  The U.S. Trustee declined to make such an appointment, implicitly finding such a committee is not warranted.[4]  *Id.*

## Objection

### a.  *Municipalities are Not Entitled to a Committee*

11.        Throughout the Motion, the Ad Hoc Municipalities Committee fails to establish any creditor-debtor relationship between the Debtors and the Municipalities.  Indeed, the only instrumentality of the Commonwealth the Ad Hoc Municipalities Committee argues it is a creditor of—the Government Development Bank ("GDB")—is a non-Debtor.  However, this relationship is an insufficient basis for the appointment of any committee in the Title III cases.[5]

---

[4]   *See* 11 U.S.C. § 1102(a)(1) ("[T]he United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders *as the United States trustee deems appropriate*.") (emphasis added).

[5]   In addition, the Ad Hoc Municipalities Committee's assertion that actions by the GDB have further eroded its constituents' financial positions, Motion at 10, is immaterial to its request for

See In re E. Maine Elec. Co-op, Inc., 121 B.R. 917, 927 (Bankr. D. Me. 1990) ("Unless the interests of the [party in interest] can be characterized as those of creditors or of equity security holders, § 1102(a)(2) grants no authority to establish a committee.").

12.     With respect to the Debtors, the Ad Hoc Municipalities Committee and its constituents appear to have political grievances for decreased appropriations of Commonwealth discretionary funds as set forth in the budget and pursuant to the Fiscal Plans, to which they have not established legal entitlement,[6] and against HTA under a hypothetical scenario in which HTA fails to maintain roads which do not belong to but are located in the Municipalities.[7]  These concerns do not themselves make the Ad Hoc Municipalities Committee, its constituents, or any of the Municipalities creditors of the Commonwealth or its instrumentalities.  Instead, the Ad Hoc Municipalities Committee's efforts express dissatisfaction with the Fiscal Plans, the certification of which, as the Ad Hoc Municipalities Committee is likely aware, is not subject to judicial review.[8]   However, dissatisfaction does not create any claim or the necessary relationship between the Municipalities, on the one hand, and the Debtors, on the other, that would entitle it to an additional committee, and there is no basis for such an appointment.[9]  Such an outcome would only serve the impossible and inequitable mission of diverting resources to

---

a statutory committee.  GDB has not commenced a title III case, and the Municipalities can pursue those claims outside this Court.  Accordingly, GDB's actions have no bearing on the Ad Hoc Municipalities Committee's entitlement to a statutory committee.

[6] Motion at 9.

[7] Motion at 21.  Under such circumstances, the Municipalities would not be required to maintain HTA's roads, and it is unclear what claim, if any, the Municipalities would have against HTA on account of its failure to fulfill its purpose.  But-for HTA's and the Commonwealth's efforts, each Municipality would be required, in the first instance, to provide transportation services to its residents, and accordingly, HTA's efforts only benefit the Municipalities.

[8] PROMESA §§ 106(e) and 201(c)(3).

[9] E. Maine Elec. Co-op, 121 B.R. at 927.

non-creditors that would otherwise be available to fund recoveries of the Debtors' actual creditors.

### b. *Municipalities are Adequately Represented*

13.     Even assuming the Municipalities are creditors of the Debtors, there is no need for a statutory committee because their interests, as organized creditors of the Commonwealth, are adequately represented by the Ad Hoc Municipalities Committee and the UCC.  Bankruptcy Code section 1102 provides that an additional committee may be warranted "*if necessary* to assure adequate representation of creditors . . . ."  11 U.S.C. § 1102(a)(2) (emphasis added); *In re Wang Labs., Inc.*, 149 B.R. 1, 2 (Bankr. D. Mass. 1992) (citing 11 U.S.C. § 1102(a)(2)); *see also In re Dana Corp.*, 344 B.R. at 37 (the movant has the burden of proving the appointment of an additional committee is necessary to insure "adequate representation").

