**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

------------------------------------------------------------------------- x
                                                        :
In re:                                                  :
                                                        :
THE FINANCIAL OVERSIGHT AND                             : PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                       : Title III
                                                        :
        as representative of                            : Case No. 17-BK-3283 (LTS)
                                                        :
THE COMMONWEALTH OF PUERTO RICO *et al.*,               : (Jointly Administered)
                                                        :
        Debtors.[1]                                     :
------------------------------------------------------------------------- x

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO**
**AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS'**
**MOTION TO RECONSTITUTE COMMITTEE**
**UNDER BANKRUPTCY CODE SECTIONS 105(a) AND 1102(a)(4)**

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND .................................................................................... 5

GO GROUP ......................................................................................... 6

OBJECTION......................................................................................... 8

    A.    Request to Add Commonwealth Bondholders to Committee Is Premature Because Court Has Not Yet Determined Whether Commonwealth Bonds Are Secured or Unsecured ................................................................. 9

        i.    Fully Secured Creditors Are Ineligible for Committee Membership ........ 9

        ii.    The GO Group's Bizarre "Appoint Me Now and You Can Remove Me Later If I Prevail" Argument .............................................. 10

    B.    Existing Committee Members Adequately Represent Unsecured Creditors....... 13

        i.    Existing Committee Members Are Representative and Remain Unpaid Unsecured Creditors.................................................. 13

        ii.    Adding GO Group Members at This Time Would Harm, Not Help Committee's Representative Role.......................................... 14

        iii.    Precedent Used by GO Group Is Off Point............................. 17

    C.    Constitution of Committee Should Be Left to Discretion of Trustee ................. 17

    D.    Monoline Insurer Statements in Support of GO Group's Motion Should Be Rejected for the Same Reasons.............................................................. 18

    E.    Court Should Not Create Any Additional Official Committees, Including One to Represent "Constitutional Debtholders" ................................................... 21

        i.    Committee Adequately Represents Commonwealth Bondholders if They Are Unsecured .................................................. 21

        ii.    Even if Court Determined that Commonwealth Bondholders Are not Adequately Represented, Court Should Decline to Appoint Additional Official Committees in Its Discretion................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*In re Am. W. Airlines*,
142 B.R. 901 (Bankr. D. Ariz. 1992) ........................................................................9

*In re Bennett*,
17 B.R. 819 (Bankr. D.N.M. 1982) ..........................................................................9

*In re Budd Co., Inc.*,
512 B.R. 910 (Bankr. N.D. Ill. 2014) ......................................................................22

*In re Daig Corp.*,
17 B.R. 41 (Bankr. D. Minn. 1981) .........................................................................18

*In re Dana Corp.*,
344 B.R. 35 (Bankr. S.D.N.Y. 2006) ..........................................................15, 22, 24

*In re Dewey & Leboeuf LLP*,
12-12321 MG, 2012 WL 5985325 (Bankr. S.D.N.Y. Nov. 29, 2012) ...................25

*In re Dow Corning Corp.*,
194 B.R. 121 (Bankr. E.D. Mich. 1996)
  *rev'd by*, 212 B.R. 258 (E.D. Mich. 1997).....................................................17, 25

*In re Enron Corp.*,
279 B.R. 671 (Bankr. S.D.N.Y. 2002).....................................................................15

*In re Enron Corp.*,
279 B.R. 685 (Bankr. S.D.N.Y. 2002)............................................................ *passim*

*In re Fas Mart Convenience Stores, Inc.*,
265 B.R. 427 (Bankr. E.D.Va 2001)..................................................................11, 12

*In re First RepublicBank Corp.*,
95 B.R. 58 (Bankr. N.D. Tex. 1988) ........................................................................9

*In re Garden Ridge Corp.*,
No. 04-10324 (DDS), 2005 WL 523129 (Bankr. D. Del. Mar. 2, 2005).........18, 27

*In re Glendale Woods Apartments, Ltd.*,
25 B.R. 414 (Bankr. D. Md. 1982) ...........................................................................9

*In re Grant Broad. of Philadelphia, Inc.*,
71 B.R. 655 (Bankr. E.D. Pa. 1987) ..................................................................23, 26

*In re Hills Stores Co.*,
    137 B.R. 4 (Bankr. S.D.N.Y. 1992) ...................................................................18

*In re Jartran*,
    732 F.2d 584 (7th Cir. 1984) .........................................................................20

*Johns-Manville Corp. v. Doan*,
    26 B.R. 919 (Bankr. S.D.N.Y.1983) ...............................................................12

*In re Kontaratos*,
    15 B.R. 298 (B.A.P. 1st Cir. 1981) ...................................................................9

*Lex Claims v. Garcia Padilla*,
    No. 16-02374, 0 (D.P.R. Nov. 4, 2016) ............................................................7

*In re Mammoth Mart, Inc.*,
    536 F.2d 950 (1st Cir. 1976)...........................................................................20

*Mirant Ams. Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of*
    *Enron Corp.*,
    No. 02-cv-6274 (GBD), 2003 WL 22327118 (S.D.N.Y. Oct. 10, 2003)........................ *passim*

*Mirant Ams. Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of*
    *Enron Corp.*,
    02 Civ. 6274 (GBD), 2003 U.S. Dist. LEXIS 18149 (S.D.N.Y. Oct. 9, 2003) ......................19

*In re Ne. Dairy Coop. Fed'n, Inc.*,
    59 B.R. 531 (Bankr. N.D.N.Y. 1986) ...............................................................18

*In re New Century TRS Holdings, Inc.*,
    No. 07-10416 (KJC), 2013 WL 5377962 (Bankr. D. Del. Sept. 26, 2013) ............................21

*Official Comm. of Unsecured Creditors of Apex Glob. Info. Servs., Inc. v. Qwest*
    *Commc'ns Corp.*,
    405 B.R. 234 (E.D. Mich. 2009),
    *aff'd sub nom. In re A.P. Liquidating Co.*, 421 F. App'x 583 (6th Cir. 2011) ........................9

*In re Park W. Circle Realty, LLC*,
    No. 10-12965 (AJG), 2010 WL 3219531 (Bankr. S.D.N.Y. Aug. 11, 2010)........................18

*In re Plabell Rubber Prods.*,
    140 B.R. 179 (Bankr. N.D. Ohio 1992) ............................................................10

*In re Pub. Serv. Co. of New Hampshire*,
    89 B.R. 1014 (Bankr. D.N.H. 1988) ................................................................25

*In re Residential Capital, LLC*,
    480 B.R. 550 (Bankr. S.D.N.Y. 2012) .........................................................21, 23

*In re Richmond Tank Car Co.*,
  93 B.R. 504 (Bankr. S.D. Tex. 1988) ...................................................................9

*In re Seaescape Cruises, Ltd.*,
  131 B.R. 241, 243 (Bankr. S.D. Fla. 1991) ........................................................10

*In re Sharon Steel Corp.*,
  100 B.R. 767 (Bankr. W.D. Pa. 1989) ...................................................18, 24, 27

*In re ShoreBank Corp.*,
  467 B.R. 156 (Bankr. N.D. Ill. 2012) .................................................................24

*In re Swolsky*,
  55 B.R. 144 (Bankr. N.D. Ohio 1985) ................................................................12

*In re Vt. Real Estate Inv. Tr.*,
  20 B.R. 33 (Bankr. D. Vt. 1982) ...........................................................................9

*In re Walat Farms, Inc.*,
  64 B.R. 65 (Bankr. E.D. Mich. 1986) ............................................................20, 21

*In re Wang Labs, Inc.*,
  149 B.R. 1 (Bankr. D. Mass. 1992) .......................................................23, 25, 26

*In re Winn-Dixie Stores, Inc.*,
  326 B.R. 853 (Bankr. M.D. Fla. 2005) ..................................................21, 23, 26

