Objection Deadline:  September 15, 2017 4:00 PM EPT
Hearing Date:  September 26, 2017 9:30 AM EPT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGE-MENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## OBJECTION AND MOTION OF AURELIUS
## TO DISMISS TITLE III  PETITION[2]

Luis A. Oliver-Fraticelli
Katarina Stipec-Rubio
USDC-PR Bar Nos. 209204, 206611
ADSUAR MUÑIZ GOYCO SEDA &
    PÉREZ-OCHOA PSC
208 Ponce de Leon Ave., Suite 1600
San Juan, P.R.  00918
Phone:  (787) 756-9000
Fax:  (787) 756-9010
Email: loliver@amgprlaw.com

Theodore B. Olson  (*pro hac vice* pending)
Matthew D. McGill  (*pro hac vice* pending)
Helgi C. Walker  (*pro hac vice* pending)
Michael R. Huston  (*pro hac vice* pending)
Lochlan F. Shelfer  (*pro hac vice* pending)
Jeremy M. Christiansen  (*pro hac vice* pending)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone:  (202) 955-8500
Fax:  (202) 467-0539
Email:  tolson@gibsondunn.com

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).

[2]  On July 26, 2017, the Court proposed changing the September 26 Omnibus hearing date to October 4.  Dkt. 754.  As of this filing, no order has been entered changing the date.  If the October 4 hearing date is implemented, the objection deadline for this filing will be September 22 at 4:00 PM Prevailing Eastern Time.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................5

I.     PROMESA................................................................................................5

II.    THE POWERS OF THE OVERSIGHT BOARD ...................................6

III.   THE SELECTION OF OVERSIGHT BOARD MEMBERS...................8

ARGUMENT .........................................................................................................10

I.     THE TITLE III PETITION SHOULD BE DISMISSED BECAUSE ITS FILING
WAS NOT AUTHORIZED BY A VALIDLY CONSTITUTED OVERSIGHT
BOARD.................................................................................................10

     A.    The Board's Members Must Be Appointed In Compliance With The
Appointments Clause Because They Are Officers Of The United States ........... 11

          1.    Officials Who Exercise Significant Authority Pursuant To The
Laws Of The United States Are Officers Of The United States And
Must Be Appointed In Compliance With The Appointments Clause....... 11

          2.    The Oversight Board's Members Are Officers Of The United
States ...................................................................................... 13

               a.    The Oversight Board Exercises Significant Federal
Executive Authority .............................................................13

               b.    The Oversight Board's Members Are Officers Of The
Federal Government, Not The Commonwealth...........................16

     B.    PROMESA's Method For Selecting The Members Of The Board Does Not
Comply With The Appointments Clause ............................................................. 23

          1.    Because The Board's Members Are Principal Officers, They Had
To Be Appointed With The Advice And Consent Of The Senate ........... 24

          2.    Even If The Board's Members Were Inferior Officers,
PROMESA's List Mechanism Unlawfully Constrains The
President's Appointment Authority ......................................... 26

     C.    The Limitations On The President's Removal Power Exacerbate The
Appointments Clause Violation.................................................................. 33

     D.    Dismissal Of The Title III Petition Is The Appropriate Remedy.......................... 34

CONCLUSION......................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*In re Aiken Cty.*,
645 F.3d 428 (D.C. Cir. 2011)...................................................................34

*Alden v. Maine*,
527 U.S. 706 (1999)...................................................................................20

*Binns v. United States*,
194 U.S. 486 (1904)...................................................................................21

*Boumediene v. Bush*,
553 U.S. 723 (2008)...................................................................................16

*Bowsher v. Synar*,
478 U.S. 714 (1986)..............................................................................23, 30

*Buckley v. Valeo*,
424 U.S. 1 (1976)...................................2, 9, 12, 13, 15, 27, 28, 30, 35

*Burrow-Giles Lithographic Co. v. Sarony*,
111 U.S. 53 (1884).....................................................................................20

*Cincinnati Soap Co. v. United States*,
301 U.S. 308 (1937)...................................................................................21

*Citizens for Abatement of Aircraft Noise, Inc. v. MWAA*,
917 F.2d 48 (D.C. Cir. 1990).....................................................................14

*Crowell v. Benson*,
285 U.S. 22 (1932).....................................................................................17

*Dep't of Transp. v. Ass'n of Am. R.R.*,
135 S. Ct. 1225 (2015)........................................................................4, 17, 19

*District of Columbia v. John R. Thompson Co.*,
346 U.S. 100 (1953)...................................................................................21

*Edmond v. United States*,
520 U.S. 651 (1997)....................................2, 3, 9, 11, 12, 13, 24, 32, 33

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010)..........................................1, 3, 24, 26, 29, 32, 33

*Freytag v. Comm'r of Internal Revenue*,
501 U.S. 868 (1991)..................................9, 11, 12, 13, 15, 29, 33

*Glidden Co. v. Zdanok*,
370 U.S. 530 (1962)...................................................................................35

*Golan v. Holder*,
565 U.S. 302 (2012)...................................................................................20

*Ex parte Hennen*,
    38 U.S. (13 Pet.) 225 (1839) ................................................................13

*Humphrey's Ex'r v. United States*,
    295 U.S. 602 (1935) ............................................................................33

*INS v. Chadha*,
    462 U.S. 919 (1983) ......................................................................14, 26

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
    796 F.3d 111 (D.C. Cir. 2015) ...........................................................35

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995) ............................................................................17

*MWAA v. Citizens for Abatement of Aircraft Noise, Inc.*,
    501 U.S. 252 (1991) .......................................................14, 17, 29, 30

*Mistretta v. United States*,
    488 U.S. 361 (1989) ............................................................................18

*Morrison v. Olson*,
    487 U.S. 654 (1988) ............................................................................25

*Myers v. United States*,
    272 U.S. 52 (1926) .........................................................13, 27, 28, 31

*New York v. United States*,
    505 U.S. 144 (1992) ............................................................................26

*NLRB v. Noel Canning*,
    134 S. Ct. 2550 (2014) ....................................................................3, 20

*NLRB v. SW Gen., Inc.*,
    137 S. Ct. 929 (2017) .....................................................................24, 26

*Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*,
    732 F. Supp. 1183 (D.D.C. 1990) .......................................................30

*The Pocket Veto Case*,
    279 U.S. 655 (1929) ..............................................................................3

*Printz v. United States*,
    521 U.S. 898 (1997) ............................................................................20

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) ......................................................................27, 28

*Ryder v. United States*,
    515 U.S. 177 (1995) ......................................................................12, 35

*Ex parte Siebold*,
    100 U.S. 371 (1879) ............................................................................13

*Snow v. United States*,
    85 U.S. (18 Wall.) 317 (1873) ............................................................22

*Springer v. Gov't of Philippine Islands*,
    277 U.S. 189 (1928)...............................................................................29, 30

*Thomas v. Union Carbide Agric. Prod. Co.*,
    473 U.S. 568 (1985) ......................................................................................17

*United States v. Germaine*,
    99 U.S. 508 (1878)................................................................................12, 13

*United States v. Hartwell*,
    73 U.S. (6 Wall.) 385 (1867) ........................................................................19

*United States v. Hilario*,
    218 F.3d 19 (1st Cir. 2000)...........................................................................25

*United States v. Moore*,
    95 U.S. 760 (1877) .......................................................................................13

*United States v. Perkins*,
    116 U.S. 483 (1886) .....................................................................................13

*Weiss v. United States*,
    510 U.S. 162 (1994)................................................................................28, 32

*Wise v. Withers*,
    7 U.S. (3 Cranch) 331 (1806).......................................................................19

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 .....................................................2, 9, 12, 25, 27

**Statutes**

11 U.S.C. § 105 .............................................................................................1

11 U.S.C. § 109(c)(2)......................................................................................6

11 U.S.C. § 904 ..............................................................................................6

31 U.S.C. § 703(a) ........................................................................................30

48 U.S.C. § 2121 .........................................................................................6, 9

48 U.S.C. § 2121(c) ...............................................................................4, 8, 16

48 U.S.C. § 2121(d) ..................................................................................6, 24

48 U.S.C. § 2121(e) ...........................................3, 8, 9, 10, 22, 23, 24, 25, 26, 31, 33, 34

48 U.S.C. § 2121(f)......................................................................................27

48 U.S.C. § 2122 .......................................................................................8, 23

48 U.S.C. § 2124(a) ..................................................................................7, 14

48 U.S.C. § 2124(c) .......................................................................................8

48 U.S.C. § 2124(f).....................................................................................7, 15

48 U.S.C. § 2124(g) ....................................................................................................14

48 U.S.C. § 2124(i) ..................................................................................................6, 8

48 U.S.C. § 2124(j) ..................................................................................................6, 7

48 U.S.C. § 2124(k) ................................................................................................7, 15

48 U.S.C. § 2124(n) ...............................................................................................8, 23

48 U.S.C. § 2124(*o*) .............................................................................................7, 15

48 U.S.C. § 2127 ..........................................................................................................6

48 U.S.C. § 2128 ............................................................................2, 8, 14, 22, 23, 25

48 U.S.C. § 2129 ...................................................................................................8, 22

48 U.S.C. § 2141(a) ...................................................................................................24

48 U.S.C. § 2141(b) .....................................................................................................6

48 U.S.C. § 2141(c) .........................................................................................6, 8, 13

48 U.S.C. § 2141(d) .....................................................................................................8

48 U.S.C. § 2141(e) ...................................................................................................13

48 U.S.C. § 2142 ....................................................................................6, 8, 14, 24

48 U.S.C. § 2143 ..........................................................................................................6

48 U.S.C. § 2144(a) .....................................................................................................8

48 U.S.C. § 2144(c) ................................................................................................8, 14

48 U.S.C. § 2146 ...........................................................................6, 10, 23, 24, 34, 35

48 U.S.C. § 2147 ........................................................................................................15

48 U.S.C. § 2148 ........................................................................................................22

48 U.S.C. § 2151 ..........................................................................................................6

48 U.S.C. § 2161 ........................................................................................................15

48 U.S.C. § 2162(2) .............................................................................................10, 34

48 U.S.C. § 2164 .......................................................................1, 5, 6, 15, 34, 35

48 U.S.C. § 2167 ..........................................................................................................6

