Objection Deadline:  September 19, 2017 4:00 PM EPT
Hearing Date:  September 26, 2017 9:30 AM EPT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGE-MENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## MOTION OF AURELIUS FOR RELIEF FROM THE AUTOMATIC STAY[2]

Luis A. Oliver-Fraticelli
Katarina Stipec-Rubio
USDC-PR Bar Nos. 209204, 206611
ADSUAR MUÑIZ GOYCO SEDA &
    PÉREZ-OCHOA PSC
208 Ponce de Leon Ave., Suite 1600
San Juan, P.R.  00918
Phone:  (787) 756-9000
Fax:  (787) 756-9010
Email: loliver@amgprlaw.com

Theodore B. Olson  (*pro hac vice* pending)
Matthew D. McGill  (*pro hac vice* pending)
Helgi C. Walker  (*pro hac vice* pending)
Michael R. Huston  (*pro hac vice* pending)
Lochlan F. Shelfer  (*pro hac vice* pending)
Jeremy M. Christiansen  (*pro hac vice* pending)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone:  (202) 955-8500
Fax:  (202) 467-0539
Email:  tolson@gibsondunn.com

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bank-ruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).

[2]  On July 26, 2017, the Court proposed changing the September 26 Omnibus hearing date to Oc-tober 4.  Dkt. 754.  As of this filing, no order has been entered changing the date.  If the October 4 hearing date is implemented, the objection deadline for this filing will be September 27 at 4:00 PM Prevailing Eastern Time.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT..................................................................... 1

BACKGROUND ....................................................................................... 3

I.      PROMESA........................................................................................ 3

II.     THE POWERS OF THE OVERSIGHT BOARD ................................ 4

III.    THE APPOINTMENT OF OVERSIGHT BOARD MEMBERS.................... 6

IV.     THE BOARD ACTIONS.................................................................... 8

ARGUMENT ........................................................................................... 8

I.      THE COURT SHOULD CLARIFY THAT THE AUTOMATIC STAY UNDER
        SECTIONS 362(A) AND 922 DOES NOT APPLY TO AURELIUS'S
        PROPOSED ACTION ........................................................................ 8

II.     IN THE ALTERNATIVE, GOOD CAUSE EXISTS TO LIFT THE STAY.....................11

        A.      PROMESA's Method For Selecting The Members Of The Board Does
                Not Comply With The Appointments Clause. ...................................... 12

        B.      The Unconstitutional Acts Of The Board Result In Irreparable And
                Continuing Harm ........................................................................... 24

        C.      Complete Relief Cannot Be Afforded Aurelius In The Title III Case.................. 25

CONCLUSION ........................................................................................ 27

# TABLE OF AUTHORITIES

**Cases**

*In re Aiken Cty.*,
645 F.3d 428 (D.C. Cir. 2011) ............................................................................23

*Allman v. Padilla*,
979 F. Supp. 2d 205 (D.P.R. 2013) ....................................................................24

*Armstrong v. Exceptional Child Ctr., Inc.*,
135 S. Ct. 1378 (2015) ......................................................................................25

*Barton v. Barbour*,
104 U.S. 126 (1881) ............................................................................................9

*Bell v. Hood*,
327 U.S. 678 (1946) ..........................................................................................25

*Bhatia Gautier v. Rosello-Nevares*,
No. 17-136-LTS, (D.P.R. July 7, 2017) ............................................................25

*Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*,
217 F. Supp. 3d 508 (D.P.R. 2016) ...................................................................11

*Buckley v. Valeo*,
424 U.S. 1 (1976) ...........................................................................6, 12, 16, 18, 20

*Byrd v. Hoffman*,
417 B.R. 320 (D. Md. 2008) ...............................................................................9

*Capital Commc'ns Fed. Credit Union v. Boodrow*,
197 B.R. 409 (N.D.N.Y. 1996) .........................................................................12

*Centro de Periodismo Investigativo, Inc. v. Financial Oversight & Mgmt. Board
for Puerto Rico*,
No. 17-1743, (July 14, 2017) ............................................................................10

*Citizens for Abatement of Aircraft Noise, Inc. v. MWAA*,
917 F.2d 48 (D.C. Cir. 1990) ..................................................................13, 19, 20

*Correctional Services Corp. v. Malesko*,
534 U.S. 61 (2001) ............................................................................................25

*Davis v. D.C.*,
158 F.3d 1342 (D.C. Cir. 1998) ........................................................................24

*In re El Comandante Mgmt. Co., LLC*,
  358 B.R. 1 (Bankr. D.P.R. 2006) ........................................................................10

*Fleet Mortg. Grp., Inc. v. Kaneb*,
  196 F.3d 265 (1st Cir. 1999) ..............................................................................10

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010) ................................................1, 13, 14, 15, 19, 21, 23, 25

*Freytag v. Comm'r of Internal Revenue*,
  501 U.S. 868 (1991) ...................................................................6, 13, 18, 22

*Goldie's Bookstore, Inc. v. Super. Ct. of State of Cal.*,
  739 F.2d 466 (9th Cir. 1984) ..............................................................................24

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) ............................................................................24

*In re Hill*,
  364 B.R. 826 (Bankr. M.D. Fla. 2007) ................................................................8

*Humphrey's Ex'r v. United States*,
  295 U.S. 602 (1935) .........................................................................................23

*INS v. Chadha*,
  462 U.S. 919 (1983) .........................................................................................15

*Lopez Leon v. Rosello-Nevares*,
  No. 17-137-LTS (D.P.R. June 13, 2017) ............................................................25

*Marrama v. Citizens Bank of Massachusetts*,
  549 U.S. 365 (2007) ...........................................................................................9

*In re Middlesex Power Equip. & Marine, Inc.*,
  292 F.3d 61 (1st Cir. 2002) ................................................................................25

*Morrison v. Olson*,
  487 U.S. 654 (1988) .....................................................................................14, 15

*Muratore v. Darr*,
  375 F.3d 140 (1st Cir. 2004) ...............................................................................9

*In re Myers*,
  491 F.3d 120 (3d Cir. 2007) ..............................................................................11

*Myers v. United States*,
  272 U.S. 52 (1926) ..............................................................................16, 18, 19, 20

iii

*New York v. United States*,
    505 U.S. 144 (1992) ...........................................................................................16

*NLRB v. SW Gen., Inc.*,
    137 S. Ct. 929 (2017) ...................................................................................14, 16

*Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*,
    732 F. Supp. 1183 (D.D.C. 1990) ......................................................................19

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) ...........................................................................................17

*Romero Feliciano v. Torres Gaztambide*,
    836 F.2d 1 (1st Cir. 1987) ..................................................................................24

*In re Soares*,
    107 F.3d 969 (1st Cir. 1997) ..............................................................................10

*In re Sonnax, Indus., Inc.*,
    907 F.2d 1280 (2d Cir. 1990) .............................................................................26

*In re Soto*,
    302 B.R. 757 (Bankr. D.N.H. 2003) ..................................................................10

*Springer v. Gov't of Philippine Islands*,
    277 U.S. 189 (1928) ...........................................................................................19

*United States v. Hilario*,
    218 F.3d 19 (1st Cir. 2000) ................................................................................14

*Weiss v. United States*,
    510 U.S. 163 (1994) ......................................................................................18, 21

*Ex parte Young*,
    209 U.S. 123 (1908) ...........................................................................................25

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 .......................................................................6, 15, 16

**Statutes**

11 U.S.C. § 105(a) ......................................................................................................9

11 U.S.C. § 109(c)(2) .............................................................................................4, 14

11 U.S.C. § 362 ...............................................................................................1, 2, 26

11 U.S.C. § 362(a) ...................................................................................................................9

11 U.S.C. § 362(d)(1) ...........................................................................................................11

11 U.S.C. § 362(k) ...............................................................................................................10

11 U.S.C. § 922 ..............................................................................................................10, 11

31 U.S.C. § 703(a) ...............................................................................................................19

48 U.S.C. § 2104(8) ...............................................................................................................9

48 U.S.C. § 2121 .................................................................................................................3, 6

48 U.S.C. § 2121(d) ..........................................................................................................4, 14

48 U.S.C. § 2121(e)(2)(E) ......................................................................................7, 8, 15, 20

48 U.S.C. § 2121(e)(2)(F) ....................................................................................................23

