```
 1                   UNITED STATES BANKRUPTCY COURT

 2                     DISTRICT OF PUERTO RICO

 3
       In Re:                      )        Docket No. 3:17-BK-3283(LTS)
 4                                 )
                                   )        Title III
 5     The Financial Oversight and )
       Management Board for        )
 6     Puerto Rico,                )        (Jointly Administered)
                                   )
 7     as representative of        )
                                   )
 8     The Commonwealth of         )        San Juan, Puerto Rico
       Puerto Rico, et al.,        )        August 8, 2017
 9                                 )
                   Debtors.        )
10
       _____
11
       In Re:                      )
12                                 )
       The Financial Oversight and )        Docket No. 3:17-BK-3567(LTS)
13     Management Board for        )
       Puerto Rico,                )        (Joint Administration
14                                 )         Requested)
       as representative of        )
15                                 )
       Puerto Rico Highways and    )
16     Transportation Authority,   )
                                   )
17                 Debtor.         )
       _____
18
19     Peaje Investment, LLC,      )        Docket No. 3:17-AP-151(LTS)
                                   )
20              Plaintiff,         )            in 17-BK-3283(LTS)
                                   )
21     v.                          )
                                   )
22     Puerto Rico Highways and    )
       Transportation Authority,   )
23     et al.,                     )
                                   )
24              Defendants.        )

25
```

```
 1   _____

 2   Peaje Investment, LLC,        )      Docket No. 3:17-AP-152(LTS)
                                   )
 3            Plaintiff,           )           in 17-BK-3283(LTS)
                                   )
 4   v.                            )
                                   )
 5   Puerto Rico Highways and      )
     Transportation Authority,     )
 6   et al.,                       )
                                   )
 7            Defendants.          )

 8   _____

 9                    EVIDENTIARY HEARING

10    BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

11              UNITED STATES DISTRICT COURT JUDGE

12   _____

13   PRESENT IN THE EVIDENTIARY HEARING:

14   The Honorable U.S. Chief Bankruptcy Judge Barbara Houser

15   APPEARANCES:

16   For Plaintiff Peaje
     Investments, LLC:            Mr. Allan S. Brilliant, Esq.
17                                Mr. Michael S. Doluisio, Esq.
                                  Mr. Stuart Steinberg, Esq.
18                                Mr. Robert Jossen, Esq.

19   For The Financial
     Oversight and Management
20   Board for Puerto Rico:       Mr. Timothy Mungovan, Esq.
                                  Mr. Lary Rappaport, Esq.
21
     For Puerto Rico Fiscal
22   Agency and Financial
     Advisory Authority:          Mr. Peter Friedman, Esq.
23                                Ms. Elizabeth McKeen, Esq.

24   Proceedings recorded by stenography.  Transcript produced by

25   CAT.
```

```
 1                           I N D E X

 2
     WITNESSES:                                        PAGE
 3
          THOMAS STANFORD
 4        Cross-examination by Ms. McKeen                48

 5        SERGIO L. GONZALEZ
          Cross-examination by Mr. Doluisio              66
 6        Redirect examination by Mr. Friedman           96

 7        TYLER DUVALL
          Cross-examination by Mr. Steinberg            105
 8
          ANDREW WOLFE
 9        Cross-examination by Mr. Jossen               129
          Redirect examination by Mr. Rappaport        151
10
          JONATHAN ARNOLD
11        Cross-examination by Mr. Jossen               162
          Redirect examination by Ms. McKeen           173
12
          W. BARTLEY HILDRETH (Rebuttal)
13        Cross-examination by Mr. Mungovan            180
          Redirect examination by Mr. Jossen           194
14
          ALBERT RACCIATTI (Rebuttal)
15        Cross-examination by Mr. Mungovan            199
          Redirect examination by Mr. Doluisio         212
16
     EXHIBITS:
17
          Plaintiff's Exhibit 102                       46
18        Plaintiff's Exhibits 92 and 93                48
          Defense Exhibit SSS                           65
19        Plaintiff's Exhibit 103                       96
          Defense Exhibit DDDDD                        105
20        Defense Exhibits GG and HH                   129
          Plaintiff's Exhibit 104                      135
21        Defense Exhibit TTT                          162
          Plaintiff's Exhibit 91                       180
22        Plaintiff's Exhibit 94                       197

23

24

25
```

```
 1                                  San Juan, Puerto Rico

 2                                  August 8, 2017

 3                                  At or about 9:33 AM

 4                        *     *     *

 5           THE COURT:  Good morning, Counsel, party

 6   representatives and witnesses, members of the public and

 7   press, and all who are observing these proceedings by video or

 8   listening in by telephone.

 9           I'll ask that counsel introduce themselves as they

10   take the podium, because that will enable everybody to put

11   names to faces as we go along.

12           Before we begin this evidentiary proceeding, I just

13   wanted to review a couple of the ground rules and also ask a

14   couple of questions.  And so, first, as to basic ground rules,

15   each side has been given three hours in total for arguments

16   and witness examination.

17           And I have made provision that the parties may make

18   their closing statements in writing submitted by Thursday so

19   that they don't have to use time during this proceeding to

20   make closing arguments.

21           I ask the parties to work out a protocol for working

22   with confidential information, since everyone is able to see

23   everything that is projected on the ELMO and, of course, hear

24   everything that is done here in open court.

25           And so would counsel who are prepared to speak to
```

1    that issue please come to the podium?

2            MR. JOSSEN:  Good morning, Your Honor.  Robert

3    Jossen, J-o-s-s-e-n, from Dechert for the plaintiff, Peaje.

4            THE COURT:  Good morning.

5            MR. JOSSEN:  I'm pleased to say the parties have

6    reached an agreement with respect to handling of confidential

7    information subject to Your Honor's approval, and it is as

8    follows:  Testimony in the courtroom from the witnesses will

9    not be deemed to be confidential.  However, documents which

10   have been marked as confidential will be maintained as

11   confidential, and they will not be shown on the ELMO.

12            So that's the agreement the parties have reached to

13   try to expedite proceedings.

14            MR. RAPPAPORT:  Good morning, Your Honor.  Lary

15   Rappaport of Proskauer on behalf of the FOMB.

16            Mr. Jossen is correct.  I would just add that the

17   documents we have filed under seal would remain under seal

18   subject to an Order by Your Honor.

19            THE COURT:  Those arrangements are acceptable to the

20   Court and seem efficient.

21            MR. RAPPAPORT:  Thank you, Your Honor.

22            MR. JOSSEN:  Thank you, Your Honor.

23            THE COURT:  So before you go away, since you both are

24   there, if you would bear with me for a moment, I'm trying to

25   figure out how to make a panel on my computer bigger, and I'm

1  about to give up on doing that.

2         All right.  I'm going to give up on that for now.

3         So there were some exhibits that were filed that were

4  not in English, and the Court had communicated the need for

5  submission of translations of anything that is not in English

6  on which the parties intend to rely.  And so at this point, I

7  will simply say that if an exhibit is not in English, it is

8  not part of the record for my purposes.

9         MR. RAPPAPORT:  Understood, Your Honor.  This is Lary

10  Rappaport again.  With respect to the exhibits we submitted,

11  we withdrew the exhibits subject to Your Honor's Order.

12         THE COURT:  Very well then.

13         MR. JOSSEN:  Your Honor, Robert Jossen.  And I think

14  we may have one document in that category, and I would ask for

15  permission to put in an English translation after the record

16  is clear, but otherwise I understand Your Honor's position.

17         THE COURT:  Any objection to the request for post hoc

18  submission?

19         MR. RAPPAPORT:  No objection, Your Honor.

20         THE COURT:  Then that request is granted.

21         And last night -- as you all know, over the past few

22  days there have been a flurry of documents articulating

23  objections to various exhibits and testimony, and that

24  continued last night into the late hours.  And so obviously

25  we're not going to work through those documents today.

1          I would urge you, as you make your choices about

2     presenting evidence, to just bear in mind that the clock is

3     running.  And so you -- to the extent you choose to put on

4     something that's subject to an objection, I will need to hear

5     it, and that will be eating the clock.

6          I wonder whether you have thought about a mechanism

7     for pointing me to what the parties consider core information

8     as to which there are objections that might need to be

9     resolved?

10          MR. JOSSEN:  Your Honor, Robert Jossen again.

11          I believe we have an understanding with respect to

12     the objections and the responses, both to the declarations and

13     to the exhibits, and we understand the volume of that, that

14     we're simply going to proceed.  They are there as a matter of

15     record.

16          We're not planning to use the time of the hearing to

17     argue objections.  To the extent I suppose that anybody has an

18     objection that it wants to pursue, it can do that in the

19     context of the submissions at the end of the hearing.  That's

20     my understanding of the way we would proceed.

21          MR. RAPPAPORT:  Lary Rappaport again.

22          That is correct, Your Honor.  I would say the only

23     possible exception which might come up are with respect to a

24     few exhibits that were designated late yesterday.  We did not

25     have an opportunity to file our objections in writing since we

1    just received them yesterday.  We may state the objections if

2    and when it comes up.

3         THE COURT:  And so your intention would be to state

4    them, but those objections and the other objections that have

5    been lodged in writing are reserved and --

6         MR. RAPPAPORT:  I believe so.  To be fully candid,

7    there's one or two objections -- I'm sorry, documents that

8    were on the exhibit list yesterday.  One is a newspaper

9    article, and one is, I believe, an eight-minute video.  As to

10   those, we may ask Your Honor if you would rule on those two

11   when it comes up.  Again, we just received that late

12   yesterday.

13        THE COURT:  All right.  Well, what I would ask is

14   that depending on the sequence of presentations, if there is a

15   break before the segment in which you would intend to bring

16   those up, that you confer to see if there's any way to narrow

17   or resolve it.  And if not --

18        MR. RAPPAPORT:  I shall.

19        THE COURT:  Thank you.  If you bear with me for a

20   moment, is there someone from AV here?

21        MR. SEGUI:  Yes.

22        THE COURT:  Thank you.

23        Please bear with us.  I'm just trying to make this

24   more helpful for myself.

25        All right.  You have to indulge us for just two

1    minutes, and then I'll give up.

2            All right.  Thank you.  Thank you for your patience

3    with that.  I've also been asked to remind counsel at the

4    podium to speak directly into the microphone, because there's

5    some audibility problem with the phone lines.  So thank you

6    for that.

7            All right.  So we have talked about the exhibits.

8    There had been an objection as well to the inclusion of Mr.

9    Racciatti as a witness in the principal case for the

10   plaintiff.  And having reviewed that objection, I am persuaded

11   that he is properly a rebuttal witness rather than a principal

12   case witness.  And so I would ask that he be dealt with in the

13   presentation of witnesses in that manner.

14           And so are there further opening remarks before the

15   official opening statements?

16           MR. JOSSEN:  Yes, Your Honor.  It's Robert Jossen.

17   One other housekeeping matter that the parties have discussed,

18   and we are in agreement that with the exception of

19   Mr. Gonzalez and Mr. Schwartz, all of the other witnesses are

20   expert witnesses.  And subject to the Court's permission, we

21   would agree that they can remain in the courtroom during the

22   testimony of other witnesses.

23           Mr. Gonzalez is not an expert witness.  He's a

24   witness for the defendant.  He would be excluded.

25           Mr. Schwartz will be the first witness for the

1    plaintiff, and so he would be here in any event.

2         THE COURT:  That argument is acceptable to the Court.

3         MR. RAPPAPORT:  Thank you, Your Honor.

4         THE COURT:  All right.  I think we are --

5         MR. JOSSEN:  Thank you, Your Honor.

6         THE COURT:  Thank you.  And so we're ready for the

7    movant's opening statement.

8         MR. BRILLIANT:  Your Honor, before we do that, can I

9    introduce my partners and client?

10        THE COURT:  Yes, please.

11        MR. BRILLIANT:  For the record, Allan Brilliant on

12   behalf of Peaje Investments, LLC.  I'm joined by Mr. Eric

13   Brunstad; Mr. Robert Jossen, who already appeared; Michael

14   Doluisio; and Stuart Steinberg; our local counsel, Dora

15   Monserrate and Fernando Gierbolini.  And then here we have

16   with us, Your Honor, Mr. Gabriel Schwartz --

17        THE COURT:  Please speak into the microphone.  Thank

18   you.

19        MR. BRILLIANT:  I'm sorry.  Mr. Gabriel Schwartz, who

20   is vice president of Peaje; and managing member of Davidson

21   Kempner, the investment advisor for Peaje, Mr. Charles Lutz;

22   and Mr. Ephraim Diamond, also from Davidson Kempner.

23        THE COURT:  Good morning.

24        MR. BRILLIANT:  Your Honor, Mr. Brunstad will do the

25   first half of the opening, and I will do the second half.  At

1    this point, I'd like to turn the podium over to

2    Mr. Brunstad.

3            THE COURT:  Thank you, Mr. Brilliant.

4            MR. BRILLIANT:  Thank you, Your Honor.

5            MR. BRUNSTAD:  Good morning, Your Honor.

6            THE COURT:  Good morning.

7            MR. BRUNSTAD:  Eric Brunstad on behalf of Peaje.  I'm

8    going to have to stoop a little bit to get down to the

9    microphone here.

10           THE COURT:  Well, you are pretty good at projecting,

11   so you might not have a problem.

12           MR. BRUNSTAD:  I think it will work, Your Honor.  In

13   the time I have this morning with my half of the opening,

14   there are a few key legal points I'd like to emphasize.

15   Before I do, a slight review of the facts.

16           As Your Honor knows, we claim we have a statutory

17   lien on the toll revenues, and that this statutory lien on the

18   toll revenues is being essentially destroyed by the

19   defendant's ongoing taking of the revenues and spending them.

20   They have been doing it for over a year.  And under their

21   fiscal plan that they propose, they intend to continue doing

22   that indefinitely for at least the next ten years.

23           And we have two paths of relief here that we are

24   asking for, Your Honor.  One is a preliminary injunction to

25   prevent them from continuing to destroy the value of our lien

 1   rights by taking the collateral.  And the second is a request

 2   for, alternatively, relief from stay for lack of adequate

 3   protection.

 4          I won't belabor the facts anymore.  I think Your

 5   Honor is very well versed in them by now.  I would like in my

 6   time with respect to the opening argument to touch upon a

 7   couple or few points.

 8          The first would be the relevant constitutional

 9   principles at stake here.  The second, drilling right down

10   into why we have a statutory lien, why this lien meets the

11   definition of a statutory lien, Section 101(53) of the

12   Bankruptcy Code.  And then I want to talk briefly about

13   Section 922 and 928, and then Section 305.  And then

14   Mr. Brilliant will be dealing with irreparable harm and

15   inadequate protection.

16          So I want to drill down first on the constitutional

17   principles.  And why do I do that?  I do that because that is

18   where the Court of Appeals for the First Circuit began in the

19   litigation that we had recently against defendants under

20   PROMESA with respect to these very same liens.

21          They interpreted PROMESA as allowing them to continue

22   to take the collateral indefinitely, and they said there was

23   no adequate protection requirement under PROMESA to prevent

24   them from doing so.

25          The Court of Appeals responded in rejecting

1 appellant's theory.  Under the appellant's reading of the

2 statute, the Commonwealth could expend every penny of the

3 movant's collateral, leaving the debt entirely unsecured.

4 Because we doubt the constitutionality of such a result, we

5 hold that lack of adequate protection for creditors

6 constitutes cause to lift the PROMESA stay.

7          The Court of Appeals has already announced its doubt

8 from a constitutional prospective that they can continue to

9 take every penny of our collateral, leaving us nothing, which

10 is why I think we do focus on the constitutional principles.

11          And I would note that the Court of Appeals did

12 something else.  It invoked the canon of constitutional

13 avoidance, that we always construe a statute to avoid conflict

14 with the Constitution if we possibly can.

15          And so I think that overarching canon and those

16 overarching principles I think superintend the entire

17 analysis.  We submit, however, Your Honor, in terms of the

18 Code, it should be in a way that does not do violence to the

19 Fifth Amendment or to the constitutional principles we say are

20 in play here, and which the Court of Appeals, I think, has

21 already recognized.  But we also think, first and foremost,

22 that those constitutional principles hold.

23          And there are several key cases we cited in our

24 papers, and I want to identify them briefly.  The most

25 important is Armstrong versus United States.  It involved the

1    destruction of a statutory lien right.  It had some

2    individuals who had liens on boats.  The United States took

3    the boats and thereby destroyed the value of the liens.  Not

4    the liens themselves.  The liens continued.  The Supreme Court

5    was very clear to recognize that.  But it destroyed the value

6    of the liens.

7          And the Supreme Court said it was the destruction of

8    the value of the liens that gave rise to a legitimate

9    constitutional concern, and the Court said it violated the

10   Fifth Amendment to take away that value without providing just

11   compensation.  It was a statutory lien.

12         The other two cases are Radford and Security

13   Industrial.  Those we think identify the relevant

14   constitutional principles at play.  Radford invalidated a

15   former provision of the Bankruptcy Act.  And Security

16   Industrial, the Supreme Court applied the canon of

17   constitutional avoidance to interpret Section 522 so that it

18   would not destroy the value of a judicial lien that was in

19   existence before the Bankruptcy Code had been enacted.

20         Now, at the prior hearing, Your Honor raised an

21   interesting and good question.  Well, the bankruptcy power

22   certainly allows the adjustment of the contractual

23   relationships.  That is so.  But as the Supreme Court

24   articulated in Security Industrial, we have to distinguish

25   contractual rights with property rights.  And the Fifth

1  Amendment protects property rights.  And we know from these

2  three cases that the Fifth Amendment protects liens in all of

3  their incarnations.

4       Armstrong was a case about statutory liens protected

5  under the Fifth.  Security Industrial was a judicial lien.

6  And Radford was a consensual mortgage.  All of them were

7  covered under the Fifth Amendment.  They are not entitled to

8  destroy the value of our lien rights in bankruptcy or not.

9       As the Supreme Court articulated in Radford, the

10  bankruptcy power is subject to the Fifth Amendment, which is

11  why we have the adequate protection concept in the Code.

12       As the legislative history may explain, it derives

13  from Fifth Amendment concerns.  The Court of Appeals in the

14  Fifth Circuit previously identified all of those principles

15  and applied them.

16       Now, at the prior hearing, opposing counsel said,

17  well, the Fifth Amendment doesn't apply, because Peaje should

18  have anticipated that at some point these liens would be

19  subject to the bankruptcy process and could be adjusted and

20  perhaps even destroyed.

21       In Armstrong, I note the Supreme Court completely

22  rejected that very same kind of argument.  There the

23  government argued that material liens are the liens on the

24  ships; the men should have known that when the government took

25  the ships, their liens would have been destroyed, because you

1 can't sue the government.  After all, these ships were being

2 built for the government.

3   The Supreme Court said no.  The prospect of a taking,

4 even if it's one that you should have been aware of, is not

5 grounds for invalidating the Fifth Amendment application or

6 the Fifth Amendment rights.

7   So those are the relevant factors.  And there are

8 relevant constitutional facts that need to be established for

9 the Constitution to apply.  And they are actually very simple.

10 That we have a lien, a statutory lien.  That's protected by

11 the Fifth Amendment.  That the toll revenues are our

12 collateral, and that they are being taken, they are being

13 dissipated.  And I think the defendants intend to do so.

14 That, I think, is already established.

15   Their fiscal plan is very clear.  They intend to pay

16 us nothing for the next 10 years from our collateral, and they

17 have continued to take and not pay us anything for over a year

18 now.  Every indication they intend to continue that.

19   Statutory lien.  Section 101(53) defines a statutory

20 lien as a lien arising solely by force of a statute on

21 specified circumstances or conditions.

22   Notice the language, by force of a statute.  And

23 also, unspecified circumstances and conditions.  As the Third

24 Circuit has made plain, the language of the statute we are

25 talking about does not have to have specific lien granting

language in it.  It is enough that the lien arises by force of the statute, that the statutory scheme culminates and provides for the lien.

Here we have two sources for our statutory lien, the Enabling Act and the '68 Resolution.  The Enabling Act by itself, by force of its own provisions, provides for this lien.  It does so in two keys provisions.  Section 2012 provides that if the HTA issues bonds with an appropriate legend, then by force of the Enabling Act itself, those bonds are going to be enforceable, valid and binding under the Enabling Act.  In addition, upon execution of the bonds, the Enabling Act, by force of its own provisions, establishes that those bonds are valid, binding and enforceable.

And then in Section 2015, the statute specifically -- this is the statutory nonrecourse provision.  The bonds are nonrecourse.  They are not, quote, payable out of any funds other than those pledged for the payment of such bonds, closed quote.

The statute itself obviously articulates that these are going to be bonds that are payable solely from pledged funds.  Pledged collateral.  The statute establishes these things, among other things, that we cite in our papers.

Those are key provisions.  So by force of the statute, upon certain specified circumstances, the HTA selects the collateral.  Once that happens, as long as the bonds are

1    executed, they have the appropriate legends, they are valid

2    and binding obligations payable solely from the pledged

3    sources by force of the statute itself.

4         So we say that that meets the definition of a

5    statutory lien for purposes of the Bankruptcy Code. But there

6    is more.  The '68 Resolution itself, which under Section 2004

7    HTA was empowered under the Enabling Act to issue bonds

8    secured by the toll revenues at stake here.  Under Section

9    601, 601 simply fleshes out -- 601 of the '68 Resolution

10   simply fleshes out Section 2015 of the Enabling Act.

11        Section 601 provides for two things:  The bonds are

12   nonrecourse, and secondly, they are payable from the toll

13   revenue.

14        Specifically Section 601 states, quote, the

15   principal, interest and premiums are payable solely from

16   revenues and from funds received by the authority for that

17   purpose from the Commonwealth.  And here is the key language,

18   which revenues, capital R, which revenues and funds are hereby

19   pledged to the payment thereof.  Specific language in the

20   resolutions establishing a lien in the revenues.

21        Section 101 defines revenues to mean toll revenues,

22   and toll revenues is defined to mean all the tolls that are

23   collected by the HTA.  We have clear language in the

24   resolutions that, again, establishes the lien.

25        A different section of the resolutions establishes a

1   lien in the fiscal agents accounts.  Once revenues come in

2   that HTA collects, we already have a lien on the stream of

3   toll revenues that's established by Section 601.  Then those

4   funds are supposed to be transferred to a fiscal agent, a

5   different entity, Bank of New York, which has a fund.

6        Section 401 gives us a lien on the proceeds in the

7   positive account in the hands of Bank of New York.  It's very

8   clear.  602 explains this pledge of revenues is a lien.  As

9   other provisions of the resolution establishes, the pledge

10  means a lien.  The terms are used interchangeably.  And if you

11  look at the whereas clause at the beginning of the resolution,

12  it identifies a pledge or lien, meaning pledge is included in

13  the concept of a lien.

14       And Jefferson County, in a case that is consistent

15  with the terminology in municipal finance, pledge revenues

16  means a lien on the entire stream of revenues.  Here, the toll

17  revenues.

18       Now, what is the status of the 68 Resolution?  And

19  this we think is key.  We think the Enabling Act in and of

20  itself establishes that by force of the statute on specified

21  circumstances and conditions, this lien in the toll revenues

22  is a statutory lien.

23       Section 68 fleshes out those terms and makes it even

24  more clear that this is a statutory lien.  But under Puerto

25  Rico law, and this is the key point --

1          THE COURT:  When you say Section 68, do you mean the

2     68 Resolution?

3          MR. BRUNSTAD:  Yes.  Forgive me, Your Honor.  I meant

4     to say the 68 Resolution, not Section 68.

5          In the case, the case that we cite, Armstrong versus

6     Ramos, it establishes under Puerto Rico law.  Whereas here an

7     Enabling Act establishes an instrumentality, and it is

8     undisputed that the HTA is an instrumentality of the

9     Commonwealth, whereas here an Enabling Act establishes,

10    empowers an instrumentality to issue ordinances, regulations,

11    resolutions, all of those kinds of things which our Enabling

12    Act does.

13         When the agency, when the instrumentality then issues

14    resolutions, ordinances, regulations, they have the force of a

15    statute.  Under Puerto Rico law, the resolutions are, by

16    themselves, statutory.  They have the force of the statute.

17         The specific language in the decision, Armstrong

18    versus Ramos, the first quote is on page 149 of the decision.

19    Quote, legislative regulations are issued by an agency

20    pursuant to a statutory delegation and implement the statute,

21    semicolon, these regulations have the force and effect of law.

22         But the decision goes on.  It's not simply in the

23    force and effect of law.  The Court said in that particular

24    case, the agency in question had exercised its delegated

25    authority, just like HTA did here.  And the Court went on to

1    say that under applicable Puerto Rico Supreme Court precedent,

2    quote -- the regulation we are talking about, the regulation,

3    quote, is not explanatory in nature, but rather implements the

4    statutory delegation contained in the relevant section of that

5    Enabling Act.  Quote, is therefore a legislative rule, and

6    pursuant to the cited Puerto Rico Supreme Court decisions,

7    that regulation becomes part of the Enabling Act, and has the

8    same legal status as a law passed by the legislature.

9         Under Puerto Rico law, the 68 Resolution, being a

10   duly authorized resolution, which the HTA was empowered to do

11   -- the Enabling Act specifically says they can proceed by

12   resolution.  They are authorized to do it.  It has the force

13   of the statute under Puerto Rico law.  It is as though it was

14   part of the Enabling Act.

15        And as I explained earlier, the Enabling Act says

16   that anyway.  Whatever the HTA does on certain specified terms

17   and conditions, that is specifically validated by the Enabling

18   Act itself as valid and enforceable.

19        So we have a situation here in which we have a set of

20   provisions that inclusively by force of the statute,

21   unspecified circumstances and conditions, establishes Peaje's

22   lien as a statutory matter in the toll revenues.

23        Now, a key case is the Orange County case, Judge Gary

24   Taylor's decision from Orange County as we cite in our papers.

25   There Judge Taylor did a number of important things.  He was

1  talking about a similar type of bond, one that was issued by

2  resolution, by a county that was authorized by an Enabling Act

3  under California law.  He concluded that was a statutory lien.

4          And in the scope of his discussion, he did something

5  that I think is absolutely critical to this case and

6  absolutely correct.  He distinguished a statutory lien from a

7  security interest.

8          And one of the key distinctions he identified is a

9  security interest arises by bilateral agreement.  It arises

10  because A and B come together, and they agree A will lend

11  money.  And B says okay, I will give you a lien.  And then

12  they have a deal, a bilateral agreement to create a lien.  And

13  then a lien is created usually under Article Nine.

14          Neither this nor the lien at issue in Orange County

15  is a bilateral agreement lien.  To use Judge Taylor's words,

16  it is not the lien that arises by agreement between the

17  parties.  They didn't negotiate for a lien and then come up

18  with one as part of a term sheet and then execute a security

19  agreement as a matter of contract that effectuates their

20  contractual intent.

21          This is a lien that is unilaterally imposed by the 68

22  Resolution, and more importantly, by the Enabling Act, which

23  is a binding obligation by force of the statute.  It does not

24  rise out of a bilateral agreement.  It arises by unilateral

25  imposition by the 68 Resolution, which has the force of a

 1  statute and the Enabling Act itself.

 2        That is a key distinction that is borne out not only

 3  for the reasons that Judge Taylor carefully explained, but

 4  also in the legislative history, in the treatises, et cetera,

 5  and it is a vital provision.

 6        You put these things together.  I note that in the

 7  Schick case, briefly, the Third Circuit said a lien doesn't

 8  have to be something that is specifically granted by the

 9  statute in terms of specific granting items in the statute.

10  That is not necessary.  The other cases, Fonseca and Graffen,

11  G-r-a-f-f-e-n, also establish those same principles.

12        So you put those things together, we submit we

13  clearly have a statutory lien.  We note they cite no case,

14  none whatsoever that establishes that a lien granted by a

15  resolution such as this in an Enabling Act is not a statutory

16  lien.

17        They have, as far as we can tell, no on-point

18  authority on their side that undercuts these arguments in this

19  analysis.  So we have a statutory lien, which takes me briefly

20  to the provisions of the Bankruptcy Code, Section 922(d).  We

21  read Section 922 the way that Jefferson County read it, Judge

22  Bennett read it in Jefferson County in his two very careful

23  decisions.  Those are very well reasoned and well articulated.

24  922(d) isn't simply just, oh, the debtor can pay the revenues

25  if it wants to.  No.  It must.

 1              The legislative history of the Senate report makes it

 2    clear, the whole point of 922(d) was to require the debtor to

 3    turn over special revenues to the bondholders.   There is no

 4    dispute that these toll revenues constitute special revenues

 5    under Section 902.   There can be no dispute.   These are

 6    pledged special revenues.   The language of the Enabling Act in

 7    the 68 Resolution makes it clear these are pledged special

 8    revenues.

 9              As the Court in <u>Jefferson County</u> articulated, these

10    are things that must be turned over during the bankruptcy.

11    The report establishes that.   In fact, that was Congress'

12    intent, and that is what makes sense.   We are to treat these

13    special revenues as a securitization.   It's as though they are

14    not part of the bankruptcy process.   They are supposed to be

15    turned over, and the automatic stay does not apply with

16    respect to the creditors' rights and remedies.

17              Briefly, under 928, because our lien is not fully a

18    statutory lien, 928 has no application, nor does Section 552,

19    552(a) does not apply -- the statutory liens, the automatic

20    lien stay cannot cut off our lien.   It is a statutory lien.

21    And under Section 928(b) which applies only to security

22    agreements, our lien is not subject to surcharge.

23              Our lien under the Enabling Act and under the 68

24    Resolution is a gross lien.   The monies are supposed to be

25    paid before the operating expenses are paid.   However, to the

1   extent that our lien is subject to surcharge under either

2   Section 928 or 506(c), it must be a reasonable, necessary

3   expense.

4          We submit only of the toll revenues that are

5   basically the basis for the generation of our collateral, and

6   there are three of them, not all of the expenses of the

7   administration, not expenses of systems and things that are

8   not related to the generation of our particular collateral,

9   the court makes that clear.  And in Judge Bennett's second

10  decision in Jefferson County, he very directly says, it is the

11  burden of the debtor to establish what those expenses are,

12  what those reasonable and necessary expenses are, not the

13  burden of the creditor.

14         And again, they are limited to not -- it doesn't

15  include it would be great if we can fix everything up and

16  build new roads and all that sort of stuff.  It is the

17  maintenance of the specific assets that generate the revenues

18  in question.  That is the correct test, and that is the

19  correct analysis.

20         Now, we have proposed in our reply brief that for

21  purposes of this hearing, that we think we are entitled to all

22  of the revenues, but we have asked for a specific percentage

23  of the revenues to be set aside for adequate protection, and

24  there can be additional funds that can be used for the

25  Commonwealth to spend to maintain the roads and other things.

1          We do put that in our reply brief with what we think

2     is enough to give us adequate protection.  But we submit,

3     because it's our right to have it as a gross lien, we simply

4     do that as an accommodation.

5          The last point I would like to make is, Your Honor --

6          THE COURT:  Well, you having said that, as you know,

7     I granted the Motion to Strike the Development of the Article

8     Nine Argument, and I read the specific breakdown figure

9     argument at the end of the brief as a proposal to the

10    defendants that I assume there is some effort to communicate

11    on off-line, principally in that fashion.

12         MR. BRUNSTAD:  I think, Your Honor, that our offer

13    stands.  I'll say that.  Our offer stands for purposes of this

14    hearing as an accommodation.  We are not demanding a hundred

15    percent of the dollars.  We have put in a percentage that we

16    think is adequate and appropriate under the circumstances, not

17    withstanding that we claim the statutory lien and not

18    withstanding to the claim, we have a gross lien that for Fifth

19    Amendment purposes and for statutory purposes, cannot be

20    violated.

21         Briefly, Section 305, Your Honor.  Section 305 does

22    not tie the Court's hands.  We would refer the Court

23    specifically, as we did before, to Judge Klein's careful

24    analysis in Stockton, and also the Orange County decision,

25    Judge Ryan's decision in the bankruptcy court on that issue.

1          Again, we fleshed this out in our papers.  Only a

2    couple of comments.  Among others, they must have impliedly

3    consented when they filed this case that they would be subject

4    to the applications and provisions of the Bankruptcy Code.

5    Otherwise, the process doesn't work.

6          They do not cite a single case that supports their

7    position, and we cite two that support ours, that there is

8    implied consent, at least with respect to the application of

9    the provisions of the Bankruptcy Code, that Your Honor can do

10   that.

11         And specifically, Your Honor can apply 922 and 928.

12   305 is a general provision.  These are specific provisions.

13   And we know that the general gives way to the specific.  Also,

14   if their interpretation of Section 305 conflicts with Section

15   106, Section 106 makes 922 and 928 specifically applicable

16   here.

17         Your Honor, I would note that in Orange County, the

18   Court said also specifically the Court can grant relief from

19   stay if there wasn't adequate protection, that can be in

20   force.  Also, if you look at the object and purpose Section

21   305 derives from Section 904, 904 was put in place to protect

22   the interest of the states.  As the Supreme Court has already

23   established for purposes of bankruptcy, Puerto Rico is not a

24   state.  It's a territory.  The same Tenth Amendment concerns

25   simply, it follows, does not apply.

1         What does apply here is the Fifth Amendment

2    principles that I articulated at the beginning, and have been

3    insisting on all along.  We must interpret Section 305 and

4    every other provision of the Amendment to avoid any conflict

5    with the Constitution.

6         And as the First Circuit has already identified, it

7    has already indicated in its decision, if the result is that

8    they can take every penny of our collateral for the next 10

9    years or whatever and not pay us, the First Circuit said we

10   doubt that would pass muster under the Constitution.  I would

11   state it absolutely violates the Fifth Amendment.

12        It would render these provisions unconstitutional

13   under the canon of constitutional avoidance.  Every effort

14   should be made to interpret the provisions of the Code to

15   avoid that kind of a conflict, including Section 305.

16        Unless the Court has questions about the points I

17   have made, I will pass to my partner, Mr. Brilliant.

18        THE COURT:  Thank you.  You have been very clear and

19   comprehensive.

20        MR. BRILLIANT:  Your Honor, following Mr. Brunstad is

21   never easy, especially when he uses up all the time we have

22   allocated.

23        MR. BRUNSTAD:  Apologies.

24        THE COURT:  I know you love a challenge.

25        MR. BRILLIANT:  Thank you, Your Honor.

1          So I'm going to jump around and try not to be too

2     quick, but I will warn you, I did have too much coffee this

3     morning.

4          THE COURT:  But do remember that the court

5     reporter --

6          MR. BRILLIANT:  I know, Your Honor.

7          THE COURT:  Thank you.

8          MR. BRILLIANT:  For the record, Allan Brilliant on

9     behalf of Peaje.

10          Your Honor, the evidence will show that absent

11     granting of the injunction, that Peaje will suffer irreparable

12     harm and the bondholders.

13          We, the plaintiffs, have the burden of proof of

14     irreparable harm, but it's the HTA and debtors that have the

15     burden of proof on adequate protection.  And when Your Honor

16     hears the evidence, we would ask that Your Honor keep in mind

17     the relevant burden of proof here on the issues.

18          Let me give you a little bit of a flavor of what

19     evidence you're going to hear and what you're not going to

20     hear in today's hearing.

21          In connection with the discovery that we had in this

22     case, Your Honor, the debtors produced monthly toll

23     transaction information for each of the roads for the last six

24     years.  We also produced actual revenues on a monthly basis

25     for each of the covered roads.

1           That information was not publicly available prior to

2    that time.  It's not publicly available probably up to this

3    time until we have this hearing.  The data that we received

4    showed the number of transactions, the number of tolls that

5    were actually paid on the roads.

6           On PR-52, a decrease by an average of 1.1 percent per

7    year since 2011 through 2016.  PR-52, I'm sure as Your Honor

8    knows, is roughly 80 percent of the toll revenues that are the

9    subject of this hearing, and you will see that fact in the

10   Gonzalez exhibit, paragraph number 36.

11          PR-53, which makes up about 18 percent of the toll

12   revenues, saw transactions decrease during that five-year

13   period by an average of .4 percent per year.  PR-20, which

14   only makes up three percent, did actually grow by 1.8 percent

15   per year.

16          The revenues themselves, Your Honor, did actually

17   grow by .2 percent on an annual basis by average.  It was

18   basically flat.  And the reason for that is there was a change

19   in the mix of toll revenues.  There were less cars, and there

20   were more trucks that I guess pay a higher toll fare.

21          Mr. Racciatti, who I guess you will hear on rebuttal,

22   he took this actual transaction data and, using a regression

23   analysis, he determined the likely growth rate of toll

24   revenues into the future with respect to the revenues we have

25   here.

1          And based on his regression analysis, Mr. Racciatti

2     calculated that the actual growth rate would be negative 3

3     percent per year on a go-forward basis, .4 percent a year on a

4     go-forward basis, or .9 percent per year at the high end based

5     upon differing assumptions that he made based on what is being

6     forecasted with Puerto Rico with respect to future employment

7     in the Commonwealth.

8          Mr. Stanford, an expert on toll road restructurings

9     who has worked on some of the largest toll road restructurings

10    to date in the country took Mr. Racciatti's projected growth

11    rates and using the actual toll revenues, one of the things

12    Your Honor, I'm sure, saw or will hear in connection with the

13    testimony is that the initial numbers that Mr. Stanford used

14    in his original Affidavit were, you know, just estimates,

15    because there were no toll revenues broken down by toll road.

16         And in their financial statements, what the HTA has

17    done, which is grouped in all toll revenues, he had made some

18    assumptions as to what was in there based on previous toll

19    revenues.  It turns out that there were bridge receipts and

20    there were also with respect to the road that had been

21    privatized, some of those numbers that were in there which

22    gave the impression that the roads had actually grown with

23    respect to revenues when, in fact, over the last period of

24    time, they had actually shrunk.

25         But when you put in the actual numbers as a starting

1    point, using the same ten to 12 percent discount rate that he

2    used in his initial Affidavit, and using Mr. Racciatti's

3    growth models, it shows that today currently at the low end we

4    have an equity cushion of only two percent of the total amount

5    of debt.  And at the high end, assuming the highest growth

6    rate from Mr. Racciatti and the lowest discount rate, there

7    would be a 38 percent equity cushion, with the middle being

8    about 18.6 percent, assuming -- that assumes, Your Honor, that

9    100 percent of all the toll revenues that come from the three

10   covered roads return to the bondholders today and into the

11   future.

12          So it assumes a hundred percent, and that would be

13   forever.  He did it on a perpetuity growth model.  So it's not

14   just the revenues of the next ten years, but it would be all

15   the revenues discounted back to today that would be forever,

16   assuming people continue to drive cars and the assumption that

17   growth rates were met.

18          In this declaration, Mr. Gonzalez testifies that the

19   operating expenses of other toll roads average 25 million

20   dollars per year, and there's an additional average over the

21   next ten years expected to be 36 million dollars per CapEx.

22          Under Mr. Stanford's highest equity cushion in his

23   range of equity cushions, the bondholder equity cushion would

24   be completely eroded based on just 28.9 million dollars of

25   annual deductions if they occur under Section 506(c) or

1   928(b).  And at the lower end, just 2 million dollars of

2   expenses per year reduced from the toll revenues would make us

3   undersecured.

4           Based on this analysis, Your Honor, and the recent

5   activity and results at the toll roads, and the evidence that

6   has been brought forth by the defendant with respect to all

7   the risks associated with the restructuring of -- and

8   Mr. Jossen knows how to get me to sit down.  But, you know,

9   based on all of the risks associated here, it's very clear

10  that we do not have a sufficient equity cushion and we are

11  being irreparably injured to the extent the toll revenues

12  continue to get diverted.

13          Your Honor, lastly, we're going to hear in terms of

14  the evidence, it makes a very compelling case, we believe that

15  we are being irreparably harmed and we lack adequate

16  protection.  But I'll tell you what you're not going to hear,

17  Your Honor.  You're not going to hear evaluation testimony

18  from any of the experts from the defendants.  You will hear

19  from Mr. Jonathan Arnold that Mr. Arnold has no toll road

20  experience, and he did no independent work here, although he

21  worked for the HTA and had numerous meetings with members of

22  the HTA.

23          Mr. Arnold did not go to find out what the actual

24  toll results were, did any kind of analysis on the growth

25  rate.  All he says in his papers is that the growth rate used

1   in the initial Stanford Affidavit was too high.  And he also

2   believed that a discount rate was too low.

3         He said a discount rate should be between ten to 15

4   percent.  Using a 15 percent discount rate, obviously the

5   equity efficient doesn't exists today with most of the

6   reasonable assumptions with respect to growth rate.  So we are

7   in a position, Your Honor, where they're saying we're

8   undersecured currently in that context.  And from that, it's

9   clear every dollar that's taken is a dollar that we will never

10  see.

11        So instead of coming back with a real evaluation,

12  instead the defendants base their entire evidentiary case upon

13  one premise, and that premise is that if the Court grants the

14  injunction, that the HTA will not have any money to fund its

15  operations, and a parade of horribles will befall the

16  Commonwealth, the citizens of the Commonwealth, and even the

17  bondholders.

18        Their case is based on that premise, but, Your Honor,

19  you will not hear one witness testify that they don't have the

20  money.  And the reason for that is because they can't.  The

21  evidence will show that as of June 30th, I guess the issue of

22  this videotape, which is a video of the Governor's recent

23  press conference of last week, where he said that they

24  currently have one billion 799 million dollars in cash on

25  hand, 1.5 billion dollars more than they were projected to

1    have at this moment in time.

2            Moreover, as you'll hear from Professor Hildreth, the

3    Commonwealth has multiple buckets of funds where it can fund

4    the replacement of 70 million dollars per year or even 150

5    million dollars now that there's no way based on today's

6    ruling Your Honor could award 150 million dollars.  There's

7    only 100 million dollars generated by the covered road.

8            But even if you buy into their assumption that if

9    they we were to win the 100 million dollars, and they would

10   win the other 50 million dollars, but even if you believe

11   that, it is very clear they have the money, they have 150

12   million dollars that they could allocate for the HTA.  As

13   Mr. Hildreth will testify, they just choose not to.

14           And if Your Honor lets them subsidize their stay on

15   the HTA with the bondholders' collateral, they will be only

16   spending on toll roads, because they'll be using our money,

17   not their own funds, less than one half of what the lowest

18   state spends when he compares it to toll road expenses for the

19   Commonwealth as a state, and also based upon GDP.

20           Your Honor, based on the testimony that you're going

21   to hear, we think Your Honor should enter the injunction, and

22   grant us adequate protection, and require the Commonwealth to

23   turn over the toll revenues for us.

24           THE COURT:  Thank you, Mr. Brilliant.

25           The opening for the defense.

1          MR. MUNGOVAN:  Good morning, Your Honor.  May it

2    please the Court.  My name is Timothy Mungovan, for Proskauer

3    Rose, counsel for the Financial Oversight and Management Board

4    for Puerto Rico and for the Puerto Rico Highways and

5    Transportation Authority.

6          I'd like to introduce my colleagues, if I could.

7          THE COURT:  Yes.

8          MR. MUNGOVAN:  At counsel table is my partner, Lary

9    Rappaport; my partner, Stephen Ratner; my partner, Brad

10   Bobroff.  Also with us in the gallery is my partner, Martin

11   Bienenstock, who you've heard from before; as well as our

12   Puerto Rican counsel, Hermann Bauer and Ubaldo Hernandez

13   Barrera.

14         THE COURT:  Good morning.

15         MR. MUNGOVAN:  We are here obviously, Your Honor, on

16   the plaintiff's motion for a preliminary injunction.  We will

17   show that Peaje is not entitled to a preliminary injunction

18   and is adequately protected.

19         Peaje has not established and cannot establish that

20   it is likely to succeed on the merits of its claim because,

21   number one, it does not have a statutory lien.  And even if it

22   did have a statutory lien, the scope of the lien attaches, as

23   my brother stated, only to the money that is at the fiscal

24   agent.

25         As we will also show in more detail in our closing

1   argument brief, Your Honor, the Enabling Act here authorizes

2   the agent to enter into a contractual pledge, not a statutory

3   one.  And in any event, we will also show that the cases that

4   Peaje cites in its reply actually support our view that there

5   is no statutory lien.

6        So with our time here today, we would rather focus,

7   Your Honor, on the factual issues that will be presented and

8   the evidence that you will hear.  And Peaje has not

9   established and cannot establish that it will suffer

10   irreparable harm.  Peaje's harm is monetary only.  And Peaje's

11   damages, if any, would be the missed payments on the bonds and

12   the applicable interest to account for the time value of the

13   money.

14        To the extent that Peaje were to prevail on the

15   merits, the evidence does not show that the HTA will be able

16   to pay the damages.  In fact, Dr. Arnold, defendant's expert,

17   shows that there is sufficient toll revenue to pay off the

18   shortfall.

19        Using Peaje's only model from its moving papers, and

20   even using Peaje's new calculations from its reply where Peaje

21   asserts an equity cushion, as my brother just acknowledged,

22   Dr. Arnold will show that there is enough toll revenue to pay

23   off any shortfall at the conclusion of this case on the

24   merits.

25        Even assuming that Peaje prevails on the merits, the

1   only way that Peaje could suffer irreparable harm would be if

2   an injunction is, in fact, entered.  Peaje's asserted

3   collateral or revenue, not from roads or the physical

4   property, if the toll revenues are paid to the bondholders,

5   the evidence shows and will show that the roads will fall into

6   disrepair, jeopardizing the HTA's ability to operate the

7   system and generate tolls.

8        It will destroy the value of any asserted lien, which

9   is exactly the concern that Peaje has raised.  The relief that

10  they seek will cause the harm they are looking to prevent.

11       Also, the balance of hardships between parties in the

12  public interest weighs strongly against the entry of an

13  injunction here, Your Honor.  As the evidence shows and will

14  show, the HTA does not have enough money to pay the toll

15  revenues to the claimholders and maintain and operate the

16  highways and transportation system.  Indeed, an injunction

17  would lead to near term safety issues and substantial

18  additional costs in the future if the highways and

19  transportation system are not sufficiently maintained and

20  preserved now.

21       For example, Mr. Gonzalez states in paragraph 33 of

22  his declaration that, quote, if the level of capital

23  investment is restricted, the attendant decline in road

24  quality would result in significant degradation of the

25  highways infrastructure with a dramatic increase in the users'

operating cost, and a significant reduction in highway safety.
This is not a theoretical risk that will develop at some
indeterminate time in the future.

Tyler Duvall, another expert of the defendant, states
in paragraph 22(c) of his declaration that in his opinion,
based on information provided by the HTA, quote, a substantial
portion of Puerto Rico's roads are at or very near the end of
their useful lives.  The failure to invest in these road
assets is likely to have material negative impacts on the
functioning, safety, and costs to repair of the entire
highways and transportation system, close quote.

In contrast, Peaje's witness, Professor Hildreth,
offers the cavalier opinion that the Commonwealth can and
should simply make the policy choice to spend the money to
maintain the roads.  The evidence shows, however, and will
show that is the proverbial equivalent of robbing Peter to pay
Paul.

Defendant's expert, Dr. Wolfe, examined the effect of
taking 150 million dollars from the Commonwealth budget to
fill the hole from the tolls being paid to the bondholders.
Dr. Wolfe opined in paragraph 11 of his declaration that,
quote, even if one looked at the withdrawal of 150 million
dollars from the Commonwealth budget for a shorter period of
time or on a year to year basis, it would still have a
significant adverse impact on real economic growth, because it

1    would jeopardize the level of economic activity necessary to

2    rebuild the growth required over time to succeed.

3          Indeed, at the incipient stage of Puerto Rico's

4    effort to regain its economic footing, if this magnitude of

5    funds is removed from the Commonwealth's budget, for example,

6    in year one, it is riskier for the success than if the funds

7    were siphoned away later.  In my view, impediment to growth at

8    the outset enhances the chance that macroeconomic decline will

9    not be corrected, close quote.

10          Dr. Wolfe also points to the importance of the modest

11   surplus that will build up each year as a result of the

12   structural reforms described in the Commonwealth fiscal plan.

13   Dr. Wolfe states in paragraph 13 of his declaration that,

14   quote, the surplus buildup is essential to the buildup and

15   confidence in Puerto Rico's economy, and the Commonwealth's

16   ability to regain access to capital markets and attract the

17   investments necessary for economic growth and repayment of an

18   appropriate debt restructuring in a sustainable manner.

19          Dr. Wolfe's testimony is unrebutted.  Peaje has no

20   answer for it.  Therefore, the evidence establishes the entry

21   of an injunction will increase the risk that Puerto Rico's

22   macroeconomic decline will not be corrected.  Contrast that

23   unrebutted harm to the Commonwealth and HTA if the injunction

24   is entered with the absence of harm to Peaje if the injunction

25   is not entered.

1          Using Peaje's own model, as I alluded to earlier in

2   my opening statement, and using Peaje's own examples, Peaje

3   claims that it has an equity cushion.  And as Dr. Arnold has

4   shown and will show, where Peaje claims that there is an

5   equity cushion, there is enough toll revenue to repay any

6   shortfall and payment on the bonds for up to two years.  And

7   under these facts, Peaje has not established or demonstrated

8   that it is entitled to a preliminary injunction.

9          Lastly, to the extent that Peaje claims that it is

10  undersecured, it is adequately protected.  The defendant's

11  conduct is not diminishing the value of Peaje's alleged

12  collateral as of this date.  In fact, the evidence shows the

13  opposite, Your Honor.

14         Because the HTA is using the toll revenues to

15  maintain the roads, including the toll roads and the

16  transportation system as a whole, the defendants are

17  preserving the value of the collateral.  Peaje's collateral is

18  the toll revenues, according to Peaje's own claim.  The toll

19  revenues are a perpetual stream of revenue.

20         There is no credible evidence that the stream of toll

21  revenues is limited or finite, as long as the asset, the

22  physical asset that produces the revenues, which are the toll

23  roads and the highways and transportation system that feeds

24  those toll roads and makes them valuable is maintained, which

25  is what the defendants are doing with the toll roads.

```
 1            It's undisputed that the HTA is using the tolls to
 2   maintain the roads, including the toll roads, and the
 3   highways, and the transportation system.  Maintaining the
 4   roads does not make Peaje worse off.  It protects their
 5   claimed collateral, because it protects the revenue stream.
 6   If the toll revenues were paid to the claimholders as they
 7   seek, they would be worse off.
 8            Accordingly, Your Honor, based on the evidence that
 9   the parties have submitted to the Court already and the
10   testimonial evidence that you will hear today, the Court
11   should deny the motion for preliminary injunction and find
12   that Peaje is adequately protected.
13            Thank you, Your Honor.
14            THE COURT:  Thank you.
15            MR. FRIEDMAN:  Good morning, Your Honor.  Peter
16   Friedman from O'Melveny & Myers on behalf of AAFAF and its
17   executive director.  I'm joined by my colleague, Elizabeth
18   McKeen, who will be doing witness examination, as well as my
19   partner, Robert Oppenheimer.  On behalf of HTA, Juan Maldonado
20   is here.
21            Our co-counsel, Andres Lopez, is also here, counsel
22   to the Governor, as well as the Honorable Raul Maldonado
23   Gutier and Jose Ivan Rosado.  Ms. Wandymar Burgos is also
24   here, as well as Raul Castellanos, who is counsel to the
25   Honorable Carlos Aponte, the executive director of HTA, right
```

1   there.

2          THE COURT:  Good morning.

3          MS. BURGOS:  Good morning, Your Honor.

4          THE COURT:  Mr. Friedman, I would ask you to be

5   particularly mindful to project.  You are a little soft

6   spoken.

7          Mr. FRIEDMAN:  Yes, Your Honor.

8          THE COURT:  Maybe not quite that loud all the time,

9   but that's getting there.  Thank you.

10          MR. FRIEDMAN:  I really just wanted to make two

11   points.  The first is that I think when we step back, we have

12   to realize what's being asked for, which is relief that

13   potentially will lead to taking away 150 million dollars in

14   revenue for a public agency that is planning on spending 500

15   to 600 million dollars over the next year.

16          And counsel for Peaje keeps talking about over the

17   next ten years, what's going to happen over the next ten

18   years.  And I think it's important to remember, we're not here

19   to talk about the next ten years.  We're here about a

20   preliminary injunction.  We're here about a stay relief.  We

21   are not here about approval of a fiscal plan or plan of

22   adjustment.

23          To the extent there is even some potential harm to

24   them, it's not irreparable and it's not something that can't

25   be reversed if the Court were ultimately to determine that

1    they are correct and ultimately granted relief.

2            The money I was talking about, I just want to spend a

3    second to talk about the fiscal plan, which is not on trial,

4    but you'll certainly hear people second-guess assumptions in

5    the cross-examination of Dr. Gonzalez.  You will hear people

6    make second-guesses about assumptions about how to spend

7    money, whether expenditures are wise or appropriate, or is

8    this assumption fully correct.

9            And I just want to remind and note that the fiscal

10   plan is not an expert report that was designed for court.  The

11   fiscal plan is a living document that reflects public policy

12   decisions about how Puerto Rico ought to be expending its

13   resources, and how HTA ought to be expending its resources to

14   keep roads safe and to keep roads operable and to fulfill the

15   mandate of the HTA.

16           And sure, people can second-guess those decisions,

17   but ultimately Dr. Gonzalez's testimony is very clear, that

18   these are the kind of expenditures that are necessary for the

19   HTA to fulfill its transit mandate and serve the people of

20   Puerto Rico.

21           With that, Your Honor, I have nothing further for my

22   opening.

23           THE COURT:  Thank you, Mr. Friedman.

24           Plaintiffs may call the first witness for

25   cross-examination.

1          MR. JOSSEN:  Your Honor, Robert Jossen for Peaje.  We

2     call Gabriel Schwartz.

3          THE COURT:  Thank you.  So you're calling Gabriel

4     Schwartz.

5          Mr. Schwartz, would you please come to the witness

6     stand and remain standing to take the oath.  The witness stand

7     is that box there.  Thank you.

8          COURTROOM DEPUTY:  Raise your right hand.

9          Do you solemnly swear that the testimony you are

10    about to give in this case is the truth, the whole truth, and

11    nothing but the truth?

12         THE WITNESS:  I do.

13         COURTROOM DEPUTY:  So help you God.

14         MR. JOSSEN:  Your Honor, I know that he will be

15    subject to cross-examination now.  It's already in the record,

16    but I thought as a matter of clarity we would offer at this

17    point what we've marked as Plaintiff's Exhibit 102, which is

18    the verified Complaint in this action, verified by

19    Mr. Schwartz.  And with that -- it's in the record, of course,

20    but I offer it as an exhibit.  And with that,

21    cross-examination can begin.

22         THE COURT:  And so have you -- obviously you haven't

23    stipulated to the admissibility of all the exhibits, because

24    there are objections, but I'll admit it subject to objections.

25              (Plaintiff's Exhibit 102 admitted into evidence,

```
 1    subject to objections.)

 2             MR. JOSSEN:  May I hand this up to the clerk?

 3             THE COURT:  Yes, please.  And it is included in the

 4    binder?  Is that --

 5             MR. JOSSEN:  I believe it is not, Your Honor, so I've

 6    handed up an extra copy for the Court.

 7             THE COURT:  Thank you.

 8             MR. MUNGOVAN:  Good morning, Your Honor.  Timothy

 9    Mungovan on behalf of the defendants.  We have no

10    cross-examination of Mr. Schwartz.

11             THE COURT:  Thank you.

12             So with no cross-examination, then there's no

13    redirect.  So thank you, Mr. Schwartz.

14             (At 10:43 AM, the witness left the stand.)

15             MR. STEINBERG:   Good morning, Your Honor.  Stuart

16    Steinberg of Dechert.  We call as our next witness, Thomas

17    Stanford.

18             THE COURT:  Thank you, Mr. Stanford.  Would you go

19    and remain standing to take the oath?

20             COURTROOM DEPUTY:  Raise your right hand.

21             Do you solemnly swear that the testimony you are

22    about to give in this case is the truth, and nothing but the

23    truth?

24             THE WITNESS:  I do.

25             COURTROOM DEPUTY:  So help you God.
```

```
 1              THE COURT:  Please be seated.

 2              MR. STEINBERG:  Your Honor, at this time we'd like to

 3   offer Mr. Stanford's original affidavit, which is Plaintiff's

 4   Exhibit 92, as well as Mr. Stanford's supplemental and

 5   rebuttal declaration, which is Plaintiff's Exhibit 93, into

 6   evidence.

 7              And with the Court's permission, I have a copy for

 8   Your Honor, as well as the witness, and defense counsel as

 9   well.

10              THE COURT:  Thank you.  Those exhibits are admitted

11   subject to any objections that have been lodged.

12              (Plaintiff's Exhibits 92 and 93 admitted into

13   evidence, subject to objections.)

14              MR. STEINBERG:  May I approach, Your Honor?

15              THE COURT:  Yes, please.

16              MR. STEINBERG:  Thank you.

17              May I approach the witness, too?

18              THE COURT:  Yes.  Thank you.

19              THE WITNESS:  Thank you.

20              MS. MCKEEN:  Good morning, Your Honor.  Elizabeth

21   McKeen for AAFAF.

22              THE COURT:  Good morning.

23                   T H O M A S   S T A N F O R D,

24         called as a witness by the plaintiff, having been sworn,

25         testified as follows:
```

```
 1                           CROSS-EXAMINATION

 2    BY MS. MCKEEN:

 3    Q.   Good morning, Mr. Stanford.

 4    A.   Good morning.

 5    Q.   Mr. Stanford, you submitted two written statements to the

 6    Court in support of Peaje's motion for a preliminary

 7    injunction; is that correct?

 8    A.   Yes, that's correct.

 9    Q.   And are those statements what counsel just marked into

10    the record as Exhibits 92 and 93?

11    A.   Yes.

12    Q.   You submitted one of those affidavits on May 31st; is

13    that correct?

14    A.   That's correct.

15    Q.   And the other on July 28th?

16    A.   That is correct.

17    Q.   Mr. Stanford, in both your affidavit and in your

18    supplemental declaration, you used a net present value formula

19    to estimate the value of a hypothetical equity cushion

20    associated with the 1968 bonds; is that correct?

21    A.   That is correct.

22    Q.   And the estimated value of that hypothetical equity

23    cushion changes depending on the inputs associated with the

24    variables that you use in your model; is that correct?

25    A.   That is correct.
```

 1   Q.   And one of those variables is the discount rate, right?

 2   A.   Yes.

 3   Q.   And another one is the growth rate, correct?

 4   A.   Correct.

 5   Q.   So depending on the value of the discount rate that you

 6   use and the value of the growth rate that you use, the value

 7   of the hypothetical equity cushion changes?

 8   A.   That is correct.

 9   Q.   Between your original affidavit and your supplemental

10   declaration, you've offered the Court more than 20 different

11   possible estimates of the hypothetical equity cushion amount,

12   correct?

13   A.   That is correct.

14   Q.   And the value of the hypothetical equity cushion under

15   your model varies significantly based on the assumptions that

16   you use, right?

17   A.   Yes.  It varies based on the discount rate and growth

18   rates that are applied.

19        THE COURT:  I'm sorry.  May I ask the witness to come

20   a little closer to the microphone?

21        THE WITNESS:  Sure.

22        THE COURT:  Thank you.

23   BY MS. McKEEN:

24   Q.   And depending on what numbers you use, there might be no

25   equity cushion at all, for example?

1   A.   That's correct.  As the discount rate increases, the

2   impact of the calculation becomes more extreme.

3   Q.   And in determining the value of those inputs you use is

4   an exercise of judgment, correct?

5   A.   Yes.

6   Q.   And you don't have an opinion as to which of the

7   different values of the hypothetical equity cushion is most

8   likely to be correct as you sit here today, do you?

9   A.   My analysis indicates a range of values.  I thought that

10  that was the proper and reasonable approach, an approach that

11  I think is customary in any form of a value analysis.

12  Q.   Mr. Stanford, neither of your statements offers any

13  opinion as to the value of that hypothetical equity cushion as

14  of May 21, do they?

15  A.   No, not specifically to the date of May 21st.  My

16  calculations are predicated or dependent upon the HTA fiscal

17  plan and the first revenue period within the fiscal plan,

18  which was FY17/18, such that July 1st would be the first

19  period with which revenues would be recognized.

20          I would state, though, that rolling that back one

21  month would not make a material difference in the values that

22  are presented within my analysis.

23  Q.   I just want to be clear for the record.  Is that a no,

24  Mr. Stanford, you did not perform an analysis as to May 21st,

25  2017, did you?

```
 1   A.   My analysis is as of June 30th, 2017.

 2   Q.   And you also didn't perform any analysis suggesting a

 3   date by which any hypothetical equity cushion would be

 4   depleted, whether that's five, six, 12 months in the future?

 5   That was not something you analyzed?

 6   A.   In the supplemental declaration, I did sensitize the

 7   analysis to include the impact of a 24-month deferral.  And I

 8   did that based on and in response to the Arnold declaration.

 9   But it's correct that I did not offer a specific date as to

10   when the equity cushion may or may not be fully depleted.

11   Q.   Okay.  And you didn't analyze, by the same token, how

12   many bond payments would need to be missed before the equity

13   cushion was depleted?  That was also something you didn't do?

14   A.   Not in terms of providing a specific date.  It is

15   something in the model that I use for the purpose of the

16   analysis, and it's incorporated in the model, which I believe

17   was provided in discovery in which the date with which the

18   deferral would extend through could be adjusted.

19        For instance, it could be adjusted for 12 months, 24

20   months, 36 months, and that was something that was provided

21   again via discovery.

22   Q.   Mr. Stanford, you used the same discount rate in each of

23   your two written submissions; is that right?

24   A.   I utilized the same range of discount rates of between

25   ten and 12 percent, correct.
```

1   Q.   And your analysis assumes that that range of discount

2   rates would stay the same in perpetuity, correct?

3   A.   Correct.  I did not change the discount rate over time.

4   Q.   But if you had certainty that the toll revenues would be

5   deposited with the fiscal agent, you would agree with me that

6   revising the discount rate downward would probably be

7   appropriate, right?

8   A.   I believe it would be -- given the current situation, I

9   think it's hard to handicap as to whether or not, you know,

10  that degree of certainty could be provided for.  But I would

11  admit, if there was an absolute certainty that the funds would

12  be diverted or be provided to the '68 bondholders, that that

13  would change the profile.

14  Q.   And when you say "change the profile," you mean the

15  discount rate would need to be lower, right?

16  A.   Not necessarily.  And I state that because the range of

17  ten to 12 percent was intended to capture the risk that is

18  inherent in the current situation, risks such as the fact that

19  I think as has been mentioned, the '68 bondholders don't

20  necessarily benefit from accessing a hundred percent of the

21  revenues.  Certain of those revenues pursuant to the bond

22  documents may be provided to the '98 bondholders.

23       In addition, the overall financial situation within

24  the Commonwealth could indicate a higher degree of risk, and I

25  believe that's captured within my range of ten to 12 percent.

```
 1   Q.   Mr. Stanford, in the event that Peaje prevails in this

 2   litigation and a permanent injunction is entered, and there's

 3   a guarantee that cash flows would be provided to the '68

 4   bondholders, you would agree on those facts a lower discount

 5   rate would be appropriate, correct?

 6   A.   The discount rate that I've provided allows for the risk

 7   that is inherent in the future collection of those revenues.

 8            And so if we're going to talk in absolutes and you

 9   could absolute guarantee that there would be no risk of future

10   litigation and no risk of any future negative impact of the

11   financial stress of the Commonwealth, then you could consider

12   a lower discount rate.

13            Given the current state of affairs and current

14   conditions, I believe that the ten to 12 percent discount

15   range is appropriate.

16   Q.   But you haven't done any analysis as to how the

17   hypothetical equity cushion would change if the Court were to

18   grant the preliminary injunction motion, have you?

19   A.   I have not adjusted my analysis to handicap the potential

20   outcome of today's proceedings.

21   Q.   And you haven't done any analysis as to how the

22   hypothetical equity cushion would change if the Court were to

23   grant a permanent injunction at the end of the litigation,

24   have you?

25   A.   No, I have not.
```

1    Q.   And all of your calculations relate to what you've

2    referred to as a hypothetical equity cushion, correct?

3    A.   That's correct.

4    Q.   And you don't have an opinion as to what the actual

5    equity cushion was on any given date, do you?

6    A.   Well, the answer to the question of what the actual

7    equity cushion would be is predicated upon whether or not

8    payments commence.

9         The analysis that I presented in my declaration

10   assumes a hypothetical equity cushion, given a conservative

11   set of assumptions, and assumes if payments were to commence

12   today, that's what the value range would be.

13   Q.   Depending on a variety of different variables?

14   A.   Depending on a certain set of, as I highlighted in my

15   declaration, which I believe to be a set of conservative

16   assumptions.

17        I think I've already highlighted the indication that

18   it assumes that a hundred percent of the revenues would go to

19   the '68 bondholders.  It assumes that there would be no

20   negative impact of the financial condition of the

21   Commonwealth.  It also assumes, you know, any future

22   litigation as it relates to the current proceedings.

23   Q.   But it's still hypothetical based on things like the

24   discount rate, the growth rate, and other variables, right?

25   A.   My analysis is dependant on the discount rate and growth

1   rate, and the underlying assumptions that are incorporated,

2   yes.

3   Q.   And you've never offered an analysis or an opinion as to

4   what the actual equity cushion was as to a particular date,

5   have you?

6   A.   The analysis, in my opinion, allocates what the equity

7   cushion would be in the -- in the hypothetical situation, if

8   payments were commenced today, and then also if payments were

9   deferred for 24 months.  That's what's currently outlined in

10  my supplemental declaration.

11  Q.   I want to be clear, Mr. Stanford.  The numbers that you

12  are providing are still hypothetical based on other

13  assumptions.  You haven't offered an opinion about the actual

14  equity cushion's value as to any date, have you?

15  A.   The evaluation date is as of June 30th.  The evaluation

16  analysis assumes if payments were to commence today, that's

17  what the hypothetical range of values would be.  If payments

18  were to be deferred for 24 months, I've also outlined what the

19  range of the values would be.

20  Q.   Mr. Stanford, do you remember when I took your deposition

21  on Saturday in Chicago?

22  A.   I do.

23  Q.   And your testimony in that deposition was under oath, was

24  it not?

25  A.   Yes.

1  Q.   And was that testimony truthful?

2  A.   Yes.

3  Q.   Do you remember in your deposition when I asked you

4  whether you had an opinion as to what the actual equity

5  cushion was on any given date?

6  A.   I recall it was a line of questioning that was asked.

7  Q.   Mr. Stanford, I asked you, and I'm quoting here from your

8  deposition at page 87, line six, and you don't have an opinion

9  as to what the actual equity cushion was on any given date, do

10  you?

11       And the answer you gave me was:  I did not complete

12  analysis to determine a particular date, no.

13       Is that accurate testimony that you gave me?

14  A.   That is accurate.  And I understand you're reading the

15  record back.  My recollection of the deposition and that

16  exchange was also in relation to certain questions that I

17  believe at the time related to the Arnold declaration. And the

18  analysis that's outlined in the Arnold declaration is

19  different than mine as it relates to a timing perspective,

20  because I do believe that Arnold looked at it on a

21  month-over-month basis.  And that was my frame of reference, I

22  recall, in answering that question.

23  Q.   So you believe one of the values of the hypothetical

24  equity cushions that you've offered the Court in your two

25  written submissions, one of the 20 written values actually

1   represents the actual equity cushion as of a particular date?

2   A.   The equity cushion -- the analysis that I've presented is

3   under two different assumptions, as I think I've mentioned

4   previously.  That is, in the event that payments were to

5   commence today, that is what the hypothetical equity cushion

6   would be, and the range of values.   I've also included in my

7   declaration if those payments were to be deferred for 24

8   months.

9           What I did not do in my declaration is I did not

10  offer a specific date or month as to when that equity cushion

11  would potentially be depleted or go negative under one of the

12  scenarios -- I mean, any of the scenarios that I represent.

13  Q.   It wasn't just the date you were specific about.  You

14  haven't committed to which growth rate is correct, have you?

15  A.   I have applied a range of discount rates, and I've also

16  applied a range of growth rates.

17          Much like the discount rate, I believe that applying

18  a range of growth rates is reasonable and appropriate, given

19  the level of uncertainty as it relates to the current

20  situation.  I also believe that that is something that is also

21  customary in any form of a value analysis.

22  Q.   Okay.  So there's over 20 different choices, correct?

23  Twenty different options, depending on the ranges of variables

24  you've offered?

25  A.   In my initial declaration, there were three values that

```
 1    were presented.  In the supplemental declaration, I believe

 2    the number would be even, because I maintain the three

 3    discount rates.  But then I also extended that analysis to

 4    incorporate three different growth rates, all of which were

 5    benefited from the additional discovery materials that were

 6    provided.

 7            And I apologize, I did that analysis based on, again,

 8    whether it was under a current pay situation or whether it was

 9    a 24-month deferral.  So that gives you an indication as to

10    the additional values that were presented.

11    Q.    And that is a range that you believe is appropriate based

12    on your judgment?

13    A.    I do.

14    Q.    And there's no one of those options that you believe is

15    the, quote, unquote, right option, is there?  You think the

16    range is appropriate?

17    A.    I think the range as presented provides a reasonable

18    range of potential outcomes.  Based on my analysis, I tend to

19    believe that the 12 percent of discount rate, given the

20    current state of affairs and the risk that's involved, is

21    maybe more appropriate than the ten percent.

22            I guess I would note that it differs from the Arnold

23    testimony that indicated a range of between ten and 15

24    percent.  And I also think that in terms of the growth rate

25    scenarios, I would be inclined to believe that the negative .3
```

1    percent might be more predictive.  And I state that based upon

2    my review of the actual monthly toll revenue reports which

3    were provided in discovery, which showed a .9 percent decrease

4    on a year-over-year basis, the most recent monthly activity.

5    But having said that, it's correct to state that my analysis

6    provides a range of potential values.

7    Q.   Mr. Stanford, does your analysis take into account what

8    might happen if HTA were not able to use the toll revenues for

9    various system expenses?

10   A.   No, that's not an analysis that I completed.

11   Q.   And you didn't analyze how HTA's use of toll revenues

12   would effect future use of toll receipts, did you?

13   A.   No.

14   Q.   Did you consider how the various assumptions in your

15   model would have to change if the toll roads were in a state

16   of disrepair?

17   A.   No, it's not something I evaluated.

18   Q.   And you didn't do any analysis as to how your model would

19   need to change if HTA would lose federal funding, for example?

20   A.   No.

21   Q.   Mr. Stanford, do you know whether there was ever a time

22   prior to the Moratorium Act that any amounts required to be

23   deposited with the fiscal agent were not, in fact, deposited?

24   A.   Not that I'm aware.

25   Q.   Do you know whether a payment was ever missed on the 1968

1   bonds prior to July 1st, 2017?

2   A.   Not that I am aware.

3   Q.   Mr. Stanford, in your supplemental declaration, you used

4   a different range of growth rates than you used in your

5   original affidavit; is that correct?

6   A.   That's correct.

7   Q.   And rather than independently analyzing the growth rates

8   yourself, you adopted the values out of Mr. Racciatti's

9   declaration; is that correct?

10  A.   That's correct.  I used Mr. Racciatti's analysis in my

11  supplemental affidavit.

12  Q.   And you didn't independently analyze any of the inputs

13  that he used in deriving any of those growth rates, did you?

14  A.   No, I did not.  However, I think it was clear based on my

15  review of certain discovery materials that the initial growth

16  rate that I utilized in my prior declaration was potentially

17  overly aggressive.

18          And I was in the process of evaluating a revised

19  growth rate, and then I had the benefit of receiving

20  Mr. Racciatti's analyses or declaration.  And it was

21  consistent with my view that the growth rate needed to be

22  adjusted.

23  Q.   Did you do any analysis to determine which of the three

24  employment rate scenarios Mr. Racciatti offered is more

25  likely, any of your own analysis on that point?

| | |
|---|---|
| 1 | A.   I did not. |
| 2 | Q.   Do you know whether he did? |
| 3 | A.   I can't speak for what Mr. Racciatti -- you know, what |
| 4 | --his analysis, what he may have contemplated. |
| 5 | Q.   And along the same lines, you don't know whether he |
| 6 | analyzed whether the condition of the transportation system |
| 7 | would affect toll receipts, do you? |
| 8 | A.   I do not. |
| 9 | Q.   And you don't know whether he analyzed the effect of the |
| 10 | transportation system's condition on the employment rate |
| 11 | either? |
| 12 | A.   I do not. |
| 13 | Q.   Mr. Stanford, you've mentioned reviewing Dr. Arnold's |
| 14 | declaration; is that correct? |
| 15 | A.   That is correct. |
| 16 | Q.   Your supplemental declaration doesn't offer any opinion |
| 17 | regarding the methodology that Dr. Arnold used in calculating |
| 18 | the figures that were in Exhibits 4-A and 4-B to his |
| 19 | declaration, did it? |
| 20 | A.   No, I believe it does not. |
| 21 | Q.   And along the same lines, you don't have any objection to |
| 22 | the methodology that Dr. Arnold used in Exhibit Five to his |
| 23 | declaration, do you? |
| 24 | A.   I think the math as utilized by Dr. Arnold was |
| 25 | sufficient, was correct. |

1  Q.   And you don't have any opinion regarding Dr. Arnold's

2  analysis of various factors related to the appropriateness of

3  a bond in this case, do you?

4  A.   I'm sorry.  Could you clarify your question.

5  Q.   Sure.  Dr. Arnold's declaration includes a discussion

6  about a bond in the event that a preliminary injunction is

7  granted.

8       Do you have any opinion one way or another about that

9  analysis in Dr. Arnold's Affidavit?

10 A.   That's not something that I evaluated.

11 Q.   Mr. Stanford, you haven't offered an opinion about the

12 harm that would result to the HTA if it's denied toll

13 revenues, have you?

14 A.   That's not something I evaluated.

15 Q.   And you don't have an opinion about the harm that the

16 injunction requested here would cause the Commonwealth, do

17 you?

18 A.   Again, that's not something I evaluated.

19 Q.   And you have no opinion as to whether HTA will be able to

20 properly maintain the roads if an injunction is granted, do

21 you?

22 A.   Again, that's not something I reviewed.

23       MS. MCKEEN:   Thank you.  I don't have any further

24 questions at this time.

25       THE COURT:   Thank you.

1          Is there any redirect?

2          MR. STEINBERG:  No questions, Your Honor.

3          THE COURT:  Thank you.

4          THE WITNESS:  Thank you.

5          THE COURT:  You are excused.

6          (At 11:09 AM, the witness was excused.)

7          THE COURT:  That concludes plaintiff's direct case.

8    And so defendants may call their first witness for

9    cross-examination by plaintiff.

10         MR. FRIEDMAN:  Your Honor, may I be excused for a

11   minute to get the witness?  It's Dr. Gonzalez, who is not in

12   the courtroom.

13         Peter Friedman on behalf of AAFAF.

14         THE COURT:  Yes, Mr. Friedman, you may be excused to

15   get the next witness, Dr. Gonzalez.

16         MR. FRIEDMAN:  Thank you, Your Honor.

17         THE COURT:  Good morning, Dr. Gonzalez.  Would you

18   please come to the witness stand and remain standing there to

19   take the oath?

20         COURTROOM DEPUTY:  Raise your right hand.

21         Do you solemnly swear that the testimony you are

22   about to give in this case is the truth, the whole truth, and

23   nothing but the truth?

24         THE WITNESS:  I do.

25         COURTROOM DEPUTY:  So help you God.

```
 1              THE COURT:  Thank you.  Please be seated.

 2              MR. FRIEDMAN:  Your Honor, Peter Friedman on behalf

 3    of AAFAF.  I would move into evidence, subject to the

 4    objections, the declaration of Sergio Gonzalez, which is DTX

 5    069.

 6              I don't know if the Court -- I believe the Court has

 7    multiple copies.  I can bring a copy up if you like, but I

 8    believe it's in your binders.  Whatever works for you, Your

 9    Honor.

10              THE COURT:  Well, I suppose if there's a need to turn

11    to it -- actually, if you have an extra copy, it will be

12    easier than my fiddling with the binders.

13              MR. FRIEDMAN:  Yes, Your Honor.  It's clipped.  May I

14    approach?

15              THE COURT:  Yes.  And Defense Exhibit DTX 69 is

16    admitted subject to objection.  It is now Defense Exhibit SSS.

17              (At 11:12 AM, Defense Exhibit SSS admitted into

18    evidence subject to objection.)

19              THE COURT:  Do you agree?

20              COURTROOM DEPUTY:  I'm sorry.  A list was resubmitted

21    to you.

22              MR. FRIEDMAN:  Okay.  SSS.

23              COURTROOM DEPUTY:  SSS.

24              MR. FRIEDMAN:  Yes, Your Honor.

25              THE COURT:  So plaintiff's have numbers.  Defendants
```

1  have letters.

2          COURTROOM DEPUTY:  Okay.

3          THE COURT:  So it is on the list, SSS.

4          MR. FRIEDMAN:  Thank you, Your Honor.

5          THE COURT:  Thank you.

6          MR. DOLUISIO:  Good morning, Your Honor.  Michael

7  Doluisio from Dechert on behalf of Peaje.  I actually have a

8  binder of documents that I thought would be helpful to hand up

9  at the beginning of the cross-examination, if you like.

10          THE COURT:  Very well.

11          Before you step away, do you have a quick list of

12  exhibit numbers that are in there or should we just deal with

13  the tenders exhibit by exhibit?

14          MR. DOLUISIO:  I think exhibit by exhibit, Your

15  Honor.

16          THE COURT:  You think exhibit by exhibit.  Okay.

17  Thank you.

18          MR. FRIEDMAN:  Your Honor, I apologize.

19          THE COURT:  Okay.  You have to come to the podium.

20          MR. FRIEDMAN:  Your Honor, Peter Friedman.

21          I apologize for breaching protocol, but would it be

22  possible for someone to get the witness a glass of water from

23  the pitcher you have?

24          THE COURT:  Yes.

25          MR. FRIEDMAN:  I apologize, but apparently the

1    witness would like some water.

2           MR. BRILLIANT:  Your Honor, we have an extra bottle

3    of water for the witness, if that would be helpful.

4           MR. FRIEDMAN:  Is it sealed?

5           THE COURT:  That would be helpful.

6           You just don't trust my water.  That's okay.

7           MR. DOLUISIO:  Thank you, Your Honor.

8           THE COURT:  Thank you.

9                S E R G I O   L.   G O N Z A L E Z,

10       called as a witness by the defense, having been sworn,

11       testified as follows:

12                        CROSS-EXAMINATION

13   BY MR. DOLUISIO:

14   Q.   Dr. Gonzalez, you provide consulting services through two

15   separate companies.  One is called FDDS Management, and the

16   other is called PMOS.  Is that correct?

17   A.   That is correct.

18   Q.   Over the last 15 years, your two companies combined have

19   received over 10 million dollars from municipalities within

20   Puerto Rico; is that correct?

21   A.   That's a rough estimate, yes.

22   Q.   And on top of that, they've received about a million and

23   a half dollars from the Puerto Rico Commonwealth government or

24   its entities; correct?

25   A.   In the last 15 years?

```
 1   Q.   Yes.

 2   A.   Yes.

 3   Q.   This year, your two companies have each signed new

 4   contracts with the HTA, correct?

 5   A.   That is correct.

 6   Q.   And the value of those contracts together is 600,000

 7   dollars?

 8   A.   That is correct.

 9   Q.   I'm going to be asking you some questions about your

10   declaration this morning, and I want to start with the issue

11   of integrated network.

12        In your declaration, you have not performed any kind

13   of origin and destination study to figure out which particular

14   roads within Puerto Rico must be maintained in order for the

15   toll roads to generate revenue, right?

16   A.   We have used VMT as a method of obtaining the same

17   results we would get from origin destination studies, and

18   that's the technically used method for what you're suggesting.

19   Q.   And your opinion on the subject, though, is that the

20   entire road network in the Commonwealth must be maintained

21   because it's one integrated network, right?

22   A.   It is one integrated network.  And 76 percent of the

23   vehicle miles traveled are made on the non-toll system.

24   Q.   Okay.  And when you use the word integrate, your view of

25   that word is there are different components within a network,
```

1   and if you're taking a trip using one component like a

2   sidewalk, to another component like a train station, then any

3   component along the way is part of an integrated network?

4   A.    There are integrations of different natures.  That would

5   be transportation integration, but there is also integration

6   from the point of view of costs and revenues.

7          The highway network of HTA is integrated both in a

8   transportation sense and also in a fiscal sense.

9   Q.    Okay.  So let's talk about that.  Let's talk about that.

10  Sidewalks, in your view, are part of your integrated

11  transportation network, right?

12  A.    From a transportation point of view, yes.  From the point

13  of view of revenues and cost on highways in particular, on HTA

14  in particular, no.

15  Q.    Municipal roads, they're part of your integrated

16  transportation network, but they're not integrated from a

17  fiscal standpoint?

18  A.    Same answer as sidewalks in this case.

19  Q.    Because HTA has nothing to do with the sidewalks or the

20  municipal roads, correct?

21  A.    Neither in costs nor in revenues.

22  Q.    Now, you do include the non-toll primary, secondary and

23  tertiary roads within your integrated network, right?

24  A.    Yes, because they are part of HTA's responsibilities.

25  Furthermore, furthermore, about more than a billion -- if, in

```
 1   fact, the highest amount of debt of HTA consists of capital
 2   projects related to those networks.
 3   Q.   And when you're talking about those networks, those
 4   non-toll road networks, the non-toll roads are not owned by
 5   the HTA, right?
 6   A.   That is correct, but they do have the responsibility of
 7   constructing them, preserving them, and that's a part of HTA's
 8   responsibilities.
 9   Q.   Now, the Department of Transportation, they own the
10   non-toll roads, right?
11   A.   Ownership, I think, is state rather than the Department
12   of Transportation.
13   Q.   The Public Works directorate of the Department of
14   Transportation, that's the entity that's responsible for
15   maintaining the toll roads, right?
16   A.   Yes.
17   Q.   And although the Department of Transportation's public
18   works department is responsible for maintaining the roads,
19   some of the toll revenues that are collected by HTA, some of
20   those toll roads have been used for maintenance of the
21   non-toll roads, right?
22   A.   Limited amounts.
23   Q.   Now, as you used the word "integrated" to refer to an
24   integrated transportation system in your declaration, an
25   integrated system can be governed and operated by different
```

 1   governmental entities, right?

 2   A.   From a transportation perspective, yes.  If you talk

 3   about full integration, including the fiscal side, no.

 4   Q.   So airports are part of your transportation integrated

 5   network, right?

 6   A.   Airports are part of the national transportation system,

 7   which is a concept promoted by the federal government, and

 8   that's from a transportation point of view.

 9   Q.   And they're not under the same fiscal system?

10   A.   Yeah, because they fiscally are not integrated.

11   Q.   So an integrated transportation system can have different

12   parts that are funded from different sources of funding,

13   right?

14   A.   Not in the case of HTA.  The HTA integrated system is

15   integrated fiscally.  It's integrated from a transportation

16   perspective.

17   Q.   Well, different bonds were used to build the trains than

18   were used to build the highways, right?

19   A.   Within the same authority.

20   Q.   And different components of an integrated transportation

21   system, they can generate different revenues, too, right?

22        When you have an integrated revenue and cost stream,

23   as is the case of the Authority, the revenue streams are used

24   regardless of the components, because they are cross-subsidies

25   between the different components of the network.  And that is

1   the way the Authority was created.

2   Q.   That wasn't my question.  My question was, isn't it right

3   different components of an integrated system can have

4   different parts that generate revenues?  Toll roads generate

5   toll revenues, trains generate train fares, right?

6   A.   That is a fact.

7   Q.   Now, under your view of an integrated transportation

8   system, if there's a highway located in New Jersey, and that

9   highway leads to Pennsylvania, which leads to an airport in

10   Philadelphia, and that airport in Philadelphia flies planes to

11   Chicago's O'Hare Airport, you told me in your deposition that

12   under your definition of an integrated transportation system,

13   the highway in New Jersey, the highway in Pennsylvania, the

14   airport in Philadelphia, and airport in Chicago, they're all

15   part of one integrated transportation system?

16   A.   First of all, it's not my view.  It is a view of the

17   federal government.  There is a concept of a national

18   transportation system.  That exists.  Second, I think I was

19   clear in my statement that indicated that from that point of

20   view, what you're saying is correct.  But from the point of

21   view of an integrated agency responsible for different

22   components of a transportation system, and both from the

23   transportation perspective and from the fiscal perspective,

24   that is not correct.

25   Q.   Okay.  You were involved in the creation of the HTA

 1 | certified fiscal plan, right?

 2 | A.   I assisted the Authority.

 3 |        THE COURT:  I'm sorry.  We've apparently lost sound

 4 | on the other end, so we need to stop.  And we'll put that

 5 | question again when we get it back.

 6 |        MR. DOLUISIO:  Thank you.

 7 |        THE COURT:  While we're waiting for this to be

 8 | repaired, it's 11:25, let's just take a five-minute period in

 9 | which anyone who needs to leave the room can leave the room

10 | and come right back to the place they're in.

11 |        COURTROOM DEPUTY:  All rise.

12 |        (At 11:23 AM, recess was taken.)

13 |        (At 11:38 AM, proceedings reconvened.)

14 |        THE COURT:  Please be seated.

15 |        Mr. Doluisio.

16 |        MR. DOLUISIO:  Thank you, Your Honor.

17 | BY MR. DOLUISIO:

18 | Q.   Dr. Gonzalez, you were part of a team that created the

19 | fiscal plan; is that right?

20 | A.   Correct.

21 | Q.   And that fiscal plan assumes that toll revenues will

22 | continue to be applied to operating expenses throughout the

23 | entire HTA system, right?

24 | A.   That's a correct statement.

25 | Q.   Under the most recent iteration of the fiscal plan,

1  bondholders are not going to get paid anything for the next

2  ten years; is that correct?

3  A.   That's an assumption in the fiscal plan.

4  Q.   So that's an assumption you were told to include in the

5  fiscal plan?

6  A.   No.

7  Q.   But it was an assumption that was included in the fiscal

8  plan?

9  A.   It resulted from the numbers that were developed for the

10  fiscal plan.

11  Q.   Now, in working on the plan and your declaration, you

12  personally haven't analyzed whether it would be more difficult

13  for HTA to raise money in the future if the bondholders here

14  don't get paid?  You haven't analyzed that, have you?

15  A.   That element was not part of the analysis done for the

16  fiscal plan.

17  Q.   So the answer to my question is no, you haven't done it,

18  right?

19  A.   That's correct.

20  Q.   All right.  I want to talk to you about Tren Urbano.

21  Tren Urbano is the urban train here in Puerto Rico, right?

22  A.   It's a heavy rail system which has an underground

23  component, a grade component and an above grade component.

24  Q.   The '68 bonds, they weren't used for the construction of

25  the Tren Urbano, were they?

1   A.   That's correct.

2   Q.   The '98 bonds, those bonds were the ones that were used

3   for the construction of Tren Urbano, correct?

4   A.   The '98 bonds were used for Tren Urbano and for highway

5   construction after '98.

6   Q.   Under the fiscal plan, the toll revenues that are the

7   covered toll revenues for the '68 bonds, those toll revenues

8   are being used to defray the expenses of the entire system,

9   including Tren Urbano, right?

10   A.   Like historically, except for federal funds which may

11   have limitations, HTA has considered all the revenues as being

12   available for all its purposes, because it's an integrated

13   agency, it's an integrated transportation system.

14   Q.   So if you could answer my question, toll revenues are

15   being used for Tren Urbano, right?

16   A.   Toll revenues are being used for all components of the

17   system.

18   Q.   Including Tren Urbano?

19   A.   Of course.  It's a component of the system.

20   Q.   And Tren Urbano, even after federal funding, is projected

21   to lose over 500 million dollars over the next ten years; is

22   that right?

23   A.   Well, that number is not necessarily a correct number

24   because -- but as any subway or train system in the nation,

25   Tren Urbano requires government subsidies.  That is true.

1   Q.   That wasn't my question.

2           You were part of a team that created the fiscal plan,

3   and the fiscal plan on page 49 shows that Tren Urbano is going

4   to lose 524 million dollars over the next ten years; isn't

5   that right?

6   A.   My recollection is -- well, first of all, it's hard to

7   pinpoint an exact number on how much it's going to lose, but

8   it's in the hundreds of millions.  It's in the hundreds of

9   millions.

10          The best recollection I have is that it may be -- it

11  will require a government subsidy in the order of 300 million

12  dollars.

13  Q.   I'm not asking about the amount of the government

14  subsidy.  I'm asking about how much money it's going to lose

15  even after federal funding.  And I asked you about this at

16  your deposition.  Do you remember?

17  A.   It's a government subsidy.  If you want to state that the

18  need for public subsidies in public transportation are a loss,

19  that would be your terms.  I would think the correct term to

20  use in public transportation systems is that they require

21  government subsidies.

22  Q.   So on page 183 of your deposition, I ask the following,

23  this reflects Puerto Rico -- sorry.  Page 194.

24          Does this chart on page 49 show that even taking into

25  account money from FTA, the mass transit operation system is

1    still losing over half a billion dollars?

2              That's what the chart reflects.

3              Question, you wanted it to be accurate when you gave

4    it to the Oversight Board, right?

5              Answer, the number reflected there is 524 million

6    dollar financial gap.

7              That's what you said.

8    A.    If that's what the number -- it says the number.  Can you

9    tell me the page just to make sure?

10   Q.    Page 184 to 185 within tab two of the document in front

11   of you.

12   A.    Tab two?

13   Q.    Yes.

14   A.    85, which line?

15   Q.    184, beginning at line 24.

16   A.    That is correct.  The government subsidy is considered a

17   loss the way it's phrased there.  You're correct.

18   Q.    I would like to know -- when you say a government

19   subsidy, you also mean that there's a subsidy coming from the

20   bondholders from these toll revenues, right?

21   A.    It's really a subsidy from the Authority's revenues.

22   Q.    And those revenues include the toll revenues, right?

23   A.    Those revenues include all the revenues of the

24   Authority.

25   Q.    Including the toll revenues, right?

1   A.   The toll revenues are included in the revenues of the

2   Authority.

3   Q.   I want to talk about GDB.  You are aware that the GDB has

4   owed money to HTA in the past; is that right?

5   A.   That is correct.

6   Q.   Can you take a look within tab one of the binder in front

7   of you?  And there should be a Post-it note on a particular

8   page.  But first of all, just for the record, tab one is a

9   copy of your declaration, correct?

10  A.   That is correct.

11  Q.   Okay.  So if you can now look at the tabs page.

12          THE COURT:  And so are you offering this exhibit now

13  or just using it for reference?

14          MR. DOLUISIO:  I'm using it now, but it is marked as

15  an exhibit.  It's behind tab five, which is Plaintiff's

16  Exhibit 100, which we will be offering.

17          THE COURT:  Mr. Friedman.

18          MR. FRIEDMAN:  This is part of Mr. Gonzalez's

19  declaration.  I already moved it.

20          THE COURT:  So you did move it.  Thank you.

21  BY MR. DOLUISIO:

22  Q.   These are tabbed pages that were attached to your

23  declaration; is that correct?

24  A.   That's right.

25  Q.   And if you look at the tabbed pages, it's a two-page

1    chart.  And the chart says, impact of the so-called clawback

2    by Puerto Rico Treasury Department of the current revenues

3    kept on the ACT.  Do you see that?

4    A.    Yes.  It further says that this table is from fiscal year

5    2015 to 2016.  So you are correct, except that it relates to a

6    specific fiscal year.

7    Q.    Okay.  And if you look down the chart, there are five

8    different recurrent revenues there that are listed, excluding

9    toll revenues, gasoline, diesel, cigarettes and accrued tax;

10    is that right?

11    A.    That's correct.

12    Q.    And those are the monies that are part of the clawback

13    monies, correct?

14    A.    These monies are part of the clawback money.

15    Q.    Right below that, two lines down it says, Less amount of

16    revenues obtained by the Puerto Rico Treasury Department to

17    pay the outstanding debt of ACT with the GDB.  Do you see

18    that?

19    A.    That's item III.

20    Q.    III, correct?

21    A.    That's correct.

22    Q.    So what this shows is that in 2015 and 2016, there was a

23    calculation of the clawback monies.  And then this shows, if

24    you look all the way over to the right-hand column, 129

25    million dollars was paid as of the grand total -- following

```
 1    the month of June, 129 million dollars was paid to the GDB.
 2              That's what it says, right?
 3    A.    It says in the year 2015 -- '16, fiscal year '15, '16,
 4    that amount was paid to GDB.
 5    Q.    And the acronym ACT, that's an another acronym standing
 6    for the Highway Transportation Authority?
 7    A.    That's the Spanish acronym for HTA.
 8    Q.    And so this was for 2015 and '16.  You don't have any
 9    reason to believe that this payment of GDB using clawback
10    money hasn't continued, do you?
11    A.    I have reason to believe, because the fiscal plan and the
12    budget of the Authority does not have this in projections, and
13    there's nothing here to indicate that these are projections.
14    This refers to payments that were made in '15, '16.
15    Q.    If these payments were being made by the Commonwealth
16    Treasury Department, that would be on the Commonwealth
17    Treasury plan, wouldn't it?
18    A.    I would assume so.
19    Q.    You've never looked at the Commonwealth fiscal plan, have
20    you?
21    A.    I have not looked at the Commonwealth fiscal plan.
22    Q.    Now, the HTA is partially funded by federal funds?
23    A.    That is correct.
24    Q.    And over the past few years, the HTA was unable to spend
25    about 400 million dollars worth of federal funds that have
```

1    been allocated to the HTA?

2    A.    There were delays in spending these monies.  However, in

3    the last few months, there has been significant progress in

4    using those monies.

5    Q.    And you explained these delays in paragraph 41 of your

6    declaration, which is behind tab one?

7    A.    21 of the declaration?

8    Q.    Paragraph 41, on page 16.

9    A.    Oh, paragraph 41.

10   Q.    Second sentence says, specifically, more than 400 million

11   dollars in available funding has not been deployed due to

12   delayed processes for project advancement, project completion,

13   provider payments, lack of consistent policies, cost overruns

14   and other operational and organizational challenges have lead

15   to difficulties in spending these obligated federal funds.

16          That's accurate, isn't it?

17   A.    That is accurate, and that's why the highway projects in

18   Puerto Rico that needed to be developed in the past few years

19   have not been completed and are being scheduled to be

20   performed now.

21   Q.    Now, the 400 million dollars in federal funding that

22   wasn't deployed on time, that's more than two years worth of

23   toll revenues, isn't it?

24   A.    Yeah, but --

25   Q.    Isn't it?  It's more than two years worth of toll

1   revenues?

2   A.    It is.

3   Q.    Okay.  Now, in the past few years, during this time, when

4   Puerto Rico has been unable to timely spend this 400 million

5   dollars, you're not aware of anyone from the federal

6   government ever coming in and saying they were considering

7   coming in and cutting off any future federal funds, are you?

8   A.    There have been warnings about this.

9   Q.    Well, I asked you about this at your deposition.  I asked

10  you if anyone from the federal government ever came in and

11  said they were considering cutting off federal funding.  And

12  you said you weren't aware of that.  Is that right?

13  A.    Probably my understanding at the time was federal costs

14  have been cut.  I may have misunderstood you then.

15  Q.    So you think when you testified in your deposition, you

16  didn't understand my question?

17  A.    That's what I think, but the fact is federal monies have

18  not been cut.

19  Q.    They have not been cut?

20  A.    They have not been cut.

21  Q.    And every single projection in the ACT fiscal plan

22  projects that they will continue, right?

23  A.    That is true.

24  Q.    Now, in issuing your declaration, you have assumed that

25  any money that will be subject to an injunction couldn't be

1   made up with any other money?

2   A.   What was that?  The question again, please.

3   Q.   Sure.  In issuing your declaration, you have assumed that

4   any money that could be subject to an injunction in this case,

5   that that money can't be made up with any other money from the

6   Commonwealth?

7   A.   That is true.

8   Q.   And as you told us previously, you haven't looked at the

9   Commonwealth fiscal plan?

10  A.   Well, as a citizen, I have a general understanding of the

11  dire situation of the Commonwealth.

12  Q.   You haven't looked at the Commonwealth fiscal plan,

13  right?

14  A.   You are correct.

15  Q.   And you haven't examined the Commonwealth budget for

16  2017, 2018, have you?

17  A.   Those are not part of my duties, no.

18  Q.   And you don't know if there are expenditures in that

19  Commonwealth fiscal plan that might be less important than

20  maintaining the road, do you?

21  A.   What was that again?  Less important?

22  Q.   Yes.

23  A.   Some might be more important, others less, yeah.

24  Q.   You don't know?

25  A.   I don't know.

1   Q.   Now, you understand that you are being offered here today

2   as a fact witness, right?

3   A.   Yes.

4   Q.   You are not an expert witness, right?

5   A.   That's my understanding, yes.

6   Q.   You're not being offered as an expert in economics,

7   right?

8   A.   That is true.

9   Q.   Let's take a look at paragraph 33 of your declaration,

10  and I want to begin with the sentence that begins on the

11  bottom of page 14.  Tell me when you're there.

12  A.   Paragraph 33, which line?

13  Q.   The line -- the last few words on page 14.  The sentence

14  reads -- and this is interesting because this is the exact

15  sentence that counsel for defendants read during the opening.

16  It says, but if the level of capital investment is restricted,

17  the attendant decline in road quality would result in

18  significant degradation of the highway's infrastructure with a

19  dramatic increase in the users' operating cost and a

20  significant reduction in highway safety.  These would lead to

21  declining economic activity, which would result in diminished

22  toll revenues.

23       I read that correctly, didn't I?

24  A.   You read it correctly.

25  Q.   Okay.  Now, you drafted those sentences with the

```
 1   assistance of your counsel, right?
 2   A.   This is my declaration.
 3   Q.   At your deposition, you told me that you drafted those
 4   sentences with the assistance of your counsel, didn't you?
 5   A.   Yes.
 6   Q.   And you also told me that these sentences reflect the
 7   opinion of HTA's technical team, right?
 8   A.   It reflects the opinion of HTA's technical team,
 9   including my work for many years in HTA.
10   Q.   You haven't seen any analysis which actually quantified
11   the amount of money if any that would need to be restricted
12   before these consequences would occur?
13   A.   I have done significant analysis for the fiscal plan.  So
14   it is not correct to say that I have not done analyses.  We
15   have reduced costs of the authority in the order of 600
16   million dollars in the ten-year period.  We have developed a
17   minimum fiscal plan to maintain the system at a minimum level.
18   And --
19   Q.   Dr. Gonzalez, I don't mean to be rude, but we have a time
20   limit, and I'd like to get an answer to my question.  So if
21   you could take a look at page 195 of your deposition, which is
22   tab two --
23   A.   Line 33 again?
24   Q.   No.
25   A.   No.
```

```
 1   Q.   Of your deposition, which is tab two in the binder.

 2   A.   Okay.  Which page?

 3   Q.   195.

 4   A.   195.

 5   Q.   Which has a page number on the bottom of 50.  It's page

 6   195 of the deposition transcript.  Are you there?

 7          Page 195, line three says, have you seen any analysis

 8   which actually quantifies the amount of money that would need

 9   to be restricted before these consequences occurred?

10           Answer, no.

11           That was truthful testimony, wasn't it?

12   A.   I was trying to explain the question.  The answer still

13   would be no.

14           MR. FRIEDMAN:  Your Honor, I believe the

15   deposition --

16           THE COURT:  You have to speak into the microphone.

17           MR. FRIEDMAN:  Peter Friedman, Your Honor.  I believe

18   under the rule of completeness, I ask it be authorized to read

19   certain language into the record from the deposition

20   transcript that provides a full answer to that question.

21           MR. DOLUISIO:  He can do it in his turn, Your

22   Honor.

23           MR. FRIEDMAN:  Your Honor, the witness is being

24   impeached in an improper way because under the Federal Rules,

25   I believe I am entitled to read the full portion of the
```

1    transcript to make intended impeachment complete --

2              MR. DOLUISIO:  Your Honor, we're not offering --

3    we're trying to impeach his prior testimony --

4              MR. FRIEDMAN:  Your Honor.

5              THE COURT:  You may read the passage.

6              MR. FRIEDMAN:  On page 195 further down, have you

7    seen any analysis which actually quantifies the amount of the

8    capital investment that needed to be restricted, consequences

9    that he described to occur?

10             Answer, we have developed the minimum requirements

11   basically.

12             Question, and that's in the most current version of

13   the fiscal plan?

14             Answer, that's in the most current version of the

15   fiscal plan.

16             THE COURT:  Thank you.

17             You may continue, Mr. Doluisio.

18   BY MR. DOLUISIO:

19   Q.   You can't tell us the amount of money that would have to

20   be restricted in order for these consequences to occur, can

21   you?

22   A.   I think I have clearly stated that there is a very tight

23   budget and that an exact amount -- a tight budget, and that

24   every single cent in that budget within the time frame of the

25   ten years is required to maintain the road system at a minimum

1   level.

2   Q.   Okay.  So your testimony today is every single cent.  One

3   cent will lead to these consequences?

4   A.   In the nature of the business we're in, and in the

5   magnitudes of the numbers we're in, talking about one cent or

6   one dollar doesn't make any sense.

7   Q.   At your deposition, we went through this exact colloquy.

8   That's on page 194.  I asked you -- line 13, I asked you, how

9   much of the fund would have to not be available for this

10  consequence to occur?  Can you answer that question?  How

11  much?

12          And your answer was, I can't answer that question.

13          Was that truthful testimony?  That was truthful,

14  right?

15  A.   After significant explanation of the very similar nature

16  that I was giving you here, yes.

17  Q.   You don't know of a single time in Puerto Rico's history

18  when there was a degradation in road quality that caused a

19  decline in economic activity, that then caused a diminished

20  toll revenues, right?

21  A.   That is correct.

22  Q.   Now, you were the executive director of the HTA from 1993

23  to 2001, correct?

24  A.   January 2001, yes.

25  Q.   And the 1968 bonds were sold during your tenure as the

1    executive director?

2    A.    I understand they were sold, yes.

3    Q.    And you, during the time that you were the executive

4    director, you attended investor conferences?

5    A.    I did.

6    Q.    And you met with rating agencies?

7    A.    I did.

8    Q.    And when you were the executive director, you understood

9    that highway revenue bonds, that those bonds were payable from

10   the gross revenues of certain highway tolls, right?

11   A.    I understood that the revenue bonds were paid from the

12   revenue sources of the Authority, included the toll revenues.

13   Q.    And you understood that they were paid from the gross

14   revenues, right?

15   A.    That was -- that is correct.

16   Q.    And you base that understanding on the statutes governing

17   HTA, right?

18   A.    On what I read on the official statements and general

19   information I was provided by my staff.

20   Q.    And on the statutes -- and on the statutes, right?

21   A.    What I read in general at that time.  It's been a very

22   long time, so exact recollection of what I had read then, but

23   it was my understanding that that was the case.

24   Q.    Please take a look at page 284 of your deposition, which

25   again is behind tab two.

1  A.   What was the page number again?

2  Q.   284 of the transcript.  And I took your deposition before

3  this hearing was determined just to focus on statutory liens.

4  And at that time, page 284, I asked you, line 18, when you

5  were the executive director, did you understand that the

6  highway revenue bonds were payable from the gross revenue of

7  certain highway tolls?

8         Answer, under the financial conditions and the

9  statutes of the Authority at the time, yes.

10        That was your testimony, right?

11  A.   General information that I understood was asked in your

12  question, the answer was yes.  Yes.

13  Q.   And it's still yes, right?

14  A.   Yes, it is.  At that time, that is clearly stated there.

15  Q.   When you were the executive director?

16  A.   Yes.  Yes.  Yes.

17  Q.   Now, you understood that there was a lien on the toll

18  revenues at the time, too, didn't you?

19  A.   I am not sure if I understood the term "lien," to tell

20  you the truth.  Okay?

21  Q.   Okay.  Let's take a look at tab six in the binder.  It's

22  a document that we've marked for identification as Plaintiff's

23  Exhibit 103.

24        Are you at tab six, Dr. Gonzalez?

25  A.   Which -- I'm at tab six.

```
 1    Q.   Yes.  Okay.  And this is an official statement for an

 2    offering of certain Puerto Rico Highway Revenue Bonds.  Do you

 3    see that at the top?

 4    A.   It is.

 5    Q.   Okay.  And at the bottom left-hand corner, it's dated

 6    July 15, 1993, right?

 7    A.   Where would the exact date be?

 8    Q.   Lower left-hand corner of the page.

 9    A.   July 15, 1993, yes.

10    Q.   And that was during the time you were the executive

11    director, right?

12    A.   That is correct.

13    Q.   Take a look at page 41 of the document.

14         THE COURT:  Are you offering this?

15         MR. DOLUISIO:  We will be, yes.

16    BY MR. DOLUISIO:

17    Q.   Page 41, that's your signature there at the bottom of

18    page 41, isn't it?

19    A.   Well, it says, slash, slash signature.  Yes.  I probably

20    signed the document.  Yes.

21    Q.   It says, Sergio L. Gonzalez, executive director.  That's

22    you?

23    A.   Yes.  But the version I have is not signed, just to make

24    sure that --

25    Q.   It's an electronic signature?
```

```
 1   A.   It's an electronic signature.

 2            THE COURT:   And only one person speaks at a time.

 3   Thank you.

 4            MR. DOLUISIO:   Sorry, Your Honor.

 5   BY MR. DOLUISIO:

 6   Q.   If you could look about four paragraphs above your

 7   signature, the second paragraph under miscellaneous, it says

 8   that there are appended to this official statement certain

 9   information concerning the Commonwealth, Appendix One.  Do you

10   see that?

11   A.   Where exactly is it?

12   Q.   Second paragraph under miscellaneous, the very first

13   sentence.  There are appended to this official statement

14   certain information concerning the Commonwealth, Appendix One.

15   Do you see that?

16   A.   Yes.

17   Q.   And when you signed this document, you knew investors

18   would be relying on it, right?

19   A.   Yes.

20   Q.   And you wanted it to be accurate, right?

21   A.   The people that put together the documents had the

22   expertise to make sure that that was the case.

23   Q.   And you wanted it to be accurate, right?

24   A.   Of course.

25   Q.   If there was something in it that was false, you wouldn't
```

1    have signed it, right?

2    A.   Well, again, these documents are legal documents.  I am

3    not a lawyer, and I relied on the general group that developed

4    these documents.

5    Q.   When you signed it, you weren't aware of anything that

6    you thought was inaccurate?

7    A.   That is correct.

8    Q.   Okay.  So take a look at page -- within that first

9    exhibit -- within that first appendix.  I'm sorry.  Appendix

10   One, page 22.  So I-22.

11         THE COURT:  Mr. Doluisio, it's almost ten after

12   12:00.  So my intention is to break at 12:20 so that people

13   can go get lunch.

14         MR. DOLUISIO:  I should be done in two minutes.

15         THE COURT:  Then I'll break at 12:15.

16         MR. DOLUISIO:  Thank you, Your Honor.

17   BY MR. DOLUISIO:

18   Q.   Are you at page I-22?

19   A.   I am.

20   Q.   Okay.  And if you look, the second paragraph down says,

21   Highway and Transportation Authority.  Do you see that?

22   A.   That's on the third paragraph.

23   Q.   Okay.  And that was the authority that you were the

24   executive director of at the time, right?

25   A.   What was that again?

```
 1   Q.   You were the executive director of HTA at this time,

 2   right?

 3   A.   Yes.

 4   Q.   And the second sentence in that paragraph says, debt

 5   service on the Authority's revenue bonds constitute a first

 6   lien on its gross revenues, which consist of all the proceeds

 7   of the gasoline tax, one half of the proceeds of the tax on

 8   gas, oil, or diesel oil, highway toll revenues and the gross

 9   receipts of 15 dollars per vehicle per year from certain motor

10   vehicle license fees.

11         That was accurate at the time, right?

12   A.   At that time, I assume it was, yes.

13   Q.   It was always your understanding, prior to the Title III

14   case, that the principal and interest on the 1968 bonds would

15   be paid first with toll revenues before any other expenses of

16   HTA would be paid, right?

17   A.   Prior to Title III?

18         MR. FRIEDMAN:  Your Honor, I object to the extent

19   there's a request for any legal conclusion.  He can testify to

20   any layman's opinion he may have.  But I object to any request

21   to the extent it's asking for any kind of legal conclusions

22   from Dr. Gonzalez.

23         THE COURT:  Are you asking for his personal

24   understanding as of the time?

25         MR. DOLUISIO:  I'm asking for his personal
```

1  understanding as the executive director of HTA at the time.

2        THE COURT:  Then the objection is overruled with that

3  clarification.

4        MR. FRIEDMAN:  Thank you, Your Honor.

5  BY MR. DOLUISIO:

6  Q.  I'm not sure if you -- I think you answered that

7  question.  I apologize if I'm repeating myself.  But it was

8  your understanding at the time when you were the executive

9  director that the principal and interest on the 1968 bonds had

10  to be paid first with the toll revenues before any other

11  expenses of the HTA could be paid with the toll revenues,

12  right?

13  A.  The answer was yes, at that time, yeah.

14  Q.  And you don't personally have an understanding as to

15  whether Title III has changed that in any way right?

16        MR. FRIEDMAN:  Just please don't answer any questions

17  based on any discussions you had with legal counsel.

18  BY MR. DOLUISIO:

19  Q.  I'm correct, right?

20  A.  I don't have a personal understanding.

21  Q.  You don't have a personal understanding as to whether

22  Title III changed that or not; is that correct?

23  A.  I don't have a personal understanding, yes.

24        MR. DOLUISIO:  So at this point, Your Honor, I would

25  like to offer this exhibit, which is marked as Exhibit 103,

1   Plaintiff'S Exhibit 103, which is tab six in the binder.

2           MR. FRIEDMAN:  Yes, Your Honor.  I believe this --

3           THE COURT:  I'm sorry.  First, the reporter asked,

4   tab six in the binder?

5           MR. DOLUISIO:  Yes, tab six in the binder.

6           THE COURT:  Mr. Friedman.

7           MR. FRIEDMAN:  Your Honor, I believe this was added

8   to the exhibit list last night.  I believe this was added last

9   night.  So just subject to any -- to the extent we have an

10  additional objection, to be able to submit it consistent with

11  the other.

12          MR. DOLUISIO:  Yes.  I'm not sure it's on the exhibit

13  list.  We marked this for purpose of cross and move it into

14  evidence.

15          THE COURT:  And we're calling it Plaintiff's Exhibit

16  103?

17          MR. FRIEDMAN:  Yes, Your Honor.

18          THE COURT:  All right.  Admitted subject to

19  examination.

20          (At 12:09 PM, Plaintiff's Exhibit 103 admitted into

21  evidence subject to examination.)

22          THE COURT:  So is your cross-examination concluded?

23          MR. DOLUISIO:  It is.

24          THE COURT:  Will there be redirect?

25          MR. FRIEDMAN:  Your Honor, I have maybe three minutes

```
 1    of redirect, I hope.
 2             THE COURT:  All right.  Well, then let's try to
 3    complete the witness.
 4                       REDIRECT EXAMINATION
 5    BY MR. FRIEDMAN:
 6    Q.   Dr. Gonzalez, there was some discussion in connection
 7    with integrated transportation networks.  Does the HTA fiscal
 8    plan spend any money on O'Hare Airport?
 9    A.   Well, not even in the Luis Marin Airport, so much less in
10    the O'Hare Airport.
11    Q.   Does it spend any money on sidewalks that you are aware
12    of?
13    A.   No.
14    Q.   What does it spend money on?
15    A.   It spends money on construction, reconstruction and
16    preservation of roads and operation of the toll system and
17    transit system in Puerto Rico.
18    Q.   Can you just briefly describe what maintenance -- the
19    difference between maintenance preservation and reconstruction
20    is?
21    A.   Well, with the lay audience, with examples I think it's
22    better.  Filling potholes is a maintenance function.  If a car
23    hits a guardrail, which is used to protect for safety
24    purposes, replacing that is maintenance.  Replacing a light
25    bulb in a toll road is maintenance.
```

1          Preservation is a part of -- a simple part of

2    reconstruction.  In the case, particular case of pavement

3    structures, it would be replacing the surface, because the

4    wear and tear of the surface, which is a continuous process,

5    requires replacement every now and then.  For example, in the

6    case of asphalt pavement, we remove two inches and replace two

7    inches.

8          And in reconstruction, of course you can have similar

9    examples for safety, like upgrading the whole safety

10   components of a road because they have -- they are out of

11   code, like replacing a guardrail, which now meet the standards

12   for a whole road, would be reconstruction.

13         And reconstruction in the pavement sense would be

14   replacing the whole pavement structure, not only the surface,

15   because the degradation is of a nature that unless you do the

16   full replacement, you would have safety issues and cost,

17   operating cost of users, et cetera.

18   Q.   Are you aware of any agency other than HTA that does

19   preservation and maintenance on the roads under HTA's

20   authority?

21   A.   No.

22   Q.   What about maintenance?

23   A.   Maintenance on the non-toll network is performed by the

24   Public Works directorate.

25   Q.   Do you believe that -- do you believe that Puerto Rico's

```
 1   road system can be kept in appropriate condition based on

 2   maintenance expenditures alone?

 3   A.    Not only in the case of Puerto Rico, nowhere in the world

 4   you could maintain a road system with maintenance alone.

 5   Q.    There were questions about Tren Urbano.  Did you have any

 6   involvement in Tren Urbano?

 7   A.    Yes.

 8   Q.    And what was that?

 9   A.    I was executive director at the time.

10   Q.    Do you recall whether it was anticipated whether or not

11   Tren Urbano would be profitable when it was built?

12   A.    Of course not.  There's no train system in the nation

13   that is profitable.  This is basically a public service that

14   has significant environmental benefits in areas which are

15   heavily congested.

16          There are significant problems with the road system,

17   and public transit serves those needs, in addition to it's

18   important component for transit dependent people which don't

19   have cars and don't have an alternative means of

20   transportation.  Tren Urbano is very important for economic

21   development.

22   Q.    Do you have an understanding of the demographics of the

23   people who use Tren Urbano?

24   A.    Of course.

25   Q.    Can you tell us what it is?
```

1   A.   You're talking about a significant percentage of transit

2   dependents.

3   Q.   What does that mean?

4   A.   People that don't have cars, who don't have other means

5   of transportation available.  You would have a significant

6   number of students there.  And the income level of Tren Urbano

7   is significantly lower than the average income level of road

8   users.

9   Q.   And how many people a day use Tren Urbano?

10   A.   30,000 people a day.

11   Q.   And is there any other train system in San Juan that they

12   would be able to use if Tren Urbano was shut down?

13   A.   No.

14         MR. FRIEDMAN:  Nothing further, Your Honor.

15         THE COURT:  Thank you.

16         MR. DOLUISIO:  One or two questions, Your Honor.

17         THE COURT:  We -- have you agreed that there will be

18   recross?  We had only discussed cross and redirect.

19         MR. FRIEDMAN:  We did not.

20         MR. DOLUISIO:  That's fine, Your Honor.  Thank you.

21         THE COURT:  Thank you.  I just don't want to change

22   rules on people.

23         All right.  Then thank you, Dr. Gonzalez.

24         THE WITNESS:  Thank you.

25         THE COURT:  Your testimony is concluded.

1        (At 12:14 PM, the witness was excused.)

2        THE COURT:  We will now break for lunch and resume at

3    1:15.  Thank you.

4        (At 12:14 PM, recess taken.)

5        (At 1:18 PM, proceedings reconvened.)

6        THE COURT:  The defense may proceed to call the next

7    witness.

8        MR. MUNGOVAN:  Good afternoon, Your Honor.  Timothy

9    Mungovan for the Oversight Board as representative of the HTA

10   and the Commonwealth.

11       The defendants would like to offer into evidence

12   Exhibit One in the defendant's exhibit list, which is the --

13   an excerpt from the deposition of Mr. Schwartz, which was

14   filed as an exhibit to the declaration of Brad Bobroff, as

15   part of the opposition to the motion for preliminary

16   injunction.

17       I just want to make sure that that's admitted into

18   evidence, subject to any objection, of course.

19       THE COURT:  So let me just ask the deputy, have we

20   redenominated that defense Exhibit A?

21       COURTROOM DEPUTY:  I'm sorry, Your Honor.

22       Do you have your code?  Because we have no Exhibit

23   One.

24       THE COURT:  Yes.  It's actually -- on the list that

25   we have, Defense Exhibit One is the HTA Enabling Act.

```
 1              COURTROOM DEPUTY:  It's basically a letter.  A, B,
 2   C.
 3              MR. MUNGOVAN:  Your Honor, it was filed as part of
 4   the opposition to the Motion for Preliminary Injunction, and
 5   it was filed on July 14, 2017.  And we want to make sure that
 6   it's part of the evidentiary record of this proceeding.
 7              THE COURT:  So this does not correlate to the list
 8   that they received before that has -- well, I don't know if
 9   you've seen this.  We had a list of DTX 001 through whatever.
10              MR. MUNGOVAN:  It does not correlate to that list,
11   Your Honor.  I apologize.
12              THE COURT:  Okay.  And so we've already gotten up to
13   five C's already on that list.  So let's, for consistency, I
14   guess, make it five D's.
15              MR. MUNGOVAN:  5-D.  Thank you, Your Honor.
16              THE COURT:  No.  DDDDD.  Five D's.
17              MR. MUNGOVAN:  D to the power of five.
18              THE COURT:  Yes.
19              MR. MUNGOVAN:  Thank you, Your Honor.
20              THE COURT:  D to the power of five.
21              MR. JOSSEN:  Your Honor, Robert Jossen for --
22              THE COURT:  I'm sorry.  We're having audio problems
23   again.  So patience, please.
24              Are we still waiting for the system to be
25   reestablished?
```

```
 1                  COURTROOM DEPUTY:  (Nodding head up and down.)

 2                  THE COURT:  So you might as well rest wherever you'd

 3      like to rest until we get this straightened out.

 4                  MR. JOSSEN:  Okay.

 5                  THE COURT:  Testing.

 6                  It seems like we're back in action, Mr. Jossen.

 7                  MR. JOSSEN:  Thank you, Your Honor.  Yes, Robert

 8      Jossen for Peaje.  We object to Exhibit DDDDD and to the

 9      offer -- first of all, Mr. Schwartz was here, could have been

10      cross-examined, has left for personal reasons, so he's no

11      longer here.  And had he been examined about that, we would

12      have had an opportunity to ask for redirect examination to

13      cover anything that's in there.

14                  I don't even know what the specific references are,

15      because the deposition is not broken out as a specific

16      exhibit.  It may be an attachment someplace.  So I would

17      object.

18                  And I would also add at a minimum, if the Court is

19      otherwise inclined to receive this exhibit, which I believe

20      Your Honor respectfully should not, I would ask that we have

21      an opportunity to counter-designate in that deposition

22      anything that we believe is either responsive to it or in

23      interest of completeness, if Your Honor so rules.

24                  THE COURT:  Thank you.

25                  Mr. Mungovan.
```

1          MR. MUNGOVAN:  Yes, Your Honor.  Timothy Mungovan for

2     the Oversight Board.

3          First of all, just to be clear, this is an Affidavit

4     of Mr. Bobroff that contains excerpts from the deposition of

5     Mr. Schwartz that was filed by the Court on July 14th, and

6     that Peaje had on July 14, and that Peaje addressed in their

7     Reply.

8          And if Peaje had wanted to submit a rebuttal

9     affidavit for Mr. Schwartz, they could have attempted to do so

10    in connection with this proceeding this morning.  They chose

11    not to.  The affidavit we believe is already part of the

12    record in the case, Your Honor.  We only offered it to avoid

13    any confusion or disagreement as to whether it is part of the

14    evidentiary record.

15         Thank you.

16         THE COURT:  Thank you.

17         MR. JOSSEN:  Your Honor, Robert Jossen.  I stand on

18    the objection.  I don't believe that addresses the concerns

19    I've expressed.

20         THE COURT:  Just to be clear, to confirm with

21    Mr. Mungovan, this excerpt was filed as part of the

22    submissions in the briefing of this motion?

23         MR. MUNGOVAN:  Yes, Your Honor.

24         THE COURT:  And so the submissions in connection with

25    the briefing on the motion are part of the record in the

1    motion practice.  And obviously not everything that was

2    articulated in those submissions was ever anticipated to be

3    covered today in this hearing.  Therefore, the objection is

4    overruled.

5            MR. MUNGOVAN:  Thank you, Your Honor.

6            (At 1:26 PM, Exhibit DDDDD admitted into evidence

7    subject to objections.)

8            THE COURT:  And so the next defense witness.

9            MR. RAPPAPORT:  Yes, Your Honor.  Lary Rappaport on

10   behalf of Proskauer, on behalf of the Financial Oversight

11   Management Board as a representative of HTA.

12           Our next witness is Tyler Duvall.  Mr. Duvall's

13   declaration also was filed on July 14.  It's been reassigned

14   Exhibit M, as in Mary, I believe.  And I have an additional

15   copy that we have a tab on it that says M, if I may approach

16   the Clerk.

17           THE COURT:  I'd be grateful.  Thank you.

18           Mr. Duvall, would you please come to the witness

19   stand and remain standing?  Thank you.

20           COURTROOM DEPUTY:  Raise your right hand.

21           Do you solemnly swear that the testimony you are

22   about to give in this case is the truth, the whole truth, and

23   nothing but the truth?

24           THE WITNESS:  I do.

25           COURTROOM DEPUTY:  So help you God.

1              MR. STEINBERG:  Stuart Steinberg on behalf of Peaje.

2   I've handed up to you, Your Honor, a binder that we'll be

3   using for purposes of the cross-examination of Mr. Duvall.

4   The defense counsel have a copy as well.

5              THE COURT:  Thank you.

6                    T Y L E R   D U V A L L,

7        called as a witness by the defense, having been sworn,

8        testified as follows:

9                         CROSS-EXAMINATION

10  BY MR. STEINBERG:

11  Q.   Mr. Duvall, you are a partner as McKinsey, correct?

12  A.   Yes.

13  Q.   And McKinsey is a strategic consultant for the Oversight

14  Board?

15  A.   Correct.

16  Q.   McKinsey has served in that capacity for the Oversight

17  Board since November of 2016; am I right?

18  A.   Yes.  Yes.

19             THE COURT:  Mr. Duvall, I'll need you to speak a

20  little bit louder.  Thank you.

21             THE WITNESS:  Yes.

22  BY MR. STEINBERG:

23  Q.   And McKinsey even helped to launch the Oversight Board's

24  operations, correct?

25  A.   Correct.

1    Q.   And it's an advisor to the Oversight Board?

2    A.   Yes.

3    Q.   It supports the Oversight Board in its decision making?

4    A.   Yes.

5    Q.   And in your deposition, you even refer to McKinsey as the

6    glue associated with the Board operation.  Do you recall that?

7    A.   Yes.

8    Q.   Now, you personally were the partner or individual at

9    McKinsey who signed McKinsey's consulting agreement with the

10   Oversight Board; is that right?

11   A.   Yes.

12   Q.   And you helped to negotiate that agreement?

13   A.   I did.

14   Q.   And if you flip to tab two of the binder that you have in

15   front of you, it's been marked -- the exhibit's been marked as

16   Plaintiff's Exhibit 88.

17            THE COURT:  88, did you say?

18            MR. STEINBERG:  Yes, Your Honor.

19   BY MR. STEINBERG:

20   Q.   That is a copy of the consulting agreement that McKinsey

21   has with the Oversight Board as it has been amended; is that

22   right?

23   A.   Yes.

24   Q.   And that agreement provides for McKinsey to be paid a

25   little over 15 million dollars; is that right?

```
 1    A.   The amended agreement, yes.

 2    Q.   As amended?

 3    A.   Yes.

 4    Q.   And that 15 million dollars under the fee schedule is to

 5    be paid out in a little over one year time, correct?

 6    A.   Yes.

 7    Q.   You are a member of McKinsey's leadership team that

 8    oversees the entire Oversight Board engagement, right?

 9    A.   Correct.

10    Q.   And you have worked on the engagement from day one?

11    A.   Yes.

12    Q.   And, in fact, your involvement even predates the start of

13    the engagement, because you were one of the people who helped

14    to bring the business through the door for McKinsey, right?

15    A.   Through development and proposal, yes.

16    Q.   Now, in addition to your role in the overall leadership

17    team, you are McKinsey's leader with respect to HTA in

18    particular; is that right?

19    A.   Yes.

20    Q.   And your work on behalf of the Oversight Board has

21    included supporting HTA in the development of its fiscal plan?

22    A.   Yes.

23    Q.   And that means that you have worked very closely with HTA

24    and its consultants, right?

25    A.   Correct.
```

1   Q.   And you told me that you viewed all of those interactions

2   as a collaborative process between HTA, HTA's consultants, and

3   McKinsey, right?

4   A.   Correct, under the rubric of the mandate of the Board to

5   stress test the plan.

6   Q.   But it was a collaborative process between McKinsey, HTA

7   and HTA's consultant?

8   A.   Correct.

9   Q.   And, in fact, at one point during your deposition, you

10  refer to it as a "seamless process," right?

11  A.   Correct.

12  Q.   Now, in addition to working with the HTA and its

13  consultants, you've also had weekly interactions with the

14  members of the Oversight Board, right?

15  A.   Yes.

16  Q.   And you've had daily interactions with the Oversight

17  Board's counsel at Proskauer, right?

18  A.   Yes, often daily.

19  Q.   You've worked closely with Andrew Wolfe?

20  A.   Yes.

21  Q.   And Mr. Wolfe will be in later to testify, right?

22  A.   Yes.

23  Q.   You've worked closely with Sergio Gonzalez, correct?

24  A.   Yes.  Correct.

25  Q.   And we've already heard from Dr. Gonzalez today, right?

```
 1  A.    Yes.

 2  Q.    And to be clear, you were serving as a strategic

 3  consultant for the Oversight Board months before you submitted

 4  your declaration and report in this lawsuit, right?

 5  A.    Correct.

 6  Q.    So let's take a look at your declaration.  It's behind

 7  tab one.  And I understand that it's been remarked as

 8  Defendant's Exhibit M.

 9          THE COURT:  Yes.  Sorry.

10          MR. STEINBERG:   Thanks, Your Honor.

11  BY MR. STEINBERG:

12  Q.    Is Exhibit M a copy of your declaration in this matter?

13  A.    It is.

14  Q.    And behind the declaration, there's an Exhibit Three to

15  it, also in tab one, and that's a report that you prepared as

16  well, correct?

17  A.    Yes.

18  Q.    That's a PowerPoint?

19  A.    Correct.

20  Q.    And that report is part of your declaration and opinions

21  in this case?

22  A.    Yes.

23  Q.    Now, before you submitted your declaration in this

24  lawsuit, you sent it to the rest of the McKinsey leadership

25  team for the Oversight Board matter for them to review it,
```

1    right?

2    A.    Correct.

3    Q.    And they provided input into your declaration?

4    A.    Minimal input, but there was input provided.

5    Q.    You had a separate working team at McKinsey that also

6    assisted you in putting together your report and declaration?

7    A.    Yes.

8    Q.    Two different lawyers at McKinsey had a hand in assisting

9    you put together your declaration, right?

10    A.    Yes, reviewing it.

11    Q.    And you also had the assistance of multiple lawyers at

12    Proskauer, right?

13    A.    Yes.

14    Q.    Let's switch topics for a second.  In paragraph 33 of

15    your declaration, you wrote that Puerto Rico's highways and

16    transportation system operate today as one integrated system

17    as opposed to separate highway and transportation assets.  And

18    we heard some testimony this morning from Dr. Gonzalez on the

19    same subject.

20            Now, you agree with me that different components on

21    an integrated transportation system can have different sources

22    of funding, right?

23    A.    Yes.

24    Q.    That's very basic?

25    A.    Yes.

1   Q.   And, for example, there is an integrated road network in

2   the continental United States, right?

3   A.   There is a national highway system and an interstate

4   highway system, and then a series of roads that are classified

5   under federal laws as part of the national road system.  So

6   under federal definitions, there is a defined term for the

7   national road system.

8   Q.   Okay.  Forty-eight different states fund portions of that

9   road network; is that correct?

10   A.   Yes.

11   Q.   And in addition to the states, there are toll roads that

12   are run by private companies under concession agreements as

13   well, right?

14   A.   Correct.

15   Q.   And if we look back or turn back to Puerto Rico now, am I

16   correct that there are roads on the island that are not under

17   HTA's jurisdiction?

18   A.   Yes.

19   Q.   For example, the local roads, those are maintained by

20   municipalities, right?

21   A.   Yes.

22   Q.   Not by HTA?

23   A.   Yes.

24   Q.   But it's your view that those local roads are still part

25   of Puerto Rico's integrated transportation network; is that

 1   right?

 2   A.    They are part of Puerto Rico's transportation network,

 3   correct.

 4   Q.    And Puerto Rico has concessioned two additional toll

 5   roads, PR-5 and PR-22, right?

 6   A.    Yes.

 7   Q.    Those roads are operated and maintained by a private

 8   company, not by HTA, right?

 9   A.    Correct.

10   Q.    But again, they're still part of Puerto Rico's integrated

11   transportation network, right, in your view?

12   A.    Correct.

13   Q.    Puerto Rico's main airport in San Juan, you would

14   consider that to be part of Puerto Rico's integrated

15   transportation network as well, right?

16   A.    It's part of the transportation system.  I mean, I think

17   what you're getting at obviously is this question of what

18   integration means.  So if you want to talk about it, we can go

19   into further detail.

20   Q.    Well, Puerto Rico's airport in San Juan is part of the

21   integrated transportation network in Puerto Rico, correct?

22   A.    It's a critical transportation asset in Puerto Rico.

23   That is part of an overall system of transportation in Puerto

24   Rico.

25   Q.    And is part of that system in spite of the fact that the

1   airport in San Juan is privatized?

2   A.   Correct.

3   Q.   On page 34 of your declaration, you gave testimony that

4   non-toll roads are necessary to the revenue generating

5   function of the toll roads because non-toll roads provide

6   access to toll roads?

7   A.   Yes.

8   Q.   Now, is it possible to perform a study of which roads on

9   the island actually generate traffic demand onto each of the

10  toll roads that's at issue in this lawsuit?

11  A.   Is it possible to perform such a study?

12  Q.   Yes.

13  A.   Yes.

14  Q.   And that study would be known as an origin and

15  destination study; am I right?

16  A.   There are multiple ways that you can test the traffic

17  demand patterns.  An O&D study or destination study is one of

18  them.  Sergio referenced others, and there are still others.

19  But yes, an origin and destination study is one way you can do

20  that.

21  Q.   And at your deposition when I asked you that question,

22  you told me an origin and destination study was the way to do

23  it, right?

24  A.   I said it's the most precise way, because it involves

25  detailed understanding of actual travel patterns taking place

1   at the time.

2   Q.    Okay.  You didn't perform an origin and destination study

3   with respect to the three covered toll roads here, did you?

4   A.    We did not.

5   Q.    And you did not?

6   A.    I did not.

7   Q.    And so you don't know one way or the other which non-toll

8   roads on the island may or may not generate traffic demand on

9   any of the three toll roads that are at issue here?

10  A.    Not at a precise degree.  It's quite clear and obvious

11  that if you look at the map and you look at where the toll

12  roads are placed, that there's obviously no way that the

13  demand on the system can be independently generated solely

14  given the volumes from the traffic that is, you know, living

15  or working along that route.

16          So by definition, the non-toll roads are feeders into

17  the toll road system.  You don't need an O&D study to make

18  that observation.

19  Q.    Well, there are a lot of roads on the island, aren't

20  there, Mr. Duvall?

21  A.    There are a lot of roads, yes.

22  Q.    I mean, there are how many thousands of miles of roads on

23  the island of Puerto Rico?

24  A.    The HTA has about 4,500, and I think there's another 9 or

25  10,000 beyond that.  I don't know the exact number of miles,

```
 1    but it's many more than what HTA controls.
 2    Q.   And sitting here today, you can't tell us what proportion
 3    of that 4,500 miles that's under HTA's jurisdiction actually
 4    feeds into the toll roads in terms of traffic demand, can you?
 5    A.   Not precisely.  I mean, we know that three-quarters of
 6    the travel demand on the HTA system comes from the non-toll
 7    network, which implies obviously the non-toll network is quite
 8    robust, but not a majority of the traffic demand.  But we do
 9    not know the specifics, as you said.
10    Q.   You can't give me a list of the roads right now that feed
11    into the demand of the toll roads?
12    A.   I can't do that.
13    Q.   On page 35 of your deposition --
14            THE COURT:  Paragraph --
15            MR. STEINBERG:  Yes, Your Honor.  Thank you.
16    BY MR. STEINBERG:
17    Q.   Paragraph 35 of your declaration, you testified that it's
18    a typical budgeting practice to maintain non-toll assets with
19    toll revenues?
20    A.   Yes.
21    Q.   Now, you agree that Puerto Rico has a significantly
22    higher dependency on toll revenues than the rest of the
23    country?
24    A.   Yes.  The current business model for the HTA is highly
25    dependent on the toll revenues to function.
```

1  Q.   That wasn't the case prior to the clawback, right?

2  A.   It was still highly dependent.  The clawback obviously

3  changed the percent, but it's highly dependent on the scenario

4  right now.

5  Q.   Do you remember testifying to me in your deposition that

6  prior to the clawback, Puerto Rico was not anywhere near as

7  reliant on toll revenues to fund non-toll roads?

8  A.   Yes.  It was not as near reliant, but it was still

9  reliant.

10  Q.   Now, the decision to become more reliant on toll

11  revenues, that's a policy choice made by the Commonwealth,

12  correct?

13  A.   Correct.

14  Q.   And if the Commonwealth provided additional money to

15  replace any of the toll revenues that had to be used to pay

16  the 1968 bondholders, the HTA would be in the same position,

17  right?

18  A.   If they decided to take other revenues to use -- to

19  replace them?

20  Q.   Correct.

21  A.   Yes.  If they took other revenues to replace them, by

22  definition they would be replaced.

23  Q.   And HTA would be in the same position?

24  A.   HTA, the way it operates is the revenues and the costs

25  are separate enterprises.  So yes, if the revenues were

1  replaced, it will be stopped to pay for the costs which are

2  incurred, then yes.  The answer to your question is yes.

3  Q.    Okay.  Now, the Commonwealth fiscal plan, you are

4  familiar with the Commonwealth fiscal plan, right?

5  A.    Yes.

6  Q.    You have been working on that fiscal plan for many, many

7  months, right?

8  A.    Yes.

9  Q.    And the Commonwealth fiscal plan projects that there will

10  be approximately 7.9 billion dollars in cumulative cash flow

11  available to pay debt service after the payment of all other

12  expenses over the ten-year projection period; is that right?

13  A.    That's what the fiscal plan says, yes, the certified

14  fiscal plan.

15  Q.    The certified fiscal plan.  And you're not offering any

16  opinion in this case whether or not the Commonwealth might use

17  any of that nearly eight billion dollars for the roads if the

18  toll revenues are unavailable to the HTA, because they have to

19  be paid to the 1968 bondholders?

20  A.    I am not offering an opinion on that.

21  Q.    Let's change to a new topic, Mr. Duvall.  You testified

22  in paragraph 39 of your declaration that Puerto Rico's road

23  assets generally are in poor condition?

24  A.    Yes.

25  Q.    First off, you're not an engineer?

1  A.   I am not an engineer.

2  Q.   You've never conducted an engineering inspection of a

3  road, right?

4  A.   I have never done that.

5  Q.   And that is not an area of expertise for you?

6  A.   I've read many engineering reports.  I know what they

7  say, and I generally know what road conditions are, but I

8  personally have never conducted an inspection.

9  Q.   You don't hold yourself out as an engineer to perform

10  inspections of roads, do you?

11  A.   I do not.

12  Q.   And you didn't conduct an engineering inspection of any

13  of the roads in Puerto Rico in connection with rendering your

14  opinions in this case, right?

15  A.   I did not.

16  Q.   Nor have you performed an independent analysis or

17  investigation of the useful lives of the roads in Puerto Rico,

18  have you?

19  A.   We relied obviously on the data produced by HTA, as well

20  as the federally produced data that is part of a regular

21  federal data collection system.

22  Q.   Okay.  That wasn't my question.

23       My question is you didn't perform an independent

24  analysis?

25  A.   No, I personally did not.

1          THE COURT:  Mr. Duvall, only one person can speak at

2    a time so we get an accurate record.

3          THE WITNESS:  Yes.

4          THE COURT:  Thank you.

5          MR. STEINBERG:  My apologies, Your Honor, too.

6    BY MR. STEINBERG:

7    Q.   You didn't personally perform any kind of independent

8    analysis or investigation of the useful lives of the roads in

9    Puerto Rico, correct?

10   A.   Correct.

11   Q.   And counsel this morning during opening statements

12   pointed to paragraph 22(c) of your declaration where you said,

13   it is my opinion based on the information provided by the HTA

14   that a substantial portion of Puerto Rico's roads are at or

15   very near the end of their useful lives.  That's not based on

16   any analysis that you performed, correct?

17   A.   Correct.

18   Q.   And that's not based on any analysis that anyone on the

19   McKinsey team that you oversee performed, correct?

20   A.   Correct.

21   Q.   That's information that you obtained from the HTA, and

22   you're taking it at face value, correct?

23   A.   Correct.

24   Q.   And you've done nothing to independently verify that

25   information, have you?

1    A.   Well, what we've done is looked at whether, you know,

2    given what we know about road systems, given what we know

3    about the way the data was presented, is it a reasonable

4    presentation of the condition.  And is it based on commonly

5    used metrics and terms.  But that's all we have done.

6    Q.   Okay.  And actually, if you look at footnote six of your

7    declaration, you wrote, where source information has been

8    provided by HTA, I have not independently verified such

9    information other than the fact that the information as

10   reported in the report or this declaration accurately

11   describes the information I received.

12           That's what you wrote?

13   A.   Yes.

14   Q.   And that's true with respect to all of the information

15   that is contained in your declaration and your report that was

16   sourced from HTA, correct?

17   A.   Yes.

18   Q.   You didn't independently verify the accuracy of any of

19   that information, right?

20   A.   Of the HTA provided information, yes.  Correct.

21   Q.   Yes.

22   A.   Beyond what I said, which was we obviously know the space

23   quite well, understand the way information is presented, but

24   our mandate was not to do an audit of HTA.

25   Q.   And so, in fact, you didn't perform such an audit,

1  correct?

2  A.    Correct.

3  Q.    Let's look at paragraph 18 -- I'm sorry, page 18 of your

4  report.

5        THE COURT:  I'm sorry.  I have to interrupt again.

6  We're having another technical difficulty.  So if you'd like,

7  you can have a seat.

8        MR. STEINBERG:  Okay.  Thank you, Your Honor.

9        THE COURT:  Thank you.

10       It seems like we are back online in all of our

11 virtual venues.  So, Mr. Steinberg.

12       MR. STEINBERG:  Thank you, Your Honor.

13 BY MR. STEINBERG:

14 Q.    Okay.  We were looking, Mr. Duvall, at page 18 of your

15 report, which is actually Exhibit C to the declaration behind

16 tab one.  And on that page, under takeaways, you wrote, 54

17 percent of Puerto Rico's roads in 2015 fell under the

18 international roughness index IOI and present serviceability

19 rating, PSR categories of poor conditions.

20       You relied on Federal Highway Administration data to

21 support that statement, correct?

22 A.    Correct.

23 Q.    And if you could take a look at what's behind tab eight,

24 this is a document that had been marked as Defendant's Exhibit

25 98.  So I'm not sure what the new designation is on it, but

1   this is the data you relied on, right, sir?

2   A.   Yes.

3   Q.   And if you look to the bottom of the first page under

4   where it says, U.S. total, that's where you find Puerto Rico,

5   correct?

6   A.   Correct.

7   Q.   And there's a footnote four next to that.  Do you see

8   that?

9   A.   Yes.

10  Q.   And if you flip to the last page of the document, that's

11  where footnote four is located.  What does footnote four say?

12  A.   It says it's 2009 data.

13  Q.   So the data that you cite in your report from Puerto Rico

14  is actually from 2009, not from 2015, correct?

15  A.   Correct.

16  Q.   All right.  So when your report says it's 2015, that's

17  wrong?

18  A.   The report does -- where are you seeing that it says

19  2000 --

20  Q.   Page 18.

21  A.   So the CapEx data is 2014, as noted.  The references to

22  the table, the table as was noted, is using 2009 data.  Where

23  are you --

24  Q.   Fifty-four percent of Puerto Rico's roads in 2015 --

25  A.   Okay.  Correct.  I think -- yes.  Our -- our

1   understanding of the current situation, based on that report,

2   and HTA's prospectives, and actually the amount of capital

3   spend that's taken place led us to conclude that basically

4   there was probably not going to be a change.

5   Q.   Okay.  But to be perfectly clear, you relied on 2009

6   data, not 2015 data, correct?

7   A.   We did.

8   Q.   And you agree --

9        THE COURT:  And just --

10  BY MR. STEINBERG:

11  Q.   -- that the reported data for Puerto Rico in -- that's

12  listed in the -- what's behind tab eight, that represents only

13  a small percentage of Puerto Rico's total roads, right?

14  A.   Our understanding is that was a sample that was

15  indicative, but it is a small sample.

16  Q.   Well, you didn't do anything or perform any analysis to

17  determine whether the roads that are reflected in the

18  document, the data behind tab eight, whether that was a

19  statistically valid sample, did you?

20  A.   We did not.

21  Q.   And you did not either, right?

22  A.   I did not.

23  Q.   When you were performing your work on this matter, you

24  were not aware that there was a requirement under the 1968

25  Resolution that there be an annual inspection of roads by a

1    traffic engineer, correct?

2              MR. RAPPAPORT:  Objection to foundation.

3              MR. STEINBERG:  Sorry, Your Honor.  Did you --

4              THE COURT:  Yes.  Two things.  First, just for

5    clarity of the record, it seems to me from my reading of our

6    correlation chart, that DTX 98 is now Exhibit Four W's, WWWW.

7              And there is an objection.

8              MR. RAPPAPORT:  I was just objecting to the

9    foundation.  The question assumed a fact which has not been in

10   evidence.

11             THE COURT:  So would you like to reformulate your

12   question?

13   BY MR. STEINBERG:

14   Q.   Well, I'll just ask you, Mr. Duvall, were you aware when

15   you were performing your work in this matter, that there was a

16   requirement under the 1968 Resolution that there be an annual

17   inspection of the roads by a traffic engineer?

18             MR. RAPPAPORT:  Same objection.

19             THE COURT:  Would you like to reformulate again,

20   perhaps asking whether he's aware whether there is such a

21   requirement?

22             MR. STEINBERG:  Yes, Your Honor.  You know what?

23   I'll just move forward, Your Honor.

24   BY MR. STEINBERG:

25   Q.   I want to direct your attention to the document behind

1    tab seven -- I'm sorry, not tab seven.  Tab six.

2              Have you ever seen this document before?

3    A.   I have seen parts of it.  I have not read this document

4    in detail.

5    Q.   And when did you see parts of this document?

6    A.   Just at some point through the process of interaction

7    with documents.  I don't know exactly when I saw it.

8    Q.   And did you understand this document to be an engineering

9    report that relates to the condition of roads in Puerto Rico?

10   A.   I did understand it, and I did -- I did not review this

11   in detail.  I've seen the cover, but I've not actually

12   reviewed any of the contents.  I know Jorgensen Associates is

13   a firm that does that, so --

14   Q.   And they're a reputable firm?

15   A.   I've never worked with them.

16   Q.   If you look at page 1-2 of the document, under the

17   heading of conclusions and recommendation, there's a

18   subheading that says, maintenance evaluation.  Based on the

19   results of analysis of the data from the field evaluation for

20   fiscal year 2013, and the review of the maintenance

21   expenditures, the present level of maintenance being performed

22   on the four administrative levels of the road network and the

23   Tren Urbano are generally adequate to preserve the investment

24   in these facilities for the anticipated life of each facility.

25              Did you consider that information in forming your

1    opinions in this case?

2    A.   So that comment, did I consider?  Is that the question?

3    Q.   Yes.

4    A.   I did not consider that comment.

5    Q.   And if you flip to the very last page of the document,

6    there is a table that says, summary of maintenance condition

7    ratings, all roads, fiscal year 2013.

8         And if you look under roadway, for pavement surface,

9    under good, you see it says, 87.64?  You see that?

10   A.   Yes.

11   Q.   And under pavement structure, under good, it says 91.79.

12   Do you see that?

13   A.   I do.

14   Q.   And am I correct that you did not take any of the data

15   that's listed on this page of this report into account when

16   you were forming your opinions in this case?

17   A.   We did not take this into account.  I did not take it

18   into account.  We also obviously had extensive interactions

19   with HTA on their current condition, and this report itself is

20   now four and a half to five years old I believe.

21        And the CapEx, both maintenance and preservation

22   CapEx over the last five years is lower than what's projected

23   to be going forward.

24        So this is not a system that has been recapitalized

25   in any meaningful way.  And obviously in the last two years,

1   there's been substantial impact on their ability to

2   capitalize.

3           So this data, I have not looked at this data in

4   detail, but I think as you noted about the 2009 reference,

5   it's obviously quite old now, so --

6   Q.   Well, you relied on 2009 data for purposes of your

7   report.  That's what you cited, correct?

8   A.   For purposes of a benchmark around pavement conditions

9   and a roughness estimate, which I don't see a counter to that

10  in here.  I'm trying to read it quickly.  I don't see a

11  counter to that roughness assessment in here.  Is there one?

12  Q.   You know what --

13  A.   I don't believe they did a benchmark inconsistent with

14  what we did based on a very quick review of this.

15  Q.   Isn't it true that this is the most recent engineering

16  report that was prepared by an outside engineer for purposes

17  of the roads in Puerto Rico?

18          MR. RAPPAPORT:  Objection.  Lack of foundation.

19          THE COURT:  Please reformulate.

20  BY MR. STEINBERG:

21  Q.   Do you know whether this is the most recent engineering

22  report that was prepared by an outside engineer for

23  summarizing the condition of the roads in Puerto Rico?

24  A.   I do not know if this is the most recent outside

25  engineering.  I have not seen anything more recent.

1          MR. STEINBERG:  That's all the questions I have now,

2    Your Honor.  Thank you.

3          THE COURT:  Thank you.

4          MR. RAPPAPORT:  I have no redirect of Mr. Duvall.

5          THE COURT:  Thank you, Mr. Duvall.  Your testimony is

6    concluded.

7          (At 1:57 PM, the witness was excused.)

8          The next defense witness may be called.

9          MR. RAPPAPORT:  Lary Rappaport again, Your Honor.

10   Your Honor, we would next call Andrew Wolfe.

11         Mr. Wolfe's declaration that was filed on July the

12   14th has been re-marked.  The declaration itself is GG, and

13   there was a one-page CV that was re-marked as HH.  Originally

14   it was 32 and 33.

15         And I was about to -- oh, I do see it.  It's

16   double-sided, so the resume, the CV is on the back of the

17   exhibit tab.  If I may approach the Clerk?

18         THE COURT:  I'm sorry.  You are entering those now?

19         MR. RAPPAPORT:  Yes.  We would like to submit these

20   to the Court, and put them into evidence.  So I would like to

21   approach the Clerk.  This is a copy for you.

22         THE COURT:  Yes.  Admitted, subject to any objections

23   that may have been filed.  And please approach.

24         (At 1:58 PM, Defense Exhibits GG and HH admitted into

25   evidence subject to any objections filed.)

1          MR. RAPPAPORT:  Thank you.

2          THE COURT:  Thank you, Mr. Rappaport.

3          And so, Mr. Wolfe, would you please come to the

4    witness stand and remain standing to take the oath?

5          COURTROOM DEPUTY:  Raise your right hand.

6          Do you solemnly swear that the testimony you are

7    about to give in this case is the truth, the whole truth, and

8    nothing but the truth?

9          THE WITNESS:  I do.

10         COURTROOM DEPUTY:  So help you God.

11         MR. JOSSEN:  May I inquire, Your Honor?

12         THE COURT:  Yes, Mr. Jossen.

13         MR. JOSSEN:  We have a binder which we're going to

14   hand up to Your Honor and to the witness, which contains

15   things that we may refer to in the course of examination.

16         THE COURT:  Very well.

17                 A N D R E W    W O L F E,

18      called as a witness by the defense, having been sworn,

19      testified as follows:

20                         CROSS-EXAMINATION

21   BY MR. JOSSEN:

22   Q.   Mr. Wolfe, you've never testified before as an expert,

23   correct?

24   A.   Correct.

25   Q.   You became a consultant to the Oversight Board in

1    November of 2016?

2    A.    Correct.

3    Q.    Since November of 2016, you have worked continuously as a

4    consultant with the Oversight Board?

5    A.    Yes.

6    Q.    And as an advisor to the Board?

7    A.    Yes.

8    Q.    Now, you were asked to review the Commonwealth's budget

9    from an economic point of view; is that right?

10   A.    Yes.

11   Q.    And you were also asked to review the HTA fiscal plan

12   before it was certified?

13   A.    Yes.

14   Q.    You reported directly to the Oversight Board and its

15   members?

16   A.    To the Oversight Board and to the COO of the Board,

17   Ms. Jaresko.

18   Q.    I think you have to keep your voice up, sir, so the

19   reporter can hear you and everybody can hear your testimony,

20   please.

21         Your work is closest with board members and Ana

22   Matosantos?

23   A.    Yes.

24   Q.    And also with Carlos Garcia?

25   A.    Yes.

1    Q.   And they are the ones who asked you to consult with the

2    Oversight Board on the certification of a fiscal plan for the

3    Commonwealth?

4    A.   Yes.

5    Q.   You also, I think, just mentioned the name, you work and

6    speak closely with Natalie Jaresko, the COO of the Oversight

7    Board?

8    A.   Yes.

9    Q.   You've attended somewhere between five and ten Oversight

10   Board meetings?

11   A.   Yes.

12   Q.   You are familiar with the Commonwealth's fiscal plan?

13   A.   Yes.

14   Q.   And you've been working on the development of that plan

15   since you started serving as a consultant for the Oversight

16   Board in November of 2016, correct?

17   A.   Yes.

18   Q.   Now, in fact, you developed an economic model, did you

19   not?

20   A.   Yes.

21   Q.   And that model was the basis for the Commonwealth plan;

22   isn't that right?

23   A.   Correct.

24   Q.   So one might actually call you an author of the plan?

25   A.   An author of the model of the plan.

1   Q.   And your work with the Oversight Board is governed by a

2   contract, an agreement; is that right?

3   A.   Correct.

4   Q.   And that agreement continues to be in effect today?

5   A.   I think the last date was July 31st, but I haven't had a

6   chance to rewrite the next extension.

7   Q.   Well, as far as you know, the work that you've been doing

8   so far for the Oversight Board is governed by this agreement,

9   correct?

10   A.   Yes.

11   Q.   And if you turn to tab three in the binder, we've marked

12   as Plaintiff's Exhibit I believe it's 102; is that right?

13          THE COURT:  It says 104.

14          MR. JOSSEN:  I'm sorry, Your Honor.  Thank you.

15   BY MR. JOSSEN:

16   Q.   104.  This document, do you recognize it?

17   A.   Yes.

18   Q.   And is that the agreement that has been in effect since

19   you started working with the Oversight Board as a consultant?

20          MR. RAPPAPORT:  I'm sorry.  May I inquire?  104 is

21   beyond the range that we had.

22          MR. JOSSEN:  I apologize.  Do you have another copy?

23          MR. RAPPAPORT:  It's okay.  If it's just the

24   contract, it's okay.  I've seen it before.  That's fine.

25          MR. JOSSEN:  Okay.

1          THE COURT:  For those who couldn't hear on the audio,

2     there was just a request for a copy of the document.  That's

3     been resolved.

4          MR. JOSSEN:  Thank you, Your Honor.

5     BY MR. JOSSEN:

6     Q.   Now, this agreement contains a clause entitled, no

7     conflict of interest, correct?

8     A.   Correct.

9     Q.   Your understanding is that under this no conflict of

10    interest clause, you are not permitted to do any work for

11    anyone or any entity or have any financial interest that would

12    be incompatible with what you've been asked to do by the

13    Oversight Board, right?

14    A.   Right.

15    Q.   There's also a provision in your agreement that deals

16    with non-disparagement, correct?

17    A.   Yes.

18    Q.   And your understanding is if you were to leave the

19    consultancy or if it were to end, you would not say anything

20    publicly about the Board in a way that would be critical of

21    them for at least two years, correct?

22    A.   Correct.

23         MR. JOSSEN:  Your Honor, I offer the exhibit into

24    evidence.

25         MR. RAPPAPORT:  Subject to any objections.  Again, it

```
 1    hasn't been marked earlier.  Subject to any objections, that's

 2    fine.

 3              THE COURT:  Exhibit 104 is admitted subject to

 4    objections.

 5              (At 2:05 PM, Plaintiff 104 admitted into evidence

 6    subject to objections.)

 7              MR. JOSSEN:  Thank you, Your Honor.

 8    BY MR. JOSSEN:

 9    Q.   Now, up until the end of July, under this consultancy

10    agreement, you were paid 25,000 dollars a month for your work,

11    correct?

12    A.   Correct.

13    Q.   And through the end of July, you've earned approximately

14    250,000 dollars in consulting fees?

15    A.   Okay.

16    Q.   Is that right?

17    A.   Yeah.

18    Q.   And you work very closely with Mr. Tyler Duvall, whose

19    testimony you just heard, correct?

20    A.   Yes.

21    Q.   And with his team at McKinsey?

22    A.   Yes.

23    Q.   You are essentially part of the same team with Mr. Tyler

24    at McKinsey, correct?

25    A.   As an advisory team to the FOMB, correct.
```

1   Q.   And your declaration in this case, which constitutes your

2   direct examination, that was a part of your ongoing work in

3   your consulting arrangement with the Oversight Board?

4   A.   Yes.

5   Q.   Another one of the assignments that you received in the

6   consultancy?

7   A.   Yes.

8   Q.   Which work you expect to continue after this proceeding?

9   A.   I hope so.

10   Q.   After this motion is resolved?

11   A.   Yes.

12   Q.   Now, turning to your declaration, in connection with the

13   model that you describe in your declaration, that's an

14   economic model; is that correct?

15   A.   A macroeconomic model, yes.

16   Q.   And prior to your presentation of that model, you were

17   doing some work preliminary to it, correct?

18   A.   Well, it carried over somewhat from my work on a previous

19   report I worked on in Puerto Rico.

20   Q.   And you agree that as of the time you prepared the model,

21   you knew that part of the deficit in the Commonwealth was that

22   it did not have systems in place to properly control budgetary

23   execution?

24   A.   Correct.

25   Q.   And also that overspending has been a problem in every

1    agency in the Commonwealth?

2    A.   As a whole.  I don't know if every single agency that's

3    been the issue, but total spending, vis-a-vis what was

4    mandated in budget -- original budgets and then revised

5    budgets have always been overspent.

6    Q.   And you can't exclude the HTA as one of those agencies

7    which has been guilty of overspending?

8    A.   No.

9    Q.   Didn't look at that?

10   A.   I didn't look at that, no.

11   Q.   Now, in your declaration, you offer your view that if the

12   Commonwealth were to take 150 million dollars and pay it to

13   the '68 bondholders to make up for the toll revenues, that

14   that would be in place of other expenses, correct?

15   A.   There's two issues with the 150 million dollars.

16   Q.   Well, let's start with the first premise, which is that

17   you ran through your model what would happen if you took 150

18   million dollars and paid it to the bondholders, correct?

19   A.   Yes.

20   Q.   And that's, in fact, you know, not the number for the

21   annual debt service for the '68 bondholders, correct?

22   A.   Correct.

23   Q.   The actual number is 70 million dollars, right?

24   A.   Correct.

25   Q.   But you used 150 million dollars?

```
 1   A.    Yes.

 2   Q.    Someone told you to do that?

 3   A.    I discussed it with the attorneys at Proskauer.

 4   Q.    And the lawyers told you to use 150 million dollars?

 5   A.    Yes.

 6   Q.    Instead of 70?

 7   A.    Yes.

 8   Q.    And at the time that you did this, did you determine what

 9   would happen if you used 70 million dollars in your model

10   instead of 150 million dollars?

11   A.    It's easy enough for me to figure out the impact of 70,

12   but 70 didn't seem like a reasonable number, because if 70

13   were --

14   Q.    I'm going to stop you.  I'm going to ask you to answer my

15   question.

16          When you did the model and when you put the 150

17   million dollars through it, did you determine what would

18   happen if you put 70 million dollars in?

19   A.    At that moment, no.

20   Q.    Now, your model does something else.  You apply what's

21   called a multiplier; is that right?

22   A.    Yes.

23   Q.    And the multiplier you use in your model is 1.34?

24   A.    Yes.

25   Q.    So that means that for every dollar under your model that
```

1   is removed from the budget, the impact is if -- is as if it

2   were $1.34, correct?

3   A.   $1.34 taken out of the economy.

4   Q.   So your model increases the effect of every dollar that's

5   spent, correct?

6   A.   It amplifies dollars spent and amplifies it in a negative

7   way, dollars taken out, yeah.

8   Q.   And so when you go through the process of taking your 150

9   million dollars that you did, in your analysis, that's as if

10  you removed 150 million dollars times 1.34, right?

11  A.   Yes.

12  Q.   And that makes the resulting effect much more

13  significant, correct?

14  A.   Yes.

15  Q.   Now, you told me I think in your deposition that it is

16  possible to identify spending with a lower multiplier, right?

17  A.   There probably is some spending with a lower multiplier,

18  maybe some spending with a higher.

19  Q.   Okay.  And you didn't attempt in your declaration to

20  determine if there was a lower multiplier spending available,

21  right?

22  A.   No.  We just used that for the whole level of spending.

23  Q.   If spending with a lower multiplier were identified and

24  used, the result would come up differently in your model,

25  correct?

```
 1   A.    Yes.

 2   Q.    Now, in fact, the multiplier is just an estimate?

 3   A.    It's an estimate for Puerto Rico, yes.

 4   Q.    Now, your model also starts with a baseline growth rate,

 5   correct?

 6   A.    Correct.

 7   Q.    And the growth rate you start with is minus 1.5 percent?

 8   A.    Yes.

 9   Q.    And that's based off of a conclusion that another

10   consultant gave you from your team?

11   A.    It's work that was done by a consulting firm called

12   DevTech.  And I worked with them, went over the model they

13   were using to generate the trend analysis.  And it made a lot

14   of sense to me.

15   Q.    And DevTech is not a member of this team of consultants,

16   correct?

17   A.    For the government.

18   Q.    For the Commonwealth?

19   A.    Not for the Board.

20   Q.    For the Commonwealth?

21   A.    Yes.

22   Q.    In your view, Mr. Wolfe, you think that Puerto Rico's

23   real economic growth needs to reach at least .8 percent to

24   achieve fiscal and debt sustainability; is that right?

25   A.    That's the minimum that makes the numbers show a rising
```

1   primary surplus over time.

2   Q.   And that eight percent number -- that .8 percent number,

3   that falls out of your model?

4   A.   Yes, it does.

5   Q.   There's no literature that you could point me to that

6   would support using .8 percent, right?

7   A.   No.  It's a result of the model of the economy.

8   Q.   There's no peer-reviewed article I could find that would

9   say to me it's .8 percent?

10  A.   No.

11  Q.   Now, in your declaration, you explain that if you use 150

12  million dollars and put it through the model, the result comes

13  out to less than .8 percent, right?

14  A.   Yes.  It drops the -- just underneath, yes.

15  Q.   And that's the linchpin of your opinion, correct?

16  A.   Well, it gets you below that numerical threshold.

17  Q.   What you think is essential to assure debt sustainability

18  and growth?

19  A.   Yes.  If you're below it, for sure.  If you're at it,

20  it's not recommended.

21  Q.   Now, you didn't run an analysis as to what would happen

22  through your model if you assumed 70 million dollars, did you?

23  A.   Never that exact number.

24  Q.   If you used 70 million dollars, you'd agree with me that

25  you would be .89 percent, right?

1   A.   I'd be above, yes.

2   Q.   You'd be okay?

3   A.   You'd be okay number wise.  You'd be, again, pushing

4   toward the lower limit of what's feasible.  And in a world

5   full of risks, including implementation, risk of the whole

6   program, I would not recommend pushing the limit down that --

7   pushing the growth down that far.

8   Q.   But you've told us that the limit from your point of view

9   is .8, right?

10  A.   The numerical limit, yes.

11  Q.   And if you ran 70 million dollars, you'd end up with .89

12  percent, right?

13  A.   Yes.

14  Q.   Which you would agree with me is above .8 percent?

15  A.   Yes.

16  Q.   Now, even if you used 100 million dollars instead of 150

17  million dollars, you'd also come up above .8 percent, right?

18  A.   Yes.

19  Q.   Now, in both of my examples of using either 70 million

20  dollars or 100 million dollars, in those two examples, I'd be

21  simply taking more money from the total budget, right?

22  A.   You would be replacing that money with some measures on

23  that order to cover that gap, yes.

24  Q.   Okay.  I'm not trying to find money elsewhere to do that,

25  right, in those two models?

1    A.   It depends whether -- what you consider finding money

2    elsewhere.  For instance, if you raised the sales tax rate by

3    a half a point to generate that money, that would be one way

4    to do it.  If you cut spending in another area, because you

5    thought it wasn't as good a piece of spending, that may fit

6    your definition of not cutting elsewhere.  But in the end,

7    you're taking money out of the economy, and that would have

8    the same impact as if you had raised the tax.

9    Q.   But as long as I stay over .8 percent, from your point of

10   view, I'm okay?

11   A.   The amount of the primary surplus will not start to

12   decline in time.

13   Q.   Now, your model assumes that the dollar amounts that

14   would be used to pay the toll revenues to the bondholders

15   would take away from other dollars that would be needed for

16   expense, right?

17   A.   The model generates an amount of revenue after expenses.

18   That's what's used for servicing, at least in part, the

19   restructured debt.

20   Q.   You didn't look elsewhere in the model to try to

21   determine whether there were other categories of spending that

22   could be the source of monies that would be used instead of

23   the toll revenues, right?

24   A.   To do that would mean cutting more spending and,

25   therefore, with the multiplier impact, pushing the growth

1    below the one percent that we're at, and I'm not trying to do

2    that.

3    Q.   Mr. Wolfe, you didn't look, did you?

4    A.   Didn't look in what sense?

5    Q.   You didn't look to see whether there were spending

6    amounts that were already planned that you could produce to

7    free up the 100 million dollars or 70 million dollars that you

8    would use to pay toll revenues, right, to the bondholders?

9    A.   No, I didn't.

10   Q.   Now, for example, in your model, in projection two tab,

11   which you looked at with me, it's not in there now, but, you

12   know, I looked at this during the course of your deposition,

13   you have a line that's called positive annual funds, right?

14   A.   Positive annual funds?

15   Q.   Right.   There's positive annual amounts; isn't that true?

16   A.   (No response.)

17   Q.   Let me try it this way.   You have something called a

18   primary balance; is that right?

19   A.   Yes.   Yes.

20   Q.   And that primary balance is approximately 600 million

21   dollars a year; is that right?

22   A.   At the start, it's a little less, and it grows during the

23   course of the fiscal plan.   It's the number that's consistent

24   with that 7.9 billion dollars that was quoted earlier.

25   Q.   And that number, the primary balance, that ties into the

1    Commonwealth's fiscal plan, right?

2    A.    Yes.

3    Q.    And, in fact, that's the amount that's available for debt

4    service; is that right?

5    A.    I would not recommend using all of it for debt service,

6    but yes, that's what's available.

7    Q.    Well, in fact, isn't that what's in the Commonwealth's

8    fiscal plan for debt service after year one going out?

9    A.    It's what's available, yeah, after expenses.

10   Q.    So that number, for example, if you took 70 million

11   dollars from that number, that wouldn't change the model?

12   A.    That particular calculation of 70, no.  But why is it

13   going to stop at 70?

14   Q.    Just answer my question.  If you took that number out,

15   the 70 million, out of that line in the Commonwealth fiscal

16   plan, it would not change, it wouldn't upset your model,

17   correct?

18   A.    No.

19   Q.    Your declaration doesn't say that, does it?

20   A.    Doesn't say that --

21   Q.    Doesn't say that if -- excuse me one moment.  Do you need

22   some water?

23            THE COURT:  Yes.  We're working on that.

24            MR. JOSSEN:  Thank you, Your Honor.

25            Let me wait for a second so you can get some.

```
 1                    THE WITNESS:  I'm all right.  Go ahead.

 2    BY MR. JOSSEN:

 3    Q.   Now, in your model, there's also a line for overspending;

 4    is that right?

 5    A.   Yes.

 6    Q.   I think that that ties into the Commonwealth fiscal plan

 7    for reconciliation adjustment; is that right?

 8    A.   Yes.

 9    Q.   And that's an amount of money, of funds that are not

10    earmarked for any specific purpose, correct?

11    A.   It's money that was spent, but not classified as to

12    whether it was spent on wages, goods and services, utilities.

13    Q.   It wasn't specifically allocated?

14    A.   It was -- it was maybe allocated in the original budget.

15    It should have been cut in a revised budget, but then it was

16    spent anyway, but because of that, it wasn't registered.

17    Q.   It was overspent?

18    A.   Yes.

19    Q.   And what you did in your model was you took that line and

20    you grew it through each year thereafter, correct?

21    A.   Correct.

22    Q.   And that's about 600 million dollars a year, right?

23    A.   A little more, yes.

24    Q.   And so that's also an amount of money that is not

25    allocated, right?
```

1   A.   Correct.

2   Q.   It's an overspending line?

3   A.   It's part of the spending that's been done, when you add

4   it into the total.  And that's in the baseline where you're

5   not taking any measures.  That's what they've been spending

6   through time.

7   Q.   Well, that's what they did in the past, right?

8   A.   Correct.

9   Q.   And you projected it out going forward for the balance of

10  the fiscal plan time without any allocation specifically in

11  mind, correct?

12  A.   Correct.

13  Q.   And there's nothing that would prohibit the allocation of

14  that amount in every year to be used for money that would

15  otherwise be used by the toll revenues that are being diverted

16  by the Commonwealth, correct?

17          MR. RAPPAPORT:  Objection, foundation.  It said

18  overspending line.

19          MR. JOSSEN:  Well, I think my question is clear on

20  its face.  I stand with it, Your Honor.

21          THE COURT:  Objection's overruled.  You may answer.

22          THE WITNESS:  Okay.  So you're taking a total amount

23  of spending in the baseline, and the baseline is then

24  projecting it out based on no assumption of measures being

25  taken.  And what does -- how do you project spending?  Well,

1   typically most spending is a function of inflation.  Some

2   might be a function of real GNP.  Health care spending is a

3   function of health care inflation.

4           That then gets offset below that number by a set of

5   expenditure measures that are in the fiscal plan.  Those are

6   growing as well over time.  And they are counteracting either

7   as specific elements in the wage line or part of it is going

8   to reduce effectively what that reconciliation number is, the

9   overspending, because part of what you're doing is getting

10  better control of your spending in the non-personnel

11  expenditure measure.

12  BY MR. JOSSEN:

13  Q.   Well, it's not in your job description to figure out what

14  happens with the overspending amount, correct?

15  A.   No.  No.

16  Q.   And so that's a decision somebody else has made, right?

17  A.   Well, we've talked about that you have to get better

18  control of your spending.

19  Q.   But you're a macroeconomist, right?  You're not a

20  government official?

21  A.   Yes.  But I gave recommendations how you'd do that.

22  Q.   All right.  And your recommendations were based on the

23  economic model, right?

24  A.   The economic model and the work I did at the IML.

25  Q.   And the fact of the matter is that the amount that you're

| | |
|---|---|
| 1 | growing in your model each year, the 600 million dollars, |
| 2 | there's nothing that would prevent that money or any part of |
| 3 | that money to be used to make up for the monies that are being |
| 4 | diverted for toll revenues, right? |
| 5 | MR. RAPPAPORT:  Same objection. |
| 6 | THE COURT:  Overruled again. |
| 7 | MR. JOSSEN:  It takes a yes or no. |
| 8 | THE WITNESS:  Can you repeat the question? |
| 9 | BY MR. JOSSEN: |
| 10 | Q.   You can't answer it? |
| 11 | A.   I don't really understand what the question's asking, |
| 12 | so -- |
| 13 | Q.   Is it your belief, Mr. Wolfe, that the Commonwealth's |
| 14 | decision to take away collateral from bondholders will not |
| 15 | influence investors in the future? |
| 16 | MR. RAPPAPORT:  Objection.  Lack of foundation. |
| 17 | THE COURT:  Please reformulate. |
| 18 | BY MR. JOSSEN: |
| 19 | Q.   Do you have a view as to whether the Commonwealth's |
| 20 | decision to take collateral away from bondholders will |
| 21 | influence investors in the future? |
| 22 | MR. RAPPAPORT:  Same objection.  My objection |
| 23 | concerns the word "collateral." |
| 24 | MR. JOSSEN:  Well, toll revenues. |
| 25 | THE COURT:  Okay.  So you're asking it with toll |

1   revenues?

2          MR. JOSSEN:  With the toll revenues in mind, yes,

3   although I think it is collateral.

4          THE COURT:  I know you think it is collateral.

5          So do you understand the question or do you want it

6   restated?

7          THE WITNESS:  Maybe you could just restate it.

8          MR. JOSSEN:  Let me try one more time, and if I can't

9   do this, I'll move on.

10          THE WITNESS:  No.  No.  No.

11   BY MR. JOSSEN:

12   Q.   Mr. Wolfe, do you have a view as to whether the

13   Commonwealth's decision to take the toll revenues away from

14   the bondholders will have an influence on investors in the

15   Commonwealth in the future?

16   A.   I have a view, yes.

17   Q.   And your view is?

18   A.   That I don't think it would preclude the Commonwealth

19   from accessing markets in the future.

20   Q.   Do you think it will hurt the Commonwealth in that

21   endeavor?

22   A.   It may lead to a slightly higher interest rate in the

23   short term on what they borrow.

24   Q.   That would be harmful?

25   A.   That would be something that would have to fit into the

1    overall fiscal plan to make sure they could afford the higher

2    interest.

3    Q.   And before working with the Oversight Board, you didn't

4    have any experience in the United States municipal financial

5    markets, did you?

6    A.   I did not.

7    Q.   You have no experience selling debt, do you?

8    A.   No.

9    Q.   The term "special revenues," that has no economic

10   significance to you?

11   A.   It does not.

12   Q.   Mr. Wolfe, did you hear the Governor of the Commonwealth

13   recently announce that as of June 30th, the Commonwealth had

14   one billion 799 million dollars in cash on hand?

15   A.   I did not hear the announcement.  I was in Panama at the

16   time.

17   Q.   So you weren't aware of that fact?

18   A.   I had seen a liquidity sheet that had a number similar to

19   that, but I didn't hear what he said at the time.

20   Q.   And that was a number that's approximately 1.5 billion

21   dollars more than it had been projected to be as of June 30th;

22   is that right?

23   A.   No.  No.

24   Q.   It's significantly greater than the number that had been

25   projected as of June 30?

1    A.    It's probably at least double, yes.

2    Q.    Maybe more?

3    A.    A little bit more.

4              MR. JOSSEN:  Your Honor, may I just have a moment?

5              THE COURT:  Yes.

6              MR. JOSSEN:  I have no further questions.

7              THE COURT:  Thank you.

8              MR. JOSSEN:  I have no further questions.  Thank you,

9    Your Honor.

10             THE COURT:  Thank you.

11                      REDIRECT EXAMINATION

12   BY MR. RAPPAPORT:

13   Q.    Good afternoon, Mr. Wolfe.  I'm Larry Rappaport at

14   Proskauer.

15             Let's focus first on this 150 million dollar number.

16   What is your understanding of where that number comes from?

17   A.    That's the -- in the fiscal plan, the sum total of all

18   the toll revenues, including fines that are part of the

19   revenue treatment for the -- for HTA, and what I understood

20   was pledged revenue to these bonds.

21   Q.    All right.  And the 150 million dollars, is that an

22   annual number?

23   A.    Yeah, roughly.

24   Q.    All right.  And I may have misheard or somebody may have

25   misspoke.  That's not a debt service number; is that correct?

```
 1   A.   No.  The debt service is much larger.  It's somewhere

 2   between 290 -- 290 million and 325 million over the course of

 3   the fiscal plan.

 4   Q.   All right.  So again, just to be clear, what you then did

 5   was you ran through your model, taking out 150 million dollars

 6   a year based on the amount of the toll revenue and fines?

 7   A.   Yes.

 8   Q.   And what was the result of -- what did you find by doing

 9   that?

10   A.   So it drops growth on a yearly basis to .71, and that

11   is -- ends up generating primary surpluses over time that

12   start to shrink and eventually turn negative.

13   Q.   And do you have an opinion of what the result would be on

14   the Commonwealth economy if that occurred?

15   A.   Well, it would make the debt service unsustainable.  We'd

16   be back in a debt crisis, and, you know, we'd be back in this

17   spiral that people would start leaving the island, the economy

18   would shrink, poverty would worsen.  We -- you know, it would

19   be a disaster basically, macroeconomically.

20   Q.   And counsel asked you whether you ran 70 million, and you

21   said no.  Did you run any numbers through your model other

22   than 150 million dollars?

23   A.   Yeah.  So what I did was I tried to find out, you know,

24   what happens to the surplus that you're building up over time

25   if growth were .1 degredations below the 1.01.  So I did it at
```

```
 1    .9, .8, .7, .6.  Obviously, once I hit .7, it got worse.  So I
 2    knew .6, .5 would be even worse.  .8 turned out to be
 3    consistent with about a hundred million dollars of additional
 4    measures.
 5             So effectively what the model is saying is every 50
 6    million dollars of revenue drop -- of measures, additional
 7    measures drops the growth by .1.  So to do 70, I could, you
 8    know, just extrapolate it and give you about .86, something
 9    like that.
10    Q.    Okay.  And you indicated if you took out 100 million
11    dollars, that gives you roughly 2.8?
12    A.    Yeah.  Right around the minimum.
13    Q.    And when Mr. Jossen asked you about that, I believe you
14    said that mathematically, that was .8, but that you wouldn't
15    recommend taking that out; is that correct?
16    A.    Correct.
17    Q.    And why would you not recommend that?
18    A.    Because what you're saying is that the Commonwealth is
19    going to generate just enough growth, just that minimum growth
20    to generate just that minimum amount of surplus that's going
21    to at least not fall over time.  But that assumes that every
22    single thing in the plan works exactly as we want.  It also
23    assumes that there's no cycle in the future, which we know is
24    going to happen.  There's going to be a period in the future
25    where the economy is going to dip, and if it dips and stays a
```

```
 1   while below the .8, we may be back here in the same

 2   discussion.

 3          You don't live -- as an economist, you would never

 4   recommend that an entity live on the edge year after year

 5   after year.  So for me, it just makes no sense to push this

 6   thing below the one percent.  I mean, the one percent

 7   generates a surplus that will be used to restructure the

 8   entire debt.  It's not to say that some -- that the

 9   Commonwealth is not going to pay debt.  They will.  It will

10   come out of that fund that's created.  But it gives you some

11   cushion, one, that if the growth dips, you'll have some space.

12   Two, you're building up some surplus that in case you really

13   dip pretty far below, you'll still be able to keep paying your

14   debt.

15          It just to me is a plan that fits together and holds

16   together going forward.  And it's -- you know, if you start

17   chipping away at it, or run it down to its bare minimum, the

18   risk is just very, very high.

19   Q.   Now, I believe in your declaration you also ran through

20   your model taking out between 290 million, 325 million dollars

21   a year; is that right?

22   A.   Yes, that's the --

23          MR. JOSSEN:  Objection, Your Honor.  Beyond the scope

24   of cross.

25          MR. RAPPAPORT:  I'm going to tie it in to the cross.
```

1   He said debt service.  My next question is, is that the debt

2   service number.

3           MR. JOSSEN:  I still object, Your Honor.  It's still

4   beyond the scope of cross.

5           THE COURT:  Overruled.  You may --

6           THE WITNESS:  That's the debt service, total debt

7   service for HTA.

8   BY MR. RAPPAPORT:

9   Q.   And the results of that exercise, those are set forth in

10  your declaration, correct?

11  A.   Yes.

12  Q.   And counsel also asked you about the use of a 1.34

13  multiplier.  What was that based on?

14  A.   So there are a lot of studies of multipliers at the

15  sovereign government level, and those multipliers, some in

16  very stable situations, would say they are closer to one.  But

17  in more crisis type situations, they can be in excess of two

18  and close to three.

19          The one that -- the paper, the analysis that I

20  studied a lot was the Greek case where the IMF used too low a

21  multiplier at first, and in retrospect thought the multiplier

22  they should have used was 1.5.  But those are all sovereign

23  analyses, and Puerto Rico in a sense isn't a sovereign, that

24  it has a monetary policy or exchange rate policy that it can

25  use to offset the impact of fiscal policy.

```
 1              So we searched through the literature, and there was

 2   a paper in the American Economic Review that did a study of

 3   regional multipliers.  And the impetus was for military base

 4   closures, when they were thinking of that issue around the

 5   country, and what was the impact on the regional economy,

 6   those authors did many different analyses and came up with

 7   very different -- they came up with different multipliers.

 8   But the one case that seemed the most appropriate to tie to

 9   Puerto Rico was the one that was related and generated the

10   multiplier of 1.34.  It was a study in the American Economic

11   Review.  It's one of the two premier economic journals in the

12   profession.  I trusted that the work that was done there was

13   done correctly.

14   Q.   Are you familiar with the term deficit spending?

15   A.   Yes.

16   Q.   And what is that?

17   A.   That's spending that's financed either by the use of --

18   sale of assets or the accumulation of debt.

19   Q.   All right.  And is it also sometimes called overspending?

20              MR. JOSSEN:  Objection, Your Honor.  Leading.

21              THE COURT:  I'll allow it.  He can answer.

22              THE WITNESS:  Not necessarily.

23   BY MR. RAPPAPORT:

24   Q.   Okay.  The reconciliation line that you mentioned

25   earlier, when you said that was over spending, what did you
```

1    mean by that?

2    A.   Well, historically, and the reason why the reconciliation

3    line is there, is the last audited fiscal data for the

4    Commonwealth is 2014.  And in 2014, what it showed was -- and

5    this is something that has been going on in the Commonwealth

6    for years.  What happens is the government passes a budget

7    based on an exaggerated revenue estimate, and then every

8    agency gets a spending limit off of that.

9          Well, come January, February of the fiscal year,

10   they would start running out of money.  And the OMB sends out

11   an order to all the departments, you have to cut spending by

12   ten percent let's say for an example.  But they have no

13   control.  There's no internal controls to do that.

14         So the Department of Education, or whichever, keeps

15   spending as if they never got that order.  But they can't tie

16   that to a budget line anymore, because that line's been cut.

17   So they just spend it and stash a bill in a drawer.  And

18   Treasury stashes the bill in a drawer.  It doesn't get

19   classified, but it's spending and it's spending on real items.

20   It's not necessarily wasteful spending.  It may be a computer

21   for a school that they didn't have the funds anymore and

22   needed to buy.

23         And so what happens, those payables, those arrears

24   would grow year after year after year.  When the next budget

25   came, they'd pay that off, and the process would start over

1  again.  Every three or four years, it got so bad that they'd

2  have to issue debt to cover it.  The last one was a GDB bond

3  for three and a half billion dollars in 2014 I think.

4  Something like that.

5         Well, that well's run dry, but the spending, it's

6  still part of the government's spending.  And we had to build

7  it into the baseline.  We're going to try to reduce that with

8  the measures, but you can't ignore that spending that's been

9  happening just because it wasn't classified in a budget way.

10 Q.   Counsel asked you a question about what I believe was

11 1.799 billion dollars in cash on hand.  Do you recall that?

12 A.   Yes.

13 Q.   What is your understanding of cash on hand?

14 A.   Well, I think what they are trying to say is that they

15 have cash that if they had to spend -- buy something or spend

16 something today, they had this amount of money to do it with.

17 But at least the data that I saw, I can't make that judgment.

18 I don't -- I can't say that there truly was that much cash on

19 hand.

20        Two factors.  One for sure is some of the money that

21 I saw in that 1.8 is money for the pensions that's already

22 embedded in the fiscal plan in covering the pension deficit.

23 The second is it's not clear if some of that money is tied to

24 bills that are -- this idea of not paying bills and just

25 accumulating payrolls, if they just supported cash and started

1    running up these payable bills again.

2        So before I would be able to pass judgment as to

3    what is truly cash on hand, I'd have to see much more details

4    of that presentation.

5       MR. JOSSEN:  Your Honor, I'm going to object to that

6    speech, because there's a lack of foundation for the

7    information.  The witness said on cross-examination he wasn't

8    even aware of what the amount was.

9       MR. RAPPAPORT:  Well, I believe he said he didn't

10    hear the Governor's speech.  He said he had seen a sheet with

11    the information on it, but he was in Panama, so he didn't hear

12    the Governor's speech.

13       THE COURT:  That's my recollection of the testimony

14    as well.

15       Mr. Jossen.

16       MR. JOSSEN:  He also indicated the number was he

17    thought significantly lower, and I think he used the number

18    half of the 800 -- 1.9 billion dollars.  So I don't know how

19    he is now in a position to make these statements when he

20    couldn't answer on cross-examination.

21       MR. RAPPAPORT:  My recollection of that is also

22    different.  I think Mr. Jossen asked him whether it was a

23    certain amount above what had been anticipated, and the

24    witness said no, it wasn't that much above.  He believed it

25    was about half above.

1        THE COURT:  I recall that he was talking about the

2   differential as well.  The objection's overruled.

3        MR. RAPPAPORT:  I have no further questions for the

4   witness.

5        THE COURT:  Thank you, Mr. Wolfe.  Your testimony is

6   concluded.

7        (At 2:40 PM, the witness left the stand.)

8        MR. BRILLIANT:  Your Honor, in order for us to budget

9   our time, would it be inappropriate for us to -- we're keeping

10  track as well, but we'd like to know what the Court thinks,

11  how much time we have left.

12       THE COURT:  I think some math is being done.

13       MR. BRILLIANT:  Thank you, Your Honor.

14       THE COURT:  So perhaps -- why don't we take a

15  five-minute pause while the math is being done.

16       MR. BRILLIANT:  Thank you, Your Honor.

17       MR. JOSSEN:  Thank you, Your Honor.

18       (At 2:41 PM, recess taken.)

19       (At 2:50 PM, proceedings reconvened.)

20       THE COURT:  We are returning to session.  Please

21  return to your seats.

22       So the calculus is as follows:  Peaje has used 127

23  minutes of the 180 minute allocation, and defendants have used

24  59 minutes of their allocation.

25       Ms. McKeen.

1          MS. MCKEEN:  Thank you, Your Honor.  Our next witness

2    is Dr. Jonathan Arnold.  His declaration was filed on July 14.

3    It's been designated Defense Exhibit TTT.

4          May I approach with an extra copy for the clerk?

5          THE COURT:  Yes, please.

6          Thank you.

7          MS. MCKEEN:  And Your Honor, we'd ask that Dr.

8    Arnold's declaration be moved into evidence.

9          THE COURT:  The tender of Exhibit TTT is accepted

10   into evidence subject to any objections that have been

11   lodged.

12         MS. MCKEEN:  Thank you, Your Honor.

13         THE COURT:  Thank you.

14         (At 2:52 PM, Defense Exhibit TTT admitted into

15   evidence subject to objections.)

16         THE COURT:  Dr. Arnold, please go to the witness

17   stand and remain standing to take the oath.

18         COURTROOM DEPUTY:  Do you solemnly swear that all the

19   testimony you are about to give will be the truth, the whole

20   truth, and nothing but the truth?

21         THE WITNESS:  Yes, I do.

22         COURTROOM DEPUTY:  So help you God.

23         MR. JOSSEN:  Your Honor, may I inquire?

24         THE COURT:  Yes, please.

25              J O N A T H A N   I.   A R N O L D,

1        called as a witness by the defense, having been

2        previously sworn, testified as follows:

3                        CROSS-EXAMINATION

4    BY MR. JOSSEN:

5    Q.   Mr. Arnold, you describe yourself as a testifying

6    economist, right?

7    A.   Yes.

8    Q.   Previously you testified on behalf of the Commonwealth in

9    a case before Judge Besosa last year, right?

10   A.   I did.

11   Q.   That was on behalf of the GDB?

12   A.   I'm not sure whether it was the GDB or the executive

13   branch or some combination of the two.

14   Q.   And that was a case where the plaintiffs wanted relief

15   from the stay that was in effect?

16   A.   Relief from the automatic temporary stay of PROMESA, yes.

17   Q.   You testified in that case that there was no harm to

18   creditors which would justify releasing of the stay, correct?

19   A.   Well, as a matter of economics I did, yes.

20   Q.   That was your testimony, right?

21   A.   That was part of it, yes.

22   Q.   After your testimony in the Brigade case, you reached out

23   to one of the lawyers for the AAFAF to offer your services

24   again, right?

25   A.   That's part of the truth.  We went into more detail at

```
 1    our deposition, as you recall.

 2    Q.   You called Peter Friedman; is that right?

 3    A.   That is one of the things I did, yes.

 4    Q.   And you offered to work with the Commonwealth in this

 5    matter, right?

 6    A.   Well, I was already working for the Commonwealth of

 7    Puerto Rico through Kirkland and Ellis.  And as part of

 8    Kirkland's transition of responsibility to O'Melveny, a call

 9    was facilitated, yes.

10    Q.   You offered to continue your work for the Commonwealth,

11    right?

12    A.   Yes.  Yes.

13    Q.   You are employed by a company called Chicago Economics?

14    A.   Yes.

15    Q.   You own that company?

16    A.   Yes.

17    Q.   And Chicago Economics in turn has an agreement with

18    Compass Lexecon, right?

19    A.   Yes.

20    Q.   And your hourly rate on this work is 925 dollars an hour?

21    A.   Yes.

22    Q.   And that's money that's paid by Compass Lexecon to

23    Chicago Economics?

24    A.   Yes.

25    Q.   Which in turn bills HTA or the Commonwealth, right?
```

1    A.   Yes.

2    Q.   With respect to your declaration, which counsel

3    identified and which has been offered, you made that statement

4    under penalty of perjury?

5    A.   I believe that was the language, yes.

6    Q.   And that was signed on July 14, 2017?

7    A.   That's my recollection, yes.

8    Q.   Your deposition was then taken on July 19, a few days

9    later?

10   A.   A few days later, yes, that's right.

11   Q.   Now, the purpose of your declaration was to critique

12   Mr. Stanford's Affidavit, right?

13   A.   No.  The purpose was to assess and respond as

14   appropriate.

15   Q.   Wasn't it in fact to give your opinion about

16   Mr. Stanford's Affidavit?

17   A.   Yes.

18   Q.   By the way, there was an error in your declaration?

19   A.   There were a couple of typos, and there is a errata sheet

20   that was prepared and I signed, yes.

21   Q.   It was an error that was not intentional?

22   A.   Yes.  It was an unintentional error.

23   Q.   Negligent?

24   A.   I don't believe I would call it negligent, and I'm happy

25   to explain why.

1    Q.   The error was pointed out to you after the declaration

2    was submitted, right?

3    A.   Yes.

4    Q.   By one of your colleagues at Compass Lexecon?

5    A.   By one of the people who assisted me on the case, yes.

6    Q.   Now, in connection with your declaration, you didn't do

7    any of your own investigation into the assumptions

8    Mr. Stanford made, right?

9    A.   I did not.  That's fair.

10   Q.   You didn't ask at the time for any information from HTA,

11   right?

12   A.   No, I did not.

13   Q.   You didn't ask to seek or see any of the HTA financial

14   information?

15   A.   That's correct.

16   Q.   Or projections?

17   A.   Well, I referred to the certified plan.  I obtained that

18   through counsel.

19   Q.   Okay.  Did you review the HTA fiscal plan of April 28,

20   2017, to determine the numbers that Mr. Stanford used and

21   whether they were accurate?

22   A.   I did not review it for that purpose.

23   Q.   Okay.  And in fact, you knew -- withdrawn.

24        You knew, as of the date of your deposition, that

25   there was a draft amended HTA fiscal plan?

1   A.   I did know that there was a draft that was under

2   development, yes.

3   Q.   But you didn't ask to see it, correct?

4   A.   I did not, and I'm happy to explain why.

5   Q.   You didn't create your own independent model in

6   connection with your declaration, did you?

7   A.   That is correct, yes.

8   Q.   You made no factual investigation whether the

9   Commonwealth had available funds to pay the HTA expenses if

10  the toll revenues were not diverted, did you?

11  A.   I did not look into that question.

12  Q.   You simply assumed that if the toll revenues were not

13  diverted, there was no money to pay for maintenance of the

14  roads, correct?

15  A.   I wouldn't put it that way.  What I would say is that I

16  relied on the certified plan, which stated that the

17  projections and overall calculations depended on the use of

18  the proceeds to fund the HTA operations.

19  Q.   You took that as a given?

20  A.   Yes, I did.

21  Q.   You made no investigation to determine whether there were

22  other monies available, right?

23  A.   That's correct.

24  Q.   You didn't consider if the clawback could be sufficient

25  to pay the HTA expenses?

1   A.   I did not look into that question, no.

2   Q.   Or how the clawback was going to be used at all?

3   A.   I did not look into that issue, no.

4   Q.   And you didn't conduct any independent factual

5   investigation whether there would be a negative impact on the

6   Commonwealth's transportation network if the injunction were

7   granted?

8   A.   That is correct.

9   Q.   You didn't make any factual investigation whether or not

10  the roads would actually deteriorate if an injunction were

11  granted?

12  A.   True.

13  Q.   And you, sir, do not have any knowledge regarding highway

14  infrastructure, correct?

15  A.   I'm not putting myself out as an expert on that topic,

16  that's true.

17  Q.   Or capital expenditures?

18  A.   With respect to highways, that's true.

19  Q.   Or road upkeep?

20  A.   True.

21  Q.   Or maintenance?

22  A.   True.

23  Q.   Now, in connection with your declaration and reacting to

24  Mr. Stanford's Affidavit, it was your view that a discount

25  rate of ten, 11 or 12 percent used by Mr. Stanford would be

```
 1   consistent with the current market yield on PRHTA bonds,
 2   right?
 3   A.    Yes.
 4   Q.    And therefore, were in a reasonable range, correct?
 5   A.    Well, reasonable for a particular purpose, I think
 6   ultimately it's not reasonable for the purpose he's using
 7   them.
 8   Q.    Well, you thought they're a reasonable range for the
 9   discount amounts to provide in this model?
10   A.    I said it was consistent with current market prices for
11   PRHTA bonds; but I think what you're asking is a different
12   question, and I disagree with that.
13   Q.    Now, in paragraph 35 of your declaration -- do you have
14   your declaration there?
15   A.    I don't know.  There are many binders here.
16   Q.    Well, without looking at it, let me just go forward with
17   it.  This paragraph accompanies Exhibit Five in your
18   declaration.  All right?
19   A.    Okay.
20   Q.    And that's designed to show what would happen if there
21   were a 24-month deferral of the receipt of the toll revenues
22   by the bondholders, correct?
23   A.    Suspension actually, yes.
24   Q.    And that analysis was done based upon Mr. Stanford's
25   assumptions in his Affidavit, right?
```

```
 1   A.   Correct.

 2   Q.   And you agree with me that if the growth rate were lower,

 3   that would affect or would have affected the table that you

 4   prepared, right?

 5   A.   Yes.

 6   Q.   And if the discount rate were higher, that would also

 7   have affected the table?

 8   A.   I agree.

 9   Q.   And if the revenues were lower, that would also have

10   affected the table, correct?

11   A.   Yes, I agree with that as well.

12   Q.   Mr. Arnold, in the last year, isn't it true that you have

13   been criticized by three appellate judges?

14   A.   If you're referring to a family law dispute and ancillary

15   litigation that I've been involved in, yes, both my ex and I

16   have been criticized by various judges over the course of that

17   dispute.

18   Q.   Your motives have been challenged by three appellate

19   judges, correct?

20            MS. MCKEEN:  Objection, argumentative.

21            THE COURT:  Sustained.

22   BY MR. JOSSEN:

23   Q.   Were your motives challenged by three appellate judges?

24            MS. MCKEEN:  Same objection.

25            THE COURT:  Are you representing, Mr. Jossen, that
```

 1   you have a good faith basis for the characterization?

 2          MR. JOSSEN:  Absolutely, Your Honor.

 3          THE COURT:  I will allow the question.

 4          THE WITNESS:  Would you repeat the question?

 5   BY MR. JOSSEN:

 6   Q.   Were your motives challenged or criticized by three

 7   appellate judges?

 8   A.   I don't want to quibble with you.  I'm not sure that that

 9   is the right way to characterize it.  I think it's fair to say

10   that there is an appellate court that criticized my appeal of

11   a decision that was adverse to me.  They characterized it in a

12   personal way.  They called -- they referred to me personally,

13   although I was represented by counsel at all relevant times

14   during the proceeding.  But I think it's fair to say that the

15   appellate court was not welcoming of my appeal.

16   Q.   Isn't it true, sir, that a federal appellate court found

17   that fraud claims you had brought in personal litigation were,

18   quote, not merely meritless, but are frivolous?

19          MS. MCKEEN:  Your Honor, I don't think this line of

20   questioning has any relevance, and I think it should be

21   excluded not only on that basis but under 611 as harassing.

22          MR. JOSSEN:  Your Honor, if I may be heard?

23          THE COURT:  Yes.

24          MR. JOSSEN:  Under 608(b), I believe that the

25   appellate decision that I have referenced to and the inquiry

1    in this area goes to credibility, and is therefore admissible

2    and permissible for me to use on cross-examination.

3           THE COURT:  Well, this last question that you asked

4    was regarding a legal argument that was advanced.  And I will

5    sustain the objection as to the last question, but not as to

6    the prior line of questioning.

7           MS. MCKEEN:  Thank you, Your Honor.

8    BY MR. JOSSEN:

9    Q.   Isn't it true that the same Court concluded that you

10   prosecuted an appeal simply to harass another party?

11          MS. MCKEEN:  Same objection, Your Honor.

12          THE COURT:  I will allow that question, and then I

13   will ask you to move on.

14          MR. JOSSEN:  Fine, Your Honor.

15          THE WITNESS:  I am not aware of them using that

16   particular language, so I can't answer that question yes or

17   no.

18   BY MR. JOSSEN:

19   Q.   Did you review the decision of the Court of Appeals that

20   I'm referring to?

21   A.   I have not.

22   Q.   Never looked at it?

23   A.   I have not looked at it.

24   Q.   Now, you in your declaration offered statements about a

25   bond, if a preliminary injunction would be granted.  You've

1    never offered testimony in any court regarding the size of the

2    bond, have you?

3    A.    Not in court, as we discussed at my deposition, that's

4    true.

5    Q.    You've never been accepted by any court as an expert in a

6    bond determination, have you?

7    A.    I don't think any of the matters in which I've

8    participated in on that topic have reached that point, so I

9    think it is fair to say that I've never been accepted by a

10   court on that basis.

11   Q.    And you based your bond position and your declaration on

12   the potential loss of federal funds, correct?

13   A.    Yes.

14   Q.    You didn't do any independent investigation whether that

15   would happen?

16   A.    I did not.

17   Q.    You didn't look at that subject at all?

18   A.    Well, I did.  I looked at the certified fiscal plan that

19   we referred to earlier, and that certified fiscal plan

20   identifies monies that would come from two federal highway

21   agencies.  And the particular page that I'm envisioning in my

22   head describes the predicates for Puerto Rico being eligible

23   to receive those funds.

24          So I did -- I didn't simply take it at whole cloth.

25   I did do additional research into that topic.

1   Q.   You didn't look to make any determination whether the

2   fund would actually be in jeopardy?

3   A.   I wouldn't put it that way.  I think that the possibility

4   of jeopardy is what I identified -- what I was advised of by

5   Mr. Gonzalez, and which is confirmed in the certified fiscal

6   plan.  But to actually determine that it would happen or what

7   the probability is is not something that I did.  But what I

8   did determine is that the probability is not zero, which is

9   what forms the basis and motivation for using that as an

10  element of the proposed bond.

11  Q.   So you took as a given what someone told you?

12  A.   I think that my answer a moment ago was more complete,

13  and that oversimplifies and overreduces my answer, sir.

14          MR. JOSSEN:  Your Honor, may I have a moment?

15          THE COURT:  Yes.

16          MR. JOSSEN:  I have no further questions of the

17  witness, Your Honor.

18          THE COURT:  Thank you.

19          Ms. McKeen.

20                    REDIRECT EXAMINATION

21  BY MS. MCKEEN:

22  Q.   Dr. Arnold, Mr. Jossen asked you a few questions about a

23  family law dispute you were involved in.  Without belaboring

24  that anymore than is necessary, did you offer any expert

25  opinions in any of the lawsuits that Mr. Jossen just referred

 1   to?

 2   A.   No.

 3   Q.   And in any of those lawsuits, did a Court ever criticize

 4   you in your capacity as an expert?

 5   A.   No.

 6   Q.   Or as an economist?

 7   A.   No.

 8   Q.   Thank you.

 9        Dr. Arnold, have you reviewed both of the

10   declarations that Mr. Stanford submitted in this matter?

11        MR. JOSSEN:  Objection, Your Honor.  It's beyond the

12   scope of -- I'm trying not to lose this.  It's beyond the

13   scope of cross-examination.

14        THE COURT:  Do you want to make a proffer in

15   connection to the cross?

16        MS. MCKEEN:  Your Honor, Dr. Arnold's Affidavit and

17   testimony respond not only to the -- his Affidavit responds to

18   the original Affidavit that Mr. Stanford submitted in this

19   matter.  Since that time, Mr. Stanford filed a Supplemental

20   Affidavit, which plaintiffs have offered as part of their case

21   in chief but as to which Dr. Arnold was never able to respond.

22   And I think given those circumstances, it would be appropriate

23   to ask Dr. Arnold a few questions about the extent to which

24   that new information informs the opinions as to which

25   Mr. Jossen just questioned him, including his opinions about

the discount rate that's at issue and Mr. Stanford's analysis,

which was the subject of cross-examination.

MR. JOSSEN:  Your Honor, I object most strenuously to

this attempt to exceed the limits of the cross-examination and

to go into an area that was not covered.  The witness has

never submitted any clarification or any supplemental

declaration, nor do the rules that Your Honor set in the

Scheduling Order envision that that could be done.  And under

Rule 26 alone, if the witness were going to supplement, he had

an obligation to come forward and do that.

We don't think that that's permitted.  We have had no

opportunity to examine him at all on this subject.  I object.

THE COURT:  The objection's sustained.

BY MS. MCKEEN:

Q.   Mr. Stanford -- I apologize.

THE COURT:  Arnold.

BY MS. MCKEEN:

Q.   Dr. Arnold, Mr. Jossen asked you a question about the ten

to 12 percent discount rate that Mr. Stanford used in his

analysis just a moment ago, correct?

A.   Yes.

Q.   Under your analysis of Mr. Stanford's model, would it be

appropriate to apply that discount rate in the event the Court

entered a permanent injunction in this matter?

A.   It would not.

1   Q.   Why not?

2   A.   As a matter of economics --

3            MR. JOSSEN:   Objection, Your Honor.   Also beyond the

4   scope of cross.

5            MS. MCKEEN:   Your Honor, Mr. Jossen was inquiring

6   regarding Mr. Arnold's opinion about the appropriate discount

7   rate that should be used in the analysis of calculating the

8   hypothetical equity cushion.   I think it's appropriate for me

9   to be able to question him about his views on that discount

10  rate and what it ought to be.

11           MR. JOSSEN:   Your Honor, there is no mention

12  whatsoever in his declaration, nor was there any questioning

13  about it in my cross relating to a permanent injunction.

14           THE COURT:   Objection sustained.

15  BY MS. MCKEEN:

16  Q.   Dr. Arnold, in your opinion, would it be appropriate to

17  use a ten to 12 percent discount rate in perpetuity as

18  Mr. Stanford does in his analysis?

19  A.   No.

20  Q.   Why not?

21  A.   It is not reasonable in my opinion, because in

22  Mr. Stanford's analysis, he is modeling a scenario in which

23  the Court enters a preliminary injunction.   If the Court

24  actually grants the preliminary injunction and the HTA takes a

25  hundred million dollars that it's collecting per year and pays

```
 1   it to the fiscal agent, then the risk of those bonds is going

 2   to be more akin to an AAA or AA risk rather than a bond that

 3   is in default.  As soon as the HTA is mandated to funnel those

 4   funds directly to the fiscal agent and then on to the holders

 5   of 1968 bonds, under his modeling, it is essentially

 6   guaranteed that the bondholders will get full payment on time

 7   for those bonds.

 8            And in that state of the world, the discount rate

 9   will be one that is akin to an AAA or AA credit, which is more

10   like three percent or three and a half percent, not ten to 12.

11            MR. JOSSEN:  Your Honor, I move to strike the last

12   answer on the grounds that it is again beyond the scope of

13   cross-examination, not covered at all in his declaration.

14            THE COURT:  That objection's overruled, and the

15   motion to strike is denied.

16   BY MS. MCKEEN:

17   Q.   Dr. Arnold, in the scenario that you've just described,

18   would the equity cushion be less than 20 percent in any of the

19   scenarios Mr. Stanford has presented in his two declarations

20   to this Court?

21            MR. JOSSEN:  Objection, Your Honor, beyond the scope

22   of the cross.  And again, in violation of the rule with

23   respect to any supplementing of this witness' testimony.

24            THE COURT:  I will allow this follow-up question.

25   You may answer.
```

1          MS. MCKEEN:  Thank you, Your Honor.

2          THE WITNESS:  No.  The hypothetical equity cushion

3     would be far in excess of 20 percent in all 21 versions of

4     Mr. Stanford's hypothetical models.

5     BY MS. MCKEEN:

6     Q.   Thank you.  No further questions.

7          THE COURT:  Thank you.

8          Your testimony is concluded, Dr. Arnold.  Thank you.

9          THE WITNESS:  Thank you.

10         (At 3:15 PM, the witness left the stand.)

11         THE COURT:  Now, the plaintiff has rebuttal

12    witnesses?

13         MR. JOSSEN:  Yes, Your Honor, we do.  And we would

14    first call W. Bartley Hildreth as our first witness.

15         THE COURT:  Thank you.

16         Mr. Hildreth, would you please come to the witness

17    stand and remain standing to take the oath.

18         COURTROOM DEPUTY:  Do you solemnly swear that the

19    testimony you are about to give in this case is the truth, the

20    whole truth, and nothing but the truth?

21         THE WITNESS:  I do.

22         COURTROOM DEPUTY:  So help you God.

23         MR. JOSSEN:  With the Court's permission, I move the

24    admission of Mr. Hildreth's declaration, which is Plaintiff's

25    Exhibit 91, into evidence.

1          THE COURT:  Plaintiff's Exhibit 91 is admitted

2     subject to any objections that have been lodged.

3          (At 3:16 PM, Plaintiff's Exhibit 91 admitted into

4     evidence subject to objections.)

5          MR. MUNGOVAN:  Good afternoon, Your Honor.  Timothy

6     Mungovan.  Thank you very much.

7          THE COURT:  Good afternoon, Mr. Mungovan.

8               W.   B A R T L E Y   H I L D R E T H,

9     called as a witness by the plaintiff in rebuttal, having been

10    sworn, testified as follows:

11                        CROSS-EXAMINATION

12    BY MR. MUNGOVAN:

13    Q.   Good afternoon, Professor Hildreth.

14    A.   Good afternoon.

15    Q.   You are not an economist, correct?

16    A.   Correct.

17    Q.   And you don't have a degree in economics, correct?

18    A.   Correct.

19    Q.   And you don't have any expertise regarding the

20    transportation system in Puerto Rico, correct?

21    A.   To the extent that my declaration covers it, that's all I

22    know, yes.

23    Q.   And you haven't familiarized yourself with the condition

24    of the roads in Puerto Rico, correct, sir?

25    A.   Other than the last couple days, no.

1    Q.    Meaning driving around the island?

2    A.    Right.

3    Q.    And the opinions that you've given concern the use of

4    toll revenues in Puerto Rico or with respect to Puerto Rico,

5    correct, sir?

6    A.    Correct.

7    Q.    And specifically your opinions relate to bonds issued

8    under a resolution called the 1968 Resolution, correct, sir?

9    A.    Correct.

10   Q.    And is it correct to say that you've not studied how the

11   proceeds of the 1968 Resolution Bonds were used, correct?

12   A.    Correct.

13   Q.    And you've given an opinion that the, quote, public

14   interest will be harmed if the government diverts the toll

15   revenues and expropriates the 1968 bondholders' collateral; is

16   that correct?

17   A.    Yes.

18   Q.    It's your opinion that the 1968 bondholders have a right

19   to be paid in what you call a waterfall set forth in the 1968

20   Resolution, correct?

21   A.    The '68 and the 2010.

22   Q.    The 2010 Bond Resolution?

23   A.    The 2010 official statement on the issuance of the AA

24   series.

25   Q.    Thank you, Professor.

1          THE COURT:  Professor Hildreth, would you please

2   speak directly into the microphone?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:   Thank you.

5   BY MR. MUNGOVAN:

6   Q.   And, Professor, you have not researched market reactions

7   to events in Puerto Rico in recent years, have you?

8   A.   No, I have not.

9   Q.   And you don't have an opinion on what the market impact

10  would be if payment on other Puerto Rico revenue bonds, aside

11  from the 1968 Resolution Bonds, were interrupted, correct?

12  A.   I do have an opinion.

13  Q.   You have an opinion with respect to what the market

14  impact would be if payment on bonds other than the 1968

15  Resolution Bonds were interrupted?

16  A.   To the extent that --

17  Q.   Yes or no, sir?

18  A.   Yes.  To the extent --

19  Q.   I'm going to cut you off.  You say yes.  Do you recall

20  having your deposition taken in this case, sir?

21  A.   Yes.

22  Q.   Last week, right, sir?

23  A.   Yes.

24          MR. MUNGOVAN:  May I approach the witness, Your

25  Honor, to show him his deposition transcript?

```
 1                 THE COURT:  Yes, you may.  And please call out the

 2    page and line number you are referring to.

 3                 MR. MUNGOVAN:  Certainly, Your Honor.  Thank you.

 4    BY MR. MUNGOVAN:

 5    Q.    Professor.

 6    A.    Sure.

 7                 THE COURT:  Please call it out now, so opposing

 8    counsel can refer to the page.

 9                 MR. MUNGOVAN:  Yes.  I apologize, Your Honor.  It's

10    the deposition dated August 3, 2017.  Transcript page 103,

11    line six, and following onto 104, line five.

12    BY MR. MUNGOVAN:

13    Q.    And the question that was put to you at the deposition by

14    my partner, sir:  Is it fair to say, though, that your opinion

15    is that all of those revenue bonds need to be paid to avoid

16    harm to the municipal market?

17                 Mr. Jossen objected to the form.

18                 And your answer was, I -- I have -- I am not issuing

19    an opinion on any other bonds.  I have not looked at those

20    offering circulars.

21                 That was your testimony last week?

22    A.    And that's consistent with what I was about to say before

23    you cut me off.

24    Q.    Thank you, sir.

25                 And one of your opinions in this case is that the
```

1   Commonwealth of Puerto Rico could spend 70 million dollars a

2   year on debt service for the 1968 Resolution Bonds without

3   materially impacting its expenditures for public service or

4   transportation network, correct?

5   A.   Yes.

6   Q.   And that's because in your opinion, 70 million dollars is

7   a small amount of money out of an 18 billion dollar budget,

8   correct?

9   A.   Yes, and that this was covered in the '68 Bond

10  Resolution.  It's covered in all the disclosure documents

11  since then over those 50 years.  That total revenue is

12  dedicated through collateral for the bondholders of the '68

13  Bond Resolution.

14  Q.   But the point, sir, is in your opinion, in a budget of 18

15  billion dollars, 70 million dollar is a relatively small

16  amount of money?  That's your opinion, right?

17  A.   Yes.

18  Q.   And then you go on in your declaration to identify a

19  number of places in the Commonwealth budget where in your

20  opinion you think it would be possible to reduce expenditures

21  in order to find money for debt service on the 1968 Resolution

22  Bonds, right?

23  A.   Yes.

24  Q.   And in fact, you're critical of the choices the

25  Commonwealth is making under its existing budgeting; isn't

1   that right?

2   A.    No.

3   Q.    One of the places you identify where you think that the

4   Commonwealth could find money to use to pay bondholders is

5   what you call the reconciliation adjustment, correct, sir?

6   A.    Correct.

7   Q.    And you describe it as, quote, cushion for cost overruns,

8   close quote; is that correct, sir?

9   A.    I believe that's a quote from someone else.

10  Q.    That's right.  You took that quote from someone called

11  Reorg Research, correct, Professor?

12  A.    Yes.

13  Q.    And you actually cite that in your declaration?

14  A.    Yes.

15  Q.    And you didn't do any other research to understand what

16  the reconciliation adjustment is other than reading that

17  article, correct, Professor?

18  A.    I looked at the fiscal plan to see it mentioned it, so

19  other than the fiscal plan and the Reorg read, those are the

20  only two sources, correct.

21  Q.    And you didn't do any independent analysis to determine

22  what the reconciliation analysis was, correct?

23  A.    Correct.  No independent work, correct.

24  Q.    But it's still your opinion that the reconciliation

25  adjustment could be used to maintain the highways and

1   transportation system, correct?

2   A.   I'm saying that there are a lot of choices, discretion in

3   allocating 18.5 billion dollars.  And that's just one pocket

4   that perhaps could be used instead.

5   Q.   But you have no idea independently what the

6   reconciliation adjustment is for, do you, Professor?

7   A.   Other than what I've read, correct, or what I've heard

8   today, correct.

9   Q.   And you have no idea whether that money is actually

10  available to be used for the purpose that you suggest that it

11  can be used for, correct, Professor?

12  A.   I have no independent knowledge of it other than what

13  I've cited.

14  Q.   Thank you.  Your declaration also states that the

15  Commonwealth's fiscal 2018 budget included 525 million dollars

16  of earmarks for Puerto Rico government agencies, and that some

17  of those funds could have been used in your opinion to

18  maintain the transportation network, correct?

19  A.   Correct.

20  Q.   And that testimony, too, was based on your review of the

21  Reorg Research publication, correct, sir?

22  A.   Correct.

23  Q.   And you cite that in your opinion?

24  A.   Yes.

25  Q.   And you did not do anything to try to determine if those

1   costs were actually avoidable, correct, sir?

2   A.   Correct.

3   Q.   And likewise, you didn't try to do anything to try to

4   determine whether those costs were essential?

5   A.   No.

6   Q.   And you don't know what those costs are for, do you,

7   Professor?

8   A.   No.

9   Q.   And you also testified that the Commonwealth's latest

10   budget includes 200 million dollars in tax cuts, and that

11   money could have used to maintain -- strike that.  Withdrawn.

12          You also testified, Professor, that the

13   Commonwealth's latest budget includes 200 million dollars in

14   tax cuts, and that that money could have been used instead to

15   maintain the Puerto Rico transportation and highways network,

16   correct, Professor?

17   A.   Yes.  I believe that was the budget message from the

18   Governor that I cited.

19   Q.   Right.  Your source for that number was the Governor's

20   budget message dated May 31, 2017, correct, Professor?

21   A.   Yes.

22   Q.   But aside from reviewing that budget message, you didn't

23   do any research to determine the purpose of the tax cut, did

24   you, Professor?

25   A.   No.

1    Q.    And you didn't do any independent analysis to determine

2    the expected effect of that tax cut on the Puerto Rico

3    economy, did you, Professor?

4    A.    No.

5    Q.    And you didn't analyze whether the tax relief was

6    intended to stimulate growth, did you, Professor?

7    A.    No.

8    Q.    And you didn't do any analysis in how removing the tax

9    cut might affect poor citizens in the Commonwealth of Puerto

10   Rico, did you, Professor?

11   A.    No.

12   Q.    And you didn't analyze whether removing the tax cut would

13   lead to outmigration from Puerto Rico or slow its economic

14   growth, did you?

15   A.    No.

16   Q.    Professor, you also provided as your opinion that the

17   Commonwealth fiscal plan forecasts growth in general fund

18   expenses, and some of that money, in your opinion, could be

19   used to fund the transportation and highways network, correct,

20   Professor?

21   A.    Yes.

22   Q.    But you didn't do any research to determine whether the

23   general fund expenses were expected to grow, did you,

24   Professor?

25   A.    No.

1   Q.   And you don't know sitting here today one way or the

2   other whether that expense growth is due principally to the

3   reinstitution of pension payments or something else, do you,

4   Professor?

5   A.   No.

6   Q.   And you don't have an opinion as to whether any

7   particular expenses should be reduced further, correct,

8   Professor?

9   A.   Well, yes, I do, in the sense that if you're going to

10  divert the toll revenue that is earmarked as a special revenue

11  for the bondholders, then before you do something like that,

12  which is a major change from what they've said for 50 years,

13  almost 50 years, to the market, then they should look at all

14  the other areas to see whether or not there are resources that

15  -- in the 18.5 billion dollar budget, that they could make a

16  change in the allocations to avoid that severe decision.

17  Q.   So in your opinion, they should look to other areas to --

18  before they make the decision not to pay the bond?  That's

19  right?  That's what you said, correct?

20  A.   Yes.

21  Q.   You don't have any idea sitting here today whether they

22  did actually look at other areas to cut, do you, Professor?

23  A.   Yes, I know they've looked.  But there are pockets that

24  I've identified in my declaration where there are questions

25  that could be logically raised about whether or not those

1    would be alternative sources for the use of highway spending,

2    instead of diverting toll revenue that has been dedicated for

3    over 50 years for the '68 bondholders.

4    Q.   Another one of your opinions, Professor, is that the

5    Commonwealth's revenue is higher than was projected in its

6    fiscal plan in your opinion, and some of that money, in your

7    opinion, could be directed to the highways and transportation

8    network, correct?

9    A.   Yes, but it was not my opinion that the revenue, the cash

10   was higher.  I cited a cash flow analysis from the Puerto Rico

11   authorities, and then I've heard today or I saw yesterday a

12   news article that was cited again today about even more cash

13   flow available than anticipated.  And that's as I cited in my

14   declaration, that cash flow was from extra revenue than they

15   had anticipated.

16   Q.   And your opinion, though, in your declaration is limited

17   on this point to the fact that in your opinion, the money

18   could be used to maintain the highways and transportation

19   network, correct?

20   A.   I'm saying that's another source of funds, yes.

21   Q.   But you didn't do anything to determine why the revenue

22   exceeded the forecast, did you, Professor?

23   A.   No.

24   Q.   And you don't have any idea whether that money that

25   apparently exceeded forecasts is already spoken for in the

1    budget?

2    A.    Well, I do, because the -- there was a news article, the

3    Bond Buyer, a newspaper, on the municipal bond market, that

4    reported that it was excess revenue, more revenue coming in

5    than projected.  It was not because of spending being

6    curtailed necessarily.  It was extra revenue.  So that was in

7    excess of what the plan had expected.  So the economy was

8    doing better, as exemplified by those revenue sources, than

9    expected.

10   Q.    Let's just be specific in our terms, Professor.  When you

11   refer to plan, you mean the budget, correct?

12   A.    Well, the -- the Commonwealth Fiscal Plan.  That would be

13   characterized through a budget, correct.

14   Q.    Professor, you didn't opine either way on your opinion on

15   whether or not the Commonwealth needs to build up cash

16   reserves, did you?

17   A.    No.

18   Q.    And you don't deny that the Commonwealth of Puerto Rico

19   is presently unable to sell bonds, do you, sir?

20   A.    I have not independently verified that that's the case.

21   I expect that is the case.

22   Q.    And you do accept, I take it, that one of the goals of

23   PROMESA is to allow Puerto Rico to regain access to the

24   capital markets, correct?

25   A.    Yes.

1    Q.    Professor, you have some comments in your declaration

2    regarding Dr. Wolfe's choice of a multiplier, correct?

3    A.    Yes.

4    Q.    And you state in your declaration that, quote,

5    multipliers are ratios that relate government or private

6    spending to national income.  And a multiplier above 1.0

7    indicates that spending has a multiplicative affect on

8    national income?

9    A.    Yes.

10   Q.    Do you recall that in your declaration?

11   A.    Yes.  Yes.

12   Q.    But you didn't attempt to identify -- withdrawn.

13         You also suggest in your declaration that, quote,

14   surely low multiplier spending can be found in a budget with

15   hundreds of millions in unaccountable spending.

16         Do you recall that in your declaration?

17   A.    Yes.

18   Q.    But you didn't attempt to do anything to identify any low

19   multiplier spending to be cut, did you, Professor?

20   A.    No.

21   Q.    And you're not holding yourself out as an expert or

22   someone with particularized knowledge on the use of

23   multipliers, correct, Professor?

24   A.    Correct.

25   Q.    Now, you criticize Dr. Wolfe because he identifies a real

1  economic growth rate of .8 percent as the threshold that

2  Puerto Rico's economy must reach in the next ten years for it

3  to achieve sustained economic growth, correct?

4  A.   I criticize, because in his --

5  Q.   Sir, I didn't ask for an explanation of why.  I just

6  asked yes or no.  You made a criticism of it --

7  A.   Yes.

8  Q.   -- correct, Professor?

9        And in your opinion, you state that the .8 percent

10  threshold that Professor Wolfe -- or Dr. Wolfe, chose is,

11  quote, not credible, close quote.  And quote, imprecise and

12  subjective.  Correct?

13  A.   Yes.

14  Q.   And the sole basis for that opinion is the deposition

15  testimony of Dr. Wolfe that you cited, correct?

16  A.   Yes.

17  Q.   And that's your characterization of Dr. Wolfe's

18  deposition testimony, correct?

19  A.   Yes.

20  Q.   But, Professor, you don't have any particularized

21  expertise that would enable you to calculate a minimum growth

22  rate to allow Puerto Rico to achieve fiscal sustainability, do

23  you?

24  A.   No, but neither did he identify a theoretical reason for

25  that.

```
 1   Q.   That wasn't my question, Professor.  My question was that
 2   you don't have any particularized expertise that would allow
 3   you to calculate a minimum growth rate that would allow Puerto
 4   Rico to achieve fiscal sustainability, correct?
 5   A.   Correct.  And I did not do such a calculation.
 6   Q.   And in fact, Professor, you have a Bachelor's Degree in
 7   political science, correct?
 8   A.   Yes.
 9   Q.   And you have a Master's Degree in public administration?
10   A.   Yes.
11   Q.   And you have a Ph.D. in public administration?
12   A.   Correct.
13   Q.   You don't have a single post high school degree in
14   economics, do you, Professor?
15   A.   Correct.
16         MR. MUNGOVAN:  I have no further questions, Your
17   Honor.
18         THE COURT:  Thank you.
19         MR. JOSSEN:  Your Honor, may I inquire?
20         THE COURT:  Yes.
21                     REDIRECT EXAMINATION
22   BY MR. JOSSEN:
23   Q.   Mr. Hildreth, you were asked a number of questions by
24   counsel about the various other buckets that you were looking
25   into or identified as potential money that might be available.
```

1  Explain to the Court, please, why you think it is important to

2  go through that exercise.

3  A.   My point is that expropriating the toll revenue from the

4  lien, the collateral that is associated with it for the

5  bondholders, is a major step, a trip wire, if you will, and

6  short of that, the Authority and the Commonwealth should use

7  all available resources to avoid that step.   And I've

8  identified several buckets where there are alternative

9  resources that could be used in a 18.5 billion dollar budget.

10  It is a discretion.   It's a choice.   It's an allocation.

11         I also pointed out that Mr. Wolfe in his .8 model

12  does have 113 million dollars of debt service in it.   The debt

13  service available -- or the cash flow available for debt

14  service includes resources that could be used for -- to avoid

15  the systemic violation of special revenue bonds.

16         So I tried to identify a variety of other places

17  that the Authority and the Commonwealth should use instead of

18  diverting toll road revenue that has -- that first dollar is

19  supposed to go in to pay debt service.   And so in my view, my

20  marked understanding is that is a fundamental break of revenue

21  bond expectation.

22  Q.   And just describe for us, please, the specific background

23  and experience you've had in dealing with such matters or

24  making such choices and looking at allegations.

25  A.   Sure.   I have 30 plus years of writing in peer review

1   journals about the municipal securities market.  I've served

2   as the chief financial officer of a city dealing with a

3   financial emergency.  I've been a board member of a statewide

4   bond issuance authority that only issues revenue bonds.

5         My name is on official statements.  I know what's

6   important.  I know why it's important to be very truthful in

7   what you say.  I've presented presentations to bond rating

8   agencies, and I've testified in court about municipal

9   securities.

10        In my experience, I've never seen a proposal that

11  would break the whole concept of a revenue bond this way.

12  This would have systemic impact, in my 30 plus years in the

13  marketplace, on the whole concept of revenue bonds, which is

14  about 60 percent of the municipal securities in this country.

15  There's an ability to pay the debt service.  There's not an

16  inability to pay.  There's an ability to pay according to the

17  68 Bond Resolution, the 2010 official statement, all the

18  continuing disclosure documents up to 2016 by the Authority

19  and by the Commonwealth.  They've been clear all those years

20  that this was a first dollar gross lien on toll revenue.

21        The thing about revenue bond financing is these are

22  kind of bespoke structures.  Every revenue bond is different.

23  Every bond resolution set of bonds are different.

24        So that's what's at issue here is a fundamental

25  break with revenue bond financing, in my opinion.

1   Q.   Thank you, sir.  I have no further questions.

2          THE COURT:  Thank you.

3          Professor Hildreth, your testimony is concluded.

4   Thank you.

5          (At 3:42 PM, the witness left the stand.)

6          MR. DOLUISIO:  Good afternoon, Your Honor.  At this

7   time, I'd like to move Plaintiff's Exhibit Number 94, which is

8   the supplemental declaration of Albert Racciatti.

9          THE COURT:  Plaintiff's Exhibit 94 is admitted into

10  evidence subject to any objections that have been lodged.

11         (At 3:42 PM, Plaintiff's Exhibit Number 94 admitted

12  into evidence subject to objections.)

13         THE COURT:  Mr. Racciatti, please go to the witness

14  stand and remain standing to take the oath.

15         COURTROOM DEPUTY:  Do you solemnly swear that the

16  testimony you are about to give in this case is the truth, the

17  whole truth, and nothing but the truth?

18         THE WITNESS:  I do.

19         COURTROOM DEPUTY:  So help you God.

20         THE COURT:  Should I have a copy of the declaration

21  or --

22         MR. MUNGOVAN:  Timothy Mungovan for the Oversight

23  Board.

24         Yes, Your Honor.

25         THE COURT:  So do you have one for me?

```
 1              MR. MUNGOVAN:  I do, Your Honor.

 2              THE COURT:  Thank you.

 3              MR. MUNGOVAN:  Just bear with me one minute, please.

 4    Thank you.

 5              THE COURT:  Oh, actually, it's here already.  Sorry.

 6    Thank you.

 7              MR. MUNGOVAN:  It should be Exhibit PX 94, Your

 8    Honor.

 9              MR. DOLUISIO:  Your Honor, we have loose copies if

10    that would be helpful.

11              THE COURT:  Yes, that would.

12              MR. DOLUISIO:  May I approach?

13              THE COURT:  Yes.  Thank you.

14              MR. DOLUISIO:  Thank you.

15              THE COURT:  Thank you.  I'm all set.

16              COURTROOM DEPUTY:  Okay.

17              MR. MUNGOVAN:  Your Honor, I'd like to give the

18    witness a package of the materials that I'm going to go

19    through in the course of my examination of him.  May I

20    approach the witness, please?

21              THE COURT:  Yes, you may.

22              MR. MUNGOVAN:  Thank you, Your Honor.

23              May I proceed, Your Honor?

24              THE COURT:  Yes, you may.

25              MR. MUNGOVAN:  Thank you.
```

```
 1                    A L B E R T   R A C C I A T T I,

 2           called as a rebuttal witness by the plaintiff, having

 3           been previously sworn, testified as follows:

 4                           CROSS-EXAMINATION

 5   BY MR. MUNGOVAN:

 6   Q.    Good afternoon, Mr. Racciatti.  How are you?

 7   A.    Very good.  Thank you.

 8   Q.    You may recall, my name is Tim Mungovan, and that I took

 9   your deposition last week.

10   A.    I do, yes.

11   Q.    In your declaration, sir, you used a regression model

12   that in your opinion forecasts a range of the likely future

13   compounded annual growth rates of the toll revenues from three

14   toll roads, PR-20, PR-52, and PR-53, correct?

15   A.    That is correct.

16   Q.    And the inputs into your regression model from fiscal

17   year 2011 to fiscal year 2016, correct?

18   A.    That is correct, yes.

19   Q.    And as you've explained in paragraph 20 of your

20   declaration, you used data from fiscal year 2017 to validate,

21   in your opinion, the predictive qualities of your regression

22   model, correct?

23   A.    That is correct, yes.

24   Q.    And according to your regression analysis, the most

25   significant factor that influenced travel demand historically
```

1    on the covered toll roads, as you've defined them, was total

2    payroll employment, correct, sir?

3    A.   Yes.  That's correct.

4    Q.   And then you attempted to forecast the future -- the

5    future compound annual growth rate of those tolls, correct?

6    A.   Correct.

7    Q.   And in your attempt to forecast that future growth rate

8    of the tolls, you didn't use a forecast of total payroll

9    employment, correct?

10   A.   I used a range of three scenarios of future total payroll

11   employment.

12   Q.   Well, let's look specifically at your declaration, if we

13   could, sir.

14        In footnote one on page seven, you based your

15   calculations on certain assumptions, correct?

16   A.   Yes.

17   Q.   And you've identified those assumptions in footnote one,

18   correct?

19   A.   I have, yes.

20   Q.   And that first assumption is part A, and it states,

21   inflation is assumed at the Puerto Rico specific rates noted

22   in the, quote, baseline macroeconomic framework, close quote,

23   model prepared by defendant witness Andrew Wolfe, correct?

24   A.   Yes.

25   Q.   And you don't state in that footnote anywhere that you

1   relied on the total payroll employment, do you, sir?

2   A.   That footnote does not contain reference to total payroll

3   employment.

4   Q.   And what you've in fact done, sir, is you've used

5   inflation that you've taken from Dr. Wolfe's baseline economic

6   framework as a proxy for total payroll employment, correct?

7   A.   No, I have not.

8   Q.   That's not how you've constructed your model; is that

9   right?

10  A.   No, that is not how I constructed my model.

11  Q.   You did base your model in part on Dr. Wolfe's baseline

12  macroeconomic framework, correct?

13  A.   The inflation assumption noted in footnote one was used

14  to calculate nominal toll revenues as a function of

15  transactions and real toll revenues in my model framework,

16  yes.

17  Q.   Okay.  And you're not a macro economist; is that correct,

18  sir?

19  A.   No, I am not.

20  Q.   And you don't even have a degree in economics, do you,

21  sir?

22  A.   I do not.

23  Q.   And you haven't published any articles or any treatises

24  on whether -- withdrawn.

25           Now, that baseline macroeconomic framework model that

1    you assumed as part of your calculation that Dr. Wolfe

2    prepared, that baseline model does not take into account the

3    fiscal measures that would stimulate the economy in Dr.

4    Wolfe's model, correct?

5    A.   I am not aware of what it takes into account.

6    Q.   Okay.  So let's take a look at your -- the documentation

7    that you looked at.  I'd ask you to take a look at DTX 31.

8    That should be in your binder there, in your Redweld.  Do you

9    see that document?

10   A.   DTX 31?

11   Q.   Yes.  It should be identified there at the bottom.

12   A.   Yes.

13   Q.   And I'd ask you to turn 26 sheets into that document.

14   It's a long spreadsheet.

15           THE COURT:  So was that DTX 31 in the original list?

16           MR. RAPPAPORT:  I believe so.

17           COURTROOM DEPUTY:  Two F's.

18           THE COURT:  Two F's.  FF.

19           MR. MUNGOVAN:  I apologize, Your Honor.

20           May I approach the witness, Your Honor, just to make

21   sure we are on the same page?  Because this spreadsheet does

22   not have Bates labels on it.

23           THE COURT:  Yes, you may.

24           THE WITNESS:  26 sheets, sheets of paper.

25   BY MR. MUNGOVAN:

1   Q.   Are we on the same page?

2   A.   Yes.

3          MR. MUNGOVAN:  May I approach the witness again, Your

4   Honor?

5          THE COURT:  Yes.

6          MR. MUNGOVAN:  May I approach the bench, Your Honor,

7   to provide a piece of paper that I'm going to be using with

8   the witness?

9          THE COURT:  Yes.

10         And do you have any hint for me besides counting 26

11  pages as to which page of Exhibit FF you're interested in?

12         MR. MUNGOVAN:  I apologize for the confusion, Your

13  Honor, because the document is not Bates labeled, because we

14  produced it electronically.  I'm going to give you a document,

15  a page, that is a blowup of the page from Exhibit FF that we

16  can work from.

17         May I approach the bench, Your Honor?

18         THE COURT:  Yes, you may.  Thank you.

19  BY MR. MUNGOVAN:

20  Q.   Mr. Racciatti, I'd ask you to take a look at this longer

21  sheet.  I provided a copy of that to you.

22  A.   I see.

23  Q.   I'll represent to you that this page is a blowup of the

24  page that we were looking at together that has the heading

25  macro framework that extends several pages into Exhibit FF.

1        Do you see that?

2    A.    It appears to be, yes.

3    Q.    And is this the macroeconomic framework that you were

4    referring to in footnote one of your declaration?

5    A.    I cannot say with certainty.  It appears -- I see several

6    line items that are familiar to me, yes.

7    Q.    And specifically, there's a reference on that document,

8    FF, to the case one, which is the baseline.  Do you see that?

9    A.    I do.

10   Q.    And there are a series of numbers that run all the way up

11   to 2060 in the row -- excuse me, in the row entitled, baseline

12   fiscal only.  Do you see that?

13   A.    Baseline fiscal only.  Yes, I do.

14   Q.    And are those the numbers that you assumed as part of

15   your model for forecasting the compound annual growth rate of

16   the tolls?

17   A.    They do not look similar to the numbers I used, no.

18   Q.    Do you see the numbers on that page anywhere that appear

19   to be the numbers that you relied upon in calculating your

20   forecast of the compound annual growth rate?

21   A.    My recollection of the time series of the numbers used in

22   the calculation of nominal revenue growth was that they were

23   positive, low positive numbers the next few years, escalating

24   to over one percent in the next few years.  Sitting here

25   today, I can't say with certainly whether I see those numbers

1   on the sheet.

2   Q.   So you can't tell whether the numbers you utilized from

3   the economic model are on this page.  Is that your testimony?

4   A.   I cannot tell sitting here today without reference to

5   other materials.  That's correct.

6   Q.   And you can't tell -- you don't recall today specifically

7   the numbers that you used for any given year to calculate the

8   forecast?

9   A.   Not sitting here today, no.

10  Q.   And can you find anywhere on that document that's in

11  front of you, Exhibit FF, which is marked 31 for you, where

12  those numbers are anywhere in that document?  Can you, sir?

13  A.   In my declaration, I make reference to a particular

14  spreadsheet tab in the native version of Dr. Wolfe's model

15  where that information is located.  In the paper version here

16  that you provided to me, and I cannot readily find that, that

17  particular sheet.  I could look through.

18  Q.   Sir, in the information relied upon, where in the

19  information relied upon section, which is Exhibit C to your

20  declaration, do you identify the tab that you're referring to

21  in the Wolfe model?

22  A.   I don't believe the tab is called out with specificity in

23  that information relied upon list, but I do recall it being

24  mentioned in my declaration.

25  Q.   But it's fair to say, sir, that you relied upon in the --

1    in your declaration, on a premeasures inflation rate for

2    Puerto Rico to forecast the future growth rate of tolls,

3    correct?

4    A.    It was my understanding that the time series I used

5    represented a baseline condition, and it was similar to

6    historical data that I used as well.

7    Q.    And so in the baseline, the measures would not be

8    implemented, correct, sir?

9    A.    In a baseline condition, it would represent, in my mind,

10   a trend condition.  I cannot say with certainly whether it was

11   the intention of Dr. Dr. Wolfe for that baseline to represent

12   a prefiscal measure or not.

13   Q.    Well, you understood, sir, didn't you, that one of the

14   measures, as a practical matter, is that the toll revenues

15   would be used to maintain the highways and transportation

16   system within Puerto Rico?  Correct?

17   A.    Correct.  Yes.

18   Q.    And you understood therefore that if you were calculating

19   your -- in calculating your future forecast, it would be

20   important to know whether or not the tolls were being paid

21   effectively to the bondholders or whether they were being

22   retained within the HTA, correct?

23   A.    I would say that it's important to, in my model framework

24   -- it was my intention, it's important to represent a rate of

25   inflation that is consistent with prior trend and specific to

1    Puerto Rico.

2    Q.   But, sir, in your regression model, you didn't call out

3    the rate of inflation as one of the three important factors.

4    You identified those factors, and the rate of inflation is not

5    one of them, correct?

6    A.   So my regression model is specifically designed to

7    determine the relationship between toll transactions and

8    economic performance, and then --

9    Q.   Sir, that's a yes or no question.  You did not identify

10   and call out as one of the three important factors in your

11   regression model the rate of inflation, did you?

12   A.   I did not, because it is not.

13   Q.   Thank you, sir.

14            Instead you identified the total employment rate,

15   correct?

16   A.   (Nodding head up and down.)

17   Q.   You identified the real cost of the tolls, correct?

18   A.   Correct.

19   Q.   And the real cost of the gasoline, correct?

20   A.   Correct.

21   Q.   And the rate of inflation was not listed, correct?

22   A.   The rate of inflation is not part of the model which

23   predicts transactions from economic performance.  Correct.

24   Q.   And yet you relied on Dr. Wolfe's base case for inflation

25   in constructing your forecast based on your regression model,

1   correct, sir?

2   A.    I relied on a baseline forecast of inflation for the

3   calculation of nominal toll revenues.  That's correct.

4   Q.    And you don't know whether that baseline case assumed

5   that the tolls would remain at the transportation authority or

6   whether the tolls would be paid to the bondholders, correct,

7   sir?

8   A.    From my review of Dr. Wolfe's materials, I assumed that

9   the baseline case represented a continuation of existing

10  trends.

11  Q.    Correct.  Meaning that under existing trend, the bond

12  would be continued to be paid, correct?

13  A.    I cannot comment on that.

14  Q.    You just don't know one way or the other, do you, sir?

15  A.    I can say that my intention was to use the baseline

16  series as the representation of continuation of existing

17  trend.

18  Q.    Sir, wouldn't it be important to your analysis to know

19  whether the toll revenues were going to be paid to the

20  bondholders or whether the toll revenues were going to be

21  maintained within the highway system in understanding the

22  impact on inflation rates?

23  A.    I don't think it would be important to understand that.

24  I think the rate of inflation may or may not be influenced by

25  that particular measure.

```
 1    Q.   You understand, sir, don't you, that if the tolls were

 2    being paid to the bondholders, the rate of inflation would be

 3    irrelevant to your analysis, because the bond would be paid,

 4    correct?

 5    A.   I do -- I do not understand your statement.  Could you

 6    repeat that question?

 7    Q.   The point of your analysis, sir, is to calculate whether

 8    ultimately it was being used to calculate whether there's an

 9    equity cushion for the bondholders, correct?

10            MR. DOLUISIO:  Objection.  I think that

11    mischaracterizes the declaration entirely.

12    BY MR. MUNGOVAN:

13    Q.   Sir, do you understand the purpose for which your

14    declaration was being used?

15    A.   I understand that my declaration was to -- the purpose of

16    my analysis as presented in my declaration was to estimate the

17    trajectory of future toll revenues.

18    Q.   And do you know the reason -- did you review

19    Mr. Stanford's supplemental affidavit in this case?

20    A.   I have not reviewed Mr. Stanford's supplemental

21    affidavit.

22    Q.   Did you understand that Mr. Stanford was putting together

23    a supplemental affidavit in this case?

24    A.   I did, yes.

25    Q.   And you understood as part of that supplemental affidavit
```

1    Mr. Stanford was relying on your analysis to understand, to

2    create a calculation of what the present value of what the

3    future tolls would be?  Did you understand that?

4    A.   I understood that Mr. Stanford would use my growth rate

5    calculations for toll revenue in his analysis.

6    Q.   And specifically, the present value of the toll revenue,

7    correct?

8    A.   I did understand it would be used in evaluation

9    calculations.

10   Q.   And so therefore, the evaluation rate that you were

11   relying upon was important ultimately to the overall

12   calculation that you were performing here, correct?

13   A.   I am not familiar with the details of Mr. Stanford's

14   analysis to make a conclusion on that, answer your question.

15   Q.   I was asking you about your calculation, not

16   Mr. Stanford's calculation.

17   A.   Could you repeat the question?

18   Q.   You understood that the inflation rate that you were

19   using was important to your overall calculation rate?

20   A.   I understood that the inflation rate was one component in

21   my calculation, specifically the component to arrive at the

22   estimate of nominal toll revenues, yes.

23   Q.   Sir, if the total level of employment in Puerto Rico is

24   higher than you've assumed in your model, then the toll

25   revenues and growth rate of the toll revenues would also be

```
 1   higher; is that correct, sir?

 2   A.   Yes.  That's correct.

 3   Q.   Let's talk about your opinion concerning integration.

 4   A.   Sure.

 5   Q.   In offering your opinion on the use and meaning of the

 6   term integrated, you are not basing your opinion on any

 7   particular study or particular source, correct?

 8   A.   I am not.

 9   Q.   And it's your opinion that even if one part of a network

10   falls into disrepair, other parts of the network may not fall

11   into disrepair; is that correct?

12   A.   That is correct.

13   Q.   But your opinion is not based on any studies that analyze

14   the relationship between relative levels of disrepair in

15   different parts of the transportation network, is it?

16   A.   I have not seen such a study, no.

17   Q.   And in fact, you've never an -- withdrawn.

18        And you personally have never analyzed the

19   relationship between the condition of access roads and the

20   condition of a toll facility, correct?

21   A.   I have not personally done that analysis, nor have I seen

22   an analysis like that.

23   Q.   And you're not aware of any examples where an access road

24   was not maintained and the demand for a toll road increased,

25   correct?
```

```
 1   A.   I have not -- I am not familiar with such a case, no.

 2   Q.   And you are aware of examples where revenues from toll

 3   facilities are used to operate and maintain non-toll

 4   facilities, correct?

 5   A.   I am aware, yes.

 6   Q.   Sir, to access the toll roads in Puerto Rico, you have to

 7   drive on the non-toll roads; isn't that right?

 8   A.   There are many points of entry to the covered toll roads

 9   that are non-toll, yes.

10   Q.   So you have to drive on non-toll roads to access the toll

11   road; is that right?

12   A.   Depending on your origin and destination, I would imagine

13   that's true, yes.

14   Q.   Thank you.

15        MR. MUNGOVAN:  I have no further questions, Your

16   Honor.

17        THE COURT:  Thank you.

18        Mr. Doluisio.

19        MR. DOLUISIO:  Yes.  May I inquire, Your Honor?

20        THE COURT:  Yes.

21                   REDIRECT EXAMINATION

22   BY MR. DOLUISIO:

23   Q.   Mr. Racciatti, what was the purpose of your regression

24   analysis?

25   A.   The purpose of my regression analysis was to ascertain
```

1   the relationship between toll transactions and toll revenue

2   and economic performance in Puerto Rico; and to develop a

3   projection of transactions and revenue based on a range of

4   assumptions regarding that economic performance.  Specifically

5   employment scenarios.

6   Q.   Was part of your assignment to figure out whether there

7   would be an equity cushion or not be an equity cushion?

8   A.   It was not.

9   Q.   And what's your background in performing regression

10   analyses like the type you performed here?

11   A.   I've performed numerous such analyses for toll roads

12   throughout the country.

13   Q.   How many times have you performed a regression analysis

14   like the sort you performed here?

15         MR. MUNGOVAN:  Objection, Your Honor.  Beyond the

16   scope of cross.

17         MR. DOLUISIO:  He asked about his qualifications.  I

18   think I'm allowed to establish his qualifications.

19         MR. MUNGOVAN:  I didn't ask him affirmatively about

20   his qualifications.  I asked him what he was not qualified to

21   do, Your Honor.

22         MR. DOLUISIO:  And I think I'm allowed to

23   establish --

24         THE COURT:  I will allow this question.

25   BY MR. DOLUISIO:

1   Q.   Okay.  I apologize if I've forgotten the exact question,

2   but I think I wanted to ask you how many times have you

3   performed an analysis of growth rates on toll roads throughout

4   your career?

5   A.   Numerous times that my CV notes, many of those occasions,

6   as attached here to my declaration.

7   Q.   And how long have you been working in this industry and

8   performing this kind of work?

9   A.   For over 20 years.

10  Q.   You were asked some questions about the Wolfe information

11  that you used with regard to inflation.  Do you remember those

12  questions?

13  A.   I do.

14  Q.   Is inflation a factor that explains future growth rates

15  of the toll roads here?

16  A.   No.  Inflation is used to estimate the nominal revenue

17  from transactions and real revenue, but it is not part of the

18  model framework.

19  Q.   And is footnote one the location in your report that

20  identifies the Wolfe information about inflation that you

21  used?

22  A.   It is.

23  Q.   A couple of questions about a second opinion in your

24  declaration, regarding your use of the word integrated.

25  What's your basis for being able to explain how that word is

1  used in your industry?

2  A.   That word appears frequently as a description of

3  transportation networks that I have seen.  It's a basic

4  description which is related to the connectivity of roadways,

5  the connectivity of transit, the way in which people move

6  throughout a region when they are out.

7  Q.   Have you ever used the term to mean that revenues from

8  one part of a network should be used to pay for costs in

9  another part of the network, because the network is

10  integrated?

11  A.   No, I have not.

12          THE COURT:  Please speak toward the microphone if

13  you're going to continue speaking.

14          MR. DOLUISIO:  Thank you, Your Honor.  I think I have

15  nothing further.

16          THE COURT:  Thank you.

17          MR. BRILLIANT:  Your Honor.

18          THE COURT:  Yes.

19          MR. BRILLIANT:  I'm sorry.  I think the witness is

20  completed.

21          THE COURT:  I was going to excuse the witness.

22          MR. BRILLIANT:  I'm sorry, Your Honor.

23          THE COURT:  Thank you.  Mr. Racciatti, your testimony

24  is completed.

25          THE WITNESS:  Thank you, Your Honor.

```
 1              THE COURT:  Thank you.

 2              (At 4:11 PM, the witness left the stand.)

 3              MR. BRILLIANT:  May I, Your Honor?

 4              For the record, Allan Brilliant for Peaje.

 5         Your Honor, for the record, that completes all the

 6   testimony.  I believe earlier this morning before we rested

 7   our case, Your Honor admitted all of our documents subject to

 8   the objections that were in, that had been raised.  And I just

 9   wanted to confirm that on the record, that in fact that is the

10   agreement of the parties and what Your Honor had done this

11   morning.

12         If not, then I guess we would move them all in now

13   subject to the objections that they have previously

14   launched.

15              THE COURT:  It wasn't exactly clear to me what the

16   parties' joint intention was.  So are you all agreed that I

17   should admit everything in these binders and the

18   supplemental -- is that what you mean?  Everything --

19              MR. BRILLIANT:  Yes, Your Honor.

20              THE COURT:  -- in the binders and the supplemental

21   documents that were handed to me subject to the objections?

22              MR. BRILLIANT:  That's how I understood what we did

23   this morning.  And I just wanted to confirm that on the

24   record, that this is in fact what we did, so we can close the

25   record.
```

1          MR. RAPPAPORT:  Lary Rappaport for Proskauer.

2          I have not spoken with O'Mulveny counsel, but I would

3     say that was my understanding -- I would say my understanding

4     was all the ones that were moved into evidence during the

5     course of the testimony.  There were many exhibits we didn't

6     use and many exhibits you didn't use either.

7          I mean, for example, some of the things, I'm just

8     mentioning them, they were documents produced by the experts,

9     source documents, which obviously, under the circumstances,

10    the expert may --

11         THE COURT:  You need to be closer to the microphone.

12    So actually, why don't you come to the podium, and you can

13    take turns.

14         MR. RAPPAPORT:  I was just saying, for example, there

15    were documents that may have been considered by an expert that

16    don't come into evidence, but certainly they can be used

17    during the examination of the witness.  Some of that occurred

18    today.  I just assumed that was not being offered into

19    evidence.

20         The actual declarations were offered into evidence,

21    and those were all offered subject to the objections.  There

22    were other documents that were specifically offered into

23    evidence in the course of testimony, but I think there's many

24    documents that weren't I mean discussed.

25         THE COURT:  Well, clearly there were documents that

1    haven't been discussed.  And it's the degree to which that's

2    true, even if one looks back at the declarations that were

3    submitted in the course of briefing, it isn't clear to me, but

4    I'm sure that that's true -- so just if I can finish this

5    thought before either of you comments further.  That is one

6    reason I raised the question first thing this morning, as to

7    how and to what extent you would propose me to engage with

8    objections, and point me to what you consider truly material

9    to the determinations I'm going to be asked to make.  And

10   that's when I perceived that the principal was moving to

11   things that were focused on here today, but then that left

12   open the question of what we would be doing about things that

13   were covered in the direct testimony as it were.  So --

14           MR. RAPPAPORT:  If I may indulge the Court, Your

15   Honor.  I certainly don't want to make people stay longer, but

16   it may be my misunderstanding.  What I would like to do, if we

17   could, if we could take a short recess, and I will speak with

18   my colleagues and O'Mulveny counsel, so we can work this out.

19           THE COURT:  I would appreciate that.  And so let us

20   -- I think it's about quarter past 4:00.  Yes.  So do you want

21   ten minutes?  Is that enough?

22           MR. RAPPAPORT:  Five minutes.

23           THE COURT:  Okay.  Fine.  We'll see you in five

24   minutes.

25           (At 4:14 PM, recess taken.)

```
 1              (At 4:24 PM, proceedings reconvened.)

 2              MR. MUNGOVAN:  May I address the Court, Your Honor?

 3              THE COURT:  Yes, Mr. Mungovan.

 4              MR. MUNGOVAN:  Counsel on both sides have reached an

 5    agreement and have the following proposal to give to the

 6    Court, Your Honor.  To avoid having to burden the Court with

 7    reviewing all the exhibits we've identified already, counsel

 8    will -- we propose the following:  Counsel will get together

 9    and identify all exhibits we propose to designate into

10    evidence.  We would propose keeping the record open until

11    Friday to designate any documents, subject to objections the

12    other side may make.

13          We would then file the briefs, our closing argument,

14    at 5:00 PM on Monday, Your Honor.  This coming Monday.  That

15    way we can get together to work out any objection -- any

16    exhibits the parties want to introduce on one side or the

17    other, any objections they may have, and then write their

18    final closing statement based on the documents that they have

19    attempted to introduce into evidence.

20          Did I characterize that correctly, Bob?

21              MR. JOSSEN:  Robert Jossen.

22          Yes, Your Honor.  Mr. Mungovan did describe the

23    agreement we reached, of course subject to Your Honor's

24    approval.

25              THE COURT:  I appreciate you working out this
```

 1    proposal.  And I'm going to do a bit of dangerous thinking out

 2    loud here, so bear with me.  My main concerns are two-fold.

 3    One is that I had set the earlier deadline for closing

 4    arguments so that while the testimony is fresh in my mind, and

 5    given everything else that's happened this week, I would have

 6    a context for reading the closing arguments sooner rather than

 7    later.

 8          The other concern, which is just related to the

 9    transaction costs of closing the record on this, is that if

10    the universe that you agree is substantially larger than the

11    actual universe of discussed documents today, that brings back

12    the concern I started with this morning, which is to what

13    extent do I need to cross-correlate and process objections to

14    particular exhibits.

15          So with multi-page and multi-component exhibits, and

16    lists of exhibits that are 120 pages long, which ones do I

17    have to engage, and which ones don't I?  And frankly, if you

18    were going in the direction of a more extensive record that

19    potentially implicated substantial elements of the objections,

20    documents that have been filed, I was considering requiring,

21    again on a very tight schedule, proposed findings and

22    conclusions pointing to particular elements of the record, and

23    thereby also pointing to particular elements of the

24    objections.

25          And so your proposal leaves open until Monday --

 1   well, Friday, and effectively Monday, my ability even to

 2   figure out whether I have a problem and whether I would want

 3   to turn around and ask you for proposed findings and

 4   conclusions.  And so I think that my counter proposal to you

 5   is that I accept your offer, but I also impose a deadline of a

 6   week from Friday the 18th for proposed findings and

 7   conclusions.  And you -- to the extent you end up with a very

 8   tight universe of documentation, you can request that I lift

 9   the proposed findings and conclusions element of it, but I'm

10   not going to promise to tell you my answer on that by nine

11   o'clock Friday night.  And/or give me with your list on Friday

12   of exhibits some sort of a key to the objections that are

13   implicated that might demonstrate to me that it's not such a

14   tortured path.

15           MR. MUNGOVAN:  May I have one minute, Your Honor?

16           THE COURT:  Yes.

17           MR. JOSSEN:  May we have a minute together?

18           Your Honor, Robert Jossen.

19           We're going to take the liberty of thinking out loud

20   in response to Your Honor thinking out loud, if we may.  What

21   we've discussed is the following:  Both sides would meet and

22   try to do two things, both look at our respective exhibit

23   lists to see if we can cut them down, but more importantly,

24   see if we can remove some of the voluminous objections that

25   have been filed by both sides with the hope that we could have

1   a closing for some documents.  And we would let you know that

2   by nine o'clock on Thursday morning.

3        And then what we would like to do is, again

4   consistent with the Court's schedule, to have the submissions

5   in by Monday morning, nine o'clock, if that's okay.  And

6   counsel does remind me, and as a part of that, we would

7   dispense with the findings of fact that Your Honor is

8   suggesting you would otherwise need.

9        We will be mindful of what could happen if we don't

10  --

11       THE COURT:  Well, let me make my final decision on

12  whether I take back the findings of fact requirement after

13  I've seen your Thursday morning communication.

14       MR. MUNGOVAN:  Thank you, Your Honor.

15       THE COURT:  And I will get back to you on that as

16  promptly as I can once I've seen the Thursday morning

17  communication.

18       Now, once the universe of exhibits is set, we need to

19  ensure that the Court here has, by way of your filing, a

20  definitive list of the agreed admitted exhibits, with

21  designations that correlate on the defense side to the letters

22  in the conversion table, and that the Court has physical

23  copies of the additional exhibits labeled appropriately,

24  because the practice in this court, unlike in some other

25  courts, is that the court retains a physical copy of the

1   original exhibits, if you will.  It's a master set of the

2   exhibits, if you will, rather than the parties maintaining a

3   set of the exhibits.

4          So it's very important the record be complete.  And

5   then the agreed list will also be reflected in a version of

6   the transcript once that element is available.  So I thank you

7   in advance for cooperating with that, and helping us to make

8   sure that the record is complete.

9          So I'll say that I will look forward to seeing on

10  Thursday morning a list that says everything just got a whole

11  lot simpler, Your Honor, so would you please take away the

12  findings and conclusions requirement, but I do reserve the

13  opportunity to see that before making a decision.

14         Now, is there -- one moment.

15         All right.  So I'm told that I have covered the

16  record maintenance issues that I need to cover with you all on

17  the record.  Ms. Tacoronte will want to talk with you about

18  whether it's better for her to give you back the binders that

19  she has in anticipation of getting a smaller, more complete

20  set of binders or whether you want to handle it in some other

21  way, but that can be an off line discussion.

22         And so with that, I thank all counsel, party

23  representatives, and witnesses for your very focused,

24  thoughtful and helpful presentations today.

25         And of course I have the matter under advisement.

1    The record remains open for these completion activities that

2    we have talked about.

3         Mr. Jossen.

4         MR. JOSSEN:  Yes, Your Honor.  I apologize for

5    getting up one more time.  I just want to make sure that we

6    are all correct that the summations will be due on Monday

7    morning at nine o'clock.

8         THE COURT:  Yes, summations are due on Monday morning

9    at nine o'clock.  On Thursday morning at nine o'clock, what

10   you are going to file is a -- actually, let me be clear about

11   that.  You had said the documents, you would let me know by

12   9:00 AM Thursday if you're able to cut down the objections and

13   the documents.  I assumed that meant that I would get a clean

14   list of the agreed exhibits for each side, and, you know,

15   either a strike list or a very slimmed down version of

16   objections that I have to pay attention to filed on the ECF

17   system.

18        Is that what I should expect or is it something less

19   than that that I should expect?

20        MR. JOSSEN:  Robert Jossen.

21        That's our hope, and counsel shares that view.

22        MR. MUNGOVAN:  Yes, Your Honor.  Thank you.

23        THE COURT:  Very good.  And then the written closings

24   by Monday morning at 9:00.

25        So again, thank you all -- hold on one moment.  Okay.

1   Sorry.  I thought there was somebody else I needed to talk to.

2            I also thank the Court leadership and staff for their

3   support and enabling of our conduct of these proceedings.  And

4   so with that, good evening, and I'll see you tomorrow.

5            MR. JOSSEN:  Thank you.

6            MR. MUNGOVAN:  Thank you, Your Honor.

7            (At 4:38 PM, proceedings concluded.)

8                              *     *     *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  U.S. DISTRICT COURT     )

 2  DISTRICT OF PUERTO RICO)

 3

 4      I certify that this transcript consisting of 225 pages is

 5  a true and accurate transcription to the best of my ability of

 6  the proceedings in this case before the Honorable United

 7  States District Court Judge Laura Taylor Swain on August 8,

 8  2017.

 9

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

< Dates >
April 28, 2017
   165:19
August 3, 2017
   182:10
August 8, 2017 1:16,
   4:2, 225:7
January 2001 87:24
January, february
   157:9
July 14 103:6,
   104:13, 161:2
July 14, 2017 101:5,
   164:6
July 14th 103:5
July 15, 1993 90:6,
   90:9
July 19 164:8
July 1st 50:18
July 1st, 2017 60:1
July 28th 48:15
July 31st 132:5
June 30 150:25
June, 129 million
   dollars 79:1
May 21 50:14
May 21st 50:15
May 21st, 2017 50:24
May 31, 2017 186:20
May 31st 48:12
$1.34 138:2, 138:3
'15 79:3, 79:14
'16 79:3
'16. 79:8, 79:14
'68 17:5, 18:6,
   18:9, 52:12,
   52:19, 53:3,
   54:19, 73:24,
   74:7, 136:13,
   136:21, 180:21,
   183:9, 183:12,
   189:3
'98 52:22, 74:2,
   74:4
'98. 74:5
--his 61:4
.1 152:25
.1. 153:7
.2 30:17
.3 58:25

.4 30:13, 31:3
.5 153:2
.6 153:2
.6. 153:1
.7 153:1
.71 152:10
.8 139:23, 140:2,
   140:6, 140:9,
   140:13, 141:9,
   141:14, 141:17,
   142:9, 153:1,
   153:2, 153:14,
   154:1, 192:1,
   192:9, 194:11
.86 153:8
.89 140:25, 141:11
.9 31:4, 59:3, 153:1

< 0 >
000 67:6, 134:10,
   134:14
001 101:9
069. 64:5

< 1 >
1–2 125:16
1.0 191:6
1.01. 152:25
1.1 30:6
1.34 137:23, 138:10,
   155:12
1.34. 156:10
1.5 34:25, 139:7,
   150:20
1.5. 155:22
1.799 158:11
1.8 30:14, 158:21
1.9 159:18
10 16:16, 28:8,
   66:19
10,000 114:25
100 32:9, 35:7,
   35:9, 77:16,
   141:16, 141:20,
   143:7, 153:10
101 18:21
101(53) 12:11, 16:19
102 3:33, 45:17,

45:25, 132:12
103 3:36, 94:25,
   95:1, 95:16,
   95:20, 182:10
103. 89:23
104 3:39, 132:13,
   132:20, 134:3,
   134:5, 182:11
104. 132:16
105 3:13, 3:37
106 27:15
10:43 46:14
11 39:21, 167:25
113 194:12
11:09 63:6
11:12 64:17
11:23 72:12
11:25 72:8
11:38 72:13
12 32:1, 51:4,
   51:19, 51:25,
   52:17, 52:25,
   53:14, 58:19,
   167:25, 175:19,
   176:17
12. 177:10
120 219:16
127 160:22
129 3:16, 3:38,
   78:24
12:00. 92:12
12:09 95:20
12:14 100:1, 100:4
12:15 92:15
12:20 92:12
13 40:13, 87:8
135 3:39
14. 83:11, 83:13
149 20:18
14th 128:12
15 34:3, 34:4,
   58:23, 66:18,
   66:25, 93:9,
   106:25, 107:4
150 35:4, 35:6,
   35:11, 39:19,
   39:22, 43:13,
   136:12, 136:15,
   136:17, 136:25,
   137:4, 137:10,

137:16, 138:8,
138:10, 140:11,
141:16, 151:15,
151:21, 152:5,
152:22
151 3:17
16. 80:8
162 3:20, 3:40
17-AP-151(LTS 1:37
17-AP-152(LTS 2:3
17-BK-3283(LTS 1:6,
1:39, 2:5
17-BK-3567(LTS 1:24
173 3:21
18 30:11, 89:4,
121:3, 121:14,
183:7, 183:14
18. 122:20
18.5 185:3, 188:15,
194:9
18.6 32:8
180 3:24, 3:41,
160:23
183 75:22
184 76:10, 76:15
185 76:10
18th 220:6
194 3:25
194. 75:23, 87:8
195 84:21, 85:6,
85:7, 86:6
195. 85:3, 85:4
1968 48:20, 59:25,
87:25, 93:14,
94:9, 116:16,
117:19, 123:24,
124:16, 177:5,
180:8, 180:11,
180:15, 180:18,
180:19, 181:11,
181:14, 183:2,
183:21
197 3:42
199 3:28
1993 87:22
1:15. 100:3
1:18 100:5
1:26 104:6
1:57 128:7
1:58 128:24

< 2 >
2 33:1
2.8 153:11
20 49:10, 56:25,
57:22, 177:18,
178:3, 198:19,
213:9
200 186:10, 186:13
2000 122:19
2001 87:23
2004 18:6
2009 122:12, 122:14,
122:22, 123:5,
127:4, 127:6
2010 180:22, 180:23,
195:17
2010. 180:21
2011 30:7, 198:17
2012 17:7
2013 125:20
2013. 126:7
2014 122:21, 157:4,
158:3
2014. 157:4
2015 17:14, 18:10,
78:5, 78:22, 79:3,
79:8, 121:17,
122:14, 122:16,
122:24, 123:6
2016 78:22, 105:17,
130:1, 130:3,
131:16, 195:18,
198:17
2016. 30:7, 78:5
2017 82:16, 198:20
2017. 51:1
2018 82:16, 185:15
2060 203:11
21 80:7, 178:3
212 3:29
22(c 39:5, 119:12
22. 92:10
225 225:4
24 51:19, 55:9,
55:18, 57:7
24-month 51:7, 58:9,
168:21
24. 76:15

25 32:19, 134:10
250 134:14
26 175:9, 201:13,
201:24, 202:10
28.9 32:24
284 88:24, 89:2,
89:4
290 152:2, 154:20
2:05 134:5
2:40 160:7
2:41 160:18
2:50 160:19
2:52 161:14

< 3 >
3 31:2
30 194:25, 195:12
30,000 99:10
300 75:11
305 26:21, 27:12,
27:14, 27:21, 28:3
305. 12:13, 28:15
30th 34:21, 51:1,
55:15, 150:13,
150:21
31 201:10, 201:15,
204:11
31. 201:7
32 128:14
325 152:2, 154:20
33 38:21, 83:9,
83:12, 84:23,
110:14
33. 128:14
34 113:3
35 115:13, 115:17,
168:13
36 32:21, 51:20
36. 30:10
3799 225:14
38 32:7
39 117:22
3: 1:6, 1:24, 1:37,
2:3
3:15 178:10
3:16 179:3
3:42 196:5, 196:11

< 4 >
4,500 114:24, 115:3
4-A 61:18
4-B 61:18
400 79:25, 80:10,
   80:21, 81:4
401 19:6
41 80:5, 80:8,
   90:13, 90:17,
   90:18
41. 80:9
46 3:33
48 3:6, 3:34
49 75:3, 75:24
4:00. 217:20
4:11 215:2
4:14 217:25
4:24 218:1
4:38 224:7


< 5 >
5-D 101:15
50 35:10, 153:5,
   183:11, 188:12,
   188:13, 189:3
50. 85:5
500 43:14, 74:21
506(c 25:2, 32:25
522 14:17
524 75:4, 76:5
525 185:15
54 121:16
552 24:18
552(a 24:19
59 160:24
5:00 218:14


< 6 >
60 195:14
600 43:15, 67:6,
   84:15, 143:20,
   145:22, 148:1
601 18:9, 18:11,
   18:14
601. 19:3
602 19:8
608(b 170:24
611 170:21

65 3:35
66 3:9
68 19:18, 19:23,
   20:1, 20:2, 20:4,
   21:9, 22:21,
   22:25, 24:7,
   24:23, 195:17
68. 20:4
69 64:15


< 7 >
7.9 117:10, 143:24
70 35:4, 136:23,
   137:6, 137:9,
   137:11, 137:12,
   137:18, 140:22,
   140:24, 141:11,
   141:19, 143:7,
   144:10, 144:12,
   144:13, 144:15,
   152:20, 153:7,
   183:1, 183:6,
   183:15
76 67:22
799 34:24, 150:14


< 8 >
80 30:8
800 159:18
85 76:14
87 56:8
87.64 126:9
88 106:17
88. 106:16


< 9 >
9 114:24
902. 24:5
904 27:21
91 3:41, 178:25,
   179:1, 179:3
91.79. 126:11
92 3:34, 47:4,
   47:12, 48:10
922 12:13, 23:21,
   27:11, 27:15
922(d 23:24, 24:2

922(d. 23:20
925 163:20
928 12:13, 24:17,
   24:18, 25:2, 27:15
928(b 24:21, 33:1
928. 27:11
93 3:34, 47:5,
   47:12, 48:10
94 3:42, 196:7,
   196:9, 196:11,
   197:7
96 3:10, 3:36
98 124:6
98. 121:25
9:00 223:12
9:00. 223:24
9:33 4:3


< A >
AA 177:2, 177:9,
   180:23
AAA 177:2, 177:9
AAFAF 42:16, 47:21,
   63:13, 64:3,
   162:23
ability 38:6, 40:16,
   127:1, 195:15,
   195:16, 220:1,
   225:5
able 4:22, 37:15,
   59:8, 62:19,
   95:10, 99:12,
   154:13, 159:2,
   174:21, 176:9,
   213:25, 223:12
above 73:23, 91:6,
   141:1, 141:14,
   141:17, 159:23,
   159:24, 159:25,
   191:6
absence 40:24
absent 29:10
absolute 52:11, 53:9
Absolutely 22:5,
   22:6, 28:11, 170:2
absolutes 53:8
accept 190:22, 220:5
acceptable 5:19,
   10:2

accepted 161:9,
    172:5, 172:9
access 40:16, 113:6,
    190:23, 210:19,
    210:23, 211:6,
    211:10
accessing 52:20,
    149:19
accommodation 26:4,
    26:14
accompanies 168:17
according 41:18,
    195:16, 198:24
Accordingly 42:8
account 19:7, 37:12,
    59:7, 75:25,
    126:15, 126:17,
    126:18, 201:2,
    201:5
accounts 19:1
accrued 78:9
accumulating 158:25
accumulation 156:18
accuracy 120:18
accurate 56:13,
    56:14, 76:3,
    80:16, 80:17,
    91:20, 91:23,
    93:11, 119:2,
    165:21, 225:5
accurately 120:10
achieve 139:24,
    192:3, 192:22,
    193:4
acknowledged 37:21
acronym 79:5, 79:7
Act 14:15, 17:5,
    17:9, 17:11,
    17:12, 18:7,
    18:10, 19:19,
    20:7, 20:9, 20:12,
    21:5, 21:7, 21:11,
    21:14, 21:15,
    21:18, 22:2,
    22:22, 23:1,
    23:15, 24:6,
    24:23, 37:1,
    59:22, 78:3,
    78:17, 79:5,
    81:21, 100:25

action 45:18, 102:6
activities 223:1
activity 33:5, 40:1,
    59:4, 83:21, 87:19
actual 29:24, 30:22,
    31:2, 31:11,
    31:25, 33:23,
    54:4, 54:6, 55:4,
    55:13, 56:4, 56:9,
    57:1, 59:2,
    113:25, 136:23,
    216:20, 219:11
add 5:16, 102:18,
    146:3
added 95:7, 95:8
addition 17:11,
    52:23, 98:17,
    107:16, 108:12,
    111:11
additional 25:24,
    32:20, 38:18,
    58:5, 58:10,
    95:10, 104:14,
    112:4, 116:14,
    153:3, 153:6,
    172:25, 221:23
address 218:2
addressed 103:6
addresses 103:18
adequate 12:2,
    12:23, 13:5,
    15:11, 25:23,
    26:2, 26:16,
    27:19, 29:15,
    33:15, 35:22,
    125:23
adequately 36:18,
    41:10, 42:12
adjusted 15:19,
    51:18, 51:19,
    53:19, 60:22
adjustment 14:22,
    43:22, 145:7,
    184:5, 184:16,
    184:25, 185:6
Administered 1:11
Administration 1:26,
    25:7, 121:20,
    193:9, 193:11
administrative

125:22
admissibility 45:23
admissible 171:1
admission 178:24
admit 45:24, 52:11,
    215:17
Admitted 45:25,
    47:10, 47:12,
    64:16, 64:17,
    95:18, 95:20,
    100:17, 104:6,
    128:22, 128:24,
    134:3, 134:5,
    161:14, 179:1,
    179:3, 196:9,
    196:11, 215:7,
    221:20
adopted 60:8
advance 222:7
advanced 171:4
advancement 80:12
adverse 39:25,
    170:11
advised 173:4
advisement 222:25
advisor 10:21,
    106:1, 130:6
Advisory 2:35,
    134:25
affairs 53:13, 58:20
affect 61:7, 169:3,
    187:9, 191:7
affected 169:3,
    169:7, 169:10
Affidavit 31:14,
    32:2, 34:1, 47:3,
    48:17, 49:9, 60:5,
    60:11, 62:9,
    103:3, 103:9,
    103:11, 164:12,
    164:16, 167:24,
    168:25, 174:16,
    174:17, 174:18,
    174:20, 208:19,
    208:21, 208:23,
    208:25
affidavits 48:12
affirmatively 212:19
afford 150:1
afternoon 100:8,

151:13, 179:5,
179:7, 179:13,
179:14, 196:6,
198:6
agencies 88:6,
136:6, 172:21,
185:16, 195:8
Agency 2:34, 20:13,
20:19, 20:24,
43:14, 71:21,
74:13, 97:18,
136:1, 136:2,
157:8
agent 19:4, 36:24,
37:2, 52:5, 59:23,
177:1, 177:4
agents 19:1
aggressive 60:17
ago 173:12, 175:20
agree 9:21, 22:10,
52:5, 53:4, 64:19,
110:20, 115:21,
123:8, 135:20,
140:24, 141:14,
169:2, 169:8,
169:11, 219:10
agreed 99:17,
215:16, 221:20,
222:5, 223:14
agreement 5:6, 5:12,
9:18, 22:9, 22:12,
22:15, 22:16,
22:19, 22:24,
106:9, 106:12,
106:20, 106:24,
107:1, 132:2,
132:4, 132:8,
132:18, 133:6,
133:15, 134:10,
163:17, 215:10,
218:5, 218:23
agreements 24:22,
111:12
ahead 145:1
Airport 71:9, 71:10,
71:11, 71:14,
96:8, 96:9, 96:10,
112:13, 112:20,
113:1
Airports 70:4, 70:6

akin 177:2, 177:9
al 1:16, 1:45, 2:11
Albert 3:27, 196:8
Allan 2:24, 10:11,
29:8, 215:4
allegations 194:24
alleged 41:11
allocate 35:12
allocated 28:22,
80:1, 145:13,
145:14, 145:25
allocates 55:6
allocating 185:3
allocation 146:10,
146:13, 160:23,
160:24, 194:10
allocations 188:16
allow 156:21, 170:3,
171:12, 177:24,
190:23, 192:22,
193:2, 193:3,
212:24
allowed 212:18,
212:22
allowing 12:21
allows 14:22, 53:6
alluded 41:1
almost 92:11, 188:13
alone 98:2, 98:4,
175:9
already 10:13, 13:7,
13:21, 16:14,
19:2, 27:22, 28:6,
28:7, 42:9, 45:15,
54:17, 77:19,
101:12, 101:13,
103:11, 108:25,
143:6, 158:21,
163:6, 189:25,
197:5, 218:7
alternative 98:19,
189:1, 194:8
alternatively 12:2
although 33:20,
69:17, 149:3,
170:13
amended 106:21,
107:1, 107:2,
165:25
Amendment 13:19,

14:10, 15:1, 15:2,
15:7, 15:10,
15:13, 15:17,
16:5, 16:6, 16:11,
26:19, 27:24,
28:1, 28:4, 28:11
American 156:2,
156:10
Among 17:22, 27:2
amount 32:4, 49:11,
69:1, 75:13,
78:15, 79:4,
84:11, 85:8, 86:7,
86:19, 86:23,
123:2, 142:11,
142:17, 144:3,
145:9, 145:24,
146:14, 146:22,
147:14, 147:25,
152:6, 153:20,
158:16, 159:8,
159:23, 183:7,
183:16
amounts 59:22,
69:22, 142:13,
143:6, 143:15,
168:9
amplifies 138:6
Amy 225:13, 225:14
Ana 130:21
analyses 60:20,
84:14, 155:23,
156:6, 212:10,
212:11
analyze 51:11,
59:11, 60:12,
187:5, 187:12,
210:13
analyzed 51:5, 61:6,
61:9, 73:12,
73:14, 210:18
analyzing 60:7
ancillary 169:14
And/or 220:11
Andres 42:21
Andrew 3:15, 108:19,
128:10, 199:23
announce 150:13
announced 13:7
announcement 150:15

annual 30:17, 32:25,
  123:25, 124:16,
  136:21, 143:13,
  143:14, 143:15,
  151:22, 198:13,
  199:5, 203:15,
  203:20
answered 94:6
answering 56:22
anticipated 15:18,
  98:10, 104:2,
  125:24, 159:23,
  189:13, 189:15
anticipation 222:19
anybody 7:17
anyway 21:16, 145:16
Apologies 28:23,
  119:5
apologize 58:7,
  65:18, 65:21,
  65:25, 94:7,
  101:11, 132:22,
  175:15, 182:9,
  201:19, 202:12,
  213:1, 223:4
Aponte 42:25
apparently 65:25,
  72:3, 189:25
appeal 170:10,
  170:15, 171:10
Appeals 12:18,
  12:25, 13:7,
  13:11, 13:20,
  15:13, 171:19
appear 203:18
APPEARANCES 2:22
appeared 10:13
appears 203:2,
  203:5, 214:2
appellant 13:1
appellate 169:13,
  169:18, 169:23,
  170:7, 170:10,
  170:15, 170:16,
  170:25
appended 91:8, 91:13
Appendix 91:9,
  91:14, 92:9
applicable 21:1,
  27:15, 37:12

application 16:5,
  24:18, 27:8
applications 27:4
applied 14:16,
  15:15, 49:18,
  57:15, 57:16,
  72:22
applies 24:21
apply 15:17, 16:9,
  24:15, 24:19,
  27:11, 27:25,
  28:1, 137:20,
  175:23
applying 57:17
appreciate 217:19,
  218:25
approach 47:14,
  47:17, 50:10,
  64:14, 104:15,
  128:17, 128:21,
  128:23, 161:4,
  181:24, 197:12,
  197:20, 201:20,
  202:3, 202:6,
  202:17
appropriate 17:8,
  18:1, 26:16,
  40:18, 44:7, 52:7,
  53:5, 53:15,
  57:18, 58:11,
  58:16, 58:21,
  98:1, 156:8,
  164:14, 174:22,
  175:23, 176:6,
  176:8, 176:16
appropriately 221:23
appropriateness 62:2
approval 5:7, 43:21,
  218:24
approximately
  117:10, 134:13,
  143:20, 150:20
area 118:5, 142:4,
  171:1, 175:5
areas 98:14, 188:14,
  188:17, 188:22
argue 7:17
argued 15:23
Argument 10:2, 12:6,
  15:22, 26:8, 26:9,

37:1, 171:4,
  218:13
argumentative 169:20
arguments 4:15,
  4:20, 23:18,
  219:4, 219:6
arises 17:1, 22:9,
  22:16, 22:24
arising 16:20
Armstrong 13:25,
  15:4, 15:21, 20:5,
  20:17
around 29:1, 127:8,
  153:12, 156:4,
  180:1, 220:3
arrangement 135:3
arrangements 5:19
arrears 157:23
arrive 209:21
Article 8:9, 22:13,
  26:7, 140:8,
  184:17, 189:12,
  190:2
articles 200:23
articulated 14:24,
  15:9, 23:23, 24:9,
  28:2, 104:2
articulates 17:19
articulating 6:22
ascertain 211:25
aside 25:23, 181:10,
  186:22
asphalt 97:6
asserted 38:2, 38:8
asserts 37:21
assess 164:13
assessment 127:11
asset 41:21, 41:22,
  112:22
assets 25:17, 39:9,
  110:17, 115:18,
  117:23, 156:18
assignment 212:6
assignments 135:5
assistance 84:1,
  84:4, 110:11
assisted 72:2,
  110:6, 165:5
assisting 110:8
associated 33:7,

33:9, 48:20,
48:23, 106:6,
194:4
Associates 125:12
assume 26:10, 79:18,
93:12
assumed 81:24, 82:3,
124:9, 140:22,
166:12, 199:21,
201:1, 203:14,
207:4, 207:8,
209:24, 216:18,
223:13
assumes 32:8, 32:12,
52:1, 54:10,
54:11, 54:18,
54:19, 54:21,
55:16, 72:21,
142:13, 153:21,
153:23
assuming 32:5, 32:8,
32:16, 37:25
assumption 32:16,
35:8, 44:8, 73:3,
73:4, 73:7,
146:24, 199:20,
200:13
assumptions 31:5,
31:18, 34:6, 44:4,
44:6, 49:15,
54:11, 54:16,
55:1, 55:13, 57:3,
59:14, 165:7,
168:25, 199:15,
199:17, 212:4
assure 140:17
attached 77:22,
213:6
attaches 36:22
attachment 102:16
attempt 138:19,
175:4, 191:12,
191:18, 199:7
attempted 103:9,
199:4, 218:19
attendant 38:23,
83:17
attended 88:4, 131:9
attention 124:25,
223:16

attorneys 137:3
attract 40:16
audibility 9:5
audience 96:21
audio 101:22, 133:1
audit 120:24, 120:25
audited 157:3
author 131:24,
131:25
authorities 189:11
Authority 1:31,
1:44, 2:10, 2:35,
18:16, 20:25,
23:18, 36:5,
70:19, 70:23,
71:1, 72:2, 76:21,
76:24, 77:2, 79:6,
79:12, 84:15,
88:12, 89:9,
92:21, 92:23,
93:5, 97:20,
194:6, 194:17,
195:4, 195:18,
207:5
authorized 21:10,
21:12, 22:2, 85:18
authorizes 37:1
authors 156:6
automatic 24:15,
24:19, 162:16
AV 8:20
available 30:1,
30:2, 74:12,
80:11, 87:9, 99:5,
117:11, 138:20,
144:3, 144:6,
144:9, 166:9,
166:22, 185:10,
189:13, 193:25,
194:7, 194:13,
222:6
average 30:6, 30:13,
30:17, 32:19,
32:20, 99:7
avoid 13:13, 28:4,
28:15, 103:12,
182:15, 188:16,
194:7, 194:14,
218:6
avoidable 186:1

avoidance 13:13,
14:17, 28:13
award 35:6
aware 16:4, 59:24,
60:2, 77:3, 81:5,
81:12, 92:5,
96:11, 97:18,
123:24, 124:14,
124:20, 150:17,
159:8, 171:15,
201:5, 210:23,
211:2, 211:5
away 5:23, 14:10,
40:7, 43:13,
65:11, 142:15,
148:14, 148:20,
149:13, 154:17,
222:11


< B >
Bachelor 193:6
back 32:15, 34:11,
43:11, 50:20,
56:15, 72:5,
72:10, 102:6,
111:15, 121:10,
128:16, 152:16,
154:1, 217:2,
219:11, 221:12,
221:15, 222:18
background 194:22,
212:9
bad 158:1
balance 38:11,
143:18, 143:20,
143:25, 146:9
Bank 19:5, 19:7
Bankruptcy 1:1,
2:21, 12:12,
14:15, 14:19,
14:21, 15:8,
15:10, 15:19,
18:5, 23:20,
24:10, 24:14,
26:25, 27:4, 27:9,
27:23
Barbara 2:21
bare 154:17
Barrera 36:13

Bartley 3:23, 178:14
base 34:12, 88:16,
  156:3, 200:11,
  206:24
Baseline 139:4,
  146:4, 146:23,
  158:7, 199:22,
  200:5, 200:11,
  200:25, 201:2,
  203:8, 203:11,
  203:13, 205:5,
  205:7, 205:9,
  205:11, 207:2,
  207:4, 207:9,
  207:15
basic 4:14, 110:24,
  214:3
basically 25:5,
  30:18, 86:11,
  98:13, 101:1,
  123:3, 152:19
basing 210:6
basis 25:5, 29:24,
  30:17, 31:3, 31:4,
  39:24, 56:21,
  59:4, 131:21,
  152:10, 170:1,
  170:21, 172:10,
  173:9, 192:14,
  213:25
Bates 201:22, 202:13
Bauer 36:12
bear 5:24, 7:2,
  8:19, 8:23, 197:3,
  219:2
became 129:25
become 116:10
becomes 21:7, 50:2
befall 34:15
began 12:18
begin 4:12, 45:21,
  83:10
beginning 19:11,
  28:2, 65:9, 76:15
begins 83:10
behalf 5:15, 10:12,
  11:7, 29:9, 42:16,
  42:19, 46:9,
  63:13, 64:2, 65:7,
  104:10, 105:1,

107:20, 162:8,
  162:11
behind 77:15, 80:6,
  88:25, 109:6,
  109:14, 121:15,
  121:23, 123:12,
  123:18, 124:25
belabor 12:4
belaboring 173:23
belief 148:13
believed 34:2,
  159:24
below 78:15, 140:16,
  140:19, 143:1,
  147:4, 152:25,
  154:1, 154:6,
  154:13
bench 202:6, 202:17
benchmark 127:8,
  127:13
benefit 52:20, 60:19
benefited 58:5
benefits 98:14
Bennett 23:22, 25:9
besides 202:10
Besosa 162:9
bespoke 195:22
best 75:10, 225:5
better 96:22,
  147:10, 147:17,
  190:8, 222:18
Beyond 114:25,
  120:22, 132:21,
  154:23, 155:4,
  174:11, 174:12,
  176:3, 177:12,
  177:21, 212:15
Bienenstock 36:11
bigger 5:25
bilateral 22:9,
  22:12, 22:15,
  22:24
bill 157:17, 157:18
billion 34:24,
  34:25, 68:25,
  76:1, 117:10,
  117:17, 143:24,
  150:14, 150:20,
  158:3, 158:11,
  159:18, 183:7,

183:15, 185:3,
  188:15, 194:9
bills 158:24, 159:1,
  163:25
binder 46:4, 65:8,
  77:6, 85:1, 89:21,
  95:1, 95:4, 95:5,
  105:2, 106:14,
  129:13, 132:11,
  201:8
binders 64:8, 64:12,
  168:15, 215:17,
  215:20, 222:18,
  222:20
binding 17:10,
  17:13, 18:2, 22:23
bit 11:8, 29:18,
  105:20, 151:3,
  219:1
blowup 202:15,
  202:23
boats 14:2, 14:3
Bob 218:20
Bobroff 36:10,
  100:14, 103:4
Bond 22:1, 51:12,
  52:21, 62:3, 62:6,
  158:2, 171:25,
  172:2, 172:6,
  172:11, 173:10,
  177:2, 180:22,
  183:9, 183:13,
  188:18, 190:3,
  194:21, 195:4,
  195:7, 195:11,
  195:17, 195:21,
  195:22, 195:23,
  195:25, 207:11,
  208:3
bondholder 32:23
borne 23:2
borrow 149:23
bottle 66:2
bottom 83:11, 85:5,
  90:5, 90:17,
  122:3, 201:11
box 45:7
Brad 36:9, 100:14
branch 162:13
breaching 65:21

break 8:15, 92:12,
    92:15, 100:2,
    194:20, 195:11,
    195:25
breakdown 26:8
bridge 31:19
brief 25:20, 26:1,
    26:9, 37:1
briefing 103:22,
    103:25, 217:3
Briefly 12:12,
    13:24, 23:7,
    23:19, 24:17,
    26:21, 96:18
briefs 218:13
Brigade 162:22
BRILLIANT 2:24,
    10:8, 10:11,
    10:19, 10:24,
    11:3, 11:4, 12:14,
    28:17, 28:20,
    28:25, 29:6, 29:8,
    35:24, 66:2,
    160:8, 160:13,
    160:16, 214:17,
    214:19, 214:22,
    215:3, 215:4,
    215:19, 215:22
bring 8:15, 64:7,
    107:14
brings 219:11
broken 31:15, 102:15
brother 36:23, 37:21
brought 33:6, 170:17
BRUNSTAD 10:13,
    10:24, 11:2, 11:5,
    11:7, 11:12, 20:3,
    26:12, 28:20,
    28:23
buckets 35:3,
    193:24, 194:8
budgetary 135:22
budgeting 115:18,
    183:25
budgets 136:4, 136:5
build 25:16, 40:11,
    70:17, 70:18,
    158:6, 190:15
building 152:24,
    154:12

buildup 40:14
built 16:2, 98:11
bulb 96:25
burden 25:11, 25:13,
    29:13, 29:15,
    29:17, 218:6
BURGOS 42:23, 43:3
business 87:4,
    107:14, 115:24
buy 35:8, 157:22,
    158:15
Buyer 190:3


< C >
calculate 192:21,
    193:3, 200:14,
    204:7, 208:7,
    208:8
calculated 31:2
calculating 61:17,
    176:7, 203:19,
    205:18, 205:19
calculation 50:2,
    78:23, 144:12,
    193:5, 201:1,
    203:22, 207:3,
    209:2, 209:12,
    209:15, 209:16,
    209:19, 209:21
calculations 37:20,
    50:16, 54:1,
    166:17, 199:15,
    209:5, 209:9
calculus 160:22
California 22:3
call 44:24, 45:2,
    46:16, 63:8,
    100:6, 128:10,
    131:24, 163:8,
    164:24, 178:14,
    180:19, 182:1,
    182:7, 184:5,
    206:2, 206:10
called 47:24, 66:10,
    66:15, 66:16,
    105:7, 128:8,
    129:18, 137:21,
    139:11, 143:13,
    143:17, 156:19,

162:1, 163:2,
    163:13, 170:12,
    179:9, 180:8,
    184:10, 198:2,
    204:22
calling 45:3, 95:15
candid 8:6
canon 13:12, 13:15,
    14:16, 28:13
capacity 105:16,
    174:4
Capex 32:21, 122:21,
    126:21, 126:22
capital 18:18,
    38:22, 40:16,
    69:1, 83:16, 86:8,
    123:2, 167:17,
    190:24
capitalize 127:2
capture 52:17
captured 52:25
car 96:22
care 147:2, 147:3
career 213:4
careful 23:22, 26:23
carefully 23:3
Carlos 42:25, 130:24
carried 135:18
cars 30:19, 32:16,
    98:19, 99:4
cases 13:23, 14:12,
    15:2, 23:10, 37:3
cash 34:24, 53:3,
    117:10, 150:14,
    158:11, 158:13,
    158:15, 158:18,
    158:25, 159:3,
    189:9, 189:10,
    189:12, 189:14,
    190:15, 194:13
Castellanos 42:24
CAT 2:40
categories 121:19,
    142:21
category 6:14
cause 13:6, 38:10,
    62:16
caused 87:18, 87:19
cavalier 39:13
cent 86:24, 87:3,

87:5
cent. 87:2
Certain 17:24,
    21:16, 52:21,
    54:14, 56:16,
    60:15, 85:19,
    88:10, 89:7, 90:2,
    91:8, 91:14, 93:9,
    159:23, 199:15
Certainly 14:22,
    44:4, 182:3,
    203:25, 205:10,
    216:16, 217:15
certainty 52:4,
    52:10, 52:11,
    203:5
certification 131:2
certified 72:1,
    117:13, 117:15,
    130:12, 165:17,
    166:16, 172:18,
    172:19, 173:5
certify 225:4
cetera 23:4, 97:17
challenge 28:24
challenged 169:18,
    169:23, 170:6
challenges 80:14
chance 40:8, 132:6
change 30:18, 52:3,
    52:13, 52:14,
    53:17, 53:22,
    59:15, 59:19,
    99:21, 117:21,
    123:4, 144:11,
    144:16, 188:12,
    188:16
changed 94:15,
    94:22, 116:3
changes 48:23, 49:7
characterization
    170:1, 192:17
characterize 170:9,
    218:20
characterized
    170:11, 190:13
Charles 10:21
chart 75:24, 76:2,
    78:1, 78:7, 124:6
Chicago 55:21,

71:11, 71:14,
    163:13, 163:17,
    163:23
Chief 2:21, 174:21,
    195:2
chipping 154:17
choice 39:14,
    116:11, 191:2,
    194:10
choices 7:1, 57:22,
    183:24, 185:2,
    194:24
choose 7:3, 35:13
chose 103:10, 192:10
cigarettes 78:9
Circuit 12:18,
    15:14, 16:24,
    23:7, 28:6, 28:9
circulars 182:20
circumstances 16:21,
    16:23, 17:24,
    19:21, 21:21,
    26:16, 174:22,
    216:9
cite 17:22, 20:5,
    21:24, 23:13,
    27:6, 27:7,
    122:13, 184:13,
    185:23
cited 13:23, 21:6,
    127:7, 185:13,
    186:18, 189:10,
    189:12, 189:13,
    192:15
cites 37:4
citizen 82:10
citizens 34:16,
    187:9
city 195:2
claim 11:16, 26:17,
    26:18, 36:20,
    41:18
claimed 42:5
claimholders 38:15,
    42:6
claims 41:3, 41:4,
    41:9, 170:17
clarification 94:3,
    175:6
clarify 62:4

clarity 45:16, 124:5
classified 111:4,
    145:11, 157:19,
    158:9
clause 19:11, 133:6,
    133:10
clawback 78:1,
    78:12, 78:14,
    78:23, 79:9,
    116:1, 116:2,
    116:6, 166:24,
    167:2
clean 223:13
clear 6:16, 14:5,
    16:15, 18:23,
    19:8, 19:24, 24:2,
    24:7, 25:9, 28:18,
    33:9, 34:9, 35:11,
    44:17, 50:23,
    55:11, 60:14,
    71:19, 103:3,
    103:20, 109:2,
    114:10, 123:5,
    146:19, 152:4,
    158:23, 195:19,
    215:15, 217:3,
    223:10
clearly 23:13,
    86:22, 89:14,
    216:25
Clerk 46:2, 104:16,
    128:17, 128:21,
    161:4
client 10:9
clipped 64:13
clock 7:2, 7:5
close 39:11, 40:9,
    155:18, 184:8,
    192:11, 199:22,
    215:24
closed 17:17
closely 107:23,
    108:19, 108:23,
    131:6, 134:18
closer 49:20,
    155:16, 216:11
closest 130:21
closing 4:18, 4:20,
    36:25, 218:13,
    218:18, 219:3,

219:6, 219:9,
  221:1
closings 223:23
closures 156:4
cloth 172:24
co-counsel 42:21
Code 12:12, 13:18,
  14:19, 15:11,
  18:5, 23:20, 27:4,
  27:9, 28:14,
  97:11, 100:22
coffee 29:2
collaborative 108:2,
  108:6
collateral 12:1,
  12:22, 13:3, 13:9,
  16:12, 16:16,
  17:21, 17:25,
  25:5, 25:8, 28:8,
  35:15, 38:3,
  41:12, 41:17,
  42:5, 148:14,
  148:20, 149:3,
  149:4, 180:15,
  183:12, 194:4
collateral. 148:23
colleague 42:17
colleagues 36:6,
  165:4, 217:18
collected 18:23,
  69:19
collecting 176:25
collection 53:7,
  118:21
collects 19:2
colloquy 87:7
column 78:24
combination 162:13
combined 66:18
comes 8:2, 8:11,
  115:6, 140:12,
  151:16
coming 34:11, 76:19,
  81:6, 81:7, 190:4,
  218:14
commence 54:8,
  54:11, 55:16, 57:5
commenced 55:8
comment 126:2,
  126:4, 207:13

comments 27:2,
  191:1, 217:5
committed 57:14
commonly 120:4
communicate 26:10
communicated 6:4
communication
  221:13, 221:17
companies 66:15,
  66:18, 67:3,
  111:12
company 112:8,
  163:13, 163:15
compares 35:18
Compass 163:18,
  163:22, 165:4
compelling 33:14
compensation 14:11
Complaint 45:18
complete 56:11,
  86:1, 96:3,
  173:12, 222:4,
  222:8, 222:19
completed 59:10,
  80:19, 214:20,
  214:24
completely 15:21,
  32:24
completeness 85:18,
  102:23
completes 215:5
completion 80:12,
  223:1
component 68:1,
  68:2, 68:3, 73:23,
  74:19, 98:18,
  209:20, 209:21
components 67:25,
  70:20, 70:24,
  70:25, 71:3,
  71:22, 74:16,
  97:10, 110:20
compound 199:5,
  203:15, 203:20
compounded 198:13
comprehensive 28:19
computer 5:25,
  157:20
concept 15:11,
  19:13, 70:7,

71:17, 195:11,
  195:13
concern 14:9, 38:9,
  180:3, 219:8,
  219:12
concerning 91:9,
  91:14, 210:3
concerns 15:13,
  27:24, 103:18,
  148:23, 219:2
concession 111:12
concessioned 112:4
conclude 123:3
concluded 22:3,
  95:22, 99:25,
  128:6, 160:6,
  171:9, 178:8,
  196:3
concluded. 224:7
concludes 63:7
conclusion 37:23,
  93:19, 139:9,
  209:14
conclusions 93:21,
  125:17, 219:22,
  220:4, 220:7,
  220:9, 222:12
condition 54:20,
  61:6, 61:10, 98:1,
  117:23, 120:4,
  125:9, 126:6,
  126:19, 127:23,
  179:23, 205:5,
  205:9, 205:10,
  210:19, 210:20
conditions 16:21,
  16:23, 19:21,
  21:17, 21:21,
  53:14, 89:8,
  118:7, 121:19,
  127:8
conduct 41:11,
  118:12, 167:4,
  224:3
conducted 118:2,
  118:8
confer 8:16
conference 34:23
conferences 88:4
confidence 40:15

confidential 4:22,
  5:6, 5:9, 5:10,
  5:11
confirm 103:20,
  215:9, 215:23
confirmed 173:5
conflict 13:13,
  28:4, 28:15,
  133:7, 133:9
conflicts 27:14
confusion 103:13,
  202:12
congested 98:15
Congress 24:11
connection 29:21,
  31:12, 96:6,
  103:10, 103:24,
  118:13, 135:12,
  165:6, 166:6,
  167:23, 174:15
connectivity 214:4,
  214:5
consensual 15:6
consent 27:8
consented 27:3
consequence 87:10
consequences 84:12,
  85:9, 86:8, 86:20,
  87:3
conservative 54:10,
  54:15
consider 7:7, 53:11,
  59:14, 112:14,
  125:25, 126:2,
  126:4, 142:1,
  166:24, 217:8
considered 74:11,
  76:16, 216:15
considering 81:6,
  81:11, 219:20
consist 93:6
consistency 101:13
consistent 19:14,
  60:21, 80:13,
  95:10, 143:23,
  153:3, 168:1,
  168:10, 182:22,
  205:25, 221:4
consisting 225:4
consists 69:1

constitute 24:4,
  93:5
constitutes 13:6,
  135:1
Constitution 13:14,
  16:9, 28:5, 28:10
constitutional 12:8,
  12:16, 13:8,
  13:10, 13:12,
  13:19, 13:22,
  14:9, 14:14,
  14:17, 16:8, 28:13
constitutionality
  13:4
constructed 200:8,
  200:10
constructing 69:7,
  206:25
construction 73:24,
  74:3, 74:5, 96:15
construe 13:13
consult 131:1
consultancy 133:19,
  134:9, 135:6
consultant 105:13,
  108:7, 109:3,
  129:25, 130:4,
  131:15, 132:19,
  139:10
consultants 107:24,
  108:2, 108:13,
  139:15
consulting 66:14,
  106:9, 106:20,
  134:14, 135:3,
  139:11
contain 200:2
contained 21:4,
  120:15
contains 103:4,
  129:14, 133:6
contemplated 61:4
contents 125:12
context 7:19, 34:8,
  219:6
continental 111:2
continuation 207:9,
  207:16
continue 11:21,
  12:21, 13:8,

16:18, 32:16,
  33:12, 72:22,
  81:22, 86:17,
  135:8, 163:10,
  214:13
continued 6:24,
  14:4, 16:17,
  79:10, 207:12
continues 132:4
continuing 11:25,
  195:18
continuous 97:4
continuously 130:3
contract 22:19,
  132:2, 132:24
contracts 67:4, 67:6
contractual 14:22,
  14:25, 22:20, 37:2
Contrast 39:12,
  40:22
control 135:22,
  147:10, 147:18,
  157:13
controls 115:1,
  157:13
conversion 221:22
COO 130:16, 131:6
cooperating 222:7
copies 64:7, 197:9,
  221:23
copy 46:6, 47:7,
  64:7, 64:11, 77:9,
  104:15, 105:4,
  106:20, 109:12,
  128:21, 132:22,
  133:2, 161:4,
  196:20, 202:21,
  221:25
core 7:7
corner 90:5, 90:8
corrected 40:9,
  40:22
correctly 83:23,
  83:24, 156:13,
  218:20
correlate 101:7,
  101:10, 221:21
correlation 124:6
cost 39:1, 68:13,
  70:22, 80:13,

83:19, 97:16,
97:17, 184:7,
206:17, 206:19
costs 38:18, 39:10,
68:6, 68:21,
81:13, 84:15,
116:24, 117:1,
186:1, 186:4,
186:6, 214:8,
219:9
counter 127:9,
127:11, 220:4
counter-designate
102:21
counteracting 147:6
counting 202:10
country 31:10,
115:23, 156:5,
195:14, 212:12
County 19:14, 21:23,
21:24, 22:2,
22:14, 23:21,
23:22, 24:9,
25:10, 26:24,
27:17
couple 4:13, 4:14,
12:7, 27:2,
164:19, 179:25,
213:23
course 4:23, 45:19,
74:19, 91:24,
97:8, 98:12,
98:24, 100:18,
129:15, 143:12,
143:23, 152:2,
169:16, 197:19,
216:5, 216:23,
217:3, 218:23,
222:25
COURTROOM 5:8, 9:21,
45:8, 45:13,
46:20, 46:25,
63:12, 63:20,
63:25, 64:20,
64:23, 65:2,
72:11, 100:21,
101:1, 102:1,
104:20, 104:25,
129:5, 129:10,
161:18, 161:22,

178:18, 178:22,
196:15, 196:19,
197:16, 201:17
courts 221:25
cover 102:13,
125:11, 141:23,
158:2, 222:16
covered 15:7, 29:25,
32:10, 35:7, 74:7,
104:3, 114:3,
175:5, 177:13,
183:9, 183:10,
199:1, 211:8,
217:13, 222:15
covering 158:22
covers 179:21
create 22:12, 166:5,
209:2
created 22:13, 71:1,
72:18, 75:2,
154:10
creation 71:25
credibility 171:1
credible 41:20,
192:11
credit 177:9
creditor 25:13
creditors 13:5,
24:16, 162:18
crisis 152:16,
155:17
critical 22:5,
112:22, 133:20,
183:24
criticism 192:6
criticize 174:3,
191:25, 192:4
criticized 169:13,
169:16, 170:6,
170:10
critique 164:11
cross 95:13, 99:18,
154:24, 154:25,
155:4, 174:15,
176:4, 176:13,
177:22, 212:16
cross-correlate
219:13
cross-examined
102:10

cross-subsidies
70:24
CSR 225:14
culminates 17:2
cumulative 117:10
current 52:8, 52:18,
53:13, 54:22,
57:19, 58:8,
58:20, 78:2,
86:12, 86:14,
115:24, 123:1,
126:19, 168:1,
168:10
currently 32:3,
34:8, 34:24, 55:9
curtailed 190:6
cushions 32:23,
56:24
customary 50:11,
57:21
cut 24:20, 81:14,
81:18, 81:19,
81:20, 142:4,
145:15, 157:11,
157:16, 181:19,
182:23, 186:23,
187:2, 187:9,
187:12, 188:22,
191:19, 220:23,
223:12
cuts 186:10, 186:14
cutting 81:7, 81:11,
142:6, 142:24
CV 128:13, 128:16,
213:5
cycle 153:23


< D >
daily 108:16, 108:18
damages 37:11, 37:16
dangerous 219:1
data 30:3, 30:22,
118:19, 118:20,
118:21, 120:3,
121:20, 122:1,
122:12, 122:13,
122:21, 122:22,
123:6, 123:11,
123:18, 125:19,

126:14, 127:3,
127:6, 157:3,
158:17, 198:20,
205:6
date 31:10, 41:12,
50:15, 51:3, 51:9,
51:14, 51:17,
54:5, 55:4, 55:14,
55:15, 56:5, 56:9,
56:12, 57:1,
57:10, 57:13,
90:7, 132:5,
165:24
dated 90:5, 182:10,
186:20
Davidson 10:20,
10:22
day 99:9, 99:10,
107:10
days 6:22, 164:8,
164:10, 179:25
DDDDD 3:37, 101:16,
102:8, 104:6
deadline 219:3,
220:5
deal 22:12, 65:12
dealing 12:14,
194:23, 195:2
deals 133:15
dealt 9:12
Debtor 1:33, 23:24,
24:2, 25:11
Debtors 1:18, 29:14,
29:22
Dechert 5:3, 46:16,
65:7
decided 116:18
decision 20:17,
20:18, 20:22,
21:24, 25:10,
26:24, 26:25,
28:7, 106:3,
116:10, 147:16,
148:14, 148:20,
149:13, 170:11,
170:25, 171:19,
188:16, 188:18,
221:11, 222:13
decisions 21:6,
23:23, 44:12,

44:16
declarations 7:12,
174:10, 177:19,
216:20, 217:2
decline 38:23, 40:8,
40:22, 83:17,
87:19, 142:12
declining 83:21
decrease 30:6,
30:12, 59:3
dedicated 183:12,
189:2
deductions 32:25
deemed 5:9
default 177:3
Defendant 9:24,
11:19, 33:6,
37:16, 39:4,
39:18, 41:10,
100:12, 109:8,
121:24, 199:23
Defendants 1:47,
2:13, 12:19,
16:13, 26:10,
33:18, 34:12,
41:16, 41:25,
46:9, 63:8, 64:25,
83:15, 100:11,
160:23
Defense 3:35, 3:37,
3:38, 3:40, 35:25,
47:8, 64:15,
64:16, 64:17,
66:10, 100:6,
100:20, 100:25,
104:8, 105:4,
105:7, 128:8,
128:24, 129:18,
161:3, 161:14,
162:1, 221:21
deferral 51:7,
51:18, 58:9,
168:21
deferred 55:9,
55:18, 57:7
deficit 135:21,
156:14, 158:22
defined 18:22,
111:6, 199:1
defines 16:19, 18:21

definition 12:11,
18:4, 71:12,
114:16, 116:22,
142:6
definitions 111:6
definitive 221:20
defray 74:8
degradation 38:24,
83:18, 87:18,
97:15
degredations 152:25
Degree 52:10, 52:24,
114:10, 179:17,
193:6, 193:9,
193:13, 200:20,
217:1
delayed 80:12
delays 80:2, 80:5
delegated 20:24
delegation 20:20,
21:4
demand 113:9,
113:17, 114:8,
114:13, 115:4,
115:6, 115:8,
115:11, 198:25,
210:24
demanding 26:14
demographics 98:22
demonstrate 220:13
demonstrated 41:7
denied 62:12, 177:15
deny 42:11, 190:18
Department 69:9,
69:11, 69:13,
69:17, 69:18,
78:2, 78:16,
79:16, 157:14
departments 157:11
dependant 54:25
depended 166:17
dependency 115:22
dependent 50:16,
98:18, 115:25,
116:2, 116:3
dependents 99:2
Depending 8:14,
48:23, 49:5,
49:24, 54:13,
54:14, 57:23,

211:12
depends 142:1
depleted 51:4,
    51:10, 51:13,
    57:11
deployed 80:11,
    80:22
deposited 52:5,
    59:23
DEPUTY 45:8, 45:13,
    46:20, 46:25,
    63:20, 63:25,
    64:20, 64:23,
    65:2, 72:11,
    100:19, 100:21,
    101:1, 102:1,
    104:20, 104:25,
    129:5, 129:10,
    161:18, 161:22,
    178:18, 178:22,
    196:15, 196:19,
    197:16, 201:17
derives 15:12, 27:21
deriving 60:13
describe 96:18,
    135:13, 162:5,
    184:7, 194:22,
    218:22
described 40:12,
    86:9, 177:17
describes 120:11,
    172:22
description 147:13,
    214:2, 214:4
designate 218:9,
    218:11
designated 7:24,
    161:3
designation 121:25
designations 221:21
designed 44:10,
    168:20, 206:6
destination 67:13,
    67:17, 113:15,
    113:17, 113:19,
    113:22, 114:2,
    211:12
destroy 11:25,
    14:18, 15:8, 38:8
destroyed 11:18,

14:3, 14:5, 15:20,
    15:25
destruction 14:1,
    14:7
detail 36:25,
    112:19, 125:4,
    125:11, 127:4,
    162:25
detailed 113:25
details 159:3,
    209:13
deteriorate 167:10
determination 172:6,
    173:1
determinations 217:9
determine 43:25,
    56:12, 60:23,
    123:17, 137:8,
    137:17, 138:20,
    142:21, 165:20,
    166:21, 173:6,
    173:8, 184:21,
    185:25, 186:4,
    186:23, 187:1,
    187:22, 189:21,
    206:7
determined 30:23,
    89:3
determining 50:3
develop 39:2, 212:2
developed 73:9,
    80:18, 84:16,
    86:10, 92:3,
    131:18
Development 26:7,
    98:21, 107:15,
    107:21, 131:14,
    166:2
Devtech 139:12,
    139:15
Diamond 10:22
diesel 78:9, 93:8
difference 50:21,
    96:19
differential 160:2
differently 138:24
differing 31:5
differs 58:22
difficult 73:12
difficulties 80:15

difficulty 121:6
diminished 83:21,
    87:19
diminishing 41:11
dip 153:25, 154:13
dips 153:25, 154:11
dire 82:11
direct 63:7, 124:25,
    135:2, 217:13
directed 189:7
direction 219:18
directly 9:4, 25:10,
    130:14, 177:4,
    181:2
director 42:17,
    42:25, 87:22,
    88:1, 88:4, 88:8,
    89:5, 89:15,
    90:11, 90:21,
    92:24, 93:1, 94:1,
    94:9, 98:9
directorate 69:13,
    97:24
disagree 168:12
disagreement 103:13
disaster 152:19
disclosure 183:10,
    195:18
discounted 32:15
discovery 29:21,
    51:17, 51:21,
    58:5, 59:3, 60:15
discretion 185:2,
    194:10
discussed 9:17,
    99:18, 137:3,
    172:3, 216:24,
    217:1, 219:11,
    220:21
discussion 22:4,
    62:5, 96:6, 154:2,
    222:21
discussions 94:17
dispense 221:7
dispute 24:4, 24:5,
    169:14, 169:17,
    173:23
disrepair 38:6,
    59:16, 210:10,
    210:11, 210:14

dissipated 16:13
distinction 23:2
distinctions 22:8
distinguish 14:24
distinguished 22:6
District 1:3, 2:17,
    2:18, 225:1,
    225:2, 225:7
divert 188:10
diverted 33:12,
    52:12, 146:15,
    148:4, 166:10,
    166:13
diverting 189:2,
    194:18
diverts 180:14
Docket 1:6, 1:24,
    1:37, 2:3
document 6:14,
    44:11, 76:10,
    89:22, 90:13,
    90:20, 91:17,
    121:24, 122:10,
    123:18, 124:25,
    125:2, 125:3,
    125:5, 125:8,
    125:16, 126:5,
    132:16, 133:2,
    201:9, 201:13,
    202:13, 202:14,
    203:7, 204:10,
    204:12
documentation 201:6,
    220:8
documents 5:9, 5:17,
    6:22, 6:25, 8:7,
    52:22, 65:8,
    91:21, 92:2, 92:4,
    125:7, 183:10,
    195:18, 215:7,
    215:21, 216:8,
    216:9, 216:15,
    216:22, 216:24,
    216:25, 218:11,
    218:18, 219:11,
    219:20, 221:1,
    223:11, 223:13
doing 6:1, 11:20,
    11:21, 12:24,
    41:25, 42:18,

132:7, 135:17,
    147:9, 152:8,
    190:8, 217:12
dollar 34:9, 76:6,
    87:6, 137:25,
    138:4, 142:13,
    151:15, 183:7,
    183:15, 188:15,
    194:9, 194:18,
    195:20
dollars. 26:15
done 4:24, 31:17,
    53:16, 53:21,
    73:15, 73:17,
    84:13, 84:14,
    92:14, 118:4,
    119:24, 120:1,
    120:5, 139:11,
    146:3, 156:12,
    156:13, 160:12,
    160:15, 168:24,
    175:8, 200:4,
    210:21, 215:10
door 107:14
Dora 10:14
double 151:1
double-sided 128:16
doubt 13:4, 13:7,
    28:10
down 11:8, 12:9,
    12:16, 31:15,
    33:8, 78:7, 78:15,
    86:6, 92:20,
    99:12, 141:6,
    141:7, 154:17,
    220:23, 223:12,
    223:15
down. 102:1, 206:16
downward 52:6
draft 165:25, 166:1
drafted 83:25, 84:3
dramatic 38:25,
    83:19
drawer 157:17,
    157:18
drill 12:16
drilling 12:9
drive 32:16, 211:7,
    211:10
driving 180:1

drop 153:6
drops 140:14,
    152:10, 153:7
dry 158:5
DTX 64:4, 64:15,
    101:9, 124:6,
    201:7, 201:10,
    201:15
due 80:11, 188:2,
    223:6, 223:8
duly 21:10
during 4:19, 9:21,
    24:10, 30:12,
    81:3, 83:15,
    87:25, 88:3,
    90:10, 108:9,
    119:11, 143:12,
    143:22, 170:14,
    216:4, 216:17
duties 82:17
Duvall 3:12, 39:4,
    104:12, 104:18,
    105:3, 105:11,
    105:19, 114:20,
    117:21, 119:1,
    121:14, 124:14,
    128:4, 128:5,
    134:18


< E >
earlier 21:15, 41:1,
    134:1, 143:24,
    156:25, 172:19,
    215:6, 219:3
earmarked 145:10,
    188:10
earmarks 185:16
earned 134:13
easier 64:12
easy 28:21, 137:11
eating 7:5
ECF 223:16
Economic 39:25,
    40:1, 40:4, 40:17,
    83:21, 87:19,
    98:20, 130:9,
    131:18, 135:14,
    139:23, 147:23,
    147:24, 150:9,

156:2, 156:10,
156:11, 187:13,
192:1, 192:3,
200:5, 204:3,
206:8, 206:23,
212:2, 212:4
Economics 83:6,
162:19, 163:13,
163:17, 163:23,
176:2, 179:17,
193:14, 200:20
economist 154:3,
162:6, 174:6,
179:15, 200:17
economy 40:15,
138:3, 140:7,
142:7, 152:14,
152:17, 153:25,
156:5, 187:3,
190:7, 192:2,
201:3
edge 154:4
Education 157:14
effect 20:21, 20:23,
39:18, 59:12,
61:9, 132:4,
132:18, 138:4,
138:12, 162:15,
187:2
effectively 147:8,
153:5, 205:21,
220:1
effectuates 22:19
efficient 5:20, 34:5
effort 26:10, 28:13,
40:4
eight 117:17,
121:23, 123:12,
123:18, 140:2
eight-minute 8:9
either 25:1, 61:11,
102:22, 123:21,
141:19, 147:6,
156:17, 190:14,
216:6, 217:5,
223:15
electronic 90:25,
91:1
electronically
202:14

element 73:15,
173:10, 220:9,
222:6
elements 147:7,
219:19, 219:22,
219:23
eligible 172:22
Elizabeth 2:36,
42:17, 47:20
Ellis 163:7
ELMO 4:23, 5:11
elsewhere 141:24,
142:2, 142:6,
142:20
embedded 158:22
emergency 195:3
emphasize 11:14
employed 163:13
employment 31:6,
60:24, 61:10,
199:2, 199:9,
199:11, 200:1,
200:3, 200:6,
206:14, 209:23,
212:5
empowered 18:7,
21:10
empowers 20:10
enable 4:10, 192:21
Enabling 17:5, 17:9,
17:11, 17:12,
18:7, 18:10,
19:19, 20:7, 20:9,
20:11, 21:5, 21:7,
21:11, 21:14,
21:15, 21:17,
22:2, 22:22, 23:1,
23:15, 24:6,
24:23, 37:1,
100:25, 224:3
enacted 14:19
end 7:19, 26:9,
31:4, 32:3, 32:5,
33:1, 39:7, 53:23,
72:4, 119:15,
133:19, 134:9,
134:13, 141:11,
142:6, 220:7
endeavor 149:21
ends 152:11

enforceable 17:10,
17:13, 21:18
engage 217:7, 219:17
engagement 107:8,
107:10, 107:13
engineer 117:25,
118:1, 118:9,
124:1, 124:17,
127:16, 127:22
engineering 118:2,
118:6, 118:12,
125:8, 127:15,
127:21, 127:25
English 6:4, 6:5,
6:7, 6:15
enhances 40:8
enough 17:1, 26:2,
37:22, 38:14,
41:5, 137:11,
153:19, 217:21
ensure 221:19
enter 35:21, 37:2
entered 38:2, 40:24,
40:25, 53:2,
175:24
entering 128:18
enterprises 116:25
enters 176:23
entire 13:16, 19:16,
34:12, 39:10,
67:20, 72:23,
74:8, 107:8, 154:8
entirely 13:3,
208:11
entities 66:24, 70:1
entitled 15:7,
25:21, 36:17,
41:8, 85:25,
133:6, 203:11
entity 19:5, 69:14,
133:11, 154:4
entry 38:12, 40:20,
211:8
environmental 98:14
envision 175:8
envisioning 172:21
Ephraim 10:22
equivalent 39:16
Eric 10:12, 11:7
eroded 32:24

errata 164:19
error 164:18,
    164:21, 164:22,
    165:1
escalating 203:23
especially 28:21
Esq 2:24, 2:25,
    2:26, 2:30, 2:31,
    2:35, 2:36
essential 40:14,
    140:17, 186:4
essentially 11:18,
    134:23, 177:5
establish 23:11,
    25:11, 36:19,
    37:9, 212:18,
    212:23
established 16:8,
    16:14, 19:3,
    27:23, 36:19,
    37:9, 41:7
establishes 17:12,
    17:21, 18:24,
    18:25, 19:9,
    19:20, 20:6, 20:7,
    20:9, 21:21,
    23:14, 24:11,
    40:20
establishing 18:20
estimate 48:19,
    66:21, 127:9,
    139:2, 139:3,
    157:7, 208:16,
    209:22, 213:16
estimated 48:22
estimates 31:14,
    49:11
et 1:16, 1:45, 2:11,
    23:4, 97:17
evaluated 59:17,
    62:10, 62:14,
    62:18
evaluating 60:18
evaluation 33:17,
    34:11, 55:15,
    125:18, 125:19,
    209:8, 209:10
evening 224:4
event 10:1, 37:3,
    53:1, 57:4, 62:6,

175:23
events 181:7
eventually 152:12
everybody 4:10,
    130:19
everyone 4:22
Everything 4:23,
    4:24, 25:15,
    104:1, 215:17,
    215:18, 219:5,
    222:10
EVIDENTIARY 2:16,
    2:20, 4:12, 34:12,
    101:6, 103:14
ex 169:15
exact 75:7, 83:14,
    86:23, 87:7,
    88:22, 90:7,
    114:25, 140:23,
    213:1
exactly 38:9, 91:11,
    125:7, 153:22,
    215:15
exaggerated 157:7
EXAMINATION 3:10,
    3:17, 3:21, 3:25,
    3:29, 4:16, 42:18,
    95:19, 96:4,
    102:12, 129:15,
    135:2, 151:11,
    173:20, 193:21,
    197:19, 211:21,
    216:17
examination. 95:21
examine 175:12
examined 39:18,
    82:15, 102:11
example 38:21, 40:5,
    49:25, 59:19,
    97:5, 111:1,
    111:19, 143:10,
    144:10, 157:12,
    216:7, 216:14
examples 41:2,
    96:21, 97:9,
    141:19, 141:20,
    210:23, 211:2
exceed 175:4
exceeded 189:22,
    189:25

except 74:10, 78:5
exception 7:23, 9:18
excerpt 100:13,
    103:21
excerpts 103:4
excess 155:17,
    178:3, 190:4,
    190:7
exchange 56:16,
    155:24
exclude 136:6
excluded 9:24,
    170:21
excluding 78:8
excuse 144:21,
    203:11, 214:21
excused 63:5, 63:10,
    63:14
excused. 63:6,
    100:1, 128:7
execute 22:18
executed 18:1
execution 17:11,
    135:23
executive 42:17,
    42:25, 87:22,
    88:1, 88:3, 88:8,
    89:5, 89:15,
    90:10, 90:21,
    92:24, 93:1, 94:1,
    94:8, 98:9, 162:12
exemplified 190:8
exercise 50:4,
    155:9, 194:2
exercised 20:24
existence 14:19
existing 183:25,
    207:9, 207:11,
    207:16
exists 34:5, 71:18
expect 135:8,
    190:21, 223:18,
    223:19
expectation 194:21
expected 32:21,
    187:2, 187:23,
    190:7, 190:9
expedite 5:13
expend 13:2
expending 44:12,

44:13
expenditure 147:5,
  147:11
expenditures 44:7,
  44:18, 82:18,
  98:2, 125:21,
  167:17, 183:3,
  183:20
expense 25:3,
  142:16, 188:2
expenses 24:25,
  25:6, 25:7, 25:11,
  25:12, 32:19,
  33:2, 35:18, 59:9,
  72:22, 74:8,
  93:15, 94:11,
  117:12, 136:14,
  142:17, 144:9,
  166:9, 166:25,
  187:18, 187:23,
  188:7
experience 33:20,
  150:4, 150:7,
  194:23, 195:10
expert 9:20, 9:23,
  31:8, 37:16, 39:4,
  39:18, 44:10,
  83:4, 83:6,
  129:22, 167:15,
  172:5, 173:24,
  174:4, 191:21,
  216:10, 216:15
expertise 91:22,
  118:5, 179:19,
  192:21, 193:2
experts 33:18, 216:8
Explain 15:12,
  85:12, 140:11,
  164:25, 166:4,
  194:1, 213:25
explained 21:15,
  23:3, 80:5, 198:19
explains 19:8,
  213:14
explanation 87:15,
  192:5
explanatory 21:3
expressed 103:19
expropriates 180:15
expropriating 194:3

extend 51:18
extended 58:3
extends 202:25
extension 132:6
extensive 126:18,
  219:18
extent 7:3, 7:17,
  25:1, 33:11,
  37:14, 41:9,
  43:23, 93:18,
  93:21, 95:9,
  174:23, 179:21,
  181:16, 181:18,
  217:7, 219:13,
  220:7
extra 46:6, 64:11,
  66:2, 161:4,
  189:14, 190:6
extrapolate 153:8
extreme 50:2

< F >
face 119:22, 146:20
faces 4:11
facilitated 163:9
facilities 125:24,
  211:3, 211:4
facility 125:24,
  210:20
factor 198:25,
  213:14
factors 16:7, 62:2,
  158:20, 206:3,
  206:4, 206:10
facts 11:15, 12:4,
  16:8, 41:7, 53:4
factual 37:7, 166:8,
  167:4, 167:9
failure 39:8
fair 165:9, 170:9,
  170:14, 172:9,
  182:14, 204:25
faith 170:1
fall 38:5, 153:21,
  210:10
falls 140:3, 210:10
false 91:25
familiar 117:4,
  131:12, 156:14,

203:6, 209:13,
  211:1
familiarized 179:23
family 169:14,
  173:23
far 23:17, 132:7,
  132:8, 141:7,
  154:13, 178:3
fare 30:20
fares 71:5
fashion 26:11
FDDS 66:15
feasible 141:4
Federal 59:19, 70:7,
  71:17, 74:10,
  74:20, 75:15,
  79:22, 79:25,
  80:15, 80:21,
  81:5, 81:7, 81:10,
  81:11, 81:13,
  81:17, 85:24,
  111:5, 111:6,
  118:21, 121:20,
  170:16, 172:12,
  172:20
federally 118:20
fee 107:4
feed 115:10
feeders 114:16
feeds 41:23, 115:4
fees 93:10, 134:14
fell 121:17
Fernando 10:15
few 6:21, 7:24,
  11:14, 12:7,
  79:24, 80:3,
  80:18, 81:3,
  83:13, 164:8,
  164:10, 173:22,
  174:23, 203:23,
  203:24
FF 201:18, 202:11,
  202:15, 202:25,
  203:8, 204:11
fiddling 64:12
field 125:19
Fifth 13:19, 14:10,
  14:25, 15:2, 15:5,
  15:7, 15:10,
  15:13, 15:14,

15:17, 16:5, 16:6,
16:11, 26:18,
28:1, 28:11
Fifty-four 122:24
figure 5:25, 26:8,
67:13, 137:11,
147:13, 212:6,
220:2
figures 61:18
file 7:25, 218:13,
223:10
filed 5:17, 6:3,
27:3, 100:14,
101:3, 101:5,
103:9, 103:21,
104:13, 128:11,
128:23, 161:2,
174:19, 219:20,
220:25, 223:16
filed. 128:25
filing 221:19
fill 39:20
Filling 96:22
final 218:18, 221:11
finance 19:15
financed 156:17
Financial 1:9, 1:24,
2:28, 2:34, 31:16,
36:3, 52:23,
53:11, 54:20,
76:6, 89:8,
104:10, 133:11,
150:4, 165:13,
195:2, 195:3
financing 195:21,
195:25
find 33:23, 42:11,
122:4, 140:8,
141:24, 152:8,
152:23, 183:21,
184:4, 204:10,
204:16
finding 142:1
findings 219:21,
220:3, 220:6,
220:9, 221:7,
221:12, 222:12
Fine 99:20, 132:24,
134:2, 171:14,
217:23

fines 151:18, 152:6
finish 217:4
finite 41:21
firm 125:13, 125:14,
139:11
fiscally 70:10,
70:15
fit 142:5, 149:25
fits 154:15
Five 51:4, 61:22,
77:15, 78:7,
101:13, 101:14,
101:16, 101:17,
126:20, 126:22,
131:9, 168:17,
217:22, 217:23
five-minute 72:8,
160:15
five-year 30:12
five. 101:20, 182:11
fix 25:15
flat 30:18
flavor 29:18
fleshed 27:1
fleshes 18:9, 18:10,
19:23
flies 71:10
flip 106:14, 122:10,
126:5
flow 117:10, 189:10,
189:13, 189:14,
194:13
flows 53:3
flurry 6:22
focus 13:10, 37:6,
89:3, 151:15
focused 217:11,
222:23
follow-up 177:24
following 28:20,
75:22, 78:25,
182:11, 218:5,
218:8, 220:21
follows 5:8, 27:25,
47:25, 66:11,
105:8, 129:19,
160:22, 162:2,
179:10, 198:3
FOMB 5:15, 134:25
Fonseca 23:10

footing 40:4
footnote 120:6,
122:7, 122:11,
199:14, 199:17,
199:25, 200:2,
200:13, 203:4,
213:19
force 16:20, 16:22,
17:1, 17:6, 17:9,
17:12, 17:23,
18:3, 19:20,
20:14, 20:16,
20:21, 20:23,
21:12, 21:20,
22:23, 22:25,
27:20
forecast 189:22,
199:4, 199:7,
199:8, 203:20,
204:8, 205:2,
205:19, 206:25,
207:2
forecasted 31:6
forecasting 203:15
forecasts 187:17,
189:25, 198:12
foremost 13:21
forever 32:13, 32:15
Forgive 20:3
forgotten 213:1
form 50:11, 57:21,
182:17
former 14:15
forming 125:25,
126:16
forms 173:9
formula 48:18
forth 33:6, 155:9,
180:19
Forty-eight 111:8
forward 124:23,
126:23, 146:9,
154:16, 168:16,
175:10, 222:9
found 170:16, 191:14
foundation 124:2,
124:9, 127:18,
146:17, 148:16,
159:6
Four 91:6, 122:7,

122:11, 124:6,
  125:22, 126:20,
  158:1
frame 56:21, 86:24
framework 199:22,
  200:6, 200:12,
  200:15, 200:25,
  202:25, 203:3,
  205:23, 213:18
frankly 219:17
fraud 170:17
free 143:7
frequently 214:2
fresh 219:4
Friday 218:11,
  220:1, 220:6,
  220:11
frivolous 170:18
front 76:10, 77:6,
  106:15, 204:11
FTA 75:25
fulfill 44:14, 44:19
full 70:3, 85:20,
  85:25, 97:16,
  141:5, 177:6
fully 8:6, 24:17,
  44:8, 51:10
function 96:22,
  113:5, 115:25,
  147:1, 147:2,
  147:3, 200:14
functioning 39:10
fund 19:5, 34:14,
  35:3, 87:9, 111:8,
  116:7, 154:10,
  166:18, 173:2,
  187:17, 187:19,
  187:23
fundamental 194:20,
  195:24
funded 70:12, 79:22
funding 59:19,
  70:12, 74:20,
  75:15, 80:11,
  80:21, 81:11,
  110:22
funds 17:16, 17:21,
  18:16, 18:18,
  19:4, 25:24, 35:3,
  35:17, 40:5, 40:6,

52:11, 74:10,
  79:22, 79:25,
  80:15, 81:7,
  143:13, 143:14,
  145:9, 157:21,
  166:9, 172:12,
  172:23, 177:4,
  185:17, 189:20
funnel 177:3
future 30:24, 31:6,
  32:11, 38:18,
  39:3, 51:4, 53:7,
  53:9, 53:10,
  54:21, 59:12,
  73:13, 81:7,
  148:15, 148:21,
  149:15, 149:19,
  153:23, 153:24,
  198:12, 199:4,
  199:5, 199:7,
  199:10, 205:2,
  205:19, 208:17,
  209:3, 213:14
FY17/18 50:18

< G >
G-r-a-f-f-e-n 23:11
Gabriel 10:16,
  10:19, 45:2, 45:3
gallery 36:10
gap 76:6, 141:23
Garcia 130:24
Gary 21:23
gas 93:8
gasoline 78:9, 93:7,
  206:19
gave 14:8, 31:22,
  56:11, 56:13,
  76:3, 113:3,
  139:10, 147:21
GDB 77:3, 78:17,
  79:1, 79:4, 79:9,
  158:2, 162:11,
  162:12
GDP 35:19
General 27:12,
  27:13, 82:10,
  88:18, 88:21,
  89:11, 92:3,

187:17, 187:23
generally 117:23,
  118:7, 125:23
generate 25:17,
  38:7, 67:15,
  70:21, 71:4, 71:5,
  113:9, 114:8,
  139:13, 142:3,
  153:19, 153:20
generated 35:7,
  114:13, 156:9
generates 142:17,
  154:7
generating 113:4,
  152:11
generation 25:5,
  25:8
gets 140:16, 147:4,
  157:8
getting 43:9,
  112:17, 147:9,
  222:19, 223:5
GG 3:38, 128:12,
  128:24
Gierbolini 10:15
give 6:1, 6:2, 9:1,
  22:11, 26:2,
  29:18, 45:10,
  46:22, 63:22,
  104:22, 115:10,
  129:7, 153:8,
  161:19, 164:15,
  178:19, 196:16,
  197:17, 202:14,
  218:5, 220:11,
  222:18
Given 4:15, 52:8,
  53:13, 54:5,
  54:10, 56:5, 56:9,
  57:18, 58:19,
  114:14, 120:2,
  166:19, 173:11,
  174:22, 180:3,
  180:13, 204:7,
  219:5
gives 19:6, 27:13,
  58:9, 153:11,
  154:10
giving 87:16
glass 65:22

glue 106:6
GNP 147:2
go-forward 31:3,
  31:4
goals 190:22
God 45:13, 46:25,
  63:25, 104:25,
  129:10, 161:22,
  178:22, 196:19
Gonzalez 3:8, 9:19,
  9:23, 30:10,
  32:18, 38:21,
  44:5, 44:17,
  63:11, 63:15,
  63:17, 64:4,
  66:14, 72:18,
  77:18, 84:19,
  89:24, 90:21,
  93:22, 96:6,
  99:23, 108:23,
  108:25, 110:18,
  173:5
goods 145:12
gotten 101:12
governed 69:25,
  132:1, 132:8
governing 88:16
government 15:23,
  15:24, 16:1, 16:2,
  66:23, 70:7,
  71:17, 74:25,
  75:11, 75:13,
  75:17, 75:21,
  76:16, 76:18,
  81:6, 81:10,
  139:17, 147:20,
  155:15, 157:6,
  158:6, 180:14,
  185:16, 191:5
governmental 70:1
Governor 34:22,
  42:22, 150:12,
  159:10, 159:12,
  186:18, 186:19
grade 73:23
Graffen 23:11
grand 78:25
grant 27:18, 35:22,
  53:18, 53:23
granted 6:20, 23:8,

23:14, 26:7, 44:1,
  62:7, 62:20,
  167:7, 167:11,
  171:25
granting 16:25,
  23:9, 29:11
grants 34:13, 176:24
grateful 104:17
great 25:15
greater 150:24
Greek 155:20
grew 145:20
gross 24:24, 26:3,
  26:18, 88:10,
  88:13, 89:6, 93:6,
  93:8, 195:20
ground 4:13, 4:14
grounds 16:5, 177:12
group 92:3
grouped 31:17
grow 30:14, 30:17,
  157:24, 187:23
growing 147:6, 148:1
grown 31:22
grows 143:22
guarantee 53:3, 53:9
guaranteed 177:6
guardrail 96:23,
  97:11
guess 30:20, 30:21,
  34:21, 58:22,
  101:14, 215:12
guilty 136:7
Gutier 42:23


< H >
half 10:25, 11:13,
  35:17, 66:23,
  76:1, 93:7,
  126:20, 142:3,
  158:3, 159:18,
  159:25, 177:10
hand 34:25, 45:8,
  46:2, 46:20,
  63:20, 65:8,
  104:20, 110:8,
  129:5, 129:14,
  150:14, 158:11,
  158:13, 158:19,

159:3
handed 46:6, 105:2,
  215:21
handicap 52:9, 53:19
handle 222:20
handling 5:6
hands 19:7, 26:22
happen 43:17, 59:8,
  136:17, 137:9,
  137:18, 140:21,
  153:24, 168:20,
  172:15, 173:6,
  221:9
happened 219:5
happening 158:9
happens 17:25,
  147:14, 152:24,
  157:6, 157:23
happy 164:24, 166:4
harass 171:10
harassing 170:21
hard 52:9, 75:6
hardships 38:11
harm 12:14, 29:12,
  29:14, 37:10,
  38:1, 38:10,
  40:23, 40:24,
  43:23, 62:12,
  62:15, 162:17,
  182:16
harmed 33:15, 180:14
harmful 149:24
head 102:1, 172:22,
  206:16
heading 125:17,
  202:24
Health 147:2, 147:3
hear 4:23, 7:4,
  29:19, 29:20,
  30:21, 31:12,
  33:13, 33:16,
  33:17, 33:18,
  34:19, 35:2,
  35:21, 37:8,
  42:10, 44:4, 44:5,
  130:19, 133:1,
  150:12, 150:15,
  150:19, 159:10,
  159:11
heard 36:11, 108:25,

110:18, 134:19,
170:22, 185:7,
189:11
HEARING 2:16, 2:20,
7:16, 7:19, 14:20,
15:16, 25:21,
26:14, 29:20,
30:3, 30:9, 89:3,
104:3
hears 29:16
heavily 98:15
heavy 73:22
help 45:13, 46:25,
63:25, 104:25,
129:10, 161:22,
178:22, 196:19
helped 105:23,
106:12, 107:13
helpful 8:24, 65:8,
66:3, 66:5,
197:10, 222:24
helping 222:7
hereby 18:18
Hermann 36:12
Hernandez 36:12
HH 3:38, 128:13,
128:24
high 31:4, 32:5,
34:1, 154:18,
193:13
higher 30:20, 52:24,
115:22, 138:18,
149:22, 150:1,
169:6, 189:5,
189:10, 209:24,
210:1
highest 32:5, 32:22,
69:1
highlighted 54:14,
54:17
highly 115:24,
116:2, 116:3
Highway 39:1, 68:7,
71:8, 71:9, 71:13,
74:4, 79:6, 80:17,
83:18, 83:20,
88:9, 88:10, 89:6,
89:7, 90:2, 92:21,
93:8, 110:17,
111:3, 111:4,

121:20, 167:13,
172:20, 189:1,
207:21
Highways 1:30, 1:43,
2:9, 36:4, 38:16,
38:18, 38:25,
39:11, 41:23,
42:3, 68:13,
70:18, 110:15,
167:18, 184:25,
186:15, 187:19,
189:7, 189:18,
205:15
Hildreth 3:23, 35:2,
35:13, 39:12,
178:14, 178:16,
178:24, 179:13,
181:1, 193:23,
196:3
hint 202:10
historical 205:6
historically 74:10,
157:2, 198:25
history 15:12, 23:4,
24:1, 87:17
hit 153:1
hits 96:23
hoc 6:17
hold 13:5, 13:22,
118:9, 223:25
holders 177:4
holding 191:21
holds 154:15
hole 39:20
Honorable 2:17,
2:21, 42:22,
42:25, 225:6
hope 96:1, 135:9,
220:25, 223:21
horribles 34:15
hour 163:20
hourly 163:20
hours 4:15, 6:24
housekeeping 9:17
Houser 2:21
hundred 26:14,
32:12, 52:20,
54:18, 153:3,
176:25
hundreds 75:8,

191:15
hurt 149:20
hypothetical 48:19,
48:22, 49:7,
49:11, 49:14,
50:7, 50:13, 51:3,
53:17, 53:22,
54:2, 54:10,
54:23, 55:7,
55:12, 55:17,
56:23, 57:5,
176:8, 178:2,
178:4

< I >
I-22 92:10, 92:18
I. 161:25
idea 158:24, 185:5,
185:9, 188:21,
189:24
identification 89:22
identified 15:14,
22:8, 28:6,
138:23, 164:3,
173:4, 188:24,
193:25, 194:8,
199:17, 201:11,
206:4, 206:14,
206:17, 218:7
identifies 19:12,
172:20, 191:25,
213:20
identify 13:24,
14:13, 138:16,
183:18, 184:3,
191:12, 191:18,
192:24, 194:16,
204:20, 206:9,
218:9
ignore 158:8
III 1:8, 78:19,
78:20, 93:13,
93:17, 94:15,
94:22
imagine 211:12
IMF 155:20
IML 147:24
impact 39:25, 50:2,
51:7, 53:10,

54:20, 78:1,
127:1, 137:11,
138:1, 142:8,
142:25, 155:25,
156:5, 167:5,
181:9, 181:14,
195:12, 207:22
impacting 183:3
impacts 39:9
impeach 86:3
impeached 85:24
impeachment 86:1
impediment 40:7
impetus 156:3
implement 20:20
implementation 141:5
implemented 205:8
implements 21:3
implicated 219:19,
220:13
implied 27:8
impliedly 27:2
implies 115:7
importance 40:10
important 13:25,
21:25, 43:18,
82:19, 82:21,
82:23, 98:18,
98:20, 194:1,
195:6, 205:20,
205:23, 205:24,
206:3, 206:10,
207:18, 207:23,
209:11, 209:19,
222:4
importantly 22:22,
220:23
impose 220:5
imposed 22:21
imposition 22:25
imprecise 192:11
impression 31:22
improper 85:24
in. 72:10, 173:23
inability 195:16
inaccurate 92:6
inadequate 12:15
inappropriate 160:9
incarnations 15:3
inches 97:6, 97:7

incipient 40:3
inclined 58:25,
102:19
include 25:15, 51:7,
68:22, 73:4,
76:22, 76:23
included 19:12,
46:3, 57:6, 73:7,
77:1, 88:12,
107:21, 185:15
includes 62:5,
186:10, 186:13,
194:14
Including 28:15,
41:15, 42:2, 70:3,
74:9, 74:18,
76:25, 84:9,
141:5, 151:18,
174:25
inclusion 9:8
inclusively 21:20
income 99:6, 99:7,
191:6, 191:8
incompatible 133:12
inconsistent 127:13
incorporate 58:4
incorporated 51:16,
55:1
increase 38:25,
40:21, 83:19
increased 210:24
increases 50:1,
138:4
incurred 117:2
indefinitely 11:22,
12:22
independent 33:20,
118:16, 118:23,
119:7, 166:5,
167:4, 172:14,
184:21, 184:23,
185:12, 187:1
independently 60:7,
60:12, 114:13,
119:24, 120:8,
120:18, 185:5,
190:20
indeterminate 39:3
index 121:18
indicate 52:24,

79:13
indicated 28:7,
58:23, 71:19,
153:10, 159:16
indicates 50:9,
191:7
indication 16:18,
54:17, 58:9
indicative 123:15
individual 106:8
individuals 14:2
indulge 8:25, 217:14
Industrial 14:13,
14:16, 14:24, 15:5
industry 213:7,
214:1
Inflation 147:1,
147:3, 199:21,
200:5, 200:13,
205:1, 205:25,
206:3, 206:4,
206:11, 206:21,
206:22, 206:24,
207:2, 207:22,
207:24, 208:2,
209:18, 209:20,
213:11, 213:14,
213:16, 213:20
influence 148:15,
148:21, 149:14
influenced 198:25,
207:24
informs 174:24
infrastructure
38:25, 83:18,
167:14
inherent 52:18, 53:7
initial 31:13, 32:2,
34:1, 57:25, 60:15
injured 33:11
input 110:3, 110:4
inputs 48:23, 50:3,
60:12, 198:16
inquire 129:11,
132:20, 161:23,
193:19, 211:19
inquiring 176:5
inquiry 170:25
insisting 28:3
inspection 118:2,

118:8, 118:12,
123:25, 124:17
inspections 118:10
instance 51:19,
142:2
Instead 34:11,
34:12, 137:6,
137:10, 141:16,
142:22, 185:4,
186:14, 189:2,
194:17, 206:14
instrumentality
20:7, 20:8, 20:10,
20:13
integrate 67:24
integration 68:5,
70:3, 112:18,
210:3
integrations 68:4
intend 6:6, 8:15,
11:21, 16:13,
16:15, 16:18
intended 52:17,
86:1, 187:6
intent 22:20, 24:12
intention 8:3,
92:12, 205:11,
205:24, 207:15,
215:16
intentional 164:21
interaction 125:6
interactions 108:1,
108:13, 108:16,
126:18
interchangeably
19:10
interest 18:15,
22:7, 22:9, 27:22,
37:12, 38:12,
93:14, 94:9,
102:23, 133:7,
133:10, 133:11,
149:22, 150:2,
180:14
interested 202:11
interesting 14:21,
83:14
internal 157:13
international 121:18
interpret 14:17,

28:3, 28:14
interpretation 27:14
interpreted 12:21
interrupt 121:5
interrupted 181:11,
181:15
interstate 111:3
introduce 4:9, 10:9,
36:6, 218:16,
218:19
invalidated 14:14
invalidating 16:5
invest 39:8
investigation
118:17, 119:8,
165:7, 166:8,
166:21, 167:5,
167:9, 172:14
Investment 1:37,
2:3, 10:21, 38:23,
83:16, 86:8,
125:23
Investments 2:24,
10:12, 40:17
investor 88:4
investors 91:17,
148:15, 148:21,
149:14
invoked 13:12
involved 13:25,
58:20, 71:25,
169:15, 173:23
involvement 98:6,
107:12
involves 113:24
IOI 121:18
irrelevant 208:3
irreparable 12:14,
29:11, 29:14,
37:10, 38:1, 43:24
irreparably 33:11,
33:15
island 111:16,
113:9, 114:8,
114:19, 114:23,
152:17, 180:1
issuance 180:23,
195:4
issue 5:1, 18:7,
20:10, 22:14,

26:25, 34:21,
67:10, 113:10,
114:9, 136:3,
156:4, 158:2,
167:3, 175:1,
195:24
issued 20:19, 22:1,
180:7
issues 17:8, 20:13,
29:17, 37:7,
38:17, 97:16,
136:15, 195:4,
222:16
issuing 81:24, 82:3,
182:18
item 78:19
items 23:9, 157:19,
203:6
iteration 72:25
itself 17:6, 17:9,
17:19, 18:3, 18:6,
19:20, 21:18,
23:1, 126:19,
128:12
Ivan 42:23


< J >
J-o-s-s-e-n 5:3
Jaresko 130:17,
131:6
Jefferson 19:14,
23:21, 23:22,
24:9, 25:10
jeopardize 40:1
jeopardizing 38:6
jeopardy 173:2,
173:4
Jersey 71:8, 71:13
job 147:13
joined 10:12, 42:17
Joint 1:26, 215:16
Jointly 1:11
Jonathan 3:19,
33:19, 161:2
Jorgensen 125:12
Jose 42:23
journals 156:11,
195:1
Juan 1:15, 4:1,

42:19, 99:11,
112:13, 112:20,
113:1
Judge 2:17, 2:18,
2:21, 21:23,
21:25, 22:15,
23:3, 23:21, 25:9,
26:23, 26:25,
162:9, 225:7
judges 169:13,
169:16, 169:19,
169:23, 170:7
judgment 50:4,
58:12, 158:17,
159:2
judicial 14:18, 15:5
July 128:11, 134:9,
134:13
jump 29:1
June 34:21, 51:1,
55:15, 150:13,
150:21
jurisdiction 111:17,
115:3
justify 162:18


< K >
keep 29:16, 44:14,
130:18, 154:13
keeping 160:9,
218:10
keeps 43:16, 157:14
Kempner 10:21, 10:22
kept 78:3, 98:1
key 11:14, 13:23,
17:23, 18:17,
19:19, 19:25,
21:23, 22:8, 23:2,
220:12
keys 17:7
kind 15:22, 28:15,
33:24, 44:18,
67:12, 93:21,
119:7, 195:22,
213:8
kinds 20:11
Kirkland 163:7,
163:8
Klein 26:23

knowledge 167:13,
185:12, 191:22
known 15:24, 113:14
knows 11:16, 30:8,
33:8

< L >
L. 3:8, 66:9, 90:21
labeled 202:13,
221:23
labels 201:22
Lack 12:2, 13:5,
33:15, 80:13,
127:18, 148:16,
159:6
language 16:22,
16:24, 17:1,
18:17, 18:19,
18:23, 20:17,
24:6, 85:19,
164:5, 171:16
larger 152:1, 219:10
largest 31:9
Larry 151:13
Lary 2:31, 5:14,
6:9, 7:21, 36:8,
104:9, 128:9,
216:1
Last 6:21, 6:24,
26:5, 29:23,
31:23, 34:23,
66:18, 66:25,
80:3, 83:13, 95:8,
122:10, 126:5,
126:22, 126:25,
132:5, 157:3,
158:2, 162:9,
169:12, 171:3,
171:5, 177:11,
179:25, 181:22,
182:21, 198:9
Lastly 33:13, 41:9
late 6:24, 7:24,
8:11
later 40:7, 108:21,
164:9, 164:10,
219:7
latest 186:9, 186:13
launch 105:23

launched 215:14
Laura 2:17, 225:7
law 19:25, 20:6,
20:15, 20:21,
20:23, 21:8, 21:9,
21:13, 22:3,
169:14, 173:23
laws 111:5
lawsuit 109:4,
109:24, 113:10
lawsuits 173:25,
174:3
lawyer 92:3
lawyers 110:8,
110:11, 137:4,
162:23
lay 96:21
layman 93:20
lead 38:17, 43:13,
80:14, 83:20,
87:3, 149:22,
187:13
leader 107:17
leadership 107:7,
107:16, 109:24,
224:2
Leading 156:20
leads 71:9
least 11:22, 27:8,
133:21, 139:23,
142:18, 151:1,
153:21, 158:17
leave 72:9, 133:18
leaves 219:25
leaving 13:3, 13:9,
152:17
led 123:3
left 46:14, 102:10,
160:7, 160:11,
178:10, 196:5,
215:2, 217:11
left-hand 90:5, 90:8
legal 11:14, 21:8,
92:2, 93:19,
93:21, 94:17,
171:4
legend 17:9
legends 18:1
legislative 15:12,
20:19, 21:5, 23:4,

24:1
legislature 21:8
legitimate 14:8
lend 22:10
Less 30:19, 35:17,
    78:15, 82:19,
    82:21, 82:23,
    96:9, 140:13,
    143:22, 177:18,
    223:18
letter 101:1
letters 65:1, 221:21
level 38:22, 40:1,
    57:19, 83:16,
    84:17, 87:1, 99:6,
    99:7, 125:21,
    138:22, 155:15,
    209:23
levels 125:22,
    210:14
Lexecon 163:18,
    163:22, 165:4
liberty 220:19
license 93:10
liens 12:20, 14:2,
    14:3, 14:4, 14:6,
    14:8, 15:2, 15:4,
    15:18, 15:23,
    15:25, 24:19, 89:3
life 125:24
lift 13:6, 220:8
light 96:24
likely 30:23, 36:20,
    39:9, 50:8, 60:25,
    198:12
likewise 186:3
limit 84:20, 141:4,
    141:6, 141:8,
    141:10, 157:8
limitations 74:11
Limited 25:14,
    41:21, 69:22,
    189:16
limits 175:4
linchpin 140:15
Line 56:6, 56:8,
    76:14, 76:15,
    83:12, 83:13,
    84:23, 85:7, 87:8,
    89:4, 143:13,

144:15, 145:3,
    145:19, 146:2,
    146:18, 147:7,
    156:24, 157:3,
    157:16, 170:19,
    171:6, 182:2,
    182:11, 203:6,
    222:21
lines 9:5, 61:5,
    61:21, 78:15
liquidity 150:18
list 8:8, 64:20,
    65:3, 65:11, 95:8,
    95:13, 100:12,
    100:24, 101:7,
    101:9, 101:10,
    101:13, 115:10,
    201:15, 204:23,
    220:11, 221:20,
    222:5, 222:10,
    223:14, 223:15
listed 78:8, 123:12,
    126:15, 206:21
listening 4:8
lists 219:16, 220:23
literature 140:5,
    156:1
litigation 12:19,
    53:2, 53:10,
    53:23, 54:22,
    169:15, 170:17
little 11:8, 29:18,
    43:5, 49:20,
    105:20, 106:25,
    107:5, 143:22,
    145:23, 151:3
live 154:3, 154:4
lives 39:8, 118:17,
    119:8, 119:15
living 44:11, 114:14
LLC 1:37, 2:3, 2:24,
    10:12
local 10:14, 111:19,
    111:24
located 71:8,
    122:11, 204:15
location 213:19
lodged 8:5, 47:11,
    161:11, 179:2,
    196:10

logically 188:25
long 17:25, 41:21,
    88:22, 142:9,
    201:14, 213:7,
    219:16
longer 102:11,
    202:20, 217:15
looked 39:22, 56:20,
    79:19, 79:21,
    82:8, 82:12,
    120:1, 127:3,
    143:11, 143:12,
    171:22, 171:23,
    172:18, 182:19,
    184:18, 188:23,
    201:7
looking 38:10,
    121:14, 168:16,
    193:24, 194:24,
    202:24
looks 217:2
loose 197:9
Lopez 42:21
lose 59:19, 74:21,
    75:4, 75:7, 75:14,
    174:12
losing 76:1
loss 75:18, 76:17,
    172:12
lost 72:3
lot 114:19, 114:21,
    139:13, 155:14,
    155:20, 185:2,
    222:11
loud 43:8, 219:2,
    220:19, 220:20
louder 105:20
love 28:24
low 32:3, 34:2,
    155:20, 191:14,
    191:18, 203:23
Lower 33:1, 52:15,
    53:4, 53:12, 90:8,
    99:7, 126:22,
    138:16, 138:17,
    138:20, 138:23,
    141:4, 159:17,
    169:2, 169:9
lowest 32:6, 35:17
Luis 96:9

lunch 92:13, 100:2
Lutz 10:21

< M >
M. 109:8
ma'am 181:3
macro 200:17, 202:25
macroeconomic 40:8,
   40:22, 135:15,
   199:22, 200:12,
   200:25, 203:3
macroeconomically
   152:19
macroeconomist
   147:19
magnitude 40:4
magnitudes 87:5
main 112:13, 219:2
maintain 25:25,
   38:15, 39:15,
   41:15, 42:2, 58:2,
   62:20, 84:17,
   86:25, 98:4,
   115:18, 184:25,
   185:18, 186:11,
   186:15, 189:18,
   205:15, 211:3
maintained 5:10,
   38:19, 41:24,
   67:14, 67:20,
   111:19, 112:7,
   207:21, 210:24
Maintaining 42:3,
   69:15, 69:18,
   82:20, 222:2
Maintenance 25:17,
   69:20, 96:18,
   96:19, 96:22,
   96:24, 96:25,
   97:19, 97:22,
   97:23, 98:2, 98:4,
   125:18, 125:20,
   125:21, 126:6,
   126:21, 166:13,
   167:21, 222:16
major 188:12, 194:5
majority 115:8
Maldonado 42:19,
   42:22

Management 1:10,
   1:25, 2:29, 36:3,
   66:15, 104:11
managing 10:20
mandate 44:15,
   44:19, 108:4,
   120:24
mandated 136:4,
   177:3
manner 9:13, 40:18
map 114:11
Marin 96:9
marked 5:10, 45:17,
   48:9, 77:14,
   89:22, 94:25,
   95:13, 106:15,
   121:24, 132:11,
   134:1, 194:20,
   204:11
market 168:1,
   168:10, 181:6,
   181:9, 181:13,
   182:16, 188:13,
   190:3, 195:1
marketplace 195:13
markets 40:16,
   149:19, 150:5,
   190:24
Martin 36:10
Mary 104:14
mass 75:25
Master 193:9, 222:1
material 15:23,
   39:9, 50:21, 217:8
materially 183:3
materials 58:5,
   60:15, 197:18,
   204:5, 207:8
math 61:24, 160:12,
   160:15
mathematically
   153:14
Matosantos 130:22
matter 7:14, 9:17,
   21:22, 22:19,
   45:16, 109:12,
   109:25, 123:23,
   124:15, 147:25,
   162:19, 163:5,
   174:10, 174:19,

175:24, 176:2,
   205:14, 222:25
matters 172:7,
   194:23
MCKEEN 2:36, 3:6,
   3:21, 42:18,
   47:20, 47:21,
   48:2, 49:23,
   62:23, 160:25,
   161:1, 161:7,
   161:12, 169:20,
   169:24, 170:19,
   171:7, 171:11,
   173:19, 173:21,
   174:16, 175:14,
   175:17, 176:5,
   176:15, 177:16,
   178:1, 178:5
Mckinsey 105:11,
   105:13, 105:16,
   105:23, 106:5,
   106:9, 106:20,
   106:24, 107:7,
   107:14, 107:17,
   108:3, 108:6,
   109:24, 110:5,
   110:8, 119:19,
   134:21, 134:24
mean 18:21, 18:22,
   20:1, 52:14,
   57:12, 76:19,
   84:19, 99:3,
   112:16, 114:22,
   115:5, 142:24,
   154:6, 157:1,
   190:11, 214:7,
   215:18, 216:7,
   216:24
Meaning 19:12,
   180:1, 207:11,
   210:5
meaningful 126:25
means 19:10, 19:16,
   98:19, 99:4,
   107:23, 112:18,
   137:25
meant 20:3, 223:13
measure 147:11,
   205:12, 207:25
measures 141:22,

146:5, 146:24,
147:5, 153:4,
153:6, 153:7,
158:8, 201:3,
205:7, 205:14
mechanism 7:6
meet 97:11, 220:21
meetings 33:21,
131:10
meets 12:10, 18:4
member 10:20, 107:7,
139:15, 195:3
members 4:6, 33:21,
108:14, 130:15,
130:21
men 15:24
mention 176:11
mentioned 52:19,
57:3, 61:13,
131:5, 156:24,
184:18, 204:24
mentioning 216:8
merely 170:18
meritless 170:18
merits 36:20, 37:15,
37:24, 37:25
message 186:17,
186:20, 186:22
met 32:17, 88:6
method 67:16, 67:18
methodology 61:17,
61:22
metrics 120:5
Michael 2:25, 10:13,
65:6
microphone 9:4,
10:17, 11:9,
49:20, 85:16,
181:2, 214:12,
216:11
middle 32:7
miles 67:23, 114:22,
114:25, 115:3
military 156:3
millions 75:8, 75:9,
191:15
mind 7:2, 29:16,
146:11, 149:2,
205:9, 219:4
mindful 43:5, 221:9

mine 56:19
Minimal 110:4
minimum 84:17,
86:10, 86:25,
102:18, 139:25,
153:12, 153:19,
153:20, 154:17,
192:21, 193:3
minus 139:7
minute 63:11,
160:23, 197:3,
220:15, 220:17
minutes 9:1, 92:14,
95:25, 160:23,
160:24, 217:21,
217:22, 217:24
miscellaneous 91:7,
91:12
mischaracterizes
208:11
misheard 151:24
missed 37:11, 51:12,
59:25
misspoke 151:25
misunderstanding
217:16
misunderstood 81:14
mix 30:19
modeling 176:22,
177:5
models 32:3, 141:25,
178:4
modest 40:10
moment 5:24, 8:20,
35:1, 137:19,
144:21, 151:4,
173:12, 173:14,
175:20, 222:14,
223:25
Monday 218:14,
219:25, 220:1,
221:5, 223:6,
223:8, 223:24
monetary 37:10,
155:24
monies 24:24, 78:12,
78:13, 78:14,
78:23, 80:2, 80:4,
81:17, 142:22,
148:3, 166:22,

172:20
Monserrate 10:15
month 50:21, 57:10,
79:1, 134:10
month-over-month
56:21
monthly 29:22,
29:24, 59:2, 59:4
months 51:4, 51:19,
51:20, 55:9,
55:18, 57:8, 80:3,
109:3, 117:7
Moratorium 59:22
mortgage 15:6
Motion 26:7, 36:16,
42:11, 48:6,
53:18, 100:15,
101:4, 103:22,
103:25, 104:1,
135:10, 177:15
motivation 173:9
motives 169:18,
169:23, 170:6
motor 93:9
movant 10:7, 13:3
move 64:3, 77:20,
95:13, 124:23,
149:9, 171:13,
177:11, 178:23,
196:7, 214:5,
215:12
moved 77:19, 161:8,
216:4
moving 37:19, 217:10
Ms 2:36, 3:6, 3:21,
42:23, 43:3,
47:20, 48:2,
49:23, 62:23,
130:17, 160:25,
161:1, 161:7,
161:12, 169:20,
169:24, 170:19,
171:7, 171:11,
173:19, 173:21,
174:16, 175:14,
175:17, 176:5,
176:15, 177:16,
178:1, 178:5,
222:17
multi-component

219:15
multi-page 219:15
multiple 35:3, 64:7,
    110:11, 113:16
multiplicative 191:7
multiplier 137:21,
    137:23, 138:16,
    138:17, 138:20,
    138:23, 139:2,
    142:25, 155:13,
    155:21, 156:10,
    191:2, 191:6,
    191:14, 191:19
multipliers 155:14,
    155:15, 156:3,
    156:7, 191:5,
    191:23
Municipal 19:15,
    68:15, 68:20,
    150:4, 182:16,
    190:3, 195:1,
    195:8, 195:14
municipalities
    66:19, 111:20
muster 28:10
Myers 42:16
myself 8:24, 94:7,
    167:15


< N >
name 36:2, 131:5,
    195:5, 198:8
names 4:11
narrow 8:16
Natalie 131:6
nation 74:24, 98:12
national 70:6,
    71:17, 111:3,
    111:5, 111:7,
    191:6, 191:8
native 204:14
nature 21:3, 87:4,
    87:15, 97:15
natures 68:4
near 38:17, 39:7,
    116:6, 116:8,
    119:15
nearly 117:17
necessarily 52:16,

52:20, 74:23,
    156:22, 157:20,
    190:6
necessary 23:10,
    25:2, 25:12, 40:1,
    40:17, 44:18,
    113:4, 173:24
need 6:4, 7:4, 7:8,
    16:8, 51:12,
    52:15, 59:19,
    64:10, 72:4,
    75:18, 84:11,
    85:8, 105:19,
    114:17, 144:21,
    182:15, 216:11,
    219:13, 221:8,
    221:18, 222:16
needed 60:21, 80:18,
    86:8, 142:15,
    157:22, 224:1
needs 72:9, 98:17,
    139:23, 190:15
negative 31:2, 39:9,
    53:10, 54:20,
    57:11, 58:25,
    138:6, 152:12,
    167:5
Negligent 164:23,
    164:24
negotiate 22:17,
    106:12
Neither 22:14,
    50:12, 68:21,
    192:24
net 48:18
networks 69:2, 69:3,
    69:4, 96:7, 214:3
New 19:5, 19:7,
    25:16, 37:20,
    67:3, 71:8, 71:13,
    117:21, 121:25,
    174:24
news 189:12, 190:2
newspaper 8:8, 190:3
next 11:22, 16:16,
    28:8, 32:14,
    32:21, 43:15,
    43:17, 43:19,
    46:16, 63:15,
    73:1, 74:21, 75:4,

100:6, 104:8,
    104:12, 122:7,
    128:8, 128:10,
    132:6, 155:1,
    157:24, 161:1,
    192:2, 203:23,
    203:24
night 6:21, 6:24,
    95:8, 95:9, 220:11
Nine 26:8, 220:10,
    221:2, 221:5,
    223:7, 223:9
Nine. 22:13
Nodding 102:1,
    206:16
nominal 200:14,
    203:22, 207:3,
    209:22, 213:16
non-disparagement
    133:16
non-personnel 147:10
non-toll 67:23,
    68:22, 69:4,
    69:10, 69:21,
    97:23, 113:4,
    113:5, 114:7,
    114:16, 115:6,
    115:7, 115:18,
    116:7, 211:3,
    211:7, 211:9,
    211:10
none 23:14
nonrecourse 17:15,
    17:16, 18:12
Nor 22:14, 24:18,
    68:21, 118:16,
    175:7, 176:12,
    210:21
note 13:11, 15:21,
    23:6, 23:13,
    27:17, 44:9,
    58:22, 77:7
noted 122:21,
    122:22, 127:4,
    199:21, 200:13
notes 213:5
Nothing 13:9, 16:16,
    44:21, 45:11,
    46:22, 63:23,
    68:19, 79:13,

99:14, 104:23,
119:24, 129:8,
146:13, 148:2,
161:20, 178:20,
196:17, 214:15
Notice 16:22
November 105:17,
130:1, 130:3,
131:16
nowhere 98:3
numbers 31:13,
31:21, 31:25,
49:24, 55:11,
64:25, 65:12,
73:9, 87:5,
139:25, 152:21,
165:20, 203:10,
203:14, 203:17,
203:18, 203:19,
203:21, 203:23,
203:25, 204:2,
204:7, 204:12
numerical 140:16,
141:10
Numerous 33:21,
212:11, 213:5


< O >
O&D 113:17, 114:17
o'clock 220:11,
221:2, 221:5,
223:7, 223:9
O'hare 71:11, 96:8,
96:10
O'melveny 42:16,
163:8
O'mulveny 216:2,
217:18
oath 45:6, 46:19,
55:23, 63:19,
129:4, 161:17,
178:17, 196:14
object 27:20, 93:18,
93:20, 102:8,
102:17, 155:3,
159:5, 175:3,
175:12
objected 182:17
objecting 124:8

objection. 64:18
objections. 46:1,
47:13, 104:7,
134:6, 161:15,
179:4, 196:12
obligated 80:15
obligation 22:23,
175:10
obligations 18:2
observation 114:18
observing 4:7
obtained 78:16,
119:21, 165:17
obtaining 67:16
obvious 114:10
Obviously 6:24,
17:19, 34:4,
36:15, 45:22,
104:1, 112:17,
114:12, 115:7,
116:2, 118:19,
120:22, 126:18,
126:25, 127:5,
153:1, 216:9
occasions 213:5
occur 32:25, 84:12,
86:9, 86:20, 87:10
occurred 85:9,
152:14, 216:17
off-line 26:11
offer 26:12, 26:13,
45:16, 45:20,
47:3, 51:9, 57:10,
61:16, 94:25,
100:11, 102:9,
133:23, 136:11,
162:23, 173:24,
220:5
offered 49:10, 55:3,
55:13, 56:24,
57:24, 60:24,
62:11, 83:1, 83:6,
103:12, 163:4,
163:10, 164:3,
171:24, 172:1,
174:20, 216:18,
216:20, 216:21,
216:22
offering 77:12,
77:16, 86:2, 90:2,

90:14, 117:15,
117:20, 182:20,
210:5
offers 39:13, 50:12
officer 195:2
Official 9:15,
88:18, 90:1, 91:8,
91:13, 147:20,
180:23, 195:5,
195:17, 225:15
offset 147:4, 155:25
often 108:18
oil 93:8
old 126:20, 127:5
OMB 157:10
on-point 23:17
Once 17:25, 19:1,
153:1, 221:16,
221:18, 222:6
one-page 128:13
One. 37:3, 91:9,
91:14, 100:23,
109:7, 121:16,
155:16
ones 74:2, 131:1,
216:4, 219:16,
219:17
ongoing 11:19, 135:2
online 121:10
open 4:24, 217:12,
218:10, 219:25,
223:1
opening 9:14, 9:15,
10:7, 10:25,
11:13, 12:6,
35:25, 41:2,
44:22, 83:15,
119:11
operable 44:14
operate 38:6, 38:15,
110:16, 211:3
operated 69:25,
112:7
operates 116:24
operating 24:25,
32:19, 39:1,
72:22, 83:19,
97:17
operation 75:25,
96:16, 106:6

operational 80:14
operations 34:15,
  105:24, 166:18
opine 190:14
opined 39:21
opinions 109:20,
  118:14, 126:1,
  126:16, 173:25,
  174:24, 174:25,
  180:3, 180:7,
  182:25, 189:4
Oppenheimer 42:19
opportunity 7:25,
  102:12, 102:21,
  175:12, 222:13
opposed 110:17
opposing 15:16,
  182:7
opposite 41:13
opposition 100:15,
  101:4
option 58:15
options 57:23, 58:14
Orange 21:23, 21:24,
  22:14, 26:24,
  27:17
Order 5:18, 6:11,
  67:14, 75:11,
  84:15, 86:20,
  141:23, 157:11,
  157:15, 160:8,
  175:8, 183:21
ordinances 20:10,
  20:14
organizational 80:14
origin 67:13, 67:17,
  113:14, 113:19,
  113:22, 114:2,
  211:12
original 31:14,
  47:3, 49:9, 60:5,
  136:4, 145:14,
  174:18, 201:15,
  222:1
Originally 128:13
others 27:2, 82:23,
  113:18
Otherwise 6:16,
  27:5, 102:19,
  146:15, 221:8

ought 44:12, 44:13,
  176:10
outcome 53:20
outcomes 58:18
outlined 55:9,
  55:18, 56:18
outmigration 187:13
outset 40:8
outside 127:16,
  127:22, 127:24
outstanding 78:17
overall 52:23,
  107:16, 112:23,
  150:1, 166:17,
  209:11, 209:19
overarching 13:15,
  13:16
overly 60:17
overreduces 173:13
Overruled 94:2,
  104:4, 146:21,
  148:6, 155:5,
  160:2, 177:14
overruns 80:13,
  184:7
oversee 119:19
oversees 107:8
oversimplifies
  173:13
overspending 135:25,
  136:7, 145:3,
  146:2, 146:18,
  147:9, 147:14,
  156:19
overspent 136:5,
  145:17
owed 77:4
own 17:6, 17:12,
  35:17, 41:1, 41:2,
  41:18, 60:25,
  69:9, 163:15,
  165:7, 166:5
owned 69:4
Ownership 69:11


< P >
package 197:18
pages 77:22, 77:25,
  202:11, 202:25,

  219:16, 225:4
paid 24:25, 30:5,
  38:4, 39:20, 42:6,
  73:1, 73:14,
  78:25, 79:1, 79:4,
  88:11, 88:13,
  93:15, 93:16,
  94:10, 94:11,
  106:24, 107:5,
  117:19, 134:10,
  136:18, 163:22,
  180:19, 182:15,
  205:20, 207:6,
  207:12, 207:19,
  208:2, 208:3
Panama 150:15,
  159:11
panel 5:25
paper 155:19, 156:2,
  201:24, 202:7,
  204:15
papers 13:24, 17:22,
  21:24, 27:1,
  33:25, 37:19
parade 34:15
Paragraph 30:10,
  38:21, 39:5,
  39:21, 40:13,
  80:5, 80:8, 80:9,
  83:9, 83:12, 91:7,
  91:12, 92:20,
  92:22, 93:4,
  110:14, 115:14,
  115:17, 117:22,
  119:12, 121:3,
  168:13, 168:17,
  198:19
paragraphs 91:6
partially 79:22
participated 172:8
particular 20:23,
  25:8, 55:4, 56:12,
  57:1, 67:13,
  68:13, 68:14,
  77:7, 97:2,
  107:18, 144:12,
  168:5, 171:16,
  172:21, 188:7,
  204:13, 204:17,
  207:25, 210:7,

219:14, 219:22, 219:23
particularized 191:22, 192:20, 193:2
particularly 43:5
parties 4:17, 4:21, 5:5, 5:12, 6:6, 7:7, 9:17, 22:17, 38:11, 42:9, 215:10, 215:16, 218:16, 222:2
partner 28:17, 36:8, 36:9, 36:10, 42:19, 105:11, 106:8, 182:14
partners 10:9
parts 70:12, 71:4, 125:3, 125:5, 210:10, 210:15
party 4:5, 171:10, 222:22
pass 28:10, 28:17, 159:2
passage 86:5
passed 21:8
passes 157:6
past 6:21, 77:4, 79:24, 80:18, 81:3, 146:7, 217:20
path 220:14
paths 11:23
patience 9:2, 101:23
patterns 113:17, 113:25
Paul 39:17
pause 160:15
pavement 97:2, 97:6, 97:13, 97:14, 126:8, 126:11, 127:8
pay 16:15, 16:17, 23:24, 28:9, 30:20, 37:16, 37:17, 37:22, 38:14, 39:16, 58:8, 78:17, 116:15, 117:1, 117:11, 136:12,

142:14, 143:8, 154:9, 157:25, 166:9, 166:13, 166:25, 184:4, 188:18, 194:19, 195:15, 195:16, 214:8, 223:16
payable 17:16, 17:20, 18:2, 18:12, 18:15, 88:9, 89:6, 159:1
payables 157:23
paying 154:13, 158:24
payment 17:17, 18:19, 41:6, 59:25, 79:9, 117:11, 177:6, 181:10, 181:14
payments 37:11, 51:12, 54:8, 54:11, 55:8, 55:16, 55:17, 57:4, 57:7, 79:14, 79:15, 80:13, 188:3
payroll 199:2, 199:8, 199:10, 200:1, 200:2, 200:6
payrolls 158:25
pays 176:25
peer 194:25
peer-reviewed 140:8
penalty 164:4
Pennsylvania 71:9, 71:13
penny 13:2, 13:9, 28:8
pension 158:22, 188:3
pensions 158:21
People 32:16, 44:4, 44:5, 44:16, 44:19, 91:21, 92:12, 98:18, 98:23, 99:4, 99:9, 99:10, 99:22, 107:13, 152:17, 165:5, 214:5,

217:15
per 30:6, 30:13, 30:15, 31:3, 31:4, 32:20, 32:21, 33:2, 35:4, 93:9, 176:25
perceived 217:10
percentage 25:22, 26:15, 99:1, 123:13
perfectly 123:5
perform 50:24, 51:2, 113:8, 113:11, 114:2, 118:9, 118:23, 119:7, 120:25, 123:16
performance 206:8, 206:23, 212:2, 212:4
performed 67:12, 80:20, 97:23, 118:16, 119:16, 119:19, 125:21, 212:10, 212:11, 212:13, 212:14, 213:3
performing 123:23, 124:15, 209:12, 212:9, 213:8
perhaps 15:20, 124:20, 160:14, 185:4
period 30:13, 31:23, 39:23, 50:17, 50:19, 72:8, 84:16, 117:12, 153:24
perjury 164:4
permanent 53:2, 53:23, 175:24, 176:13
permissible 171:2
permission 6:15, 9:20, 47:7, 178:23
permitted 133:10, 175:11
perpetual 41:19
perpetuity 32:13, 52:2, 176:17
person 91:2, 119:1

personal 93:23,
    93:25, 94:20,
    94:21, 94:23,
    102:10, 170:12,
    170:17
personally 73:12,
    94:14, 106:8,
    118:8, 118:25,
    119:7, 170:12,
    210:18, 210:21
perspective 56:19,
    70:2, 70:16, 71:23
persuaded 9:10
Peter 2:35, 39:16,
    42:15, 63:13,
    64:2, 65:20,
    85:17, 163:2
Ph 193:11
Philadelphia 71:10,
    71:14
phone 9:5
phrased 76:17
physical 38:3,
    41:22, 221:22,
    221:25
piece 142:5, 202:7
pinpoint 75:7
pitcher 65:23
place 27:21, 72:10,
    113:25, 123:3,
    135:22, 136:14
placed 114:12
places 183:19,
    184:3, 194:16
plain 16:24
Plaintiff's 95:1
Plaintiffs 29:13,
    44:24, 162:14,
    174:20
planes 71:10
planned 143:6
planning 7:16, 43:14
play 13:20, 14:14
pleased 5:5
pledge 19:8, 19:9,
    19:12, 19:15, 37:2
Pledged 17:17,
    17:20, 17:21,
    18:2, 18:19, 24:6,
    24:7, 151:20

plus 194:25, 195:12
PM 95:20, 100:1,
    100:4, 100:5,
    104:6, 128:7,
    128:24, 134:5,
    160:7, 160:18,
    160:19, 161:14,
    178:10, 179:3,
    196:5, 196:11,
    215:2, 217:25,
    218:1, 218:14,
    224:7
PMOS 66:16
pocket 185:3
pockets 188:23
podium 4:10, 5:1,
    9:4, 11:1, 65:19,
    216:12
point 6:6, 11:1,
    15:18, 19:25,
    24:2, 26:5, 32:1,
    45:17, 60:25,
    68:6, 68:12, 70:8,
    71:19, 71:20,
    94:24, 108:9,
    125:6, 130:9,
    140:5, 141:8,
    142:3, 142:9,
    172:8, 183:14,
    189:17, 194:3,
    208:7, 217:8
pointed 119:12,
    165:1, 194:11
pointing 7:7,
    219:22, 219:23
points 11:14, 12:7,
    28:16, 40:10,
    43:11, 211:8
policies 80:13
policy 39:14, 44:11,
    116:11, 155:24,
    155:25
political 193:7
poor 117:23, 121:19,
    187:9
portion 39:7, 85:25,
    119:14
portions 111:8
position 6:16, 27:7,
    34:7, 116:16,

116:23, 159:19,
    172:11
Positive 19:7,
    143:13, 143:14,
    143:15, 203:23
possibility 173:3
possible 7:23,
    49:11, 65:22,
    113:8, 113:11,
    138:16, 183:20
possibly 13:14
post 6:17, 193:13
Post-it 77:7
potential 43:23,
    53:19, 58:18,
    59:6, 172:12,
    193:25
potentially 43:13,
    57:11, 60:16,
    219:19
potholes 96:22
poverty 152:18
power 14:21, 15:10,
    101:17, 101:20
Powerpoint 109:18
PR-20 30:13, 198:14
PR-22 112:5
PR-5 112:5
PR-52 30:6, 30:7,
    198:14
PR-53 30:11, 198:14
practical 205:14
practice 104:1,
    115:18, 221:24
precedent 21:1
precise 113:24,
    114:10
precisely 115:5
preclude 149:18
predates 107:12
predicated 50:16,
    54:7
predicates 172:22
predictive 59:1,
    198:21
predicts 206:23
prefiscal 205:12
Preliminary 11:24,
    36:16, 36:17,
    41:8, 42:11,

43:20, 48:6,
53:18, 62:6,
100:15, 101:4,
135:17, 171:25,
176:23, 176:24
premeasures 205:1
premier 156:11
premise 34:13,
34:18, 136:16
premiums 18:15
prepared 4:25,
109:15, 127:16,
127:22, 135:20,
164:20, 169:4,
199:23, 201:2
PRESENT 2:20, 48:18,
121:18, 125:21,
209:2, 209:6
presentation 9:13,
120:4, 135:16,
159:4
presentations 8:14,
195:7, 222:24
presented 37:7,
50:22, 54:9, 57:2,
58:1, 58:10,
58:17, 120:3,
120:23, 177:19,
195:7, 208:16
presenting 7:2
presently 190:19
Preservation 96:16,
96:19, 97:1,
97:19, 126:21
preserve 125:23
preserved 38:20
preserving 41:17,
69:7
president 10:20
press 4:7, 34:23
pretty 11:10, 154:13
prevail 37:14
prevails 37:25, 53:1
prevent 11:25,
12:23, 38:10,
148:2
previous 31:18,
135:18
Previously 15:14,
57:4, 82:8, 162:2,

162:8, 198:3,
215:13
PRHTA 168:1, 168:11
prices 168:10
primary 68:22,
140:1, 142:11,
143:18, 143:20,
143:25, 152:11
principal 9:9, 9:11,
18:15, 93:14,
94:9, 217:10
principally 26:11,
188:2
principles 12:9,
12:17, 13:10,
13:16, 13:19,
13:22, 14:14,
15:14, 23:11, 28:2
Prior 14:20, 15:16,
30:1, 59:22, 60:1,
60:16, 86:3,
93:13, 93:17,
116:1, 116:6,
135:16, 171:6,
205:25
private 111:12,
112:7, 191:5
privatized 31:21,
113:1
probability 173:7,
173:8
Probably 30:2, 52:6,
81:13, 90:19,
123:4, 138:17,
151:1
problem 9:5, 11:11,
135:25, 220:2
problems 98:16,
101:22
proceed 7:14, 7:20,
21:11, 100:6,
197:23
proceeding 4:12,
4:19, 101:6,
103:10, 135:8,
170:14
Proceedings 2:39,
4:7, 5:13, 53:20,
54:22, 72:13,
100:5, 160:19,

218:1, 224:3,
224:7, 225:6
proceeds 19:6, 93:6,
93:7, 166:18,
180:11
process 15:19,
24:14, 27:5,
60:18, 97:4,
108:2, 108:6,
108:10, 125:6,
138:8, 157:25,
219:13
processes 80:12
produce 143:6
produced 2:39,
29:22, 29:24,
118:19, 118:20,
202:14, 216:8
produces 41:22
profession 156:12
proffer 174:14
profile 52:13, 52:14
profitable 98:11,
98:13
program 141:6
progress 80:3
prohibit 146:13
project 43:5, 80:12,
146:25
projected 4:23,
31:10, 34:25,
74:20, 126:22,
146:9, 150:21,
150:25, 189:5,
190:5
projecting 11:10,
146:24
projection 81:21,
117:12, 143:10,
212:3
projections 79:12,
79:13, 165:16,
166:17
projects 69:2,
80:17, 81:22,
117:9
PROMESA 12:20,
12:21, 12:23,
13:6, 162:16,
190:23

promise 220:10
promoted 70:7
promptly 221:16
proof 29:13, 29:15,
  29:17
proper 50:10
properly 9:11,
  62:20, 135:22
property 14:25,
  15:1, 38:4
proportion 115:2
proposal 26:9,
  107:15, 195:10,
  218:5, 219:1,
  219:25, 220:4
propose 11:21,
  217:7, 218:8,
  218:9, 218:10
proposed 25:20,
  173:10, 219:21,
  220:3, 220:6,
  220:9
prosecuted 171:10
Proskauer 5:15,
  36:2, 104:10,
  108:17, 110:12,
  137:3, 151:14,
  216:1
prospect 16:3
prospective 13:8
prospectives 123:2
protect 27:21, 96:23
protected 15:4,
  16:10, 36:18,
  41:10, 42:12
protection 12:3,
  12:15, 12:23,
  13:5, 15:11,
  25:23, 26:2,
  27:19, 29:15,
  33:16, 35:22
protects 15:1, 15:2,
  42:4, 42:5
protocol 4:21, 65:21
proverbial 39:16
provide 66:14,
  113:5, 168:9,
  202:7
provided 39:6,
  51:17, 51:20,

52:10, 52:12,
  52:22, 53:3, 53:6,
  58:6, 59:3, 88:19,
  110:3, 110:4,
  116:14, 119:13,
  120:8, 120:20,
  187:16, 202:21,
  204:16
provider 80:13
provides 17:2, 17:6,
  17:8, 18:11,
  58:17, 59:6,
  85:20, 106:24
providing 14:10,
  51:14, 55:12
provision 4:17,
  14:15, 17:15,
  23:5, 27:12, 28:4,
  133:15
provisions 17:6,
  17:7, 17:12,
  17:23, 19:9,
  21:20, 23:20,
  27:4, 27:9, 27:12,
  28:12, 28:14
proxy 200:6
PSR 121:19
Public 4:6, 38:12,
  43:14, 44:11,
  69:13, 69:17,
  75:18, 75:20,
  97:24, 98:13,
  98:17, 180:13,
  183:3, 193:9,
  193:11
publication 185:21
publicly 30:1, 30:2,
  133:20
published 200:23
purpose 18:17,
  27:20, 51:15,
  95:13, 145:10,
  164:11, 164:13,
  165:22, 168:5,
  168:6, 185:10,
  186:23, 208:13,
  208:15, 211:23,
  211:25
purposes 6:8, 18:5,
  25:21, 26:13,

26:19, 27:23,
  74:12, 96:24,
  105:3, 127:6,
  127:8, 127:16
pursuant 20:20,
  21:6, 52:21
pursue 7:18
push 154:5
pushing 141:3,
  141:6, 141:7,
  142:25
put 4:10, 6:15, 7:3,
  23:6, 23:12, 26:1,
  26:15, 27:21,
  31:25, 72:4,
  91:21, 110:9,
  128:20, 137:16,
  137:18, 140:12,
  166:15, 173:3,
  182:13
putting 110:6,
  167:15, 208:22
PX 197:7


< Q >
qualifications
  212:17, 212:18,
  212:20
qualified 212:20
qualities 198:21
quality 38:24,
  83:17, 87:18
quantified 84:10
quantifies 85:8,
  86:7
quarter 217:20
questioned 174:25
questioning 56:6,
  170:20, 171:6,
  176:12
questions 4:14,
  28:16, 56:16,
  62:24, 63:2, 67:9,
  94:16, 98:5,
  99:16, 128:1,
  151:6, 151:8,
  160:3, 173:16,
  173:22, 174:23,
  178:6, 188:24,

193:16, 193:23,
196:1, 211:15,
213:10, 213:12,
213:23
quibble 170:8
quick 29:2, 65:11,
127:14
quickly 127:10
quite 43:8, 114:10,
115:7, 120:23,
127:5
Quote 17:16, 17:18,
18:14, 20:18,
20:19, 21:2, 21:3,
21:5, 38:22, 39:6,
39:11, 39:22,
40:9, 40:14,
58:15, 170:18,
180:13, 184:7,
184:8, 184:9,
184:10, 191:4,
191:13, 192:11,
199:22
quoted 143:24
quoting 56:7


< R >
Racciatti 3:27, 9:9,
30:21, 31:1,
31:10, 32:2, 32:6,
60:8, 60:10,
60:20, 60:24,
61:3, 196:8,
196:13, 198:6,
202:20, 211:23,
214:23
Radford 14:12,
14:14, 15:6, 15:9
rail 73:22
Raise 45:8, 46:20,
63:20, 73:13,
104:20, 129:5
raised 14:20, 38:9,
142:2, 142:8,
188:25, 215:8,
217:6
Ramos 20:6, 20:18
ran 136:17, 141:11,
152:5, 152:20,

154:19
range 32:23, 50:9,
51:24, 52:1,
52:16, 52:25,
53:15, 54:12,
55:17, 55:19,
57:6, 57:15,
57:16, 57:18,
58:11, 58:16,
58:17, 58:18,
58:23, 59:6, 60:4,
132:21, 168:4,
168:8, 198:12,
199:10, 212:3
ranges 57:23
rates 31:11, 32:17,
49:18, 51:24,
52:2, 57:15,
57:16, 57:18,
58:3, 58:4, 60:4,
60:7, 60:13,
198:13, 199:21,
207:22, 213:3,
213:14
rather 9:11, 21:3,
37:6, 60:7, 69:11,
177:2, 219:6,
222:2
rating 88:6, 121:19,
195:7
ratings 126:7
ratios 191:5
Ratner 36:9
Raul 42:22, 42:24
Re 1:6, 1:22
re-marked 128:12,
128:13
reach 139:23, 192:2
reached 5:6, 5:12,
162:22, 172:8,
218:4, 218:23
reacting 167:23
reactions 181:6
read 23:21, 23:22,
26:8, 83:15,
83:23, 83:24,
85:18, 85:25,
86:5, 88:18,
88:21, 88:22,
118:6, 125:3,

127:10, 184:19,
185:7
readily 204:16
reading 13:1, 56:14,
124:5, 184:16,
219:6
reads 83:14
ready 10:6
real 34:11, 39:25,
139:23, 147:2,
157:19, 191:25,
200:15, 206:17,
206:19, 213:17
realize 43:12
really 43:10, 76:21,
148:11, 154:12
reason 30:18, 34:20,
79:9, 79:11,
157:2, 192:24,
208:18, 217:6
reasonable 25:2,
25:12, 34:6,
50:10, 57:18,
58:17, 120:3,
137:12, 168:4,
168:5, 168:6,
168:8, 176:21
reasoned 23:23
reasons 23:3, 102:10
reassigned 104:13
rebuild 40:2
Rebuttal 3:23, 3:27,
9:11, 30:21, 47:5,
103:8, 178:11,
179:9, 198:2
recall 56:6, 56:22,
98:10, 106:6,
158:11, 160:1,
163:1, 181:19,
191:10, 191:16,
198:8, 204:6,
204:23
recapitalized 126:24
receipt 168:21
receipts 31:19,
59:12, 61:7, 93:9
receive 102:19,
172:23
received 8:1, 8:11,
18:16, 30:3,

66:19, 66:22,
101:8, 120:11,
135:5
receiving 60:19
recent 33:4, 34:22,
59:4, 72:25,
127:15, 127:21,
127:24, 127:25,
181:7
recently 12:19,
150:13
recess 72:12, 100:4,
160:18, 217:17,
217:25
recognize 14:5,
132:16
recognized 13:21,
50:19
recollection 56:15,
75:6, 75:10,
88:22, 159:13,
159:21, 164:7,
203:21
recommend 141:6,
144:5, 153:15,
153:17, 154:4
recommendation
125:17
recommendations
147:21, 147:22
recommended 140:20
reconciliation
145:7, 147:8,
156:24, 157:2,
184:5, 184:16,
184:22, 184:24,
185:6
reconstruction
96:15, 96:19,
97:2, 97:8, 97:12,
97:13
reconvened. 72:13,
100:5, 160:19,
218:1
recorded 2:39
recross 99:18
recurrent 78:8
redenominated 100:20
REDIRECT 3:10, 3:17,
3:21, 3:25, 3:29,

46:13, 63:1,
95:24, 96:1, 96:4,
99:18, 102:12,
128:4, 151:11,
173:20, 193:21,
211:21
reduce 147:8, 158:7,
183:20
reduced 33:2, 84:15,
188:7
reduction 39:1,
83:20
Redweld 201:8
reestablished 101:25
refer 26:22, 69:23,
106:5, 108:10,
129:15, 182:8,
190:11
reference 56:21,
77:13, 127:4,
200:2, 203:7,
204:4, 204:13
referenced 113:18,
170:25
references 102:14,
122:21
referred 54:2,
165:17, 170:12,
172:19, 173:25
referring 169:14,
171:20, 182:2,
203:4, 204:20
refers 79:14
reflect 84:6
reflected 76:5,
123:17, 222:5
reflects 44:11,
75:23, 76:2, 84:8
reforms 40:12
reformulate 124:11,
124:19, 127:19,
148:17
regain 40:4, 40:16,
190:23
regard 213:11
regarding 61:17,
62:1, 167:13,
171:4, 172:1,
176:6, 179:19,
191:2, 212:4,

213:24
regardless 70:24
region 214:6
regional 156:3,
156:5
registered 145:16
regression 30:22,
31:1, 198:11,
198:16, 198:21,
198:24, 206:2,
206:6, 206:11,
206:25, 211:23,
211:25, 212:9,
212:13
regular 118:20
regulation 21:2,
21:7
regulations 20:10,
20:14, 20:19,
20:21
reinstitution 188:3
rejected 15:22
rejecting 12:25
relate 54:1, 180:7,
191:5
related 25:8, 56:17,
62:2, 69:2, 156:9,
214:4, 219:8
relates 54:22,
56:19, 57:19,
78:5, 125:9
relating 176:13
relation 56:16
relationship 206:7,
210:14, 210:19,
212:1
relationships 14:23
relative 210:14
relatively 183:15
releasing 162:18
relevance 170:20
relevant 12:8,
14:13, 16:7, 16:8,
21:4, 29:17,
170:13
reliant 116:7,
116:8, 116:9,
116:10
relied 92:3, 118:19,
121:20, 122:1,

123:5, 127:6,
166:16, 200:1,
203:19, 204:18,
204:19, 204:23,
204:25, 206:24,
207:2
Relief 11:23, 12:2,
27:18, 38:9,
43:12, 43:20,
44:1, 162:14,
162:16, 187:5
rely 6:6
relying 91:18,
209:1, 209:11
remain 5:17, 9:21,
45:6, 46:19,
63:18, 104:19,
129:4, 161:17,
178:17, 196:14,
207:5
remains 223:1
remarked 109:7
remarks 9:14
remedies 24:16
remember 29:4,
43:18, 55:20,
56:3, 75:16,
116:5, 213:11
remind 9:3, 44:9,
221:6
remove 97:6, 220:24
removed 40:5, 138:1,
138:10
removing 187:8,
187:12
render 28:12
rendering 118:13
Reorg 184:11,
184:19, 185:21
repair 39:10
repaired 72:8
repay 41:5
repayment 40:17
repeat 148:8, 170:4,
208:6, 209:17
repeating 94:7
replace 97:6,
116:15, 116:19,
116:21
replaced 116:22,

117:1
replacement 35:4,
97:5, 97:16
Replacing 96:24,
97:3, 97:11,
97:14, 141:22
Reply 25:20, 26:1,
37:4, 37:20, 103:7
report 24:1, 24:11,
44:10, 109:4,
109:15, 109:20,
110:6, 120:10,
120:15, 121:4,
121:15, 122:13,
122:16, 122:18,
123:1, 125:9,
126:15, 126:19,
127:7, 127:16,
127:22, 135:19,
213:19
reported 120:10,
123:11, 130:14,
190:4
Reporter 29:5, 95:3,
130:19, 225:15
reports 59:2, 118:6
represent 57:12,
202:23, 205:9,
205:11, 205:24
representation
207:16
representative 1:13,
1:28, 100:9,
104:11
representatives 4:6,
222:23
represented 170:13,
205:5, 207:9
representing 169:25
represents 57:1,
123:12
reputable 125:14
request 6:17, 6:20,
12:1, 93:19,
93:20, 133:2,
220:8
Requested 1:27,
62:16
require 24:2, 35:22,
75:11, 75:20

required 40:2,
59:22, 86:25
requirement 12:23,
123:24, 124:16,
124:21, 221:12,
222:12
requirements 86:10
requires 74:25, 97:5
requiring 219:20
Research 172:25,
184:11, 184:15,
185:21, 186:23,
187:22
researched 181:6
reserve 222:12
reserved 8:5
reserves 190:16
resolutions 18:20,
18:24, 18:25,
20:11, 20:14,
20:15
resolve 8:17
resolved 7:9, 133:3,
135:10
resources 44:13,
188:14, 194:7,
194:9, 194:14
respect 5:6, 6:10,
7:11, 7:23, 12:6,
12:20, 24:16,
27:8, 30:24, 31:6,
31:20, 31:23,
33:6, 34:6,
107:17, 114:3,
120:14, 164:2,
167:18, 177:23,
180:4, 181:13
respectfully 102:20
respective 220:22
respond 164:13,
174:17, 174:21
responded 12:25
responds 174:17
response 51:8,
220:20
response. 143:16
responses 7:12
responsibilities
68:24, 69:8
responsibility 69:6,

163:8
responsible 69:14,
  69:18, 71:21
responsive 102:22
rest 102:2, 102:3,
  109:24, 115:22
restate 149:7
restated 149:6
rested 215:6
restricted 38:23,
  83:16, 84:11,
  85:9, 86:8, 86:20
restructure 154:7
restructured 142:19
restructuring 33:7,
  40:18
restructurings 31:8,
  31:9
resubmitted 64:20
result 13:4, 28:7,
  38:24, 40:11,
  62:12, 83:17,
  83:21, 138:24,
  140:7, 140:12,
  152:8, 152:13
resulted 73:9
resulting 138:12
results 33:5, 33:24,
  67:17, 125:19,
  155:9
resume 100:2, 128:16
retained 205:22
retains 221:25
retrospect 155:21
return 32:10, 160:21
returning 160:20
reversed 43:25
Review 4:13, 11:15,
  59:2, 60:15,
  109:25, 125:10,
  125:20, 127:14,
  130:8, 130:11,
  156:2, 156:11,
  165:19, 165:22,
  171:19, 185:20,
  194:25, 207:8,
  208:18
reviewed 9:10,
  62:22, 125:12,
  174:9, 208:20

reviewing 61:13,
  110:10, 186:22,
  218:7
revised 60:18,
  136:4, 145:15
revising 52:6
rewrite 132:6
Rican 36:12
right-hand 78:24
rights 12:1, 14:25,
  15:1, 15:8, 16:6,
  24:16
rise 14:8, 22:24,
  72:11
rising 139:25
risk 39:2, 40:21,
  52:17, 52:24,
  53:6, 53:9, 53:10,
  58:20, 141:5,
  154:18, 177:1,
  177:2
riskier 40:6
risks 33:7, 33:9,
  52:18, 141:5
roadway 126:8
roadways 214:4
robbing 39:16
Robert 5:2, 6:13,
  7:10, 9:16, 10:13,
  42:19, 45:1,
  101:21, 102:7,
  103:17, 218:21,
  220:18, 223:20
robust 115:8
role 107:16
rolling 50:20
room 72:9
Rosado 42:23
Rose 36:3
rough 66:21
roughly 30:8,
  151:23, 153:11
roughness 121:18,
  127:9, 127:11
route 114:15
row 203:11
rubric 108:4
rude 84:19
Rule 8:10, 21:5,
  85:18, 175:9,

177:22
Rules 4:13, 4:14,
  85:24, 99:22,
  102:23, 175:7
ruling 35:6
run 111:12, 140:21,
  152:21, 154:17,
  158:5, 203:10
running 7:3, 157:10,
  159:1
Ryan 26:25


< S >
S. 2:24, 2:25
S/ 225:13
safe 44:14
safety 38:17, 39:1,
  39:10, 83:20,
  96:23, 97:9, 97:16
sale 156:18
sales 142:2
sample 123:14,
  123:15, 123:19
San 1:15, 4:1,
  99:11, 112:13,
  112:20, 113:1
Saturday 55:21
saw 30:12, 31:12,
  125:7, 158:17,
  158:21, 189:11
saying 34:7, 71:20,
  81:6, 153:5,
  153:18, 185:2,
  189:20, 216:14
scenario 116:3,
  176:22, 177:17
scenarios 57:12,
  58:25, 60:24,
  177:19, 199:10,
  212:5
schedule 107:4,
  219:21, 221:4
scheduled 80:19
Scheduling 175:8
scheme 17:2
Schick 23:7
school 157:21,
  193:13
Schwartz 9:19, 9:25,

10:16, 10:19,
45:2, 45:4, 45:5,
45:19, 46:10,
46:13, 100:13,
102:9, 103:5,
103:9
science 193:7
scope 22:4, 36:22,
154:23, 155:4,
174:12, 174:13,
176:4, 177:12,
177:21, 212:16
seal 5:17
sealed 66:4
seamless 108:10
searched 156:1
seat 121:7
seated 47:1, 64:1,
72:14
seats 160:21
Second 10:25, 12:1,
12:9, 25:9, 44:3,
71:18, 80:10,
91:7, 91:12,
92:20, 93:4,
110:14, 144:25,
158:23, 213:23
second-guess 44:4,
44:16
second-guesses 44:6
secondary 68:22
secondly 18:12
secured 18:8
securities 195:1,
195:9, 195:14
securitization 24:13
Security 14:12,
14:15, 14:24,
15:5, 22:7, 22:9,
22:18, 24:21
seeing 122:18, 222:9
seek 38:10, 42:7,
165:13
seem 5:20, 137:12
seemed 156:8
seems 102:6, 121:10,
124:5
seen 84:10, 85:7,
86:7, 101:9,
125:2, 125:3,

125:11, 127:25,
132:24, 150:18,
159:10, 195:10,
210:16, 210:21,
214:3, 221:13,
221:16
segment 8:15
SEGUI 8:21
selects 17:24
sell 190:19
selling 150:7
semicolon 20:21
Senate 24:1
sends 157:10
sense 24:12, 68:8,
87:6, 97:13,
139:14, 143:4,
154:5, 155:23,
188:9
sensitize 51:6
sent 109:24
sentence 80:10,
83:10, 83:13,
83:15, 91:13, 93:4
sentences 83:25,
84:4, 84:6
separate 66:15,
110:5, 110:17,
116:25
sequence 8:14
Sergio 3:8, 64:4,
90:21, 108:23,
113:18
series 111:4,
180:24, 203:10,
203:21, 205:4,
207:16
serve 44:19
served 105:16, 195:1
serves 98:17
service 93:5, 98:13,
117:11, 136:21,
144:4, 144:5,
144:8, 151:25,
152:1, 152:15,
155:1, 155:2,
155:6, 155:7,
183:2, 183:3,
183:21, 194:12,
194:13, 194:14,

194:19, 195:15
serviceability
121:18
services 66:14,
145:12, 162:23
servicing 142:18
serving 109:2,
131:15
session 160:20
set 21:19, 25:23,
54:11, 54:14,
54:15, 147:4,
155:9, 175:7,
180:19, 195:23,
197:15, 219:3,
221:18, 222:1,
222:3, 222:20
seven 125:1, 199:14
seven. 125:1
several 13:23,
194:8, 202:25,
203:5
severe 188:16
shall 8:18
shares 223:21
sheet 22:18, 150:18,
159:10, 164:19,
202:21, 204:1,
204:17
sheets 201:13,
201:24
ships 15:24, 15:25,
16:1
short 149:23, 194:6,
217:17
shorter 39:23
shortfall 37:18,
37:23, 41:6
show 29:10, 34:21,
36:17, 36:25,
37:3, 37:15,
37:22, 38:5,
38:14, 39:16,
41:4, 75:24,
139:25, 168:20,
181:25
showed 30:4, 59:3,
157:4
shown 5:11, 41:4
shows 32:3, 37:17,

38:5, 38:13,
39:15, 41:12,
75:3, 78:22, 78:23
shrink 152:12,
152:18
shrunk 31:24
shut 99:12
side 4:15, 23:18,
70:3, 218:12,
218:16, 221:21,
223:14
sides 218:4, 220:21,
220:25
sidewalk 68:2
Sidewalks 68:10,
68:18, 68:19,
96:11
signature 90:17,
90:19, 90:25,
91:1, 91:7
signed 67:3, 90:20,
90:23, 91:17,
92:1, 92:5, 106:9,
164:6, 164:20
significance 150:10
significant 38:24,
39:1, 39:25, 80:3,
83:18, 83:20,
84:13, 87:15,
98:14, 98:16,
99:1, 99:5,
138:13, 198:25
significantly 49:15,
99:7, 115:21,
150:24, 159:17
similar 22:1, 87:15,
97:8, 150:18,
203:17, 205:5
simple 16:9, 97:1
simpler 222:11
simply 6:7, 7:14,
18:9, 18:10,
20:22, 23:24,
26:3, 27:25,
39:14, 141:21,
166:12, 171:10,
172:24
single 27:6, 81:21,
86:24, 87:2,
87:17, 136:2,

153:22, 193:13
siphoned 40:7
sit 33:8, 50:8
Sitting 115:2,
188:1, 188:21,
203:24, 204:4,
204:9
situation 21:19,
52:8, 52:18,
52:23, 55:7,
57:20, 58:8,
82:11, 123:1
situations 155:16,
155:17
six 29:23, 51:4,
56:8, 89:21,
89:24, 95:1, 95:4,
95:5, 120:6,
182:11
six. 89:25, 125:1
size 172:1
slash 90:19
slight 11:15
slightly 149:22
slimmed 223:15
slow 187:13
small 123:13,
123:15, 183:7,
183:15
smaller 222:19
so-called 78:1
soft 43:5
sold 87:25, 88:2
sole 192:14
solely 16:20, 17:20,
18:2, 18:15,
114:13
solemnly 45:9,
46:21, 63:21,
104:21, 129:6,
161:18, 178:18,
196:15
somebody 147:16,
151:24, 224:1
Someone 8:20, 65:22,
137:2, 173:11,
184:9, 184:10,
191:22
someplace 102:16
sometimes 156:19

somewhat 135:18
somewhere 131:9,
152:1
soon 177:3
sooner 219:6
Sorry 8:7, 10:19,
49:19, 62:4,
64:20, 72:3,
75:23, 91:4, 92:9,
95:3, 100:21,
101:22, 109:9,
121:3, 121:5,
124:3, 125:1,
128:18, 132:14,
132:20, 197:5,
214:19, 214:22,
224:1
sort 25:16, 212:14,
220:12
sound 72:3
source 120:7,
142:22, 186:19,
189:20, 210:7,
216:9
sourced 120:16
sources 17:4, 18:3,
70:12, 88:12,
110:21, 184:20,
189:1, 190:8
sovereign 155:15,
155:22, 155:23
space 120:22, 154:11
Spanish 79:7
speaking 214:13
speaks 91:2
special 24:3, 24:4,
24:6, 24:7, 24:13,
150:9, 188:10,
194:15
Specific 16:25,
18:19, 20:17,
23:9, 25:17,
25:22, 26:8,
27:12, 27:13,
51:9, 51:14,
57:10, 57:13,
78:6, 102:14,
102:15, 145:10,
147:7, 190:10,
194:22, 199:21,

205:25
Specifically 17:14,
    18:14, 21:11,
    21:17, 23:8,
    26:23, 27:11,
    27:15, 27:18,
    50:15, 80:10,
    145:13, 146:10,
    180:7, 199:12,
    203:7, 204:6,
    206:6, 209:6,
    209:21, 212:4,
    216:22
specificity 204:22
specifics 115:9
specified 16:21,
    17:24, 19:20,
    21:16
speech 159:6,
    159:10, 159:12
spend 25:25, 39:14,
    44:2, 44:6, 79:24,
    81:4, 96:8, 96:11,
    96:14, 123:3,
    157:17, 158:15,
    183:1
spends 35:18, 96:15
spent 138:5, 138:6,
    145:11, 145:12,
    145:16
spiral 152:17
spite 112:25
spoken 43:6, 189:25,
    216:2
spreadsheet 201:14,
    201:21, 204:14
SSS 3:35, 64:16,
    64:17, 64:22,
    64:23, 65:3
stable 155:16
staff 88:19, 224:2
stage 40:3
stake 12:9, 18:8
stand 45:6, 63:18,
    103:17, 104:19,
    129:4, 146:20,
    161:17, 178:17,
    196:14
stand. 46:14, 160:7,
    178:10, 196:5,

215:2
standards 97:11
standing 45:6,
    46:19, 63:18,
    79:5, 104:19,
    129:4, 161:17,
    178:17, 196:14
standpoint 68:17
stands 26:13
start 67:10, 107:12,
    136:16, 139:7,
    142:11, 143:22,
    152:12, 152:17,
    154:16, 157:10,
    157:25
started 131:15,
    132:19, 158:25,
    219:12
starting 31:25
starts 139:4
stash 157:17
stashes 157:18
state 8:1, 8:3,
    27:24, 28:11,
    35:18, 35:19,
    50:20, 52:16,
    53:13, 58:20,
    59:1, 59:5, 59:15,
    69:11, 75:17,
    177:8, 191:4,
    192:9, 199:25
stated 36:23, 86:22,
    89:14, 166:16
statement 10:7,
    41:2, 71:19,
    72:24, 90:1, 91:8,
    91:13, 121:21,
    164:3, 180:23,
    195:17, 208:5,
    218:18
statements 4:18,
    9:15, 31:16, 48:5,
    48:9, 50:12,
    88:18, 119:11,
    159:19, 171:24,
    195:5
States 1:1, 2:18,
    13:25, 14:2,
    18:14, 27:22,
    38:21, 39:4,

40:13, 111:2,
    111:8, 111:11,
    150:4, 185:14,
    199:20, 225:7
statewide 195:3
station 68:2
statistically 123:19
status 19:18, 21:8
statute 13:2, 13:13,
    16:20, 16:22,
    16:24, 17:2,
    17:14, 17:19,
    17:21, 17:24,
    18:3, 19:20,
    20:15, 20:16,
    20:20, 21:13,
    21:20, 22:23,
    23:1, 23:9
statutes 88:16,
    88:20, 89:9
stay 12:2, 13:6,
    24:15, 24:20,
    27:19, 35:14,
    43:20, 52:2,
    142:9, 162:15,
    162:16, 162:18,
    217:15
stays 153:25
stenography 2:39
step 43:11, 65:11,
    194:5, 194:7
Stephen 36:9
stimulate 187:6,
    201:3
stipulated 45:23
Stockton 26:24
stoop 11:8
stop 72:4, 137:14,
    144:13
stopped 117:1
straightened 102:3
strategic 105:13,
    109:2
stream 19:2, 19:16,
    41:19, 41:20,
    42:5, 70:22
streams 70:23
strenuously 175:3
stress 53:11, 108:5
Strike 26:7, 177:11,

177:15, 186:11,
223:15
strongly 38:12
structural 40:12
structure 97:14,
126:11
structures 97:3,
195:22
Stuart 2:26, 10:14,
46:15, 105:1
students 99:6
studied 155:20,
180:10
studies 67:17,
155:14, 210:13
study 67:13, 113:8,
113:11, 113:14,
113:15, 113:17,
113:19, 113:22,
114:2, 114:17,
156:2, 156:10,
210:7, 210:16
stuff 25:16
subheading 125:18
subjective 192:12
submission 6:5, 6:18
submissions 7:19,
51:23, 56:25,
103:22, 103:24,
104:2, 221:4
submit 13:17, 23:12,
25:4, 26:2, 95:10,
103:8, 128:19
submitted 4:18,
6:10, 42:9, 48:5,
48:12, 109:3,
109:23, 165:2,
174:10, 174:18,
175:6, 217:3
subsidies 74:25,
75:18, 75:21
subsidize 35:14
subsidy 75:11,
75:14, 75:17,
76:16, 76:19,
76:21
substantial 38:17,
39:6, 119:14,
127:1, 219:19
substantially 219:10

subway 74:24
succeed 36:20, 40:2
success 40:6
sue 16:1
suffer 29:11, 37:9,
38:1
sufficient 33:10,
37:17, 61:25,
166:24
sufficiently 38:19
suggest 185:10,
191:13
suggesting 51:2,
67:18, 221:8
sum 151:17
summarizing 127:23
summary 126:6
summations 223:6,
223:8
superintend 13:16
supplement 175:9
Supplemental 47:4,
48:18, 49:9, 51:6,
55:10, 58:1, 60:3,
60:11, 61:16,
174:19, 175:6,
196:8, 208:19,
208:20, 208:23,
208:25, 215:18,
215:20
supplementing 177:23
support 27:7, 37:4,
48:6, 121:21,
140:6, 224:3
supported 158:25
supporting 107:21
supports 27:6, 106:3
suppose 7:17, 64:10
supposed 19:4,
24:14, 24:24,
194:19
Supreme 14:4, 14:7,
14:16, 14:23,
15:9, 15:21, 16:3,
21:1, 21:6, 27:22
surcharge 24:22,
25:1
surely 191:14
surface 97:3, 97:4,
97:14, 126:8

surplus 40:11,
40:14, 140:1,
142:11, 152:24,
153:20, 154:7,
154:12
surpluses 152:11
Suspension 168:23
sustain 171:5
sustainability
139:24, 140:17,
192:22, 193:4
sustainable 40:18
Sustained 169:21,
175:13, 176:14,
192:3
Swain 2:17, 225:7
swear 45:9, 46:21,
63:21, 104:21,
129:6, 161:18,
178:18, 196:15
switch 110:14
sworn 47:24, 66:10,
105:7, 129:18,
162:2, 179:10,
198:3
systemic 194:15,
195:12
systems 25:7, 75:20,
120:2, 135:22


< T >
Tab 76:10, 76:12,
77:6, 77:8, 77:15,
80:6, 84:22, 85:1,
88:25, 89:21,
89:24, 89:25,
95:1, 95:4, 95:5,
104:15, 106:14,
109:7, 109:15,
121:16, 121:23,
123:12, 123:18,
125:1, 128:17,
132:11, 143:10,
204:14, 204:20,
204:22
tabbed 77:22, 77:25
table 36:8, 78:4,
122:22, 126:6,
169:3, 169:7,

169:10, 221:22
tabs 77:11
Tacoronte 222:17
takeaways 121:16
taken. 72:12, 100:4,
    160:18, 217:25
talked 9:7, 147:17,
    223:2
tax 78:9, 93:7,
    142:2, 142:8,
    186:10, 186:14,
    186:23, 187:2,
    187:5, 187:8,
    187:12
Taylor 2:17, 21:24,
    21:25, 22:15,
    23:3, 225:7
team 72:18, 75:2,
    84:7, 84:8, 107:7,
    107:17, 109:25,
    110:5, 119:19,
    134:21, 134:23,
    134:25, 139:10,
    139:15
tear 97:4
technical 84:7,
    84:8, 121:6
technically 67:18
telephone 4:8
temporary 162:16
ten 11:22, 32:1,
    32:14, 32:21,
    34:3, 43:17,
    43:19, 51:25,
    52:17, 52:25,
    53:14, 58:21,
    58:23, 73:2,
    74:21, 75:4,
    86:25, 92:11,
    131:9, 157:12,
    167:25, 175:18,
    176:17, 177:10,
    192:2, 217:21
ten-year 84:16,
    117:12
tend 58:18
tender 161:9
tenders 65:13
Tenth 27:24
tenure 87:25

term 22:18, 38:17,
    75:19, 89:19,
    111:6, 149:23,
    150:9, 156:14,
    210:6, 214:7
terminology 19:15
terms 13:17, 19:10,
    19:23, 21:16,
    23:9, 33:13,
    51:14, 58:24,
    75:19, 115:4,
    120:5, 190:10
territory 27:24
tertiary 68:23
test 25:18, 108:5,
    113:16
testified 47:25,
    66:11, 81:15,
    105:8, 115:17,
    117:21, 129:19,
    129:22, 162:2,
    162:8, 162:17,
    179:10, 186:9,
    186:12, 195:8,
    198:3
testifies 32:18
testify 34:19,
    35:13, 93:19,
    108:21
testifying 116:5,
    162:5
testimonial 42:10
Testing 102:5
Thanks 109:10
themselves 4:9,
    14:4, 20:16, 30:16
theoretical 39:2,
    192:24
theory 13:1
thereafter 145:20
thereby 14:3, 219:23
thereof 18:19
they'll 35:16
They've 66:22,
    146:5, 188:12,
    188:23, 195:19
thinking 156:4,
    219:1, 220:19,
    220:20
thinks 160:10

Third 16:23, 23:7,
    92:22
Thomas 3:5, 46:16
though 21:13, 24:13,
    50:20, 67:19,
    182:14, 189:16
thoughtful 222:24
thousands 114:22
Three 4:15, 15:2,
    25:6, 30:14, 32:9,
    57:25, 58:2, 58:4,
    60:23, 85:7,
    95:25, 109:14,
    114:3, 114:9,
    132:11, 158:1,
    158:3, 169:13,
    169:18, 169:23,
    170:6, 177:10,
    198:13, 199:10,
    206:3, 206:10
three-quarters 115:5
three. 155:18
threshold 140:16,
    192:1, 192:10
throughout 72:22,
    212:12, 213:3,
    214:6
Thursday 4:18,
    221:2, 221:13,
    221:16, 222:10,
    223:9, 223:12
tie 26:22, 154:25,
    156:8, 157:15
tied 158:23
ties 143:25, 145:6
tight 86:22, 86:23,
    219:21, 220:8
Tim 198:8
timely 81:4
timing 56:19
Timothy 2:30, 36:2,
    46:8, 100:8,
    103:1, 179:5,
    196:22
Title 1:8, 93:13,
    93:17, 94:15,
    94:22
together 22:10,
    23:6, 23:12, 67:6,
    91:21, 110:6,

110:9, 154:15,
154:16, 202:24,
208:22, 218:8,
218:15, 220:17
token 51:11
tolls 18:22, 30:4,
38:7, 39:20, 42:1,
88:10, 89:7,
199:5, 199:8,
203:16, 205:2,
205:20, 206:17,
207:5, 207:6,
208:1, 209:3
tomorrow 224:4
took 14:2, 15:24,
30:22, 31:10,
55:20, 89:2,
116:21, 136:17,
144:10, 144:14,
145:19, 153:10,
166:19, 173:11,
184:10, 198:8
top 66:22, 90:3
topic 117:21,
167:15, 172:8,
172:25
topics 110:14
tortured 220:14
total 4:15, 32:4,
78:25, 122:4,
123:13, 136:3,
141:21, 146:4,
146:22, 151:17,
155:6, 183:11,
199:1, 199:8,
199:10, 200:1,
200:2, 200:6,
206:14, 209:23
touch 12:6
toward 141:4, 214:12
track 160:10
traffic 113:9,
113:16, 114:8,
114:14, 115:4,
115:8, 124:1,
124:17
train 68:2, 71:5,
73:21, 74:24,
98:12, 99:11
trains 70:17, 71:5

trajectory 208:17
transaction 29:23,
30:22, 219:9
transactions 30:4,
30:12, 200:15,
206:7, 206:23,
212:1, 212:3,
213:17
Transcript 2:39,
85:6, 85:20, 86:1,
89:2, 181:25,
182:10, 222:6,
225:4
transcription 225:5
transferred 19:4
transit 44:19,
75:25, 96:17,
98:17, 98:18,
99:1, 214:5
transition 163:8
translation 6:15
translations 6:5
travel 113:25,
115:6, 198:25
traveled 67:23
Treasury 78:2,
78:18, 79:16,
79:17, 157:18
treat 24:12
treatises 23:4,
200:23
treatment 151:19
Tren 73:20, 73:21,
73:25, 74:3, 74:4,
74:9, 74:15,
74:18, 74:20,
74:25, 75:3, 98:5,
98:6, 98:11,
98:20, 98:23,
99:6, 99:9, 99:12,
125:23
trend 139:13,
205:10, 205:25,
207:11, 207:17
trends 207:10
trial 44:3
tried 152:23, 194:16
trip 68:1, 194:5
trucks 30:20
True 74:25, 81:23,

82:7, 83:8,
120:14, 127:15,
143:15, 167:12,
167:16, 167:18,
167:20, 167:22,
169:12, 170:16,
171:9, 172:4,
211:13, 217:2,
217:4, 225:5
truly 158:18, 159:3,
217:8
trust 66:6
trusted 156:12
truth 45:10, 45:11,
46:22, 46:23,
63:22, 63:23,
89:20, 104:22,
104:23, 129:7,
129:8, 161:19,
161:20, 162:25,
178:19, 178:20,
196:16, 196:17
truthful 56:1,
85:11, 87:13,
195:6
try 5:13, 29:1,
96:2, 142:20,
143:17, 149:8,
158:7, 185:25,
186:3, 220:22
trying 5:24, 8:23,
85:12, 86:3,
127:10, 141:24,
143:1, 158:14,
174:12
TTT 3:40, 161:3,
161:9, 161:14
turn 11:1, 24:3,
35:23, 64:10,
85:21, 111:15,
132:11, 152:12,
163:17, 163:25,
201:13, 220:3
turned 24:10, 24:15,
153:2
turning 135:12
turns 31:19, 216:13
Twenty 57:23
two-fold 219:2
two-page 77:25

two. 88:25, 162:13
Tyler 3:12, 39:4,
   104:12, 134:18,
   134:23
type 22:1, 155:17,
   212:10
typical 115:18
typically 147:1
typos 164:19

< U >
Ubaldo 36:12
ultimately 43:25,
   44:1, 44:17,
   168:6, 208:8,
   209:11
unable 79:24, 81:4,
   190:19
unaccountable 191:15
unavailable 117:18
uncertainty 57:19
unconstitutional
   28:12
undercuts 23:18
underground 73:22
underlying 55:1
underneath 140:14
undersecured 33:3,
   34:8, 41:10
understand 6:16,
   7:13, 56:14,
   81:16, 83:1, 88:2,
   89:5, 109:7,
   120:23, 125:8,
   125:10, 148:11,
   149:5, 184:15,
   207:23, 208:1,
   208:5, 208:13,
   208:15, 208:22,
   209:1, 209:3,
   209:8
understanding 7:11,
   7:20, 81:13,
   82:10, 83:5,
   88:16, 88:23,
   93:13, 93:24,
   94:1, 94:8, 94:14,
   94:20, 94:21,
   94:23, 98:22,

113:25, 123:1,
   123:14, 133:9,
   133:18, 151:16,
   158:13, 194:20,
   205:4, 207:21,
   216:3
Understood 6:9,
   88:8, 88:11,
   88:13, 89:11,
   89:17, 89:19,
   151:19, 205:13,
   205:18, 208:25,
   209:4, 209:18,
   209:20, 215:22
undisputed 20:8,
   42:1
unilateral 22:24
unilaterally 22:21
unintentional 164:22
United 1:1, 2:18,
   13:25, 14:2,
   111:2, 150:4,
   225:6
universe 219:10,
   219:11, 220:8,
   221:18
Unless 28:16, 97:15
unlike 221:24
unquote 58:15
unrebutted 40:19,
   40:23
unsecured 13:3
unspecified 16:23,
   21:21
unsustainable 152:15
until 30:3, 102:3,
   134:9, 218:10,
   219:25
upgrading 97:9
upkeep 167:19
upset 144:16
urban 73:21
Urbano 73:20, 73:21,
   73:25, 74:3, 74:4,
   74:9, 74:15,
   74:18, 74:20,
   74:25, 75:3, 98:5,
   98:6, 98:11,
   98:20, 98:23,
   99:6, 99:9, 99:12,

125:23
urge 7:1
useful 39:8, 118:17,
   119:8, 119:15
users 38:25, 83:19,
   97:17, 99:8
uses 28:21
Using 30:22, 31:11,
   32:1, 32:2, 34:4,
   35:16, 37:19,
   37:20, 41:1, 41:2,
   41:14, 42:1, 68:1,
   77:13, 77:14,
   79:9, 80:4, 105:3,
   122:22, 139:13,
   140:6, 141:19,
   144:5, 168:6,
   171:15, 173:9,
   202:7, 209:19
utilities 145:12
utilized 51:24,
   60:16, 61:24,
   204:2

< V >
v. 1:41, 2:7
valid 17:10, 17:13,
   18:1, 21:18,
   123:19
validate 198:20
validated 21:17
valuable 41:24
value 11:25, 14:3,
   14:5, 14:8, 14:10,
   14:18, 15:8,
   37:12, 38:8,
   41:11, 41:17,
   48:18, 48:19,
   48:22, 49:5, 49:6,
   49:14, 50:3,
   50:11, 50:13,
   54:12, 55:14,
   57:21, 67:6,
   119:22, 209:2,
   209:6
values 50:7, 50:9,
   50:21, 55:17,
   55:19, 56:23,
   56:25, 57:6,

57:25, 58:10,
59:6, 60:8
variables 48:24,
49:1, 54:13,
54:24, 57:23
varies 49:15, 49:17
variety 54:13,
194:16
various 6:23, 59:9,
59:14, 62:2,
169:16, 193:24
vehicle 67:23, 93:9,
93:10
venues 121:11
verified 45:18,
120:8, 190:20
verify 119:24,
120:18
versed 12:5
version 86:12,
86:14, 90:23,
204:14, 204:15,
222:5, 223:15
versions 178:3
versus 13:25, 20:5,
20:18
via 51:21
vice 10:20
video 4:7, 8:9,
34:22
videotape 34:22
view 37:4, 40:7,
60:21, 67:24,
68:6, 68:10,
68:12, 68:13,
70:8, 71:7, 71:16,
71:20, 71:21,
111:24, 112:11,
130:9, 136:11,
139:22, 141:8,
142:10, 148:19,
149:12, 149:16,
149:17, 167:24,
194:19, 223:21
viewed 108:1
views 176:9
violated 14:9, 26:20
violates 28:11
violation 177:22,
194:15

violence 13:18
virtual 121:11
vis-a-vis 136:3
vital 23:5
VMT 67:16
voice 130:18
volume 7:13
volumes 114:14
voluminous 220:24


< W >
W. 3:23, 178:14,
179:8
wage 147:7
wages 145:12
wait 144:25
waiting 72:7, 101:24
Walker 225:13,
225:14
Wandymar 42:23
wanted 4:13, 43:10,
76:3, 91:20,
91:23, 103:8,
162:14, 213:2,
215:9, 215:23
wants 7:18, 23:25
warn 29:2
warnings 81:8
wasteful 157:20
water 65:22, 66:1,
66:3, 66:6, 144:22
waterfall 180:19
ways 113:16
wear 97:4
week 34:23, 181:22,
182:21, 198:9,
219:5, 220:6
weekly 108:13
weighs 38:12
welcoming 170:15
Whatever 21:16,
28:9, 64:8, 101:9
whatsoever 23:14,
176:12
Whereas 19:11, 20:6,
20:9
wherever 102:2
whichever 157:14
whole 24:2, 41:16,

45:10, 63:22,
97:9, 97:12,
97:14, 104:22,
129:7, 136:2,
138:22, 141:5,
161:19, 172:24,
178:20, 195:11,
195:13, 196:17,
222:10
win 35:9, 35:10
wire 194:5
wise 44:7, 141:3
withdrawal 39:22
Withdrawn 165:23,
186:11, 191:12,
200:24, 210:17
withdrew 6:11
Within 50:17, 50:22,
52:23, 52:25,
66:19, 67:14,
67:25, 68:23,
70:19, 76:10,
77:6, 86:24, 92:8,
92:9, 205:16,
205:22, 207:21
Without 14:10,
146:10, 168:16,
173:23, 183:2,
204:4
withstanding 26:17,
26:18
WITNESSES 3:3, 4:6,
5:8, 9:13, 9:19,
9:20, 9:22,
178:12, 222:23
wonder 7:6
word 67:24, 67:25,
69:23, 148:23,
213:24, 213:25,
214:2
words 22:15, 83:13
worked 31:9, 33:21,
107:10, 107:23,
108:19, 108:23,
125:15, 130:3,
135:19, 139:12
working 4:21, 73:11,
108:12, 110:5,
114:15, 117:6,
131:14, 132:19,

144:23, 150:3,
  163:6, 213:7,
  218:25
Works 64:8, 69:13,
  69:18, 97:24,
  153:22
world 98:3, 141:4,
  177:8
worse 42:4, 42:7,
  153:1, 153:2
worsen 152:18
worth 79:25, 80:22,
  80:25
write 218:17
writing 4:18, 7:25,
  8:5, 194:25
written 48:5, 51:23,
  56:25, 223:23
wrote 110:15, 120:7,
  120:12, 121:16
WWWW 124:6


< Y >
year-over-year 59:4
yearly 152:10
yesterday 7:24, 8:1,
  8:8, 8:12, 189:11
yield 168:1
York 19:5, 19:7
yourself 60:8,
  118:9, 162:5,
  179:23, 191:21


< Z >
zero 173:8