```
 1                 UNITED STATES BANKRUPTCY COURT

 2                    DISTRICT OF PUERTO RICO

 3
      In Re:                    )        Docket No. 3:17-BK-3283(LTS)
 4                              )
                                )        Title III
 5    The Financial Oversight and )
      Management Board for       )
 6    Puerto Rico,              )        (Jointly Administered)
                                )
 7    as representative of      )
                                )
 8    The Commonwealth of       )
      Puerto Rico, et al.,      )        August 9, 2017
 9                              )
                Debtors.        )
10
     _____
11
      In Re:                    )
12                              )
      The Financial Oversight and )      Docket No. 3:17-BK-3566(LTS)
13    Management Board for       )
      Puerto Rico,              )        (Joint Administration
14                              )         Requested)
      as representative of      )
15                              )
      Employees Retirement      )
16    System of the Government  )
      of the Commonwealth of    )
17    Puerto Rico,              )
                                )
18              Debtor.         )
     _____
19
      In Re:                    )
20                              )
      The Financial Oversight and )      Docket No. 3:17-BK-3567(LTS)
21    Management Board for       )
      Puerto Rico,              )        (Joint Administration
22                              )         Requested)
      as representative of      )
23                              )
      Puerto Rico Highways and  )
24    Transportation Authority, )
                                )
25              Debtor.         )
     _____
```

```
 1      In Re:                    )
                                  )
 2      The Financial Oversight and )    Docket No. 3:17-BK-4780(LTS)
        Management Board for      )
 3      Puerto Rico,              )      (Joint Administration
                                  )       Requested)
 4      as representative of      )
                                  )
 5      Puerto Rico Electric      )
        Power Authority,          )
 6                                )
                      Debtor.     )
 7      _____
 8
 9                         OMNIBUS HEARING
10      BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN
11                 UNITED STATES DISTRICT COURT JUDGE.
12      _____
13
14      PRESENT IN THE OMNIBUS HEARING:
15      The Honorable U.S. Chief Bankruptcy Judge Barbara Houser
16      The Honorable U.S. Magistrate Judge Judith Dein
17
        APPEARANCES:
18
        For the U.S. Trustee
19      Region 21:                Ms. Monsita Lecaroz Arribas,
                                      AUST
20
        For The Commonwealth
21      of Puerto Rico, et al.:  Mr. Martin Bienenstock, PHV
                                 Mr. Chris Theodoridis, PHV
22
        For Peaje
23      Investment, LLC:         Mr. Allan S. Brilliant, PHV
24      For Stericycle of
        Puerto Rico:             Mr. Adrian Linares Palacios, Esq.
25
```

```
 1    APPEARANCES, Continued:

 2    For Ad Hoc Group of
      General Obligation
 3    Bondholders:             Mr. Andrew N. Rosenberg, PHV

 4    For Ambac Assurance
      Corporation:             Mr. Dennis F. Dunne, PHV
 5
      For Assured Guaranty
 6    Corp.:                   Ms. Ellen M. Halstead, PHV

 7    For Puerto Rico Fiscal
      Agency and Financial
 8    Advisory Authority:      Ms. Suzzanne Uhland, PHV
                               Mr. Peter Friedman, PHV
 9                             Mr. Nathan Haynes, PHV
                               Ms. Nancy Mitchell, PHV
10
      For Official Committee
11    of Unsecured Creditors:  Mr. Luc Despins, PHV

12    For Financial Guaranty
      Insurance Company:       Mr. Martin Sosland, PHV
13
      For Ad Hoc Group of
14    PREPA Bondholders:       Mr. Gregory Horowitz, PHV

15    For U.S. Bank:           Mr. Clark Whitmore, PHV

16    For National Public
      Finance Guaranty Corp:   Mr. Salvatore Romanello, PHV
17
      For Autonomous
18    Municipality of Ponce:   Mr. Paul Glassman, PHV

19    For South Parcel:        Mr. Victor Rivera Rios, Esq.

20    For Scotia Bank of
      Puerto Rico:             Mr. Emil Kleinhaus, PHV
21
      For University of
22    Puerto Rico Retirement
      System Trust:            Mr. Jose Ramirez Coll, Esq.
23
      For the Ad Hoc Puerto
24    Rico Municipalities
      Committee:               Mr. Michael Rochelle, PHV
25
```

```
 1   APPEARANCES, Continued:

 2   For Puerto Rico Fund:     Ms. Cheryl Sloane, PHV

 3   For Solus Alternative
     Asset Management:         Mr. Nicholas Baker, PHV
 4
     For Mutual Fund Group:    Mr. Philip Bentley, PHV
 5
     For Ad Hoc Retiree
 6   Committee:                Mr. Robert Gordon, PHV

 7   For Canyon Balanced
     Master Fund Ltd.,
 8   et al.:                   Mr. Susheel Kirpalani, PHV

 9   For National Guaranty:    Mr. Jonathan Polkes, PHV

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by stenography.  Transcript produced by
     CAT.
25
```

```
 1                          I N D E X

 2   WITNESSES:                                    PAGE

 3        None offered.

 4

 5   EXHIBITS:

 6        None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico

 2                                    August 9, 2017

 3                                    At or about 9:31 AM

 4                          *     *     *

 5          THE COURT:  Welcome counsel, parties of interest,

 6   members of the public, the press, participants in New York and

 7   observers by telephone.

 8          We have a busy agenda for this third hearing in the

 9   jointly administered cases, and the first hearing in the Title

10   III case filed by PREPA.

11          Mr. Bienenstock.

12          MR. BIENENSTOCK:  Thank you, Your Honor.  Good

13   morning.  My name's Martin Bienenstock of Proskauer Rose, LLP

14   for the Oversight Board itself and as representative of the

15   Title III debtors.

16          THE COURT:  Good morning.  I just ask you to remember

17   to project, because we often have problems with that

18   microphone.

19          MR. BIENENSTOCK:  Yes, Your Honor.

20          THE COURT:  And before we go into the uncontested

21   matters, I had a question for you, and I also wanted to take

22   the opportunity to call on Judge Houser to make a statement

23   about the mediation team.

24          So would this be an appropriate time for me to do

25   that?
```

```
 1              MR. BIENENSTOCK:  Sure.

 2              THE COURT:  All right.  I see that the revised agenda

 3   that was just filed last night moves the HTA assumption

 4   rejection timing motions to an adjourned section.  And so

 5   should I anticipate that at the time that we get to that

 6   portion of the agenda, you'll explain that further, or do you

 7   wish to explain that now?

 8              MR. BIENENSTOCK:  I'll explain it now in a sentence,

 9   Your Honor, but the parties have agreed to ask Your Honor to

10   adjourn it because they think they're on the verge of

11   resolving it totally.

12              THE COURT:  Well, that is good news.  And so would

13   that be an adjournment to the next Omni as a control date, or

14   will there be some other more specific request in terms of

15   timing?

16              MR. BIENENSTOCK:  I think we'd be satisfied with

17   adjournment to the next control date, contemplating that

18   between now and then we'd file something indicating that it's

19   resolved and off the calendar.

20              THE COURT:  That is quite acceptable to the Court.

21   So you will file an informative motion with that request that

22   we can then grant?

23              MR. BIENENSTOCK:  Yes, Your Honor.

24              THE COURT:  Thank you.

25              And so I would like to call on Judge Houser at this
```

 1  point.

 2            THE HONORABLE U.S. CHIEF BANKRUPTCY JUDGE HOUSER:

 3  All right.  For the first time in my life, I was told to speak

 4  up last month, so I'm speaking up.  Anyone having trouble

 5  hearing me?

 6            (No audible response.)

 7            THE HONORABLE U.S. CHIEF BANKRUPTCY JUDGE HOUSER: So

 8  good morning.  As you'll recall, I did speak to you at the

 9  last Omnibus hearings on June 28th to give you an overview of

10  the mediation process that I envisioned implementing in these

11  cases and related proceedings.

12            As I explained on June 28th, a key component for our

13  mediation process is that the process will be confidential,

14  which will allow parties to have open and frank conversations

15  with both the mediators and with each other.

16            By having these open and frank conversations, I

17  believe we can find common ground in these Title III cases,

18  and achieve a facilitated consensual or substantially

19  consensual plan of adjustment for these debtors.

20            Because the process that has been implemented is

21  confidential, I must exercise great care today in what I feel

22  able to say to you about our process.  As you will also

23  recall, after telling you on June 28th that much of the

24  mediation team's work in these cases must be done behind the

25  scenes, and thus will not be readily visible to the public, I

1    ask everyone who is involved in these cases, or effected by

2    these cases, to trust me when I told you that the members of

3    my mediation team and I would work tirelessly to assist the

4    parties in finding these consensual resolutions, or

5    substantially consensual resolutions of the many complex

6    issues that Puerto Rico faces so that plans of adjustment can

7    be confirmed by the debtors.

8         In fact, since I last spoke to you, we have been

9    working tirelessly since June 28th to finalize and design the

10   mediation process and to begin implementing that process,

11   among other things.  As a result, much has been accomplished

12   since last June with input from the various parties of

13   interest in these cases.

14        For example, members of the mediation team, three of

15   us, Judge Ambro, Judge Marrero, and myself, met on July 12th

16   in New York City with all parties that were either ordered to

17   come visit with us, or who asked for the opportunity to come

18   visit with us and participate in that meeting to learn more

19   about the mediation process.

20        Following that meeting, significant thought has been

21   given by the members of my team and me to the issues that are

22   going to be significant to a consensual resolution, or a

23   substantially consensual resolution of these cases.

24        The mediation team is developing its game plan on how

25   we are going to tackle these issues.  We expect to finalize

1   that game plan within the next week or so, and to then make

2   that game plan available to the parties that we expect to

3   actively participate in the mediation process with us.

4           Formal mediation sessions are expected to begin on

5   specific key issues that the mediation team has identified

6   within the month after getting confidential merits mediation

7   statements from the parties.

8           These confidential merits mediation statements will

9   allow the members of the mediation team to better understand

10  the parties' legal and factual disputes so that we may assist

11  them in attempting to achieve a consensual resolution of those

12  issues.

13          As the leader of the mediation team, I will assign

14  members of the team to be responsible for particular issues

15  that we will have to address.  And I will make those

16  assignments based on various factors:  Availability of the

17  member of the mediation team, expertise with respect to

18  particular issues, and a variety of other things.

19          I will push the parties and the mediation process as

20  expeditiously as I feel appropriate under all of the

21  circumstances that exist in these cases in order to facilitate

22  what I hope to be a fully consensual resolution of the

23  cases.

24          In summary, I am very pleased with the progress that

25  has been made to date.  While the mediation process is truly

1   in its infancy, as are these formal cases, and much work

2   remains to be done, I am satisfied with where we stand today

3   and how we will proceed to tackle the issues that we must

4   address.

5       I have been asked if I am concerned about what

6   appears to be a proliferation of lawsuits and litigation and

7   other contentious things that are being filed virtually daily

8   in these cases.  The short answer to that question is no.  I

9   am not surprised or concerned.

10      It is perfectly fine for the parties to stake out

11  their legal positions in these cases forcefully in the

12  pleadings that are being filed in these cases.  That's why

13  Judge Swain is here.  If necessary, she will deal with those

14  forcefully filed pleadings and address those legal issues as

15  they come before her.

16      But with that said, my team and I are here to analyze

17  those forcefully stated positions, and to attempt to work with

18  the parties behind the scenes that are filing those positions

19  to see if we can't facilitate a resolution of those cases,

20  without the need for Judge Swain to actually have to hear and

21  decide them.

22      I recognize that it must be disconcerting to the

23  people of Puerto Rico to read about the contentiousness of

24  these cases, and to see news reports of all of the litigation

25  that's being filed.  But what I ask of all of you today is to

1   be patient and hopeful about our ability to work through and

2   resolve these many issues behind the scenes, with that

3   resolution then implemented through a public process that will

4   be overseen by Judge Swain.

5        To be sure, this is a challenging task that will

6   require the cooperation, ingenuity, and diligence of all

7   involved.  However, I remain highly confident that if the

8   parties and the mediators work together, we will be able to

9   successfully develop confirmable plans of adjustment in these

10   cases for the debtors.

11        Judge Swain, thank you for the opportunity to address

12   the parties with respect to the mediation process.

13        THE COURT:  Thank you, Judge Houser.

14        And so, as you know, we have a very long agenda

15   today.  We will begin with uncontested matters, as to which I

16   have some questions, but I expect that that will go pretty

17   quickly, and then later turn to issues that are contested and

18   as to which people have filed informative motions.

19        And so I make the same request that I made the last

20   time, that to the extent there does need to be discussion of

21   contentious matters, that counsel keep their remarks brief,

22   nonduplicative and going only to truly contested issues.

23        I am making every effort that I can to enable us to

24   finish these proceedings today and not carry over until

25   tomorrow; but obviously I can't do that alone, so let's join

1    together in that effort.  And I thank you in advance for that.

2         Mr. Bienenstock.

3         MR. BIENENSTOCK:  Thank you again, Your Honor.  In a

4    moment, I'm going to suggest a possible way to expedite some

5    of these uncontested matters.  But the first matter deserves

6    at least a few sentences.

7         This is the Proposed Stipulation and Order resolving

8    on a protocol to resolve the Commonwealth-COFINA dispute.  I

9    think the last thing I expected at the last hearing was to

10   come back here and have this uncontested this morning.

11        The only thing I want to say, because I think the

12   Court and all the parties are thoroughly familiar with it, is

13   that what does deserve mention is that Judge Houser was both

14   indefatigable and heroic in getting us to where we are.

15        Your Honor can't imagine how many times we thought it

16   was accomplished, only to find out that there was one more

17   thing.  And it truly required 24/7 attention, including Judge

18   Houser.  So we thank her, and I know all the parties thank

19   her.

20        But I have nothing more to say about that; and unless

21   the Court has questions or the parties, we ask that Your Honor

22   so order the stipulation.

23        THE COURT:  Well, I have no more questions, but I

24   would just like to make what is, in essence, a similar remark.

25   I've reviewed the proposed stipulation, and I commend the

1    efforts of the parties, as well as Judge Houser and the

2    mediation team, to reach consensus on this highly important

3    and complex aspect of these Title III cases.

4         As Mr. Bienenstock had noted, I raised several

5    concerns at the last hearing, and I am very pleased to see

6    that the parties have been able to work together in good faith

7    to address my concerns and create a thoughtful and detailed

8    plan to allow us to move forward to address the

9    Commonwealth-COFINA dispute.

10        And so I will enter the proposed stipulated Order,

11   for which I thank you all, and I encourage the parties to

12   continue their constructive dialogue amongst themselves and

13   with Judge Houser and the mediation team in the weeks to come.

14        MR. BIENENSTOCK:  Thank you, Your Honor.  Now, for

15   items two through eight in the uncontested portion of the

16   agenda, these are a combination of retention applications for

17   the committees, and a creditor information access motion by

18   the committee.

19        Unless the Court has questions, or other parties who

20   propounded these motions have things they need to add, I would

21   propose that we simply submit the proposed orders to Your

22   Honor.

23        THE COURT:  I do have some specific questions, and

24   I've done my best to keep these narrow and brief.  And some

25   are issues that are crosscutting to an extent.

1          So starting with agenda item two, which is the Paul

2     Hastings application to represent the UCC, the discounting is

3     traditional in these cases for there to be a discount on the

4     stated fee rate.  The discounting provision is a little bit --

5     well, it's not quite clear to me.  And so the application

6     indicates that -- could be read to say that it's only 20

7     percent of the final invoice for fees, or maybe a 20 percent

8     retroactive adjustment.

9          So first I would like to know whether we're talking

10    about 20 percent effectively of all fees that are billed, and

11    then to preview, I would -- if it is indeed 20 percent of all

12    fees that are billed, I think it's more appropriate for each

13    invoice to reflect that 20 percent, so that any holdbacks

14    under the Compensation Procedures Motion are real holdbacks.

15          MR. DESPINS:  Okay.  It is 20 percent of the overall

16    bill, but it was negotiated with the committee.  First of all,

17    I would say that we have never discounted our fees in any

18    situation.  We're doing this in this case because of the

19    particular situation of this case.  So I -- if discounting is

20    standard, it's not standard for us.  But it is 20 percent of

21    the overall bill.

22          But what was negotiated is that this would be done at

23    the end, and that we would select the -- out of the hundred

24    percent of our fees, what hours constitute the 20 percent

25    that's written off.

1    But to address your question about the holdback, we

2    never get more than 80 percent in any event, except that now

3    there's a proposal to make it 90 percent.  But we will limit

4    ourselves to 80 percent at all times.

5    THE COURT:  But if -- I'm sorry.  And good morning,

6    Mr. Despins.

7    MR. DESPINS:  Good morning.  I'm sorry.

8    THE COURT:  If I give you 80 percent of a gross

9    figure that you've already indicated an intention to

10   effectively net, then that's not a holdback in the real world.

11   I can provide for a 40 percent holdback on interim billings,

12   and we can sort that out later.

13   MR. DESPINS:  Well, no, Your Honor, because the

14   agreement with the committee was that it would be done at the

15   end.  From a cash flow point of view, we'll never get more

16   than 80 percent of our fees on an interim basis, because

17   otherwise we're getting 80 percent of 80 percent, which is not

18   right in a sense that because the agreement is this will be

19   done at the end.

20   So we're taking a risk of delayed payment, et cetera,

21   et cetera, so that the quid pro quo for that is that during

22   the pendency of the case, we're getting 80 percent of the

23   hundred percent.  But at the end, the estate will never pay

24   more than 80 percent of our total fees.  And it is within our

25   discretion to choose which fees are being written off at the

1    end.

2           So that was an important part of the quid pro quo,

3    Your Honor.  Otherwise, from a cash flow point of view, we're

4    getting 80 percent of 80 percent, which is a big difference,

5    and we're taking a risk of delayed payment at the end.  And

6    that was not the understanding we had with the committee.

7           So that was very important to us.  And I think this

8    applies to Zolfo Cooper as well, the financial advisors.

9           THE COURT:  Which is another application about which

10   I had this question.  I would ask you about the determination

11   of the committee that this arrangement, which is to my

12   knowledge and experience unusual in structure, is one that

13   they have determined is in -- is reasonable and in the best

14   interests of the debtor body, vis-a-vis the Commonwealth.  But

15   obviously you are here speaking for them and so you'll --

16          MR. DESPINS:  Well, no.  As I said, we never, never

17   discount our fees on these types of litigation.  We never do

18   that.  We did that because of the situation, the fact that

19   this is a crisis and that the discount was very heavy.  But

20   the quid pro quo for that is that that will be done at the

21   end, and we will select which hours are going to be written

22   off.  And so that's -- I think the committee understood that.

23          And so this was reviewed, meaning drafted by us, but

24   reviewed by a member of the committee who is a lawyer who

25   approved this and circulated to the committee.  And I know

 1    they've had their own internal discussions about this outside

 2    of our presence.

 3         So I don't know if they've discussed this particular

 4    provision, but they discussed our retention, the discount in

 5    the terms of the engagement outside of our presence, so I know

 6    that they are heavily focused on this discount.

 7         THE COURT:  And so you were -- among your

 8    representations is a representation that these fees are

 9    consistent with fees that you have historically billed and

10    been paid in situations in which you are representing a

11    statutory committee, and this type of structure is consistent

12    with your real world activity with respect to statutory

13    committees as opposed to creditor -- private creditor clients?

14         MR. DESPINS:  I will state that we have never

15    discounted a penny of our fees in any official committee

16    matter except for one, which was an arrangement with a train

17    derailment.  We represented a victims committee, and I charged

18    50 percent of my time only.  But that's my time.  The rest of

19    the firm was billed at a hundred cents of the dollar.  I'm

20    happy that we didn't revert to that in this case.

21         THE COURT:  So you'll be working all the time.  You

22    will be the only one on the team.

23         MR. DESPINS:  So other than that, we've never

24    discounted by a penny.  It's always been full freight.  So in

25    other words, there's never been any such arrangements in other

1  cases before.

2          THE COURT:  And your expectation of being able to

3  make the retroactive adjustment is by virtue of the holdback?

4          MR. DESPINS:  Yes.

5          THE COURT:  Having that outstanding liability to work

6  with?

7          MR. DESPINS:  Correct, in the sense that even though

8  the Payment Procedure Order provides for a ten percent

9  holdback only.

10         THE COURT:  So far it does.

11         MR. DESPINS:  Sorry.  So far it does.  As to us, it

12  will be 20 percent.  And therefore, if I'm -- no, either

13  things being equal, we should not have to write a check back

14  to the estate at the end.  But we will see how it ends up.

15         THE COURT:  All right.  With that clarification of

16  the undertaking and of the breadth of the undertaking and its

17  context of historical practice and committee consideration and

18  deliberation, as you've described, I approve the application

19  and I will sign the proposed order, enter the proposed order

20  as presented.

21         MR. DESPINS:  Thank you.  I don't know if Your Honor

22  has questions for other applications.

23         THE COURT:  I think I do.  But let me --

24         MR. DESPINS:  Okay.

25         THE COURT:  -- make myself a note.

1          So the next one is for what I gather is your outgoing

2    local counsel.

3          MR. DESPINS:  Correct.

4          THE COURT:  And so am I then -- would I be correct in

5    understanding that the absence of a discount is a negotiated

6    matter there as well in relation to --

7          MR. DESPINS:  Because you'll see the hourly rates are

8    -- you know, put us to shame really.  So that's why there's no

9    discount at that level.

10         THE COURT:  And may I also assume that there is a

11   budget of projected fees or some mechanism for making sure

12   that there's a smooth, nonduplicative transition in that fee,

13   that there will be a first and final fee application?

14         MR. DESPINS:  That's correct.  The O'Neill firm will

15   file a first and final application soon.

16         THE COURT:  And the ten-day payment provision is

17   something also that was specifically negotiated that seems

18   unusually rapid in my experience.

19         MR. DESPINS:  Your Honor, that -- again, the

20   committee would have discussed fees of counsel, would have

21   excluded us from those discussions, so I don't know if they

22   focused on that particular item.  So I cannot make a

23   representation on that.

24         THE COURT:  But you're not expecting this is going to

25   be an enormous bill.

1          And Mr. Bienenstock, is there any expectation that a

2    ten-day payment window would present a problem?  There's a

3    microphone near you, Mr. Bienenstock, if you wish to answer.

4          MR. BIENENSTOCK:  Your Honor, for the Title III fees,

5    the question really needs to be posed to the Commonwealth and

6    perhaps the other debtors, because we don't control that.

7          What we were told by the Government is that if we

8    have a court order, it facilitates actual payment in a

9    relatively prompt fashion, but without a court order, it might

10   not be so prompt.  But the Commonwealth may want to speak to

11   this.  We don't control those payments.

12         THE COURT:  All right.  Ms. Uhland.

13         MS. UHLAND:  Yes.  That's correct, Your Honor.  If

14   there is a court order, I think two weeks would be an

15   appropriate amount of time to be able to make a payment.

16         THE COURT:  So 14 days?

17         MS. UHLAND:  Yes.

18         THE COURT:  Mr. Despins.

19         MR. DESPINS:  That's fine.

20         THE COURT:  All right.  I will change that payment

21   provision to 14 days.

22         Thank you, Ms. Uhland and Mr. Bienenstock.

23         And so based on the representations here, I will

24   approve the proposed order with that change to 14 days.

25         Now, Zolfo Cooper is the same issue that I raised

1   with respect to Paul Hastings.  And so will you give me some

2   background and the contextual -- sort of the contextual

3   representations as to them?

4           MR. DESPINS:  I think we were first to the extent

5   that Paul Hastings' retention was discussed first, again

6   outside of our presence.  And I think that the understanding

7   was that Zolfo Cooper would mirror in terms of compensation,

8   what we agreed to in terms of the discount, how it works, et

9   cetera, et cetera.  It's supposed to be a mirror image.  If

10  it's not, then we didn't do it right.

11          MS. KARDOS:  Good morning, Your Honor.  This is

12  Elizabeth Kardos from Zolfo Cooper, and I just wanted to

13  confirm Mr. Despins' statement.

14          THE COURT:  Thank you.  Out of curiosity, from where

15  are you speaking?

16          MS. KARDOS:  I'm speaking from New Jersey.

17          THE COURT:  And so I thought that all of the Court

18  Solutions lines were listen only lines.  That's why I am

19  surprised.

20          MS. KARDOS:  Oh, I apologize, Your Honor.  No.  There

21  are a few of us that are live lines according to the website,

22  but I can certainly mute the line as it was muted before.

23          THE COURT:  Well, we're logging into the website now.

24  This is a fortuitous event.  Thank you for making that

25  confirmation.  Those of you who have live lines will soon find

1  yourselves with listen only lines.  So good morning, and

2  listen well.

3          MS. KARDOS:  Thank you.  Good morning.

4          THE COURT:  All right.  Thank you.

5          All right.  Based on Mr. Despins' representations and

6  the representations of counsel for Zolfo as to the history and

7  negotiation of this provision, I will approve the Order as

8  submitted.

9          MR. DESPINS:  Thank you, Your Honor.

10         THE COURT:  The next one is the retirees committee

11 application to retain Jenner & Block.

12         And so is there a representative of Jenner & Block?

13         MR. GORDON:  Good morning, Your Honor.  Robert Gordon

14 on behalf of Jenner & Block.

15         THE COURT:  Good morning, Mr. Gordon.  I will start

16 with you in substantially the same place that I started with

17 Mr. Despins.  My understanding of the typical market rate

18 discount is 20 percent.  You are proposing 15.  And it also

19 isn't clear whether you are -- the basis on which you intend

20 to bill.  So would you please give me some context and

21 clarification?

22         MR. GORDON:  Certainly, Your Honor.  As to the first

23 point, all I can say as far as -- your understanding is

24 certainly your understanding.  I can tell you that my

25 experience from the Detroit bankruptcy case was that 15

1    percent was the agreed upon discount that was given by the

2    retirement systems professionals and several other

3    professionals.

4           I believe the 15 percent was also in, if I'm not

5    mistaken, one of the applications.  I don't know if it was on

6    behalf of the professionals for AAFAF or for the Board.  And

7    forgive me, it's been a while since I looked at this.  I did

8    not know this issue was going to come up.  But we saw that 15

9    percent, and we mimicked that 15 percent.

10          So I've seen 15 percent in some of the other

11   applications here.  The 15 percent, the way we've structured

12   it, I would suggest, is fairly simplified.  It would be 15

13   percent off of whatever the allowed fees are.

14          So if we submit a bill for a hundred dollars and the

15   Court approves the hundred dollars, we would expect that we

16   would be -- we don't know what the interim compensation

17   proceedings would be.  We haven't had discussions about how

18   that would work with the holdback, but otherwise we'd assume

19   we're going to be paid 85 dollars out of the hundred

20   dollars.

21          THE COURT:  On an interim basis or at the end of the

22   day?

23          MR. GORDON:  Well, we haven't had a discussion about

24   it.  When we filed the application, there wasn't even an

25   interim procedure proposed.

1    THE COURT:  But there is one proposed now.  So in

2  your more informed state, what is your expectation?

3    MR. GORDON:  I would suggest that if the holdback

4  that is ultimately approved by the Court as part of the

5  interim compensation procedures is greater than the 15 percent

6  that we are suggesting we would write off, then the holdback

7  should cover any issue there.

8    If the holdback is, say, ten percent, and we are

9  suggesting that we're going to only seek 15 -- only 85 percent

10  of our fees ultimately, then a holdback of 15 percent would be

11  acceptable to us I think under that circumstance.  So that's

12  consistent with whatever we ultimately expect to receive in

13  the case.

14    THE COURT:  And so the interim bill that you render

15  would be rendered at the non-discounted rates with the

16  representation that you would not actually be paid more than

17  85 percent of the non-discounted rate?

18    MR. GORDON:  That's correct, Your Honor.

19    THE COURT:  And are you -- with respect to holdbacks,

20  is it your understanding that Detroit was done on that basis

21  and these others have been done on that basis?

22    MR. GORDON:  No.  In -- I don't -- I apologize.  I

23  don't recall exactly how it was done in the Detroit case,

24  whether the holdback and the reduction were both taken on an

25  interim basis.  I don't believe they were.  I believe that

1   the -- it was simply the holdback.  And at the end of the

2   case, the total fees that were allowed were examined to

3   determine whether -- what would be owed from that holdback,

4   without exceeding -- without undermining the discount that was

5   supposed to be given, if that makes sense.

6          THE COURT:  Well, with this explanation and your

7   representations, and subject to work on the Compensation

8   Procedures Motion, I will approve the application.

9          MR. GORDON:  Thank you, Your Honor.

10         THE COURT:  Thank you.  And so now I have before me

11  the Segal Consulting application that is -- am I correct in

12  understanding that Segal is not proposing to discount the

13  rates, and that the committee has determined that that is

14  appropriate and reasonable compensation at the rates that are

15  stated?

16         MR. GORDON:  That's correct, Your Honor.  Again, I

17  don't know what other people's general experiences have been.

18  Our general experience has been that the discount has been

19  sought primarily with respect to the law firms.  I don't know

20  why.  Maybe there's a general animus against lawyers that I

21  haven't heard about before.

22         THE COURT:  I've never heard of any animus toward

23  lawyers of anyone in America.

24         MR. GORDON:  Then we must be moving in the same

25  circles.

```
 1              And similarly, whatever that animus might be, it
 2    doesn't seem to apply as to what I'll refer to as, for lack of
 3    a better term, as the ancillary professionals.  So, you know,
 4    their fee structure is different to begin with, and their role
 5    might be slightly more limited.
 6              So I think as a general matter, the request for a
 7    discount from a party providing the kind of services that
 8    Segal is providing is not requested or sought, and it was not
 9    requested or sought by the committee in this case.
10              THE COURT:  And the committee made an affirmative
11    determination that the compensation arrangements were
12    appropriate and reasonable?
13              MR. GORDON:  Yes, Your Honor.  All of these
14    applications that have been filed on behalf of the committee
15    were fully reviewed and vetted by the committee and approved.
16    And in particular, approved by the chairperson.
17              THE COURT:  I notice that this application provides
18    for billing in quarter hour increments as opposed to tenth of
19    an hour increments, which is certainly the standard for
20    lawyers, and I think even for other financial advisors.  And
21    of course the concern is about the short telephone call
22    turning into 15 minutes of time, as opposed to six or
23    something.  So would you speak to me about that?
24              MR. GORDON:  Certainly.  Because of the entity we're
25    speaking of, they have, I would say, perhaps more clients that
```

 1    are not necessarily of the type that all the construction

 2    professionals in this room necessarily deal with who expect

 3    billing intensive hours, so they often bill on a regular basis

 4    in quarter hour increments.

 5         They can -- I'm not going to say it's impossible for

 6    them to bill intensive hours, but they can.  It's not easy.

 7    It's difficult for them.  We'd be more than happy to have that

 8    conversation with the U.S. Trustee's office, if it was of

 9    concern to them.

10         I will tell you that I've not heard that concern from

11    them, but if they had that concern, we're more than happy to

12    address it.  If it's the Court's concern, of course, we're

13    happy to address that as well.  But my understanding is they

14    can do it.  It's difficult.  It's not the normal methodology

15    internally for that firm.

16         THE COURT:  Well, it is the Court's concern, and so I

17    will hold this under advisement pending further information

18    from you as to whether they are willing to amend the

19    application to provide for tenths of an hour.

20         MR. GORDON:  Very well, Your Honor.  Thank you.

21         THE COURT:  Thank you.

22         And the next is the application regarding local

23    counsel.  And would you -- I mean, it's an undiscounted

24    structure?  Make your representations about how it came to be

25    and reasons for those determinations, please.

1          MR. GORDON:  As Mr. Despins indicated with respect to

2     his local counsel, the same considerations apply to our

3     co-counsel.  You know, their rates are substantially less than

4     the rates of Jenner & Block.  And it didn't seem that it was

5     necessary or appropriate to ask them to further discount their

6     rates for this matter.

7          They are going to be devoting significant resources

8     to this matter.  And as a result, to ask them to take a

9     discount off of their fees that are reasonable and appropriate

10    in this market seems to be inappropriate.

11         We discussed this with the committee.  The committee

12    has reviewed their application and was satisfied that the lack

13    of a discount was appropriate for the Bennazar firm.

14         THE COURT:  Thank you.  With that context, I will

15    approve and enter the application as submitted for the

16    Bennazar firm.

17         MR. GORDON:  Thank you, Your Honor.

18         THE COURT:  Thank you.  And number eight is the

19    application of the UCC to obtain Prime Clerk and the

20    information procedures.  There have been no objections, and

21    the Court has reviewed the Order and will enter the Order as

22    submitted.

23         MR. DESPINS:  Your Honor, if I can just thank you for

24    entering the Order, but I just want to say on the record --

25         THE COURT:  That's Mr. Despins, for anyone who can't

```
 1   see.
 2        MR. DESPINS:  I'm sorry.  Luc Despins for Paul
 3   Hastings, counsel for the creditors committee.  I just want to
 4   read for the record, because there's a lot of press out there,
 5   the new e-mail.  So it's www.prcreditorscommittee.com for the
 6   English version.  And in Spanish, I'll try my best,
 7   www.deacreedoresdepr.com.  That's spelled
 8   D-e-a-c-r-e-e-d-o-r-e-s-d-e-p-r.com.  That website should go
 9   live sometime this afternoon.
10        Thank you, Your Honor.
11        THE COURT:  Thank you.
12        MS. UHLAND:  Your Honor, excuse me.
13        THE COURT:  Ms. Uhland, yes.
14        MS. UHLAND:  Suzanne Uhland on behalf of AAFAF.  I
15   just received a message from my client.  They would actually
16   like four weeks to make the payment instead of two weeks upon
17   the Order, if that's acceptable.
18        THE COURT:  Mr. Despins, I think this was in your
19   portfolio.
20        MR. DESPINS:  It's really on the retirement
21   committee.
22        THE COURT:  Oh, I'm sorry.
23        MR. DESPINS:  I'm kidding.
24        THE COURT:  Not fair to confuse me on this.
25        MR. DESPINS:  So I guess it will be four weeks.
```

```
 1              THE COURT:  So 28 days.

 2              MS. UHLAND:  Yes, Your Honor.

 3              THE COURT:  We will provide for 28 days.

 4              MS. UHLAND:  Thank you, Your Honor.

 5              THE COURT:  And so the next is the motion of the

 6    debtor to amend the Case Management Order.

 7              Mr. Friedman.

 8              MR. FRIEDMAN:  Yes, Your Honor.  Peter Friedman of

 9    O'Melveny & Myers on behalf of AAFAF.  The Oversight Board has

10    asked us to be responsible for this, given that the

11    Commonwealth -- Ms. Burgos, who was here yesterday, is

12    generally responsible for dealing with stay matters.

13              No objection was received on the motion.  The purpose

14    of dealing with the case management motion is to deal with

15    automatic stay matters.  And in order to provide the

16    Commonwealth the opportunity to work with creditors before

17    having the motion filed, having the Court set a response date,

18    which are often relatively quick because of the statutory

19    obligation to have the motion heard, would be to have parties

20    essentially in the 15 day meet and confer period so the

21    parties can discuss.

22              AAFAF and the Commonwealth were trying to figure out

23    a threshold, some financial issues that may also work so there

24    can be quick decisions once parties reach out to the

25    Commonwealth with respect to a Lift Stay Motion.
```

 1          Nothing in the motion -- in the case management

 2    amendments are designed to prevent people who have an urgent,

 3    truly urgent relief from seeking that relief.  But the goal

 4    is, again, to create a meet and confer process which will

 5    hopefully alleviate both motion practice and responsibility of

 6    this Court, to the extent we can work cooperatively with

 7    people to resolve the motions.

 8          THE COURT:  Well, I have reviewed the proposed

 9    amendment as well, and I think it is a healthy and

10    constructive one.  And so I will incorporate that amendment

11    into an amended Case Management Order.  And I thank you for

12    your work in putting that together.

13          It is very important for there to be a process and an

14    opportunity to consult on these matters.  And I'll also be

15    grateful for any reduction in my Lift Stay applications that

16    result from this, so --

17          MR. FRIEDMAN:  Thank you, Your Honor.

18          THE COURT:  Thank you.  And so I -- I'm sorry.

19          MR. FRIEDMAN:  Your Honor, I believe Nathan Haynes of

20    Greenberg Traurig who represents AAFAF in the PREPA case

21    wanted to request or note that the request, that this applies

22    to the PREPA case as well.

23          THE COURT:  Yes.

24          MR. FRIEDMAN:  Thank you, Your Honor.

25          THE COURT:  And so I think we have -- is there

 1   provision in anything that I've already entered that would

 2   apply the Case Management Order for the jointly administered

 3   cases in its various incarnations in PREPA?

 4          MR. HAYNES:  Your Honor, Nathan Haynes, Greenberg

 5   Traurig for AAFAF, as fiscal agent for the Puerto Rico

 6   Electric Power Authority.  The answer to that is yes.  It's in

 7   the initial CMO that the Court has entered in the

 8   Commonwealth.

 9          THE COURT:  I thought this was to the extent that I

10   amend the Commonwealth case, the jointly administered case,

11   CMO, then it will automatically apply to PREPA.

12          MR. HAYNES:  That is correct, Your Honor, although

13   I'll say that PREPA is considering filing a motion with the

14   informed copy of the case management reports to make it clear

15   that it applies in our case.

16          So it would be the same order, just with PREPA

17   substituting for the Commonwealth, so it's clear to the people

18   in our case they don't need to go to the Commonwealth case to

19   look at the CMO.

20          THE COURT:  Clarity is always a good thing.  And if

21   you -- you can do it that way.  If you would like us to have

22   the captioned order entered, we can include both captions on

23   the order and enter it into 3283 and 4780.  That would --

24   anyway, these are mechanics that we can work out.

25          MR. HAYNES:  Very well, Your Honor.

```
1              THE COURT:  But it's fine.

2              MR. HAYNES:  Your Honor, turning your attention to

3    items ten and 11 --

4              THE COURT:  Before we get there, I would like to

5    speak to the amendments that the Court had proposed to the

6    case management procedures.

7              I have had no objections to the proposed change for

8    the September date, nor to the nine dates in total that I have

9    proposed so that we have dates going out into July.  And so,

10   therefore, I intend to incorporate those dates into the next

11   iteration of the case management procedures.

12             I had also proposed to amend the case management

13   procedures to include specific provisions requiring compliance

14   with Rule 2019, which had begun to happen organically around

15   the same time, but I want to have that clear in the Case

16   Management Order.

17             There was a response from the UCC by way of an

18   informative motion seeking a very detailed refinement of

19   requirements in that regard that go, to an extent, in the

20   Court's view, beyond 2019.  The Court declines to require the

21   full scope of additions to disclosures that were suggested by

22   the UCC.  However, the Court does believe that and agrees with

23   the UCC that compliance with 2019 requires disclosure of all

24   economic interest with respect to each debtor in whose Title

25   III case the group committee and/or entity has taken a
```

1   position, including interests in derivatives, and that the

2   disclosure must also include the existence and amount of any

3   bond insurance or other credit protection, including such

4   protection by a monoline insurer.

5        And so I will incorporate these changes into the

6   amendment to the Case Management Order.  Among other things, I

7   will not require CUSIP numbers.

8        Finally, in light of the growing number and

9   complexity of these cases, and to ensure that the Court has

10  sufficient preparation time for Omnis, I intend to amend the

11  case management procedures further to provide, in effect, that

12  all briefing in connection with matters scheduled for an

13  Omnibus hearing must be completed a week prior to the hearing.

14       So specifically, the amendment will move the

15  initiation date for pleadings back to 22 calendar days before

16  the hearing date.  Objections will be due 15 calendar days

17  before the hearing date, except that debtors and statutory

18  committees' objections are due 14 days prior to the hearing

19  date.

20       Replies are generally due eight days prior to the

21  hearing date, but the deadline for the debtors and any

22  statutory committees will be seven days prior to the hearing

23  date.  So these changes will be rolled up into the restated, I

24  think, third amended Case Management Order.  Thank you.

25       MR. HAYNES:  Again, Your Honor, Nathan Haynes,

1    Greenberg Traurig for AAFAF as fiscal agent for PREPA.  Your

2    Honor, items nine -- or rather ten and 11 of the agenda I will

3    take together, which are the notice motion for agenda credit

4    matrix motion.

5         The orders proposed here are somewhat if not

6    identical to those entered by the committee in the

7    Commonwealth case, and take into account the issue that Your

8    Honor had raised at the first hearing in those cases.

9         One thing I did want to specifically note, Your

10   Honor, is that PREPA has some million customers.  And as part

11   of the ordinary course of business, these customers post

12   deposits for both residential and commercial use.

13        These customers are entitled to receive the balance

14   of the deposit when they cease electric service.  As a

15   practical matter, most of them set it off in their last bill,

16   but in no uncertain circumstances, PREPA does pay out deposits

17   back to customers terminating services.

18        Your Honor, PREPA intends to continue to honor the

19   system in the ordinary course, and PREPA does not view these

20   customers as being creditors for purposes of the deposits in

21   these proceedings.  So we do not intend to have to include

22   them in the creditors matrix or provide them with full on

23   notifications of the case.

24        What we do have to do is in the bill, there's a

25   little area where we'll put some language directing the

1   customers to go to the -- notifying them of the case, saying

2   service is not going to be interrupted.  It directs them to

3   the Epiq website.  And the Epiq website also has a customer

4   FAQ section both in English and Spanish and provides a service

5   number.

6           THE COURT:  Can you speak just slightly slower?

7           MR. HAYNES:  Sorry.  It provides a service number

8   that they can call, and it's staffed by bilingual staffers, so

9   the customers do have ability to find information about the

10  case.

11          But we thought it would be confusing to send a

12  million customers notice of this case when we're not treating

13  them as creditors for purposes of their deposits.

14          THE COURT:  I appreciate that fuller explanation.  I

15  had gathered that that was the general flavor of the proposal,

16  but I did have a couple of concerns that I wanted to raise

17  with you.

18          First, if many of your customers are like me, they

19  don't read the fine print things that are in their monthly

20  bills.  And so I would be comforted, have more confidence if

21  there were a legend printed on the outside of the bill with

22  the notice in it that says, this includes important legal

23  information about PREPA's PROMESA filing, something to that

24  effect.

25          And then also that within the bill, if you are

1   planning to just print it as a run-on to one of the pages in

2   the bill, or if it looks like privacy statements or the other

3   things that we tend not to read, to have some larger type,

4   bold-faced legend pointing to that language on the paper with

5   the language saying, this is the important legal notice.  That

6   seems to me better calculated to get the attention of the

7   customer.

8           So I have three issues.  So that's one.  The second

9   one is that if there are customers on E-billing or auto pay,

10  what are you planning to do?  And if it involves an e-mail, it

11  seems to me that the subject line of that e-mail ought to say,

12  this includes important legal information, and it's one that

13  you should open and read, something to that effect.

14          And then the third issue is that as you may know, I

15  think we've reached out to counsel a bit about this, after the

16  issuance of the joint administration case notice, there has

17  been some confusion among the populous and some distress about

18  how and when to file proofs of claim and whether the notice

19  that went out was -- started an automatic clock for the filing

20  of proofs of claim.  And so it seemed to me that we have an

21  opportunity here not to compound that problem with this

22  notice.

23          And what I suggest is that right after the reference

24  to the Court website and before the purpose of the Title III

25  case section, we add a section that says -- that's headed

1    something like, proofs of claim do not need to be filed now.

2    And then says, underneath in bold, this notice does not

3    establish any deadline to file a proof of claim.  Notice of

4    the deadline and instructions to file a proof of claim will be

5    sent to known creditors at a later date.  That date will be

6    set pursuant to a court order.  And hope that that calms down

7    some of the panic and gives people a sense of when they would

8    be called upon to do something.

9         And I lied, there was one small fourth thing, which

10   is that the paragraph, which is the second to last paragraph

11   of your proposed order, talking about the limiting of further

12   notice, I think just said in your original version, limit

13   notice, which didn't immediately mean something to me.  And so

14   I think it might be clearer if you captioned that limited

15   future notices, and I think that might be somewhat clearer

16   disclosure.

17        MR. HAYNES:  All right.  Your Honor, with four, we'll

18   make that change.  I'll address one and three together.

19        THE COURT:  Yes.

20        MR. HAYNES:  I don't think we'll be able to fit all

21   that in the space that we have.  And I'm not sure about the

22   legend on the envelope.  I can check on that.  If it's

23   possible, we'll do that.

24        My suggestion is as follows:  We do have the ability

25   to put in a whole separate sheet to the bill.  So why don't

1    we, if I can speak to the operational people, we can put

2    something together, make sure that that can work.  And we'll

3    pull it out of the little notice line, and we'll put it in its

4    own separate sheet and stuff it with a bill.

5           I don't know if we'll be able to as a --

6           THE COURT:  And will you try to make some sort of

7    bold-faced heading on a separate sheet?

8           MR. HAYNES:  Yes.  Yes.  We'll make it appropriately

9    large.  And we can frankly submit it to Your Honor for

10   approval in connection with the revised or proposed order that

11   we'll submit.

12          THE COURT:  Great.

13          MR. HAYNES:  As far as the E-billing, I will check on

14   that.  We will do the necessary to make sure that it's

15   appropriately indicated.  And we can advise the Court

16   separately as to how we're going to resolve that once we speak

17   with the operational folks.

18          THE COURT:  That's fine.  So you'd include that

19   information in a proposed revision as well.  And so if there's

20   any difference in a protocol between E-billing and people who

21   have automatic payments set up, you'll think about that and

22   let me know.

23          MR. HAYNES:  Very well.  And, Your Honor, just as an

24   operational matter, I mean, there's a million things to do

25   here literally.  So we had intended to send this out with the

1    September bill, which I am cautiously optimistic we can do

2    that, but it may slip to the October date.  I just wanted to

3    advise the Court.

4              THE COURT:  Thank you for giving me the head's up on

5    that.  That seems to be a reasonable time frame considering

6    everything else that's going on.  And so will you present a

7    revised version of this on five days notice?

8              MR. HAYNES:  That's correct.

9              THE COURT:  Very good.  Thank you.

10             Just one second.  All right.  Number 11.

11             MR. HAYNES:  Your Honor, I don't want to throw off

12   your agenda, but 11 is actually the creditors matrix motion

13   that I addressed simultaneously with that last one.

14             Do you have additional questions on that?

15             THE COURT:  I didn't realize you addressed it

16   simultaneously.  You did give me a separate proposed order,

17   so --

18             MR. HAYNES:  That's correct.

19             THE COURT:  -- I approve the unopposed creditor

20   matrix motion and proposed order, and I will enter that.

21             MR. HAYNES:  Thank you, Your Honor.  Your Honor, I do

22   not have item 12, but I have item 13.  I'm happy to sit down

23   and pop up again.  I don't want to throw off your pace.

24             THE COURT:  No.  We can do item 13.

25             MR. HAYNES:  Item 13 is the application seeking to

 1   approve Epiq Solutions.  The form of order is consistent with

 2   the Prime Clerk Order that's been proposed in the Commonwealth

 3   cases, and also addresses the concerns that Your Honor raised

 4   at the first day hearing in connection with the Prime Clerk

 5   basis with respect to retention.

 6        Your Honor had asked for an explanation as to why we

 7   needed a separate claims agent for this case.  I submitted an

 8   affidavit of me explaining that.  I'm happy to respond to any

 9   further questions you may have in that regard.

10        THE COURT:  I've read the affidavit, and that was

11   sufficiently informative.  I have a couple other questions.

12        MR. HAYNES:  Very well.  Ms. McGinnis is in the

13   courtroom as well, and she can assist with response.

14        THE COURT:  Very well.  So Ms. McGinnis will need to

15   come up to the podium so she can use the microphone, but let

16   me throw the questions out first.

17        One is that in my experience with the website, I have

18   not found links for the adversary proceedings, unlike the

19   Prime Clerk website, which provides dockets for adversaries.

20   And so will that be fixed or added promptly, or is this not a

21   utility that's intended to provide information about the

22   adversaries?

23        MR. HAYNES:  It is intended to provide information.

24   I think we just got our first adversary in, and we will update

25   the website accordingly.

```
 1              THE COURT:  I think you have two and counting.

 2              MR. HAYNES:  Three, actually.  All recent.

 3              THE COURT:  That's true.  It is three.  Every day our

 4     landscape changes.  So, and then will you just -- I guess I'd

 5     just like your brief reassurance that your protocols are in

 6     place to avoid overlapping or duplication with Prime Clerk in

 7     the areas in which the practical administration, you know, may

 8     come close.

 9              MR. HAYNES:  Assured, Your Honor, that Prime Clerk

10     does not have a role in the PREPA cases at this time.  And to

11     the extent they do, we would be back before Your Honor to

12     explain any expansion in that regard.  Epiq is running the

13     whole show from the claims noticing and solicitation

14     perspective in the PREPA case.

15              THE COURT:  Thank you.  So with that explanation and

16     undertaking, I will enter the order as proposed.

17              MR. HAYNES:  Thank you, Your Honor.

18              THE COURT:  Thank you.  So now we're going back to

19     number 12.

20              MR. THEODORIDIS:  Good morning, Your Honor.  My name

21     is Chris Theodoridis with Proskauer Rose on behalf of the

22     Oversight Board.

23              THE COURT:  Good morning, Mr. Theodoridis.

24              MR. THEODORIDIS:  I'll address number 12 of the

25     agenda.  This is the motion of the debtors to extend the
```

1    deadline to assume and/or reject real property leases.  This

2    is on behalf of the Commonwealth, COFINA, HTA and debtors.

3            As Your Honor knows, under the Bankruptcy Code you

4    get 120 days automatically to make the decision.  And the

5    debtors can request a 90-day extension for cause, which we've

6    laid out in our papers.

7            These are very complex Title III cases under a novel

8    statute.  The debtors have thousands of these leases to

9    analyze in order to make their proper decision.  The debtors

10   simply need more time.  There haven't been any objections to

11   this motion.  It's uncontested.

12           There was one reservation of rights filed by the QTCB

13   noteholder group, but they didn't object to the relief we're

14   seeking.  So we would ask you enter the Order as proposed in

15   our motion.

16           THE COURT:  The motion is granted and the Order as

17   proposed will be entered.

18           MR. THEODORIDIS:  Okay.  Thank you.

19           THE COURT:  Thank you.

20           MR. FRIEDMAN:  Good morning, Your Honor.  Peter

21   Friedman from O'Melveny & Myers on behalf of AAFAF with

22   respect to agenda item 14, which is the notice of presentment

23   with respect to the utilities order.

24           THE COURT:  Yes.

25           MR. FRIEDMAN:  As you may recall, Your Honor, there

 1   was a motion that was originally heard at the last Omnibus,

 2   and the Court granted the motion on the recommended hearing

 3   subject to certain revisions with respect to the deadline for

 4   request for additional adequate assurance.

 5        The revised proposed Order was filed on July 17.

 6   Certain monolines filed an objection to the proposed Order.

 7   That was resolved.  And on August 4th, a further revised

 8   proposed Order was made -- was presented.  The deadline to

 9   object to those changes is actually tomorrow at 5:00, but

10   Stericycle of Puerto Rico has filed an objection already.

11        Our view is the objection is improper in that it does

12   not address any change in the revised proposed Order, but

13   actually seeks to enter a new term with respect to adequate

14   assurance.  It seeks to add a 30-day payment provision as a

15   form of adequate protection, which is well outside the scope

16   of the revised -- the revisions made.

17        It also frankly doesn't make sense.  Different

18   parties have different contract terms.  To put in a 30-day,

19   one-size-fits-all provision for adequate protection, there's

20   no basis to do that.

21        That said, AAFAF is working with Stericycle to the

22   extent there is some unpaid bill.  Obviously, the extent that

23   AAFAF doesn't meet the terms of the contract, there are

24   provisions set forth for what people's adequate protection is.

25   It's an administrative claim.  If somebody wants to file a

```
 1   motion to get their administrative claim paid, they can do

 2   that.

 3          So it's our view that the objection that's before the

 4   Court are to be overruled.  And hopefully pending no further

 5   objections by the five o'clock deadline tomorrow, we would

 6   hope that the Order now, you know, a month or six weeks past

 7   the June 28 hearing and two months into the case, we'd be able

 8   to get it entered.

 9          So nothing further about that, unless you have any

10   questions about the modification.

11          THE COURT:  I don't have all the sign-ups.  Did

12   anyone from Stericycle file informative motions or is someone

13   here from Stericycle?  It looks like there's a gentleman

14   coming from the back of the courtroom.

15          MR. LINARES:  Good morning, Your Honor.  Yes.  The

16   situation --

17          THE COURT:  What is your name please, sir.

18          MR. LINARES:  I'm sorry.  I am Adrian Linares,

19   representing Stericycle.

20          THE COURT:  Hello, Mr. Linares.

21          MR. LINARES:  Good morning.  The position

22   specifically with Stericycle is that for some reason the

23   contract we have with the Commonwealth doesn't establish a

24   term for payment.  So what we are looking is to establish a

25   specific term so we can make effective the items that are
```

 1   proposed in the Order.

 2             THE COURT:  Mr. Friedman, is this something that

 3   AAFAF is willing to talk to Stericycle about with respect to

 4   its contract off-line or --

 5             MR. FRIEDMAN:  Absolutely, Your Honor.  Peter

 6   Friedman from O'Melveny Myers.  It's my understanding these

 7   discussions are ongoing, and it's a matter AAFAF will seek to

 8   consensually resolve; but we don't think it's appropriate in

 9   the context of holding up this Order that we do seek entry of

10   hopefully, unless someone files objections tomorrow.

11             We understand Stericycle reserves its right to

12   determine whether the assurances received are adequate under

13   the procedures set forth in the motion; but again, AAFAF is

14   doing what you suggested, which is discussing with Stericycle

15   how to deal with their issue.

16             THE COURT:  And so, Mr. Linares, since AAFAF is going

17   to work with your client to get a mutually acceptable routine,

18   it does seem to be inappropriate to try to impose something

19   across the board.

20             And so given the undertaking and representation by

21   Mr. Friedman, is that satisfactory to you?

22             MR. LINARES:  Yes.  The situation is, I understand

23   that different creditors have different contracts and

24   different terms, but I believe it is not incompatible to state

25   in the Order that when no term is established, a term of 30

48

1    days should be -- can be established as an alternative.

2           THE COURT:  Well, since no one else has raised that

3    objection at this point, and the Order provides that if an

4    entity has an issue, the entity can come forward and raise it,

5    I don't see a need to create a gap-filling mechanism that may

6    or may not be inconsistent with the standard practices that

7    have been working.

8           And so I will overrule this objection, but in the

9    context of AAFAF's agreement that it will work out something

10   that works for your client.

11          MR. LINARES:  Thank you, Your Honor.

12          THE COURT:  Thank you very much, Mr. Linares.

13          Just one second.  All right.  Item 15, the PREPA

14   utilities function.  Mr. Haynes.

15          MR. HAYNES:  Good morning.  Nathan Haynes for AAFAF

16   and as fiscal agent for PREPA.

17          Your Honor, this motion is essentially identical to

18   the motion filed by Mr. Friedman in the Commonwealth case.  We

19   are in something of a procedurally different posture in that

20   this is the first time this motion is up, so the Order is

21   actually before Your Honor for entry today, although we made

22   similar revisions to the Order to address the limited

23   objection that was filed.

24          Unless Your Honor has any questions, I did just want

25   to also note for the record that the PRASA, the Aqueduct and

1    Sewer Authority, is represented by separate counsel in

2    connection with any utility dispute it may have with PREPA.

3            THE COURT:  So I have read the proposed Order as

4    filed on August 4th.  That would be the updated version.

5            MR. HAYNES:  That's correct.

6            THE COURT:  It's docket entry number 171.  And I will

7    enter that unopposed proposed updated Order.

8            MR. HAYNES:  Thank you, Your Honor.

9            THE COURT:  Thank you.

10           MS. UHLAND:  Good morning again, Your Honor.

11           THE COURT:  Good morning.

12           MS. UHLAND:  Suzanne Uhland of O'Melveny Myers on

13   behalf of AAFAF as fiscal agent for HTA.

14           THE COURT:  Good morning, Ms. Uhland.

15           MR. RIVERA RIOS:  Good morning, Your Honor and

16   everybody in the courtroom.  For the record, Victor Rivera

17   Rios on behalf of South Parcel.

18           THE COURT:  Thank you.  It's Mr. Rivera Rios?

19           MR. RIVERA RIOS:  Rivera Rios.

20           THE COURT:  Good morning.

21           MR. RIVERA RIOS:  Good morning.

22           MS. UHLAND:  So Your Honor, we're pleased to report

23   we've reached a settlement of this matter under which HTA will

24   catch up the missed payments and continue to make payments

25   under the parties' settlement agreement approved by a

1    confirmation reserving certain rights to treatment under the

2    plan.  And of course, South Parcel reserving their rights as

3    to treatment under the plan and dischargeability.

4         And with that settlement arrangement and our

5    agreement to recommence and catch-up payments, our

6    understanding is that South Parcel will withdraw its motion.

7         MR. RIVERA RIOS:  That is correct, Your Honor.  South

8    Parcel has agreed that they will withdraw the motion that they

9    filed before this Court without prejudice obviously.  We

10   reserve the issues that were raised in that motion, to raise

11   them again at a future date at the --

12        THE COURT:  You have to speak closer to the

13   microphone.  Nobody is hearing you.

14        So would you say that again into the microphone?

15        MR. RIVERA RIOS:  Where was I --

16        THE COURT:  Actually, would you just repeat the last

17   --

18        MR. RIVERA RIOS:  I'll repeat.  Okay.

19        THE COURT:  Thank you.

20        MR. RIVERA RIOS:  South Parcel has agreed that they

21   will withdraw the motion that they filed before this Court

22   without prejudice.  The issues that were raised in that

23   motion, we reserve the right to raise those issues again at a

24   later date.

25        We understand obviously HTA is also reserving the

 1   right to raise the issues objecting to our position, so we

 2   understand that.  If anything happens in the future, it will

 3   be discussed before this Court.

 4           THE COURT:  Thank you.  And so mechanically, will you

 5   then file an informative motion withdrawing that motion?

 6           MR. RIVERA RIOS:  I can very well file that motion,

 7   if necessary.  I was wondering if I could just withdraw it

 8   right here verbally, but I will file it if it's necessary for

 9   this Court.

10           THE COURT:  Well, let me consult with the Deputy who

11   is the expert on the docketing.

12           And so I have been told that we can reflect this in

13   the minutes of the proceedings, and on that basis, the Clerk's

14   office will administratively note the withdrawal of the

15   motion.  So it won't be necessary for you to file the

16   informative motion.

17           MR. RIVERA RIOS:  All right.  Thank you very much,

18   Your Honor.

19           THE COURT:  Thank you.

20           MS. UHLAND:  Thank you, Your Honor.

21           THE COURT:  Thank you, Ms. Uhland and thank you,

22   Ms. Tacoronte.

23           And so as to adjourned matters, we discussed the HTA

24   matters at the outset.  And then as to the Rule 2004 motion,

25   that has been adjourned as noted in the most recent version of

1    the agenda.

2         A hearing will be held in Boston before Judge Dein,

3    and observation by video will be made available here in San

4    Juan.  And audio observation will be made available through

5    the Court Solutions telephone portal for lawyers who have

6    appeared in the case.  And Judge Dein will be entering an

7    Order shortly that specifies the date and all of the other

8    details.

9         MR. BIENENSTOCK:  Thank you, Your Honor.

10        THE COURT:  Thank you.

11        MR. BIENENSTOCK:  If it's okay, I think we can move

12   on to the first contested matter, which is number five.

13        THE COURT:  Yes.  And so the agenda had allocated 20

14   minutes for this.  And now I can use my little lights again.

15   So shall we do -- shall I set it up for ten and ten or what

16   should I expect?

17        MR. BIENENSTOCK:  It's fine with me.  I hope we don't

18   require use of them.

19        THE COURT:  All right.  So we'll set it for ten and

20   ten.  Please proceed.

21        MR. BIENENSTOCK:  Thank you, Your Honor.  I'd like to

22   explain the contextual background.  There are really two

23   things going on here.  One is we needed a procedure for

24   payment of interim fees.  The second is we were advised at the

25   outset by the United States Trustee that they do intend to

1   have a fee examiner, and we concur in that.

2           We were hoping to bring them on in the same motion,

3   but -- with the blessing of the U.S. Trustee's office, which

4   I've spoken to many times.  We've brought this for the interim

5   payment now because they needed a little more time on the fee

6   examiner and whatever arrangements would go along with that.

7           So I asked -- this is a relatively conventional

8   motion.  Your Honor mentioned earlier, made a comment about,

9   when I think Mr. Despins mentioned 90 percent, Your Honor said

10  that's what it says now.  And really I want to address that

11  part of it to explain what's behind this.

12          And that is something that I asked the U.S. Trustee's

13  office in Washington about at the outset, and they didn't have

14  a problem with it.  The reason we're asking for 90 percent,

15  and I think Your Honor has probably seen many cases where it's

16  payment of 80 percent, when we're talking fees, there's a

17  hundred percent payment of out-of-pocket disbursements.

18          THE COURT:  Yes.

19          MR. BIENENSTOCK:  Unlike, I guess, some of the

20  committee professionals, we, for instance, at Proskauer are

21  representing the Oversight Board both for itself and its

22  representative.  We didn't need to file a retention

23  application, but our retention agreement is a public matter.

24  It's on the Board's website.

25          We provided a very substantial discount in the form

1    of a fixed blended rate for all attorney hours, which is

2    roughly 750 plus or minus dollars per hour.  To give Your

3    Honor a sense of context, my rate, when I represent private

4    clients, Chapter 11 debtors or Chapter 11 statutory

5    committees, is 1,425 dollars.  So we're talking about a real

6    concession to the crisis, et cetera.

7         And the staffing of the matter has been very top

8    heavy in the sense that a lot of senior partners, many of whom

9    Your Honor has seen in various trials, et cetera, are senior

10   partners and not young associates.  So the blended rate has

11   the effect of a very significant steep discount.

12        To then multiply that by 80 percent really

13   exacerbates what is already a cash flow issue for us and other

14   firms that are supplying discounts.  And our -- we did not

15   provide, as did the creditors' committee, that if the fee

16   examiner or the Court deducts further fees, that it will come

17   out of what we've already given as opposed to what we agreed

18   to charge.

19        So we're really at an extreme low end, and that's why

20   we first asked the U.S. Trustee if it was okay with them.  And

21   we're now asking Your Honor to agree to the 90 percent payment

22   on a monthly basis.

23        The issue that's raised by the single objection is

24   that as in all of these interim fee procedure motions, there

25   are what people call the notice parties, who can object to the

 1   monthly invoices, and then only the non-objected to portion is

 2   paid.  And then everyone, all parties at interest, can object

 3   to the fee applications when they're filed every three or four

 4   months.

 5        So we've had one request for a notice party.  And

 6   Your Honor, we ask that that be overruled simply because their

 7   substantive rights are being preserved to object to all fees

 8   on every fee application, interim and final.  But it's

 9   impossible to allow one creditor to be a notice party and not

10   others who might raise their hand.

11        And even if it were only one in total, this is

12   frequently tactical.  It can create real problems in the time

13   it takes simply to deal with one party who wants to go through

14   a monthly invoice, and who has the power to stop all payment

15   by saying simply, I don't understand, I'm objecting.

16        So we ask that that type of objection and screening

17   by individual creditors be restricted to the actual fee

18   applications and not the monthly process.  And that was all I

19   had, unless Your Honor has questions.

20        THE COURT:  The question that I have for you is that

21   I now understand how it came to be proposed as 90/10 and how

22   that is appropriate in the context of Proskauer's approach.

23   And of course, Proskauer is the principal across -- well,

24   AAFAF has the same issue across all of the cases.

25        But am I correct in understanding that this is a

1  template for the handling of the committee counsel and service

2  provider applications as well?

3  MR. BIENENSTOCK:  It's all professionals who are paid

4  by the debtor under the Title III process.  And while Your

5  Honor might be suggesting that others who might have provided

6  lesser discount don't have the same need, we think they're all

7  good for the money, Your Honor.  These are professionals that

8  are well known to all of us, and we think there should be a

9  single rule that applies to all.

10  MR. DESPINS:  Your Honor, Luc Despins.  I've agreed

11  we've already stated we're going to go down to 80 because

12  that's the understanding of the committee, so we're not going

13  to get 90.  So we're happy to have a change for us.  We're not

14  happy, but we'll do it.

15  THE COURT:  Thank you.  I accept your acceptance of

16  my concern there.  Thank you very much for that.

17  So I guess there -- well, is there anyone else, does

18  anyone want to be heard further on the notice of party issue?

19  MR. WHITMORE:  Good morning, Your Honor.  Clark

20  Whitmore from Maslon, LLP on behalf of U.S. Bank National

21  Association as trustee under the Trust Agreement.

22  Your Honor, under the Trust Agreement, U.S. Bank

23  holds a pledge in all of the PREPA system revenues, and that

24  qualifies as pledged special revenues.  And from that context,

25  U.S. Bank reviewed this motion and had some special concerns

1   that it wants to raise with the Court.

2          In reviewing the motion, it's impossible to ascertain

3   who are the professionals who are going to be paid on an

4   interim basis by PREPA from presumably PREPA's revenues or

5   pledged special revenues.

6          And, for example, PREPA's professionals who performed

7   Title III work who are not obtained through approval of the

8   Court would be paid.  The Oversight Board's professionals

9   doing work related to Title -- to this Title III case would be

10  paid.

11         And then it goes on to say, just for clarification,

12  that all professionals are retained through the

13  instrumentalities of Puerto Rico, including AAFAF, who

14  performed work relating to PREPA's Title III case would be

15  paid.

16         So the concept is PREPA will be paying money out on

17  an ongoing basis with pledged special revenues.  And we're not

18  trying to stop the process of professionals getting paid, but

19  we do have concerns when we look at this motion, because we

20  can't tell how the services will be allocated among different

21  instrumentalities, who will be making those decisions.

22         And there are going to be disputes in this case about

23  PREPA's ongoing obligations under the Trust Agreement with

24  respect to current expenses.  And with this in mind and with

25  the idea that we're not trying to get in the way of an orderly

1   process for interim compensation, the Trustee filed the

2   reservation of rights asking to be included as a notice party

3   so that we could not object to everybody's fees, but we could

4   have a sense early in the case about what's going on.

5        We don't want to be in a position where we find out

6   at a hearing on December 30th that 25 million dollars of fees

7   is being allocated to PREPA and has already been paid out at

8   90 cents on the dollar.  I think that U.S. Bank and the

9   bondholders have a pledge on monies -- on PREPA's money.  And

10  so it would be entitled to have the notice about what fees are

11  purportedly PREPA expenses, and on a real, live basis so that

12  the issues and disputes can be brought to the Court's

13  attention early on, and we don't get into a situation where

14  lots of money has changed hands and it's difficult to undo it

15  down the road.

16       So A, we would like to be a notice party.  We think

17  it's fair, because we have a secured interest.  We're not just

18  another creditor.  And two, Section 710 of our Trust Agreement

19  specifically provides that PREPA will provide additional

20  information to the trustee upon request relating to the

21  operations of the system.

22       And so there's no flood gate arguments that if you're

23  going to give notice to the trustee about what these fees are,

24  that you're expanding, or these professionals' fees, that

25  every Tom, Dick and Harry in the world would be entitled to

1    the same type of accommodation.

2          So having a secured claim on all of the system

3    revenues and the size and magnitude, and given the

4    pre-existing agreement of PREPA to provide additional

5    information, we think is wholly within the trustee's rights to

6    become a notice party under the procedures.

7          We also want to make sure this morning that the

8    Court, in entering an Order regarding the procedures for

9    interim compensation, doesn't do anything that would prejudice

10   in any way the disputes that the parties will likely have

11   about what expenditures by PREPA are appropriate under the

12   Trust Agreement and under the case law talking about pledged

13   special revenues.

14         Those are issues not to be argued now in connection

15   with the interim special procedures order, but there are going

16   to be issues.  And I think that our bondholders who joined in

17   our motion, as well as the Trustee, are entitled to know that

18   whatever procedures might be implemented by the Court would be

19   entirely without prejudice to the resolution of those issues

20   later on.

21         THE COURT:  And so are you making a specific request

22   for additional or different language in the proposed Order?

23         MR. WHITMORE:  Yes, Your Honor.  We would like to be

24   a trustee added as a notice party, and we would like to have a

25   consensually to be agreed upon language providing reservation

1    of rights with respect to the expenditure by PREPA of funds

2    for these purposes.

3              THE COURT:  Thank you.

4              MR. BENTLEY:  Good morning, Your Honor.  Philip

5    Bentley of Kramer Levin for the Mutual Fund Group.

6              We filed a limited objection to the COFINA

7    compensation procedures motion.  We are satisfied by the

8    points that the Oversight Board made in their reply, and we're

9    prepared to withdraw our objection.

10             We do want to add that the COFINA procedures issues

11   are different because the facts of COFINA are different from

12   those of PREPA.  And by withdrawing our objection, we do not

13   in any way mean to suggest that we don't support the comments

14   made by the PREPA indentured trustee.  We do support those

15   comments.

16             THE COURT:  Thank you.

17             MR. BENTLEY:  Thank you, Your Honor.

18             THE COURT:  Mr. Bienenstock.

19             MR. BIENENSTOCK:  Thank you, Your Honor.  I just

20   wanted to respond briefly to the U.S. Bank comments.  It's one

21   thing for them to know what invoices parties are submitting

22   and another thing for them to have the power to stop things on

23   a monthly basis.

24             So we would have no problem providing that all the

25   professionals billing PREPA send them copies, but we don't

1   think they should be notice parties in the sense that they can

2   hold up things on a monthly basis.

3          They do, as counsel suggested, and Your Honor

4   acknowledged, they have the power to come to court, and the

5   parties haven't been bashful, to say that their collateral

6   should be turned over, not used for a certain purpose.  And of

7   course it's without prejudice to their vindicating those

8   rights to the extent they have them.

9          Unless Your Honor has other questions, that was all I

10  wanted to add.

11          THE COURT:  And so let's talk practicalities here.

12  So are you willing to amend the proposal?  Because it sounds

13  like it would be an amendment to include an undertaking or an

14  obligation to send copies of the bills to the bank trustee.

15          MR. BIENENSTOCK:  Sure.

16          THE COURT:  And that would be a separate provision

17  from the notice, the more empowered notice parties

18  provision.

19          MR. BIENENSTOCK:  Right.

20          THE COURT:  And are you also willing to work with the

21  trustee for some general reservation of rights?

22          MR. BIENENSTOCK:  Of course.

23          THE COURT:  This is without prejudice to anybody's

24  position language?

25          MR. BIENENSTOCK:  Right.

 1          THE COURT:  All right.  So with those inundations,

 2   the Court approves the anticipated revised Order, and except

 3   to the extent reflected in the requested inundations fee

 4   objection, the record is overruled.

 5          MR. BIENENSTOCK:  Thank you, Your Honor.

 6          THE COURT:  And so you will reformulate and put it on

 7   a five-day notice of presentment?

 8          MR. BIENENSTOCK:  Yes, Your Honor.

 9          THE COURT:  Good.  Thank you.

10          Just one moment.  I am ready for the next item.

11          MR. BIENENSTOCK:  Okay.  I think there are now a

12   series of motions for either additional committees and/or

13   reconstitution.  I will step aside for the proponents of the

14   first such motion.

15          THE COURT:  Thank you.

16          So the first one is item seven, which is the motion

17   requesting an additional retiree committee or reconsideration

18   of the composition of the retiree committee.

19          We had allocated 30 minutes on the calendar for this.

20   Do the opponents have any problem with my setting it up as 15

21   and 15 with my little light system?  All right.  That's how

22   I'm going to set it up.  So we'll start it running at 15

23   minutes.

24          MR. RAMIREZ COLL:  Good morning, Your Honor.  Jose

25   Ramirez Coll on behalf of the University of Puerto Rico

1   Retirement System Trust.  We would like the Court, if we may,

2   reserve three minutes for rebuttal out of our 15 minutes.

3           THE COURT:  Yes.  We will do that.  Twelve and three

4   then.

5           And good morning, Mr. Ramirez Coll, and I will ask

6   you speak a little slower for my benefit.

7           MR. RAMIREZ COLL:  Yes.  As you know, we filed two

8   motions, one for a creation of committee; or two, for

9   reconstitution of the committee.  There were five objections

10  received in objection to that motion.  Three of them are

11  exclusively with the creation of a new committee, and two of

12  them address the reconstitution of the committee.  That's the

13  U.S. Trustee's motion and the retiree committee's motion.

14          And we will basically address those two in our

15  argument, as we did on our reply, because of some

16  representations made by the U.S. Trustee which alleviate some

17  of the concerns we have.  And I'll explain how just now.

18          First of all, we would like to note from the outset

19  that we agree with the U.S. Trustee, that it is that office

20  and not this Court that appoints committee members.

21          And we want to make clear that the trust is not

22  requesting in any way that this Court appoint a particular

23  member to a particular committee.  What we are requesting is

24  the Court reconstitute the retiree committee to include an

25  active UPR employee, whichever that person might be, in the

 1  U.S. Trustee's judgment, as an additional member of the

 2  committee.

 3       And initially, before we filed the motion, we had

 4  sought some clarification from the Trustee regarding the

 5  composition of the retiree committee, because even though we

 6  understand that some members of the committee are actual

 7  employees, not UPR employees, but employees of the

 8  Commonwealth, we were not sure what the scope of the

 9  committee's mission was.  And we believe we have gathered some

10  clarity from the U.S. Trustee's own objection to our motion,

11  which I will quote.

12       The U.S. Trustee stated in its objection that the

13  official committee of retirees, the retiree committee,

14  represents all beneficiaries of vested pension and other post

15  employment benefits, while the official committee of unsecured

16  creditors or the UCF, I'll call them for now, represents any

17  residual creditor claims that active employees hold.

18       The Trustee also added its objection that the retiree

19  committee has an interest in maximizing recoveries on the

20  primary claims held by active employees, albeit pension

21  benefits, health care, and other post-employment benefits.

22  The U.S. Trustee sees the role of the UCC as complimentary for

23  those claims of employees that do not have to do with pension

24  benefits.

25       We respectfully submit that if these representations

1    are correct, and contrary to what the committees themselves

2    may argue in the motion, to extend this is what the Trustee

3    intended when it appointed two separate committees to deal

4    with two separate issues, then there would not be a need to

5    create a separate committee.

6          As the Trustee clearly intended the retiree committee

7    to represent all pension beneficiaries, whether they are

8    active employees or retired employees, and the constitution of

9    the retiree committee, as we have analyzed the situation,

10   although we do not know the identity of all the members

11   vis-a-vis their particular employment, we do know that at

12   least one of the employees, and this is from the Ad Hoc

13   Group's initial motion at docket number eight, one of the

14   members of the committee is actually an active employee of the

15   Police Department of Puerto Rico, Mr. Jose Marin, who presides

16   a syndicate that purports to represent at least 1,560 active

17   members of the police force, and only 21 retired members of

18   the police force.

19         So to the extent there's already at least one active

20   member or active employee that is an active member of one of

21   the retirement systems, it does make sense to discuss whether

22   there is a need to have an active UPR employee in the retiree

23   committee.

24         We also think this makes sense because we do believe

25   that there is a need for a representation -- a committee

1    representation separate from the UCC.  The UCC, in its motion,

2    stated that it can adequately represent the interest of active

3    employees.

4          However, first we saw that this is inconsistent with

5    what the U.S. Trustee views as the mission of the UCC as

6    complimentary to those claims that might be unsecured and

7    might be unrelated to pension benefits.  But also we would

8    submit to the Court that given PROMESA's specific mandate to

9    protect pension benefits, there are situations where potential

10   conflicts or even actual conflicts may arise between the

11   mission of the retiree committee and the claims of active or

12   retired employees and the mission of the UCC.

13         And in our reply brief, I gave a hypothetical

14   example, and I would like to set forth a more particular and

15   real example, obviously without identifying particular persons

16   or the Social Security numbers.  But there are employees that

17   have moved to the UPR system or have become UPR employees

18   after 28 years or 29 years of public service.

19         To the extent the Reciprocity Act that we cited in

20   our brief requires the monies to be transferred from the

21   previous system or from the previous employer, to the extent

22   that the matching contributions or that the contributions of

23   the previous system are not enough to cover the benefits

24   received under the UPR system, in those cases, in the case of

25   that employee, that would mean if the transfer is not made and

1    those benefits are not protected, that person would only have

2    accumulated two years of pension benefits.  They would be

3    basically deprived of his or her pension benefits.

4            And we submit to the Court without, at this point,

5    acquiescing which portions of which claims might be unsecured

6    or secured -- because it truly depends on an interpretation of

7    PROMESA, and it does truly depend on the interpretation of

8    fiscal plans that have not yet been certified by the Board,

9    including, for example, the UPR's own fiscal plan -- that

10   these interests are inherent in retirees and active employees.

11   And they are inherent to the mission of the retiree committee,

12   and not the mission of the UCC, who the Trustee's office

13   itself represented is complimentary to those claims that

14   involved pension benefits.

15           That being understood, the question is why is not the

16   actual representation in the current committee as constituted

17   adequate?  The actual committee contains one retired UPR

18   employee as a member.

19           And we are not, and I'm going to be very clear about

20   this, we are not saying that this person does not have a claim

21   in connection with his retirement benefits.  That person, of

22   course, has a claim, as well as tens of thousands of members

23   of the system.  But those claims are not claims in this case.

24   In this case, the UPR is not a debtor.

25           And so to the extent that there's at some point a

1    Title III case involving UPR, which is not necessarily going

2    to happen, which depends on the certification of fiscal plans

3    and other events that have not happened, that person may have

4    a claim in a Title III proceeding, but just not in this case.

5           And we were a bit concerned with some representations

6    made by the Trustee in its motion, because the U.S. Trustee

7    understands that a retired employee of the University might

8    have a claim to the ex -- in his case or might have standing

9    to the extent that government appropriations might effect the

10   trust or the funds in the trust, Judge, which yours truly

11   represents.

12          And those statements are a little concerning to us

13   because, first, they are completely at odds with the

14   representation made by the UCC in connection with, for

15   example, the motion filed by the municipalities seeking a

16   committee to be appointed.  And I am not expressing any views

17   as to the merit of that motion.  But to quote the UCC, in

18   connection with that motion, the UCC stated concerns about

19   levels of appropriations are political issues to be addressed

20   through the political process.  They do not create a claim or

21   make the municipalities a creditor.

22          In that motion, the issue is whether there are claims

23   against the Commonwealth, vis-a-vis GDB, which Your Honor

24   knows is not a party or debtor in these proceedings.

25   Similarly, UPR is not a debtor in these proceedings.

 1              And a retired UPR employee who has already his

 2    benefits in the fund may be affected by appropriations and by

 3    the level of funds in the trust, but it's that his or her

 4    direct claim is not in these proceedings.

 5              On the other hand, an active UPR employee, and we are

 6    talking about hundreds, if not thousands, of active UPR

 7    employees, do have claims against the Commonwealth and other

 8    debtors in these cases to the extent there are transfers that

 9    have not been made either, and there are several different

10    scenarios that the retiree committee, it would be helpful for

11    the retiree committee to be advised about.

12              There are different scenarios.  There are employees

13    that have not received their transfer from the retirement

14    system upon transfer to the UPR.  And there are some

15    employees, because the UPR benefits -- the employer

16    contributions are higher on average than from the other

17    systems.

18              There are varying contributions that have not been

19    received, to the extent the individuals have made their

20    pairing individual contribution, but have not received the

21    equivalent contribution from the former employer, who in this

22    case are debtors.  They are agencies of the Commonwealth or

23    ERS itself, in the case of ERS employees who transferred to

24    the UPR.

25              So what we submit to the Court is that ultimately

1    there's no practical or legal reason not to include a UPR

2    employee in the retiree committee.  And again, we are not here

3    to ask that a particular person be appointed, but just that in

4    the interest -- and as the Commonwealth itself said, in the

5    interest of being all-inclusive, the Commonwealth itself

6    actually did not object to the inclusion of an additional

7    member or two into the committee, because it would serve the

8    interests of the committee.

9         And we are talking -- we are aware that not every

10   constituency of a committee has to be represented by a member,

11   but this particular committee serves the interest of a handful

12   of retirement systems.  And the UPR retirement system involves

13   at least 18,000 employees, and at present there is not a

14   member of the committee with standing to represent the

15   interests of those employees and active participants who do

16   have claims in these proceedings.

17        And so as a matter of practice, this involves no

18   cost.  We do understand there are costs involved in the

19   creation of an additional committee.  We are satisfied with

20   the representations of the Trustee, to the extent that the

21   retiree committee represents active and retired employees

22   about pension benefits, and the UCC will represent active

23   employees regarding other matters.

24        And we would request that the Court issue an Order

25   pursuant to 1102(a)(4) including an additional member in the

1   committee.  We had requested that the UPR employee, retiree

2   employee be removed from the committee because of the standing

3   issue, but our main request is that a UPR employee be

4   included, so those interests of those employees, which are

5   about 10,000 active employees, be represented.

6        Thank you, Your Honor.

7        THE COURT:  And so to be clear, you're withdrawing

8   the request for an additional committee, and you are also

9   withdrawing the request that the Court somehow direct the U.S.

10  Trustee to remove the retired employee from the retirees

11  committee.  Instead, your sole request at this point is that

12  an active UPR employee be added to the existing official

13  retirees committee?

14       MR. RAMIREZ COLL:  Your Honor, we would withdraw our

15  request for the creation of a new committee, to the extent the

16  U.S. Trustee validates our understanding of its position in

17  its motion in its turn right now, to the extent that the

18  committee represents active and retired employees prosecuting

19  the claims regarding benefits.

20       THE COURT:  Yes.

21       MR. RAMIREZ COLL:  And with regard to the retired UPR

22  employee, we believe that employee does not have standing, but

23  we understand the discretion is of the U.S. Trustee, if this

24  Court order the reconstitution of the committee, whether the

25  U.S. Trustee deems fit to remove that person and/or add a UPR

1    employee, to the extent the Order is granted.

2              THE COURT:  Thank you.

3              MR. RAMIREZ COLL:  Thank you.

4              THE COURT:  So I'd like next to call the

5    representative of the United States Trustee.  And I'm setting

6    the clock for 15 minutes now, in the hope that we can hear all

7    of the opponents within that 15 minutes.

8              U.S. TRUSTEE LECAROZ ARRIBAS:  I'll be short, Your

9    Honor.  Thank you.  Good morning.

10             THE COURT:  Good morning.

11             U.S. TRUSTEE LECAROZ ARRIBAS:  Good morning.  May it

12   please the Court, my name is Monsita Lecaroz Arribas,

13   Assistant U.S. Trustee for the District of Puerto Rico, on

14   behalf of Guy Gebhardt, Acting U.S. Trustee, Region 21.  With

15   me is an attorney in our Cleveland office.

16             Your Honor, the University Puerto Rico Retirement

17   Trust requests an Order either directing the appointment of an

18   unprecedented additional committee of active employees,

19   government employees under 1102(a)(2) or B, directing changes

20   to the retiree committee to substitute a member from the Trust

21   acts of active employees under 1102(a)(4).

22             Your Honor, I believe it is important to all these

23   committee issues to stick to the Statute.  The absolute

24   predicate for judicial relief directing either the appointment

25   of an additional committee under 1102(a)(2), or ordering a

1    change in committee composition under 1102(a)(4), is that the

2    existing committee or committees do not adequately represent

3    the unsecured creditor body.  That is the absolute predicate

4    for judicial relief.

5         The movant has the burden of proving that the

6    judicial committee does not provide adequate representation.

7    The Trust has not met its burden.

8         THE COURT:  May I just ask you to speak slightly

9    slower?

10        U.S. TRUSTEE LECAROZ ARRIBAS:  Yes, Your Honor.

11        It is an extraordinary remedy to grant an appointment

12   of an additional committee.  Adequate representation is not

13   perfect representation.

14        The existing committees were thoughtfully created and

15   adequately represent employee interests.  The Trust is not

16   correct.  The retiree committee is an all-retiree committee.

17   It has a Trust participant already on its retiree membership,

18   and Jose Marin is a retiree of the Police Department.

19        It represents all beneficiaries of vested pension

20   benefits, health care and other post-employment benefits,

21   while the committee of unsecured creditors with 20 unions

22   already in its membership represents any residual creditor

23   claims that active employees hold, such as work place safety,

24   compensation and active benefits.

25        Any example brought by the Trust would be protected

1    by these committees.  Any change requires a showing of

2    necessity for adequate representation that is not present

3    here.  There is no need for an additional committee, because

4    existing committees adequately represent employee interests,

5    and this adequate representation does not require perfect

6    alignment or lockstep agreement.

7           Taken together, the existing committees adequately

8    represent the creditors' interests of all employees.

9    Therefore, the Court should deny the request for additional

10   committee under 1102(a)(2).

11          The Court should also deny the Trust request to

12   change the committee's membership for the same reason it

13   should not order the appointment of a separate employee for

14   the active employees.  The Trust has not met its burden.

15          Nowhere does the Code mandate that the exact

16   representation of the committee body be produced in committee

17   membership.

18          This statute, which we should stick to, does not

19   present relief simply because all Trust representatives are

20   adequately represented, and U.S. Trustee selection of a

21   committee member does not equate to either lack of

22   representation or proper legal basis to modify the membership.

23          The Trust motion should be denied in its entirety,

24   Your Honor.

25          THE COURT:  So I would just ask you to address the

1    scenario that the Trust raised in terms of which committee

2    you're saying adequately deals with that.  So, as I understand

3    the Trust, they say that employees go from one Commonwealth

4    entity to another and have a concern that funds follow them.

5    And there may be claims among, for instance, the University

6    and its retirement system and some other Commonwealth

7    instrumentality for which the employee was formerly employed.

8           And so which committee would be concerned with those

9    sorts of claims?

10          U.S. TRUSTEE LECAROZ ARRIBAS:  Yes, Your Honor.  To

11   be honest, I don't see how that is relevant to this issue.  We

12   believe that the retiree committee is covering all retirement

13   compensation benefits, and the creditors' committee is

14   covering everything that is not retiree benefits.

15          Whether an employee moves from one agency to the

16   next, they're supposed to be fiduciaries for any and all

17   employees.  All retirees and all active employees by the UCC.

18   I don't see how any of the examples brought by the Trust are

19   relevant to committee representation, Your Honor.

20          THE COURT:  And so are you considering that issue an

21   active employee issue insofar as it is a claim, but a claim

22   that relates to --

23          U.S. TRUSTEE LECAROZ ARRIBAS:  To a current

24   employee.

25          THE COURT:  To a current employee?

```
1              U.S. TRUSTEE LECAROZ ARRIBAS:  Absolutely.
2    Absolutely.
3              THE COURT:  Thank you.
4              U.S. TRUSTEE LECAROZ ARRIBAS:  You're welcome.
5              THE COURT:  Yes, sir.
6              MR. GORDON:  Good morning again, Your Honor.  Again,
7    for the record, Robert Gordon of Jenner & Block on behalf of
8    the official retiree committee.
9              THE COURT:  Good morning.
10             MR. GORDON:  Your Honor, the UPR Retirement System
11   argues extensively on behalf of active employees who are
12   participants in the plan, that those active participants hold
13   claims that are different than those held by other members of
14   the retiree committee, and that therefore the retiree
15   committee should be reconstituted.
16             There are two fundamental flaws with that position.
17   First, the claims identified are -- well, first of all, they
18   are alleged claims, arise under the Reciprocity Act.  Those
19   are not claims of the active participants of the UPR system at
20   all.  They are claims of the retirement system itself.
21             The active participants in the UPR plan, when they
22   transfer over, their claims are only claims for their
23   retirement benefits against the retirement system. They do not
24   have an independent claim for the failure to transfer funds
25   under the Reciprocity Act.  That is a claim only of the
```

1   retirement system.  And it is a claim that isn't against the

2   Commonwealth.  It's against another retirement system that

3   hasn't transferred the money.

4           I also point out that it is an alleged claim, because

5   as we've pointed out in our papers, there's been no evidence

6   provided that any of those transfers haven't actually

7   occurred, or the extent of them, and that was not responded to

8   in the Omnibus reply of the retirement system.

9           The second problem with the argument is that the

10  motion presumes that the committee should represent all

11  individualized interests with respect to holders of retirement

12  benefits.  And I would submit, Your Honor, that that is the

13  problem with all the motions that you're going to be

14  addressing today on some level.

15          It misapprehends and it mischaracterizes the nature

16  of committees.  Succinctly, a committee is intended to provide

17  generalized representation to creditor groups, and

18  specifically to creditor groups that cannot or should not be

19  expected to have or devote the resources to zealously and

20  effectively protect their interests in court.

21          It's not supposed to be a committee to provide

22  representation of parties that can get to the Court.  All

23  members of the retiree committee are retirees who hold accrued

24  retirement benefits.

25          As the U.S. Trustee has indicated, and I can further

1   illuminate, Sergeant Marin is retired.  The allegation that he

2   is not retired is absolutely false.  And I have a

3   certification here, if the Court needs it, from the Police

4   Department of Puerto Rico, indicating that Sergeant Marin

5   retired on April 15, 2013.

6        But more importantly, the retirement system comprises

7   retirees, holders of retirement benefits from diverse sections

8   of the government, teachers, police, judges, municipal

9   employees, and yes, UPR retirees and participants in the UPR

10  plan.  We have a representative already on the committee.  To

11  switch that to somebody else is absolutely arbitrary.

12       It is undeniable, the retiree committee, as formed,

13  and it's formed under the very appropriate processes of the

14  U.S. Trustee's office, undoubtedly, broadly represents the

15  general interest of holders of accrued retirement benefits,

16  and that's where the inquiry should end.

17       The suggestion that specific interests should somehow

18  be represented by the committee misapprehends the nature of a

19  committee.  We are there to represent generalized interests,

20  not individualized interests.

21       It is important then to determine what is before the

22  Court and what is not before the Court.  What is not before

23  the Court is an active employee from the UPR retirement system

24  that timely responded to U.S. Trustee's solicitation for

25  participants on the committee.

```
 1            Instead what you have is a retirement system itself

 2      essentially asserting claims of its own, claims that don't

 3      even go against the Commonwealth itself, and complain about

 4      the composition of a committee in the Commonwealth's Title III

 5      case.  The motion is simply off the mark in every way.

 6            If the retirement system itself believes that there

 7      is additional representation needed for certain participants

 8      within its plan, the solution to that is exactly what you're

 9      seeing today.  The retirement system can come to court on its

10      own dime and represent these people.

11            And I can at least represent that indeed that's

12      exactly what happened in Detroit.  I represented the Detroit

13      retirement systems, and they believed it was important to have

14      specific representatives, and they did that, they hired their

15      own professionals and they showed up in court.  They didn't

16      participate in the committee.  They didn't ask the city to pay

17      their fees.

18            Thank you, Your Honor.

19            THE COURT:  Thank you.  Does anyone else wish to be

20      heard in opposition to this motion?

21            MR. DESPINS:  Your Honor.

22            THE COURT:  Mr. Despins.

23            MR. DESPINS:  Two seconds, Your Honor.  Luc Despins

24      for the official committee.  Given the limitations that were

25      mentioned by counsel for the movant, the committee will rest
```

1    on its papers.

2          THE COURT:  Thank you.

3          MR. RAMIREZ COLL:  Your Honor, Jose Ramirez Coll on

4    behalf of the UPR System Trust.  It is not clear to us whether

5    the U.S. Trustee was confirming the representation made in

6    writing in its motion, but we would hold the Trustee to its

7    word in its motion to the effect that the retiree committee

8    represents the interests of pension beneficiaries, regardless

9    if they are active employees or retired employees.  And in

10   that sense, we would reiterate our request as already argued.

11         As to Mr. Jose Marin, we just learned that he is a

12   retired employee.  However, per the Ad Hoc Group's motion, he

13   purports to represent 1,560 active employees of the police

14   force.  Whether he has standing or not to do so is not of our

15   concern, and we don't pretend to argue that.

16         What we are submitting to the Court is that as a

17   matter of law, a UPR Trust member who does not have standing

18   in this case is not an adequate representative of UPR Trust

19   members.  And we already submitted the reasons why a UPR

20   retirement employee does not have a claim in this case.

21         We have disagreements with counsel for the retiree

22   committee as to what the scope of the claims are, and I think

23   Article III of the Reciprocity Act speaks for itself in terms

24   of who the debtor may be.  There are claims that involve the

25   systems, where the debtors are in the systems, to the extent

1    that the systems haven't made transfers to the employees.

2            There are claims that involve the employers, to the

3    extent that the claim involves a matching contribution because

4    of the higher benefit received by the employee at the UPR,

5    vis-a-vis what was reserved or what that employee had

6    accumulated in the system.  But without going into the details

7    of the claim, all claims are alleged, Your Honor.

8            And the retiree committee, as well as the UCC

9    committee, represents members with alleged claims, as well as

10   the Trust claims.  And what the Court needs to determine is

11   not the scope of the claims, whether they are alleged or

12   proven or not.  It's whether there's a person that can

13   represent these claimants in this case.

14           And we submit to the Court that the person actually

15   appointed to the committee in the UPR system's case cannot,

16   because of the reasons explained before, because he has a

17   claim, and he has a claim defended by the Trust in another

18   forum, but he doesn't have a claim in this case.

19           Thank you.

20           THE COURT:  Thank you.  Give me just a moment to

21   reflect.

22           I have reviewed carefully the written submissions on

23   this motion, and I've considered carefully the arguments made

24   in court today.  For the reasons that I will now explain, the

25   motion of the University of Puerto Rico Retirement System

1   Trust, which I will refer to as the Trust in these remarks,

2   for the reconstitution of the retiree committee is denied.

3       I will focus on the reconstitution or additional

4   member aspect of the motion, because it is my understanding

5   that the Trust is no longer requesting an additional

6   committee.

7       Under Section 1102(a) of Title XI, on the request of

8   a party in interest, the Court may change the membership of

9   the committee, of a committee, if necessary to assure adequate

10  representation of creditors.

11      The Statute doesn't specifically define "adequate

12  representation," and bankruptcy courts general consider

13  various factors in determining the adequacy of representation.

14  These factors include, in relevant part, the nature of the

15  case, the ability of the existing committee to function, the

16  ability of creditors to participate in a case without an

17  additional committee, and the delay and additional costs that

18  might result in the event of the creation of a new committee.

19      And I recognize here that Mr. Ramirez is not asking

20  for an entirely new committee, so that cost issue is not one

21  that is really implicated here.  But in general, for these

22  factors, I would refer for the record to In Re:  Residential

23  Capital, LLC, 480 BR 550 at page 558, a decision from the

24  Bankruptcy Court for the Southern District of New York from

25  2012.

1          No one factor is dispositive and the consideration

2    given to any particular factor depends on the circumstances of

3    a particular case.

4          The Court recognizes the unprecedented magnitude and

5    complexity of these cases; and the fact that there are

6    particular issues that arise for historical, practical,

7    statutory and other reasons that may be different among groups

8    of retirees from specific state institutions and may overlap;

9    and that there is a relationship between concerns of active

10   employees with future retirement-related issues and the

11   concerns that are specifically the focus of the retirees

12   committee.

13         Having said all that, the Court concludes that the

14   circumstances do not warrant the exercise of the Court's

15   discretionary power to order the appointment of an additional

16   University of Puerto Rico specific member.

17         The Trust has failed to carry its burden of

18   establishing a lack of adequate representation.  The general

19   committee of secured -- unsecured creditors, as well as the

20   general committee of retirees, already exists in these cases.

21   And in many ways, the interests represented by these two

22   committees in their full scope are aligned with those of the

23   Trust.

24         The official creditors' committee, for example,

25   certainly has an interest in maximizing value for all

1   unsecured creditors, no matter the particular nature of the

2   unsecured claims to be asserted.  And it includes

3   representatives of active employees whose interests in the

4   general matter would include the funding and payment of future

5   retirement benefits.  And the retirees committee is concerned

6   with the retirement status rights of all retirees from across

7   the system, the various systems.

8          Adequate representation does not require proportional

9   representation of distinct groups of creditors on a committee

10  of unsecured creditors.  And importantly, Trust participants,

11  or the Trust itself, which believe that the committees are not

12  for some reason sufficiently protecting their particularized

13  issues, may still be heard individually or as one or more ad

14  hoc committees in these cases.

15         And so for these reasons, the Court finds that the

16  Trust has not demonstrated that inadequate representation of

17  its owner or its members' interest require any change in

18  membership of the existing retiree committee, and the motion

19  is denied.

20         The Court will issue an Order further memorializing

21  this decision.  Thank you.

22         MR. RAMIREZ COLL:  Your Honor, if I may, one minute.

23  We abide by the Court's decision, and we understand it.  We

24  wanted some clarification in terms of future communications

25  between the Trust and the committees, regarding what the U.S.

1    Trustee mentioned in the sense that the Trustee understands

2    that the retirement committee represents employees, active or

3    retired, regarding benefits.  And to the extent we are going

4    to use the assistance of those committees, we would like to

5    have some clarity in that regard.

6            THE COURT:  And so I would invite you to direct those

7    inquiries to the office of the United States Trustee and to

8    counsel for the retirees committee.

9            MR. RAMIREZ COLL:  We will, Your Honor.  Thank you.

10           THE COURT:  Thank you.

11           We'll take up the municipalities motion next.  And so

12   would counsel for the Ad Hoc Municipalities Committee please

13   come forward?

14           MR. ROCHELLE:  Good morning, Your Honor.

15           THE COURT:  Good morning.

16           MR. ROCHELLE:  I'm Michael Rochelle.  I'm one of the

17   counsel for the Ad Hoc Puerto Rico Municipalities Committee.

18           THE COURT:  Good morning, Mr. Rochelle.

19           MR. ROCHELLE:  Your Honor, the municipalities are

20   here this morning because they currently believe they do not

21   have a voice in the reorganization process.

22           They have seen, over the past several years,

23   including this year, the constant diminution of the operating

24   funds which they have received from tax revenues from the

25   central government.  They are informed that under the current

1  approved budget, next year there will be no funds from the

2  central government.

3          One of the problems with that is that they have not

4  been consulted on these changes.  The other problem is that

5  the central government, strapped as it is, also cannot manage

6  to take over the municipal functions, which those previous tax

7  revenues used to fund.

8          And so what the municipalities find today is that

9  they are being asked to make bricks without straw.  Indeed,

10 without even getting to talk about getting any straw.

11         We applaud the work of the uniform -- or the

12 unsecured creditors' committee in this case.  They have done

13 good work, as far as we can see thus far.  But their concerns

14 are not those of the municipalities, the unions, the

15 businesses which constitute that group, are looking to make

16 and realize the best dividend for their constituents.

17         The municipalities have a different focus.  We're

18 concerned with two things.  First is the future economic

19 viability of this island, period.  And second is access to

20 capital markets.

21         Those two things are not really the concerns of the

22 unsecured committee.  We've even been told that we're not

23 persons under the Statute.  And certainly, if one looks back

24 at the legislative history of municipalities, or government

25 entities at all on committees, the thought was that they would

1    lord it over the individual members of a committee and it

2    would crush them.

3         Your Honor, it is the municipalities that are being

4    crushed today.  They are not bullying anybody.  There is also

5    an important precedent here.  There are states that are

6    currently all but -- they are insolvent in all but name.

7         What this Court does today may well be the template

8    for Illinois' filing, whenever they finally get around to that

9    and acknowledge the obvious.  That's why we're here.

10        Why do we need to be heard?  The municipalities have

11   responsibilities to their services.  They do the basic things

12   that make urban life possible.  They pay the police.  They

13   pick up the trash.  They mend the roads.  They build the

14   schools.  Some municipalities are seeing cuts larger than 50

15   percent in their budgets.

16        My bricks without straw analogy is not frivolous.

17   And yet at the same time, while we are told we must provide

18   these services, we are being told that in this process, we

19   cannot have a voice, we're not -- we're unpersons.

20        There has even been political pressure applied.

21   Indeed, one municipality joined us, and then three days later,

22   unjoined us in an obvious move by those who did not want that

23   to happen.

24        The municipalities understand there must be cuts.

25   Forty years of unfortunate decisions on this island have

1    mandated that.  I have watched that as an advocate in cases on

2    this island.  The municipalities are not -- are not acting as

3    though we can simply wish our way back to solvency, but they

4    do wish to participate in the process.

5         And that process, though some of the respondents to

6    our motion have said, oh, it's all political, the fact is that

7    the politicians have turned what has been a political process

8    over to this Court.  This is where we must come, if we are to

9    have relief and if we are to be heard.

10        Indeed, PROMESA says in Section 201(b) that one of

11   its key functions is that the fiscal plan is going to assure

12   access for the funding of essential public services.  We're

13   not so sure where we stand right now that that is happening.

14        So what will happen if the municipalities are not

15   heard?  They can't fulfill their responsibilities.  They can't

16   mend the road.  They can't take out the trash.  This place

17   will become Greece.  And even worse than that, they won't be

18   able to pay their own creditors.

19        We will have municipalities needing to be bankrupt.

20   We hear through the political grapevine that there will be

21   consolidation of smaller and weaker municipalities, or perhaps

22   grafting onto some of the larger, more prosperous ones.  All

23   that will do is cause more municipalities to sink under the

24   weight.  And it's also going to create more unemployment.

25        Herbert Hoover balanced the budget every year of his

1    presidential term, and it was a good thing that Roosevelt was

2    elected at that point, because finally the ship began to turn.

3    We are asking this Court to allow us to help the ship to turn.

4            A committee will provide a focus.  There are 78

5    municipalities on this island.  Without a committee, the only

6    way that any municipality can be heard is in litigation.

7    Several cases have already been brought.  Other municipalities

8    are simply too poor to afford lawyers, literally.

9            But what we will have is more litigation than this

10   Court and the other courts of the island ever wanted to see

11   unless there is a focus and a forum for the municipality.  If

12   that were to happen, it would be cost effective.

13           We've heard that this is just going to be

14   ridiculously expensive.  Not as expensive as 78 municipalities

15   or however many can scratch up the money and hire lawyers.

16   Litigating all over the place, that's expensive.

17           What we're talking about is wanting to participate in

18   a process of consultation, not litigation.  My own home judge

19   stands, sits right over here as one of the leaders of that

20   consultation.  That's what we're looking for.

21           We are the parties at the local level who can find

22   solutions.  If we can't find those solutions, local government

23   is simply going to collapse on this island.  We don't want

24   that to happen.

25           We respectfully request that this Court direct that a

 1    committee be formed.

 2              THE COURT:   Thank you.

 3              Mr. Bienenstock.

 4              MR. BIENENSTOCK:   Thanks, Your Honor.   Mr. Rochelle

 5    used to be my partner, and we have the highest regard for him,

 6    but the short version is the U.S. Trustee is right.   This

 7    Court lacks the power to appoint a committee of non-persons.

 8    It's clear in the Code.

 9              And the municipalities, as was just expressed here a

10    moment ago, are really asking for political relief.   They

11    think they should get more money from the Commonwealth, which

12    is understandable, and we at the Oversight Board are extremely

13    sympathetic to their plight.

14              We're dealing with obviously lack of sufficient

15    resources and the allocation of those resources.   They will

16    always be able to have meetings, et cetera, with the Oversight

17    Board.   And we look forward actually to their organization and

18    working with them.

19              But as far as the additional committee, for the

20    statutory reason that I just mentioned, which was really

21    raised by the U.S. Trustee, and the other reasons we are not

22    pleading, we ask the Court not to create an additional

23    committee, including a municipalities committee.

24              MR. MUDD:   May it please the Court, John Mudd for the

25    Municipality of San Sebastian.

1          Your Honor, when we look at the motions, we see this

2     group of eleven municipalities are claiming they have causes

3     of action.  When they're asked what the causes of action are,

4     or claims against the government, it's, well, we haven't been

5     assigned funds, sufficient funds.

6          I go, like, okay, but that's not a cause of action

7     under Federal law.  It's not a cause of action under Puerto

8     Rico law.  So you have no claim.

9          So the second claim they make is that the GDB is

10    evil, which is probably true, but the GDB is not a party to

11    this bankruptcy.

12         So they come up with the third argument, which is

13    well, the GDB is actually an appendix or an alter ego of the

14    government.  Okay.  But that has several problems.  As we all

15    know, the GDB is in Title VI, is in the process of getting an

16    agreement. The Government of Puerto Rico and the Board have

17    decided that the GDB is not part of this bankruptcy.

18         Second, the Ad Hoc Group, where none of these 11

19    municipalities has filed any claim or any case saying that the

20    Title VI is illegal.  The Municipality of Caguas, the

21    Municipality of San Juan have filed that.  And no one has

22    joined them except for Mayaguez who tried to join, and you

23    quite correctly said you can't join, you're supposed to file a

24    motion for intervention.

25         Okay.  In this courtroom, we have appearances by

1    Guayanilla, Ponce and San Sebastian.  Those are the ones I

2    know of.

3          Where are the rest of the municipalities?  San

4    Sebastian has only 46,000 people in it.  It's a very small

5    place.  They were able to hire me.  Of course, I'm not from

6    Texas.

7          Now we look at the other part of the argument, of the

8    alter ego of the government, of GDB of the government.  That's

9    very common Eleventh Amendment argument.  And I took the

10   liberty to check the cases, and I couldn't find one about the

11   GDB as to the Eleventh Amendment.

12         I did find an interesting case, CMI Capital Market

13   versus Municipality of Bayamon, 410 F.Supp.2d 61.  It's

14   decided by Judge Acosta, may he rest in peace.

15         The important thing here is Judge Acosta makes a

16   stirring analysis of the GDB, and he was also the judge in the

17   District Court in the case of In Re:  San Juan Dupont Plaza,

18   889 F.2d, in which he decided that the Tourism Company was

19   part of the government and protected by the Eleventh

20   Amendment.  So he knew that by heart.

21         And in this case that I cite, he doesn't even mention

22   it, because never has it been thought that the GDB was an

23   appendix of the government.

24         Finally, Your Honor, being quick about it, I think

25   that the municipalities should be here, all of them, either in

1    groups, like the Ad Hoc Group, which is 11, and they can share

2    the fees there.  But most municipalities, and this is a fact

3    we all know in Puerto Rico, are insolvent.  They are -- they

4    survive because the government of Puerto Rico gave them

5    subsidies or, like in the case of the municipality of San

6    Sebastian, they were well administered.

7         We all can have a saying here if we come, like we do,

8    and come to all the hearings, check all the motions and see

9    what's going on.  But we can't -- there is no -- it makes no

10   sense to have a committee under the circumstances that we

11   have.

12        That would be all, Your Honor.

13        THE COURT:  Thank you.

14        Mr. Friedman.

15        MR. FRIEDMAN:  Good morning, Your Honor.  Peter

16   Friedman from O'Melveny & Myers on behalf of AAFAF.

17        GDB is not evil, and I say that actually not tongue

18   in cheek.  It's a government entity.  People may disagree with

19   its policies.  I'm sure Mr. Mudd was being tongue in cheek,

20   but, you know, rhetoric gets hot.  And, you know, I feel like

21   it's important to note that it's an institution full of people

22   who are working very hard to achieve specific results for

23   public good.

24        And the issue of GDB is important in its own

25   restructuring and its own potential Title VI, but those are

 1    not issues here.  And I think with respect to the relief

 2    that's being sought, it is important to differentiate the

 3    municipalities' concerns about GDB and how they might get

 4    addressed in the future in separate proceedings.

 5            But keeping that distinct, and I think the fact that

 6    the motion is trying to use GDB as a back door to organize

 7    into this case is really clear from paragraph three of the

 8    response, which talks about the fact that a good example of

 9    why relief should be granted here is the complaints

10    municipalities have filed against GDB.  And I respectfully

11    submit that can't be a basis for appointing a statutory

12    committee of the municipalities in the Commonwealth's Title

13    III case.

14            Thank you, Your Honor.

15            THE COURT:  Thank you.

16            MR. DESPINS:  Good afternoon, Your Honor.  Luc

17    Despins, counsel for the committee.

18            Very quickly, we're generally resting on our papers,

19    but I wanted to rise to address the point that was made that

20    the committee is not concerned about two things, one being

21    viability and access to capital markets.

22            I just want to assure the Courts and parties at

23    interest, including Mr. Rochelle, that there is not a

24    committee meeting that goes on without a discussion of those

25    topics.  So even though the committee does not believe the

1    municipalities should be appointed, these issues are on the

2    forefront of the committee.

3          Thank you.

4          THE COURT:  Thank you.

5          U.S. TRUSTEE LECAROZ ARRIBAS:  Good morning again,

6    Your Honor.  Monsita Lecaroz Arribas, U.S. Assistant

7    Trustee.

8          THE COURT:  Good morning.

9          U.S. TRUSTEE LECAROZ ARRIBAS:  I don't want to rehash

10   our argument in our pleading, Your Honor.  I just want to

11   reiterate the statutory provision of 1102, which requires that

12   committee members be persons, and municipalities are not

13   persons.  Thank you.

14         THE COURT:  Thank you.

15         All right.  I think there had been a notice of

16   intention to speak by Paul Glassman for the Municipality of

17   Ponce.

18         MR. GLASSMAN:  Your Honor, Paul Glassman, Stradling

19   Yocca Carlson & Rauth, appearing for the Autonomous

20   Municipality of Ponce.

21         First, I'd just like to clear one matter that was

22   raised, which was the filing and withdrawal of the pleading in

23   support.  Our firm has just been recently retained to

24   represent the Municipality of Ponce, and so no one was more

25   surprised than us to see a pleading that was filed.

1        And the reason it was withdrawn is because it was

2   filed without authorization to file with consultation of the

3   City.  So that's the reason it was withdrawn, and not for

4   other reasons.

5        And the -- and the Autonomous Municipality of Ponce

6   does have a number of concerns regarding matters that have

7   been raised today, but at this time the Autonomous

8   Municipality of Ponce intends to work with AAFAF and

9   ultimately the Oversight Board to address these concerns, and

10  is not taking the position on formation of the committee at

11  this time and reserving its rights.

12       I would mention that we have, in one of the cases

13  that was raised, the Orange County case, I actually

14  represented one of the official committees in that case, as

15  well as I'm representing the City of San Bernardino in that

16  case.  So I am certainly aware that committees may be

17  appropriate.  But they are not taking a position with respect

18  to that issue for the reasons that were raised.  And our

19  position is that we are attempting to work with AAFAF and the

20  Oversight Board regarding these matters.

21       THE COURT:  Thank you.

22       Mr. Rochelle, did you have any further comment?

23       MR. ROCHELLE:  Just the briefest of remarks, Your

24  Honor.

25       There are some several claims that have been filed by

1    municipalities already.  One of them I think is instructive.

2    The City of Mayaguez filed yesterday.  Its claim is for 17

3    million dollars, and those are simply on straight claims that

4    the municipality has against the central government.  That

5    does not include another 35 million dollars of claims which

6    Mayaguez has against the GDB.

7           So to be sure, the GDB problems are significant.  But

8    as others have noted, they are not here.  I'm not here because

9    I'm a rich Texas lawyer.  I'm here because David Godreau, my

10   old friend, called me and asked me to help.

11          I haven't seen any money, and I don't think I likely

12   will.  But Tocqueville did say about Americans, and he thought

13   it was odd, he said, you know, unlike Europeans, Americans

14   always go to the Court with their political questions.

15          Whatever kind of odd looking mongoose we've got here,

16   this is where our society solves it.  I think there is

17   sufficient case law that we have presented to this Court, and

18   sufficient need to make it not only possible, but wise to

19   appoint a committee of municipalities to assist in the

20   reorganization of the Commonwealth.

21          Thank you, Your Honor.

22          THE COURT:  Thank you, Mr. Rochelle.

23          It is now ten past 12:00, and I would like some

24   further time to reflect on the remarks.  And so it seems to me

25   this is an appropriate time to break for lunch.

1          So we will break and resume at ten past 1:00.  Thank

2     you all.  Have a good lunch.

3          (At 12:10 PM, recess taken.)

4          (At 1:14 PM, proceedings reconvened.)

5          THE COURT:  I will now make my oral ruling on the

6     motion requesting a municipalities committee.  I have reviewed

7     carefully the written submissions of all of the parties and

8     the movant, and I have carefully considered all of the

9     arguments made today in court.

10          I understand the profound concerns and frustrations

11     that have been expressed here today on behalf of the

12     municipalities who may be asked to shoulder extraordinary

13     burdens in this extraordinary financial crisis.

14          However, for the reasons that I will now explain, the

15     motion of the Ad Hoc Puerto Rico Municipalities Committee,

16     which I will refer to as the Municipalities Group, for the

17     appointment of an additional committee of municipalities, must

18     be denied.

19          As a preliminary matter, neither Section 301(c)(3)(a)

20     nor Section 105 of the Bankruptcy Code provides independent

21     authority for the appointment of a statutory committee.

22     Rather, any order directing the appointment of a statutory

23     committee would have to rest on the grant of authority

24     contained in Section 1102 of the Bankruptcy Code.

25          Pursuant to Section 1102, the Court may appoint an

1    additional committee of creditors or of equity security

2    holders, if necessary, to assure adequate representation of

3    such creditors or equity security holders.

4        In this case, the principal concerns articulated in

5    the motion are not concerns that arise from creditors' status

6    with respect to the Commonwealth, and the municipalities are

7    not equity holders.

8        Section 1015 of the Bankruptcy Code defines claim to

9    mean either a right to payment or a right to an equitable

10   remedy for breach of performance.

11       On the record before the Court, the Municipalities

12   Group has failed to proffer evidence of either type of claim

13   as against the Commonwealth or any of its instrumentalities

14   that have filed Title III petitions.  And, therefore, has

15   failed to establish that it is at all qualified to constitute

16   or serve on a creditors' committee.

17       The potential elimination of funding from the

18   Commonwealth is a monumental concern, but it is not equivalent

19   to either of the recognized creditor rights because the

20   Municipalities Group has not established that the

21   Municipalities have a right to the funding in question.  Thus,

22   the Municipalities Group has not shown that it has a claim

23   within the meaning of the Code against a Title III debtor.

24       The example that counsel offered of a municipality

25   that has a claim is also insufficient to demonstrate the need

1    for a committee to represent municipalities as creditors.  The

2    unsecured creditors committee has the protection of the

3    general interests of unsecured creditors as its mission.

4         The Municipalities Group asserts that it or its

5    members have a claim against the GDB.  However, the GDB is not

6    a Title III debtor.  The Municipalities Group also incorrectly

7    asserts that PROMESA treats the Commonwealth and its

8    instrumentalities as one and the same.

9         However, Section 302 of PROMESA provides that either

10   a territory or a territorial instrumentality of a territory

11   may be a debtor pursuant to Title III, and clearly

12   contemplates instrumentality filings separate from one of the

13   Commonwealth.

14        So, for instance, Section 302 defines the territory

15   and its instrumentalities as separately eligible debtor

16   entities, and Section 308 has different procedures for

17   selecting presiding judges for a territory and its entities or

18   instrumentalities.

19        So treating GDB and the Commonwealth as a single

20   entity for Title III purposes would run afoul of this

21   statutory structure.

22        The Court declines to consider the Municipalities

23   Group's alter ego arguments which were advanced for the first

24   time in the Municipalities Group's reply brief and are

25   therefore procedurally improper.  Even if the Municipalities

1   Group had satisfied the threshold requirement of creditor

2   status, the motion must still be denied, because there has

3   been no showing of a lack of adequate representation.  And

4   such a showing is a necessary predicate for Court ordered

5   appointment of the committee under Section 1102 of the

6   Bankruptcy Code.

7          Instead, the record shows that the municipalities are

8   capable of representing their own interests in connection with

9   these cases and PROMESA matters, and have been active in that

10  regard.  Indeed, municipalities have filed PROMESA related

11  lawsuits.

12         Moreover, as previously noted, to the extent that the

13  municipalities hold unsecured claims against a Title III

14  debtor, their interests are represented, at least as

15  Commonwealth debtors and Commonwealth creditors, by the

16  existing and official unsecured creditors' committee.

17         In light of these considerations, it is unnecessary

18  for the Court to address the United States Trustee's argument

19  regarding the ineligibility of municipalities to serve on a

20  committee due to lack of personhood.

21         For the reasons stated, the motion is denied, and the

22  Court will issue an Order further memorializing this decision.

23         The next item on the agenda is a motion of the Ad Hoc

24  General Bondholders Group to reconstitute the official

25  committee of unsecured creditors and appoint a statutory

1     committee of constitutional debt holders.

2          Mr. Rosenberg.

3          MR. ROSENBERG:  Good afternoon, Your Honor.  I'm

4     Andrew Rosenberg, from Paul Weiss, on behalf of the Ad Hoc GO

5     Group.

6          I'd like to reserve about three minutes for rebuttal.

7     I also hope that three's a charm in terms of motion three,

8     reconstitution of creditors' committees today.

9          Your Honor, to structure the argument, because I know

10    Your Honor has reviewed the pages thoroughly, I'm only going

11    to spend a few minutes on the facts, and then turn to why

12    constitutional factors associated with a lien should not

13    preclude the creditor listed as the largest unsecured creditor

14    group from representation on the UCC.  And then conclude with

15    our argument as to why the constitutional debt holders must be

16    placed on the UCC, both to ensure adequate representation and

17    to enable the UCC to better fulfill its statutory role, or

18    alternatively, to have a separate committee of constitutional

19    debt holders.

20         Quickly, to the facts, the Oversight Board in the

21    petition lists the constitutional debt holders as the largest

22    class of unsecured creditors in Commonwealth's Title III

23    cases.  The other large creditor group, the retirees, already

24    have their own official committee.

25         Constitutional debt holders are owed approximately 19

1   billion dollars and counting.  There is not a single

2   constitutional debt holder on the UCC.  Rather, the UCC is

3   made up of the following:  Four trade creditors, and the

4   Commonwealth recently estimated the total amount of trade debt

5   at approximately 373 million dollars; one tax refund claimant,

6   and we had thought all tax refunds were actually paid.  We

7   understand that this one was not paid, because there's some

8   dispute as to whether it's owed or not.  And two employee

9   unions, and we're not sure what claims employees actually have

10  apart from their claims as retirees, which are already covered

11  by the retirees committee.

12          As we note in our papers, the fiscal plan provides

13  that the Commonwealth will pay all these constituencies in

14  full, and many of them are being paid in full right now.

15          In fact, since the automatic stay or the stay went

16  into effect 13 months ago, and payments to the first priority

17  constitutional bondholders stopped, I believe that trade

18  payables have decreased from 1.3 billion to roughly 373

19  million dollars that I mentioned before.

20          In addition, we heard at the board meeting on Friday

21  that the Commonwealth is now at a 1.8 billion dollar cash

22  stockpile.  I suspect that that may result in it being no

23  claims unpaid in short order.

24          By contrast, bondholders as a group are slated for a

25  80 percent discount, depending on how you read the fiscal

1    plan, and there is no agent or indenture trustee that speaks

2    on behalf of or represents the constitutional debt holders.

3            This is an interesting argument, but I don't think

4    there's any argument that a group of small trade creditors and

5    disputed tax refund claimants and unions who are potentially

6    being paid in full adequately represent 19 billion dollars in

7    constitutional debt holders that the fiscal plan proposes to

8    receive drastic haircuts.

9            In sum, I don't think there's any dispute that the

10   UCC does not accurately represent the constitutional

11   bondholders.  The question raised by the UST and the UCC is

12   whether the UCC should represent the constitutional debt

13   holder at all.  They argue that because some of us assert

14   liens, we are not entitled to be on the committee or to be

15   adequately represented by the committee.

16           Notably, both the U.S. Trustee and the UCC -- excuse

17   me, certain people's objective of the Oversight Board suggest

18   that if the constitutional debt holders were unsecured, then

19   changing membership of the UCC would actually be appropriate.

20           The correct view, in our opinion, is that the simple

21   assertion of a lien in these particular cases is not by any

22   means disqualifying, and I think there are five reasons.

23   First, the obvious one, the lien is disputed by the Oversight

24   Board, the Commonwealth and potentially the committee.  It

25   bears repeating.  Again, as I mentioned before, the petition

1  lists the constitutional debt holders as the largest group of

2  unsecured creditors.

3        Second, for an argument that the objectors put so

4  much emphasis on, there's actually little case law to support

5  the position about the constituents asserting the secured

6  status being disqualified.  There are two cases cited in the

7  papers that go to whether the assertion of the lien, how it

8  affects UCC eligibility.  They go in different ways, quite

9  frankly.

10        The UCC cites In Re:  Fas Mart, which stands for the

11  proposition that assertion of a lien is not disqualifying.  We

12  cite In Re:  Seascape Cruises which stands for the exact

13  opposite proposition.

14        In neither of those cases, it bears noting, did the

15  debtor list the creditor as the largest unsecured creditor in

16  the case, as they've done here.  We also cite to a litany of

17  cases in which the creditor holding a disputed claim can serve

18  on the UCC.

19        The parallel is obvious.  That creditor may have no

20  claim or a full claim.  Nobody knows.  But it's not

21  disqualified and it's disputed.  We may have a lien.  We may

22  not.

23        THE COURT:  But presumably that disputed creditor's

24  disputed claim was not one that that particular creditor was

25  in a position to prime every other interest represented on the

1    committee.

2         MR. ROSENBERG:  That is true, and actually the

3    perfect segue to get into the priming point.  Because these

4    are the unsecured creditors in this case, there's little

5    distinction between an enforceable priority, which we can also

6    assert is in the Puerto Rico Constitution and applicable laws,

7    and enforceable.  There may be other distinctions in terms of

8    506(b) rights, adequate protection.  But vis-a-vis the

9    unsecured creditors, we are first unsecured priority, or

10   whether a lien, one form or another.  And this case is unique,

11   as I'm sure we're going to hear throughout the cases we have.

12   PROMESA contains numerous positions with no parallel under the

13   Bankruptcy Code.

14        Therefore, constitutional debt holders here, even if

15   they have no lien, may very well be like senior unsecured

16   bondholders, while other Commonwealth creditors may be like

17   subordinated unsecured bondholders.  Both may be unsecured.

18   One gets paid before the other.  They're often placed on the

19   same committee. It's quite routine.

20        And I've done this for a long time, Your Honor, and

21   I've heard much griping about why they should ultimately have

22   separate committees.  And the U.S. Trustee always says put

23   them together and let them work it out.

24        This came up in the Hills Store cases where there

25   were two holders of senior notes and four holders of different

1    types of subordinated notes.  And even the UCC had to concede

2    that the seniors themselves were often appointed to the exact

3    same creditors' committee.

4         Similarly, again, dealing with the issue of priority,

5    which comes up all the time, lien or no lien, is you have a

6    lot of creditors in a large corporate unit with claims against

7    different entities.  And they may be structurally senior,

8    because the assets may be in one.  They may be Holdco

9    creditors, which are separate from Opco creditors.  And the

10   Opco creditors, obviously they may get paid before Holdco gets

11   anything at all, or not at all.

12        You have 503(b)(9) administrative type creditors who

13   are entitled to be paid before everyone, or trade creditors,

14   set off, reclamation.  The list is endless with different

15   types of priority creditors that are all stacked together on

16   one creditors committee.  And that is actually always done on

17   purpose by the United States Trustee.

18        There are -- different types of creditors with

19   diverse or even conflicting interests should be on a

20   committee, whether they have different priorities, under all

21   different ways, senior, sub, different debtor, set off,

22   503(b)(9), et cetera.

23        As the Enron Court noted, the ultimate aim here is to

24   strike a proper balance.  And the overall takeaway from these

25   cases is that it's a good thing in the Court's view, not a bad

1  thing, that the creditors have different interests and have to

2  work it out.

3       And many of the cases involve people who have a

4  senior or sub or priority wanting their own committee because

5  they felt they were underrepresented in the UCC.  And the

6  Trustee and the courts have always come back and said no,

7  different priorities, go figure it out on the same committee.

8  It's a strength, not a weakness to help resolve these cases.

9       In addition, in terms of conflicts, one of the things

10  I think we heard from the Commonwealth is oh -- or the Control

11  Board, excuse me, was you want to be paid first.  How can you

12  be you on the committee with everyone else?

13       Well, the committee right now is entirely composed of

14  people who the Commonwealth and the Oversight Board has said

15  will be paid first, and then we will get, quote, the

16  remainder.  It's unclear how that's not a conflict where

17  they're supposed to be paid in full and we get the remainder,

18  as opposed to the reverse.

19       It's the exact same principle.  They simply have

20  priority as the fiscal plan is currently set up.  We believe

21  it's incorrect, but that's what it says right now.

22       And finally, we would not obviously be using our

23  position as secured creditors.  Any discussions involving that

24  on the committee we would recuse ourselves on, which happens

25  all the time where people have large claims or different

1   interests.  Where anything involved secured interests, well,

2   there's mechanisms to have us recused from those particular

3   type of discussions.

4            Turning to adequate representation itself, and this,

5   I believe, would apply whether we're seeking to reconstitute

6   committee or alternatively have our own separate GO committee.

7   The nature of the case seems to be the real driving factor.

8   There's lots of factors.  I think most of those don't apply

9   here.  There's no delay in the case.  We're up to speed.

10  We've been at this for years, so we know the case.

11           The cost, if we're on the same committee, no

12  additional cost.  No getting up to speed cost if we had our

13  separate committee.  I think it's really the nature of the

14  case.  And while this case is obviously unique and demands

15  adequate representation either on the UCC or on their own

16  committee for the constitutional, adequate representation

17  generally requires participation on the committee that is

18  commensurate to the creditor's role in the case.

19           Here, the constitutional debt holders are 50 times

20  larger than the trade debt, the undisputed tax refunds.  The

21  employee claimed that they are 373 million, zero, zero, versus

22  19 billion.

23           We also, and this is the most important point we

24  really stressed in our papers, we may be the only true

25  creditors in this case.  As I said, the Control Board and the

1    Commonwealth have stated their intention to pay the trade

2    creditors and tax refund claims in full.  They've been doing

3    that.  They have now apparently a billion eight in the bank to

4    do it even more.

5         The government's been very clear and publicly made

6    speeches that employees and retirees won't suffer any losses.

7    And as to the unions, they may have other interests in these

8    cases, such as insuring future employment, but that is not the

9    claim and that does not make them a creditor.  And since they

10   won't be creditors for long, the nature of the UCC is

11   naturally made up of constituencies that will focus not on the

12   typical creditors committee role of increasing the creditor

13   pie, but the future relationship with the Commonwealth's

14   employees, suppliers, et cetera.

15     Adequate representation of the claim is typically found

16   on a creditors committee.  Those focused on their actual

17   recovery as creditors can only be insured by placing

18   constitutional debt holders on the UCC.

19        In fact, placing constitutional debt holders on the

20   committee will also aid the committee in fulfilling its

21   responsibilities.  For instance, the committee claimed it

22   should have a pivotal role in these cases.  It argues over and

23   over again it's the watch dog that oversees the debtors.

24   Unfortunately, we don't doubt their intentions or sincerity,

25   but it's presently formed.  It's just not suited to carry out

1    that function.

2            Its interests in many cases align with the Control

3    Board in supporting the current fiscal claim that turns the

4    constitutional priority on its head and makes first priority

5    creditors last.  I don't think it's surprising that the

6    Oversight Board and AAFAF are supporting the current

7    Constitution and don't want us on that committee.  One has to

8    ask why they're so interested in the formation of the

9    creditors committee.

10           We, of course, expect that the committee -- I will

11   use that 30 seconds of my rebuttal time, Your Honor.  We, of

12   course, expect the committee will challenge the Commonwealth

13   and seek to increase creditor recovery.  But we are the only

14   creditor right now the Commonwealth isn't promising to pay us

15   in full.  Its bondholders.

16           And the committee appears to believe that increased

17   recoveries to bondholders will mean decreased payments to

18   them.  A zero sum game that may not exist if, for instance,

19   more effort is placed on dealing with the modified fiscal

20   plan, count their actual revenues that are coming in above

21   projection, and realistic levels of GNP growth that helped

22   contribute to this 1.8 billion dollar tax bill, in addition to

23   not paying the bondholders, and then pay down their billion

24   dollars of tax bills.

25           It is simply human nature that creditors standing to

1   receive 20 percent or similar types of recovery under the

2   current fiscal plan will be more motivated to increase

3   creditor recoveries than creditors who stand to receive 100

4   percent under that same fiscal plan.

5          Thank you.

6          THE COURT:  Thank you.  Yes.

7          MR. SOSLAND:  Good afternoon, Your Honor.  Martin

8   Sosland of Butler Snow on behalf of Financial Guaranty

9   Insurance Company.

10          We filed a response in support of the motion filed by

11   the GO group.  I will not repeat anything that Mr. Rosenberg

12   said and will attempt to be brief.

13          Your Honor, this is really about a voice, and not

14   because Mr. Rosenberg's clients or mine and Assured's and

15   other monolines who hold GO positions aren't represented in

16   this case.  They are.  Just as by my quick count before I

17   stood up here, at least seven unions are actively

18   participating in the Title III cases, of the mediation, and

19   also have two members on the statutory committee of unsecured

20   creditors.

21          But the two most important things in my mind that the

22   unsecured creditors' committee is currently focused on is the

23   fiscal plan, which Mr. Rosenberg addressed a little bit.

24          And as the agent of the Commonwealth, there's a

25   stipulation that Your Honor approved first thing this morning

1    at the hearing, in which we were going to talk about the -- in

2    which we were going to attempt to resolve by litigation or

3    settlement or mediation the Commonwealth-COFINA dispute.

4         And for the reasons that Mr. Rosenberg stated, no one

5    has more of an economic interest in the outcome of either the

6    discussions regarding the fiscal plan and how all Commonwealth

7    creditors participate, or in however the Commonwealth and

8    COFINA -- versus COFINA dispute may be resolved, than the

9    general obligation bondholders who are entitled to -- who have

10   claims of 18 billion dollars against the Commonwealth estate.

11        I feel like we are in a little bit of the same

12   position of Captain John Yossarian in Catch 22.  These are the

13   things that I know.  I know that the Constitution of Puerto

14   Rico gives the general obligation debt of the Commonwealth a

15   priority.  No one really disputes that that priority exists

16   against available resources of all creditors.

17        There is a huge dispute in this case about what that

18   means in connection with the fiscal plan.  And the position of

19   the Oversight Board is that there are 787 million dollars --

20   billion dollars a year available for all of the debt of the

21   Commonwealth and its agencies, and how is that going to be

22   split up.

23        If that is all that's available for the Commonwealth

24   creditors, and COFINA creditors, and HTA, and other agency

25   creditors, then we're all going to -- we're all collectively

 1   going to be taking major haircuts.  That doesn't have the feel

 2   of being secure.

 3        I understand the U.S. Trustee's position in defending

 4   its appointment.  The one statement -- we're taking the

 5   position that there's a priority.  Mr. Rosenberg is arguing

 6   about delay.  The one segment relating to delay in the U.S.

 7   Trustee's response that I know is not true is they say it's

 8   impossible to be a secured creditor and an unsecured creditor.

 9   No, it's not.  Section 506 of the Bankruptcy Code says

10   precisely that.

11        And under the current fiscal plan, there isn't enough

12   available for us to be fully secured, even if Mr. Rosenberg

13   thinks we are, or for the priority to be paid in full under

14   the constitutional priority argument that we are making.

15        And so we are in the position that if we're not going

16   to be paid, and that is the place from which we start these

17   Title III cases, there isn't enough money to pay us, that

18   pretty much sounds like we -- I would call that being an

19   unsecured creditor.  And I think that's the context in which

20   we're here.

21        And so why shouldn't the voice be heard on these

22   issues, with a position on the Commonwealth creditors

23   committee?  What I don't understand, AAFAF's position is

24   really there shouldn't be a new committee formed because we

25   don't want to pay for it.  And I want to focus on additional

1   members of the unsecured creditors' committee.

2        I don't understand why any of the other parties

3   voicing concern should even care if there are two or three

4   members of -- who hold GO claims added to that group, because

5   of all of the work that has been done by the creditors, we

6   understand that the financing we've devoted, our clients

7   collectively have devoted more hours, years, years, to trying

8   to help resolve these disputes than anyone else.

9        Being at the table, being at the table where

10  discussions with the other unsecured creditors of the

11  Commonwealth can take place, behind closed doors, with

12  counsel, and the representatives of the creditors committee,

13  is something that can only help move these cases forward.  It

14  won't hurt it.

15       In another lifetime, years ago, Mr. Bienenstock and I

16  often pitched to creditors committees together about how

17  representing multiple layers of contractually subordinated

18  debt, as well as trade creditors on one committee was the best

19  way to move a case forward to a resolution.  I'm proud to say

20  we succeeded in doing that multiple times.

21       That's what we should be focused on in this case:

22  How do we move the case forward.

23       THE COURT:  I hear you.  Thank you.

24       MR. DUNNE:  Good afternoon.  Dennis Dunne on behalf

25  of Ambac Assurance Corporation.

1          Your Honor, I'll be very brief, less than one minute.

2     I'm not going to repeat anything that you just heard from

3     Mr. Rosenberg or Mr. Sosland.

4          I do want to make one factual point, which is that

5     when the creditors committee for the Commonwealth was formed,

6     Ambac submitted a questionnaire, I believe other monoline

7     insurers like National Assured submitted questionnaires and a

8     willingness to serve, because they rapped GO bonds.

9          And we were excluded from service for the same reason

10    Mr. Rosenberg's clients were excluded, because of the argument

11    that the constitutional debt priority claim removes us from

12    the unsecured creditor pool.  We don't believe it does or

13    should, but were this Court to rule that the U.S. Trustee

14    should consider appointing GO bondholders, we believe it would

15    be appropriate that they consider adding one or more of the

16    monoline insurers who previously had expressed a willingness

17    to serve to the committee.

18          THE COURT:  Thank you.

19          MR. DUNNE:  Thank you.

20          THE COURT:  Good afternoon, Ms. Halstead.

21          MS. HALSTEAD:  Good afternoon, Your Honor.  Ellen

22    Halstead, Caldwalader Wickersham & Taft for Assured Guaranty

23    Corp. and Assured Municipal Guaranty Corp.

24          Assured joins in the motion of the GO group, and the

25    arguments made by Mr. Rosenberg today.  And as he explained,

1   we join in the motion because the current committee is

2   comprised of a very small subset of creditors that is not

3   reflective of the creditor body in these complex cases.  And,

4   therefore, the committee does not insure adequate

5   representation as required by Section 1102 of the Bankruptcy

6   Code.

7          And like Ambac, Assured also requested to serve on

8   the committee and was not selected to be on the committee.

9   Assured would still be happy to serve on the committee if the

10  GO group motion was granted.  Thank you.

11         THE COURT:  Thank you.

12         Are there any other supporters of the motion who wish

13  to be heard?

14         Now we'll turn to opponents.  Mr. Despins.

15         MR. DESPINS:  Good afternoon, Your Honor.  Luc

16  Despins with Paul Hastings on behalf of the creditors

17  committee.

18         Your Honor, the committee has several issues or

19  concerns with the Aurelius Group's motion.  Their papers

20  contain a lot of snippets, extracts from various cases, even

21  extracts from statements that are -- that are taken; and they

22  are collated together, but don't really stand for the

23  propositions they are advancing.

24         For example, Mr. Rosenberg quoted extensively the

25  Enron case.  The first time I read their papers, I said my

 1   God, I seem to recall that case, and there was no other

 2   committee appointed.

 3           So the bottom line, Your Honor, is that they can't

 4   cite to one case where a fully secured creditor -- I want to

 5   be very precise what that means to address some points made --

 6   a fully secured creditor, that's defined -- the way we defined

 7   it is in footnote four of our position objection, which is a

 8   creditor that has a lien and also is taking a position that no

 9   one else can get paid until they get paid.  They can't cite

10   any case where such a creditor's appointed.

11           The case they rely on, Mr. Rosenberg said, well,

12   that's even in a 50-50, one case goes my way or -- no.  That

13   case, the creditor had extensive unsecured claim separate from

14   the secured claim.  And Fas Mart is the only case on point

15   where a creditor, and this is Judge Tice ruled, that the U.S.

16   Trustee had abused its discretion.  Very high standard.  Had

17   abused its discretion because it appointed a creditor that was

18   seeking to be treated as secured creditor and that was

19   actively litigating against the committee.

20           And again, that's a very high standard.  That's the

21   only case.  And frankly, other than Mr. Rosenberg mentioning

22   today, there was no discussion, no attempt to distinguish that

23   case in any way.

24           And then they focus on the next issue, which is well,

25   okay, we're secured, but we also have priority.  And so this

1   reminds me of the shell games on 42nd Street 20 years ago
2   before they cleaned up the city, where they're moving this
3   shell here, which is the priority shell.  Let's focus on that.
4   Where the other shell, there's a secured shell, they don't
5   want you to look at that one.
6         It's a fascinating discussion about well, we can be
7   priority creditors, still on a committee, but they don't tell
8   you oh, by the way, they're still asserting it head on.  So
9   that issue of priority is a red herring.
10        In the cases they cite, for example, Hills Department
11  Stores, the distinction here is very important.  In those
12  cases, they were trade creditors, they were not subordinated
13  in any way.
14        It was funded debt where the senior creditor and a
15  junior creditor, they were appointed to the committee, but
16  they were also trade creditors that were not junior in any
17  way.  That is not the case here.
18        It's a case, it's a zero sum game.  It's all or
19  nothing.  And that's their position, and that's why it's
20  problematic.
21        And this issue of their priority or security is a
22  issue that permeates the entire case.  I'll give you an
23  example.  Not only does the committee need to investigate that
24  issue, but there's more than that.
25        The committee's also the agent.  Now, is not the

1    agent on the Commonwealth side.  And depending on what legal

2    theories are used to go and -- because that's our job, to go

3    and grab that money and bring it to the Commonwealth.  Some of

4    the -- the constitutional debt holders may be favored by

5    the -- depending on which theory is used.  And therefore,

6    they'll be -- this issue permeates the case entirely.  It's

7    not possible to isolate that issue on the committee.

8           Then to raise the issue of the trade creditors being

9    paid in full, I think we addressed that in our papers.  But

10   just to be clear, when they say the Commonwealth has promised

11   to pay trade creditors in full and we say, we appreciate that

12   promise, but everyone in this courtroom was promised many,

13   many times they would get paid in full.  In their case, they

14   were issued bonds, opinions and all that saying that they were

15   getting paid in full, but they're not getting paid in full.

16          The point there is it's not like a priority creditor

17   that by statute must be paid in full, otherwise you cannot

18   confirm the plan.  This is a current intention.  I can assure

19   the creditors on the committee are not paid in full.

20          Why would they spend hours listening to me on

21   conference calls every week if they were getting paid in full?

22   Why would they hire their own counsel at their own expense if

23   they thought they were getting paid in full?

24          They don't know that.  And the committee, that's the

25   point that's very important, the committee has been operating

1    as if we need to be very aggressive, either because we're not

2    going to be paid in full or because there is a good chance

3    that the earlier group or the bondholders, like the GO

4    bondholders will and end up on our lap.

5         Why?  Because there's a good chance the Court will

6    determine it's unsecured.  If that happens, we need to be as

7    aggressive as possible to generate funds, to bring funds to

8    the Commonwealth.  And therefore, we are highly motivated to

9    do this.

10        For example, the 2004 motion, which is not before

11   you, but is a perfect example of that, why would we go through

12   the trouble if we're guaranteed getting paid in full.  We're

13   not guaranteed getting paid in full.  In fact, what they're

14   telling us is they won't let the Commonwealth pay us in full.

15   That they will assert their priority.  And, therefore, we want

16   to bring as much money as possible on the Commonwealth side to

17   try to pay all creditors the maximum amount possible.

18        Your Honor, if you're still on the fence after this,

19   let me give you what I think is the clincher, which is that

20   two days ago, Aurelius filed, this is docket number 913, and I

21   think you can take judicial notice of this, filed a Motion to

22   Dismiss these cases.

23        Another way to look at that motion, it's a motion to

24   disband the committee.  This is the committee that they want

25   to join.  I don't know what to say about that other than this

1  makes no sense.  And to grant their motion while they're

2  actively seeking to dismiss these cases would be a travesty,

3  Your Honor.

4         I want to rebut just some of the factual points about

5  the unions, Your Honor.  The unions have claims.  Actually,

6  you're seeing that claim.  There's a huge tension -- or I

7  shouldn't say huge.  There is tension between the government

8  and the Board over furloughs, over issues like that.  And

9  these are affecting union employees.  We're not making this

10  up.  These are real issues.  The issue of the fact that their

11  lien is disputed.

12         What they're saying is put us on the committee.  And

13  that's why we used this heading in our objection, which is a

14  bizarre suggestion.  And the suggestion is hey, we think we're

15  secured, but other people think we're unsecured.  So put us on

16  a committee until the Court determines that we're secured.

17         And the practical implication of that, across the

18  country, if the Court were to adopt that suggestion, would be

19  incredible.  Meaning that in every case of involvement -- I

20  shouldn't say every case, but most cases I've been involved in

21  on the committee's side, we have received the lenders.  We've

22  challenged them sometimes.

23         Under that logic, they should be put on the committee

24  until they prevail on our challenge.  It makes no sense.

25  There's no case law that supports that.

 1          And for all these reasons, Your Honor, we would ask

 2   you to deny the motion.  Thank you.

 3          THE COURT:  Thank you.

 4          Ms. Lecaroz.

 5          U.S. TRUSTEE LECAROZ ARRIBAS:  Good afternoon,

 6   Monsita Lecaroz Arribas, Assistant U.S. Trustee.

 7          Your Honor, since the enacting of GO holders --

 8   holders of GO bonds have strongly asserted that based on a

 9   constitutional guarantee, they hold first priority statutory

10   liens on all Commonwealth revenues, including revenues that

11   have been assigned to other classes of bonds.  Whether they do

12   or not is the crux of this Title III case, and that is what

13   makes this request so ironic.

14          The U.S. Trustee conducted a robust committee

15   formation process.  While the GO bondholders sought membership

16   on the committee and were duly and thoughtfully considered,

17   the U.S. Trustee properly excluded GO bondholders from

18   membership because they are actively and aggressively pursuing

19   their secured status.  They are not willing to forego secured

20   status and thus, cannot serve as fiduciaries for the unsecured

21   creditor body.

22          The U.S. Trustee appointed a committee that

23   adequately represents the creditors that assert to be

24   unsecured creditors, not the ones that assert to be secured.

25   The type of creditors that we appoint, Your Honor, as an

example advanced to the Court, are always creditors that

assert to be unsecured.  They may have intercreditor

agreements, such as senior and subordinate, but they always

assert to be unsecured.

Since the GO bondholders are claiming to be secured,

regardless of the type of security or priority they claim,

they're hardly representative or protectors of the interests

of unsecured creditors.

In fact, this constitutes a blatant conflict of

interest as they're attempting to minimize their recovery for

the unsecured.  Potential recusal is not an option.  Their

assertion claiming secured status creates their own

fundamental conflict and would permeate all dealings within

the committee.

To the extent this conflict of interest exists, GO

bondholders cannot be part of the committee, nor can they be

appointed now and removed later because that conflict exists

and persists.  There is simply no provision in the Bankruptcy

Code for provisional sitting in a committee.

As long as the bondholders assert that they're wholly

secured, they are not entitled to representation.  Their

request under 1102(a)(4) should be denied.

We also understand the request pursuant to 1102(a)(2)

should be denied.  They are aggressively representing

themselves.  Until a determination is made as to their secured

1   status, the GO bondholders are adequately represented by the

2   existing committee.  If they end up being secured, they never

3   needed a committee to begin with.

4          Thank you, Your Honor.

5          THE COURT:  Thank you.  Mr. Friedman, did you wish to

6   speak?  You are the last one on my list of people signed up to

7   speak.

8          MR. FRIEDMAN:  No, thank you, Your Honor.  I think

9   everything's been covered.

10         THE COURT:  Thank you.

11         Mr. Rosenberg.

12         MR. ROSENBERG:  Quickly, if the Court will indulge, I

13   may go a few seconds over.  Just a lot to cover.

14         First, as to the cases cited by Mr. Despins,

15   obviously there's not time to go through all of them, I would

16   ask the Court to look at In Re:  Seascape where I believe they

17   claimed they put on -- the committee had disputed asserted

18   maritime liens for the full amount of their claim.

19         Second, while we may be entitled as a secured

20   creditor or a priority creditor to be paid in full before

21   anyone gets anything, that doesn't mean we're not willing to

22   have discussions and compromise.  People all the time are on

23   committees, as I said, with senior and junior claims, and part

24   of putting them all on the same committee is they work those

25   things out consensually.

1            Third, the point that Mr. Despins mentioned about

2    COFINA is exactly one of the reasons we did want a voice on

3    the committee, because the illusion is there that we may

4    pursue different causes of action or pursue this in a

5    different way that benefits the, quote, trade creditors, but

6    not the GO creditors.  That's exactly the kind of concern that

7    we're afraid of and why we do need adequate representation on

8    the committee, as opposed to why we don't.

9            Fourth, I think what we heard also from Mr. Despins

10   is exactly what we feared.  This has nothing to do with the

11   lien.  It also has to do with the priority, and that

12   ultimately is the gating issue.

13           Again, priority senior, sub -- structurally senior,

14   structurally junior.  503(b)(9) comes up all the time.  Just

15   because we may have a priority that puts us first is not a

16   reason under any of the case law to not include us.  It's

17   every reason to include us to try to work things out on the

18   committee.

19           Fifth, as to Aurelius, Aurelius is on a committee.

20   We represent an entire committee of seven members.  I am

21   unclear what's filed by one member, a separate counsel, a

22   pleading, has to do or not do with others being on the

23   committee.

24           Second to last, as to the lien challenge, I'm aware

25   that unsecured creditors can place challenges to liens all the

1   time.  I would point to two things here.  One, we said we'd

2   recuse ourselves.  Two, I said -- that came up.  That was no

3   fun.  Two, most importantly, generally the challenges are to a

4   particular lien as to how secured you are or not.  Here the

5   issue is a little bit different.  They're challenging that we

6   have no lien at all, and that's a little different, because

7   they're basically saying they are wholly unsecured.  At least

8   that's what the Oversight Board intimated.

9           THE COURT:  So which way does that cut?

10          MR. ROSENBERG:  I think that cuts in way of putting

11  us on the committee, because it's not saying if they're

12  looking at whether they have one lien here, one lien there.  I

13  don't mean to say essentially they're unsecured.  That's the

14  challenge.  Are we secured?  Are we not secured?

15          And then finally, I think in conclusion I would note

16  that I think it's clear that we are not adequately

17  represented.  You're hearing, at least from the committee

18  itself, why the interests are so different.

19          If that's the concern and we're not adequately

20  represented, I would ask for the alternative relief that we do

21  get our own committee as a 19 billion dollar plus creditor

22  group does not interest an agent, does not have an indenture

23  trustee, that we should be entitled to official status as a

24  large creditor group.

25          And if they're concerned about conflicts, those could

 1   be rectified by giving us official status, and an official

 2   voice, and the deference that an official committee often gets

 3   in any type of bankruptcy proceeding.

 4            Thank you, Your Honor.

 5            THE COURT:  Thank you, Mr. Rosenberg.  The Court will

 6   reserve decision on this motion.

 7            Next on the agenda is the ad hoc PREPA bondholders'

 8   motion for relief from the automatic stay.  The agenda

 9   allocated 60 minutes to argument.  And have you had any -- I

10   really don't want this to go over 60 minutes of argument.  So

11   has there been any consultation about how that's to be split

12   as among supporters and opponent?

13            MR. HOROWITZ:  Yes, Your Honor.  Gregory Horowitz

14   with Kramer Levin on behalf of the Ad Hoc Group of PREPA

15   Bondholders.

16            Your Honor, we can only speak for the movant's side.

17   I will be the primary person arguing.  Mr. Polkes representing

18   our own National Guaranty Corp. has asked me to reserve four

19   minutes for him to speak in favor of the motion.

20            THE COURT:  All right.  So you're asking for 26 and

21   four, minus whatever you are reserving for rebuttal?

22            MR. HOROWITZ:  I would like to reserve five minutes

23   of my time for rebuttal, Your Honor.

24            THE COURT:  So that would be 21, four and five, is

25   that --

1         MR. HOROWITZ:  That's right, Your Honor.

2         THE COURT:  All right.

3         MR. HOROWITZ:  That's how I got it.  I don't know if

4   you want to hear what the opponents are going to do on their

5   side before I proceed?

6         THE COURT:  That would be helpful.  So opponents,

7   will you get yourselves all within the 30 minutes?  That's

8   what I would like.

9         MR. BIENENSTOCK:  The answer is yes.  I'm going to

10  start, but I think Greenberg Traurig again for AAFAF will have

11  statements, much shorter than mine.

12        THE COURT:  And there are two gentlemen on the --

13        MR. KLEINHAUS:  Good afternoon, Your Honor.  Emil

14  Kleinhaus from Wachtell, Rosen, Lipton & Katz on behalf of

15  Scotia Bank of Puerto Rico.  I would like to have all of three

16  minutes.

17        THE COURT:  Okay.

18        MR. KLEINHAUS:  Possibly, hopefully less.

19        THE COURT:  All right.

20        MR. BAKER:  Good afternoon, Your Honor.  Nicholas

21  Baker, Simpson, Thacher & Bartlett on behalf of Solus

22  Alternative Asset Management.  It's a fuel line lender.  I

23  would similarly request a very short period, three, two

24  minutes at the conclusion.

25        THE COURT:  All right.  We will -- I'm sorry.

1    Mr. Despins.

2            MR. DESPINS:  Your Honor, Luc Despins.  One minute

3    please for the committee.  One minute only will do it.

4            THE COURT:  All right.  I am going to ask that

5    opponents sort of try to get everybody into the 30 minutes,

6    and if not, I'll do this extra, but let's just try that.

7    Thank you.

8            So Mr. Horowitz.

9            MR. HOROWITZ:  Thank you, Your Honor.  Gregory

10   Horowitz from Kramer Levin.  I represent the ad hoc group of

11   bondholders.  Together with our co-movants, the National

12   Guaranty or Assured Guaranty Corp., and Syncora Guarantee,

13   together we represent approximately 65 percent of the 8.3

14   billion dollars in outstanding PREPA bond debt.

15           By this motion, the movants seek to have the

16   automatic stay lifted so we can file a separate complaint in

17   the Federal District Court for the District of Puerto Rico to

18   obtain the independent receiver that the bondholders are

19   automatically entitled to under Puerto Rico law, in light of

20   the acknowledged default on the PREPA bonds, and the fact that

21   well over 25 percent of the holders are making the request.

22           Your Honor, cause exists to lift the stay in light of

23   the fact that the value of the revenues that the opponents I

24   think acknowledge have been pledged as collateral on the bonds

25   is in imminent danger of diminution.  That fact is

1   dramatically illustrated by the Oversight Board's position and

2   opposition to the motion that the value of collateral is zero,

3   because they assert incorrectly, Your Honor, the net revenues

4   are currently negative, and the Oversight Board, on behalf of

5   the debtors, has no intention of seeking an appropriate rate

6   increase to set electricity rates at a level that the

7   bondholders are entitled to, both as a matter of the Trust

8   Agreement and Puerto Rico statutory law, adequate to pay all

9   of the expenses of PREPA and to service all of the debt.

10          Adequate protection, Your Honor, is not possible here

11   because the only asset that PREPA has available to satisfy the

12   bond claims are the revenues.  And the failure to set rates by

13   definition deprives us of the value of our collateral.  And

14   there's no other alternative for adequate protection.

15          The inability to provide adequate protection, as Your

16   Honor knows, is grounds for lifting the stay.  Your Honor, I

17   want to start by saying that we have an agreement on what

18   we're going to accomplish today.  We've reached an agreement

19   with the Oversight Board.

20          Both the movants and the Oversight Board in

21   opposition proffered testimony in the form of declarations in

22   our papers.  We put in two witnesses.  The Oversight Board put

23   in two witnesses who were providing opinion testimony.

24   There's been no opportunity for discovery.  And clearly

25   there's not adequate time today to have a full evidentiary

1   hearing.

2          In light of that, we agreed that today we're only

3   going to argue on legal issues based on undisputed or admitted

4   facts, and if Your Honor concludes that it's necessary to

5   reach disputed facts that have been put forward here, then

6   we'll ask for an evidentiary -- a full evidentiary hearing to

7   be scheduled at the Court's earliest opportunity.

8          What I want to do today, Your Honor, is I want to

9   identify what I believe are the three disputed facts that bear

10  on this motion.  And I want to explain to Your Honor why we

11  believe that you can grant the motion to lift the stay without

12  reaching those disputed facts.

13         The first disputed issue of fact is the Oversight

14  Board's contention that the value of the pledged revenues is

15  zero because they assert that based on the current rates,

16  projected revenues are going to not even be adequate to pay

17  the projected expenses of PREPA.

18         At the appropriate time, if necessary, Your Honor, we

19  will be able to demonstrate that that is false.  It has to be

20  false, Your Honor.

21         And here I think I have to start talking about the

22  administrative body that was created under Puerto Rico law in

23  2014, the Puerto Rico Energy Commission, PREC, which is

24  charged under Puerto Rico law with setting electricity rates

25  for PREPA.

1          PREC conducted extensive rate making proceedings,

2   leading up to an order in January of 2017 establishing the

3   rates to be charged in fiscal year 2017.  And it's explained

4   in the two declarations of Derek HasBrouck, our energy

5   consultant.

6          Those rates were expressly calculated to be adequate

7   to pay all of the current expenses of PREPA, and to fund 279

8   million dollars in capital expenditures, which is the

9   waterfall under the Trust Agreement, which Your Honor actually

10  subordinated to the bond debt.  And to pay 314 million dollars

11  to service what PREC at the time anticipated would be all the

12  debt remaining after the implementation of the RSA, which I

13  think Your Honor knows unfortunately was not consummated.

14         Just to quote Your Honor from the final order, which

15  we placed into evidence from PREC, the fiscal year 2017

16  revenue requirement represents the total dollars PREPA must

17  receive during fiscal year 2017 to pay all of its expenses,

18  fund the group capital expenses, pay principal and interest on

19  debt due during the year and have an appropriate debt service

20  coverage ratio.  Having determined the revenue requirement,

21  the commission now needs to set rates so that PREPA's

22  customers pay the dollars that produce the revenue

23  requirement.

24         That's the final order of paragraph three on June 11.

25  That is what PREC did.  By design, net revenues must be

1  positive, Your Honor, unless the mismanagement in PREPA is far

2  greater than the Oversight Board -- or the Oversight Board and

3  the debtors have no intention of complying with PREC's lawful

4  authority, and I'll have more on that later.

5  I also wanted to note earlier today that two days

6  ago, the movants also filed an adversary proceeding seeking

7  adjudication in a number of disputes as to our rights under

8  Section 922 of the Bankruptcy Code.

9  THE COURT:  I need you to speak a little slower and

10  project a little more.  This room swallows sound.  So if you

11  can just go back two sentences.  Thank you.

12  MR. HOROWITZ:  I'm sorry, Your Honor.

13  I was just observing that two days ago, the movants

14  filed an adversary proceeding seeking to -- a number of

15  disputes as to how net revenues are calculated and our rights

16  under 922 of the Bankruptcy Code, to have special revenues

17  paid out to us on a current basis.

18  Your Honor, as I promised, I'm going to tell you that

19  it's not necessary to reach this factual dispute in order to

20  lift the stay.  And the reason is the Oversight Board's

21  contention that based on current rates and anticipated

22  expenses, there will be no positive net revenues fundamentally

23  misconceives the nature of our collateral.

24  The nature of our collateral includes property rights

25  not only to the revenues that are received at the moment, but

1    to have those revenues set based on lawful rights required

2    under the Trust Agreement and Puerto Rico law adequate to

3    cover all expenses and debt service.

4           Your Honor, this is, I would submit, the most

5    important issue that's coming before the Court today.  It's an

6    issue that has wide ramifications for the entire municipal

7    finance world.

8           If the Oversight Board's position were accurate, that

9    our collateral is only in the revenues that are collected

10   based on whatever rate PREPA decides to charge, without

11   reference to the contractual covenants and without reference

12   to the Puerto Rico statutory requirements, then the revenue

13   pledge is meaningless.

14          And given that our revenue pledge is as secured as

15   any revenue bond we will find, with strong covenants, strong

16   language, pledging those covenants and statutory protections,

17   if our revenue pledge is not meaningful, Your Honor, it's not

18   meaningful and enforceable, then no revenue pledge is.

19          Fortunately, that's not the case, Your Honor.  The

20   revenue covenant is not a mere contractual right that can be

21   ignored at will.  Every municipal revenue bond, Your Honor,

22   must be and is accompanied by meaningful and enforceable

23   projections as to the level of revenues that are pledged.

24   Here we have both a contractual rate covenant with a right to

25   oversee or enforce that covenant, and both the rate covenant

 1    and the receiver right are enshrined in Puerto Rico law.

 2           The Enabling Act authorizes PREPA to charge rates

 3    adequate to cover all expenses and service debt.  And what's

 4    referred to as Act 57 or the Relief Act, Your Honor, 2014,

 5    which established PREC.  PREC is required under that law to

 6    set rates adequate to cover operating expenses and service

 7    debt.

 8           These protections are all intrinsic parts, excuse me,

 9    of the bundle of property rights that bondholders received as

10    collateral.  All property rights, Your Honor, are a creature

11    of law.  They are a creature of statute, contractual law,

12    contractual obligations.  That's true for hard collateral.

13    It's true of revenue pledges and municipal financing.  It's

14    true for intangible property.

15           In fact, if I can use for a moment the example of a

16    patent were pledged to a lender as security, the scope of the

17    right that is pledged to that lender is a function of all of

18    the applicable law governing what a patent means.

19           The Federal law governing the term of the patent, the

20    right to go after infringers and collect damages, collect

21    royalty rates set by the Court, all of the licensing

22    agreements, those are all part of the bundle of property

23    rights that are given to the lender as collateral.

24           Equally here, Your Honor, when the revenues were

25    pledged to the PREPA bondholders, the PREPA bondholders

1    received all of the property rights established under the

2    constitution of laws, under the compilation of the Trust

3    Agreement, under Puerto Rico law and so forth, Your Honor.

4    That the failure to pursue those rights constitutes a

5    diminution in the value of collateral.

6          In my patent example, for example, Your Honor, if a

7    borrower failed to go after infringers to collect damages on

8    the patent or failed to collect for -- perhaps a good

9    analogy -- failed to collect from an affiliate because they

10   decided they wanted to give the affiliate a free benefit at

11   the expense of the secured lender, those are actions that

12   diminish the value of collateral.

13         And whether or not there's a covenant in that loan

14   agreement obligating the borrower to take these actions, the

15   failure to do so would be grounds to lift the automatic stay.

16         Here, Your Honor, the rate covenant and right to

17   receive are exclusively part of the bond holder collateral in

18   the trust agreement.  There's a grantor clause at the very

19   start of the Trust Agreement.  And that grantor clause, we've

20   placed the language in our pleadings, explicitly pledges the

21   revenue as security for all of the covenants and undertakings

22   in the agreement.  And conversely, Your Honor, pledges all of

23   the covenants and undertakings in the agreement as security

24   for the bond obligations.

25         So it's not a mere unsecured contract right.  It is

1    an intrinsic part of the collateral.

2            That's not all, Your Honor.  As I've said on a number

3    of occasions, because I can't repeat it often enough, Puerto

4    Rico statute requires that rates be set at an appropriate

5    level.

6            Remarkably, the Oversight Board's papers were

7    completely silent about the Puerto Rico statutory protections.

8    But as we pointed out in our reply brief, there are numerous

9    courts and commentators that have pointed out the importance

10   of rate protections, statutory and contractual, to revenue

11   bonds.

12           For example, in Patterson versus New York, the Court

13   of Appeals held that statutory requirements the tolls be set

14   at a level appropriate to pay off bonds is a property right

15   that could not be rescinded by a subsequent statute without

16   violating the takings clause.  Same holding in Domino versus

17   Secretary of Commonwealth, a Massachusetts Supreme Court case

18   from 1998.

19           And indeed, Your Honor, in this situation, in

20   Franklin California Tax-Free Trust, the PREPA case, Judge

21   Besosa held, in denying a motion to dismiss, that the right to

22   a receiver on the PREPA bonds was a property right that could

23   support a claim for violation of the takings clause if a

24   statute removed the right to that receiver.

25           Now, the Oversight Board says in their objections

1    that the Supreme Court has held that covenants and remedies

2    are not part of the bundle of property rights given to a

3    secured lender.  That is not true, Your Honor.

4            None of the Supreme Court precedents they cite stand

5    for that position at all.

6            In Radford, the first case that they cite, in fact,

7    expressly listed the right to foreclose as part of the bundle

8    of property rights the lender gets, and cannot be taken

9    without protection.

10           Wright v. Vinton, Wright v. Union Central Life and a

11   whole patent of subsequent adequate protection cases, Your

12   Honor, just stands for the proposition that certain parts of

13   the bundle of property rights may be suspended in bankruptcy

14   so long as the value of the collateral is protected.

15           Here suspending the right to have a rate increase,

16   suspending a right to appoint a receiver in order to allow us

17   to enforce that, is fundamentally destructive of the value of

18   the collateral, of the bondholders' collateral, the revenue

19   stream.  This is not something that can be taken away in

20   bankruptcy, Your Honor.

21           So in sum, on this point, the bonds are secured by a

22   lien on the revenue stream and must be based on an adequate

23   rate.  The Oversight Board has made it clear they have no

24   intention of seeking an adequate rate.  That, in itself,

25   requires -- a diminution in value, requires the stay to be

1    lifted.

2         The second issue, Your Honor, is the Oversight

3    Board's contention that raising rates will be

4    counterproductive, because such an increase would have such a

5    negative impact on the Puerto Rico economy, the electric

6    demand would actually decrease and would result in a reduction

7    of revenues.

8         As I said, Your Honor, if we had to reach that

9    disputed issue of fact, we could disprove it.  What we have is

10   they have not supported it.  The purported support, the

11   declaration of Dr. Wolfe, does not support that proposition at

12   all.  Dr. Wolfe -- and I should point out, debtors bear the

13   burden of proof on this point on establishing adequate

14   protection.

15        Dr. Wolfe's declaration does not provide any analysis

16   to quantify or support any impact of rate increases on the

17   demand for electricity.  He nowhere opines that it's not

18   possible to set rates at a level that would be adequate to pay

19   debt service.  Nowhere does he attempt to quantify the effect

20   of a few cents rate increase on the Puerto Rico economy, and

21   nowhere does he suggest an increase in rates would fail to

22   increase revenues.

23        Still more fundamentally, Your Honor, it's not an

24   issue for this Court.  As I pointed out, there is an

25   administrative entity that has been established under Puerto

1  Rico law to consider all issues regarding rates, including the

2  assertion that raising rates might be counterproductive.

3         Act 57 established PREC and charged it was

4  establishing electric rates that are, quote, just and

5  reasonable, consistent with sound fiscal and operational

6  practices, which resulted in reliable service at the lowest

7  reasonable cost.

8         Act 57 also gave power of -- a right to any

9  intervenor to show up at a rate proceeding and make their

10 case.  And, in fact, one of the objectors here, Your Honor,

11 the ICSC, the Instituto, they did appear in the rate making

12 proceedings.  And they presented the testimony from their

13 witness, Dr. Kou (ph), who unlike Dr. Wolfe, actually did

14 provide a multiple regression analysis purporting to quantify

15 the impact of increased rates on revenues.  And PREC fully

16 considered that and rejected it.

17        But if the ISCS or the Oversight Board or anyone else

18 wants to show up and make this argument to PREC, they're free

19 to do so.

20        The final contested fact, Your Honor, is the

21 assertion by the Oversight Board that all of the decades of

22 waste and mismanagement at PREPA, that I think they

23 acknowledge occurred, have now been cured.  We seriously

24 disagree with this, Your Honor.  If we had to, we could

25 disprove it.

1          I don't need to get into this here with Your Honor,

2    but the most important issue with regard to PREPA is the fact

3    PREPA's management and the need for a receiver is the fact

4    that PREPA and the Oversight Board are fundamentally

5    conflicted.  And that point, Your Honor, I would say has been

6    amply admitted in the Oversight Board today.

7          The Oversight Board's objection brazenly states that

8    they have no intention of running PREPA or setting rates in

9    the interests of PREPA and their stakeholders.

10         They intend to keep rates down to an unnatural level,

11   to a level that by their account is not even adequate to cover

12   expenses, not for the benefit of PREPA and its stakeholders,

13   but to provide a benefit to the Puerto Rican economy as a

14   whole.

15         That, Your Honor, is the essence of a conflict of

16   interest.  They are operating for the interests of another

17   outside the debtor, and they admit it.  And that, I think in

18   itself, is sufficient grounds to lift the stay to appoint an

19   independent receiver.

20         The last thing I wanted to address, Your Honor, in

21   the couple minutes I have left, is the Oversight Board's

22   assertion that appointing a receiver would somehow violate the

23   spirit if not the letter of PROMESA by somehow usurping the

24   Oversight Board's proper role as in the driver's seat.

25         And in that regard, what I want to say, Your Honor,

1    is that they vastly overstate the nature of their powers and

2    responsibilities.  Under PROMESA generally, the Oversight

3    Board's role with regard to PREPA is limited to approving a

4    fiscal plan and providing non-binding recommendations on

5    day-to-day management.

6            Approving a fiscal plan, Your Honor, does not include

7    the right to set rates.  To the contrary, PROMESA, Section

8    201(b)(1) requires that the fiscal plan has to establish --

9    has to involve projections of revenues and expenses that are

10   consistent with law, which means has to be consistent with the

11   role of PREC and the power -- and PREC's obligation to set

12   rates at an appropriate level.

13           With regard to Title III, the filing of Title III,

14   does not give the Oversight Board somehow the status of debtor

15   in possession, able to run the day-to-day operations of the

16   debtor.  It's true that PROMESA says that for all purposes on

17   the Bankruptcy Code provisions that are incorporated, the

18   Oversight Board is a Trustee.

19           None of the incorporated provisions of the Bankruptcy

20   Code, Your Honor, give the Trustee the power to run the

21   day-to-day operations.  PROMESA's provisions, the incorporated

22   provisions, solidify the Oversight Board's role as a legal

23   representative in this bankruptcy.

24           Nothing about the appointment of a receiver would do

25   that, Your Honor.  They would continue to have, for example,

1    exclusive right to propose a plan of adjustment, and to

2    otherwise be the exclusive representative.

3         So unless you have any --

4         THE COURT:  Yes, I do.  I don't think any of the

5    papers really engage Section 305 and Section 306, the issues

6    under PROMESA.  But how is the appointment of a receiver

7    consistent with the exclusive jurisdiction of the property of

8    the debtor and consistent with the 305 proposition --

9    prohibition on interference with governmental functions,

10   revenues, and property of debtor?

11        MR. HOROWITZ:  Well, Your Honor, 303 expressly

12   preserves the power of the territory, the Commonwealth, to

13   regulate its instrumentalities by legislation and otherwise.

14   So it preserves the role of PREC.  It preserves the statutory

15   scheme that was put in place, including the state law right to

16   a receiver.

17        I would agree that PROMESA prohibits this Court

18   sitting as a Title III PROMESA court from appointing a

19   receiver.  But we're not asking you to do so.  We're asking

20   you to lift the stay to allow us to proceed with the scheme

21   that was set up by the Commonwealth to regulate the entity.

22        THE COURT:  But this Court has jurisdiction of the

23   debtors' property.  How is turning over to a receiver

24   effective control of that property consistent with the PROMESA

25   statutory construct, whether that turnover happens in the

1    courtroom, across the hall, or is requested in this courtroom?

2                MR. HOROWITZ:  I think --

3                THE COURT:  It's a little metaphysical, but --

4                MR. HOROWITZ:  It is metaphysical, but it's not a

5    transfer of property.  It's changing the identity of the

6    entity -- of the party that is allowed to manage the

7    day-to-day affairs of the property.

8                For purposes of PROMESA, the Oversight Board

9    continues to be the legal representative, and no adjudication

10   is made as to the ownership of the property here.  It's simply

11   putting the receiver in as a custodian and to pursue the rate

12   increase that the Oversight Board has made it clear they have

13   no intention of pursuing.

14               I should say not withstanding the fact that PREC has

15   a standing order propelling PREPA to put in a rate case update

16   in October to seek a rate increase.

17               THE COURT:  Thank you.

18               MR. HOROWITZ:  Thank you, Your Honor.

19               THE COURT:  So next is the representative of

20   National, Mr. Polkes.

21               MR. POLKES:  Good afternoon, Your Honor.

22               THE COURT:  Good afternoon.

23               MR. POLKES:  Jonathan Polkes from Weil, Gotshal

24   representing National.  I just want to make one point in the

25   few minutes that I've got, which is a practical one.

```
 1              I believe the objector's position is extremely
 2    antithetical to the goals of this Court and the mediation
 3    process to get to a resolution of this entire matter, and
 4    here's why.  I believe baked into their response is explicitly
 5    an acknowledgement or a concession that the entire regime of
 6    state law around getting rate increases from PREPA that was
 7    explained previously by Mr. Horowitz is true.
 8              There's no dispute with regard to what the Power
 9    Authorization Act specifies or what's in the covenants of the
10    trust.  Those things are what they are.  Nor is there a
11    dispute that the enforcing commission has actually ordered
12    rates that PREPA has refused to increase.  The projections are
13    all technical ones with regard to whether or not the status is
14    -- here's why I think that's important, because PROMESA in
15    314(B)(6) says that a plan of adjustment after Title III
16    proceeding must provide creditors with a recovery consistent
17    with their rights under non-bankruptcy law.
18              And so under any set of circumstances, a confirmation
19    plan here is going to have to protect the creditors the same
20    way as the non-bankruptcy law.  In other words, the regime
21    regarding rate increases would otherwise have done.
22              Similarly, Section 11, USC 1129(a)(6) says the plan
23    can't be confirmed unless any rate change has been approved,
24    provided for in the plan -- excuse me -- unless PREC has
25    approved any rate change provided for in the plan, or such
```

 1  plan is expressly conditioned on such approval.

 2          In other words, you still get back to the fact that

 3  traditionally bankruptcy law exempts from jurisdiction

 4  regulatory rate actions, and those things are all

 5  traditionally part of state law regime which has not been

 6  disputed here.

 7          So the fact of the matter is everyone is going to be

 8  better off if that entire process under state law, with a

 9  receiver who would act appropriately under state law, worked

10  with PREC, put in place any rate changes that are called for

11  by PREC, is done in order to actually get a plan confirmed at

12  the end.

13          Otherwise, all that's going to happen is there's

14  going to be a booby trap, in effect, when we do get to

15  confirmation, if we do, when all of those things have

16  happened.

17          Thank you, Your Honor.

18          THE COURT:  Thank you.

19          Mr. Bienenstock.

20          MR. BIENENSTOCK:  Your Honor, may I ask for a

21  five-minute recess?

22          THE COURT:  Yes.  We'll all return in five minutes.

23          (At 2:27 PM, recess taken.)

24          (At 2:40 PM, proceedings reconvened.)

25          THE COURT:  Please be seated.

1          Mr. Bienenstock.

2          MR. BIENENSTOCK:   Thank you for the recess, Your

3    Honor.  Martin Bienenstock for the Financial Oversight

4    Management Board of Puerto Rico as representative of PREPA and

5    for itself.

6          Your Honor, I'm going to start with the issue you

7    raised, because I think one of the few points on which

8    bondholders counsel and we agree is that Your Honor can decide

9    this on the law.  And I'm going to try to point out several

10   legal issues on which Your Honor can decide it.  We obviously

11   don't agree on which way they go, but that's understood.

12         So PROMESA Section 306, which provides this Court

13   exclusive jurisdiction over property of the debtor, and Your

14   Honor asked how can you grant the permission requested for

15   them to seek a receiver of the revenues and to control the

16   rate increase process, application process while -- without

17   violating this Court's exclusive jurisdiction over what Your

18   Honor would be giving up.

19         And the answer is you can't.  And that's why in

20   Jefferson County, the Court said when it was confronted with a

21   very similar motion, within two months of the commencement of

22   the Jefferson County case, that's why the Court said, granting

23   this state relief is tantamount to giving up jurisdiction over

24   the case.  So that's the decision presented to this Court

25   right now.

 1          This case was filed July 2.  We're now at August 9,

 2    so it's a month and seven days old.  Is the Court going to

 3    relinquish its exclusive jurisdiction over the revenue stream

 4    of the only electric utility in Puerto Rico upon which the

 5    entire economic turnaround of this island depends?

 6          I think the answer is obviously no.  That's why their

 7    motion could be denied, and I could sit down now.  This is far

 8    too important, and I'm not going to do that.

 9          There are other points that Your Honor could also

10    decide this motion on.  So let me join issue with the

11    bondholders counsel now on what I believe is the fundamental

12    legal issue for this afternoon.  It's the contention as to

13    what the collateral is that is entitled to adequate

14    protection.

15          PREPA contends it is the revenue stream pledged to

16    secure the bonds. And in fact, if we go to footnote seven of

17    the bondholders reply brief on page six, the first sentence of

18    that footnote says, the Trust Agreement's granting clause

19    pledges revenues to secure the performance and observance of

20    all the covenants, including the rate covenant and the right

21    to a receiver, period.

22          That makes perfect sense to me, and we agree with

23    that sentence.  Their obligation is -- PREPA's obligation is

24    to repay the debt.  PREPA has subsidiary obligations, such as

25    to apply for rate increases and the other covenants of the

1  agreement.  Those are all obligations, liabilities of PREPA to

2  its creditors.  They are secured by the pledge of revenues.

3      Collateral security is always property that's owned

4  by the borrower.  It can be sold by the borrower or by a

5  lender on foreclosure.  What does the borrower own?  It's

6  right to revenues.  It has pledged that right to revenues to

7  secure the debt and the other subsidiary obligations it has

8  undertaken.

9      To that point, we are all in agreement.  But now

10  let's look at the second sentence of footnote seven of their

11  reply brief.  It says, the Trust Agreement further provides

12  that all provisions as follows in the Trust Agreement,

13  including the rate covenant and the right to a receiver, are

14  for the security of all bondholders and are made in order to

15  secure payment of all bonds, end of quote.

16      So the second sentence says that whereas in the first

17  sentence we said the revenue secures the obligations,

18  including the rate covenant, the second sentence says, the

19  rate covenant secures payment of the bonds.  So they're now

20  saying in their second sentence, quoting from the Trust

21  Agreement, that the rate covenant is two different things.

22      On the one hand, it's an obligation of PREPA to its

23  bondholders that's secured by the revenues.  Simultaneously

24  they're saying it's no obligation.  It is some kind of asset,

25  which it serves as their collateral security, that secures

1   payment of their bonds.

2           Your Honor, this shows people can write anything they

3   want.  But the rate covenant is either an obligation, a

4   liability, or it's an asset.  It isn't both.  It cannot be

5   both.  And it's not both.  It is a liability.

6           And as Your Honor, no doubt, knows from vast

7   experience, and everyone in the courtroom knows, in your

8   typical credit agreement, including these bonds, there's a

9   payment obligation and there are covenants.  You're supposed

10  to keep the corporation alive.  You're supposed to insure it.

11  You're supposed to do financial reporting.  You're supposed to

12  apply for rate increases.

13          And what's the effect and reason for these covenants?

14  If you breach them, there's an event of default and they are

15  entitled to try to enforce their debt.  That's the purpose of

16  a rate covenant.  It's not specific performance.  It's

17  basically what we call an early warning signal for creditors,

18  that there are all these subsidiary obligations that have to

19  be performed.

20          If you don't perform one, chances are there may be a

21  payment default, so they get to call it a default and force

22  their remedies.  That's what this rate covenant is.  We have

23  an obligation.  If we don't do it, it's a default.

24          Now, we have another obligation, to pay the debt.  We

25  didn't do it.  It's a default.  One is no greater than the

1    other.  One is not entitled to specific performance.  They are

2    both obligations.

3           Now, why is this an issue that let's Your Honor

4    decide this case this afternoon?  Well, simply because if Your

5    Honor agrees with me that the rate covenant is an obligation

6    of PREPA, it cannot be collateral if it's a liability.

7           If it's a liability, and it's not collateral, then

8    it's not something that is adequately entitled to adequate

9    protection.  What's entitled to adequate protection are the

10   assets pledged to them.  Those are the revenues that come into

11   PREPA.  That's what's pledged to them.

12          Now, their problem is that whether their net pledge,

13   you know, revenues minus the current expenses that PREPA is

14   allowed to take from the revenues under the Trust Agreement to

15   pay for operations and whatnot, whether the net pledge at the

16   moment is worth zero, because expenses equal or exceed

17   revenues, or whether the net pledge has a positive value,

18   either way, they're only entitled to some relief, stay relief,

19   is if they show that it's declining.  And they haven't tried

20   to show that.

21          What they've said is they're not being -- able to get

22   to their remedy of a receiver who would apply for rate

23   increases.  What they want to do, in other words, is whatever

24   the value their collateral is, which they're not saying -- we

25   pegged it at zero.  They're not saying what it is.  But

1    they're saying whatever it is, we want to take steps to

2    increase that value by getting a rate increase.

3          Now, we can talk about that.  We can talk about it

4    during the case.  We can talk about it in the context of a

5    plan adjustment.  But it has nothing to do with stay relief,

6    because a remedy is not entitled to adequate protection.

7    Their quest to try to do things to increase rates are not

8    entitled to adequate protection.

9          What's entitled to adequate protection is what is

10   their collateral.  And their collateral is their revenue.  And

11   frankly, their footnote seven, which says two opposite things,

12   the rate covenant is an obligation that's secured by the

13   revenues; the rate covenant is an asset that secures the

14   payment obligation.  The fact that they say two opposite

15   things in the same footnote basically exposes them, Your

16   Honor.  This is backwards and forward.

17         And just simple logic that we just went through tells

18   us whatever rights they have, and whatever they are entitled

19   to, they cannot show, and have not shown, that we're

20   diminishing any of their collateral security, even if it has a

21   causative value to them.  There's no danger of that.

22         Now, in their reply brief they say the cases that we

23   cited, Radford, and then Wright, and Vinton Branch are

24   irrelevant, and I want to explain to Your Honor why they're

25   not.  They start out by saying that the Radford case, which

1    lists five rights of a secured creditor, right to bid in a

2    foreclosure, right to remain in the lien, right to get the

3    value, right to have a receiver, et cetera, they're saying the

4    Radford case was simply taking off rights of a secured

5    creditor under Kentucky law.

6         What does that have to do with this?  Well, there are

7    rights of a secured creditor just about anywhere.  But more

8    important, the Vinton Branch and Wright decisions that were

9    decided after Radford tell us which of those five rights are

10   constitutionally protected by the Fifth Amendment.

11        And between the two cases, they knock out four of the

12   five rights.  And the only right left that's protected by the

13   Fifth Amendment is to the value of the collateral.  Of the

14   collateral.  So they are relevant to this case.

15        Their right to a receiver, for instance, is not a

16   right that needs to be protected by adequate protection.  It's

17   a remedy.  That's why we cited to them.  That's why it's so

18   important.  The Fifth Amendment does not protect that right.

19        And as they admit, it's the Fifth Amendment concern

20   that drove Congress to insert adequate protection into the

21   Bankruptcy Code, and then it's adopted in PROMESA.  So the

22   right to a receiver is not something they're entitled to

23   adequate protection for.

24        The right to bid in at a sale is not something

25   they're adequately protected for.  The right to have a

1    foreclosure sale is not something they get adequate protection

2    for.  They're entitled to have adequate protection of the

3    value.

4         Now they go to mismanagement.  We explained in our

5    brief, so I won't repeat it, why gross mismanagement is a

6    ground for a Chapter 11 Trustee.  But there are no trustees in

7    Title III or in Chapter Nine cases under the Bankruptcy Code.

8    So our point there is that's another point of law Your Honor

9    can decide without any factual hearing, which is that claiming

10   prior mismanagement is not a ground for stay relief.

11        Gross mismanagement would have been a ground for

12   Trustee if this were not a Title III case, but it is a Title

13   III case and there's no such thing.

14        So they're really left with their only other claim.

15   They want a receiver to grab the revenues, which is

16   effectively taking jurisdiction of this case out of this

17   Court, and they want that receiver to apply for rate

18   increases.

19        And that's going to be my final point, Your Honor.

20   Contrary to what they've represented about Dr. Wolfe's

21   declaration containing no analysis, perhaps we're all probably

22   happy that he didn't put in all of his numerical analysis.

23   But he does explain at pages 19 and 20 of his declaration, the

24   two -- two of the down sides of rate increases.

25        One is it makes Puerto Rico further uncompetitive

1    among its competitors' set, different venues where

2    manufacturers can locate to use a lot of energy.

3            And the second, on page 20, at paragraph 53, Dr.

4    Wolfe explains that putting rates above 21.4 cents per

5    kilowatt hour, given the current inflation environment and

6    certain other external factors, increases rates at a faster or

7    greater pace than increases adopted by Puerto Rico's tourism

8    and manufacturing competitors in the Caribbean and the U.S.

9    mainland regions, would contribute to preventing the

10   Commonwealth from reversing its negative economic growth, and

11   would sharply raise the risk of not allowing the minimum 0.8

12   percent real economic growth rate required to achieve fiscal

13   sustainability.

14           So that's what the Oversight Board is concerned with.

15   That's what Dr. Wolfe is concerned with.  And what is the

16   PREPA bondholder response?  Their response is conflicts?

17   You're looking at it from the point of view of whether you can

18   save the island.  You can't do that.  You have to look at it

19   from what money you'll put in bondholders' pockets tomorrow if

20   you jack up the rates.

21           Your Honor, they can call it conflicts.  They can

22   call it whatever they want.  The fact is Congress put one

23   Oversight Board in charge and made one Oversight Board the

24   representative of every covered entity in Puerto Rico.

25           And thank God it did, because just imagine what would

1    be going on here if we had one manager of PREPA who says, I

2    don't care about the island.  I don't care about the economy.

3    I don't care about the people.  Let's jack up the rates and

4    get these creditors paid real fast.

5           Well, then we lose.  Then the things Your Honor said

6    at the first hearing, we're not turning off the lights,

7    failure is not an option, well, then that happens.  Someone,

8    some grown-up has said, wait a minute.  You have your rights.

9    They're going to be dealt with in a plan of adjustment, but

10   we're not going to deal with them in a way that destroys the

11   people and the economy and makes a turnaround impossible.

12          Congress didn't make a mistake when it put one entity

13   in charge of all these entities.  They are one organism.  And

14   you can't have them fighting with each other and not caring

15   about what one does affects the others, because in the long

16   run, it wouldn't help PREPA creditors either.

17          Sure, in the short run, they'd get some cash.  But

18   how long does that last?  Well, not when you accelerate out

19   migration, which leads to a further need for a rate increase

20   because fewer people are paying electric bills.  So you jack

21   up the price some more to make up for the people who have

22   left, and more and more as the death spiral accelerates.

23   That's what we have to prevent.

24          Now, they -- they said some things that are just

25   wrong.  I think my colleagues will help me correct them from

 1   AAFAF and PREPA.  But bottom line, the so-called mismanagement

 2   they referred to in their papers is historical.  There are new

 3   directors.  There's a new executive director.  These are

 4   matters of fact that they can't dispute.

 5          We want PREPA to be the most efficient, honest

 6   electrical utility manufacturer anywhere, because that's going

 7   to be good for the bondholders.  It's going to be good for the

 8   people.  And it's going to drive down electric prices.

 9          But even if Your Honor were to disagree that

10   mismanagement could be grounds for the stay relief, which I

11   explained before why we think it's not, they're talking about

12   history, not what's going on now at PREPA to correct

13   everything that's been wrong before.

14          So unless Your Honor has some additional questions, I

15   think I'll -- I could talk more, but I want to defer to my

16   colleagues.  If they leave me some time, I may ask to come

17   back.

18          Thank you, Your Honor.

19          THE COURT:  Thank you, Mr. Bienenstock.

20          MS. MITCHELL:  Good afternoon Your Honor.  Nancy

21   Mitchell of Greenberg Traurig on behalf of AAFAF as fiscal

22   agent of PREPA.  I would love to leave Mr. Bienenstock some

23   more time since we agree wholeheartedly with the Oversight

24   Board on the legal analysis.

25          I wanted to make a couple of points. One is there

 1   seems to be a misapprehension about the rate process.  And

 2   while we recognize this isn't an evidentiary hearing, PREPA is

 3   in full compliance with the rates that were ordered by PREC.

 4   Those rates were based on a restructuring support agreement

 5   that no longer exists.  It terminated on June 29th, a day I'll

 6   never forget.

 7          And the creditors had suggested that PREPA ought to

 8   raise rates.  We don't raise rates.  As the movants indicated,

 9   the next rate process would be in October.  So we're here

10   talking about the failure of PREPA to raise rates when, in

11   fact, PREPA would have no ability to raise rates when we're

12   five weeks into a Title III case, fully in compliance with our

13   rate.  I just wanted to make sure that was clear.

14          In regard to the mismanagement allegations with

15   respect to our obligations, and I understand this isn't an

16   evidentiary hearing, but there were a lot of shots taken at

17   the people of PREPA.  The Governor put a board in place that

18   is fully compliant, subject to the Senate confirming the last

19   independent director, with the agreement that we had with the

20   bondholders in the restructuring support agreement.

21          It isn't that the Governor changed the law and pulled

22   the directors off of the board.  We had a discussion with the

23   bondholders.  We agreed on a board structure, and that board

24   structure is in place.

25          With regard to the executive director, he has been in

1    place since March.  He has not run a public utility before,

2    which is the one thing they point to in their papers as

3    evidence of mismanagement.  But I spend virtually every day

4    with Mr. Ramos.  He's a dedicated industry professional who is

5    working very hard to turn around PREPA.

6              And if given the opportunity to have an evidentiary

7    hearing, which we think is unnecessary, we certainly would be

8    happy to have the Court introduce Mr. Ramos.  We would be

9    happy to introduce him to the movants, because they certainly

10   haven't met him and wouldn't recognize him if they met with

11   him.

12             With regard to the balance of the argument, the one

13   other thing I think is important is that this utility is

14   critically important to the island.  And as the government of

15   Puerto Rico and the duly appointed representatives of the

16   people of Puerto Rico, protecting this utility and

17   transforming this utility is critical to not only the

18   restructuring, but to the daily lives of the people in Puerto

19   Rico.

20             For the bondholders to suggest that we should simply

21   pull the existing management out and put in some unknown

22   receiver so that they can get their rate increase and

23   destabilize an organization that has put in a project

24   management organization, is actively working with the

25   Oversight Board on a transformation plan, it is really at this

1    point -- if you spent any time in our organization, would be

2    hugely prejudicial to the progress that we made with PREPA and

3    our goal that we have of turning it into a world-class

4    utility.

5           Thank you, Your Honor.

6           THE COURT:  Thank you.

7           MR. BIENENSTOCK:  Your Honor, I did --

8           THE COURT:  There's a gentleman behind you.

9           MR. BIENENSTOCK:  I'm sorry.

10          MR. KLEINHAUS:  Good afternoon, Your Honor.  For the

11   record, Emil Kleinhaus from Wachtell Lipton Rosen & Katz.  I

12   represent Scotia Bank of Puerto Rico.  Scotia Bank is a

13   significant creditor of PREPA.  It's administrative agent on a

14   fuel line of 550 million dollars.

15          PREPA borrowed that 550 million dollars to buy fuel

16   necessary to operate its system, and PREPA committed to treat

17   the Scotia fuel line as a current expense for purposes of the

18   Trust Agreement.

19          Your Honor, Scotia Bank agent filed a short statement

20   in response to the bondholders' motion.  The statement had a

21   very simple and narrow point, which is that in light of the

22   prepetition negotiations at PREPA in which Scotia Bank was

23   very significantly involved, which yielded an RSA and an

24   amended RSA and a further amended RSA, we believe that there's

25   a realistic prospect at PREPA for a mediated solution of the

1    issues in this case in the near term.

2           And we heard Judge Houser say today that mediation

3    often works after parties have forcefully expressed their

4    positions.  The bondholders have forcefully expressed their

5    position in terms of the need for a receiver and other

6    matters.

7           There are many things in the bondholders' motion that

8    our clients agree with.  In particular, our clients share the

9    bondholders dismay at the Oversight Board's decision not to

10   certify the restructuring support agreement, which was the end

11   of a three-year process of negotiation.

12          But we don't agree with the punch line of the

13   bondholders' motion, which is that the stay should be lifted

14   today so that a new lawsuit can be filed to seek appointment

15   of a receiver.  There are only two reasons for that.  The

16   first is we really believe that the mediation process should

17   be given a chance to play out in the short term to see if a

18   new solution can be reached along the lines of the RSA.  And

19   the second reason, Your Honor, is that while the receiver

20   motion or the motion to lift the stay narrowly raises the

21   question whether the stay should be lifted as the briefing has

22   developed, it has also touched on much broader questions.

23          And one of the broader questions that's developed in

24   the briefing is the scope of the bondholders' lien.  Is it a

25   net revenue lien or a gross revenue lien?  And if it's a net

 1   revenue lien, net of what?

 2          And we would submit, Your Honor, those issues that

 3   are also raised in the adversary proceedings, raised a couple

 4   days ago would require more factual development than legal

 5   development.  And in particular, there is a profound interest

 6   of unsecured creditors, and Scotia Bank in particular and

 7   other fuel line lenders are being heard on those issues and

 8   having an opportunity to present their case.

 9          So for those reasons, Your Honor, we would suggest

10   that the Court hold this motion in abeyance.  Do not grant it

11   today.  Provide an opportunity for the mediation to play out

12   and allow the bondholders to bring a motion again in the

13   future, should they choose to do so.

14          Thank you.

15          THE COURT:  Thank you.  And just for clarity, by hold

16   in abeyance, you're saying I should deny it without prejudice,

17   not that I should ignore the statutory period?

18          MR. KLEINHAUS:  Well, the statutory period I think

19   provides Your Honor with flexibility.  You could hold today a

20   preliminary hearing, for example, but I'll defer to Your Honor

21   as to whether hold it as a preliminary hearing or deny without

22   prejudice.  Our focus is on making sure there is an

23   opportunity to mediate before the flood gates open for

24   mediation.

25          Thank you.

| | |
|---|---|
| 1 | THE COURT:  Thank you. |
| 2 | MR. BAKER:  Good afternoon, Your Honor.  Nicholas |
| 3 | Baker, Simpson, Thacher & Bartlett on behalf of Solus |
| 4 | Alternative Asset Management. |
| 5 | Your Honor, Solus is actually the largest unsecured |
| 6 | creditor in this case.  They hold over 280 million dollars of |
| 7 | fuel line debt over two separate facilities.  One, 140 million |
| 8 | under the Scotia facility, as well as a stand-alone facility |
| 9 | of 140 million dollars. |
| 10 | And Solus' position, therefore, is that this is a |
| 11 | decision that does not need to be made today.  The |
| 12 | implications are far too wide, not only for the fuel line |
| 13 | lenders, for the unsecured creditors in general, the |
| 14 | implications in general for a receiver being appointed. |
| 15 | So we respectfully request, similarly, that this not |
| 16 | be decided today, even though you have two sides forcing the |
| 17 | issue.  I also would like to reserve all rights, again, as |
| 18 | this motion has -- a response has been filed, the |
| 19 | intercreditor issues of current expense relative to the bond |
| 20 | rights to the revenue have become more and more relevant. |
| 21 | And so I would like to reserve all of Solus' rights |
| 22 | with respect to the current expense issues, and to private |
| 23 | issues generally under the Trust Agreement. |
| 24 | THE COURT:  Thank you. |
| 25 | So Mr. Despins, you wanted to be heard? |

1           MR. DESPINS:  No, thank you.  I'll wait until

2    Mr. Bienenstock --

3           THE COURT:  Thank you.

4           Mr. Bienenstock.

5           MR. BIENENSTOCK:   Thank you.  I might spare

6    Mr. Despins the minute he asked for.  I realize I hadn't

7    responded to Mr. Polkes on behalf of National.  So he made two

8    points, that somehow PROMESA Section 314(b)(6) and Bankruptcy

9    Code Section 1129(a)(6) have some bearing here, and I just

10   want to just explain briefly why they don't.

11          1129(A)(6) simply requires, as a confirmation

12   requirement, that any rate increases in the plan be obtained,

13   the non-bankruptcy law approvals necessary, and they will.

14   It's certainly not in front of the Court today.

15          And 314(b)(6) is the Title III best interest test

16   which says the Court should continue what creditors would

17   receive, if they force their claims under non-bankruptcy law.

18   So two points about that.

19          Point number one is nowhere in PROMESA does it import

20   state law priorities.  It just uses some, but not all of the

21   Bankruptcy Code priorities.  But most important and applicable

22   to Mr. Polkes' comment is what they -- what 314(b)(6) is

23   asking this Court to do is to say, well, if the creditors were

24   all free to enforce their claims under non-bankruptcy law

25   today, what would they end up with?

```
 1              So just imagine, all those bondholders, plus the
 2    unsecureds, charge into the courthouse, I want mine.  What
 3    will they get and what will happen to PREPA?  We'll be able to
 4    pass that test, Your, Honor.  And it's certainly not
 5    applicable today.
 6              And there's still a minute for Mr. Despins.
 7              THE COURT:  Thank you.
 8              MR. DESPINS:  Your Honor, we rest on our papers
 9    filed.
10              THE COURT:  Thank you.
11              MR. HOROWITZ:  Five minutes?
12              THE COURT:  Yes.
13              MR. HOROWITZ:  Thank you, Your Honor.  Again, Gregory
14    Horowitz on behalf of the movants.
15              Your Honor, I think it's really quite remarkable.  I
16    got up at the podium and I think I directly -- I tried to be
17    pretty direct --
18              THE COURT:  Could you speak a bit louder?  Thank
19    you.
20              MR. HOROWITZ:  Sure.  I directly challenged
21    Mr. Bienenstock to address what the Oversight Board failed to
22    address in their papers, the fact that Puerto Rico, by
23    statute, requires rates to be set at a level appropriate --
24    well, identical to the rate covenant, at a level appropriate
25    to pay all expenses and service all debt.  Not one word about
```

 1   the statutes.

 2           Your Honor, there's a pledge of rates, what do rates

 3   mean.  I pointed out on my opening argument and

 4   Mr. Bienenstock did not contest that on their theory, it's

 5   meaningless.  It's a pledge of rates at whatever level the

 6   debtor chooses to set.  That's not true.  It's a part of the

 7   rate covenant -- I'm sorry.  The revenue pledge is a pledge of

 8   a bundle of property rights, and one of those rights is the

 9   right provided under Puerto Rico law to have the rates set at

10   an appropriate level.  It's also defined in the agreement, and

11   that's the meaning of pledging the rate covenant, it's making

12   it clear what the rates are that are provided.

13           Mr. Bienenstock says that we did not offer any

14   evaluation of our collateral.  It's not our burden to

15   establish that we're adequately protected.  It's their burden.

16           That said, Your Honor, I'll take that.  The value of

17   our collateral is 8.3 billion dollars.  It has to be.  By

18   definition, we have to be exactly fully secured, because our

19   collateral is the pledge of revenues adequate to service our

20   debt.

21           Our debt is 8.3 billion.  Therefore, the value of our

22   collateral has to be 8.3 billion.  So as long as it's possible

23   to set rates at a level appropriate to satisfy all debt, and I

24   repeat, Mr. Wolfe did not challenge that.  Nowhere in his

25   opinion does he suggest that it is not possible to charge

1   rates that are going to be adequate to service all of the

2   debt.

3          That said, if the debtors and the Oversight Board

4   continue on their announced plan to refuse to seek a rate

5   increase, then it's entirely possible that the value of our

6   collateral will diminish.  That's the threat that justifies

7   the lifting of the stay.

8          Your Honor, counsel for PREPA suggested that I have

9   been misleading or confused about the ability to get a rate

10  increase or increase rates.  I think I have been very clear.

11  Neither the receiver nor PREPA has the power to set rates.

12  They only have the power to put in a rate to PREC.  PREC has

13  to set rates.

14         I think I also was clear, in the January 2017 order

15  which sets rate for fiscal year 2017, expiring June 30th,

16  2017, the order requires PREPA to come up -- to come back to

17  them in October with a rate update.  And orders PREPA to

18  submit a proposed rate that will be adequate to service all

19  debt.

20         I want to just read one paragraph from the order,

21  paragraph 450, quote, to prevent any misunderstanding, the

22  commission is committed to creating a rate setting process

23  that provides PREPA the revenues it needs to operate

24  efficiently and pay bondholders timely.

25         So the commission has made it clear that if PREPA

1   complies with the order and comes back before them with an

2   appropriate rate case, they will set the rates we're entitled

3   to.

4           Unfortunately, everything that has happened in the

5   context of this motion gives us ample cause to believe that

6   the Oversight Board and PREPA have no intention of complying

7   with that requirement.

8           Your Honor, the last thing I want to do is to come

9   back to your question to me on what Mr. Bienenstock opened up

10  with.  We do not believe that the grant of exclusive

11  jurisdiction over the property to this Court under 306 in any

12  way interferes with the right of the bondholders to pursue

13  their state law remedy of getting a receiver who would manage

14  the property, but not dispose of it.

15          That receiver would be subject to all of the same

16  oversight exclusive jurisdiction powers of this Court that

17  PREPA currently is.  It could not -- you cannot read 306 to

18  prohibit the bondholders or PREC, for example, from setting

19  rates, because 303 is quite explicit. Nothing in Title III in

20  any way impairs or undermines the power of the Commonwealth to

21  regulate its instrumentalities through legislation and

22  otherwise.

23          So that exclusive jurisdiction provision cannot be

24  inconsistent with the power of the Commonwealth to continue --

25  with our right, I should say, to continue to enforce our

1    statutory rights to a receiver.

2            THE COURT:  Well, I don't think it was said that 306

3    prevents PREC from doing its governmental thing, and maybe

4    there might be a different situation if PREC, in invoking its

5    police powers or whatever, sought an order of mandamus against

6    the debtor to raise rates.

7            But you all are bondholders, private creditors

8    seeking to commandeer control over aspects of the governmental

9    function of seeking rate changes from the government, the

10   other governmental entity, PREC.  And I think that the

11   construct is receiver of the revenues and the property putting

12   a third party, a non-debtor, a non-governmental party as -- in

13   the position controlling the management and husbanding of the

14   revenues.

15           So I think there is a difference.  You had sort of

16   said, well, it doesn't impede PREC, it doesn't impede us.

17   There's a difference between you and PREC.

18           MR. HOROWITZ:  Okay.  Your Honor, I think I should

19   have made a distinction.  I think that we are concerned that

20   they will challenge PREC's continuing jurisdiction, and I had

21   to make that clear.

22           My other point, though, is that the appointment of a

23   receiver would simply put the receiver in the shoes of the

24   debtor, subject to the same oversight of the Court, and with

25   no power to dispose of the property, to pay -- for example, to

1    pay bondholders.  The receiver would be subject to exactly the

2    same requirements and restrictions as the debtor currently.

3            THE COURT:  Thank you.

4            MR. HOROWITZ:  Thank you, Your Honor.

5            THE COURT:  Decision is reserved.

6            Next on the agenda as afternoon item one is the

7    creditors' committee's motion to intervene in the Assured

8    proceeding.

9            MR. HOROWITZ:  I apologize, Your Honor.  Gregory

10   Horowitz.  I just wanted to make one -- to rise for one point.

11   I wanted, Your Honor --

12           THE COURT:  Just one second.

13           Folks, court is still in session, so if you're

14   leaving, leave in silence without chatting on the way out.

15   Thank you.

16           MR. HOROWITZ:  I just wanted Your Honor to know,

17   should the Court wish for more time since you've taken it

18   under advisement, if you wish for us to waive the 30-day

19   requirement, the movants are prepared to do that.

20           THE COURT:  The Court would be grateful for that,

21   given the travel and all that are happening this week.  So

22   thank you.

23           MR. DESPINS:  Good afternoon, Your Honor.

24           THE COURT:  Good afternoon.

25           MR. DESPINS:  Luc Despins for the committee.  I know

1    it's been a long day and I'm sure you already -- I shouldn't

2    say you've already made up your mind, but you have a good idea

3    of what you're going to do.  So I won't spend a lot of time

4    arguing the case law.  I just want to say a couple of points

5    about this.

6              The first one is this is the Assured -- this is the

7    proceeding in our case, in the Commonwealth's case, so that's

8    very important.  We are not seeking full, whatever you call

9    it, party intervention.  We are prepared to adopt the

10   Oversight Board's request that we limit our intervention -- as

11   reflected in the revised Order that was submitted attached to

12   our reply that basically says we can be heard, we can file

13   briefs, but we cannot, for example, block a settlement because

14   we're a party.

15             So given the very limited intervention that we're

16   seeking in our own case, we believe this relief should  be

17   granted.  But I'll be happy to answer any questions if Your

18   Honor has questions regarding the proposed order or any other

19   matter.

20             THE COURT:  I don't have questions.

21             MR. DESPINS:  Thank you.

22             THE COURT:  Thank you.  Did anyone -- yes.

23             MR. ROMANELLO:   Your Honor, Salvatore Romanello from

24   Weil, Gotshal & Manges on behalf of National Public Finance

25   Guaranty Corporation.

1        Your Honor, I will follow Mr. Despin's lead here.

2   It's pretty straight forward.  We don't think 1109(p) provides

3   a right to intervene.  In an adversary proceeding, we don't

4   think UCC should intervene.  But the real issue I want to get

5   to is the prejudice here.

6        Your Honor knows better than anybody else how much

7   paper has been filed in this case, and to streamline the

8   matters.  And even scheduling is very difficult, as you can

9   imagine with all the parties.

10       We have an opposition to a Motion to Dismiss that's

11  due in the next few days.  We do not want the UCC to have the

12  ability to file a reply.  And the reason for that is one of

13  two things could happen.  One, it could be duplicative of what

14  the Oversight Board is filing.  In that case, there's no need

15  for it.

16       Two, if they're filing a reply to our opposition, the

17  only thing that could happen is they could raise additional

18  arguments, and that leaves us with having to write to the

19  Court to file a surreply.  So it's completely duplicative.

20  They haven't asserted a position separate and apart from what

21  the Oversight Board has asserted.  They don't have interim

22  fact -- they don't have interim standing, and the motion

23  should be denied.

24       Thank you, Your Honor.

25       THE COURT:  Thank you.

1          MR. ROMANELLO:   One other thing, Your Honor.   Our

2    oppositions in motion to dismiss are due today.  We filed the

3    stipulation on Monday.  Again, we realize the Court is very

4    busy, but it would be a short extension given this week's

5    hearing here.  The extension would go until Monday for the

6    opposition.  It's on consent.

7          THE COURT:  I'm sorry.  I thought that we had entered

8    that.  I missed the paperwork.

9          MR. ROMANELLO:   It may have been entered today.  I

10   was told that we hadn't received it, so --

11         THE COURT:  Well, it looks like we didn't, and so I

12   had intended to grant the extension.

13         The extension is granted, and we'll catch up with the

14   paperwork.

15         MR. ROMANELLO:   Thank you, Your Honor.

16         THE COURT:  Thank you.

17         Mr. Despins.

18         MR. DESPINS:  If I may?

19         THE COURT:  Yes.

20         MR. DESPINS:  Two minutes, Your Honor.  I think the

21   argument by counsel -- first of all, let me just say if the

22   Court wants to condition our intervention on that requirement,

23   so be it.  We don't think it's necessary, but so be it.  But I

24   would say that we cited cases regarding the fact that the

25   committee as a statutory creature should be viewed in terms of

1    intervention differently than other creditors.  So this issue

2    of injury and fact, that has not been adopted in the context

3    of creditors' committees.

4         We cited a District Court, which of course I'm not

5    doubting Your Honor in any way, but it basically says in the

6    context of an appeal by a creditors' committee, which is a

7    higher standing, that the creditors' committee cannot be

8    deemed not to have standing to appeal just because an economic

9    harm cannot be shown by the committee.

10        So we want to -- that's all in our reply, but we

11   wanted to make sure that was before the Court.

12        Thank you.

13   THE COURT:  Thank you.  I did read everything

14   carefully before I came, and I've listened carefully.  And I

15   understand now that the requested mode of intervention or

16   participation is that outlined in the proposal from the

17   Oversight Board and adopted by the UCC.  The application is

18   nonetheless denied.

19        In Re:  Thompson, the First Circuit held quite

20   clearly that non-party participation in an adversary is

21   dependent on Rule 24 intervention.  And that's the Thompson

22   opinion at 965 F.2d at 1141.

23        So absent a proper basis to intervene on Rule 24, and

24   this Court has very carefully considered all of the arguments

25   in that connection and finds that there is no basis to

intervene under Rule 24 presented on this record.  The UCC is

not entitled to participate in the adversary, in even the

limited formal fashion that it has proposed.  Therefore, the

Motion to Intervene is denied in its entirety.

And shall -- may I simply adopt my prior remarks as

to the Peaje adversaries?

MR. DESPINS:  Yes, Your Honor.

THE COURT:  The motion to intervene in the Peaje

adversaries is denied for the same reason.

MR. BRILLIANT:  Thank you, Your Honor.  May I be

excused?

THE COURT:  Yes.

And so that takes us to the senior COFINA

bondholders' modification motion.  And Mr. Kirpalani, before

you begin, I think it only fair to tell you that I perceive

this as fundamentally a motion for reconsideration.  And so

you might want to tailor your remarks to that perspective

because that is my perspective.

MR. KIRPALANI:  Okay.  Thank you, Your Honor.  For

the record, Susheel Kirpalani from Quinn Emanuel on behalf of

the COFINA Senior Bondholders Coalition.

Your Honor, during the morning session, I believe it

was in connection with one of the other debtors, you had a

remark that I wrote down, because I thought it was apt for my

motion.  And what you said, Judge, was quote, every day our

1   landscape changes, end quote.

2        We filed this motion to modify the Bank of New York

3   Interpleader Order, because it seemed pretty clear to us that

4   our landscape was changing.  And parties have lost sight as to

5   what this action actually was.  And you don't have to look

6   very far beyond the caption to really see what it was about.

7   And we'll get there in just a few minutes.

8        The COFINA bondholder trustee, our bond trustee,

9   commenced this interpleader action because it was receiving

10  inconsistent instructions from senior bondholders, from

11  subordinate bondholders, from cash pay senior bondholders,

12  from capital appreciation senior bondholders.

13       And it is true at that time in early May, COFINA

14  itself, acting through AAFAF, this is prebankruptcy, had

15  already asserted some interest in the property.  So some

16  residual interest, unspecified interest.  No one really knew

17  exactly what it was.  But that's what the Bank of New York

18  came here and told the Court.

19       And so faced with these conflicting instructions,

20  intraCOFINA, within the COFINA house, at that time COFINA,

21  through its representatives, had told the Court it was willing

22  to pay its bondholders.  And the Bank of New York came here

23  and asked Your Honor to help them figure out which bondholders

24  it should actually pay.

25       And the Oversight Board, and this Court noted this

1   from the outset, was the exclusive party once Title III was

2   commenced to speak on behalf of COFINA.  And Your Honor

3   specifically asked Mr. Bienenstock in the Southern District of

4   New York courtroom where we had the hearing on May 30th,

5   whether the Board consented or not to the Court's

6   jurisdiction, and to determine how the disputed funds should

7   be disbursed.

8        And the quotes and representations made by counsel

9   for the Oversight Board, made by counsel to AAFAF, are night

10  and day from the statements that we have now before the Court.

11       So to the extent I do need to meet a higher standard

12  of changed circumstances, I think we can do that, Your Honor.

13  And to be very specific, and we do quote this in our reply

14  brief throughout footnotes, as well as the texts that I can

15  give Your Honor the references.

16       At May 30th, the hearing on the transcript on page

17  34, lines 19 to 24, Mr. Bienenstock said, quote, the Board

18  does not believe it would be appropriate to not consent to

19  this Court's determination of whether interpleader is

20  appropriate or not because there are no instrumentality,

21  municipality, territory-type powers and services for the

22  people at issue here.  End quote.

23       And that's important context because it informs other

24  things that Mr. Bienenstock and even Ms. Uhland said on the

25  same date.

1            On May 30th, at the transcript, page 35, lines five

2    through seven, Mr. Bienenstock told the Court, quote, we look

3    at it, it being this action, as intercreditor disputes between

4    the different types of COFINA creditors, and it's not

5    something the Board has reason to weigh into, at least at this

6    point.  End quote.

7            And on June 6, the Oversight Board filed a pleading

8    with this Court, and we quoted that pleading as well in our

9    reply brief.  And the quote that we wanted Your Honor to pay

10   attention to said the following:  Quote, the scope of this

11   adversary proceeding is narrow and discrete and singularly

12   focused on determining the relative rights of the holders of

13   the COFINA bonds in the funds held by BNYM, period.  End

14   quote.

15           So Your Honor will recall that on May 30th at the

16   hearing in New York, we had explained that although there is a

17   dispute, and I think Your Honor remembers that my Coalition

18   has both cash pay senior bondholders, as well as capital

19   appreciation bondholders, some folks have remarked it's a

20   miracle they're still together and talking, but we try very

21   hard to make sure that happens.

22           And what the entire group, capital appreciation

23   bondholders and cash pay bondholders said is whatever this

24   dispute is, the senior cash pay bondholders should not become

25   collateral damage when mathematically those holders would

1   always get at least as much as they are otherwise entitled to

2   for their regular payments.

3           And I asked Your Honor to consider that, and Your

4   Honor implicitly said, I can't really take your word for it.

5   There's no evidence here.

6           There was counsel for Ambac who stood up, and Mr.

7   Dunne had to leave, but he did stand up on May 30th and say,

8   Your Honor, we disagree with those calculations.  We don't

9   think that that's right.

10          There could be some circumstances where if there was

11  an acceleration, the way Ambac and other capital appreciation

12  bondholders have asserted occurred prebankruptcy, that if that

13  happened, then the payments would not exactly be the same.  It

14  would be impossible to true it up.

15          So reflecting on this over the period of time and

16  watching our landscape changing, which Your Honor does not see

17  everything.  Magistrate Judge Dein sees some of it with some

18  of the discovery.  But COFINA, Your Honor would remember, was

19  taking the position on May 30th, we're happy to pay.  We're

20  here.  We're ready.  We're happy to pay.

21          The Oversight Board took the position, this is an

22  interCOFINA dispute and we have no reason to put our thumb on

23  the scales one way or the other either.

24          And the issues were and have been up in Boston

25  whether prepetition conduct of AAFAF and the Oversight Board

1    constituted covenant defaults.

2          Why are we even talking about that if we have a

3    payment default anyway?  Right?  The reason was because they

4    had not decided to make a payment.  And so now for them to

5    take -- "them" being the government positions, to take the

6    position lifting of the stay in order to demand payment, it

7    was news to us that COFINA did not want to pay.

8          This was the first time, quite different from what

9    the circumstance was on May 30th.  First time that we had ever

10   heard that.  COFINA senior bonds are the -- if not the, among

11   the most widely held bonds by individuals on island, as well

12   as in the 50 states.  People depend on this income every

13   single month.

14         There is simply no reason the money couldn't be paid

15   out, if it's just sitting there and collecting, especially

16   considering, and we can take a look at the caption, who are

17   the parties to this lawsuit.  It's transparent.  It is the

18   Bank of New York suing COFINA, White Box, Pandora, Ambac,

19   Franklin Advisors, and CDN Company.  That's it.  There's no

20   Commonwealth party, even in this adversary proceeding.

21         The first time anyone has even suggested that, well,

22   the Commonwealth might want to stick a wrench in the spokes

23   here and stop the payments was the reply papers that we got on

24   Monday of this week when the Oversight Board and AAFAF

25   asserted purportedly the rights of non-party, the

1    Commonwealth.

2             So Your Honor, we were under the impression, and

3    perhaps it was incorrect, but we were under the impression

4    that when this Court wrote into the Interpleader Order

5    initially that the Court will hold the funds until it

6    determines which of the parties are entitled to the funds, the

7    parties were the parties on the page, Your Honor.  It was

8    always intramural within COFINA.

9             Your Honor may recall, I think it was Mr. Stancil for

10   the GO bondholders on that very first day hearing who ran up

11   to the podium and said, well, we're not necessarily going to

12   intervene or interfere with the COFINA lawsuit, but what we

13   want to do is make sure the COFINA matter in the Bank of New

14   York case stays in its lane.  That was the quote.  I remember

15   that.

16            And now what we have is the GO bondholders, the

17   unsecured creditors' committee, AAFAF and the Oversight Board

18   essentially jumping the median and trying to create a

19   multi-car pileup of issues, of issues with respect to what

20   should have been and always was the COFINA bondholder trustee

21   saying, I have conflicting instructions from my bondholders.

22   Please help me sort this out.

23            And for all of those reasons, we've been debating

24   whether there's been covenant defaults.  If today COFINA's

25   representative, the Oversight Board, is standing up and

1    saying, we do not wish to pay our bonds, we would like this to

2    remain a giant pot of cash, which is in excess of 550 million

3    dollars today, okay, and watch it continue to grow so we can

4    all stare at it.  Even though COFINA has no other purpose, it

5    is just a securitization.

6           But to create some sort of piñata that other third

7    parties can come in and hit at with the hope of getting money

8    out, which Mr. Despins referred to himself as one with the

9    grabby hands now, so that's fine too.  If he's going to be

10   that person, he should make an application to actually do

11   that.  But that's not to date what this case has been about.

12          We did think this was really in the nature of

13   clarification, because Your Honor also ruled in connection

14   with the Interpleader Order that it's not going to be an issue

15   whether the senior bondholders, the subordinate bondholders or

16   some subset or different groupings on those creditors are

17   entitled to this cash.  It's all being held for them anyway.

18          It's a very different world if what the Commonwealth

19   party is saying is we want to jump the median and get into

20   this lane and stop the payments.  And if that's the case,

21   Mr. Bienenstock is right.  He's right that I don't have the

22   basis today on the motion we filed to demand the payments.

23   That was news to me that they were refusing payments.

24          So if that's the position, then I suppose our

25   alternative relief, which is that the Court is not prejudging

1   that there's no payment defaults based on the actions of

2   COFINA, we would seek to have the right to at least seek

3   summary judgment on that issue and probably make a lot of the

4   other issues in the case simpler.

5         But they can't have it both ways, where they say by

6   virtue of some magic wand, there's not going to be a payment

7   default, but meanwhile we're refusing to pay the bonds.

8         I'm not from Texas and I don't have any eloquent,

9   literary icons to quote to you today, Your Honor.  I'm from

10  Queens.  And I remember, when you don't pay, there are

11  consequences, okay?  I remember that from my childhood days on

12  the playground.  There are consequences.

13        So COFINA has a choice, and they're making that

14  choice right now, right here.  But up until this past Monday,

15  this was news.  I'm sure it's news to Magistrate Judge Dein,

16  who's been wondering if there's a fund in default or not based

17  on actions, statements, things that supposedly were happening

18  prebankruptcy.

19        So we are going to brief those, because the timing of

20  the default will be relevant, Your Honor.  But if what we have

21  here is a payment default, let's call it what it is.

22        Thank you, Your Honor.

23        THE COURT:  Mr. Bienenstock.

24        MR. BIENENSTOCK:  Thank you, Your Honor.  Listening

25  to Mr. Kirpalani, I suspect that there's a misunderstanding,

 1 │ because he's not normally tricky and -- but what he said

 2 │ appeared to me to ignore an important part of the facts.

 3 │          When Bank of New York started the interpleader

 4 │ action, it was sitting on a bunch of money.  And the money,

 5 │ when it arose as sales and use taxes in the Commonwealth, may

 6 │ or may not have been property of the Commonwealth or property

 7 │ of COFINA, but that would be -- that's now left to two agents

 8 │ to fight about.

 9 │          But at the time, the money, when it arose, was

10 │ transferred to COFINA.  And in our view, it made that money

11 │ COFINA's property, and the only issue was which COFINA

12 │ creditors should get it.  And that's what I was speaking to

13 │ when -- and I'm sure Mr. Kirpalani quoted me accurately.

14 │          Our pleading in response to the motion was aimed at

15 │ changing facts.  The way the COFINA system works is they

16 │ collect a bunch of taxes as the fiscal year starts, and then

17 │ when they have enough money geared to their debt service, et

18 │ cetera, then other taxes stay in the Commonwealth or transfer

19 │ back to the Commonwealth.

20 │          Well, that's going to be happening, if it's not

21 │ happening already, as of July 1.  And what we were addressing

22 │ was this additional money that wasn't there when we were in

23 │ your courtroom in New York back in June.

24 │          This additional money that arose during the Title III

25 │ cases, that could be Commonwealth property.  That could be

1    COFINA property.  So there's a right answer to that.  I'm not

2    saying what the right answer is, but there's one right answer.

3         And our pleading for today simply wanted to make the

4    point that nothing should happen with the new money, such that

5    it would be inconsistent with whatever that right answer is

6    that's ultimately determined either by adjudication or by a

7    settlement.

8         So -- and I think the Commonwealth agent, the

9    committee, is equally concerned that the Commonwealth not lose

10   rights in money that certainly that's arising after July 1 and

11   after the Title III petitions just because it may be channeled

12   to Bank of New York to hold, because that's the way the system

13   was set up.  And frankly, I don't think Mr. Kirpalani would

14   even disagree with that.

15        We also agree with him on one point, that whether

16   Bank of New York holding the money and not paying it to COFINA

17   bondholders who are ultimately deemed to be entitled to it is

18   an event of default or not is something that we thought Your

19   Honor always allowed them to litigate.

20        We all came up with the best system we could by

21   saying, let's suspend the money.  But whether that really

22   avoids an event of default is something that I thought was

23   being left to litigation.

24        But the primary reason why I rose is it's not that

25   our position has changed since June, it's that facts are

1    changing.  As more money goes there, we want to protect it for

2    its rightful owner, whoever that is.

3            Thank you, Your Honor.

4            THE COURT:  Thank you.

5            Mr. -- do you want to be heard in opposition, in

6    support?

7            MR. BENTLEY:  Your Honor, Philip Bentley for the

8    Mutual Fund Group.  As Your Honor may recall --

9            THE COURT:  Would you come to the podium, please?

10           MR. BENTLEY:  Yes.

11           THE COURT:  So everyone can see you who's not in

12    here.

13           MR. BENTLEY:  Philip Bentley of Kramer Levin for the

14    Mutual Fund Group.

15           As Your Honor will recall, we support the motion in

16    part and oppose it in part.  Your Honor was asking which side

17    are we on.  We're on both sides in that sense.

18           I'd like to focus principally on the portion of the

19    motion that we oppose, but very briefly as to the portion we

20    support.  Your Honor will recall, we supported the request to

21    permit payment to the senior SIBs through January subject to

22    certain conditions specified in our response.

23           We did so based on the positions that the Oversight

24    Board and AAFAF had taken at the outset of the interpleader

25    action.  And I would like to echo Mr. Kirpalani's comments

1  that we do think the Oversight Board has done an about-face in

2  terms of their position.

3          At the outset of this adversary proceeding, the

4  Oversight Board stated very clearly to the Court, we see this

5  as an intercreditor -- an interCOFINA creditor dispute.  The

6  rights of the Commonwealth to payment are not involved.  The

7  rights to COFINA are not involved.  It's just a dispute

8  between different groups of COFINA creditors.

9          It was on that basis that we thought it was

10  appropriate to join in the seniors' request that payments be

11  made to senior COFINA bondholders on a limited basis.  The

12  Oversight Board and AAFAF are now taking new positions, and

13  that does arguably change the situation in at that regard.

14          Turning to the portion of the motion that we oppose,

15  and this, I think, is very clear-cut.  Your Honor said at the

16  beginning, you view the motion as a reconsideration motion.

17  We agree with that, Your Honor.

18          Mr. Kirpalani is trying to present it as a small

19  clarification that he's requesting.  We don't think it's small

20  at all.  We don't think it's a clarification, but rather it's

21  a modification.  He is asking the Court to modify what you

22  said in your interpleader order back on May 30th as to what is

23  the effect of the interpleader.

24          The fact that the money is paid into court rather

25  than paying to bondholders starting on June 30th, is that a

1  payment default?   And Your Honor will recall, this was a very

2  big issue on May 30th.

3         The main reason that AAFAF opposed interpleader, the

4  main reason that the Mutual Fund Group and Assured opposed

5  interpleader was specifically this, that we were very

6  concerned that when the money is paid into court, rather than

7  paid to the bondholders per the resolution, it would be argued

8  that that was a payment default.

9         And if that were the outcome, then the effect of

10  interpleader would be not to preserve the status quo, which is

11  what everybody understands the purpose to be, but the effect

12  would have been to fundamentally change the status quo because

13  the payment default could have dramatic consequences with

14  respect to the rights of bondholders amongst themselves.

15         And I believe Your Honor expressly took note of that

16  concern and recognized it.   That was a concern you wanted to

17  address and alleviate.   And you specifically stated in your

18  interpleader decision that to alleviate this concern, you

19  would state in your interpleader order, as you then did, that

20  the money was being held in trust for the benefit of the

21  parties ultimately found to be entitled to it.

22         That finding, we submit, Your Honor should not

23  reconsider.   That was carefully considered.   That was based on

24  the arguments of all of the parties, and nothing has changed

25  to warrant reconsideration.

1          Your Honor has already opined on what the standard

2     for reconsideration is on an interim order of this sort.  Your

3     Honor has said there must be either a manifest error of law,

4     and here I don't think that's even argued and it couldn't be,

5     or there must be new circumstances, newly discovered evidence,

6     not previously available to the parties, that has emerged

7     since the original ruling.  And that's certainly not the case.

8          The one argument that the seniors have made to try to

9     address that issue, to try to satisfy that requirement, is

10    that Your Honor subsequently ruled on the GO's motion to

11    intervene in the interpleader action, but that's not an

12    unexpected development.  That motion was pending at the time

13    Your Honor ruled, in your May 30th interpleader ruling.

14         So the fact that Your Honor ultimately ruled on a

15    motion that was pending, this isn't remotely the sort of event

16    that would ultimately warrant reconsideration.

17         THE COURT:  Thank you.

18         MR. BENTLEY:  Thank you, Your Honor.

19         MS. HALSTEAD:  Good afternoon, Your Honor.

20         THE COURT:  Good afternoon.

21         MS. HALSTEAD:  Ellen Halstead from Caldwalader,

22    Wickersham & Taft for Assured.

23         Assured is objecting to all relief sought by Mr.

24    Kirpalani.  And as Your Honor observed, the senior bondholder

25    is making a motion for reconsideration.  And therefore, Your

1    Honor should either resolve the motion under Rule 59(E) and

2    Bankruptcy Rule 9023, or Federal Rule 60(B) and Bankruptcy

3    Rule 9024.

4         In our objection, we set forth why the Court should

5    not reconsider the Interpleader Order.  In brief, the senior

6    bondholder coalition arguments were either made in response to

7    BNY's filing the interpleader action or they were never made.

8    And neither is a proper reason to amend the Interpleader

9    Order.  There is no newly discovered evidence, as Mr. Bentley

10   pointed out.

11        The purpose of an interpleader action is to resolve

12   disputes regarding funds.  It would be highly unusual for a

13   portion of disputed funds to be paid during the interpleader

14   to some of the defendants, but not all the defendants.  And

15   here I'm referring to paying the senior bonds while not paying

16   the subordinate bonds.

17        And again, the subordinate bonds had no issues with

18   how the bonds were being paid under Article Five.  They did

19   not threaten litigation, but as a result of the actions of the

20   senior bondholders, they're not being made now.

21        And in contrast, the senior bondholders had an issue

22   of how they were being paid under Article Five.  They wrote

23   some letters to BNY, Ambac and White Box filed litigations in

24   state court.  And as a result of these actions, Bank of New

25   York filed interpleader action.

1    　　　But now, the senior bondholders want to go back in

2    time and get paid, I guess how they were getting paid under

3    Article Five, if the action was filed, but they don't want to

4    to have the subordinate bondholders being paid.  And that's

5    not how interpleader actions are supposed to work, and it's

6    also inconsistent with interpleader actions, and it's also

7    inequitable to the subordinate bondholders.

8    　　　And as Mr. Bentley pointed out, an event of default

9    cannot arise due to the entry of the Interpleader Order.  And

10   my view was the Court's Order, opinion on that was quite

11   clear.  I think Mr. Bienenstock doesn't agree with that, but

12   that was our view.  And the interpleader action was filed to

13   resolve whether or not there was an event of default.

14   　　　The Interpleader Order should not be the cause of an

15   event of default.  And, you know, Mr. Kirpalani, he is asking

16   for a decision on the merits, and they're asking to get paid

17   under their version of scenario two, which is an event of

18   default and no acceleration.

19   　　　When I say "their version," their version is that

20   under that scenario, the senior bondholders get paid and the

21   subordinate bondholders get nothing.  Our position, Assured's

22   position is that under that scenario, an event of default into

23   acceleration, the subordinate bonds would continue to get paid

24   under that scenario.

25   　　　But Your Honor, the briefs are due a month from now.

1   There's no reason to reconsider the Interpleader Order at this

2   time.

3        And also I want to address one other point that the

4   senior bondholder coalition made.  They made a claim that

5   Assured is acting for the GO bonds in objecting to all of

6   this.  And by making this claim, the senior bondholder

7   coalition is demonstrating a misunderstanding of how financial

8   guaranty insurance works.

9        Assured has duties and obligations to all of the

10  bondholders of the bonds of Assured.  We do insure GO bonds,

11  but we also insure subordinate bonds of COFINA.  And here we

12  are defending the interest of the subordinate bonds.

13       In fact, Assured is the only party that only has an

14  interest in subordinate bonds.  The Mutual Fund Group has

15  about 400 million in senior bonds and about 200 million in

16  subordinate bonds, but Assured only has an interest in

17  subordinate bonds.

18       And that tells you exactly why we are objecting to

19  senior bondholders being paid during the pendency of this

20  interpleader.  That's all.

21       Thank you, Your Honor.

22       THE COURT:  Thank you, Ms. Halstead.

23       Just one moment.

24       MS. SLOANE:  Good afternoon, Your Honor.  I'm Cheryl

25  Sloane for White Case on behalf of the Puerto Rico Fund.  We

1    joined in support of the senior coalition bondholders' motion

2    insofar as it sought to pay senior interest payments.  We do

3    so even though we are holders in both subordinate and senior

4    bonds.

5           The Puerto Rico funds are Puerto Rico based funds.

6    They're close-ended funds.  And in May, we appeared before

7    Your Honor and we asked that because in our view, no event of

8    default would have a right until at least July 5th, that the

9    June 1st and July 1st interest payments be made.

10          We argued that point, one, because we thought it was

11   legally correct, but also just as important, as Mr. Kirpalani

12   said, these COFINA bonds are the most widely held bonds on our

13   island.  Our shareholders are tens of thousands of retirees

14   who very sincerely depend on those interest payments.  And for

15   them, the June 1st and July 1st payments made a world of

16   difference.

17          So with all due respect, to say that we have a motion

18   for summary judgment in one month, they haven't gone with any

19   payments in the last few months, and we're going at least a

20   few months without payments.

21          So although we would ask that you deny the motion

22   insofar as the case of summary judgment clarification with

23   regard to the consideration points, we stand in support of the

24   payments on the senior SIB payments pending until January of

25   2018.

1          Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Mr. Despins, I had denied your motion to intervene in

4     this.  And so in what capacity is it that you wish to speak?

5          MR. DESPINS:  This is a scenario where I start

6     singing, Who Am I, like in Les Miserables, but here we are

7     addressing the Court as the Commonwealth agent, Your Honor.

8          We had filed this motion to intervene, yet you denied

9     it because you said you're not the Commonwealth agent, but I

10    think now we are, unless I'm mistaken.

11         THE COURT:  Well, you are the Commonwealth agent for

12    the structuring and pursuit of a particular litigation process

13    to address GO COFINA.  I don't know that -- I didn't read that

14    stipulation to put you in the shoes of the Commonwealth for

15    all purposes retrospective and prospective, but perhaps I

16    should -- Mr. Bienenstock, are you the -- I'm sorry.  It gets

17    confusing now to remember who put a paper in on which motion,

18    when, but I know that they're -- anyway, Mr. Bienenstock, do

19    you want to say anything about this?

20         MR. BIENENSTOCK:  Your Honor, our only point here was

21    that money that may come into Bank of New York, or perhaps it

22    already has started in the new fiscal year, after the hearing

23    we had in New York in May or June, is money that is clearly

24    the subject of the dispute between the Commonwealth agent and

25    the COFINA agent.

1        And that's why we filed a pleading in connection with

2   Mr. Kirpalani's motion to say that money ought to be

3   safeguarded so that whoever the real owner is, gets it at the

4   end of the day.  We never agreed that more money coming into

5   Bank of New York would only go to COFINA creditors.

6        It's just being held for its rightful owner.  That's

7   our only point, and that's the point that I think Mr. Despins,

8   as Commonwealth agent, wants to protect.

9        MR. DESPINS:  But it is --

10       THE COURT:  I think that is the filing that I was

11  thinking about, because you had brought on some urgent motion

12  as anticipated agent to speak, and I said there had already

13  been a filing, so --

14       MR. DESPINS:  Correct.  So let me try to -- there are

15  two aspects.  That is, there's money that was already there

16  before July 1st.

17       THE COURT:  Yes.

18       MR. DESPINS:  And the Commonwealth-COFINA dispute

19  stipulation says that the ownership of money, where the sales

20  and use tax is going to be decided through this vehicle.  It

21  doesn't say, from this date or that date.  And frankly, the

22  way the Commonwealth side took it, and I believe at this time

23  Mr. Rosenberg may agree with me, is that that applied to this,

24  the reason, to this adversary proceeding.

25       The reason being is that when he tried to intervene

1  in this proceeding, you said no, I'm denying this.  The

2  Commonwealth is going to assert an interest.  You said that in

3  the ruling on denying his motion to intervene, that the

4  Commonwealth was asserting interest to these funds.  And

5  that's why we're here, to assert an interest in these funds.

6  Existing, future funds as well.

7          THE COURT:  And so for the avoidance of doubt, you

8  are saying that the Commonwealth not only wants to keep all

9  options and positions open with respect to the post initial

10 deposit money at Bank of New York, but that the Commonwealth

11 also asserts rights in the initial deposits under the

12 interpleader?

13         MR. DESPINS:  Correct.

14         THE COURT:  All of the money under the interpleader?

15         MR. DESPINS:  Correct.  Should be decided pursuant to

16 this litigation that's going to be commenced between the

17 Commonwealth and COFINA, you know, in the next few days.

18         THE COURT:  Thank you.

19         MR. DESPINS:  So the only thing I wanted to -- and I

20 know you denied our motion to intervene, but there was in

21 there not only an objection, but a request to add some

22 language, what I call the account neutrality language that

23 says what Mr. Bienenstock essentially has said, but it's not

24 an order anywhere, that says the fact that every day there's

25 money coming into that account.

1          The Court's not going to rely on the fact that it's

2     going into that account to make a ruling as to who owns it.

3     It should be mutual.  That's why they call it the account

4     neutrality language.

5          So we're happy to refile that if we need to, but we

6     believe that that's something the Court could do sua sponte,

7     because the issue is -- what we don't want to happen is that,

8     let's say in December you ruled that this is all the

9     Commonwealth's money.  In my dreams.  And -- but you say

10    except that for the money that came in during this time, you

11    lose your rights, because the money did come into the Bank of

12    New York account.

13         That would be a horrible result, because that means

14    the passage of time, a party gains an advantage over another

15    party, and that's not the purpose of the bankruptcy.

16    Everything should be frozen.  The fact it's in one account

17    over another should have no legal consequence.

18         Now, they may argue that it has a legal consequence

19    as the money that came in before we came into existence, and

20    that's fair game to argue that.  But as far as money that's

21    coming in every day, there should be some kind of account

22    neutrality language in something, somewhere.

23         If Your Honor doesn't feel comfortable entering it

24    sua sponte, then perhaps we file a motion just for that

25    limited purpose.  But we think it's very important to have an

1    order, not just statements on the record, that basically says

2    that the fact the money is in that account is not going to be

3    outcome determinative.

4            Thank you, Your Honor.

5            THE COURT:  Okay.  Thank you.

6            Ms. Uhland.  And if you'll just give me one moment.

7            MS. UHLAND:  Thank you, Your Honor.  I will.

8            THE COURT:  Ms. Uhland.

9            MS. UHLAND:  Thank you, Your Honor.  I'll be very

10   brief.  I just wanted to remind the Court that one of the

11   issues in the interpleader is the issue of whether the nature

12   of the bondholders' interest is that of a secured interest or

13   an ownership interest.

14           And while in their motion the COFINA senior coalition

15   asserts that they are the owners of the funds and, therefore,

16   there's no relief from stay required to make the payments,

17   COFINA has previously in connection with the -- in its papers,

18   asserted it has an ownership interest, that COFINA owns the

19   funds that are in the BNY account, and the bondholders'

20   interest is that of a secured creditor.

21           So we want to be clear that that is a live issue, and

22   the interpleader should not be summarily decided in this

23   motion.

24           Thank you, Your Honor.

25           THE COURT:  Thank you.

1          MR. KIRPALANI:  Your Honor, Susheel Kirpalani for the

2    COFINA Seniors Bondholders' Coalition.

3          I want to ask if we can perhaps move in baby steps,

4    because there are a lot of things being hurled at the Court

5    without any legal doctrine behind it.  A lot of -- well, from

6    Assured, the insurer of subordinate bonds, the position is the

7    following, we insure subordinated bonds, not senior bonds.

8    We're not getting paid because senior bondholders said we

9    shouldn't.  So on that legal doctrine, the senior bondholders

10   shouldn't get paid here.  Okay?  It wouldn't be fair.  It's

11   only a month way.

12         I'm not sure there's any legal canon that could

13   conceivably support the position that, well, just because I'm

14   not getting paid, they shouldn't get paid.  The issue, the

15   factual issue -- this is a court of law.  This is not a place

16   for folks to come in, including Mr. Despins, to come in after

17   parties -- parties have joined issues in the litigation and

18   are proceeding to summary judgment, to put his hand up and

19   say, may I just say, we should just hold all this money until

20   I get up to speed and get my act together and file an

21   intervention that gets granted, and then file an application

22   for a TRO, because you can't take Mr. Despins' word for it.

23         That would be a travesty of justice.  It would do

24   horrible things to notions of bankruptcy.  There is no support

25   for these statements.

1          What we have here is an adversary proceeding over the

2    disbursement of funds, parties who have expressed and joined

3    legal issues.  I went through who the parties in this case are

4    over those funds.  The Commonwealth is not one of them.

5    They're just not.  They have not yet done it.

6          If they feel -- if Mr. Despins, as the Commonwealth

7    agent, feels property at the Bank of New York's bank accounts,

8    not Banco Popular, the Bank of New York's bank accounts,

9    belongs to the Commonwealth, they know how to access the

10   courthouse to do that.  But the way that was just done was not

11   the way.

12         The way to access the courthouse is to make an

13   application.  Explain what's the basis for that argument.

14   Show the facts.  Say it must be decided on a preliminary basis

15   now.  They must freeze the funds now.  That's called a

16   temporary restraining order or preliminary injunction.

17   Mr. Despins taught me about it, so he certainly knows what it

18   is.

19         And it's not an easy standard to meet.  There's a

20   reason they have not filed that application, because they

21   probably are not confident that they could meet the standards

22   that are going to be required of them.

23         There is no magic wand doctrine that I'm aware of

24   that says, just because parties are expressing views, from the

25   views, that funds should be frozen, and there's no legal

1    consequences as a result of that.  It's a stop, look and

2    listen type of thing.  It doesn't exist in a court of law,

3    Your Honor.

4         There are hundreds of millions of dollars at stake.

5    There are tens of thousands of bondholders looking for their

6    income every month.  And there is no adversity at all with

7    respect to the parties in this adversary proceeding over the

8    senior cash pay bondholders' entitlement to be paid.

9         The subordinate bondholders' sour grapes that they're

10   not getting paid because senior bondholders, including my

11   clients, don't feel they're entitled to be paid has nothing to

12   do with it.

13        Mr. Despins' concern that, well, someone should be

14   minding the shop before I got appointed, and I got appointed

15   and it took a heck of a long time to get a stipulation that

16   gave me standing, so let's just go back and start over again,

17   there's no legal doctrine for this.  If they want to try to

18   file one and seek nunc pro tunc relief for it, I'd be curious

19   in seeing the case law.

20        But what we have here is, at least with

21   Mr. Bienenstock's statements, at least the Oversight Board's

22   position, who is part of this proceeding on behalf of COFINA,

23   COFINA is a party, that the cash that was there from January

24   -- because if Your Honor remembers, the way the sales tax

25   flows, the COFINA bucket is filled by January.  That's why

1    they're talking about starting by July 1, the new fiscal year,

2    the cash starts flowing again to COFINA.  But at least the old

3    and cold cash, 420 some odd million dollars is COFINA

4    property, according to the Oversight Board's representative.

5         That cash, if the money is turned back on for the

6    senior cash pay bondholders, is the declaration of Matt

7    Rodrigue (ph) with the schedules.  It's 247 million dollars of

8    the 420, which could go out the door between now and next

9    year, in January of 2018.

10        Maybe by then Mr. Despins will sharpen his pencils

11   and file an action and seek an injunction with respect to his

12   rights or the Commonwealth's rights with respect to money that

13   came in after July 1.

14        But all of these arguments or statements or equities

15   or fairness have nothing to do with the legal rights of

16   bondholders with respect to cash that does belong to COFINA,

17   even according to the Oversight Board, even what I had thought

18   was an about-face.  But maybe it was a half turn.

19        And then I think that if nothing else, the funds

20   could be turned back on for the benefit of the senior

21   bondholders, because there's no adversity.

22        There's no party who could explain why that money --

23   no party to this adversary who could explain why that money

24   shouldn't be released to the senior cash pay bondholders

25   between now and the time that 420 million dollars is used,

1   while maintaining the reserves that were requested by the

2   subordinated bondholders.  And frankly, for the benefit of

3   senior capital appreciation bondholders as well.

4           We don't want to have a situation where there's not

5   enough money left and there's been a disproportionate

6   distribution to anyone.  That's never been our goal with

7   respect to that cash.

8           And if Ms. Uhland is now saying, and she had said

9   similar things on May 30th, I'm not saying she's done anything

10  different, but if what she's saying is that COFINA had once

11  consented to the June 1st payment, but we're no longer

12  consenting to any other payments, well, then there is a

13  payment default.

14          And I don't think Your Honor contemplated that

15  circumstance when the Court wrote in the Interpleader Order

16  that while we hold the funds to decide which party is entitled

17  to payment -- I think Your Honor's trying to avoid a "gotcha"

18  situation, which I completely understood at the time.  And I

19  do think the landscape has changed for us.

20          So I don't know if that clarifies it, what our

21  position is, Your Honor, but I'd be happy to answer any

22  questions from you.  But I'm out of time I think.

23          THE COURT:  I have no questions for you at this time.

24          It looks like Mr. Rosenberg wants to say something,

25  and then I need a moment to reflect, if he's the last one,

1   subject to your wanting to --

2         MR. KIRPALANI:  Thank you.

3         MR. ROSENBERG:  Good afternoon, Your Honor.  Andrew

4   Rosenberg, Paul, Weiss, Rifkind, Wharton & Garrison on behalf

5   of the Ad Hoc GO Group.  And yes, we too were denied

6   intervention preceding Mr. Dispens' denial, so I'm not going

7   to talk about anything with respect to the money on January 1

8   that was put in there.  You've denied us intervention to

9   discuss that.

10        I just want to mention two quick points in terms of

11  the future monies coming in since.  It was pointed out that

12  Mr. Despins or anyone had not made any motions to stop it or

13  enjoin it.  I think in all fairness, this is -- there is a

14  Court Order that says that whatever money is in there will

15  belong to the rightful owners.

16        I'm not sure why us, the Board, Mr. Despins or anyone

17  else would feel the need or be required to do something to

18  stop that money and say, oh, it shouldn't go in there because

19  now it belongs to COFINA, because the Court Order in effect

20  today says it belongs to whoever the Court ultimately

21  determines who the rightful owner is.  So I think there is no

22  need to file anything further.

23        Two, I have to say, only because we've heard it

24  throughout the entire day in terms of the thousands of people

25  who rely on the COFINA monies, I will point out that the first

1  priority constitutional debt holders also have thousands of

2  holders who depend on that money.

3      They have not been paid, I believe, since January of

4  last year at this point, despite the fact that we are first

5  priority creditors under the constitutional applicable law.

6  By far the longest standing group that has not received a

7  single payment in this case.

8      Thank you.

9      MR. DESPINS:  Your Honor, two more minutes.

10     THE COURT:  If you must.

11     MR. DESPINS:  Your Honor, very briefly.  Paragraph

12 four of the stipulation you entered clearly addresses the

13 issue.  It talks about -- it says that the issue of the

14 ownership of the sales and use taxes generally between COFINA

15 and Commonwealth shall be determined pursuant to this process.

16     And there's no -- I don't need to seek an injunction.

17 There's an automatic stay in place.  There is an automatic

18 stay that precludes creditors from grabbing their cash.

19     Thank you.

20     THE COURT:  Yes.

21     MR. KIRPALANI:  I feel -- I do feel bad.  It does

22 appear that it's been a very long day, and there are a lot of

23 people throwing a lot of very complicated issues at the Court,

24 and people are being very imprecise.  Okay?

25     This is not an automatic stay issue.  I've already

said three times that on this motion, I have not sought any

relief to force the debtor to pay me something.  The automatic

stay is not what precludes a debtor in bankruptcy from paying

if it wanted to.  It's Section 363, which does not apply.

Your Honor knows that.

       If COFINA wanted to pay its bondholders, which was

our expectation at the last time we got together like this,

they are free to do that.  I did not need to seek to lift the

stay, because it was not my understanding that they had

decided, recently apparently, perhaps at the behest of the

unsecured creditors' committee, doing their job, that we don't

want to make these payments.

       But if that's the case, there is no legal doctrine

that says somehow we're also going to pretend there is no

payment default.  It's got to be one or the other.  It's as

simple as that.

       Thank you, Judge.

       THE COURT:  Thank you.

       The motion for clarification, reconsideration,

modification is denied.  It is, in essence, a reconsideration

motion.  And the facts, there's no new evidence as to the

facts that existed at the time I decided it.  I do not find

that there are grounds for finding manifest injustice here.

       I deliberately drafted it to provide that the

interpleader, the money in interpleader would be held for the

1    benefit of whoever I determined was entitled to it, at the

2    point when that -- and it also provided that the creation of

3    the interpleader itself was not a liability event.

4            There were disparity positions as to claims clearly

5    among the COFINA bondholders, and as to whether there are

6    defaults and what the applicable priority situation would be

7    there.

8            There was an assertion by COFINA that COFINA, not the

9    bondholders, was the owner of the bonds.  There was clearly

10   brewing and articulated in the atmosphere, at least the

11   position of the Commonwealth, that what COFINA owned could be

12   subject to claims of the Commonwealth.

13           And so the Order says that it will belong to whoever

14   I determine it belongs to.  If there is perceived to be a risk

15   of -- that the Order has implications for new money going into

16   the Bank of New York, you all should talk about that.  If you

17   can stipulate to something that makes sense, I will consider

18   the stipulation.  Otherwise, you -- there is a litigation

19   machine unprecedented in the history of man sitting here, and

20   women, in this room.

21           You have summary judgment motion practice coming up.

22   You can cue up the prospective issue in a way in which we

23   don't have people flinging equitable principles and

24   perceptions of changed circumstances at me, and asking me to

25   improvise retrospectively modifications to an Order that I

1    entered under particular circumstances earlier this year.

2         So the bottom line is the senior bondholders' motion

3    is denied.

4         MR. KIRPALANI:  Your Honor, Susheel Kirpalani.  Just

5    a question.  It's not clear from what Your Honor just said

6    whether we are precluded from seeking summary judgment that

7    there has been a payment default.

8         If Your Honor is making that an Order, is that a

9    final Order?

10        THE COURT:  I haven't precluded anybody from doing

11   anything.

12        MR. KIRPALANI:  Okay.

13        THE COURT:  I have said I'm not changing the Order

14   that I entered.

15        MR. KIRPALANI:  Okay.  Thank you, Your Honor.

16        THE COURT:  I think that we have come to the end of

17   our agenda, and we have come to the end on Wednesday, which is

18   a good thing.  I thank you all for your ernest and good faith

19   work in aid of your constituencies and in aid of the goal of

20   an outcome that is one that is forward looking here.

21        I also want to thank the Court's leadership and staff

22   for everything that the District of Puerto Rico is doing, and

23   the Southern District of New York by video, to make it

24   possible for us to come together and address the issues that

25   need to be addressed.

1          And on the matters on which I've reserved, obviously

2     you will be hearing from me.  And I'm sure that I will be

3     hearing from all of you.

4          And I thank you also for your engagement with Judge

5     Houser and her team.  That is a very important element of our

6     progress.  It's a separate one from my aspect of it, but it is

7     very important indeed.

8          So safe travels all.  Keep well.  We are adjourned.

9     Thank you.

10          (At 4:17 PM, proceedings concluded.)

11                          *      *      *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   U.S. DISTRICT COURT      )

 2   DISTRICT OF PUERTO RICO)

 3

 4       I certify that this transcript consisting of 211 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain on August 9,

 8   2017.

 9

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

< Dates >
April 15, 2013 78:5
August 4th 45:7,
    49:4
August 9 149:1
August 9, 2017 6:2,
    211:7
January 1 205:7
January 2017 168:14
July 1 185:21,
    186:10, 203:1,
    203:13
July 17 45:5
July 1st 194:9,
    194:15, 196:16
July 2 149:1
July 5th 194:8
June 11 133:24
June 1st 194:9,
    194:15, 204:11
June 28 46:7
June 28, 2017 1:16
June 28th 8:9, 8:12,
    8:23, 9:9
June 29th 159:5
June 6 179:7
may, one 84:22


< 0 >
0.8 156:11


< 1 >
1 54:5
1,560 65:16, 80:13
1.3 103:18
1.8 103:21, 111:22
10,000 71:5
100 112:3
1015 99:8
105 98:20
11 34:3, 36:2,
    41:10, 41:12,
    54:4, 91:18, 93:1,
    146:22, 155:6
1102 95:11, 98:24,
    98:25, 101:5,
    117:5
1102(a 82:7

1102(a)(2 72:19,
    72:25, 74:10,
    124:23
1102(a)(4 70:25,
    72:21, 73:1,
    124:22
1109(p 173:2
1129(A)(6 146:22,
    165:9, 165:11
1141. 175:22
12 41:22, 43:24
12. 43:19
120 44:4
12:00 97:23
12:10 98:3
12th 9:15
13 41:24, 41:25,
    103:16
13. 41:22
14 21:16, 21:21,
    21:24, 35:18,
    44:22
140 164:7, 164:9
15 23:25, 24:4,
    24:8, 24:9, 24:10,
    24:11, 24:12,
    25:5, 25:9, 25:10,
    27:22, 31:20,
    35:16, 48:13,
    62:20, 62:21,
    62:22, 63:2, 72:6,
    72:7
15. 23:18
17 97:2
17-BK-3283(LTS 1:6
17-BK-3566(LTS 1:24
17-BK-3567(LTS 1:40
17-BK-4780(LTS 2:4
171. 49:6
18 113:10
18,000 70:13
19 102:25, 104:6,
    109:22, 127:21,
    155:23, 178:17
1998. 138:18
1:00. 98:1
1:14 98:4


< 2 >

20 15:6, 15:7,
    15:10, 15:11,
    15:13, 15:15,
    15:20, 15:24,
    19:12, 23:18,
    52:13, 73:21,
    112:1, 119:1,
    155:23, 156:3
200 193:15
2004 51:24, 121:10
201(b 88:10
201(b)(1 143:8
2012. 82:25
2014 132:23, 136:4
2017 133:2, 133:15,
    133:17, 168:15,
    168:16
2017. 133:3
2018. 194:25, 203:9
2019 34:14, 34:23
2019. 34:20
21 65:17, 128:24
21. 72:14
21.4 156:4
211 211:4
21: 2:29
22 35:15
22. 113:12
24 175:21, 175:23,
    176:1, 178:17
24/7 13:17
247 203:7
25 58:6, 130:21
26 128:20
279 133:7
28 31:1, 31:3, 66:18
280 164:6
29 66:18
2:27 147:23
2:40 147:24


< 3 >
30 47:25, 62:19,
    111:11, 129:7,
    130:5
30-day 45:14, 45:18,
    171:18
301(c)(3)(a 98:19
302 100:9, 100:14

303 144:11, 169:19
305 144:5, 144:8
306 144:5, 148:12,
    169:11, 169:17,
    170:2
308 100:16
30th 58:6, 168:15,
    178:4, 178:16,
    179:1, 179:15,
    180:7, 180:19,
    181:9, 188:22,
    188:25, 189:2,
    190:13, 204:9
314 133:10
314(b)(6 146:15,
    165:8, 165:15,
    165:22
3283 33:23
34 178:17
35 97:5, 179:1
363 207:4
373 103:5, 103:18,
    109:21
3799 211:14
3: 1:6, 1:24, 1:40,
    2:4

< 4 >
40 16:11
400 193:15
410 92:13
420 203:3, 203:7,
    203:25
425 54:5
42nd 119:1
450 168:21
46,000 92:4
4780. 33:23
480 82:23
4:17 210:10

< 5 >
50 18:18, 87:14,
    109:19, 181:12
50-50 118:12
503(b)(9 107:12,
    107:22, 126:14
506 114:9

506(b 106:8
53 156:3
550 82:23, 161:14,
    161:15, 183:2
558 82:23
57 136:4, 141:3,
    141:8
59(E 191:1
5:00 45:9

< 6 >
60 128:9, 128:10
60(B 191:2
61. 92:13
65 130:13

< 7 >
710 58:18
750 54:2
78 89:4, 89:14
787 113:19

< 8 >
8.3 130:13, 167:17,
    167:21, 167:22
80 16:2, 16:4, 16:8,
    16:16, 16:17,
    16:22, 16:24,
    17:4, 53:16,
    54:12, 56:11,
    103:25
85 24:19, 25:9,
    25:17
889 92:18

< 9 >
90 16:3, 53:9,
    53:14, 54:21, 58:8
90-day 44:5
90. 56:13
90/10 55:21
9023 191:2
9024. 191:3
913 121:20
922 134:8, 134:16
965 175:22

9:31 6:3

< A >
abeyance 163:10,
    163:16
abide 84:23
ability 12:1, 37:9,
    39:24, 82:15,
    82:16, 159:11,
    168:9, 173:12,
    211:5
able 8:22, 12:8,
    14:6, 19:2, 21:15,
    39:20, 40:5, 46:7,
    88:18, 90:16,
    92:5, 132:19,
    143:15, 152:21,
    166:3
about-face 188:1,
    203:18
above 111:20, 156:4
absence 20:5
absent 175:23
absolute 72:23, 73:3
Absolutely 47:5,
    76:1, 76:2, 78:2,
    78:11
abused 118:16,
    118:17
accelerate 157:18
accelerates 157:22
acceleration 180:11,
    192:18, 192:23
accept 56:15
acceptable 7:20,
    25:11, 30:17,
    47:17
acceptance 56:15
access 14:17, 86:19,
    88:12, 94:21,
    201:9, 201:12
accommodation 59:1
accompanied 135:22
accomplish 131:18
accomplished 9:11,
    13:16
according 22:21,
    203:4, 203:17
accordingly 42:25

account 36:7,
142:11, 197:22,
197:25, 198:2,
198:3, 198:12,
198:16, 198:21,
199:2, 199:19
accounts 201:7,
201:8
accrued 77:23, 78:15
accumulated 67:2,
81:6
accurate 135:8,
211:5
accurately 104:10,
185:13
achieve 8:18, 10:11,
93:22, 156:12
acknowledge 87:9,
130:24, 141:23
acknowledged 61:4,
130:20
acknowledgement
146:5
Acosta 92:14, 92:15
acquiescing 67:5
across 47:19, 55:23,
55:24, 84:6,
122:17, 145:1
Act 66:19, 76:18,
76:25, 80:23,
136:2, 136:4,
141:3, 141:8,
146:9, 147:9,
200:20
Acting 72:14, 88:2,
177:14, 193:5
action 91:3, 91:6,
91:7, 126:4,
177:5, 177:9,
179:3, 185:4,
187:25, 190:11,
191:7, 191:11,
191:25, 192:3,
192:12, 203:11
actions 137:11,
137:14, 147:4,
184:1, 184:17,
191:19, 191:24,
192:5, 192:6
actively 10:3,

112:17, 118:19,
122:2, 123:18,
160:24
activity 18:12
acts 72:21
actual 21:8, 55:17,
64:6, 66:10,
67:16, 67:17,
110:16, 111:20
Ad 3:3, 3:26, 3:46,
4:10, 65:12,
80:12, 84:13,
85:12, 85:17,
91:18, 93:1,
98:15, 101:23,
102:4, 128:7,
128:14, 130:10,
205:5
add 14:20, 38:25,
45:14, 60:10,
61:10, 71:25,
197:21
added 42:20, 59:24,
64:18, 71:12,
115:4
adding 116:15
addition 103:20,
108:9, 111:22
additions 34:21
address 10:15, 11:4,
11:14, 12:11,
14:7, 14:8, 16:1,
28:12, 28:13,
39:18, 43:24,
45:12, 48:22,
53:10, 63:12,
63:14, 74:25,
94:19, 96:9,
101:18, 118:5,
142:20, 166:21,
166:22, 189:17,
190:9, 193:3,
195:13, 209:24
addressed 41:13,
41:15, 68:19,
94:4, 112:23,
120:9, 209:25
addresses 42:3,
206:12
addressing 77:14,

185:21, 195:7
adequacy 82:13
adequately 66:2,
73:2, 73:15, 74:4,
74:7, 74:20, 75:2,
104:6, 104:15,
123:23, 125:1,
127:16, 127:19,
152:8, 154:25,
167:15
adjourn 7:10
adjourned 7:4,
51:23, 51:25,
210:8
adjournment 7:13,
7:17
adjudication 145:9,
186:6
adjustment 8:19,
9:6, 12:9, 15:8,
19:3, 144:1,
146:15, 153:5,
157:9
Administered 1:11,
6:9, 33:2, 33:10,
93:6
Administration 1:26,
1:42, 2:6, 38:16,
43:7
administrative
45:25, 46:1,
107:12, 132:22,
140:25, 161:13
administratively
51:14
admit 142:17, 154:19
admitted 132:3,
142:6
adopt 122:18, 172:9,
176:5
adopted 154:21,
156:7, 175:2,
175:17
Adrian 2:40, 46:18
advance 13:1
advanced 100:23,
124:1
advancing 117:23
advantage 198:14
adversaries 42:19,

42:22, 176:6,
176:9
adversary 42:18,
42:24, 134:6,
134:14, 163:3,
173:3, 175:20,
176:2, 179:11,
181:20, 188:3,
196:24, 201:1,
202:7, 203:23
adversity 202:6,
203:21
advise 40:15, 41:3
advised 52:24, 69:11
advisement 28:17,
171:18
Advisors 17:8,
27:20, 181:19
Advisory 3:15
advocate 88:1
affairs 145:7
affected 69:2
affecting 122:9
affects 105:8,
157:15
affidavit 42:8,
42:10
affiliate 137:9,
137:10
affirmative 27:10
afford 89:8
afoul 100:20
afraid 126:7
afternoon 30:9,
94:16, 102:3,
112:7, 115:24,
116:20, 116:21,
117:15, 123:5,
129:13, 129:20,
145:21, 145:22,
149:12, 152:4,
158:20, 161:10,
164:2, 171:6,
171:23, 171:24,
190:19, 190:20,
193:24, 205:3
agencies 69:22,
113:21
Agency 3:14, 75:15,
113:24

agenda 6:8, 7:2,
7:6, 12:14, 14:16,
15:1, 36:2, 36:3,
41:12, 43:25,
44:22, 52:1,
52:13, 101:23,
128:7, 128:8,
171:6, 209:17
agent 33:5, 36:1,
42:7, 48:16,
49:13, 104:1,
112:24, 119:25,
120:1, 127:22,
158:22, 161:13,
161:19, 186:8,
195:7, 195:9,
195:11, 195:24,
195:25, 196:8,
196:12, 201:7
agents 185:7
aggressive 121:1,
121:7
aggressively 123:18,
124:24
ago 90:10, 103:16,
115:15, 119:1,
121:20, 134:6,
134:13, 163:4
agree 54:21, 63:19,
144:17, 148:8,
148:11, 149:22,
158:23, 162:8,
162:12, 186:15,
188:17, 192:11,
196:23
agreed 7:9, 22:8,
24:1, 50:8, 50:20,
54:17, 56:10,
59:25, 132:2,
159:23, 196:4
agreements 124:3,
136:22
agrees 34:22, 152:5
aid 110:20, 209:19
aim 107:23
aimed 185:14
al 1:16, 2:33, 4:15
albeit 64:20
align 111:2
aligned 83:22

alignment 74:6
alive 151:10
all-inclusive 70:5
all-retiree 73:16
Allan 2:37
allegation 78:1
allegations 159:14
alleged 76:18, 77:4,
81:7, 81:9, 81:11
alleviate 32:5,
63:16, 189:17,
189:18
allocated 52:13,
57:20, 58:7,
62:19, 128:9
allocation 90:15
allow 8:14, 10:9,
14:8, 55:9, 89:3,
139:16, 144:20,
163:12
allowed 24:13, 26:2,
145:6, 152:14,
186:19
allowing 156:11
alone 12:25
already 16:9, 33:1,
45:10, 54:13,
54:17, 56:11,
58:7, 65:19, 69:1,
73:17, 73:22,
78:10, 80:10,
80:19, 83:20,
89:7, 97:1,
102:23, 103:10,
172:1, 172:2,
177:15, 185:21,
190:1, 195:22,
196:12, 196:15,
206:25
alter 91:13, 92:8,
100:23
Alternative 4:5,
48:1, 127:20,
129:22, 131:14,
164:4, 183:25
alternatively
102:18, 109:6
although 33:12,
48:21, 65:10,
179:16, 194:21

Ambac 3:7, 115:25,
    116:6, 117:7,
    180:6, 180:11,
    181:18, 191:23
Ambro 9:15
amend 28:18, 31:6,
    33:10, 34:12,
    35:10, 61:12,
    191:8
amended 32:11,
    35:24, 161:24
Amendment 32:9,
    32:10, 35:6,
    35:14, 61:13,
    92:9, 92:11,
    92:20, 154:10,
    154:13, 154:18,
    154:19
amendments 32:2,
    34:5
America 26:23
Americans 97:12,
    97:13
Among 9:11, 18:7,
    35:6, 38:17,
    57:20, 75:5, 83:7,
    128:12, 156:1,
    181:10, 208:5
amongst 14:12,
    189:14
amount 21:15, 35:2,
    103:4, 121:17,
    125:18
ample 169:5
amply 142:6
Amy 211:13, 211:14
analogy 87:16, 137:9
analysis 92:16,
    140:15, 141:14,
    155:21, 155:22,
    158:24
analyze 11:16, 44:9
analyzed 65:9
ancillary 27:3
and/or 34:25, 44:1,
    62:12, 71:25
Andrew 3:5, 102:4,
    205:3
animus 26:20, 26:22,
    27:1

announced 168:4
answer 11:8, 21:3,
    33:6, 129:9,
    148:19, 149:6,
    172:17, 186:1,
    186:2, 186:5,
    204:21
anticipate 7:5
anticipated 62:2,
    133:11, 134:21,
    196:12
antithetical 146:2
anybody 61:23, 87:4,
    173:6, 209:10
anyway 33:24, 181:3,
    183:17, 195:18
apart 103:10, 173:20
apologize 22:20,
    25:22, 171:9
apparently 110:3,
    207:10
appeal 175:6, 175:8
Appeals 138:13
appear 141:11,
    206:22
APPEARANCES 2:26,
    3:1, 4:1, 91:25
appeared 52:6,
    185:2, 194:6
appearing 95:19
appears 11:6, 111:16
appendix 91:13,
    92:23
applaud 86:11
applicable 106:6,
    136:18, 165:21,
    166:5, 206:5,
    208:6
application 15:2,
    15:5, 17:9, 19:18,
    20:13, 20:15,
    23:11, 24:24,
    26:8, 26:11,
    27:17, 28:19,
    28:22, 29:12,
    29:15, 29:19,
    41:25, 53:23,
    55:8, 148:16,
    175:17, 183:10,
    200:21, 201:13,

201:20
applications 14:16,
    19:22, 24:5,
    24:11, 27:14,
    32:15, 55:3,
    55:18, 56:2
applied 87:20,
    196:23
applies 17:8, 32:21,
    33:15, 56:9
apply 27:2, 29:2,
    33:2, 33:11,
    109:5, 109:8,
    149:25, 151:12,
    152:22, 155:17,
    207:4
appoint 63:22, 90:7,
    97:19, 98:25,
    101:25, 123:25,
    139:16, 142:18
appointed 65:3,
    68:16, 70:3,
    81:15, 95:1,
    107:2, 118:2,
    118:17, 119:15,
    123:22, 124:17,
    160:15, 164:14,
    202:14
appointing 94:11,
    116:14, 142:22,
    144:18
appointment 72:17,
    72:24, 73:11,
    74:13, 83:15,
    98:17, 98:21,
    98:22, 101:5,
    114:4, 143:24,
    144:6, 162:14,
    170:22
appoints 63:20
appreciate 37:14,
    120:11
appreciation 177:12,
    179:19, 179:22,
    180:11, 204:3
approach 55:22
appropriately 40:8,
    40:15, 147:9
appropriations 68:9,
    68:19, 69:2

approval 40:10,
  57:7, 147:1
approvals 165:13
approve 19:18,
  21:24, 23:7, 26:8,
  29:15, 41:19, 42:1
approved 17:25,
  25:4, 27:15,
  27:16, 49:25,
  86:1, 112:25,
  146:23, 146:25
approves 24:15, 62:2
Approving 143:3,
  143:6
approximately
  102:25, 103:5,
  130:13
apt 176:24
Aqueduct 48:25
arbitrary 78:11
area 36:25
areas 43:7
arguably 188:13
argue 65:2, 80:15,
  104:13, 132:3,
  198:18, 198:20
argued 59:14, 80:10,
  189:7, 190:4,
  194:10
argues 76:11, 110:22
arguing 114:5,
  128:17, 172:4
argument 63:15,
  77:9, 91:12, 92:7,
  92:9, 95:10,
  101:18, 102:9,
  102:15, 104:3,
  104:4, 105:3,
  114:14, 116:10,
  128:9, 128:10,
  141:18, 160:12,
  167:3, 174:21,
  190:8, 201:13
arguments 58:22,
  81:23, 98:9,
  100:23, 116:25,
  173:18, 175:24,
  189:24, 191:6,
  203:14
arise 66:10, 76:18,

83:6, 99:5, 192:9
arising 186:10
arose 185:5, 185:9,
  185:24
around 34:14, 87:8,
  146:6, 160:5
arrangement 17:11,
  18:16, 50:4
arrangements 18:25,
  27:11, 53:6
Arribas 2:29, 72:8,
  72:11, 72:12,
  73:10, 75:10,
  75:23, 76:1, 76:4,
  95:5, 95:6, 95:9,
  123:5, 123:6
Article 80:23,
  191:18, 191:22,
  192:3
articulated 99:4,
  208:10
ascertain 57:2
aside 62:13
aspect 14:3, 82:4,
  210:6
aspects 170:8,
  196:15
assert 104:13,
  106:6, 121:15,
  123:23, 123:24,
  124:2, 124:4,
  124:20, 131:3,
  132:15, 197:2,
  197:5
asserted 84:2,
  123:8, 125:17,
  173:20, 173:21,
  177:15, 180:12,
  181:25, 199:18
asserting 79:2,
  105:5, 119:8,
  197:4
assertion 104:21,
  105:7, 105:11,
  124:12, 141:2,
  141:21, 142:22,
  208:8
asserts 100:4,
  100:7, 197:11,
  199:15

Asset 4:6, 129:22,
  131:11, 150:24,
  151:4, 153:13,
  164:4
assets 107:8, 152:10
assign 10:13
assigned 91:5,
  123:11
assignments 10:16
assist 9:3, 10:10,
  42:13, 97:19
assistance 85:4
Assistant 72:13,
  95:6, 123:6
associated 102:12
associates 54:10
Association 56:21
assume 20:10, 24:18,
  44:1
assumption 7:3
Assurance 3:7, 45:4,
  45:14, 115:25
assurances 47:12
assure 82:9, 88:11,
  94:22, 99:2,
  120:18
Assured 3:10, 43:9,
  112:14, 116:7,
  116:22, 116:23,
  116:24, 117:7,
  117:9, 130:12,
  171:7, 172:6,
  189:4, 190:22,
  190:23, 192:21,
  193:5, 193:9,
  193:10, 193:13,
  193:16, 200:6
ata 183:6
atmosphere 208:10
attached 172:11
attempt 11:17,
  112:12, 113:2,
  118:22, 140:19
attempting 10:11,
  96:19, 124:10
attention 13:17,
  34:2, 38:6, 58:13,
  179:10
attorney 54:1, 72:15
audible 8:6

audio 52:4
Aurelius 117:19,
   121:20, 126:19
AUST 2:30
Authority 1:47,
   2:11, 3:15, 33:6,
   49:1, 98:21,
   98:23, 134:4
Authorization 96:2,
   146:9
authorizes 136:2
auto 38:9
automatic 31:15,
   38:19, 40:21,
   103:15, 128:8,
   130:16, 137:15,
   206:17, 206:25,
   207:2
automatically 33:11,
   44:4, 130:19
Autonomous 3:34,
   95:19, 96:5, 96:7
Availability 10:16
available 10:2,
   52:3, 52:4,
   113:16, 113:20,
   113:23, 114:12,
   131:11, 190:6
average 69:16
avoid 43:6, 204:17
avoidance 197:7
avoids 186:22
aware 70:9, 96:16,
   126:24, 201:23
away 139:19


< B >
baby 200:3
back 13:10, 19:13,
   35:15, 36:17,
   43:11, 43:18,
   46:14, 86:23,
   88:3, 94:6, 108:6,
   134:11, 147:2,
   158:17, 168:16,
   169:1, 169:9,
   185:19, 185:23,
   188:22, 192:1,
   202:16, 203:5,

203:20
background 22:2,
   52:22
backwards 153:16
bad 107:25, 206:21
baked 146:4
Baker 4:6, 129:20,
   129:21, 164:2,
   164:3
balance 36:13,
   107:24, 160:12
Balanced 4:13, 88:25
Banco 201:8
Bank 3:29, 3:39,
   56:20, 56:22,
   56:25, 58:8,
   60:20, 61:14,
   110:3, 129:15,
   161:12, 161:19,
   161:22, 163:6,
   177:2, 177:17,
   177:22, 181:18,
   182:13, 185:3,
   186:12, 186:16,
   191:24, 195:21,
   196:5, 197:10,
   198:11, 201:7,
   201:8, 208:16
bankrupt 88:19
Barbara 2:23
Bartlett 129:21,
   164:3
Based 10:16, 21:23,
   23:5, 123:8,
   132:3, 132:15,
   134:21, 135:1,
   135:10, 139:22,
   159:4, 184:1,
   184:16, 187:23,
   189:23, 194:5
bashful 61:5
basic 87:11
basically 63:14,
   67:3, 127:7,
   151:17, 153:15,
   172:12, 175:5,
   199:1
basis 16:16, 23:19,
   24:21, 25:20,
   25:21, 25:25,

28:3, 42:5, 45:20,
   51:13, 54:22,
   57:4, 57:17,
   58:11, 60:23,
   61:2, 74:22,
   94:11, 134:17,
   175:23, 175:25,
   183:22, 188:9,
   188:11, 201:13,
   201:14
Bayamon 92:13
bear 132:9, 140:12
bearing 165:9
bears 104:25, 105:14
become 59:6, 66:17,
   88:17, 164:20,
   179:24
began 89:2
begin 9:10, 10:4,
   12:15, 27:4,
   125:3, 176:15
beginning 188:16
begun 34:14
behest 207:10
behind 8:24, 11:18,
   12:2, 53:11,
   115:11, 161:8,
   200:5
believed 79:13
believes 79:6
belong 203:16,
   205:15, 208:13
belongs 201:9,
   205:19, 205:20,
   208:14
beneficiaries 64:14,
   65:7, 73:19, 80:8
benefit 63:6, 81:4,
   137:10, 142:12,
   142:13, 189:20,
   203:20, 204:2,
   208:1
benefits 64:15,
   64:21, 64:24,
   66:7, 66:9, 66:23,
   67:1, 67:2, 67:3,
   67:14, 67:21,
   69:2, 69:15,
   70:22, 71:19,
   73:20, 73:24,

75:13, 75:14,
76:23, 77:12,
77:24, 78:7,
78:15, 84:5, 85:3,
126:5
Bennazar 29:13,
29:16
Bentley 4:8, 60:4,
60:5, 60:17,
187:7, 187:10,
187:13, 190:18,
191:9, 192:8
Bernardino 96:15
Besosa 138:21
best 14:24, 17:13,
30:6, 86:16,
115:18, 165:15,
186:20, 211:5
better 10:9, 27:3,
38:6, 102:17,
147:8, 173:6
beyond 34:20, 177:6
bid 154:1, 154:24
big 17:4, 189:2
bilingual 37:8
bill 15:16, 15:21,
20:25, 23:20,
24:14, 25:14,
28:3, 28:6, 36:15,
36:24, 37:21,
37:25, 38:2,
39:25, 40:4, 41:1,
45:22, 111:22
billed 15:10, 15:12,
18:9, 18:19
billing 27:18, 28:3,
60:25
billings 16:11
billion 103:1,
103:18, 103:21,
104:6, 109:22,
110:3, 111:22,
111:23, 113:10,
113:20, 127:21,
130:14, 167:17,
167:21, 167:22
bills 37:20, 61:14,
111:24, 157:20
bit 15:4, 38:15,
68:5, 112:23,

113:11, 127:5,
166:18
bizarre 122:14
blatant 124:9
blended 54:1, 54:10
blessing 53:3
Block 23:11, 23:12,
23:14, 29:4, 76:7,
172:13
BNY 191:7, 191:23,
199:19
BNYM 179:13
body 17:14, 73:3,
74:16, 117:3,
123:21, 132:22
bold 39:2
bold-faced 38:4,
40:7
bond 35:3, 130:14,
131:12, 133:10,
135:15, 135:21,
137:17, 137:24,
164:19, 177:8
bondholder 156:16,
177:8, 182:20,
190:24, 191:6,
193:4, 193:6
booby 147:14
borrowed 161:15
borrower 137:7,
137:14, 150:4,
150:5
Boston 52:2, 180:24
bottom 118:3, 158:1,
209:2
Box 181:18, 191:23
BR 82:23
Branch 153:23, 154:8
brazenly 142:7
breach 99:10, 151:14
breadth 19:16
break 97:25, 98:1
brewing 208:10
bricks 86:9, 87:16
brief 12:21, 14:24,
43:5, 66:13,
66:20, 100:24,
112:12, 116:1,
138:8, 149:17,
150:11, 153:22,

155:5, 178:14,
179:9, 184:19,
191:5, 199:10
briefest 96:23
briefing 35:12,
162:21, 162:24
briefly 60:20,
165:10, 187:19,
206:11
briefs 172:13,
192:25
BRILLIANT 2:37,
176:10
bring 53:2, 120:3,
121:7, 121:16,
163:12
broader 162:22,
162:23
broadly 78:14
brought 53:4, 58:12,
73:25, 75:18,
89:7, 196:11
bucket 202:25
budget 20:11, 86:1,
88:25
budgets 87:15
build 87:13
bullying 87:4
bunch 185:4, 185:16
bundle 136:9,
136:22, 139:2,
139:7, 139:13,
167:8
burden 73:5, 73:7,
74:14, 83:17,
140:13, 167:14,
167:15
burdens 98:13
Burgos 31:11
business 36:11
businesses 86:15
busy 6:8, 174:4
Butler 112:8
buy 161:15

< C >
Caguas 91:20
calculated 38:6,
133:6, 134:15

calculations 180:8
Caldwalader 116:22,
    190:21
calendar 7:19,
    35:15, 35:16,
    62:19
California 138:20
call 6:22, 7:25,
    27:21, 37:8,
    54:25, 64:16,
    72:4, 114:18,
    151:17, 151:21,
    156:21, 156:22,
    172:8, 184:21,
    197:22, 198:3
called 39:8, 97:10,
    147:10, 201:15
calls 120:21
calms 39:6
canon 200:12
Canyon 4:13
capable 101:8
capacity 195:4
Capital 82:23,
    86:20, 92:12,
    94:21, 133:8,
    133:18, 177:12,
    179:18, 179:22,
    180:11, 204:3
Captain 113:12
caption 177:6,
    181:16
captioned 33:22,
    39:14
captions 33:22
care 8:21, 64:21,
    73:20, 115:3,
    157:2, 157:3
carefully 81:22,
    81:23, 98:7, 98:8,
    175:14, 175:24,
    189:23
Caribbean 156:8
caring 157:14
Carlson 95:19
carry 12:24, 83:17,
    110:25
cash 16:15, 17:3,
    54:13, 103:21,
    157:17, 177:11,

179:18, 179:23,
    179:24, 183:2,
    183:17, 202:8,
    202:23, 203:2,
    203:3, 203:5,
    203:6, 203:16,
    203:24, 204:7,
    206:18
CAT 4:48
Catch 49:24, 113:12,
    174:13
catch-up 50:5
causative 153:21
cause 44:5, 88:23,
    91:6, 91:7,
    130:22, 169:5,
    192:14
causes 91:2, 91:3,
    126:4
cautiously 41:1
CDN 181:19
cease 36:14
Central 85:25, 86:2,
    86:5, 97:4, 139:10
cents 18:19, 58:8,
    140:20, 156:4
Certain 45:3, 45:6,
    50:1, 61:6, 79:7,
    104:17, 139:12,
    156:6, 187:22
Certainly 22:22,
    23:22, 23:24,
    27:19, 27:24,
    83:25, 86:23,
    96:16, 160:7,
    160:9, 165:14,
    166:4, 186:10,
    190:7, 201:17
certification 68:2,
    78:3
certified 67:8
certify 162:10,
    211:4
cetera 16:20, 16:21,
    22:9, 54:6, 54:9,
    90:16, 107:22,
    110:14, 154:3,
    185:18
chairperson 27:16
challenge 111:12,

122:24, 126:24,
    127:14, 167:24,
    170:20
challenged 122:22,
    166:20
challenges 126:25,
    127:3
challenging 12:5,
    127:5
chance 121:2, 121:5,
    162:17
chances 151:20
change 21:20, 21:24,
    34:7, 39:18,
    45:12, 56:13,
    73:1, 74:1, 74:12,
    82:8, 84:17,
    146:23, 146:25,
    188:13, 189:12
changed 58:14,
    159:21, 178:12,
    186:25, 189:24,
    204:19, 208:24
changes 35:5, 35:23,
    43:4, 45:9, 72:19,
    86:4, 147:10,
    170:9, 177:1
changing 104:19,
    145:5, 177:4,
    180:16, 185:15,
    187:1, 209:13
channeled 186:11
Chapter 54:4, 155:6,
    155:7
charge 54:18,
    135:10, 136:2,
    156:23, 157:13,
    166:2, 167:25
charged 18:17,
    132:24, 133:3,
    141:3
charm 102:7
chatting 171:14
check 19:13, 39:22,
    40:13, 92:10, 93:8
cheek 93:18, 93:19
Cheryl 4:3, 193:24
CHIEF 2:23, 8:2, 8:7
childhood 184:11
choice 184:13,

184:14
choose 16:25, 163:13
chooses 167:6
Chris 2:34, 43:21
circles 26:25
Circuit 175:19
circulated 17:25
circumstance 25:11,
    181:9, 204:15
circumstances 10:21,
    36:16, 83:2,
    83:14, 93:10,
    146:18, 178:12,
    180:10, 190:5,
    208:24, 209:1
cite 92:21, 105:12,
    105:16, 118:4,
    118:9, 119:10,
    139:4, 139:6
cited 66:19, 105:6,
    125:14, 153:23,
    154:17, 174:24,
    175:4
cites 105:10
City 9:16, 79:16,
    96:3, 96:15, 97:2,
    119:2
claimant 103:5
claimants 81:13,
    104:5
claimed 109:21,
    110:21, 125:17
claiming 91:2,
    124:5, 124:12,
    155:9
clarification 19:15,
    23:21, 57:11,
    64:4, 84:24,
    183:13, 188:19,
    188:20, 194:22,
    207:19
clarifies 204:20
Clarity 33:20,
    64:10, 85:5,
    163:15
Clark 3:29, 56:19
class 102:22
classes 123:11
clause 137:18,
    137:19, 138:16,

138:23, 149:18
cleaned 119:2
clear 15:5, 23:19,
    33:14, 33:17,
    34:15, 63:21,
    67:19, 71:7, 80:4,
    90:8, 94:7, 95:21,
    110:5, 120:10,
    127:16, 139:23,
    145:12, 159:13,
    167:12, 168:10,
    168:14, 168:25,
    170:21, 177:3,
    192:11, 199:21,
    209:5
clear-cut 188:15
clearer 39:14, 39:15
clearly 65:6,
    100:11, 131:24,
    175:20, 188:4,
    195:23, 206:12,
    208:4, 208:9
Clerk 29:19, 42:2,
    42:4, 42:19, 43:6,
    43:9, 51:13
Cleveland 72:15
client 30:15, 47:17,
    48:10
clients 18:13,
    27:25, 54:4,
    112:14, 115:6,
    116:10, 162:8,
    202:11
clincher 121:19
clock 38:19, 72:6
close 43:8
close-ended 194:6
closed 115:11
closer 50:12
CMI 92:12
CMO 33:7, 33:11,
    33:19
co-counsel 29:3
co-movants 130:11
Coalition 176:21,
    179:17, 191:6,
    193:4, 193:7,
    194:1, 199:14,
    200:2
Code 44:3, 74:15,

90:8, 98:20,
    98:24, 99:8,
    99:23, 101:6,
    106:13, 114:9,
    117:6, 124:19,
    134:8, 134:16,
    143:17, 143:20,
    154:21, 155:7,
    165:9, 165:21
cold 203:3
COLL 3:44, 62:24,
    62:25, 63:5, 63:7,
    71:14, 71:21,
    72:3, 80:3, 84:22,
    85:9
collapse 89:23
collated 117:22
colleagues 157:25,
    158:16
collect 136:20,
    137:7, 137:8,
    137:9, 185:16
collected 135:9
collecting 181:15
collectively 113:25,
    115:7
com 30:7, 30:8
combination 14:16
comes 107:5, 126:14,
    169:1
comfortable 198:23
comforted 37:20
coming 46:14,
    111:20, 135:5,
    196:4, 197:25,
    198:21, 205:11,
    208:21
commandeer 170:8
commenced 177:9,
    178:2, 197:16
commencement 148:21
commend 13:25
commensurate 109:18
comment 53:8, 96:22,
    165:22
commentators 138:9
comments 60:13,
    60:15, 60:20,
    187:25
commercial 36:12

Commission 132:23,
    133:21, 146:11,
    168:22, 168:25
committed 161:16,
    168:22
committees 14:17,
    18:13, 35:18,
    35:22, 54:5,
    62:12, 65:1, 65:3,
    73:2, 73:14, 74:1,
    74:4, 74:7, 77:16,
    83:22, 84:11,
    84:14, 84:25,
    85:4, 86:25,
    96:14, 96:16,
    102:8, 106:22,
    115:16, 125:23,
    175:3
common 8:17, 92:9
Commonwealth-cofina
    13:8, 14:9, 113:3,
    196:18
communications 84:24
Company 3:24, 92:18,
    112:9, 181:19
Compensation 15:14,
    22:7, 24:16, 25:5,
    26:7, 26:14,
    27:11, 58:1, 59:9,
    60:7, 73:24, 75:13
competitors 156:1,
    156:8
compilation 137:2
complain 79:3
complaint 130:16
complaints 94:9
completed 35:13
completely 68:13,
    138:7, 173:19,
    204:18
complex 9:5, 14:3,
    44:7, 117:3
complexity 35:9,
    83:5
compliance 34:13,
    34:23, 159:3,
    159:12
compliant 159:18
complicated 206:23
complies 169:1

complimentary 64:22,
    66:6, 67:13
complying 134:3,
    169:6
component 8:12
composed 108:13
composition 62:18,
    64:5, 73:1, 79:4
compound 38:21
comprised 117:2
comprises 78:6
compromise 125:22
concede 107:1
conceivably 200:13
concept 57:16
concern 27:21, 28:9,
    28:10, 28:11,
    28:12, 28:16,
    56:16, 75:4,
    80:15, 99:18,
    115:3, 126:6,
    127:19, 154:19,
    189:16, 189:18,
    202:13
concerned 11:5,
    11:9, 68:5, 75:8,
    84:5, 86:18,
    94:20, 127:25,
    156:14, 156:15,
    170:19, 186:9,
    189:6
concerning 68:12
concerns 14:5, 14:7,
    37:16, 42:3,
    56:25, 57:19,
    63:17, 68:18,
    83:9, 83:11,
    86:13, 86:21,
    94:3, 96:6, 96:9,
    98:10, 99:4, 99:5,
    117:19
concession 54:6,
    146:5
conclude 102:14
concluded. 210:10
concludes 83:13,
    132:4
conclusion 127:15,
    129:24
concur 53:1

condition 174:22
conditioned 147:1
conditions 187:22
conduct 180:25
conducted 123:14,
    133:1
confer 31:20, 32:4
conference 120:21
confidence 37:20
confident 12:7,
    201:21
confidential 8:13,
    8:21, 10:6, 10:8
confirm 22:13,
    120:18
confirmable 12:9
confirmation 22:25,
    50:1, 146:18,
    147:15, 165:11
confirmed 9:7,
    146:23, 147:11
confirming 80:5,
    159:18
conflict 108:16,
    124:9, 124:13,
    124:15, 124:17,
    142:15
conflicted 142:5
conflicting 107:19,
    177:19, 182:21
conflicts 66:10,
    108:9, 127:25,
    156:16, 156:21
confronted 148:20
confuse 30:24
confused 168:9
confusing 37:11,
    195:17
confusion 38:17
Congress 154:20,
    156:22, 157:12
connection 35:12,
    40:10, 42:4, 49:2,
    59:14, 67:21,
    68:14, 68:18,
    101:8, 113:18,
    175:25, 176:23,
    183:13, 196:1,
    199:17
consensual 8:18,

8:19, 9:4, 9:5,
9:22, 9:23, 10:11,
10:22
consensually 47:8,
59:25, 125:25
consensus 14:2
consent 174:6,
178:18
consented 178:5,
204:11
consenting 204:12
consequence 198:17,
198:18
consequences 184:11,
184:12, 189:13,
202:1
consider 82:12,
100:22, 116:14,
116:15, 141:1,
180:3, 208:17
consideration 19:17,
83:1, 194:23
considerations 29:2,
101:17
considered 81:23,
98:8, 123:16,
141:16, 175:24,
189:23
considering 33:13,
41:5, 75:20,
181:16
consistent 18:9,
18:11, 25:12,
42:1, 141:5,
143:10, 144:7,
144:8, 144:24,
146:16
consisting 211:4
consolidation 88:21
constant 85:23
constituencies
103:13, 110:11,
209:19
constituency 70:10
constituents 86:16,
105:5
constitute 15:24,
86:15, 99:15
constituted 67:16,
181:1

constitutes 124:9,
137:4
Constitution 65:8,
106:6, 111:7,
113:13, 137:2
Constitutional
102:1, 102:12,
102:15, 102:18,
102:21, 102:25,
103:2, 103:17,
104:2, 104:7,
104:10, 104:12,
104:18, 105:1,
106:14, 109:16,
109:19, 110:18,
110:19, 111:4,
114:14, 116:11,
120:4, 123:9,
206:1, 206:5
constitutionally
154:10
construct 144:25,
170:11
construction 28:1
constructive 14:12,
32:10
consult 32:14, 51:10
consultant 133:5
consultation 89:18,
89:20, 96:2,
128:11
consulted 86:4
Consulting 26:11
consummated 133:13
contain 117:20
contained 98:24
containing 155:21
contains 67:17,
106:12
contemplated 204:14
contemplates 100:12
contemplating 7:17
contends 149:15
contention 132:14,
134:21, 140:3,
149:12
contentious 11:7,
12:21
contentiousness
11:23

contest 167:4
contested 12:17,
12:22, 52:12,
141:20
context 19:17,
23:20, 29:14,
47:9, 48:9, 54:3,
55:22, 56:24,
114:19, 153:4,
169:5, 175:2,
175:6, 178:23
contextual 22:2,
52:22
continue 14:12,
36:18, 49:24,
143:25, 165:16,
168:4, 169:24,
169:25, 183:3,
192:23
Continued 3:1, 4:1
continues 145:9
continuing 170:20
contract 45:18,
45:23, 46:23,
47:4, 137:25
contracts 47:23
contractual 135:11,
135:20, 135:24,
136:11, 136:12,
138:10
contractually 115:17
Contrary 65:1,
143:7, 155:20
contrast 103:24,
191:21
contribute 111:22,
156:9
contribution 69:20,
69:21, 81:3
contributions 66:22,
69:16, 69:18
Control 7:13, 7:17,
21:6, 21:11,
108:10, 109:25,
111:2, 144:24,
148:15, 170:8
controlling 170:13
conventional 53:7
conversation 28:8
conversations 8:14,

8:16
conversely 137:22
Cooper 17:8, 21:25,
  22:7, 22:12
cooperation 12:6
cooperatively 32:6
copies 60:25, 61:14
copy 33:14
Corp 3:32
Corp. 3:11, 116:23,
  128:18, 130:12
corporate 107:6
Corporation 3:8,
  115:25, 151:10,
  172:25
Correct 19:7, 20:3,
  20:4, 20:14,
  21:13, 25:18,
  26:11, 26:16,
  33:12, 41:8,
  41:18, 49:5, 50:7,
  55:25, 65:1,
  73:16, 104:20,
  157:25, 158:12,
  194:11, 196:14,
  197:13, 197:15
correctly 91:23
cost 70:18, 82:20,
  89:12, 109:11,
  109:12, 141:7
costs 70:18, 82:17
counsel 6:5, 12:21,
  20:2, 20:20, 23:6,
  28:23, 29:2, 30:3,
  38:15, 49:1, 56:1,
  61:3, 79:25,
  80:21, 85:8,
  85:12, 85:17,
  94:17, 99:24,
  115:12, 120:22,
  126:21, 148:8,
  149:11, 168:8,
  174:21, 178:8,
  178:9, 180:6
count 111:20, 112:16
counterproductive
  140:4, 141:2
counting 43:1, 103:1
country 122:18
County 96:13,

148:20, 148:22
couple 37:16, 42:11,
  142:21, 158:25,
  163:3, 172:4
course 27:21, 28:12,
  36:11, 36:19,
  50:2, 55:23, 61:7,
  61:22, 67:22,
  92:5, 111:10,
  111:12, 175:4
courthouse 166:2,
  201:10, 201:12
courtroom 42:13,
  46:14, 49:16,
  91:25, 120:12,
  145:1, 151:7,
  178:4, 185:23
Courts 82:12, 89:10,
  94:22, 108:6,
  138:9
covenant 135:20,
  135:24, 135:25,
  137:13, 137:16,
  149:20, 150:13,
  150:18, 150:19,
  150:21, 151:3,
  151:16, 151:22,
  152:5, 153:12,
  153:13, 166:24,
  167:7, 167:11,
  181:1, 182:24
covenants 135:11,
  135:15, 135:16,
  137:21, 137:23,
  139:1, 146:9,
  149:20, 149:25,
  151:9, 151:13
cover 25:7, 66:23,
  125:13, 135:3,
  136:3, 136:6,
  142:11
coverage 133:20
covered 103:10,
  125:9, 156:24
covering 75:12,
  75:14
create 14:7, 32:4,
  48:5, 55:12, 65:5,
  68:20, 88:24,
  90:22, 182:18,

183:6
created 73:14,
  132:22
creates 124:12
creating 168:22
creation 63:8,
  63:11, 70:19,
  71:15, 82:18,
  208:2
creature 136:10,
  136:11, 174:25
credit 35:3, 36:3,
  151:8
crisis 17:19, 54:6,
  98:13
critical 160:17
critically 160:14
crosscutting 14:25
Cruises 105:12
crush 87:2
crushed 87:4
crux 123:12
CSR 211:14
cue 208:22
cured 141:23
curiosity 22:14
curious 202:18
current 57:24,
  67:16, 75:23,
  75:25, 85:25,
  111:3, 111:6,
  112:2, 114:11,
  117:1, 120:18,
  132:15, 133:7,
  134:17, 134:21,
  152:13, 156:5,
  161:17, 164:19,
  164:22
currently 85:20,
  87:6, 108:20,
  112:22, 131:4,
  169:17, 171:2
CUSIP 35:7
custodian 145:11
customer 37:3, 38:7
customers 36:10,
  36:11, 36:13,
  36:17, 36:20,
  37:1, 37:9, 37:12,
  37:18, 38:9,

133:22
cut 127:9
cuts 87:14, 87:24,
  127:10


< D >
D-e-a-c-r-e-e-d-o-r-
  e-s-d-e-p-r 30:8
daily 11:7, 160:18
damage 179:25
damages 136:20,
  137:7
danger 130:25,
  153:21
date 7:13, 7:17,
  10:25, 31:17,
  34:8, 35:15,
  35:16, 35:17,
  35:19, 35:21,
  35:23, 39:5, 41:2,
  50:11, 50:24,
  52:7, 178:25,
  183:11, 196:21
dates 34:8, 34:9,
  34:10
David 97:9
day 24:22, 31:20,
  42:4, 43:3, 159:5,
  160:3, 172:1,
  176:25, 178:10,
  182:10, 196:4,
  197:24, 198:21,
  205:24, 206:22
day-to-day 143:5,
  143:15, 143:21,
  145:7
days 21:16, 21:21,
  21:24, 31:1, 31:3,
  35:15, 35:16,
  35:18, 35:20,
  35:22, 41:7, 44:4,
  48:1, 87:21,
  121:20, 134:5,
  134:13, 149:2,
  163:4, 173:11,
  184:11, 197:17
deacreedoresdepr
  30:7
deadline 35:21,

39:3, 39:4, 44:1,
  45:3, 45:8, 46:5
deal 11:13, 28:2,
  31:14, 47:15,
  55:13, 65:3,
  157:10
dealing 31:12,
  31:14, 90:14,
  107:4, 111:19
dealings 124:13
deals 75:2
dealt 157:9
death 157:22
debating 182:23
Debtor 1:35, 1:49,
  2:13, 17:14, 31:6,
  34:24, 56:4,
  67:24, 68:24,
  68:25, 80:24,
  99:23, 100:6,
  100:11, 100:15,
  101:14, 105:15,
  107:21, 142:17,
  143:14, 143:16,
  144:8, 144:10,
  148:13, 167:6,
  170:6, 170:24,
  171:2, 207:2,
  207:3
Debtors 1:18, 6:15,
  8:19, 9:7, 12:10,
  21:6, 35:17,
  35:21, 43:25,
  44:2, 44:5, 44:8,
  44:9, 54:4, 69:8,
  69:22, 80:25,
  101:15, 110:23,
  131:5, 134:3,
  140:12, 144:23,
  168:3, 176:23
decades 141:21
December 58:6, 198:8
decide 11:21, 148:8,
  148:10, 149:10,
  152:4, 155:9,
  204:16
decided 91:17,
  92:14, 92:18,
  137:10, 154:9,
  164:16, 181:4,

196:20, 197:15,
  199:22, 201:14,
  207:10, 207:22
decides 135:10
Decision 44:4, 44:9,
  82:23, 84:21,
  84:23, 101:22,
  128:6, 148:24,
  162:9, 164:11,
  171:5, 189:18,
  192:16
decisions 31:24,
  57:21, 87:25,
  154:8
declaration 140:11,
  140:15, 155:21,
  155:23, 203:6
declarations 131:21,
  133:4
declines 34:20,
  100:22
declining 152:19
decrease 140:6
decreased 103:18,
  111:17
dedicated 160:4
deducts 54:16
deemed 175:8, 186:17
deems 71:25
default 130:20,
  151:14, 151:21,
  151:23, 151:25,
  181:3, 184:7,
  184:16, 184:20,
  184:21, 186:18,
  186:22, 189:1,
  189:8, 189:13,
  192:8, 192:13,
  192:15, 192:18,
  192:22, 194:8,
  204:13, 207:15,
  209:7
defaults 181:1,
  182:24, 184:1,
  208:6
defendants 191:14
defended 81:17
defending 114:3,
  193:12
defer 158:15, 163:20

deference 128:2
define 82:11
defined 118:6,
   167:10
defines 99:8, 100:14
definition 131:13,
   167:18
Dein 2:24, 52:2,
   52:6, 180:17,
   184:15
delay 82:17, 109:9,
   114:6
delayed 16:20, 17:5
deliberately 207:24
deliberation 19:18
demand 140:6,
   140:17, 181:6,
   183:22
demands 109:14
demonstrate 99:25,
   132:19
demonstrated 84:16
demonstrating 193:7
denial 205:6
denied 74:23, 82:2,
   84:19, 98:18,
   101:2, 101:21,
   124:22, 124:24,
   149:7, 173:23,
   175:18, 176:4,
   176:9, 195:3,
   195:8, 197:20,
   205:5, 205:8,
   207:20, 209:3
Dennis 3:8, 115:24
deny 74:9, 74:11,
   123:2, 163:16,
   163:21, 194:21
denying 138:21,
   197:1, 197:3
Department 65:15,
   73:18, 78:4,
   119:10
depend 67:7, 181:12,
   194:14, 206:2
dependent 175:21
depending 103:25,
   120:1, 120:5
depends 67:6, 68:2,
   83:2, 149:5

deposit 36:14,
   197:10
deposits 36:12,
   36:16, 36:20,
   37:13, 197:11
deprived 67:3
deprives 131:13
Deputy 51:10
derailment 18:17
Derek 133:4
derivatives 35:1
described 19:18
deserve 13:13
deserves 13:5
design 9:9, 133:25
designed 32:2
Despin 173:1
despite 206:4
destabilize 160:23
destroys 157:10
destructive 139:17
detailed 14:7, 34:18
details 52:8, 81:6
determination 17:10,
   27:11, 124:25,
   178:19
determinations 28:25
determinative 199:3
determine 26:3,
   47:12, 78:21,
   81:10, 121:6,
   178:6, 208:14
determined 17:13,
   26:13, 133:20,
   186:6, 206:15,
   208:1
determines 122:16,
   182:6, 205:21
determining 82:13,
   179:12
Detroit 23:25,
   25:20, 25:23,
   79:12
develop 12:9
developed 162:22,
   162:23
developing 9:24
development 163:4,
   163:5, 190:12
devote 77:19

devoted 115:6, 115:7
devoting 29:7
dialogue 14:12
Dick 58:25
difference 17:4,
   40:20, 170:15,
   170:17, 194:16
differentiate 94:2
differently 175:1
difficult 28:7,
   28:14, 58:14,
   173:8
diligence 12:6
dime 79:10
diminish 137:12,
   168:6
diminishing 153:20
diminution 85:23,
   130:25, 137:5,
   139:25
direct 69:4, 71:9,
   85:6, 89:25,
   166:17
directing 36:25,
   72:17, 72:19,
   72:24, 98:22
directly 166:16,
   166:20
director 158:3,
   159:19, 159:25
directors 158:3,
   159:22
directs 37:2
disagree 93:18,
   141:24, 158:9,
   180:8, 186:14
disagreements 80:21
disband 121:24
disbursed 178:7
disbursement 201:2
disbursements 53:17
dischargeability
   50:3
disclosure 34:23,
   35:2, 39:16
disclosures 34:21
disconcerting 11:22
discount 15:3,
   17:17, 17:19,
   18:4, 18:6, 20:5,

20:9, 22:8, 23:18, 24:1, 26:4, 26:12, 26:18, 27:7, 29:5, 29:9, 29:13, 53:25, 54:11, 56:6, 103:25
discounted 15:17, 18:15, 18:24
discounting 15:2, 15:4, 15:19
discounts 54:14
discovered 190:5, 191:9
discovery 131:24, 180:18
discrete 179:11
discretion 16:25, 71:23, 118:16, 118:17
discretionary 83:15
discuss 31:21, 65:21, 205:9
discussed 18:3, 18:4, 20:20, 22:5, 29:11, 51:3, 51:23
discussing 47:14
discussion 12:20, 24:23, 94:24, 118:22, 119:6, 159:22
discussions 18:1, 20:21, 24:17, 47:7, 108:23, 109:3, 113:6, 115:10, 125:22
dismay 162:9
Dismiss 121:22, 122:2, 138:21, 173:10, 174:2
disparity 208:4
Dispens 205:6
dispose 169:14, 170:25
dispositive 83:1
disproportionate 204:5
disprove 140:9, 141:25
dispute 13:8, 14:9, 49:2, 103:8,

104:9, 113:3, 113:8, 113:17, 134:19, 146:8, 146:11, 158:4, 179:17, 179:24, 180:22, 188:5, 188:7, 195:24, 196:18
disputed 104:5, 104:23, 105:17, 105:21, 105:23, 105:24, 122:11, 125:17, 132:5, 132:9, 132:12, 132:13, 140:9, 147:6, 178:6, 191:13
disputes 10:10, 57:22, 58:12, 59:10, 113:15, 115:8, 134:7, 134:15, 179:3, 191:12
disqualified 105:6, 105:21
disqualifying 104:22, 105:11
distinct 84:9, 94:5
distinction 106:5, 119:11, 170:19
distinctions 106:7
distinguish 118:22
distress 38:17
distribution 204:6
District 1:3, 2:18, 2:19, 72:13, 82:24, 92:17, 130:17, 175:4, 178:3, 209:22, 209:23, 211:1, 211:2, 211:7
diverse 78:7, 107:19
dividend 86:16
djudication 134:7
Docket 1:6, 1:24, 1:40, 2:4, 49:6, 65:13, 121:20
docketing 51:11
dockets 42:19
doctrine 200:5,

200:9, 201:23, 202:17, 207:13
dog 110:23
doing 15:18, 47:14, 57:9, 110:2, 115:20, 170:3, 207:11, 209:10, 209:22
dollar 103:21, 111:22, 127:21
dollar. 18:19, 58:8
Domino 138:16
done 8:24, 11:2, 14:24, 15:22, 16:14, 16:19, 17:20, 25:20, 25:21, 25:23, 86:12, 105:16, 106:20, 107:16, 115:5, 146:21, 147:11, 188:1, 201:5, 201:10, 204:9
door 94:6, 203:8
doors 115:11
doubt 110:24, 151:6, 197:7
doubting 175:5
down 39:6, 41:22, 56:11, 58:15, 111:23, 142:10, 149:7, 155:24, 158:8, 176:24
drafted 17:23, 207:24
dramatic 189:13
dramatically 131:1
drastic 104:8
dreams 198:9
drive 158:8
driver 142:24
driving 109:7
drove 154:20
due 35:16, 35:18, 35:20, 101:20, 133:19, 173:11, 174:2, 192:9, 192:25, 194:17
duly 123:16, 160:15
Dunne 3:8, 115:24,

116:19, 180:7
duplication 43:6
duplicative 173:13,
  173:19
Dupont 92:17
during 16:21,
  133:17, 133:19,
  153:4, 176:22,
  185:24, 191:13,
  193:19, 198:10
duties 193:9

< E >
E-billing 38:9,
  40:13, 40:20
e-mail 30:5, 38:10,
  38:11
earlier 53:8, 121:3,
  134:5, 209:1
earliest 132:7
early 58:4, 58:13,
  151:17, 177:13
easy 28:6, 201:19
echo 187:25
economic 34:24,
  86:18, 113:5,
  149:5, 156:10,
  156:12, 175:8
economy 140:5,
  140:20, 142:13,
  157:2, 157:11
effect 35:11, 37:24,
  38:13, 54:11,
  68:9, 80:7,
  103:16, 140:19,
  147:14, 151:13,
  188:23, 189:9,
  189:11, 205:19
effected 9:1
effective 46:25,
  89:12, 144:24
effectively 15:10,
  16:10, 77:20,
  155:16
efficient 158:5
efficiently 168:24
effort 12:23, 13:1,
  111:19
efforts 14:1

ego 91:13, 92:8,
  100:23
eight 14:15, 29:18,
  35:20, 65:13,
  110:3
either 9:16, 19:12,
  62:12, 69:9,
  72:17, 72:24,
  74:21, 92:25,
  99:9, 99:12,
  99:19, 100:9,
  109:15, 113:5,
  121:1, 151:3,
  152:18, 157:16,
  180:23, 186:6,
  190:3, 191:1,
  191:6
elected 89:2
Electric 2:10, 33:6,
  36:14, 140:5,
  141:4, 149:4,
  157:20, 158:8
electrical 158:6
electricity 131:6,
  132:24, 140:17
element 210:5
eleven 91:2
Eleventh 92:9,
  92:11, 92:19
eligibility 105:8
eligible 100:15
elimination 99:17
Elizabeth 22:12
Ellen 3:11, 116:21,
  190:21
eloquent 184:8
Emanuel 176:20
emerged 190:6
Emil 3:40, 129:13,
  161:11
emphasis 105:4
employed 75:7
employer 66:21,
  69:15, 69:21
employers 81:2
employment 64:15,
  65:11, 110:8
empowered 61:17
enable 12:23, 102:17
Enabling 136:2

enacting 123:7
encourage 14:11
End 15:23, 16:15,
  16:19, 16:23,
  17:1, 17:5, 17:21,
  19:14, 24:21,
  26:1, 54:19,
  78:16, 121:4,
  125:2, 147:12,
  150:15, 162:10,
  165:25, 177:1,
  178:22, 179:6,
  179:13, 196:4,
  209:16, 209:17
endless 107:14
ends 19:14
Energy 132:23,
  133:4, 156:2
enforce 135:25,
  139:17, 151:15,
  165:24, 169:25
enforceable 106:5,
  106:7, 135:18,
  135:22
enforcing 146:11
engage 144:5
engagement 18:5,
  210:4
English 30:6, 37:4
enjoin 205:13
enormous 20:25
enough 66:23,
  114:11, 114:17,
  138:3, 185:17,
  204:5
Enron 107:23, 117:25
enshrined 136:1
ensure 35:9, 102:16
enter 14:10, 19:19,
  29:15, 29:21,
  33:23, 41:20,
  43:16, 44:14,
  45:13, 49:7
entered 33:1, 33:7,
  33:22, 36:6,
  44:17, 46:8,
  174:7, 174:9,
  206:12, 209:1,
  209:14
entering 29:24,

52:6, 59:8, 198:23
entire 119:22,
  126:20, 135:6,
  146:3, 146:5,
  147:8, 149:5,
  179:22, 205:24
entirely 59:19,
  82:20, 108:13,
  120:6, 168:5
entirety 74:23,
  176:4
entities 86:25,
  100:16, 100:17,
  107:7, 157:13
entitlement 202:8
entity 27:24, 34:25,
  48:4, 75:4, 93:18,
  100:20, 140:25,
  144:21, 145:6,
  156:24, 157:12,
  170:10
entry 47:9, 48:21,
  49:6, 192:9
envelope 39:22
environment 156:5
envisioned 8:10
Epiq 37:3, 42:1,
  43:12
equal 19:13, 152:16
Equally 136:24,
  186:9
equate 74:21
equitable 99:9,
  208:23
equities 203:14
equity 99:1, 99:3,
  99:7
equivalent 69:21,
  99:18
ernest 209:18
error 190:3
ERS 69:23
especially 181:15
Esq 2:40, 3:37, 3:44
essence 13:24,
  142:15, 207:20
essential 88:12
essentially 31:20,
  48:17, 79:2,
  127:13, 182:18,

197:23
establish 39:3,
  46:23, 46:24,
  99:15, 143:8,
  167:15
established 47:25,
  48:1, 99:20,
  136:5, 137:1,
  140:25, 141:3
establishing 83:18,
  133:2, 140:13,
  141:4
estate 16:23, 19:14,
  113:10
estimated 103:4
et 1:16, 2:33, 4:15,
  16:20, 16:21,
  22:8, 22:9, 54:6,
  54:9, 90:16,
  107:22, 110:14,
  154:3, 185:17
Europeans 97:13
evaluation 167:14
event 16:2, 22:24,
  82:18, 151:14,
  186:18, 186:22,
  190:15, 192:8,
  192:13, 192:15,
  192:17, 192:22,
  194:7, 208:3
events 68:3
everybody 49:16,
  58:3, 130:5,
  189:11
everyone 9:1, 55:2,
  107:13, 108:12,
  120:12, 147:7,
  151:7, 187:11
Everything 41:6,
  75:14, 125:9,
  158:13, 169:4,
  175:13, 180:17,
  198:16, 209:22
evidence 77:5,
  99:12, 133:15,
  160:3, 180:5,
  190:5, 191:9,
  207:21
evidentiary 131:25,
  132:6, 159:2,

159:16, 160:6
evil 91:10, 93:17
ex 68:8
exacerbates 54:13
exact 74:15, 105:12,
  107:2, 108:19
exactly 25:23, 79:8,
  79:12, 126:2,
  126:6, 126:10,
  167:18, 171:1,
  177:17, 180:13,
  193:18
examined 26:2
examiner 53:1, 53:6,
  54:16
example 9:14, 57:6,
  66:14, 66:15,
  67:9, 68:15,
  73:25, 83:24,
  94:8, 99:24,
  117:24, 119:10,
  119:23, 121:10,
  121:11, 124:1,
  136:15, 137:6,
  138:12, 143:25,
  163:20, 169:18,
  170:25, 172:13
examples 75:18
exceed 152:16
exceeding 26:4
except 16:2, 18:16,
  35:17, 62:2,
  91:22, 198:10
excess 183:2
excluded 20:21,
  116:9, 116:10,
  123:17
exclusive 144:1,
  144:2, 144:7,
  148:13, 148:17,
  149:3, 169:10,
  169:16, 169:23,
  178:1
exclusively 63:11,
  137:17
excuse 30:12,
  104:16, 108:11,
  136:8, 146:24
excused 176:11
executive 158:3,

159:25
exempts 147:3
exercise 8:21, 83:14
EXHIBITS 5:9
exist 10:21, 111:18,
    202:2
existed 207:22
existence 35:2,
    198:19
Existing 71:12,
    73:2, 73:14, 74:4,
    74:7, 82:15,
    84:18, 101:16,
    125:2, 160:21,
    197:6
exists 83:20,
    113:15, 124:15,
    124:17, 130:22,
    159:5
expanding 58:24
expansion 43:12
expect 9:25, 10:2,
    12:16, 24:15,
    25:12, 28:2,
    52:16, 111:10,
    111:12
expectation 19:2,
    21:1, 25:2, 207:7
expected 10:4, 13:9,
    77:19
expecting 20:24
expedite 13:4
expeditiously 10:20
expenditure 60:1
expenditures 59:11,
    133:8
expense 120:22,
    137:11, 161:17,
    164:19, 164:22
expenses 57:24,
    58:11, 131:9,
    132:17, 133:7,
    133:17, 133:18,
    134:22, 135:3,
    136:3, 136:6,
    142:12, 143:9,
    152:13, 152:16,
    166:25
expensive 89:14,
    89:16

experience 17:12,
    20:18, 23:25,
    26:18, 42:17,
    151:7
experiences 26:17
expert 51:11
expertise 10:17
expiring 168:15
Explain 7:6, 7:7,
    7:8, 43:12, 52:22,
    53:11, 63:17,
    81:24, 98:14,
    132:10, 153:24,
    155:23, 165:10,
    201:13, 203:22,
    203:23
explained 8:12,
    81:16, 116:25,
    133:3, 146:7,
    155:4, 158:11,
    179:16
explaining 42:8
explains 156:4
explanation 26:6,
    37:14, 42:6, 43:15
explicit 169:19
explicitly 137:20,
    146:4
exposes 153:15
expressed 90:9,
    98:11, 116:16,
    162:3, 162:4,
    201:2
expressing 68:16,
    201:24
expressly 133:6,
    139:7, 144:11,
    147:1, 189:15
extend 43:25, 65:2
extension 44:5,
    174:4, 174:5,
    174:12, 174:13
extensive 118:13,
    133:1
extensively 76:11,
    117:24
extent 12:20, 14:25,
    22:4, 32:6, 33:9,
    34:19, 43:11,
    45:22, 61:8, 62:3,

65:19, 66:19,
    66:21, 67:25,
    68:9, 69:8, 69:19,
    70:20, 71:15,
    71:17, 72:1, 77:7,
    80:25, 81:3, 85:3,
    101:12, 124:15,
    178:11
external 156:6
extra 130:6
extracts 117:20,
    117:21
extraordinary 73:11,
    98:12, 98:13
extreme 54:19
extremely 90:12,
    146:1


< F >
F. 3:8
F.2d 92:18, 175:22
F.supp.2d 92:13
faced 177:19
faces 9:6
facilicit 10:21,
    11:19
facilitated 8:18
facilitates 21:8
facilities 164:7
facility 164:8
factor 83:1, 83:2,
    109:7
factors 10:16,
    82:13, 82:14,
    82:22, 102:12,
    109:8, 156:6
facts 60:11, 102:11,
    102:20, 132:4,
    132:5, 132:9,
    132:12, 185:2,
    185:15, 186:25,
    201:14, 207:21,
    207:22
factual 10:10,
    116:4, 122:4,
    134:19, 155:9,
    163:4, 200:15
fail 140:21
failed 83:17, 99:12,

99:15, 137:7,
137:8, 137:9,
166:21
failure 76:24,
131:12, 137:4,
137:15, 157:7,
159:10
fair 30:24, 58:17,
176:15, 198:20,
200:10
fairly 24:12
fairness 203:15,
205:13
faith 14:6, 209:18
false 78:2, 132:19,
132:20
familiar 13:12
FAQ 37:4
far 19:10, 19:11,
23:23, 40:13,
86:13, 90:19,
134:1, 149:7,
164:12, 177:6,
198:20, 206:6
Fas 105:10, 118:14
fascinating 119:6
fashion 21:9, 176:3
fast 157:4
faster 156:6
favor 128:19
favored 120:4
feared 126:10
Federal 91:7,
130:17, 136:19,
191:2
fee 15:4, 20:12,
20:13, 27:4, 53:1,
53:5, 54:15,
54:24, 55:3, 55:8,
55:17, 62:3
feel 8:21, 10:20,
93:20, 113:11,
114:1, 198:23,
201:6, 202:11,
205:17, 206:21
feels 201:7
fees 15:7, 15:10,
15:12, 15:17,
15:24, 16:16,
16:24, 16:25,

17:17, 18:8, 18:9,
18:15, 20:11,
20:20, 21:4,
24:13, 25:10,
26:2, 29:9, 52:24,
53:16, 54:16,
55:7, 58:3, 58:6,
58:10, 58:23,
58:24, 79:17, 93:2
felt 108:5
fence 121:18
few 13:6, 22:21,
102:11, 125:13,
140:20, 145:25,
148:7, 173:11,
177:7, 194:19,
194:20, 197:17
fewer 157:20
fiduciaries 75:16,
123:20
Fifth 126:19,
154:10, 154:13,
154:18, 154:19
fight 185:8
fighting 157:14
figure 16:9, 31:22,
108:7, 177:23
file 7:18, 7:21,
20:15, 38:18,
39:3, 39:4, 45:25,
46:12, 51:5, 51:6,
51:8, 51:15,
53:22, 91:23,
96:2, 130:16,
172:12, 173:12,
173:19, 198:24,
200:20, 200:21,
202:18, 203:11,
205:22
files 47:10
filing 11:18, 33:13,
37:23, 38:19,
87:8, 95:22,
143:13, 173:14,
173:16, 191:7,
196:10, 196:13
filings 100:12
filled 202:25
final 15:7, 20:13,
20:15, 55:8,

133:14, 133:24,
141:20, 155:19,
209:9
finalize 9:9, 9:25
Finally 35:8, 87:8,
89:2, 92:24,
108:22, 127:15
Finance 3:32, 135:7,
172:24
Financial 1:9, 1:24,
1:40, 2:4, 3:14,
3:23, 17:8, 27:20,
31:23, 98:13,
112:8, 148:3,
151:11, 193:7
financing 115:6,
136:13
find 8:17, 13:16,
22:25, 37:9, 58:5,
86:8, 89:21,
89:22, 92:10,
92:12, 135:15,
207:22
finding 9:4, 189:22,
207:23
finds 84:15, 175:25
fine 11:10, 21:19,
34:1, 37:19,
40:18, 52:17,
183:9
finish 12:24
firm 18:19, 20:14,
28:15, 29:13,
29:16, 95:23
firms 26:19, 54:14
fit 39:20, 71:25
Five 41:7, 46:5,
63:9, 104:22,
128:22, 128:24,
147:22, 154:1,
154:9, 154:12,
159:12, 166:11,
179:1, 192:3
five-day 62:7
five-minute 147:21
Five. 52:12, 191:18,
191:22
fixed 42:20, 54:1
flavor 37:15
flaws 76:16

flexibility 163:19
flinging 208:23
flood 58:22, 163:23
flow 16:15, 17:3,
    54:13
flowing 203:2
flows 202:25
focus 82:3, 83:11,
    86:17, 89:4,
    89:11, 110:11,
    114:25, 118:24,
    119:3, 163:22,
    187:18
focused 18:6, 20:22,
    110:16, 112:22,
    115:21, 179:12
Folks 40:17, 171:13,
    179:19, 200:16
follow 75:4, 173:1
Following 9:20,
    103:3, 179:10,
    200:7
follows 39:24,
    150:12
footnote 118:7,
    149:16, 149:18,
    150:10, 153:11,
    153:15
footnotes 178:14
force 65:17, 65:18,
    80:14, 151:21,
    165:17, 207:2
forcefully 11:11,
    11:14, 11:17,
    162:3, 162:4
forcing 164:16
foreclose 139:7
foreclosure 150:5,
    154:2, 155:1
forefront 95:2
forego 123:19
forget 159:6
forgive 24:7
form 42:1, 45:15,
    53:25, 106:10,
    131:21
Formal 10:4, 11:1,
    176:3
formation 96:10,
    111:8, 123:15

formed 78:12, 78:13,
    90:1, 110:25,
    114:24, 116:5
former 69:21
formerly 75:7
forth 45:24, 47:13,
    66:14, 137:3,
    191:4
fortuitous 22:24
Fortunately 135:19
Forty 87:25
forum 81:18, 89:11
forward 14:8, 48:4,
    85:13, 90:17,
    115:13, 115:19,
    115:22, 132:5,
    153:16, 173:2,
    209:20
found 42:18, 110:15,
    189:21
Four 30:16, 30:25,
    39:17, 55:3,
    103:3, 106:25,
    118:7, 128:18,
    128:21, 128:24,
    154:11, 206:12
Fourth 39:9, 126:9
frame 41:5
frank 8:14, 8:16
Franklin 138:19,
    181:19
frankly 40:9, 45:17,
    105:9, 118:21,
    153:11, 186:13,
    196:21, 204:2
free 137:10, 141:18,
    165:24, 207:8
freeze 201:15
freight 18:24
frequently 55:12
Friday 103:20
FRIEDMAN 3:16, 31:7,
    31:8, 32:17,
    32:19, 32:24,
    44:20, 44:21,
    44:25, 47:2, 47:5,
    47:6, 47:21,
    48:18, 93:14,
    93:15, 93:16,
    125:5, 125:8

friend 97:10
frivolous 87:16
front 165:14
frozen 198:16,
    201:25
frustrations 98:10
fuel 129:22, 161:14,
    161:15, 161:17,
    163:7, 164:7,
    164:12
fulfill 88:15,
    102:17
fulfilling 110:20
full 18:24, 34:21,
    36:22, 83:22,
    93:21, 103:14,
    104:6, 105:20,
    108:17, 110:2,
    111:15, 114:13,
    120:9, 120:11,
    120:13, 120:15,
    120:17, 120:19,
    120:21, 120:23,
    121:2, 121:12,
    121:13, 121:14,
    125:18, 125:20,
    131:25, 132:6,
    159:3, 172:8
fuller 37:14
fully 10:22, 27:15,
    114:12, 118:4,
    118:6, 141:15,
    159:12, 159:18,
    167:18
fun 127:3
function 48:14,
    82:15, 111:1,
    136:17, 170:9
functions 86:6,
    88:11, 144:9
Fund 4:3, 4:8, 4:14,
    60:5, 69:2, 86:7,
    133:7, 133:18,
    184:16, 187:8,
    187:14, 189:4,
    193:14, 193:25
fundamental 76:16,
    124:13, 149:11
fundamentally
    134:22, 139:17,

140:23, 142:4,
176:16, 189:12
funded 119:14
funding 84:4, 88:12,
99:17, 99:21
funds 60:1, 68:10,
69:3, 75:4, 76:24,
85:24, 86:1, 91:5,
121:7, 178:6,
179:13, 182:5,
182:6, 191:12,
191:13, 194:5,
194:6, 197:4,
197:5, 197:6,
199:15, 199:19,
201:2, 201:4,
201:15, 201:25,
203:19, 204:16
furloughs 122:8
future 39:15, 50:11,
51:2, 83:10, 84:4,
84:24, 86:18,
94:4, 110:8,
110:13, 163:13,
197:6, 205:11


< G >
gains 198:14
game 9:24, 10:1,
10:2, 111:18,
119:18, 198:20
games 119:1
gap-filling 48:5
Garrison 205:4
gate 58:22
gates 163:23
gather 20:1
gathered 37:15, 64:9
gating 126:12
gave 66:13, 93:4,
141:8, 202:16
GDB 68:23, 91:9,
91:10, 91:13,
91:15, 91:17,
92:8, 92:11,
92:16, 92:22,
93:17, 93:24,
94:3, 94:6, 94:10,
97:6, 97:7, 100:5,

100:19
geared 185:17
Gebhardt 72:14
General 3:4, 26:17,
26:18, 26:20,
27:6, 37:15,
61:21, 78:15,
82:12, 82:21,
83:18, 83:20,
84:4, 100:3,
101:24, 113:9,
113:14, 164:13,
164:14
generalized 77:17,
78:19
generally 31:12,
35:20, 94:18,
109:17, 127:3,
143:2, 164:23,
206:14
generate 121:7
gentleman 46:13,
161:8
gentlemen 129:12
gets 93:20, 106:18,
107:10, 125:21,
128:2, 139:8,
195:16, 196:3,
200:21
getting 10:6, 13:14,
16:17, 16:22,
17:4, 57:18,
86:10, 91:15,
109:12, 120:15,
120:21, 120:23,
121:12, 121:13,
146:6, 153:2,
169:13, 183:7,
192:2, 200:8,
200:14, 202:10
giant 183:2
Give 8:9, 16:8,
22:1, 23:20,
41:16, 54:2,
58:23, 81:20,
119:22, 121:19,
137:10, 143:14,
143:20, 178:15,
199:6
Given 9:21, 24:1,

26:5, 31:10,
47:20, 54:17,
59:3, 66:8, 79:24,
83:2, 135:14,
136:23, 139:2,
156:5, 160:6,
162:17, 171:21,
172:15, 174:4
gives 39:7, 113:14,
169:5
giving 41:4, 128:1,
148:18, 148:23
Glassman 3:35,
95:16, 95:18
GNP 111:21
goal 32:3, 161:3,
204:6, 209:19
goals 146:2
God 118:1, 156:25
Godreau 97:9
GORDON 4:11, 23:13,
23:15, 23:22,
24:23, 25:3,
25:18, 25:22,
26:9, 26:16,
26:24, 27:13,
27:24, 28:20,
29:1, 29:17, 76:6,
76:7, 76:10
gotcha 204:17
Gotshal 145:23,
172:24
governing 136:18,
136:19
Government 1:31,
21:7, 68:9, 72:19,
78:8, 85:25, 86:2,
86:5, 86:24,
89:22, 91:4,
91:14, 91:16,
92:8, 92:19,
92:23, 93:4,
93:18, 97:4,
110:5, 122:7,
160:14, 170:9,
181:5
governmental 144:9,
170:3, 170:8,
170:10
Governor 159:17,

159:21
grab 120:3, 155:15
grabbing 206:18
grabby 183:9
grafting 88:22
grant 7:22, 73:11,
   98:23, 122:1,
   132:11, 148:14,
   163:10, 169:10,
   174:12
granted 44:16, 45:2,
   72:1, 94:9,
   117:10, 172:17,
   174:13, 200:21
granting 148:22,
   149:18
grantor 137:18,
   137:19
grapes 202:9
grapevine 88:20
grateful 32:15,
   171:20
Great 8:21, 40:12
greater 25:5, 134:2,
   151:25, 156:7
Greece 88:17
Greenberg 32:20,
   33:4, 36:1,
   129:10, 158:21
Gregory 3:27,
   128:13, 130:9,
   166:13, 171:9
griping 106:21
Gross 16:8, 155:5,
   155:11, 162:25
ground 8:17, 155:6,
   155:10, 155:11
grounds 131:16,
   137:15, 142:18,
   158:10, 207:23
groupings 183:16
groups 77:17, 77:18,
   83:7, 84:9, 93:1,
   188:8
grow 183:3
growing 35:8
grown-up 157:8
growth 111:21,
   156:10, 156:12
Guarantee 123:9,

130:12
guaranteed 121:12,
   121:13
Guaranty 3:10, 3:23,
   3:32, 4:17, 112:8,
   116:22, 116:23,
   128:18, 130:12,
   172:25, 193:8
Guayanilla 92:1
guess 30:25, 43:4,
   53:19, 56:17,
   192:2
Guy 72:14


< H >
haircuts 104:8,
   114:1
half 203:18
hall 145:1
Halstead 3:11,
   116:20, 116:21,
   116:22, 190:19,
   190:21, 193:22
hand 55:10, 69:5,
   150:22, 200:18
handful 70:11
handling 56:1
hands 58:14, 183:9
happen 34:14, 68:2,
   87:23, 88:14,
   89:12, 89:24,
   147:13, 166:3,
   173:13, 173:17,
   186:4, 198:7
happened 68:3,
   79:12, 147:16,
   169:4, 180:13
happening 88:13,
   171:21, 184:17,
   185:20, 185:21
happens 51:2,
   108:24, 121:6,
   144:25, 157:7,
   179:21
happy 18:20, 28:7,
   28:11, 28:13,
   41:22, 42:8,
   56:13, 56:14,
   117:9, 155:22,

160:8, 160:9,
   172:17, 180:19,
   180:20, 198:5,
   204:21
hard 93:22, 136:12,
   160:5, 179:21
hardly 124:7
harm 175:9
Harry 58:25
Hasbrouck 133:4
Hastings 15:2, 22:1,
   22:5, 30:3, 117:16
HAYNES 3:17, 32:19,
   33:4, 33:12,
   33:25, 34:2,
   35:25, 37:7,
   39:17, 39:20,
   40:8, 40:13,
   40:23, 41:8,
   41:11, 41:18,
   41:21, 41:25,
   42:12, 42:23,
   43:2, 43:9, 43:17,
   48:14, 48:15,
   49:5, 49:8
head 41:4, 111:4,
   119:8
headed 38:25
heading 40:7, 122:13
health 64:21, 73:20
healthy 32:9
hear 11:20, 72:6,
   88:20, 106:11,
   115:23, 129:4
heard 26:21, 26:22,
   28:10, 31:19,
   45:1, 56:18,
   79:20, 84:13,
   87:10, 88:9,
   88:15, 89:6,
   89:13, 103:20,
   106:21, 108:10,
   114:21, 116:2,
   117:13, 126:9,
   162:2, 163:7,
   164:25, 172:12,
   181:10, 187:5,
   205:23
hearings 8:9, 93:8
heart 92:20

heavily 18:6
heavy 17:19, 54:8
heck 202:15
held 52:2, 64:20,
   76:13, 138:13,
   138:21, 139:1,
   175:19, 179:13,
   181:11, 183:17,
   189:20, 194:12,
   196:6, 207:25
Hello 46:20
help 89:3, 97:10,
   108:8, 115:8,
   115:13, 157:16,
   157:25, 177:23,
   182:22
helped 111:21
helpful 69:10, 129:6
Herbert 88:25
heroic 13:14
herring 119:9
high 118:16, 118:20
higher 69:16, 81:4,
   175:7, 178:11
highest 90:5
highly 12:7, 14:2,
   121:8, 191:12
Highways 1:46
Hills 106:24, 119:10
hire 89:15, 92:5,
   120:22
hired 79:14
historical 19:17,
   83:6, 158:2
historically 18:9
history 23:6, 86:24,
   158:12, 208:19
hit 183:7
Hoc 3:3, 3:26, 3:46,
   4:10, 65:12,
   80:12, 84:14,
   85:12, 85:17,
   91:18, 93:1,
   98:15, 101:23,
   102:4, 128:7,
   128:14, 130:10,
   205:5
hold 28:17, 61:2,
   64:17, 73:23,
   76:12, 77:23,

80:6, 101:13,
   112:15, 115:4,
   123:9, 163:10,
   163:15, 163:19,
   163:21, 164:6,
   182:5, 186:12,
   200:19, 204:16
holdback 16:1,
   16:10, 16:11,
   19:3, 19:9, 24:18,
   25:3, 25:6, 25:8,
   25:10, 25:24,
   26:1, 26:3
holdbacks 15:13,
   15:14, 25:19
Holdco 107:8, 107:10
holder 103:2,
   104:13, 137:17
holders 77:11, 78:7,
   78:15, 99:2, 99:3,
   99:7, 102:1,
   102:15, 102:19,
   102:21, 102:25,
   104:2, 104:7,
   104:18, 105:1,
   106:14, 106:25,
   109:19, 110:18,
   110:19, 120:4,
   123:7, 123:8,
   130:21, 179:12,
   179:25, 194:3,
   206:1, 206:2
holding 47:9,
   105:17, 138:16,
   186:16
holds 56:23
home 89:18
honest 75:11, 158:5
Honorable 2:18,
   2:23, 2:24, 8:2,
   8:7, 211:6
Hoover 88:25
hope 10:22, 39:6,
   46:6, 52:17, 72:6,
   102:7, 183:7
hopeful 12:1
hopefully 32:5,
   46:4, 47:10,
   129:18
hoping 53:2

HOROWITZ 3:27,
   128:13, 128:22,
   129:1, 129:3,
   130:8, 130:9,
   130:10, 134:12,
   144:11, 145:2,
   145:4, 145:18,
   146:7, 166:11,
   166:13, 166:14,
   166:20, 170:18,
   171:4, 171:9,
   171:10, 171:16
horrible 198:13,
   200:24
hot 93:20
hour 27:18, 27:19,
   28:4, 28:19, 54:2,
   156:5
hourly 20:7
hours 15:24, 17:21,
   28:3, 28:6, 54:1,
   115:7, 120:20
house 177:20
Houser 2:23, 6:22,
   7:25, 8:2, 8:7,
   12:13, 13:13,
   13:18, 14:1,
   14:13, 162:2,
   210:5
HTA 7:3, 44:2,
   49:13, 49:23,
   50:25, 51:23,
   113:24
huge 113:17, 122:6,
   122:7
hugely 161:2
human 111:25
hundred 15:23,
   16:23, 18:19,
   24:14, 24:15,
   24:19, 53:17
hundreds 69:6, 202:4
hurled 200:4
hurt 115:14
husbanding 170:13
hypothetical 66:13

< I >
icons 184:9

ICSC 141:11
idea 57:25, 172:2
identical 36:6,
  48:17, 166:24
identified 10:5,
  76:17
identify 132:9
identifying 66:15
identity 65:10,
  145:5
ignore 163:17, 185:2
ignored 135:21
illegal 91:20
Illinois 87:8
illuminate 78:1
illusion 126:3
illustrated 131:1
image 22:9
imagine 13:15,
  156:25, 166:1,
  173:9
immediately 39:13
imminent 130:25
impact 140:5,
  140:16, 141:15
impairs 169:20
impede 170:16
implementation
  133:12
implemented 8:20,
  12:3, 59:18
implementing 8:10,
  9:10
implicated 82:21
implication 122:17
implications 164:12,
  164:14, 208:15
implicitly 180:4
import 165:19
importance 138:9
importantly 78:6,
  84:10, 127:3
impose 47:18
impossible 28:5,
  55:9, 57:2, 114:8,
  157:11, 180:14
imprecise 206:24
impression 182:2,
  182:3
improper 45:11,

100:25
improvise 208:25
inability 131:15
inadequate 84:16
inappropriate 29:10,
  47:18
incarnations 33:3
include 33:22,
  34:13, 35:2,
  36:21, 40:18,
  61:13, 63:24,
  70:1, 82:14, 84:4,
  97:5, 126:16,
  126:17, 143:6
included 58:2, 71:4
includes 37:22,
  38:12, 84:2,
  134:24
including 13:17,
  35:1, 35:3, 57:13,
  67:9, 70:25,
  85:23, 90:23,
  94:23, 123:10,
  141:1, 144:15,
  149:20, 150:13,
  150:18, 151:8,
  200:16, 202:10
inclusion 70:6
income 181:12, 202:6
incompatible 47:24
inconsistent 48:6,
  66:4, 169:24,
  177:10, 186:5,
  192:6
incorporate 32:10,
  34:10, 35:5
incorporated 143:17,
  143:19, 143:21
incorrect 108:21,
  182:3
incorrectly 100:6,
  131:3
increase 111:13,
  112:2, 131:6,
  139:15, 140:4,
  140:20, 140:21,
  140:22, 145:12,
  145:16, 146:12,
  148:16, 153:2,
  153:7, 157:19,

160:22, 168:5,
  168:10
increased 111:16,
  141:15
increases 140:16,
  146:6, 146:21,
  149:25, 151:12,
  152:23, 155:18,
  155:24, 156:6,
  156:7, 165:12
increasing 110:12
incredible 122:19
increments 27:18,
  27:19, 28:4
indefatigable 13:14
indenture 104:1,
  127:22
indentured 60:14
independent 76:24,
  98:20, 130:18,
  142:19, 159:19
indicated 16:9,
  29:1, 40:15,
  77:25, 159:8
indicates 15:6
indicating 7:18,
  78:4
individual 55:17,
  69:20, 87:1
individualized
  77:11, 78:20
individually 84:13
individuals 69:19,
  181:11
indulge 125:12
industry 160:4
ineligibility 101:19
inequitable 192:7
infancy 11:1
inflation 156:5
information 14:17,
  28:17, 29:20,
  37:9, 37:23,
  38:12, 40:19,
  42:21, 42:23,
  58:20, 59:5
informative 7:21,
  12:18, 34:18,
  42:11, 46:12,
  51:5, 51:16

informed 25:2,
33:14, 85:25
informs 178:23
infringers 136:20,
137:7
ingenuity 12:6
inherent 67:10,
67:11
initial 33:7, 65:13,
197:9, 197:11
initially 64:3,
182:5
initiation 35:15
injunction 201:16,
203:11, 206:16
injury 175:2
injustice 207:23
input 9:12
inquiries 85:7
inquiry 78:16
insert 154:20
insofar 75:21,
194:2, 194:22
insolvent 87:6, 93:3
instance 53:20,
75:5, 100:14,
110:21, 111:18,
154:15
Instead 30:16,
71:11, 79:1, 101:7
institution 93:21
institutions 83:8
Instituto 141:11
instructions 39:4,
177:10, 177:19,
182:21
instructive 97:1
instrumentalities
57:13, 57:21,
99:13, 100:8,
100:15, 100:18,
144:13, 169:21
instrumentality
75:7, 100:10,
100:12, 178:20
insufficient 99:25
Insurance 3:24,
35:3, 112:9, 193:8
insure 117:4,
151:10, 193:10,

193:11, 200:7
insured 110:17
insurer 35:4, 200:6
insurers 116:7,
116:16
insuring 110:8
intangible 136:14
intend 23:19, 34:10,
35:10, 36:21,
52:25, 142:10
intended 40:25,
42:21, 42:23,
65:3, 65:6, 77:16,
174:12
intends 36:18, 96:8
intensive 28:3, 28:6
intention 16:9,
95:16, 110:1,
120:18, 131:5,
134:3, 139:24,
142:8, 145:13,
169:6
intentions 110:24
intercofina 180:22,
188:5
intercreditor 124:2,
164:19, 179:3,
188:5
interested 111:8
interesting 92:12,
104:3
interests 17:14,
35:1, 67:10, 70:8,
70:15, 71:4,
73:15, 74:4, 74:8,
77:11, 77:20,
78:17, 78:19,
78:20, 80:8,
83:21, 84:3,
100:3, 101:8,
101:14, 107:19,
108:1, 109:1,
110:7, 111:2,
124:7, 127:18,
142:9, 142:16
interfere 182:12
interference 144:9
interferes 169:12
interim 16:11,
16:16, 24:16,

24:21, 24:25,
25:5, 25:14,
25:25, 52:24,
53:4, 54:24, 55:8,
57:4, 58:1, 59:9,
59:15, 173:21,
173:22, 190:2
internal 18:1
internally 28:15
interpretation 67:6,
67:7
interrupted 37:2
Intervene 171:7,
173:3, 173:4,
175:23, 176:1,
176:4, 176:8,
182:12, 190:11,
195:3, 195:8,
196:25, 197:3,
197:20
intervenor 141:9
intervention 91:24,
172:9, 172:10,
172:15, 174:22,
175:1, 175:15,
175:21, 200:21,
205:6, 205:8
intimated 127:8
intracofina 177:20
intramural 182:8
intrinsic 136:8,
138:1
introduce 160:8,
160:9
inundations 62:1,
62:3
investigate 119:23
Investment 2:37
invite 85:6
invoice 15:7, 15:13,
55:14
invoices 55:1, 60:21
invoking 170:4
involve 80:24, 81:2,
108:3, 143:9
involved 9:1, 12:7,
67:14, 70:18,
109:1, 122:20,
161:23, 188:6,
188:7

involvement 122:19
involves 38:10,
    70:12, 70:17, 81:3
involving 68:1,
    108:23
ironic 123:13
irrelevant 153:24
ISCS 141:17
island 86:19, 87:25,
    88:2, 89:5, 89:10,
    89:23, 149:5,
    156:18, 157:2,
    160:14, 181:11,
    194:13
isolate 120:7
issuance 38:16
issued 120:14
Item 15:1, 20:22,
    41:22, 41:24,
    41:25, 44:22,
    48:13, 62:10,
    62:16, 101:23,
    171:6
items 14:15, 34:3,
    36:2, 46:25
iteration 34:11
itself 6:14, 53:21,
    67:13, 69:23,
    70:4, 70:5, 76:20,
    79:1, 79:3, 79:6,
    80:23, 84:11,
    109:4, 127:18,
    139:23, 142:18,
    148:5, 177:14,
    208:3

< J >
jack 156:20, 157:3,
    157:20
January 133:2,
    187:21, 194:24,
    202:23, 202:25,
    203:9, 206:3
Jefferson 148:20,
    148:22
Jenner 23:11, 23:12,
    23:14, 29:4, 76:7
Jersey 22:16
job 120:2, 207:11

John 90:24, 113:12
join 12:25, 91:22,
    91:23, 117:1,
    121:25, 149:10,
    188:10
joined 59:16, 87:21,
    91:22, 194:1,
    200:17, 201:2
joins 116:24
Joint 1:26, 1:42,
    2:6, 38:16
Jointly 1:11, 6:9,
    33:2, 33:10
Jonathan 4:17,
    145:23
Jose 3:44, 62:24,
    65:15, 73:18,
    80:3, 80:11
Juan 6:1, 52:4,
    91:21, 92:17
judges 78:8, 100:17
judgment 64:1,
    184:3, 194:18,
    194:22, 200:18,
    208:21, 209:6
judicial 72:24,
    73:4, 73:6, 121:21
Judith 2:24
July 9:15, 34:9
jump 183:19
jumping 182:18
June 9:12, 168:15,
    185:23, 186:25,
    188:25, 195:23
junior 119:15,
    119:16, 125:23,
    126:14
jurisdiction 144:7,
    144:22, 147:3,
    148:13, 148:17,
    148:23, 149:3,
    155:16, 169:11,
    169:16, 169:23,
    170:20, 178:6
justice 200:23
justifies 168:6

< K >
KARDOS 22:11, 22:12,

    22:16, 22:20, 23:3
Katz 129:14, 161:11
Keep 12:21, 14:24,
    142:10, 151:10,
    197:8, 210:8
keeping 94:5
Kentucky 154:5
key 8:12, 10:5,
    88:11
kidding 30:23
kilowatt 156:5
kind 27:7, 97:15,
    126:6, 150:24,
    198:21
KIRPALANI 4:15,
    176:14, 176:19,
    176:20, 184:25,
    185:13, 186:13,
    187:25, 188:18,
    190:24, 192:15,
    194:11, 196:2,
    200:1, 205:2,
    206:21, 209:4,
    209:12, 209:15
KLEINHAUS 3:40,
    129:13, 129:14,
    129:18, 161:10,
    161:11, 163:18
knock 154:11
knowledge 17:12
known 39:5, 56:8
knows 44:3, 68:24,
    105:20, 131:16,
    133:13, 151:6,
    151:7, 173:6,
    201:17, 207:5
Kou 141:13
Kramer 60:5, 128:14,
    130:10, 187:13

< L >
lack 27:2, 29:12,
    74:21, 83:18,
    90:14, 101:3,
    101:20
lacks 90:7
laid 44:6
landscape 43:4,
    177:1, 177:4,

180:16, 204:19
lane 182:14, 183:20
language 36:25,
    38:4, 38:5, 59:22,
    59:25, 61:24,
    135:16, 137:20,
    197:22, 198:4,
    198:22
lap 121:4
large 40:9, 102:23,
    107:6, 108:25,
    127:24
larger 38:3, 87:14,
    88:22, 109:20
largest 102:13,
    102:21, 105:1,
    105:15, 164:5
last 7:3, 8:4, 8:9,
    9:8, 9:12, 12:19,
    13:9, 14:5, 36:15,
    39:10, 41:13,
    45:1, 50:16,
    111:5, 125:6,
    126:24, 142:20,
    157:18, 159:18,
    169:8, 194:19,
    204:25, 206:4,
    207:7
later 12:17, 16:12,
    39:5, 50:24,
    59:20, 87:21,
    124:17, 134:4
Laura 2:18, 211:7
lawful 134:3, 135:1
laws 106:6, 137:2
lawsuit 162:14,
    181:17, 182:12
lawsuits 11:6,
    101:11
lawyer 17:24, 97:9
lawyers 26:20,
    26:23, 27:20,
    52:5, 89:8, 89:15
layers 115:17
lead 173:1
leader 10:13
leaders 89:19
leadership 209:21
leading 133:2
leads 157:19

learn 9:18
learned 80:11
leases 44:1, 44:8
least 13:6, 65:12,
    65:16, 65:19,
    70:13, 79:11,
    101:14, 112:17,
    127:7, 127:17,
    179:5, 180:1,
    184:2, 194:8,
    194:19, 202:20,
    202:21, 203:2,
    208:10
leave 158:16,
    158:22, 171:14,
    180:7
leaves 173:18
leaving 171:14
Lecaroz 2:29, 72:8,
    72:11, 72:12,
    73:10, 75:10,
    75:23, 76:1, 76:4,
    95:5, 95:6, 95:9,
    123:4, 123:5,
    123:6
left 142:21, 154:12,
    155:14, 157:22,
    185:7, 186:23,
    204:5
legal 10:10, 11:11,
    11:14, 37:22,
    38:5, 38:12, 70:1,
    74:22, 120:1,
    132:3, 143:22,
    145:9, 148:10,
    149:12, 158:24,
    163:4, 198:17,
    198:18, 200:5,
    200:9, 200:12,
    201:3, 201:25,
    202:17, 203:15,
    207:13
legally 194:11
legend 37:21, 38:4,
    39:22
legislation 144:13,
    169:21
legislative 86:24
lender 129:22,
    136:16, 136:17,

136:23, 137:11,
    139:3, 139:8,
    150:5
lenders 122:21,
    163:7, 164:13
Les 195:6
less 29:3, 116:1,
    129:18
lesser 56:6
letter 142:23
letters 191:23
level 20:9, 69:3,
    77:14, 89:21,
    131:6, 135:23,
    138:5, 138:14,
    140:18, 142:10,
    142:11, 143:12,
    166:23, 166:24,
    167:5, 167:10,
    167:23
levels 68:19, 111:21
Levin 60:5, 128:14,
    130:10, 187:13
liabilities 150:1
liability 19:5,
    151:4, 151:5,
    152:6, 152:7,
    208:3
liberty 92:10
licensing 136:21
lied 39:9
lien 102:12, 104:21,
    104:23, 105:7,
    105:11, 105:21,
    106:10, 106:15,
    107:5, 118:8,
    122:11, 126:11,
    126:24, 127:4,
    127:6, 127:12,
    139:22, 154:2,
    162:24, 162:25,
    163:1
liens 104:14,
    123:10, 125:18,
    126:25
Life 8:3, 87:12,
    139:10
lifetime 115:15
Lift 31:25, 32:15,
    130:22, 132:11,

134:20, 137:15,
142:18, 144:20,
162:20, 207:8
lifted 130:16,
140:1, 162:13,
162:21
lifting 131:16,
168:7, 181:6
light 35:8, 62:21,
101:17, 130:19,
130:22, 132:2,
161:21
lights 52:14, 157:6
likely 59:10, 97:11
limit 16:3, 39:12,
172:10
limitations 79:24
limited 27:5, 39:14,
48:22, 60:6,
143:3, 172:15,
176:3, 188:11,
198:25
limiting 39:11
Linares 2:40, 46:15,
46:18, 46:20,
46:21, 47:16,
47:22, 48:11,
48:12
line 22:22, 38:11,
40:3, 118:3,
129:22, 158:1,
161:14, 161:17,
162:12, 163:7,
164:7, 164:12,
209:2
lines 22:18, 22:21,
22:25, 23:1,
162:18, 178:17,
179:1
links 42:18
Lipton 129:14,
161:11
list 105:15, 107:14,
125:6
listed 102:13, 139:7
listen 22:18, 23:1,
23:2, 202:2
listened 175:14
Listening 120:20,
184:24

lists 102:21, 105:1,
154:1
litany 105:16
literally 40:25,
89:8
literary 184:9
litigate 186:19
Litigating 89:16,
118:19
litigation 11:6,
11:24, 17:17,
89:6, 89:9, 89:18,
113:2, 186:23,
191:19, 195:12,
197:16, 200:17,
208:18
litigations 191:23
little 15:4, 36:25,
40:3, 52:14, 53:5,
62:21, 63:6,
68:12, 105:4,
106:4, 112:23,
113:11, 127:5,
127:6, 134:9,
134:10, 145:3
live 122:21, 22:25,
30:9, 58:11,
199:21
lives 160:18
LLC 2:37, 82:23
LLP 6:13, 56:20
loan 137:13
local 20:2, 28:22,
29:2, 89:21, 89:22
locate 156:2
lockstep 74:6
logging 22:23
logic 122:23, 153:17
long 12:14, 106:20,
110:10, 124:20,
139:14, 157:15,
157:18, 167:22,
172:1, 202:15,
206:22
longer 82:5, 159:5,
204:11
longest 206:6
look 33:19, 57:19,
90:17, 91:1, 92:7,
119:5, 121:23,

125:16, 150:10,
156:18, 177:5,
179:2, 181:16,
202:1
looked 24:7
looking 46:24,
86:15, 89:20,
97:15, 127:12,
156:17, 202:5,
209:20
looks 38:2, 46:13,
86:23, 174:11,
204:24
lord 87:1
lose 157:5, 186:9,
198:11
losses 110:6
lost 177:4
lot 30:4, 54:8,
107:6, 117:20,
125:13, 156:2,
159:16, 172:3,
184:3, 200:4,
200:5, 206:22,
206:23
lots 58:14, 109:8
louder 166:18
love 158:22
low 54:19
lowest 141:6
Ltd 4:14
Luc 3:21, 30:2,
56:10, 79:23,
94:16, 117:15,
130:2, 171:25
lunch 97:25, 98:2

< M >
M. 3:11
machine 208:19
magic 184:6, 201:23
Magistrate 2:24,
180:17, 184:15
magnitude 59:3, 83:4
main 71:3, 189:3,
189:4
mainland 156:9
maintaining 204:1
major 114:1

man 208:19
manage 86:5, 145:6,
    169:13
Management 1:10,
    1:25, 1:41, 2:5,
    4:6, 31:6, 31:14,
    32:1, 32:11, 33:2,
    33:14, 34:6,
    34:11, 34:12,
    34:16, 35:6,
    35:11, 35:24,
    129:22, 142:3,
    143:5, 148:4,
    160:21, 160:24,
    164:4, 170:13
manager 157:1
mandamus 170:5
mandate 66:8, 74:15
mandated 88:1
Manges 172:24
manifest 190:3,
    207:23
manufacturer 158:6
manufacturers 156:2
manufacturing 156:8
March 160:1
Marin 65:15, 73:18,
    78:1, 78:4, 80:11
maritime 125:18
mark 79:5
Market 23:17, 29:10,
    92:12
markets 86:20, 94:21
Marrero 9:15
Mart 105:10, 118:14
Martin 2:33, 3:24,
    6:13, 112:7, 148:3
Maslon 56:20
Massachusetts 138:17
Master 4:14
matching 66:22, 81:3
mathematically
    179:25
matrix 36:4, 36:22,
    41:12, 41:20
Matt 203:6
matter 13:5, 18:16,
    20:6, 27:6, 29:6,
    29:8, 36:15,
    40:24, 47:7,

49:23, 52:12,
    53:23, 54:7,
    70:17, 80:17,
    84:1, 84:4, 95:21,
    98:19, 131:7,
    146:3, 147:7,
    172:19, 182:13
matters 6:21, 12:15,
    12:21, 13:5,
    31:12, 31:15,
    32:14, 35:12,
    51:23, 51:24,
    70:23, 96:6,
    96:20, 101:9,
    158:4, 162:6,
    173:8, 210:1
maximizing 64:19,
    83:25
maximum 121:17
Mayaguez 91:22,
    97:2, 97:6
Mcginnis 42:12,
    42:14
mean 28:23, 39:13,
    40:24, 60:13,
    66:25, 99:9,
    111:17, 125:21,
    127:13, 167:3
Meaning 17:23,
    99:23, 122:19,
    167:11
meaningful 135:17,
    135:18, 135:22
meaningless 135:13,
    167:5
means 104:22,
    113:18, 118:5,
    136:18, 143:10,
    198:13
meanwhile 184:7
mechanically 51:4
mechanics 33:24
mechanism 20:11,
    48:5
mechanisms 109:2
median 182:18,
    183:19
mediate 163:23
mediated 161:25
mediation 6:23,

8:10, 8:13, 8:24,
    9:3, 9:10, 9:14,
    9:19, 9:24, 10:3,
    10:4, 10:5, 10:6,
    10:8, 10:9, 10:13,
    10:17, 10:19,
    10:25, 12:12,
    14:2, 14:13,
    112:18, 113:3,
    146:2, 162:2,
    162:16, 163:11,
    163:24
mediators 8:15, 12:8
meet 31:20, 32:4,
    45:23, 178:11,
    201:19, 201:21
meeting 9:18, 9:20,
    94:24, 103:20
meetings 90:16
member 10:17, 17:24,
    63:23, 64:1,
    65:20, 67:18,
    70:7, 70:10,
    70:14, 70:25,
    72:20, 74:21,
    80:17, 82:4,
    83:16, 126:21
members 6:6, 9:2,
    9:14, 9:21, 10:9,
    10:14, 63:20,
    64:6, 65:10,
    65:14, 65:17,
    67:22, 76:13,
    77:23, 80:19,
    81:9, 84:17, 87:1,
    95:12, 100:5,
    112:19, 115:1,
    115:4, 126:20
membership 73:17,
    73:22, 74:12,
    74:17, 74:22,
    82:8, 84:18,
    104:19, 123:15,
    123:18
memorializing 84:20,
    101:22
mend 87:13, 88:16
mention 13:13,
    92:21, 96:12,
    205:10

mentioned 53:8,
    53:9, 79:25, 85:1,
    90:20, 103:19,
    104:25, 126:1
mentioning 118:21
mere 135:20, 137:25
merit 68:17
merits 10:6, 10:8,
    192:16
message 30:15
met 9:15, 73:7,
    74:14, 160:10
metaphysical 145:3,
    145:4
methodology 28:14
Michael 3:48, 85:16
microphone 6:18,
    21:3, 42:15,
    50:13, 50:14
migration 157:19
million 36:10,
    37:12, 40:24,
    58:6, 97:3, 97:5,
    103:5, 103:19,
    109:21, 113:19,
    133:8, 133:10,
    161:14, 161:15,
    164:6, 164:7,
    164:9, 183:2,
    193:15, 203:3,
    203:7, 203:25
millions 202:4
mimicked 24:9
mind 57:24, 112:21,
    172:2
minding 202:14
mine 112:14, 129:11,
    166:2
minimize 124:10
minimum 156:11
minus 54:2, 128:21,
    152:13
minute 84:22, 116:1,
    130:2, 130:3,
    157:8, 165:6,
    166:6
minutes 27:22,
    51:13, 52:14,
    62:19, 62:23,
    63:2, 72:6, 72:7,

102:6, 102:11,
    128:9, 128:10,
    128:19, 128:22,
    129:7, 129:16,
    129:24, 130:5,
    142:21, 145:25,
    147:22, 166:11,
    174:20, 177:7,
    206:9
miracle 179:20
mirror 22:7, 22:9
misapprehends 77:15,
    78:18
misapprehension
    159:1
mischaracterizes
    77:15
misconceives 134:23
Miserables 195:6
misleading 168:9
mismanagement 134:1,
    141:22, 155:4,
    155:5, 155:10,
    155:11, 158:1,
    158:10, 159:14,
    160:3
missed 49:24, 174:8
mission 64:9, 66:5,
    66:11, 66:12,
    67:11, 67:12,
    100:3
mistake 157:12
mistaken 24:5,
    195:10
misunderstanding
    168:21, 184:25,
    193:7
Mitchell 3:18,
    158:20, 158:21
mode 175:15
modification 46:10,
    176:14, 188:21,
    207:20
modifications 208:25
modified 111:19
modify 74:22, 177:2,
    188:21
moment 13:4, 62:10,
    81:20, 90:10,
    134:25, 136:15,

152:16, 193:23,
    199:6, 204:25
Monday 174:3, 174:5,
    181:24, 184:14
mongoose 97:15
monies 58:9, 66:20,
    205:11, 205:25
monoline 35:4,
    116:6, 116:16
monolines 45:6,
    112:15
Monsita 2:29, 72:12,
    95:6, 123:6
month 8:4, 10:6,
    46:6, 149:2,
    181:13, 192:25,
    194:18, 200:11,
    202:6
monthly 37:19,
    54:22, 55:1,
    55:14, 55:18,
    60:23, 61:2
months 46:7, 55:4,
    103:16, 148:21,
    194:19, 194:20
monumental 99:18
motions 7:4, 12:18,
    14:20, 32:7,
    46:12, 54:24,
    62:12, 63:8,
    77:13, 91:1, 93:8,
    205:12
motivated 112:2,
    121:8
movant 73:5, 79:25,
    98:8, 128:16
movants 130:15,
    131:20, 134:6,
    134:13, 159:8,
    160:9, 166:14,
    171:19
move 14:8, 35:14,
    52:11, 87:22,
    115:13, 115:19,
    115:22, 200:3
moved 66:17
moves 7:3, 75:15
moving 26:24, 119:2
Mudd 90:24, 93:19
multi-car 182:19

multiple 115:17,
   115:20, 141:14
multiply 54:12
Municipal 78:8,
   86:6, 116:23,
   135:6, 135:21,
   136:13
Municipality 3:35,
   87:21, 89:6,
   89:11, 90:25,
   91:20, 91:21,
   92:13, 93:5,
   95:16, 95:20,
   95:24, 96:5, 96:8,
   97:4, 99:24,
   178:21
mute 22:22
muted 22:22
Mutual 4:8, 60:5,
   187:8, 187:14,
   189:4, 193:14,
   198:3
mutually 47:17
Myers 31:9, 44:21,
   47:6, 49:12, 93:16
myself 9:15, 19:25


< N >
N. 3:5
name 6:13, 43:20,
   46:17, 72:12, 87:6
Nancy 3:18, 158:20
narrow 14:24,
   161:21, 179:11
narrowly 162:20
Nathan 3:17, 32:19,
   33:4, 35:25, 48:15
National 3:31, 4:17,
   56:20, 116:7,
   128:18, 130:11,
   145:20, 145:24,
   165:7, 172:24
naturally 110:11
nature 77:15, 78:18,
   82:14, 84:1,
   109:7, 109:13,
   110:10, 111:25,
   134:23, 134:24,
   143:1, 183:12,

199:11
near 21:3, 162:1
necessarily 28:1,
   28:2, 68:1, 182:11
necessary 11:13,
   29:5, 40:14, 51:7,
   51:8, 51:15, 82:9,
   99:2, 101:4,
   132:4, 132:18,
   134:19, 161:16,
   165:13, 174:23
necessity 74:2
needed 42:7, 52:23,
   53:5, 79:7, 125:3
needing 88:19
needs 21:5, 78:3,
   81:10, 133:21,
   154:16, 168:23
negative 131:4,
   140:5, 156:10
negotiated 15:16,
   15:22, 20:5, 20:17
negotiation 23:7,
   162:11
negotiations 161:22
Neither 98:19,
   105:14, 168:11,
   191:8
net 16:10, 131:3,
   133:25, 134:15,
   134:22, 152:12,
   152:15, 152:17,
   162:25, 163:1
neutrality 197:22,
   198:4, 198:22
newly 190:5, 191:9
news 7:12, 11:24,
   181:7, 183:23,
   184:15
Next 7:13, 7:17,
   10:1, 20:1, 23:10,
   28:22, 31:5,
   34:10, 62:10,
   72:4, 75:16,
   85:11, 86:1,
   101:23, 118:24,
   128:7, 145:19,
   159:9, 171:6,
   173:11, 197:17,
   203:8

Nicholas 4:6,
   129:20, 164:2
night 7:3, 178:9
Nine 34:8, 36:2,
   155:7
No. 1:6, 1:24, 1:40,
   2:4, 11:8, 17:16,
   22:20, 25:22,
   41:24, 118:12,
   149:6
Nobody 50:13, 105:20
non-bankruptcy
   146:17, 146:20,
   165:13, 165:17,
   165:24
non-binding 143:4
non-debtor 170:12
non-discounted
   25:15, 25:17
non-governmental
   170:12
non-objected 55:1
non-party 175:20,
   181:25
non-persons 90:7
nonduplicative
   12:22, 20:12
None 5:5, 5:11,
   91:18, 139:4,
   143:19
nonetheless 175:18
Nor 34:8, 98:20,
   124:16, 146:10,
   168:11
normal 28:14
normally 185:1
Notably 104:16
note 19:25, 32:21,
   36:9, 48:25,
   51:14, 63:18,
   93:21, 103:12,
   127:15, 134:5,
   189:15
noted 14:4, 51:25,
   97:8, 101:12,
   107:23, 177:25
noteholder 44:13
notes 106:25, 107:1
Nothing 13:20, 32:1,
   46:9, 119:19,

126:10, 143:24,
153:5, 169:19,
186:4, 189:24,
192:21, 202:11,
203:15, 203:19
Notice 27:17, 36:3,
37:12, 37:22,
38:5, 38:16,
38:18, 38:22,
39:2, 39:3, 39:12,
39:13, 40:3, 41:7,
44:22, 54:25,
55:5, 55:9, 56:18,
58:2, 58:10,
58:16, 58:23,
59:6, 59:24, 61:1,
61:17, 62:7,
95:15, 121:21
notices 39:15
noticing 43:13
notifications 36:23
notifying 37:1
noting 105:14
notions 200:24
novel 44:7
Nowhere 74:15,
140:17, 140:19,
140:21, 165:19,
167:24
Number 29:18, 35:8,
37:5, 37:7, 41:10,
43:19, 43:24,
49:6, 52:12,
65:13, 96:6,
121:20, 134:7,
134:14, 138:2,
165:19
numbers 35:7, 66:16
numerical 155:22
numerous 106:12,
138:8
nunc 202:18


< O >
o'clock 46:5
O'melveny 31:9,
44:21, 47:6,
49:12, 93:16
O'neill 20:14

object 44:13, 45:9,
54:25, 55:2, 55:7,
58:3, 70:6
objecting 51:1,
55:15, 190:23,
193:5, 193:18
objection 31:13,
45:6, 45:10,
45:11, 46:3, 48:3,
48:8, 48:23,
54:23, 55:16,
60:6, 60:9, 60:12,
62:4, 63:10,
64:10, 64:12,
64:18, 118:7,
122:13, 142:7,
191:4, 197:21
Objections 29:20,
34:7, 35:16,
35:18, 44:10,
46:5, 47:10, 63:9,
138:25
objective 104:17
objector 146:1
objectors 105:3,
141:10
obligating 137:14
Obligation 3:4,
31:19, 61:14,
113:9, 113:14,
143:11, 149:23,
150:22, 150:24,
151:3, 151:9,
151:23, 151:24,
152:5, 153:12,
153:14
obligations 57:23,
136:12, 137:24,
149:24, 150:1,
150:7, 150:17,
151:18, 152:2,
159:15, 193:9
observance 149:19
observation 52:3,
52:4
observed 190:24
observers 6:7
observing 134:13
obtain 29:19, 130:18
obtained 57:7,

165:12
obvious 87:9, 87:22,
104:23, 105:19
Obviously 12:25,
17:15, 45:22,
50:9, 50:25,
66:15, 90:14,
107:10, 108:22,
109:14, 125:15,
148:10, 149:6,
210:1
occasions 138:3
occurred 77:7,
141:23, 180:12
October 41:2,
145:16, 159:9,
168:17
odd 97:13, 97:15,
203:3
odds 68:13
off-line 47:4
offer 167:13
offered 5:5, 5:11,
99:24
office 28:8, 51:14,
53:3, 53:13,
63:19, 67:12,
72:15, 78:14, 85:7
Official 3:20,
18:15, 64:13,
64:15, 71:12,
76:8, 79:24,
83:24, 96:14,
101:16, 101:24,
102:24, 127:23,
128:1, 128:2,
211:15
often 6:17, 28:3,
31:18, 106:18,
107:2, 115:16,
128:2, 138:3,
162:3
Okay 15:15, 19:24,
44:18, 50:18,
52:11, 54:20,
62:11, 91:6,
91:14, 91:25,
118:25, 129:17,
170:18, 176:19,
183:3, 184:11,

199:5, 200:10, 206:24, 209:12, 209:15
old 97:10, 149:2, 203:2
Omni 7:13
Omnibus 2:17, 2:22, 8:9, 35:13, 45:1, 77:8
Omnis 35:10
once 31:24, 40:16, 178:1, 204:10
one-size-fits-all 45:19
one. 32:10, 38:8, 41:13, 107:8, 119:5, 145:25
ones 88:22, 92:1, 123:24, 146:13
ongoing 47:7, 57:17, 57:23
Opco 107:9, 107:10
open 8:14, 8:16, 38:13, 163:23, 197:9
opened 169:9
opening 167:3
operate 161:16, 168:23
operating 85:23, 120:25, 136:6, 142:16
operational 40:1, 40:17, 40:24, 141:5
operations 58:21, 143:15, 143:21, 152:15
opined 190:1
opines 140:17
opinion 104:20, 131:23, 167:25, 175:22, 192:10
opinions 120:14
opponent 128:12
opponents 62:20, 72:7, 117:14, 129:4, 129:6, 130:5, 130:23
opportunity 6:22,

9:17, 12:11, 31:16, 32:14, 38:21, 131:24, 132:7, 160:6, 163:8, 163:11, 163:23
oppose 187:16, 187:19, 188:14
opposed 18:13, 27:18, 27:22, 54:17, 108:18, 126:8, 189:3, 189:4
opposite 105:13, 153:11, 153:14
opposition 79:20, 131:2, 131:21, 173:10, 173:16, 174:6, 187:5
oppositions 174:2
optimistic 41:1
option 124:11, 157:7
options 197:9
oral 98:5
Orange 96:13
ordered 9:16, 101:4, 146:11, 159:3
ordering 72:25
orderly 57:25
orders 14:21, 36:5, 168:17
ordinary 36:11, 36:19
organically 34:14
organism 157:13
organization 90:17, 160:23, 160:24, 161:1
organize 94:6
original 39:12, 190:7
originally 45:1
others 25:21, 55:10, 56:5, 97:8, 126:22, 157:15
Otherwise 16:17, 17:3, 24:18, 120:17, 144:2, 144:13, 146:21, 147:13, 169:22,

180:1, 208:18
ought 38:11, 159:7, 196:2
ourselves 16:4, 108:24, 127:2
out-of-pocket 53:17
outcome 113:5, 189:9, 199:3, 209:20
outgoing 20:1
outlined 175:16
outset 51:24, 52:25, 53:13, 63:18, 178:1, 187:24, 188:3
outside 18:1, 18:5, 22:6, 37:21, 45:15, 142:17
outstanding 19:5, 130:14
overall 15:15, 15:21, 107:24
overlap 83:8
overlapping 43:6
overrule 48:8
overruled 46:4, 55:6, 62:4
oversee 135:25
overseen 12:4
oversees 110:23
overstate 143:1
overview 8:9
owed 26:3, 102:25, 103:8
own 18:1, 40:4, 64:10, 67:9, 79:2, 79:10, 79:15, 88:18, 89:18, 93:24, 93:25, 101:8, 102:24, 108:4, 109:6, 109:15, 120:22, 124:12, 127:21, 128:18, 150:5, 172:16
owned 150:3, 208:11
owner 84:17, 187:2, 196:3, 196:6, 205:21, 208:9
owners 199:15,

205:15
ownership 145:10,
    196:19, 199:13,
    199:18, 206:14
owns 198:2, 199:18


< P >
pace 41:23, 156:7
PAGE 5:3, 82:23,
    149:17, 156:3,
    178:16, 179:1,
    182:7
pages 38:1, 102:10,
    155:23, 211:4
pairing 69:20
Palacios 2:40
Pandora 181:18
panic 39:7
paper 38:4, 173:7,
    195:17
papers 44:6, 77:5,
    80:1, 94:18,
    103:12, 105:7,
    109:24, 117:19,
    117:25, 120:9,
    131:22, 138:6,
    144:5, 158:2,
    160:2, 166:8,
    166:22, 181:23,
    199:17
paperwork 174:8,
    174:14
Paragraph 39:10,
    94:7, 133:24,
    156:3, 168:20,
    168:21, 206:11
parallel 105:19,
    106:12
Parcel 3:37, 49:17,
    50:2, 50:6, 50:8,
    50:20
part 17:2, 25:4,
    36:10, 53:11,
    82:14, 91:17,
    92:7, 92:19,
    124:16, 125:23,
    136:22, 137:17,
    138:1, 139:2,
    139:7, 147:5,

167:6, 185:2,
    187:16, 202:22
participant 73:17
participants 6:6,
    70:15, 76:12,
    76:19, 76:21,
    78:9, 78:25, 79:7,
    84:10
participate 9:18,
    10:3, 79:16,
    82:16, 88:4,
    89:17, 113:7,
    176:2
participating 112:18
participation
    109:17, 175:16,
    175:20
particular 10:14,
    10:18, 15:19,
    18:3, 20:22,
    27:16, 63:22,
    63:23, 65:11,
    66:14, 66:15,
    70:3, 70:11, 83:2,
    83:3, 83:6, 84:1,
    104:21, 105:24,
    109:2, 127:4,
    162:8, 163:5,
    163:6, 195:12,
    209:1
particularized 84:12
partner 90:5
partners 54:8, 54:10
parts 136:8, 139:12
party 27:7, 55:5,
    55:9, 55:13,
    56:18, 58:2,
    58:16, 59:6,
    59:24, 68:24,
    82:8, 91:10,
    145:6, 170:12,
    172:9, 172:14,
    178:1, 181:20,
    183:19, 193:13,
    198:14, 198:15,
    202:23, 203:22,
    203:23, 204:16
pass 166:4
passage 198:14
past 46:6, 85:22,

97:23, 98:1,
    184:14
patent 136:16,
    136:18, 136:19,
    137:6, 137:8,
    139:11
patient 12:1
Patterson 138:12
Paul 3:35, 15:1,
    22:1, 22:5, 30:2,
    95:16, 95:18,
    102:4, 117:16,
    205:4
payables 103:18
paying 57:16,
    111:23, 157:20,
    186:16, 188:25,
    191:15, 207:3
payments 21:11,
    40:21, 49:24,
    50:5, 103:16,
    111:17, 180:2,
    180:13, 181:23,
    183:20, 183:22,
    183:23, 188:10,
    194:2, 194:9,
    194:14, 194:15,
    194:19, 194:20,
    194:24, 199:16,
    204:12, 207:12
peace 92:14
Peaje 2:36, 176:6,
    176:8
pegged 152:25
pencils 203:10
pendency 16:22,
    193:19
pending 28:17, 46:4,
    190:12, 190:15,
    194:24
penny 18:15, 18:24
pension 64:14,
    64:20, 64:23,
    65:7, 66:7, 66:9,
    67:2, 67:3, 67:14,
    70:22, 73:19, 80:8
per 54:2, 80:12,
    156:4, 189:7
perceive 176:15
perceived 208:14

perceptions 208:24
perfect 73:13, 74:5,
  106:3, 121:11,
  149:22
perfectly 11:10
perform 151:20
performance 99:10,
  149:19, 151:16,
  152:1
performed 57:6,
  57:14, 151:19
perhaps 21:6, 27:25,
  88:21, 137:8,
  155:21, 182:3,
  195:15, 195:21,
  198:24, 200:3,
  207:10
period 31:20, 86:19,
  129:23, 149:21,
  163:17, 163:18,
  179:13, 180:15
permeate 124:13
permeates 119:22,
  120:6
permission 148:14
permit 187:21
persists 124:18
person 63:25, 67:1,
  67:20, 67:21,
  68:3, 70:3, 71:25,
  81:12, 81:14,
  128:17, 183:10
personhood 101:20
persons 66:15,
  86:23, 95:12,
  95:13
perspective 43:14,
  176:17, 176:18
Peter 3:16, 31:8,
  44:20, 47:5, 93:15
petition 102:21,
  104:25
petitions 99:14,
  186:11
ph 141:13, 203:7
Philip 4:8, 60:4,
  187:7, 187:13
PHV 2:33, 2:34,
  2:37, 3:5, 3:8,
  3:11, 3:15, 3:16,

3:17, 3:18, 3:21,
  3:24, 3:27, 3:29,
  3:32, 3:35, 3:40,
  3:48, 4:3, 4:6,
  4:8, 4:11, 4:15,
  4:17
pi 183:6
pick 87:13
pie 110:13
pileup 182:19
pitched 115:16
pivotal 110:22
place 23:16, 43:6,
  73:23, 88:16,
  89:16, 92:5,
  114:16, 115:11,
  126:25, 144:15,
  147:10, 159:17,
  159:24, 160:1,
  200:15, 206:17
placed 102:16,
  106:18, 111:19,
  133:15, 137:20
placing 110:17,
  110:19
planning 38:1, 38:10
plans 9:6, 12:9,
  67:8, 68:2
play 162:17, 163:11
playground 184:12
Plaza 92:17
pleading 90:22,
  95:10, 95:22,
  95:25, 126:22,
  179:7, 179:8,
  185:14, 186:3,
  196:1
pleadings 11:12,
  11:14, 35:15,
  137:20
Please 23:20, 28:25,
  46:17, 52:20,
  72:12, 85:12,
  90:24, 130:3,
  147:25, 182:22,
  187:9
pleased 10:24, 14:5,
  49:22
pledge 56:23, 58:9,
  135:13, 135:14,

135:17, 135:18,
  150:2, 152:12,
  152:15, 152:17,
  167:2, 167:5,
  167:7, 167:19
pledged 56:24, 57:5,
  57:17, 59:12,
  130:24, 132:14,
  135:23, 136:16,
  136:17, 136:25,
  149:15, 150:6,
  152:10, 152:11
pledges 136:13,
  137:20, 137:22,
  149:19
pledging 135:16,
  167:11
plight 90:13
plus 54:2, 127:21,
  166:1
PM 98:3, 98:4,
  147:23, 147:24,
  210:10
pockets 156:19
podium 42:15,
  166:16, 182:11,
  187:9
point. 8:1, 106:3,
  179:6
pointed 77:5, 138:8,
  138:9, 140:24,
  167:3, 191:10,
  192:8, 205:11
pointing 38:4
points 60:8, 118:5,
  122:4, 148:7,
  149:9, 158:25,
  165:8, 165:18,
  172:4, 194:23,
  205:10
Police 65:15, 65:17,
  65:18, 73:18,
  78:3, 78:8, 80:13,
  87:12, 170:5
policies 93:19
political 68:19,
  68:20, 87:20,
  88:6, 88:7, 88:20,
  90:10, 97:14
politicians 88:7

Polkes 4:17, 128:17,
    145:20, 145:21,
    145:23, 165:7,
    165:22
Ponce 3:35, 92:1,
    95:17, 95:20,
    95:24, 96:5, 96:8
pool 116:12
poor 89:8
pop 41:23
Popular 201:8
populous 38:17
portal 52:5
portfolio 30:19
portion 7:6, 14:15,
    55:1, 187:18,
    187:19, 188:14,
    191:13
portions 67:5
posed 21:5
positions 11:11,
    11:17, 11:18,
    106:12, 112:15,
    162:4, 181:5,
    187:23, 188:12,
    197:9, 208:4
positive 134:1,
    134:22, 152:17
possession 143:15
possible 13:4,
    39:23, 87:12,
    97:18, 120:7,
    121:7, 121:16,
    121:17, 131:10,
    140:18, 167:22,
    167:25, 168:5,
    209:24
Possibly 129:18
post 36:11, 64:14,
    197:9
post-employment
    64:21, 73:20
posture 48:19
pot 183:2
Potential 66:9,
    93:25, 99:17,
    124:11
potentially 104:5,
    104:24
Power 2:11, 33:6,

55:14, 60:22,
    61:4, 83:15, 90:7,
    141:8, 143:11,
    143:20, 144:12,
    146:8, 168:11,
    168:12, 169:20,
    169:24, 170:25
powers 143:1,
    169:16, 170:5,
    178:21
ppointed 118:10,
    202:14
practical 36:15,
    43:7, 70:1, 83:6,
    122:17, 145:25
practicalities 61:11
practice 19:17,
    32:5, 70:17,
    208:21
practices 48:6,
    141:6
PRASA 48:25
pre-existing 59:4
prebankruptcy
    177:14, 180:12,
    184:18
PREC 132:23, 133:1,
    133:11, 133:15,
    133:25, 134:3,
    136:5, 141:3,
    141:15, 141:18,
    143:11, 144:14,
    145:14, 146:24,
    147:10, 147:11,
    159:3, 168:12,
    169:18, 170:3,
    170:4, 170:10,
    170:16, 170:17,
    170:20
precedent 87:5
precedents 139:4
preceding 205:6
precise 118:5
precisely 114:10
preclude 102:13
precluded 209:6,
    209:10
precludes 206:18,
    207:3
predicate 72:24,

73:3, 101:4
prejudging 183:25
prejudice 50:9,
    50:22, 59:9,
    59:19, 61:7,
    61:23, 163:16,
    163:22, 173:5
prejudicial 161:2
preliminary 98:19,
    163:20, 163:21,
    201:14, 201:16
preparation 35:10
prepared 60:9,
    171:19, 172:9
prepetition 161:22,
    180:25
presence 18:2, 18:5,
    22:6
PRESENT 2:22, 21:2,
    41:6, 70:13, 74:2,
    74:19, 163:8,
    188:18
presented 19:20,
    45:8, 97:17,
    141:12, 148:24,
    176:1
presently 110:25
presentment 44:22,
    62:7
preserve 189:10
preserved 55:7
preserves 144:12,
    144:14
presidential 89:1
presides 65:15
presiding 100:17
press 6:6, 30:4
pressure 87:20
presumably 57:4,
    105:23
presumes 77:10
pretend 80:15,
    207:14
pretty 12:16,
    114:18, 166:17,
    173:2, 177:3
prevail 122:24
prevent 32:2,
    157:23, 168:21
preventing 156:9

prevents 170:3
preview 15:11
previous 66:21,
    66:23, 86:6
previously 101:12,
    116:16, 146:7,
    190:6, 199:17
price 157:21
prices 158:8
primarily 26:19
primary 64:20,
    128:17, 186:24
Prime 29:19, 42:2,
    42:4, 42:19, 43:6,
    43:9, 105:25
priming 106:3
principal 55:23,
    99:4, 133:18
principally 187:18
principle 108:19
principles 208:23
print 37:19, 38:1
printed 37:21
prior 35:13, 35:18,
    35:20, 35:22,
    155:10, 176:5
priorities 107:20,
    108:7, 165:20,
    165:21
priority 103:16,
    106:5, 106:9,
    107:4, 107:15,
    108:4, 108:20,
    111:4, 113:15,
    114:5, 114:13,
    114:14, 116:11,
    118:25, 119:3,
    119:7, 119:9,
    119:21, 120:16,
    121:15, 123:9,
    124:6, 125:20,
    126:11, 126:13,
    126:15, 206:1,
    206:5, 208:6
privacy 38:2
private 18:13, 54:3,
    164:22, 170:7
pro 16:21, 17:2,
    17:20, 202:18
probably 53:15,

91:10, 155:21,
    184:3, 201:21
problem 21:2, 38:21,
    53:14, 60:24,
    62:20, 77:9,
    77:13, 86:4,
    152:12
problematic 119:20
problems 6:17,
    55:12, 86:3,
    91:14, 97:7
procedurally 48:19,
    100:25
Procedure 19:8,
    24:25, 52:23,
    54:24
Procedures 15:14,
    25:5, 26:8, 29:20,
    34:6, 34:11,
    34:13, 35:11,
    47:13, 59:6, 59:8,
    59:15, 59:18,
    60:7, 60:10,
    100:16
proceed 11:3, 52:20,
    129:5, 144:20
proceeding 68:4,
    128:3, 134:6,
    134:14, 141:9,
    146:16, 171:8,
    172:7, 173:3,
    179:11, 181:20,
    188:3, 196:24,
    197:1, 200:18,
    201:1, 202:7,
    202:22
Proceedings 4:47,
    8:11, 12:24,
    24:17, 36:21,
    42:18, 51:13,
    68:24, 68:25,
    69:4, 70:16, 94:4,
    98:4, 133:1,
    141:12, 147:24,
    163:3, 210:10,
    211:6
processes 78:13
produce 133:22
produced 4:47, 74:16
professional 160:4

professionals 24:2,
    24:3, 24:6, 27:3,
    28:2, 53:20, 56:3,
    56:7, 57:3, 57:6,
    57:8, 57:12,
    57:18, 58:24,
    60:25, 79:15
proffer 99:12
proffered 131:21
profound 98:10,
    163:5
progress 10:24,
    161:2, 210:6
prohibit 169:18
prohibition 144:9
prohibits 144:17
project 6:17,
    134:10, 160:23
projected 20:11,
    132:16, 132:17
projection 111:21
projections 135:23,
    143:9, 146:12
proliferation 11:6
PROMESA 37:23, 66:8,
    67:7, 88:10,
    100:7, 100:9,
    101:9, 101:10,
    106:12, 142:23,
    143:2, 143:7,
    143:16, 143:21,
    144:6, 144:17,
    144:18, 144:24,
    145:8, 146:14,
    148:12, 154:21,
    165:8, 165:19
promise 120:12
promised 120:10,
    120:12, 134:18
promising 111:14
prompt 21:9, 21:10
promptly 42:20
proof 39:3, 39:4,
    140:13
proofs 38:18, 38:20,
    39:1
propelling 145:15
proper 44:9, 74:22,
    107:24, 142:24,
    175:23, 191:8

properly 123:17
proponents 62:13
proportional 84:8
proposal 16:3,
    37:15, 61:12,
    175:16
propose 14:21, 144:1
proposes 104:7
proposing 23:18,
    26:12
proposition 105:11,
    105:13, 139:12,
    140:11, 144:8
propositions 117:23
propounded 14:20
prosecuting 71:18
Proskauer 6:13,
    43:21, 53:20,
    55:22, 55:23
prospect 161:25
prospective 195:15,
    208:22
prosperous 88:22
protect 66:9, 77:20,
    146:19, 154:18,
    187:1, 196:8
protected 67:1,
    73:25, 92:19,
    139:14, 154:10,
    154:12, 154:16,
    154:25, 167:15
protecting 84:12,
    160:16
protection 35:3,
    35:4, 45:15,
    45:19, 45:24,
    100:2, 106:8,
    131:10, 131:14,
    131:15, 139:9,
    139:11, 140:14,
    149:14, 152:9,
    153:6, 153:8,
    153:9, 154:16,
    154:20, 154:23,
    155:1, 155:2
protections 135:16,
    136:8, 138:7,
    138:10
protectors 124:7
protocol 13:8, 40:20

protocols 43:5
proud 115:19
proven 81:12
Provide 16:11,
    28:19, 31:3,
    31:15, 35:11,
    36:22, 42:21,
    42:23, 54:15,
    58:19, 59:4, 73:6,
    77:16, 77:21,
    87:17, 89:4,
    131:15, 140:15,
    141:14, 142:13,
    146:16, 163:11,
    207:24
provided 53:25,
    56:5, 77:6,
    146:24, 146:25,
    167:9, 167:12,
    208:2
provider 56:2
provides 19:8,
    27:17, 37:4, 37:7,
    42:19, 48:3,
    58:19, 98:20,
    100:9, 103:12,
    148:12, 150:11,
    163:19, 168:23,
    173:2
providing 27:7,
    27:8, 59:25,
    60:24, 131:23,
    143:4
proving 73:5
provision 15:4,
    18:4, 20:16,
    21:22, 23:7, 33:1,
    45:14, 45:19,
    61:16, 61:18,
    95:11, 124:18,
    169:23
provisional 124:19
provisions 34:13,
    45:24, 143:17,
    143:19, 143:21,
    143:22, 150:12
Public 3:31, 6:6,
    8:25, 12:3, 53:23,
    66:18, 88:12,
    93:23, 160:1,

172:24
publicly 110:5
pull 40:3, 160:21
pulled 159:21
punch 162:12
purported 140:10
purportedly 58:11,
    181:25
purporting 141:14
purports 65:16,
    80:13
purpose 31:13,
    38:24, 61:6,
    107:17, 151:15,
    183:4, 189:11,
    191:11, 198:15,
    198:25
purposes 36:20,
    37:13, 60:2,
    100:20, 143:16,
    145:8, 161:17,
    195:15
Pursuant 39:6,
    70:25, 98:25,
    100:11, 124:23,
    197:15, 206:15
pursue 126:4, 137:4,
    145:11, 169:12
pursuing 123:18,
    145:13
pursuit 195:12
push 10:19
puts 126:15
putting 32:12,
    125:24, 127:10,
    145:11, 156:4,
    170:11

< Q >
QTCB 44:12
qualified 99:15
qualifies 56:24
quantify 140:16,
    140:19, 141:14
quarter 27:18, 28:4
Queens 184:10
quest 153:7
question 6:21, 11:8,
    16:1, 17:10, 21:5,

55:20, 67:15,
99:21, 104:11,
162:21, 169:9,
209:5
questionnaire 116:6
questionnaires 116:7
questions 12:16,
13:21, 13:23,
14:19, 14:23,
19:22, 41:14,
42:9, 42:11,
42:16, 46:10,
48:24, 55:19,
61:9, 97:14,
158:14, 162:22,
162:23, 172:17,
172:18, 172:20,
204:22, 204:23
quick 31:18, 31:24,
92:24, 112:16,
205:10
Quickly 12:17,
94:18, 102:20,
125:12
quid 16:21, 17:2,
17:20
Quinn 176:20
quite 7:20, 15:5,
91:23, 105:8,
106:19, 166:15,
169:19, 175:19,
181:8, 192:10
quo 16:21, 17:2,
17:20, 189:10,
189:12
Quote 64:11, 68:17,
108:15, 126:5,
133:14, 141:4,
150:15, 168:21,
176:25, 177:1,
178:13, 178:17,
178:22, 179:2,
179:6, 179:9,
179:10, 179:14,
182:14, 184:9
quoted 117:24,
179:8, 185:13
quotes 178:8
quoting 150:20

< R >
Radford 139:6,
153:23, 153:25,
154:4, 154:9
raise 37:16, 48:4,
50:10, 50:23,
51:1, 55:10, 57:1,
120:8, 156:11,
159:8, 159:10,
159:11, 170:6,
173:17
raised 14:4, 21:25,
36:8, 42:3, 48:2,
50:10, 50:22,
54:23, 75:1,
90:21, 95:22,
96:7, 96:13,
96:18, 104:11,
148:7, 163:3
raises 162:20
raising 140:3, 141:2
ramifications 135:6
RAMIREZ 3:44, 62:24,
62:25, 63:5, 63:7,
71:14, 71:21,
72:3, 80:3, 82:19,
84:22, 85:9
Ramos 160:4, 160:8
ran 182:10
rapid 20:18
rapped 116:8
Rather 36:2, 98:22,
103:2, 188:20,
188:24, 189:6
ratio 133:20
Rauth 95:19
Re 1:6, 1:22, 1:38,
2:2, 82:22, 92:17,
105:10, 105:12,
125:16, 175:19
reach 14:2, 31:24,
132:5, 134:19,
140:8
reached 38:15,
49:23, 131:18,
162:18
reaching 132:12
read 11:23, 15:6,
30:4, 37:19, 38:3,

38:13, 42:10,
49:3, 103:25,
117:25, 168:20,
169:17, 175:13,
195:13
readily 8:25
ready 62:10, 180:20
real 15:14, 16:10,
18:12, 44:1, 54:5,
55:12, 58:11,
66:15, 109:7,
122:10, 156:12,
157:4, 173:4,
196:3
realistic 111:21,
161:25
realize 41:15,
86:16, 165:6,
174:3
really 20:8, 21:5,
30:20, 52:22,
53:10, 54:12,
54:19, 82:21,
86:21, 90:10,
90:20, 94:7,
109:13, 109:24,
112:13, 113:15,
114:24, 117:22,
128:10, 144:5,
155:14, 160:25,
162:16, 166:15,
177:6, 177:16,
180:4, 183:12,
186:21
reason 46:22, 53:14,
70:1, 74:12,
84:12, 90:20,
96:1, 96:3, 116:9,
126:16, 126:17,
134:20, 151:13,
162:19, 173:12,
176:9, 179:5,
180:22, 181:3,
181:14, 186:24,
189:3, 189:4,
191:8, 193:1,
196:24, 196:25,
201:20
reasonable 17:13,
26:14, 27:12,

29:9, 41:5, 141:5,
141:7
reasons 28:25,
80:19, 81:16,
81:24, 83:7,
84:15, 90:21,
96:4, 96:18,
98:14, 101:21,
104:22, 113:4,
123:1, 126:2,
162:15, 163:9,
182:23
reassurance 43:5
rebut 122:4
rebuttal 63:2,
102:6, 111:11,
128:21, 128:23
recall 8:8, 8:23,
25:23, 44:25,
118:1, 179:15,
182:9, 187:8,
187:15, 187:20,
189:1
receive 25:12,
36:13, 104:8,
112:1, 112:3,
133:17, 137:17,
165:17
received 30:15,
31:13, 47:12,
63:10, 66:24,
69:13, 69:19,
69:20, 81:4,
85:24, 122:21,
134:25, 136:9,
137:1, 174:10,
206:6
receiving 177:9
recent 43:2, 51:25
recently 95:23,
103:4, 207:10
recess 98:3, 147:21,
147:23, 148:2
Reciprocity 66:19,
76:18, 76:25,
80:23
reclamation 107:14
recognize 11:22,
82:19, 159:2,
160:10

recognized 99:19,
189:16
recognizes 83:4
recommence 50:5
recommendations
143:4
recommended 45:2
reconsider 189:23,
191:5, 193:1
reconsideration
62:17, 176:16,
188:16, 189:25,
190:2, 190:16,
190:25, 207:19,
207:20
reconstitute 63:24,
101:24, 109:5
reconstituted 76:15
reconstitution
62:13, 63:9,
63:12, 71:24,
82:2, 82:3, 102:8
reconvened. 98:4,
147:24
record 29:24, 30:4,
48:25, 49:16,
62:4, 76:7, 82:22,
99:11, 101:7,
161:11, 176:1,
176:20, 199:1
recorded 4:47
recoveries 64:19,
111:17, 112:3
recovery 110:17,
111:13, 112:1,
124:10, 146:16
rectified 128:1
recusal 124:11
recuse 108:24, 127:2
recused 109:2
red 119:9
reduction 25:24,
32:15, 140:6
refer 27:2, 82:1,
82:22, 98:16
reference 38:23,
135:11
references 178:15
referred 136:4,
158:2, 183:8

referring 191:15
refile 198:5
refinement 34:18
reflect 15:13,
51:12, 81:21,
97:24, 204:25
reflected 62:3,
172:11
reflecting 180:15
reflective 117:3
reformulate 62:6
refund 103:5, 104:5,
110:2
refunds 103:6,
109:20
refuse 168:4
refused 146:12
refusing 183:23,
184:7
regard 34:19, 42:9,
43:12, 71:21,
85:5, 90:5,
101:10, 142:2,
142:25, 143:3,
143:13, 146:8,
146:13, 159:14,
159:25, 160:12,
188:13, 194:23
regarding 28:22,
59:8, 64:4, 70:23,
71:19, 84:25,
85:3, 96:6, 96:20,
101:19, 113:6,
141:1, 146:21,
172:18, 174:24,
191:12
regardless 80:8,
124:6
regime 146:5,
146:20, 147:5
Region 2:29, 72:14
regions 156:9
regression 141:14
regular 28:3, 180:2
regulate 144:13,
144:21, 169:21
regulatory 147:4
rehash 95:9
reiterate 80:10,
95:11

reject 44:1
rejected 141:16
rejection 7:4
related 8:11, 57:9,
    101:10
relates 75:22
relating 57:14,
    58:20, 114:6
relation 20:6
relationship 83:9,
    110:13
relative 164:19,
    179:12
relatively 21:9,
    31:18, 53:7
released 203:24
relevant 75:11,
    75:19, 82:14,
    154:14, 164:20,
    184:20
reliable 141:6
Relief 32:3, 44:13,
    72:24, 73:4,
    74:19, 88:9,
    90:10, 94:1, 94:9,
    127:20, 128:8,
    136:4, 148:23,
    152:18, 153:5,
    155:10, 158:10,
    172:16, 183:25,
    190:23, 199:16,
    202:18, 207:2
relinquish 149:3
rely 118:11, 198:1,
    205:25
remain 12:7, 154:2,
    183:2
remainder 108:16,
    108:17
remaining 133:12
remains 11:2
remark 13:24, 176:24
remarkable 166:15
Remarkably 138:6
remarked 179:19
remarks 12:21, 82:1,
    96:23, 97:24,
    176:5, 176:17
remedies 139:1,
    151:22

remedy 73:11, 99:10,
    152:22, 153:6,
    154:17, 169:13
remember 6:16,
    180:18, 182:14,
    184:10, 184:11,
    195:17
remembers 179:17,
    202:24
remind 199:10
reminds 119:1
remotely 190:15
remove 71:10, 71:25
removed 71:2,
    124:17, 138:24
removes 116:11
render 25:14
rendered 25:15
reorganization
    85:21, 97:20
repay 149:24
repeat 50:16, 50:18,
    112:11, 116:2,
    138:3, 155:5,
    167:24
repeating 104:25
Replies 35:20
reply 60:8, 63:15,
    66:13, 77:8,
    100:24, 138:8,
    149:17, 150:11,
    153:22, 172:12,
    173:12, 173:16,
    175:10, 178:13,
    179:9, 181:23
report 49:22
Reporter 211:15
reporting 151:11
reports 11:24, 33:14
represent 15:2,
    54:3, 65:7, 65:16,
    66:2, 70:14,
    70:22, 73:2,
    73:15, 74:4, 74:8,
    77:10, 78:19,
    79:10, 79:11,
    80:13, 81:13,
    95:24, 100:1,
    104:6, 104:10,
    104:12, 126:20,

130:10, 130:13,
    161:12
representations
    18:8, 21:23, 22:3,
    23:5, 23:6, 26:7,
    28:24, 63:16,
    64:25, 68:5,
    70:20, 178:8
representative 1:13,
    1:28, 1:44, 2:8,
    6:14, 23:12,
    53:22, 72:5,
    78:10, 80:18,
    124:7, 143:23,
    144:2, 145:9,
    145:19, 148:4,
    156:24, 182:25,
    203:4
representatives
    74:19, 79:14,
    84:3, 115:12,
    160:15, 177:21
represented 18:17,
    49:1, 67:13,
    70:10, 71:5,
    74:20, 78:18,
    79:12, 83:21,
    96:14, 101:14,
    104:15, 105:25,
    112:15, 125:1,
    127:17, 127:20,
    155:20
representing 18:10,
    46:19, 53:21,
    96:15, 101:8,
    115:17, 124:24,
    128:17, 145:24
represents 32:20,
    64:14, 64:16,
    68:11, 70:21,
    71:18, 73:19,
    73:22, 78:14,
    80:8, 81:9, 85:2,
    104:2, 123:23,
    133:16
Requested 1:27,
    1:43, 2:7, 27:8,
    27:9, 62:3, 71:1,
    117:7, 145:1,
    148:14, 175:15,

204:1
requesting 62:17,
  63:22, 63:23,
  82:5, 98:6, 188:19
requests 72:17
require 12:6, 34:20,
  35:7, 52:18, 74:5,
  84:8, 84:17, 163:4
required 13:17,
  117:5, 135:1,
  136:5, 156:12,
  199:16, 201:22,
  205:17
requirement 101:1,
  133:16, 133:20,
  133:23, 165:12,
  169:7, 171:19,
  174:22, 190:9
requirements 34:19,
  135:12, 138:13,
  171:2
requires 34:23,
  66:20, 74:1,
  95:11, 109:17,
  138:4, 139:25,
  143:8, 165:11,
  166:23, 168:16
requiring 34:13
rescinded 138:15
reservation 44:12,
  58:2, 59:25, 61:21
reserve 50:10,
  50:23, 63:2,
  102:6, 128:6,
  128:18, 128:22,
  164:17, 164:21
reserved 81:5,
  171:5, 210:1
reserves 47:11,
  204:1
reserving 50:1,
  50:2, 50:25,
  96:11, 128:21
Residential 36:12,
  82:22
residual 64:17,
  73:22, 177:16
resolution 9:22,
  9:23, 10:11,
  10:22, 11:19,

12:3, 59:19,
  115:19, 146:3,
  189:7
resolutions 9:4, 9:5
resolve 12:2, 13:8,
  32:7, 40:16, 47:8,
  108:8, 113:2,
  115:8, 191:1,
  191:11, 192:13
resolved 7:19, 45:7,
  113:8
resolving 7:11, 13:7
resources 29:7,
  77:19, 90:15,
  113:16
respectfully 64:25,
  89:25, 94:10,
  164:15
respond 42:8, 60:20
responded 77:7,
  78:24, 165:7
respondents 88:5
response 31:17,
  34:17, 42:13,
  94:8, 112:10,
  114:7, 146:4,
  156:16, 161:20,
  164:18, 185:14,
  187:22, 191:6
response. 8:6
responsibilities
  87:11, 88:15,
  110:21, 143:2
responsibility 32:5
responsible 10:14,
  31:10, 31:12
rest 18:18, 79:25,
  92:3, 92:14,
  98:23, 166:8
restated 35:23
resting 94:18
restraining 201:16
restricted 55:17
restrictions 171:2
restructuring 93:25,
  159:4, 159:20,
  160:18, 162:10
result 9:11, 29:8,
  32:16, 82:18,
  103:22, 140:6,

191:19, 191:24,
  198:13, 202:1
resulted 141:6
results 93:22
resume 98:1
retain 23:11
retained 57:12,
  95:23
retention 14:16,
  18:4, 22:5, 42:5,
  53:22, 53:23
retired 65:8, 65:17,
  66:12, 67:17,
  68:7, 69:1, 70:21,
  71:10, 71:18,
  71:21, 78:1, 78:2,
  78:5, 80:9, 80:12,
  85:3
retirees 23:10,
  64:13, 67:10,
  71:10, 71:13,
  75:17, 77:23,
  78:7, 78:9, 83:8,
  83:11, 83:20,
  84:5, 84:6, 85:8,
  102:23, 103:10,
  103:11, 110:6,
  194:13
retirement-related
  83:10
retroactive 15:8,
  19:3
retrospective 195:15
retrospectively
  208:25
return 147:22
revenue 133:16,
  133:20, 133:22,
  135:12, 135:14,
  135:15, 135:17,
  135:18, 135:20,
  135:21, 136:13,
  137:21, 138:10,
  139:18, 139:22,
  149:3, 149:15,
  150:17, 153:10,
  162:25, 163:1,
  164:20, 167:7
reverse 108:18
reversing 156:10

revert 18:20
reviewed 13:25,
    17:23, 17:24,
    27:15, 29:12,
    29:21, 32:8,
    56:25, 81:22,
    98:6, 102:10
reviewing 57:2
revised 7:2, 40:10,
    41:7, 45:5, 45:7,
    45:12, 45:16,
    62:2, 172:11
revision 40:19
revisions 45:3,
    45:16, 48:22
rhetoric 93:20
Rican 142:13
rich 97:9
ridiculously 89:14
Rifkind 205:4
rightful 187:2,
    196:6, 205:15,
    205:21
RIOS 3:37, 49:15,
    49:17, 49:18,
    49:19, 49:21,
    50:7, 50:15,
    50:18, 50:20,
    51:6, 51:17
rise 94:19, 171:10
risk 16:20, 17:5,
    156:11, 208:14
RIVERA 3:37, 49:15,
    49:16, 49:18,
    49:19, 49:21,
    50:7, 50:15,
    50:18, 50:20,
    51:6, 51:17
road 58:15, 88:16
roads 87:13
Robert 4:11, 23:13,
    76:7
robust 123:14
Rochelle 3:48,
    85:14, 85:16,
    85:18, 85:19,
    90:4, 94:23,
    96:22, 96:23,
    97:22
Rodrigue 203:6

role 27:4, 43:10,
    64:22, 102:17,
    109:18, 110:12,
    110:22, 142:24,
    143:3, 143:11,
    143:22, 144:14
rolled 35:23
ROMANELLO 3:32,
    172:23, 174:1,
    174:9, 174:15
room 28:2, 134:10,
    208:20
Roosevelt 89:1
Rose 6:13, 43:21,
    186:24
Rosen 129:14, 161:11
Rosenberg 3:5,
    102:2, 102:3,
    102:4, 106:2,
    112:11, 112:14,
    112:23, 113:4,
    114:5, 114:12,
    116:3, 116:10,
    116:25, 117:24,
    118:11, 118:21,
    125:11, 125:12,
    127:10, 128:5,
    196:23, 204:24,
    205:3, 205:4
roughly 54:2, 103:18
routine 47:17,
    106:19
royalty 136:21
RSA 133:12, 161:23,
    161:24, 162:18
Rule 34:14, 51:24,
    56:9, 116:13,
    175:21, 175:23,
    176:1, 191:1,
    191:2, 191:3
ruled 118:15,
    183:13, 190:10,
    190:13, 190:14,
    198:8
ruling 98:5, 190:7,
    190:13, 197:3,
    198:2
run 100:20, 143:15,
    143:20, 157:16,
    157:17, 160:1

run-on 38:1
running 43:12,
    62:22, 142:8


< S >
S. 2:37
S/ 211:13
safe 210:8
safeguarded 196:3
safety 73:23
sale 154:24, 155:1
sales 185:5, 196:19,
    202:24, 206:14
Salvatore 3:32,
    172:23
San 6:1, 52:3,
    90:25, 91:21,
    92:1, 92:3, 92:17,
    93:5, 96:15
satisfactory 47:21
satisfied 7:16,
    11:2, 29:12, 60:7,
    70:19, 101:1
satisfy 131:11,
    167:23, 190:9
save 156:18
saw 24:8, 66:4
saying 37:1, 38:5,
    55:15, 67:20,
    75:2, 91:19, 93:7,
    120:14, 122:12,
    127:7, 127:11,
    131:17, 150:20,
    150:24, 152:24,
    152:25, 153:1,
    153:25, 154:3,
    163:16, 182:21,
    183:1, 183:19,
    186:2, 186:21,
    197:8, 204:8,
    204:9, 204:10
scales 180:23
scenario 75:1,
    192:17, 192:20,
    192:22, 192:24,
    195:5
scenarios 69:10,
    69:12
scenes 8:25, 11:18,

12:2
scheduled 35:12,
   132:7
schedules 203:7
scheduling 173:8
scheme 144:15,
   144:20
schools 87:14
scope 34:21, 45:15,
   64:8, 80:22,
   81:11, 83:22,
   136:16, 162:24,
   179:10
Scotia 3:39, 129:15,
   161:12, 161:17,
   161:19, 161:22,
   163:6, 164:8
scratch 89:15
screening 55:16
Seascape 105:12,
   125:16
seat 142:24
seated 147:25
Sebastian 90:25,
   92:1, 92:4, 93:6
Second 38:8, 39:10,
   41:10, 48:13,
   52:24, 77:9,
   86:19, 91:9,
   91:18, 105:3,
   125:19, 126:24,
   140:2, 150:10,
   150:16, 150:18,
   150:20, 156:3,
   162:19, 171:12
seconds 79:23,
   111:11, 125:13
Secretary 138:17
Section 7:4, 37:4,
   38:25, 58:18,
   82:7, 88:10,
   98:19, 98:20,
   98:24, 98:25,
   99:8, 100:9,
   100:14, 100:16,
   101:5, 114:9,
   117:5, 134:8,
   143:7, 144:5,
   146:22, 148:12,
   165:8, 165:9,

207:4
sections 78:7
secure 114:2,
   149:16, 149:19,
   150:7, 150:15
secures 150:17,
   150:19, 150:25,
   153:13
securitization 183:5
Security 66:16,
   99:1, 99:3,
   119:21, 124:6,
   136:16, 137:21,
   137:23, 150:3,
   150:14, 150:25,
   153:20
seeing 79:9, 87:14,
   122:6, 202:19
seek 25:9, 47:7,
   47:9, 111:13,
   130:15, 145:16,
   148:15, 162:14,
   168:4, 184:2,
   202:18, 203:11,
   206:16, 207:8
seeking 32:3, 34:18,
   41:25, 44:14,
   68:15, 109:5,
   118:18, 122:2,
   131:5, 134:6,
   134:14, 139:24,
   170:8, 170:9,
   172:8, 172:16,
   209:6
seeks 45:13, 45:14
seem 27:2, 29:4,
   47:18, 118:1
seemed 38:20, 177:3
seems 20:17, 29:10,
   38:6, 38:11, 41:5,
   97:24, 109:7,
   159:1
seen 24:10, 53:15,
   54:9, 85:22, 97:11
sees 64:22, 180:17
Segal 26:11, 26:12,
   27:8
segment 114:6
segue 106:3
select 15:23, 17:21

selected 117:8
selecting 100:17
selection 74:20
Senate 159:18
send 37:11, 40:25,
   60:25, 61:14
Seniors 107:2,
   188:10, 190:8,
   200:2
sense 16:18, 19:7,
   26:5, 39:7, 45:17,
   54:3, 54:8, 58:4,
   61:1, 65:21,
   65:24, 80:10,
   85:1, 93:10,
   122:1, 122:24,
   149:22, 187:17,
   208:17
sent 39:5
sentence 7:8,
   149:17, 149:23,
   150:10, 150:16,
   150:17, 150:18,
   150:20
sentences 13:6,
   134:11
separate 39:25,
   40:4, 40:7, 41:16,
   42:7, 49:1, 61:16,
   65:3, 65:4, 65:5,
   66:1, 74:13, 94:4,
   100:12, 102:18,
   106:22, 107:9,
   109:6, 109:13,
   118:13, 126:21,
   130:16, 164:7,
   173:20, 210:6
separately 40:16,
   100:15
September 34:8, 41:1
Sergeant 78:1, 78:4
series 62:12
seriously 141:23
serve 70:7, 99:16,
   101:19, 105:17,
   116:8, 116:17,
   117:7, 117:9,
   123:20
serves 70:11, 150:25
service 36:14, 37:2,

37:4, 37:7, 56:1,
66:18, 116:9,
131:9, 133:11,
133:19, 135:3,
136:3, 136:6,
140:19, 141:6,
166:25, 167:19,
168:1, 168:18,
185:17
services 27:7,
36:17, 57:20,
87:11, 87:18,
88:12, 178:21
session 171:13,
176:22
sessions 10:4
sets 168:15
setting 62:20, 72:5,
132:24, 142:8,
168:22, 169:18
settlement 49:23,
49:25, 50:4,
113:3, 172:13,
186:7
seven 35:22, 62:16,
112:17, 126:20,
149:2, 149:16,
150:10, 153:11,
179:2
Several 14:4, 24:2,
69:9, 85:22, 89:7,
91:14, 96:25,
117:18, 148:9
Sewer 49:1
shall 52:15, 176:5,
206:15
shame 20:8
share 93:1, 162:8
shareholders 194:13
sharpen 203:10
sharply 156:11
sheet 39:25, 40:4,
40:7
shell 119:1, 119:3,
119:4
ship 89:2, 89:3
shoes 170:23, 195:14
shop 202:14
short 11:8, 27:21,
72:8, 90:6,

103:23, 129:23,
157:17, 161:19,
162:17, 174:4
shorter 129:11
shortly 52:7
shots 159:16
shoulder 98:12
shouldn't 114:21,
114:24, 122:7,
122:20, 172:1,
200:9, 200:10,
200:14, 203:24,
205:18
Show 43:13, 141:9,
141:18, 152:19,
152:20, 153:19,
201:14
showed 79:15
showing 74:1, 101:3,
101:4
shown 99:22, 153:19,
175:9
shows 101:7, 151:2
SIB 194:24
Sibs 187:21
side 120:1, 121:16,
122:21, 128:16,
129:5, 187:16,
196:22
sides 155:24,
164:16, 187:17
sight 177:4
sign 19:19
sign-ups 46:11
signal 151:17
signed 125:6
significant 9:20,
9:22, 29:7, 54:11,
97:7, 161:13
significantly 161:23
silence 171:14
silent 138:7
similar 13:24,
48:22, 112:1,
148:21, 204:9
Similarly 27:1,
68:25, 107:4,
129:23, 146:22,
164:15
simple 104:20,

153:17, 161:21,
207:16
simpler 184:4
simplified 24:12
simply 14:21, 26:1,
44:10, 55:6,
55:13, 55:15,
74:19, 79:5, 88:3,
89:8, 89:23, 97:3,
108:19, 111:25,
124:18, 145:10,
152:4, 154:4,
160:20, 165:11,
170:23, 176:5,
181:14, 186:3
Simpson 129:21,
164:3
Simultaneously
41:13, 41:16,
150:23
sincerely 194:14
sincerity 110:24
singing 195:6
single 54:23, 56:9,
100:19, 103:1,
181:13, 206:7
singularly 179:11
sink 88:23
sir 46:17, 76:5
sit 41:22, 149:7
sits 89:19
sitting 124:19,
144:18, 181:15,
185:4, 208:19
situation 15:18,
15:19, 17:18,
46:16, 47:22,
58:13, 65:9,
138:19, 170:4,
188:13, 204:4,
204:18, 208:6
situations 18:10,
66:9
six 27:22, 46:6,
149:17
size 59:3
slated 103:24
slightly 27:5, 37:6,
73:8
slip 41:2

Sloane 4:3, 193:24,
    193:25
slower 37:6, 63:6,
    73:9, 134:9
small 39:9, 92:4,
    104:4, 117:2,
    188:18, 188:19
smaller 88:21
smooth 20:12
snippets 117:20
Snow 112:8
so-called 158:1
Social 66:16
society 97:16
sold 150:4
sole 71:11
solicitation 43:13,
    78:24
solidify 143:22
Solus 4:5, 129:21,
    164:3, 164:5,
    164:10, 164:21
solution 79:8,
    161:25, 162:18
Solutions 22:18,
    42:1, 52:5, 89:22
solvency 88:3
solves 97:16
somebody 45:25,
    78:11
somehow 71:9, 78:17,
    142:22, 142:23,
    143:14, 165:8,
    207:14
Someone 46:12,
    47:10, 157:7,
    202:13
sometime 30:9
sometimes 122:22
somewhat 36:5, 39:15
somewhere 198:22
soon 20:15, 22:25
Sorry 16:5, 16:7,
    19:11, 30:2,
    30:22, 32:18,
    37:7, 46:18,
    129:25, 134:12,
    161:9, 167:7,
    174:7, 195:16
sort 16:12, 22:2,

40:6, 130:5,
    170:15, 182:22,
    183:6, 190:2,
    190:15
sorts 75:9
Sosland 3:24, 112:7,
    112:8, 116:3
sought 26:19, 27:8,
    27:9, 64:4, 94:2,
    123:15, 170:5,
    190:23, 194:2,
    207:1
sound 134:10, 141:5
sounds 61:12, 114:18
sour 202:9
South 3:37, 49:17,
    50:2, 50:6, 50:7,
    50:20
Southern 82:24,
    178:3, 209:23
space 39:21
Spanish 30:6, 37:4
spare 165:5
speaking 8:4, 17:15,
    22:15, 22:16,
    27:25, 185:12
speaks 80:23, 104:1
special 56:24,
    56:25, 57:5,
    57:17, 59:13,
    59:15, 134:16
specific 7:14, 10:5,
    14:23, 34:13,
    46:25, 59:21,
    66:8, 78:17,
    79:14, 83:8,
    83:16, 93:22,
    151:16, 152:1,
    178:13
specifically 20:17,
    35:14, 36:9,
    46:22, 58:19,
    77:18, 82:11,
    83:11, 178:3,
    189:5, 189:17
specified 187:22
specifies 52:7,
    146:9
speeches 110:6
speed 109:9, 109:12,

200:20
spelled 30:7
spend 102:11,
    120:20, 160:3,
    172:3
spent 161:1
spiral 157:22
spirit 142:23
split 113:22, 128:11
spoke 9:8
spoken 53:4
spokes 181:22
sponte 198:6, 198:24
stacked 107:15
staff 209:21
staffed 37:8
staffers 37:8
staffing 54:7
stake 11:10, 202:4
stakeholders 142:9,
    142:12
Stancil 182:9
stand 11:2, 88:13,
    112:3, 117:22,
    139:4, 180:7,
    194:23
stand-alone 164:8
standard 15:20,
    27:19, 48:6,
    118:16, 118:20,
    178:11, 190:1,
    201:19
standards 201:21
standing 68:8,
    70:14, 71:2,
    71:22, 80:14,
    80:17, 111:25,
    145:15, 173:22,
    175:7, 175:8,
    182:25, 202:16,
    206:6
stands 89:19,
    105:10, 105:12,
    139:12
stare 183:4
start 23:15, 62:22,
    114:16, 129:10,
    131:17, 132:21,
    137:19, 148:6,
    153:25, 195:5,

202:16
started 23:16,
  38:19, 185:3,
  195:22
starting 15:1,
  188:25, 203:1
starts 185:16, 203:2
state 18:14, 25:2,
  47:24, 83:8,
  144:15, 146:6,
  147:5, 147:8,
  147:9, 148:23,
  165:20, 169:13,
  189:19, 191:24
stated 11:17, 15:4,
  26:15, 56:11,
  64:12, 66:2,
  68:18, 101:21,
  110:1, 113:4,
  188:4, 189:17
statement 6:22,
  22:13, 114:4,
  161:19, 161:20
statements 10:7,
  10:8, 38:2, 68:12,
  117:21, 129:11,
  178:10, 184:17,
  199:1, 200:25,
  202:21, 203:14
States 1:1, 2:19,
  52:25, 72:5, 85:7,
  87:5, 101:18,
  107:17, 142:7,
  181:12, 211:7
status 84:6, 99:5,
  101:2, 105:6,
  123:19, 123:20,
  124:12, 125:1,
  127:23, 128:1,
  143:14, 146:13,
  189:10, 189:12
Statute 44:8, 72:23,
  74:18, 82:11,
  86:23, 120:17,
  136:11, 138:4,
  138:15, 138:24,
  166:23
statutes 167:1
statutory 18:11,
  18:12, 31:18,

35:17, 35:22,
  54:4, 83:7, 90:20,
  94:11, 95:11,
  98:21, 98:22,
  100:21, 101:25,
  102:17, 112:19,
  123:9, 131:8,
  135:12, 135:16,
  138:7, 138:10,
  138:13, 144:14,
  144:25, 163:17,
  163:18, 170:1,
  174:25
stays 182:14
steep 54:11
stenography 4:47
step 62:13
steps 153:1, 200:3
Stericycle 2:39,
  45:10, 45:21,
  46:12, 46:13,
  46:19, 46:22,
  47:3, 47:11, 47:14
stick 72:23, 74:18,
  181:22
stipulate 208:17
stipulated 14:10
Stipulation 13:7,
  13:22, 13:25,
  112:25, 174:3,
  195:14, 196:19,
  202:15, 206:12,
  208:18
stirring 92:16
stockpile 103:22
stood 112:17, 180:6
stop 55:14, 57:18,
  60:22, 181:23,
  183:20, 202:1,
  205:12, 205:18
stopped 103:17
Store 106:24
Stores 119:11
Stradling 95:18
straight 97:3, 173:2
strapped 86:5
straw 86:9, 86:10,
  87:16
stream 139:19,
  139:22, 149:3,

149:15
streamline 173:7
Street 119:1
strength 108:8
stressed 109:24
strike 107:24
strong 135:15
strongly 123:8
structurally 107:7,
  126:13, 126:14
structure 17:12,
  18:11, 27:4,
  28:24, 100:21,
  102:9, 159:23,
  159:24
structured 24:11
structuring 195:12
stuff 40:4
sua 198:6, 198:24
sub 107:21, 108:4,
  126:13
subject 26:7, 38:11,
  45:3, 159:18,
  169:15, 170:24,
  171:1, 187:21,
  195:24, 205:1,
  208:12
submissions 81:22,
  98:7
submit 14:21, 24:14,
  40:9, 40:11,
  64:25, 66:8, 67:4,
  69:25, 77:12,
  81:14, 94:11,
  135:4, 163:2,
  168:18, 189:22
submitted 23:8,
  29:15, 29:22,
  42:7, 80:19,
  116:6, 116:7,
  172:11
submitting 60:21,
  80:16
subordinate 124:3,
  177:11, 183:15,
  191:16, 191:17,
  192:4, 192:7,
  192:21, 192:23,
  193:11, 193:12,
  193:14, 193:16,

193:17, 194:3,
200:6, 202:9
subordinated 106:17,
107:1, 115:17,
119:12, 133:10,
200:7, 204:2
subsequent 138:15,
139:11
subsequently 190:10
subset 117:2, 183:16
subsidiary 149:24,
150:7, 151:18
subsidies 93:5
substantial 53:25
substantially 8:18,
9:5, 9:23, 23:16,
29:3
substantive 55:7
substitute 72:20
substituting 33:17
succeeded 115:20
successfully 12:9
Succinctly 77:16
suffer 110:6
sufficient 35:10,
90:14, 91:5,
97:17, 97:18,
142:18
sufficiently 42:11,
84:12
suggest 13:4, 24:12,
25:3, 38:23,
60:13, 104:17,
140:21, 160:20,
163:9, 167:25
suggested 34:21,
47:14, 61:3,
159:7, 168:8,
181:21
suggesting 25:6,
25:9, 56:5
suggestion 39:24,
78:17, 122:14,
122:18
suing 181:18
suited 110:25
sum 104:9, 111:18,
119:18, 139:21
summarily 199:22
summary 10:24,

184:3, 194:18,
194:22, 200:18,
208:21, 209:6
suppliers 110:14
supplying 54:14
support 60:13,
60:14, 95:23,
105:4, 112:10,
138:23, 140:10,
140:11, 140:16,
159:4, 159:20,
162:10, 187:6,
187:15, 187:20,
194:1, 194:23,
200:13, 200:24
supported 140:10,
187:20
supporters 117:12,
128:12
supporting 111:3,
111:6
supports 122:25
suppose 183:24
supposed 22:9, 26:5,
75:16, 77:21,
91:23, 108:17,
151:9, 151:10,
151:11, 192:5
supposedly 184:17
Supreme 138:17,
139:1, 139:4
surprised 11:9,
22:19, 95:25
surprising 111:5
surreply 173:19
survive 93:4
Susheel 4:15,
176:20, 200:1,
209:4
suspect 103:22,
184:25
suspend 186:21
suspended 139:13
suspending 139:15,
139:16
sustainability
156:13
Suzzanne 3:15,
30:14, 49:12
Swain 2:18, 11:13,

11:20, 12:4,
12:11, 211:7
swallows 134:10
switch 78:11
sympathetic 90:13
Syncora 130:12
syndicate 65:16
systems 24:2, 65:21,
69:17, 70:12,
79:13, 80:25,
81:1, 84:7


< T >
table 115:9
tackle 9:25, 11:3
Tacoronte 51:22
tactical 55:12
Taft 116:22, 190:22
tailor 176:17
takeaway 107:24
taken. 98:3, 147:23
takings 138:16,
138:23
talks 94:8, 206:13
tantamount 148:23
task 12:5
taught 201:17
tax 85:24, 86:6,
103:5, 103:6,
104:5, 109:20,
110:2, 111:22,
111:24, 196:20,
202:24
Tax-free 138:20
taxes 185:5, 185:16,
185:18, 206:14
Taylor 2:18, 211:7
teachers 78:8
team 6:23, 8:24,
9:3, 9:14, 9:21,
9:24, 10:5, 10:9,
10:13, 10:14,
10:17, 11:16,
14:2, 14:13,
18:22, 210:5
technical 146:13
telephone 6:7,
27:21, 52:5
tells 153:17, 193:18

template 56:1, 87:7
temporary 201:16
ten 19:8, 25:8,
    34:3, 36:2, 52:15,
    52:19, 97:23, 98:1
ten-day 20:16, 21:2
ten. 52:20
tend 38:3
tens 67:22, 194:13,
    202:5
tension 122:6, 122:7
tenth 27:18
tenths 28:19
term 27:3, 45:13,
    46:24, 46:25,
    47:25, 89:1,
    136:19, 162:1,
    162:17
terminated 159:5
terminating 36:17
terms 7:14, 18:5,
    22:7, 22:8, 45:18,
    45:23, 47:24,
    75:1, 80:23,
    84:24, 102:7,
    106:7, 108:9,
    162:5, 174:25,
    188:2, 205:10,
    205:24
territorial 100:10
territory 100:10,
    100:14, 100:17,
    144:12
territory-type
    178:21
test 165:15, 166:4
testimony 131:21,
    131:23, 141:12
Texas 92:6, 97:9,
    184:8
texts 178:14
Thacher 129:21,
    164:3
Thanks 90:4
themselves 14:12,
    65:1, 107:2,
    124:25, 189:14
THEODORIDIS 2:34,
    43:20, 43:21,
    43:23, 43:24,

44:18
theories 120:2
theory 120:5, 167:4
they'll 120:6
They've 18:1, 18:3,
    105:16, 110:2,
    152:21, 155:20
thinking 196:11
thinks 114:13
Third 6:8, 35:24,
    38:14, 91:12,
    126:1, 170:12,
    183:6
Thompson 175:19,
    175:21
thoroughly 13:12,
    102:10
though 19:7, 64:5,
    88:3, 88:5, 94:25,
    164:16, 170:22,
    183:4, 194:3
thoughtful 14:7
thoughtfully 73:14,
    123:16
thousands 44:8,
    67:22, 69:6,
    194:13, 202:5,
    205:24, 206:1
threat 168:6
threaten 191:19
Three 9:14, 38:8,
    39:18, 43:2, 55:3,
    63:2, 63:3, 63:10,
    87:21, 94:7,
    102:6, 102:7,
    115:3, 129:15,
    129:23, 132:9,
    133:24, 207:1
three-year 162:11
three. 43:3
threshold 31:23,
    101:1
throughout 106:11,
    178:14, 205:24
throw 41:11, 41:23,
    42:16
throwing 206:23
thumb 180:22
Tice 118:15
timely 78:24, 168:24

timing 7:4, 7:15,
    184:19
tirelessly 9:3, 9:9
Tocqueville 97:12
Together 12:8, 13:1,
    14:6, 32:12, 36:3,
    39:18, 40:2, 74:7,
    106:23, 107:15,
    115:16, 117:22,
    130:11, 130:13,
    179:20, 200:20,
    207:7, 209:24
tolls 138:13
Tom 58:25
tomorrow 12:25,
    45:9, 46:5, 47:10,
    156:19
tongue 93:17, 93:19
took 92:9, 180:21,
    189:15, 196:22,
    202:15
top 54:7
topics 94:25
total 16:24, 26:2,
    34:8, 55:11,
    103:4, 133:16
totally 7:11
touched 162:22
Tourism 92:18, 156:7
toward 26:22
trade 103:3, 103:4,
    103:17, 104:4,
    107:13, 109:20,
    110:1, 115:18,
    119:12, 119:16,
    120:8, 120:11,
    126:5
traditional 15:3
traditionally 147:3,
    147:5
train 18:16
Transcript 4:47,
    178:16, 179:1,
    211:4
transcription 211:5
transfer 66:25,
    69:13, 69:14,
    76:22, 76:24,
    145:5, 185:18
transferred 66:20,

69:23, 77:3,
185:10
transfers 69:8,
77:6, 81:1
transformation
160:25
transforming 160:17
transition 20:12
transparent 181:17
Transportation 1:47
trap 147:14
trash 87:13, 88:16
Traurig 32:20, 33:5,
36:1, 129:10,
158:21
travel 171:21
travels 210:8
travesty 122:2,
200:23
treat 161:16
treated 118:18
treating 37:12,
100:19
treatment 50:1, 50:3
treats 100:7
trials 54:9
tricky 185:1
tried 91:22, 152:19,
166:16, 196:25
TRO 200:22
trouble 8:4, 121:12
true 43:3, 91:10,
106:2, 109:24,
114:7, 136:12,
136:13, 136:14,
139:3, 143:16,
146:7, 167:6,
177:13, 180:14,
211:5
truly 10:25, 12:22,
13:17, 32:3, 67:6,
67:7, 68:10
trustees 155:6
try 30:6, 40:6,
47:18, 121:17,
126:17, 130:5,
130:6, 148:9,
151:15, 153:7,
179:20, 190:8,
190:9, 196:14,

202:17
trying 31:22, 57:18,
57:25, 94:6,
115:7, 182:18,
188:18, 204:17
tunc 202:18
turn 12:17, 71:17,
89:2, 89:3,
102:11, 117:14,
160:5, 203:18
turnaround 149:5,
157:11
turned 61:6, 88:7,
203:5, 203:20
Turning 27:22, 34:2,
109:4, 144:23,
157:6, 161:3,
188:14
turnover 144:25
turns 111:3
Twelve 63:3
type 18:11, 28:1,
38:3, 55:16, 59:1,
99:12, 107:12,
109:3, 123:25,
124:6, 128:3,
202:2
types 17:17, 107:1,
107:15, 107:18,
112:1, 179:4
typical 23:17,
110:12, 151:8
typically 110:15


< U >
UCF 64:16
Uhland 3:15, 21:12,
21:13, 21:17,
21:22, 30:12,
30:13, 30:14,
31:2, 31:4, 49:10,
49:12, 49:14,
49:22, 51:20,
51:21, 178:24,
199:6, 199:7,
199:8, 199:9,
204:8
ultimate 107:23
ultimately 25:4,

25:10, 25:12,
69:25, 96:9,
106:21, 126:12,
186:6, 186:17,
189:21, 190:14,
190:16, 205:20
uncertain 36:16
unclear 108:16,
126:21
uncompetitive 155:25
uncontested 6:20,
12:15, 13:5,
13:10, 14:15,
44:11
undeniable 78:12
undermines 169:20
undermining 26:4
underneath 39:2
underrepresented
108:5
understand 10:9,
47:11, 47:22,
50:25, 51:2,
55:15, 55:21,
64:6, 70:18,
71:23, 75:2,
84:23, 87:24,
98:10, 103:7,
114:3, 114:23,
115:2, 115:6,
124:23, 159:15,
175:15
understandable 90:12
understanding 17:6,
20:5, 22:6, 23:17,
23:23, 23:24,
25:20, 26:12,
28:13, 47:6, 50:6,
55:25, 56:12,
71:16, 82:4, 207:9
understands 68:7,
85:1, 189:11
understood 17:22,
67:15, 148:11,
204:18
undertaken 150:8
undertaking 19:16,
43:16, 47:20,
61:13
undertakings 137:21,

137:23
undiscounted 28:23
undisputed 109:20,
    132:3
undo 58:14
undoubtedly 78:14
unemployment 88:24
unexpected 190:12
unfortunate 87:25
Unfortunately
    110:24, 133:13,
    169:4
uniform 86:11
Union 122:9, 139:10
unions 73:21, 86:14,
    103:9, 104:5,
    110:7, 112:17,
    122:5
unique 106:10,
    109:14
unit 107:6
United 1:1, 2:19,
    52:25, 72:5, 85:7,
    101:18, 107:17,
    211:6
University 3:42,
    62:25, 68:7,
    72:16, 75:5,
    81:25, 83:16
unjoined 87:22
unknown 160:21
Unless 13:20, 14:19,
    46:9, 47:10,
    48:24, 55:19,
    61:9, 89:11,
    134:1, 144:3,
    146:23, 146:24,
    158:14, 195:10
Unlike 42:18, 53:19,
    97:13, 141:13
unnatural 142:10
unnecessary 101:17,
    160:7
unopposed 41:19,
    49:7
unpaid 45:22, 103:23
unpersons 87:19
unprecedented 72:18,
    83:4, 208:19
unrelated 66:7

unsecureds 166:2
unspecified 177:16
Until 12:24, 118:9,
    122:16, 122:24,
    124:25, 165:1,
    174:5, 182:5,
    184:14, 194:8,
    194:24, 200:19
unusual 17:12,
    191:12
unusually 20:18
update 42:24,
    145:15, 168:17
updated 49:4, 49:7
urban 87:12
urgent 32:2, 32:3,
    196:11
USC 146:22
uses 165:20
using 108:22
UST 104:11
usurping 142:23
utilities 44:23,
    48:14
utility 42:21, 49:2,
    149:4, 158:6,
    160:1, 160:13,
    160:16, 160:17,
    161:4


< V >
v. 139:10
validates 71:16
value 83:25, 130:23,
    131:2, 131:13,
    132:14, 137:5,
    137:12, 139:14,
    139:17, 139:25,
    152:17, 152:24,
    153:2, 153:21,
    154:3, 154:13,
    155:3, 167:16,
    167:21, 168:5
variety 10:18
various 9:12, 10:16,
    33:3, 54:9, 82:13,
    84:7, 117:20
varying 69:18
vast 151:6

vastly 143:1
vehicle 196:20
venues 156:1
verbally 51:8
verge 7:10
version 30:6, 39:12,
    41:7, 49:4, 51:25,
    90:6, 192:17,
    192:19
versus 92:13,
    109:21, 113:8,
    138:12, 138:16
vested 64:14, 73:19
vetted 27:15
VI 91:15, 91:20,
    93:25
viability 86:19,
    94:21
victims 18:17
Victor 3:37, 49:16
video 52:3, 209:23
view 16:15, 17:3,
    34:20, 36:19,
    45:11, 46:3,
    104:20, 107:25,
    156:17, 185:10,
    188:16, 192:10,
    192:12, 194:7
viewed 174:25
views 66:5, 68:16,
    201:24, 201:25
vindicating 61:7
Vinton 139:10,
    153:23, 154:8
violate 142:22
violating 138:16,
    148:17
violation 138:23
virtually 11:7,
    160:3
virtue 19:3, 184:6
vis-a-vis 17:14,
    65:11, 68:23,
    81:5, 106:8
visible 8:25
visit 9:17, 9:18
voice 85:21, 87:19,
    112:13, 114:21,
    126:2, 128:2
voicing 115:3

< W >
Wachtell 129:14,
    161:11
wait 157:8, 165:1
waive 171:18
Walker 211:13,
    211:14
wand 184:6, 201:23
wanted 6:21, 22:12,
    32:21, 37:16,
    41:2, 60:20,
    61:10, 84:24,
    89:10, 94:19,
    134:5, 137:10,
    142:20, 158:25,
    159:13, 164:25,
    171:10, 171:11,
    171:16, 175:11,
    179:9, 186:3,
    189:16, 197:19,
    199:10, 207:4,
    207:6
wanting 89:17,
    108:4, 205:1
wants 45:25, 55:13,
    57:1, 141:18,
    174:22, 196:8,
    197:8, 204:24
warning 151:17
warrant 83:14,
    189:25, 190:16
Washington 53:13
waste 141:22
watch 110:23, 183:3
watched 88:1
watching 180:16
waterfall 133:9
ways 83:21, 105:8,
    107:21, 184:5
weaker 88:21
weakness 108:8
website 22:21,
    22:23, 30:8, 37:3,
    38:24, 42:17,
    42:19, 42:25,
    53:24
Wednesday 209:17
week 10:1, 35:13,

120:21, 171:21,
    174:4, 181:24
weeks 14:13, 21:14,
    30:16, 30:25,
    46:6, 159:12
weigh 179:5
weight 88:24
Weil 145:23, 172:24
Weiss 102:4, 205:4
Welcome 6:5, 76:4
Wharton 205:4
Whatever 24:13,
    25:12, 27:1, 53:6,
    59:18, 97:15,
    128:21, 135:10,
    152:23, 153:1,
    153:18, 156:22,
    167:5, 170:5,
    172:8, 179:23,
    186:5, 205:14
whatnot 152:15
whenever 87:8
whereas 150:16
whichever 63:25
White 181:18,
    191:23, 193:25
WHITMORE 3:29,
    56:19, 56:20,
    59:23
whoever 187:2,
    196:3, 205:20,
    208:1, 208:13
whole 39:25, 43:13,
    139:11, 142:14
wholeheartedly
    158:23
wholly 59:5, 124:20,
    127:7
whom 54:8
Wickersham 116:22,
    190:22
wide 135:6, 164:12
widely 181:11,
    194:12
willing 28:18, 47:3,
    61:12, 61:20,
    123:19, 125:21,
    177:21
willingness 116:8,
    116:16

window 21:2
wise 97:18
wish 7:7, 21:3,
    79:19, 88:3, 88:4,
    117:12, 125:5,
    171:17, 171:18,
    183:1, 195:4
withdraw 50:6, 50:8,
    50:21, 51:7, 60:9,
    71:14
withdrawal 51:14,
    95:22
withdrawing 51:5,
    60:12, 71:7, 71:9
withdrawn 96:1, 96:3
within 10:1, 10:6,
    16:24, 37:25,
    59:5, 72:7, 79:8,
    99:23, 124:13,
    129:7, 148:21,
    177:20, 182:8
Without 11:20, 21:9,
    26:4, 50:9, 50:22,
    59:19, 61:7,
    61:23, 66:15,
    67:4, 81:6, 82:16,
    86:9, 86:10,
    87:16, 89:5,
    94:24, 96:2,
    132:11, 135:10,
    135:11, 138:15,
    139:9, 148:16,
    155:9, 163:16,
    163:21, 171:14,
    194:20, 200:5
withstanding 145:14
witness 141:13
WITNESSES 5:3,
    131:22, 131:23
Wolfe 140:11,
    140:12, 140:15,
    141:13, 155:20,
    156:4, 156:15,
    167:24
women 208:20
wondering 51:7,
    184:16
word 80:7, 166:25,
    180:4, 200:22
words 18:25, 146:20,

147:2, 152:23
worked 147:9
working 9:9, 18:21,
    45:21, 48:7,
    90:18, 93:22,
    160:5, 160:24
works 22:8, 48:10,
    162:3, 185:15,
    193:8
world 16:10, 18:12,
    58:25, 135:7,
    183:18, 194:15
world-class 161:3
worse 88:17
worth 152:16
wrench 181:22
Wright 139:10,
    153:23, 154:8
write 19:13, 25:6,
    151:2, 173:18
writing 80:6
written 15:25,
    16:25, 17:21,
    81:22, 98:7
wrote 176:24, 182:4,
    191:22, 204:15
www 30:7
www.prcreditorscommi
    ttee.com 30:5


< X >
XI 82:7


< Y >
year 85:23, 86:1,
    88:25, 113:20,
    133:3, 133:15,
    133:17, 133:19,
    168:15, 185:16,
    195:22, 203:1,
    203:8, 206:4,
    209:1
years 66:18, 67:2,
    85:22, 87:25,
    109:10, 115:7,
    115:15, 119:1
yesterday 31:11,
    97:2

yielded 161:23
Yocca 95:19
York 6:6, 9:16,
    82:24, 138:12,
    177:2, 177:17,
    177:22, 178:4,
    179:16, 181:18,
    182:14, 185:3,
    185:23, 186:12,
    186:16, 191:25,
    195:21, 195:23,
    196:5, 197:10,
    198:12, 201:7,
    201:8, 208:16,
    209:23
Yossarian 113:12
young 54:10
yourselves 23:1,
    129:7


< Z >
zealously 77:19
zero 109:21, 111:18,
    119:18, 131:2,
    132:15, 152:16
zero. 152:25
Zolfo 17:8, 21:25,
    22:7, 22:12, 23:6