**Hearing Date**: August 22, 2017 at 11:00 a.m. (Prevailing Eastern Time)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------------- x

|  |  |
|---|---|
| In re: | : |
|  | : |
| THE FINANCIAL OVERSIGHT AND | : PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | : Title III |
|  | : |
| as representative of | : Case No. 17-BK-3283 (LTS) |
|  | : |
| THE COMMONWEALTH OF PUERTO RICO *et al.*, | : (Jointly Administered) |
|  | : |
| Debtors.[1] | : |

---------------------------------------------------------------------- x

## OMNIBUS REPLY OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO VARIOUS OBJECTIONS AND RESPONSES TO COMMITTEE MOTION FOR ORDER, UNDER BANKRUPTCY RULE 2004, AUTHORIZING DISCOVERY PROGRAM WITH RESPECT TO CERTAIN CAUSES OF PUERTO RICO FINANCIAL CRISIS

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474).

## TABLE OF CONTENTS

Page

BACKGROUND ....................................................................................................... 1

ARGUMENT ............................................................................................................. 9

I.    PROMESA GRANTS COMMITTEE SPECIFIC AUTHORITY TO PURSUE
      DISCOVERY PROGRAM, AND FACT THAT OVERSIGHT BOARD COULD
      PURSUE SIMILAR INVESTIGATIONS IS IRRELEVANT ......................... 9

      A.    Committee Is Statutorily Authorized to Commence Discovery Program,
            and Has Broader Authority Than Oversight Board ............................... 9

      B.    Elephant in the Room – Oversight Board's Various Conflicts Mean That
            Committee, Not Oversight Board, Is Best Placed to Conduct Investigation
            into Puerto Rico Financial Institutions ................................................ 14

      C.    Discovery Program Would Not Interfere with Any Investigative Work
            Performed by Oversight Board, and Would Create Minimal Additional
            Burden .................................................................................................. 18

II.   SCALE OF POTENTIAL MISDEEDS BEING INVESTIGATED PROVIDES
      AMPLE CAUSE FOR DISCOVERY PROGRAM ........................................ 20

      A.    Committee Has Right to Investigate Potential Claims and Causes of
            Action .................................................................................................... 20

      B.    Discovery Under Bankruptcy Rule 2004 Is Not Limited to Potential
            "Claims" and Encompasses Any Matter Affecting Administration of
            Debtor's Estate or Formulation of a Plan ............................................ 21

      C.    Significant Indicia of Potential Misconduct Exists, Highlighting
            Importance of Discovery Program ........................................................ 22

      D.    GDB's Reliance on Pending Proceeding Rule Misses Mark ............... 26

III.  DISCOVERY REQUESTS ARE CLOSELY TIED TO ISSUES BEING
      INVESTIGATED AND COMMITTEE'S AUTHORITY ............................... 27

      A.    There Is No Basis for Santander's Fee-Shifting Request ................... 27

      B.    Complaints Regarding Scope of Discovery Are Premature ................ 28

      C.    In Any Event, Requests Issued Here Are Targeted at Potentially
            Questionable Activities of Puerto Rico Financial Institutions............. 28

IV.   RETIREE COMMITTEE'S REQUEST FOR JOINT INVESTIGATIONS
      SHOULD BE DENIED, AS BOTH COMMITTEES ARE CAPABLE OF
      COOPERATING WITHOUT BEING FORCED TO DO SO ......................... 29

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Addison Cmty. Hosp. Auth.*,
175 B.R. 646 (Bankr. E.D. Mich. 1994) ................................................................20

*In re AOG Entm't*,
558 B.R. 98 (Bankr. S.D.N.Y. 2016) ......................................................................12

*In re Barnwell Cty. Hosp.*,
459 B.R. 903 (Bankr. D.S.C. 2011) ........................................................................20

*Biondi v. Scrushy*,
820 A.2d 1148 (Del. Ch. 2003), *aff'd sub nom. In re HealthSouth Corp.*
*S'holders Litig*, 847 A.2d 1121 (Del. 2004) ...........................................................17

*In re Buccaneer Resources LLC*,
No. 14-60041, 2015 WL 8527424 (Bankr. S.D. Tex. Dec. 10, 2015) .....................27

*In re Buick*,
174 B.R. 299 (Bankr. D. Colo. 1994) .....................................................................21

*In re Caesars Entm't Operating Co.*,
No. 15-01145 (ABG) (Bankr. N.D. Ill. Jan. 15, 2015) ...........................................10

*In re Catholic Bishop of Spokane*,
329 B.R. 304 (Bankr. E.D. Wash. 2005), *rev'd in part sub nom. Comm. of*
*Tort Litigants v. Catholic Diocese of Spokane*, 364 B.R. 81 (E.D. Wash. 2006) ...................12

*Cohen v. Morgan Schiff & Co. (In re Friedman's, Inc.)*,
385 B.R. 381 (S.D. Ga. 2008), *vacated in part on other grounds on*
*reconsideration,* 394 B.R. 623 (S.D. Ga. 2008) .....................................................18

*In re Countrywide Home Loans*,
384 B.R. 373 (Bankr. W.D. Pa. 2008) .............................................................19, 26

*In re Enron Corp.*,
281 B.R. 836 (Bankr. S.D.N.Y. 2002) ............................................................1, 9, 12

*In re Fanuzzi*,
No. 12-60143-11, 2012 WL 1390634 (Bankr. D. Mont. Apr. 20, 2012) .................19

*In re Friedman's, Inc.*,
356 B.R. 779 (Bankr. S.D. Ga. 2005) .....................................................................10

*Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong,*
66 A.3d 963 (Del. Ch. 2013)........................................................................16

*Gesoff v. IIC Indus.,*
902 A.2d 1130 (Del. Ch. 2006)....................................................................17

*In re Lehman Bros. Holdings Inc.,*
No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 15, 2008)..........................1, 9

*Matter of M4 Enters.,*
190 B.R. 471 (Bankr. N.D. Ga. 1995) .........................................................19

*In re MF Global Holdings Ltd.,*
465 B.R. 736 (Bankr. S.D.N.Y. 2012) .........................................................12

*In re New Century TRS Holdings, Inc.,*
407 B.R. 558 (Bankr. D. Del. 2009) ............................................................10

*In re Norman,*
No. 06-70859-A, 2006 WL 3053309 (Bankr. E.D. Va. Oct. 24, 2006)....................19

*In re Oracle Corp. Derivative Litig.,*
824 A.2d 917 (Del. Ch. 2003).....................................................................16

*In re Orchard Enters., Inc.,*
88 A.3d 1 (Del. Ch. 2014)...........................................................................16

*In re Pub. Serv. Co. of New Hampshire,*
91 B.R. 198 (Bankr. D.N.H. 1988) ...........................................................7, 21

*In re Refco Inc.,*
No. 05-60006 (RDD) (Bankr. S.D.N.Y. Oct. 17, 2015) ...........................1, 9

*In re Sheetz,*
452 B.R. 746 (Bankr. N.D. Ind. 2011)........................................................23

*In re Summit Corp.,*
891 F.2d 1 (1st Cir. 1989)...........................................................................23

*In re Texaco,*
79 B.R. 551 (Bankr. S.D.N.Y. 1987) ..........................................................12

*In re Tribune Co.,*
No. 08-13141 (KJC) (Bankr. D. Del. Dec. 8, 2008) ...................................10

*In re Vantage Petroleum Corp.,*
34 B.R. 650 (Bankr. E.D.N.Y. 1983)...........................................................23

*In re Washington Mut., Inc.*,
    408 B.R. 45 (Bankr. D. Del. 2009) ...................................................................................26

*In re Williams Commc'ns. Grp.*,
    281 B.R. 216 (Bankr. S.D.N.Y. 2002) .............................................................................12

*In re Youk-See*,
    450 B.R. 312 (Bankr. D. Mass. 2011) .......................................................................23, 28

**Statutes**

11 U.S.C.
    § 544...................................................................................................................................20
    § 545...................................................................................................................................20
    § 547...................................................................................................................................20
    § 548...................................................................................................................................20
    § 549(a)..............................................................................................................................20
    § 550...................................................................................................................................20
    § 926(a)..............................................................................................................................20
    § 1102...................................................................................................................................6
    § 1103............................................................................................................................*passim*
    § 1103(c)............................................................................................................................11
    § 1103(c)(2).............................................................................................................6, 11, 13
    § 1106...................................................................................................................................6
    § 1106(b)............................................................................................................................10
    § 1109...................................................................................................................................6
    § 1111(b)..............................................................................................................................6

48 U.S.C.
    § 2101-2241..........................................................................................................................5
    § 2124(o)............................................................................................................................16

Puerto Rico Oversight Management and Economic Stability Act ("PROMESA")

§ 104(a) ................................................................................................................11
§ 104(f) ................................................................................................................11
§ 104(o) ..............................................................................................6, 10, 13, 16
§ 104(p) ..................................................................................................6, 11, 13
§ 201 ...................................................................................................................17
§ 202 ...................................................................................................................17
§ 203 ...................................................................................................................17
§ 204 ...................................................................................................................17
§ 211 ...................................................................................................................17
§ 301 ............................................................................................................5, 11, 20
§ 301(a) ...............................................................................................................6
§ 301(c)(7) ..........................................................................................................6
§ 305 ...................................................................................................................20
§ 307(a) ...............................................................................................................1
§ 310 ...................................................................................................................1
§ 503(c) ...............................................................................................................17
§ 601(g) ...............................................................................................................17

## Other Authorities

Bankruptcy Rule
R 2004 ...................................................................................................... *passim*
R 2004(b) ...........................................................................................................7
R 2004(c) ...........................................................................................................11

