# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | ) ) | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | ) ) ) ) | Case No. 17-bk-03283 (LTS)<br>(Jointly Administered) |
| as representative of | ) ) | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | ) ) ) | |
| Debtors.[1] | ) ) | |

| | |
|---|---|
| In re: | ) ) | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | ) ) ) | Case No. 17-bk-03566 (LTS) |
| as representative of | ) ) | |
| THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO (ERS), | ) ) ) ) | |
| Debtor. | ) ) | |

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO, | ) ) ) ) | Adv. No. _____ |
| Plaintiff, | ) ) | |
| v. | ) | |

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); and (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474).

|  |  |
|---|---|
| | ) |
| THE FINANCIAL OVERSIGHT AND | ) |
| MANAGEMENT BOARD FOR PUERTO | ) |
| RICO; MEMBERS OF THE FINANCIAL | ) |
| OVERSIGHT AND MANAGEMENT | ) |
| BOARD FOR PUERTO RICO, including | ) |
| members Jose B. Carrion III, Andrew G. | ) |
| Biggs, Carlos M. Garcia, Arthur J. | ) |
| Gonzalez, Jose R. Gonzalez, Ana J. | ) |
| Matosantos, and David A. Skeel, in their | ) |
| official capacity as the voting members of | ) |
| the Financial Oversight and Management | ) |
| Board for Puerto Rico; the | ) |
| COMMONWEALTH OF PUERTO RICO; | ) |
| HON. RICARDO ANTONIO ROSSELLO | ) |
| NEVARES, in his official capacity as the | ) |
| Governor of the Commonwealth of Puerto | ) |
| Rico; PUERTO RICO FISCAL AND | ) |
| FINANCIAL ADVISORY AUTHORITY | ) |
| (AAFAF); GERARDO PORTELA | ) |
| FRANCO, in his official capacity as | ) |
| Executive Director of AAFAF; HON. | ) |
| RAUL MALDONADO GAUTIER, in his | ) |
| official capacity as the Secretary of the | ) |
| Treasury of the Commonwealth; and John | ) |
| Does 1-15, | ) |
| | ) |
| Defendants. | ) |
| | X |

## <u>ADVERSARY COMPLAINT</u>

Plaintiff American Federation of State, County and Municipal Employees (AFSCME), on behalf of its affiliates Servidores Públicos Unidos (in English, "United Public Servants," hereafter "SPU") and the Capítulo de Retirados de SPU (the independently-chartered AFSCME chapter for retired employees of the Commonwealth of Puerto Rico, hereafter the "SPU Retiree Chapter"), by and through counsel, submits this Adversary Complaint against defendants the Financial Oversight and Management Board for Puerto Rico ("Oversight Board" or "Board"); Commonwealth of Puerto Rico ("Commonwealth"); the Puerto Rico Fiscal Agency and

Financial Advisory Authority ("AAFAF"); and the following individual defendants sued in their official capacity: Oversight Board voting members Jose B. Carrion III, Andrew G. Biggs, Carlos M. Garcia, Arthur J. Gonzalez, Jose R. Gonzalez, Ana J. Matosantos, and David A. Skeel; Commonwealth Governor Honorable Ricardo Rosselló Nevares; Commonwealth Secretary of the Treasury Raúl Maldonado Gautier; AAFAF Executive Director Gerardo Portela Franco; and John Does 1-15, and allege as follows:

## I.  NATURE OF THIS ADVERSARY PROCEEDING AND GENERAL ALLEGATIONS

1.      AFSCME brings this action to enforce the rights of Puerto Rico public employees under the United States Constitution, the Puerto Rico Constitution, the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA" or "the Act"), and common law.  The relief sought herein is further authorized by the Civil Rights Act of 1871, 42 U.S.C. § 1983.

2.      AFSCME, through SPU, serves as the exclusive collective bargaining representative under Commonwealth law for approximately 12,000 active Commonwealth employees ranging from social workers to corrections officers to nurses who care for juvenile wards of the Commonwealth.  Separately, AFSCME's independently-chartered Retiree Chapter in Puerto Rico represents thousands of retired employees who receive monthly payments from the Commonwealth as currently administered via the Employees Retirement System ("ERS" or the "System").

3.      AFSCME brings this action to secure and protect the rights of its members, both active and retired employees of the Commonwealth, for the purpose of obtaining declaratory and injunctive relief to oppose the implementation of austerity measures on Commonwealth employees and retirees through furloughs and cuts to retirement income.  The anticipated furloughs and cuts are the product of an unauthorized and illegal policy adopted by an unelected

3

oversight board, to be imposed by such Board over the objection of the Commonwealth's democratically-elected governor.   Putting aside matters of Puerto Rican sovereignty and democratic principles, these actions of the Board are illegal as they violate the terms of PROMESA and exceed the statutorily-conferred authority granted by PROMESA to the Board.

4.     AFSCME and its members are invested in the Commonwealth's financial recovery and desire, above all else, for it to thrive.  Unlike some other of the Commonwealth's creditors, the result of these Title III proceedings will not be reflected merely by a line item adjustment to a balance sheet, but will be endured by AFSCME members daily -- at home, work, and in retirement -- through a multitude of daily lived experiences.

5.     AFSCME complains that the development, approval, amendment and then certification of a Fiscal Plan, as defined by PROMESA, for Puerto Rico on March 13, 2017 (the "Final Fiscal Plan"), violated PROMESA both procedurally and substantively when on the one hand, the Board certified the plan proposed by the Governor, but then on the other hand adopted "amendments," among other things, to such Plan.   Further, the Oversight Board failed to adequately fund pensions and contingently imposed furloughs and compensation cuts on public workers who perform essential services.    AFSCME seeks a ruling that the Board's "amendments," and subsequent acts implementing such "amendments," exceed the limited authority granted it by Congress under PROMESA.

6.     The Board's amendments to the Governor's Fiscal Plan also violated the U.S. Constitution and Puerto Rico Constitution by requiring the Commonwealth to take employees' property, namely their individual retirement savings account balances, which were funded solely by the employees' own wage deductions (and that contain no employer contribution).  AFSCME seeks a ruling that these retirement savings account balances cannot constitutionally be reduced

4

in these Title III cases, as well as equitable relief including the imposition of a statutory or constructive trust over retirement plan assets.

### *The Complained-of Austerity Measures: Cuts to Vested Retirement Income*

7.      On August 4, 2017, the Board made concrete its unauthorized imposition of these austerity measures on employees and retirees when, at a public meeting, it announced its plans to (1) cut the retirement benefits of public servants receiving as little as $600 per month in the form of pensions, annuitized individual retiree savings accounts, and other modest benefits including retiree health care stipends, and (2) require furloughs of public employees which would both undermine the provision of essential government services and impose a monthly wage reduction of 10% (together, the "August 4 Decrees").

8.      The Board's cuts are explicitly designed to drive Puerto Rico retirees' fixed incomes down to the poverty line for an individual, which the Board pegs at $12,000 per year. Many retirees, however, also support dependents.

9.      The Board's cuts also explicitly include cuts to employees' individual retirement savings account balances—accounts which have been in existence since 2000 and have always been exclusively funded by employee contributions.   It appears, however, that the Commonwealth or ERS may have diverted employees' funds, as the  Board indicated in the August 4 Decrees that "instead of depositing employee contributions to [these] accounts" the employees' money was "diverted" rather than "saved in defined contribution accounts to fund their future retirement benefits (as they should have been all along)."  The Board's statement corroborates the fact that employees have been robbed of their property and must receive full restitution notwithstanding the passage of PROMESA and the powers granted the Court under Title III.

10.     Exacerbating this unconstitutional taking, the Board on June 30, 2017, adopted a budget resolution as part of the Commonwealth's FY 2018 budget which proposes to sell all assets held by Commonwealth pension systems and transfer them to the Commonwealth itself, thereby further diverting funds over which the Commonwealth has no title and that must be held in trust, as the funds are attributable to money employees and retirees have deposited from their own wages.   Both houses of the Commonwealth legislature have since passed a statute implementing this budget resolution, including the asset sale and transfer.   AFSCME seeks a ruling that this asset transfer must be halted and that the assets instead preserved for the exclusive purpose of funding employees' and retirees' individual accounts.

*The Board's Overstep of Its Authority under PROMESA*

11.     When providing for the creation of the Oversight Board to assist in managing the financial affairs of Puerto Rico, Congress crafted PROMESA to strike a careful balance between the popular will of the Puerto Rican people as expressed through their democratically-elected representatives, and the territorial powers of Congress.   Although Congress granted significant authority to the Oversight Board, Congress purposefully constrained that authority through the procedure by which Fiscal Plans are developed, the substance of Fiscal Plans, and the budgetary process by which Fiscal Plans are carried out.   This balance was intended to protect all stakeholders but primarily the people of Puerto Rico, who are entitled to a functioning government that can provide essential services and safety and which includes thousands of citizens who as employees of the government are tasked with this challenging and urgent obligation.   The Board's actions, however, have violated this balance by exceeding the statutory authority granted to the Board by Congress.

