**Objection Deadline:** September 19, 2017, 4:00 p.m.
**Hearing Date:** October 4, 2017, 9:30 a.m.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

## MOTION OF NATIONAL PUBLIC FINANCE
## GUARANTEE CORPORATION FOR ENTRY OF AN
## ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING DISCOVERY

---

[1] The Debtors in these Title III cases (collectively, the "**Title III Cases**"), along with each Debtor's respective Title III Case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "**Commonwealth**") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("**COFINA**") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("**HTA**") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ....................................................................................1

JURISDICTION AND VENUE ...................................................................................5

BACKGROUND ........................................................................................................5

RELIEF REQUESTED..............................................................................................10

BASIS FOR RELIEF REQUESTED ........................................................................11

CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 2004-1.....................17

NOTICE ...................................................................................................................18

NO PRIOR REQUEST FOR RELIEF.......................................................................18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Air Line Pilots Ass'n., Int'l v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*,
  156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) .........................................13

*Cameron v. United States*,
  231 U.S. 710 (1914).....................................................................................................................12

*In re Coffee Cupboard, Inc.*,
  128 B.R. 509 (Bankr. E.D.N.Y. 1991).........................................................................................12

*Dynamic Fin. Corp. v. Kipperman (In re N. Plaza LLC)*,
  395 B.R. 113 (S.D. Cal. 2008).....................................................................................................12

*In re Enron Corp.*,
  281 B.R. 836 (Bankr. S.D.N.Y. 2002).........................................................................................12

*ePlus, Inc. v. Katz (In re Metiom, Inc.)*,
  318 B.R. 263 (S.D.N.Y. 2004).....................................................................................................13

*In re Gawker Media LLC*,
  No. 16-11700 (SMB), 2017 WL 2804870 (Bankr. S.D.N.Y. June 28, 2017) ........................13

*In re Hilsen*,
  Case No. 87-11261, 2008 WL 2945996 (Bankr. S.D.N.Y. July 25, 2008) .....................12, 13

*In re Hughes*,
  281 B.R. 224 (Bankr. S.D.N.Y. 2002).........................................................................................13

*In re Recoton Corp.*,
  307 B.R. 751 (Bankr. S.D.N.Y. 2004)...................................................................................12, 13

*In re Summit Corp.*,
  891 F.2d 1 (1st Cir. 1989)............................................................................................................12

*In re Youk-See*,
  450 B.R. 312 (Bankr. D. Mass. 2011).........................................................................................12

**Statutes**

11 U.S.C. § 1109(b) ............................................................................................................................12

11 U.S.C. § 1125 ................................................................................................................................14

48 U.S.C. § 2166.................................................................................................................................4

48 U.S.C. § 2167 ............................................................................................................4

48 U.S.C. § 2170 .......................................................................................................1, 11

Fed. R. Bankr. P. 2004 ........................................................................................... *passim*

Fed. R. Bankr. P. 9006(f) ...........................................................................................18

PR Laws Ann. tit. 32 § 1781 .......................................................................................15

PR Local Bankruptcy Rules Rule 2004-1(b) ..............................................................17

**Other Authorities**

*Gobernador Rosselló Nevares Demuestra Es Innecesaria Una Reducción de la Jornada Laboral*,
    La Fortaleza, Aug. 3, 2017 ....................................................................................3

**TO THE HONORABLE COURT**:

National Public Finance Guarantee Corporation ("**National**"), a party in interest in these Title III Cases, files this motion (the "**Motion**") for an order, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), made applicable to the Title III Cases by section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act ("**PROMESA**"), substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), authorizing National to take discovery of (i) the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as representative of the Commonwealth of Puerto Rico (the "**Commonwealth**" or the "**Debtor**"); (ii) the Commonwealth; and (iii) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**") and approving procedures to take related discovery from other parties. In an effort to minimize the burden on the Commonwealth and the Oversight Board, National has worked jointly with other substantial creditors of the Commonwealth. National's proposed discovery, including discovery requests, is nearly identical to that sought by the Ad Hoc Group of General Obligation Bondholders (the "**GO Group**"), Assured Guaranty Corp. and Assured Guaranty Municipal Corp. ("**Assured**"), and the Mutual Fund Group in their contemporaneous request for Rule 2004 discovery. In support of this Motion, National respectfully represents as follows:

<u>**PRELIMINARY STATEMENT**</u>

1. National seeks from the Oversight Board, AAFAF, the Commonwealth, and other third parties basic financial information that is necessary for National and its advisors to understand the Commonwealth's financial condition and its fiscal plan, as certified by the Oversight Board on March 13, 2017 (the "**Fiscal Plan**"). Without more information regarding the assumptions and methodology underlying the Fiscal Plan, including key financial

information regarding the Debtor's assets and projected revenues and expenses, National cannot accurately evaluate and react to any restructuring proposals made by the Debtor, including in connection with any proposed plan of adjustment, which by law must be based on the Fiscal Plan.

2.     Counsel for the Oversight Board has addressed the importance of allowing creditors to understand the full picture of the Commonwealth's financial condition.  For example, at a hearing before Judge Dein on August 22, 2017, counsel for the Oversight Board emphasized the importance of conducting investigations in a bankruptcy case:  "There are always two reasons for an investigation in bankruptcy, Your Honor:  One is to see if you can find something that will help enlarge the pie for the benefit of the stakeholders; the other is simply to provide sunshine.  Creditors are suffering losses.  They should know why."[2]  Moreover, counsel for the Oversight Board asserted that "the Board also doesn't have a problem making public other findings because the sunshine policy is important, and the Board is in a perfect position to provide that sunshine. . . . The Board has certainly been as transparent as possible[.]"[3]

3.     While transparency is a hallmark of both democratic government and the bankruptcy process, contrary to the Oversight Board's assertions, the Commonwealth and its representatives have inconceivably, repeatedly refused to provide basic financial information to its creditors.  Indeed, National's financial advisor, PJT Partners ("**PJT**") and National's counsel, Weil, Gotshal & Manges LLP ("**Weil**") have submitted multiple requests to the Oversight Board, AAFAF and their respective advisors for financial information and other diligence that would allow National to evaluate the financial condition of the Commonwealth and its

_____

[2] *See* 8/22/17 Hr'g Tr. at 54:9-15.

[3] *See* 8/22/17 Hr'g Tr. at 54:18-24.

2

instrumentalities, including various fiscal plans and their implications for stakeholders.  The
Oversight Board and AAFAF, however, have repeatedly ignored such requests and have yet to
produce the majority of the requested information.  The need for transparency is obvious.  For
example, at a press conference on August 3, 2017, Governor Rossello stated that the
Commonwealth government had approximately $1.799 billion cash on hand as of June 30,
2017.[4]  This figure is well above the projected $291 million cash on hand for the June 30, 2017
forecast in the Fiscal Plan.  *See* Fiscal Plan, at 31.  The significant discrepancy highlights the
need for transparency into the assumptions underlying the Fiscal Plan as well as to the
Commonwealth's overall financial condition.

4.     There is no reason to further delay the disclosure of this important
information.  Creditors in these Title III Cases must have this information in order to participate
meaningfully in the process of advancing these Title III Cases.  This Court recognized this point
at the very first hearing in these cases, when the Court emphasized that "transparency is
important in these proceedings" and expressed hope that the Commonwealth would make
"progress on issues relating to the disclosure of information to creditors."[5]  To that end, the
Court ordered the Oversight Board to submit a status report (the "**Status Report**") to keep the
Court apprised of such progress and also the status of settlement discussions.

---

[4] *See Gobernador Rossello Nevares Demuestra Es Innecesaria Una Reducción de la Jornada Laboral*, LA FORTALEZA, Aug. 3, 2017, http://www.fortaleza.pr.gov/content/gobernador-rossell-nevares-demuestra-es-innecesaria-una-reducci-n-de-la-jornada-laboral.

[5] *See* 5/17/17 Hr'g Tr. at 63:5-9; 147:16-25.

5. The Status Report filed by the Oversight Board,[6] however, focused predominantly on the extremely limited information that the Oversight Board deposited into a data room shortly before the commencement of the Title III Cases. The Oversight Board acknowledged that the Commonwealth received extensive follow-up diligence requests and exaggerated the response delivered to creditors by the Oversight Board and AAFAF. Contrary to the Oversight Board's assertion that it "agreed to produce a substantial amount of additional data," in large part they refused to provide more information. Creditors' repeated requests for critical information have been left unanswered and this is evidenced by the various statements filed in response to the Status Report, all of which express dissatisfaction with the lack of transparency in these Title III Cases.[7]

6. Unfortunately, the Oversight Board, AAFAF, and the Commonwealth have thus far shown little intention of voluntarily conducting the transparent and cooperative process that all parties, including creditors, deserve and expect in a proposed restructuring of this magnitude and importance. As a result, National now seeks an order from this Court compelling the Oversight Board, AAFAF, the Commonwealth, and related third parties to produce this information.

---

[6] *See Debtors' Status Report Regarding (A) Financial Disclosures to Creditors and (B) Status of Settlement Discussions*, Case No. 17-03283 (D.P.R. June 15, 2017), ECF No. 350.

[7] *See Statement of the Ad Hoc Group of General Obligation Bondholders, Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., the Mutual Fund Group, National Public Finance Guarantee Corporation, and the Puerto Rico Funds in Response to Debtors' Status Report Regarding (A) Financial Disclosures to Creditors and (B) Status of Settlement Discussions*, Case No. 17-03283 (D.P.R. June 26, 2017), ECF No. 461 ("**Joint Creditor Statement**"); *Statement of the COFINA Senior Bondholders' Coalition in Response to Debtors' Status Report Regarding (A) Financial Disclosures to Creditors and (B) Status of Settlement Discussions*, Case No. 17-03283 (D.P.R. June 26, 2017), ECF No. 464 ("**COFINA Senior Bondholders' Coalition Statement**").

## JURISDICTION AND VENUE

7.     The United States District Court for the District of Puerto Rico (the "**Court**") has jurisdiction to consider this matter pursuant to section 306 of PROMESA.  48 U.S.C. § 2166.  Venue is proper pursuant to section 307 of PROMESA.  48 U.S.C. § 2167.

## BACKGROUND

8.     National insures (i) more than $690 million of general obligation bonds issued by the Commonwealth[8]; (ii) more than $1.1 billion in senior sales tax revenue bonds[9] issued by the Puerto Rico Sales Tax Financing Corporation ("**COFINA**"); and (iii) $706 million of outstanding bonds issued by the Puerto Rico Highways and Transportation Authority ("**HTA**").  National has the right to assert bondholders' rights in these Title III Cases under applicable bond and insurance documents.

9.     As a bond insurer, National remains obligated on debt it insures until the debt is legally defeased or matured and in this regard, National's perspective is identical to that of a "buy-and-hold" bond investor, as its insured debt matures over the next 30 years. A restructuring of Puerto Rico's debt only makes sense if the restructuring leads to the long-term sustainability of Puerto Rico's economy and debt load.  These considerations are set forth as foundational goals under PROMESA.  As described in numerous public filings, including pleadings filed with this Court, there are substantial concerns about the legality of the

---

[8] This amount excludes approximately $192 million of claims already paid by National as a result of the Commonwealth's failure to make scheduled payments on July 1, 2016 and January 1, 2017.

