# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## DECLARATION OF JAMES BAIRD IN SUPPORT OF MOTION OF NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING DISCOVERY

I, James Baird, declare as follows:

1.      I submit this declaration in support of National Public Finance Guarantee Corporation's ("**National**") motion (the "**Motion**") for an order, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).

2.      I am a Partner in the Restructuring and Special Situations Group at PJT Partners, National's financial advisor.  I have personal knowledge of National and PJT's diligence and document requests of the Oversight Board, AAFAF, and the Debtors.

3.      On April 7, 2017, PJT sent a preliminary diligence list to Rothschild, AAFAF's financial advisor.  Rothschild provided answers to some—but not all—of PJT's questions, and many of the responses provided were vague, incomplete, or simply directed PJT to other materials unrelated to the question asked.  A true and correct copy of the preliminary diligence list is attached hereto as Exhibit A.

4.      On April 11, 2017, AAFAF responded to PJT's preliminary diligence list.  Similar to the responses received from Rothschild, AAFAF's response was insufficient, because AAFAF provided answers to some—but not all—of PJT's questions, and many of the responses received were vague, incomplete or unrelated to the question asked.  Additionally, many of AAFAF's responses merely re-directed PJT to documents that PJT had previously reviewed and deemed insufficient, either because the working models were hardcoded (and did not provide enough supporting detail) or because the documents failed to explain the rationale for the assumptions that were put forth.

5.      On April 28, 2017, in connection with a proposed forbearance agreement, counsel for National sent a detailed diligence request (prepared by PJT) to counsel to the Oversight Board as well as to counsel to the Commonwealth.  A true and correct copy of the April 28, 2017 diligence request is attached hereto as Exhibit B.

6.      The documents and information requested by PJT included, among other things, (i) live excel models demonstrating the quantitative analyses found in the Fiscal Plan; (ii) rationales for certain assumptions contained in the Fiscal Plan (*e.g.*, rationale for assumptions

relating to indefinite population decline, flat productivity, flat labor force participation, and the size and timing of impact structural reforms); (iii) a detailed list of information that Ernst & Young reviewed during its review of the Commonwealth's financial information for fiscal year 2015 and fiscal year 2016; (iv) normalized government expenditure information for fiscal year 2010 through fiscal year 2013; (v) a comparison of historical healthcare expenditures for the past ten years; (vi) an estimate of aggregate book and market value of government and public enterprise-owned land and real estate; (vii) details regarding tax collection other than sales and use tax collection; and (viii) a breakdown of capital expenditures.  Ultimately, the forbearance was never finalized and these diligence requests went unanswered.

7.      Although not directly in response to the diligence requests above, the Commonwealth and the Oversight Board eventually produced material that was responsive to some of the diligence requests, including a working model for the Commonwealth.  However, the information produced had significant shortcomings and did not address the main focus of PJT's request, which was seeking additional layers of information that provided the foundation and build-up for the Fiscal Plan.  The working model, for example, consists of 10 tabs of primarily summary output information and includes links to other excel models that have either not been provided or, if provided, are in fact also mostly hardcoded.  The model does not contain all of the information necessary for one to determine how its numbers were calculated.  As a result, many of the numbers and calculations are not auditable.

8.      On May 19, 2017, National sent a letter (the "**May 19 Commonwealth Letter**") to counsel to the Oversight Board, requesting that the Oversight Board provide the previously requested diligence relating to the Fiscal Plan, and attached a comprehensive list of National's outstanding diligence requests.   The Oversight Board did not respond to the May 19

Commonwealth Letter. A true and correct copy of the May 19 Commonwealth Letter is attached hereto as Exhibit C.

9.    On May 19, 2017, National also sent a separate letter to counsel to the Oversight Board (the "**May 19 HTA Letter**" and together with the May 19 Commonwealth Letter, the "**May 19 Letters**") requesting a response to its outstanding diligence requests relating to HTA. The Oversight Board did not respond to the May 19 HTA Letter. A true and correct copy of the May 19 HTA Letter is attached hereto as Exhibit D.

10.    By letter dated June 5, 2017 (the "**June 5 Letter**"), National reiterated to the Oversight Board its need for the diligence requested in the May 19 Letters. Attached hereto as Exhibit E is a true and correct copy of the June 5 Letter.

11.    By letter dated June 13, 2017 (the "**Reply Letter**"), the Oversight Board and AAFAF replied to the June 5 Letter. Attached hereto as Exhibit F is a true and correct copy of the Reply Letter.

12.    The Oversight Board and AAFAF have refused to produce any documents whatsoever in response to over half of the approximately 75 requests addressed in the Reply Letter, while providing only partial and sometimes unhelpful responses to the remainder.[2] Instead of offering to be forthcoming with additional information, the Oversight Board, among other things: (i) characterized many of National's requests as "overbroad," while not committing to produce any of the requested information; (ii) stated that it will not provide "proprietary models created by outside consultants," often without identifying the specific requests it believes

---

[2] For example, in response to a request for a functional version of the macroeconomic growth model employed to develop the Fiscal Plan, AAFAF agreed to provide "underlying raw data" but otherwise refused disclosure on the grounds (among others) that "certification of the proposed Fiscal Plan is not reviewable by any court." *See* Reply Letter at 4. AAFAF provided the same answer in response to requests for documents relating to growth rates for expenditure line items in the Fiscal Plan. *See id.* at Ex. A, p. 8.

to fall into this category; and (iii) reiterated that "factual inquiries made into the 'determinations'

by the [Oversight Board]" are statutorily mandated to be in the Oversight Board's discretion and

the Fiscal Plan is not reviewable by any court.  *See* Reply Letter, at 2-8.

I declare under the penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

Executed on this 25th day of August, 2017.

/s/ James Baird
James Baird

# EXHIBIT A
## (April 7, 2017 Preliminary Diligence Requests)

Confidential
Preliminary, Subject to Material Revision
Subject to FRE 408 and Similar Rules

**PJT - Preliminary Fiscal Plan Diligence Question List**
As of April 7, 2017
*(Subject to further additions after review of follow-up requests and updated dataroom materials)*

<u>General</u>

1) Please provide Fiscal Plan model with all line items "pro forma" for impact of Revenue and Expense Measures

<u>Macro-Economic Assumptions</u>

1) Please share any analysis (memo if available) that underlies the GNP forecast (from IMF or others)

2) Per file 1.1.4.1.1, please explain directionally how each of the following factors impacts the GNP forecast:

   a) Elasticity

   b) US Population Growth

   c) US Nominal GDP Growth

3) Please explain the assumption that the PR population continues to decline throughout the 10 year forecast as a constant rate (rather than improving or even increasing)

4) Please provide detail on the impact of each structural reform on GNP growth, particularly those mentioned by Mr. Wolfe

   a) Please provide study/studies used to determine timing of impacts (at least American Economic Review article and IMF study on reforms)

5) Please explain which (if any) of the Economic Task Force suggestions were incorporated into the Fiscal Plan, and their impact on growth

6) Please explain the material downward revision in GNP growth between the February 28th Fiscal Plan and the certified plan.

7) Please share any sensitivity analyses performed based on different macroeconomic assumptions

8) Please share assumed labor force participation rate and productivity rates

9) Please provide file called "PR_Macroframework methodology.docx" referenced in Fiscal Plan model

10) Please provide file called "DataRoomSlides_CM_03222017_.pdf" referenced in Fiscal Plan model

Confidential
Preliminary, Subject to Material Revision
Subject to FRE 408 and Similar Rules

**Revenue Assumptions (Re: 1.1.4.2.1, 1.1.4.4.1, 1.1.4.4.3, 1.1.4.4.4)**

1) Please quantify the impact of structural reform measures on government revenue

   a) In addition, please break out any assumed revenues from privatizations and P3s)

   b) Confirm that "baseline" GNP and revenue forecast includes impact from structural reforms

2) Please explain the different forecasting method for SUT growth for 2018 and 2019

3) Please explain why "Act 154" baseline revenues are assumed to be flat

   a) Why aren't the losses fully replaced starting in 2019 post-measures?

4) Please quantify impact of adjusted the 2017 baseline revenue projection for YTD actuals being ahead of forecast

5) Please detail tax collection rates assumed (pre and post-measures) (Re: 1.1.4.4.4)

   a) Please provide comparison to historical rates

   b) Please provide a breakdown of collection rates for income taxes, corporate taxes, SUT, Act 154, and excise taxes, in as much detail as possible.

   c) Please explain basis for capture rates assumed in 1.1.4.4.4 - are these benefits assumed to stay flat beyond 2020?

6) Please explain file 1.1.4.4.3 generally (or provide file with clearer labels)

7) Where is the Slot Machine revenue included from the Tourism CU?


**Expense Assumptions (1.1.4.3)**

1) Please provide further detail on payroll expenses

   a) Subdivisions within Dept. of Ed. and Dept. of Police

   b) Components of "Other Agencies"

   c) Headcount and Average Salaries by Department (comparison of current vs. historical)

2) Please provide further detail on operational expenses

   a) Generally describe / provide build for expenses for legislature (presumably this excludes personnel-related expenses?)

   b) Please provide breakdown of Dept. of Ed. expenses (agency overhead vs. money going directly to schools)

   c) Breakdown of "Other Agencies"

3) Please describe assumed "Power" usage and cost/kwh

4) Please explain large increase in Water cost post-2017

2

Confidential
Preliminary, Subject to Material Revision
Subject to FRE 408 and Similar Rules

5) Please explain large increase in Judicial appropriations from 2017 to 2018, and generally detail on the uses of these appropriations

6) Please provide updated pension spending numbers based on OB requirements, as soon as available

7) Please describe "Health Insurance" gross appropriation of $885 million and how it flows to the ASES budget

8) Please provide breakdown of "Other" gross appropriations of ~$1 billion per year

9) Please provide Capex breakdown when available (currently "Pending")

10) Please explain why the Special Revenue Funds are in deficit throughout the projection period

   a) Describe services provided (P&L by service)

   b) Describe opportunities for privatization or increasing revenues to make special revenue fund self-sufficient

11) Why are component unit deficits growing so much faster than inflation?

   a) Including Healthcare/UPR, the CAGR is almost 12%

   b) Excluding Healthcare/UPR, the CAGR is still ~4.5%

12) Please provide detail on municipal subsidies

   a) Historical subsidy amounts broken out by municipality

   b) Detail on proposed subsidies broken out by municipality (pro forma for proposed reductions)

13) Please provide breakdown of Oversight Board expenses

14) Please provide breakdown of AAFAF expenses

### Healthcare

1) Please provide latest update on status of ACA funding replacement negotiations

2) Please provide pre-ACA healthcare funding expenditures per capita

   a) Bridge from pre-ACA funding to current funding (pro forma for new healthcare model)

### Other

1) Provide estimate of aggregate book and market value of gov't and public enterprise-owned land and real estate (register of government owned property)

2) Discuss potential to sell assets with significant regulatory or other outstanding liabilities in exchange for assumption by purchaser of obligations (e.g., EPA-mandated investments)

3

# EXHIBIT B
## (April 28, 2017 diligence request list)

Privileged & Confidential
DRAFT – Subject to Material Change
Subject to FRE 408

**Diligence Requests and Milestones for Forbearance**

*April 27, 2017*

| Request | Deadline |
|---|---|
|  |  |
| 1. Live Excel Models for:<br>    a. PR Fiscal Plan Model<br>    b. CU Rollup (with key assumptions) | Immediately after forbearance executed |
| 2. Current cash balance from clawback revenues<br>    a. Location and proof of cash balances<br>    b. Sources and uses of clawback revenue | Immediately after forbearance executed |
| 3. Meeting With AAFAF and Advisors to Review FY2018 Budget | May 5 |
| 4. E&Y Report Diligence Requests | May 5 |
| 5. Healthcare Diligence and Meeting With Healthcare Expert | May 10 |
| 6. Macroeconomic Diligence and Meeting With Economists | May 15 |
| 7. Asset/Privatization Diligence | May 15 |
| 8. Component Unit Diligence and Meeting With Conway McKenzie | May 15 |
| 9. Tax Collection Diligence | May 15 |
| 10. Other Outstanding Diligence Requests | May 15 |
| 11. Definition of "Essential Services" and line by line explanation of why each budgeted expense qualifies | May 15 |
| 12. Benchmarking analyses prepared to create / assess reasonableness of fiscal plan | May 15 |
| 13. Agreement on assumptions underlying the Fiscal Plan | May 31 |

Privileged & Confidential
DRAFT – Subject to Material Change
Subject to FRE 408

**Detailed Diligence Requests**

A) Macroeconomic Diligence
   a. Detailed macroeconomic model in excel demonstrating quantitative analysis described in "PR_Macroframework methodology.pdf"
   b. Rationale for size and timing of impact structural reforms (in meeting)
   c. Rationale for the following assumptions:
      i. Indefinite population decline
      ii. Flat productivity
      iii. Flat labor force participation
   d. If live excel model does not easily sensitize for economic growth, please provide sensitivity analysis showing revenues, expenses, and cash flows under a range of upside cases.

B) E&Y Report Diligence Requests (Note: all page numbers refer to the long version of the E&Y Report)
   a. Page 10: Please provide a detailed list of information that E&Y reviewed during its review of Commonwealth Financial information for FY15 and FY16, including system generated information and all subsequent adjustments.
   b. Page 13: Please provide "normalized" government expenditure information for FY2010 through FY2013.
      i. For normalized expenditure information included in report (FY14-17), please provide line-item detail for each adjustment.
   c. Page 15-17: Detailed breakdown of the "Adjustments" listed on line 11 of the table on page 15.
      i. Include each individual line-item adjustment.
   d. Page 20: Please provide back-up line item detail regarding the decline in education funding.
   e. Page 23: Please provide detailed list of changes included in each draft of the bridge analysis provided to Oversight Board, along with summary of changes required by the Board.
   f. Page 27: Backup / Detail for Manual Adjustments
      i. Cash Reconciliation
      ii. Accrual Reconciliation
      iii. Trend Adjustment
      iv. Estimated Increase
   g. Page 33: Please provide independently forecasted normalized EBTIDA for Major Component Units, including build-up and live model.

2

Privileged & Confidential
DRAFT – Subject to Material Change
Subject to FRE 408

C) Healthcare Diligence
   a. Detailed breakdown of MCO and TPA disbursements per year, including by use, number of beneficiaries, and assumptions regarding eligibility and level of service provided
   b. Comparison of historical (past ten years) healthcare expenditures and federally imposed requirements with comparable line item detail to the Fiscal Plan forecast breakdown provided in F.a. above
   c. Detail and build-up for requirements imposed under federal programs (Medicare, Medicaid, ACA) for eligibility, benefits, and pricing
   d. Any cuts that the Commonwealth has identified that it will take if ACA funding is eliminated
   e. Detailed update on Affordable Care Act replacement funding / healthcare parity discussions in DC

D) Asset / Privatization Diligence
   a. Estimate of aggregate book and market value of government and public enterprise-owned land and real estate (register of government owned property)
   b. Potential to sell assets with significant regulatory or other outstanding liabilities in exchange for assumption by purchaser of obligations (e.g., EPA-mandated investments)
   c. Break-out of assumed revenues from privatizations and P3s in Fiscal Plan

E) Component Unit Diligence
   a. Walk-through of CU Rollup with Conway Mackenzie
   b. Describe opportunities for privatization or increasing revenues to make special revenue funds self-sufficient
   c. Discuss underlying reasons why component unit expenses and deficits grow significant faster than inflation

F) Tax Collection Diligence
   a. Detail on tax collection other than SUT
   b. McKinsey Tax benchmarking analysis
   c. Explanation of why Act 154 revenues are assumed to be flat
      i. Details on replacement plan / timing

G) Other Outstanding Diligence Requests
   a. Updated fiscal plan incorporating Oversight Board amendments regarding pensions
   b. Breakdown of capital expenditures
   c. Details on proposed subsidies and subsidy reductions broken out by municipality

3

Privileged & Confidential
DRAFT – Subject to Material Change
Subject to FRE 408

      i.  Municipality budgets, where available

d.  Breakdown of Oversight Board expenses

e.  Detailed budgets in English and PDF (certain links to websites that were provided were very difficult to navigate)

# EXHIBIT C
## (May 19 Commonwealth Letter)

# Weil, Gotshal & Manges LLP

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

BY E-MAIL

**Marcia L. Goldstein**
+1 (212) 310-8214
marcia.goldstein@weil.com

May 19, 2017

Martin Bienenstock
Proskauer Rose LLP
11 Times Square
New York, NY 10036
mbienenstock@proskauer.com
*Counsel for the Financial Oversight and Management Board for Puerto Rico*

Re:  Follow-Up on Disclosure Requests

Dear Martin:

I write on behalf of National Public Finance Guarantee Corporation ("National") to follow up on our repeated requests for meaningful diligence into the Commonwealth of Puerto Rico's (the "Commonwealth") financial situation and the assumptions underlying the Fiscal Plan for Puerto Rico (the "Fiscal Plan") certified by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") on March 13, 2017.  As Judge Swain stressed at the hearing yesterday, transparency is the cornerstone of a successful restructuring, and the Court will soon expect a status report on disclosure of information to creditors.  We believe that the Oversight Board must now do everything possible to fulfill its obligation to provide the requested diligence.

