**Objection Deadline:** September 19, 2017, 4:00 p.m.
**Hearing Date:** October 4, 2017, 9:30 a.m.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

## JOINT MOTION BY THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS, ASSURED GUARANTY CORP. ASSURED GUARANTY MUNICIPAL CORP., AND THE MUTUAL FUND GROUP FOR ORDER AUTHORIZING RULE 2004 EXAMINATION

---

[1]    The Debtors in these Title III cases (collectively, the "Title III Cases"), along with each Debtor's respective Title III Case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).  (Title III Case numbers are listed as bankruptcy case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................................................ii

INTRODUCTION ......................................................................................................................... 1

JURISDICTION AND VENUE ..................................................................................................... 3

BACKGROUND ............................................................................................................................ 3

LEGAL STANDARD..................................................................................................................... 8

ARGUMENT.................................................................................................................................. 9

I.        Movants Are Entitled To Information Regarding The Commonwealth's
          Fiscal Health And Its Fiscal Plan........................................................................... 9

II.       The Board And The Commonwealth Cannot Shield The Commonwealth's
          Financial Condition From Scrutiny By Invoking The "Pending Proceeding" Doctrine .. 17

RELIEF REQUESTED.................................................................................................................. 19

CERTIFICATION OF COMPLIANCE WITH LOCAL BANKRUPTCY RULE 2004-1.......... 20

NOTICE........................................................................................................................................ 20

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Air Line Pilots Ass'n., Int'l v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*,
  156 B.R. 414 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994) ......................................... 15

*Cameron v. United States*,
  231 U.S. 710 (1914) ................................................................................................................. 10

*ePlus, Inc. v. Katz (In re Metiom, Inc.)*,
  318 B.R. 263 (S.D.N.Y. 2004) ................................................................................................ 15

*Fano v. Newport Heights Irr. Dist.*,
  114 F. 2d 563 (9th Cir. 1940) ................................................................................................. 12

*In re 2435 Plainfield Ave., Inc.*,
  223 B.R. 440 (D.N.J. 1998) ............................................................................................... 17, 18

*In re Barnwell Cty. Hosp.*,
  471 B.R. 849 (Bankr. D.S.C. 2012) ........................................................................................ 12

*In re Bennett Funding Grp Inc.*,
  203 B.R. 24 (SDNY 1996) ....................................................................................................... 18

*In re Chateaugay Corp.*,
  120 B.R. 707 (S.D.N.Y. 1990) ................................................................................................ 15

*In re Coffee Cupboard, Inc.*,
  128 B.R. 509 (Bankr. E.D.N.Y. 1991) .................................................................................... 10

*IIn re Corcoran Hosp. Dist.*,
  233 B.R. 449 (Bankr. E.D. Cal. 1999) .................................................................................... 12

*In re Drexel Burnham Lambert Grp., Inc.*,
  123 B.R. 702 (Bankr. S.D.N.Y. 1991) ............................................................................... 10, 15

*In re Enron Corp.*,
  281 B.R. 836 (Bankr. S.D.N.Y. 2002) ...................................................................................... 8

*In re Hardeman Cty. Hosp. Dist.*,
  540 B.R. 229 (Bankr. N.D. Tex. 2015) ................................................................................... 12

*In re Hughes*,
  281 B.R. 224 (Bankr. S.D.N.Y. 2002) .................................................................................. 9, 16

*In re International Fibercom, Inc.*,
  283 B.R. 290 (Bankr. D. Ariz. 2002) ...................................................................................... 18

*In re M4 Enters., Inc.*,
   190 B.R. 471 (Bankr. N.D. Ga. 1995) ................................................................ 18

*In re Matter of Sun Medical Mgmt., Inc.*,
   104 B.R. 522 (Bankr. M.D. Ga. 1989) ............................................................... 18

*In re Recoton Corp.*,
   307 B.R. 751 (Bankr. S.D.N.Y. 2004) ........................................................... 10, 15

*In re Summit Corp.*,
   891 F.2d 1 (1st Cir. 1989) ..................................................................................... 9

*In re Wash. Mut. Inc.*,
   408 B.R. 45 (D. Del. 2009) ................................................................................. 18

*In re Youk-See*,
   450 B.R. 312 (Bankr. D. Mass. 2011) ................................................................. 8

*Kelley v. Everglades Drainage Dist.*,
   319 U.S. 415 (1943) ............................................................................................ 12

*Lorber v. Vista Irrigation Dist.*,
   127 F.2d 628 (9th Cir. 1942) .............................................................................. 12

*Noone v. St. Cyr*,
   188 B.R. 710 (Bankr. D. Mass. 1995) ............................................................... 18

*W. Coast Life Ins. Co. v. Merced Irr. Dist.*,
   114 F.2d 654 (9th Cir. 1940) .............................................................................. 12

**Statutes**

11 U.S.C. § 1109 .......................................................................................................... 9

11 U.S.C. § 1129 ........................................................................................................ 12

28 U.S.C. § 1331 .......................................................................................................... 3

28 U.S.C. § 1391 .......................................................................................................... 3

PROMESA § 106 ........................................................................................................ 5

PROMESA § 201 ..................................................................................................... 3, 5

PROMESA § 202 ................................................................................................... 3, 14

PROMESA § 301 ....................................................................................................... 12

PROMESA § 306 ........................................................................................................ 3

PROMESA § 307 ................................................................................................................ 3

PROMESA § 310 ................................................................................................................ 1

PROMESA § 314 ................................................................................................ 3, 10, 12

Federal Rules of Bankruptcy Procedure Rule 7026 ..................................................... 18

Federal Rules of Bankruptcy Procedure Rule 2004 ............................................... passim

**Other Authorities**

Collier on Bankruptcy (16th ed.) .......................................................................... 12, 18

Associated Press, *Puerto Rico Gov Vows To Fight Possible Furloughs Amid Crisis*,
    Caribbean Business, Aug. 3, 2017 .................................................................... 7

H.R. Rep. No. 686, 94th Cong., 1st Sess. 32-33 (1977) ............................................ 12

Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to these Title III Cases by section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[1] the Ad Hoc Group of General Obligation Bondholders (the "GO Group")[2], Assured Guaranty Corp. and Assured Guaranty Municipal Corp. ("Assured") and the Mutual Fund Group, (collectively with the GO Group, and Assured, "Movants") submit this motion (the "Motion") for entry of an order (1) compelling the Commonwealth and the Federal Oversight and Management Board for Puerto Rico (the "Oversight Board" or the "Board" and, with the Commonwealth, "Respondents"), to produce documents responsive to the requests listed in **Schedule A**; (2) compelling the depositions of the individual members of the Oversight Board; (3) compelling the Commonwealth and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") to designate for deposition a witness or witnesses knowledgeable about the topics in **Schedule A**; and (4) authorizing Movants to serve subpoenas on third parties with knowledge of the topics in **Schedule A** without seeking further leave of the Court.

## INTRODUCTION

How much can the Commonwealth really pay?  Its Title III case turns on that question. The case's goal is a plan of adjustment, which must, among other things, be "fair and equitable" (to be confirmed over the objection of a class of creditors) and "in the best interests of creditors" (in all cases).  Whether a plan of adjustment meets those criteria depends, in turn, on whether it does all that is reasonably possible to maximize creditor recoveries.   And that is a

---

[1]        PROMESA has been codified at 48 U.S.C. §§ 2101-2241.

[2]        Members of the GO Group file this Motion exclusively on their own behalves and do not assume any fiduciary or other duties to any other creditor or person.

quintessentially *factual* question that turns on the data, financial models, and other analytical materials underlying the Commonwealth's plan of adjustment.

The Bankruptcy Rules provide just the tool to develop the necessary facts. Rule 2004 allows the Court to order a sweeping examination of "the liabilities and financial condition of the debtor." Fed. R. Bankr. P. 2004(b). That is what this Motion seeks. Specifically, this Motion seeks an examination of documents and key witnesses concerning the projections in the Fiscal Plan (defined below), which will no doubt form the basis of any plan of adjustment, and the Commonwealth's fiscal health in general.

The Oversight Board and the Commonwealth have steadfastly refused to provide these facts voluntarily to Movants or to most other creditors. Movants also understand that National Public Finance Corporation ("National"), which also owns or insures billions of dollars of debt issued by the Commonwealth or its instrumentalities, will be filing a motion pursuant to Rule 2004 because it too has been denied basic facts regarding the Commonwealth's financial situation and the Fiscal Plan. In the Board's view as expressed repeatedly to all creditors, to this Court, and most recently to Movants during a conference held in advance of our filing this Motion, the determination to certify the Fiscal Plan is insulated by PROMESA not only from our "second-guessing," but even from this Court's scrutiny. That facile response misses the point: Movants' purpose in seeking this discovery is to be able to assess whether any proposed plan of adjustment—which must be consistent with the Fiscal Plan—*is confirmable*. And the confirmability of a plan of adjustment is assuredly open to the Court's scrutiny.[3]

---

[3] In light of the Board's categorical position that discovery under Rule 2004(b) is unavailable *as a matter of law*, its objection during the August 24, 2017 meet-and-confer call that Movants should have held off on filing this Motion until Movants afforded the Board an opportunity to review the specific discovery requests, is just an effort at still further delay. The Board was explicit during that conference that it has no obligation (and no intent) to provide discovery of materials that relate to the Fiscal Plan because (among other reasons) (1) per PROMESA, the assumptions underlying the Fiscal Plan are none of our business, and (2) no plan of confirmation has yet been proposed, so any discovery relevant to whether a plan would be confirmable is premature.

Movants and National have coordinated the filing of their motions and are willing to coordinate their further discovery efforts in order to minimize burden on the Commonwealth and the Oversight Board. But the evidence sought by this Motion and the motion that will be filed by National is critical to these Title III Cases. No less important, it is critical to any settlement— without it, no creditor can satisfy itself that a proposed settlement is fair. The Court therefore should grant the Motion.

## JURISDICTION AND VENUE

This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1331 and PROMESA § 306(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and PROMESA § 307(a).

## BACKGROUND

*The Fiscal Plan*. PROMESA provides that the Commonwealth will be subject to a fiscal plan. The fiscal plan is developed by the Commonwealth (by default) and, if it satisfies certain requirements, certified by the Oversight Board. PROMESA §§ 201(b), (c).

Much hinges on the fiscal plan and associated projections regarding how actions taken pursuant to the fiscal plan will impact the Commonwealth for decades to come. Once the Board has approved and certified a fiscal plan, the Commonwealth's budgets must comply with it. *Id.* § 202. Additionally, in the Commonwealth's Title III case, any plan of adjustment may be confirmed only if it is "consistent with the applicable Fiscal Plan." *Id.* § 314(b)(7). But consistency with the fiscal plan alone does not suffice. The plan of adjustment, which will govern how much creditors receive for 20, 30, or even 40 years after the fiscal plan ceases to be in effect, must also be "fair and equitable" and "in the best interests of creditors" and satisfy several other requirements not relevant to the instant motion. *See id.* §§ 314(b)(1), (6).

3

In March 2017, the Board certified a fiscal plan for the Commonwealth (as amended, the "Fiscal Plan"). While the Board's advisors have, at times, relied upon longer-term projections, the Fiscal Plan covers fiscal years 2017 through 2026 and contains financial projections and other data for that period. On its face, the Fiscal Plan requires financial creditors collectively to accept a haircut of nearly 80%.

*Movants' efforts to seek discovery out of court.* Movants long have tried to work with the Oversight Board and the Commonwealth to understand the Commonwealth's finances. These efforts date to at least fall 2015, when the previous administration proposed an opaque (and now obsolete) "Fiscal and Economic Growth Plan." By May 2017, the Board and the Commonwealth had given Movants access to a "data room" containing some fifty documents. Many of these documents either were hard-coded spreadsheets, which did not include working financial models, or lacked necessary backup files.

The latest chapter in Movants' consensual-discovery efforts began after the Board, in May, filed a Title III petition for the Commonwealth. On June 2, Assured and the GO Group sent the Board and the Commonwealth a letter explaining that the existing "data room" did not enable Movants to understand the Fiscal Plan and the haircut it purported to impose. Ex. A (6/2 Letter).[4] Accordingly, the letter requested 56 specific categories of documents concerning the data underlying the Fiscal Plan, the Commonwealth's revenue and expense projections, and other issues. *Id.* at 3-9.

