# EXHIBIT A

June 2, 2017

***Via Mail and E-mail***

John J. Rapisardi                                           Martin J. Bienenstock
O'Melveny & Myers LLP                              Proskauer Rose LLP
Time Square Tower                                        Eleven Time Square
7 Times Square                                              New York, NY  10036
New York, NY  10036

Re: *In re Commonwealth of Puerto Rico*, No. 17-cv-01578 (D.P.R)

Dear Mr. Rapisardi and Mr. Bienenstock:

We write on behalf of the Ad Hoc Group of Puerto Rico General Obligation Bondholders (the "GO Group") and Assured Guaranty Corp. and Assured Guaranty Municipal Corp. ("Assured"), to request that the Commonwealth and Oversight Board promptly produce all documents and materials that underlie or relate to the March 13, 2017, Fiscal Plan, as amended, for Puerto Rico ("Fiscal Plan"), and the Oversight Board's approval of that Plan.[1]

We plainly are entitled to this information.  If the Commonwealth and the Oversight Board are genuine in their stated intention to negotiate a consensual resolution even as the Title III action is pending, the materials we request will be integral to that process.  The materials are relevant because according to PROMESA, any plan of restructuring must be "consistent with" the Fiscal Plan.  PROMESA § 314(b)(7), 48 U.S.C. § 2174(b)(7).  But without the ability to examine and consider the bases for the Fiscal Plan—which does not comply with the requirements of PROMESA, and about which we have expressed substantial concerns—the GO Group, Assured, and other creditor groups will not be in a position to determine whether any portion of the current Fiscal Plan is acceptable.

Moreover, in a contested confirmation, we would have the right to object to the proposed plan for not "compl[ying] with the provisions of" of PROMESA because it fails to respect the GO Group's and Assured's first lien on and first priority claim to all "available resources," *id.* § 314(b)(2); not being "in the best interests of creditors," *id.* § 314(b)(6); and not being "fair and equitable" under the circumstances, or discriminating unfairly.  11 U.S.C. § 1129(b)(1).  Again, if the Commonwealth and Oversight Board are genuine in their stated intention to negotiate a consensual resolution even as the Title III action is pending, we must have complete transparency as to the underlying bases for any proposed plan of adjustment, and an open dialogue as to any possible revisions.

---

[1] Unless otherwise specified, all page numbers correspond to the version of the Fiscal Plan filed with the Court as Exhibit A to Title III Petition for Covered Territory or Covered Instrumentality, *In re Commonwealth of Puerto Rico*, No. 3:17-cv-01578 (May 3, 2017).

In recognition of these rights, Bankruptcy Rule 2004 broadly permits discovery into any matter regarding the "nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); *see also In re Washington Mutual, Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) ("[T]he right to object to immaterial or improper questions is limited."). Indeed, although our requests are carefully tailored to information that it relevant to the Tile III proceeding, Rule 2014's scope is expansive. *See In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002).[2]

Despite multiple requests made on behalf of our clients (including in a letter sent by both the GO Group and Assured on March 27; in follow-up letters by Assured on April 5, 2017 and April 27, 2017; in a written due diligence request sent by the GO Group on April 7, 2017; and via oral communications by the GO Group on April 6 and April 25, 2017), however, almost none of this information has been provided.[3]  At the May 17, 2017 hearing, Mr. Rapisardi insisted that "a very extensive effort went into preparing a data room of thousands of pages of documents." May 17, 2017 Hearing Tr. at 145.  In fact, the data room contains only around 50 documents, which consist largely of hardcoded spreadsheets that hide from creditors and their advisors the actual models used to create the Fiscal Plan.  To the extent the Commonwealth has posted live models to the data room, these models were not accompanied by the backup files, schedules, and assumptions underlying those models.  And contrary to Mr. Rapisardi's suggestion, the data room omits the most basic documents required to understand the assumptions and projections underlying the Fiscal Plan, including categories of information that we have repeatedly requested.  Such a lack of transparency by the debtor is not permitted under the law, and could not be what Judge Swain had in mind when she directed that you submit a status report on this issue by mid-June.  May 17 Tr. at 147.

