# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*

     Debtors.[1]

PROMESA
Title III

Case No. 17 BK 3283-LTS

(Jointly Administered)

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

PUERTO RICO ELECTRIC POWER AUTHORITY,

     Debtor.

PROMESA
Title III

Case No. 17 BK 4780-LTS

**Court Filing Relates only to PREPA: ECF No. 332.**

-------------------------------------------------------------------x

---

[1] The Debtors in the jointly-administered Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**THE PUERTO RICO ELECTRIC POWER AUTHORITY'S
OPPOSITION TO PV PROPERTIES, INC.'S
MOTION REGARDING RELIEF FROM STAY**

To the Honorable United States District Court Judge Laura Taylor Swain:

On behalf of the Puerto Rico Electric Power Authority ("PREPA"), the Puerto Rico Fiscal

Agency and Financial Advisory Authority ("AAFAF"), pursuant to the authority granted to it

under the *Enabling Act of the Fiscal Agency and Financial Advisory Authority*, Act 2-2017,

respectfully submits this opposition (the "Opposition") to PV Properties, Inc.'s ("PV Properties")

Motion Regarding Relief From Stay 11 USCS § 362(b)(4) (Dkt. No. 332) (the "Motion").[2]  In

support of its Opposition, AAFAF respectfully states as follows:

## I.      PRELIMINARY STATEMENT

As this Court is well aware, the Commonwealth of Puerto Rico (the "Commonwealth") is

currently facing a grave and severe humanitarian and economic crisis.  On September 20, 2017,

the Commonwealth was hit directly by Hurricane Maria, the most powerful hurricane to strike

Puerto Rico in nearly a century.  Hurricane Maria devastated Puerto Rico and obliterated the

Commonwealth's power infrastructure.  While the situation has improved due to the heroic efforts

of many, there are many residents still without the basic necessities, including power.  Indeed,

based on government estimates, over 80% of the island is still without power[3] and the grid is

extremely unstable in those areas where electricity has been restored.

Against this backdrop, PV Properties has filed a Motion to lift the automatic stay so that it

can pursue claims against PREPA that it brought before the Puerto Rico Energy Commission

---

[2] The Financial Oversight and Management Board for Puerto Rico ("FOMB"), as the Debtors' representative pursuant
to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), 48 U.S.C.
§§ 2101-2241, has authorized AAFAF to file this Opposition on behalf of PREPA.

[3] See http://status.pr/#, last visited on October 18, 2017.

("PREC", or "CEPR" by its Spanish language acronym), claiming that the prosecution of its claims will benefit the public. Nothing could be further from the truth. As evidenced by the Complaint filed by PV Properties before PREC (the "PV Properties Complaint"),[4] which PV Properties conveniently failed to attach to its Motion, the only interest furthered by PV Properties' Complaint is its pecuniary interest. Specifically, the PV Properties Complaint seeks an order from PREC compelling PREPA to purchase Renewable Energy Credits previously offered by PV Properties at a price dictated by PV Properties even though Puerto Rico's renewable energy regulatory scheme does not impose a requirement on PREPA to purchase Renewable Energy Credits, let alone from PV Properties or at a price dictated by PV Properties. While the claims asserted in the PV Properties Complaint necessarily implicate the applicability and enforceability of the aforementioned renewable energy regulatory scheme, those issues are clearly subordinate and secondary to the monetary relief sought by PV Properties against PREPA.

Neither section 362(b)(4) nor section 362(d)(1) of the Bankruptcy Code support the lifting of the automatic stay so that PV Properties can pursue its own financial gain at the expense of the Commonwealth's residents. Section 362(b)(4) does not apply because the PV Properties proceeding before PREC was neither commenced nor continued by a governmental unit, but rather a private party. Section 362(d)(1) is similarly inapplicable because PV Properties cannot show "cause" that would warrant the stay to be lifted. For all of these reasons, more fully set forth below, the Court should deny the Motion.

## II.     RELEVANT BACKGROUND

### A.  *The Renewable Energy Policy Act*

---

[4] A certified translated copy of the PV Properties Complaint is attached hereto as **Exhibit 1**.

On July 29, 2010, Puerto Rico enacted Act No. 82 of 2010, also known as the Public Policy on Energy Diversification by Means of Sustainable and Alternative Renewable Energy in Puerto Rico Act (the "Renewable Energy Policy Act"), 12 L.P.R.A. § 8121, *et seq*.  Among other provisions, the Renewable Energy Policy Act mandates that retail electricity suppliers (as defined) in Puerto Rico, like PREPA, comply with a Renewable Portfolio Standard ("RPS") that requires that specified percentages of their energy production come from renewable energy sources (as defined therein), escalating over time to 20% by 2035, subject to important qualifications (exceptions).

The RPS itself is found in Section 2.3 of Act 82-2010, 12 L.P.R.A. § 8124, which provides for graduated increases in use of renewable energy sources from 2015 through 2035.  The Puerto Rico Renewable Energy Commission originally was charged with the administration, oversight, and enforcement functions, Act 82-2010, Section 2.2, *et seq.*; 12 L.P.R.A. § 8123, *et seq.*, but that role later was transferred to PREC by Section 7.1 of Act 57-2014; 22 L.P.R.A. § 1055; *see also* Section 6.3(r) of Act 57-2014; 22 L.P.R.A. § 1054b(r).

The RPS is subject to a compliance process that includes, among other things, provisions that a supplier receiving a non-compliance notice may establish that it acted reasonably and in good faith to comply and that its non-compliance was due to one or more of six categories of reasons or a seventh category of any other justification accepted by PREC through regulation that is consistent with the public policy.  Act 82-2010, Section 2.12; 12 L.P.R.A. § 8133.  In brief, the reasons may include, among others, force majeure, insufficiency, or excessive cost.  Excessive costs could include, for example, energy costs as such or associated curtailment costs, as was discussed by PREPA in its Integrated Resource Plan ("IRP") case and its first Rate Review, Case Nos. CEPR-AP-2015-0002 and CEPR-AP-2015-0001, respectively.

The Renewable Energy Policy Act, in relation to the RPS, uses the concept of the Renewable Energy Credit ("REC") as a legally recognized asset that can be purchased, sold, trade and transferred separately from electric power.  Act 82-2010, Section 1.4 (definition of REC); 12 L.P.R.A. § 8121.  A REC is personal property that constitutes a tradable and negotiable asset or commodity that may be purchased, sold, assigned and transferred between persons for any legal purposes, which is equal to one (1) megawatt-hour (MWh) of electricity generated from a sustainable renewable energy source or alternative renewable energy source (issued and registered pursuant to Act 82-2010), and represents all environmental and social attributes as defined in Act 82-2010.  Act 82-2010, Section 1.4; 12 L.P.R.A. § 8121.  Retail electricity suppliers may, but are not required to, acquire RECs to comply with the percentage requirements of the RPS.  *E.g.*, Act 82-2010, Section 2.8; 12 L.P.R.A. § 8129.  In fact, there is no mandate in the Renewable Energy Policy Act as to the manner in which retail energy providers achieve the RPS as Section 2.11 of Act 82-2010 provides the ways retail energy providers may use to achieve compliance with the RPS.  Act 82-2010, Section 2.11; 12 L.P.R.A. § 8132.

Regardless, in order for RECs purchased from distributed renewable energy producers (as defined in the Renewable Energy Policy Act) to count towards the RPS, certain requirements must be met, including but not limited to the issuance of regulations by PREC.  Act 82-2010, Section 2.11(e); 12 L.P.R.A. § 8132(e).   PREC has yet to issue any such regulations.

### B.    *The PV Properties Complaint against PREPA*

On March 3, 2017, PV Properties filed the PV Properties Complaint with PREC, Case No. CEPR-QR-2017-0001.  The PV Properties Complaint alleges that PREPA violated Articles 2.10 and 2.11 of the Renewable Energy Policy Act, 12 L.P.R.A. §§ 8131, 8132, by failing to purchase any and all RECs offered by PV Properties.  (**Ex. 1 ¶¶** 34, 41, 42, 51, 52 and 57).  In its prayer for

relief, PV Properties seeks:  (1) a declaration that PREPA's failure to purchase RECs offered by PV Properties violated the Renewable Energy Policy Act; (2) an order compelling PREPA to purchase the RECs offered by PV Properties at a price no less than the one initially offered by PV Properties and any and all RECs offered by PV Properties in the future; and (3) an order requesting that PREC impose any legally available sanction or remedy to ensure that PREPA timely and properly complies with its obligation to purchase any and all RECs offered by PV Properties.  (**Ex. 1**, pp. 27-28).  In short, PV Properties is trying to use PREC to coerce PREPA into a transaction with PV Properties on pricing terms it has dictated, a blatant grab for PREPA's revenue for its own gain.

### C.   *The PV Properties Proceeding Before PREC*

On March 23, 2017, PREPA filed a Motion to Dismiss the PV Properties Complaint, arguing that PREC lacked the jurisdiction to address the claims asserted by PV Properties because PREC had yet to enact the necessary regulations for implementing any provisions or requirements set forth in the Renewable Energy Policy Act.[5]  A certified translated copy of PREPA's Motion to Dismiss is attached hereto as **Exhibit 2**.

---

[5] Although PREC has some authority to adjudicate controversies under Act 82-2010, if it were to attempt to resolve the issues raised by PV Properties in an adjudicatory proceeding, it risks acting illegally or arbitrarily according to Puerto Rico Supreme Court case law, which has emphasized the importance of regulations in guaranteeing a due process and providing rules to guide an agency's discretion.  *See Torres Arzola v. Policia de P.R.*, 17 P.R. Offic. Trans. 245, 253-54 (1986) ("[w]hen government agencies' enabling statutes contain ample and general rules, the boundaries and scope of their powers should be defined through regulations."); *Asoc. Fcias. Com. v. Depto. de Salud*, 156 DPR 105, 134 (2002) (noting that if an administrative agency acts in absence of duly promulgated regulations, the non-delegation doctrine and due process clause may be implicated, and an administrative agency may avoid illegal or arbitrary actions by complying with at least one of the following alternatives: (*i*) promulgate specific regulations not limited to repeating the broad criteria set forth in the applicable law, or (*ii*) establish a case law system with detailed and reasoned opinions, accessible to the public in general, capable of establishing precedents, and subject to judicial review); *M. & B.S., Inc. v. Depto. de Agricultura*, 18 P.R. Offic. Trans. 380, 388 (1987) ("controlling measures require agencies to pass regulations which restrict or outline their powers pursuant to law and thus avoid unlawful or arbitrary actions"); *Soto v. Srio. de Justicia*, 12 P.R. Offic. Trans. 597, 623 (1982) ("[w]hen . . . there are no standards governing the exercise of the discretion granted by the law, the scheme permits and encourages an arbitrary and discriminatory enforcement of the same") (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972)).

On April 21, 2017, while PREPA's Motion to Dismiss was pending, PV Properties filed a Motion for Summary Judgment, seeking an order granting all of the relief requested in the PV Properties Complaint, including, but not limited to, an order directing PREPA to purchase any and all RECs offered by PV Properties at the price previously offered, as well as an order directing PREPA to purchase any and all RECs offered by PV Properties in the future.  A certified translated copy of PV Properties' Motion for Summary Judgment is attached hereto as **Exhibit 3**.  In so doing, PV Properties claimed there was no issue of substantial dispute because PREPA moved to dismiss the PV Properties Complaint without specifically denying the allegations set forth therein. (**Ex. 3 ¶¶** 3, 4 and 7).  PREPA filed its opposition to PV Properties' Motion for Summary Judgment, arguing, among other things, that PREPA need not respond to the allegations set forth in the PV Properties Complaint until PREC resolves the threshold jurisdictional issue.  A certified translated copy of PREPA's opposition to PV Properties' Motion for Summary Judgment is attached hereto as **Exhibit 4**.

On June 2, 2017, PREC issued a Resolution and Order denying PREPA's Motion to Dismiss, finding that, pursuant to Article 6.4 of Act 57-2014, 22 L.P.R.A. § 1054c, it had the primary and exclusive jurisdiction to "resolve" PV Properties' claim that PREPA breached the Renewable Energy Policy Act by failing to purchase the RECs offered by PV Properties.  A certified translated copy of PREC's June 2, 2017, Resolution and Order was attached to the Motion as Appendix 1 and is attached hereto as **Exhibit 5**.  To that end, PREC ordered both PV Properties and PREPA to submit a memorandum of law addressing various factual and legal questions raised by PREC regarding the applicability and enforceability of the Renewable Energy Policy Act. **Exhibit 5** at 8-9.

6

### D.     PREPA's Title III Case

On July 2, 2017, the FOMB filed a voluntary petition for relief for PREPA pursuant to PROMESA section 304(a), commencing a case under Title III thereof.  The filing of the Title III case triggered the automatic stay.  *See* PROMESA § 301 (incorporating 11 U.S.C. §§ 362 and 922—the automatic stay provisions—into the Title III case).

On July 12, 2017, PREPA filed a Notice of Automatic Stay of Proceedings Pursuant to the Commencement of Case Under Title III of PROMESA (the "Notice of Automatic Stay") with PREC, notifying PREC of the stay of the PV Properties proceeding, including any of the requested briefing on the applicability and enforceability of the Renewable Energy Policy Act.  A true and correct copy of PREPA's Notice of Automatic Stay is attached hereto as **Exhibit 6**.

On September 13, 2017, PREC rejected PREPA's Notice of Automatic Stay, incorrectly stating that the PV Properties proceeding is exempted from the automatic stay pursuant to the governmental unit exception set forth in section 362(b)(4) of the Bankruptcy Code, which exempts "the commencement or continuation of an action or proceeding by a governmental unit [ …] to enforce such governmental unit's or organization's police or regulatory power []."  A true and correct copy of PREC's September 13, 2017, Resolution and Order is attached hereto as **Exhibit 7**.

On October 4, 2017, PV Properties filed the Motion, which seeks to reaffirm PREC's incorrect decision that the PV Properties proceeding before PREC is exempted from the automatic stay.

## III.     AUTHORITIES AND ARGUMENT

### A.     The Automatic Stay under Section 362(a) of the Bankruptcy Code.

Section 362(a) of the Bankruptcy Code, made applicable by Section 301(a) of PROMESA, 48 U.S.C. § 216, imposes an automatic stay on "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the cause under this title." 11 U.S.C. § 362(a)(1); *see also* PROMESA § 301(a) (incorporating Section 362 into Title III cases).

The automatic stay is "one of the basic protections under the Bankruptcy Code and becomes operative by the mere filing of a bankruptcy petition." *In re El Comandante Mgmt. Co., LLC*, 358 B.R. 1, 10 (Bankr. D.P.R. 2006) (citing *In re Soares*, 107 F.3d 969, 971 (1st Cir. 1997)). The purpose of the automatic stay, which remains in force until a federal court disposes of the case or lifts the stay, *In re Soares*, 107 F.3d at 975, is to avoid having creditors chase what limited assets a debtor has. *See Unisys Corp. v. Dataware Prod., Inc*., 848 F.2d 311, 313 (1st Cir. 1988) (the automatic stay "forestalls a race of diligence by creditors for the debtor's assets"); *Mass. Dep't of Revenue v. Crocker (In re Crocker)*, 362 B.R. 49, 56 (B.A.P. 1st Cir. 2007) (quoting H.R.Rep. No. 95-595 at 340 (1977)) ("[O]ne of the fundamental purposes of the automatic stay is to give the debtor 'a breathing spell from his creditors' and 'to be relieved of the financial pressures that drove him into bankruptcy.'"). The automatic stay "permits the debtor to attempt a repayment or reorganization plan or simply to be relieved from the financial pressures that drove him into bankruptcy." *Assoc. of St. Croix Condo Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982). Moreover, the automatic stay "is extraordinarily broad: it protects the debtor from nearly any act to collect a pre-petition claim and any action affecting the property of the debtor's estate, subject only to section 362(b)'s narrow exceptions." *Atiles-Gabriel v. Commonwealth of*

8

*P.R.*, 2017 WL 2709757, * 2 (D. P.R. June 23, 2017) (citation omitted); *see also In re Ramos*, 493

B.R. 355, 362 (Bankr. D.P.R. 2013) (exceptions to automatic stay are to be read narrowly).

> **B.      The Governmental Unit's Police or Regulatory Power Exception to the Automatic Stay**

Section 362(b)(4) of the Bankruptcy Code provides that the filing of a bankruptcy petition

does not operate as a stay "of the commencement or continuation of an action or proceeding by a

governmental unit . . . to enforce such governmental unit's or organization's police and regulatory

power, including the enforcement of a judgment other than a money judgment, obtained in an

action or proceeding by the governmental unit to enforce such governmental unit's or

organization's policy of regulatory power."   11 U.S.C. § 362(b)(4).[6]   ***The fundamental policy***

***underlying this exception is to prevent the bankruptcy court from becoming a haven for***

***wrongdoers.***   *In re McMullen*, 386 F.3d 320, 324-25 (1ˢᵗ Cir. 2004) (citation omitted).  Specifically,

the exception discourages debtors from submitting bankruptcy petitions either primarily or solely

for the purpose of evading impending governmental efforts to invoke the governmental police

powers to enjoin or deter ongoing debtor conduct which would seriously threaten the public safety

and welfare.  *Id.*; *see also In re Montalvo*, 537 B.R. 128, 142 (Bankr. D.P.R. 2015) (the purpose

of this exception is to prevent a debtor from frustrating necessary government functions by seeking

refuge in bankruptcy court) (citations omitted).   Accordingly, this exception must be narrowly

construed.  *Id.* at 325.[7]

---

[6] The term governmental unit is defined as "the United States; State; Commonwealth; District; Territory; municipality; foreign state; department; agency or instrumentality of the United States, … a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government."  11 U.S.C. § 101(27)

[7] The legislative history of Section 362(b)(4) strongly suggests that this exception to the automatic stay is to be interpreted narrowly:  "[t]his section is intend to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate."  124 Cong.Rec. S 17,409 (Oct. 6, 1978).

By its plain language, section 362(b)(4) requires both that: 1) the action be brought by a governmental unit and 2) the proceeding be brought to enforce the police or regulatory power of the governmental unit.   *See, e.g., in re Edison Mission Energy*, 502 B.R. 830, 835 (Bankr. N.D. Ill. 2013).

### C.     The Governmental Unit's Police or Regulatory Power Exception Does Not Apply Because the PV Properties Proceeding is Designed Primarily to Further the Pecuniary Interest of PV Properties

As noted by PV Properties, Motion ¶ 8, courts, in determining whether a proceeding falls within section 362(b)(4), assess, based on the totality of the circumstances, whether the particular proceeding is designed primarily to protect the public safety or welfare or to further a pecuniary interest. *In re McMullen*, 386 F.3d at 325.

As an initial matter, given the severe fiscal crisis facing PREPA at the time its Title III case was commenced, (s*ee* Dkt. No. 149 at 7–8), and the unprecedented and grave humanitarian and economic crisis facing the Commonwealth after Hurricane Maria, it is unclear and frankly unfathomable, just how the PV Properties proceeding, which primarily seeks payment of money to itself from PREPA, protects the public safety or welfare.  Setting that fact aside, upon review of the PV Properties Complaint, there is little doubt, irrespective of PREC's decision regarding the applicability of the automatic stay, that the primary purpose of the PV Properties Complaint is to further the pecuniary interest of PV Properties.  Indeed, in its prayer for relief, PV Properties seeks: (1) a declaration that ***PREPA's failure to purchase RECs offered by PV Properties*** violated the Renewable Energy Policy Act; (2) an order ***compelling PREPA to purchase the RECs offered by PV Properties*** at a price no less than the one initially offered by PV Properties ***and any and all RECs offered by PV Properties in the future***; and (3) an order requesting ***PREC impose any legally available sanction or remedy to ensure that PREPA timely and properly complies with***

10

*its obligation to purchase any and all RECs offered by PV Properties*.  (Ex. 1, pp. 27-28).  The common theme underlying all three aspects of the requested relief involves a determination that PREPA failed to purchase RECs offered or to be offered by PV Properties and that PREPA be compelled to purchase any and all RECs offered by PV Properties at the price dictated by PV Properties even though nothing in the Renewable Energy Policy Act requires retail electricity suppliers, like PREPA, to purchase RECs from renewable energy producers, like PV Properties, let alone at a price dictated by those renewable energy producers.  More importantly from the standpoint of the automatic stay, PV Properties fails to show how the public safety or welfare is protected by requiring PREPA to purchase RECs from *one particular renewable energy producer* at the price dictated by that producer**,** when PV Properties is not the only game in town.

In light of this failure, PV Properties' acknowledgement that the stay exception under section 362(b)(4) precludes the enforcement of a money judgment, Motion at ¶ 13, is disingenuous for two reasons.  First, PV Properties does not seek a limited lift of the stay such that PREC would be allowed only to determine the applicability and enforceability of purported obligations arising under Puerto Rico's renewable energy regulatory scheme—its Motion asks this Court to "reaffirm" PREC's September 13, 2017, Resolution and Order that the automatic stay does not apply to the PV Properties proceeding. (Motion ¶ 5).  That Resolution and Order, however, did not in any way limit the continuation of the PV Proceeding to PREC's determination of the aforementioned regulatory scheme issues.  As issued, PREC's September 13, 2017, Resolution and Order allows PV Properties to pursue its requested monetary relief, including, but not limited to, the enforcement and collection of any ruling or judgment in its favor.  Such a result runs afoul of section 362(b)(4).  *In re Montalvo*, 537 B.R. at 142 (even if section 362(b)(4) applied, a governmental unit may not enforce a money judgment against the debtor); *In re Mohawk Greenfield Motel Corp.*, 239 B.R. 1,

11

6 (Bankr. D. Mass. 1999) (enforcement of a money judgment by a governmental unit is precluded).

Second, even if the proceeding initiated by PV Properties could require PREC to analyze and render decisions regarding the enforceability and applicability of various provisions and purported obligations under the Renewable Energy Policy Act and, to the extent PREC has the jurisdiction and power to do so, compel PREPA to comply with purported obligations arising under Act 82-2010, the public benefit, if any, from any such decisions would clearly be secondary to PV Properties' goal of securing for itself a present and future income stream from PREPA on its own terms. *See In re Montalvo*, 537 B.R. at 143 (if the action furthers both public and private interests, then the action falls within section 362(b)(4) if the private interest does not significantly outweigh the public benefit). Again, the Court need not look any further than PV Properties' requested relief to conclude that the PV Properties Complaint is designed to further the pecuniary interest of PV Properties rather than any public interest in the applicability and enforceability of the Renewable Energy Policy Act.

But if there were any doubts about PV Properties' financial motivation, such doubts were dispelled when PV Properties filed its Motion for Summary Judgment while PREPA's motion to dismiss for lack of jurisdiction had yet to be ruled on. According to PV Properties, it was entitled to summary judgment because PREPA failed to specifically deny the allegations set forth in the PV Properties Complaint. (**Ex. 3 ¶¶** 3, 4 and 7). By filing such a motion, PV Properties attempted to secure a collectible money judgment through procedural maneuvering while bypassing the analysis and decision-making by PREC regarding whether the public interest or welfare was at stake in any way.

