UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| GAM REALTY, LLC<br><br>    Plaintiff<br><br>           v.<br><br>NELSON J. SANTIAGO MARRERO, SECRETARY OF THE DEPARTMENT OF NATURAL AND ENVIRONMENTAL RESOURCES OF PUERTO RICO; ALBERTO LASTRA POWER, EXECUTIVE DIRECTOR OF THE PERMITS MANAGEMENT OFFICE OF PUERTO RICO<br><br>    Defendants | Civil Action No. 16-2910 |

## COMPLAINT

TO THE HONORABLE COURT:

    The plaintiff GAM Realty, LLC ("GAM") brings this civil rights action seeking declaratory judgment and injunctive relief because defendants have deprived it of the use of its property without due process and by imposing unconstitutional conditions on GAM's right to use and develop the property.

### I. JURISDICTION AND VENUE

    1. This action arises under Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and under the Fifth and Fourteenth Amendments of the Constitution of the United States. The defendants, acting under color of the laws of Puerto Rico, have deprived plaintiff of rights, privileges, or immunities secured by the Constitution of the United States. Therefore, the court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4).

2. Injunctive relief is requested under 42 U.S.C. § 1983 and Rule 65 of the Federal Rules of Civil Procedure. GAM also seeks a declaratory judgment under the Federal Declaratory Judgment Act, 28 USC §§ 2201-2202 and Rule 57 of Federal Rules of Civil Procedure. Under 42 U.S.C. § 1988, GAM has a right to attorney's fees.

3. This court is the proper venue for the action under 28 U.S.C. § 1391(b)(1) and (2), since the defendants reside in Puerto Rico, the events and omissions giving rise to the claim occurred in Puerto Rico, and the property that is the subject of the action is situated in the municipality of Cataño, Puerto Rico.

## II.   PARTIES

4. The plaintiff, GAM, is a limited liability corporation organized under the laws of Puerto Rico. Its principal place of business is in GAM Tower, 2 Calle Tabonuco, Suite 300, Guaynabo PR 00968.

5. Defendant Nelson J. Santiago Marrero is the Secretary of the Department of Natural and Environmental Resources of Puerto Rico ("DRNA", for its acronym in Spanish). He performs his official duties in Puerto Rico, where he resides. DRNA is the agency of the government of Puerto Rico in charge of implementing the Commonwealth of Puerto Rico's public policy on environmental matters and is responsible for putting in place programs for the use and conservation of Puerto Rico's natural resources. Santiago Marrero heads the DRNA and has the final policymaking authority of said government agency.

6. Defendant Alberto Lastra Power is the executive director of the Permits Management Office of Puerto Rico ("OGPe" for its acronym in Spanish). He performs his official duties in Puerto Rico, where he resides. OGPe is the agency of the government of Puerto Rico with authority to issue permits directly or indirectly related to land development and use. Upon its

2

creation by Act No. 161 of December 1, 2009, OGPe assumed the evaluation and permitting duties previously carried out by other government agencies. Lastra Power heads the OGPe, and has the final policymaking authority of said government agency.

7. GAM is suing Santiago Marrero and Lastra Power only in their official capacities as Secretary of the DRNA and Executive Director of the OGPe, respectively.

### III.  FACTS

8. On July 14, 2000, GAM's predecessor, GAM Realty, Sociedad en Comandita, S.E., purchased a real estate property located at *Barrio Palmas* (Palmas Ward) in Cataño, Puerto Rico (the "Property"). The Property's size was 39,715.6086 square meters, equivalent to 10.1047 *cuerdas*.

9. GAM bought the property at a price of $5,700,000, of which GAM paid $3,632,203.93 in cash. The balance of the purchase price ($2,067,796.07) consisted of the aggregate principal amount of two mortgage debts secured by the Property, which GAM assumed.

10. At the time of the purchase, the only liens and encumbrances on the Property were the two mortgages that GAM assumed and a pair of easements: one in favor the Puerto Rico Water Resources Authority (now the Puerto Rico Electric Power Authority), another in favor of the Puerto Rico Aqueduct and Sewer Authority ("PRASA").

11. The Property was zoned for light industrial and/or residential use when GAM bought it.

12. On April 4, 2012, GAM obtained a use permit for the installation of car storage facilities at the Property by Sojitz de Puerto Rico, Corp., the distributor of the Hyundai brand of motor vehicles (the "Hyundai Facilities"). The use permit allowed offices, warehouse, sales area, motor vehicle distribution, and motor vehicle parts at the Property.

