**Hearing Date and Time: January 10, 2018 at 11:00 a.m. (prevailing Atlantic Standard Time)**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al*.

        Debtors.[1]

---------------------------------------------------------------- x

PROMESA
Title III

No. 17 BK 03283-LTS

(Jointly Administered)

# AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES'
# OBJECTION TO MOTION OF AURELIUS TO DISMISS TITLE III PETITION

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); and (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474).

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND .................................................................................................................. 3

ARGUMENT ....................................................................................................................... 5

    I.     The Appointments Clause Cannot Apply to Puerto Rico unless the Offensive
            Doctrine of Territorial Incorporation is Overruled by the Supreme Court .......... 5

    II.    Even in the Absence of the Doctrine of Territorial Incorporation, the
            Appointments Clause Would Not Apply to Territorial Officers such as
            the Oversight Board ................................................................................................ 9

    III.   The Oversight Board Members Are at Most Inferior Officers of the United
            States Whose Appointment by the President Complied with Both the
            Appointments Clause and Separation of Powers Principles ............................... 14

CONCLUSION .................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Ins. Co. v. 356 Bales of Cotton*,
   26 U.S. 511 (1828) (Marshall, C.J.) ........................................................................... 10

*Balzac v. Porto Rico*,
   258 U.S. 298 (1922) (Taft, C.J.) ..................................................................... 2, 7, 8, 9

*Binns v. United States*,
   194 U.S. 486 (1904) ....................................................................................................... 13

*Boumediene v. Bush*,
   553 U.S. 723 (2008) ...................................................................................................... 7, 8

*Department of Transportation v. Association of American Railroads*,
   135 S. Ct. 1225 (2015) ................................................................................................... 11

*FEC v. NRA Political Victory Fund*,
   6 F.3d 821 (D.C. Cir. 1993) .......................................................................................... 15

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) ......................................................................................................... 1

*Humphrey's Executor v. United States*,
   295 U. S. 602 (1935) ...................................................................................................... 15

*Igartua-De La Rosa v. United States*,
   417 F.3d 145 (1st Cir. 2005) ................................................................................ *passim*

*Metro. RR v. D.C.*,
   132 U.S. 1 (1889) ........................................................................................................... 12

*Morrison v. Olson*,
   487 U.S. 654 (1988) ....................................................................................................... 14

*NLRB v. SW Gen., Inc.*,
   137 S. Ct. 929 (2017) ....................................................................................................... 1

*Raymond J. Lucia Cos. v. SEC*,
   868 F.3d 1021 (2017) ....................................................................................................... 1

*Sere v. Pitot*,
   10 U.S. 332 (1810) (Marshall, C.J.) ...................................................................... 10, 12

*Territorial Judges Not Liable to Impeachment*,
    3 U.S. Op. Atty. Gen. 409 (1839) ..................................................................10

*United States v. Hartwell*,
    73 U.S. 385 (1867) ......................................................................................12

*United States v. Hilario*,
    218 F.3d 19 (1st Cir. 2000) ........................................................................14

*Wise v. Withers*,
    7 U.S. 331 (1806) ........................................................................................12

### STATUTES

48 U.S.C. § 2121(b) ...........................................................................................10

48 U.S.C. § 2121(b)(2) ........................................................................................3

48 U.S.C. § 2121(c) ...........................................................................................11

48 U.S.C. § 2121(c)(1) .........................................................................................4

48 U.S.C. § 2121(e)(1)(A) ....................................................................................4

48 U.S.C. § 2121(e)(2)(E) ..................................................................................4, 5

48 U.S.C. § 2121(e)(2)(G) .................................................................................5, 15

48 U.S.C. § 2121(e)(5)(A) ...................................................................................14

48 U.S.C. § 2121(f)(2) ..........................................................................................8

48 U.S.C. § 2149 ................................................................................................14

48 U.S.C. § 2192 ................................................................................................14

48 U.S.C. § 2194(m) .............................................................................................3

48 U.S.C. § 2194(m)(1-2) ......................................................................................8

### OTHER AUTHORITIES

District of Columbia Financial Responsibility and Management Assistance Act of 1995,
    Pub. L. 104-8, Section 101(a) ......................................................................4

