# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO'S OPPOSITION TO THE MOTION TO DISMISS TITLE III PETITION

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

*/s/ Hermann D. Bauer*              _
Hermann D. Bauer
USDC No. 215205
Ubaldo M. Fernández
USDC No. 224807
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944
Email: hermann.bauer@oneillborges.com
        ubaldo.fernandez@oneillborges.com


*/s/ Donald B. Verrilli, Jr.*_
Donald B. Verrilli, Jr. (p*ro hac vice*)
Ginger D. Anders (p*ro hac vice*)
Chad I. Golder (p*ro hac vice*)
Sarah G. Boyce (p*ro hac vice*)
Adele M. El-Khouri (p*ro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
1155 F Street N.W., Seventh Floor
Washington, D.C. 20004-1357
Tel:  (202) 220-1100
Fax:  (202) 220-2300
Email: Donald.Verrilli@mto.com
        Ginger.Anders@mto.com
        Chad.Golder@mto.com
        Sarah.Boyce@mto.com
        Adele.El-Khouri@mto.com


*/s/ Martin J. Bienenstock*_
Martin J. Bienenstock (*pro hac vice*)
Stephen L. Ratner  (*pro hac vice*)
Timothy W. Mungovan (*pro hac vice*)
Mark D. Harris (*pro hac vice*)
Chantel L. Febus (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email:  mbienenstock@proskauer.com
        sratner@proskauer.com
        tmungovan@proskauer.com
        mharris@proskauer.com
        cfebus@proskauer.com

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................................1

BACKGROUND ...........................................................................................................................2

    I.      PROMESA..........................................................................................................2

    II.     APPOINTMENT OF BOARD MEMBERS...........................................................5

    III.    THE BOARD'S WORK TO DATE ....................................................................6

ARGUMENT ...............................................................................................................................7

    I.      THE APPOINTMENTS CLAUSE DOES NOT GOVERN THE
        APPOINTMENT OF MEMBERS OF THE FINANCIAL OVERSIGHT
        AND MANAGEMENT BOARD BECAUSE THEY ARE
        TERRITORIAL, NOT FEDERAL, OFFICERS ....................................................7

        A.     The Appointments Clause Does Not Constrain Congress's
              Creation Of Territorial Offices In The Exercise Of Its Plenary
              Article IV Power ...............................................................................8

        B.     The Board Members Are Territorial Officers Whose Appointment
              Need Not Comply With The Appointments Clause .................................13

        C.     Because The Board Members Are Not Federal Officers, Congress
              Had Broad Discretion To Determine The Manner Of Their
              Appointment ...................................................................................21

    II.     THE APPOINTMENTS CLAUSE IS NOT A "FUNDAMENTAL"
        CONSTITUTIONAL PROVISION AND DOES NOT APPLY TO
        PUERTO RICO .............................................................................................23

    III.    EVEN IF THE APPOINTMENTS CLAUSE APPLIES TO PUERTO
        RICO, THE BOARD MEMBERS WERE PROPERLY APPOINTED...............27

        A.     Board Members Are Inferior Officers. ....................................................27

        B.     PROMESA's List Mechanism Does Not Unlawfully Constrain The
              President's Appointment Authority .......................................................28

    IV.    AURELIUS'S PROPOSED RELIEF IS INCONSISTENT WITH WELL-
        ESTABLISHED LAW......................................................................................32

CONCLUSION ...........................................................................................................................35

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Am. Ins. Co. v. 356 Bales of Cotton (Canter),*
    26 U.S. 511 (1828)................................................................................1, 8, 9, 18

*In re Application of President's Comm'n on Organized Crime,*
    763 F.2d 1191 (11th Cir. 1985) ...........................................................................33

*Balzac v. Porto Rico,*
    258 U.S. 298 (1922)............................................................................................24, 25

*Benner v. Porter,*
    50 U.S. 235 (1850)..............................................................................................8, 9, 20

*Binns v. United States,*
    194 U.S. 486 (1904)............................................................................................8, 13

*Boumediene v. Bush,*
    553 U.S. 723 (2008)............................................................................................24, 25, 26

*Bowsher v. Synar,*
    478 U.S. 714 (1986)............................................................................................22, 30

*Brewer v. D.C. Fin. Responsibility & Mgmt.,*
    953 F. Supp. 406 (D.D.C. 1997) ........................................................................22

*Buckley v. Valeo,*
    424 U.S. 1 (1976)................................................................................................33, 34

*Citizens for Abatement of Aircraft Noise, Inc. v. Metro. Wash. Airports Auth.,*
    917 F.2d 48 (D.C. Cir. 1990), *aff'd,* 501 U.S. 252 (1991)...................................33

*The City of Panama,*
    101 U.S. 453 (1879)............................................................................................9

*Clinton v. City of New York,*
    524 U.S. 417 (1998)............................................................................................18

*Clinton v. Englebrecht,*
    80 U.S. 434 (1871)..............................................................................................9, 18, 19, 20

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Conde Vidal v. Garcia-Padilla*,
   167 F. Supp. 3d 279, 286 (D.P.R. 2016), *vacated on other grounds by In re*
   *Conde Vidal*, 818 F.3d 765 (1st Cir. 2016)..............................................................24

*Consumer Fin. Prot. Bureau v. Navient Corp.*,
   No. 3:17-cv-101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017)...............................33

*Dep't of Transp. v. Ass'n of Am. R.R.*,
   135 S. Ct. 1225 (2015)....................................................................................15, 16

*District of Columbia v. John R. Thompson Co.*,
   346 U.S. 100 (1953)...............................................................................................12

*Dorr v. United States*,
   195 U.S. 138 (1904)..........................................................................................24, 25

*Downes v. Bidwell*,
   182 U.S. 244 (1901)...............................................................................................24

*Edmond v. United States*,
   520 U.S. 651 (1997)...............................................................................................27

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
   485 U.S. 568 (1988)...............................................................................................35

*Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*,
   426 U.S. 572 (1976)...............................................................................................20

*Ezratty v. Puerto Rico*,
   648 F.2d 770 (1st Cir. 1981)..................................................................................27

*Federal Election Comm'n v. NRA Political Victory Fund*,
   6 F.3d 821 (D.C. Cir. 1993)...................................................................................30

*Figueroa v. Puerto Rico*,
   232 F.2d 615 (1st Cir. 1956)..................................................................................25

*First Nat'l Bank v. Yankton Cnty.*,
   101 U.S. 129 (1879)....................................................................................... 3, passim

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010)..........................................................................................34, 35

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Freytag v. Comm'r*,
    501 U.S. 868 (1991)......................................................................................................9

*Hooper v. California*,
    155 U.S. 648 (1895)....................................................................................................35

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
    796 F.3d 111 (D.C. Cir. 2015).................................................................................34

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
    849 F.3d 1129 (D.C. Cir. 2017)........................................................................32, 33

*Keller v. Potomac Elec. Power Co.*,
    261 U.S. 428 (1923)..................................................................................................8, 19

*Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States*,
    136 U.S. 1 (1890).........................................................................................................8

*Lindsey v. Ipock*,
    732 F.2d 619 (8th Cir. 1984)....................................................................................33

*Lopez v. Davis*,
    531 U.S. 230 (2001)....................................................................................................29

*McAllister v. United States*,
    141 U.S. 174 (1891)......................................................................................9, 11, 14

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.
    (MWAA)*,
    501 U.S. 252 (1991)....................................................................................................32

*Mistretta v. United States*,
    488 U.S. 361 (1989)..............................................................................................22, 31

*Morrison v. Olson*,
    487 U.S. 654 (1988)......................................................................................22, 27, 28

*Myers v. United States*,
    272 U.S. 52 (1926)................................................................................................30, 31

*Nat'l Fed'n of Indep. Businesses v. Sebelius*,
    567 U.S. 519 (2012)....................................................................................................29

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Nguyen v. United States*,
539 U.S. 69 (2003) ................................................................................................10

*NLRB v. Noel Canning*,
134 S. Ct. 2550 (2014) ....................................................................................10, 30

*Northern Mariana Islands v. Atalig*,
723 F.2d 682 (9th Cir. 1984) ..............................................................................25

*O'Donoghue v. United States*,
289 U.S. 516 (1933) .............................................................................................13

*Palmore v. United States*,
411 U.S. 389 (1973) ........................................................................11, 13, 14, 20

*In re Plaza Resort at Palmas, Inc.*,
741 F.3d 269 (1st Cir. 2014) ...............................................................................29

*Printz v. United States*,
521 U.S. 898 (1997) .............................................................................................23

*Pub. Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989) .............................................................................................31

*Puerto Rico v. Franklin Cal. Tax–Free Tr.*,
136 S. Ct. 1938 (2016) ..........................................................................................2

*Puerto Rico v. Sanchez Valle*,
136 S. Ct. 1863 (2016) .....................................................................................1, 19

*Reid v. Covert*,
354 U.S. 1 (1957) .................................................................................................25

*Stanley v. Gonzales*,
476 F.3d 653 (9th Cir. 2007) ..............................................................................28

*Torres v. Puerto Rico*,
442 U.S. 465 (1979) .............................................................................................24

*Trailer Marine Transp. Corp. v. Rivera Vazquez*,
977 F.2d 1 (1st Cir. 1992) ..............................................................................24, 26

*Tuaua v. United States*,
788 F.3d 300 (D.C. Cir. 2015) ......................................................................24, 25

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*United States v. Germaine,*
99 U.S. 508 (1879)..............................................................................................27, 28

*United States v. Hartwell,*
73 U.S. 385 (1867)....................................................................................................19

*United States v. Hilario,*
218 F.3d 19 (1st Cir. 2000)..................................................................................27, 28

*United States v. McMillan,*
165 U.S. 504 (1897)....................................................................................................8

*United States v. v. Lebrón-Caceres,*
No. 15-279 (PAD), 2016 WL 204447 (D.P.R. Jan. 15, 2016).................................24

*Ursulich v. Puerto Rico Nat'l Guard,*
384 F. Supp. 736 (D.P.R. 1974)...............................................................................27

*Wabol v. Villacrusis,*
958 F.2d 1450 (9th Cir. 1992)..................................................................................25

*Wal–Mart P.R., Inc. v. Zaragoza–Gómez,*
174 F. Supp. 3d 585 (D.P.R. 2016)............................................................................3

*Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez,*
834 F.3d 110 (1st Cir. 2016)......................................................................................2

*Wise v. Withers,*
7 U.S. (3 Cranch) 331 (1806)...................................................................................19

## FEDERAL STATUTES

5 U.S.C. App. § 8G(a)(2)...............................................................................................16

5 U.S.C. App. § 101.......................................................................................................16

5 U.S.C. §§ 551(a), 552(f)............................................................................................15

5 U.S.C. § 701(b)(1)(c)..................................................................................................15

5 U.S.C. § 2301(a) .........................................................................................................15

5 U.S.C. § 3372(a) .........................................................................................................17

8 U.S.C. § 1723(b)(2)....................................................................................................31

## TABLE OF AUTHORITIES
### (continued)

Page(s)

18 U.S.C. § 208 ................................................................................................................. 16

28 U.S.C. § 541 ................................................................................................................. 21

28 U.S.C. § 991(a) ............................................................................................................ 31

