Hearing Date and Time: January 10, 2018, 11:00 a.m. AST

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>               Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## OBJECTION OF OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO TO MOTION OF AURELIUS TO DISMISS TITLE III PETITION

---

[1] The Debtors in these jointly-administered PROMESA Title III Cases, along with each Debtor's respective Title III Case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are: (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric and Power Authority  (Bankruptcy Case No. 17 BK 4780) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as bankruptcy case numbers due to software limitations).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

BACKGROUND ...................................................................................................... 3

ARGUMENT ........................................................................................................... 5

I.     THE   APPOINTMENTS   CLAUSE   DOES   NOT   APPLY   TO   THE
       APPOINTMENT   OF   TERRITORIAL   OFFICIALS   LIKE   THE   FOMB
       MEMBERS. ................................................................................................... 5

       A.     Supreme Court Precedent Makes Clear that Structural Constitutional
              Limitations Such as the Appointments Clause Do Not Apply to the
              Appointment of Territorial Officials .................................................... 6

       B.     Historical Practice Confirms that the Appointments Clause Does Not Apply
              to the Appointment of Territorial Officials ......................................... 13

              1.     Congressional practice confirms that the Appointments Clause does
                     not apply to the appointment of territorial officials. .................. 13

              2.     The Executive Branch has long maintained that territorial officials
                     are not subject to the Appointment Clause. ............................... 18

       C.     Exempting Territorial Officials from the Appointments Clause Is Consistent
              With the Constitutional Design ........................................................... 20

II.    AURELIUS'S   CLAIM   THAT   ONLY   SOME   SELECT   TERRITORIAL
       OFFICIALS ARE SUBJECT TO THE APPOINTMENTS CLAUSE FAILS. ............... 22

       A.     An Officer's Method of Selection Does Not Determine Whether the
              Appointments Clause Applies ............................................................. 23

       B.     Neither the Level of Federal Oversight Nor the Nature of the Functions
              Performed Distinguishes Board Members from Other Territorial Officials .......... 29

III.   EVEN IF THE CLAUSE APPLIES, AURELIUS'S MOTION SHOULD BE
       DENIED. ...................................................................................................... 32

       A.     FOMB Members Are Not Principal Officers, or Officers at all. .......................... 32

       B.     A Claim that Congress Infringed the President's Nominating Authority Is
              Nonjusticiable. .................................................................................... 33

       C.     Aurelius's Proposed Remedy Is Inappropriate. ....................................... 34

CONCLUSION..............................................................................................................35

# TABLE OF AUTHORITIES

CASES

*American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511 (1828)................................................8, 9

*Atchison, Topeka, & Santa Fe Railway Co. v. Sowers*, 213 U.S. 55 (1909) ................................18

*Balzac v. Porto Rico*, 258 U.S. 298 (1922)........................................................................7, 9, 28

*Barnes v. District of Columbia*, 91 U.S. 540 (1875)......................................................................23

*Benner v. Porter*, 50 U.S. 235 (1850) ..............................................................7, 8, 9, 19, 25

*Binns v. United States*, 194 U.S. 486 (1904) ...........................................................................7, 17

*Bowsher v. Synar*, 478 U.S. 714 (1986)...............................................................................19, 33

*Buckley v. Valeo*, 424 U.S. 1 (1976) .................................................................5, 11, 12, 24, 35

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937)........................................7, 8, 10

*Department of Transportation v. Association of American Railroads*, 135 S. Ct. 1225 (2015)....................................................................................................................30

*Downes v. Bidwell*, 182 U.S. 244 (1901) ..............................................................................9, 11

*Edmond v. United States*, 520 U.S. 651 (1997) ...........................................................................24

*El Paso & Northeastern Railway Co. v. Gutierrez*, 215 U.S. 87 (1909) ........................................8

*Examining Board of Engineers, Architects, & Surveyors v. Flores de Otero*, 426 U.S. 572 (1976)....................................................................................................................7

*FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993) .........................................33, 34

*First National Bank v. Yankton County*, 101 U.S. 129 (1879) .................................................7, 31

*Freytag v. Commissioner*, 501 U.S. 868 (1991) .................................................9, 11, 12, 17, 24, 32

*Glidden Co. v. Zdanok*, 370 U.S. 530 (1962) ..............................................................................29

*Grafton v. United States*, 206 U.S. 333 (1907).............................................................................26

*Hobson v. Hansen*, 265 F. Supp. 902 (D.D.C 1967).........................................................12, 13, 21

*Hornbuckle v. Toombs*, 85 U.S. (18 Wall.) 648 (1873) ............................................................9, 30

*Howard v. United States*, 22 Ct. Cl. 305 (1887) .........................................................................19

iii

*In re Hennen*, 38 U.S. (13 Pet.) 230 (1839) .......................................................................12

*Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 796 F.3d
111 (D.C. Cir. 2015) ....................................................................................................35

*Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995) ...........................30

*Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892) ..................................................10

*McConaughey v. Morrow*, 263 U.S. 39 (1923)..............................................................16

*Metropolitan Railroad Co. v. District of Columbia*, 132 U.S. 1 (1889) ..........12, 23, 24, 26, 27, 30

*Mistretta v. United States*, 488 U.S. 361 (1989) ....................................................14, 33

*Morrison v. Olson*, 487 U.S. 654 (1988) .....................................................................32

*Myers v. United States*, 272 U.S. 52 (1926)..................................................................31

*NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014) ..........................................................14

*National Committee of Reform Party of United States v. Democratic National
Committee*, 168 F.3d 360 (9th Cir. 1999) ...................................................................34

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50
(1982)................................................................................................................7, 11, 12, 35

*O'Donoghue v. United States*, 289 U.S. 516 (1933)..........................................13, 27, 29

*Palmore v. United States*, 411 U.S. 389 (1973)..............................8, 9, 11, 19, 20, 29, 30

*Puerto Rico v. Franklin California Tax-Free Trust*, 136 S. Ct. 1938 (2016).................3

*Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863 (2016) ...........................................20, 21

*Ryder v. United States*, 515 U.S. 177 (1955) ...............................................................35

*Sere v. Pitot*, 10 U.S. (6 Cranch) 332 (1810) .................................................................7

*Simms v. Simms*, 175 U.S. 162 (1899) ............................................................................7

*Snow v. United States*, 118 U.S. 346 (1886) ....................................................17, 25-26, 31

*Talbott v. Board of Commissioners of Silver Bow County*, 139 U.S. 438 (1891).........31

*Techworld Development Corp. v. District of Columbia Preservation League*, 648
F. Supp. 106 (D.D.C. 1986), *vacated on other grounds*, No. 86-5630, 1987
WL 1367570 (D.C. Cir. Aug. 5, 1987) ....................................................13, 18, 22

*United States ex rel. Goodrich v. Guthrie*, 58 U.S. 284 (1854)....................................19

*United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993)..........................24

*United States v. Hartwell*, 73 U.S. (6 Wall.) 385 (1867).............................................27

*United States v. Heinszen*, 206 U.S. 370 (1907).........................................................10

*United States v. Hilario*, 218 F.3d 19 (1st Cir. 2000).................................................32

*United States v. Kagama*, 118 U.S. 375 (1886)...........................................................26

*United States v. Wheeler*, 435 U.S. 313 (1978), *superseded by statute on other
  grounds as recognized by United States v. Lara*, 541 U.S. 193 (2004)...................26

*Whitman v. American Trucking Associations*, 531 U.S. 457 (2001) ...........................10

*Wise v. Withers*, 7 U.S. (3 Cranch) 331 (1806)...........................................................27

CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const., art. I, § 8, cl. 17......................................................................................8

U.S. Const. art. II, § 2, cl. 2 ..............................................................................5, 17, 22

U.S. Const. art. IV, § 3, cl. 2 .......................................................................................6

48 U.S.C. § 771 (Supp. II 1948) ................................................................................18

48 U.S.C. § 771 (1946) ..............................................................................................18

48 U.S.C. § 1422 ........................................................................................................18

48 U.S.C. § 1591 ...................................................................................................18, 31

48 U.S.C. § 2121 ...................................................................................3, 4, 5, 6, 29, 32

48 U.S.C. § 2124 ....................................................................................................4, 35

48 U.S.C. § 2127 .........................................................................................................4

48 U.S.C. § 2141 .........................................................................................................4

48 U.S.C. § 2142 .........................................................................................................4

48 U.S.C. § 2143 .........................................................................................................4

48 U.S.C. § 2144 .........................................................................................................4

48 U.S.C. § 2149 ........................................................................................................32

An Act further providing for the government of the territory of Orleans, § 1, 8th
Cong. ch. 23, 2 Stat. 322, 322 (Mar. 2, 1805).........................................................16

An Act Making appropriations for the support of the Army for the fiscal year
ending June thirtieth, nineteen hundred and two, 56th Cong. ch. 803, 31 Stat.
895, 910 (Mar. 2, 1901) ...........................................................................................15

An act to authorize the President of the United States to take possession of East
and West Florida and establish a temporary government therein, 15th Cong.
ch. 93, § 1, 3 Stat. 523, 524 (Mar. 3, 1819) ...........................................................15

An Act to enable the President of the United States to take possession of the
territories ceded by France to the United States, by the treaty concluded at
Paris, on the thirtieth of April last; and for the temporary government thereof,
8th Cong. ch. 1, § 2, 2 Stat. 245 (Oct. 31, 1803) ...................................................14

An Act to provide for the Government of the Territory North-west of the River
Ohio, 1st Cong. ch. 8, 1 Stat 50, 52 n.a (Aug. 7, 1789).............................16, 17, 28

An Act To provide for the temporary government of the Canal At Panama, the
protection of the canal works, and for other purposes, Pub. L. No. 58-190, ch.
1758, § 2, 33 Stat. 429, 429 (Apr. 28, 1904) .........................................................15

Act of Aug. 5, 1947, Pub. L. No. 80-362, ch. 490, § 1, 61 Stat. 770, 770-71 ...............17

