**Hearing Date**: January 10, 2018 at 11:00 a.m. (AST)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

```
------------------------------------------------------------------------ x
                                                 :
In re:                                           :
                                                 :
THE FINANCIAL OVERSIGHT AND                      :   PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,                :   Title III
                                                 :
        as representative of                     :   Case No. 17-BK-3283 (LTS)
                                                 :
THE COMMONWEALTH OF PUERTO RICO et al.,          :   (Jointly Administered)
                                                 :
        Debtors. [1]                             :
                                                 :
                                                 :
------------------------------------------------------------------------ x
```

## OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO OBJECTION AND MOTION OF AURELIUS TO DISMISS TITLE III PETITION

---

[1]  The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

I.     U.S. CONSTITUTION GIVES CONGRESS VIRTUALLY UNLIMITED
       AUTHORITY TO GOVERN UNINCORPORATED TERRITORIES
       DIRECTLY, OR TO DELEGATE THAT POWER TO SUCH AGENCIES AS IT
       MAY SELECT ...................................................................................................5

II.    PROCESS THROUGH WHICH CONGRESS STAFFED OVERSIGHT BOARD
       IS NOT UNIQUE .............................................................................................12

III.   CONGRESS' POWER TO REGULATE UNINCORPORATED TERRITORIES
       IS CONSTRAINED ONLY BY THOSE PERSONAL RIGHTS EMBEDDED IN
       U.S. CONSTITUTION THAT FORM BASIS OF ALL FREE GOVERNMENT.........14

IV.    OVERSIGHT BOARD MEMBERS ARE TERRITORIAL OFFICIALS, NOT
       "OFFICERS OF THE UNITED STATES" .................................................21

V.     EVEN IF APPOINTMENTS CLAUSE HAD SOME APPLICABILITY HERE,
       IT WOULD NOT PROHIBIT OVERSIGHT BOARD FROM TAKING
       ACTIONS INDISPUTABLY WITHIN CONGRESS' POWER.....................................26

VI.    EVEN IF THE APPOINTMENTS CLAUSE PROHIBITED MANNER IN
       WHICH OVERSIGHT BOARD MEMBERS WERE DESIGNATED, THE
       ACTIONS TAKEN BY OVERSIGHT BOARD ARE NONETHELESS *DE
       FACTO* VALID ...............................................................................................27

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant:small-caps">Cases</span>

*Application of President's Comm'n on Organized Crime,*
    763 F.2d 1191 (11th Cir. 1985) ............................................................................. 29

*Arkansas v. Oklahoma,*
    503 U.S. 91 (1992) ................................................................................................. 25

*Armstrong v. United States,*
    182 U.S. 243 (1901) ................................................................................................. 5

*Bd. of Pub. Util. Comm'rs v. Ynchausti & Co.,*
    251 U.S. 401 (1920) ........................................................................................... 3, 23

*Binns v. United States,*
    194 U.S. 486 (1904) ............................................................................................. 7, 8

*Bond v. United States,*
    564 U.S. 211 (2011) ............................................................................................... 18

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ........................................................................................... 2, 12

*Brewer v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.,*
    953 F. Supp. 406 (D.D.C.), *aff'd*, 132 F.3d 1480 (D.C. Cir. 1997) ................... 13, 14

*Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla,*
    217 F. Supp. 3d 508 (D.P.R. 2016) ....................................................................... 31

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ............................................................................................*passim*

*Calero-Toledo v. Pearson Yacht Leasing Co.,*
    416 U.S. 663 (1974) ............................................................................................... 17

*Califano v. Torres,*
    435 U.S. 1 (1978) ................................................................................................... 11

*Cincinnati Soap Co. v. United States,*
    301 U.S. 308 (1937) ........................................................................................*passim*

*Cintron v. State Bd. of Educ.,*
    384 F. Supp. 674 (D.P.R. 1974) ............................................................................ 16

## **TABLE OF AUTHORITIES**
(continued)

Page(s)

*Citizens for Abatement of Aircraft Noise, Inc. v. Metro. Washington Airports*
 *Auth.*, 917 F.2d 48 (D.C. Cir. 1990),
  *aff'd*, 501 U.S. 252 (1991) ................................................................................29

*City of Richmond v. United States*,
 422 U.S. 358 (1975) .........................................................................................28

*Connor v. Williams*,
 404 U.S. 549 (1972) .........................................................................................28

*DeLima v. Bidwell*,
 182 U.S. 1 (1901) ...............................................................................................5

*Dep't of Energy v. Ohio*,
 503 U.S. 607 (1992) .........................................................................................26

*Dep't of Transp. v. Ass'n of Am. R.R.*,
 135 S. Ct. 1225 (2015) .......................................................................................6

*Dooley v. United States*,
 182 U.S. 222 (1901) ...........................................................................................5

*Dorr v. United States*,
 195 U.S. 138 (1904) ...................................................................................*passim*

*Downes v. Bidwell*,
 182 U.S. 244 (1901) ................................................................................3, 5, 15

*Edmond v. United States*,
 520 U.S. 651 (1997) ...................................................................................21, 22

*Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*,
 426 U.S. 572 (1976) ...........................................................................................6

*Fournier v. Gonzalez*,
 269 F.2d 26 (1st Cir. 1959) ..............................................................................17

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
 561 U.S. 477 (2010) .........................................................................................21

*Freytag v. C.I.R.*,
 501 U.S. 868 (1991) .................................................................................2, 4, 21

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
 505 U.S. 88 (1992) ...........................................................................................25

**<u>TABLE OF AUTHORITIES</u>**

(continued)

**Page(s)**

*Gibbons v. District of Columbia*,
116 U.S. 404 (1886) ........................................................................................7

*Hawaii v. Mankichi*,
190 U.S. 197 (1903) ....................................................................................5, 17

*Hechinger v. Metro. Washington Airports Auth.*,
36 F.3d 97 (D.C. Cir. 1994)..............................................................................28

*Kenaitze Indian Tribe v. Alaska*,
860 F.2d 312 (9th Cir. 1988), *cert. denied*, 491 U.S. 905 (1989) ..........................................26

*Marin v. University of Puerto Rico (Marin II)*,
377 F. Supp. 613 (D.P.R. 1973) ........................................................................16

*McAllister v. United States*,
141 U.S. 174 (1891) ......................................................................................17

*Miller v. French*,
530 U.S. 327 (2000) ......................................................................................18

*Mistretta v. United States*,
488 U.S. 361 (1989) ........................................................................................6

*Montalvo v. Colon*,
377 F. Supp. 1332 (D.P.R. 1974) ......................................................................17

*N. Mariana Islands v. Atalig*,
723 F.2d 682 (9th Cir. 1984) ..........................................................................17

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982) ..............................................................................5, 29, 30

*Nguyen v. U.S.*,
539 U.S. 69 (2003), 2003 WL 548057 (Feb. 21, 2003) ........................................16

*Popular Democratic Party v. Puerto Rico*,
24 F. Supp. 2d 184 (D.P.R. 1998) ....................................................................11

*Puerto Rico v. Franklin California Tax-Free Tr.*,
136 S. Ct. 1938 (2016) ..................................................................................31

*Puerto Rico v. Sanchez Valle*,
136 S. Ct. 1863 (2016) ..................................................................................12

## TABLE OF AUTHORITIES

(continued)

Page(s)

*Rayphand v. Sablan,*
 95 F. Supp. 2d 1133 (D. N. Mar. I. 1999), *aff'd sub nom. Torres v. Sablan,*
 528 U.S. 1110 (2000) ...........................................................................................17

*Ryan v. Tinsley,*
 316 F.2d 430 (CA10 1963) ..................................................................................28

*Ryder v. United States,*
 515 U.S. 177 (1995) .............................................................................................30

*Samuels, Kramer & Co. v. C.I.R.,*
 930 F.2d 975 (2d Cir. 1991) ................................................................................18

*Schaefer v. Thomson,* 251 F.Supp. 450 (Wyo.1965),
 *aff'd sub nom. Harrison v. Schaeffer,* 383 U.S. 269 (1966)................................28

*Sere v. Pitot,*
 10 U.S. 332 (1810) ...........................................................................................5, 22

*Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.,*
 132 F.3d 775 (D.C. Cir. 1998)..............................................................................29

*Simms v. Simms,*
 175 U.S. 162 (1899) ...............................................................................................5

*Soto v. United States,*
 273 F. 628 (3d Cir. 1921) ................................................................................16, 17

*Tuaua v. United States,*
 788 F.3d 300 (D.C. Cir. 2015), *cert. denied,* 136 S. Ct. 2461 (2016) ...................15

*United States v. Harris,*
 106 U.S. 629 (1883) ...............................................................................................4

*United States v. Heinszen,*
 206 U.S. 370 (1907) .....................................................................................6, 7, 20

*United States v. Husband R.,*
 453 F.2d 1054 (5th Cir. 1971) ...........................................................................6, 7

*United States v. Morrison,*
 529 U.S. 598 (2000) ...............................................................................................4

*United States v. Nixon,*
 418 U.S. 683 (1974) ...............................................................................................4

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*United States v. Perez Oviedo,*
  281 F.3d 400 (3d Cir. 2002) ...............................................................................17

*United States v. Sanchez,*
  992 F.2d 1143 (11th Cir.), *on reconsideration,* 3 F.3d 366 (11th Cir. 1993)...................17, 24

