# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br><br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br><br>Title III<br><br><br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## THE COFINA SENIOR BONDHOLDERS' COALITION'S
## <u>OPPOSITION TO MOTION TO DISMISS TITLE III PETITION</u>

---

[1] The Debtors in these Title III cases, along with each Debtor's respective bankruptcy case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**<u>Page</u>**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

    I.     The Board's Structure Is Constitutional Because Congress's Power
           Over the Territories Is Plenary and Not Subject to the Structural
           Limitations of the United States Constitution .......................................................... 2

           A.     Under Article IV, Congress may vest legislative, executive, or judicial
                    power in persons or bodies that would be unqualified to exercise it
                    under Articles I, II, and III. ........................................................................ 4

           B.     Under Article IV, Congress may also intermingle legislative, executive,
                    and judicial powers in ways that are foreign to Articles I, II, and III. ....... 12

    II.    PROMESA's Provisions Governing the Nomination of Oversight Board
           Members Do Not Infringe the President's Constitutional Prerogatives. ............... 14

CONCLUSION ................................................................................................................. 17

i

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*American Ins. Co. v. Canter*, 26 U.S. (1 Pet.) 511 (1828) .................................................10, 11, 12

*Benner v. Porter*, 50 U.S. 235 (1850) .........................................................................4, 11

*Binns v. United States*, 194 U.S. 486 (1904) ...........................................................................6

*Bowsher v. Synar*, 476 U.S. 714 (1986) ...................................................................................13

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................................................6

*Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103 (1948).......................................13

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937) ............................................3, 5, 6

*Clinton v. City of New York*, 524 U.S. 417 (1998).....................................................................13

*Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434 (1871) .........................................................8, 12

*Freytag v. CIR*, 501 U.S. 868 (1991) ...................................................................................12, 14

*Hayburn's Case*, 2 U.S. (2 Dall.) 408 (1792) ...........................................................................13

*Hooven & Allison Co. v. Evatt*, 324 U.S. 652 (1945) ..................................................................4

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).................................................................13

*Murphy v. Ramsey*, 114 U.S. 15 (1885) ..............................................................................3, 10

*Myers v. United States*, 272 U.S. 52 (1926)...............................................................................6

*Palmore v. United Sates*, 411 U.S. 389 (1973)........................................................................11

*Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863 (2016) .........................................................3, 6

*Sere v. Pitot*, 10 U.S. (6 Cranch) 332 (1810).............................................................................3

*Snow v. United States*, 85 U.S. (18 Wall.) 317 (1873) ................................................................8

*Wayman v. Southard*, 23 U.S. (10 Wheat.) 1 (1825) ................................................................13

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) ................................................4, 5

**Constitutions**

U.S. CONST. art. I,

   § 1................................................................................................................................4

   § 2...............................................................................................................................13

   § 3...............................................................................................................................16

U.S. CONST. art. II,

   § 1, cl. 1 .....................................................................................................................6

   § 2, cl. 2.................................................................................................................6, 10

   § 2, cl. 3.................................................................................................................6, 8

U.S. Const. art. III, § 1 ...................................................................................................10

U.S. Const. art. IV, § 3, cl. 2.........................................................................................1, 2

Puerto Rico Const. art. IV, § 1 .........................................................................................6

**Statutes**

28 U.S.C. § 541 ..................................................................................................................8

31 U.S.C. § 703(a) ...........................................................................................................16

48 U.S.C.

   § 2121(e) ......................................................................................................................2

   § 2121(e)(1)(E) ..........................................................................................................14

   § 2121(e)(2)(A)(i)–(vi) .............................................................................................15

   § 2121(e)(2)(B) ..........................................................................................................15

   § 2121(e)(2)(C) ..........................................................................................................15

   § 2121(e)(2)(E) ..........................................................................................................15

   § 2121(e)(2)(G) ..........................................................................................................15

   § 2194(m).....................................................................................................................1

An Act erecting Louisiana into two territories, and providing for the temporary government thereof, 1 Stat. 283 (1804) ...........................................................................5, 7, 11

An Act establishing a separate territorial government in the southern part of the territory of Missouri, 3 Stat. 493 (1819) ...........................................................5, 7, 9, 11, 13, 14

An Act establishing the Territorial Government of Wisconsin, 5 Stat. 10 (1836) ...............7, 8, 11

An Act For the Government of the Territory of the United States, south of the river Ohio, 1 Stat. 123 (1790) ....................................................................................................13

An Act Providing for the Government of the Territory of Missouri, 2 Stat. 743 (1812) ....7, 11, 16

An Act To amend the Organic Act of Puerto Rico, Pub. L. No. 80-362, 61 Stat. 770 (1947) ........7

An Act to authorize the President of the United States to take possession of East and West Florida, and establish a temporary government therein, 3 Stat. 523 (1819) ................................9

