**Hearing Date: January 10, 2018 11:00 AM AST**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>           Debtors. [1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

### OPPOSITION OF PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY TO AURELIUS'S MOTION TO DISMISS TITLE III PROCEEDING

---

[1]    The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case NO. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808).

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 4

ARGUMENT ......................................................................................................................... 7

    I.      THE APPOINTMENTS CLAUSE DOES NOT GOVERN THE OVERSIGHT BOARD BECAUSE ITS MEMBERS ARE NOT UNITED STATES OFFICIALS .......................................................................................... 7

           A.    The Appointments Clause Does Not Limit Congress's Plenary Power to Fashion Territorial Offices ......................................... 8

           B.    Puerto Rico's Historical Governance Confirms that Territorial Officials Are Not Officers of the United States under the Appointments Clause ................................................................... 9

           C.    Historical Practice in Other Territories Confirms that the Appointments Clause Does Not Apply to Territorial Officials .............. 12

           D.    There Is No Elections Exception to the Appointments Clause ............... 13

           E.    Oversight Board Members Are Territorial—Not United States— Officers ............................................................................... 15

                 1.    Aurelius Fails to Establish That the Oversight Board's Authority Extends Beyond Local Matters ................................... 15

                 2.    Aurelius Fails to Establish Federal Control of the Oversight Board ..................................................................... 16

                 3.    Oversight Board Members Do Not Exercise Significant Authority in a Federal Capacity ................................................ 17

                 4.    Federal Appointment Does Not Make Board Members Federal Officers ........................................................... 21

    II.     PROMESA'S OVERSIGHT-BOARD APPOINTMENT AND REMOVAL PROVISIONS DO NOT VIOLATE THE SEPARATION OF POWERS ............................................................................................... 23

           A.    PROMESA's Appointment Procedures Do Not Improperly Encroach on Executive Powers or Aggrandize Congress ....................... 24

           B.    PROMESA's Removal Provisions Do Not Unconstitutionally Curtail Presidential Power ...................................................... 29

    III.    IF THE COURT FINDS THE OVERSIGHT BOARD'S APPOINTMENT UNCONSTITUTIONAL, IT SHOULD HOLD THE BOARD'S PAST ACTIONS DE FACTO VALID ......................................................... 31

CONCLUSION ...................................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Ins. Co. v. 356 Bales of Cotton (Canter),*
26 U.S. (1 Pet.) 511 (1828) ...................................................................................19

*Auffmordt v. Hedden,*
137 U.S. 310 (1890) .............................................................................................7

*Barnhart v. Peabody Coal Co.,*
537 U.S. 149 (2003) ...........................................................................................26

*Buckley v. Valeo,*
424 U.S. 1 (1976) (per curiam) ...........................................................7, 10, 24, 32

*Cincinnati Soap Co. v. U.S.,*
301 U.S. 308 (1937) .............................................................................................8

*Conner v. Williams,*
404 U.S. 549 (1972) ...........................................................................................32

*Dep't of Transp. v. Assoc. of Amer. Railroads,*
135 S.Ct. 1225 (2015) ....................................................................................22, 23

*Downes v. Bidwell,*
182 U.S. 244 (1901) .............................................................................................8

*Endleman v. United States,*
86 F. 456 (9th Cir. 1898) ...................................................................................28

*F.E.R.C. v. Miss.,*
456 U.S. 742 (1982) ...........................................................................................20

*Franklin California Tax-Free Trust v. Puerto Rico,*
805 F.3d 322 (1st Cir. 2015) ................................................................................3

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
561 U.S. 477 (2010) ...........................................................................................31

*Freytag v. Comm'r,*
501 U.S. 868 (1991) ....................................................................................9, 10, 28

*Glidden Co. v. Zdanok,*
370 U.S. 530 (1962) ...........................................................................................33

*Hartwell,* 73 U.S. at 393 ...........................................................................16, 22

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Hechinger v. Metro. Washington Airports Auth.*,
  36 F.3d 97 (D.C. Cir. 1994) ........................................................................33

*Hooven & Allison Co. v. Evatt*,
  324 U.S. 652 (1945), overruled on other grounds in *Limbach v. Hooven &
  Allison Co.*, 466 U.S. 353 (1984) ...............................................................8

*Humphrey's Ex'r v. United States*,
  295 U.S. 602 (1935) .............................................................................16, 30

*Kinion v. United States*,
  8 F.3d 639 (8th Cir. 1993) ....................................................................26, 27

*Metro. Airports Auth. v. Citizens for the Abatement of Aircraft Noise*,
  501 U.S. 252 (1991) .............................................................................28, 29

*Mistretta v. United States*,
  488 U.S. 361 (1989) .............................................................................16, 24

*Morrison v. Olson*,
  487 U.S. 654 (1988) .............................................................................24, 30

*Myers v. United States*,
  272 U.S. 52 (1926) ...............................................................................27, 29

*Nat'l Bank v. County of Yankton*,
  101 U.S. 129 (1880) ..................................................................................28

*Nat'l Petrochemical & Refiners Ass'c v. E.P.A.*,
  630 F.3d 145 (D.C. Cir. 2010) ...................................................................26

*Nixon v. Adm'r of General Servs.*,
  433 U.S. 425 (1977) .............................................................................23, 24

*NLRB v. Noel Canning*,
  134 S. Ct. 2550 (2014) .....................................................................9, 25, 26

*Norton v. Shelby County*,
  118 U.S. 425 (1886) ..................................................................................32

*Palmore v. United States*,
  411 U.S. 389 (1973) ..................................................................................19

*Puerto Rico v. Franklin Cal. Tax-Free Trust*,
  136 S. Ct. 1938 (2016) (Sotomayor, J., dissenting) .....................................3

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Puerto Rico v. Sanchez Valle*,
　136 S. Ct. 1863 (2016) ..................................................................................1, 9, 14

*Ryan v. Tinsley*,
　316 F.2d 430 (10th Cir. 1963) ...............................................................................32

*Ryder v. United States*,
　515 U.S. 177 (1995).............................................................................................32, 33

*Schaefer v. Thomson*,
　251 F. Supp. 450, 453 (D. Wyo. 1965).....................................................................32

*Seattle Master Builders Ass'n v. Pacific Northwest Elec. Power & Conservation
　Planning Council*,
　786 F.2d 1359 (9th Cir. 1986), *cert. denied*, 479 U.S. 1059 (1987).........................7

*Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*,
　132 F.3d 775 (D.C. Cir. 1998) ..........................................................................20, 32

*Springer v. Gov't of Philippine Islands*,
　277 U.S. 189 (1928).................................................................................................28

*Techworld Dev. Corp. v. D.C. Preservation League*,
　648 F. Supp. 106 (D.D.C. 1986), *vacated as moot,* 1987 U.S. App. LEXIS
　18346 (D.C. Cir. June 2, 1987) .........................................................................7, 19

*U.S. v. Gratiot*,
　39 U.S. (14 Pet.) 526 (1840) ....................................................................................9

*U.S. v. Nixon*,
　418 U.S. 683 (1974).................................................................................................24

*United States v. Germaine*,
　99 U.S. 508 (1879)....................................................................................................7

*Wiener v. United States*,
　357 U.S. 349 (1958).................................................................................................30

*Wise v. Withers*,
　7 U.S. 331 (1806)....................................................................................................22

*Youngstown Sheet & Tube Co. v. Sawyer*,
　343 U.S. 579 (1952)............................................................................................9, 24

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Zivotofsky v. Kerry,*
    135 S. Ct. 2076 (2015)..................................................................9, 24

**Constitutional Provisions**

P.R. Const. art. I, § 1 ...............................................................17, 18

P.R. Const. art. III, § 1 ...................................................................11

P.R. Const. art. IV, § 1 ...................................................................11

P.R. Const. art. V, § 8 ....................................................................11

U.S. Const. art. II, § 2, cl. 2 ..................................................7, 13, 25

U.S. Const. art. IV, § 3, cl. 2 ..........................................................4, 8

**Statutes**

5 U.S.C. § 3372(a) .........................................................................17

10 U.S.C. 4342(a)(3)–(10) ...............................................................29

10 U.S.C. § 4355(a)(1)–(4) ..............................................................29

11 U.S.C. § 109(c)(2) ......................................................................21

12 U.S.C. § 242 .............................................................................30

20 U.S.C. §§ 42–43 ........................................................................28

20 U.S.C. § 42(a) ...........................................................................29

20 U.S.C. § 76h(a) .........................................................................28

28 U.S.C. § 991(a) .........................................................................25

36 U.S.C. § 2302(b) ........................................................................29

39 U.S.C. § 202(a) ..........................................................................29

40 U.S.C. § 8711(b) ........................................................................29

42 U.S.C. § 5841(e) ........................................................................30

48 U.S.C.. § 2123(e) .......................................................................17

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

48 U.S.C. § 2121(a) ................................................................................................4

48 U.S.C. § 2121(a)(2) ............................................................................................4

48 U.S.C. § 2121(b)(2) ..........................................................................................15

48 U.S.C. § 2121(c)(1) .......................................................................................5, 15

48 U.S.C. §§ 2121(d)(1)(B) ....................................................................................5

48 U.S.C. § 2121(e)(1) ...........................................................................................31

48 U.S.C. § 2121(e)(1)–(2) ......................................................................................6

48 U.S.C. § 2121(e)(2)(A) .....................................................................................24

48 U.S.C. § 2121(e)(2)(A)(vi) ...............................................................................24

48 U.S.C. § 2121(e)(2)(C) ..................................................................................7, 25

48 U.S.C. § 2121(e)(2)(G) ..................................................................................6, 25

48 U.S.C. § 2121(e)(5)(A)–(B) ...............................................................................5

48 U.S.C. § 2121(e)(5)(B) .....................................................................................16

48 U.S.C. § 2121(e)(6) ...........................................................................................31

48 U.S.C. § 2121(g) ...........................................................................................5, 16

48 U.S.C. § 2123(d) ...............................................................................................17

48 U.S.C. § 2124 .......................................................................................................6

48 U.S.C. § 2124(f)(1) ...........................................................................................15

48 U.S.C. § 2124(g) ...............................................................................................18

48 U.S.C. § 2124(k) ...............................................................................................18

48 U.S.C. § 2124(o) ..........................................................................................15, 16

48 U.S.C. § 2127(b) ...........................................................................................5, 16

48 U.S.C. §§ 2141–44 ..............................................................................................5

**TABLE OF AUTHORITIES**
(continued)

Page(s)

