**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT<br>AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**OMNIBUS REPLY TO OBJECTIONS TO
URGENT MOTION OF FINANCIAL GUARANTY INSURANCE
COMPANY REGARDING PROPOSED 90-DAY STAY OF ALL LITIGATION
TO FACILITATE THE RECOVERY FROM HURRICANES IRMA AND MARIA**

To the Honorable United States District Court Judge Laura Taylor Swain:

Financial Guaranty Insurance Company ("**FGIC**"), by and through its attorneys Rexach & Picó, CSP and Butler Snow LLP, files this *Omnibus Reply to Objections to Urgent Motion of Financial Guaranty Insurance Company Regarding Proposed 90-Day Stay of All Litigation to Facilitate the Recovery from Hurricanes Irma and Maria* (the "***Reply***")[2] to the Objections[3] filed

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2]   Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms as in the *Urgent Motion of Financial Guaranty Insurance Company Regarding Proposed 90-Day Stay of All Litigation to Facilitate the Recovery from Hurricanes Irma and Maria* [Dkt. # 1514] (the "***Motion***").

[3]   *Debtors' Objection to Urgent Motion of Financial Guaranty Insurance Company Regarding Proposed 90-Day Stay of All Litigation to Facilitate the Recovery from Hurricanes Irma and Maria* [Dkt. # 1581] (the "***Debtors' Objection***"), *Objection to Urgent Motion of Financial Guaranty Insurance Company Regarding Proposed 90-Day Stay of All Litigation to Facilitate the Recovery from Hurricanes Irma and Maria* [Dkt. # 1585] filed by the

by the Debtors, the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "***Retirees Committee***"), the Puerto Rico Fiscal Agency and Financial Advisory Authority ("***AAFAF***") and the Official Committee of Unsecured Creditors (the "***UCC***") (the Debtors, Retirees Committee, AAFAF and the UCC, collectively, the "***Objecting Parties***"). In support of the Reply, FGIC hereby respectfully states as follows:

## Reply

### I. Litigating Without a Settlement Framework is Counterproductive.

1. At its most recent meeting on October 31, 2017, the Oversight Board publicly acknowledged that the Commonwealth's Fiscal Plan must be redone, and its target date for certification is February 23, 2018. The statements by the Objecting Parties that legal issues must be resolved when all relevant facts are unknown are tantamount to an admission that there will be no consensual plan of adjustment and no settlements, only litigation. Indeed, counsel for the UCC in its capacity as Agent for the Commonwealth made the same point to the Court on October 25, 2017, in connection with counsel's presentation of a proposed revised schedule for the Commonwealth-COFINA Dispute. Specifically, counsel for the UCC stated that the issues could be litigated but not settled in the proposed time frame.

2. FGIC submits that, in a restructuring context, litigating when there is no framework for settlement only impedes the ultimate resolution of a case. FGIC believes that litigating "purely legal issues" that relate to commercial claims without the underlying commercial facts does not help the Debtors or creditors achieve a resolution. Instead, it only

---

Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "***Retirees Committee's Objection***"), *The Puerto Rico Fiscal Agency and Financial Advisory Authority's Objection to Urgent Motion of Financial Guaranty Insurance Company Regarding Proposed 90-Day Stay of All Litigation to Facilitate the Recovery from Hurricanes Irma and Maria* [Dkt. # 1586] ("***AAFAF's Objection***"), and *Objection of Official Committee of Unsecured Creditors to Urgent Motion of Financial Guaranty Insurance Company Regarding Proposed 90-Day Stay of All Litigation to Facilitate the Recovery from Hurricanes Irma and Maria* [Dkt. # 1602] (the "***UCC's Objection***") (collectively, the "***Objections***").

2

benefits their lawyers who will now be paid to litigate these issues in a vacuum. A new fiscal plan reflecting present conditions in the Commonwealth could provide the proper commercial context for a resolution. Indeed, ultimate resolution of the Title III Litigations could be hastened by the Oversight Board's participation with stakeholders in a collaborative effort as the new fiscal plan is developed. It is painfully obvious, however, that there will be no collaborative process without the Court's intervention. Indeed, if past actions are any indication, "I'll see you in Court" will be the mantra of these Title III Litigations.

3. The Debtors' hypocrisy is best demonstrated by their recently-filed, proposed *Joint Supplemental Memorandum of Law in Further Support of Debtors' Omnibus Objection to Motions for Orders Authorizing Rule 2004 Discovery* [Dkt. # 1616]. There, the Debtors argue that these discovery requests will only turn up "stale data" because, as stated by the Oversight Board's Executive Director, "Hurricanes Maria and Irma have fundamentally changed Puerto Rico's reality and the revised Fiscal Plan must take that new reality into account." *Id.* at 2. How the facts here could possibly support going forward yet also justify the denial of any discovery is baffling. Instead, FGIC agrees that the reality on the ground in Puerto Rico has "fundamentally changed" and this is why a 90-day stay is warranted.

