UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO, et al.,

    Debtors.[1]

------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

### NOTICE OF CORRESPONDENCE RECEIVED BY THE COURT

The Court has received and reviewed the attached correspondence, described below, from interested persons in the above-captioned cases. Although the Court cannot respond individually to all of those who have expressed their thoughts or concerns, the Court is deeply mindful of the impact of the fiscal crisis on lives, institutions, and expectations, and of the importance of the issues that are raised in these unprecedented cases.

1. Letter dated September 4, 2017 from Jose R. Font.
2. Letter dated October 28, 2017 from Glenn Ryhanych.
3. Email dated October 30, 2017 from Carlos Sumpter.
4. Email dated November 11, 2017 from Carlos Sumpter.

Dated: November 16, 2017

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).



September 4, 2017



**Honorable Laura Taylor Swain**
**United States District Court for the District of Puerto Rico**
**Federal Court of PR Office 150, Federal Building**
**San Juan, PR 00918-1767**

**RE: Notice of Commencement of Cases Under Title III of PROMESA
Entry of Order for Relief and Related Matters (No. 17 BK3566-LTS)**

Dear Judge Swain:

My name is José R. Font Zelinski and I am 83 years old. I worked for the government of Puerto Rico for 30 years and retired with a pension 26 years ago.

The reason I am writing you is to inquiry about the document of Reference that I received in the mail a couple of weeks ago. I have tried, many times, to contact the members of the Financial Oversight and Management Board for Puerto Rico (FOMBPR) but none of them would talk to me. What I know about this matter is what I have heard in the media news. They say that FOMBPR wants to collect the debt owed by the government of Puerto Rico to bond holders from government employees and retirees by reducing their salaries and pensions. I believe this plan is cruel and inhumane against the most vulnerable group of people in our island; the senior citizens, many who are disable, sick and desperately need their pension, and unfortunately cannot defend themselves against this injustice. The FOMBPR plan, if implemented, would be detrimental and will create enormous economic distress to our people.

In my opinion, the debt incurred by the government of Puerto Rico should be paid but in a logical manner, i.e. utilizing an orderly payment plan that does not create economic instability and suffering in our island. The employees and retirees of the government of Puerto Rico should not be forced to pay for a debt that they did not personally incurred. There must be a better way for the government of Puerto Rico to pay the debt. I believe justice is to be fair.

I respectfully request of Your Honor to consider my plea for justice in this matter that could unjustly affect so many innocent and honest people. Thank you.

God bless you,

*José R. Font Zelinski*

José R. Font Zelinski

*[Handwritten note at top:]* Mrs Swain, Rather critical of the judicial branch but very nice sentiment in the municipal market. Best, Glenn

October 28, 2017

## "Lamenting Puerto Rico and the State of the Municipal Bond Market"

### The Future of Bond Holder Rights: Making Sense of a Changing Industry

Longtime bond professional Glenn Ryhanych CFA, CFP® reviews the highly charged Commonwealth of Puerto Rico vs. COFINA debt dispute — and shines a light on the potentially devastating precedent the outcome of the case could have on the future of the municipal bond market.

The municipal bond market, for issuers and investors alike, is fundamentally changing. However, at a time when critical infrastructure spending is needed, contagion from the current Puerto Rico vs. COFINA dispute could halt these changes, leading to higher borrowing costs and fewer, if any, bonding options.

**The background:** Clearly, some state and local governments are showing increased contempt for lenders and less concern over falling credit scores. In addition, courts are increasingly viewed by some market professionals as quasi lawmakers favoring home team creditors. The result, in my view, is that general obligation bonds (GOs) have lost their luster and debt requiring annual budget appropriation is extinct. Reacting to this altered landscape, the emerging trend in municipal finance, at least for low-investment-grade or stressed municipal borrowers, is to pledge a specific revenue stream for debt payments that is separate from a borrower's general full faith and credit pledge – in short, a securitized loan. Tailored for the "once burned twice shy" investor, I foresee the increased use of securitization not only for second-tier borrowers, but for higher-rated borrowers as well. I make this assertion in light of the accelerating crowd-out effect of meeting pension and benefit obligations, tepid revenue growth, inflexible public employment contracts, policymaker gridlock, and a few emboldened government leaders who think of municipal bankruptcy as an early step toward solving economic challenges, not a last. Here are but a few of the *most recent* news events that illuminate the changing municipal landscape and the consideration or use of securitized loans:

