## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

IN RE:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al.*

    *Debtors.*

ATLANTIC MEDICAL CENTER, INC. , et al.,

    Plaintiffs,

        v.

COMMONWEALTH OF PUERTO RICO,

    Defendant.

PROMESA
Title III

No.  17 BK 3283 – LTS

(Jointly Administered)

Adv. Proc. No. 2017-____
In 17 BK 3283 LTS

## ADVERSARY COMPLAINT

Plaintiffs Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. de Serv. Médicos Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc., Centro de Servicios Primarios de Salud de Patillas, Inc., Hospital General Castañer, Inc. and Rio Grande Community Health Center, Inc. (the "Health Centers"), through their undersigned attorneys, respectfully state, allege and pray as follows:

### INTRODUCTION

1.    As the Commonwealth of Puerto Rico (the "Commonwealth") and the Fiscal Oversight and Management Board ("FOMB") acknowledged in a recent filing, federal grant programs require special consideration in the administration of this Title III proceeding under the

Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA"), 48 U.S.C. §

2121, *et. seq. See* Urgent Joint Motion of the Commonwealth of Puerto Rico, Puerto Rico

Highways and Transportation Authority, Puerto Rico Electric Power Authority, and the Puerto

Rico Fiscal Agency and Financial Advisory Authority for Order Concerning Receipt and use of

Anticipated Federal Disaster Relief Funds and Preserving Rights of Parties, the Health Centers

[ECF No. 1444] ("Urgent Joint Motion") at 8-9.

2.      Specifically, the "Urgent Joint Motion" acknowledged that the federal government

retains an interest in and claim to federal funds given to the Commonwealth under federal grant

programs. *Id.* The federal government's interest and claim also extend (through rules issued by

the Office of Management and Budget ("OMB") applicable to federal grants) to any non-federal

funds that Congress requires grantees to commit in support of the grant program.

3.      PROMESA affirms these requirements by directing the Commonwealth to satisfy

any obligations under federal grant programs. 48 U.S.C. §§ 2106, 2144(d) and 2164(h).

4.      One such obligation (in addition to federal control over Section 330 grantees'

funds) is that the Commonwealth must pay Plaintiffs for services provided in furtherance of the

Commonwealth's Medicaid program, a grant jointly supported by the federal government and the

Commonwealth. Federal law requires the Commonwealth to make certain payments to Plaintiffs,

and Congress gave Plaintiffs an enforceable right under 42 U.S.C. § 1983 to compel the

Commonwealth to make those payments. Despite Plaintiffs' collection efforts, which are being

carried out under the authority of 42 U.S.C. § 1983 (found applicable to Plaintiffs in Rio Grande

Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56 (1st Cir. 2005)), the Commonwealth still owes

Plaintiffs money.

5.      By this Complaint, Plaintiffs seek declaratory relief determining that Plaintiffs'
claims for all supplemental payments for Medicaid services owed by the Commonwealth for the
period between 1997, onward, and that are object of Adversary Proceeding 17-0227 (LTS), are
non-dischargeable and otherwise unimpaired by the Commonwealth's filing of a Title III
proceeding because of PROMESA's own terms -- in particular, those of 48 U.S.C. § 2106 stating
that "nothing in this Act shall be construed as impairing or *in any manner* relieving [the
Commonwealth] from compliance with Federal laws…implementing a federally delegated
program protecting the health safety, and environment of persons in [the Commonwealth]."

6.      For the reasons set forth below, this Court should grant Plaintiffs the relief they
seek.

## PARTIES

7.      Plaintiff Atlantic Medical Center, Inc. ("Atlantic") is a domestic non-profit
corporation organized under the laws of the Commonwealth with its principal place of business
located at Carr. Numero 2, Km 57 8 Cruce Davila, Barceloneta, Puerto Rico 00617.

8.      Plaintiff Camuy Health Services, Inc. ("Camuy") is a domestic non-profit
corporation organized under the laws of the Commonwealth with its principal place of business
located at Avenida Muñoz Rivera Numero 63 Camuy, Puerto Rico 00627.

