# EXHIBIT A

**DEPARTMENT OF HEALTH & HUMAN SERVICES**  Public Health Service

Health Resources and  
Services Administration  
Bethesda MD 20814

NOV 15 2002

Mr. Leida A. Nazario  
Executive Director and CEO  
Barceloneta Primary Health Services, Inc.  
PO Box 2045  
Barceloneta, Puerto Rico 00617

Dear Mr. Nazario:

Over the last 2 years members of my staff have met with health centers in Puerto Rico to discuss the health care reform initiative. Health Reform greatly changed the health care landscape in Puerto Rico, as the Commonwealth transferred the responsibility of providing health services for Medicaid eligible beneficiaries from the public to the private sector. We have been very concerned that the Managed Care Organizations (MCOs), under contract to Puerto Rico's Health Insurance Administration, require health centers to accept financial risk for most services (hospital, pharmacy, specialty care and primary care).

We believe the current arrangements have had a negative effect on health centers throughout Puerto Rico. We have provided technical assistance on a variety of key areas, managed care issues, the development of Medicare and Medicaid cost reports and other contract issues to minimize the financial impact, yet center after center continues to experience financial problems. Recently we asked David Kelleher, an experienced managed care consultant, to determine the magnitude of the problem, the nature and extent of the losses and the causes of the financial difficulties facing the health centers. Mr. Kelleher's report is included with this letter.

We have reviewed his findings carefully and believe that if the issues he has identified are not addressed quickly, the financial stability of all health centers in Puerto Rico will be at risk. We are also concerned that the 330 grant dollars may be paying for services to the health care reform population that are beyond the scope of services for which these funds are intended. These funds are primarily intended for primary care services. Therefore, we are encouraging all health centers in Puerto Rico, with the assistance of the Primary Care Association (PCA) and the Puerto Rico Sub-Field Office, to begin discussions to renegotiate the current contracts with the MCOs and regulatory authorities. These discussions should focus on the elimination of financial risk for services over which the health center and its providers have no financial and utilization control.

Page 2 - Mr. Leida A. Nazario

If these negotiations fail, we believe health centers should consider not renewing any future contracts since the MCOs have structured a program that essentially transfers financial risk for most health center costs to the federally-funded health centers in Puerto Rico. In order to implement this contract termination if negotiations are unsuccessful, each center should send to each managed care company with which they contract, a letter of intent to terminate the contract. The letter should be sent in accordance with the termination clause of each contract. Most contracts require a notice of termination, ranging from 30 to 90 days prior to the renewal date of the contract.

We are prepared to offer additional technical assistance, including the possibility of having David Kelleher return to work with the health centers as a group. Please continue to work closely with the Sub-Field Office and the PCA in the months ahead.

Sincerely,

Sam S. Shekar, M.D., M.P.H.
Assistant Surgeon General and
Associate Administrator for Primary Health Care

Enclosure

cc: HRSA New York Field Office

July 24, 2002

# Final Report
## FQHC Financial Experience With Health Reform Patients
## In Puerto Rico

Federally Qualified Health Centers (FQHCs) are reporting significant financial losses as a result of Health Reform in Puerto Rico. This study was undertaken at the request of HRSA to determine the magnitude of these losses and, to the extent possible, the causes of the financial difficulties reported by the health centers.

**Brief Background**

To implement health reform, the Department of Health (DOH) divided the commonwealth into 10 regions. Each of these 10 regions has a different per capita funding rate (capitation) for physical health and behavioral health services. HMO funding rates for physical health range from a low of $49.75 pmpm to a high of $69.85 pmpm.[1] For each of these regions, DOH selected one HMO to provide services on an at-risk basis. The program covers Medicaid eligibles and certain low-income non-Medicaid recipients, including Medicare beneficiaries. Benefits are reasonably comprehensive and include prescription medications. Co-payment levels start at $0 for all services and rise very modestly as beneficiary income increases. Significantly, for prescription medications, co-payment levels rise above $3 per prescription only at the very highest income level and, at this level, are only $5 for generic and $10 for branded drugs.

