HBFHCOM1

```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF PUERTO RICO
 2   ------------------------------x
     IN RE: THE FINANCIAL OVERSIGHT
 3   AND MANAGEMENT BOARD FOR
     PUERTO RICO,
 4
         as representative of
 5                                  No. 17 BK 3283-LTS
                                    No. 17 BK 3284-LTS
 6   THE COMMONWEALTH OF PUERTO RICO,  No. 17 BK 3567-LTS
     et al.,
 7              Debtors.             (Jointly Administered)
     ------------------------------x
 8   THE BANK OF NEW YORK MELLON,
                    Plaintiff,
 9       v.                          Adv. Proc. No. 17 AP 133-LTS
                                     in Case No. 17 BK 3284-LTS
10
     PUERTO RICO SALES TAX FINANCING
11   CORPORATION (COFINA), et al.,
12              Defendants.
     ------------------------------x
13   ASOCIACIÓN DE SALUD PRIMARIA DE
14   PUERTO RICO, INC., et al.
15              Plaintiffs,
         v.                          Adv. Proc. No. 17 AP 227-LTS
16                                   in Case No. 17 BK 3283
     COMMONWEALTH OF PUERTO RICO,
17   et al.,
18              Defendants.
     ------------------------------x
19                                   Motion Hearing
                                     November 15, 2017
20                                   8:48 a.m.
21   Before:
22                    HON. LAURA TAYLOR SWAIN,
23                                        District Judge
24                    HON. JUDITH G. DEIN
25                                        Magistrate Judge
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HBFHCOM1

1                                    APPEARANCES

2   PROSKAUER ROSE LLP
          Attorneys for FOMB Oversight Board
3   BY:   MARTIN J. BIENENSTOCK
          BRIAN ROSEN
4         PAUL V. POSSINGER
          TIMOTHY W. MUNGOVAN
5
    O'NEILL & BORGES LLC
6         Attorneys for FOMB Oversight Board
    BY:   HERMANN D. BAUER-ALVAREZ
7
    PAUL HASTINGS LLP
8         Attorneys for Official Committee of Unsecured Creditors
    BY:   LUC A. DESPINS
9
    O'MELVENY & MYERS LLP
10        Attorneys for AAFAF
    BY:   WILLIAM SUSHON
11        SUZZANNE UHLAND
          DIANA PEREZ
12
    QUINN EMANUEL URQUHART & SULLIVAN LLP
13        Attorneys for COFINA Senior Bondholders
    BY:   SUSHEEL KIRPALANI
14
    KRAMER LEVIN NAFTALIS & FRANKEL LLP
15        Attorneys  for Mutual Fund Group
    BY:   GREGORY A. HOROWITZ
16
    CADWALADER WICKERSHAM & TAFT LLP
17        Attorneys for Assured Guaranty
    BY:   ELLEN M. HALSTEAD
18        THOMAS J. CURTIN
          HOWARD R. HAWKINS JR.
19
    FELDESMAN TUCKER LEIFER FIDELL
20        Attorneys for Plaintiff Centro de Medicina Familiar Julio
    Palmieri Ferri, Inc.
21  BY:   JAMES L. FELDESMAN

22  LAW OFFICES OF JOHN E. MUDD
          Attorney for Plaintiff Corporación de Servicios Integrales
23  de Salud del Area de Barranquitas
    BY:   JOHN E. MUDD
24

25

                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

HBFHCOM1

1                          APPEARANCES (Cont'd)

2    REXACH & PICO, CSP
          Attorney for Plaintiff Financial Guaranty Insurance Co.
3    BY:  MARIA E. PICO

4    YOUNG CONAWAY STARGATT & TAYLOR, LLP
          Attorneys for Banco Popular
5    BY:  JOHN T. DORSEY

6    WEIL GOTSHAL & MANGES LLP
          Attorneys for National Public Finance Guarantee Corp.
7    BY:  KELLY DIBLASI
          SALVATORE ROMANELLO
8         GABRIEL MORGAN

9    ROBBINS RUSSELL ENGLERT ORSECK UNTEREINER & SAUBER LLP
          Attorneys for Ad Hoc Group of General Obligation
10   Bondholders
     BY:  GARY A. ORSECK
11        MARK T. STANCIL

12   REED SMITH LLP
          Attorneys for Siemens Transportation
13   BY:  CLAUDIA Z. SPRINGER

14   MILBANK, TWEED, HADLEY & McCLOY LLP
          Attorneys for Ambac Assurance Corp.
15   BY:  ATARA MILLER

16        – and –

17   CURTIS MALLET-PREVOST COLT & MOSLE LLP
     BY:  THERESA FOUDY
18

19   JENNER & BLOCK LLP
          Attorneys for Official Committee of Retired Employees
     BY:  CATHERINE STEEGE
20        MELISSA ROOT

21   KASOWITZ BENSON TORRES LLP
          Attorneys for Whitebox Funds
22   BY:  KENNETH R. DAVID
          DANIEL A. FLIMAN
23

24   MORRISON & FOERSTER LLP
          Attorneys for PBA Funds
     BY:  JAMES M. PECK
25

                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

HBFHCOM1

1                           APPEARANCES (Cont'd)

2     GREENBERG TRAURIG, LLP
            Attorneys for AAFAF PREPA Matters
3     BY:   NATHAN A. HAYNES
            DAVID CLEARY
4           JOSEPH P. DAVIS III

5     JONES DAY
            Attorneys for ERS Secured Creditors
6     BY:   BENJAMIN ROSENBLUM
            BRUCE BENNETT

7
      PIETRANTONI MENDEZ & ALVAREZ LLC
8           Attorneys for GDB
      BY:   ORESTE R. RAMOS
9           MARIA D. TRELLES HERNANDEZ

10    SIDLEY AUSTIN LLP
            Attorneys for Santander
11    BY:   NICHOLAS P. CROMWELL

12    ALSO PRESENT:   Chief Judge Barbara J. Houser, Mediation Team
                      United States Bankruptcy Court
13                    Northern District of Texas

14

15

16

17

18

19

20

21

22

23

24

25

HBFHCOM1

1         (Case called)

2         THE DEPUTY CLERK:  This case is In Re the Financial

3  Oversight Management Board for Puerto Rico as representatives

4  of the Commonwealth of Puerto Rico, et al.  PROMESA Title III,

5  case No. 17BK3283 LTS.

6         JUDGE SWAIN:  Again, welcome to counsel, parties in

7  interest, members of the public, the press here in New York,

8  and to all of the participants in San Juan and the observers by

9  telephone.

10        We extend a special welcome today to those in

11 attendance here who have traveled from Puerto Rico to be here.

12 Our thoughts continue to be with those on the island as they

13 continue to face challenges in the aftermath of Hurricane

14 Maria.  Our colleagues at the federal court in San Juan are

15 again represented here today by Gretchen Rodriguez, the

16 assistant operations manager for the District Court.

17        As I mentioned at Monday's hearing, I have received

18 and authorized many requests to bring many electronic devices

19 into the courtroom today.  I want to remind you again that our

20 court and judicial conference policies impose tight limitations

21 on the use of such devices in the courtroom and in connection

22 with court proceedings in general.  Thus, there is to be no use

23 of any electronic devices in the courtroom to communicate with

24 any person, source, or outside repository of information, nor

25 to record any part of the proceedings.  All electronic devices

HBFHCOM1

```
1   must be turned off unless you are using a particular device to

2   take notes or to refer to notes or documents that are already

3   loaded on the device.  All audible signals, including vibration

4   features, must be turned off.  As provided in this Court's

5   standing order, no recording or retransmission of the hearing

6   is permitted by any person, including but not limited to the

7   parties or the press.  Failing to adhere to these policies will

8   result in sanctions as outlined in the Court's orders.

9              Our first order of business is the report of the

10  mediation team which Judge Houser will be delivering through

11  the Court Solutions phone line as she is out of town today.

12             So, Ms. Ng, would you please make Judge Houser's line

13  live.

14             Good morning, Judge Houser.

15             JUDGE HOUSER:  Good morning, Judge Swain, and good

16  morning to all parties who are both in the courtroom and --

17             JUDGE SWAIN:  Judge Houser, it's very staticky.  So if

18  you could, we're trying to do something about it, but try to

19  speak even louder and directly into whatever you're speaking

20  into.

21             JUDGE HOUSER:  All right.  I do have the phone in my

22  hand not on the -- so I will attempt to speak louder.  Is that

23  better?

24             JUDGE SWAIN:  Ever so slightly.  Just do your best,

25  and we will all listen really hard.
```

HBFHCOM1

1           JUDGE HOUSER:  OK.  I'll speak up even louder.

2           JUDGE SWAIN:  That's better.

3           JUDGE HOUSER:  Very well.  Good morning again, Judge

4    Swain, and to all parties who are both present in the courtroom

5    in Puerto Rico and New York and to the parties who are

6    listening via the Court Solutions procedures.  I would be

7    remiss if I didn't start this morning by recognizing the

8    difficult circumstances that the people of Puerto Rico face

9    daily as a result of the devastating effects of Hurricane

10   Maria.  We know that lives on the island have changed

11   dramatically in the aftermath of the hurricane, and we admire

12   the courage shown by the people of Puerto Rico in addressing

13   the challenges of everyday life.

14           While the members of the mediation team were committed

15   to helping the parties resolve the issues in dispute among them

16   in these cases before the hurricane, we believe even more

17   strongly in the importance of the mediation process to a fair

18   and just resolution of these cases as expeditiously as possible

19   following the devastation inflicted on the island by Hurricane

20   Maria.

21           As I explained when I last addressed you, a key

22   component of our mediation process is that the process is

23   confidential, which will allow parties to have open and frank

24   conversations with the mediators and each other.  By having

25   these open and frank conversations, I believe we can find

1    common ground that will facilitate a consensual, or

2    substantially consensual, resolution of these cases.  Because

3    our process is confidential, I will exercise care in what I say

4    to you today.

5           Since I last addressed you, the mediation team

6    identified the issues in dispute among the parties that we

7    believe we should attempt to resolve through mediation, and

8    importantly, we began formal mediation sessions with the

9    parties involved in those disputes.  While I cannot point to

10   any major breakthrough that we have made through the mediation

11   process at the time Hurricane Maria made landfall on the

12   island, the mediators each believes that incremental process

13   was being made in these cases.  Unfortunately, like many other

14   things, Hurricane Maria has caused some disruption to our

15   mediation process, but after some relatively short delays, we

16   have renewed formal mediation sessions with the parties who

17   have chosen to participate in our mediation process.

18          On October 31 the Oversight Board formally approved a

19   timeline for the development of new fiscal plans for the

20   Commonwealth and certain other instrumentalities.  The board's

21   approved timeline is fairly aggressive.  Because the

22   development of new fiscal plans is important to all

23   stakeholders in these cases, we are working with the parties to

24   facilitate the development of these new fiscal plans in as

25   collaborative a fashion as possible prior to their anticipated

1    certification by the Oversight Board in early 2018.  Moreover,

2    we expect to resume formal mediation sessions on critical

3    disputed legal issues in early 2018.  To the extent necessary,

4    parties will be asked to submit confidential merits mediation

5    statements to the mediators.  These confidential merit

6    mediation statements will allow the members of the mediation

7    team to better understand the parties' positions on the legal

8    and factual issues in dispute among them so that we may assist

9    them in attempting to negotiate a consensual resolution of

10   those issues.  I will assign various members of the mediation

11   team to be responsible for particular issues based upon various

12   factors, including availability and expertise of a member or

13   members of the mediation team, and I will push the mediation

14   process as expeditiously as I feel appropriate in order to

15   facilitate a consensual or substantially consensual resolution

16   of these cases.

17          In summary, I believe adequate progress has been made

18   today.  While much work remains to be done, I am satisfied

19   where we are and how we will tackle the issues that must be

20   addressed going forward.  To be sure, pre-hurricane these cases

21   presented enormously challenging debt restructures that I

22   believe would require the cooperation, ingenuity, and diligence

23   of all involved to accomplish.  Hurricane Maria has added new

24   layers of complexity to the development of confirmable plans of

25   adjustment in these cases.  However, I remain highly confident

HBFHCOM1

1    that if the parties and mediators work together, we will be

2    able to restructure the debt on a consensual or substantially

3    consensual basis.  The mediators remain committed to this goal.

4           Judge Swain, thank you for the opportunity to give

5    this brief update to the parties in interest in these cases.

6           JUDGE SWAIN:  Thank you, Judge Houser, for that update

7    and for your continuing dedicated work in facilitating the

8    mediation process.

9           JUDGE HOUSER:  My pleasure, Judge Swain.  And might I

10   be excused?

11          JUDGE SWAIN:  Yes.  Thank you.

12          JUDGE HOUSER:  Thank you.

13          JUDGE SWAIN:  We will now turn to Item 2 on the

14   agenda, the contested matters.  And as you can hear, there are

15   some audio problems.  I understand that that static problem is

16   one that affects people listening on the Puerto Rico end as

17   well, and so let's each of us speak into the microphones a bit

18   slowly and as clearly as we can so that everyone can hear us as

19   well as possible.  All remarks of counsel should be made from

20   the podium in a strong, slow voice.

21          The first item on the agenda is the resolution of the

22   debtors' Section 365(D)(4) motion.  I understand that

23   Mr. Possinger is going to present.

24          MR. POSSINGER:  Good morning, your Honor.  Paul

25   Possinger, Proskauer Rose, on behalf of the Oversight Board.

HBFHCOM1

1    the first item on the agenda is the debtors' motion to for an

2    extension of time to assume or reject leases.  We do have a

3    resolution of this motion -- of the objections to the motion.

4    Briefly, as I think your Honor understands --

5         JUDGE SWAIN:  A little slower, just in case of the

6    static.  Thank you.

7         MR. POSSINGER:  Got it.  As I think your Honor

8    understands, the Bankruptcy Code provides for an initial

9    120-day period for a debtor to decide whether to assume or

10   reject nonresidential leases subject to nonconsensual

11   extensions of up to an additional 90 days.  We've obtained

12   those nonconsensual extensions regardless of landlords' consent

13   from your Honor with respect to all five debtors, and we're now

14   up against a deadline for the Commonwealth of November 29.

15        At the time we filed the motion seeking further

16   extensions with landlord consent, which is now required for

17   further extensions beyond that initial 210 days, we had one

18   consent in hand, and that was from the Puerto Rico Public

19   Building Authority, which is a governmental instrumentality.

20   It is not a Title III debtor.  The PBA had consented to an

21   extension of the deadline to decide to assume or reject its

22   leases with the debtors until the confirmation of a plan of

23   adjustment for each of the debtors.  That drew objections from

24   creditors, certain creditors of the PBA, that indicated that --

25   or that argued that consent was open-ended.  They didn't object

HBFHCOM1

1   to an extension in concept.  They just didn't want an

2   open-ended extension.  In conversations with AAFAF, PBA has

3   agreed that its consent for now would be limited to 120 days

4   beyond each of the deadlines with respect to each of the

5   debtors.  So that resolves the objections of the PBA creditors.

6       With respect to other landlords -- and I'm told by

7   AAFAF that there are hundreds of them -- AAFAF has commenced a

8   process of reaching out to all other landlords other than the

9   PBA.  Given the state of the records with respect to some of

10  these leases, it's difficult to identify both the landlord and

11  contact information, and also the state of communications on

12  the island has made it difficult to communicate with the

13  landlords.  To date we've received an additional 20 consents to

14  extensions from landlords, and the process that we envision is

15  that as we obtain additional consents, we will submit

16  additional proposed orders under notice of presentment pursuant

17  to case management procedures that will indicate by exhibit

18  which landlords have provided their consent and for how long.

19  It's the best we can do at this point in time.

20      JUDGE SWAIN:  I saw that you filed a revised proposed

21  order that incorporates the 120-day limitation, gives the

22  specific extended deadlines for each debtor, and does make that

23  provision for additional proposed orders on presentment for

24  additional landlords, and that ability to get further

25  extensions by orders on presentment goes up to seven days

HBFHCOM1

1   before the expiry of the relevant deadline.  And I'm assuming

2   that's because the presentment process needs a few days to take

3   place; is that correct?

4         MR. POSSINGER:  That's correct.  There's a seven-day

5   notice period on presentment of orders.  We expect the first of

6   these additional orders will be submitted by November 22 with

7   respect to the Commonwealth because of the looming deadline of

8   November 29 for the Commonwealth.  As consents come in with

9   respect to Commonwealth leases after that, we're just going to

10  have to work out by agreement with the landlords because the

11  deadline, the date by which leases are deemed rejectible, have

12  come and gone, and so we're just going to have to work through

13  the process.

14        I will also note, though, that based on communications

15  with AAFAF, the letters that have gone out to the landlords

16  have suggested that they are seeking consent on negative notice

17  in the event that landlords don't receive the communication or

18  are unable to respond.  Again, that's the best that we can do.

19  So we're sort of firing on all cylinders, trying to get as many

20  consents as we can.

21        JUDGE SWAIN:  Do you have a position now as to whether

22  you would deem that negative notice actual consent and propose

23  an order on presentment extending based on that absence of

24  objection to consent, or are you going to see how things go and

25  make that decision later?

HBFHCOM1

1          MR. POSSINGER:  We are going to see how things go, but

2     when we submit the orders, we will indicate which landlords are

3     subject to the negative notice.  And we understand that that's

4     got to remain subject to whatever arguments they have,

5     including that they didn't get the communication, that we

6     identified the wrong landlord, that they no longer have a

7     lease, whatever the facts may be.

8          JUDGE SWAIN:  All right.  It is certainly appropriate

9     to make that clear in the documentation for the Court and for

10    the record, and then we will see what, if any, issues are

11    raised later.

12         MR. POSSINGER:  With respect to the order that I

13    emailed -- we emailed the chambers last night, we copied all

14    the objecting parties, and I believe we have an agreed order at

15    least with respect to the objecting parties.

16         JUDGE SWAIN:  I see no indication that there's no

17    objection to that form of agreed order which I have reviewed,

18    and so the request to enter the agreed order is granted, and I

19    will enter that later today.

20         MR. POSSINGER:  Thank you, your Honor.

21         JUDGE SWAIN:  Thank you.

22         MR. POSSINGER:  One other housekeeping item with

23    respect to No. 3 on the agenda.  That motion has been

24    withdrawn.  So in the event that your Honor was not aware of

25    that, we don't need to take up No. 3 today.

HBFHCOM1

1          JUDGE SWAIN:  That's the Rexach motion to lift the

2     automatic stay?

3          MR. POSSINGER:  That's correct.

4          JUDGE SWAIN:  Thank you.  I was aware of the

5     withdrawal of that motion.

6          MR. POSSINGER:  Thank you, your Honor.

7          JUDGE SWAIN:  Thank you.

8          The next agenda item is the motion of FGIC to stay all

9     litigation for 90 days, and I understand that Ms. Pico will be

10    speaking first for the movant for seven minutes.

11         MS. PICO:  Good morning, your Honor.

12         JUDGE SWAIN:  Good morning.

13         MS. PICO:  And good morning to all members of the

14    court.  I first want to -- as you mentioned, I do represent

15    FGIC, Financial Guarantee Insurance Company, which I will refer

16    to as FGIC.  I have been asked by FGIC to argue this motion, to

17    come from Puerto Rico to argue before this Court.

18         First thing I want to do is thank your Honor for all

19    its expressed sympathies at the beginning of each hearing.  It

20    makes us feel good.  It makes us feel very good that you are

21    aware of the challenges that all Puerto Ricans are facing.  We

22    faced them after the hurricane, and we are still facing them.

23    As I mentioned in our initial motion, which was filed some time

24    ago, at that time it was 40-some days without electricity.

25    Today it's 70 days without electricity.  For myself and for

1   many, many others, there's statistics out there.  I will leave

2   them at that, statistics.  I don't live out in the boondocks.

3   I do live one mile away from the Condado Vanderbilt, which

4   everybody here knows.

5           So that is the state of the affairs in San Juan.  For

6   those of us that are more fortunate, and as I say more

7   fortunate because we do have power generators, both in our home

8   and in our offices, when they work, they're great.  When they

9   break down, as they do because they're emergency generators,

10  they break down, and we don't have any power whatsoever.  So

11  these are, in fact, big challenges.

12          As I sat here and heard Judge Houser express how she

13  has a new schedule of mediation, a new schedule that takes into

14  account the challenges that are faced by Puerto Rico, and it

15  takes her, I believe -- I couldn't hear the right date, exact

16  date, but apparently to the end of January when actual formal

17  mediation will start again.

18          I'm here after the board on October 31, after we filed

19  our motion, finally recognized that new fiscal plans need to be

20  put in place.  And for those fiscal plans to be put in place,

21  they have expressed that optimistically they may be certified

22  or put in place by the end of February, maybe March, and I do

23  have to say optimistically because I don't know how they're

24  going to get the information that they need.  Honestly, we hear

25  that they need to know how many Puerto Ricans that are leaving

1   the island.  There were many Puerto Ricans leaving the island.

2   I was at the airport two days ago, and there are many Puerto

3   Ricans leaving the island, and there are many more going out.

4   So the demographics of Puerto Rico will not be known.  That is

5   something that the board will have to take into account and

6   probably have to guess.

7              There are many other factors that need to be guessed.

8   What is the collection of sales and use taxes?  Well, you know,

9   now the governor has issued an executive order, and now they're

10  called payments.  Small, medium size merchants are not paying

11  sales taxes.  So where is the board going to get information

12  about revenues that may come in from sales taxes?  And those

13  are just two examples.  It's going to be very difficult.  Until

14  we have power, until we have electricity, until people can sit

15  at their desk, not only lawyers but government employees,

16  people that need to give the data, to provide the data to make

17  a fiscal plan, it's going to be very hard to go forward.

18             I'm here to argue on why a stay to litigation, and

19  it's a short stay.  And it's for no reason different than what

20  the board has done with the fiscal plan, what the mediators are

21  doing with the mediation, and I think we need it for -- excuse

22  me, what the mediators have done with mediation, and I think we

23  need it for litigation.  It's -- go ahead.

24             JUDGE SWAIN:  There are certain litigations that have

25  voluntarily been discontinued.  I have not received from

1    parties to the other cases, including cases in which FGIC

2    itself is a party, requests to stay those particular

3    litigations.  So on what basis do you believe that FGIC has

4    standing to ask me to stay other cases that have not requested

5    to be stayed?

6         MS. PICO:  FGIC has one -- is involved in one

7    adversary proceeding.  FGIC is involved in the Commonwealth

8    bankruptcy.  And FGIC, while it may not be involved in parallel

9    litigation, has to be aware of what's going on in parallel

10   litigation, has to be in that sense involved in that litigation

11   because it will affect the ultimate result of all the cases.

12   And I truly believe that it's in your Honor's discretion just

13   to direct its docket and to do so in a way that counsel from

14   Puerto Rico can participate.

15        This case, your Honor, was filed in the U.S. District

16   Court of Puerto Rico.  That is the venue of that case.  The

17   local rules of the court, the local rules of the District Court

18   of Puerto Rico, require all counsel in Puerto Rico to sign all

19   motions, and under penalty, as you know, of sanctions if what

20   they sign results to be false or to have any misrepresentation.

21   And we're also required by our local rules to be present in all

22   proceedings.  That is what our local rules say.

23        Now, since Maria, which bears my same name, *San Maria*

24   *buena*, since Maria, you don't -- while I know you sympathize,

25   I'm not sure you understand what we have to go through to read

HBFHCOM1

1    all the motions that are being filed, because it's part of our

2    duty, it's part of our duty to our client, and it's our duty to

3    the Court, and it's our duty under the local rules.  And

4    counsel in Puerto Rico, nobody else is here, but I can attest

5    to that, the tribulations we go through to see if we got, we

6    received, the motions that are being filed.  Sometimes we

7    don't.  Sometimes we don't have Internet.  Some days we don't;

8    some days we do.  Some days we have communications, you know,

9    telephone.  Some days we do; some days we don't.  And that

10   still remains the same way.  I still have to go out on the

11   beach to speak on the phone and to get Internet.  The Internet

12   in my office, while it's much better than in my home, stops at

13   4:00 o'clock because the generator stops at 4:00 and all

14   communications stop at 4:00.  I understand there are other

15   offices in the banking area who are in better position.  Still,

16   the blackouts, as your Honor must have heard, last week alone

17   there was some places 36 hours without any power, without any

18   Internet.

19        And here we are, when you turn on your phone again,

20   you find out that 25 motions were filed, and you've got to read

21   them because it is your duty.  And you wonder, where are these

22   headed?  I mean, if the foundation, if the factual foundation

23   for all this litigation has gone upside down, what is the sense

24   of going into abstract litigation -- and I say -- I may go even

25   further, I think --

1           JUDGE SWAIN:  I'm going to ask you to wrap up your

2      remarks now.

3           MS. PICO:  I'm sorry.  I wasn't taking a look at the

4      time.  I'll come back, and I guess I'll save three more

5      minutes.

6           JUDGE SWAIN:  Yes.

7           MS. PICO:  I'll come back to give you the rest.

8           JUDGE SWAIN:  Thank you, Ms. Pico.

9           MS. PICO:  Thank you.

10          JUDGE SWAIN:  I'm very glad that you're able to be

11     here today and to help to bring home even more the reality of

12     this situation in Puerto Rico.

13          Next, Mr. Bienenstock for five minutes.

14          MR. BIENENSTOCK:  Thank you, Judge Swain.  Martin

15     Bienenstock of Proskauer Rose for the Oversight Board, both for

16     itself and as representative of the Title III debtors.

17          We immediately engaged in a practice where anyone's

18     request for adjournments or stays or whatever due to hardship

19     on the island is absolutely granted unless there's some

20     countervailing prejudice that we need to work out.  And I

21     believe that the Oversight Board is not unique in doing that.

22     I believe AAFAF has done that and creditors have done that as

23     well, and we all plan to continue to do that.

24          The motion, though, is striking in that it's an

25     attempted silver bullet to create a solution, and I think we

1   all have inside ourselves a desire at most times to come up

2   with that type of silver bullet. So we appreciate the -- where

3   it's coming from, but silver bullets with such broad reach

4   don't always work, and we don't believe it works here. So I'd

5   like to address the specific reasons why we think the broad

6   suspension of everything for 90 days except certain stay

7   motions that they've carved out is both outside the Court's

8   power and not in anyone's interest, including people in

9   Puerto Rico.

10          This has to be done on a case-by-case basis. There

11  are creditors who have raised pivotal issues, as your Honor

12  knows: Is there a cause of action under Sections 922 and 928

13  of the Bankruptcy Code as made applicable to PROMESA? Do

14  certain creditors have rights to turnover automatically of

15  certain revenues? Do certain creditors have priorities

16  recognized under PROMESA to certain revenues before they can

17  even be used for police and firemen, the GO bondholders have

18  said they do come first. These are pivotal issues. Without

19  the answers to those issues, it's hard to go forward, and it's

20  not going to help by delaying the answers. Everyone needs to

21  know those answers so that, ultimately, the plans of adjustment

22  put on the table will be confirmable. If we go forward without

23  knowing the answers, there's a higher risk that all the effort

24  that the mediators and the attorneys and creditors are putting

25  into the resolutions won't work.

1          Now, we're sympathetic to the abstract concept of FGIC

2     that why should people litigate when they can't settle?  So

3     they're asking for more facts.  And, your Honor, the answer to

4     that is their premise is wrong.  While it is true that we don't

5     have new fiscal plans and won't have them till January or

6     February, that doesn't mean people don't know the facts.

7     People do know the hard facts.  The government said at public

8     meetings that its income for this fiscal year will be down

9     approximately 15 percent.  People do know the facts that

10    Puerto Rico, for the foreseeable future, cannot pay for its own

11    government without federal funding.  Bottom line, we know now

12    that the money available for debt service for the next five

13    years is almost nonexistent.  And the resolutions that we all

14    have to discuss and are discussing are contingent-type

15    resolutions where, based on the actual availability of income,

16    people will be paid.  So it's not that people can't settle now.

17    People are working on settlements.

18          In recognition of that fact, the fiscal plans are only

19    going to be five-year plans.  So they're not going to show

20    availability for debt service in the near term.  We're still,

21    even after the fiscal plans, going to have to do resolutions

22    based on people's best guesses and methods of dealing with the

23    20, 30, 40 years after the five-year fiscal plans.

24          Now, specifically, FGIC raised abstention.  Your

25    Honor, abstention, which they say is your power to do and

HBFHCOM1

