# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGE-MENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**Re:  Dkt. 913** |

## REPLY IN SUPPORT OF
## OBJECTION AND MOTION OF AURELIUS
## TO DISMISS TITLE III PETITION

Luis A. Oliver-Fraticelli
Katarina Stipec-Rubio
USDC-PR Bar Nos. 209204, 206611
ADSUAR MUÑIZ GOYCO SEDA &
    PÉREZ-OCHOA PSC
208 Ponce de Leon Ave., Suite 1600
San Juan, P.R.  00918
Phone:  (787) 756-9000
Fax:  (787) 756-9010
Email:  loliver@amgprlaw.com
kstipec@amgprlaw.com

Theodore B. Olson  (*pro hac vice*)
Matthew D. McGill  (*pro hac vice*)
Helgi C. Walker  (*pro hac vice*)
Lucas C. Townsend  (*pro hac vice*)
Lochlan F. Shelfer  (*pro hac vice*)
Jeremy M. Christiansen  (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone:  (202) 955-8500
Fax:  (202) 467-0539
Email:  tolson@gibsondunn.com

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

ARGUMENT ........................................................................................................1

I.    The Board Members Are Unconstitutionally Appointed........................................ 5

      A.    Congress Is Not Free To Ignore The Appointments Clause When It
            Legislates With Respect To The Territories ................................................ 5

            1.    Supreme Court Precedent Makes Clear That The
                  Appointments Clause Applies When Congress Acts Under
                  The Territories Clause.......................................................................5

            2.    Historical Practice Confirms That The Appointments
                  Clause Applies To Officials Overseeing The Territories ...............8

            3.    Democratic Election Is Consistent With The Appointments
                  Clause...............................................................................................15

            4.    This Court Should Reject The Opposing Parties' Calls To
                  Extend The Racist *Insular Cases* ...................................................16

      B.    The Board's Members Are Officers Of The United States....................... 19

            1.    The Board Exercises Significant Federal Authority ......................19

            2.    Supreme Court And Other Precedents Indicate That The
                  Board Members Are Officers Of The United States......................22

      C.    PROMESA's Method For Selecting The Members Of The Board
            Does Not Comply With The Appointments Clause................................. 24

II.   Aurelius Is Entitled To An Appropriate Remedy ................................................. 28

CONCLUSION...................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Airlines, Inc. v. Brock,*
 480 U.S. 678 (1987)..............................................................................................28

*Am. Insurance Co. v. 356 Bales of Cotton,*
 26 U.S. 511 (1828)..............................................................................................10

*Balzac v. Porto Rico,*
 258 U.S. 298 (1922)............................................................................................17

*In re Beck,*
 526 F. Supp. 2d 1291 (S.D. Fla. 2007) ..............................................................22

*Benner v. Porter,*
 50 U.S. 253 (1850)................................................................................................7

*Binns v. United States,*
 194 U.S. 486 (1904)..............................................................................................5

*Buckley v. Valeo,*
 424 U.S. 1 (1976)..........................................................................3, 19, 25, 28, 29

*Cincinnati Soap Co. v. United States,*
 301 U.S. 308 (1937)..............................................................................................6

*Citizens for Abatement of Aircraft Noise, Inc. v. MWAA,*
 917 F.2d 48 (D.C. Cir. 1990)........................................................................21, 26

*City of New Orleans v. N.Y. Mail S.S. Co.,*
 87 U.S. 387 (1874)..............................................................................................12

*Clinton v. City of New York,*
 524 U.S. 417 (1998)..............................................................................................5

*Comm'r of Internal Revenue v. N. Coal Co.,*
 62 F.2d 742 (1st Cir. 1933)...................................................................................7

*Consejo de Salud Playa de Ponce v. Rullan,*
 586 F. Supp. 2d 22 (D.P.R. 2008)......................................................................18

*Dorr v. United States,*
 195 U.S. 138 (1904)......................................................................................17, 18

*Downes v. Bidwell,*
 182 U.S. 244 (1901).......................................................................................7, 17

# TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*In re Duncan*,
139 U.S. 449 (1891).................................................................15

*Edmond v. United States*,
520 U.S. 651 (1997)..............................................................4, 18

*Examining Bd. of Eng'rs v. Flores de Otero*,
426 U.S. 572 (1976)...............................................................18

*FDIC v. Dintino*,
167 Cal. App. 4th 333 (2008) ..................................................21

*FEC v. NRA Political Victory Fund*,
6 F.3d 821 (D.C. Cir. 1993).....................................................30

*First Nat'l Bank v. Yankton Cty.*,
101 U.S. 129 (1879)..................................................................5

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010).............................................2, 4, 18, 24, 25

*Freytag v. C.I.R.*,
501 U.S. 868 (1991).....................................................10, 22, 23

*Hechinger v. MWAA*,
36 F.3d 97 (D.C. Cir. 1994) ....................................................26

*Hechinger v. MWAA*,
845 F. Supp. 902 (D.D.C.).......................................................26

*In re Hennen*,
38 U.S. (13 Pet.) 230 (1839)....................................................22

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
684 F.3d 1332 (D.C. Cir. 2012)................................................24

*Kuretski v. C.I.R.*,
755 F.3d 929 (2014)...........................................................10, 23

*Marbury v. Madison*,
5 U.S. 137 (1803)...............................................................9, 14

*McAllister v. United States*,
141 U.S. 174 (1891).............................................................10, 11

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*,
501 U.S. 252 (1991)....................................2, 6, 8, 20, 25, 27

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Morgan v. Callender,*
    8 U.S. 370 (1808) ..................................................................................................10

*Murphy v. Ramsey,*
    114 U.S. 15 (1885) ..................................................................................................5

*Myers v. United States,*
    272 U.S. 52 (1926) ................................................................................................25

*NLRB v. Noel Canning,*
    134 S. Ct. 2550 (2014) ............................................................................................8

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,*
    458 U.S. 50 (1982) ................................................................................................30

*Oswald v. United States,*
    96 F.2d 10 (9th Cir. 1938) ....................................................................................23

*Parsons v. United States,*
    167 U.S. 324 (1897) ..............................................................................................23

*In re Perry Hollow Mgmt. Co.,*
    297 F.3d 34 (1st Cir. 2002) ..................................................................................21

*Posadas de Puerto Rico v. Tourism Co.,*
    478 U.S. 328 (1986) ..............................................................................................18

*Printz v. United States,*
    521 U.S. 898 (1997) ..............................................................................................10

*Puerto Rico v. Sanchez Valle,*
    136 S. Ct. 1863 (2016) .....................................................................................4, 15

*In re Revco D.S., Inc.,*
    898 F.2d 498 (6th Cir. 1990) ................................................................................21

*Ryder v. United States,*
    515 U.S. 177 (1995) .........................................................................................28, 30

*Shoemaker v. United States,*
    147 U.S. 282 (1893) ..............................................................................................11

*Stern v. Marshall,*
    564 U.S. 462 (2011) ..............................................................................................18

*Torres v. Puerto Rico,*
    442 U.S. 465 (1979) ..............................................................................................18

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*United States v. Ferreira,*
    54 U.S. 40 (1851) ..................................................................................10, 22, 25

*United States v. Heinszen,*
    206 U.S. 370 (1907) ..............................................................................................7

*United States v. Hilario,*
    218 F.3d 19 (1st Cir. 2000) ..........................................................................21, 24

*United States v. State of Cal.,*
    332 U.S. 19 (1947) ..........................................................................................6, 12

**Constitutional Provisions**

U.S. Const., art. II, § 3 ..........................................................................................19

U.S. Const., art. IV, § 3, cl. 2 ........................................................................2, 6, 12

**Statutes**

12 U.S.C. § 1812(a) ................................................................................................21

12 U.S.C. § 1819 ....................................................................................................21

28 U.S.C. § 541(a) ..................................................................................................21

28 U.S.C. § 581(a) ..................................................................................................21

48 U.S.C. § 2102 ....................................................................................................28

48 U.S.C. § 2121(c) ................................................................................................21

48 U.S.C. § 2121(e) ..............................................................................25, 26, 27, 29

48 U.S.C. § 2124(f) ................................................................................................21

48 U.S.C. § 2124(k) ..........................................................................................19, 20

48 U.S.C. § 2128 ....................................................................................................20

48 U.S.C. § 2141 ....................................................................................................20

48 U.S.C. § 2142 ....................................................................................................20

48 U.S.C. § 2144 ....................................................................................................20

48 U.S.C. § 2147 ....................................................................................................20

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

Act of May 3, 1802, ch. 53, 2 Stat. 195 .................................................................................16

Act of Oct. 31, 1803, 2 Stat. 245 ..........................................................................................11

Act of May 4, 1812, ch. 75, 2 Stat. 721 ................................................................................16

Act of Mar. 3, 1817, 3 Stat. 371.............................................................................................13

Act of May 15, 1820, ch. 104, 3 Stat. 583 ............................................................................16

Act of Feb. 21, 1871, ch. 62, 16 Stat. 419 ............................................................................16

Act of June 20, 1874, ch. 337, 18 Stat. 116 ..........................................................................16

District of Columbia Financial Responsibility and Management Assistance Act,
   Pub. L. No. 104-8, 109 Stat. 97 (Apr. 17, 1995)...........................................................27, 28

Pub. L. No. 93-198 § 433, 87 Stat 774, 795–96 (Dec. 24, 1973) .................................26

Foraker Act, Pub. L. No. 56-191, 31 Stat. 77 (Apr. 12, 1900) .................................12, 14

Home Rule Act, Pub. L. No. 93-198, § 421, 87 Stat. 774 ...............................................16

Northwest Ordinance of 1787, 32 J. Cont'l Cong. 334 ....................................................8

Northwest Ordinance of 1789, 1 Stat. 50 (Aug. 7, 1789) ..................................8, 15, 26

Reorganization Plan Act of 1967, 81 Stat. 948..................................................................16

**Rules**

Fed. R. App. P. 8(a)(1)(A) ........................................................................................................29

**Other Authorities**

10 Annals of Cong. 854 (Dec. 22, 1800) .............................................................................24

13 Annals of Cong. 508 (Oct. 27, 1803)...............................................................................12

18 Annals of Cong. 2068 (Apr. 11, 1808) ............................................................................24

Brief for Petitioner, *NLRB v. Noel Canning*,
   No. 12-1281, 2013 WL 5172004 (U.S.) ................................................................................12

David P. Currie, *The Constitution in Congress: Democrats and Whigs, 1829–
   1861* (2005)...............................................................................................................................23

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

David P. Currie, *The Constitution in Congress: The Jeffersonians, 1801-1829* (2001) ................................................................................................................8

*Executive Authority to Remove the Chief Justice of Minnesota*, 5 U.S. Op. Atty. Gen. 288 (1851) ....................................................................23

Gary Lawson, *Territorial Governments and the Limits of Formalism*, 78 Cal. L. Rev. 853 (1990) ..............................................................................................10

House Comm. on Natural Resources, H.R. 5278, *"Puerto Rico Oversight, Management, Economic Stability Act", Section by Section* ..................................27

3 Joseph Story, *Commentaries on the Constitution* (1833) ..............................5

*Mem. to the Director of Territories and Island Possession, from the Office of the Solicitor, U.S. Dep't of the Interior* (May 1936) ....................................13

*Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73 (2007) .........................................................................15

1 *Official Letter Books of W.C.C. Claiborne*, 1801–1816 (1917) ..................11

*Permanent and Temporary Presidential Commissions 1789–1962* ..................9, 13, 14

Saikrishna Bangalore Prakash, *Zivotofsky and the Separation of Powers*, 2015 Sup. Ct. Rev. 1 (2015) ........................................................................6

1 Sen. Exec. J. .......................................................................................8, 9, 11

2 Sen. Exec. J. ...........................................................................................14

## ARGUMENT

Aurelius's Objection and Motion to Dismiss presents a single yet fundamental question: whether the members of the Board should be secretly hand-picked by four members of Congress, or selected by the President and publicly confirmed by the Senate. The text and history of the Constitution provide a clear answer: The President must choose the Board's members, subject to Senate confirmation. That is how Presidents implement the policies they were elected to pursue, and how the American people know whom to hold accountable for decisions that affect their lives.

