## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

**DECLARATION OF LANORA C. PETTIT IN SUPPORT OF URGENT RENEWED JOINT MOTION BY THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS, AMBAC ASSURANCE CORPORATION, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., THE MUTUAL FUND GROUP, AND NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION FOR ORDER AUTHORIZING RULE 2004 EXAMINATION**

1.    I am an attorney associated with the law firm of Robbins, Russell, Englert, Orseck, Untereiner, and Sauber LLP, counsel, along with Paul, Weiss, Rifkind, Wharton & Garrison, LLP and Jiménez, Graffam & Lausell, for movants the Ad Hoc Group of General Obligation Bondholders.  I submit this declaration in further support of the Urgent Renewed Joint Motion By The Ad Hoc Group Of General Obligation Bondholders, Ambac Assurance Corp., Assured Guaranty Corp., Assured Guaranty Municipal Corp. and National Public Finance Guarantee Corporation for Order Authorizing Rule 2004 Examination.

---

[1]    The Debtors in these title III cases (collectively, the "Title III Cases"), along with each Debtor's respective Title III Case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico; and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).  (Title III Case numbers are listed as bankruptcy case numbers due to software limitations).

2.      Attached hereto as Exhibit A is a transcript of the First Public Meeting of the Financial Oversight and Management Board for Puerto Rico, which was held on September 30, 2016. The transcript was prepared by Alderson Court Reporting from a recording of the meeting.

3.      Attached hereto as Exhibit B is a true and correct copy of an article titled "Commonwealth, Oversight Board Remain Divided on Furloughs After Board Approves Reduced Program Beginning Sept. 1 to Address $218M Funding Gap," which was published by Reorg Research on August 4, 2017.

I declare under penalty of perjury that to the best of my knowledge the foregoing is true and correct.


Executed on November 28, 2017 in Washington, D.C.


By: _____
                Lanora C. Pettit

# EXHIBIT A



Transcript of **1st Public Meeting - September 30, 2016**

September 30, 2016

*Transcription for Robbins Russell*

Alderson Reporting
1-800-367-3376
info@aldersonreporting.com
http://www.aldersonreporting.com

Alderson Reference Number: 71670

Page 1

1

2

3

4     THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD

5                     FOR PUERTO RICO

6

7

8

9          PRIMERA REUNION DE LA JUNTA

10

11

12                 1ST PUBLIC MEETING

13

14

15

16             September 30th, 2016

17

18

19

20

21

22                 New York, New York

1st Public Meeting - September 30, 2016                        September 30, 2016
Washington, D.C.

Page 2

```
 1                          PARTICIPANTS

 2              BOARD MEMBERS:

 3          JOSE B. CARRION (Chair), President and Principal

 4      Partner, HUB International CLC, LLC, San Juan, Puerto

 5      Rico

 6          ANDREW G. BIGGS, Resident Scholar, American

 7      Enterprise Institute, Washington, D.C.

 8          CARLOS M. GARCIA, CEO, BayBoston Managers LLC, and

 9      Managing Partner, BayBoston Capital L.P., Newton

10      Centre, Massachusetts

11          HONORABLE ARTHUR J. GONZALEZ, Senior Fellow, New

12      York University School of Law, New York, New York; and

13      Former Judge, Bankruptcy Court, Southern District of

14      New York, New York, New York

15          JOSE R. GONZALEZ, CEO and Resident, Federal Home

16      Loan Bank of New York, New York, New York

17          ANA J. MATOSANTOS, President, Matosantos

18      Consulting, Sacramento, California

19          DAVID A. SKEEL, Professor, University of

20      Pennsylvania Law School, Philadelphia, Pennsylvania

21          HONORABLE RICHARD RAVITCH, Former Lieutenant

22      Governor, State of New York, Albany, New York
```

1st Public Meeting - September 30, 2016                          September 30, 2016
Washington, D.C.

Page 3

1                    P R O C E E D I N G S

2          MR. GONZALEZ:  Buenos dias.  Good morning.  I'm

3    Jose Ramon Gonzalez (Speaking Spanish).  A few words in

4    Spanish, then we'll move on to English.

5          (Speaking Spanish.)

6          MR. GONZALEZ:  Again, I'm Jose Gonzalez, the --

7    I'm one of the members of the Board.  The other members

8    have asked me to open the meeting and welcome you all

9    to this first meeting of the Financial Oversight and

10   Management Board for Puerto Rico.

11         The documents which we will be discussing are

12   generally available in Spanish and English at the

13   Board's website, and the meeting itself will be

14   transmitted live -- is being transmitted live through

15   the Board website.  The website addresses in Spanish

16   and English are listed in the auditorial projection.

17         I will conduct a roll call to determine the

18   existence of a quorum and initiate the meeting.

19         Andrew Biggs.

20         MR. BIGGS:  Present.

21         MR. GONZALEZ:  Jose Carrion.

22         MR. CARRION:  Present.

1st Public Meeting - September 30, 2016                    September 30, 2016
Washington, D.C.

Page 4

 1        MR. GONZALEZ:  Carlos Garcia.

 2        MR. GARCIA:  Present.

 3        MR. GONZALEZ:  Arthur Gonzalez.

 4        JUDGE GONZALEZ:  Present.

 5        MR. GONZALEZ:  Ana Matosantos.

 6        MS. MATOSANTOS:  Present.

 7        MR. GONZALEZ:  David Skeel.

 8        MR. SKEEL:  Present.

 9        MR. GONZALEZ:  The governor of Puerto Rico is an

10   ex officio member of the Board, but he has notified us

11   of his delegation of his presence of the Board through

12   his representative, Richard Ravitch.

