# IN THE UNITED STATES OF AMERICA
## IN THE FEDERAL DISTRICT COURT
### DISTRICT OF PUERTO RICO

| | |
|---|---|
| **BEATRIZ NIEVES-LÓPEZ; BETHZAIDA OLIVERA-VÁZQUEZ; FÉLIX ROLÓN-QUIÑONES; FACUNDO M. DI MAURO-VÁZQUEZ; HIRAM MALARET-GÓMEZ; JUAN C. FONTÁNEZ-LÓPEZ; LUIS O. BERRÍOS-VEGA; MADELINE CAMACHO-SOLÁ; SHIAMALY ALICEA-RIVERA, and Josué Laureano-Miranda, with their conjugal partnership; ZURYS FAJARDO-ROJAS, and Carlos Torres, with their conjugal partnership; LUISA ENID ROMÁN-RIVERA; GISELLE M. IRIZARRY-LÓPEZ, and José F. García-Colón, with their conjugal partnership; ACTRIZ ARIANA ALBINO-TORRES; NILDA FRAGOSO-VALENTÍN, and Julio Morales Rosario, with their conjugal partnership; JOSÉ ANTONIO ZAMORA-FERNÁNDEZ; ALLISON RODRÍGUEZ-ARROYO; DOHANNIE SEPULVEDA-NEGRONI, and James A. Tantillo, with their conjugal partnership; GINA HERNÁNDEZ-GONZÁLEZ, and Alberto Laboy, with their conjugal partnership; ROLANDO RIVERA-GUEVAREZ; EDWIN MOLINA-ROMÁN; ARLEEN YANIRA ÁVILES-CANCEL, and Miguel Roldán, and their conjugal partnership; PEDRO M. CARRASQUILLO-CRUZ, and Wilda Cruz Rivera, with their conjugal parnership; MARÍA TERESA ALBORS-PERALTA; MARIE SANTOS-ORTIZ; ANA C. FRADERA-DELGADO; ANABELLE COLÓN-CINTRÓN; EVELYN RODRÍGUEZ-AMARO; DORIS PÉREZ-OCASIO, and José R. Rivera-González, with their conjugal partnership; FÉLIX GIOVANNI BOSCHETTI-MARTÍNEZ; IVONNE QUINTERO-CORTÉS, and Marcel Ortiz-Figueroa, with their conjugal partnership; CARLOS RENÉ RODRÍGUEZ-FIGUEROA; MAYRA JIMÉNEZ-RIVERA.** | **CASE NO.**<br><br>**CIVIL ACTION**<br>**CIVIL RIGHTS**<br>**JURY TRIAL REQUESTED** |

**Plaintiffs**

**v.**

**HON. EDUARDO BHATIA-GAUTIER, in his personal and official capacity as President of the Senate of Puerto Rico; JUAN L.**

MARTÍNEZ-MARTÍNEZ, in his personal and official capacity as Director of the Office of Legislative Services; DENISSE M. RIVERA-GONZÁLEZ, in her personal and official capacity as Director of Human Resources of the Senate of Puerto Rico; MARITZA TORRES-RIVERA, in her personal and official capacity as head of the Legislative Research Unit; EVANGELINA APONTE, in her personal and official capacity as Acting Director of the Property Unit of the OLS; MARITZA AVILÉS, in her personal and official capacity as an employee of the Office of Legislative Services; X, Y, and Z insurance companies with coverage for liability for any Defendant; and A, B, and C as yet unidentified persons responsible for civil rights violations against Plaintiffs.

**Defendants**

## COMPLAINT

**TO THE HONORABLE COURT**:

NOW COME, the Plaintiffs, through the undersigning counsel, and respectfully allege and pray as follows:

### I.  INTRODUCTION

1.  This is a civil action filed by 32 former employees of the Office of Legislative Services (hereinafter "the OLS"), an office falling under the administration of the Senate of Puerto Rico (hereinafter "the Senate").  Plaintiffs were summarily and illegally dismissed because of their political affiliation without cause or prior hearing following the general elections of November 6, 2012, and the inauguration of a new Popular Democratic Party (hereinafter "the PDP"), majority and presidency in the Senate.  Plaintiffs were dismissed by codefendant Juan L. Martínez-Martínez (hereinafter "Martínez-Martínez"), at the order and behest of the President of the Senate, codefendant Hon. Eduardo Bhatia-Gautier (hereinafter "Bhatia-Gautier"), because they were not identified with the PDP and were in fact active members of the New Progressive

Party (hereinafter "the NPP").  This brash action was further compounded by public statements made by Bhatia-Gautier and other members of the Legislative Assembly affirming that Plaintiffs were dismissed because they were "political potatoes" of the NPP.

## II. JURISDICTIONAL STATEMENT

2.  Plaintiffs allege a violation of their rights under the First, Fifth and Fourteenth Amendments, Freedom of Speech and Association, Due Process and Equal Protection clauses of the Constitution of the United States, as well as under the laws and Constitution of Puerto Rico, and pray equitable relief in the form of reinstatement, and legal relief in the form of economic and punitive damages, pursuant to the Civil Rights Act of 1866.  42 U.S.C. § 1983.  As this is a civil action brought pursuant to the laws and Constitution of the United States, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.  This Court also has supplemental jurisdiction over all claims arising under of the laws and Constitution of Puerto Rico pursuant to 28 U.S.C. § 1367.  Venue is proper under 28 U.S.C. § 1391(b).

## III. THE PARTIES

3.  Plaintiff Beatriz Nieves-López (hereinafter "Nieves-López"), a resident of Puerto Rico and a citizen of the United States, worked as a Legal Research Technician (hereinafter "LRT"), in the OLS for 4 years until she was wrongfully dismissed on March 21, 2013.  Nieves-López' performance was consistently described as excellent.  As an LRT, Nieves-López was not involved in the creation of public policy or with confidential matters.  Nieves-López is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

4.  Bethzaida Olivera-Vázquez (hereinafter "Olivera-Vázquez"), a resident of Puerto Rico and a citizen of the United States, worked as an LRT in the OLS for more than 3 years until she was wrongfully dismissed on March 21, 2013.  Olivera-Vázquez' performance was consistently described as excellent.  As an LRT, Olivera-Vázquez was not involved in the creation of public

policy or with confidential matters.  Olivera-Vázquez is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

5.  Félix Rolón-Quiñones (hereinafter "Rolón-Quiñones"), a resident of Puerto Rico and a citizen of the United States, worked as an LRT in the OLS for more than 35 years until he was wrongfully dismissed on March 21, 2013.  As an LRT, Rolón-Quiñones was not involved in the creation of public policy or with confidential matters.  Rolón-Quiñones is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

6.  Facundo M. Di Mauro-Vázquez (hereinafter "Di Mauro-Vázquez"), a resident of Puerto Rico and a citizen of the United States, worked as Legislative Adviser II in the OLS since October 30, 2006.  Di Mauro-Vázquez's performance was consistently described as excellent. As a Legislative Adviser, Di Mauro-Vázquez was not involved in the creation of public policy or with confidential matters.  Di Mauro-Vázquez is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

7.  Hiram Malaret-Gómez (hereinfter "Malaret-Gómez"), a resident of Puerto Rico and a citizen of the United States, worked as Legislative Adviser II in the OLS since June 16, 2009. Malaret-Gómez' performance was consistently described as excellent.  As a Legislative Adviser, Malaret-Gómez was not involved in the creation of public policy or with confidential matters. Malaret-Gómez is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

8.  Juan C. Fontánez-López (hereinfter "Fontánez-López"), a resident of Puerto Rico and a citizen of the United States, worked as an LRT in the OLS since March of 2009.  Fontánez-López' performance was consistently described as excellent.  As an LRT, Fontánez-López was not involved in the creation of public policy or with confidential matters.  Fontánez-López is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

9.  Luis O. Berríos-Vega (hereinafter "Berríos-Vega"), a resident of Puerto Rico and a citizen of the United States, worked as an Internal Auditor in the OLS since March of 2010. Berríos-Vega's performance was consistently described as excellent.  As an Internal Auditor, Berríos-Vega was not involved in the creation of public policy or with confidential matters. Berríos-Vega is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

10. Madeline Camacho-Solá (hereinafter "Camacho-Solá"), a resident of Puerto Rico and a citizen of the United States, worked as an Executive Official at the Commissions Archive in the OLS since June 5, 2000.  Camacho-Solá's performance was consistently described as excellent. As an Executive Official, Camacho-Solá was not involved in the creation of public policy or with confidential matters.  Camacho-Solá is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

11. Shiamaly Alicea-Rivera (hereinafter "Alicea-Rivera"), a resident of Puerto Rico and a citizen of the United States, worked as an Administrative Secretary in the OLS since 2011. Alicea-Rivera's performance was consistently described as excellent.  As an Administrative Secretary, Alicea-Rivera was not involved in the creation of public policy or with confidential matters.  Alicea-Rivera is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.  Her husband, Josué Laureano-Miranda, with their conjugal partnership, is included for relief under the Puerto Rico Civil Code.

12. Zurys Fajardo-Rojas (hereinafter "Fajardo-Rojas"), a resident of Puerto Rico and a citizen of the United States, worked as an Office Clerk in the Digitalization Center of the OLS since 2003.  Fajardo-Rojas' performance was consistently described as excellent.  As an Office Clerk, Fajardo-Rojas was not involved in the creation of public policy or with confidential matters.  Fajardo-Rojas is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.  Her husband, Carlos Torres, with their conjugal

partnership, is included for relief under the Puerto Rico Civil Code.

13. Luisa Enid Román-Rivera (hereinafter "Román-Rivera"), a resident of Puerto Rico and a citizen of the United States, worked as an Administrative Secretary in the Digitalization Center of the OLS since 2008.  Román-Rivera's performance was consistently described as excellent.  As an Administrative Secretary, Román-Rivera was not involved in the creation of public policy or with confidential matters.  Román-Rivera is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

14. Giselle M. Irizarry-López (hereinafter "Irizarry-López"), a resident of Puerto Rico and a citizen of the United States, worked as an Administrative Official in the OLS since 2007. Irizarry-López's performance was consistently described as excellent.  As an Administrative Official, Irizarry-López was not involved in the creation of public policy or with confidential matters.  Irizarry-López is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.  Her husband, José F. García-Colón, with their conjugal partnership, is included for relief under the Puerto Rico Civil Code.

15. Actriz Ariana Albino-Torres (hereinafter "Albino-Torres"), a resident of Puerto Rico and a citizen of the United States, worked as an Administrative Secretary in the OLS since 2012. Albino-Torres' performance was consistently described as excellent.  As an Administrative Secretary, Albino-Torres was not involved in the creation of public policy or with confidential matters.  Albino-Torres is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

16. Nilda Fragoso-Valentín (hereinafter "Fragoso-Valentín"), a resident of Puerto Rico and a citizen of the United States, worked as an Executive Official in the OLS since July of 1999. Fragoso-Valentín's performance was consistently described as excellent.  As an Executive Official, Fragoso-Valentín was not involved in the creation of public policy or with confidential matters.  Fragoso-Valentín is an active member of the NPP, was identified as such by

Defendants and dismissed from the OLS because of it. Her husband, Julio Morales-Rosario, with their conjugal partnership, is included for relief under the Puerto Rico Civil Code.

17. José Antonio Zamora-Fernández (hereinafter "Zamora-Fernández"), a resident of the State of Florida and a citizen of the United States, worked as a Receiver at the OLS Warehouse since April of 1999. Zamora-Fernández's performance was consistently described as excellent. As a Receiver, Zamora-Fernández was not involved in the creation of public policy or with confidential matters. Zamora-Fernández is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it. Zamora-Fernández's address is 643 Creekwood Drive, Orlando, FL 32809.

18. Allison Rodríguez-Arroyo (hereinafter "Rodríguez-Arroyo"), a resident of Puerto Rico and a citizen of the United States, worked as in charge of auxiliary property, at the OLS since July of 2012. Rodríguez-Arroyo's performance was consistently described as excellent. In her position, Rodríguez-Arroyo was not involved in the creation of public policy or with confidential matters. Rodríguez-Arroyo is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

19. Dohannie Sepulveda-Negroni (hereinafter "Sepulveda-Negroni"), a resident of Puerto Rico and a citizen of the United States, worked as a Translator at the OLS since July of 2012. Sepulveda-Negroni's performance was consistently described as excellent. As a Translator, Sepulveda-Negroni was not involved in the creation of public policy or with confidential matters. Sepulveda-Negroni is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it. Her husband, James A. Tantillo, with their conjugal partnership, is included for relief under the Puerto Rico Civil Code.

20. Gina Hernández-González (hereinafter "Hernández-González"), a resident of Puerto Rico and a citizen of the United States, worked as an Executive Secretary at the OLS since 2005. Hernández-González's performance was consistently described as excellent. As an

Executive Secretary, Hernández-González was not involved in the creation of public policy or with confidential matters. Hernández-González is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it. Her husband, Alberto Laboy, with their conjugal partnership, is included for relief under the Puerto Rico Civil Code.

21. Rolando Rivera-Guevarez (hereinafter "Rivera-Guevarez"), a resident of Puerto Rico and a citizen of the United States, worked as a Legislative Adviser III at the OLS since 2011. Rivera-Guevarez's performance was consistently described as excellent. As Legal Adviser III, Rivera-Guevarez was not involved in the creation of public policy or with confidential matters. Rivera-Guevarez is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

22. Edwin Molina-Román (hereinafter "Molina-Román"), a resident of Puerto Rico and a citizen of the United States, worked as an Executive Official at the OLS since 2001. Molina-Román's performance was consistently described as excellent. As an Executive Official, Molina-Román was not involved in the creation of public policy or with confidential matters. Molina-Román is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

23. Arleen Yanira Avilés-Cancel (hereinafter "Avilés-Cancel"), a resident of Puerto Rico and a citizen of the United States, worked as a Tourist Guide in the OLS since April of 2007. Avilés-Cancel's performance was consistently described as excellent. As a Tourist Guide, Avilés-Cancel was not involved in the creation of public policy or with confidential matters. Avilés-Cancel is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it. Her husband, Miguel Roldan, with their conjugal partnership, is included for relief under the Puerto Rico Civil Code.

24. Pedro M. Carrasquillo-Cruz (hereinafter "Carrasquillo-Cruz"), a resident of Puerto Rico and a citizen of the United States, worked as an Administrative Director for Documents in the

OLS since 2005. Carrasquillo-Cruz's performance was consistently described as excellent. As an Administrative Director, Carrasquillo-Cruz was not involved in the creation of public policy or with confidential matters. Carrasquillo-Cruz is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it. His wife, Wilda Cruz Rivera, with their conjugal partnership, is included for relief under the Puerto Rico Civil Code.

