IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>        *as representative of*<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br>                Debtors.[1] | PROMESA Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**UNITED STATES' MEMORANDUM OF LAW
<u>IN SUPPORT OF THE CONSTITUTIONALITY OF PROMESA</u>**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686).  (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).  (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## Table of Contents

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

   I.   Puerto Rico's Fiscal Crisis and the Enactment of PROMESA ............................................ 3

   II.  PROMESA and the Oversight Board ............................................................................... 5

ARGUMENT ....................................................................................................................... 7

   I.   PROMESA'S APPOINTMENTS SCHEME IS NOT SUBJECT TO THE
APPOINTMENTS CLAUSE. .......................................................................................... 7

      A. The Appointments Clause Does Not Govern the Appointment of Territorial
Officers. ................................................................................................................. 8

         1.   Congress's authority over the territories is plenary and not subject to
the complex distribution of powers that regulate the Federal Government......... 8

         2.   Historical practice confirms that the Appointments Clause is inapplicable to
the appointment of territorial officers. ............................................................. 12

         3.   Aurelius's arguments about the applicability of the Appointments Clause to
the territories have no merit. ............................................................................. 15

      B. The Oversight Board Members Are Territorial Officers. ........................................... 21

         1.   The Oversight Board's creation, statutory objectives, authority,
characteristics, and relationship with the Federal Government confirm that
it is a territorial entity. ...................................................................................... 21

         2.   The Oversight Board's characteristics cited by Aurelius do not undermine
the Board's status as a territorial entity............................................................. 25

   II.  PROMESA'S APPOINTMENTS SCHEME DOES NOT VIOLATE SEPARATION
OF POWERS.................................................................................................................. 27

      A. The List-Based Selection Scheme Does Not Implicate the Same Separation-of-
Powers Concerns As If the President Were Appointing Constitutional Officers. ....... 29

      B. PROMESA's Appointments Scheme Does Not Result in an Unconstitutional
Aggrandizement of Congress's Power or an Impermissible Encroachment on the
President's Authority. ............................................................................................. 31

   CONCLUSION.................................................................................................................. 35

## Table of Authorities

### Cases

*Am. Ins. Co. v. 356 Bales of Cotton,*
   26 U.S. 511 (1828) ............................................................................ 8, 10

*Balzac v. Porto Rico,*
   258 U.S. 298 (1922) ............................................................................ 9

*Benner v. Porter,*
   50 U.S. 235 (1850) ............................................................... 10, 19, 25, 29

*Binns v. United States,*
   194 U.S. 486 (1904) .................................................................. 14, 21, 24

*Brewer v. D.C. Fin. Responsibility & Mgm't Assistance Auth.,*
   953 F. Supp. 406 (D.D.C. 1997) ............................................................ 30

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ............................................................................ 9

*Bowsher v. Synar,*
   478 U.S. 714 (1986) ............................................................. 30, 31, 32, 34

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ......................................................................... passim

*Chavous v. D.C. Fin. Responsibility & Mgm't. Assistance Auth.,*
   154 F. Supp. 2d 40 (D.D.C. 2001) ......................................................... 31

*Cincinnati Soap Co. v. United States,*
   301 U.S. 308 (1937) ............................................................. 11, 18, 21, 25

*City of Panama,*
   101 U.S. 453 (1879) ........................................................................... 10

*Clinton v. Englebrecht,*
   80 U.S. 434 (1871) ................................................................... 10, 18, 23

*Cross v. Harrison,*
   57 U.S. 164 (1853) ............................................................................ 15

*D.C. v. John R. Thompson Co.,*
   346 U.S. 100 (1953) ..................................................................... 11, 18

*Dep't of Transp. v. Ass'n of Am. R.Rs.,*
   135 S. Ct. 1225 (2015) ............................................................. 21, 23, 25

*Domenech v. Nat'l City Bank*,
    294 U.S. 199 (1935) ............................................................................... 18

*Downes v. Bidwell*,
    182 U.S. 244 (1901) ............................................................................ 8, 9

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (2009) ............................................................................... 34

*El Paso & N.E. Ry. Co. v. Gutierrez*,
    215 U.S. 87 (1909) ................................................................................... 8

*Examining Bd. of Eng'rs, Architects and Surveyors v. Flores de Otero*,
    426 U.S. 572 (1976) ................................................................................. 9

*FEC v. NRA Political Victory Fund*,
    6 F.3d 821 (D.C. Cir. 1993) ............................................................... 32, 33

*First Nat'l Bank v. County of Yankton*,
    101 U.S. 129 (1879) ................................................................................. 9

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ........................................................................... 8, 35

*Freytag v. Comm'r of Internal Revenue*,
    501 U.S. 868 (1991) ......................................................................... passim

*Grafton v. United States*,
    206 U.S. 333 (1907) ............................................................................... 18

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) ............................................................................... 34

*In re Hennen*,
    38 U.S. 230 (1839) ................................................................................. 20

*INS v. Chadha*,
    462 U.S. 919 (1983) ............................................................................... 19

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995) ..................................................................... 21, 22, 25

*McCulloch v. Maryland*,
    17 U.S. 316 (1819) ................................................................................. 12

*McAllister v. United States*,
    141 U.S. 174 (1891) ............................................................................... 10

*Mistretta v. United States*,
     488 U.S. 361 (1989) ..................................................................................... 11

*Morrison v. Olson*,
     487 U.S. 654 (1988) ..................................................................................... 34

*MWAA v. Citizens for Abatement of Aircraft Noise*, Inc.,
     501 U.S. 252 (1991) ......................................................................... 19, 28, 32

*Myers v. United States*,
     272 U.S. 52 (1926) ....................................................................................... 24

*Ngiraingas v. Sanchez*,
     495 U.S. 182 (1990) ..................................................................................... 18

*NLRB v. Noel Canning*,
     134 S. Ct. 2550 (2014) ....................................................................... 3, 12, 33

*Palmore v. United States*,
     411 U.S. 389 (1973) .............................................................................. passim

*Puerto Rico v. Franklin California Tax-Free Trust*,
     136 S. Ct. 1938 (2016) ................................................................................... 4

*Puerto Rico v. Sanchez Valle*,
     136 S. Ct. 1863 (2016) ........................................................................... passim

*Simms v. Simms*,
     175 U.S. 162 (1899) ....................................................................................... 8

*Snow v. United States*,
     85 U.S. 317 (1873) .............................................................................. 9, 14, 24

*United States v. Ackerman*,
     831 F.3d 1292 (10th Cir. 2016) ................................................................... 23

*United States v. California*,
     332 U.S. 19 (1947) ....................................................................................... 19

*United States v. Ferreira*,
     54 U.S. 40 (1851) ......................................................................................... 20

*United States v. Gratiot*,
     39 U.S. 526 (1840) ......................................................................................... 9

*Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez,*
     174 F. Supp. 3d 585 (D.P.R. 2016) ............................................................... 4

iv

**Constitutional Provisions**

P.R. Const. art. IV.................................................................................................17

U.S. Const. art. I, § 7............................................................................................24

U.S. Const. art. I, § 8............................................................................................ 9

U.S. Const. art. II, § 2 ................................................................................... passim

U.S. Const. art. IV, § 3.................................................................................. 5, 16, 18

**Statutes**

Act of April 7, 1798, 5 Cong., 1 Stat. 549-50...............................................................30

Act of Aug. 5, 1947, Pub. L. No. 80-362, 61 Stat. 770 (1947)....................................... 13

Act of May 26, 1790, 1 Cong., 1 Stat. 123.................................................................30

Act of July 3, 1950, Pub. L. No. 600, 64 Stat. 319 ...................................................... 13

Act of July 3, 1952, 66 Stat. 327...........................................................................13

Act of Oct. 31, 1803, 8 Cong. Ch. 1, 2 Stat. 245 (November 10, 1803).......................................15

Act of Dec. 8, 1983, Pub. L. 98-213, 97 Stat. 1459, 1462 (1983) ................................... 14

*An Ordinance for the Government of the Territory of the United States, North West*
    *of the River Ohio*, 32 J. Cont'l Cong. 333 (1787) , *reprinted in* 1 Cong. Ch. 8,
    1 Stat. 50–53 (Aug. 7, 1789)…………...................................................................14, 15, 16, 30

District of Columbia Financial Responsibility Management and Assistance Act of 1995,
    Pub. L. No. 104-8, 109 Stat. 97 ........................................................................ 7, 22, 24

District of Columbia Self-Government and Governmental Reorganization Act,
    Pub. L. No. 93-198, 87 Stat. 774 (1973)................................................................ 6, 26

Foraker Act, 56 Cong. Ch. 191, 31 Stat. 77 (1900)........................................................12

Guam Elective Governor Act, Pub. L. 90-497, 82 Stat. 842 (1968)........................................... 13

Intergovernmental Personnel Act of 1970, 5 U.S.C. §§ 3371–75 ........................................ 7, 23

Jones Act, 64 Cong. Ch. 145, 39 Stat. 951–53 (1953).............................................13, 27

Organic Act of Guam, 81 Cong. Ch. 512, 64 Stat. 384 (1950)......................................13

Puerto Rico Public Corporation Debt Enforcement and Recovery Act,
   2014 P.R. Laws Ann. § 371 (2014).............................................................................4

Revised Organic Act of the Virgin Islands, 83 Cong. Ch. 558, 68 Stat. 497 (1954)....................13

Virgin Islands Elective Governor Act, Pub. L. 90-496, 82 Stat. 837 (1968)................................ 13

18 U.S.C. § 208......................................................................................................... 6, 26

22 U.S.C. § 290h...………..............................................................................................26

22 U.S.C. § 4603......................................................................................................... 26

22 U.S.C. § 4604......................................................................................................... 26

28 U.S.C. § 2403........................................................................................................... 1

31 U.S.C. § 703........................................................................................................... 31

40 U.S.C. § 502........................................................................................................... 26

48 U.S.C. § 1469......................................................................................................... 26

48 U.S.C. § 2121................................................................................................... passim

48 U.S.C. § 2122........................................................................................................ 26

48 U.S.C. § 2123........................................................................................................7, 23

48 U.S.C. § 2124............................................................................................... 22, 23, 26

48 U.S.C. § 2127..................................................................................................... 6, 23

48 U.S.C. § 2128.................................................................................................. 7, 23, 24

48 U.S.C. § 2129....................................................................................................6, 26, 27

48 U.S.C. §§ 2101, *et seq.*............................................................................................ 1

48 U.S.C. § 2141........................................................................................................... 5

48 U.S.C. § 2142........................................................................................................... 5

48 U.S.C. § 2143........................................................................................................... 5

48 U.S.C. § 2144........................................................................................................... 5

48 U.S.C. § 2147...........................................................................................................5

48 U.S.C. § 2148........................................................................................................ 27

48 U.S.C. § 2149 ............................................................................................................7