14.     While there is no "bright-line" test for adequate representation,  *In re Hills Stores Co.*, 137 B.R. 4, 5 (Bankr. S.D.N.Y. 1992), the incontrovertible facts demonstrate the appointment of an additional committee to represent the Ad Hoc Municipalities Committee is neither necessary nor warranted here because the Municipalities' interests are adequately represented.  *First*, the Municipalities are more than capable of representing themselves.  They are cities and towns, not orphans.  Certain Municipalities have filed lawsuits to protect their rights,[10] and eleven of them organized the Ad Hoc Municipalities Committee, which represents the interests of *all* Municipalities, and invited others to join.[11]  Indeed, the Ad Hoc Municipalities

---

[10] *See Mun.'s of San Juan and Carolina v. Gov't Dev. Bank and the Commonwealth of Puerto Rico*, Nos. SJ2016CV00091 and SJ2016CV00102 (cases consolidated) (P.R. Sup. Ct. 2016); *Mun.'s of San Juan v. Gov't Dev. Bank*, SJ2017CV00501 (P.R. Sup. Ct. 2016); *Mun.'s of Caguas v. Gov't Dev. Bank et al.*, 17-cv-1973 (D.P.R. 2017).

[11] Motion at 6 ("The Ad Hoc Committee is comprised of . . . eleven (11) Municipalities . . . and was created to represent the interests of all seventy-eight (78) Puerto Rico Municipalities in the PROMESA proceedings.  Any Municipality that wishes to join in the future will also be

7

Committee is the very vehicle through which Municipalities may participate in the Title III cases while keeping their costs economical through the sharing of expenses, and there is no need for each of the Commonwealth's seventy-eight municipalities to appear individually.  Motion at 13. Simply put, the Ad Hoc Municipalities Committee's own efforts demonstrate the Municipalities are adequately represented in the Debtors' cases.

15.     Further yet, even assuming the Ad Hoc Municipalities Committee fails to adequately represent its constituents and their interests, the Municipalities are adequately represented by the UCC.  Indeed, the UCC represents the interests of all non-retiree unsecured claimholders in the Debtors' cases.  Suffice it to say, the UCC, and other parties representing unsecured claimholders, have been participating, and will continue to participate, extensively in the Title III cases.  Moreover, the Ad Hoc Municipalities Committee does not argue that the Municipalities' unsecured claims, to the extent they exist, are likely to be treated differently from other unsecured claims.  *See In re Drexel Burnham Lambert Grp., Inc.*, 118 B.R. 209, 212 (Bankr. S.D.N.Y. 1990) (denying the appointment of an additional committee, where, among other things, movants made no claim similarly situated debt was going to be treated differently). Importantly, even divergence of interests alone among general unsecured claimholders does not prevent an unsecured claimholders' committee from adequately representing all its constituents. *See*, *e.g.*, *In re Dana Corp.*, 344 B.R. at 38–39 ("Creditor committees often contain creditors having a variety of viewpoints . . . however, these differing views do not require a separate homogeneous committee unless they impair the ability to reach a consensus."); *In re McLean Indus., Inc.*, 70 B.R. 852, 861 (Bankr. S.D.N.Y. 1987) ("the presence of potential conflict may

---

joined.").  The Municipality of San Sebastian, however, objected to the appointment of a statutory committee of Municipalities, explaining, among other things, that no committee can adequately represent the interests of the Municipalities as a whole because they have different interests [ECF No. 780].