**Statutes**

48 U.S.C. §§ 2101 *et seq.*......................................................................................5

11 U.S.C. § 1102(a)(4)...........................................................................................8

11 U.S.C. § 1103(c)(2)......................................................................................4, 12

**Other Authorities**

7-1102 COLLIER ON BANKRUPTCY ¶ 1102.02 (16th ed. 2017) .................................9

7-1102 COLLIER ON BANKRUPTCY ¶ 1102.05 (16th ed. 2017) ...............................12

Kenneth N. Klee & K. John Shaffer, Symposium on Bankruptcy: Chapter 11
  Issues: *Creditors' Committees Under Chapter 11 of the Bankruptcy Code*, 44
  S.C. L. Rev. 995 (1993) .....................................................................................9

David A. Skeel, Jr., *What is a Lien? Lessons from Municipal Bankruptcy*, 2015 U.
  Ill. L. Rev. 675 ..................................................................................................8

iii

The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico

(and other title III debtor(s) (if any) for which it acts as the official committee of unsecured

creditors) (the "Committee") hereby submits this objection (the "Objection") to the *Motion of the*

*Ad Hoc Group of General Obligation Bondholders* (the "GO Group") *to Reconstitute the Official*

*Committee of Unsecured Creditors Pursuant to 11 U.S.C. §§ 105(a) and 1102(a)(4)* [Docket No.

694] (the "Motion")[1] and certain monoline insurer responses and joinders thereto,[2] seeking,

among other things, entry of an order (i) directing the United States Trustee (the "Trustee") to

alter the membership of the Committee, or (ii) in the alternative, appointing an additional official

committee for holders of Commonwealth bonds ("Commonwealth Bondholders").  In support of

the Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Trustee has ably fulfilled its statutory duties by appointing a diverse and

representative Committee comprised of trade creditors, unions representing current employees,

and tax refund creditors.  The Committee includes businesses that do construction, deliver

hospital supplies, provide fuel-oil, and offer security services to the Commonwealth, as well as

labor organizations which represent thousands of public employees whose services are essential

to the island.  Although the members of the Committee are owed millions of dollars, and have

experienced the hardships shared by all other unsecured creditors, they have volunteered dozens

of hours per week to serve on the Committee as representatives of the entire class of general

---

[1]     Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

[2]     The Committee objects to the relief requested by the monoline insurers of Commonwealth Bonds on the same
        grounds that it objects to the Motion.  The pleadings filed by monoline insurers include the (a) Joinder, filed by
        Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (f/k/a Financial Security Assurance Inc.)
        (collectively, "Assured") [Docket No. 811], (b) the Response of Financial Guaranty Insurance Company
        ("FGIC") in Support of the Motion [Docket No. 795], and (c) the Objection filed by Ambac Assurance

unsecured creditors.  Each of the Committee members remains unpaid and is dedicated to working diligently to protect and maximize the recoveries of all general unsecured creditors.

2.       The Committee's members have one other thing in common: they are undoubtedly *unsecured* creditors.  By contrast, the GO Group has been arguing for years that it holds *secured* claims, and it does so again in the ***first*** paragraph of this Motion where it requests to be appointed to the unsecured creditors' committee.[3]  The GO Group fails to cite a single case where a court appointed a creditor holding only secured claims (or a creditor arguing that it is "fully secured"[4]) to an unsecured creditors' committee because no such case exists.  If the GO Group is correct about its status as fully secured, courts and commentators agree that none of the holders of those bonds can serve on the Committee—fully secured creditors are barred from participation on an unsecured creditors' committee.

3.       All the cases cited by the GO Group that address whether a creditor is entitled to appointment to a committee involve creditors holding *unsecured* claims, or at least *partially unsecured* claims.  While the Committee does not disagree with the basic premise that an *unsecured* bondholder owed several billion dollars could be selected by the Trustee to sit on an unsecured creditors' committee, the Trustee refused to appoint the GO Group to the Committee because it insists that it holds fully secured claims, rather than unsecured claims.  The GO Group is, therefore, the architect of its own predicament.

---

Corporation ("Ambac") [Docket No. 809] arguing that it too should be appointed to the Committee if the Motion is granted.

[3]   Mot. ¶ 1 n.3 ("The GO Group disputes the Commonwealth's assertion that Constitutional Debtholders are general unsecured creditors. In due course, the GO Group will establish that Constitutional Debt is protected by a statutory lien on all 'available resources' or certain subsets of those resources.").

[4]   The Committee uses the term "fully secured" in this Objection to reflect the theory advocated by the GO Group that it is secured by all available resources of the Commonwealth and entitled to be paid in full before any other creditors receive any distributions on account of their unsecured claims.

2

4.      The Trustee appropriately recognized that a group of ostensibly *fully secured*

creditors cannot adequately represent the interests of unsecured creditors in these cases (and

potentially other related cases).  Arguably, the Trustee would have abused its discretion had it

appointed a group of creditors to the Committee who have consistently and repeatedly asserted

that they are fully secured.  Indeed, the conflicts of interest that would arise from such an

appointment to the Committee would be insurmountable given the "all or nothing" nature of the

GO Group's asserted liens.  The GO Group asserts the position that it is fully secured and if it is

correct this would deprive unsecured creditors of any recovery on their claims to the extent that

the Commonwealth cannot pay the general obligation bonds in full.  That fundamentally cannot

align with a duty to maximize recoveries for the benefit of all general unsecured creditors of the

Commonwealth.  Stated another way, a constituency that is actively litigating to minimize, rather

than maximize, the recoveries of general unsecured creditors is hardly "representative" of the

interests of unsecured creditors as contemplated by section 1102(b)(1) of the Bankruptcy Code.

5.      The GO Group disparages the representation of unsecured creditors by the current

members of the Committee on the basis that the Commonwealth has expressed its intention to

pay employees and trade creditors in full.  But the Committee knows that these intentions, while

welcomed, may not come to fruition, especially if the GO Group succeeds in its position that it is

fully secured.  Moreover, over the years, labor unions and their members have had to make

painful economic concessions to the Commonwealth.[5]  In addition, negotiations over the

Proposed Fiscal Plan have recently taken place between the government of Puerto Rico and the

Oversight Board regarding worker furloughs and Christmas bonuses, other negotiations may take

---

[5]     The notion that the interests of the labor unions on the Committee somehow align with those of the
Commonwealth ignores these hard fought concessions that the unions have had to make.

place in the future, and the Fiscal Plan may well change.  At bottom, none of the general

unsecured creditors, including the members of the Committee, are assured of full payment in

these cases.

6.      And that is precisely why the current members of the Committee adequately

represent the interests of unsecured creditors generally.  Unlike the GO Group, the Committee's

members are actively pursuing strategies designed to maximize the recoveries of unsecured

creditors *as unsecured creditors.*  In stark contrast, the GO Group seeks to maximize the

recoveries of the Commonwealth Bondholders based on their position that they are fully secured.

Seeking status as a fully secured creditor is in direct conflict with the duties of the Committee.

7.      The GO Group suggests that this conflict can be cured by removing them from the

Committee *after* the Court holds that they are fully secured creditors.  But that argument is

totally backwards.  They could only be added to the Committee in the first place if the Court

determined that the GO Group holds *unsecured* claims.  In every large, complex bankruptcy

case, the statutory creditors' committee will investigate, and often challenge, the validity and

enforceability of purported liens on estate assets as contemplated by section 1103(c)(2) of the

Bankruptcy Code.  Under the approach advocated by the GO Group, the holder of a lien that may

be disputed or challenged should be placed on the official committee of unsecured creditors until

the creditor wins a final judgment that the liens are valid and enforceable.  The precedential

effect of a court ruling that adopts this approach would be staggering, as it could be used

nationwide by banks and other lenders holding potentially contested liens to argue that they

should be placed on the committees tasked by Congress with the duty of investigating the

purported liens.  This "fox guarding the henhouse" approach makes bad law and no sense.