48 U.S.C. § 2172 ........................................................................................................15

48 U.S.C. § 2175 ..................................................................................................6, 15

48 U.S.C. § 2194 ..........................................................................................................6

48 U.S.C. § 2231 ..................................................................................................6, 15

49 U.S.C. § 24301(a) .............................................................................................4, 17

1 Stat. 50 (Aug. 7, 1789) .....................................................................................19, 20

39 Stat. 951 (Mar. 2, 1917) .......................................................................................21

61 Stat. 770 (Aug. 5, 1947) ........................................................................................21

**Other Authorities**

1 Annals of Cong. (Joseph Gales Ed., 1834) ....................................................28, 29

162 Cong. Rec. 105 (June 29, 2016) ...........................................................4, 16

32 J. Cont'l Cong. 334 ...............................................................................19, 21

13 Op. Att'y Gen. 516 (1871) .........................................................................31

13 Op. O.L.C. 248 (1989) ...............................................................................31

20 Op. O.L.C. 124 (1996) ...............................................................................18

20 Op. O.L.C. 279 (1996) ...............................................................................31

31 Op. O.L.C. 73 (2007) .................................................................................14

Bankruptcy Rule 9013 ....................................................................................1

*The Federalist No. 66*,
   (Hamilton) (Clinton Rossiter ed., 1961) ...................................................28

*The Federalist No. 76*,
   (Hamilton) (Clinton Rossiter ed., 1961) .............................................28, 29

*The Federalist No. 77*,
   (Hamilton) (Clinton Rossiter ed., 1961) .............................................29, 32

Thomas Jefferson, Powers of the Senate Respecting Diplomatic Appointments
   (Apr. 24, 1790), *reprinted in* 16 Papers of Thomas Jefferson 378 (Julian P.
   Boyd ed., 1961) ..........................................................................................28

Gary Lawson, *Territorial Governments and the Limits of Formalism*,
   78 Cal. L. Rev. 853 (1990) .........................................................................20

Gordon Wood, *The Creation of the American Republic 1776–1787* (1969) ................11

Hearings on S. 244 Before the Senate Comm. on Energy and Natural Resources,
   102d Cong., 1st Sess. 190 (1991) ..............................................................14

House Comm. on Natural Resources, *H.R. 5278 'Puerto Rico Oversight,
   Management, Economic Stability Act' (PROMESA), Section by Section* .....................4, 28, 33

President Obama Announces the Appointment of Seven Individuals to the
   Financial Oversight and Management Board for Puerto Rico, August 31, 2016 ...................10

Statement by President George H.W. Bush on Signing the National and
   Community Service Act of 1990, 2 Pub. Papers 1613 (Nov. 16, 1990) ................................31

Statement by President George W. Bush on Signing H.R. 5441 .................................31

Statement by President James Earl Carter, Jr. on Signing H.R. 6370 .........................31

Statement by President William J. Clinton on Signing S. 1060 ................................31

James Monroe, Message to the Senate of the United States (Apr. 13, 1822),
*reprinted in* A Compilation of the Messages and Papers of the Presidents
1789–1907 (James D. Rich-ardson Ed., 1908) ...................................................................31

Press Release, *Oversight Board to Conduct Investigation of Puerto Rico's Debt*
(Aug. 2, 2017) .........................................................................................................................7

Pursuant to 48 U.S.C. § 2164(b), 11 U.S.C. § 105(a), Bankruptcy Rule 9013, and this Court's Case Management and Administrative Procedures (Dkt. 262-1), Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC ("Aurelius"), as parties in inter-est and collectively the beneficial holders of substantial amounts of outstanding bonds that were issued by the Commonwealth of Puerto Rico (the "Commonwealth") and backed by a pledge of Puerto Rico's full faith, credit, and taxing power, submit this Objection and Motion to Dismiss the petition filed by the Financial Oversight and Management Board for Puerto Rico (the "Over-sight Board") under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA" or the "Act"), Pub. L. No. 114-187, 130 Stat. 549 (2016). This Court should dismiss the Oversight Board's Title III petition for lack of lawful authority to initiate these pro-ceedings and as inconsistent with the requirements of PROMESA.

## PRELIMINARY STATEMENT

"Perhaps the most telling indication of [a] severe constitutional problem" with a govern-mental body "is the lack of historical precedent for [the] entity." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (internal quotation marks omitted). The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or the "Board") derives its existence and authority entirely from PROMESA, and it controls almost every aspect of the Commonwealth's finances pursuant to that federal law. The Board is com-posed of seven voting members who have no superior officer save the President, yet were *never* subject to Senate confirmation. Moreover, six of them were effectively hand-picked by individ-ual members of Congress pursuant to an intricate system of Balkanized lists designed to severely constrain the President's appointment powers. There are no "historical analogues for this novel structure." *Ibid.* That is because it violates the Appointments Clause of the United States Con-

stitution and principles of separation of powers.  The actions that the Board has purported to take since its inception—including its authorization of this Title III proceeding—are therefore void. The Court must dismiss the Title III petition.

The Appointments Clause governs the appointment of all federal officers.  "Principal officers" must be appointed by the President with the advice and consent of the Senate.  U.S. Const. art. II, § 2, cl. 2.  For the next rung down—"inferior officers"—Congress may "vest" their appointments in courts, department heads, or "in the President alone." *Ibid*.  These requirements reflect "significant structural safeguards of the constitutional scheme," to "prevent[ ] congressional encroachment upon the Executive and Judicial Branches" and "to ensure public accountability for both the making of a bad appointment and the rejection of a good one." *Edmond v. United States*, 520 U.S. 651, 659–60 (1997).

The members of the Oversight Board are principal officers of the United States under controlling Supreme Court precedent.  They "exercis[e] significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).  In PROMESA, Congress empowered the Board: (i) to replace certain local laws with federal requirements for Puerto Rico's fiscal affairs; and (ii) to commence and manage on behalf of the debtor a federal mechanism for restructuring Puerto Rico's liabilities in federal court.  *See* 48 U.S.C. §§ 2141–2152 (Title II), 2161–2177 (Title III).  Thus, the Board can initiate and direct under federal law what is likely to be the largest and most complicated bankruptcy proceeding in the Nation's history—surely the deployment of "significant authority."  In carrying out these weighty obligations, the Board sits atop the Legislature and Governor of Puerto Rico, wielding control over the Commonwealth's budgetary and fiscal decisions with "autonomy" from local elected officials.  *Id*. § 2128.  The Board's members are also selected by the President and not supervised by, or accountable to, an-

yone other than the President.  Because the question "'[w]hether one is an 'inferior' officer depends on whether he has a superior'" who ranks below the President, *Free Enter. Fund*, 561 U.S. at 510 (quoting *Edmond*, 520 U.S. at 660–61), the Board members *must* be principal federal officers.  As such, the Constitution required that they be appointed by the President and confirmed by the Senate.  It is undisputed that none of the present Board members ever faced Senate confirmation.

PROMESA stands in stark contrast to the consistent historical treatment of territorial officials.  To our knowledge, since 1789, every civilian official appointed by the federal government to oversee the operation of a territorial government has been recognized as a principal federal officer, with advice-and-consent Senate appointment.  This includes all governors of Puerto Rico until Congress granted Puerto Rico's citizens the right to select their governors.  That "'[l]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions' regulating the relationship between Congress and the President." *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)).  Just as Senate confirmation was necessary when a President appointed Puerto Rico's (or any other territory's) governor, so is it necessary for the Board members, who are statutorily authorized to override and in many instances entirely supplant the Governor.

Even if the Board members were inferior officers, PROMESA would still violate the Appointments Clause because the Act does not vest the appointment power "in the President *alone*."  PROMESA effectively required the President to "choose" six of the seven Board members from seat-specific lists compiled by the Speaker of the House, the Majority Leader of the Senate, the Minority Leader of the Senate, and the Minority Leader of the House.  48 U.S.C. § 2121(e)(2).  This novel procedure was intended to "ensure[ ] that a majority of [the Board's]

members are effectively chosen by Republican congressional leaders."[3]  And that is exactly what happened:  Congressional leaders dictated lists of potential Board members, and the President "selected" the Board from those lists.

From the start, these constitutional defects in PROMESA's appointment mechanism were glaringly obvious.  One Senator warned: "The appointments clause requires that these officers, who are being appointed under the authority of Federal law, be appointed by the President and confirmed by the Senate. . . . If you don't think someone is going to challenge the constitutionality of this, I guarantee you they are going to challenge it."  162 Cong. Rec. 105 at S4687 (June 29, 2016) (Sen. Cantwell).  Rather than comply with the Constitution, PROMESA's drafters tried to define their way out of the problem, simply declaring that the Board is "an entity within the territorial government" and not "a department, agency, establishment, or instrumentality of the Federal Government."  48 U.S.C. § 2121(c).  The point was to pretend that the Oversight Board is not a federal entity subject to the Appointments Clause in the first place.  But the Constitution is not so easily circumvented.  The Supreme Court has repeatedly rejected similar statutory characterizations, instead requiring an examination of the entity's real-world operation.  *See*, *e.g.*, *Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225, 1231 (2015) (holding that Amtrak was a federal governmental entity for constitutional purposes despite provision characterizing Amtrak as "'not a department, agency, or instrumentality of the United States Government'") (quoting 49 U.S.C. § 24301(a)(3)).  Notwithstanding PROMESA's *ipse dixit*, the Board is decidedly federal:  It is federally created and constituted, implements federal law, and is accountable solely to the federal government, not the people of Puerto Rico.

---

[3]  House Comm. on Natural Resources, H.R. 5278, *"Puerto Rico Oversight, Management, Economic Stability Act" (PROMESA), Section by Section*, at 5, *available at* https://naturalresources.house.gov/UploadedFiles/Section_by_Section_6.6.16.pdf.