48 U.S.C. § 2121(e)(3) ...........................................................................................................6

48 U.S.C. § 2121(e)(5)(B) ......................................................................................6, 14, 22

48 U.S.C. § 2121(f) ..............................................................................................................16

48 U.S.C. § 2122 ....................................................................................................................6

48 U.S.C. § 2124(a) ..........................................................................................................4, 13

48 U.S.C. § 2124(f)(1) ...........................................................................................................4

48 U.S.C. § 2124(d) ...............................................................................................................5

48 U.S.C. § 2124(i) ............................................................................................................4, 5

48 U.S.C. § 2124(j)(3) ......................................................................................................4, 14

48 U.S.C. § 2124(k) ..........................................................................................................5, 13

48 U.S.C. § 2124(n) ...............................................................................................................6

48 U.S.C. § 2124(*o*) .........................................................................................................4, 14

48 U.S.C. § 2126(a) ...............................................................................................................4

48 U.S.C. § 2128 ..............................................................................................................5, 14

48 U.S.C. § 2129 ....................................................................................................................5

48 U.S.C. § 2141(b)(1) ............................................................................................3

48 U.S.C. § 2141(b)(1)(B) .......................................................................................5

48 U.S.C. § 2141(b)(1)(N) ....................................................................................3, 8

48 U.S.C. § 2141(c)(3) .........................................................................................5, 13

48 U.S.C. § 2141(d)(2) .............................................................................................5

48 U.S.C. § 2142 .....................................................................................3, 4, 5, 13, 14

48 U.S.C. § 2144(a)(1) .............................................................................................5

48 U.S.C. § 2146 .............................................................................................4, 8, 14

48 U.S.C. § 2162 .......................................................................................................8

48 U.S.C. § 2162(a) ..................................................................................................1

48 U.S.C. § 2164 .............................................................................................3, 4, 25

48 U.S.C. § 2175 ..................................................................................................4, 14

48 U.S.C. § 2231(m) ..................................................................................................4

**Other Authorities**

1 Annals of Cong. 463 (1789)...............................................................................19

1 Annals of Cong. 581 (Joseph Gales Ed., 1834) ................................................18

13 Op. Att'y Gen. 516 (1871)...............................................................................20

13 Op. O.L.C. 248 (1989) .....................................................................................20

20 Op. O.L.C. 279 (1996) .....................................................................................20

31 Op. O.L.C. 73, 87 (2007) .................................................................................13

*The Federalist No. 66*,
    (Hamilton) (Clinton Rossiter ed., 1961) ..........................................................17

*The Federalist No. 76*,
    (Hamilton) (Clinton Rossiter ed., 1961) ..........................................................17

*The Federalist No. 77*,
    (Hamilton) (Clinton Rossiter ed., 1961) ......................................................21, 18

President Obama Announces the Appointment of Seven Individuals to the
Financial Oversight and Management Board for Puerto Rico (Aug. 31, 2016) ........................7

Press Release, *Oversight Board to Conduct Investigation of Puerto Rico's Debt*
(Aug. 2, 2017) .........................................................................................................................5

Statement by President George H.W. Bush on Signing the National and
Community Service Act of 1990, 2 Pub. Papers 1613 (Nov. 16, 1990)..................................20

Statement by President George W. Bush on Signing H.R. 5441, 2 ...............................................20

Statement by President James Earl Carter, Jr. on Signing H.R. 6370, 2 .......................................20

Statement by President William J. Clinton on Signing S. 1060, 2 ................................................20

vii

Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC ("Aurelius"), as parties in interest and collectively the beneficial holders of substantial amounts of outstanding bonds issued by the Commonwealth of Puerto Rico (the "Commonwealth") and backed by a pledge of Puerto Rico's full faith, credit, and taxing power, respectfully move the Court for either:  (1) a clarification that the automatic stay under 11 U.S.C. §§ 362 and 922 (made applicable to Title III proceedings generally by 48 U.S.C. § 2162(a)) does not apply; or, alternatively, (2) relief from the stay so that Aurelius may pursue an independent action for declaratory and injunctive relief outside the Title III case against the Financial Management and Oversight Board for Puerto Rico ("Oversight Board" or "Board") and its members on the grounds that they were appointed in violation of the Appointments Clause of the United States Constitution and that the Board violates the separation of powers.

## PRELIMINARY STATEMENT

"Perhaps the most telling indication of [a] severe constitutional problem" with a governmental body "is the lack of historical precedent for [the] entity." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (internal quotation marks omitted).    The Oversight Board derives its existence and authority entirely from PROMESA, and it controls almost every aspect of the Commonwealth's finances pursuant to that federal law.  The Board is composed of  seven voting members who have no superior officer save the President, yet were *never* subject to Senate confirmation.  Moreover, six of them were effectively hand-picked by individual members of Congress pursuant to an intricate system of Balkanized lists designed to severely constrain the President's appointment powers.  There are no "historical analogues for this novel structure." *Ibid.*  That is because, as explained in Aurelius's Motion to Dismiss, filed today,

1

it violates the Appointments Clause of the United States Constitution and principles of separation of powers.

Consequently, the actions that the Board has purported to take since its inception—including, but not limited to, its certification of a fiscal plan for Puerto Rico, approval of faulty budgets, and the authorization of this Title III proceeding—are void.  All of these actions have already inflicted serious harm on Aurelius, and the continued operation of the Board threatens to perpetrate yet more harm on Aurelius.  The structural constitutional defects inherent in the Board raises these harms to an irreparable level.  Another consequence of the Board's unconstitutionality is that it lacks authority to take any further official action unless and until it is lawfully constituted.  For many of the same reasons that this Title III proceeding must be dismissed, Aurelius is also entitled to broader declaratory and injunctive relief on these constitutional questions.

Aurelius respectfully submits that the automatic stay under 11 U.S.C. §§ 362 and 922 is inapplicable to its constitutional claims against the Oversight Board.  Aurelius's claims are not against the Debtor (the Commonwealth), nor do they seek to enforce Aurelius's claims as beneficial owners of bonds against the Debtor.  Nevertheless, out of an abundance of caution, Aurelius requests a comfort order declaring that the stay does not apply to the contemplated  suit, which would be filed outside the Title III proceeding but in the U.S. District Court of the District of Puerto Rico.  Alternatively, there is good cause to lift the stay given the severe constitutional harms imposed on Aurelius through the Board's various past unlawful acts and continuing operation. Complete relief on these claims cannot be afforded Aurelius within the confines of this Title III proceeding because Aurelius plans to seek declaratory and injunctive relief as to the status of the Board under Title I and its actions under Title II, which goes well beyond the instant case and controversy over the Commonwealth's debt restructuring.  The many types of harm created by the

unconstitutional status of the Board—and the remedies necessary to address them—are outside the scope of this case.

For the reasons below, the Court should grant the Motion and issue an Order substantially similar to one of the proposed orders attached as **Exhibit A**.

## BACKGROUND

### I.   PROMESA

On June 30, 2016, pursuant to its power over the territories under Article IV of the Constitution, Congress passed PROMESA and President Obama signed it into law.  As relevant here, PROMESA accomplished three things.  First, it created the Oversight Board, 48 U.S.C. § 2121, vesting it with the power to enforce federal law, including the authority to review and approve the Commonwealth's proposed budgets, *id*. § 2142.

Second, PROMESA required the Commonwealth to establish, and the Board to approve, a fiscal plan to "provide a method to achieve fiscal responsibility and access to the capital markets." 48 U.S.C. § 2141(b)(1).  The plan could *not* be certified unless, among other things, it "respect[s] the relative lawful priorities or lawful liens . . . in the constitution, other laws, or agreements of [the Commonwealth] in effect prior to" PROMESA's enactment.  *Id.* § 2141(b)(1)(N).  The fiscal plan is the standard with which the Commonwealth's proposed budgets must comply.  *Id.* §§ 2141(c)(1), 2142(c).  No fiscal plan for the Commonwealth or any Commonwealth instrumentality, and no budget for the Commonwealth for any fiscal year, is valid without a certification from the Board.  *See*, *e.g.*, *id.* §§ 2141(c), 2142(e)(1)–(2), 2143(c)–(d).

Finally, PROMESA created a mechanism, known as Title III, for the adjustment of certain of Puerto Rico's debts.  *See* 48 U.S.C. § 2164.