Daniel Marans, *Two Of Puerto Rico's New Overlords Are Accused Of Helping
    Create Its Debt Crisis*, HUFFINGTON POST (Dec. 17 2016) (available at
    http://www.huffingtonpost.com /entry/puerto-rico-control-board-debt-
    crisis_us_58544d53e4b0390447088ce4) .............................................................25

Fed. R. Civ. P. 26 ....................................................................................................28

FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO, *Annual
    Report, Fiscal Year 2017* (available at https://juntasupervision.pr.gov/wp-
    content/uploads/wpfd/50/597eb4ede89ad.pdf) ...............................................4, 8, 15

FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO, *Request for
    Proposal – Independent Investigation Team* (August 16, 2017) (available at
    https://juntasupervision.pr.gov/wp-
    content/uploads/wpfd/50/59947faa9f94b.pdf) .................................................4

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD BYLAWS, section 3.9
    (available at https://juntasupervision.pr.gov/wp-
    content/uploads/wpfd/50/58b4ab70c6217.pdf ) ...............................................16

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, Carlos M.
Garcia (available at https://juntasupervision.pr.gov/index.php/en/carlos-m-
garcia-2/) ................................................................................................................25

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, *General
Release Regarding the Investigation of the Puerto Rico Debt* (August 2, 2017)
(available at https://juntasupervision.pr.gov/index.php/en/documents) .....................3, 4, 6, 22

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, José Carrión Financial
Disclosure as of Dec. 31 2016 (released July 13, 2017) (available at
https://juntasupervision.pr.gov/wp-
content/uploads/wpfd/50/596800fadb9cc.pdf) ..........................................................2

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, 9th Open Meeting Video
(Aug. 4, 2017) (available at
https://livestream.com/fombpr/events/7635708/videos/160794392)........................2

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, Independent Contractor
Services Arrangement (December 1, 2016) (available at
https://juntasupervision.pr.gov/wp-
content/uploads/wpfd/50/58b612eae3d79.pdf)..........................................................25

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, Press Release – Oversight
Board Issues Request for Proposal for Independent Investigation Team
(August 16, 2017) (available at https://juntasupervision.pr.gov/wp-
content/uploads/wpfd/49/59948024bacaf.pdf) .................................................3, 15

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, Unanimous Written Consent
Designating a Board Special Committee to Investigate the Puerto Rico Debt
(Aug. 6, 2017) (available at https://juntasupervision.pr.gov/wp-
content/uploads/wpfd/50/598a41caab253.pdf)..........................................................2, 14, 16

FINRA, BrokerCheck (available at
https://brokercheck.finra.org/individual/summary/4689916)..................................25

GOVERNMENT DEVELOPMENT BANK, 2012 Puerto Rico Credit Conference
(available at http://www.gdb-pur.com/PRCC2012/PRCConference.html)...........................25

GOVERNMENT DEVELOPMENT BANK, Gallery of Presidents – Alfredo Salazar
(available at http://www.gdb-pur.com/about-
gdb/pastpresidents/AlfredoSalazar.html).................................................................25

GOVERNMENT DEVELOPMENT BANK, Gallery of Presidents – Juan Batlle
(available at http://www.gdb-pur.com/about-
gdb/pastpresidents/JuanCBatlle.html) .....................................................................25

GOVERNMENT DEVELOPMENT BANK, *Government Development Bank for Puerto Rico Announces Its New Management Team* (available at http://www.gdb-pur.com/communications/PressReleases/2009-01-22-NewGDB-ManagementTeam.pdf) ..................................................................................................25

HEDGE CLIPPERS, *How Santander's Revolving Door with Puerto Rico's Development Bank Exacerbated a Fiscal Catastrophe for the Puerto Rican People*, available at http://hedgeclippers.org/wp-content/*uploads*/2016/12/20161025_HedgeClippers_ReportPR_v3-3.pdf ............................18

Joanisabel Gonzalez & Jose A. Delgado, *A Boom in Times of Crisis*, EL NUEVO DIA (May 2, 2017) (available at https://www.elnuevodia.com/english/english/nota/aboomintimesofcrisis-2316914/) .................................................................................................................25

NOTICEL, *Carrión sobre la auditoría: "es una pérdida de tiempo,"* June 24, 2017 (available at http://www.noticel.com/noticia/204703/carrion-sobre-la-auditoria-es-una-perdida-de-tiempo-video.html) ......................................................3

Popular, Inc. 2007 Proxy Statement (available at https://www.sec.gov/Archives/edgar/data/763901/000095014407002272/g05906def14a.htm) ....................................................................................................2

POPULAR, Javier D. Ferrer Fernandez (available at http://newsroom.popular.com/leadership/chief-legal-officer/javier-d-ferrer-fernandez) ...........................................................................................................25

POPULAR, Notice of 2016 Annual Meeting of Stockholders and Proxy Statement (available at http://annualreport.popular.com/assets/55622_016_web_bmk.pdf) .................................................25

REUTERS *Puerto Rico appoints head of Government Development Bank*, (Dec.11, 2012), available at http://www.reuters.com/article/usa-puerto-rico-idUSL1E8NBF3B20121211 ...........................................................................25

*Santander BanCorp Announces New Appointments* (available at https://www.sec.gov/Archives/edgar/data/1099958/000109995801500014/press_release.htm) ...........................................25

Matthias Rieker, WALL STREET JOURNAL, *Puerto Rico Bank Family Members Lose Claim* (Feb. 3,2014) (available at https://www.wsj.com/articles/puerto-rico-bank-family-members-lose-claim-1391443238) .................................................2

The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico
(the "Committee") hereby submits this omnibus reply in support of the *Motion of Official
Committee of Unsecured Creditors for Order, Under Bankruptcy Rule 2004, Authorizing
Discovery Program With Respect to Certain Causes of Puerto Rico Financial Crisis* [Docket No.
706] (the "Motion").[1]

## **Background**

1.      The myriad and vociferous responses to the Motion aptly demonstrate why the
Committee must conduct the Discovery Program outlined by its Motion.  Those responses
attempt to portray the Court's sole choice as between allowing the Committee's investigation to
go forward or allowing the investigation proposed by the Financial Oversight and Management
Board for Puerto Rico (the "Oversight Board") to go forward.  That is a false choice.  The
Oversight Board is free to conduct its investigation, and the Motion only seeks authority for the
Committee to commence its **own** investigation—one which is specifically permitted by Congress
and consistent with the Committee's fiduciary duties to its hundreds of thousands of constituent
creditors.  Moreover, the responses have cited no cases, and the Committee is not aware of any
cases, where a court has refused to grant a Bankruptcy Rule 2004 motion by an official creditors'
committee or has directed an official committee to stand down merely because another
investigation was underway or was soon to be commenced.  To the contrary, the same arguments
made by the objections here have been rejected repeatedly in large, well-known cases such as
*Enron*, *Refco*, and *Lehman Brothers* (just to name a few) where an examiner (which is really the
Oversight Board's function here) was appointed to investigate the issues which an official
committee was also investigating.   As in those cases, the Court should reject the invitation to

---

[1]      Capitalized terms used but not otherwise defined in this Reply have the meanings set forth in the Motion.

deny the Committee's investigation.

2.      As if these precedents were not enough, the justification for refusing to vest

**exclusive** investigatory authority with the Oversight Board is established by its fumbling actions

over the past few weeks.  The day before the objection deadline to the Motion, the conflicted

Oversight Board finally roused itself from its one year slumber to issue a public announcement

that it will conduct an investigation into the Commonwealth's bond issuing practices.  Then,

during a two-minute discussion in its two hour long open meeting on August 4, 2017, the

Oversight Board announced the composition of a purportedly independent "special" committee

of four members.[2]  When deciding the membership of this "special" committee, the Oversight

Board was apparently oblivious to the fact that one of its members, Chairman José Carrión III, is

a scion of the family that founded Banco Popular, the son of a former Popular Inc. board

member, a relative of the current Executive Chairman of the Board of Popular Inc., and the

founder of an insurance firm which has received millions per year in commissions from Popular

Inc.[3]—and of course Banco Popular (as defined below) is one of the targets here.

3.      Apparently only after counsel for the Committee brought this glaring conflict to

---

[2]   *See* FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, 9th Open Meeting Video (Aug. 4, 2017) (available at https://livestream.com/fombpr/events/7635708/videos/160794392).  The Board formalized this announcement through a resolution two days later, on August 6, 2017.  *See* FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, Unanimous Written Consent Designating a Board Special Committee to Investigate the Puerto Rico Debt (Aug. 6, 2017) (available at https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/598a41caab253.pdf) (the "August 6 Resolution").

[3]   Matthias Rieker, WALL STREET JOURNAL, *Puerto Rico Bank Family Members Lose Claim* (Feb. 3,2014) (available at https://www.wsj.com/articles/puerto-rico-bank-family-members-lose-claim-1391443238); *see also* Popular, Inc. 2007 Proxy Statement (available at https://www.sec.gov/Archives/edgar/data/763901/000095014407002272/g05906def14a.htm) (". . . **Carrión, Laffitte & Casellas, Inc. earned commissions of approximately $1,642,000 for the institutional insurance business of [Popular]** and its subsidiaries. Mr. José B. Carrión, III, son of José B. Carrión Jr., a director of the Corporation, is a significant shareholder and the president of Carrión, Laffitte & Casellas, Inc.") (emphasis added). On top of all the Banco Popular connections, it also appears from his financial disclosure forms that Carrión III currently owns stock in Santander.  *See* FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, José Carrión Financial Disclosure as of Dec. 31 2016 (released July 13, 2017) (available at https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/596800fadb9cc.pdf).

the Oversight Board's attention did it take any action—issuing a press release two days ago removing Carrión from the "special" committee in order to "eliminate any distractions" due to his "family's ties to Banco Popular."[4]  One can only imagine what the Oversight Board would have done had this issue not been raised by the Committee.  What does not need much imagination to discern, however, is that the Oversight Board has failed to conduct any sort of preliminary independence analysis which would accompany a credible investigation.