12.     The substance of the Oversight Board's amendments to the Governor's proposed

6

Fiscal Plan are plainly unlawful under PROMESA.  By requiring the Commonwealth to reduce retirees' and employees' vested retirement income security by 10% in total, the Final Fiscal Plan, through its second amendment and as amplified by the Board in its August 4 Decree, contravenes Congress' clearly-stated mandate that any Fiscal Plan must "provide adequate funding for public pension systems" per section 201(b)(1)(C) of PROMESA.

13.     This obligation is also a function of both the Commonwealth and U.S. Constitutions.

14.     Further, by requiring a furlough of Commonwealth employees across the board without regard to the Commonwealth's ability to provide essential public services, the Final Fiscal Plan, through the Board's amendment and as applied by the Board in promulgating its furlough decree on August 4, 2017, contravenes the clearly-stated requirement that any Fiscal Plan adopted under PROMESA must "ensure the funding of essential public services" per section 201(b)(1)(B) of PROMESA.

15.     The Board's amendments are also procedurally invalid under PROMESA. Congress recognized Puerto Rico's sovereignty by designing a specific and particular process for settling on a financially-distressed territory's Fiscal Plan.  PROMESA provides the Oversight Board with two, *and only two*, paths to attaining a Fiscal Plan: The Oversight Board must either (a) exercise "its sole discretion" to approve as-is a Fiscal Plan developed by the democratically-elected Governor, or (b) develop its own Fiscal Plan.  Unfortunately, the Oversight Board took neither lawful route in developing the Final Fiscal Plan.

16.     Instead, the Board charted an unauthorized and dangerously uncertain path for the Commonwealth by departing from PROMESA's procedural and substantive requirements when the Board opted to declare it had certified the democratically-elected Governor's Fiscal Plan with

7

two "amendments," even though PROMESA provides no authority to the Oversight Board to certify a Governor's plan subject to amendment.

17.    This technical discrepancy has real-world impact.  It must be noted that the Governor is accountable to the People of Puerto Rico, whereas the Oversight Board is not. PROMESA's procedures recognize this distinction, which the Board failed to acknowledge when it declared that it was approving and certifying the Governor's proposed Fiscal Plan pursuant to PROMESA Section 201(e) but subject to its own amendments, and neglecting to specify, as required by PROMESA, whether the approval and certification occurred pursuant to Section 201(e)(1) (entitled "Approval of Fiscal Plan Developed by the Governor") or Section 201(e)(2) (entitled "Deemed Approval of Fiscal Plan Developed by Oversight Board").  As a result, the Governor and Oversight Board are currently embroiled in a dispute about whether the Board's amendments were part of the Governor's own proposed fiscal plan as certified (as the Board contends) or mere "recommendations" of the Board which the Governor is not obliged to follow (as the Governor asserts).

### The Complained-of Austerity Measures – Employee Furloughs

18.    It is under the guise of this procedurally improper Final Fiscal Plan that the Oversight Board now seeks to require the Commonwealth, through AAFAF, to impose furloughs on its employees—over the objections of the Governor—and to do so through a provision in the FY 2018 budget that exceeds the authority provided to the Board with respect to its budget oversight authority.

19.    Like its process for the development, approval, and certification of Fiscal Plans, PROMESA's process for the approval and implementation of Commonwealth budgets contains provisions designed to protect the sovereignty of Puerto Rico.  In particular, under PROMESA

8

Section 203, once an annual territory budget is certified, the Oversight Board shall only assess the sovereign territorial government's compliance therewith *following* the end of each subsequent fiscal *quarter,* and then, after so finding, must engage in a series of steps if it wishes to make any budgetary adjustments.  First, the Board must request "additional information" from the territorial government (Section 203(b)(1)(A)).  Second, if that "additional information" does not satisfy the Board, the Board may "advise the territorial government to correct the inconsistency by implementing remedial action" (Section 203(b)(1)(B)).  Third, if the territorial government fails to do so, the Board "shall certify to the President . . . that the territorial government is inconsistent with the applicable certified Budget" (Section 203(c)(1)).  Fourth, the sovereign territorial government shall be given another chance to correct the inconsistency as it sees fit, and if it does so, the Oversight Board "shall certify the correction to the President" (Section 201(c)(2)).  It is only if this painstaking official process fails—*i.e.*, if, following certification of an inconsistency to the President of the United States, the sovereign territory government fails to correct the inconsistency on its own terms—that the Oversight Board may order a "budget reduction" under PROMESA Section 201(d).

20.     Flouting the above-described will of Congress, the Oversight Board illegally ordered the furloughs, which are clearly a "budget reduction" within the meaning of PROMESA, *before* the first fiscal quarter of FY 2018 had ended and without certifying a budget inconsistency to the President as required by law.  To accomplish this unlawful result, the Oversight Board illegally included the furloughs in the FY 2018 budget (and Fiscal Plan) as a contingency left entirely to the Board's future discretion.

21.     In other words, the Oversight Board created for itself the opportunity to make future direct and substantial budgetary decisions for the Commonwealth outside of the process

mandated by PROMESA.

22.     This violation of PROMESA Section 203 is a violation of the Puerto Rico government's right to control its own operations, as embodied in PROMESA's budgetary process as well as other provisions.  At its core, and as reflected by the specific "back-and-forth" budgetary process violated by the Board here, PROMESA simply does not confer on the Oversight Board authority over operational personnel decisions, such as whether to engage in furloughs.  This limitation is reflected in PROMESA.  Indeed, under PROMESA Section 203(d), the Oversight Board's budget reductions are limited "with respect to the territorial government" to ordering "appropriate reductions in nondebt expenditures to ensure that the actual quarterly revenues and expenditures for the territorial government are in compliance with the applicable certified Territory Budget"—i.e., edit financial line items and nothing else—whereas "with respect to covered territorial *instrumentalities*" the Board is expressly permitted to go further and institute "automatic hiring freezes."

23.     In fact, the only place that PROMESA permits the Oversight Board to weigh in on "placing controls on expenditures for personnel, reducing benefit costs" and "the establishment of alternatives for meeting obligations to pay for the pensions of territorial government employees" is under Section 205, which sets forth a process for the Board to make *nonbinding* "recommendations" to the territorial government on these and other subjects.  Yet the Board's August 4 Decrees purport to mandate Commonwealth personnel decisions, and the Governor asserts that the furlough program may only be considered as nonbinding "recommendations" under PROMESA Section 205. (*See* Defendant Governor Rossello's August 4, 2017 letter to President Trump rejecting the Board's furlough plan as a "recommendation" made under Section 205.)

### *The Relief Sought by AFSCME*

24.     The relief sought by AFSCME through this adversary proceeding is narrow and modest.  First, AFSCME seeks a declaration that only the *amendments* to the Final Fiscal Plan are unlawful or else not part of the Fiscal Plan as certified and injunctive relief preventing their implementation.  As to employees' own contributions to their individual retirement savings accounts, which must be paid in full and cannot be impaired in any Title III plan of adjustment or order confirming a Title III plan of adjustment.  AFSCME further seeks an order imposing a trust over and enjoining the sale of pension fund assets attributable to employee contributions in order to ensure the Commonwealth is not unjustly enriched by its admittedly improper diversion of employees' own funds.

25.     AFSCME does not seek to stall the Commonwealth's economic recovery, and the relief sought here would not prevent or prohibit the Governor or the Oversight Board from developing *a different* Fiscal Plan or FY 2018 budget, or simply using or adopting the Governor's Fiscal Plan in its un-amended form.

26.     The Commonwealth's current and future retirees are not rich and will not become rich because of their pensions or public employment.  To the contrary, many of them will suffer grievous harm from the cuts promised by the Board's Final Fiscal Plan and implemented by the August 4 Decrees, which threaten to plunge retirees to the Federal Poverty Line and cut already modest salaries to below livable wages.

27.     Accordingly, AFSCME seeks declaratory and injunctive relief that the Final Fiscal Plan and August 4 Decrees, and subsequent legislative acts implementing them, constitute a taking without due process or just compensation in violation of Amendment 5 of the United States Constitution ("Fifth Amendment"); a taking of property without just compensation in

violation of Article II, Section 9 of the Puerto Rico Constitution ("Puerto Rico Takings Clause");

a derogation of the Oversight Board's statutory duty to follow the requirement, set forth in

section 201 of PROMESA at 48 U.S.C. § 2141(b)(1)(C), that an approved Fiscal Plan "provide

adequate funding for public pension systems"; a derogation of the Board's statutory duty to

follow the requirement, set forth in section 201 of PROMESA at 48 U.S.C. § 2141(b)(1)(B), that

an approved Fiscal Plan "ensure the funding of essential public services"; a derogation of the

Board's statutory duty to follow the Fiscal Plan development, approval, and certification

procedures set forth in Section 201 of PROMESA at 48 U.S.C. § 2141(c-e); a violation of the

budget development, approval, certification, and correction procedures set forth in Sections 202

and 203; as well as common law unjust enrichment and breach of fiduciary duty which requires

imposition of a statutory or constructive trust over pension fund assets to prevent their unlawful

sale and transfer to the Commonwealth.