[9] For capital appreciation bonds, stated amounts reflect accreted interest as of March 31, 2017. In addition, stated amount includes approximately $173 million of senior sales tax revenue bonds directly held by National.

Commonwealth's Fiscal Plan and many of the assumptions and analyses on which it relies. This includes, for example, the lack of respect for Puerto Rico's Constitution, the failure to recognize enforceable liens, the failure to differentiate between essential and non-essential expenditures, underlying questionable macro-economic assumptions, and a highly suspect $6.2 billion "Reconciliation Adjustment" designed to provide a cushion for budget overruns.[10]

10.     On April 7, 2017, National's financial advisor, PJT, sent a preliminary diligence list to Rothschild, AAFAF's financial advisor.[11]   *See* Baird Declaration at ¶ 3. Rothschild provided answers to some – but not all – of PJT's questions and many of the responses provided were vague, incomplete, or simply directed PJT to other materials unrelated to the question asked. *Id.*

11.     On April 11, 2017, AAFAF responded to PJT's preliminary diligence list. Similar to the responses received from Rothschild, AAFAF's response was insufficient, because AAFAF provided answers to some – but not all – of PJT's questions, and many of the responses received were vague, incomplete or unrelated to the question asked. *See* Baird Declaration at ¶ 4. Additionally, many of AAFAF's responses merely re-directed PJT to documents that PJT had previously reviewed and deemed insufficient, either because the working models were hardcoded (and did not provide enough supporting detail) or because the documents failed to explain the rationale for the assumptions that were put forth. *Id.*

12.     On April 28, 2017, in connection with a proposed forbearance agreement, counsel for National sent a detailed diligence request (prepared by PJT) to counsel to the

---

[10] *See* Adversary Complaint, *Assured Guar. Corp., et al. v. Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-00125 (D.P.R. May 3, 2017), ECF No. 1.

[11] The Declaration of James Baird in Support of the Motion (the "**Baird Declaration**") contains the April 7, 2017 preliminary diligence list as **Exhibit A**.

Oversight Board as well as to counsel to the Commonwealth.[12]  *See* Baird Declaration at ¶ 5. The documents and information requested by PJT included, among other things:  (i) live excel models demonstrating the quantitative analyses found in the Fiscal Plan; (ii) rationales for certain assumptions contained in the Fiscal Plan (*e.g.*, rationale for assumptions relating to indefinite population decline, flat productivity, flat labor force participation, and the size and timing of impact structural reforms); (iii) a detailed list of information that Ernst & Young reviewed during its review of the Commonwealth's financial information for fiscal year 2015 and fiscal year 2016; (iv) normalized government expenditure information for fiscal year 2010 through fiscal year 2013; (v) a comparison of historical healthcare expenditures for the past ten years; (vi) an estimate of aggregate book and market value of government and public enterprise-owned land and real estate; (vii) details regarding tax collection other than sales and use tax collection; and (viii) a breakdown of capital expenditures.  *Id.* at ¶ 6.  Ultimately, the forbearance was never finalized and these diligence requests went unanswered.[13]

      13.    The Oversight Board filed a Title III petition in this Court on (i) May 3, 2017 on behalf of the Commonwealth; (ii) May 5, 2017 on behalf of COFINA; and (iii)  May 21, 2017 on behalf of HTA.

---

[12]  The April 28, 2017 detailed diligence request is attached to the Baird Declaration as **Exhibit B**.

[13] Although not directly in response to the diligence requests above, the Commonwealth and the Oversight Board eventually produced material that was responsive to some of the diligence requests, including a working model for the Commonwealth.  *See* Baird Declaration at ¶ 7. However, the information produced had significant shortcomings and did not address the main focus of PJT's request, which was seeking additional layers of information that provided the foundation and build-up for the Fiscal Plan.  *Id.*  The working model, for example, consists of 10 tabs of primarily summary output information and includes links to other excel models that have either not been provided or, if provided, are in fact also mostly hardcoded.  *Id.*  The model does not contain all of the information necessary for one to determine how its numbers were calculated.  *Id.*  As a result, many of the numbers and calculations are not auditable.  *Id.*

14.     At the May 17, 2017 "first day" hearing (the "**First Day Hearing**"), counsel to National, among others, alerted the Court to its concerns over the lack of information flow to creditors, prompting the Court to request the Status Report.[14]   On May 19, 2017, National sent a letter (the "**May 19 Commonwealth Letter**") to counsel to the Oversight Board, requesting that the Oversight Board provide the previously requested diligence relating to the Fiscal Plan, and attached a comprehensive list of National's outstanding diligence requests.[15]   On that day, National also sent a separate letter to counsel to the Oversight Board (the "**May 19 HTA Letter**" and, together with the May 19 Commonwealth Letter, the "**May 19 Letters**") requesting a response to its outstanding diligence requests relating to HTA.[16]   The Oversight Board did not respond to the May 19 Letters.

15.     By letter dated June 5, 2017 (the "**June 5 Letter**"), National reiterated to the Oversight Board its need for the diligence requested in the May 19 Letters.[17]   National also joined in the diligence requests submitted to the Oversight Board by the GO Group and Assured.

16.     By letter dated June 13, 2017 (the "**Reply Letter**"), the Oversight Board and AAFAF replied to the June 5 Letter.[18]   The Oversight Board and AAFAF refused to produce any documents whatsoever in response to over half of the approximately 75 requests addressed in the Reply Letter, while providing only partial and sometimes unhelpful responses to the

---

[14] *See* 5/17/17 Hr'g Tr. at 136:22-141:14; 147:16-19.

[15] A copy of the May 19 Commonwealth Letter is attached to the Baird Declaration as **Exhibit C**.

[16] A copy of the May 19 HTA Letter is attached to the Baird Declaration as **Exhibit D**.

[17] A copy of the June 5 Letter is attached to the Baird Declaration as **Exhibit E**.

[18] A copy of the Reply Letter is attached to the Baird Declaration as **Exhibit F**.

remainder.[19]   Instead of offering to be forthcoming with additional information, the Oversight Board, among other things: (i) characterized many of National's requests as "overbroad," while not committing to produce any of the requested information; (ii) broadly stated that it will not provide "proprietary models created by outside consultants," often without even identifying the specific requests it believes to fall into this category; and (iii) repeated the refrain that "factual inquiries made into 'determinations' by the [Oversight Board]" are statutorily mandated to be in the Oversight Board's discretion and the Fiscal Plan is not reviewable by any court.  *See* Reply Letter at 2-8.   In sum, despite the Court's call for transparency and notwithstanding the Oversight Board's public statements promoting transparency, the Oversight Board has been largely unresponsive to National's information requests for over three months.

17.     On June 15, 2017, the Oversight Board filed the Status Report.  On June 26, 2017, the Joint Creditor Statement and the COFINA Senior Bondholders' Coalition Statement were filed in response to the Status Report.  The Joint Creditor Statement emphasizes the fact that the Fiscal Plan is a proper subject of discovery and describes why the information provided thus far is insufficient to properly assess the various assumptions contained in the Fiscal Plan.  *See* Joint Creditor Statement at 12-15.  The COFINA Senior Bondholders' Coalition Statement emphasizes that the Fiscal Plan fails to comply with section 201(b)(1) of PROMESA because the Fiscal Plan commingles COFINA's pledged sales tax revenues and debt service with the assets and liabilities of the Commonwealth; it also highlights the importance of restoring

---

[19] For example, in response to a request for a functional version of the macroeconomic growth model employed to develop the Fiscal Plan, AAFAF agreed to provide "underlying raw data" but otherwise refused disclosure on the grounds (among others) that "certification of the proposed Fiscal Plan is not reviewable by any court."  *See* Reply Letter at 4.  AAFAF provided the same answer in response to requests for documents relating to growth rates for expenditure line items in the Fiscal Plan.  *See id.* at Ex. A, p. 8.

creditor confidence, which is critical to ever achieving a consensual restructuring.  *See* COFINA
Senior Bondholders' Coalition Statement at 3-5.

18.    As the Title III Cases continue, it is imperative that the Oversight Board,
AAFAF, and the Commonwealth produce the documents and information sought by National
and other creditors.  Eventually the Commonwealth must propose a plan of adjustment based on
the Fiscal Plan and without the information requested, National cannot analyze the Fiscal Plan
and its implications in order to make informed judgments about any restructuring proposal or any
presented plan of adjustment.  After numerous unanswered requests for important financial
documents and information, National is left with no choice but to seek Court intervention to
require the Commonwealth and its representatives to produce such documents.

## RELIEF REQUESTED

19.    By this Motion, National requests entry of an order, pursuant to
Bankruptcy Rule 2004:

a) Directing the Oversight Board, AAFAF, and the Commonwealth to
produce responsive, non-privileged documents requested on the attached
**Exhibit 1** hereto for examination by National (such requests are nearly
identical to those being simultaneously sought by the GO Group, Assured,
and the Mutual Fund Group in their request for Rule 2004 discovery);

b) Directing that each of José B. Carrión III, Raúl Maldonado, Gerardo José
Portela Franco and Natalie Jaresko submit to an examination under oath
on such date and time and at a location in Puerto Rico as designated in
writing by National on not less than 14 days' notice;

c) Directing each of the Oversight Board, the Commonwealth, and AAFAF to designate an individual or individuals with knowledge of the matters described in **Exhibit 1** hereto and to produce that individual(s) to be examined by National under oath on such date and time and at such location in Puerto Rico as may be designated in writing by National on not less than 14 days' notice; and

d) Authorizing National to issue subpoenas directing the production of documents and the examination of other witnesses who may have knowledge of the matters described in **Exhibit 1** hereto without separate application to this Court for each subpoena or witness, and in accordance with the procedures set forth herein and in the Proposed Order.

## BASIS FOR RELIEF REQUESTED

20.    Pursuant to section 310 of PROMESA, the Bankruptcy Rules apply in cases under Title III.  48 U.S.C. § 2170.  Bankruptcy Rule 2004(a) states that on "motion of any party in interest, the court may order the examination of any entity."  Fed. R. Bankr. P. 2004(a). The scope of any examination sought under Bankruptcy Rule 2004 may relate to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge."  Fed. R. Bankr. P. 2004(b).

21.    Thus, creditors may obtain discovery into any matter regarding the "nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred."  *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); *see In re Hilsen*, Case No. 87-11261, 2008 WL 2945996, at *4 (Bankr. S.D.N.Y. July 25,

2008) (Peck, J.); *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) ("The

purpose of a Rule 2004 examination is 'to show the condition of the estate and to enable the

Court to discover its extent and whereabouts, and to come into possession of it, that the rights of

the creditor may be preserved.'") (quoting *Cameron v. United States*, 231 U.S. 710, 717 (1914)).