PROMESA requires that creditors be provided with "information sufficient . . . to make an informed decision with respect to a possible restructuring."  *See* 48 U.S.C. § 2146(a)(2).  So far, that information has been critically lacking.  Creditors need adequate and accurate financial diligence to be able to understand the Fiscal Plan, engage in negotiations, and make informed decisions.  It is the Oversight Board's role and duty to enforce transparency and ensure that all creditors obtain equal access to the requisite information.  As the parties consider returning to mediation, information sharing is especially important to set the stage for productive negotiations.

Since early April 2017, National has made repeated requests for the data and assumptions underlying the Fiscal Plan in order to perform its own analysis of the Commonwealth's financial situation.  As of today, neither the Oversight Board nor the Commonwealth has provided genuine access to that information. Instead, the Commonwealth has set up a data room consisting of documents that fail to respond to National's diligence requests and shed little light onto the Commonwealth's finances.  The below chronology illustrates the lack of diligence:

Martin Bienenstock
May 19, 2017
Page 2

**Weil, Gotshal & Manges LLP**

- On April 7, 2017, National's financial advisor, PJT Partners ("PJT"), sent a preliminary diligence list to Rothschild, the financial advisor for the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF").  Rothschild provided answers to some but not all of PJT's questions on April 12, 2017, and many of the responses were deficient.

- On April 17, 2017, a representative of the Oversight Board made assurances that further diligence and live models would be shared, but PJT never received that information.

- On April 20, 2017, at the request of creditors, Rothschild stated that the live models serving as the basis for the Fiscal Plan would be shared.  Once again, PJT did not receive any live models.

- On April 25, 2017, PJT and Weil met with Ernst & Young ("E&Y") to discuss an E&Y report which purported to be the basis for the Fiscal Plan's $618 million annual budget cushion.  At that meeting, E&Y stated that the figure was an extrapolation of historic unaccounted-for expenses but could not answer questions about the specifics of the expenses, why they would be continuing, or if they were even appropriate.  PJT followed up in writing with E&Y on the same day, requesting additional financial backup for the conclusions in the E&Y report.  PJT received no response.

- On April 28, 2017, in connection with a proposed forbearance agreement, counsel for National sent a detailed diligence request (prepared by PJT) to counsel for the Oversight Board and counsel for the Commonwealth.  The documents and information requested by PJT included, among other things, (i) live excel models demonstrating the quantitative analyses found in the Fiscal Plan; (ii) rationales for certain assumptions contained in the Fiscal Plan (*e.g.*, rationale for assumptions relating to indefinite population decline, flat productivity, flat labor force participation, and the size and timing of impact structural reforms); (iii) a detailed list of information that E&Y reviewed during its review of the Commonwealth's financial information for fiscal year 2015 and fiscal year 2016; (iv) normalized government expenditure information for fiscal year 2010 through fiscal year 2013; (v) a comparison of historical healthcare expenditures for the past ten years; (vi) an estimate of aggregate book and market value of government and public enterprise-owned land and real estate; (vii) details regarding tax collection other than sales and use tax collection; and (viii) a breakdown of capital expenditures.  Neither National's counsel nor PJT received any response to these detailed requests.[1]  The Title III cases for the Commonwealth and COFINA were filed a few days later.

National and its advisors urge the Oversight Board to take all the necessary steps to share the requested information as soon as possible.  We are available to discuss any questions you may have and look forward to engaging with you in constructive discussions.

---

[1] A full schedule of documents and information that National is requesting is attached hereto as Exhibit 1.

Martin Bienenstock
May 19, 2017
Page 3

**Weil, Gotshal & Manges LLF**

Sincerely,

*/s/ Marcia L. Goldstein*
Marcia L. Goldstein


cc:   Oversight Board Members
        Suzzanne Uhland
        John J. Rapisardi


Encl.

## Exhibit 1

### SCHEDULE OF DOCUMENTS AND INFORMATION TO BE PRODUCED BY THE OVERSIGHT BOARD AND COMMONWEALTH

1. Live Excel Models for (a) PR Fiscal Plan Model, (b) CU Rollup, including any underlying files and assumptions
2. Current cash balance from clawback revenues, including location and proof of cash balances
   a. Sources and uses of clawback revenue since 2015
3. FY2018 budget as well as any underlying excel files and assumptions
4. All documents regarding the definition of essential services and the determination that each expense in the certified fiscal plan constitutes an essential service
5. All benchmarking analyses used to create or assess the reasonableness of the fiscal plan
6. All documents related to the development of the macroeconomic forecast used in the fiscal plan, including documents related to the:
   a. Size and timing of the impact of structuring reforms
   b. Decline in population for each year in the forecast
   c. Flat productivity level
   d. Flat labor force participation rate
7. Detailed macroeconomic model in excel demonstrating quantitative analysis described in "PR_Macroframework methodology.pdf"
8. All documents related to the Reconciliation adjustment included in the fiscal plan, including all underlying data used by E&Y for the "Bridge Report"
   a. Detailed list of information that E&Y reviewed during its review of Commonwealth Financial information for FY15 and FY16, including system generated information and all subsequent adjustments
   b. "Normalized" government expenditure information for FY2010 through FY2013
   c. For normalized expenditure information included in report (FY14-17), line-item detail for each adjustment
   d. Detailed breakdown of the "Adjustments" listed on line 11 of the table on page 15
   e. Detailed list of changes included in each draft of the bridge analysis provided to Oversight Board, along with summary of changes required by the Board (page 23)
   f. Backup / Detail for Manual Adjustments including (i) Cash Reconciliation, (ii) Accrual Reconciliation, (iii) Trend Adjustment, and (iv) Estimated Increase (page 27)
   g. Independently forecasted normalized EBTIDA for Major Component Units, including build-up and live model (page 33)
9. All documents related to the forecasted healthcare-related expenditures, including at ASES and ASEM
   a. Detailed breakdown of MCO and TPA disbursements per year, including by use, number of beneficiaries, and assumptions regarding eligibility and level of service provided

    b.  Detail and build-up for requirements imposed under federal programs (Medicare, Medicaid, ACA) for eligibility, benefits, and pricing

    c.  Any cuts that the Commonwealth has identified that it can/will take if ACA funding is eliminated

    d.  Detailed update on Affordable Care Act replacement funding / healthcare parity discussions in DC

10. All documents related to the assets of the government

    a.  Estimate of aggregate book and market value of government and public enterprise-owned land and real estate (register of government owned property)

    b.  Break-out of assumed revenues / cash inflows from privatizations and P3s in Fiscal Plan

    c.  Any additional analysis performed on potential privatizations and P3s

11. All documents related to the assumed tax collections in the Fiscal Plan

    a.  Income tax collection rate

    b.  Excise tax collection rate

    c.  Other tax collection rates

    d.  McKinsey tax benchmarking analysis referenced in diligence responses

    e.  Assumptions and analysis behind Act 154 revenues

12. Updated Fiscal Plan that incorporates Oversight Board required amendments for certification

13. Breakdown of capital expenditures

14. Details on proposed subsidies and subsidy reductions broken out by municipality

      i.  Municipality budgets, where available

15. Detailed commonwealth and agency budgets

2

# EXHIBIT D
## (May 19 HTA Letter)

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Marcia L. Goldstein**
+1 (212) 310-8214
marcia.goldstein@weil.com

May 19, 2017

Martin Bienenstock
Proskauer Rose LLP
11 Times Square
New York, NY 10036
mbienenstock@proskauer.com
*Counsel for the Financial Oversight and Management Board for Puerto Rico*

Re:  HTA Creditors Meeting

Dear Martin:

I write on behalf of National Public Finance Guarantee Corporation ("National") as a follow up to my email regarding the meeting held on Monday, May 15, 2017, in which the Oversight Board presented a proposal to the creditors representing a controlling group, in fact, almost all, of the debt owed by HTA. The proposal completely disregarded HTA as a separate entity, lumped HTA into a category of claw back entities—making no distinction among them—and assumed no cash flow was available to make payments on account of debt secured by special revenues or otherwise.  These positions directly contradict statements made by Commonwealth counsel in a prior federal court proceeding concerning the automatic stay imposed under PROMESA.  In the earlier proceeding, Commonwealth counsel took the position that the stay should not be lifted because HTA debt holders had a *perpetual lien* in the HTA revenues and therefore would not be harmed by continuation of the stay.  The federal court relied on those assertions in ruling that it would not lift the stay.  The Commonwealth cannot reverse its position now.

The May 15 meeting also underscored deficiencies in information and diligence regarding HTA. No one on behalf of AAFAF or the Oversight Board could answer creditors' questions about the historic or current flow of funds in and out of HTA.  Nor could AAFAF or the Oversight Board provide an accounting of the funds "clawed back" from HTA and how those clawbacks complied with applicable governing rules.  Creditors also requested information regarding the impact of proposed restructuring alternatives on privatization opportunities and federal funding.  You also noted that budgets and audited financials were not yet available.

National also repeated its outstanding diligence requests that had been made to the Commonwealth and the Oversight Board.  However, the Commonwealth, with the apparent agreement of the Oversight Board, denied the requests, maintaining that the information would not be made available to National because it is a plaintiff in an adversary proceeding.  As National stated in the meeting and reiterated at the Title III hearing on May 17, 2017, financial diligence and credible information is needed for all creditors, including National, if there are to be meaningful negotiations with respect to the

**Weil, Gotshal & Manges LLP**

Martin Bienenstock
May 19, 2017
Page 2

Commonwealth or any of its instrumentalities.  The pendency or outcome of National's adversary proceeding does not change that.  National and its advisors have reviewed the entries to the data room including entries made on May 17, and found mostly publicly available information.  Accordingly, a joint diligence request prepared by the financial advisors for National, Assured Guaranty Corp., Financial Guaranty Insurance Company, and Ambac Assurance Corp. is attached hereto as Exhibit A.  This request was sent to Rothschild on May 17.  These questions and diligence requests should be addressed as soon as possible.

No creditor in attendance at the HTA meeting believed they had sufficient information to make informed decisions regarding any HTA proposal.  The meeting was far from a good faith effort by the Oversight Board to achieve a consensual restructuring.

Notwithstanding the foregoing, it was announced in court on May 17 that there would soon be a Title III filing for HTA.  A Title III proceeding for HTA appears to be particularly unnecessary and premature given that all of the debt holders fit easily into a reasonably sized conference room and have more than sufficient control to achieve an effective restructuring.  Further, all creditors present stated a willingness to engage in good faith negotiations.  National also expects the Oversight Board to consider the impact of a Title III filing on Federal funding for HTA before making any decisions.  Doing so would be a more constructive approach than having the Oversight Board issue a restructuring certification that cannot legitimately meet the requirements of section 206(a) of PROMESA.

Since the May 17 hearing, Elias Sanchez was quoted in the press to the effect that "good faith negotiations" with HTA creditors are "ongoing," and that an "exchange of offers" has taken place.  We are not aware of any discussions or exchange of proposals since the meeting on May 15.  If we are wrong, please provide us with the dates of meetings or discussions held, the names of attendees, and copies of proposals and counterproposals that were made since the May 15 meeting.  As stated above, we are willing to engage in good faith negotiations with respect to HTA.  Ambac and FGIC, whose counsel are copied below, join in the sentiments expressed in this letter.

Sincerely,

Marcia L. Goldstein   JCC

Marcia L. Goldstein

Encl.

Cc:  Oversight Board Members
     Suzzanne Uhland, O'Melveny & Meyers LLP
     John J. Rapisardi, O'Melveny & Meyers LLP

**Weil, Gotshal & Manges LLP**

Martin Bienenstock
May 19, 2017
Page 3


Dennis F. Dunne, Milbank, Tweed, Hadley & McCloy LLP
Martin A. Sosland, Butler Snow LLP

# Exhibit A

**Privileged & Confidential**

# HTA DILIGENCE REQUEST LIST
### MAY 17, 2017

*The following is an information request list relating to the Puerto Rico Highways and Transportation Authority ("PRHTA" or "HTA") Fiscal Plan released on April 28, 2017. If you cannot provide directly responsive material, note the item and send the most comparable information that is responsive. Provide an estimate of when the directly responsive material can be made available (or a justification of why such estimate, or the information, can't be provided). Additional diligence request list(s) may be sent after we have reviewed the materials you provide in response to this list.*

*The following list is not exhaustive and could be accompanied by a more robust set of questions relating to the Fiscal Plan or any other materials released by, produced by or otherwise available to PRHTA.*

1. **PROMESA Resolutions**
   a. Provide a draft (in clean and redline forms) of the Fiscal Plan as amended to comply with the six amendments required pursuant to the Oversight Board's certification of the same
      i. If such draft is not available, provide an update on planned changes to the Fiscal Plan including ranges of the forecast financial impact of each

2. **Sources and Uses of Clawback HTA Revenue**
   a. Provide a detailed sources and uses analysis for all revenue that has been clawed back from PRHTA and transferred to the Commonwealth over the past four years

3. **HTA Fiscal Plan (April 28, 2017)**
   a. Provide the dynamic model behind the revenue and expense build in the HTA Fiscal Plan, including a buildup of, and relevant backup detail on, each major line item
   b. Detail necessary operating expenses and any essential services included in the plan

4. **Additional Diligence Items**
   a. Detailed asset-level 10-year historical HTA financials split out, including:
      i. Revenue, opex and capex breakdown for each asset
      ii. Must include details including, but not limited to: tolls, fares, fees, passengers / ridership, cars / traffic, etc.
   b. Provide the expected impact to future federal funding (from each of the FHWA and the FTA) and any associated incremental expenses in the event of a HTA Title III filing
      i. Describe all communications with the FHWA and FTA regarding this issue
   c. Detail on the FHWA & Earmarked Projected funding over next 10 years (i.e., description of the earmarked projects and current construction and funding status)
   d. Provide IRR analysis of planned construction projects
   e. Schedule of all owned assets
      i. Details / background on other major projects / assets
   f. Tolls
      i. Toll charge analytics (detailed per toll road)
      ii. Details / background on electronic tolling potential and past measures undertaken (detailed per toll road)
      iii. Detail on demand elasticity for toll prices (detailed by toll road)
   g. Detail on the planned utilization of toll credits
   h. Provide all documents concerning the allocation or application of any proceeds of the 2016 PR-5 and PR-22 toll road concession extension with Metropistas. This relates to:
      i. An initial payment of $100mm, presumably transferred last year

  ii. A second disbursement of $15mm, initially expected by 30 June 2017 at the latest

 i. For each source of revenue that HTA collects from consumers (e.g., tolls, fares, fees and other charges), specify percentages of each collected electronically and / or manually

 j. Detail behind pension / OPEB

  i. Funded status, contributions, etc.

 k. P3s

  i. Provide all relevant materials that have been prepared in the process of evaluating additional public private partnership prospects

  ii. Provide detailed plan and cost-benefit analysis on each of the following:

   1. Potential corporatization of specific parts of the highways and transportation system (i.e., assigning responsibility for management and operation to a separate body, to run an asset in a more businesslike way)

   2. Potential privatization of the transit system or Tren Urbano and maintenance of the Highway Authority as a government agency

   3. Potential corporatization of HTA and transit as separate entities

   4. Potential full privatization

  iii. Provide the projected flow of funds from the potential proceeds from P3s

 l. Provide all documents, agreements and financial data concerning relationship with concessionaires

 m. Provide detail regarding employee headcount, wages and benefits

  i. Organizational chart and employee headcount by department / function

  ii. Employee salaries and benefits by position

 n. Provide details regarding HTA Board members (including employment history, affiliations, other appointed or elected positions held, etc.)

 o. Provide an explanation of HTA cash accounts:

  i. Describe how HTA revenue and expense cash flows are separated or intermingled with the Treasury Cash Accounts

  ii. Describe how HTA keeps track of capital spending (multi-year capital budgets) vs. operating cash

5. **Tren Urbano**

  i. Provide a separate Tren Urbano fiscal plan, including the following:

   1. Analysis of demand inducement and cost efficiency measures that allow the train to target a fare box recovery ratio in line with heavy rail systems on the mainland (35-60%)

   2. Revenue enhancement measures for the train system, including fare increases

    a. The last fare increase had the effect of increasing revenues despite a decrease in ridership; provide analyses of revenue-maximizing fares

   3. Address the separation of Tren Urbano from HTA as a way to enhance profitability

# EXHIBIT E
### (June 5 Letter)

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

BY EMAIL AND MAIL

**Marcia L. Goldstein**
+1 (212) 310-8214
marcia.goldstein@weil.com

June 5, 2017

Martin Bienenstock
Proskauer Rose LLP
11 Times Square
New York, NY 10036
mbienenstock@proskauer.com
*Counsel for the Financial Oversight and Management Board for Puerto Rico*

Re:  Diligence Request

Dear Martin:

I write on behalf of National Public Finance Guarantee Corporation ("National") to follow up on our letter dated May 19, 2017,[1] which requested diligence into the Commonwealth of Puerto Rico's (the "Commonwealth") financial situation and the assumptions underlying the Fiscal Plan for Puerto Rico (the "Fiscal Plan") certified by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") on March 13, 2017.  National has yet to receive the documents and information requested in the May 19, 2017 letter other than the live model of the Fiscal Plan, which we received last week.  Although we appreciate receipt of the "live model," we have not received relevant back up files, schedules, and the rationale for the underlying assumptions.  In addition, we have not received the categories of information previously requested needed to evaluate the assumptions and projections underlying the Fiscal Plan.