*The Board and the Commonwealth's refusal.* The Board and the Commonwealth largely refused Movants' requests. On June 13, they responded to Movants' June 2 letter by referring to the existing data room and to publicly available data. Ex. B (6/13 Letter). They also agreed to

---

[4] Unless otherwise specified, exhibits are attached to the Declaration of Lanora C. Pettit filed herewith.

4

add some new documents to the data room.  For the most part, though, Respondents claimed that

PROMESA precludes the GO Group and Assured from access to the information they sought:

> AAFAF and the [Board] . . . will not provide proprietary models created by
> outside consultants, nor provide information obviously sought for *no purpose
> other than litigating the propriety of the [Board's] certification* of the Fiscal Plan.
> Any factual inquiries made into "determinations" by the [Board] are statutorily
> mandated to be within in its *"sole discretion" pursuant to PROMESA Section
> 201(c)(3)* and certification of the proposed Fiscal Plan is *not reviewable by any
> court pursuant to PROMESA [§ 106(e)].*

*E.g.*, *id.* at 5 (emphases added).

Two days later and after receiving a response to the GO Group,[5] the Oversight Board

reiterated its arguments in a status report to this Court.  ECF No. 350.[6]  Citing section 106(e) of

PROMESA, the Board asserted that its "certifications are not . . . subject to being second-

guessed by the Court."  *Id.* ¶ 26; *see also id.* ¶ 25 n.11 (citing PROMESA § 201(c)(3)).  Finally,

the Board claimed that "extensive" financial information was available publicly and in the data

room.  *Id.* ¶¶ 12, 15.

Since May 3, the Board and the Commonwealth have added only 34 additional

documents to the data room, fifteen of which are publicly available articles from academic

journals.  Since June, no additional information has been added to the data room.

*The Adversary Proceedings.*  On May 11, 2017, Assured and National Public Finance

Guarantee Corporation ("National") filed an adversary proceeding challenging, among other

things, the unlawful diversion of collateral pursuant to Act 24-2017 and the violations of

constitutional rights under the Fiscal Plan and Act 24-2017.  *See Assured Guaranty Corp. v.*

---

[5]     The GO Group immediately sent a letter explaining why that these objections from the Oversight Board
and AAFAF were without merit.  Ex. C.  The GO Group also raised concerns that the Oversight Board and AAFAF
were inappropriately claiming deliberative process and executive privileges over vast swaths of factual information,
*id.* at 2, and that they were refusing to produce "proprietary" models from third party consultants without any legal
basis whatsoever, *ibid.*

[6]     Unless otherwise specified, ECF references in this Motion are taken from the docket of *In re
Commonwealth of Puerto Rico*, No. 17 BK 3283-LTS.

*Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00125-LTS.  As of the date hereof, no discovery has been taken in this adversary proceeding.

On June 3, 2017, Assured, National and Financial Guaranty Insurance Company ("FGIC") commenced adversary proceedings challenging the diversion of (i) proceeds of certain excise taxes that are collateral for revenue bonds issued by certain public agencies and (ii) toll revenues, each of which qualify as "special revenues" under section 902(2) of the Bankruptcy Code.  *See Assured Guaranty Corp. v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00155-LTS, 17-00156-LTS (the "Assured HTA Adversary").  Pursuant to the Court's Order entered on July 7, 2017 in the Assured HTA Adversary (ECF No. 31), discovery taken in *Peaje Investments LLC v. Puerto Rico Highways and Transportation Authority*, Adv. Proc. No. 17-151-LTS, Nos. 17-151-LTS (the "Peaje HTA Adversary") in connection with a motion for preliminary injunction was made available to Assured, National and FGIC.  Other than reproduction of the discovery from the Peaje HTA Adversary, as of the date hereof, no other discovery has been taken in the Assured HTA Adversary.

On June 27, 2017, the GO Group filed an adversary proceeding challenging the diversion of two specific streams of revenue: (1) proceeds of certain taxes and fees that, although conditionally earmarked for payment of certain obligations of Commonwealth instrumentalities (*e.g.*, the Puerto Rico Highways and Transportation Authority), are required by Puerto Rico law to be "clawed back" for the sole purpose of paying debt guaranteed under the Puerto Rico Constitution ("Constitutional Debt") when other available resources are insufficient to do so; and (2) certain proceeds of property taxes that Puerto Rico statutory law requires be levied and collected for the benefit of Constitutional Debtholders.  *See generally ACP Master, Ltd. v. Commonwealth*, Adv. Proc. No. 17-189-LTS.  No discovery has taken place in that proceeding;

indeed, defendants have taken the position that discovery should generally be stayed pending its motion to dismiss.  Even basic and easily accessible materials, such as the native spreadsheet used by Dr. Andrew Wolfe to analyze the Fiscal Plan, have been withheld from any creditors—some of whom are owed hundreds of millions, if not billions, of dollars—who do not have direct access to discovery materials produced in the Peaje HTA Adversary Proceeding.

*The Fiscal Plan's inaccuracies*.  Even without access to the underlying data and analytical models, we are able to show fundamental weaknesses and errors in the current Fiscal Plan (and, hence, any future projections derived from figures contained in it or any plan of adjustment based upon it).  Those flaws exceed the scope of this Motion, but one recent revelation illustrates the problem.  The Fiscal Plan projected that the Commonwealth would reach June 30, 2017 (the end of the fiscal year) with $291 million in cash.  ECF No. 1, Ex. A, at 31.  By early August, however, the Commonwealth's Governor announced that, as of June 30, the Commonwealth actually had $1.8 billion in its main operating account.  Associated Press, *Puerto Rico Gov Vows To Fight Possible Furloughs Amid Crisis*, Caribbean Business, Aug. 3, 2017, available at http://caribbeanbusiness.com/puerto-rico-gov-vows-to-fight-possible-furloughs-amid-crisis/ (last accessed Aug. 23, 2017).  In other words, according to the Commonwealth, the Fiscal Plan underestimated the Commonwealth's financial position by ***$1.5 billion***.  *See, e.g.*, Ex. D (Tr. 8/4 FOMB Meeting) at 85:15-21 ("The numbers speak for themselves, from the $230 liquidity projection.  For June 2017 the number was surpassed by almost $1.6 billion and the sources of those funds have been shown to the Board.").  This is particularly striking because Fiscal Year 2017 formed the baseline for the entire Fiscal Plan and presumably for financial projections extending as many as 50 years in the future.  *Id.* at 85:4-6

("To be clear, we beat the expectations once already and I commit that we will beat those expectations again.").

Faced with this discrepancy, even the Board had to confess error.  The day after the revelation, its Executive Director observed that "the significant variance . . . highlights the need for more to be done to ensure transparency, timeliness and accuracy."  Ex. D at 72:6-8.  The Board agreed; it approved a resolution calling for its Executive Director, Natalie Jaresko, to propose reforms to provide additional transparency into the Commonwealth's financial controls, including potentially the "appointment of a Central Commonwealth Treasury Manager."  Ex. E (FOMB Resolution #4 (Aug. 4, 2017)).  Despite talk of transparency, however, the Board since has disclosed no additional information.

*This Motion*.  By this Motion, Movants seek an examination, pursuant to Bankruptcy Rule 2004, of categories of documents and testimony relating to the support for the numerous projections in the Fiscal Plan, bases for the Board's and the Commonwealth's numerous claims that the Commonwealth lacks funds to pay financial creditors, and documents provided to the Commonwealth's and the Oversight Board's financial advisors and other professionals.  It also seeks permission to request information on similar topics from the Commonwealth's financial advisors and other professionals without further leave from the Court.

## LEGAL STANDARD

Rule 2004 is a unique tool in bankruptcy that provides the Court with discretion to allow a "broad and unfettered" look into a debtor's financial affairs.  *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002); *see also In re Youk-See*, 450 B.R. 312, 319-20 (Bankr. D. Mass. 2011).  The examination "may relate only to the acts, conduct, or property or to the liabilities and

financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge."  Fed. R. Bankr. P. 2004(b).

## ARGUMENT

### I.   Movants Are Entitled To Information Regarding The Commonwealth's Fiscal Health And Its Fiscal Plan

The Court should authorize Movants' examination because the evidence they seek—data about and analyses underlying the Commonwealth's financial condition—is exactly the kind of evidence that Rule 2004 is designed to elicit.  Contrary to the Board's arguments, PROMESA does not change that.  And other factors that a Court may consider in ruling on a Rule 2004 motion, such as hardship, likewise favor Movants.

A.   Examinations under Rule 2004 may be conducted by any party in interest, not merely the trustee.  *See In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989) ("Courts have generally construed the term 'party in interest' as used in 11 U.S.C. § 1109(b) liberally.").   Congress deliberately chose to allow Rule 2004 examinations in Title III.    PROMESA § 310 (incorporating the Bankruptcy Rules).  Accordingly, Movants, who collectively own or insure more than $15.6 billion of debt issued by Puerto Rico or its instrumentalities, are entitled to pursue Rule 2004 discovery.

B.   Movants' proposed examination falls within the heartland of Rule 2004—the "financial condition of the debtor."  Fed. R. Bankr. P. 2004(b); *see also In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("Rule 2004 of the Federal Rules of Bankruptcy Procedure provides courts with the authority to order examinations with respect to the financial matters of debtors.")  (quoting Fed. R. Bankr. P. 2004).  It concerns the Commonwealth's revenues, expenses, growth, and budgetary plans. The Commonwealth and the Board insist that the Commonwealth's condition is so desperate that creditors must accept a haircut of

unprecedented proportions. Movants and others believe that the evidence does not support that assertion. The question of who is right is intensely factual. Discovery of those facts—that is, "assist[ing] a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, [and] examining transactions"—is the very "purpose of a Rule 2004 examination." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); *see also In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) ("The purpose of a Rule 2004 examination is 'to show the condition of the estate and to enable the Court to discover its extent and whereabouts, and to come into possession of it, that the rights of the creditor may be preserved.'") (quoting *Cameron v. United States*, 231 U.S. 710, 717 (1914)).

Indeed, it is only a matter of time before the Commonwealth's financial condition is before the Court. Any plan of adjustment must, to be confirmed, be "consistent with the applicable Fiscal Plan." PROMESA § 314(b)(7). Hence, the Commonwealth's Fiscal Plan—a key subject of Movants' proposed examination—is necessarily the blueprint for the Commonwealth's plan of adjustment. If any party contests the plan of adjustment, it will, of necessity, build its argument (and the Board its defense) on the evidence sought here. Consequently, "the relevance of and necessity of the information sought by examination" is substantial. *See In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991).

Take just two examples. Request No. 10 in Schedule A seeks a fully functional version of the macroeconomic growth model used to calculate the forward-looking projections contained in the Fiscal Plan, which the Commonwealth used to calculate both projected revenues and expenses over the 10-year period covered by the Fiscal Plan (and beyond). Request No. 17 seeks information regarding a "Bridge" analysis that was created by Ernst & Young and used by the

Oversight Board to estimate expenses for Fiscal Year 2017 after the Oversight Board concluded that the budget for Fiscal Year 2017 was not an accurate baseline from which to calculate likely expense growth. These two pieces of information are crucial to any genuine understanding of the Fiscal Plan, and thus to creditors' ability to address the assertion by the Board's own expert that cutting any additional government expenditure would lead to an economic death spiral. *See, e.g.*, *Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority*, No. 17-152, ECF No. 216 (8/8 Tr.) at 153 (Testimony of A. Wolfe). The motion also seeks testimony to explain (among other things) inconsistencies in the written record between publicly available information, requirements imposed by the Oversight Board, and positions publicly announced by the Governor and his administration.