We are prepared to invoke our rights to formal discovery pursuant to Federal Rules of Bankruptcy Procedure 2004, 7026-37 and 9014.  But in the spirit of cooperation that counsel for all parties pledged to pursue during the May 17 hearing, we thought it best in the first instance simply to send you this letter request.  So, without prejudice to our rights to propound further formal and informal discovery, we ask that you produce each of the following materials on or before June 12, 2017.  All of these materials were, or should have been, considered as part of formulating the Fiscal Plan, and thus should be readily accessible to you.  If you decline for any reason to produce any responsive documents, please state the basis for your position.

---

[2]   The Bankruptcy Rules are fully applicable to any action under Title III.  PROMESA § 310, 48 U.S.C. § 2170.

[3]   While the Commonwealth did provide additional material on or around April 11, 2017 that was responsive to certain of our requests, this information was unusable, inadequate, or both.

*General*

(1)   A complete version of the Fiscal Plan, including any amendments mandated by the Board Resolution Adopted on March 13, 2017.  This should include functional versions of any embedded Excel charts;[4]

(2)   The Fiscal Year 2018 budget for the Territorial Government or any Covered Instrumentality, including any preliminary drafts;

(3)   A functional version of the macroeconomic growth model used to calculate all forward-looking projections included in the certified Fiscal Plan as well as any data fed into that model.  We also request similar information for any prior proposed fiscal plan as well as the presentation known as *Technical Meeting Discussion Materials* (which was presented by the prior administration on Nov. 16, 2016), and in the *Revised Baseline Projections* (which was presented by the prior administration on Dec. 20, 2016);

(4)   A functional version of the cash flow models used to prepare the Fiscal Plan, including any data that was fed into the model;

(5)   Documents sufficient to identify the makeup of the *pro forma* revenue and expense measures discussed in the Fiscal Plan at 8, 10, 17-22;

(6)   To the extent any advisor to the Board, including Andrew Wolfe, used a different model than the models referenced in Items (3) and (4) above, a functional version of that model or those models, including any data that was fed into the model(s);

(7)   Any additional documentation relating to the assumptions used in formulating the Fiscal Plan, including, for example, the fiscal multiplier used to calculate the impact that proposed revenue and expense measures are expected to have on the Puerto Rico economy and inflation assumptions;

(8)   Any sensitivity analyses that measure the impact of growth initiatives, including those discussed on page 24 of the Fiscal Plan, and recommendations included in Congressional Task Force on Economic Growth in Puerto Rico, *Report to the House and Senate* (Dec. 20, 2016);

---

[4]   There are a number of discrepancies in the Fiscal Plan's figures and calculations.  For example, the Fiscal Plan lists FY23 revenues pre-measures to be $16.746 billion.  The sum of the figures in the column in question, however, is $16.744.  While insignificant on its own, that single chart has similar errors for Fiscal Years 2019, 2022, 2025 and 2026.  Without the underlying Excel charts, it is impossible to tell whether these are due to simple rounding errors, incomplete information, or some other cause.  Similarly, a number of documents in the data room are spreadsheets that purport to show data or underlying models regarding how certain calculations were made.  But the data is useless in the format in which it was provided because it is "hard-coded" to prevent creditors from seeing anything other than the incomplete figures on the face of the spreadsheet.

(9)   A copy of the Fiscal Plan Comparison to Historical Results, prepared by the Territorial Government[5] at the request of the Oversight Board (the "Bridge") as well as any underlying data and models;

(10)   Any and all documents provided to the Oversight Board prior to its approval of the Fiscal Plan;

(11)   Any and all documents provided to Ernst & Young in connection with its preparation of *Fiscal Oversight and Management Board for Puerto Rico: Financial Bridge Analysis* (Mar. 7, 2017) ("Bridge Analysis").  See Bridge Analysis at 7 ("E&Y submitted a detailed data/document request to the Government, and . . . these parties were generally timely and diligent in fulfilling this request to the extent the information was readily available.");