Indeed, one of the cases cited by PV Properties in support of its own motion, *In re McMullen*, 386 F.3d 320, is instructive regarding this issue, though largely as it flatly contradicts

its own position.  In *McMullen*, a couple filed a complaint against a realtor, after the realtor had declared bankruptcy, with the Massachusetts Division of Registration for Real Estate Agents, alleging that the realtor had wrongfully retained a deposit.  386 F.3d at 323.  The relevant regulatory agency commenced an investigation to determine whether the realtor should have his license suspended or revoked, and the realtor sought to stop the investigation, alleging it contravened the automatic stay.  *Id.* at 326.  The bankruptcy court rejected that argument.  *Id.* at 327.  While the bankruptcy court found that the section 362(b)(4) exception applied to the disciplinary proceeding—even though it was initiated by a private party complaint—it did so solely because the complaint asked the governmental unit to investigate the claims raised in the complaint and could not possibly have led to an order requiring that the deposit be repaid to the complainants. *Id.* at 327-28.  In other words, the complaint was initiated solely to protect the public and determine whether the realtor should keep his license.  *Id.*  The First Circuit Court of Appeals repeatedly highlighted this finding, noting that although:

> it is alleged that the [complainants] harbored such a pecuniary interest in the recovery of their deposit from McMullen's funds, the suspension, revocation, or refusal to renew a real estate broker license are the *only* enumerated powers accorded the Board. *See* Mass. Gen. Laws ch. 112, § 87AAA(d). Hence, the Board was neither empowered to compel McMullen to repay the deposit to the [complainants], nor to award any other restitutionary remedy. . . Thus, the disciplinary proceeding before the Board was designed to serve - and did in fact principally serve - to protect the public in the future, rather than to seek recompense for the alleged financial losses sustained by the [complainants].

*Id.* at 326 (emphasis in original).  Indeed, the bankruptcy court ruled, and the First Circuit did not question, that the complainants' other court action, seeking return of the deposit from the realtor, based on exactly the same facts as alleged in the complaint filed with the Massachusetts Division of Registration of Real Estate, *did* in fact constitute a violation of the stay.  *Id.* at 330.  It is obvious that PV Properties' claim here is completely unlike the regulatory investigation in *McMullen* that

13

was held to have a public purpose and was delinked from any monetary consequence to the debtor, and instead is almost identical to the *impermissible* action seeking a monetary award held to be subject to the automatic stay in that case, and thus should also be held subject to automatic stay here.

That the pecuniary interest of PV Properties predominates is made even more clear by PREC's own resolution purportedly holding that the proceeding was not subject to the automatic stay. The only public purpose identified by PREC that could be furthered by the proceeding initiated by PV Properties was the "interest in clarifying and determining the scope and applicability of the provisions of Act 82-2010," thereby "promoting compliance" with its provisions. (**Ex. 7**, pp. 4-5). This is simply not enough of a public purpose to evade the automatic stay, certainly not in a manner that could result in material economic consequences to a Title III debtor. If "clarifying," "determining the scope" of, and thereby "promoting compliance" with the law were enough to take what is, in effect, a suit for a money judgment out of the automatic stay, no civil action commenced against a debtor that so much as touched upon environmental, health and safety, labor or other similar laws that were remotely in need of clarification could ever be subject to the automatic stay. If allowed, such relief would reduce the automatic stay, "one of the fundamental protections that the Bankruptcy Code affords to debtors," *In re Jamo,* 283 F.3d 392, 398 (1st Cir. 2002), to nothing more than a dead letter, as any plaintiff could in theory make the case that it is seeking to clarify the law. This position is untenable. Indeed, the jurisprudence makes clear that actions and proceedings designed primarily to further private interests or adjudicate private rights, even when leading to the interpretation and application of laws designed to protect the public interest, do not fall within the section 362(b)(4) exception. *See In re Nortel Networks, Inc.,* 669 F.3d 128, 142 (3rd Cir. 2011); *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d

374, 386 (6th Cir. 2001) ("an action will only be exempt from the automatic stay of the Bankruptcy Code if the action has been instituted to effectuate the public policy goals of the governmental entity, as opposed to actions instituted to protect the entity's pecuniary interest in the debtor's property *or to adjudicate private rights*") (emphasis added).  The PV Properties proceeding has been instituted, undeniably, "to adjudicate private rights," not to effectuate the public policy goals of the Commonwealth, which at best will only be obliquely furthered, and therefore it is subject to the automatic stay.

> ### D.     The Governmental Unit's Police or Regulatory Power Exception Does Not Apply Because the PV Properties Proceeding was neither Commenced nor Continued by a Governmental Unit

PV Properties does not expressly contend that section 362(b)(4) applies to actions which are commenced or initiated by private parties, purportedly acting to protect the public health and safety.  Nor could it do so, as the plain and unambiguous language of section 362(b)(4) clearly excludes such private actions.  *In re Revere Copper and Brass, Inc.*, 29 B.R. 584, 587 (Bankr. S.D.N.Y. 1983); *see also City of New York v. Exxon Corp.*, 932 F.2d 1020, 1025 (2d Cir. 1991) (finding that section 362(b)(4) requires that suits falling within the exception are brought by governmental units, not private parties); *Porter v. Nabors Drilling USA, L.P.*, 854 F.3d 1057, 1062 (9th Cir. 2017) (holding that section 362(b)(4) did not apply to private attorney general actions as a government's creation of a private right of action to enforce laws aimed to protect the health and safety of the public is insufficient to invoke the exception).  Indeed, if Congress had wanted to exempt this type of citizen action from the ambit of the automatic stay, it could have easily done so.  *In re Revere Copper and Brass, Inc.*, 29 B.R. at 587.

Undeterred, PV Properties argues that section 362(b)(4) applies to the "*continuation* of an action or proceeding by a governmental unit [ …] to enforce such governmental unit's or

organization's police and regulatory power." (Motion ¶ 10) (emphasis in original). Specifically, PV Properties argues that "private parties like PV Properties can trigger *commencement* of regulatory action, yet the *continuation* of such action by the governmental unit is . . . the factor that determines the applicability of this exception. (*Id.* ¶ 11) (emphasis in original). PV Properties concludes that the PREC proceeding falls within the exception because PREC has clearly "continued" the proceeding by asking both parties to submit a legal memorandum of law addressing various factual and legal questions raised by PREC regarding the applicability and enforceability of the Renewable Energy Policy Act and by deciding that the automatic stay did not apply to the proceeding. (*Id.* ¶ 12).

PV Properties is mistaken. In cases where suits initiated by private parties were allowed to proceed under the governmental unit's police or regulatory power exception, ***either the governmental unit later joined in as a party to the suit or commenced its own proceeding or investigation***, or they involved other special considerations not present here. Indeed, not a single case cited by PV Properties supports its argument. First, *In re Halo Wireless, Inc.*, 684 F.3d 581 (5th Cir. 2012), the case on which PV Properties primarily relies, is far removed from the case at hand. In *Halo*, multiple suits were filed against Halo, a wireless service provider, before state public utility commissions by local telephone companies alleging that Halo had failed to pay fees for the use of wireless networks. *Id.* at 585. The claims largely revolved around breaches of, or the failure to enter into, intercommunication agreements ("ICAs") by Halo. *Id.* This was critical, as it was held by the court that "ICAs between two private companies, such as those in dispute between AT&T and Halo (what Halo calls "private contracts") *have a public nature, as they must be approved by the applicable State commission*." *Id.* at 594 (emphasis added). The court further noted that "at least some of the [actions] at issue here are similar to any action that a state regulatory

commission might take itself." *Id.* at 592.  Indeed, as commented on by a later court discussing *Halo*, there was evidence "indicating that the state public utility commissions either [had become] a party to the proceeding or commenced their own "substantively identical" proceeding or investigation into the claims raised by the private parties" in *Halo*.  *In re Edison Mission Energy*, 502 B.R. at 835.  The facts in *Halo* are entirely different to those here.  Here, PV Properties is seeking to force a purely private sale of a purely private asset to a utility company—notably, this action is by a seller that *is not* even the sole provider of such asset, which is not required under Act 82-2010 or any other applicable law and was not approved or mandated by any governmental or regulatory body.  No state regulatory commission would ever commence such an action as has been filed by PV Properties to compel a utility to buy a specific asset from a specific party for a specific price, nor has any such entity attempted to, and the attempted forced sale has no requisite "public nature" or benefit.  Therefore, *Halo* is of no use to PV Properties in arguing that the section 362(b)(4) exception applies.

PV Properties however cites the statement in *Halo* that section 362(b)(4) excepts from the automatic stay "suits continued by a governmental unit, without regard to who initially filed the complaint.  Accordingly, we find that the PUC actions meet the first requirement of the exception to the automatic stay, because they are being continued by governmental units," (Motion ¶ 10, citing *Halo*, 684 F.3d at 592), as support for its position.  Unfortunately for PV Properties, this statement, when read in context, provides absolutely no support for its argument that PREC has "continued" the action by ordering further submissions on the law and facts.  It is clear from the paragraph immediately preceding this statement that the court was discussing cases where a governmental entity had in some way taken over or joined a case so as to actively pursue the case *as a litigant*.  *Id*. at 592.  The statement provides no support that a court or similar body ordering

further argument is itself "continuing" the matter.  Nor could it—such an interpretation would be manifestly absurd as it would effectively exempt from the automatic stay every single proceeding in which a tribunal issues any order allowing the matter to proceed.

Finally, *Alpern v. Lieb,* 11 F.3d 689 (7th Cir. 1993) does not help PV Properties either. *Alpern* involved the imposition of Rule 11 sanctions, by a court, on a party to a lawsuit for pursuing a frivolous claim.  As expressly noted by the court, the purpose of the sanction was to "punish unprofessional behavior" in the court room.  *Id.* at 690.  As noted by a later court, *Alpern* only cited cases involving disciplinary proceedings by courts and similar institutions, and, indeed, "[n]othing in *Alpern* suggests that the court intended a broader application of its decision, outside the context of a sanctions proceeding."  *In re Edison Mission Energy*, 502 B.R. at 835.  Further, as held by the Ninth Circuit Court of Appeals, "[a]lthough a litigant may initially request the imposition of sanctions, ultimately the sanctions proceedings [such as those at issue in *Alpern*] are conducted by a governmental unit, the court, to advance its own interest in enforcing its authority." *Porter v. Nabors Drilling USA, L.P.,* 854 F.3d at 1063.  PV Properties' action seeking a forced sale of a private asset from a private company to a utility company could scarcely be more different to such proceedings.

Much more like the present case is the recent decision of the Ninth Circuit Court of Appeals in *Porter v. Nabors Drilling USA, L.P.*  There, Porter commenced a civil action under a California statute to personally recover a civil penalty for the breach of a labor law (referred to as "PAGA") by Nabors Drilling, in what was held to be akin to a *qui tam* action.  *Id.* at 1061.  Nonetheless, the Ninth Circuit held that the proceeding was not exempt from the automatic stay for essentially two reasons, both of which are directly relevant here.  First, "Porter's claim against Nabors was filed by Porter, and it remains under his control. Despite having received notice of Porter's allegations

pursuant to PAGA's notice provisions, the state of California, through [the regulatory agency], did not request, direct, or join in the filing. Nor has the state attempted to intervene in the action since its filing. Under these circumstances, the action cannot properly be understood to be an action 'by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power.'" *Id.* at 1062.  Second, in response to the argument that the action was within the section 362(b)(4) exception as the court adjudicating the action (which would ultimately order any sanction) was itself a governmental unit, the Ninth Circuit held that "[t]he subsequent involvement of the court does not bring his PAGA action within the language of the exception: 'by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power.'  11 U.S.C. § 362(b)(4). That a court might ultimately decide the fate of Porter's PAGA action does not mean that the court decision is an action to enforce its own power."  854 F.3d at 1063.  Here, the action filed by PV Properties remains solely under its control, has not been joined in by PREC, and, in the end, the only PREC involvement will be as an administrative body in adjudicating what is mostly a civil claim by a private litigant for a private sale of a private asset, with even less connection to the governmental enforcement of public regulations than in *Porter*.  Accordingly, the PV Properties proceeding is subject to the automatic stay.

This view is bolstered by recent decisions rejecting suggestions, such as those in *Halo*, that lawsuits commenced by private individuals could ever be "continued" under Section 362(b)(4). One court put it eloquently when it endorsed "the better-reasoned view, which is to refrain from extending the exclusion to private citizens' suits such as the district court lawsuit, especially in the circumstances existing here, where the actual governmental unit(s) have refrained from participating over an extended period of time, reflecting in a very real sense, a lack of 'public interest.' This determination is buttressed by a generally accepted policy in favor of upholding the

stay, and reading any exclusions narrowly." *In re Taylor*, 2017 Bankr. LEXIS 2392 *7 (Bankr.

E.D.N.C. Aug. 24, 2017); *see also United States ex rel. Goldstein v. P&M Draperies, Inc.,* 303

B.R. 601, 604 (D. Md. 2004) ("When the government plays no role in pursuing an action, it can

hardly be said that the action was commenced or continued 'by' the government."); *United States*

*ex rel. Kolbeck v. Point Blank Solutions, Inc.*, 444 B.R. 336, 340 (E.D. Va. 2011) ("In other words,

where, as here, the government declines to intervene in a *qui tam* FCA action, the action

nonetheless continues in the name of, and on partial behalf of the government, but the proceedings

are thereafter conducted solely by the *qui tam* relator . . .*it cannot reasonably be argued that the*

*action is being continued or pursued 'by a governmental unit*,'") (emphasis added).  This would

be in line with binding First Circuit precedent commanding that section 362(b)(4) be narrowly

construed.  *See In re McMullen,* 386 F.3d at 325 ("given the expansiveness of subsection 362(a),

the exception contained in subsection 362(b)(4) is to be narrowly construed"); *In re Corporacion*

*de Servicios Medicos Hospitalarios de Fajardo*, 805 F.2d 440, 447 (1st Cir. 1986) ("Because we

cannot conceive of any situation in which an action for contractual relief would be the only avenue

available for the enforcement of generally applicable regulatory laws, we choose to follow the

congressional directive to give section 362(b)(4) a 'narrow construction.'").

Here, there is no indication or suggestion that PREC has joined the PV Properties

proceeding as a party or commenced its own proceeding or investigation into the claims asserted

in the PV Properties Complaint, especially not merely by issuing a decision—one that is not

binding on this Court—on the applicability of the automatic stay.  In fact, PREC has not issued a

notice of noncompliance to PREPA under Act 82-2010, which is the formal step to start the

prescribed administrative process for RPS compliance (Act 82-2010, Section 2.12(c); 12 L.P.R.A.

§ 8133(c)), even though the subject of PREPA's RPS compliance was first raised in the IRP and

Rate Review cases and now once again in the PV Properties proceeding. As such, none of the cases cited by PV Properties apply and none of them support the application of the section 362(b)(4) exception to the automatic stay.

First, tacitly recognizing the absence of any action by PREC which other courts have found to be a "continuation" of a proceeding under section 362(b)(4), PV Properties offers a strained interpretation of that term, arguing, albeit unconvincingly, that PREC has "continued" the PV Properties proceeding by requesting both parties to submit a legal memorandum of law addressing various factual and legal questions raised by PREC regarding the applicability and enforceability of the Renewable Energy Policy Act and by deciding that the automatic stay did not apply to the proceeding.  PV Properties is mistaken.  First, PREC's June 2, 2017, Resolution and Order asking for briefing on factual and legal issues raised by the PV Properties Complaint does not constitute the "continuation" of the PV proceeding such that section 362(b)(4) is triggered.  The June 2, 2017, Resolution and Order did not add PREC as party to the proceeding and it certainly did not authorize an inspection, investigation, or audit, which PREC has the authority to initiate.  *See* **Ex. 5**.  PREC's order simply denied PREPA's Motion to Dismiss and asked the parties to address various factual and legal issues raised by the parties' allegations and briefing.  (**Ex. 5** at 8-9).  As noted above, to hold that such an order constitutes a governmental unit's "continuation" of a proceeding would impermissibly and extraordinarily expand the scope of section 362(b)(4) to include any proceeding brought by a private party in which a non-bankruptcy court or regulatory agency took any post-petition action—even actions that do not amount to the "continuation" of a proceeding, and which violate the automatic stay and are void *ab initio*.

Second, PREC's September 13, 2017, Resolution and Order that the PV Properties proceeding fell within the exception set forth in section 362(b)(4), a decision which necessarily

reviewed the public policy and pecuniary interests at issue, does not constitute a "continuation" of

a proceeding under section 362(b)(4). Not only is PREC's decision regarding the applicability of

the automatic stay not binding on this Court—and, in fact, this Court's determination of the

applicability of the automatic stay controls,[8] PV Properties does not cite to any case law, and

PREPA's research did not reveal any, supporting the notion that a decision on the applicability of

the automatic stay by a regulatory entity constitutes a "continuation" of a governmental unit's

proceeding to enforce its police and regulatory power. Again, to accept such circular logic would

impermissibly and extraordinarily expand the scope of section 362(b)(4), an exception which must

be narrowly construed.

Lastly, there is no indication or suggestion that PREPA filed for bankruptcy primarily or

solely for the purpose of evading impending governmental efforts to invoke governmental police

or regulatory powers in connection with the Renewable Energy Policy Act, which was enacted in

2010. Although PREC has the authority to conduct regulatory processes under Acts 82-2010 and

57-2014 to further the purpose and directives of the Renewable Energy Policy Act, as indicated

earlier, no such process has been initiated by PREC against PREPA in connection with its

purported obligations under the Renewable Energy Policy Act. PREPA commenced its Title III

case not to avoid any yet-to-be initiated investigation into its purported obligations under the

Renewable Energy Policy Act, but to restructure and reorganize its approximately $14 billion in

---

[8] It is well-established not only (1) that PREPA may challenge PREC's September 13, 2017 Resolution and Order,
*see In re Soares,* 107 F.3d at 975 (unauthorized post-petition proceedings in violation of the automatic stay are void);
*In re Benalcazar,* 283 B.R. 514, 525–26 (Bankr. N.D. Ill. 2002) ("state court judgments entered in violation of an
automatic stay in bankruptcy are void ab initio and subject to collateral attack[.]"); *accord In re Angelo,* 480 B.R. 70,
83 (Bankr. D. Mass. 2012) ("when faced with a collateral challenge to a state court determination that the stay does
not apply, the bankruptcy court having jurisdiction over a bankruptcy case in which the stay arises must adjudicate
the question anew."); *see also* 2B Bankr. Service L. Ed., § 19:56 (recognizing federal bankruptcy court may entertain
a collateral attack on stay rulings made by non-bankruptcy forum), but also (2) that this Court's determination as to
the applicability of the automatic stay controls, *see Chao,* 270 F.3d at 384 ("[i]f a state court and the bankruptcy court
reach differing conclusions as to whether the automatic stay bars maintenance of a suit in the non-bankruptcy forum,
the bankruptcy forum's resolution has been held determinative").

liabilities in order to remain a viable business entity.  (*See* Dkt. No. 149 at 7–8.)  Accordingly,

neither the clear and unambiguous language of section 362(b)(4) nor the fundamental policy

underlying the exception support its application to the PV Properties proceeding.

### E.     No "Cause," under Section 362(d)(1) Exists to Lift the Automatic Stay

Alternatively, PV Properties argues that the Court should lift the automatic stay for

"cause," arguing that the relief requested by PV Properties—an order compelling PREPA to use

its scarce resources to purchase RECs at a price dictated by PV Properties even though no such

obligation exists—somehow inures to PREPA's benefit, notwithstanding the grave humanitarian

and economic crisis facing the Commonwealth at this moment.  (Motion ¶¶ 15-17).  PV Properties

also claims that, absent a lifting of the automatic stay, its economic model and expected revenues

will be harmed.  (*Id.* ¶ 18).  PV Properties' arguments are unavailing.

"[W]hether there is sufficient 'cause' to vacate the automatic stay in bankruptcy cases

requires the court to engage in an equitable, case-by-case balancing of the various harms at stake."

*Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*, 217 F. Supp. 3d 508, 518

(D.P.R. 2016) (citing cases that determined whether "cause" existed by weighing harm to the

debtor versus harm to the party seeking relief from the stay).  Here, the equities clearly tip in favor

of having the automatic stay remain in place.

First, lifting the automatic stay will negatively impact PREPA and its restructuring efforts.

Given the severe economic crisis facing PREPA at the time it filed for bankruptcy and the

unprecedented devastation and ruin wrought by Hurricane Maria since that time, the

Commonwealth and PREPA must re-assess all aspects of the RPS and any requirements and

obligations set forth therein.  Accordingly, lifting the automatic stay so that PREC can assess and

determine the applicability and enforceability of a regulatory scheme, which may no longer inure

to the benefit of the Commonwealth and PREPA, is not only counterproductive to PREPA's restructuring efforts but also pointless, especially given that energy production as a whole has decreased and will continue to decrease following Hurricane Maria, rendering compliance with the RPS an exercise in futility.

Second, given the unprecedented devastation to the Commonwealth's infrastructure and the wholesale decrease in energy production, PREPA has limited funds at its disposal, the vast majority of which, understandably, is earmarked for the massive repair and restoration effort it is currently undertaking. Indeed, based on government estimates, currently only less than 20% of the island has power. Lifting the automatic stay would only hinder PREPA's repair and restoration efforts as funds would be diverted from restoration efforts simply to line the pockets of PV Properties.[9]

Third, despite PV Properties' claim that (i) the PREC proceeding simply seeks to "clarify" that RECs are equivalent for RPS compliance purposes, and (ii) a determination it claims will only benefit PREPA in the long run and is "completely aligned" with the policy objectives of PROMESA (Motion ¶¶ 15-17), that is simply not true. The PV Properties proceeding seeks an order from PREC requiring PREPA to purchase RECs offered by PV Properties at a price dictated by PV Properties and not at a reduced price or a price driven down by competitive market forces such that it could arguably benefit PREPA. In other words, PV Properties seeks full payment for the RECs it previously offered to PREPA and such a result can only benefit PV Properties. Moreover, such a finding, contrary to PV Properties' assertions, is not "completely aligned" with

---

[9] Pursuant to the PREC's June 2, 2017, Resolution and Order, both parties were directed to submit legal memorandum addressing various factual and legal issues raised by PREC regarding the applicability and enforceability of the Renewable Energy Policy Act. Should this Court lift the automatic stay, PREPA will be required to divert life-saving and necessary resources from its efforts to repair and restore electricity throughout the Commonwealth during this humanitarian and economic crisis so that PV Properties can continue to pursue its pecuniary interest and obtain an order compelling PREPA to purchase RECs from PV Properties at a price dictated by PV Properties.

the policy objectives of PROMESA but runs afoul of them by compelling a debtor who has sought relief from its creditors through a Title III case under PROMESA, to compensate certain creditors outside of the Title III process.