3

13. In the course of getting the use permit for the Hyundai Facilities, GAM submitted the plans for the facilities to the U.S. Army Corps of Engineers (the "Corps") for their evaluation, in view of the Property's proximity to the *Las Cucharillas* Swamp (*Ciénaga Las Cucharillas*).

14. On August 10, 2010, the Corps issued its determination about the proposed Hyundai Facilities. It determined that "the project as proposed will not require a Department of the Army permit in accordance with Section 404 of the Clean Water Act as it will not involve the discharge of dredged or fill material into the waters of the United States, including wetlands." The Corps noted that "the proposed work will be conducted in an upland area and the existing wetland at your client property will be protected through the installation of a chain link fence and keeping a buffer zone of 20 feet from the wetland borderline."

15. After GAM obtained the use permit, the Hyundai Facilities were established at the Property.

16. In early 2014, GAM proposed expanding the Hyundai Facilities by constructing an additional open-area parking lot at the Property (the "Parking Lot"). The Parking Lot would be used for storing Hyundai's on-sale vehicles, and would be built in a five-acre portion of the Property.

17. Pursuant to the government of Puerto Rico's *Joint Regulation on Permits for Construction Works and Land Use* (the "Joint Regulation," now retitled and amended as the *Joint Regulation for the Evaluation and Issuance of Permits Related to Land Development and Use*), GAM filed a petition with OGPe for a permit to allow the construction and use of the Parking Lot.

18. By letter dated June 13, 2014, the municipality of Cataño approved and recommended (endorsed) the Parking Lot. The municipality deemed that Property's current zoning as a CR

District (Conservation of Resources) allowed the construction and use of the Parking Lot. The municipality also deemed that the Parking Lot met the requirements of its Territorial Ordering Plan.

19. Section 17.26.4 of the Joint Regulation allows the construction of parking areas in properties zoned as CR Districts, so long as it does not imply the destruction of natural resources of great ecological value such as mangrove swamps (*mangles*) o saltpeter beds (*salitrales*).

20. The construction and use of the Parking Lot did not imply the destruction of any natural resources of great ecological value. No such resources exist at the Property. Therefore, the construction and use of the Parking Lot at the Property was permitted under both the Joint Regulation and the Property's zoning as a CR District.

21. During the permit evaluation process, OGPe's executive director, Alberto Lastra Power, asked the DRNA to express its view about the proposed Parking Lot.

22. On July 8, 2015, DRNA required the submission of additional information before it would endorse the construction of the Parking Lot. It said that once the additional information was submitted it would continue with its evaluation of the project, and recommended that OGPe refrain from issuing the permit until all the required information had been submitted and the DRNA could issue its comments.

23. To this day, OGPe has refrained from issuing the permit for the Parking Lot.

24. On January 22, 2016, after GAM had submitted the additional information, the DRNA imposed numerous conditions for the construction and use of the Parking Lot. Among them, it required that for the Parking Lot to be allowed, GAM had to cede to the DRNA a conservation easement on an unspecified amount of land of the Property that allegedly formed part of the *Las Cucharillas* Swamp Natural Reserve. The DRNA also required reforestation, the use of special

5

permeable asphalt in the Parking Lot, the construction of a 15-meter wide buffer zone right through the middle of the Property aligned with the PRASA right-of-way easement, and the planting of a line of trees to constitute a barrier between the Parking Lot and the buffer zone.

25. On March 8, 2016, DRNA imposed additional conditions on the proposed Parking Lot. Specifically, it required GAM to cede to it for free and in perpetuity title to 2.8 *cuerdas* of the Property out of the five acres where the development of the Parking Lot was planned. It also required GAM to establish two buffer zones between the Property and the *Las Cucharillas* Swamp or any wetlands in the area: a first buffer zone 20 meters wide and a second one 25 meters wide.

26. According to the DRNA the conditions that it imposed in its letters of January 22, 2016 and March 8, 2016 were meant as mitigation for the environmental impact of the Parking Lot.