District of Columbia Financial Responsibility and Management Assistance Act of 1995,
    Pub. L. 104-8, Section 101(b)(1) ...................................................................4

iii

District of Columbia Financial Responsibility and Management Assistance Act of 1995,
Pub. L. 104-8, Section 101(b)(2) ........................................................................................4, 12

Public Law 81-600 ..................................................................................................................13

U.S. Const. Art. II, Sec. 2, Cl. 2 ............................................................................................14

U.S. Constitution Article III and Amendments 6 and 7 ........................................................7

U.S. Constitution Article IV ..............................................................................................2, 10

U.S. Constitution Article IV, section 3 ..................................................................................8

American Federation of State, County and Municipal Employees ("AFSCME"), on

behalf of the thousands of active Commonwealth employee members represented by AFSCME's

Puerto Rico affiliate Servidores Publicos Unidos (the "AFSCME Employees") and the thousands

of retired Commonwealth employee members represented by AFSCME's separately-chartered

Retiree Chapter for Puerto Rico (the "AFSCME Retirees"), respectfully submits this objection to

the Motion to Dismiss Title III Petition filed by Aurelius (the "Aurelius Motion").[2]  For the

Court's convenience, AFSCME notes that the arguments made in the instant brief are

substantially similar to those made by AFSCME in its motion, also filed today, to dismiss the

adversary proceeding *UTIER v. PREPA*  [Adv. Pro. No. 17-228] (the "UTIER Action, and

together with the Aurelius Motion, the "Appointments Clause Challenges"), and respectfully

states as follows:

## PRELIMINARY STATEMENT

The Aurelius Motion follows in the footsteps of other financial institutions who have

sought refuge in the Appointments Clause when confronted with economic regulations designed

by Congress to level the playing field between Wall Street and Working Americans.  Indeed,

arguments likes those advanced in the Appointments Clause Challenges have become quite

common in recent years by parties attempting to escape government oversight where it is needed

most.  *See, e.g., NLRB v. SW Gen., Inc.,* 137 S. Ct. 929 (2017) (attack on appointment of NLRB

General Counsel); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,* 561 U.S. 477 (2010)

(attack on appointment of board members who regulate auditors of public companies); *Raymond

J.  Lucia  Cos. v. SEC,* 868  F.3d 1021 (2017), petition for cert. pending, No. 17-130 (filed July

26,  2017) (attack on appointment of all SEC ALJs).

---

[2]  Capitalized terms not otherwise defined herein shall have the same meaning as ascribed to them in the Aurelius Motion.

Aurelius—holders of general obligation bonds whose claims may be adjusted if these Title III proceedings continue—make little secret of their true agenda, which is simply to get paid in full irrespective of the Commonwealth's ability to provide essential services and pay pensions as PROMESA requires. *See* Aurelius Motion at 6 (identifying, among the many elements of a fiscal plan set forth by PROMESA Section 201(b), only that it "respect the relative lawful priorities and lawful liens . . . in effect prior to" PROMESA). AFSCME also makes no secret of its agenda in this case: to insist that the Oversight Board comply with PROMESA by ensuring the full funding of essential public services and pensions while respecting Puerto Rico's right to self-government. *See, e.g., AFSCME v. FOMB* [Adv. Proc. No. 17-00242]. Insofar as the Aurelius Motion does not seek to strike down PROMESA but only to eliminate these particular Board members, it is not in the interests of the AFSCME Employees, AFSCME Retirees, or Puerto Rico as a whole simply to delay the path to recovery.

For these same reasons, AFSCME opposes dismissing this Title III case based on the Appointments Clause unless, at a minimum, the offensive doctrine of territorial incorporation is completely overruled. Under that doctrine, as set forth by the Supreme Court in *Balzac v. Porto Rico,* Congress's plenary power over U.S. territories under Article IV of the U.S. Constitution is limited only by those provisions of the Constitution which guaranty "fundamental personal rights." 258 U.S. 298, 312 (1922). As long as this affront to the rights of Puerto Ricans continues to be the law of the land, the Appointments Clause does not apply to Puerto Rico unless Congress says it does. AFSCME strongly believes that Congress should not be allowed to pick and choose which provisions of the Constitution apply to the millions of U.S. citizens living in Puerto Rico, but until the Supreme Court overrules *Balzac* as it should*, this oppressive *status quo* means that the Appointments Clause Challenges must fail.