40 U.S.C. §§ 102(4)-(5) & 321(c)(2) ............................................................................... 16

42 U.S.C. § 17352 ............................................................................................................. 31

48 U.S.C. §§ 1421–1424 (1988) ....................................................................................... 12

48 U.S.C. § 2102 ............................................................................................................... 35

48 U.S.C. § 2121(a) ................................................................................................. 3, 13, 14

48 U.S.C. § 2121(b)(2) ............................................................................................... 3, 14

48 U.S.C. § 2121(c) ..................................................................................................... 3, 14

48 U.S.C. § 2121(e)(1)(A) ................................................................................................. 5

48 U.S.C. § 2121(e)(2)(A)(i) ............................................................................................ 29

48 U.S.C. § 2121(e)(2)(B) ................................................................................................ 30

48 U.S.C. § 2121(e)(2)(C) ................................................................................. 29, 30, 32

48 U.S.C. § 2121(e)(2)(E) ................................................................................... 6, 29, 34

48 U.S.C. § 2121(e)(2)(G) ................................................................................................ 30

48 U.S.C. § 2121(e)(5)(B) ................................................................................................ 28

48 U.S.C. § 2123(b), (c) ................................................................................................... 15

48 U.S.C. § 2123(d) .......................................................................................................... 17

48 U.S.C. § 2124(f) ........................................................................................................... 15

48 U.S.C. § 2124(f)(1) ........................................................................................................ 4

48 U.S.C. § 2124(n) .......................................................................................................... 16

48 U.S.C. § 2127 ............................................................................................................... 15

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

48 U.S.C. § 2129 ..............................................................................................................16

48 U.S.C. §§ 2141–52 .......................................................................................................28

48 U.S.C. § 2146(a)(2)-(3) ..................................................................................................6

48 U.S.C. § 2149 ................................................................................................5, 14, 28

48 U.S.C. §§ 2172-2173 & 2175 .....................................................................................28

48 U.S.C. § 2194(m) ...........................................................................................................3

48 U.S.C. § 2194(m)(5) ....................................................................................................35

49 U.S.C. § 24315 .............................................................................................................16

Act of Sept. 9, 1850, § 8, 9 Stat. 449 ..............................................................................12

Act Proposing to the State of Texas the Establishment of her Northern and
    Western Boundaries, etc., § 8, 9 Stat. 449 (1850) ...................................................12

An Act erecting Louisiana into two territories, and providing for the temporary
    government thereof, § 4, 2 Stat. 283, 284 (1804) ....................................................11

An Act temporarily to provide revenues and a civil government for Porto Rico,
    ch. 191, 31 Stat. 77, §§ 17, 18, 33, 34 (1900)........................................................11

An Act To Amend the Organic Act of Puerto Rico, Pub. L. No. 80-362, 61 Stat.
    770, 771 (1947)........................................................................................................12

An Act to further amend the Charter of the City of Washington, ch. 75, § 3, 2 Stat.
    721, 723–24 (1812)..................................................................................................12

An Act to Provide a Civil Government for Porto Rico, and for Other Purposes,
    Pub. L. No. 64-38, §§ 12-13, 39 Stat. 951 (1917) .............................................11, 20

An Act to provide for the Government of the Territory Northwest of the river
    Ohio, 1 Stat. 50, 51 n.(a) (1789) ....................................................................11, 18, 31

An Act to provide for the popular election of the Governor of Guam, Pub. L. No.
    90-497, 82 Stat. 842 (1968) .....................................................................................12

District of Columbia Financial Responsibility and Management Assistance Act of
    1995, Pub. L. 104-8, 109 Stat. 97, § 101(b)..............................................................5

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Organic Act of Guam, Pub. L. No. 81-630, 64 Stat. 384 (1950) ....................................................12

**STATUTES - OTHER**

P.R. Laws Ann. tit. 32, App. III. R. 4. 7 ...............................................................................4

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article I ..............................................................................................9

U.S. Const. Article II ..........................................................................................22

U.S. Const. Article II, § 2, cl. 2 ...........................................................................9

U.S. Const. Article II, § 3 ....................................................................................22

U.S. Const. Article II § 4 .....................................................................................10

U.S. Const. Article III ..................................................................................9, 18, 24

U.S. Const. Article III, § 1 ....................................................................................9

U.S. Const. Article IV ................................................................................1, passim

U.S. Const. Article IV, § 3 ................................................................................3, 14

U.S. Const. Article IV, § 3, cl. 2 ..........................................................................8

**LEGISLATIVE MATERIALS**

162 Cong. Rec. H3581 (June 9, 2016) ..................................................................5

H.R. Rep. 114-602(I) (June 3, 2016) ....................................................................5

H. Rep. No. 104-96 (1995) .................................................................................20

**OTHER AUTHORITIES**

Adam D. Chandler, Note, *Puerto Rico's Eleventh Amendment Status Anxiety*, 120
Yale L.J. 2183 (2011) ....................................................................................27

Brief of the United States, *Nguyen v. United States*, 539 U.S. 69 (2003) (Nos. 01-
10873, 02-5034), 2003 WL 548057 ...............................................................10

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Commc'ns Satellite Corp.*,
42 U.S. Op. Att'y Gen. 165 (1962)..................................................................10, 11

Financial Oversight and Management Board for Puerto Rico, Forecasted
Statement of Revenues, Expenditures and Changes in Fund Balance For Year
Ending June 30, 2018 at 1, https://juntasupervision.pr.gov/wp-
content/uploads/wpfd/50/59591e28dbdb4.pdf.......................................................5

General Accounting Office, *Principles Of Federal Appropriations Law* (4th rev.
ed. 2016) ...............................................................................................................15

Max Farrand, *The Legislation of Congress for the Government of the Organized
Territories of the United States*, at 35–36 (1896), https://
archive.org/details/legislationofcon00farrrich ......................................................12

Mem. of Law in Support of Defendant United States' Motion to Dismiss, *O'Brien
v. Calvo*, No. 1:12-cv-02700-ARR, Dkt. entry No. 49 (E.D.N.Y. Feb. 19,
2013) .....................................................................................................................10

President Obama Announces the Appointment of Seven Individuals to the
Financial Oversight and Management Board for Puerto Rico,
https://obamawhitehouse. archives. gov/the-press-office/2016/08/31/president-
obama-announces-appointment-seven-individuals-financial ...................................30

Statement by President George H.W. Bush on Signing the National and
Community Service Act of 1990, 2 Pub. Papers 1613 (Nov. 16, 1990)..................30

Statement of Financial Oversight and Management Board on the Occasion of the
Certification of a Fiscal Plan for Puerto Rico Under PROMESA (Mar. 13,
2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/
58c6e4e543444.pdf..................................................................................................6

*Territorial Judges Not Liable to Impeachment*,
3 U.S. Op. Atty. Gen. 409 (1839) ......................................................5, 10, 18, 20

Tom Hals, *Aurelius hedge fund seeks to toss Puerto Rico's bankruptcy filing*,
Reuters (Aug. 17, 2017 11:18 AM), https://www.reuters.com/article/us-
puertorico-debt-bankruptcy/aurelius-hedge-fund-seeks-to-toss-puerto-ricos-
bankruptcy-filing-idUSKBN1AN27H.......................................................................6

U.S. Dep't of Justice, Office of Legal Counsel, Proposed Commission on
Deregulation of International Ocean Shipping, 7 Op. O.L.C. 202, 203 (1983)......29

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

U.S. House of Reps., Committee on the District of Columbia, 101st Cong.,
*Governance  of the Nation's Capital: A Summary History of the Forms and
Powers of Local Government for the District Of Columbia, 1790 to 1973*,
(Comm. Print 1990) ................................................................................................12

William Wirt Blume & Elizabeth Gaspar Brown, *Territorial Courts and Law:
Unifying Factors in the Development of American Legal Institutions*, 61 Mich.
L. Rev. 39, 106 (1962) ..............................................................................................11

## PRELIMINARY STATEMENT

Faced with a severe and immediate fiscal crisis in Puerto Rico, Congress exercised its plenary power under Article IV of the Constitution to "develop innovative approaches to territorial governance" by enacting a comprehensive statute that created a new, independent entity within the Puerto Rican government to manage Puerto Rico's debt restructuring and restore the Commonwealth to fiscal stability. *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1876 (2016). By placing the Financial Oversight and Management Board ("Board") within the territorial government, Congress addressed Puerto Rico's debt crisis while respecting the policy of territorial self-governance that has guided congressional action with respect to the territories for decades.

Now, with the vital work of the Board well underway and made all the more pressing by the existential crisis facing Puerto Rico in the aftermath of Hurricanes Irma and Maria, a single creditor seeks to derail the entire reorganization process. In particular, Aurelius seeks to void the Board's prior actions, and to disable it from future action, on the theory that members of the Board are "officers of the United States" who must be, but were not, appointed in conformity with the requirements of the Constitution's Appointments Clause. That argument is groundless.

Centuries of Supreme Court jurisprudence, Congress's historical practice in superintending territories, and the Executive Branch's long-held understanding of the Appointments Clause demonstrate that the Clause does not govern Congress's creation of territorial offices pursuant to Article IV. Indeed, Congress possesses "the combined powers of a general and of a state government" over territories, *Am. Ins. Co. v. 356 Bales of Cotton (Canter)*, 26 U.S. 511, 546 (1828) (Marshall, C.J.), and may exercise that plenary authority to structure territorial governments unconstrained by separation-of-powers principles that apply to the federal government itself. In enacting the Puerto Rico Oversight, Management, and Economic Stability

1

Act ("PROMESA"), Congress left no doubt that the Board is a territorial entity, or that the Board members are territorial officers whose appointments are not covered by the Appointments Clause. Congress expressly invoked its Article IV authority to structure the territorial government; the Board is located in, and funded entirely by, the Puerto Rican government; and the Board exercises delegated local authority that is strictly territorial in scope.

Aurelius's arguments to the contrary are sweeping in their implications: accepting Aurelius's view of the Appointments Clause would threaten the constitutionality of Puerto Rico's long-established system of self-government, as well as the governments of other territories and the District of Columbia. Moreover, if accepted, Aurelius's meritless challenge would not only vitiate the progress that the Board and this Court have already made, but also would have catastrophic consequences for Puerto Rico's future. Any cessation or delay in the Board's restructuring work will exacerbate Puerto Rico's fiscal crisis, raising the risk that economic conditions may deteriorate to such an extent that reconstituting the Board at some unknown future date will come too late to restore Puerto Rico to fiscal health.

## BACKGROUND

### I.    PROMESA

By 2016, Puerto Rico faced a calamitous economic situation. The Supreme Court observed that "Puerto Rico and its instrumentalities are in the midst of a fiscal crisis." *Puerto Rico v. Franklin Cal. Tax–Free Tr.*, 136 S. Ct. 1938, 1942 (2016). The First Circuit explained that "Puerto Rico is in dire financial straits." *Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez*, 834 F.3d 110, 112 (1st Cir. 2016). And the District of Puerto Rico issued these factual findings:

> [T]he Commonwealth is being crushed under the weight of a public debt that is larger than its gross national product, Puerto Rico's annual budget is running a structural deficit that is about [to] explode into the multibillion-dollar range, the government's cash reserves are about to dry out, its credit rating is at junk status, it has started to default on its debt obligations, and it has no place to turn for external funding.…

*Wal–Mart P.R., Inc. v. Zaragoza–Gómez*, 174 F. Supp. 3d 585, 602 (D.P.R. 2016).