**OTHER AUTHORITIES**

13 Annals of Cong. (1803).........................................................................................10, 15

Amicus Brief of United States, *Nguyen v. United States*, 539 U.S. 69 (2003) (No.
01-10873), 2003 WL 548057.................................................................................12, 20

*The Constitutional Separation of Powers Between the President and Congress*, 20
Op. O.L.C. 124 (1996).................................................................................................26

David P. Currie, *The Constitution in Congress: The Jeffersonians 1801-1829*
(2001)...............................................................................................................10, 28, 29

*Employees Compensation Act—Assistant United States Attorney*, 31 Op. Att'y
Gen. 201 (1918) ...........................................................................................................28

The Federalist No. 76 (Alexander Hamilton) (Clinton Rossiter ed., 1961)....................17

Gary Lawson, *Territorial Governments and the Limits of Formalism*, 78 Cal. L.
Rev. 853 (1990) ...........................................................................................................11

Memorandum for the Secretary of War, in Hearings on S. 4604 before the Senate
Committee on Pacific Islands and Porto Rico, 63d Cong., 2d Sess. (1914)..............20

*Officers of the United States Within the Meaning of the Appointments Clause*,
  2007 WL 1405459 (O.L.C. Apr. 16, 2007) ..............................................24, 25, 26, 27, 28, 33

Press Release, White House, President Obama Announces the Appointment of
  Seven Individuals to the Financial Oversight and Management Board for
  Puerto Rico (Aug. 31, 2016), http://bit.ly/2vLQRnH ..............................................................5

3 Joseph Story, *Commentaries on the Constitution of the United States* § 1319 (1st
  ed. 1833) .................................................................................................................................9

*Territorial Judges Not Liable to Impeachment*, 3 Op. Att'y Gen. 409 (1839) .......................13, 19

The Title To Certain Lands in Louisiana, 4 Op. Att'y Gen. 643 (1847) ......................................15

The Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "**Retiree Committee**") respectfully submits this opposition to the Motion of Aurelius to Dismiss Title III Petition ("**Aurelius Mot.**"), filed by Aurelius Investment, LLC, Aurelius Opportunities Fund, LLC, and Lex Claims, LLC ("**Aurelius**"), on August 7, 2017 (*see* Dkt. 913).

## INTRODUCTION

Facing a fiscal emergency in Puerto Rico and the prospect of imminent economic chaos, Congress enacted PROMESA—the Puerto Rico Oversight, Management, and Economic Stability Act—in bipartisan fashion to stabilize Puerto Rico's economy, gain control over the Island's crushing debt, and create a path for restructuring that Congress deemed essential for Puerto Rico's return to economic health.  A centerpiece of the Act was the creation of the Financial Oversight and Management Board (the "**FOMB**" or "**Board**").  Congress established the Board as an "entity within the territorial government of Puerto Rico," with authority over Puerto Rico's financial affairs and a mission to achieve fiscal responsibility and ensure Puerto Rico's continued access to the capital markets.  Consistent with the bipartisan approach to the legislation, Congress enacted provisions designed to encourage the President to appoint Board members reflecting the interests and concerns of all parties.  The President strongly supported the legislation, and he appointed Board members consistent with the process Congress designed.  With the Board's leadership, PROMESA has worked as Congress intended, as Puerto Rico has taken critical initial steps to restore financial stability.

Aurelius now moves this Court to terminate the Board and these proceedings on the ground that the Board's appointment did not comply with the Appointments Clause.  As Aurelius would have it, the Board members are principal officers of the United States, so Congress and the President had no choice but to appoint them as the President would appoint (for example) members of his Cabinet.  That argument is fundamentally misguided.  Congress created the Board pursuant

to its expansive authority under the Territory Clause of Article IV of the Constitution, and both precedent and history establish that the Appointments Clause does not apply when Congress, acting pursuant to this plenary power, provides for the appointment of territorial officials exercising authority in the territories.

The Supreme Court has routinely held, for example, that structural constitutional limitations akin to the Appointments Clause—Article III and various separation-of-powers principles—do not apply when Congress legislates for the territories.  And, from the time of the Framing, Congress has devolved such local autonomy to U.S. territories as Congress deemed warranted at any given time, free from structural constraints such as the Appointments Clause.  Thus, Congress has allowed territories including Puerto Rico to elect their own leaders, consistent with the Constitution's preference for a Republican form of government and Congress's plan for most territories to eventually become States.  In other instances, Congress has authorized the President acting alone to immediately erect temporary territorial governments in newly annexed, and often far-flung, territories—rather than waiting for the lengthy Senate confirmation process or hastily calling a popular election.

Aurelius seeks to evade these precedents by claiming that some (but not all) structural constraints apply to some (but not all) territorial officials in some (but not all) circumstances.  According to Aurelius, Congress thus does not violate the Constitution when it provides for territorial officials to be appointed via direct election; and Congress apparently may bypass the Appointments Clause when providing for the appointment of officers for temporary territorial governments but not for ongoing ones.  But nothing in the Constitution permits Aurelius's a la carte approach to limiting Congress's authority over the territories, and indeed Supreme Court precedent, common sense, and historical practice refute it.

In short, the Framers understood that they could not possibly anticipate the unique local histories and needs of all territories the new Nation might acquire, and they thus wrote the Territory Clause to give Congress broad leeway in its exercise of the full measure of legislative authority over these lands, freed from structural constraints such as the Appointments Clause. The enactment of PROMESA to meet the emergency conditions in Puerto Rico shows the wisdom of that approach. Contrary to the contentions of Aurelius, the Appointments Clause does not limit Congress's authority here. The Board was constitutionally created, and the motion to dismiss should be denied.

## BACKGROUND

As this Court knows, in the spring of 2016, Puerto Rico was "in the midst of a fiscal crisis." *Puerto Rico v. Franklin California Tax-Free Tr.*, 136 S. Ct. 1938, 1942 (2016). A lengthy economic recession had shrunk the government's revenue base, requiring the government to borrow extensively to cover its basic expenses. By 2014, "ratings agencies downgraded Puerto Rican bonds ... to noninvestment grade," "severely compromis[ing]" the Island's "access to capital markets." *Id.* By 2016, the Island was quickly exhausting its resources, and its ability to provide basic services—much less to make payments on its outstanding debt—was increasingly in doubt. And in June of that year, the Supreme Court struck down as preempted Puerto Rico's attempt to restructure its finances via territorial legislation, concluding that the Commonwealth had to "wait for possible congressional action to avert the consequences of [its] fiscal crisis." *Id.* at 1949.

Recognizing the gravity of Puerto Rico's situation, Congress invoked its authority under Article IV of the Constitution and passed the Puerto Rico Oversight, Management, and Economic Stability Act ("**PROMESA**") on a bipartisan vote. PROMESA created the FOMB, an entity with authority over Puerto Rico's financial affairs and a mission to allow Puerto Rico "to achieve fiscal responsibility and access to the capital markets." 48 U.S.C. § 2121(a). The FOMB is "an entity

3

within the territorial government" of Puerto Rico, and "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government." *Id.* § 2121(c). Accordingly, the FOMB is funded by Puerto Rico, not Congress. *Id.* § 2127. And its powers are limited to Puerto Rico: it wields authority over Puerto Rico's budget, *id.* §§ 2121(d)(1)(B), 2141-2144, is granted access to Puerto Rico's records, *id.* § 2124(c)(2), can enforce, reject or rescind certain Puerto Rican laws, *id.* §§ 2124(h), 2144(a), 2144(c), and can file certain restructuring documents on behalf of Puerto Rico, *id.* § 2124(j). It has none of these powers outside of Puerto Rico. And to the limited extent the FOMB may exercise authority over *individuals* located outside Puerto Rico—like the territory's creditors—it can do so only because those individuals have availed themselves of the territory's laws. *See, e.g.*, *id.* § 2124(f) (subpoena power of Board limited to individuals within personal jurisdiction of Puerto Rican courts); *id.* § 2124(o) (Board can investigate disclosure and selling practices only of individuals selling Puerto Rico bonds).

The FOMB has seven members, *id.* § 2121(e)(1)(A), removable by the President "only for cause." *Id.* § 2121(e)(5)(B). The President selects each member. One "may be selected in the President's sole discretion." *Id.* § 2121(e)(2)(A)(vi). The remaining six may be selected from lists submitted by various congressional officers. *Id.* § 2121(e)(2)(A)(i)-(v). To select the first four members, the President may select one from each of four lists, each containing "at least three individuals." *Id.* § 2121(e)(2)(B)(i), (iii)-(iv). The President may select the remaining two members from a list containing "at least four individuals." *Id.* § 2121(e)(2)(B)(ii).

Under the statute, the President is not required to select from these lists. If the President rejects the initial list of names, the congressional officer who "submitted [the] list may supplement" it "with additional names." *Id.* § 2121(e)(2)(C). If the President still declines to select from that list, he can nominate a different candidate, whose "appointment shall be by and

with the advice and consent of the Senate." *Id.* § 2121(e)(2)(E). "[I]n the event any of the 7 members" had "not been appointed by September 1, 2016," PROMESA required "the President [to] appoint an individual from the list for the current vacant category by September 15, 2016," assuming those individuals met the requisite qualifications. *Id.* § 2121(e)(2)(G).