## U.S. CONSTITUTIONAL PROVISIONS

U.S. Const.
  amend. V .......................................................................................................17
  art. I...........................................................................................................*passim*
  art. I, § 1......................................................................................................8
  art. I, § 6, cl. 2 ...........................................................................................20
  art. I, § 8......................................................................................................7
  art. I, § 8, cl. 1, 17 ......................................................................................12
  art. II ...........................................................................................................2, 4
  art. II, § 2, cl. 2 .......................................................................................*passim*
  art. III .......................................................................................................17, 29
  art. IV ......................................................................................................*passim*
  art. IV, § 3 ...............................................................................................*passim*
  art. IV, § 3, cl. 2 .........................................................................................1, 6

## FEDERAL STATUTES

16 U.S.C. § 3101 *et seq.* ...................................................................................26

29 U.S.C. § 651 *et seq.* .....................................................................................25

33 U.S.C. § 1251 *et seq.* ...................................................................................25

42 U.S.C. § 6901 *et seq.* ...................................................................................26

**TABLE OF AUTHORITIES**
(continued)

Page(s)

48 U.S.C.
    § 201(d) ................................................................................................................ 24
    § 201(f) ................................................................................................................. 24
    § 731 *et seq.* ........................................................................................................ 10
    § 731b .................................................................................................................. 14
    § 1422c(a) ............................................................................................................... 9
    § 1423 ..................................................................................................................... 8
    § 1571 ..................................................................................................................... 8
    § 1591 ..................................................................................................................... 9
    § 2101 *et seq.* ....................................................................................................... 1
    § 2121(b)(2) ............................................................................................................ 2
    § 2121(c)(1) ...................................................................................................... 1, 12
    § 2141(d) ............................................................................................................... 24
    § 2141(f) ................................................................................................................ 24
    § 2164(a) ................................................................................................................. 2
    § 2191(a) ............................................................................................................... 13
    § 2212(b)(1) .......................................................................................................... 24

Clean Water Act, Pub. L. 92-500, 86 Stat. 816 (1972) ................................................ 25

Elective Governor Act, Pub. L. 80-362, 61 Stat. 770 (1947) ...................................... 10

Jones-Shafroth Act, Pub. L. 64-368, 39 Stat. 951 (1917) ........................................... 10

Occupational Safety and Health Act of 1970, Pub. L. 91-596, 84 Stat. 1590 ............... 25

Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. 114-
    187, 130 Stat. 549 (2016) ..................................................................................*passim*

Resource Conservation and Recovery Act of 1976, Pub. L. 94-580, 90 Stat. 2795 ................... 25

Sarbanes Oxley Act of 2002, Pub. L. 107-204, 116 Stat. 745 ..................................... 21

Pub. L. 82-447, 66 Stat. 327 (1952) ............................................................................ 18

Public Law 600, Pub. L. 81-600, 64 Stat. 319 (1950) ................................................. 11

STATE STATUTES

Alaska National Interest Lands Conservation Act, Pub. L. 96-487, 94 Stat. 2374
    (1980) .................................................................................................................... 26

Ariz. Rev. Stat. § 3-103 ................................................................................................. 8

# TABLE OF AUTHORITIES
(continued)

Page(s)

District of Columbia Financial Responsibility and Management Assistance Act of
1995, Pub. L. 104-8, 109 Stat. 97 ................................................................ 13

Michigan Financial Review Commission Act, Act 181 of 2014, § 141.1635(5) ........................... 9

PICA Act of June 5, 1991, Pub. L. 9, 53 P.S. § 12720.101 *et seq.* ................................. 9

STATE AND TERRITORY CONSTITUTIONAL PROVISIONS

N.H. Const. Pt. 2, Art. 46 ....................................................................... 9

N.J. Const. Art. V, § 4 .......................................................................... 8

P.R. Const.
Art. III, §§ 1-2 ................................................................................. 9
Art. III § 7 ..................................................................................... 9

OTHER AUTHORITIES

96 Cong. Rec. 8569 (1950) ........................................................................ 11

AUSTRALIAN CONSTITUTION § 64 (July 9, 1900) ..................................................... 20

THE CABINET MANUAL:  A GUIDE TO LAWS CONVENTIONS AND RULES ON THE
OPERATION OF GOVERNMENT 21 (Cabinet Secretariat, ed., 1st ed. 2011),
*available at* www.cabinetoffice.gov.uk ......................................................... 20

CONSTITUCIÓN ESPAÑOLA, art. 100 (Spain, Dec. 29, 1978) ......................................... 20

CONSTITUTION OF CANADA, arts. 9-11 (1867, rev. 1982) ........................................... 19

Federalist No. 10 ................................................................................ 10

GRUNDGESETZ, Art. 54 Abs. 1 (Germany, May 8, 1949) .............................................. 20

GUIDE TO FOREIGN AND INTERNATIONAL LEGAL CITATIONS 206
(N.Y.U. J. Int'l L. & Pol, ed., 1st ed. 2006), available *at*
http://www.law.nyu.edu/sites/default/files/upload_documents/Final_GFILC_p
df.pdf ........................................................................................... 20

LA CONSTITUTION, art. 8 (France, Oct. 4, 1958) .................................................. 20

N. P. Flannery, *Will Puerto Rico Find A Way To Survive Its Debt Crisis*, Forbes
(June 1, 2017) .................................................................................... 1

## <u>TABLE OF AUTHORITIES</u>

(continued)

**Page(s)**

*Political Status of Puerto Rico*, Congressional Research Service Report for
Congress (June 7, 2011) ..........................................................................11

President Barack Obama, Remarks by the President at Bill Signings of the FOIA
Improvement Act of 2016 and PROMESA (June 30, 2016), transcript at
https://obamawhitehouse.archives.gov/the-press-office/2016/06/30/remarks-
president-bill-signings-foia-improvement-act-2016-and-promesa...........................................1

*Puerto Rico's Governor Says Island's Debts Are 'Not Payable,'"* The New York
Times (June 28, 2015) ........................................................................1

Report by the President's Task Force on Puerto Rico's Status (March 2011) ...........................11

U.S. Office of Legal Counsel Memorandum Opinion, *Mutual Consent Provisions
In the Guam Commonwealth Legislation* (July 28, 1994).......................................25

Washington's Farewell Address (1796), available at
http://avalon.law.yale.edu/18th_century/washing.asp (last visited Sept. 25,
2017)..............................................................................10

To the Honorable United States District Court Judge Laura T. Swain:

The Official Committee of Unsecured Creditors of all title III Debtors (other than
COFINA) (the "Committee") hereby submits its objection (the "Objection") to the *Objection and
Motion of Aurelius to Dismiss Title III Petition* [Docket No. 913] (the "Motion to Dismiss"), and
respectfully represents as follows:

## PRELIMINARY STATEMENT

Even before the twin cataclysms of Hurricanes Irma and Maria, Puerto Rico's economy
was in the midst of a painful economic crisis.[2]  To address this crisis and to secure a brighter
future for Puerto Rico and its citizens, in 2016, Congress exercised the authority and the
responsibility imposed on it by Article IV of the United States Constitution[3] by passing the
Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA" or the "Act").[4]
The centerpiece of PROMESA's design was a new "entity [established by Congress] within [the
Puerto Rican] territorial government"[5] called the Financial Oversight and Management Board
(the "Oversight Board"), which Congress empowered to assume control over significant aspects
of Puerto Rico's tangled financial affairs.

---

[2] *See* Michael Corkery and Mary Williams Walsh, "*Puerto Rico's Governor Says Island's Debts
Are 'Not Payable,'*" The New York Times (June 28, 2015),
https://www.nytimes.com/2015/06/29/business/dealbook/puerto-ricos-governor-says-islands-
debts-are-not-payable.html.; *see generally*  N. P. Flannery, *Will Puerto Rico Find A Way To
Survive Its Debt Crisis*?, Forbes Magazine (June 1, 2017 at 8:00 am),
https://www.forbes.com/sites/nathanielparishflannery/2017/06/01/will-puerto-rico-find-a-way-
to-survive-its-debt-crisis/#341c52a45b90; President Barack Obama, Remarks by the President at
Bill Signings of the FOIA Improvement Act of 2016 and PROMESA (June 30, 2016), transcript
at https://obamawhitehouse.archives.gov/the-press-office/2016/06/30/remarks-president-bill-
signings-foia-improvement-act-2016-and-promesa.

[3] In relevant part, U.S. Const. art. IV, §3, cl. 2 imposes on Congress the "power to dispose of and
make all needful Rules and Regulations respecting the Territory or other Property belonging to
the United States."

[4] Pub. L. No. 114-187, 130 Stat. 549, codified at 48 U.S.C. § 2101 *et seq.* (2016).

[5] 48 U.S.C. §2121(c)(1).

Dissatisfied with the hard choices the Oversight Board has made in an effort to resolve this crisis, and, in particular, with the impact the Oversight Board's decisions might have on their own financial interests, a group of bondholders, Aurelius Investment, LLC, *et al.* (collectively "Aurelius"),[6] moved to dismiss the title III case the Oversight Board had initiated pursuant to the explicit statutory authority granted to it by Congress. *See* 48 U.S.C. §2164(a). Aurelius' Motion to Dismiss rests entirely on the claim that Congress acted unconstitutionally when it created the Oversight Board, because it adopted a plan for staffing the Oversight Board that differs from the one set out in the Appointments Clause, U.S. Constitution art. II, § 2, cl. 2—the method established by the Constitution for appointing "the principal federal officers [of the United States' own government]—ambassadors, ministers, heads of departments, and judges." *Freytag v. C.I.R.*, 501 U.S. 868, 884 (1991). Aurelius thus insists that the only way that Congress was constitutionally permitted to staff this arm of the Puerto Rican government was to have each Oversight Board member appointed by the President and confirmed by the full Senate.[7]

Aurelius is mistaken. An unbroken line of Supreme Court authority stretching back more than 100 years distinguishes between the constitutionally constrained legislative power Congress possesses when it is acting under Articles I and II for the federal government, and the nearly unfettered authority it possesses under Article IV of the Constitution when it is governing the affairs of Puerto Rico and the other "unincorporated" territories.[8] Aurelius all but ignores this

---

[6] Including Aurelius Opportunities Fund, LLC, and Lex Claims, LLC.