An Act to enable the President of the United States to take possession of the territories ceded by France to the United States, by the treaty concluded at Paris, on the thirtieth of April last, and for the temporary government thereof, 2 Stat. 245 (1803) .....................................9

An Act to establish a separate territorial government for the eastern part of the Mississippi territory, 3 Stat. 371 (1817).........................................................................................8

An Act to provide a civil government for Porto Rico, and for other purposes, 39 Stat. 951 (1917)...........................................................................................................5

An Act to provide for the Government of the Territory Northwest of the river Ohio, 1 Stat. 50 (1789)...........................................................................................................5, 16

An Ordinance for the government of the territory of the United States northwest of the river
Ohio, 32 J. CONT'L CONG. 334 (July 13, 1787) ............................................................5, 13, 16

## <u>Other</u>

3 JOSEPH STORY, COMMENTARIES ON THE CONSTITION OF THE UNITED STATES (1833) ................3

DAVID P. CURRIE, THE CONSTITUTION IN CONGRESS: THE FEDERALIST PERIOD,
1789–1801 (1997).................................................................................................................5

*Governor of the Northwestern Territory*, 1 U.S. Op. Atty. Gen. 102 (1802) .................................8

Letter from Arthur St. Clair, Governor of the Northwest Territory, to George Washington,
President of the United States (Aug. 1789), *in* 2 TERRITORIAL PAPERS OF THE UNITED STATES
(C.E. Carter, ed. 1934) ......................................................................................................7

## PRELIMINARY STATEMENT

The United States Congress enjoys virtually unlimited discretion under Article IV of the United States Constitution to "make all needful rules and regulations respecting the territory . . . belonging to the United States." U.S. CONST. art. IV, § 3, cl. 2. Faced with a grave financial crisis in the Commonwealth of Puerto Rico, Congress exercised that power to establish the Financial Oversight and Management Board ("Oversight Board"), an entity whose sole purpose is to guide Puerto Rico out of its present straits.

Since the early days of the Republic, Congress has been held to possess and has exercised broad authority to structure territorial governments in ways that it, and it alone, deems "needful" in light of the unique situation in each territory. This necessary flexibility is made possible by the fact that Congress is unconstrained when legislating pursuant to Article IV by the structural provisions of the United States Constitution: it may vest legislative, executive, and judicial power in officers or bodies in a manner that does not conform to Articles I, II, and III, and it may intermingle legislative, executive, and judicial power. As it has done for centuries with other territorial governments, Congress structured the Oversight Board in the way it thought appropriate to meet the challenges of the Puerto Rican debt crisis. Article IV gives Congress that power, and it is not for the Court to second-guess its judgment.

## BACKGROUND

As set forth in greater detail in the Oversight Board's brief, Congress responded to Puerto Rico's debt crisis by enacting PROMESA. 48 U.S.C. § 2194(m). That statute created the Oversight Board and vested it with certain enumerated powers to see Puerto Rico through its recovery from that crisis, including the power to initiate Title III proceedings to restructure Puerto Rico's debt. Members of the Oversight Board are selected in one of two ways: either the President may nominate an individual of his choosing, and appoint him with the advice and consent of the Senate,

1

or, for six members of the Oversight Board, he may select individuals from various lists provided by congressional leaders, in which case confirmation by the Senate is not required. *See* 48 U.S.C. § 2121(e). Approximately three months after the Oversight Board filed the present Title III proceeding, several affiliated entities (referred to in the pleadings collectively as "Aurelius") moved to dismiss the proceeding on the ground that this method of appointment violates the United States Constitution.

The Senior COFINA Bondholders' Coalition ("Coalition") is a group of entities that hold approximately $2.6 billion of COFINA senior bonds, which are bonds secured by Puerto Rico's sales tax. The Coalition submits this response because of the far-ranging impact the position of Aurelius could have in all the Title III cases. The decision of Congress to establish the innovative means for Puerto Rico to commence a bankruptcy case for the Commonwealth—which is woefully insolvent and whose destiny could not be left to politics—has ample support in Article IV of the Constitution and should be applauded.

## ARGUMENT

Because Congress exercised its Article IV power to enact PROMESA and create the Oversight Board, it was not constrained by the structural provisions of the Constitution. The Oversight Board's structure—and specifically the provisions under which its members are appointed—therefore violates neither Article II nor the separation of powers. Accordingly, the Title III proceeding it has instituted is constitutionally valid.

I.  **The Board's Structure Is Constitutional Because Congress's Power Over the Territories Is Plenary and Not Subject to the Structural Limitations of the United States Constitution.**

When Congress acts pursuant to its Article IV power to "make all needful rules and regulations respecting the territory . . . belonging to the United States," U.S. CONST. art. IV, § 3, cl. 2, the territorial governments it establishes are not subject to the separation of powers in the

2

United States Constitution. Legislative practice beginning in the First Congress, executive understanding stretching back to the Washington Administration, and judicial precedent dating to the days of Chief Justice Marshall leave no room for doubt on this score.