48 U.S.C. § 2141(a)–(e) ............................................................................................5, 6

48 U.S.C. § 2141(a) ..........................................................................................5, 18, 28

48 U.S.C. § 2141(c) ...............................................................................................18, 28

48 U.S.C. § 2141(c)(2) ...................................................................................................5

48 U.S.C. § 2141 (c)(3)(B) ............................................................................................5

48 U.S.C. § 2141(d) ...............................................................................................18, 28

48 U.S.C. § 2141 (d)(1) ..................................................................................................5

48 U.S.C. § 2141(d)(2) ...................................................................................................5

48 U.S.C. § 2141(e) ...............................................................................................18, 28

48 U.S.C. § 2141(f) ................................................................................................18, 28

48 U.S.C. § 2142 ....................................................................................................18, 28

48 U.S.C. § 2142(a) ........................................................................................................5

48 U.S.C. § 2142(c)(1)(B)(i) .........................................................................................5

48 U.S.C. § 2142(d)(1)(B)(i) .........................................................................................5

48 U.S.C. § 2143(a) ........................................................................................................5

48 U.S.C. § 2143(a)(3) ...................................................................................................5

48 U.S.C. § 2143(c)(1) ...................................................................................................5

48 U.S.C. § 2144(a)(2) ...................................................................................................5

48 U.S.C. § 2144(a)(3) ...........................................................................................18, 28

48 U.S.C. § 2144(b)(1) ...........................................................................................18, 28

48 U.S.C. § 2145 ....................................................................................................18, 28

48 U.S.C. § 2145(b)(1) ...................................................................................................5

48 U.S.C. § 2146 ...............................................................................................5, 21, 31

## TABLE OF AUTHORITIES
### (continued)

Page(s)

48 U.S.C. § 2147 ................................................................................................18

48 U.S.C. § 2148(a) ........................................................................................5, 16

48 U.S.C. § 2161(c)(2) .......................................................................................21

48 U.S.C. § 2161(c)(6) .......................................................................................21

48 U.S.C. § 2164 ................................................................................................31

48 U.S.C. § 2164(a) ...........................................................................................21

48 U.S.C. § 2172(a) ...........................................................................................21

48 U.S.C. § 2175 ..................................................................................................6

48 U.S.C. § 2175(b) ...........................................................................................21

48 U.S.C. § 2194(m)(1)–(3) ..............................................................................33

Act of Feb. 23, 1920, c. 91, § 304, 41 Stat. 456, 470 ......................................27

Act of July 1, 1902, c. 1362, § 59, 32 Stat. 641, 654 .......................................27

Act to Provide for Organization of a Constitutional Govt. by the People of Puerto
  Rico, Pub. L. No. 81-600, 64 Stat. 319 (1950) ("Public Law 600") (codified at
  48 U.S.C. § 731b *et seq.*). ..........................................................................11

An Act Temporarily to Provide Revenues and Civil Government for Puerto Rico
  ("Foraker Act"), ch. 191, 31 Stat. 77 (1900) ...............................................10

An Act to Amend the Organic Act of Puerto Rico ("1947 Act"), ch. 490, § 1, 61
  Stat. 770 (1947) .................................................................................11, 16, 22

An Act to Provide a Civil Government for Porto Rico ("Jones Act"), ch. 145, 39
  Stat. 953, 955–56 (1917) ...........................................................10, 11, 16, 22

An Act to Provide a Civil Government for the Virgin Islands of the United States,
  ch. 699, § 20, 49 Stat. 1807, 1812 (1936) ....................................................11

An Act to Provide for the Government of the Territory North-West of the River
  Ohio, ch. 8, § 1, 1 Stat. 50 (1789) ................................................................13

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

An Act to Provide for the Popular Election of the Governor of the Virgin Islands,
Pub. L. No. 90-496, § 4, 82 Stat. 837, 837 (1968) (codified as amended at 48
U.S.C. § 1591 (1968) ..................................................................................................11

An Ordinance for the Government of the Territory of the United States, North-
West of the River Ohio (July 13, 1787), available at
https://www.loc.gov/resource/bdsdcc.22501/?sp=1 ..................................................12

D.C. Financial Responsibility and Management Assistance Act of 1995
("FRMAA"), § 101(a), 104 Pub. Law No. 8, 109 Stat. 97 (1995) (codified as
amended at D.C. Code 47-391.01 *et seq.*) ....................................................... *passim*

Intergovernmental Personnel Act of 1970, 5 U.S.C. §§ 3371–3375 ...........................16

Joint Resolution Approving the Constitution of the Commonwealth of Puerto
("Joint Resolution"), Pub. L. No. 82-447, 66 Stat. 327.(1952) ........................17, 18

Puerto Rico Oversight, Management, and Economic Stability Act
("PROMESA"), Pub. L. No. 114-187, 130 Stat. 549 (2016) (codified at 48
U.S.C. § 2101 *et seq.*) ...................................................................................... *passim*

**Other Authorities**

162 Cong. Rec. (Daily Digests for Jul. 1, 5, 15, 19, 22, 26, 29; Aug. 2, 5, 9, 12,
16, 19, 23, 26, 30, 2016) ...........................................................................................26

162 Cong. Rec. H3581 (2016) .....................................................................................19

D. Andrew Austin, *The Puerto Rico Oversight Management and Economic
Stability Act (PROMESA; H.R. 5278; S. 2328)* 3 (Congressional Research
Service 2016) ..............................................................................................................18

*Communications Satellite Corporation,*
42 Op. Att'y Gen. 165 (1962) ....................................................................................14

*The Constitutional Separation of Powers between the President and Congress,*
20 Op. O.L.C. 124 (1996) ............................................................................................7

Eliot Howard Gilkey & William Alexander Taylor, *The Ohio Hundred Year
Book: A Handbook of the Public Men and Public Institutions of Ohio from the
Formation of the North-West Territory 1787 to July 1, 1901,* 131 (1982) ...............13

*The Federalist No. 45,* at 308 ......................................................................................20

H. R. Rep. 114-602, pt. 1 (2016) .................................................................................33

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Officers of the United States Within the Meaning of the Appointments Clause*,
31 Op. O.L.C. 73 (2007)..................................................................................17, 20

President Obama Announces the Appointment of Seven Individuals to the
Financial Oversight and Management Board for Puerto Rico (Aug. 31, 2016),
https://obamawhitehouse.archives.gov/the-press-office/2016/08/31/president-
obama-announces-appointment-seven-individuals-financial ............................7, 26

## PRELIMINARY STATEMENT

Aurelius's challenge to PROMESA[2]—that the Oversight Board's actions to date are void because its appointment method violates the Constitution's Appointments Clause—stumbles at the start.  It fails even to mention, let alone address, the threshold question, namely, whether the Appointments Clause applies to territorial offices such as the Oversight Board at all.  The answer is remarkably consequential not just for this Title III proceeding, but also for the Puerto Rico government and all other United States territories.  No office within Puerto Rico's government is filled by procedures set forth in the Appointments Clause.  Nor is any office in the government of Guam, the U.S. Virgin Islands, the District of Columbia, or any other United States territory appointed by the procedure in the Appointments Clause.  Ruling in Aurelius's favor would invalidate every territorial government and every action they have ever taken.

But Aurelius's motion must be denied because the Appointments Clause does not apply to territorial offices.  As the Supreme Court affirmed only last term, "Congress has broad latitude to develop innovative approaches to territorial governance."  *Puerto Rico v. Sanchez Valle,* 136 S. Ct. 1863, 1876 (2016).  This caps more than a century of Supreme Court jurisprudence demonstrating that local, territorial governments need not comply with the Constitution's structural provisions, such as the Appointments Clause, or the separation of powers.

In fact, the Supreme Court has repeatedly emphasized that the Constitution's Territorial Clause vests Congress with broad discretion in legislating for the territories.  While Congress must observe fundamental constitutional rights, it is otherwise free to establish whatever

---

[2] "PROMESA" means the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Pub. L. No. 114-187, 130 Stat. 549 (2016) (codified at 48 U.S.C. § 2101 *et seq.*).  The Financial Oversight and Management Board for Puerto Rico established under PROMESA shall be referred to as the "Oversight Board" or the "Board."  Unless otherwise specified, all emphasis is added and citations and quotations are omitted.

1

governmental structures Congress regards as well-adapted to meet territorial needs.  That is what Congress did in PROMESA.

Congress's extensive, consistent practice with respect to United States territories fortifies the conclusion that the Appointments Clause does not establish the procedure for filling territorial offices.  Every government of Puerto Rico, including its current government, includes offices that are not appointed in conformance with the Appointments Clause.  Using differing appointment methods for territorial government offices is pervasive.

Contrary to Aurelius's contention, there is nothing novel about the Oversight Board as a territorial government agency.  When the District of Columbia similarly faced serious budget problems in the 1990s, Congress created the District of Columbia's Financial Responsibility and Management Assistance Authority to help put the District back on firm financial footing.  Congress reasonably chose to adapt this successful model to address a similar problem here.  In doing so, Congress acted for the territory and did not establish an "Office[] of the United States" subject to the Appointments Clause.

No one disputes that when Congress enacted PROMESA, the Commonwealth and its municipalities faced a grave fiscal crisis that required swift action.  Less than three weeks earlier, a United States Supreme Court Justice had written:

> The combined debt of Puerto Rico's three main public utilities exceeds $20 billion. These utilities provide power, water, sewer, and transportation to residents of the island. With rising interest rates and limited access to capital markets, their debts are proving unserviceable. … [V]ital public services will be imperiled, including the utilities' ability to provide safe drinking water, maintain roads, and operate public transportation.[3]

---

[3] *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct. 1938, 1949-50 (2016) (Sotomayor, J., dissenting)

Puerto Rico's own legislative effort to address the crisis through debt restructuring had

foundered in mid-2015 when the First Circuit held that the Bankruptcy Code preempted the law,

*Franklin California Tax-Free Trust v. Puerto Rico*, 805 F.3d 322, 325 (1st Cir. 2015), a decision

the Supreme Court affirmed on June 13, 2016. *Franklin Cal. Tax-Free Trust*, 136 S. Ct. at 1949.

Thus Congress turned to its legislative precedent of the D.C. Control Board, modifying its

appointment procedures to ensure the Oversight Board's swift, efficient appointment.

   Aurelius argues that this Court owes no deference to Congress's designation of the

Oversight Board as an entity within the territorial government of Puerto Rico.  Everyone agrees

that Congress cannot designate what is truly a federal office as territorial and thereby evade the

Appointments Clause.  But that is not what happened here:  the Oversight Board's powers and

functions demonstrate that it truly is part of the government of Puerto Rico (which is, of course,

a territory).  All those functions relate directly to the territory itself.  If the Oversight Board were

struck, its functions would revert to the Puerto Rico territorial government—which is not chosen

in conformity with the Appointments Clause.  Conversely, the Oversight Board cannot bind the

federal government or obligate the federal fisc.  Instead, the Oversight Board is funded by the

Puerto Rico government within its own budget.