## II. The Motion Does Not Obstruct the Formulation of Plans of Adjustment.

4. A ninety (90) day stay cannot possibly interfere with the formulation of plans of adjustment since a new fiscal plan for the Commonwealth will not be certified until February 2018, at the earliest, assuming there are no delays. *See* PROMESA section 104(j), 48 U.S.C. § 2124(j)(3) ("The Oversight Board may certify a plan of adjustment only if it determines, in its sole discretion, that it is consistent with the applicable certified Fiscal Plan.").

3

5. Earlier today, November 7, 2017, Natalie Jaresko, Executive Director of the Oversight Board, testified before the House Committee on Natural Resources. A copy of Ms. Jaresko's written testimony is annexed hereto as Exhibit A. In the section of her testimony entitled "Puerto Rico's New Reality," Ms. Jaresko describes the dire circumstances on the island, including "The devastation has destroyed critical infrastructure, making revenue collection extremely difficult. . . .Many businesses were forced to shut down due to structural damage. . . .Puerto Rico's tax revenue collections will be severely impacted." No reasonable person would contest these assessments. Ms. Jaresko also states, among other things, that "without support from the federal government, Puerto Rico would run out of cash by the end of this quarter," and "Puerto Rico is experiencing a massive population exodus, but the exact amount of the exodus is unknowable."

6. After discussing the need to revise the previously certified Fiscal Plans, Ms. Jaresko sets forth, on page 6 of her written testimony, nine principles and three key components that will drive the Fiscal Plan revision process. FGIC submits that the timeline Ms. Jaresko describes as a "goal" for Fiscal Plan revision is extraordinarily optimistic, given the complexity and difficulty of applying the principles described by Ms. Jaresko.

### III. A Stay is Appropriate and Within the Power of the Court.

7. The thrust of FGIC's Motion is to stay disputes among financial creditors, the Objecting Parties, and other similarly situated parties in interest. In case FGIC's Motion was unclear, FGIC does not propose a blanket stay of ordinary course stay relief sought by the Commonwealth's trade creditors, or a stay of administrative matters in the Title III Cases. The scope and duration of any stay may be fashioned and subsequently modified as appropriate by the Court.

8. This Court is endowed with the inherent power to manage its dockets. *Marquis v. F.D.I.C.*, 965 F.2d 1148, 1154 (1st Cir. 1992) ("It is beyond cavil that, absent a statute or rule to the contrary, federal district courts possess the inherent power to stay pending litigation when the efficacious management of court dockets reasonably requires such intervention.") (citations omitted). That PROMESA does not incorporate section 305 of the Bankruptcy Code is of no moment. PROMESA does not prohibit the Court from staying the Title III Litigations.

9. Additionally, PROMESA section 309 (48 U.S.C. § 2169) provides, "Nothing in this subchapter prevents a district court in the interests of justice from abstaining from hearing a particular proceeding arising in or related to a case under this chapter." If this Court may abstain from hearing the Title III Litigations altogether, then surely the Court may also manage its dockets and stay proceedings as appropriate.

WHEREFORE, FGIC respectfully requests entry of the Order substantially in the form of Exhibit A to the Motion, granting the relief requested therein and any other relief as is just and proper.

Dated: November 7, 2017　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　REXACH & PICÓ, CSP

　　　　　　　　　　　　　　　　　　　　By: *María E. Picó*　　　　　　　　
　　　　　　　　　　　　　　　　　　　　　　María E. Picó
　　　　　　　　　　　　　　　　　　　　　　USDC-PR 123214
　　　　　　　　　　　　　　　　　　　　　　802 Ave. Fernández Juncos
　　　　　　　　　　　　　　　　　　　　　　San Juan PR 00907-4315
　　　　　　　　　　　　　　　　　　　　　　Telephone: (787) 723-8520
　　　　　　　　　　　　　　　　　　　　　　Facsimile: (787) 724-7844
　　　　　　　　　　　　　　　　　　　　　　E-mail: mpico@rexachpico.com

BUTLER SNOW LLP

By: *Martin A. Sosland*
    Martin A. Sosland (*pro hac vice*)
    5430 LBJ Freeway, Suite 1200
    Dallas, TX 75240
    Telephone: (469) 680-5502
    Facsimile: (469) 680-5501
    E-mail: martin.sosland@butlersnow.com

    Stanford G. Ladner (*pro hac vice*)
    1700 Broadway, 41st Floor
    New York, NY 10019
    Telephone: (646) 606-3996
    Facsimile: (646) 606-3995
    E-mail: stan.ladner@butlersnow.com