Cities across the U.S. often feel the same pinch – trying to manage the typical costs of running a city, such as picking up trash and filling potholes, on top of ballooning retirement obligations and outstanding debts. Several major cities are struggling to keep up. Twenty-six large U.S. cities have fixed cost ratios (debt and employee benefits / total operating expenses) above 23%, including Los Angeles and Houston. When measuring fixed costs relative to a city's overall budget, no city is as embattled as much as Jacksonville, Florida with a ratio of 31%. Reports that smaller cities are not necessarily immune.
*Bloomberg News, Muni Brief 10/27/17*

As reported, John Naglick, Detroit's finance director, said the city recognizes that any debt it plans to bring to market for transportation projects still needs a security boost from a quality revenue stream and some enhancement such as a state intercept. "Everything that we have been able to do since exiting bankruptcy has an attached revenue stream to it," he said. "You secured it and bond lawyers

1

agonize over how that will be protected in the unlikely event of another bankruptcy because everyone has to ask that question now." *The Bond Buyer, 9/27/17*

Chicago wants authority to refinance as much as $3 billion of debt backed by sales tax revenue. To avoid punishing interest rates due to its junk credit rating, Chicago wants to establish a new corporation that would be legally and structurally insulated from Chicago's general obligation credit rating. Chicago's CFO Carole Brown said she expects the bonds to win a higher rating and "thus a lower interest rate," saving "millions of dollars" in debt costs. *Bloomberg News, 10/5/17*

Pennsylvania, Governor, Tom Wolfe, has called for securitizing $1.2 billion of future expected payments from the commonwealth's state-run liquor system. *The Bond Buyer, 10/5/17*

Connecticut state Treasurer Denise Nappier repeated her call for the General Assembly to consider her proposal for tax-secured revenue bonds, which she said could improve state credit and lower its borrowing costs by as much as $980 million over 12 years. "This legislation provides a clear-cut approach to improving the state's fiscal health," she said. *The Bond Buyer, 10/16/17*

Jefferson County Warrants (bonds) will not constitute general obligations of the County nor a charge against the general credit or taxing power of the State of Alabama, but are payable solely out of and secured by a pledge of sales taxes levied and collected by the county. *Official Statement for Jefferson County, Alabama, Sales Tax Refunding Bonds, 7/10/17*

**COFINA – legal framework:** The Puerto Rico Sales Tax Financing Corporation (COFINA) was established over a decade ago during a period of severe economic crisis and government shutdown. Unable to access the capital markets in any other cost-effective way, the Commonwealth legislated a plan to sell bonds secured by a segregated revenue source. This plan called for a territory-wide sales and use tax (SUT) whereby the *first* revenues collected from the SUT were dedicated to paying bond interest and principal. **Puerto Rico Act No. 56**, approved by the legislature on July 5, 2007, best summarizes the bargain:

> "*A special fund is hereby created to be known as the Dedicated Sales Tax Fund*, to be administered by the Government Development Bank of Puerto Rico and the Secretary of the Treasury of the Commonwealth. The Dedicated Sales Tax Fund and **all the funds** deposited therein on the effective date of this act **and all the future funds** that must be deposited in the Dedicated Fund **pursuant to the provisions of this law are hereby transferred to, and shall be the property of COFINA**. This transfer is made in exchange for, and in consideration of COFINA's commitment to pay, or establish mechanisms to pay, all or part of the extraconstitutional debt outstanding as of June 30, 2006. The Dedicated Sales Tax Fund shall be funded each fiscal year from the **first revenues of the SUT**, deposited at the time of receipt and **shall not be deposited in the Treasury of Puerto Rico, nor shall it constitute resources available to the Commonwealth of Puerto Rico, nor shall be available for use by the Secretary of the Treasury.**"

**COFINA – revenue analysis:** In addition to a bond's legal framework, credit analysts generally focus on the following elements which, for our purposes, include an abbreviated review of COFINA.

- *Demographics and Economic Base* – **Poor**. The island has a declining population, low per-capita income levels, high unemployment relative to the mainland, and tourism is a surprisingly low contributor to the economy. However, airport statistics are trending moderately higher.

- *Nature of the Dedicated Revenue* – **Superior**. The sales and use tax applies to a very broad list of services and essential consumer goods. It excludes volatile auto, hotel/motel, and gasoline sales, making it very stable. The entire island is subject to the tax. Amidst economic stress, policymakers usually see increasing the sales tax rate as a first option when raising needed revenue.