9.      Plaintiff Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc. ("Arroyo") is a
domestic non-profit corporation organized under the laws of the Commonwealth with its principal
place of business located at Calle Morse Numero 46, Esquina Valentina, Arroyo, Puerto Rico
00714.

10.     Plaintiff Ciales Primary Health Care Services, Inc. ("Ciales") is a domestic non-profit corporation organized under the laws of the Commonwealth with its principal place of business located at Carretera 149 Km 12.3, Ciales, Puerto Rico 00638.

11.     Plaintiff Corp. de Serv. Médicos Primarios y Prevención de Hatillo, Inc. ("Hatillo") is a domestic non-profit corporation organized under the laws of the Commonwealth with its principal place of business located at Avenida Dr. Susoni Numero 116**,** Hatillo, Puerto Rico 00659.

12.     Plaintiff Costa Salud, Inc. ("Costa Salud") is a domestic non-profit corporation organized under the laws of the Commonwealth with its principal place of business located at Calle Muñoz Rivera Numero 28, Rincon, Puerto Rico 00677.

13.     Plaintiff Centro de Salud de Lares, Inc. ("Lares") is a domestic non-profit corporation organized under the laws of the Commonwealth of Puerto Rico with its principal place of business located at Carretera 111 Km 1.9 Avenida Los Patriotas, Lares, Puerto Rico 00669.

14.     Plaintiff Centro de Servicios Primarios de Salud de Patillas, Inc. ("Patillas") is a domestic non-profit corporation organized under the laws of the Commonwealth with its principal place of business located at Calle Guillermo Riefkohl Numero 99, Patillas, Puerto Rico 00723.

15.     Plaintiff Hospital General Castañer, Inc. ("Castañer") is a domestic non-profit corporation organized under the laws of the Commonwealth with its principal place of business located at Carretera 135 Km 4.5, Castañer, Lares, Puerto Rico 00631.

16.     Plaintiff Rio Grande Community Health Center, Inc. ("Rio Grande") is a domestic non-profit corporation organized under the laws of the Commonwealth of Puerto Rico with its principal place of business located at Calle 6 M1 Villas De Rio Grande, Rio Grande, Puerto Rico 00745.

17.     Defendant Commonwealth of Puerto Rico is a United States territory subject to the laws of the United States and the plenary powers of Congress.

### JURISDICTION AND VENUE
### AND RELATED AUTHORITY

18.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331.  The Court also has jurisdiction pursuant to 48 U.S.C. § 2166 because this action arises in and relates to a Title III proceeding under PROMESA.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b).  Venue is also proper under 48 U.S.C. § 2167 because this adversary proceeding is brought in a case filed under Title III of PROMESA.

20.     The declaratory relief sought in this action is authorized under 28 U.S.C. §§ 2201 and 2202 and 11 U.S.C. § 105(a).  It is also authorized by the provisions of 42 U.S.C. § 1983, as held by United States Court of Appeals for the First Circuit (the "First Circuit") in *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005).

### ALLEGATIONS

*PROMESA*

21.     Congress enacted the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA") in 2016.  42 U.S.C. § 2121, *et. seq.*  PROMESA is designed to assist Puerto Rico in achieving financial stability.  *See* 48 U.S.C. § 2141(b)(1)(B).  Congress was motivated to act based, in part, on its finding that "[a]s a result of its fiscal emergency, the Government of Puerto Rico has been unable to provide its citizens with effective services."  48 U.S.C. § 2194(m).

22.     In assisting the Commonwealth to achieve financial security, Congress was careful to ensure the continuation of federal grant programs that provide for the safety, health and welfare of residents of the Commonwealth.  48 U.S.C. § 2144(d).  But PROMESA is not a bailout.  In fact,

"[n]o Federal funds" are authorized "for the payment of any liability of the territory or territorial instrumentality."  42 U.S.C. § 2150.

23.     Congress made clear that the Commonwealth must make good on all past, current and future obligations under federal grant programs.  For one, Congress insisted that "nothing in this Act shall be construed as impairing or in any manner relieving a territorial government, or any territorial instrumentality thereof, from compliance with Federal laws or requirements or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety and environment of persons in such territory."  48 U.S.C. § 2106.