As a result of the implementation of health reform, FQHCs must contract with an HMO that has been awarded an exclusive territory by DOH. The HMOs offer the FQHCs the same terms and compensation as other providers of service. Each HMO deducts administrative expense and other amounts for selected "carve out" services. The balance remaining after these deductions is

---

[1] Undated presentation provided by HRSA.

12/03/2002 17:34 FAX
Case:17-03283-LTS Doc#:1822-1 Filed:11/15/17 Entered:11/17/17 13:51:27 Desc:
Exhibit A Page 5 of 14

Final Report
FQHCs and Health Reform
Page 2

offered to primary care groups. There are some differences in funding methodologies among HMOs. Some offer a flat capitation rate (e.g. $30 pmpm) regardless of the type of member enrolled. Others offer multiple capitation rates based upon the age, gender and eligibility category of the enrollee.

But all of the HMOs offer contracts to primary care groups (often called IPAs or HCOs) on a take-it-or-leave-it basis and all contracts require primary care groups to accept full risk for a comprehensive set of benefits. For any primary care group, the choice is between full risk (without a guarantee of payment for internally provided services) and no payment for this covered population.

**Methods**

In preparing this report, we reviewed a number (but not all) of the HMO contracts between FQHCs and HMOs, summary descriptions of the health reform process, selected reviews of contracts developed by consultants to HRSA and a 1997 contract between the government and PCA. We then asked FQHCs to report the financial results of their HMO contracts for reform patients for the period October 2001 through April 2002. These reports consisted of two parts. The first section reported member months, HMO funding (budget) rates and then claims and reserve deductions made by the HMOs from these funds. The second report covered internal costs. Finally, we met in San Juan with the majority of the community health centers to gain their input.

We had considerable contact with the centers as they were developing the information. It was apparent that most of the centers did not routinely develop a "contract P&L" for this population. We performed tests of reasonableness on the reports and used these results to clarify reporting issues but we did not audit the reports.

12/03/... Case 17-03283-LTS ... Case 1:07-cv-01034-RMC Document 15-1 Filed 09/24/07 Page 6 of 14 Desc:
Exhibit A Page 6 of 14

Final Report
FQHCs and Health Reform
Page 3

## Payment Process

Each HMO receives capitation funding from the government. It then deducts amounts for administration and for selected services whose costs remain the responsibility of the HMO. Examples of retained responsibilities include dental coverage and the cost of selected high cost services. The remaining funds (constituting about 50% of the government capitation) are established as the risk target for primary care groups. These funds are intended to cover most hospitalizations, outpatient hospital care, specialty care, primary care and prescription medications. From this budget, the HMO deducts the cost of the claims it pays for services that are the responsibility of the primary care group, including a reserve for IBNR. The remaining amounts are paid to the primary care group.

It is important to understand, when evaluating the attached reports, that the FQHC often has a choice between paying for services directly or having the HMO pay for certain services, which are then deducted from the balances available to the center. This means that some differences in the FQHC reports between the cost of internal services and claims deductions are the result of decisions by FQHCs. It should also be noted that patients have freedom of choice as to hospital, specialty physician and pharmacy among all of the providers that contract with any HMO. The result is that capitation agreements for services, other than primary care, are difficult to arrange.

## Financial Results

10 organizations reported for a total of 13 HMO contracts. These reports cover 122,927 reform patients, 829,455 exposure months (i.e., member months) and $27 million in capitation payments (annualized at about $54 million). This represents just under 50% of the reform members enrolled in the 19 FQHCs. The reports are shown in Exhibit 1 and summarized here.

The organizations differ markedly in size of contract. The average risk pool covers just under 9,500 patients with a high of 40,000 and a low of 3,100. The median is 7,500 members. The

12/03/... Case 17-03283... Desc:
Case 1:07-cv-01034-RMC Document 15-1 Filed 09/24/07 Page 7 of 14
Exhibit A Page 7 of 14

Final Report
FQHCs and Health Reform
Page 4

weighted average capitation budget is $32.46 with a range of $29.68 to $35.83. The median is $30.68 because the largest center receives funding that is above the average.