```
 1    they're right, of course, but abstention is in favor of another

 2    court.  So that really doesn't support their argument because

 3    if your Honor abstains, that would only be for another Court to

 4    pick up.  And as we said, and they haven't answered, Congress

 5    did not put Section 305 of the Bankruptcy Code into PROMESA.

 6    That's the power of the Court to suspend everything for a

 7    while.  So we submit there's a reason for that.  In this

 8    emergency, we should do what the government says and the board

 9    agrees with.  We should get these key issues resolved.  Thank

10    you.

11              JUDGE SWAIN:  Thank you, Mr. Bienenstock.

12              Now, Ms. Steege, for the retirees committee.  We've

13    allocated one minute.

14              MS. STEEGE:  Good morning, your Honor.  Catherine

15    Steege on behalf of the retirement committee.  The committee

16    that we represent represents 160,000 retirees that live on the

17    island.  Most of my clients do live on the island, throughout

18    the island, and they're suffering on a daily basis the same

19    hardships that counsel for FGIC are suffering.  But the

20    committee met, and we believe, notwithstanding what's happening

21    with regard to Hurricane Maria, that it's very important to the

22    retirees who depend on the fiscal soundness of the island that

23    the case proceed and make progress where it can make progress

24    over the next several months.  And so they voted unanimously to

25    oppose this stay because we do not believe it is in the best
```

1    interests of folks on the island.  The board and AAFAF have

2    been generous with extensions when that's required because of

3    circumstances on the island, and we think that that's

4    sufficient and the Court should continue to make what progress

5    it can on the issues that can be resolved over the next several

6    months.  So we do oppose the stay.

7            JUDGE SWAIN:  Thank you, Ms. Steege.

8        Ms. McKeen for AAFAF for two minutes.

9            MS. McKEEN:  Morning, your Honor.  Elizabeth McKeen

10   with O'Melveny & Myers on behalf of AAFAF.  And I want to note

11   that I'm joined here in the courtroom by Oreste Ramos from PMA

12   who's our local counsel who traveled here from San Juan.

13           JUDGE SWAIN:  Good morning, Mr. Ramos.

14           MS. McKEEN:  The government and the Oversight Board

15   have worked very closely together in the aftermath of the

16   hurricane to continue to prosecute these Title III cases and

17   related litigation because, as your Honor noted, moving forward

18   is an essential component of Puerto Rico's recovery.  There are

19   certain key legal issues like the one that was decided on

20   Monday that are too important to delay.  As Mr. Bienenstock

21   referenced, there are a variety of issues that can and should

22   move forward, and the parties have also worked together to

23   grant the adjournments and extensions on a case-by-case basis

24   where they're appropriate.  But the idea of a blanket extension

25   is something that both the government and the board have

1   concluded would actually be contrary to the interests of

2   Puerto Rico and its people in terms of doing whatever we can to

3   resolve matters as expeditiously as possible.

4         As your Honor noted, there are also some standing

5   issues with FGIC's request.  We respectfully believe that they

6   have no standing to seek a stay of cases which they aren't a

7   party, including COFINA, ERS, PREPA.  And so we respectfully

8   request that the best course of action here is to deny the

9   motion for a stay and to continue to allow the parties to

10   negotiate adjournments and extensions on a case-by-case basis

11   so that other key aspects of this can move forward.

12         In particular, I just want to note for the record that

13   AAFAF is fully committed to meeting the December 22 deadline

14   set by the board for the fiscal plans and that we continue to

15   work with the board every day to push these matters towards a

16   resolution.  Thank you.

17         JUDGE SWAIN:  Thank you, Ms. McKeen.

18         Mr. Despins for the Unsecured Creditors Committee for

19   two minutes.

20         MR. DESPINS:  Good morning, your Honor.  For the

21   record, Luc Despins from Paul Hastings on behalf of the

22   committee.

23         I'll be very brief on this.  The committee, to be

24   candid, initially had the exact same reaction as FGIC even

25   before they filed their motion, which was that it was really

HBFHCOM1

1    troubling to proceed with these cases given that people in

2    Puerto Rico were looking for basic things like water, etc.

3    However, after that initial reaction, we heard from the board,

4    and in this case I would say, more importantly -- I measure my

5    words here only on this issue -- more importantly from AAFAF,

6    AAFAF represents the government.  If the government of

7    Puerto Rico is saying that it is more important to its

8    residents, to the people of Puerto Rico, to proceed with these

9    cases, we believe that the committee is not in a position to

10   second-guess their judgment on that issue.  And, therefore, the

11   committee opposes the broad objection -- sorry, extension or

12   stay and, rather, would support the type of piecemeal

13   extension.

14          I'll give you an example.  The motion to approve a bar

15   date, which the Oversight Board withdrew at our request and the

16   request of the parties, we feel -- and we're very happy that

17   they did that because practically we just don't know how people

18   would have received notices of the bar date given that some of

19   them have lost their homes.  Going to the post office is maybe

20   not feasible, etc., etc.  So piecemeal is the way to go, but we

21   do share the feelings expressed by counsel for FGIC.  But,

22   unfortunately, we take our lead on this issue -- when I say "on

23   this issue" only from AAFAF which represents the residents of

24   Puerto Rico.  Thank you, your Honor.  (Continued on next page)

25

HBFsCOM2

```
 1              JUDGE SWAIN:  Ms. Pico, before you get up, we are
 2   continuing to have these sound difficulties, and apparently
 3   there is a big difficulty on the court solutions line, which is
 4   crackly.
 5              I am going to take a brief few minutes so that we can
 6   terminate that line and let people call back in, in the hope
 7   that they will be able to hear better.
 8              We'll just all sit while Ms. Ng organizes that.
 9              (Pause)
10              We have reestablished the court solutions line.  It
11   doesn't seem to be materially better, but we'll have to work
12   with it as it is.  Once again, everyone, please speak slowly,
13   clearly, and into the microphone.  I apologize to the people
14   who are having difficulty hearing us.
15              We will now continue with Ms. Pico's rebuttal argument
16   on the FGIC motion to stay the litigation.
17              MS. PICO:  Good morning, again.
18              Your Honor, I heard the debtor saying that we're
19   asking for an abstention.  That is a word and a term of art
20   that we are not using and that I would not characterize our
21   request for a stay for a limited time as an abstention.  I also
22   don't know if I heard correctly or I understood correctly that
23   the five-year plan that is being contemplated does not
24   encompass any debt service during that five-year term.
25              Did I hear that correctly?
```

1          JUDGE SWAIN:  Mr. Bienenstock, did you say that you

2     don't anticipate that the five-year plan will provide for any

3     debt service?

4          MR. BIENENSTOCK:  Yes.  Of course, that is subject to

5     your Honor's rulings as to whether any creditors are entitled

6     to the money before payment of essential services.

7          JUDGE SWAIN:  Yes.

8          MS. PICO:  So if that is correct, if they are not

9     contemplating any debt service for the next five years, that

10    means we have five years to litigate all these issues about

11    priorities or who comes first or who comes next or whether

12    PROMESA has a right to the sales taxes, if the sales taxes

13    remain because, as you also know, not only has it been ordered

14    not to -- there is an order for no taxes to be paid for the

15    next couple months, there has also been a discussion that there

16    may be no sales tax, that we're going to go back to the tax

17    program that we have before the COFINA, which is raising taxes

18    at the border.

19         What is the rush or what is the hurry, if there is

20    no money to be distributed in the next five years, to be

21    litigating who is going to go where first?  I mean, it doesn't

22    make any sense to us.  I believe of that if you litigate in the

23    abstract, when the facts come in, what you do is you run the

24    risk of all that abstract litigation turning upside down,

25    because all of a sudden the facts don't fit the abstract

HBFsCOM2

1    litigation.

2           Last but not least, all the money that is spent on

3    litigation is coming out of the coffers of the Commonwealth of

4    Puerto Rico, meaning all the litigation on the debtors side, on

5    the AAFAF side, that is coming from our coffers.  Is that where

6    the money should go or should the money go to turn the power

7    back on, to see ways of turning the power back on, to consult

8    on issues to get back our infrastructure together, not run on

9    litigation that is just going to leave money to attorneys, I'm

10   sorry to say.

11          Thank you very much.

12          JUDGE SWAIN:  Thank you.

13          To be clear, you do want litigation to go forward as

14   to whether the PROMESA structure is constitutional.  You have a

15   proposed exception from your stay, am I correct?

16          MS. PICO:  It is not that we want that to go forward,

17   it's about the only issue FGIC could carve out to say that is

18   not based on facts on the economics of the island, but it is

19   not that we are promoting that to go forward right now.  That

20   is just the one issue we carved out as really being purely

21   abstract.  But in FGIC's mind, that can wait the same way as

22   all other litigation.

23          JUDGE SWAIN:  Thank you.

24          MS. PICO:  You're welcome.

25          JUDGE SWAIN:  I have considered carefully all of the

HBFsCOM2

1    written submissions and all of the arguments made here in court

2    today.

3            For the following reasons, the request of FGIC to stay

4    the Title III proceedings and the pending litigation except for

5    the appointments clause litigation, which is how the request

6    was originally cued up, is denied.  FGIC has not cited any

7    specific authority granting the court broad power to implement

8    the extraordinary relief that has been requested and has not

9    demonstrated that it has standing to request stays of

10   litigation proceedings to which it is not a party.  The court

11   notes in this connection that there has been no request in the

12   adversary proceedings to which FGIC is actually a party for

13   stays of those particular proceedings.

14           The arguments, particularly those of the Oversight

15   Board and AAFAF, demonstrate the critical need for the

16   restructuring process, including any necessary legal

17   determinations as to the parties' relative rights and

18   obligations to continue in tandem with the formulation of

19   fiscal plans and with recovery efforts following Hurricane

20   Maria.  Working toward a timely and confirmable plan of

21   adjustment in these cases is the only clear path to ensuring it

22   progress toward the financial recovery of the Commonwealth of

23   Puerto Rico and the welfare of its people.  Absent consensual

24   resolutions of disputed issues of rights and priorities,

25   litigation is necessary to resolve fundamental disputes that

HBFsCOM2

1   can affect the structure and viability of any plan of

2   adjustment.

3           While, as the court noted at the first public hearing

4   of these matters back in May, Puerto Rico cannot afford the

5   time or the expense that it would take to litigate every one of

6   the disputed issues, and the court continues to urge focused

7   work in good faith with the mediation team in an atmosphere of

8   candor as to key factual issues, the parties will not be

9   precluded from calling upon the court to resolve legal issues

10  as the Title III process continues.

11          Therefore, the motion is denied and the court will

12  enter an order accordingly.

13          That concludes the portion of this hearing over which

14  I am presiding, and I will now turn the bench over to Judge

15  Dein, who will hear the remaining matters.

16          JUDGE DEIN:  Please be seated.

17          First, I would like to join Judge Swain's and Judge

18  Houser's introductory comments and expressions of support and

19  admiration for all those struggling and coping with really

20  unimaginable conditions in Puerto Rico, and these conditions

21  were so eloquently described to us.  Thank you.

22          On a personal note, I would also like to send my

23  greetings to everyone who is listening, and to the extent you

24  can hear me, those in Puerto Rico and those here in the

25  courtroom.  It is kind of nice to be in a courtroom where I

1    don't need to explain my accent.  It's nice to be in New York

2    every once in a while.

3            Housekeeping matters.  We will break at 11 o'clock for

4    lunch in Puerto Rico.  What I am going to try to stick to the

5    time collectively, so the time assigned to each motion will be

6    honored, but I have not divided it among the counsel.  We will

7    see how that works.  If it doesn't work, we will take a break,

8    and I'll give everybody a minute and a half to talk literally.

9            The first motion we have is Siemens' 2004 motion.

10           MS. SPRINGER:  Good morning.  Claudia Springer for

11   Siemens from the firm of Reed Smith.

12           Your Honor, this is a fairly straightforward motion.

13   By the way, before I start, I would like to also express my

14   tremendous sympathy on behalf of myself and my client for the

15   people of Puerto Rico and our understanding of what it must be

16   like.  Obviously, we are not experiencing that, but we have

17   tremendous empathy for the people who are going through this

18   terrible time there.

19           Your Honor, this matter actually goes back many years.

20   By way of background, Siemens, Siemens entity entered into a

21   contract a long time ago with the Highway and Transportation

22   Authority of Puerto Rico, which is a Title III debtor in this

23   case, that contract ultimately was in dispute.  There was

24   litigation among the parties for the contract and ultimately

25   resulted in a settlement that dates back to 2010.

HBFsCOM2

```
 1              That settlement, in order for Siemens to be a party to

 2     that settlement agreement, the Government Development Bank of

 3     Puerto Rico took on an obligation to guarantee the remaining

 4     payments that were due under that contract.  In reliance upon

 5     that settlement agreement, as well as the guarantee that was

 6     signed by the Government Development Bank of Puerto Rico,

 7     Siemens agreed to continue to provide services and resources --

 8              JUDGE SWAIN:  Judge Dein, apparently we lost Puerto

 9     Rico.  We have to stop and reestablish.  The electricity --

10     someone should say this into a microphone.

11              JUDGE DEIN:  Tell me what I am supposed to say.

12              JUDGE SWAIN:  The electricity is down in the Puerto

13     Rico courthouse.

14              JUDGE DEIN:  The electricity is down in the Puerto

15     Rico courthouse.  So this is not going through there at all, is

16     that correct?

17              JUDGE SWAIN:  No.  It will still be on the phone line,

18     but I guess we need to continue with apologies.

19              JUDGE DEIN:  We have no choice.  We will continue.

20     Hopefully Puerto Rico will be back online shortly.

21              MS. SPRINGER:  Thank you, Judge.  Over the years --

22              JUDGE DEIN:  I see somebody.  Is it Puerto Rico?

23              JUDGE SWAIN:  Sounds like they're back.

24              JUDGE DEIN:  Can Puerto Rico hear me?

25              There are smiles.  They can hear us.  Welcome back.
```

HBFsCOM2

```
1              Continue.
2              MS. SPRINGER:  Thank you, your Honor.
3              Over the years, there were numerous representations
4    made to Siemens by both the Highway Authority and the
5    Government Development Bank that the funds that were escrowed
6    to pay the balance of the settlement amount owed to Siemens
7    were, in fact, in the possession of the Government Development
8    Bank and in an escrow account.  The word escrow was used in
9    numerous documents and writings and verbally to describe the
10   status of that account.
11             THE COURT:  These were HTA funds that were in this
12   account?
13             MS. SPRINGER:  These were funds that ostensively, we
14   are trying to find that out, your Honor.
15             JUDGE DEIN:  That was your understanding?
16             MS. SPRINGER:  That was our understanding, that the
17   funds were provided to the Government Development Bank by HTA
18   to be put in escrow to pay Siemens upon the compliance or
19   performance by Siemens of certain conditions.  And they were
20   spaced out, and the last of these payments was supposed to have
21   been made in June of 2017.  And that amount, which is in
22   dispute at this point, but it is either $12 million or
23   $13 million.  Either way, there was supposed to be $13 million
24   in that escrow account.
25             When we became involved in this situation, it was
```

HBFsCOM2

```
 1   because all of a sudden in, I guess it was, June or July of
 2   this year, all correspondence and assurances, all of a sudden
 3   by the Government Development Bank, ceased in terms of those
 4   funds.  We then attempted to reach out to counsel for AAFAF and
 5   Government Development Bank to find out where the funds were
 6   and why they were not being turned over, since they were
 7   supposed to be held in escrow and not supposed to be property
 8   of the estate of the HTA estate.
 9            We were advised at that time, roughly, I believe it
10   was in July, that the term escrow account was not quite
11   accurate and that, in fact, there was no escrow account, even
12   though representations had been made for years that, in fact,
13   there was an escrow account.  And these representations, by the
14   way, had been made not by someone who would not know the
15   difference presumably between an escrow account and some other
16   type of account, but by fairly senior people at the Government
17   Development Bank.  Certainly those people in that position
18   should have known the difference between or legal significance
19   of escrow account versus a demand deposit account.
20            At that point, we found it necessary to file a motion
21   seeking a 2004 examination of the very people who had
22   represented to us over the years or represented to Siemens over
23   the years that, in fact, it was an escrow account, that, in
24   fact, there was $13 million in that escrow account specifically
25   for Siemens' benefit upon the performance of certain
```

1     requirements that had been met by Siemens.  And we advised

2     counsel to GDB that we would be -- and to AAFAF, that we would

3     be happy to meet and confer regarding how to deal with our

4     motion.

5          The only response that we got in terms of a

6     meet-and-confer was a request for us to withdraw our motion,

7     not simply to delay it, but to withdraw our motion upon the

8     submission of certain documents, and there was no telling us

9     what the documents would consist of.  We said we would be

10    willing to defer the 2004 exam to review the documents to see

11    what the documents provided, but we would not be willing to do

12    that permanently.  We felt it was absolutely critical to take a

13    2004 exam.

14         In terms of the 2004 exam, the 2004 exam will not only

15    impact Siemens' rights vis-a-vis whatever type of account there

16    may exist, but will also impact the estate of HTA.  Because to

17    the extent that Siemens has an account that does qualify under

18    the law as an escrow account, and to the extent that that

19    account contains funds that are sufficient to pay Siemens'

20    claim, Siemens will no longer be a creditor of a debtor and

21    that will enable the debtor to have fewer claims filed against

22    it.

23         In addition, there may be other similarly situated

24    creditors, such as Siemens, that were also misled, if that is

25    the case, into believing that there were separate trusts or

HBFsCOM2

1    escrows set aside for their benefit, and parties should know

2    that, what really happened here.

3           In addition, it sort of surprised me that AAFAF took

4    the position they did given the fact that the Oversight Board,

5    which is represented by AAFAF here, has stated that they are

6    independent, that they want there to be -- they want to restore

7    confidence in the capital market for Puerto Rico going forward,

8    they want to essentially make sure that the problems that

9    occurred in the past vis-a-vis Puerto Rico and its access to

10   palpable market funds doesn't recur.  And one would think that

11   if the very people who assured Siemens that funds were

12   protected and held in escrow are still working for either AAFAF

13   or the Government Development Bank and still have access to

14   funds, those people ought not to be there and that ought to be

15   an interest on the part of the Oversight Board, AAFAF, and the

16   Government Development Bank.

17          For all of those reasons, we believe that we are

18   entitled to take our examination under 2004, we believe that we

19   have met our burden, and that there is not going to be any

20   undue hardship caused by it.  We have also stated to AAFAF that

21   we expect to come to Puerto Rico to do so, and we would be glad

22   to participate, as part of other 2004s that I know your Honor

23   is hearing today, so that we cause as little disruption as

24   possible in taking our 2004 examination.

25          Thank you.

HBFsCOM2

```
1            THE COURT:  Thank you.

2            MR. RAMOS:  Good morning, Magistrate Judge Dein and

3    colleagues and members of the court.

4            First of all, I would like to join in the words of

5    District Counsel Pico in thanking the court and their

6    expressions of well wishes with respect to the people of Puerto

7    Rico.

8            My name is Oreste Ramos, the law firm of Pietrantoni

9    Mendez & Alvarez in San Juan, Puerto Rico, and I represent the

10   Government Development Bank for Puerto Rico in this matter.

11           Your Honor, there are essentially three components why

12   the rule 2004 motion filed by Siemens is inadequate and

13   inappropriate in these proceedings.  As we know, rule 2004

14   casts a very broad swath.  However, it is only meant to protect

15   the estate, not to protect private causes of action by

16   particular creditor vis-a-vis a third party, in this case, GDB.