Because the Opposing Parties[2] have no persuasive legal arguments, they respond with apocalyptic cries of "catastroph[e]" and "massive disruption," Dkt. 1622 ("Board Opp.") at 2, 34, that would supposedly ensue if this Court acknowledges the notorious constitutional flaws in PROMESA's appointment mechanism. None of this is true or even relevant.

In fact, the Opposing Parties *agree* with Aurelius that the proper remedy here is narrow and eminently practical: The Court should simply sever the offending portions of Section 2121(e). Board Opp. 34–35. That would cure the constitutional problem by allowing the President to decide for himself, with the Senate's consent, who is best suited to serve on the Board. The parties *also* agree that the Court has procedural tools to ensure an orderly transition from the current Board to one that complies with the Appointments Clause. *See, e.g.,* Dkt. 1627 ("GO Bondholders' Stmt.") at 2–3; *see also* Board Opp. 34; Dkt. 1629 ("Retiree Comm. Opp.") at 35; Dkt. 1640 ("AAFAF Opp.") at 31; Dkt. 1631 ("Unsecured Creditors Opp.") at 28. In particular, this Court could simply stay its order of dismissal pending appeal, and the First Circuit, following appellate review, could

---

[2] The "Opposing Parties" are the Financial Oversight and Management Board ("Board"), the Official Committee of Retired Employees ("Retiree Committee"), the Official Committee of Unsecured Creditors ("Unsecured Committee"), the COFINA Senior Bondholders' Coalition ("COFINA Bondholders"), the Fiscal Agency and Financial Advisory Authority ("AAFAF"), and the American Federation of State, County, and Municipal Employees ("AFSCME").

stay its mandate pending the nomination and confirmation of a new Board. The Opposing Parties' prophecies of disaster are belied by their own view of the remedies. They are also revealing. The Opposing Parties presuppose that the President would not select, or the Senate would not confirm, the same people who currently occupy the Board's seats—even if that *were* necessary to prevent the sky from falling in Puerto Rico. If the President did determine that the current members are unworthy of their offices or not capable of discharging the Board's important responsibilities in the wake of the hurricanes, and the Senate did not disagree, that would be to the good. There is no legitimate reason to shield the Board from this public scrutiny.

Ultimately, the issue is not *whether and how* the Title III proceedings should continue, but *who should decide*. Those decisions must be undertaken by a validly constituted and democratically accountable Board. That is all Aurelius seeks, and what our Constitution requires.

The Opposing Parties make little effort to show that PROMESA's appointment mechanism satisfies the Appointments Clause. Instead, they stake out a stunning position: The Constitution's structural separation-of-powers limitations are *irrelevant* whenever Congress invokes the Territories Clause of Article IV, Section 3, Clause 2. But that extreme position is foreclosed by a controlling decision of the Supreme Court. Whatever power Congress has to organize *the territories* through duly enacted legislation, Congress cannot decree *its own* actions "immune from scrutiny for constitutional defects," even when invoking "Art. IV, § 3, cl. 2." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 270 (1991) ("*MWAA*"). Thus, Congress is not free to ignore the rest of the Constitution because it acts under the Territories Clause. Whatever Congress's source of legislative authority, it may not invest its Members with executive power, *id.* at 274, and "if any power whatsoever is in its nature Executive, it is the power of appointing." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 492 (2010).

History also teaches that there is no "Territories Clause" exception to the Appointments Clause. To the contrary, since 1789, territorial governors have been treated as officers of the United States subject to the Appointments Clause: They have been nominated by the President and confirmed by the Senate, appointed under the Appointments Clause and the related Recess Appointments Clause, and awarded Article II Commissions—documents that, as the famed dispute over the commission in *Marbury v. Madison* illustrates, are required only for officers of the United States. Centuries of Presidents and Senators would not have adhered to the process set forth in the Appointments Clause when installing superintendents of the territories unless it actually applied.

In an effort to distinguish Puerto Rico from the District of Columbia and "mainland" territories, the Opposing Parties astonishingly invoke the discredited *Insular Cases*. This controversial precedent, which conceives of the citizens of Puerto Rico as an "uncivilized race" of "fierce, savage, and restless people," treats them as second-class citizens by denying them certain constitutional rights. As troubling as that precedent is, it does not stand for the proposition that Congress can override the President's Article II power to appoint (and the Senate's authority to confirm) high federal officials by citing Article IV. Even if the Opposing Parties were correct that the citizens of Puerto Rico do not enjoy the benefits of the Constitution's structural safeguards, Aurelius and the other creditors throughout the United States adversely affected by the Board's actions *do*.

The Opposing Parties alternatively argue that the Appointments Clause does not apply because the Board members are not officers of the United States, but rather merely "local" officials. Again, history teaches the opposite. The Board is no more "local" than a federally appointed Governor of Puerto Rico, and the Board's vast powers are a textbook example of the type of "significant authority pursuant to the laws of the United States" that only federal officers can exercise. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). Having no answer to this legal issue, the Opposing

3

Parties threaten that recognizing federally appointed territorial officials as officers of the United States could imperil home rule in the territories and the District of Columbia. But as the Supreme Court recently explained, because the Commonwealth's officials are locally elected, the "most immediate source" of their government's sovereignty to enact and enforce laws is the "Puerto Rico populace." *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1867–70, 1875 (2016). These elected officials are not "officers of the United States" at all.

On the merits of PROMESA's appointments mechanism, the Opposing Parties do not deny that the Board members, who are principal officers because they answer to nobody but the President, were never confirmed by the Senate. That is reason enough to find that the mechanism is unlawful. And although the Opposing Parties take a brief pass at defending the list procedure as applied to inferior officers, the Supreme Court has rejected attempts by Congress to limit the President's power of appointment in less restrictive ways than PROMESA.

It is remarkable that Opposing Parties who supposedly care about the future of the Commonwealth would argue *against* recognizing one of the "significant structural safeguards" of liberty (*Edmond v. United States*, 520 U.S. 651, 659 (1997)) for the benefit of the people of Puerto Rico. Yet that is what they argue here. No "flexibility" rationale, Board Opp. 27; Dkt. 1638 ("COFINA Opp.") at 1; Dkt. 1610 ("AFSCME Opp.") at 3, can justify Congress's gross intrusion on the President's power of appointment and utter disregard for the rights of Puerto Ricans to know who is responsible for naming the members of the Board that will determine their economic future. Even if a law is "efficient, convenient, and useful in facilitating functions of government," that cannot "save it if it is contrary to the Constitution." *Free Enter. Fund*, 561 U.S. at 499. Nor does the imperative of proper constitutional process depend on who wins or loses in the end. "The Constitution's structure requires a stability which transcends the convenience of the moment."

*Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (Kennedy, J., concurring).  PROMESA violates these core principles, and this Court should now so hold.

## I.     The Board Members Are Unconstitutionally Appointed.

The Opposing Parties defend the appointment of the Board members on two main grounds: (1) the Appointments Clause does not apply whenever Congress legislates for Puerto Rico; and (2) even if the Appointments Clause does apply, the Board Members are not officers of the United States.  The Opposing Parties are wrong on both counts.  Moreover, the Opposing Parties' scant efforts to defend PROMESA's appointments mechanism on the merits fail.

### A.     Congress Is Not Free To Ignore The Appointments Clause When It Legislates With Respect To The Territories.

In order to save PROMESA's unprecedented appointment process, the Opposing Parties stake out a stunning position:  The Constitution's structural separation-of-powers limitations do not constrain Congress *at all* when it invokes the Territories Clause.  *See*, *e.g.*, Board Opp. 23. This extreme stance cannot be reconciled with Supreme Court precedent or history.

#### 1.     Supreme Court Precedent Makes Clear That The Appointments Clause Applies When Congress Acts Under The Territories Clause.

At every turn, the Opposing Parties selectively quote sources emphasizing that "the form of government established in the territories depends exclusively upon the discretion of [C]ongress," curiously omitting that such power is still "subject . . . to the . . . constitution of the United States."  3 Joseph Story, *Commentaries on the Constitution* § 1319 (1833).  But "Congress, in the government of the territories as well as of the District of Columbia, has plenary power, *save as controlled by the provisions of the Constitution*."  *Binns v. United States*, 194 U.S. 486, 491 (1904) (emphasis added); *see also*, *e.g.*, *First Nat'l Bank v. Yankton Cty.*, 101 U.S. 129, 133 (1879) ("Congress is supreme" and has all powers, "*except such as have been expressly or by implication reserved in the prohibitions of the Constitution*.") (emphasis added); *Murphy v. Ramsey*, 114 U.S.

5

15, 44 (1885) ("[T]he government of the United States" has full authority over the territories, except for "*such restrictions as are expressed in the constitution, or are necessarily implied in its terms, or in the purposes and objects of the power itself.*") (emphasis added).

The Supreme Court has flatly rejected the contention that Congress's acts are "immune from scrutiny for constitutional defects" just because they were taken "in the course of Congress' exercise of its power" under "Art. IV, § 3, cl. 2." *MWAA*, 501 U.S. at 270. That is why, for example, the Supreme Court has held that although "the constitutional power of Congress" under the Territories Clause "is without limitation," still a "joint resolution [that] was vetoed by the President . . . does not represent an exercise of the constitutional power of Congress" under the Territories Clause. *United States v. State of Cal.*, 332 U.S. 19, 27–28 (1947) . In other words, the President's veto power in Article I, Section 7 of the Constitution applies will full force when Congress legislates with respect to in the territories. Similarly, Article IV, Section 3, Clause 2 states that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." But "[t]he Property Clause is not some caustic acid that Congress may wield to dissolve the Constitution's separation of powers." Saikrishna Bangalore Prakash, *Zivotofsky and the Separation of Powers*, 2015 Sup. Ct. Rev. 1, 25 (2015).