13        LIEUTENANT GOVERNOR RAVITCH:  Present.

14        MR. GONZALEZ:  Thank you.  Mr. Skeel, I will ask

15   you if you can serve as secretary pro tem for this

16   meeting.

17        MR. SKEEL:  Yes, I can.

18        MR. GONZALEZ:  Thank you very much.  The Board, as

19   you know, has been established under the Puerto Rico

20   Oversight Management and Economic Stability Act, and

21   its purpose is to provide a way for Puerto Rico to

22   achieve fiscal equilibrium in a sustainable manner, and

Alderson Court Reporting

Page 5

1    restore its access to the capital markets.  The Board

2    is tasked with working with the people of Puerto --

3    with the people and the government of Puerto Rico to

4    create the needed foundation for economic growth and

5    development.

6          The purpose of today's meeting is to authorize

7    some important initial actions that are required under

8    PROMESA, and are critical to the functioning of the

9    Board.  We have six agenda items, including five

10   matters which require a Board approval, and each of

11   those will require an affirmative vote of no fewer than

12   four voting Board members to pass.

13         The first matter is the election of the Board's

14   chairperson.  Section 101(e)(4) of PROMESA provides

15   that the voting members of the Board shall designate

16   one of its members as the chair, and the Board's

17   bylaws, as proposed, state that the term of the chair

18   shall be for two years.  Our first order of business

19   will be to elect the chair.

20         I will open the nominations process.  Any

21   nominations, please.

22         MS. MATOSANTOS:  I nominate Mr. Carrion to be the

1st Public Meeting - September 30, 2016                    September 30, 2016
Washington, D.C.

Page 6

1   chairman.

2        MR. GONZALEZ:  Mr. Carrion, do you accept the

3   nomination?

4        MR. CARRION:  I do.

5        MR. GONZALEZ:  Any other nominations for chairman

6   of the Board?

7        (No response.)

8        MR. GONZALEZ:  Hearing no other nominations, I

9   hereby declare the nominations closed.

10       We will then vote for the chair.  I'm sorry.

11       BOARD MEMBER:  We need a second.

12       MR. GONZALEZ:  Do we have a second for the

13   nomination?

14       MR. BIGGS:  I second the motion.

15       MR. GONZALEZ:  Very good.  Andrew seconds the

16   motion.

17       We will move to voting.  By a show of hands, in

18   favor of the nominee for chair of the Board.

19       (Hands raised.)

20       MR. GONZALEZ:  I see a unanimous vote of the

21   voting members of the Board.

22       Do the members have any objections?

Alderson Court Reporting

1st Public Meeting - September 30, 2016                                  September 30, 2016
Washington, D.C.

Page 7

1        (No response.)

2        MR. GONZALEZ:  None noted.  All the members having

3   voted in favor of the motion, Mr. Carrion has been

4   elected chair, and I will now -- I'd like to extend my

5   congratulations, and turn over the meeting to him.  Mr.

6   Carrion.

7        CHAIRMAN CARRION:  Thank you, Jose Ramon.  I want

8   to thank you and my colleagues for this great honor.

9   We will strive to work in a collegial manner for the

10  benefit of the people of Puerto Rico.

11       Let's move forward with the agenda and the

12  adoption of the Board bylaws.  But before I do that, I

13  would like to thank Professor Skeel and Judge Gonzalez

14  for their work regarding this issue.  We've done well

15  in an expedited manner, so thank you very much.

16       The members have been previously provided with the

17  proposed bylaws, and a copy is also available if you

18  wish to review it again.  I would like to request

19  Professor Skeel to provide a summary of said bylaws and

20  Judge Gonzalez.

21       JUDGE GONZALEZ:  Thank you.  I wanted to speak

22  briefly about the thinking of the Board in drafting the

1st Public Meeting - September 30, 2016                    September 30, 2016
Washington, D.C.

Page 8

1    bylaws and on other matters.  We are acutely aware of

2    the importance of transparency and consensus and

3    actions in establishing the credibility of this Board.

4         We have a great deal of work to do -- to do to

5    continue to advance this goal, and we are making every

6    effort to do so as expeditiously as we can.  We welcome

7    and encourage your comments and suggestions in this and

8    other matters.  We will continue to work to enhance

9    methods and means of communications, as indicated today

10   by your access to our website and other information

11   thereon.

12        I now turn it over to Professor Skeel to give a

13   summary of the bylaws.

14   MR. SKEEL:  Thank you, Judge Gonzalez.  Our bylaws

15   are general operating rules essentially.  Rather than

16   go through the document, which, as Judge Gonzalez said,

17   is on our website now, so anybody who's interested can

18   look at it, I'll just say a word about the general

19   principle we used in putting the bylaws together, and

20   highlight a couple of the significant provisions in the

21   bylaws.

22        The general operating principle we used was we

1st Public Meeting - September 30, 2016                                    September 30, 2016
Washington, D.C.

Page 9

1    wanted everything to be consistent with the Act,

2    consistent with PROMESA.  So, the bylaws are framed by

3    the statute itself.  We've incorporated a lot of the

4    statute into the bylaws, but everything is meant to be

5    consistent with PROMESA.