25. María Teresa Albors-Peralta (hereinafter "Albors-Peralta"), a resident of Puerto Rico and a citizen of the United States, worked as Director of the Digitalization Unit of the OLS since 2005. Albors-Peralta's performance was consistently described as excellent. As a Director, Albors-Peralta was not involved in the creation of public policy or with confidential matters. Albors-Peralta is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

26. Marie Santos-Ortiz (hereinafter "Santos-Ortiz"), a resident of Puerto Rico and a citizen of the United States, worked as a Graduate Nurse in the OLS since 2000. Santos-Ortiz's performance was consistently described as excellent. As a Nurse, Santos-Ortiz was not involved in the creation of public policy or with confidential matters. Santos-Ortiz is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

27. Ana C. Fradera-Delgado (hereinafter "Fradera-Delgado"), a resident of Puerto Rico and a citizen of the United States, worked as a Fixed Asset Analyst in the OLS since 1995. Fradera-Delgado's performance was consistently described as excellent. As an Analyst, Fradera-Delgado was not involved in the creation of public policy or with confidential matters. Fradera-Delgado is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

28. Anabelle Colón-Cintrón (hereinafter "Colón-Cintrón"), a resident of Puerto Rico and a citizen of the United States, worked as a First Aid Nurse in the OLS since 2012. Colón-Cintrón's performance was consistently described as excellent. As a Nurse, Colón-Cintrón was

-9-

not involved in the creation of public policy or with confidential matters.  Colón-Cintrón is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

29. Evelyn Rodríguez-Amaro (hereinafter "Rodríguez-Amaro"), a resident of Puerto Rico and a citizen of the United States, worked as the First Aid Unit Administrator in the OLS since 1999.  Rodríguez-Amaro's performance was consistently described as excellent.  As the First Aid Unit Administrator, Rodríguez-Amaro was not involved in the creation of public policy or with confidential matters.  Rodríguez-Amaro is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

30. Doris Pérez-Ocasio (hereinafter "Pérez-Ocasio"), a resident of Puerto Rico and a citizen of the United States, worked as the Practice Nurse in the First Aid Unit of the OLS since 1999.  Pérez-Ocasio's performance was consistently described as excellent.  As the Practice Nurse, Pérez-Ocasio was not involved in the creation of public policy or with confidential matters.  Pérez-Ocasio is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.  Her husband, José R. Rivera González, with their conjugal partnership, is included for relief under the Puerto Rico Civil Code.

31. Félix Giovanni Boschetti-Martínez (hereinafter "Boschetti-Martínez"), a resident of Puerto Rico and a citizen of the United States, worked as the Accounting Assistant in the OLS since 2009.  Boschetti-Martínez's performance was consistently described as excellent.  As the Accounting Assistant, Boschetti-Martínez was not involved in the creation of public policy or with confidential matters.  Boschetti-Martínez is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

32. Ivonne Quintero-Cortés (hereinafter "Quintero-Cortés"), a resident of Puerto Rico and a citizen of the United States, worked as a Librarian in the Legislative Library in the OLS since 1993.  Quintero-Cortés' performance was consistently described as excellent.  As a Librarian,

Quintero-Cortés was not involved in the creation of public policy or with confidential matters. Quintero-Cortés is a member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it. Her husband, Marcel Ortiz-Figueroa, with their conjugal partnership, is included for relief under the Puerto Rico Civil Code.

33. Carlos René Rodríguez-Figueroa (hereinafter "Rodríguez-Figueroa"), a resident of Puerto Rico and a citizen of the United States, worked as a Director in the Legislative Library in the OLS since 2004. Rodríguez-Figueroa's performance was consistently described as excellent. As a Director of the Library, Rodríguez-Figueroa was not involved in the creation of public policy or with confidential matters. Rodríguez-Figueroa is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

34. Mayra Jiménez-Rivera (hereinafter "Jiménez-Rivera"), a resident of Puerto Rico and a citizen of the United States, worked as an Executive Officer in the OLS since 2009. Jiménez-Rivera's performance was consistently described as excellent. Jiménez-Rivera was not involved in the creation of public policy or with confidential matters. Jiménez-Rivera is an active member of the NPP, was identified as such by Defendants and dismissed from the OLS because of it.

35. All Plaintiffs were illegally dismissed without previous notice or hearing on March 21, 2013.

36. Prior to the inauguration of Bhatia-Gautier and his designation of Martínez-Martínez as its director, all Plaintiffs were employees of the OLS.

37. None of the Plaintiffs performed functions involving the shaping or modification of public policy. None of the Plaintiffs performed functions that could influence or be considered in close propinquity to policy making employees or otherwise had access to confidential information. Moreover, Plaintiffs' were tasked with providing services in equal measure to all

members of the Legislative Assembly[1], regardless of which party the Representatives and Senators belonged to.

38. Neither the Defendants nor their agents reviewed or evaluated the Plaintiffs' performance prior to making the decision to dismiss them.

39. All Plaintiffs are staunch activists and supporters of the NPP, and were identified with the NPP within the OLS and the Senate.

40. Defendant Bhatia-Gautier, is included in his personal and official capacity as President of the Senate of Puerto Rico.  He has held the position of Senator since January 2, 2009, having been elected as Senator-at-large in the 2008 elections under the PDP ticket.  Defendant Bhatia-Gautier had also served in the Senate between 1997 and 2000.  As a result of the November 6, 2012, elections, the PDP received a majority representation in the Senate and the ability to muster the necessary votes to select its President.  Shortly after the elections, Bhatia-Gautier emerged as the candidate with the support needed among his PDP delegation to be elected President of the Senate.  Bhatia-Gautier received the most votes of any PDP Senate candidate in the 2012 elections.  As presumptive President during the transition between the previously NPP majority of the Senate and the incoming PDP majority, Bhatia-Gautier was closely involved in the transition process.  Bhatia-Gautier was sworn in for a second term in the Senate on January 2, 2013, but assumed the Presidency on January 14, 2013, when the Senate session came to order.  Besides having been a candidate under the PDP ticket for the Senate in 2008 and 2012, Bhatia-Gautier had been the PDP candidate for Mayor of San Juan in 2000 and 2004, and served as the Executive Director of the Puerto Rico Federal Affairs Administration between 2005 and 2008 under the administration of former Governor and PDP President, Hon. Aníbal Acevedo-

---

[1] The Puerto Rico Senate and House of Representatives are collectively referred to as "the Legislative Assembly." Also, the Senate and the House chambers and the offices of the Senators and Representatives are located in the Puerto Rico Capitol Building and its annexes.  We therefore use "Legislative Assembly" to refer to both the Senate and the House of Representatives of Puerto Rico and "the Capitol" to refer to the Senate and House's chambers and offices.

Vilá.  During Bhatia-Gautier's presidency, the Senate is in charge of the administration of the OLS and Bhatia-Gautier is the ultimate authority over that office.  The OLS Director answers to Bhatia-Gautier directly.  Bhatia-Gautier is sued in his personal and official capacity given that the actions attributed to him in this Complaint were undertaken under color of state law and in deprivation of Plaintiffs' constitutional rights.

41. Codefendant Martínez-Martínez is included in the Complaint in his personal and official capacity as the Director of the OLS.  Martínez-Martínez was appointed to the position of Director of the OLS by codefendant Bhatia-Gautier.  Martinez-Martinez is a known activist of the PDP.  Martinez-Martinez was the supervising authority within the OLS, is responsible for all human resources decisions within the OLS and signed the letters of dismissal given to the Plaintiffs.  Martínez-Martínez is sued in his personal and official capacity given that the actions attributed to him in this Complaint were undertaken under color of state law and in deprivation of Plaintiffs' constitutional rights.  Martínez-Martínez is a known activist and supporter of the PDP.

42. Denisse  M.  Rivera-González (hereinafter "Rivera-González"), is included in the Complaint in her personal and official capacity as the Director of Human Resources of the Senate of Puerto Rico.  Rivera-González was in charge of human resources at the time of Plaintiffs' dismissals.  Defendant Rivera-González directly participated in the decision and the actual dismissal of Plaintiffs.  Defendant Rivera-González is sued in her personal and official capacity given that the actions attributed to her in this Complaint were undertaken under color of state law and in deprivation of Plaintiffs' constitutional rights.  Rivera-González is a supporter of the PDP.

43. Maritza Torres-Rivera (hereinafter "Torres-Rivera"), is included in the Complaint in her personal and official capacity as the head of the Legislative Research Unit of the OLS.  Torres-Rivera was the supervising authority within the Legislative Research Unit of the OLS is

responsible for human resources decisions within that office. Torres-Rivera is sued in her personal and official capacity given that the actions attributed to her in this Complaint were undertaken under color of state law and in deprivation of Plaintiffs' constitutional rights. Torres-Rivera is a supporter of the PDP.

44. Evangelina Aponte (hereinafter "Aponte"), is included in the Complaint in her personal and official capacity as an Acting Director of the Property Unit of the OLS. Aponte was assigned to the Property Unit of the OLS and acted in deprivation of Plaintiffs' civil rights. Aponte is sued in her personal and official capacity given that the actions attributed to her in this Complaint were undertaken under color of state law and in deprivation of Plaintiffs' constitutional rights. Aponte is a known activist and supporter of the PDP.

45. Maritza Avilés (hereinafter "Avilés"), is included in the Complaint in her personal and official capacity as an employee of the OLS. Avilés was assigned to the Human Resources Office of the OLS to keep tabs on Plaintiffs and report back to fellow Defendants. Avilés is sued in her personal and official capacity given that the actions attributed to her in this Complaint were undertaken under color of state law and in deprivation of Plaintiffs' constitutional rights. Avilés is a known activist and supporter of the PDP.

46. All Defendants are supporters of the PDP.

47. Codefendants A, B, and/or C are potential Defendants whose name and information are not currently known to Plaintiffs but who have acted under color of state law in deprivation of Plaintiffs' constitutional rights.

48. Codefendants X, Y, and Z are potential insurance companies whose name and information are not currently known but which could have insurance coverage for liability over the claims raised in this Complaint.

## IV. STATEMENT OF FACTS

49. The OLS is a support office attached to the Legislative Assembly of Puerto Rico. It was

originally created pursuant to a Resolution approved by the Legislative Assembly on January 27, 1954. Its principal function is to serve as a research and service provider for members of both the House of Representatives and the Senate of Puerto Rico. The OLS is administrated by a Director who is appointed by the President of the Legislative body in charge of the OLS during any given four-year term. This control is exchanged each term between the Senate and the House of Representatives. In the 2013-2017 term, the OLS falls under the Senate's purview. Once appointed, the Director of the OLS has to be approved by the other Legislative body which traditionally occurs as a matter of course.

50. The OLS, and specifically Plaintiffs, served a number of functions. To wit, the Plaintiffs' tasks included providing legal research; drafting in proper format pieces of legislation tailored to the requests of any given Senator or Representative; reviewing drafts of bills to determine whether there could be constitutional ramifications, formatting issues or interference with other laws; providing legal research and information; translation of official documents of the Legislative Assembly; maintaining and updating the Legislative Library; administration of the Legislative Assembly's First Aid Unit; accounting and economic research; clerical services; digitalization services; equipment services; record keeping; and the like. Each of these services is public, meaning that no member of the Legislative Assembly can assign confidential tasks to specific employees of the OLS. Also, and most importantly, Plaintiffs were required to provide the same services to all members of the Legislative Assembly, regardless of political affiliation. That is to say that a PDP Senator could request from Plaintiffs legal research on a specific point of law while an NPP Representative could request legal research on an opposing point of law, and Plaintiffs were required to provide both in the same manner. As such, it is clear that the OLS, and specifically the Plaintiffs, could not partake in the formulation of public policy and/or in confidential matters. The public policy was crafted by the Senators and the Representatives. Plaintiffs only provided technical support in that endeavor.

51. The offices of the OLS are located in the Old School of Tropical Medicine Building, across the street from the Capitol building and its annexes which house the Senate Chamber and the offices of Senators.

52. Administration over the OLS passes from the Senate to the House of Representatives along with the administration of the Capitol Superintendent's Office. One term, the Senate is responsible for the OLS while the House is responsible for the Superintendent's Office, and the following term the Senate assumes charge of the Superintendent's Office and the OLS falls to the House.

53. The NPP held a majority in the Senate of Puerto Rico from January 2, 2005, to December 31, 2013. During those terms, the Senate was presided by the Hon. Kenneth D. McClintock-Hernández (2005-2008) and Hon. Thomas Rivera-Schatz (2009-2012). Likewise, the House of Representatives had been dominated by an NPP majority between 2005 and 2012. During those terms, the House of Representatives was presided by the Hon. José Aponte-Hernández (2005-2008) and Hon. Jennifer González-Colón (2009-2012). The OLS had continuously been under NPP administration from 2005 to 2012. Also noteworthy is that the NPP held majorities in both Houses of the Legislative Assembly in the electoral terms of 1969-1972, 1977-1980, 1993-1996, and 1997-2000. The OLS was under NPP administration during those terms as well.

54. It is common for employees in the Capitol to participate in political activities in their free time. The nature of the Legislative Assembly, which is composed of members who ran for election on a political party's ticket and who generally debate important issues along party lines, lends itself to a heightened political and partisan atmosphere.

55. On November 6, 2012, Puerto Rico held general elections for all elected positions in government, in both the Executive and Legislative Branches. To wit, the elections held included governor, resident commissioner, all members of the Senate and the House of Representatives,

-16-

(both at district level and at-large), all 78 mayors and 78 municipal legislatures. At that time, the NPP and the PDP were the only parties with active delegations in the Legislative Assembly. Political affiliation is commonly discussed and stated between personnel in the Capitol and its offices. The political atmosphere described above was aggravated by the election season. It was common for employees in the Capitol, including Plaintiffs, to express their support for their respective parties and candidates in any number of ways, including comments, conversations during lunch, and even the use of their party's colors in clothing, with PDP supporters using red and white and NPP supporters using blue and white. Through these actions, employees including Plaintiffs were identified with their respective political parties.

56. As part of the political campaign for the general elections, Bhatia-Gautier attacked the NPP majority and the NPP Senate President, Hon. Thomas Rivera-Schatz, labeling him as repressive and corrupt. Specifically, Bhatia-Gautier produced and distributed commercials and literature with his slogan "Speak, people, speak" (in Spanish "habla, pueblo, habla"). In this manner, Bhatia-Gautier advanced his ambitions to become the next President of the Senate, promoting an image of supremacy above other candidates for the Senate.

57. The results of the 2012 general elections rendered a narrow but reaching victory for the PDP. The PDP won the governorship; a majority in the Senate consisting of 18 seats, including 6 senators at-large and 12 district senators, to the NPP's 8 seats and the Puerto Rican Independence Party's 1 seat; a PDP majority in the House of Representatives consisting of 28 seats, including 6 at-large and 22 district representatives, to the NPP's 23 seats; and most of the municipal races for mayor and municipal assemblies.

58. On November 14, 2012, just 8 days after the general elections, Bhatia-Gautier was unanimously elected President of the Senate in a meeting held at the PDP headquarters with all elected PDP Senators in assistance. Having been selected President at this early stage, Bhatia-Gautier directed the transition process in the Senate and was closely involved in all its

endeavors. On November 16, 2012, Bhatia-Gautier announced the composition of his transition team. The announcement was also published on the PDP website. This transition team was composed of PDP supporters and close and trusted colleagues of Bhatia-Gautier. Codefendant Martínez-Martínez was part of this transition team.

59. Immediately following the general elections, rumors began to surface that all Legislative Assembly employees identified with the NPP would be dismissed once the new legislative majorities and Presidents were inaugurated.

60. At this time, Defendant Torres-Rivera instructed Plaintiffs who worked in her division not to fraternize with people from other divisions within the OLS. In fact, Defendant Torres-Rivera prohibited Plaintiffs from participating in any social exchange when at the office.

61. Defendant Torres-Rivera would also tell Plaintiffs under her supervision that "they had to make themselves known to the new administration for the good work they did."

62. With regards to the OLS, Bhatia-Gautier was quick to express his opinion that it was filled with political potatoes and political appointments of the NPP. Bhatia-Gautier thus manifested that he identified the OLS and its employees, including Plaintiffs, with the NPP.

63. On January 17, 2013, the local radio news station "NotiUno" reported that Bhatia-Gautier described the employees in the OLS as political "screw-ins" used by the NPP to position its members. To wit, Bhatia-Gautier made the following remarks:

> Legislative Services is a dependency that is a satellite of the House and the Senate and what has been done in the last 3 months is fill it with the secretaries of the [former] presidents of both Houses. Even [former House of Representatives President] Jennifer González's stepfather has been positioned there. It is a shameful thing…

> We are talking about tens of people that were placed there simply to be screwed-in ("atornillados"). It is an effrontery…

> I am not dismissing anybody. The people of Puerto Rico chose a new team and that new team brings its people. We are not firing anyone, we are substituting the teams. You will understand that Rivera-Schatz' administration secretary will not be my administration secretary.