48 U.S.C. §§ 2141–52 .................................................................................................. 22

48 U.S.C. § 2175 ............................................................................................................5

48 U.S.C. §§ 2161–77 ...................................................................................................5

48 U.S.C. § 2194 ..................................................................................... 5, 11, 22, 24

**Regulations**

Elected Governor and Lieutenant Governor of American Samoa, 42 Fed. Reg. 48,398
   (Sept. 23, 1977) ....................................................................................................... 13

Proclamation No. 5564, 51 Fed. Reg. 40,399 (Nov. 3, 1986) ...................................... 14

**Other Authorities**

162 Cong. Rec. H3600 (daily ed. June 9, 2016) .....................................................7, 32

162 Cong. Rec. (Daily Digests for July 1, 5, 15, 19, 22, 26, 29; August 2, 5, 9, 12, 16, 19,
   23, 26, 30, 2016) .....................................................................................................33

1 Logan Esarey, *A History of Indiana From Its Exploration to 1850* (1922) ................................30

Daniel J. Ryan, *A History of Ohio, with Biographical Sketches of Her Governors and the
   Ordinance of 1787* (1888) ............................................................................................30

Government Development Bank, *Commonwealth of Puerto Rico Financial
   Information and Operating Data Report* (Dec. 18, 2016), http://www.gdb-
   pur.com/documents/CommonwealthofPuertoRicoFinancialInfo FY201612-18-
   16.pdf ..........................................................................................................................3, 4

H.R. Rep. No. 114-602 (2016) .................................................................................6, 33

Joseph Story, 3 *Commentaries on the Constitution of the United States* (1833).......................9, 16

Robert H. Jackson, *Problems of Statutory Interpretation*, 8 F.R.D. 121 (1949) .......................... 19

*The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C.
   124 (1996) .................................................................................................................. 34

*The Federalist No. 43* (James Madison) (Clinton Rossiter ed., 1961).........................................14

The White House, Office of the Press Secretary, *President Obama Announces the Appointment
of Seven Individuals to the Financial Oversight and Management Board for Puerto Rico*
(August 31, 2016), https://www.whitehouse.gov/the-press-office/2016/08/31/president-
obama-announces-appointment-seven-individuals-financial....................................................6

The White House, *Puerto Rico Hill Update*–Humanitarian Crisis (April 19, 2016),
https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Blog/Puerto%
20Rico%20Humanitarian%20Crisis%20.pdf...........................................................................4

Pursuant to 28 U.S.C. § 2403(a), the United States submits this memorandum of law in support of the constitutionality of the Puerto Rico Oversight, Management, and Economic Stability Act of 2016 ("PROMESA"), 48 U.S.C. §§ 2101–41.

## PRELIMINARY STATEMENT

Congress enacted PROMESA in 2016 amidst the worst fiscal crisis in Puerto Rico's history.  To prevent the further downward spiral of Puerto Rico's economy, PROMESA provides a comprehensive approach that, among other things, allows the Commonwealth of Puerto Rico and its instrumentalities to restructure their debts in a process akin to Chapter 9 of the U.S. Bankruptcy Code.  Central to PROMESA's statutory scheme is the creation of a Financial Oversight and Management Board ("Oversight Board") within Puerto Rico's territorial government, which Congress tasked with achieving Puerto Rico's fiscal responsibility and restoring access to the capital markets.  This includes acting as the sole representative of the debtor in a debt restructuring proceeding instituted under PROMESA.  Aurelius Investment, LLC, Aurelius Opportunities Fund, and Lex Claims, LLC ("Aurelius")—hedge funds holding outstanding bonds issued by the Commonwealth—contend that PROMESA's statutory scheme governing the appointment of members of the Oversight Board violates the Appointments Clause of the Constitution, U.S. Const. art. II, § 2, cl. 2, and encroaches on the President's executive authority in violation of separation of powers.  Accordingly, Aurelius asks that the Court dismiss the debt restructuring proceeding initiated by the Board on behalf of the Commonwealth of Puerto Rico.

Contrary to Aurelius's arguments, PROMESA's appointments scheme is constitutional. First, the scheme is not subject to the Appointments Clause because the Oversight Board is a component of the territorial government.  Congress enacted PROMESA pursuant to its plenary authority under the Territory Clause of Article IV of the Constitution, *see* 48 U.S.C. § 2121(b)(2), which gives Congress "broad latitude to develop innovative approaches to territorial governance."  *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1876 (2016).  The Appointments Clause does not govern the appointment of territorial officers, including members

1

of the Oversight Board, because Congress may legislate for the territories "in a manner . . . that would exceed its powers or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it." *Palmore v. United States*, 411 U.S. 389, 398 (1973). Indeed, the Supreme Court has held that structural constitutional constraints similar to those imposed by the Appointments Clause are inapplicable to Congress's governance of the territories and the District of Columbia. For example, the Court has held that Congress may create territorial courts that decide cases arising under the Constitution and laws of the United States without providing the structural assurances of judicial independence required by Article III of the Constitution—namely, life tenure and protection against reduction in pay. The Court also has held that Congress may confer legislative authority on territorial officers notwithstanding the non-delegation doctrine, which is similarly rooted in the constitutional separation of powers. Moreover, history shows that Congress has adopted various territorial governance structures pursuant to its Article IV authority without regard to the Appointments Clause, including more recently, providing for democratic elections and self-governance in Puerto Rico and other territories. A finding that the Appointments Clause applies to territorial officers would not only fly in the face of this historical practice, but also call into question the current governmental structures of the territories and the District of Columbia that have been in place for decades.

Against that backdrop, Aurelius's insistence that the members of the Oversight Board are officers of the United States within the meaning of the Appointments Clause is simply incorrect. Congress created the Oversight Board as an entity within the territorial government of Puerto Rico to pursue purely local, territorial objectives. The Board's authority extends no further than the territory itself, and its actual operation and statutory characteristics—including its exclusive funding by the territorial government and the corresponding lack of federal budgetary control— leave no doubt as to its territorial character, rendering the structural constraints of the Appointments Clause inapplicable here.

2

Second, PROMESA's appointments scheme does not otherwise violate separation of powers principles.  The appointments at issue concern offices created by Congress pursuant to its Article IV authority in the context of territorial governance.  The scheme does not unconstitutionally aggrandize Congress's powers because no member of Congress serves on the Oversight Board in any capacity and the Board, as a territorial entity created by Congress, is ultimately subject to Congress's supervision and control under our constitutional scheme.  Nor does the scheme—applicable only to the selection of territorial officials—encroach on the President's authority.  PROMESA vests the authority to appoint members of the Oversight Board in the President alone, and the President exercised that discretion in the manner he preferred.

To be sure, to expeditiously constitute the Oversight Board to address the emergency at hand, PROMESA encouraged the President to select members of the Board from congressional lists that recommended candidates who met PROMESA's statutory qualifications.  The statute also set a deadline by which the President must appoint members of the Board.  But these facts do not raise any separation-of-powers concerns in the context of selecting territorial officers such as the Oversight Board members here.  Although the President ultimately chose to select the Board members from the congressional lists, he could have requested the recommendatory lists to be supplemented with additional candidates or nominated his own candidates for Senate confirmation under PROMESA's appointments structure.  Aurelius's invitation to engage in counterfactual speculation as to what the dynamics between the President and Congress might have been had the President made a different choice is neither "legally [n]or practically" appropriate.  *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2576 (2014).

## BACKGROUND

### I.    Puerto Rico's Fiscal Crisis and the Enactment of PROMESA

The history of Puerto Rico's debt crisis is now familiar.  By the end of June 2016, the Commonwealth and its instrumentalities had an outstanding debt of approximately $72 billion, an amount larger than the island's gross national product.  *See* Government Development Bank, *Commonwealth of Puerto Rico Financial Information and Operating Data Report* (Dec. 18,

3

2016) ["GDB Report"] at 52.[2]  As a result of this crushing debt, the Commonwealth and its
instrumentalities had no place to turn for external funding, particularly after their credit ratings
were downgraded to junk levels, severely limiting their access to the capital markets.  *Id.* at 67–
68.  "[T]he Commonwealth's very ability to persist" was in doubt.  *Wal-Mart Puerto Rico, Inc.
v. Zaragoza-Gomez*, 174 F. Supp. 3d 585, 592 (D.P.R.), *aff'd*, 834 F.3d 110 (1st Cir. 2016).

Puerto Rico's fiscal woes had a tangible impact on the 3.4 million U.S. citizens who
reside on the island:  hundreds of schools had closed; hospitals were left without electricity and
forced to reduce patient capacity; the largest university had to drastically reduce services; and
public pensions were substantially underfunded and expected to be depleted in three years.  *See*
The White House, *Puerto Rico Hill Update–*Humanitarian Crisis, 2–4 (April 19, 2016).[3]
Government suppliers, which were collectively owed nearly $2 billion, halted capital
improvement programs and threatened to cut off essential services.  *Id.* at 3.  Unemployment in
Puerto Rico was double the national average, despite the decreasing labor force as residents
moved elsewhere to seek better economic opportunities.  *Id.* at 4.

Compounding the crisis, Puerto Rico's municipalities and public instrumentalities—
unlike cities and municipalities on the mainland—cannot avail themselves of bankruptcy
proceedings under Chapter 9 of the U.S. Bankruptcy Code.  Indeed, Puerto Rico's legislature
enacted the Puerto Rico Public Corporation Debt Enforcement and Recovery Act, 2014 P.R.
Laws Ann. § 371 (2014), in an attempt to create a debt restructuring process for the
Commonwealth's municipalities and instrumentalities.  But in June 2016, the Supreme Court
held that the United States Bankruptcy Code preempted the Act.  *Puerto Rico v. Franklin
California Tax-Free Trust*, 136 S. Ct. 1938 (2016).

---

[2] *Available at* http://www.gdb-pur.com/documents/CommonwealthofPuertoRicoFinancialInfo
FY201612-18-16.pdf.

[3] *Available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Blog/Puerto%
20Rico%20Humanitarian%20Crisis%20.pdf.

4

In light of Puerto Rico's "fiscal emergency" and "severe economic decline," Congress enacted PROMESA with strong bipartisan support, and the President signed it into law on June 30, 2016.  48 U.S.C. § 2194(m).  PROMESA provides "[a] comprehensive approach" to facilitate Puerto Rico's economic recovery, by requiring "independent oversight" through the creation of the Oversight Board and by authorizing the Commonwealth and its instrumentalities to restructure debts in a process akin to that under Chapter 9 of the Bankruptcy Code.  *Id.* §§ 2194(m), 2161–77.