8

not always require separate committees for representation to be adequate"); *see also Matter of Bohack Corp.*, 607 F.2d 258, 262 n.4 (2d Cir. 1979) ("[T]he committee owes a fiduciary duty to the creditors, and must guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors."). Given these facts, it is evident the interests of Municipalities are adequately represented in the Title III cases, and the Debtors should not be burdened with paying for the costs and expenses attendant to an additional committee.[12]

16.     The primary support cited by the Ad Hoc Municipalities Committee, *In re Lion Capital Grp.*, 44 B.R. 684 (Bankr. S.D.N.Y. 1984), is not to the contrary. In *Lion Capital*, the issue before the Court concerned a committee's retention of counsel, not the appointment of a committee in the first instance. However, in establishing the relevant background, the Court recited its reasoning for entering an earlier order establishing a committee of municipal claimants, noting  it "observed that the great need for organized official creditor representation in this case, the inability of the United States Trustee to form an official creditors' committee [due to the small amount of debt owed to non-municipal, non-school district unsecured claimholders,] and the heavy preponderance of the claims of municipalities and school districts (over 90%) in the calculus of unsecured debt commanded the appointment of an official special committee." *Id.* at 685–86. Here, however, none of these considerations are applicable:  the UCC has been formed, it has been actively involved in the Title III cases,[13] and the Municipalities likely have

---

[12]This is especially true given the Ad Hoc Municipalities Committee seems solely concerned with the Municipalities' future appropriations from the Commonwealth instead of maximizing returns on their prepetition claims, if any, against the Debtors.

[13]Since its appointment, the UCC has filed numerous pleadings, has attended the mediation organizational meeting, and is engaged in ongoing discussions with the Oversight Board and other interested parties.

no claims against the Debtors.[14]  Accordingly, the Ad Hoc Municipalities Committee's reliance on *Lion Capital* is misplaced.[15]

17.     Moreover, the Ad Hoc Municipalities Committee's citation that government committees were formed in the *Orange County* and *Davis Indus, Inc.* bankruptcies misses the mark.  The governmental units in *Orange County* held direct prepetition claims against the debtor, with school districts having invested *over $200 million* with the debtor prior to the commencement of its chapter 9 case.[16]  Even then, the governmental unit "subcommittees" formed were not even funded by the debtor because they were already adequately represented by the UCC, and instead agreed to seek compensation on a "substantial contribution" basis under Bankruptcy Code section 503(b).  *See In re Cty. of Orange*, 179 B.R. 195, 197 n.3–4 (Bankr. C.D. Cal. 1995) (noting the U.S. Trustee "believ[ed] these groups were already adequately represented" and "agreed to appoint these subcommittees, provided that they would only seek compensation on a 'substantial contribution' basis.").  Further, the *Davis Indus., Inc.* chapter 11 case was precipitated by prepetition municipal lawsuits against the debtor alleging, among other

---

[14] Even assuming the Municipalities have valid claims, the Debtors have more than $70 billion in aggregate debt obligations, completing inundating the amounts alleged by the Municipalities. Motion at 9 (noting, in the past year, the Municipalities received $450 million in *discretionary* apportionments from the Commonwealth and legislative assignments).

[15] In addition, Ad Hoc Municipalities Committee's reliance on *In re Dow Corning Corp.*, 212 B.R. 258, 264 (E.D. Mich. 1997) is equally misplaced because it assumes, without reason, the Municipalities are entitled to a statutory committee under Bankruptcy Code section 1102(a). As demonstrated herein, they are not, and accordingly, there is no need to consider any analysis under Bankruptcy Code section 1102(b).  *See* 11 U.S.C. § 1102(b)(1).

[16] Floyd Norris, *Orange County's Bankruptcy: The Overview*, N.Y. Times (Dec. 8, 1994), *available at* http://www.nytimes.com/1994/12/08/business/orange-county-s-bankruptcy-the-overview-orange-county-crisis-jolts-bond-market.html.

things, damages for "extra police and hospital costs resulting from gun violence."[17] Accordingly, it is almost certainly the case those governmental units also held prepetition claims against the debtor.[18]   Therefore, while the Ad Hoc Municipalities Committee points to cases in which certain types of committees were established for governmental units, it fails to provide pertinent facts and reasoning that clearly demonstrate those cases stand in stark contrast to the Title III cases.  If anything, those cases demonstrate the Municipalities do not need a committee precisely because they are adequately protected by the UCC.