8.      For this reason, the Committee urges the Court to deny the Motion, without prejudice.  The relief requested by the GO Group is simply premature.  If, in the future, they concede that they are unsecured creditors, or the Court makes that determination for them, it may be appropriate for Trustee to add representation from the Commonwealth Bondholders to the Committee.  That cannot happen, however, as long as the question remains in doubt regarding whether the Commonwealth's general obligation bonds are fully secured by all available resources.

9.      The Committee also requests the Court to deny the GO Group's request for an official committee of Commonwealth Bondholders.  At this time, the Court has multiple motions pending for the appointment of official committees representing the parochial interests of various constituencies.  Additional committees are, at this juncture, unnecessary, wasteful of the Commonwealth's limited resources, and threaten to open the floodgates to a countless number of requests for official committees to represent different groups of stakeholders in these very large and complex cases.[6]  The Court would be wise to avoid that hornet's nest.  Accordingly, the Committee respectfully requests that the Court deny the Motion, without prejudice.

## BACKGROUND

10.      On May 3, 2017, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") commenced a title III case for the Commonwealth of Puerto Rico (the "Commonwealth") by filings a voluntary petition for relief pursuant to section 304(a) of PROMESA (the "Commonwealth Title III Case").[7]  Thereafter, the Oversight Board commenced title III cases (together with the Commonwealth Title III Case, the "Title III Cases") for each of

---

[6]     Indeed, bootstrapping to the Motion within hours was a request for an official committee to represent the interests of municipalities [Docket No. 709].

[7]     References to PROMESA are references to 48 U.S.C. §§ 2101 *et seq.*

COFINA, the Employees Retirement System for the Commonwealth of Puerto Rico, the Puerto

Rico Highways and Transportation Authority, and the Puerto Rico Electric Power Authority

(collectively, and together with any other Commonwealth instrumentalities that file title III

cases, the "Debtors").[8]

11.     By order dated June 29, 2017, the Court approved the joint administration of the

title III cases of the Commonwealth, COFINA, the Employees Retirement System for the

Commonwealth of Puerto Rico, and the Puerto Rico Highways and Transportation Authority

(together, the "Jointly Administered Cases") [Docket No. 537].

12.     On June 15, 2017, the Trustee filed a *Notice Appointing Creditors Committee for

Unsecured Creditors* [Docket No. 338].  The members of the Committee are the American

Federation of Teachers, Drivetrain, LLC as the Creditors' Trustee for Doral Financial

Corporation, Genesis Security Services, Inc., Puerto Rico Hospital Supply, Service Employees

International Union, Total Petroleum Puerto Rico Corp., and the Unitech Engineering Group,

S.E.

### GO Group

13.     The GO Group has been heavily involved with the Puerto Rico debt crisis for

many years in multiple venues.  The Commonwealth has issued or guaranteed approximately

$18.2 billion in principal amount of bonds, including $12.5 billion in general obligation bonds

issued by the Commonwealth and $5.7 billion in other bonds guaranteed by the Commonwealth

(collectively, "Commonwealth Bonds").  The Oversight Board and the Commonwealth have

taken the position that the Commonwealth Bonds are unsecured, but the GO Group has

---

[8]     Unless otherwise indicated, references to docket numbers shall be to the docket of the Commonwealth Title III
Case.

repeatedly argued that Commonwealth Bonds are fully secured.[9]  Indeed, the argument is

repeated in a footnote in the first paragraph of the Motion.[10]

14.    Despite insisting that Commonwealth Bonds are fully secured, the GO Group

recently asked the Trustee to be included on the Committee.[11]  The Trustee, however, exercised

its discretion to exclude the GO Group from the Committee—at least for now—because it does

not believe that "creditors claiming that their claims are secured or otherwise have full priority"

should be included on the Committee.[12]

15.    For its part, the Committee has not yet completed its analysis of whether the GO

Group holds secured or unsecured claims.  The Committee is working diligently to reach a

conclusion on that threshold issue, but the Committee will require time to work through the

myriad legal and factual issues surrounding that issue.  Even at this early stage however, the

Committee is aware that non-frivolous arguments have been raised (by the Commonwealth,

---

[9]    *See, e.g.*, GO Group Obj. to Commonwealth-COFINA Procedures Mot. [ECF 408] at 3 n.4 ("In due course, the GO Group will also establish that the Constitutional Debt is also protected by a statutory lien on all "available resources" and/or certain subsets of those resources. The Court need not address that issue in connection with this objection, because the Constitutional Debt's status as a secured claim does not bear on the proper disposition of the Board Procedure Motion."); Compl. ¶ 2, *ACP Master,* Adv. Proc. 17-00189 (Bankr. D.P.R. June 29, 2017) [ECF 1] ("Unique among all of the Commonwealth's debt obligations, public debt is secured by an absolute and enforceable first claim and lien on all of the Commonwealth's "available resources," P.R. Const. art. VI, § 8, in addition to, and complemented by, a pledge of the Commonwealth's good faith, credit, and taxing power."); Second Am. Compl. ¶ 5, *Lex Claims v. Garcia-Padilla*, No. 16-02374, (D.P.R. Nov. 4, 2016) [ECF 78] ("Plaintiffs are beneficial owners of substantial amounts of bonds that are explicitly protected by Puerto Rico's Constitution, and are therefore protected by PROMESA Sections 204(c)(3) and 207. These constitutionally protected bonds fall into two categories: (i) the Commonwealth's general obligation bonds, which were issued by the Commonwealth, are protected and secured by a first lien on all available resources of the Commonwealth, and are backed by a pledge of the Commonwealth's good faith, credit, and taxing power; and (ii) bonds issued by certain of the Commonwealth's public corporations, which are guaranteed by the same first lien and pledge by the Commonwealth."); Compl. ¶ 21, *Jacana Holdings, Inc. v. Commonwealth of P.R.,* , Case No. 16-04702, (S.D.N.Y. June 21, 2016) [ECF 1] ("The total amount of Constitutional Debt protected and secured by the Constitutional Debt Priority Guarantee is less than $18.3 billion—only a small portion of the $70 billion figure that Puerto Rico has repeatedly asserted as its total debt load (which figure includes debts not only of the Commonwealth but also of its public corporations, instrumentalities, and municipalities).").

[10]    Mot. ¶ 1 n.3.

[11]    *See* Mot. Exs. B & C.

[12]    Mot. Ex. D.

among others) to the effect that the Commonwealth Bondholders are not secured creditors.[13]

Still, the Committee recognizes that *to the extent the GO Group holds unsecured claims*, the

Committee will fulfill its fiduciary duties to the GO Group.  The Committee does not, however,

owe duties to the GO Group to the extent the GO Group's claims are fully secured.

16.     The GO Group filed the Motion on July 21, 2017 to either (a) force the

reconstitution of the Committee to include the two GO Group members willing to serve on the

Committee, or (b) direct the Trustee to form an official committee of Commonwealth

Bondholders.

## **OBJECTION**

17.     Section 1102(a)(4) of the Bankruptcy Code provides that "the court may order the

United States trustee to change the membership of a committee . . . if the court determines that

the change is necessary to ensure adequate representation of creditors . . . ."[14]  As the Committee

explains below, its current representation of general unsecured creditors is more than adequate

and adding creditors that have asserted fully secured claims will harm rather than help that

representation.

---

[13]     *See, e.g.*, David A. Skeel, Jr., *What is a Lien? Lessons from Municipal Bankruptcy*, 2015 U. Ill. L. Rev. 675
(analyzing the dispute over GO bond priorities in the City of Detroit bankruptcy and "conclud[ing] that
traditional GO bondholders are simply general creditors" because "[a] municipality's 'full faith and credit'
commitment does not by itself create a lien").  Professor Skeel is one of the members of the PROMESA
Oversight Board.