4

The fundamental flaws in the appointments of the Board's members flow from well-established principles of constitutional law that do not depend on how well or how poorly the Board has carried out its duties thus far.  That said, since the Board's installation, it has unfortunately engaged in irresponsible, counter-productive, and extra-statutory conduct that vividly illustrates the wisdom of the Framers in crafting the Appointments Clause and the dangers that lurk when Congress is allowed to evade its requirements in the interests of political expediency. *See*, *e.g.*, Dkt. 461.  Here, the Board members were picked from secret lists devised by individual members of Congress and never subjected to the sunshine of Senate confirmation.  The Senate as a whole was thus absolved of *any* political responsibility for the suitability of the Board members and, ultimately, the part they would play in deciding Puerto Rico's financial future.  And because the President was not singly responsible for their appointments, the public does not know for sure whether the buck stops with him when it comes to the Board.  True public accountability for the Board thus lies with no one.

Because the Board is unconstitutional, its acts are void.  No validly constituted Board ever initiated this Title III proceeding, and no restructuring certification, a statutory prerequisite to the commencement of the case, was ever validly voted upon.  For these reasons, Aurelius objects to the Title III petition and moves the Court to dismiss the petition, which the Court, after notice and a hearing, may do after August 31, 2017.  *See* 48 U.S.C. § 2164(b).  Aurelius proposes the order attached as **Exhibit A**.

## BACKGROUND

### I. PROMESA

On June 30, 2016, pursuant to its power over the territories under Article IV of the Constitution, Congress passed PROMESA and President Obama signed it into law.  As relevant here,

PROMESA accomplished three things.  First, it created the Oversight Board, 48 U.S.C. § 2121,

vesting it with the power to enforce federal law, including the authority to review and approve

the Commonwealth's proposed budgets, *id*. § 2142.

Second, PROMESA required the Commonwealth to establish, and the Board to approve,

a Fiscal Plan to "provide a method to achieve fiscal responsibility and access to the capital mar-

kets."  48 U.S.C. § 2141(b)(1).  The plan could *not* be certified unless, among other things, it

"respect[s] the relative lawful priorities or lawful liens . . . in the constitution, other laws, or

agreements of [the Commonwealth] in effect prior to" PROMESA's enactment.   *Id.*

§ 2141(b)(1)(N).  The Fiscal Plan is the standard with which the Commonwealth's proposed

budgets must comply.  *Id.* §§  2141(c)(1), 2142(c).  No Fiscal Plan for the Commonwealth or any

Commonwealth instrumentality, and no budget for the Commonwealth for any fiscal year, is val-

id without a certification from the Board.  *See*, *e.g.*, *id.* §§ 2141(c), 2142(e)(1)–(2), 2143(c)–(d).

Finally, PROMESA created a mechanism, known as Title III, for the adjustment of cer-

tain of Puerto Rico's debts.  *See* 48 U.S.C. § 2164.

## II.    The Powers Of The Oversight Board

PROMESA gives the Board significant (indeed, vast) executive authority under federal

law over the Commonwealth and its instrumentalities.  Although Aurelius disputes the extent of

the Board's discretion under PROMESA and its compliance with certain provisions of the stat-

ute, *see generally* Dkt. 461, there is no denying that PROMESA grants to the Board numerous

significant responsibilities to be carried out "in [the Board's] sole discretion."  *See*, *e.g.*, 48

U.S.C.  §§ 2121(d)(1)(A)–(E),  (d)(2)(A);  2124(i),  (j)(3);  2127(b)(3);  2141(b)(2),  (c)(1)–(3);

2142(a), (c)(1), (d)(2); 2146(a); 2151(a); 2167(b)(1); 2194(d)(1)(B), (*l*); 2231(m)(1)(B).  Only

the Board, as it has done here, can initiate Title III proceedings.  *Id.* § 2164(a).  Within the Title

III proceeding, the Board is the sole representative of, and decision-maker for, the Title III debt-or, *id.* § 2175(b), thereby completely supplanting the role that locally elected officials play in Chapter 9 cases, *cf.* 11 U.S.C. §§ 109(c)(2), 904. The Board has the exclusive right to propose a plan of adjustment for the debtor in Title III. *See* 48 U.S.C. § 2124(j)(3).

The Board also possesses broad federal investigative and enforcement powers, which are plainly executive in nature. It can hold hearings, take testimony, receive evidence, and adminis-ter oaths "as the Oversight Board considers appropriate" "for the purpose of *carrying out*" feder-al law (*i.e.*, PROMESA). 48 U.S.C. § 2124(a) (emphasis added). It enjoys a broad subpoena power to compel the attendance of witnesses or the production of "materials of any nature relat-ing to any matter under investigation by the Oversight Board." *Id.* § 2124(f)(1). PROMESA even permits the Board to deploy these investigative powers to police "the disclosure and selling practices" of Commonwealth and instrumentality bonds, including any potential "conflicts of interest maintained by" brokers, dealers, or investment advisers—issues that could extend far outside of Puerto Rico. *Id.* § 2124(*o*). In fact, the Board recently announced its intent to "con-duct an investigation" into "Puerto Rico's debt and its relationship to the fiscal crisis . . . pursu-ant to the authority granted to it by Congress and the President under PROMESA." Press Re-lease, *Oversight Board to Conduct Investigation of Puerto Rico's Debt* (Aug. 2, 2017), *available at* https://juntasupervision.pr.gov/wp-content/uploads/wpfd/49/598239c5a7286.pdf. To top it off, the Board "may seek judicial enforcement of its authority to carry out its responsibilities un-der [PROMESA]." *Id*. § 2124(k).

The Board interprets and applies federal law each time it exercises its powers to veto, re-vise, or rescind Puerto Rico laws that the Board deems inconsistent with PROMESA or the Fis-cal Plan established pursuant to that statute—all things the Board is empowered to do. *See* 48

7

U.S.C. § 2144(a)(1), (5), (c)(3)(B).  It can rule that a fiscal plan proposed by the Commonwealth is deficient, *id.* § 2141(c)(3); issue its own fiscal plan if it rejects the Commonwealth's proposed plan, *id.* § 2141(d)(2); approve or disapprove all budgets, *id.* § 2142; and certify a debt restructuring under Title VI, *id.* § 2124(i).

Although PROMESA ostensibly characterizes the Board "as an entity within the territorial government" of the Commonwealth, 48 U.S.C. § 2121(c)(1)–(2), PROMESA goes to great pains to establish the Board as a completely independent federal overseer of the Commonwealth and any related fiscal matters, immune from interference from the democratically elected Commonwealth government or the people of Puerto Rico, *id.* § 2128(a) ("Neither the Governor nor the Legislature" may "exercise any control, supervision, oversight, or review over the Oversight Board or its activities," or "enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of [PROMESA], as determined by the Oversight Board.").  Further, Board members are subject only to *federal* ethics laws, not Commonwealth laws, *id.* § 2129, and they enjoy numerous other trappings of federal power, *see id.* § 2122 (use of federal facilities); *id.* § 2124(n) (support from GSA); *id.* § 2124(c) (use of federal information).   And the only person who can remove a member is the President.   *See id.* § 2121(e)(5)(B).

## III.    The Selection Of Oversight Board Members

Federal officers must be appointed in accordance with the requirements of the Constitution's Appointments Clause, which provides that the President:

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . [*all*] *Officers of the United States*, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, *in the President alone*, in the Courts of Law, or in the Heads of Departments.

8

U.S. Const. art. II, § 2, cl. 2 (emphases added).

The Appointments Clause thus recognizes three categories of federal officials: (1) principal officers, whose appointment may be made only by the President with the Advice and Consent of the Senate; (2) "inferior Officers," whose appointment may be vested "in the President alone, in the Courts of Law, or in the Heads of Departments"; and (3) employees, to whom the Clause does not apply. *See Edmond*, 520 U.S. at 660–61; *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 880–81 (1991). "[A]ny appointee exercising significant authority pursuant to the laws of the United States" is an officer and subject to the Appointments Clause. *Buckley*, 424 U.S. at 126.

The Oversight Board's members are not appointed in accordance with these constitutional requirements. Instead, PROMESA established unprecedented procedures for the appointment of the seven voting members. *See* 48 U.S.C. § 2121.[4] The Act provides that six members be selected from lists of pre-approved individuals submitted to the President by House and Senate leaders. One "Category A" member and one "Category B" member would be selected from separate lists submitted by the Speaker of the House of Representatives; two "Category C" members would be selected from a single list submitted by the Majority Leader of the Senate; a "Category D" member would be selected from a list submitted by the Minority Leader of the House of Representatives; and a "Category E" member would be selected from a list submitted by the Minority Leader of the Senate. *Id.* §§ 2121(e)(2)(A)(i)–(v), (e)(2)(B). Only the seventh member, "Category F," could be selected in the President's sole discretion. *Id.* § 2121(e)(2)(A)(vi). PROMESA further provided that if the President chose from those lists, the nominees would not require Senate confirmation. *Id.* § 2121(e)(2)(E). "Off-list" nominations—nominations of indi-

---

[4]  PROMESA provides that "[t]he Governor, or the Governor's designee, shall be an ex officio member of the Oversight Board without voting rights." 48 U.S.C. § 2121(e)(3).

viduals not included on a list for a given category—require Senate Confirmation. *Id.* § 2121(e)(1)(E). But if off-list nominees were not confirmed by the Senate by September 1, 2016—a mere two months after PROMESA's enactment (during most of which time the Senate was on its summer recess)—the President was required to select members from the lists provided by members of Congress. *Id.* § 2121(e)(2)(G). As one House Report stated, PROMESA's appointments procedure "ensures that a majority of [the Board's] members are effectively chosen by Republican congressional leaders on an expedited timeframe."[5]

The President ultimately acceded to PROMESA's procedure and restricted his appointment power to the Board members put forward by Congressional leadership. Thus, none of the Board members was confirmed by the Senate. *See* President Obama Announces the Appointment of Seven Individuals to the Financial Oversight and Management Board for Puerto Rico (Aug. 31, 2016), https://goo.gl/4ZeKuK; 48 U.S.C. § 2121(e)(2)(E), (e)(2)(G), (e)(2)(A)(vi).

## ARGUMENT

The Court should dismiss this unauthorized Title III proceeding because the Board is unconstitutionally structured.

## I.   The Title III Petition Should Be Dismissed Because Its Filing Was Not Authorized By A Validly Constituted Oversight Board.