## II.      The Powers Of The Oversight Board

PROMESA gives the Board significant (indeed, vast) executive authority under federal law over the Commonwealth and its instrumentalities.  Although Aurelius disputes the extent of the Board's discretion under PROMESA and its compliance with certain provisions of the statute, *see generally* Dkt. 461, there is no denying that PROMESA grants to the Board numerous significant responsibilities to be carried out "in [the Board's] sole discretion."  *See*, *e.g.*, 48 U.S.C. §§ 2121(d)(1)(A)–(E), (d)(2)(A); 2124(i), (j)(3); 2127(b)(3); 2141(b)(2), (c)(1)–(3); 2142(a), (c)(1), (d)(2); 2146(a); 2151(a); 2167(b)(1); 2194(d)(1)(B), (*l*); 2231(m)(1)(B).  Only the Board, as it has done here, can initiate Title III actions.  *Id.* § 2164(a).  Within the Title III proceeding, the Board is the sole representative of, and decision-maker for, the Title III debtor, *id.* § 2175(b), thereby completely supplanting the role that locally elected officials play in Chapter 9 cases, *cf.* 11 U.S.C. §§ 109(c)(2), 904.  The Board has the exclusive right to propose a plan of adjustment for the debtor in Title III.  *See* 48 U.S.C. § 2124(j)(3).

The Board also possesses broad federal investigative and enforcement powers, which are plainly executive in nature.  It can hold hearings, take testimony, receive evidence, and administer oaths "as the Oversight Board considers appropriate" "for the purpose of *carrying out*" federal law (*i.e.*, PROMESA).  48 U.S.C. § 2124(a) (emphasis added).  It enjoys a broad subpoena power to compel the attendance of witnesses or the production of "materials of any nature relating to any matter under investigation by the Oversight Board."  *Id.* § 2124(f)(1).  PROMESA even permits the Board to deploy these investigative powers to police "the disclosure and selling practices" of Commonwealth and instrumentality bonds, including any potential "conflicts of interest maintained by" brokers, dealers, or investment advisers—issues that could extend far outside of Puerto Rico.  *Id.* § 2124(*o*).  In fact, the Board recently announced its intent to "conduct an investigation"

4

into "Puerto Rico's debt and its relationship to the fiscal crisis . . . pursuant to the authority granted to it by Congress and the President under PROMESA."  Press Release, *Oversight Board to Conduct Investigation of Puerto Rico's Debt* (Aug. 2, 2017), *available at* https://juntasupervision.pr.gov/wp-content/uploads/wpfd/49/598239c5a7286.pdf.  To top it off, the Board "may seek judicial enforcement of its authority to carry out its responsibilities under [PROMESA]."  *Id.* § 2124(k).

The Board interprets and applies federal law each time it exercises its powers to veto, revise, or rescind Puerto Rico laws that the Board deems inconsistent with PROMESA or the fiscal plan established pursuant to that statute—all things the Board is empowered to do.  *See* 48 U.S.C. § 2144(a)(1), (5), (c)(3)(B).  It can rule that a fiscal plan proposed by the Commonwealth is deficient, *id.* § 2141(c)(3); issue its own fiscal plan if it rejects the Commonwealth's proposed plan, *id.* § 2141(d)(2); approve or disapprove all budgets, *id.* § 2142; and certify any debt restructuring under Title VI, *id.* § 2124(i).

Although PROMESA ostensibly characterizes the Board "as an entity within the territorial government" of the Commonwealth, 48 U.S.C. § 2121(c)(1)–(2), PROMESA goes to great pains to establish the Board as a completely independent federal overseer of the Commonwealth and any related fiscal matters, immune from interference from the democratically elected Commonwealth government or the people of Puerto Rico, *id*. § 2128(a) ("Neither the Governor nor the Legislature" may "exercise any control, supervision, oversight, or review over the Oversight Board or its activities," or "enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of [PROMESA], as determined by the Oversight Board.").  Further, Board members are subject only to *federal* ethics laws, not Commonwealth laws, *id*. § 2129, and they enjoy numerous other trappings of federal power, *see id*. § 2122 (use of federal facilities); *id.*

5

§ 2124(n) (support from GSA); *id.* § 2124(c) (use of federal information).  And the only person

who can remove a member is the President.  *See id.* § 2121(e)(5)(B).

### III.    The Appointment Of Oversight Board Members

Federal officers must be appointed in accordance with the requirements of the Constitu-

tion's Appointments Clause, which provides that the President:

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint
> . . . [*all*] *Officers of the United States*, whose Appointments are not herein otherwise
> provided for, and which shall be established by Law: but the Congress may by Law
> vest the Appointment of such inferior Officers, as they think proper, *in the President
> alone*, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2 (emphases added).

The Appointments Clause thus recognizes three categories of federal officials: (1) principal

officers, whose appointment may be made only by the President with the Advice and Consent of

the Senate; (2) "inferior Officers," whose appointment may be vested "in the President alone, in

the Courts of Law, or in the Heads of Departments"; and (3) employees, to whom the Clause does

not apply.  *See Edmond v. United States*, 520 U.S. 651, 660–61 (1997); *Freytag v. Comm'r of

Internal Revenue*, 501 U.S. 868, 880–81 (1991).  "[A]ny appointee exercising significant authority

pursuant to the laws of the United States" is an officer and subject to the Appointments Clause.

*Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam).

The Oversight Board's members are not appointed in accordance with these constitutional

requirements.  Instead, PROMESA established unprecedented procedures for the appointment of

the seven voting members.  *See* 48 U.S.C. § 2121.[3]  The Act provides that six members be selected

from lists of pre-approved individuals submitted to the President by House and Senate leaders.

---

[3]  PROMESA provides that "[t]he Governor, or the Governor's designee, shall be an ex officio
member of the Oversight Board without voting rights."  48 U.S.C. § 2121(e)(3).

One "Category A" member and one "Category B" member would be selected from separate lists submitted by the Speaker of the House of Representatives; two "Category C" members would be selected from a single list submitted by the Majority Leader of the Senate; a "Category D" member would be selected from a list submitted by the Minority Leader of the House of Representatives; and a "Category E" member would be selected from a list submitted by the Minority Leader of the Senate. *Id.* §§ 2121(e)(2)(A)(i)–(v), (e)(2)(B).  Only the seventh member, "Category F," could be selected in the President's sole discretion.  *Id.* § 2121(e)(2)(A)(vi).  PROMESA further provided that if the President chose from those lists, the nominees would not require Senate confirmation. *Id.* § 2121(e)(2)(E).  "Off-list" nominations—nominations of individuals not included on a list for a given category—require Senate Confirmation.  *Id.* § 2121(e)(2)(E).  But if off-list nominees were not confirmed by the Senate by September 1, 2016—a mere two months after PROMESA's enactment (during most of which time the Senate was on its summer recess)—the President was required to select members from the lists provided by members of Congress.  *Id.* § 2121(e)(2)(G). As one House Report stated, PROMESA's appointments procedure "ensures that a majority of [the Board's] members are effectively chosen by Republican congressional leaders on an expedited timeframe."[4]

The President ultimately acceded to PROMESA's procedure and restricted his appointment power to the Board members put forward by Congressional leadership.  Thus, none of the Board members were confirmed by the Senate.  *See* President Obama Announces the Appointment of Seven Individuals to the Financial Oversight and Management Board for Puerto Rico (Aug. 31, 2016), https://goo.gl/4ZeKuK; 48 U.S.C. § 2121(e)(2)(E), (e)(2)(G), (e)(2)(A)(vi).

---

[4]  House Comm. on Natural Resources, H.R. 5278, *"Puerto Rico Oversight, Management, Economic Stability Act" (PROMESA), Section by Section*, at 5, *available at*  https://naturalresources.house.gov/UploadedFiles/Section_by_Section_6.6.16.pdf.

## IV.   The Board Actions

Since the Oversight Board's inception, it has taken numerous actions outside the Title III context that have harmed Aurelius.  For example, the Board has not taken steps under Title II of PROMESA to  prevent the diversion of the Commonwealth's available resources available to pay creditors.  *See* 48 U.S.C. § 2144(c)(3)(B).  Moreover, the Board certified  a fiscal plan under Title II that failed to respect priorities established by Puerto Rico law.  *See id.* § 2141(b)(1)(N).  Finally, the Board issued  a restructuring certification pursuant to Title II, *id.* § 2146(a)–(b), based on that fiscal plan. *See generally* Dkt. 461.