4.      The Oversight Board's haphazard announcement and its repeated misses do not reflect a well thought out investigation, and are plainly nothing more than defensive reactions to the Motion.  The Oversight Board's real view is best summarized by a June 24, 2017 quote from its Chairman, Mr. Carrión, issued **before** the Committee filed its Motion:

> "If someone wants to audit the debt it can be done by the private sector . . . **I think that it is a waste of time**."[5]

5.      Despite this stated lack of interest, the Oversight Board now argues that it is the only proper party to conduct an investigation into the issues raised by the Committee's Motion simply because it has now announced "**its intention** to conduct a comprehensive investigation of Puerto Rico's debt and its relationship to the financial crisis."[6]  Importantly, the investigation proposed by the Committee is not an ancillary aspect of these cases.  Rather, a thorough and credible review of the activities and potential culpability of the Puerto Rico Financial Institutions (as defined below) and their employees is central to the task in these cases.  The Oversight Board

---

[4]   *See* FINANCIAL OVERSIGHT AND MANAGEMENT BOARD, Press Release – Oversight Board Issues Request for Proposal for Independent Investigation Team (August 16, 2017) (available at https://juntasupervision.pr.gov/wp-content/uploads/wpfd/49/59948024bacaf.pdf) (the "August 16 Press Release").

[5]   NOTICEL, *Carrión sobre la auditoría: "es una pérdida de tiempo,"* June 24, 2017 (available at http://www.noticel.com/noticia/204703/carrion-sobre-la-auditoria-es-una-perdida-de-tiempo-video.html) (linking to video of interview with *Carrión*) ("Si alguien quiere auditar la deuda la puede hacer el sector privado . . . Yo pienso que es una pérdida de tiempo.").  A certified translation of this article is attached as Exhibit B.

[6]   FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, *General Release Regarding the Investigation of the Puerto Rico Debt* (August 2, 2017) (available at https://juntasupervision.pr.gov/index.php/en/documents) (the "August 2 Press Release").

admits as much in its press release when it states that such an investigation is "integral" to

restoring "fiscal balance and economic opportunity" in Puerto Rico, but the investigation

outlined in the Oversight Board's August 16, 2017 announcement would not address critical

issues raised by the Motion.[7]

6.      The one fact the Oversight Board's recent actions do make clear is that it has not

done anything to date.  A **year** after the Oversight Board was formed, the **only** step the Oversight

Board had taken was the adoption of "framework procedures" for a possible future investigation.

This situation does not arise out of a lack of resources.  The Oversight Board spent $31 million

in the first ten months of its existence, but its July 30, 2017 Annual Report is silent on any plans

to commence an investigation into the Puerto Rico Financial Institutions.[8]

7.      The reason for the Oversight Board's inaction is self-evident and demonstrates

why it cannot be the **sole** party to conduct this investigation: too many of its members have deep

ties to GDB, Santander and Banco Popular (who operated a revolving door of executives among

themselves), and therefore cannot conduct a disinterested investigation.  The Oversight Board's

attempt to establish a "special" committee acknowledges this fact, but the initial inclusion of

individuals like Carrión and the structure of this subcommittee (which cannot decide to pursue

claims without the full board's authorization) is troubling.  Indeed, the Oversight Board's August

16, 2017 request for proposal reflects its failure to grasp these issues—saying nothing about the

need to investigate claims arising from potential conflicts of interest or breaches of duties owed

to the Commonwealth or its creditors, which would be one of the subjects of the Committee's

---

[7]   *See supra*, note 6 (August 2 Press Release).

[8]   *See* FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO, *Annual Report, Fiscal Year 2017* (available
at https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/597eb4ede89ad.pdf)

investigation.[9]   One can only wonder whether this omission was due to the initial involvement of Carrión.

8.      The targets' other responses are no more convincing.  The objections by the Santander entities (collectively, "<u>Santander</u>"), the Banco Popular entities (collectively, "<u>Banco Popular</u>"), and the Government Development Bank for Puerto Rico (the "<u>GDB</u>")[10] (collectively, the "<u>Puerto Rico Financial Institutions</u>") all claim to favor an investigation by the Oversight Board, because the Oversight Board has shown no interest in investigating them and —due to its conflicts—is the institution least likely to seriously scrutinize their conduct.  It is no surprise they claim the Oversight Board is the **sole** entity with authority to scrutinize them.  The objection of the GDB (through its successor, AAFAF) rings particularly hollow in this regard, as numerous AAFAF senior officers have deep ties to Santander and have every incentive to defend their former employer and prevent scrutiny of it.

9.      In any event, the Oversight Board and the Puerto Rico Financial Institutions are wrong to claim that the Oversight Board has exclusive authority to conduct the activities the Committee contemplates.  While the Oversight Board certainly has limited authority to investigate retail selling practices for Puerto Rico bonds, Congress **also granted the Committee specific statutory authority to investigate the "acts, conduct, assets, [and] liabilities . . . of the debtor . . . [or] any other matter relevant to the case or formulation of a plan."** 11 U.S.C. 1103.[11]   The Oversight Board's narrow grant of authority does not supplant the

---

9       *See* FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO, *Request for Proposal – Independent Investigation Team* (August 16, 2017) (available at https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/59947faa9f94b.pdf) (the "<u>August 16 RFP</u>").

10      The GDB's current successor-in-interest is the Puerto Rico Fiscal and Financial Advisory Authority (known by its Spanish acronym, "<u>AAFAF</u>").

11      11 U.S.C. § 1103 is made applicable to these proceedings by section 301 of the Puerto Rico Oversight, Management, and Economic Stability Act ("<u>PROMESA</u>"), which has been codified at 48 U.S.C. § 2101-2241.

Committee's own investigative authority, nor can it supplant the Committee's fiduciary duties to its constituents.

10.      For example, the issues that are within the Committee's purview are significantly broader than the limited investigatory authority assigned to the Oversight Board under PROMESA.  The Committee's investigation would focus on, among other things, potential malfeasance vis-à-vis the Commonwealth.  That topic is much broader than the topic covered by section 104(o) of PROMESA and therefore a "preemption" argument has no relevance as to that topic of investigation.[12]  Section 104(o) of PROMESA grants the Oversight Board authority to review retail bond selling practices, allowing the Oversight Board to investigate the "disclosure and selling practices in connection with the purchase of bonds issued by a covered territory[.]"  In contrast, the Committee's investigatory powers are far broader, touching on "the acts, **conduct**, assets liabilities  . . . **and any other matter relevant to the case or formulation of a plan**."  11 U.S.C. § 1103 (emphasis added).   Moreover, the end goals of an investigation under PROMESA section 104(o) differ significantly from the goals of an investigation by the Committee as a fiduciary.  The Oversight Board's investigatory aim is to "make public the findings of any investigation referenced in subsection (o)."  *See* section 104(p) of PROMESA.[13]  In contrast, the Committee has a separate and broader statutory role—maximizing the value of

---

[12]      The Oversight Board argues that, based on PROMESA section 301(c)(7),  it has the powers of a trustee in the case.  *See* Oversight Board Objection, at para. 2.  But section 301(c)(7) does not end the inquiry.  The scope of that power is restricted to what Congress decided to ether grant to the Oversight Board outright (i.e., section 104(o)) **or** import into PROMESA from the Bankruptcy Code.  Unfortunately for the Oversight Board, Congress decided **not** to import into PROMESA the broad investigative powers that a chapter 11 trustee has under section 1106 of the Bankruptcy Code, which states that "[a] trustee shall . . . investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan."  *See* section 301(a) of PROMESA (incorporating among other provisions "1102, 1103, 1109, 1111(b)" of the Bankruptcy Code and notably omitting section 1106).  In contrast, Congress granted those broad investigative powers to the Committee by incorporating section 1103(c)(2) into PROMESA.  Therefore, the Oversight Board's argument that it has investigative powers beyond the narrow scope described in section 104(o) is not supported by the applicable statutes.  Any preemption argument based on its "trustee" status suffers from the same infirmities.

[13]      *See also supra*, note 6 (August 2 Press Release).

the estate and increasing recoveries for creditors (through affirmative claims or claim
disallowance or claim subordination).  These objectives are inherently different, and the
Committee's unique role will bring added focus and relevance to its investigation in the context
of this Title III Case.

11.     In addition, in the context of the ongoing Commonwealth-COFINA Dispute, the
Committee was designated as the Commonwealth's agent by order dated August 10, 2017.  *See*
Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute [ECF
No. 996] (the "Commonwealth-COFINA Dispute Stipulation").  In this capacity the Committee
will already be evaluating some of the same facts that the Discovery Program seeks to evaluate
with respect to the issuance of the COFINA debt.  Because this discovery will be ongoing, the
Committee should also be free to use such discovery to investigate potential malfeasance.

12.     The severity and scale of the potential misconduct here also provides ample cause
for the Committee's commencement of the Discovery Program, regardless of whether the
Committee has standing to pursue claims in its own right, or whether it pursues claims at all.
Bankruptcy Rule 2004's scope is "unfettered and broad," and it provides that parties in interest
may seek *any* materials pertinent to the administration of the case.[14]  Here, the issues to be
investigated through the Discovery Program and the potential breaches of duties or malfeasance
by the Puerto Rico Financial Institutions which the Discovery Program may uncover could
impact the Commonwealth Title III case in a number of ways—including by leading to the
commencement of affirmative claims for relief or by providing grounds for the subordination or
disallowance of claims brought by the Puerto Rico Financial Institutions or other parties.

---

[14]     Bankruptcy Rule 2004(b) ("The examination of an entity under this rule may relate to . . . any matter which may
affect the administration of the debtor's estate."); *see also In re Pub. Serv. Co. of New Hampshire*, 91 B.R. 198, 199
(Bankr. D.N.H. 1988) ("The scope of discovery afforded under Bankruptcy Rule 2004 is 'unfettered and broad.'").