## II.    THE PARTIES

28.    Plaintiff American Federation of State, County, and Municipal Employees, the

largest labor union in the AFL-CIO, has two affiliated local chapters in Puerto Rico: Servidores

Públicos Unidos, AFSCME Council 95 (in English, "United Public Servants,"), and Capítulo de

Retirados de SPU, the independently-chartered AFSCME chapter for retired employees of the

Commonwealth of Puerto Rico. SPU serves as the exclusive collective bargaining representative

under Commonwealth law for approximately 12,000 active Commonwealth employees ranging

from social workers to corrections officers to nurses who care for juvenile wards of the

Commonwealth. Separately, SPU Retiree Chapter represents thousands of retirees, all of whom

receive retirement benefits currently administered by the Commonwealth's Employees

Retirement System.  AFSCME brings this adversary proceeding on behalf of Commonwealth

employees represented by SPU, who will be affected by the furloughs and retiree income cuts, and retirees represented by SPU Retiree Chapter, who will also be affected by such cuts.

29.     Defendant the Financial Oversight and Management Board for Puerto Rico was created under Section 101(b)(1) of PROMESA (48 U.S.C. § 2121(b)(1)) as an "entity within the [Commonwealth] government." 48 U.S.C. § 2121(c)(1).

30.     Defendant the Commonwealth of Puerto Rico is a territory of the United States.

31.     Defendant the Puerto Rico Fiscal Agency and Financial Advisory Authority  is a public corporation organized under the laws of the Commonwealth.

32.     Defendant Hon. Ricardo Rosselló Nevares ("Governor Rosselló") is the Governor of the Commonwealth. Plaintiffs sue Governor Rosselló in his official capacity.

33.     Defendant Gerardo Portela Franco (the "AAFAF Executive Director") is the Executive Director of AAFAF and in that capacity is empowered to implement the budget and any furloughs ordered by the Board.  Plaintiffs sue the AAFAF Executive Director in his official capacity.

34.     Defendant Hon. Raúl Maldonado Gautier (the "Secretary of Treasury") is the Secretary of Treasury of the Commonwealth and in that capacity is empowered to implement the budget and any furloughs ordered by the Board.  Plaintiffs sue the Secretary of Treasury in his official capacity.

35.     Defendant John Doe 1 is any successor to Governor Rosselló as Governor of the Commonwealth. Plaintiffs sue John Doe 1 in his or her official capacity.

36.     Defendant John Doe 2 is any successor to Gerardo Portela Franco as Executive Director of AAFAF and in that capacity is empowered to implement the Illegal HR 188 and any furloughs ordered by the Board.  Plaintiffs sue John Doe 2 in his or her official capacity.

37.      Defendant John Doe 3 is any successor to Hon. Raúl Maldonado Gautier as Secretary of Treasury of the Commonwealth and in that capacity is empowered to implement the Illegal HR 188 and any furloughs ordered by the Board.  Plaintiffs sue John Doe 3 in his or her official capacity.

38.      Defendant José B. Carrión III is the Chairman of the Oversight Board. Carrión participated in the Oversight Board's development of the Final Fiscal Plan, FY 2018 budget, and August 4 Decrees.  AFSCME sues Carrión in his official capacity.

39.      Defendant Andrew G. Biggs is a member of the Oversight Board.  Biggs participated in the Oversight Board's development of the Final Fiscal Plan, FY 2018 budget, and August 4 Decrees.  AFSCME sues Biggs in his official capacity.

40.      Defendant Carlos M. García is a member of the Oversight Board.  García participated in the Oversight Board's development of the Final Fiscal Plan, FY 2018 budget, and August 4 Decrees.  AFSCME sues Garcia in his official capacity.

41.      Defendant Arthur J. González is a member of the Oversight Board.  Arthur González participated in the Oversight Board's development of the Final Fiscal Plan, FY 2018 budget, and August 4 Decrees.  AFSCME sues Gonzalez in his official capacity.

42.      Defendant José R. González is a member of the Oversight Board.  José González participated in the Oversight Board's development of the Final Fiscal Plan, FY 2018 budget, and August 4 Decrees.  AFSCME sues Gonzalez in his official capacity.

43.      Defendant Ana J. Matosantos is a member of the Oversight Board. Matosantos participated in the Oversight Board's development of the Final Fiscal Plan, FY 2018 budget, and August 4 Decrees.  AFSCME sues Matosantos in her official capacity.

44.      Defendant David A. Skeel, Jr. is a member of the Oversight Board.  Skeel

participated in the Oversight Board's development of the Final Fiscal Plan, FY 2018 budget, and
August 4 Decrees.  AFSCME sues Skeel in his official capacity.

45.     Defendants John Does 4-15 are any successors to the voting members of the
Oversight Board. AFSCME sues John Does 4-15 in their official capacities.

### III.     JURISDICTION AND VENUE

46.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §
1331 and Section 106 of PROMESA, 48 U.S.C. § 2126, because this action arises under
PROMESA and the U.S. Constitution.  In addition, this Court has jurisdiction under Section 306
of PROMESA, 48 U.S.C. § 2166, because the controversy between the parties arises in, or is
related to, a case under Title III.  AFSCME also seeks relief pursuant to 42 U.S.C. § 1983, as to
the individual defendants who, acting under the color of law, have deprived public employees of
rights guaranteed by both the United States Constitution and by PROMESA.

47.     This Court has supplemental subject matter jurisdiction under 28 U.S.C. § 1367(a)
over AFSCME's claims arising under the Puerto Rico Constitution, because those claims form
part of the same case and controversy and involve identical factual allegations as AFSCME's
claims arising under the United States Constitution and PROMESA.

48.     This Court has personal jurisdiction over all of the Defendants pursuant to 48
U.S.C. § 2166(c).

49.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of
Bankruptcy Procedure and Section 310 of PROMESA, which provides "The Federal Rules of
Bankruptcy Procedure shall apply to a case under [Title III of PROMESA] and to all civil
proceedings arising in or related to cases under [Title III of PROMESA]." 48 U.S.C. § 2170;
Fed. R. Bankr. P. 7001.

50.     AFSCME seeks a declaration and related relief pursuant to 28 U.S.C. §§ 2201 and

2202, Fed R. Bankr. P. 7001, and Fed. R. Civ. P. 65 (applicable in Title III under Fed. R. Bankr.

P. 7065).  Further, under the All Writs Act, 28 U.S.C. § 1651, the Court may issue any writ

necessary or appropriate in aid of its jurisdiction and aggregable to the usages and principles of

law.

51.     PROMESA Section 106(e) is not a bar to review of the Final Fiscal Plan's two

purported amendments to the Fiscal Plan for at least four reasons.  First, Section 106(e) does not

deprive the Court of jurisdiction over AFSCME's challenge to the Oversight Board's

certification of the Fiscal Plan to the extent that challenge arises under the U.S. Constitution.

*See, e.g., Johnson v. Robinson,* 415 U.S. 361 (1974).  Second, Section 106(e) applies only to

"challenges to the Oversight Board's certification determinations," not to the predicate question

of whether a certification actually took place properly under the procedures of PROMESA.

Third, Section 106(e) does not deprive the Court of jurisdiction over AFSCME's challenges to

the Oversight Board's August 4 decree implementing furloughs, which was issued without a

certification of budgetary noncompliance as required by PROMESA Section 203, or to any

Commonwealth statute or action which is not a certification.  Fourth, Section 106(e) does not

apply because the Oversight Board acted *ultra vires,* as it is well established that federal courts

have authority to review decisions of an agency that are made in excess of the agency's authority

or that are contrary to a specific provision of the statute administered by the agency (even in the

face of an express Congressional denial of judicial review of the agency's decisions).  *See*

*Leedom v. Kyne*, 358 U.S. 184, 190 (1958); *Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988).

52.     An actual and justiciable controversy has arisen and exists between the parties

with respect to the issues and claims alleged herein.

53.     Venue is proper in this District under Section 307 of PROMESA, 48 U.S.C. § 2167, as well as 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred, and continue to occur, in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     Retirement Benefits

*The Commonwealth's Defined Benefit Plan – Act 447 and Act 1*

54.     At its inception, Puerto Rico Act 447 of 1951 covered all full-time employees of the Commonwealth Government and its instrumentalities, making membership in ERS a mandatory condition of employment.  In addition to specific provisions governing disability and occupational death annuities (Sections 9-12), Act 447 provided, *inter alia,* that as of January 1, 1955, a member of ERS "shall be entitled to receive" an annuity upon retirement based on a multiplier of 1.5%, average salary, and years of service, with certain adjustments; retirement benefits were available upon separation from and completion of 25 years of service and reaching an age of at least 55 years, or 10 years of service with an age of at least 58 years (Section 6-7). Payment of benefits became mandatory at age 65 for all employees (*Id.*).  ERS was created as a trust (Section 15) in which employees make mandatory contributions that are directly deducted from their earned wages, at the rate of 6% for police and fire fighters and 5.5% for all other members.