Examinations under Bankruptcy Rule 2004 may be conducted by any party in interest, not

merely the trustee. *See In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989) ("Courts have generally

construed the term "party in interest" as used in 11 U.S.C. § 1109(b) liberally."). Accordingly,

National, as one of Puerto Rico's largest creditors, is entitled to pursue Rule 2004 discovery.

      22.    The granting of a motion under Bankruptcy Rule 2004 is within the

discretion of the Court, *see In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) ("As

the permissive language of the rule suggests, the Court has the discretion to grant a request for a

2004 examination . . ."), and the scope of the discovery granted pursuant to a Rule 2004 motion

may be extremely broad. Courts consistently have emphasized that the scope of a Bankruptcy

Rule 2004 examination is broader than discovery available under the Federal Rules of Civil

Procedure. *See In re Youk-See*, 450 B.R. 312, 319-20 (Bankr. D. Mass. 2011) (citing *Dynamic

Fin. Corp. v. Kipperman (In re N. Plaza LLC)*, 395 B.R. 113, 122 n. 9 (S.D. Cal. 2008) ("It is

well established that the scope of a Rule 2004 examination is exceptionally broad and provides

few of the procedural safeguards found in Federal Rule of Civil Procedure 26.")). Bankruptcy

Rule 2004 "allows considerable leeway for all manner of so-called fishing expeditions provided

that there is a reasonable nexus to the debtor and the administration of the debtor's case." *In re

Hilsen*, 2008 WL 2945996, at *1.

      23.    Moreover, the target of Rule 2004 discovery is not limited to the debtor

itself. "Any third party who has a relationship with a debtor may be made subject to a Rule 2004

investigation." *In re Recoton Corp.*, 307 B.R. at 755 (citing *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 432 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994)); *see also ePlus, Inc. v. Katz (In re Metiom, Inc.)*, 318 B.R. 263, 268 (S.D.N.Y. 2004) (holding that Bankruptcy Rule 2004 may be employed to compel discovery of information maintained by creditors or third parties where such information relates to the effective reorganization and administration of the estate).

24.     In any restructuring, basic financial information about the debtor, its assets and liabilities, and its projected revenues and expenses is a necessary prerequisite for creditors to understand the debtor's financial condition.  Courts have found that this kind of information is the appropriate subject of a Rule 2004 request.  *See, e.g.*, *In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("Rule 2004 of the Federal Rules of Bankruptcy Procedure provides courts with the authority to order examinations with respect to the financial matters of debtors[.]"); *In re Gawker Media LLC*, No. 16-11700 (SMB), 2017 WL 2804870, at *5 (Bankr. S.D.N.Y. June 28, 2017) ("[T]he [Rule 2004] examination may extend to matters relating 'to the operation of any business and the desirability of its continuance[.]'").

25.     National's information requests are narrowly focused, targeting specific information needed to better understand the Fiscal Plan and the Commonwealth's finances.  The Oversight Board and AAFAF have failed to identify an appropriate basis on which to deny these requests.   In particular, there is also no reason that the Oversight Board should withhold "proprietary models," as National and other creditors are already subject to non-disclosure agreements.  Further, irrespective of whether the Oversight Board's fiscal plan certifications are subject to challenge, creditor access to information concerning the Fiscal Plan and its underlying

assumptions is essential to enable creditors to understand the Fiscal Plan and meaningfully participate in this restructuring process.

26.     With a complete understanding of the debtor's financial condition, creditors can then assess and respond to any restructuring proposal – whether in a plan or otherwise – made by the debtor.  Creditor access to such information is a fundamental tenet of PROMESA, the importance of which extends far beyond the Fiscal Plan.  Creditors are entitled to information that enables them to make informed decisions about potential restructurings; accordingly, both Titles III and VI of PROMESA ensure creditors access to such information. *See, e.g.*, PROMESA § 206(a) (providing that the issuance of restructuring certification and, consequently, Title III eligibility, requires that an entity has "made public draft financial statements and other information sufficient for any interested person to make an informed decision with respect to a possible restructuring"); *id.* at § 301(a) (incorporating the disclosure requirements of section 1125 of the Bankruptcy Code to a Title III plan of adjustment); *id.* at § 601(f) (requiring delivery of certain information to creditors prior to soliciting votes on a bond modification under Title VI of PROMESA).

27.     This focus on transparency is also consistent with Puerto Rico law.  The Commonwealth, AAFAF, and the Oversight Board are public entities, not private enterprises. The Puerto Rico legislative and executive branches have gone to great lengths to ensure that citizens have access to public entity information.  For example, with certain exceptions, Puerto Rico law grants every citizen the right to inspect and copy any public document.  *See* PR Laws Ann. tit. 32 § 1781. Recently, in Executive Order OE 2017-10, the Governor reinforced the Commonwealth's public policy in favor of access to information, and outlined a procedure by which citizens can obtain such information.

14

28.     Eventually, the Commonwealth will need to prove to the Court that its plan of adjustment satisfies the applicable provisions of PROMESA and the Bankruptcy Code for confirmation.  Doing so necessarily will involve the provision of much of the same financial information National seeks now.  There is no need for or benefit to waiting to share such information, particularly where the Commonwealth wants to engage in consensual restructuring negotiations with creditors in advance of proposing a plan of adjustment.[20]  For any such negotiations to be productive, creditors like National demand a foundational understanding about the Fiscal Plan and its underlying assumptions and inputs.

29.     National seeks production of documents and examination of witnesses relating to the Fiscal Plan, as set forth in **Exhibit 1** to the Proposed Order.  The information and documents requested by National will allow it to determine the nature and extent of the assets, liabilities, and overall financial landscape of the Commonwealth.  It is indisputable that National's requests have a reasonable nexus to the Commonwealth and the administration of the Title III Cases.  National also requests authority to conduct additional discovery and to issue subpoenas to third parties in connection with its investigations of the Commonwealth, including if necessary, based upon the fruits of the investigation of National.

30.     National seeks the Court's pre-approval of authority to issue subpoenas to other parties that may have information regarding the Fiscal Plan and the Commonwealth's actions as they relate to the Fiscal Plan, subject to the reasonable procedures set forth below.

---

[20] *See Statement of Oversight Board in Connection with PROMESA Title III Petition*, at 6, *In re Commonwealth of Puerto Rico*, 17-cv-01578 (D.P.R. May 3, 2017), ECF No. 1-2 ("Utilizing the tools provided by PROMESA . . . the Oversight Board and the Commonwealth will continue efforts to negotiate, *preferably through consensual deals with all constituencies*, a comprehensive debt restructuring through a Title III plan of adjustment, which can incorporate all consensual agreements reached. . . ." (emphasis added)).

31.     National will endeavor to avoid replication or duplication when requesting information from third parties as part of their efforts to investigate the Fiscal Plan.  National intends to seek voluntary cooperation and consensual discovery from holders of information.  National is cognizant that not all parties will cooperate with Nationals' requests for information.  National intends to issue subpoenas to compel the appearance of a witness for examination only when appropriate.

32.     National thus seeks to establish streamlined procedures governing the issuance of subpoenas to third parties to provide witnesses with notice and an opportunity to object and preserve all substantive rights of witnesses.  Specifically, the Proposed Order includes the following procedures in connection with the issuance of subpoenas to third parties in connection with the investigation:  (A) except as otherwise agreed by National, within fourteen (14) days of service of National's subpoena, witnesses shall be directed to produce, on a rolling basis all non-privileged documents responsive to National's subpoena, or within fourteen (14) days of service of National's subpoena, to file all objections and/or responses to National's subpoena with the Court, with a hearing promptly scheduled; (B) the witness is directed to submit to oral examination upon reasonable notice and, absent other agreement with National, in no event more than fourteen (14) days from the service of a deposition subpoena upon a witness; and (C) in accordance with Bankruptcy Rule 2004, the Clerk of the Court shall issue subpoenas, signed but otherwise blank as requested by National.  National is also willing to coordinate discovery with other creditors, in order to limit the burden placed on the Commonwealth and its representatives in responding to discovery.

33.     Courts have granted similar relief to the pre-authorization relief requested herein.  *See Order Granting Authority to Issue Subpoenas for the Production of Documents and*

16

*the Examination of the Debtors' Current and Former Officers, Directors and Employees, and Other Persons, In re Lehman Brothers Inc.*, Case No. 08-1420 (Bankr. S.D.N.Y. Jan. 15, 2009), ECF No. 561; *Order Granting Examiner's Motion Directing the Production of Documents and Authorizing the Examinations of the Debtors' Current and Former Officers, Directors and Employees, and Other Persons and Entities, In re Lehman Brothers Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Feb. 11, 2009), ECF No. 2804; *Order Granting the Debtors Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities, In re Lehman Brothers Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Nov. 23, 2009), ECF 5910.

## CERTIFICATION OF COMPLIANCE WITH LOCAL BANKRUPTCY RULE 2004-1

34.     Undersigned counsel hereby certifies that, prior to filing this Motion, they requested a conference with counsel for the Oversight Board and AAFAF, on August 21, 2017, to "arrange a mutually agreeable date, place, and time for the examination." Rule 2004-1(b) of the Puerto Rico Local Bankruptcy Rules. A conference was held on August 24, 2017. Counsel for the Oversight Board and AAFAF maintained that National had not complied with its obligation under that Rule because National did not provide a copy of **Exhibit 1** in advance of the call. However, counsel also repeated its long-held position that Rule 2004 discovery is categorically prohibited for a number of reasons, and, indeed, as described above, has refused repeatedly to respond to National's diligence requests. In light of counsel's refusal to consider Rule 2004 disclosure, the undersigned counsel certifies that further meet and confer would not be fruitful.

**NOTICE**

35.     Under the Second Amended Case Management Procedures, the deadline to file an objection to this Motion is September 19, 2017, 4:00 p.m. (AST).  National therefore provides the following notice pursuant to Rule 2004-1(d) of the Puerto Rico Local Bankruptcy Rules, modified accordingly with respect to the objection deadline:  Any party who objects to the examination shall serve and file an objection or motion for protective order with the United States Bankruptcy Court for the District of Puerto Rico by September 19, 2017, 4:00 p.m. (AST) for a Fed. R. Bankr. P. 2004 Examination.  If no objection or motion for protective order is timely filed, the Court may grant the motion for examination without further notice or a hearing.

**NO PRIOR REQUEST FOR RELIEF**

36.     No previous request for the relief sought herein has been made by National to this or any other Court.

**WHEREFORE,** National respectfully requests authority to direct the examination of witnesses and the production of documents pursuant to Bankruptcy Rule 2004 as set forth herein and consistent with the Proposed Order, and that National be granted such other and further relief as is just.

**RESPECTFULLY SUBMITTED**, in San Juan, Puerto Rico, this 25th day of August, 2017.

**I HEREBY CERTIFY** that on this same date a true and exact copy of this notice was filed with the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record.