As explained in my May 19 letter, there can be no question that the information requested by National is both required by law and integral to the restructuring process.  It is simply incomprehensible that National, together with other creditors of the Commonwealth, have been forced to lodge repeated requests for this information with limited response.

The continued lack of transparency and disclosure by the Commonwealth and the Oversight Board has caused creditors to once again reiterate their demands for diligence, including the recent letter to you sent on behalf of the Ad Hoc Group of Puerto Rico General Obligation Bondholders (the "GO Group") and Assured Guaranty Corp. ("Assured"),[2] which contains information requests that National supports and hereby requests production of in addition to our outstanding requests.  National also agrees with the GO Group's and Assured's characterization of the Commonwealth's data room, which is void of any meaningful or helpful information.

---

[1] A copy of which is attached hereto as Exhibit A.

[2] A copy of which is attached hereto as Exhibit B.

**Weil, Gotshal & Manges LLP**

Martin Bienenstock
June 5, 2017
Page 2

National sent a similar letter[3] to the Oversight Board requesting diligence with respect to the Puerto Rico Highways and Transportation Authority ("HTA"), however, the Oversight Board has not responded to such letter.

If these demands are left unanswered, National (like the GO Group and Assured) will be forced to escalate matters further, and to invoke our rights to formal discovery pursuant to Federal Rules of Bankruptcy Procedure 2004, 7026-37, and 9014, which are fully applicable to an action under Title III. *See* 48 U.S.C. § 2170.  We hope this can be avoided through cooperation by the Commonwealth and the Oversight Board.

Sincerely,

*/s/ Marcia L. Goldstein*
Marcia L. Goldstein

Encl.

Cc:  Oversight Board Members
    Suzzanne Uhland, O'Melveny & Meyers LLP
    John J. Rapisardi, O'Melveny & Meyers LLP
    Andrew Rosenberg, Paul, Weiss, Rifkind, Wharton & Garrison LLP
    Gary Orseck, Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
    Mark Ellenberg, Cadwalader, Wickersham & Taft LLP

---

[3] A copy of which is attached hereto as Exhibit C.

**Exhibit A**

# Weil, Gotshal & Manges LLP

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Marcia L. Goldstein**
+1 (212) 310-8214
marcia.goldstein@weil.com

BY E-MAIL

May 19, 2017

Martin Bienenstock
Proskauer Rose LLP
11 Times Square
New York, NY 10036
mbienenstock@proskauer.com
*Counsel for the Financial Oversight and Management Board for Puerto Rico*

Re:  Follow-Up on Disclosure Requests

Dear Martin:

I write on behalf of National Public Finance Guarantee Corporation ("National") to follow up on our repeated requests for meaningful diligence into the Commonwealth of Puerto Rico's (the "Commonwealth") financial situation and the assumptions underlying the Fiscal Plan for Puerto Rico (the "Fiscal Plan") certified by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") on March 13, 2017.  As Judge Swain stressed at the hearing yesterday, transparency is the cornerstone of a successful restructuring, and the Court will soon expect a status report on disclosure of information to creditors.  We believe that the Oversight Board must now do everything possible to fulfill its obligation to provide the requested diligence.

PROMESA requires that creditors be provided with "information sufficient . . . to make an informed decision with respect to a possible restructuring."  *See* 48 U.S.C. § 2146(a)(2).  So far, that information has been critically lacking.  Creditors need adequate and accurate financial diligence to be able to understand the Fiscal Plan, engage in negotiations, and make informed decisions.  It is the Oversight Board's role and duty to enforce transparency and ensure that all creditors obtain equal access to the requisite information.  As the parties consider returning to mediation, information sharing is especially important to set the stage for productive negotiations.

Since early April 2017, National has made repeated requests for the data and assumptions underlying the Fiscal Plan in order to perform its own analysis of the Commonwealth's financial situation.  As of today, neither the Oversight Board nor the Commonwealth has provided genuine access to that information. Instead, the Commonwealth has set up a data room consisting of documents that fail to respond to National's diligence requests and shed little light onto the Commonwealth's finances.  The below chronology illustrates the lack of diligence:

Martin Bienenstock
May 19, 2017
Page 2

**Weil, Gotshal & Manges LLP**

- On April 7, 2017, National's financial advisor, PJT Partners ("PJT"), sent a preliminary diligence list to Rothschild, the financial advisor for the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF").  Rothschild provided answers to some but not all of PJT's questions on April 12, 2017, and many of the responses were deficient.

- On April 17, 2017, a representative of the Oversight Board made assurances that further diligence and live models would be shared, but PJT never received that information.

- On April 20, 2017, at the request of creditors, Rothschild stated that the live models serving as the basis for the Fiscal Plan would be shared.  Once again, PJT did not receive any live models.

- On April 25, 2017, PJT and Weil met with Ernst & Young ("E&Y") to discuss an E&Y report which purported to be the basis for the Fiscal Plan's $618 million annual budget cushion.  At that meeting, E&Y stated that the figure was an extrapolation of historic unaccounted-for expenses but could not answer questions about the specifics of the expenses, why they would be continuing, or if they were even appropriate.  PJT followed up in writing with E&Y on the same day, requesting additional financial backup for the conclusions in the E&Y report.  PJT received no response.

- On April 28, 2017, in connection with a proposed forbearance agreement, counsel for National sent a detailed diligence request (prepared by PJT) to counsel for the Oversight Board and counsel for the Commonwealth.  The documents and information requested by PJT included, among other things, (i) live excel models demonstrating the quantitative analyses found in the Fiscal Plan; (ii) rationales for certain assumptions contained in the Fiscal Plan (*e.g.*, rationale for assumptions relating to indefinite population decline, flat productivity, flat labor force participation, and the size and timing of impact structural reforms); (iii) a detailed list of information that E&Y reviewed during its review of the Commonwealth's financial information for fiscal year 2015 and fiscal year 2016; (iv) normalized government expenditure information for fiscal year 2010 through fiscal year 2013; (v) a comparison of historical healthcare expenditures for the past ten years; (vi) an estimate of aggregate book and market value of government and public enterprise-owned land and real estate; (vii) details regarding tax collection other than sales and use tax collection; and (viii) a breakdown of capital expenditures.  Neither National's counsel nor PJT received any response to these detailed requests.[1]  The Title III cases for the Commonwealth and COFINA were filed a few days later.

National and its advisors urge the Oversight Board to take all the necessary steps to share the requested information as soon as possible.  We are available to discuss any questions you may have and look forward to engaging with you in constructive discussions.

---

[1] A full schedule of documents and information that National is requesting is attached hereto as Exhibit 1.

Martin Bienenstock
May 19, 2017
Page 3

**Weil, Gotshal & Manges LLP**

Sincerely,

*/s/ Marcia L. Goldstein*
Marcia L. Goldstein


cc:   Oversight Board Members
      Suzzanne Uhland
      John J. Rapisardi


Encl.

**Exhibit 1**

**SCHEDULE OF DOCUMENTS AND INFORMATION TO BE PRODUCED BY THE OVERSIGHT BOARD AND COMMONWEALTH**

1. Live Excel Models for (a) PR Fiscal Plan Model, (b) CU Rollup, including any underlying files and assumptions
2. Current cash balance from clawback revenues, including location and proof of cash balances
   a. Sources and uses of clawback revenue since 2015
3. FY2018 budget as well as any underlying excel files and assumptions
4. All documents regarding the definition of essential services and the determination that each expense in the certified fiscal plan constitutes an essential service
5. All benchmarking analyses used to create or assess the reasonableness of the fiscal plan
6. All documents related to the development of the macroeconomic forecast used in the fiscal plan, including documents related to the:
   a. Size and timing of the impact of structuring reforms
   b. Decline in population for each year in the forecast
   c. Flat productivity level
   d. Flat labor force participation rate
7. Detailed macroeconomic model in excel demonstrating quantitative analysis described in "PR_Macroframework methodology.pdf"
8. All documents related to the Reconciliation adjustment included in the fiscal plan, including all underlying data used by E&Y for the "Bridge Report"
   a. Detailed list of information that E&Y reviewed during its review of Commonwealth Financial information for FY15 and FY16, including system generated information and all subsequent adjustments
   b. "Normalized" government expenditure information for FY2010 through FY2013
   c. For normalized expenditure information included in report (FY14-17), line-item detail for each adjustment
   d. Detailed breakdown of the "Adjustments" listed on line 11 of the table on page 15
   e. Detailed list of changes included in each draft of the bridge analysis provided to Oversight Board, along with summary of changes required by the Board (page 23)
   f. Backup / Detail for Manual Adjustments including (i) Cash Reconciliation, (ii) Accrual Reconciliation, (iii) Trend Adjustment, and (iv) Estimated Increase (page 27)
   g. Independently forecasted normalized EBTIDA for Major Component Units, including build-up and live model (page 33)
9. All documents related to the forecasted healthcare-related expenditures, including at ASES and ASEM
   a. Detailed breakdown of MCO and TPA disbursements per year, including by use, number of beneficiaries, and assumptions regarding eligibility and level of service provided

    b.  Detail and build-up for requirements imposed under federal programs (Medicare, Medicaid, ACA) for eligibility, benefits, and pricing

    c.  Any cuts that the Commonwealth has identified that it can/will take if ACA funding is eliminated

    d.  Detailed update on Affordable Care Act replacement funding / healthcare parity discussions in DC

10. All documents related to the assets of the government

    a.  Estimate of aggregate book and market value of government and public enterprise-owned land and real estate (register of government owned property)

    b.  Break-out of assumed revenues / cash inflows from privatizations and P3s in Fiscal Plan

    c.  Any additional analysis performed on potential privatizations and P3s

11. All documents related to the assumed tax collections in the Fiscal Plan

    a.  Income tax collection rate

    b.  Excise tax collection rate

    c.  Other tax collection rates

    d.  McKinsey tax benchmarking analysis referenced in diligence responses

    e.  Assumptions and analysis behind Act 154 revenues

12. Updated Fiscal Plan that incorporates Oversight Board required amendments for certification

13. Breakdown of capital expenditures

14. Details on proposed subsidies and subsidy reductions broken out by municipality

      i.  Municipality budgets, where available

15. Detailed commonwealth and agency budgets

**Exhibit B**

June 2, 2017

*Via Mail and E-mail*

John J. Rapisardi                      Martin J. Bienenstock
O'Melveny & Myers LLP                  Proskauer Rose LLP
Time Square Tower                      Eleven Time Square
7 Times Square                         New York, NY 10036
New York, NY 10036

Re: *In re Commonwealth of Puerto Rico*, No. 17-cv-01578 (D.P.R)

Dear Mr. Rapisardi and Mr. Bienenstock:

We write on behalf of the Ad Hoc Group of Puerto Rico General Obligation Bondholders (the "GO Group") and Assured Guaranty Corp. and Assured Guaranty Municipal Corp. ("Assured"), to request that the Commonwealth and Oversight Board promptly produce all documents and materials that underlie or relate to the March 13, 2017, Fiscal Plan, as amended, for Puerto Rico ("Fiscal Plan"), and the Oversight Board's approval of that Plan.[1]

We plainly are entitled to this information. If the Commonwealth and the Oversight Board are genuine in their stated intention to negotiate a consensual resolution even as the Title III action is pending, the materials we request will be integral to that process. The materials are relevant because according to PROMESA, any plan of restructuring must be "consistent with" the Fiscal Plan. PROMESA § 314(b)(7), 48 U.S.C. § 2174(b)(7). But without the ability to examine and consider the bases for the Fiscal Plan—which does not comply with the requirements of PROMESA, and about which we have expressed substantial concerns—the GO Group, Assured, and other creditor groups will not be in a position to determine whether any portion of the current Fiscal Plan is acceptable.

Moreover, in a contested confirmation, we would have the right to object to the proposed plan for not "compl[ying] with the provisions of" of PROMESA because it fails to respect the GO Group's and Assured's first lien on and first priority claim to all "available resources," *id.* § 314(b)(2); not being "in the best interests of creditors," *id.* § 314(b)(6); and not being "fair and equitable" under the circumstances, or discriminating unfairly. 11 U.S.C. § 1129(b)(1). Again, if the Commonwealth and Oversight Board are genuine in their stated intention to negotiate a consensual resolution even as the Title III action is pending, we must have complete transparency as to the underlying bases for any proposed plan of adjustment, and an open dialogue as to any possible revisions.

---

[1] Unless otherwise specified, all page numbers correspond to the version of the Fiscal Plan filed with the Court as Exhibit A to Title III Petition for Covered Territory or Covered Instrumentality, *In re Commonwealth of Puerto Rico*, No. 3:17-cv-01578 (May 3, 2017).

In recognition of these rights, Bankruptcy Rule 2004 broadly permits discovery into any matter regarding the "nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); *see also In re Washington Mutual, Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) ("[T]he right to object to immaterial or improper questions is limited."). Indeed, although our requests are carefully tailored to information that it relevant to the Tile III proceeding, Rule 2014's scope is expansive. *See In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002).[2]

Despite multiple requests made on behalf of our clients (including in a letter sent by both the GO Group and Assured on March 27; in follow-up letters by Assured on April 5, 2017 and April 27, 2017; in a written due diligence request sent by the GO Group on April 7, 2017; and via oral communications by the GO Group on April 6 and April 25, 2017), however, almost none of this information has been provided.[3]  At the May 17, 2017 hearing, Mr. Rapisardi insisted that "a very extensive effort went into preparing a data room of thousands of pages of documents." May 17, 2017 Hearing Tr. at 145.  In fact, the data room contains only around 50 documents, which consist largely of hardcoded spreadsheets that hide from creditors and their advisors the actual models used to create the Fiscal Plan.  To the extent the Commonwealth has posted live models to the data room, these models were not accompanied by the backup files, schedules, and assumptions underlying those models.  And contrary to Mr. Rapisardi's suggestion, the data room omits the most basic documents required to understand the assumptions and projections underlying the Fiscal Plan, including categories of information that we have repeatedly requested.  Such a lack of transparency by the debtor is not permitted under the law, and could not be what Judge Swain had in mind when she directed that you submit a status report on this issue by mid-June.  May 17 Tr. at 147.

We are prepared to invoke our rights to formal discovery pursuant to Federal Rules of Bankruptcy Procedure 2004, 7026-37 and 9014.  But in the spirit of cooperation that counsel for all parties pledged to pursue during the May 17 hearing, we thought it best in the first instance simply to send you this letter request.  So, without prejudice to our rights to propound further formal and informal discovery, we ask that you produce each of the following materials on or before June 12, 2017.  All of these materials were, or should have been, considered as part of formulating the Fiscal Plan, and thus should be readily accessible to you.  If you decline for any reason to produce any responsive documents, please state the basis for your position.