C.      Against this backdrop, the Board's refusal to provide the discovery Movants seek could be justified only if the Board were correct that the Fiscal Plan's analysis and assumptions, as incorporated in the budget and ultimately in a plan of adjustment, are immune from judicial review. If that were true, one might conclude that discovery would be pointless because creditors would be stuck with the Board's analysis and projections—no matter how erroneous they are shown to be through discovery. But the Board's position is fundamentally wrong. The evidence Movants seek—including information about the Commonwealth's financial condition, the Board's projections for future revenues and expenses, and the proposed measures embodied in the Fiscal Plan—pertains to multiple requirements for confirmation of a plan of adjustment. Those requirements may (indeed, must) be considered by the Court. Contrary to the Board's contention, PROMESA does not work a dramatic—and entirely unprecedented—exception to the basic premise in bankruptcy that creditors are entitled to full transparency into the debtor's financial condition and operations.

For example, the information sought is relevant to the requirement that, to be confirmed

(over an impaired class's objection), a plan of adjustment must be "fair and equitable."   11

U.S.C. § 1129(b)(1); *see* PROMESA §§ 301(a), 314(b)(1) (incorporating this requirement).  This

fair-and-equitable requirement has especially "important content" in municipal bankruptcy cases.

6 Collier on Bankruptcy 943.03[1][f][i][A] (16th ed.) ("*Collier*").   In particular, a municipal

debtor's plan of adjustment may be approved only upon a factual finding that the recovery

proposed for creditors is "the maximum that the [debtor] could reasonably pay."  *Lorber v. Vista*

*Irrigation Dist.*, 127 F.2d 628, 639 (9th Cir. 1942); *see also* 6 *Collier* 943.03[1][f][i] ("A plan

under chapter 9 is fair and equitable if the amount to be received by the bondholders is all that

they can reasonably expect in the circumstances." (quotation marks omitted)); H.R. Rep. No. 94-

686, 94th Cong., 1st Sess. 33 (1977) (noting that the debtor "must exercise its taxing power to

the fullest extent possible for the benefit of its creditors").[7]  This inquiry necessarily considers

both the revenue and expense sides of the Commonwealth's budget, which in turn depend on the

assumptions and projections in the Fiscal Plan.

Nothing in PROMESA overrides the requirement that the Commonwealth do all that is

reasonably possible to maximize creditor recoveries if any proposed plan of adjustment is to be

confirmed.  To the contrary, this requirement is expressly incorporated.  Nor does PROMESA

commit that determination to the Oversight Board.  Rather, "*[t]he court shall confirm the plan*

---

[7]      *See also Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 419-420 (1943) (per curiam) ("In order that a court may determine the fairness of the total amount of cash or securities offered to creditors by the plan, the court must have before it data which will permit a reasonable, and hence an informed, estimate of the probable future revenues available for the satisfaction of creditors."); *Fano v. Newport Heights Irrigation Dist.*, 114 F. 2d 563, 565-566 (9th Cir. 1940); *cf. W. Coast Life Ins. Co. v. Merced Irrigation. Dist.*, 114 F.2d 654, 679 (9th Cir. 1940) (upholding finding "that 51.501 cents on the dollar is fair and equitable and all that could reasonably be expected in all the existing circumstances"); *In re Corcoran Hosp. Dist.*, 233 B.R. 449, 461 (Bankr. E.D. Cal. 1999) (upholding plan only because debtor could not "raise taxes sufficient to pay more to" the rejecting class); *In re Hardeman Cty. Hosp. Dist.*, 540 B.R. 229, 239 (Bankr. N.D. Tex. 2015) (same); *In re Barnwell Cty. Hosp.*, 471 B.R. 849, 869 (Bankr. D.S.C. 2012) (requiring that "the Plan afford[] all creditors the potential for the greatest economic return from Debtor's assets").

if," based on the evidence before it, the confirmation requirements are satisfied.  PROMESA § 314(b) (emphasis added).

Thus, in any contested confirmation proceeding, the Board will have to demonstrate to the Court's satisfaction that the proposed plan of adjustment does all that is reasonably possible to maximize creditor recoveries.  If (and when) the Board proposes a plan of adjustment premised on the current Fiscal Plan, then creditors will be entitled to challenge the assumptions, projections, and analyses that underlie the Fiscal Plan's proposed debt-service figures.

The evidence Movants seek also bears heavily on the requirement that any plan of adjustment be "in the best interests of creditors."  PROMESA § 314(b)(6).  That rule "require[s] the court to consider whether available remedies under the non-bankruptcy laws and constitution of the [Commonwealth] would result in a greater recovery for the creditors than is provided by such plan."  *Ibid.*  The Board claims that allowing creditors to pursue non-bankruptcy remedies would "yield[] little for anyone because the Commonwealth cannot survive for long under that scenario."[8]  Thus, the Board maintains, a plan of adjustment consistent with the current Fiscal Plan would satisfy the best-interests requirement.  Movants, by contrast, believe the opposite: that the Commonwealth will not recover from its current economic downturn unless it *jettisons* the current Fiscal Plan and provides appreciably more funds for debt service.  But wherever the truth lies, it cannot be uncovered without a close evaluation of the pertinent financial premises of the Fiscal Plan and any related assumptions about growth over the next 30-40 years (the period over which many of Puerto Rico's bonds will mature).  In short, this fundamental disagreement

---

[8]     Assured HTA Adversary, ECF No. 46  (Defendants Motion to Dismiss) at 10.

about the Commonwealth's financial condition cannot be resolved without complete transparency, and robust discovery.[9]

These confirmation standards affect not only litigation but also settlement.  Without complete transparency, creditors cannot be assured that the recovery proposed under any consensual plan of adjustment in fact represents a fair resolution of their claims.  Accordingly, settlement will be impossible.  Indeed, some of the most critical materials sought here have already been provided to *a subset of* creditors but not others.  For example, numerous creditors have requested the native spreadsheet used by Dr. Wolfe to evaluate the Fiscal Plan on behalf of the Board.  Respondents have refused to produce it on the grounds that the Fiscal Plan is not subject to challenge.  Ex. B at 5 (6/13 Letter).  By contrast, Respondents *have* provided that model to certain litigants in a proceeding before the Court, including Assured but *not* the GO Group.  *Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority*, No. 17-152, ECF No. 216 (8/8 Tr.) at 140 (discussing results from model apparently calculated by *Peaje* plaintiffs' counsel).  Settlement is unimaginable unless all parties have equal access to complete information.

Finally, even were the Board's argument valid, it would not shield it and the Commonwealth from all the discovery Movants seek.  Many of Movants' requests do not in any way implicate the Fiscal Plan.  *E.g.*, Schedule A at Request No. 23 (requesting documents regarding actuarial assessments of and proposed reforms to the Commonwealth's public pension system).

---

[9]     Movants seek discovery regarding not only the Commonwealth's Fiscal Plan but also the Commonwealth's budget for fiscal year 2018.  Such discovery likewise is relevant to the standards for confirmation of a plan of adjustment.  Movants do not seek to question whether the budget complies with the Fiscal Plan, a determination the Board makes in its "sole discretion."  PROMESA § 202(c)(1).  Any arguments concerning whether the budget for fiscal year 2018 complies with other applicable law, however, are expressly reserved.

D.     Movants' proposed discovery is also supported by other factors courts consider in determining whether to authorize an examination under Rule 2004.

For instance, Movants have sought the information through other, less intrusive means. *Cf. In re Chateaugay Corp.*, 120 B.R. 707, 709-10 (S.D.N.Y. 1990).  They have sent letters, attended meetings, and served informal document requests.   Moreover, Movants will suffer "undue hardship [and] injustice" if they are not provided the information they seek.  *See Drexel Burnham Lambert*, 123 B.R. at 712.  Without that information, Movants may be constrained to accept the Commonwealth's financial projections at face value.  But, as explained above, even on their face, those projections are wildly askew.  The Commonwealth, even after paying over $1 billion in accounts payable, surpassed the Fiscal Plan's 2017 end-of-year cash estimate by $1.5 billion.  *Supra* at 7.  Such outperformance is particularly significant given that fiscal year 2017 formed the baseline for every projection the Fiscal Plan uses all the way through 2026.

E.     Moreover, Movants are entitled to seek Rule 2004 discovery from parties other than the Debtor.  "Any third party who has a relationship with a debtor may be made subject to a Rule 2004 investigation."  *Recoton*, 307 B.R. at 755 (citing *Air Line Pilots Ass'n., Int'l v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 432 (S.D.N.Y. 1993), *aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co. of Chi.*, 17 F.3d 600 (2d Cir. 1994)); *see also ePlus, Inc. v. Katz (In re Metiom, Inc.)*, 318 B.R. 263, 268 (S.D.N.Y. 2004) (holding that Rule 2004 may be employed to compel discovery of information maintained by creditors or third parties where such information relates to the effective reorganization and administration of the estate).  In this instance, the Commonwealth and Oversight Board have themselves conceded that fundamental analyses incorporated into the Fiscal Plan were conducted

15

by third parties.[10]  For example, Ernst & Young conducted an analysis that led to the creation of a $600 million "Reconciliation Adjustment" that is layered onto projected expenses each year, and which serves to wipe out the effect of the Commonwealth's proposed financial reform measures.  ECF No. 1, Ex. A at 15.  The basis and outcome of such an analysis is rightly the subject of a Rule 2004 examination.  *See Hughes*, 281 B.R. at 226 (allowing examination of Deloitte).

Movants therefore request the Court's approval of authority to issue subpoenas to third parties that may have information regarding the Fiscal Plan, subject to reasonable procedures approved by the Court.  Specifically, the Proposed Order includes the following procedures in connection with the issuance of subpoenas to third parties in connection with the investigation: (A) except as otherwise agreed by Movants, within fourteen (14) days of service of Movants' subpoena, witnesses shall be directed to produce, on a rolling basis all non-privileged documents responsive to Movants' subpoena, or within fourteen (14) days of service of Movants' subpoena, to file all objections and/or responses to Movants' subpoena with the Court, with a hearing promptly scheduled; (B) the witness is directed to submit to oral examination upon reasonable notice and, absent other agreement with Movants, in no event more than fourteen (14) days from the service of a deposition subpoena upon a witness; and (C) in accordance with Bankruptcy Rule 2004, the Clerk of the Court shall issue subpoenas, signed but otherwise blank as requested by Movants.

---

[10]     Indeed, the Oversight Board has few employees and has not opted to use the services of individuals employed by the governments of either Puerto Rico or the United States.  As a result, almost the entirety of the Board's work is accomplished through use of such "third parties."  That policy choice should not effectively place otherwise discoverable information beyond the scope of investigation, let alone judicial scrutiny.

This procedure, which has been accepted by courts in other complex bankruptcies,[11] may allow both Movants and third parties to avoid any unnecessary duplication or expense should Rule 2004 discovery from the Commonwealth and Oversight Board prove sufficient.

## II. The Board And The Commonwealth Cannot Shield The Commonwealth's Financial Condition From Scrutiny By Invoking The "Pending Proceeding" Doctrine

In previous correspondence, the Board and Commonwealth have taken the position that discovery under Rule 2004 is unavailable here because "Rule 2004 discovery is not allowed once adversary proceedings are filed." Ex. B (6/13 Letter) at 2. That is wrong. While it is true that the Puerto Rico Local Bankruptcy Rules direct that Rule 2004 is "inapplicable *to pending adversary proceedings and contested matters*" (P.R. LBR 2004-1, emphasis added), Movants are not seeking Rule 2004 discovery as part of any adversary proceeding. To date, Movants have not served discovery in the adversary proceedings. In any event, the fact that Movants filed adversary proceedings and have or will seek discovery in such proceedings does not foreclose on their rights to pursue discovery in the Title III Cases under Rule 2004.

Nor does the closely related "pending proceeding" doctrine, which has been adopted by some courts but not others, compel a different result. Consistent with the Local Rule cited above, the doctrine holds that a plaintiff in an adversary proceeding *may* be disallowed from invoking Rule 2004 to seek discovery from any opposing party *in that adversary proceeding*. *See, e.g.*, *In re 2435 Plainfield Ave., Inc.*, 223 B.R. 440, 455-56 (Bankr. D.N.J. 1998) (collecting cases). The doctrine derives from the sensible view that, because the Bankruptcy Rules expressly hold that discovery in adversary proceedings is governed by the Federal Rules of Civil Procedure, it would not make sense to allow a party to evade the limits imposed by those rules

---

[11]     *See, e.g.*, Order Granting Authority to Issue Subpoenas for the Production of Documents and the Examination of the Debtors' Current and Former Officers, Directors and Employees, and Other Persons, *In re Lehman Brothers Inc.*, No. 08-1420 (Bankr. S.D.N.Y. Jan. 15, 2009), ECF No. 561.

by invoking Rule 2004.  *Ibid.*  Again, however, the doctrine has no application here, where the Movants are seeking Rule 2004 discovery in the main Title III case, not in an adversary proceeding.