(12)   Any and all documents provided to KPMG in connection with its preparation of the *Commonwealth of Puerto Rico Tax Reform Assessment Project* (2014);

(13)   Any and all documents provided to Anne Krueger (or her colleagues or assistants) in connection with her preparation of *Puerto Rico – A Way Forward* (2015), commonly known as the "Krueger Report";

(14)   Any and all documents provided to Conway Mackenzie in connection with its work to prepare fiscal projections contained in the presentation entitled *Technical Meeting Discussion Materials* (Nov. 16, 2016);

(15)   Any and all documents provided to Pension Trustee Advisors in connection with any actuarial assessment performed on a public pension system maintained by the Territorial Government;

(16)   Any analyses that quantify the financial impact of the financial control reforms discussed in the Fiscal Plan at 34-38;

(17)   Documents sufficient to identify any expert or consultant whose services were used in analyzing Puerto Rico's fiscal situation since January 1, 2014, and any analysis, reports or recommendations offered by such experts or consultants;

*Documents Relating To Revenues*

(18)   For any revenue line item in the Fiscal Plan that does not grow at the rate of nominal GNP (see Fiscal Plan at 10), documents demonstrating or relating to how those growth rates are derived, including any supporting indices on which you may have relied;

---

[5]   Unless otherwise specified, capitalized terms are given the meanings they are supplied in PROMESA.

(19)   Any documents or analyses  that reconcile the special revenue funds considered in the Bridge or Bridge Analysis (see for example Bridge Analysis at 11, 18, 28) to special revenue funds in the Fiscal Plan (at 12, 15);

(20)   Any documents, analyses or data underlying the estimated collection rates on all local revenue streams cited in the Fiscal Plan at page 11, as well as any sales and use tax currently collected on behalf of municipalities, including the basis for the Board's statement in the Letter from Jose Carrion to Gov. Ricardo A. Rosselló Nevares dated March 9, 2017 ("March 9 Letter") (at 2-3) that the Commonwealth had overstated the possibility for increased revenue collections in its proposed February 28, 2017 Fiscal Plan;

(21)   Documents sufficient to determine the historical amounts (by month and by fiscal year) and present location of so-called "clawback revenues" discussed on page 28 of the Fiscal Plan, including whether such funds have been placed in escrow, and for whose benefit.  To the extent that annual projections of any future revenues subject to clawback exist, those should be provided as well;

(22)   Documents sufficient to ascertain the status and treatment of (a) any sales and use tax currently being collected on behalf of municipalities, and (b) the special property tax, which under Puerto Rico law should be collected and segregated in a trust "for the amortization and redemption of the general obligations of the Commonwealth," 21 L.P.R.A. § 5002, see also 21 L.P.R.A. § 5004(a), neither of which is addressed in the Fiscal Plan.  To the extent that annual projections of those revenues exist, those should be provided as well;

(23)   Any communications, documents, or analyses regarding potential changes to the tax code in connection with the formulation of the Fiscal Plan, including, but not limited to, documents relating to reassessing real estate property valuations for the first time since 1958, increasing property tax rates to the levels proposed in the February 28, 2017 version of the Fiscal Plan (at 48), extending Act 154, reassessing the Tax Incentives Act of 1998, or transitioning the Commonwealth's sales and use tax to a broad-based value added tax;

(24)   Documents sufficient to identify the source of increased revenues from the "Fees & Charges" revenue measure discussed on page 19 of the Fiscal Plan, and the accounts into which such increased revenues are expected to flow;[6]

(25)   The Report on Discretionary Tax Abatement Agreements that the Governor was required to submit to the Oversight Board within six months of the establishment of the Board, by PROMESA § 208, 48 U.S.C. § 2148;

---

[6]   If you prefer, a list of the bank accounts into which the funds are expected to flow will suffice.