In addition, PV Properties has not credibly articulated any harm to it should the stay remain in place. While it claims that the automatic stay will result in less clarity for its business model, that claimed uncertainty has existed since at least 2010, when the Renewable Energy Policy Act was enacted. Moreover, there is no suggestion or indication that there are exigent circumstances such that time is of the essence to continue with the proceeding before PREC. In fact, PREC recently stayed all proceedings before it in light of the grave humanitarian crisis and severe damage to the Commonwealth's infrastructure following Hurricane Maria. A true and correct copy of PREC's October 5, 2017, Resolution and Order is attached hereto as **Exhibit 8**.

Some courts in the First Circuit and other circuits have also applied the 12-factor test enunciated in *Sonnax Indus., Inc. v. TriComponent Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990). In *Sonnax,* the court analyzed whether relief from the stay should be granted by examining: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution

of litigation; (11) whether the parties are ready for trial in the other proceedings; and (12) impact of the stay on the parties and the balance of harms.  907 F.2d at 1286.

Here, the relief sought would clearly not result in a complete resolution of the issues, would indeed interfere with the bankruptcy case and PREPA's repair and restoration efforts by requiring time, money, and attention from PREPA as described above, does not relate to a proceeding in which the debtor is a fiduciary, and would prejudice the interests of other creditors.  Further, there is no claim that PREPA's insurer has assumed responsibility and the proceeding does not primarily involve third parties.  In addition, there is not yet a judgment claim arising from the PV Properties Complaint, nor a judicial lien, and the amount of potential judgment is unknown.  Finally, PV Properties makes no argument that lifting the stay is in the interest of judicial economy, and it is clear here that neither the parties nor PREC are ready for resolution given the various factual and legal questions that both parties have been requested to address through a legal memorandum of law.  As described above, under these facts, the harm to PREPA—and the people of Puerto Rico— should relief from the stay be granted far outweighs any alleged harm resulting to PV Properties should the stay remain in place, and the balance of harms therefore favors maintaining the stay. Thus, even under the *Sonnax* standard, the stay should remain in place.  *See id.*

## IV.    CONCLUSION

For the reasons set forth above, AAFAF respectfully requests that the Court deny the Motion.

Respectfully submitted,

THE PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY
AUTHORITY,

By its attorneys,

/s/ *Kevin D. Finger*

Kevin D. Finger (*admitted pro hac vice*)
David D. Cleary (*admitted pro hac vice*)
Greenberg Traurig, LLP
77 West Wacker Drive Suite 3100
Chicago, IL 60601
Phone: 312.456.8400
Fax: 312.456.8435
Email: fingerk@gtlaw.com
         clearyd@gtlaw.com

Nancy A. Mitchell (*admitted pro hac vice*)
Nathan A. Haynes (*admitted pro hac vice*)
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
Phone: 212.801.9200
Fax: 212.801.6400
Email: mitchelln@gtlaw.com
         haynesn@gtlaw.com

PUERTO RICO ELECTRIC POWER
AUTHORITY

By its attorneys,

/s/ *Arturo Díaz Angueria*
USDC No. 117907

/s/ *Katiuska Bolaños Lugo*
USDC No. 231812
CANCIO, NADAL, RIVERA & DÍAZ, P.S.C.
PO Box 364966
San Juan, PR 00936-4966
Tel. (787) 767-9625
Fax. (787) 764-4430
adiaz@cnrd.com
kbolanos@cnrd.com

**Exhibit 1**

<u>PV Properties Complaint</u>

[Rubberstamp:]

**PUERTO RICO
ENERGY COMMISSION**
Received by: *Cecilia Sánchez*
Date: *May 31, 2017*
Time: *11:15 a.m.*

COMMONWEALTH OF PUERTO RICO
ENERGY COMMISSION

| | | |
|---|---|---|
| PV PROPERTIES, INC., | &#124; | |
| | &#124; | |
| plaintiff, | &#124; | Complaint No.: *CEPR-QR-2017-001* |
| v. | &#124; | |
| | &#124; | Re.: Act 82 of July 19, 2010, |
| AUTORIDAD DE ENERGÍA | &#124; | as amended; Renewable energy |
| ELÉCTRICA DE PUERTO RICO, | &#124; | credits |
| | &#124; | |
| defendant | &#124; | |
| _____ | &#124; | |

**COMPLAINT**

**BEFORE THE HONORABLE ENERGY COMMISSION**:

Now appears *PV Properties, Inc.*, through the undersigned legal representative, and most respectfully states, alleges, and requests:

**I.  <u>Jurisdiction</u>**

1.     Article 3 of the *Rules and Regulations for Adjudicative Proceedings, Notices of Non-Compliance, Rate Reviews and Investigation*s of this Energy Commission (the Commission), Regulation 8543 of December 18, 2014, establishes that any person with standing may initiate an adjudicative proceeding before the Energy Commission in relation to any matter under the jurisdiction thereof.

1

## II.  **Parties**

1.      Plantiff *PV Properties, Inc.*, (hereinafter *PV Properties*) is a corporation organized under the laws of the State of Delaware and authorized to do business in Puerto Rico, whose registration number with the Department of State is: 14778.

2.      The physical and postal address of *PV Properties*, as reflected in its Certification before this Honorable Commission as an Electric Utility Company is: Calle San Francisco number 206, San Juan, Puerto Rico 00901.  Its electronic mail is marcgrp@gmail.com.

3.      The Defendant, the Puerto Rico Electric Energy Authority, (hereinafter AEE) is a public corporation of the Commonwealth of Puerto Rico pursuant to Act No. 83 of May 2, 1941, as amended, 22 L.P.R.A. § 191 *et seq*.

4.      As shown in the Directory of Agencies of the Commonwealth of Puerto Rico, the physical address of AEE is: 1110 Ave. Ponce de León, Edificio Neos, 8th floor, suite 801, Santurce, Puerto Rico, and its postal address is P.O. Box 364267, San Juan, PR  00936-4267.  The electronic mail known to us is n-vazquez@aeeepr.com

III.  **Standing**

5.     *PV Properties* is one of the companies of Windmar Group (which also includes *Windmar Renewable Energy, Inc., Coto Laurel Solar Farm, Inc.,* [and] *Windmar PV Energy, Inc.*, among other entities), which have designed and built in excess of 35 MW of clean solar energy throughout Puerto Rico, including Vieques and Culebra.

6.     *PV Properties* is the owner of distributed generation systems within the Windmar Group.  This electric production generates Renewable Energy Certificates (RECs) which AEE has to acquire in accordance with Act 82 of July 19, 2010, as amended.  However, AEE has illegally and arbitrarily failed to acquire the RECs that *PV Properties* has made available to it, thereby vitiating said Act's mandate and its mandatory Renewable Energy Portfolio and denying the Plaintiff the economic and financial value represented by each REC as an asset and an incentive for the promotion of renewable energy in the country.

7.     Indeed, this Honorable Commission, through its *Final Resolution and Order of January 10, 2017*, in *In Re. Puerto Rico Electric Power Authority Rate Review*, CEPR-AP-2015-01, at page 60, footnote 133,

expressly acknowledges the Windmar Group's standing and directs it to file

the present complaint:

> *Sunnova and Windmar argue that PREPA's revenue requirement should include an amount for distributed generation RECs. They assert that PREPA has refused to comply with the Renewable Portfolio Standard established by Act 82-2010 by not acquiring all available RECs, and that PREPA owes penalties for non-compliance.* **Enforcing the RPS** *obligations --including determining the scope of that obligation-- does not fall within the boundaries of this rate proceeding.* **The proper approach is to submit a complaint alleging specific facts and proposing remedies** [...] (Our emphasis.)

## IV.   **Facts**

8.     *PV Properties* is one of the companies of the Windmar Group

(which, in addition, comprises *Windmar Renewable Energy, Inc.*, *Coto*

*Laurel Solar Farm, Inc.*, [and] *Windmar PV Energy, Inc.*, among other

entities) which have designed and built in excess of 35 MW of clean solar

energy throughout Puerto Rico, including Vieques and Culebra.

9.     *PV Properties* is one of two electric utility companies that are

part of the Windmar Group. The number of its certification, granted by the

Commission, is CEPR-CT-2016-0005.

10.     The Windmar Group is the largest renewable energy

operation in the country.  It has been at the forefront of the development of

the renewable energy industry in Puerto Rico:     the first to explore and

measure

the Island's potential to generate wind power on a commercial scale; the first to have completed a utilities-scale project; and the first to provide electricity from a photovoltaic system to the Puerto Rico Electric Energy Authority. At the time of its inauguration, *Martino Solar Farm* was the largest photovoltaic system in the whole of Latin America, with 4 MW. Windmar Home, its residential division, has already exceeded 500 residences with photovoltaic systems.

11.   *PV Properties'* distributed photovoltaic generation generates Renewable Energy Certificates (RECs). *PV Properties* produces in excess of 20,000,000 kWh per annum through distributed generators, which is the equivalent of more than 20,000 RECs generated per year. The RECs generated by *PV Properties* are registered and serialized in the *North American Renewable Registry* in accordance with Act 82, *supra*. The estimated worth of these RECs is one million dollars ($1,000,000.00) per annum, at the rate of forty-five dollars ($45.00) per each REC.

12.   AEE is the only retail energy provider in Puerto Rico. For this reason, compliance with the compulsory renewable energy percentages

mandated by the Renewable Energy Portfolio falls exclusively on this public corporation.

13.    According to data published by this Honorable Energy Commission on the basis of information provided by AEE, the energy generated by burning oil, a highly polluting source, has not only not been reduced but has increased dramatically:  **in 2015 it stood at 50.05%, and in 2016 it increased to 61.77%**.  *See*: "Percentile Distribution of Power Generation by Types" http://energia.pr.gov/datos/distribucion-porcentual-de-la-generacion-de-energia-por tipo.

14.    Likewise, according to these same AEE data, the progress in energy **generation through renewable sources is minuscule and insignificant, from 0.14% in 2015 to 0.2% in 2016**. Substantially below the 1% and far removed from the 12.0% mandatory minimum renewable generation it will have to demonstrate in a little more than two years, in 2019.  *See*: "Percentile Distribution of Power Generation by Types" http://energia.pr.gov/datos/distribucion-porcentual-de-la-generacion-de-energia-por tipo.

15.    In the "Annual Report on Compliance Renewable Energy Portfolio Act 82-2010," submitted to this Commission on April 1, 2016, AEE

admits its non- compliance with the RPS. The report's pertinent section states: "VI.  Amount of Energy AEE should generate or acquire in order to comply with the Renewable Energy Portfolio applicable to the current calendar year: a. For 2016: 12% […] 2,075,243.7 MWh. However, [allegedly] renewable energy projects in operation in Puerto Rico do not have the capacity to provide this energy."

16.    Víctor Luis González, the lead executive of *PV Properties* and of Windmar Group, has submitted at least two formal RECs offers, one on January 13, 2015, to the previous AEE executive director, Engineer Juan Alicea, and another on September 6, 2016, to the current executive director of said public corporation, Dr. Javier Quintana Méndez.  Exhibit 2.

17.    Copies of the RECs offer that was formally submitted to AEE's current executive director, Dr. Javier Quintana Méndez, were sent to the chairman of this Energy Commission, the Honorable Agustín Carbó Lugo; to the previous executive director of the State Office of Public Policy on Energy; and to the previous secretary of the federal Department of Energy, Ernest Moniz.  Exhibit 3.

18.    Likewise, the Windmar Group has been consistent and diligent in raising its claim to the effect that it is proper that AEE acquire the  RECs

this party plaintiff has offered them, as reflected in the letter of January 19, 2015, to the honorable chairman of this Energy Commission (Exhibit 4) and as reflected in the *Final Order and Resolution* issued by this Honorable Energy Commission on January 10, 2017, CEPR-AP-2015-01, at page 60, *fn* 133, *"[...] Windmar argue[s] that PREPA's revenue requirement should include an amount for distributed generation RECs. They assert that PREPA has refused to comply with the Renewable Portfolio Standard established by Act 82-2010 by not acquiring all available RECs, and that PREPA owes penalties for non-compliance."*

19.    This notwithstanding, neither the previous nor the current executive director of AEE, nor any other officer of said public corporation, have answered any of the aforementioned RECs offers.   AEE, with no explanation at all, has opted not to acquire all the RECs which *PV Properties* has made available to it, which would allow it to credit [them] towards compliance with Act 82, *supra*, and with its Renewable Energy Portfolio obligation as established in said statute.

## V.  <u>Applicable Law</u>

20.    Faced with the prevailing need to conserve our environment, the Constitution of Puerto Rico established as a public policy "the most efficacious conservation of natural resources, as well as the most advantageous use thereof for the overall benefit of the community …" Article VI, Sec. 19, Const. Comm. PR.   "This provision is a mandate binding upon all components of the state and <u>it prevails over any statute, regulation or ordinance contrary to it</u> [and] unquestionably establishes the crucial legal criterion for determining the validity or interpreting the meaning of any norm or decision related to the use or protection of natural resources formulated by the Legislative Assembly or by any agency, department, municipality or governmental instrumentality."  *Misión Ind. P.R. v. J.C.A.*, 145 D.P.R. 908, 919-920 (1998).

21.    The   whereas   clauses   of   the   Puerto   Rico   *Energy Diversification through Sustainable Renewable and Alternate Energy Public Policy Act*, Act No. 82 of July 19, 2010, as amended (hereinafter "Act 82") 12 L.P.R.A. §§ 121 *et seq*., describe the mandate in Article VI, Sec. 19, of the Constitution as "the **Government's obligation** to promote sustainable development in

Puerto Rico," and adds that "the inexistence of concrete goals that would lead us to the achievement of this goal has resulted in leaving Puerto Rico behind in terms of its energy policy."  Act 83 of July 19, 2010, as amended, the *"Puerto Rico Green Energy Incentives Act,"* 13 L.P.R.A., §§ 10421 *et seq*. (hereinafter "Act 83") contains language that is essentially identical. (Our emphasis.)

22.   Likewise, Article 1.2 of Act 82, *supra*, declares and establishes the Government of Puerto Rico's public policy on energy:

> "achieving the diversification of the sources of electricity and of energy technology infrastructure through **the reduction of our dependence on sources of energy derived from fossil fuels such as oil**; reducing and stabilizing our energy costs; controlling the volatility in the price of electricity in Puerto Rico; reducing capital flight caused by the importation of fossil fuels derivatives; preserving and improving our environment, natural resources, and quality of life; promoting energy conservation and social welfare through various mechanisms, **including the establishment of and compliance with goals within a mandatory timetable and through economic** and tax **incentives** in order to stimulate electrical power generation activities through sustainable renewable energy sources and alternate energy sources. To achieve these goals, the Government of Puerto Rico adopts a Renewable Energy Portfolio in the form of a compliance timetable that will be applicable to all retail energy providers in Puerto Rico." (Our emphasis.)

23.     Our Supreme Court has reiterated this point:

"The Legislative Assembly of Puerto Rico adopted Act No.
82-1010 [i]n accordance with the constitutional mandate of
effective conservation of natural resources […] [and] created
a Renewal Energy Charter for the purpose of achieving a
certain independence from the use of fossil fuels for energy
consumption. With a view towards attaining this objective,
AAE **was given the duty and the responsibility to** create
and **offer** alternative financing and **special incentives to
increase the renewable energy portfolio, and to develop
alternate sustainability sources.**" *Accurate Solutions v.
Heritage Environmental*, 193 D.P.R., 423, 437; 2015 TSPR 9.
(Our emphasis.)

24.     In this context, Article 1.4(7) of Act 82, *supra*, establishes in

Puerto Rico a "Renewable Energy Portfolio" (or RPS, after the initials of

*Renewable Portfolio Standard* in English) which "signifies the **mandatory**

percentage of sustainable renewable energy or alternate energy **required**

from each retail provider of energy […]."  (Our emphasis.)

25.     Pursuant to Article 2.3 of Act 82, *supra*, "the **compulsory**

amount" of alternate or sustainable renewable energy required from **each**

**retail provider** is: 12% between 2015 and 2019, and 15% between 2020

and 2027.  Subsequently to these dates, a "progressive plan" is required that

would establish the annual percentages for the years between 2028 and 2035,

and would attain 20% by 2035. (Our emphasis).  At the present time, "retail energy provider" means exclusively the Electric Energy Authority "that which sold more than […] 50,000 […] MWh […] to consumers […]." Act 82, *supra*, Article 1.4 (29).

26.   Pursuant to the Act, **"sustainable renewable energy"** means energy derived from **solar**, wind, geothermal, renewable biomass, renewable biomass fuels, hydroelectric, hydrokinetic/marine, oceanothermal energy, and others defined by the Commission through orders or regulations.  Article 1.4 (15), Act 82, *supra*.

27.   On the other hand, "renewable alternate energy" means: conversion of municipal solid waste, combustion of gas obtained from sanitary landfills, anaerobic digestion, fuel cells, and such others as the State Office of Public Policy on Energy may determine in the future. Article 1.4 (13), Act 82, *supra*.

28.   In accordance with Article 1.3(K) of Act No. 57 of May 27, 2014, as amended (hereinafter "Act 57"), 9 L.P.R.A. §§ 1051 *et seq*., the

*Act on Energy Transformation and RELIEF*, "energy company" or "**electric utility company**" means, in its pertinent portion, "[…] any physical or legal

person engaged in offering electric energy generation, billing, or resale services. […]" (Emphasis supplied.)

29. **"Distributed renewable energy"** means sustainable renewable energy or sustainable alternate energy that "provides electric energy to an electric utility company or generates [it] for its own consumption or for sale to a third party […]. Article 1.4 (14), Act 82, *supra*. "**Any** operator of a source of distributed renewable energy" is a "producer of distributed renewable energy" under Article 1.4 (26) of Act 82, *supra*. (Emphasis supplied.)

30. By its own terms, Act 82, *supra*, orders that this law be construed "liberally so as to make it possible to implement the public policy established in Article 1.2 and **to guarantee compliance with the Renewable Energy Portfolio created through this Act.**"

31. All provisions of Act 82, *supra*, including everything related to the Renewable Energy Portfolio and compliance therewith, are self-executable *ipso iure* "since the absence of any regulation contemplated in

this Act shall not prevent the application thereof."   Article 3.3, Act 82, *supra*.

32.   This Honorable Energy Commission was created in 2014. By virtue of Article 1.2 of its Organic Law, Act 57, *supra*, declares [the following] as public policy of the Commonwealth, *inter alia*:

"[…] (i) It is the responsibility of the Commonwealth of Puerto Rico, its agencies, municipalities, and public corporations, as well as of every physical or legal person, to comply with all environmental laws and regulations applicable to the Commonwealth of Puerto Rico for the sake of preserving the quality of life of all male and female Puerto Ricans and of the environment;
[…]
(r) There shall be an independent entity to regulate energy, endowed with ample powers and duties to **ensure compliance with the public policy on energy**, the provisions and mandates of this Act, and to ensure fair and reasonable energy costs through the monitoring and review of the rates of the Electric Energy Authority and of any electric utility company […]."  (Our emphasis.)

33.   Indeed, the whereas clauses of Act 57, *supra*, reiterate that the statute permits that "Puerto Rico continue with its mission to comply with the goals established in Act 82 by facilitating greater connectivity of renewable <u>sources</u> to the power grid."

34)   AEE may comply with the RPS a) by generating its own renewable energy; b) by purchasing renewable energy wholesale from other producers; c) by acquiring "Renewable Energy Certificates" (also known as

RECs, after the initials of *Renewable Energy Certificates* in English).

Nevertheless, under Article 2.10 and Article 2.11 of Act 82, *supra*, the

*main*

form in which a retail energy provider such as AEE has to demonstrate its

compliance with the Renewable Energy Portfolio or RPS is through the

submittal of RECs acquired from a renewable energy producer.

35.    One REC represents "the equivalent of one (1) megawatt-

hour (MWh) of electricity generated by a source of sustainable renewable

energy or alternate renewable energy (issued and recorded pursuant to this

Act) and, in turn, includes all environmental and social attributes" of said

energy. Article 1.4 (8), Act 82, *supra*.

36.    RECs will be issued annually by a renewables registry, will

indicate the total megawatts-hour of energy generated by a sustainable

renewable or alternate source, the year in which it was generated, and the

name of the party that generated it.  Title to every REC issued shall belong

to the source that generated it until title to the REC is sold, assigned, or

lawfully transferred.  Act 82, supra, Article 2.8(b).

37.     RECs are concepts of state law and, therefore, the law of the state in question rather than federal law controls their interpretation. *American Ref-Fuel Co.*, 105 F.E.R.C. § 61,004 (2003); *Morgantown Energy Assocs. v. PSC*, 2013 U.S. Dist. Lexis 140220.

38.     The supremacy of RECs (also known in some jurisdictions as *"Tradeable Energy Certificates"* or TRCs after their initials) in demonstrating compliance by retail energy providers with mandatory Renewable Energy Portfolios is the norm in at least 35 states, including Puerto Rico.[1]

39.     The need to efficiently, actually, and credibly demonstrate and accredit renewable generation through RECs responds to physical nature of electric distribution systems.   Without RECs, it would be impossible for retail energy providers to prove their claims of renewable generation so as to be able to meet renewable energy portfolios.   According to the Public Service Commission of the State of Iowa:

> *"Because of the laws of physics that govern operation of the electric transmission system, it is **impossible** to ensure that electricity produced by a particular renewable source is*

---

[1] Center for Resource Solutions (CRS) Comments, RE: Solar Electricity Project P161200 (9/5/2016) at the Federal Energy Regulatory Commission https://www.ftc.gov/system/files/documents/public_comments/2016/05/000_05-127987.pdf; https://www.green-e.org/about.

*specifically and exclusively directed, in a physical sense, to the purchasing entity. **An accounting system that verifies compliance must therefore rely on an agreed-upon abstract medium of exchange similar to the way the financial markets rely on money to represent value.** In the renewable energy area, Tradable Renewable Certificates (TRCs) have been developed as a medium of exchange representing the renewable attributes of renewable energy."* (Our emphasis.)[2]

40.     The RECs' supremacy or priority as the method to comply with

RPS-type norms also operates on the federal level. *See*, for instance,

Executive Order 13693 of March 19, 2015:

*"Sec. 3G (B) (d)  [Sustainability Goal (minimum percentage of total electric and thermal energy for Federal Agencies)]. 'In implementing the policy set forth [not less than 10 percent in fiscal years 2016 and 2017; not less than 13 percent in fiscal years 2018 and 2019; not less than 16 percent in fiscal years 2020 and 2021; not less than 20 percent in fiscal years 2022 and 2023; and not less than 25% by fiscal year 2015 and each year thereafter] the head of each agency **__shall__**: [...] include in the renewable electric energy portion of the clean energy target established [...] renewable electric energy [...] with the following actions, **which are listed in order of __priority__**: (i) installing agency-funded renewable energy on site at Federal facilities and retaining corresponding renewable energy certificates (RECs) or obtaining equal value replacement RECs [...].'* (Our emphasis.)"[3]

---

[2] IOWA UTIL. BD. AEP-07-1(2007) (Order Approving Facilities & Associated Capacities, Adopting Requirements for M-RETS participation, % Requiring Report; In Re.: Interstate Power & Light Co. & Midamerican Energy Co., https://iub.iowa.gov/files/archives/orders/2007/1121_aeop071.pdf

[3] *Planning for Federal Sustainability in the Next Decade*, 80 Fed. Reg. No. 57, p. 15871, https://www.gpo.gov/fdsys/pkg/FR-2015-03-25/pdf/2015-07016.pdf

41.     The pertinent part of Article 2.10(a) of Act 82, *supra*, reflects this supremacy of compliance through RECs by ordering this Honorable Energy Commission to "[…] monitor […] that **the Authority** or other

retail energy provider **complies with the Renewable Energy Porfolio established in this Act in the most efficient manner possible**."  (Our emphasis.)