27. The DRNA made no findings, however, of any environmental impact that the Parking Lot would have.

28. In its March 8, 2016 letter, the DRNA also notified GAM that it had reclassified the habitats found in the Property.

29. Habitat classifications are established in the DRNA's Regulation No. 6765, *Regulation to Govern the Conservation and Management of Wildlife, Exotic Species, and Hunting in the Commonwealth of Puerto Rico* ("Regulation 6765"). They are also regulated by the Joint Regulation. Regulation 6765 establishes six categories of habitat, in order of value: (1) Irreplaceable habitat; (2) Essential habitat; (3) Habitat of high ecological value; (4) Habitat of ecological value; (5) Natural habitat with great potential of becoming an essential habitat, of high ecological value, or of ecological value; (6) Natural habitat with a low potential of becoming essential, of high value, or of ecological value

6

30. Regulation 6575 was adopted by the Secretary of the DRNA pursuant to the Organic Act of the DRNA, 3 LPRA §§ 151-163; the Natural and Environmental Resources Rangers of the DRNA Act, 12 LPRA §§ 1201-1210; and the New Wildlife Act of Puerto Rico, 12 LPRA §§ 107-107u. In particular, Regulation 6765 was intended to implement the New Wildlife Act and to regulate the management of wildlife, exotic species, and hunting.

31. In its March 8, 2016 letter, the DRNA informed GAM that it had classified a part of the Property that consisted of land-fill from many years ago as a Category 6 "Natural Habitat With a Low Potential of Becoming Essential, of High Value, or of Ecological Value." It had also classified 2.8 *cuerdas* of the Property as a Category 4 "Habitat of Ecological Value."

32. Regulation 6765 defines a Category 4 "Habitat of Ecological Value" as "a habitat with a high degree of biodiversity of flora and fauna or a high density of species of wildlife, without being limited to a specific physiographic region."

33. Regulation 6765 establishes that mitigation in relation to a Category 4 Habitat should aim at having no net loss in the quality and quantity of the habitat. Accordingly, Regulation 6765 provides that the impact of a proposed project on such a habitat must be avoided through alternatives to the project, or if the impact is inevitable the mitigation must be carried out through the cession or transfer of a similar habitat *in situ*, adjacent to, or outside the area that will be impacted. Under Regulation 6765, mitigation of this kind for a Category 4 Habitat requires the transfer of terrains of equal or greater ecological value in no less than a 1:1 proportion.

34. The DRNA's reclassification of the habitats in question at the Property was arbitrary and lacked grounding in fact. The DRNA made no findings of fact, analyses, or studies that called for the reclassification. It misclassified the habitats in the Property, particularly the 2.8 *cuerdas* classified as Category 4, not because it was the correct classification but only because the DRNA

7

wanted to be able to justify its demand that GAM cede or transfer to it title to the Property's 2.8 *cuerdas* for free and in perpetuity.

35. In September 2015, before the DRNA reclassified the habitats, Mr. Jesús Marrero had carried out a study of the flora and fauna at the Property at the request of the DRNA and GAM in order to determine the proper habitat classification. Marrero's study found little variety of flora and, except for trees, no element that would support fauna. The study found that the Property's conditions were such that the lack of support for fauna could hardly be surmounted. The study also failed to detect any critical or vulnerable elements that would merit protection. It further determined that the Property was similar to a grassland or savanna, with the difference that it received occasional maintenance.

36. Marrero's study concluded that the portion of the Property under study could qualify as a habitat with a low development potential, or that potentially, with a proper investment of money or with the passing of time owing to the migration of flora and fauna typical of the tropics, it could at some future time qualify as a Category 5 Habitat.

37. The DRNA ignored the factual findings of Marrero's study as to the lack of flora and fauna in the Property, and incorrectly, unreasonably, and arbitrarily classified the 2.8 *cuerdas* of the Property as a Category 4 Habitat. This classification directly contradicts the DRNA's own Regulation 6765, which establishes as the defining characteristic of a Category 4 Habitat "a high degree of biodiversity of flora and fauna or a high density of species of wildlife," neither of which is present in the Property nor in the Property's 2.8 *cuerdas* that the DRNA misclassified.

38. In point of fact, owing to the lack of a diverse flora, of fauna, and of the ecological conditions to support them at the Property, the proposed construction and use of the Parking Lot would not have any environmental impact that requires mitigation.

8

39. Actually, owing to the scarcity of flora and fauna at the Property, the construction and use of the Parking Lot cannot qualify as a "modification of habitat" as the term is defined in Regulation 6765, that is, as "any change caused by the human being in the natural habitat that kills or affects the native wildlife or that could cause these effects by altering their essential patterns of normal conduct such as reproduction, feeding or their refuge."

40. Additionally, the other conditions imposed by the DRNA, such as the establishment of the two buffer zones and the use of permeable asphalt, are disproportionate to any environmental impact that the Parking Lot could have, and unnecessary for the conditions' purported aim of protecting the natural habitats in the area or the *Las Cucharillas* Swamp.