2

But even if the territorial incorporation doctrine were to be overruled as AFSCME
believes it should be, the Appointments Clause should still not apply because the Oversight
Board is an entity of the territorial government.  A contrary holding could cast doubt on
Congress's flexibility in how it appoints territorial government officials, for example by
delegating that power to the residents of a territory in a democratic election.  Like the residents
of many U.S. territories, the people of Puerto Rico elect their own Governor with no regard for
compliance with the Appointments Clause, and hard-won forms of territorial self-governance
like this should not be called into doubt now.  Puerto Ricans, of course, deserve complete self-
determination—regardless of whether that means statehood, independence, or an adjustment to
the current Commonwealth status—instead of the government-by-decree to which they are
currently being subjected under PROMESA.  For now, though, the *status quo* means that
Congress possesses flexibility, free at least from the Appointments Clause (and without
conceding that PROMESA is not unlawful for independent reasons).

In the alternative, this Court should dismiss the Appointments Clause Challenges because
the Oversight Board members are at most inferior officers of the United States whose
appointments were appropriately made by the President without Senate confirmation and in
accordance with principles of separation of powers.

## **BACKGROUND**

Congress enacted PROMESA to address the "fiscal emergency in Puerto Rico," 48
U.S.C. § 2194(m), with which this Court is by now exceedingly familiar.  Congress passed
PROMESA "pursuant to article IV, section 3 of the Constitution of the United States" (the
"Territory Clause" or "Property Clause").  48 U.S.C. § 2121(b)(2).  In language reminiscent of
its 1995 law creating a Fiscal Control Board for the District of Columbia, Congress in Title I of

3

PROMESA established a Financial Oversight and Management Board for the Commonwealth
("FOMB" or "Oversight Board") "as an entity within the territorial government" not to be
"considered to be a department, agency, establishment, or instrumentality of the Federal
Government."  48 U.S.C. § 2121(c)(1).  *Compare* District of Columbia Financial Responsibility
and Management Assistance Act of 1995, Pub. L. 104-8, Section 101(a) ("the Authority is
established as an entity within the government of the District of Columbia, and is not established
as a department, agency, establishment, or instrumentality of the United States Government.").

Like the members of the D.C. Control Board, the members of the FOMB were appointed
by the President but not subject to a confirmation vote by the Senate.  *Compare* 48 U.S.C. §
2121(e)(1)(A) ("The Oversight Board shall consist of seven members appointed by the President
who meet the qualifications described in subsection (f) and section 109(a)."); Pub. L. 104-8,
Section 101(b)(1) ("The Authority shall consist of 5 members appointed by the President who
meet the qualifications described in subsection (c).").  Also like the D.C. Control Board, the
process for appointing the FOMB members involved a specific statutory instruction to the
President to consult with the leadership of both houses of Congress before making the
appointments himself or herself.  *Compare* 48 U.S.C. § 2121(e)(2)(E) (instructing the President
that 6 of the 7 appointees to the Oversight Board "should" but need not be drawn from lists
provided by the House and Senate majority and minority leadership); Pub. L. 104-8, Section
101(b)(2) ("The President shall appoint the members of the Authority after consulting with the
Chair of the Committee on Appropriations and the Chair of the Committee on Government
Reform and Oversight of the House of Representatives, the Chair of the Committee on
Appropriations and the Chair of the Committee on Governmental Affairs of the Senate, and the
Delegate to the House of Representatives from the District of Columbia.").

4

More specifically, PROMESA gives the President the option of appointing Oversight

Board members from the various lists provided by the majority and minority leadership of the

House and Senate, however the President retains the right to appoint any individual he or she

likes with the advice and consent of the Senate.  48 U.S.C. § 2121(e)(2)(E).  In the case of Puerto

Rico, PROMESA further specified that if the President wished to appoint members other than

from these lists, he should do so on or before September 1, 2016.  48 U.S.C. § 2121(e)(2)(G).

President Obama appointed the seven current Oversight Board members on August 31, 2016.

## ARGUMENT

**I.     The Appointments Clause Cannot Apply to Puerto Rico unless the Offensive
Doctrine of Territorial Incorporation is Overruled by the Supreme Court**

Judge Torruella's dissent in *Igartua-De La Rosa v. United States*, 417 F.3d 145 (1st Cir.