In response to this "fiscal emergency," Congress enacted PROMESA.  48 U.S.C. § 2194.
Congress expressly invoked "article IV, section 3 of the Constitution of the United States, which
provides Congress the power to dispose of and make all needful rules and regulations for
territories."  *Id.* § 2121(b)(2).  Under that authority, PROMESA created the Board "to provide a
method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets."  *Id.*
§ 2121(a).  The Board would be part of the "territorial government," and not a "department,
agency, establishment, or instrumentality of the Federal Government."  *Id.* § 2121(c).[2]

PROMESA gives the Board two main responsibilities.  *First*, it must work with the
Governor and Legislature to ensure that Puerto Rico achieves economic stability.  To that end,
the Board oversees the certification of "Fiscal Plans" and "Budgets" for the Commonwealth and
covered instrumentalities.  *Id.* §§ 2141–2152.  PROMESA sets forth detailed requirements for
what the "Fiscal Plans" must do, such as estimate revenues and expenditures, ensure the funding
of essential public services, and include a debt-sustainability analysis.  *Id.* § 2141(b)(1), (c)(3).
The statute authorizes the Board and the Governor jointly to develop Fiscal Plans, *id.* § 2141(f),
but the Board retains the "sole discretion" to determine whether the Fiscal Plans satisfy the
statutory requirements, *id.* § 2141(d)(2).

Similarly, the Board must "deliver a notice to the Governor and the Legislature providing
a schedule for developing, submitting, approving, and certifying Budgets."  *Id.* § 2142(a).
PROMESA authorizes the Governor and the Legislature to develop and submit Budgets for the
territory and its instrumentalities to the Board, *id.* § 2142(c)-(d), and it requires the Board to

---

[2] PROMESA provides that the purpose of the Board extends to any "covered territory." 48
U.S.C. § 2121(a).  PROMESA's current provisions, however, establish a Board only for Puerto
Rico.  *Id.* § 2121(b)(1).

certify that the Budgets comply with the applicable Fiscal Plans, *id.* § 2142(e)(1)-(2).   If the Governor and Legislature fail to submit compliant Budgets, then the Board must submit its own Budgets.   *Id.* § 2142(e)(3)-(4).   Once again, the statute authorizes the Board, Governor, and Legislature jointly to develop Budgets.   *Id.* § 2142(f).   As an adjunct to those duties, the Board reviews and certifies actual performance for compliance with the Budgets and Fiscal Plans, *id.* §§ 2143–2144, and it may at any time submit "recommendations to the Governor or the Legislature on actions the territorial government may take to ensure compliance with the Fiscal Plan, or to otherwise promote the financial stability, economic growth, management responsibility, and service delivery efficiency of the territorial government," *id.* § 2145(a).

*Second*, the Board must step into the shoes of the government of Puerto Rico and covered instrumentalities in proceedings under PROMESA's bankruptcy-like scheme.   Under Title III, which is relevant here, the Board may, as the representative of a debtor, "take any action necessary on behalf of the debtor to prosecute the case of the debtor."   *Id.* § 2175(a).

To carry out these responsibilities, the Board may hold hearings, take testimony, and receive evidence; obtain data from the federal and territorial governments; obtain creditor information; issue subpoenas; enter into contracts; enforce certain laws of the Commonwealth; and seek judicial enforcement of its authority.   *Id.* § 2124(a), (c)-(h), (k).[3]

PROMESA also requires the Board to be funded *entirely* by the territorial government. For the Board's initial funding, the Governor of Puerto Rico "transfer[red] . . . $2,000,000 . . . to a new account established by the territorial government, . . . available to and subject to the exclusive control of the Oversight Board."   *Id.*   § 2127(b)(2).   And subsequent budgets are to be paid from *territorial* funds at the Board's discretion.   *Id.* § 2127(b)(1).   To date, Puerto Rico has

---

[3] Notably, PROMESA provides that the Board's "[j]urisdiction to compel the attendance of witnesses and the production of such materials shall be governed by" *Commonwealth law*.   48 U.S.C. § 2124(f)(1) (citing P.R. Laws Ann. tit. 32, App. III. R. 4. 7, as amended).

already contributed substantial sums to the Board's operation.  *See* Financial Oversight and Management Board for Puerto Rico, Forecasted Statement of Revenues, Expenditures and Changes in Fund Balance For Year Ending June 30, 2018 at 1, https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/59591e28dbdb4.pdf.

PROMESA expressly provides for the Board's termination upon certification of two conditions:  (1) "the applicable territorial government has adequate access to short-term and long-term credit markets at reasonable interest rates to meet the borrowing needs of the territorial government"; and (2) "for at least 4 consecutive fiscal years," the Commonwealth has developed its budgets in accordance with agreed-upon accounting standards, and the expenditures made by the Commonwealth have not exceeded its revenues in each fiscal year.  *Id.* § 2149.

## II.   APPOINTMENT OF BOARD MEMBERS

PROMESA's appointment structure closely resembles the structure for the District of Columbia Financial Control Board, the entity after which the PROMESA Board was modeled.[4] PROMESA provides that the Board shall have seven members, 48 U.S.C. § 2121(e)(1)(A), and the Governor or his designee shall serve as an *ex officio* member, *id.* § 2121(e)(3).  PROMESA further provides that the President "shall appoint the individual members" of the Board, one of whom "may be selected in the President's sole discretion," and six of whom "*should* be selected" from specific lists of individuals submitted by the Speaker and Minority Leader of the House and the Majority and Minority Leaders of the Senate.  *Id.* § 2121(e)(2)(A)-(B) (emphasis added).

---

[4] District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub. L. 104-8, 109 Stat. 97, § 101(b) (establishing the  Board, which consisted of members who met certain qualifications and were appointed by the President "after consult[ation]" with the chairs of certain committees); *see also* 162 Cong. Rec. H3581, H3583 (June 9, 2016) ("[PROMESA] establishes a reasonable board with powers far less potent than the powers that Congress gave the board it established for the District of Columbia in 1995.  If the Puerto Rican Government does its job well, the board will have a limited role and will cease to operate within a few years.") (Statement of Representative Pierluisi); H.R. Rep. 114-602 pt. 1, at 111 (June 3, 2016).

Nothing in PROMESA's text, however, requires the President to appoint any member from any list. If the President selects a member from a congressional list, then no Senate confirmation is required; if he instead selects someone outside of those lists, as the statute permits him to do, then the appointment shall be by and with the advice and consent of the Senate. *Id.* § 2121(e)(2)(E).

## III.   THE BOARD'S WORK TO DATE

The fully-appointed Board began its work in August 2016, facing a daunting task. The Commonwealth had $74 billion of debt, $49 billion of pension liabilities, and insufficient resources to satisfy those obligations. From September 2016 to March 2017, the Board reviewed, and objected to, several Fiscal Plans before ultimately amending and certifying one that met the statutory requirements. Statement of Financial Oversight and Management Board on the Occasion of the Certification of a Fiscal Plan for Puerto Rico Under PROMESA (Mar. 13, 2017), https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/58c6e4e543444.pdf. And after working with the Puerto Rican government to formulate restructuring proposals and engaging in good-faith negotiations with creditors in an effort to enter into consensual restructurings, 48 U.S.C. § 2146(a)(2)-(3), the Board filed five Title III cases, one on behalf of the Commonwealth and four on behalf of Puerto Rico's covered instrumentalities. In connection with those cases, twenty-nine adversary proceedings have been filed. One of the many creditors in these proceedings is Aurelius, a hedge fund that invested heavily in Puerto Rican bonds.[5]

As this Court is well aware, these Title III cases already have required a massive investment of resources by the parties and the judiciary. To date, there have been two trials, and

---

[5] Tom Hals, *Aurelius hedge fund seeks to toss Puerto Rico's bankruptcy filing*, Reuters (Aug. 17, 2017 11:18 AM), https://www.reuters.com/article/us-puertorico-debt-bankruptcy/aurelius-hedge-fund-seeks-to-toss-puerto-ricos-bankruptcy-filing-idUSKBN1AN27H.

numerous legal issues have been decided, including the scope of Title III's automatic stay provision; various intervention issues; the proper scope of discovery; the applicability and scope of privileges; and the proper scope of relevant bankruptcy rules.

## **ARGUMENT**

**I.    THE APPOINTMENTS CLAUSE DOES NOT GOVERN THE APPOINTMENT OF MEMBERS OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD BECAUSE THEY ARE TERRITORIAL, NOT FEDERAL, OFFICERS**

Aurelius's argument that the Board members must be appointed in accordance with the Appointments Clause depends on its assertion that the Board members are federal officers rather than territorial officers.  But they are not.  Centuries of Supreme Court precedent and historical practice establish that Congress, pursuant to its plenary Article IV authority over the territories, may structure a territorial government—including the appointment of territorial officers— unconstrained by the structural and separation-of-powers provisions that govern when Congress legislates for the federal government.  That is precisely what Congress did in enacting PROMESA.

Board members are territorial officers: they are expressly a part of the territorial government and are exempt from federal laws that apply as a matter of course to federal officers and agencies; they exercise delegated local authority pursuant to Article IV; and their focus and authority are strictly territorial in scope.  Although Aurelius labors mightily to establish the federal character of the Board, the indicia of federal appointment and control on which Aurelius relies are routine attributes of many territorial governments.  Accepting Aurelius's position would thus do far more than upend the vitally important work of restoring Puerto Rico's fiscal integrity.  It would throw into doubt the constitutionality of numerous territorial officials, including governors, who for decades have been appointed in a manner that would be unconstitutional if the Appointments Clause applied to territorial positions.

**A.    The Appointments Clause Does Not Constrain Congress's Creation Of Territorial Offices In The Exercise Of Its Plenary Article IV Power**

1.    The Territories Clause empowers Congress to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  U.S. Const. art. IV, § 3, cl. 2.  Congress's power pursuant to that Clause is "general and plenary." *Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States*, 136 U.S. 1, 42 (1890).  The Supreme Court has long held that because "[t]he territories are but political subdivisions of the outlying dominion of the United States," their "relation to the general government is much the same as that which counties bear to the respective States, and Congress may legislate for them as a State does for its municipal organizations."   *First Nat'l Bank v. Yankton Cnty.*, 101 U.S. 129, 133 (1879).  As Chief Justice Marshall explained in 1828, when Congress acts pursuant to the Territories Clause, it "exercises the combined powers of the general, and of a state government."  *Canter*, 26 U.S. at 546; *see also, e.g.*, *United States v. McMillan*, 165 U.S. 504, 510–11 (1897).  Put another way, Congress has "dual authority" with respect to the territories, and it may act as both the national and the local government.  *Keller v. Potomac Elec. Power Co.*, 261 U.S. 428, 442–43 (1923) (describing Congress's substantially identical power over the District of Columbia).