Before September 1, 2016, the President duly appointed individuals from the lists submitted by officers of Congress. *See* Press Release, White House, President Obama Announces the Appointment of Seven Individuals to the Financial Oversight and Management Board for Puerto Rico (Aug. 31, 2016), http://bit.ly/2vLQRnH. Far from decrying his inability to select nominees of his choosing, President Obama stated: "With a broad range of skills and experiences, these officials have the breadth and depth of knowledge that is needed to tackle this complex challenge and put the future of the Puerto Rican people first." *Id.*

## ARGUMENT

## I.     THE APPOINTMENTS CLAUSE DOES NOT APPLY TO THE APPOINTMENT OF TERRITORIAL OFFICIALS LIKE THE FOMB MEMBERS.

The Appointment Clause states:

> He [the President] ... shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. "[A]n 'Officer of the United States'" is "any appointee exercising significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam). Officers who are not "Officers of the United States" may, as relevant here, "perform duties only in aid of those functions that Congress may carry out by itself.'" *Id.* at 138-39. Thus, where the Clause applies, any individual "exercising significant authority pursuant to

the laws of the United States" and not "perform[ing] duties only in aid of those functions that Congress may carry out by itself" is an "Officer of the United States" who must be appointed pursuant to the Appointments Clause. Aurelius asserts that the Appointments Clause applies here, and that members of the FOMB are "Officers of the United States" subject to the Clause's requirements. *See* Aurelius Mot. 13-23.

Aurelius is wrong. Critically, the Board members here are territorial officials. Congress expressly stated in PROMESA that the Board was created pursuant to Congress's authority over Puerto Rico under the Territory Clause of Article IV of the Constitution, *see* 48 U.S.C. § 2121(b)(2) (PROMESA enacted "pursuant to article IV, section 3 of the Constitution"), and Congress designated the Board "an entity within the territorial government" of Puerto Rico, rather than "a department, agency, establishment, or instrumentality of the Federal Government," *id.* § 2121(c). Consistent with that designation, the Board is funded by Puerto Rico, and its authority is confined to Puerto Rico. *See supra* at 3-4.

Aurelius contends that is of no moment—as Aurelius sees it, the Appointments Clause applies to territorial officials like the Board members, just as it applies to members of the President's Cabinet. But as detailed below, precedent, history, and the design of Article IV refute that argument. The Appointments Clause has no application here.

### A.     Supreme Court and Other Precedent Makes Clear that Structural Constitutional Limitations Such as the Appointments Clause Do Not Apply to the Appointment of Territorial Officials.

Article IV, Section 3 of the Constitution provides that "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory … belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. When Congress, acting pursuant to this power, provides for the appointment of officers exercising authority only in the territories—that is,

territorial officials—the Appointments Clause does not apply.

The Territory Clause is the most expansive grant of authority to Congress in the Constitution, and the Supreme Court has interpreted it as such.  Chief Justice Marshall first described Congress's territorial authority as "the absolute and undisputed power of governing and legislating."  *Sere v. Pitot*, 10 U.S. (6 Cranch) 332, 337 (1810).  In the territories, "Congress has the entire dominion and sovereignty, national and local, Federal and state, and has full legislative power over all subjects upon which the legislature of a state might legislate within the state." *Simms v. Simms*, 175 U.S. 162, 168 (1899); *First Nat'l Bank v. Yankton Cty.*, 101 U.S. 129, 133 (1879) (Congress "has full and complete legislative authority over the people of the Territories and all the departments of the territorial governments").  These powers are "practically unlimited," *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 317-18 (1937), "broad," *Examining Board of Engineers, Architects, & Surveyors v. Flores de Otero*, 426 U.S. 572, 586 n.16 (1976), and "plenary," *Binns v. United States*, 194 U.S. 486, 491 (1904).  Such an "exceptional grant of power" is "obviously different in kind from the other broad powers conferred on Congress."  *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 70, 76 (1982) (plurality op.).

As a result, Congress faces fewer constitutional constraints when it legislates pursuant to the Territory Clause.  *Cincinnati Soap*, 301 U.S. at 323 (laws regarding territories "not subject to the same restrictions" as "laws for the … political body of states in union"); *Balzac v. Porto Rico*, 258 U.S. 298, 312 (1922) (only "fundamental" constitutional rights apply in Puerto Rico).  In the territories, Congress combines "the powers of both the Federal and State authorities," and so its power is not "subject to the constitutional provisions in respect to State and Federal jurisdiction." *Benner v. Porter*, 50 U.S. 235, 242 (1850).  Likewise, territorial governments are not "organized under the Constitution," and so are not "subject to its complex distribution of the powers of

government." *Id.*  In short, constitutional provisions "which are applicable where laws of national applicability and affairs of national concern are at stake, must in proper circumstances give way to accommodate" Article IV's "plenary grant[] of power to Congress to legislate with respect to specialized areas having particularized needs and warranting distinctive treatment." *Palmore v. United States*, 411 U.S. 389, 408 (1973).

The Appointments Clause is one of the constitutional "restrictions" to which "Congress in legislating is not subject" when "dealing with the territories." *Cincinnati Soap*, 301 U.S. at 323. To be sure, the Supreme Court has not squarely addressed whether territorial officials are subject to the Appointments Clause.  But the Court has held that analogous structural constitutional restrictions do not restrain Congress's authority under the Territory Clause.  And the courts that have addressed Congress's analogous authority to provide for officers in the District of Columbia, *see* U.S. Const., art. I, § 8, cl. 17; *El Paso & N.E. Ry. Co. v. Gutierrez*, 215 U.S. 87, 94 (1909) (equating "[t]he legislative power of Congress over the District of Columbia and the territories" as both "being plenary"), have concluded that the Appointments Clause does not apply to the appointment of D.C. officials.

*Analogous limitations*.  In a line of precedent dating to the early 19th century, the Supreme Court has held that structural limitations of the Constitution—Article III and various separation-of-powers principles—do not apply to Congress's creation of territorial officials.  The logic of these decisions implies that the Appointments Clause likewise does not apply.

*First*, the Supreme Court has long held that the appointment of territorial judges need not comply with Article III.  In *American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511 (1828), the Court held that territorial courts could exercise admiralty jurisdiction—within Article III's

exclusive province in the States—despite not having life tenure as Article III required, because the structural safeguards of Article III *did not apply* to the creation of territorial courts:

> These Courts, then, *are not constitutional Courts* ….  They are *legislative Courts*, created … in virtue of that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States.   The jurisdiction with which they are invested, is not a part of that judicial power which is defined in the 3d article of the Constitution, but is conferred by Congress, in the execution of those general powers which that body possesses over the territories of the United States.  Although admiralty jurisdiction can be exercised in the states in those Courts, only, which are established in pursuance of the 3d article of the Constitution, *the same limitation does not extend to the territories*.

*Id.* (emphases added).  "[*Canter*] has ever since been accepted as authority for the proposition that the judicial clause of the Constitution has no application to courts created in the territories, and that with respect to them Congress has a power wholly unrestricted by it."  *Downes v. Bidwell*, 182 U.S. 244, 267 (1901) (opinion of Brown, J.); *see Palmore*, 411 U.S. at 403 (*Canter* reflects "the consistent view" of the Supreme Court); *Balzac*, 258 U.S. at 312; *Hornbuckle v. Toombs*, 85 U.S. (18 Wall.) 648, 655 (1873).

*Second*, the Supreme Court has routinely affirmed that Congress when legislating for the territories may act in ways that would ordinarily violate separation-of-powers principles.  "[T]he form of government established in the territories depends exclusively upon the discretion of congress[,] ... [which] may confer on it such powers, legislative, judicial, and executive, as they may deem best."  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1319 (1st ed. 1833).   Accordingly, "Congress may endow territorial governments with a plural executive; it may allow the executive to legislate; it may dispense with the legislature or judiciary altogether"; all of which would ordinarily violate the separation of powers.  *Freytag v. Commissioner*, 501 U.S. 868, 914 (1991) (Scalia, J., concurring in part and concurring in the judgment); *see Benner*, 50 U.S. at 242 (territorial governments not "organized under the Constitution, nor subject to its complex distribution of the powers of government").  Historical

practice confirms the point:  In the early 19th century, Congress "seemed to recognize in the territories neither the separation of powers, nor meaningful limitations on the delegation of congressional authority."  David P. Currie, *The Constitution in Congress: The Jeffersonians 1801-1829*, at 112 (2001).

Likewise, Congress can delegate legislative power to territorial governments even though Congress ordinarily cannot delegate legislative power "because no such power can be exercised other than through Congressional bicameralism and presentment."  Aurelius Mot. 14 n.8; *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).  Thus, the Supreme Court has held that Congress has a "comprehensive" "power of delegation to … a local [territorial] government." *Cincinnati Soap*, 301 U.S. at 322-23.  Indeed, Congress may delegate legislative powers even *to the President* when the latter acts in the territories, even though it is "universally recognized" that generally "[C]ongress cannot delegate legislative power to the president."  *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892); *see, e.g.*, *United States v. Heinszen*, 206 U.S. 370, 384-85 (1907) (Congress in the territories may "delegate to the President the legislative power of prescribing a tariff").  Congress has consistently done so since at least 1803, when Congress granted the President complete legislative authority within the territory of Louisiana, *see infra* at 14 n.3, over the objection that that delegation would violate separation-of-powers principles, *see* 13 Annals of Cong. 508 (1803) (Rep. Elliott objecting that territorial statute violated the principle that "the Constitution … not only precluded the President from exercising [legislative power], but likewise forbade our delegation of it to him").

That Article III and separation-of-powers principles do not apply to Congress's creation of offices in the territories strongly implies that the Appointments Clause likewise does not apply. As to Article III, even though Article IV does not explicitly grant Congress the authority to appoint

judges that do not comply with Article III, or even to appoint judges at all, the Court nevertheless has held that Article III's restrictions must "give way to accommodate" Article IV's "plenary grant of power to Congress to legislate" with respect to courts and judges in the territories. *Palmore*, 411 U.S. at 407-08; *N. Pipeline*, 458 U.S. at 70-71 (plurality op.). Similarly, even though Article IV does not explicitly grant Congress the authority to appoint territorial officials that do not comply with the Appointments Clause, or even to appoint territorial officials at all, *Canter* suggests that the Appointments Clause must "give way to accommodate" Congress's Article IV power. *Palmore*, 411 U.S. at 408. In the words of Justice Brown, "We must assume as a logical inference from [*Canter*] that the other powers vested in Congress by the Constitution have no application to these territories, or that the judicial clause is exceptional in that particular." *Downes*, 182 U.S. at 267 (opinion of Brown, J.); *see also* Gary Lawson, *Territorial Governments and the Limits of Formalism*, 78 Cal. L. Rev. 853, 894 (1990) ("If Congress can create queer-duck territorial judges who need not conform to the structural requirements of article III, why can't it also create queer-duck territorial executives who need not conform to the structural requirements of article II?").