[7] The Union de Trabajadores de la Industria Eléctrica y Riego, (UTIER), has filed an Adversary Complaint (Case:17-00228-LTS, Dkt. No. 1) premised on the theory and citing much of the authority relied upon by Aurelius. For the reasons given in this brief, UTIER's position is similarly untenable.

[8] As explained in greater detail below, the United States Constitution applies in full only with respect to those territories that are "surely destined for statehood"—the so-called "incorporated territories"—but applies only in quite limited respects in territories like Puerto Rico (the

unique source of congressional power; it never discusses the Territorial Clause in Article IV, on which Congress expressly relied in passing PROMESA,[9] or the many Supreme Court cases construing the clause's few limits.  Rather, its entire argument implicitly rests on the "erroneous assumption that the constitutional limitations of power which operate upon the authority of Congress when legislating *for the United States* are [just as] applicable . . . when it comes to exert, in virtue of the sovereignty of the United States, legislative power *over territor*[*ies*] not forming part of the United States because not incorporated therein."  *Bd. of Pub. Util. Comm'rs v. Ynchausti & Co*., 251 U.S. 401, 406–07 (1920) (emphasis added).  With limited exceptions that Aurelius does not even mention, much less claim to be applicable here,[10] Congress' Article IV power to govern the territories, "is absolute in its terms, and suggestive of no limitations."  *Downes v. Bidwell,* 182 U.S. 244, 285 (1901).  Aurelius' misplaced and exclusive focus on the Appointments Clause is fatal to the Motion to Dismiss.

History makes this plain.  As explained below, since the earliest days of the Republic, Congress has exercised its "absolute" territorial power under Article IV by establishing, abolishing, and reconfiguring the governmental entities to which it has delegated its singular constitutional responsibility over the unincorporated territories.  Over that time, territorial power has been exercised by occupying generals, admirals, and "executive councils"; Congress has directed the President to appoint territorial governors, and more recently, it has allowed the

---

"unincorporated" territories) for which statehood is neither expected nor imminent.  *Boumediene v. Bush*, 553 U.S. 723, 757-58 (2008).

[9] *See* 48 U.S.C. §2121(b)(2) (PROMESA enacted "pursuant to article IV, section 3 of the Constitution of the United States"); *see also* Aurelius brief in support of Motion to Dismiss ("Aurelius Br.") at 5 ("pursuant to its power over the territories under Article IV of the Constitution, Congress passed PROMESA").

[10] *See infra* at Section I.

citizens of each territory to elect governors and legislators to form various types of government, composed to address local desires and needs.

More specifically, throughout most of Puerto Rico's 119 year history as a possession of the United States, Congress' sovereign power to govern has been delegated to entities that were not designated pursuant to the Appointments Clause, and yet no court has ever held that the Appointments Clause limits the range of governing options available to Congress, or even suggested a credible argument that this might be so. That is why Aurelius has been unable to cite a single decision—from any court, at any level—holding that the territorial powers of Congress are so constrained, or even that the Appointments Clause is a factor to be considered in the analysis.

To invalidate the Oversight Board and the Act of Congress that created it, Aurelius faced a "heavy" burden;[11] it was obligated to show convincingly that the Appointment Clause limits Congress' authority to govern the territories. Congress expressly invoked its Article IV territorial powers when it adopted PROMESA and created the Oversight Board, and as a co-equal branch of the federal government, its actions are entitled to respect and a presumption of constitutionality.[12] Therefore, this court must uphold PROMESA "unless the lack of [Congress'] constitutional authority . . . is clearly demonstrated." *United States v. Harris*, 106 U.S. 629, 635 (1883). Because Congress' authority in this case derives from Article IV, which Aurelius has all

---

[11] *Freytag*, 501 U.S. at 883.

[12] *See United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds"); *U.S. v. Nixon*, 418 U.S. 683, 703 (1974) ("In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others.").

4

but ignored, and not Article II, Aurelius has failed to carry that heavy burden.  The Motion to

Dismiss should be denied.

I.      U.S. CONSTITUTION GIVES CONGRESS VIRTUALLY UNLIMITED AUTHORITY
        TO GOVERN UNINCORPORATED TERRITORIES DIRECTLY, OR TO DELEGATE
        THAT POWER TO SUCH AGENCIES AS IT MAY SELECT

As Chief Justice Marshall declared more than 200 years ago, Congress possesses an

"absolute and undisputed power of governing and legislating" for the territories—those

possessions of the United States that lie outside of the individual States.  *Sere v. Pitot*, 10 U.S.

332, 337 (1810) (Marshall, C.J.).  This "absolute and undisputed" power was then reaffirmed in

the so-called "*Insular* cases" at the turn of the last century,[13] and has been reinforced through

more than 100 years of unbroken authority since.  In this extensive line of cases, the Supreme

Court has repeatedly emphasized that Congress

> may do for [territories like Puerto Rico] whatever a state might do for itself or one
> of its political subdivisions, since over such a dependency the nation possesses the
> sovereign powers of the general government plus the powers of a local or a state
> government in all cases where legislation is possible.  [Congress possesses]
> practically unlimited powers of legislation in respect of a dependency. . . .

*Cincinnati Soap Co. v. United States*, 301 U.S. 308, 317–18 (1937).

Because this is not a shared responsibility, the "separation of powers" concerns

underlying the Appointments Clause[14] do not even theoretically apply.  The Territorial Clause

"bestowed *upon Congress alone* a complete power of government over territories not within the

States."  *N. Pipeline Constr. Co. v. Marathon Pipe Line Co*., 458 U.S. 50, 64–65 (1982) (citing

*American Ins. Co. v. Canter*, 26 U.S. 511 (1828)) (emphasis added).  Congress *alone* thus

---

[13] *Dorr v. United States*, 195 U.S. 138 (1904); *Hawaii v. Mankichi*, 190 U.S. 197 (1903);
*DeLima v. Bidwell*, 182 U.S. 1 (1901); *Dooley v. United States*, 182 U.S. 222 (1901); *Armstrong
v. United States*, 182 U.S. 243 (1901); *Downes v. Bidwell*, 182 U.S. 244 (1901).

[14] *See*, e.g., *Buckley v. Valeo*, 424 U.S. 1, 119 (1976) (Appointments Clause "must be construed
within the doctrine of separation of powers").

possesses "the entire dominion and sovereignty, national and local, Federal and state, and has full legislative power over all subjects upon which the legislature of a state might legislate within the state." *Simms v. Simms,* 175 U.S. 162, 167–68 (1899).

Although the power to govern the territories was bestowed by the Constitution upon Congress alone,[15] Congress is not required to *exercise* that power alone or directly.  "[P]ursuant to art. IV, § 3, cl. 2 of the Constitution [and in] the exercise of [its] plenary powers, Congress may freely delegate its legislative authority to such agencies as it may select." *U.S. v. Husband R.*, 453 F.2d 1054, 1058–59 (5th Cir. 1971); *see also Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 607 (1976) (although sovereign power to govern the territories is "reserved to Congress . . . the Puerto Rican Legislature . . . should be treated as the delegate of Congress"); *Dorr*, 195 U.S. at 140–41 (Congress lawfully gave the territory of "Orleans . . . a legislative, an executive, and a judiciary, with such powers as it has been their will to assign to those departments respectively").

Like its substantive power to legislate for the territories in the first instance, Congress' power to delegate this power is in all relevant respects unconstrained by the Constitution.  For example, in other contexts—where Congress is legislating under Article I *for the United States*, and not governing the territories under Article IV, the Supreme Court has held that Congress cannot delegate its legislative authority to the Executive branch; to do so would be a signal violation of the separation of powers mandated by the Constitution.[16]  But in *Cincinnati Soap Co.*, 301 U.S. at 322–23 and *United States v. Heinszen*, 206 U.S. 370, 384–85 (1907), the Court

---

[15] *N. Pipeline*, 458 U.S. at 87–89.

[16] *See*, e.g. *Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct. 1225, 1246 (2015) ("Congress could not delegate legislative power"); *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989) ("The Constitution provides that '[a]ll legislative Powers herein granted shall be vested in a Congress of the United States' . . . and we long have insisted that . . . Congress generally cannot delegate its legislative power to another Branch.").

6

made clear that this principle is simply *irrelevant* when Congress exercises its Article IV power

to regulate the territories.  Those territories, the Court explained, are

> dependenc[ies] for which [Congress can] provide[] a complete system of
> government to administer the affairs of a population . . . .  The congressional
> power of delegation to such a local government is and must be as comprehensive
> as the needs.  [Thus, in legislating for] the territories, possessions and
> dependencies of the United States, . . . Congress . . . *is not subject to the same*
> *restrictions which are imposed in respect of laws for the United States considered*
> *as a political body of states in union.*

*Cincinnati Soap Co.,* 301 U.S. at 322–23 (emphasis added); *see also Husband R.*, 453 F.2d at

1059 ("With respect to the basic areas of civil government of the Canal Zone, Congress has

[lawfully] delegated its plenary authority to the executive branch of our government").