The Supreme Court has repeatedly emphasized the extraordinary breadth of the power granted to Congress by the Territories Clause. Congress's authority under Article IV to make rules for the territories is "absolute and undisputed." *Sere v. Pitot*, 10 U.S. (6 Cranch) 332, 336–37 (1810) (Marshall, C.J.); *see also Cincinnati Soap Co. v. United States*, 301 U.S. 308, 317–18 (1937) (describing Congress's powers as "practically unlimited" and emphasizing its "completeness and flexibility"). "The national government may do for one of its dependencies whatever a state might do for itself or one of its political subdivisions, since over such a dependency the nation possesses the sovereign powers of the general government plus the powers of a local or a state government in all cases where legislation is possible." *Cincinnati Soap Co.*, 301 U.S. at 317.

Congress's broad power extends to the manner in which territories are governed, enabling it to structure territorial governments in almost any way that it chooses. "[I]n ordaining government for the territories, and the people who inhabit them, all the discretion which belongs to legislative power is vested in congress; and that extends, beyond all controversy, to determining by law, from time to time, the form of the local government in a particular territory, and the qualification of those who shall administer it." *Murphy v. Ramsey*, 114 U.S. 15, 44 (1885); *see also Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1876 (2016) ("Congress has broad latitude to develop innovative approaches to territorial governance."); 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1319 (1833). This general rule manifests itself in numerous concrete historical examples of Congress—often with the sanction of the courts and the cooperation of the

3

Executive—structuring the territorial governments in ways that do not conform to the separation of powers in the Constitution. *See Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 673 (1945) (interpreting Congress's territorial powers based on "the practical construction of the Constitution by all the agencies of our government in dealing with our insular possessions").

The Oversight Board's structure is not a recent or isolated innovation: since 1789, Congress has exercised its Article IV powers to vest territorial legislative, executive, and judicial power in individuals or bodies that would be unqualified to exercise *federal* legislative, executive, or judicial power under the first three articles of the Constitution. The breadth of Congress's discretion under Article IV also appears in statutes that transgress other principles derived from those articles or the general structure of the Constitution: Congress has blended legislative, executive, and judicial powers in ways that are foreign to our federal government. But these departures have been upheld time and again because territorial governments "are not organized under the Constitution, nor subject to its complex distribution of the powers of government, as the organic law; but are the creations, exclusively, of the legislative department, and subject to its supervision and control." *Benner v. Porter*, 50 U.S. 235, 242 (1850).

> **A. Under Article IV, Congress may vest legislative, executive, or judicial power in persons or bodies that would be unqualified to exercise it under Articles I, II, and III.**

1. Article I of the Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States." U.S. CONST. art. I, § 1. "This text permits no delegation of those powers, and so [the Supreme Court] repeatedly [has] said that when Congress confers decisionmaking authority upon" other entities, it "must lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Whitman v.*

4

*American Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (citation and quotation marks omitted).
Under Article I, unfettered legislative discretion may be vested in Congress and Congress alone.

Not so with territorial bodies and officers. From the Northwest Ordinance forward,
Congress has repeatedly "confer[ed] decisionmaking authority"—authority that it itself
characterizes as "legislative power"—on territorial entities and officers without the remotest hint
of an intelligible principle to guide their exercise of that authority. *See, e.g.*, An Ordinance for the
government of the territory of the United States northwest of the river Ohio § 11, 32 J. CONT'L
CONG. 334 (July 13, 1787) ("Northwest Ordinance of 1787") ("And the governor, legislative
council, and house of representatives shall have authority to make laws in all cases for the good
government of the district, not repugnant to the principles and articles in this ordinance established
and declared.").[2] The Supreme Court has held these delegations to be permissible when done
pursuant to the Territories Clause, under which Congress's "power of delegation . . . is and must
be as comprehensive as the needs." *Cincinnati Soap Co.*, 301 U.S. at 322–23. Thus, while

---

[2] The Northwest Ordinance was enacted by Congress under the Articles of Confederation,
but the First Congress evidently "assumed it was still in force" when it amended the Ordinance in
1789. DAVID P. CURRIE, THE CONSTITUTION IN CONGRESS: THE FEDERALIST PERIOD, 1789–1801
at 106 (1997). Notably, the 1789 amendment did not divest the legislature of its legislative
authority. *See* An Act to provide for the Government of the Territory Northwest of the river Ohio,
§ 1, 1 Stat. 50, 51 n.(a) (1789). And the pattern of vesting legislative authority in a variety of
territorial entities continued unabated. *E.g.*, An Act erecting Louisiana into two territories, and
providing for the temporary government thereof, § 4, 1 Stat. 283, 284 (1804) (vesting the Governor
and legislative counsel with legislative powers "extend[ing] to all the rightful subjects of
legislation"); An Act establishing a separate territorial government in the southern part of the
territory of Missouri § 5, 3 Stat. 493, 494 (1819) (temporarily vesting the governor and the judges
of the Arkansas Territory with "power to pass any law for the administration of justice in said
territory"); An Act to provide a civil government for Porto Rico, and for other purposes § 37, 39
Stat. 951, 964 (1917) (establishing the legislature as it existed before Puerto Rico constituted its
own government in the 1950s, and vesting it with legislative authority "extend[ing] to all matters
of a legislative character not locally inapplicable" and with "the power to alter, amend, modify, or
repeal any or all laws and ordinances of every character now in force in Porto Rico or municipality
or district thereof in so far as such alteration, amendment, modification, or repeal may be consistent
with the provisions of this Act").