   Aurelius also attempts to manufacture a limitation that would cabin the consequences of a

ruling in its favor, contending that there is an election exception to the Appointments Clause.

Nothing in the Constitution even suggests such an exception exists.  Nor does it have any basis in

logic or principle.  It is, at bottom, a tautology that cannot be squared with history or decades of

Supreme Court precedent recognizing Congress's plenary power to legislate for the territories.

   For many of the same reasons that the Oversight Board's appointment method does not

violate the Appointments Clause, it also does not run afoul of the separation of powers principles

undergirding the Clause or impermissibly aggrandize Congress at the President's expense.  The

President remains free to nominate anyone he chooses to the Oversight Board, either with Senate

advice and consent or by rejecting the Congress members' lists until they supply names with

which he is satisfied, rendering the lists recommendatory.  And even if the lists were not merely

recommendatory, Congress has not granted to itself power it does not already have under the

Constitution because Article IV gives Congress plenary power over territorial governance.

Similarly, limiting the President's authority to remove Oversight Board members to "for cause"

situations does not unduly interfere with the President's power.

Aurelius is also wrong in arguing that the only appropriate remedy here is dismissing the

Board's petition and terminating these proceedings, nullifying more than a year's painstaking

work to stabilize Puerto Rico and set it on the path to fiscal stability.  Courts have repeatedly

concluded, when finding a public body has been chosen in an unconstitutional manner, that the

better course is to endorse the body's completed actions as de facto valid to avoid the chaos of

retrospective invalidation.  Given these proceedings' urgency and the disruption an abrupt

termination would engender, the Court should follow that course here.

## BACKGROUND

Congress enacted PROMESA on June 30, 2016, under the Territorial Clause, which

empowers Congress to "make all needful Rules and Regulations" for United States territories.

*See* 48 U.S.C. § 2121(a)(2); U.S. Const. art. IV, § 3, cl. 2.  The statute established the Oversight

Board to provide a method for Puerto Rico "to achieve fiscal responsibility and access to the

capital markets."  48 U.S.C. § 2121(a).  Just as Congress had established the District of

Columbia's Control Board as "as an entity within the government of the District of Columbia"

and *not* "a department, agency, establishment, or instrumentality of the United States

4

Government,"[4] PROMESA created the Oversight Board as "an entity within the territorial government" of Puerto Rico. 48 U.S.C. § 2121(c)(1). Board members receive no pay from the federal government, *id.* § 2121(g), and the Board enjoys considerable independence. The Commonwealth's budget funds the Board's expenses. *Id.* §2127(b). Members serve for a fixed three-year term and may be removed by the President only for cause. *Id.* § 2121(e)(5)(A)–(B). While PROMESA imposes significant reciprocal reporting obligations on the Oversight Board and other Commonwealth departments,[5] the Board must report to the President and Congress only once annually unless the Board determines that Puerto Rico's government is out of compliance with its budget, *id.* §§ 2143(c)(1), 2148(a).

PROMESA charges the Oversight Board with three core functions: (1) certifying and monitoring compliance with Commonwealth and instrumentality fiscal plans; (2) certifying Commonwealth and instrumentality budgets; and (3) issuing restructuring certifications to the Commonwealth and its instrumentalities and representing them in restructuring proceedings. *See* 48 U.S.C. §§ 2141–44, 2146. As an entity within Puerto Rico's government, the Board performs these functions in close cooperation with other officials and departments. For instance, Puerto Rico's Governor must develop a fiscal plan in compliance with specified criteria, which is then submitted to the Oversight Board for approval, with opportunities for revision if the Oversight Board finds the proposed plan fails to satisfy PROMESA's requirements. *Id.* § 2141(a)–(e). PROMESA also outlines a budgeting process that entails successive budget proposals by the

---

[4] D.C. Financial Responsibility and Management Assistance Act of 1995 ("FRMAA"), § 101(a), 104 Pub. Law No. 8, 109 Stat. 97 (1995) (codified as amended at D.C. Code 47-391.01 *et seq.*).

[5] *See, e.g.,* 48 U.S.C. §§ 2121(d)(1)(B); 2141(a), (c)(2), (c)(3)(B), (d)(1), (d)(2); 2142(a), (c)(1)(B)(i), (d)(1)(B)(i); 2143(a); 2144(a)(2), (a)(3), 2145(b)(1).

Governor and Legislature, with the Oversight Board determining whether the budgets comply with the fiscal plan and requesting certain revisions to achieve compliance.  *Id.* § 2141(a)–(e).

Thus the Oversight Board assists, augments, monitors, and—in certain aspects of the restructuring proceedings—stands in the shoes of the Commonwealth, its entities and its municipalities, *id.*, § 2175.  The other powers Congress conferred on the Board—to investigate, subpoena, review, monitor compliance, and enforce the provisions of PROMESA—enable it to perform these specified functions.  *See* 48 U.S.C. § 2124.  What Aurelius characterizes as the Oversight Board's power to "interpret[] and appl[y] federal law" (Mot. at 7) does not flow from legal enforcement powers on behalf of the United States, but from the Board's obligations to comply with federal law like a state official operating within the constraints of federal regulation.

In keeping with the urgency surrounding PROMESA's swift enactment, the statute provided an expedited appointment process for the Oversight Board.  The President could simply nominate candidates and all but one (selected in the President's "sole discretion") would be offered for Senate confirmation.  *See* 48 U.S.C. § 2121(e)(1)–(2).  Alternatively, he could rely on candidates included on lists from the Speaker of the House, the House Minority Leader, the Senate Majority Leader, and the Senate Minority Leader—in which case formal confirmation hearings were unnecessary.  *Id.*  If Board appointments were not complete by September 1, 2016, the President was to make selections from the Congressional lists by September 15.  *Id.* § 2121(e)(2)(G).  Even if the President opted to employ the lists, he could reject the candidates initially included on a given list, prompting the specified members of Congress to supplement

6

the list until it was acceptable.  *Id.* § 2121(e)(2)(C).  President Obama appointed the Board

members on August 31, 2017—sixty-two days after PROMESA's enactment.[6]

**ARGUMENT**

**I.    THE APPOINTMENTS CLAUSE DOES NOT GOVERN THE OVERSIGHT
       BOARD BECAUSE ITS MEMBERS ARE NOT UNITED STATES OFFICIALS.**

The Appointments Clause establishes the exclusive procedure for appointing "all . . .

Officers of the United States . . . ."  U.S. Const. art. II, § 2, cl. 2.  The phrase "Officer of the

United States" is a constitutional term of art.  Only someone who is appointed "(1) to a position

of employment (2) within the federal government (3) that carries significant authority pursuant to

the laws of the United States" is an "Officer of the United States" under the Appointments

Clause.[7]  Thus, Congress does not violate the Appointments Clause when it vests significant

authority under federal law in state officers because those positions are not within the federal

government.[8]  This is also why the authority that Congress has vested in the D.C. City Council

does not violate the Appointments Clause.  Those positions are not within the federal

government, but the D.C. municipal government, even though Congress established that

municipal government and the D.C. City Council exercises authority ultimately derived from

federal enactments.[9]  So too, here, Oversight Board members' are not United States officers, and

---

[6] *See*  President Obama Announces the Appointment of Seven Individuals to the Financial
Oversight and Management Board for Puerto Rico (Aug. 31, 2016),
https://obamawhitehouse.archives.gov/the-press-office/2016/08/31/president-obama-announces-
appointment-seven-individuals-financial.

[7] *The Constitutional Separation of Powers between the President and Congress*, 20 Op. O.L.C.
124, 148 (1996).  *See Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam); *Auffmordt v.
Hedden*, 137 U.S. 310, 326-28 (1890); *United States v. Germaine*, 99 U.S. 508, 509-11 (1879).

[8] *See Seattle Master Builders Ass'n v. Pacific Northwest Elec. Power & Conservation Planning
Council*, 786 F.2d 1359, 1364-66 (9th Cir. 1986), *cert. denied*, 479 U.S. 1059 (1987).

[9] *See Techworld Dev. Corp. v. D.C. Preservation League*, 648 F. Supp. 106, 115–17 (D.D.C.
1986), *vacated as moot,* 1987 U.S. App. LEXIS 18346 (D.C. Cir. June 2, 1987).

7

their appointment procedures need not comply with the Appointments Clause or its underlying

separation of powers principles.

Aurelius assumes—without citing any legal authority—that the Appointments Clause

governs the selection of territorial officials.  But more than a century of precedent establishes

that, in exercising its plenary power under the Territorial Clause, "Congress is not subject to the

same constitutional limitations, as when it is legislating for the United States."[10]

### A.   The Appointments Clause Does Not Limit Congress's Plenary Power to Fashion Territorial Offices.

The Territorial Clause confers on Congress "[p]ower to dispose of and make all needful

Rules and Regulations" respecting United States territories.  U.S. Const. art. IV, § 3, cl. 2.

"[T]here is no express or implied limitation on Congress in exercising its power to create local

governments for any and all of the territories, by which that body is restrained from the widest

latitude of discretion," Justice White observed in *Downes v. Bidwell*[11]—one of the early

twentieth-century "Insular Cases" in which the Court grappled with the extent to which

legislation for Puerto Rico and other newly acquired territories had to conform to Constitutional

structural provisions.  The *Downes* Court concluded that if the Founders had meant to limit

Congressional power concerning the territories, as it did for the exercise of legislative power

within the United States, "such limitations should have been express."  *Id.* at 285.  Instead, "there

is nothing in the Constitution to indicate that the power of Congress in dealing with [territories]

was intended to be restricted by any of the [Constitution's] other provisions."[12]  The

---

[10] *Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 673–674 (1945), overruled on other grounds in *Limbach v. Hooven & Allison Co*., 466 U.S. 353, 359 (1984).

[11] 182 U.S. 244, 290–91 (1901) (White, J., concurring).

[12] *Id.* at 285–86; *see also Cincinnati Soap Co. v. U.S.*, 301 U.S. 308, 323 (1937) (in legislating for territories, Congress "not subject to the same restrictions which are imposed in respect of

Appointments Clause, like other Constitutional structural provisions, therefore does not constrain

Congress in establishing territorial governments and offices.