    Christopher R. Maddux (*pro hac vice*)
    J. Mitchell Carrington (*pro hac vice*)
    1020 Highland Colony Parkway, Suite 1400
    Ridgeland, MS 39157
    Telephone: (601) 985-2200
    Facsimile: (601) 985-4500
    E-mail: chris.maddux@butlersnow.com
     mitch.carrington@butlersnow.com

    Jason W. Callen (*pro hac vice*)
    150 3rd Avenue, South, Suite 1600
    Nashville, TN 37201
    Telephone: (615) 651-6774
    Facsimile: (615) 651-6701
    E-mail: jason.callen@butlersnow.com

*Attorneys for Financial Guaranty Insurance Company*

## **EXHIBIT A**

39205395.v3

Written Testimony of Natalie Jaresko

Executive Director

Financial Oversight and Management Board for Puerto Rico

before the

House Committee on Natural Resources

"**Examining Challenges in Puerto Rico's**

**Recovery and the Role of the Financial Oversight and Management Board**"

November 7, 2017

Chairman Bishop, Ranking Member Grijalva and members of the Committee, I am Natalie Jaresko, Executive Director of the Puerto Rico Financial Oversight and Management Board (the "Board"). Thank you for this opportunity to update the Committee on the work of the Board and the situation in Puerto Rico in light of the tragic damage done to the Island and its people by Hurricane Maria and to a lesser extent Irma. Puerto Rico and its residents were engaging in often heroic efforts to help those who suffered greatly from Irma when Maria unleashed its fury on us. My testimony will concentrate on the Maria-caused challenges.

First, I want to thank this Committee, Congress, the Administration and the American people for the generous, recently-enacted emergency aid to the Island along with support for our fellow citizens in Texas, Florida, California and USVI. Likewise, we are deeply grateful for the efforts of FEMA, the U.S. military, the Army Corps of Engineers and all those involved in this historic relief effort. I also wish to acknowledge the efforts of Governor Rosselló, local mayors, and all those in Puerto Rico who are saving lives and supporting the recovery efforts. Maria was the worst storm to hit Puerto Rico in the past 100 years. The entire island was devastated.

As you know, the Board was established by Congress to support the fiscal and economic turnaround of Puerto Rico, as well as restructure the sizable debt obligations that the Commonwealth and a number of additional governmental entities in Puerto Rico have incurred over the years. The terrible impact of Hurricane Maria makes these challenges both more difficult and more urgent. The Board and I have been working every day to make sure that we are providing the kind of support, leadership and oversight necessary to help the Island.

The day after Hurricane Maria hit, the Board provided Governor Rosselló with the authority to reallocate up to $1 billion of the Commonwealth's budget to give the government flexibility to respond to the most pressing needs presented by the first weeks of the crisis. Shortly thereafter, we focused on the need for emergency liquidity assistance to deal with the fact that the hurricane caused revenues to drop and expenditures to increase. We worked closely with the Governor and his staff to estimate the dimensions of the cash-flow shortfall caused by the

1

hurricane's damage and disruption. We jointly presented the results of that work to the Administration and Congress. Again, we thank the Administration and Congress for including liquidity relief via the Community Disaster Loan program with the other essential assistance provided in the emergency supplemental legislation. We know that longer term liquidity to keep the government functioning and to provide key basic services to the residents of the Island is a subject that we will need to continue to work to address with the Governor, Congress and the Administration.

I served as Minister of Finance of Ukraine after the Revolution of Dignity and during the war in the east. I understand the complicated and often difficult measures that are required in times of crisis. I lived through the painful process of determining how to use limited funds in the treasury to ensure the government could effectively govern despite the realities. I know the importance of the need to restore confidence and build a recovery that inspires individuals and businesses to play their valuable ongoing role in rebuilding Puerto Rico. The work of recovery and rebuilding will be long and taxing. In many ways it has barely begun. For these reasons, we will continue to do everything in our power to help the Governor and local authorities in the ongoing efforts.

The hard truth is that the Island now needs help—emergency and restoration funds and assistance on an unprecedented scale. Before the hurricanes, the Board was determined that Puerto Rico and its instrumentalities could achieve balanced budgets, work its way through its debt problems, and develop a sustainable economy *without* federal aid. That is simply no longer possible. Without unprecedented levels of help from the United States government, the recovery we were planning for will fail.

More immediately, there are areas of pressing need—problem areas turned into full-blown emergencies by the hurricanes. These include energy, water, housing, and healthcare. While conditions have improved—for example, distribution of fuel has normalized and grocery store shelves have been restocked—the Island continues to lack electricity, which will not only frustrate economic recovery but impacts daily life, particularly for people who need access to refrigeration for their medicines. Thousands remain in shelters, including seniors, people with disabilities and the bedridden. Tens of thousands of houses do not have roofs, and the installation of temporary tarps will not be completed for months.