- *Revenue Analysis and Fund Flows* – **Superior**. Collections since 2007 have increased every year except for 2009 and have never been less than one-billion dollars, even during the great recession. Fiscal year 2017 collections were a record high and more than double 2013 levels. There is a priority lien whereby collected tax goes first to bondholders, second to local municipalities, then to the general fund.

- *Debt Service Coverage* – **Superior**. For fiscal year 2017, the ratio of pledged revenue to annual debt service (coverage, cushion, or margin of error ratio) on the senior lien bonds was 11x – extremely high coverage for this type of bond issue.

| Fiscal Year | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| Total Collected SUT* | $1,162,189 | $1,242,227 | $1,417,008 | $2,376,840 | $2,547,388 |
| COFINA Senior Lien Debt Service | $233,279 | $233,279 | $233,279 | $233,279 | $233,279 |
| Debt Service Coverage Ratio | 5.0x | 5.3x | 6.1x | 10.2x | 10.9x |

*Reported by the Puerto Rico Treasury Department
(Figures expressed in thousands of dollars)

**The problem:** After following the law and the set-forth payment mechanism for many years, countless legal opinions attesting to COFINA's property rights, multiple opinions rendered by the Commonwealth's own Department of Justice, year upon year of statements by Governors, Legislators, and Development Bank officials attesting to COFINA's rights, the Commonwealth provided the following statement as part of its complaint filed with the bankruptcy court (Under Title III of PROMESA) on September 8, 2017:

> "This adversary proceeding is being commenced to resolve the Commonwealth-COFINA Dispute. The issue in dispute is 'whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes (SUT) purportedly pledged by COFINA to secure debt…are property of the Commonwealth or COFINA under applicable law.' **As set forth, in this complaint**, the **SUT revenues**, wherever located and whenever arising, **are the exclusive property of the Commonwealth**."

With 25 years of experience as a municipal bond analyst and portfolio manager, I have never witnessed such apparent disregard for property rights, existing statutes, and Constitutional law. Since July 2015,

3

while remaining current on debt payments, the Commonwealth has increasingly made bondholders uneasy by their actions and inactions with regard to COFINA's rights and priorities. With this complaint, however, they essentially deny COFINA's existence altogether. Even in Title III bankruptcy, the Commonwealth's actions appear almost contemptuous of US Municipal Bankruptcy law as amended in 1988, which had the sole purpose of distinguishing between certain revenue bonds and general obligation debt. At least in this matter, it appears that promises, obligations, commitments, liens, contracts, and bargains carry little weight with the Commonwealth government.

**The ramifications**: Make no mistake, if the Commonwealth of Puerto Rico somehow prevails in its adversarial procedure, municipal borrowing costs across the country will surely rise and access to the securitized loan market will be turned on its head, forcing more local governments to make excruciating choices between default and painful austerity. As referenced above, it is questionable whether Chicago and Connecticut will be able to sell their tax-secured bonds at a lower interest rate, Detroit may not have any bond options, Pennsylvania may lack the bonding flexibility to deal with short run illiquidity, and Jefferson County should feel fortunate to have floated their issue before a game-changing court decision. State and local governments function to provide essential services, and those services are most efficiently financed by debt spread over the useful life of a project or system. If a borrower's ability to repay is in doubt, and complying with the law is optional, then that borrower will be forced to pay higher interest rates. Puerto Rico is no exception. The irony is that the Commonwealth's apparent efforts to misappropriate COFINA property are foreclosing upon the only bonding option they may ever have in the future to finance and maintain needed infrastructure: a securitized loan.

**The contagion effect:** A ruling in favor of the Commonwealth over COFINA could send shock waves throughout the municipal market. In such an environment, it is not difficult to envision a future market with only minor distinctions between general obligations (GO) and revenue bonds, as bond ratings will surely converge to reflect only a borrower's ability (willingness) to pay. As asserted earlier, the market is grappling with a number of macroeconomic issues that have added stress to the budgets of state and local governments. In addition, the outcome of the Detroit case – where unsecured bondholders received 14% and GO bondholders as little as 34%, while unsecured pensioners got 95% of their respective claims – was totally unexpected and anything but "fair" to bondholders according to municipal bankruptcy law. The result has been a dramatic shift in the political calculus of elected state and local government officials. In the past when *all creditors* – both pensioners and bondholders alike – were thought to be equal under bankruptcy law, policymakers were dissuaded from declaring bankruptcy; a 50% cut in pensions while also losing market credibility was unfathomable. After Detroit, however, some elected officials now view bankruptcy as an option with much less pain – a politically "easy" short-term solution to more difficult long-term problems. Logically, the bond market's reaction to this, given the elevated risk, has been to shun GO debt altogether. Therefore, the use of GOs as a means to raise funds for infrastructure is now effectively closed to any municipality facing higher-than-normal financial pressures. In addition, as macro elements continue to exert pressure on local government finances, the GO dilemma will likely spread to higher-quality borrowers, raising the costs for *all state and local governments,* as risk is repriced in the marketplace. As a result, securitized loans remain as one of the few, if not the only, borrowing options governments have left to raise money in an increasingly fragile market.