24.     Second, Congress prohibited the FOMB from impeding "territorial actions taken to – (1) comply with a court-issued consent decree or injunction, or an administrative order or settlement with a Federal agency, with respect to Federal programs."  48 U.S.C. § 2144(d).

25.     Third, although PROMESA provides a process for adjusting the debts of the Commonwealth under the supervision of a Court, 48 U.S.C. § 2161, *et. seq.*, it prohibits "the discharge of obligations under Federal police or regulatory laws, including laws relating to the environment, public health or safety, or territorial laws implementing such Federal legal provisions.  This includes compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties."  48 U.S.C. § 2164(h).

*Section 330 and Medicaid*

26.     Plaintiffs are federally funded health centers that participate in two distinct, but complementary federal healthcare grant programs:  Grants to States for Medical Assistance

Programs ("Medicaid"), 42 U.S.C. § 1396-1(1), and Section 330 of the Public Health Service ("PHS") Act ("Section 330"), 42 U.S.C. § 254b.

27.     Medicaid and Section 330 are different in several ways.  Medicaid makes health care services available to needy individuals and families whose resources are insufficient to meet the costs of necessary medical services.  *See* 42 U.S.C. § 1396-1(1).  Section 330, on the other hand, supports health care services for patients in medically underserved communities who do not qualify for public assistance, like Medicaid, and cannot afford to purchase private insurance or pay out of pocket for healthcare.  42 U.S.C. § 254b.

28.     Under Medicaid, the federal government gives grants to states[1] to make medical assistance available to eligible beneficiaries.  Section 330, however, authorizes grants to private health centers which provide ambulatory healthcare services to all individuals who reside in the health center's catchment area.

29.     Despite these differences, Medicaid and Section 330 are two types of the same species – federal grants – and grantees of Medicaid and Section 330 are both subject to certain requirements applicable to federal grants.  For one, both the Commonwealth (as a Medicaid grantee) and Plaintiffs (as Section 330 grantees), agree, in exchange for federal funding, to abide by federal law governing the federal grant program in which they participate.

30.     Second, both the Commonwealth and Plaintiffs must use federal grant funds in furtherance of the specific purpose for which Congress appropriated the funds.  And the Commonwealth and Plaintiffs must comply with the federal government's detailed cost principles about which costs a grantee may – and may not – incur in furtherance of the grant program.  *See*

---

[1] The Medicaid statute's definition of a "State" includes the Commonwealth of Puerto Rico.  42 U.S.C. § 1301(a)(1).

45 C.F.R. § 74.27 (2007). For these reasons, courts hold that federal grantees do not own grant funds; instead grantees hold such funds in trust for the benefit of program beneficiaries. *In re Joliet-Will Cty. Cmty. Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988); *see also Buchanan v. Alexander,* 45 U.S. 20, 20–21, 11 L. Ed. 857 (1846).

31.    The trustee relationship is not limited to federal funds. In exchange for federal funds, the Commonwealth and Plaintiffs dedicate certain non-federal funds to the specific purpose for which Congress appropriated the federal funds, and they follow the same detailed cost principles in spending those non-federal funds.

32.    Under Medicaid, for example, states agree to provide certain mandatory services. 42 U.S.C. § 1396a. States accept federal funds to support these mandatory services, but agree to finance the rest with non-federal funds in an amount "equal to all of such non-Federal share." 42 U.S.C. § 1396(a)(2). With regard to these non-federal funds, states agree to follow the same cost principles that they follow in expending federal grant funds. (One court noted that states act as trustees holding "state and federal monies for the benefit of the medically needy." *Bass v. Rockefeller*, 331 F. Supp. 945, 951 (S.D.N.Y. 1971), vacated on mootness grounds, 464 F.2d 1300 (2d Cir. 1971)).

33.    Under Section 330, any income a grantee generates must be used to further the objectives of Section 330 and may not be used for any purpose specifically prohibited by Section 330. 42 U.S.C. § 254b(e)(5)(D).