On average, and including IBNR, the claims deductions totaled $24.93 pmpm, leaving only $7.53 available for the centers. The amount available to the centers is highly volatile, with a median of $7.00 but a range of

| Reform Patients | Totals | Average | High | Low | Median |
|---|---|---|---|---|---|
| Members in April | 122,927 | 9,456 | 40,233 | 3,130 | 7,518 |
| Member Months | 829,455 | | | | |
| Net Capitation | $26,923,744 | $32.46 | $35.83 | $29.68 | $30.68 |
| Claims Expense | | | | | |
| Specialty Referrals | $2,551,610 | $3.08 | | | |
| Hospital Care | $5,769,331 | $6.96 | | | |
| Other Medical | $1,716,412 | $2.07 | | | |
| Reserves & Retention | $2,415,426 | $2.91 | | | |
| Rx Coverage | $8,228,607 | $9.92 | | | |
| Total Claims Expense | $20,681,386 | $24.93 | $45.69 | $16.35 | $25.70 |
| Net to FQHC | $6,242,358 | $7.53 | $13.88 | -$15.41 | $7.00 |
| Cost to FQHC | $15,753,025 | $18.99 | $35.65 | $7.60 | $20.99 |
| Gain | ($9,510,667) | -$11.47 | $0.11 | -$37.19 | -$19.05 |

minus $15.41 to a positive $13.88.[2] The average internal cost of serving these members (which includes payment for hospital care, specialty services, lab, radiology, 24-7 ER and internal pharmacy services) is $18.99 pmpm with a range of $7.60 to $35.65 and a median of $20.99.

*For this six-month period, all contracts except one are reporting losses* (we exclude one plan that reported earnings because it did not report the costs of internally provided prescriptions). The weighted average loss is $11.47 pmpm but *the median loss is $19.05 pmpm* (again, reflecting a more modest loss by the largest contractor).

### Issues

There are a number of issues raised by this review of the structure of the program and the experience of the primary care contractors. We will review the most important here.

1. *Monopoly and its results*. The government has established a payment monopoly in each region. In three important respects this monopoly is unregulated:

---

[2] The FQHC with the largest negative reported unusually high hospital claims expenditures and its enrollment was below the median. These facts raise the questions as to proper pool size and the use of stop loss coverage.

Case 17-03283-LTS Doc 1822-1 Filed 11/15/17 Entered 11/15/17 13:51:27 Desc.
Exhibit A Page 8 of 14
Case 1:07-cv-01084-RMC Document 15-1 Filed 09/24/07 Page 8 of 14

Final Report
FQHCs and Health Reform
Page 5

- The government does not control the amount retained by the HMOs for "carve out" services. As a result, it appears that somewhere near 50% of the government's funds are retained by the HMOs. The amount retained appears to be at the discretion of the HMO without governmental input and without regard for the cost of medical services retained by the HMO. This critical, and apparently unregulated, retention substantially affects the funding available to at-risk providers. Medical expenses typically consume between 84% of premium (for-profit plans) to 90% (non-profit). Since we don't know what the HMOs spend for "carve out" services, we don't know their full loss ratios.

- The 1997 government contract required HMOs to pay HCOs (their term for at-risk providers) on a reasonable basis that "does not jeopardize or infringe upon the quality of services provided." However, this requirement "will be reinforced through the establishment of different alternatives in order to ensure that HCOs, HCO's network of participating providers and insurers participating providers are paid in full for contracted services in accordance with established budgets." The FQHCs are not aware of any such alternative reimbursement options and the contracts do not provide parity between HCOs and other providers. In fact, the HCOs (primary care groups) are paid last and only what remains (if anything) after other contractors have been paid in full. They alone bear risk for the cost of services.

- The government does not control the risk-transfer environment in two important respects. First, we can find no controls on the size of risk pools in the government contract with HMOs. HMOs appear to be free to transfer full risk on enrollment pools as low as 3,100 patients. Second, we find no government oversight of the services for which HCOs are held responsible. The most significant issue here is the cost of prescription medications, which will be discussed below. Finally, we find no required provisions for stop loss.[3]

---

[3] A general caution applies here. The government-HMO contract we reviewed was dated in 1997. Some features could have changed since that time. For example, we understand the government now controls the HMO's administrative retention amount which it did not in 1997. However, it does not appear that this control extends to other important aspects of the HMOs' relationships with risk bearing providers.