17           Now, this case is straightforward, as the movant

18   suggests, but in the other direction.  Essentially, what

19   Siemens wants is to "determine the appropriate characterization

20   of the escrow account held at GDB."  Nomenclature aside, the

21   fact of the matter is that, as a matter of Puerto Rico law --

22   and I would like to cite to the case of Ocasio v. Municipio de

23   Maunabo, 121 D.P.R. 37, that is a 1988 Supreme Court case --

24   from a legal standpoint, a government instrumentality of the

25   central government of Puerto Rico or its municipalities or
```

1    municipal corporations cannot assume a contractual obligation

2    absent a binding written legal contract that establishes and

3    defines what those obligations are.

4             JUDGE DEIN:  You're not telling me that they couldn't

5    have set up an escrow account?

6             MR. RAMOS:  Your Honor, that is precisely what we are

7    saying.  The reason why we are saying that is because an escrow

8    account, an escrow structure, creates responsibilities on the

9    part of the escrow account that are fiduciary in nature.  And

10   for there to have been a responsibility assumed by the

11   Government Development Bank to segregate funds from its asset

12   pool, from its deposits, which is where those funds are right

13   now, and segregate them to an escrow account, that without

14   exception, and those have been the words of the Puerto Rico

15   Supreme Court in the Maldonado case, those obligations have to

16   be written in by way of a contract.

17            So essentially the funds where they are right now, and

18   that was certified in the certification by Jose Santiago, the

19   chief financing officer of the GDB, the account, the monies

20   right now are held in deposits at GDB.  So essentially we all

21   know that the GDB is going through a restructuring process.

22   That process is part of an RSA, which is bound to come up

23   before this honorable court by way of a Title VI.  It is in

24   that proceeding, along with the contest of all other creditors

25   that may have an interest over the deposits held at GDB, that

1  this issue should be raised, not in this proceeding.

2         It is very telling that Siemens has opted not to show

3  good cause to establish the need for the rule 2004 examination

4  by the very fact that they have not presented one piece of

5  paper establishing what the agreements were between the

6  parties.

7         JUDGE DEIN:  Well, they certainly presented

8  correspondence which has referred to this escrow account.

9         MR. RAMOS:  Yes, your Honor.  They presented

10  correspondence, but case in point, Exhibit A of their docket

11  272A, what it cites to as the binding authority by which GDB

12  would be required to pay those sums of money would be the

13  guarantee agreement, and that guarantee agreement was not

14  included as part of the materials.  In fact, the guarantee

15  agreement has an entire clause that says that that guarantee

16  agreement contains the entirety of the agreements between the

17  parties as it relates to this matter.

18         So with respect to the correspondence that counsel

19  enclosed with its motion for a 2004, they cite to the

20  guarantee.  Not only that, but in the opposition to the 2004

21  motion filed by GDB on Exhibit 2, docket 3212, the letters sent

22  on the 23rd of June of 2017 by Siemens to President Christian

23  Sobrino-Vega of the GDB precisely invokes the guarantee

24  agreement as the nucleus or the source of the obligation that

25  the bank has with respect to the payment of those monies.

HBFsCOM2

1          Now, we understand, your Honor, that this is something

2     that should be entertained not as part of this proceeding, but

3     that it should be entertained as part of the proceedings at a

4     Title VI moment, if that is the case.

5          JUDGE DEIN:  But do you agree that if the money is in

6     escrow, it is not part of HTA's estate?

7          MR. RAMOS:  If the money is in escrow, it would not be

8     a part of HTA's estate and therefore it would be payable to

9     Siemens, and therefore it would not benefit the estate, it

10    would benefit them directly.

11         JUDGE DEIN:  All right.  But the inquiry is directly

12    related to what assets are included in the estate?

13         MR. RAMOS:  Yes.  And that answer, your Honor, was

14    given already by GDB by stating, even as a matter of law, that

15    the escrow account cannot be established absent a contractual

16    document highlighting and spelling out what that escrow

17    agreement would say.  Counsel for Siemens, counsel for Siemens

18    cites to case law from the First Circuit, but none of that case

19    law is really applicable to this matter because it pertains to

20    non-governmental entities, and therefore it need not abide by

21    the municipality of Maunabo and its progeny under Puerto Rico

22    Supreme Court jurisprudence.

23         Now, we believe, your Honor, that what is left, the

24    claim that Siemens would have should be either entertained by

25    way of some adversary proceeding, but not as part of this

HBFsCOM2

1    particular proceeding, because where the monies lie is in a

2    deposit account, and those monies are not part of an

3    estate-benefiting endeavor.

4         JUDGE DEIN:  The problem, as I see it, though, is that

5    those are based on your representations, and so the question

6    becomes whether or not Siemens is entitled to explore that.  It

7    seems to me that this is not a situation where the 2004 should

8    be used to challenge all escrow accounts or potential escrow

9    accounts or the standing of anybody else or whether or not the

10   appropriate people are running GDB.  It also seems to me that

11   the 2004 should not be used as the basis of an adversary

12   proceeding either, to the extent that Siemens contends that it

13   has a claim against the GDB based on a guarantee.  That is not

14   the subject of a 2004.

15        But it does seem to me that 2004 is appropriate for

16   the very limited inquiry as to whether or not these accounts,

17   these funds are held in an escrow account, because that deals

18   with whether or not these assets are part of HTA's estate.

19        That's where I am going.

20        MR. RAMOS:  I understand that, your Honor.  The truth

21   of the matter is that the information that was already given to

22   Siemens, it is either an escrow account or it is not an escrow

23   account.  So going beyond that, we feel, would essentially push

24   the boundaries of what is reasonable as far as a 2004 --

25        JUDGE DEIN:  I agree that the inquiry is whether this

HBFsCOM2

1    is an escrow account or not an escrow account, but I don't

2    think that Siemens needs to take your word for it.  I think

3    Siemens is allowed to ask for the backup documents of it and I

4    think it is allowed to take a deposition.

5         Let's start with one deposition.  Can we do that?  I

6    am going to ask you to see if you can meet and confer on the

7    scope of it, but the 2004 will be limited to one deposition

8    document request and the inquiry being simply whether or not

9    these funds are held in an escrow account.

10        OK?  See if you can work out a proposed order on that,

11   and if not, let me know and I'll draft something.

12        MR. RAMOS:  Yes, your Honor.

13        JUDGE DEIN:  Thank you.

14        MS. SPRINGER:  Thank you, your Honor.

15        JUDGE DEIN:  I did it in 20 minutes.  All right.

16        The UCC 2004, I think there is a total of 30 minutes

17   for this.

18        MR. DESPIS:  Yes, your Honor.

19        Good morning, Judge Dein.  For the record, Luc Despins

20   with Paul Hastings, counsel for the official committee.

21        Your Honor, this is a motion that we filed

22   approximately three and a half months ago.  I'm not going to

23   repeat all of it.  I know you're very familiar with it.

24   Unfortunately, I think that this is one of the motions that may

25   have been a victim of the hurricane in the sense that there

HBFsCOM2

1    were so many delays that we couldn't get to it.  Now we are

2    getting to, I guess, to the main event.

3              This is the motion that dealt with three entities or

4    members, Santander and Banco Popular, those two entities had

5    received more than a billion dollars in fees arising from the

6    sale of bonds of Puerto Rico bonds, and also GDB, which is the

7    equivalent of the secretary of finance, Department of Finance

8    in Puerto Rico.

9              In the first thing, your Honor, as I mentioned the

10   hurricane.  I was wondering, does the hurricane or the impact

11   of a hurricane change anything in terms of the relevance of

12   this motion?  I think that it does not, because there will be a

13   plan of adjustment, there will be claims that need to be dealt

14   with.  I think, if anything, this motion is even more relevant

15   now that we heard Mr. Bienenstock say that they will not be, at

16   least the Oversight Board does not foresee debt service on debt

17   under the plan that they are looking at for the first five

18   years or something along those lines.

19             So that looks fairly dire and therefore the exercise

20   of seeing if we can increase for creditors is even more

21   relevant.  I propose, your Honor, to address just a few points

22   this morning.  I will take 15 minutes, but only 12 minutes

23   initially, and reserve three minutes for reply.

24             During the 13 minutes I have I want to address four or

25   five points.  The first one is the scope of the statute of the

HBFsCOM2

1    investigation under the statute and also the scope of the

2    investigation proposed by the board and proposed by the

3    committee in fact.  At the last hearing we had in August, your

4    Honor, there was an assumption that the board's investigation

5    was completely duplicative or that our investigation was

6    completely duplicative of the board's investigation first from

7    a statutory point of view that they had a right to do all of

8    what we want to do and also in fact.

9           I want to talk about, first, the statute.  I think it

10   is very important --

11          JUDGE DEIN:  I want you to cover that, but I also want

12   you to address the COFINA discovery, because the last time it

13   hadn't started yet.

14          MR. DESPIS:  Yes.

15          JUDGE DEIN:  Clearly now, it has.

16          MR. DESPIS:  Yes.

17          JUDGE DEIN:  I need to understand where that fits in.

18          MR. DESPIS:  Yes.  I will come to that, your Honor.

19          So the first issue is, from a statutory point of view,

20   what is the board's authority to conduct the investigation they

21   want to conduct.  It is in Section 104(o), which talks very

22   precisely about an investigation of disclosure and selling

23   practices with respect to retail investors.  It doesn't talk

24   about other things.  That does not include fraudulent transfer

25   claims or charging billions of dollars in fees to the

1    Commonwealth for issuing bonds that maybe should not have been

2    issued.  It does not include issues of whether the bonds were

3    issued in violation of Puerto Rico Constitution and whether

4    people -- and by that I mean the targets here -- were aware of

5    that or were involved, trying to circumvent that.

6            But Mr. Bienenstock at the last hearing said, we have,

7    the board has, this general power because the board is the

8    trustee in the case.  Your Honor, that would be a very

9    compelling point, but for the fact that a trustee in Chapter 11

10   would have incredibly broad power.  We do not dispute that.

11   And I want to take you to Section 1106, paragraph (a)(3), which

12   says that the trustee may investigate the acts, conducts,

13   assets, liabilities, and financial conditions of the debtor,

14   etc., etc.  So that is the power of a Chapter 11 trustee, but

15   that section does not apply at all in PROMESA.

16           However, PROMESA has the identical language by

17   importing Section 1103 of the code, 1103(c)(2), which says the

18   committee may do that.  So, first, from a essentially

19   construction point of view, your Honor, we disagree that the

20   assumption should be that the Oversight Board can't occupy the

21   entire field that the committee wants to occupy.

22           But let's assume for a second you don't buy that and

23   you believe that they have that broad power.  The question is,

24   are they, in fact, doing exactly what we want to do, which is

25   to look at claims and cause of actions against folks, folks

HBFsCOM2

1    here being these three targets here.

2            Here, this is not just argument, your Honor, this is

3    coming right from them, and it is in their status report in

4    September.  If you look at our status report in September,

5    docket number 1284, page 8 out of 16, you go to paragraph 20,

6    and you will see that document is marked to show changes.  You

7    might say, why is it marked to show change?  This is a draft

8    they sent to us of what their mission statement would be, what

9    their plan would be, and then they corrected it to reflect what

10   is in the final work plan.  If you look at paragraph 20,

11   somebody in the investigator's office decided that they wanted

12   to do exactly what the committee wanted to do.  It says in

13   (2)(ii), whether identifying potential claims under Puerto Rico

14   law, under the bankruptcy law or other federal law, as well as

15   the targets of those claims, the validity of debt, etc., etc.

16           What happened is that that was their initial thought,

17   but somebody with higher authority crossed that out.  So what

18   they found with the court, that is why it is so important to

19   look at that draft at docket 1284-2, paragraph 20, somebody

20   crossed that offer to replace it with what I would call a

21   Reader's Digest, you know, Smithsonian report, which is a

22   report regarding the relationship between the debt and Puerto

23   Rico structural budget deficit, a comparison of how Puerto

24   Rico's debt practices compare to the debt practices in large

25   municipal jurisdictions, which is fascinating, but the

1    creditors have no interest in that.  The creditors want money.

2    So that is the --

3         JUDGE DEIN:  But isn't it the next provision that is

4    the one that they are relying on where it says pursuing

5    investigations and disclosures and selling practices in

6    connection with bond issuances by the common law?  Isn't that

7    within the authority of the investigator?

8         MR. DESPIS:  These are retail selling practices.  It

9    does not deal with the issue of whether there are claims

10   against the underwriters based on the theory that we have

11   explained, the theory being as follows:  There are two banks

12   that were on almost all debt offerings by the government, which

13   is Santander and Banco Popular.  And folks from these banks,

14   including two of the members of the Oversight Board, basically

15   played musical chairs where they were at Santander for three

16   years, they were at GDB for three years, then they were at

17   Banco Popular for three years.  And if you have the same set of

18   facts here in the U.S., where you have Goldman Sachs and Morgan

19   Stanley do over 99 percent of all federal debt offerings, and

20   that the same folks from these two banks went to work for the

21   entity at the fed that decides who is going to be hired as an

22   underwriter of federal debt, there would be a scandal over

23   that.

24        That is the issue we are looking at, and that is not

25   the issue they are looking at.  That is not part of their

HBFsCOM2

1    described mandate.  So, in fact, I don't believe they are

2    looking at the issues we want to look at.  But let's assume

3    that, again, you're not convinced by these documents.  Let's

4    look at the statements of the investigator at the October 31st

5    board meeting in San Juan.  He stated, "We are not getting paid

6    to sue anyone.  We are not getting paid to find causes of

7    action.  We are not getting paid to find cause of action.  Our

8    focus always being on restoring Puerto Rico's access to capital

9    markets."  Which is fascinating, again, but from the creditors'

10   point of view, these words are ominous.  And they tell us there

11   is not going to be claims brought or reviewed against these

12   principal institutions.

13          So we believe that not only is there no statutory

14   overlap, but there is no overlap in fact.  Now, if you disagree

15   with all of that and you think that, in fact, we will look hard

16   at these issues and they have the statutory authority to do it,

17   I would still argue, your Honor, that we should be authorized

18   to conduct our own investigation, because that is the only way

19   to ensure that there is a thorough vetting of issues involving

20   these three entities, which is GDB, Santander and Banco

21   Popular.

22          Why do we say that?  Because, one, the board is tone

23   deaf to issues that they face themselves regarding these three

24   entities.  The first is, your Honor, noted that at the first

25   hearing, they did nothing regarding this investigation for 11

HBFsCOM2

1    months, but then when we filed a motion, they said, OK, we're

2    doing it, and with great fanfare press release, we're doing it.

3    And we created a special conflict-free committee, of course,

4    chaired by Mr. Carrion.  That is until we told them, wait a

5    minute, Mr. Carrion's family was involved in forming Banco

6    Popular.  How does that work?  Then they removed Mr. Carrion

7    from the special board.  And then they told the court, we are

8    going to get a world class investigator who is going to look at

9    these issues, and they did hire someone.

10        The first time we interfaced with that person, we

11   said, OK, the committee needs to know what is your relationship

12   or what any relationship you've had in the past with these

13   three targets or members of the board, and you can see that is

14   attached as Exhibit C to our status report in September,

15   September 12, where basically there was a game of cat and mouse

16   where I would say, describe your relationship.  He would say,

17   my firm has no conflicts.  I said no, I didn't ask about

18   conflicts.  I want to know what relationships you have had.

19   Eventually, he said, well, I met Mr. So-and-so 12 years ago.

20   And I said, OK, what about the other person?  No response.

21   What about Santander?  No response.

22        And now that they know there is a hearing.  In their

23   status report, they draw up a footnote which, again, is full of

24   non-disclosure.  They say, well, we inquired about his

25   involvement when he was at Davis Polk, and we never mentioned

HBFsCOM2

1   Davis Polk.  We just wanted to know the relationships he has

2   had, any relationship he has had with these institutions.  And,

3   again, he is not coming forthwith the full story.

4           The point here is we are not trying to stop the board.

5   The board can do their investigation.  They can do that, but it

6   is to explain to the court why the creditors are not satisfied

7   with the board doing the investigation as to those three

8   entities.  We want to be clear, we are not trying to stop the

9   board, we are just trying to be allowed ourselves to do an

10  investigation only as to those three things, only as to

11  document production at this time.  Your Honor, we are not

12  trying to to anything regarding depositions at this point, at

13  this time.

14          The next point I want to hit, your Honor, is that

15  courts have repeatedly allowed competing or dual investigation

16  involving examiners and creditors' committees, and the parties

17  have not cited any cases to the contrary.  Enron, Lehman,

18  Caesars, Refco, all involve -- and the court is basically

19  saying that the examiners have different roles than committees.

20  Committees are there to increase the pie.  Examiners are not

21  about that, they want to write a book.  I am not saying this in

22  a negative way, I am just saying that their angle is not to

23  increase the pie.  That is why courts tolerate the duplication

24  that is necessary in that contest.

25          The next point, your Honor, is the investigation that

HBFsCOM2

1   we want to take that is crucial to this case and to the plan

2   process, because the plan process will unfold very soon.  So

3   this goes beyond the pie-increasing exercise, your Honor.  It

4   goes to the issue of which creditors are going to get a

5   distribution.  Are we going to give a distribution to creditors

6   that have bonds that may be challenged without having the full

7   investigation?  You can't do that.  Are we allowed to vote on

8   the plan?  I can assure you, your Honor, that there will be --

9   I hope that is not the case -- but if history is an indication

10  in this case, there will be a divided creditor body on this

11  plan.

12          The point here is that the question is who is going to

13  vote?  Are we going to allow people that have bad claims to

14  vote?  In order to do that, we need to do the investigation.

15  The investigator will not be done by the time we get to the

16  plan.

17          I hope your Honor will reject the cynical argument

18  that was made last time, which is why give the committee the

19  right to investigate because they can't sue, because under 305,

20  the court cannot interfere with the debtor without the consent

21  of the board.  And since the board will not give consent,

22  what's the point of the committee investigation?  The point is,

23  that is a very cynical argument.  You have to assume, to buy

24  into the argument, that if the committee found good claims,

25  that the board would not bring them or that the court would not

1    order that some of these claims be brought under 928 of the

2    bankruptcy code, which that is besides 305.  925 clearly allows

3    the court to appoint a trustee to pursue claims if the debtor

4    does not want to pursue them.

5         More importantly, Section 502(d) of the bankruptcy

6    code provides that any claim of a recipient of a fraudulent

7    transfer shall be disallowed.  That can be brought on by an

8    objection which the committee could file.  In order to do that,

9    to bring that objection, you need to do an investigation.

10        Let me address the point you raised, your Honor, which

11   is the COFINA litigation.  So there is discovery going on, and

12   I want to make sure than your Honor is familiar with the scope

13   of that investigation.  There is litigation going on regarding

14   the ownership of the SUT, both the one that is in escrow and

15   the one that is to be collected in the future.  In that

16   litigation, we are taking discovery or in the process of taking

17   discovery of Santander and Banco Popular and GDB.

18        However, your Honor, I want to be very clear, this

19   does not get into the 2004 adversary proceeding issue.  These

20   parties -- GDB, Banco Popular, and Santander -- are not parties

21   to that adversary proceeding.  They are not parties.  They are

22   not targets.  So therefore the discovery we are getting from

23   them there is not the same as the discovery we are seeking

24   here.

25        In those instances, we want to know what e-mail

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HBFsCOM2

1   exchange or whatever they have regarding the issue of ownership

2   of the SUT, whether that was discussed or not.  The discovery

3   we are proposing to take here, your Honor, is discovery

4   regarding whether they knew, for example, that the debt that

5   was raised violated the Puerto Rico Constitution, whether there

6   were conflicts of interest involving this rotating door point

7   that I made before.  It is different than the COFINA litigation

8   discovery.

9        JUDGE DEIN:  Part of my problem is I feel like you're

10  a moving target.  Your initial papers said you wanted to find

11  out the causes of the Puerto Rico economic conditions, and now

12  you say that's outrageous, we would certainly never do anything

13  that broad.

14       You have filed papers that say that you are

15  undertaking extensive discovery in the COFINA common law

16  litigation, and that allowing this 2004 would be a rather

17  modest extension of the work that you are already undertaking.

18       My question is, if you would able to define the modest

19  extension and ensure that the investigator got that modest

20  extension, wouldn't that get you all the information that you

21  need?  I'm just trying to figure out what you're doing here.

22       MR. DESPIS:  Well, from our first motion, remember, it

23  was directed at three entities only from the beginning.

24       JUDGE DEIN:  Right, but it started very broad, and

25  then you said it could be narrowed and it could be more

HBFsCOM2