Contrary to the position of the Opposing Parties, the Court in *MWAA* held that, even when Congress legislates pursuant to the Territories Clause, the Court "*must* [] consider whether" the statute is "consistent with the separation of powers." 501 U.S. at 271 (emphasis added). The Court acknowledged that the broadest of Congress's enumerated powers may not be limited by the Constitution's "allocation of power between the Federal Government and the States." *Id*. For example, "[t]he Tenth Amendment is without application" to the territories "since the powers of the several

6

states over local affairs are not invaded or involved." *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 312 (1937).  For the same reason, *Downes v. Bidwell* held that the Uniformity Clause applies only to "'the several States,'" and territories are not states.  182 U.S. 244, 278 (1901).  Thus, while it is true that the territories "are not organized under the Constitution, nor subject to its complex distribution of the powers of government," this exception applies only to "those provisions that refer particularly to the distinction between Federal and State jurisdiction," not the entire Constitution.  *Benner v. Porter*, 50 U.S. 253, 242 (1850).  Federalism principles—which govern Congress's relationship with the *States*—are not relevant when Congress legislates over the territories, because there are no States involved.  The Opposing Parties are mistaken to contend that federalism principles demonstrate that the separation of powers and other structural constitutional provisions—which limit Congress's power vis-à-vis the *other federal branches of government*—do not constrain Congress when it acts with regard to the territories.[3]

And if Congress is *not* bound by such principles when it legislates under Article IV, what other provisions of the Constitution can be cast aside?  Can Congress cut the President out of the picture entirely by ignoring the Constitution's presentment requirement of Article I?  Could Congress designate the Speaker of the House as the commander-in-chief for a territorial militia?  The Opposing Parties' theory has no principled stopping point, and would result in the "pass[age] from the era of constitutional liberty guarded and protected by a written constitution into an era of legislative absolutism."  *Downes*, 182 U.S. at 379 (Harlan, J., dissenting).  Fortunately, their theory is not the law.  The Supreme Court has squarely held that "when Congress [takes] action that ha[s]

---

[3]  The Opposing Parties' reliance on *United States v. Heinszen*, 206 U.S. 370 (1907), is unavailing.  *Heinszen* is nothing more than a case about statutory ratification.  *Comm'r of Internal Revenue v. N. Coal Co.*, 62 F.2d 742, 746 (1st Cir. 1933) (describing *Heinszen* as involving the situation where "Congress ratified acts of a public nature done under the assumption of authority").

the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative Branch, it must take that action by the procedures authorized in the Constitution." *MWAA*, 501 U.S. at 276.

> **2.      Historical Practice Confirms That The Appointments Clause Applies To Officials Overseeing The Territories.**

More than 230 years of historical practice confirms that there is no "Territories Clause" exception to the Appointments Clause.  Congress and the President have consistently ensured that officials overseeing the territories were Presidentially appointed and Senate-confirmed, Presidents have acted to fill such vacancies under the Recess Appointment Clause, and Presidents have commissioned these officials as officers of the United States.  That "'[l]ong settled and established practice'" is the best proof of all that the Appointments Clause applies in the territories, *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014), and the Opposing Parties have failed to rebut it.

**a.** The Northwest Ordinance of 1787, enacted by the Continental Congress operating under the Articles of Confederation, provided for congressional appointment and removal of territorial governors for the Northwest Territory.  32 J. Cont'l Cong. 334.  Shortly after the ratification of the Constitution in 1789, the First Congress amended the Northwest Ordinance so that the President would appoint the governors, with the advice and consent of the Senate, "so as to adapt the [Ordinance] to the present Constitution of the United States."  1 Stat. 50, 51 (Aug. 7, 1789).  Contrary to the Board's suggestion, Board Opp. 18 n.8, the reason for this change was "to bring the Ordinance itself into conformity with Article II's requirement that federal officers be appointed by the President with Senate consent."  David P. Currie, *The Constitution in Congress: The Jeffersonians, 1801-1829*, at 113 (2001).  Since then, the unbroken practice is clear:  Placing an official over a territorial government does not render the Appointments Clause inapplicable.

On August 20, 1789, George Washington nominated, and the Senate confirmed, Arthur St. Clair as the first governor of the Northwest Territory.  1 Sen. Exec. J. 18 (Aug. 20, 1789); *see also* 1B *Permanent and Temporary Presidential Commissions 1789–1962*, at 1 (Sept. 1, 1789) , General Records of the Dep't of State, Record Group 59 (RG 59), National Archives College Park ("*Presidential Commissions*").[4]  President Washington was not just being polite by agreeing to comply with Congress's confirmation "require[ment]."  COFINA Opp. 16.  He was exercising his Article II powers.  If, as the Opposing Parties suggest, Governor St. Clair was not an officer of the United States subject to the Appointments Clause, he could not have negotiated treaties on President Washington's behalf for the Senate to ratify—which he did.  1 Sen. Exec. J. 28 (Sept. 22, 1789).

The Opposing Parties cannot write this history off merely because Congress sometimes provided appointment mechanisms by statute.  *See*, *e.g.*, COFINA Opp. 16.  For example, D.C. Justices of the Peace were not statutorily required to be confirmed by the Senate, *see* 2 Stat. at 107, yet the President still sent their nominations to the Senate for confirmation as per the Appointments Clause.  As *Marbury v. Madison* made clear, those appointments could "only be performed by and with the advice and consent of the Senate."  5 U.S. (1 Cranch) 137, 155 (1803).  These actions are powerful evidence that the Appointments Clause applied in the territories as well as the District of Columbia, and refute the idea that the President was simply acting pursuant to statutory authority.

The historical record abounds with additional evidence that territorial appointees were officers of the United States appointed pursuant to the Appointments Clause.  *See*, *e.g.*, 1 Sen. Exec. J. 400–04 (Jan. 6, 1802) (Senate confirmation of the territorial Governor of Mississippi); 2 Sen. Exec. J. 303–05 (Nov. 13–18, 1812) (same for territorial Governor of Illinois).  Indeed, save for

---

[4]  Aurelius has included copies of the cited presidential commissions in Exhibit A.

home-rule elections, *see infra* Section I.A.3, the pattern of compliance with the Appointments Clause holds true for every single civilian governor of every territory of which we are aware, including Puerto Rico. *See* Gary Lawson, *Territorial Governments and the Limits of Formalism*, 78 Cal. L. Rev. 853, 868–69 n.85 (1990) (listing statutes).

Straining for exceptions to this rule, the Opposing Parties rely heavily on the existence of non-Article III judges in the territories as evidence that the Appointments Clause and the separation of powers do not apply in the territories, *see*, *e.g.*, Board Opp. 8–9, but that conclusion does not follow. The existence of Bankruptcy Courts and Tax Courts in every state and territory says nothing about whether the separation of powers or the Appointments Clause applies in those locales. *Kuretski v. C.I.R.*, 755 F.3d 929, 941 (2014). Thus, *American Insurance Co. v. 356 Bales of Cotton (Canter)*, 26 U.S. 511 (1828), concerned only whether Congress must permit all federal questions to be decided by courts in which "the judicial power of the United States" can be deposited, *i.e.*, Article III courts. That case merely reaffirms the compromise struck at the Constitutional Convention, that Congress would have the power to decide whether to create inferior federal courts. *See Printz v. United States*, 521 U.S. 898, 907 (1997). The district courts Congress created in the territories were still, however, "courts of the United States." *Morgan v. Callender*, 8 U.S. 370 (1808) (describing the "district court of the United States, for the territory of Orleans"). Likewise, the judges and their clerks were officers of the United States subject to the Appointments Clause. *See Freytag v. C.I.R.*, 501 U.S. 868, 892 (1991); *United States v. Ferreira*, 54 U.S. (13 How.) 40, 51 (1851). As the D.C. Circuit has explained, while "[i]t is true that territorial courts do not exercise 'the judicial power of the United States' in the particular sense addressed by Article III," that is not relevant to whether the Appointments Clause applies, because

under *Freytag*, "territorial courts and the Tax Court are similarly situated for purposes of the Appointments Clause." *Kuretski*, 755 F.3d at 941.[5]

Similarly, the Retiree Committee points to interim military governments, installed when the United States appropriated land under the Louisiana Purchase. Retiree Comm. Opp. 14 (citing 2 Stat. 245 (Oct. 31, 1803)). The Retiree Committee omits critical information. The appointed governor of Louisiana, William Claiborne, was *already* an officer of the United States on the day he was appointed; indeed, he was the "Governor of the Mississippi Territory," appointed by President Jefferson and confirmed by the Senate a year earlier. *See* 1 Sen. Exec. J. 401 (Jan. 6, 1802). His appointment was therefore fully consistent with the Appointments Clause. *See Shoemaker v. United States*, 147 U.S. 282, 301 (1893) (rejecting Appointments Clause challenge to D.C. commissioners because they "were [already] at the time of the passage of the act . . . officers of the United States who had been theretofore appointed by the President and confirmed by the Senate").

The Retiree Committee also cites the Louisiana territory's organic statute vesting appointment power in the President, Retiree Comm. Opp. 14–15, but that statute was *military* in nature. It authorized the President to "take possession of, and occupy the territory" and to "employ any party of the army and navy of the United States" in so doing, 2 Stat. 245, § 1, because there was a real military threat from the Spanish occupation of New Orleans and Spanish opposition to the Louisiana Purchase. *See* 1 *Official Letter Books of W.C.C. Claiborne*, 1801–1816, at 302 (1917) (expressing hope to Secretary of State James Madison "that the Province of Louisiana will be surrendered to the United States immediately" via Governor Claiborne and General Wilkinson,

---

[5]  *McAllister v. United States*, 141 U.S. 174 (1891), illustrates the point, recognized in *Kuretski*, that whether a territorial judge is subject to Article III is irrelevant to whether that judge is subject to the Appointments Clause. Even though territorial judges do not enjoy life tenure, the Court still considered them "civil officers" subject under general statutory provisions to Presidential removal. *Id.* at 189.

who oversaw military command, "and that no blood will be shed on the occasion").  This broader
context was not lost on members of Congress, who defended the statute against charges of consti-
tutional flaws, 13 Annals of Cong. 508 (Oct. 27, 1803) (Rep. Griswold), by pointing to the Presi-
dent's powers as commander-in-chief to take possession of this vast new expanse and "preserve
tranquility and good order," *id.* at 506–07 (Rep. Eustis).  The conclusion was that the President
would "already have all the powers now given him" in such circumstances.  *Id.* at 507.  In times
of war, the United States as a "conquering power" "has a right to displace the pre-existing author-
ity," and "may appoint all the necessary officers and clothe them with designated powers, larger
or smaller, according to its pleasure" with the only limits being "those which are found in the laws
and usages of war."  *City of New Orleans v. N.Y. Mail S.S. Co.*, 87 U.S. 387, 393–94 (1874).