6         The key adjustments that we made primarily have to

7    do with the voting rules in a couple of places.  We've

8    clarified a little bit, and in a couple of places we

9    increased the voting rules.  So, for all of the major

10   decisions that we make, ordinarily we're going to

11   require that there be four votes of the seven of us for

12   any of those decisions to go through except in places

13   where the Act requires a different, a particularly

14   higher vote.

15        So, the idea is if for some reason not all of us

16   can be at a meeting, we still are going to require four

17   votes, a majority of the full Board, not just a

18   majority of the number of directors or Board members

19   who happen to be at the meeting.  So, it's a four-vote

20   requirement we've put in.

21        The other big change we've made or significant

22   change we've made in the voting is that with several of

1st Public Meeting - September 30, 2016                    September 30, 2016
Washington, D.C.

Page 10

1    the appointments, in particular the executive director

2    and the general counsel, we're going to require the

3    chair plus four members of the Board approve those

4    appointments.  So, effectively it's a five-vote

5    requirement.

6         There are two reasons for this.  One is, those are

7    going to be extraordinarily important appointments.

8    The executive director and our general counsel are

9    going to have an enormous workload.  They're going to

10   be very, very important, and so we want to make sure

11   that we have a supermajority of us on board with those

12   appointments.  It also is consistent with the general

13   desire to operate with as much consensus as we can

14   within the Board, given the magnitude of the challenge

15   we have in front of us.

16        Thank you.

17        CHAIRMAN CARRION:  Thank you, Professor Skeel.

18   Does anybody have any questions regarding the proposed

19   bylaws?

20        (No response.)

21        CHAIRMAN CARRION:  Do I have a motion to approve

22   the bylaws?

Alderson Court Reporting

1st Public Meeting - September 30, 2016                                September 30, 2016
Washington, D.C.

Page 11

 1        JUDGE GONZALEZ:  Yes.  I move to adopt the bylaws

 2   for the Board in the form presented at this meeting.

 3        MR. GARCIA:  I second the motion.

 4        CHAIRMAN CARRION:  Thank you, Mr. Garcia.

 5        A show of hands in favor of approving the bylaws.

 6        (Hands raised.)

 7        CHAIRMAN CARRION:  Excellent.  Moving on.  The

 8   request for the fiscal plan and other information from

 9   the governor of Puerto Rico.  Before I do, I would like

10   to state that we as a Board are making every effort to

11   meet our obligations, to complete the fiscal plan

12   certification process, and engage in good faith

13   negotiations under the Act, okay?

14        One of the duties of the Board, Section 210(a), is

15   to provide a schedule to the governor of Puerto Rico

16   for the purpose -- for the process of development,

17   submission, approval, and certification of fiscal plans

18   for the Government of Puerto Rico, and for covered

19   territorial instrumentalities, and to consult with the

20   governor in establishing said schedule.

21        In preparing to provide that schedule, in the

22   spirit of cooperation, and in the exercise of the

1st Public Meeting - September 30, 2016                              September 30, 2016
Washington, D.C.

Page 12

1    Board's right under Section 104(c), to obtain

2    information necessary to carry out our

3    responsibilities, we believe it appropriate that we

4    first request certain periodic information from the

5    Government of Puerto Rico.

6         The initial request of information from the

7    Government of Puerto Rico's central government is as

8    follows:  a weekly cash flow report, including all

9    revenues received and all expenses paid, including any

10   debt service, and broken down by main categories;

11   monthly downloads of bank account data and statements

12   of all principle banking accounts provided directly to

13   the Board by each bank; monthly and year-to-date report

14   of compliance with current approved budget by budgetary

15   fund and by agency, including local special funds and

16   Federal funds; monthly and year-to-date detailed report

17   of revenues and a narrative about collection efforts

18   and main initiatives of the Puerto Rico Treasury

19   Department; monthly detailed payroll report by agency;

20   monthly reports on Federal funds received and disbursed

21   by area and by agency; monthly report of all debt

22   obligations due this current Fiscal Year, and which

1st Public Meeting - September 30, 2016                    September 30, 2016
Washington, D.C.

Page 13

1   have been paid; quarterly report on each agency's

2   productivity and performance with appropriate metrics

3   and narrative description; quarterly report on any key

4   Puerto Rico economic financial, social, and labor

5   statistics.

6       I'd like to open this up for discussion and

7   thoughts with regards to the timetable before we put

8   this to the governor.  Any comments?

9       AUDIENCE MEMBER:  It sounds like slavery to me.

10      CHAIRMAN CARRION:  Any comments from the Board?

11      MR. GONZALEZ:  So, I think this is a very complete

12  and -- listing of information that is required and

13  reasonable for the Board to do its job and to begin to

14  gather the information necessary for decisions we may

15  make.  So, it seems reasonable and appropriate.

16      CHAIRMAN CARRION:  Thank you.  Thank you very

17  much.  Are there any further comments from the Board?

18      (No response.)

19      CHAIRMAN CARRION:  There being no further

20  comments, I would now like to move that in connection

21  with the Board's responsibilities under the Act with

22  respect to fiscal plans, the Board request the governor

1st Public Meeting - September 30, 2016                    September 30, 2016
Washington, D.C.