-18-

(Translations ours.)  Article published by Noti Uno on January 17, 2013, and found on web address  www.notiuno.com/2013/01/denuncian-que-pnp-atornilla-hasta-padrastro-de-exlider-cameral-en-oficina-de-servicios-legislativos/.

64. Codefendant Bhatia-Gautier's unequivocal political statement shows his identification of Plaintiffs' as NPP supporters and his intent to remove them from their position because of their political affiliation.  In his words, Bhatia-Gautier meant to "substitute teams", that is to say the losing "team" belonging to the NPP had to be substituted with the winning "team" belonging to the PDP.

65. In February of 2013, codefendant Martínez-Martínez was appointed acting Director of the OLS by Bhatia-Gautier.  Martínez-Martínez did not meet any of the employees of the OLS, including Plaintiffs, and did not undertake an evaluation of their performance.

66. The conditions for Plaintiffs at the OLS began to worsen quickly after January of 2013. First, Plaintiffs were instructed that they could no longer park at the Legislative Assembly's parking structure.  Plaintiffs were forced to find their own parking spaces.  In some instances, Plaintiffs were fined parking violations in their efforts to park their cars and get to work. Plaintiffs would often have to park their cars far from their offices, sometimes up to a half-mile away, and in unsafe areas where they and their cars were unsafe. Or Plaintiffs had to park in private parking structures where they had to pay a charge.  To add insult to injury, the parking spaces where Plaintiffs parked before remained empty.

67. Morale at the OLS was noticeably low due to the abusive acts of the new administration. Whenever Plaintiffs in the Legislative Research Unit of the OLS complained to Defendant Torres-Nieves- they were not allowed to complain to anyone else- she would respond that Defendant Martínez-Martínez was well aware of the situation but that Plaintiffs should refrain from complaining because "there were more important things than parking" play and that they did not want to give the new administration the impression that they complained a lot.

68. A page in "Facebook" was created under the title "bobmeencanta" in which threats and

-19-

fear was promoted against the NPP employees of the OLS, including the Plaintiffs, warning them that they would soon be removed from their jobs.

69. Plaintiffs were also told that they had to recycle used paper to hand in their assignments since there was no new paper.  They were told that if they ran out of recycled paper they would have to buy their own paper.  Water bottles for the cooler were also left out, forcing Plaintiffs to go without being able to drink water for hours.  At this time the air conditioning unit at some of the Plaintiffs' offices began to mysteriously shut down during work hours.

70. Between January and March of 2013, there was a notable decrease in the number of assignments and requests made by PDP members of the Legislative Assembly to the OLS.  In particular, immediately following the inauguration of the PDP majority, Plaintiffs stopped receiving the requests for services at the same levels as before.  The requests that did filter in were from NPP members of the Legislative Assembly.  This change in work flow was especially noteworthy since customarily the beginning of a session at the Legislative Assembly, particularly one immediately following general elections and a change in administration, was a time of heightened activity at the OLS.  This decrease was part of a concerted effort by PDP members of the Legislative Assembly to isolate the OLS, which as Bhatia-Gautier stated was viewed as being filled with NPP employees.

71. On March 5, 2013, Defendant Bhatia-Gautier assisted a forum to discuss the Legislative Reform at Sacred Heart University ("Universidad del Sagrado Corazón").  As reported by the newspaper "El Nuevo Día" on March 7, 2013, Defendant Bhatia-Gautier stated that "[t]he [OLS] is over because of the partisan shuffling ("batateo") that goes on.  Today I pronounce it dead."  (Translation ours.)  El Nuevo Día on March 7, 2013, article titled "Conversatorio por la Legislatura."  Again, Defendant Bhatia-Gautier expressed his opinion that Plaintiffs were NPP supporters who, because of their affiliation, had to be removed.

72. During March of 2013, personnel from the General Services Unit and the Computer

Center began making an inventory of all the equipment in the OLS. This despite the fact that an inventory had already been made during the transition only 3 months prior. When Plaintiff Fontánez-López asked why the inventory was being made again, personnel from the Computer Center only stated that the new administration had ordered it.

73. Around this time, Plaintiff Rodríguez-Figueroa had a conversation with Defendant Martínez-Martínez in which they discussed the future employment of Plaintiffs. Martínez-Martínez told Rodríguez-Figueroa that if it were up to him, he would not dismiss any OLS employee. However, if the directive "came from above", in reference to codefendant Bhatia-Gautier, to whom Martínez-Martínez answered, he would proceed with the dismissals. By Defendant's own admission, then, there was no reason to dismiss the Plaintiffs other than instructions from Defendant Bhatia-Gautier, who had previously stated that he identified the Plaintiffs as political "screw-ins" and intended to remove them from the OLS. In March of 2013, Plaintiff Rodríguez-Figueroa met with fellow Plaintiff di Mauro-Vázquez and another employee of the OLS and related the conversation he'd had with Martínez-Martínez.

74. By the second week of March of 2013, Plaintiffs noticed that security personnel were stationed at the entrances to the building housing the OLS. Plaintiffs also noticed that these persons had notepads and made notes every time any of them entered or exited the building.

75. On March 21, 2013, Plaintiffs were called by Elizabeth Reyes, secretary to Defendant Torres-Rivera, and asked Plaintiffs Nieves-López, Rolón-Quiñones, Di-Mauro-Vázquez, Malaret-Gómez, and Fontánez-López to report to Torres-Rivera's office. Plaintiffs did not know at that time that Elizabeth Reyes had just been fired as well. When the Plaintiffs arrived at Torres-Rivera's office, she was not there. Plaintiffs were received by 2 women they had never seen before, the person in charge of property in the OLS, and a security officer with a Senate badge. In all, there were 4 people waiting for Plaintiffs. Plaintiffs asked for Torres-Rivera but the women in the office only looked at each other and laughed. When one of the women began

to speak, Plaintiff Malaret-Gómez asked for her name. The woman identified herself as Defendant Rivera-González, the Director of Human Resources in the Senate. Rivera-González explained to Plaintiffs that they would receive a letter and hand over their badges and keys, and with that "conclude the process." One by one, Plaintiffs' names were called out, a letter handed to them and they handed in their badges and keys and exited the office. Shortly thereafter additional security personnel from the Senate showed up at the OLS and Plaintiffs were told that they had to pack up their belongings and leave the OLS immediately.

76. Other Plaintiffs were called to the Library where, in front of everybody, they were lined up and called out by name. Defendant Torres-Rivera was there and personally handed the dismissal letters to the rest of the Plaintiffs. The publicity of the delivery of the dismissal notices served to highlight the contempt with which Defendants treated the Plaintiffs.

77. After Plaintiffs were dismissed, Torres-Rivera and a detachment of security personnel went around the OLS handing out dismissal notices, including to other Plaintiffs. When the press started showing up, the OLS personnel were called to the Library were, in plain view of fellow employees but not of the press, and with no regard for their dignity, tens of employees and Plaintiffs were publicly and humiliatingly dismissed from the OLS.

78. The letters handed to Plaintiffs on March 21, 2013, stated:

I hereby inform you that I have made the determination of dispensing with your services effective on March 22, 2013. To that effect, I appreciate the services rendered by you to this Office.

As you know, the Human Resources Administration Regulations of the OLS establish everything related to your appointment and the payment of vacation and sick leave.

Wishing you success in your future professional endeavors, I bid farewell.

Cordially,
Juan Luis Martínez-Martínez

Letter dated March 21, 2013, signed by codefendant Martínez-Martínez.

79. The dismissal letter did not provide any information as to the justification or reason

behind the same. Defendants never evaluated nor reviewed the specific tasks or performance of the Plaintiffs prior to the dismissal.

80. Plaintiffs were never given notice of Defendants' intention to dismiss them prior to March 21, 2013, were never given a prior hearing nor advised as to their right to appeal the decision to dismiss them. Thus, Plaintiffs were not given any due process guarantees in relation to their dismissal. To the contrary, Defendant Torres-Rivera had before that day consistently told some Plaintiffs that they had no reason to be concerned.

81. Following the dismissal of the Plaintiffs, codefendant Martínez-Martínez defended his actions by stating to the press the following:

> The Senate of Puerto Rico is in the process of finalizing a Legislative Reform. An essential element is the existence of consulting bodies that have existed for years and that need to be reformulated. With the purpose of restructuring the OLS, addressing the claim of the people of realizing a complete Legislative Reform, and with the objective of being consistent with the responsible management of public funds, today in the afternoon the separation of 72 persons from their employment at the [OLS] was authorized. The [OLS] is in the process of review and restructuring with the goal of redefining its responsibilities and functions in order to adapt them to the needs the Government of Puerto Rico has today.

(Translations ours.) Quote taken from an article published by NotiCel on March 21, 2013, and found on web address www.noticel.com/noticia/139162/mas-de-70-despidos-en-servicios-legislativos-denunciados-como-politicos.html.

82. Defendant Martínez-Martínez alleged that the dismissals were due to the restructuring of the OLS as part of a Legislative Reform. However, at the time of the dismissals, no restructuring plan had been prepared. Neither Defendants nor any other official had reviewed Plaintiffs' performance or functions to determine whether they could be incorporated into the unknown new and improved OLS. There was no information as to the new structure to determine how many employees it would have and whether it was necessary to dismiss Plaintiffs. The only consideration used to dismiss the Plaintiffs was their political affiliation and the fact that they were not supporters of the PDP.

83. On March 22, 2013, the dismissal of Plaintiffs and other OLS employees was applauded

by the Senate Vice-President, Hon. José L. Dalmau. As quoted by the newspaper "El Nuevo Día", Senator Dalmau stated:

> Contrary to the Executive and Judicial Branches, in the Legislature the positions are at will ("libre remoción"). Every term when a change in administration comes that change in administration brings its own trust employees. The House and the Senate have delayed much in making the changes that they have to make…
>
> Many of them were appointed in December when they knew that there was going to be a change in government. They were screwed in ("atornillaron") there when it was known there would be a change in government.

(Translations ours.) Quote taken from an article published by newspaper "El Nuevo Día" on March 22, 2013, and found on web address www.elnuevodia.com/xstatic/endi/template/imprimir.aspx?id=1475459&t=3.

84. The remarks by the Senate Vice-President reflect the political animus behind the dismissal of the employees in the OLS, including Plaintiffs. According to the Senator, the dismissals responded to the change in administration and the need of the incoming administration to position its own people in public employment positions. However, as previously stated, Plaintiffs did not perform any public policy functions or address confidential issues. Plaintiffs had to work with elected and appointed officials of all political parties. Plaintiffs' political affiliation, which is what Senator Dalmau was referring to, could not be used as criteria for the decision to dismiss them. The Senate Vice-President also made reference to the Plaintiffs being "screwed in" after the elections, suggesting that, in Defendants' view, the Plaintiffs were appointed by the NPP administration because they were affiliated with and responded to the NPP. This politically charged comment reflects that Plaintiffs were removed because they were appointed by the outgoing NPP administration and because they were affiliated with the NPP. This despite the fact that the vast majority of Plaintiffs were appointed long before the 2012 general elections, including some Plaintiffs with over 10 years of service and as much as 20 and 35 years within the OLS.

85. On March 22, 2013, the day after the dismissals were notified, Senator Ramón Luis

Nieves of San Juan, who ran under the PDP ticket, and Senator Carmelo Ríos, of the NPP, debated one another on the television segment "Without Hesitation" (in Spanish, "Sin Titubeo"), on the news in the Univisión network.   During that debate, Senator Ramón Luis Nieves defended the dismissal of Plaintiffs by stating:

> The truth is that the NPP has not realized that they lost the elections, Carmelo face it you lost the elections.   And the Senate employees are trust employees and at will.   Also, the truth is that we have to give work to those who are committed to our government plan, and the NPP pretends to govern forever, from the all government agencies, in all the Senate at will positions, and the NPP forgets that they lost the elections because the people refused them.   This is not about political discrimination.

Video clip from segment "Without Hesitation", found at web address http://puertorico.univision.com/ultima-hora/sin-titubeo/video/2013-03-22/un-gobierno-sin-direccion-sin, at the 4:10 minute mark.

86. Senator Ramón Luis Nieves cleverly tried to end by saying that it was not a case of political discrimination, but the statement clearly shows the political animus behind the dismissals.   It is evident that Defendants and PDP senators viewed Plaintiffs as part of the NPP administration and that they had to be removed because the PDP had to "give work to those who are committed with our [PDP] government plan."   By his own admission, the PDP was removing the NPP employees because the NPP had lost, and the PDP now had to give work to those who supported it.

87. The statements issued by Defendants and other PDP leaders constitute direct evidence that Defendants and Plaintiffs were of opposing political affiliations, that Defendants knew of Plaintiffs' political affiliation, and that political affiliation was the motivating factor behind the decision to dismiss them.

88. At the time of their dismissal, Plaintiffs were not given any information as to their healthcare plans or other benefits.   Ultimately, Plaintiffs found out that Defendants contacted their healthcare providers and instructed them to cease their coverage on March 31, 2013.

89. It was not until May 10, 2013, more than 45 days after Plaintiffs were dismissed, that

anything resembling a restructuring plan for the OLS was finalized by the Senate of Puerto Rico. On that date, the Senate's Special Commission for the Study of a Legislative Reform issued a report on a bill to eliminate the OLS altogether. However, even this report does not definitively establish the amount of personnel the new office would have and thus, what need, if any, there could have been to dismiss Plaintiffs. Likewise, the bill expressly states that the new office would try to do away with an alleged "regrettable partisan politics intervention that causes so much harm to the hiring process of employees in public service…" (Translation ours.) Substitute bill for P. of S. 24, P. of S. 448 and P. of S. 450. Again, Defendants and the Senate in general use partisan political terms to describe the actions taken, highlighting the motivations and considerations taken for the dismissal of Plaintiffs. To add insult to injury, the bill proposing the restructuring of the OLS was not passed by the Legislative Assembly. Meaning that the alleged restructuring plan that did not exist at the time of the dismissals was ultimately rejected by the same Legislative Assembly majorities that used it as a pretext to dismiss Plaintiffs.

90. It is also important to note that the neither the bill nor any Senate study discusses the testimony offered by former presidents of the Legislative Assembly as part of the investigation into Legislative Reform. To wit, former Legislative presidents Miguel Hernández-Agosto, Kenneth McKlintock and José Ronaldo Jarabo offered testimony before the Senate's Special Commission for the Study of a Legislative Reform. None of these former Legislative presidents, 2 of which are strongly affiliated with the PDP, spoke of partisan intervention in the OLS or the need to restructure or change it. To the contrary, all former presidents spoke of the effective service rendered by the OLS.

Plaintiff Di Mauro-Vázquez

91. All previous factual allegations are incorporated heretofore.

92. Plaintiff Di Mauro-Vázquez was appointed to the position of Legislative Counsel II at

-26-

the Legislative Studies Unit of the OLS on October 30, 2006. In November and December of 2008, Plaintiff Di Mauro-Vázquez was detached to the State Elections Commission as a representative of then Resident Commissioner, and later Governor, Luis G. Fortuño-Burset. It was during these elections that Governor Fortuño-Burset was elected. Barring that brief interruption, Plaintiff Di Mauro-Vázquez held the position continuously until he was given an unpaid leave to fill the trust position of Assistant Administrator of the Vocational Rehabilitation Administration (hereinafter "VRA"), on January 31, 2010. On August 16, 2010, Plaintiff Di Mauro-Vázquez went on to occupy the trust position of Director of the Legal Affairs Office at the VRA. On June 30, 2012, Plaintiff Di Mauro-Vázquez left the VRA for the Department of State of Puerto Rico and the trust positions of Director of the Legal Affairs Office and Director of the Governor's Appointments Registration Office. On December 31, 2012, Plaintiff Di Mauro-Vázquez concluded his unpaid leave and returned to his regular position of Legislative Counsel II at the OLS. All correspondence and determinations made regarding Plaintiff Di Mauro-Vázquez's unpaid leave and return spoke of his regular position as Legislative Counsel II.