## II.    PROMESA and the Oversight Board

Congress enacted PROMESA pursuant to its power under the Territory Clause, which provides that "Congress [shall have] power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."  U.S. Const. art. IV, § 3, cl. 2; *see* 48 U.S.C. § 2121(b)(2).  A central feature of PROMESA is the creation of the Oversight Board "within the territorial government" of Puerto Rico.  *Id.* § 2121(c)(1).  The Oversight Board's statutory mission is to "achieve fiscal responsibility" and ensure Puerto Rico's "access to the capital markets."  *Id.* § 2121(a).  Accordingly, the Board is vested with extensive authority over Puerto Rico's fiscal matters, including the power to approve fiscal plans and budgets for the Commonwealth and its instrumentalities, *id.* §§ 2141–42; to enforce budget and fiscal plan compliance, §§ 2143–44; to approve the territorial government's issuance and guarantee of debts or modification or similar transactions with respect to its debt, *id.* § 2147; and to file petitions to adjust debts under Title III of PROMESA through procedures similar to Chapter 9 of the Bankruptcy Code, *id.* §§ 2161–77.  In addition, the Oversight Board acts as the sole representative of the debtor in a Title III proceeding.  *Id.* § 2175(b).  As this Court has observed, Congress granted the Oversight Board "significant leverage in the form of guidance, gatekeeping, and enabling powers that would in essence provide guardrails for the territorial government on its journey to fiscal credibility and responsibility."  Op. and Order Denying Board's Motion for CTO Appointment ("Order") at 14, ECF No. 1820.

5

The Oversight Board is composed of seven voting members and one non-voting member, the Governor of Puerto Rico or his designee, serving *ex officio*.  48 U.S.C. § 2121(e)(1), (3).  As enacted, PROMESA requires the President to appoint all seven voting members:  one voting member is selected by the President at his sole discretion, while the other six "should" be selected from lists of candidates provided by congressional leaders, which may be supplemented upon the President's request.  *Id*. § 2121(e)(2)(C).  The President may select members from outside the congressional recommendatory lists, but such selections require Senate confirmation. *Id.* § 2121(e)(2)(E).  Because the appointments scheme was designed to ensure that the initial members of the Board would be chosen "on an expedited timeframe," H.R. Rep. No. 114-602, pt. 1, at 42 (2016), the statute also provides that if any of the seven voting members had not been appointed by September 1, 2016, then the President had to appoint an individual from the list associated with the vacant position by September 15, 2016.  48 U.S.C. § 2121(e)(2)(G).  Ultimately, the President appointed all seven voting members on August 31, 2016, choosing members from the congressional lists (except for the one chosen solely at the President's discretion).[4]

The Oversight Board members serve three-year terms, *id*. § 2121(e)(5)(A), and may be removed by the President for cause,  *id.* § 2121(e)(5)(B).  They do not receive monetary compensation, must disclose their financial interests, and, like officers and employees of the District of Columbia, are subject to the requirements of the federal conflict of interest statute, 18 U.S.C. § 208.  *See* 48 U.S.C. §§ 2121(g), 2129; *see also* District of Columbia Self-Government and Governmental Reorganization Act ("DC Self-Government Act"), Pub. L. No. 93-198, § 732, 87 Stat. 774 (1973).  Funding for the Oversight Board comes from the territorial government, and any excess funds must be remitted to the territorial government.  48 U.S.C.

---

[4] *See* The White House, Office of the Press Secretary, *President Obama Announces the Appointment of Seven Individuals to the Financial Oversight and Management Board for Puerto Rico* (August 31, 2016), https://www.whitehouse.gov/the-press-office/2016/08/31/president-obama-announces-appointment-seven-individuals-financial.

§ 2127(b)(3).  Moreover, the Board is authorized to hire its own legal representation, *id.*
§ 2128(b), and is not subject to federal or territorial laws governing appointments and salaries,
*id.* § 2123(c).  The Board may request that a territorial instrumentality detail its personnel to the
Board to assist it in carrying out its duties.  *Id.* § 2123(d).  It may also request that federal
employees be detailed to the Board, but only pursuant to the Intergovernmental Personnel Act of
1970, 5 U.S.C. §§ 3371(1)–75.  48 U.S.C. § 2123(d).  Finally, the Oversight Board will terminate
once the Commonwealth has adequate access to credit markets at reasonable interest rates and
has had balanced budgets for four consecutive years.  *Id.* § 2149.

Congress did not create the Oversight Board's structure out of whole cloth.  Rather, the
Board is modeled in part after an entity that Congress created in 1995 to address the District of
Columbia's fiscal crisis:  the Financial Responsibility and Management Assistance Authority
("D.C. Control Board").  *See* District of Columbia Financial Responsibility Management and
Assistance Act of 1995 ("DCFRMAA"), Pub. L. No. 104-8, 109 Stat. 97; *see also* 162 Cong.
Rec. H3604 (daily ed. June 9, 2016) (statement of Rep. Lucas) ("We passed a bill very similar to
[PROMESA].  We set up a supervisory board that took control of [D.C.'s] finances to help right
the ship.").  The D.C. Control Board was established within the District of Columbia
government, *see* DCFRMAA, § 101(a), and its members were appointed by the President
without Senate confirmation, *id.* § 101(b).  It ceased to exist in 2001 after the District of
Columbia achieved four consecutive years of balanced budgets.

## ARGUMENT

### I.     PROMESA'S APPOINTMENTS SCHEME IS NOT SUBJECT TO THE APPOINTMENTS CLAUSE.

The Appointments Clause of Article II of the Constitution prescribes the method of
appointment for all "officers of the United States" whose appointments are not otherwise
provided for in the Constitution.  U.S. Const. art. II, § 2, cl. 2; *see Buckley v. Valeo*, 424 U.S. 1,
125–26, 132 (1976).  "Officers" are those persons who hold federal "offices" and exercise
"significant authority pursuant to the laws of the United States."  *Buckley*, 424 U.S. at 125–26.

7

Pursuant to the Clause, principal officers are nominated by the President with the advice and consent of the Senate, while the power to select "inferior Officers" may be vested by law "in the President alone, in the Courts of Law, or in the Heads of Department." U.S. Const. art. II, § 2, cl. 2. "Whether one is an inferior officer depends on whether [his work] is directed and supervised at some level by [principal officers]." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 510 (2010) (citation omitted).

Aurelius argues that the Oversight Board is unconstitutionally constituted because its members are principal "Officers of the United States" appointed without Senate confirmation. As explained below, however, the Appointments Clause does not govern the appointment of members of the Oversight Board in the first instance, as they are territorial officers. Supreme Court precedent and more than two centuries of evolving territorial governance demonstrate that Congress's plenary authority to create a territorial entity under the Territory Clause of Article IV of the Constitution is not constrained by the Appointments Clause of Article II of the Constitution. Because Congress created the Oversight Board pursuant to its authority under the Territory Clause to address only Puerto Rico's fiscal matters, the Board's members are territorial officers whose appointments are not subject to the Appointments Clause.

## A. The Appointments Clause Does Not Govern the Appointment of Territorial Officers.

### 1. Congress's authority over the territories is plenary and not subject to the complex distribution of powers that regulate the Federal Government.

It has long been settled that Congress has "plenary power . . . under the Constitution over the territories of the United States." *El Paso & N.E. Ry. Co. v. Gutierrez*, 215 U.S. 87, 93 (1909). With respect to a territory, "Congress has the entire dominion and sovereignty, national and local, Federal and state, and has full legislative power over all subjects upon which the legislature of a state might legislate within the state." *Simms v. Simms*, 175 U.S. 162, 168 (1899); *see also Am. Ins. Co. v. 356 Bales of Cotton*, 26 U.S. 511, 512 (1828) ("In legislating for [the territories], Congress has the combined powers of the general and state governments.").

8

That authority extends over "the people of the territories and all the departments of the territorial government," *First Nat'l Bank v. County of Yankton*, 101 U.S. 129, 133 (1879), and is "without limitation," *United States v. Gratiot*, 39 U.S. 526, 537 (1840). *See also Downes v. Bidwell*, 182 U.S. 244, 285–86 (1901) (the Constitution is "suggestive of no limitations upon the power of Congress in dealing with [the territories]" and gives no indication "that the power of Congress in dealing with [the territories] was intended to be restricted by any of the [Constitution's] other provisions").[5]

As the Supreme Court reaffirmed just last year, "Congress has broad latitude to develop innovative approaches to territorial governance." *Sanchez Valle*, 136 S. Ct. at 1876. Within that latitude, it can legislate directly for the territories or provide for territorial self-governance, with each governance structure "at all times subject to such alterations as Congress may see fit to adopt." *Snow v. United States*, 85 U.S. 317, 320 (1873); *see also* Joseph Story, 3 *Commentaries on the Constitution of the United States*, ch. 31 § 1319 (1833) ("What shall be the form of government established in the territories depends exclusively upon the discretion of Congress. Having a right to erect a territorial government, they may confer on it such powers, legislative, judicial, and executive, as they may deem best."); *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 914 (1991) (Scalia, J., concurring) ("Congress may endow territorial governments with

---

[5] *Downes* is one in a series of cases known as the *Insular Cases* in which the Supreme Court sought to determine whether certain constitutional rights extended to the territories based on whether the territory was destined for statehood from the time of acquisition. *See Examining Bd. of Eng'rs, Architects and Surveyors v. Flores de Otero*, 426 U.S. 572, 600 (1976); *see, e.g.*, *Downes*, 182 U.S. at 244 (upholding special duties on Puerto Rican goods because the Constitution's requirement that "all Duties, Imposts and Excises shall be uniform throughout the United States," U.S. Const. art. I, § 8, cl. 1, does not apply to Puerto Rico); *Balzac v. Porto Rico*, 258 U.S. 298, 312–13 (1922) (holding that the constitutional guarantees of jury trial in criminal cases and indictment by grand jury do not apply to Puerto Rico). The Supreme Court has cited the *Insular Cases* for the proposition that the Constitution does not extend *ex proprio vigore* (of its own force) to the territories. *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723, 759 (2008) (court's analysis of the Suspension Clause's extension to the Guantanamo Bay Naval Station "inform[ed]" by the *Insular Cases*' consideration of the practical difficulties of enforcing constitutional provisions in the territories).

a plural executive; it may allow the executive to legislate; it may dispense with the legislature or judiciary altogether.").  Thus, for example, in creating territorial courts, Congress could choose to have territorial courts "decide all cases arising under the Constitution and laws of the United States" and have the territorial judges be either "appointed by the President under [an] act of Congress" or "elected by the people of the Territory[] and commissioned by the governor." *Clinton v. Englebrecht*, 80 U.S. 434, 447 (1871).  Notably, appointment by the President would not "make the courts [the territorial judges] are authorized to hold courts of the United States," any more than if the judges were elected.  *Id.*  As the Supreme Court has explained, this is so because territorial courts are considered "legislative Courts" and "[t]he jurisdiction with which they are invested[] is not a part of that judicial power which is defined in the Third Article of the Constitution, but is conferred by Congress in the exercise of its powers over the territories of the United States."  *Am. Ins. Co.*, 26 U.S. at 512; *see also McAllister v. United States*, 141 U.S. 174, 184 (1891) ("It must be regarded as settled that courts in the territories, created under the plenary municipal authority that congress possesses over the territories of the United States, are not courts of the United States"); *City of Panama*, 101 U.S. 453, 460 (1879); *Freytag*, 501 U.S. at 913 (Scalia, J., concurring) (territorial courts are "neither Article III nor Article I courts").