18.     Finally, the appointment of a <u>third</u> statutory committee in these Title III cases would be unprecedented.  In *Detroit*, the largest municipal restructuring in the history of the United States, only a single committee, representing retiree interests, was appointed.  Although the Office of the United States Trustee appointed a second committee—a committee of unsecured claimholders—the court disbanded this second committee as prohibitively expensive given the minimal value the committee would bring to the case, noting that "the participation and representation of various groups of unsecured creditors in this case has been extraordinary."  *See In re City of Detroit, Mich.*, 519 B.R. 673, 681 (Bankr. E.D. Mich. 2014) (disbanding a second committee as prohibitively expensive given the minimal value the committee would bring to the case).  In *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sep. 15, 2008), the largest chapter 11 case in history, there was only one statutory committee.  Participation here has likewise been extraordinary in these cases.  As noted above, no fewer than

---

[17] Fox Butterfield, *Lawsuits Lead Gun Maker to File for Bankruptcy*, N.Y. Times (June 24, 1999), *available at*  http://www.nytimes.com/1999/06/24/us/lawsuits-lead-gun-maker-to-file-for-bankruptcy.html.

[18] Due to the case's age, the contents of its docket are unavailable for review.

19 parties were required to attend the mediation meeting held on July 12, 2017.[19]  Accordingly, it strains credulity to believe the interests of the Municipalities, as creditors of the Commonwealth, are <u>not</u> being adequately represented given the UCC's and Ad Hoc Municipalities Committee's involvement.  Moreover, in addition to the Motion, there are two other pending requests for the appointment or reconstitution of committees.[20]  It simply is not the case that each entity or constituency participating in the Title III cases lacks adequate representation and needs its own committee, funded at everyone else's expense, to represent its interests.

c. *The Costs Associated with an Additional Committee Substantially Outweigh Any Benefits Thereof*

19.     "[T]he Court must then consider whether it should exercise its discretion and make the appointment." *Wang Labs*, 149 B.R. at 2.  This second level of analysis involves consideration of such factors as the costs involved, the time of the application, the potential for added complexity and the presence of other avenues for creditor participation.  *In re Dow Corning, Corp.*, 194 B.R. 121, 143 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997).  However, the appointment of an additional committee under Bankruptcy Code section 1102(a)(2) constitutes "extraordinary relief."  *In re Dana Corp.*, 344 B.R. at 38 (citing *In re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002); *In re Sharon Steel Corp.*, 100 B.R. 767, 778 (Bankr. W.D. Pa. 1989); *In re Grant Broad. of Philadelphia, Inc.*, 71 B.R. 655, 661 (Bankr. E.D. Pa. 1987)); *see also In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009) ("The court's appointment of an additional committee is considered 'extraordinary

---

[19] *See* Exhibit A to the *Order and Notice of Meeting with Representatives of Mediation Team* [ECF No. 560].

[20] *See Motion Requesting Appointment of Additional Committee of Government Employees and Active Pension Plan Participants or, in the Alternative, for the Reconstitution of the Retiree Committee* [ECF Nos. 607 and 692] and *Motion of the Ad Hoc Group of General Obligation Bondholders to Reconstitute the Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. §§ 105(a) and 1102(a)(4)* [ECF No. 694].

relief' and should be the 'rare exception.'") (quoting *In re Dana Corp.*, 344 B.R. at 38; *Exide Techs. v. State of Wisconsin Invest. Bd.*, No. 02-11125-KJC, 2002 WL 32332000 (D. Del. Dec. 23, 2002)).