[14]     11 U.S.C. § 1102(a)(4).

**A.** **Request to Add Commonwealth Bondholders to Committee Is Premature Because Court Has Not Yet Determined Whether Commonwealth Bonds Are Secured or Unsecured**

18.     Courts have long recognized that holding an *unsecured* claim is one of the prerequisites for eligibility to sit on an unsecured creditors' committee.[15]  Indeed, courts have refused to appoint secured creditors to an official unsecured creditors' committee where the secured creditor asserts a lien on all assets or alleges that it is fully secured.[16]  The leading secondary sources agree.[17]

**i.     Fully Secured Creditors Are Ineligible for Committee Membership**

19.     The GO Group cites no authority to support its argument that creditors who are fully secured should nonetheless be allowed to sit on an unsecured creditors' committee.  The GO Group attempts to bury its disqualification at the end of its brief, citing inapposite cases where courts appointed a creditor with both an ***unsecured claim*** and a secured claim to

---

[15]     *See e.g., In re Kontaratos*, 15 B.R. 298, 300 (B.A.P. 1st Cir. 1981) (stating that section 1102 directs the court to appoint a committee of creditors holding unsecured claims); *Official Comm. of Unsecured Creditors of Apex Glob. Info. Servs., Inc. v. Qwest Commc'ns Corp.*, 405 B.R. 234, 250 (E.D. Mich. 2009), *aff'd sub nom. In re A.P. Liquidating Co.*, 421 F. App'x 583 (6th Cir. 2011) (noting that a requirement to be on an unsecured creditors' committee is that the creditors' "claims must be 'unsecured'"); *In re Richmond Tank Car Co.*, 93 B.R. 504, 506 (Bankr. S.D. Tex. 1988) (same); *In re First RepublicBank Corp.*, 95 B.R. 58, 60 (Bankr. N.D. Tex. 1988) ("To be eligible for committee membership, the creditor must hold an unsecured pre-petition claim."); *In re Vt. Real Estate Inv. Tr.*, 20 B.R. 33, 35 (Bankr. D. Vt. 1982) (stating that to be on an unsecured creditors' committee a creditor's "claim held must be unsecured") (citing *In re Bennett*, 17 B.R. 819, 820 (Bankr. D.N.M. 1982)).

[16]     *See In re Am. W. Airlines*, 142 B.R. 901 (Bankr. D. Ariz. 1992) (holding that an unsecured creditor who issued a post-petition DIP loan to debtor secured by substantially all of debtor's assets was unable to properly represent the interests of the unsecured creditors);  *In re Glendale Woods Apartments, Ltd.*, 25 B.R. 414, 415 (Bankr. D. Md. 1982) (refusing to appoint a secured creditor to creditors' committee because "[a]t this time . . .  it is not known whether [the movant] is fully secured" and that even if it was not fully secured, its interests might be in conflict with those of other members of the unsecured creditors' committee).

[17]     *See* 7-1102 COLLIER ON BANKRUPTCY ¶ 1102.02 (16th ed. 2017) ("There is no doubt that a creditor holding only a secured claim should not be entitled to serve on an unsecured creditors' committee."); Kenneth N. Klee & K. John Shaffer, Symposium on Bankruptcy: Chapter 11 Issues: *Creditors' Committees Under Chapter 11 of the Bankruptcy Code*, 44 S.C. L. Rev. 995, 1066 (1993) (same).

unsecured creditors' committees,[18] and cases where there was a dispute over whether a creditor

on, or seeking appointment to, the committee was owed any money at all (with that debt always

being unsecured if it existed).[19]  Moreover, in the very rare situations where a holder of a secured

claim has been appointed to the unsecured creditors' committee, the creditor in those cases held a

large unsecured claim **and** some other secured claim.[20]  By contrast, the GO Group alleges that

all of its claims are fully secured.  Therefore, those creditors cannot be allowed on the

Committee.

> ### ii.  The GO Group's Bizarre "Appoint Me Now and You Can Remove Me Later If I Prevail" Argument

20.  The GO Group deflects these concerns by arguing that the Court may determine,

at a later date, that its claims are unsecured, and thus the GO Group should be allowed to serve

on the Committee until that determination has been made.  But this reasoning is backwards.

Whatever conflicts of interest may exist between the Committee and the GO Group exist now

and will only be eliminated by a final determination of the Court that those creditors are

unsecured.  The Committee should not be put in the untenable position of having to fulfill its

fiduciary duties to review and be heard on the merits of the pending litigation over whether the

Commonwealth Bonds are fully secured—which is one of the central issues in the entire case—

while the creditors advocating that they are fully secured sit on the Committee.

21.  Here, the GO Group's claims are either fully secured or fully unsecured.  This is

not a situation like the *Plabell Rubber* and *Seaescape Cruises* cases where a creditor held a large

---

[18]   *See* Mot. ¶ 64 (citing *In re Plabell Rubber Prods.*, 140 B.R. 179 (Bankr. N.D. Ohio 1992) (holding that a union holding secured claims and also a lawsuit for unfair labor practices that was the sixth largest unsecured claim against the Debtor could sit on the unsecured creditors' committee); Mot. ¶ 67 (citing *In re Seaescape Cruises, Ltd.,* 131 B.R. 241, 243 (Bankr. S.D. Fla. 1991) (appointing creditor to creditors' committee that held unsecured claims and may, in addition,  have held maritime secured claims that could decide to abandon ).

[19]   *Id*. ¶ 67 (collecting cases).

and substantial unsecured claim in addition to a secured claim.  The resolution of whether the

GO Group has secured or unsecured bonds is a central question in the Title III Cases, for the

answer will dictate who else, besides the GO Group, may recover on its claims in these cases.

22.     In fact, when a court was faced with facts nearly identical to this case, the court

determined the **United States trustee abused its discretion** in appointing a creditor asserting

only a secured claim and ordered that the creditor be removed from the committee.[21]  In *Fas*

*Mart*, the creditor at issue was aggressively litigating its entitlement to a secured claim.[22]  The

creditor, a business that issued money orders, filed an adversary proceeding against the debtor

for a judgment directing the immediate release of "trust funds" that the debtor held.  The creditor

argued that it had a security interest in those "trust funds."[23]  The committee, which had

intervened in the adversary proceeding to oppose the "trust fund" claims, sought an order from

the court striking the United States trustee's appointment of the allegedly secured creditor to the

committee. The court removed the creditor from the committee, holding that the allegedly

secured creditor "has consistently asserted and aggressively advanced its status not as an

unsecured creditor, but rather as a secured creditor entitled to the immediate turnover of

approximately four million dollars in 'trust funds.'"[24]  As a result, the interests of the creditor

were in conflict with those of the unsecured creditors comprising the committee and its exclusion

was proper.[25]  The court also noted that ***the trustee abused its discretion*** by failing to exclude the

creditor at the behest of the debtors and the other committee members.

---

[20]   *See Plabell Rubber,* 140 B.R. at 181–82; *see also Seaescape Cruises,* 131 B.R. at 243.

[21]   *In re Fas Mart Convenience Stores, Inc.*, 265 B.R. 427, 430 (Bankr. E.D.Va 2001).

[22]   *Id*. at 433

[23]   *Id*. at 429–30.

[24]   *Id*. at 430.

[25]   *Id*. at 433.