The Board members were not validly appointed under the Appointments Clause, and thus the Board lacked the power to authorize this Title III petition, to conduct this case as the Commonwealth's representative, and to certify Puerto Rico as a debtor. *See* 48 U.S.C. §§ 2146(b), 2162(2). This Title III proceeding should be dismissed.[6]

---

[5] House Committee, *supra* n.2 at 5.

[6] Although the Board may determine the Commonwealth's eligibility for Title III in its sole discretion, 48 U.S.C. § 2146, the Board's own validity and thus the legitimacy of this proceeding is a question of constitutional law committed to the judgment of the courts.

The Board's members are Officers of the United States because they derive their authority from the federal government, are appointed by the federal government, are overseen by the federal government, and exercise significant executive authority under the laws of the United States.  Accordingly, the Board's selection method must comply with the Appointments Clause. The Board's members are "principal officers" under the Appointments Clause because they are supervised by the President alone, and then only in limited ways.  Because the Senate *never* confirmed them—as the Appointments Clause requires for principal officers—each Board member's appointment is invalid.

Even if the Board's members were inferior officers—and they are not, as they have no superiors, *see Edmond*, 520 U.S. at 660–61—for six of the seven members, PROMESA impermissibly vested the appointment power not "in the President alone" but in individual members of Congress by effectively requiring the President to "choose" only among congressional leaders' lists of preferred candidates for particular seats.  This constitutional violation is exacerbated by the limitation on the President's ability to remove these unlawfully installed officers.

### A.    The Board's Members Must Be Appointed In Compliance With The Appointments Clause Because They Are Officers Of The United States.

#### 1.    Officials Who Exercise Significant Authority Pursuant To The Laws Of The United States Are Officers Of The United States And Must Be Appointed In Compliance With The Appointments Clause.

"The 'manipulation of official appointments'" was among the founding generation's "greatest grievances against" British royal authorities.  *Freytag*, 501 U.S. at 883 (quoting Gordon Wood, *The Creation of the American Republic 1776–1787*, at 79 (1969)).  The "power of appointment to offices" was "the most insidious and powerful weapon of eighteenth century despotism."  *Ibid.* (internal quotation marks omitted).  The Framers responded to these concerns "by carefully husbanding the appointment power to limit its diffusion," thereby "ensur[ing] that those

11

who wielded it were accountable to political force and the will of the people."  *Id.* at 883–84.
The Appointments Clause is thus "a bulwark against one branch aggrandizing its power at the
expense of another branch" that preserves "the Constitution's structural integrity by preventing
the diffusion of the appointment power," *Ryder v. United States*, 515 U.S. 177, 182 (1995), and
"prevent[ing] congressional encroachment," *Edmond*, 520 U.S. at 659.

　　To implement this critical "structural protection," *Freytag*, 501 U.S. at 880, the Appoint-
ments Clause provides that the President "shall nominate, and by and with the Advice and Con-
sent of the Senate, shall appoint" all principal "Officers of the United States."  U.S. Const. art. II,
§ 2, cl. 2.  For "inferior Officers," Congress may "vest" their appointments in courts, department
heads, or "in the President alone."  *Ibid*.  The Appointments Clause thus sets forth, in careful de-
tail, the exclusive means for appointing "*all* officers of the United States."  *Buckley*, 424 U.S. at
132 (emphasis added); *see ibid.* ("[A]ll Officers of the United States are to be appointed in ac-
cordance with the Clause. . . . No class or type of officer is excluded because of its special func-
tion."); *United States v. Germaine*, 99 U.S. 508, 510 (1878) (the Appointments Clause applies to
"all persons who can be said to hold an office under the [federal] government").

　　The Supreme Court has consistently applied a simple, expansive definition of "Officer":
Every official whose position is "established by Law" and who exercises "significant authority
pursuant to the laws of the United States is an 'Officer of the United States.'"  *Buckley*, 424 U.S.
at 125, 126 (quoting U.S. Const. art. II, § 2, cl. 2).  The term "officer" was thus "intended to have
substantive meaning," *ibid.*, by demarcating that class of public officials whose appointments are
subject to constitutional restrictions.  In this manner, the Appointments Clause is "among the
significant structural safeguards of the constitutional scheme," *Edmond*, 520 U.S. at 659, rather
than a matter of mere "etiquette or protocol," *Buckley*, 424 U.S. at 125.

12

*Buckley*'s definition of "officer" was informed by the well-settled historical understanding of that term. *See* 424 U.S. at 126. For example, the Court has long held that a postmaster first class and the clerk of a district court are officers of the United States within the meaning of the Appointments Clause, *ibid.* (citing *Myers v. United States*, 272 U.S. 52 (1926); *Ex parte Hennen*, 38 U.S. (13 Pet.) 225 (1839)), as well as "thousands of clerks in the Departments of the Treasury, Interior, and the other[ ] [departments]," *Germaine*, 99 U.S. at 511; engineers and assistant surgeons, *United States v. Moore*, 95 U.S. 760, 762 (1877), *United States v. Perkins*, 116 U.S. 483, 484 (1886); and federal marshals, *Ex parte Siebold*, 100 U.S. 371, 397 (1879).

These decisions have applied a broad understanding of the "significant authority" sufficient to create an office within the meaning of the Appointments Clause, reflecting its overriding purpose of "preserv[ing] political accountability relative to important Government assignments." *Edmond*, 520 U.S. at 663. Only those public officials who are properly characterized as mere "employees"—*i.e.*, "lesser functionaries subordinate to officers of the United States"—fall outside the Clause's scope. *Buckley*, 424 U.S. at 126 n.162; *see also Freytag*, 501 U.S. at 881 (characterizing employees as officials who perform "ministerial tasks").

### 2. The Oversight Board's Members Are Officers Of The United States.

#### a. The Oversight Board Exercises Significant Federal Executive Authority.

The powers exercised by the Oversight Board far exceed the "significant authority" threshold. As an initial matter, the Board has the power to approve or disapprove fiscal plans for the Commonwealth and its instrumentalities. 48 U.S.C. § 2141(c)(3). If the Board disapproves the Commonwealth's proposed fiscal plan, it may develop its own fiscal plan, to which the Governor and Legislature of the Commonwealth may not object. *Id*. § 2141(e)(2). Because any Commonwealth budgets during the term of a fiscal plan must comply with the fiscal plan's re-

quirements, *id*. § 2142(c)(1), the Board in effect superintends the operation of the Common-
wealth's government, with the authority to override the determinations of its Governor and Leg-
islative Assembly.  *Cf. Citizens for Abatement of Aircraft Noise, Inc. v. MWAA*, 917 F.2d 48, 56
(D.C. Cir. 1990), *aff'd*, 501 U.S. 252 (1991) ("This authority over key operational decisions
[such as budget approval, bond issuance, and repeal of regulations] is quintessentially execu-
tive.").[7]  This oversight that the Board possesses over the Commonwealth's government ensures
that the Board's ongoing power is significant even after the certification of the fiscal plan.
PROMESA has preempted all local executive and legislative control over Puerto Rico's fiscal
matters.  *See* 48 U.S.C. § 2128(a).  And the Board wields the executive power to enforce that
federal law (and ensure that the Commonwealth complies).[8]

The Board also possesses the ability to bind those outside the government—a hallmark of
officer status.  *See Officers of the United States Within the Meaning of the Appointments Clause*,
31 Op. O.L.C. 73, 87 (2007).  For example, the Board has the authority to rescind certain laws
enacted by the Commonwealth that "alter[ed] pre-existing priorities of creditors."  48 U.S.C.
§ 2144(c)(3)(B)(ii).  The Oversight Board may enter into contracts of its own, *id*. § 2124(g), and
the Board's authorization is required to permit the Commonwealth to issue or guarantee new

---

[7]  This broad power is similar to power the U.S. Attorney General has determined would consti-
tute significant governmental authority under U.S. law.  In the Attorney General's view, allow-
ing the Governor of Puerto Rico to force a federal agency to reconsider a regulation that nega-
tively affects Puerto Rico would violate the Appointments Clause:  That would constitute the ex-
ercise of "significant governmental authority under the laws of the United States" that "may be
vested only in an officer of the United States, appointed pursuant to the requirements of the Ap-
pointments Clause of the Constitution."  Hearings on S. 244 Before the Senate Comm. on Energy
and Natural Resources, 102d Cong., 1st Sess. 190, 212–13 (1991) (statement of Richard Thorn-
burgh, Attorney General).

[8]  It cannot be seriously disputed that the Board exercises executive power (as opposed to legisla-
tive power).  But even if the Board were exercising legislative power, it would still be unconsti-
tutional because no such power can be exercised other than through Congressional bicameralism
and presentment.  *See MWAA v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252,
274–76 (1991); *INS v. Chadha*, 462 U.S. 919, 951 (1983).

debt, or to exchange, modify, repurchase, redeem, or enter into any similar transactions with respect to its debt, *id*. § 2147.  Moreover, the Board has the power to initiate civil actions in federal court.  *Id*. § 2124(k); *see Buckley*, 424 U.S. at 140 (the FEC's "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights" rendered the FEC members "officers" subject to the Appointments Clause).

The Board also exercises wide investigative and enforcement powers, allowing it to exercise its executive power by holding hearings, taking testimony, receiving evidence, administering oaths, and subpoenaing witnesses and materials.  48 U.S.C. § 2124(a), (f); *see Freytag*, 501 U.S. at 881–82 (Tax Court special trial judges are officers because they "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders").  The Board may deploy these investigative powers to police "the disclosure and selling practices" of Commonwealth and instrumentality bonds, including any "conflicts of interest maintained by" brokers, dealers, or investment advisers, a power which extends the Board's regulatory scope far beyond Puerto Rico's borders.  48 U.S.C. § 2124(*o*).

Finally, the Board wields significant federal authority in the context of Title III restructuring proceedings such as this one.  To take just a few examples, the Board is charged with certifying that the Commonwealth has satisfied federal statutory prerequisites before seeking restructuring relief, initiating the Title III case by filing a petition in federal district court, and conducting the ongoing litigation of the case.  48 U.S.C. § 2164(a).  The Board acts as "the representative of the debtor," and "may take any action necessary on behalf of the debtor to prosecute the case of the debtor."  *Id.* § 2175(a)–(b).  The Board has the exclusive authority to file a plan of adjustment in a Title III case, *id.* § 2172(a), and generally acts as the trustee for purposes of those provisions of the Bankruptcy Code made applicable in a Title III case, *id.* § 2161(c)(7).