All of these actions have impaired Aurelius's rights, as a holder of general obligation bonds, to recoup proper payment.  Aurelius believes these actions are unlawful, but the relevant point for present purposes is that, as explained below, they cannot be remediated by dismissal of the Title III petition and thus contribute to Aurelius's need to seek broader declaratory and injunctive relief in a separate action.

## ARGUMENT

For the reasons set forth below, Aurelius respectfully requests an order providing that the automatic stay is inapplicable to its potential suit against the Oversight Board on constitutional grounds, or, in the alternative, relief from the automatic stay to pursue that suit.

## I.   The Court Should Clarify That The Automatic Stay Under Sections 362(a) And 922 Does Not Apply To Aurelius's Proposed Action

Section 105 of the Bankruptcy Code (made applicable in Title III by 48 U.S.C. § 2162) empowers courts in bankruptcy proceedings to issue "[c]omfort orders" confirming the applicability, or non-applicability, of the bankruptcy stay.  *See, e.g.*, *In re Hill*, 364 B.R. 826, 828 (Bankr. M.D. Fla. 2007); *see also* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *Marrama v. Citizens*

8

*Bank of Massachusetts*, 549 U.S. 365, 375 (2007) (recognizing broad discretion under Section 105 to issue necessary orders). This Court has itself granted similar orders under Section 105 pertaining to the reach of the stay in this very proceeding. *See* Dkt. 543 (confirming application of the stay to various Commonwealth officers, agents, and representatives). Aurelius respectfully submits that such an order is warranted here because the plain language of Section 362(a) (and Section 922(a)) takes the proposed suit outside the parameters of the bankruptcy stay.

First, Aurelius's action would not be against "the debtor" or against any of the property of the estate. 11 U.S.C. § 362(a)(1), (5)–(7); *see also id.* § 922(a)(1)–(2). Aurelius's action would be against *the Oversight Board* and the Board members, who are specifically amenable to suit. 48 U.S.C. § 2126(a).[5] Indeed, this Court has recognized, in lifting the stay as to other litigation, that the stay does not apply to "separate legal entit[ies]" that are not themselves the Commonwealth: an apt description of the Oversight Board. *Compare Mem. Order*, Dkt. 618 at 3 (D. P.R. July 12, 2017) (lifting stay to the extent claims were against separate government agency and not against Commonwealth itself); *with*, *e.g.*, 48 U.S.C. § 2104(8) (contrasting a "covered territory" with that territory's "Oversight Board"); *id.* § 2121(a)–(b) (establishing an "Oversight Board" "*for* Puerto Rico" (emphasis added)).

Second, Aurelius's suit would not be seeking "to recover a claim"; "enforce[ ] . . . a judgment"; "obtain possession of property"; "create, perfect, or enforce any lien"; "collect, assess, or recover a claim"; "setoff . . . any debt"; or commence or continue proceedings "concerning a tax

---

[5] PROMESA's recognition that the Board can be sued renders inapplicable the *Barton* doctrine for suits against the equitable representative of the debtor. *Cf. Barton v. Barbour*, 104 U.S. 126, 127 (1881) ("[B]efore suit is brought against a receiver, leave of the court by which he was appointed must be obtained."); *Muratore v. Darr*, 375 F.3d 140, 145 (1st Cir. 2004); *Byrd v. Hoffman*, 417 B.R. 320, 326 (D. Md. 2008), *aff'd sub nom. In re Byrd*, 331 F. App'x 212 (4th Cir. 2009) (suit against Trustee in state court during pendency of bankruptcy case constituted violation of the automatic stay and *Barton* doctrine).

9

liability." 11 U.S.C. § 362(a)(1)–(8); *see also id.* § 922(a)(1)–(2).  Aurelius's constitutional action

would not aim to enforce or recover on the bonds of which it is the beneficial owner.  Rather, it

would seek declaratory and injunctive relief as to the unconstitutionality of the Board and the

resulting unlawful nature of all the Board's official actions (including certification of the fiscal

plan and the restructuring certification), as well as future actions the Board may take until it is

lawfully constituted.  It is the *Board*'s actions in those respects that are legally relevant under

PROMESA and which have harmed and will continue to harm Aurelius's interests.[6]

That said, Aurelius respects this Court's authority and recognizes the significance of vio-

lating the automatic stay, 11 U.S.C. § 362(k), as well as the ease with which the stay can be violated

even inadvertently, *Fleet Mortg. Grp., Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir. 1999).  Moreover,

courts have, at times, emphasized the breadth of the stay.  *In re Soares*, 107 F.3d 969, 975 (1st Cir.

1997); *In re El Comandante Mgmt. Co., LLC*, 358 B.R. 1, 10 (Bankr. D.P.R. 2006) ("The automatic

stay is extremely broad in scope."); *In re Soto*, 302 B.R. 757, 759 (Bankr. D.N.H. 2003) ("[T]he

filing of a petition creates a broad automatic stay.").  This Court's comfort order references the

Commonwealth's "representatives" as being within the stay, but does not make entirely clear

whether that includes the Oversight Board.  *See* Dkt. 543 at 4, 6.  Aurelius, for the reasons dis-

cussed above, believes that its constitutional challenge against the Board is not within the stay; but

in an abundance of caution, Aurelius respectfully seeks clarification from the Court.  *See id.* at 6

---

[6]  The U.S. District Court for the District of Puerto Rico recently denied a request for stay relief in
*Centro de Periodismo Investigativo, Inc. v. Financial Oversight & Management Board for Puerto
Rico*, No. 17-1743, Dkt. 18 (July 14, 2017), on the grounds that a suit against the Board *is* a suit
against the Debtor.  *Id.* at 2-3.  However, this Court is not bound by that decision, and the decision
is inconsistent with this Court's recognition that the stay does not apply to entities, like the Board,
that are legally distinct from the Commonwealth.  *See Mem. Order*, Dkt. 618 at 3.

("The Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, enforcement, or interpretation of this Order.").

The Court should grant the proposed Order, **Exhibit A**, holding that the stay is inapplicable to a constitutional claim against the Oversight Board and its members as described in this Motion.[7]

## II.     In The Alternative, Good Cause Exists to Lift the Stay

If the Court holds that the stay applies to Aurelius's contemplated suit, the Court should nonetheless lift the stay for good cause.  "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay" when there is "cause."  11 U.S.C. § 362(d)(1); *see also id.* § 922(b).  "Cause" is not defined under the Bankruptcy Code, and this Court accordingly has "wide latitude" in finding cause to lift the stay. *Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*, 217 F. Supp. 3d 508, 518 (D.P.R. 2016) (quoting *In re Myers*, 491 F.3d 120, 130 (3d Cir. 2007)).  Ultimately, the cause analysis is "an equitable, case-by-case balancing of the various harms at stake." *Brigade Leveraged Capital*, 217 F. Supp. 3d at 518.  Thus, the Court "must assess the hardships realistically borne by the plaintiffs if their requested relief is denied and determine whether those outweigh the harm likely to be visited upon [the debtor] if that relief is granted." *Id.* at 518–19.

Here, the continuation of the stay with respect to the contemplated action "will cause . . . affirmative harm to" Aurelius, *Capital Commc'ns Fed. Credit Union v. Boodrow*, 197 B.R. 409, 413 (N.D.N.Y. 1996), because the Board is unconstitutional, it has thus inflicted (and continues to

---

[7] Aurelius hereby reserves its rights, to the extent that the Court denies this motion, to file an adversary complaint against the Oversight Board and its members within this Title III proceeding seeking whatever legal relief may be permissible. *See* Dkt. 543 at 6 (holding that nothing in the Court's comfort order interferes "with any party's right to bring . . . an adversary proceeding or contested matter in [the] Title III Case[ ] against any other party").  Aurelius also respectfully requests that if the Court denies the Motion, the Court do so without prejudice.

11

inflict) irreparable harm on Aurelius, and that harm that cannot be fully remedied within the Title III Proceeding.  By contrast, the *Commonwealth* will suffer no prejudice, because the action would not seek to collect property of the estate and concerns only the constitutionality of the Board.