13.     For all these reasons, the Discovery Program proposed in the Motion should go forward under the Committee's direction.  The Committee is fully prepared to consult with the Oversight Board and to share information gathered with the Oversight Board to minimize any duplication.  Further, there are doubtless other important investigatory efforts that a non-conflicted Oversight Board can and should lead.  Here, however, placing the Oversight Board in sole control of the Discovery Program—in addition to the myriad other vital work the Oversight Board must perform in the near term—can only cause delay and inefficiencies.  Not only will the Oversight Board lack the real-time benefit of what the Committee learns in its COFINA-related work, creating inefficiency and duplication of effort, but the Oversight Board will be burdened by the need to operate an unconflicted special committee and hire new (and unconflicted) advisors for that committee who know nothing of the matters at hand in these complex and fast-moving cases.  Indeed, the August 16 request for proposal indicates that submissions are due on August 23, 2017[15]—requiring weeks more to select from the proposals, negotiate an agreement, and bring those professionals up to speed.  The Committee is obviously the faster and less expensive option here.

14.     The remaining objections may be disposed of quickly.  Concerns about the proposed document requests are both premature and misplaced.  As the Committee noted in the Motion, objections should first be made on a request-by-request basis through the ordinary meet-and-confer and objection and response process.  The Committee will then address those objections in light of the fact that the requests seek information and materials highly relevant to the question of whether the Puerto Rico Financial Institutions, or individuals associated with the Puerto Rico Financial Institutions, violated duties to the Commonwealth or its creditors.  At this

---

[15]     *See supra* note 9 (August 16 RFP).

stage, the Committee is entitled to issue these requests, with objections as to scope and burden to be addressed in the normal course.  The process will never occur at all, however, unless the Court first authorizes the Discovery Program.[16]

**Argument**

I.   **PROMESA GRANTS COMMITTEE SPECIFIC AUTHORITY TO PURSUE DISCOVERY PROGRAM, AND FACT THAT OVERSIGHT BOARD COULD PURSUE RELATED, BUT NARROWER, INVESTIGATION IS IRRELEVANT**

    A.   **Committee Is Statutorily Authorized to Commence Discovery Program, and Has Broader Authority Than Oversight Board**

15.   **None of the objections have identified a case, and the Committee is aware of no such cases, where a court denied an official committee's Bankruptcy Rule 2004 motion on the basis that a parallel investigation was ongoing.**  Indeed, the objections' primary argument—that the Committee should stand down simply because another investigation is underway—has been squarely rejected in numerous high-profile cases.  *See In re Enron Corp.*, 281 B.R. 836, 842-43 & n.7 (Bankr. S.D.N.Y. 2002) (noting that committee, examiner, and debtor, were conducting separate contemporaneous investigations and the existence of a pending investigation "**does not preclude the use of Rule 2004 by a party of interest"**) (emphasis added); *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 15, 2008) (ECF Nos. 1143, 2477 and 2569) (appointing examiner and directing examiner to meet and confer with parties in interest to develop a plan to avoid duplication) (attached as Exhibits C-E); *In re Refco Inc.*, No. 05-60006 (RDD) (Bankr. S.D.N.Y. Oct. 17, 2015) (ECF No. 1487 at 2-3) (ordering appointment of examiner who, with the creditors' committee, "shall cooperate and

---

[16]   The request from the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "Retiree Committee") to consolidate its anticipated discovery program with the Committee's program is unnecessary.  The Committee has already agreed to share the fruits of its discovery with the Retiree Committee and the COFINA Agent (as defined below), and there is no indication that this consensual cooperation will turn out to be insufficient or inadequate to meet the legitimate needs of interested parties.  There is only one mandatory official committee in this case and that is the Committee, and the Court should decline an invitation to complicate the discovery process.

coordinate their efforts to assure, **to the extent possible**, that their investigations are not **unduly
duplicative**" and providing that nothing in the order "**shall diminish the powers and authority
of the . . . Creditors Committee . . . including the powers to investigate transactions and
entities . . . .**") (emphasis added) (attached as Exhibit F); *In re New Century TRS Holdings, Inc.*,
407 B.R. 558, 567 (Bankr. D. Del. 2009) (permitting creditors' committee and bankruptcy
examiner to conduct separate investigations); *In re Friedman's, Inc.*, 356 B.R. 779, 783 (Bankr.
S.D. Ga. 2005) (noting that both committee and debtor had commenced "investigations into a
number of transactions and occurrences in which [accounting firm] was an active participant");
*In re Caesars Entm't Operating Co.*, No. 15-01145 (ABG) (Bankr. N.D. Ill. Jan. 15, 2015) (ECF
Nos. 369, 442, 541, 584, 655, 901, 903-04, 906-07, 1521, 1551, and 1673) (granting noteholders'
committee's and claimholders' committees' motions for Bankruptcy Rule 2004 examinations
over objections by debtors and other parties that examinations would be duplicative due to the
appointment of an examiner);[17] *In re Tribune Co.*, No. 08-13141 (KJC) (Bankr. D. Del. Dec. 8,
2008) (ECF No. 4120, at 3, 6) (ordering appointment of examiner who shall "meet and confer
with, [among others, creditors' committee]" and providing that nothing "shall diminish the
powers and authority of the . . . Committee . . . including the powers to investigate transactions
and entities") (attached as Exhibit I).   Notably, the examiner's authority to investigate was far
clearer in those cases than the Oversight Board's authority here.  Unlike section 104(o) of
PROMESA, which states that the Oversight Board ***"may"*** investigate disclosure and retail
practices, section 1106(b) of the Bankruptcy Code (which is **not** applicable to PROMESA) states
that a bankruptcy examiner "shall" be appointed (if some statutory thresholds are met, as they

---

[17]     The orders granting these examinations, located in ECF docket entries 584 and 1673, are attached as Exhibits G and
H.  The remaining docket entries are available upon request.

were in all these cases) to conduct an appropriate investigation.  As such, there is no justification

for the claim that section 104(o) of PROMESA preempts the Committee's request here.

16.      Santander, the Oversight Board, and the GDB observe that, pursuant to sections

104(o) and 104(p) of PROMESA, the Oversight Board is entitled to investigate certain issues

relating to the retail sale of Commonwealth Bonds and publish a report.  **That authority is not**

**exclusive, however, and Congress never directed that the Oversight Board is the only party**

**entitled to investigate these issues.**  By incorporating section 1103 of the Bankruptcy Code in

PROMESA, Congress granted the Committee the authority to investigate "the **acts, conduct,**

**assets, liabilities, and financial condition of the debtor**, the operation of the debtor's business

. . . **and any other matter relevant to the case or to the formulation of a plan**."  11 U.S.C. §

1103(c)(2) (applied to these cases by section 301 of PROMESA) (emphasis added).

17.      Indeed, the Committee is required to commence investigations into potential

wrongdoing, as it has a fiduciary duty to zealously represent the interests of its constituent

creditors.  *See* Collier on Bankruptcy ¶ 1103.05 (Alan N. Resnick & Henry J. Sommer eds., 16th

ed. 2017) ("Although section 1103(c) states that a committee 'may' exercise these powers, the

members of a committee have a fiduciary duty to their constituents and *are obligated* to exercise

those powers as necessary to protect the interests of those constituents.") (emphasis added).  The

Oversight Board's attempt to point to sections 104(a) and (f) of PROMESA—which grant

subpoena power and allow it to penalize Commonwealth officials who provide false testimony—

is a red herring.  *See* Oversight Board Objection, para. 2.  Under Bankruptcy Rule 2004(c), the

Committee has similar powers, enabling it to issue compulsory subpoenas, compel the

attendance of any witness (not just Commonwealth employees or officials), and request

sanctions—as always—for a party's failure to comply.

18.      The reason for this structure is simple—the Committee has important, separate, and statutorily-protected interests that differ in significant ways from the Oversight Board's interests and purpose.  As courts have noted, "[t]he right to investigate the financial affairs of the debtor, including the assets of the estate, would have limited usefulness if a committee were not empowered to disagree with the debtor's characterization of its assets and bring that disagreement to the Bankruptcy Court for resolution."  *See In re Catholic Bishop of Spokane,* 329 B.R. 304, 314 (Bankr. E.D. Wash. 2005), *rev'd in part sub nom. Comm. of Tort Litigants v. Catholic Diocese of Spokane*, 364 B.R. 81 (E.D. Wash. 2006).

19.      Even the remaining cases cited by Santander and the GDB prove the point that creditors' committees occupy a special, statutory role.  No case cited in any of the oppositions restricts the right of a **committee** to conduct discovery; to the contrary, these authorities reflect the primacy of a committee's role.[18]  Though the GDB and Santander cite *In re Enron Corp.*, 281 B.R. at 842-43, that case concludes that multiple parties **can** conduct parallel investigations and "[t]he fact that an investigation by a creditors' committee, debtor, examiner, or trustee is ongoing regarding the subject matter of a proposed Rule 2004 examination **does not preclude the use of Rule 2004 by a party of interest**."  *Id.* at 843 n. 7 (emphasis added).  The objectors also read far too much into the temporary denial of discovery in *In re MF Global Holdings Ltd.*, 465 B.R. 736, 743-44 (Bankr. S.D.N.Y. 2012).  The court in *MF Global* specifically relied on the fact that the Bankruptcy Rule 2004 request was made by **private** parties—not an official creditors'

---

[18]    *See In re AOG Entm't*, 558 B.R. 98, 108–09 (Bankr. S.D.N.Y. 2016) (denying a private party's request for Bankruptcy Rule 2004 discovery on the grounds that the discovery sought had been pursued by the **creditors' committee** and had resulted in a settlement which mooted that private party's potential claims) (emphasis added); *In re Texaco*, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987) (limiting scope of single creditor's discovery requests because matters were already being pursued by, among others, the creditors' committee); *In re Williams Commc'ns. Grp.*, 281 B.R. 216, 222-23 (Bankr. S.D.N.Y. 2002) (refusing to appoint equity committee because "[t]he Creditors' Committee has a significant economic interest, as noted above, in investigating the [] claims, notwithstanding its fiduciary obligation to do the same").

committee—and also stated that "[t]here may well be a time when private-party discovery is appropriate, but now is clearly not that time." *Id.* at 744.  Unlike the private parties' requests in *MF Global*, the time for the Committee's discovery is now.