55.     Act 447 clearly recognized the vested contractual right to defined benefit retirement annuities that employees accrued through their service to the Commonwealth.  For example, Act 447 states the retirement and disability annuities earned "shall be payable in equal monthly installments as life annuities, and shall not be increased, decreased, revoked or repealed" (Section 25) and "shall constitute obligations of the employer" (Section 26).

56.     Act 447 also required employer contributions to be "sufficient to provide" the promised benefits (Section 21).

57.     Recognizing that employees have a property right in their own wage deductions, Act 447 further provides that any member not eligible for a retirement annuity "shall be paid . . . a refund equal to the amount of his contributions to the System, including regular interest" and "shall thereby forfeit and waive all *accrued rights* in the System" (Section 14, emphasis added).

58.     Act 447 has been amended several times since 1951, each time preserving the benefits theretofore earned by employees and retirees.  For purposes of this Complaint, three amendments are most pertinent: Act 1 of 1990 ("Act 1"), Act 305 of 1999 ("Act 305" or "Reform 2000"), and Act 3 of 2013 ("Act 3").

59.     Benefits provided under Act 447 applied to all Commonwealth employees until the effective date of Act 1, which left in place the benefits for incumbent employees and retirees under Act 447 but created a new (lower) "tier" of traditional defined pension benefits for Commonwealth employees hired on or after Act 1's effective date.

60.     ERS internally refers to members hired prior to April 1, 1990, the effective date of Act 1, as "Act 447 members."  Likewise, ERS refers to members hired between April 1, 1990 and December 31, 1999, the effective date of Act 305, as "Act 1 members."

61.     The benefits of both Act 447 members and Act 1 members were, until Act 3 took effect in 2013, accrued as traditional defined benefit pensions ("DB Pensions").  Such a benefit provides for a guaranteed retirement annuity benefit calculated by multiplying the retiree's years of service under the plan by his/her average annual compensation and by a fixed multiplier (and then adjusting to account for certain other factors. e.g., mandatory minimum or maximum pension amounts).  The product of these factors is divided by twelve to reach the monthly

18

defined pension benefit.

62.     Although Act 1 made significant changes to the traditional defined pension benefit accrual formula for Act 1 members, *i.e.* new employees hired as of April 1, 1990, the benefits earned and accrued by Act 1 members were still to be accrued as DB Pensions and provided for a defined benefit upon retirement.

63.     As noted, Act 1 implemented a reduced benefit tier for new hires, but it also increased both the employer's and employee's contributions into the pension system trust fund. Act 1's Statement of Motives noted that although Act 447 members would also see an increase in their employee contributions "from 7% to 8.275% of [their] salary" going forward, their already-accrued vested benefits would not be affected, as

> "they will keep all their rights under the Retirement Act in force, with the certainty that the System will have the necessary resources for the payment thereof.  Therefore, as of the date of the approval of this Act, the employees shall have the same benefits to which they are entitled now, upon their retirement that is, the benefits they will receive will not be affected in the least."

*The Commonwealth's "Reform 2000"*

64.     Only ten years after Act 1, the Commonwealth enacted Act 305 of 1999, known as Reform 2000, which adopted an entirely different (but still mandatory) type of retirement plan for employees hired on or after its effective date of January 1, 2000.  Under Reform 2000, the Commonwealth established individual employee "retirement savings accounts" ("System 2000 RSAs") in lieu of the DB Pensions described above.  Thus, Chapter 2 of Act 305, which preserves DB Pensions for pre-2000 hires, is entitled "Defined Retirement Benefits Program," while Chapter 3, which creates the System 2000 RSAs, is entitled "Retirement Savings Account Program."

65.     Employees hired since 2000 are referred to as "System 2000 members" by ERS.

66. Upon information and belief, a small number of then-active employee Act 447 and Act 1 members elected to voluntarily transfer their DB Pension benefits into a System 2000 RSA under a program permitting such a voluntary transfer established by Reform 2000. Act 305 set forth the formula for converting such members' accrued DB Pension entitlement under the DB Pension Plan into an individual System 2000 RSA cash balance.

67. The System 2000 RSA was and always has been employee property. Act 305 provided that each and every System 2000 participant "shall always have one hundred percent (100%) vested rights" to the entire value of her RSA, which value consisted of the employee's own contributions from her wages to her RSA, plus the investment yield on the RSA account balance for each semester of the fiscal year based on an investment alternative elected by the participant (Section 30), plus any initial RSA transfer balance in the case of the few Act 447 and Act 1 members who voluntarily transferred from the DB Pension plan.

68. ERS provided for three investment options in which System 2000 participants could choose to invest in increments of ten percent of their total account balance: (1) fixed income (yield equal to the average monthly yield of the two-year constant maturity treasuries during each semester of the fiscal year), (2) 75% of the net yield of the investment portfolio of ERS during each semester of the fiscal year, or (3) other alternatives adopted by the ERS Board.

69. In other words, System 2000 established a 401(k)-style plan funded purely by employees who directly contributed to their System 2000 RSAs from their wages, and who thereby had a 100% vested property right in their account balance at all times. Neither the Commonwealth nor other ERS-participating employers (e.g., municipalities) contributed to fund System 2000 RSA balances. Rather, employees' account balances were funded solely by their own individual contributions from earned wages.

20

*Act 3 Defined Contribution Accounts*

70.     In 2013, the Commonwealth yet again amended the terms of its pension and retirement plans, this time through Act 3 of 2013, the effect of which was to establish individual defined contribution accounts for all existing and future Commonwealth employees.

71.     Under Act 3, all employees hired before System 2000 who had remained in the DB Pension plans under the terms of Act 447 or Act 1 ceased earning additional service credits under the DB Pension plans and were enrolled in a going-forward basis in an "individual contribution account" ("DC Account") similar to a System 2000 RSA—i.e., an individual account funded solely by mandatory employee wage deductions—with the main difference being that the payout of the account balance upon retirement would be annuitized.  In pension parlance, this means the DB Pension plans were "frozen" as of July 1, 2013, and members of such plans were enrolled going-forward in a 401(k)-style DC account.

72.     ERS thus maintained two separate accounts for Act 447 members and Act 1 members, a DB Pension account (to track the frozen DB Pension benefit accrued pre-Act 3) and a DC Account.  Hence, this was known as the "Hybrid Program."  The ERS Administrator recently explained precisely this dichotomy in comments supporting Commonwealth pension legislation passed on August 11, 2017, in which it stated that ERS currently administers two distinct types of plans: a defined benefit plan and a defined contribution plan.

73.     Act 3, in freezing DB Pensions but preserving the vested right to those DB pensions already accrued through work already performed, provided that "[t]he right of every participant who, as of June 30, 2013 was eligible to receive a deferred pension for meeting all the requirements thereof, to receive such pension regardless of whether he/she has applied therefor, is hereby preserved."

21

74.     As to System 2000 members, Act 3 transferred each individual System 2000 participant's RSA balance into a corresponding DC Account established for that purpose, into which the employee would make all future contributions deducted from wages.

75.     Act 3 specifically provided, at Section 5-104, that the ERS "Administrator shall establish and maintain in the System an account with the contributions of each participant in the Hybrid Program, which shall be credited and debited in accordance with Sections 5-108 and 5-109."

76.     Act 3 provided at Section 5-108 that "participants shall always have one hundred percent (100%) right over the initial balance transfer" from a System 2000 account, as well as to "their contributions to the Hybrid Program accounts."

77.     For all employees, Act 3 increased each employee's contribution to the individual DC Account to 10% of compensation while continuing to provide for no employer contribution credit to that DC Account balance.

78.     One difference between a System 2000 RSA and an Act 3 DC Account was that the DC Account offered only one investment option.  Like System 2000, DC Accounts are credited with a return on investment, but that return "shall be determined by the [ERS] Board and shall never be less than eighty percent (80%) of the System's portfolio net rate of return during each semester of each fiscal year."

### *Misuse of RSA and DC Account Property*

79.     Subsequent to Act 3, the Commonwealth passed Act 244 of 2014, which promised that in subsequent fiscal years, ERS would receive an Additional Uniform Contribution in the amount certified by the external actuary of the System as necessary to avoid having the projected gross assets of ERS, during any subsequent fiscal year, fall below $1 billion.

80.     However, the Commonwealth and Board have both stated in 2017 that ERS is out of money to pay retirees because, *inter alia,* the individual System 2000 RSAs/DC Accounts of participants were used by the Commonwealth for other purposes rather than being segregated.

81.     On May 21, 2017, ERS itself filed for Title III bankruptcy under PROMESA.

82.     On June 30, 2017, Puerto Rico Budget Resolution HR 188 was adopted by the Oversight Board following its passage by the Puerto Rico legislature on June 25, 2017.