**ADSUAR MUÑIZ GOYCO
SEDA & PÉREZ-OCHOA, P.S.C.**
208 Ponce de León Avenue, Suite 1600
San Juan, PR 00936
Telephone: 787.756.9000
Facsimile: 787.756.9010
Email:  epo@amgprlaw.com
            acasellas@amgprlaw.com
            larroyo@amgprlaw.com


By:   */s/ Eric Pérez-Ochoa*
Eric Pérez-Ochoa
USDC-PR No. 206314

*/s/ Luis Oliver-Fraticelli*
Luis Oliver-Fraticelli
USDC-PR No. 209204

*/s/ Alexandra Casellas-Cabrera*
Alexandra Casellas-Cabrera
USDC-PR No. 301010

*/s/ Lourdes Arroyo-Portela*
Lourdes Arroyo Portela
USDC-PR No. 226501

**WEIL, GOTSHAL & MANGES LLP**
Marcia Goldstein (*pro hac vice* pending)
Salvatore A. Romanello (*pro hac vice* pending)
Kelly DiBlasi (*pro hac vice* pending)
Gabriel A. Morgan (*pro hac vice* pending)

767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: marcia.goldstein@weil.com
            salvatore.romanello@weil.com
            kelly.diblasi@weil.com
            gabriel.morgan@weil.com

## Exhibit A

**Proposed Order**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

## ORDER GRANTING MOTION OF NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING DISCOVERY

Upon the motion (the "**Motion**")[2] of National Public Finance Guarantee Corporation ("**National**"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing National to take Rule 2004 discovery of (i) the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as representative of the Commonwealth of Puerto Rico (the "**Commonwealth**" or the "**Debtor**") pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("**PROMESA**"); (ii) the Commonwealth; and (iii) the Puerto Rico Fiscal Agency and Financial Advisory

---

[1] The Debtors in these Title III cases (collectively, the "**Title III Cases**"), along with each Debtor's respective Title III Case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "**Commonwealth**") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("**COFINA**") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("**HTA**") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Authority ("**AAFAF**"), as well as the examination of and production of documents from entities

determined by National to have information in connection with National's investigation, as more

fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the

relief requested therein in accordance with 48 U.S.C. § 2166; and venue being proper before this

Court pursuant to 48 U.S.C. § 2167; and notice of the Motion having been given as provided in

the Motion, and such notice having been adequate and appropriate under the circumstances; and

it appearing that no other or further notice of the Motion need be provided; and the Court having

held a hearing to consider the relief requested in the Motion; and the Court having found and

determined that the relief sought in the Motion and granted herein is in the best interests of the

Debtor, its respective creditors, and all parties in interest, and that the legal and factual bases set

forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein.

2.      The Oversight Board, AAFAF, and the Commonwealth shall comply with

the document requests attached hereto as **<u>Exhibit 1</u>** by no later than ten (10) days after entry of

this Order.

3.      The Commonwealth and AAFAF shall each designate an individual or

individuals with knowledge of the matters described in **<u>Exhibit 1</u>** hereto (the "**Designated**

**Individual(s)**").  Each member of the Oversight Board and each of the Designated Individual(s)

shall produce themselves for examination by counsel to National under oath and in accordance

with Bankruptcy Rule 2004 on such date and time and at such location as may be designated in

writing by counsel to National.

2

4. National is authorized, pursuant to Bankruptcy Rule 2004, to issue such subpoenas as may be necessary to compel the production of documents and/or testimony of a third party witness to accomplish the discovery authorized by this Order.

5. Third party witnesses shall have fourteen (14) days from the service of a subpoena to either (i) produce to National all responsive non-privileged documents requested in National's subpoena, or (ii) file with the Court an objection or response to the subpoena with a hearing promptly scheduled.

6. Third party witnesses are directed to either (i) submit to oral examination upon reasonable notice and, absent other agreement with National, in no event more than fourteen (14) days from the date of the service of a deposition subpoena upon such witness, or (ii) file with the Court an objection or response to the subpoena with a hearing promptly scheduled.

7. National shall serve each subpoena and a copy of this Order on the target of the subpoena.

8. National's rights are reserved to request additional discovery,  including any additional documents or depositions, under Bankruptcy Rule 2004 and applicable law, based on any information that may be revealed as a result of the information provided pursuant to this Order or otherwise.

9. This Court shall retain jurisdiction to resolve any dispute arising or related to this Order and to interpret, implement and enforce the provisions of this Order.

10. This Order is without prejudice to National's right to file further motions seeking additional documents pursuant to Bankruptcy Rule 2004(a) or any other applicable law.

Dated: _____, 2017
     San Juan, Puerto Rico

_____
HONORABLE LAURA TAYLOR SWAIN
UNITED STATES DISTRICT COURT JUDGE

**Exhibit 1**

**SCHEDULE OF DOCUMENTS TO BE PRODUCED BY THE OVERSIGHT BOARD,
AAFAF, AND THE DEBTOR.**

**DEFINITIONS**

The terms used herein shall have the meanings ascribed to them in the definitions set forth below and should be given their most expansive and inclusive interpretation unless otherwise expressly limited.  This includes, without limitation, the following.

1.      "AAFAF" means the Puerto Rico Fiscal Agency and Financial Advisory Authority, including its officers, directors, employees, partners, subsidiaries, and affiliates, as applicable.

2.      "All," "any," "each," and "every" shall be construed as inclusive or exclusive, and shall be construed as both "each" and "every" to bring within the scope of the Request all responses that might otherwise be construed to be outside its scope.

3.      "Act 26" means Act 26-2017, also known as the Fiscal Plan Compliance Act, which was passed by the Legislative Assembly on April 28, 2017 and signed by Governor Ricardo Rosselló Nevares on April 29, 2017.

4.      "April 28 Proposal" means the term sheet for a plan of adjustment proposed by AAFAF on April 28, 2017.

5.      "*Assured* Motion" means the Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6), which was filed on July 10, 2017, by the Financial Oversight and Management Board ("FOMB") in *Assured Guaranty Corp. v. Commonwealth of Puerto Rico*, No. 17-00125-LTS (Dkt. 27).

6.      "Bridge" means the Fiscal Plan Comparison to Historical Results, prepared by the Territorial Government at the Request of the FOMB.

7.      "Bridge Analysis" means the review of the Bridge conducted by Ernst & Young and presented to the FOMB on March 7, 2017.

8.      "Budget" means the budget(s) adopted for Fiscal Year 2018 for the Territorial Government, including the budget Commonwealth and any agency or instrumentality thereof, as well as the FOMB.

9.      "COFINA" mean the Puerto Rico Sales Tax Financing Corporation.

10.     "COFINA Correspondence" includes: (1) the letter sent by Bank of New York Mellon ("BNYM") to COFINA on May 1, 2017; (2) the May 4, 2017 letter from BNYM to COFINA regarding a default under the terms of COFINA Resolution; (3) the May 16, 2017 letter sent by AAFAF, on behalf of COFINA, which responded to the Trustee Default Notice; and (4) the May 16, 2017 letter sent by AAFAF to the Trustee's counsel regarding COFINA's property rights and Section 301(a) of PROMESA".

11.     "COFINA Resolution" means the Amended and Restated Sales Tax Revenue Bond Resolution (as amended and restated on June 10, 2009, and as further supplemented) pursuant to which COFINA issued bonds.

12.     "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and, with respect to oral Communications, includes any document evidencing the Date, participants, subject matter, and content of any such oral communication, including, but not limited to, transcripts, minutes, notes, audio, video, electronic recordings, telephone records and calendar entries.

13.     "Comprehensive Investigation" means the FOMB's investigation of Puerto Rico's debt and its relationship to the fiscal crisis, as announced via the FOMB's August 2, 2017 press release.

14.     "CRIM" means Centro de Recaudaciones de Ingresos Municipales.

15.     "CU Rollup" means the Component Unit Roll-Up, which is the Microsoft Excel file provided by the Commonwealth that provides certain back-up information regarding the Component Units included in the Fiscal Plan.

16.     "Dedicated Sales Tax" means the portion of the Sales and Use Tax that, pursuant to 13 L.P.R.A. § 12, is transferred to COFINA.

17.     "Diligence Responses" means AAFAF's response, which was dated April 11, 2017, to a preliminary diligence list sent by PJT Partners, financial advisors to National Public Finance Guarantee Corporation.

18.     "Document" means any and all writings and recorded materials, of any kind, that are or have been in Your possession, custody or control, whether originals or copies. Such writings include, but are not limited to, Communications, electronically stored information in any medium, such as emails, text messages, and instant messages; contracts; notes; drafts; interoffice memoranda; memoranda for files; letters; research materials; correspondence; logs; diaries; forms; bank statements; tax returns; card files; books of accounts; journals; ledgers; invoices; drawings; computer files; records; data; print-outs or tapes; reports; statistical components; studies; graphs; charts; minutes; manuals; pamphlets; or books of all nature and kind whether handwritten, typed, printed, mimeographed, photocopied or otherwise reproduced; all tape recordings (whether for computer, audio or visual display) or other tangible things on which words, phrases, symbols or information are stored.

19.     "Fiscal Plan" shall mean the Fiscal Plan certified by the FOMB on March 13, 2017.  To the extent there is a difference between the Fiscal Plan that the FOMB filed as an exhibit to the Title III petition, and the Fiscal Plan that the Governor of Puerto Rico asserts is the

"'foundation of the Government's finances" and "work[s] hand-in-hand with the Budget" for Fiscal Year 2018, Letter from Governor Ricardo Rosselló Nevares to President Donald J. Trump et al. (August 4, 2017) ("August 4 Letter"), these Requests should be interpreted to include both such plans.

20.     "FOMB" means the Financial Oversight and Management Board for Puerto Rico.

21.     "GDB" means the Government Development Bank of Puerto Rico.

22.     "GDB RSA" means the Restructuring Support Agreement announced by the Commonwealth on May 15, 2017, as amended.

23.     "General Fund" means both the Commonwealth's primary operating fund, and all other entities, components, or units that must be consolidated with the General Fund under U.S. Generally Accepted Accounting Principles for purposes of preparing the Commonwealth's basic financial statements. *See* Commonwealth of Puerto Rico, *Financial Information And Operating Data Report* 148-152 (Dec. 18, 2016) (describing Territorial Government's historic financial reporting practices).

24.     "GO Group" means, individually and collectively, the members of the "Ad Hoc Group of General Obligation Bondholders."

25.     "March 9 Letter" means the letter sent from Jose B. Carrion, III, Chairman of the FOMB to the Honorable Ricardo A. Rosselló Nevares on March 9, 2017.

26.     "March 13 Resolution" means the FOMB Resolution Adopted on March 13, 2017 (Fiscal Plan Certification).

27.     "MBA" means the Metropolitan Bus Authority.

28.     "MCO" means Managed Care Organization.

29.     "Party" or "Parties" means, as applicable, each or every plaintiff and defendant in this Action (including, without limitation, any party that seeks to intervene).

30.     "*Peaje* Opposition" means Defendants' Opposition To Plaintiff's Motion For A Preliminary Injunction, filed on July 14, 2017, in *Peaje Investments, LLC v. Puerto Rico Highway and Transportation Authority*, No. 17-00151-LTS (Dkt. 96).