---

[2]   The Bankruptcy Rules are fully applicable to any action under Title III.  PROMESA § 310, 48 U.S.C. § 2170.

[3]   While the Commonwealth did provide additional material on or around April 11, 2017 that was responsive to certain of our requests, this information was unusable, inadequate, or both.

*General*

(1)   A complete version of the Fiscal Plan, including any amendments mandated by the Board Resolution Adopted on March 13, 2017.   This should include functional versions of any embedded Excel charts;[4]

(2)   The Fiscal Year 2018 budget for the Territorial Government or any Covered Instrumentality, including any preliminary drafts;

(3)   A functional version of the macroeconomic growth model used to calculate all forward-looking projections included in the certified Fiscal Plan as well as any data fed into that model.   We also request similar information for any prior proposed fiscal plan as well as the presentation known as *Technical Meeting Discussion Materials* (which was presented by the prior administration on Nov. 16, 2016), and in the *Revised Baseline Projections* (which was presented by the prior administration on Dec. 20, 2016);

(4)   A functional version of the cash flow models used to prepare the Fiscal Plan, including any data that was fed into the model;

(5)   Documents sufficient to identify the makeup of the *pro forma* revenue and expense measures discussed in the Fiscal Plan at 8, 10, 17-22;

(6)   To the extent any advisor to the Board, including Andrew Wolfe, used a different model than the models referenced in Items (3) and (4) above, a functional version of that model or those models, including any data that was fed into the model(s);

(7)   Any additional documentation relating to the assumptions used in formulating the Fiscal Plan, including, for example, the fiscal multiplier used to calculate the impact that proposed revenue and expense measures are expected to have on the Puerto Rico economy and inflation assumptions;

(8)   Any sensitivity analyses that measure the impact of growth initiatives, including those discussed on page 24 of the Fiscal Plan, and recommendations included in Congressional Task Force on Economic Growth in Puerto Rico, *Report to the House and Senate* (Dec. 20, 2016);

---

[4]   There are a number of discrepancies in the Fiscal Plan's figures and calculations.   For example, the Fiscal Plan lists FY23 revenues pre-measures to be $16.746 billion.   The sum of the figures in the column in question, however, is $16.744.   While insignificant on its own, that single chart has similar errors for Fiscal Years 2019, 2022, 2025 and 2026.   Without the underlying Excel charts, it is impossible to tell whether these are due to simple rounding errors, incomplete information, or some other cause.   Similarly, a number of documents in the data room are spreadsheets that purport to show data or underlying models regarding how certain calculations were made.   But the data is useless in the format in which it was provided because it is "hard-coded" to prevent creditors from seeing anything other than the incomplete figures on the face of the spreadsheet.

(9)  A copy of the Fiscal Plan Comparison to Historical Results, prepared by the Territorial Government[5] at the request of the Oversight Board (the "Bridge") as well as any underlying data and models;

(10)  Any and all documents provided to the Oversight Board prior to its approval of the Fiscal Plan;

(11)  Any and all documents provided to Ernst & Young in connection with its preparation of *Fiscal Oversight and Management Board for Puerto Rico: Financial Bridge Analysis* (Mar. 7, 2017) ("Bridge Analysis").  See Bridge Analysis at 7 ("E&Y submitted a detailed data/document request to the Government, and . . . these parties were generally timely and diligent in fulfilling this request to the extent the information was readily available.");

(12)  Any and all documents provided to KPMG in connection with its preparation of the *Commonwealth of Puerto Rico Tax Reform Assessment Project* (2014);

(13)  Any and all documents provided to Anne Krueger (or her colleagues or assistants) in connection with her preparation of *Puerto Rico – A Way Forward* (2015), commonly known as the "Krueger Report";

(14)  Any and all documents provided to Conway Mackenzie in connection with its work to prepare fiscal projections contained in the presentation entitled *Technical Meeting Discussion Materials* (Nov. 16, 2016);

(15)  Any and all documents provided to Pension Trustee Advisors in connection with any actuarial assessment performed on a public pension system maintained by the Territorial Government;

(16)  Any analyses that quantify the financial impact of the financial control reforms discussed in the Fiscal Plan at 34-38;

(17)  Documents sufficient to identify any expert or consultant whose services were used in analyzing Puerto Rico's fiscal situation since January 1, 2014, and any analysis, reports or recommendations offered by such experts or consultants;

***Documents Relating To Revenues***

(18)  For any revenue line item in the Fiscal Plan that does not grow at the rate of nominal GNP (see Fiscal Plan at 10), documents demonstrating or relating to how those growth rates are derived, including any supporting indices on which you may have relied;

---

[5]   Unless otherwise specified, capitalized terms are given the meanings they are supplied in PROMESA.

(19) Any documents or analyses that reconcile the special revenue funds considered in the Bridge or Bridge Analysis (see for example Bridge Analysis at 11, 18, 28) to special revenue funds in the Fiscal Plan (at 12, 15);

(20) Any documents, analyses or data underlying the estimated collection rates on all local revenue streams cited in the Fiscal Plan at page 11, as well as any sales and use tax currently collected on behalf of municipalities, including the basis for the Board's statement in the Letter from Jose Carrion to Gov. Ricardo A. Rosselló Nevares dated March 9, 2017 ("March 9 Letter") (at 2-3) that the Commonwealth had overstated the possibility for increased revenue collections in its proposed February 28, 2017 Fiscal Plan;

(21) Documents sufficient to determine the historical amounts (by month and by fiscal year) and present location of so-called "clawback revenues" discussed on page 28 of the Fiscal Plan, including whether such funds have been placed in escrow, and for whose benefit. To the extent that annual projections of any future revenues subject to clawback exist, those should be provided as well;

(22) Documents sufficient to ascertain the status and treatment of (a) any sales and use tax currently being collected on behalf of municipalities, and (b) the special property tax, which under Puerto Rico law should be collected and segregated in a trust "for the amortization and redemption of the general obligations of the Commonwealth," 21 L.P.R.A. § 5002, see also 21 L.P.R.A. § 5004(a), neither of which is addressed in the Fiscal Plan. To the extent that annual projections of those revenues exist, those should be provided as well;

(23) Any communications, documents, or analyses regarding potential changes to the tax code in connection with the formulation of the Fiscal Plan, including, but not limited to, documents relating to reassessing real estate property valuations for the first time since 1958, increasing property tax rates to the levels proposed in the February 28, 2017 version of the Fiscal Plan (at 48), extending Act 154, reassessing the Tax Incentives Act of 1998, or transitioning the Commonwealth's sales and use tax to a broad-based value added tax;

(24) Documents sufficient to identify the source of increased revenues from the "Fees & Charges" revenue measure discussed on page 19 of the Fiscal Plan, and the accounts into which such increased revenues are expected to flow;[6]

(25) The Report on Discretionary Tax Abatement Agreements that the Governor was required to submit to the Oversight Board within six months of the establishment of the Board, by PROMESA § 208, 48 U.S.C. § 2148;

---

[6] If you prefer, a list of the bank accounts into which the funds are expected to flow will suffice.

(26) Documents sufficient to identify any public private partnerships that are contemplated during the Fiscal Plan period, including anticipated revenue impacts, cash flow projections, and funding sources (*see* February 28 Fiscal Plan at 74-80);

(27) Any communications, documents, or analyses regarding anticipated revenues relating to health care. This information should include any assumptions, models or data used to project anticipated federal transfers, returns from any Commonwealth-run medical facility, municipal employer or employee contributions, or Commonwealth Fund collections;

### *Documents Relating To Expenses*

(28) For any expense line item in the Fiscal Plan that does not grow at the rate of nominal GNP, documents demonstrating or relating to how those growth rates are derived;[7]

(29) A functional version of any model used by the Territorial Government or Ernst & Young to "normalize" expenses so that they can be compared across years in the Bridge or Bridge Analysis;

(30) All documents relating to the Board's basis for its "recommendation" in the March 9 Letter (at 2) that FY17 expenses be increased by $585 million, including the type and amount of "historical expenditures" in FY 14-FY16 that Ernst & Young discusses on page 13 of the Bridge Analysis;

(31) A functional model or workbook showing how the Reconciliation Adjustment discussed on page 15 of the Fiscal Plan was calculated;

(32) Any data, models, analyses or communications regarding the meaning of the term "essential services" in the Fiscal Plan;

(33) Documents reflecting the calculation of the "other non-recurring" expenses projected on page 12 of the Fiscal Plan, including a functioning version of any model used;

(34) Any documents, analyses or data regarding the non-personnel "right sizing" expense measures cited on page 15, 18 and 20 of the Fiscal Plan. To the extent that a model was used in calculating this line item in the Fiscal Plan, a functioning version of that model should be provided;

(35) Documents sufficient to identify the nature, cost, status and proposed timeline of any project being funded from the capital expenditures line item in the Fiscal Plan as projected on page 12 and discussed on page 14;

(36) Documents sufficient to identify how $2.2 billion in legal expenses from the Commonwealth of Puerto Rico, *Financial Information and Operating Report* 283 (Dec. 18, 2016), are treated under the Fiscal Plan;

---

[7] For example, the healthcare expense growth rate appears higher than the projected nominal growth rate. Fiscal Plan at 21.

(37) Documents sufficient to show the source of any funds used to pay down any trade debt, overdue tax refund or any other outstanding payable since the passage of PROMESA (Fiscal Plan at 10, 15, 18);

(38) Documents sufficient to disaggregate expenses associated with the Territorial Government's various pension systems, including a breakdown of expenses associated with (a) defined benefit rather than defined contribution accounts; (b) base benefits rather than system administered benefits; (c) retirees rather than active employees; and (d) any "catch up" expenses accrued before the passage of PROMESA rather than ongoing costs of the programs (*see* Fiscal Plan at 22);[8]

(39) Any communications, documents, or analyses regarding expenses relating to health care. This information should include detail regarding the healthcare expense growth rates (to the extent not already produced in response to Request 28), any supporting healthcare cost indices (see March 9 Letter at 3-4), efforts to control health care expenses (Fiscal Plan at 20), and any assumptions made regarding enrollment in light of projected population declines;

(40) Any communications, documents, or analysis regarding how deficits relating to health care are accounted for in the Fiscal Plan;

(41) Any communications, documents or analysis regarding historical reimbursements from the Center for Medicare and Medicaid Services or analysis regarding the projected impact of the newly enacted "Modified Adjusted Growth Impact" or "MAGI" standards;

(42) Documents that reflect the basis for the Board's request for "Amendment No. 1: Furlough and Christmas Bonus Amendment to the Commonwealth's Proposed Fiscal Plan," in in *Board Resolution Adopted on March 13, 2017 (Fiscal Plan Certification)* ("March 13 Resolution"), which required a furlough program rather than a reduction in the government work force;

(43) Documents that reflect the basis for the Board's request for "Amendment No. 2: Pension Amendment to the Commonwealth's Proposed Fiscal Plan" the March 13 Resolution, which required certain alterations to the treatment of pension plans under the Fiscal Plan;

(44) Documents sufficient to identify the source of and efforts to control substantial projected deficits at Puerto Rico's instrumentalities and component units as projected on page 12 and discussed on page 15 of the Fiscal Plan, as well as the Fiscal Plan recently certified by the Puerto Rico Highway Transportation Authority;

---

[8] With regard to the Employment Retirement System, which covers multiple sponsoring employers, this information should be provided in sufficient detail to track each sponsoring employer to the pension expenses for which it is responsible.

(45) Documents, models, analyses or communications that reflect the basis for the demands to improve the Commonwealth's liquidity, as discussed in Chairman Carrion's March 8, 2017 letter to Governor Rosselló;

(46) Documents sufficient to identify any rents paid by the Territorial Government or any Territorial Government Instrumentality to the Public Building Authority ("PBA"). This material should include the terms and documents of any leases of PBA-owned or managed property and any Territorial Government Instrumentality;

(47) Documents, models, analyses, or communications regarding any decision to reduce subsidies to the University of Puerto Rico, municipalities or other entities that are discussed on pages 45-48 of the February 28, 2017 version of the Fiscal Plan. To the extent that certified Fiscal Plan seeks to replace those direct subsidies through indirect means (e.g., changing property taxes or municipal licensing fees), documents regarding those efforts should be provided as well;

### *Documents Relating To Puerto Rico's Debt Sustainability*

(48) Any analyses, including models and data, regarding how the amounts available for debt service proposed on page 8 of the Fiscal Plan will, if implemented, affect Puerto Rico's future ability to access the capital markets;

(49) Any analyses comparing Puerto Rico's debt situation to that of other economies that were relied upon in determining what would be a sustainable debt load (*cf*. Fiscal Plan at 27-29), including documents sufficient to identify any comparable economies considered;

(50) Any projections, including both underlying data and models, regarding macroeconomic growth following the end of the Fiscal Plan period and the projected maturity of any proposed restructured obligation. See, *e.g.*, March 9, 2017 Letter at 2 (describing February 28, 2017 proposed Fiscal Plan as too optimistic with respect to "a) economic growth rates and the time to return to nominal economic growth; and, b) the failure to reflect near-certain declines in baseline revenues associated with corporate taxes and non-resident withholding taxes"); GO/COFINA Title VI proposal made public by the Commonwealth on April 28, 2017 at 4 (term sheet proposes a 30 year restructured bond subject to "optional amortization…sized based on Fiscal Plan forecast");

### *Documents Relating To GDB Restructuring Or Wind Down*

(51) Documents reflecting the historical amounts and present status of any funds or accounts held by the Government Development Bank of Puerto Rico ("GDB") on behalf of the Territorial Government, including, but not limited to, the balance of any accounts at the GDB into which any so-called "clawback revenues" were deposited and the intended treatment of such funds in the Restructuring Support Agreement announced by the Commonwealth on May 15, 2017 ("GDB RSA");

(52) Documents sufficient to identify any accounts held on behalf of the Territorial Government at financial institutions other than the GDB, including but not limited to accounts that were transferred from the GDB since January 1, 2015;

(53) Documents regarding the division of assets between the New Issuer and the Public Entity Trust in the GDB RSA;

(54) Loan level detail on the GDB Municipal Loan portfolio, including all loan and deposit agreements as well as current loan balances;

(55) Documents that reflect the source of repayment for SUT-backed GDB Municipality loans, as that term is used in the GDB RSA and associated documents released on February 28, 2017;

(56) Documents sufficient to identify how SUT flowing to municipalities (if any) in excess of municipal loan debt service is distributed or spent.

Please contact us if you would like to discuss the above.

Very truly yours,

**Robbins, Russell, Englert, Orseck, Untereiner, & Sauber LLP**
as counsel to and on behalf of the GO Group

By:     /s/ Gary A. Orseck

Name: Gary A. Orseck

Title: Partner

**Cadwalader, Wickersham & Taft LLP**
as counsel to and on behalf of Assured

By:     /s/ Mark C. Ellenberg

Name: Mark C. Ellenberg

Title: Consulting Attorney

**Exhibit C**

# Weil, Gotshal & Manges LLP

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Marcia L. Goldstein**
+1 (212) 310-8214
marcia.goldstein@weil.com

May 19, 2017

Martin Bienenstock
Proskauer Rose LLP
11 Times Square
New York, NY 10036
mbienenstock@proskauer.com
*Counsel for the Financial Oversight and Management Board for Puerto Rico*

Re:  HTA Creditors Meeting

Dear Martin:

I write on behalf of National Public Finance Guarantee Corporation ("National") as a follow up to my email regarding the meeting held on Monday, May 15, 2017, in which the Oversight Board presented a proposal to the creditors representing a controlling group, in fact, almost all, of the debt owed by HTA. The proposal completely disregarded HTA as a separate entity, lumped HTA into a category of claw back entities—making no distinction among them—and assumed no cash flow was available to make payments on account of debt secured by special revenues or otherwise.  These positions directly contradict statements made by Commonwealth counsel in a prior federal court proceeding concerning the automatic stay imposed under PROMESA.  In the earlier proceeding, Commonwealth counsel took the position that the stay should not be lifted because HTA debt holders had a *perpetual lien* in the HTA revenues and therefore would not be harmed by continuation of the stay.  The federal court relied on those assertions in ruling that it would not lift the stay.  The Commonwealth cannot reverse its position now.