In any event, even the courts that have adopted the pending proceeding doctrine recognize that it "paints with a broad brush," *In re Bennett Funding Grp.*, 203 B.R. 24, 28-29 (S.D.N.Y. 1996), and thus courts retain considerable discretion to determine that a Rule 2004 examination is appropriate under the particular circumstances of the case, even in the context of an adversary proceeding.  *E.g.*, *In re Wash. Mut. Inc.*, 408 B.R. 45, 51 (D. Del. 2009); *In re Matter of Sun Medical Mgmt., Inc.*, 104 B.R. 522, 524-525 (Bankr. M.D. Ga. 1989); *In re M4 Enters., Inc.*, 190 B.R. 471, 476 (Bankr. N.D. Ga. 1995); *see also* 9 *Collier* ¶ 2004.01 (citing *In re Int'l Fibercom, Inc.*, 283 B.R. 290, 292 (Bankr. D. Ariz. 2002) (bankruptcy court has ultimate discretion under the prior proceeding doctrine whether to permit the use of Rule 2004)).  This view is supported by the plain language of Rule 2004, which does *not* prohibit the use of Rule 2004 when an adversary proceeding is pending.  And it has been endorsed by courts in this Circuit, including in one instance where the court entered summary judgment against the debtor in an adversary proceeding because "they had two months to conduct discovery by way of Rule 2004 examinations" but failed to do so.  *Noone v. St. Cyr (In re Noone)*, 188 B.R. 710, 713 (Bankr. D. Mass. 1995).

Even if this Court were to conclude (contrary to this authority) that the pending proceeding doctrine *may* be applied to prohibit a Rule 2004 examination because of the pendency of a separate adversary proceeding, it should not apply that rule here.  This is not a case in which Movants are "seeking to avoid the procedural safeguards of Bankruptcy Rules 7026-7037."  *Plainfield*, 223 B.R. at 456 (quotation marks omitted).  Instead, each of the

requests seeks materials and information plainly discoverable under the Federal Rules. Moreover, as the Governor has recognized, "the Fiscal Plan [i]s the foundation of the Government's finances" as well as the Budget.  Ex. F at 3.  As explained above, the assumptions and projections in the Fiscal Plan are absolutely central to the issues that must be adjudicated if a plan of adjustment is to be confirmed, and thus are discoverable notwithstanding the pendency of any adversary proceeding.

### RELIEF REQUESTED

By this Motion, Movants request entry of an order, pursuant to Bankruptcy Rule 2004:

a)  Directing the Oversight Board, AAFAF, and the Debtors to produce responsive, non-privileged documents requested on the attached **Schedule A** hereto for examination by Movants;

b)  Directing the Commonwealth, and AAFAF to each designate an individual or individuals with knowledge of the matters described in **Schedule A** hereto (the "Designated Individual(s)"), and directing each member of the Oversight Board and each of the Designated Individual(s) to be examined by Movants under oath on such date and time and at such location in Puerto Rico as may be designated in writing by Movants on not less than 14 days' notice; and

c)  Authorizing Movants to issue subpoenas directing the production of documents and the examination of other witnesses who may have knowledge of the matters described in **Schedule A** hereto without separate application to this Court for each subpoena or witness, and in accordance with the procedures set forth herein and in the Proposed Order.

If the Court concludes that a Rule 2004 examination is inappropriate in light of Movants'
pending adversary proceedings, Movants request that the Court schedule a joint status
conference at the Court's earliest convenience so that a scheduling order may be entered
providing for completion of discovery in those adversary proceedings in an orderly but
expeditious manner.

## CERTIFICATION OF COMPLIANCE WITH LOCAL BANKRUPTCY RULE 2004-1

Undersigned counsel hereby certifies that, prior to filing this motion, they requested a
conference with counsel for the Oversight Board and AAFAF, on August 21, 2017, to "arrange a
mutually agreeable date, place, and time for the examination."  Rule 2004-1(b) of the Puerto
Rico Local Bankruptcy Rules.  A conference was held on August 24.  Counsel for Respondents
maintained that Movants had not complied with their obligation under that Rule because
Movants did not provide a copy of **Schedule A** in advance of the call.  However, counsel also
repeated its long-held position that Rule 2004 discovery is categorically prohibited for a number
of reasons.  In light of Respondents' refusal to consider Rule 2004 disclosure, Movants certify
that further meet and confer would not be fruitful.

## NOTICE

Under the Second Amended Case Management Procedures, the deadline to file an
objection to this Motion is September 19, 2017.  Movants therefore provide the following notice
pursuant to Rule 2004-1(d) of the Puerto Rico Local Bankruptcy Rules, modified accordingly
with respect to the objection deadline:

Any party who objects to the examination shall serve and file an objection or motion for
protective order with the United States Bankruptcy Court for the District of Puerto Rico by

September 19, 2017.  If no objection or motion for protective order is timely filed, the court may

grant the motion for examination without further notice or a hearing.

Dated: August 25, 2017
San Juan, Puerto Rico

Respectfully submitted.

JIMÉNEZ, GRAFFAM & LAUSELL

By: /s/ Andrés F. Picó Ramírez

J. Ramón Rivera Morales
(USDC-PR No. 200701)
Andrés F. Picó Ramírez
(USDC-PR No. 302114)
PO Box 366104
San Juan, PR 00936-6104
Telephone: (787) 767-1030
Email: rrivera@jgl.com
apico@jgl.com

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP

Andrew N. Rosenberg (admitted *pro hac vice*)
Kyle J. Kimpler (admitted *pro hac vice*)
Karen R. Zeituni (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Email: arosenberg@paulweiss.com
kkimpler@paulweiss.com
kzeituni@paulweiss.com

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP

Lawrence S. Robbins (admitted *pro hac vice*)
Mark T. Stancil (admitted *pro hac vice*)
Gary A. Orseck (admitted *pro hac vice*)
Kathryn S. Zecca (admitted *pro hac vice*)
Ariel N. Lavinbuk (admitted *pro hac vice*)
Donald Burke (admitted *pro hac vice*)
1801 K Street, NW
Washington, D.C. 20006
Telephone: (202) 775-4500
Email: lrobbins@robbinsrussell.com
mstancil@robbinsrussell.com
gorseck@robbinsrussell.com
kzecca@robbinsrussell.com
alavinbuk@robbinsrussell.com
dburke@robbinsrussell.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*

**CASELLAS ALCOVER & BURGOS P.S.C**
.

By: */s/ Heriberto Burgos Pérez*

   Heriberto Burgos Pérez
     USDC-PR 204809
   Ricardo F. Casellas-Sánchez
     USDC-PR 203114
   Diana Pérez-Seda
     USDC-PR 232014
   P.O. Box 364924
   San Juan, PR 00936-4924
   Telephone: (787) 756-1400
   Facsimile: (787) 756-1401
   Email: hburgos@cabprlaw.com
      rcasellas@cabprlaw.com
      dperez@cabprlaw.com

**CADWALADER, WICKERSHAM & TAFT LLP**

By: */s/ Howard R. Hawkins*

   Howard R. Hawkins, Jr. (*pro hac vice*)
   Mark C. Ellenberg (*pro hac vice*)
   Ellen Halstead (*pro hac vice*)
   Thomas J. Curtin (*pro hac vice*)
   Casey J. Servais (*pro hac vice*)*
   200 Liberty Street
   New York, NY 10281
   Telephone: (212) 504-6000
   Facsimile: (212) 406-6666
   Email: howard.hawkins@cwt.com
      mark.ellenberg@cwt.com
      ellen.halstead@cwt.com
      thomas.curtin@cwt.com
      casey.servais@cwt.com

*Counsel for Assured Guaranty Corp and Assured Guaranty Municipal Corp.*

**TORO, COLÓN, MULLET, RIVERA&
SIFRE, P.S.C.**

*s/ Manuel Fernandez-Bared*
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204
E-mail: mfb@tcmrslaw.com

*s/ Linette Figueroa-Torres*
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
E-mail: lft@tcmrslaw.com

*s/ Jane Patricia Van Kirk*
JANE PATRICIA VAN KIRK
USDC-PR No. 220,510
E-mail: jvankirk@tcmrslaw.com

P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760

*Counsel to the Mutual Fund Group*

**KRAMER LEVIN NAFTALIS &
FRANKEL LLP**

*s/ Gregory A. Horowitz*
THOMAS MOERS MAYER*
AMY CATON*
GREGORY A. HOROWITZ*
DOUGLAS BUCKLEY*
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Email: tmayer@kramerlevin.com
        acaton@kramerlevin.com
        ghorowitz@kramerlevin.com
        dbuckley@kramerlevin.com
*(admitted *pro hac vice*)

*Counsel to the Mutual Fund Group*

**<u>Exhibit A</u>**

**Proposed Order**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

### [PROPOSED] ORDER GRANTING JOINT MOTION BY THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP. AND THE MUTUAL FUND GROUP FOR ORDER AUTHORIZING RULE 2004 EXAMINATION

Upon the motion (the "**Motion**")[2] of the Ad Hoc Group of General Obligation

Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp. and the Mutual Fund

Group ("**Movants**"), pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**"), authorizing Movants to take Rule 2004 discovery of (i) the Financial

Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as representative of

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

the Commonwealth of Puerto Rico (the "**Commonwealth**") pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("**PROMESA**"); (ii) the Commonwealth; and (iii) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**") (collectively the "**Debtors**"), as well as the examination of and production of documents from entities determined by Movants to have information in connection with Movants' investigation, as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 48 U.S.C. § 2166; and venue being proper before this Court pursuant to 48 U.S.C. § 2167; and notice of the Motion having been given as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice of the Motion need be provided; and the Court having held a hearing to consider the relief requested in the Motion; and the Court having found and determined that the relief sought in the Motion and granted herein is in the best interests of the Debtors, their respective creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. The Motion is granted as provided herein.

2. The Oversight Board, AAFAF, and the Commonwealth shall comply with the document requests attached hereto as **Schedule A** by no later than ten (10) days after entry of this Order.

3. The Commonwealth and AAFAF shall each designate an individual or individuals with knowledge of the matters described in **Schedule A** hereto (the "**Designated Individual(s)**"). Each member of the Oversight Board and each of the Designated Individual(s)

shall produce themselves for examination by counsel to Movants under oath and in accordance with Bankruptcy Rule 2004 on such date and time and at such location as may be designated in writing by counsel to Movants.

4.      Movants are authorized, pursuant to Bankruptcy Rule 2004, to issue such subpoenas as may be necessary to compel the production of documents and/or testimony of a third party witness to accomplish the discovery authorized by this Order.

5.      Third party witnesses shall have fourteen (14) days from the service of a subpoena to either (1) produce to Movants all responsive non-privileged documents requested in Movants' subpoena, or (2) file with the Court an objection or response to the subpoena with a hearing promptly scheduled.

6.      Third party witnesses are directed to either (1) submit to oral examination upon reasonable notice and, absent other agreement with Movants, in no event more than fourteen (14) days from the date of the service of a deposition subpoena upon such witness, or (2) file with the Court an objection or response to the subpoena with a hearing promptly scheduled.

7.      Movants shall serve each subpoena and a copy of this Order on the target of the subpoena.

8.      Movants' rights are reserved to request additional discovery, including any additional documents or depositions, under Bankruptcy Rule 2004 and applicable law, based on any information that may be revealed as a result of the information provided pursuant to this Order or otherwise.

9.      This Court shall retain jurisdiction to resolve any dispute arising or related to this Order and to interpret, implement and enforce the provisions of this Order.