(26)  Documents sufficient to identify any public private partnerships that are contemplated during the Fiscal Plan period, including anticipated revenue impacts, cash flow projections, and funding sources (*see* February 28 Fiscal Plan at 74-80);

(27)  Any communications, documents, or analyses regarding anticipated revenues relating to health care.  This information should include any assumptions, models or data used to project anticipated federal transfers, returns from any Commonwealth-run medical facility, municipal employer or employee contributions, or Commonwealth Fund collections;

*Documents Relating To Expenses*

(28)  For any expense line item in the Fiscal Plan that does not grow at the rate of nominal GNP, documents demonstrating or relating to how those growth rates are derived;[7]

(29)  A functional version of any model used by the Territorial Government or Ernst & Young to "normalize" expenses so that they can be compared across years in the Bridge or Bridge Analysis;

(30)  All documents relating to the Board's basis for its "recommendation" in the March 9 Letter (at 2) that FY17 expenses be increased by $585 million, including the type and amount of "historical expenditures" in FY 14-FY16 that Ernst & Young discusses on page 13 of the Bridge Analysis;

(31)  A functional model or workbook showing how the Reconciliation Adjustment discussed on page 15 of the Fiscal Plan was calculated;

(32)  Any data, models, analyses or communications regarding the meaning of the term "essential services" in the Fiscal Plan;

(33)  Documents reflecting the calculation of the "other non-recurring" expenses projected on page 12 of the Fiscal Plan, including a functioning version of any model used;

(34)  Any documents, analyses or data regarding the non-personnel "right sizing" expense measures cited on page 15, 18 and 20 of the Fiscal Plan.  To the extent that a model was used in calculating this line item in the Fiscal Plan, a functioning version of that model should be provided;

(35)  Documents sufficient to identify the nature, cost, status and proposed timeline of any project being funded from the capital expenditures line item in the Fiscal Plan as projected on page 12 and discussed on page 14;

(36)  Documents sufficient to identify how $2.2 billion in legal expenses from the Commonwealth of Puerto Rico, *Financial Information and Operating Report* 283 (Dec. 18, 2016), are treated under the Fiscal Plan;

---

[7]  For example, the healthcare expense growth rate appears higher than the projected nominal growth rate.  Fiscal Plan at 21.

(37) Documents sufficient to show the source of any funds used to pay down any trade debt, overdue tax refund or any other outstanding payable since the passage of PROMESA (Fiscal Plan at 10, 15, 18);

(38) Documents sufficient to disaggregate expenses associated with the Territorial Government's various pension systems, including a breakdown of expenses associated with (a) defined benefit rather than defined contribution accounts; (b) base benefits rather than system administered benefits; (c) retirees rather than active employees; and (d) any "catch up" expenses accrued before the passage of PROMESA rather than ongoing costs of the programs (*see* Fiscal Plan at 22);[8]

(39) Any communications, documents, or analyses regarding expenses relating to health care. This information should include detail regarding the healthcare expense growth rates (to the extent not already produced in response to Request 28), any supporting healthcare cost indices (see March 9 Letter at 3-4), efforts to control health care expenses (Fiscal Plan at 20), and any assumptions made regarding enrollment in light of projected population declines;

(40) Any communications, documents, or analysis regarding how deficits relating to health care are accounted for in the Fiscal Plan;

(41) Any communications, documents or analysis regarding historical reimbursements from the Center for Medicare and Medicaid Services or analysis regarding the projected impact of the newly enacted "Modified Adjusted Growth Impact" or "MAGI" standards;

(42) Documents that reflect the basis for the Board's request for "Amendment No. 1: Furlough and Christmas Bonus Amendment to the Commonwealth's Proposed Fiscal Plan," in in *Board Resolution Adopted on March 13, 2017 (Fiscal Plan Certification)* ("March 13 Resolution"), which required a furlough program rather than a reduction in the government work force;

(43) Documents that reflect the basis for the Board's request for "Amendment No. 2: Pension Amendment to the Commonwealth's Proposed Fiscal Plan" the March 13 Resolution, which required certain alterations to the treatment of pension plans under the Fiscal Plan;

(44) Documents sufficient to identify the source of and efforts to control substantial projected deficits at Puerto Rico's instrumentalities and component units as projected on page 12 and discussed on page 15 of the Fiscal Plan, as well as the Fiscal Plan recently certified by the Puerto Rico Highway Transportation Authority;

---

[8]   With regard to the Employment Retirement System, which covers multiple sponsoring employers, this information should be provided in sufficient detail to track each sponsoring employer to the pension expenses for which it is responsible.