42.     In this regard, Articles 2.11(a)(ii) and (e) of Act 82, *supra*, establish that even though a retail energy provider may opt to file a "report" with this Honorable Commission evidencing its compliance with the Renewable Energy Portfolio "through the actual purchase of renewable energy [..] **from producers of distributed renewable energy […]," that option is not available or, at least, is not the primary option when RECs exist and are available to be acquired by said retail provider**; in other words, according to Act 82, *supra*, AEE's alternative to comply with the RPS through the actual purchase of energy "shall be [the] only [one] available":

> "[…] **when it is <u>not</u> viable to obtain RECs representing said electricity** […]" (Article 2.11(a)(ii).   "[…] [T]his alternative [a report on the actual purchase of energy] shall only be available if the retail energy provider shows that […] **it is not possible to submit to the Commission RECs representing said energy**." (Article 2.11(e))   (Our emphasis.)

33.     In connection with this crucial point, Professor Luis Aníbal Avilés Pagán, the previous chairman of the AEE government board, affirms the following with respect to compliance with the RPS by AEE through the purchase of RECs generated by Puerto Rico producers, even though the latter may not generate the "amounts necessary for AEE to comply with Puerto Rico's Portfolio obligations":

> "AEE could buy **<u>all</u>** the RECs issued by entities producing … solar energy […] to reduce its dependence […]."[4]

## VI.  <u>Discussion</u>

43.     The  potential  that  renewable  energy  sources  have  to positively transform our country is an unquestionable fact, as well as the

---

[4] Luis Aníbal Avilés, "La Cartera de Energía Renovable de Puerto Rico: ¿Demasiado Poco, Demasiado Tarde?" ["Puerto Rico's Renewable Energy Portfolio: ¿Too Little, Too Late?], 81 U. of Puerto Rico Law Rev., 135, 165 *fn* 169 (2013)

public policy of the Commonwealth of Puerto Rico today: nowadays
sustainable energy development is not an option but, rather, a mandate
morally and legally binding under the umbrella of our Constitution, Act 82
and Act 83 of 2010, *supra*, as amended, and Act 57 of 2014, *supra*, as
amended.

44.     It is fitting to recall and cite here one of the studies that
preceded and, to a large extent, served as a catalytic agent to bring
about

these very advanced laws; a work prepared by scientists at the Mayagüez
University Campus and commissioned by the Administration of Energy
Matters (today the State Office for Public Policy on Energy) headed by Dr.
Javier Quintana Méndez, the current executive director of AEE:

> *"In Puerto Rico, with our abundant renewable energy
> resources, the question should be not how to best integrate
> renewable resources into the existing electric energy grid or
> other energy infrastructures, but how our existing
> infrastructures **and practices** should change or transition **in
> order to <u>allow maximum</u> use of solar, wind, ocean and other
> renewable energy sources**.*
>
> *The **<u>renewable energy</u>** potential **<u>is available</u>**, the
> technological know-how is present, **but we need the will as a
> People** and the inclusive and open dialogue spaces **to reach
> historic decisions**.*
>
> *We need to stop thinking within the bounds of our
> disciplinary or sector limits, start considering the bigger*

*picture and identify the connections and implications of our decisions in other areas or sectors.  It is up to us, all Puerto Ricans, to make a stand for the future, a true social pact in which we do not wait for problems to be solved from the outside but solve the problems ourselves.*"[5]

45.    This Honorable Energy Commission is both guardian and protagonist in this effort to protect the public interest, our ecological self-preservation, and our economy, and the mechanism to achieve [its goals] is to enforce the Renewable Energy Portfolio.

46.    This Honorable Commission has the obligation to interpret Act 82, *supra*, liberally so as to **guarantee** the implementation of the public policy that leads us to energy autonomy through compliance with the RPS ordered in the Act.

47.    The instant case is most important but, at the same time, it is very simple: AEE is today in clear violation of the legal mandate of Act 82, *supra*, which orders it to reduce its dependence --the country's dependence-- on oil.  Instead of it being reduced as ordered by law, **said dependence on fossil fuels has increased from 55% to close to 62%, according to the AEE's own data**.

48.    AEE has admitted in official documents that it is not in compliance with the RPS.  It does not comply today with the 12% of

---

[5] Irizarry Rivera, Colucci Ríos, O'Neill Carrillo, *Achievable Renewable Energy Targets for Puerto Rico's Renewable Portfolio Standards: Final Report*, 1-11 (2008)

renewable sources required by the RPS and, if it does not acquire all RECs available, its non-compliance will be even more patent, more serious.

49.     Worse still: the mandatory 15% is fast approaching.   This Honorable Commission cannot allow the mandates of Act 82, *supra*, to become dead letter, to be mocked without any consequences.

50.     We say the matter is a simple one because Act 82, *supra*, provides clear solutions, susceptible of being implemented efficiently and

easily.   **These are, moreover, mandatory solutions, not only insofar as AEE is concerned but because they also direct the steps this Honorable Commission can and must take as remedies.**

51.     The Honorable Commission has to guarantee that AEE complies with the renewable Energy Portfolio **"in the most efficient manner possible."**   Article 2.10(a), Act 82, *supra*.   We ask: is it not obvious that the most efficient manner to start complying with the RPS is that method of compliance which is available today and now?   **The Plaintiff's RECs are available today and now for acquisition by AEE. This Commission can and must order that remedy**.

52.     **It is incumbent upon AEE to prove to this Honorable Commission that it is actually impossible to file RECs to accredit its**

**compliance with the RPS, <u>which is a mandatory norm that affords no
discretion to disobey it.</u>** (Article 2.11(e)).

53.     That possibility of non-compliance simply does not exist: the
Plaintiff's RECs are available today and now for acquisition by AEE, as
established by the Act.  But even if some difficulty were to exist on the part
of AEE in fully complying with all of the RPS, that does not mean that it
does not have to do everything possible in order to comply: it has to
endeavor to comply as best it can, albeit partially.

In other words, AEE always has a full-compliance statutory obligation and
must always aim to comply fully, regardless of how complex that [effort]
may be.  In that process, the agency achieves something different from full
non-compliance by showing partial compliance, a "more complete
compliance" which in this case is achieved through the purchase of RECs
from the Plaintiff.  *Cf. United States Brewers Ass'n v. Environmental
Protection Agency,* 600 F.2d 974 (1979): "[…] *a party seeking to force full
compliance with a statutory requirement by an agency should seek as a
remedy an order to the agency to* **comply more completely** *with the
statutory mandate.* […]" (Our emphasis.)

54.     It would be equally improper to allege AEE's impossibility
[to comply] on the basis of financial reasons. *Public Citizen v. Federal*

*Trade Commission*, 869 F.2d 1541, 1556 (D.C. Circ. 1989), citing *Alabama Power Co. v. Costle*, 636 F.2d 323. 357 (D.C. Circ. 1979)  "[…] *there exists no general administrative power to create exemptions to statutory requirements based upon the agency's perceptions of costs and benefits.* […]"

55.     In any event, this Honorable Commission has already stated that: *"to the extent [the REC purchase obligation] changes PREPA's revenue requirement, the Commission would reflect such change in future rates."  Final Resolution and Order, In Re. Puerto Rico Electric Power Authority Rate Review*, CEPR-AP-2015-01, at page 60, *fn* 133; *Cf.* also Article 3.2, Act 82, *supra*.

56.     **Act 82**, *supra*, in the framework of Article VI, Sec. 19, of our Charter, **leaves no room at all to interpret neither the compulsory nature of the goals established in the Renewable Portfolio nor the binding accreditation of RECs as a method to achieve compliance**.  In accordance with Act 82, *supra*, the submittal of RECs --whether self-generated by AEE or acquired from renewable energy providers such as this Plaintiff-- is the manner to accredit compliance with the RPS.

57.     This notwithstanding, AEE, illegally and arbitrarily, has not acquired the RECs *PV Properties* has made available to it, in violation of

the obligation under, and the mandate of, Act 82 and the mandatory Renewable Energy Portfolio provided for therein.

58.    Worse yet: by denying the Plaintiff the economic and financial value each REC represents, AEE's illegal and arbitrary attitude neutralizes the RECs' function to incentivize and promote the renewable energy industry in the country.  The investment made by the Plaintiff by installing distributed

generators was made with the reasonable expectation that Act 82, *supra*, would be complied with, and with the economic expectation, likewise reasonable, associated with this compliance.  Both are fundamental principles of legal and financial stability for the Puerto Rican renewable industry in general, and are equally central to the viability and operational and financial sustainability equations of the Plaintiff's present and future projects.

59.    By acting promptly and righteously with respect to AEE's compulsory purchase of RECs, this Honorable Commission would correct this serious situation, [thereby] rapidly improving the liquidity of distributed renewable energy producers like the Plaintiff and, consequently,

substantially lowering the costs of financing and acquisition of photovoltaic systems for the country's consumers.

60.     **An order from this Honorable Commission requiring AEE to acquire all the RECs generated by distributed renewable energy producers like the Plaintiff would be triply virtuous: it would set AEE on the path towards partial compliance with the RPS; it would incentivize the growth of the entire industry, increasing the local production of renewable energy; and, in turn, would increase the amount of RECs available in the market to attain full compliance with the RPS**.

61.     Finally, with the Order we are requesting today, this Honorable Commission, by incentivizing clean energy sources (and, at the same time, de-incentivizing the generation of polluting fossil fuels), would quickly and positively impact our environmental quality and, at the same time, pump that same oxygen into our local economy,

62.     Article 2.12(g) of Act 82, *supra*, certainly empowers this Honorable Commission to levy monetary sanctions on AEE for its non-compliance with the RPS, and emphasizes that the sanction should not be lower than the cost of complying with the RPS.  However, we hold that, at this stage, ordering the purchase of the Plaintiff's RECs in order to set in

motion partial compliance with the RPS is more efficient and redounds in greater benefit to the public interest than levying fines on AEE.

63.    **Fining AEE in the first instance instead of ordering its fullest possible compliance through the acquisition of available RECs would, in our opinion, result in a disservice to the public interest: the option would be more expensive for the public treasury but it would not carry the social, economic, and environmental benefits generated by complying with the RPS**.

64.    The present case is actually a great opportunity for this Honorable Commission: a juncture where it can avail itself of its ministerial powers to foster environmental improvement and wealth creation. This Honorable Commission's action would constitute an economic tool in and of itself: in addition to improving the quality of the physical environment where renewable energy is generated --our island--, it would incentivize a whole economic sector based on native raw materials (such as sunshine, wind, etc.), thereby diminishing the flight of funds towards other economies in the way of oil purchases, and, moreover, maintaining (and creating) quality jobs directly and indirectly associated to the distributed renewable energy generation industry.

65.     This is indeed the definition of sustainable development reflected in our Constitution. And the challenge that all of us must willingly assume. We do not have to choose between energy and the environment. We know this is a false dichotomy. The truth is that all of us aspire to having sustainable development, as there is no economy without ecology, and vice versa; in the particular case of the financing of renewable energy: the ecological benefits resulting from clean sources are achieved by rationally channeling the economic incentives (such as the RECs) that make those benefits possible.

66.     This Honorable Commission finds itself in the special position of translating into reality the highest aspirations of individuals who have devoted their lives to thinking about these issues and their solutions, as well as the vision of sustainability initiated by the founders of the Commonwealth. The road is out there; all that needs be done is to follow it.

## VII.  Petition

**WHEREFORE** we ask this Honorable Energy Commission to grant the following relief as a whole, at its discretion:

a)     To declare illegal and null the behavior of the Defendant AEE in failing to acquire the Renewable Energy Certificates the Plaintiff has offered to it;

b)     To order the Defendant AEE to acquire all the Renewable Energy Certificates the Plaintiff has

offered to it, at a price not lower than that already offered, as well as those RECs the latter may offer to it in the future;

c) To warn and/or to levy upon the Defendant any appropriate sanction or remedy under the law which, at the Commission's discretion, would ensure prompt compliance by AEE with its obligation to acquire all Renewable Energy Certificates the Plaintiff has offered to it, as well as those it may offer in the future.

I CERTIFY: having sent today, March 3, 2017, a true and accurate copy of this Complaint to:  Autoridad de Energía Eléctrica de Puerto Rico [Puerto Rico Electric Energy Authority], P.O. Box 364267, San Juan, PR 00936-4267, and e-mailed to n-vazquez@aeepr.com.

**RESPECTFULLY SUBMITTED**.

San Juan, Puerto Rico, March 3, 2017

[Illegible signature]
**Javier Rúa Jovet**
SUPREME COURT No. 12,602
COUNSEL FOR THE PLAINTIFF
701 AVENIDA PONCE DE LEÓN
EDIFICIO CENTRO DE SEGUROS
SUITE 414
SAN JUAN, P.R.  00907
TELEPHONE: (787) 396-6511
FAX: (787) 724-0353
Electronic mail: javrua@gmail.com

## LOPEZ AND DURAN

### Interpreting and Translating

740 Malaga Avenue
Coral Gables, Florida  33134
Tel.: (305) 443-3432
e-mail: lopezandduran@aol.com
nelduran@bellsouth.net

## CERTIFICATE OF ACCURACY

STATE OF FLORIDA )

) SS.

COUNTY OF DADE  )

Before me, a notary public in and for the State of Florida at large, appears Nelson Duran, Ph.D., who is personally known to me, a certified court interpreter, qualified by the Administrative Office of the United States Courts, for and on behalf of Lopez and Duran Interpreting and Translating, who, after being duly sworn, deposes and says that he is fully versed in the Spanish and the English languages, and that the foregoing is a true and correct translation of the attached document consisting of _twenty-nine_ pages, and that this is the last of the attached.

_Nelson Duran_

Nelson Duran, Ph.D.

Sworn to and subscribed this _tenth_ day of _October_, 20_17_.

_Armando M. Escoto_

Notary Public,
State of Florida at Large

My commission expires:

ARMANDO M. ESCOTO
MY COMMISSION # GG 076721
EXPIRES: June 24, 2021
Bonded Thru Notary Public Underwriters

The utmost care has been taken to ensure the accuracy of all translations.  Lopez and Duran Interpreting and Translating and its employees shall not be liable for any damages due to negligence or error in typing or translation.

**Exhibit 2**

PREPA's Motion to Dismiss

[Stamp: COPY]

COMMONWEALTH OF PUERTO RICO
ENERGY COMMISSION

SECRETARY OF THE
ENERGY COMMISSION
OF PUERTO RICO

'17 MAR 23 3:10PM)

PV PROPERTIES, INC.

Plaintiff

v.

ELECTRIC ENERGY AUTHORITY
OF PUERTO RICO

Defendant

NO. CEPR-QR-2017-00001

Re: Act No. 82 of July 19, 2010, as amended;
Renewable energy credits.

## MOTION TO DISMISS

TO THE HONORABLE ENERGY COMMISSION OF PUERTO RICO:

The undersigned attorneys, representing the Electric Energy Authority ("AEE" in Spanish, "EEA" hereafter), appear before you and respectfully state and request:

## I.       INTRODUCTION

On March 3 of 2017, PV Properties, Inc. ("PV Properties," also "plaintiff") initiated the lawsuit indicated in the heading. In essence, they allege having designed and built 35 MW of renewable energy in the jurisdiction of Puerto Rico, by means of its distributed generation systems, for which it generates Renewable Energy Certificates ("RECs" in Spanish, "RECs" hereafter), which it understands that the EEA is obligated to acquire. Under the protection of several statutes, PV Properties requests that this Honorable Commission, among others, order the EEA to acquire all the RECs that it has offered the EEA for a price equal or greater than the one offered already, as well as those that it shall offer in the future, and that the Commission imposes the corresponding penalties to the EEA.

Nevertheless, the lawsuit initiated by PV Properties must be dismissed as, currently, this Distinguished Commission lacks the jurisdiction to address the claims of PV Properties, as it hasn't issued the regulations necessary for the implementation of the provisions of Act No. 82 of July 19, 2010, as amended, known as "Puerto Rico Energy Diversification Policy through Sustainable and Alternative Renewable Energy Act" ("Act No. 82-2010" hereafter). Otherwise, the EEA would be deprived of the protections of due process of law, granted by our Constitution, as well as the regulations applicable to administrative procedures, such as this one. The Commission is obligated to establish the parameters under which it might exercise the powers delegated by the Legislator in Act No. 82-2010. Any determination at which the Commission were to arrive on the merits, would be permeated by arbitrariness, as the entities to which the implementation of this law would be applied haven't been warned in advance about the requirements, parameters,

and procedures they will have to abide to, nor to the penalties they would expose themselves to.

Based on the grounds that we present below, the EEA, very respectfully requests that the Honorable Commission dismisses the lawsuit indicated in the heading.

## II.      SUMMARY OF THE PLAINTIFF'S CLAIMS

In synthesis, PV Properties claims that Act No. 82-2010 obligates the EEA to meet a compulsory annual percentage of energy generated by renewable energy sources in Puerto Rico, known as the "Renewable Portfolio Standard," which, to date, is not taking place. In light of this, they allege having offered RECs on several occasions to the public corporation, "which would allow them to pay towards their compliance with Law 82, supra and with their obligations related to the Renewable Portfolio Standard." See *Lawsuit,* page 8, ¶ 19.

The plaintiff claims that their distributed photovoltaic generation surpasses 20,000,000 Kwh annually, which is equivalent to more than 20,000 RECs generated per year, which are supposedly registered in the Renewables Registry of North America, and whose estimated value is $1,000,000 per year, based on $45.00 per each REC.

Based on the foregoing, PV Properties proposes to this Commission, as an alternative, in order for the EEA to be in compliance, that the plaintiff's RECs be acquired. It is their understanding that "[t]his impossibility of non-compliance simply doesn't exist: the Plaintiff's RECs are available today and now for acquisition by the EEA, as established in the Law." Id. page 22, ¶¶ 52-53. Their argument goes further, to the point of stating that the "EEA, illegally and arbitrarily hasn't acquired the RECs that *PV Properties* has placed at its disposal, in violation of the obligation and mandate of Law 82, supra, and the mandatory Renewable Portfolio Standard indicated therein." Id. Page 24, ¶ 57.

As remedies, PV Properties requests that the Commission:

> "a) Declare the illegality and nullity of the actions of the Defendant EEA by not acquiring the Renewable Energy Certificates that the Plaintiff has offered them;

> b) order the Defendant EEA to acquire all the Renewable Energy Certificates that the Plaintiff has offered them for a price equal or greater than offered, as well as the RECs that it offers in the future;

> c) warn the plaintiff and/or impose on it any penalty or remedy permitted by law, that will, according to the Commission's discretion, ensure swift compliance, on the part of the EEA, with their obligation to acquire all the Renewable Energy Certificates that the Plaintiff has offered them, as well as those it will offer them in the future."

(See *Lawsuit, page 28).*

### III.    LEGAL BASIS

A.    <u>Standard applicable to motions to dismiss filed before the Energy Commission</u>

Section 6.01 of the Adjudication Procedures Regulations, Non-compliance Notices, Review of Tariffs, and Investigations, issude by the Commission, Rule No. 8543 from December 18, 2014, states the following:

> **"Section 6.01 – Dismissal Requests and Orders to Show Cause**
>
> Instead of, or in addition to file an answer to a lawsuit, appeal, counterclaim, lawsuit or appeal against a third party, or a complaint or appeal against a co-party, any defendant may ask the Commission to dismiss the corresponding vehicle through a duly justified motion. In their motion to dismiss, the defendant can argue that the matter raised against them lacks a claim that justifies the concession of a remedy, that the matter lacks merit, that the Commission lacks jurisdiction over the person or over the matter to address the controversies raised in the matter, or to base their motion to dismiss on any other Legal basis.
>
> In any event, the Commission may, *motu proprio* or by request of a party, order the plaintiff to show cause for which the lawsuit, appeal, counterclaim, lawsuit or appeal against a third party, or a complaint or appeal against a co-party, should not be dismissed.

These dispositions of Rule No. 8543, supra, are analogous to Rule 10.2 of Civil Procedure, which establishes – among others – that it is possible to request the dismissal of a claim when when the court lacks jurisdiction to address a controversy. (32 L.P.R.A., Ap. V, R. 10.2).

The lack of jurisdiction on the matter implies the nullity of the judicial acts. If a court or entity acts without jurisdiction, its findings will be null, due to which they will not have any effect whatsoever. <u>Montañez Rivera v. Policía de Puerto Rico</u>, 150 D.P.R. 917 (2000). A court or administrative entity cannot assume jurisdiction over the matter with consent from the parts, nor out of mere liberality or the inaction of any of the parts. Before this, it ought to be examined, in advance, whether the examining forum has jurisdiction in a dispute, and the parts will be able to do so *motu proprio* without this being called to either party's attention. <u>Ponce Federal Bank v. Chubb Life Ins. Co.</u>, 155 D.P.R. 309 (2001). In the absence of jurisdiction, the matter must be dismissed immediately.

B.    <u>Public Policy of Energy Diversification through Renewable, Sustainable, and Alternative Energy in our jurisdiction</u>

With the approval of Act No. 82-2010, the Legislative Assembly promoted the generation of sustainable renewable energy, in accordance to short, medium, and long-term goals, through the establishment of a percentage of sustainable renewable energy or alternative renewable

energy required from every retail supplier of energy, called "Renewable Portfolio Standard." This way, it is sought to reduce the dependency on the use of fossil fuels for the consumption of energy. See Act No. 82-2010, *Statement of Reasons*. The Renewable Portfolio Standard is used as a compliance calendar. Id., Articles 1.2 and 2.1, 12 L.P.R.A. ("L.P.R.A." in the original, "Leyes de Puerto Rico Anotadas" in Spanish, "Laws of Puerto Rico Annotated" in English) §§ 8121 note and 8122.

The Legislator delegated on the Commission the enforcement of Act No. 82-2010. Id., Article 2.4, 12 L.P.R.A. § 8125. Among others, the Commission must monitor yearly that the EEA complies with the applicable Renewable Portfolio Standard. Id., Article 2.3, 12 L.P.R.A. § 8124. The Commission must "[f]ormulate and enforce strategies to achieve, directly or indirectly, the objectives of this Law, including the ability to meet the goal of reducing and stabilizing energy costs, and controlling the volatility of the price of electricity in Puerto Rico." Id., Article 2.4(e), 12 L.P.R.A. § 8125. Likewise, **the Commission must issue rules to establish "the requirements for documentation, registration, and verification of RECs," among others. Id.** Article 2.4(d). These rules most abide by the provisions of Act No. 82-2010 and the procedures established in Act No. 170, from August 12, 1988, as amended, known as the "Uniform Administrative Procedures Act" ("Act No. 170-1998"). Id. Article 2.4(k) and (l).