41. For instance, the two separate buffer zones of 20 meters and 25 meters wide required by the DRNA are exaggerated and completely disproportional to any need to protect the nearby *Las Cucharillas* Swamp from effects that could arise from the Parking Lot. They greatly exceed, by comparison, the 20-feet buffer zone that the Corps had already deemed adequate as protection for any nearby wetlands, that is, for the *Las Cucharillas* Swamp. The costly use of a special, permeable asphalt is also an onerous condition that lacks nexus and proportionality to the stated aim of protecting *Las Cucharillas* Swamp, as its environmental effects would not differ in any significant way from those arising from the use of regular asphalt, nor would it mitigate any impact that the latter could have.

42. The measures requested by the DRNA as a condition to the issuance of the permit for the Parking Lot rather than being related to the aim of mitigating any environmental impact arising from the Parking Lot, or being related to the aim of protecting the *Las Cucharillas* Swamp, aim instead at forcing GAM to implement onerous measures and to incur in expenses to improve the

9

nature and quality of the existing habitats at the Property, at the DRNA's whim, not to preserve and protect existing natural habitats, flora, or fauna.

43. With its demands, conditions, and misclassification of the habitats at the Property, the DRNA has deprived GAM of the use of its Property. The DRNA has imposed unconstitutional conditions on the issuance of the permit that GAM has requested for the Parking Lot and that it needs to develop its property. The DRNA has deprived GAM of all productive use of the 2.8 *cuerdas* of its Property that DRNA has demanded that GAM cede to it for free and in perpetuity and has impaired the use and value of the remaining portions of the Property.

44. The Property is located within a Foreign Trade Zone as certified and authorized by the U.S. Customs and Border Protection. The Property's status as a Foreign Trade Zone makes it highly valuable.

45. The conditions imposed by the DRNA and the resulting stay on the issuance of the permit for the Parking Lot are depriving GAM of $30,000 in monthly rent that it would be receiving from Sojitz de Puerto Rico under a contract between them that has already been signed.

46. The Fifth Amendment of the Constitution of the United States establishes that "[n]o person shall be … be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

47. DRNA has conditioned GAM's ability to develop and use its Property on the condition that GAM renounce to its constitutional right under the Fifth Amendment to not be deprived of its property without just compensation. GAM has no remedy under Puerto Rico law for this deprivation, as the condition imposed by the DRNA is precisely that GAM give up its ownership rights to the Property while simultaneously renouncing all compensation for the DRNA's taking of its Property for public use.

48. The OGPe has similarly deprived GAM of its constitutional rights under the Fifth Amendment by subjecting the issuance of the permit for the Parking Lot to the conditions and endorsement of the DRNA, and by refraining from issuing the permit until the DRNA's demands and conditions are met.

49. Both the DRNA and OGPe have further deprived GAM of its due process rights under the Fifth Amendment by imposing arbitrary, capricious, and unreasonable habitat classifications on GAM's Property and conditions on the issuance of the permit for the Parking Lot, all of which deprive GAM of the use and enjoyment of the Property.

50. The conditions imposed on the issuance of the permit for the Parking Lot by the DRNA and OGPe are unrelated to the aims for which they are purportedly being imposed, and even if in some measure they are so related, they are disproportionate to such an exaggerated degree to the achievement of those aims that they are excessive and unnecessary. As a result, the conditions imposed by the DRNA and OGPe are an unconstitutional deprivation of GAM's Fifth Amendment rights to due process and to not have its property taken for public use without just compensation.

51. Santiago Marrero, the Secretary of the DRNA, and Lastra Power, the Executive Director of the OGPe, have the final policymaking authority in their agencies and the decision-making power to condition and issue the permit GAM has requested for the Parking Lot. They are responsible for the imposition of the unconstitutional conditions on the issuance of said permit to GAM, and for the policies, custom, and usage at the DRNA and OGPe pursuant to which DRNA and OGPe have imposed such unconstitutional conditions.

52. Santiago Marrero and Lastra Power acted under color of the laws of the Commonwealth of Puerto Rico when they imposed the unconstitutional conditions requiring GAM to renounce

11

its constitutional rights as a condition to obtain the permit for the development and use of the Property, and when they deprived GAM of its due process rights through the misclassification of the Property's habitat.