2005), provides a detailed history of the development of the pernicious territorial incorporation

doctrine, which warrants extensive reproduction here:

> On July 25, 1898, in the closing days of the Spanish–American
> War, the United States invaded Puerto Rico. At that point in time
> the inhabitants of Puerto Rico had full rights as Spanish citizens.
> This included the right to elect sixteen deputies and three senators,
> with full voting rights, to the Spanish Cortes (Parliament).
> Furthermore, Puerto Ricans had recently been granted a high
> measure of self-government.
>
> All this came to naught with the signing of the Treaty of Paris on
> December 10, 1898, which officially concluded this "splendid little
> war" and ended four hundred years of Spanish colonial rule. Thus
> commenced, in its place, a new period of colonialism which has so
> far lasted one hundred and seven years.
>
> . . . [F]or the first time in American history, the United States
> acquired territory without *ipso facto* granting its inhabitants
> citizenship, and therefore, also contrary to its founding history, the
> United States became a colonial nation.  Immediately after the
> invasion, Puerto Rico settled into a military government that lasted
> until 1900, when Congress enacted the so-called Foraker Act. This
> statute established a civil government composed almost totally of

5

officials appointed by the President. A local legislature was provided, but only its lower house was elected by Puerto Rican residents. The Foraker Act declared these residents to be "citizens of Porto Rico."  As such, they became "nationals" of the United States.  Almost immediately after the Foraker Act went into effect, a challenge was made to its provisions allowing the imposition of duties on goods imported into Puerto Rico from the United States. It was claimed that this tax was contrary to the Uniformity Clause of Article I, Section 8 of the Constitution.

In the course of ruling upon this issue, the Supreme Court, in 1901, decided the *Insular Cases*, wherein it sanctioned Puerto Rico's colonial status *ad perpetuam*. There is no question that the Insular Cases are on par with the Court's infamous decision in *Plessy v. Ferguson* in licensing the downgrading of the rights of discrete minorities within the political hegemony of the United States.

. . . . Justice Brown, who wrote the opinion of the Court in *Downes v. Bidwell,* the leading [of the] *Insular Cases* held:

> We are also of opinion that the power to acquire territories by treaty implies, not only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants, and what their status shall be in what Chief Justice Marshall termed the "American Empire."

*Downes*, 182 U.S. at 279, 21 S.Ct. 770.

Justice Brown goes on to say, in language that is tinged by *Plessy*-like views:

> It is obvious that in the annexation of outlying and distant possessions grave questions will arise from differences of race, habits, laws and customs of the people . . . which may require action on the part of Congress that would be quite unnecessary in the annexation of contiguous territory inhabited only by people of the same race, or by scattered bodies of native Indians.

*Id.* at 282, 21 S. Ct. 770.

*Igartua-De La Rosa,* 417 F.3d at 159-64 (Torruella, J., dissenting) (citations omitted).  Judge

Torruella further explains that while Justice Brown's opinion set forth the formal holding of

*Downes*—namely, that Puerto Rico is "not a part of the United States within the revenue clauses

of the Constitution" found in Article I—it was actually the concurrence of Justice White in

*Downes* which "provided the central support of the seminal 'unincorporated territory' doctrine

for which the *Insular Cases* have become known." *Id.* at 164.

That offensive doctrine, dating to 1901, "states that in the case of unincorporated

territories—that is, those for which, at the time of acquisition, the United States did not express

an intention of incorporating into the Union—only those parts of the Constitution dealing with

'fundamental' rights apply." *Id.* Even after Puerto Ricans were subsequently granted U.S.

citizenship by the Jones Act of 1917, the Court in 1922 unanimously reaffirmed this theory when

it held that not only was Puerto Rico still not incorporated into the Union, but also that the right

to trial by jury, as set forth in Article III and Amendments 6 and 7 of the U.S. Constitution, was

not a "fundamental personal right" which necessarily applied in Puerto Rico. *Balzac v. Porto

Rico,* 258 U.S. 298 (1922) (Taft, C.J.).