As a result, when Congress structures a territorial government, it acts in the capacity of a state or local government, and it is no more constrained by constitutional separation-of-powers provisions than a state or local government would be.  *Binns v. United States*, 194 U.S. 486, 491–92 (1904).  Territorial governments "are not organized under the Constitution, nor subject to its complex distribution of the powers of government, as the organic law; but are the creations, exclusively, of the legislative department, and subject to its supervision and control."  *Benner v. Porter*, 50 U.S. 235, 242 (1850).  For instance, in establishing territorial judgeships, Congress

need not observe Article III's requirement of life tenure. *McAllister v. United States*, 141 U.S. 174, 184–85 (1891). That is because Congress exercises its "plenary municipal authority" under Article IV in creating territorial courts. *Id.* at 184 (territorial courts' jurisdiction "is conferred by Congress, in the execution of those general powers which that body possesses over the territories of the United States" (quoting *Canter*, 26 U.S. at 546)). Those courts then exercise the delegated municipal authority of Congress, rather than Article III authority—even though they were created by federal statute and have jurisdiction to apply federal law. *Id.* Phrased in terms of Article III's text, territorial courts do not exercise the "judicial power *of the United States*," U.S. Const. art. III, § 1, and thus Article III does not apply. *The City of Panama*, 101 U.S. 453, 460 (1879); *Clinton v. Englebrecht*, 80 U.S. 434, 447 (1871); *Benner*, 50 U.S. at 244.

Just as territorial courts do not exercise the judicial power "of the United States" for purposes of Article III, territorial officers are not officers "of the United States" for purposes of the Appointments Clause. That Clause provides in relevant part that the President "shall nominate, and by and with the advice and consent of the Senate, shall appoint . . . *all other officers of the United States*." U.S. Const. art. II, § 2, cl. 2 (emphasis added). The Appointments Clause therefore applies only when Congress creates federal offices. It does not govern Congress's exercise of its "plenary municipal authority" under Article IV to create territorial offices and designate the method of appointment. *See Freytag v. Comm'r*, 501 U.S. 868, 913 (1991) (Scalia, J., concurring) (Territorial courts "are neither Article III nor Article I courts, just as territorial governors are not Article I executives but Article IV executives.").

That has been the longstanding position of the Executive Branch. It has taken the position in the Supreme Court that territorial officers need not be appointed in accordance with the Appointments Clause, because that Clause, "like the protections of Article III, regulates only the framework of the federal government and thus is no more applicable to the Territories than it

is to State governments." *See* Brief of the United States at 33, *Nguyen v. United States*, 539 U.S. 69 (2003) (Nos. 01-10873, 02-5034), 2003 WL 548057, at *33; *see also* Mem. of Law in Support of Defendant United States' Motion to Dismiss, *O'Brien v. Calvo*, No. 1:12-cv-02700-ARR, Dkt. entry No. 49 (E.D.N.Y. Feb. 19, 2013).   The Executive Branch has held that view since at least 1839, when the Attorney General concluded that territorial officers are not "officers of the United States" for purposes of the Impeachment Clause, U.S. Const. Art. II § 4, which applies to all "civil officers of the United States."   Territorial Judges Not Liable to Impeachment, 3 U.S. Op. Att'y Gen. 409, 411 (1839); *see* Commc'ns Satellite Corp., 42 U.S. Op. Att'y Gen. 165, 172 (1962) (Impeachment Clause applies to officials who are "officers of the United States" for purposes of the Appointments Clause).   The Attorney General reasoned that because territorial judges were "created in virtue of [Congress's] general rights of sovereignty" over the territories rather than "under the Constitution," they were "not civil officers of the United States, in the constitutional meaning of the phrase; they are merely Territorial officers, and therefore . . . not subject to impeachment."  3 U.S. Op. Atty. Gen. at 410–11.   That reasoning applies in full to the Appointments Clause.

2.     Congressional practice over the last 200 years confirms that the Appointments Clause does not constrain Congress in structuring territorial governments.   *See NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560 (2014) ("[T]he longstanding practice of the government can inform [a] determination of what the law is." (internal quotation marks omitted)).

a.     From the time of the Founding, Congress structured territorial governments on the assumption that it was not bound by separation-of-powers principles that apply to the federal government.   Starting with the first territorial governments, including the Northwest Territory, Congress conferred on territorial governors the authority both to enforce territorial laws and to enact those laws as a member of the legislature—an arrangement that would plainly violate the

separation-of-powers principles applicable to the federal government.  An Act to provide for the Government of the Territory Northwest of the river Ohio, 1 Stat. 50, 51 n.(a) (1789); *see* An Act erecting Louisiana into two territories, and providing for the temporary government thereof, § 4, 2 Stat. 283, 284 (1804) (territory of Orleans); William Wirt Blume & Elizabeth Gaspar Brown, *Territorial Courts and Law: Unifying Factors in the Development of American Legal Institutions*, 61 Mich. L. Rev. 39, 106 (1962).  And as discussed above, in establishing territorial courts, Congress routinely disregarded Article III's provision that judges enjoy lifetime appointments to serve "during good behavior." *McAllister*, 141 U.S. at 185 & nn.1–2.

b.    Since the eighteenth century, Congress has employed a variety of procedures for appointing territorial officers, only some of which would have complied with the Appointments Clause.  Congress required that some Article IV offices—in particular, territorial governors and judges—be filled through advice and consent.  *See, e.g.*, An Act temporarily to provide revenues and a civil government for Porto Rico, ch. 191, 31 Stat. 77, §§ 17, 18, 33, 34 (1900).  But there is no evidence, and Aurelius points to none, that Congress believed advice and consent was constitutionally required.  See 42 U.S. Op. Atty. Gen. at 167 ("it does not follow … that every appointment authorized by law which is preceded by nomination and confirmation necessarily renders the appointee an officer of the United States").  And at the same time, Congress often provided that other officials, including legislative officers and executive officials subordinate to the territorial governors, would be appointed through methods that would not have complied with the Appointments Clause—namely, by popular election or appointment by other territorial officials.[6]  *See* Ch. 191, 31 Stat. 77, § 27; An Act to Provide a Civil Government for Porto Rico,

---

[6] Congress similarly failed to abide by the Appointments Clause in legislating for the District of Columbia, over which it possesses materially similar plenary authority.  *See Palmore v. United States*, 411 U.S. 389, 398 (1973) (equating Congress's authority over territories and the District).  In 1812, Congress provided that the mayor, who had the authority to execute all of the District's

and for Other Purposes, Pub. L. No. 64-38, §§ 12-13, 39 Stat. 951 (1917); Act Proposing to the State of Texas the Establishment of her Northern and Western Boundaries, etc., § 8, 9 Stat. 449 (1850); Max Farrand, *The Legislation of Congress for the Government of the Organized Territories of the United States*, 1798-1895, at 35–36 (1896), https://archive.org/details/ legislationofcon00farrrich.

For the past seventy years, Congress has permitted the territories a greater measure of self-government, including the right to select their own executive officers. In 1947, Congress provided that the Governor of Puerto Rico would be popularly elected, and that he would have the authority to appoint all the heads of the Puerto Rican executive departments with the advice and consent of the Puerto Rican Senate. *See* An Act To Amend the Organic Act of Puerto Rico, Pub. L. No. 80-362, 61 Stat. 770, 771 (1947). Congress has enacted similar self-government provisions for other territories. *See, e.g.,* Organic Act of Guam, Pub. L. No. 81-630, 64 Stat. 384 (1950) (codified as amended at 48 U.S.C. §§ 1421–1424 (1988)); An Act to provide for the popular election of the Governor of Guam, Pub. L. No. 90-497, 82 Stat. 842 (1968). None of these measures of self-governance would be constitutional if the Appointments Clause governed. But their constitutionality has gone virtually unchallenged. *See District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 106–07 (1953) ("The power of Congress to grant self-government to the . . . territories" is virtually unlimited.).

---

laws and to appoint all of its officers, would be elected by two municipal legislative bodies, both of which were popularly elected. *See* An Act to further amend the Charter of the City of Washington, ch. 75, § 3, 2 Stat. 721, 723–24 (1812); U.S. House of Reps., Committee on the District of Columbia, 101st Cong., *Governance of the Nation's Capital: A Summary History of the Forms and Powers of Local Government for the District Of Columbia, 1790 to 1973*, at 40, (Comm. Print 1990). In subsequent years, Congress experimented with various forms of government in the District, ultimately settling on a popularly elected mayor and City Council. *Id.* at 28–32, 40–43.

**B.    The Board Members Are Territorial Officers Whose Appointment Need Not Comply With The Appointments Clause**

In enacting PROMESA and creating the Board, Congress acted pursuant to its plenary Article IV power over the territories to create a new entity expressly located within the territorial government.  The Board's purpose is to restore fiscal stability and restructure Puerto Rico's debt, and its authority is limited to applying PROMESA—a statute that pertains only to Puerto Rico and other territories, 48 U.S.C. § 2121(a)—within Puerto Rico.  The Board's exclusively territorial character and focus establish that the Board's members are territorial officers who are not subject to the Appointments Clause.  Aurelius's contrary arguments are meritless.

1.    The Board members are territorial officers because Congress created the Board in the exercise of its Article IV authority to structure territorial governments, and its mission and authority are exclusively local in nature.  In considering whether an entity is territorial or federal, the Supreme Court has placed great weight on (1) whether Congress invoked its Article IV power (or its similar plenary power over the District of Columbia); and (2) whether the entity's objective and authority are local rather than national.  *Palmore v. United States*, 411 U.S. 389, 407 (1973) (holding that D.C. courts are local rather than federal because Congress "expressly created" the courts pursuant to its plenary authority and created a body with authority over matters of "strictly local concern"); *Binns*, 194 U.S. at 494 (upholding congressional tax on the Territory of Alaska where it "satisfactorily appears that" Congress acted as the territorial legislature).  When Congress invokes its plenary local power, the Supreme Court has rejected attempts to characterize the resulting entity as federal (and therefore subject to the Constitution's structural provisions) unless the entity's responsibility over "'purely local affairs [is] obviously subordinate and incidental."  *Palmore*, 411 U.S. at 407 (quoting and limiting *O'Donoghue v. United States*, 289 U.S. 516 (1933)).  Evaluated in light of these considerations, the Board is

clearly part of the territorial government, and the Board members are territorial officers.

Congress expressly stated that it enacted PROMESA "pursuant to Article IV, section 3," the Constitution's Territories Clause.  48 U.S.C. § 2121(b)(2).  Because Congress acted in its capacity as a plenary municipal legislature under Article IV, Congress delegated to Board members a portion of that municipal authority—not any portion of the national authority Congress exercises when it legislates in its capacity as the national legislature.  *McAllister*, 141 U.S. at 184.  The Board members therefore exercise only territorial authority.

PROMESA's grant of authority confirms that the Board exercises purely local authority. PROMESA is directed only to Puerto Rico and other territories; it has no application outside of the territories.  48 U.S.C. § 2121(a).  The Board's purpose is purely territorial: it is tasked with "provid[ing] a method for a covered territory to achieve fiscal responsibility and access to the capital markets."  *Id.*   The Board's oversight authority extends only to territorial instrument-alities, *id.* § 2121(d), and its primary responsibilities—approving the Puerto Rican government's fiscal plans and budgets, and petitioning on behalf of Puerto Rican government instrumentalities to restructure their debt—are exclusively focused on Puerto Rico.  *Id.* §§ 2141, 2164.  The Board "shall terminate," moreover, when the "territorial government" has achieved access to credit markets and fiscal stability.  *Id.* § 2149.  The Board's enforcement authority thus does not extend to any other federal law, nor can it act with respect to any governmental entity beyond Puerto Rico.  *See Palmore*, 411 U.S. at 407.