The same is true for separation-of-powers principles. The Appointments Clause is but an express manifestation of those principles. *Freytag*, 501 U.S. at 882 ("The principle of separation of powers is embedded in the Appointments Clause."); *see also Buckley*, 424 U.S. at 124 (the "principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted"). It is thus untenable to insist that the Clause applies to the territories, even when the Court has held that separation-of-powers principles do not.

The Court's opinion in *Buckley* is instructive. There, the Court rejected the argument that Congress's plenary authority to regulate elections permitted it to appoint the Federal Election

Commission's members without complying with the Appointments Clause, *see* 424 U.S. at 131-33, but only because Congress's authority over elections was not "of such a wholly different nature from the other grants of authority to Congress that it may be employed in such a manner as to offend well-established constitutional restrictions stemming from the separation of powers." *Id.* at 132. Unlike Congress's elections authority, Congress's power over the territories *is* "of such a wholly different nature," *see Northern Pipeline*, 458 U.S. at 76 (plurality op.) (territorial power is "obviously different in kind from the other broad powers conferred on Congress"), and (as just explained) has been "employed in such a manner as to offend well-established constitutional restrictions stemming from the separation of powers." *Buckley*, 424 U.S. at 132. Accordingly, Congress need not comply with the Appointments Clause in legislating under Article IV.[1]

    *D.C. officials.* The federal courts' treatment of appointments to the government of the District of Columbia confirms this analysis. In 1889, the Supreme Court stated that "the mode of appointing officials" to D.C.'s municipal government involves "matters of legislative discretion." *Metro. R.R. Co. v. District of Columbia*, 132 U.S. 1, 8 (1889). Following that command, a three-judge district court later concluded that Congress could vest the appointment of D.C. Board of Education members in local judges, even if that did not comply with the Appointments Clause. *Hobson v. Hansen*, 265 F. Supp. 902, 906-11, 919 n.19 (D.D.C 1967). Because "Congress

---

[1] The Court in *Freytag* did not hold to the contrary. In *Freytag*, the Court stated that the "clerks" of "non-Article III territorial courts" were, "as of at least 1839, … 'inferior Officers' within the meaning of the Appointments Clause." *Freytag*, 501 U.S. at 892. But that was both dicta and a dubious historical assertion. *Freytag* relied exclusively on *In re Hennen*, 38 U.S. (13 Pet.) 230 (1839), which held that the clerk of an *Article III* court in the *State* of Louisiana was an "inferior Officer" under the Clause—a conclusion nobody disputes. *Id.* at 258. *In re Hennen* reasoned that such clerks must be inferior officers, because Congress had consistently given Article III courts the power to appoint them. *Id.* In passing, the Court mentioned that Congress had done so even prior to statehood. *Id.* But *In re Hennen* did not even purport to decide that clerks of *territorial* courts were inferior officers under the Clause. Indeed, just one month after *Hennen* was decided, Attorney General Grundy opined that territorial judges were *not* "Officers of the United States," without so much as mentioning *Hennen*. *See infra* at 18-19. That is no doubt why the U.S. Solicitor General could assure the Supreme Court, in a brief relying heavily on *Freytag*, that "this Court has never held that the Appointments Clause applies to the governance of the United States Territories." Amicus Br. of United States at 33, *Nguyen v. United States*, 539 U.S. 69 (2003) (No. 01-10873), 2003 WL 548057.

possesses … the powers of a state" in acting for D.C., *O'Donoghue v. United States*, 289 U.S. 516,

545 (1933), it could select any appointment procedure a State could select, including appointment

by judges. *Hobson*, 265 F. Supp. at 907-10. Twenty years later, a district court again held that the

Clause did not apply to D.C.'s City Council, and so the Clause did not prohibit the Council from

being popularly elected. *Techworld Development Corp. v. District of Columbia Preservation*

*League*, 648 F. Supp. 106, 116-17 (D.D.C. 1986), *vacated on other grounds*, No. 86-5630, 1987

WL 1367570 (D.C. Cir. Aug. 5, 1987). The Court reasoned that the Council members were not

"Officers of the United States" because they were acting "in aid of th[ose] functions that Congress

may carry out by itself"—given that Congress could itself legislate locally for D.C., *id.* at 116—

and they did not act "pursuant to any law of national application." *Id.* at 117. The reasoning of

these cases applies equally here. Just as it did for D.C., Congress, while exercising the full "powers

of a state," devised territory-specific local legislation to address a set of territory-specific local

concerns. In those circumstances, the Appointments Clause is no bar.

### B. Historical Practice Confirms that the Appointments Clause Does Not Apply to the Appointment of Territorial Officials.

History confirms that the Appointments Clause does not apply to the appointment of

territorial officials. Congressional practice dating to the 18th century demonstrates that Congress

has never thought itself bound by the Clause in exercising authority under Article IV. And the

Executive Branch has long concluded that territorial officials, even if Senate-confirmed, are

"merely Territorial officers," not "Officers of the United States." *Territorial Judges Not Liable to*

*Impeachment*, 3 Op. Att'y Gen. 409, 411 (1839).

#### 1. Congressional practice confirms that the Appointments Clause does not apply to the appointment of territorial officials.

As early as 1789, Congress authorized officers in the territories to be appointed in ways

that would clearly violate the Appointments Clause if it applied. First, Congress has permitted

territorial officials exercising significant authority in the territories to be appointed by the President without "the Advice and Consent of the Senate," even though those officials are principal "Officers of the United States" under Aurelius's theory. Aurelius Mot. 24-26. Second, Congress has required that the President select territorial officials from short lists, even though Aurelius contends that would violate the President's "sole" nomination authority if the Clause applies. Aurelius Mot. 26-33. Third, Congress has repeatedly provided for the direct election of officials that are unquestionably "Officers of the United States" under Aurelius's test, even though that method of appointment is not permitted under the Clause. These "'[l]ong settled and established practice[s]" merit "'great weight in a proper interpretation of constitutional provisions regulating the relationship between Congress and the President" like the Appointments Clause. *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)); *see also Mistretta v. United States*, 488 U.S. 361, 401 (1989). Collectively, these practices indicate the Clause does not apply to territorial officials.

*Appointment of principal officers without advice and consent.* Aurelius complains that Congress cannot allow the President alone to appoint territorial officials if they have no superior other than the President, because they are then "principal" officers who must be confirmed by the Senate. Aurelius Mot. 24-26. But some of the earliest territorial legislation following the Constitution's ratification did just that.

In 1803, Congress passed a statute "for the temporary government" of the territories of Orleans and Louisiana.[2] Congress vested "all the military, civil and judicial powers, exercised by the officers of the existing [French] government" of the territories "in such person and persons …

---

[2] An Act to enable the President of the United States to take possession of the territories ceded by France to the United States, by the treaty concluded at Paris, on the thirtieth of April last; and for the temporary government thereof, 8th Cong. ch. 1, § 2, 2 Stat. 245 (Oct. 31, 1803).

as the President … shall direct."[3]  Those "persons" were appointed by the President and subject to

his oversight, and at least the Governor of Louisiana was subject to supervision only by the

President.  *See* The Title To Certain Lands in Louisiana, 4 Op. Att'y Gen. 643, 652 (1847) (noting

Jefferson's appointment of Louisiana governor).  According to Aurelius, these were principal

officers.  *See* Aurelius Mot. 20 (appointed governors are principal officers).  Yet they were not

appointed with the advice and consent of the Senate.

This did not go unnoticed at the time.  In debating the bill, a member of Congress raised

an Appointments Clause objection to the statute:

> [P]ower is given to the President to appoint all the officers in the province, from
> the governor down to the lowest officer.  Gentlemen will not say that the office of
> governor or judge is one of the inferior offices contemplated in the Constitution.
> They had never been so considered.  In all the arrangements of appointments for
> the territorial governments, the sanction of the Senate had been required for the
> governors, judges, secretaries, &c.; whereas, in this instance, the President is
> clothed with power to appoint all the officers in the territory.

13 Annals of Cong. 509 (1803).  Congress passed the legislation over this constitutional objection,

as Congress "appeared to think the only constitutional provisions that applied to the territories

were those authorizing the United States to acquire and administer them."  Currie, *supra*, at 113.

Congress subsequently used same statutory language to grant the President the same

plenary appointment power with respect to Florida,[4] and a century later with respect to the first

civil government of the Philippines[5] and Panama Canal Zone.[6]  When reviewing the Panama Canal

Zone's appointment statute in 1923, the Supreme Court did not so much as hint that it violated the

---

[3] *Id.*

[4] *See* An act to authorize the President of the United States to take possession of East and West Florida and establish
a temporary government therein, 15th Cong. ch. 93, § 1, 3 Stat. 523, 524 (Mar. 3, 1819).

[5] *See* An Act Making appropriations for the support of the Army for the fiscal year ending June thirtieth, nineteen
hundred and two, 56th Cong. ch. 803, 31 Stat. 895, 910 (Mar. 2, 1901).

[6] *See* An Act To provide for the temporary government of the Canal At Panama, the protection of the canal works,
and for other purposes, Pub. L. No. 58-190, ch. 1758, § 2, 33 Stat. 429, 429 (Apr.  28, 1904).

Appointments Clause.  *McConaughey v. Morrow*, 263 U.S. 39, 45 (1923).

***Requiring the President to nominate from a list.***  Aurelius also complains that Congress cannot restrict "the President's appointment authority" under the Clause by requiring that he select from lists of nominees.  Aurelius Mot. 28; *see id.* at 26-31.  According to Aurelius, "[e]ven cabining the President's appointment authority to two or three names for each available seat is a *radical departure* from the constitutional structure."  *Id.* at 27 (emphasis added).