That is why, in *Heinszen*, 206 U.S. at 384–85, the Supreme Court expressly rejected the

argument that Congress was "without authority [under the Territorial Clause] to delegate *to the*

*President* [its] legislative authority."  *Id.* (emphasis added).  "[T]he premise upon which this

proposition rests presupposes that Congress, in dealing with the [territories, there the Philippine

Islands], may not . . . delegate legislative authority to such agencies as it may select [but that

argument] is [no longer] open for discussion."  *Id.* at 385.  Thus, when it governs the territories,

Congress can delegate its powers as it wishes, *even if doing so would be unconstitutional* were it

legislating for the United States.

*Cincinnati Soap* and *Heinszen* are not the only cases in which the Supreme Court has

held that explicit constitutional limits on the authority of Congress that apply when it legislates

for the federal government do not constrain its Article IV power over the territories.  Article I, §8

gives "Congress [the] power to lay and collect taxes, duties, imposts and excises," but when it

does so, it must apply those taxes or duties "uniform[ly] throughout the United States."  In *Binns*

*v. United States*, 194 U.S. 486, 491 (1904), however, the Court held that when it is governing the

territories, "Congress is not limited" by this constitutional restriction. "In the exercise of [its
Article IV] power Congress, like any state legislature [is] unrestricted by [these] constitutional
provisions [and] may, at its discretion, wholly exempt certain classes of property from taxation,
or may tax them at a lower rate than other property." *Id.* at 492 (citation omitted); *see also
Gibbons v. District of Columbia*, 116 U.S. 404, 408 (1886) (applying the same standard with
respect to the District of Columbia, over which Congress possesses complete constitutional
authority).

A key to these cases is the fact that Congress "may do for [territories like Puerto Rico]
whatever a state might do for itself or one of its political subdivisions[.]" *Cincinnati Soap*, 301
U.S. at 317; *see also Binns*, 194 U.S. at 492 ("Congress, like any state legislature [is] unrestricted
by [these] constitutional provisions"). Thus, Congress may establish or delegate its territorial
power to whatever organs of government it finds appropriate, even if they are structured in ways
that would be unconstitutional if they were adopted for the federal government itself. Just as
Nebraska is entitled to establish a unicameral legislature, which would be incompatible with
Article I, §1 of the U.S. Constitution if that provision applied to the states, Congress was able to
delegate its territorial power to unicameral legislatures in Guam and the Virgin Islands. *See* 48
U.S.C. §§1423, 1571. Article I, §1, which requires a bicameral Congress, is simply irrelevant.

Similarly, the States are free to adopt executive appointment schemes that would be
unlawful under the Appointment Clause were that provision applicable. The Governor of New
Jersey is entitled to appoint his or her Lieutenant Governor to serve as the Secretary of State as
well, without any input or approval from the state legislature. *See* New Jersey Const. Art. V, § 4,
¶ 4. An individual designated by the Governor of Arizona to be Director of Agriculture—a
cabinet level position—is first screened by a five-member committee appointed by the Governor,

but is not subject to state senate confirmation, or any other legislative approval.  *See* Ariz. Rev.

Stat. § 3-103.  The New Hampshire Attorney General is appointed by the Governor and must be

approved, not by the state senate, but by a five-member elected body called the Executive

Council.  *See* NH Const. Pt. 2, Art. 46.[17]

Just as these individual States are permitted to adopt these governmental structures at

odds with the Constitution's blueprint for the federal government, Congress, with its "practically

unlimited powers of legislation in respect of" the territories, can do so as well.  *Cincinnati Soap,*

301 U.S. at 317.  In doing so, it would merely be doing "for [the territories what] a state might do

for itself or one of its political subdivisions," something the Court has repeatedly said Congress

may do under Article IV.  *Id.*

And that is precisely what Congress has done.  Although in Guam, the governor makes

appointments to executive office subject to advice and consent by its unicameral legislature (48

U.S.C. §1422c(a)), in the Virgin Islands, Congress has authorized the governor to make those

appointments without any form of legislative consent.  *Id.* at §1591.  In Puerto Rico, Congress

delegated its power to legislate to a 27-member Senate and a 51-member House of

Representatives, P.R.Const., Art. III, §§ 1-2, but that number of legislators must be *increased* if

in any general election "more than two-thirds of the members of either house are elected from

---

[17] The State of Michigan created a nine-member Financial Review Commission to assist Detroit
with its financial crisis, which was composed of several elected officials and a number of
gubernatorial appointees, none of whom had to be confirmed legislatively.  *See* Michigan
Financial Review Commission Act, Act 181 of 2014, Section 141.1635(5).  Similarly, the
Pennsylvania Intergovernmental Cooperation Authority, created in 1991 to assist Philadelphia
through its own financial crisis, consisted of five individuals, each designated by one of five
elected officials in the state government without legislative confirmation.  Philadelphia's
Director of Finance was an *ex officio* member.  *See* PICA Act of June 5, 1991, P.L. 9, 53 P.S.
§ 12720.101 et seq.  And as discussed *infra* at 13, Congress required the President to *consult with*
various congressional leaders before he appointed the members of the District of Columbia
Financial Responsibility and Management Assistance Authority, but did not require Senate
confirmation of any of his appointees.

one political party or from a single ticket." *Id.* at §7.  Parties, of course, were among the primary

evils our republican form of government was designed to address,[18] and the structure of

government Congress adopted for Puerto Rico would be patently unconstitutional if the

structural provisions of Article I constrained Congress with respect to its territorial powers.

In fact, Congress has exercised its power to delegate its constitutional authority to govern

Puerto Rico in a wide variety of ways:

- From 1898–90, after Spain ceded Puerto Rico to the United States as a prize of the Spanish-American War, the territory was governed by the same general who commanded the Army of Occupation; the military administered the Territory's civil affairs through orders issued with the force of law, without senatorial confirmation.[19]

- In 1900, Congress withdrew the military governor's authority and instead delegated that power to an appointed governor and an elected unicameral legislature, i.e., one at odds with the Constitution's bicameral design.

- In 1917, Congress declared Puerto Rico an "organized but unincorporated territory," dissolved the unicameral legislature, and created a territorial house and a senate, both elected by the people of Puerto Rico.  Jones-Shafroth Act, Pub. L. 64-368, 39 Stat. 951, codified as 48 U.S.C. §731 *et seq*.

- In 1947, Congress allowed the citizens of Puerto Rico to elect a governor for the first time.  Elective Governor Act, Pub. L. 80-362, 61 Stat. 770.

---

[18] Parties, James Madison, explained, acted on the basis of "common impulse of passion . . . adversed [sic] to the rights of other citizens, or to the permanent and aggregate interests of the community."  *See* The Federalist No. 10.  The answer, he thought, would be "supplied by the republican principle, which enables the majority to defeat [the party's] sinister views by regular vote.  [Factionalism, he believed] may clog the administration, it may convulse the society; but it will be unable to execute and mask its violence under the forms of the Constitution."  Washington, too, feared the impact of political parties.  Unchecked, he thought they would "become potent engines, by which cunning, ambitious, and unprincipled men will be enabled to subvert the power of the people and to usurp for themselves the reins of government, destroying afterwards the very engines which have lifted them to unjust dominion."  Washington's Farewell Address (1796), available at http://avalon.law.yale.edu/18th_century/washing.asp (last visited Sept. 25, 2017).

[19] Counsel for the Committee has been unable to find any congressional record of such a confirmation vote.

- In 1950, Congress authorized Puerto Rico to adopt its own constitution, with imposed limitations (e.g., the document was required to provide for a republican form of government).  Public Law 600, Pub. L. No. 81-600, 64 Stat. 319.[20]

As this history demonstrates, for most of the 119 years that Puerto Rico has been a possession of the United States, Congress has delegated its plenary authority to govern in ways other than that specified by the Appointments Clause, providing powerful evidence that the Clause does not apply to the territory.

No matter what sort of government Congress has prescribed for Puerto Rico, however, the *power* to govern has always remained with Congress.  "Congress retains all essential powers [over the territories] set forth under our constitutional system, and . . . Congress . . . will determine the changes, if any, in the political status of the island."  96 Cong. Rec. 8569, 9595 (1950).  No matter how Congress has disposed of its day-to-day responsibility for governance under Article IV, it has always "retain[ed] and continues to exercise plenary powers over Puerto Rico pursuant to the Territorial Clause and [that] status of Puerto Rico did not change with the advent of the Constitution of Puerto Rico."  *Popular Democratic Party*, 24 F. Supp. 2d at 193 (citing *Harris v. Rosario*, 446 U.S. 651 (1980) (per curium)); *Califano v. Torres*, 435 U.S. 1, 3 n.4 (1978) (per curium).