Congress may "legislate directly in respect to the local affairs of a territory," it may also "transfer the power of such legislation to a legislature elected by the citizens of the territory," or even to territorial executive and judicial officers. *Binns v. United States*, 194 U.S. 486, 491–92 (1904). For "[i]n dealing with the territories, possessions and dependencies of the United States, this nation has all the powers of other sovereign nations, and Congress in legislating is not subject to the same restrictions which are imposed in respect of laws for the United States considered as a political body of states in union." *Cincinnati Soap Co.*, 301 U.S. at 323.

2. Article II of the Constitution vests "the executive Power . . . in a President of the United States." U.S. CONST. art. II, § 1, cl. 1. Perceiving that the President alone could not carry out the functions of the executive branch, however, the Founders provided for departments led and staffed by "Officers of the United States" to assist the President in carrying out his powers and duties. *Myers v. United States*, 272 U.S. 52, 117 (1926). In order to aid in the exercise of "the executive Power" vested in the President, an "Officer of the United States" must be appointed pursuant to one of three procedures set forth in the Appointments Clause of Article II: by the President, after his nomination receives the advice and consent of the Senate; by the President, a Court of Law, or a Head of Department alone, if the officer is an "inferior Officer;" or, temporarily, by the President during a recess of the Senate. U.S. CONST. art. II, § 2, cls. 2–3. Any officer not so appointed may not exercise Article II executive power. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam).

And yet Congress has repeatedly acted under Article IV to vest executive power in officers selected by other means. In Puerto Rico itself, the executive power is exercised by a Governor who is popularly elected. PUERTO RICO CONST. art. IV, § 1. This is no mere innovation attributable to Puerto Rico's unique status in our system. *See Sanchez Valle*, 136 S. Ct. at 1868 (describing the "unique political relationship" between the United States and Puerto Rico). The Governor of

Puerto Rico has been elected by the people of Puerto Rico since before they adopted their own Constitution. *See* An Act To Amend the Organic Act of Puerto Rico, Pub. L. No. 80-362, 61 Stat. 770, 771 (1947).

To be sure, as Aurelius emphasizes, *see* Obj. & Mot. for Aurelius to Dismiss Title III Petition at 19–20 (Aug. 7, 2017), Doc. 913 ("Aurelius Br."), Congress frequently provided for presidential appointment of territorial governors with the Senate's advice and consent during the eighteenth and nineteenth centuries.[3] Yet even these early exercises of Congress' Article IV

---

[3] One reason for this practice may have been that some territorial governors *also* served concurrently as Officers of the United States. Many of the governors of the territories created during the first fifty years of the Republic filled separate *ex officio* offices as superintendents of Indian affairs, roles in which they carried out national policy and reported separately to the Department of War. *See, e.g.*, An Act erecting Louisiana into two territories, and providing for the temporary government thereof § 8, 1 Stat. 283, 284 (1804); An Act providing for the government of the territory of Missouri § 1, 2 Stat. 743, 744 (1812); An Act establishing a separate territorial government in the southern part of the territory of Missouri § 3, 3 Stat. 493, 494 (1819); An Act establishing the Territorial Government of Wisconsin § 10, 5 Stat. 10, 14 (1836). Other early territorial statutes vested governors with the power to grant reprieves for offenses against the United States. *See, e.g.*, An Act providing for the government of the territory of Missouri § 1, 2 Stat. 743, 744 (1812); An Act erecting Louisiana into two territories, and providing for the temporary government thereof § 1, 1 Stat. 283, 284 (1804); An Act establishing a separate territorial government in the southern part of the territory of Missouri § 3, 3 Stat. 493, 494 (1819); An Act establishing the Territorial Government of Wisconsin § 2, 5 Stat. 10, 11 (1836).