Thus, as the Supreme Court recently affirmed, "Congress has broad latitude to develop

innovative approaches to territorial governance." *Sanchez Valle,* 136 S. Ct. at 1876.  This

includes the power to merge rather than separate the branches of government:  "Congress may

endow territorial governments with a plural executive; it may allow the executive to legislate; it

may dispense with the legislature or judiciary altogether." *Freytag v. Comm'r*, 501 U.S. 868,

914 (1991) (Scalia, J., concurring).  This power is not—and never has been—restricted by the

Appointments Clause or other procedural components of the federal separation of powers.

### B.    Puerto Rico's Historical Governance Confirms that Territorial Officials Are Not Officers of the United States under the Appointments Clause.

As the Court has emphasized, a "longstanding 'practice of the government' …. can

inform our determination of 'what the law is,'" particularly when interpreting provisions

regulating the relationship between Congress and the President.[13]  Here, the history of Puerto

Rico's territorial governance—indeed, of United States territorial governance generally—

confirms that Congress has never regarded Puerto Rico's officials as "Officers of the United

States" for Appointments Clause purposes.  Every government of Puerto Rico has included

offices whose method of selection does not satisfy the Appointments Clause.

---

laws for the United States considered as a political body of states in union"); *U.S. v. Gratiot,* 39 U.S. (14 Pet.) 526, 537 (1840) (power over territories "vested in Congress without limitation").

[13] *NLRB v. Noel Canning,* 134 S. Ct. 2550, 2559–60 (2014); *see also Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2091 (2015); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring).

*The Foraker Act:*  In the Foraker Act,[14] the first organic acts establishing Puerto Rico's territorial government, there were at least two significant Appointments Clause deviations:

- Puerto Rico's district court judges were appointed by the territory's Governor with the advice and consent of Puerto Rico's executive council—a hybrid body that included a secretary, attorney-general, treasurer, auditor, interior and education commissioners (and five other members) and served as both part of the executive branch and the legislature's upper house.  Foraker Act, §§ 18, 33, 31 Stat. at 81, 84.  The judges' appointment mechanism cannot be explained away on the thesis that they were "inferior officers" appointed by a Department Head for the simple reason that Puerto Rico is not a Department of the United States government.[15]

- The Foraker Act also established a legislative lower house elected directly by the people of Puerto Rico.  *Id.* § 27, 31 Stat. at 82.  The legislature's rule-making authority is precisely the sort of power that the Supreme Court has regarded as significant authority under the Appointments Clause.  *See Buckley*, 424 U.S. at 140–41 (per curiam) (rulemaking authority is an administrative function that must be performed within federal government by "Officers of the United States").

*The Jones Act:*  Seventeen years later, a second organic act, the "Jones Act," revised Puerto Rico's governmental structure to create an additional departure from the Appointments Clause, providing that the treasurer and commissioners of agriculture and labor, the interior, and health should be appointed by Puerto Rico's Governor with the Puerto Rico Senate's advice and consent.[16]  Even though these officials' positions arose under federal law and they exercised significant authority under federal law, their appointment procedures did *not* comport with the Appointments Clause because they required the Puerto Rico Senate's advice and consent.

---

[14] An Act Temporarily to Provide Revenues and  Civil Government for Puerto Rico ("Foraker Act"), ch. 191, 31 Stat. 77 (1900).

[15] *Freytag*, 501 U.S. at 886 (Appointments Clause reference to Departments embraces only major divisions of the Executive Branch, such as cabinet agencies, noting that "[t]his Court for more than a century has held that the term 'Department' refers only to '*a part or division of the executive government, as the Department of State, or of the Treasury,*' expressly '*created*' and '*giv[en] . . . the name of a department*' by Congress.'") (quoting *Germaine*, 99 U.S. at 510–11.

[16] An Act to Provide a Civil Government for Porto Rico ("Jones Act"), ch. 145, 39 Stat. 953, 955–56 (1917).

*The 1947 Act:*  Still later, Congress amended the Jones Act to turn over the choice of the

Governor to popular elections.  *See* An Act to Amend the Organic act of Puerto Rico ("1947

Act"), ch. 490, § 1, 61 Stat. 770 (1947).[17]  The Puerto Rico governorship remained a federal-

government creation, charged with executing the laws of the United States "applicable in Puerto

Rico" and required to report "transactions of the government of Puerto Rico" to a designated

United States executive department.  Jones Act, § 12, 39 Stat. at 955—despite no longer being an

appointed office.  The 1947 Act also amended the Jones Act to require appointment of the

attorney general and commissioner of education by the Governor, with advice and consent of the

Puerto Rico Senate, rather than by the United States President with Senate advice and consent.

*See* Jones Act, § 13, 39 Stat. at 955–56; 1947 Act, § 3, 61 Stat. at 771.  Thus, three Puerto Rico

executive branch offices, mandated by federal statute and previously appointed by the President

with consent of the Senate, were now elected or appointed by the territorial Governor, without

any other change in these positions' authorization, status, or duties.

*Public Law 600 and the Puerto Rico Constitution:*  In 1950, in what is known as "Public

Law 600,"[18] Congress authorized the people of Puerto Rico to draft a constitution, subject to

ratification by Congress and the Puerto Rican people.   Under the Commonwealth's Constitution,

the Governor and two houses of the Legislature are popularly elected, while the Governor

appoints judges with the Puerto Rico Senate's advice and consent.  P.R. Const. art. III, § 1; art.

IV, § 1; art. V, § 8.  Thus, none of the current officers within the Puerto Rican government is

---

[17] In a similar fashion, Congress revised the Virgin Islands governorship from an appointed
official to a popularly elected official.  *See* An Act to Provide a Civil Government for the Virgin
Islands of the United Sates, ch. 699, § 20, 49 Stat. 1807, 1812 (1936); An Act to Provide for the
Popular Election of the Governor of the Virgin Islands, Pub. L. No. 90-496, § 4, 82 Stat. 837,
837 (1968) (codified as amended at 48 U.S.C. § 1591 (1968)).

[18] Act to Provide for Organization of a Constitutional Govt. by the People of Puerto Rico, Pub. L.
No. 81-600, 64 Stat. 319 (1950) ("Public Law 600") (codified at 48 U.S.C. § 731b *et seq.*).

appointed in conformity with the Appointments Clause, although federal law authorized and the Congress ratified the Commonwealth Constitution establishing their positions.

This history demonstrates that neither Congress nor the President regarded the Appointments Clause as applicable to territorial governments or Puerto Rico's executive officials as "Officers of the United States."  Aurelius offers no explanation for the 1917 or 1947 revisions to Puerto Rico's governance consistent with Aurelius's assumption that the Appointments Clause applies.  If the Appointments Clause *had* applied, significant portions of the Foraker and Jones Acts, and their amendments, would have been invalid.  Indeed, if territorial executive officials are "Officers of the United States" under the Appointments Clause, every territorial government for which Congress has established elected offices would be unconstitutional.

### C.    Historical Practice in Other Territories Confirms that the Appointments Clause Does Not Apply to Territorial Officials.

The Northwest Territory's history provides another example of how no one believed that the Appointments Clause constrained Congress in structuring territorial governments.  While still under the Articles of Confederation, the Continental Congress adopted the Northwest Ordinance, which provided for the Continental Congress to appoint the territory's Governor, as there was no federal executive under the Articles.  Once the territory's population grew to 5,000 free white males, a bicameral territorial legislature would be selected.  The lower chamber, the House of Representatives, would have twenty members elected by eligible inhabitants of the territory.  The upper chamber, the Legislative Council, would have five members appointed by the Continental Congress from a list of ten nominees submitted by the territorial House of Representatives.[19]

---

[19]    *See* An Ordinance for the Government of the Territory of the United States, North-West of the River Ohio (July 13, 1787), available at https://www.loc.gov/resource/bdsdcc.22501/?sp=1.

After the United States Constitution was ratified, Congress shifted the appointment power
that had resided in the Continental Congress to the new President of the United States with the
Senate's advice and consent.[20]  While that brought the Governor's appointment into line with the
Appointments Clause, the lower chamber of the territorial legislature would still have violated
the Appointments Clause because legislators were elected, not appointed.  And while the upper
chamber would be appointed by the President, his discretion was limited to choosing from a list
of nominees that the territorial House of Representatives supplied,[21] something Aurelius
contends the Appointments Clause would forbid.

### D.      There Is No Elections Exception to the Appointments Clause.

Perhaps recognizing that that the Appointments Clause cannot conceivably govern
territorial officers' selection, Aurelius has invented an exception:  the Appointments Clause does
not apply to *elected* territorial officials.  (Mot. at 21.)  This exception finds no basis in the
Appointments Clause or the Constitution.  The text is unequivocal.  Unless the Constitution
provides otherwise, if a position is an "Office of the United States," it must be filled under the
Appointments Clause's procedures.  Election is not one of them.  U.S. Const. art. II, § 2, cl. 2.

Aside from being flatly irreconcilable with the Appointments Clause's text, Aurelius's
confected election exception cannot account for history, which shows that officials within
territorial governments need not be appointed as Officers of the United States.  Aurelius's
position cannot account even for Puerto Rico's officials under the Foraker or Jones Act.  As
discussed above, many of those officials were appointed by a federally-appointed Governor and

---

[20] *See* An Act to Provide for the Government of the Territory North-West of the River Ohio, ch.
8, § 1, 1 Stat. 50 (1789).

[21] *See* Eliot Howard Gilkey & William Alexander Taylor, *The Ohio Hundred Year Book:  a
Handbook of the Public Men and Public Institutions of Ohio from the Formation of the North-
West Territory (1787) to July 1, 1901*, 131 (1982).

confirmed by Puerto Rico's popularly-elected Senate (*see supra* pp. 10-11)—making them *neither* federal officers *nor* territorial officers within Aurelius's scheme.

More fundamentally, the notion that the Appointments Clause embodies an exception for elections lacks any basis in principle.  Ultimately, Aurelius's position is mere tautology: Territorial officers appointed in conformity with the Appointments Clause must be federal officers, Aurelius maintains, while those not appointed in conformity with the Clause must *not* be federal officers.  This proposition's first part has been soundly rejected:

> Article II, section 2, clause 2 does not state, and it does not follow therefrom, or from anything else in the Constitution, that every appointment authorized by law which is preceded by nomination and confirmation necessarily renders the appointee an officer of the United States regardless of his functions and the provisions of the law pursuant to which he was appointed.[22]

In fact, Aurelius's scheme would permit Congress to do exactly what Aurelius elsewhere argues Congress may *not*—deprive the President of appointment power for a federal office.  If Aurelius were correct, Congress could thwart the President's will, thereby violating separation of powers, simply by requiring that key executive officials—such as the Secretary of State or the Secretary of Defense—be elected.  Such elections would plainly violate the Appointments Clause.