In PROMESA, Congress charged us with guiding and overseeing the restoration of the Island to fiscal health via long term fiscal planning and annual balanced budgeting, restoring its ability to access private capital via both debt restructuring and economic development, and, as part of that, helping the Island transition to a sustainable economic model that provides opportunities for our citizens.

We are all too well aware, and as you, Mr. Chairman, and this Committee well knows, that Hurricanes Irma and Maria have made our job much more challenging. The hurricane-caused damage has added greatly—and will add greatly—to the financial distress of the Commonwealth and its instrumentalities. In our view, while our job has become more difficult, it has also become ever more important.

Every dollar of relief funds must be used to address the hurricane-caused needs of those on the Island and to meet the extraordinary challenges of rebuilding a more resilient Puerto Rico with a revitalized economy. It would be tragic if the hurricane-recovery efforts were not integrated into the broader and lasting plan for economic recovery upon which the Board and the Government were focused prior to the hurricane.

Central to avoiding such outcomes will be rethinking and adapting the Fiscal Plans created before the hurricanes in a way that is cognizant of the on-the-ground realities of a hurricane-devastated island but that does not lose sight of our charge to restore Puerto Rico to long-term financial health. I will describe in some detail in this testimony how we are approaching the dual challenges.

Hurricane Maria and the infusion of federal rebuilding funds it will involve likewise raise questions about how to apply PROMESA to the challenges ahead which were not part of the original thinking when PROMESA became law.

**Our Work Pre-Maria**

The period after the passage of PROMESA and before Hurricanes Irma and Maria stretched a little more than a year. In that time, much had been done to fulfill our charge to work with the Government of Puerto Rico to ensure Puerto Rico achieves fiscal balance, to provide a path for its return to the capital markets, and to restore economic growth and opportunity for the people of the Island.

Consistent with its charge under PROMESA, the Board conducted an independent and comprehensive analysis of Puerto Rico's fiscal situation. Before the hurricanes, Puerto Rico had over $74 billion in debt, over $53 billion of unfunded pension liabilities, an economy that had contracted nearly 15% over the last decade, and a nearly 50% poverty rate. In addition, Puerto Rico's structural budget deficits were projected to average 50% of recurring revenues. Severe liquidity challenges and persistent budget deficits have contributed to a perilous lack of investment in infrastructure.

The certified Fiscal Plan for Puerto Rico and those for its covered instrumentalities charted a path for a turnaround without new federal funding. The fiscal and structural reform measures — from transforming the energy sector and modernizing labor laws to reducing government spending by approximately 30 percent over three years—were ambitious and required unprecedented levels of effort by the Government of Puerto Rico.

The Government of Puerto Rico was acutely aware of the difficult choices necessary to achieve fiscal balance and restore economic growth when it developed ten year Fiscal Plans for Puerto Rico and its instrumentalities, as was the Board when it assessed, amended and certified them. The Government of Puerto Rico had begun the hard work of implementing the changes required by the Fiscal Plans via the adoption and certification of the first fiscal year budget compliant with the Fiscal Plan, which included reducing subsidies, increasing tax compliance, taking on direct payment of pensions in the budget, and beginning a three-year process of rightsizing the government. More medium-term work had begun on deeper pension reform, as well as healthcare reform that would reduce forecast costs some 30% within ten years.

**Puerto Rico's New Reality**

Puerto Rico is faced with a unique set of circumstances – the largest public entity restructuring in the history of the U.S. combined with the greatest hurricane devastation to strike in 100 years.

*Liquidity*

Let me shed some light on Puerto Rico's liquidity situation. The devastation has destroyed critical infrastructure, making revenue collection extremely difficult. Moreover, Hurricane Maria

3

has caused severe damages to the private sector. Many businesses were forced to shut down due to structural damage, while those able to continue operating will likely incur substantial losses due to the additional expenses they must make in order to stay open, such as purchasing and running generators for electricity. Puerto Rico's tax revenue collection will be severely impacted.

At the same time, operating expenses during this period, such as paying for essential services, will remain generally the same, while disaster-related expenses will increase relative to the baseline, which had not contemplated a historic hurricane. In addition, there is a timing mismatch between when disaster-related expenses are incurred and when, if at all, FEMA reimburses the Government for those expenses.

Therefore, without support from the federal government, Puerto Rico would run out of cash by the end of this quarter. That means no money to make payroll for teachers, police, and first responders, or pay pensions and other liabilities. This puts the Commonwealth, with limited cash on hand, in a liquidity crisis.