As already alluded to, securitized loans are debt instruments secured by a specific tax, revenue stream, or fixed asset(s). Such loan collateral is considered separate from the general creditworthiness of the

4

state or local borrower. However, what happens when, in times of stress, government borrowers do not affirm this revenue separation and the public confiscation of private property is upheld in court? This is the COFINA vs. Commonwealth showdown. To review, COFINA, a securitized loan, has a *statutory lien* on the sales and use tax (SUT) and is a *special revenue bond* – both of which are important distinctions in bankruptcy – and arose from an enabling act that includes essentially all of the criteria a bond analyst looks for when legitimizing a government diverted revenue stream. Moreover, the act was drafted when alternative borrowing options did not exist for Puerto Rico and thus empowered bond buyers to demand an airtight agreement with strong safeguards against default. How, then, are investors supposed to make sense of the fact that senior COFINA bonds, which have a priority lien on a very stable and growing revenue source, are in fact rated Ca/D – the highest risk? Clearly the rating agencies are basing their ratings on an extreme lack of faith in the politicians and judges to uphold COFINA's legally binding agreement. This sets a dangerous precedent. If the economic underpinnings of a loan do not matter, and politics are the driving force, then how can a bond's risk be priced and an appropriate interest rate be determined? How do investors price political uncertainty as the only relevant criterion? And, how can any future securitized loan issuer, like Chicago or Connecticut, come to the market professing that a revenue lien, which is supposedly separate from one's general creditworthiness, actually reduces risk and is therefore worthy of a lower interest rate? And what about the ratings on hundreds of municipal bonds with a securitized loan structure that are already outstanding? Won't there be massive downgrades if COFINA's enabling act is declared invalid? This is why it is imperative that a bond's legal structure is clear and that the market can have confidence it will be affirmed and protected.

In summary, the Detroit bankruptcy left a permanent scar on the general obligation (GO) market, reducing bonding options for more than a few borrowers. If, as I believe, the relatively few affected borrowers today grow to include many more struggling municipalities, and the GO market is effectively closed, then upholding COFINA's property rights and the use of securitized loans is absolutely critical. A ruling against COFINA will not just affect one of many possible borrowing options, it will eliminate the only one left.

**Local impact**: First, I cannot begin to imagine the daily life for the vast majority of Puerto Rico's citizens. Without electricity, adequate shelter, and dependable water supplies, I am at a complete loss to relate to the challenges on the ground now and for the future. For myself, many times over the last few months I started and stopped writing this article not feeling entirely comfortable with the message. However, I must state, even at this time of severe hardship that the actions taken by the Commonwealth government against COFINA will hurt, not help, the territory as it emerges from this crisis. The ability to raise funds to deliver needed services is one of most broadly essential functions a government can provide, and the cost of said funds affects all citizens. Consider the Virgin Islands Electric and Water Authority, which in July, shunned by the Puerto Rico-weary municipal market, had to bond out via a private transaction a three-year note paying 10.85%. Contrast this with three-year notes yielding 1.2% issued at the same time by Philadelphia Gas Works Authority. That is an interest penalty spread of 9.65% (10.85% - 1.2%). Using, for example, the $3 billion Chicago loan referenced earlier, the interest penalty applied to the principal and measured in annual dollars would be almost $290 million. That equates to 5,272 teachers, policeman, or fireman using US average salary data for those public servants. Applying this penalty to *half* of Puerto Rico's estimated outstanding debt of $60 billion would equal almost $3 billion per year.

**The bottom line:** Today, I'm an understanding holder of Puerto Rico general obligation debt, but I'm an angry COFINA bondholder. Policymakers and the public must recognize that bonds are not all structured the same. Each bond has very separate and unique security features which need to be considered and respected, not just in the case of COFINA, but for the overall health of the municipal bond market. For if all bonds are treated the same, and politics trump property rights and security analysis, then the unintended consequences will be costly and far-reaching.