*The intersection of Section 330 and Medicaid*

8

34.     Health centers receive Section 330 grants to provide healthcare services to un-insured and underinsured patients located in medically underserved areas.  42 U.S.C. § 254b(e)(1)(a).  Congress also requires health centers that receive Section 330 grants to serve as Medicaid providers.  42 U.S.C. §§ 254b(a)(1) and 254b(k)(3)(G).

35.     From the outset of the health center program (in 1975) the Ford Administration raised concerns that state Medicaid programs would under-reimburse health centers and divert the money appropriated under Section 330 to subsidize Medicaid.  S. Rep. No. 94-29, at 5 (1975), reprinted in 1975 U.S.C.C.A.N. 469.

36.     To address this concern, Congress added special provisions to Section 330.  *See* S. Rep. 94-29 (1975).  First, each health center grantee must establish "a schedule of fees or payments for . . . its services consistent with locally prevailing rates . . . and designed to cover its reasonable costs of operation . . ." 42 U.S.C. § 254b(k)(3)(G)(i).  Although federal law requires health centers to discount services for patients who cannot afford the fees, *id.*; *see also* § 254b(k)(3)(G)(iii)(I), it prohibits health centers from discounting services provided to beneficiaries of Medicaid, Medicare and "any other public assistance program or private health insurance program."  42 U.S.C. § 254b(k)(3)(G)(ii)(II).  This provision ensures that the Medicaid program will be charged its fair share of the costs of providing covered services to Medicaid beneficiaries.

37.     Second, health center grantees must make "every reasonable effort" to collect reimbursement for services provided to patients who have public or private health insurance.  42 U.S.C. § 254b(k)(3)(G)(ii).  This provision ensures that health centers collect amounts charged to the Medicaid program.

38.     By entrusting the health centers with federal funds and delegating to them the responsibility to safeguard these funds, Congress made health centers "bailees" for federal

property.  *E.g.*, *United States v. Allegheny Cty., Pa.,* 322 U.S. 174, 64 S. Ct. 908, 88 L. Ed. 1209 (1944)*, abrogated on other grounds by *United States v. City of Detroit,* 355 U.S. 466, 78 S. Ct. 474, 2 L. Ed. 2d 424 (1958), (noting that a private party in possession of federal property "is under a duty to protect the property and may protect itself from unlawful burdens put upon it.").

39.     At the same time, Congress recognized that these provisions alone would not stop the unlawful subsidy: "[B]ecause of varying state Medicaid programs, and restrictive regulations with respect to both Medicare and Medicaid, most centers are not able to collect more than a small percentage of their costs from these public programs."  S. Rep. No. 94-29, at 6.  As a result, Congress suggested certain legislative changes to Medicaid.  *Id.* at 7 ("[T]he Committee believes…that public and private health insurance coverages should be modified so as to cover the services of these centers.").

40.     Initially, no such modifications were made.  In 1988, Congress, once again, confronted the reality that the subsidy the Ford Administration had predicted was ever-present.

> The Committee also wishes to stress that Federal grant funds are "last dollar" to other funds available to health centers for the provision of comprehensive health services to medically underserved populations. The Committee finds totally unacceptable the position apparently taken by some states that, because health centers are obligated to serve everyone, grant funds are available to reduce the level of reimbursement paid for services to Medicaid recipients.

S. Rep. No. 100-343, at 20, 1988 U.S.C.C.A.N. 1165, 1178.

41.     In 1989, Congress finally made the modifications envisioned in 1975.  Congress amended the Medicaid Act, designating health centers that receive Section 330 funds as "Federally-qualified health centers" (commonly known as "FQHCs") for Medicaid payment purposes and requiring states to offer and cover FQHC services in their Medicaid programs.