12/03/2002 Case 1:07-cv-01084-RMC Document 15-1 Filed 09/24/07 Page 9 of 14
Case 17-03283-LTS Doc#1822-1 Filed 11/15/17 Entered 11/17/17 13:51:27 Desc:
Exhibit A Page 9 of 14

Final Report
FQHCs and Health Reform
Page 6

This is especially important given the small size of the risk pools resulting from the contract structure.

The government appears to have granted the HMOs a monopoly that is unregulated with respect to critical features affecting primary care providers. The expected result of this monopoly is to ensure profitability at the HMO level and losses at the risk-bearing provider level. No other options are available to primary care providers who traditionally serve the needs of indigent patients.

This HMO market power is apparent in many of the contract features noted by experts reviewing the HMO contracts on behalf of HRSA. Features such as short periods for claims submissions and appeals by providers but relatively long payment timeframes for HMOs, comprehensive one-sided indemnification provisions and non-compete clauses (that extend beyond the contract period) suggest the power that HMOs derive from their state-established monopoly position.

2. *Prescription Medications*. The single most important *financial* issue for most FQHCs is the cost of prescription medications. For the 10 contracts where we have sufficient information to separate these costs from other expense, we have the following results:

The patient is not required to use the internal FQHC pharmacy and any participating physician can write prescriptions (but these must be approved by the

| Reform Patients | Totals | High | Low | Median |
|---|---|---|---|---|
| Members in April | 100,083 | | | |
| Member Months | 680,920 | | | |
| Budget | $32.49 | | | |
| Rx Costs | | | | |
| Claims | $10.90 | | | |
| Internal | $7.04 | | | |
| Total Rx | $17.94 | $25.79 | $13.29 | $19.75 |
| Funding Net of Rx | $14.55 | | | |

PCP – causing further difficulties). The resulting costs consume, on average, over 54% of the total amount available for all of the (very comprehensive) services for which the primary care groups are responsible.

Only four centers were able to report funding levels and prescription costs separately for Medicare beneficiaries. For these centers, the reported cost of prescriptions for seniors exceeded the total HMO-provided funding (budget) for all services *in all cases* by a wide margin. The government is simply not adequately funding an unlimited prescription medication benefit for this population at $0 to $3 co-payment levels. The HMOs all require primary care groups to fully absorb this loss. And the situation will probably become much worse over time. Prescription medication costs are increasing faster than other medical expense and faster than the government is increasing its capitation to HMOs.

The chart at the right shows what happens if the government (and HMOs) increase

| Effect of Rx Inflation | Current | Assumed Inflation | Year 2 | Assumed Inflation | Year 3 |
|---|---|---|---|---|---|
| Governement Payment | $65.00 | 4% | $67.60 | 4% | $70.30 |
| HMO Retention | $34.00 | 4% | $35.36 | 4% | $36.77 |
| Capitation to HCOs | $31.00 | | $32.24 | | $33.53 |
| Prescription Costs | $17.00 | 11% | $18.87 | 11% | $20.95 |
| $ for all of other care | $14.00 | | $13.37 | | $12.58 |

payment and carve out prices by 4% a year while prescription costs increase at 11% per year. The latter is about the mid range of Rx inflation forecasts. The 4% may be overly generous, as the Commonwealth did not increase capitation rates over the last year. The effect will be to markedly reduce the amount available for all other care even though this amount is currently insufficient to cover the costs of these benefits. Note also that if the Medicare population increases, the situation will deteriorate even further.

3. *Free Choice of Providers*. The government requires that all patients have free choice of provider – specialist, hospital, pharmacy. For this reason risk-bearing primary care providers cannot manage significant aspects of the costs for which they are held responsible. A review of the exhibit will show that the majority of these costs (see claims section) are generated by outside providers, where payment levels are negotiated between the HMO and the provider – not between the HCO and the provider.