```
1    focused.  Certainly after what we've heard today and what we've
2    been hearing and what we know from the beginning of this case,
3    that regardless of whether other cases with unlimited funds,
4    with unlimited parties, can take extensive discovery again and
5    again by different entities, that is not the situation that we
6    have here.  So we have to make sure that what we're doing here
7    is the most efficient and actually going to happen, as opposed
8    to spending months and months of lawyers exchanging letters.  I
9    am trying to figure out how to contain this.
10           MR. DESPIS:  Let me be precise.  The point that was
11   made in the motion regarding our involvement of the COFINA
12   discovery was that we are already interfacing with lawyers for
13   Banco Popular and Santander.  Therefore, there has been some
14   brush-clearing that is normal in any discovery process, but
15   that discovery is not the same as the discovery we are talking
16   about now.  That discovery is limited to the COFINA matter.
17              And I mentioned, there are other issues that have got
18   nothing to do with COFINA.  For example, did the issuance of
19   some GO bond debt violate the constitutional limitations.  That
20   has nothing to do with COFINA and that is the type of extension
21   that we're talking about in terms of Santander and Banco
22   Popular and GDB, which is not part of COFINA.  The point about
23   being modest is we are already interfacing with these people.
24   There is minimum disruption that is going to happen if we
25   enlarge that discovery to cover these points.
```

1          Your Honor, at the last hearing, you said I want the

2   parties to talk about potential allocation or joint efforts and

3   all that, and there was one call that I recall with the

4   investigator, and since then there have been no offers of

5   sharing, the reports they filed are very clear, which is they

6   are doing it all and the committee should stand down.

7          Your Honor, we don't believe that that is an

8   acceptable resolution for the reasons we mentioned not only

9   because this will be relevant in the plan process, but because

10  given that there is likely to be very low recoveries here, the

11  creditors are entitled to have somebody who is aggressively

12  pursuing those claims, if there are meritorious claims.  If

13  they're not, they're not.

14         But remember, there are billions of dollars in fees

15  that were paid.  Billions of dollars.  I am not saying

16  automatically because I say that, that the billions of dollars

17  would come back, but it is certainly important to look at these

18  issues.

19         Thank you.

20         JUDGE DEIN:  Thank you.

21         (Continued on next page)

22

23

24

25

1          MR. MUNGOVAN:  Good morning, your Honor.  Timothy

2     Mungovan from Proskauer Rose for the Oversight Board.  I want

3     to recognize our Puerto Rico counsel who's in the courtroom

4     today, Hermann Bauer from O'Neill & Borges.

5          JUDGE DEIN:  Welcome.

6          MR. MUNGOVAN:  Your Honor, if I may, I'd like to

7     reserve, hold nine minutes, to take nine minutes of the 15

8     minutes and to allocate three minutes to Cathy Steege of the

9     retiree committee and three minutes to Liz McKeen or her

10    partner, Bill Sushon, on behalf of the AAFAF.

11         JUDGE DEIN:  So much for my plan.  OK.

12         MR. MUNGOVAN:  Thank you, your Honor.  To start, the

13    UCC cannot establish good cause for the examination that it

14    seeks at this point in time, and the motion should be denied

15    for that reason, your Honor.  When we were before you in Boston

16    in late August, at the end of a long hearing, you had

17    essentially indicated that you were interested in hearing going

18    forward about two things: scope, the scope of the investigation

19    that the independent investigator that would be appointed by

20    the Oversight Board, what the scope of that investigation would

21    be, and to have the constituent parties discuss and coordinate

22    where possible.  And I want to address both of those things.

23         First, with respect to scope, the Oversight Board did

24    appoint an independent investigator.  That is the law firm of

25    Kobre & Kim.  That independent investigator has commenced their

HBFHCOM3

1   investigation as of September 1.  On October 30 they issued a

2   public report.  That public report has indicated or stated the

3   progress of their independent investigation to that point in

4   time.  It is broad-reaching.  Among other things that they are

5   looking at are as described in the report, witnesses, subjects,

6   targets, and causes of action, and they're working to preserve

7   the relevant evidence.  They've been in contact with 84

8   different parties as of October 30, and they had reached an

9   agreement with 79 of those parties to preserve their evidence

10  and documents.  Among those parties, among those 79, your

11  Honor, are the three that the Unsecured Creditors Committee

12  would like to conduct an examination with respect to.  That is,

13  the Banco Popular entities, the Santander entities, and GDB.

14  All three of those entities are among the parties that the

15  independent investigator has contacted and reached an agreement

16  to preserve documents and information.

17          With respect to the coordination, I want to address

18  that directly.  I want to contrast the coordination that the

19  retirees committee has engaged in with the independent

20  investigator with the lack of cooperation by the Unsecured

21  Creditors Committee.

22          The retirees, as I'm sure you will hear from my

23  colleague Ms. Steege, reached out directly to the independent

24  investigator.  They had a discussion.  They proposed an

25  approach whereby the retiree committee would execute a

1   nondisclosure agreement.  The nondisclosure agreement was

2   drafted by Kobre & Kim.  It was commented on by the retirees.

3   They reached an agreement and executed it.  That same document

4   was shared with counsel for the Unsecured Creditors Committee,

5   Paul Hastings.  After some discussion, notwithstanding

6   Mr. Despins' suggestion that there had been no contact, there

7   has in fact been contact, email contact.  I have the emails

8   here if you're interested in them between Kobre & Kim and Paul

9   Hastings.  My understanding is that a nondisclosure agreement

10  has not been reached yet.  If, however, a nondisclosure

11  agreement is entered into, then the Unsecured Creditors

12  Committee will obtain the same rights that the retirees have.

13  And that is, in essence, they'll have the ability to review

14  documents subject to certain conditions.  They'll have the

15  ability to attend depositions.  They'll have the ability to

16  suggest questions in advance of those depositions.

17          So I would say to your Honor, let's be practical in

18  the way that we're approaching this.  An investigation has

19  started.  An investigation is underway.  The independent

20  investigator has stated that they expect that their

21  investigation will take approximately 200 days to complete and

22  issue a report.  From September 1, 200 days takes us into late

23  March.  Let's assume that it goes a little longer than that

24  into April.  By April the investigation, at least based on

25  current projections, will be completed and a report will be

1    produced.  At this point in time, the retirees have the ability

2    to ride along, if you will, with that investigation.

3         What I would suggest to your Honor is that the UCC

4    should evaluate the NDA.  They should sign the NDA.  If there

5    are documents that they believe that should be requested, they

6    should make that known to the independent investigator and say:

7    Hey, you should suggest seeking these additional documents, if

8    you haven't already, from those three entities.  And the

9    independent investigator can evaluate whether to do it or not.

10        At the end, in March, if the UCC is not satisfied --

11   as we all said in August before your Honor in Boston, if the

12   UCC is not satisfied with the scope, depth, intensity, or what

13   have you, with respect to that investigation, they can come

14   back here and renew their 2004 motion.

15        JUDGE DEIN:  But that's late down the line.  What I

16   didn't get and what I was hoping for was more of a commitment

17   to having the UCC perhaps give the subjects to the

18   investigator, but having the investigator say, yes, we're doing

19   it; and if they're not, having a forum to have that fight.  I

20   don't see that that happened.

21        MR. MUNGOVAN:  Thank you, your Honor.  I think that

22   there's a possibility for it to happen, but the condition to it

23   happening is to have a nondisclosure agreement in place.

24   What's the harm in entering into a nondisclosure agreement and

25   then having that?  And if the UCC suggests the topics, the

HBFHCOM3

1    documents that should be requested, and if the investigator

2    doesn't engage, then there may be a basis to come back here.

3    But there's no basis today for the UCC to stand here and say,

4    we have to do our own investigation without having made any

5    genuine effort to engage and to have a discussion.  And what we

6    can find out from Ms. Steege is -- you should pose that same

7    question to Ms. Steege to see how she will handle it on behalf

8    of the retirees in connection with her discussions, because she

9    stands in the same position, as a practical matter, on behalf

10   of the retirees as Mr. Despins stands for the unsecured

11   creditors.

12         JUDGE DEIN:  The other thing that we talked about was

13   a potential protocol for getting there, so a timetable that

14   says these are the documents that we're requesting, this is

15   when you'll let us know.  There is legitimacy to the argument

16   that the status reports seem to come out very close to court

17   hearings, and they're general.  I don't know whether there's

18   more detail being provided to the UCC or not.  Certainly, when

19   you read the status report, it's impossible to determine where

20   the investigation is actually going.

21         MR. MUNGOVAN:  Your Honor, that's a fair comment on

22   the document as it is presented.  And in asking the independent

23   investigator that type of question, there is a tension between

24   sharing what is and should be made public for everyone to

25   understand what is being undertaken while preserving the need

HBFHCOM3

1    for some investigatory confidentiality or privacy with respect

2    to the actions that it's undertaking, but some of those

3    concerns about confidentiality are obviated by a nondisclosure

4    agreement.  And the ability to ride shotgun, if you will,

5    should obviate many of Mr. Despins' concerns.  And to the

6    extent that those concerns remain after an NDA and after some

7    effort at a dialogue with the independent investigator, then I

8    expect that the UCC, if they're not satisfied, will come back

9    here.

10           But at this point in time, I think that there's a

11   marked distinction between what the retirees have done,

12   frankly, and what the UCC has done in terms of attempting to

13   not only be engaged in and understand what is understandable

14   but also to influence, where they're able to, the scope and

15   direction of the investigation.

16           JUDGE DEIN:  Would you anticipate that under the NDA,

17   if that was signed, that all the documents would be available

18   to the UCC?

19           MR. MUNGOVAN:  I can't say all of the documents, your

20   Honor, but the NDA is a document that both the UCC, the

21   retirees, and we -- I have a copy of it.  What I would suggest

22   is, based on the terms that are set forth, there are conditions

23   under which counsel can see the documents, but my understanding

24   is they will have a significant ability to review documents.

25           JUDGE DEIN:  Thank you.

1              MR. MUNGOVAN:  Thank you, your Honor.

2              MS. STEEGE:  Good morning.  Katherine Steege on behalf

3      of the retiree committee.

4              JUDGE DEIN:  Good morning.

5              MS. STEEGE:  I'd like to pick up on your Honor's point

6      about the situation that we find ourselves in and the need to

7      engage in the most efficient and cost-effective investigation

8      possible under the circumstances, because what we're talking

9      about here is getting to the facts.  Mr. Despins' concerns

10     about whether or not the investigators are going to develop

11     causes of action, and the like, what we really want are the

12     facts.  Both committees have a statutory duty to uncover what

13     the facts are and to use that information in the way that they

14     feel it's appropriate on behalf of their constituents, either

15     arguing in the plan of adjustment that certain creditors'

16     claims should be reduced, using it for settlement discussions

17     to try to reach consensual resolutions with regard to that.

18     But the basic starting point isn't legal briefs on the law in

19     these things, it's getting to what the facts are so that each

20     of us can do that analysis.  And that's what we're talking

21     about in this investigation.

22              The board, frankly, and its investigators have the

23     greatest powers available to do that.  They don't need to come

24     back to this Court to examine witnesses, take formal testimony,

25     do the types of things that will need to be done to get all the

HBFHCOM3

1    facts forward.  So they have cost efficiencies built into how

2    they can proceed.  They own these causes of action if there are

3    causes of action, and they've started and they're moving

4    forward.

5            I'd like to address why we're not concerned that this

6    investigation will be a whitewash that Mr. Despins has

7    suggested or that we won't get all the information or that

8    things won't be requested to really know what needs to be done

9    here in terms of any other claims of these parties that might

10   be the target of the investigation.  And that's because our

11   agreement is more than a nondisclosure agreement.  It's a joint

12   interest and cooperation agreement.  It protects the ability to

13   communicate with the investigators about the issues that we

14   think need to be investigated.  It requires both parties to

15   cooperate with each other.  They have indicated that they will

16   seek documents that we request.  They will ask the questions

17   that we want asked.  If it's appropriate, they will allow us to

18   be present when the questioning occurs.

19           Now, sometimes that might not be in the best interests

20   for lots of reasons when you're doing an investigation, and

21   I've worked on the Lehman report, wrote sections of it.  I know

22   how this process works.  Sometimes you don't want a gang of 30

23   interviewing someone.  Sometimes it makes sense for one person

24   to do that, taking questions from the group and walking into a

25   room and having a conversation to get the facts.  They've

HBFHCOM3

```
1    agreed to cooperate with us with regard to all of that so that

2    we will get the facts that we need to find out what really

3    happened and to use that appropriately in connection with this

4    case.

5            In terms of reviewing documents, the qualifications

6    aren't allowing counsel to see it, but in some instances

7    parties will designate documents as confidential and, as your

8    Honor is aware, they'll say it's attorneys' eyes only.  And,

9    obviously, we have to respect that, and we have to have our

10   parties, counsel, and any experts that we might have sign the

11   appropriate paperwork with any type of protective order

12   arrangements that are reached with third parties that are

13   producing their documents.  Those are the types of restrictions

14   that are there.  They're going to make available to us their

15   database and again work with us so that this investigation gets

16   us the facts, and we will have those facts on real-time basis.

17   It's not as if we anticipate that we are going to have to wait

18   till April to get a report and read it.  We anticipate that we

19   will be aware of what is going on, and we can give input as it

20   is occurring.

21           They've been very open and very cooperative with us.

22   And we think, you know, any firm can say, I should issue the

23   discovery request.  Let me send the document requests out, but

24   the fact of the matter is the board has chosen an investigator.

25   They have the powers under PROMESA to seek this information.
```

```
1    They can do it in the most cost-effective way.  They are

2    working cooperatively with our committee, and I believe they

3    would do the same with the UCC.  So we would very much urge,

4    although it's an unusual position for one committee to take

5    with respect to another, that they stand down for the next

6    several months, do what they're doing in COFINA and the

7    proceeding.  We fully support what's happening there, but allow

8    this to go forward on a more efficient and cost-effective way

9    so that the resources of the island are not wasted with dual

10   and duplicate investigations.

11             JUDGE DEIN:  Thank you.

12             MR. SUSHON:  Good morning, your Honor.  Bill Sushon of

13   O'Melveny & Myers LLP for AAFAF.

14             AAFAF joins in the arguments of the Oversight Board

15   and the retirees committee.  AAFAF welcomes the investigation

16   that the Oversight Board has undertaken.  They welcome that

17   investigation because that investigation is being carried out

18   by the body that PROMESA empowers to do the investigation and

19   because that -- not because that investigation is going to be

20   one that goes easy on the government, but because that

21   investigation will provide transparency and accountability.

22   And that's why we support the investigation, and to that end,

23   we've been cooperating with the Oversight Board.

24             From the time since the August hearing and since the

25   appointment of the investigator, we've been having, in recent
```

1    weeks, weekly contact with the investigator.  We've already

2    produced over 50,000 pages of documents.  We're negotiating a

3    nondisclosure agreement, confidentiality agreement that will

4    allow us to provide further information to them.  We expect

5    that to be signed up within the next week.  We expect tens of

6    thousands more pages of documents to be coming out in the next

7    couple of weeks, and we anticipate within the next day or two

8    getting a custodian and search term list which will allow us to

9    begin email production to the investigator.  The investigation

10   is moving along, and we welcome it and we're cooperating in it.

11          What we are concerned about, your Honor, is

12   unnecessary duplication.  Every dollar that gets spent on the

13   investigations is a dollar that can't be used to help rebuild

14   Puerto Rico.  It's a dollar that can't be used to provide

15   essential services to the citizens.  It's a dollar that can't

16   be used to pay creditor claims.  And while the UCC has argued

17   that its investigation is going to be different from the

18   Oversight Board's, as the retirees committee counsel pointed

19   out, the investigation of the Oversight Board goes to the

20   underlying facts.  And whether those facts support claims that

21   the UCC thinks are out there or those facts don't, the facts

22   are the facts, and they're going to be looking at the same

23   facts.

24          The only limitation that I heard on the scope of the

25   UCC's proposed investigation are the parties that would be the

HBFHCOM3

1    subject of the UCC's investigation.  But when we're producing

2    documents for the GDB, I didn't hear any limitation on what

3    they would be looking at with respect to the GDB.  They're just

4    going to be hunting around for claims and they're going to be

5    requiring us to produce overlapping discovery that's going to

6    be an additional effort.  The government is already paying to

7    produce materials to the Oversight Board.  It's already paying

8    for the Oversight Board's investigators to review those

9    materials and to do its investigation.  So putting the UCC on

10   top of that becomes a triple whammy.  We'd have to pay for yet

11   one more investigator, and it's just unnecessary at this point

12   in time, your Honor.  So we again support the Oversight Board.

13            JUDGE DEIN:  Thank you.

14            MR. SUSHON:  Thank you, your Honor.

15            MR. DORSEY:  Good morning.  I wasn't given time, but

16   I'm John Dorsey with Young Conaway Stargatt & Taylor.

17            JUDGE DEIN:  OK.

18            MR. DORSEY:  Just wanted to take one minute, your

19   Honor, to explain to the Court that Banco Popular is

20   cooperating in all the discovery that has been occurring in

21   this case so far.  We've been cooperating with the

22   investigator.  We received a letter.  We preserved our

23   documents.  We requested that they issue a subpoena as opposed

24   to doing it an informal manner to make sure we were complying

25   with federal and Commonwealth banking laws, and that process is

1    moving forward.

2              We're also cooperating with the UCC in connection with

3    the COFINA Commonwealth dispute.  We're in the process of

4    producing documents in that case.  And we've produced documents

5    in connection with the Bank of America interpleader action.

6    Banco Popular is more than happy to continue with the process.

7    We want to make sure it's done in as efficient and

8    cost-effective way as possible for everybody involved.

9              JUDGE DEIN:  OK.

10             MR. DORSEY:  Thank you, your Honor.

11             JUDGE DEIN:  Somebody else there?

12             MR. CROMWELL:  One minute.

13             JUDGE DEIN:  We have a lot of one minutes.

14             MR. CROMWELL:  Sorry, your Honor.  Nick Cromwell from

15   Sidley Austin for Santander.

16             I want to echo what Mr. Dorsey said that Santander is

17   cooperating with the investigator.  We've had several

18   conversations with them, fully intend to cooperate.  We are

19   also cooperating with the UCC, as well as COFINA.  That being

20   said, all these various subpoenas and investigations obviously

21   have strained our resources.  So I echo Mr. Dorsey's

22   sentiments.  We want this to go forward as efficiently as

23   possible, and we think one investigator is the efficient way to

24   do that with those parties, the retiree committee and the UCC,

25   cooperating with that investigator.

HBFHCOM3

1           JUDGE DEIN:  Thank you.  I think you have three

2    minutes.

3           MR. DESPINS:  Briefly, your Honor.  I think the facts

4    speak for themselves.  I think your Honor has picked up on the

5    fact that not one document has been produced so far.  What

6    they've done, what their claim to fame is to have sent document

7    preservation letters to people, and that's just -- the fact

8    that we're in November and that's what has been done is really

9    problematic.  Until this Court and unless this Court directs

10   the investigator to work with the committee to come up with a

11   joint document production request, nothing will happen.

12          They say, well, we don't know what the committee

13   wants.  Well, you know in July we filed document production

14   requests.  If you think they're too broad, fine.  You can

15   comment on that, but they've had that for three and a half

16   months now.  This argument about the NDA, your Honor, is so

17   ridiculous.  We have no NDA with Proskauer or the Oversight

18   Board.  The committee has none because there's a well-known

19   practice in bankruptcy that committees have the confidentiality

20   provision in their bylaws and that Proskauer relies on that.  I

21   have conversations with Mr. Bienenstock that are much more

22   sensitive than issues with Santander and Banco Popular and

23   they're not governed by any NDA because he knows that we are

24   duty bound to keep everything confidential.  So the fact that

25   there's no NDA is such a red herring.

1          JUDGE DEIN:  But are you precluded from signing one?

2          MR. DESPINS:  No, we're not precluded, and we're not

3    refusing it.  There's been discussion between my partner and

4    the person at Kobre & Kim about the terms of it.  But the

5    argument that that's what's precluded them from talking to us

6    is ridiculous.  They have no intention of working with us on

7    this issue.  So it's clear what's going on here.  Unless the

8    Court directs that they sit down with us and they work on

9    something that is joint, because I want to avoid the burden on

10   Banco Popular and Santander.  That's OK.  Courts have done that

11   all the time to force people to coordinate.  So authorize us as

12   to those three entities only, subject to an obligation to

13   coordinate with the investigator, and if we have a dispute,

14   we'll come back to the Court.

15         But right now the pace of this investigation and the

16   progress speaks for itself.  Nothing's happened.  We're talking

17   about April before we're going to get a report.  And, again, as

18   far as we know, other than Banco Popular, I don't think that

19   any document production request has been sent out to anyone.

20   That's shocking that that has not happened at this point.  And,

21   your Honor, it's for that reason that this should be -- that

22   our limited relief should be granted.  Remember, there were

23   dozens of institutions involved in this.  We're only focusing

24   on three.  The investigator can do all other entities, and

25   there's a good reason for that.  I mentioned it before.

HBFHCOM3

1     Mr. Coriel represented Santander in Puerto Rico with respect to

2     these two Oversight Board members.  It may have been ten years

3     ago, but he did represent Santander, and he was heavily

4     involved in that investigation.  And based also on the fact

5     that it was not fully disclosed, that's why the committee is

6     concerned about basically giving him complete discretion to run

7     the investigation.

8            What's going to happen, unless the Court directs that

9     something happens, we will be here in March, and at that point

10    document production requests will have been issued but no

11    documents produced.  We just don't know.  This should be on a

12    fast track.  It's a very important issue.  And, your Honor, for

13    that reason, we think that the Court should authorize a 2004

14    limited to those three entities, limited to document

15    production, subject to meet and confer with the investigator so

16    that anybody's concerns about us completely duplicating what

17    he's doing are covered by your order.  That's what we're asking

18    the Court to do.  Thank you.

19           JUDGE DEIN:  I'm going to take a few minutes during

20    lunch to sort of outline what I think is going to be the order,

21    but I think the 2004 is premature at this point.  Though I do

22    think that the concerns that the UCC has raised about

23    investigating potential other claims are significant concerns

24    and that they have the authority to do so and that we all

25    should know exactly what was going on.  On the other hand, I

HBFHCOM3

1    think that the independent investigator should be given the

2    opportunity to conduct this investigation, and it's not a joint

3    investigation.  It's their investigation at this point, though

4    with input from the UCC.  I'm not sure how that input gets

5    ordered at this point.

6          I want to take a few minutes, but what I'm

7    anticipating is a time schedule, something like in the next

8    week the NDA needs to be signed, within the next month the UCC

9    needs to have presented its document requests to the

10   independent investigator, and the independent investigator

11   needs to determine whether or not -- state affirmatively

12   whether there's an objection to any specific types of

13   categories, and that if there is really a conflict on something

14   that's more narrow that we can deal with as to if the

15   investigator is refusing to gather some types of documents for

16   whatever reason, that that's an issue that you can file a

17   motion on at that point for an examination, and we can see what

18   happens with that.  I don't have the details yet, but that's

19   where I'm thinking.  If you want to think as well, that would

20   be good.  We could all think together.

21          I see we only have a few minutes before we're breaking

22   for lunch.  Let me suggest -- I'm sorry?

23          MR. ROMANELLO:  Your Honor, the next matter on the

24   agenda -- I don't mean to interrupt -- we have a procedural

25   agreement if we could put on the record beforehand so we can

 1     proceed efficiently after lunch.

 2             JUDGE SWAIN:  Would you repeat that for the

 3     microphone, because that didn't go into the microphone.

 4             JUDGE DEIN:  Why don't we do that.

 5             MR. ROMANELLO:  Good morning, your Honor.  Salvatore

 6     Romanello from Weil Gotshal on behalf of National Public

 7     Finance Guarantee.  Last yesterday afternoon we had a

 8     discussion with the Oversight Board to more efficiently move

 9     through the next three matters because they're very similar in

10     substance and argument.  In fact, the Oversight Board submitted

11     omnibus responses to three matters.  So what we would suggest,

12     subject to your Honor's approval, is that the movants proceed

13     together.  Mr. Gary Orseck from Robbins Russell will be the

14     primary speaker on behalf of all three of the movants.  On

15     behalf of National, we'd like to reserve a few minutes, if

16     necessary, after Mr. Orseck speaks, and then Ambac also may

17     have a few minutes.  We think the first part of this will be 30

18     minutes, and hopefully rebuttal will be a lot less than that.

19             JUDGE DEIN:  Good, because that's exactly what I've

20     decided.  So that's perfect.

21             MR. ROMANELLO:  Thank you, your Honor.

22             JUDGE DEIN:  Let me ask now.  We have a pretrial

23     conference.  Are the parties here for that?  That seemed to me

24     to be short, and then can we do that now and get that in before

25     lunch?

1          SPEAKER-05:  Yes, your Honor.

2          JUDGE DEIN:  So this is in 17-3283, docket No. -- no,

3     that's as much as I can get.

4          JUDGE SWAIN:  Would you announce the adversary

5     proceeding, Adversary 17-227, Asociación de Salud against

6     Commonwealth.

7          JUDGE DEIN:  Thank you so much.  Am I supposed to say

8     that?

9          JUDGE SWAIN:  Somebody needs to say it.

10         THE LAW CLERK:  Adversary proceeding 17-227 Asociación

11    de Salud Primaria de Puerto Rico v. Commonwealth.

12         JUDGE DEIN:  All right.  Thank you.

13         MS. McKEEN:  Good morning.  Elizabeth McKeen of

14    O'Melveny & Myers on behalf of AAFAF, representing the

15    Commonwealth with the consent of the board and the DOJ.  For

16    the record, I believe, Wandymar Burgos from the DOJ may be

17    joining us on the phone from Puerto Rico on this matter as

18    well.

19         JUDGE DEIN:  Does this mean it's longer than a few

20    minutes?

21         MS. McKEEN:  It should not be, your Honor.

22         JUDGE DEIN:  OK.

23         THE CLERK:  What is the name again?

24         MS. McKEEN:  Wandymar Burgos.

25         MR. FELDESMAN:  James Feldesman, but we are for the

HBFHCOM3

1   plaintiffs.  Here, so --

2              JUDGE DEIN:  Do you want to proceed or do you want to

3   wait?

4              MS. McKEEN:  We'd be happy to go forward, your Honor.

5   From the Commonwealth's perspective, this should be very

6   straightforward.  We think going through various aspects of a

7   pretrial conference would be premature at this time.  The stay

8   has not been lifted in this matter, and yesterday the

9   Commonwealth filed an abstention motion.  We think the proper

10  course of action would be for the Court to set a briefing

11  schedule on that abstention motion, and depending on the

12  resolution, then proceed with the pretrial if it's necessary.

13  Our request would be that an opposition come in on December 5,

14  that a reply brief be filed by December 13 so that the

15  abstention motion could be heard at the December 20 omnibus, if

16  that's acceptable to the Court and to plaintiffs.

17             JUDGE DEIN:  Just identify yourself again, please.

18             MR. FELDESMAN:  Yes.  James Feldesman for the

19  plaintiff, your Honor.  I've recently filed a joint -- we filed

20  a joint statement, and we're in support of the joint statement.

21  The Court gave us 15 minutes combined.  I don't know whether

22  there are some questions or issues that the Court has beyond

23  the statement itself.

24             We do think that this is an instance where everybody

25  should take a breath before they proceed.  We are going to be

HBFHCOM3

1    filing, and may already have filed, various and sundry things,

2    including most notably a new adversary proceeding stating our

3    position that, effectively, we're entitled to be treated

4    separately from these proceedings and to proceed -- or to be

5    able to get immediately, if we have claims to present -- we

6    have a few -- but to be able to effectively get paid and to get

7    started because we're a grantee and really protected by

8    Section 7 of the statute and corresponding statutes.  That's

9    going to be presented in an adversary proceeding.

10          This is a case which really should start settling.

11   There are nearly 20 of these community health centers located

12   throughout the Commonwealth.  They're functioning in some

13   instances after the hurricane, and even now they're the only

14   effective medical group in the community.  They have

15   pharmacies, and in many instances they're the only pharmacy

16   operating.  And getting some of the money to which they clearly

17   are entitled by federal law into them now and getting them

18   moving could be of great benefit.

19          There are statutory and grant authority under federal

20   law that gives them a great deal of flexibility to cooperate

21   with other healthcare providers in their communities to give

22   money out, to give assistance out, and the like.  And what we

23   don't have is we're here, we're ready, we keep signaling, but

24   what we would really like to do is engage right now in

25   settlement before we start filing motions and getting the

HBFHCOM3

1    various courts caught up in what's the extent of our rights to

2    go forward.  We'd like to take a go at settlement.  But so far,

3    takes two or maybe three to Tango, and there's only one ready

4    to dance.

5         JUDGE DEIN:  OK, sir.

6         MR. MUDD:  Good morning.  John Mudd representing

7    Integrales, Barranquitas, and several other municipalities.

8    We're party to this litigation in state court.  We were dragged

9    into the removal.  Our point is similar in the sense that we

10   believe that Section 7 of PROMESA makes the automatic stay

11   inapplicable to our case.  Irrespective of that, we have no

12   problem with the briefing schedule that sister counsel has

13   presented as to the motion for abstention, and we also plan on

14   filing adversary proceedings to challenge the constitutionality

15   of Law 66 which limits the way the Commonwealth will pay

16   claims, etc.

17        JUDGE DEIN:  Does it make sense for me to adopt that

18   schedule on the briefing and have you reach out to the

19   mediation group and see if it's an appropriate time for you to

20   try to settle this?

21        MR. MUDD:  Well, I'm a firm believer that you only get

22   to settlements when people want to settle.  And we had

23   discussions with AAFAF, etc., and we were led to believe that

24   they weren't interested in dealing with settlement.  So I would

25   put the ball in their court in terms of that point.

HBFHCOM3

1          JUDGE DEIN:  I never send people to mediation who

2     don't want to be there because time is short.

3          MR. MUDD:  Yes.

4          JUDGE DEIN:  On the other hand, as I read the

5     pretrial, everybody was sort of inclined to understand that at

6     some point trying to settle this makes sense.

7          MR. MUDD:  We have no problem with settlement.

8     Settling is good, but --

9          JUDGE DEIN:  Let me just say that I think it is within

10    the purview of the mediation team to tackle this if you are

11    interested.  I leave that out there and encourage you all to

12    take advantage of it before additional adversary proceedings

13    are filed.  But I will adopt the schedule as proposed for the

14    abstention briefing, and I think nothing else needs to be done

15    on the pretrial right now.

16         MR. MUDD:  We agree.  Thank you.

17         MR. FELDESMAN:  Your Honor, if I may say one more

18    thing if it's possible?  There is a case right now that has in

19    that case both between the District Court Judge Gelpí presiding

20    and the First Circuit where virtually every conceivable issue

21    concerning the duty of Puerto Rico under these federal programs

22    has been decided.  Judge Gelpí still has an active case going

23    forward because there is a preliminary injunction that has yet

24    to be reduced to judgment and is still not really quite ready

25    to be reduced to judgment.  We've just also filed a motion with

HBFHCOM3