    **b.**  The history of recess appointments strengthens the case that the Appointments Clause
applies in the territories.  Under the Opposing Parties' theory, if there were no statutory provision
for the recess appointment of territorial officers, the President would have no power to act, there
being no inherent constitutional power to do so.  *See State of Cal.*, 332 U.S. at 27 (when Congress
acts pursuant to Article IV, § 3, cl. 2, Executive cannot "proceed contrary" because of Congress's
plenary power).  Yet the Solicitor General defended the President's constitutional recess appoint-
ment powers in *Noel Canning*, in part, on the basis of appointments made *in the territories*.  Br.
for Pet. 3a, 4a, 15a, 67a, *NLRB v. Noel Canning*, No. 12-1281, 2013 WL 5172004 (U.S.) (citing
recess appointments made in the Idaho, Colorado, Dakota, Hawaii, and Michigan Territories).  The
reason he did so is that the Appointments Clause applies in the territories:  After all, the President
cannot appoint an individual under the Recess Appointments Clause unless the individual is a
federal officer subject to the Appointments Clause in the first place.

12

The Foraker Act, which did not provide for recess appointment mechanisms at all, proves the point. Pub. L. No. 56-191, §§ 17–26, 31 Stat. 77, 81–82 (Apr. 12, 1900). When the office of governor of Puerto Rico became vacant during a recess of the Senate, President McKinley appointed William H. Hunt as governor of Puerto Rico without advice and consent, "until the end of the next session of the Senate of the United States," in conformity with the Appointments Clause. 5 *Presidential Commissions*, *supra*, at 3 (Aug. 27, 1901). President Roosevelt then nominated and appointed him "with the advice and consent of the Senate." *Id.* at 10 (Dec. 10, 1901). President Roosevelt followed this exact protocol when appointing Regis H. Post during a recess and then later resubmitting his nomination for advice and consent. *Id.* at 202 (Mar. 6, 1907) (recess appointment); *id.* at 244 (advice and consent appointment) (Jan. 16, 1908). It is no wonder, then, that when the question arose whether the President could make a particular kind of recess appointment in Puerto Rico, the Solicitor of the Interior, charged with preparing the advice, concluded unequivocally that the President had such authority "vested in him by Article II, section 2, clause 3 of the Constitution." *Mem. to the Director of Territories and Island Possession*, *from the Office of the Solicitor, U.S. Dep't of the Interior* 1 (May 1936), Central Classified Files Relating to Puerto Rico, 1907–1951, Records of the Office of the Territories, Record Group 126 (RG 126), National Archives College Park (attached hereto as Exhibit B).

Implicitly conceding the connection between the President's powers under the Appointments and Recess Appointments Clauses, the COFINA Bondholders cite the division of the Mississippi territory in arguing that Congress authorized appointments that did not conform to the Recess Appointments Clause. COFINA Opp. 8 n.4. They fail to note that the statute was passed on March 3, 1817—*the last day of Congress's session*. *See* 3 Stat. 371, 372. Thus, the act's provision for Presidential appointment of the governor during the ensuing seven-month recess with

advice and consent "at the next session," *id.* at 372, perfectly mirrors the Recess Appointments Clause, which the President followed to the tee by resubmitting the name of William W. Bibb, "whose commission expires, to be Governor in and over the Alabama Territory" once the Senate was back in session.  2 Sen. Exec. J. 96 (Dec. 12, 1817); *see also* 3 Stat. at 524 (same for Florida).

**c.**  Even more telling of the vitality of the Appointments Clause is that Puerto Rico's governors, like all other appointed territorial governors of which Aurelius is aware, were not just nominated by the President and appointed by and with the advice and consent of the Senate, they were each *commissioned* by the President.  *See, e.g.*, 5 *Presidential Commission*, *supra*, at 3, 10, 202, 244 (commissions of Puerto Rico governors); *see also, e.g.*, 1B *Presidential Commissions*, *supra*, at *id.* at 314 (June 21, 1809) (Illinois Territory); *id.* at 302 (Mar. 7, 1809) (same); *id.* at 283 (May 7, 1798) (Mississippi Territory); *id.* at 69 (June 8, 1790) (Southwest Territory).  A Presidential commission is a distinct constitutional act required only for officers of the United States.  U.S. Const. art. II, § 3 (the President "*shall Commission all* the Officers of the United States") (emphasis added); *see also Marbury*, 5 U.S. at 156 (explaining the constitutional distinction and significance of the President's separate acts of "nomination," "appointment," and "commission," under Article II).  The Foraker Act did not provide for the commissioning of the governor, *see* 31 Stat. at 81, so the President must have been acting pursuant to his constitutional authority under the Commissions Clause when he commissioned the Puerto Rico Governors.  And they, in turn, could only be federal officers of the United States subject to the Appointments Clause.

The Opposing Parties would have this Court believe that this immense history in the territories of advice-and-consent Presidential appointments and Article II commissions was based on a misapprehension of the relevance of the Appointment Clause.  It was not.  Rather, it shows that the Appointments Clause has always been understood to apply to territorial officers.

### 3.      Democratic Election Is Consistent With The Appointments Clause.

The Opposing Parties also assert that recognizing the blatant constitutional flaws in PROMESA's appointment mechanism would be the death of democracy in the territories.  This is melodrama.  No party to this proceeding, including Aurelius, contends that democratic election of territorial officers violates the Appointments Clause.  On the contrary, when authority is derived directly from the consent of the governed, as opposed to immediately from Congress, the character of the office is fundamentally changed.  The Opposing Parties overlook this critical distinction.

When officials are not selected by the federal government itself, they are not regarded as officers of the United States.  This is why state officers may execute federal law without being subject to the Appointments Clause:  Their authority is "ultimately delegated by the people of that state," and the local electorate or state officers "who appoint them are accountable for their actions." *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 99 (2007).  In the same way, when individuals are locally elected to positions within a territorial government, they derive their immediate authority from the electorate, not the federal government.  While the federal government remains the "ultimate" source of all sovereignty in Puerto Rico, local democracy makes the Commonwealth "sovereign" in the "ordinary" sense that the island has "a measure of autonomy comparable to that possessed by the states," and the "most immediate source" of Puerto Rico's authority to enact and enforce laws is the "Puerto Rico populace." *Sanchez Valle*, 136 S. Ct. at 1867–70.  When a territory is structured as a local representative government, it is premised on "'the right of the people to choose their own officers,'" making them not officers of the United States, but local officers "'whose legitimate acts may be said to be those of the people themselves.'" *Id*. at 1881 (quoting *In re Duncan*, 139 U.S. 449, 461 (1891)).

Again, the Northwest Ordinance of 1789 illustrates the point.  Under the 1787 version, Congress exercised the appointment power; after the Constitution was ratified, Congress changed

the statute to require Presidential nomination and appointment with the Senate's advice and consent.  1 Stat. 50, 51, 53 (1789).  *Congress* could exercise no role in the appointment of officers, but the territorial lower house could continue to be democratically elected, and, as many of the Opposing Parties explicitly acknowledge, the President's appointment power could be combined with the input of democratically elected members of the territorial house to form the Council.

The history of the Mayor of the District of Columbia also bears this out.  Since 1802, Congress has always provided for the office of D.C. Mayor (or its equivalent) to be either elected or filled by an individual who was appointed by the President and confirmed by the Senate.[6]  But Congress never attempted to reserve for itself any power to appoint the Mayor, because the Appointments Clause certainly requires that where the federal government appoints an official with substantial authority to administer federal law, it must be the President who does the appointing.

In short, democratic elections are not inconsistent with the Appointments Clause:  When governmental officials are elected by the people of a territory, they are not federal officials at all—they are local officials who derive their authority from and are accountable to the local electorate.

### 4. This Court Should Reject The Opposing Parties' Calls To Extend The Racist *Insular Cases*.

To escape the Supreme Court's square holding in *MWAA*—that legislating pursuant to the

---

[6]  Initially, Congress created a Mayor appointed by the President.  Act of May 3, 1802, ch. 53, § 5, 2 Stat. 195, 196.  A decade later, Congress switched to a system of representative democracy.  Act of May 4, 1812, ch. 75, §§ 1, 3, 2 Stat. 721, 721–23.  Congress then allowed the Mayor to be directly elected, Act of May 15, 1820, ch. 104, § 3, 3 Stat. 583, 584, before again providing for the Mayor to be appointed by the President and confirmed by the Senate, Act of Feb. 21, 1871, ch. 62, § 2, 16 Stat. 419, 419.  In 1874, Congress replaced the Mayor with a three-member Board of Commissioners, each of whom was appointed by the President with Senate confirmation.  Act of June 20, 1874, ch. 337, § 2, 18 Stat. 116, 116.  After almost a century, Congress replaced the Board with a single commissioner-mayor appointed by the President and confirmed by the Senate, Reorganization Plan Act of 1967, § 301(b), 81 Stat. 948, 950.  In 1974, Congress again provided that the Mayor be locally elected, Home Rule Act, Pub. L. No. 93-198, § 421, 87 Stat. 774, 789.

Territories Clause does not make the Appointments Clause disappear—and the teachings of history, the Opposing Parties turn to the controversial *Insular Cases*.  These are a series of decisions from the turn of the last century, in the mold of *Plessy v. Ferguson*, that applied a different set of constitutional rules for those of "alien races, differing from us."  *Downes*, 182 U.S. at 279–80 (Brown, J.); *id.* at 302, 306 (White, J.) (different rules for an "uncivilized race" of "fierce, savage, and restless people"); *Dorr v. United States*, 195 U.S. 138, 148 (1904) (jury-trial right does not extend to territory of "savages").  Whatever validity those discredited cases retain, they at most prevent the application of a few individual rights in the territory.  *None* has held that structural provisions of the Constitution are inapplicable when Congress legislates with respect to a territory.

The *Insular Cases* held that certain non-fundamental "personal" constitutional rights did not apply in unincorporated territories to the extent they were incompatible with those territories' "new conditions and requirements."  *Balzac v. Porto Rico*, 258 U.S. 298, 312–13 (1922).  For instance, Puerto Rico had a judicial system that "kn[ew] no juries," so the Court held that Congress was permitted "to avoid forcing a jury system" on this "civil-law country."  *Id.* at 310–11.  At the same time, the *Insular Cases* drew a "clear distinction between [those] prohibitions [that] go to the very root of power of Congress to act at all, irrespective of time and place,"—*e.g.*, structural provisions—and those governing individual rights.  *Downes*, 182 U.S. at 277 (Brown, J.).  Because "Congress in governing the territories is subject to the Constitution, it results that all the limitations of the Constitution which are applicable to Congress in exercising this authority necessarily limit its power on this subject."  *Id.* at 291–92 (White, J.).  Congress's powers to legislate with respect to a territory thus remain subject to "constitutional restrictions upon the powers of that body as are applicable to the situation."  *Dorr*, 195 U.S. at 143.  None of the *Insular Cases* involved the Appointments Clause or any other structural constitutional provision or principle.

17

And even if the *Insular Cases* had encompassed certain structural provisions, they also recognized that "restrictions of so fundamental a nature that they cannot be transgressed" still apply in the territories. *Dorr*, 195 U.S. at 147. The Appointments Clause is "among the significant structural safeguards of the constitutional scheme." *Edmond*, 520 U.S. at 659. The separation of powers in general is also unquestionably fundamental. "[T]here is no liberty" without the separation of powers. *Stern v. Marshall*, 564 U.S. 462, 483 (2011); *accord Free Enter. Fund*, 561 U.S. at 501 ("[T]he Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty.").