Page 14

1    of Puerto Rico to provide, one, the Board with the

2    fiscal plan for the Commonwealth of Puerto Rico by no

3    later than October 14th; for the governor or his

4    representative to present such fiscal plan at the next

5    Board meeting to be held in October; and lastly, for

6    the governor to provide the information previously

7    listed, as may be modified by the Board from time to

8    time, initially as of September 30th, with a delivery

9    date of the end of October, or as such other time

10   agreed with the Board, and thereafter with periodicity

11   requested by the Board.

12        Would anybody second this motion?

13        MR. GONZALEZ:  I will second the motion.

14        CHAIRMAN CARRION:  Thank you.  A show of hands

15   affirmative vote.

16        (Hands raised.)

17        CHAIRMAN CARRION:  Thank you.  All members having

18   voted in favor of the motion, the motion has passed.

19        Now, let's move on to the process -- to establish

20   a process for a search of the Board's executive

21   director and certain other key personnel, a process

22   which we will endeavor to do as expeditiously as

1st Public Meeting - September 30, 2016                              September 30, 2016
Washington, D.C.

Page 15

1    possible.  And we would like to begin that process with

2    -- by stating that Section 103 requires that the

3    executive director be appointed by this chair with the

4    consent of the Oversight Board.  The bylaws define the

5    executive director's role, stating that he or she shall

6    execute instructions of the Board and essentially be a

7    full-time chief executive of the Board, and subject to

8    supervision and control of the Board, and shall have

9    general supervision and direction of the business

10   affairs of the Board.

11        PROMESA establishes in Section 5.2 that under the

12   Board, the position of the revitalization coordinator

13   will be a central figure in the development of

14   infrastructure revitalization projects.  PROMESA

15   requires that the coordinator be appointed by the

16   governor, and the Board submit at least three nominees

17   for the position.

18        The bylaws require that the Board have a general

19   counsel, who shall be the chief legal officer of the

20   Board, and have such other duties as may be assigned by

21   the Board and executive director.

22        PROMESA makes it clear that the executive director

1st Public Meeting - September 30, 2016                    September 30, 2016
Washington, D.C.

Page 16

1   may hire additional staff from time to with the

2   approval of the Board.  Given the importance of this

3   matter and the deadline involved, I believe it is

4   appropriate, and I'm asking for approval, to engage an

5   executive search firm to assist the Board to identify

6   qualified candidates for the executive director and

7   other key positions, including, but not limited to, the

8   coordinator and the general counsel.

9        To those ends, I would like to create a committee

10  composed of three other Board members -- Mr. Garcia,

11  Mr. Gonzalez, and Ms. Matosantos, and me -- to identify

12  the appropriate firm or firms and conduct a search

13  process for these positions.  Before engaging the firm,

14  we will seek the consent of the committee, describing

15  generally the scope of services and of compensation of

16  said firm.

17       Any thoughts regarding this issue before we put it

18  to a vote?

19       (No response.)

20       CHAIRMAN CARRION:  There being --

21       (Disturbances in meeting room.)

22       AUDIENCE MEMBER:  You have no right to do this.

1st Public Meeting - September 30, 2016                    September 30, 2016
Washington, D.C.

Page 17

1    You have no right --

2         AUDIENCE MEMBER:  Down with PROMESA.  No to these

3    asshole promises.  You guys are raping Puerto Rico.

4    You're pillaging Puerto Rico.  Shame on all of you.

5    You're wanted, Chairman Carrion, for crimes against

6    Puerto Rico.  Shame on all of you.  Stop pillaging

7    Puerto Rico.  Stop pillaging Puerto Rico.  (Speaking

8    Spanish) PROMESA.  No to the promises.  Stop raping

9    Puerto Rico.  Our people do not deserve that.  Puerto

10   Rico is not in slavery.  Stop raping Puerto Rico.  Stop

11   raping Puerto Rico.

12        AUDIENCE MEMBER:  This is slavery.  As you know,

13   we will resist.  As you know, we will resist.

14        AUDIENCE MEMBER:  Shame on you guys.

15        AUDIENCE MEMBER:  Shame --

16        AUDIENCE MEMBER:  All of you.

17        AUDIENCE MEMBER:  They're sell-outs, every one of

18   them.

19        CHAIRMAN CARRION:  Any thoughts regarding the

20   issues that I just plotted out by the -- from the

21   Board?

22        MR. MATOSANTOS:  Mr. Chair, it makes sense to me

1st Public Meeting - September 30, 2016                          September 30, 2016
Washington, D.C.

Page 18

1    that we'd move forward in this matter so that we can

2    move with our duties as expeditiously as possible.

3          CHAIRMAN CARRION:   Thank you, Ms. Matosantos.

4    There being no further discussion, would someone like

5    to make a motion?

6          MR. BIGGS:   I would like to move that a committee

7    of the Board be created for the executive searches

8    composed of the chair and Board members, Carlos Garcia,

9    Jose Gonzalez, Ana Matosantos.

10         (Disturbances in the meeting room.)

11         MR. BIGGS:   And that the chair be authorized to

12   seek and engage an executive search firm or firms which

13   will be -- which will identify qualified candidates for

14   the key executive positions, including, but not limited

15   to, executive director, revitalization coordinator, and

16   general counsel, provided that prior to engagement, the

17   chair first receives the written consent of a majority

18   of members of the committee to the firms or firms

19   selected, and the compensation to be paid to the firm

20   or firms selected.