93. Upon arriving at the OLS, Plaintiff Di Mauro-Vázquez tried to request and follow up on the compensation for unused vacation leave from his trust positions. In order to process those requests, Defendant Martínez-Martínez, as acting head of the OLS, had to authorize the request. Despite numerous efforts to that effect, Defendant Martínez-Martínez did not sign Plaintiff Di Mauro-Vázquez's authorization until the same week Governor García-Padilla announced said unused leaves would not be paid.

94. Immediately upon returning to the OLS in December of 2013, Plaintiff Di Mauro-Vázquez began to hear the rumors that OLS employees who were affiliated with the NPP would be dismissed. Defendant Martínez-Martínez's detached attitude towards the OLS did not help matters. Defendant Martínez-Martínez did not meet with OLS employees or even introduce

himself as the Acting Director.

95. When Defendants removed Plaintiffs' parking privileges, Plaintiff Di Mauro-Vázquez had to pay $6.15 a day in order to park at a parking structure in Old San Juan to get to work. Plaintiff Di Mauro-Vázquez was also fined $75.00 for parking at the Legislative Assembly parking structure once.

96. In January of 2013, codefendant Torres-Rivera called Plaintiff Di Mauro-Vázquez to her office and told him that someone higher up had informed her that he had been posting partisan comments on his Facebook page. According to Torres-Rivera, she was asked to instruct Plaintiff Di Mauro-Vázquez to cease immediately and that "they" knew that he was a political activist. Plaintiff Di Mauro-Vázquez replied that his political comments were posted outside of work hours and that he had every right to continue doing so. Torres-Rivera answered that he did not have that right. In order to avoid further discussion and for fear that this could risk his position at the OLS, Plaintiff Di Mauro-Vázquez said that he would refrain from posting political or partisan comments on his Facebook page, which he did.

97. Prior to 2013, under the NPP administration, Torres-Rivera had an open door policy in her office, meaning that all OLS employees, including Plaintiffs, could approach her for any reason. In the weeks leading to March 21, 2013, this policy changed dramatically. Torres-Rivera now had her door literally closed every day. Torres-Rivera began meeting with Defendant Martínez-Martínez often but would not disclose why. She also instructed all Plaintiffs that the due date for all pending assignments was March 21, 2013. On March 20, 2013, Torres-Rivera, who was ordinarily jovial and good humored, tried to avoid Plaintiff Di Mauro-Vázquez and someone else in the hallway outside their offices. When Torres-Rivera could no longer avoid them, she said "hello" barely looking at them.

98. On March 21, 2013, Plaintiff Di Mauro-Vázquez was given his dismissal letter signed by Denfendant Martínez-Martínez. As previously discussed, Plaintiffs who worked at the

Legislative Research Unit of the OLS were called to Torres-Rivera's office where they were handed their letters signed by Defendant Martínez-Martínez. Plaintiff Di Mauro-Vázquez was the first to be called and receive his letter of dismissal. He then left for his office and observed when shortly thereafter a platoon of Senate security officers came in to the OLS offices and began to instruct the dismissed employees to pack up and leave.

99. Outside of work, Plaintiff Di Mauro-Vázquez actively participated in political activities. Plaintiff Di Mauro-Vázquez donated funds to the NPP campaign and that of some of its candidates, including House President Jennifer González and Resident Commissioner Pedro Pierluisi; worked in the NPP campaign for the 11th Representative District in 2008; is a member of "Abogados Progresistas", a group of lawyers affiliated with the NPP, and acted as an observer for the group in the Municipality of Vega Alta in the 2012 elections; he was in charge of the primary elections in the 2nd Representative District in 2012; represented the NPP as a polling officer during the review of the 2008 elections at the State Elections Commission; actively participated during the reorganization process of the NPP in 2010; and has attended dozens if not hundreds of political meetings, rallies, fundraisers, and activities.

100. Plaintiff Di Mauro-Vázquez's tasks in the OLS consisted of studying and researching all pertinent information for the review of legislative proposals, studying legal aspects of issues set forth by any member of the Legislative Assembly, providing technical legal counsel to Permanent and/or Special Commissions of the Legislative Assembly when requested, drafting legislative documents upon request from members of the Legislature, review legislative proposals, provide technical opinions on bills of law, and other ancillary functions as required. Plaintiff Di Mauro-Vázquez's work was not limited to members of one political party but to all members of the Legislative Assembly. In other words, Plaintiff Di Mauro-Vázquez could work on one project in service of one PDP senator and simultaneously work in another project for an NPP representative. As such, it cannot be said that Plaintiff Di Mauro-Vázquez was a trust

employee since he was equally required to work in support of all members of the Legislative Assembly. Likewise, it cannot be said that Plaintiff Di Mauro-Vázquez worked in confidential matters for members of one party or another. Plaintiff did not occupy a trust position or one where political and party considerations were valid.

101.     At no time during his work at the OLS did Plaintiff Di Mauro-Vázquez work on the creation of public policy or on confidential matters.

102.     Plaintiff Di Mauro-Vázquez was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss him.

103.     Plaintiff Di Mauro-Vázquez was dismissed because of his political affiliation.

104.     Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

105.     As a result of Plaintiff Di Mauro-Vázquez's illegal dismissal, he has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain car payments, mortgage payments, credit card payments, student loan payments and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

Plaintiff Fontánez-López

106.     All previous factual allegations are incorporated heretofore.

107.     Plaintiff Fontánez-López began his tenure at the OLS in March of 2009. He was appointed to the position of Legal Research Technician at the Legislative Studies Unit, as he was still in law school. As part of his tasks, Plaintiff Fontánez-López performed legal and

legislative research for all members of the Legislative Assembly, drafted legal memoranda containing that research, drafted and formatted bills according to a legislator's request, and other similar assignments.

108.    Immediately following the commencement of the new legislative session with the PDP majorities, the atmosphere at the OLS turned tense.    On several occasions, Plaintiff Fontánez-López met with Torres-Rivera and other Plaintiffs to discuss the rumors that the OLS employees affiliated with the NPP would be dismissed.  Torres-Rivera would only respond that she would work on that, and that everyone should have a positive attitude.

109.    In mid-March of 2013, Plaintiff Fontánez-López met with Torres-Rivera to ask about the rumors of the upcoming dismissals.  When Plaintiff Fontánez-López expressed his concerns, Torres-Rivera responded that she had very good communication with Defendant Martínez-Martínez.  Torres-Rivera also commented that unlike the previous administration, she now felt that her opinion regarding the office she supervised was taken into consideration. Torres-Rivera concluded by saying that she knew that Defendant Martínez-Martínez had direct contact with Defendant Bhatia-Gautier, so she felt confident that the interests of the OLS would be well looked after.

110.    Plaintiff Fontánez-López asked Torres-Rivera if he could have March 20, 2013, off in order to address a personal situation.  Torres-Rivera responded initially and with concern that he could not take March 21, 2013, off and that he had to be at the OLS.  When Plaintiff Fontánez-López explained that he only needed March 20 off and that he would be back on the 21st, Torres-Rivera authorized it.  The reason that Torres-Rivera was hesitant at first was that she knew that Plaintiffs would be dismissed on March 21, 2013.

111.    On March 21, 2013, Plaintiff Fontánez-López arrived to work in the morning like any other day except for the anxiety he felt due to the rumors that he and fellow Plaintiffs would be dismissed that day.  At around 3:15 PM that day, Plaintiff di Mauro-Vázquez told Plaintiff

Fontánez-López that they were summoned to Torres-Rivera's office. Once there, Plaintiff Fontánez-López looked in and saw that Torres-Rivera was not in her office, but that another OLS employee, Defendant Aponte, two unidentified women and a security guard were there. Once inside the office, one of the unknown women told them that they had letters for them for which they would have to sign as they were handed. Plaintiffs asked what the letters were for but received no response. Plaintiff Fontánez-López asked the woman who she was and she answered that she was the Director of Human Resources and that she was sent to deliver the letters. Plaintiffs asked for Torres-Rivera but were told she was not there. Defendant Aponte told Plaintiffs that once the letters were given, Plaintiffs had to hand in their office badges, identifications and keys, before Plaintiffs had the opportunity to read the letters or even know what they said. Plaintiffs were then called one by one, they were handed their dismissal letters and asked to sign a copy of the same. When Plaintiff Fontánez-López was given his letter he was asked to hand in his office keys. He responded that he would hand in the keys when he finished packing his personal effects from his office and that he did not have is identification card on him at that time but that he would look for it. Plaintiff Fontánez-López then headed to his office and saw that the security guard had taken a position in the hall outside the Plaintiffs' offices. Plaintiff Fontánez-López also noticed that an older man arrived at the OLS with a legal notepad in hand. Plaintiff Fontánez-López then proceeded to his office having asked the security guards to accompany him so that they could certify that Plaintiff Fontánez-López was returning OLS property in his office and packing up only his belongings. It was only after this process that Plaintiff Fontánez-López could take some time to read his dismissal letter.

112.     Plaintiff Fontánez-López then went to Torres-Rivera's office and handed Defendant Aponte the keys and identification card. He then passed by his colleagues' offices to bid farewell, finding one of them in tears while 2 others were helping each other pack their belongings.

113.    Outside his working hours, Plaintiff Fontánez-López had been an active supporter of the NPP. Plaintiff Fontánez-López participated in multiple political activities, caravans, meetings, rallies, conventions and gatherings. Plaintiff Fontánez-López also worked as a polling officer in the NPP primaries and in representation of the NPP in the general elections. Plaintiff Fontánez-López's political affiliation and involvement was of common knowledge in the OLS and the Legislative Assembly, including to the current Director of Human Resources and to Torres-Rivera.

114.    Plaintiff Fontánez-López's tasks in the OLS consisted of studying and researching all pertinent information for the review of legislative proposals, analyzing legal aspects of issues set forth by any member of the Legislative Assembly, providing technical legal counsel to Permanent and/or Special Commissions of the Legislative Assembly when requested, drafting legislative documents upon request from members of the Legislature, review legislative proposals, provide technical opinions on bills of law, and other ancillary functions as required. Plaintiff Fontánez-López's work was not limited to members of one political party but to all members of the Legislative Assembly. In other words, Plaintiff Fontánez-López could work on one project in service of one PDP senator and simultaneously work in another project for an NPP representative. As such, it cannot be said that Plaintiff Fontánez-López was a trust employee since he was equally required to work in support of all members of the Legislative Assembly. Likewise, it cannot be said that Plaintiff Fontánez-López worked in confidential matters for members of one party or another. Plaintiff did not occupy a trust position or one where political and party considerations were valid.

115.    At no time during his work at the OLS did Plaintiff Fontánez-López work on the creation of public policy or on confidential matters.

116.    Plaintiff Fontánez-López was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss him.

117.    Plaintiff Fontánez-López was dismissed because of his political affiliation.

118.    Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

119.    As a result of Plaintiff Fontánez-López illegal dismissal, he has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain car payments, mortgage payments, credit card payments, student loan payments and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

Plaintiff Rolón-Quiñones

120.    All previous factual allegations are incorporated heretofore.

121.    Plaintiff Rolón-Quiñones began working at the OLS in 1978 and worked almost continuously there for 35 years until Defendants' unlawful actions. During that time, Plaintiff Rolón-Quiñones worked under several PDP administrations and had never experienced any problems or discrimination like the one exercised by Defendants.

122.    Rolón-Quiñones was appointed to the position of Legal Research Technician at the Legislative Studies Unit. As part of his tasks, Plaintiff Rolón-Quiñones performed legal and legislative research for all members of the Legislative Assembly, drafted legal memoranda containing that research, drafted and formatted bills according to a legislator's request, and other similar assignments.

123.    Plaintiff Rolón-Quiñones could feel that something awful was going to happen as the tension at the OLS was palpable. On the day that Plaintiffs were told that they could no

-34-

longer use the Legislative Assembly's parking, Plaintiff Rolón-Quiñones and others requested a meeting with Mr. Charlie Cintrón, who was the Director of the General Services Office, but he evaded the Plaintiffs.  They then met with Defendant Torres-Rivera, who told them that they had to remain positive because other more important issues were being addressed at that time.

124.    Outside of work hours, Plaintiff Rolón-Quiñones was an active participant of meetings and rallies in the NPP.  Also, Plaintiff Rolón-Quiñones worked in the campaigns for NPP candidates.  Plaintiff Rolón-Quiñones' political affiliation was well known at the Capitol, including to Defendants.

125.    Plaintiff Rolón-Quiñones' tasks centered on technical support and services to all members of the Legislative Assembly.  He did not participate or in any way played a role in the creation of public policy or in close propinquity to public policy or confidential matters.  As such, it cannot be said that Plaintiff Rolón-Quiñones was a trust employee since he was equally required to work in support of all members of the Legislative Assembly.  Likewise, it cannot be said that Plaintiff Rolón-Quiñones worked in confidential matters for members of one party or another.  Plaintiff did not occupy a trust position or one where political and party considerations were valid.

126.    At no time during his work at the OLS did Plaintiff Rolón-Quiñones work on the creation of public policy or on confidential matters.

127.    Plaintiff Rolón-Quiñones was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss him.

128.    Plaintiff Rolón-Quiñones was not evaluated in his performance by Defendants prior to his dismissal.

129.    Plaintiff Rolón-Quiñones was dismissed because of his political affiliation.

130.    Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only

after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

131.    As a result of Plaintiff Rolón-Quiñones illegal dismissal, he has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain car payments, mortgage payments, credit card payments, student loan payments and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal

### Plaintiff Nieves-López

132.    All previous factual allegations are incorporated heretofore.

133.    Plaintiff Nieves-López was appointed to the position of Legal Research Technician at the Legislative Studies Unit of the OLS in August of 2009.

134.    Following the 2012 elections, Plaintiff Nieves-López would often ask Defendant Torres-Rivera about the OLS and its prospects under the new administration. Defendant Torres-Rivera would offer non-responsive answers or otherwise tell her that she did not need that information, thus compounding an already stressful environment. Defendant Torres-Rivera also prohibited Plaintiffs within her division to complain about any situation in that office.

135.    Once the new session began in January of 2013, Defendant Torres-Rivera ordered Plaintiff Nieves-López to move from her old cubicle to a smaller one situated in a much more distracting spot. Defendant Torres-Rivera did this knowing that the Plaintiff suffers from attention deficit hyperactivity disorder ("ADHD") and needed certain reasonable accommodations. Among the accommodations needed were a secluded work space and minimal distractions.

136.    Plaintiff Nieves-López was particularly affected by the change in parking

privileges. Plainitff Nieves-López had a medical order that states that she had to have available parking close to her place of work because of a knee injury in her job. As a result of this act of political harassment, Plaintiff Nieves-López suffered inflammation and great pain in her knee due to the long and uphill walking she now had to do to get from her parking spot to the OLS more than 2 blocks away.

137.     Plaintiff Nieves-López is a staunch supporter of the NPP. She has participated multiple political rallies and meetings of the NPP. She worked in Representative Jennifer González's election campaign. Nieves-López served as an electoral polling officer and coordinator in the 2008 and 2012 NPP primaries and in representation of the NPP in the elections held in those years.

138.     Plaintiff Nieves-López's tasks in the OLS consisted of research for legislative proposals, study of legal aspects of issues set forth by any member of the Legislative Assembly, technical legal counsel to Permanent and/or Special Commissions of the Legislative Assembly when requested, review legislative proposals, provide technical opinions on bills of law, and other ancillary functions as required. Plaintiff Nieves-López's work was not limited to members of one political party but to all members of the Legislative Assembly. In other words, Plaintiff Nieves-López could work on one project in service of one PDP senator and simultaneously work in another project for an NPP representative. As such, it cannot be said that Plaintiff Nieves-López was a trust employee since he was equally required to work in support of all members of the Legislative Assembly. Likewise, it cannot be said that Plaintiff Nieves-López worked in confidential matters for members of one party or another.