Because territorial governments are "not organized under the Constitution" but are "the creations, exclusively, of the legislative department," they are not "subject to [the Constitution's] complex distribution of the powers of government, as the organic law."  *Benner v. Porter*, 50 U.S. 235, 242 (1850).  That is, Congress may legislate for the territories (and the District of Columbia) "in a manner . . . that would exceed its powers, or at least would be very unusual in the context of national legislation enacted under other powers delegated to it under Art. I, s 8."  *Palmore*, 411 U.S. at 398.  Accordingly, the Supreme Court has held that constitutional structural constraints similar to the limitations imposed by the Appointments Clause are

inapplicable to the territories and the District of Columbia.[6]  For example, in *Palmore*, the Court
held that the structural assurances of judicial independence in Article III of the Constitution—life
tenure and protection against reduction in pay—are inapplicable to judges in the Superior Court
of the District of Columbia.  The Court reasoned that territorial judges "have not been deemed
subject to the strictures of Art. III, even though they characteristically enforced . . . the civil and
criminal laws of Congress applicable throughout the United States."  *Id.* at 403.

Similarly, the non-delegation doctrine—which prohibits Congress from delegating its
legislative authority to another branch of the Government—is inapplicable in the context of
Congress's governance of the territories.  The doctrine is "rooted in the principle of separation of
powers that underlies our tripartite system of Government."  *Mistretta v. United States*, 488 U.S.
361, 371–72 (1989); *see also Buckley*, 424 U.S. at 123.  Nevertheless, "[t]he power of Congress
to delegate legislative power to a territory is well settled."  *John R. Thompson Co.*, 346 U.S. at
106.  In *Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937), the Supreme Court held that
the non-delegation doctrine did not preclude Congress from delegating its legislative authority to
the territorial government of the Philippines.  *Id.* at 323.  As the Court explained, Congress's
plenary power over the territories "is not subject to the same restrictions which are imposed in
respect of laws for the United States considered as a political body of states in union."  *Id.*

Just as Congress can create territorial courts free from Article III's structural
requirements for judicial independence and vest authority in a territorial government without
regard to the non-delegation doctrine, Congress has the authority to create the Oversight Board
outside the strictures of the Appointments Clause.  Here, in light of Congress's finding that
Puerto Rico's fiscal emergency was caused in part by the Commonwealth's "lack of financial
transparency," "management inefficiencies," and "excessive borrowing," 48 U.S.C.
§ 2194(m)(1), and to address Puerto Rico's debt crisis, Congress created a new entity within

---

[6] "The power of Congress over the District [of Columbia] and its power over the Territories are
phrased in very similar language in the Constitution."  *D.C. v. John R. Thompson Co.*, 346 U.S.
100, 105–07 (1953).

Puerto Rico's territorial government to supervise the existing territorial government, using a structure that had proven successful when addressing District of Columbia's financial crisis. As an entity that owes its existence to Congress's exercise of plenary authority under the Territory Clause, the Oversight Board is a territorial entity. Accordingly, its members are not "Officers of the United States" within the meaning of the Appointments Clause of Article II of the Constitution, just like territorial courts are not constitutional courts of the United States within the meaning of Article III. In sum, given Congress's wide latitude in governing the territories, the Appointments Clause is inapplicable to the appointment of territorial officers like the Oversight Board members.

### 2. Historical practice confirms that the Appointments Clause is inapplicable to the appointment of territorial officers.

History confirms that the Appointments Clause does not govern the appointment of territorial officers. *See, e.g.*, *Noel Canning*, 134 S. Ct. at 2559 ("significant weight" must be placed on "historical practice"); *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819) (where "the great principles of liberty are not concerned . . . [a doubtful question,] if not put at rest by the practice of the government, ought to receive a considerable impression from that practice").

First, Congress has flexibly governed Puerto Rico through various governance structures without always tracking the requirements of the Appointments Clause. In 1900, Congress first enacted the Foraker Act, which established a civil government in Puerto Rico. 56 Cong. Ch. 191, 31 Stat. 77 (1900). The Foraker Act provided for an elected house of representatives, as well as territorial officials who were appointed by the President with the advice and consent of the Senate—a governor, an eleven-member executive council, and a territorial Supreme Court. Under this scheme, the elected members of the legislature were not selected in conformity with the Appointments Clause. Yet, they undoubtedly exercised significant authority pursuant to the Foraker Act—a federal law—and their appointments were not otherwise provided for in the Constitution and thus, would have been subject to the Appointments Clause if they were federal officers. *See* U.S. Const. art. II. § 2, cl. 2.

12

The Foraker Act was superseded in 1917 by the Jones Act, 64 Cong. Ch. 145, 39 Stat. 951–53 (1953), which created six executive departments—Justice, Finance, Interior, Education, Agriculture and Labor, and Health—with only the governor, the attorney general, and the commissioner of education appointed by the President with Senate confirmation. The remaining heads of departments were appointed by the Governor, even though the treasurer and the commissioner of the interior were previously presidentially appointed and Senate confirmed under the Foraker Act.

Then, in 1947, Congress authorized qualified voters in Puerto Rico to elect their own governor. *See* Act of Aug. 5, 1947, Pub. L. No. 80-362, Ch. 490, 61 Stat. 770 (1947). Again, such a selection process is not in conformity with the Appointments Clause. And in 1950, Congress authorized the people of Puerto Rico to "organize a government pursuant to a constitution of their own adoption." *Sanchez Valle*, 136 S. Ct. at 1876 (citation omitted); *see* Act of July 3, 1950, Pub. L. No. 600, ch. 446, § 1, 64 Stat. 319. The new constitution was drafted in a popularly elected constitutional convention and approved by popular referendum. In 1952, after "Congress approved that proposal—subject to several important conditions accepted by the convention—the Commonwealth, a new political entity, came into being." *Sanchez Valle*, 136 S. Ct. at 1874; *see* Act of July 3, 1952 (1952 Act), ch. 567, 66 Stat. 327. Since then, Puerto Rico has operated as a self-governing territory, with none of its officials assuming their positions in the manner prescribed by the Appointments Clause.

Indeed, the same has long been true as to the selection of officials in other territories. Both Guam and the Virgin Islands have selected their officials through democratic elections since 1968, *see* Guam Elective Governor Act, Pub. L. 90-497, 82 Stat. 842, 842–43 (1968); Virgin Islands Elective Governor Act, Pub. L. 90-496, 82 Stat. 837, 837–38 (1968), even though both territories were initially governed by an executive appointed by the President and confirmed by the Senate, *see* Organic Act of Guam, 81 Cong. Ch. 512, 64 Stat. 384 (1950) and Revised Organic Act of the Virgin Islands, 83 Cong. Ch. 558, 68 Stat. 497, 503 (1954). American Samoa has also held gubernatorial elections since 1977, under the terms of a constitution adopted by the

13

territory and approved by the Secretary of the Interior in 1967.[7]  And in the Northern Mariana Islands, democratic elections have been permitted since 1986.  *See* Proclamation No. 5564, 51 Fed. Reg. 40,399, 1986 WL 796859 (Nov. 3, 1986).

Second, throughout the nineteenth century, territorial attorneys general and district attorneys generally were elected by territorial legislatures—in other words, not in conformity with the Appointments Clause.  *See Snow*, 85 U.S. at 321–22 (explaining that in the territory of Utah, as in other territories, the legislative assembly elected an attorney-general and district attorneys to prosecute individuals accused of offenses against the laws of the territory).  These territorial officials undoubtedly exercised "significant authority," *Buckley*, 424 U.S. at 126, and the "ultimate source" of their power to prosecute was the United States Congress, as the Supreme Court reaffirmed in *Sanchez Valle*, 136 S. Ct. at 1871.  But the Appointments Clause did not constrain their appointment.

Third, territorial legislatures had been elected offices since the Nation's founding without complying with the Appointments Clause.  *See, e.g.*, *An Ordinance for the Government of the Territory of the United States, North West of the River Ohio*, 32 J. Cont'l Cong. 333, 333–34 (1787); *cf. Binns v. United States*, 194 U.S. 486, 491 (1904) (recognizing that Congress may transfer the legislative power to "a legislature elected by the citizens of the territory"); *The Federalist No. 43*, at 272–73 (James Madison) (Clinton Rossiter ed., 1961) ("[A] municipal legislature for local purposes derived from their own suffrages, will of course be allowed [the citizens of the district].").  Yet, again, each territorial legislator exercised significant authority pursuant to the congressionally-enacted organic act of his or her respective territory.

As explained above, the Appointments Clause applies to those federal officers "whose Appointments are not herein otherwise provided for" in the Constitution.  *See* U.S. Const. art. II,

---

[7] *See* Elected Governor and Lieutenant Governor of American Samoa, 42 Fed. Reg. 48,398 (Sept. 23, 1977); *see also* Act of December 8, 1983, Pub. L. 98-213, 97 Stat. 1459, 1462 (1983) ("Amendments of, or modifications to, the constitution of American Samoa, as approved by the Secretary of the Interior . . . may be made only by Act of Congress.").

§ 2, cl. 2.  The Constitution does not otherwise provide for the appointment of territorial officials such as territorial attorneys general, district attorneys, and legislators.  If they were constitutional officers, they would have been subject to the Appointments Clause, yet their appointments were not compliant with the Appointments Clause nor was the constitutionality of their appointments or selections ever in doubt throughout history.  These historical practices thus provide further support that the Appointments Clause does not govern the appointment of territorial officers.[8]

### 3.  Aurelius's arguments about the applicability of the Appointments Clause to the territories have no merit.

**i.**  Notwithstanding the history of Congress utilizing a variety of methods for the selection and appointment of territorial officials without regard to the Appointments Clause, Aurelius argues that history supports its position.  Aurelius cites the First Congress's amendment of the Northwest Ordinance and the fact that until 1947, civilian territorial governors were presidentially appointed and Senate confirmed.  Obj. and Mot. of Aurelius to Dismiss Title III Petition ("Mot.") at 20–21, ECF No. 913.  The Northwest Ordinance of 1787 originally provided for the appointment and removal of various officials in the Northwest Territory by the Confederation Congress.  *Reprinted in* 1 Cong. Ch. 8, 1 Stat. 50–53, note (a) (Aug. 7, 1789).  Following the ratification of the Constitution, Congress amended the Northwest Ordinance to replace any reference to the Confederation Congress with "President" and provided that "the President shall nominate, and by and with the advice and consent of the Senate, shall appoint all

---

[8] Interim territorial governments similarly did not follow the strictures of the Appointments Clause.  For example, shortly after the United States acquired control of the Louisiana Territory through the Louisiana Purchase, Congress granted complete and exclusive control to President Thomas Jefferson over the territory pending further congressional action.  Congress authorized the President to vest "all the military, civil, and judicial powers" in such persons as he shall direct.  Act of Oct. 31, 1803, 8 Cong. Ch. 1, § 2, 2 Stat. 245, 245 (November 10, 1803).  Such arrangement, even if temporary, likely did not comport with the requirements of the Appointments Clause and would otherwise "be very unusual, in the context of national legislation" under Article I.  *Palmore*, 411 U.S. at 398; *see also Cross v. Harrison* 57 U.S. 164, 193, 195 (1853) (noting that the government of California organized in 1847 from a right of conquest properly continued to operate during peacetime following ratification of the treaty with Mexico "without [] violat[ing] the Constitution or the laws of the United States").

officers which by the said ordinance were to have been appointed by the United States in Congress assembled." 1 Stat. 50 at 53.