20.     Even assuming the Ad Hoc Municipalities Committee or its constituents are the Debtors' creditors and lack adequate representation, the costs and burdens associated with an additional committee would substantially outweigh any benefit it would provide to its constituents, and accordingly, this extraordinary relief is not justified.  The various professional fees in the Title III cases to be paid by the heavily indebted and cash-strapped Debtors, and ultimately by the Commonwealth's taxpayers and creditor bodies, are expected to cost millions of dollars per month.   Further, the appointment of an additional committee will require substantial time investment by the Commonwealth, the Oversight Board and their advisors, distracting them from more time pressing issues.  An additional committee would only serve to add to those costs, but would provide marginal, if any, benefit to its constituency above the work of the UCC and other parties in interest.  Those costs are unreasonable and unjustifiable under the circumstances.  Moreover, as noted above, the Ad Hoc Municipalities Committee's assertion that failure to appoint a committee will require each of the Commonwealth's seventy-eight municipalities to appear individually is completely misplaced.  The Ad Hoc Municipalities Committee's and UCC's active efforts demonstrate an additional statutory committee is unnecessary to adequately represent the interests of Municipalities.

### d.  PROMESA section 301(c)(3)(A) Does Not Require the Appointment of a Statutory Committee for Municipalities

21.     Scrambling to find any reason to have a committee appointed, the Ad Hoc Municipalities Committee also advocates for a strained reading of PROMESA section

301(c)(3)(A).[21]  However, despite its efforts, such section does not entitle the Municipalities to a committee.  It is facially absurd that, in a definitional section of Title III of PROMESA, Congress intended to create, or did create, a circuitous entitlement to a committee for municipalities in these Title III cases when (a) the very definition at issue implicates a provision governing voting on a chapter 11 plan, and (b) Congress knows how to draft clear, statutory language requiring the appointment of a statutory committee.  *See* 11 U.S.C. § 1102(a)(1) (requiring the U.S. Trustee to appoint a committee of unsecured claimholders).  Indeed, section 301(c)(3)(A) requires first that there be a claim legally owned or controlled by the Commonwealth-issuer that the latter cannot vote, and requires second that creditors be the beneficiaries of the entity holding such claim.  The Municipalities do not pass the threshold requirements.

22.     Here, the Municipalities are neither a legal entity controlled by the Commonwealth, nor are they beneficiaries of such legal entity, and accordingly, do not qualify for a statutory committee under their interpretation of PROMESA section 301(c)(3)(A).  *First*, the fact that the Ad Hoc Municipalities Committee (a) was organized by Municipalities and (b) filed the Motion is evidence the Commonwealth does not control the Municipalities.  If it did, it certainly would not have allowed these actions to transpire.  Indeed, the Municipalities are

---

[21] PROMESA Section 301(c)(3)(A) provides:

> The term 'holder of a claim or interest', when used in [Bankruptcy Code] section 1126 . . . (A) shall exclude any Issuer or Authorized Instrumentality of the Territory Government Issuer (as defined under Title VI of this Act) or a corporation, trust or other legal entity that is controlled by the Issuer or an Authorized Territorial Instrumentality of the Territory Government Issuer, provided that the beneficiaries of such claims, to the extent they are not referenced in this subparagraph, shall not be excluded, and that, for each excluded trust or other legal entity, the court shall, upon the request of any participant or beneficiary of such trust or entity, at any time after the commencement of the case, order the appointment of a separate committee of creditors pursuant to section 1102(a)(2) of title 11, United States Code[.]

legally separate from and independent of the Commonwealth and enjoy autonomy as separate political entities.   The Municipalities raise their own taxes and approve their own budgets. Therefore, PROMESA section 301(c)(3)(A) is inapplicable to the Municipalities.

23.   *Second*, even if the Municipalities were a controlled trust or legal entity, they would not be the beneficiaries of such claims of the trust or legal entity.   There is no trust agreement or control agreement showing the Municipalities are beneficiaries.   The Municipalities' inhabitants are the ones the Oversight Board and the Debtors, among others, are tasked to protect,[22]  and are adequately represented by both the UCC and, to the extent they are retirees, the Retiree Committee.   Granting the Motion would simply divert the Debtors' and Oversight Board's attention from their essential tasks and require them to devote time to the Municipalities' specific complaints that fail to take into account a global perspective.   Accordingly, even under the Ad Hoc Municipalities Committee's strained reading of PROMESA section 301(c)(3)(A), a committee is neither required, nor warranted, and would only prejudice the Debtors and their actual stakeholders.