23.     While conflicting viewpoints over strategic objectives may be commonplace on unsecured creditors' committees, it is difficult to fathom how a member of the Committee can at once fulfill its fiduciary duties to all unsecured creditors while aggressively litigating that it is a fully secured creditor entitled to get paid before any other creditor of the Commonwealth.  In the Committee's view, participation on the Committee by these creditors at this time presents a disqualifying conflict of interest.[26]

24.     Under the GO Group's suggested approach, secured lenders would now be entitled to seek appointment to unsecured creditors' committees and, thus, guard against the risk that the committee's challenges to their claims could be successful.  The precedential effects of the GO Group's argument that it should be allowed to serve on the Committee until the Court determines the validity of the alleged liens would be staggering and would undermine the proper administration of bankruptcy cases generally.  Unsecured creditors' committees frequently challenge the validity of lenders' security interests in chapter 11 cases around the United States. The GO Group asks this Court to rule that any creditor holding a disputed lien should be eligible for appointment to the unsecured creditors' committee until the disputed liens are adjudicated. That has never been the law, nor should it be.  Creditors' committees must be able to fulfill their statutory duty to investigate and, where appropriate, challenge liens[27] without the prospect of banks and other lenders using a *bona fide* dispute over the lien as a basis for appointment to the committee itself.

---

[26]     *Id*. at 432; *see also Johns-Manville Corp. v. Doan (In re Johns-Manville Corp.)*, 26 B.R. 919, 925 (Bankr. S.D.N.Y.1983) (stating that "the individuals constituting a committee should be honest, loyal, trustworthy and without conflicting interests."); *In re Swolsky*, 55 B.R. 144 (Bankr. N.D. Ohio 1985) (holding that a creditor who was an insider was removed because that creditor would have a chilling effect on the other committee members); COLLIER ON BANKRUPTCY ¶ 1102.05[3]).

[27]     11 U.S.C. § 1103(c)(2).

12

25.     Here, the Court has not yet determined whether the GO Group holds fully secured or unsecured claims—and the GO Group is the one advocating that its claims are fully secured. Until the Court reaches a final determination on the lien question, a disqualifying conflict of interest exists that would undermine the Committee's fulfillment of its statutory duties.  The GO Group's request should be denied.

**B.      Existing Committee Members Adequately Represent Unsecured Creditors**

26.     The Committee and its members have been, and will continue to, adequately represent *all* unsecured creditors and any assertion to the contrary is not true.  The Committee has members that are trade creditors, unions for current employees (that, contrary to the GO Group's assertions, hold both contingent and non-contingent claims), and tax refund claimants. While their claims may be, comparatively, less than what is owed to the GO Group, there are significant numbers of trade, employee, and tax refund creditors in these cases and they deserve the kind of representation provided by the current membership of the Committee.

**i.     Existing Committee Members Are Representative and Remain Unpaid Unsecured Creditors**

27.     The members of the Committee are dedicated business people and employees who are owed millions of dollars, which, to them, might as well be $3 billion.  If forced to take dimes or nickels on the dollar, many of these people will go out of business, be forced into chapter 11 themselves, miss paychecks, or be forced into delayed or impoverished retirement. That is why they are participating in such high numbers and volunteering so much of their time participating in the Title III Cases.  Indeed, most members of the Committee have retained counsel, at their own expense, to aid them in their efforts to discharge their duties as members of the Committee.  They have real skin in this game.

13

28.     While the GO Group correctly points out that the Commonwealth has stated that it intends to pay certain types of creditors that are currently on the Committee (though notably, not current employee pension claimants), and the Committee members appreciate this sentiment, nothing is set in stone and the Committee members have not yet been paid.  All classes of creditors, including the GO Group, were promised that they would be paid countless times over by the Commonwealth, whether in bond documents, contracts, or budgets.  But this is not a case where unsecured creditors, or any currently contemplated class of creditors, must be paid in full pursuant to a statute for a plan to be confirmed.  Until the most recent promise is kept by way of actual payment, Committee members will diligently press their rights as *unsecured* creditors in the Title III Cases as members of the Committee, and have every incentive to help try to maximize the payout to all unsecured creditors of Puerto Rico.

### ii.     Adding GO Group Members at This Time Would Harm, Not Help Committee's Representative Role

29.     Courts interpreting "adequate representation" under section 1102(a) have employed a variety of factors in their evaluations, including the (1) nature of the case, (2) the tasks that the proposed additional committee is to perform, (3) the ability of the committee to function, (4) the ability to participate in the case without an official committee or ability to recover expenses, (5) the standing and desires of the various constituencies, (6) the timing of the request, and (7) other factors relevant to the issue of adequate representation.[28]   No factor alone is dispositive, and courts should apply the factors with a fact-intensive inquiry.[29]

30.     The factors weigh in favor of finding adequate representation.  Most importantly, the GO Group is currently adequately represented in these Title III Cases and related proceedings

---

[28]     *See In re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002).

[29]     *See In re Dana Corp.,* 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006).

by the attorneys filing the Motion.  The GO Group has been participating in this Puerto Rico debt crisis for years, filing pleadings and advocating for their cause loudly and competently.  They are not in dire need of representation at the risk of their opinions not being heard.  Quite the contrary, Paul Weiss and the GO Group's other law firms are more than capable of carrying the GO Group's torch throughout the Title III Cases.  On the other hand, the standing and desires of trade creditors, unions, tax claimants, and others with far less resources, require the representation of the Committee.  If drowned out on the Committee by very large and potentially secured creditors, these unsecured creditors have no other way to have their voices heard in these cases.

31.     Next, the nature of the case—incredibly complex and possibly protracted—lends itself to not rushing to force potentially fully secured creditors onto the Committee.  The Court should be patient with that judgment.  In the end, the Committee agrees that, if unsecured, the GO Group members should be considered for Committee membership—but the nature of the case means that decision will not be reached for some time, and thus the Court should wait until the issue is ripe.

32.     The ability of the Committee to perform its function—representation of unsecured creditors—will be greatly limited, if not impossible, if potentially fully secured creditors are involved in its deliberations and decision making.  Again, the trade, tax, and union/employee creditors will lose their capacity to be heard in these cases at all if the Committee cannot function to protect them, and that result must be avoided.  Meanwhile, as currently constituted, the Committee is getting its legs under it and functioning very well—a fact that the GO Group seems to recognize when, at the end of its brief's section on "functionality," it admits the Committee is operating properly despite (and perhaps because of) its lack of allegedly fully secured

15

Commonwealth Bondholders.[30]  By contrast, if permitted to join the Committee at this time, GO

Group members might cause (until they are determined by the Court to be unsecured, anyway)

real issues in the functioning of the Committee.  There would be arguments about what

communications the GO Group should be barred from, what information they can have access to,

and vice versa.  Such disputes would be greatly detrimental to the Committee fulfilling its duties

and purpose to unsecured creditors.

33.      Additionally, the Committee is already performing all of its tasks efficiently and

expeditiously.  Certainly, these cases are complex, the learning-curve has been steep, but the

Committee is hardly handicapped.  The Committee has filed motions to intervene in several

adversary proceedings, served Rule 2004 discovery, appeared in Court, began investigating

potential sources of revenue and causes of action, and has worked well with different

stakeholders.

34.      It is also notable that the GO Group's intentions are hardly innocent or benign—

the GO Group seeks to neuter the Committee before it can become another substantial

stakeholder arguing that the GO Group holds unsecured claims.  The Court should decline the

invitation to do the GO Group's bidding in this regard.  To be clear, the Committee has not yet

reached a conclusion on whether Commonwealth Bonds are secured or unsecured.  But it should

be permitted to investigate those issues objectively.  If the GO Group is appointed to the

Committee now, it could attempt to impede any opposition by the Committee to its alleged

statutory lien and effectively paralyze other actions that general unsecured creditors view as

important to maximize value until that decision is made.

---

[30]    *See* the Mot. ¶ 57.