15

In short, PROMESA confers on the Oversight Board the authority to assess and in large measure rearrange the fiscal affairs of the Commonwealth, to bind those outside the government, and to initiate and direct what is likely to be the largest and most complicated bankruptcy proceeding in the Nation's history.  There can be no serious dispute that these broad powers represent the sort of "significant authority" that makes the Board's members Officers of the United States within the meaning of the Appointments Clause.

### b.    The Oversight Board's Members Are Officers Of The Federal Government, Not The Commonwealth.

Congress was well aware of PROMESA's constitutional defect during the legislative process.  As one Senator wisely put it:

> The appointments clause requires that these officers, who are being appointed under the authority of Federal law, be appointed by the President and confirmed by the Senate.  But, if this bill is enacted, we will have board members who have significant authority over Federal law and they are not appointed by the President and they are not confirmed by the Senate.  So it is going to be challenged constitutionally. . . . [T]his small group of people are being given some very large powers. . . . If you don't think someone is going to challenge the constitutionality of this, I guarantee you they are going to challenge it.

162 Cong. Rec. 105 at S4687.  PROMESA's drafters attempted to sidestep the problem by declaring that the Board is "an entity within the territorial government" and "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government." 48 U.S.C. §§ 2121(c)(1), (2).  The apparent goal was to set up the defense that the Board members are not *federal* officers at all, and thus that the Appointments Clause is irrelevant.

Congress's legislative *ipse dixit*, however, cannot determine the constitutional status of the Board.  While "[t]he Constitution grants Congress and the President the power to acquire, dispose of, and govern territory," it does not give the Government "the power to decide when and where its terms apply."  *Boumediene v. Bush*, 553 U.S. 723, 765 (2008).  To the contrary, where

16

"constitutional limits are invoked," courts ignore "mere matters of form" and look instead "to the substance of what is required." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 586–87 (1985) (emphasis omitted) (quoting *Crowell v. Benson*, 285 U.S. 22, 53 (1932)).

The Supreme Court recently rejected a conclusory legislative declaration invoked to determine a party's "status as a governmental entity for purposes of separation of powers analysis under the Constitution." *Dep't of Transp.*, 135 S. Ct. at 1231.  In that case, the plaintiff argued that Congress could not lawfully delegate to Amtrak the authority to issue standards and metrics binding other railroads, because Amtrak was a private entity.  To that end, the plaintiff "relie[d] principally on the statutory directives that Amtrak 'shall be operated and managed as a for profit corporation' and 'is not a department, agency, or instrumentality of the United States Government.'"  *Id.* at 1233 (quoting 49 U.S.C. § 24301(a)(2)–(3)).  The Court rejected that contention: "[F]or purposes of Amtrak's status as a federal actor or instrumentality under the Constitution, the practical reality of federal control and supervision prevails over Congress' disclaimer of Amtrak's governmental status."  It was therefore necessary to consider Amtrak's real-world operations, including the federal government's control over its management, mission, and goals. *See id.* at 1231–33.  On that basis, the Court easily concluded "that Amtrak is a governmental entity" for purposes of deciding the constitutional challenge presented.  *Id.* at 1233; *see also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) (holding that Congress may determine "Amtrak's status as a Government entity for purposes of matters that are within Congress's control," but "congressional pronouncement that it" is not an agency of the federal government "can no more relieve it of its First Amendment restrictions than a similar pronouncement could exempt the Federal Bureau of Investigation from the Fourth Amendment"); *MWAA,* 501 U.S. at 267 (observing that "'separation of powers analysis does not turn on the labeling of an activity'"

17

and rejecting statutory "*ipse dixit*" that the board at issue was not a federal entity subject to sepa-

ration-of-powers scrutiny) (quoting *Mistretta v. United States*, 488 U.S. 361, 393 (1989)).

Here, practical realities belie Congress's characterization of the Board as an entity within

the government of the Commonwealth.  Historical practice, consistent with the structure and

purpose of the constitutional provisions at issue, establishes that the crucial distinction between

federal and territorial officers is whether they take their offices by virtue of federal or territorial

authority, whether they are overseen by the federal government, and whether their authority is

confined to purely local matters.  The federal government's control over the Board's members'

appointments and the Board's ongoing operations, as well as the extent of the Board's powers,

confirm that, despite Congress's made-for-litigation label, the Board's members are federal offic-

ers administering a federal territory, rather than a unit of the government of the Commonwealth

created by the Puerto Rico Constitution.

### i. The Oversight Board's Members Are Appointed By The Federal Government.

The Board's members are appointed by the federal government, a critical fact that distin-

guishes them from those who have taken office by virtue of local, territorial authority.  "[T]he

historical understanding [is] that a constitutional officer is an individual who is appointed to his

or her office *by the federal government*."  *The Constitutional Separation of Powers Between the*

*President and Congress*, 20 Op. O.L.C. 124, 145 (1996) (emphasis added).  Courts have long

looked to the method of an official's appointment to determine his status as an officer of the

United States.

In *Wise v. Withers*, for example, the Supreme Court concluded that a Justice of the Peace

in the District of Columbia was an "officer of the United States" because "he is appointed, by the

president, by and with the advice and consent of the senate, and receives his commission from

18

the president." 7 U.S. (3 Cranch) 331, 336 (1806). As Chief Justice Marshall explained, in light

of the Justice of the Peace's appointment by the federal government, "he must be an officer under

the government of the United States." *Ibid.* "Deriving all his authority from the legislature and

president of the United States, he certainly is not the officer of any other government." *Ibid.*

Similarly, in *United States v. Hartwell*, the Court relied on the fact that the official had

been appointed by the head of a federal department to determine that he was an "officer" of the

United States. 73 U.S. (6 Wall.) 385, 393 (1867); *cf. Dep't of Transp.*, 135 S. Ct. at 1232 (con-

cluding that Amtrak was a federal entity because, among other things, a "majority of its Board is

appointed by the President and confirmed by the Senate"). Thus, federally appointed officers are

Officers of the United States within the meaning of the Appointments Clause, even if their re-

sponsibilities may include supervision of the local government established for a territory.

That conclusion is confirmed by Founding Era history. The Northwest Ordinance of

1787, enacted by the Continental Congress operating under the Articles of Confederation, pro-

vided for congressional appointment and removal of territorial governors for the Northwest Ter-

ritory.[9] Shortly after the ratification of the Constitution in 1789, Congress amended the North-

west Ordinance "so as to adapt the same to the present Constitution of the United States."[10] Be-

cause the Northwest Territory's governors would continue to be appointed by the federal gov-

ernment, Congress recognized that their selection would have to comply with the Appointments

Clause. Thus, the 1789 Act directed that "the President shall nominate, and by and with the ad-

---

[9] *See* An Ordinance for the Government of the Territory of the United States, North West of the
River Ohio (July 13, 1787), 32 J. Cont'l Cong. 334 ("That there shall be appointed from time to
time, by Congress, a governor, whose commission shall continue in force for the term of three
years, unless sooner revoked by Congress.").

[10] An Act to provide for the Government of the Territory North West of the River Ohio, 1 Cong.
Ch. 8, 1 Stat. 50, 51 (August 7, 1789).

vice and consent of the Senate, shall appoint all officers which by the said ordinance were to have been appointed by the United States in Congress assembled."[11]

It is well settled that "early congressional practice . . . provides 'contemporaneous and weighty evidence of the Constitution's meaning.'" *Alden v. Maine*, 527 U.S. 706, 743–44 (1999) (quoting *Printz v. United States*, 521 U.S. 898, 905 (1997)).  "[T]he 'construction placed upon the Constitution'" by the First Congress, "'many of whom were members of the convention which framed it, is of itself entitled to very great weight.'" *Golan v. Holder*, 565 U.S. 302, 321 (2012) (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884)).  Here, the First Congress's action in the 1789 Act left no room for doubt:  In the text of the statute itself, Congress explained that the decision to subject the Northwest Territory's governors to advice-and-consent appointment was dictated by the newly ratified Constitution.

Congress has consistently followed the understanding reflected in the 1789 Act by ensuring that every presidential appointment of civilian territorial governors is subject to the advice and consent of the Senate.[12]  Indeed, to our knowledge, every civilian official appointed by the federal government to oversee a territorial government has been recognized as a principal federal officer, with advice-and-consent appointment.  That "'[l]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions' regulating the relationship between Congress and the President." *Noel Canning*, 134 S. Ct. at 2559.

More recently, Congress has chosen to devolve significant authority over territorial affairs to the people of Puerto Rico and other territories.  Since 1947, Congress has provided for

---

[11] *Id.* § 1, 1 Stat. at 53.  *See generally* Gary Lawson, *Territorial Governments and the Limits of Formalism*, 78 Cal. L. Rev. 853, 868 (1990).

[12] *See* Lawson, *supra* n.8, at 868 & n.85 (listing every statute that created a territorial government before 1947, each of which "provided for direct control by the executive branch, usually through a presidentially appointed governor").

20

locally elected governors for Puerto Rico.  *See* Act of Aug. 5, 1947, ch. 490, § 1, 61 Stat. 770,

770–71 (authorizing popular elections for Puerto Rico's governor).  These elected governors are

generally *not* considered officers of the United States, because they are not selected by the feder-

al government and thus do not directly derive their authority from the federal government.[13]

Historical practice thus confirms that officials who are elected by the people of a territory

(or appointed by such elected representatives) are not officers of the federal government, while

those installed by the federal government *are* federal officers.  The Northwest Ordinance of 1787

itself provided for territorial legislative authorities composed of locally elected territorial repre-

sentatives.[14]  The drafters of the 1789 Act, although mindful of the constitutional flaw associated

with congressional appointment of a territorial governor, saw no need to modify the local elec-

tion of legislative representatives "so as to adapt the same to the present Constitution."  That is

because territorial representatives, elected by territorial citizens, were not officers of the United

States because they did not take their offices by virtue of federal authorization.  Over the ensuing

centuries, Congress has routinely delegated legislative authority to territorially created legisla-

tures.  *See Binns v. United States*, 194 U.S. 486, 491 (1904) ("[Congress] may legislate directly

in respect to the local affairs of a territory, or transfer the power of such legislation to a legisla-

ture elected by the citizens of the territory.").[15]  These legislators have not been thought to be

subject to the Appointments Clause in light of their local appointment.  Likewise, the appoint-

---

[13]  For instance, those Puerto Rico officials who used to be appointed by the President, such as the Governor and the Attorney General, were appointed by the President, with the advice and consent of the Senate, and were removable by the President, whereas no Puerto Rico officials were federally appointed but not subject to Senate confirmation.  *See* Act of Mar. 2, 1917, Pub. L. 64-368, ch. 145, §§ 12, 13, 39 Stat. 951, 955–56.