### A. PROMESA's Method For Selecting The Members Of The Board Does Not Comply With The Appointments Clause.

As officers of the United States, the Board's members were required to be appointed pursuant to the Appointments Clause.  Because they have no superiors save the President, they are necessarily principal officers of the United States under controlling Supreme Court precedent.  Accordingly, they had to be—but were indisputably not—confirmed by the Senate.  Whether they are classified as principal or inferior officers, however, their appointments violated the Constitution because Congress impermissibly restricted the President's exclusive power to appoint them and at the same time impermissibly aggrandized itself by giving individual legislators a role in the appointment process.  PROMESA's restrictions on the President's power to remove the Board members only heightens the constitutional problems here.

### 1. Because The Board's Members Are Principal Officers, They Had To Be Appointed With The Advice And Consent Of The Senate.

a.  Under the Appointments Clause, "principal officers" of the United States may be appointed only by the President with the "Advice and Consent" of the Senate.  *Edmond*, 520 U.S. at 659.  The Board's members are officers because they exercise "significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126, and they are "principal" officers because they are subject to supervision (if at all) only by the President.  They are not "'directed and supervised at some level' by other officers appointed by the President with the Senate's consent." *Free Enter. Fund*, 561 U.S. at 510 (quoting *Edmond*, 520 U.S. at 664).

12

The Board wields expansive federal executive authority over all fiscal matters affecting Puerto Rico.  It approves or disproves all Commonwealth and instrumentality budgets, 48 U.S.C. § 2141(c)(3); it oversees the development of a fiscal plan for the Commonwealth and its instrumentalities, *id.* § 2142(e)(2), which is in effect the power to superintend the operations of the Commonwealth's government, with the authority to override the determinations of its Governor and Legislative Assembly, *id.* § 2142(c)(1);[8] it can bind parties outside the government, *id.* §§ 2124(g), 2144(c)(3)(B)(ii), & 2147; it possesses vast investigative powers, *id.* § 2124(a); and it can enforce its powers in federal court, *id.* § 2124(k)—all hallmarks of the authority of an officer of the United States.  *See, e.g., Freytag*, 501 U.S. at 881–82; *Citizens for Abatement of Aircraft Noise, Inc. v. MWAA*, 917 F.2d 48, 56 (D.C. Cir. 1990), *aff'd*, 501 U.S. 252 (1991); *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 87 (2007).  And the Board acts as the sole decision-maker for the Commonwealth within the Title III case—the Commonwealth cannot do anything in the Title III case without the Board's express approval.  *See* 48 U.S.C. §§ 2124(j)(3) & 2175(b).  The Board replaces the decisional power that, in an ordinary Chapter 9 proceeding, would be wielded by local, elected officials.  *Cf.* 11 U.S.C. §§ 109(c)(2) & 904.

Moreover, only the President can oversee the Board.  As the Supreme Court has explained, "[w]hether one is an 'inferior' officer depends on whether he has a superior."  *Free Enter. Fund*,

---

[8] This broad power is similar to power the U.S. Attorney General has determined would constitute significant governmental authority under U.S. law.  In the Attorney General's view, allowing the Governor of Puerto Rico to force a federal agency to reconsider a regulation that negatively affects Puerto Rico would violate the Appointments Clause:  That would constitute the exercise of "significant governmental authority under the laws of the United States" that "may be vested only in an officer of the United States, appointed pursuant to the requirements of the Appointments Clause of the Constitution."  Hearings on S. 244 Before the Senate Comm. on Energy and Natural Resources, 102d Cong., 1st Sess. 190, 212–13 (1991) (statement of Richard Thornburgh, Attorney General).

13

561 U.S. at 510 (quoting *Edmond*, 520 U.S. at 662). In other words, a "principal officer is one who

has no superior other than the President." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 947 (2017)

(Thomas, J., concurring). The Board's members have no superior. They are removable only by

the President—and then "only for cause." 48 U.S.C. § 2121(e)(5)(B). Their "work" is not "di-

rected and supervised at some level" by any other "officers appointed by the President with the

Senate's consent." *Free Enter. Fund*, 561 U.S. at 510. Rather, the Board's members operate

wholly outside of any non-Presidential supervisory structure. And while Aurelius contests the

breadth of the Board's discretion in various respects, the Board undeniably is empowered to take

numerous actions in "its sole discretion." *See, e.g.*, 48 U.S.C. §§ 2121(d)(1)(A)–(E); 2141(a);

2142(a); 2146(a). By law, "[n]either the Governor nor the Legislature may . . . exercise any con-

trol, supervision, oversight, or review over the Oversight Board or its activities." *Id*. § 2128(a).

Even setting aside the fact that the Board's members lack any supervisor besides the Pres-

ident, the nature of their roles does not "suggest[ ] sufficient limitations of responsibility and au-

thority" to render them inferior officers. *United States v. Hilario*, 218 F.3d 19, 25 (1st Cir. 2000);

*see Morrison v. Olson*, 487 U.S. 654, 671–72 (1988) (independent counsel was inferior officer due

to limited tenure, limited duties, limited jurisdiction, and was removable by a superior officer other

than the President). Their jurisdiction is broad and their duties many; the Board effectively stands

over the government of Puerto Rico, wielding control over the Commonwealth's budgetary and

fiscal decisions with "autonomy" from local elected officials. 48 U.S.C. § 2128. Thus, whether

measured by the scope of their duties or lack of supervision, the Board's members are principal

officers. *Cf. Morrison*, 487 U.S. at 671.

14

b.  PROMESA's appointment scheme conflicts with the requirement that Board members, as principal officers, be nominated by the President and appointed "with the Advice and Consent of the Senate."  U.S. Const. art. II, § 2, cl. 2.

First, one member of the Board—the "Category F" member—could be (and in fact was) appointed at the President's "sole discretion," with no Senate confirmation.  48 U.S.C. § 2121(e)(2)(A)(vi), (e)(2)(E).  The appointment of the Category F member was therefore invalid under the Appointments Clause.

Second, PROMESA provided that the other six members could *also* be appointed without Senate confirmation, so long as the President agreed to appoint nominees pre-selected for him by certain individual members of Congress.  *See* 48 U.S.C. §§ 2121(e)(2)(A)(i)–(v), (e)(2)(E).  It should come as no surprise, given the squeeze-play created by the statute, that the President did, in fact, select the remainder of the Board entirely from the congressional leaders' lists, thereby allowing the candidates to skip the public scrutiny of the Senate confirmation process that the Appointments Clause requires.  *See id*. § 2121(e)(2)(E).  All seven members of the Board were thus appointed without Senate confirmation, in violation of the Appointments Clause.

The congressional leaders' lists cannot replace Senate confirmation.  Where the Constitution requires the *Senate* to act, Congress may not reassign that role to an individual legislator in an effort to pack the Board with its desired candidates.  *See INS v. Chadha*, 462 U.S. 919, 955–56 (1983).  It is the Senate that must advise and consent, not the Speaker of the House, the Senate Majority Leader, or any other individual member.  And the "separation of powers does not depend on . . . whether 'the encroached-upon branch approves the encroachment.'"  *Free Enter. Fund*, 561 U.S. at 497 (quoting *New York v. United States*, 505 U.S. 144, 182 (1992)).  Thus, the fact "[t]hat the Senate voluntarily relinquished its advice-and-consent power . . . does not make this end-run

15

around the Appointments Clause constitutional." *SW Gen.*, 137 S. Ct. at 949 (Thomas, J., concurring).  As principal officers appointed without Senate confirmation, all seven members of the Board hold their offices unlawfully.

### 2. Even If The Board's Members Were Inferior Officers, PROMESA's List Mechanism Unlawfully Constrains The President's Appointment Authority.

Even if the members of the Oversight Board were "inferior officers," their appointment procedure is still unlawful.  Absent Senate confirmation on or before September 1, 2016, PROMESA forces the President to choose six of the members from five lists separately prepared by four congressional leaders from both houses of Congress.  But the Appointments Clause unambiguously requires that, if appointments of inferior officers are not made with the advice and consent of the Senate and are not made by courts of law or department heads, then the appointment power must be vested "in the President *alone*."  U.S. Const. Art. II, § 2, cl. 2 (emphasis added). Congress may not arrogate the appointment power to itself.  *Buckley*, 424 U.S. at 126.