20.     The primacy of the Committee's role is actually highlighted, not diminished, by the circumstances here.  Section 1103 of the Bankruptcy Code grants the Committee the separate authority to investigate, among other things, **"any other matter relevant to the case or to the formulation of a plan**."  11 U.S.C. § 1103(c)(2).  In contrast, PROMESA section 104(o)—the section relied upon by the GDB, Oversight Board, and Santander— addresses only retail sales and disclosure issues, stating:

> "The Oversight Board may investigate the disclosure and selling practices in connection with the purchase of bonds issued by a covered territory **for or on behalf of any retail investors** including any underrepresentation of risk for such investors and any relationships or conflicts of interest maintained by such broker, dealer, or investment adviser is as provided in applicable laws and regulations."

PROMESA section 104(o) (emphasis added).  This does not address potential claims of malfeasance affecting the value of the Commonwealth's estate.

21.     These different aims and roles are also highlighted by the different end goals of each entity.  The Oversight Board's mandate is to write a report "mak[ing] public the findings of any investigation referenced in subsection (o)," *see* PROMESA section 104(p), and the Oversight Board argues that this obligation promotes transparency.  Congress assigned contrasting goals to the Committee—directing it to pursue its fiduciary duty to maximize the value of the estate and increase recovery for creditors.

22.     Given the Committee's broad mandate, the Discovery Program would give stakeholders in these Title III Cases the benefit of a party dedicated to uncovering **everything** that could impact the matter.  In fact, the Committee is already tasked with at least one broad

13

investigation.  In the context of the Commonwealth-COFINA Dispute, the Committee was

designated as the Commonwealth's agent by order dated August 10, 2017.  *See* Commonwealth-

COFINA Dispute Stipulation.  In that capacity, the Committee will investigate circumstances

relating to the creation of the COFINA structure and issuance of COFINA debt and whether it

was created to circumvent constitutional debt limits or restrictions.  A further grant of authority

to allow the Committee to evaluate potential estate claims against the Puerto Rico Financial

Institutions is entirely sensible.  Splitting the two efforts would unnecessarily fragment the

discovery process and increase the burden on the taxpayers of Puerto Rico.

**B.** **Elephant in the Room – Oversight Board's Various Conflicts Mean That Committee, Not Oversight Board, Is Best Placed to Conduct Investigation into Puerto Rico Financial Institutions**

23.      The facts here highlight why the Oversight Board should not be the ***sole*** entity to

conduct an investigation into the Puerto Rico Financial Institutions.[19]  Whatever its authority

might be, the Oversight Board has **not** conducted (or even commenced) any investigation despite

the passage of almost a year since it was formed.  And now that it has shown grudging

willingness to take *some* action, it proposed a "special" committee of four members—**one of**

**whom, José B. Carrión III, happens to be a scion of the family that founded Banco**

**Popular, the son of a former Popular Inc. board member, a relative of Popular, Inc.'s**

**Executive Chairman of the Board of Directors, and the founder of an insurance firm which**

**has received millions per year in commissions from Popular Inc.**[20]  Then, in a public *mea*

*culpa* (which was prompted by a discussion with counsel for the Committee), the Oversight

---

[19]      The Committee maintains that it is possible and routine for multiple investigations to proceed, just as in the numerous cases cited in section I.A.  However, if the Court determines that only one party may investigate the Puerto Rico Financial Institutions, the Committee should be that party.  To do otherwise would unnecessarily splinter the ongoing discovery process (requiring duplication of the work performed in the Commonwealth-COFINA dispute) and would damage the legitimacy of the investigation conducted by a conflicted Oversight Board.

[20]      *See supra* note 2 (August 6 Resolution).

14

Board acknowledged its glaring error and announced in a press release two days ago that it was

removing Carrión from the "special" committee.[21]  Yet even in that announcement and

concurrent request for proposal the Oversight Board again misses the point—omitting from its

proposed scope of work **any** review of the individuals and entities who may have breached

duties to the Commonwealth, due to their conflicts of interest or otherwise.[22]  The Oversight

Board's three misses are too many, and the only way that an investigation into these issues can

be credibly performed is with the involvement of the Committee.

24.     These missteps are perhaps explained by the fact that three other members of the

Oversight Board have direct connections to Santander, Banco Popular, or the GDB:

- Oversight Board member José R. González worked for Santander for 12 years, serving as CEO of Santander Securities from 1996-2001 and as CEO of Santander Bancorp from 2002-2008;

- Oversight Board member Carlos Garcia—who had previously worked for Popular Securities—spent more than 20 years with Santander before leading the GDB in 2009 and returning to a different Santander entity in 2011; and

- Governor's Representative Christian Sobrino-Vega, who joined the Oversight Board in July 2017, is currently the President of the GDB.[23]

25.     The Oversight Board effectively admits these disabling conflicts in its proposal to

form its "special" committee of members (David A. Skeel, Jr., Arthur J. González, and Ana J.

Matosantos).  Merely naming a committee and calling it independent is not enough, in light of

the facts here.  First, the Oversight Board has yet to explain its delay in investigating—even

though that delay speaks volumes about the Oversight Board's inability to act independently.

---

[21]    *See supra* note 4 (August 16 Press Release).

[22]    *See supra* note 9 (August 16 RFP).

[23]    These individuals were not named directly in the Motion because the Committee hoped that the Oversight Board would realize that these conflicts mandate a more open approach, but are named here because of the need to explore in detail the range of potential conflicts which could damage the credibility of any "independent" investigation run by the Oversight Board.

*See Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 979 (Del. Ch. 2013) (finding colorable claim of self-interestedness where plaintiff pled that board "has abdicated its responsibilities because *the investigation has been left in limbo, with no progress, for several months*") (emphasis added).

26.     Second, even if some other members of the Oversight Board lack direct ties to the Puerto Rico Financial Institutions, they have spent a year serving with individuals such as Messrs. Carrión, Garcia and González—who do possess such ties, and with whom they will have to serve for an extensive period of time.  This means that one group of board members will potentially be investigating another group, all the while continuing to serve with such persons on the Oversight Board—an issue that calls into question the independence of the Oversight Board with respect to the Puerto Rico Financial Institutions.[24]

27.     Third, there is no indication that the Oversight Board's "special" committee has the power to bind the full Oversight Board, and the Board's bylaws actually state that "[n]o committee is authorized to take any official action on behalf of the Board, unless expressly so authorized by the Board."[25]  The August 6, 2017 resolution announcing the creation of this "special" committee says nothing of its ability to commence litigation on the Oversight Board's behalf or do anything other than publish a report. [26]  In this respect, the "independent" structure is a complete façade if the "special" committee lacks the ability to act independently of the

---

[24]   *In re Orchard Enters., Inc*., 88 A.3d 1, 22 (Del. Ch. 2014) (holding that a "sufficiently close relationship" between a member of a special committee for negotiations and another party to the negotiations could potentially "render him unfit" to serve on the committee); *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 942-43 (Del. Ch. 2003) (noting that a member of a special litigation committee could have difficulty "objectively determining" the facts of an investigation where he had previously worked with one of the parties to be investigated).

[25]   See FINANCIAL OVERSIGHT AND MANAGEMENT BOARD BYLAWS, section 3.9 (available at https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58b4ab70c6217.pdf ) ("No committee is authorized to take any official action on behalf of the Board, unless expressly so authorized by the Board.").

[26]   *See supra note*  2 (August 6 Resolution) (delegating only the authority to "pursue investigations pursuant to the Oversight Board's authority under PROMESA Section 104(o), 48 U.S.C. § 2124(o), or such other authority invested in the Board to conduct investigations under PROMESA" and to publish a report).

dictates of the full (and conflicted) Oversight Board.  *See, e.g.*, *Biondi v. Scrushy*, 820 A.2d

1148, 1156 (Del. Ch. 2003), *aff'd sub nom. In re HealthSouth Corp. S'holders Litig*, 847 A.2d

1121 (Del. 2004)  ("If a special litigation committee is comprised of directors with

compromising ties to the key officials who are suspected of malfeasance, *if the committee is not

fully empowered to act for the company without approval by the full board*, or if the committee

behaves in a manner inconsistent with the duty to carefully and open-mindedly investigate the

alleged wrongdoing, its ability to instill confidence is, at best, compromised and, at worst,

inutile.") (emphasis added).

28.      Fourth, the Oversight Board has not yet hired unconflicted professionals.[27]  This

issue is of particular significance because the Oversight Board's existing professionals currently

have serious conflicts with regard to either the topic of the Committee's investigation or the

targets of the investigation.

29.      As a result of these myriad conflicts, the mere fact that a "special" committee has

been appointed is not a talisman that will solve all conflicts issues.  In the eyes of the residents of

Puerto Rico, the "special" committee will be tainted, especially given the Oversight Board's

repeated missteps.  At the very least, the Oversight Board's conflicts will delay any investigation

still further, and the fact that the Oversight Board is just now requesting proposals for

independent professionals means that any investigation would be delayed weeks, or months, into

the future.  The Oversight Board also has a number of other significant responsibilities.[28]  With

these strains on the Oversight Board's attention (and the complications presented by the need to

---

[27]   *Gesoff v. IIC Indus.*, 902 A.2d 1130, 1154 (Del. Ch. 2006) (determining that the financial advisor for a transaction
"was deeply conflicted" in spite of being  "ostensibly hired by [a] special committee" because evidence suggested
that the advisor was actually beholden to an interested party to the transaction).