83.     HR 188 provides for the transfer to the Commonwealth, from ERS, of the mechanism for paying the Commonwealth's DB Pension and DC Account obligations.  This new system, in which the Commonwealth meets its own obligations under law as they come due, is called the "pay as you go" system by HR 188.

84.     HR 188 orders ERS to sell its assets and to transfer the net cash proceeds, in addition to any available funds, in the Puerto Rico Treasury Secretary's account.

85.     No consideration was provided to System 2000 members in exchange for the trust property transferred to the Commonwealth's general fund under HR 188 or diverted for other sources previously.

86.     In a July 27, 2017 press release calling a special session of the Puerto Rico legislature to address the pension issue, the office of the Governor admitted that the contributions of public servants were misused in the past.

87.     In the August 4 Decrees, the Oversight Board admitted that "instead of depositing employee contributions to System 2000 accounts to fund future benefits, the plans have diverted employee contributions" when instead "they should have been all along" depositing "employees' contributions . . . in defined contribution accounts to fund their future retirement benefits."

88.     Yet, as of August 10, 2017, an active employee of the Commonwealth could still

register and access statements online which clearly state instruct the employee that "you possess" a "contribution balance" of a given number.  There is no indication that these balances do not exist in reality, to the contrary, they are communicated to the reader as if they constitute real account balances deposited and maintained as employee property.

89.     By August 11, 2017, both houses of the Commonwealth Legislature had signed Senate Bill 603.  Senate Bill 603 creates new individual defined contribution accounts for all employee contributions made beginning in July 1, 2017, to be administered by an outside entity, not commingled with other assets, and portable to private-sector employers upon separation of service.

90.     However, while SB 603 purports to preserve all retiree benefit rights accrued through July 1, 2017, it violates SPU members' rights as it implements the ERS asset sale and transfer to the Commonwealth as set forth in HR 188 and does not transfer in full the DC Account balances of Commonwealth employees.

### B.     PROMESA

*The Statutory Framework for Fiscal Plans*

91.     On May 18, 2016, United States Representative Sean Duffy (R-WI) introduced the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) in the United States House of Representative as HR 5278.  PROMESA was referred to the House Committee on Natural Resources.  The Committee on Natural Resources met in open session on Tuesday, May 24, 2016 and Wednesday, May 25, 2016 to markup PROMESA.

92.     Following passage by Congress, on June 29, 2016, President Obama signed PROMESA, as amended, into law as Public Law 114-187.

93.     Broadly speaking and as relevant here, PROMESA establishes an Oversight

24

Board for Puerto Rico (Title I); sets forth a process for the Oversight Board to approve, or else develop, a Fiscal Plan governing the territory's future finances and budgets (Title II); and provides a process for the territory to declare and emerge from bankruptcy if necessary and consistent with the Fiscal Plan (Title III).

94.     Although it applies to all United States Territories, PROMESA was drafted with Puerto Rico and its current fiscal condition specifically in mind, as reflected by the fact that its passage established an Oversight Board for Puerto Rico.

95.     The premise of PROMESA is to provide federal territories, and especially Puerto Rico, with the tools to address a financial crisis with the guidance of an "Oversight Board" and subject to specific constraints and protections for territorial self-governance.

96.     The heart of PROMESA is the Fiscal Plan, which provides the territory with a financial roadmap to govern territory finances, but not operations.

97.     Title I of PROMESA, 48 U.S.C. § 2121 *et seq.*, establishes an Oversight Board for Puerto Rico.  The Oversight Board is defined as an entity within the territorial government, although the President of the United States appoints its seven members.  The Oversight Board is given sole discretion to review and then approve or reject proposed Fiscal Plans offered by the Governor on behalf of the Commonwealth.  It also permits the Oversight Board to develop its own Fiscal Plan if it rejects the Governor's proposal – even following revisions made by the Governor after consultation with the Oversight Board – in the event that the Board determines the Governor's plan does not meet the Fiscal Plan Requirements set forth by PROMESA. Ultimately, the Oversight Board is given the responsibility to approve and certify a Fiscal Plan that is proposed by the Governor, unless the Board develops its own Fiscal Plan following rejection of the Governor's, in which case the Board's self-developed Fiscal Plan is "deemed

approved" by the Governor.

98.     Although an Oversight Board established under Title I is given significant authority, that authority is not unrestricted, as set forth in Title II of PROMESA, entitled "RESPONSIBILITIES OF THE OVERSIGHT BOARD," at 48 U.S.C. § 2141, *et seq*.

99.     Within Title II, PROMESA Section 201(b) sets forth a number of "requirements" for any Fiscal Plan including, pertinent here, that it "provide adequate funding for public pension systems" (the "Adequate Pension Funding Requirement") and "ensure the funding of essential public services" (the "Essential Services Requirement").

100.    As alleged herein, the Oversight Board and its members failed to adhere to either the Adequate Pension Funding Requirement or the Essential Services Requirement in purporting to develop, review, approve and/or certify the Final Fiscal Plan.

101.    The meaning of the Adequate Pension Funding Requirement is clear on its face: the retiree benefit obligations owed by a pension system must be adequately funded to be satisfied in full under a Fiscal Plan.   Other provisions of PROMESA confirm PROMESA requires maintenance and full funding of benefits.  *See, e.g*., 48 U.S.C. 2144(a)(4) (relating to Oversight Board providing non-binding recommendations to Commonwealth regarding "the establishment of alternatives for *meeting obligations* to pay for the pensions of territorial government employees") (emphasis added).

102.    This is also apparent from PROMESA's legislative history.  At the Committee on Natural Resources markup of PROMESA, Representative Fleming (R-AZ) offered Amendment Number 92, which would have amended the Adequate Pension Funding Requirement to read as follows: "provide adequate funding, or other reasonable alternatives, to satisfy contribution liabilities to public pension systems, but solely to the extent that such contributions are due under

26

the terms of the applicable pension plan (*as may be restructured pursuant to this Act*) in the fiscal years covered by a Fiscal Plan" (emphasis added).  Representative Fleming's Amendment Number 92 was rejected by a voice vote of the Committee, leaving the Adequate Pension Funding Requirement in place as originally drafted.

103.    As detailed above, there are two methods by which PROMESA allows a Fiscal Plan to be certified by the Oversight Board: (1) approval of the Governor's proposed Fiscal Plan as-is, or (2) development by the Board of its own Fiscal Plan following rejection of the Governor's.

104.    More specifically, Section 201(c) of PROMESA sets forth procedures for the "Development, Review, Approval, and Certification of Fiscal Plans."  First, the Governor is charged with developing a "proposed Fiscal Plan" (Section 201(c)(2)) which must be reviewed by the Oversight Board.  In reviewing a proposed Fiscal Plan, the Oversight Board must review it "to determine whether it satisfies the requirements set forth in subsection (b) [of Section 201]," which includes the Adequate Pension Funding Requirement and Essential Services Requirement. Upon review, the Oversight Board is charged with either accepting or rejecting the Governor's proposed Fiscal Plan.  Specifically, if the Oversight Board "determines in its sole discretion that the Proposed Fiscal Plan . . . satisfies such requirements, the Oversight Board shall approve the proposed Fiscal Plan," but if the Oversight Board "determines in its sole discretion that the proposed Fiscal Plan . . . does not satisfy such requirements, the Oversight Board shall provide to the Governor . . . an opportunity to correct the violation."

105.    In the event the initial Fiscal Plan proposed by the Governor is not certified under Section 201(c), Section 201(d) sets forth procedures for submission by the Governor of a proposed "Revised Fiscal Plan."  First, as set forth at Section 201(d)(1), the Governor is charged

with submitting a Revised Fiscal Plan to the Oversight Board following receipt of a "notice of violation" from the Oversight Board.

106.   As set forth at Section 201(d)(2), "[i]f the Governor fails to submit to the Oversight Board a Fiscal Plan that the Oversight Board determines in its sole discretion satisfies the requirements set forth in subsection (b) [of Section 201]. . . the Oversight Board shall develop and submit to the Governor and the Legislature a Fiscal Plan that satisfies the requirements set forth in subsection (b)."

107.   Notably, while PROMESA consistently refers to the Oversight Board's decision to reject or certify the democratically-elected Governor's proposed Fiscal Plans under Sections 201(c)(3) and (d)(2) as within the Board's "sole discretion," PROMESA does not use this terminology with respect to the Oversight Board developing and certifying its own Fiscal Plan.

108.   Instead, if the Oversight Board rejects a Revised Fiscal Plan, Section 201(d)(2) of PROMESA instructs that the Oversight Board "shall develop and submit to the Governor and the Legislature a Fiscal Plan that satisfies the requirements set forth in subsection (b) [of Section 201]," which includes the Adequate Pension Funding Requirement and Essential Services Requirement.

109.   Likewise, a different statutory subsection governs "approval and certification" if the Oversight Board has approved and certified a Fiscal Plan proposed by the Governor—in which case Section 201(e), entitled "Approval of Fiscal Plan Developed by Governor," applies— versus if the Oversight Board has developed its own Fiscal Plan—in which case Section 201(e)(2), entitled "Deemed Approval of Fiscal Plan Developed by Oversight Board," applies.