31.     "Person" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

32.     "PREPA RSA" means the Restructuring Support Agreement between the Puerto Rico Electric Power Authority and its creditors, which the FOMB declined to certify on June 27, 2017.

33.     "PRCCDA" means Puerto Rico Convention Center District Authority.

34.     "PRHTA" (or "HTA") means the Puerto Rico Highways and Transportation Authority.

35.     "PRIFA" means the Puerto Rico Infrastructure Financing Authority.

36.     "PROMESA" means the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat 549.

37.     "Relate" and "concern" shall be construed to bring within the scope of the Request all information that comprises, references, constitutes, describes, evidences, explicitly or implicitly relates to, was reviewed in conjunction with, or was made as a result of the subject matter of the Request, including without limitation all Documents that reflect, record, memorialize, discuss, evaluate, consider, review or report the subject matter of the Request.

38.     "Request" means a request for the production of Documents contained herein.

39.     "Territorial Government" shall be given the meaning that is ascribed in PROMESA § 5(18), 48 U.S.C. § 2104(18).

40.     "Title III Proceedings" means all litigation relating to any effort to restructure the debt of the Commonwealth or any of its public instrumentalities that is filed pursuant to Title III of PROMESA, including but not limited to *In re FOMB for P.R. as representative of The Commonwealth of Puerto Rico*, No. 17 BK 3283; *In re FOMB as representative of Puerto Rico Sales Tax Financing Corporation ("COFINA")*, No. 17 BK 3284; *In re FOMB as representative of Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS")*, No. 17 BK 3566; *In re FOMB for P.R. as representative of Puerto Rico Highways and Transportation Authority ("HTA")*, No. 17 BK 3567; *In re FOMB as representative for Puerto Rico Electric Power Authority (PREPA)*, No. 17 BK 4780.

41.     "TPA" means Third Party Administrator.

42.     "You" or "Your" refers to (1) the Financial Oversight and Management Board for Puerto Rico; and (2) the Commonwealth, and their respective divisions, subdivisions, offices, departments, agencies, affiliates, and any current and former elected officials, officers, trustees, accountants, attorneys, employees, agents, consultants, experts, and independent contractors, assigns, and any Person or entity acting or purporting to act on their behalf.

## GENERAL INSTRUCTIONS

1.     You are required to answer these Document Requests drawing upon all materials in Your possession, custody, or control, as well as materials that are not in Your custody but are owned in whole or in part by You and those that You have an understanding, express or implied, that You may use, inspect, examine, or copy.  You must provide all information in response to a

Document Request which is known to You, Your agents, consultants employees, accountants, attorneys, or experts, or which appears in Your records.

    2.    The following rules of construction shall apply to these Document Requests.

        a.    The terms "all" and "any," whenever used separately, shall be construed as "any and all" to encompass the greatest amount of responsive material.

        b.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Interrogatory or Document Request all responses that might otherwise be construed to be outside of its scope.

        c.    The term "including" shall always be construed to mean "including, but not limited to," or "including, without limitation" to encompass more than the specifically identified materials.

        d.    The present tense shall also include the past tense and vice versa.

        e.    The use of the singular form of any word includes the plural and vice versa.

    3.    Documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond to the categories in these Interrogatories and Document Requests.

    4.    You are required to produce all non-identical copies and drafts of each document. The originals of all Documents produced in copy form shall be made available for inspection upon request.

    5.    Documents attached to each other in their original form should not be separated.

    6.    If no information or Documents responsive to a numbered paragraph are in Your possession, You are to indicate this in a written response.

    7.    The fact that a Document has or will be produced by another plaintiff, third party, or other party to these or related proceedings does not relieve You of the obligation to produce Your copy of the same Document.

7

8.      If any Document is withheld in whole or in part under claim of any privilege or work product or other immunity, then consistent with Fed. R. Civ. P. 26(b)(5), as applied to this proceeding by Bankruptcy Rule 7026, and PROMESA § 310, 48 U.S.C. § 2170, You are to provide a list of such Documents identifying each such document for which any such privilege, work product, or other immunity is claimed, together with the following information:

a.      the nature of the claim of privilege or immunity, including the statute, rule, or decision giving rise to the claim of privilege or immunity;

b.      all facts relied upon in support of the claim of privilege or immunity;

c.      all Persons on whose behalf the privilege or immunity is claimed;

d.      the type of Document (*e.g.*, letter, memorandum, note, telegram, e-mail, chart, report, recording, etc.);

e.      the subject matter (without revealing the information as to which privilege is claimed);

f.      its Date, author(s), sender(s), addressee(s), and recipient(s); and

g.      the paragraph(s) of these Interrogatories and Document Requests to which production of the document is responsive.

You are further directed to describe the factual and legal basis for each claim of privilege or immunity in sufficient detail so as to permit the court to adjudicate the validity of the claim of privilege or immunity, and to produce all Documents or portions thereof not subject to Your objection.

9.      If any Document requested was, but is no longer, in Your possession, custody, or control, identify the document and state what disposition was made of it and the Date or Dates upon which such disposition was made, and additionally, produce all Documents relating to the disposition of such document.

10.    If You object to any Document Request (or portion thereof), state the reason for the objection in detail and respond to that Document Request as narrowed by Your objection.

11.    Electronically stored information ("ESI") as that term is used in Fed. R. Civ. P. 34 should be produced as follows:

a.    TIFFs.  Black and white images shall be delivered as single page Group IV TIFF image files.  Color images must be produced in .jpeg format. Image file names should not contain spaces or special characters and must have a unique file name, *i.e.*, Beginning Bates Number.  Images must be endorsed with sequential Bates numbers in the lower right corner of each image.

b.    Unique IDs.  Each image should have a unique file name and should be named with the Bates number assigned to it.

c.    Text Files.  Extracted full text in the format of document level txt files shall be provided in a separate folder, one text file per document.  Each text file should match the respective TIFF filename (Beginning Bates Number).  Text from redacted pages will be produced in OCR format rather than extracted text.

d.    Parent-Child Relationships.  Parent-child relationships (the association between an attachment and its parent record) should be preserved.

e.    Database Load Files/Cross-Reference Files.  Records should be provided in a format compatible with the following industry standards.

- The image cross-reference file to link the images to the database should be a comma-delimited file with a line in the cross-reference file for every image in the database.

- The data file (.dat) should contain all the fielded information that will be loaded into the database.

- The first line of the .dat file must be a header row identifying the field names.

- The .date file must use the following *Concordance* default delimiters: Comma          ¶          ASCII          character          (020) Quote þ ASCII character (254)

9

- Date Fields should be provided in the format mm/dd/yyyy.

- Date and time fields must be two separate fields.

- If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments.

- An OCRPATH field must be included to provide the file path name of the extracted text file(s).

- Each text file must be named after the Beginning Bates Number.

- For production with native files, a NATIVELINK field must be included in the .dat file to provide the file path and name of the native file being produced.

- Beginning Bates Number and Ending Bates Number should be two separate fields.

- A complete list of metadata fields is included in paragraph 11(f).

f.      Metadata.   For all ESI records, provide all of the following metadata fields:   Custodian, Beginning Bates Number, Ending Bates Number, Beginning Attachment Number, Ending Attachment Number, Record Type, Master Date, SentOn Date and Time, Received Date and Time, Create Date and Time, Last Modified Date and Time, Parent Folder, Author, To, From, CC, BCC, Subject/Title, Original Source, Native Path, File Extension, File Name, File Size, Full Text, and page count.

g.      Spreadsheets.   For spreadsheets that were originally created using common, off-the-shelf software (*e.g.*, Microsoft Excel), produce the spreadsheets in native format and, in addition, in TIFF format.   Native file Documents must be named per the Beginning Bates Number.   The full path of the native file must be provided in the .dat file.

12.   Hard copy Documents shall be produced as follows:

a.      TIFFs.   Black and white images shall be delivered as single page Group IV TIFF image files.   Color images must be produced in .jpeg format. Image file names should not contain spaces or special characters and must have a unique file name, *i.e.*, Beginning Bates Number.   Images must be endorsed with sequential Bates numbers in the lower right corner of each image.

10

b.      Unique IDs.  Each image should have a unique file name and should be named with the Bates number assigned to it.

c.      OCR.  High-quality document level OCR text files should be provided in a separate folder, one text file per document.  Each text file should match the respective TIFF filename (Beginning Bates Number).  For redacted Documents, provide the re-OCR'd version.

d.      Database Load Files/Cross-Reference Files.  Records should be provided in a format compatible with the following industry standards.

- The image cross-reference file to link the images to the database should be a comma-delimited file with a line in the cross-reference file for every image in the database.

- The data file (.dat) should contain all the fielded information that will be loaded into the database.

- The first line of the .dat file must be a header row identifying the field names.

- The .date file must use the following *Concordance* default delimiters: Comma            ¶            ASCII            character            (020) Quote þ ASCII character (254)

- Date Fields should be provided in the format mm/dd/yyyy.

- Date and time fields must be two separate fields.

- If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments.

- An OCRPATH field must be included to provide the file path name of the extracted text file(s).

- Each text file must be named after the Beginning Bates Number.

- For production with native files, a NATIVELINK field must be included in the .dat file to provide the file path and name of the native file being produced.

- Beginning Bates Number and Ending Bates Number should be two separate fields.

11

e. Unitizing of Records. In scanning hard copy records, distinct records should not be merged into a single record, and single records, should not be split into multiple records (*i.e.*, hard copy records should be logically unitized).

f. Parent-Child Relationships. Parent-child relationships (the association between an attachment and its parent record) should be preserved.

g. Objective Coding Fields. The following objective coding fields should be provided: Beginning Bates Number, Ending Bates Number, Beginning Attachment Number, Ending Attachment Number, Source-Custodian, and page count.

13. These Documents Requests are continuing in nature. If any information or Document responsive to a Document Request herein is not presently in Your possession, custody, or control but subsequently becomes available, is discovered or is created, or comes into Your possession, custody, or control, You have a continuing obligation pursuant to Fed. R. Civ. P. 26(e), and are hereby requested, to supplement Your responses to these Interrogatories and Document Requests within a reasonable period of time after it comes into Your possession, custody, or control.

## **RELEVANT TIME PERIOD**

Unless otherwise specified, the relevant time period for these requests is January 1, 2014 to the present.

## **DOCUMENT REQUESTS**

## **REQUEST NO. 1.**

All Documents that You have produced or received in connection with discovery or disclosure in (1) these Title III Proceedings, including any adversary proceedings filed in any of the Title III Proceedings; (2) *Leon v. Rosselló-Nevares*, Civil No. SJ2017cv00107; (3) *Bhatia Gautier v. Rosselló-Nevares*, Civil No. SJ2017cv00271; (4) *Centro de Periodismo Investigativo v. Rosselló-Nevares*, Civil No. SJ2017cv00396; and (5) the Comprehensive Investigation.