The May 15 meeting also underscored deficiencies in information and diligence regarding HTA. No one on behalf of AAFAF or the Oversight Board could answer creditors' questions about the historic or current flow of funds in and out of HTA.  Nor could AAFAF or the Oversight Board provide an accounting of the funds "clawed back" from HTA and how those clawbacks complied with applicable governing rules.  Creditors also requested information regarding the impact of proposed restructuring alternatives on privatization opportunities and federal funding.  You also noted that budgets and audited financials were not yet available.

National also repeated its outstanding diligence requests that had been made to the Commonwealth and the Oversight Board.  However, the Commonwealth, with the apparent agreement of the Oversight Board, denied the requests, maintaining that the information would not be made available to National because it is a plaintiff in an adversary proceeding.  As National stated in the meeting and reiterated at the Title III hearing on May 17, 2017, financial diligence and credible information is needed for all creditors, including National, if there are to be meaningful negotiations with respect to the

**Weil, Gotshal & Manges LLP**

Martin Bienenstock
May 19, 2017
Page 2

Commonwealth or any of its instrumentalities.  The pendency or outcome of National's adversary proceeding does not change that.  National and its advisors have reviewed the entries to the data room including entries made on May 17, and found mostly publicly available information.  Accordingly, a joint diligence request prepared by the financial advisors for National, Assured Guaranty Corp., Financial Guaranty Insurance Company, and Ambac Assurance Corp. is attached hereto as Exhibit A. This request was sent to Rothschild on May 17.  These questions and diligence requests should be addressed as soon as possible.

No creditor in attendance at the HTA meeting believed they had sufficient information to make informed decisions regarding any HTA proposal.  The meeting was far from a good faith effort by the Oversight Board to achieve a consensual restructuring.

Notwithstanding the foregoing, it was announced in court on May 17 that there would soon be a Title III filing for HTA.  A Title III proceeding for HTA appears to be particularly unnecessary and premature given that all of the debt holders fit easily into a reasonably sized conference room and have more than sufficient control to achieve an effective restructuring.  Further, all creditors present stated a willingness to engage in good faith negotiations.  National also expects the Oversight Board to consider the impact of a Title III filing on Federal funding for HTA before making any decisions.  Doing so would be a more constructive approach than having the Oversight Board issue a restructuring certification that cannot legitimately meet the requirements of section 206(a) of PROMESA.

Since the May 17 hearing, Elias Sanchez was quoted in the press to the effect that "good faith negotiations" with HTA creditors are "ongoing," and that an "exchange of offers" has taken place.  We are not aware of any discussions or exchange of proposals since the meeting on May 15.  If we are wrong, please provide us with the dates of meetings or discussions held, the names of attendees, and copies of proposals and counterproposals that were made since the May 15 meeting.  As stated above, we are willing to engage in good faith negotiations with respect to HTA.  Ambac and FGIC, whose counsel are copied below, join in the sentiments expressed in this letter.

Sincerely,

*Marcia L. Goldstein*   JCC

Marcia L. Goldstein

Encl.

Cc:  Oversight Board Members
      Suzzanne Uhland, O'Melveny & Meyers LLP
      John J. Rapisardi, O'Melveny & Meyers LLP

**Weil, Gotshal & Manges LLP**

Martin Bienenstock
May 19, 2017
Page 3


Dennis F. Dunne, Milbank, Tweed, Hadley & McCloy LLP
Martin A. Sosland, Butler Snow LLP

# Exhibit A

**Privileged & Confidential**

# HTA DILIGENCE REQUEST LIST

*MAY 17, 2017*

*The following is an information request list relating to the Puerto Rico Highways and Transportation Authority ("PRHTA" or "HTA") Fiscal Plan released on April 28, 2017. If you cannot provide directly responsive material, note the item and send the most comparable information that is responsive. Provide an estimate of when the directly responsive material can be made available (or a justification of why such estimate, or the information, can't be provided). Additional diligence request list(s) may be sent after we have reviewed the materials you provide in response to this list.*

*The following list is not exhaustive and could be accompanied by a more robust set of questions relating to the Fiscal Plan or any other materials released by, produced by or otherwise available to PRHTA.*

1. **PROMESA Resolutions**
   a. Provide a draft (in clean and redline forms) of the Fiscal Plan as amended to comply with the six amendments required pursuant to the Oversight Board's certification of the same
      i. If such draft is not available, provide an update on planned changes to the Fiscal Plan including ranges of the forecast financial impact of each

2. **Sources and Uses of Clawback HTA Revenue**
   a. Provide a detailed sources and uses analysis for all revenue that has been clawed back from PRHTA and transferred to the Commonwealth over the past four years

3. **HTA Fiscal Plan (April 28, 2017)**
   a. Provide the dynamic model behind the revenue and expense build in the HTA Fiscal Plan, including a buildup of, and relevant backup detail on, each major line item
   b. Detail necessary operating expenses and any essential services included in the plan

4. **Additional Diligence Items**
   a. Detailed asset-level 10-year historical HTA financials split out, including:
      i. Revenue, opex and capex breakdown for each asset
      ii. Must include details including, but not limited to: tolls, fares, fees, passengers / ridership, cars / traffic, etc.
   b. Provide the expected impact to future federal funding (from each of the FHWA and the FTA) and any associated incremental expenses in the event of a HTA Title III filing
      i. Describe all communications with the FHWA and FTA regarding this issue
   c. Detail on the FHWA & Earmarked Projected funding over next 10 years (i.e., description of the earmarked projects and current construction and funding status)
   d. Provide IRR analysis of planned construction projects
   e. Schedule of all owned assets
      i. Details / background on other major projects / assets
   f. Tolls
      i. Toll charge analytics (detailed per toll road)
      ii. Details / background on electronic tolling potential and past measures undertaken (detailed per toll road)
      iii. Detail on demand elasticity for toll prices (detailed by toll road)
   g. Detail on the planned utilization of toll credits
   h. Provide all documents concerning the allocation or application of any proceeds of the 2016 PR-5 and PR-22 toll road concession extension with Metropistas. This relates to:
      i. An initial payment of $100mm, presumably transferred last year

**Privileged & Confidential**

    ii. A second disbursement of $15mm, initially expected by 30 June 2017 at the latest

i. For each source of revenue that HTA collects from consumers (e.g., tolls, fares, fees and other charges), specify percentages of each collected electronically and / or manually

j. Detail behind pension / OPEB

    i. Funded status, contributions, etc.

k. P3s

    i. Provide all relevant materials that have been prepared in the process of evaluating additional public private partnership prospects

    ii. Provide detailed plan and cost-benefit analysis on each of the following:

        1. Potential corporatization of specific parts of the highways and transportation system (i.e., assigning responsibility for management and operation to a separate body, to run an asset in a more businesslike way)

        2. Potential privatization of the transit system or Tren Urbano and maintenance of the Highway Authority as a government agency

        3. Potential corporatization of HTA and transit as separate entities

        4. Potential full privatization

    iii. Provide the projected flow of funds from the potential proceeds from P3s

l. Provide all documents, agreements and financial data concerning relationship with concessionaires

m. Provide detail regarding employee headcount, wages and benefits

    i. Organizational chart and employee headcount by department / function

    ii. Employee salaries and benefits by position

n. Provide details regarding HTA Board members (including employment history, affiliations, other appointed or elected positions held, etc.)

o. Provide an explanation of HTA cash accounts:

    i. Describe how HTA revenue and expense cash flows are separated or intermingled with the Treasury Cash Accounts

    ii. Describe how HTA keeps track of capital spending (multi-year capital budgets) vs. operating cash

5. **Tren Urbano**

    i. Provide a separate Tren Urbano fiscal plan, including the following:

        1. Analysis of demand inducement and cost efficiency measures that allow the train to target a fare box recovery ratio in line with heavy rail systems on the mainland (35-60%)

        2. Revenue enhancement measures for the train system, including fare increases

            a. The last fare increase had the effect of increasing revenues despite a decrease in ridership; provide analyses of revenue-maximizing fares

        3. Address the separation of Tren Urbano from HTA as a way to enhance profitability

# EXHIBIT F

## (June 13, 2017 Reply Letter)

June 13, 2017

**<u>Via E-Mail</u>**

Marcia L. Goldstein
Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10028

Re:   ***Creditors' Diligence Information Access***

Dear Marcia:

We write jointly on behalf of the Financial Oversight and Management Board for Puerto Rico (the "FOMB" or the "Oversight Board") and Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") in response to your June 5, 2017 letter to the Oversight Board regarding National Public Finance Guarantee Corporation's ("National") diligence information access.

Your letter tracks closely the letter of June 2, 2017 sent to our clients by the Ad Hoc Group of Puerto Rico General Obligation Bondholders (the "GO Group") and Assured Guaranty Corp. and Assured Guaranty Municipal Corp. ("Assured").  For purposes of efficiency, we attach a copy of our response to that letter to this correspondence (attached as **Exhibit A**), as it dispels many of the misstatements and mischaracterizations in your June 5 letter and prior statements including those made to the court on May 17, 2017.  All the reservations of rights set forth in our attached letter apply with equal force to this correspondence.

In the hope of a constructive dialogue with your client, we have outlined below preliminary responses to your inquiries.  We reserve our right to supplement these responses as additional information becomes available.

**SCHEDULE OF DOCUMENTS**

**Request 1**

1. Live Excel Models for (a) PR Fiscal Plan Model, (b) CU Rollup, including any underlying files and assumptions

**Response to Request 1**

A copy of the Live Excel Model has already been provided, as you know.  AAFAF will upload the Live CU Rollup to the Data Room.  AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

**Request 2**

2.  Current cash balance from clawback revenues, including location and proof of cash balances

    a.  Sources and uses of clawback revenue since 2015

**Response to Request 2**

AAFAF will upload information relevant to clawback revenue to the Data Room.  AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.  AAFAF also will not create information that does not otherwise exist, or provide bank account data.

**Request 3**

3.  FY2018 budget as well as any underlying excel files and assumptions

**Response to Request 3**

Relevant materials are publicly available.  AAFAF and the FOMB direct National to the following government websites.  Indeed, Reorg Research compiled a list of these websites and published it in a June 1, 2017 article.

- FY2018 Budget Breakdown by Agency:
  http://www2.pr.gov/presupuestos/PresupuestoRecomendado2017-2018/Pages/PRESUPUESTO-POR-AGENCIA.aspx

- FY2018 General Fund Budget Proposal:
  http://www.fortaleza.pr.gov/sites/default/files/PRESUPUESTO%20DEL%20FONDO%20GENERAL%20AF%202015%20AL%202018.pdf

- OMB Report on FY2018 Budget Proposal:
  http://www2.pr.gov/presupuestos/PresupuestoRecomendado2017-
  2018/Captulo%20de%20la%20Oficina%20de%20Gerencia%20y%20Presupuesto/PRE
  SUPUESTO%20RECOMENDADO%20AÑO%20FISCAL%202017-2018.pdf

**Request 4**

4. All documents regarding the definition of essential services and the determination that each expense in the certified fiscal plan constitutes an essential service.

**Response to Request 4**

This request is premised on your legal contention that "each expense" should be for an essential service. In fact, PROMESA § 201(b)(1)(B) requires the funding of essential public services, while § 201(b)(1)(C) requires adequate funding for public pension systems, and § 201(b)(1)(J) provides for capital expenditures and investments necessary to promote economic growth. Perhaps all expenditures and investments are essential to the overall economic turnaround, without which Puerto Rico cannot survive, but clearly the statute requires funding of expenses it does not refer to as essential services. Although you did not acknowledge to the Court that on April 6, 2017 and on many other dates, AAFAF and the FOMB provided many of their experts to respond to creditors' questions, the fact is that on April 6, 2017, an eminent economist for the FOMB, Andy Wolfe, explained to you and to other creditor representatives why any further material cuts in expenditures would do more harm than good to the money available for debt service.

On its face, this request is designed to seek the FOMB's legal analyses and other information covered by Attorney Client, Work Product, and Deliberative Process Privileges. It is also clearly designed to seek information related to the FOMB's decision to certify the Fiscal Plan. AAFAF and the FOMB will not provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan. "Determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

**Request 5**

5. All benchmarking analyses used to create or assess the reasonableness of the fiscal plan.

**Response to Request 5**

This request is designed to seek information covered by Attorney Client, Work Product, and Deliberative Process and Attorney Client Privileges. It is also clearly designed to seek information related to the FOMB's determination to certify the Fiscal Plan. AAFAF and the FOMB will not provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan. Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion"

pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

**Request 6**

6.  All documents related to the development of the macroeconomic forecast used in the fiscal plan, including documents related to the:

      a.  Size and timing of the impact of structuring reforms

      b.  Decline in population for each year in the forecast

      c.  Flat productivity level

      d.  Flat labor force participation rate

**Response to Request 6**

      AAFAF will provide underlying raw data used in the macroeconomic growth model (i.e., revenues, cash flow data) used in the certified Fiscal Plan.  The growth models (as opposed to the underlying data), however, are proprietary and AAFAF and the FOMB will not provide them. AAFAF and the FOMB will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

**Request 7**

7.  Detailed macroeconomic model in excel demonstrating quantitative analysis described in "PR_Macroframework methodology.pdf"

**Response to Request 7**

      The model (as opposed to the underlying data) is proprietary and AAFAF and the FOMB will not provide them.

**Request 8**

8.  All documents related to the Reconciliation adjustment included in the fiscal plan, including all underlying data used by E&Y for the "Bridge Report"

      a.  Detailed list of information that E&Y reviewed during its review of Commonwealth Financial information for FY15 and FY16, including system generated information and all subsequent adjustments

      b.  "Normalized" government expenditure information for FY2010 through FY2013

    c. For normalized expenditure information included in report (FY14-17), line-item detail for each adjustment

    d. Detailed breakdown of the "Adjustments" listed on line 11 of the table on page 15

    e. Detailed list of changes included in each draft of the bridge analysis provided to Oversight Board, along with summary of changes required by the Board (page 23)

    f. Backup / Detail for Manual Adjustments including (i) Cash Reconciliation, (ii) Accrual Reconciliation, (iii) Trend Adjustment, and (iv) Estimated Increase (page 27)

    g. Independently forecasted normalized EBTIDA for Major Component Units, including build-up and live model (page 33)

**Response to Request 8**

    AAFAF will upload underlying raw data relating to the Bridge to the Data Room.  AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

**Request 9**

9. All documents related to the forecasted healthcare-related expenditures, including at ASES and ASEM

    a. Detailed breakdown of MCO and TPA disbursements per year, including by use, number of beneficiaries, and assumptions regarding eligibility and level of service provided

    b. Detail and build-up for requirements imposed under federal programs (Medicare, Medicaid, ACA) for eligibility, benefits, and pricing

    c. Any cuts that the Commonwealth has identified that it can/will take if ACA funding is eliminated

    d. Detailed update on Affordable Care Act replacement funding / healthcare parity discussions in DC

**Response to Request 9**

    Under the facts of this situation, this request is overbroad.  We are prepared to discuss a more reasonable, targeted approach to health care data with you.

**Request 10**

10. All documents related to the assets of the government

a.  Estimate of aggregate book and market value of government and public enterprise-owned land and real estate (register of government owned property)

b.  Break-out of assumed revenues / cash inflows from privatizations and P3s in Fiscal Plan

c.  Any additional analysis performed on potential privatizations and P3s

**Response to Request 10**

Under the facts of this situation, this request is overbroad.  We are prepared to discuss a more reasonable, targeted approach to assets with you.

**Request 11**

11.  All documents related to the assumed tax collections in the Fiscal Plan

a.  Income tax collection rate

b.  Excise tax collection rate

c.  Other tax collection rates

d.  McKinsey tax benchmarking analysis referenced in diligence responses

e.  Assumptions and analysis behind Act 154 revenues

**Response to Request 11**

AAFAF will upload underlying raw data relating to tax collection to the Data Room. Under the facts of this situation, this request is overbroad.  We are prepared to discuss a more reasonable, targeted approach to tax data with you.  AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

**Request 12**

12.  Updated Fiscal Plan that incorporates Oversight Board required amendments for certification

**Response to Request 12**

These documents are publicly available.  *See* *https://juntasupervision.pr.gov/index.php/en/documents/*.