10.     This Order is without prejudice to Movants' rights to file further motions seeking additional documents pursuant to Bankruptcy Rule 2004(a) or any other applicable law.

Dated: _____, 2017
      San Juan, Puerto Rico

_____
HONORABLE LAURA TAYLOR SWAIN
UNITED STATES DISTRICT COURT JUDGE

## SCHEDULE A

**DEFINITIONS**

"AAFAF" means the Puerto Rico Fiscal Agency and Financial Advisory Authority, including its officers, directors, employees, partners, subsidiaries, and affiliates, as applicable.

"All," "any," "each," and "every" shall be construed as inclusive or exclusive, and shall be construed as both "each" and "every" to bring within the scope of the Request all responses that might otherwise be construed to be outside its scope.

"April 28 Proposal" means the term sheet for a plan of adjustment proposed by AAFAF on April 28, 2017.

"*Assured* Motion" means the Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6), which was filed on July 10, 2017, by the Financial Oversight and Management Board ("FOMB") in *Assured Guaranty Corp. v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-00125-LTS (Dkt. 27).

"Bridge" means the Fiscal Plan Comparison to Historical Results, prepared by the Territorial Government at the Request of the FOMB.

"Bridge Analysis" means the review of the Bridge conducted by Ernst & Young and presented to the FOMB on March 7, 2017.

"Budget" means the budget(s) adopted for Fiscal Year 2018 for the Territorial Government, including the budget Commonwealth and any agency or instrumentality thereof, as well as the FOMB.

"COFINA" mean the Puerto Rico Sales Tax Financing Corporation.

"Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and, with respect to oral Communications, includes any document

evidencing the Date, participants, subject matter, and content of any such oral communication, including, but not limited to, transcripts, minutes, notes, audio, video, electronic recordings, telephone records and calendar entries.

"Comprehensive Investigation" means the FOMB's investigation of Puerto Rico's debt and its relationship to the fiscal crisis, as announced via the FOMB's August 2, 2017 press release.

"CRIM" means Centro de Recaudaciones de Ingresos Municipales.

"CU Rollup" means the Component Unit Roll-Up, which is the Microsoft Excel file provided by the Commonwealth that provides certain back-up information regarding the Component Units included in the Fiscal Plan.

"Dedicated Sales Tax" means the portion of the Sales and Use Tax that, pursuant to 13 L.P.R.A. § 12, is transferred to COFINA.

"Diligence Responses" means AAFAF's response, which was dated April 11, 2017, to a preliminary diligence list sent by PJT Partners, financial advisors to National Public Finance Guarantee Corporation.

"Document" means any and all writings and recorded materials, of any kind, that are or have been in Your possession, custody or control, whether originals or copies. Such writings include, but are not limited to, Communications, electronically stored information in any medium, such as emails, text messages, and instant messages; contracts; notes; drafts; interoffice memoranda; memoranda for files; letters; research materials; correspondence; logs; diaries; forms; bank statements; tax returns; card files; books of accounts; journals; ledgers; invoices; drawings; computer files; records; data; print-outs or tapes; reports; statistical components; studies; graphs; charts; minutes; manuals; pamphlets; or books of all nature and kind whether

handwritten, typed, printed, mimeographed, photocopied or otherwise reproduced; all tape recordings (whether for computer, audio or visual display) or other tangible things on which words, phrases, symbols or information are stored.

"Fiscal Plan" shall mean the Fiscal Plan certified by the FOMB on March 13, 2017.  To the extent there is a difference between the Fiscal Plan that the FOMB filed as an exhibit to the Title III petition, and the Fiscal Plan that the Governor of Puerto Rico asserts is the "foundation of the Government's finances" and "work[s] hand-in-hand with the Budget" for Fiscal Year 2018, Letter from Governor Ricardo Rosselló Nevares to President Donald J. Trump et al. (August 4, 2017) ("August 4 Letter"), these Requests should be interpreted to include both such plans.

"FOMB" means the Financial Oversight and Management Board for Puerto Rico.

"GDB" means the Government Development Bank of Puerto Rico.

"GDB RSA" means the Restructuring Support Agreement announced by the Commonwealth on May 15, 2017, as amended.

"General Fund" means both the Commonwealth's primary operating fund, and all other entities, components, or units that must be consolidated with the General Fund under U.S. Generally Accepted Accounting Principles for purposes of preparing the Commonwealth's basic financial statements.  *See* Commonwealth of Puerto Rico, *Financial Information And Operating Data Report* 148-152 (Dec. 18, 2016) (describing Territorial Government's historic financial reporting practices).

"GO Group" means, individually and collectively, the members of the "Ad Hoc Group of General Obligation Bondholders."

"March 9 Letter" means the letter sent from Jose B. Carrion, III, Chairman of the FOMB to the Honorable Ricardo A. Roselló Nevares on March 9, 2017.

"March 13 Resolution" means the FOMB Resolution Adopted on March 13, 2017 (Fiscal Plan Certification).

"MBA" means the Metropolitan Bus Authority.

"MCO" means Managed Care Organization.

"Party" or "Parties" means, as applicable, each or every plaintiff and defendant in this Action (including, without limitation, any party that seeks to intervene).

"*Peaje* Opposition" means Defendants' Opposition To Plaintiff's Motion For A Preliminary Injunction, filed on July 14, 2017, in *Peaje Investments, LLC v. Puerto Rico Highway and Transportation Authority*, Adv. Proc. No. 17-00151-LTS (Dkt. 96).

"Person" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

"*PREPA* Opposition" means means the Opposition of the Financial Oversight And Management Board For Puerto Rico To Motion Of Ad Hoc Group Of PREPA Bondholders, National Public Finance Guaranty Municipal Corp., Assured Guaranty Corp., Assured Guaranty Municipal Corp., And Syncora Guarantee Inc. For Relief From Automatic Stay, filed on July 31, in *In re Puerto Rico Electric Power Authority*, No. 17 BK 04780-LTS (Dkt. 149).

"PREPA RSA" means the Restructuring Support Agreement between the Puerto Rico Electric Power Authority and its creditors, which the FOMB declined to certify on June 27, 2017.

"PRCCDA" means Puerto Rico Convention Center District Authority.

"PRHTA" or "HTA" means the Puerto Rico Highways and Transportation Authority.

"PRIFA" means the Puerto Rico Infrastructure Financing Authority.

"PROMESA" means the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat 549.

"Relate" and "concern" shall be construed to bring within the scope of the Request all information that comprises, references, constitutes, describes, evidences, explicitly or implicitly relates to, was reviewed in conjunction with, or was made as a result of the subject matter of the Request, including without limitation all Documents that reflect, record, memorialize, discuss, evaluate, consider, review or report the subject matter of the Request.

"Request" means a request for the production of Documents contained herein.

"Territorial Government" shall be given the meaning that is ascribed in PROMESA § 5(18), 48 U.S.C. § 2104(18).

"Title III Proceedings" means all litigation relating to any effort to restructure the debt of the Commonwealth or any of its public instrumentalities that is filed pursuant to Title III of PROMESA, including but not limited to *In re FOMB for P.R. as representative of The Commonwealth of Puerto Rico*, No. 17 BK 3283; *In re FOMB as representative of Puerto Rico Sales Tax Financing Corporation ("COFINA")*, No. 17 BK 3284; *In re FOMB as representative of Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS")*, No. 17 BK 3566; *In re FOMB for P.R. as representative of Puerto Rico Highways and Transportation Authority ("HTA")*, No. 17 BK 3567; *In re FOMB as representative for Puerto Rico Electric Power Authority (PREPA)*, No. 17 BK 4780.

"TPA" means Third Party Administrator.

"You" or "Your" refers to (1) the FOMB; and (2) the Commonwealth, and their respective divisions, subdivisions, offices, departments, agencies, affiliates, and any current and

former elected officials, officers, trustees, accountants, attorneys, employees, agents, consultants, experts, and independent contractors, assigns, and any Person or entity acting or purporting to act on their behalf.

## INSTRUCTIONS

1.      You are required to answer these Document Requests drawing upon all materials in Your possession, custody, or control, as well as materials that are not in Your custody but are owned in whole or in part by You and those that You have an understanding, express or implied, that You may use, inspect, examine, or copy.  You must provide all information in response to a Document Request which is known to You, Your agents, consultants employees, accountants, attorneys, or experts, or which appears in Your records.

2.      The following rules of construction shall apply to these Document Requests.

      a.      The terms "all" and "any," whenever used separately, shall be construed as "any and all" to encompass the greatest amount of responsive material.

      b.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Interrogatory or Document Request all responses that might otherwise be construed to be outside of its scope.

      c.      The term "including" shall always be construed to mean "including, but not limited to," or "including, without limitation" to encompass more than the specifically identified materials.

      d.      The present tense shall also include the past tense and vice versa.

      e.      The use of the singular form of any word includes the plural and vice versa.

3.      Documents shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond to the categories in these Interrogatories and Document Requests.

4.    You are required to produce all non-identical copies and drafts of each document. The originals of all Documents produced in copy form shall be made available for inspection upon request.

5.    Documents attached to each other in their original form should not be separated.

6.    If no information or Documents responsive to a numbered paragraph are in Your possession, You are to indicate this in a written response.

7.    The fact that a Document has or will be produced by another plaintiff, third party, or other party to these or related proceedings does not relieve You of the obligation to produce Your copy of the same Document.

8.    If any Document is withheld in whole or in part under claim of any privilege or work product or other immunity, then consistent with Fed. R. Civ. P. 26(b)(5), as applied to this proceeding by Bankruptcy Rule 7026, and PROMESA § 310, 48 U.S.C. § 2170, You are to provide a list of such Documents identifying each such document for which any such privilege, work product, or other immunity is claimed, together with the following information:

   a.    the nature of the claim of privilege or immunity, including the statute, rule, or decision giving rise to the claim of privilege or immunity;

   b.    all facts relied upon in support of the claim of privilege or immunity;

   c.    all Persons on whose behalf the privilege or immunity is claimed;

   d.    the type of Document (*e.g.*, letter, memorandum, note, telegram, e-mail, chart, report, recording, etc.);

   e.    the subject matter (without revealing the information as to which privilege is claimed);

   f.    its Date, author(s), sender(s), addressee(s), and recipient(s); and

   g.    the paragraph(s) of these Interrogatories and Document Requests to which production of the document is responsive.

11

You are further directed to describe the factual and legal basis for each claim of privilege or immunity in sufficient detail so as to permit the court to adjudicate the validity of the claim of privilege or immunity, and to produce all Documents or portions thereof not subject to Your objection.

9.      If any Document requested was, but is no longer, in Your possession, custody, or control, identify the document and state what disposition was made of it and the Date or Dates upon which such disposition was made, and additionally, produce all Documents relating to the disposition of such document.

10.      If You object to any Document Request (or portion thereof), state the reason for the objection in detail and respond to that Document Request as narrowed by Your objection.

11.      Electronically stored information ("ESI") as that term is used in Fed. R. Civ. P. 34 should be produced as follows:

a.      TIFFs.  Black and white images shall be delivered as single page Group IV TIFF image files.  Color images must be produced in .jpeg format. Image file names should not contain spaces or special characters and must have a unique file name, *i.e.*, Beginning Bates Number.  Images must be endorsed with sequential Bates numbers in the lower right corner of each image.

b.      Unique IDs.  Each image should have a unique file name and should be named with the Bates number assigned to it.

c.      Text Files.  Extracted full text in the format of document level txt files shall be provided in a separate folder, one text file per document.  Each text file should match the respective TIFF filename (Beginning Bates Number).  Text from redacted pages will be produced in OCR format rather than extracted text.

d.      Parent-Child Relationships.  Parent-child relationships (the association between an attachment and its parent record) should be preserved.

e.    Database Load Files/Cross-Reference Files.  Records should be provided in a format compatible with the following industry standards.

- The image cross-reference file to link the images to the database should be a comma-delimited file with a line in the cross-reference file for every image in the database.

- The data file (.dat) should contain all the fielded information that will be loaded into the database.

- The first line of the .dat file must be a header row identifying the field names.