(45) Documents, models, analyses or communications that reflect the basis for the demands to improve the Commonwealth's liquidity, as discussed in Chairman Carrion's March 8, 2017 letter to Governor Rosselló;

(46) Documents sufficient to identify any rents paid by the Territorial Government or any Territorial Government Instrumentality to the Public Building Authority ("PBA"). This material should include the terms and documents of any leases of PBA-owned or managed property and any Territorial Government Instrumentality;

(47) Documents, models, analyses, or communications regarding any decision to reduce subsidies to the University of Puerto Rico, municipalities or other entities that are discussed on pages 45-48 of the February 28, 2017 version of the Fiscal Plan.  To the extent that the certified Fiscal Plan seeks to replace those direct subsidies through indirect means (e.g., changing property taxes or municipal licensing fees), documents regarding those efforts should be provided as well;

### *Documents Relating To Puerto Rico's Debt Sustainability*

(48) Any analyses, including models and data, regarding how the amounts available for debt service proposed on page 8 of the Fiscal Plan will, if implemented, affect Puerto Rico's future ability to access the capital markets;

(49) Any analyses comparing Puerto Rico's debt situation to that of other economies that were relied upon in determining what would be a sustainable debt load (*cf*. Fiscal Plan at 27-29), including documents sufficient to identify any comparable economies considered;

(50) Any projections, including both underlying data and models, regarding macroeconomic growth following the end of the Fiscal Plan period and the projected maturity of any proposed restructured obligation.  See, *e.g.*, March 9, 2017 Letter at 2 (describing February 28, 2017 proposed Fiscal Plan as too optimistic with respect to "a) economic growth rates and the time to return to nominal economic growth; and, b) the failure to reflect near-certain declines in baseline revenues associated with corporate taxes and non-resident withholding taxes"); GO/COFINA Title VI proposal made public by the Commonwealth on April 28, 2017 at 4 (term sheet proposes a 30 year restructured bond subject to "optional amortization…sized based on Fiscal Plan forecast");

### *Documents Relating To GDB Restructuring Or Wind Down*

(51) Documents reflecting the historical amounts and present status of any funds or accounts held by the Government Development Bank of Puerto Rico ("GDB") on behalf of the Territorial Government, including, but not limited to, the balance of any accounts at the GDB into which any so-called "clawback revenues" were deposited and the intended treatment of such funds in the Restructuring Support Agreement announced by the Commonwealth on May 15, 2017 ("GDB RSA");

(52) Documents sufficient to identify any accounts held on behalf of the Territorial Government at financial institutions other than the GDB, including but not limited to accounts that were transferred from the GDB since January 1, 2015;

(53) Documents regarding the division of assets between the New Issuer and the Public Entity Trust in the GDB RSA;

(54) Loan level detail on the GDB Municipal Loan portfolio, including all loan and deposit agreements as well as current loan balances;

(55) Documents that reflect the source of repayment for SUT-backed GDB Municipality loans, as that term is used in the GDB RSA and associated documents released on February 28, 2017;

(56) Documents sufficient to identify how SUT flowing to municipalities (if any) in excess of municipal loan debt service is distributed or spent.

Please contact us if you would like to discuss the above.

Very truly yours,

**Robbins, Russell, Englert, Orseck, Untereiner, & Sauber LLP**
as counsel to and on behalf of the GO Group

By: ___/s/ Gary A. Orseck_____

Name: Gary A. Orseck

Title: Partner

**Cadwalader, Wickersham & Taft LLP**
as counsel to and on behalf of Assured

By: ___/s/ Mark C. Ellenberg_____

Name: Mark C. Ellenberg

Title: Consulting Attorney