The RECs are chattels that constitute a marketable and negotiable asset or financial value, that can be purchased, sold, yielded and transferred among persons for any legal purpose and represent the equivalent of one (1) megawatt-hour (MWh) of electricity generated by a renewable energy source (issued and registered ini accordance with Act No. 82-2010) and, at the same time, involves all the environmental and social attributes established in said legal body. See Article 1.4(8) of Act No. 82-2010, 12 L.P.R.A. § 8121. The commission shall require producers of sustainable renewable energy to issue RECs through the use of the North American Renewables Registry. Article 2.7 of Act No. 82.2010, 12 L.P.R.A. § 8128. In order to issue them, each producer of sustainable renewable energy shall maintain an agreement with the retail energy supplier for the reading of production through counters. Id. The retail energy supplier shall send the information about generation by every sustainable energy producer to the renewables registry. Id. In order to implement these dispositions, the Commission is obligated to adopt a regulation. Id.

The purpose of the RECs is to "facilitate compliance with the Renewable Portfolio Standard." Article 2.8, 12 L.P.R.A. § 8129. In order to comply, on an annual basis, with said requirement, the EEA will present, annually, before the Commission, on or before March 31 of each year – a Compliance Report with the provisions of Act No. 82-2010, certifying that: (a) during the previous natural year, it has acquired the necessary RECs1 necessary to reach the compulsory annual percentage of energy generated by sources of renewable energy in Puerto Rico, established in Article 2.3, cited above; and/or (b) in case the EEA accounts for the electricity generated by and purchased from producers of distributed renewable energy in Puerto Rico through a program of net measurement, and it's not viable to obtain the RECs that represent such electricity, a report showing that the public corporation has complied with the Renewable Portfolio Standard through the purchase of real renewable energy, together with all the environmental and social attributes related to the production of such energy. Article 2.11, 12 L.P.R.A. § 8132. As in the articles cited above, it is stipulated that the Commission is obligated to issue regulations to these effects. Id.

For its part, sub-paragraph (d) of Article 2.12 stipulates, among others, the following:

> "The concerned retail energy provider may justify non-compliance showing, in a detailed manner, the reasonable and good faith efforts it might have made in order to comply with the Renewable Portfolio Standard. In order to establish the reasonableness and good faith of its defense against non-compliance, the renewable energy provider shall show, to the satisfaction of the Commission, that it was due to one or more of the following reasons: (i) force majeure or unforeseen circumstances, as defined in this Act; (ii) unforeseeable substantial loss of the renewable resource; (iii) work disturbances and strikes; (iv) contractual violations of a renewable energy purchase agreement by the contracting party (which is not the retail provider of energy); (v) insufficiency of producers of sustainable renewable energy or alternative renewable energy; (vi) excessive cost of acquisition of the electrical energy generated by a producer of renewable energy; and (vii) any other justification accepted by the Commission based on the regulations to this effect that is consistent with the public policy outlined in this Act."

(12 L.PR.A. § 8133)

Sub-paragraphs (f) and (g) of Article 2.12 of the Act allow for the Commission to impose fines through administrative procedures when it is determined that the EEA has failed to comply with the Renewable Portfolio Standard applicable to the natural year under review. 12 L.P.R.A. § 8133.

Nevertheless, to this day, the Commissioni has not issued the regulations to implement and exercise the powers and faculties delegated on it by the Legislator under Act No.

---

1   The RECs issued, shall indicate the number of megawatt-hours (MWh) of energy generated from a sustainable renewable source, the year during which said energy was generated, and the name of the source that generated the energy. See Article 2.8(b), 12 L.P.R.A. § 8129.

82-2010. Next, we will discuss the principles of due process of law applicable to the administrative realm, with the purpose to provide this Honorable Commission with a clear picture of the reasons for which this lawsuit should be dismissed.

        C.      <u>General principles of the due process of law in administrative law</u>

As it's well known, in our judicial system, the actions of the State, exercised through its legislative and executive powers, or through those delegated to administrative agencies, are limited by the Bill of Rights of the Constitution of Puerto Rico, which state that "[no] person shall be deprived of their freedom or property without due process of law, nor will any person in Puerto Rico be denied equal protection of the laws." Art. II, Sec. 7, Const. Commonwealth, L.P.R.A., Volume 1. Parallel to this, the Fifth Amendment of the Constitution of the United States, states, pertinent to this "...nor [shall] any person] be deprived of life, liberty or property, without due process of law." Fifth Amendment, Const. U.S.A., L.P.R.A., Volume11 I. Both dispositions constitute the keystone of due process of law, which is guided by the principle of guaranteeing the parts' fundamental rights and avoid arbitrary and capricious actions by the State.

This constitutional mandate manifests itself in two dimensions: the substantive and the procedural. <u>See Cleveland Bd. Of Education v. Loudermill</u>, 470 U.S. 532 (1985). Under the protection of the former, the courts examine the validity of the substantive part of a law or rule under the light of the Constitution, ensuring that it doesn't impeach any fundamental right. <u>See</u>, e.g., <u>Marina Ind. Inc. v. Brown Boveri Corp.</u>, 114 D.P.R. 64, 77-86 (1983). With regards to the latter, of a procedural nature, **it takes into account the minimum procedural guarantees that the State must provide an individual when affecting their life, property, or liberty.** ROTUNDA, NOWAK & YOUNG, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE, § 14.6 (1986). Their procedural applicability requires an individual interest in liberty or property. <u>Board of Regents v. Roth</u>, 408 U.S. 565 (1972). Once this requirement is satisfied, it is necessary then to determine which is the procedure required. <u>Cleveland Bd. Of Education v. Loudermill</u>, *supra;* <u>Morissey v. Brewer</u>, 408 U.S. 471, 481 (1972). Thus, the fundamental characteristic of this right is that the procedure followed by the State be a fair one. <u>Vives v. Policia de P.R.</u>, 118 D.P.R. 219 (1987). "The essential guarantee of the due process of law clause is that it be fair." <u>Id.</u>, on page 225. In simple terms, the due process of law, both, in its procedural, as well as in its substantive dimensions, require that the law and the procedures before the State be fair, and this fairness is framed in a

6

series of basic requirements that can be summarized in that the party affected by the State's action have **clarity** and **certainty** with regards of the rules that apply to it.

In the administrative realm, the law is the source that confers power to an administrative agency in order to oversee the compliance with the law that enables it, a mechanism that authorizes and delegates upon the administrative agency the powers to act with the purpose established by the law. Administrative agencies enjoy two (2) essential powers: the power to regulate as they perform quasi-legislative functions, and the power to adjudicate controversies as they perform quasi-judicial functions within the agency's field of action.2

The Uniform Administrative Procedure Act establishes the characteristics and requirements that administrative agencies must meet in regulation and adjudication procedures. The statement of reasons for said law reads, in what's pertinent to this, as follows:

> "The measure systematizes and creates a uniform body of minimum rules that all agencies must observe when formulating rules and regulations that define the legal rights and duties of a particular class of persons. It contains, also, another body of different norms to govern the determinations of an agency in adjudicative procedures when issuing an order or resolution that defines the legal rights and duties of specific persons."

(Statement of Reasons of the U.A.P.A.., *supra*).

The U.A.P.A. defines a concept of regulation as that which is subject to a procedure by which an agency formulates, adopts, amends or abrogate a rule or regulation. 3 L.P.R.A. § 2102(m). This law defines a rule or regulation as:

> "any norm or set of norms of an agency that are of **general application** that executes or interprets public policy or the law, or that regulates the requirements of the procedures or practices of an agency, that has the force of Law. The term includes the amendment, abrogation, or suspension of an existing rule." (**Emphasis added.**)

(3 L.P.R.A. § 2102(m)).

The above-mentioned norms state that, in order for an administrative agency to exercise its faculties within the reach granted by the Legislator in its enabling law, it must issue a regulation. The procedure required for the approval of a regulation by an administrative agency is governed by sub-chapter II of the Uniform Administrative Procedure Act, 3 L.P.R.A. §§ 2121-2141. For a regulation to be valid, it is a requirement to complete this procedure. Hernandez v. Col. Optometras, 157 D.P.R. 332, 342-343 (2002). This requirement only applies to those norms that affect the substantive rights of individuals. In other words, it only concerns to "legislative" rules. **It is essential to stress that this type of rules creates rights, imposes obligations and establishes a behavior pattern that has**

---

2   Translator's note: The original in Spanish reads "funciones … dentro de la pericia de la agencia," whose literal translation is "functions … withing the agency's expertise."

the force of law. **Not even the agency itself has discretion to detach itself from its effects, as these are rules that provide substantive or detailed content, or in a certain way, complement the law.** L.P.R.A. §§ 2121-2141. See, also, <u>Centro Unido Detallistas v. Comision de Servicio Publico</u>, 174 D.P.R. 174 (2008); <u>Asoc. de Maestros v. Comision</u>, 159 D.P.R. 81, 93 (2003); <u>Agosto Serrano v. F.S.E.</u>, 132 D.P.R. 866 (1993); <u>Hernandez v. Colegio de Optometras</u>, *supra.*

Thus, it is stipulated that any rule or regulation adopted or amended by an agency must contain a brief and concise explanation of its purposes or of the reasons for its adoption or amendment. 3 L.P.R.A. § 2125(b). A regulation issued in order to implement the execution of a law may be complemented but may not be in conflict with the latter. <u>P.S.P. v. Comision Estatal de Elecciones</u>, 110 D.P.R. 400, 409 (1980). **The Legislative Assembly may delegate broad faculties and discretion upon an administrative agency, but such power may not be exercised in an arbitrary or capricious manner. <u>Id</u>. The above underscores the importance of agencies to issue regulations that are linked to the faculties delegated upon them.**

Within this faculty to regulate, it is expected that each agency specifies with more clarity, through regulations, precisely the parameters under which it will exercise the authority delegated upon it. <u>See</u> BERNARD SCHWARTZ, ADMINISTRATIVE LAW 69-70 (1991). As a consequence, the rules issued by the agencies perform an essential function, delimiting the discretion delegated upon the same. <u>Sandin v. Conner</u>, 515 US 472 (1995). **The regulations of the agencies provide the affected parties a clearer notification about which conducts are allowed and which aren't.** K.C. DAVIS AND RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 6.2 (1994). It is extremely valuable, as it provides the affected parties information about which types of conduct are acceptable. <u>Massachusetts v. Blackstone</u>, 67 F.3d 981 (1ˢᵗ Cir. 1995). This underscores that **in the absence of regulations, the party upon which the agency hopes to exercise its delegated faculties, lacks the criteria to understand clearly which actions are or not penalized by the agency.** This generates a dual situation in which, on one side, the party is left in a state of defenselessness and, on the other, the agency exercises arbitrariness if it acts without statutory limits.

For all of the above, case law insists that an agency must establish administrative standards through regulation, in order to thusly structure the procedural and substantive discretion that has been granted to it, in order to eliminate, this way, arbitrariness and, at the same time, provide adequate notification to the public about the prevailing state of law. ARTHUR EARL BONFIELD, STATE ADMINISTRATIVE RULE MAKING § 4.3.1 (1986). **This rule requires the agencies to establish the boundaries of said discretion through regulations.** "What is currently required, as an oversight measure, is for the agencies to approve regulations that delimit or specify their faculties under the law in order to avoid illegal or arbitrary actions." See, also, Marketing and Brokerage Specialists v. Secretario de Agricultura, 118 D.P.R. 319 (1987); Soto v. Jimenez, 112 D.P.R. 477 (1982), citing papachristou v City of Jacksonville, 40 U.S. 156, 170 (1972); Soto v. Jimenez, 112 D.P.R. 477 (1982), and Torres Arzola v Policia de Puerto Rico, 117 D.P.R. 204, 2011 (1986).

The academy has also expressed itself thusly when it stated that:

> "Without any doubt, to require the agencies to approve a procedural regulation intends to address, precisely, these concerns. That is, the adoption of a regulation […] creates a presumption of reasonableness and non-arbitrariness. On the contrary, the absence of regulations when the law requires one should be to have the effect of transferring upon the agency the burden of proof with regards to the reasonableness of the adjudication process that it might have used."

(*See* William Vazquez Irrizary, *Derecho Administrativo,* 79 REV. JUR. UPR 647, 683 (2010))

D.   To this day, the Commission is precluded from addressing the controversies raised by PV Properties in their lawsuit, as it hasn't approved the regulations necessary for this.

In its lawsuit, PV Properties claims that the EEA is obligated to acquire the RECs produced by said company, in order to be in compliance with Act No. 82-2010. In light of this, it requests that this Commission (a) determines that the EEA is acting illegally by not acquiring the RECs that PV Properties allegedly has offered it; (b) force the appearing public corporation to acquire the above mentioned instruments, both, those that it has offered before, as well as those in the future; (c) impose to the EEA penalties and remedies that it considers necessary to ensure the acquisition of all the RECs that the plaintiff has offered it and those it shall offer in the future. Regardless of the clear statutory mandate contained in Act No. 82-2010, which we summarized in the previous section, there are no regulations, to this day, that establish the precise parameters that the EEA, as well as the providers of renewable energy must comply with, with regards to the Renewable Portfolio Standard.

The statutes of Act No. 82-2010 raised by the plaintiff constitute **general** legislative mandates on highly technical issues that require that this Distinguished Commission exercise the faculties delegated upon it and provide specificity and clarity in order to be able to exercise its regulatory power. We are facing, therefore, two concurring obligations (constitutional and legislative), which, to date, have not been addressed by the Commission and, today, preclude it, jurisdictionally, from addressing these controversies.

Act No. 82-2010 clearly obligates the Commission to issue one or more rules in order to formulate and enforce it in order to achieve it's purpose, including the parameters to ensure compliance with the goals of the Renewable Portfolio Standard; documentation, registration, and verification of RECs; procedures for the EEA to register the RECs in the North American Renewables Registry; requirements that must be met by the agreements between producers of sustainable renewable energy and the EEA, and ways to obtain the production measurements; requirements applicable to the reports to be submitted annually by the public corporations appearing before the Commission; regulations of prices at which it shall be possible to sell the RECs; and for the imposition of penalties for non-compliance with this law; among others.

Nevertheless, to this day, the Commission has not issued the regulations needed to implement and exercise the powers and faculties delegated upon it by the Legislator through Act No. 82-2010, a fundamental requirement for this Honorable Commission to be able to exercise the faculties delegated upon it by virtue of the above-mentioned act. The Commission is obligated to adopt, issue, amend, and abrogate those rules, orders, and regulations as it deems necessary and proper to the exercise of its faculties and performance of its duties, within the framework established in Act No. 82-2010, subject to the parameters established in the U.A.P.L. In the absence of regulation, the Commission must dismiss this lawsuit. Otherwise, the parties' due process of law will be violated, both to the EEA and the renewable energy producers, as this process would be permeated by arbitrariness and, additionally, any finding regarding this issue would be null.

FOR ALL THE ABOVE, the EEA respectfully requests that the Examining Officer UPHOLD this motion to dismiss and, as a consequence, dismisses the lawsuit indicated in the heading.

WE CERTIFY: That today we submitted a faithful and exact copy of this writ to Mr. Javier Rua Jovet, Esq., javrua@gmail.com.

RESPECTFULLY SUBMITTED

In San Juan, Puerto Rico, on the 23rd day of March, 2017

**QUIÑONES ARBONA & CANDELARIO, PSC**
PO Box 10906
San Juan, Puerto Rico 00922
Tel. 787-620-6776 / Fax 787-620-6777

(Signature)

**VÍCTOR D. CANDELARIO VEGA**
TSPR No. 13926
vcandelario@qaclaw.com

(Signature)

**GISELLE MARTÍNEZ VELÁZQUEZ**
TSPR No. 17896
gmartinez@qaclaw.com

11

**Exhibit 3**

PV Properties' Motion for Summary Judgment

(Stamp: COPY
SECRETARY OF THE
ENERGY COMMISSION
OF PUERTO RICO

'17 APR 21 4:14PM)

**COMMONWEALTH OF PUERTO RICO
ENERGY COMMISSION**

| | |
|---|---|
| **PV PROPERTIES, INC.**<br>        **Plaintiff**<br><br>              **v.**<br><br>**ELECTRIC ENERGY AUTHORITY<br>OF PUERTO RICO**<br>        **Defendant** | **CASE NO. CEPR-QR-2017-00001**<br><br>**Re: Act No. 82 of July 19,<br>2010, as amended; Renewable<br>energy credits.** |

## MOTION FOR SUMMARY JUDGMENT

**BEFORE THE HONORABLE ENERGY COMMISSION:**

*PV Properties, Inc.* appears through the undersigned legal representation and very respectfully alleges and requests:

1.    On March 3 of 2017, the plaintiff, *PV Properties, Inc.* ("Plaintiff" hereafter) filed the lawsuit indicated in the heading, in accordance to Article 3 of the Adjudicative Procedures Rules, Non-compliance Notices, Tariffs Reviews and Investigations of this Honorable Energy Commission, Rule 8543 from December 18, 2014 ("Rule 8543" hereafter).

2.    In accordance with Article 3.03(C) of Rule 8543, this Honorable Energy Commission issued a Summons to the EEA, notifying it about the venue of the suit against it, and giving notice of the twenty (20) days term that

began at that moment in order to answer the allegations raised in said lawsuit, and that "if it weren't answered on time, the Commission could find it in contempt and grant the requested remedy" in the lawsuit.

3.   On March 23 of 2017, last day to file responsive allegations, in accordance with Articles 3.03(C) and 4.02 of Rule 8543, the defendant, Electric Energy Authority of Puerto Rico ("EEA" hereafter), opted for only filing a Motion to Dismiss, under Article 6.01 of Rule 8543, as opposed to an answer to the lawsuit, or both.

4.   In its Motion to Dismiss, **EEA opts for not denying any of the allegations formulated in the lawsuit, and even summarizes, in a factually correct manner, the central allegations of the Plaintiff,** which represent the heart of the lawsuit:

> "In synthesis, PV Properties claims that Act No. 82-2010 obligates the EEA to meet a compulsory annual percentage of energy generated by means of renewable energy in Puerto Rico, known as the "Renewable Portfolio Standard," which, to date, is not taking place. In light of this, they allege having offered RECs on several occasions to the public corporation, "which would allow them to pay towards their compliance with Act No. 82, supra and with their obligations related to the Renewable Portfolio Standard." [See Motion to Dismiss, page 2.]

[…] In its lawsuit, PV Properties claims that the EEA is
obligated to acquire the RECs produced by said company, in
order to be in compliance with Act No. 82-2010. In light of
this, it requests that this Commission (a) determines that
the EEA is acting illegally by not acquiring the RECs that
PV Properties allegedly has offered it; (b) force the
appearing public corporation to acquire the above mentioned
instruments, both, those that it has offered before, as
well as those in the future; (c) impose to the EEA
penalties and remedies that it considers necessary to
ensure the acquisition of all the RECs that the plaintiff
has offered it and those it shall offer in the future."
[See Motion to Dismiss, page 9.]

5.   In its April 3 of 2017 resolution, this Honorable Energy

Commission granted *PV Properties* a twenty (20) day period for us to

express ourselves with regards to the Motion to Dismiss filed. In

compliance with said resolution, *PV Properties,* through their April

19 of 2017 Opposition to Motion to Dismiss, conclusively rebutted

EEA's statements regarding the Commission's alleged lack of

jurisdiction in order to address this lawsuit, as well as the

inapplicable claim for protection with regards to the due process of

law.

6.   Today, we present this Motion for Summary Judgment,

reiterating the facts, documents, and law stated in the lawsuit, and

summarized by EEA in their Motion to Dismiss, and include, as

additional evidence, an Affidavit that states the following:

4

I, Victor Luis Gonzalez Barahona, of age, married, executive, and resident of San Juan, Puerto Rico, affirm, under oath:

1)    That my name and other personal circumstances are those stated above.
2)    That I am the President and Principal Executive of *PV Properties, Inc.,* a corporation established under the laws of the State of Delaware and authorized to do business in Puerto Rico.
3)    I am the President and Principal Executive of Grupo Windmar, comprised, additionally, by *PV Properties, Inc., Windmar Renewable Energy, Inc., Coto Laurel Solar Farm, Inc., Windmar PV Energy, Inc.,* among others, which have designed and built over 35MW of clean solar energy throughout Puerto Rico, including Vieques and Culebra.
4)    That *PV Properties, Inc.* is one of two Electric Service Companies that are part of Grupo Windmar. Its certification number, issued by the Commission, is CEPR-CT-2016-0005.
5)    That the distributed photo-voltaic production of PV Properties, Inc. generates Renewable Energy Certificates (RECs). PV Properties, Inc. produces over 20,000,000 kWh (sic.) annually via distributed generators, which is the equivalent of 20,000 RECs generated per year.
6)    That the RECs generated by *PV Properties, Inc*. are registered and serialized in the North American Renewables Registry in accordance to Act No. 82, supra. The estimated value of these RECs is one million dollars per year ($1,000,000.00) on the basis of forty-five dollars ($45.00) per REC.
7)    That the Electric Energy Authority (EEA) is the only retail provider in Puerto Rico. Due to this, compliance with the compulsory percentages of Renewable Energy falls, exclusively, on this public corporation.
8)    That, according to data published by this Honorable Energy Commission on its portal, based on information provided by the EEA, the energy production from oil combustion, a highly polluting source, has not only not decreased, but it has increased

5

dramatically in the "*Percentage of Distribution of Energy
Generation by Type/Accumulation Fiscal Year Until December:*"
(*sic.*) ("Distribución Porcentual de la Generación de Energía por
Tipo/Acumulación Año Fiscal Hasta Diciembre" in the original) in
2015 it was 55.05% and in 2016 it increased to 61.77%. See:
<http://energia.pr.gov/datos/distribucion-porcentual-de-la-
generacion-de-energia-por-tipo/>.

9)   That according these same data, the progress of generation
of EEA through renewable sources is minuscule and unsubstantial,
under 1% and well apart from the mandatory 12% minimum of
renewable generation that it will have to show in little over
two years, in 2019.

10)  That in the "Annual Report of Compliance Renewable
Portfolio Standard Act No. 82-2010" (sic.) filed before this
Honorable Commission on April 1 of 2016, EEA admits their non-
compliance with the RPS (sic.).

11)  That I have submitted at least two formal RECs offerings,
one on January 13 of 2015, to Engineer Juan Alicea, Executive
Director of EEA, at the time, as well as another one, on
September 6 of 2016, to Dr. Javier Quintana Mendez, former
Executive Director of said public corporation.

12)  That copies of the RECs offer I formally submitted on
September 6 of 2016, to Dr. Javier Quintana Mendez, former
Executive Director of EEA, were sent to the Honorable Agustin
Carbo Lugo, President of this Honorable Energy Commission, to
the former Executive Director of the State Office of Energy
Public Policy, as well as to Dr. Ernest Monir, former Secretary
of the Federal Department of Energy.