53. GAM will suffer irreparable harm from the demands, conditions, and habitat classifications imposed by the DRNA on the Property and on the issuance of the permit for the Parking Lot, since those demands, conditions, and habitat classifications will deprive GAM of its Property and of all use of it in a permanent way, without the possibility of obtaining compensation. GAM has no remedy at law for this deprivation, because the DRNA's demands and conditions for the transfer of the 2.8 *cuerdas* of the Property for free and in perpetuity require by their nature that GAM in effect renounce any remedy that it would have available at law for the taking of its Property for public use.

## IV. FIRST CAUSE OF ACTION (42 U.S.C. § 1983)

54. By their actions, as described herein, Santiago Marrero and Lastra Power have, under color of law, deprived GAM of its rights under the Fifth and Fourteenth Amendments of the United States Constitution. They have required GAM to renounce to its constitutional rights in order to be able to enjoy the benefits of developing, using, and enjoying its Property.

55. The actions of Santiago Marrero and Lastra Power, under color of state law, constitute a deprivation of GAM's constitutional rights under the Fifth and Fourteenth Amendments to (1) not be deprived of its property without due process of law and (2) not have its property taken for public use without just compensation.

56. As a direct and proximate result of the acts of Santiago Marrero and Lastra Power, GAM has and will continue to suffer the privation of its Property, and has incurred attorney's fees and costs.

12

57. The acts of Santiago Marrero and Lastra Power were done with the intent of requiring GAM to renounce its constitutional rights and deter GAM from exercising those rights.

58. The acts of Santiago Marrero and Lastra Power will cause GAM an irreparable harm through the violation of GAM's constitutional rights and the permanent and uncompensated loss of its property. GAM has no remedy at law for this injury, since the acts of Santiago Marrero and Lastra Power that it seeks to enjoin require GAM to renounce any such remedy.

59. GAM therefore requests that the Court issue injunctive relief under 42 U.S.C. § 1983 to enjoin Santiago Marrero and Lastra Power, in their official capacities, from depriving GAM of its property through the imposition of unconstitutional conditions on the issuance of the permit for the Parking Lot and through the misclassification of the habitats in GAM's Property.

## V. SECOND CAUSE OF ACTION (DECLARATORY JUDGMENT)

60. GAM requests a declaratory judgment under 28 U.S.C. §§ 2201-2202 and Rule 57 of Federal Rules of Civil Procedure that the conditions and demands imposed by Santiago Marrero and Lastra Power, in their official capacities, (1) lack an essential nexus to the purported aim of protecting the natural habitats in or nearby GAM's Property or the *Las Cucharillas* Swamp; (2) lack proportionality with any actual need to protect the natural habitats in or nearby GAM's Property or the *Las Cucharillas* Swamp from any environmental effects that the construction or use of the Parking Lot may have, or with any need to mitigate any such effects.

61. GAM also seeks a declaratory judgment that the classification of the habitats in GAM's Property was arbitrary, lacked basis in fact and law, and thus aims to deprive GAM of its Property without due process of law.

WHEREFORE, GAM requests that the Court issue a judgment against Santiago Marrero and Lastra Power, in their official capacities:

13

1. Declaring that (a) the demands and conditions imposed on the issuance of the permit for the Parking Lot are unconstitutional and (2) the misclassification of the habitats in the Property has deprived GAM of its property without due process of law.

2. Issue a permanent injunction, directing Santiago Marrero and Lastra Power as agency heads of the DRNA and the OGPe, respectively, and their agents, employees, and successors in office, to (a) rectify the unconstitutional conditions imposed on GAM and to issue the permit for the Parking Lot without requiring that GAM cede to the DRNA for free and in perpetuity title to the 2.8 *cuerdas* of the Property nor requiring the construction of the two buffer zones 20 meters and 25 meters wide; and (b) refrain from classifying the 2.8 *cuerdas* of the Property as a Category 4 Habitat.

3. Order defendants to pay GAM attorney's fees and costs pursuant to 42 U.S.C. § 1988.

4. Issue any other relief that the Court may deem just and proper.

Respectfully submitted.

At San Juan, Puerto Rico, November 2, 2016.

**CASELLAS ALCOVER & BURGOS, P.S.C.**
PO Box 364924
San Juan, PR 00936-4924
Tel. (787) 756-1400
Fax (787) 756-1401

**s/Ricardo F. Casellas Sánchez**
USDC Bar No. 203114
E-mail: rcasellas@cabprlaw.com

**s/Mariano A. Mier Romeu**
USDC Bar No. 217203
E-mail: mmier@cabprlaw.com

*Attorneys for GAM Realty, LLC*