Sadly, "[t]his century old doctrine" remains on the books and has continued to "inform"

the Supreme Court's analysis as recently as its landmark decision in *Boumediene v. Bush. See*

553 U.S. 723, 757-59 (2008) (noting that under "the doctrine of territorial incorporation . . . the

Constitution applies in full in incorporated Territories surely destined for statehood but only in

part in unincorporated Territories."). The doctrine thus still stands for the proposition set forth in

*Balzac* that "in unincorporated Territories the Government of the United States was bound to

provide to noncitizen inhabitants 'guaranties of certain fundamental personal rights declared in

the Constitution'" only. *Id.* at 758 (quoting *Balzac,* 258 U.S. at 312) (other citations omitted).

The questionable purpose of the unincorporated territory doctrine remains, in light of

what the Supreme Court has called "the inherent practical difficulties of enforcing all

constitutional provisions" in unincorporated territories, to ensure the Supreme Court "use[s] its power sparingly and where it would be most needed" when reviewing Congress's exercise of its power under the Territory Clause. *Id.* at 759. This means "[a]bstaining from questions involving formal sovereignty and territorial governance," which "reflects" the Supreme Court's "recognition that certain matters requiring political judgments are best left to the political branches." *Id.* at 765. It also requires that any related analysis "turn on objective factors and practical concerns, *not formalism.*" *Id.* at 764 (emphasis added).

The Appointment Clause Challenges, however, ask this Court to do the opposite: to disregard, in the name of formalism, the "practical concerns" that motivated Congress when it made a "political judgment" in PROMESA about how to structure a controversial Oversight Board created to carry out "territorial governance" of Puerto Rico. In doing so, Congress engaged in the quintessential Article IV, Section 3 activity of "dealing with new conditions and requirements" in the territories, *see Balzac,* 258 U.S. at 312, in this case the unprecedented and potentially calamitous "fiscal emergency in Puerto Rico" which has denied Puerto Rican citizens the "essential services" they need and deserve. 48 U.S.C. § 2194(m)(1-2).

Likely nobody was entirely satisfied by the legislative compromise reflected in PROMESA, including the process for appointing the Oversight Board. AFSCME, for instance, takes umbrage that its own active employee members were all explicitly forbidden from serving on the Oversight Board due to their prior public service. *See* 48 U.S.C. § 2121(f)(2).

Regardless, this particular compromise by Congress was plainly constitutional under the unincorporated territory doctrine, because the Appointments Clause does not affect a "fundamental personal right." Neither of the Appointments Clause Challenges even attempts to allege otherwise. Nor could they. Whether an appointment was made in the manner set forth in

the Appointments Clause does not implicate "fundamental personal rights declared in the

Constitution, as, for instance, that no person could be deprived of life, liberty, or property

without due process of law." *Balzac,* 258 U.S. at 312-13.  Rather, the Appointments Clause

concerns the *form* of territorial governance, which the unincorporated territory doctrine leaves to

the discretion of Congress based on the practical concerns of a given situation.

To be clear, AFSCME believes that Judge Torruella is correct that "[t]he Supreme Court

has every reason to reconsider the *Insular Cases* and *Balzac*" for at least the following reasons:

> They are the product of an era which is a blot on our national and
> judicial history. The basis upon which they were premised—that
> the United States could hold territories and their inhabitants in a
> colonial status *ad infinitum*—was unprecedented and unauthorized
> by the Constitution. The interpretation given by the *Insular Cases*
> and *Balzac* to the Constitution permits the perpetuation, without
> limitation, of a class of citizens unequal in rights to the rest of the
> body politic, an anachronism that is unsupportable morally,
> logically or legally."

*Igartua-De La Rosa v. United States*, 417 F.3d 145, 169 (1st Cir. 2005) (Torruella, J.,

dissenting).  However, so long as those cases remain on the books and continue to discriminate

against the people of Puerto of Rico, they should at least be applied consistently where, as here,

they have the rare opportunity to block formalistic attempts by Wall Street to ward off needed

economic regulation in a time of crisis.  For if anyone is to pick and choose which isolated

provisions of the Constitution should apply to the 3.5 million U.S. Citizens currently living in

hurricane-ravaged Puerto Rico, it should certainly not be an off-Island hedge fund.