Numerous aspects of PROMESA confirm that the Board is an entity within the territorial government.  Most importantly, Congress expressly provided that the Board is an "entity within the territorial government for which it is established," and "shall not be considered to be a department, agency, establishment, or instrumentality of the federal Government."  48 U.S.C. § 2121(c).  Contrary to Aurelius's contention, that declaration merits great deference from this

14

Court—especially because it is confirmed by several other statutory provisions indicating that the Board is not a federal department or agency.

For example, although Aurelius argues (Br. 22) that the Board is subject to federal authority in "every meaningful respect," Aurelius overlooks the most meaningful respect of all: the Board's funding comes entirely from Puerto Rico, not the federal government.  48 U.S.C. § 2127.  PROMESA requires "the territorial government" both to provide initial funding for the Board and to "designate a dedicated funding source" for future years.  *Id*. § 2127(b)(1), (2)(A). If the Board were a federal agency, funding the agency from local rather than federal sources would be a stark and dubious departure from normal practice.  General Accounting Office, *Principles Of Federal Appropriations Law*, at 2-24 to 2-26 (4th rev. ed. 2016).  In addition, Puerto Rican law constrains the Board's investigative authority.  *See* 48 U.S.C. § 2124(f) (subpoena jurisdiction).  If the Board's members were officers of the United States exercising federal executive authority, Congress would have no reason to constrain the Board's authority in that manner.

Moreover, PROMESA's declaration that the Board is not a federal agency has important substantive consequences, exempting the Board from the numerous federal laws that would apply if the Board were a federal agency and its members officers of the United States.  For instance, the Board is not subject to FOIA or the APA.  *See* 5 U.S.C. §§ 551(1)(c), 552(f) (FOIA applies to "each authority of the Government of the United States," but not "the governments of the territories"); 5 U.S.C. § 701(b)(1)(c) (APA; same).  Similarly, the Board's employees are not federal employees and are not protected by federal civil service protections.  48 U.S.C. § 2123(b), (c); 5 U.S.C. § 2301(a) (provisions apply to "the executive agencies").[7]

---

[7] These substantive consequences further demonstrate why the Board should be considered territorial while other entities, like Amtrak, are considered federal.  In *Dep't of Transp. v. Ass'n*

Aurelius makes much of the minor exceptions to this general rule, i.e., instances in which Congress expressly provided that certain federal provisions would apply to the Board.  But those exceptions prove that the Board is territorial, not federal.  First, PROMESA provides that "notwithstanding any ethics provision governing employees of the covered territory," the Board's members and employees "shall be subject to the federal conflict of interest requirements" set forth in 18 U.S.C. § 208 and certain federal financial disclosure requirements. 48 U.S.C. § 2129.  If the Board members were officers of the United States, there would have been no need for Congress expressly to apply those federal statutes to the Board, as they would apply of their own force.  18 U.S.C. § 208 (applying to "an[y] officer or employee of the executive branch of the United States government"); 5 U.S.C. App. § 101 (applying to "each officer or employee in the executive branch").  Second, Congress's decision to expressly authorize the "Administrator of General Services" to provide services to the Board (48 U.S.C. § 2124(n)) would have been unnecessary if the Board were a "federal" or "executive" agency within the meaning of the General Services Administration's organic act, which does not encompass territorial entities.  40 U.S.C. §§ 102(4)-(5) & 321(c)(2).  *See generally id.* § 101 ("The purpose of this subtitle is to provide *the Federal Government* with an economical and efficient system for" various administrative services) (emphasis added).  And PROMESA's express grant of authority to the Board's Chair to request *federal* employees on detail pursuant to the Intergovernmental Personnel Act of 1970 provides further evidence that Congress viewed the

---

*of Am. R.R.,* 135 S. Ct. 1225 (2015), the Supreme Court pointed to a statutory provision *expressly* applying FOIA to Amtrak in "any fiscal year in which [Amtrak] receives a federal subsidy" as an additional reason to disregard Congress's statement that Amtrak was not an agency of the federal government.   135 S. Ct. at 1232 (citing 49 U.S.C. § 24315).   Here, however, no analogous statutory provisions applying FOIA or the APA to the Board exist.   Nor is the Board a "designated Federal entity'" under the Inspector General Act of 1978, like Amtrak.  *Id.* (quoting 5 U.S.C. App. § 8G(a)(2)).

Board as a territorial entity that it created it using its plenary Article IV powers. *See* 48 U.S.C. § 2123(d); 5 U.S.C. § 3372(a). After all, there would have been no need to reference that Act in the statutory text if Congress viewed the Board Chair as another "head of any Federal department or agency." 48 U.S.C. § 2123(d).

2. Despite Congress's invocation of its Article IV authority and the Board's exclusively territorial focus, Aurelius argues that the Board members are in fact federal constitutional officers. Remarkably, Aurelius never mentions the Supreme Court's decisions distinguishing between territorial and federal entities, much less the century-long line of precedent discussing the nature of Congress's Article IV authority to create territorial offices. It instead purports to glean from "[h]istorical practice" a three-factor test for distinguishing between federal and territorial officers: (1) whether the officials are appointed by federal or territorial authorities; (2) whether they are controlled by the federal government; and (3) whether their authority is "confined to purely local matters." Br. 18. It is bad enough that Aurelius invents this test out of whole cloth. But worse than that, Aurelius does not even attempt to satisfy the three-part test it has concocted.

Surprisingly, Aurelius says nothing about the third factor it identifies—doubtless because the fact that the Board undeniably exercises only local authority cuts so sharply against Aurelius's effort to characterize Board members as federal officers. Indeed, Aurelius does not even try to explain how to weigh the local nature of the Board's authority against the other factors that, in its view, point the other way. As a practical matter, then, the local nature of the Board's authority—a consideration of paramount importance—plays no role in Aurelius's analysis. Aurelius's test for federal character therefore relies solely on federal appointment and control. That test is contrary to Supreme Court jurisprudence and the relationship between the federal government and the territories under the Constitution.

17

*First*, the fact that the Board members are appointed by the federal government does not establish that they are federal officers.  Aurelius contends (Br. 20-22) that historically, officials who were appointed by the federal government were considered federal officers, while officials who were selected by territorial authorities were considered territorial officers.[8]  That is simply wrong.  For instance, territorial judges exercised authority to enforce federal law by virtue of their appointment by the President with advice and consent.  Under Aurelius's view, because territorial judges derived their authority from federal sources, they should have been subject to Article III, and should have been considered officers "of the United States."  But both the Supreme Court and the Executive Branch concluded otherwise—on the ground that Congress had exercised its plenary local authority in providing for territorial courts and judges, making them territorial rather than federal in nature, and thus exempt from Article III's life tenure requirement.  *See supra* p. 8-10; 3 U.S. Op. Atty. Gen. at 410–11; *Englebrecht*, 80 U.S at  447 ("The judges of the Supreme Court of the territory are appointed by the president under the act of congress, but this does not make the courts they are authorized to hold courts of the United States.").  The critical question in distinguishing between territorial and federal officers is therefore whether Congress acted under its Article IV authority to create an entity with territorial, rather than national, responsibilities.  *See supra* Part I.A.1.  When Congress does so, it

---

[8] Contrary to Aurelius's argument (Br. at 19-20), the 1789 Northwest Ordinance does not establish that Congress believed that federally appointed territorial governors were Federal officers.  That ordinance provided that the Governor would be appointed by the President with advice and consent, and that he would be removable by the President rather than by Congress (as had been the case under the 1787 ordinance).  The ordinance stated that its purpose was to "adapt" the 1787 statute governing the Northwest Territories "to the present constitution of the United States," 1 Stat. at 51—a phrase best understood as responding to the fact that the Confederation Congress no longer existed and therefore could no longer appoint the Governor and other territorial officials.  The ordinance does not support any inference Congress understood the Governor to be an "officer of the United States"; as discussed above, Congress also gave the Governor legislative powers that an executive officer of the United States could not constitutionally possess.  *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (the Constitution does not empower executive officers "to enact, to amend, or to repeal statutes").

18

delegates its plenary "state" power, not its "general" power, to the entity. *Canter*, 26 U.S. at

546; *Englebrecht*, 80 U.S. at 447. The Board exercises that local authority here.[9]

Aurelius's theory is also irreconcilable with the Supreme Court's understanding of the

relationship between the federal government and the territories. Aurelius appears to suggest that

the only officers who may be considered territorial are those who are popularly elected by the

residents of a territory. In that case, Aurelius asserts (Br. 21), the officers "do not directly derive

their authority from the federal government." But just last year the Supreme Court held exactly

the opposite. *Sanchez Valle*, 136 S. Ct. at 1875 ("[Behind] the Puerto Rican people and their

Constitution, the 'ultimate' source of prosecutorial power remains the U.S. Congress.").

Because an official's authority *always* derives from Congress, whether the official is federal or

territorial, the ultimate source of that authority cannot possibly be a basis for distinction. Rather,

the nature of the authority that Congress has delegated is the critical consideration. *Keller*, 261

U.S. at 442–43 (Congress has "dual authority" over by the territories).

*Second*, federal "control"—which Aurelius discerns in PROMESA's provisions that the

Board can be removed by the President and will apply federal law (*i.e.*, PROMESA itself)—

does not establish that the Board members are federal officers. Because Congress is the ultimate

source of sovereignty in the territories, *Sanchez Valle*, 136 S. Ct. at 1874, federal appointment

---

[9] In arguing otherwise (Br. 18–19), Aurelius relies on two inapposite decisions, neither of which
concerns Article IV or the Appointments Clause. In *Wise v. Withers*, 7 U.S. (3 Cranch) 331,
335–37 (1806), the Court held that a D.C. justice of the peace fell within a statute exempting
"officers of the . . . United States" from military service. The Court reasoned that the justice of
the peace was such an officer because he had been appointed by the President. The Court had no
occasion to consider whether the justice was an "officer of United States" for constitutional
purposes. In any event, *Wise*'s approach was expressly repudiated in later decisions holding that
territorial and D.C. courts did not exercise the judicial power "of the United States" because they
were established in the exercise of Congress's plenary municipal authority. *See, e.g.*,
*Englebrecht*, 80 U.S. at 447. *United States v. Hartwell*, 73 U.S. 385 (1867), is even less
apposite. There, the Court considered only whether a clerk employed in the Treasury
Department was an "officer" for purposes of a federal bribery statute, despite his subordinate
position.

and removal historically have been common attributes of territorial offices—including territorial judges.  But those attributes have never been evidence that an office is federal rather than territorial.  3 U.S. Op. Atty. Gen. at 410-11; *Englebrecht*, 80 U.S. at 447.  More broadly, Congress's discretion in structuring a territorial government is comparable to that of a state over its municipalities.  *Benner*, 50 U.S. at 242.  States may make certain municipal officials removable by the governor when they wish to safeguard those officials' independence.  It is not surprising that Congress would use the same technique to ensure that the Board is independent of other Puerto Rican officials.  *Cf.* H. Rep. No. 104-96, at 25 (1995) (D.C. Financial Oversight Board modeled on municipal authorities over which state officials retained control).