What Aurelius describes as a "radical departure" is exactly what the First Congress did with respect to the Northwest Territories in 1789.  The Northwest Ordinance, as amended by the First Congress, required the President, with Senate confirmation, to appoint members of the territorial legislative council; for that reason, under Aurelius's view, they had to be appointed pursuant to the Appointments Clause.  Aurelius Mot. 18.  But Congress required the President select these members from lists submitted by the territorial house of representatives: five members from a list of just ten, and, in the event of a vacancy, one member from a list of just two.[7]  Thus, the First Congress restricted the President's purportedly "sole" authority to select territorial officials in just the same way Congress did here.[8]  Congress repeated these restrictions in subsequent territorial statutes.[9]

***Direct election of officers.***  Congress has also provided for the direct election of territorial officials who are "Officers of the United States" in Aurelius's view, even though that is inconsistent with the Appointments Clause.  The Clause permits Congress to vest the power to appoint "Officers of the United States" in only four entities: the President, "by and with the Advice

---

[7] *See* An Act to provide for the Government of the Territory North-west of the River Ohio, 1st Cong. ch. 8, 1 Stat 50, 52 n.a (Aug. 7, 1789).

[8] *Id.*

[9] *See, e.g.*, An Act further providing for the government of the territory of Orleans, 8th Cong. ch. 23, § 1, 2 Stat. 322, 322 (Mar. 2, 1805) (incorporating terms of Northwest Ordinance providing for appointment by President of five-member Legislative Council from list of ten nominees provided by the territorial house of representatives).

and Consent of the Senate"; "the President alone"; "the Courts of Law"; and "the Heads of Departments."  U.S. Const. art. II, § 2, cl. 2; *Freytag*, 501 U.S. at 884 ("The Appointments Clause names the possible repositories for the appointment power.").   The appointing power was *intentionally* "vested in a single man[,] or in a select assembly of a moderate number; or in a single man, with the concurrence of such an assembly," because "[t]he exercise of it *by the people at large* will be readily admitted to be impracticable."  The Federalist No. 76 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (emphasis added).  But Congress has repeatedly allowed territorial officials to be elected "by the people at large" or appointed by such elected officials.

The First Congress provided that a "house of representatives" of the Northwest Territory would be directly elected by its population.  1 Stat. 50, 51 n.a.  That body wielded significant authority in the territories:  with the assent of the legislative council and the Governor, it possessed all of Congress's delegated legislative authority in those territories.  1 Stat. 50, 52 n.a.  Over the next two centuries, Congress "routinely delegated legislative authority to … legislatures" that are directly elected, and the Supreme Court has sanctioned that practice.  Aurelius Mot. 21; *Binns*, 194 U.S. at 491 ("[Congress] may ... transfer the power of such legislation to a legislature elected by the citizens of the territory.").  For 70 years, Congress has similarly provided for the popular election of territorial governors.  *See, e.g.,* Act of Aug. 5, 1947, Pub. L. No. 80-362, ch. 490, § 1, 61 Stat. 770, 770-71.  And Congress has permitted these elected territorial officials to appoint others wielding significant authority in the territories—like prosecutors—even though an elected territorial official cannot appoint an "Officer of the United States" under the Clause.  *See Snow v. United States*, 85 U.S. 317, 321 (1873).  The Supreme Court has never intimated that any of these practices is constitutionally suspect.

All of these officers "exercise[] significant authority pursuant to the laws of the United

States."  Aurelius Mot. 12 (quotation marks omitted).  Territorial governors, for example, execute

not only territorial law, but also the laws of the United States.  *See, e.g.*, 48 U.S.C. § 771 (Supp. II

1948) (Puerto Rico Governor "shall be responsible for the faithful execution of the laws of Puerto

Rico and the laws of the United States applicable in Puerto Rico"); 48 U.S.C. § 1422 (same for

Guam); 48 U.S.C. § 1591 (same for Virgin Islands).  They also have the authority to grant pardons,

veto territorial legislation, remove territorial officials and employees, commission and appoint

officers, and call out the militia or request the assistance of the United States Armed Forces.  *E.g.*,

48 U.S.C. § 771 (1946) (Puerto Rico); 48 U.S.C. § 1422 (Guam); 48 U.S.C. § 1591 (Virgin

Islands).  Territorial legislators, meanwhile, pass legislation that binds third parties, and "the

passage of" "legislative acts of the territory ... *is* the exercise of authority under the United States."

*Atchison, T. & S.F. Ry. Co. v. Sowers*, 213 U.S. 55, 65 (1909) (emphasis added).  These powers

are more expansive than those exercised by the FOMB, and thus if the Board members are Officers

of the United States who must be appointed in compliance with the Appointments Clause, then so

too are all of these territorial officials.[10]  Yet Congress has embraced a practice that has continued,

unbroken, for over 200 years of providing for these officials to take office by direct popular

election rather than by appointment pursuant to the Appointments Clause.

> **2.     The Executive Branch has long maintained that territorial officials
> are not subject to the Appointments Clause.**

For its part, the Executive Branch has long understood that certain territorial officials are

not subject to the Appointments Clause.  In 1839, Attorney General Grundy concluded that

---

[10] The Court could conclude that these territorial officials merely perform duties "in aid of those functions that
Congress may carry out by itself," because Congress could itself legislate for the territories.  *Techworld Dev. Corp.*,
648 F. Supp. at 116 (quotation marks omitted); *infra* at 21-22.  But if that rule applies to elected territorial officers
like Puerto Rico's governor, it applies to FOMB members.  There is thus no escaping the conclusion that *if* FOMB
members are "Officers of the United States," and *if* the Appointments Clause applies, all of this historical practice
would be invalid.

territorial judges, though appointed by the President with Senate confirmation, "*are not civil officers of the United States,* in the constitutional meaning of the phrase; they are merely Territorial officers," and so not subject to impeachment under Article II, Section 4.  3 Op. Att'y Gen. at 411. That was because such judges were "not constitutional, but legislative judges" created by Congress under Article IV.  *Id.*  Fifteen years later, Attorney General Cushing treated that opinion as settled law.  *See United States ex rel. Goodrich v. Guthrie*, 58 U.S. 284, 289 (1854) (noting arguments of Attorney General Cushing).  As territorial judges were not "civil officers of the United States" under Article II's Impeachment Clause, it followed that they were not "Officers of the United States" as that phrase is used in the Appointments Clause of that same Article.  *See Bowsher v. Synar*, 478 U.S. 714, 723 (1986) (equating the class of officers subject to those clauses).  Thus, in 1887, Assistant Attorney-General Howard observed that the "*appointment*, removal, and compensation of Territorial judges … *is entirely within the control of Congress.*"  *Howard v. United States*, 22 Ct. Cl. 305, 306 (1887) (emphasis added) (describing this as part of the consistent "position taken by the Executive" from "as far back as 1839," *id.* at 315).

That is so even though territorial judges satisfy Aurelius's definition of "Officers of the United States."  *See supra* at 18-19.  Territorial judges have "characteristically enforced ... the civil and criminal laws of Congress applicable throughout the United States," and so "have regularly tried criminal cases arising under the general laws of Congress."  *Palmore*, 411 U.S. at 403.  They enforce federal laws, and so exercise significant authority pursuant to those laws.

The Executive Branch's conclusion regarding territorial judges applies as well to territorial legislators and executive officers.  Just as territorial judges are "not constitutional, but legislative judges," territorial governments are "not organized under the Constitution," but instead are "legislative governments" created under Article IV.  *Benner*, 50 U.S. at 242.  Thus, just as

territorial judges are not subject to the Appointments Clause, neither are territorial legislators or executive officers.   As the U.S. Solicitor General told the Supreme Court on behalf of the Executive Branch in 2003, "the Appointments Clause, like the protections of Article III, regulates only the framework of the federal government and thus is no more applicable to the Territories than it is to State governments."  Amicus Br. of United States at 33, *Nguyen v. United States*, 539 U.S. 69 (2003) (No. 01-10873), 2003 WL 548057.

### C.   Exempting Territorial Officials from the Appointments Clause Is Consistent with the Constitutional Design.

Interpreting the Appointments Clause not to apply to territorial officials is consistent with the Constitution's design.  Under the Territory Clause, "Congress has broad latitude to develop innovative approaches to territorial governance."  *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1876 (2016).  Over the past two centuries, Congress has confronted a wide variety of territorial possessions "warranting distinctive treatment": some destined for statehood, others not; some near existing States, others so distant as to make communication and commerce with the States difficult. *Palmore*, 411 U.S. at 408.  Congress is able to manage these disparate territories because the Constitution permits it to craft innovative governance solutions tailored to each territory's "particularized needs."  *Id.*  As Felix Frankfurter, then the Law Officer in the Bureau of Insular Affairs at the Department of War, explained, "[h]istory suggests a great diversity of relationships between a central government and dependent territory.  The present day shows a great variety in actual operation.  One of the great demands upon inventive statesmanship is to help evolve new kinds of relationship so as to combine the advantages of local self-government with those of a confederated union.  Luckily, our Constitution has left this field of invention open."  Memorandum for the Secretary of War, in Hearings on S. 4604 before the Senate Committee on Pacific Islands and Porto Rico, 63d Cong., 2d Sess., 22 (1914) (cited at *Sanchez-Valle*, 136 S. Ct. at 1876).