Congress, of course, no longer uses an occupying general as its agent for governing Puerto Rico.  As augmented by PROMESA, the territorial government to which Congress has delegated its authority is comprised of four distinct entities:  the elected governor, the elected bicameral legislature, the territorial courts, and the Oversight Board—the latter created "as an entity within the territorial government" of Puerto Rico for a limited time and a limited (though

---

[20] *See generally* R.S. Garrett, *Political Status of Puerto Rico*, Congressional Research Service Report for Congress, at 9 (June 7, 2011); Report by the President's Task Force on Puerto Rico's Status at 17 (March 2011); *Popular Democratic Party v. Puerto Rico*, 24 F. Supp. 2d 184, 190–92 (D.P.R. 1998).

critical) purpose.[21]  Congress might have abolished the legislature altogether and reposed all of

this authority in the governor, or might have eliminated the office of governor and reposed its

power in the legislature, or it might have eliminated both and delegated all of its constitutional

authority to the Oversight Board, but it concluded that the interests of the citizens of Puerto Rico

would best be served by dividing the responsibility among the existing structures of elected

government (the governor and the legislature) and augmenting those entities with the Oversight

Board.  That was its constitutional right.

## II.   PROCESS THROUGH WHICH CONGRESS STAFFED OVERSIGHT BOARD IS NOT UNIQUE

Aurelius claims that the clearest evidence of Congress' constitutional breach is "the lack

of historical precedent for" the Oversight Board.  *See* Aurelius Br. at 1 (there are "no "historical

analogues for this novel structure").  Aurelius apparently believes that Congress adopted an

unprecedented method for designating the members of the Oversight Board, and has concluded

that if that approach were constitutional, Congress would have used it before.

Of course, an approach is not defective simply because it is novel (there is a first time for

everything).  Indeed, as the Supreme Court recently reiterated, one important purpose of

Article IV was to give Congress "broad latitude to develop innovative approaches to territorial

governance."  *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1876 (2016).

But even if Aurelius' "novelty" point had some validity, the factual premise on which it

rests is simply untrue.  The District of Columbia, like Puerto Rico, is a "territory that is not a

State,"[22] over which Congress has plenary power to govern.[23]  In the mid-1990s, the District of

---

[21] 48 U.S.C. §2121(c)(1).

[22] *Boumediene,* 553 U.S. at 756.

[23] U.S. Const. Art. I, § 8, cl. 1, 17 ("The Congress shall have Power To … exercise exclusive Legislation in all Cases whatsoever, over [the] District" of Columbia).

Columbia was, as Puerto Rico is now, experiencing a financial crisis.  Congress did there as it

has done here:  it created a new agency—a financial control board—as an entity within the

District's government to take a measure of control over the District's finances.  The members of

the board were appointed by the President, but there was no provision for Senatorial

confirmation.  Instead, the President was statutorily required to "consult with" certain specific

Congressional leaders designated in the statute about his intended appointees.[24]

The constitutionality of that board was challenged on separation of powers grounds, just

as Aurelius challenges the Oversight Board here.  *Brewer v. D.C. Fin. Responsibility & Mgmt.*

*Assistance Auth.*, 953 F. Supp. 406, 410 (D.D.C.), *aff'd*, 132 F.3d 1480 (D.C. Cir. 1997).  The

court found that, as here, "Congress [had] created the [District's local government and through

delegation had] authorized it to legislate, but Congress [had nonetheless] reserved its

constitutional authority to alter the institutions of the District of Columbia government at any

time and for nearly any reason."  *Id.*  The district court held that when it created the board and

assigned it some of the existing government's responsibilities, Congress "exercise[d] its

constitutional authority as legislature for the District,"[25] just as Congress exercised its power

"pursuant to article IV, section 3 of the Constitution" as legislature for Puerto Rico when it

created the Oversight Board here.  PROMESA, 48 U.S.C. § 2191(a).  Rejecting the separation of

powers challenge, the court held that the "Executive Branch has no constitutional role with

respect to the District that corresponds or competes with that of Congress."  *Brewer,* 953 F.

Supp. at 410.  That is, because Congress was exercising its plenary authority to govern the

District—a zone where the Constitution gives the Executive branch no corresponding

---

[24] District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub.
L. 104–8, 109 Stat. 97 (1995).

[25] *Id.*

responsibilities—the court held that there was no "dange[r] of congressional usurpation of Executive Branch functions." *Id.* The D.C. Circuit affirmed.

*Brewer* thus brings together two important points that resolve this case. In that case, the court observed that Congress had absolute and undisputed power to govern the District of Columbia and to delegate that authority to any entity it saw fit to use. Moreover, because the Constitution bestowed this power to govern on Congress *alone*, there was no room for the separation of powers doctrine to operate.

The same is true here. The Constitution bestows the power to govern Puerto Rico on Congress alone. The separation of powers doctrine, which lies at the heart of the Appointments Clause argument Aurelius advances, has no role to play in considering the scope of that power. *Brewer* is thus indistinguishable in any material respect from this case, and the same result is compelled here.

III.     CONGRESS' POWER TO REGULATE UNINCORPORATED TERRITORIES IS
         CONSTRAINED ONLY BY THOSE PERSONAL RIGHTS EMBEDDED IN U.S.
         CONSTITUTION THAT FORM BASIS OF ALL FREE GOVERNMENT

As noted *supra* at 4-5 and n.12, Congress' power to govern Puerto Rico is nearly, but not quite entirely, unlimited. When a territory is "surely destined for statehood," it is considered an "incorporated" territory, and the Constitution constrains Congress' power to govern that territory just as it would if the territory had already become a state. In "unincorporated" territories such as Puerto Rico,[26] on the other hand, the Constitution in full does not limit Congress' power to govern; it constrains that power only to the extent that Congress' actions would otherwise transgress "fundamental [constitutional] limitations [that operate] in favor of personal rights [that

---

[26] Congress has declared that Puerto Rico is an *unincorporated* territory. *See* 48 U.S.C. § 731b.

are] the basis of all free government." *Dorr*, 195 U.S. at 146–47 (quoting *Downes*, 182 U.S.at

291 (White, J., concurring)).

The District of Columbia Circuit helpfully explained this distinction in *Tuaua v. United*

*States*, 788 F.3d 300, 308 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 2461 (2016):

> "Fundamental" has a distinct and narrow meaning in the context of territorial
> rights.  It is not sufficient that a right be considered fundamentally important in a
> colloquial sense or even that a right be "necessary to [the] [ ]American regime of
> ordered liberty." . . .  Under the *Insular* framework the designation of
> fundamental extends only to the narrow category of rights and "principles which
> are the basis of *all* free government." . . .  In this manner the *Insular* Cases
> distinguish as universally fundamental those rights so basic as to be integral to
> free and fair society.  In contrast, we consider non-fundamental those artificial,
> procedural, or remedial rights that—justly revered though they may be—are
> nonetheless idiosyncratic to the American social compact or to the Anglo–
> American tradition of jurisprudence.

*Id.*  (citations omitted).  The question in this case, then, is whether the Appointments Clause

creates some "personal right" that is "so basic as to be integral to free and fair society" that it

forms "the basis of all free government," and not merely features of government "that—justly

revered though they may be—are nonetheless idiosyncratic to the American social compact or to

the Anglo-American tradition of jurisprudence."  The Appointments Clause creates no such

rights.

First, as Aurelius' lead counsel told the Supreme Court in 2003, when he was serving as

the Solicitor General of the United States:

> [The Supreme] Court has never held that the Appointments Clause applies to the
> governance of the United States Territories.  The Court has never identified it as
> one of the fundamental rights enjoyed by residents of the Territories . . . .  To the
> contrary, *the Appointments Clause, like the protections of Article III, regulates
> only the framework of the federal government and thus is no more applicable to
> the Territories than it is to State governments*.  Accordingly, [individual citizens

of the territories] are not within the class of persons protected by the
Appointments Clause . . . .[27]

It is now possible to update this research.  Since 2003, the Supreme Court has said

nothing to contradict counsel's statement that the Appointments Clause regulates the framework

of the federal government, but is not applicable to the territories.  Moreover, counsel for the

Committee has been unable to find any court, trial or appellate, either before 2003 or since, that

has reached a contrary conclusion.  The representation made in 2003 to the Supreme Court by

the United States (through Aurelius' current lead counsel)—that the Appointments Clause is not

"applicable to the Territories"—was an accurate statement of the law when it was made, and is

still an accurate statement of the law today.

Second, the dividing line between the few constitutional rights that do apply to the

unincorporated territories, on the one hand, and the many that do not on the other shows that the

Appointments Clause does not restrict the methods by which Congress is permitted to govern

Puerto Rico.  The test has two parts:  for a provision of the Constitution to constrain Congress'

power, it must (a) create a "personal right" that (b) is so intimately connected to basic civil

liberties as to form "the basis of all free government."  *Dorr*, 195 U.S. at 146–47.  Only rights

that embody "the spirit of the Constitution [by guaranteeing the right] to be protected in life,

liberty and property and not to be deprived thereof without due process of law" can pass this test.

*Soto v. United States*, 273 F. 628, 633–34 (3d Cir. 1921).

Under this standard, courts have held that the right of free speech[28] and the right to

assemble freely[29] apply in the territories.  So does the right to personal privacy undergirding

---

[27] Brief for the United States in *Nguyen v. U.S.*, 539 U.S. 69 (2003), 2003 WL 548057, at *33
(Feb. 21, 2003) (emphasis added).

[28] *Cintron v. State Bd. of Educ.*, 384 F. Supp. 674, 681 (D.P.R. 1974).