Early sources reflect the belief that, although territorial officers were not subject to Article II, they could not take on *federal* responsibilities without an Article II commission. The same month that Congress amended the Northwest Ordinance to provide for the governor to be appointed by the President with the advice and consent of the Senate, Governor St. Claire of the Northwest Territory wrote to President Washington recommending that Congress also provide for the appointment, in accordance with Article II, of a salaried attorney general for the territory. Letter from Arthur St. Clair, Governor of the Northwest Territory, to George Washington, President of the United States (Aug. 1789), *in* 2 TERRITORIAL PAPERS OF THE UNITED STATES 204, 208 (C.E. Carter, ed. 1934). Acknowledging that he could appoint an attorney general of his own accord, the Governor pointed out that "if the Appointment was made by [the Governor] the attorney would be an Officer of the Territory only, whereas he should be an Officer of the United States," in order that he could "sue for, or defend, the property of the United States in civil Cases . . . ." *Id.* Perhaps as a result of this advice, later territorial statutes provided separately for a U.S. attorney and marshal. *See, e.g.*, An Act erecting Louisiana into two territories, and providing for the temporary government thereof § 8, 1 Stat. 283, 284 (1804); An Act establishing the Territorial Government

powers departed from Article II in certain respects. For example, although territorial governors could not rightly be viewed as federal department heads (and certainly not the President or the Courts of Law), they were frequently vested with the power to appoint inferior territorial officers. *See generally Governor of the Northwestern Territory*, 1 U.S. Op. Atty. Gen. 102 (1802). And the Supreme Court has confirmed that the Constitution permitted the Utah territorial legislature to appoint prosecuting attorneys, despite their weighty responsibilities in carrying out the sovereign power of the United States. *Snow v. United States*, 85 U.S. (18 Wall.) 317, 321–22 (1873). Thus, if Aurelius's theory were correct, then the various methods of appointment of inferior officers in the territories has violated the Appointments Clause repeatedly for over 200 years.  But Aurelius ignores inferior officers entirely in its account of the historical appointment of officers in the territories.

Moreover, for certain territories, Congress provided for the temporary appointment of governors in ways that did not conform to the Recess Appointments Clause, U.S. CONST. art. II, § 2, cl. 3.[4] Still other territorial statutes *explicitly* provided for classic recess appointments of

---

of Wisconsin § 10, 5 Stat. 10, 14 (1836). The Supreme Court would later suggest that these officers enjoyed a unique status "for their duties in the courts have exclusive relation to cases arising under the laws and Constitution of the United States." *Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434, 448 (1871) (distinguishing them from territorial courts, which did not exercise federal judicial power). And indeed, even in Puerto Rico, where selection of officers largely reflects Puerto Rico's unusual degree of self-rule, the appointment of the U.S. Attorney conforms to Article II. *See* 28 U.S.C. § 541.

[4] For example, the President was authorized unilaterally to appoint a governor and secretary for the eastern portion of the Mississippi territory (to be renamed the "Alabama territory") once Mississippi became a State, irrespective of whether the Senate was then in session. The only requirement was that he submit the officers' appointment to the Senate at the next Session of Congress. An Act to establish a separate territorial government for the eastern part of the Mississippi territory § 2, 3 Stat. 371, 372 (1817). This provision seems to have been modeled on an earlier one authorizing unilateral presidential appointments of all officers in the territory acquired by the Louisiana Purchase until Congress could pass a statute providing for a more permanent form of territorial government. An Act to enable the President of the United States to

territorial officers, which would not have been necessary were it understood that Article II applied to the offices in question. *See, e.g.*, An Act establishing a separate territorial government in the southern part of the territory of Missouri § 9, 3 Stat. 493, 495 (1819). And Congress sometimes differentiated between recess and other provisional appointments in ways that appear to reflect its understanding that territorial officers were not subject to Article II's provisions governing the appointment of federal officers. In East and West Florida, for example, the President was authorized without qualification to make provisional appointments of officers to exercise "all the military, civil, and judicial, powers, exercised by the officers of the existing government of the . . . territories." An Act to authorize the President of the United States to take possession of East and West Florida, and establish a temporary government therein § 2, 3 Stat. 523, 524 (1819). But when it came to officers who would collect revenue under generally applicable revenue "laws of the United States"—and were thus officers of the United States—Congress pointedly limited his provisional unilateral appointment power to "during the recess of Congress." *Id.* Once again, Aurelius ignores this history in claiming that all (or virtually all) appointments of officers in the territories have conformed to Article II requirements.

Furthermore, these allocations of executive power have gone virtually unchallenged. Indeed, Aurelius is unable to point to a single example of Congress exercising its Article IV authority to vest executive power in an officer that has been held to be unconstitutional on the ground that the officer in question was not appointed in conformance with Article II. And Aurelius concedes that the vesting of executive power in an elected official is constitutional.  Indeed, such

---

take possession of the territories ceded by France to the United States, by the treaty concluded at Paris, on the thirtieth of April last, and for the temporary government thereof § 2, 2 Stat. 245 (1803). Notably, in none of these cases had the officers in question yet been made *ex officio* superintendents of Indian affairs. *See supra* note 3.

a concession is compelled by Supreme Court precedent.  *See Murphy*, 114 U.S. at 44 ("It rests with congress to say whether, in a given case, any of the people resident in the territory shall participate in the election of its officers or the making of its laws.").  Aurelius claims that such an election is permissible because the Appointments Clause supposedly does not apply to officers that are not appointed, *see* Aurelius Br. at 21, but this argument is circular. The Appointments Clause, which states that officers of the United States must be appointed in a certain manner, cannot be evaded by not appointing officers at all. Indeed, Aurelius does not cite a single example in the history of the United States where an officer of the United States (not in a territory) was elected, rather than appointed. Thus, there is no plausible distinction for purposes of the Appointments Clause between having elected officials in the territories—which is well established and of undisputed legality— and having officials appointed to the Oversight Board without Senate approval. Neither is a violation because governmental structure of a territory is committed entirely to Congress's discretion.