Aurelius's failure to account for the realities and complexities of territorial governance runs headlong into uniform Supreme Court precedent:  In establishing territorial offices, Congress exercises its plenary power under the Territorial Clause[23] and need not observe the requirements of the Appointments Clause.  Congress expressly drew on this Article IV power to establish the Oversight Board and designated the Oversight Board as "an entity within the

---

[22] *Communications Satellite Corporation*, 42 Op. Att'y Gen. 165, 167 (1962); *see also id.* ("'In many cases of appointments, Congress have [sic] required the concurrence of the Senate, where, perhaps, it might not be easy to say that it was required by the Constitution.'") (quoting 2 Story, *Commentaries on the Constitution* 362 (5th ed. 1891)).

[23] *Sanchez Valle,* 136 S. Ct. at 1876.

territorial government," 48 U.S.C. § 2121(b)(2), (c)(1).  As territorial officers, Oversight Board members do not come within the purview of the Appointments Clause.

### E.      Oversight Board Members Are Territorial—Not United States—Officers.

Aurelius dismisses PROMESA's placement of the Oversight Board "within the territorial government" as a defense against an Appointments Clause challenge.  (Mot. at 16–17.)  Aurelius posits a multi-prong test that, Aurelius contends, shows that Oversight Board members are United States officers—whether (i) their authority is confined to local matters; (ii) the federal government oversees them; (iii) they take office by virtue of federal or territorial authority; and (iv) they are appointed by the federal government.  (Mot. at 18, 11.)  But evaluating these factors merely affirms what Congress said—Oversight Board members are territorial officers.

### 1.      *Aurelius Fails to Establish That the Oversight Board's Authority Extends Beyond Local Matters.*

Having advanced this test, Aurelius does not even attempt to satisfy its key element—that the Oversight Board's mandate extends beyond the local affairs of the Commonwealth.  And with good reason.  The Oversight Board's functions concern the Commonwealth's internal management—its fiscal planning, budgets, and restructuring of debt.  The Board's subpoena power is governed by Puerto Rico's own statutes.  *See* 48 U.S.C. § 2124(f)(1).  When the Board terminates, the budgetary and planning responsibilities will devolve to the Commonwealth government under its own constitution.  Aurelius suggests that the Board's power to investigate "disclosure and selling practices" of Commonwealth and instrumentality bonds, *id.* § 2124(o), may extend the Board's "regulatory scope" beyond Puerto Rico's borders, but this provision confers on the Board no capacity to regulate, only to *investigate* compliance with "applicable laws and regulations."  *Id.*  Aurelius's failure to address the scope of the Oversight Board's authority, standing alone, defeats its argument that Board members are United States officers.

15

2.    *Aurelius Fails to Establish Federal Control of the Oversight Board.*

Aurelius also fails to show the second element of its test—that the federal government "control[s] . . . the Board's ongoing operations."  (Mot. at 22.)  Aurelius observes that the Board reports annually to the President and Congress—but PROMESA likewise requires the Board to report to the Commonwealth Governor and Legislature.  *See* 48 U.S.C. § 2148(a).  And under the Jones Act, Puerto Rico's Governor was required annually to report to Congress and the executive branch even after he became a popularly elected office and therefore, in Aurelius's own telling, a *territorial* official.  Jones Act, § 12, 39 Stat. at 955; 1947 Act, § 1, 61 Stat. at 771.  The only actual "control" Aurelius identifies is the President's ability to remove Board members "for cause."  48 U.S.C. § 2121(e)(5)(B).  But courts regard narrow for-cause removal power as a measure of an agency's *independence,* not control.[24]

Nor is the Board subject to federal financial control.  The federal government does *not* provide any salary to Board members, 48 U.S.C. § 2121(g), although "emoluments" are among the customary indicia of federal offices.  *See Hartwell,* 73 U.S. at 393.  And Puerto Rico, not the United States, funds the Board's expenses.  48 U.S.C. § 2127 (b).  Federal agencies' assistance to the Board likewise fails to demonstrate federal control.  Under PROMESA, such assistance is subject to the Intergovernmental Personnel Act of 1970, 5 U.S.C. §§ 3371–3375, which governs cross-assignments of personnel between federal and state or local agencies.  *See* 48 U.S.C. § 2123(d); 5 U.S.C. § 3372(a).  And the Board is similarly empowered to request that personnel of

---

[24] *See, e.g., Mistretta v. United States*, 488 U.S. 361, 411 (1989) (Congress "insulated" Sentencing Commission members from Presidential removal except for good cause "precisely to ensure that they would not be subject to coercion."); *Humphrey's Ex'r v. United States,* 295 U.S. 602, 629 (1935) (in specifying President may remove agency official only "for cause," Congress enables officials "to act in discharge of their duties independently of executive control.").

16

the Commonwealth be detailed to provide assistance.  *Id.* § 2123(e).  These arrangements

confirm that the Board-federal government relationship is akin to federal-state cooperation.

In the end, Aurelius shows little more than that that the Board exercises authority

"conferred by a federal statute that sets federal standards."  (Mot. at 23.)  This formulation would

make all territorial officials—including Puerto Rico's elected officials—federal officials.  The

Commonwealth's Constitution became effective only upon Congressional ratification[25] and

specifies that the Commonwealth's political power "shall be exercised …within the terms of the

compact agreed upon between the people of Puerto Rico and the United States of America."

P.R. Const. art. I, § 1.  Aurelius thus fails to establish the federal-oversight element of its four-

part test.

> 3.    *Oversight Board Members Do Not Exercise Significant Authority in a Federal Capacity.*

Aurelius erroneously maintains that Board members must be Officers of the United States

because their positions are "established by Law" and they exercise "significant authority

pursuant to the laws of the United States" (Mot. at 12 (quoting *Buckley,* 424 U.S. at 126), 13–

16).  But this broad reading of *Buckley*'s formulation—which has been characterized as

"shorthand for the full historical understanding of the essential elements of a public office"[26]—

fails to account for the entire range of actors exercising authority under federal law, including

territorial officers.  Indeed, Aurelius fails even to ask on whose behalf the Oversight Board acts.

By enacting PROMESA, Congress did not create offices within the *federal* government,

but revised the existing *territorial* government established by the Puerto Rico Constitution in a

---

[25] Joint Resolution Approving the Constitution of the Commonwealth of Puerto ("Joint
Resolution"), Pub. L. No. 82-447, 66 Stat. 327, 327–28 (1952).

[26] *See Officers of the United States Within the Meaning of the Appointments Clause,* 31 Op.
O.L.C. 73, 87 (2007).

17

"compact" with the United States in 1952.[27] The Board employs its express powers—to certify

fiscal plans and budgets, investigate, and make recommendations concerning fiscal stability and

management—on the Commonwealth's behalf and in concert with existing territorial offices,

such as the Governor and the Legislature.  *See, e.g.,* 48 U.S.C. §§ 2141(a), (c), (d), (e), (f), 2142,

2144(a)(3), (b)(1), 2145.  While the Board may contract with third parties, approve issuance of

debt, and initiate actions in federal court, as Aurelius points out,[28] it does not act in the service of

the United States in so doing.  The Board does not, for example, contract on behalf of the United

States, draw on the federal fisc, or file suit on behalf of the United States government.

Here again, historical precedent is an important guide.  In adding an "oversight" layer to

Puerto Rico's existing territorial government through PROMESA and devising procedures for

the appointment of Board members, Congress did not write on a blank slate, as Aurelius

suggests.  Rather, Congress drew on its experience with Washington D.C.'s own fiscal

emergency decades earlier, when Congress passed the District of Columbia Financial

Responsibility and Management Assistance Act of 1995 ("FRMAA").  109 Stat. 97.  PROMESA

resembles the earlier legislation in a number of respects.[29]  Notably, Congress conferred on the

District's Financial Responsibility and Management Assistance Authority, known as the

"Control Board," many of the same powers and responsibilities that Aurelius catalogues in

arguing that the Oversight Board exercises "significant authority" that makes its members federal

officers.  The Control Board was authorized to approve the District's financial plan or budget,

FRMAA, § 202; pre-review contracts proposed to be executed by the District government, *id.* §

---

[27] *See* 1952 Joint Resolution, 66 Stat. at 327-28; P.R. Const. art. I, § 1.

[28] *See* Mot. at 14–15 (citing 48 U.S.C. §§ 2124(g), 2124(k), 2147).

[29] *See* D. Andrew Austin, *The Puerto Rico Oversight Management and Economic Stability Act
(PROMESA; H.R. 5278; S. 2328)* 3 (Congressional Research Service 2016).

203(b)(1)(A); consent to the appointment of the District's Chief Financial Officer and the
Inspector General, *id.* § 101(e)(1)(C)–(D); seek judicial enforcement of its authority, *id.* §
103(h); conduct investigations by taking testimony and evidence and issuing subpoenas, *id.* §
103(a), (e)(1), (g); and contract with third parties, *id.* § 103(g).  One member of Congress
described the powers afforded the Control Board in FRMAA as considerably more "potent" than
those assigned to the Oversight Board.  162 Cong. Rec. H3581, 3583 (2016).

Nevertheless, in forming the Control Board, Congress did not create *federal* offices.  In
enacting FRMAA, Congress acted under its plenary authority over the District.  FRMAA, §
101(a) (citing U.S. Const. art. I, § 8, cl. 17).  This authority, like that conferred by the Territorial
Clause, authorizes Congress to legislate *local* governance structures distinct from "federal
appointments of common national significance."[30]  Employing the same language later used in
PROMESA, Congress established the Control Board "as an entity within the government of the
District of Columbia," and expressly *not* "a department, agency, establishment, or
instrumentality of the United States Government."  FRMAA, § 101(a).

Congress therefore did not treat the D.C. Control Board's members as principal federal
officers in providing for their appointment, despite their considerable authority under federal
law.  They were to be appointed by the President, after required consultation with specified
members of Congress,[31] but confirmation by the full Senate was not required.  As Aurelius

---

[30] *Techworld Development Corp. v. D.C. Preservation League,* 648 F. Supp. 106, 116 (D.D.C.
1986) (discussing Congress's "dual authority" over the District in Appointments Clause context);
*compare Palmore v. United States,* 411 U.S. 389, 397 (1973) ("Not only may statutes of
Congress of otherwise nationwide application be applied to the District of Columbia, but
Congress may also exercise all the police and regulatory powers which a state legislature or
municipal government would have in legislating for state or local purposes.") *and Am. Ins. Co. v.
356 Bales of Cotton (Canter),* 26 U.S. (1 Pet.) 511, 546 (1828) ("In legislating for [territories],
Congress exercises the combined powers of the general, and of a state government.").