In the first weeks after the hurricane, the Board and the Government jointly produced an estimate of the size of this liquidity crisis based on the best available data. The extent of the short-term impact of the hurricane on the capacity of the Commonwealth and its instrumentalities is illustrated by the work we did with the Government in estimating its cash requirement through the end of this year to be approximately $5 billion. The Government subsequently revised the estimate to $3.6 billion to account for the facts that the Government has been able to receive FEMA advances to pay for expenditures and FEMA has been directly paying other federal agencies, such as the U.S. Army Corps of Engineers. The original $5 billion estimate did not anticipate either of these developments.

The liquidity analysis relied on many factors, some of which are difficult to forecast. For example, we know that Puerto Rico is experiencing a massive population exodus, but the exact amount of that exodus is unknowable. We used a figure of 5%, or 170,000 people through the end of the calendar year. The number is certainly alarming, but not far from reality. In fact, Florida Governor Rick Scott has said that since October 3, more than 90,000 Puerto Ricans have arrived in Florida through Miami, Orlando, and Port Everglades.

Most of the revised liquidity shortfall estimate of $3.6 billion results from updates to disaster relief funding assumptions. In particular, the funding requirement has been reduced by approximately $1.5 billion to account for the fact that most disaster relief spending is presently being funded directly and wholly by FEMA, rather than being processed through Puerto Rico's Treasury Single Account with a reimbursement lag and a partial cost share. The estimate for recovery expenditures was based on the public portion of total reconstruction costs from Hurricane Katrina, scaled to the population and construction costs of Puerto Rico, and taking into account a timing lag of reimbursements which is typical in recovery situations. The forecast will continue to be updated to reflect official damage assessments and updated relief funding projections as that data becomes available.

We have also worked with the Government to provide a more medium-term perspective. Our initial estimates of the Island's liquidity over the next seven quarters, including the present quarter, for which Congress has already provided liquidity assistance, are in the range of $13 to $21 billion, but they are currently being revised. This is the amount of money we, along with the Government, project is necessary to ensure provision of the basic functions of government, keep on the job policemen, firemen, teachers, healthcare workers and all public service employees who

4

are helping in the hurricane recovery efforts, and advance the funds required for recovery before FEMA reimburses.

As Congress considers its support for Puerto Rico, it will be vital that any loans or grants provided to meet these needs be measured against the Fiscal Plans and integrated with them. The mechanisms of PROMESA and the full participation of the Board will be required. We have proposed legislative language to this end with regard to liquidity. It would require the Board to certify all requests for liquidity advances. This will assure that only *hurricane-caused* liquidity advances will be sought.

*Fiscal Plan Revision*

We are well aware that—just as you have stated, Mr. Chairman—we will have to revise the certified Fiscal Plans in light of the hurricanes' devastation. Working closely with the Government of Puerto Rico, it is essential to use the process of revising Fiscal Plans to return to the PROMESA goals of fiscal responsibility, access to private capital markets, and sustainable economic independence. The baseline of the existing certified Fiscal Plans and their associated budgets provides critical information against which to measure the changes caused by the hurricane. But the existing Fiscal Plans do not provide a map for the post-hurricane future and do not provide timely oversight. In this light, the process of thinking through the nature and scope of the changes to Puerto Rico's economy post-hurricane has already begun.

Responding to the humanitarian crisis on the Island must be the Government's first priority, and the Fiscal Plans must be revised to reflect that priority—just as they must be revised to reflect the economic-realities of hurricane devastation. Fiscal and structural reforms need to be reviewed in light of the new baseline that results from this disaster. A critical additional element in the Fiscal Plan process will be understanding the amount of federal funding for rebuilding which we understand will be made available later this year once more detailed damage assessments can be provided. These federal funds will be essential to understanding the economic assumptions, projections and capital expenditure plans that will drive much of the revised Fiscal Plan. Revisions to the Fiscal Plan are necessary due to four primary reasons:

- First, the Commonwealth's ability to collect revenues has been significantly compromised as a result of the serious negative effect of infrastructure damage and population outflows on underlying economic activity.
- Second, recovery-related expenses are substantial, not all will be reimbursed by federal aid, especially if local share requirements are not waived, and are not currently accounted for in the existing fiscal plans.
- Third, many of the cost-saving measures built into the budgets—the reduction in certain subsidies incorporated into the certified budget, for example—must be looked at with a fresh perspective given the demands of the recovery process.
- Fourth, the "federal line" will be significantly larger than the existing Fiscal Plans. It is important to note that the revised plans will reflect any and all capital expenditures funded by FEMA or other federal recovery assistance. It will also involve any revisions to Medicaid funding.