In closing, as a Chartered Financial Analyst and Certified Financial Planner®, I pride myself on taking a long-term view, doing extensive research, and adhering to a moderately conservative risk profile. My clients are accepting of lower returns in lieu of lower overall portfolio volatility — and like me, they are pleased to provide capital to state and local governments in need of infrastructure development. They are not vultures or unscrupulous speculators, and I take offense to the generalization by public officials and others who insist they are – and the last thing any of us expects is to be "wiped out." Risk is certainly a part of this business, but my hope is that we will all look to the future and craft solutions that protect not only investors and borrowers, but also the citizens of Puerto Rico who desperately require our help.

*Glenn Ryhanych, is an Investment Advisor Representative of Spire Wealth Management, LLC, an SEC Registered Investment Advisor, and is President and Founder of BlueList Partners, LLC, a municipal bond management firm in Northern Virginia. The views express in this article are his own and do not in any way reflect the opinions of Spire Wealth Management. Mr. Ryhanych personally owns General Obligation, Highway & Transportation, and COFINA bonds issued by the Commonwealth of Puerto Rico.*



**Bootstrap 2**
Carlos Sumpter
to:
swaindprcorresp
10/29/2017 02:13 PM
Hide Details
From: Carlos Sumpter

To: swaindprcorresp@nysd.uscourts.gov

Your Honor,

Peace be with you in Jesus our Lord.

Governor Rosello is a champ, an athlete and a young man.

He is been blessed with wise parents, a Christian wife and beautiful children.

Please give him space to operate so he can take care of business.

Our military are exhausted and FEMA personnel are burned out, it is time for Boricuas to move their behinds and work really hard in our long road to recovery.

Bankers would not take a haircut, they are going to fight till the end. After all PROMESA was Taylor made in their favor.

Madam let our people in the US territories have a legitimate and democratic government.

It could give us a second chance to build a new life from scratch.

In Him,

Carlos Sumpter

10/30/2017



We Need Help
Carlos Sumpter
to:
swaindprcorresp
11/11/2017 10:36 AM
Hide Details
From: Carlos Sumpter

To: swaindprcorresp@nysd.uscourts.gov

**"And to preserve their independence, we must not let our rules load us with perpetual debt. We must make our election between economy and liberty, or profusion and servitude"**

**Thomas Jefferson**

## Hon. Laura Taylor Swain

## US District Court of Puerto Rico

Your Honor:

Peace be with you in Jesus.

Who will make certain the board will have the jobs and the capital growth requirements with the people of Puerto Rico in mind.?

Back on the mainland, international relations are changing and some previous global arrangements will end. War against North Korea also might occur.

Driving Puerto Rico into a severe inflation - depression period.

Your Honor in the event of an economic crash or collapse, the returning of sound operations of those G-SIFI (globally active and systematically important financial institutions) would be provided by converting unsecured debt from creditors.

We shouldn't go there Madam.

Why should we trust actual Wall St. agents as Board members, when they were appointed in open violation of the Law of the Land?

At this new level of exploitation by global capital, under an economic shocking therapy that allows globalists to buy valuable assets at knock down prices, eradicating any form of sovereignty left and stating that if a ruler is reluctant to relinquish its power, he or she will be pushed, se are supposed to rebuild our island?

Our new rulers transcend state boundaries and believe that all nations must be subordinated to international law and international institutions.

Global actors who have been implementing the same private banking exploitation model used in eastern European socialist countries after glassnot and perestroika.

Have we become the new invisible main media jurisdiction.

Ms. Natalia Jaresko a global agent, and an ex Ukrainian Finance Minister with ties to Joe Biden Jr. and the oil industry, now works in Puerto Rico ?.

Puerto Rico is at a state of debt bondage thanks to Obama's 2006 financial entrapment. Our only option under a financial servitude is a pledge of labor or services as security for the repayment of a debt.

The services required to repay the debt may be undefined, and the services' duration may be undefined.

Debt bondage can be passed on from generation to generation.

Just like slavery.

Unless, some counteracting cause, comes along to prevent a depression as that of 1929-1933 (namely when the more debtors pay the more they owe) Puerto Rico will continue going into a vicious spiral.

Strapped for cash and devoid of any urgently needed investment, will see its economy plummet to levels never experienced by regions free of wars.

Our government's indebtedness must cease to grow greater.

Otherwise, our so called "natural" way out, will be a period of at least two decades of vicious bankruptcy, unemployment, and starvation.

Sincerely,

Carlos Sumpter