42.    The amendment required that states pay FQHCs 100 percent of the FQHC's costs that are reasonable and related to providing FQHC services to Medicaid beneficiaries.  Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, Title VI, Section 6404; 42 U.S.C. § 1396a(a)(13)(E), later reclassified at 42 U.S.C. § 1396a(a)(13)(C).  Congress's explicit motive for passing the new payment requirement was to avoid having Section 330 grants diverted to fund Medicaid services:

> The Subcommittee on Health and the Environment heard testimony that, on average, Medicaid payment levels to Federally-funded health centers cover less than 70 percent of the costs incurred by the centers in serving Medicaid patients … To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is compromising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.
>
> ***
>
> To ensure that Federal [Public Health Service] Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries, States would be required to make payment for these [FQHC] services at 100 percent of the costs which are reasonable and related to the cost of furnishing those services….

H.R. Rep. No. 101-247, at 392-393, reprinted in 1989 U.S.C.C.A.N. 2118-19.

43.    From 1989 until 2000, the Medicaid FQHC payment provision remained at 100 percent of a health center's reasonable costs in furnishing FQHC services.  In December 2000, Congress changed the FQHC payment provision to a cost-related prospective payment system ("PPS") methodology, which requires states to reimburse FQHCs at a prospective, or predetermined, rate per patient visit (also known as an "encounter").  42 U.S.C. § 1396a(bb).

11

44.     When states began to experiment with managed care[2] to deliver Medicaid services, Congress again carefully calibrated state payment responsibility to ensure that Medicaid paid its fair share of the costs of providing Medicaid services to Medicaid beneficiaries.  Congress first required the MCOs to reimburse FQHCs at 100 percent of those FQHCs' reasonable costs. H.R. Rep. 105-217, at 868 (July 30, 1997).

45.     After concerns that MCOs were not fully paying FQHCs for Medicaid services, Congress mandated a two-part payment system for FQHCs in managed care: First, a state's contract with an MCO must require the MCO to pay FQHCs "not less" than the MCO would pay any other provider for similar services.  *See* H. Rep. 105-217, at 869 (2007) (MCO required to "pay the FQHC . . . at least as much as it would pay any other provider for similar services").  Second, states must make supplemental payments to FQHCs equal to the amount by which the FQHC's cost-based or PPS rate exceeds the payment the FQHC received from the MCO.  *See id.* ("[s]tates would be required to make supplemental payments to the FQHCs" and "[s]uch payments would be equal to the difference between the contracted amount and the cost-based amount").[3] States must make these supplemental payments "in no case less frequently than every 4 months." 42 U.S.C. § 1396a(bb)(5).

46.     Every United States Court of Appeal to consider the issue, including (as previously noted) the First Circuit, has concluded that health centers have a private right of action under 28

---

[2] In managed care, a state contracts with managed care organizations ("MCOs") to provide and manage Medicaid services for a segment of the population.  42 U.S.C. § 1396u-2(a)(1).  (In Puerto Rico's Medicaid program, MCOs are labeled health maintenance organizations, or HMOs).  In exchange for its services, an MCO receives from the state a per-member per-month payment, known as capitation, based on the number of beneficiaries enrolled with the MCO.  42 C.F.R. § 438.2.  The MCO in turn contracts with various providers, including FQHCs, to provide services to the MCO's enrollees.

[3] These supplemental payments are generally referred to as "wraparound."

U.S.C. § 1983 to sue states to obtain this payment for Medicaid services. *See Shah,* 770 F.3d at 129*; Cal. Ass'n of Rural Health Clinics v. Douglas,* 738 F.3d 1007, 1013 (9th Cir. 2013)*; New Jersey Primary Care,* 722 F.3d at 541*; Concilio de Salud Integral de Loiza, Inc. v. Perez–Perdomo,* 551 F.3d 10, 17–18 (1st Cir. 2008)*; Pee Dee,* 509 F.3d at 212 (4th Cir. 2007)*; Rio Grande,* 397 F.3d at 74.

*Section 330 and Medicaid in the Commonwealth*

47.     Since the mid-1990s, the Commonwealth has elected to participate in Medicaid. The Commonwealth's Medicaid program is jointly financed by the federal government and the Commonwealth.  In general, where the Medicaid program is concerned, there are no upward limits on the total amount the federal government will pay.  As long as the costs being charged are "allowable" and the state pays its share, the federal match must be made.