This issue goes beyond the issue of price levels. The result is that the community health center must pay other parties for services such as pharmacy, laboratory, and radiology while

12/03/2002
Case: 17-03283-LTS Doc#:1822-1 Filed:11/15/17 Entered:11/17/17 13:51:27 Desc:
Case 4:07-cv-01094-RMC Document 15-1 Filed 09/24/07 Page 11 of 14
Exhibit A Page 11 of 14

Final Report
FQHCs and Health Reform
Page 8

also maintaining the internal capacity to provide these services where marginal costs are substantially below payment levels.

An especially costly requirement for the FQHCs is that they maintain a 24/7 emergency room. This requirement, combined with free choice, greatly increases the burden of this program to FQHCs.

4. *Health Status Adjustments*. None of the HMOs adjust payment or pool funding for significant differences in health status. Some use age/gender/program-specific capitation funding rates but these capture very little of the variation in costs among groups of patients – certainly less than 20%. As traditional providers-of-service to medically indigent patients, we would expect FQHCs to experience adverse selection.

The modern health status adjustment systems (also called, predictive modeling), which combine diagnosis with demographics, are becoming powerful and they are inexpensive to use. Their use is exploding in the United States because they provide a more level playing field for both health plans (when used by employers to adjust premium contributions) and provides (when used by health plans to adjust payment or evaluate performance).

5. *HMO Reporting*. I reviewed reports to FQHCs from some of the HMOs. I found the reports confusing and missing significant information I see in other similar environments. It is often difficult to determine how much has been earned by an FQHC in any given period – who owes what to whom. The reports lack comparative information (how am I doing compared to other HCOs) and utilization information. They give few signals to FQHCs as to how their practice patterns differ from "successful" practices.

6. *Risk Contract*. Probably the most significant defect of the HMO contracts is that there is no guarantee of any payment to the HCO. Risk is unlimited and the FQHC can be asked to pay the HMO even as it provides services to the HMO's members. As noted above in the

12/03/... Case 17-03283-LTS Doc #:1822-1 Filed:11/15/17 Entered:11/17/17 13:51:27 Desc:
Case 4:07-cv-01094-RMC  Document 15-1  Filed 09/24/07  Page 12 of 14
Exhibit A  Page 12 of 14

Final Report
FQHCs and Health Reform
Page 9

"government" section, all other providers are paid their negotiated fees. Primary care groups are, by design, last in line and many receive nothing in return for the services they provide.

## Conclusions

Based upon the information we reviewed, it appears that the benefits offered to indigent residents of Puerto Rico by the government cost more, at prevailing HMO fee levels and current utilization levels, than the government is able to pay. Some party must suffer a loss. The present government-designated structure pushes these losses down to primary care providers. The government is protected from loss by its contracts with HMOs. The HMOs are protected from loss by their grant of unsupervised monopoly power. On the provider side, the structure is lacking important aspects of parity. Specialty physicians, hospitals, pharmacies and other providers who have a claim paid by the HMO are guaranteed their full negotiated fees. Primary care providers absorb the full cost of inadequate funding. FQHCs are particularly vulnerable in this setting because they have few non-reform patients that could offset these losses. If the majority FQHCs are to survive, the financial "pain" needs to be shared by other participants on some equitable basis.

This "sharing" can be initiated by the government along a number of dimensions. It could begin to enforce its contract provisions requiring "actuarially sound" provider payment structures from HMOs, by enforcing contract provisions that payment be equitable or by extending controls to HMO carve out retentions. It could address the issues of stop loss, pool size, the types of services that primary care providers can be held responsible for, and guaranteed payments for primary care services as discussed above.

Or the government could change the monopoly aspects of the HMO contracts by allowing more than one HMO to serve each market. This "market based" approach would change the balance of power between primary care groups and HMOs that is now so one-sided.

Final Report
FQHCs and Health Reform
Page 10

If the government does not act to provide some protection for primary care providers, these providers will continue to bear the full burden of the imbalance between the government's desire to provide comprehensive services and its inability to pay for these services. HRSA will be faced with a decision. Its funds are now being used to subsidize care for reform patients. If these funds cease, many of the community health centers will not be able to continue to operate. This may happen even without action by HRSA. The losses reported for less than half of the reform patients served by community health centers for a six-month period of time totaled $9.5 million. If we extrapolate this to a full year and the full population (263,600), annual losses may approach $38 million. This exceeds HRSA funding by about $6 million.