```
 1   him, I think, and if it hasn't been filed already, it will be
 2   by the end of today, so I'm told.  And that motion adds a few
 3   years to his considerations, backing those considerations up
 4   all the way to the state case which, as we refer to it, which
 5   we've removed and are proceeding here.
 6          If any judge is needed, he's the judge.  The state
 7   court has already decided to defer completely to the judgments
 8   of the federal court.  Second Circuit has already decided that
 9   the law in question is entirely a federal matter.  We would ask
10   the Court, yourself, to consider this in whatever
11   recommendations you may be making and maybe apply some gas to
12   that pedal of urging the various parties to settle.  Judge
13   Gelpí is the appropriate -- at least an appropriate, if nothing
14   else, mentor to everybody to get things consolidated and in a
15   position where perhaps settlement can take place.  Thank you.
16          JUDGE DEIN:  Ms. McKeen.
17          MS. McKEEN:  Your Honor, I think those comments by
18   counsel underscore the government's position that a predicate
19   step here before anything further takes place is that we figure
20   out what court we're going to be in and who's going to be
21   dealing with this dispute that has already been going on for 15
22   years, which is part of why we filed an abstention motion.  So
23   I think that just underscores the need to get that issue
24   briefed quickly, decided promptly, so that the next steps can
25   take place after that occurs.  Thank you, your Honor.
```

HBFHCOM3

```
1              JUDGE DEIN:  Thank you.

2              MR. MUDD:  Your Honor, on a personal matter, I want to

3    thank the Court for my first hot shower in 50 days.

4              JUDGE DEIN:  Well, I'm happy we could comply with that

5    request, but I'm sorry that we had to.

6              All right.  Why don't we break for lunch for an hour,

7    and I'm going to suggest that everybody go back to the same

8    assigned seats afterwards.  Thank you.

9              (Lunch recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

HBFsCOM4

```
1          JUDGE DEIN:  In the adversary proceeding 227, I just
2   wanted to add something.  I would like a joint status report by
3   November 28 where the parties believe that the cases should
4   proceed and the authority and why it should proceed there.  I
5   think it makes sense to do that before the due date on the
6   abstention argument.
7          MS. PICO:  Yes, your Honor.
8          JUDGE DEIN:  As to the creditors committee, the 2004
9   motion, it is denied without prejudice.  I think, at this
10  point, the UCC has not established the need for the independent
11  examination in light of the independent investigation that is
12  going on.  It would not be efficient or cost effective to have
13  parallel investigations going on at this time, and while the
14  parties may ultimately view and analyze the information
15  differently, I think at this point there is a common goal of
16  obtaining the information and understanding the underlying
17  facts.
18          I also think that many of the requests are
19  repetitive of the adversary proceeding in the common law COFINA
20  litigation.  The denial is without prejudice, though, and I
21  would expect that the parties would be able to work together to
22  develop a protocol whereby the UCC is to have meaningful input
23  into the investigation.  I think the UCC needs to be much more
24  targeted in its requests.
25          The UCC needs to sign the NDA and the UCC can renew a
```

 1    targeted request for discovery, but only if it submits its

 2    proposed document request to the investigator and gives them at

 3    least two weeks to indicate whether or not they would be

 4    including those requests in the investigation's request, but

 5    the requests needs to be much more targeted.  It is not the

 6    document requests that you have attached to the motions, it

 7    needs to be targeted so the investigator doesn't need to spend

 8    weeks on a meet and confer on what are the topics included.

 9            If then there is still a dispute as to the scope of

10    the documents being requested, the UCC can file another motion

11    for discovery.  I am only dealing with, right now, with the

12    document requests.  I am assuming you're going to work through

13    on the depositions or interviews, however it works.  But,

14    again, if you can't reach a resolution, the concept has to be

15    that the UCC has meaningful input, but the investigator also

16    needs to be able to respond to the UCC and explain to them why,

17    if they are following the same path, getting the same

18    information, and if not, why not.  Only then will I be able to

19    sort of deal with this on a more specific basis.

20            More 2004 motions.  I missed the timing.  If you would

21    just tell me again.

22            MR. ORSECK:  Gary Orseck from Robbins Russell on

23    behalf of the Ad Hoc Group of general obligation bond holders.

24    As you know, we filed a joint motion together with Assured and

25    the mutual fund group.  They are separate, although

HBFsCOM4

1   substantially identical motions filed by National and Ambac.  I

2   think among the three different motions that were set down, we

3   would have had 45 minutes among us and the respondents would

4   have had 45 minutes.

5        What we propose to do, with the caveat that I don't

6   anticipate us taking all of this time --

7        JUDGE DEIN:  I was going to say, you don't need

8   90 minutes to do this.

9        MR. ORSECK:  -- just to divide it up for purposes of

10  the outset, I think the agreement among the movants is that I

11  would take 20, they would take up to 15 after me to further any

12  points that need being made, and then we would reserve ten

13  minutes for rebuttal.  But, once again, I don't anticipate any

14  of us taking all that time.

15       JUDGE DEIN:  Thank you.

16       MR. ORSECK:  As you know, Judge, the motion is for an

17  order authorizing a rule 2004 examination in the main Title III

18  case.  In addition to the parties that I just mentioned, there

19  are a number of parties who have filed joinders.  I think, by

20  my count, there are eight or nine in the group, all of

21  disparate interests.  Most recently, the committee of unsecured

22  creditors who had initially sort of stayed on the sideline on

23  this, instead they had hoped to work cooperatively with the

24  board and AAFAF to get what they need, came in and said they

25  tried and they failed, so we are joining as well.

HBFsCOM4

1           All of us, at the outset I would like to say first,

2     share and echo the sentiments expressed by counsel and the

3     court of the suffering that continues to go on on the island,

4     and we are mindful of that all the time as we proceed.  We all,

5     however, want the same thing here, and that is the same basic

6     information about the financial condition of the debtor that is

7     routinely provided in bankruptcy cases like this one.  We have

8     all been after it for about six months now, and with the board

9     now stating previously and this morning that it believes the

10    best way to go forward is to proceed, not to have a stay and on

11    an aggressive timeline, I think it is more important than ever

12    that we have access to discovery, that we have transparency,

13    and that all parties have the same information available.  That

14    is more important now than it was before.

15          Let me begin by just summarizing the basic argument as

16    to why we ought to be entitled to a 2004 examination.  It is

17    pretty straightforward.  To be confirmed, any plan of

18    adjustment has to be fair and equitable.  For it to qualify as

19    fair and equitable, it must provide for the creditors the

20    maximum amount that the debtor could reasonably pay.  The

21    board, however, has sought to impose an unprecedented cut, and

22    we heard this morning and we heard before that in a forthcoming

23    fiscal plan, they anticipate no money for debt service at least

24    for the next five years, but they will have to establish that

25    that is the best that can reasonably be expected in order for

HBFsCOM4

```
 1    any plan of adjustment to be approved.

 2            The precise purpose of rule 2004 is to show the

 3    condition of the estate and to enable the court to discover its

 4    extent and whereabouts.  That's exactly what our requests go

 5    to.  They go to discovering the financial condition of the

 6    debtor in anticipation of that litigation.  They also go to the

 7    position of the board's expert that cutting an additional

 8    dollar of government expenditures beyond what they have set

 9    forth in the fiscal plan will lead inescapably to an economic

10    death spiral.  We seek discovery as to that as well.

11            I submit that there is no colorable argument -- and I

12    don't think they even really advance one -- that the creditors

13    are not entitled to this information.  Instead, they have put

14    forward an array, an ever-changing array of arguments, as to

15    why discovery is inappropriate, off the table, not allowed, and

16    it has been changing.  They have declined to meet and confer

17    with us, they have declined to go forward, go through the

18    document requests and tell us where they think it is overbroad,

19    tell us where they think there are items that are privileged.

20    They assert those arguments in their brief.  They say that we

21    sought materials that they think tread on deliberate process,

22    but they assert that in the service of an argument, that they

23    ought or be immune entirely from discovery and that the court

24    should therefore deny the motion.

25            I am going to get to their objections in a minute and
```

HBFsCOM4

1    explain why none of them gets them where they want to go, but

2    what I would like to do before that is, with reference to our

3    attachment A which are the requests we propose to serve, I

4    would like to just point out merely as an illustrative matter

5    what some of the requests seek, which I think will debunk the

6    argument that they have been asserting that the materials we

7    are after are either inaccessible because of the effects of

8    Hurricane Maria, that it is inappropriate for us to impose the

9    expense upon them of finding these materials, conjuring the

10   image of a flooded basement somewhere that they would have to

11   wade through to get the materials, or else that they are

12   obsolete or irrelevant in light of the intervening efforts

13   since the time we filed our motion.

14        Let me just hit a few of them, and I want to be

15   careful to say that I'm not giving these as a list of a subset

16   of what we're after.  We think we're entitled to what we have

17   requested.  It is just to illustrate the point.  Let me go to

18   that.

19        The first thing is we have requested all historical

20   and ongoing periodic financial reports, in particular, ones

21   that have been provided to the board in whatever form they have

22   been provided to the board.  This would include 2017 financials

23   in whatever format, it would include reports of various

24   revenues and expense items by department, by agency, by time

25   period, and we know they exist.  This is called for in our

1    request 56. How do we know? Ms. Duresco said in her

2    November 7 written testimony, which is attached as an exhibit

3    to our motion, I'll quote her, "We also will receive a budget

4    compliance report next week that will show how actual expenses

5    and revenues compare to budget expenses and revenues for the

6    first fiscal quarter ending September 30, 2017." We want that.

7              She said in September, this is attached as Exhibit 1

8    to our reply brief, "On a monthly basis, the @Ross and Go

9    government is providing the board a report comparing budgeted

10   to actual spending department by department. The board is also

11   receiving a weekly report of cash and liquidity." Judge, none

12   of these has been provided to us. They should be produced

13   forthwith. They fall right into the center of what 2004 is

14   designed to provide and we have requested it.

15             Second category, as an illustration, the board and

16   AAFAF has produced materials to other parties, to some parties

17   in adversary proceedings. Our understanding is that there have

18   been one or more depositions. These are called for in our

19   requests number one and two. I'll point one out to you. We

20   should be provided with the workbook that their economist,

21   Mr. Wolf, used and all the documents that he referred to, used,

22   or relied upon in preparing his economic model. Those may have

23   been in the context of an adversary proceeding, but the basis

24   for Mr. Wolf's argument is that unless the Commonwealth

25   achieves a certain level of economic growth and continues it

HBFsCOM4

1    forward, there will be a collapse.  That plainly goes to the

2    question of whether what will be offered to the debtors as the

3    most that can reasonably be expected.

4          Third category, there was a model produced in the data

5    room by the DevTech firm that was provided after significant

6    push and pull, but our FAAs and the other creditors, advisors,

7    and consultants have told us and shown us that there are

8    materials that we can't understand.  There are variables that

9    are undefined, that are datasets that we don't know the origin

10   of.  We need further information to understand that economic

11   model.  We could work that out with the respondents if they

12   would engage with us.

13         Fourth example, and I am almost through, as I think

14   your Honor knows, Ernst & Young prepared what they call a

15   bridge analysis, which resulted in this reconciliation

16   adjustment that is a line item in the fiscal plan that says,

17   in the first year and going forward, hundreds and hundreds of

18   millions of dollars need to be set aside in recognition of what

19   we are told is their expectation that their actual expenses

20   will exceed what the budgeted expenses are.  That is a very

21   substantial item that goes to the financial condition of the

22   debtor.  We are entitled to see, as I think as your Honor said

23   earlier, we shouldn't have to take their word for it, we should

24   get to see how those figures were developed.

25         The last one I am going to identify, and I could

HBFsCOM4

1    provide you the request numbers in our document requests that

2    correspond to these examples, but the last one I am going to

3    point out for illustrative purposes is the board and AAFAF have

4    taken the position that where essential services are at issue,

5    I think there was a reference to policemen and firemen, that

6    expense ought to come before the GOs in line.  I am not here to

7    debate that point right now, but for present purposes, we ought

8    to be able to see how they define essential services, what are

9    the documents that will tell us what is or is not, in their

10   view, essential services.

11        The reason I've selected just these examples for

12   present purposes is to show, number one, the notion that it

13   would cost millions of dollars to identify and locate and

14   produce these things is baseless.  All of these things exist.

15   They have been produced to somebody.  They reside on hard

16   drives or computers of the board or the government or its

17   consultants somewhere.  They exist.

18        The second reason I have identified these is to

19   respond to the suggestion that all of our requests are now

20   stale.  We are in a new world.  Well, certainly the world has

21   changed, but the underlying financial information relating to

22   the debtor remains relevant, remains relevant to the fair and

23   equitable test going forward.

24        JUDGE DEIN:  How do you know that if they haven't yet

25   identified the methodology that they are going to use in the

HBFsCOM4

1    new fiscal plan?

2            MR. ORSECK:  I have two responses to that.  First is,

3    methodology aside, they could use methodology B, C, or D

4    compared to the one they have used in the existing fiscal plan,

5    but the financial condition of the Commonwealth is an input to

6    any model.  That is to say they cannot project what will be

7    available for debt service or how much the economy will grow

8    except by using a baseline, except by looking at what the

9    condition of the debtor is today.

10           We will have to be entitled to this, and the longer we

11   wait to get discovery, the one thing I can assure you is that

12   the litigation will last on and on.  And the additional point I

13   want to make here, you haven't heard in their briefing the

14   board say, just wait until we come out with a new fiscal plan,

15   then we'll give you discovery as to that fiscal plan.  They

16   have said from the start, PROMESA prohibits you from getting

17   any discovery because you can't second guess the fiscal plan,

18   the court can't and you can't.  They have said this pending

19   proceeding doctrine forecloses us from any discovery.  And then

20   the hurricane came and they said, well, now your requests are

21   stale.  You can't get any discovery.

22           Their position all along has been not now, not later,

23   not ever, but the materials that we seek go to the underlying

24   condition of the debtor, number one.  And number two, even with

25   respect to the methodology.  And we have put forward requests

HBFsCOM4

1    asking for the methodology by which the fiscal plan was

2    developed -- I can't go into details on this because of the

3    mediation constraints -- but it is our understanding from

4    Mr. Wolf that the basic structure of the methodology will be

5    the same in any future fiscal plan, it is just that there will

6    now be a line item or a methodology to account for the effect

7    of the hurricane, the out migration, the destruction of

8    infrastructure.

9         So it is not as though their expert is suddenly going

10   to change the methodology according to what we have been told.

11   By the way, even if he were to do that, I think they would

12   still be entitled to see what was done to the first instance so

13   we would have a basis for assessing what is being done in the

14   second instance.

15        JUDGE DEIN:  Of course I wrote down very carefully

16   what Judge Houser said and I put it on a piece of paper that I

17   don't know where I put the piece of paper.  But she did say

18   that she was working with the parties to ensure that there was

19   transparency in how the plan was being developed is my

20   understanding.

21        MR. ORSECK:  We commend the efforts of Judge Houser

22   and the mediation team.  I am here to report to you that the

23   items that I just went through have never been produced.  The

24   mediation team and the mediation effort is doing what it can

25   do, but it is no substitute for the vehicle of a 2004

HBFsCOM4

1   examination, where we are allowed to request specific

2   documents.

3           Again, if they have objections to them, if they say

4   that something is privileged or something is unduly burdensome,

5   well, that is what counsel typically works out in the

6   meet-and-confer process.  That is not a reason to say that

7   we're not entitled to any discovery.  Whatever has been going

8   on in the mediation, which has not been as successful

9   regrettably, as we had hoped it would have been in terms of

10  providing information is certainly no substitute, for we asked

11  for this stuff six months ago.

12          Let me just now address, and I'll try to be brief,

13  what the board and AAFAF's main objections are.  The reasons

14  they say you shouldn't get any discovery at all.  The first I

15  am just going to be particularly brief with, and that is they

16  have said that some of the materials we seek implicate the

17  deliberate process privilege.  That is the quintessential

18  meet-and-confer issue.  To assert it in a brief as a reason to

19  deny our motion, I think, is unprecedented.

20          In any event, there has been no procedural predicate.

21  Judge Dein, you have expressed that in order to assert

22  deliberate process, as the case law says, there needs to be an

23  affidavit, there needs to be a log, there needs to be a list,

24  there needs to be a balancing test.  We don't have any of that.

25  Even if we did, I think you can see, based on the illustrative

HBFsCOM4

1    items I mentioned, what we are seeking are essentially factual

2    materials.  We are not asking for what went into a certain

3    policy judgment.  So the deliberate process objection is no

4    reason to deny our motion.

5          The meteor one, the one that they have hitched their

6    wagon to in their papers, is the pending proceeding doctrine.

7    They want to read a version of that doctrine, to the extent it

8    exists, to say that once any party has filed any adversary

9    proceeding on any topic, a giant iron door comes down, and

10   discovery under rule 2004 in the main case is forever

11   foreclosed.

12         That utterly fails for a number of reasons, but let me

13   just say, first and foremost, the movant mutual fund group, our

14   co-movant, doesn't have any adversary proceeding to begin with.

15   The one they put as the centerpiece of that argument was the

16   one filed by National and Assured, which has been voluntarily

17   dismissed.

18         JUDGE DEIN:  I'll hear argument on it if I need to,

19   but let me just state that I read it as being if there is a

20   direct conflict with information being requested or otherwise

21   proceeding in an adversary proceeding, then it needs to go

22   under the Federal Rules of Civil Procedure with those

23   safeguards.  Otherwise, it is not a total ban on it.

24         MR. ORSECK:  Let me go to that point, because I think

25   we said in our brief, I read the doctrine and we do the same as

HBFsCOM4

1    you do, to the extent it exists.  The doctrine exists so you

2    can't circumvent the procedural and evidentiary safeguards of

3    Rule 26 by the artifice of saying we are going to proceed under

4    rule 2004.

5         JUDGE DEIN:  But they do have another argument.  I

6    think they go a little beyond that.  They say that, to the

7    extent that discovery is stayed in certain proceedings, that

8    you shouldn't be able to use the 2004 to circumvent that.

9         MR. ORSECK:  They do say that, but that is to

10   completely apply the issue.  As I said, our two co-movants are

11   not parties to an adversary proceeding.  Our adversary

12   proceeding, known as the clawback case, asserts that as a legal

13   matter, the GO bondholders have a statutory lien and other

14   property interests as a matter of law in these two specific

15   identified revenue streams.  They are trying to take advantage

16   of the fact that we filed that adversary proceeding to say, no,

17   you can't get the weekly revenue and expense reports that

18   Ms. Duresco highlighted.  You can't find out what our

19   definition of essential services is.  You can't find any of the

20   underlying information as to the model that is going to be used

21   for the old fiscal plan and the new fiscal plan.

22        All we are saying is if the court and the respondents

23   want us to proceed under the constraints of Rule 26, we are

24   happy to do that, and of course your Honor has -- it wasn't a

25   stay, there has been no pretrial, you know, discovery

1    conference.  The notion that these motions, these 2004 motions

2    are a pretext to circumvent that order is just preposterous

3    conspiracy theory.  We have nine different parties seeking the

4    basic information that we should have, and we filed the motions

5    before your Honor entered the stay, as you called it, in the

6    adversary proceeding.  We are not trying to circumvent

7    anything.

8             JUDGE DEIN:  I want to make it clear on what I

9    entered.  I entered an order saying I'm not entering any orders

10   pending the motion to dismiss unless somebody wants one.  So if

11   somebody wants discovery or wants an official stay or whatever

12   they want, they have to ask for it.  I just want to make it

13   clear.  I know a number of people referenced this order that I

14   entered.  It was just to put you on notice that unless somebody

15   is asking for the case to move forward, I am not mandating that

16   discovery move forward.

17            MR. ORSECK:  Forgive me.  I bought into that language.

18            JUDGE DEIN:  I just want to make that clear.

19            MR. ORSECK:  The essential point that I wanted to make

20   is that there is no authority for a holding that creditors

21   seeking information that is plainly relevant to whether a plan

22   adjustment is confirmable should be precluded from taking

23   discovery as to those matters because a separate adversary

24   proceeding has not yet proceeded forward in discovery.

25            Indeed, since the board raised it, we put in our reply

1   brief, there is case law that says it would be especially

2   inappropriate and a perverse application of the pending

3   proceeding doctrine to foreclose a party from getting 2004

4   examination when discovery is not going forward at all in

5   another proceeding.  I think that was the <u>Fibercon</u> case.

6        The last of their objections, I think I've touched on

7   already, is that the requests are stale because there will be a

8   new fiscal plan in the future.  The responses, as I say, to

9   those are, number one, the underlying methodologies remain

10  relevant.  The information that we seek regarding the financial

11  condition of the debtor remains more relevant than ever before,

12  and even if there is some change in methodology, that doesn't

13  mean we are not entitled to the broad and unfettered look that

14  2004 allows.