Thus, the Opposing Parties seek to dramatically *extend* the *Insular Cases* to deprive Puerto Rico's citizens of not only the Bill of Rights' individual guarantees, but also the Constitution's structural protections. The reach of the *Insular Cases*, however, is contracting, not increasing. The Supreme Court has recognized that Puerto Rico's citizens are protected by: equal protection, *Examining Bd. of Eng'rs v. Flores de Otero*, 426 U.S. 572 (1976); the Fourth Amendment, *Torres v. Puerto Rico*, 442 U.S. 465 (1979); and the First Amendment, *Posadas de Puerto Rico Assocs. v. Tourism Co.*, 478 U.S. 328 (1986). Indeed, one judge in this District has held already that "the territory has evolved from an unincorporated to an incorporated one" and "Congress today, thus, must afford Puerto Rico and the 4,000,000 United States citizens residing therein all constitutional guarantees." *Consejo de Salud Playa de Ponce v. Rullan*, 586 F. Supp. 2d 22, 43 (D.P.R. 2008). There is no reason to stretch the *Insular Cases* far beyond what even their authors contemplated.[7]

Even if the citizens of Puerto Rico do not enjoy the benefits of the Constitution's structural safeguards, which they should, Aurelius and the many other entities throughout the United States,

---

[7] To the extent the *Insular Cases* preclude this challenge, Aurelius respectfully preserves its argument that they should be overturned.

such as pension plans and financial institutions, who are adversely affected by the Board's actions *do*. Such citizens possess the right to a lawfully constituted Board, *Buckley*, 424 U.S. at 137, and Congress cannot strip them of that right simply because it acts pursuant to the Territories Clause.

**B.     The Board's Members Are Officers Of The United States.**

The Board's members are officers of the United States because they "exercis[e] significant authority pursuant to the laws of the United States." *Buckley*, 424 U.S. at 126. The Board is federally created and constituted, implements federal law, and is accountable solely to the federal government. It cannot reasonably be said to be part of the Government of the Commonwealth.

**1.     The Board Exercises Significant Federal Authority.**

The Board's members are selected by federal officials (the President and Congressional leaders), are not supervised by or accountable to anyone other than the President, and have broad authority to enforce federal law in the federal courts. The "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights" is a hallmark of an officer of the United States. *Buckley*, 424 U.S. at 140. PROMESA, a law enacted by Congress— and one of the "Laws" the President is to "take Care" to "be faithfully executed," U.S. Const. art. II, § 3—has but one enforcer: the Board. And not only *may* the Board "seek judicial enforcement of its authority to carry out its responsibilities under" PROMESA in the federal courts, 48 U.S.C. § 2124(k), it has in fact done so. The Board, displeased with the actions of the Governor, sent him a "Fiscal Plan Enforcement Letter" and then sued in federal court for an injunction to force the Governor to comply with provisions of PROMESA. Dkt. 1180 at 17.

Such actions refute the contention that the Board is simply "like a state official operating within the constraints of federal regulation" and that it does not possess "legal enforcement powers on behalf of the United States." AAFAF Opp. 6. In the Board's *own* words, the Board's job is "to enforce compliance" with federal law "though broad-based powers" given to it by Congress.

19

FOMB Basic Financial Statement and Required Supp. Info., at 17 n.1 (June 30, 2017). Similarly, the Board exercises far-ranging investigatory power, which, the Board represented to Magistrate Judge Dein, "cannot have [been] broader," and extends to "anything that seems appropriate" to the Board. Tr. 44–45, Dkt. 1153 (Aug. 22, 2017). That is hardly "laser-focused." AFSCME Opp. 11. Indeed, as the Board further represented, Congress "empowered" the Board "with powers that no other board in bankruptcy *has ever had before*." Tr. 44–46, Dkt. 1153 (emphasis added).

In fact, the Board's powers are substantially greater than those classified as significant federal power in *MWAA*. *See* 501 U.S. at 260; *see also id.* at 287 (White, J., dissenting) (disputing that "the Board in fact exercises significant federal power"). The Board in *MWAA* had no unilateral power; it had only veto power over the state-created regional airport authority's "adoption of a budget, authorization of bonds, promulgation of regulations, [and] endorsement of a master plan." *Id*. at 255, 260. Here, the Board has veto power over the Commonwealth's adoption of budgets, 48 U.S.C. § 2142, authorization of bonds, *id.* § 2147, and legislation, § 2147(a)(1), (5). But it also has unilateral power to rescind Puerto Rico laws, *id.* § 2144(c)(3)(B), rule that a fiscal plan proposed by the Commonwealth is deficient, *id*. § 2141(c)(3), and issue its own fiscal plan if it rejects the Commonwealth's plan, *id*. § 2141(d)(2). These powers are "quintessentially executive." *MWAA*, 917 F.2d at 56. Moreover, as discussed above and no party denies, the Board is the sole entity empowered to enforce PROMESA in federal court. 48 U.S.C. § 2124(k). And "[n]either the Governor nor the Legislature" may "exercise any control, supervision, oversight, or review over the Oversight Board or its activities" in any way. *Id.* § 2128(a).

In the face of these facts, Opposing Parties suggest that the Board's powers are purely local in nature because the Board's subpoena power relies on Commonwealth procedural rules and may be enforced in Commonwealth courts. *See*, *e.g.*, AAFAF Opp. 15. This is beside the point.

PROMESA says only that the Board "may" enforce its subpoenas in Commonwealth courts, not that it *must* do so.  48 U.S.C. § 2124(f)(2).  More importantly, even the authority to enforce matters in state court does not alter the character of the Board members' status as constitutional officers. The FDIC, which is plainly headed by five officers of the United States, 12 U.S.C. § 1812(a)(1)(A)–(C), can by statute participate in state-court litigation, *id.* § 1819(b)(2)(D), and does so frequently, *see, e.g.*, *FDIC v. Dintino*, 167 Cal. App. 4th 333 (2008).

Even if the Board's powers were confined to the Commonwealth, that would not render them non-federal powers.  U.S. Trustees, for example, have jurisdiction limited to defined regions, 28 U.S.C. § 581(a), but that does not alter their status as "officer[s] of the Executive Branch."  *In re Revco D.S., Inc.*, 898 F.2d 498, 499 (6th Cir. 1990); *In re Perry Hollow Mgmt. Co.*, 297 F.3d 34, 38 (1st Cir. 2002) ("[T]he U.S. Trustee [is] an agency of the United States.").  So, too, for United States Attorneys, who serve in a particular geographic district, 28 U.S.C. § 541(a), but are "part of the Executive Branch," *United States v. Hilario*, 218 F.3d 19, 27 (1st Cir. 2000).

The Opposing Parties rely on PROMESA's provision that says the Board is created "within the territorial government."  48 U.S.C. § 2121(c)(1).  But, as well-settled history shows, *see supra* Section I.A.2, the exercise of significant federal powers is what makes someone an officer of the United States—not statutory *ipse dixit*.  That is why the Opposing Parties are forced to concede that local officials "could not take on *federal* responsibilities without an Article II commission." COFINA Opp. 7 n.3.  Because the Board possesses vast authority "derived from a federal source," "separation-of-powers principles apply."  *Citizens for Abatement of Aircraft Noise, Inc. v. MWAA*, 917 F.2d 48, 54 (D.C. Cir. 1990), *aff'd*, 501 U.S. 252.

2.    **Supreme Court And Other Precedents Indicate That The Board Members Are Officers Of The United States.**

The Opposing Parties suggest that the Supreme Court has never regarded territorial officers to be officers of the United States.  In fact, the Court has twice considered whether territorial officers are subject to the Appointments Clause, and each time indicated that they are.

*First*, in *Ferreira*, the Court addressed statutes from 1823 and 1834 that appointed the Florida territorial judge as a claims adjustor, and another statute from 1849, passed after Florida's admission to the union, that appointed the federal district judge of Florida as the claims adjustor. 54 U.S. 40.  Although neither party raised the issue, the Court on its own recognized that a "question might arise" as to whether there was an Appointments Clause problem.  The Court noted that, as to both territorial and federal judges, "the power of appointment is in the President, by and with the advice and consent of the senate; and Congress could not by law, designate the persons to fill these offices," thereby voiding "the acts of 1823, and 1834, and 1849."  *Id.* at 51.  But the Court held that it lacked jurisdiction to review a non-judicial act, and as neither side had raised the Appointments Clause issue, it dismissed the appeal for lack of jurisdiction.  *Id.* at 52.  Courts have since relied on *Ferreira* for the proposition that "Congress does not enjoy the power of appointment."  *In re Beck*, 526 F. Supp. 2d 1291, 1298 (S.D. Fla. 2007).

*Second*, in *Freytag*, the Court noted that "clerks" of "non-Article III territorial courts" were "'inferior Officers' within the meaning of the Appointments Clause."  501 U.S. at 892 (citing *In re Hennen*, 38 U.S. (13 Pet.) 230 (1839)).  The Retiree Committee tries to duck these unequivocal words by labelling them "dicta" and "dubious," arguing that *Hennen* was not about territorial courts.  Retiree Comm. Opp. 12 n.1.  But the Retiree Committee misreads *Hennen*, which explicitly relied on both the statute establishing the territorial government and the statute admitting Louisiana into the Union without drawing any distinction between the two.  38 U.S. at 258.

22

For this reason, courts have relied on *Freytag*'s conclusion that territorial judges are officers of the United States for purposes of the Appointments Clause. *See*, *e.g.*, *Kuretski*, 755 F.3d at 941. While "territorial courts do not exercise 'the judicial power of the United States' in the particular sense addressed by Article III," that is not relevant to whether the Appointments Clause applies, because, under *Freytag*, "territorial courts and the Tax Court are similarly situated for purposes of the Appointments Clause." *Id.*; *see also Oswald v. United States*, 96 F.2d 10, 12 (9th Cir. 1938) (holding that the "reporter in the District Court of the United States for the Territory of Hawaii" is "an officer of the United States" for the purposes of the Appointments Clause).