21         CHAIRMAN CARRION:   Thank you, Mr. Biggs.   Does

22   anybody second the motion?

1st Public Meeting - September 30, 2016                    September 30, 2016
Washington, D.C.

Page 19

1          JUDGE GONZALEZ:  I second the motion.

2          CHAIRMAN CARRION:  Thank you, Judge Gonzalez.  May

3     I have a show of hands for that -- the motion, please?

4          (Hands raised.)

5          CHAIRMAN CARRION:  Thank you very much.  Shall we

6     move to other administrative matters?

7          (Disturbances in the meeting room.)

8          CHAIRMAN CARRION:  Until the executive director is

9     recruited, it is important for the Board to be able to

10    contact services needed to organize, support, and carry

11    out the responsibilities required by the Board, such as

12    open bank accounts, sign leases and contracts,

13    implement reimbursement policies, and conduct any other

14    official business, including the ability to retain

15    counsel required to attend to immediate matters.

16         Ana, do you have a -- Ms. Matosantos, do you have

17    a --

18         MS. MATOSANTOS:  Yes, thanks for acknowledging me

19    to speak.  Mr. Chair, I move to grant the chair the

20    power to contract for services needed to organize,

21    support, and carry out the responsibilities required of

22    the Board:  open bank accounts, sign leases, sign

1st Public Meeting - September 30, 2016                                          September 30, 2016
Washington, D.C.

Page 20

1   contracts, implement reimbursement policies, retain

2   professional advisors as needed, including counsel, to

3   address matters that require immediate attention, and

4   conduct any other official business of the Board.

5        CHAIRMAN CARRION:  Thank you, Mrs. Matosantos.

6   Before we move on to second -- before I ask that the

7   motion be seconded, I wanted to take a moment to thank

8   the Department of Treasury for their technical

9   assistance, the good people of the GSA for their

10  assistance, and finally, Mr. Garcia for his technical

11  support in the last few days who made this meeting

12  possible.

13       Does anybody second this motion?

14       BOARD MEMBER:  I'd like to second the motion.

15       CHAIRMAN CARRION:  Great.  Just a show of hands to

16    see --

17       (Hands raised.)

18       CHAIRMAN CARRION:  All right.  Thank you very

19  much.

20       MS. MATOSANTOS:  Mr. Chair, I'd like to add also

21  our thanks to the Government of Puerto Rico for their

22  assistance with the website and other matters related

1st Public Meeting - September 30, 2016                    September 30, 2016
Washington, D.C.

Page 21

1    to the making this meeting happen.

2         CHAIRMAN CARRION:  Well said.  Thank you.  All

3    right.  Please note that Mr. Gonzalez has stepped out.

4         Our final agenda item will be the initial

5    designation of covered entities under PROMESA.  And

6    here I'd like to also thank Ms. Matosantos' work in

7    assisting and Mr. Garcia's work in assisting and

8    putting together this list for the Board.

9         The statute states in Section 101(d) that the

10   Board may designate any Puerto Rico instrumentality as

11   a covered territory instrumentality, which will be

12   subject to the requirements of the statute.  An

13   instrumentality is defined in Section 5.19 as any

14   political subdivision, public agency, instrumentality,

15   or public corporation of Puerto Rico.

16        The Board members have previously been provided a

17   list, entitled "Covered Entities Under PROMESA Act,"

18   showing those instrumentalities which are being

19   proposed to be designated as covered territorial

20   instrumentalities.  And that list is here at the

21   meeting if you would like to view it again.

22        Any discussion regarding this issue?

1st Public Meeting - September 30, 2016                    September 30, 2016
Washington, D.C.

Page 22

```
1        MR. GARCIA:  If I may, Mr. Chair, I just want to

2   share the list of the covered entities that -- before

3   the motion is presented.  So, the initial proposed list

4   of covered entities will be the Commonwealth of Puerto

5   Rico, the Employees Retirement System, the Judiciary

6   Retirement System, the Teachers Retirement System, the

7   University of Puerto Rico, and then all the public

8   corporations of Puerto Rico, including, but not limited

9   to, the Aqueduct and Sewer Authority, the Children

10  Trust Fund, the Convention Center District Authority,

11  the Economic Development Bank, the Electric Power

12  Authority, the Fiscal Agency and Financial Advisory

13  Authority, the Government Development Bank, Highway and

14  Transportation Authority, Housing Financial Authority,

15  Industrial Development Company, Infrastructure

16  Financial Authority, Municipal Financial Authority,

17  Ports Authority, Public Buildings Authority, Public

18  Broadcasting Corporation, Public Corporations for the

19  Supervision and Insurance of Cooperatives, better known

20  as COSSEC, Public Finance Corporation, Sales Tax

21  Financing Corporation, State Insurance Fund

22  Corporation, UPR Palacio University Stadia, and Tourism
```

1st Public Meeting - September 30, 2016                               September 30, 2016
Washington, D.C.

Page 23

 1    Companies; all the entities that are affiliated with or

 2    are subsidiaries of the entities listed above, as well

 3    as the entities that succeeded these entities are also

 4    designated as covered entities and subject to the

 5    oversight of the Board.

 6        CHAIRMAN CARRION:  Thank you, Mr. Garcia.  I'd

 7    like to put a motion on the table for approval.

 8        MS. MATOSANTOS:  Mr. Chair, if I may, on the

 9    rationale a little bit before we get to the motion, if

10    that's acceptable.