139.     At no time during her work at the OLS did Plaintiff Nieves-López work on the creation of public policy or on confidential matters. Plaintiff did not occupy a trust position or one where political and party considerations were valid.

140.     Plaintiff Nieves-López was never given and the dismissal letter did not include

any explanation or justification behind the decision to dismiss her.

141.    Plaintiff Nieves-López was dismissed because of her political affiliation.

142.    Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss her was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

143.    As a result of Plaintiff Nieves-López's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity.  As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain car payments, mortgage payments, credit card payments, student loan payments and the like.  In fact, Plaintiff Nieves-López was forced to let go of her residence and move into a property lent by a friend. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

Plaintiff Malaret-Gómez

144.    All previous factual allegations are incorporated heretofore.

145.    Plaintiff Malaret-Gómez worked as Legislative Adviser II in the OLS since June 16, 2009.  Malaret-Gómez's performance was consistently described as excellent. Plaintiff Malaret-Gómez's tasks in the OLS consisted of research and study of legal aspects of issues set forth by any member of the Legislative Assembly, technical legal counsel to Permanent and/or Special Commissions of the Legislative Assembly when requested, review legislative proposals, provide technical opinions on bills of law, and other ancillary functions as required.  Plaintiff Malaret-Gómez's work was not limited to members of one political party but to all members of the Legislative Assembly.  Plaintiff Malaret-Gómez could work on one project in service of one PDP senator and simultaneously work in another project for an NPP representative.  As such, it

cannot be said that Plaintiff Malaret-Gómez was a trust employee since he was equally required to work in support of all members of the Legislative Assembly. Likewise, it cannot be said that Plaintiff Malaret-Gómez worked in confidential matters for members of one party or another. Plaintiff did not occupy a trust position or one where political and party considerations were valid.

146.    At no time during his work at the OLS did Plaintiff Malaret-Gómez work on the creation of public policy or on confidential matters.

147.    Plaintiff Malaret-Gómez was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss him.

148.    Plaintiff Malaret-Gómez was dismissed because of his political affiliation.

149.    Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

150.    Plaintiff Malaret-Gómez is a life-long supporter of the NPP. He worked as an observer in the NPP 2012 primaries, and has consistently voted in NPP primaries. During his tenure at the OLS, Plaintiff Malaret-Gómez would commonly use his spare time to assist political rallies and meetings of the NPP. Plaintiff Malaret-Gómez's political affiliation and activism was commonly known to fellow employees at the OLS

151.    As a result of Plaintiff Malaret-Gómez's illegal dismissal, he has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet his economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

Plaintiff Olivera-Vázquez

152.     All previous factual allegations are incorporated heretofore.

153.     Plaintiff Olivera-Vázquez, began her public service in 2007 and in January of 2010 joined the Legislative Studies Unit of the OLS as a LRT.  Her tasks were limited to legal and legislative research and analysis of legislative drafts to determine whether they complied with established standards.  Plaintiff Olivera-Vázquez also worked on assignments from all members of the Legislative Assembly, regardless of political party.

154.     Plaintiff Olivera-Vázquez is a committed member of the NPP and has participated in political campaigns in support of NPP candidates in her free time.  In 2008, Plaintiff Olivera-Vázquez worked on Hon. José Aponte-Hernández's, the then President of the House of Representatives, reelection campaign to the House.  Plaintiff Olivera-Vázquez also worked as a representative of the NPP at the State Elections Commission during the 2008 elections.  She is a member of the 9th District electoral team, encompassing Bayamón and Toa Alta, and working as an electoral polling officer during the 2012 elections.

155.     The week after the 2012 elections, Plaintiff Olivera-Vázquez met with Defendant Torres-Rivera to inquire about the members of the Unit at the OLS.  Torres-Rivera told Plaintiff Olivera-Vázquez that she had nothing to worry about since the last say on who stayed and who left the Unit was hers.

156.     On or about Februray of 2013, and after numerous observations made by Plaintiff Olivera-Vázquez to Defendant Torres-Rivera regarding the deteriorating working conditions, the Defendant decided to move Plaintiff Olivera-Vázquez against her will to another office.  That way, Defendant Torres-Rivera could limit her contact with Plaintiff Olivera-Vázquez and not respond to her inquiries.  The Defendant told Plaintiff Olivera-Vázquez that she needed to make the change because of Plaintiff's constant "complaints" regarding the future of the OLS and Plaintiffs' employment and in order to place the Plaintiff next to fellow Plaintiff Rivera-

Guevarez to keep an eye on him.

157.     This change prompted Plaintiff Olivera-Vázquez to see Defendant Martínez-Martínez in order to make sure that the change of office had not been requested by her and that it could not constitute a disciplinary action.

158.     On several occasions during the month of February, Defendant Torres-Rivera met with the Plaintiffs under her supervision and told them that they would not be fired and that the unit was well-known for its excellent work.  However, the attitude of fellow employees who were affiliated with the PDP towards the Plaintiffs turned cold and distant.  The atmosphere at the OLS was tense amid rumors that Plaintiffs would be dismissed.  Defendant Torres-Rivera instructed Plaintiffs under her supervision to stay at their desks as much as possible, including during lunch hours, because they needed to finish as much work as possible quickly in order to show Defendants Martínez-Martínez and Defendant Bhatia-Gautier how well they worked.  Plaintiffs under Defendant Torres-Rivera ate lunch at their desks, would refrain from taking breaks and/or leave their work area for any reason in order to avoid giving Defendant Torres-Rivera any excuse to chastise them.  However, it was later learned that the pressure to finish their work had nothing to do with showing Defendants how well they worked, but with finishing their assigned work before they were dismissed, thus facilitating their removal.

159.     This was further aggravated with the diminished flow of working assignments given to Plaintiffs; all the while PDP affiliated employees still received the same and even higher number of assignments.  In this way, retaining the PDP employees could be justified. When Plaintiff Olivera-Vázquez brought up this situation with Defendant Torres-Rivera, she responded that there was nothing to worry about and that it was not the amount of work but the quality that made the difference.

160.     As late as early March of 2013, Defendant Torres-Rivera told Plaintiff under her supervision that they would not be fired and that they should continue to work.

161.     On March 21, 2013, Plaintiff Olivera-Vázquez was called to Defendant Torres-Rivera's office but found that she was not there.  In her stead, Defendant Aponte told Plaintiffs that they were to be given a letter for which they had to sign and hand in their identification cards and office keys.  All Plaintiff dismissed in that unit of the OLS were NPP supporters.

162.     At no time during her work at the OLS did Plaintiff Olivera-Vázquez work on the creation of public policy or on confidential matters.  Plaintiff did not occupy a trust position or one where political and party considerations were valid.

163.     Defendants never evaluated Plaintiff Olivera-Vázquez's performance at the OLS.

164.     Plaintiff Olivera-Vázquez was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

165.     Plaintiff Olivera-Vázquez was dismissed because of her political affiliation.

166.     Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

167.     Plaintiff Olivera-Vázquez is a life-long supporter of the NPP.  Plaintiff Olivera-Vázquez's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

168.     As a result of Plaintiff Olivera-Vázquez's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity.  As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like.  Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

        Plaintiff Berríos-Vega

-42-

169.     All previous factual allegations are incorporated heretofore.

170.     Plaintiff Berríos-Vega, of 44 years of age, worked as an Internal Auditor in the OLS since March of 2010.  Berríos-Vega's performance was consistently described as excellent.

171.     At no time during his work at the OLS did Plaintiff Berríos-Vega work on the creation of public policy or on confidential matters.  Plaintiff did not occupy a trust position or one where political and party considerations were valid.  Plaintiff Berríos-Vega's tasks at the OLS were limited to performing internal audits on the OLS to ensure its proper function.

172.     Defendants never evaluated Plaintiff Berríos-Vega's performance at the OLS.

173.     Plaintiff Berríos-Vega was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss him.

174.     Plaintiff Berríos-Vega was dismissed because of his political affiliation.

175.     Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him/her was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

176.     Plaintiff Berríos-Vega is a life-long supporter of the NPP.  He worked as an electoral polling officer in NPP primaries and representing the NPP in general elections.  He also served as a delegate within the organizational structure of the NPP.  During his tenure at the OLS, Plaintiff Berríos-Vega would commonly use his spare time to assist political rallies and meetings of the NPP.  Plaintiff Berríos-Vega's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

177.     As a result of Plaintiff Berríos-Vega's illegal dismissal, he has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity.  As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet

his economic obligations and the like. The cancellation of Plaintiff Berríos-Vega's meant that he could not continue the treatment that he needed for a cardiac condition. Plaintiff Berríos-Vega's condition worsened because of this and he had to be hospitalized for nearly a month. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

### Plaintiff Camacho-Solá

178.     All previous factual allegations are incorporated heretofore.

179.     Plaintiff Camacho-Solá, of 34 years of age, worked as an Executive Official at the Commissions Archive in the OLS since June 5, 2000. Camacho-Solá's performance was consistently described as excellent. Plaintiff Camacho-Solá's tasks in the OLS consisted of clerical and record-keeping duties and services. Plaintiff Camacho-Solá's work was not limited to members of one political party but to all members of the Legislative Assembly. As such, it cannot be said that Plaintiff Camacho-Solá was a trust employee since she was equally required to work in support of all members of the Legislative Assembly. Likewise, it cannot be said that Plaintiff Camacho-Solá worked in confidential matters for members of one party or another.

180.     After the general elections of 2012 and the inauguration of Defendant Bhatia-Gautier's presidency, Plaintiff Camacho-Solá was told by Irmady Rivera-Grau, a colleague at the Commissions Archive in the OLS, that all requests from the PDP members would now be channeled through her because the Plaintiff and the other NPP employees of the OLS were not of their confidence. Because Irmady Rivera-Grau was a PDP supporter, then the new majority of the Legislative Assembly would direct their requests for services through her. This despite the fact that none of the Plaintiffs occupied a trust position and/or performed any confidential or public policy related tasks and had to provide services to all members of the Legislative Assembly on equal terms.

181.     Around this time, Irmady Rivera-Grau would also mention out loud that she was

meeting with Defendant Bhatia-Gautier or attending meetings "at the president's office", leaving her workspace without authorization and without consequences. She would also ask Plaintiffs that "now that you have lost, what are you going to do?" These were common occurrences.

182.     Plaintiff Camacho-Solá was part of former House President Jennifer González's advance team. Representative Jennifer González occupies and has always occupied an at-large seat in the House for the NPP. Plaintiff Camacho-Solá also worked as an electoral polling officer in the NPP primaries and representing the NPP in general elections. She has also worked in NPP conventions and assemblies, and worked in Representative Jorge Navarro's, another member of the House under the NPP ticket, advance team.

183.     During her participation in political events, she would often take pictures of herself with NPP leaders and post them in social networks. Defendant Rivera-González was part of Plaintiff Camacho-Solá's social network and thus had seen the pictures of the Plaintiff participating in NPP activities.

184.     At the Commissions Archive, 5 out of the 6 employees who worked there were fired on March 21, 2013. The only employee who remained was Irmady Rivera-Grau, a PDP supporter. Later on, additional employees who were PDP supporters would be transferred to that office to cover the gap left when the NPP employees were dismissed.

185.     At no time during her work at the OLS did Plaintiff Camacho-Solá work on the creation of public policy or on confidential matters. Plaintiff did not occupy a trust position or one where political and party considerations were valid.

186.     Plaintiff Camacho-Solá was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss him.

187.     Plaintiff Camacho-Solá was dismissed because of her political affiliation.

188.     Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only

after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

189.     As a result of Plaintiff Camacho-Solá's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity.  As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like.  Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

Plaintiff Alicea-Rivera

190.     All previous factual allegations are incorporated heretofore.

191.     Plaintiff Alicea-Rivera, of 25 years of age, worked as an Administrative Secretary in the OLS since 2011.  Alicea-Rivera's performance was consistently described as excellent.

192.     As an Administrative Secretary, Alicea-Rivera's duties were limited to routine clerical and support services.  Plaintiff Alicea-Rivera was not involved in the creation of public policy or with confidential matters.  Plaintiff did not occupy a trust position or one where political and party considerations were valid.

193.     Alicea-Rivera worked as an electoral polling officer representing the NPP in the general elections and at the State Elections Commission for the NPP primaries and representing the NPP in the 2012 referendum and the general elections.  She was also part of former House President and current Representative Jennifer González's, who occupies an at-large seat under the NPP ticket, advance team.  Her political affiliation was commonly known at the OLS and the Capitol.

194.     At no time during her work at the OLS did Plaintiff Alicea-Rivera work on the creation of public policy or on confidential matters.

195.    Plaintiff Alicea-Rivera was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

196.    Plaintiff Alicea-Rivera was dismissed because of her political affiliation.

197.    Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

198.    As a result of Plaintiff Alicea-Rivera's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

Plaintiff Fajardo-Rojas

199.    All previous factual allegations are incorporated heretofore.

200.    Plaintiff Fajardo-Rojas of 35 years of age, worked as an Office Clerk in the Digitalization Center of the OLS since 2003. Plaintiff Fajardo-Rojas' job performance at the OLS was consistently described as excellent.

201.    At no time during his work at the OLS did Plaintiff Fajardo-Rojas work on the creation of public policy or on confidential matters. In fact, Plaintiff Fajardo-Rojas' duties as an office clerk were limited to support services and information processing in the efforts to digitalize the records of the Legislative Assembly. Plaintiff did not occupy a trust position or one where political and party considerations were valid.

202.    Plaintiff Fajardo-Rojas was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

-47-

203.     Plaintiff Fajardo-Rojas was dismissed because of her political affiliation.

204.     Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

205.     Plaintiff Fajardo-Rojas is a life-long supporter of the NPP.  She was part of former Governor Fortuño-Burset's, then the NPP president, advance team.  Also, Plaintiff Fajardo-Rojas' brother is Carlos Fajardo-Berdejo, a former secretary of the House of Representatives and heavily identified with the NPP.

206.     As a result of Plaintiff Fajardo-Rojas' illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity.  As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like.  Plaintiff has even had to file bankruptcy due to her loss of employment.  Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

   Plaintiff Román-Rivera

207.     All previous factual allegations are incorporated heretofore.

208.     Plaintiff Román-Rivera, of 62 years of age, worked as an Administrative Secretary in the Digitalization Center of the OLS since 2008.  Román-Rivera's performance was consistently described as excellent.

209.     In February of 2013, the electricity went out in the OLS offices.  Defendant Martínez-Martínez took that opportunity to pay a surprise visit to the Digitalization Center of the OLS.  Plaintiff Román-Rivera witnessed how Defendant Martínez-Martínez commented that he did not know that the Center existed or was there prior to that visit.  This denotes Defendant's

-48-

lack of knowledge or interest in the workings of the OLS, the services it provided and the quality of the work done.

210.      At no time during her work at the OLS did Plaintiff Román-Rivera work on the creation of public policy or on confidential matters.  On the contrary, Román-Rivera's position as an Administrative Secretary provided only clerical tasks that had no close propinquity to policy or confidential.  Plaintiff did not occupy a trust position or one where political and party considerations were valid

211.      Plaintiff Román-Rivera was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

212.      Plaintiff Román-Rivera was dismissed because of her political affiliation.

213.      Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

214.      Plaintiff Román-Rivera is a life-long supporter of the NPP.  She worked as an electoral polling officer representing the NPP in the general elections and was even detached to work at the State Elections Commission for the recounts in the NPP primaries.  She would often attend political meetings and rallies wearing clothing allusive to the NPP and its candidates and be pictured; later on the pictures were posted on social networks.  Plaintiff Román-Rivera's political affiliation and activism was commonly known to fellow employees at the OLS

215.      As a result of Plaintiff Román-Rivera's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity.  As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like.  Plaintiff has also suffered great stress, mental anguish,

humiliation, depression, and loss of self-worth because of her dismissal.