In so "adapt[ing] the [Ordinance] to the present Constitution of the United States," *id.* at 51, however, Congress gave no indication that the territorial officers to be appointed by the President would be "Officers of the United States" within the meaning of Article II of the Constitution or that the amendment was compelled by the Appointments Clause.  Indeed, such a reading would have been in significant tension with the Territory Clause, which grants Congress plenary authority to govern the territories by "mak[ing] all needful Rules and Regulations," U.S. Const. art. IV, § 3, cl. 2.  *See* Story, 3 *Commentaries on the Constitution of the United States*, ch. 31 § 1319 ("What shall be the form of government established in the territories depends exclusively upon the discretion of Congress.").  As already established above, since the Nation's founding, the appointments of many territorial officials had not complied with the Appointments Clause.  Accordingly, a better reading of the 1789 amendment to the Northwest Ordinance is that Congress was merely conforming the Ordinance to the new Constitution by removing references to the Confederation Congress, a body which no longer existed.  And the amendment's provision of presidential appointment with Senate confirmation—a method Congress used for the appointment of civilian territorial governors (but not all territorial officers) until Puerto Rico's first gubernatorial election in 1947—was merely an exercise of legislative prerogative, rather than a matter of constitutional compulsion.  This reading is consistent with subsequent Congresses' experimentation with various structures of territorial governance.

ii.  Similarly unavailing is Aurelius's attempt to draw a distinction based on whether the territorial officers are appointed by the Federal Government.  Aurelius argues that "officials who are elected by the people of a territory (or appointed by such elected representatives) are not officers of the federal government, while those installed by the federal government *are* federal officers."  Mot. at 21.  Selectively quoting the dissent in *Sanchez Valle*, 136 S. Ct. at 1881 (Breyer, J., dissenting), Aurelius posits that "[w]hen a territory is structured as a local representative government, it is premised on the 'right of the people to choose their own

16

officers,' making them not officers of the United States[.]"  Reply in Supp. of Obj. & Mot. of
Aurelius to Dismiss Title III Petition ("MTD Reply"), at 15, ECF No. 1833.   The purported
distinction, however, is undermined by the language of the Appointments Clause itself, which
makes no exception for elected officers; rather, all "Officers of the United States" must be
appointed in accordance with the methods prescribed by Clause, unless otherwise provided for in
the Constitution.  U.S. Const. Art. II, § 2, cl. 2.  To be sure, Aurelius cites Supreme Court
precedent predating *Buckley v. Valeo* for the proposition that the manner of an official's
appointment may be determinative of his constitutional status as an "Officer[] of the United
States."  *See* Mot. at 18–19.  But *Buckley* itself rejected such circular reasoning; rather, as the
Court made clear, an "Officer[] of the United States" is one who holds a federal "office" and
exercises "significant authority pursuant to the laws of the United States."  424 U.S. at 125–26.
The method of appointment does not control that determination.  In fact, the suggestion that
Congress could avoid the requirements of the Appointments Clause by simply providing for the
election of a constitutional officer lacks merit because it would directly contravene the plain
language of the Clause.  Surely, Congress could not provide for the election of Article III judges
without violating the Appointments Clause.  For the same reason, it makes little sense to say that
the Appointments Clause applies to the Oversight Board members because they are
presidentially appointed, but not if they were chosen in a manner even less compatible with the
Clause, such as if they were selected by the people of Puerto Rico or their elected officials.[9]

  **iii.**  Aurelius also offers a variation of the argument above, contending that elected
officials exercise "local, territorial authority," whereas those "installed" by the Federal
Government exercise federal authority.  Mot. at 18.  Aurelius suggests that if the Board had

---

[9] The Puerto Rico government has many officers who are not democratically elected but are
appointed and who otherwise would be constitutional officers if they were deemed to hold
federal offices.  For example, the Secretary of Justice is appointed by the Governor of Puerto
Rico with the advice and consent of the Puerto Rico Senate, and the Secretary of State
is appointed by the Governor of Puerto Rico with the advice and consent of the Puerto Rico Senate
and House of Representatives.  *See* P.R. Const. art. IV, §§ 5–6.

"derive[d] [its] existence and powers from the Puerto Rico Constitution," *id.* at 22, then there would have been no constitutional violation. Aurelius is mistaken. It is well-established that "'the Government of [a Territory] owes its existence wholly to the United States,'" *Ngiraingas v. Sanchez*, 495 U.S. 182, 204 (1990) (quoting *Grafton v. United States*, 206 U.S. 333, 354 (1907)), and the authority exercised by officials in the territories (and the District of Columbia) ultimately derives from the United States Congress, *see Sanchez Valle*, 136 S. Ct. at 1875–76 (Congress is the "ultimate source" of Puerto Rico's power to prosecute crimes); *Domenech* v. *Nat'l City Bank*, 294 U.S. 199, 204 (1935) (a U.S. territory has "no independent sovereignty comparable to that of a state"). This is true of territorial legislators enacting laws for the territory, *see John R. Thompson Co.*, 346 U.S. at 106–09; *Cincinnati Soap*, 301 U.S. at 323; territorial judges adjudicating cases or controversies, *see Palmore*, 411 U.S. at 398; *Clinton*, 80 U.S. at 447; and territorial prosecutors prosecuting offenses against territorial laws, *see Sanchez Valle*, 136 S. Ct. at 1875–76.

Thus, rather than distinguishing between whether the territorial official is acting pursuant to locally-enacted laws that ultimately derive from Congress's Article IV authority and whether the official is appointed by the Federal Government, the appropriate inquiry—one consistent with historical practice as well as with the governmental structure of the current territories and the District of Columbia—is whether Congress created a federal office pursuant to its Article I enumerated powers to enact national legislation or instead a territorial office pursuant to its Article IV authority over the territories. As will be discussed later in more detail, Congress's creation of the Oversight Board falls in the latter category.

**iv.** Aurelius argues that Congress's authority pursuant to the Territory Clause is not without limitation, as is seen in the context of Congress's exercise of power under the Property Clause, which shares the same text as the Territory Clause. *See* U.S. Const. art. IV, § 3, cl. 2 ("Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."). Specifically, Aurelius argues that when seeking to dispose of Federal property, Congress's legislative power is

still subject to the President's veto. *See* MTD Reply at 6 (citing *United States v. California*, 332 U.S. 19, 27–28 (1947), where a joint resolution to dispose of federal property was vetoed by the President and thus had no effect). But that contention is not in dispute. The Constitution expressly requires that "legislative power of the Federal government be exercised in accord with [the] single, finely wrought and exhaustively considered, procedure" set forth in Article I, § 1, and Article VII. *INS v. Chadha*, 462 U.S. 919, 951 (1983). This is true even when Congress acts pursuant to the Territory Clause because compliance with the prescription of bicameralism and presentment is the only way for Congress to act. *Id.*; *see also* Robert H. Jackson, *Problems of Statutory Interpretation*, 8 F.R.D. 121, 125 (1949) (Congress is "expected to speak its will with considerable formality . . . . Its exact language requires Executive approval, or enough support to override a veto."). Here, there is no question that PROMESA satisfied the requirements of bicameralism and presentment.

Aurelius also cites *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise*, *Inc.*, 501 U.S. 252 (1991) ("*MWAA*"), for the proposition that Congress's Property Clause authority is subject to separation of powers. MTD Reply at 6. As will be discussed in greater detail later, in *MWAA*, a Board of Review consisting of only congressional members was struck down on separation of powers grounds, notwithstanding the fact that Congress was acting pursuant to the Property Clause. 501 U.S. at 270–71. This holding, however, was premised on the fact that the Board of Review was a federal entity wielding federal power. *See id.* at 271. Specifically, the Court held that through the Board of Review, Congress either encroached on the Executive Branch by exercising executive power or failed to satisfy the bicameralism and presentment requirements by exercising legislative power. *Id.* at 276. Here, in contrast, no member of Congress sits on the Oversight Board and the Board is an entity within the territorial government of Puerto Rico that wields no federal power—legislative or executive—but exercises only that portion of Congress's territorial authority that is not subject to the "complex distribution of the powers" applicable at the national level. *Benner*, 50 U.S. at 242. *MWAA*, therefore, is of no help to Aurelius.

19

**v.** Finally, Aurelius argues that the Supreme Court indicated in *United States v. Ferreira*, 54 U.S. 40 (1851), and *Freytag*, 501 U.S. at 868, that the Appointments Clause applies to territorial officers. *See* MTD Reply at 22. Those cases, however, do not bear the weight Aurelius places on them. In *Ferreira*, the Supreme Court merely noted that territorial judges would be subject to presidential appointment with Senate confirmation "*if* they are to be regarded as officers, holding offices under the government" of the United States. 54 U.S. at 51 (emphasis added). The Court did not consider, let alone decide, whether a territorial judge was an "Officer[] of the United States" within the meaning of the Appointments Clause because "[that] question has not been made[,] nor does it arise in the case." *Id.* Ultimately, the Court dismissed the appeal for lack of jurisdiction, *see id.* at 52, and, as Aurelius recognizes, *Ferreira* stands at most for the unremarkable proposition that Congress does not have the power to appoint "Officers of the United States," *see* MTD Reply at 22.

As for *Freytag*, Aurelius claims that the Supreme Court "noted that 'clerks' of 'non-Article III territorial courts' were 'inferior officers' within the meaning of the Appointments Clause." *Id.* at 22 (quoting *Freytag*, 501 U.S. at 892). Aurelius mischaracterizes the opinion. In *Freytag*, the Court noted that "since the early 1800's, Congress regularly granted non-Article III territorial courts the authority to appoint their own clerks of court, who, *as of at least 1839*, were 'inferior Officers' within the meaning of the Appointments Clause." *Freytag*, 501 U.S. at 892 (citing *In re Hennen*, 38 U.S. 230, 258 (1839) (emphasis added). That statement is referring to *In re Hennen*'s holding in 1839 that a Clerk of Court for the U.S. District Court for the Eastern District of Louisiana, an Article III court, was an "inferior Officer[]" of the United States. *See In re Hennen,* 38 U.S. at 258. *In re Hennen* itself did not hold that a clerk of court for a territorial court is an inferior officer. And, in any event, to the extent *Freytag* can be read to suggest that territorial judges are subject to the Appointments Clause, the suggestion would be mere dicta based on an improper reading of *In re Hennen*.