### e. *Bankruptcy Code Section 105 Does Not Empower the Court to Override Section 1102*

24.   In closing, the Ad Hoc Municipalities Committee makes a last gasp attempt to have the Court fulfill its request by using its equitable powers under Bankruptcy Code section 105 to appoint a committee.[23]   However, because Bankruptcy Code section 1102 provides the explicit requirements for the formation of a statutory committee, Bankruptcy Code section 105 cannot be used to override those requirements or substitute others.  *See Law v. Siegel*, 134 S. Ct.

---

[22] *See*, *e.g.*, PROMESA section 201(b) (Among other things, "[a] Fiscal Plan shall . . . ensure the funding of essential public services[.]").

[23] Bankruptcy Code section 105(a) provides the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

1188, 1194 (2014) ("Bankruptcy Code  § 105(a) does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.") (internal quotation marks omitted). Therefore, the Ad Hoc Municipalities Committee's failure to fulfill the requirements for the appointment of its own committee cannot be remedied by Bankruptcy Code section 105, and for the relief it seeks, the Ad Hoc Municipalities Committee must fulfill Bankruptcy Code section 1102's explicit requirements.

### f.   An Additional Committee Would Imperil the Debtors' Restructuring Efforts

25.     In addition to all the above, the appointment of an additional statutory committee would have a substantial, negative impact on the Debtors' restructuring efforts.  In particular, the Debtors' turnaround is premised and dependent on integrated Fiscal Plans, which serve to end negative economic growth and end outmigration from the Commonwealth.  Each action of the Debtors and their non-Debtor instrumentalities, in and outside the Title III cases, affects their restructuring efforts.  Accordingly, it is of the utmost importance that (a) the UCC deal with the Commonwealth and other Debtors on an integrated basis, and (b) there not be individual committees not having the big picture view.  Notably, this is not a disadvantage for individual entities or creditor groups.  It does no good for an instrumentality of the Commonwealth to act independently and to obtain a result at the expense of other instrumentalities because that type of outcome maximizes the prospects of failure of the Commonwealth as a whole.  Individualistic help could prove detrimental to those entities and constituencies if they further positions that help their own constituencies in a vacuum, without taking into consideration the effect on the Commonwealth's economy as a whole, which would prevent a turnaround of the Debtors.

26.     Moreover, the management time of the Debtors, the Oversight Board, and all professionals in dealing with an additional committee would be substantial, and each extra committee means there is less time to address all other issues.  Indeed, this loss of time is even

16

more detrimental than any marginal monetary cost associated with the committee alone due to the additional time that will necessarily be devoted to litigation, requests for review, access to information, and the like.

27.     Further, if the Ad Hoc Municipalities Committee's request were granted, it would also serve as terrible precedent for the future Title III cases.  To the extent an additional committee is appointed in the Debtors' Title III cases, the floodgates will open in these cases as each group of creditors having a unique slant on the case will stand on line to prove its entitlement.  This outcome would undoubtedly drain significant resources from the Commonwealth and its instrumentalities that could otherwise be used toward the Debtors' restructuring, to satisfy the claims of their creditors, and provide much-needed services to residents of the Commonwealth.

*[Remainder of Page Intentionally Left Blank]*

17

WHEREFORE the Debtors respectfully request the Court to (a) sustain the Objection, (b) deny the Motion, and (c) grant the Debtors such other and further relief as is just.

Dated: July 28, 2017
San Juan, Puerto Rico

Respectfully submitted,

*/s/*   Martin J. Bienenstock

Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Maja Zerjal
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

*/s/*   Ubaldo M. Fernández

Ubaldo M. Fernández
USDC No. 224807
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

18