### iii. Precedent Used by GO Group Is Off Point

35.     The GO Group makes the uncontroversial point that, where a debtor has both

senior and subordinated *unsecured* bonds, it is not uncommon for United States trustees to

appoint trustees of both the senior and the subordinated unsecured bond debt to the unsecured

creditors' committee.  So what? That is not the case here.  The GO Group is actively pursuing

rights as a fully secured creditor, which **never** happens when two indenture trustees for

**unsecured** bonds, whether subordinated or senior, sit on a committee.

36.     Lastly, it must be noted that a large number of the cases cited and relied heavily

upon by the GO Group for statements of "basic principles" or to "support" other arguments

regarding adequate representation actually deny requests to reconstitute an unsecured creditors'

committee or deny the appointment of an additional committee after finding adequate

representation by the existing committees in those cases.[31]  This Court should do the same.

### C.     Constitution of Committee Should Be Left to Discretion of Trustee

37.     The Trustee did not abuse its discretion by excluding members of the GO Group

on the Committee at this time.  The Trustee has adequately explained its position that no creditor

---

[31]     *See Enron*, 279 B.R., at 685 (faced with several motions for additional committees, but denying them all); *Dana Corp.,* 344 B.R. at 38 (denying the motion because the movant failed to satisfy its burden of showing that appointment of additional committee was necessary to ensure the movant's adequate representation); *In re Dow Corning Corp.*, 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), *rev'd by,* 212 B.R. 258 (E.D. Mich. 1997) (bankruptcy court's decision to order the United States trustee to add certain creditors to the unsecured creditors' committee was *reversed* on appeal); *In re Sharon Steel Corp.,* 100 B.R. 767, 776–77 (Bankr. W.D. Pa. 1989) (holding that the unsecured creditors' committee adequately represented creditors such that no additional members or an additional committee were necessary); *In re Garden Ridge Corp.*, No. 04-10324 (DDS), 2005 WL 523129, at *5 (Bankr. D. Del. Mar. 2, 2005) (denying the appointment of an additional committee); *In re Daig Corp.*, 17 B.R. 41, 43 (Bankr. D. Minn. 1981) (denying the restoration of a creditor to the committee); *In re Hills Stores Co.*, 137 B.R. 4, 8 (Bankr. S.D.N.Y. 1992) (motion for a subcommittee or additional committee for subordinated bondholders denied). *But see In re Park W. Circle Realty, LLC*, No. 10-12965 (AJG), 2010 WL 3219531, at *6 (Bankr. S.D.N.Y. Aug. 11, 2010) (creditor holding the largest **unsecured** claim was added to the unsecured creditors' committee); *In re Ne. Dairy Coop. Fed'n, Inc.*, 59 B.R. 531, 534 (Bankr. N.D.N.Y. 1986) (granting a motion of union and trustee of welfare funds to participate on the unsecured creditors' committee where, unlike here, the movants held general unsecured claims, even though those general unsecured claims were entitled to limited priority: "[w]hile the Union's wage claims are

asserting that it holds fully secured claims should be on the Committee.[32]  Such reasoning

demonstrates the determination was not "arbitrary and capricious."  This is a uniform decision

that applies to all Commonwealth Bondholders, not just the GO Group.

38.     Just as importantly, the Trustee's reasoning upholds Congress's intent that

members of the Committee be representative of the unsecured creditors as a whole.  Though the

GO Group argues that the Committee fails to adequately represent unsecured creditors, adequate

representation would not be enhanced by participation on the Committee by the GO Group.  By

actively litigating that it is fully secured, the GO Group cannot possibly represent general

unsecured creditors as a whole.  The Trustee's analysis was undoubtedly correct.

**D.     Monoline Insurer Statements in Support of GO Group's Motion Should Be Rejected
for the Same Reasons**

39.     Assured and FGIC support the Motion because their economic interests are

completely aligned with the GO Group.  FGIC, Assured and other monoline insurers stand to

avoid massive liabilities if the GO Group succeeds in its argument that Commonwealth Bonds

are fully secured.  By contrast, unsecured creditors stand to suffer massive losses if this litigation

tactic succeeds.  Accordingly, the same pervasive conflicts of interest that disqualify GO Group

also disqualify Ambac, FGIC and Assured.  Monoline insurers should not be permitted to create

a "*fifth column*" resistance movement on the Committee any more than the GO Group should be

allowed to mount a full frontal assault.

40.     Notably, in arguing for the inclusion of a group of allegedly fully secured

creditors on the unsecured Committee, FGIC ***elides*** the most important part of the long quote it

---

admittedly entitled to a priority, they are, nonetheless, general unsecured claims with only limited priority
status").

[32]     Mot. Ex. D.

provides in paragraph 3 of its Response.  The omitted text from the cited *Enron* decision also

points out that these various kinds of creditors "with significantly different characteristics

nonetheless ***continue to possess greater commonality as unsecured creditors***."[33]  That is

precisely what is missing here.  The GO Group and its monoline acolytes want to divert all

available resources of Puerto Rico to repayment of Commonwealth Bonds ***at the expense of all***

***unsecured creditors.***  These creditors share no commonality as unsecured creditors and,

therefore, are incapable of fulfilling the fiduciary duties of the Committee until the Court has

determined that Commonwealth Bonds are general unsecured claims.

41.     Along the way, FGIC attempts to argue that these conflicts of interest are no

greater than the potential conflicts faced by vendors of goods who enjoy administrative expense

priority under the Bankruptcy Code for certain goods supplied to the Commonwealth in the

twenty days before commencement of the Title III Cases.[34]  But this argument is simply beside

the point.  Congress created administrative priority for certain expenses in order to induce third

parties to continue doing business with the debtor.[35]  Administrative expenses that a debtor must

pay in full have no bearing at all on whether the administrative creditor may also have a

prepetition general unsecured claim that will receive a distribution of pennies on the dollar.  The

two concepts are completely separate under the Bankruptcy Code.  The members of the

Committee each hold prepetition general unsecured claims that are *not* required to be paid in full

---

[33]   *Mirant Ams. Energy Mktg., L.P. v. Official Comm. of Unsecured Creditors of Enron Corp.*, 02 Civ. 6274
(GBD), 2003 U.S. Dist. LEXIS 18149, at *24 (S.D.N.Y. Oct. 9, 2003).

[34]   FGIC Resp. ¶ 4.

[35]   *See In re Jartran*, 732 F.2d 584 (7th Cir. 1984) (administrative priority provides incentive to third parties to
furnish credit necessary for debtor's reorganization); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.
1976) (purpose of chapter 11 administrative expense status is to induce third parties to contribute toward
rehabilitation of reorganizing debtor).

19

by section 503 of the Bankruptcy Code.  FGIC's arguments from section 503 are sorely misplaced.

42.     FGIC also attempts to draw a comparison between creditors arguing they are fully secured in the Title III Cases and the *undersecured* creditor appointed to a statutory committee of unsecured creditors in *Walat Farms*.[36]  *Walat Farms,* however, is easily distinguishable because the facts were completely different.  The *Walat Farms* decision makes clear that the undersecured creditor in that case held only a lien on "various" assets, rather than "all" assets as the GO Group argues here.[37]  And, more obviously, none of the Commonwealth Bondholders are arguing that they are *undersecured creditors.*  Instead, the GO Group argues that it is fully secured.

43.     At bottom, *Walat Farms* does not help FGIC or the GO Group make its case.  The *Walat Farms* court recognized that if the facts were similar to those presented by the Motion, ***a disqualifying conflict of interest would be "obvious"*:**

> Suppose, for example, the undersecured creditor's security constitutes the primary asset of the estate, without which it would be impossible for the debtor to continue business. Should the bank, wearing its secured creditor hat, seek a lift of the automatic stay for the purpose of recovering its collateral, which would result in a *de facto* liquidation of the estate with no distribution to general unsecured creditors, **the conflict is obvious**. The general creditors represented by the committee stand to receive payment of their claims only if the debtor successfully reorganizes; yet a member of that committee is taking action which would make reorganization impossible.[38]

By analogy, that is precisely what is happening here.  A well-funded and well-organized group of Commonwealth Bondholders have instituted litigation for the purpose of recovering on their

---

[36]   FGIC Resp. ¶ 4.