[14]  *See* An Ordinance for the Government of the Territory of the United States, North West of the River Ohio (July 13, 1787), 32 J. Cont'l Cong. 334.

[15]  *See also Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937) (Philippines); *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100 (1953) (District of Columbia).

ment of a prosecuting attorney by the locally elected territorial legislature was upheld by the Supreme Court in *Snow v. United States* without a suggestion that the territorial officer might be a federal officer subject to the Appointments Clause.  85 U.S. (18 Wall.) 317, 321 (1873).  As with locally elected legislative representatives, this official took office by virtue of local, territorial authority—not federal authority.

The members of the Oversight Board, by contrast, unquestionably hold their offices exclusively by virtue of federal appointment.  The Board members are nominated by the President, and in some instances could be subject to the advice and consent of the Senate—something that is true *only* of officers of the United States.  No official or member of the public from the Commonwealth plays any role in the nomination, appointment, or removal of the Board's members. *See* 48 U.S.C. §§ 2121(e), 2128(a).  Unlike the three branches of Puerto Rico's government— which derive their existence and powers from the Puerto Rico Constitution—the Board is purely a creature of federal law, tasked with carrying out federal law.  For that reason, the Board members are not officials of the government of the Commonwealth but Officers of the United States subject to the Appointments Clause.

### ii.    The Oversight Board's Ongoing Operations Are Subject To Federal Control.

The conclusion that the Oversight Board's members are federal officers is reinforced by the federal government's control over the Board's ongoing operations.  Despite the conclusory statement in PROMESA that the Board is "an entity within the territorial government," in every meaningful respect it operates under the aegis of federal authority.  The Board reports to the President and Congress.  *See* 48 U.S.C. § 2148(a).  And its ongoing ethics obligations are governed not by local law, but by federal conflicts of interest and financial disclosure statutes. *Id.* § 2129.  Board members may be removed, if at all, only by the President of the United States.

22

*See id*. § 2121(e)(5)(B).  The Commonwealth's Governor may not remove Board members under *any* circumstances, and "[n]either the Governor nor the Legislature may . . . exercise any control, supervision, oversight, or review over the Oversight Board or its activities."  *Id*. § 2128(a).  Because the power to remove is the power to control, *see Bowsher v. Synar*, 478 U.S. 714, 726 (1986) (an officer "must fear" "only the authority that can remove him"), the Board's operations, to the extent they are subject to any control, are subject only to federal control.

What is more, at every turn the Board wields authority conferred by a federal statute that sets federal standards.  The criteria for certifying a fiscal plan and for approving the budgets and laws of the Commonwealth are all set forth in PROMESA, a federal statute enacted by Congress.  *See* 48 U.S.C. §§ 2141–2144.  The same is true of the statutory prerequisites for authorizing a Title III filing.  *Id*. § 2146.  Put simply, when the Board does its work, it looks first to the United States Code, not Commonwealth law.  And when the Board needs help with its work, it looks to the United States government, too.  *See id*. § 2122 (authorizing any federal agency to provide the Board with office space on terms established by the agency); *id*. § 2124(n) (authorizing the Board to request the assistance of the Administrator of General Services, or other federal agencies, for administrative assistance).

The Board is therefore subject to the ongoing control of the federal government and cannot plausibly be characterized as a component of the government of the Commonwealth.

### B.    PROMESA's Method For Selecting The Members Of The Board Does Not Comply With The Appointments Clause.

As officers of the United States, the Board's members were required to be appointed pursuant to the Appointments Clause.  Because they have no superiors save the President, they are necessarily principal officers of the United States under controlling Supreme Court precedent.  Accordingly, they had to be—but were indisputably not—confirmed by the Senate.  Whether

they are classified as principal or inferior officers, however, their appointments violated the Con-

stitution because Congress impermissibly restricted the President's exclusive power to appoint

them and at the same time impermissibly aggrandized itself by giving individual legislators a

role in the appointment process.

### 1.   Because The Board's Members Are Principal Officers, They Had To Be Appointed With The Advice And Consent Of The Senate.

a.   Under the Appointments Clause, "principal officers" of the United States may be ap-

pointed only by the President with the "Advice and Consent" of the Senate.  *Edmond*, 520 U.S.

at 659.  The Board's members are "principal" officers because they are subject to supervision (if

at all) only by the President.  They are not "'directed and supervised at some level' by other of-

ficers appointed by the President with the Senate's consent."  *Free Enter. Fund*, 561 U.S. at 510

(quoting *Edmond*, 520 U.S. at 664).

As the Supreme Court has explained, "[w]hether one is an 'inferior' officer depends on

whether he has a superior."  *Free Enter. Fund*, 561 U.S. at 510 (quoting *Edmond*, 520 U.S. at

662).  In other words, a "principal officer is one who has no superior other than the President."

*NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 947 (2017) (Thomas, J., concurring).  The Board's mem-

bers have no superior.  They are removable only by the President—and then "only for cause."  48

U.S.C. § 2121(e)(5)(B).  Their "work" is not "directed and supervised at some level" by any oth-

er "officers appointed by the President with the Senate's consent."  *Free Enter. Fund*, 561 U.S. at

510.  Rather, the Board's members operate wholly outside of any non-Presidential supervisory

structure.  And while Aurelius contests the breadth of the Board's discretion in various respects,

the Board undeniably is empowered to take numerous actions in "its sole discretion."  *See*, *e.g.*,

48 U.S.C. §§ 2121(d)(1)(A)–(E); 2141(a); 2142(a); 2146(a).  By law, "[n]either the Governor nor

the Legislature may . . . exercise any control, supervision, oversight, or review over the Over-sight Board or its activities." *Id.* § 2128(a).

Even setting aside the fact that the Board's members lack any supervisor besides the President, the nature of their roles does not "suggest[ ] sufficient limitations of responsibility and authority" to render them inferior officers. *United States v. Hilario*, 218 F.3d 19, 25 (1st Cir. 2000); *see Morrison v. Olson*, 487 U.S. 654, 671–72 (1988) (independent counsel was inferior officer due to limited tenure, limited duties, limited jurisdiction, and removability by a superior officer other than the President). Their jurisdiction is broad and their duties many; the Board effectively stands over the government of Puerto Rico, wielding control over the Commonwealth's budgetary and fiscal decisions with "autonomy" from local elected officials. 48 U.S.C. § 2128. Thus, whether measured by the scope of their duties or lack of supervision, the Board's members are principal officers. *Cf. Morrison*, 487 U.S. at 671.

b. PROMESA's appointment scheme conflicts with the requirement that Board members, as principal officers, be nominated by the President and appointed "with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2.

First, one member of the Board—the "Category F" member—could be (and in fact was) appointed at the President's "sole discretion," with no Senate confirmation. 48 U.S.C. § 2121(e)(2)(A)(vi), (e)(2)(E). The appointment of the Category F member was therefore invalid under the Appointments Clause.

Second, PROMESA provided that the other six members could *also* be appointed without Senate confirmation, so long as the President agreed to appoint nominees pre-selected for him by certain individual members of Congress. *See* 48 U.S.C. §§ 2121(e)(2)(A)(i)–(v), (e)(2)(E). It should come as no surprise, given the squeeze-play created by the statute, that the President did,

25

in fact, select the remainder of the Board entirely from the congressional leaders' lists, thereby allowing the candidates to skip the public scrutiny of the Senate confirmation process that the Appointments Clause requires. *See id*. § 2121(e)(2)(E). All seven members of the Board were thus installed without Senate confirmation, in violation of the Appointments Clause.

The congressional leaders' lists cannot replace Senate confirmation. Where the Constitution requires the *Senate* to act, Congress may not reassign that role to an individual legislator in an effort to pack the Board with its desired candidates. *See Chadha*, 462 U.S. at 955–56. It is the Senate that must advise and consent, not the Speaker of the House, the Senate Majority Leader, or any other individual member. And the "separation of powers does not depend on . . . whether 'the encroached-upon branch approves the encroachment.'" *Free Enter. Fund*, 561 U.S. at 497 (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)). Thus, the fact "[t]hat the Senate voluntarily relinquished its advice-and-consent power . . . does not make this end-run around the Appointments Clause constitutional." *SW Gen.*, 137 S. Ct. at 949 (Thomas, J., concurring). As principal officers appointed without Senate confirmation, all seven members of the Board hold their offices unlawfully.

**2. Even If The Board's Members Were Inferior Officers, PROMESA's List Mechanism Unlawfully Constrains The President's Appointment Authority.**

Even if the members of the Oversight Board were "inferior officers," their appointment procedure is still unlawful. Absent Senate confirmation on or before September 1, 2016, PROMESA forces the President to choose six of the members from five lists separately prepared by four congressional leaders from both houses of Congress. But the Appointments Clause unambiguously requires that, if appointments of inferior officers are not made with the advice and consent of the Senate and are not made by courts of law or department heads, then the appoint-

26

ment power must be vested "in the President *alone*."  U.S. Const. Art. II, § 2, cl. 2 (emphasis added).  Congress may not arrogate the appointment power to itself.  *Buckley*, 424 U.S. at 126.