Nor may Congress achieve the same result by limiting the President's appointment discretion to little more than a decision dictated by Congress's choices.  *See Myers v. United States*, 272 U.S. 52, 128 (1926).  To be sure, Congress has authority to "prescribe qualifications for office." *Ibid*.  To that end, PROMESA separately sets forth the *actual* qualifications for Board membership, such as "knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government," and certain disqualifying criteria, including prior involvement in Commonwealth government.  48 U.S.C. § 2121(f).  That Congress specified, in a separate subsection, the qualifications for these offices underscores that being included on a list is not a "qualification" at all.  Congress may not use the pretense of "qualifications" to "so

16

limit selection and so trench upon executive choice as to be in effect legislative designation." *My-ers*, 272 U.S. at 128.

PROMESA's list-based scheme does just that. Nothing in PROMESA prevents congressional leaders from including on their lists only names the President will find entirely unacceptable. Even cabining the President's appointment authority to two or three names for each available seat is a radical departure from the constitutional structure, under which "[n]o role whatsoever is given either to the Senate or to Congress as a whole in the process of choosing the person who will be nominated for appointment." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 483 (1989) (Kennedy, J., concurring in the judgment).

PROMESA's list device was intended to offer a veneer of discretion to the President. Forcing the President's hand by giving him a list of prescribed "choices," however, does not afford him the discretion the Appointments Clause requires. The legislative history demonstrates that PROMESA's appointments provisions were specifically intended to "ensure[ ]" that a majority of the Board's members were "effectively chosen by Republican congressional leaders." House PROMESA Report, *supra*, at 5. But Congress cannot add any restrictions to the President's appointment authority; "the sole limitation on the President's power to nominate" is "the Incompatibility Clause." *Pub. Citizen*, 491 U.S. at 484 (Kennedy, J., concurring in the judgment). It is the President's power "to *nominate*"; there will "be no exertion of *choice* on the part of the Senate. They may defeat one choice of the Executive, and oblige him to make another; but they cannot themselves *choose*—they can only ratify or reject the choice he may have made." *The Federalist No. 66*, at 405 (Hamilton) (Clinton Rossiter ed., 1961); *see The Federalist No. 76*, at 456–57 ("In the act of nomination," the President's "judgment alone would be exercised," and it is "his sole

17

duty" to nominate); *Weiss v. United States*, 510 U.S. 163, 185 n.1 (1994) (Souter, J., concurring) ("Hamilton was clear that" the President has "the sole power to nominate.").

The Senate, meanwhile, exercises no part of the nomination power. After Congress has created the office, "'the legislative power ceases. They ought to have nothing to do with designating the man to fill the office.'" *Myers*, 272 U.S. at 128 (quoting 1 Annals of Cong. 581, 582 (Joseph Gales Ed., 1834) (Madison)). The Constitution "gives the *nomination*" power "exclusively to the President," and the Senate is "only to see that no unfit person be employed." Thomas Jefferson, Powers of the Senate Respecting Diplomatic Appointments (Apr. 24, 1790), *reprinted in* 16 Papers of Thomas Jefferson 378, 379 (Julian P. Boyd ed., 1961). Congress may not "vest in itself" the power "to appoint officers of the United States when the Appointments Clause by clear implication prohibits it from doing so." *Buckley*, 424 U.S. at 135. As Hamilton knew, whenever "an assembly of men" has the power of appointment, it is infected by "all the private and party likings and dislikes, partialities and antipathies, attachments and animosities" of "the assembly," and "the intrinsic merit of the candidate will be too often out of sight." *The Federalist No. 76*, at 456 (Hamilton). But when the President exercises that power, he "cannot be distracted and warped by that diversity of views, feelings, and interests, which frequently distract and warp the resolutions of a collective body." *Ibid*. Indeed, PROMESA's list mechanism even gives a portion of the nomination power to leaders of the House of Representatives, a body that has no proper role in the appointments process at all. *See The Federalist No. 77* (Hamilton).

This basic distinction applies with equal force to inferior officers: The Senate may exercise its confirmation power, or Congress may authorize a Department Head, a Court of Law, or "the President alone," to make an appointment. But nowhere does the Constitution contemplate that

Congress—let alone individual members of *both* houses—may *share* in the selection power.  Rather, "[t]he Appointments Clause names the possible repositories for the appointment power." *Freytag*, 501 U.S. at 884.  PROMESA's congressional-list requirements manifestly—indeed, admittedly—are intended to force the President to cede to some members of Congress the power to decide which qualified candidates are eligible for appointment.

In this way, too, PROMESA impermissibly aggrandizes Congress in violation of the separation of powers:  Congress "may not invest itself or its Members with . . . executive power," *MWAA*, 501 U.S. at 274, and "if any power whatsoever is in its nature Executive, it is the power of appointing . . . those who execute the laws," *Free Enter. Fund*, 561 U.S. at 492 (quoting 1 Annals of Cong. 463 (1789) (statement of J. Madison)).  *See also Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 202–03 (1928); *Myers*, 272 U.S. at 202–03.  Yet PROMESA's list mechanism arrogates a core executive function and places it in the hands of individual legislators—"the kind of decisionmaking about who will serve in Executive department posts that the Constitution says [Congress] cannot" exercise.  *Olympic Fed. Sav. & Loan Ass'n v. Dir., Office of Thrift Supervision*, 732 F. Supp. 1183, 1193 (D.D.C. 1990); *see also Springer*, 277 U.S. at 202 ("[A]ppointment . . . is an executive act . . . the Legislature is without capacity to perform.").[9]

Congress's use of this list-based system to increase its own authority is, like other aspects of PROMESA, unprecedented.  To counsel's knowledge, the only other instance in which Congress has directed the President to select nominees from lists of its own choosing is the Comptroller

---

[9]  To the extent this Congressional assertion of executive authority presents a stand-alone claim under the separation of powers, *see MWAA*, 501 U.S. at 277 n.23 (distinguishing alleged Appointments Clause violation from "basic separation-of-powers principles"), Aurelius preserves that claim.

General and Deputy Comptroller General.  Congress has required that those officials be appointed by the President from a list of as few as three persons recommended by a commission of various members of Congress, though the President may ask the commission to recommend additional candidates.  *See* 31 U.S.C. § 703(a).  The Comptroller General, however, has only a legislative function.  *Bowsher*, 478 U.S. at 730.  And officials who exercise purely legislative functions need not be appointed consistent with the Appointments Clause.  *See Buckley*, 424 U.S. at 137.  To our knowledge, never before has Congress attempted to require the President to appoint *executive* officers from lists of its own choosing.

PROMESA's list system is no mere "innocuous" "practical accommodation."  *MWAA*, 501 U.S. at 276–77.  "The statutory scheme [of PROMESA] provides a blueprint for extensive expansion" of Congress's powers "beyond its constitutionally confined role."  *Id.*  If Congress is allowed to invade the President's appointment power here in this manner, then there is nothing stopping Congress from enacting further legislation inserting itself into other appointments—from cabinet secretaries and Article III judges to postmasters and U.S. Attorneys.[10]

---

[10]  Recognizing this steep and slippery slope, presidential administrations of both parties have repeatedly emphasized that Congress cannot infringe upon the President's appointment power by limiting persons who can be nominated for various posts.  *See, e.g.*, Statement by President George W. Bush on Signing H.R. 5441, 2 Pub. Papers 1775 (Oct. 4, 2006); Constitutionality of Statute Governing Appointment of United States Trade Representative, 20 Op. O.L.C. 279 (1996); Statement by President William J. Clinton on Signing S. 1060, 2 Pub. Papers 1907 (Dec. 19, 1995); Statement by President George H.W. Bush on Signing the National and Community Service Act of 1990, 2 Pub. Papers 1613 (Nov. 16, 1990); Common Legislative Encroachments on Executive Branch Constitutional Authority, 13 Op. O.L.C. 248, 248–50 (1989); Statement by President James Earl Carter, Jr. on Signing H.R. 6370, 2 Pub. Papers 1479 (Aug. 18, 1977); Civil Service Commission, 13 Op. Att'y Gen. 516, 520–21 (1871); James Monroe, Message to the Senate of the United States (Apr. 13, 1822), *reprinted in* A Compilation of the Messages and Papers of the Presidents 1789–1907, at 129, 132 (James D. Richardson Ed., 1908) ("Congress ha[s] no right under the Constitution to impose any restraint by law on the power granted to the President so as to prevent his making a free selection of" officers); *see also Myers*, 272 U.S. at 96–97 (Solicitor General Beck stating that "when the condition imposed upon the creation of the office has no reasonable