[28]   These include the approval of fiscal plans and budgets (and assuring compliance with the foregoing) analysis of
pensions, review and approval of critical infrastructure projects, and certifying qualifying modifications under title
VI of PROMESA.  Sections 201, 202, 203, 204, 211, 503(c), and 601(g) of PROMESA.

oversee a new and independent structure), the investigation is unlikely to be completed in time to

bear any weight on these Title III Cases.  Given the delays that have already occurred and the

actual or potential conflicts of interest, it defies reason that the Committee should be expected to

sit on its hands in the hope that an admittedly conflicted entity will rouse itself to undertake a

vigorous and independent investigation, including into its own members.[29]

### C.  Discovery Program Would Not Interfere with Any Investigative Work Performed by Oversight Board, and Would Create Minimal Additional Burden

30.  Santander and the GDB argue that a "duplicative" discovery program would be

burdensome and "chaotic," and that the Committee has therefore failed to show good cause for

its request.  As an initial matter, complaints about burden and expense carry little weight coming

from financial institutions like Santander and Banco Popular that pocketed hundreds of

millions[30] in fees and other benefits directly from the residents of Puerto Rico and from the

Commonwealth.  And AFAAF, in its response on behalf of the GDB, has no authority to speak

on behalf of the Commonwealth, which is represented in these Title III cases by the Oversight

Board.  The GDB here speaks only for itself, as a target of discovery requests.[31]

31.  Such "burdens" as may legitimately exist can be managed in the meet-and-confer

---

[29]  In other settings, courts have specifically noted the potential that conflicts of interest could hamper the effectiveness of investigations and have endorsed the additional value of an "additional set of eyes."  *See, e.g., Cohen v. Morgan Schiff & Co. (In re Friedman's, Inc.),* 385 B.R. 381, 429 (S.D. Ga. 2008), *vacated in part on other grounds on reconsideration,* 394 B.R. 623 (S.D. Ga. 2008) ("What is alleged is that the plaintiff has been given the products of others' investigation, over 1.3 million pages of documents for that matter.  HEDGE CLIPPERS, *How Santander's Revolving Door is the successor in interest to the debtor and creditors' committee does not mean that both groups approached the investigation with the same litigation focus* [.]") (emphasis added).

[30]  One report estimates that Santander participated in the underwriting of an estimated $61 billion in Puerto Rico bond issues, generating $1.1 billion in fees for Santander and others.  HEDGE CLIPPERS, *How Santander's Revolving Door with Puerto Rico's Development Bank Exacerbated a Fiscal Catastrophe for the Puerto Rican People*, available at http://hedgeclippers.org/wp-content/*uploads*/2016/12/20161025_HedgeClippers_ReportPR_v3-3.pdf.

[31]  Although Santander's connections to the Oversight Board have already been laid bare, it bears mentioning that AAFAF does not act here as an "independent" government entity, because senior leaders of AAFAF worked at Santander during the time period in question (including, but not limited to, the timeframe when COFINA and other bonds were issued) and could potentially be implicated by any findings of the Discovery Program.

and objection process and do not support a complete rejection of the Committee's efforts.  *See,*
*e.g.*, *Matter of M4 Enters.*, 190 B.R. 471, 474 (Bankr. N.D. Ga. 1995) (granting request for Rule
2004 discovery in light of "policy behind the Rule and [] bankruptcy's *general predilection for*
*open-aired examination*") (emphasis added).[32]

32.     Moreover, to the extent that the Discovery Program turns out to be
"duplicative"—of an Oversight Board investigation that to date has yet to materialize—the
burden is easily managed.  The recipients of the discovery requests can simply make the same
production of materials to each requesting entity.[33]  The Oversight Board's worries about
"imped[ing]" its investigation or "mak[ing] it burdensome to witnesses," *see* Oversight Board
Objection, para. 4, are premature arguments for another day, especially given that the current
motion pertains only to **document** discovery.  Finally, any minimal additional burden and
duplication is fully justifiable here in order to achieve what Congress intended, for distinct
investigative bodies with different roles, priorities, and viewpoints to get to the bottom of the
causes of Puerto Rico's financial crisis and to examine whether any duties to the Commonwealth
or its creditors were breached during the build-up to the crisis.[34]

---

[32]    *See also In re Fanuzzi*, No. 12-60143-11, 2012 WL 1390634, at *11 (Bankr. D. Mont. Apr. 20, 2012) (granting
motion under Bankruptcy Rule 2004 for discovery and referring to policy favoring disclosure as one of the
"attendant burdens" of bankruptcy proceedings); *see also In re Norman*, No. 06-70859-A, 2006 WL 3053309, at *7
(Bankr. E.D. Va. Oct. 24, 2006) ("if a person wants to obtain the benefits of bankruptcy, such as the automatic stay,
reduced debt repayment and the permanent discharge of debt, they must make all of their financial information,
including the initial disclosure letter and the engagement letter with their counsel, available for the scrutiny of those
tasked with administering the system").

[33]    *See In re Countrywide Home Loans*, 384 B.R. 373, 399 (Bankr. W.D. Pa. 2008) ("Since Countrywide has already
voluntarily agreed to provide this information to the Chapter 13 Trustee there is no reason why the UST should not
also receive similar information here.")

[34]    *See Matter of M4 Enters.*, 190 B.R. at 474 (noting that policy behind Bankruptcy Rule 2004 is to support "general
predilection for open-aired examination"); *In re Fanuzzi*, 2012 WL 1390634, at *11 (noting that Bankruptcy Rule
2004 discovery is one of the "attendant burdens" of bankruptcy proceedings).

## II.     SCALE OF POTENTIAL MISDEEDS BEING INVESTIGATED PROVIDES AMPLE CAUSE FOR DISCOVERY PROGRAM

### A.     Committee Has Right to Investigate Potential Claims and Causes of Action

33.     The objectors argue that the Discovery Program is futile, because the Committee cannot pursue any "claims" on behalf of the Commonwealth.  They are wrong.  First, the objectors have cited no case—and the Committee is aware of no such cases—where a court has denied an official committee's Bankruptcy Rule 2004 motion because the committee was not likely to obtain derivative standing to pursue claims in the future.  The objectors' argument here is simply manufactured to distract from the Committee's statutory role as an investigative body. In any event, none of the cases cited stand for the proposition that derivative standing is inapplicable in chapter 9 cases involving governmental entities.[35]

34.     Second, the objectors are incorrect when they claim that section 305 of PROMESA prohibits the Court from removing a cause of action from the debtor's control. PROMESA in fact permits creditors and their representatives to bring claims on the Commonwealth's behalf.  Section 926(a) of the Bankruptcy Code (which is incorporated in section 301 of PROMESA) provides that "[i]f the debtor refuses to pursue a cause of action under section 544, 545, 547, 548, 549(a), or 550 of this title, then on request of a creditor, the court may appoint a trustee to pursue such cause of action."  11 U.S.C. § 926(a)

35.     The ability to petition the Court for appointment of a trustee under section 926(a) of the Bankruptcy Code would be meaningless without the right to first investigate and

---

[35]     Santander relies on two cases which are entirely unrelated to the question of a creditor's authority to bring claims on behalf of the estate.  *See* Santander Objection, at p. 7-8 (citing *In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 650 (Bankr. E.D. Mich. 1994) and *In re Barnwell Cty. Hosp.*, 459 B.R. 903, 910-11 (Bankr. D.S.C. 2011)).  Each of these stand only for the proposition that non-creditor members (e.g., "concerned citizens" groups) could not raise objections during a chapter 9 case.  *See In re Addison*, 175 B.R. at 651 (holding that the **non-creditor** members of a taxpayer group called "Concerned Citizens" were not permitted to raise objections during the hospital's chapter 9 case); *see also In re Barnwell*, 459 B.R. at 910-11 (same).

determine what potential claims and causes of action actually exist—which is exactly why

section 1103 of the Bankruptcy Code and Bankruptcy Rule 2004 provide such rights.  It bears

noting also that the Committee is not seeking derivative standing at this time and therefore it is

entirely speculative to attempt to handicap, at this early stage, how the Court would rule on such

a request.  Their argument is also premature because the Oversight Board may decide that the

evidence requires it to advance claims against these parties.

### B.    Discovery Under Bankruptcy Rule 2004 Is Not Limited to Potential "Claims" and Encompasses Any Matter Affecting Administration of Debtor's Estate or Formulation of a Plan

36.    Santander's and the GDB's arguments also incorrectly presume that the sole

justification for a Bankruptcy Rule 2004 examination is to determine potential affirmative

"claims" for relief.  The discovery powers provided by Bankruptcy Rule 2004 are not so limited.