*The Governor's Proposed and Revised Fiscal Plans*

110.   On October 14, 2016, then-Governor of Puerto Rico Alejandro García Padilla submitted to the Oversight Board the first proposed Fiscal Plan for the Commonwealth (the "García Padilla Plan").

111.   The García Padilla Plan provided adequate funding for public pension systems as required by PROMESA.   As the García Padilla Plan noted (page 8), it would "ensure the payment of an already meager average benefit that is only 53 percent of the average U.S. State." It did not provide for any reductions to already-accrued vested retirement benefits, whether DB Pensions or DC Account balances, and set forth an actuarially-determined schedule for employer contributions to adequately fund the pension systems in order to provide the benefits that had been earned thereunder, as required by PROMESA.

112.   The García Padilla Plan was rejected by the Oversight Board at its meeting on November 18, 2016.   At that meeting, the Oversight Board adopted and communicated publically a set of five principles for the Fiscal Plan.

113.   Following the inauguration of Governor Rossello on January 2, 2017, the Oversight Board, on January 18, 2017, sent Governor Rossello a letter, pursuant to PROMESA Section 201(c)(3), that provided "recommendations for revisions to the applicable Fiscal Plan" and an opportunity to correct the García Padilla Plan through submission of a revised plan by February 28, 2017.   The Board's letter stated, without any careful explanation as to precisely why, that "a reduction of approximately 10% in pension costs and related expenses may be necessary, for savings of $0.2 billion [per year] by fiscal year 2019."

114.   Governor Rossello submitted his first Revised Fiscal Plan – a revision of the García Padilla Plan – to the Oversight Board on February 28, 2017 (the "February 28 Plan").

The February 28 Plan proposed no funding for public pension systems *per se*, but instead provided for a "pay-as-you-go model to cover remaining defined benefit obligations" from the Commonwealth's general budget.

115.   The February 28 Plan further provided that earned accrued pension benefits would be reduced by $60 million per year beginning in 2018, for a cumulative reduction of 3% ($563 million in total by end of fiscal year 2026), by cutting 30% of all current and future retirement benefits that exceed $2000 per month.  For example, the February 28 Plan stated that a vested and accrued monthly pension benefit of $3000 would be reduced to $2700 per month by cutting 30% of the $1000 in monthly benefits earned above $2000, generating a net reduction of 10% to that hypothetical pensioner's retirement income security.

116.   On March 9, 2017, the Oversight Board, sent the Governor a letter stating that the February 28 Plan did not "comply with the requirements set forth in PROMESA."  Despite noting that, in the Oversight Board's view, the February 28 Plan was "heading in the right direction" in many areas, the Board again insisted—as it had at its November 18, 2016 meeting and its January 18, 2017 letter—on a firm, round and unexplained "10% benchmark" for pension cuts.  The Oversight Board also stated that it would approve a Fiscal Plan on March 13, 2017.

117.   The Governor, in response, submitted another Revised Fiscal Plan on March 13, 2017 (the "March 13 Plan").  The March 13 Plan provides for nearly identical pension cuts to the February 28 Plan ($541M in total over the life of the fiscal plan, but with cuts beginning as of 2020 rather than 2018), but closed revenue and cost gaps in a number of other significant areas.

118.   At this point, pursuant to PROMESA, the Oversight Board had the option of electing one of two options under Section 201: (1) exercise "its sole discretion"  to  approve the democratically-elected Governor's March 13 Plan pursuant to Section 201(c)(3); or (2) "develop

and submit . . . a Fiscal Plan that satisfies the requirements set forth in subsection (b)" of Section 201 (which necessarily includes the Adequate Pension Funding Requirement applicable to all Fiscal Plans) pursuant to Section 201(d)(2).

119.    Rather than pursue either of the options legally available to it under PROMESA, the Oversight Board, at a public meeting it held later on March 13, 2017, instead steered a course that PROMESA does not authorize: the Board issued a "Fiscal Plan Certification" which purported to "approve[] and certify[y] the Governor's latest proposed fiscal plan pursuant to PROMESA § 201(e), *as modified by*" two amendments made by the Oversight Board (emphasis added).  Notably, the Board did not specify whether it was certifying the Final Fiscal Plan under Section 201(e)(1) (applicable to a "Fiscal Plan developed by Governor") or Section 201(e)(2) (applicable to a "Fiscal Plan developed by Oversight Board").

120.    The Governor and his representatives have since clarified his view that the Board's amendments were not part of the Governor's proposed fiscal plan and therefore were merely recommendations of the Board made under Section 205 of PROMESA.  The Board disagrees with the Governor and contends that the amendments are part of the Fiscal Plan as certified.

121.    Despite lacking statutory authority to amend a Revised Fiscal Plan under Section 201, the Oversight Board purported to amend the March 13 Plan in two ways: (1) imposing a furlough program for Commonwealth employees and removal of all Commonwealth employee Christmas bonuses, contingent on certain indeterminate eventualities whose satisfaction (or not) was to be determined at the Board's discretion at a later date, and (2) requiring that the 3% pension cuts already specified in the Governor's proposed fiscal plan be "supplemented to provide for progressively reduced total pension outlays by 10% by fiscal year 2020" subject only

31

to the constraint "that no member is pushed below the federal poverty line as a result of the reductions."

122.    Notably, the federal government does not publish a "Federal Poverty Line" and presumably the Oversight Board's statement refers to the Department of Health and Human Services' Annual Update of the HHS Poverty Guidelines, most recently published in Vol. 82, No. 19, p. 8831 of the Federal Register (January 31, 2017), which for an individual living in the contiguous United States and District of Columbia is an annual income of $12,060.  A guideline is not published for Puerto Rico, and the cost of living in Puerto Rico is substantially higher than in the contiguous United States.

123.    The Oversight Board's purported "amendments" of the Governor's Fiscal Plan that it simultaneously purported to certify exceeded the Board's statutory authority under PROMESA for at least three reasons.  First, the Board was not authorized to make "amendments" to the Governor's March 13 Plan and then approve and certify pursuant to either subsection of Section 201(e).  Second, the Board blatantly ignored the Adequate Pension Funding Requirement by cutting retirement benefits owed by the Commonwealth.  Third, the Board gave no consideration to the Essential Services Requirement by ordering furloughs (which in any case constitute an impermissible intrusion into sovereign Commonwealth operations) that are tied to contingencies unrelated to the ability of the sovereign Puerto Rico government to provide essential services.

### *Implementation of the Fiscal Plan*

124.    Under PROMESA, once a Fiscal Plan is properly certified, it must be implemented and adhered to by the Commonwealth government through the budgetary and legislative process as reviewed and overseen by the Oversight Board with strict constraints on

both Commonwealth and Board action.

125.    Specifically, Section 202 of PROMESA requires a territory's budget to comply with the Fiscal Plan and sets forth a process for Oversight Board review and approval and/or revision of a budget for each fiscal year; Section 203 sets forth a process for the Oversight Board to take specific action in the event of Commonwealth noncompliance with the budget, but only after the end of each fiscal quarter; and Section 204 requires the territory's legislative acts to comply with the Fiscal Plan and sets up a process for Oversight Board review of legislation.

126.    Under Section 203, the Oversight Board does have the right to institute mid-year "reductions in nondebt expenditures to ensure that the actual *quarterly* revenues and expenditures for the territorial government are in compliance with the applicable certified territory budget," but only *after*—as the emphasis on quarterly revenues makes clear—a back-and forth process with the Commonwealth that *begins* at the close of each fiscal *quarter* subsequent to the certification of the annual budget.

127.    In contrast, Section 205 sets forth a process by which the Oversight Board can make non-mandatory recommendations, and receive a response from the Commonwealth thereon, as to operational, personnel, benefit, and other issues.

128.    The Section 203 process first requires the Oversight Board to determine that "the actual *quarterly* revenues, expenditures, or cash flows of the territorial government are not consistent with the projected revenues, expenditures, or cash flows *set forth in the certified Budget for such quarter*."

129.    The Board made no such determination before instituting the furloughs in the August 4 Decrees—nor could it have, because the furloughs were announced almost two months before the close of Q1 2018.

33

130.    In any case, if the Board does properly make a determination under Section 203(b) that actual quarterly revenues have fallen short, Section 203(b) next requires the Oversight Board to request additional information from the Commonwealth regarding this *quarterly* inconsistency.

131.    The Board made no such request before instituting the furloughs in the August 4 Decrees—nor could it have, because the furloughs were announced almost two months before the close of Q1 2018.

132.    In any case, if the Board does make a determination under Section 203(b) that actual quarterly revenues have fallen short, *and* if the Board has requested additional information from the Commonwealth but is still not satisfied with the additional information provided, Section 203(c) next requires the Oversight Board to "certify to the President" and other federal and Commonwealth officials "that the territorial government is inconsistent with the applicable certified Budget, and shall describe the nature and amount of the inconsistency."