**REQUEST NO. 2.**

All records of testimony (whether in the form of notes, transcript, or other format) that You have produced or received in connection with discovery or disclosure in (1) these Title III Proceedings, including any adversary proceedings filed in any of the Title III Proceedings, (2) *Leon v. Rosselló-Nevares*, Civil No. SJ2017cv00107; (3) *Bhatia Gautier v. Rosselló-Nevares*, Civil No. SJ2017cv00271; (4) *Centro de Periodismo Investigativo v. Rosselló-Nevares*, Civil No. SJ2017cv00396; and (5) the Comprehensive Investigation.

**REQUEST NO. 3.**

All Documents You produced to any federal agency, including but not limited to the United States Securities and Exchange Commission, the Department of the Treasury, or any law enforcement agency, relating to (1) any debt issued by the Territorial Government, (2) the fiscal situation of the Territorial Government, or (3) PROMESA, its development and its implementation.  This Request explicitly includes Documents provided by the prior administration, and it includes documents provided as part of both civil and criminal investigations.

**REQUEST NO. 4.**

All Documents You provided to or Communications You had with any member of the Congress of the United States relating to (1) the fiscal situation of the Territorial Government, (2) any efforts to restructure any debt issued by the Territorial Government, or (3) PROMESA and its implementation.  This Request explicitly includes Documents provided or Communications by any Person affiliated with the prior administration.

13

**REQUEST NO. 5.**

Minutes or notes of any meeting of the FOMB, or any committee subcommittee thereof,

whether in public or in executive session, that are not posted on the FOMB's website.

**REQUEST NO. 6.**

A revised version of the Fiscal Plan, which incorporates the Oversight Board's conditions

for certification contained in the March 13 Resolution.

**REQUEST NO. 7.**

To the extent that it differs from the Fiscal Plan produced in response to the prior

Request, a complete version of any Fiscal Plan (including the CU Rollup) that forms the basis for

the *Assured* Motion, the *Peaje* Opposition, the *PREPA* Opposition, or the August 4 Letter.  This

Request encompasses functional versions (in native format) of any embedded Excel charts and

any underlying data.

**REQUEST NO. 8.**

To the extent that the Fiscal Plan produced in response to Request No. 7 does not

incorporate or reflect any amendments required by March 13 Resolution, any Documents,

Communications or analysis concerning how incorporating such amendments would impact the

assertions made in the *Assured* Motion, the *Peaje* Opposition, or the *PREPA* Opposition.

**REQUEST NO. 9.**

Documents, Communications, or analysis regarding the Budget and any drafts thereof.

This Request explicitly includes, but is not limited to, (1) any analysis or description of any

undefined category of expenses that is not reflected in Puerto Rico's historic financial statements

(*e.g.*, "concepto de gasto" and "asignaciones englobadas"), and (2) the intended use of the

Dedicated Sales Tax.  This Request explicitly includes any breakdown of the "concepto de

gasto" or Dedicated Sales Tax used (if any) by agency, department or component unit of the government. This Request also includes a fully functional model (in native format) used to calculate any Budget line item as well as any backup or linked spreadsheets and all data run through that model.

## REQUEST NO. 10.

A fully functional version of the macroeconomic growth model (in native format) used to calculate each forward-looking projection contained in the Fiscal Plan (as incorporated in the *Assured* Motion, the *Peaje* Opposition, *PREPA* Opposition, or the August 4 Letter), any prior proposed fiscal plan as well as the presentation known as the *Technical Meeting Discussion Materials* (which was presented by the prior administration on November 16, 2017), in the *Revised Baseline Projections* (which was presented by the prior administration on December 20, 2016), and the document provided by the Commonwealth titled "PR_Macroframework methodology.pdf". For any expense or revenue line items in the Fiscal Plan that do not grow at the rate of nominal GNP, this request explicitly includes Documents demonstrating or relating to how those growth rates are derived.

## REQUEST NO. 11.

Any projections, including both underlying data and models (in native format), regarding macroeconomic growth between 2026 and the projected maturity of any proposed restructured obligation. See, *e.g.*, FOMB, *Annual Report: Fiscal Year 2017*, *supra* at 6 (referencing a "50-year long-term projection using the [Fiscal Plan] as a starting point"); March 9, 2017 Letter at 2 (describing February 28, 2017 proposed Fiscal Plan as too optimistic with respect to "a) economic growth rates and the time to return to nominal economic growth; and, b) the failure to reflect near-certain declines in baseline revenues associated with corporate taxes and non-

resident withholding taxes"); GO/COFINA Title VI proposal made public by the Commonwealth on April 28, 2017 at 4 (term sheet proposes a 30-year restructured bond subject to "optional amortization…sized based on Fiscal Plan forecast").  This Request explicitly including any backup or linked spreadsheets (in native format) and all data run through any piece of these model(s).

**REQUEST NO. 12.**

Documents, Communications, analyses or models relating to the assumptions used in formulating the Fiscal Plan (including the CU Rollup), including those assumptions described in the August 4 Letter, including, but not limited to (1) the fiscal multiplier used to calculate the impact that proposed revenue and expense measures are expected to have on the Puerto Rico economy, (2) inflation assumptions, and (3) estimated population change between FY 2018 and FY 2026, (4) the size and timing of the impact of structural reforms, (5) flat productivity level, (6) flat labor force participation rate, and (7) electricity rate assumptions.  This Request explicitly includes a fully functional version of any model (in native format) used to test these assumptions including any backup or linked spreadsheets and all data run through those models.

**REQUEST NO. 13.**

Documents, Communications, analyses or models relating to any proposed revenue and expense measures discussed in the Fiscal Plan (including CU Rollup), the *Assured* Motion, the *Peaje* Opposition, the *PREPA* Opposition, the Budget, or the August 4 Letter.  This Request explicitly includes any analyses, projections or models (in native format) concerning the impact of any financial control reforms proposed by the Territorial Government, including the reforms discussed in the Fiscal Plan at 34-38, or referenced in the August 4 Letter.

**REQUEST NO. 14.**

To the extent not produced in response to any prior Request, any sensitivity analyses that measure the impact of growth initiatives, capital expenditures, or proposed Public Private Partnerships including those discussed on page 24 of the Fiscal Plan and recommendations included in Congressional Task Force on Economic Growth in Puerto Rico, Report to the House and Senate (Dec. 20, 2016) and those discussed on Inventario de Propuestas de Proyectors Prioritarios 2017 (May 11, 2017).  This Request explicitly includes a fully functional version of any model (in native format) used to conduct these sensitivity analyses including any backup or linked spreadsheets and all data run through those models.

**REQUEST NO. 15.**

To the extent not provided in response to any prior Request, any analyses, including models (in native format) and data, regarding the creditworthiness of the Territorial Government, including but not limited to any financial modeling, evaluation or analysis of (1) the economic condition, economic activity, and economic performance of the Territorial Government, or (2) how the amounts available for debt service proposed on page 8 of the Fiscal Plan, the *Assured* Motion, the *Peaje* Opposition, the *PREPA* Opposition, the Budget, or the August 4, Letter, will, if implemented, affect Puerto Rico's future ability to access the capital markets as required by PROMESA § 201(b)(1).  To the extent that any model(s) were used to estimate the impact that the proposed haircut reflected in the Fiscal Plan will have on future market access, this Request explicitly includes any backup or linked spreadsheets (in native format) and all data run through any piece of these model(s).

## REQUEST NO. 16.

To the extent not provided in response to any prior Request, Documents and Communications concerning benchmarking analyses You used to create the Fiscal Plan or assess the reasonableness thereof.  This Request explicitly includes, but not limited to, any analyses comparing Puerto Rico's debt situation to that of other economies that were relied upon in determining what would be a sustainable debt load (*cf*. Fiscal Plan at 27-29), including Documents sufficient to identify any comparable economies considered.

## REQUEST NO. 17.

Documents, Communications, analyses or models relating to the Bridge, including the "five versions of the Bridge submitted in the last four weeks, with adjustments amounting to hundreds of millions of dollars" referenced on page 23 of the Bridge Analysis.  This Request explicitly includes a fully functional version of any model (in native format) used in creating the Bridge or Bridge Analysis as well as any backup or linked spreadsheets and all data run through those models.

## REQUEST NO. 18.

Documents, Communications, analyses or models relating to the request to amend the Fiscal Plan in the letter from Gerald J. Portela Franco, Executive Director of AAFAF, to Natalie A. Jaresko, Executive Director of the FOMB, on May 31, 2017.

## REQUEST NO. 19.

All Documents provided to Ernst & Young in connection with its preparation of the Bridge Analysis.

**REQUEST NO. 20.**

All Documents provided to KPMG in connection with its preparation of the *Commonwealth of Puerto Rico Tax Reform Assessment Project* (2014). For this request, the relevant time period should be construed to mean January 1, 2013 to the date of publication.

**REQUEST NO. 21.**

Documents provided to Anne O. Kruger, Ranjit Teja, Andrew Wolfe, or any individual who participated in the preparation of *Puerto Rico – A Way Forward* (2015), commonly known as the "Krueger Report," during the Relevant Time Period, regardless of when those Documents were created. The Krueger Report shall refer to the initial report released on June 29, 2015 and the updated report released on July 13, 2015.

**REQUEST NO. 22.**

All Documents provided to Conway MacKenzie during the Relevant Time Period, regardless of when those Documents were created, including but not limited to documents provided in connection with its work to prepare fiscal projections contained in the presentation entitled *Technical Meeting Discussion Materials* (Nov. 16, 2016), and in connection with its recent retention by AAFAF for consulting services related to Office of the Chief Financial Officer.

**REQUEST NO. 23.**

All Documents provided to Pension Trustee Advisors during the Relevant Time Period regardless of when those Documents were created, including but not limited to documents provided in connection with (1) any actuarial assessment performed on a public pension system maintained by the Territorial Government; (2) any review of the existing public pension system benefits and their sustainability; and (3) related proposed reforms of such pension systems.

**REQUEST NO. 24.**

To the extent that it is not already produced in response to any prior Request, any Documents considered by or any analysis, reports, or recommendations from experts or consultants analyzing the Territorial Government's fiscal situation since January 1, 2014, including but not limited to Tyler Duvall, Andrew Wolfe, Sergio L. Gonzalez, Jonathan I. Arnold, Bradley R. Bobroff, Kevin Lavin, William B. Fornia, Rafael Romeu, and any employee of or contractor with DevTech Systems, Inc.

**REQUEST NO. 25.**

Documents and Communications concerning the assets of the Commonwealth, including Documents and Communications concerning: (1) estimates of the aggregate book and market value of government and public enterprise-owned land and real estate (register of government owned property); (2) break-outs of assumed revenues and/or cash inflows from privatizations and P3s in the Fiscal Plan; and (3) any additional analyses performed on potential privatizations and P3s.

**REQUEST NO. 26.**

For any revenue line item in the Fiscal Plan (as incorporated into the *Peaje* Opposition *PREPA* Opposition *or* Budget, *see* August 4 Letter at 3) that does not grow at the rate of GNP (see Fiscal Plan at 10), Documents sufficient to identify how these growth rates are derived, including any supporting indices upon which You or Your agents (including any experts) relied.