**Request 13**

13.  Breakdown of capital expenditures

**Response to Request 13**

      Under the facts of this situation, this request is overbroad.  We are prepared to discuss a more reasonable, targeted approach to capital expenditures with you.

**Request 14**

14.  Details on proposed subsidies and subsidy reductions broken out by municipality

          i.  Municipality budgets, where available

**Response to Request 14**

      Under the facts of this situation, this request is overbroad.  We are prepared to discuss a more reasonable, targeted approach to subsidies with you.

**Request 15**

15.  Detailed commonwealth and agency budgets

**Response Request 15**

      This information is publicly available.

- FY2018 Budget Breakdown by Agency:
  http://www2.pr.gov/presupuestos/PresupuestoRecomendado2017-2018/Pages/PRESUPUESTO-POR-AGENCIA.aspx

- FY2018 General Fund Budget Proposal:
  http://www.fortaleza.pr.gov/sites/default/files/PRESUPUESTO%20DEL%20FONDO%20GENERAL%20AF%202015%20AL%202018.pdf

**HTA DILIGENCE REQUEST LIST**

**Request 1**

**1.  PROMESA Resolutions**

    a.  Provide a draft (in clean and redline forms) of the Fiscal Plan as amended to comply with the six amendments required pursuant to the Oversight Board's certification of the same

        i.  If such draft is not available, provide an update on planned changes to the Fiscal Plan including ranges of the forecast financial impact of each

**Response to Request 1**

    The Government of Puerto Rico is working on addressing the amendments proposed by the FOMB and any material changes to the Fiscal Plan will be disclosed as appropriate once the amendment process has been completed.  We note that your client has commenced an adversary proceeding involving HTA.

**Request 2**

**2.  Sources and Uses of Clawback HTA Revenue**

    a.  Provide a detailed sources and uses analysis for all revenue that has been clawed back from PRHTA and transferred to the Commonwealth over the past four years

**Response to Request 2**

    Under the facts of this situation, this request is overbroad.  We are prepared to discuss a more reasonable, targeted approach to this subject with you.

**Request 3**

**3.  HTA Fiscal Plan (April 28, 2017)**

    a.  Provide the dynamic model behind the revenue and expense build in the HTA Fiscal Plan, including a buildup of, and relevant backup detail on, each major line item

    b.  Detail necessary operating expenses and any essential services included in the plan

**Response to Request 3**

    AAFAF will provide underlying raw data relating to revenue and expenses in the HTA Fiscal Plan.  AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion"

pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

**Request 4**

4. **Additional Diligence Items**

    a.  Detailed asset-level 10-year historical HTA financials split out, including:

          i.  Revenue, opex and capex breakdown for each asset

          ii.  Must include details including, but not limited to: tolls, fares, fees, passengers / ridership, cars / traffic, etc.

    b.  Provide the expected impact to future federal funding (from each of the FHWA and the FTA) and any associated incremental expenses in the event of a HTA Title III filing

          i.  Describe all communications with the FHWA and FTA regarding this issue

    c.  Detail on the FHWA & Earmarked Projected funding over next 10 years (i.e., description of the earmarked projects and current construction and funding status)

    d.  Provide IRR analysis of planned construction projects

    e.  Schedule of all owned assets

    i.  Details / background on other major projects / assets

    f.  Tolls

          i.  Toll charge analytics (detailed per toll road)

          ii.  Details / background on electronic tolling potential and past measures undertaken (detailed per toll road)

          iii.  Detail on demand elasticity for toll prices (detailed by toll road)

    g.  Detail on the planned utilization of toll credits

    h.  Provide all documents concerning the allocation or application of any proceeds of the 2016 PR-5 and PR-22 toll road concession extension with Metropistas.  This relates to:

          i.  An initial payment of $100mm, presumably transferred last year

          ii.  A second disbursement of $15mm, initially expected by 30 June 2017 at the latest

i. For each source of revenue that HTA collects from consumers (e.g., tolls, fares, fees and other charges), specify percentages of each collected electronically and / or manually

j. Detail behind pension / OPEB

i. Funded status, contributions, etc.

k. P3s

    i. Provide all relevant materials that have been prepared in the process of evaluating additional public private partnership prospects

    ii. Provide detailed plan and cost-benefit analysis on each of the following:

        1. Potential corporatization of specific parts of the highways and transportation system (i.e., assigning responsibility for management and operation to a separate body, to run an asset in a more businesslike way)

        2. Potential privatization of the transit system or Tren Urbano and maintenance of the Highway Authority as a government agency

        3. Potential corporatization of HTA and transit as separate entities

        4. Potential full privatization

    iii. Provide the projected flow of funds from the potential proceeds from P3s

l. Provide all documents, agreements and financial data concerning relationship with concessionaires

m. Provide detail regarding employee headcount, wages and benefits

    i. Organizational chart and employee headcount by department / function

    ii. Employee salaries and benefits by position

n. Provide details regarding HTA Board members (including employment history, affiliations, other appointed or elected positions held, etc.)

o. Provide an explanation of HTA cash accounts:

    i. Describe how HTA revenue and expense cash flows are separated or intermingled with the Treasury Cash Accounts

    ii. Describe how HTA keeps track of capital spending (multi-year capital budgets) vs. operating cash

**Response to Request 4**

Under the facts of this situation, this request is overbroad.  We are prepared to discuss a more reasonable, targeted approach to HTA data with you.

**Request 5**

**5.  Tren Urbano**

    i.  Provide a separate Tren Urbano fiscal plan, including the following:

        1.  Analysis of demand inducement and cost efficiency measures that allow the train to target a fare box recovery ratio in line with heavy rail systems on the mainland (35-60%)

        2.  Revenue enhancement measures for the train system, including fare increases

            a.  The last fare increase had the effect of increasing revenues despite a decrease in ridership; provide analyses of revenue-maximizing fares

        3.  Address the separation of Tren Urbano from HTA as a way to enhance profitability

**Response to Request 5**

Under the facts of this situation, this request is overbroad and requests analyses to be created as opposed to existing data.  We are prepared to discuss a more reasonable, targeted approach to Tren Urbano data with you.

                Very truly yours,

By:  /s/ Martin J. Bienenstock        By:  /s/ John J. Rapisardi

Martin J. Bienenstock           John J. Rapisardi
mbienenstock@proskauer.com     jrapisardi@omm.com
(212) 969-4530              (212) 326-2063
Proskauer Rose LLP          O'Melveny & Myers LLP
Eleven Time Square           Times Square Tower
New York, NY 10036         7 Times Square
                        New York, NY 10036

*Attorney for The Financial Oversight and Management Board for Puerto Rico*     *Attorney for the Puerto Rico Fiscal Agency and Financial Advisory Authority*

# Exhibit A

June 13, 2017

<u>**VIA E-MAIL**</u>

Gary A. Orseck
Robbins, Russell, Englert, Orseck, Untereiner, & Sauber LLP
1801 K Street, N.W.
Suite 411L
Washington, D.C. 20006

Mark C. Ellenberg
Cadwalader, Wickersham & Taft
LLP700 Sixth Street, N.W.
Washington, DC 20001

Re:     ***Creditors' Diligence Information Access***

Dear Messrs. Orseck and Ellenberg:

        We write on behalf of Puerto Rico Fiscal Agency and Financial Advisory Authority
("AAFAF") and the Financial Oversight and Management Board for Puerto Rico (the "FOMB") in
response to your June 2, 2017 letter on behalf of the Ad Hoc Group of Puerto Rico General
Obligation Bondholders (the "GO Group") and Assured Guaranty Corp. and Assured Guaranty
Municipal Corp. ("Assured").  As an initial matter, we reject the assertion in your letter that
creditors have not been provided with substantial and meaningful information about the finances
of the Commonwealth of Puerto Rico ("Puerto Rico").  As explained below, this is untrue and
remains untrue, no matter how often it is falsely repeated by your client group.

        AAFAF and the FOMB have each made publicly available extensive and robust data (a
list of all publicly available websites and descriptions is attached as **Exhibit A**).  In that regard,
Puerto Rico has extensively disclosed its finances and contracts, and the FOMB has made
available information concerning proceedings, as well as contracts and official correspondence
with the government of Puerto Rico inclusive of correspondence addressing specific Fiscal Plan
components.  In addition to this public material, AAFAF has provided voluminous data to your
firms, and your clients and their financial advisors.  AAFAF has met with creditors numerous
times on April 6, 2017 and April 11, 2017, made senior government officials and advisors
available to your clients on April 6, 2017 and April 11, 2017, made information available at
mediation meetings on April 13, 2017, April 17, 2017, April 20, 2017, and April 25, 2017, and
provided answers to multitudes of your clients' questions.  As we think you well know, the
problem here is not any lack of disclosure, but rather what the disclosure shows.  Your clients
advised us they were refusing to negotiate because they do not like or accept what the

disclosure shows.  In turn, they demanded disclosures going to the FOMB's certification of the Fiscal Plan.  But, in PROMESA § 106(e), Congress expressly barred challenges to all certification determinations.

AAFAF strongly objects to the baseless contention that "almost none" of the information you have requested has been provided and that the Intralinks Data Room (the "Data Room") provided to you is unhelpful.  Those complaints are based on a fundamental distortion of the Data Room's contents.  The Data Room has abundant relevant data that includes Puerto Rico's entire Fiscal Plan Model in a highly-detailed live Excel file that includes formulas, links, and interrelated tabs summarizing the projected financial and operating performance of the Government of Puerto Rico from FY 2017 through FY 2026.  The information in the Data Room is readily useful and should be understandable to any experienced financial professional willing to examine such data in good faith.  Nevertheless, AAFAF is providing a narrative drafted by its financial advisor, Rothschild & Co, that explains in detail the Fiscal Plan's contents and how its formulas, links, and tabs can be helpful (attached as **Exhibit B**).

Puerto Rico has also produced or otherwise made available a substantial volume of additional documents pertaining to its financial condition to further explain the finances and operations of the government.  Your clients have refused to acknowledge these efforts and have instead put forth false accusations that no information has been coming from Puerto Rico.  The fact is that AAFAF has been closely working with the FOMB and each of their professionals to locate and provide additional materials to you and your clients.

Our clients, however, will not fulfill unduly burdensome, vague or harassing requests (which covers many of the 50 plus categories of information demanded in your letter), nor will it make available information covered by the Attorney-Client, Work Product, and Executive and Deliberative Process Privileges.  Of course, if privileged material is or has been inadvertently provided, we reserve the right to delete it from the Data Room and demand its return.  We also will not provide proprietary models created by outside consultants, nor will our clients provide information obviously sought for no purpose other than challenging the FOMB's certification determination that the Fiscal Plan satisfied PROMESA.[1]

We note that we are providing the additional information mentioned in this letter in the spirit of cooperation, and not due to your letter's threat of Rule 2004 discovery.  The jurisprudence is clear that Rule 2004 discovery is not allowed once adversary proceedings are filed.  Currently, there are many pending adversary proceedings launched by various parties (including Assured) at AAFAF, Puerto Rico, and the FOMB.  *See, e.g.*, *In re Enron Corp.*, 281 B.R. 836, 840–41 (Bankr. S.D.N.Y. 2002) (denying motion for discovery under Rule 2004 because of "the well recognized rule that once an adversary proceeding or contested matter is commenced, discovery should be pursued under the Federal Rules of Civil Procedure and not by Rule 2004."); *In re 2435 Plainfield Ave., Inc.*, 223 B.R. 440, 455 (Bankr. D.N.J. 1998) (denying discovery under Rule 2004 in a pending adversary proceeding because "[t]he majority

---

[1] Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

of courts that have addressed this issue have prohibited a Rule 2004 exam of parties involved in or affected by an adversary proceeding while it is pending" (collecting cases)).

While we could restrict further disclosure to discovery in adversary proceedings, in the hope your clients will turn to constructive negotiations, we are outlining below preliminary responses to your inquiries which encompass further disclosures.  We reserve our right to supplement these responses as additional information becomes available or as we further consider your requests.  Please note that we reserve all rights with respect to information we are providing, including but not limited to the right to argue that none of it is admissible in any Title III case or other proceedings.  Please be further advised that with respect to any additional information requested to the extent it implicates determinations by the FOMB as it pertains to certification of the Fiscal Plan, we reserve all rights including the right to assert that such requests are not subject to the Court's jurisdiction pursuant to PROMESA Section 106(e).  Also note that our clients will not provide any underlying materials that contain work product of advisors, or are otherwise protected by any applicable privilege.  We are also willing to have discussions with you about our responses and would consider additional information sessions with our advisors, although preferably after your financial advisors are familiar with the data we provide.

With these general parameters in mind, below we list our specific responses to the data requests made in your June 2 letter.  Our responses are not in the form of formal discovery request responses, as no formal discovery has been served.  We reserve the right to set forth general and specific responses to any of these requests to the extent set forth in formal discovery requests.

**"General" Category**

*Request 1*

*A complete version of the Fiscal Plan, including any amendments mandated by the Board Resolution Adopted on March 13, 2017. This should include functional versions of any embedded Excel charts.*

A complete, live version of the Fiscal Plan has already been uploaded to the Data Room.

*Request 2*

*The Fiscal Year 2018 budget for the Territorial Government or any Covered Instrumentality, including any preliminary drafts.*

AAFAF directs Assured and the GO Group to the following government websites. Notably, Reorg Research found all this data and listed its sources in an article published on June 1, 2017.

- FY2018 Budget Breakdown by Agency:
  http://www2.pr.gov/presupuestos/PresupuestoRecomendado2017-2018/Pages/PRESUPUESTO-POR-AGENCIA.aspx

- FY2018 General Fund Budget Proposal:
  http://www.fortaleza.pr.gov/sites/default/files/PRESUPUESTO%20DEL%20FONDO%2
  0GENERAL%20AF%202015%20AL%202018.pdf

- OMB Report on FY2018 Budget Proposal:
  http://www2.pr.gov/presupuestos/PresupuestoRecomendado2017-
  2018/Captulo%20de%20la%20Oficina%20de%20Gerencia%20y%20Presupuesto/PRE
  SUPUESTO%20RECOMENDADO%20AÑO%20FISCAL%202017-2018.pdf

### *Request 3*

*A functional version of the macroeconomic growth model used to
calculate all forward-looking projections included in the certified Fiscal
Plan as well as any data fed into that model. We also request similar
information for any prior proposed fiscal plan as well as the presentation
known as Technical Meeting Discussion Materials (which was presented
by the prior administration on Nov. 16, 2016), and in the Revised Baseline
Projections (which was presented by the prior administration on Dec. 20,
2016).*

AAFAF will upload to the Data Room underlying raw data used in the macroeconomic
growth model (i.e., revenues, cash flow data) used in the certified Fiscal Plan.  Insofar as this
request seeks materials relating to draft fiscal plans developed by the previous administration,
the request is burdensome and invades the Executive and Deliberative Process Privileges.  And
the growth models requested (as opposed to the underlying data) are proprietary.  AAFAF will
not provide proprietary models created by outside consultants, nor provide information obviously
sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal
Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to
be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the
proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

### *Request 4*

*A functional version of the cash flow models used to prepare the Fiscal
Plan, including any data that was fed into the model.*

A functional version of the cash flow model, including the underlying data that was fed
into the model will be uploaded to the Data Room.  AAFAF and the FOMB, however, will not
provide proprietary models created by outside consultants, nor provide information obviously
sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal
Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to
be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the
proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

### Request 5

*Documents sufficient to identify the makeup of the pro forma revenue and expense measures discussed in the Fiscal Plan at 8, 10, 17-22.*

Relevant information will be uploaded to the Data Room.  AAFAF and the FOMB, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

### Request 6

*To the extent any advisor to the Board, including Andrew Wolfe, used a different model than the models referenced in Items (3) and (4) above, a functional version of that model or those models, including any data that was fed into the model(s).*

Pursuant to PROMESA, the FOMB's rationales for its input on Puerto Rico''s Fiscal Plan are not subject to challenge.