- The .date file must use the following *Concordance* default delimiters: Comma ¶ ASCII character (020) Quote þ ASCII character (254)

- Date Fields should be provided in the format mm/dd/yyyy.

- Date and time fields must be two separate fields.

- If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments.

- An OCRPATH field must be included to provide the file path name of the extracted text file(s).

- Each text file must be named after the Beginning Bates Number.

- For production with native files, a NATIVELINK field must be included in the .dat file to provide the file path and name of the native file being produced.

- Beginning Bates Number and Ending Bates Number should be two separate fields.

- A complete list of metadata fields is included in paragraph 11(f).

f.    Metadata.  For all ESI records, provide all of the following metadata fields:  Custodian, Beginning Bates Number, Ending Bates Number, Beginning Attachment Number, Ending Attachment Number, Record Type, Master Date, SentOn Date and Time, Received Date and Time, Create Date and Time, Last Modified Date and Time, Parent Folder,

Author, To, From, CC, BCC, Subject/Title, Original Source, Native Path, File Extension, File Name, File Size, Full Text, and page count.

g.    Spreadsheets.  For spreadsheets that were originally created using common, off-the-shelf software (*e.g.*, Microsoft Excel), produce the spreadsheets in native format and, in addition, in TIFF format. Native file Documents must be named per the Beginning Bates Number. The full path of the native file must be provided in the .dat file.

12.    Hard copy Documents shall be produced as follows:

a.    TIFFs. Black and white images shall be delivered as single page Group IV TIFF image files. Color images must be produced in .jpeg format. Image file names should not contain spaces or special characters and must have a unique file name, *i.e.*, Beginning Bates Number. Images must be endorsed with sequential Bates numbers in the lower right corner of each image.

b.    Unique IDs. Each image should have a unique file name and should be named with the Bates number assigned to it.

c.    OCR. High-quality document level OCR text files should be provided in a separate folder, one text file per document. Each text file should match the respective TIFF filename (Beginning Bates Number). For redacted Documents, provide the re-OCR'd version.

d.    Database Load Files/Cross-Reference Files. Records should be provided in a format compatible with the following industry standards.

- The image cross-reference file to link the images to the database should be a comma-delimited file with a line in the cross-reference file for every image in the database.

- The data file (.dat) should contain all the fielded information that will be loaded into the database.

- The first line of the .dat file must be a header row identifying the field names.

- The .date file must use the following *Concordance* default delimiters:
  Comma      ¶      ASCII      character      (020)
  Quote þ ASCII character (254)

- Date Fields should be provided in the format mm/dd/yyyy.

- Date and time fields must be two separate fields.

- If the production includes imaged emails and attachments, the attachment fields must be included to preserve the parent/child relationship between an email and its attachments.

- An OCRPATH field must be included to provide the file path name of the extracted text file(s).

- Each text file must be named after the Beginning Bates Number.

- For production with native files, a NATIVELINK field must be included in the .dat file to provide the file path and name of the native file being produced.

- Beginning Bates Number and Ending Bates Number should be two separate fields.

  e.  Unitizing of Records.  In scanning hard copy records, distinct records should not be merged into a single record, and single records, should not be split into multiple records (*i.e.*, hard copy records should be logically unitized).

  f.  Parent-Child Relationships.  Parent-child relationships (the association between an attachment and its parent record) should be preserved.

  g.  Objective Coding Fields.  The following objective coding fields should be provided:  Beginning Bates Number, Ending Bates Number, Beginning Attachment Number, Ending Attachment Number, Source-Custodian, and page count.

  13.  These Documents Requests are continuing in nature.  If any information or Document responsive to a Document Request herein is not presently in Your possession, custody, or control but subsequently becomes available, is discovered or is created, or comes into Your possession, custody, or control, You have a continuing obligation pursuant to Fed. R. Civ. P. 26(e), and are hereby requested, to supplement Your responses to these Interrogatories and Document Requests within a reasonable period of time after it comes into Your possession, custody, or control.

## RELEVANT TIME PERIOD

Unless otherwise specified, the relevant time period for these requests is January 1, 2014 to the present.

## DOCUMENT REQUESTS

### REQUEST NO. 1.

All Documents that You have produced or received in connection with discovery or disclosure in (1) these Title III Proceedings, including any adversary proceedings filed in any of the Title III Proceedings; (2) *Leon v. Rosselló-Nevares*, Civil No. SJ2017cv00107; (3) *Bhatia Gautier v. Rosselló-Nevares*, Civil No. SJ2017cv00271; (4) *Centro de Periodismo Investigativo v. Rosselló-Nevares*, Civil No. SJ2017cv00396; and (5) the Comprehensive Investigation.

### REQUEST NO. 2.

All records of testimony (whether in the form of notes, transcript, or other format) that You have produced or received in connection with discovery or disclosure in (1) these Title III Proceedings, including any adversary proceedings filed in any of the Title III Proceedings, (2) *Leon v. Rosselló-Nevares*, Civil No. SJ2017cv00107; (3) *Bhatia Gautier v. Rosselló-Nevares*, Civil No. SJ2017cv00271; (4) *Centro de Periodismo Investigativo v. Rosselló-Nevares*, Civil No. SJ2017cv00396; and (5) the Comprehensive Investigation.

### REQUEST NO. 3.

All Documents You produced to any federal agency, including but not limited to the United States Securities and Exchange Commission, the Department of the Treasury, or any law enforcement agency, relating to (1) any debt issued by the Territorial Government, (2) the fiscal situation of the Territorial Government, or (3) PROMESA, its development and its implementation.   This Request explicitly includes Documents provided by the prior

administration, and it includes documents provided as part of both civil and criminal investigations.

**REQUEST NO. 4.**

All Documents You provided to or Communications You had with any member of the Congress of the United States relating to (1) the fiscal situation of the Territorial Government, (2) any efforts to restructure any debt issued by the Territorial Government, or (3) PROMESA and its implementation. This Request explicitly includes Documents provided or Communications by any Person affiliated with the prior administration.

**REQUEST NO. 5.**

Minutes or notes of any meeting of the FOMB, or any committee subcommittee thereof, whether in public or in executive session, that are not posted on the FOMB's website.

**REQUEST NO. 6.**

A revised version of the Fiscal Plan, which incorporates the Oversight Board's conditions for certification contained in the March 13 Resolution.

**REQUEST NO. 7.**

To the extent that it differs from the Fiscal Plan produced in response to the prior Request, a complete version of any Fiscal Plan (including the CU Rollup) that forms the basis for the *Assured* Motion, the *Peaje* Opposition, the *PREPA* Opposition, or the August 4 Letter. This Request encompasses functional versions (in native format) of any embedded Excel charts and any underlying data.

**REQUEST NO. 8.**

To the extent that the Fiscal Plan produced in response to Request No. 7 does not incorporate or reflect any amendments required by March 13 Resolution, any Documents,

Communications or analysis concerning how incorporating such amendments would impact the assertions made in the *Assured* Motion, the *Peaje* Opposition, or the *PREPA* Opposition.

**REQUEST NO. 9.**

Documents, Communications, or analysis regarding the Budget and any drafts thereof. This Request explicitly includes, but is not limited to, (1)  a complete copy of the Budget in native form; (2) any analysis or description of any undefined category of expenses that is not reflected in Puerto Rico's historic financial statements (*e.g.*, "concepto de gasto" and "asignaciones englobadas"), and (3) the intended use of the Dedicated Sales Tax.  This Request explicitly includes any breakdown of the "concepto de gasto" or Dedicated Sales Tax used (if any) by agency, department or component unit of the government.  This Request also includes a fully functional model (in native format) used to calculate any Budget line item as well as any backup or linked spreadsheets and all data run through that model.

**REQUEST NO. 10.**

A fully functional version of the macroeconomic growth model (in native format) used to calculate each forward-looking projection contained in the Fiscal Plan (as incorporated in the *Assured* Motion, the *Peaje* Opposition, *PREPA* Opposition, or the August 4 Letter), any prior proposed fiscal plan as well as the presentation known as the *Technical Meeting Discussion Materials* (which was presented by the prior administration on November 16, 2017), in the *Revised Baseline Projections* (which was presented by the prior administration on December 20, 2016), and the document provided by the Commonwealth titled "PR_Macroframework methodology.pdf".  For any expense or revenue line items in the Fiscal Plan that do not grow at the rate of nominal GNP, this request explicitly includes Documents demonstrating or relating to how those growth rates are derived.

18

**REQUEST NO. 11.**

Any projections, including both underlying data and models (in native format), regarding macroeconomic growth between 2026 and the projected maturity of any proposed restructured obligation.  See, *e.g.*, FOMB, *Annual Report: Fiscal Year 2017*, *supra* at 6 (referencing a "50-year long-term projection using the [Fiscal Plan] as a starting point"); March 9, 2017 Letter at 2 (describing February 28, 2017 proposed Fiscal Plan as too optimistic with respect to "a) economic growth rates and the time to return to nominal economic growth; and, b) the failure to reflect near-certain declines in baseline revenues associated with corporate taxes and non-resident withholding taxes"); GO/COFINA Title VI proposal made public by the Commonwealth on April 28, 2017 at 4 (term sheet proposes a 30-year restructured bond subject to "optional amortization…sized based on Fiscal Plan forecast").  This Request explicitly including any backup or linked spreadsheets (in native format) and all data run through any piece of these model(s).

**REQUEST NO. 12.**

Documents, Communications, analyses or models relating to the Fiscal Plan including the assumptions used in formulating the Fiscal Plan (including the CU Rollup) or August 4 Letter, including, but not limited to (1) the fiscal multiplier used to calculate the impact that proposed revenue and expense measures are expected to have on the Puerto Rico economy, (2) inflation assumptions, and (3) estimated population change between FY 2018 and FY 2026, (4) the size and timing of the impact of structural reforms, (5) flat productivity level,  (6) flat labor force participation rate, and (7) electricity rate assumptions.  This Request explicitly includes a fully functional version of any model (in native format) used to test these assumptions including any backup or linked spreadsheets in live form and all data run through those models.

**REQUEST NO. 13.**

Documents, Communications, analyses or models relating to any proposed revenue and expense measures discussed in the Fiscal Plan (including CU Rollup), the *Assured* Motion, the *Peaje* Opposition, the *PREPA* Opposition, the Budget, or the August 4 Letter.  This Request explicitly includes any analyses, projections or models (in native format) concerning the impact of any financial control reforms proposed by the Territorial Government, including the reforms discussed in the Fiscal Plan at 34-38, or referenced in the August 4 Letter.

**REQUEST NO. 14.**

To the extent not produced in response to any prior Request, any sensitivity analyses that measure the impact of growth initiatives, capital expenditures, or proposed Public Private Partnerships including those discussed on page 24 of the Fiscal Plan and recommendations included in Congressional Task Force on Economic Growth in Puerto Rico, Report to the House and Senate (Dec. 20, 2016) and those discussed on Inventario de Propuestas de Proyectors Prioritarios 2017 (May 11, 2017).  This Request explicitly includes a fully functional version of any model (in native format) used to conduct these sensitivity analyses including any backup or linked spreadsheets and all data run through those models.

**REQUEST NO. 15.**

To the extent not provided in response to any prior Request, any analyses, including models (in native format) and data, regarding the creditworthiness of the Territorial Government, including but not limited to any financial modeling, evaluation or analysis of (1) the economic condition, economic activity, and economic performance of the Territorial Government, or (2) how the amounts available for debt service proposed on page 8 of the Fiscal Plan, the *Assured* Motion, the *Peaje* Opposition, the *PREPA* Opposition, the Budget, or the August 4,

Letter, will, if implemented, affect Puerto Rico's future ability to access the capital markets as required by PROMESA § 201(b)(1). To the extent that any model(s) were used to estimate the impact that the proposed haircut reflected in the Fiscal Plan will have on future market access, this Request explicitly includes any backup or linked spreadsheets (in native format) and all data run through any piece of these model(s).

## REQUEST NO. 16.

To the extent not provided in response to any prior Request, Documents and Communications concerning benchmarking analyses You used to create the Fiscal Plan or assess the reasonableness thereof. This Request explicitly includes, but not limited to, any analyses comparing Puerto Rico's debt situation to that of other economies that were relied upon in determining what would be a sustainable debt load (*cf.* Fiscal Plan at 27-29), including Documents sufficient to identify any comparable economies considered.