13)  That we have been consistent and diligent in raising the
claim for the EEA to acquire the RECs that we have offered it,
as stated in a letter, dated January 19 of 2015, to the
Honorable President of this Honorable Energy Commission, and as
indicated in the *Final Resolution and Order,* issued by this
Honorable Energy Commission on January 10 of 2017, CEPR-AP-2015-
01, on page 60, note 133.

14)  That neither the former Executive Directors of EEA, nor any
other official of said public corporations, have responded to
the above-mentioned RECs offers.

15)  That EEA has opted not to acquire all the RECs that *PV
Properties, Inc.* has put at its disposal, which EEA would use in
their process to comply with Act No. 82, supra, before the
Honorable Commission,

in particular, with their obligations under Puerto Rico's
Renewable Portfolio Standard.
16) That I have first-hand knowledge of all the foregoing.

7. The allegations stated in the lawsuit, <u>are now facts that
haven't been disputed by the EEA. These facts are properly backed by
the documentation attached to the lawsuit and by the Affidavit
included with this Motion for Summary Judgment.</u> **Due to this, there is
no substantial controversy whatsoever in this case that would impede
its summary adjudication in favor of the Plaintiff.**

8. In addition, this Honorable Commission has already
expressed itself with regards to the mandatory character of Act No.
82, <u>supra</u>. In *In Re: Integrated Resources Plan of the Electric Energy
Authority of Puerto Rico,* Resolution Regarding the Electric Energy
Authority's Motion to Reconsider, CEPR-AP-2015-0002, page 26, sub-
paragraph 84, this Honorable Commission resolved:

"The explanation of the Authority [EEA] regarding its failure to
model **and comply <u>fully with the RPS,</u> as defined by Act No. 82-
2010,** is based on an explanation stating that the costs would
become excessive. The Authority cites a 'potential annual cost
of over $100 millions' that is not in evidence. [Citation
omitted.] **The Authority's allegation that a cost of more than
$100 million impedes compliance under Act No. 82-2010 <u>is
irrelevant.</u>** Just as with the Commission's regulations, <u>**the
Authority may not pick and choose which laws to abide by.
Compliance with the RPS is required by law,**</u> and Section
2.04(B)(7)(d) of the rules in the Commission's IRP, following

the Action Plan requires the "action plan to be in compliance
with all the applicable laws and regulations … including, but
without limiting itself [sic] the Renewable Portfolio Standard."
(Emphasis added.)

9.   This Honorable Commission simply reaffirms the language of
an act written in mandatory and very clear terms. In this context,
Article 1.4(7) of Act No. 82, <u>supra</u>, establishes a "Renewable
Portfolio Standard" in Puerto Rico (or RPS), which "means the
**mandatory** percentage of sustainable renewable energy or alternative
energy required from each retail supplier of energy […]." (Emphasis
added.) **The lawsuit is clear, and this Honorable Commission has
already expressed that EEA is not in compliance with the RPS as of
today.**

10.   Act No. 82, <u>supra</u>, in its own terms orders that this law
shall be construed "liberally, in order to achieve the implementation
of the public policy set forth in Section 1.2 and **guarantee
compliance** with the Renewable Portfolio Standard created hereunder."
(Emphasis added.)

11.   And this Honorable Energy Commission has the duty to
guarantee "[…] that the Authority […] complies with the Renewable
Portfolio Standard set forth in this Act in the **most efficient manner
possible."** (Emphasis added.) Art. 2.10(a) of Act No. 82, <u>supra</u>.

8

12.   EEA may comply with the RPS a) generating its own renewable energy; b) through the wholesale purchase the renewable energy of other producers; c) acquiring "Renewable Energy Certificates" (RECs). **But the manner and "most efficient" -and to date perhaps the only possible- (sic.) in which the EEA could begin to show compliance with the RPS is through the presentation of RECs acquired from a renewable energy producer, such as *PV Properties*.** Articles 2.10 and 2.11 of Act No. 82, supra.

13.   Act No. 170, from August 12 of 1988, as amended, known as the Uniform Administrative Procedure Act of Puerto Rico (UAPA), 3 L.P.R.A. secs. 2101 et seq., empowers the administrative entities to dispose of the affairs brought to their consideration through summary judgment. Section 3.7(b) of the UAPA, 3 L.P.R.A. sec. 2157(b) (2011). This mechanism's purpose is to streamline the adjudication process in cases in which material facts in controversy are not present. Comisionado Seguros P.R. v. Integrand, 173 D.P.R. 900 (2008).

14.   In accordance to case law, the summary adjudication of a controversy facilitates the fair, swift, and economical solution of quarrels, reason for which they don't merit a trial or deep review. Garcia Rivera v. Enriquez Marin, 2001 TSPR 12; Pilot Life Ins. Co. v. Crespo

9

Martinez, 136 D.P.R. 624 (1994).

15.  In this sense, Art. 6.02 of Rule 8543 states, regarding
this, that:

> "A)  A plaintiff may, at any moment, after twenty (20) days
> from the date when a defendant is notified, or after the
> opposing part has notified them of a motion for summary
> judgment, file a motion based on sworn statements or on
> such evidence that demonstrates the non-existence of a
> substantial controversy of essential and pertinent facts,
> in order for the Commission to issue, summarily, a final
> judgment in its favor regarding the whole or any part of
> the claim.
> […]
> G)  **The summary judgment requested will be issued
> immediately** if the allegations, depositions, responses to
> interrogatories, and admissions offered, together with the
> sworn statements, should there be any, or other evidence,
> show that **there is no real substantial controversy** with
> regards to any essential and pertinent fact, and that, **as a
> matter of Law, the Commission must issue a summary judgment
> in favor of the part that presented the motion.**" (Emphasis
> added.)

16.  This Honorable Commission has the obligation to guarantee
the implementation of the public policy intended to lead us towards
energy autonomy, through compliance with the RPS ordered in the Law.

17.  This case is very important, but at the same time very
simple: to this date, EEA is in clear violation of the judicial
mandate of Act No. 82, supra, which orders it to reduce its
dependency – the dependency of the Country – on oil, and the way to
start obeying this mandate – the acquisition of RECs

from the Plaintiff – is before its eyes and it has opted to ignore it.

18.  As we mentioned before, the Honorable Commission must guarantee that the EEA complies with the Renewable Energy Standard "in the most efficient manner possible." Art. 2.10(a), Act No. 82, supra. **It is obvious that the most efficient manner to start complying with the RPS is such a compliance method as the one that is available now. The RECs of the Plaintiff are available now for their acquisition by the EEA. This Honorable Commission can and must order this remedy summarily.**

19.  The swift and just summary action of this Honorable Commission, to order the compulsory purchase of the Plaintiff's RECs by EEA would be virtuous three-fold: it would direct EEA towards compliance with the RPS, it would stimulate industry growth, increasing the local production of renewable energy, and it would, at the same time, increase the number of RECs available in the market in order to achieve full compliance with the RPS, inasmuch as the order would apply to all the other electric service companies that produce distributed renewable energy who are similarly situated.

20.  For all of the above, the Honorable Commission must issue a judgment, summarily, adjudicating the lawsuit in favor of the Plaintiff, *PV Properties*.

11

**FOR ALL OF THE ABOVE,** we request that this Honorable Energy Commission, **GRANT** the present Motion for Summary Judgment and grant, at its discretion, the remedies requested by the Plaintiff in the Lawsuit that initiated this administrative procedure.

**I CERTIFY:** That I have sent today, April 21 of 2017, an exact and faithful copy of this Motion for Summary Judgment to: Electric Energy Authority of Puerto Rico PO Box 364267, San Juan, PR 00936-4267 and via electronic mail to n-vazquez@aeepr.com, and to its legal representatives, Mr. Victor D. Candelario Vega, Esq., Ms. Giselle Martinez Velazquez, Esq., and Mr. Edwin J. Quinones Porrata, Esq., to PO Box 10906, San Juan, Puerto Rico, 00922 and via electronic mail to vcandelario@gaclaw.com, gmartinez@gaclaw.com, and ejquinones@gaclaw.com.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on the 21st of April of 2017.

```
_____(Signature)_____
JAVIER RUA JOVET
SUPREME COURT NO. 12,602
ATTORNEY FOR THE PLAINTIFF
701 AVENIDA PONCE DE LEON
EDIFICIO CENTRO DE SEGUROS
OFICINA 414
SAN JUAN, P.R. 00907
TELEPHONES: (787) 396-6511
FAX: (787) 724-0353
Electronic mail: javrua@gmail.com
```

**COMMONWEALTH OF PUERTO RICO
ENERGY COMMISSION**

PV PROPERTIES, INC.
      Plaintiff

      v.

ELECTRIC ENERGY AUTHORITY
OF PUERTO RICO
      Defendant

CASE NO. CEPR-QR-2017-00001

Re: Act No. 82 of July 19, 2010, as amended; Renewable energy credits.

## AFFIDAVIT

I, Victor Luis Gonzalez Barahona, of age, married, executive, and resident of San Juan, Puerto Rico, affirm, under oath:

1) That my name and other personal circumstances are those stated above.

2) That I am the President and Principal Executive of PV Properties, Inc., a corporation established under the laws of the State of Delaware and authorized to do business in Puerto Rico.

3) I am the President and Principal Executive of Grupo Windmar, comprised, additionally, by PV Properties, Inc., Windmar Renewable Energy, Inc., Coto Laurel Solar Farm, Inc., Windmar PV Energy, Inc., among others, which have designed

13

and built over 35MW of clean solar energy throughout Puerto Rico, including Vieques and Culebra.

4) That PV Properties, Inc. is one of two Electric Service Companies that are part of Grupo Windmar. Its certification number, issued by the Commission, is CEPR-CT-2016-0005.

5) That the distributed photo-voltaic production of PV Properties, Inc. generates Renewable Energy Certificates (RECs). PV Properties, Inc. produces over 20,000,000 kWh (sic.) annually via distributed generators, which is the equivalent of 20,000 RECs generated per year.

6) That the RECs generated by PV Properties, Inc. are registered and serialized in the North American Renewables Registry in accordance to Act No. 82, supra. The estimated value of these RECs is one million dollars per year ($1,000,000.00) on the basis of forty-five dollars ($45.00) per REC.

7) That the Electric Energy Authority (EEA) is the only retail provider in Puerto Rico. Due to this, compliance with the compulsory percentages of Renewable Energy falls, exclusively, on this public corporation.

14

8) That, according to data published by this Honorable Energy Commission on its portal, based on information provided by the EEA, the energy production from oil combustion, a highly polluting source, has not only not decreased, but it has increased dramatically in the "Percentage of Distribution of Energy Generation by Type/Accumulation Fiscal Year Until December:" (sic.) ("Distribución Porcentual de la Generación de Energía por Tipo/Acumulación Año Fiscal Hasta Diciembre" in the original) in 2015 it was 55.05% and in 2016 it increased to 61.77%. See:

<http://energia.pr.gov/datos/distribucion-porcentual-de-la-generacion-de-energia-por-tipo/>.

9) That according these same data, the progress of generation of EEA through renewable sources is minuscule and unsubstantial, under 1% and well apart from the mandatory 12% minimum of renewable generation that it will have to show in little over two years, in 2019.

10) That in the "Annual Report of Compliance Renewable Portfolio Standard Act No. 82-2010" (sic.) filed before this Honorable Commission on April 1 of 2016, EEA admits their non-compliance with the RPS (sic.).

11) That I have submitted at least two formal RECs offerings, one on January 13 of 2015, to Engineer Juan Alicea, Executive Director of EEA, at the time, as well as another one, on

15

September 6 of 2016, to Dr. Javier Quintana Mendez, former
Executive Director of said public corporation.

12) That copies of the RECs offer I formally submitted on
September 6 of 2016, to Dr. Javier Quintana Mendez, former
Executive Director of EEA, were sent to the Honorable Agustin
Carbo Lugo, President of this Honorable Energy Commission, to
the former Executive Director of the State Office of Energy
Public Policy, as well as to Dr. Ernest Monir, former Secretary
of the Federal Department of Energy.

13) That we have been consistent and diligent in raising the
claim for the EEA to acquire the RECs that we have offered it,
as stated in a letter, dated January 19 of 2015, to the
Honorable President of this Honorable Energy Commission, and as
indicated in the Final Resolution and Order, issued by this
Honorable Energy Commission on January 10 of 2017, CEPR-AP-2015-
01, on page 60, note 133.

14)  That neither the former Executive Directors of EEA, nor any
other official of said public corporations, have responded to
the above-mentioned RECs offers.

15) That EEA has opted not to acquire all the RECs that PV
Properties, Inc. has put at its disposal, which EEA would use in
their process to comply with Act

16

No. 82, supra, before the Honorable Commission, in particular, with their obligations under Puerto Rico's Renewable Portfolio Standard.

16) That I have first-hand knowledge of all the foregoing. AND IN ORDER FOR IT TO BE SO KNOWN, I swear and sign the present statement in San Juan, Puerto Rico, on April 19 of 2017.


(Signature)

**VICTOR LUIS GONZALEZ BARAHONA**



Affidavit Number: _2883_

Sworn and signed before me by Victor Luis Gonzalez Barahona, whose personal circumstances are expressed above, whom I give faith of knowing personally. In San Juan, Puerto Rico, on April 19 of 2017.


(Signature)

**NOTARY PUBLIC**


(Revenue Stamp)

(Stamp:
Fernando E. Agrait Betancourt
Notary Attorney)

**Exhibit 4**

PREPA's Opposition to PV Properties' Motion for Summary Judgment

(Stamp: COPY
SECRETARY OF THE
ENERGY COMMISSION
OF PUERTO RICO

'17 MAY 11 4:21PM)

COMMONWEALTH OF PUERTO RICO
ENERGY COMMISSION

| | |
|---|---|
| PV PROPERTIES, INC. | NO. CEPR-QR-2017-00001 |
| Plaintiff | |
| v. | Re: Act No. 82 of July 19, 2010, as amended; Renewable energy credits. |
| ELECTRIC ENERGY AUTHORITY OF PUERTO RICO | |
| Defendant | |

## MOTION REGARDING SUMMARY DECISION MOTION

TO THE HONORABLE ENERGY COMMISSION OF PUERTO RICO:

The undersigned attorneys, representing the Electric Energy Authority ("AEE" in Spanish, "EEA" hereafter), appear before you and respectfully state and request:

### I.    BACKGROUND

On March 3 of 2017, PV Properties, Inc. ("PV Properties," also "plaintiff") initiated the lawsuit indicated in the heading alleging, in essence, having designed and built 35 MW of renewable energy (sic.) in the jurisdiction of Puerto Rico, by means of its distributed generation systems, for which it generates Renewable Energy Certificates ("CERs" in Spanish, "RECs" hereafter), which it understands that the EEA is obligated to acquire. In accordance to several statutes, PV Properties requests that this Honorable Commission, among others, order the EEA to acquire all the Renewable Energy Certificates that it has offered the EEA for a price equal or greater than the one offered already, as well as those that it shall offer in the future, and that the Commission imposes the corresponding penalties to the EEA.

1

Thus, on March 23 of 2017, the above mentioned EEA filed a motion to dismiss, in which we allege that this Distinguished Commission lacks the jurisdiction to address the claims of PV Properties, as there are no regulations for the implementation of the provisions of Act No. 82 of July 19, 2010, as amended, known as "Public Policy on Energy Diversification by Means of Sustainable and Alternative Renewable Energy in Puerto Rico Act" ("Act No. 82-2010" hereafter). To address the claim of the plaintiff under these circumstances would deprive the EEA of the protections of due process of law, as well as the regulations applicable to administrative procedures, such as this one. We reiterate in it that this Honorable Commission is obligated to establish the parameters under which it might exercise the powers delegated by the Legislator in Act No. 82-2010. Any determination at which the Commission were to arrive on the merits, would be permeated by arbitrariness, as the entities to which the implementation of this law would be applied haven't been warned in advance about the requirements, parameters, and procedures they will have to abide to, nor to the penalties they would expose themselves to.

Then, on April 19, 2017, PV Properties presented Opposition to Motion to Dismiss, which was answered by the EEA on April 27, 2017, in Answer to Opposition to Motion to Dismiss. In it, we presented solid arguments about the unreasonableness of the arguments of PV Properties, to wit, that due process of law doesn't apply to public corporations, such as the EEA, in the context of an adversarial, quasi-official, process before a regulatory agency, as is the case in the present complaint. We warned about the detrimental effects, from a judicial and procedural point of view, of such interpretation. After this, on May 4, 2017, and recurring to arguments already brought up in their Opposition to

2

Motion to Dismiss, PV Properties filed a response to Opposition to Motion to Dismiss.

In parallel, and surprisingly, PV Properties presented, on April 21, 2017, a "Motion of Summary Judgment," to which we vigorously oppose today. As we shall see below, this motion has been presented before the complaint had been answered, based on the assumption that the facts on which the complaint is based have been accepted by the EEA. Likewise, this motion seeks to circumvent the controversy of **threshold and jurisdiction** that has been posited in our Motion to Dismiss, which is pending resolution by this Honorable Commission. In other words, the plaintiff expects that the complaint be summarily resolved, despite the fact that the issue of whether this Honorable Commission holds jurisdiction to address the same, hasn't been resolved. Again, PV Properties hope to dispossess the EEA of its minimal procedural rights in order to resolve this controversy.

Based on the grounds that we present below, the EEA, very respectfully requests that the Honorable Commission dismisses the Motion for Summary Judgment.

## II. DISMISSAL REVIEW STANDARD

To begin, it is imperative to clarify that the factual basis on which the plaintiff's Motion for Summary Judgment stands is completely incorrect. In that motion, in an **incredible** manner, and ignoring the most basic procedural canons, the plaintiff indicates that "in its Motion to Dismiss, **EEA opts for not denying any allegation stated on the complaint, and even summarizes in a factually correct way, the central allegations of the Plaintiff,** which represent the heart of the complaint" (emphasis in the original). This affirmation is very strange. Please note, Honorable Commission, that the **basic premise** of a Motion to Dismiss is to accept as true, solely in order to

3

present the arguments of the same, the allegation of the part that complains. On the other hand, the plaintiff implies in their writs that our motion to dismiss constitutes a breach of our responsive duty. Thus, consistently, the plaintiff indicates that the EEA "opted for **only** basing a Motion to Dismiss under Article 6.01 of Rule 8543, instead of an answer to the complaint." It seems to us that these affirmations are meant to ignore fundamental parameters of our procedural law.

Firstly, we reiterate that Section 6.01 of the Adjudication Procedures Regulations, Non-compliance Notices, Review of Tariffs, and Investigations, issued by the Commission, Rule No. 8543 from December 18, 2014, states the following:

> **"Section 6.01 – Dismissal Requests and Orders to Show Cause Instead of, or** in addition to file an answer to a lawsuit, appeal, counterclaim, lawsuit or appeal against a third party, or a complaint or appeal against a co-party, any defendant may ask the Commission to dismiss the corresponding vehicle through a duly justified motion. In their motion to dismiss, the defendant can argue that the matter raised against them lacks a claim that justifies the concession of a remedy, that the matter lacks merit, that the Commission lacks jurisdiction over the person or over the matter to address the controversies raised in the motion, or to base their motion to dismiss on any other Legal basis.

These dispositions of Rule No. 8543, *supra,* are analogous to Rule 10.2 of Civil Procedure, which establishes – among others – that it is possible to request the dismissal of a

4

claim when the court lacks jurisdiction to address a controversy. (32 L.P.R.A., Ap. V, R. 10.2). This rule regulates, specifically, how defenses and objections are presented against a judicial complaint. The motion to dismiss under the above rule is a defense formulated by the defendant or, by analogy, the defendant, in which the action against them is requested to be dismissed, **even without the need to formulate a previous allegation.** See, among others, *Aut. Tierras v. Moreno & Ruiz Dev. Corp.* 174 D.P.R. 409, 428 (2008); *Colon v. Loteria,* 167 D.P.R. 625, 649 (2006).

Case law has established repeatedly that towards the goal of resolving a dismissal under this Rule, the allegations in the complaint must be accepted as true and be considered in the way most favorable for the plaintiff. *Aut. Tierras v. Moreno & Ruiz Dev. Corp. supra,* pages 428-29; *Garcia v E.L.A.,* 163 D.P.R. 800, 814 (2005); *Dorante v. Wrangler of P.R.,* 145 D.P.R. 408, 413 (1998). Likewise, "all the facts well alleged in the lawsuit, and which have been asserted in a clear and conclusive manner, who, on their face do not create doubts, will be taken as true." *Colon v. Loteria,* 167 D.P.R. 625, 649 (2006); *Sanchez v. Aut. De los Puertos,* 153 D.P.R. 559, 569 (2001).

As we can see, the plaintiff seems to ignore this fundamental premise of judicial and administrative procedure, hoping, either by error or intentionally, to induce this Honorable Commission to err. To demand that this controversy be resolved summarily, alleging that the defendant has tacitly accepted facts and allegations, isn't but a new attempt to abate the minimal procedural rights to which the EEA is entitled.

### III.    LACK OF JURISDICTION OF THE COMMISSION TO ADDRESS THE COMPLAINT

Having said this, we must vigorously oppose the Motion for Summary Judgment filed, as the same hopes to force the EEA to present a responsive allegation

//Translator's note: Page 6 of original document in Spanish is missing.

Despite the clear statutory mandate contained in Act No. 82-2010, to this day there is no regulation whatsoever indicating the precise requirements which both EEA, as well as renewable energy suppliers, must meet, with regards to the Renewable Portfolio Standard. The statutes in Act No. 82-2010 brought up by the plaintiff, are **general** statutes with regards to highly technical issues, which require that this Honorable Commission exercise its delegated faculties and bring specificity and clarity in order to be able to exercise its regulatory power. This Act clearly forces the Commission to issue one or more rules in order to formulate and apply its letter, in order to achieve its purposes, including the requirements to ensure compliance with the goals of the Renewable Portfolio Standard; documentation, registration, and verification of RECs; procedure intended for the EEA to register the RECs before the North America Renewables Registry; requirements with which agreements among sustainable renewable energy producers and the EEA must comply, and ways to obtain the production readings; requirements applicable to the reports to be submitted annually by the public corporation appearing before the Commission; prices regulations through which RECs could be sold; for the imposition of fines for non-compliance of this law; among others.

Nevertheless, to this day, the Commission hasn't issued one or more rules in order to implement and exercise the powers and faculties that the Legislator delegated upon it through Act No. 82-2010, a fundamental requirement for enabling this Honorable Commission to exercise the faculties that were delegated upon it by virtue of the above act. The Commission is obligated to adopt, issue, amend, and revoke such rules, orders, and regulations as it deems necessary and proper to the exercise of its faculties and the performance of its duties, all within the canopy provided by Act No. 82-2010, subject to the parameters established by the Uniform Administrative Procedures Act ("L.P.A.U." in original, "Ley de Procedimiento Administrativo Uniforme" in Spanish). In light of

7

the regulatory void, the Commission must dismiss this complaint. Otherwise, the right to due process of law of the parties, including the EEA's and that of the suppliers of renewable energy, would be violated by having this procedure be permeated with arbitrariness, not to mention that any determination regarding this matter would be vitiated by nullity.