## II.     <u>Even in the Absence of the Doctrine of Territorial Incorporation, the Appointments Clause Would Not Apply to Territorial Officers such as the Oversight Board</u>

In the first reported decision on the Property Clause which AFSCME has been able to

locate, Chief Justice Marshall wrote that under the Clause, "[w]e find congress possessing and

exercising the absolute and undisputed power of governing *and* legislating for the territory."
*Sere v. Pitot*, 10 U.S. 332, 337 (1810) (emphasis added) (Marshall, C.J.).  The Chief Justice's
mention of two distinct powers of Congress—the powers of "governing" and of "legislating,"
respectively—was not by accident.  For as the Supreme Court held 18 years later in *American
Insurance Co.,* although, for example, admiralty jurisdiction in the states may be exercised only
by Article III Courts, "the same limitation does not extend to the territories" because "[i]n
legislating for them, Congress exercises the combined powers of the general and state
governments."  *Am. Ins. Co. v. 356 Bales of Cotton*, 26 U.S. 511, 546 (1828) (Marshall, C.J.).

Attorney General Felix Grundy, relying on Chief Justice Marshall's opinion in *American
Insurance Co.,* further concluded in 1839 that because territorial judges "are mere creatures of
legislation," the impeachment provisions of the Constitution, Art. II Sec. 4 (the "Impeachment
Section"), do not apply to them.  *Territorial Judges Not Liable to Impeachment*, 3 U.S. Op. Atty.
Gen. 409 (1839).  The Impeachment Section cannot apply to territorial judges because those
judges, having been appointed under the Property Clause in Article IV, are not "officers of the
United States"—as explicitly required by the language of the Impeachment Section—"in the
constitutional meaning of the phrase; they are merely Territorial officers, and therefore . . . not
subject to impeachment."  *Id.*

The Appointments Clause, like the Impeachment Section, is found in Article II, and it too
should be inapplicable when Congress acts under the Property Clause.  Like territorial judges, all
territorial government officers, such as the Oversight Board, are not "officers of the United
States"—as explicitly required by the language of the Appointments Clause—in the
constitutional meaning of the phrase; they are merely territorial officers, and therefore not
subject to the Appointments Clause.  *See* 48 U.S.C. § 2121(b).

The Appointments Clause Challenges cite no precedential authority to contradict these early opinions of Chief Justice Marshall or Attorney General Grundy.  Instead, the Aurelius Motion offers essentially two main rejoinders, each of which we now address.

*First,* Aurelius contends that the Oversight Board members are not territorial officers but rather federal officers.  Aurelius Motion at 16-23.  In an effort to counter Congress's clear statutory declaration that the Oversight Board is a territorial entity, 48 U.S.C. § 2121(c), Aurelius points principally to *Department of Transportation v. Association of American Railroads* for the proposition that "the practical reality of federal control and supervision prevails over Congress's disclaimer."  135 S. Ct. 1225, 1233 (2015).  The problem with this argument is that *Department of Transportation* did not involve an effort by the Court to distinguish between two different types of governmental entities created by Congress—let alone the more particular question here of distinguishing between a territorial governmental entity and a federal governmental entity— but was solely concerned with whether Amtrak was "governmental" or "private" in the broadest sense.  *Id.*

The reality is that the FOMB is a quintessentially territorial entity.  Aurelius contends that the Board differs from other territorial entities because it is "overseen by the federal government" and its authority is not "confined to purely local matters," Aurelius Motion at 18, however (a) all territorial officials are overseen by the federal government, and (b) the FOMB is, by statute, laser-focused on the local matter of Puerto Rico's fiscal crisis and recovery.  While the Oversight Board's work on behalf of the Commonwealth may impact some off-Island financial institutions who have purposefully availed themselves of the Commonwealth's debt, that makes the Board no different than a territorial court which exercises jurisdiction over aliens whose dealings in a territory have given rise to legal claims by or against a territory resident.

11

*See, e.g., Sere v. Pitot,* 10 U.S. 332, 338 ("[T]he citizens of the territory of Orleans may sue and be sued in that court in the same cases in which a citizen of Kentucky may sue and be sued in the court of Kentucky.").

And while Aurelius characterizes the statutory language declaring the Oversight Board a territorial entity as a "made-for-litigation label," it is worth reiterating that, as described *supra,* Congress used almost identical language in 1995 when it created the D.C. Fiscal Control Board—perhaps the closest analogue to the FOMB to be found in another federal statute—and did not subject the D.C. Fiscal Control Board's appointees to Senate confirmation either, despite the fact that they too were appointed by the President as part of a statutory process specifying a particular form of "consultation with Congress."  Pub. L. 104-8, Section 101(b)(2).