Aurelius also relies on the fact that Board members exercise authority pursuant to, and enforce the Federal standards contained in, PROMESA.  But any time Congress exercises its Article IV power to confer authority on a territorial government, it does so by means of a federal statute.  Congress cannot take action in any other way, so that cannot plausibly be a basis for distinguishing federal officers from territorial officers.  Territorial officers historically have enforced congressionally enacted organic laws, and territorial judges have long enforced federal law.[10]  *See Palmore*, 411 U.S. at 402.  In fact, Puerto Rico's constitution was approved by Congress, *see Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 593 (1976); if Aurelius' rule prevailed, *every entity* enforcing that Constitution would effectively enforce federal law.  The critical question is what the federal statute *does*—i.e., whether it creates a territorial entity with strictly local powers.  There can be no question that the

---

[10] For example, in the early twentieth century, in an organic act establishing the government of Puerto Rico, Congress provided that several heads of Puerto Rican agencies would have authority to execute the organic act.  See An Act to Provide a Civil Government for Porto Rico, and for Other Purposes, Pub. L. No. 64-38, §§ 12-13, 39 Stat. 951 (1917).

Board's focus is territorial for the reasons discussed above.[11]

3.     Finally, it is important to consider the breathtaking consequences of Aurelius's argument.  If Aurelius is correct that the Appointments Clause governs, notwithstanding Article IV, all territorial officers with significant responsibilities must be appointed in accordance with the Clause's terms.   It follows that Congress's salutary efforts to introduce greater self-government would be unconstitutional:  all territorial governors, heads of departments, Puerto Rico Supreme Court justices, and the equivalent positions in the District of Columbia—at the very least—over the last 70 or more years have been constitutionally illegitimate.   Aurelius cannot avoid those consequences by carving out territorial officials who are popularly elected; for the reasons stated above, those officials draw their authority from Congress and would therefore necessarily be federal "officers of the United States" if Aurelius is correct.  The number of laws and executive actions that would be potentially unconstitutional would be staggering.

**C.     Because The Board Members Are Not Federal Officers, Congress Had Broad Discretion To Determine The Manner Of Their Appointment**

Aurelius suggests that the list mechanism through which the Board members were appointed unconstitutionally constrained the President's discretion to select the appointees of his choice, in violation of the Appointments Clause.   For the reasons discussed below, *infra* Part III.B, the list mechanism in fact allowed the President broad leeway to choose Board members, and it would be constitutional even if the Appointments Clause applied.   But Aurelius's argument suffers from a deeper flaw: because Board members are territorial officers rather than federal officers, Congress had authority to structure the appointments process as it saw fit.

The Appointments Clause gives the President authority to "nominate" principal "officers

---

[11] The Board's members are thus distinguishable from officers who enforce national, generally applicable statutes with respect to Puerto Rico—and who are therefore federal officers.  The United States Attorney for Puerto Rico, for instance, is a constitutional officer within the federal Department of Justice who enforces general federal criminal law.  *See* 28 U.S.C. § 541.

of the United States," and to select "such inferior officers" whose appointment Congress confers

on the President.   Even assuming that the Constitution textually commits to the President

exclusive authority to select his nominees and appointees, that exclusive authority is not

implicated here, because the Appointments Clause specifies that the President's selection

authority extends only to "officers of the United States."   Because the Board members are not

"officers of the United States," the President does not even arguably possess sole constitutional

authority to select nominees for the Board.   As a result, Congress had discretion, in enacting

PROMESA, to decide whether to give the President a role in appointing the Board members—

and if so, how much of a role to give him.   In performing his selection function pursuant to the

statute, the President was simply exercising his general Article II authority to execute the law

according to Congress's direction.   *See* Art. II, § 3.   Congress's limitation of the universe of

candidates is therefore no different from Congress's customary provision of standards to

constrain the Executive's discretion in implementing the law.

Nor does Congress's role in the Board's selection raise any concerns that Congress is

aggrandizing itself at the expense of the Executive.   *See Mistretta v. United States*, 488 U.S. 361,

382 (1989) ("the encroachment or aggrandizement of one branch at the expense of the other"

animates separation-of-powers jurisprudence).     In relation to Executive Branch officials,

Congress may not exercise appointment or removal power because that authority would mean

Congress could control the Executive Branch's execution of the law, thereby encroaching on the

President's authority.   *Morrison v. Olson*, 487 U.S. 654, 689–90 (1988); *Bowsher v. Synar*, 478

U.S. 714, 727 (1986).   That concern is not present here.   Territorial officers are not part of the

Executive Branch, and they need not be subject to the President's control, either through

appointment or removal.   *Cf. Brewer v. D.C. Fin. Responsibility & Mgmt.*, 953 F. Supp. 406, 410

(D.D.C. 1997) (rejecting a separation-of-powers challenge involving the D.C. Financial Control

Board because "[t]he Executive Branch has no constitutional role with respect to the District that corresponds or competes with that of Congress").  Congress's role in their appointment therefore does not take away any authority that the President otherwise would have had.  A contrary conclusion would endanger the system of territorial self-government that has existed for seventy years: if territorial officials must be subject to Presidential control through appointment and removal, the popular election of territorial governors and other officials would be an unconstitutional encroachment on the President's authority.[12]

## II.   THE APPOINTMENTS CLAUSE IS NOT A "FUNDAMENTAL" CONSTITUTIONAL PROVISION AND DOES NOT APPLY TO PUERTO RICO

As the previous Part explains, the Appointments Clause does not govern the Board members' appointment because they are territorial officers, and the Constitution's separation-of-powers provisions do not constrain Congress's discretion in structuring territorial governments. Even if this Court does not agree with that understanding of Congress's Article IV authority and the Board's territorial character, however, it should still hold that, under later Supreme Court decisions concerning unincorporated territories, the Appointments Clause does not govern here.

The Supreme Court has repeatedly addressed the application to the territories of constitutional provisions that are directed to Congress's authority to legislate with respect to private parties and states (as opposed to those that govern the distribution of powers among the three branches of the federal government).  In a series of cases, the Court recognized that the

---

[12] The fact that territorial officers who are not subject to presidential control enforce federal law does not impinge on Executive authority.  As discussed above, territorial officers historically have had a role in enforcing federal laws pertaining specifically to the territories; PROMESA is simply the latest example. It is well established, moreover, that Congress may vest authority to enforce federal law in non-federal officials, at least where it is unlikely that Congress would be able "to use this device as a means of reducing the power of the Presidency."  *Printz v. United States*, 521 U.S. 898, 923 & n.12 (1997).  This is surely such a situation.  Congress's use of territorial officials to execute a federal statute that pertains exclusively to the territories over which Congress has plenary power poses no threat to executive power.  Two hundred years of historical practice reinforce that conclusion.

23

U.S. Constitution applies "*only in part* in unincorporated Territories."[13]  *Boumediene v. Bush*,

553 U.S. 723, 757 (2008) (emphasis added); *see Torres v. Puerto Rico*, 442 U.S. 465, 468–70

(1979); *Balzac v. Porto Rico*, 258 U.S. 298, 312 (1922).  In unincorporated territories, only

"fundamental" constitutional rights apply, absent express direction to the contrary from

Congress.  *Boumediene*, 553 U.S. at 758; *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977

F.2d 1, 7 (1st Cir. 1992).[14]  As a result, even if it were not the case that Congress's exercise of its

Article IV authority is unconstrained by the Appointments Clause, that Clause would still be

inapplicable here because Puerto Rico is an unincorporated territory and the Appointments

Clause is not "fundamental" within the meaning of the Court's decisions.

"Notwithstanding the intense political, judicial and academic debate the island's

territorial status has generated over the years, the fact is that, to date, Puerto Rico remains an

unincorporated territory subject to the plenary powers of Congress over the island under the

Territorial Clause."  *Conde Vidal v. Garcia-Padilla*, 167 F. Supp. 3d 279, 286 (D.P.R. 2016),

*vacated on other grounds by In re Conde Vidal*, 818 F.3d 765 (1st Cir. 2016).  Courts thus have

long held that only "fundamental" constitutional provisions apply in Puerto Rico. *See United

States v. v. Lebrón-Caceres*, No. 15-279 (PAD), 2016 WL 204447, at *7 (D.P.R. Jan. 15, 2016).

"[I]n the context of territorial rights," ""[f]undamental' has a distinct and narrow

---

[13]  At the same time, the Court (in a plurality concurring opinion later treated as controlling)
reaffirmed the line of decisions holding that with respect to *all* territories, Congress had plenary
discretion to structure territorial governments as it saw fit, unconstrained by the Constitution's
separation-of-powers provisions.  *Downes v. Bidwell*, 182 U.S. 244, 289 (1901) (White, J.,
concurring in the judgment).  The Court thus explained that Article III "is inapplicable . . . even
in territories which are incorporated into the United States." *Id.* at 293.

[14]  The first Supreme Court cases to distinguish between incorporated and unincorporated
territories were the *Insular Cases*.  *E.g.*, *Dorr v. United States*, 195 U.S. 138 (1904); *Downes,
supra*.  Though these cases have been criticized for "rest[ing] on anachronistic views of race and
imperialism," "the Court has continued to invoke the Insular framework when dealing with
questions of territorial and extraterritorial application." *Tuaua v. United States*, 788 F.3d 300,
307 (D.C. Cir. 2015).

meaning." *Tuaua*, 788 F.3d at 308. "It is not sufficient that a right be considered fundamentally important in a colloquial sense or even that a right be necessary to the American regime of ordered liberty." *Id.* (internal quotation marks omitted). Rather, a constitutional provision is "fundamental" only if it imposes one of those "'limitations in favor of personal rights' which are 'the basis for all free government.'" *N. Mariana Islands v. Atalig*, 723 F.2d 682, 690 (9th Cir. 1984) (quoting *Dorr*, 195 U.S. at 146); *see also Wabol v. Villacrusis*, 958 F.2d 1450, 1460 (9th Cir. 1992) (guarantees must be "fundamental in [an] *international* sense"). "[T]hose artificial, procedural, or remedial rights that—justly revered though they may be—are nonetheless idiosyncratic to the American social compact" do not qualify. *Tuaua*, 788 F.3d at 308.

The Appointments Clause cannot possibly be a "fundamental" constitutional provision as that term has been understood. It is not difficult to envision a "free and fair society" that opts not to split the appointments power between two co-equal branches of government. *See id.* Indeed, "numerous free and democratic societies" have opted for an alternative approach. *Id.* The federal courts, moreover, have concluded that even the right to birthright citizenship is not "fundamental." *Tuaua*, 788 F.3d at 308. Nor is the right to a trial by jury. *Balzac*, 258 U.S. at 304–05; *Atalig*, 723 F.2d at 690; *cf. Figueroa v. Puerto Rico*, 232 F.2d 615, 619 (1st Cir. 1956). If these rights—which seem far more "integral to free and fair society" than any right the Appointments Clause protects, *Tuaua*, 788 F.3d at 308—do not apply in unincorporated territories, then the Appointments Clause cannot possibly be considered "fundamental."