Exempting territorial officials from the strictures of the Appointments Clause grants Congress the flexibility it needs to meet the diverse governance challenges the territories present, unconstrained by certain federalism and structural protections essential for legislation affecting the sovereign States. When newly annexed territories were ceded to the United States, Congress did not always have time to appoint the territory's leadership through the lengthy Senate confirmation process. Instead, Congress immediately erected territorial governments to maintain order. *See supra* at 14-15 & nn. 2-6. That was only possible because the Appointments Clause did not needlessly restrict Congress's ability to act. Likewise, it has been understood since the Founding that Congress could and often would provide for territorial self-government through the direct election of territorial officials. *See supra* at 16-18. But Congress could not have "enable[d] a territory's people to make large-scale choices about their own political institutions" if the Appointments Clause rigidly required federal appointment of territorial officials wielding authority of any significance. *Sanchez-Valle*, 136 S. Ct. at 1876. The appointment of territorial officials thus perfectly demonstrates why the Court has permitted Congress to act free from certain constitutional restraints in governing the territories.

\*      \*      \*

Precedent, history, and constitutional design thus confirm that the Appointments Clause does not apply to officials appointed pursuant to Article IV and exercising authority within the territories. As these authorities show, there are multiple paths this Court could take to reach that conclusion. The Court could conclude that the Appointments Clause, like other structural constitutional protections, does not apply to Congress's exercise of its plenary Article IV power, as the Supreme Court has concluded with respect to Article III, *see supra* at 8-11; *see also Hobson*, 265 F. Supp. at 907-10. Or, like the Executive Branch, this Court could conclude that territorial

officials are not "Officers of the United States," because (for example) they perform duties "in aid of those functions that Congress may carry out by itself" in the territories under Article IV. *See supra* at 18-19; *Techworld*, 648 F. Supp. at 116. Or, this Court could conclude that the appointment of territorial officials is "otherwise provided for" in the Constitution—and so not subject to the Appointments Clause's requirements—because it is within Congress's Article IV authority. U.S. Const. art. II, § 2, cl. 2. Regardless, the conclusion is the same: The appointment of Article IV officers exercising authority solely within the territories is not subject to the strictures of the Appointments Clause.

## II. AURELIUS'S CLAIM THAT ONLY SOME SELECT TERRITORIAL OFFICIALS ARE SUBJECT TO THE APPOINTMENTS CLAUSE FAILS.

Aurelius concedes (as it must) that Congress has long provided for the appointment of territorial officials in ways that the Appointments Clause would not permit, *see* Aurelius Mot. 20-22, but maintains that the Board's appointment nevertheless violates the Appointments Clause. It urges that the Clause should be read to apply to some territorial officials (which it calls "federal officers"), but not others (which it calls "territorial officers"). *Id.* at 18. Aurelius thus makes two principal arguments. First, Aurelius contends that the Appointments Clause applies only to officials that Congress specifies are to be appointed by the President, but not to officials that Congress specifies are to be elected by the citizens or even appointed by local officials. *Id.* at 18-22. Second, Aurelius argues that officials are subject to the Clause if their authority is not "confined to purely local matters" or they are "overseen by the federal government." *Id.* at 18.

But the applicability of the Appointments Clause turns not on the officer's method of selection, but rather on the functions the officer is intended to perform and the powers Congress properly invoked for the officer's appointment; if the Clause otherwise applied to territorial officials, Congress could no more evade application of the Clause by providing for election of

22

territorial officials than it could evade application of the Clause by providing for the election of the Secretary of State.  And the Board's authority and degree of oversight are comparable to other territorial officials that have not been appointed pursuant to the Clause.  Thus, neither of these factors distinguishes the Board from what Aurelius terms territorial officers.

The bottom line is that if, as Aurelius argues, the Clause applies to the territories, *all* territorial officials would have to be appointed pursuant to its terms.  As explained above and as Aurelius recognizes, that view cannot be squared with precedent or historical practice.

### A. An Officer's Method of Selection Does Not Determine Whether the Appointments Clause Applies.

Aurelius suggests that the applicability of the Appointments Clause depends principally on the manner of the officer's appointment.  As Aurelius would have it, an officer is a territorial officer if she is elected or appointed by local officials, but is a federal officer if (as here) she is appointed by the President, even if her actual responsibilities are the same in both instances.  Aurelius Mot. 22.  That is wrong.

The Supreme Court has twice rejected this argument in the context of the District of Columbia.  In *Barnes v. District of Columbia*, 91 U.S. 540 (1875), the Court held that the D.C. board of public works was a part of the D.C. municipal government, even though its members were "nominated by the President" with the "advice and consent of the Senate." *Id.* at 548.  That was "quite immaterial"; whether they were D.C. officers did not depend on "from what source the power comes to these officers,—whether by appointment of the President, or by the legislative assembly, or by election." *Id.* at 549. The board "was regarded as a mere branch of the District government, though appointed by the President, and not subject to the control of the District authorities." *Metro. R.R. Co.*, 132 U.S. at 6.  Then, in *Metropolitan Railroad Co.*, the Court rejected the argument that the D.C. Commission was "a department of the United States

23

government" merely because its commissioners were appointed by "the [P]resident, by and with the advice and consent of the [S]enate." *Id.* at 7. That "mode of appointing its officers" did "not abrogate its character as a municipal body politic," and it was not "necessary ... that the officers should be elected by the people" for the Commission to be within the D.C. government. *Id.* at 8. These cases refute the idea that the "mode of appointing" an officer—whether by the President or by election—determines whether that officer is located in the territorial or federal government.

Moreover, the Supreme Court's definition of "Officer of the United States" focuses on the scope of the officer's authority, not the method by which the officer was appointed. The Supreme Court has made clear that if the Clause applies, "*any* appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by [the Clause]." *Buckley*, 424 U.S. at 126; *Freytag*, 501 U.S. at 881 (same); *Edmond v. United States*, 520 U.S. 651, 662 (1997) (same); Aurelius Mot. 13, (relying on this same definition). The officer's method of appointment is irrelevant. *Cf. United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 757 (9th Cir. 1993) (holding that even though qui tam relators are "completely unappointed," court must inquire whether they "wield so much governmental power that they must be appointed in conformity with the Appointments Clause"); *see also Officers of the United States Within the Meaning of the Appointments Clause* ("*Officers of the United States*"), 2007 WL 1405459, at *32-33 (O.L.C. Apr. 16, 2007) (explaining irrelevance of "[m]ethod of appointment" in making "Officer of the United States" determination).

It is perfectly consistent with the Court's definition to hold that territorial officials are not Officers of the United States because the scope of their authority is limited to the territories. *See supra* 5-22. By contrast, Aurelius's focus on an officer's method of appointment would make nonsense of the Court's focus on an officer's responsibilities. For example, Aurelius contends that

24

the day Congress authorized the direct election of Puerto Rico's governor, the governor transformed from an appointed "Officer of the United States" to an elected territorial officer— even if the governor's authority remained exactly the same. *See* Aurelius Mot. 21 & n.13.

Aurelius's approach also makes little sense. It would permit an officer's method of appointment to determine whether that method of appointment complies with the Appointments Clause. If Congress ignores the Clause entirely and permits a territorial official to be popularly elected, the officer's appointment is not subject to the Clause. Similarly, if Congress vests a territorial official's appointment in another elected territorial official, the officer's appointment is not subject to the Clause. But if Congress follows the Clause and requires appointment by the President with Senate confirmation, the officer's appointment *is* subject to the Clause. For Aurelius, whether Congress must comply with the Clause is determined by whether Congress has complied with the Clause. "Under such a (tautological) reading, the Clause would require a certain means of appointment only for persons appointed by that means." *Officers of the United States*, 2007 WL 1405459, at *33. That cannot be correct.

Indeed, it is worse. In Aurelius's view, Congress violates the Clause only when it allows the President to appoint principal territorial officials or itself retains the power to appoint. Aurelius Mot. 22. The upshot of this argument is that Congress could have vested the appointment of the Board in the Mayor of San Juan but not the President of the United States.

The fundamental error in Aurelius's position is it relies on the notion that there is a distinct "local, territorial authority" from which an officer could derive authority. There is not. In the territories, the Supreme Court has consistently held, "[t]here is but one system of government, or of laws operating within [the territory's] limits." *Benner*, 50 U.S. at 242. "[T]here is no sovereignty in a Territory of the United States but that of the United States itself." *Snow*, 85 U.S.

25

(18 Wall.) at 321.  It is therefore wrong to state that elected territorial officials "do not directly derive their authority from the federal government."   Aurelius Mot. 21.   "The territorial governments owe *all their powers* to the statutes of the United States conferring on them the powers which they exercise."  *United States v. Kagama*, 118 U.S. 375, 379-80 (1886) (emphasis added); *Grafton v. United States*, 206 U.S. 333, 354 (1907) ("[T]he government of the [territory] owes its existence wholly to the United States, and its judicial tribunals exert all their powers by authority of the United States.").   Accordingly, "[w]hen a territorial government enacts and enforces ... laws to govern its inhabitants, it is not acting as an independent political community like a State, but as 'an agency of the federal government.'"  *United States v. Wheeler*, 435 U.S. 313, 321 (1978) (quoting *Domenech v. National City Bank*, 294 U.S. 199, 204-05 (1935)), *superseded by statute on other grounds as recognized by United States v. Lara*, 541 U.S. 193, 199-207 (2004); *cf. Metro. R.R. Co.*, 132 U.S. at 9 ("[T]he sovereign power of [D.C.] is not lodged in the corporation of the District of Columbia, but in the government of the United States.").   That is why territorial officials' method of appointment is irrelevant: regardless, they derive their authority from the United States.   Either *all* such officers are subject to the Clause, or none are.

Aurelius derives its "method of appointment" rule from four sources.  But none of them support the categorical rule that Aurelius advances.  First, Aurelius relies on a 1996 opinion from the Office of Legal Counsel.  *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 145 (1996) (cited at Aurelius Mot. 18).  But OLC has since disavowed the position that "a constitutional officer is an individual who is appointed to his or her office by the federal government,'" *id.*; *see Officers of the United States*, 2007 WL 1405459, at *4 (rejecting this criterion), and now concludes that an officer's "method of appointment" is *not* a criterion for determining whether an official is an "Officer of the United States."  *Id.* at *32-33.