[29] *Marin v. University of Puerto Rico (Marin II)*, 377 F. Supp. 613 (D.P.R. 1973).

reproductive choice,[30] the Fifth Amendment's guarantee of due process,[31] the right to confront

one's accusers,[32] and the right to be protected from double jeopardy.[33]

On the other side of the ledger are rights that courts have concluded fail this personal-

rights/free-government test, even though they are far more "personal" and more intimately

connected to what one might consider "free government" than any that might arise under the

Appointments Clause.  For example, territorial citizens are not entitled to "one man, one vote"

apportionment in their legislatures.[34]  They can be called to "answer for a capital or otherwise

infamous crime" without the "presentment or indictment of a Grand Jury" notwithstanding the

fact that the Fifth Amendment guarantees that right,[35] they have no constitutional right to insist

on a trial by jury,[36] or, when such a jury is provided, to insist on a unanimous verdict.[37]  Indeed,

the Supreme Court has long held that citizens of the unincorporated territories have no right to a

trial before an Article III judge *at all*[38]; the territorial courts of Puerto Rico are *legislative*

entities, created by Congress pursuant to its Article IV power to govern,[39] and not under Article

---

[30] *Montalvo v. Colon*, 377 F. Supp. 1332 (D.P.R. 1974).

[31] *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974).

[32] *Soto*, 273 F. at 634–35.

[33] *United States v. Sanchez*, 992 F.2d 1143, 1148–52 (11th Cir.), *on reconsideration*, 3 F.3d 366 (11th Cir. 1993).

[34] *Rayphand v. Sablan*, 95 F. Supp. 2d 1133, 1139–40 (D. N. Mar. I. 1999), *aff'd sub nom. Torres v. Sablan*, 528 U.S. 1110 (2000).

[35] *Mankichi*, 190 U.S. at 212.

[36] *Dorr*, 195 U.S. at 146–48.

[37] *Mankichi*, *supra* at n.35.

[38] *Dorr*, 195 U.S. at 146–48; *McAllister v. United States*, 141 U.S. 174, 180 (1891); *accord N. Mariana Islands v. Atalig*, 723 F.2d 682 (9th Cir. 1984); *Fournier v. Gonzalez*, 269 F.2d 26 (1st Cir. 1959).

[39] *United States v. Perez Oviedo*, 281 F.3d 400, 403–04 (3d Cir. 2002).

III, which would require life-tenured judges appointed by the President and confirmed by the
Senate.

These cases make clear that the "rights" arising from the Appointments Clause do not
impinge on Congress' Article IV authority.  First, "[s]tructural protections such as those
embodied in the Appointments Clause stand on a different footing from personal constitutional
rights."  *Samuels, Kramer & Co. v. C.I.R.*, 930 F.2d 975, 984 (2d Cir. 1991).  The clause,
grounded in the separation of powers doctrine, creates no intimately personal rights comparable
to the individual liberties that have been applied by the courts to the unincorporated territories.
As the Supreme Court has observed, "[i]n contrast to due process, which principally serves to
protect the personal rights of litigants to a full and fair hearing, separation of powers principles
are primarily addressed to the structural concerns of protecting the role of the independent
Judiciary within the constitutional design."  *Miller v. French*, 530 U.S. 327, 350 (2000).[40]

Second, as explained *supra* at 6-7, the "[s]tructural protections [contained in the U.S.
Constitution] such as those embodied in the Appointments Clause"[41] have never been held
relevant to the form of the government to which Congress has delegated its authority.  That was
true when Puerto Rico was governed by an occupying army, but is also true now.  As noted
above, the governmental structure established by the Puerto Rican constitution—which was
expressly approved by Congress in 1952[42]—is different in fundamental ways from the structure
mandated by the U.S. Constitution for the federal government itself.  No court has ever held that

---

[40] *Bond v. United States*, 564 U.S. 211, 222 (2011), is not to the contrary.  There, the Court
recognized that the separation of powers doctrine was primarily intended "to protect each branch
of government from incursion by the others," but concluded that this principally structural nature
of the rights involved did not necessarily deprive individuals of standing to bring separation of
powers challenges.  *Id.*

[41] *Samuels, Kramer & Co.,* 930 F.2d at 984.

[42]  Pub. L. 82–447, 66 Stat. 327 (1952).

the structure-of-government provisions in the Puerto Rican Constitution are invalid because they differ from those provisions in the United States Constitution that dictate the structure of the *federal* government.  As Aurelius' lead counsel correctly observed, the structure-of-government provisions of the United States Constitution have no more application to Puerto Rico than they do the individual U.S. States.

Merely listing the rights that are and are not applicable to the territories exposes the fallacy in Aurelius' argument.  The rights that have been made applicable to the unincorporated territories, and thus constrain Congress and its delegees, implicate personal freedoms; it would be hard to imagine a "free government" that denies the right freely to speak, to assemble, or to pray.  And even the rights that have been held *inapplicable*, like the right to a trial by jury, are more central to our conception of "free government" than any supposed right to insist that a territorial agency be composed in any particular way.  No such claim can plausibly be made about any "rights" associated with the Appointments Clause.

Finally, as noted above, "free government" can, and does, exist in the States without the official-designation scheme prescribed by the Appointments Clause or the structures otherwise established by the Constitution for the federal government such as a bicameral legislature.  *See supra* at Section III.  Similarly, many of our democratic allies do not even *have* a President or a Senate, much less an analogous staffing scheme.  In Canada, "[p]ersons who are to be Members of [the Privy] Council [are] chosen and summoned by the Governor General"; no legislative approval is required.[43]  In Great Britain, the Prime Minister is selected by the Queen after elections for the House of Commons, and (s)he selects cabinet Ministers, who are then appointed

---

[43] CONSTITUTION OF CANADA, 1867, rev. 1982, arts. 9–11.

by the Queen.[44]  This structure—with sitting legislators simultaneously serving in the executive

branch as members of the Prime Minister's cabinet—would be expressly prohibited under our

Constitution.[45]  There is no "advice and consent" role for either House of Parliament with respect

to cabinet ministers, but Great Britain manages to provide a "free government" to its citizens

nonetheless.  The same is true in Australia.[46]  In Spain, high governmental officers are nominated

by the president and appointed by the king.[47]  In Germany, cabinet ministers are installed and

removed by the president, upon recommendation of the chancellor.[48]  In France, the president

appoints executive officers on the nomination of the prime minister, without legislative

confirmation.[49]  Although the separation of powers doctrine is an important one in American law

and tradition, one can hardly claim that it is an indispensable ingredient for a "free government."

Because Aurelius has paid no mind to the Territorial Clause and the Supreme Court cases

construing it, it has not attempted to argue that the Appointment Clause creates any personal

rights that might fairly be characterized as the basis of all free government—rights that might

constrain Congress' otherwise absolute and undisputed right to delegate its power to govern the

territories "to such agencies as it may select."  *Heinszen*, 206 U.S. at 384–85.  But even if

---

[44] GUIDE TO FOREIGN AND INTERNATIONAL LEGAL CITATIONS 206 (N.Y.U. J. Int'l L. & Pol, ed., 1st ed. 2006), available *at* http://www.law.nyu.edu/sites/default/files/upload_documents/Final_GFILC_pdf.pdf; *see also* THE CABINET MANUAL:  A GUIDE TO LAWS CONVENTIONS AND RULES ON THE OPERATION OF GOVERNMENT 21 (Cabinet Secretariat, ed., 1st ed. 2011), *available at* www.cabinetoffice.gov.uk.

[45] Art. I, §6, cl. 2 provides:  "No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."

[46] AUSTRALIAN CONSTITUTION § 64, July 9, 1900.

[47] CONSTITUCIÓN ESPAÑOLA , art. 100, Dec. 29, 1978 (Spain).

[48] GRUNDGESETZ, May 8, 1949, Art. 54 Abs. 1 (Ger.).

[49] LA CONSTITUTION, art. 8, OCT. 4, 1958 (Fr.).

Aurelius had addressed the question, a century of authority on the point would have made such

an argument impossible to sustain.

IV.    OVERSIGHT BOARD MEMBERS ARE TERRITORIAL OFFICIALS, NOT
       "OFFICERS OF THE UNITED STATES"

As noted above, Aurelius' brief cites none of the relevant Article IV cases.  For example,

absent entirely from Aurelius' brief are the *Insular Cases*, which together "cover every phase of

the question, either legal or historical" regarding the "constitutional relation of the powers of the

government [over the] territory acquired by a treaty cession to the United States."  *Dorr*, 195

U.S. at 139.  Similarly absent are the cases that establish Congress' quite nearly absolute power

to govern the territories through such agencies as it might select, or the cases that mark out the

very limited constraints the Constitution places on the exercise of its territorial powers.

Instead, Aurelius' brief is thickly populated with non-territory cases dealing with

constitutional constraints on Congress' power for designating "the principal federal officers [of

the United States' own government]—ambassadors, ministers, heads of departments, and

judges."  *Freytag*, 501 U.S. at 884.  These are Aurelius' principal cases, and none is relevant:

- *Buckley v. Valeo*, 424 U.S. 1, 126 (1976), cited nine times in Aurelius' brief, considered the appointment scheme used by Congress for populating the Federal Election Commission.

- *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010), cited seven times, dealt with a sub-unit of the Securities and Exchange Commission created by the Sarbanes Oxley Act of 2002, Pub. L. 107-204, 116 Stat. 745.

- *Edmond v. United States*, 520 U.S. 651, 659–60 (1997), cited nine times, dealt with judges appointed to the Coast Guard Court of Criminal Appeals, and upheld convictions affirmed by those judges in the face of an Appointments Clause challenge.

- *Freytag v. CIR*, 501 U.S. 868, 880–81 (1991), cited seven times, upheld, against separation of powers challenge, a statute permitting the Chief Judge of the United States Tax Court, an Article I court, to appoint special trial judges and to assign to them to certain specified proceedings.