3. Article III of the Constitution vests "[t]he judicial Power of the United States . . . in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. art. III, § 1. In order to be eligible to exercise the judicial power, a court must be established by Congress and composed of judges who are appointed in accordance with the Appointments Clause, *id.* art. II, § 2, cl. 2, and "hold their Offices during good Behaviour," *id.* art. III, § 1.

From the days of Chief Justice Marshall, however, it has been well established that territorial courts may exercise judicial power without adhering to these requirements. In *American Insurance Company v. Canter*, 26 U.S. (1 Pet.) 511 (1828) (Marshall, C.J.), the Supreme Court unanimously held that territorial courts of Florida, although not Article III courts, could hear and

10

determine cases governed by the admiralty and maritime law that ordinarily could be heard only by Article III judges. *Id.* at 546; *see also Palmore v. United Sates*, 411 U.S. 389, 403 n.10 (1973) (collecting similar cases). Pointing out that the judges of the court held their offices for a term of years, the Court held that the courts in question were "legislative Courts, created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States." *Canter*, 26 U.S. at 546. It concluded that the courts were capable of exercising otherwise exclusive admiralty jurisdiction *because* Article III "does not extend to the territories." *Id.*; *see also Benner*, 50 U.S. at 242.

Even before *Canter* settled the question, numerous examples of Congress's practical construction of its Article IV powers supported this conclusion. *See, e.g.*, An Act erecting Louisiana into two territories, and providing for the temporary government thereof § 5, 1 Stat. 283, 284 (1804) (judges appointed for a term of years); An Act providing for the government of the territory of Missouri § 10, 2 Stat. 743, 746 (1812) (same); An Act establishing a separate territorial government in the southern part of the territory of Missouri § 7, 3 Stat. 493, 495 (1819) (same). Yet even in the wake of *Canter*, Congress still frequently *chose* to extend tenure protections to territorial judges, *e.g.*, An Act establishing the Territorial Government of Wisconsin § 9, 5 Stat. 10, 13–14 (1836), undermining the inference (urged by Aurelius) that Congress' frequent discretionary choices to adopt the structural model of the Constitution in establishing territorial governments reflects any sort of institutional doubt about its ability to disregard the Constitution's structural provisions when legislating pursuant to Article IV. Indeed, in reaching its conclusion in *Canter*, the Supreme Court rejected counsel's argument that Congress's decision to provide for presidential appointment of the territorial judges, by and with the advice of the Senate, "manifests

11

the admission that [the structural requirements of] the Constitution exten[d] [to territories]."
*Canter*, 26 U.S. at 527 (argument of counsel).

The Court would later confirm what was implicit in this rejection: that just as Congress is unconstrained by Article III's requirement of tenure during good behavior in establishing or providing for territorial courts under Article IV, so too is it unconstrained by Article II's requirement that federal judges be appointed by the President with the advice and consent of the Senate: "There is nothing in the Constitution which would prevent Congress from conferring the jurisdiction which they exercise, if the judges were elected by the people of the Territory, and commissioned by the governor." *Clinton*, 80 U.S. at 447. The logical conclusion *Clinton* so effortlessly drew from *Canter* applies with equal force here: just as territorial judicial bodies not subject to Article III are likewise not subject to the structural requirements of Article II, so too Congress need not adhere to Article II when establishing other territorial governing officers or bodies. *See Freytag v. CIR*, 501 U.S. 868, 913 (1991) (Scalia, J., concurring in part and concurring in the judgment) (Territorial courts "are neither Article III courts nor Article I courts, but Article IV courts—just as territorial governors are not Article I executives but Article IV executives.").

\*      \*      \*

In short, by exercising its Article IV powers to establish the Oversight Board, Congress was free to vest it with any sort of power it saw fit—legislative, executive, or judicial—irrespective of whether the Oversight Board's members were vested with such power in accordance with the requirements of Articles I, II, or III.

### B.  Under Article IV, Congress may also intermingle legislative, executive, and judicial powers in ways that are foreign to Articles I, II, and III.