[31] *See* FRMAA, § 101(b)(2) ("The President shall appoint the members of the Authority after

19

would have it, such a scheme would violate the Appointments Clause—for a principal officer or even for an inferior officer, who may be appointed by the President "alone" but not by the President *and* individual members of Congress.  (*See* Mot. at 26–27.)  Yet while litigants have challenged Control Board actions on statutory and constitutional grounds,[32] we are unaware of any challenge to FRMAA under the Appointments Clause.

Aurelius also ignores the status of state officials.  Such officials regularly assist in implementing federal law, as the Founders anticipated.[33]  But this power to exercise significant authority under federal law does not by itself render a state officer a *federal* officer such that the Appointments Clause would apply.[34]  While this is in part because of the "dual sovereignty" of the United States and individual states, it is also because federal statutes promulgate rights and responsibilities for states *as states*.  Nevertheless, Aurelius appears to assume that merely because PROMESA is a federal statute, any action under it is an exercise of federal authority, rather than fulfilling a responsibility or exercising a right conferred by the statute.  Aurelius argues, for example, that "the Board wields significant federal authority in the context of Title III restructuring proceedings."  (Mot. at 15.)  But PROMESA makes it clear that in terms of restructuring, the Board inhabits a role akin to that of a state, not the federal government.  For

---

consulting with the Chair of the Committee on Appropriations and the Chair of the Committee on Government Reform and Oversight of the House of Representatives, the Chair of the Committee on Appropriations and the Chair of the Committee on Governmental Affairs of the Senate, and the Delegate to the House of Representatives from the District of Columbia.")

[32] *See, e.g., Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 132 F.3d 775 (D.C. Cir. 1998).

[33] *See The Federalist No. 45*, at 308 (James Madison) (Ford. ed., 1788) ("[E]ventual collection [of internal revenue] under the immediate authority of the Union, will generally be made by the officers, and according to the rules, appointed by the several States"); *F.E.R.C. v. Miss.,* 456 U.S. 742 (1982) (upholding requirement that states implement federal utility regulatory scheme).

[34] *See Officers of the United States Within the Meaning of the Appointments Clause,* 31 Op. O.L.C. 73, 99 (2007) (State officials ordinarily "do not possess delegated sovereign authority of the federal government, even when they assist in the administration of federal law.").

example, in making certain Bankruptcy Code provisions applicable to Title III proceedings,
PROMESA broadens the Bankruptcy Code's defined term "State" to mean "State or territory"
for specified purposes.  48 U.S.C. § 2161(c)(6).  The Oversight Board's state-like role is
exemplified by requiring the Board's restructuring certification before an entity may file a
petition.  *Id.* §§ 2146, 2164(a).  This responsibility mirrors that of a state in regard to a
municipality under the Bankruptcy Code.  *See* 11 U.S.C. § 109(c)(2) (municipality may be
debtor if "specifically authorized . . . by State law or by a governmental officer or organization
empowered by State law to [so] authorize.").  And in acting as the "representative of the debtor,"
48 U.S.C. § 2175(b), filing a petition, *id.* § 2164(a), and filing a plan of adjustment, *id.* §
2172(a), the Board serves as an agent of "the territory or covered territorial instrumentality" for
which Title III proceedings are conducted.  *See id.* § 2161(c)(2) (defining "debtor").[35]  In doing
so, the Board exercises Commonwealth rights created by federal statute, and its members act as
territorial officials in the public service of Puerto Rico, not the United States.

> ### 4.    *Federal Appointment Does Not Make Board Members Federal Officers.*

Aurelius insists that "federally appointed officers are Officers of the United States within
the meaning of the Appointments Clause, even if their responsibilities may include supervision
of the local government established for a territory."  (Mot. at 19.)  As discussed above, Aurelius
makes the fact of appointment itself the test of whether a position is subject to the Appointments
Clause, but this is not the test.  Instead, courts examine whether the powers and duties of a
position bring it within the scope of the Constitutional mandate.  (*See supra* p. 11.)

---

[35] Elsewhere, Aurelius admits that the Oversight Board's role in Title III proceedings is similar
to that of local officials.  (*See* Mot. at 6-7.)

Indeed, if federal appointment were the sole requirement for the Appointments Clause to apply, many offices in Puerto Rico's government transformed from federal to territorial offices with no change in powers or responsibilities.  As Aurelius would have it, Puerto Rico's Attorney General *was* a federal officer under the 1917 Jones Act, but *was not* a federal officer under the 1947 Act, even though his powers and responsibilities remained exactly the same.[36]  Similarly, Aurelius argues that once Puerto Rico's Governor became an elected official in 1947, he was no longer a federal officer.  (Mot. at 20–21.)  Yet under the Jones Act he continued to supervise the Auditor, who was still appointed by the President—and therefore *was* a federal officer, according to Aurelius.  *See* Jones Act, § 20, 39 Stat. 957–58.  Aurelius makes no attempt to explain how a territorial officer could supervise a federal officer.  Historical practice thus eviscerates any contention that federal appointment alone determines whether a position is federal or territorial.

Aurelius's legal authority likewise falls short.  The only judicial decision Aurelius cites that arguably concerned a territory stands for the unremarkable proposition that a Washington D.C. justice of the peace was "an officer under the government of the United States" under a District statute exempting certain persons from militia duty—*not* the Appointments Clause. *Wise v. Withers,* 7 U.S. 331, 335-36 (1806).  While the court in *Hartwell* relied in part on the assistant treasurer's appointment of the defendant in finding that he was a government officer, 73 U.S. at 393, that case did not concern any government other than that of the United States and so has no bearing on whether an office is within the United States or a territorial government.

Analyzing the four factors Aurelius has identified also reveals why *Department of Transportation v. Association of American Railroads*, 135 S.Ct. 1225 (2015), on which Aurelius heavily relies, is inapposite.  For starters, that case concerned only whether Amtrak is a *private*

---

[36] *See* Jones Act, §§ 13-14, 39 Stat. at 955-56; 1947 Act, § 3, 61 Stat. at 771.

actor or a federal government instrumentality.  *Id.* at 1232.  It did not concern the question

here—whether an entity is a part of the federal or a territorial government.  As significantly,

Amtrak had several hallmarks of being a *federal* governmental entity that are absent here:

| Amtrak | Oversight Board |
|---|---|
| "[P]riorities, operations, and decisions are extensively supervised" by the federal government. | Reporting responsibilities to both United States and Puerto Rico governments.  (*See supra* p. 16.) |
| "Congress has mandated certain aspects of Amtrak's day-to-day operations." | Operates with substantial discretion, much of which cannot be challenged in ay court. |
| "[R]emovable by the President at will." | Removable by the President only for cause. (*See supra* p. 24.) |
| "Dependent on federal financial support." | Funded entirely by the budget of the government of Puerto Rico.  (*See supra* p. 16.) |
| "[O]perates for the [federal] Government's benefit." | Operates for the benefit of Puerto Rico.  (*See supra* p. 20-21.) |

Comparing the Oversight Board to Amtrak merely underscores the conclusion that the Oversight

Board is a territorial, not a federal, government entity.

## II.  PROMESA'S OVERSIGHT-BOARD APPOINTMENT AND REMOVAL PROVISIONS DO NOT VIOLATE THE SEPARATION OF POWERS.

Just as the appointment of Board members does not violate the Appointments Clause, nor

does it raise the separation of powers concerns underlying that Clause, as Aurelius erroneously

suggests.  Where not expressly prohibited by the Constitution, Congressional action

impermissibly encroaches on another branch's powers only if the action prevents that branch

from performing its constitutionally assigned functions.[37]  This doctrine acknowledges that while

---

[37] *See Zivotofsky*, 135 S. Ct. at 2094 (action unlawful where it "prevents the Executive Branch from accomplishing its constitutionally assigned functions") (quoting *Nixon v. Adm'r of General Servs.*, 433 U.S. 425, 443 (1977)); *see also Morrison v. Olson,* 487 U.S. 654, 695 (1988) ("Finally, we do not think that the Act . . . 'disrupts the proper balance between the coordinate

the Constitution distributes powers among the three branches, "the separate powers were not intended to operate with absolute independence."[38]  Even when a potential intrusion on executive or judicial power exists, it may be "justified by an overriding need to promote objectives within the constitutional authority of Congress."  *Adm'r of Gen. Servs.,* 433 U.S. at 443.

### A.   PROMESA's Appointment Procedures Do Not Improperly Encroach on Executive Powers or Aggrandize Congress.

PROMESA makes it plain that, at least with respect to replacement Board members, the President may nominate candidates entirely of his choosing.  While PROMESA states that the President "should" select six of the seven members from candidate lists provided by specified members of Congress, 48 U.S.C. § 2121(e)(2)(A), the statute *does not require* the President to draw from the lists.  It provides only that the Senate must confirm any off-list nominee—except position "F," whom the President selects in his "sole discretion," *id.* § 2121(e)(2)(A)(vi).  Senate confirmation mirrors the Appointments Clause's own procedure and cannot unconstitutionally impinge Presidential power.  U.S. Const. art. II, § 2, cl. 2.   As for original Board members, only if they were not appointed by September 1, 2016, was the President required to select them from the Congress members' lists.  48 U.S.C. § 2121(e)(2)(G).  But even then, PROMESA preserves

---

branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions.") (quoting *Nixon*, 433 U.S. at 443).

[38] *U.S. v. Nixon,* 418 U.S. 683, 707 (1974)*; see Mistretta,* 488 U.S. at 380–81 (quoting Madison in Federalist No. 47 that separation of powers "d[oes] not mean that these [three] departments ought to have no *partial agency* in, or no *controul* over the acts of each other," but rather "that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution, are subverted." (emphasis in original)); *see also Nixon*, 433 U.S. at 443 (rejecting "archaic" view that separation of powers requires "three airtight departments of government"); *Buckley*, 424 U.S. at 120–21 (Founders "saw that a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a nation capable of governing itself effectively."); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity.").

Presidential power to veto those lists if the President finds the proposed candidates unacceptable and permits the relevant Congressional leader to supply new names.  *Id.* § 2121(e)(2)(C).

The Congress members' candidate lists are therefore nothing more than non-binding recommendations.  PROMESA's procedure does not differ materially from that mandated for the Federal Sentencing Commission, which requires the President to consult with "representatives of judges, prosecuting attorneys, defense attorneys, law enforcement officials, senior citizens, victims of crime, and others interested in the criminal justice process" and to appoint to the Commission at least three federal judges "selected after considering a list of six judges recommended to the President by the Judicial Conference of the United States."  28 U.S.C. § 991(a).  In both cases, Congress has merely specified a means for implementing the statute.