The Board has outlined nine principles for the Government to guide the work on revised Fiscal Plans:

5

- *Principle 1*:  The fiscal plan must reflect the current demographic trends, economic challenges, hurricane damage assessments, federal funding commitments, and a government, both the central government and local governments, sized to this post-hurricane reality.
- *Principle 2*:  The revised fiscal plan must cover five fiscal years, the first fiscal year being FY18 and concluding with FY22.
- *Principle 3*: To properly establish an accurate assessment of the fiscal outlook, the base-case scenario within the fiscal plan must assume no additional federal support beyond that which is already established by law. Nevertheless, fiscal plans should be adjusted as additional federal funding is committed.
- *Principle 4*:  The revised fiscal plan must provide sufficient resources to ensure appropriate immediate emergency response and recovery effort in anticipation of federal funds, including provision of public safety, healthcare and education, in order to avoid increased outmigration – particularly by working families and working age populations. The fiscal plan must include metrics focused on the improvement of living standards, e.g. education, healthcare, job creation.
- *Principle 5*:  Pension reform, corporate tax reform, and other structural reforms necessary to improve the business climate must remain priorities in the fiscal plan.
- *Principle 6*:  Based on available and dedicated resources, the capital expenditure plan must provide the basis for a long-term economic recovery plan for Puerto Rico, focusing on increased and expedited support for rebuilding critical infrastructure such as energy, water, transportation and housing.
- *Principle 7*:  The fiscal plan must include the resources to complete the FY15 Commonwealth consolidated audited financial statements by no later than December 31, 2017, and FY16 and FY17 Commonwealth consolidated audited financial statements by no later than June 30, 2018.  Thereafter, Commonwealth consolidated audited financial statements should be issued no later than within six months of the fiscal year-end.
- *Principle 8*:  Structural balance should be achieved as soon as possible, in any event by no later than FY22, after taking into account the period of time required for the stabilization of Puerto Rico's humanitarian crisis.
- *Principle 9*:  The fiscal plan must be accompanied by a long-term debt sustainability analysis (DSA) and detailed economic projections, reflecting a 30-year period.

Finally, the Commonwealth's Fiscal Plan revision process is based on three key components:

- Revising macroeconomic driver effects on revenue and expenses,
- Adapting fiscal and structural reform schedules based on the recovery timeline and feasibility, and
- Integrating recovery funds and reimbursement timing with a capital plan.

This process will require us to make the best possible analytical projections on the basis of all data available. However, given the level of uncertainty, it is important to note that unlike the original fiscal plan which covered ten years, the revised fiscal plan will cover five years, as required by PROMESA, with the first fiscal year being FY18 and concluding with FY22.

In an effort to incorporate input from all stakeholders, the Board will hold three listening sessions to which all stakeholders are invited to provide input to the Fiscal Plans as part of the revision process. They each will be a full day in duration; two of them in Puerto Rico, and one in New York City. In addition, we have agreed with the court-appointed mediators to hold two additional sessions with creditor stakeholders. The Government will participate in these sessions as well.

Our aim is to move deliberately to prepare and approve revised Fiscal Plans. The reason is simple: a revised fiscal plan is key for the Government to move forward in requesting federal funds, outlining structural and fiscal reforms, implementing capital expenditure plans, and enabling proper oversight on a timely basis, as required by PROMESA. The deadline for the Commonwealth, PREPA, and PRASA to submit draft Fiscal Plans to the Board is December 22, 2017 with review and revision ongoing through the goal certification date of February 2, 2018. The deadline for the University of Puerto Rico, HTA, GDB, and COSSEC to submit draft Fiscal Plans to the Board is February 9, 2018 with review and revision ongoing through the goal certification date of March 16, 2018.

In keeping with PROMESA's purposes, it will take great discipline, transparency and accountability to make the best use of federal and Commonwealth rebuilding funds. To the full extent possible, the rebuilding of hurricane-damaged Puerto Rico should serve PROMESA's goal of a financially sustainable Puerto Rico enabled by a resilient and vibrant economy that makes sense for the Commonwealth.

*Contracts Review Policy*

We have also taken other steps to fulfill our mandate under PROMESA. As we embark on the immense task of rebuilding Puerto Rico in the wake of Hurricanes Irma and Maria, we expect the Government to enter into numerous large contracts. We have implemented a Contract Review Policy ("Policy") as a tool to ensure transparency throughout the entire government for the benefit of the people of Puerto Rico and all stakeholders. The Policy is implemented pursuant to Section 204(b)(2) of PROMESA to assure that contracts promote market competition and are not inconsistent with the approved fiscal plan. It also follows sections 204(b)(3) and 204(b)(5).