48.     The federal share of the Commonwealth's Medicaid program is different.  The federal government pays fifty-five cents for every dollar spent by the Commonwealth up to an annual ceiling established by 42 U.S.C. § 1308(g).  The ceiling was temporarily eased under the Patient Protection and Affordable Care Act, Pub.L. 111-148 § 2005, 124 Stat. 119, 283 (2010), but the federal share is being gradually returned to its pre-ACA limit.  The Commonwealth, for its part, is obligated to contribute any remaining funds necessary to fulfill its obligations under Medicaid.

49.     The Commonwealth implements its Medicaid program through managed care.  In the past, Puerto Rico was divided into ten (10) regions.  For each region, a single MCO was responsible for Medicaid services.  All providers of Medicaid services, including Section 330 grantees, were forced to contract with the MCO that has exclusive responsibility for the region in which the providers were located.

50.     From 1989 through 2010, the Commonwealth has failed to pay Plaintiffs for Medicaid services as required by law.  Among other things, the Commonwealth:

a.   neglected to calculate federally-required rates for any Health Centers;

b.   failed to implement any process for Health Centers to claim supplemental payments from its Medicaid program when MCOs paid the Centers less than the Medicaid Act's required amounts; and

c.   refused to make supplemental payments to Health Centers to make up the difference between the Health Centers' required rates and the amounts payed by the MCOs.

51.     The MCOs participating in the Commonwealth's Medicaid program systematically paid Health Centers significantly less than their costs for providing Medicaid services.

52.     Because of the chronic underpayment, Section 330 grantees were forced to use their Section 330 grant funds to pay for Medicaid services provided to residents of the Commonwealth – the precise result Congress intended to avoid.

53.     As a consequence, the Commonwealth failed to meet its requirement to contribute matching funds to the Medicaid project and in the process appropriated federal money for an unlawful purpose.

54.     In 2002, the Associate Administrator for Primary Health Care of the Health Resources and Services Administration ("HRSA"), the HHS agency responsible for administering Section 330 PHS Act grants, advised all Puerto Rico health centers to take measures to prevent the unlawful Medicaid subsidy:

> We are . . . concerned that the [PHS Act Section] 330 grant dollars may be paying for services to the health care reform population that are beyond the scope of services for which the funds are intended... [T]he health centers should consider not renewing any future contracts since the MCOs have structured a program that essentially

transfers financial risk for most health center costs to the federally-
funded health centers in Puerto Rico.

**Exhibit A**.

*Litigation*

55.     As part of their reasonable efforts to collect full payment for Medicaid services,

various health centers initiated lawsuits against the Commonwealth in both state and federal courts.

The litigation in Puerto Rico is still ongoing after nearly two decades.

A.                    *State court litigation*

56.     In 2002, Plaintiffs initiated a lawsuit against the Commonwealth in the Puerto Rico

Court of First Instance, San Juan Part.  *See Asociación de Salud Primaria de Puerto Rico, Inc., et.*

*al. v. Estado Libre Asociado de Puerto Rico, et. al.*, Civil No. KPE02-1037.  Plaintiffs sought an

order compelling the Commonwealth to make supplemental payments for Medicaid services.

57.     The Court of First Instance has entered four partial final judgments resulting from

admissions by the defendants and that by now are firm and unappealable (the "Final and Firm

Judgments"), awarding some of the Plaintiffs $11,568,458.33, plus post-judgment interest, in

supplemental payments for Medicaid services owed from January 1, 2001, onward. There is

nothing left to do regarding the Final and Firm Judgments, but to enforce and collect the same

58.     In addition, the Court of First Instance has issued one partial final judgment (the

"Final but Not Firm Judgment"), which still needs to be modified to take into account a judgment

issued on March 24, 2014, by the Puerto Rico Court of Appeals remanding the case back to the

Court of First Instance to incorporate certain changes mandated by an opinion dated August 20,

2012, by the United States Court of Appeals for the First Circuit in *Consejo de Salud de la*

*Comunidad Playa Ponce, Inc. v. González Feliciano*, 695 F.3d 83 (1st Cir. 2012) (the "First Circuit

Opinion").  The First Circuit Opinion required the District Court to engage in further proceedings

15

to address some modifications to the formula used to calculate the Commonwealth's reimbursement calculations. The Final but Not Firm Judgment also covers supplemental payments for Medicaid services owed from January 1, 2001, onward, and as it stands now and before the modifications mandated by the First Circuit Opinion which should only affect the amounts involved slightly, awards some of the Plaintiffs $28,662,538.67.