If this situation is not ameliorated, reform and other indigent patients, especially in the non-metropolitan areas of Puerto Rico, will lose a significant access to health care services.


David E. Kelleher
HealthCare Options, Inc.

Exhibit 1
Page 1

**FQHC Experience with Reform Patients**
**October 2001 - April 2002**
**Self Reported Information**

| Name of CHC | 1 | 2 | 3 | 4(a) | 4(b) | 5 | 6(a) | 6(b) | 7 | 8(a) | 8(b) | 9 | 10 | Totals/ Averages |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Members in April | 40,233 | 7,887 | 7,198 | 7,759 | 5,929 | 5,127 | 2,641 | 7,518 | 13,703 | 9,219 | 3,130 | 4,678 | 7,905 | 122,927 |
| Member Months | 290,563 | 53,807 | 50,619 | 44,109 | 41,693 | 36,182 | 18,973 | 53,822 | 112,458 | 26,854 | 9,447 | 33,210 | 57,718 | 829,455 |
| Net Capitation | $10,129,803 | $1,614,383 | $1,605,157 | $1,380,244 | $1,262,638 | $1,074,027 | $587,190 | $1,711,000 | $3,492,792 | $805,620 | $283,410 | $993,838 | $1,783,643 | $26,923,744 |
| Claims Expense | | | | | | | | | | | | | | |
| Specialty Referrals | $1,007,429 | $138,975 | $71,515 | $121,645 | $100,994 | $63,978 | $15,857 | $162,261 | $651,356 | $47,412 | $15,063 | $49,092 | $106,033 | $2,551,610 |
| Hospital Care | $1,316,646 | $465,516 | $533,420 | $362,622 | $1,091,213 | $347,884 | $177,349 | $560,898 | $270,420 | $41,864 | $39,625 | $218,564 | $343,311 | $5,769,331 |
| Other Medical | $413,322 | $25,500 | $90,343 | $166,336 | $254,338 | $90,623 | $45,947 | $148,730 | $37,433 | $22,334 | $8,513 | $213,552 | $199,441 | $1,716,412 |
| Reserves & Retention | $548,882 | $346,133 | $128,211 | $83,804 | $95,591 | $7,656 | $3,991 | $242,614 | $481,454 | $60,551 | $29,281 | $198,621 | $2,415,426 | |
| Rx Coverage | $2,809,524 | $223,860 | $184,348 | $398,999 | $362,806 | $523,926 | $211,150 | $664,105 | $1,406,669 | $138,911 | $73,161 | $441,212 | $789,936 | $8,228,607 |
| Total Claims Expense | $6,095,803 | $1,199,984 | $1,007,836 | $1,133,406 | $1,904,942 | $1,034,067 | $454,294 | $1,376,833 | $3,249,107 | $439,158 | $196,913 | $951,701 | $1,637,342 | $20,681,386 |
| Net to FQHC | $4,034,000 | $414,399 | $597,320 | $446,838 | ($642,304) | $39,960 | $132,896 | $334,167 | $243,685 | $366,462 | $86,497 | $42,137 | $146,301 | $6,242,358 |
| Cost to FQHC | $4,229,743 | $408,723 | $976,518 | $410,890 | $908,336 | $1,005,729 | $634,645 | $1,788,569 | $2,360,586 | $957,295 | $143,458 | $682,870 | $1,245,663 | $15,753,025 |
| Gain | ($195,743) | $5,676 | ($379,198) | $35,948 | ($1,550,640) | ($965,769) | ($501,749) | ($1,454,402) | ($2,116,901) | ($590,833) | ($56,961) | ($640,733) | ($1,099,362) | ($9,510,667) |