15       So I have taken up most of my time.  Let me just

16  conclude by suggesting that the items that I've identified as,

17  to which I don't think there is any colorable claim of

18  deliberate process or of some overlap with a pending adversary

19  proceeding, those materials should be produced forthwith.  As I

20  say, we requested them nearly six months ago, and mediation or

21  otherwise, we have gotten nowhere.  Once that is done, I would

22  propose that the board and AAFAF be directed, within a

23  reasonable period of time, 30 days comes to mind, to serve us

24  with any principle objections they have upon which we will

25  respond with a meet and confer very promptly.  It is in our

HBFsCOM4

1    interest to move promptly.  And then if we can't work it out

2    the way all of us in this room have done probably hundreds of

3    times, we will come back before your Honor.  But this ought to

4    be something that counsel can work out among themselves.

5              Thank you.

6              JUDGE DEIN:  Thank you.

7              MR. ROMANELLO:  Good afternoon, your Honor.  Salvatore

8    Romanello from Weil Gotshal & Manges on behalf of National

9    Public Finance Guarantee.

10             We join in all of Mr. Orseck's arguments.  From the

11   very first day in these proceedings and in virtually every

12   proceeding, we have told the court that disclosure and

13   transparency is paramount.  We have tried over and over again,

14   you can see in all of the submissions, there are many letters,

15   calls, back and forth to try to get this information, basic

16   financial information that is produced in every debtor case.

17   There has been a refusal to provide that information, so we had

18   to bring this 2004 motion.

19             Your Honor, when we were before you in August, counsel

20   for the Oversight Board, and I am paraphrasing, said something

21   like the creditors are being asked to take substantial losses

22   here and they need to know why.  They made that in reference to

23   the investigation that the Oversight Board wanted to hire a law

24   firm to undertake.  That "why" question cannot be answered

25   unless we get the financial information.  It is imperative that

HBFsCOM4

1    we get the basic information.  When our financial people tell

2    us, we looked at this purported live model and we can't figure

3    out the calculations in it because there is hard coding and

4    there is references to other Excel models that we don't have,

5    that is a big problem for us.

6         This morning we started off the proceedings with

7    Judge Houser saying that she hoped to reach a substantially

8    consensual restructuring.  We hope for that too, but that is

9    impossible unless and until we have significant disclosure on

10   the financial condition of the debt.  We need this information

11   to analyze the restructuring.

12        We are concerned with efficiency, your Honor, that is

13   why, if you look at National's document requests, they align

14   reasonable virtually identical to the requests of the other

15   parties.  Obviously we worked together on that.  We are happy

16   to work together as a creditor group to get this information

17   and to take as much burden off of the Oversight Board and the

18   Commonwealth that we can, but we need to have the basic

19   information or else we are just going to continue down this

20   path of litigation.

21        As I said, efficiency is important, and as Mr. Orseck

22   noted, that in some of the litigations, materials have been

23   produced for parties, some creditors, only because they are a

24   party.  That information has already been produced.  It should

25   be produced to the whole creditor group.  There is no reason or

HBFsCOM4

1    no burden not to make that information available.

2              Thank you, your Honor.

3              THE COURT:  Thank you.

4              MS. MILLER:  Good afternoon, your Honor.  Atara Miller

5    from Milbank Tweed Hadlet & McCloy on behalf of Ambac Assurance

6    Corporation.

7              Your Honor, just a couple brief points.  I echo the

8    arguments and the sentiments made by Mr. Orseck and

9    Mr. Romanello with respect to just the fundamental need for

10   creditors in these cases to have information.  You know, these

11   requests are coming now in the form of a 2004 motion, but

12   frankly, Ambac has been sending letters for years asking for

13   the same information for an understanding of how we can come

14   together and work together based on basic financial information

15   that, frankly, there may be additional inputs that have impacts

16   on it, but the core information of how much it takes to run the

17   Commonwealth is not changing, and that is information that has

18   never been made available for creditors and, frankly, is going

19   to make reaching consensual resolution of these cases

20   impossible.

21             One specific comment I heard Mr. Orseck make which

22   made me chuckle slightly to myself that I suggested that

23   asserting the deliberate process privilege in a brief is

24   unprecedented.  Frankly, when I read that assertion in the

25   brief, I said, wow, it is like groundhog day.  We have been

HBFsCOM4

```
1    here and done this before.  Your Honor will remember that the

2    Oversight Board, in connection with discovery to the

3    interpleader action, asserted deliberate process privilege as a

4    basis not to produce documents.  We had extensive discussions

5    in connection with those proceedings about the contours of the

6    deliberate process privilege, and where we came out was that it

7    is not a wholesale basis to refuse to produce documents, and

8    your Honor directed the parties to meet and confer and figure

9    out a way to deal with how we were going to get the information

10   that was not protected and still respect the deliberate process

11   privilege.

12           As Mr. Orseck suggested, we are all professionals, we

13   have been doing this for a long time, and we are quite capable,

14   as we were successful in doing in connection with the

15   interpleader with meeting and conferring and getting past the

16   privilege whether a deliberate process or otherwise in

17   connection with these matters and, frankly, just getting the

18   flow of information going.

19           THE COURT:  Thank you.

20           MS. HALSTEAD:  Good afternoon, your Honor.  Ellen

21   Halstead of Cadwalader Wickersham & Taft for Assured Guaranty

22   Corporation.

23           Again, I also want to echo the thoughts of Mr. Orseck,

24   Mr. Romanello, and Ms. Miller.  Assured is one of the largest

25   creditors of the Commonwealth, being about $5.4 billion of
```

1    exposure.  Quite frankly, if we were satisfied by the level of

2    information that was set forth in the mediations or the data

3    room, we wouldn't be filing the 2004 motion.  Needless to say,

4    we have not been given sufficient transparency and information

5    in the data room or in the mediations and that is why we are

6    here before your Honor.

7          I echo the thoughts that other people have made today,

8    including your Honor, regarding the situation in Puerto Rico.

9    It is obviously a devastating situation.  I am not disputing

10   that.  No one is disputing that.  But from our perspective, it

11   seems like the Oversight Board wants to pick and choose what

12   goes forward and what doesn't, and they very clearly do not

13   want to give us this information.

14         Today, Mr. Bienenstock said there is going to be a new

15   fiscal plan and it is supposed to be certified in four months,

16   in February 2018.  But right now, we haven't been given the

17   sufficient level of disclosure and transparency in order for us

18   to review the fiscal plan and dispute the findings in it.  We

19   just don't have that information.  The cases cannot be

20   consensually resolved if we don't have this information.  As

21   Mr. Orseck said, this data is not stale and the documents that

22   we are seeking should have been given months ago or if not a

23   year or more.

24         Thank you.

25         MR. HOROWITZ:  Good afternoon, your Honor.  Gregory

HBFsCOM4

1  Horowitz from Kramer Levin on behalf of the Mutual Fund Group.

2  Mutual Fund Group, your Honor, consists of Oppenheimer funds,

3  Frankfort advisors, and First Puerto Rico Family of Funds who,

4  in turn, represent hundreds of thousands of ordinary investors,

5  U.S. citizens, both in the United States and many, many

6  investors beyond Puerto Rico who have invested in over

7  $2.8 billion dollars in COFINA bonds for in excess of 30 years.

8         Your Honor, on behalf of Mutual Fund Group, we fully

9  join in the comments of --

10         THE COURT:  Everyone.

11         MR. HOROWITZ:   -- Mr. Orseck and all my friends,

12  co-counsel.

13         There shouldn't be very much for me to add after all

14  of those counsel have talked.  I will just say, your Honor,

15  that all of the movants here are key stakeholders in these

16  Title III proceedings.  None of us has any desire to interpose

17  discovery in order to impose a burden, nobody here has any

18  belief that by engaging in oppressive discovery, there is going

19  to be any use in settlement.  These discovery efforts are

20  reasonable and necessary to prepare for an inevitable

21  litigation over plans of adjustment in these Title III cases

22  that are going to be based on fiscal plan, financial

23  projections.

24         It is fundamentally, your Honor, that when debtors

25  seek to meet their burden through such testimony, through such

HBFsCOM4

1    projections, in some cases actual expert testimony, you have to

2    show your work, and that is what we are seeking here.  We are

3    seeking their work.

4              In that regard, your Honor, I will point out that one

5    thing that is just not a good objection in that regard is the

6    notion that this work includes proprietary models.  Your Honor,

7    if my teenage children got marked off in a math exam for

8    failing to show their work, maybe they should say to the

9    teacher, I can't show my work, I am using a proprietary model.

10   Your Honor, there are ways of getting around the proprietary

11   interests, but this is not an objection when this information

12   needs to be disclosed and we need a chance to review it and

13   verse it for ourselves.  That's all, your Honor.

14             THE COURT:  Thank you.

15             MR. ROSENBLUM:  Good afternoon, your Honor.  Benjamin

16   Rosenblum from Jones Day on behalf of the ERS Secured Creditors

17   Group.  ERS Secured Creditors Group represents approximately

18   $1.4 billion dollars of the ERS Group debt, and I am not going

19   to rehash all the arguments of my colleagues that were done

20   more eloquently than I could.  We do think that transparency

21   and getting this information out as soon as possible, this is

22   basic information, is going to facilitate resolution of these

23   cases, consensual or otherwise.  It just will move things

24   along.

25             That's all.  Thank you.

1            JUDGE DEIN:  Thank you.

2            MR. POSSINGER:  Good afternoon, Judge Dein.  Paul

3    Possinger of Proskauer Rose on behalf of the Oversight Board as

4    representative of the debtors.

5            The one overarching theme that I want to emphasize up

6    front is that the Oversight Board, the government, and AAFAF

7    have worked tirelessly over the last many months to produce

8    information, post information on the data site before

9    mediation, during mediation, and ongoing in response to

10   hundreds and hundreds of creditor inquiries.

11           I don't have the details on what is in the data room,

12   so my colleague, Ms. McKeen, is going to share this argument,

13   so I would suggest, for a time allocation, I'll take about

14   12 to 15 minutes tops, and I think Ms. McKeen will need about

15   10 or so.

16           THE COURT:  OK.

17           MR. POSSINGER:  Your Honor, as you heard, there are

18   three motions here.  The movants have conceded that the three

19   motions are essentially identical, and all of the discovery

20   requests are directed towards the fiscal plan that the board

21   certified in March of 2017.

22           It is obvious from the remarks, it is obvious from the

23   last 50 days since the hurricanes hit, Puerto Rico is living in

24   a completed new fiscal reality.  Puerto Rico is faced with

25   major business interruptions, major impairment of revenue and

1    tax collections, they are facing significant migration of

2    residents and industry, to the extent to which they don't yet

3    know and they are also in the process of trying to obtain

4    federal assistance, the extent to which is not yet known.

5         These are not line items.  This is a complete game

6    change from the fiscal plan that we certified in March.  We are

7    starting essentially from a blank slate.  As the board

8    announced at the public meeting on October 31, as Judge Houser

9    indicated, a revised fiscal plan is now obviously necessary.  A

10   revised fiscal plan is now underway to take Puerto Rico's new

11   reality into account.  So the data, the assumptions, the

12   projections, the methodologies that led to the current

13   certified fiscal plan are, in fact, stale and obsolete.

14        The process is underway towards working towards a new

15   fiscal plan.  The board is engaged in discussions with creditor

16   groups.  The board is cooperating with the mediator and

17   mediation process, and the board and AAFAF, I should say, have

18   responded and will continue to respond to correct inquiries in

19   an attempt to get information to them through the informal

20   process of mediation.

21        THE COURT:  Tell me what that means with respect to

22   the requests that are attached to these motions.

23        MR. POSSINGER:  On that, I would need to defer to my

24   colleague, Ms. McKeen, in terms of the specific categories of

25   information.

HBFsCOM4

1          THE COURT:  I don't want it item by item, but when you

2     say you're responding to specific requests, what does that mean

3     conceptually?

4          MR. POSSINGER:  The requests we received, there have

5     been hundreds and hundreds of requests.  They are communicated

6     to us through mediators and mediators' financial advisors, and

7     we have been responding.  Additional documentation has been

8     posted to the data site and written responses to specific

9     questions have been provided, hundreds and hundreds of

10    questions.

11         In the meantime, formal discovery, formal 2004

12    discovery into what is involved in the current fiscal plan is

13    really an exercise in futility.  We are not going to be using

14    the current fiscal plan.  As I said, the data, the assumptions,

15    the projections are no longer relevant to Puerto Rico's

16    restructuring.  So there is no information, little or no

17    information of value responsive to these requests that is going

18    to be relevant going forward and of value to the creditors, but

19    the burden on the government and the board and AAFAF would be

20    significant.  As I said, AAFAF is going to elaborate on this.

21         We have spent months gathering data regarding the

22    existing fiscal plan and posting it to the data sites so that

23    it can be accessed by creditors and their advisors.  Through

24    the mediation process, we will continue to do so.

25         The government and AAFAF, particularly the government

HBFsCOM4

1   itself, the government agencies, should not be put through the

2   added burden of complying with formal document requests,

3   sitting for depositions regarding a fiscal plan that is

4   currently obsolete, particularly in light of everything that

5   has been produced to date.

6          One final point I made with respect to the new

7   circumstances as a result of the hurricane.  We are not seeing

8   that the change, economic and fiscal facts with respect to

9   Puerto Rico, merit delaying or altering the schedule regarding

10  pending legal disputes.  The board continues to assert that the

11  answers to these core legal questions that are currently at the

12  center of pending adversary proceedings will be valuable to

13  establishing the path forward and getting us to a plan of

14  adjustment.  The answers to these legal questions are not

15  dependent on the changes to Puerto Rico's fiscal circumstances.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HBFHCOM5

```
 1              MR. POSSINGER:  The second point I make, your Honor,

 2   as I stated in the opposition we filed pre-hurricane, is that

 3   the purpose of this discovery is to challenge the fiscal plan

 4   certified in March.  That's the core purpose of this, of the

 5   discovery that they seek.  And to challenge the fiscal plan is,

 6   in essence, to challenge the certification of the fiscal plan.

 7   The two are not severable.  Certification of a fiscal plan by

 8   the board is not subject to challenge before this Court

 9   pursuant to Section 106(e) of PROMESA, and this is not a

10   technicality that we are hanging our hat on.  Congress did not

11   want fiscal plans to be the subject of dispute or litigation or

12   negotiation or creditor --

13              JUDGE DEIN:  Do you agree, though, that there's going

14   to be a confirmation process?

15              MR. POSSINGER:  Yes.

16              JUDGE DEIN:  And do you agree that the creditors are

17   going to have to understand the plan?

18              MR. POSSINGER:  They're going to have to understand

19   the plan of adjustment.

20              JUDGE DEIN:  Right.

21              MR. POSSINGER:  And the plan of adjustment is going to

22   have to comply with the then-certified fiscal plan.

23              JUDGE DEIN:  Right.

24              MR. POSSINGER:  But that's not to say that a valid

25   confirmation objection will be that the fiscal plan did not
```

1    comply with PROMESA.  The board is the final word as to whether

2    the fiscal plan complies with PROMESA.

3            JUDGE DEIN:  I understand that that's your position,

4    and I'm not even sure that anybody has taken that head on, so

5    I'm not going to speak for anybody.  But do I understand that

6    they're asking for the discovery in anticipation of needing to

7    confirm the final plan.

8            MR. POSSINGER:  That's correct.

9            JUDGE DEIN:  It seems to me that this is an

10   opportunity.  You've got two baskets here.  You've got the

11   historical information that may or may not be relevant.  I

12   understand you're auguring it's no longer relevant and they're

13   arguing it is, but it seems to me that we're now in a period

14   where you're actually working to create a new fiscal plan,

15   which means that you're gathering information at this moment

16   and doing it at a time when you know that the creditors are

17   going to ask for this information.  So how do we make that

18   happen so that the disclosures which will -- it will be nothing

19   less than a major sin if this gets to the end and then we start

20   doing discovery.  I mean, that is just not going to happen.

21           MR. POSSINGER:  No, that is not --

22           JUDGE DEIN:  Nobody wants that to happen.  So the

23   question is then how do you make it happen now that you're in

24   the process of pulling together the information that actually

25   will eventually be disclosed?  It's an opportunity.

HBFHCOM5

```
1          MR. POSSINGER:  Sure.  And, your Honor, that is the
2    purpose of the ongoing mediation exercise, the informal sharing
3    of information that's been ongoing for months and continues.
4    And as I said, the added burden of formal discovery when this
5    informal cooperation is underway is going to be overly
6    burdensome for the government and for the FOMB board when
7    they're now dealing with an emergency and a crisis on the
8    island.
9          JUDGE DEIN:  Does it make sense, though, to work
10   toward a protocol for the disclosure of information going
11   forward?  I don't know.  I'm not on the mediation at all.  So I
12   have no idea what's going on or what makes sense.  From up
13   here, I'm sitting here with a room full of people who say we
14   don't have any information, and I'm sitting here with the front
15   row that's telling me:  But we've given them all the
16   information.  I don't know the reality.  My guess is that
17   there's truth on both sides here.
18         But what happens going forward?  How do you make that
19   happen so that when we get to the end, it's not a new request
20   for discovery?
21         MR. POSSINGER:  Again, I come back to the mediation
22   process which has generated ample --
23         JUDGE DEIN:  But they don't agree with that.  For
24   whatever reason, they don't agree with it.
25         MR. POSSINGER:  And that's where I think Judge Houser
```

HBFHCOM5

1  will come in and engage the parties in discussion as to what

2  they believe they don't have, what we believe they do have, and

3  then start a dialogue in that manner rather than proceed with a

4  formal discovery process and depositions.  It's not our desire

5  to get -- to file a plan of adjustment and then start contested

6  matters of discovery.  That's not our desire at all.  We don't

7  believe that they're starting at ground zero.  We don't believe

8  they're starting anywhere near ground zero.  As far as a plan

9  of adjustment goes, when it comes time to present and confirm a

10  plan of adjustment, the plan will need to comply with the

11  fiscal plan, and we will demonstrate that.

12         The Court should also consider, and this is in

13  PROMESA, whether the creditors would do better than the

14  distribution under the plan if they could pursue their

15  Puerto Rico law remedies against the debtors.  That's the

16  standard for best interest, not it's the best that they could

17  possibly do, but are they doing better than if they could go

18  foreclose or exercise remedies outside the bankruptcy process?

19  That's, you know, part of the discovery -- part of the

20  information that they're going to need to evaluate the plan,

21  and that's the information that I think has been shared or the

22  sharing of which is ongoing.  And as I said, if there are gaps

23  with respect to information that's relevant, that's not

24  privileged, and we don't need to get into the deliberative

25  process of privilege with respect to any particular requests

HBFHCOM5

1    here today, then the information in discussions with the

2    mediator will be shared.

3        JUDGE DEIN:  What about the argument that you're

4    producing to certain parties and not to others or you're

5    producing in different formats?

6        MR. POSSINGER:  I'm not aware -- if there's documents

7    that have been produced in particular adversaries, my

8    understanding is that all the adversaries now have pending

9    motions to dismiss.  There has been some limited discovery in

10   the ERS v. Altair matter because that is under a motion for

11   summary judgment schedule.  So on that question, I think I'm

12   going to have to defer again to Ms. McKeen who might have

13   better information regarding what's actually been produced in

14   ongoing litigation.

15       JUDGE DEIN:  OK.

16       MR. POSSINGER:  Third point, your Honor, I don't want

17   to dwell on it, relates to the pending proceeding rule.  Most

18   of the movants have pending motions against one or more of the

19   debtors.  It implicates the current fiscal plan and it

20   implicates many, if not most, of the requests set forth in the

21   motions.  All of those adversary proceedings are now subject to

22   dispositive motions.  I can't go through and click off which

23   have discovery stays and which don't.  Suffice to say, that the

24   movants are trying to use Rule 2004 discovery to circumvent any

25   limitations on discovery in the adversaries that they've chosen

1    to bring.  I would think that also applies to the fiscal plan

2    challenge adversary that was brought at the outset of this

3    case -- that's adversary 17-125 -- that the plaintiffs have

4    voluntarily withdrawn.  The plaintiffs in that action made

5    clear that opposing the fiscal plan is going to be a strategy

6    in this case.

7            As Mr. Bienenstock indicated, a new fiscal plan is

8    likely going to have far less on offer for creditors, at least

9    in the first five years, than the prior fiscal plan.  It's

10   reasonable to assume that there will be renewed challenges to

11   that fiscal plan once it's certified.  Just because plaintiffs

12   agreed to stand down for now doesn't mean they've abandoned

13   that challenge.  So I would say the pending proceeding rule

14   applies with equal force to that adversary regardless of the

15   fact that it was withdrawn.

16           With respect to the offer or agreement in the reply

17   brief that any 2004 discovery would proceed pursuant to

18   Rule 26, I would reiterate that most of the movants have chosen

19   their path in this case for now.  They have sued the debtors.

20   They're pursuing alleged rights and remedies in adversary

21   proceedings.  If they want discovery into matters that are

22   germane to that litigation -- and I would submit that most, if

23   not all, of the requests that are attached to these motions are

24   germane to their litigation --

25           JUDGE DEIN:  Do you think that they're germane to the

1    ultimate confirmation issues, though, in addition to the

2    litigation?

3         MR. POSSINGER:  As presently crafted, no, because they

4    relate to the fiscal plan that was certified in March.  They

5    relate to the historical financial reality of Puerto Rico

6    that's no longer --

7         JUDGE DEIN:  But you didn't want to produce this

8    information before there was going to be a new fiscal plan.  So

9    if you had the same requests for the new fiscal plan -- do you

10   know what I'm asking?  The types of requests that are made, do

11   you agree that some of that information will actually be

12   produced somewhere along the line for the confirmation process?

13        MR. POSSINGER:  I don't think we're saying -- and you

14   know, we keep hearing that, you know, not now, not later, not

15   ever.  That's not true.  It is not true that we oppose

16   producing information.  What we're doing now is opposing formal

17   2004 discovery in lieu of allowing the mediation process to

18   play out.

19        The final point I want to make and I want to

20   emphasize, and probably be repetitive, the board and the

21   Commonwealth are not trying to avoid any and all discovery in

22   this case.  This concept is repeated.  We've heard it at the

23   first omnibus hearing in this case.  We've heard it in these

24   motions.  We've heard it today.  It's just not true.  The

25   process of sharing information through the mediation is already

1     placing significant burden on the government and its agencies.

2     Given the state of emergency on the island and the fact that

3     government and these agencies and their resources are already

4     stretched very thin, we, the board, ask the Court not to add a

5     substantial burden of formal 2004 discovery to produce

6     information that's going to be of little or no value to the

7     creditors and allow the mediation process to continue.

8          MS. McKEEN:  Good afternoon.  Elizabeth McKeen on

9     behalf of AAFAF.

10          As counsel for the board just reiterated, the

11    Commonwealth and the board are absolutely committed to

12    transparency and providing information.  That is exactly what

13    has been happening.  This is not a black box.  No one is

14    resisting sharing information.

15          And with respect to counsel who spoke previously, the

16    Commonwealth of Puerto Rico is not a teenage child trying to

17    get out of homework.  It is a government leading its people

18    through a crisis.  And as your Honor noted in connection with

19    the UCC argument, we can't do here what we might do in other

20    cases because we have to take what is the most efficient path

21    possible.  Even before the hurricane, the government of

22    Puerto Rico's resources, both in terms of finances and

23    personnel, were stretched thin.  After the hurricane there is

24    no question that every dollar counts, every minute of personnel

25    time counts.  These motions aren't about transparency.  They're

1    about balancing competing demands for these resources.  By

2    definition, granting these motions would result in taking away

3    funds and personnel from something else that they should be

4    accomplishing in the meantime, like working on developing the

5    fiscal plan with the board or running an agency, literally

6    getting the lights back on.