The Opposing Parties also rely on an 1839 opinion of Attorney General Grundy. *See*, *e.g.*, Board Opp. 10. But Grundy's "less than overpowering" reasoning, David P. Currie, *The Constitution in Congress: Democrats and Whigs, 1829–1861*, at 191 n.42 (2005), has nothing to do with the Appointments Clause, and is also wrong on several grounds. *First*, contrary to Grundy's assumption, a judge need not be vested with Article III "judicial power" to be subject to the Appointments Clause; even a territorial court is "a 'Court of Law' for purposes of the Appointments Clause." *Kuretski*, 755 F.3d at 940–41. *Second*, since clerks of territorial courts are officers of the United States, *Freytag*, 501 U.S. at 892, the territorial judges who appoint them must also be officers of the United States. *Third*, Grundy's opinion is contradicted by a subsequent opinion of Attorney General Crittenden, who assumed that territorial judges *were* subject to impeachment and concluded that they could *also* be removed by the President because they are "civil officers." *Executive Authority to Remove the Chief Justice of Minnesota*, 5 U.S. Op. Atty. Gen. 288, 290 (1851); *see also Parsons v. United States*, 167 U.S. 324, 333–34 (1897) (relying on Crittenden's opinion that a statute that "preclude[d] either the house of representatives or the president from the exercise of their respective powers of impeachment or removal" of territorial judges "would have

23

been in conflict with the Constitution"). *Fourth*, the House of Representatives has convened committees to investigate impeachment of territorial officers. *See, e.g.*, 10 Annals of Cong. 854 (Dec. 22, 1800) (appointing a committee to inquire into the official conduct of Mississippi territorial governor for possible impeachment); 18 Annals of Cong. 2068–69 (Apr. 11, 1808) (appointing a committee to consider impeachment of territorial Mississippi judge). Grundy's opinion cannot bear the weight the Opposing Parties place on it.

Similarly, the Opposing Parties' premise that a territorial Governor cannot be a "Department Head," AAFAF Opp. 10; *see* COFINA Opp. 6, is refuted by *Free Enterprise Fund*, 561 U.S. at 510. A "department" under the Appointments Clause is not simply a "cabinet," but is any "separate allotment or part of business; a distinct province, in which a class of duties are allotted to a particular person." *Id.* at 511. The territories fit this description as much as "the Postmaster General," *id.*, the SEC, *id.*, or the Library of Congress, *see Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1340–41 (D.C. Cir. 2012).

## C.   PROMESA's Method For Selecting The Members Of The Board Does Not Comply With The Appointments Clause.

The Board's members are not just officers of the United States, they are principal officers because they have no superior but the President. In arguing that the Board members are inferior officers, the Opposing Parties point to *Hilario*, 218 F.3d 19, *see, e.g.*, Board Opp. 27–28. *Hilario* relied on ambiguity about the proper test for distinguishing inferior and principal officers, 218 F.3d at 24–25, but *Free Enterprise Fund* subsequently clarified that there is only one test: "Whether one is an 'inferior' officer depends on whether he has a superior." 561 U.S. at 510. The Board members are principal officers—they answer only to the President. As such, they had to be appointed with the advice and consent of the Senate. The Opposing Parties do not deny that no confirmation ever occurred. That is reason enough to find the mechanism unlawful.

Even if the Board's members were inferior officers, six were still unconstitutionally appointed because the list mechanism severely constrained the "power of appointment," which lies exclusively "in the President." *Ferreira*, 54 U.S. at 51.[8]  Congress's role is limited to Senate confirmation; "Congress [may] not by law, designate the persons to fill" "offices under the government." *Id.*  Nor may Congress "vest in itself" the power "to appoint officers of the United States when the Appointments Clause" prohibits it from doing so. *Buckley*, 424 U.S. at 135; *Myers v. United States*, 272 U.S. 52, 128 (1926) (Congress may not "so trench upon executive choice as to be in effect legislative designation"); *see also MWAA*, 501 U.S. at 274 (Congress "may not invest itself or its Members with . . . executive power").

PROMESA's list mechanism violates these basic constitutional limitations.  PROMESA, passed on June 30, 2016, specifically gave the President a truncated time frame, until September 1, 2016, to choose between two options: (1) pick his own nominees who would be subject to advice and consent of the Senate, or (2) pick from lists provided by members of Congress.  48 U.S.C. § 2121(e)(2).  But this was a Hobson's choice, because Congress was only in session for *eight days* during this period—thus ensuring that the President would "choose" the list mechanism.[9]

As here, the fundamental problem with the Board in *MWAA* was that the list mechanism gave "Congress effective control over appointments."  501 U.S. at 269.  And even when Congress

---

[8]  Some of the Opposing Parties argue that Aurelius's claim is not justiciable, *see* AFSCME Opp. 15; Board Opp. 30 n.15; Retiree Comm. Opp. 33–34, but the Supreme Court has rejected this position, holding that courts "cannot assume" that the President "would have made the same appointments acting alone," and a challenger's "standing does not require precise proof" of "that counterfactual world."  *Free Enter. Fund*, 561 U.S. at 512 n.12.

[9]  The existence of pro forma sessions during this period changes nothing.  AAFAF Opp. 25–26.  AAFAF theorizes that the President, in two months, could reject the congressional lists, vet and nominate his own appointees, and persuade the Senate to reconvene and hold a pro forma session to confirm the President's choices after he rejected Congress's candidates.  Congress well knew that this was practically impossible.

amended the statute so that membership was not limited to members of Congress, Congress still unconstitutionally "retain[ed] control over the appointments" because "the Directors may never go outside the lists furnished by the Speaker and the President *pro tempore.*"  *Hechinger v. MWAA*, 36 F.3d 97, 101 (D.C. Cir. 1994).  This mechanism meant that "the members of the Board of Review are selected in violation of the Appointments Clause." *Hechinger v. MWAA*, 845 F. Supp. 902, 908 (D.D.C.), *aff'd*, 36 F.3d 97 (D.C. Cir. 1994); *see MWAA*, 917 F.2d at 336–36 (describing letter from Assistant Attorney General expressing the view that, since "at least some of the functions to be performed by the board were 'clearly operational,'" the statute violated the Appointments Clause).  Nor does it make a difference that the President may ask the congressional members, in their discretion, to provide additional nominees.  48 U.S.C. § 2121(e)(2)(C).  As the D.C. Circuit noted in *Hechinger*, "we have little doubt who would win a test of wills."  36 F.3d at 101.

The Opposing Parties point to lists under the Northwest Ordinance from which the President chose various officers for nomination.  *See*, *e.g.*, COFINA Opp. 16.  As they admit, those lists were not compiled by members of Congress, as PROMESA's lists are, but were prepared by *elected* members of the territorial house of representatives.  *Id.* (citing 1 Stat. 50, 51–52 n.a (1789)); *see supra* Part I.B.3.  They therefore resemble the list-based mechanism by which the President appoints Justices of the D.C. Court of Appeals.  Pub. L. No. 93-198 § 433, 87 Stat 774, 795–96 (Dec. 24, 1973).  The Opposing Parties cite no example of Congress requiring the President to choose an officer from *its own list*, much less lists compiled by individual members of Congress.

As a fallback, the Opposing Parties urge this Court to ignore PROMESA's mandatory text and hold that it is merely hortatory, like the lists for choosing members of the Sentencing Commission and the Comptroller General.  Board Opp. 29–31.  In those examples, however, the statutes require the President to do no more than "consider" Congress's suggestions, a purely precatory

26

step that tracks the Senate's "advice" function and does not usurp the President's power.  *See MWAA*, 501 U.S. at 268.   In stark contrast, the appointment mechanism in *MWAA*, like PROMESA, was mandatory and "guaranteed Congress *effective control over appointments*."  *Id.* (emphasis added).  Congress was not shy about that.  House Comm. on Nat. Res., H.R. 5278, *"Puerto Rico Oversight, Management, Economic Stability Act" (PROMESA), Section by Section*, at 5, https://naturalresources.house.gov/UploadedFiles/Section_by_Section_6.6.16.pdf (list mechanism "*ensures* that a majority of [the Board's] members *are effectively chosen by Republican congressional leaders on an expedited timeframe*") (emphasis added).

Moreover, the Board's assertion that "[n]othing in the text of the statute requires the President to select Board candidates from lists submitted by congressional leaders," Board Opp. 29, is demonstrably wrong.  PROMESA expressly dictated that, in the event no Board members were appointed within the impossibly short period of time provided, "the President *shall* appoint an individual from the list for the current vacant category."  48 U.S.C. § 2121(e)(2)(G) (emphasis added).  AAFAF expressly concedes this point.  AAFAF Opp. 6 ("If Board appointments were not complete by September 1, 2016, the President *was to make* selections from the Congressional lists by September 15.") (emphasis added); *id.* at 24 (the President was "*required* to select them from Congress' members' lists" if the deadline was not met) (emphasis added).

For similar reasons, the Opposing Parties' attempts to analogize to the D.C. Control Board are not only inapt, but further demonstrate that the Appointments Clause applies in the territories. In providing for the D.C. Control Board, Congress took pains to adhere to the process required by the Appointments Clause.  Congress required the President only to "*consult*[]" with certain members of Congress, who could place no limitations on the President's choice, prior to selecting Control Board members.  Pub. L. No. 104-8, § 101(b)(2), 109 Stat. 97, 100 (Apr. 17, 1995) (emphasis

added).  AAFAF contends that the D.C. Control Board's organic statute, too, had a deadline; but

that deadline, unlike the one in PROMESA, lacked any consequences for noncompliance.  *Id.*

§ 101(b)(4).  Moreover, Congress made the D.C. Control Board inferior officers by subjecting

them to supervision by the Treasury Secretary.  *See*, *e.g.*, *Id.* §§ 204(c), 206(c)(1), 109 Stat. at 121,

132.  Here, in contrast, the Board members "exercis[e] significant authority pursuant to the laws

of the United States," *Buckley*, 424 U.S. at 126, outside of any superior officer's oversight—the

quintessential definition of an officer of the United States.  Thus, the D.C. Control Board example

stands as a sharp contrast to the mandatory procedures required by PROMESA and only confirms

that the Appointments Clause is operative in D.C. and the territories.

## II.    Aurelius Is Entitled To An Appropriate Remedy.

If Aurelius is correct that the Board is unconstitutional, Aurelius, as the party making a

"timely" appointment challenge, "is entitled to a decision on the merits of the question and what-

ever relief may be appropriate."  *Ryder v. United States*, 515 U.S. 177, 182–83 (1995).  This Court

should sever the relevant language from PROMESA and dismiss the Title III petition.  That rem-

edy does *not* invalidate PROMESA in its entirety, or deprive Puerto Rico of the protection of Title

III.  It merely permits the President to nominate, and the Senate to confirm, a new Board consistent

with the Appointments Clause.  While those constitutional mechanisms play out, this Court can

issue a stay pending appeal and the First Circuit could, in turn, stay its mandate pending refor-

mation of the Board.  PROMESA provides that, if any "provision" "is held invalid, the remainder

of" PROMESA "is not affected thereby, provided that subchapter III is not severable from sub-

chapters I and II, and subchapters I and II are not severable from subchapter III."  48 U.S.C. § 2102.