11        CHAIRMAN CARRION:  Absolutely.

12        MS. MATOSANTOS:  I think this approach that Mr.

13    Garcia has outlined of kind of a broad -- a broad

14    capturing of the different covered entities is

15    reasonable and wise given the interrelatedness of the

16    financing for different entities and the budget

17    situation in Puerto Rico.  And focusing on all entities

18    at the Commonwealth level, but including the initial

19    fiscal plan in a more focused manner with things that

20    are directly related to the budget is appropriate and

21    will be helpful to the -- to the Board's work,

22    particularly given the information we have received.

1st Public Meeting - September 30, 2016                                September 30, 2016
Washington, D.C.

Page 24

1          So, I'm very supportive of this approach, and also

2     think we should consider if there are other entities

3     that we need to be looking at and other financial

4     situations subject -- that are potentially subject to

5     the Board's oversight that needed to be included in the

6     future.  But as a -- as an initial designation, this

7     kind of holistic approach that focuses on the

8     Commonwealth-wide entities and related public

9     corporations seems appropriate and warranted.

10         CHAIRMAN CARRION:  Thank you, Ms. Matosantos.  A

11    motion to approve covered entities under the PROMESA

12    Act.

13         MR. GONZALEZ:  Mr. Chair, I would like to move

14    that the entities shown on the list presented at this

15    meeting, entitled "Covered Entities Under the PROMESA

16    Act," as I have read them and are provided on the

17    website both in English and Spanish, be designed

18    covered territorial instrumentalities subject to

19    PROMESA.

20         CHAIRMAN CARRION:  Thank you, Mr. Garcia.  Does

21    anybody second the motion?

22         MS. MATOSANTOS:  I second the motion.

1st Public Meeting - September 30, 2016                                    September 30, 2016
Washington, D.C.

Page 25

```
 1        CHAIRMAN CARRION:  Thank you, Ms. Matosantos.
 2   Show of hands in favor.
 3        (Hands raised.)
 4        CHAIRMAN CARRION:  Anybody opposed?
 5        (No response.)
 6        CHAIRMAN CARRION:  Thank you very much.  Since we
 7   have no other matters to cover, I move that we adjourn
 8   this meeting.
 9        JUDGE GONZALEZ:  Thank you, Judge Gonzalez.  We'll
10   be available for the press after the meeting.  Thank
11   you very much for coming.
12        (Whereupon, the meeting was adjourned.)
13
14
15
16
17
18
19
20
21
22
```



**ALDERSON**
COURT REPORTING

## <u>CERTIFICATE OF TRANSCRIBER</u>

I, Charlene Williamson, do hereby certify that, to the best of my knowledge and belief, the

attached transcript is a true and accurate transcription of the indicated audio recording.


I further certify that I am neither attorney nor counsel for nor related nor employed by any

of the parties to the action; further, that I am not a relative or employee of any attorney or

counsel employed by the parties hereto or financially interested in this action.

07/06/2017

DATE

*Charlene Williamson*

Charlene Williamson
TRANSCRIBER

1155 Connecticut Avenue, NW
Suite 200
Washington, DC 20036

P 202.289.2260
F 202.289.2221

800.367.3376
www.aldersonreporting.com

# EXHIBIT B

**Pettit, Lanora**

| | |
|---|---|
| **From:** | Brian Bromberg REDACTED |
| **Sent:** | Friday, August 04, 2017 1:32 PM |
| **To:** | REDACTED ; Pettit, Lanora |
| **Subject:** | FW: Puerto Rico (U.S. Intelligence) - Commonwealth, Oversight Board Remain Divided on Furloughs After Board Approves Reduced Program Beginning Sept. 1 to Address $218M Funding Gap |

---

**From:** Reorg Research Alert
**Sent:** Friday, August 4, 2017 1:31:40 PM (UTC-05:00) Eastern Time (US & Canada)
**To:** Brian Bromberg
**Subject:** Puerto Rico (U.S. Intelligence) - Commonwealth, Oversight Board Remain Divided on Furloughs After Board Approves Reduced Program Beginning Sept. 1 to Address $218M Funding Gap



August 04, 2017 13:31

Puerto Rico

## Commonwealth, Oversight Board Remain Divided on Furloughs After Board Approves Reduced Program Beginning Sept. 1 to Address $218M Funding Gap

_Relevant Documents:_
Right-Sizing Discussion
Board Letter to Governor on Right-Sizing
Conformed Certified Fiscal Plan (Commonwealth)
Certified Fiscal Plan (COSSEC)
Press Release

PROMESA board members and Puerto Rico government officials sparred this morning during a public meeting in which the board decided to impose a worker furlough program beginning Sept. 1 over commonwealth objections. The board approved the measure unanimously.

Reorg's full live coverage of today's hearing can be found **HERE**.

Board Chairman Jose Carrión warned that the matter will likely end up in court and said that any delay in implementing the program will require the board to increase its intensity. He called the expected court fight "unfortunate" and said it would add to costs. The worker furlough program, which is slated to run through the end of fiscal year 2018, aims to close a $218 million gap against an $880 million target in right-sizing savings. The board and the commonwealth also disagreed over a suggestion by PROMESA board Executive Director Natalie Jaresko that it may be necessary to appoint a monitor in connection with the oversight of key budget functions across the commonwealth budget.