Plaintiff Irizarry-López

216.    All previous factual allegations are incorporated heretofore.

217.    Plaintiff Irizarry-López, of 28 years of age, worked as an Administrative Official in the OLS since 2007. Irizarry-López's performance was consistently described as excellent.

218.    Following the general elections of 2012, Plaintiff Irizarry-López was told by Mrs. Evangelina Aponte, another OLS employee and a PDP supporter, that "they are going to remove a lot of people from here, the NPP'ers will pay for the 8 years they were in power, and I know about that because I have been to the PDP meetings." This demonstrates that the plan to remove Plaintiffs from their positions within the PDP was politically motivated as retaliation for their support of the NPP.

219.    Plaintiff Irizarry-López worked at the Human Resources Office of the OLS. Shortly after the elections and the inauguration of Defendant Bhatia-Gautier as President, Defendant Avilés was assigned to the Human Resources Office. Avilés told Plaintiff Irizarry-López that she was there because she was affiliated with the PDP and was assigned to "keep an eye on them", as instructed by Defendants Martínez-Martínez and Bhatia-Gautier. Defendant Avilés also told the Plaintiff that she had worked with Bhatia-Gautier since his run for San Juan mayor in 2000 and that he trusted her. That was why he had assigned her to the Human Resources Office to keep tabs on everything the Plaintiffs did because, by her own admission, Defendant Bhatia-Gautier knew they were supporters of the NPP. She also warned the Plaintiff that they knew that she was there because of her previous work with Representative Jennifer González, an at-large representative under the NPP ticket.

220.    On one occasion, Avilés told Plaintiff Irizarry-López that "if you stay quiet and do not do any campaigning at work, you will not get fired." When Irizarry-López responded that she never worked on politics while at work, Defendant Avilés stated that "yes, you do, we

-50-

have seen you Facebook with a Jennifer [González] shirt on." Irizarry-López affirmed that that happened in her spare time, and Defendant Avilés concluded by saying "do not do it, think of your son."

221.    Plaintiff Irizarry-López was substituted in her position by a PDP supporter.

222.    At no time during her work at the OLS did Plaintiff Irizarry-López work on the creation of public policy or on confidential matters. Her tasks as an administrative official were limited to administrative and support services at the OLS. Moreover, the OLS provides services to members of both parties in the Legislative Assembly. Therefore, Plaintiff did not occupy a trust position or one where political and party considerations were valid.

223.    Plaintiff Irizarry-López was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

224.    Plaintiff Irizarry-López was dismissed because of her political affiliation.

225.    Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

226.    Plaintiff Irizarry-López is a life-long supporter of the NPP. She commonly assisted political rallies and meetings in support of the NPP and its candidates. Plaintiff Irizarry-López's political affiliation and activism was commonly known to fellow employees at the OLS

227.    As a result of Plaintiff Irizarry-López's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. Plaintiff's situation was particularly egregious, as her son was diagnosed with autism shortly before her dismissal. Plaintiff's removal and cancellation of healthcare coverage delayed the initiation of treatment and therapy needed for her son and which should occur promptly after a

diagnosis. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

Plaintiff Albino-Torres

228.    All previous factual allegations are incorporated heretofore.

229.    Plaintiff Albino-Torres, of 29 years of age, worked as an Administrative Secretary in the OLS since 2012. Albino-Torres' performance was consistently described as excellent.

230.    At no time during her work at the OLS did Plaintiff Albino-Torres work on the creation of public policy or on confidential matters. On the contrary, Albino-Torres worked as a secretary, limited to clerical and support functions. Therefore, it cannot be said that Albino-Torres occupied a trust position or one where political and party considerations were valid.

231.    Plaintiff Albino-Torres was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

232.    Plaintiff Albino-Torres was dismissed because of her political affiliation.

233.    Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

234.    Plaintiff Albino-Torres is a staunch supporter of the NPP. She served as vice-president of the youth organization of the NPP in Corozal, Puerto Rico. She was also active in Jennifer González's advance team. During her tenure at the OLS, Plaintiff Albino-Torres would commonly use her spare time to assist political rallies and meetings of the NPP. Plaintiff Albino-Torres' political affiliation and activism were commonly known to fellow employees at

the OLS

235.     As a result of Plaintiff Albino-Torres' illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity.  As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like.  Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

        Plaintiff Fragoso-Valentín

236.     All previous factual allegations are incorporated heretofore.

237.     Plaintiff Fragoso-Valentín, of 44 years of age, worked as an Executive Official in the OLS since July of 1999.  Fragoso-Valentín's performance was consistently described as excellent.

238.     At no time during her work at the OLS did Plaintiff Fragoso-Valentín work on the creation of public policy or on confidential matters.  Fragoso-Valentín's position as an executive official was limited to providing clerical support in the OLS.  Fragoso-Valentín did not occupy a trust position within the OLS or one where political and party considerations were valid.

239.     Plaintiff Fragoso-Valentín was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

240.     Plaintiff Fragoso-Valentín was dismissed because of her political affiliation.

241.     Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

242.     Plaintiff Fragoso-Valentín is a life-long member of the NPP.  During her tenure

at the OLS, Plaintiff Fragoso-Valentín would commonly use her spare time to assist political rallies and meetings of the NPP. Plaintiff Fragoso-Valentín would often take pictures of herself at these rallies and post them on social networks. Also, Fragoso-Valentín's husband was part of Governor Fortuño-Burset's security detail. Plaintiff Fragoso-Valentín's political affiliation and activism was commonly known to fellow employees at the OLS

243. As a result of Plaintiff Fragoso-Valentín's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

Plaintiff Zamora-Fernández

244. All previous factual allegations are incorporated heretofore.

245. Plaintiff Zamora-Fernández, of 41 years of age, worked as a Receiver at the OLS Warehouse since April of 1999. Zamora-Fernández's performance was consistently described as excellent.

246. At no time during his work at the OLS did Plaintiff Zamora-Fernández work on the creation of public policy or on confidential matters. Plaintiff Zamora-Fernández's duties were limited to working at the OLS warehouse. Therefore, Zamora-Fernández was not in a trust position or one where political and party considerations were valid.

247. Plaintiff Zamora-Fernández was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss him.

248. Plaintiff Zamora-Fernández was dismissed because of his political affiliation.

249. Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable

expectation to continue in his employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

250.     Plaintiff Zamora-Fernández is a life-long supporter of the NPP. During his tenure at the OLS, Plaintiff Zamora-Fernández would commonly use his spare time to assist political rallies and meetings of the NPP. Plaintiff Zamora-Fernández's political affiliation and activism was commonly known to fellow employees at the OLS

251.     As a result of Plaintiff Zamora-Fernández's illegal dismissal, he has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. Plaintiff has also fallen behind in payments to creditors and the bankruptcy trustee, further complicating his previous bankruptcy proceedings. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet his economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

### Plaintiff Rodríguez-Arroyo

252.     All previous factual allegations are incorporated heretofore.

253.     Plaintiff Rodríguez-Arroyo, of 23 years of age, worked as in charge of auxiliary property at the OLS since July of 2012. Rodríguez-Arroyo's performance was consistently described as excellent.

254.     When the new area supervisor, Defendant Aponte, came in after the change in majority at the Legislative Assembly, she took all the office keys from the employees. Every day, Plaintiffs in this office had to wait until Defendant Aponte arrived and opened the office for them to begin their workday. The same thing happened during their lunch hour. Defendants treated Plaintiffs as if they could not be trusted to even have office keys. In fact, Plaintiff Rodríguez-Arroyo was moved to another desk so that Defendant Aponte could have a closer eye on her and continuously monitor her activities.

255.     At no time during his work at the OLS did Plaintiff Rodríguez-Arroyo work on the creation of public policy or on confidential matters. Plaintiff Rodríguez-Arroyo's functions were of a clerical and support nature. It therefore cannot be said that she occupied a position of trust within the OLS or one where political and party considerations were valid.

256.     Plaintiff Rodríguez-Arroyo was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her. In fact, Defendants never even evaluated the Plaintiff's performance.

257.     Plaintiff Rodríguez-Arroyo was dismissed because of her political affiliation.

258.     Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

259.     Plaintiff Rodríguez-Arroyo is a life-long supporter of the NPP. She has worked as an electoral polling officer representing the NPP and has contributed in the political campaigns of Governor Fortuño-Burset and Representative Jennifer González. During her tenure at the OLS, Plaintiff Rodríguez-Arroyo would commonly use her spare time to assist political rallies and meetings of the NPP. Plaintiff Rodríguez-Arroyo's political affiliation and activism was commonly known to fellow employees at the OLS

260.     As a result of Plaintiff Rodríguez-Arroyo's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

<u>Plaintiff Sepulveda-Negroni</u>

261.     All previous factual allegations are incorporated heretofore.

262.     Plaintiff Sepulveda-Negroni, of 58 years of age, worked as a Translator at the OLS since July of 2012.   Sepulveda-Negroni's performance was consistently described as excellent.

263.     At no time during his work at the OLS did Plaintiff Sepulveda-Negroni work on the creation of public policy or on confidential matters.  To wit, Plaintiff Sepulveda-Negroni's functions were limited to the translation of the reports, resolutions, projects and laws of issued and approved by the Legislative Assembly.  Therefore, Plaintiff Sepulveda-Negroni's position could not be one of trust or one where political and party considerations were valid.

264.     Defendants never evaluated Plaintiff Sepulveda-Negroni's performance at the OLS.

265.     Plaintiff Sepulveda-Negroni was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

266.     Plaintiff Sepulveda-Negroni was dismissed because of her political affiliation.

267.     Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

268.     Plaintiff Sepulveda-Negroni is a life-long supporter of the NPP.  She worked as an electoral polling officer representing the NPP in multiple elections and inside Representative Jennifer González's legislative office.  During her tenure at the OLS, Plaintiff Sepulveda-Negroni would commonly use her spare time to assist political rallies and meetings of the NPP. Plaintiff Sepulveda-Negroni's political affiliation and activism were commonly known to fellow employees at the OLS

269.     As a result of Plaintiff Sepulveda-Negroni's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. Plainitff Sepulveda-Negroni's dismissal also limited the financial aid she could provide to her 2 daughters who are university students. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

Plaintiff Hernández-González

270.     All previous factual allegations are incorporated heretofore.

271.     Plaintiff Hernández-González, of 40 years of age, worked as an Executive Secretary at the OLS since 2005. Hernández-González's performance was consistently described as excellent.

272.     At no time during her work at the OLS did Plaintiff Hernández-González work on the creation of public policy or on confidential matters. Plaintiff Hernández-González's functions were of a clerical and support nature. Therefore, Hernández-González did not occupy a trust position or one where political and party considerations were valid.

273.     Defendants never evaluated Plaintiff Hernández-González's performance at the OLS.

274.     Plaintiff Hernández-González was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

275.     Plaintiff Hernández-González was dismissed because of her political affiliation.

276.     Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss her was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely. Plaintiff was dismissed

without prior notice and/or a prior hearing.

277.    Plaintiff Hernández-González is a life-long supporter of the NPP.  She even worked as an executive secretary in Senator Thomas Rivera-Schatz's senate office.  During her tenure at the OLS, Plaintiff Hernández-González would commonly use her spare time to assist political rallies and meetings of the NPP.  Plaintiff Hernández-González's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

278.    As a result of Plaintiff Hernández-González's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. Hernández-González was the primary source of income in her household, which compounded the effect her dismissal had on her family.  As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

### Plaintiff Rivera-Guevarez

279.    All previous factual allegations are incorporated heretofore.

280.    Plaintiff Rivera-Guevarez, of 43 years of age, worked as a Legislative Adviser III at the OLS since 2011.  Rivera-Guevarez's performance was consistently described as excellent.

281.    Once the new PDP majority and Defendants moved in, they deprived Plaintiff Rivera-Guevarez of all functions and tasks for nearly a month.  Plaintiff Rivera-Guevarez was previously assigned to the Legal Division but was moved to isolation in the Facilities Division. He was also left without a working computer in his workspace for weeks.  By the end of January of 2013, he was given notice of an immediate transfer to another workspace that did not deserve the name.  The new space was inhabitable, without air conditioning, filled with boxes, dust and trash.  It was not until Plaintiff Rivera-Guevarez complained that the new administration partially habilitated that space.  The reason behind Plaintiff Rivera-Guevarez's transfers was to

place a former special adviser to Defendant Bhatia-Gautier in his old space.  Despite the fact that the Plaintiff had previously occupied the position of Sub-Director of the OLS, his requests for a meeting with Defendant Martínez-Martínez to discuss these situations went unheeded.

282.     At no time during his work at the OLS did Plaintiff Rivera-Guevarez work on the creation of public policy or on confidential matters.  Although he had previously held the position of Sub-Director, Plaintiff Rivera-Guevarez then held the regular position of legislative adviser.  Plaintiff's tasks included research and technical support for members of the Legislative Assembly, regardless of party ticket.  Rivera-Guevarez did not occupy a trust position or one where political and party considerations were valid.

283.     Defendants never evaluated Plaintiff Rivera-Guevarez's performance at the OLS.

284.     Plaintiff Rivera-Guevarez was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss him.

285.     Plaintiff Rivera-Guevarez was dismissed because of his political affiliation.

286.     Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

287.     Plaintiff Rivera-Guevarez is a life-long supporter of the NPP.  He served as Secretary of the Candidate Evaluation Committee of the NPP as well as held numerous other positions within the party.  During his tenure at the OLS, Plaintiff Rivera-Guevarez would commonly use his spare time to assist political rallies and meetings of the NPP.  Plaintiff Rivera-Guevarez's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

288.     As a result of Plaintiff Rivera-Guevarez's illegal dismissal, he has suffered

considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet his economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

Plaintiff Molina-Román

289.    All previous factual allegations are incorporated heretofore.

290.    Plaintiff Molina-Román, of 37 years of age, worked as an Executive Official at the OLS since 2001. Molina-Román's performance was consistently described as excellent.

291.    At no time during his work at the OLS did Plaintiff Molina-Román work on the creation of public policy or on confidential matters. Plaintiff Molina-Román's duties were limited to clerical and support tasks for other OLS employees and members of the Legislative Assembly from all party affiliations. Plaintiff Molina-Román's position could not be one of trust or one where political and party considerations were valid.

292.    Defendants never evaluated Plaintiff Molina-Román's performance at the OLS.

293.    Plaintiff Molina-Román was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss him.

294.    Plaintiff Molina-Román was dismissed because of his political affiliation.

295.    Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

296.    Plaintiff Molina-Román is a staunch supporter of the NPP. He worked as an assistant at the office of former Senator under the NPP ticket, Myriam Ramírez-de-Ferrer, as an adviser in Jennifer González's office, and had 3 detachments from the OLS to the office of the

Electoral Comissioner for the NPP in 2012. During his tenure at the OLS, Plaintiff Molina-Román would commonly use his spare time to assist political rallies and meetings of the NPP. Plaintiff Molina-Román's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

297. As a result of Plaintiff Molina-Román's illegal dismissal, he has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet his economic obligations and the like. The stress of this situation provoked an episode or paralysis in Plaintiff Molina-Román's face. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

Plaintiff Avilés-Cancel

298. All previous factual allegations are incorporated heretofore.

299. Plaintiff Avilés-Cancel, of 40 years of age, worked as a Tourist Guide in the OLS since 2007. Avilés-Cancel's performance was consistently described as excellent.