20

### B.  The Oversight Board Members Are Territorial Officers.

#### 1.  The Oversight Board's creation, statutory objectives, authority, characteristics, and relationship with the Federal Government confirm that it is a territorial entity.

As established above, the Appointments Clause does not govern the appointment of territorial officers.  Here, there is no doubt that the Oversight Board is a territorial entity, rendering the Clause inapplicable.  The Oversight Board was created by Congress pursuant to Congress's plenary power under Article IV of the Constitution to pursue purely territorial objectives, and the Board's statutory authority, characteristics, and relationship with the Federal Government are also consistent with its status as a territorial entity.[10]

Supreme Court jurisprudence regarding Congress's governance of the territories has consistently credited Congress's express declaration that it is acting pursuant to its plenary authority under the Territory Clause of Article IV of the Constitution.  *See, e.g.*, *Palmore*, 411 U.S. at 407; *Cincinnati Soap*, 301 U.S. at 323; *Binns*, 194 U.S. at 494.  PROMESA expressly states that it was enacted pursuant to Congress's Territory Clause power.  48 U.S.C. § 2121(b)(2).  It further provides that the Oversight Board "shall be created as an entity within the territorial government" and "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government."  *Id.* § 2121(c).  Nothing rebuts Congress's declaration regarding the source of its authority and its designation of the Oversight Board as a territorial body.

First, the Board was indisputably created to pursue local, territorial objectives—namely "to provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets."  *Id.* § 2121(a).  As PROMESA makes clear, Puerto Rico was unable to both meet its crushing debt obligations and provide essential services to the 3.4 million Americans in Puerto

---

[10] The Supreme Court has looked at similar factors in a different context.  In *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 383–400 (1995), and *Department of Transportation v. Association of American Railroads*, 135 S. Ct. 1225, 1231–33 (2015), the Supreme Court considered Amtrak's creation, objectives, and practical operation to determine that Amtrak—a for-profit public corporation—is a federal instrumentality for constitutional purposes.

21

Rico. *See id.* § 2194(m)(1)–(3).  Relying on the successful model of the D.C. Control Board,[11]

Congress created the Oversight Board to respond swiftly to Puerto Rico's fiscal emergency and

to provide "[a] comprehensive approach to fiscal, management, and structural problems and

adjustments that exempts no part of the Government of Puerto Rico[.]"  *Id.* § 2194(m)(4).  In

other words, PROMESA provides an intra-territorial solution to address a predominantly local,

intra-territorial problem.  *Cf. Lebron*, 513 U.S. at 383–84, 397 (Amtrak was a federal

instrumentality for constitutional purposes because, among other things, it was created

"explicitly for the furtherance of federal governmental goals"—*i.e.*, "to avert the threatened

extinction of passenger trains in the United States").  As this Court has noted, Congress

"deliberately" chose to "divide[] [the] responsibility and authority between" the Oversight Board

and the elected officials of the territorial government so that they may "work together to

establish a fiscally responsible path forward" for Puerto Rico and her people.  Order at 19.

Second, the Oversight Board's statutory powers extend no further than the territory of

Puerto Rico itself, and all of the Board's responsibilities relate to addressing the territory's fiscal

matters.  *See* 48 U.S.C. §§ 2141–52 ("Responsibilities of Oversight Board").  Numerous

statutory provisions also support the Board's non-federal, territorial status.  For example, the

Oversight Board's subpoena powers are governed by Puerto Rico's statute defining the scope of

personal jurisdiction.  *Id.* § 2124(f).  Puerto Rico government employees who intentionally

provide false or misleading information to the Board are subject to prosecution and penalties

under Puerto Rico, not federal, law.  *Id.* § 2124(*l*).  In addition, the Oversight Board may adopt

the rules and regulations of the Puerto Rico government in its bylaws, rules, and procedures, *id.*

---

[11] Aurelius claims that unlike here, Congress made the members of the D.C. Control Board "inferior officers" by subjecting them to the supervision of the Secretary of the Treasury.  *See* MTD Reply at 27–28 (citations omitted).  The statutory provisions cited by Aurelius, however, show no such supervision.  *See, e.g.*, DCFRMAA, § 206(c)(1) (requiring the Control Board to certify to the Council, the President, the Secretary of the Treasury, and Congress that the District government is at variance with the financial plan and budget).  Indeed, as this Court has noted, members of the D.C. Control Board had more authority and discretion than members of the Oversight Board.  *See* Order at 13–14.

§ 2121(h)(3), and can also enforce Puerto Rico laws prohibiting public sector employees from
participating in a strike or a lockout, *id.* § 2124(h).  Moreover, Puerto Rico's Governor, or his
designee, serves as an "*ex officio* member of the Oversight Board," *id.* § 2121(e)(3); there are no
*ex officio* federal officials serving on the Board.  And Federal laws governing appointments and
salaries do not apply to the Oversight Board's employees.  *Id.* § 2123(c).  Finally, the only
mechanism through which a federal employee may work for the Oversight Board is through a
detail pursuant to the Intergovernmental Personnel Act of 1970, 5 U.S.C. § 3371–75, which
authorizes federal employees to be detailed to state or territorial entities and vice versa.  48
U.S.C. § 2123(d).

Third, the Oversight Board operates with significant autonomy from the Federal
Government in facilitating Puerto Rico's economic recovery.  It has significant flexibility in
carrying out its statutory mandates, has wide discretion in its day-to-day operations, and may hire
its own legal counsel.  *See, e.g.*, 48 U.S.C. §§ 2124, 2128.  Its members do not receive federal
compensation (in fact, they serve without any compensation), *id.* § 2121(g), and its funding
comes entirely from the territorial government, *id.* § 2127(b).  *Cf. Ass'n of Am. R.Rs.*, 135 S. Ct.
at 1232 (noting that "[i]n its first 43 years of operation, Amtrak has received more than $41
billion in federal subsidies," and [i]n recent years these subsidies have exceeded $1 billion
annually"); *United States v. Ackerman*, 831 F.3d 1292, 1297–98 (10th Cir. 2016) (noting that as
much as 75 percent of the budget of organization found to be a federal entity came from the
Federal Government).  That is, there is no federal budgetary control of the Board's actions.  *Cf.
Ass'n of Am. R.Rs.*, 135 S. Ct. at 1232 (noting that the political branches set and supervise
Amtrak's annual budget).

Finally, the nature and degree of the Federal Government's supervision of the Oversight
Board is consistent with the Oversight Board's territorial character.  To be sure, pursuant to
PROMESA, the President appoints all Board members and may remove them for cause.  But the
law is clear that presidential appointment by itself does not determine whether the Board
members are federal officers for constitutional purposes.  *See Clinton*, 80 U.S. at 447

23

(appointment by the President did not "make the courts [that territorial judges] are authorized to hold courts of the United States").  And, in the context of a territorial government whose elected officials are not accountable to the President, Congress's decision to give the President some removal power over the territorial officers he appoints neither changes the status of those officers nor raises separation-of-powers concerns.  Indeed, that choice is also consistent with the well-established constitutional principle that "the power of appointment carried with it the power of removal."  *Myers v. United States*, 272 U.S. 52, 119 (1926).  Furthermore, although the Board's power stems from a federal statute that sets forth instructions and general guidelines with which the Board must comply, the power exercised in the territories always stems from Congress by virtue of legislation.  As noted above, the enactment of a statute is the only way for Congress to exercise its authority over the territories under the constitutional scheme.  *See* U.S. Const. art. I, § 7; *Binns*, 194 U.S. at 491 (Congress "may *legislate* directly in respect to the local affairs of a territory") (emphasis added).  Even when Congress grants self-governance to a territory, it does so by statute, as it did in the case of Puerto Rico, and "[t]he extent of the power thus granted" to the territorial officials is "at all times subject to such alterations as Congress may see fit to adopt," *Snow*, 85 U.S. at 320, again, by statute.

Here, in light of the congressional findings concerning Puerto Rico's financial woes, *see* 48 U.S.C. § 2194(m), Congress concluded that the best way for Puerto Rico to stabilize its economy is to have a temporary entity within the territorial government that would supervise, and collaborate with, the existing territorial government in the area of fiscal management—much like when it created the D.C. Control Board within the District of Columbia government to address the District's financial crisis in the 1990s, *see* DCFRMAA, § 101(a)–(b).  For this reason, the fact that Puerto Rico's Governor and Legislature are prohibited from passing laws or taking any action to exert control, supervision, or oversight over the Oversight Board, *see* 48 U.S.C. § 2128(a), similarly does not undermine the Board's status as a territorial entity in the "joint structure created by PROMESA," Order at 20.

24

### 2.    The Oversight Board's characteristics cited by Aurelius do not undermine the Board's status as a territorial entity.

Aurelius disputes that the Oversight Board is a territorial entity.  It argues that Congress's pronouncement of the Board's territorial status is not dispositive, citing *Lebron*, 513 U.S. at 392, and *Association of American Railroads*, 135 S. Ct. at 1231–33.  *See* Mot. at 16–17.  Those cases treated Congress's classification of Amtrak as a non-profit public corporation as "instructive" but "not dispositive of Amtrak's status as a governmental entity for purposes of separation of powers analysis under the Constitution."  *Ass'n of Am. R.Rs.*, 135 S. Ct. at 1231 (citation omitted); *see also Lebron*, 513 U.S. at 392, 397 (Amtrak is a federal entity for purposes of individual constitutional rights).  Those cases are inapposite with respect to the weight to be given to Congress's classification of the Oversight Board because in creating Amtrak, Congress was operating in an arena of limited, enumerated powers under Article I of the Constitution in regulating rail transit and, thus, Congress's exercise of authority was "subject to [the Constitution's] complex distribution of the powers."  *Benner*, 50 U.S. at 242.  As the Supreme Court explained, in such a circumstance, Congress's authority to classify Amtrak as a non-federal entity was only "for purposes of matters that are within Congress's control."  *Lebron*, 513 U.S. at 392.  Here, by contrast, Congress's power over the territory is plenary and its authority to delineate the territorial entities it creates is "not subject to the same restrictions . . . imposed in respect of laws for the United States," *Cincinnati Soap*, 301 U.S. at 323.  While Congress cannot label a federal entity exercising federal authority as a territorial entity, its designation of the Board as a territorial entity in PROMESA is fully corroborated by the Board's statutory purpose and features.  Thus, there is no reason to question Congress's designation of the Board in this instance.