[37]   *In re Walat Farms, Inc.,* 64 B.R. 65, 66 (Bankr. E.D. Mich. 1986).

[38]   *Id.* at 69-70 (emphasis added).

"collateral" (i.e. all available resources of Puerto Rico) to repay Commonwealth Bonds and leave general unsecured creditors without a source of repayment.  The conflict is obvious.

E.      **Court Should Not Create Any Additional Official Committees, Including One to Represent "Constitutional Debtholders"**

44.      The GO Group also requests, in the alternative, that the Court appoint an official committee of Commonwealth Bondholders.  Requests such as this are routinely raised in large and complex chapter 11 and chapter 9 cases, and are just as routinely denied—for good reason. The "appointment of an additional committee is an extraordinary remedy that courts are reluctant to grant."[39]  Appointment of one official creditors' committee is the norm in large and complex cases.[40]

i.      **Committee Adequately Represents Commonwealth Bondholders if They Are Unsecured**

45.      A party seeking the appointment of an additional official committee has the burden of showing that the additional committee is necessary to adequately represent its interests, and the standard is a high one.  Courts interpreting "adequate representation" under section 1102(a) have employed a variety of factors in their evaluations, including the (1) nature of the case, (2) tasks that the proposed additional committee is to perform, (3) ability of the committee to function, (4) ability to participate in the case without an official committee or ability to recover expenses, (5) standing and desires of the various constituencies, (6) timing of the request, and (7) other factors relevant to the issue of adequate representation.[41]

---

[39]   *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC), 2013 WL 5377962, at *3 (Bankr. D. Del. Sept. 26, 2013); *see also In re Winn-Dixie Stores, Inc.,* 326 B.R. 853, 857 (Bankr. M.D. Fla. 2005); *Enron Corp.,* 279 B.R. at 685.

[40]   *See In re Residential Capital, LLC,* 480 B.R. 550, 558 (Bankr. S.D.N.Y. 2012) (single committee deemed sufficient "in the vast majority of … cases").

[41]   *See Enron*, 279 B.R., at 685.

46.     Here, the GO Group does not come close to meeting its burden for an additional

committee.  Indeed, in the litany of cases cited by the GO Group in its brief, only one actually

led to the appointment of an additional committee.[42]  The vast majority of the legal principles

relied on by the GO Group to make its argument are out-of-context snippets taken from cases

where a request for an additional committee was denied.[43]  A review of the applicable factors

shows that this Court should similarly decline to appoint an additional committee of

Commonwealth Bondholders.

47.     <u>Nature of the Case</u>.  "The large size of a bankruptcy case is not determinative of

whether additional committees should be appointed."[44]  Rather, appointment of one official

creditors' committee is the norm in large and complex cases.[45]  The proliferation of multiple

official committees in the Title III Cases will lead to substantial, and unnecessary, increases in

professional fees and costs for all parties, cause significant delays and confusion, and can

actually impair the prospects of a successful adjustment of Puerto Rico's debts.[46]

---

[42]  *In re Budd Co., Inc.*, 512 B.R. 910, 912 (Bankr. N.D. Ill. 2014) (in a chapter 11 liquidation case where all other
creditors were represented by some committee except asbestos claimants, the court found it was appropriate to
create a committee specifically for asbestos claimants who, because there would be no reorganized debtor, had
no other recourse aside from participation in a committee because they could not otherwise afford or properly
organize to participate).

[43]  *See, e.g.*, *Enron Corp.*, 279 B.R. at 685; *Dana Corp.*, 344 B.R. at 38.

[44]  *In re Dana Corp.*, 344 B.R. at 39 (applying "nature of the case" factor); *see also Mirant Ams. Energy*, 2003 WL
22327118, at *1 (affirming bankruptcy court's denial of motion to appoint additional creditors' committee in
what was, at the time, the largest bankruptcy matter in history).

[45]  *See In re Residential Capital, LLC*, 480 B.R. at 558 (single committee deemed sufficient "in the vast majority of
… cases").

[46]  *In re Grant Broad. of Phila., Inc.*, 71 B.R. 655, 661 (Bankr. E.D. Pa. 1987); *see also Mirant Ams. Energy*, 2003
WL 22327118, at *8 (appointing additional committees simply because cases are large and complex with inter-
creditor conflicts would lead to the "unnecessary proliferation of committees at an astronomical cost to the
bankruptcy estates") (internal quotation marks omitted); *In re Winn-Dixie*, 326 B.R. at 857–58 ("The Court
finds that the additional costs, especially those associated with the retention of experts, militate against the
appointment of an additional committee."); *In re Wang Lab., Inc.*, 149 B.R. 1, 4 (Bankr. D. Mass. 1992)
("appointment of additional committees is closely followed by applications to retain attorneys and
accountants").

48.     Right now, the Court has at least three requests pending for an additional

committee.  On July 21, 2017, the University of Puerto Rico Retirement System Trust filed a

motion seeking appointment of an additional official committee to represent "Active Trust

Participants."  Also on July 21, 2017, the Ad Hoc Puerto Rico Municipalities Committee, a

group representing 11 of the Commonwealth's 78 municipalities (the "Municipalities"), filed a

motion seeking appointment of an additional official committee to represent all Municipalities.

49.     As noted above, the Committee is adequately representing unsecured creditors of

the Commonwealth.  The Court should be wary of opening the floodgates to a host of additional

requests for new statutory committees in these incredibly complex and high-stakes cases.  These

requests could easily get out of control and bog the case down to the point where a party

eventually asks for a "committee of committees."

50.     Tasks the Additional Committee is to Perform.  The GO Group fails to identify

any tasks that need to be handled by an official committee of Commonwealth Bondholders, other

than advocating the same positions taken to date by the GO Group.  Official committees are not

meant to advance the parochial interests of individual creditors, which is precisely what the GO

Group seeks to do.[47]

51.     Ability of the Committee to Function.  "The ability of an official committee to

function is a significant factor in the determination of whether a court should order the

---

[47]   *See In re Sharon Steel Corp.*, 100 B.R. 767, 770–71, 79 (Bankr. W.D. Pa. 1989) (noting consensus that
additional committees are met with general disfavor because each committee focuses on the parochial interests
of one specific class of creditors that weakens "the impetus to compromise" on which a successful
reorganization depends); *Mirant Ams. Energy*, 2003 WL 22327118 at *8 ("because creditors would be
balkanized into several independent committees, each furthering the interests of only certain groups, the
consultation and balancing of interests necessary for a successful negotiation of a reorganization plan would be
severely hampered, leading to increased costs and delay").

23

appointment of another committee."[48]  As noted previously, the Committee is functioning

effectively and performing all of its duties.  The Committee has moved to intervene in several

adversary proceedings, served Rule 2004 discovery, appeared in court, began an investigation

into sources of revenue and causes of action, started to diligence the Commonwealth's fiscal

plan, been heavily involved in the proposed stipulations to resolve the dispute between the

Commonwealth and COFINA (one of the gating issues in the Title III Cases), and has worked

well with different stakeholders.  The Committee functions extraordinarily well, as the GO

Group concedes.[49]

      52.    <u>Ability to Participate in the Case without an Official Committee</u>.  The GO Group

is a massively well-funded group of distressed-debt investment funds represented by expensive

and very capable law firms that are already more than adequately representing the interests of

Commonwealth Bondholders in these Title III Cases and related proceedings.  As noted above,

the GO Group is not in dire need of representation at the risk of their interests not being heard.