Nor may Congress achieve the same result by limiting the President's appointment discretion to little more than a decision dictated by Congress's choices.  *See Myers*, 272 U.S. at 128. To be sure, Congress has authority to "prescribe qualifications for office."  *Ibid*.  To that end, PROMESA separately sets forth the *actual* qualifications for Board membership, such as "knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government," and certain disqualifying criteria, including prior involvement in Commonwealth government.  48 U.S.C. § 2121(f).  That Congress specified, in a separate subsection, the qualifications for these offices underscores that being included on a list is not a "qualification" at all.  Congress may not use the pretense of "qualifications" to "so limit selection and so trench upon executive choice as to be in effect legislative designation."  *Myers*, 272 U.S. at 128.

PROMESA's list-based scheme does just that.  Nothing in PROMESA prevents congressional leaders from including on their lists only names the President will find entirely unacceptable.  Even cabining the President's appointment authority to two or three names for each available seat is a radical departure from the constitutional structure, under which "[n]o role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for appointment."  *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 483 (1989) (Kennedy, J., concurring in the judgment).

PROMESA's list device was intended to offer a veneer of discretion to the President. Forcing the President's hand by giving him a list of prescribed "choices," however, does not afford him the discretion the Appointments Clause requires.  The legislative history demonstrates

that PROMESA's appointments provisions were specifically intended to "ensure[ ]" that a majority of the Board's members were "effectively chosen by Republican congressional leaders." House PROMESA Report, *supra* n.2, at 5.  But Congress cannot add any restrictions to the President's appointment authority; "the sole limitation on the President's power to nominate" is "the Incompatibility Clause."  *Pub. Citizen*, 491 U.S. at 484 (Kennedy, J., concurring in the judgment).  It is the President's power "to *nominate*"; there will "be no exertion of *choice* on the part of the Senate.  They may defeat one choice of the Executive, and oblige him to make another; but they cannot themselves *choose*—they can only ratify or reject the choice he may have made." *The Federalist No. 66*, at 405 (Hamilton) (Clinton Rossiter ed., 1961); *see The Federalist No. 76*, at 456–57 (Hamilton) ("In the act of nomination," the President's "judgment alone would be exercised," and it is "his sole duty" to nominate); *Weiss v. United States*, 510 U.S. 163, 185 n.1 (1994) (Souter, J., concurring) ("Hamilton was clear that" the President has "the sole power to nominate.").

The Senate, meanwhile, exercises no part of the nomination power.  After Congress has created the office, "'the legislative power ceases.  They ought to have nothing to do with designating the man to fill the office.'"  *Myers*, 272 U.S. at 128 (quoting 1 Annals of Cong. 581, 582 (Joseph Gales Ed., 1834) (Madison)).  The Constitution "gives the *nomination*" power "exclusively to the President," and the Senate is "only to see that no unfit person be employed." Thomas Jefferson, Powers of the Senate Respecting Diplomatic Appointments (Apr. 24, 1790), *reprinted in* 16 Papers of Thomas Jefferson 378, 379 (Julian P. Boyd ed., 1961).  Congress may not "vest in itself" the power "to appoint officers of the United States when the Appointments Clause by clear implication prohibits it from doing so."  *Buckley*, 424 U.S. at 135.  As Hamilton knew, whenever "an assembly of men" has the power of appointment, it is infected by "all the

private and party likings and dislikes, partialities and antipathies, attachments and animosities"
of "the assembly," and "the intrinsic merit of the candidate will be too often out of sight." *The
Federalist No. 76*, at 456 (Hamilton).  But when the President exercises that power, he "cannot
be distracted and warped by that diversity of views, feelings, and interests, which frequently dis-
tract and warp the resolutions of a collective body." *Ibid*.  Indeed, PROMESA's list mechanism
even gives a portion of the nomination power to leaders of the House of Representatives, a body
that has no proper role in the appointments process at all.  *See The Federalist No. 77* (Hamilton).

This basic distinction applies with equal force to inferior officers:  The Senate may exer-
cise its confirmation power, or Congress may authorize a Department Head, a Court of Law, or
"the President alone," to make an appointment.  But nowhere does the Constitution contemplate
that Congress—let alone individual members of *both* houses—may *share* in the selection power.
Rather, "[t]he Appointments Clause names the possible repositories for the appointment power."
*Freytag*, 501 U.S. at 884.  PROMESA's congressional-list requirements manifestly—indeed,
admittedly—are intended to force the President to cede to some members of Congress the power
to decide which qualified candidates are eligible for appointment.

In this way, too, PROMESA impermissibly aggrandizes Congress in violation of the sep-
aration of powers:  Congress "may not invest itself or its Members with . . . executive power,"
*MWAA*, 501 U.S. at 274, and "if any power whatsoever is in its nature Executive, it is the power
of appointing . . . those who execute the laws," *Free Enter. Fund*, 561 U.S. at 492 (quoting 1 An-
nals of Cong. 463 (1789) (statement of J. Madison)).  *See also Springer v. Gov't of Philippine
Islands*, 277 U.S. 189, 202–03 (1928); *Myers*, 272 U.S. at 202–03.  Yet PROMESA's list mecha-
nism arrogates a core executive function and places it in the hands of individual legislators—"the
kind of decisionmaking about who will serve in Executive department posts that the Constitution

29

says [Congress] cannot" exercise. *Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*, 732 F. Supp. 1183, 1193 (D.D.C. 1990); *see also Springer*, 277 U.S. at 202 ("[A]ppointment . . . is an executive act . . . the Legislature is without capacity to perform.").[16]

Congress's use of this list-based system to increase its own authority is, like other aspects of PROMESA, unprecedented.  To counsel's knowledge, the only other instance in which Congress has directed the President to select nominees from lists of its own choosing is the Comptroller General and Deputy Comptroller General.  Congress has required that those officials be appointed by the President from a list of as few as three persons recommended by a commission of various members of Congress, though the President may ask the commission to recommend additional candidates.  *See* 31 U.S.C. § 703(a).  The Comptroller General, however, has only a legislative function.  *Bowsher*, 478 U.S. at 730.  And officials who exercise purely legislative functions need not be appointed consistent with the Appointments Clause.  *See Buckley*, 424 U.S. at 137.  To our knowledge, never before has Congress attempted to require the President to appoint *executive* officers from lists of its own choosing.

PROMESA's list system is no mere "innocuous" "practical accommodation."  *MWAA*, 501 U.S. at 276–77.  "The statutory scheme [of PROMESA] provides a blueprint for extensive expansion" of Congress's powers "beyond its constitutionally confined role."  *Ibid.*  If Congress is allowed to invade the President's appointment power here in this manner, then there is nothing

---

[16]  To the extent this Congressional assertion of executive authority presents a stand-alone claim under the separation of powers, *see MWAA*, 501 U.S. at 277 n.23 (distinguishing alleged Appointments Clause violation from "basic separation-of-powers principles"), Aurelius preserves that claim.

stopping Congress from enacting further legislation inserting itself into other appointments—from cabinet secretaries and Article III judges to postmasters and U.S. Attorneys.[17]

That PROMESA permitted the President to appoint persons other than those named on various congressional lists only if they could be confirmed on a hopelessly short time frame makes transparent Congress's intention to intrude on the President's appointment power. *See* 48 U.S.C. § 2121(e)(2)(E). PROMESA took effect on June 30, 2016, but the President's ability to nominate board members of his own choosing expired just two months later. If all seven seats of the Board were not filled by September 1, 2016, PROMESA *required* that the President "shall appoint an individual" from the congressional leadership's "list[s]" if such lists had at least two names on them. *Id*. § 2121(e)(2)(G). The President thus had no realistic ability to obtain Senate confirmation on this timeframe. Sixty days to identify, vet, nominate, and obtain Senate confirmation for seven Board members is plainly inadequate—particularly since the Senate was in a scheduled recess for all but a few days from July 1 to September 1, 2016. Given that scheduled

---

[17]   Recognizing this steep and slippery slope, presidential administrations of both parties have repeatedly emphasized that Congress cannot infringe upon the President's appointment power by limiting persons who can be nominated for various posts. *See*, *e.g.*, Statement by President George W. Bush on Signing H.R. 5441, 2 Pub. Papers 1775 (Oct. 4, 2006); Constitutionality of Statute Governing Appointment of United States Trade Representative, 20 Op. O.L.C. 279 (1996); Statement by President William J. Clinton on Signing S. 1060, 2 Pub. Papers 1907 (Dec. 19, 1995); Statement by President George H.W. Bush on Signing the National and Community Service Act of 1990, 2 Pub. Papers 1613 (Nov. 16, 1990); Common Legislative Encroachments on Executive Branch Constitutional Authority, 13 Op. O.L.C. 248, 248–50 (1989); Statement by President James Earl Carter, Jr. on Signing H.R. 6370, 2 Pub. Papers 1479 (Aug. 18, 1977); Civil Service Commission, 13 Op. Att'y Gen. 516, 520–21 (1871); James Monroe, Message to the Senate of the United States (Apr. 13, 1822), *reprinted in* A Compilation of the Messages and Papers of the Presidents 1789–1907, at 129, 132 (James D. Richardson Ed., 1908) ("Congress ha[s] no right under the Constitution to impose any restraint by law on the power granted to the President so as to prevent his making a free selection of" officers); *see also Myers*, 272 U.S. at 96–97 (Solicitor General Beck stating that "when the condition imposed upon the creation of the office has no reasonable relation to the office . . . and is not the declaration of qualifications, but is the creation of an appointing power other than the President, then Congress has crossed the dead line, for it has usurped the prerogative of the President").

recess, the time actually available for the President to nominate Board members and gain Senate confirmation was a mere eight business days at the beginning of July—an impossibly short deadline.  Thus, PROMESA's alternative was nothing more than a ruse.  But even if it were not, the availability of a legitimate selection process would make no constitutional difference because the President did not choose that path.  *See Free Enter. Fund*, 561 U.S. at 512 n.12 (the Court "cannot assume" that the "same appointments" would have been made in a "counterfactual world").