That PROMESA permitted the President to appoint persons other than those named on various congressional lists only if they could be confirmed on a hopelessly short time frame makes transparent Congress's intention to intrude on the President's appointment power. *See* 48 U.S.C. § 2121(e)(2)(E). PROMESA took effect on June 30, 2016, but the President's ability to nominate board members of his own choosing expired just two months later. If all seven seats of the Board were not filled by September 1, 2016, PROMESA *required* that the President "shall appoint an individual" from the congressional leadership's "list[s]" if such lists had at least two names on them. *Id*. § 2121(e)(2)(G). The President thus had no realistic ability to obtain Senate confirmation on this timeframe. Sixty days to identify, vet, nominate, and obtain Senate confirmation for seven Board members is plainly inadequate—particularly since the Senate was in a scheduled recess for all but a few days from July 1 to September 1, 2016. Given that scheduled recess, the time actually available for the President to nominate Board members and gain Senate confirmation was a mere eight business days at the beginning of July—an impossibly short deadline. Thus, PROMESA's alternative was nothing more than a ruse. But even if it were not, the availability of a legitimate selection process would make no constitutional difference because the President did not choose that path. *See Free Enter. Fund*, 561 U.S. at 512 n.12 (the Court "cannot assume" that the "same appointments" would have been made in a "counterfactual world").

PROMESA's novel list-based selection mechanism frustrates a key purpose of the Appointments Clause: ensuring clear "political accountability" for the appointment of officials who will exercise significant federal authority. *Edmond*, 520 U.S. at 662–63; *see Weiss*, 510 U.S. at 186 (Souter, J., concurring) (the Appointments Clause "allows the public to hold the President and

---

relation to the office . . . and is not the declaration of qualifications, but is the creation of an appointing power other than the President, then Congress has crossed the dead line, for it has usurped the prerogative of the President").

21

Senators accountable for injudicious appointments" so that "the public would be at no loss to determine what part had been performed by the different actors" (internal citation omitted)).  When an officer is nominated by the President alone, the lines of responsibility are clear:  "'The blame of a bad nomination would fall upon the president singly and absolutely,'" and where Senate confirmation is required, the "'censure of rejecting a good one would lie entirely at the door of the senate.'"  *Edmond*, 520 U.S. at 660 (quoting *The Federalist No. 77*, at 392 (Hamilton)).

But here, the convoluted process obscures who bears responsibility for installing the Board's members.  Both the President and the members of Congress who crafted the lists can deflect responsibility to one another; true accountability lies with no one.  And to make matters worse, the lists submitted to the President were not required to be—and have never been—made public.  Because the statute does not require any public disclosure regarding which congressional leader proffered which Board member, it undermines any particular legislator's accountability to the electorate for his or her selections.  The Framers' paramount concern for accountability in appointments is thus frustrated:  Voters (and the people of Puerto Rico) cannot know who was ultimately responsible for "the making of a bad appointment" to a Board with such immense powers.  *Edmond*, 520 U.S. at 660.

"The Framers' experience . . . taught them that combining the power to create offices with the power to appoint officers was a recipe for legislative corruption."  *Freytag*, 501 U.S. at 904 (Scalia, J., concurring).  PROMESA's list system, the very purpose of which was to "ensure [ ]" that the members of the Board that Congress established were chosen by individual members of Congress, House Report, *supra*, at 5, violates the separation of powers.

22

### 3. The Limitations On The President's Removal Power Exacerbate The Appointments Clause Violation.

The limitations on the President's removal authority add constitutional insult to injury, further undermining the core principle of democratic accountability inherent in the separation of powers. PROMESA strips the President of his appointment authority and also restricts his removal power to removals "for cause." 48 U.S.C. § 2121(e)(5)(B). Thus, not only does PROMESA's opaque appointments procedure hinder the Constitution's goal of clear "political accountability," *Edmond*, 520 U.S. at 663, but the Act exacerbates this constitutional defect by diminishing the President's ability "to keep these officers accountable—by removing them from office, if necessary." *Free Enter. Fund*, 561 U.S. at 483. This double layer of insulation results in a "novel structure" that "does not merely add to the Board's independence, but transforms it." *Id.* at 496.[11] In the event the President removes a Board member, the President is back to square one and must select from a new list prepared by the current congressional leaders, who could force the President to choose between leaving the vacancy unfilled and appointing an unpalatable candidate. 48 U.S.C. § 2121(e)(2)(F), (e)(6). Thus, even the amputated removal authority that PROMESA leaves the President is undermined by the uncertainty attending every appointment. The combined restriction of the President's appointment *and* removal powers is all the more reason for the Court to conclude that the Oversight Board is unconstitutional.

\*   \*   \*

---

[11] Although the Supreme Court has upheld for-cause-removal provisions, *see Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935), this Board presents a new situation because PROMESA combines insulation from removal with unprecedented diminution of the appointment power. Moreover, the continued viability of *Humphrey's Executor* has been questioned in the wake of *Free Enterprise Fund*. *See*, *e.g.*, *In re Aiken Cty.*, 645 F.3d 428, 444, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring). Aurelius respectfully preserves the argument that the Supreme Court should revisit and overturn *Humphrey's Executor* as inconsistent with the separation of powers.

23

As officers of the United States, the Board members were required to be appointed consistent with the Appointments Clause and the separation of powers. PROMESA, however, disregarded the Clause's methods for appointment, instead devising an unconstitutional scheme of congressional encroachment and aggrandizement. After ignoring the advice-and-consent requirement and infringing on the President's appointments power by dictating the composition of the Board, Congress compounded the problem by constraining his ability to remove the members of the Board. The Board is unconstitutional and its actions void. That alone is sufficient cause to lift the stay so that Aurelius can proceed with its contemplated action against the Board and its members.

**B.     The Unconstitutional Acts Of The Board Result In Irreparable And Continuing Harm**

By virtue of the Board's unlawful existence, Aurelius has already suffered harm through the certification of an unlawful fiscal plan, unlawful budget, and the issuance of an unlawful restructuring certification, among other things. These are not trifling or mere pecuniary harms—they are structural, constitutional harms of the highest order and are thus irreparable. *Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1, 4 (1st Cir. 1987); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("a prospective violation of a constitutional right constitutes irreparable injury."); *Davis v. D.C.*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself."); *Goldie's Bookstore, Inc. v. Super. Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) ("constitutional infringement will often alone constitute irreparable harm"); *Allman v. Padilla*, 979 F. Supp. 2d 205, 221 (D.P.R. 2013). Absent declaratory and injunctive relief, that harm will continue with each action the Board takes, whether such action occurs inside or outside the Title III proceeding. Denying Aurelius the ability to file suit accordingly imposes a serious inequity on Aurelius.

24

### C.     Complete Relief Cannot Be Afforded Aurelius In The Title III Case.

The Title III proceeding is inadequate to afford Aurelius the complete relief it seeks for the redress of these constitutional harms.

First, Aurelius's suit would not seek "to dismiss the [Title III] petition," 48 U.S.C. § 2164(b)—it would seek  a declaration that the Board is unconstitutional (and its actions thus void) and an order enjoining the Board from operating until it is lawfully constituted.  That relief concerns the Board's appointment pursuant to Title I and the Board's actions taken pursuant to Title II.  As this Court has recognized in the Title III case, the Title III Court lacks jurisdiction to provide relief for a claim that does not arise under, or is not related to, Title III itself.  *Lopez Leon v. Rosello-Nevares*, No. 17-137-LTS, Dkt. 14 (D.P.R. July 7, 2017); *Bhatia Gautier v. Rosello-Nevares*, No. 17-136-LTS, Dkt. 16 (D.P.R. June 13, 2017).  What matters is whether the "cause of action is created by" the Bankruptcy laws.  *Gautier*, Dkt. 16 at 5 (cause of action "clearly did not arise under Title III," because the creation of the fiscal plan and budgets and their certification are creatures of "Title II of PROMESA, which is not addressed by [the Title III] jurisdictional grant"); *see also In re Middlesex Power Equip. & Marine, Inc.*, 292 F.3d 61, 68 (1st Cir. 2002) (identical title 11 Bankruptcy jurisdiction provision applies where "the cause of action is created by" the Bankruptcy Code itself).