Instead, Rule 2004 permits the Committee or any other examiner to engage in an examination

relating to "the acts, conduct, or property or to the liabilities and financial condition of the

debtor, **or to any matter which may affect the administration of the debtor's estate**, or to the

debtor's right to a discharge." Bankruptcy Rule 2004(b); *see also In re Pub. Serv. Co. of New

Hampshire*, 91 B.R. at 199 ("The scope of discovery afforded under Bankruptcy Rule 2004 is

"unfettered and broad.").[36]

37.    Aside from any affirmative claims, the evidence uncovered by the Discovery

Program could affect a variety of issues in these Title III Cases—including but not limited to the

disallowance or subordination of claims, including potential claims submitted by the Puerto Rico

---

[36]    In fact, one of the cases cited by the GDB stands for this very principle.  In *In re Buick*, 174 B.R. 299, 306 (Bankr. D. Colo. 1994), the court held that a creditor's request for discovery under Bankruptcy Rule 2004 was merited because "[t]he Court believes . . . that in addition to the right to commence an adversary proceeding to determine dischargeability, the Bankruptcy Code provides significant other or supplemental rights to creditors."  174 B.R. at 306.  The court noted that creditors like the party seeking discovery were not required to rely "solely and exclusively on the efforts of the trustee," indicating that "if a trustee refuses, fails, or is unable to pursue certain claims, the creditors may do so, with the permission of the Court."  *Id.*

Financial Institutions.   For one, Santander and Banco Popular were both listed in the *Notice of Filing of Creditor Matrix for the Commonwealth of Puerto Rico* [Docket No. 568].  As such, these entities are presumed to have claims until they are contested by the Commonwealth or other parties in this case—highlighting the need for a disinterested party to examine the validity of their claims and whether they should be contested based on the claimants' actions.

38.     Furthermore, it is a virtual certainty that creditors in these cases will receive not only cash and new bonds, but also some other form of contingent notes or bonds which would be dependent on the financial performance of the Commonwealth and its instrumentalities. **Creditors cannot be expected to "re-invest" in the Commonwealth without knowing what happened to cause the current crisis and whether culpable individuals would still be involved in Commonwealth financial affairs going forward.**

### C.     Significant Indicia of Potential Misconduct Exists, Highlighting Importance of Discovery Program

39.     Even though Bankruptcy Rule 2004 does not require the articulation of potential claims, and the Court need not identify potential claims in order to authorize the Discovery Program, significant publicly available information highlights various potentially improper roles played by the Puerto Rico Financial Institutions.  This evidence more than satisfies the "good cause" analysis required by Bankruptcy Rule 2004, and confirms that—even though a "fishing expedition" is permitted by Bankruptcy Rule 2004—the rationale for the Discovery Program is far more concrete.  Even the Oversight Board now seems to recognize as much, as its announcement on August 2, 2017 demonstrates.[37]

40.     Once a request for discovery has been challenged, Bankruptcy Rule 2004's good

---

[37]     *See supra* note 6, (August 2 Press Release) (stating that investigation is "integral" to restoring "fiscal balance and economic opportunity" in Puerto Rico).

cause analysis requires a balancing of the importance of the issues being investigated against the burden of such discovery on the targets.  *See In re Youk-See*, 450 B.R. 312, 320 (Bankr. D. Mass. 2011).  In general, "[g]ood cause is established if the party in interest seeking the Rule 2004 examination has shown that such an examination is reasonably necessary for the protection of its legitimate interests."  *Id.*  It is difficult to imagine a "legitimate interest" more significant to the future of the Commonwealth and to these Title III Cases than shedding light on the role of the Puerto Rico Financial Institutions in the Puerto Rico financial crisis.  This goal fully justifies the Discovery Program even if no claims are ever brought.  Further, the magnitude of the potential claims and defenses in issue—involving potentially billions of dollars—justifies whatever limited burden might result.[38]

41.     The "good cause" analysis tips heavily in favor of discovery when there has been at least some showing that the examinee may have engaged in misconduct.[39]   The discovery sought here is directly tied to significant indicia of potential misconduct.   For example:

- Financial institutions such as Santander and Banco Popular played every possible role in the creation and sale of Commonwealth debt—earning substantial fees along the way;

- These institutions have already admitted in regulatory proceedings that they lacked supervisory controls, including those necessary to monitor risk in their clients' accounts, enabling them to profit handsomely by encouraging their clients to invest in concentrated accounts of suspect Puerto Rico debt; and

- Santander and Banco Popular profited from highly-questionable debt transactions (for example, through the sale of that debt) such that they potentially violated their fiduciary and other duties to the Commonwealth—whether by failing to disclose the inherent conflict in their myriad roles, or by failing to disclose their internal analysis of the risk of such debt, or the profits that they could receive from the creation and sale of such debt.

---

[38]   *See In re Sheetz*, 452 B.R. 746, 750 (Bankr. N.D. Ind. 2011) ("Rule 2004 can properly be a fishing expedition and upon setting out for such an expedition one does not usually limit the fish one sets out to catch."); *In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989) (affirming Rule 2004 discovery order; noting that "Rule 2004 is broad in nature.").

[39]   *See In re Vantage Petroleum Corp.*, 34 B.R. 650, 651 (Bankr. E.D.N.Y. 1983) (granting request for examination under Bankruptcy Rule 2004 and noting that "courts have indicated that the [examiner's] latitude should be greater where there has been a showing that the debtor has engaged in questionable conduct").

42.     Moreover, Santander, Banco Popular, and the GDB created a revolving door, with individuals at senior levels of the GDB routinely landing in highly-compensated senior positions at Santander and Banco Popular or individuals at these institutions joining the GDB at a time when the GDB rewarded these institutions with lucrative work.  As mentioned in the Motion, publicly available information points to at least the following potential conflicts (which are summarized in the graphic shown by Exhibit J): (1) Carlos Garcia (who, as mentioned above, also serves on the Oversight Board), left Santander in 2009 to lead the GDB before returning two years later to Santander; (2) Fernando Batlle left the GDB in 2011 to become the CEO of Santander Securities and the Commercial Director of Banco Santander Puerto Rico; (3) Juan Carlos Batlle left Santander to be appointed president of the GDB in 2011 (the same year that his brother, Fernando, left for Santander) after 14 years with various Santander entities and is now employed by Ankura Consulting, a firm which is being paid millions to advise the GDB; (4) Ignacio Canto served as the Executive Vice President and Treasurer of the GDB after a career with Santander entities; (5) Jesús Mendez worked as a Managing Director for Santander Securities before joining the GDB; (6) Javier Ferrer joined Popular, Inc. in 2014 as Executive Vice President and General Counsel after serving as the President and Vice Chairman of the Board of Directors of the GDB; (7) Alejandro Ballester was appointed to the board of Popular Inc. in 2010 after serving as a director for the GDB and a member of its audit and investment committees; (8) David Chafey was appointed to the GDB as board chairman in 2012 after spending over 30 years at Popular Inc., most recently as chief operating officer and president; (9) Jose R. Coleman Tio was hired as a consultant for the Oversight Board in 2016 for $18,500 per month, after having served as general counsel for the GDB from 2013-15 (and after having accepted an offer to work for Banco Popular in 2017); and (10) Alfredo Salazar served as the

president of Banco de Ponce (now part of Banco Popular) from 1989-1993 and then as president

of the GDB from 2005-2007.[40]

43.     Finally, Santander's argument that these issues concern only harm to *private*

investors is both wrong and misses the point.  *See* Santander Objection, pp. 10-11.  The

Discovery Program seeks information related to a range of activities by the Puerto Rico Financial

Institutions, including information about personal and institutional conflicts of interest and the

management of those conflicts, the profits earned by those entities, and the analysis those entities

undertook before they engaged in their various financial engineering activities.  Each of these

issues—which pertain to duties owed to the Commonwealth and/or its creditors—could give rise

---

[40]     *See* FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, Carlos M. Garcia (available at
https://juntasupervision.pr.gov/index.php/en/carlos-m-garcia-2/); Daniel Marans, *Two Of Puerto Rico's New
Overlords Are Accused Of Helping Create Its Debt Crisis*, HUFFINGTON POST (Dec. 17 2016) (available at
http://www.huffingtonpost.com /entry/puerto-rico-control-board-debt-crisis_us_58544d53e4b0390447088ce4)
("Juan Carlos Batlle, another Santander executive, took Garcia's place as chief of the GDB in 2011.  At the same
time, Batlle's brother Fernando left a top post at the GDB to head up Santander Securities."); GOVERNMENT
DEVELOPMENT BANK, Gallery of Presidents – Juan Batlle (available at http://www.gdb-pur.com/about-
gdb/pastpresidents/JuanCBatlle.html); *see also* Joanisabel Gonzalez & Jose A. Delgado, *A Boom in Times of Crisis*,
EL NUEVO DIA (May 2, 2017) (available at https://www.elnuevodia.com/english/english/nota/aboomintimesofcrisis-
2316914/) (noting that Juan Carlos Batlle's current firm, Ankura Consulting, was hired by the GDB and offered a
budget of $1.4 million to assist with the GDB's restructuring); GOVERNMENT DEVELOPMENT BANK, 2012 Puerto
Rico Credit Conference (available at http://www.gdb-pur.com/PRCC2012/PRCConference.html) (listing Canto's
role within GDB as Executive Vice President and Treasurer); FINRA, BrokerCheck (available at
https://brokercheck.finra.org/individual/summary/4689916) (showing Canto's years of employment at Santander);
GOVERNMENT DEVELOPMENT BANK, *Government Development Bank for Puerto Rico Announces Its New
Management Team* (available at http://www.gdb-pur.com/communications/PressReleases/2009-01-22-NewGDB-
ManagementTeam.pdf) (announcing Mendez's appointment to GDB); *Santander BanCorp Announces New
Appointments* (available at https://www.sec.gov/Archives
/edgar/data/1099958/000109995801500014/press_release.htm) (announcing Mendez's appointment as Chief
Operating Officer of Santander Securities); POPULAR, Javier D. Ferrer Fernandez (available at
http://newsroom.popular.com/leadership/chief-legal-officer/javier-d-ferrer-fernandez); POPULAR, Notice of 2016
Annual Meeting of Stockholders and Proxy Statement (available at http://
/annualreport.popular.com/assets/55622_016_web_bmk.pdf) (showing Ballester's membership on the Popular Inc.
Board and his previous employment at the GDB); REUTERS *Puerto Rico appoints head of Government Development
Bank*, (Dec.11, 2012), available at http://www.reuters.com/article/usa-puerto-rico-idUSL1E8NBF3B20121211
("Former Banco Popular President David Chafey was named Board chairman."); *see* FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD, Independent Contractor Services Arrangement (December 1, 2016) (available at
https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58b612eae3d79.pdf) (setting forth Tio's compensation
and discussing the fact that Tio had accepted offer with Banco Popular); GOVERNMENT DEVELOPMENT BANK,
Gallery of Presidents – Alfredo Salazar (available at http://www.gdb-pur.com/about-
gdb/pastpresidents/AlfredoSalazar.html).

to claims (or to the subordination or disallowance of claims) beyond just those that could be advanced by individual investors.