133.    The Board made no such certification before instituting its mandate to require employee furloughs.

134.    Even through this quarterly budgetary oversight process the Board lacks statutory authority to make personnel decisions for the Commonwealth.  Thus, even if the Board were to make a determination under Section 203(b) that quarterly revenues have fallen short, *and* requested additional information from the Commonwealth, *and* has certified its resulting determination of a budget inconsistency to the President, the Oversight Board has only the authority provided by Section 203(d)(1) to "make appropriate reductions to *nondebt* expenditures" of the Commonwealth (emphasis added).  By its terms, PROMESA's reference to "nondebt expenditures" does not include personnel decisions with respect to the Commonwealth,

34

a point made clear as PROMESA grants such authority to the Board only with respect to "territorial instrumentalities"—not territories themselves—in the form of "automatic hiring freezes." *Compare* 48 U.S.C. § 2143(d)(1) with 48 U.S.C. § 2143(d)(2).

135.    On June 30, 2017, the Oversight Board purported to certify the Commonwealth's FY 2018 budget as amended by the Board.

136.    However, one of the Board's amendments to the FY 2018 budget consisted of a contingency that the Board reserved the right, at any time, to institute furloughs based on the Board's "determination that the measures to collect or reduce expenditures do not generate sufficient cash and budgetary savings to meet the revenue and expense projections of the Fiscal plan." This furlough contingency contains no specific numbers and does not allocate, or not allocate, money to any particular expense as would be proper for a budget provision. Plainly, the Board's reservation of authority to mandate furloughs on-the-fly -- and outside of the PROMESA-required quarterly budgetary review process -- is contrary to PROMESA and an exercise of authority that exceeds the limited authority conferred by PROMESA on the Board.

137.    On August 4, 2017, the Board sent a letter to the Governor ordering that furloughs be implemented by September 1, 2017, to save at least $218M by the end of FY 2018 via "a two-day per month furlough for all Executive Branch government employees, with the exclusion of front-line police, for fiscal year 2018." The Oversight Board also states that the FY 2018 budget will be "revised to reflect . . . the expenditure adjustments resulting from the furlough program."

138.    The Board's August 4 furlough decree asks that the Commonwealth attempt to "[p]revent adverse effect on public safety or critical health services" yet provides no analysis as to how this could be possible with such extensive furloughs. For example, only "front-line" police are excluded—not even the thousands of correctional officers represented by AFSCME

35

whose work is critical to public safety.

139.    Also on August 4, 2017, the Board issued a memorandum on pension reform. Among other things, the memorandum confirms the Board seeks to require the Commonwealth to "[r]educe total annual pension benefit payments by an average of ten percent."

140.    The Board's August 4 pension decree admits that "instead of depositing employee contributions to System 2000 accounts to fund future benefits, the plans have diverted employee contributions" instead of those contributions being "saved in defined contribution accounts to fund their future retirement benefits (as they should have been all along)."

141.    Despite this admission of misconduct, the Board states categorically that a "feature" of the 10% reduction is its application to DC Account balances "attributable to benefits accrued as of the PROMESA effective date of June 30, 2016," i.e., a direct taking of employees' property.  Thus, an employee who began service with the Commonwealth in 2000 stands to see cuts to more than 15 years of their wage contributions to their DC Account Plans.

## FIRST CAUSE OF ACTION

### (for Declaratory and Injunctive Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 for Violations of U.S. Const. Am. V against All Defendants)

142.    AFSCME repeats and realleges the allegations contained in the foregoing paragraphs, as if fully set forth herein.

143.    The development and approval of the Final Fiscal Plan and the passage and implementation of HR 188, SB 603, and the August 4 Decrees have harmed active and retired employees represented by AFSCME by taking or imminently threatening to take their property—DC Account Plan balances—without any compensation, for no public use, and without due process of law.

144.    An actual justiciable controversy exists between the parties.

145.   AFSCME is entitled to an order declaring as follows:

a.      Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets are unconstitutional on the ground that each violates the Fifth Amendment of the United States Constitution;

b.      Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets are unlawful, invalid, null, and void; and

c.      Any award of just compensation or damages for violation of the Takings Clause cannot be impaired by a PROMESA Plan or an Order confirming a PROMESA Plan because doing so would violate the Fifth and Fourteenth Amendments to the U.S. Constitution and Article II of the Puerto Rico Constitution.

146.   If Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets are enforced, then the illegal taking of property effected thereby will result in imminent and irreparable harm to active and retired workers represented by AFSCME by allowing collateral to be diverted and threatening the ability of active and retired employees to pay for basic necessities such as housing and medication.

147.   In addition, enforcement of Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets will cause immediate and irreparable harm by depriving active and retired workers represented by AFSCME of their property rights in a manner that violates the Takings and Due

Process Clauses of the U.S. Constitution.

148. The individual defendants, as alleged above, have acted under color of statute, ordinance, regulation or law of the Commonwealth and subjected AFSCME's members to a deprivation of rights and privileges under the U.S. constitution and PROMESA, as alleged herein.

149. AFSCME is entitled to injunctive relief invalidating Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets, and prohibiting Defendants from taking or causing to be taken any action pursuant to Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets, including any action relating to future legislation, rules, or budgets; or presenting, continuing, soliciting votes on, or seeking modification or confirmation of any plan of adjustment premised on the illegal Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets.

## SECOND CAUSE OF ACTION

**(for Declaratory and Injunctive Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 for taking of property without just compensation in violation of Article II, Sections 7 & 9 of the Puerto Rico Constitution ("Puerto Rico Takings and Due Process Clauses"))**

150. AFSCME repeats and realleges the allegations contained in the foregoing paragraphs, as if fully set forth herein.

151. The development of the Final Fiscal Plan and the passage and implementation of HR 188, SB 603, and the August 4 Decrees have harmed active and retired employees represented by AFSCME by taking or imminently threatening to take their property—DC

Account Plan balances—without any compensation, for no public use, and without due process of law.

152.     An actual justiciable controversy exists between the parties.

153.     AFSCME is entitled to an order declaring as follows:

a.     Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets are unconstitutional on the ground that each violates the Article II, Sections 7 and 9 of the Puerto Rico Constitution;

b.     Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets are unlawful, invalid, null, and void; and

c.     Any award of just compensation or damages for violation of the Takings Clause cannot be impaired by a PROMESA Plan or an Order confirming a PROMESA Plan because doing so would violate the Fifth and Fourteenth Amendments to the U.S. Constitution and Article II of the Puerto Rico Constitution.

154.     If Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets are enforced, then the illegal taking of property effected thereby will result in imminent and irreparable harm to active and retired workers represented by AFSCME by allowing collateral to be diverted and threatening the ability of active and retired employees to pay for basic necessities such as housing and medication.

155.     In addition, enforcement of Amendment No. 2 of the Final Fiscal Plan, the August

4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets will cause immediate and irreparable harm by depriving active and retired workers represented by AFSCME of their property rights in a manner that violates the Takings and Due Process Clauses of the Puerto Rico Constitution.

156.    The individual defendants, as alleged above, have acted under color of statute, ordinance, regulation or law of the Commonwealth and subjected AFSCME's members to a deprivation of rights and privileges under the U.S. constitution and PROMESA, as alleged herein.

157.    AFSCME is entitled to injunctive relief invalidating Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets, and prohibiting Defendants from taking or causing to be taken any action pursuant to Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets, including any action relating to future legislation, rules, or budgets; or presenting, continuing, soliciting votes on, or seeking modification or confirmation of any plan of adjustment premised on the illegal Amendment No. 2 of the Final Fiscal Plan, the August 4 Decree concerning pensions, and the provisions of HR 188 and SB 603 ordering liquidation of ERS assets.

### THIRD CAUSE OF ACTION

**(for Declaratory and Injunctive Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 for Violations of Section 201 of PROMESA)**

158.    AFSCME repeats and realleges the allegations contained in the foregoing paragraphs, as if fully set forth herein.

159.    The development of the Final Fiscal Plan and the passage and implementation of

the August 4 Decrees enforcing it have harmed active and retired employees represented by AFSCME by taking or imminently threatening their ability to support themselves in retirement at even a basic standard of living, such as payment for housing and medication.

160.    An actual justiciable controversy exists between the parties.

161.    AFSCME is entitled to an order declaring as follows:

a.    Amendment No. 2 of the Final Fiscal Plan, and the August 4 Decree concerning pensions enforcing it, violate the PROMESA Section 201(b)(1)(C) requirement that public pensions be adequately funded;

b.    Amendment No. 1 of the Final Fiscal Plan, and the August 4 Decree concerning furloughs enforcing it, violate the PROMESA Section 201(b)(1)(B) requirement that funding of essential public services be ensured;

c.    Both Amendments in the Final Fiscal Plan, and the August 4 Decrees enforcing them, violate the process for the development of a Fiscal Plan set forth at PROMESA Section 201(c-e) and are not lawfully part of the Fiscal Plan as certified; and

d.    Both Amendments to the Final Fiscal Plan, and the August 4 Decrees enforcing them, are unlawful, invalid, null, and void.