**REQUEST NO. 27.**

Documents, Communications or analyses used to reconcile the special revenue funds considered in the Bridge or Bridge Analysis (see for example Bridge Analysis at 11, 18, 28) to special revenue funds discussed in the Fiscal Plan (at 12, 15).

**REQUEST NO. 28.**

Documents, Communications, or analyses relating to the estimated collections and collection rates on all local revenue streams cited in the Fiscal Plan at pages 11 and 19, relied upon in formulating the Budget, and all Documents and Communications concerning: (1) the income tax collection rate; (2) the excise tax collection rate; (3) sales and use tax collection rate; (4) property tax collection rates; (5) other tax collection rates; and (6) assumptions and analysis behind Act 154 revenues.  This Request explicitly includes a fully functional version of any backup or linked spreadsheets and all data used to create the Budget.

**REQUEST NO. 29.**

To the extent not produced in response to Request No. 28, Documents and Communications concerning the assumed tax collections in the Fiscal Plan, including the McKinsey tax benchmarking analysis referenced in Your Diligence Responses, and all Documents and Communications concerning: (1) the income tax collection rate; (2) the excise tax collection rate; (3) sales and use tax collection rates; (4) property tax collection rates; (5) other tax collection rates; (6) assumptions and analysis behind Act 154 revenues; and (7) any comparisons between assumed or projected tax collections and actual tax collections.

**REQUEST NO. 30.**

Documents sufficient to ascertain the status and treatment of any taxes collected on behalf of municipalities by the central government of Puerto Rico, including sales and use taxes and property taxes.

**REQUEST NO. 31.**

Documents or Communications relating to the assertion in the *Assured* Motion (at 3) that the FOMB "constantly strives to find ways to generate more money for . . . creditors." This Request explicitly includes any Communications, Documents, or analyses regarding potential changes to the tax code in response to Puerto Rico's current fiscal crisis, including but not limited to Documents relating to reassessing real estate property valuations for the first time since 1958, increasing property tax rates to the levels proposed in the February 29, 2017 version of the Fiscal Plan (at 48), extending Act 154, reassessing any tax incentives or abatements, transitioning the Commonwealth sales and use tax to a broad-based value added tax, or amendments to Law 20/22 incentives passed on July 11, 2017.

**REQUEST NO. 32.**

Documents, Communications, analyses or models (in native format) regarding the Report on Discretionary Tax Abatement Agreements that the Governor was required to submit to the FOMB within six months of the establishment of the FOMB, by PROMESA § 208, 48 U.S.C. § 2148, and which was referenced in FOMB, *Annual Report: Fiscal Year 2017* 6 (July 31, 2017).

**REQUEST NO. 33.**

Documents, Communications, analyses or models (in native format) relating to anticipated revenues relating to health care. This Request explicitly includes any assumptions, models, or data used to project anticipated federal transfers, returns from any Commonwealth-

run medical facility, public corporation or municipal employer or employee contributions, or Commonwealth Fund collections.

**REQUEST NO. 34.**

Documents, Communications or analyses reflecting how the Fiscal Plan and Budget reflect any actual or projected federal transfer allotted to Puerto Rico for use in its Medicaid program, including but not limited to the $295.9 million allotment passed by Congress on or about May 1, 2017, and any potential allotment proposed by the President in the fiscal year 2018 federal budget.

**REQUEST NO. 35.**

Documents, Communications or analyses regarding historical reimbursements from the Center for Medicare and Medicaid Services.

**REQUEST NO. 36.**

A fully functional version of any model (in native format) used by the Territorial Government or Ernst & Young to "normalize" expenses so that they could be compared across years in the Bridge or Bridge Analysis, which was used to calculate the baseline of expenses in the Fiscal Plan and incorporated into the Budget.  *See* August 4 Letter at 3.  This Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s).

**REQUEST NO. 37.**

Documents, Communications, analyses or models (in native format) relating to the FOMB's "recommendation" in the March 9 Letter (at 2) that Fiscal Year 2017 expenses be increased by $585 million, including the type and amount of "historical expenditures" in Fiscal Year 2014-2016 that Ernst & Young discusses on page 13 of the Bridge Analysis.  This Request

explicitly includes any Communications regarding whether that "recommendation" was ever put into effect.

## REQUEST NO. 38.

A fully functional model or workbook (in native format) showing how the Reconciliation Adjustment discussed on page 15 of the Fiscal Plan was calculated, and any analysis, Documents, or Communications regarding how that Reconciliation Adjustment is reflected in the Budget.  To the extent that You maintain that the Reconciliation Adjustment existed, in sum or substance, in earlier budgets or fiscal plans, this Request explicitly includes all Documents, Communications or analyses relating to such Reconciliation Adjustments.  This Request also explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s).  To the extent that You maintain that the Reconciliation Adjustment accounts for previous overspending on the part of the Territorial Government, this Request also includes any backup data or analyses of how that money was used.

## REQUEST NO. 39.

Documents, Communications, analyses or models (in native format) regarding the meaning of the term "essential services" in the Fiscal Plan or the Budget.  To the extent that a model or model(s) was used to estimate the cost of "essential services," this Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s). This Request also includes any Document, Communication, analyses, or assumptions regarding the number of inhabitants who will use or receive such "essential services" during the Fiscal Year 2018 to Fiscal Year 2026 period.

**REQUEST NO. 40.**

Documents, Communications, analyses or models (in native format) that form the basis for Your statement in the *Assured* Motion that the Commonwealth could not provide "necessary services to the people of Puerto Rico . . . while still honoring all its commitments to creditors." To the extent that a model or model(s) was used to estimate the cost of "essential services," this Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s).

**REQUEST NO. 41.**

Documents, Communications, analysis or models (in native format) relating to the extent to which individuals who receive transfer payments from the Territorial Government, including but not limited to debt service payments (whether received directly or indirectly), health care benefits and payments from the Territorial Government's pension programs, are misclassified and/or reside or are employed outside the Commonwealth.

**REQUEST NO. 42.**

Documents, Communications, analyses or models (in native format) relating to the calculation of the "other non-recurring" expenses projected on page 12 of the Fiscal Plan and incorporated in the Budget, including a fully functional version of any model used. This Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s). *See, e.g.*, Reserva para Reintegro, Ingresos Netos Al Fondo General, Año Fiscal 2015 - 2016 - Fiscal Year 2016 - 2017 (reflecting $480m deduction from "gross" general fund revenues to the "reported" general fund revenues), *available at* http://www.hacienda.gobierno.pr/sites/default/files/ingresos_netos_junio_2016-17.pdf.

**REQUEST NO. 43.**

Documents, Communications, analyses or models (in native format) relating to any government "right sizing" expense measures cited on page 15, 18 and 20 of the Fiscal Plan; or reflected in the Budget; discussed in a presentation regarding the Budget, which was held on June 30, 2017; discussed at the meeting of the FOMB, which was held on August 4, 2017, or referenced in the August 4 Letter.  This request explicitly includes any Documents, Communications, analyses, or models regarding the historic and projected number of employees employed in each agency, instrumentality, or component unit of Puerto Rico as well as the governor's decision not to (1) adjust the size of the public work force in light of a declining population requiring government services and the privatization of government services, *see, e.g.*, Press Release, Government Denies Statistics On Temporary Jobs And Ensures No Layoffs (July 13, 2017) ("Our government has not laid off public employees, nor will it do so, according to the commitment of the governor."), (2) implement the furlough program required by the FOMB, see generally August 4 Letter.  To the extent that a model was used in calculating this line item in the Fiscal Plan, a fully functional version of that model (in native format) should be provided.  This Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s).

**REQUEST NO. 44.**

Documents sufficient to identify the total number of permanent employees, temporary hires, subcontractors and consultants, of the Territorial Government.  This information should be provided by department or instrumentality.  To the extent that You have information regarding the number of employees of municipalities, this Request explicitly includes such information. The time period for this Request is 2000 to the present.

**REQUEST NO. 45.**

Documents sufficient to identify any trade creditors who have been paid or taxpayers who have received refunds since the passage of PROMESA.  This Request explicitly includes Documents sufficient to identify whether those trade creditors possessed a lien over the funds used to pay them.

**REQUEST NO. 46.**

Any non-privileged Documents, analyses or Communications that reflect Your basis for stating, "No podemos considerar el reintegro de un contribuyente como una deuda del gobierno con un acreedor."  House Bill 1135.

**REQUEST NO. 47.**

Documents sufficient to identify the amounts, origin, and historical use of any budgetary reserve, including but not limited to, the "Fondo Presupuestario", the "Reserva Presupuestaria" and any emergency, contingency, or tax refund reserve.  *See, e.g.*, http://www.hacienda.gobierno.pr/sites/default/files/Inversionistas/ingresos_netos_junio_2015-16_ingresos_netos_junio_2015-16_0.pdf/.  This Request explicitly includes any Documents, Communications, analyses or models (in native format) that demonstrate why payment of any tax refunds from the General Fund is necessary in light of the existence of such reserves.

**REQUEST NO. 48.**

Documents sufficient to disaggregate expenses associated with the Territorial Government's various pension systems, including a breakdown of expenses associated with (1) defined benefit rather than defined contribution accounts; (2) base benefits rather than system administered benefits; (3) retirees rather than active employees; and (4) any "catch up" expenses accrued before the passage of PROMESA rather than ongoing costs of the programs.  *See, e.g.*,

Fiscal Plan at 22; Act 2013-3. With regard to the Employment Retirement System, which covers multiple sponsoring employers, this Request explicitly includes information that tracks each sponsoring employer to the pension expenses for which it is responsible.

**REQUEST NO. 49.**

Documents, Communications, analyses or models (in native format) regarding the potential impact of the pension reforms discussed in the FOMB, Explanatory Memorandum on Pension Reform (Aug. 4, 2017), or Senate Bill 603, which was signed into law on August 23, 2017, if implemented on (1) the Territorial Government's fiscal situation, (2) compliance with the Fiscal Plan, or (3) projected recoveries of holders of general obligation debt issued or guaranteed by the Commonwealth.

**REQUEST NO. 50.**

Documents, Communications, analyses or models (in native format) regarding expenses relating to health care, including but not limited to:

1. Detailed breakdowns of MCO and TPA disbursements per year, including by use, number of beneficiaries, and assumptions regarding eligibility and level of service provided;

2. Detail and build-up for eligibility, benefits, and pricing requirements imposed under federal programs, including Medicare, Medicaid, and the ACA;

3. Any models used to estimate healthcare expense growth rates (to the extent not already produced in response to Request 9);

4. Any supporting healthcare cost indices (*see* March 9 Letter at 3-4);

5. Efforts to control health care expenses (Fiscal Plan at 20);

6. Initiatives to eliminate waste in the healthcare system (*see, e.g.*, "Areas for possible cuts in Health identified," EL VOCERO (Feb. 2, 2017);

7. And any assumptions made regarding enrollment in light of projected population declines.

To the extent that any model(s) were used to estimate the growth in health care expenses, this Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s).