### Request 7

*Any additional documentation relating to the assumptions used in formulating the Fiscal Plan, including, for example, the fiscal multiplier used to calculate the impact that proposed revenue and expense measures are expected to have on the Puerto Rico economy and inflation assumptions.*

AAFAF will upload raw data responsive to this request into the Data Room, to the extent such data exists.  AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

### Request 8

*Any sensitivity analyses that measure the impact of growth initiatives, including those discussed on page 24 of the Fiscal Plan, and recommendations included in Congressional Task Force on Economic Growth in Puerto Rico, Report to the House and Senate (Dec. 20, 2016).*

AAFAF will upload underlying raw data responsive to this request to the Data Room, to the extent such data exists.  AAFAF, however, will not provide proprietary models created by

outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

### Request 9

*A copy of the Fiscal Plan Comparison to Historical Results, prepared by the Territorial Government at the request of the Oversight Board (the "Bridge") as well as any underlying data and models.*

The Bridge is publicly available.  AAFAF and the FOMB will upload underlying raw data relating to the Bridge into the Data Room.  AAFAF and the FOMB, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

### Request 10

*Any and all documents provided to the Oversight Board prior to its approval of the Fiscal Plan.*

Under the facts of this situation, this request is overbroad and is designed to invade multiple privileges.  While our clients have provided and will provide your clients with substantial data and diligence, they will not fulfill this request specifically.

### Request 11

*Any and all documents provided to Ernst & Young in connection with its preparation of Fiscal Oversight and Management Board for Puerto Rico: Financial Bridge Analysis (Mar. 7, 2017) ("Bridge Analysis"). See Bridge Analysis at 7 ("E&Y submitted a detailed data/document request to the Government, and . . . these parties were generally timely and diligent in fulfilling this request to the extent the information was readily available.").*

The FOMB already provided your clients the Bridge Analysis, even though (a) the FOMB is allowed to certify or not certify a fiscal plan in its sole discretion, and (b) its determination is not subject to review by the Court.  This request seeks to go behind the Bridge Analysis.  Under the facts of this situation, this request is overbroad and is designed to invade multiple privileges and inquires into matters PROMESA renders not subject to review.  While, as indicated in other responses, our clients have provided and will provide your clients substantial data and diligence, they will not fulfill this request specifically.

### Requests 12–13

*Any and all documents provided to KPMG in connection with its preparation of the Commonwealth of Puerto Rico Tax Reform Assessment Project (2014).*

*Any and all documents provided to Anne Krueger (or her colleagues or assistants) in connection with her preparation of Puerto Rico – A Way Forward (2015), commonly known a*s the "Krueger Report."

Under the facts of this situation, these requests are overbroad and seek information that has no relevance.  The reports referenced in these requests pre-date the current administration, AAFAF's, and the FOMB's existence, and will not be searched for or provided.

### Requests 14–15

*Any and all documents provided to Conway Mackenzie in connection with its work to prepare fiscal projections contained in the presentation entitled Technical Meeting Discussion Materials (Nov. 16, 2016).*

*Any and all documents provided to Pension Trustee Advisors in connection with any actuarial assessment performed on a public pension system maintained by the Territorial Government.*

AAFAF and the FOMB direct you to Puerto Rico's publicly available quarterly report published on December 18, 2016[2] for information responsive to "Technical Meeting Discussion Materials" (request 14) and to the publicly available Government Development Bank of Puerto Rico's ("GDB") website[3] for responsive information relating to public pensions (request 15).

### Request 16

*Any analyses that quantify the financial impact of the financial control reforms discussed in the Fiscal Plan at 34-38.*

AAFAF and the FOMB will upload underlying raw data responsive to this request to the Data Room, to the extent such data exists.  AAFAF and the FOMB, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

---

[2] *See* http://www.aafaf.pr.gov/documents.html (last visited June 8, 2017); http://www.gdb-pur.com/documents/CommonwealthofPuertoRicoFinancialInfoFY201612-18-16.pdf (last visited June 8, 2017).

[3] *See* http://www.gdb-pur.com/investors_resources/introduction.html (last visited June 8, 2017).

*Request 17*

*Documents sufficient to identify any expert or consultant whose services were used in analyzing Puerto Rico's fiscal situation since January 1, 2014, and any analysis, reports or recommendations offered by such experts or consultants.*

AAFAF and the FOMB direct you to their publicly available contract database, inclusive of their contracts with consultants, for documents responsive to this request.

**"Documents Relating to Revenues" Category**

*Request 18*

*For any revenue line item in the Fiscal Plan that does not grow at the rate of nominal GNP (see Fiscal Plan at 10), documents demonstrating or relating to how those growth rates are derived, including any supporting indices on which you may have relied.*

AAFAF will upload underlying raw data responsive to this request to the Data Room, to the extent such data exists.  Under the facts of this situation, this request is overbroad.  Moreover, this request seeks documents that are the product of deliberations of AAFAF, Puerto Rico, or the FOMB.  Those documents are protected from disclosure by the Executive and Deliberative Process Privileges.  AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

*Request 19*

*Any documents or analyses that reconcile the special revenue funds considered in the Bridge or Bridge Analysis (see for example Bridge Analysis at 11, 18, 28) to special revenue funds in the Fiscal Plan (at 12, 15).*

AAFAF will upload underlying raw data responsive to this request to the Data Room, to the extent such data exists.  Under the facts of this situation, this request is overbroad.  Moreover, this request seeks documents that are the product of deliberations of AAFAF, Puerto Rico, or the FOMB.  Those documents are protected from disclosure by the Executive and Deliberative Process Privileges.  AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

### Request 20

*Any documents, analyses or data underlying the estimated collection rates on all local revenue streams cited in the Fiscal Plan at page 11, as well as any sales and use tax currently collected on behalf of municipalities, including the basis for the Board's statement in the Letter from Jose Carrion to Gov. Ricardo A. Rosselló Nevares dated March 9, 2017 ("March 9 Letter") (at 2-3) that the Commonwealth had overstated the possibility for increased revenue collections in its proposed February 28, 2017 Fiscal Plan.*

AAFAF will upload underlying raw data responsive to this request to the Data Room, to the extent such data exists.  Under the facts of this situation, this request is overbroad.  Moreover, this request seeks documents that are the product of deliberations of AAFAF, Puerto Rico, or the FOMB.  Those documents are protected from disclosure by the Executive and Deliberative Process Privileges.  AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

### Request 21

*Documents sufficient to determine the historical amounts (by month and by fiscal year) and present location of so-called "clawback revenues" discussed on page 28 of the Fiscal Plan, including whether such funds have been placed in escrow, and for whose benefit. To the extent that annual projections of any future revenues subject to clawback exist, those should be provided as well.*

AAFAF will upload available summary data relating to the historical amounts of "clawback revenues" to the Data Room.  AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.  With respect to "projections of any future revenues" AAFAF and the FOMB direct you to the certified Fiscal Plans of each covered territorial entity.

### Request 22

*Documents sufficient to ascertain the status and treatment of (a) any sales and use tax currently being collected on behalf of municipalities, and (b) the special property tax, which under Puerto Rico law should be collected and segregated in a trust "for the amortization and redemption of the general obligations of the Commonwealth," 21 L.P.R.A. § 5002, see*

*also 21 L.P.R.A. § 5004(a), neither of which is addressed in the Fiscal Plan. To the extent that annual projections of those revenues exist, those should be provided as well.*

AAFAF will provide a narrative response drafted by its financial consultants responsive to this request.

### Request 23

*Any communications, documents, or analyses regarding potential changes to the tax code in connection with the formulation of the Fiscal Plan, including, but not limited to, documents relating to reassessing real estate property valuations for the first time since 1958, increasing property tax rates to the levels proposed in the February 28, 2017 version of the Fiscal Plan (at 48), extending Act 154, reassessing the Tax Incentives Act of 1998, or transitioning the Commonwealth's sales and use tax to a broad-based value added tax.*

Under the facts of this situation, this request is overbroad.  Moreover, the requested documents consist of AAFAF's and the FOMB's deliberations to formulate the Fiscal Plan, as well as requests for information regarding core governmental policy functions.  As such, they are protected from disclosure by the Executive and Deliberative Process Privileges.

### Request 24

*Documents sufficient to identify the source of increased revenues from the "Fees & Charges" revenue measure discussed on page 19 of the Fiscal Plan, and the accounts into which such increased revenues are expected to flow.*

We will take this request under advisement and consider what data may be made available to creditors.

### Request 25

*The Report on Discretionary Tax Abatement Agreements that the Governor was required to submit to the Oversight Board within six months of the establishment of the Board, by PROMESA § 208, 48 U.S.C. § 2148.*

AAFAF will look into the extent that "Discretionary Tax Abatement Agreements" are available and will provide what is readily available.  The agreements have not yet been provided to the FOMB.

### Request 26

*Documents sufficient to identify any public private partnerships that are contemplated during the Fiscal Plan period, including anticipated revenue impacts, cash flow projections, and funding sources (see February 28 Fiscal Plan at 74-80).*

No specific public private partnerships are currently being negotiated.  AAFAF and the FOMB hope to attract such partnerships as part of their efforts to increase investment in Puerto Rico and to render services more efficiently.  To the extent any such partnerships are formed, appropriate information will be made available.

### Request 27

*Any communications, documents, or analyses regarding anticipated revenues relating to health care. This information should include any assumptions, models or data used to project anticipated federal transfers, returns from any Commonwealth-run medical facility, municipal employer or employee contributions, or Commonwealth Fund collections.*

Under the facts of this situation, this request is overbroad.  We are prepared to discuss a more reasonable, targeted approach to health care data with you.

## "Documents Relating to Expenses" Category

### Requests 28–32

*For any expense line item in the Fiscal Plan that does not grow at the rate of nominal GNP, documents demonstrating or relating to how those growth rates are derived.*

*A functional version of any model used by the Territorial Government or Ernst & Young to "normalize" expenses so that they can be compared across years in the Bridge or Bridge Analysis.*

*All documents relating to the Board's basis for its "recommendation" in the March 9 Letter (at 2) that FY17 expenses be increased by $585 million, including the type and amount of "historical expenditures" in FY 14-FY16 that Ernst & Young discusses on page 13 of the Bridge Analysis.*

*A functional model or workbook showing how the Reconciliation Adjustment discussed on page 15 of the Fiscal Plan was calculated.*

*Any data, models, analyses or communications regarding the meaning of the term "essential services" in the Fiscal Plan.*

AAFAF will upload underlying raw data responsive to these requests to the Data Room. AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Under the facts of this situation, this request is overbroad.  Moreover, to the extent they seek documents that are the product of deliberations of government officials, those documents are protected from disclosure by the Attorney-Client, Work Product, and Executive and Deliberative Process Privileges.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion"

pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

### Request 33

*Documents reflecting the calculation of the "other non-recurring" expenses projected on page 12 of the Fiscal Plan, including a functioning version of any model used.*

AAFAF will upload underlying raw data responsive to this request to the Data Room, to the extent such data exists. Under the facts of this situation, this request is overbroad. Moreover, this request seeks documents that are the product of deliberations of AAFAF, Puerto Rico, or the FOMB. Those documents are protected from disclosure by the Executive and Deliberative Process Privileges. AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan. Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

### Request 34

*Any documents, analyses or data regarding the non-personnel "right sizing" expense measures cited on page 15, 18 and 20 of the Fiscal Plan. To the extent that a model was used in calculating this line item in the Fiscal Plan, a functioning version of that model should be provided.*

AAFAF will upload underlying raw data responsive to this request to the Data Room, to the extent such data exists. Under the facts of this situation, this request is overbroad. Moreover, this request seeks documents that are the product of deliberations of AAFAF, Puerto Rico, or the FOMB. Those documents are protected from disclosure by the Executive and Deliberative Process Privileges. AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan. Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

### Request 35

*Documents sufficient to identify the nature, cost, status and proposed timeline of any project being funded from the capital expenditures line item in the Fiscal Plan as projected on page 12 and discussed on page 14.*

AAFAF will upload underlying raw data responsive to this request to the Data Room, to the extent such data exists. Under the facts of this situation, this request is overbroad.

Moreover, this request seeks documents that are the product of deliberations of AAFAF, Puerto Rico, or the FOMB.  Those documents are protected from disclosure by the Executive and Deliberative Process Privileges.  AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

### Request 36

*Documents sufficient to identify how $2.2 billion in legal expenses from the Commonwealth of Puerto Rico, Financial Information and Operating Report 283 (Dec. 18, 2016), are treated under the Fiscal Plan.*

Under the facts of this situation, this request is vague, particularly insofar as this request is not included in the Fiscal Plan.  We invite you to meet to clarify this request, and we would be happy to discuss it with you.

### Request 37

*Documents sufficient to show the source of any funds used to pay down any trade debt, overdue tax refund or any other outstanding payable since the passage of PROMESA (Fiscal Plan at 10, 15, 18).*

Under the facts of this situation, this request is vague.  We invite you to meet to clarify this request, and we would be happy to discuss it with you, but note that the funds used to pay all debts and obligations are the funds in Puerto Rico's possession.

### Request 38

*Documents sufficient to disaggregate expenses associated with the Territorial Government's various pension systems, including a breakdown of expenses associated with (a) defined benefit rather than defined contribution accounts; (b) base benefits rather than system administered benefits; (c) retirees rather than active employees; and (d) any "catch up" expenses accrued before the passage of PROMESA rather than ongoing costs of the programs (see Fiscal Plan at 22).*

We will take this request under advisement and provide a further response as soon as practicable.

### Request 39

*Any communications, documents, or analyses regarding expenses relating to health care. This information should include detail regarding the healthcare expense growth rates (to the extent not already produced in response to Request 28), any supporting healthcare cost indices (see*

*March 9 Letter at 3-4), efforts to control health care expenses (Fiscal Plan at 20), and any assumptions made regarding enrollment in light of projected population declines.*

Under the facts of this situation, this request is overbroad and vague.  We invite you to meet to clarify this request, and we would be happy to discuss it with you to clarify and narrow the scope of this request.

### Request 40

*Any communications, documents, or analysis regarding how deficits relating to health care are accounted for in the Fiscal Plan.*

AAFAF and the FOMB direct you to the Fiscal Plan model.

### Request 41

*Any communications, documents or analysis regarding historical reimbursements from the Center for Medicare and Medicaid Services or analysis regarding the projected impact of the newly enacted "Modified Adjusted Growth Impact" or "MAGI" standards.*

No such analysis has been completed.  Moreover, under the facts of this situation, this request is overbroad.  In addition, this request seeks documents that are the product of deliberations of AAFAF, Puerto Rico, or the FOMB.  Those documents are protected from disclosure by the Executive and Deliberative Process Privileges.

### Request 42–43

*Documents that reflect the basis for the Board's request for "Amendment No. 1: Furlough and Christmas Bonus Amendment to the Commonwealth's Proposed Fiscal Plan," in in Board Resolution Adopted on March 13, 2017 (Fiscal Plan Certification) ("March 13 Resolution"), which required a furlough program rather than a reduction in the government work force.*

*Documents that reflect the basis for the Board's request for "Amendment No. 2: Pension Amendment to the Commonwealth's Proposed Fiscal Plan" the March 13 Resolution, which required certain alterations to the treatment of pension plans under the Fiscal Plan.*

The FOMB states that its resolutions speak for themselves.  As a practical matter, Amendment #1 demonstrates by its express terms that it was imposed to provide liquidity if Puerto Rico does not otherwise manage to maintain sufficient funds.  Amendment #2 was imposed to save money in a progressive manner while ensuring that retirees (many of whom are ineligible for Social Security) receive at least sufficient funds to keep them above the federal poverty level.

*Request 44*

*Documents sufficient to identify the source of and efforts to control substantial projected deficits at Puerto Rico's instrumentalities and component units as projected on page 12 and discussed on page 15 of the Fiscal Plan, as well as the Fiscal Plan recently certified by the Puerto Rico Highway Transportation Authority.*

This request seeks documents that are the product of deliberations of AAFAF, Puerto Rico, or the FOMB.  Those documents are protected from disclosure by the Executive  and Deliberative Process Privileges.  Nevertheless, in the spirit of cooperation, and without waiving its privilege objections, we agree to further consider what materials may be provided in response to this request.

*Request 45*

*Documents, models, analyses or communications that reflect the basis for the demands to improve the Commonwealth's liquidity, as discussed in Chairman Carrion's March 8, 2017 letter to Governor Rosselló.*

Under the facts of this situation, this request is overbroad.  Moreover, this request seeks documents that are the product of deliberations of AAFAF, Puerto Rico, or the FOMB.  Those documents are protected from disclosure by the Executive Privilege and Deliberative Process Privileges.  Moreover, this request clearly attempts to go behind the FOMB's determination to certify Puerto Rico's Fiscal Plan which is not subject to review under PROMESA.