## REQUEST NO. 17.

Documents, Communications, analyses or models relating to the Bridge, including the "five versions of the Bridge submitted in the last four weeks, with adjustments amounting to hundreds of millions of dollars" referenced on page 23 of the Bridge Analysis. This Request explicitly includes a fully functional version of any model (in native format) used in creating the Bridge or Bridge Analysis as well as any backup or linked spreadsheets and all data run through those models.

## REQUEST NO. 18.

Documents, Communications, analyses or models relating to the request to amend the Fiscal Plan in the letter from Gerald J. Portela Franco, Executive Director of AAFAF, to Natalie A. Jaresko, Executive Director of the FOMB, on May 31, 2017.

**REQUEST NO. 19.**

All Documents provided to Ernst & Young in connection with its preparation of the Bridge Analysis.

**REQUEST NO. 20.**

All Documents provided to KPMG in connection with its preparation of the *Commonwealth of Puerto Rico Tax Reform Assessment Project* (2014). For this request, the relevant time period should be construed to mean January 1, 2013 to the date of publication.

**REQUEST NO. 21.**

Documents provided to Anne O. Kruger, Ranjit Teja, Andrew Wolfe, or any individual who participated in the preparation of *Puerto Rico – A Way Forward* (2015), commonly known as the "Krueger Report," during the Relevant Time Period, regardless of when those Documents were created. The Krueger Report shall refer to the initial report released on June 29, 2015 and the updated report released on July 13, 2015.

**REQUEST NO. 22.**

All Documents provided to Conway MacKenzie during the Relevant Time Period, regardless of when those Documents were created, including but not limited to documents provided in connection with its work to prepare fiscal projections contained in the presentation entitled *Technical Meeting Discussion Materials* (Nov. 16, 2016), and in connection with its recent retention by AAFAF for consulting services related to Office of the Chief Financial Officer.

**REQUEST NO. 23.**

All Documents provided to Pension Trustee Advisors during the Relevant Time Period regardless of when those Documents were created, including but not limited to documents

provided in connection with (1) any actuarial assessment performed on a public pension system maintained by the Territorial Government; (2) any review of the existing public pension system benefits and their sustainability; and (3) related proposed reforms of such pension systems.

**REQUEST NO. 24.**

To the extent that it is not already produced in response to any prior Request, any Documents considered by or any analysis, reports, or recommendations from experts or consultants analyzing the Territorial Government's fiscal situation since January 1, 2014, including but not limited to Tyler Duvall, Andrew Wolfe, Sergio L. Gonzalez, Jonathan I. Arnold, Bradley R. Bobroff, Kevin Lavin, William B. Fornia, Rafael Romeu, and any employee of or contractor with DevTech Systems, Inc.

**REQUEST NO. 25.**

Documents and Communications concerning the assets of the Commonwealth, including Documents and Communications concerning: (1) estimates of the aggregate book and market value of government and public enterprise-owned land and real estate (register of government owned property); (2) break-outs of assumed revenues and/or cash inflows from privatizations and P3s in the Fiscal Plan; and (3) any additional analyses performed on potential privatizations and P3s.

**REQUEST NO. 26.**

For any revenue line item in the Fiscal Plan (as incorporated into the *Peaje* Opposition *PREPA* Opposition *or* Budget, *see* August 4 Letter at 3) that does not grow at the rate of GNP (see Fiscal Plan at 10), Documents sufficient to identify how these growth rates are derived, including any supporting indices upon which You or Your agents (including any experts) relied.

**REQUEST NO. 27.**

Documents, Communications or analyses used to reconcile the special revenue funds considered in the Bridge or Bridge Analysis (see for example Bridge Analysis at 11, 18, 28) to special revenue funds discussed in the Fiscal Plan (at 12, 15).

**REQUEST NO. 28.**

Documents, Communications, or analyses relating to the estimated collections and collection rates on all local revenue streams cited in the Fiscal Plan at pages 11 and 19, relied upon in formulating the Budget, and all Documents and Communications concerning: (1) the income tax collection rate; (2) the excise tax collection rate; (3) sales and use tax collection rate; (4) property tax collection rates; (5) other tax collection rates; and ( 6) assumptions and analysis behind Act 154 revenues.  This Request explicitly includes a fully functional version of any backup or linked spreadsheets and all data used to create the Budget.

**REQUEST NO. 29.**

To the extent not produced in response to Request No. 28, Documents and Communications concerning the assumed tax collections in the Fiscal Plan, including the McKinsey tax benchmarking analysis referenced in Your Diligence Responses, and all Documents and Communications concerning: (1) the income tax collection rate; (2) the excise tax collection rate; (3) sales and use tax collection rates; (4) property tax collection rates; (5) other tax collection rates;  (6) assumptions and analysis behind Act 154 revenues; and (7) any comparisons between assumed or projected revenues and actual revenues (including revenues from tax collections).

**REQUEST NO. 30.**

Documents sufficient to ascertain the status and treatment of any taxes collected on behalf of municipalities by the central government of Puerto Rico, including sales and use taxes and property taxes.

**REQUEST NO. 31.**

Documents or Communications relating to the assertion in the *Assured* Motion (at 3) that the FOMB "constantly strives to find ways to generate more money for . . . creditors." This Request explicitly includes any Communications, Documents, or analyses regarding potential changes to the tax code in response to Puerto Rico's current fiscal crisis, including but not limited to Documents relating to reassessing real estate property valuations for the first time since 1958, increasing property tax rates to the levels proposed in the February 29, 2017 version of the Fiscal Plan (at 48), extending Act 154, reassessing any tax incentives or abatements, transitioning the Commonwealth sales and use tax to a broad-based value added tax, or amendments to Law 20/22 incentives passed on July 11, 2017.

**REQUEST NO. 32.**

Documents, Communications, analyses or models (in native format) regarding the Report on Discretionary Tax Abatement Agreements that the Governor was required to submit to the FOMB within six months of the establishment of the FOMB, by PROMESA § 208, 48 U.S.C. § 2148, and which was referenced in FOMB, *Annual Report: Fiscal Year 2017* 6 (July 31, 2017).

**REQUEST NO. 33.**

Documents, Communications, analyses or models (in native format) relating to anticipated revenues relating to health care. This Request explicitly includes any assumptions, models, or data used to project anticipated federal transfers, returns from any Commonwealth-

run medical facility, public corporation or municipal employer or employee contributions, or Commonwealth Fund collections.

**REQUEST NO. 34.**

Documents, Communications or analyses reflecting how the Fiscal Plan and Budget reflect any actual or projected federal transfer allotted to Puerto Rico for use in its Medicaid program, including but not limited to the $295.9 million allotment passed  by Congress on or about May 1, 2017, and any potential allotment proposed by the President in the fiscal year 2018 federal budget.

**REQUEST NO. 35.**

Documents, Communications or analyses regarding historical reimbursements from the Center for Medicare and Medicaid Services.

**REQUEST NO. 36.**

A fully functional version of any model (in native format) used by the Territorial Government or Ernst & Young to "normalize" expenses so that they could be compared across years in the Bridge or Bridge Analysis, which was used to calculate the baseline of expenses in the Fiscal Plan and incorporated into the Budget.  *See* August 4 Letter at 3.  This Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s).

**REQUEST NO. 37.**

Documents, Communications, analyses or models (in native format) relating to the FOMB's "recommendation" in the March 9 Letter (at 2) that Fiscal Year 2017 expenses be increased by $585 million, including the type and amount of "historical expenditures" in Fiscal Year 2014-2016 that Ernst & Young discusses on page 13 of the Bridge Analysis.  This Request

explicitly includes any Communications regarding whether that "recommendation" was ever put into effect.

## REQUEST NO. 38.

A fully functional model or workbook (in native format) showing how the Reconciliation Adjustment discussed on page 15 of the Fiscal Plan was calculated, and any analysis, Documents, or Communications regarding how that Reconciliation Adjustment is reflected in the Budget. To the extent that You maintain that the Reconciliation Adjustment existed, in sum or substance, in earlier budgets or fiscal plans, this Request explicitly includes all Documents, Communications or analyses relating to such Reconciliation Adjustments. This Request also explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s). To the extent that You maintain that the Reconciliation Adjustment accounts for previous overspending on the part of the Territorial Government, this Request also includes any backup data or analyses of how that money was used.

## REQUEST NO. 39.

Documents, Communications, analyses or models (in native format) regarding the meaning of the term "essential services" in the Fiscal Plan or the Budget. To the extent that a model or model(s) was used to estimate the cost of "essential services," this Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s). This Request also includes any Document, Communication, analyses, or assumptions regarding the number of inhabitants who will use or receive such "essential services" during the Fiscal Year 2018 to Fiscal Year 2026 period.

**REQUEST NO. 40.**

Documents, Communications, analyses or models (in native format) that form the basis for Your statement in the *Assured* Motion that the Commonwealth could not provide "necessary services to the people of Puerto Rico . . . while still honoring all its commitments to creditors." To the extent that a model or model(s) was used to estimate the cost of "essential services," this Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s).

**REQUEST NO. 41.**

Documents, Communications, analysis or models (in native format) relating to the extent to which individuals who receive transfer payments from the Territorial Government, including but not limited to debt service payments (whether received directly or indirectly), health care benefits and payments from the Territorial Government's pension programs, are misclassified and/or reside or are employed outside the Commonwealth.

**REQUEST NO. 42.**

Documents, Communications, analyses or models (in native format) relating to the calculation of the "other non-recurring" expenses projected on page 12 of the Fiscal Plan and incorporated in the Budget, including a fully functional version of any model used. This Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s). *See, e.g.*, Reserva para Reintegro, Ingresos Netos Al Fondo General, Año Fiscal 2015 - 2016 - Fiscal Year 2016 - 2017 (reflecting $480m deduction from "gross" general fund revenues to the "reported" general fund revenues), *available at* http://www.hacienda.gobierno.pr/sites/default/files/ingresos_netos_junio_2016-17.pdf.

**REQUEST NO. 43.**

Documents, Communications, analyses or models (in native format) relating to any government "right sizing" expense measures cited on page 15, 18 and 20 of the Fiscal Plan; or reflected in the Budget; discussed in a presentation regarding the Budget, which was held  on June 30, 2017; discussed at the meeting of the FOMB, which was held on August 4, 2017; or referenced in the August 4 Letter.  This request explicitly includes any Documents, Communications, analyses, or models regarding the historic and projected number of employees employed in each agency, instrumentality, or component unit of Puerto Rico as well as the governor's decision not to (1) adjust the size of the public work force in light of a declining population requiring government services and the privatization of government services, *see, e.g.*, Press Release, Government Denies Statistics On Temporary Jobs And Ensures No Layoffs (July 13, 2017) ("Our government has not laid off public employees, nor will it do so, according to the commitment of the governor."), (2) implement the furlough program required by the FOMB, see generally August 4 Letter.  To the extent that a model was used in calculating this line item in the Fiscal Plan, a fully functional version of that model (in native format) should be provided.  This Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s).

**REQUEST NO. 44.**

Documents sufficient to identify the total number of permanent employees, temporary hires, subcontractors and consultants, of the Territorial Government.  This information should be provided by department or instrumentality.  To the extent that You have information regarding the number of employees of municipalities, this Request explicitly includes such information. The time period for this Request is 2000 to the present.

**REQUEST NO. 45.**

Documents sufficient to identify any trade creditors who have been paid or taxpayers who have received refunds since the passage of PROMESA.  This Request explicitly includes Documents sufficient to identify whether those trade creditors possessed a lien over the funds used to pay them.

**REQUEST NO. 46.**

Any non-privileged Documents, analyses or Communications that reflect Your basis for stating, "No podemos considerar el reintegro de un contribuyente como una deuda del gobierno con un acreedor."  House Bill 1135.