Therefore, the Summary Judgment pursued by the plaintiff is, at the very least, premature, if not unwise, as it requires that this Commission resolves the matter summarily, outside of the most basic procedural rules, without having addressed the issue of jurisdiction.  Likewise, the EEA cannot be expected to present responsive allegations after having filed a Motion to Dismiss. Very respectfully, we posit that this motion definitely must be rejected.

## IV.    CONCLUSION

In conclusion, this Honorable Commission must overrule the Motion for Summary Judgment, as the same ignores the basic norms of the resolution of dismissal requests, attempting to make believe that the defendant has accepted the facts and allegations of the complaint as true. Likewise, the Motion for Summary Judgment intends to circumvent the controversy of **threshold and jurisdiction** that has been stated in our Motion to Dismiss, which must be resolved prior to any responsive allegation by the EEA. This Commission cannot resolve summarily without first having its own jurisdiction to address the present matter determined.

FOR ALL OF THE ABOVE, the EEA respectfully requests that this Honorable Commission OVERRULE the Motion for Summary Judgment.

WE CERTIFY: That today we submitted a faithful and exact copy of this writ to Mr. Javier Rua Jovet, Esq., javrua@gmail.com.

8

RESPECTFULLY SUBMITTED

In San Juan, Puerto Rico, on the 22nd day of March, 2017

**QUIÑONES ARBONA & CANDELARIO, PSC**
PO Box 10906
San Juan, Puerto Rico 00922
Tel. 787-620-6776 / Fax 787-620-6777

(Signature)

**VÍCTOR D. CANDELARIO VEGA**
TSPR No. 13926
vcandelario@qaclaw.com

(Signature)

**LUIS DANIEL ROSA VELÁZQUEZ**
TSPR No. 14843
lrosa@qaclaw.com

(Signature)

**GISELLE MARTÍNEZ VELÁZQUEZ**
TSPR No. 17896
gmartinez@qaclaw.com

9

# The United States of America



# Administrative Office of the United States Courts

Be it known that

## Alexander Wieder

has qualified as a

### Federally Certified Court Interpreter

for Spanish/English court proceedings as established pursuant to the Court Interpreters Act, 28 United States Code, section eighteen hundred twenty-seven.

In testimony whereof, I hereunto subscribe my name and affix the seal of the Administrative Office of the United States Courts, February 2010.

*James C. Duff*

James C. Duff, Director

Certificate Number 10-082

**Exhibit 5**

<u>June 2, 2017 Resolution and Order</u>

APPENDIX 1

[Certified Translation]



8/23/17

DANIEL TOMLINSON
CERTIFIED TRANSLATOR
ADMINISTRATIVE OFFICE OF
THE UNITED STATES COURTS

**COMMONWEALTH OF PUERTO RICO
PUERTO RICO ENERGY COMMISSION**

| PV PROPERTIES, INC. **PETITIONER** | **CASE NO.:** CEPR-QR-2017-0001 |
| vs. | **MATTER:** Resolution regarding the Motion to Dismiss filed by the Authority. |
| PUERTO RICO ELECTRIC POWER AUTHORITY **RESPONDENT** | |

**RESOLUTION AND ORDER**

The purpose of this Resolution and Order is to address the Motion to Dismiss filed by the Puerto Rico Electric Power Authority (the "Authority") on March 23, 2017.

**I.   Procedural Background**

On March 3, 2017, PV Properties, Inc. ("PV Properties") filed a Complaint in which it requested the Puerto Rico Energy Commission (the "Commission") to declare illegal and null and void the Authority's action of not acquiring the Renewable Energy Certificates ("RECs")[1] that PV Properties has offered to it. Likewise, PV Properties requested the Commission to order the Authority to acquire all the CERs that PV Properties has offered it, at a price of no less than what was already offered, as well as any CERs that it will offer in the future. Finally, PV Properties requested the Commission to warn and/or impose any sanction or remedy that is proper in law that ensures prompt compliance by the Authority with its obligation to acquire all the RECs that PV Properties has offered it, as well as those that it may offer in the future.

---

[1] As defined in Article 1.4(8) of Act 82-2010, an REC is a commodity that constitutes an asset or marketable and negotiable economic item of value that may be bought, sold, assigned and transferred between persons for any legal means, and in an integrated and inseparable manner represents the equivalent of one (1) megawatt-hour (Mwh) of electricity generated by a sustainable renewable energy source or renewable alternate energy source (issued and registered pursuant to Act 82-2010), and, in turn, encompasses all the environmental and social attributes, as defined in Act 82-2010.

1

PV Properties based its Complaint on the provisions of Act 82-2010, as amended, known as the "Puerto Rico Public Policy of Energy Diversification through Renewable Sustainable and Alternative Energy Act." Specifically, PV Properties argued that the Authority is obligated to acquire any RECs that it offers them, as established in Articles 2.10 and 2.11 of Act 82-2010.[2] Likewise, PV Properties argued that the Authority has acted illegally and arbitrarily by not acquiring the RECs that PV Properties has made available to it, in violation of the obligation and mandate of Act 82-2010.[3] Finally, PV Properties argued that all the provisions of Act 82-2010 are self-enforcing, whose implementation does not require any regulations whatsoever.[4] PV Properties based this last argument on what is provided in Article 3.3 of Act 82-2010, in which it establishes that the absence of any regulation contemplated by this act will not prevent it from being applied.

On March 23, 2017, the Authority filed a Motion to Dismiss in which it argued that the Commission is lacking jurisdiction to address the claims by PV Properties.[5] The Authority based its argument on the fact that the Commission has not enacted the necessary regulations for implementing the provisions of Act 82-2010.[6] According to the Authority, in the absence of regulations duly approved by the Commission, any decision on the merits of the Complaint filed by PV Properties would deprive the Authority of the protections of due process of law, as well as the rules applicable to administrative proceedings.[7] In that regard, the Authority stated:

> Any decision the Commission might make on the merits would be permeated by arbitrariness, due to the fact that the entities to which the implementation of this act would be applied have not been advised beforehand as to the requirements, parameters and proceedings with which they would, in fact, have to comply, and the sanctions and/or penalties that they are exposed to.[8]

On April 19, 2017, PV Properties filed a pleading entitled Opposition to the Motion to Dismiss. In short, PV Properties argued that, because it is a public corporation, the Authority lacks the constitutional right of due process of law.[9] Furthermore, PV Properties reiterated its argument presented in its Complaint with respect to the fact that the provisions of Act 82-2010

---

[2] Complaint by PV Properties, March 3, 2017, ¶¶ 50-56.

[3] *Id.* ¶ 57.

[4] *Id.* ¶ 31.

[5] Motion to Dismiss by the Authority, on pg. 1.

[6] *Id.,* on pgs. 9-10.

[7] *Id.,* on pgs. 1, 6-9.

[8] *Id.,* on pgs. 1-2.

[9] Opposition to the Motion to Dismiss by PV Properties, April 19, 2017, ¶¶ 25-28.

are self-enforcing and entirely mandatory without the need for additional regulations.[10]

On April 21, 2017, PV Properties filed a Motion for Summary Judgment in which it requested the Commission to grant, at its discretion, the remedies sought in the Complaint.[11] In support of its Motion for Summary Judgment, PV Properties argued that the Authority had only filed a Motion to Dismiss without denying the allegations made by PV Properties in the Complaint, and for that reason said allegations are facts that are supported by the documentation attached to the Complaint and have not been contested by the Authority.[12] PV Properties concludes that, due to the above, there is no substantial dispute whatsoever in this case that prevents the summary adjudication of this case in its favor.[13]

On April 27, 2017, the Authority filed a pleading entitled Reply to the Opposition to the Motion to Dismiss, in which it reiterated its request that the Commission dismiss the Complaint filed by PV Properties. The Authority argued [that what was] outlined by PV Properties as far as the allegation that Act 82-2010 is entirely mandatory *ex proprio vigore*, without the need for additional regulations, constitutes an unconstitutional interpretation thereof.[14] For that purpose, the Authority again raised its position that Act 82-2010 requires that the Commission enact a series of regulations to formulate and implement its letter so that it may be effective.[15]

---

[10] *Id.,* ¶¶ 16-17. In that regard, PV Properties stated:

The Legislator, we infer, foresaw that PREPA would make use of this type of strategy to evade its ministerial duties and wisely reiterated the mandatory nature *ex proprio vigore* of Act 82, supra, including everything relating to the Renewable Energy Portfolio and its compliance, by means of a simply constructed and inescapable phrase:

> **"the absence of any regulation contemplated by this Act will not prevent the application thereof,** *Id.* ¶ 17. (Underlining, boldface type and quotes in the original, citation omitted).

[11] Motion for Summary Judgment by PV Properties, April 21, 2017, on pg. 11.

[12] *Id.,* ¶¶ 3, 4, 7.

[13] *Id.,* ¶ 7.

[14] Reply to the Opposition to the Motion to Dismiss by the Authority, April 27, 2017, on pgs. 1-4.

[15] *Id.,* on pg. 4. The Authority argued that it is necessary for the Commission to pass regulations for the purpose of establishing "the parameters to ensure compliance with the goals of the Renewable Energy Portfolio; documentation, registering and verification of the RECs; a procedure for the AEE to register the RECs with the North American Renewable Registry;

Furthermore, the Authority argued that public corporations, from the procedural point of view, have certain rights, including the right to due process of law.[16] The Authority argued that, in accordance with the provisions of Act 83 of May 2, 1941, as amended, known as the "Electric Power Authority Act," it was created as a government agency subject to the control of its Governing Board, with an existence and legal personality separate and apart from the Puerto Rico Government, for which reason said autonomy "implies that for procedural and adjudicative purposes it is to be treated as a private entity or individual."[17]

On May 4, 2017, PV Properties filed a pleading entitled Surreply to Reply to the Opposition to the Motion to Dismiss, stating arguments similar to those already set forth in its Complaint, its Opposition to the Motion to Dismiss and its Motion for Summary Judgment. PV Properties stated that Act 82-2010 is very clear and specific and that, in addition, the Legislator ordered that "its implementation shall not be obstructed by unnecessary regulatory processes."[18] Just as in its Opposition to the Motion to Dismiss, PV Properties requested that the Commission Deny the Motion to Dismiss, as well as the Reply to the Opposition to the Motion to Dismiss filed by the Authority.

Furthermore, on May 11, 2017, the Authority filed a Motion Regarding the Motion for Summary Judgment in which it requested that the Commission Deny the Motion for Summary Judgment filed by PV Properties. The Authority outlined arguments similar to the ones presented in its Motion to Dismiss and in its Reply to the Opposition to the Motion to Dismiss. The Authority argued that the Motion for Summary Judgment "ignores the basic rules on resolving requests for dismissal attempting to make us believe that the respondent has accepted the facts and allegations in the complaint as true."[19] Likewise, the Authority stated that the Motion for Summary Judgment "tries to circumvent the threshold and jurisdictional issue that has been raised in [its] Motion to Dismiss, which must be resolved prior to any responsive allegation by the AEE."[20]

---

requirements with which the agreements between the producers of renewable sustainable energy and the AEE must comply, and ways of obtaining production readings; requirements applicable to the reports to be submitted annually by the public corporation appearing before the Commission; regulations on the prices at which the RECs may be sold; for imposing fines for noncompliance with this act; among others." *Id.*

[16] *Id.,* on pgs. 4-8.

[17] *Id.,* on pgs. 7-8.

[18] Surreply to the Reply to the Opposition to the Motion to Dismiss by PV Properties, May 4, 2017, ¶ 16.

[19] Motion Regarding the Motion for Summary Judgment by the Authority, May 11, 2017, on pg. 8. Emphasis in the original.

[20] *Id.*

Case:17-03283-LTS   Doc#:1462   Filed:10/18/17   Entered:10/18/17 18:57:27   Desc: Main
Document   Page 106 of 125

Case:17-04780-LTS   Doc#:332-1   Filed:10/04/17   Entered:10/04/17 11:10:42   Desc:
Appendix ECPR RESOLUTION AND ORDER   Page 5 of 9

On May 18, 2017, PV Properties filed a pleading entitled Reply to the Motion Regarding the Motion for Summary Judgment. In said pleading, PV Properties stated that it agrees with the arguments presented by the Authority in its Motion Regarding the Motion for Summary Judgment, in reference to the fact that the Commission must, in the first place, resolve the issue of lack of jurisdiction, as raised by the Authority, and then decide whether or not the arguments raised by PV Properties in its Motion for Summary Judgment are proper.[21] In that regard, PV Properties requested the Commission to resolve the pending jurisdictional question, and issue a Resolution summarily adjudicating the Complaint in its favor.[22]

Finally, on May 30, 2017, the Authority filed a Surreply to the "Reply to the Motion Regarding the Motion for Summary Judgment," in which it reiterated that "it is not its intention to delay this or any administrative procedure in an unreasonable manner."[23] Likewise, the Authority argued that in the procedural stage in which the case is at, it does not have the duty to make responsive allegations because the resolution of a motion to dismiss is still pending.[24] Furthermore, the Authority again outlined the arguments raised in its Motion to Dismiss, its Reply in Opposition to the Motion to Dismiss and its Motion Regarding the Motion for Summary Judgment, with respect to the fact that the Commission has not enacted the necessary regulations for the implementation of the provisions of Act 82-2010.[25]

## II.   Applicable Law and Analysis

Article II of the Puerto Rico Constitution establishes that "no person shall be deprived of his property or liberty without due process of law."[26] For that purpose, the Puerto Rico Supreme Court has established that "when we analyze an assertion of a violation of due process of law in its procedural aspect, we must decide, first, whether there is a proprietary or liberty right that deserves the corresponding constitutional protection."[27] Further on, the Court establishes that

---

[21] Reply to the Motion Regarding the Motion for Summary Judgment by PV Properties, ¶¶ 2-3.

[22] *Id.,* on pg. 5

[23] Surreply to the "Reply to the Motion Regarding the Motion for Summary Judgment" by the Authority, ¶ 5.

[24] *Id.,* ¶ 6.

[25] *Id.,* ¶ 8.

[26] Article II, Section 7, Constitution of the Commonwealth of Puerto Rico.

[27] Calderón Otero v. Corporación del Fondo de Seguro del Estado, D.P.R. 386, 397 (2011). For that purpose, Prof. Demetrio Fernández has stated that "if the administrative action intervenes in constitutionally protected interests such as life, property and liberty, it is mandatory to provide due process of law to the injured person." D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme* [Administrative Law and

"once said demand has been complied with, we have adopted and developed certain factors that should be analyzed to decide whether an administrative proceeding complies with the constitutional requirements of due process of law.[28] According to the Supreme Court, these factors are "(1) the private interest that can be affected by the official action; (2) the risk of an erroneous determination due to the procedure used and the probable value of additional or different guarantees; and (3) the governmental interest protected in the summary action, including the function in question and the fiscal and administrative burdens that it would entail to impose other procedural guarantees."[29]

Furthermore, the Supreme Court has also stated that "due process of law encompasses the right of every person to have a fair trial and with all the guarantees that the law offers, both in the judicial and in the administrative spheres."[30] For those purposes, due process of law requires that "facing the deprivation of a right, the affected party has access to a proceeding that is consistent with the principles of justice and impartiality."[31] For that reason, the Court has established that the requirements for guaranteeing that the parties in a controversy will have their due process of law in the procedural modality are: "(1) proper notice of the proceeding; (2) a proceeding before an impartial judge; (3) the opportunity to be heard; (4) the right to cross-examine the witnesses and examine the evidence presented against them; (5) to have the assistance of counsel, and (6) that the decision is based on the record or case file."[32] It is important to emphasize that "the general rule is that due process of law is granted **before the administrative decision is effective.**"[33]

As a result, the right to due process of law covers all the parties in an administrative proceeding. Now, there are circumstances in which the determination of who is a "party" in an administrative proceeding is a complex task.[34] Section 1.3(k) of Act No.170 of August 12, 1988, as amended, known as the Uniform Administrative Procedure Act ("LPAU -- Spanish acronym) defines the term "party" as "every person or **agency authorized by law to whom the action of an agency is specifically addressed** or who is a party in said action, or who is allowed to intervene or participate in the action, or who has filed a petition for the review of or compliance

---

Uniform Administrative Procedural Law] 3rd Ed. Forum, 2013, on pg. 404.

[28] Calderón Otero *supra*, on pg. 398.

[29] *Id.*

[30] San Antonio Acha v. García Vélez, 2016 T.S.P.R. [Puerto Rico Supreme Court] 227, on pg. 9.

[31] *Id.*

[32] Calderón Otero, *supra*, on pg. 399. *See* also Rivera Rodríguez & Co. v. Lee Stowell, etc. 133 D.P.R. 881, 889 (1993).

[33] D. Fernández, *supra*, on pg. 405. Emphasis added.

[34] Rivera v. Morales, 149 D.P.R. 672, 683 (1999).

with an order, or who is designated as a party in said proceeding."[35] For that purpose, the Supreme Court has reiterated that the concept of "party" includes: (1) the person to whom the action is directed; (2) **the agency to whom the action is directed**; (3) the intervener; (4) anyone who has filed a petition for a review of or compliance with the order; (5) the person designated as such in the proceeding; and (6) anyone who actively participated during the administrative proceeding, and whose rights and obligations may be adversely affected by the action or inaction of the agency."[36]

Moreover, the LPAU defines the term "adjudication" as "the pronouncement through which an agency determines the rights, obligations or privileges that correspond to a party."[37] As a result, the adjudicative process before an agency is distinguished from the process of regulating "by being of a particular application, **through which the rights and obligations of one or more specific persons are adjudicated."[38]**

Finally, Article 6.4 of Act 57-2014, as amended, known as the Puerto Rico Energy Transformation and RELIEF Act, establishes that the Commission, among others, shall have primary and exclusive jurisdiction over cases and controversies in which a breach of Puerto Rico public energy policy is raised, as well as cases and controversies in which any breach by the Authority of any of the mandates established in Act 83 of May 2, 1941 is raised. Likewise, said Article 6.4 establishes that the Commission will have regulatory investigative and **adjudicative** jurisdiction over the Authority and any other certified energy company that provides services within Puerto Rico.

## III.   Conclusion

In its Complaint, the Petitioner alleged that the Authority is not complying with the Puerto Rico energy policy as far as the requirements related to its Renewable Energy Portfolio.[39] Likewise, the Petitioner alleged that the Authority is not complying with certain provisions of Act 82-2010 in regard to the acquisition of the RECs to ensure compliance with said act.[40]

---

[35] 3 L.P.R.A. § 2102 (k). Emphasis added.

[36] JP Plaza Santa Isabel v. Cordero Badillo, 177 D.P.R. 177, 188 (2009). Emphasis added. *See* also, Fund Surfrider et al. v. A.R.Pe., 178 D.P.R. 563, 576 (2010); "the petitioner or respondent is a party for the purposes of the judicial review, that is, **the person who is the subject of the administrative action."** Emphasis added.

[37] 3 L.P.R.A. § 2102(b).

[38] Municipio de San Juan v. Junta de Planificación, 18 D.P.R. 895, 906 (2013). Emphasis added.

[39] Complaint by PV Properties, ¶¶ 13-15.

[40] *Id.*, ¶ 34.

7

It is clear that, under these circumstances, this case is about a controversy in regard to the alleged breach by the Authority of Puerto Rico energy public policy. Therefore, in accordance with the provisions of Article 6.4 of Act 57-2014, the Commission has primary and exclusive jurisdiction to resolve it. Based on the statutory provisions presented above, the argument by the Authority that the Commission has not enacted the regulations necessary for implementing the provisions of Act 82-2010 is a substantive issue and not a jurisdictional one.

Furthermore, pursuant to the provisions of Section 1.3 of the LPAU and the interpretive case law stated above, we find that the Authority is a "party" in this case. As a result, and contrary to allegations by the Petitioner,[41] the Authority is covered by all the rights that the other parties thereto have.

Pursuant to the foregoing, the Motion to Dismiss filed by the Authority is **DENIED**.

Having determined that the Commission has jurisdiction for addressing the Complaint filed by PV Properties, the parties are **ORDERED** to file, **within a term of twenty (20) days running from the notice of this Resolution and Order**, a memorandum of law in which they must address the following questions:

1. What are the Authority's responsibilities and obligations to comply with the Renewable Energy Portfolio?

2. What are the responsibilities and obligations of a renewable energy producer under Act 82-2010?

3. Is the Authority exempt from attempting compliance with the Renewable Energy Portfolio due to the absence of particular regulation of the REC market?

4. In the absence of regulations, what would be the mechanism available for the Authority to comply with the Renewable Energy Portfolio?

5. What is the scope of what is provided in Article 2.7 of Act 82-2010 in regard to the issuing, registering and marketing of RECs in Puerto Rico?

6. Are RECs generated and registered by PV Properties valid in the light of Article 2.7 of Act 82-2010?

7. Does Article 2.7 of Act 82-2010 require that the RECs be solely registered in the retail renewable energy provider registry?

8. Can a retail energy provider acquire RECs registered in a renewable registry by another entity, including the renewable energy producer?

---

[41] Opposition to the Motion to Dismiss, *supra,* ¶ 28. "Having seen the case law, it is impossible to deprive PREPA of protections of due process of law, which it does not have, or can legally have. As a governmental entity, as a public corporation, PREPA is simply not an individual capable of deserving a constitutional right to due process of law."

9.   In the light of the provisions of Act 82-2010, can the Authority and a renewable energy producer establish by negotiations the terms and conditions that will apply to the acquisition of the REC? What limits do the provisions of Act 82-2010 Impose on said negotiation?

10.   In the case of energy produced by a distributed renewable energy producer and that has been exported into the Authority system (*outflow*), should it be considered that the Authority has acquired jointly the environmental and social attributes and the energy attributes of said energy?

11.   Should there be a distinction between the RECs corresponding to energy produced by distributed renewable energy producers that has been exported to the Authority and the RECs corresponding to energy produced by producers of distributed renewable energy that has been consumed by the owner of the distributed generation system and/or the property which said system serves?

Likewise, **within the term of twenty (20) days provided above**, the Authority must file any additional responsive actions that it deems beneficial to make in answer to the Complaint filed by PV Properties and what is provided in this Resolution and Order.

Provide notice and publish.

|  |  |
|---|---|
| [Sgd.] | [Sgd.] |
| Ángel R. Rivera de la Cruz | José H. Román Morales |
| Associate Commissioner | Associate Commissioner |
|  | Interim Chairman |

**CERTIFICATION**

I certify that the majority of the members of the Puerto Rico Energy Commission reached this agreement on June _2_, 2017, and that on this date a copy of this Resolution and Order in regard to Case No. CEPR-QR-2017-0001 was sent by e-mail as notice to: javrua@gmail.com, marcgrp@gmail.com, vcandelaria@qaclaw.com, gmartinez@qaclaw.com and to ejquinones@qaclaw.com. Likewise, I certify that this is a true and exact copy of the Resolution and Order issued by the Puerto Rico Energy Commission, and that today I proceeded to file this in the case file and I have sent a copy hereof to:

**Puerto Rico Electric Power Authority**
Quiñones, Arbona & Candelario, PSC
Atty. Víctor D. Candelario Vega
Atty. Giselle Martínez Velázquez
Atty. Edwin J. Quiñones Porrata
P.O. Box 10906
San Juan, P.R. 00922

**PV Properties, Inc.**
Atty. Javier Rua Jovet
701 Ponce de León Ave.
Centro de Seguros Building
Office 414
San Juan, P.R. 00907

And for the record, I hereby sign in San Juan, Puerto Rico, today June _2_, 2017.
[Sgd.]
María del Mar Cintrón Alvarado
Clerk

9

**Exhibit 6**

PREPA's Notice of Automatic Stay

SECRETARIA
COMISION DE ENERGIA DE
PUERTO RICO

COMMONWEALTH OF PUERTO RICO

PUERTO RICO ENERGY COMMISSION

'17   JUL 12   A10 :46

PV PROPERTIES, INC.,

Movant,

v.