***Second and more fundamentally,*** Aurelius alleges a "consistent historical treatment of territorial officials" whereby "every civilian official appointed by the federal government to oversee the operation of a territorial government" has been confirmed by the Senate.  Aurelius Motion at 3.  The main problem with this assertion is that it assumes its own conclusion by defining the phrase "appointed by the federal government" to exclude the long congressional tradition of appointing territorial government officials through popular election.[3]

Congress has, since the First Congress, allowed territorial citizens to elect some of their own territorial government officials, just as Puerto Rico elects its own Governor today.  Aurelius

---

[3]  For the record, no court has held that an "official appointed by the federal government" for purposes of the Appointments Clause necessarily means an "official appointed by the federal government" directly as opposed to through a local election by the citizens of a territory.  The cases cited by Aurelius for this proposition at pages 19-20 of its motion are inapposite.  *See Wise v. Withers,* 7 U.S. 331 (1806) (involving a justice of the peace commissioned by the President within the District of Columbia, not a territorial officer, and never considering the argument that the justice of the peace was instead a D.C. government officer for Appointments Clause purposes); *United States v. Hartwell,* 73 U.S. 385 (1867) (involving federal Treasury Department officer, not territorial officer).  On the other hand, the Supreme Court has held that even during the time period that the President appointed, with the advice and consent of the Senate, a commission to govern the District of Columbia, this did not convert D.C. into "a department of the United States government."  *Metro. RR v. D.C.,* 132 U.S. 1, 7 (1889).

Motion at 20-21.  Aurelius argues that there is a constitutional difference, for purposes of the

Appointments Clause, between territorial officers elected by territorial citizens versus those

"selected by the federal government directly."  *Id.* at 21.  But this distinction is made-up.  No

court or Congress has explicitly declared that this distinction has any legal significance, and none

of the historical examples cited by Aurelius requires Aurelius's conclusion.  For instance, the

fact that Congress amended the ordinance governing the Northwest Territories following

ratification of the Constitution "so as to adapt the same to the present Constitution," Aurelius

Motion at 19-20, could mean no more than that an amendment was necessary to address the fact

that the previous ordinance had been drafted under the now-defunct Articles of Confederation.  It

is highly speculative to read any further into the reason for any particular changes in the

ordinance, and Aurelius provides no other historical examples that are any more definitive.

In light of the above, had the Supreme Court not already explicitly blessed Congress's

power to delegate its own authority to elected territorial legislatures, *see Binns v. United States,*

194 U.S. 486, 491 (1904), AFSCME would be deeply worried that the Appointments Clause

Challenges here might threaten the rights of residents of U.S. territories to elect their own

officials in the future.  Stripping Puerto Ricans in particular of that right would independently

violate the "compact" between the United States and Puerto Rico created in 1950 by Public Law

81-600 and the Commonwealth Constitution which followed—and there is a colorable argument

that PROMESA already violates that compact by drastically diminishing Puerto Rico's vested

right to self-governance—yet it is still dangerous to democratic government in the territories, or

whatever semblance of democracy there may be, to argue that the Appointments Clause

constrains Congress's flexibility in this area.  For while Puerto Ricans "are today divided as to

what relationship they would prefer on the spectrum from statehood to Commonwealth status to

13

independence," *Igartua-De La Rosa v. United States*, 417 F.3d 145, 149 (1st Cir. 2005), all
should agree that further diminishment of the extent of self-governance would be problematic.[4]

### III.   The Oversight Board Members Are at Most Inferior Officers of the United States Whose Appointment by the President Complied with Both the Appointments Clause and Separation of Powers Principles

Even assuming *arguendo* that the Oversight Board members are federal, and not
territorial officers, they are at most inferior officers whose appointment was appropriately made
by President Obama.

**1.** Under the balancing test set forth in *Morrison v. Olson,* 487 U.S. 654, 671-72 (1988),
the Board members are inferior officers.  First, their duties and jurisdiction are limited to the
single issue and situs of Puerto Rico and its fiscal recovery, as conclusively shown by the fact
that the FOMB ceases to exist once the territory is on secure financial footing.  *See* 48 U.S.C. §
2149.  Second, their tenure is only three years.  48 U.S.C. § 2121(e)(5)(A).