This conclusion is bolstered by the Supreme Court's guidance in *Boumediene* suggesting that courts also must weigh the "practical considerations" involved in extending a particular constitutional provision to a territory. 553 U.S. at 759–60; *see Tuaua*, 788 F.3d at 309–12. Applying the Appointments Clause to Puerto Rico would be both "impractical" and "anomalous." *Boumediene*, 553 U.S. at 759 (quoting *Reid v. Covert*, 354 U.S. 1, 74–75 (1957)

(Harlan, J., concurring)).    Engrafting federal appointments procedures onto territorial governments would be unwieldy, and it would undercut Congress's ability to delegate continually increasing powers of self-government to the people of Puerto Rico.    Additionally, it would raise difficult questions whether offices created by territorial law might have to be filled through procedures consistent with the Appointments Clause.    Under *Boumediene*, these consequences provide additional reason to reject any effort to extend the Clause to Puerto Rico.

Finally, the First Circuit's decisions extending to Puerto Rico certain federalism-related constitutional provisions only reinforce the conclusion that the Appointments Clause does not apply.   In *Trailer Marine*, for example, the First Circuit held that the dormant Commerce Clause applies to Puerto Rico because the territory was more functionally equivalent to a State.   977 F.2d at 7–8.   The First Circuit's conclusion "derive[d] from reasoning specific to the Commerce Clause as applied to Puerto Rico's current circumstances."   *Id.* at 7.   Significantly, the court of appeals did not conduct a "fundamental rights" analysis, but instead focused on the peculiarities of the Commerce Clause.   It recognized that the "central rationale" of the dormant Commerce Clause doctrine is "to foster economic integration and prevent local interference with the flow of the nation's commerce."   *Id.* at 8.   Because "[f]ull economic integration is as important to Puerto Rico as to any state in the Union," the court of appeals explained, there "is no reason to believe that Congress intended to authorize Puerto Rico to restrict or discriminate against cross-border trade and ample reason to believe otherwise."   *Id.*   By contrast, it is difficult to understand why the Appointments Clause must apply to Puerto Rico, particularly where such a ruling would eviscerate the current structure of its government and that of similar territories.   *Trailer Marine* thus counsels *against* applying the Appointments Clause to Puerto Rico.

The same is true of the First Circuit cases holding that Eleventh Amendment sovereign immunity extends to Puerto Rico.   They, too, do not involve a fundamental rights analysis—or,

for that matter, much analysis at all.  *See* Adam D. Chandler, Note, *Puerto Rico's Eleventh Amendment Status Anxiety*, 120 Yale L.J. 2183, 2189-91 (2011).  Instead, they hold simply that Puerto Rico enjoys sovereign immunity because of its resemblance to a State.  *Ursulich v. Puerto Rico Nat'l Guard*, 384 F. Supp. 736, 737 (D.P.R. 1974), *cited in Ezratty v. Puerto Rico*, 648 F.2d 770, 776 n.7 (1st Cir. 1981).  This State-centric reasoning again undermines any notion that the Appointments Clause should apply to Puerto Rico.  Just as the Appointments Clause does not apply to state officers, it should not apply to the Board members.

## III.   EVEN IF THE APPOINTMENTS CLAUSE APPLIES TO PUERTO RICO, THE BOARD MEMBERS WERE PROPERLY APPOINTED

Having given short shrift to these dispositive Article IV issues, Aurelius devotes page after page to whether the Board exercises "significant authority."  The Board certainly has weighty responsibilities, necessitated by the territory's unprecedented economic crisis.  But that fact alone does not mean the Board members' appointment violated the Appointments Clause.  Even if the Appointments Clause is applicable, the Board members were appointed in accordance with it because they must be considered "inferior officers" under binding First Circuit precedent, and because PROMESA's list mechanism does not constrain the President's appointment flexibility.

### A.     Board Members Are Inferior Officers

The Constitution "divides all its officers into two classes."  *United States v. Germaine*, 99 U.S. 508, 509 (1879).  "Principal officers" must be appointed by the President and confirmed with the advice and consent of the Senate.  *Morrison*, 487 at 670.  "Inferior officers" may be appointed by the President alone.  *Id*.  In this Circuit, *United States v. Hilario*, 218 F.3d 19 (1st Cir. 2000), governs how to distinguish between principal and inferior officers.  *Hilario* holds that appointees may be "regarded as inferior officers if their work is 'directed and supervised at some

level by others who were appointed by Presidential nomination with the advice and consent of the Senate,' *Edmond v. United States*, 520 U.S. 651, 663 (1997), and, if not, might still be considered inferior officers if the nature of their work suggests sufficient limitations of responsibility and authority, *see Morrison*, 487 U.S. at 671–72." *Hilario*, 218 F.3d at 25.

Although the Board members are not supervised by a Senate-confirmed Presidential appointee, they qualify as inferior officers because the nature of their work is sufficiently limited. Indeed, the Board's responsibility and authority closely mirrors the factors that led the Supreme Court to conclude in *Morrison* that the independent counsel was an "inferior officer."

- *First*, the Board's duties are limited, and its jurisdiction confined, to the limited functions PROMESA sets forth.  48 U.S.C. §§ 2141–2152; 48 U.S.C. §§ 2172-2173 & 2175.  The Board may perform only those functions, and it must perform them in the precise ways the statute directs.  *Compare Morrison*, 487 U.S. at 671 ("An independent counsel's role is restricted primarily to investigation and, if appropriate, prosecution for certain federal crimes."); *see Stanley v. Gonzales*, 476 F.3d 653, 660 (9th Cir. 2007) (U.S. bankruptcy trustee's duties, which are similar to the Board's, render it at most "an inferior officer").

- *Second*, the Board's duties are cabined by the provisions in PROMESA that contemplate that it will work with the Commonwealth's Governor and Legislature to carry out its functions.  *Compare Morrison* at 672 ("The Act specifically provides that in policy matters appellant is to comply to the extent possible with the policies of the Department.").

- *Third*, the Board's tenure terminates when it fulfills its mission.  48 U.S.C. § 2149.  *Compare Morrison*, 487 U.S. at 672 ("[I]ndependent counsel is appointed essentially to accomplish a single task, and when that task is over the office is terminated.").

- *Fourth*, the Board members are subject to removal for cause by the President.  48 U.S.C. § 2121(e)(5)(B).  *Compare Morrison*, 487 U.S. at 671 (independent counsel subject to removal for cause "by higher Executive Branch official").

In sum, under *Hilario*, these factors "are sufficient to establish that [the Board members are] 'inferior officer[s].'"  *Morrison*, 487 U.S. at 672 (quoting *Germaine*, 99 U.S. at 511).

### B.   PROMESA's List Mechanism Does Not Unlawfully Constrain The President's Appointment Authority

Aurelius insists (Br. at 27) that PROMESA's list-based appointment mechanism violates the Appointments Clause because it impermissibly cabins the President's authority.  That is

incorrect. Nothing in the text of the statute requires the President to select Board candidates from lists submitted by congressional leaders. And even if it did, the President has ample discretion under PROMESA to choose from a range of potential candidates.

PROMESA does not require the President to choose from the lists submitted by congressional leaders. As an initial matter, the only consequence for not choosing from the lists is that the nominee must be appointed with the advice and consent of the Senate, *see* 48 U.S.C. § 2121(e)(2)(E)—something that is not required for inferior officers anyway. In addition, the relevant provisions in 48 U.S.C. § 2121(e)(2)(A)(i), *et seq.* use the word "should"—not "shall." This permissive text stands in stark contrast to the mandatory "shall" language that is used elsewhere in the statute, including the text introducing that provision, which provides that the President "*shall* appoint the individual members of the Oversight Board." *Id.* § 2121(e)(2)(A) (emphasis added). In addition, 48 U.S.C. § 2121(e)(2)(C) provides that "if the President does not select any of the names submitted" from the various lists, "then whoever submitted such list *may* supplement the lists provided in this subsection with additional names." (emphasis added). Together, this permissive "should" and "may" language indicates that the President is free to choose Board members not on the congressional lists, and can essentially treat those lists as recommendations. *See, e.g.*, *Lopez v. Davis*, 531 U.S. 230, 241 (2001); *In re Plaza Resort at Palmas, Inc.*, 741 F.3d 269, 276-277 (1st Cir. 2014); U.S. Dep't of Justice, Office of Legal Counsel, Proposed Commission on Deregulation of International Ocean Shipping, 7 Op. O.L.C. 202, 203 (1983) ("We also read § 17(a)(4), pursuant to which the Senate Majority Leader and the Speaker of the House of Representatives make recommendations for appointments under § 17(a)(2)(C)&(D), as in no way limiting the President's ultimate responsibility for the selection of the members of the Commission."). Accordingly, PROMESA's list mechanism does not unlawfully constrain the President's selection discretion. At the very least, the Court should read

this permissive text to allow for off-list appointment to avoid any constitutional concerns with the list mechanism. *Nat'l Fed'n of Indep. Businesses v. Sebelius*, 567 U.S. 519, 562 (2012).[15]

In any event, PROMESA's mechanism would pose no Appointments Clause problem even if it *mandated* appointment from the lists. The statute provides that the lists include multiple candidates whom the President can choose. 48 U.S.C. § 2121(e)(2)(B). That is not, as Aurelius insists (at 27), "a veneer of discretion." It is *real* discretion because it provides several

_____

[15] Aurelius also erroneously argues that the President's discretion was practically constrained by subsection 2121(e)(2)(G), which directed the President to "appoint an individual from the list for the current vacant category by September 16, 2016," if he had not already made an appointment by September 1, 2016. But there is *no evidence whatsoever* that the President felt bound to choose from the recommendatory congressional lists. Indeed, all publicly available information points in the opposite direction: The President did not issue a signing statement objecting to the appointment mechanism or, more specifically, subsection 2121(e)(2)(G). Other Presidents, by contrast, have issued signing statements protesting Congress's enactment of laws involving list-based appointment mechanisms that they have thought unconstitutional. *See, e.g.*, Statement by President George H.W. Bush on Signing the National and Community Service Act of 1990, 2 Pub. Papers 1613 (Nov. 16, 1990). Even more tellingly, the President did not invoke the option provided in subsection 2121(e)(2)(C), which allows the recommenders to submit supplemental lists if the President is unsatisfied with his original options. What is more, when the President announced the appointment of the current Board members, he praised their "broad range of skills and experiences" and the "breadth and depth" of their knowledge. President Obama Announces the Appointment of Seven Individuals to the Financial Oversight and Management Board for Puerto Rico, https://obamawhitehouse.archives.gov/the-press-office/2016/08/31/president-obama-announces-appointment-seven-individuals-financial. In any event, because Aurelius cannot show that any harm arose from the recommendatory list provision, it has no standing to challenge it. *See Federal Election Comm'n v. NRA Political Victory Fund*, 6 F.3d 821, 824 (D.C. Cir. 1993) ("[A]ppellant's challenge to the alleged restriction on the President's appointment power to select more than three commissioners from one party is not justiciable. . . . [I]t is impossible to determine in this case whether the *statute* actually limited the President's appointment power. Appellants do not argue, nor can we assume, that the President wished to appoint more than three members of one party and was restrained by FECA from doing so.").