Second, Aurelius cites *Wise v. Withers*, 7 U.S. (3 Cranch) 331 (1806), and *United States v. Hartwell*, 73 U.S. (16 Wall.) 385 (1867).  In both cases, the Court held that a government official was an "officer of the United States" as that phrase was used in a statute while referring to the official having been appointed in a manner consistent with the Appointment Clause.  *Wise*, 7 U.S. at 336; *Hartwell*, 73 U.S. at 393.  But neither case dealt with territorial officials or the territories.[11] Neither case addressed which individuals were required to be appointed under the Clause.  Neither case even intimated that an officer who was *not* properly appointed pursuant to the Clause was *required* to be because of the "method of [his] appointment."  Aurelius Mot. 18.  And neither case is consistent with the Supreme Court's twice-repeated admonition that the "mode of appointing" the "officers" of a D.C. agency cannot make it part of the U.S. government.  *Metro. R.R. Co.*, 132 U.S. at 8.

Aurelius's misunderstanding of these cases stems from its conflation of two issues: first, who must be appointed pursuant to the Appointments Clause; and second, what consequences flow from being appointed pursuant to the Clause.  *Wise* and *Hartwell* dealt with only the second issue.  They stand for the unremarkable proposition that if an officer *is* appointed via a method that complies with the Clause, that officer may exercise the prerogatives and authority of an "Officer of the United States."  "Conversely, courts also have concluded that an individual who is *not* appointed in accordance with the Appointments Clause is not technically an 'Officer of the United States.'"  *Officers of the United States*, 2007 WL 1405459, at *32.  But neither of those principles addresses the first question: whether an officer *must* be appointed pursuant to the Clause in the first place.  That is why even an officer who is *not* appointed pursuant to the Clause "may nevertheless be required to be appointed as prescribed by the Clause in order constitutionally to

---

[11] *Wise* involved a Justice of the Peace in the District of Columbia.  The District has at times been thought subject to more stringent constitutional restrictions than the territories.  *E.g.*, *O'Donoghue*, 289 U.S. at 535-45.

exercise his authority." *Id.* Conversely, even an officer who *was* appointed pursuant to the Clause may nevertheless not have been *required* to be appointed pursuant to it. *See id.* at *23-24 (noting, for example, that Jay Treaty commissioners, though confirmed by Senate, were not Officers of the United States); *id.* at *33 (recognizing principle); *Employees Compensation Act—Assistant United States Attorney*, 31 Op. Att'y Gen. 201, 202-04 (1918) (recognizing that Congress might provide for appointment by President or head of department even though position was not an office).

Third, Aurelius relies on the Northwest Ordinance of 1787, which was amended by the First Congress to provide that certain territorial officials would be appointed by the President with Senate confirmation. *See* Aurelius Mot. 19-20. But that amendment of the Ordinance's appointing provisions to "adapt the same to the present Constitution of the United States," 1 Stat. 50, 51, does not mean that Congress viewed itself bound by the Appointments Clause. Amending those provisions was necessary for a separate reason: "the old Continental Congress, which had previously made appointments under the Ordinance, no longer existed." Currie, *supra*, at 114 n.200.[12] In any event, as explained above, early congressional practice demonstrates that the appointment of officers within the territories has never consistently followed the Clause's strict procedures. Indeed, the Northwest Ordinance itself severely restrained the President's authority to nominate individuals, which Aurelius claims would violate the Clause. Aurelius Mot. 26-29

Fourth, Aurelius relies on the purported congressional practice of requiring "advice-and-consent appointment" for "every civilian official appointed by the federal government to oversee a territorial government." Aurelius Mot. 20. But as noted above, that is not true; Congress has regularly permitted the President alone to appoint what Aurelius terms "principal" officers,

---

[12] Alternatively, even assuming the Clause applied when Congress amended the Northwest Ordinance, that does not mean the Clause applies when Congress legislates for Puerto Rico. The *Insular Cases* distinguish between incorporated territories destined for statehood, like those governed by the Ordinance, and unincorporated territories like Puerto Rico; the Constitution applies to the former but not always to the latter. *See Balzac*, 258 U.S. at 312.

including territorial governors, and including in some of the first territories.  *See supra* at 14-15.

To the extent Congress *has* provided for appointment as set forth in the Clause, it should be viewed

as having done so because of "policy considerations rather than constitutional compulsion."

Currie, *supra*, at 114; *supra* at 27-28 (Congress can choose to comply with Clause even if not

required to).  That is not unusual in the territories; Congress has, for example, chosen to create

courts complying with Article III in the territories (as in Puerto Rico) "as a matter of legislative

grace and not of constitutional compulsion."  *See Glidden Co. v. Zdanok*, 370 U.S. 530, 548 (1962)

(plurality op).

### B.   Neither the Level of Federal Oversight Nor the Nature of the Functions Performed Distinguishes Board Members from Other Territorial Officials.

Aurelius also contends that the Board members are federal officers because they are

"overseen by the federal government" and because their authority is not "confined to purely local

matters."  Aurelius Mot. 18.  But neither of these factors distinguishes the Board's members from

other territorial officials who have not been appointed pursuant to the Clause.

First, Aurelius asserts that territorial officers' authority must be "confined to purely local

matters."  *Id.*  To be sure, that is relevant to the inquiry—Congress could not, for example, assert

that the Secretary of Defense is a territorial official.  But the Board members clearly exercise

authority only within the territory of Puerto Rico.  Congress expressly designated the Board "an

entity within the territorial government" of Puerto Rico," 48 U.S.C. § 2121(c), and that

congressional judgment is entitled to great weight.  *See, e.g.*, *Glidden*, 370 U.S. 530.[13]  That

---

[13] In *Glidden*, the Court held that judges of the Court of Claims and the Court of Customs and Patent Appeals were Article III judges, not Article I judges, in large part because Congress had suggested as much in two statutes.  *See id.* at 542 (plurality op.) (Congress's "forthright statement of understanding" was "persuasive evidence" that courts were constituted under Article III); *id.* at 588 (Clark, J., concurring) (concluding that "the court became an Article III court upon the clear manifestation of congressional intent that it be such").  Indeed, the Court followed Congress's express designation even though the Court had previously twice held that these were Article I courts before Congress "pronounced its disagreement."  *Id.* at 531 (plurality op.).  Likewise, in *O'Donoghue*, 289 U.S. 516, and *Palmore*, 411 U.S. 389, the Court "[r]el[ied] heavily on congressional intent" to ascertain the constitutional status of the courts of

designation, moreover, is entirely consistent with the actual duties and responsibilities of the

Board, which are largely limited to Puerto Rico. The Board does not enforce any "law[s] of

national applicability" or manage any "affairs of national concern"; instead, it exercises its

authority solely with respect to Puerto Rico's debts, a "matter[] of strictly local concern." *Palmore*,

411 U.S. at 407-08. The Board is funded by Puerto Rico, not Congress, and its powers are limited

to Puerto Rico. *See supra* at 4. Although Aurelius notes that the Board also exercises authority

over some individuals outside of Puerto Rico, Aurelius Mot. 7, 15, that is no different than the

authority exercised by territorial prosecutors and territorial courts over individuals that reside

outside of a territory but have availed themselves of the territory's laws. Thus, the Board members'

powers are indistinguishable from those exercised by many other territorial officials, including

those Aurelius concedes are not subject to the Clause. *See* Aurelius Mot. 21-22 (prosecutors not

subject to Clause). Even if there might in some cases be reason to question Congress's designation

of officers as Article IV territorial officials, here, nothing regarding the FOMB's makeup or

authority is inconsistent with that designation.

Second, Aurelius contends that Board members are federal officers because they are

"overseen by the federal government." *Id.* at 18. But *all* territorial governments are "wholly

dependent upon [C]ongress," and *all* territorial officials are "subject to its absolute supervision

---

the District of Columbia. *Palmore*, 411 U.S. at 406; *see also, e.g.*, *Metro. R.R. Co.*, 132 U.S. at 7 (rejecting argument that D.C. government "is a department of the United States government" because that view "is contrary to the express language of the statutes"); *Hornbuckle*, 85 U.S. at 655 (concluding that statutes "were not intended as exertions of that plenary municipal authority which Congress has over … the Territories," because "[t]hey do not contain a word to indicate any such intent").

Aurelius cites *Department of Transportation v. Association of American Railroads*, 135 S. Ct. 1225 (2015), and *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 392 (1995), and contends that this Court should disregard Congress's judgment. But neither of those cases holds that Congress's intent—as expressed through an express designation—is *irrelevant* to how an office created by Congress should be labeled, and *Glidden*, *Palmore*, and other cases refute that notion. In any event, as explained in the text, a functional analysis of the Board's duties under *Association of American Railroads* and *Lebron* serves mainly to confirm (not refute) the appropriateness of Congress's designation.

and control." *Talbott v. Bd. of Comm'rs of Silver Bow Cty.*, 139 U.S. 438, 441 (1891).  Congress may abolish their office, change their salary, or require that they (like the Board) report directly to the President or Congress. *E.g.*, 48 U.S.C. § 1591 (elected Virgin Islands governor must "submit to the Congress … [an] annual financial report" and "other reports" Congress "require[s]").

Third, Aurelius cites the President's power to remove Board members, Aurelius Mot. 22-23.  But the "power to remove ... executive officers" is simply "an incident of the power to appoint them," *Myers v. United States*, 272 U.S. 52, 161 (1926).  This argument thus adds nothing to Aurelius's first argument, that the appointment of an officer by the President is in itself sufficient to render that officer a federal officer.

Finally, Aurelius cites the fact that the Board "wields authority conferred by a federal statute that sets federal standards."  Aurelius Mot. 23.  The same is true of most territorial officials, many of whom actually apply federal law (such as territorial judges applying federal criminal law or governors applying federal law), *supra* at 18, 19, and the rest of whom have taken office by virtue of "authority conferred by" their territory's organic act, "a federal statute," *e.g.*, *First Nat'l Bank*, 101 U.S. at 133 ("The organic law of a Territory … [is] the fundamental law of the local government. It is obligatory on and binds the territorial authorities . . . ."); *Snow*, 118 U.S. at 353 ("[T]he authority of every court sitting in a territory is founded on a statute of the United States.").  Thus, the members of the FOMB cannot be distinguished from other territorial officers on the ground that they enforce or derive authority from a federal statute.