21

Because none of these cases (or the others on which Aurelius has relied) involved any supposed limits on the Territorial Clause powers of Congress, necessarily, none of those cases considered the question whether the Appointments Clause created any personal rights that might be said to form the basis of free government.

Nonetheless, Aurelius lifts from the non-territory cases (*Buckley* and *Edmond* in particular) the asserted principle that any "official whose position is 'established by Law' and who exercises 'significant authority pursuant to the laws of the United States' is an 'Officer of the United States'" and thus must be designated through the process established by the Appointments Clause.  Aurelius Br. at 12 (quoting *Buckley*, 424 U.S. at 125-26).  Aurelius' Motion to Dismiss, then, is premised on the implicit assertion that the Appointments Clause applies identically whether the "officer" in question is a cabinet member such as the Secretary of Labor or the U.S. Attorney General, or territorial official appointed "pursuant to article IV, section 3 of the Constitution of the United States" to serve on a territorial board created "as an entity within the territorial government [and *not* as an official in] a department, establishment, or instrumentality of the Federal Government."  PROMESA §101(b)–(c).[50]

That cannot be.  First, as noted above, the test for determining whether a constitutional provision such as the Appointments Clause constrains Congress' otherwise "absolute and undisputed power of governing and legislating" for the territories[51] has long been settled; it has existed for more than a hundred years and has developed in a uniform line of authority that Aurelius does not mention.  Aurelius cannot succeed on its Motion to Dismiss by ignoring this settled law.

---

[50] Aurelius concedes, as it must, that "Congress passed PROMESA . . . pursuant to its power over the territories under Article IV of the Constitution."  Aurelius Br. at 5.

[51] *Sere*, 10 U.S. at 337.

22

Second, the Supreme Court has already expressly rejected Aurelius' argument that the constitutional constraints on Congressional power that apply *when it is legislating with respect to federal agencies* also apply when it governs the territories under Article IV.  Specifically, the Court has held that it is "erroneous[] [to] assum[e] that the constitutional limitations of power which operate upon the authority of Congress when legislating *for the United States* are [just as] applicable and are controlling upon Congress when it comes to exert, in virtue of the sovereignty of the United States, legislative power *over territor*[*ies*] not forming part of the United States because not incorporated therein."  *Ynchausti & Co.*, 251 U.S. at 406–07 (emphasis added).  Just because the exercise of "significant authority pursuant to the laws of the United States" makes an appointee for the Security and Exchange Commission or the Department of the Interior an "Officer of the United States" to whom the Appointments Clause applies does not mean that the same is true for a territorial official.

Third, Aurelius' argument proves far too much.  Every elected governor of Puerto Rico (and, for that matter, every elected official of Guam, the Northern Marianas Islands, the U.S. Virgin Islands, and American Samoa) is an "official whose position is 'established by Law' and who exercises 'significant authority pursuant to the laws of the United States.'"  Thus, under the standard Aurelius asks the court to apply, these governors must also be "Officers of the United States" subject to the Appointments Clause.  Yet, by definition, none of them has been appointed by the President or subjected to Senate confirmation; Aurelius effectively asks the court to invalidate not merely the Oversight Board, but the government of all of the unincorporated territories and every act they have ever undertaken.  The Supreme Court has considered many

cases involving elected territorial governors, over more than a century, and it has never even

questioned their *bona fides* on these grounds.[52]

Anticipating this problem, Aurelius says that "[t]hese elected governors are generally *not*

considered officers of the United States, because they are not selected by the federal government

and thus do not directly derive their authority from the federal government."  Aurelius Br. at 21.

Aurelius, however, cites no cases that might establish how territorial governors are "generally

… considered," and in fact cites not a single case involving the intersection of the Appointments

and Territorial clauses.

More importantly, the assertion misses the point entirely.  *All* sovereign power, and *all*

governmental authority exercised in the territories is "derive[d] from the federal government," as

shown *supra*.  Every governor—indeed, every legislator, every mayor, and every policeman,

justice of the peace or motor vehicles clerk—in the territories "derive[s] [his or her] authority

from the federal government," or, more specifically, from Congress' absolute power to govern.

Each of these government employees "derives" his or her authority from Congress pursuant to

federal law and operates *exclusively* as an agent of Congress in the exercise of its delegated

authority.  Each territorial office exists only as a matter of Congress' legislative grace.[53]  *See*

*Sanchez*, 992 F.2d at 1152 (over time, "Congress has simply delegated more authority to Puerto

---

[52] Indeed, the current governor of Puerto Rico is given new responsibilities by PROMESA itself. For example, under the Act, he is authorized to develop budgets and fiscal plans, either alone or jointly with the Oversight Board, and to appoint a variety of subordinate officials.  *See,* e.g., Sections 201(d), (f), 48 U.S.C. §§2141(d), (f); Section 502(b)(1), 48 U.S.C. §2212(b)(1) (power to appoint Revitalization Coordinator).

[53] Aurelius makes much of the fact that as a matter of "historical practice," when Congress has chosen to use *appointed* territorial governors, it has made them subject to Senate confirmation. Aurelius Br. at 21–22.  The question, however, is not whether Senate confirmation was for some time the custom, or whether it would be wise now, but whether the Appointment Clause gives Aurelius a right so personally and intimately tied to the essence of free government that it should be imposed here as a constraint on Congressional power.  No court has ever so held.

24

Rico over local matters.  But this has not changed in any way Puerto Rico's constitutional status

as a territory, or the source of power over Puerto Rico.  Congress continues to be the ultimate

source of power pursuant to the Territory Clause of the Constitution") (citing *U.S. v. Lopez*

*Andino*, 831 F.2d 1164, 1176 (1st Cir. 1987) (Torruella, J, concurring)); U.S. Office of Legal

Counsel Memorandum Opinion, *Mutual Consent Provisions In the Guam Commonwealth*

*Legislation*, at p.4 (July 28, 1994) (congressional "delegation of governmental authority to the

non-state areas [is] subject to federal supremacy and . . . such delegation is necessarily subject to

the right of Congress to revise, alter, or revoke the authority granted. . . .  The power of Congress

to delegate governmental powers to non-state areas thus is contingent on the retention by

Congress of its power to revise, alter, and revoke that legislation").[54]

The sweep of Aurelius' proposed standard is breathtaking.  Not only would it invalidate

the current governments in each of the unincorporated territories, and everything they have ever

undertaken on behalf of their citizens, but it would undermine essential components of modern

federalism.  Under the doctrine known as "cooperative federalism," the governors in every State

of the Union exercise "significant authority pursuant to the laws of the United States."  Under

this doctrine, the States and their governors play central roles in the administration of such

federal statutory regimes as the Clean Water Act, Pub. L. 92-500, 86 Stat. 816, as amended, 33

U.S.C. § 1251 *et seq.,* see *Arkansas v. Oklahoma,* 503 U.S. 91, 101 (1992) (Clean Water Act

"anticipates a partnership between the States and the Federal Government, animated by a shared

objective"); the Occupational Safety and Health Act of 1970, Pub. L. 91-596, 84 Stat. 1590,

codified at 29 U.S.C. § 651 *et seq.,* see *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 97

(1992); the Resource Conservation and Recovery Act of 1976, Pub. L. 94-580, 90 Stat. 2795, as

---

[54] Available at https://www.justice.gov/file/163646/download.

amended, 42 U.S.C. § 6901 *et seq.,* see *Dep't of Energy v. Ohio,* 503 U.S. 607, 611–612 (1992);

and the Alaska National Interest Lands Conservation Act, 94 Stat. 2374, 16 U.S.C. § 3101 *et

seq.,* see *Kenaitze Indian Tribe v. Alaska,* 860 F.2d 312, 314 (9th Cir. 1988), *cert. denied*, 491

U.S. 905 (1989).  State governors routinely exercise "significant authority" under these and

many other federal statutes; that does not make these governors "Officers of the United States,"

nor make them subject them to Senate confirmation.

V.      EVEN IF APPOINTMENTS CLAUSE HAD SOME APPLICABILITY HERE, IT
        WOULD NOT PROHIBIT OVERSIGHT BOARD FROM TAKING ACTIONS
        INDISPUTABLY WITHIN CONGRESS' POWER

        Even if one were to assume that the Appointments Clause has some theoretical

application to the scheme adopted by Congress to select members of the Oversight Board that

would not invalidate the Oversight Board's work or the congressionally authorized title III cases

it filed, as Aurelius claims.  *See* Aurelius Br. at 35.  In *Buckley v. Valeo*, on which Aurelius

heavily relies, the Supreme Court faced a separation of powers challenge to the scheme by which

members of the Federal Election Commission ("FEC") had been appointed.  There, two

Presidential selections for the Commission were subject to confirmation not merely by the

Senate, but by the House as well.  The remaining four members were appointed by the President

pro tempore of the Senate and by the Speaker of the House without confirmation.  424 U.S. at

126.

        A plurality of the Court held that this structure could not be sustained in the face of an

Appointments Clause challenge—the FEC being an organ of the federal government and the

Commissioners principle, Constitutional "Officers"—but rather than holding that everything

done by the Commissioned was *ultra vires* and thus invalid, as Aurelius suggests should occur

here, the Court went on to determine "which, if any, of [its] powers [could] be exercised by the

present voting Commissioners."  *Id*. at 137.  The Court explained that, to the extent that "the

powers confided in the Commission [fell] in the same general category as those powers which Congress might delegate . . . there can be no question that the Commission [even] as . . . constituted [might] exercise them." *Id.* and at 139 (notwithstanding Appointments clause deficiency, FEC can perform any activity necessary and proper "in aid of those functions that Congress may carry out by itself").