Implicit in the three Vesting Clauses is the structural principle that the legislative, executive, and judicial powers may not be intermingled in a single body or office except in

12

accordance with the carefully calibrated "checks and balances" set forth in the text of the Constitution. For example, although the President may veto a bill, he may not exercise Congress's authority to enact, amend, or repeal a law, even with Congress's blessing. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Conversely, Legislative officers may not exercise the Executive's power to enforce or execute the law. *Bowsher v. Synar*, 476 U.S. 714, 732 (1986). And while "[i]t is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), the courts of the United States may not exercise executive or legislative power. *Hayburn's Case*, 2 U.S. (2 Dall.) 408 (1792); *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46 (1825); *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 114 (1948).

Here, too, the territorial governments have never been understood to be restricted by these basic separation of powers precepts. Beginning with the Northwest Ordinance, Congress has vested legislative power in executive officers and judges who simultaneously enforced and interpreted the laws they adopted. Northwest Ordinance of 1787 § 5 ("The governor and judges, or a majority of them, shall adopt and publish in the district such laws of the original States, criminal and civil, as may be necessary, and best suited to the circumstances of the district . . . .);[5] *see also* An Act establishing a separate territorial government in the southern part of the territory of Missouri § 5, 3 Stat. 493, 494 (1819) ("That the legislative power shall, until the organization of the general assembly, hereinafter provided for, be vested in the governor and the judges of the

---

[5] Once again, this provision was left untouched by the 1789 Amendment and incorporated by reference into subsequent territorial legislation. *See, e.g.*, An Act for the government of the territory of the Unites States, south of the river Ohio § 1, 1 Stat. 123 (1790). As the Board points out, Financial Oversight & Management Board for Puerto Rico's Opp'n to MTD Title III Pet. at 18 n.8 (Nov. 3, 2017), Doc. 1622 ("Board Br."), this decision provides dispositive evidence that the 1789 Congress did not believe that the territorial governor—in his capacity as territorial governor—was an "Officer of the United States."

superior court of the territory, who shall have power to pass any law for the administration of justice in said territory . . . ."). These precedents—remarkable for their contrast with the norms of our federal government—provide further confirmation that Congress's Article IV powers have long been understood not to be subject to the separation of powers in the Constitution. *See generally Freytag*, 501 U.S. at 914 (Scalia, J.) ("Congress may endow territorial governments with a plural executive; it may allow the executive to legislate; it may dispense with the legislature or judiciary altogether.").

*      *      *

Because Congress acted pursuant to Article IV when it created the Oversight Board, it was free to provide for the appointment of the Oversight Board's members in ways that did not comply with Article II. To the extent that Aurelius contends that unique features of the Oversight Board's structure—the significance of its authority, the manner in which its members are appointed, or the degree of control exerted by the federal Government—the Oversight Board in its opposition explains why these factors are not relevant to the Court's inquiry under Article IV, and why, in any event, these are features the Oversight Board shares in common with territorial entities established throughout this Nation's history. Board Br. at 23–27. In short, Congress acted well within the scope of its authority and within the range of historical practice when it enacted PROMESA, and the Oversight Board therefore possessed constitutional authority to file the pending Title III petition.

## II.      PROMESA's Provisions Governing the Nomination of Oversight Board Members Do Not Infringe the President's Constitutional Prerogatives.

PROMESA offers the President two methods of selecting members of the Oversight Board. The President may unilaterally nominate an individual of his choosing, who is then subject to confirmation by the Senate. 48 U.S.C. § 2121(e)(1)(E). Alternatively, for six of the Members of

the Board, the President may select individuals from various lists provided by congressional leaders. *See id*. §§ 2121(e)(2)(A)(i)–(vi), (e)(2)(B). Individuals chosen from these lists need not be confirmed by the Senate. *See id*. § 2121(e)(2)(E). If the President is unsatisfied with the individuals on these lists, congressional leaders may add additional names to the lists. *See id*. § 2121(e)(2)(C).[6]

As part of its argument that the mechanism that Congress has established for selecting members of the Oversight Board violates the Article II's Appointments Clause, Aurelius suggests that the provisions of PROMESA allowing the President to avoid the Senate confirmation process by selecting Oversight Board members from the congressional leadership lists impermissibly restrict the President's constitutional prerogative to nominate individuals of his own choosing. Because Congress established the Oversight Board pursuant to Article IV of the Constitution, the provisions it has made for selecting Board Members do not in any way infringe the President's constitutional prerogatives. As demonstrated above, precedent and practice make clear that Congress need not involve the President in the selection of territorial officials at all. Rather, pursuant to its plenary powers under Article IV, Congress may vest the selection of such officials in the territorial legislature, in territorial officials, or in the territorial electorate.

To be sure, as a matter of interbranch comity, Congress can—and frequently has—provided a role for the President in selecting territorial officials. When Congress elects to provide the President such a role, however, it may do so on whatever terms it chooses. Indeed, even had Congress *required* the President to select members of the Oversight Board from lists provided by

---

[6] For initial appointments to the Oversight Board, Subsection 2121(e)(2)(G) provided that if the President did not make an appointment by September 1, 2016, "[he] shall appoint an individual from the list for the current vacant category by September 15, 2016," subject to certain conditions. Because the President made his appointments before September 1, 2016, this provision never came into play. Nor does this date-limited provision have any further operation or legal effect now that the initial board has been appointed.