Aurelius nevertheless argues that in practice, PROMESA deliberately precluded Presidential discretion in the initial nominating process because the statutorily mandated 62-day period for those nominations provided a "hopelessly short time frame" for confirmation given that Congress's summer recess fell during this period.  (Mot. at 31-32.)  This contention wishes away the urgent circumstances in which PROMESA was enacted.  Like the District of Columbia Financial Responsibility and Management Assistance Act, which urged the President to appoint the Control Board to address D.C.'s financial crisis no more than *25 days* after enactment, FRMAA § 101(b)(1)(A), PROMESA pressed the President to fill Oversight Board seats quickly. And contrary to Aurelius's suggestion, the summer recess did not preclude Senate confirmation. The Senate convened twice weekly pro forma sessions[39] at which (as the Court explained in *NLRB v. Noel Canning*) the Senate *can* and *does* conduct business by passing unanimous consent

---

[39] *See* 162 Cong. Rec. (Daily Digests for Jul. 1, 5, 15, 19, 22, 26, 29; Aug. 2, 5, 9, 12, 16, 19, 23, 26, 30, 2016).

agreements—a routine Senate procedure by which the Senate has even passed legislation during

a pro forma session.  134 S. Ct. at 2575.  Aurelius fails to show that Congress could not have

used this mechanism, given the exigent circumstances, had the President disfavored the

Congressional leaders' Oversight Board candidates.  Nor does Aurelius offer any evidence that

President Obama regarded the Congressional lists as anything more than recommendations when

he appointed the Oversight Board on August 31, 2016[40]—*before* PROMESA required

appointments from the lists.

        In any event, September 1, 2016, was not a deadline after which the President's power to

appoint whomever he chose (subject only to Senate confirmation) expired, as Aurelius suggests.

In fact, nowhere does PROMESA say that the President's power to nominate for the original

Board individuals not on the Congressional lists was nullified after September 1, 2016.  In the

analogous context of statutes that set deadlines for agency action, courts have held that such

deadlines do not divest the agency of the power to act.  *See Nat'l Petrochemical & Refiners

Ass'c v. E.P.A.*, 630 F.3d 145, 154 (D.C. Cir. 2010) ("Precedent from the Supreme Court and this

court instructs … that where there are less drastic remedies available for an agency's failure to

meet a statutory deadline, courts should not assume Congress intended for the agency to lose its

power to act.").  Applying that principle here, had September 1, 2016, come and gone, there is no

reason the President could not have appointed whomever he chose and sought the Senate's

advice and consent, notwithstanding the statute's so-called "deadline."[41]

---

[40] *President Obama Announces the Appointment of Seven Individuals to the Financial Oversight and Management Board for Puerto Rico* (Aug. 31, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/08/31/president-obama-announces-appointment-seven-individuals-financial.

[41] *Barnhart v. Peabody Coal Co*., 537 U.S. 149, 158 (2003) (Court does not "construe[ ] a provision that the Government 'shall' act within a specified time, without more, as a jurisdictional limit precluding action later."); *Kinion v. United States*, 8 F.3d 639, 643-44 (8th

Even if PROMESA were construed as compelling the President to appoint the Board

from the Congressional lists, it still would not unconstitutionally encroach on the Executive or

aggrandize Congress. Aurelius's argument to the contrary hinges on its characterization of

nominating power as belonging exclusively to the President. (*See* Mot. at 26–29.) But any such

characterization pertains only to Presidential power under the Appointments Clause. It does not

extend to the appointment of officials—such as territorial officers—not subject to that Clause.

Aurelius effectively concedes as much when it notes that the President must nominate the

Comptroller General and Deputy Comptroller General only after receiving a list of at least three

recommended nominees compiled by a commission including members of Congress. (Mot. at 30

(citing 31 U.S.C. § 703(a)).) Aurelius accounts for this procedure by noting the Comptroller

General exercises legislative functions, i.e., because the Appointments Clause does not govern.

(Mot. at 30 (citing *Buckley,* 424 U.S. at 137).) In these circumstances, Congressional limitations

on Presidential discretion are lawful if they do not hamper the President's execution of the law.

Historical practice confirms this. Congress has long cabined Presidential discretion by

providing detailed statutory qualifications for offices and agencies. *See Myers v. United States,*

272 U.S. 52, 265–74 (1926) (Brandeis, J., dissenting) (collecting statutes). It has also required

the President to make appointments from lists provided by third parties.[42] Congressional

participation in Oversight Board appointments also does not impede executive power because the

---

Cir. 1993) (missed deadline for debt restructuring and loan servicing decisions did not deprive
Farmers Home Administration of jurisdiction).

[42] *See, e.g.,* Act of Feb. 23, 1920, c. 91, § 304, 41 Stat. 456, 470 (providing three of nine Railroad
Labor Board member be appointed from six nominees selected by carrier employees and three
members be appointed from six nominees selected by the carriers); Act of July 1, 1902, c. 1362,
§ 59, 32 Stat. 641, 654 (providing that appointment of 3-member commission to sell coal and
asphalt deposits in Indian lands include one member recommended by principal chief of the
Choctaw Nation and one member recommended by the Governor of the Chickasaw Nation).

Board is not a *federal executive* agency, but one established under the Territorial Clause, exercising Congress's Article IV authority to manage the territories.[43]  "In a territory *all the functions of government* are within the legislative jurisdiction of [C]ongress."[44]  Even within the territorial government, the Oversight Board's duties are integrated with those of *both* the Governor of Puerto Rico and its Legislature, making it quasi-legislative and quasi-executive.[45]

Thus Congress does not improperly expand its constitutional authority when it submits candidate lists for an Oversight Board.[46]  Tellingly, in cases Aurelius cites as examples of Congressional aggrandizement, legislators hampered executive power by (i) requiring the appointment of *legislators themselves* to executive agencies or (ii) vesting Congress with removal powers amounting to agency control.[47]  Here, Congress has done neither.

*Metropolitan Washington Airports Authority* illustrates why PROMESA's list mechanism is *not* congressional aggrandizement.  The Supreme Court there held that Congress

---

[43] *See Freytag,* 501 U.S. at 913 (1991) (Scalia, J., concurring) (Territorial governors "are not Article I executives but Article IV executives," just as territorial courts are neither Article III nor Article I courts, but Article IV courts).

[44] *Endleman v. United States*, 86 F. 456, 459 (9th Cir. 1898); *see also Nat'l Bank v. County of Yankton,* 101 U.S. 129, 133 (1880) (in regard to territories, Congress's "governmental authority has all the powers of the people of the United States, except such as have been expressly or by implication reserved in the prohibitions of the Constitution").

[45] *See, e.g.,* 48 U.S.C. §§ 2141(a), (c), (d), (e), (f), 2142, 2144(a)(3), (b)(1), 2145.

[46] Nominating power alone is not outside legitimate legislative functions, as Congress exercises such power for various federal positions.  *See, e.g.,* 20 U.S.C. §§ 42–43 (empowering Congress to appoint Regents for Smithsonian Institution, an independent federal agency); 20 U.S.C. § 76h(a) (vesting Congress with appointment power for positions on Board of Trustees for John F. Kennedy Center for the Performing Arts, while certain trustees were appointed by President).

[47] *See Metro. Airports Auth. v. Citizens for the Abatement of Aircraft Noise,* 501 U.S. 252, (1991) ("*MWAA*")*,* 501 U.S. 252, 255, 274–77 (1991) (Congress authorized transfer of control of two major airports contingent on creation of Board of Review composed of nine members of Congress); *Springer v. Gov't of Philippine Islands,* 277 U.S. 189 (1928) (Philippine Legislature assigned voting power of corporations formed under its authority to boards including specified members of the Legislature); *Myers,* 272 U.S. at 106–07 (Tenure of Office Act of 1867 required Senate approval of Presidential removal of officers).

28

impermissibly aggrandized itself by delegating federal power to Congress's agent.  But the Oversight Board, unlike the *MWAA* Board of Review, "neither exercises federal power nor acts as an agent of Congress."  *MWAA*, 501 U.S. at 265.  And unlike the Board of Review in *MWAA* (which was subject to removal at Congress's whim, *see* 501 U.S. at 268–69)), the Oversight Board is subject to no Congressional removal authority or any supervisory power.

If *MWAA*'s aggrandizement concern were not limited to offices exercising federal power under Congressional control, but instead applied whenever Congress played any role in appointment, numerous statutes would be unconstitutional.[48]  None of the entities created under these statutes exercises solely legislative authority or acts exclusively in aid of the legislative process.  The statutes are permissible only because, like the Oversight Board, these entities do not exercise federal sovereign power and so do not implicate aggrandizement concerns.

**B.     PROMESA's Removal Provisions Do Not Unconstitutionally Curtail Presidential Power.**

Aurelius also contends that PROMESA unconstitutionally restricts the President's removal powers by permitting the removal of Board members only "for cause."  (Mot. at 33–34 (citing 48 U.S.C. § 2121(e)(5)(B)).)  But the Constitution does not require that the President hold any removal powers over territorial officers.  Not one Puerto Rico official—the Governor or members of its legislature—is subject to Presidential removal.

---

[48] *See, e.g.,* 10 U.S.C. 4342(a)(3)–(10) (authorizing Congress members to appoint U.S.M.A. cadets); 10 U.S.C. § 4355(a)(1)–(4) (authorizing Congress to appoint members of Academy's Board of Visitors); 39 U.S.C. § 202(a) (providing President "should consult" with Congressional leaders in choosing Postal Service's Board of Governors); 40 U.S.C. § 8711(b) (providing for Congress members to sit on National Capital Planning Commission); 20 U.S.C. § 42(a) (providing Congress members seats on the Board of Regents of the Smithsonian Institution); 36 U.S.C. § 2302(b) (providing Congress members sit on Holocaust Memorial Council).