In establishing the Policy, the Board is mindful of Section 204(d)(2) of PROMESA and does not intend to impede the Government's implementation of any federal programs, particularly those related to disaster response and recovery. To the contrary, the Board established the Policy in large part to support the Government's implementation of federal programs, including, for example, to ensure that contracts are consistent with the requirements of federal programs, particularly those related to funding and reimbursement for disaster aid spending. Non-compliance with federal requirements could cause substantial fiscal costs to be borne by the Commonwealth, having a severely adverse fiscal effect on compliance with fiscal plans.

The Policy applies to all contracts in which the Commonwealth or any covered instrumentality is a counterparty, including those with the federal government, state governments,

7

private parties, and nonprofit organizations. The Policy provides that effective November 6, 2017, all contracts or series or related contracts, inclusive of any amendments or modifications, with an aggregate expected value of $10 million or more must be submitted to the Board for its approval before execution. In addition, the Board retains the authority to adopt other methods, such as random sampling of contracts below the $10 million threshold, to assure that they promote market competition and are not inconsistent with the approved fiscal plan.

The Oversight Board is prepared to review contracts in a timely manner. As such, we have identified an internal working group to take the lead on the contract review process. We look forward to working hand in hand with the Government of Puerto Rico to ensure the upmost transparent, fair, and competitive contracting processes.

*Appointment of Chief Transformation Officer for PREPA*

PREPA is a case in point of an entity within the Government that needs to be transformed. Past mismanagement has led to an outmoded, unstable, patch-work grid and an inefficient and unduly expensive power sector. Rebuilding efforts should be integrated into the planning that avoids reprising past mistakes. We should plan and build for a better power sector and one that can move rapidly toward attraction of private capital to ensure the most effective transformation of the power sector.

As a critical step towards this, the Board has appointed Noel Zamot, the Board's current Revitalization Coordinator, as the Chief Transformation Officer of PREPA in accordance with its authority under Title III of PROMESA. The Title III court set a hearing for November 13, 2017 to consider our motion. In bankruptcy proceedings, it is common practice for a debtor in possession to name a Chief Transformation Officer, sometimes also referred to as a chief restructuring officer, to help turn around organizations and manage them while in bankruptcy. This is no different, but certainly more urgent.

Upon confirmation by the court, Noel's task will be to lead the transformation of PREPA and the rebuilding of the electricity sector following the devastation of Hurricane Maria. His immediate priority will be to fast-track reconstruction efforts on the Island in close coordination with the Government of Puerto Rico, the Board, and the federal government. In addition, Noel will be fully committed to bringing the resources necessary to restore electricity to the people of Puerto Rico as quickly as possible, and to re-activate the economy and bring normalcy to the Island.

The appointment of Noel is an essential step in achieving the goal of providing Puerto Rico residents and businesses reliable, resilient and reasonably priced electricity supply, which will also require attracting the private capital we need to revitalize the power sector. Our vision for the future of Puerto Rico's energy sector is simple: a more modern, efficient and resilient power sector to revitalize the economy and deliver a better future for the people of Puerto Rico.

*Role of the Oversight Board*

PROMESA and its tools were not written for responding to or recovery from a catastrophic hurricane. The reality in which we operated prior to the devastation is much different than Puerto Rico's current reality. The tools to rebuild a more resilient and economically viable Puerto Rico now include significant federal funds, and we see the Board having an active role in ensuring those monies are used in the best interest of the Island. For us, ensuring fiscal controls to deliver

8

confidence in the government is key. The role we can play is clear, but we remain cognizant that in several occasions in which we have exercised our authority, there has been substantial opposition, often resulting in litigation.

**Questions**

I will now turn directly to the questions the Committee has posed to us:

**1. What is the Board doing now to fulfill its oversight function, specifically with respect to revision of Fiscal Plans?**

As indicated above, careful, principled and transparent revision of the Fiscal Plans is essential. We are actively engaged, along with the Government, in the analytical work that underlies that process. The extent of federal aid in the year-end disaster relief package Congress is planning is obviously a key variable. The "federal line" will constitute a very significant change from the existing Fiscal Plans. As you know, the earlier plans were balanced without any federal assistance. The revised plans will reflect any and all capital expenditures funded by FEMA or other federal recovery assistance. It will also involve any revisions adopted to Medicaid funding. As soon as we know that and have had an opportunity to study its impact, we will have all we need to work with the Government in finalizing revised Fiscal Plans. We aim to complete Board certification in the first week of February 2018 for the Commonwealth, PREPA, and PRASA.

We are also reviewing and renewing all of the liquidity estimates we submitted to Treasury and Congress with the Government over the last few weeks. The passage of a few months should give us a better idea of the extent of revenue losses, hurricane-caused net increase in expenditures, and delayed cost reductions. We will continue to monitor liquidity weekly, which is now being published publicly by the Government.

With respect to budgeting, we are updating our reporting blueprint to incorporate information on disbursements and use of federal funds received by the Government and its instrumentalities, as well as reallocation of budget items for emergency measures as we laid out in our letter to the Governor the day after Hurricane Maria hit. We also will receive a budget compliance report next week that will show how actual expenses and revenues compare to budgeted expenses and revenues for the first fiscal quarter, ending September 30, 2017.

Moreover, pursuant to Section 103(d) of PROMESA, the Board is initiating formal requests to Federal department and agency heads to detail personnel of their respective department and agencies to the Board to assist it in carrying out its duties under the Act. We are certain that we will receive cooperation from our federal counterparts in detailing subject matter experts to support the Board and the Government of Puerto Rico.

**2. What can the Board do to oversee the proper expenditure of federal Hurricane recovery funds?**

Through the process of working with the Governor to create and certify Fiscal Plans under Section 201 of PROMESA, we can make sure that hurricane recovery funds are properly accounted for and directed in a revised Fiscal Plan. We have similar authority with respect to making sure that the more detailed annual operating budgets developed by the Governor or covered instrumentalities conform with the certified Fiscal Plans.

Once certified Fiscal Plans and budgets are in place, we have authority to ensure compliance with those Fiscal Plans and budgets. Section 203 requires the Governor to submit a

9

report at the end of each fiscal quarter on actual receipts, expenditures and cash flow. We are instructed to alert the Governor to any inconsistencies with the certified Fiscal Plan and budgets. If the Governor or a covered instrumentality fails to make corrections, the Board is empowered to make appropriate reductions in non-debt expenditures to ensure the quarterly budget aligns with the certified budget. Further clarity with regard to these authorities may prevent challenges that have previously resulted in litigation.

With respect to the actual contracting process by the Commonwealth or covered instrumentalities, as just described, we can review contracts under our policy created under Section 204 to ensure they are consistent with the fiscal plan, promote market competition, and as applicable are consistent with federal regulations pertaining to reimbursement and funding. Section 204(d) does state that the Board shall not impede the Government's actions to implement federal authorized or federally delegate programs, but our policy does not impede the implementation of federal disaster relief programs – to the contrary, it should provide stakeholders with greater confidence in the process itself.

With respect to debt, pursuant to Section 207 the Board must approve any new debt issuance or debt exchange or modification. Under the legislation you just passed to assist Puerto Rico with its liquidity challenges, the funds will be distributed via the Community Disaster Loan program. Because these are loans, the Board must and will review each loan to ensure it is advisable that the borrower take out that specific loan with those specific terms.

**3. What additional tools does the Board need to ensure that federal funds are properly expended and that they are expended as part of a plan that makes sense for Puerto Rico's future?**

Mr. Chairman and members of the Committee, I understand the importance of this question and the imperative for this Committee to examine it. My general answer—and my answers to any particular questions posed to me today—will of course reflect the current limitations of the Board's ability to meet the great challenges that the hurricanes' devastation has caused Puerto Rico and the new challenges it presents to Congress and the PROMESA structure as well.

I want to emphasize, though, that while the question is expressed in terms of "need," the Board is not seeking additional responsibilities nor the tools to go with them. The Board is a creature of Congress, appointed on a voluntary, bipartisan basis, serving the American citizens of Puerto Rico. We have been exercising our authority under PROMESA.

If Congress determines that additional Board responsibilities will enhance confidence and enable greater support for Puerto Rico after these devastating hurricanes, I believe the Board would be willing to accept additional responsibilities. Similarly, if Congress determines that clarification and reaffirmation of our existing authority in light of the new demands placed on all of us by the necessity of hurricane recovery will be useful to avoid litigation and the uncertainty, time, and cost it entails, we would of course welcome that. Like the people and Government of Puerto Rico, Congress and the Administration, we know that the hurricanes have produced new realities we must deal with as wisely and faithfully as we can.

I can give one example of where Congressional clarification and ratification of our authority may well be critical—the appointment of the PREPA Chief Transformation Officer. We believe our authority—and responsibility—under PROMESA and basic bankruptcy tenets is clear. However, our authority is being vigorously opposed by some parties in the Title III proceeding.

10

Even after an initial ruling, litigation and associated uncertainty may linger during appeals. Congressional clarification would resolve what otherwise is potentially very damaging litigation.

### **Conclusion**

Again, Mr. Chairman and members of the Committee, we deeply appreciate your concern for the American citizens who live in Puerto Rico, and, on behalf of the Board, I pledge to continue to work with you to do all we can to meet the new challenges and to achieve PROMESA's goals. I look forward to your questions.