59.   The Court of First Instance, however, has yet to consider Plaintiffs' claims for supplemental payments for Medicaid services owed for the period between 1997 to 2000, which are covered by the predecessor FQHC payment statute and methodology.[4]

60.   The state court litigation is ongoing and Plaintiffs allege that the Commonwealth owes them a significant amount for Medicaid services in excess of the amounts already awarded in the Final and Firm Judgments and the Final but Not Firm Judgment

61.   Plaintiffs' claims were removed to this Court pursuant to 48 U.S.C. § 2166(d). *See Asociacion de Salud Primaria de Puerto Rico, Inc., et. al. v. Commonwealth of Puerto Rico*, *et. al.*; Case No. 17-00227-LTS (D.P.R. Aug. 2, 2017).

*B.       Federal court litigation*

62.   In 2003, three Puerto Rican health centers (Río Grande and two health centers not party to this complaint) filed suit in the United States District Court for the District of Puerto Rico against the Secretary of the Department of Health of the Commonwealth, alleging that the Commonwealth had failed to comply with the FQHC payment rights at 42 U.S.C. § 1396a(bb) and seeking prospective injunctive relief requiring the Commonwealth to comply with federal law.

63.   Shortly after filing, the district court granted a preliminary injunction in favor of the three health centers, ordering the Commonwealth to make supplemental payments to the health

---

[4] 42 U.S.C. § 1396a(a)(13)(E), later reclassified at 42 U.S.C. § 1396a(a)(13)(C).

centers in compliance with federal law.  The First Circuit, in *Rio Grande Community Health Center, Inc., et al. v. Rullan*, 397 F.3d 56 (2005), upheld the district court's opinion.

64.     Three more lawsuits were filed in 2006.  Atlantic, Camuy, Arroyo, Ciales, Hatillo, Costa Salud, Lares, Patillas, and Castañer (along with other health centers not party to this complaint) filed a lawsuit in federal district court containing substantially the same claims and requests for relief as in the 2003 lawsuit.  *See Atlantic Medical Center, Inc., et. al. v. The Commonwealth of Puerto Rico, et. al.*, Case No. 06-1291 (March 20, 2006).  Two other federal lawsuits seeking the same relief were filed by health centers not party to this complaint.  *See Consejo de Salud de la Comunidad de la Playa de Ponce, Inc. v. Hon. Rosa Perez-Perdomo, Secretary, Department of Health, Commonwealth of Puerto Rico*, Case No. 06-1260 (March 13, 2006) and *Gurabo Community Health Center, Inc., et. al. v. Hon. Rosa Perez-Perdomo, Secretary, Department of Health, Commonwealth of Puerto Rico*, Case No. 06-1524 (May 26, 2006).

65.     Because the First Circuit had affirmed the health centers' theory of the case, the Secretary did not contest the merits of the health centers' claims.  Instead, the Secretary argued that the Commonwealth's Department of Health had finally established a system of wraparound reimbursement that complied with federal law, and assured the Court that proper FQHC payments would commence as of the third quarter of 2006.

66.     Based on the Secretary's assurances, the Court declined to enter a preliminary injunction.

67.     When it became clear that the promised payments would not materialize per the Secretary's representations, some of the federal court plaintiffs renewed their motion for a preliminary injunction.

68.     Initially the District Court denied the motion based on the Secretary's continued representation that the Commonwealth would make the payments voluntarily.

69.     In 2008, the Court held a hearing to (1) determine whether the Secretary had adhered to his pledges of compliance with 42 U.S.C. § 1396a(bb), and (2) consider the renewed motion for preliminary injunction.

70.     Following the hearing, the Court concluded that the Department of Health still had not complied with federal law to establish a process for calculating and paying wraparound reimbursement.

71.     The Court consolidated the three federal lawsuits and issued Orders that, among other things, (1) notified the parties that the court intended to appoint a Special Master to calculate the Medicaid payments owed to the health centers and (2) determined that the health centers were entitled to a preliminary injunction.

72.     The court delayed entering the preliminary injunction until the Special Master, which was the same professional appointed by the Court of First Instance to assist such court in the state court litigation, determined the amounts that were owed to the health centers.

73.     After the Special Master finally completed his work, the Court entered an "Order and Preliminary Injunction" dated November 8, 2010 in which it enjoined the Secretary to make wraparound payments to the health centers from the date of that order forward. ***Exhibit. B***.

74.     The District Court declined to order payments arising between 2006 and the date of the preliminary injunction, finding that the Eleventh Amendment barred such relief.  The District Court's opinion was affirmed in *Consejo de Salud de la Comunidad de la Playa de Ponce, Inc. v. Gonzalez-Feliciano*, 695 F.3d 83 (1st Cir. 2012).

*Recent developments*

18

75.     On May 3, 2017, the FOMB approved and certified the filing of a proceeding for the adjustment of the Commonwealth's debts under Title III of PROMESA.

76.     Under PROMESA, this Court has broad powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a), incorporated by reference at 48 U.S.C. § 301.

77.     On August 1, 2017, the Plaintiffs removed their claims in the State Court Action to this court (the "Removed Claims").  *See Asociación de Salud Primaria de Puerto Rico, Inc. et al v. The Commonwealth of Puerto Rico*, Adv. Proc. No. 17-227-LTS in 17 BK 3283-LTS.

78.     Plaintiffs now seek declaratory relief to the effect that the Removed Claims are non-dischargeable under PROMESA and that such claims may not be impaired in any manner.

## CLAIM FOR RELIEF

79.     Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 78 above.

80.     PROMESA prohibits the "impairing or in any manner relieving a territorial government, or any territorial instrumentality thereof, from compliance with Federal laws or requirements or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory."  48 U.S.C. § 2106.

81.      Both the Medicaid and Section 330 programs are the type of federally authorized or federally delegated programs protecting the health and safety of persons in the Commonwealth referenced in 48 U.S.C. § 2106.

82.     PROMESA further prohibits "the discharge of obligations under Federal police or regulatory laws, including laws relating to the environment, public health or safety, or territorial

laws, implementing such Federal legal provisions. This includes compliance obligations, requirements under consent decrees or judicial orders and obligations to pay associated administrative, civil or other penalties." 48 U.S.C. § 2164(h).

83. The Removed Claims seek to enforce precisely the type of obligations under Federal police or regulatory laws, including laws relating to the environment, public health or safety, or territorial laws" referenced in 48 U.S.C. § 2164(h).

84. In light of the above, the Plaintiffs are entitled to declaratory judgment determining that the Removed Claims are non-dischargeable under PROMESA and that those claims may not otherwise be impaired in any manner.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter declaratory judgment determining that Plaintiffs' claims to payment under the Medicaid Act (1) are non-dischargeable under PROMESA; and (2) they are otherwise unimpaired by PROMESA or the Commonwealth's filing of Title III proceedings under such Act.

Respectfully submitted,

November 15, 2017

/s/ Miguel Rodríguez Marxuach
Miguel Rodríguez Marxuach
USDC No. 206011
Maria Celeste Colberg Guerra
USDC 227314
RODRÍGUEZ MARXUACH, PSC
268 Ponce de León Ave., Suite 524
San Juan, Puerto Rico 00918
Tel 787-754-9898
Fax 787-754-9897
mrm@rmlawpr.com
mcc@rmlawpr.com


/s/ James L. Feldesman
James L. Feldesman*
Kathy S. Ghiladi*
Feldesman Tucker Leifer Fidell LLP
1129 20th Street, N.W., Fourth Floor
Washington, DC 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
jfeldesman@ftlf.com
kghiladi@ftlf.com
*Pro Hac Vice admission