| PMPM | | | | | | | | | | | | | | |
| Net Capitation | $34.86 | $30.00 | $31.71 | $35.83 | $30.28 | $29.68 | $30.95 | $31.79 | $31.06 | $30.00 | $30.00 | $29.93 | $30.90 | $32.46 |
| Claims Expense | | | | | | | | | | | | | | |
| Specialty Referrals | $3.47 | $2.58 | $1.41 | $2.76 | $2.42 | $1.77 | $0.84 | $3.01 | $5.79 | $1.77 | $1.59 | $1.48 | $1.84 | $3.08 |
| Hospital Care | $4.53 | $8.65 | $10.54 | $8.22 | $26.17 | $9.61 | $9.35 | $5.02 | $4.99 | $1.56 | $4.19 | $6.58 | $5.95 | $6.96 |
| Other Medical | $1.42 | $0.47 | $1.78 | $3.77 | $6.10 | $2.50 | $2.42 | $0.70 | $1.32 | $0.83 | $0.90 | $6.43 | $3.46 | $2.07 |
| Reserves & Retention | $1.89 | $6.43 | $2.53 | $1.90 | $2.29 | $0.21 | $0.21 | $4.51 | $4.28 | $7.02 | $6.41 | $0.88 | $3.44 | $2.91 |
| Rx Coverage | $9.67 | $4.16 | $3.64 | $9.05 | $8.70 | $14.48 | $11.13 | $12.34 | $12.51 | $5.17 | $7.74 | $13.29 | $13.69 | $9.92 |
| Total Claims Expense | $20.98 | $22.30 | $19.91 | $25.70 | $45.69 | $28.58 | $23.94 | $25.58 | $28.89 | $16.35 | $20.84 | $28.66 | $28.37 | $24.93 |
| Net to FQHC | $13.88 | $7.70 | $11.80 | $10.13 | $15.41 | $1.10 | $7.00 | $6.21 | $2.17 | $13.65 | $9.16 | $1.27 | $2.53 | $7.53 |
| Cost to FQHC | $14.56 | $7.60 | $19.29 | $9.32 | $21.79 | $27.80 | $33.45 | $33.23 | $20.99 | $35.65 | $15.19 | $20.56 | $21.58 | $18.99 |
| Gain | $0.67 | $0.11 | $7.49 | $0.81 | $37.19 | $26.69 | $26.45 | $27.02 | $18.82 | $22.00 | $6.03 | $19.29 | $19.05 | $11.47 |
| Budget | | | | | | | | | | | | | | |
| Members in April | 40,233 | 7,887 | 7,198 | 7,759 | 5,929 | 5,127 | 2,641 | 7,518 | 13,703 | 9,219 | 3,130 | 4,678 | 7,905 | 100,083 |
| Member Months | 290,563 | 53,807 | 50,019 | 44,109 | 41,693 | 36,182 | 18,973 | 53,822 | 112,458 | 26,854 | 9,447 | 33,210 | 57,718 | 680,920 |
| Rx Costs | $34.86 | $30.00 | $31.71 | $35.83 | $30.28 | $29.68 | $30.95 | $31.79 | $31.06 | $30.00 | $30.00 | $29.93 | $30.90 | $32.49 |
| Claims | $9.67 | $4.16 | $3.64 | $9.05 | $8.70 | $14.48 | $11.13 | $12.34 | $12.51 | $5.17 | $7.74 | $13.29 | $13.69 | $10.90 |
| Internal | $5.45 | $2.67 | $0.63 | $0.00 | $12.07 | $11.31 | $11.03 | $10.96 | $6.20 | $12.96 | $5.55 | $8.92 | $1.81 | $7.04 |
| Total Rx | $15.12 | $6.83 | $4.27 | $9.05 | $20.78 | $25.79 | $22.16 | $23.30 | $18.71 | $18.13 | $13.29 | $22.20 | $15.50 | $17.94 |
| Funding Net of Rx | $19.75 | $23.17 | $27.44 | $26.78 | $9.51 | $3.89 | $8.79 | $8.49 | $12.35 | $11.87 | $16.71 | $7.72 | $15.41 | $14.55 |

Notes

| 80% of IBNR to Rx, per discussion | Can't break Rx from reserves | Internal - can't separate Rx from other | Can't find internal Rx |
|---|---|---|---|