7           Against that backdrop of strained resources, there are

8    two critical reasons that these motions need not be granted,

9    and they've both been alluded to already.  One is the fact that

10   there is already a robust mediation process in place through

11   which information is being shared with creditors.  Judge Houser

12   is presiding over this process, and while it's not a formal

13   Rule 2004 discovery process, I don't think it does it credit to

14   call the process informal, per se, because the intensity with

15   which the parties have approached this mediation and put effort

16   into the mediation can't be understated.  The amount of

17   information and data that's been provided is overwhelming.  I

18   printed out just the table of contents of the data room that's

19   in place to bring to court, your Honor, and just the table of

20   contents is 17 pages long.

21          So the idea that we're in an information vacuum just

22   isn't fair.  And, frankly, I don't think Judge Houser would

23   tolerate it.  We heard her say this morning that she's

24   satisfied with the progress that the parties have been making,

25   and the cornerstone of that process so far has been the sharing

HBFHCOM5

1    of information that has been accomplished through the parties

2    and their financial advisers.  The mediators have retained

3    their own financial adviser at the debtors' expense to

4    facilitate this very sharing of information.

5            So given that there is that robust process in place

6    and, as Mr. Possinger referenced, the fiscal plan undergoing a

7    reboot, there's no good cause in light of that to subject the

8    Commonwealth and the board to very voluminous kind of

9    rifle-shot discovery requests that are overlapping with one

10   another.  They're extremely burdensome, and importantly, they

11   have not been revised or amended in any way to reflect what has

12   already been shared with the creditors through the mediation

13   process.  These were requests that were first formulated and

14   propounded as attached to these motions back in August.

15   There's been a huge amount of information that was not only

16   shared before that time but has been shared since that time.

17           While we've heard counsel make reference to a

18   meet-and-confer process, I think, acknowledging that it

19   wouldn't make sense on its face for the Court to actually grant

20   the order that they propose requiring compliance within ten

21   days, if the Court were inclined to order such a meet and

22   confer, I think the first step would be to ask the creditors to

23   go back and narrowly tailor their requests so they make sense

24   in light of the new world we're in.  And that would include not

25   only it's going to be a new fiscal plan but what's already been

1   provided to them.

2           So I think, with that framework in mind, I want to

3   respond to some of the specific points that were made earlier

4   about what we have and haven't provided.  AAFAF is now posting

5   the Commonwealth's liquidity weekly.  Regarding some of the

6   arguments about the basis for macroeconomic findings, all the

7   source data relating to that point is in the data room already.

8   It's in folder 2.1.3.  It's right there for anyone who wants to

9   look at it.  And I think, to the extent there are these

10  isolated issues and specific requests that need to be addressed

11  that were mentioned in some of the creditors' reply papers, the

12  best way for the Court to facilitate that is to continue to

13  have the financial advisers address these issues with each

14  other through the mediation process that's under Judge Houser's

15  auspices so that things can be done efficiently and in a

16  targeted manner, not to cut the legs out from underneath that

17  process by essentially having it proceed and then with a side

18  Rule 2004 process running in parallel.  I think that's the

19  opposite of what the efficiencies of the situation suggest

20  would be appropriate.

21          I think, from the Commonwealth's perspective, at the

22  end of the day, given the amount of information that's been

23  provided through the mediation, the Rule 2004 requests as

24  they're formulated would not only be burdensome and

25  inefficient, they would be premature.  That is not to say that

HBFHCOM5

1    the Commonwealth isn't committed to providing information.  I

2    think it plainly is, and I think the work that the Commonwealth

3    and the board have done with Judge Houser and under her

4    auspices has not only shown that commitment, but it's not

5    finished yet.  And so I think it would be a mistake to take

6    isolated examples of points of data or documents that we're

7    still in the process of providing and gathering and saying that

8    that's a basis for authorizing Rule 2004 discovery.

9            I think that the best course of action would be for

10   the Court to let that mediation process work, to let the new

11   fiscal plan be submitted to the board, hopefully certified.

12   And then if the mediation process isn't successful or if these

13   things can't be resolved in that way once the new fiscal plan

14   has been certified, that would be a much more appropriate time

15   for creditors to come forward with narrowly tailored requests.

16   But the sort of 70-plus requests that are attached to these

17   motions that were formulated based on the old fiscal plan and

18   months before hundreds of more questions have been answered

19   through the mediation process, I think that would frustrate not

20   only the mediation but impose undue burden on the Commonwealth.

21           Counsel's suggestion that maybe what should just

22   happen is that the Commonwealth have 30 days to provide written

23   objections and responses to these burdensome requests, that's

24   30 days that AAFAF and the Commonwealth and the board should be

25   using to get that fiscal plan ready.  And the idea that we

HBFHCOM5

1    should take those 70 requests that haven't been narrowed at all

2    in light of what's in the data room, haven't been tailored

3    around the fact that we are having a fiscal plan reboot, that

4    it should be our burden to start with those rather than their

5    burden to first take a look and figure out what do we still

6    really need, the burden should be on them and not on us.

7         JUDGE DEIN:  Does it make sense, be it through

8    mediation or otherwise, to have that process of identifying the

9    types of documents that will be produced, an agreement on that,

10   which would be perhaps a new set of requests, attorneys

11   responding, so not the actual production necessarily, but

12   working together towards at least agreeing on the scope of

13   information that will be produced?  And the other thing, I

14   can't help but oversimplify the situation, but you are starting

15   from scratch.  And it seems to me that now's the opportunity to

16   really figure out how the information gets conveyed in an

17   ongoing process so that it's not a surprise at the end.

18        MS. McKEEN:  I agree with that, your Honor, and I

19   think my answer to both those questions is the same, which is

20   that's exactly why Judge Houser and the financial adviser that

21   the mediators have hired -- that's why they are working so hard

22   to facilitate exactly what you've just described.  The

23   information that the Commonwealth and the board are providing

24   as part of that process is not only being closely managed by

25   Judge Houser, it necessarily involves input from the creditors.

HBFHCOM5

1   They and their financial advisers are conferring, as are we

2   with the mediators, to figure out who would like what

3   information, how can we get it to them.  And the process that

4   you just described and envisioned in terms of let's think about

5   what information needs to be shared and what makes sense,

6   that's exactly the process that's already going on.  So the

7   idea of doing Rule 2004 discovery against that backdrop, I

8   think, would only frustrate and duplicate that process rather

9   than work in harmony with it.  I think we should allow that

10  process to continue to work instead of cutting its legs out

11  from underneath it.

12       JUDGE DEIN:  Do you anticipate as part of that process

13  that discovery will be produced prior to the fiscal plan being

14  certified.

15       MS. McKEEN:  Information is being provided pursuant to

16  that process all the time.  Every week there is new information

17  that's going in the data room.  In advance of listening

18  sessions, there are questions being answered.  So this is not a

19  situation where the requests are all sort of going into a box

20  that's going to be opened later.  This is a very iterative,

21  happening-in-real-time process that Judge Houser's actively

22  managing, and I think that that illustrates that, particularly

23  given the resource-constrained situation we're in, having a

24  sort of parallel but different Rule 2004 way of getting at the

25  same information would be particularly inappropriate in this

1    case.  Thank you, your Honor.

2            JUDGE DEIN:  Thank you.

3            MR. ORSECK:  Thank you, Judge.  I scarcely know where

4    to start.  Let me begin, I think, here.  The overriding theme

5    that I take from both of counsel's remarks is that the

6    ultimate, the ultimate goal that they put forward is to avoid

7    any judicial oversight of what they produce and when and to

8    arrogate to themselves authority to produce or not to produce

9    as they see fit.  That is why we keep hearing about the

10   mediation and all of this is happening through the mediation,

11   and every day we're told new documents are posted to the data

12   room through the mediation.  The mediation has gone on for six

13   months, and we don't have the materials that I listed for you.

14           I listened to Mr. Possinger say that he was going to

15   defer to his colleague, Ms. McKeen, who was going to recite to

16   you chapter and verse the documents we did get.  I listened

17   very carefully.  She said something about a folder 2.1.3.  I

18   can tell you that none of the categories, which again I listed

19   for illustrative purposes only, has been produced to us through

20   the mediation.

21           JUDGE DEIN:  But do you feel that you have the

22   opportunity in the mediation to bring up those kind of

23   objections?

24           MR. ORSECK:  We have an opportunity to bring up.  We

25   have no opportunity to force.  And I think it is a little

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

HBFHCOM5

1    cynical to repeatedly invoke Judge Houser as the basis upon

2    which we will get what we want when I am prohibited from

3    telling you what's gone on in mediation.  What I will say, what

4    I will say, and I am out on a limb for not conferring with my

5    clients on this, but if Judge Houser -- if the Oversight Board

6    and AAFAF will authorize it, we'll be happy for Judge Houser to

7    tell you what has and hasn't been produced in that process.

8    We've got nine parties telling you --

9            JUDGE DEIN:  That answer is not what I need because

10   the problem with the 2004 and the problem with me authorizing

11   that is that it's not in the context of an actual reality of a

12   fiscal plan, and it's not -- right now the requests are broad,

13   and right now they do relate to an old fiscal plan.  So that's

14   easy.  I mean, that's clearly inappropriate.  The question then

15   becomes does the Court sit there and do the meet and confer, or

16   do you do that in the context of a mediation where the

17   mediators do have their own financial fiscal adviser and they

18   are working together to develop what type of information you

19   need to evaluate this and that is actually more technically

20   savvy than I am in evaluating your requests?  That's a problem

21   for me.  It's a problem for me to sit here and look at this

22   list and say, maybe this should be produced or that should be

23   produced.

24           A 2004, as you've requested, is very broad.  So I want

25   the message to be that it's not without judicial oversight at

HBFHCOM5

```
 1        some point.  At some point, if there's no cooperation in the
 2        mediation, if people are really not getting anything that they
 3        need, if you want to say have it certified that says, look,
 4        we're not continuing the discussions about the materials that
 5        should be produced, there's certainly judicial oversight and
 6        there's certainly a point in the process where 2004 may be
 7        appropriate or targeted 2004 discovery may be appropriate.  I
 8        just don't know whether or not the opportunity is now to work
 9        with the mediators right now, because the new fiscal plan is in
10        the process of being developed, to say that as you're
11        developing it, this is the type of data that we need, this
12        is -- you know, your basic assumptions, your basic numbers.  I
13        mean, somebody's going to come up with a plan that's going to
14        be based on something, based on information that's being
15        gathered right now.
16                MR. ORSECK:  Judge, with respect, the "at some point"
17        is today.  We have been at this in mediation for six months.
18        And as I started to say, I waited to hear somebody say to you:
19        We have produced the materials Mr. Orseck listed.  We are going
20        to produce the materials Mr. Orseck listed.  Instead, all we
21        got were generalities:  We are committed to transparency, we
22        believe in working cooperatively, and there has been
23        cooperation.  To take the Tango metaphor again, it takes two to
24        Tango.  You can't have one side to a litigation pronounce to
25        the Court that there has been cooperation.  All nine of us are
```

1    here to tell you that there has not been.  So it is not that

2    we're here for sport or to impose cost or burden or because we

3    don't believe in the mediation process.  Judge Houser doesn't

4    have authority and hasn't exercised authority to make the board

5    produce the materials that we are entitled to, and that's a

6    fact, and that has been our experience over a long period of

7    time.

8              So we are coming to the Court only as a last resort,

9    not because we don't believe in working things out among

10   counsel.  I have recited to you what we need, and not only

11   that, as I have said, these are materials that are relevant to

12   the fair and equitable test.  They're not tethered to any

13   particular fiscal plan.  They are just requests to discover the

14   financial condition of the debtor.  Mr. Possinger's response,

15   the most circular thing I ever heard, he said the plan of

16   adjustment needs to be consistent with the fiscal plan, and the

17   fiscal plan isn't out yet, so you're not entitled to any

18   documents that tell you what the financial condition of the

19   debtor is.  They suggest but they stop well short of committing

20   that they will produce these materials after there's a new

21   fiscal plan.

22             Remember, we didn't get these documents for many, many

23   months when nobody thought there was going to be a second

24   fiscal plan.  We had a single fiscal plan, we had no hurricane,

25   and we got the argument that Mr. Possinger referred to again

HBFHCOM5

1    today, which I thought was dead and buried.  It's not in their

2    brief.  That argument is you creditors don't have any right to

3    challenge the fiscal plan.  That authority is reposed solely in

4    the board, and all of your requests someway, somehow connect to

5    the fiscal plan or bear on the fiscal plan.  And so the

6    conclusion is you don't have any right to get discovery of

7    those.  We'll give you maybe what we want out of our good

8    graces.  That was the argument they put to us in June when we

9    proceeded informally.  In their brief, they abandoned that

10   argument.  All they said was the pending proceeding doctrine

11   and deliberative process, but now we hear it again.

12           So this continued hiding behind you might get it

13   someday when it's appropriate, when it becomes appropriate, you

14   might get it in mediation if you'll just work cooperatively

15   with us -- you're at a disadvantage, I acknowledge, Judge,

16   because you have one set of litigants saying:  I don't know

17   what they're talking about, we are working cooperatively, they

18   can get what they need, or they will actually stand before you

19   and tell you that we have gotten what we need, and I'm here

20   telling you, as are all my colleagues, just the opposite.

21   There is no solution to that other than the process of

22   discovery.  If they want to object and say we're not entitled

23   to something, if they want to say that a document doesn't exist

24   and we need to bring a motion to compel, that is the only way

25   to resolve this circumstance.  There is no more kicking the can

HBFHCOM5

1   down the road when we are told that there will be a new fiscal

2   plan in February.

3           What are we to do?  We are utterly unequipped to

4   assess whether any plan of adjustment is fair and equitable

5   unless we have complete transparency.  And they continue to

6   stand before you and tell you a combination of we don't have a

7   right to it and we've already given it to them.  That's why

8   we're here.  And I am sorry, but to suggest that we need to go

9   through more paces and go back to Judge Houser again and ask

10  her to try to persuade them to give us what we're statutorily

11  entitled to, we're just going to end up back before you much

12  later, and it's going to delay things.  So that is my basic

13  response.

14          I want to just mention one other thing here.  I think

15  I heard Mr. Possinger say that there aren't any other adversary

16  proceedings in which materials have been produced that haven't

17  been produced to us.  The Peaje proceeding, I have Mr. Wolf's

18  declaration in that and in another proceeding.  We know there's

19  been discovery in that proceeding, and I believe in the

20  interpleader proceeding too.  So those materials are out there.

21          JUDGE DEIN:  Let me ask Ms. McKeen to respond to that

22  issue of whether or not there are materials that have been

23  produced to other parties that are not being produced here.

24          MS. McKEEN:  Your Honor, there are materials that have

25  been produced in connection with individual adversary

1    proceedings.  Peaje is an example of an adversary in which

2    material has been produced not only to those parties and that

3    adversary but to, I believe, other parties in the HTA Title

4    III, including Ambac and Assured.

5         JUDGE DEIN:  So is there a reason that it would not be

6    produced now?

7         MS. McKEEN:  I don't think it was previously

8    contemplated, but I think the parties could certainly meet and

9    confer about the propriety of producing that pursuant to an

10   appropriate protective order if it's already been shared with

11   other parties.

12        MR. ORSECK:  Let me speak to that for a moment.  I'll

13   tell you where that stands.  It was offered to us if we would

14   drop our 2004 examination.  Does that sound like a policy of

15   sunshine, as counsel called it, or transparency?  We don't have

16   it because they wouldn't give it to us unless we would drop our

17   discovery request.

18        Two small final points.  One is I heard again, and I

19   just -- I'm almost without words, that the problem here is that

20   our document requests is a rifle shot and that we have never

21   revised it to limit it in light of Maria or narrowly tailor it.

22   We were told to pound sand on multiple grounds.  You have no

23   entitlement to discovery because it seeks to undermine our

24   authority for certification.  And now they wait until we're at

25   the hearing, which we've waited forever to get before you, and

HBFHCOM5

1    they say:  You know what should happen next?  They should go

2    back to the drawing board and try to be more careful about what

3    they request.  And then they'll tell us the same things they've

4    told us before: Buzz off.  We're not going to produce anything.

5    Then we'll come back before you, and then it will be February

6    or March.  That's the first point.

7           The second point is this data room you keep hearing

8    about.  The materials in the data room, limited as they are,

9    some of them are subject to the mediation agreement.  So they

10   are limited in that respect.  Some of them are subject to

11   nondisclosure agreements that we're not even allowed to share

12   with our clients who are much more sophisticated about these

13   materials than we are.  The mediation process has not been an

14   effective vehicle for us to get what we need.  And I will just

15   say the thing I've said before.  All you have to look at is the

16   list of materials I set out.  There is no debate that they fall

17   squarely within what is discoverable under Rule 2004.  There is

18   no debate that they go to the fair and equitable test for

19   confirmation.  Has nothing to do with what fiscal plan we're

20   looking at or not.  And counsel, despite plenty of

21   opportunities, has never suggested that those materials have

22   been produced.  Thank you.

23           JUDGE DEIN:  I knew you'd stand up eventually.

24           MR. BIENENSTOCK:  Thank you, your Honor.  Martin

25   Bienenstock, Proskauer Rose, for the Oversight Board.  I

HBFHCOM5

1   appreciate the opportunity to respond to those last remarks

2   which we submit, your Honor, are categorically incorrect.

3           Number one, there's a premise that the ad hoc group or

4   the mutual fund group has asserted here that at confirmation

5   you are going to be able to attack the fiscal plan because the

6   plan of adjustment is supposed to be consistent with the fiscal

7   plan.  Their premise is totally false.  Why is it false?

8   Because there's only one part of the fiscal plan that bears on

9   the plan of adjustment.  That's the debt sustainability

10  analysis, how much is available for debt service.  It's a

11  requirement in PROMESA that the plan of adjustment be compliant

12  with the fiscal plan; meaning, we can't spend more on debt

13  service in the plan of adjustment than the fiscal plan says is

14  available for debt service.

15          The test for the creditors at confirmation is not this

16  fair and equitable test that you've been hearing about all

17  morning, as if everything is all open.  The test is, as my

18  partner Mr. Possinger said earlier, could the creditors,

19  outside of bankruptcy, using Puerto Rico law and the priorities

20  under it, if they all ran to the courthouse and stampeded,

21  would they come up with more collectively than is being offered

22  to them under the plan?  And PROMESA says in Section 314, the

23  Court can consider that.  So that's the test.

24          Now I'd like to get to something constructive, your

25  Honor, because your Honor's asked, well, what will you give?

1    And that's the question.  And the board and AAFAF have been

2    determined to be completely transparent.  We have been and will

3    give all of the raw data that we get, that we will use to try

4    to formulate a sensible, successful fiscal plan.  What you

5    heard earlier, although it might not have been all connected

6    for your Honor, is that's not what they're asking for in the

7    main.  They know they have that, and they'll be getting the new

8    information that we get.  They're asking for how Ernst & Young

9    came up to its conclusions that the actual expenses that would

10   be incurred by the Commonwealth in the prior fiscal plan would

11   be more than the expenses that were on the Commonwealth's

12   books.  That's what was called the reconciliation analysis, and

13   that's what added up to a $600-million-a-year cost.

14   Fortunately, we have no reason to believe that in the new

15   fiscal plan there's going to be anything like that, but he's

16   asking for Ernst & Young's thought processes.

17            To be sure, they can go out and hire experts who will

18   have different thought processes.  And that's where

19   Mr. Possinger tried to explain before, Congress knew that could

20   happen, and that's why it said we're not letting people

21   challenge the Oversight Board's judgments on what they do with

22   the data in the fiscal plan.  It was extraordinary.  I mean,

23   not many statutes do something like that, but they said no

24   district court has subject matter jurisdiction to challenge it.

25   So what they want is they basically want the mental work

HBFHCOM5

1   product of how you took the data and decided what it meant for

2   the future.

3          Now, as I said, we have been sharing, we will continue

4   to share all the raw data we get.  Someone said earlier that

5   they want to know how much the running the government costs,

6   and we haven't provided that.  Your Honor, there's a public

7   budget.  How can you get more specific about how much the

8   government costs than the public budget?

9          Another fact that the moving parties are ignoring or

10  not mentioning is that this is a public governmental entity.  A

11  lot of the information that they say they always get is already

12  public, not just to them, it's to anyone who has a computer who

13  can get on the Internet can get onto AAFAF's sites and see all

14  this public data.  It's been public all along.

15         I think if we were to respond to all of the requests

16  in the motion, what we would be back to you with is this:  Raw

17  data, yes, you should have the same data to work with that we

18  have to work with.  But the judgment calls that Ernst & Young

19  or another expert came up with to determine how certain raw

20  data may understate actual costs, what's the purpose of giving

21  them that, especially for a fiscal plan that is now stale and,

22  you know, we're having to do all over again?

23         So, constructively, I would hope and ask that what we

24  do going forward is let's make sure they get all the raw data.

25  We think they're getting it already.  If there's some raw data

1    they're not getting, we can fix that, and then your Honor can

2    weigh any requests they have that go beyond that.  Thank you.

3              MR. ORSECK:  May I have 60 seconds?

4              JUDGE DEIN:  Yes, as opposed to a minute.

5              MR. ORSECK:  I was going to say 30, and then I

6    switched it to 60.  The first thing is I think we need to be

7    clear about the legal test.  Mr. Bienenstock has now said that

8    what matters at confirmation is that the plan of adjustment be

9    consistent with the fiscal plan; and, therefore, there's no

10   need to discover what's underlying the fiscal plan.  All you

11   have to do is compare the two.  That is one of the tests.  That

12   is one of the tests, but there are two other tests.  One is the

13   fair and equitable test which we cited at length in our brief

14   and all sorts of authority.  And what that means is that the

15   creditors have to be provided all that could reasonably be

16   provided by the debtors.  That is a separate requirement, and

17   that's the target of our request.

18             There's a third requirement too, which is that any

19   plan of adjustment needs to be in the best interests of

20   creditors.  So that's a misdirection that we're seeking

21   something that we're not entitled to as a legal matter.

22             Second point, what we're hearing yet again, now from

23   three separate lawyers, is they are offering you, Judge,

24   something, anything, to avoid your imposing an order that

25   compels them to provide documents.  We've now heard:  You

HBFHCOM5

1    already have the raw data.  I am standing here before you to

2    tell you that that is untrue.  If they're saying, I promise to

3    give it to them if only you won't impose an order allowing a

4    2004 examination, all the more reason to do so when we have a

5    six-month history of their failure to do that.

6          The last point, Mr. Bienenstock reiterated that some

7    of the materials we're seeking go to deliberative process.  We

8    disagree, but that's what we have meet and confer for.  If they

9    think some of the materials we've requested are an overreach or

10   are protected, sit down with us and talk about it under the

11   auspices of a Rule 2004 order.

12         Thank you, Judge.

13         JUDGE DEIN:  Since part of my other life is being a

14   mediator, unfortunately not in this case, I do recognize that

15   the process itself can be very frustrating and difficult, but I

16   think it's something that has made a lot of progress as I

17   understand it in this case, without understanding the details,

18   and really does need further opportunity to proceed.

19         I think the 2004 is premature in this case, but again,

20   a denial would be without prejudice.  You need to make this

21   work, and you need to be able to agree on the disclosure of

22   this information.  I've just heard:  "We will disclose all raw

23   data," or, "We have been disclosing all raw data," and, "We

24   don't have all the raw data."  I don't know the answer to that

25   because I don't even know what the scope of the raw data is.

HBFHCOM5

```
1    But that seems to me to be something that needs to be
2    reconciled.  I think that the government entity needs to
3    understand that the Court will step in, all right.  That is a
4    very real problem, concern.  Understand that there's a limit.
5    This information and their ability to understand the ultimate
6    fiscal plan is real.  And maybe I'll have to finesse what the
7    standard is, but fundamentally they're going to have to
8    understand what it is and what it's based on.  I'm going to say
9    that without analyzing all the different levels of PROMESA and
10   what the analysis requires.  But, fundamentally, there has to
11   be an understanding of what you're proposing and why.
12          I will entertain another 2004 like I did with the UCC
13   committee, but it has to be targeted.  So the denial is without
14   prejudice.  It has to be based on specific, more limited
15   requests, and more like a motion to compel and a representation
16   to me that says:  We've asked for it.  We didn't get it.  We've
17   tried.  We need it.  But it's got to be much more targeted than
18   the general request that exists now.  They're too broad.  The
19   meet and confer at this point, unfortunately, would require the
20   rewriting of the request because time has gone by.  And I will
21   admit, in most cases you don't have such a total rewrite
22   necessary due to the time delay.
23          I will certainly entertain having more frequent
24   meetings on this if that's appropriate.  If the creditors feel
25   that we need to put this on a track -- a discovery type of
```

HBFHCOM5

1    track, I will be certainly happy to entertain that.  I do think

2    that you have heard and have probably stated that the mediation

3    is very available and certainly on the front burner right now

4    that the fiscal plan is being rewritten.  Now is really the

5    time to set the parameters for what is being produced.  I can't

6    emphasize that enough.  I think the goals are the same, and I

7    think that the mediators need the opportunity to see if that

8    can happen.

9         That having been said, I recognize mediation's a very

10   frustrating process, and it does mean that you -- no side wins;

11   right?  I used to say I mediate in a robe so nobody can throw

12   anything at me, all right, because that's the reality.  The

13   government's going to have to give more than they want, and the

14   creditors are going to have to get a little less than they

15   want, but there is a process there to work that through.

16        All right.  So I am going to deny the motions without

17   prejudice but with the understanding that I will entertain

18   subsequent motions.  And progress just really, really needs to

19   be made on this.

20        Did we do it in less than 90 minutes?  I don't know.

21   I've lost track.  All right.  I think I have one more thing on.

22   I have the motion to strike.

23        MR. DAVID:  Thank you, your Honor.  Kenneth David,

24   Kasowitz Benson Torres on behalf of Whitebox.  I think we've

25   been allotted 20 minutes in total.  So I'll take ten minutes of

HBFHCOM5

1   that, and if it's OK with you, I'll allot seven minutes for

2   opening and three minutes for rebuttal.  Hopefully won't need

3   all of that.

4           Your Honor, we think this is pretty straightforward

5   based on the record and the transcripts here.  First, Judge

6   Swain, when she set the schedule in the interpleader action,

7   denied two separate applications to have substantive motions

8   heard before the discovery began and was completed.  So based

9   on that, the parties served discovery.  Later, in early July we

10  were before your Honor in Boston to hear discovery disputes

11  concerning that discovery, and in fact this very issue came up.

12  And in order, I think -- I don't want to put words in your

13  Honor's mouth, but in order to comply with the schedule that

14  was set by Judge Swain, which was to have discovery completed

15  by September 1, you thought the only way to do that would be to

16  narrow the time frame for discovery.  We objected to that with

17  respect, of course, because our allegations were and our

18  position was that there were defaults that went prior to 2017,

19  meaning all the way back to 2015.  But at that hearing you and

20  I had you an extensive discussion back and forth about whether

21  or not that discovery was appropriate now.  And it's clear from

22  the transcript that your Honor ruled that discovery would be

23  deferred to another phase after summary judgment on the 2017

24  defaults.  In fact, it's quite clear from both the transcript

25  and from the order that both discovery and any summary judgment

HBFHCOM5

1    motions thereafter for the pre-2017 defaults would await a

2    second or a phase 2A or an interim phase, as I think is the way

3    you described it.

4         The next day you issued an order that was equally

5    clear, in our view, and everyone relied on those orders and

6    those rulings.  And in fact, Ambac and Whitebox, the two

7    movants here, clearly relied on that and did not pursue that

8    discovery at that time.  In fact, all the parties to the

9    interpleader relied on that except for the mutual fund group

10   and the Puerto Rico fund group.  When it came time for summary

11   judgment, they filed summary judgment seeking a summary

12   judgment ruling on the pre-2017 defaults.

13        Your Honor, we think that's inconsistent with both

14   your ruling and your order from July, and we think it

15   prejudices the Whitebox -- Whitebox and Ambac group as well as

16   anyone else.  In fact, your Honor, in the summary judgments

17   that were filed, all the parties, including Bank of New York

18   and Assured complied with your rulings to not address the

19   pre-2017 defaults.

20        JUDGE DEIN:  And my memory was that we focused on 2017

21   because those are actually the clearest.  And while there may

22   be some remnants, if you don't prevail on 2017, that the

23   decision on the 2017 would be instructive as to the likelihood

24   of success on the other claimed defense.

25        MR. DAVID:  Correct, your Honor.  You in fact

HBFHCOM5

1    encouraged us to wait until the summary judgment was decided

2    and then reevaluate whether or not we wanted to pursue the

3    pre-2017 defaults.  And in fact we took that guidance and we

4    will do that, and we're awaiting the completion of the summary

5    judgment before we make those decisions.

6          But, of course, one of the key points that I raised

7    with you on July 5 in Boston was without the discovery, we

8    didn't want to be prejudiced.  And the outcome of that, of

9    course, was we weren't going to be prejudiced because this

10   would be deferred to a different phase.  But now, with the

11   mutual fund group and the Puerto Rico fund group making their

12   summary judgment, that prejudice that I was concerned about and

13   that you and I discussed and assured ourselves we wouldn't be

14   prejudiced is coming to fruition.

15         JUDGE DEIN:  Let me just ask, because they do raise

16   the point that they do raise a strictly legal argument that's

17   not fact based.  What do you say to that?

18         MR. DAVID:  Your Honor, we don't think it's a strictly

19   legal argument.  We think there are fact issues.  For example,

20   they've put at issue whether or not the defaults were actually

21   real defaults under the resolution, and, of course, we need to

22   know.  The same discovery that we took and that is applicable

23   for the 2017 default is appropriate for the pre-2017 defaults,

24   specifically what was the effect of the events that we allege

25   were actual defaults?

HBFHCOM5

1          And then there are other points too, your Honor,

2     regarding notice.  Notice and whether it was procedurally

3     appropriate is a key issue in their motion, and we think there

4     are fact issues even to those arguments.  And specifically,

5     their entire argument is based on who is or isn't a registered

6     owner under the resolution, but that term is not defined.

7     There are other defined terms that ultimately wind up with a

8     definition -- with the definition of registered owner, but the

9     term "registered owner" itself is not defined.  So we think

10    discovery is appropriate about who the parties thought a

11    registered owner would be and who should be, because under

12    their view, it leads to the absurd result that the only entity

13    that could provide -- excuse me, the only holder that can issue

14    a notice of default would be DTC and not any of the actual

15    holders that have the economic interest.

16         JUDGE DEIN:  Before you go on, just so that the record

17    is clear, this is a motion to strike in 17 adversary proceeding

18    133 the Bank of New York Mellon interpleader action.

19         MR. DAVID:  Your Honor, the other point they make is

20    that somehow they weren't on notice and that they weren't at

21    this hearing that I'm referring to in Boston.  Clearly, they

22    were on notice of the hearing.  They were on notice that it was

23    happening, and they could have come.  And even if there's an

24    excuse for them not coming, it's clear that they were on notice

25    of what happened at the hearing and what your order said.  In

1  fact, the docket in this case in the interpleader action

2  reflects that counsel for the mutual fund group ordered the

3  transcript that very day of the hearing.  So they knew what

4  happened, because if you read that transcript, it is clear as a

5  bell, it's over ten pages of back and forth between you and I,

6  what the result was.  So they waited from July 5 until November

7  to raise these issues while all the other parties in the case

8  were relying on your Honor's rulings and order to not address

9  the pre-2017 default.

10      So we think, your Honor, if they're allowed to make

11  this motion, it's highly prejudicial to us.  We have to both

12  make the procedural arguments about what discovery is necessary

13  but also just to be safe, we'd have to make the substantive

14  argument as well.  So the whole point of our discussion back in

15  July was if we're going to have to do that, we should be

16  entitled to the discovery first.

17      So with that, I'll save the rest for rebuttal.  Thank

18  you.

19      JUDGE DEIN:  Thank you.

20      MR. BENTLEY:  Good afternoon.  Philip Bentley of

21  Kramer Levin for the mutual fund group.  By agreement with my

22  cocounsel, Mr. Zakia of White and Case who represents the

23  Puerto Rico Funds, I'll be taking the lead in responding to the

24  motion.  Mr. Zakia may have brief comments to add after I'm

25  done.

1          JUDGE DEIN:  OK.

2          MR. BENTLEY:  Your Honor, let me very briefly talk

3     about your order and the motions that you are resolving, but

4     then I'd like to turn and focus principally on practical

5     consequences and what would be a resolution here that would not

6     cause any prejudice to the movants and that would avoid the

7     very substantial harms that would result if the relief they're

8     seeking is was granted.

9          Just starting very briefly with your order, and I

10    won't belabor it because we briefed it.

11         JUDGE DEIN:  I was there.

12         MR. BENTLEY:  Your Honor probably knows better than we

13    do what you intended.  I'll limit myself to two quick points.

14    One is, as your Honor knows very well, your order which was

15    captioned an order resolving discovery disputes doesn't even

16    mention the scheduling order.  We think it's clear there was no

17    intent to look at what the scheduling order provides, what

18    arguments were made by both sides when the scheduling order was

19    briefed and then entered by Judge Swain, let alone to modify

20    the scheduling order.  Moreover, because the matters that were

21    before you in Boston on July 5 were merely discovery disputes

22    and not one of the motions said anything about possibly

23    modifying the scheduling order, not all of the parties to the

24    interpleader appeared before you, and as a result, if your

25    Honor was -- to the extent your Honor intended possibly to

HBFHCOM5

1   modify the scheduling order, you were doing so without having

2   been informed of what the consequences of that might be.

3            And with that I'd like to turn to the practical

4   consequences of doing it their way versus doing it the way

5   Judge Swain has already ordered.  My friend, Mr. David, has

6   made a lot of supposed prejudice.  With respect, we don't think

7   there's any prejudice at all from leaving Judge Swain's

8   scheduling order in place with no modification, no striking of

9   our summary judgment motion.  He's mentioned two supposed kinds

10  of prejudice.  One has to do with the limits of the motion he

11  made, the fact that he didn't move for summary judgment, and he

12  says other parties also chose, made a decision, not to move for

13  summary judgment as to pre-2017 defaults.

14           Your Honor, I have a simple response to that.  Putting

15  aside the fact that we think the reason they didn't move for

16  that relief is that would have been preposterous relief, as

17  your Honor has recognized, the strongest defaults, alleged

18  defaulted, the ones that have the best shot of possibly winning

19  are the 2017 ones.  If Judge Swain rejects those alleged

20  defaults, says they're not defaults, the notion that earlier

21  defaults might be defaults and might even be adjudged defaults

22  on summary judgment seems to me slim to none.  But put that

23  aside.  If they want to move for summary judgment as to

24  pre-2017 defaults, we don't object.  That is, we're prepared to

25  waive the fact that they're now late in doing that.  If they

HBFHCOM5

1    want, when they respond to our summary judgment motion, to make

2    it a response and cross-motion and throw in a --

3              (Continued on next page)

HBFsCOM6

1      THE COURT:  They want discovery.

2      MR. BENTLEY:  Let me turn to that.  Let me turn to

3  that.  The relief they are seeking would have one basic fact,

4  and it would preclude us from arguing to Judge Swain, as we

5  have done in our summary judgment motion, that there are purely

6  legal grounds, not factual grounds, that don't need discovery

7  on which the pre-2017 defaults can be disposed of.

8      If they think they need discovery to respond, the

9  federal rules give them a clear remedy.  Rule 56(d) says they

10 can argue that this is just as if we had made a summary

11 judgment motion before there was discovery in the case.  If

12 they thought they needed discovery, they would cite Rule 56(d).

13 They argued that they need discovery, that it is not fair to

14 rule on summary judgment prior to discovery.  They can make

15 that argument now.  Judge Swain will not grant summary judgment

16 on your favor in the pre-2017 issues.

17     We don't think there is any prejudice to them there.

18 It is simply a matter of them asking to deprive Judge Swain of

19 the ability to determine whether the pre-2017 alleged defaults

20 are defaults where discovery is needed before she can probably

21 address summary judgment.  We think they are clearly not.

22     While I don't want to get into the merits, let me just

23 very briefly respond to Mr. David and briefly address the

24 merits.  He mentioned this issue of we argue that most of the

25 notices of default were deficient, including a bunch of 2017

1    notices, as well as all of the pre-2017 notices.  We said they

2    were deficient because they didn't comply with the requirements

3    contained in the COFINA resolution, and we think that is an

4    issue that can be decided on the face of the resolution and on

5    the face of the notices.  You would look at the notices, you

6    ask whether they satisfy the requirements.

7          They say we need discovery into what the resolution

8    meant, what did it mean when it says registered owner.  Your

9    Honor, this is a simple answer to that.  That issue has been

10   before the court from the very outset in this case because it

11   relates to 2017 defaults as well as 2016 and 2015 defaults.

12         When they were up before your Honor on July 5th,

13   nobody had moved to strike discovery with respect to the

14   meaning of the resolution, the resolutions' requirements,

15   notice requirements for notices of default, because they had

16   not served any discovery requests seeking to interpret the

17   resolution.  So they made their choice.  They concluded that

18   they don't need discovery on that issue.  Nothing has changed.

19   The fact that your Honor said they can't have discovery as to

20   the existence or nonexistence of defaults prior to 2017, that's

21   a separate issue.

22         THE COURT:  Let me be honest.  My least favorite

23   activity is reading my own transcripts, but I think I made it

24   clear at the hearing that I was limiting summary judgments,

25   appropriately or not, to the 2017 default.  The colloquy was

1    once that is decided, we will see what's left, if there is

2    anything, whether it is pursuing.  I am not going to change

3    that.  That was the ruling and the transcript was available and

4    was obtained and you don't have the luxury of not reading my

5    transcript.

6         MR. BENTLEY:  Your Honor, we read your transcript.  We

7    also read your order, and we do rely on the principle that what

8    your Honor says in an order is more authoritative than what

9    might be said in colloquy at a hearing.

10        JUDGE DEIN:  I think as I wrote the order and as I

11   read it, it was that the summary judgments will be on the 2017

12   and then thereafter the parties can see if it is without

13   prejudice to seeking others.  I don't want to get caught up in

14   delaying the resolution of the 2017 summary judgments on a

15   whole fight about whether or not discovery is needed on

16   something else.  That is what is going to happen.

17        Actually, I am going to strike the pre-2017 arguments.

18   You are free to, if you think to move separately and have a

19   separate fight about it, you can do that, or you can wait until

20   the resolution of the 2017 decisions and see if it is renewed,

21   if the arguments are renewed by the other side.  But I think it

22   is actually more complicated to keep the pre-2017 arguments in

23   there.

24        MR. BENTLEY:  Your Honor, then may I address,

25   recognizing your Honor's ruling, can I address the precise form

HBFsCOM6

1    of the relief you're going to enter?

2           The order that was proposed, along with the motion,

3    proposed something that we think is really improper.  They

4    annexed portions of our brief, they were striking parts of our

5    brief that applied to 2017 as well as to 2016.  We think that

6    is wrong.  There is a simple alternative way to go, and that is

7    your Honor should order a one-line order that says, defaults of

8    the following sort may not be determined by summary judgment on

9    the pending summary judgment motions.  And if I may address

10   what X should be, defaults of the following sort?

11          JUDGE DEIN:  Do you want to talk about that and see if

12   you can submit something to me?

13          MR. BENTLEY:  I'm happy to discuss it with them.  I

14   think it is very clear what the dispute is going to be, and I

15   think it might be more efficient for me to raise it now.  If we

16   can't resolve it now, I am happy to follow up and discuss it

17   with them.

18          We would propose that the order say what's off

19   limits on the current summary judgment is the existence or

20   nonexistence of defaults prior to 2017.  Now, I want to be

21   clear about what we're not including in that category.  What

22   we're not including is we have argued, as you have heard, that

23   even if those were defaults, they couldn't have ripened into

24   event of default because the notices that were given didn't

25   comply with the resolution.  That is a different issue.

HBFsCOM6

1          Your Honor did not preclude discovery on that issue

2     because nobody had requested discovery on that issue.  Even

3     though that issue has been on the table from the beginning,

4     that is an issue that affects the 2017 notice of default as

5     well as the 2016.  So we say there is no basis to put that off

6     limits.

7          JUDGE DEIN:  I think you're fine-tuning something that

8     I didn't intend.  I think that the summary judgment shall be

9     limited to defaults or events of default occurring in 2017.

10    Does that make sense?

11         MR. BENTLEY:  Your Honor, with respect to what that

12    doesn't grapple with is the fact that your Honor didn't

13    preclude them from taking any discovery as to the adequacy of

14    notice at any time, either 2017 or pre 2017.  That was not

15    before your Honor.

16         JUDGE DEIN:  If you have raised an argument that says

17    that the notice was deficient in 2017 and that is going to be

18    resolved in connection with the 2017, then there will be a

19    ruling on that.  And you will either look at it and say this

20    applies to pre 2017 or our notices were so different that it

21    doesn't apply.

22         MR. BENTLEY:  If there is an efficient way to come

23    back to Judge Swain to deal with that, I am sure we can work

24    something out that would be a solution as well, your Honor.

25         JUDGE DEIN:  I don't think I should be striking lines

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    off every –– I think you may want to.  If you want leave to

2    refile, you can.  But if not, I would just enter an order that

3    says that the summary judgment is limited to default or events

4    of default occurring in 2017, the issues for summary judgment.

5    Does that work?

6         MR. DAVID:  Just to ensure I am on the microphone,

7    your Honor, that's fine with us.  I take issue with some of

8    Mr. Bentley's comments about what we have sought.  Your Honor's

9    phrasing of the order and decision is fine with us and we are

10   comfortable with that.  Thank you.

11        MS. MILLER:  Your Honor, Atara Miller from Milbank on

12   behalf of Ambac.

13        We are also fine with that.  I just do want to make

14   clear on the record that with respect to Mr. Bentley's argument

15   about the sufficiency of notice, we have also advanced in our

16   motion for summary judgment that notice and cure was not needed

17   because the acts of the common law COFINA were fundamental

18   repudiations of the agreement.  So that argument, to the extent

19   that we are going to talk about sufficiency of notice, is

20   certainly something that we would want discovery on that goes

21   directly to that.  I think it is appropriate to keep it all off

22   the table as you proposed.

23        JUDGE DEIN:  If there is a fight about the notice in

24   2017, that is on the table.  That is part of the summary

25   judgments.

HBFsCOM6

1          MS. MILLER:  Agreed.  Thank you.

2          THE COURT:  We are not done.

3          MR. SACK:  Jason Sack on behalf the Puerto Rico Funds.

4   I am not here to reargue anything.  I want to ask, given your

5   Honor's ruling, one point of clarification just so I make sure

6   we respond appropriately.  This scheduling order that provided

7   for summary judgment deadlines didn't provide for what I think

8   counsel called (2)(a).

9          I just want to be clear, is it the court's expectation

10  that we move now to address what happens, or is it OK if we

11  wait to see how Judge Swain rules on summary judgment?  I just

12  don't want to waive anything, if we have this one deadline that

13  was there.  Let's say given however summary judgment comes out,

14  we want to renew as your Honor has invited.  I just don't want

15  to sit on the existing order for too long.

16         Did that question make sense?

17         JUDGE DEIN:  Yes.

18         MR. SACK:  OK.

19         JUDGE DEIN:  Now I need to make sure my answer makes

20  sense, which is the original order was that after the summary

21  judgment is decided on the 2017 issues, the parties may seek

22  leave to bring another summary judgment motion.  Am I

23  paraphrasing myself wrong?

24         I would not expect you to move now.  I would expect

25  that after the decision is made on the pending summary judgment

HBFsCOM6

1    motions, there will be a period for everyone to re-evaluate

2    whether or not there are open claims as to efforts that

3    occurred before 2017 and whether those are being pursued as

4    events of default or not.

5         If Judge Swain, who I can't see on the other side of

6    this -- there you are -- she is going to tell me that I have

7    messed up her schedule, she will issue a different order.  But

8    my expectation is that these summary judgment motions will go

9    forward based on the 2017 issues, and once that is decided,

10   there will be a status conference or some other form for the

11   parties to represent whether or not they are continuing to

12   pursue efforts that occurred before that time.

13        MR. SACK:  Understood, your Honor.  Thank you.

14        MR. DAVID:  Your Honor, I stood up just to make one

15   clarification.  I agree with everything you just said, other

16   than whenever it is we make that decision, assuming we want to

17   go forward, we are not just going to look for summary judgment

18   necessarily, but we will raise potentially the need for

19   discovery at that time.

20        JUDGE DEIN:  That's correct.

21        Anybody have anything to say that we haven't talked

22   about already?

23        MR. ORSECK:  Judge Dein, at the risk of pushing my

24   luck on the 2004 motion, I am not asking you to revisit

25   anything you have said.  My understanding is we are to pursue

HBFsCOM6

1   getting materials that we request in the context of the

2   mediation to try to minimize the chances that we will return

3   before you.  What I am concerned about is that there is a

4   dispute about what actually has been produced in mediation as

5   we have today.

6       I wonder if the court would find it useful to issue an

7   order or permit that what is and is not produced in the context

8   of the mediation may be the subject of public discussion to

9   you.  So, in other words, we could come before you if we need

10  to and say they have produced X, Y, and Z in the mediation, but

11  they have declined to produce A, B, and C in the mediation and

12  we can prove that.

13      My understanding is the mediation privilege is so that

14  it won't prejudice the parties' positions on the merits before

15  the court, but having the mediator supervise discovery, which

16  is in effect what is going on, I think would fall outside of

17  that general policy.  I think it would avoid us coming back

18  with this kind of dispute, if it is subject to the court's

19  understanding of what happened in that process.

20      JUDGE DEIN:  I am just reluctant to do that because I

21  know that you all signed a very lengthy mediation agreement

22  that I don't know what it says.  I don't want to enter anything

23  that may conflict with an existing agreement.  It is certainly

24  something you can talk about.  My expectation would be that any

25  subsequent request for 2004 discovery would somehow reflect the

HBFsCOM6

```
1    fact that there was targeted requests that were denied and that

2    somehow that issue needs to be brought to my attention.

3              I am hoping that, within that context, you can talk,

4    but it also seems to me -- it is always easy from the

5    outside -- but it seems to me that what has been produced and

6    has not been produced ought to be the basis of a

7    meet-and-confer and that that ought to be able to be resolved.

8    If it can't be resolved, it seems to me that it certainly can

9    be brought up in a targeted way with Judge Houser or any of the

10   mediators to say this is really our problem right now, we think

11   we don't have X and they say we do.  It seems to me that that

12   ought to be able to be resolved.

13             I hear you.  I am hoping, because hope springs

14   eternal, that you will be able to, if you present anything

15   further to me, that you will be able to at least agree to the

16   disclosures, however appropriate, in that motion.  If not, if

17   we have to do it in mini steps, we will.  If we have to have

18   first a hearing on what is allowed to be discussed, we'll do

19   that.  I am just reluctant because I do know that you have

20   parameters that I actually don't know anything about.

21             MR. ORSECK:  We'll go forward on that basis.

22             JUDGE DEIN:  Thank you.

23             Before anybody else has any thoughts, the court is

24   adjourned.

25             (Adjourned)
```

HBFsCOM6

UNITED STATES DISTRICT COURT)

                              ) ss.
OF PUERTO RICO                )

1

2

3

4                      REPORTER'S CERTIFICATE

5

6          I, Raquel Robles and Lisa Picciano Fellis, do hereby

7  certify that the above and foregoing pages, consisting of the

8  preceding 155 pages constitutes a true and accurate transcript

9  of our stenographic notes and is a full, true, and complete

10 transcript of the proceedings to the best of our ability.

11         Dated this 15th day of November, 2017.

12         S/Raquel Robles_____

13         Raquel Robles, RMR, CRR

14         S/Lisa Picciano Fellis_____

15         Lisa Picciano Fellis, RMR,CRR

16         Official Court Reporters

17         500 Pearl Street

18         New York, NY 10007

19         212-805-0320

20

21

22

23

24

25