Thus, Congress "explicitly provided for severance," and there is no "strong evidence that Congress

intended otherwise."  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).  Aurelius thus

agrees with the Board—and all of the other parties who addressed remedies—that this Court "should sever the statutory language" that offends the Constitution.  Board Opp. 34–35.[10]

The parties also agree that this Court's ruling need not undo all that the Board has done: The Court has procedural tools to minimize any possible disruption in this Title III proceeding and to allow for the nomination and confirmation process.  *See*, *e.g.*, GO Bondholders' Stmt. 2–3 (suggesting that the Court stay its judgment of dismissal for a "reasonable period" pending reconstitution of the Board); *see also* Board Opp. 34 (recommending "'limited stay' of [the] mandate"); Retiree Comm. Opp. 35 (urging that "appropriate remedy . . . would be to stay this proceeding"); AAFAF Opp. 31 (stating "the Court should . . . issue a stay"); Unsecured Creditors Opp. 28 (advocating "'limited stay'").  To the extent the Court wishes to employ such tools, Aurelius would consent to this Court's simply staying its order pending appeal, *see* Fed. R. App. P. 8(a)(1)(A), and the First Circuit, following appellate review, could then deploy *Buckley's* remedy of staying its mandate pending replacement of the Board.  424 U.S. at 142–43.  The Board may then revisit its prior acts taken pursuant to Title III, such as the decision whether to certify the Title III petition, after it is reconstituted consistent with the Appointments Clause.

In suggesting that the Court can rule for Aurelius and yet somehow "permit this proceeding to continue unimpeded," Unsecured Creditors Opp. 27, the Opposing Parties largely rely on a

---

[10] The Board is mistaken, however, that the Court need only strike the words "unless the President appoints an individual from a list, as provided in this subsection, in which case no Senate confirmation is required."  48 U.S.C. § 2121(e)(2)(E).  The severance of that provision would cure the Senate's abdication of its duty to confirm principal officers.  But the provision in § 2121(e)(2)(G), which rendered the list mechanism mandatory, and the requirement in § 2121(e)(6), which mandates that any "vacancy on the Oversight Board shall be filled in the same manner in which the original member was appointed," must also be severed in order to cure the invasion of the President's appointment powers and to establish a lawful process for future vacancies.  Nor can the Court "interpret" the statute as permitting Senate confirmation in all cases.  Board Opp. 35 n.17. The plain text of PROMESA cannot bear that reading.

misunderstanding of the remedies in *Buckley* and *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982). But in those cases, the prevailing challenger *received relief*. *Ryder*, 515 U.S. at 182–84 & n.3. In *Buckley*, although the Court blessed "the 'past acts of the [FEC],'" it still awarded plaintiffs "the declaratory and injunctive relief they sought." *Ryder*, 515 U.S. at 183. And in *Northern Pipeline*, the Court held that the bankruptcy courts were unconstitutional "and applied its decision prospectively only," but "affirmed the judgment of the District Court, which had dismissed petitioner's bankruptcy action and afforded respondent the relief requested pursuant to its constitutional challenge." *Id.* at 184 n.3. *Ryder* expressly noted that "[t]o the extent these civil cases may be thought to have implicitly applied a form of the *de facto* officer doctrine, we are not inclined to extend them beyond their facts." 515 U.S. at 184. Thus, this Court may stay its decision pending the reconstitution of a new Board, but it may not deny Aurelius any relief at all. The Opposing Parties can point to no court that found a violation of the Appointments Clause but failed to grant the requested relief. *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 828 (D.C. Cir. 1993) ("[W]e are aware of no theory that would permit us to declare the [FEC's] structure unconstitutional without providing relief to the appellants in this case.").

Aurelius has properly raised in this Court the constitutionality of the Board, and the object of Aurelius's Objection and Motion to Dismiss is dismissal of the Title III petition. If a constitutional violation occurred, Aurelius must be afforded this relief in the instant controversy.

## CONCLUSION

Aurelius's Objection and Motion to Dismiss the Board's petition under Title III of PROMESA should be granted.

Dated:  November 17, 2017                Respectfully submitted,

 _/s/ Luis A. Oliver-Fraticelli_                _/s/ Theodore B. Olson_

Luis A. Oliver-Fraticelli               Theodore B. Olson  (*pro hac vice*)
Katarina Stipec-Rubio                   Matthew D. McGill  (*pro hac vice*)
USDC-PR Bar Nos. 209204, 206611         Helgi C. Walker  (*pro hac vice*)
ADSUAR MUÑIZ GOYCO SEDA &               Lucas C. Townsend  (*pro hac vice*)
    PÉREZ-OCHOA PSC                      Lochlan F. Shelfer  (*pro hac vice*)
208 Ponce de Leon Ave., Suite 1600      Jeremy M. Christiansen  (*pro hac vice*)
San Juan, P.R.  00918                   GIBSON, DUNN & CRUTCHER LLP
Phone:  (787) 756-9000                  1050 Connecticut Avenue, N.W.
Fax:  (787) 756-9010                    Washington, D.C.  20036
Email:  loliver@amgprlaw.com            Phone:  (202) 955-8500
kstipec@amgprlaw.com                    Fax:  (202) 467-0539
                                        Email:  tolson@gibsondunn.com
                                        mmcgill@gibsondunn.com
                                        hwalker@gibsondunn.com
                                        ltownsend@gibsondunn.com
                                        lshelfer@gibsondunn.com
                                        jchristiansen@gibsondunn.com

## <u>EXHIBIT TABLE OF CONTENTS</u>

### EXHIBIT A

Presidential Commission of Arthur St. Clair, Governor of Nw. Territory
Presidential Commission of William Blount, Governor of Sw. Territory
Presidential Commission of Winthrop Sargent, Governor of Mississippi Territory
Presidential Commission of John Boyle, Governor of Illinois Territory
Presidential Commission of Ninian Edwards, Governor of Illinois Territory
Presidential Commission of William Hunt, Governor of Puerto Rico (recess appointment)
Presidential Commission of William Hunt, Governor of Puerto Rico
Presidential Commission of Regis Post, Governor of Puerto Rico (recess appointment)
Presidential Commission of Regis Post, Governor of Puerto Rico

### EXHIBIT B

*Mem. to the Director of Territories and Island Possession, from the Office of the Solicitor, U.S. Dep't of the Interior* (May 1936)

# EXHIBIT A

George Washington President of the United States
of America,
To all who shall see these Presents — Greeting:

Know Ye, That reposing special Trust and Confidence
in the Patriotism, Integrity, and abilities of Arthur St.
Clair Esquire, a Citizen of Pennsylvania, and a Major Ge-
neral in the late army of the United States. I have nomi-
nated, and by and with the advice and Consent of the
Senate, do appoint him Governor in and over the Territory
of the said United States Northwest of the River Ohio, and
do authorize and empower him to execute and fulfil the
Duties of that office according to law; and to have and
to hold the said office, with all the Powers, Privileges, and
Emoluments to the same of Right appertaining, for the
Term of three years from the day of the date hereof, un-
less the President of the United States for the time being
shall be pleased sooner to revoke and determine this
Commission.

In Testimony whereof I have caused
these Letters to be made patent, and the
Seal of the United States to be hereunto af-
fixed. Given under my hand at the City
of New York, the first day of September in
the year of our Lord one thousand seven
hundred and eighty nine.

(L. S.)

G°. Washington.

George Washington President of the United States
of America
To all who shall see these Presents Greeting.

Know Ye, That reposing special Trust and Confidence
in the Patriotism, Integrity, and Abilities of William
Blount Esquire, a Citizen of North Carolina, I have
nominated, and by and with the Advice and Consent
of the Senate, do appoint him Governor in and over the
Territory of the United States South of the River Ohio, and
do authorize and empower him to execute and fulfil the
Duties of that Office according to Law, and to have and
to hold the said Office, with all the Powers, Privileges, and
Emoluments to the same of Right appertaining for the
term of three years from the day of the date hereof, unless
the President of the United States for the time being shall
be pleased sooner to revoke and determine this Commission.

In Testimony whereof I have caused these
letters to be made Patent and the Seal of
the United States to be hereunto affixed.
(S.S.) Given under my hand at the City of New
York the eighth day of June in the year
of our Lord one thousand seven hun-
dred and ninety.

G. Washington.

(253)

John Adams, President of the United
States of America

To all who shall see these Presents, Greeting:

Know Ye, That reposing especial Trust and Con-
fidence in the Patriotism, Integrity and abilities of
Winthrop Sargent, of the Territory of the United
States, north west of the River Ohio, I have nominated
and by and with the Advice and Consent of the Senate do ap-
point him Governor in and over the Mississippi Terri-
tory, and do authorize and empower him to execute
and fulfil the Duties of that Office according to Law,
and to have and to hold the said Office, with all
the Powers, Privileges and Emoluments to the same
of Right appertaining, for the term of three years
from the Day of the date hereof, unless the President of
the United States for the time being shall be pleased
sooner to revoke and determine this Commission.

In Testimony whereof, I have caused
(LS.) these Letters to be made Patent and the Seal of
the United States to be hereunto affixed.
Given under my Hand, at Philadelphia, the
seventh day of May, in the Year of our Lord one
thousand seven hundred and ninety eight and
of the Independence of the United States of Ame-
rica the Twenty second.
John Adams

By the President,
Timothy Pickering
Secretary of State.

302

James Madison, President of the United States of America,

To all who shall see these presents, Greeting:

Know Ye, That reposing special Trust and Confidence in the Patriotism, Integrity and Abilities of John Boyle, of Kentucky, I have nominated, and by and with the advice and consent of the Senate do appoint him Governor in and over the Illinois Territory; and do authorize and empower him to execute and fulfil the duties of that office according to Law, and to Have and to Hold the said office with all the powers, privileges and emoluments to the same of right appertaining for the term of three years from the day of the date hereof, unless the President of the United States for the time being should be pleased sooner to revoke and determine this Commission.

In Testimony whereof, I have caused these Letters to be made patent, and the Seal of the United States to be hereunto affixed. Given under my hand at the City of Washington the Seventh day of March in the year of our Lord one thousand Eight hundred & nine; and of the Independence of the United States of America the Thirty third.

(L. S.)

James Madison

By the President
R Smith Secretary of State

James Madison President of the United States of America

To all who shall see these presents, Greeting:

Know Ye That reposing special trust and confidence in the Patriotism, Integrity, and Abilities of Ninian Edwards, of Kentucky, I have nominated, and by and with the advice and consent of the Senate do appoint him Governor in and over the Illinois Territory; and do authorize and empower him to execute and fulfil the duties of that office according to Law, and to Have and to Hold the said office, with all the powers privileges and Emoluments to the same of right appertaining for the term of three years from the day of the date hereof, unless the President of the United States for the time being should be pleased sooner to revoke and determine this Commission.

In Testimony whereof, I have caused these Letters to be made patent, and the Seal of the U. States to be hereunto affixed. Given under my hand at the City of Washington the Twenty first day of June in the year of our Lord one thousand Eight hundred & Nine; and of the Independence of the United States of America the Thirty third.

James Madison

By the President,
R. Smith Secy of State

WILLIAM MCKINLEY,

# President of the United States of America,

## TO ALL WHO SHALL SEE THESE PRESENTS, GREETING:

*Know ye, That, reposing special trust and confidence in the* Integrity and Ability of William H.Hunt, *of* Montana, *I have nominated, and, by and with the advice and consent of the Senate, do appoint him* The Governor of Porto Rico,

*and do authorize and empower him to execute and fulfill the duties of that office according to* law *and to have and to hold the said office, with all* the powers, privileges and emoluments *thereunto of right appertaining: unto him, the said* William H.Hunt, until the end of the next session of the Senate of the United States, and no longer, subject to the conditions prescribed by law.

*In Testimony Whereof, I have caused these Letters to be made Patent, and the Seal of the United States to be hereunto affixed.*

*Given under my hand, at the City of Washington, the* 87th *day of* August *in the year of our Lord one thousand nine* hundred and one *and of the Independence of the United States of America the one hundred and* twenty-sixth.

[SEAL]

William McKinley.

BY THE PRESIDENT:

Alvey A.Adee,

Acting *Secretary of State.*

1-M

10

THEODORE ROOSEVELT

# President of the United States of America,

TO ALL WHO SHALL SEE THESE PRESENTS, GREETING:

Know ye, That reposing special trust and confidence in the Integrity and Ability of William H.Hunt, of Montana, I have nominated, and, by and with the advice and consent of the Senate, do appoint him The Governor of Porto Rico, for the term of four years from the day of the date hereof,

and do authorize and empower him to execute and fulfill the duties of that office according to law and to have and to hold the said office, with all the powers, privileges and emoluments thereunto of right appertaining, unto him, the said William H.Hunt, subject to the conditions prescribed by law.

In Testimony Whereof, I have caused these Letters to be made Patent, and the Seal of the United States to be hereunto affixed.

Given under my hand, at the City of Washington, the 10th day of December in the year of our Lord one thousand nine hundred and one and of the Independence of the United States of America the one hundred and twenty-sixth.

(Seal)

BY THE PRESIDENT;

Theodore Roosevelt.

John Hay,

1-H

Secretary of State.

202

193

THEODORE ROOSEVELT,

## President of the United States of America,

### TO ALL WHO SHALL SEE THESE PRESENTS, GREETING:

Know ye, That, reposing special trust and confidence in the Integrity and Ability of New York, of Regis H. Post, I have nominated, and, by and with the advice and consent of the Senate do appoint him, the Governor of Porto Rico,

and do authorize and empower him to execute and fulfill the duties of that office according to law and to have and to hold the said office, with all the powers, privileges and emoluments thereunto of right appertaining; unto him; the said Regis H. Post, until the end of the next session of the Senate of the United States, and no longer, subject to the conditions prescribed by law.

In Testimony Whereof, I have caused these Letters to be made Patent, and the Seal of the United States to be hereunto affixed.

Given under my hand, at the City of Washington, the sixth day of March in the year of our Lord one thousand nine hundred and seven, and of the Independence of the United States of America the one hundred and thirty-first.

( SEAL )

BY THE PRESIDENT:

Theodore Roosevelt

Elihu Root

Secretary of State.

1-8

244

THEODORE ROOSEVELT,

# President of the United States of America,

## TO ALL WHO SHALL SEE THESE PRESENTS, GREETING:

Know ye, That, reposing special trust and confidence in the Integrity and Ability

of New York,

of Regis H. Post,

I have nominated, and, by and with the advice and consent

of the Senate, do appoint him The Governor of Porto Rico,

and do authorize and empower him to execute and fulfill the duties of that office according to law

and to have and to hold the said office, with all

the powers, privileges and emoluments thereunto of right

appertaining; unto him, the said Regis H. Post, in accordance with the provisions of the

Act of Congress entitled "An Act Temporarily to provide revenues and a civil government

for Porto Rico, and for other purposes", approved April 12, 1900,

In Testimony Whereof, I have caused these Letters to be made Patent, and the Seal of the United States to be hereunto affixed.

Given under my hand, at the City of Washington, the sixteenth

[Seal.]

day of January, in the year of our Lord one thousand nine

hundred and eight, and of the Independence of the

United States of America the one hundred and thirty-second.

BY THE PRESIDENT:

Theodore Roosevelt

Elihu Root

Secretary of State.

1-S

# EXHIBIT B

Reproduced from the Declassified/Declassified Holdings of the National Archives

DECLASSIFIED
Authority NND 88304

UNITED STATES
DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
WASHINGTON

Memorandum to the Director of Territories
and Island Possessions.

RE: President's power to reappoint
Attorney General of Puerto Rico at
expiration of recess appointment.

During the last recess of the Congress, the President filled
a vacancy in the office of the Attorney General of Puerto Rico,
pursuant to the power vested in him by Article II, section 2,
clause 3 of the Constitution, which provides:

"The President shall have Power to fill up all Vacancies
that may happen during the Recess of the Senate, by
granting Commissions which shall expire at the End of
their next Session."

When the Congress again convened the President sent the name of
the recess appointee to the Senate for confirmation. The Senate has
taken no action on this nomination and the question arises whether,
in the event that it remains unconfirmed at the end of the current
session, the President may reappoint the same person pursuant to the
quoted constitutional provision. Direct authority on the exact ques-
tion is meager but the authorities reviewed in the following dis-
cussion in my opinion clearly support the conclusion that such an
appointment may be made.

That there will be a vacancy which the President will have the
power to fill with someone, if the pending nomination remains uncon-
firmed, is clear. The conclusion that the words "may happen during
the Recess" mean "happen to exist" rather than "first occurring" is
supported by a large number of opinions of Attorneys General begin-
ning with one rendered to the President by Attorney General Wirt in
1 Ops. Atty. Gen. 631 (1823) and including 2 Ops. Atty. Gen. 525 (1832),
3 Ops. Atty. Gen. 673 (1841), 4 Ops. Atty. Gen. 523 (1846), 11 Ops.
Atty. Gen. 179 (1865), 12 Ops. Atty. Gen. 32 (1866), 14 Ops. Atty. Gen.
562 (1875), 26 Ops. Atty. Gen. 234 (1907), and 30 Ops. Atty. Gen. 314
(1914).

This being true, the next question is whether the President may
reappoint the same person to the vacancy thus created. In 2 Ops. Atty.
Gen. 525 (1832), Attorney General Taney considered a question with

Reproduced from the Unclassified / Declassified Holdings of the National Archives

DECLASSIFIED
Authority NND 88304

UNITED STATES
DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
WASHINGTON

which the instant one appears identical.  During a recess a vacancy
arose in the office of a district register of the Land Office and
the President appointed one Samuel Gwinn to fill the vacancy.  When
Congress next convened Gwinn was regularly nominated by the Presi-
dent but was rejected by the Senate.  Upon additional recommendations,
the President again sent his name to the Senate, which on the last day of
its session tabled a resolution informing the President of its intention
to take no action on the renomination.  The Attorney General held that
the President had the power to "appoint Mr. Gwinn, or anyone else to
the office", the discussion being chiefly with reference to the question
whether the new vacancy was one "happening" during a recess.  The opinion
was cited with approval by Attorney General Mason in 4 Ops. Atty. Gen.
523, 525 (1846).

The following is quoted from 11 Ops. Atty. Gen. 179, 179-180 (1865):

"It appears that on the 8th day of July, 1864, a few
days after the adjournment of Congress, a commission was
issued by the President appointing Peter McGough collector
of internal revenue for the 20th district of Pennsylvania,
under which Mr. McGough qualified and entered upon the
duties of his office.  The commission of McGough expired
on the 3d day of March last, that being the last day of
the succeeding session of the Senate.  There was a called
session of the Senate on the 4th of March.

"By an unfortunate oversight by one of the clerks
in your Department the name of McGough was not sent into
the session which succeeded his appointment, nor the called
session.

"You ask me whether, under that state of facts, the
President can now fill the vacancy?

"According to the opinions of my predecessors in this
office, and in which I concur, he can fill the vacancy."

The opinion does not disclose who was proposed to fill the new vacancy,
but lacking discussion of the specific question it seems not unreason-
able to suppose that it was the same person.

In 14 Ops. Atty. Gen. 562 (1875), the President had submitted to
the Senate the names of certain persons for confirmation as paymasters
in the Army.  The Senate adjourned, having failed to confirm two of the
nominations.  The following is from the opinion (p.564):

Reproduced from the Unclassified / Declassified Holdings of the National Archives

DECLASSIFIED
Authority NND 88304

"I accordingly answer, that the two vacancies exist-
ing in the grade of paymaster, with the rank of major, can
now be filled by the President by temporary appointments.
"Touching the other questions submitted, namely, as
to whether there are any restrictions on the President in
regard to the persons who may be thus appointed, and whether
he is at liberty to appoint those whom the Senate failed to
confirm: to the former I answer, that I know of no such
restrictions upon his power of appointment."

In In re Farrow, 3 Fed. 112 (1880), two persons claimed the office
of United States Attorney for the District of Georgia. The term of
Farrow had expired during the session of the Senate and he qualified
under a new appointment by the circuit justice, made pursuant to sec-
tion 793 of the Revised Statutes. A month later, the President nomi-
nated one Rigby to the Senate, which adjourned without acting on the
nomination. The President thereupon tendered Rigby a recess appointment,
under which he successfully claimed the office.

Only the opinion of Attorney General Taney (2 Ops. Atty. Gen.
525), herein first discussed, is exactly in point. The others, how-
ever, demonstrate a uniform disposition to interpret Article II, sec-
tion 2, clause 3 of the Constitution in a manner favorable to the re-
cess reappointment of a person previously appointed during a recess.
I therefore know of no constitutional or statutory prohibition of such
action.

The only remaining question is that of the possible effect of
Revised Statutes, section 1761 (tit. 5, U.S.C., sec. 56), which pro-
vides:

"No money shall be paid from the Treasury, as salary,
to any person appointed during the recess of the Senate,
to fill a vacancy in any existing office, if the vacancy
existed while the Senate was in session and was by law re-
quired to be filled by and with the advice and consent of
the Senate, until such appointee has been confirmed by the
Senate. The provisions of this section shall not apply to
any person appointed as an original member of the Board of
Tax Appeals, if such appointment was made prior to December 1,
1924."

It will be noted that this limits, not the power of the President to make
certain appointments, but the right of the appointees to receive salary.

5

DECLASSIFIED
Authority NND 88304

In a situation identical with the instant one the Comptroller General
has held that this statute prohibits the payment of money from the
Treasury to the recipient of a second recess appointment, prior to
his confirmation by the Senate.  The decision is based on the ground
that "a vacancy existed while the Senate was in session" because "a
recess appointment, being merely a temporary expedient provided for
under the law, does not fill the vacancy" notwithstanding that the
Constitution empowers the President to "fill up all vacancies" by
making recess appointments.  6 Comp. Gen. 147, 149.  See also 7 Comp.
Gen. 329, 9 Comp. Gen. 60.

The Comptroller General has further held, however, that upon con-
firmation by the Senate the recess appointee becomes entitled to com-
pensation for all services rendered under his recess appointment. 9 Comp.
Gen. 190.

It is therefore my conclusion that the President has the power to
fill the vacancy that may occur with the adjournment of Congress either
with the same or another person, but that in either event the recess
appointee will be entitled to receive no compensation whatever unless
he is confirmed by the Senate.  If ultimately confirmed, he apparently
will be entitled to compensation from the date of his entrance on duty
under the second appointment.

Solicitor.

4