In addition to the furlough program, the oversight board unanimously adopted a resolution approving the certification of COSSEC's fiscal plan subject to certain amendments. The board requested that the government submit a plan to implement the amendments within 30 days and a revised fiscal plan that complies with the measures described in the amendments within 15 days thereafter.

The board also provided an overview of the proposed pension reform, saying that it is proceeding with its plan to reduce pension benefit outlays by an average of 10% by 2020 as contemplated in the certified fiscal plan

1

despite increasing pushback from the administration of Gov. Ricardo Rosselló.

**Furlough Program**

Jaresko said the government has made "significant progress" in right-sizing measures, providing sufficient evidence that it could realize about $662 million of the projected $880 million in savings, but that the worker furlough program is needed to close the $218 million gap. While she said an incentivized retirement program pushed by government officials is a promising development, it will not result in budgetary savings during this fiscal year.

Jaresko noted that the intensity of the worker furlough program is less than initially contemplated by the board, with most government employees having two days off a month rather than four days a month as originally planned. Front-line police officers will be exempt. The executive director also said that the board would not make a decision on whether to suspend Christmas bonuses for government employees until Sept. 30.

"The furlough program is substantially smaller than that was contemplated originally in certifying the fiscal plan," Jaresko said.

In response to the oversight board's decision on the furlough program, GDB President and *ex officio* board member Christian Sobrino told the oversight board that the commonwealth will not implement the furlough program. "The government understands the line needs to be drawn," Sobrino said, adding, "There will be no furloughs. You can take that to the bank." During his comments, Sobrino argued that the amendments to the fiscal plan that were made earlier this year prior to certification were "unilateral amendments" that the commonwealth government views as recommendations. He added that the commonwealth will meet its fiscal goals but will do so in accordance with its own policy.

"If they want to take us to court, we will defend ourselves," Sobrino told reporters after the meeting.

The governor's board representative also reiterated administration arguments that the PROMESA board lacked the authority to unilaterally impose the furlough program and said the program would have a negative economic impact of more than $600 million over the next two fiscal years.

But both Jaresko and Carrion rebutted the arguments, saying the program is an integral part of the fiscal plan and commonwealth budget that the board certified earlier this year. Also, the negative economic impact is already contemplated in the fiscal plan.

Board member Carlos García also moved to clarify the historical record surrounding the worker furlough contingency plan, noting that the commonwealth agreed to its inclusion in the fiscal plan.

"There would not have been a certification of the fiscal plan if these conditions were not included, "Garcia said. "We discussed these with everyone and [some] were in some cases modified."

Other board members also noted that the board had granted the commonwealth several extensions to the documentation required on the right-sizing measures. Sobrino countered that the governor was "notified" of the contingency plans but never agreed to them.

The official also asked Jaresko at one point if the commonwealth is complying with the fiscal plan, which prompted her to respond: "You just announced a pension plan in conflict with the fiscal plan."

Commonwealth and board officials also sparred over the significance of a cash balance of nearly $1.8 billion at the close of fiscal year 2017, when fiscal plan estimates had put the figure at $291 million. Two board members clarified that the commonwealth provided the number, while Jaresko placed the variance with the forecast to the poor quality of financial projections.

Jaresko was also asked how she could justify to creditors maintaining the debt service levels contemplated under the fiscal plan when the commonwealth government just reported nearly $2 billion of cash on hand.

"Debt negotiations are happening as we speak and I prefer not to get into that conversation here, not into the conversations that are ongoing in litigation," Jaresko said. "Suffice it to say that a moment in time - a single day's liquidity level - has nothing to do with either liquidity management or the capacity to pay. A single moment in time is just that, a single moment in time. There are a wide variety of downside risks in Puerto

Rico's fiscal future. There's a liquidity policy, a liquidity management and liquidity forecast that needs to follow. Taking one number out of context is not relevant from a debtor perspective."

Board member Ana Matosantos noted the "human impact" of the worker furlough program but argued that not doing it would pose a greater risk because it will increase the possibility of the government running out of cash and erode its ability to deliver essential services. She also noted that "year one of the fiscal plan is the easiest of the next three years," pointing to targets to reduce government spending and healthcare spending by 30% each.

Sobrino also noted that the commonwealth and the board "may have a contentious discussion on this issue" but indicated that the administration remained committed to complying with the fiscal plan.

Another point of contention between the board and administration, however, also arose during the meeting. Jaresko stressed the need for centralized oversight of key budget functions across the commonwealth budget and signaled that the board may consider appointing a monitor to that end. "No single person right now has access to the complete picture," she said.

Sobrino told reporters after the meeting that he was "surprised" by the comment given the collaboration between Treasury Department and board officials and questioned the legality of such a move. He noted it was not mentioned on the board agenda.

Jaresko said that government reports to date have failed to provide a full liquidity picture across the commonwealth. She said some reporting has been started, but a roadmap for future reporting is still needed.

The executive director said that board and commonwealth officials have discussed and reached an agreement on financial reporting and that the first report under this accord will be an Aug. 15 budget-to-actual report corresponding to July, the first month of the fiscal year. She said the government and board have agreed on a long list of weekly and monthly reports, adding that they would be made public. Sobrino noted that the government will commence its reporting requirements under PROMESA in the coming weeks.

## Board Pursuing Pension Reform, Reductions

The PROMESA oversight board said it is pursuing a plan to reduce pension benefit outlays by an average of 10% by 2020 as contemplated in the certified fiscal plan despite increasing pushback from the Rosselló administration.

A pension reform memo released this morning by the PROMESA board notes that expenditures are being reduced throughout the commonwealth's budget and that holders of government bonds are not likely to be repaid in full. "Retirement plan participants, like other unsecured creditors, will have a reduction in the amounts paid to them by the Commonwealth," the memo said.

PROMESA board member Andrew Biggs said that the board's proposals for the systemwide overhaul of the government's pension system are meant to accomplish three things:

- Fund existing pension obligations on a "pay go" basis;

- Enroll both active employees and newly hired workers in a true defined contribution retirement system; and

- Ensure that all newly hired employees are enrolled in Social Security.

The PROMESA board's pension memo says that the reduction will average 10% for the entire group of retirement system members. Benefit reductions will begin 90 days following confirmation of the plan of adjustment under Title III of PROMESA. Although the average benefit reduction would be 10%, reductions would be implemented progressively so that there is no reduction for those with combined retirement plan and Social Security benefits below the poverty level of $1,000 per month.

Jorge Irizarry, executive director of local bondholder's group Bonistas del Patio, said the group supports that government pensions are paid to the greatest extent possible but noted that most local bondholders use the

interest payments for their retirement and are already experiencing a more dramatic impact than government retirees. He noted that the fiscal plan finds that 96% of government spending is essential and said it contemplates a 74% cut in debt service payments.

"[Local bondholders] are being affected dramatically in the fiscal plan, and that is not being addressed," Irizarry said.

### COSSEC Fiscal Plan Presentation and Certification

AAFAF chief Portela and AAFAF COO Alejandro Camporeal stressed that COSSEC is different than other covered entities in that it is not a debt issuer, is solvent and financially self-sufficient.

COSSEC has adequate capital to perform its regulatory and insurance duties under ordinary and relatively stressed scenarios, according to the fiscal plan. It says the main risks to COSSEC are the high exposure of certain cooperatives to Puerto Rico government debt and the impact on their capital from a reduction in value of those bonds due to debt restructuring.

The plan outlines the cooperatives' exposure to Puerto Rico debt, pegging its amortization value at $976 million and its market value at $334.8 million, and breaking down the holdings by credit:  Government Development Bank (44%); general obligation bonds (14%); Puerto Rico Electric Power Authority (8%); Public Finance Corp. (7%); COFINA (7%); Public Buildings Authority (5%); Highways and Transportation Authority (2%); Employees Retirement System (2%); and others (4%).

Camporeal said the fiscal plan as presented is focused on confirming COSSEC's capacity to perform its regulatory and insurance duties, governance structure reforms and a COOP-SELF program to inject some $533 million into the system. He outlined the four stress test scenarios conducted as part of the plan's development, none of which included the Government Development Bank's proposed restructuring support agreement and Title VI restructuring.

A summary of the cooperative's exposure, the applicable amortization values and the results of the stress tests are set forth below:

Camporeal also addressed the breakdown of the $533 million described in connection with the COOP-HELP, which is as follows:

The board called for the COSSEC plan to include the following amendments:

- revised stress-test analyses that replicate the National Credit Union Administration's approach;

- an implementation plan for the COOP-SELF program;

- a reform plan that redefines COSSEC'S mission and governance; and

- to outline the scope of activities that should be addressed through requests for external assistance from federal agencies or external contractors.

The board also included three additional conditions upon which certification of the COSSEC fiscal plan remains contingent, including the amendment of the COSSEC charter law that provides for the appointment of a three-member committee that will supersede COSSEC's board and its powers during the implementation of the fiscal plan. The committee's membership will comprise the president of COSSEC's board, the executive director of AAFAF and the Commissioner of Financial Institutions.

The other two legislative contingencies are as follows: (i) "amending both the Coops Act and COSSEC's Enabling Act to authorize a coop to issue preferred shares in an amount in excess of the amount of its common stock and to expressly authorize COSSEC to sell the assets of a coop to a non-coop entity in the event that COSSEC orders the liquidation, consolidation or merger of such coop"; and (ii) "amending Act 220-2015 in order that COSSEC's regulatory powers over a cooperative are not limited in any way due to a coop's investments in bonds or notes issued by the Commonwealth or its instrumentalities."

See on Reorg Research

## Contact Us

Contact us to ask a question or contact Reorg Research regarding this story.

## Docket Alerts

Update your docket alert or tracking preferences.

## Intelligence Emails

Update your intelligence email preferences.

## SEC Alerts

Update your SEC alert preferences.

The information contained in this publication is provided by Reorg Research, Inc., or one of its affiliates for informational purposes only and should not be construed as legal, investment, accounting or other professional services advice on any subject matter. Reorg Research obtains information from a wide variety of publicly available sources, which it believes to be reliable, but does not have, nor does it claim to have, sources of inside or private information and does not certify or guarantee the accuracy or completeness of the information discussed in this publication. Laws and regulations differ by jurisdiction, and the information in this publication may not apply to every recipient. Recipients must make their own decisions about investment strategies or securities mentioned in this publication. Reorg Research, its affiliates, officers, directors, partners and employees expressly disclaim all liability in respect to actions taken or not taken based on any or all the contents of this publication. Copyright 2017 Reorg Research, Inc. All rights reserved. Unsubscribe from all Reorg Research emails.