300. On March 21, 2013, a colleague, Mr. Daniel Rodríguez, told Plaintiff Avilés-Cancel and another colleague that they had to go to the Legislative Library in the OLS. The Plaintiff could immediately notice that Daniel Rodríguez looked worried and down. The Plaintiff and her colleague went to the Legislative Library and upon reaching the floor in the elevator saw a journalist and a cameraman, confirming Plaintiff's fear that something was going on. The Plaintiff was overcome with nerves and started crying and could not exit the elevator. Fellow OLS employees from the First Aid Unit entered the elevator and confirmed to Plaintiff Avilés-Cancel that the letters of dismissal were being handed out. One of the nurses had to calm the Plaintiff down as she was having an anxiety attack before she could return to the Library. Once there, the Plaintiff saw many fellow OLS employees with their heads down looking like they had been crying. Plaintiff Avilés-Cancel then heard her name being called and she entered

an office where her supervisor, Mr. Adrian Pacheco-Suarez, and Defendant Torres-Rivera were seated. On the other side of the office, Plaintiff Avilés-Cancel could see a security guard and another person moved behind her. Defendant Torres-Rivera told Plaintiff Avilés-Cancel to take a seat and said "I am going to give you a letter which you will read and sign, and I need you to give me your identification card." Plaintiff Avilés-Cancel quickly read the document and signed it. Plaintiff Avilés-Cancel felt intimidated by the amount of security personnel around. Plaintiff Avilés-Cancel left the office crying because of her dismissal and humiliation.

301.     At no time during her work at the OLS did Plaintiff Avilés-Cancel work on the creation of public policy or on confidential matters. Plaintiff did not occupy a trust position or one where political and party considerations were valid. Plaintiff Avilés-Cancel was a tourist guide for the OLS, offering guided tours around the Capitol to visitors. These tasks can in no way be considered a matter of public policy.

302.     Defendants never evaluated Plaintiff Avilés-Cancel's performance at the OLS.

303.     Plaintiff Avilés-Cancel was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

304.     Plaintiff Avilés-Cancel was dismissed because of her political affiliation.

305.     Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss her was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

306.     Plaintiff Avilés-Cancel is a staunch supporter of the NPP. She worked as an electoral polling officer representing the NPP. She also worked in the Fortaleza during an NPP administration just prior to starting her work at the OLS. Plaintiff Avilés-Cancel has even received certificates of recognition from the NPP for her service. During her tenure at the OLS,

Plaintiff Avilés-Cancel would commonly use her spare time to assist political rallies and meetings of the NPP. Plaintiff Malaret-Gómez's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

307.     As a result of Plaintiff Avilés-Cancel's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. The situation was particularly heinous because Plaintiff Avilés-Cancel was unable to provide for her children, one of which suffers from learning disabilities and permanent and progressive health problems. Plaintiff Avilés-Cancel was forced to send her 14-year-old daughter to live in the State of Florida with her father because she could not afford her school tuition. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

Plaintiff Carrasquillo-Cruz

308.     All previous factual allegations are incorporated heretofore.

309.     Plaintiff Carrasquillo-Cruz, of 54 years of age, worked as an Administrative Director for Documents in the OLS since 2005. Carrasquillo-Cruz's performance was consistently described as excellent.

310.     At no time during his work at the OLS did Plaintiff Carrasquillo-Cruz work on the creation of public policy or on confidential matters. Plaintiff did not occupy a trust position or one where political and party considerations were valid. Plaintiff Carrasquillo-Cruz's duties at the OLS were limited to overseeing the conservation and access to legislative documents and their accessibility to the Legislative Assembly and the general public. In this endeavor, the Plaintiff had to service all members of the Assembly and the public, regardless of affiliation.

311.     Defendants never evaluated Plaintiff Carrasquillo-Cruz's performance at the OLS.

312.     Plaintiff Carrasquillo-Cruz was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss him.

313.     Plaintiff Carrasquillo-Cruz was dismissed because of his political affiliation.

314.     Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

315.     Plaintiff Carrasquillo-Cruz is a life-long supporter of the NPP.  The Plaintiff represented the NPP at the State Elections Commission as a polling officer on several occasions. Carrasquillo-Cruz also served as the Municipal Secretary for the Municipality of Yabucoa, a trust position under the NPP mayors Francisco Díaz y Ángel García-de-Jesús.  During his tenure at the OLS, Plaintiff Carrasquillo-Cruz would commonly use his spare time to assist political rallies and meetings of the NPP.  Plaintiff Carrasquillo-Cruz's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS, including but not limited to Mrs. Ruth Figueroa and Mr. Edgardo Cintrón, both renowned leaders of the PDP and employees at the OLS.

316.     As a result of Plaintiff Carrasquillo-Cruz's illegal dismissal, he has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. Defendants' illicit actions also caused the Plaintiff to postpone his retirement plans, as he was just 2 years shy of being able to retire when he was dismissed.  As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments, including child support, and meet his economic obligations and the like.  Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

Plaintiff Albors-Peralta

317.     All previous factual allegations are incorporated heretofore.

318.     Plaintiff Albors-Peralta, of 47 years of age, worked as Director of the Digitalization Unit of the OLS since 2005.  Albors-Peralta's performance was consistently described as excellent.

319.     Like all other Plaintiffs, Albors-Peralta repeatedly heard rumors and comments by PDP supporters in the OLS to the effect that the NPP-affiliated employees would be dismissed.  Plaintiff Albors-Peralta also read the chilling comments posted on the "facebook" page "bobmeencanta" threatening Plaintiffs that they would soon be fired.

320.     Plaintiff Albors-Peralta also witnessed first-hand how Defendants tried to fabricate a file against her to justify her dismissal.  Some weeks before her dismissal, Defendant Martínez-Martínez instructed the director of Human Resources to require a letter from Plaintiff Albors-Peralta excusing an alleged tardiness in punching in to work.  Plaintiff Albors-Peralta wrote said letter in fear that a refusal to do so could be used against her.  Plainitff Albors-Peralta arrived late because her car was in the shop.  However, Plaintiff Albors-Peralta's record shows no other mark against her.  Customarily, an isolated case of late arrival would be overlooked or simply excused verbally.  In the Plaintiff's case, however, it was cause for an apology letter to be included in her file.  This disparity in the treatment towards Plaintiff demonstrates that Defendants' were intent on dismissing Plaintiffs without just cause or due process, based solely on their political affiliation.

321.     At no time during her work at the OLS did Plaintiff Albors-Peralta work on the creation of public policy or on confidential matters.  Plaintiff did not occupy a trust position or one where political and party considerations were valid.  On the contrary, Plaintiff Albors-Peralta oversaw the digitalization efforts for the OLS.  In other words, she worked in converting all of the documents issued by the Legislative Assembly from hardcopy to a digital file so it could be shared electronically.  This is a complicated effort, but not one remotely related to or

influential on public policy.

322.     Defendants never evaluated Plaintiff Albors-Peralta's performance at the OLS.

323.     Plaintiff Albors-Peralta was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

324.     Plaintiff Albors-Peralta was dismissed because of her political affiliation.

325.     Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

326.     Plaintiff Albors-Peralta is a life-long supporter of the NPP.  She worked as electoral polling officer in several elections, primaries and referenda, all representing the NPP. Plaintiff Albors-Peralta also made monthly monetary contributions to the NPP through the "Blue Circle" (in Spanish, "Círculo Azul")[2] system whereby the donations were deducted from her salary at the OLS.  That meant that anybody who worked at the OLS' Human Resources or Payroll Divisions knew Plaintiff Albors-Peralta supported the NPP.  During her tenure at the OLS, Plaintiff Albors-Peralta would commonly use her spare time to assist political rallies and meetings of the NPP.  Pictures of the Plaintiff participating in these activities were commonly posted on "facebook."   Plaintiff Albors-Peralta's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS.

327.     As a result of Plaintiff Albors-Peralta's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity.  As a

---

[2] In Puerto Rico, the NPP is identified with the color blue, while the PDP is identified with the color red.  The "Blue Circle" is a system whereby someone authorizes an employer or a bank to deduct a monthly donation to the NPP.

result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff and her family, including her daughter, were forced to move out of their home because the Plaintiff could not afford to pay rent. Plaintiff's daughter did not receive her high school diploma because there was an outstanding debt with the high school which resulted from Plaintiff's dismissal and lack of income. Plaintiff's daughter could not begin college because her financial aid did not cover all of her studies and the Plaintiff could not pay the difference due to her dismissal. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

### Plaintiff Santos-Ortiz

328.    All previous factual allegations are incorporated heretofore.

329.    Plaintiff Santos-Ortiz, of 40 years of age, worked as a Graduate Nurse in the OLS since 2000. Santos-Ortiz's performance was consistently described as excellent.

330.    At no time during her work at the OLS did Plaintiff Santos-Ortiz work on the creation of public policy or on confidential matters. Plaintiff did not occupy a trust position or one where political and party considerations were valid. Plaintiff Santos-Ortiz worked as a graduate nurse at the First Aid Unit of the OLS. Her tasks were providing medical and first aid to employees at the Capitol. These functions cannot be considered sensitive or otherwise in close propinquity to public policy or confidential matters.

331.    Defendants never evaluated Plaintiff Santos-Ortiz's performance at the OLS.

332.    Plaintiff Santos-Ortiz was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

333.    Plaintiff Santos-Ortiz was dismissed because of her political affiliation.

334.    Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable

expectation to continue in her employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

335.      Plaintiff Santos-Ortiz is a life-long supporter of the NPP. During her tenure at the OLS, Plaintiff Santos-Ortiz would commonly use her spare time to assist political rallies and meetings of the NPP. Plaintiff Santos-Ortiz would also publicly recognize her political affiliation in front of other OLS employees. Plaintiff Santos-Ortiz's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

336.      As a result of Plaintiff Santos-Ortiz's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

   Plaintiff Fradera-Delgado

337.      All previous factual allegations are incorporated heretofore.

338.      Plaintiff Fradera-Delgado, of 49 years of age, worked as a Fixed Asset Analyst in the OLS since 1995. Fradera-Delgado's performance was consistently described as excellent.

339.      On February 14, 2013, Plaintiff Fradera-Delgado witnessed when Defendant Aponte was announced as Acting Director of the Property Unit of the OLS. On February 15, 2013, Defendant Aponte began her tenure as Acting Director. By order of Defendant Martínez-Martínez, Defendant Aponte instructed everybody in her unit, which was overwhelmingly filled with NPP supporters, to hand in their office keys. Plaintiff Fradera-Delgado then had to wait for Defendant Aponte to arrive and open the doors to have access to her workspace, including during the beginning of the workday and when Plaintiff Fradera-Delgado took lunch or a bathroom break. She could only enter her work area when Defendant Aponte or someone designated by her turned up and opened the door.

340.     Later on, Defendant Aponte moved Plaintiff Fradera-Delgado from her desk in order for the Defendant to move fellow Plaintiff Rodríguez-Arroyo to that desk, have Rodríguez-Arroyo closer and be able to spy on her more effectively.

341.     Later on that same week, Defendant Aponte informed Plaintiff Fradera-Delgado that she would be moved again, this time with the warehouse and property personnel.  A couple of days after that, Plaintiff Fradera-Delgado was given a letter signed by Defendant Martínez-Martínez stating that they would be cancelling all compensatory leaves and advising on the proper attire and assistance standards for the OLS.  This was unnecessary because Plaintiff Fradera-Delgado always me the attire standards and only arrived late to work on that occasion. This was a further attempt by Defendants to position Plaintiff Fradera-Delgado in a position of weakness because of her political affiliation.

342.     Because the Plaintiff feared for her job, she accepted the letter and carried on in her functions, namely working with the "fast-gov" system as part of her tasks as a Fixed Asset Analyst and working with the person in charge of property to make an updated inventory of the fixed assets (equipment) in the OLS.  Plaintiff also worked on clerical assignments given to her by Defendant Aponte because the secretary was on leave.

343.     At no time during her work at the OLS did Plaintiff Fradera-Delgado work on the creation of public policy or on confidential matters.  Plaintiff did not occupy a trust position or one where political and party considerations were valid.  As previously stated, Plaintiff worked on mostly clerical and inventory tasks, which in no way affect public policy.

344.     Defendants never evaluated Plaintiff Fradera-Delgado's performance at the OLS.

345.     Plaintiff Fradera-Delgado was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

346.     Plaintiff Fradera-Delgado was dismissed because of her political affiliation.

347.     Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's

appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

348. Plaintiff Fradera-Delgado is a life-long supporter of the NPP. During her tenure at the OLS, Plaintiff Fradera-Delgado would commonly use her spare time to assist political rallies and meetings of the NPP. Plaintiff Fradera-Delgado's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

349. As a result of Plaintiff Fradera-Delgado's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

Plaintiff Colón-Cintrón

350. All previous factual allegations are incorporated heretofore.

351. Plaintiff Colón-Cintrón, of 29 years of age, worked as a First Aid Nurse in the OLS since 2012. Colón-Cintrón's performance was consistently described as excellent.

352. At no time during his work at the OLS did Plaintiff Colón-Cintrón work on the creation of public policy or on confidential matters. Plaintiff did not occupy a trust position or one where political and party considerations were valid. Plaintiff's functions as a nurse were limited to providing first aid to any member or employee of the Legislative Assembly.

353. Defendants never evaluated Plaintiff Colón-Cintrón's performance at the OLS.

354. Plaintiff Colón-Cintrón was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

355. Plaintiff Colón-Cintrón was dismissed because of her political affiliation.

356.     Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

357.     Plaintiff Colón-Cintrón is a life-long supporter of the NPP. During her tenure at the OLS, Plaintiff Colón-Cintrón would commonly use her spare time to assist political rallies and meetings of the NPP. Plaintiff Colón-Cintrón's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

358.     As a result of Plaintiff Colón-Cintrón's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. Because of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff lost her car due to her inability to meet its payment. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

        Plaintiff Rodríguez-Amaro

359.     All previous factual allegations are incorporated heretofore.

360.     Plaintiff Rodríguez-Amaro, of 43 years of age, worked as the First Aid Unit Administrator in the OLS since 1999. Rodríguez-Amaro's performance was consistently described as excellent.

361.     At no time during her work at the OLS did Plaintiff Rodríguez-Amaro work on the creation of public policy or on confidential matters. Plaintiff did not occupy a trust position or one where political and party considerations were valid. Plaintiff Rodríguez-Amaro's functions were limited to the administration of the First Aid Unit, a unit that provides medical and first response services to all members and employees of the Legislative Assembly. This was

purely a support service, in no way incidental to public policy, confidential matters or political affiliation.

362. Defendants never evaluated Plaintiff Rodríguez-Amaro's performance at the OLS.

363. Plaintiff Rodríguez-Amaro was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

364. Plaintiff Rodríguez-Amaro was dismissed because of her political affiliation.

365. Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

366. Plaintiff Rodríguez-Amaro is a life-long supporter of the NPP. She worked as an electoral polling officer representing the NPP in multiple elections. During her tenure at the OLS, Plaintiff Rodríguez-Amaro would commonly use her spare time to assist political rallies and meetings of the NPP. Plaintiff Rodríguez-Amaro's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

367. As a result of Plaintiff Rodríguez-Amaro's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. Plaintiff has not been able to maintain payments and meet his economic obligations and the like. Plaintiff was the principal provider for her son and her mother, and has been unable to meet those obligations due to Defendants' unlawful acts. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

<u>Plaintiff Pérez-Ocasio</u>

368. All previous factual allegations are incorporated heretofore.

369.     Plaintiff Pérez-Ocasio, of 58 years of age, worked as the Practice Nurse in the First Aid Unit of the OLS since 1999.  Pérez-Ocasio's performance was consistently described as excellent.

370.     Plaintiff Pérez-Ocasio began to work at the Legislative Assembly under the presidency of Senator Charles Rodríguez, a renowned leader within the NPP, in the day care center.  Under the Senate presidency of Kenneth McClintock, another renowned NPP leader, Plaintiff Pérez-Ocasio was moved to the First Aid Unit of the OLS.

371.     With the initiation of the new majority in both houses of the Legislative Assembly, Plaintiff Pérez-Ocasio commonly heard rumors that "the NPP'ers would be fired" and that "the lists of the people who were going to be dismissed had already been drawn up."

372.     On March 21, 2013, Defendant Torres-Rivera called to the First Aid Unit and instructed them to go up to the Library.  There she handed the Plaintiff her dismissal letter and told her that they were rescinding her services and that she had to hand over her identification card and office keys.  A Mr. Jorge Ortiz and other Senate employees accompanied the Plaintiff to the First Aid Unit to pack up her stuff.  This final petty act of humiliation, where Plaintiffs were escorted to pack up their belongings and then out the building, highlighted the contempt with which Defendants treated Plaintiffs.

373.     At no time during her work at the OLS did Plaintiff Pérez-Ocasio work on the creation of public policy or on confidential matters.  Plaintiff did not occupy a trust position or one where political and party considerations were valid.  Plaintiff Pérez-Ocasio worked as a nurse, providing first aid, a required service, in cases of emergency to all members and employees of the Legislative Assembly.

374.     Defendants never evaluated Plaintiff Pérez-Ocasio's performance at the OLS.

375.     Plaintiff Pérez-Ocasio was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

-74-

376.     Plaintiff Pérez-Ocasio was dismissed because of her political affiliation.

377.     Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

378.     Plaintiff Pérez-Ocasio is a life-long supporter of the NPP. She consistently voted in NPP primaries and general elections for the NPP. Plaintiff Pérez-Ocasio's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

379.     As a result of Plaintiff Pérez-Ocasio's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

Plaintiff Boschetti-Martínez

380.     All previous factual allegations are incorporated heretofore.

381.     Plaintiff Boschetti-Martínez, of 60 years of age, worked as an Accounting Assistant in the OLS since 2009. Boschetti-Martínez's performance was consistently described as excellent.

382.     At no time during his work at the OLS did Plaintiff Boschetti-Martínez work on the creation of public policy or on confidential matters. Plaintiff did not occupy a trust position or one where political and party considerations were valid. Plaintiff's tasks were limited to accounting research and information for support services within the OLS and to all members of the Legislative Assembly, without distinction of political affiliation.

383.     Defendants never evaluated Plaintiff Boschetti-Martínez's performance at the

OLS.

384.     Plaintiff Boschetti-Martínez was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss him.

385.     Plaintiff Boschetti-Martínez was dismissed because of his political affiliation.

386.     Plaintiff was neither a fixed-term or contract employee at the OLS. Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed. The Plaintiff had a reasonable expectation to continue in his employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

387.     Plaintiff Boschetti-Martínez is a life-long supporter of the NPP. He commonly worked as an electoral polling officer in NPP primaries and representing the NPP in general elections. During his tenure at the OLS, Plaintiff Boschetti-Martínez would commonly use his spare time to assist political rallies and meetings of the NPP. Plaintiff Boschetti-Martínez's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

388.     As a result of Plaintiff Boschetti-Martínez's illegal dismissal, he has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet his economic obligations, including child support payments. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

### Plaintiff Quintero-Cortés

389.     All previous factual allegations are incorporated heretofore.

390.     Plaintiff Quintero-Cortés, of 48 years of age, worked as a Librarian in the Legislative Library in the OLS since 1993. Quintero-Cortés' performance was consistently described as excellent.

391.     At no time during his work at the OLS did Plaintiff Quintero-Cortés work on the creation of public policy or on confidential matters.  Plaintiff did not occupy a trust position or one where political and party considerations were valid.  Plaintiff worked as a librarian, with functions corresponding to that position.

392.     Defendants never evaluated Plaintiff Quintero-Cortés' performance at the OLS.

393.     Plaintiff Quintero-Cortés was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

394.     Plaintiff Quintero-Cortés was dismissed because of her political affiliation.

395.     Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

396.     Plaintiff Malaret-Gómez is a life-long supporter of the NPP.  Plaintiff Quintero-Cortés' political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

397.     As a result of Plaintiff Quintero-Cortés' illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity.  As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like.  Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of her dismissal.

Plaintiff Rodríguez-Figueroa

398.     All previous factual allegations are incorporated heretofore.

399.     Plaintiff Rodríguez-Figueroa, of 50 years of age, worked as a Director in the Legislative Library in the OLS since 2004.  Rodríguez-Figueroa's performance was consistently

described as excellent.

400.     Some time prior to his dismissal, Plaintiff Rodríguez-Figueroa had a conversation with Defendant Martínez-Martínez in which they discussed the future employment of Plaintiffs. Martínez-Martínez told Rodríguez-Figueroa that if it were up to him, he would not dismiss any OLS employee.  However, if the directive "came from above", in reference to codefendant Bhatia-Gautier, to whom Martínez-Martínez answered, he would proceed with the dismissals. By Defendant's own admission, then, there was no reason to dismiss the Plaintiffs other than instructions from Defendant Bhatia-Gautier, who had previously stated that he identified the Plaintiffs as political "screw-ins" and intended to remove them from the OLS in order to introduce his own "team".  In March of 2013, Plaintiff Rodríguez-Figueroa met with fellow Plaintiff di Mauro-Vázquez and another employee of the OLS and related the conversation he'd had with Martínez-Martínez.

401.     At no time during his work at the OLS did Plaintiff Rodríguez-Figueroa work on the creation of public policy or on confidential matters.  Plaintiff did not occupy a trust position or one where political and party considerations were valid.  Plaintiff Rodríguez-Figueroa worked as the director of the Library, overseeing that the Library was well maintained and up to date in order to serve as an adequate resource to members and employees of the Legislative Assembly.

402.     Defendants never evaluated Rodríguez-Figueroa's performance at the OLS.

403.     Plaintiff Rodríguez-Figueroa was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss him.

404.     Plaintiff Rodríguez-Figueroa was dismissed because of his political affiliation.

405.     Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable

expectation to continue in his employment at the OLS indefinitely. Plaintiff was dismissed without prior notice and/or a prior hearing.

406.     Plaintiff Rodríguez-Figueroa is a life-long supporter of the NPP. Plaintiff Rodríguez-Figueroa previously served as a municipal assemblyman under the NPP ticket in the Municipality of Maunabo, as the NPP Electoral Commissioner in Maunabo, and as a candidate for mayor under the NPP ticket in Maunabo, not to mention as an electoral polling officer representing the NPP in general elections. During his tenure at the OLS, Plaintiff Rodríguez-Figueroa would commonly use his spare time to assist political rallies and meetings of the NPP. Plaintiff Rodríguez-Figueroa's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

407.     As a result of Plaintiff Rodríguez-Figueroa's illegal dismissal, he has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet his economic obligations and the like. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

        Plaintiff Jiménez-Rivera

408.     All previous factual allegations are incorporated heretofore.

409.     Plaintiff Jiménez-Rivera, of 49 years of age, of 49 years of age, worked as an Executive Officer in the OLS since 2009. Jiménez-Rivera's performance was consistently described as excellent.

410.     On or about January 31, 2013, tension was very high within the OLS because rumors had been running that Plaintiffs would be fired that week. Defendant Avilés told Plaintiff Jiménez-Rivera that it was a good thing that it did not happen that week but that she did not know what was going to happen. Defendant Avilés told Plaintiff Jiménez-Rivera that Defendant Martínez-Martínez was a good person, that he was there to work and that she was

-79-

there "borrowed" from another place because he had asked her and because she was a supporter of the PDP.

411.    On another occasion, Defendant Avilés told Plaintiff Jiménez-Rivera that some lists of the people that would be dismissed had already been drafted.

412.    One day, Defendant Avilés held a meeting within her unit with Plaintiff Jiménez-Rivera in attendance and explained that someone had been destroying documents in a shredder. Defendant Avilés also stated that they all knew that Plaintiffs were there because they were of Jennifer González's, the previous president of the House of Representatives and a renowned NPP leader, trust.  Likewise, Defendant Avilés elaborated, she was there because she was of Defendant Martínez-Martínez's trust with the purpose of spying on Plaintiffs and informing on them to Defendants.

413.    At no time during his work at the OLS did Plaintiff Jiménez-Rivera work on the creation of public policy or on confidential matters.  Plaintiff did not occupy a trust position or one where political and party considerations were valid.  Plaintiff Jiménez-Rivera's functions were clerical in nature.

414.    Defendants never evaluated Plaintiff Jiménez-Rivera's performance at the OLS.

415.    Plaintiff Jiménez-Rivera was never given and the dismissal letter did not include any explanation or justification behind the decision to dismiss her.

416.    Plaintiff Jiménez-Rivera was dismissed because of her political affiliation.

417.    Plaintiff was neither a fixed-term or contract employee at the OLS.  Plaintiff's appointment was to be effective until a legitimate reason to dismiss him was evident, and only after the corresponding due process guarantees were observed.  The Plaintiff had a reasonable expectation to continue in her employment at the OLS indefinitely.  Plaintiff was dismissed without prior notice and/or a prior hearing.

418.    Plaintiff Jiménez-Rivera is a life-long supporter of the NPP.  During her tenure at

the OLS, Plaintiff Jiménez-Rivera would commonly use her spare time to assist political rallies and meetings of the NPP. Plaintiff Jiménez-Rivera's political affiliation and activism were commonly known to Defendants and fellow employees at the OLS

419. As a result of Plaintiff Jiménez-Rivera's illegal dismissal, she has suffered considerable loss of earnings, mental anguish and suffering, humiliation and indignity. As a result of Defendants' unlawful acts, Plaintiff has not been able to maintain payments and meet her economic obligations and the like. Plaintiff Jiménez-Rivera was unable to pay her rent and had to move to her sister's home along with her 2 children. Plaintiff Jiménez-Rivera's situation affected her marriage, which deteriorated because of her loss of employment to the point of divorce. Plaintiff Jiménez-Rivera's diabetic treatment had to be interrupted because of the loss of her medical plan. Plaintiff has also suffered great stress, mental anguish, humiliation, depression, and loss of self-worth because of his dismissal.

## V. FIRST CAUSE OF ACTION – VIOLATIONS TO FIRST AMENDMENT RIGHTS UNDER THE CONSTITUTION OF THE UNITED STATES

420. All previous factual allegations are incorporated heretofore.

421. The First Amendment of the Constitution of the United States establishes the right of all citizens to freedom of speech, freedom of expression, freedom of assembly and petition to the Government for redress.

422. Black letter law and jurisprudence has long established that government bodies and/or officials cannot take adverse employment actions against employees on the basis of political affiliation. Likewise, the First Amendment protects citizens from suffering adverse employment consequences under color of state law in retaliation for engaging in political activity.

423. It is clear from the evidence that the Plaintiffs' First Amendment protected activities of speech, association and activities were the motivating factor in the adverse

employment actions complained of herein. By subjecting Plaintiffs to adverse employment actions, namely their dismissal, and/or retaliating against them on the basis of political affiliation, and/or for engaging in political activity, Defendants deprived Plaintiffs of their First Amendment Rights.

## VI. SECOND CAUSE OF ACTION – VIOLATIONS TO DUE PROCESS RIGHTS UNDER THE CONSTITUTION OF THE UNITED STATES

424.     All previous factual allegations are incorporated heretofore.

425.     The Due Process Clause of the Constitution of the United States requires notice and an opportunity to be heard when the state seeks to deprive a person of a property interest.

426.     Plaintiffs in the case before us had regular positions within the OLS. Plaintiffs occupied positions that were not time-limited or fixed-term, they did not partake in the formulation of public policy nor did they have unfettered access to confidential government information. Plaintiffs worked at the OLS, mostly tasked with research, clerical, technical and support functions. None of the positions occupied by Plaintiffs were subject to public policy and/or political or partisan affiliation consideration. All Plaintiffs had a proprietary right over their employment and a reasonable expectation of continued employment.

427.     Defendants summarily dismissed Plaintiffs without cause, without a prior hearing, without an informal hearing shortly thereafter, and/or without any formal procedure or hearing. Also, Plaintiffs were terminated without adequate prior notice, much less a valid explanation of the reasons for the termination or review mechanisms. Plaintiffs' job performance at the OLS was not reviewed by Defendants prior to their termination and previous reviews had been consistently favorable. Plaintiffs were not afforded a real opportunity to be heard before the decision to dismiss them was made. Defendants acted with intent to deprive these Plaintiffs of their Due Process rights.

428.     As a result, Defendants deprived Plaintiffs of the rights afforded by the Due

Process Clauses of the Fifth and/or Fourteenth Amendments to the Constitution of the United States.

## VII.   THIRD CAUSE OF ACTION – INJUNCTIVE RELIEF

429.     All previous factual allegations are incorporated heretofore.

430.     The allegations set forth herein establish a clear case of political discrimination incurred by Defendants against Plaintiffs.   Also, Defendants deprived Plaintiffs of thir due process rights.   Defendants in their official capacity are liable for injunctive relief.   To wit, Plaintiffs respectfully aver that they are entitled to reinstatement in their positions within the OLS, any and all salaries they would have received in that employment since they were dismissed, and to any other injunctive relief this Honorable Court deems adequate.

## VIII.   FOURTH CAUSE OF ACTION – TORT ACTION UNDER PUERTO RICO LOCAL LAW

431.     All previous factual allegations are incorporated heretofore.

432.     Defendants' actions also constitute a violation of Plaintiffs' rights secured by Article II, Sections 1, 2, 4, 6 and 7 of the Constitution of Puerto Rico.

433.     Defendants' actions also constitute violations of Puerto Rico's Public Service Personnel laws; Law No. 131 of May 13, 1943, P.R. Laws Ann., Tit. 1, § 13-19; Puerto Rico's Local Law 100; and Articles 1802 and 1803 of the Civil Code, § 5141-5142 of Title 31.

434.     Under Article 1802 and 1803 of the Civil Code of Puerto Rico, Plaintiffs' spouses also have a cause of action for damages suffered against Defendants.

## IX. JURY TRIAL

435.     All previous factual allegations are incorporated heretofore.

436.     Plaintiffs request a jury trial.

## X.  PRAYER FOR RELIEF

437.     All previous factual allegations are incorporated heretofore.

438.    Wherefore, Plaintiffs request the following relief, jointly and severally against all Defendants:

a.  That this Court determine and declare that the actions by all Defendants were in violation of the Constitution and laws of the United States and of Puerto Rico;

b.  Compensatory and punitive damages in excess of 47,000,000.00, said request for compensation is made up of the following amounts:

    i.  An amount in excess of $1,000,000.00 for each named Plaintiff, for a total of $30,000,000.00;

    ii.  Punitive damages in excess of $500,000.00 for each Plaintiff, for a total of $15,000,000.00, due to the malicious and wanton nature of the violations alleged herein.

    iii.  Damages in excess of $200,000.00 for each of Plaintiffs' spouse pursuant to Article 1802 and 1803 of the Puerto Rico Civil Code, due to their suffering and hardships.

c.  Equitable relief in the form of a permanent injunction ordering Defendants to reinstate Plaintiffs to their positions, with all corresponding privileges and benefits, and ordering Defendants to refrain from further engaging in adverse employment action on the basis of political affiliations and beliefs.

d.  Attorneys' fees, costs and litigation expenses incurred in connection to this action pursuant to, inter alia, 42 U.S.C. § 1988, and other applicable statutes.

e.  All applicable interests, including pre- and post- judgment interest.

f.  That the Court retain jurisdiction over this action in order to ensure compliance with any decree issued;

g.  Any such other and further relief as the Court may deem just and proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this March 17, 2014.

**I HEREBY CERTIFY**: that on this date a true copy of the foregoing has been notified to Defendants attorneys of record by the CM/ECF system

<u>**s/Francisco J. González-Magaz**</u>
**FRANCISCO J. GONZÁLEZ-MAGAZ**
USDC No. 223907
FRANCISCO R. GONZÁLEZ LAW OFFICE
1519 PONCE DE LEÓN AVE.
FIRST FEDERAL BLDG. SUITE 805
SAN JUAN, P.R. 00909
Tel. (787) 723-3222 FAX 722-7099
gonzalezmagaz@gmail.com