Aurelius also identifies various provisions in PROMESA, which allegedly are indicative of the Oversight Board's status as a federal government instrumentality.  *See* Mot. at 22–23.  But none has that effect.  First, section 102 of PROMESA provides that federal agencies "*may provide the Oversight Board use of Federal facilities and equipment*" in accordance with any

25

terms and conditions established by the agency, 48 U.S.C. § 2122 (emphasis added), and section 104 additionally requires federal agencies and the General Services Administration ("GSA") to provide administrative support services to the Board upon the Board's request, *id.* § 2124(n). These provisions are not inconsistent with the Board's territorial status. Federal law specifically authorizes federal assistance to U.S. territories. *See id.* § 1469c ("To the extent practicable, services, facilities, and equipment of agencies and instrumentalities of the United States Government may be made available, on a reimbursable [or a non-reimbursable] basis, to the governments of the territories and possessions of the United States[.])"  Moreover, it is not uncommon for GSA to provide administrative assistance to non-federal entities. *See, e.g.*, 40 U.S.C. § 502 (GSA may provide services and assistance to the District of Columbia, mixed ownership Government corporations, among others); 22 U.S.C. §§ 4603, 4604(o) (the United States Institute of Peace, an independent non-profit corporation established under the laws of the District of Columbia, "may obtain administrative support services from the [GSA] and use all sources of supply and services of the [GSA]"); *id.* §§ 290h-1–290h-8, (similarly provision with respect to the United States African Development Foundation, a non-profit corporation).

Second, Aurelius cites PROMESA's provisions subjecting the Board to certain federal ethics requirements.  Section 109(a) of PROMESA, 48 U.S.C. § 2129(a), provides that the Oversight Board shall comply with the conflicts of interest requirements in 18 U.S.C. § 208. Section 109(b), in turn, provides that the members and staff of the Board shall be "subject to disclosure of their financial interests, the contents of which shall conform to the same requirements set forth in section 102 of the Ethics in Government Act of 1978."  48 U.S.C. § 2129(b).  Congress's importation of existing, available federal standards on conflicts of interest, however, does not suggest that the Board is a federal entity.  The standards are about good governance, and in exercising its Article IV power to ensure that the Board members are free from conflicts of interest, Congress surely could decide not to reinvent the standards but to simply import them from federal law.  Indeed, Congress similarly has made 18 U.S.C. § 208 applicable to officials of the District of Columbia government.  *See* DC Self-Government Act,

§ 732.  Moreover, the language of section 109(b) reveals a deliberate effort by Congress to avoid making the federal financial disclosure requirements directly applicable to Board.  *See* 48 U.S.C. § 2129(b) ("the *contents* of [the financial disclosures] *shall conform to the same requirements*" in the Ethics in Government Act of 1978) (emphasis added).

Finally, Aurelius cites section 208 of PROMESA for the proposition that the Board reports to the President and Congress, and thus, is subject to federal control.  However, this section merely requires the Oversight Board to submit annual reports to not only the President and Congress, but also the Governor and the Legislature of Puerto Rico.  *See* 48 U.S.C. § 2148(a).  Moreover, this kind of annual reporting was required of Puerto Rico's governors in the Jones Act, a practice that continued even after the governorship became a popularly elected office in 1947 and was discontinued only after the establishment of the Commonwealth in 1952. *See* Jones Act, § 12, 39 Stat. at 955, and as amended, 61 Stat. at 771.  It is, therefore, not indicative of the Oversight Board's federal status.  Ultimately, the relationship between the Oversight Board and the Federal Government is best understood in terms of Puerto Rico's status as a territory and Congress's plenary authority over it under the Territory Clause.  Like all Article IV territorial entities, the Oversight Board is a creature of Congress and is necessarily subject to Congress's supervision and control to some degree as specified in PROMESA.  All the provisions cited by Aurelius are not inconsistent with that proposition.

In sum, because the Oversight Board is a territorial entity, Congress has significant flexibility in tailoring the Oversight Board's appointments mechanism without being constrained by the strictures of the Appointments Clause.  There is no Appointments Clause violation.

## II.   PROMESA'S APPOINTMENTS SCHEME DOES NOT VIOLATE SEPARATION OF POWERS.

As a corollary to its Appointments Clause challenge, Aurelius also argues that PROMESA's list-based selection mechanism constrains the President's appointment authority in violation of separation of powers.  Mot. at 26–33.  According to Aurelius, "PROMESA impermissibly aggrandizes Congress" because its "list mechanism arrogates a core executive

function and places it in the hands of individual legislators—the kind of decisionmaking about who will serve in [the] Executive department posts that the Constitution says [Congress] cannot exercise." *Id.* at 29–30 (citation omitted). But PROMESA does not unduly constrain the President's authority, and, at a minimum, the statute can be construed in a way that does not raise constitutional concerns.

The Supreme Court explained in *MWAA* that "the system of separated powers and checks and balances" was viewed "by the Framers as a 'self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.'" 501 U.S. at 273 (quoting *Buckley*, 424 U.S. at 122). "To forestall the danger of encroachment beyond the legislative sphere," the Court said, the Constitution prohibits Congress from "invest[ing] itself or its Members with either executive power or judicial power." *Id.* at 274 (citation omitted). *MWAA* itself involved a regional authority created to operate the two federally-owned Washington, D.C. area airports. In consenting to the formation of the regional authority and in transferring the airports to local control, Congress created a Board of Review that had the power to veto many significant decisions of the regional authority. *Id.* at 258. To ensure congressional control, Congress also specified that appointments to the Board of Review "*must* be made" from lists consisting of specified numbers of Members of Congress from various congressional committees. *Id.* at 268 (emphasis added). The Supreme Court found the Board of Review's composition and statutory authority to be an unconstitutional aggrandizement of Congress's power because the Board of Review was a "congressional agent" that was exercising either federal legislative power without complying with the bicameralism and presentment requirements or federal executive authority at the expense of the President. *See id.* at 267, 276.

As discussed below, unlike in *MWAA*, PROMESA's appointments scheme—designed by Congress pursuant to its authority under the Territory Clause—does not result in an unconstitutional aggrandizement of Congress's power or an impermissible encroachment on the President's executive authority.

28

**A. The List-Based Selection Scheme Does Not Implicate the Same Separation-of-Powers Concerns As If the President Were Appointing Constitutional Officers.**

As an initial matter, unlike the separation-of-powers analysis in *MWAA* that concerned a Board of Review wielding federal power, any separation-of-powers analysis in this case is informed by Congress's plenary Article IV authority to govern the territories. Crucial to the consideration of the perceived constraints on the President's appointment of the Board members is the fact that the Oversight Board does not exercise federal authority. Rather, as already discussed above, the Oversight Board is a "creation[], exclusively, of the legislative department," *Benner*, 50 U.S. at 242, and exercises authority vested in it by Congress pursuant to Congress's plenary authority under the Territory Clause. *Cf. Freytag*, 501 U.S. at 913 (Scalia, J., concurring) (territorial courts "do not exercise the national *executive* power—but neither do they exercise any national *judicial* power"; "[t]hey are neither Article III courts nor Article I courts, but Article IV courts—just as territorial governors are not Article I executives but Article IV executives") (emphasis in original). When the President selects the Board's members, he is not choosing "Officers of the United States," U.S. Const. art. II, § 2, cl. 2, who would carry out his executive functions. Therefore, statutory constraints on the President's appointment of the Oversight Board members do not raise the same separation-of-powers concerns as when the President is selecting federal officers. Because Aurelius's separation-of-powers challenge to the list-based scheme is premised entirely on the Oversight Board members being federal officers, the challenge fails.

Historical practice is not to the contrary. The President's role in the territories has fluctuated considerably over time, ranging from the near total control given to President Jefferson immediately following the Louisiana Purchase (*see supra* note 8) to the nearly non-existent role in the current self-governing territories, including Puerto Rico. Consistent with its broad discretion in territorial governance, Congress has used a wide range of methods to select territorial officials without encroaching on the President's authority. Indeed, the use of lists for presidential appointment of territorial officials is not new. The Northwest Ordinance reenacted

29

by the First Congress in 1789 to govern the Northwest Territory provided for the creation of a
legislative council of five presidentially-appointed members, who were required to be chosen
from a list of ten candidates nominated by the elected representatives of the territorial legislature.
*See* 1 Cong. Ch. 8, 1 Stat. at 52, note (a) (Aug. 7, 1789) (the elected representatives "shall
nominate ten persons . . . five of whom [the President] *shall* appoint and commission to serve")
(emphasis added).  It also provided that, whenever a vacancy should arise mid-term, the
Territory's legislature "shall nominate two persons . . . for each vacancy," and the President
"shall appoint and commission" one such nominee to serve for the remainder of the term.  *Id.*
Similar appointment structures were adopted for other territories.[12]  Yet, no concern was raised
about such structures encroaching on the President's executive authority.  *See Bowsher v. Synar*,
478 U.S. 714, 723–24 (1986) (actions by Members of the First Congress provide
contemporaneous and weighty evidence about the meaning of the Constitution).

Cases involving separation-of-powers challenges to the former D.C. Control Board—
upon which the Oversight Board is modeled—likewise support the proposition that the
President's constitutional role in the territories may be circumscribed.  In *Brewer v. District of
Columbia Financial Responsibility and Management Assistance Authority*, a district court
rejected a separation-of-powers challenge to the D.C. Control Board on the basis that "[t]he
Executive Branch has no constitutional role with respect to the District that corresponds or
competes with that of Congress."  953 F. Supp. 406, 410 (D.D.C.), *aff'd,* 132 F.3d 1480 (D.C.
Cir. 1997).  Because "Congress expressly reserved its constitutional authority to alter the

---

[12] *See* Act of May 26, 1790, 1 Cong., Ch. 14, § 1, 1 Stat. 123 (Southwest Territory) ("And the
government of the said territory, south of the Ohio, shall be similar to that which is now
exercised in the territory northwest of the river Ohio[.]"); Act of April 7, 1798, 5 Cong., Ch. 28,
§ 3, 1 Stat. 549-50 (Mississippi Territory) (same); Daniel J. Ryan, *A History of Ohio, with
Biographical Sketches of Her Governors and the Ordinance of 1787*, 51 (1888) ("It was made
their duty to nominate ten residents of the territory . . . out of which five would be selected by the
President to act as the Legislative Council, or Upper House of the Territorial Legislature."); 1
Logan Esarey, *A History of Indiana From Its Exploration to 1850*, 170 (1922) ("[The House of
Representatives] nominated ten candidates from whom President Jefferson was to select five to
constitute the Council.").

institutions of the District of Columbia government at any time and for any reason," the court

reasoned, Congress's creation of the D.C. Control Board did "not present the 'dange[r] of

congressional usurpation of Executive Branch functions.'" *Id.* (quoting *Bowsher,* 478 U.S. at

727); *see also Chavous v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 154 F. Supp. 2d

40, 54 (D.D.C. 2001) (dismissing separation-of-powers claim against the D.C. Control Board on

the basis that the Board's power was not executive in nature but was coextensive with

"Congress' own power to act"; the Board exercised "legislative power rather than executive

power").

In sum, both Supreme Court precedent and historical practice confirm that separation-of-

powers principles governing the national government do not apply with equal force when

Congress acts to create a territorial entity pursuant to its Article IV plenary authority.[13]

### B. PROMESA's Appointments Scheme Does Not Result in an Unconstitutional Aggrandizement of Congress's Power or an Impermissible Encroachment on the President's Authority.

PROMESA's list-based scheme does not raise separation-of-powers concerns that would

otherwise exist in other contexts. First, PROMESA's appointments scheme does not provide for

members of Congress to serve in any capacity on the Board. In exercising its broad authority to

legislate with respect to matters of territorial governance, Congress has imposed qualifications

for serving on the Oversight Board, *see* 48 U.S.C. § 2121(f), and provided recommendatory lists

---

[13] Aurelius also relies on what it says is the only other instance in which Congress has required
the President to select nominees from congressional lists. According to Aurelius, the
Comptroller General and Deputy Comptroller General are appointed from a congressional list of
as few as three persons (although the list is subject to supplementation). *See* Mot. at 30 (citing
31 U.S.C. § 703(a)). Aurelius reasons that this type of list mechanism is permissible because the
"Comptroller General . . . has only a legislative function" and does not exercise executive power.
*Id.* Under Aurelius's own reasoning, then, the list mechanism at issue here is similarly
permissible because the Oversight Board members also do not exercise federal executive power
in the constitutional sense. It should be noted, however, that Aurelius has misread the statute.
The statute permits a commission appointed by Congress to "recommend individuals to the
President for appointment" of the Comptroller General and Deputy Comptroller General, but
does not require the President to appoint these officials from the list of recommendations. *See* 31
U.S.C. § 703(a)(2).

of candidates who meet those qualifications.  Based on these facts, Congress has not invested a congressional agent with executive power.  *Cf. MWAA*, 501 U.S. at 276; *Bowsher*, 478 U.S. at 736  (Act vesting certain executive authorities in the Comptroller General violated separation of powers because as an officer of the Legislative Branch, the Comptroller General may not perform any executive functions); *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826–27 (D.C. Cir. 1993) (*ex officio* non-voting membership of the Secretary of the Senate and the Clerk of the House of Representatives in the Federal Elections Commission violated separation of powers because "the mere presence of agents of Congress on an entity with executive powers offends the Constitution").

Second, PROMESA does not require the President to choose members from the congressional lists.  It merely encourages the President to do so.  *See* 48 U.S.C. § 2121(e)(2)(A)(i)–(v) (except for one category of Board member, members "*should* be selected from a list of individuals submitted by" various congressional leaders) (emphasis added); *see also* 162 Cong. Rec. H3601 (daily ed. June 9, 2016) (statement of Rep. Grijalva) ("The President appoints all seven members of this Puerto Rico Board.  To be sure, members of Congress may make suggestions to the President, but the power to appoint members of this territorial entity remains with the President.").  Indeed, the President had a number of options:  he could have chosen from the congressional lists, rejected the candidates on the lists and requested the lists to be supplemented with additional candidates, or appointed his own candidates after Senate confirmation by the statutory deadline.  The President ultimately selected all six candidates from the congressional lists (with the seventh chosen entirely at his discretion) on August 31, 2016, without asking Congress to supplement the recommendatory lists of candidates.

Aurelius argues that the time constraints on the President's ability to appoint Board members—*i.e.*, from PROMESA's enactment on June 30, 2016 to the statutory deadline of September 1, 2016—makes the existence of options illusory.  Aurelius's factual premise is dubious.  As noted above, the political branches acted expeditiously to enact PROMESA to prevent the further downward spiral of Puerto Rico's economy, and the appointment scheme was

designed to ensure that members of the Oversight Board would be chosen "on an expedited timeframe." H.R. Rep. No. 114-602, pt. 1, at 42 (2016). Given the political branches' common goal to address Puerto Rico's fiscal crisis, if the President had wished to nominate his own candidates, the Senate might well have confirmed the President's nominations in time to meet the statutory deadline. In fact, the Senate had convened weekly *pro forma* sessions between July 1 and September 1, 2016, *see* 162 Cong. Rec. (Daily Digests for July 1, 5, 15, 19, 22, 26, 29; August 2, 5, 9, 12, 16, 19, 23, 26, 30, 2016), and "the Senate's rules make clear that during its *pro forma* sessions . . . the Senate retained the power to conduct business," *Noel Canning*, 134 S. Ct. at 2575 (noting that the Senate has enacted legislation during *pro forma* sessions).

In any event, this Court need not engage in counterfactual speculation as to whether the Senate would have confirmed the President's nominations if he had chosen to nominate his own candidates or as to whether the President felt constrained by the appointments scheme.[14] As the Supreme Court has admonished, a "factual appraisal" of what the Senate would have done during its *pro forma* sessions is neither "legally [n]or practically appropriate"; rather, it is the

---

[14] If the Board members were properly appointed by the President, as they were here, then a private party should not be able to challenge the members' service on the Board by challenging antecedent limitations on the President's selection that the President chose to follow, particularly where, as here, there is no evidence that the President felt constrained by PROMESA's appointments mechanism. In *Federal Election Commission v. NRA Political Victory Fund*, the D.C. Circuit rejected a challenge to the composition of the Federal Election Commission on the basis that, among other things, Congress's limitation that the President was not permitted to select more than three members affiliated with any single political party was too restrictive of his appointment power. 6 F.3d at 822. Specifically, the D.C. Circuit held that the claim was "not justiciable" because "it is impossible to determine . . . whether the statute actually limited the President's appointment power. Appellants do not argue, nor can we assume, that the President wished to appoint more than three members of one Party and was restrained by the [statute] from in doing so." *Id.* at 824-25. Notably, the court stated it could not assume "that the bipartisanship requirement has any effect on the Commission's work, for without the statute the President could have appointed exactly the same members. For appellants to prevail we would have to conclude that all the Commission's appointments were invalid because infected by the statute" and "in order to redress . . . [the] alleged injuries in this case, we must assume, without any factual support, that each of the commissioners would not have been appointed but for the statute. That we cannot do." *Id.* at 825. Similarly here, Aurelius's challenge to the supposed constraints on the President's selection is not justiciable because, among other things, it is impossible to determine whether the statute actually limited the President's selection.

Senate's "*capacity* to act" that matters.  *Id.* at 2575-76 (emphasis added); *see also Bowsher*, 478

U.S. at 730 ("the separated powers of our Government cannot be permitted to turn on judicial

assessment of whether an officer exercising executive power is on good terms with Congress").[15]

Finally, citing *Free Enterprise Fund*, 561 U.S. 477, Aurelius contends that the for-cause

removal provision in PROMESA, 48 U.S.C. § 2121(e)(5)(B), imposes a unique "double layer" of

protection that unconstitutionally constrains the President's removal power.  Mot. at 33.

PROMESA, however, provides for only one layer of for-cause protection from removal, and the

Supreme Court has upheld such restrictions for multi-member bodies.  *See Humphrey's Executor

v. United States*, 295 U.S. 602, 620 (1935).  Moreover, the provision can be read broadly to

permit removal for insubordination or "misconduct" by the Oversight Board members, as well as

the failure to perform their "statutory responsibilities in a manner that comports" with

Congress's requirements in PROMESA.  *Morrison v. Olson*, 487 U.S. 654, 692 (1988); *see also

id.* at 724 n.4 (Scalia, J., dissenting) (noting that grounds for "remova[l] *for cause* . . . would

include, of course, the failure to accept supervision").  This reading of the "for cause" provision

preserves sufficient political accountability over the actions of the Oversight Board while also

providing the newly-created territorial entity with a certain degree of independence from the

Federal Government.  *Cf. The Constitutional Separation of Powers Between the President and

Congress*, 20 Op. O.L.C. 124, 169 n.117 (1996) ("[A] generous reading of the President's (or a

---

[15] PROMESA also provides that if any of the seven members had not been appointed by
September 1, 2016, then the President would have to appoint an individual from the list
associated with the vacant position by September 15, 2016.  *See* 48 U.S.C. § 2121(e)(2)(G).
That provision, however, never came into play, and will not have any constraining effect on the
President's authority going forward.  PROMESA provides that future vacancies will be filled "in
the same manner in which the original member was appointed."  *Id.* § 2121(e)(2).  That
provision is most naturally read to mean that the President can choose future candidates off a
congressional list (supplemented, as needed, by additional names) or select his own candidates
subject to Senate confirmation.  This reading is consistent with the text and the well-settled
doctrine of constitutional avoidance.  *See Edward J. DeBartolo Corp. v. Florida Gulf Coast
Building & Constr. Trades Council*, 485 U.S. 568, 575 (2009) ("The so-called canon of
constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be
construed to avoid serious constitutional doubts.").

department head's) power to remove an inferior officer for cause may be essential to the

constitutionality of removal restrictions.").  And contrary to Aurelius's suggestion, PROMESA's

ordinary for-cause removal is nothing like the robust tenure protection found unconstitutional in

*Free Enterprise Fund*, where the inferior officers were protected from removal except "for

willful violations of the [Sarbanes-Oxley] Act, [the Public Company Accounting Oversight

Board] rules, or the securities laws; willful abuse of authority; or unreasonable failure to enforce

compliance," 561 U.S. at 503, and the principal officers to whom they reported also could not be

removed by the President except for "'inefficiency, neglect of duty, or malfeasance in office,'"

*id.* at 487.  No such "dual for-cause limitations" on the President's removal power is present

here.  *Id.*

## CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Court uphold

the constitutionality of PROMESA and deny Aurelius's motion to dismiss the Title III petition.

Dated:  December 6, 2017

Respectfully submitted,

ROSA E. RODRIGUEZ-VELEZ
United States Attorney

THOMAS G. WARD
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director
Federal Programs Branch

/s/ *Jean Lin*
JEAN LIN (USDC-PR No. G02514)
Special Counsel
CESAR A. LOPEZ-MORALES (USDC-PR
No. G02704)
Trial Attorney
U.S. Department of Justice, Civil Division

35

Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20530
(202) 514-3716 (office)
(202) 616-8202 (fax)
Jean.lin@usdoj.gov

*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of December 2017, I caused a true and correct copy

of the foregoing Notice of Appearance to be filed with the Clerk of the Court using the CM/ECF

system which will generate electronic notification to all CM/ECF participants in these cases.


/s/ *Jean Lin*
JEAN LIN