      53.    <u>Other Considerations</u>.  The Committee's members are all *unsecured* creditors

whose interests are consistent with the interests of all general unsecured creditors.  Thus, if the

Court ultimately determines that the GO Group holds *unsecured* claims, they will have been

adequately represented by the Committee.[50]

---

[48]   *In re Dana Corp.*, 344 B.R. at 38 (citing *In re Enron Corp.*, 279 B.R. at 671); *see also In re Sharon Steel*, 100
B.R. at 778 (denying additional committee where movant had not demonstrated that official committee was not
able to function); *In re ShoreBank Corp.*, 467 B.R. 156, 163 (Bankr. N.D. Ill. 2012) (explaining that a court
should not appoint additional committees unless there is "specific evidence" that the committee will breach its
fiduciary duty to all general unsecured creditors).

[49]   *See* Mot. ¶ 57.

[50]   *See Mirant Ams. Energy*, 2003 WL 22327118 at *10 (committee owes fiduciary obligation to all unsecured
creditors, "whether or not a member of a particular group is included in its membership").

**ii.  Even if Court Determined that Commonwealth Bondholders Are not Adequately Represented, Court Should Decline to Appoint Additional Official Committees in Its Discretion**

54.     Even if the Court found that the above-cited factors pointed to inadequate representation, appointment of additional committees is not mandatory.  The Court must still "decide whether it ***should*** exercise its discretion and appoint additional committees."[51]

55.     In considering whether to exercise its discretion to appoint additional committees even where there are questions of inadequate representation, courts consider (1) the cost associated with the appointment, (2) the time of the application, (3) the potential for added complexity, and (4) the presence of other avenues for creditor participation.[52]

56.     Assuming, *for argument's sake*, that the Committee's representation is inadequate, application of the Court's discretion demonstrates that it should not appoint additional official committees.  The extreme cost associated with additional official committees is reason alone for the Court to decline to exercise its discretion.  As one court explained in declining to exercise its discretion, appointing an additional committee would "open [the court] to the otherwise justifiable criticism that we allowed two firms to tax the Debtors' estate, at the ultimate cost to the Debtors and the creditors, by appointing two Creditors' Committees, just

---

[51]    *In re Dewey & Leboeuf LLP*, 12-12321 MG, 2012 WL 5985325, at *3 (Bankr. S.D.N.Y. Nov. 29, 2012) (emphasis added); *In re Wang Labs*, 149 B.R. at 2 (if appointment of additional committee is necessary to assure adequate representation, court must then consider whether it should exercise its discretion and make the appointment); *In re Enron Corp.*, 279 B.R. at 685 (court can deny additional committee "even once inadequate representation is found"); *In re Pub. Serv. Co. of New Hampshire*, 89 B.R. 1014, 1019-20 (Bankr. D.N.H. 1988) (declining to appoint additional committee notwithstanding conclusion that "there is a question of adequate representation" and "there accordingly is no question that [moving creditors] would "benefit" from the appointment of a separate committee").

[52]    *In re Enron Corp.*, 279 B.R. at 685.  Bankruptcy courts are "generally been reluctant to appoint additional committees, and their decisions have placed great weight on these discretionary factors."  *In re Dow Corning*, 194 B.R. at 143.

25

because they could not resolve a squabble between themselves . . . appointment of multiple Creditors' Committees should be the rare exception."[53]

57.     These concerns are particularly acute in the Title III Cases.  Additional committees would retain their own attorneys, financial advisors, and other experts.[54]   Indeed, despite the combined resources of AAFAF and the Oversight Board, which are significant,[55] the Debtors appear at times to be unable to meet the demands of the various creditor groups in the Title III Cases.  Adding additional official committees would only exacerbate this situation. Separate committees would also lead to an unnecessary duplication of efforts, as the connections between the Title III Cases will require the Committee (and likely any other committee the Court would appoint) to participate in all of the Title III Cases in order to safeguard the interests of its constituents, who will assuredly be impacted by each of the cases.  Further, if the Court appoints additional official committees, it will assuredly face a flood of requests for new statutory committees in these incredibly complex and high-stakes cases.

58.     Appointing additional official committees would also make the Title III Cases (which are complicated enough) even more complex and decrease the likelihood of a successful reorganization.[56]  Multiple official committees, each focused on the parochial interests of one

---

[53]   *In re Grant Broad. of Phila., Inc.*, 71 B.R. 655, 661 (Bankr. E.D. Pa. 1987); *see also Mirant Ams. Energy*, 2003 WL 22327118, at *8 (appointing additional committees simply because cases are large and complex with inter-creditor conflicts would lead to the "unnecessary proliferation of committees at an astronomical cost to the bankruptcy estates") (internal quotation marks omitted); *see also In re Winn-Dixie*, 326 B.R. at 857–58 (Bankr. M.D. Fla. 2005) ("The Court finds that the additional costs, especially those associated with the retention of experts, militate against the appointment of an additional committee.").

[54]   *See In re Winn-Dixie*, 326 B.R. at 858, n.4 ("In light of the numerous experts retained by the Debtors and the Creditors' Committee, the Court has little doubt that an additional committee would seek to retain its own experts."); *In re Wang*, 149 B.R. at 4 ("appointment of additional committees is closely followed by applications to retain attorneys and accountants").

[55]   For example, the Oversight Board and AAFAF have employed two separate noticing and service agents, at least three separate international law firms, and several financial advisors each.

[56]   *See In re Sharon Steel Corp.*, 100 B.R. at 770–71 (describing consensus that appointment of additional committee was "met with general disfavor in view of the obvious complexities it would create, complicating

specific class of creditors, "will only weaken the impetus to compromise" on which a successful reorganization depends.[57]

59.     The GO Group has been actively participating in the Title III Cases and has been aggressively litigating its parochial issues.  Official status is not necessary for their voices to be heard.[58]  What the GO Group wants, however, is immediate compensation for its efforts.  But, as one court noted in denying a similar request, that alone does not justify an additional committee because a party like the GO Group "may file an appropriate application for administrative expense payment for substantial contribution to the estate pursuant to 11 U.S.C. § 503(b) at an appropriate time."[59]  For all of these reasons, no additional official committee should be appointed for the GO Group.

*[Remainder of page intentionally left blank.]*

---

negotiations of the [debtor, regulatory agencies, creditors], the union, and current lenders by a geometric progression [and favoring] the "one-stop shopping" expression of the preferability of one committee").

[57]    *Id.* at 779; *see also Mirant Ams. Energy*, 2003 WL 22327118 at *8 ("because creditors would be balkanized into several independent committees, each furthering the interests of only certain groups, the consultation and balancing of interests necessary for a successful negotiation of a reorganization plan would be severely hampered, leading to increased costs and delay").

[58]    *See In re Garden Ridge Corp.*, No. 04–10324 (DDS), 2005 WL 523129, at *4, 2005 (Bankr. D. Del. Mar. 2, 2005) (an "Official Committee is simply not intended to represent individual creditor interests").

[59]    *In re Enron Corp.*, 279 B.R. at 694.  The Committee expressly reserves any and all rights regarding any such application filed by the GO Group pursuant to 11 U.S.C. § 503(b).

WHEREFORE, the Committee respectfully requests that this Court enter an order denying the relief requested in the Motion, without prejudice, and granting the Committee such other and further relief as this Court deems appropriate.


Dated:  July 31, 2017
     San Juan, Puerto Rico

*/s/ G. Alexander Bongartz*

PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
Andrew V. Tenzer, Esq. *(Pro Hac Vice)*
James T. Grogan, Esq. *(Pro Hac Vice* requested)
Michael E. Comerford, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Tel:  (212) 318-6000
lucdespins@paulhastings.com
andrewtenzer@paulhastings.com
michaelcomerford@paulhastings.com
alexbongartz@paulhastings.com
jamesgrogan@paulhastings.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

- and -

*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com

28

emontull@cstlawpr.com

*Proposed Replacement Local Counsel to the Official
Committee of Unsecured Creditors*