PROMESA's novel list-based selection mechanism frustrates a key purpose of the Appointments Clause: ensuring clear "political accountability" for the appointment of officials who will exercise significant federal authority.  *Edmond*, 520 U.S. at 662–63; *see Weiss*, 510 U.S. at 186 (Souter, J., concurring) (the Appointments Clause "allows the public to hold the President and Senators accountable for injudicious appointments" so that "the public would be at no loss to determine what part had been performed by the different actors" (citation omitted)).  When an officer is nominated by the President alone, the lines of responsibility are clear:  "'The blame of a bad nomination would fall upon the president singly and absolutely,'" and where Senate confirmation is required, the "'censure of rejecting a good one would lie entirely at the door of the senate.'"  *Edmond*, 520 U.S. at 660 (quoting *The Federalist No. 77*, at 392 (Hamilton)).

But here, the convoluted process obscures who bears responsibility for installing the Board's members.  Both the President and the members of Congress who crafted the lists can deflect responsibility to one another; true accountability lies with no one.  To make matters worse, the lists submitted to the President were not required to be—and never have been—made public.  Because the statute does not require any public disclosure regarding which congressional leader proffered which Board member, it undermines any particular legislator's accountability to the electorate for his or her selections.  Nor is there any information regarding how those lists

were compiled or whether the other candidates were even remotely qualified, in stark contrast to

the open debates and public examinations of suitability that attend Senate confirmation. The

Framers' paramount concern for accountability in appointments is thus frustrated: Voters (and

the people of Puerto Rico) cannot know who was ultimately responsible for "the making of a bad

appointment" to a Board with such immense powers. *Edmond*, 520 U.S. at 660.

"The Framers' experience . . . taught them that combining the power to create offices

with the power to appoint officers was a recipe for legislative corruption." *Freytag*, 501 U.S. at

904 (Scalia, J., concurring). PROMESA's list system, the very purpose of which was to "en-

sure[ ]" that the members of the Board that Congress established were chosen by individual

members of Congress, House Report, *supra* n.2, at 5, violates the separation of powers.

### C.   The Limitations On The President's Removal Power Exacerbate The Appointments Clause Violation.

The limitations on the President's removal authority add constitutional insult to injury,

further undermining the core principle of democratic accountability inherent in the separation of

powers. PROMESA strips the President of his appointment authority and also restricts his re-

moval power to removals "for cause." 48 U.S.C. § 2121(e)(5)(B). Thus, not only does

PROMESA's opaque appointments procedure hinder the Constitution's goal of clear "political

accountability," *Edmond*, 520 U.S. at 663, the Act also exacerbates this constitutional defect by

diminishing the President's ability "to keep these officers accountable—by removing them from

office, if necessary." *Free Enter. Fund*, 561 U.S. at 483. This double layer of insulation results

in a "novel structure" that "does not merely add to the Board's independence, but transforms it."

*Id.* at 496.[18]   In the event the President removes a Board member, the President is back to square

---

[18]   Although the Supreme Court has upheld for-cause-removal provisions, *see Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935), this Board presents a new situation because PROMESA combines insulation from removal with unprecedented diminution of the appointment power.

one and must select from a new list prepared by the current congressional leaders, who could force the President to choose between leaving the vacancy unfilled and appointing an unpalatable candidate.  48 U.S.C. § 2121(e)(2)(F), (e)(6).  Thus, even the amputated removal authority that PROMESA leaves the President is undermined by the uncertainty attending every appointment. The combined restriction of the President's appointment *and* removal powers is all the more reason for the Court to conclude that the Oversight Board is unconstitutional.

*   *   *

As officers of the United States, the Board members were required to be appointed consistent with the Appointments Clause and the separation of powers.  PROMESA, however, disregarded the Clause's methods for appointment, instead devising an unconstitutional scheme of congressional encroachment and aggrandizement.  After ignoring the advice-and-consent requirement and infringing on the President's appointments power by dictating the composition of the Board, Congress compounded the problem by constraining his ability to remove the members of the Board.  The Board is unconstitutional and its actions void.

### D.   Dismissal Of The Title III Petition Is The Appropriate Remedy.

The Board's Title III petition should be dismissed and this proceeding thereby terminated. The Board instituted this case by filing a petition under Title III pursuant to 48 U.S.C. § 2164. *See* Dkt. 1.  As a prerequisite to that filing, the Board was required to issue a "restructuring certification."  48 U.S.C. § 2146; *see also id.* § 2162(2) (providing that "[a]n entity may be a debtor" under Title III only if "the Oversight Board has issued a certification under section 2146(b) of this title for such entity").  But that issuance requires the "vote of no fewer than 5 members of

---

Moreover, the continued viability of *Humphrey's Executor* has been questioned in the wake of *Free Enterprise Fund*.  *See*, *e.g.*, *In re Aiken Cty*., 645 F.3d 428, 444, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring).  Aurelius respectfully preserves the argument that the Supreme Court should revisit and overturn *Humphrey's Executor* as inconsistent with the separation of powers.

the Oversight Board." *Id*. § 2146(b). As detailed above, the Board lacked the five members nec-

essary to vote to issue a "restructuring certification," and so the certification was invalid.[19] The

invalidity of the Oversight Board members' appointments, moreover, is a "structural error" that

would "warrant[ ] reversal regardless of whether prejudice can be shown." *Intercollegiate

Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 123 (D.C. Cir. 2015); *see also Ryder*,

515 U.S. at 180–83 (rejecting application of *de facto* officer doctrine to Appointments Clause

violation); *Glidden Co. v. Zdanok,* 370 U.S. 530, 536 (1962) (refusing to apply the *de facto* of-

ficer doctrine in a case involving "basic constitutional protections designed in part for the benefit

of litigants"). The Board's actions are invalid; it cannot act until it is properly constituted. *See*,

*e.g.*, *Buckley*, 424 U.S. at 137. As a result, the Board's certification is a nullity and cannot satisfy

the requirements of PROMESA nor otherwise make the Commonwealth eligible for relief under

Title III. Because the Commonwealth is not eligible to be a debtor under Title III and the Board

lacks lawful authority to operate as presently constituted, the Board cannot act as the Common-

wealth's representative, and this Title III petition should be dismissed and this proceeding there-

by terminated. *See* 48 U.S.C. § 2164(b).

## CONCLUSION

For the foregoing reasons, the Board's petition for debt restructuring under Title III of

PROMESA should be dismissed.

---

[19] The Board's other actions, including certifying the Fiscal Plan, are also void, and Aurelius
reserves the right to challenge them in this proceeding.

Dated:  August 7, 2017                              Respectfully submitted,

 /s/ Luis A. Oliver-Fraticelli                       /s/ Theodore B. Olson

Luis A. Oliver-Fraticelli                        Theodore B. Olson  (*pro hac vice* pending)
Katarina Stipec-Rubio                            Matthew D. McGill  (*pro hac vice* pending)
USDC-PR Bar Nos. 209204, 206611                  Helgi C. Walker  (*pro hac vice* pending)
ADSUAR MUÑIZ GOYCO SEDA &                         Michael R. Huston  (*pro hac vice* pending)
    PÉREZ-OCHOA PSC                               Lochlan F. Shelfer  (*pro hac vice* pending)
208 Ponce de Leon Ave., Suite 1600               Jeremy M. Christiansen  (*pro hac vice* pending)
San Juan, P.R.  00918                            GIBSON, DUNN & CRUTCHER LLP
Phone:  (787) 756-9000                           1050 Connecticut Avenue, N.W.
Fax:  (787) 756-9010                             Washington, D.C.  20036
Email: loliver@amgprlaw.com                      Phone:  (202) 955-8500
kstipec@amgprlaw.com                             Fax:  (202) 467-0539
                                                 Email:  tolson@gibsondunn.com
                                                 mmcgill@gibsondunn.com
                                                 hwalker@gibsondunn.com
                                                 mhuston@gibsondunn.com
                                                 lshelfer@gibsondunn.com
                                                 jchristiansen@gibsondunn.com

# **EXHIBIT A**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGE-MENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>        Debtors[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**Re: Docket No. __** |

## ORDER DISMISSING TITLE III PETITION

Upon the *Objection and Motion of Aurelius to Dismiss Title III Petition* (the "Motion");[2] subject matter jurisdiction existing and venue being proper; adequate notice having been given to all relevant parties; having held a hearing before the Court on September 26, 2017; and objections to the requested relief having been withdrawn or overruled on the merits, it is **HEREBY ORDERED THAT**:

1.      The Motion is granted as set forth herein.

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).

[2]  Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

2.      A prerequisite to the commencement of this Title III case was the Fiscal Management and Oversight Board for Puerto Rico's issuance of a "restructuring certification." 48 U.S.C. § 2146.  That certification, however, requires "a vote of no fewer than 5 members of the Oversight Board in the affirmative." *Id.* § 2146(b).  The appointments of the Board violated the Appointments Clause.  U.S. Const. Art. II, § 2, cl. 2.

3.      The Board members are principal officers of the United States, within the meaning of the Appointments Clause, because they exercise significant authority pursuant to federal law, were appointed by the President, and are overseen only by the President and by no other officer of the United States.  *See Edmond v. United States*, 520 U.S. 651, 660–63 (1997); *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 880–84 (1991); *Buckley v. Valeo*, 424 U.S. 1, 126, 135–37 (1976) (per curiam).  It is uncontested that none of the Board members was ever confirmed by the U.S. Senate, as required by the Appointments Clause.

4.      In the alternative, even if the Board members were inferior officers, their appointment (except as to the Category F Board member) was not made by the President alone, as also required by the Appointments Clause.  Rather, PROMESA impermissibly restricts the President's power to choose the members of the Board.  *See* 48 U.S.C. §§ 2121(e)(2)(A)(i)–(v), (e)(2)(E); *Edmond*, 520 U.S. at 662–63; *INS v. Chadha*, 462 U.S. 919, 955–56 (1983).

5.      Because the Board was unconstitutionally appointed, its acts were void ab initio. In particular, none of the Board members could, as principal officers, lawfully instigate this Title III case; in the alternative, the voting majority necessary to do so was made up of inferior officers who were not chosen by the President alone.  For these reasons, the petition also "does not meet the requirements of [PROMESA]." 48 U.S.C. § 2164(b).

6.      The Court accordingly DISMISSES the Commonwealth's Title III petition, with-

out prejudice.

 SO ORDERED.

Dated: _____
San Juan, Puerto Rico


_____
LAURA TAYLOR SWAIN
United States District Judge