Aurelius's proposed litigation does not arise under Title III.  It arises in equity based on the well-established judicial power to stop unconstitutional actions.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action … ."); *Free Enter. Fund.*, 561 U.S. at 491 n.2 (2010) (recognizing petitioners' right "to challenge governmental action under the Appointments Clause or separation-

of-powers principles," and rejecting government's argument that petitioners had to identify "an implied private right of action") (internal quotation omitted); *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001) (explaining that equitable relief has "long been recognized as the proper means for preventing entities from acting unconstitutionally"); *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution."); *see also Ex parte Young*, 209 U.S. 123, 149, 165, 167 (1908).  Moreover, it would cover past actions of the Board only as predicates to the Title III case.  *Lopez Leon*, Dkt. 14 at 5 ("the obligations to create and certify fiscal plans are imposed by Title II of PROMESA.").  Thus, it is far from clear that this Court, in its Title III capacity, is empowered to grant such broad relief that pertains to actions outside of the Title III setting altogether.  It would also seek an injunction against any further acts of the Board under *any* part of PROMESA.  To be sure, a favorable ruling for Aurelius in the separate action would more than "conceivably have an effect" on the Title III proceeding, *cf. Lopez Leon*, Dkt. 14 at 6, but the implications of the action would extend well beyond the Title III case.

Accordingly, if the Court disagrees with Aurelius that the stay does not apply, the Court should lift the stay by issuing an order substantially similar to the proposed Order lifting the stay, attached as **Exhibit A.**[12]

---

[12] Even if the Court applies the Second Circuit's twelve factor approach from *In re Sonnax, Indus., Inc.*, 907 F.2d 1280 (2d Cir. 1990), *see* Dkt. 654 at 3-4, those factors weigh in Aurelius's favor: (a) relief for Aurelius in its proposed suit would result in the complete resolution of the constitutional issue (factor 1); (b) although the suit would have a "connection" with the Title III case, it seeks relief broader than that which is available in the Title III case (factors 2, 4, and 10); (c) the suit would be against the Board and its members, not the "debtor" (factors 3, 5, 6, and 9); (d) creditors will be vindicated, not prejudiced, by the suit (factor 7); and (e) the constitutional and irreparable harm suffered by Aurelius outweighs any harms the Board will face in litigating outside the Title III context (factor 12).

## CONCLUSION

The automatic stay under 11 U.S.C. §§ 362 and 922 is inapplicable to Aurelius's contemplated suit and this Court should so hold.  Alternatively, there is good cause to lift the stay.


Dated:  August 7, 2017                                Respectfully submitted,

_/s/ Luis A. Oliver-Fraticelli_                              _/s/ Theodore B. Olson_

Luis A. Oliver-Fraticelli                    Theodore B. Olson  (*pro hac vice* pending)
Katarina Stipec-Rubio                        Matthew D. McGill  (*pro hac vice* pending)
USDC-PR Bar Nos. 209204, 206611              Helgi C. Walker  (*pro hac vice* pending)
ADSUAR MUÑIZ GOYCO SEDA &                     Michael R. Huston  (*pro hac vice* pending)
    PÉREZ-OCHOA PSC                           Lochlan F. Shelfer  (*pro hac vice* pending)
208 Ponce de Leon Ave., Suite 1600           Jeremy M. Christiansen  (*pro hac vice* pending)
San Juan, P.R.  00918                        GIBSON, DUNN & CRUTCHER LLP
Phone:  (787) 756-9000                       1050 Connecticut Avenue, N.W.
Fax:  (787) 756-9010                         Washington, D.C.  20036
Email: loliver@amgprlaw.com                  Phone:  (202) 955-8500
kstipec@amgprlaw.com                         Fax:  (202) 467-0539
                                             Email:  tolson@gibsondunn.com
                                             mmcgill@gibsondunn.com
                                             hwalker@gibsondunn.com
                                             mhuston@gibsondunn.com
                                             lshelfer@gibsondunn.com
                                             jchristiansen@gibsondunn.com

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGE-MENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>          Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**Re: Docket No. __** |

## ORDER PURSUANT TO PROMESA SECTION 301(A) AND BANKRUPTCY CODE SECTIONS 105(A), 362, and 922 CONFIRMING INAPPLICABILITY OF AUTOMATIC STAY TO PROPOSED AURELIUS CONSTITUTIONAL LITIGATION

Upon the *Aurelius Motion for Relief From the Automatic Stay to Pursue Injunctive and Declaratory Relief* (the "Motion");[2] subject matter jurisdiction existing and venue being proper; adequate notice having been given to all relevant parties; having held a hearing before the Court on September 26, 2017; objections to the requested relief having been withdrawn or overruled on

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bank-ruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).

[2]  Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

2

the merits; and the Court finding it both necessary and appropriate in order to carry out the provisions of both PROMESA and the Bankruptcy Code, it is **HEREBY ORDERED THAT**:

1.      The Motion is granted as set forth herein.

2.      Pursuant to Bankruptcy Code section 105, made applicable by PROMESA section 301(a), the Court hereby clarifies that the automatic stay of Bankruptcy Code sections 362 and 922 does not apply to the proposed Aurelius litigation, *i.e.*, a suit in the U.S. District Court for the District of Puerto Rico seeking declaratory and injunctive relief as to the alleged unconstitutionality of the Fiscal Management and Oversight Board for Puerto Rico, and the subsequent invalidity of the Board's actions.

3.      The suit is against the Board and its members, not the Debtor, and seeks only declaratory and injunctive relief regarding the appointment and removal of the Board members and the validity of their actions and is not for any of the purposes delineated in Bankruptcy Code section 362(a)(1)–(8) or 922(a)(1)–(2).

4.      For the avoidance of doubt, nothing in this Order authorizes Aurelius to sue the Oversight Board or its members on grounds not fairly indicated by the Motion or for relief not fairly indicated by the Motion (*e.g.*, monetary damages, the enforcement of liens, etc.).

5.      For the further avoidance of doubt, nothing in this Order authorizes any other suit against the Oversight Board or its members or the Debtor by either Aurelius or any other party in interest, nor does the Order preclude any such suits in the future by Aurelius or any other party in interest.  The applicability of the automatic stay to any litigation not fairly indicated by the Motion is not before the Court, has not been resolved, and is reserved for future resolution should any party seek further clarification of the applicability of the stay.

SO ORDERED.

Dated: _____
San Juan, Puerto Rico

_____
LAURA TAYLOR SWAIN
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGE-MENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**Re: Docket No. __** |

**ORDER PURSUANT TO PROMESA SECTION 301(A) AND BANKRUPTCY CODE SECTIONS 105, 362, AND 922 LIFTING THE AUTOMATIC STAY AS TO PROPOSED AURELIUS CONSTITUTIONAL LITIGATION**

Upon the *Aurelius Motion for Relief From the Automatic Stay to Pursue Injunctive and Declaratory Relief* (the "Motion");[2] subject matter jurisdiction existing and venue being proper; adequate notice having been given to all relevant parties; having held a hearing before the Court on September 26, 2017; objections to the requested relief having been withdrawn or overruled on the merits; and for good cause shown, it is **HEREBY ORDERED THAT**:

1.      The Motion is granted as set forth herein.

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).

[2]  Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

1

2.       Pursuant to Bankruptcy Code sections 105, 362, and 922, made applicable by PROMESA section 301(a), the automatic stay is hereby lifted for the limited purpose of permitting the proposed Aurelius litigation, *i.e.*, a suit in the U.S. District Court for the District of Puerto Rico seeking declaratory and injunctive relief as to the alleged unconstitutionality of the Fiscal Management and Oversight Board for Puerto Rico, and the subsequent invalidity of the Board's actions.

3.       For the avoidance of doubt, nothing in this Order authorizes Aurelius to sue the Oversight Board or its members on grounds not fairly indicated by the Motion or for relief not fairly indicated by the Motion (*e.g.*, monetary damages, the enforcement of liens, etc.).

4.       For the further avoidance of doubt, nothing in this Order authorizes any other suit against the Oversight Board, its members, or the Debtor by either Aurelius or any other party in interest; nor does the Order preclude any such suits in the future by Aurelius or any other party in interest.  All such matters are reserved for future resolution by this Court.

SO ORDERED.

Dated:  _____
San Juan, Puerto Rico

_____
LAURA TAYLOR SWAIN
United States District Judge

2