**D.**     **GDB's Reliance on Pending Proceeding Rule Misses Mark**

44.     The GDB argues that the Discovery Program is barred by the "pending proceeding" rule, merely because (a) some documents pertaining to the creation of COFINA are expected to be produced as part of the Commonwealth-COFINA Dispute; and (b) some of the Committee's requests pertain to COFINA-related issues.  This argument is in error.

45.     First, as the GDB acknowledges, the pending proceeding rule applies only where the discovery goes "squarely to issues" involved in then-pending litigation.  GDB Opposition, para. 9.  For that reason, courts refuse to deny discovery merely because the discovery overlaps with a pending matter in some respects.[41]  **Moreover, because the "pending proceeding" rule is aimed at preventing parties from sidestepping the protections in the Federal Rules of Civil Procedure, the "pending proceeding" rule only holds force when the targets of the discovery are the subject of the pending lawsuit**.[42]  Because the Puerto Rico Financial Institutions are not expected to be parties to the Commonwealth-COFINA dispute, the rule is not implicated here.

46.     The Commonwealth-COFINA Dispute is also distinct from the Discovery Program sought here, and should not be used as an excuse for delay.  The Discovery Program seeks information concerning the COFINA bonds, among other topics, in the context of inquiries into the contemporaneous knowledge and analyses of the institutions (and individuals) who issued the Commonwealth's bonds, conflicts of interest that arose in those activities, the profits

---

[41]   *See In re Countrywide Home Loans*, 384 B.R. at 401 (holding that pending contested matter was "no impediment to the Rule 2004 examination sought here" because the discovery for the purposes of the Rule 2004 examination "is broader in degree than that which is sought [] in the underlying contested matter").

[42]   *See In re Washington Mut., Inc.*, 408 B.R. 45, 51 (Bankr. D. Del. 2009) ("The primary concern of courts is the use of Rule 2004 examinations to circumvent the safeguards and protections of the Federal Rules of Civil Procedure.").

those institutions stood to gain, and whether any duties to the Commonwealth or its creditors were violated during those processes.[43]

47.     It also makes no difference that **some** discovery materials may be relevant to the aims of both discovery processes.  Instead, as discussed in Section I.A, *see supra* para. 22, this heightens the need for the Committee to leverage the work being performed in that dispute to minimize the burden of any investigation on the taxpayers of Puerto Rico.

## III.    DISCOVERY REQUESTS ARE CLOSELY TIED TO ISSUES BEING INVESTIGATED AND COMMITTEE'S AUTHORITY

### A.    There Is No Basis for Santander's Fee-Shifting Request

48.     It bears repeating that the banks and institutions targeted at this stage by the Discovery Program each earned millions in fees due to their myriad engagements concerning Commonwealth Debt.  Yet one of those banks—Santander—is now brazen enough to argue that it should be reimbursed by the Commonwealth's unsecured creditors for the costs of responding to discovery requests that seek to uncover the scope of the potential abuses at the heart of Puerto Rico's financial crisis.  The Court should reject this request.  The Committee is not aware of any cases where a court has directed an official committee to pay for the costs incurred by another party in responding to discovery under Bankruptcy Rule 2004, and the Santander has cited no case for the proposition that such costs can be awarded.[44]  More importantly, the Discovery Program is not a mere frolic—rather, it is targeted at potentially questionable activities that enabled these institutions to profit off of the Commonwealth of Puerto Rico and its creditors. *See supra,* section II.C.

---

[43]    *See id.* at 52 (holding that 2004 motion, which sought materials relating to potential "business torts," sought materials unrelated to pending declaratory judgment actions relating to ownership of contested assets).

[44]    Besides involving a private party—not a statutory committee—the case cited by Santander, *In re Buccaneer Resources LLC*, No. 14-60041, 2015 WL 8527424, at *2-3 (Bankr. S.D. Tex. Dec. 10, 2015), involved a **consensual agreement** between the examiner and examinees regarding the reimbursement of costs, and is not relevant here.  *Id.* at *2.

### B.      Complaints Regarding Scope of Discovery Are Premature

49.      As discussed in the Motion, the relief sought here is limited.  The Committee

merely seeks judicial authorization to commence the Discovery Program and issue specific

requests pursuant to that program.  The requests attached to the Motion are only the start to that

investigation.  Moreover, as mentioned in the Motion, "[a]ll objections by the Puerto Rico

Financial Institutions with respect to scope, burden, or privilege as to specific document requests

would be reserved."[45]  Thus, the objections leveled by Banco Popular and Santander are

premature attempts to avoid their discovery obligations under Bankruptcy Rule 2004.

50.      The responses of the Puerto Rico Financial Institutions to the discovery

requests—consisting of objections and blanket denials of the Committee's right to investigate—

indicate that the Committee can anticipate being rebuffed at every turn without judicial

recognition of its powers under section 1103 of the Code and Bankruptcy Rule 2004.

### C.      In Any Event, Requests Issued Here Are Targeted at Potentially Questionable Activities of Puerto Rico Financial Institutions

51.      Without the benefit of request-by-request objections or meaningful conferral, it is

too soon to address Santander's and Banco Popular's scope arguments in detail.  Nevertheless, a

few initial points are appropriate in response to the broad brushstrokes offered by Banco Popular

and Santander—none of which recognize the fact that Rule 2004 is an entirely different vehicle

than Federal Rule of Civil Procedure 26, and that ordinary "relevance" objections have no merit

here.  *See In re Youk-See*, 450 B.R. at 319 (a "Rule 2004 examination is exceptionally broad and

provides few of the procedural safeguards found in [FRCP] 26.") (internal quotations omitted).

52.      Most importantly, the requests seek information pertaining to the questions of

---

[45]      To the extent it was not already clear, the Committee does not object to the right of the targets of the Discovery
Requests to raise their objections for adjudication in the future.  Accordingly, the Committee accepts Banco
Popular's proposed revisions to Paragraph 3 in the draft order attached as Exhibit A to this reply.

whether any individuals at the Puerto Rico Financial Institutions violated any duties to the

Commonwealth or its creditors or were willfully blind to the risks of Commonwealth debt.

Consequently, complaints about the following categories of requests are without merit:

- Documents and communications in the examinees' possession[46] regarding the COFINA structure and the Puerto Rico Financial Institutions' analyses of the validity of that structure—all of which pertain to potential knowledge of the questionable nature of the debt issuances, or whether COFINA was structured in order to evade constitutional debt limits;

- Documents and communications from 2006 onward, which may pertain directly to whether any duties were breached when COFINA was established in 2006; and

- Internal assessments or analyses of the Commonwealth's financial state or the creditworthiness of its debt, which are highly probative of the question of whether individuals at the GDB or the other Puerto Rico Financial Institutions were willfully blind to the risks of issuing Commonwealth debt (and remain highly relevant, regardless of whether certain other information regarding the Commonwealth's financial state was in the public domain)

53.     Of course, the Committee and its counsel will work in good faith with the Puerto

Rico Financial Institutions (and any recipients of future document requests) to address burden

and scope objections, privilege issues, and any other specific objections that arise.

## IV.   **RETIREE COMMITTEE'S REQUEST FOR JOINT INVESTIGATIONS SHOULD BE DENIED, AS BOTH COMMITTEES ARE CAPABLE OF COOPERATING WITHOUT BEING FORCED TO DO SO**

54.     The Retiree Committee argues that it and the Committee should be wedded to the

same discovery programs, cooperating in the issuance of requests and in meet-and-confer

discussions.  This forced coordination is unnecessary, and there is no reason to conjoin the

committees to each other at this point.  As shown in the revised Proposed Order attached as

---

[46]   Santander's complaint about the definitions for Santander entities is misplaced.  *See* Santander Objection, n. 4.  As always, the recipients of the requests are only required to produce documents in their possession, custody, or control.

29

Exhibit A, the Committee has agreed to share the discovery it receives through the Discovery Program with both the Retiree Committee and the COFINA Agent.[47]

55.     Moreover, there is no reason that both committees cannot cooperate on a going-forward basis while still making separate requests when deemed necessary or where their interests diverge.[48]  At this stage, there is no reason to hamstring the efforts of either committee in the manner proposed by the Retiree Committee, and the Retiree Committee has every right to raise complaints or objections later down the road about the scope of the Committee's cooperation.  However, complaints at this stage are premature.

*[Remainder of page intentionally left blank]*

---

[47]   The term "COFINA Agent" is defined in the Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute [Docket No. 996].

[48]   For example, the Retiree Committee does not take issue with any substantive aspect of the Creditors' Committee's request to commence the Discovery Program or the discovery requests appended to the Motion as exhibits.  If it feels these requests are inadequate, the Retiree Committee is fully capable of sending additional targeted follow-up requests.

WHEREFORE, the Committee respectfully requests that this Court enter an order

substantially in the form attached hereto granting the relief requested herein, and granting the

Committee such other relief as this Court deems just and proper.

Dated:  August 18, 2017                              /s/ Luc A. Despins
San Juan, Puerto Rico

PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
James B. Worthington, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured
Creditors*

- and –

 /s/ Juan J. Casillas Ayala

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Proposed Replacement Local Counsel to the Official
Committee of Unsecured Creditors*

31