162.    If the amendments of the Final Fiscal Plan and the August 4 Decrees are enforced, then the violations of Section 201 of PROMESA effected thereby will result in imminent and irreparable harm to active and retired workers represented by AFSCME by threatening the ability of active and retired employees to pay for basic necessities such as housing and medication.

163.    The individual defendants, as alleged above, have acted under color of statute, ordinance, regulation or law of the Commonwealth and subjected AFSCME's members to a

deprivation of rights and privileges under the U.S. constitution and PROMESA, as alleged herein.

164.     AFSCME is entitled to injunctive relief invalidating the Amendments to the Final Fiscal Plan, and the August 4 Decrees enforcing them, and prohibiting Defendants from taking or causing to be taken any action pursuant to the Amendments to the Final Fiscal Plan or the August 4 Decrees, including any action relating to future legislation, rules, or budgets; or presenting, continuing, soliciting votes on, or seeking modification or confirmation of any plan of adjustment premised on the Amendments to the Final Fiscal Plan or the August 4 Decrees.

## FOURTH CAUSE OF ACTION

### (for Declaratory and Injunctive Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 for Violations of Section 203 of PROMESA)

165.     AFSCME repeats and realleges the allegations contained in the foregoing paragraphs, as if fully set forth herein.

166.     The development of Amendment No. 1 of the Final Fiscal Plan, and the passage and implementation of the Commonwealth's FY 2018 budget and the August 4 Decree on furloughs, has harmed active employees represented by AFSCME by taking or imminently threatening their ability to support themselves at even a basic standard of living, such as payment for housing and medication.

167.     The individual defendants, as alleged above, have acted under color of statute, ordinance, regulation or law of the Commonwealth and subjected AFSCME's members to a deprivation of rights and privileges under the U.S. constitution and PROMESA, as alleged herein.

168.     An actual justiciable controversy exists between the parties.

169.     AFSCME is entitled to an order declaring as follows:

a.      Amendment No. 1 of the Final Fiscal Plan, and the enactment and implementation of the Commonwealth's FY 2018 budget and the August 4 Decree on furloughs, violates the PROMESA Section 203 requirement that the Board only order a budget reduction following the close of a fiscal quarter and after a strict process including, but not limited to, certifying a budget inconsistency to the President of the United States;

b.      Amendment No. 1 of the Final Fiscal Plan, and the enactment and implementation of the Commonwealth's FY 2018 budget and the August 4 Decree on furloughs, violates the PROMESA Section 203 requirement that the Board only "make reductions in nondebt expenditures to ensure that quarterly revenues and expenses . . . are in compliance with the applicable certified budget," not make operational decisions about how allocated expenses for personnel are used in practice; and

c.      Amendment No. 1 of the Final Fiscal Plan, and the enactment and implementation of the Commonwealth's FY 2018 budget and the August 4 Decree on furloughs, are unlawful, invalid, null, and void.

170.    If Amendment No. 1 of the Final Fiscal Plan, and the enactment and implementation of the Commonwealth's FY 2018 budget and the August 4 Decree on furloughs, are enforced, then the violations of Section 203 of PROMESA effected thereby will result in imminent and irreparable harm to active employees represented by AFSCME by threatening their ability to pay for basic necessities such as housing and medication.

171.    AFSCME is entitled to injunctive relief invalidating Amendment No. 1 of the Final Fiscal Plan, and the enactment and implementation of the Commonwealth's FY 2018

43

budget and the August 4 Decree on furloughs, and prohibiting Defendants from taking or causing

to be taken any action pursuant to Amendment No. 1 of the Final Fiscal Plan, and the enactment

and implementation of the Commonwealth's FY 2018 budget and the August 4 Decree on

furloughs, including any action relating to future legislation, rules, or budgets; or presenting,

continuing, soliciting votes on, or seeking modification or confirmation of any plan of

adjustment premised on Amendment No. 1 of the Final Fiscal Plan, and the enactment and

implementation of the Commonwealth's FY 2018 budget and the August 4 Decree on furloughs,.

## FOURTH CAUSE OF ACTION

### (for Declaratory and Injunctive Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 for Breach of Fiduciary Duty and Unjust Enrichment)

172.    AFSCME repeats and realleges the allegations contained in paragraphs 1 through

136 hereof, as if fully set forth herein.

173.    ERS is, by statute, a trust that holds assets in trust for participants and

beneficiaries, including AFSCME-represented active employees and retirees.

174.    The Oversight Board and Commonwealth have revealed that ERS and the

Commonwealth misused employee contributions to RSAs and DC Accounts since 2000 by

diverting them in bad faith to pay other debts instead of funding the individual employees'

accounts as they should have.  This was accomplished without justification, without notice or

knowledge, and in breach of fiduciary duty, and has enriched ERS and the Commonwealth at the

expense of the trust participants and beneficiaries.

175.    Moreover, to the extent that the Commonwealth obtains or has obtained property

from the ERS trust attributable to employee contributions to DC Accounts, the Commonwealth is

or will be intentionally and wrongfully holding property of active and retired employees without

their consent, in violation of United States and Puerto Rico law.

176.     AFSCME is entitled to a declaration that any transfer of property from ERS to the

Commonwealth or any other third party that took place in the past or takes place in the future has

resulted or will result in an unjust enrichment of the Commonwealth at the expense of those

AFSCME represents, and the enforcement of the statutory trust—or, in the alternative,

imposition of a constructive trust under Puerto Rico law—preserving and protecting those funds,

and any other funds of ERS or the Commonwealth with any nexus to employee contributions

whatsoever, for the employees and retirees who contributed to their System 2000 and DC

Accounts but have not yet received 100% payment of those account balances.

## PRAYER FOR RELIEF

Wherefore Plaintiff prays for the following relief:

1.      A Declaratory Judgment that the amendments to the Fiscal Plan adopted and

imposed by the Defendant Oversight Board and its members, as alleged herein, are

unlawful, improper and constitute *ultra vires* acts and are null and void;

2.      Injunctive relief prohibiting all defendants from implementing or otherwise giving

force to the terms of the amendments to the Fiscal plan, including but not limited to cuts

to retirement income and employee furloughs;

3.      A Declaratory Judgment that the furlough provisions of the FY 2018

Commonwealth budget adopted by the Oversight Board and its members, as alleged

herein, are unlawful, improper and constitute *ultra vires* acts and are null and void;

4.      Injunctive relief prohibiting all defendants from implementing or otherwise giving

force to the terms of the furlough provisions of the FY 2018 Commonwealth budget;

5.      A Declaratory Judgment that the Oversight Board's August 4 Decrees, as alleged

herein, are unlawful, improper and constitute *ultra vires* acts and are null and void;

6.      Injunctive relief prohibiting all defendants from implementing or otherwise giving force to the Oversight Board's August 4 Decrees;

7.      A Declaratory Judgment that any reduction or elimination to Commonwealth retirees' and employees' DC Account Plan balances constitutes an unconstitutional taking with no just compensation or due process of law;

8.      Injunctive relief prohibiting all defendants from requiring the, or implementing a, reduction, elimination or diminution of Commonwealth retirees' and employees' DC Account Plan balances;

9.      The imposition or enforcement of a statutory or constructive trust over ERS assets and any other appropriate equitable relief to preserve and ensure the preservation of Commonwealth retirees' and employees' DC Account Plan balances;

10.     Attorneys' fees and costs of suit as authorized by statute; and

11.     Such other relief as the Court may deem just and proper.

Dated: August 22, 2017                    **SAUL EWING LLP**

                           By:    */s/ Sharon L. Levine*
                                  Sharon L. Levine *(pro hac vice)*
                                  Dipesh Patel *(pro hac vice)*
                                  1037 Raymond Blvd.
                                  Suite 1520
                                  Newark, NJ 07102
                                  (973) 286-6713 (Telephone)
                                  (973) 286-6821 (Facsimile)
                                  slevine@saul.com; dpatel@saul.com

                                  -and-

                                  */s/ Judith S. Rivlin*
                                  **AMERICAN FEDERATION OF STATE,
                                  COUNTY AND MUNICIPAL EMPLOYEES**
                                  Judith S. Rivlin *(pro hac vice)*
                                  Teague P. Paterson *(pro hac vice)*
                                  Matthew S. Blumin *(pro hac vice)*

1101 17th Street NW, Suite 900
Washington, DC 20011
(202) 775-5900 (Telephone)
(202) 452-0556 (Facsimile)
tpaterson@afscme.org; mblumin@afscme.org

-and-

*/s/ Manuel A. Rodriguez Banchs*
Manuel A. Rodriguez Banchs
P.O. Box 368006
San Juan, Puerto Rico 00936-8006
(787) 764-8896 (Telephone)
(787) 721-0975 (Facsimile)
manuel@rodriguezbanchs.com

*Attorneys for the American Federation of State,*
*County and Municipal Employees*