**REQUEST NO. 51.**

Communications, Documents, or analysis regarding how deficits relating to health care are accounted for in the Fiscal Plan or the Budget.  To the extent that any model(s) were used to estimate these deficits, this Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s).

**REQUEST NO. 52.**

Documents, Communications, analyses or models (in native format) regarding (1) any budget cuts identified by the Territorial Government that it can or will take if funding provided by the Affordable Care Act is not replaced; and (2) discussions with any representative of the federal government regarding replacement of the funding in the Affordable Care Act or a policy known as healthcare "parity".

**REQUEST NO. 53.**

Documents relating to the FOMB's request for "Amendment No. 1: Furlough and Christmas Bonus Amendment to the Commonwealth's Proposed Fiscal Plan," in the March 13 Resolution, which required a furlough program rather than a reduction in the government work force.

**REQUEST NO. 54.**

Documents relating to the FOMB's request for "Amendment No. 2: Pension Amendment to the Commonwealth's Proposed Fiscal Plan" the March 13 Resolution, which required certain alterations to the treatment of pension plans under the Fiscal Plan.  This Request explicitly includes, but is not limited to, both the basis for the Board's request and any Documents, Communications, or analyses relating to the "system overhaul [that was] to be formulated by the Commonwealth and the Board on or before June 30, 2017."  See March 13 Resolution at 4.

**REQUEST NO. 55.**

Documents sufficient to identify the source of and efforts to control substantial projected deficits at Puerto Rico's instrumentalities and component units as projected on page 12 and discussed on page 15 of the Fiscal Plan, as well as the Fiscal Plan recently certified by any instrumentality of the Territorial Government.  This Request explicitly includes any analysis regarding (1) how further efforts to such substantial projected deficits would impact the analysis of Andrew Wolfe cited in and incorporated by the *Peaje* Opposition or *PREPA* Opposition, and (2) any analysis of the impact of any revenue or expense measures contemplated by the certified fiscal plan of any unit or instrumentality of the Territorial Government.

**REQUEST NO. 56.**

Documents, Communications, or analyses regarding how actual expenses differ from budgeted expenses, including but not limited to, Documents sufficient to identify the source of and efforts to control cash disbursements for supplier payables and other expenses, which are over and above the original budget for the particular Fiscal Year in which the disbursements are made.  This Request explicitly includes any document describing the process by which (and the legal basis on which) such payments are made as well as any budget-to-actual reports provided

to the FOMB and any budget-to-actual reports prepared for the FOMB since the passage of PROMESA.

**REQUEST NO. 57.**

Documents, Communications, analyses or models relating to the Territorial Government's liquidity position and cash balances, including but not limited to Documents and Communications concerning (1) the location and proof of such cash balances, (2) the uses of clawback revenue since 2015, (3) the basis for the demands to improve the Commonwealth's liquidity, as discussed in Chairman Carrion's March 8, 2017 letter to Governor Rosselló; (4) source and intended use of the funds reflected in the document tiled "Puerto Rico Treasury Department Treasury Single Account (TSA) Cash Flow Current-to-Forecast Comparison," which was dated May 26, 2017; and (5) source and intended use of the funds reflected in the announcement on August 3, 2017, that the Territorial Government had $1.799 billion cash on hand; and (6) any efforts to investigate further pockets of liquidity in light of the statement by Elias Gutierrez that "I do not rule out there being a lot of money which has [been] lost, since information systems are flawed and there are no ways to reflect anything. God knows what other surprises will be revealed."[1]  To the extent that any model(s) were used to estimate the needs for a liquidity reserve of any sort, this Request explicitly includes any backup or linked spreadsheets (in native format) and all data run through any piece of these model(s).  This Request also includes the intended use of any reserves incorporated in the Budget and the impact of such reserves on Andrew Wolfe's conclusions as cited by or incorporated in the *Peaje* Opposition.

---

[1] Illeanexis Vera Rosado, *Another $395 Million in Government Accounts*, El Vocero (June 15, 2017).

**REQUEST NO. 58.**

Documents, Communications analyses, or models (in native format) relating to any subsidies provided to the University of Puerto Rico, municipalities or other entities, including those discussed on pages 45-48 of the February 28, 2017 version of the Fiscal Plan.  To the extent that the Territorial Government intends to replace such subsidies through indirect means (e.g., changing property taxes, municipal licensing fees, etc.), this Request explicitly includes Documents relating to those efforts.  To the extent that any model(s) were used to estimate the need for these subsidies or the effect that reducing such subsidies will impact economic growth, this Request explicitly includes any backup or linked spreadsheets (in native format) and all data run through any piece of these model(s).  To the extent these subsidies are maintained, this Request also includes any analysis regarding how such subsidies are reflected in the positions taken in the *Assured* Motion and *Peaje* Opposition.

**REQUEST NO. 59.**

To the extent not produced in response to any prior Request, Documents, Communications, analyses, or models (in native format) relating to the continued need for such subsidies to municipalities.  This Request explicitly includes any information regarding the number of municipalities, population of those municipalities, services provided by such municipalities, and employees hired to provide services to those municipalities.  The time period for this Request shall be 2000 to the present.

**REQUEST NO. 60.**

Documents, Communications, analyses or models (in native format) relating to any contemplated P3s, including but not limited to the intended uses of the $38 million appropriated to the Public Private Partnerships Authority.  This Request explicitly includes the nature and cost

of any P3s that have been identified since June 13, 2017, when counsel for AAFAF and the FOMB represented that "[n]o specific public private partnerships are currently being negotiated."

**REQUEST NO. 61.**

Documents, Communications or analyses breaking down any non-publicly traded loans or other debt issued by any element of the Territorial Government and any contingent liabilities recognized for payment on explicit or implicit guarantees by the Commonwealth on debt issued by any other part of the Territorial Government from FY 2008 to the present.

**REQUEST NO. 62.**

To the extent not produced in response to any prior request, Documents, Communications or analyses relating to proposed capital expenditures of the Territorial Government included in the Fiscal Plan or the FY 2018 budget, including but not limited to the "Compra de Equipo" and "Inversión en Mejoras Permanentes" categories in the FY 2018 budget, that might impact the positions taken in the *Peaje* Opposition and *PREPA* Opposition as well as Documents provided by the prior administration.

**REQUEST NO. 63.**

Documents, Communications or analyses regarding any obligations between the Territorial Government and the GDB—including, but not limited to the historical amounts and present status of any funds held by the GDB on behalf of the Territorial Government—and the intended treatment of such obligations under the GDB RSA.  This Request explicitly includes any analyses regarding how any write-off, write-down, or other impairment of any obligation owed to the Commonwealth in the GDB RSA comports with the analysis of Dr. Andrew Wolfe as cited by and incorporated in the *Peaje* Opposition or the *PREPA* Opposition.  This Request

also includes the division of assets between the New Issuer and the Public Entity Trust in the GDB RSA.

**REQUEST NO. 64.**

Documents and Communications between the Commonwealth and financial institutions regarding the deposit or withdrawal of funds belonging to the Territorial Government, including but not limited to clawback revenues, special property related funds, SUT related funds, or COFINA-related Funds.

**REQUEST NO. 65.**

Documents, Communications, analyses or models (in native format) relating to the GDB Municipal Loan portfolio, including but not limited to (1) any valuation of the portfolio, (2) loan and deposit agreements, (3) current loan balances, and (4) Documents identifying the source of repayment for SUT-backed GDB Municipality loans, as that term is used in the GDB RSA and associated Documents released on February 28, 2017.   This Request includes Documents sufficient to identify how SUT flowing to municipalities (if any) in excess of municipal loan debt service is distributed or spent.

**REQUEST NO. 66.**

Documents, Communications or analysis projecting the impact of the FOMB's rejection of the PREPA RSA or the certification of fiscal plans of any territorial instrumentalities on (1) other aspects of the Territorial Government, including but not limited to the General Fund, or (2) the expected recoveries of any creditor of the Territorial Government.   To the extent that any certified fiscal plan of any territorial instrumentality contemplates the write-off, write-down, or other impairment of any obligation to the Commonwealth, this Request includes any analysis of

such impairment on any position taken in the *Assured* Motion, *Peaje* Opposition, or *PREPA*
Opposition.

**REQUEST NO. 67.**

Documents sufficient to identify any participation by or ownership interest of any
member of the FOMB in any bond issued by any part of the Territorial Government.

**REQUEST NO. 68.**

Documents sufficient to identify any interest (financial or otherwise) that any member of
the FOMB has in any creditor or vendor of the Territorial Government.

**REQUEST NO. 69.**

Documents sufficient to identify any interest (financial or otherwise) that any member of
the FOMB has in any financial institution insured by the Corporación Pública para Supervisión y
Seguro de Cooperativas de. Puerto Rico, frequently known as "COSSEC."

**REQUEST NO. 70.**

Documents sufficient to identify any benefits, perquisites, or emoluments (in whatever
form) received by any member of the FOMB as a result of such membership.  This Request
includes any benefits, perquisites or emoluments provided to a Board member's immediate
family.

**REQUEST NO. 71.**

To the extent not produced in response to prior Requests, all Documents,
Communications, or analyses concerning whether the Commonwealth's "available resources are
insufficient" to pay Constitutional Debt, including any and all Documents that were incorporated
into or formed the basis of any position taken in the *Peaje* Opposition.  *E.g.*, *Peaje* Opposition at
33 ("As explained by Andrew Wolfe, the CW Fiscal Plan projects real economic growth of

1.01% after 10 years, which would be sufficient to sustain growth and enable Puerto Rico to regain access to capital markets.").

**REQUEST NO. 72.**

To the extent not produced in response to prior Requests, Documents and Communications concerning any actual, proposed, or potential change to the use of Dedicated Sales Tax.

**REQUEST NO. 73.**

Documents or Communications concerning the duties of any unit of the Territorial Government or the FOMB, under Article VII of the COFINA Resolution, including any and all Documents and Communications concerning duties under Section 706 of the COFINA Resolution and those entities' compliance or non-compliance with those duties.   This  Request explicitly includes any actions taken to comply with the duties set out in Article VII of the COFINA Resolution, including but not limited to any actions taken to defend, preserve, and protect the Dedicated Sales Tax or the COFINA structure.

**REQUEST NO. 74.**

Documents or Communications concerning the ability of AAFAF, the GDB, the Commonwealth and any of their officers, directors, agents, or advisors to direct, control, or influence the actions or positions of COFINA.

**REQUEST NO. 75.**

Documents, Communications or analyses concerning any piece of the COFINA Correspondence.  This Request explicitly includes, but is not limited to, (1) documents sufficient to identify the basis of any statement by the Territorial Government in the COFINA

Correspondence, and (2) any communications between the Territorial Government or FOMB with any creditor or creditor group regarding the COFINA Correspondence.

**REQUEST NO. 76.**

Documents concerning Your Communications and relationships with persons or entities responsible for collecting, holding, or transferring the Dedicated Sales Tax, including Banco Popular Puerto Rico and the Bank of New York Mellon.