*Request 46*

*Documents sufficient to identify any rents paid by the Territorial Government or any Territorial Government Instrumentality to the Public Building Authority ("PBA"). This material should include the terms and documents of any leases of PBA-owned or managed property and any Territorial Government Instrumentality.*

AAFAF and the FOMB direct you to publicly available information relating to "[d]ocuments sufficient to identify any rents paid by the Territorial Government or any Territorial Government Instrumentality to the Public Building Authority ("PBA")."[4]

*Request 47*

*Documents, models, analyses, or communications regarding any decision to reduce subsidies to the University of Puerto Rico, municipalities or other entities that are discussed on pages 45-48 of the February 28, 2017 version of the Fiscal Plan. To the extent that the certified Fiscal Plan*

---

[4] *See* http://www.bgfpr.com/investors_resources/commonwealth-cfiodr.html (last visited June 8, 2017) (containing Commonwealth Financial Information and Operating Data Reports which contain details regarding the total rent payments made to PBA).

*seeks to replace those direct subsidies through indirect means (e.g., changing property taxes or municipal licensing fees), documents regarding those efforts should be provided as well.*

Under the facts of this situation, this request is overbroad and seeks production of materials related to a draft fiscal plan that was not certified.  We will not be producing such documents.

**"Documents Relating To Puerto Rico's Debt Sustainability" Category**

*Requests 48–50*

*Any analyses, including models and data, regarding how the amounts available for debt service proposed on page 8 of the Fiscal Plan will, if implemented, affect Puerto Rico's future ability to access the capital markets.*

*Any analyses comparing Puerto Rico's debt situation to that of other economies that were relied upon in determining what would be a sustainable debt load (cf. Fiscal Plan at 27-29), including documents sufficient to identify any comparable economies considered.*

*Any projections, including both underlying data and models, regarding macroeconomic growth following the end of the Fiscal Plan period and the projected maturity of any proposed restructured obligation. See, e.g., March 9, 2017 Letter at 2 (describing February 28, 2017 proposed Fiscal Plan as too optimistic with respect to "a) economic growth rates and the time to return to nominal economic growth; and, b) the failure to reflect near-certain declines in baseline revenues associated with corporate taxes and non-resident withholding taxes"); GO/COFINA Title VI proposal made public by the Commonwealth on April 28, 2017 at 4 (term sheet proposes a 30 year restructured bond subject to "optional amortization…sized based on Fiscal Plan forecast").*

AAFAF will upload underlying raw data responsive to these requests to the Data Room, to the extent such data exists.  Under the facts of this situation, this request is overbroad. Moreover, these requests seek documents that are the product of deliberations of AAFAF, Puerto Rico, or the FOMB.  Those documents are protected from disclosure by the Executive and Deliberative Process Privileges.  AAFAF, however, will not provide proprietary models created by outside consultants, nor provide information obviously sought for no purpose other than litigating the propriety of the FOMB's certification of the Fiscal Plan.  Any factual inquiries made into "determinations" by the FOMB are statutorily mandated to be within in its "sole discretion" pursuant to PROMESA Section 201(c)(3) and certification of the proposed Fiscal Plan is not reviewable by any court pursuant to PROMESA.

**"Documents Relating To GDB Restructuring Or Wind Down" Category**

*Requests 51–56*

*Documents reflecting the historical amounts and present status of any funds or accounts held by the Government Development Bank of Puerto Rico ("GDB") on behalf of the Territorial Government, including, but not limited to, the balance of any accounts at the GDB into which any so-called "clawback revenues" were deposited and the intended treatment of such funds in the Restructuring Support Agreement announced by the Commonwealth on May 15, 2017 ("GDB RSA").*

*Documents sufficient to identify any accounts held on behalf of the Territorial Government at financial institutions other than the GDB, including but not limited to accounts that were transferred from the GDB since January 1, 2015.*

*Documents regarding the division of assets between the New Issuer and the Public Entity Trust in the GDB RSA.*

*Loan level detail on the GDB Municipal Loan portfolio, including all loan and deposit agreements as well as current loan balances.*

*Documents that reflect the source of repayment for SUT-backed GDB Municipality loans, as that term is used in the GDB RSA and associated documents released on February 28, 2017.*

*Documents sufficient to identify how SUT flowing to municipalities (if any) in excess of municipal loan debt service is distributed or spent.*

We direct you to GDB's publicly available financial statements. Additionally, pursuant to GDB's recently negotiated RSA, if the FOMB authorizes GDB to implement the RSA in Title VI of PROMESA, there will be extensive disclosure documents provided pursuant to PROMESA § 601(f). Under the facts of this situation, these requests are overbroad and harassing. Moreover, these requests have no relevance whatsoever to the Commonwealth Title III case.

\*       \*       \*

AAFAF and the FOMB remain committed to working cooperatively with you to provide information to which creditors are entitled.  We look forward to discussing these matters with you further.

Very truly yours,

By:  /s/ Martin J. Bienenstock

Martin J. Bienenstock
mbienenstock@proskauer.com
(212) 969-4530
Proskauer Rose LLP
Eleven Time Square
New York, NY 10036

*Attorney for the Financial Oversight and Management Board for Puerto Rico*

By:  /s/ John J. Rapisardi

John J. Rapisardi
jrapisardi@omm.com
(212) 326-2063
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

*Attorney for the Puerto Rico Fiscal Agency and Financial Advisory Authority*

**Exhibit A**

***Publicly Available Information***

| Entity | Web link | Type of information publicly available |
|--------|----------|----------------------------------------|
| **Office of the Comptroller** | https://www.ocpr.gov.pr/inicio/ | Governmental Contract Registry<br><br>Employees and Payroll Registry<br><br>Audits Reports<br><br>Annual Reports<br><br>Privatization Reports |
| **Office of Management and Budget** | http://www.ogp.pr.gov/ | Budgets of Puerto Rico<br><br>Relevant Statistics<br><br>Federal Funds Management<br><br>Governmental Contract Processing<br><br>Government's Organization Chart<br><br>Governmental Restructures |
| | | Commonwealth CAFR<br><br>Commonwealth Financial |

19

| | | |
|---|---|---|
| **Government Development Bank** | http://www.bgfpr.com/index.html | Information and Operating Data Report<br><br>Commonwealth Cash Flow Projection<br><br>General Fund Net Revenues and Cash Flow Projection<br><br>P.R. Tax-Exempt Securities by Issuer (Official Statements and Bonds Resolutions)<br><br>Economic Activity Index |
| **EMMA**<br>**(Municipal Securities Rulemaking Board)** | https://emma.msrb.org/ | P.R. Tax-Exempt Securities disclosures pursuant to Rule 15c2-12 |
| **P.R. Department of State** | http://estado.pr.gov/en/ | Regulations<br><br>Executives Orders<br><br>Registry of Commercial Transactions |
| **Office of Legislative Services** | http://www.oslpr.org/v2/ | P.R. Legislation<br><br>(from 1993 to present)<br><br>Legislative Process related documents |
| | | |

| | | |
|---|---|---|
| **P.R. Institute of Statistics** | http://www.estadisticas.gobierno.pr/iepr/ | Cost of Living Index<br><br>Group Quarter Report<br><br>Statistics of government entities and the private sector |
| **P.R. Department of Treasury** | http://www.hacienda.gobierno.pr/ | Statistics of the General Fund Net Revenues<br><br>Tax Credits<br><br>Public Rulings<br><br>Commonwealth's Financial Information and Operational Data Reporting<br><br>Sales and Use Tax Collection Index<br><br>Commonwealth's Financial Statements |
| **P.R. Planning Board** | http://www.jp.gobierno.pr/ | Macroeconomic Data Center<br><br>Municipal Data Center<br><br>Economic Cycles<br><br>Economic Reports<br><br>Economic Development Strategy (CEDS),<br><br>among other information. |
| | | |

| | | |
|---|---|---|
| **Puerto Rico Fiscal Agency and Financial Advisory Authority** | http://www.aafaf.pr.gov/index.html | Fiscal Plans<br><br>Oversight Board's Communications |
| **Employees Retirement System of the Government of Puerto Rico** | http://www.retiro.pr.gov/ | Historical Financial Statements for ERS and JRS<br><br>Historical Actuarial Valuation Reports for ERS and JRS |
| **Puerto Rico Teachers Retirement System** | https://www.srm.pr.gov/ | Historical Actuarial Valuation Reports |

\* This table contains the agencies that have information publicly available that would be relevant to an investor. However, there are many other agencies with additional information on their web pages about other topics.

**Exhibit B**

<u>**Overview of the Fiscal Plan Model**</u>

The Fiscal Plan Model is an Excel file that summarizes the projected financial and operating performance of the Government of Puerto Rico from FY 2017 (July 1, 2016 to June 30, 2017) through FY 2026 (July 1, 2025 to June 30, 2026). The Fiscal Plan Model incorporates projected revenue to be generated and expenses to be incurred by the Central Government as well as Component Units ("CUs") that are covered by the certified March 13, 2017 Fiscal Plan. Additionally, the Fiscal Plan Model accounts for the revenue and expense measures that the Central Government will implement as early as FY 2018. Taking into account the projected revenue, expenses, and measures, the Fiscal Plan Model provides an annual projection of cash flows that are expected to be available for debt service (principal and interest) from FY 2017 through FY 2026.

The Fiscal Plan Model was provided to the various creditor groups via the Intralinks Project AAFA Dataroom (the "Dataroom") on April 5, 2017. A "live" version of the Fiscal Plan Model, which includes formulas and links between tabs of the file, was provided to the various creditor groups via the Dataroom on June 6, 2017.

The following is an overview of each of the 10 tabs of the Fiscal Plan Model, how they relate to each other, and what relevant sources and documents have been made available to the various creditor groups via the Dataroom.

<u>"Sum" tab</u>

The Sum tab is linked to the remaining tabs of the Fiscal Plan model, discussed below, and summarizes the detailed financial projections included in those tabs. The first section of the tab exhibits the projected revenue from the General Fund (i.e. Individual Income Taxes, Corporate Income Taxes, Non-Resident Withholdings, Taxes on Alcoholic Beverages and Cigarettes, General Fund portion of SUT), as well as other sources such Additional SUT, Other Tax Revenues, Other Non-Tax Revenues, Federal Transfers, and the Impact of Loss of Affordable Care Act ("ACA") Funding. These items provide the projected Revenues Before Measures.

The second section of the tab exhibits projected expenses. General Fund Expenses include Direct Payroll, Direct Operational Expenses, Utilities, and Special Appropriations. Other Expenses include Paygo Contributions, Run-Rate Capital Expenditures, Net Deficits of Special Revenue Funds, Component Units, HTA Operational Expenses, Disbursements to Entities Outside of the Fiscal Plan, Federal Programs, the Reconciliation Adjustment, and Non-Recurring Expenses. These items provide the projected Expenses Before Measures.

By subtracting the total annual Expenses Before Measures from the total annual Revenues Before Measures, The Sum tab presents the annual projection of Cash Flows Pre-Measures. The third section of the Sum tab summarizes the Net Impact of Measures, which is the sum of the savings projected from the implementation of revenue and expense measures. Adding the total annual Net Impact of Measures to the annual Cash Flows Pre-Measures provides the annual Cash Flows Post-Measures, Before Debt Service.

<u>"Rev. build" tab</u>

The Rev. build tab provides the more detailed financial projections that serve as the basis for the annual Revenues Before Measures in the Sum tab. The tab includes projected revenue

related to the General Fund and other sources, as described in the "Sum" tab section above. In general, revenue was projected through FY 2017 or FY 2018, with revenue in the remaining years growing based on the Puerto Rico nominal GNP growth factor. The sources of the FY 2017 and FY 2018 projections and the Puerto Rico nominal GNP growth factor are explicitly referenced in the Rev. build tab and are available in the Dataroom. Certain revenue line items are linked to other tabs in the Fiscal Plan model and will be discussed in the sections that follow (i.e. Cigarette Tax revenue and Excise on Off-Shore Shipments of Rum are linked to the "Cig & Rum" tab).

"Exp. build" tab

The Exp. build tab provides the more detailed financial projections that serve as the basis for the annual Expenses Before Measures in the Sum tab. The tab includes projected expenses related to the General Fund and other areas of the Government, as described in the Sum tab section above. The expenses related to certain line items were projected for FY 2017, with expenses in the remaining years growing based on projected inflation for Puerto Rico. Other line items, such as those related to CUs, were explicitly forecasted over the projection period. The sources of the FY 2017 projections and the projected inflation for Puerto Rico are explicitly referenced in the Exp. build tab and are available in the Dataroom. Certain expense line items are linked to other tabs in the Fiscal Plan model and will be discussed in the sections that follow (i.e. Paygo Retirement System Appropriations are linked to the "Retire" tab).

"Measures" tab

The Measures tab provides the more detailed projections of the annual savings from Revenue Measures and Expense Measures summarized in the Sum tab. The Revenue Measures include enhancements from Stabilizing Corporate Tax Revenue, Improved Tax Compliance, Right-Rate Fees, and Additional Revenue Enhancements. In general, Revenue Measures were projected through FY 2019 or FY 2020, with the revenue enhancements in the remaining years growing based on the Puerto Rico nominal GNP growth factor. The Expense Measures include savings from Right-Sizing the Puerto Rico Government, Reducing Healthcare Spending, Pension System Reform, Rehabilitation of Trade Terms With Local Suppliers, and Payroll and Operational Expense Freeze Through FY 2019. The sources of the projections and the macroeconomic assumptions related to growth are explicitly referenced in the Measures tab and are available in the Dataroom.

"SUT" tab

The SUT tab provides the detailed projections of the annual SUT revenue and the distribution to the General Fund, COFINA, Municipal Administration Fund (FAM), and the Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico (CINE). Certain line items in the SUT tab flow into the Sum and Exp. build tabs. The source of the projections is explicitly referenced in the SUT tab and is available in the Dataroom.

"Retire" tab

The Retire tab provides the detailed projections of the annual pension paygo contributions by the Government of Puerto Rico for the Employees' Retirement System ("ERS"), the Teachers' Retirement System ("TRS"), and the Judiciary Retirement System ("JRS"). Certain line items in the Retire tab flow into the Exp. build tab. The source of the projections is explicitly referenced in the Retire tab and is available in the Dataroom.

<u>"Cig & Rum" tab</u>

The Cig and Rum tab provides the detailed projections of the annual revenue associated with Cigarette Taxes and Excise Taxes on Off-Shore Shipments of Rum. The projections are distinguished between revenues that will be directed to the General Fund and revenues that will be directed elsewhere. Certain line items in the Cig & Rum tab flow into the Rev. build and Exp. build tabs. The source of the projections is explicitly referenced in the Cig & Rum tab and is available in the Dataroom. A document named "Additional Appendix Pages" provides further detail regarding assumptions and methodology and is also available in the Dataroom.

<u>"ASES" tab</u>

The ASES tab provides the detailed projections of the sources of funding and disbursements related to ASES (Health Insurance Administration). The projections estimate a surplus in FY 2018 and FY 2019 and a deficit in all other years, inclusive of the forecasted receipt of ACA funding from the Federal Government. Certain line items in the ASES tab flow into the Rev. build and Exp. build tabs. The source of the projections is explicitly referenced in the ASES tab and is available in the Dataroom. A document named "Additional Appendix Pages" provides further detail regarding assumptions and methodology and is also available in the Dataroom.

<u>"UPR" tab</u>

The UPR tab provides the detailed projections of the sources of revenue and expenses related to the University of Puerto Rico. Sources of revenue include Tuition Charges, State Grants, Federal Transfers, Appropriations, Federal Pell Grants, and Slot Machine Revenue. Expenses include Operating Disbursements (net of General Fund Appropriations and Federal Transfers). Certain line items in the UPR tab flow into the Rev. build and Exp. build tabs. The sources of the projections are explicitly referenced in the Cig & Rum tab and are available in the Dataroom. A document named "Additional Appendix Pages" provides further detail regarding assumptions and methodology and is also available in the Dataroom.

<u>"HTA" tab</u>

The HTA tab provides the detailed projections of the sources of revenue and expenses related to the Highway & Transportation Authority of Puerto Rico. Sources of revenue include Gasoline and Diesel Taxes, Toll Receipts, Vehicle License Fees, Petroleum Taxes, Tren Urbano Receipts, and others. Expenses include Salaries and Benefits, Pension and Early Retirement Benefits, Repairs & Maintenance, Utilities, and others. Certain line items in the HTA tab flow into the Rev. build tab.