**REQUEST NO. 47.**

Documents sufficient to identify the amounts, origin, and historical use of any budgetary reserve, including but not limited to, the "Fondo Presupuestario", the "Reserva Presupuestaria" and any emergency, contingency, or tax refund reserve.  *See, e.g.*, http://www.hacienda.gobierno.pr/sites/default/files/Inversionistas/ingresos_netos_junio_2015-16_ingresos_netos_junio_2015-16_0.pdf/.  This Request explicitly includes any Documents, Communications, analyses or models (in native format) that demonstrate why payment of any tax refunds from the General Fund is necessary in light of the existence of such reserves.

**REQUEST NO. 48.**

Documents sufficient to disaggregate expenses associated with the Territorial Government's various pension systems, including a breakdown of expenses associated with (1) defined benefit rather than defined contribution accounts; (2) base benefits rather than system administered benefits; (3) retirees rather than active employees; and (4) any "catch up" expenses accrued before the passage of PROMESA rather than ongoing costs of the programs.  *See, e.g.*,

Fiscal Plan at 22; Act 2013-3. With regard to the Employment Retirement System, which covers multiple sponsoring employers, this Request explicitly includes information that tracks each sponsoring employer to the pension expenses for which it is responsible.

## REQUEST NO. 49.

Documents, Communications, analyses or models (in native format) regarding the potential impact of the pension reforms discussed in the FOMB, Explanatory Memorandum on Pension Reform (Aug. 4, 2017), or Senate Bill 603, which was signed into law on August 23, 2017, if implemented on (1) the Territorial Government's fiscal situation, (2) compliance with the Fiscal Plan; or (3) projected recoveries of holders of general obligation debt issued or guaranteed by the Commonwealth.

## REQUEST NO. 50.

Documents, Communications, analyses or models (in native format) regarding expenses relating to health care, including but not limited to:

1. Detailed breakdowns of MCO and TPA disbursements per year, including by use, number of beneficiaries, and assumptions regarding eligibility and level of service provided;

2. Detail and build-up for eligibility, benefits, and pricing requirements imposed under federal programs, including Medicare, Medicaid, and the ACA;

3. Any models used to estimate healthcare expense growth rates (to the extent not already produced in response to Request 9);

4. Any supporting healthcare cost indices (*see* March 9 Letter at 3-4);

5. Efforts to control health care expenses (Fiscal Plan at 20);

6. Initiatives to eliminate waste in the healthcare system (*see, e.g.*, "Areas for possible cuts in Health identified," EL VOCERO (Feb. 2, 2017);

7. And any assumptions made regarding enrollment in light of projected population declines.

To the extent that any model(s) were used to estimate the growth in health care expenses, this Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s).

**REQUEST NO. 51.**

Communications, Documents, or analysis regarding how deficits relating to health care are accounted for in the Fiscal Plan or the Budget. To the extent that any model(s) were used to estimate these deficits, this Request explicitly includes any backup or linked spreadsheets and all data run through any piece of these model(s).

**REQUEST NO. 52.**

Documents, Communications, analyses or models (in native format) regarding (1) any budget cuts identified by the Territorial Government that it can or will take if funding provided by the Affordable Care Act is not replaced; and (2) discussions with any representative of the federal government regarding replacement of the funding in the Affordable Care Act or a policy known as healthcare "parity".

**REQUEST NO. 53.**

Documents relating to the FOMB's request for "Amendment No. 1: Furlough and Christmas Bonus Amendment to the Commonwealth's Proposed Fiscal Plan," in the March 13 Resolution, which required a furlough program rather than a reduction in the government work force.

**REQUEST NO. 54.**

Documents relating to the FOMB's request for "Amendment No. 2: Pension Amendment to the Commonwealth's Proposed Fiscal Plan" the March 13 Resolution, which required certain alterations to the treatment of pension plans under the Fiscal Plan. This Request explicitly includes, but is not limited to, both the basis for the Board's request and any Documents, Communications, or analyses relating to the "system overhaul [that was] to be formulated by the Commonwealth and the Board on or before June 30, 2017." See March 13 Resolution at 4.

**REQUEST NO. 55.**

Documents sufficient to identify the source of and efforts to control substantial projected deficits at Puerto Rico's instrumentalities and component units as projected on page 12 and discussed on page 15 of the Fiscal Plan, as well as the Fiscal Plan recently certified by any instrumentality of the Territorial Government. This Request explicitly includes any analysis regarding (1) how further efforts to such substantial projected deficits would impact the analysis of Andrew Wolfe cited in and incorporated by the *Peaje* Opposition or *PREPA* Opposition, and (2) any analysis of the impact of any revenue or expense measures contemplated by the certified fiscal plan of any unit or instrumentality of the Territorial Government.

**REQUEST NO. 56.**

Documents, Communications, or analyses regarding how actual expenses differ from budgeted expenses, including but not limited to, Documents sufficient to identify the source of and efforts to control cash disbursements for supplier payables and other expenses, which are over and above the original budget for the particular Fiscal Year in which the disbursements are made. This Request explicitly includes any document describing the process by which (and the legal basis on which) such payments are made as well as any budget-to-actual reports provided

to the FOMB and any budget-to-actual reports prepared for the FOMB since the passage of PROMESA.

**REQUEST NO. 57.**

Documents, Communications, analyses or models relating to the Territorial Government's liquidity position and cash balances, including but not limited to Documents and Communications concerning (1) the location and proof of such cash balances, (2) the uses of clawback revenue since 2015, (3) the basis for the demands to improve the Commonwealth's liquidity, as discussed in Chairman Carrion's March 8, 2017 letter to Governor Rosselló; (4) source and intended use of the funds reflected in the document tiled "Puerto Rico Treasury Department Treasury Single Account (TSA) Cash Flow Current-to-Forecast Comparison," which was dated May 26, 2017; and (5) source and intended use of the funds reflected in the announcement on August 3, 2017, that the Territorial Government had $1.799 billion cash on hand; and (6) any efforts to investigate further pockets of liquidity in light of the statement by Elias Gutierrez that "I do not rule out there being a lot of money which has [been] lost, since information systems are flawed and there are no ways to reflect anything. God knows what other surprises will be revealed."[3]  To the extent that any model(s) were used to estimate the needs for a liquidity reserve of any sort, this Request explicitly includes any backup or linked spreadsheets (in native format) and all data run through any piece of these model(s).  This Request also includes the intended use of any reserves incorporated in the Budget and the impact of such reserves on Andrew Wolfe's conclusions as cited by or incorporated in the *Peaje* Opposition.

---

[3] Illeanexis Vera Rosado, *Another $395 Million in Government Accounts*, El Vocero (June 15, 2017).

**REQUEST NO. 58.**

Documents, Communications analyses, or models (in native format) relating to any subsidies provided to the University of Puerto Rico, municipalities or other entities, including those discussed on pages 45-48 of the February 28, 2017 version of the Fiscal Plan.  To the extent that the Territorial Government intends to replace such subsidies through indirect means (e.g., changing property taxes, municipal licensing fees, etc.), this Request explicitly includes Documents relating to those efforts.  To the extent that any model(s) were used to estimate the need for these subsidies or the effect that reducing such subsidies will impact economic growth, this Request explicitly includes any backup or linked spreadsheets (in native format) and all data run through any piece of these model(s).  To the extent these subsidies are maintained, this Request also includes any analysis regarding how such subsidies are reflected in the positions taken in the *Assured* Motion and *Peaje* Opposition.

**REQUEST NO. 59.**

To the extent not produced in response to any prior Request, Documents, Communications, analyses, or models (in native format) relating to the continued need for such subsidies to municipalities.  This Request explicitly includes any information regarding the number of municipalities, population of those municipalities, services provided by such municipalities, and employees hired to provide services to those municipalities.  The time period for this Request shall be 2000 to the present.

**REQUEST NO. 60.**

Documents, Communications, analyses or models (in native format) relating to any contemplated P3s, including but not limited to the intended uses of the $38 million appropriated to the Public Private Partnerships Authority.  This Request explicitly includes the nature and cost

of any P3s that have been identified since June 13, 2017, when counsel for AAFAF and the FOMB represented that "[n]o specific public private partnerships are currently being negotiated."

**REQUEST NO. 61.**

Documents, Communications or analyses breaking down any non-publicly traded loans or other debt issued by any element of the Territorial Government and any contingent liabilities recognized for payment on explicit or implicit guarantees by the Commonwealth on debt issued by any other part of the Territorial Government from FY 2008 to the present.

**REQUEST NO. 62.**

To the extent not produced in response to any prior request, Documents, Communications or analyses relating to proposed capital expenditures of the Territorial Government included in the Fiscal Plan or the FY 2018 budget, including but not limited to the "Compra de Equipo" and "Inversión en Mejoras Permanentes" categories in the FY 2018 budget, that might impact the positions taken in the *Peaje* Opposition and *PREPA* Opposition as well as Documents provided by the prior administration.

**REQUEST NO. 63.**

Documents, Communications or analyses regarding any obligations between the Territorial Government and the GDB—including, but not limited to the historical amounts and present status of any funds held by the GDB on behalf of the Territorial Government—and the intended treatment of such obligations under the GDB RSA.  This Request explicitly includes any analyses regarding how any write-off, write-down, or other impairment of any obligation owed to the Commonwealth in the GDB RSA comports with the analysis of Dr. Andrew Wolfe as cited by and incorporated in the *Peaje* Opposition or the *PREPA* Opposition.  This Request

also includes the division of assets between the New Issuer and the Public Entity Trust in the GDB RSA.

**REQUEST NO. 64.**

Documents and Communications between the Commonwealth and financial institutions regarding the deposit or withdrawal of funds belonging to the Territorial Government, including but not limited to clawback revenues, special property tax related funds, PBA related funds, SUT related funds or COFINA-related Funds.

**REQUEST NO. 65.**

Documents, Communications, analyses or models (in native format) relating to the GDB Municipal Loan portfolio, including but not limited to (1) any valuation of the portfolio, (2) loan and deposit agreements, (3) current loan balances, and (4) Documents identifying the source of repayment for SUT-backed GDB Municipality loans, as that term is used in the GDB RSA and associated Documents released on February 28, 2017.   This Request includes Documents sufficient to identify how SUT flowing to municipalities (if any) in excess of municipal loan debt service is distributed or spent.

**REQUEST NO. 66.**

Documents, Communications or analysis projecting the impact of the FOMB's rejection of the PREPA RSA or the certification of fiscal plans of any territorial instrumentalities on (1) other aspects of the Territorial Government, including but not limited to the General Fund, or (2) the expected recoveries of any creditor of the Territorial Government.   To the extent that any certified fiscal plan of any territorial instrumentality contemplates the write-off, write-down, or other impairment of any obligation to the Commonwealth, this Request includes any analysis of

such impairment on any position taken in the *Assured* Motion, *Peaje* Opposition, or *PREPA*
Opposition.

## REQUEST NO. 67.

Documents sufficient to identify any participation by or ownership interest of any
member of the FOMB in any bond issued by any part of the Territorial Government.

## REQUEST NO. 68.

Documents sufficient to identify any interest (financial or otherwise) or any other
relationship that any member of the FOMB, including the Governor's ex officio
representative(s), has or had in any creditor or vendor of the Territorial Government during the
Relevant Time Period.

## REQUEST NO. 69.

Documents sufficient to identify any interest (financial or otherwise) that any member of
the FOMB has in any financial institution insured by the Corporación Pública para Supervisión y
Seguro de Cooperativas de. Puerto Rico, frequently known as "COSSEC."

## REQUEST NO. 70.

Documents sufficient to identify any benefits, perquisites, or emoluments (in whatever
form) received by any member of the FOMB as a result of such membership.  This Request
includes any benefits, perquisites or emoluments provided to a Board member's immediate
family.

## REQUEST NO. 71.

To the extent not produced in response to prior Requests, all Documents,
Communications, or analyses concerning whether the Commonwealth's "available resources are
insufficient" to pay Constitutional Debt, including any and all Documents that were incorporated

into or formed the basis of any position taken in the *Peaje* Opposition.  *E.g.*, *Peaje* Opposition at 33 ("As explained by Andrew Wolfe, the CW Fiscal Plan projects real economic growth of 1.01% after 10 years, which would be sufficient to sustain growth and enable Puerto Rico to regain access to capital markets.").