PUERTO RICO ELECTRIC POWER
AUTHORITY,

Respondent.

Case no.: CEPR-QR-2017-0001

Matter: Law 82 as approved on
July 19, 2010, as amended,
Renewable Energy Credits

### NOTICE OF AUTOMATIC STAY OF PROCEEDINGS PURSUANT TO THE COMMENCEMENT OF CASE UNDER TITLE III OF PROMESA

TO THE HONORABLE ENERGY COMMISSION:

**COMES NOW** the Puerto Rico Electric Power Authority (hereinafter "PREPA") through the undersigned attorney and very respectfully SETS FORTH and PRAYS as follows:

1.      The above captioned action was commenced on March 3, 2017, alleging claims against the Puerto Rico Electric Power Authority.

2.      On June 30, 2016, the federal law known as Puerto Rico Oversight, management, and Economic Stability Act", also known as PROMESA, 48 U.S.C. § 2101 et seq., was enacted.

3.      Pursuant to section 315 of PROMESA, on July 2, 2017, PREPA, through its representative, the Financial Oversight and Management Board for Puerto Rico (hereinafter "FOMB"), filed a petition in the United States District Court for the District of

1

Puerto Rico under Title III of PROMESA. *In re: Puerto Rico Electric Power Authority, United States District Court for the District of Puerto Rico, case no. 17 BK 4780-LTS*

4.      According to sections 362(a) and 922(a) of the Bankruptcy Code, as incorporated by reference under Section 301(a) of PROMESA, the commencement <u>or continuation</u> "of a judicial, administrative, or other actions or proceedings against the debtor that was or could have been commenced <u>before</u> the commencement" of the petition under Title III or "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under" a Title III proceeding <u>is automatically stayed  without further action</u>. 11 U.S.C. §§ 362(a), 922(a); 48 U.S.C. §2161(a) (emphasis provided). PREPA is the debtor in the Petition pursuant to 48 U.S.C. § 2161(c)(2) (PROMESA § 301(c)(2)).

5.      "The automatic stay is among the most basic of debtor protections under bankruptcy law", *Midlantic Nat'l Bank* v. *New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 503 (1986); *see also Jamo v. Katahdin Fed. Credit Union*, 283 F.3d 292, 398 (1st Cir. 2002), and takes effect "immediately upon the filing of a bankruptcy petition "because the automatic stay is exactly what the name implies – 'automatic' – it operates without the necessity for judicial intervention." *Soares v. Brockton Credit Union* (*In re Soares*), 107 F.3d 969, 975 (1st Cir. Mass. Mar. 10, 1997) citing *Sunshine Dev., Inc.* v. *FDIC*, 33 F.3d 106, 113 (1st Cir. 1994)). The automatic stay is aimed at "giv[ing] the debtor breathing room by "'stopping all collection efforts, all harassment, and all foreclosure actions.'" *In re Soares*, 107 F.3d at 975 (citations omitted); *see also Jamo*, 283 F.3d at 398. And, the stay "remains in force until a federal court either disposes of the case, *see* 11 U.S.C. § 362(c)(2), or lifts the stay, *see id.* § 362(d)-(f)", allowing "debtors to resolve their debts in a more orderly fashion [citation omitted], and at the



2

same time safeguards their creditors". *Id.*

6.      Given that the automatic stay under section 922 of the Bankruptcy Code is applicable to the present case, the undersigned requests the Energy Commission to take judicial notice of the above, staying the proceedings in the present case pursuant to sections 362(a) and 922(a) of the Bankruptcy Code, as incorporated by reference under section 301(a) of PROMESA, 48 USC § 2161(a).

7.      It should be understood that PREPA does not waive any right or defenses arising from Title III of PROMESA and PREPA's petition under Title III. Further, PREPA reserve its rights to plead or address any pending matter or claim in this case if the stay is lifted or if any order is issued in the Petition proceedings under Title III.

**WHEREFORE,** it is respectfully requested from this Honorable Commission to take notice of the above stated.

**I HEREBY CERTIFY** that on this same date, I electronically sent a copy of this document to Attny. Javier Rúa Jovet, to javrua@gmail.com.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on July 12, 2017.

Katiuska Bolaños Lugo
**CANCIO, NADAL, RIVERA & DÍAZ, P.S.C.**
**PR-Bar no.: 18,888**
Counsel for Respondent PREPA
PO Box 364966
San Juan, PR  00936-4966
Tel. (787) 767-9625
Fax. (787) 764-4430
kbolanos@cnrd.com

3

**Exhibit 7**

<u>September 13, 2017 Resolution and Order</u>



**COMMONWEALTH OF PUERTO RICO**
**PUERTO RICO ENERGY COMMISSION**

| | |
|---|---|
| PV PROPERTIES, INC.<br>**MOVANT**<br><br>vs.<br><br>AUTORIDAD DE ENERGÍA ELÉCTRICA DE<br>PUERTO RICO<br>**RESPONDENT** | **CASE No.:** CEPR-QR-2017-0001<br><br>**SUBJECT:** Resolution on Notice of Automatic Stay of Proceedings filed by the Puerto Rico Electric Power Authority. |

<u>**RESOLUTION**</u>

On July 12, 2017, the Puerto Rico Electric Power Authority ("PREPA") filed before the Puerto Rico Energy Commission ("Commission") a motion titled "Notice of Automatic Stay of Proceedings Pursuant to the Commencement of case Under Title III of PROMESA" ("Motion").  In its Motion, PREPA requested the Commission to stay the proceedings in the instant case, pursuant to Sections 362(a) and 922(a) of the Bankruptcy Code,[1] as incorporated by reference under section 301(a) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").[2]

As argued by PREPA, Section 362(a) of the Bankruptcy Code states that the commencement or continuation of a judicial, administrative, or other actions or proceedings against a debtor that was or could have been commenced before the commencement of the petition under Title III or any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under a Title III proceeding is automatically stayed without further action.[3]  However, Section 362(b)(4) of the Bankruptcy Code states:

> The filing of a petition under **section 301, 302, or 303 of this title**, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an **action or proceeding by a governmental unit** […] **to enforce such governmental unit's or organization's police and regulatory power**, including the enforcement of a judgment other than a money judgment,

---

[1] 11 U.S.C. § 362(a), 922(a).

[2] PREPA's Motion at ¶ 6. The cited text corresponds to Section 362(a)(1) of the Bankruptcy Code.

[3] *Id.*, at ¶ 4.



obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.[4]

Regarding the exception referenced above, the United States Court of Appeals for the First Circuit has establish that "[t]his exception discourages debtors from submitting bankruptcy petitions either primarily or solely for the purpose of evading impending governmental efforts to invoke the governmental police powers."[5] Moreover, "the courts have devised two interrelated, fact-dominated inquiries - the so-called "public policy" and "pecuniary purpose" tests - for assessing whether a particular governmental proceeding comes within the subsection 362(b)(4) exception."[6] To conduct these inquiries, it must be determined "whether the particular regulatory proceeding at issue is designed primarily to protect the public safety and welfare, or represents a governmental attempt to recover from property of the debtor estate, whether on its own claim, or on the nongovernmental debts of private parties."[7]

To that effect, the United States Bankruptcy Court for the District of Puerto Rico has stated that under the pecuniary purpose test, the government's proceeding is analyzed "to determine whether the same seek to enforce a matter of public safety and welfare, **which favors the stay exception**, or its pecuniary interest, which does not."[8] Therefore, "the governmental unit satisfies the "pecuniary purpose" test if its actions were not brought primarily to benefit the government's pecuniary interest."[9]

On the other hand, "[u]nder the public policy test, the relevant inquiry is whether the government is primarily trying to effectuate public policy or to adjudicate private rights."[10] Moreover, "[i]f the action furthers both public and private interests, then the same should be exempt from the automatic stay if the private interests do not significantly outweigh the public benefit from enforcement."[11]

---

[4] 11 U.S.C. §362(b)(4). Emphasis added.

[5] *McMullen v. Sevigny*, 386 F. 3d. 320, 324-325 (1st Cir. 2004).

[6] *Id.*, at 325.

[7] *Id.*

[8] *Montalvo v. Autoridad de Acueductos y Alcantarillados*, 537 B.R. 128, 143 (Bankr. D. P.R. 2015). Emphasis added.

[9] *Id.*

[10] *Id.* Quotation marks omitted.

[11] *Id.* Citing *Chao v. Hosp. Staffing Servs. Inc.*, 270 F. 3d 374, 390 (6th Cir. 2001). Quotation marks omitted.

Act 82-2010[12] invests the Commission with "any powers as necessary and convenient to fully attain the purposes of this Act".[13]  Among other things, the Commission has the power "**to issue to do or cease and desist orders** to any person in order to comply with the requirements, purposes, and objectives of this Act, including without it being limited to compliance with the Renewable Portfolio Standard"[14].

According with Act 82-2010 Statement of Motives "this Act creates, for the first time, a Renewable Portfolio Standard in Puerto Rico and establishes the requirements and specific percentages through which [PREPA] and other retail electricity suppliers shall supply electric power from renewable energy sources and alternative renewable energy throughout the next twenty-five (25) years."[15]   Regarding the Renewable Portfolio Standard, Act 82-2010 Statement of Motives also established that:

> With this, we seek to achieve a twenty percent (20%)-sustainable renewable energy production in Puerto Rico and dramatically reduce our dependence on fossil fuels for energy consumption. Furthermore, this shall pave the way for the "Puerto Rico: Green Island" initiative, which seeks to establish and implement the Puerto Rico's new energy policy based on energy source diversification and conservation. In this manner, it is ensured that the generation of electricity in this jurisdiction be affordable, feasible, reliable, stable, and sustainable, while "green jobs" are created and the environment is preserved.[16]

Moreover, "[t]he production of electric power from sustainable renewable energy and alternative renewable energy sources has highly valuable attributes, which shall yield benefits for the entire citizenry, since the use of this kind of energy reduces air pollution and mitigates the adverse effects on the health of our people associated with pollution."[17]  Finally, Article 6.3(r) of Act 57-2014[18], establishes that the Energy Commission will have the power and duty to "[o]versee compliance with any mandatory standard or goal under the Renewable Energy Portfolio imposed by legislation or regulations."[19]

---

[12] Public Policy on Energy Diversification by Means of Sustainable and Alternative Renewable Energy in Puerto Rico Act, as amended.

[13] *Id.* Article 2.4, 12 L.P.R.A. § 8125.

[14] *Id.* Emphasis added.

[15] *Id.* Statement of Motives, ¶ 7.

[16] *Id.*

[17] *Id.* ¶ 11.

[18] Puerto Rico Energy Transformation and RELIEF Act, as amended.

[19] *Id.* Article 6.3(r), 9 L.P.R.A. § 1054b.

Recently, in *Rafael Lacourt Martínez v. Junta de Libertad Bajo Palabra the Puerto Rico*,[20] and *Laboratorio Clínico Irizarry v. Departamento de Salud, y otros*,[21] the Puerto Rico Supreme Court urged lower courts to carefully review the specific circumstances of each case prior to staying any proceeding since an automatic stay is not indiscriminately applicable to every proceeding.  Specifically, the Supreme Court stated that the automatic stay "gives the debtor breathing spell from his creditors[,] stops all collection efforts, all harassment, and all foreclosure actions [and] permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy."[22] Citing longstanding jurisprudence recognizing that both federal and state systems "have jurisdiction to initially determine whether pending litigation is stayed,"[23] the Supreme Court determined that proceedings not involving a monetary claim against the debtor are not automatically stayed.[24]

In light of the aforementioned, for an action before the Commission to be automatically stayed pursuant to Section 301(a) of PROMESA, the primary purpose of such action must be to determine that the movant has a right to payment, that it has a right to an equitable remedy for which monetary payment is an alternative remedy or to protect the government's pecuniary interest. On the other hand, if the primary purpose of an action by the government is to enforce and or adopt public policy, then such an action is not considered to be automatically stayed, even if, as a consequence of such a government action, a pecuniary claim may arise against the debtor.

The Commission, among other things, has regulatory power to oversee and implement the Renewable Portfolio Standard, as established by Act 82-2010.  The main controversy in the instant case is whether the provisions of Act 82-2010, including compliance by PREPA with the Renewable Portfolio Standard established therein, are readily enforceable, or if PREPA is exempt from complying with Act 82-2010 until appropriate rules and regulations have been adopted.[25] While Movant's Claim seeks a determination that PREPA should purchase certain Renewable Energy Credits at a set price, there is an underlying and compelling interest in clarifying and determining the scope and applicability of the provisions of Act 82-2010.  Therefore, the primary purpose of

---

[20] 2017 TSPR 144

[21] 2017 TSPR 145

[22] *Id.* citing 3 Collier on Bankruptcy, sec. 362.03, sub sec. 6 and H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977).

[23] *Id.* citing *Mid-City Parking, Inc.*, 332 B.R. 798, 803 (N.D. Ill. 2005).

[24] *Id.* citing *Atiles-Gabriel v. Puerto Rico*, 2017 WL 2709757, 2 (D. PR 2017)("The relief sought concerns a person's liberty; it does not seek a right to payment, nor an equitable remedy for which monetary payment is an alternative remedy.")

[25] *See* "Querella" filed by the Movant on March 3, 2017 and "Moción de Desestimación", field by the Respondent on March 23, 2017.



the instant case is to determine whether the provisions of Act 82-2010, including the mandate requiring PREPA to comply with the Renewable Portfolio Standard, is currently and readily enforceable, or whether compliance with such provisions is dependent on the approval of the appropriate rules and regulations.

To address both controversies, the Commission ordered both parties to file a legal brief answering several questions which would provide the Commission with sufficient information to issue a policy determination with regards to the applicability and enforceability of Act 82-2010 and the rights and responsibilities of each party involved.[26]

The implementation of the Renewable Portfolio Standard and the increase in production of electric power from sustainable renewable energy is a matter of public safety, welfare and concern. The Commission has, for the first time, the opportunity to make a policy determination with regards to Act 82-2010 and the rights and responsibilities established therein. The instant case does not benefit the government's or the Commission's pecuniary interest nor its primary purpose is the adjudication of monetary responsibility. Accordingly, the "pecuniary purpose" test is satisfied.

Act 82-2010 and Act 57-2014 established a public policy of promoting energy generation through renewable sources.[27]  At the center of this public policy is compliance with the Renewable Portfolio Standard by retail energy suppliers, including PREPA. Determining the scope and enforceability of Act 82-2010 is a public policy action, not limited to the adjudication of specific private rights.  The fact that a possible outcome of the proceeding would benefit Movant's claims with respect to PREPA's obligation under Act 82-2010 does not outweigh the underlying public interest in promoting compliance with Puerto Rico's Renewable Portfolio Standard.  Consequently, the "public policy" test is satisfied.

In light of the aforementioned, the Commission finds that the instant proceeding falls within the exception of Section 362(b)(4) of the Bankruptcy Code. Respondent's request for a stay of the proceedings in the instant case is **DENIED**. Respondent shall have

---

[26] Resolution and Order of June 2, 2016 in the instant proceeding.

[27] *See* Article 1.2(h) of Act 57-2014, 9 L.P.R.A. § 1051. "The maximum percentage of renewable energy that may be integrated and incorporated into Puerto Rico's electricity infrastructure in a safe and reliable manner and at a reasonable cost shall be identified and kept updated. Moreover, suitable technologies and locations shall also be identified to make such integration feasible in accordance with the best interest of the Commonwealth of Puerto Rico".  *See also* Statement of Motives, Act 57-2014; "Through the adoption of regulations using the SGIP and SGIA's as models, procedures shall be standardized, current obstacles for interconnection shall be eliminated, a reliable and safe interconnection process shall be provided for, and the economic activity of the Island shall be increased by reducing energy costs. These amendments shall also allow Puerto Rico to continue with its mission of achieving the goals established in Act 82-2010, […] by enabling a greater interconnection of renewable sources to the electric power grid."

fifteen (15) days from the date this Resolution is notified to file its legal brief in response to the Commission's June 2, 2017 Resolution and Order.[28]

Be it notified and published.

_____
Ángel R. Rivera de la Cruz
Associate Commissioner

_____
José H. Román Morales
Associate Commissioner
Interim Chairman

**CERTIFICATION**

I hereby certify that the majority of the members of the Puerto Rico Energy Commission has so agreed on September 13, 2017 and on this date a copy of this Resolution regarding the Case No. CEPR-QR-2017-0001 was notified by electronic mail to the following: javrua@gmail.com, marcgrp@gmail.com, javier.morales@prepa.com y kbolanos@cnrd.com. I also certify that today, September 13, 2017, I have proceeded with the filing of the Resolution issued by the Puerto Rico Energy Commission and I have sent a true and exact copy to the following:

**Autoridad de Energía Eléctrica de Puerto Rico**
Lcda. Katiuska Bolaños Lugo
Cancio, Nadal, Rivera & Díaz, PSC
403 Avenida Muñoz Rivera
Hato Rey, P.R. 00918-3345

**PV Properties, Inc.**
Lcdo. Javier Rua Jovet
701 Ave. Ponce de León
Edificio Centro de Seguros Oficina 414
San Juan, P.R. 00907

**Autoridad de Energía Eléctrica de Puerto Rico**
Lcdo. Javier Morales Tañón
P.O. Box 363928
San Juan, P.R. 00936-3928

For the record, I sign this in San Juan, Puerto Rico, today, September 13, 2017.

_____
María del Mar Cintrón Alvarado
Clerk

---

[28] Movant, PV Properties Inc. filed its legal brief on June 22, 2017.

**Exhibit 8**

October 5, 2017 Resolution and Order

**COMMONWEALTH OF PUERTO RICO**
**PUERTO RICO ENERGY COMMISSION**

| IN RE: STAYING OF PROCEEDINGS AND TEMPORARY ELECTRONIC FILLING REQUIREMENTS | CASE NO.: CEPR-MI-2017-0007 |
| --- | --- |
| | SUBJECT: Resolution and Order staying all adjudicative proceedings and terms before the Commission. |

### RESOLUTION AND ORDER

On September 17, 2017, the Governor of Puerto Rico, Hon. Ricardo A. Rosselló Nevares, issued Executive Order OE-2017-047 declaring a state of emergency, in response to the imminent passage of Hurricane María.[1] Accordingly, on September 18, 2017, the Puerto Rico Energy Commission ("Commission") issued an Order establishing temporary instructions for the filing of documents on September 18, 2017, to suspend the terms of ongoing proceedings and to suspend the filing of documents starting on September 19, 2017.[2]

On September 20, 2017, Hurricane María, a category 4 hurricane in the Saffir-Simpson Hurricane Scale, made landfall in Puerto Rico, causing significant devastation throughout Puerto Rico and severely damaging the Island's infrastructure, leaving virtually all of its inhabitants without essential utility services. While reconnaissance and evaluation efforts are still underway and a detailed report of the extent of the damages is not available, the Puerto Rico Electric Power Authority ("PREPA") estimates that only 5% of its customers have electric service and 80% of its transmission and distribution system has suffered significant damage.[3]

While the Commission has partially resumed its operations on September 26, 2017, the continuous state of emergency, as affirmed by the Governor through subsequent Executive Orders,[4] prevents the Commission from establishing normal operations. Accordingly, the Commission hereby **STAYS** all adjudicative proceedings still pending before the Commission and their corresponding terms, while the state of emergency remains in effect or until normal operations are resumed at the

---

[1] Executive Order, OE-2017-047 of September 17, 2017, Executive Order of the Governor of Puerto Rico, Hon. Ricardo Roselló Nevarez declaring an emergency state due to the impeding hurricane María and activating the National Guard to provide assistance during the emergency.

[2] Commission's Order CEPR-MI-2017-0006 of September 18, 2017.

[3] *See* PREPA's Motions filed on September 30, 2017 on dockets CEPR-AP-2015-0001 (motion amended on October 2, 2017) and CEPR-AP-2015-0002.

[4] *See*, for example, Executive Order OE-2017-053.

Commission. Once normal operations are established or once the Governor declares that the emergency has ceased, the Commission will notify all parties of any changes in their pending proceedings and the lifting of the aforementioned stay.

During the following days, the Commission will establish the appropriate regulatory and procedural steps necessary to normalize the Commission's operations in order to adequately respond to the current state of emergency. The Commission will notify such determinations promptly.

### Commission's Clerk Office

The Commission's Clerk Office will be temporarily relocated to the seventh floor of the Seaborne Plaza, 268 Avenida Muñoz Rivera, Suite 704, San Juan, Puerto Rico. Hours of operations will be from 8:30am – 5:00pm, Monday through Friday. In order to access the temporary location in the seventh floor, every person **must** present a photo identification at the security post.

All parties of active cases must be advised that any document filed in an active docket during the stay period, **will be considered filed on the first day that normal operations are resumed**, as determined by the Commission through Resolution or by the Governor of Puerto Rico through Executive Order.

*Electronic Filing*

Due to the state of emergency, the Commission has determined to allow electronic filing of documents until normal operations are resumed and the emergency is over. In the event a party determines to file documents electronically, it must comply with all the following directives. Failure to comply with all directives will result in rejection of the filing.

1. Electronic filings must be sent to secretaria@energia.pr.gov.
2. All documents **must** be sent in **searchable PDF format.**
3. With the purpose of easing the filing process, due to the nature of the emergency and the access limitations to the Commission's Clerk Office, the Commission has determined to exempt all parties during the emergency period from the requirement of physically signing documents. The party's authorized representative may use electronic signatures when filing electronically (e.g. /s/Authorize Representative). This exemption only applies to documents filed electronically.
4. All documents shall be sent to all parties in the case, via the email on record of the authorized representatives, and to the Commission's Clerk via the email indicated above.
5. Parties that meet all above requirements will not need to file physical copies of documents filed electronically during the emergency period once normal operations are resumed.

For the benefit of all parties involved, the Commission publishes this Resolution and Order in both the Spanish and English languages. Should any discrepancy arise between these two versions, the provisions of the Spanish version shall prevail.

Be it notified and published.

_____
Angel R. Rivera de la Cruz
Associate Commissioner

_____
José H. Román Morales
Associate Commissioner
Interim Chairman

**CERTIFICATION**

I hereby certify that the majority of the members of the Puerto Rico Energy Commission has so agreed on October _5_, 2017.

For the record, I sign this in San Juan, Puerto Rico, today, October _5_, 2017.

_____
María del Mar Cintrón Alvarado
Clerk

3