Contrary to the position taken by the Aurelius Motion on page 24, the First Circuit has
held that a federal officer who, like the FOMB, is not "supervised at some level by" a principal
officer, may nevertheless qualify as an "inferior officer" for purposes of the Appointments
Clause "if the nature of their work suggests sufficient limitations of responsibility and authority."
*United States v. Hilario,* 218 F.3d 19, 25 (1st Cir. 2000) (holding that United States Attorneys
are inferior officers).  Such is the case for the FOMB members, whose responsibility and
authority is limited to the single issue and territory of the Commonwealth and its fiscal recovery.
Having been named and empowered to solve a single problem, in a single location, with only a
three-year tenure, the FOMB members are inferior officers for Appointments Clause purposes.

**2.** Because the FOMB consists of inferior officers, Congress was entitled to "vest the
Appointment . . . as they think proper, in the President alone."  U.S. Const. Art. II, Sec. 2, Cl. 2.

---

[4] PROMESA does preserve "Puerto Rico's right to determine its future political status."  48 U.S.C. § 2192.

This is precisely what Congress did.  Although PROMESA allows the President to consult lists

of potential nominees generated by leaders in the House and Senate, it does not require that the

President choose from those lists until a specified date, 48 U.S.C. § 2121(e)(2)(G), which had not

passed when the President made his FOMB appointments.  Accordingly, the power to choose

these FOMB members was vested in the President alone, and whether he might have made

different appointments after his unlimited discretion expired is not justiciable.  *FEC v. NRA*

*Political Victory Fund*, 6 F.3d 821, 824 (D.C. Cir. 1993).

    **3.**  It is important to recognize that apart from the hyper-technical Appointments Clause

arguments, the only two distinct "separation of powers" arguments identified by the Aurelius

Motion, towards its tail end, are that (a) "PROMESA impermissibly aggrandizes Congress" by

giving Congress a role in the nomination process through the lists of potential nominees

suggested to the President, Aurelius Motion at 29, and (b) the President's power to remove the

Board members "only for cause" goes too far, Aurelius Motion at 33.  However, in this case (a)

Congress's role was never "arrogated" because President Obama chose his nominees to the

FOMB while he still had time to seek the advice and consent of the Senate on any nominee he

wished, and (b) it is well-established under *Humphrey's Executor v. United States*, 295 U. S. 602

(1935), that a single layer of "good cause" protection between the President and a government

officer does not violate the Constitution's separation of powers.

## CONCLUSION

WHEREFORE, based on the foregoing, AFSCME respectfully requests that this Court (i)

deny the Aurelius Motion and (ii) grant any further relief as it just and proper.

Dated: November 3, 2017          **SAUL EWING ARNSTEIN & LEHR LLP**

By:     */s/ Sharon L. Levine*
        Sharon L. Levine *(pro hac vice)*
        Dipesh Patel *(pro hac vice)*
        1037 Raymond Blvd.
        Suite 1520
        Newark, NJ 07102
        (973) 286-6713 (Telephone)
        (973) 286-6821 (Facsimile)
        sharon.levine@saul.com; dipesh.patel@saul.com

            -and-

        */s/ Judith E. Rivlin*
        **AMERICAN FEDERATION OF STATE,**
        **COUNTY AND MUNICIPAL EMPLOYEES**
        Judith E. Rivlin *(pro hac vice)*
        Teague P. Paterson *(pro hac vice)*
        Matthew S. Blumin *(pro hac vice)*
        1101 17th Street NW, Suite 900
        Washington, DC 20011
        (202) 775-5900 (Telephone)
        (202) 452-0556 (Facsimile)
        jrivlin@afscme.org; tpaterson@afscme.org;
        mblumin@afscme.org

            -and-

        */s/ Manuel A. Rodriguez Banchs*
        Manuel A. Rodriguez Banchs
        P.O. Box 368006
        San Juan, Puerto Rico 00936-8006
        (787) 764-8896 (Telephone)
        (787) 721-0975 (Facsimile)
        manuel@rodriguezbanchs.com

        *Attorneys for the American Federation of State,*
        *County and Municipal Employees*

16