Aurelius's contentions about the Senate hypothetically providing unacceptable recommendations and short Senate calendars (Br. at 27, 31-32) are also irrelevant to this Court's analysis. The Supreme Court has been clear that speculation about inter-branch dynamics should play no role in a separation-of-powers analysis. *E.g.*, *Bowsher*, 478 U.S. at 730 (the "separated powers of our Government cannot be permitted to turn on judicial assessment of whether an officer exercising executive power is on good terms with Congress"); *Noel Canning*, 134 S. Ct. at 2576 ("The Solicitor General asks us to engage in a more realistic appraisal of what the Senate actually did. . . . We do not believe, however, that engaging in [that] kind of factual appraisal . . . is either legally or practically appropriate.").

qualified options without requiring that the President choose any particular one.  PROMESA's
list mechanism, even if mandatory, cannot remotely be described as a "legislative designation,"
and Aurelius cites no case holding so.  *Myers v. United States*, 272 U.S. 52, 128 (1926).

What is more, Aurelius correctly recognizes (at 27) that Congress has the authority to
"prescribe qualifications for office."  *Myers*, 272 U.S. at 128.  But contrary to Aurelius's
contention (at 27), it makes no difference that *other* qualifications are set forth elsewhere in the
statute.  Obtaining the recommendation of the list-makers is an additional qualification that a
candidate must satisfy before being eligible for selection by the President.

At bottom, Aurelius's attack on PROMESA's list-based selection mechanism is premised
on a radical understanding of the Constitution and an incorrect understanding of history.
Aurelius's argument is built on a sweeping assertion (at 28) that "Congress cannot add any
restrictions to the President's appointment authority."  But all Aurelius cites to support this
inflexible position is an opinion concurring in the judgment.  *See* Br. 27 (citing *Pub. Citizen v.
U.S. Dep't of Justice*, 491 U.S. 440, 483 (1989) (Kennedy, J. concurring in the judgment)).
Aurelius cites no majority opinion from any court holding that Congress may not provide the
President with a slate of qualified candidates from which to choose.  And Aurelius underscores
the weakness of its position by wrongly describing this procedure as "unprecedented."  *Id*. at 30.
In fact, Congress has routinely enacted list-based appointment procedures, from the Council for
the Northwest Territories in 1789, 1 Stat. at 51-52 n.(a), to the Commission on Interoperable
Data Sharing in 2002, *see* 8 U.S.C. § 1723(b)(2), to the Board of Directors of the International
Clean Energy Foundation in 2007, *see* 42 U.S.C. § 17352.

And as noted above, Aurelius's arguments cannot be squared with the Board's
establishment under Article IV.  Much like the Sentencing Commission—whose members are
chosen from a list provided to the President by the Judicial Conference of the United States

because the Commission is part of the Judicial Branch, 28 U.S.C. § 991(a); *Mistretta*, 488 U.S. at

390—the Board is a part of the Commonwealth by virtue of Congress's exercise of its Article IV

powers.  That Article IV context ensures that the Board is not "part of the Executive Branch" in a

way that could arguably raise separation-of-powers concerns in other contexts.

In the end, PROMESA's list-based procedure does not transgress the only Appointments

Clause line that the Supreme Court has drawn regarding congressional lists in an actual honest-

to-goodness majority opinion.  In *Metropolitan Washington Airports Authority v. Citizens for

Abatement of Aircraft Noise, Inc. (MWAA)*, 501 U.S. 252 (1991), the Court found a list-based

appointment procedure to be unconstitutional because "appointments *must* be made from the

lists, and there is no requirement that the lists contain more recommendations than the number of

Board openings."  *Id*. at 268.  But *both* of those requirements are absent here.  As explained

above, the permissive language in the statute ensures that appointments need not be made from

the lists.  Further, the lists contain more recommendations than Board openings, and PROMESA

gives the list-makers the opportunity to supplement their lists if the President is not willing to

make a selection from the original list.  48 U.S.C. § 2121(e)(2)(C).  The presence of *one* of these

features would be sufficient to place PROMESA's list-based appointment procedures on the

constitutionally-permissible side of the *MWAA* line.   That both are present cinches the

conclusion that PROMESA's mechanism does not offend the Appointments Clause.

## IV. AURELIUS'S PROPOSED RELIEF IS INCONSISTENT WITH WELL-ESTABLISHED LAW

Even if this Court concludes that the Board was unconstitutionally appointed, it should

not grant Aurelius's requested relief.  Aurelius's proposed Order (Order ¶ 5) specifically takes

issue with the "instigat[ion of] this Title III case."  Insisting that the Title III petition is "void ab

initio" (*id.*), Aurelius asks this Court to dismiss it.  But this relief is drastic and premature, and it

is inconsistent with the way courts have previously remedied Appointments Clause violations.

*First*, it is well established that "vacatur of past actions" by an unconstitutionally appointed entity "is not routine." *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1133 (D.C. Cir. 2017). Courts around the country "have often accorded validity to past acts of unconstitutionally structured governmental agencies." *Id.* In *Buckley v. Valeo*, 424 U.S. 1, 142 (1976), for example, the Supreme Court "accorded de facto validity" to the past actions of the Federal Election Commission, even though the Commission's members had been selected in violation of the Appointments Clause. And just this summer, a district court recognized the same *de facto* validity principle in connection with prior actions of an allegedly unconstitutionally appointed entity. *See Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-cv-101, 2017 WL 3380530, at *18 (M.D. Pa. Aug. 4, 2017). In the intervening forty years, numerous courts have taken the same approach.[16]

This Court should do the same here. The actions that Aurelius seeks to dismiss as "void ab initio" are precisely the kinds of past acts that courts have granted *de facto* validity. Indeed, it would be unusually disruptive to annul the Title III petition in this and other cases, given the extraordinary amount of resources the Board and the judiciary have already devoted to them. *See supra* pp. 6-7. What is more, voiding the Board's past actions could not be limited to the Title III cases. Fiscal Plans, the Budget, and other measures the Board has taken to stabilize the Puerto Rican economy would be voidable as well. Because Aurelius's relief would cause

---

[16] *See, e.g.*, *Citizens for Abatement of Aircraft Noise, Inc. v. Metro. Wash. Airports Auth.*, 917 F.2d 48, 57 (D.C. Cir. 1990) ("We direct, however, that actions taken by the Board to this date not be invalidated automatically on the basis of our decision."), *aff'd*, 501 U.S. 252 (1991); *In re Application of President's Comm'n on Organized Crime*, 763 F.2d 1191, 1202 (11th Cir. 1985) (Fay, J., writing separately) ("[O]ur holding regarding the separation of powers doctrine does not require the voiding" of a Commission subpoena); *id.* (Roney, J., specially concurring) (same); *Lindsey v. Ipock*, 732 F.2d 619, 623 n.3 (8th Cir. 1984) ("A decision holding a statute prospectively unconstitutional means that the statute is given de facto validity prior to the decision.").

massive disruption to the existing Title III cases—as well as the economic health of Puerto Rico—this Court should follow *Buckley*'s judicious approach of providing only prospective relief if it determines that PROMESA violates the Appointments Clause.

In addition to treating the Board's prior actions as *de facto* valid, this Court should grant a "limited stay" of its mandate if it finds the Board unconstitutional, as the Court did in *Buckley*. 424 U.S. at 143. This would either allow the President to re-appoint members consistent with the Court's opinion or "afford Congress an opportunity to reconstitute [the Board] by law or to adopt other valid enforcement mechanisms without disrupting the enforcement of the provisions" that Aurelius has not challenged, "allowing the present [Board] in the interim to function de facto in accordance with the substantive provisions of the Act." *Id.* Not only would a stay permit the other branches to address any errors they may have made in the past, but it will allow a reconstituted Board to consider and ratify the past actions of the current Board. *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 118 (D.C. Cir. 2015).

*Second*, although Aurelius does not seek relief other than the dismissal of its own Title III petition, a decision finding the current Board to be unconstitutionally appointed would have a range of consequences that must be considered. Consistent with the Supreme Court's practice, this Court should craft a prospective remedy that "'limit[s] the solution to the problem.'" *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) (citation omitted)). Here, the alleged Appointments Clause problem is found in 48 U.S.C. § 2121(e)(2)(E), which provides:

> With respect to the appointment of a Board member in Category A, B, C, D, or E, such an appointment shall be by and with the advice and consent of the Senate, unless the President appoints an individual from a list, as provided in this subsection, in which case no Senate confirmation is required.

If this Court finds an Appointments Clause violation, it should sever the statutory language

beginning with the word "unless."  The provision would then require the President to seek advice and consent.  This "'partial, rather than facial invalidation is the required course,'" *Free Enter. Fund*, 561 U.S. at 508 (citation omitted), because PROMESA would remain "'fully operative as a law'" with this language excised, and because there is no evidence that Congress would not have enacted PROMESA without that language, *id*. (citation omitted).  PROMESA's severability provision is clear evidence to the contrary.  *See* 48 U.S.C. § 2102.  And nothing in the statute's text or historical context "makes it 'evident' that Congress, faced with the limitations imposed by the Constitution, would have preferred no Board at all to a Board" whose members must be submitted to the Senate for advice and consent.  *Id*. at 509 (citation omitted).  In fact, the excised language itself indicates that Congress intended to *allow* the President to submit these candidates for advice and consent—it simply did not "require[]" the President to take that course.[17]

For the reasons stated above, this Court need not reach these remedial questions because the Board was properly appointed.  But if this Court holds otherwise, these prudent retrospective and prospective remedial measures are most consistent with Congress's goal of effectively resolving the "territorial crisis" that lead to PROMESA's enactment.  48 U.S.C. § 2194(m)(5).

## CONCLUSION

For the foregoing reasons, Aurelius's motion to dismiss should be denied.

---

[17] This Court need not even formally sever the offending language.  It can interpret the provision to permit the President to submit future Board nominees for Senate advice and consent, and indicate that the failure to do so would be an as-applied Appointments Clause violation.  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality." (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895))).

Dated: November 3, 2017
San Juan, Puerto Rico

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
Ubaldo M. Fernández
USDC No. 224807
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944
Email: hermann.bauer@oneillborges.com
        ubaldo.fernandez@oneillborges.com


*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr. (p*ro hac vice*)
Ginger D. Anders (p*ro hac vice*)
Chad I. Golder (p*ro hac vice*)
Sarah G. Boyce (p*ro hac vice*)
Adele M. El-Khouri (p*ro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
1155 F Street N.W., Seventh Floor
Washington, D.C. 20004-1357
Tel:  (202) 220-1100
Fax:  (202) 220-2300
Email: Donald.Verrilli@mto.com
        Ginger.Anders@mto.com
        Chad.Golder@mto.com
        Sarah.Boyce@mto.com
        Adele.El-Khouri@mto.com


*/s/ Martin J. Bienenstock*
Martin J. Bienenstock (*pro hac vice*)
Stephen L. Ratner  (*pro hac vice*)
Timothy W. Mungovan (*pro hac vice*)
Mark D. Harris (*pro hac vice*)
Chantel L. Febus (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email:  mbienenstock@proskauer.com
        sratner@proskauer.com
        tmungovan@proskauer.com
        mharris@proskauer.com
        cfebus@proskauer.com

*Attorneys for The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s <u>Hermman D. Bauer</u>*
Hermann D. Bauer