In short, Aurelius cannot cloud what the statute, case law, and history make clear:  Board members are territorial officials whose appointment is not subject to the Appointments Clause.

31

## III.   EVEN IF THE CLAUSE APPLIES, AURELIUS'S MOTION SHOULD BE DENIED.

Even if the Appointments Clause applies to the appointment of FOMB members, Aurelius's motion should be denied.  Aurelius's contention that FOMB members are principal Officers of the United States is incorrect, and Aurelius's contention that PROMESA infringed the President's nominating authority is non-justiciable.

### A.   FOMB Members Are Not Principal Officers, or Officers at all.

If the FOMB members are officers of the United States at all, they are inferior officers who were validly appointed by the President alone.  Irrespective of whether they have a superior "appointed by Presidential nomination with the advice and consent of the Senate," an officer is an "inferior officer" if "the nature of their work suggests sufficient limitations of responsibility and authority."  *United States v. Hilario*, 218 F.3d 19, 25 (1st Cir. 2000) (quoting *Edmond*, 520 U.S. at 663, and citing *Morrison v. Olson*, 487 U.S. 654, 671-72 (1988)).

Here, FOMB members are inferior officers because their "responsibility and authority" is limited to a single territory and to solve a single problem.  The FOMB has authority to act only with respect to Puerto Rico.  *See supra* at 3-4.  It lacks the type of national authority typically vested in principal officers like "ambassadors, ministers, heads of departments, and judges." *Freytag*, 501 U.S. at 884.  Moreover, much like the independent counsel in *Morrison v. Olson*, the FOMB "is appointed essentially to accomplish a single task"—addressing Puerto Rico's fiscal crisis—"and when that task is over the office is terminated."  487 U.S. 654, 672 (1988).  FOMB members are thus appointed for just three years, 48 U.S.C. § 2121(e)(5)(A), and the FOMB will terminate once the territory meets certain financial benchmarks, *see id.* § 2149.  These geographic and topical limitations on FOMB members' authority render them inferior officers.

Indeed, these same features indicate that the Board members do not hold an office *at all*.

"[A] position which is merely temporary *and* local cannot *ordinarily* be considered an office"
requiring appointment via the Appointments Clause. *Officers of the United States*, 2007 WL
1405459, at \*29 (quoting Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers*
§ 8, at 6 (1890)). As OLC has explained, commissioners have long been temporarily authorized
to resolve particular disputes—including arbitration of creditor disputes—even though they do not
hold "offices," and so were not appointed pursuant to the Clause. *Id.* at \*23-25. The FOMB,
created temporarily to resolve the particular problem of Puerto Rico's debt, is similarly situated.

### B.    A Claim that Congress Infringed the President's Nominating Authority Is Nonjusticiable.

Even if Board members are Officers of the United States, Congress's recommending Board
nominees did not "[u]nlawfully [c]onstrain[]" the President's "[a]ppointment [a]uthority."
Aurelius Mot. 26. As Aurelius concedes, PROMESA does not *require* that the President appoint
from these lists; they are recommendatory. *Id.* at 9-10. The Supreme Court has not cast doubt on
the constitutionality of such recommendatory lists. *See Bowsher*, 478 U.S. at 727-28 (President's
appointment of the Comptroller General from a list of three individuals provided by the Speaker
of the House and the President *pro tempore* of the Senate); *Mistretta*, 488 U.S. at 410 n.31
(President could appoint three judges to the Sentencing Commission, having considered a list of
six recommended by the Judicial Conference of the United States).

But in any event, any "challenge to the alleged restriction on the President's appointment
power" is "not justiciable." *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 824 (D.C. Cir. 1993).
Although "[c]ongressional limitations—even the placement of burdens—on the President's
appointment power may raise serious constitutional questions," a court cannot grant relief when
"it is impossible to determine ... whether the *statute* actually limited the President's appointment
power." *Id.* This Court cannot "assume" "that the President wished to appoint" individuals not

on Congress's lists "and was restrained by [PROMESA] from doing so." *Id.* "[W]ithout the

statute[,] the President could have appointed exactly the same members." *Id.* at 825. Indeed,

"Presidents have often viewed restrictions on their appointment power not to be legally binding,"

*id.* at 824, but instead of taking that view here, the President praised the members of the FOMB as

he appointed them. *Supra* at 5. Any challenge to the statute is therefore nonjusticiable. *See also*

*Nat'l Comm. of Reform Party of U.S. v. Democratic Nat'l Comm.*, 168 F.3d 360, 365 (9th Cir.

1999) (denying standing on similar grounds).

### C.   Aurelius's Proposed Remedy Is Inappropriate.

Even if the Court were to disregard the text of PROMESA and Article IV of the

Constitution, it should not accept the remedy Aurelius proposes. Aurelius suggests that the Court

should dismiss the FOMB's Title III petition and terminate this proceeding. Aurelius Mot. 34-35.

That result is unwarranted and would cause tremendous harm to creditors, including the

approximately 160,000 retired employees of the Commonwealth—teachers, police officers,

firefighters, judges, city clerks, engineers, and other personnel—and their beneficiaries.

The governmental entities and agencies that employed these retirees were responsible for

funding their pensions and other retirement benefits but failed to do so, leaving them almost

completely unfunded. According to the Commonwealth's Fiscal Plan, 86% of these retirees—or

about 137,600—receive less than $2,000 per month in benefits. For most retirees, these pensions

are their principal source of income, and in many cases provide for an extended family including

children and grandchildren. A reduction in their income could thus be devastating. Moreover,

because an estimated 150,000 of these retirees reside in Puerto Rico, any reduction in their income

will only further weaken the Commonwealth's already fragile economy. The Commonwealth

cannot meet its pension obligations unless it is restored to fiscal health. Dismissing the FOMB's

Title III petition would delay that for years, to devastating effect.

The more appropriate remedy, given the circumstances, would be to stay this proceeding to allow Congress and the President to re-appoint the FOMB members.  "[A] court's holding that there has been an Appointments Clause violation does not mean that the violation cannot be remedied by a new, proper appointment."  *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 124 (D.C. Cir. 2015).  Staying a judgment to permit Congress to cure constitutional deficiencies is the course the Supreme Court has taken under similar circumstances.  *See Buckley*, 424 U.S. at 142-43 (staying judgment to allow Congress to reconstitute the FEC and allowing the present FEC to operate in the interim); *N. Pipeline*, 458 U.S. at 88 (entering stay to allow Congress to cure constitutional defect with bankruptcy courts).[14]  A newly-constituted FOMB could elect whether to certify the filing of the Commonwealth's Title III petition under 48 U.S.C. § 2124(j)(2), or not: "[O]nce a new Board has been properly appointed (or reconstituted), the Appointments Clause does not bar it from reaching the same conclusion as its predecessor."  *Intercollegiate Broad. Sys.*, 796 F.3d at 121.  If it did so, this matter would proceed apace, minimizing harm to creditors while allowing Puerto Rico to achieve fiscal responsibility as intended by Congress.  If the new FOMB declines to certify the petition, this matter could then properly be dismissed.  Either way, Aurelius would obtain the only relief it seeks: a decision whether to certify the petition by a properly appointed FOMB.  Aurelius Mot. 5.

## CONCLUSION

For the reasons given above, the Court should deny Aurelius's Motion.

---

[14] The case Aurelius relies on, *Ryder v. United States*, 515 U.S. 177 (1995), does not dictate a different result.  The officers there found to have been appointed in violation of the Appointments Clause were military judges appointed by the General Counsel of the Department of Transportation, and the Court held that the petitioner was entitled to a new hearing before a properly appointed panel of military judges.  *Id.* at 180.  Unlike this case and cases like *Buckley* and *Northern Pipeline*, there was no option to stay *Ryder's* case in order to allow a legislative fix.  Moreover, the relief in *Ryder* was limited; the Government was required only to retry the petitioners and any others similarly situated.  Here, the broad relief Aurelius requests would throw the finances of a territorial government into doubt, interfering with their ability to provide essential public services to hundreds of thousands of citizens.

Dated: November 3, 2017

JENNER & BLOCK LLP

By:
*/s/ Robert Gordon*
Robert Gordon (admitted *pro hac vice*)
Richard Levin (admitted *pro hac vice*)
919 Third Ave
New York, NY 10022-3908
rgordon@jenner.com
rlevin@jenner.com
212-891-1600 (telephone)
212-891-1699 (facsimile)

Catherine Steege (admitted *pro hac vice*)
Melissa Root (admitted *pro hac vice*)
353 N. Clark Street
Chicago, IL 60654
csteege@jenner.com
mroot@jenner.com
312-222-9350 (telephone)
312-239-5199 (facsimile)

Ian Heath Gershengorn (*pro hac vice* submitted)
Lindsay C. Harrison (*pro hac vice* submitted)
William Dreher (*pro hac vice* submitted)
1099 New York Ave NW
Washington, DC 20001
igershengorn@jenner.com
lharrison@jenner.com
wdreher@jenner.com
202-639-6000 (telephone)
202-639-6066 (facsimile)

Respectfully submitted,

BENNAZAR, GARCÍA & MILIÁN, C.S.P.

By:
*/s/ A.J. Bennazar-Zequeira*
A.J. Bennazar-Zequeira
Edificio Union Plaza
PH-A piso 18
Avenida Ponce de León #416
Hato Rey, San Juan
Puerto Rico 00918
ajb@bennazar.org
787-754-9191 (telephone)
787-764-3101 (facsimile)

*Counsel for The Official Committee of Retired Employees of Puerto Rico*