Here, as already explained, the Constitution gives Congress *alone* the power to govern the territories—a power "Congress may carry out by itself,"—and with it the power to delegate that responsibility to such agencies as it may deem appropriate. *Id.* at 139.  Unquestionably, Congress could have empaneled the Oversight Board directly to provide Congress with recommendations, and it then could have passed legislation that imposed every action the Oversight Board has taken.  Congress could also have passed legislation compelling the elected Governor to file the title III case or to take any other action it desired.  Thus, even if *Buckley* had some relevance, the test it devised—that the Oversight Board could continue to exercise whatever powers "Congress might [otherwise have permissibly] delegate[d]"—would simply reinforce the conclusion that the Motion to Dismiss should be denied.

VI.     <u>EVEN IF THE APPOINTMENTS CLAUSE PROHIBITED MANNER IN WHICH OVERSIGHT BOARD MEMBERS WERE DESIGNATED, THE ACTIONS TAKEN BY OVERSIGHT BOARD ARE NONETHELESS *DE FACTO* VALID</u>

Finally, even if Aurelius' Appointments Clause challenge were to prevail on the merits, and this court were to become the first court in the Nation's history to hold that the Appointments Clause constrains Congress' power to govern in the territories, the Oversight Board's actions (including the title III cases) should be accorded "*de facto* validity" and the Court should permit this proceeding to continue unimpeded.

In *Buckley*, the plurality recognized that invalidating all of the work that had already been performed by the FEC prior to the court's decision would have resulted in great instability. According, it concluded

> that the Commission's inability to exercise certain powers because of the method by which its members have been selected should not affect the validity of the Commission's administrative actions and determinations to this date, including its administration of those provisions, upheld today [in the face of first amendment challenges], authorizing the public financing of federal elections. *The past acts of the Commission are therefore accorded de facto validity*, just as we have recognized should be the case with respect to legislative acts performed by legislators held to have been elected in accordance with an unconstitutional apportionment plan. *Connor v. Williams*, 404 U.S. 549 (1972). *See Ryan v. Tinsley*, 316 F.2d 430, 431-432 (CA10 1963); *Schaefer v. Thomson*, 251 F.Supp. 450, 453 (Wyo.1965), *aff'd sub nom. Harrison v. Schaeffer*, 383 U.S. 269 (1966). *Cf. City of Richmond v. United States*, 422 U.S. 358, 379 (1975) (Brennan, J., dissenting).

424 U.S. at 142 (emphasis added).

Going one step further, the *Buckley* Court drew "on [its] practice in the apportionment and voting rights cases and stay[ed], for a period not to exceed 30 days, the Court's judgment insofar as it affects the authority of the Commission to exercise the duties and powers granted it under the Act. This limited stay [was designed to] afford Congress an opportunity to reconstitute the Commission by law or to adopt other valid enforcement mechanisms without interrupting enforcement of the provisions the Court sustains, allowing the present Commission in the interim to function de facto in accordance with the substantive provisions of the Act." *Id.* at 143.[55]

On this same basis, in litigation challenging the constitutionality of the composition of a board or commission, courts of appeals have routinely made any finding of invalidity prospective only and have granted *de facto* validity to prior actions. In *Hechinger v. Metro. Washington*

---

[55] That stay was later extended.

28

*Airports Auth.*, 36 F.3d 97, 105 (D.C. Cir. 1994), for example, the court held, citing *Buckley*, that

"actions taken by [an impermissibly constituted Metro Washington Airport Authority] Board to

this date [will] not be invalidated automatically on the basis of our decision."  *Accord Shook v.*

*D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 784 (D.C. Cir. 1998)

(although statute creating board was "contrary to law," court "[e]mploy[ed] [its] remedial

discretion" and "accorded [past acts] *de facto* validity," citing *Buckley*; "[w]e see no benefit in

plunging the District's school system into further chaos by invalidating all actions taken by the

Board of Trustees over the past year"); *Citizens for Abatement of Aircraft Noise, Inc. v. Metro.*

*Washington Airports Auth.*, 917 F.2d 48, 57 (D.C. Cir. 1990), *aff'd*, 501 U.S. 252 (1991);

*Application of President's Comm'n on Organized Crime*, 763 F.2d 1191, 1192 (11th Cir. 1985)

(composition and powers of the President's Commission on Organized Crime violated

Appointments clause; majority would apply de facto validity standard and applied ruling

prospectively only).

   A similar result was reached in *Northern Pipeline*, *supra*, in which the Supreme Court

held unconstitutional a broad delegation of Article III powers to bankruptcy judges that had been

appointed under Article I, but refused to give that holding retroactive application.  "It is plain

that Congress' broad grant of judicial power to non-Art. III bankruptcy judges presents an

unprecedented question of interpretation of Art. III.  It is equally plain that retroactive

application would not further the operation of our holding, and would surely visit substantial

injustice and hardship upon those litigants who relied upon the Act's vesting of jurisdiction in

the bankruptcy courts."  *Id.* at 88.  The Court accordingly held that its decision would apply only

prospectively.  As in *Buckley*, the Court also stayed its "judgment [to] afford Congress an

opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication, without impairing the interim administration of the bankruptcy laws." *Id.*

The three factors identified in *Northern Pipeline* as important considerations in the *de facto* validity inquiry all militate in favor of such treatment here. First, as Aurelius must concede, an order invalidating PROMESA would "decid[e] an issue of first impression whose resolution was not clearly foreshadowed" by earlier cases. Indeed, as noted above, Aurelius' lead counsel has previously acknowledged that no case has ever imposed Appointments Clause restrictions on Congress' territorial powers.

Second, "retrospective operation will [neither] further [n]or retard [the] operation" of the holding in question. And most importantly, retroactive application "could produce substantial inequitable results" given the enormous amounts of work done to date to save Puerto Rico from financial ruin—work done while the Oversight Board, the government and citizens of Puerto Rico, and countless third parties have been reasonably relying on Congress' express delegation of its sovereign power to the Oversight Board. *Compare Ryder v. United States*, 515 U.S. 177, 180–81 (1995) (denying *de facto* validity to criminal conviction where there was no risk of "the sort of grave disruption or inequity involved in awarding retrospective relief to petitioner that would bring that doctrine into play"; "parties [had] agree[d] that the defective appointments [at issue there] affect[ed] only between 7 to 10 cases pending on direct review").

Invalidating the work the Oversight Board has done to date would compound the chaos that already faces this hurricane-ravaged Commonwealth. Since PROMESA was enacted, the Oversight Board has made significant progress toward turning Puerto Rico's economy around. It has, for example, created a framework for resolving (either through mediation or litigation) the

central dispute between Puerto Rico and one of its instrumentalities, COFINA, regarding bonds amounting to approximately 55% of the $74 billion of Puerto Rico's aggregate debt.

Moreover, invalidating the Oversight Board's actions would necessarily mean invalidating the title III cases which, in turn, would likely eliminate the automatic stay currently shielding the Commonwealth and the other title III debtors from suit buy their thousands of creditors.  That would effectively leave Puerto Rico without a refuge from a "massive wave of litigation."  *Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*, 217 F. Supp. 3d 508, 528 (D.P.R. 2016) (internal quotation marks omitted).  The "distraction and expense inherent in [such a wave of] cascading litigation would stretch the government's resources and personnel," sparking a "rush to the courts by aggrieved creditors—an event that could increase the impact of and accelerate Puerto Rico's debt crisis."  *Id*.

Puerto Rico would effectively be "unable to pay for things like fuel to generate electricity, . . . to provide safe drinking water, maintain roads, and operate public transportation" if the court were to invalidate the Oversight Board's work to date.  *Puerto Rico v. Franklin California Tax-Free Tr.*, 136 S. Ct. 1938, 1949–50 (2016) (Sotomayor, J., dissenting).  Given the ongoing humanitarian crisis Puerto Rico faces as a result of Hurricanes Irma and Maria, impeding the Government's efforts to meet these enormous challenges would be inequitable.

Thus, even assuming that the court were to rule in Aurelius' favor, and to forestall this calamitous result, the court should accord *de facto* validity to the Oversight Board's actions, including its prosecution of these title III cases that was *explicitly* authorized by Congress.  The *Buckley* plurality not only gave *de facto* validity to the actions taken by the improperly constituted FEC before the date of the decision; it gave those decisions *de facto* validity to the extent that they would govern elections to come.  *Id.* at 125-26 (notwithstanding Appointments

Clause violation, giving *de facto* validity to Commission's prospective "administration of [otherwise lawful decisions] authorizing the public financing of federal elections"). *Id.* at 142. It did so because of the chaos that would have resulted from a contrary ruling. If the Court determines it must be the first ever to impose Appointment Clause constraints on the Territorial Clause powers of Congress, it should do likewise.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Committee respectfully requests that the court deny the Motion to

Dismiss.

Dated:  November 3, 2017          /s/ Luc A. Despins
       San Juan, Puerto Rico

PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
Andrew V. Tenzer, Esq. *(Pro Hac Vice)*
Michael Comerford, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
lucdespins@paulhastings.com
andrewtenzer@paulhastings.com
michaelcomerford@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured
Creditors*

- and -

/s/ Juan J. Casillas Ayala

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured
Creditors*