15

others—and, as explained above, it did not—that requirement would be fully consistent with practice dating from the United States' founding. Specifically, the Northwest Territories Ordinance enacted by the Continental Congress provided that members of the territorial council would be selected by Congress from a list provided by the lower house of the territorial legislature. *See* Northwest Ordinance of 1787 § 11. While the First Congress amended this ordinance to provide that the territorial council would be nominated by the President and confirmed by the Senate, rather than appointed by Congress, it did not change the requirement that nominees for the council be selected by the President from the list provided by lower house of the territorial legislature. *See* An Act to provide for the Government of the Territory Northwest of the river Ohio, § 1, 1 Stat. 50, 51–52, n.(a) (1789). Accordingly, the President was required to select his nominees from this list. Nor may this historical precedent be dismissed as an oversight or idiosyncrasy resulting from the unique circumstances in which the Northwest Territories Ordinance was enacted pursuant to the Articles of Confederation and then amended after the Constitution's adoption. Indeed, little more than twenty years later, Congress adopted the same model for the Missouri Territory—requiring the President to select nominees for the Territory's legislative council from a list provided by the lower house of the Territory's legislature. *See* An Act providing for the government of the territory of Missouri § 5, 2 Stat. 743, 744 (1812).[7] If, as these early precedents make clear, Congress may

---

[7] Congress's power under Article IV to permit—or even to require—the President to select nominees for territorial offices from lists provided by members of Congress is also supported by practice involving the selection of legislative officers. Just as Congress has authority to provide for the selection of territorial officers under Article IV, the Senate and the House also have the power to choose their own officers (other than the Vice President). *See* U.S. CONST. art. I, §§ 2–3. As Aurelius acknowledges, *see* Aurelius Br. at 30, Congress has provided that nominees for two legislative offices—the Comptroller General and Deputy Comptroller General—be selected by the President from a list of persons recommended by a commission comprising various members of Congress, *see* 31 U.S.C. § 703(a). Aurelius properly does not dispute the constitutionality of this limitation on the President's choice of nominees.

16

*require* the President to select nominees for territorial offices, subject to Senate confirmation, from lists provided by others, it plainly may take the less restrictive step of simply *encouraging* the President to select individuals for territorial offices from such lists by providing that such individuals need not be confirmed by the Senate.

## CONCLUSION

For the foregoing reasons, Aurelius's motion to dismiss should be denied.

Dated: November 3, 2017                     Respectfully submitted,

REICHARD & ESCALERA LLC                     COOPER & KIRK, PLLC

By :   */s/ Rafael Escalera*_____   **Charles J. Cooper** (*pro hac vice*
    **Rafael Escalera**                        forthcoming)
    USDC No. 122609                        ccooper@cooperkirk.com
    escalera@reichardescalera.com          **Howard C. Nielson, Jr.** (*pro hac vice*
                                           forthcoming)
    */s/ Sylvia M. Arizmendi*_____   hnielson@cooperkirk.com
    **Sylvia M. Arizmendi**                    **Haley N. Proctor** (*pro hac vice*
    USDC-PR 210714                         forthcoming)
    arizmendis@reichardescalera.com        hproctor@cooperkirk.com

    */s/ Fernando Van Derdys*_____   1523 New Hampshire Ave., NW
    **Fernando Van Derdys**                    Washington, DC 20036
    USDC-PR 201913
    fvander@reichardescalera.com           QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP
    */s/ Carlos R. Rivera-Ortiz*\_\_\_\_\_
    **Carlos R. Rivera-Ortiz**                 **Susheel Kirpalani** (*pro hac vice*)
    USDC-PR 303409                         susheelkirpalani@quinnemanuel.com
    riverac@reichardescalera.com           **Eric Winston** (*pro hac vice*)
                                           ericwinston@quinnemanuel.com
    */s/ Gustavo A. Pabón-Rico*\_\_\_\_      **Daniel Salinas**
    **Gustavo A. Pabón-Rico**                  USDC-PR 224006
    USDC-PR 231207                         danielsalinas@quinnemanuel.com
    pabong@reichardescalera.com            **David Cooper** (*pro hac vice*)
                                           davidcooper@quinnemanuel.com
    255 Ponce de León Avenue               **Eric Kay** (*pro hac vice*)
    MCS Plaza, 10th Floor                  erickay@quinnemanuel.com
    San Juan, Puerto Rico 00917-1913       **Kate Scherling** (*pro hac vice*)
                                           katescherling@quinnemanuel.com
                                           **Brant Duncan Kuehn** (*pro hac vice*)
                                           brantkuehn@quinnemanuel.com

                                           51 Madison Avenue, 22nd Floor
                                           New York, New York 10010-1603