Even as to federal offices, there is no requirement that the President's removal power be
unlimited.  In *Humphrey's Executor*, the Court explained that whether Congress can limit the
President's power of removal "will depend upon on the character of the office."  295 U.S. at 631;
*see also Morrison,* 487 U.S. at 687.  Oversight Board members' duties are well within the scope
of those the Supreme Court has held can be subject to removal only for cause.[49]

Moreover, as discussed above, the Oversight Board is not a federal agency; it exercises
only local power.  While the Board has discretion over Puerto Rico's fiscal management,
Presidential control over that discretion is scarcely "so central to the functioning of the Executive
Branch as to require as a matter of constitutional law that [the Board] be terminable at will by the
President."  *Morrison,* 487 U.S. at 691–92.  In the Oversight Board's absence, the Puerto Rico
Legislature and Governor, not the federal executive branch, would perform the Board's duties.
A finding that PROMESA's "for cause" removal is unconstitutional would call into question
comparable provisions for numerous positions—ranging from the Federal Reserve Board to the
Nuclear Regulatory Commission—that allow removal only "for cause" or for "inefficiency,
neglect of duty, or malfeasance in office."  *See, e.g.,* 12 U.S.C. § 242; 42 U.S.C. § 5841(e).

While Aurelius argues that limiting the President's removal power obscures
accountability (Mot. at 33), removal only for "cause" does not grant the Oversight Board carte
blanche to overstep its statutory mandate.  The President retains authority to assure that the
official is "competently performing his or her statutory responsibilities in a manner that
comports" with legislative requirements.  *See Morrison,* 487 U.S. at 692.  And Aurelius's

---

[49] *See Morrison*, 487 U.S. at 685–93 (upholding "cause" requirement even though Independent
Counsel exercised purely executive powers); *Wiener v. United States*, 357 U.S. 349 (1958)
(upholding implicit removal limitations for War Crimes Commission members); *Humphrey's
Ex'r*, 295 U.S. at 628–32.

contention that PROMESA's appointment and removal procedures result in "a double layer of insulation" (Mot. at 33) again misreads the statute and Supreme Court precedent.  Under the statute, if a Board seat becomes vacant, the President need not select from a Congressional list of potentially "unpalatable" candidates, but could select a nominee for confirmation by the Senate—without the deadline that governed only the initial appointment of the Board.  *See* 48 U.S.C. § 2121(e)(1), (6).  Nor does the Oversight Board enjoy a "double layer" of protection as described in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 527 (2010).  Setting aside that Oversight Board members are territorial officers that need not be subject to Presidential removal at all, that case found unconstitutional a scheme under which a board member could be removed only for cause not by the President, but by another officer or commission whom the President may remove only for cause, such as the Securities Exchange Commission.  *Id.*  PROMESA, by contrast, directly vests the removal authority in the President and so does not create such an impermissible "double layer of insulation."

III.   **IF THE COURT FINDS THE OVERSIGHT BOARD'S APPOINTMENT UNCONSTITUTIONAL, IT SHOULD HOLD THE BOARD'S PAST ACTIONS DE FACTO VALID.**

As discussed above, the Court should find that the Oversight Board members' appointment did not violate the Constitution's Appointments Clause and the Board had lawful authority to issue "restructuring certification" for the Commonwealth, 48 U.S.C. § 2146, and initiate these Title III proceedings pursuant to 48 U.S.C. § 2164.  But if the Court were to conclude otherwise, it should not nullify the year's worth of work that the Oversight Board has accomplished.  Instead, it should declare the Board's actions to date de facto valid, deny Aurelius's motion to dismiss, and issue a stay to permit statutory revision or the Board's reconstitution.  To dismiss this action would unnecessarily delay the Board's efforts to stabilize Puerto Rico and exacerbate an already precarious situation affecting millions of U.S. citizens.

31

Precedent supports de facto validity here.  While *Buckley* concluded that the Federal

Election Commission's selection violated the Appointments Clause, the Court also held that its

ruling "should not affect the validity of the Commission's administrative actions and

determination" and afforded the Commission's past acts de facto validity.  *Buckley,* 424 U.S. at

142.  Doing so, the Court cited the treatment of legislators elected under unconstitutional

apportionment plans.[50]  In such cases, courts have relied upon the "de facto officer" doctrine,

which confers validity on acts of a person acting under color of official title even though the

legality of that person's appointment or election to office is later found deficient.  *Ryder v.*

*United States,* 515 U.S. 177, 180 (1995) (citing *Norton v. Shelby County*, 118 U.S. 425, 440

(1886)).  As the Court explained, "The de facto doctrine springs from the fear of the chaos that

would result from multiple and repetitious suits challenging every action taken by every official

whose claim to office could be open to question, and seeks to protect the public by insuring the

orderly functioning of the government despite technical defects in title to office."  *Id.* at 180–81.

Courts have followed a similar path in cases involving statutory and constitutional

challenges to federally-appointed administrative boards.  For example, after holding that a D.C.

Control Board improperly delegated authority to a Board of Trustees, the court exercised its

"remedial discretion" to afford past acts of the Board of Trustees de facto validity.  *Shook,* 132

F.3d at 784.  The court explained that it saw "no benefit in plunging the District's school system

into further chaos by invalidating all actions taken by the Board of Trustees over the past year."

*Id.*  And while a Court of Appeal found that the Metropolitan Washington Airports Act

unconstitutionally violated the separation of powers by making the Metropolitan Washington

---

[50] *Id.* (citing *Conner v. Williams,* 404 U.S. 549, 550–51 (1972); *Ryan v. Tinsley,* 316 F.2d 430,
431–32 (10th Cir. 1963); *Schaefer v. Thomson,* 251 F. Supp. 450, 453 (D. Wyo. 1965), *aff'd sub*
*nom. Harrison v. Schaeffer*, 383 U.S. 269 (1966)).

Airports Authority an agent of Congress, it ordered that actions taken by the Board not be

"invalidated automatically."  *Hechinger v. Metro. Washington Airports Auth.*, 36 F.3d 97, 105

(D.C. Cir. 1994).

The cases Aurelius cites are not to the contrary because they involved discrete judicial

disputes that affected only a limited number of litigants.  Petitioners in *Glidden Co. v. Zdanok*

challenged the validity of judgments in two cases (concerning an alleged breach of a collective

bargaining agreement and an alleged armed robbery) on the grounds certain judges were

improperly sitting by designation.  370 U.S. 530, 531–33 (1962).  And *Ryder* addressed the

validity of affirming an individual court martial in the Court of Military review.  *Ryder,* 515 U.S.

at 179.  The courts' rejection of the de facto officer doctrine in these matters did not threaten

widespread social disruption like that flowing from dismissing the petition here.

Indeed, few cases more urgently cry out for the de facto officer doctrine's application.  In

passing PROMESA, Congress found that Puerto Rico was suffering a "fiscal emergency" that

rendered its government "unable to provide its citizens with effective services" and affected the

Commonwealth's long-term economic stability.  48 U.S.C. § 2194(m)(1)–(3).  The House

Committee Report noted that Puerto Rico had already been shut out of the municipal bond

market for more than two years and had "[run] out of funding sources traditionally used to

finance government operations" six months earlier.  H. R. Rep. 114-602, pt. 1, at 121 (2016).  As

the Report further explained, the fiscal emergency carried profound human consequences:

> The situation in Puerto Rico is close to, or has already become, a humanitarian
> crisis.  Essential services are being cut or reduced.  Schools and hospitals, if not
> already shuttered, face daily electricity or water shortages.  Because hospitals
> don't have money to pay vendors, they are increasingly unable to provide
> healthcare services.

*Id.*  Puerto Rico's Congressional representative likewise emphasized the situation's urgency,

driving constituents to flee the island in historic numbers.  *Id.* at 110.

33

Dismissing the Board's petition would, yet again, stymie efforts to contain this crisis and compel Petitioners and this Court to repeat work already well underway. Since it was constituted, the Oversight Board has, among other things, (i) held nine meetings in which it reviewed and certified fiscal plans and budgets for the Commonwealth and numerous instrumentalities (*e.g.,* the Government Development Bank for Puerto Rico, the Puerto Electric Power Authority, the Puerto Rico Highways and Transportation Authority, and the Puerto Rico Aqueduct and Sewer Authority); (ii) issued restructuring certifications for the Commonwealth and several instrumentalities; (iii) filed Title III Petitions for the Commonwealth and four instrumentalities; and (iv) appointed a Revitalization Coordinator and executed numerous contracts necessary to complete its statutory responsibilities.[51] If the Court were to nullify these actions, the work would need to be re-done, with the attendant delay and expense for Puerto Rico, which can afford neither. For this reason, and because Aurelius has shown no harm from the Board's acts, this Court should not dismiss the petition, even if it finds the appointment of the Oversight Board unconstitutional, and instead afford the Board's acts to date de facto validity.

## CONCLUSION

More than a hundred years of Supreme Court precedent, as well as the even longer history of United States territorial governance, shows that Congress's plenary power under the Territorial Clause is not limited by the Appointments Clause. On the contrary, Congress has consistently styled territorial governments, like Puerto Rico's, as it sees fit in light of particular needs and circumstances. Were territorial officials regarded as Officers of the United States, as Aurelius assumes, virtually all of the existing territorial governments would be unconstitutional.

---

[51] The Oversight Board's certifications, as well as announcements of appointments and contracts, can be found at https://juntasupervision.pr.gov/index.php/en/documents/.

But they are not—and neither is the Oversight Board. While Members of the Board exercise authority created by federal statute, as Aurelius maintains, they do so in the public service of Puerto Rico, not the United States, and all of their functions pertain exclusively to the internal governance of the Commonwealth. They are territorial officers and their positions do not come within the purview of the Appointments Clause or its underlying separation of powers principles. If the Court concludes otherwise, it should declare the work of the Board to date to be de facto valid, to avoid profound disruption of the ongoing effort to stabilize Puerto Rico's economy.

Dated:       November 3, 2017
             San Juan, Puerto Rico

/s/ Andrés W. Lopez
Andrés W. López
USDC No. 215311
**THE LAW OFFICES OF ANDRÉS W. LÓPEZ, P.S.C.**
902 Fernández Juncos Ave.
San Juan, Puerto Rico 00907
Tel: (787) 294-9508
Fax: (787) 294-9519

/s/ William J. Sushon
John Rapisardi (Admitted *Pro Hac Vice*)
Suzzanne Uhland (Admitted *Pro Hac Vice*)
William J. Sushon (Admitted *Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
7 Times Square
New York, New York 10036
Tel: (212) 326-2000
Fax: (212) 326-2061
-and-
M. Randall Oppenheimer (Admitted *Pro Hac Vice*)
1999 Avenue of the Stars 8th Floor
Los Angeles, California 90067-6035
Tel: (310) 553-6700
Fax: (310) 246-6779
-and-
Walter Dellinger (*Pro Hac Vice* pending)
Peter Friedman (Admitted *Pro Hac Vice*)
1625 Eye Street, NW
Washington, D.C. 20006
Tel: (202) 383-5300
Fax: (202) 383-5414

*Attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority*