1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF PUERTO RICO

3
      In Re:                          )
4                                     )
      THE FINANCIAL OVERSIGHT AND     )
5     MANAGEMENT BOARD FOR PUERTO RICO, )
                                      )
6        as representatives of        )   No. 17 BK 3283-LTS
                                      )
7     THE COMMONWEALTH OF PUERTO RICO, )
      et al,                          )
8                                     )   Pages 1 - 58
                   Debtors.           )
9     _____ )   December 14, 2017

10

11

12                        **HEARING**

13       BEFORE THE HONORABLE JUDITH GAIL DEIN
              UNITED STATES MAGISTRATE JUDGE

14

15                       United States District Court
16                       1 Courthouse Way, Courtroom 8
                         Boston, Massachusetts  02210
17

18

19

20

21

22              JOAN M. DALY
            OFFICIAL COURT REPORTER
23        United States District Court
          1 Courthouse Way, Room 5507
24            Boston, MA  02210
            joanmdaly62@gmail.com
25

```
 1    A P P E A R A N C E S:

 2
          GARY ORSECK, ESQ., and KATHERYN ZECCA, ESQ., Robbins
 3    Russell, for GO Bondholders.

 4        PETER FRIEDMAN, ESQ., and ASHLEY PAVEL, ESQ., O'Melveny &
      Myers, for AAFAF.
 5
          TIMOTHY W. MUNGOVAN, ESQ., GREGG M. MASHBERG, ESQ., and
 6    CARL FORBES, JR., ESQ., Proskauer Rose, for the Financial
      Oversight and Management Board for Puerto Rico (FOMB).
 7
          ELLEN HALSTEAD, ESQ., Cadwalader, Wickersham & Taft, for
 8    Assured Guaranty.

 9        CHRISTOPHER DiPOMPEO, ESQ., Jones Day, for ERS Secured
      Creditors.
10
          RICHARD LEVIN, ESQ., Jenner & Block, for Official
11    Committee of Retired Employees.

12        SHANNON WOLF, ESQ., Bracewell LLP, for QTCB Noteholder
      Group.
13
          LUC DESPINS, ESQ., Paul Hastings, for UCC.
14
          MARTIN SOSLAND, ESQ., Butler Snow, LLP, for Financial
15    Guaranty Insurance Company.

16        GREGORY A. HOROWITZ, ESQ., Kramer Levin Naftalis &
      Frankel, for The Mutual Fund Group.
17
          ERIC WEISS, ESQ., Milbank, Tweed, Hadley & McCloy, for
18    Ambac.

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE CLERK: All rise. You may be seated. United States District Court for the District of Puerto Rico is now in session on December 14 in the year 2017 in the matter of The Financial Oversight and Management Board for Puerto Rico as representatives of the Commonwealth of Puerto Rico, et al., case number 17-BK-3283-LTS.

Could counsel please identify themselves for the record.

MR. ORSECK: Good afternoon, Your Honor. Gary Orseck and my partner Kathy Zecca for the ad hoc group of General Obligation Bondholders.

MR. HOROWITZ: Good afternoon, Your Honor. Gregory Horowitz from Kramer Levin on behalf of the Mutual Fund Group.

MS. HALSTEAD: Good afternoon, Your Honor. Ellen Halstead of Cadwalader, Wickersham & Taft for Assured Guaranty.

MR. MUNGOVAN: Good afternoon, Your Honor. Timothy Mungovan for Proskauer Rose for the Oversight Board on behalf of itself and the debtors. With me are my colleagues Gregg Mashberg and Carl Forbes.

MR. MASHBERG: Good afternoon, Your Honor.

MR. FORBES: Good afternoon, Your Honor.

MS. PAVEL: Good afternoon, Your Honor. Ashley

```
 1    Pavel from O'Melveny & Myers for AAFAF.  My colleague Peter

 2    Friedman will be here in a moment.

 3            MR. LEVIN:  Good afternoon, Your Honor.  Richard

 4    Levin, Jenner & Block, for the Official Committee of Retired

 5    Employees of the Commonwealth of Puerto Rico.

 6            MR. DESPINS:  Good afternoon, Your Honor.  Luc

 7    Despins on behalf of the Official Creditors Committee.

 8            MR. DiPOMPEO:  Good afternoon, Your Honor.

 9    Christopher DiPompeo of Jones Day on behalf of the ERS

10    Secured Creditors.

11            MR. SOSLAND:  Good afternoon, Your Honor.  Martin

12    Sosland of Butler Snow on behalf of Financial Guaranty

13    Insurance Company.

14            THE COURT:  All right.  Welcome also to our friends

15    in Puerto Rico and in New York.  I'm going to again ask

16    everybody to make sure that they speak into the microphones

17    so that we can hear everybody.  Do you want to introduce

18    yourself?

19            MR. FRIEDMAN:  Peter Friedman from O'Melveny &

20    Myers on behalf of AAFAF, Your Honor.

21            THE COURT:  I would like to put on the record that

22    the snow delay was not caused by the northern state of

23    Massachusetts.  Okay?  So I am glad.  I think we have

24    everybody or some other people are wandering in who are still

25    on a plane or at an airport or something.  Okay.  Who is
```

1    leading this one?  Mr. Orseck?

2              MR. ORSECK:  I will, Your Honor.  Shall I speak

3    from here?

4              THE COURT:  Yes.

5              MR. ORSECK:  Good afternoon, again.  Gary Orseck

6    from Robins Russell.  We are here this afternoon, Judge,

7    pursuant to your November 21 order which prompted the joint

8    movants to file a new request for a 2004 Examination with 17

9    separate document requests.  There have been objections and

10   responses filed by the Board and AAFAF.  We filed per your

11   instruction a joint report and a reply on the same day.

12             Behind the scenes there have been a number of

13   conversations going on that I will report to you, and the

14   board and AAFAF can certainly give their version of it if

15   they think I've misstated anything.  But before we get to the

16   questions about what should or shouldn't be produced, what

17   privileges may or may not apply, and what does or doesn't

18   exist, there are a couple of overarching issues that I want

19   to briefly address first.

20             The first thing is that the respondents continue to

21   maintain that the motion should be denied.  So even as they

22   are discussing with us protocols for producing information

23   and agreements as to what else they will or will not produce,

24   their overarching position is that Rule 2004 is inappropriate

25   and unnecessary, and I want to just briefly address that.

1              We've explained at some length in our filings as to

2       why presumptively Rule 2004 order is appropriate here

3       pursuant to the fair and equitable test.  For a plan of

4       confirmation, it's our right to ensure that a plan of

5       confirmation gives the maximum that the debtor could

6       reasonably pay.  And because of that we're entitled to

7       examine the financial condition of the debtor.  Our requests

8       are specifically targeted to those legal tests.

9              The respondents assert three principle reasons why

10      the motion nevertheless should be denied.  The first is the

11      Pending Proceeding Doctrine that was briefed before the

12      November hearing and is resuscitated here.  As we've laid out

13      in our briefs, and I won't address it if you don't want me

14      to.

15             THE COURT:  Let me just ask, are all these points

16      still being pursued?  Let me confirm that.  Is there still an

17      objection to the entry of a 2004 Examination?

18             MR. MUNGOVAN:  For the Oversight Board, Your Honor,

19      yes.

20             MR. FRIEDMAN:  Yes for AAFAF, Your Honor.

21             THE COURT:  So maybe actually it makes sense for

22      you to go first and explain the basis for your objection to

23      the 2004 and then you can respond.

24             MR. ORSECK:  Sure.

25             MR. MUNGOVAN:  Good afternoon, Your Honor.  Once

1    again for the record Timothy Mungovan from Proskauer Rose on

2    behalf of the Oversight Board for itself and on behalf of the

3    Title III debtors.

4           To start and to reiterate my prior point, the

5    motion should be denied, Your Honor, and I want to address

6    the three reasons why it should be denied.

7           First I want to address the renewed motion itself.

8    Second I want to address the response that the joint movants

9    filed on Monday.  And then I want to address what remains

10   unresolved because I think that that ties into whether or not

11   the motion should be granted.

12          First of all, with respect to the renewed motion

13   itself, nowhere do the movants -- nowhere do they acknowledge

14   that some or all of the documents that they claim not to have

15   were actually publicly available or available in the data

16   room.  They say they need documents and that they don't have

17   them.  Yet they don't address the fundamental fact that

18   they're available publicly in some part or they're available

19   in some part in the data room.

20          Effectively what their renewed motion did, Your

21   Honor, is to reiterate what Mr. Orseck, counsel speaking for

22   all of the joint movants, told you so forcefully at the

23   omnibus hearing on November 15.  And that is, they don't have

24   these documents.  But as we showed in our response last week,

25   that's in large part not the case.

1              Many of the documents, the vast majority of them,

2      in fact, are available, whether publicly or in the data room.

3      And what they don't already have we've agreed largely to

4      either give them, and we've given them some additional

5      documents already, or we're prepared to largely give them

6      some additional documents going forward.  So the area of

7      dispute around what hasn't been given and what we think

8      properly should not be given is very narrow.

9              In their reply, the movants' position shifts.

10     Their concern is no longer that they don't have the

11     documents.  That's hard for them to argue any longer.  What

12     they're really arguing is that they can't use the documents

13     in the way that they claim they need to use them.  And that's

14     really the point that Mr. Orseck just raised.

15             And he referred to a plan of confirmation.  Their

16     papers refer to a plan of adjustment.  And I think we're all

17     in agreement, Your Honor, that the purpose of Rule 2004, they

18     even say in their moving papers and we agree, the purpose of

19     Rule 2004, "is to show the condition of the estate and to

20     enable the Court to discover its extent and whereabouts and

21     to come into possession of it and the rights of the creditor

22     may be preserved -- so that the rights of the creditor may be

23     preserved."

24             They have that information, Your Honor.  What

25     they're looking now and what they claim now they need the

1    ability to use the information in connection with the plan of

2    confirmation or a plan of adjustment, as they've referred to

3    it and we have, there's only one problem with that, Your

4    Honor, that's grossly premature.  There is no plan of

5    adjustment.  There will be we expect in the future a plan of

6    adjustment.  And we expect in the future when that plan of

7    adjustment is developed and filed that there will be

8    discovery related to that plan of adjustment, and there will

9    be a trial in all likelihood related to that plan of

10   adjustment.

11          And so their request for Rule 2004 discovery in aid

12   of examining a plan of adjustment that doesn't yet exist

13   itself demonstrates that their request and reason for it is

14   premature.

15          THE COURT:  So just address for me though why a

16   2004 order, which the Court has some control over, is a

17   problem for you as opposed to even if I order a 2004 exam and

18   your answer is and they have all these documents and these

19   are where the documents are, why is it a problem not to have

20   it in the form of a 2004 exam where the Court has some

21   control?  That's number one.

22          And two, this premature argument, I think we talked

23   about at the last hearing, that if the discovery is going to

24   be appropriate at some point, why is it inappropriate now?

25          MR. MUNGOVAN:  So I'll take the first question

1    first and the second question second, if I may.

2              THE COURT:  There you go.

3              MR. MUNGOVAN:  With respect to the first question,

4    why not a Rule 2004 order, an order granting Rule 2004.

5    First of all, it's not necessary.  The information concerning

6    the financial condition of the Commonwealth is publicly

7    available, Your Honor.  Let me just explain why.  This was

8    released yesterday as one example.

9              On Reorg Research, which I'm sure every lawyer,

10   every person on this side of the bench in the room gets,

11   Reorg Research released a report known as the TSA Variance

12   Report.  And among other things that it identifies, Your

13   Honor, are the revenues and the expenditures of the

14   Commonwealth of Puerto Rico for a snapshot time period.

15             And we've agreed to give the movants these reports

16   that haven't already been publicly made available.  The

17   government is making these available now.  Whatever wasn't

18   previously made available, we will make available and will be

19   put into the data room, and they will have it.  That's reason

20   one why you shouldn't enter a Rule 2004 order.

21             Reason two, the area of dispute that we are

22   disagreeing on with respect to what remains, as I said, is

23   narrow.  And that area of dispute or disagreement really in

24   large part relates to what we believe are documents

25   concerning or squarely within the Deliberative Process

1    Privilege in some way, shape, or form.

2           THE COURT:  But it still begs the question, with

3    all due respect, which is if I do it in the form of here are

4    the 17 categories, here are the responses, I have some

5    control, and the parties are all aware of what documents

6    we're talking about.  So we're not talking about a 2004 exam

7    which was the broad request as initially which was sort of

8    any kind of documents that are available, and I understood

9    your objections to that.

10          But it seems to me that when we have categorized

11   the documents that are being requested, and all the parties

12   are focusing on those categories and identifying specifically

13   what documents we're talking about, that that's a much more

14   efficient way of actually making sure that everybody is on

15   the same page with information.

16          MR. MUNGOVAN:  Second reason Your Honor should deny

17   it, and that is the Pending Proceeding Doctrine.  And let me

18   explain that specifically.  And to take on one of the points

19   that they address in their reply, which is they say, for

20   example, at least one of the joint movants is not party to an

21   adversary proceeding.

22          Well, that's not quite right, Your Honor.  That

23   party, the Mutual Fund group, is, in fact, a defendant in the

24   BONY Mellon adversary proceeding in the *COFINA* case, so the

25   BONY Mellon interpleader.  And they're also an intervenor in

1    the *Commonwealth COFINA* adversary proceeding which is pending

2    in the Commonwealth Title III case.  So each of the parties

3    we believe, the Oversight Board contends, each of the movant

4    parties is party to another adversary proceeding or they're a

5    party in interest to another adversary proceeding.

6         And in the *Commonwealth COFINA* dispute, there is

7    currently ongoing discovery as between the Commonwealth agent

8    and the COFINA agent.  And a lot of the information that is

9    being sought as part of this Rule 2004 case, including issues

10   concerning revenues and expenditures, is just the type of

11   information that we believe is part of the financial superweb

12   which is one of the rationales that we, the Oversight Board

13   and AAFAF, presented in our opposition papers, in our

14   original opposition to this Rule 2004 motion.

15        So we believe under the Pending Proceeding Doctrine

16   that the information that they're seeking here doesn't just

17   bleed into, it directly relates to these other proceedings in

18   which each of these movants is involved.

19        The last point that I would raise, Your Honor, is

20   with respect to entering an order under Rule 2004, the

21   purpose of the order is to allow them to investigate the

22   affairs, the financial circumstances of the debtor, not just

23   in a vacuum but as Mr. Orseck himself stated in connection

24   with a plan of adjustment or a plan of confirmation.  If and

25   when that plan is developed and released, there will be

1   discovery around it.

2          These issues that they're seeking now, they'll have

3   full and fair opportunity to seek this type of information

4   without waiving any objection that we may have down the road,

5   they'll have their opportunity to seek it in the context of a

6   plan of adjustment that actually exists at the time as

7   opposed to in a vacuum.

8          And we also have, Your Honor, pending proceedings

9   and motions to dismiss in pending adversary proceedings where

10  we contend the movants, which include, for example, the

11  General Obligation Bondholders here, are essentially

12  attacking the fiscal plan, the prior fiscal plan.  And the

13  information that they're seeking today may be in aid of and

14  may directly relate to the claims in those cases.

15         So it's not just a matter of why wouldn't I, it's

16  easier, it's a tool, for example, this Court to manage the

17  exchange of information and what's the harm.  We believe that

18  there is potential harm.  We believe that the approach is

19  inconsistent with the Pending Proceeding Doctrine.  And

20  they're already receiving all of the information or largely

21  all of the information that they're seeking.

22         And the narrow area of disagreement, as I'm happy

23  to explain to Your Honor and we can walk through, there is

24  very little area of disagreement as between the parties.  Let

25  me just highlight those for you.  Requests 1 through 7, 12

and 13, there's largely no dispute.  With respect to 1 and 2,
there's a category of documents that they are seeking from
the time period of September and October of 2016.  We the
Oversight Board have a half dozen or so documents that we are
evaluating that relate to the so-called requests that the
Oversight Board had made in September of 2016 to AAFAF.  We
have documents.  We're evaluating them.  We expect to be able
to tell the movants in the coming days whether we can share
those documents with them or not.  We believe that we will be
able to.

     So request 8 is the first area where there may be
an area of disagreement.  Mr. Friedman is going to address
that with respect to the DevTech model.

     With respect to requests 10 and 11 which really
relate to Andy Wolfe and the Wolfe model, we believe we've
fully resolved their inquiries here.  We've posted not only
the Wolfe model but also the documents that Wolfe considered
in developing the model and his conclusions in the model.
And we provided the deposition of Mr. Wolfe, Dr. Wolfe, where
he testified how it was that he arrived at the 0.8 percent
number that the movants seem to be so concerned about.  They
have that information.

     THE COURT:  That's 9 and 10?

     MR. MUNGOVAN:  That's 9 and 10.  I apologize.  Yes,
Your Honor.  Request number 11, we received a reformulated

1    request yesterday from the movants, and the Oversight Board

2    and AAFAF are in the process of working through it and

3    evaluating it.  I expect that we'll be able to get back to

4    them in the coming days.

5            With respect to requests 14 and 15, we are working

6    through what we have that may be responsive, and we will

7    produce it.  I will note for you that some information was

8    produced yesterday by AAFAF that specifically addresses their

9    concerns we believe.  And as of this afternoon, our

10   understanding was at least one of the movants had not yet

11   seen that document.  It was in the data room as of last

12   night.  And I expect that if they have concerns we can

13   discuss them, but we believe that we've complied with 14 and

14   15.  At a minimum we're working through it.

15           Let me skip 16 for a minute and address 17.  We

16   have a few documents with respect to 17 on the order of a

17   half dozen that we believe that we'll be able to review and

18   potentially produce.  And we expect to be able to resolve

19   that in the coming days.

20           So really what we're talking about is request 16.

21   We believe that that's the principle area of disagreement

22   between the parties right now.  And we believe that in their

23   reply they have recast request 16 more broadly than the

24   request is really stated or articulated.  But regardless,

25   with respect to request 16, it looks in two directions, Your

1    Honor.  It relates retrospectively to the fiscal plans, we'll

2    call them the 2017 fiscal plans.  We provided, as you saw in

3    our opposition papers, a substantial amount of information

4    concerning the fiscal plans and the fiscal plan models.

5         On a forward-looking basis prospectively they're

6    looking for information concerning the future fiscal plans.

7    We'll call those the 2018 fiscal plans.  Those plans are in

8    process.  They're being developed and worked out.  We've

9    agreed that if and when we develop those new fiscal plans,

10   we'll produce the same information that we produced with

11   respect to the 2017 fiscal plans once those plans are

12   finalized.

13        THE COURT:  So I assume you're claiming a privilege

14   on the --

15        MR. MUNGOVAN:  With respect to the in-process

16   development work today, which I think is really the area of

17   disagreement for the future fiscal plans, yes.  We believe

18   that they're objectionable on three grounds.  It's not a

19   proper purpose of Rule 2004.  Mr. Friedman will address that

20   specifically.

21        Deliberative process privilege.  We believe that

22   it's squarely within the deliberative process privilege.  And

23   number three, we believe that it treads on Rule 106(e),

24   Section 106(e) of PROMESA, excuse me, and therefore it's not

25   a proper area of inquiry.

1              At a minimum, Your Honor, we believe that it's

2        premature.  And for them to be able to obtain that

3        information at this moment in time is terribly premature.

4        But what we have said, and we said this in the context of the

5        joint status report, we're prepared to get together with them

6        and think through and identify on a category basis what we

7        believe may be covered by the deliberative process privilege.

8              Your Honor, we believe that is really the sole area

9        of disagreement.  And for you to enter a Rule 2004 order on

10       the basis of that one area of disagreement feels like using a

11       missile to kill a fly.  It's needless and excessive.  And at

12       this point in time what we would suggest is you deny the

13       motion without prejudice.  We continue the process that we've

14       undertaken.

15             We certainly believe that we've demonstrated based

16       on everything that we've shown the Court that contrary to the

17       story that we believe you were left with, a significant

18       amount of information was shared a long time ago, and we

19       continue to share information.  And the quality and degree of

20       information has improved in part because of AAFAF's processes

21       have improved.  And so they're getting the kind of

22       information now that we believe is indisputably the type of

23       information that they sought and are seeking, and they're

24       getting it.

25             And we're prepared to work with them to evaluate

1    whether they're genuinely looking for information that we

2    believe concerns the development of the future fiscal plans.

3    And if that is what they're looking for, we're prepared to

4    discuss it with them.  And we can come back here and the

5    Court can decide whether or not they should properly obtain

6    it.

7              THE COURT:  What about the limitations on the

8    documents that have been produced?  I gather that there are

9    various levels of restrictions.

10             MR. MUNGOVAN:  So let me describe that, and then I

11   believe that we have a proposal -- we have a proposal.  We

12   shared it with a few of the counsel before this hearing

13   began, Your Honor.  And Mr. Friedman will describe it in more

14   detail.  But let me at least describe the state of play.

15   There are restrictions on documents in the data room.  And

16   those restrictions arise from three sources.

17             Source number one is a nondisclosure agreement that

18   the parties who have obtained access to the data room have

19   executed in order to obtain access.  That's category one.

20             Category two.  Certain documents were loaded into

21   the data room that are also subject to what we will call a

22   confidentiality order and stipulation.  For example, in the

23   Peaje adversary proceeding in the HTA Title III case, the

24   parties to that adversary proceeding, namely the plaintiff

25   Peaje and the defendants entered into a confidentiality

1     stipulation and order controlling those documents.

2            What Judge Swain ordered as part of the HTA Title

3     III case is that the other parties to the other two pending

4     HTA adversary proceedings, namely the monoline insurers, we

5     call it the Ambac case, and we at the Oversight Board refer

6     to it as the Assured case, although there are two other

7     plaintiffs in that case as well, they entered into a similar

8     protective order and received access to the documents that

9     were subject to the Peaje protective order.  That's the

10     second category of restriction on the documents.

11            The third category of restriction is the mediation

12     agreement.  There is a folder, if you will, and I'll describe

13     the data room in more detail just so the Court understands

14     it, but there is a folder within the data room that is

15     intended to have the documents and information that were

16     provided in the context of mediation to the parties who have

17     entered into the NDA in the data room.

18            THE COURT:  Those are separate?

19            MR. MUNGOVAN:  Those are separate.  They are

20     separate, and they are protected separately by the mediation

21     agreement.

22            THE COURT:  For the NDA and Peaje?

23            MR. MUNGOVAN:  Peaje.  It means tolls in Spanish.

24            THE COURT:  Are there different levels of

25     protection?

1          MR. MUNGOVAN:  Within the Peaje Agreement?  I do

2     not believe so, Your Honor.  There are not separate levels of

3     protection within the Peaje confidentiality stipulation and

4     order.

5          THE COURT:  Is it different than the NDA?

6          MR. MUNGOVAN:  It is different than the NDA, yes,

7     Your Honor.  Just to describe the data room because I went

8     back on it to take a look so I could describe it to you.

9     It's like a website.  It's a protected website.  It lists all

10    of the documents.  I believe that it's hosted or related to

11    Intralinks which is a well-known hosting function that allows

12    for the sharing of information on a restricted basis.

13         And all of the documents are loaded there with

14    titles and names.  There's an outline that we have created

15    that we have that shows the documents that are on there.  And

16    parties are given electronic access to that website through a

17    password.  And when documents are loaded on there, as I

18    understand it, because I see the document notice come

19    through, when documents are loaded on that I have a right to

20    access, I receive an Intralinks notification to tell me new

21    documents are loaded on.

22         If this is an appropriate time, I'd like to turn it

23    over to Mr. Friedman to at least address, Your Honor, both

24    the appropriateness of 2004 with respect to what we'll call

25    materials concerning the development of the future fiscal

1   plan and also to address the proposal that we had made with

2   respect to lifting or resolving the restrictions on use which

3   was really the key point, I believe, of the movants'

4   response.

5          THE COURT:  I'm trying to figure out the most

6   efficient way to do it.  Why don't we finish, and then I'll

7   give the movants an opportunity to address all of the above.

8          MR. FRIEDMAN:  Your Honor, Peter Friedman from

9   O'Melveny & Myers on behalf of AAFAF.  So what Mr. Orseck

10  said was they wanted to use Rule 2004 to understand

11  confirmation issues and whether a fair and equitable test is

12  met, potentially whether a feasibility test is met.  Other

13  provisions of 1129 of the bankruptcy code, which go to plan

14  confirmation.

15         You ask what's the issue.  The issue is the

16  bankruptcy -- the Federal Rules of Bankruptcy Procedure

17  actually create different kinds of discovery mechanisms

18  precisely because they're not all to be mingled together.

19  The plan of adjustment once it's filed and once a response is

20  filed becomes a contested matter.  And a contested matter is

21  governed by Rule 9014 of the Federal Rules of Bankruptcy

22  Procedure, which then in turn don't look to Rule 2004 for

23  discovery guidance but look to the rules in part 7000 of the

24  Federal Rules of Bankruptcy Procedure.

25         They don't look to Rule 2004.  Rule 2004, its

1    purpose is not to govern contested matters which are going to

2    become -- matters which are going to become contested in the

3    future.  It's about understanding the financial condition of

4    a debtor.

5             And so, for example, the kind of information that

6    we're providing now, which is either I think in scope and in

7    quality in the data room, it's really important to understand

8    what's being put in there now in addition to the publicly

9    available reports.  It's in large part, not completely but in

10   large part, much of the financial data that AAFAF is

11   providing to the Oversight Board, the very entity that

12   Congress gave it substantial responsibility for the finances

13   of Puerto Rico to.

14            Its actual liquidity versus projected liquidity.

15   It's cash flow.  It's component unit reports.  Right?  It

16   provides cash balances, accounts receivable, accounts

17   payable, head count data for approximately 15 territorial

18   entities.

19            THE COURT:  What I'm not understanding is why -- I

20   understand that you're telling me you're producing this

21   voluntarily.  But it also seems to me that it's the type of

22   information that would be produced under a 2004 exam.  So the

23   fact that you are producing it voluntarily I don't think

24   takes it out of that examination.

25            MR. FRIEDMAN:  So, Your Honor, I think my point

1    is --

2              THE COURT:  You may be going broader for whatever

3    reason you want, to but it is the kind of information that

4    would establish the financial condition and understanding of

5    the financial condition of the debtor, the income, the

6    expenses, and where the assets are and where they can be.

7              MR. FRIEDMAN:  So, Your Honor, I guess our view on

8    this issue is the same as Mr. Mungovan's with respect to --

9    the big focus of dispute is whether Rule 2004 is an

10   appropriate vehicle for discovery about a plan of adjustment.

11   And that's very different than financial reporting.

12   Financial reporting we're happy to give.  We don't think it's

13   necessary to enter Rule 2004.  But if a Rule 2004 order is

14   going to be entered, it should be limited to issues about

15   financial condition, not about the development of a fiscal

16   plan which is clearly being sought as you heard for purposes

17   of testing whether the confirmation standard can be met.

18              I think that's what's so problematic about a Rule

19   2004 order compelling information to be produced in

20   conjunction with an objection to an as yet unfiled plan of

21   adjustment.

22              THE COURT:  If you're having a dispute about

23   whether that should be produced or not, and you want me to

24   resolve it, in what context do I resolve it?

25              MR. FRIEDMAN:  Your Honor, so I think the right way

1    to resolve that particular issue is in two contexts.

2    Certainly not Rule 2004.  The right way to address that

3    specific issue is either in any of the adversary proceedings

4    to the extent that they get to a point where there are

5    discovery disputes in the adversary proceedings if the

6    validity or certification or other aspects of a fiscal plan

7    are subject to litigation.  That would be a ripe concrete

8    compute where there's an actual adversary proceeding where

9    that issue would be joined.

10        In fact, in some respects those issues as

11   Mr. Mungovan already explained have already been joined.

12   People have filed suits and they're being argued on motions

13   to dismiss.  People have filed suits and withdrawn them with

14   statements that we'll file it again if we don't like your

15   fiscal plan.  That's one area.

16        The second area is when we get to confirmation of

17   an actual plan of adjustment based on some future fiscal

18   plan, the Court can then make a determination as to what the

19   appropriate parameters of discovery are in connection with

20   AAFAF and the Oversight Board's work in putting together a

21   fiscal plan.

22        Those are two very concrete mechanisms for

23   determining the issue in accordance with the Federal Rules of

24   Bankruptcy Procedure for contested matters in adversary

25   proceedings.

1          So, Your Honor, I want to switch to the use issue,

2     and the way I've conceptualize it, and the way I explained it

3     to the other side -- I won't speak for them.  I'll let them

4     only speak for themselves.  There are four categories of

5     information that we're producing as of now voluntarily.

6     Depending where the Court winds up either subject to or not

7     subject to an order.

8          The first is things like the Oversight Board

9     reporting packages, Treasury single account reporting

10    information, perhaps information in response to requests

11    about healthcare expenditures.  That's data.  If it's in the

12    data room, then subject entry of an appropriate litigation

13    confidentiality order with respect to that kind of

14    information, which I'm confident that all the lawyers in here

15    can get to because we do it all the time, it can be used for

16    the purposes of -- it can be attempted to be used for the

17    purposes that they want to use it for.  We can argue that

18    it's inadmissible.  We can argue whatever we want to.  But

19    they can at least try to use that in a different matter.

20         Second is information we've produced in another

21    litigation.  If we produced it in another litigation, again

22    subject to an appropriate litigation confidentiality order,

23    they should be allowed to try to use it for whatever

24    purposes.

25         Third is stuff that we -- I want to tread really

1    carefully here, Your Honor.  Third is stuff that's in the

2    data room in a folder called mediation or related to

3    mediation.  I'm not going to talk about the substance of any

4    of it.  But it is information that we have put there in

5    response to specific requests made in the mediation or

6    perhaps even created for purposes of responding to requests

7    in the context of mediation.

8               THE COURT:  That's sufficient.

9               MR. FRIEDMAN:  Okay.  Our view is that should never

10   be used in any litigation.  That's off limits.  In fact, we

11   actually don't think that stuff is appropriate necessarily to

12   be ordered to be deemed as having been produced under Rule

13   2004 order.  But it's there.  And our view is if opposing

14   counsel sees a piece of data in that information, in that

15   mediation information, and says to us there's data in there

16   that we would like you to extract and produce in some format

17   that it can be put into group one, we'll work with them and

18   try to make that -- put that into the first bucket, try to

19   find a way to cooperatively come up with a format that if

20   it's data it can be used.

21              And the fourth category is information related to

22   either development of past fiscal plans such as assumptions,

23   formula, back and forth discussions between people at AAFAF

24   or people at the Oversight Board and AAFAF or people at the

25   Oversight Board and their consultants either historically or

1    on an ongoing basis.  And that we have provided some of it

2    voluntarily to this point, but we don't think it ought to be

3    subject to either a Rule 2004 order or permitted to be used

4    in any other proceeding unless they can come to you in the

5    context of an actual concrete dispute in a contested matter

6    over plan confirmation or an adversary proceeding and obtain

7    effectively an order saying we have to be compelled to

8    produce it over whatever objections that are actually ripe

9    that we can assert at the time related to 106(e) or

10   deliberative process or relevance, if it's about this fiscal

11   plan and the next fiscal plan is radically different, it's a

12   formulation of a plan of adjustment.  All of those kinds of

13   objections.

14           THE COURT:  And are those documents categorized in

15   any way in the existing room?

16           MR. FRIEDMAN:  I think there are many that are.

17   And for those that aren't, I will sit or people from our team

18   will sit with anybody from the other side to help figure it

19   out.  I actually believe there is enough good faith on both

20   sides to not, certainly with respect to mediation, put stuff

21   out that's not supposed to be out there and to work

22   cooperatively to avoid issues like that.

23           Are we going to have disputes perhaps as to what

24   qualifies as data reporting versus things we have voluntarily

25   given about the fiscal plan?  Because just to be clear we

1     have said to the other side here's the model, and they have

2     questions and we try to answer them.  Our view is that's

3     purely voluntary on our part designed to foster a useful

4     process.

5            If we have to draw lines about what we think falls

6     in that category versus what falls into the purely

7     data-focused category or reporting category, we'll work with

8     them about it.  And hopefully we can be reasonable on both

9     sides.  If we can't, we'll have a process for coming back to

10    the Court.  That's sort of how we see the world as to both

11    what we've provided, why we think a Rule 2004 order isn't

12    appropriate and certainly isn't appropriate as to fiscal plan

13    materials, and how information ought to be used across the

14    board.  Thank you, Your Honor.

15           MR. ORSECK:  Gary Orseck for the General Obligation

16    Bondholders again.  Judge, let me go back to the point where

17    I left off and that Mr. Mungovan picked up, which is what

18    their reasons are for posing the entry of a 2004 order and

19    why we think they're incorrect.

20           The overriding theme that they present is that it

21    is unnecessary.  It was termed to be a sledgehammer to kill a

22    mouse, or whatever the metaphor is, a missile I think it was,

23    and the answer is that's what's necessary.  And here's why:

24    You heard from both counsel that in recent days, just in

25    recent days they have produced this document or that

1    document.  And tomorrow they're going to produce the next one

2    and the next one is coming after that, and they're willing to

3    sit down with us and work through all of these issues.

4                To be clear, we welcome that.  We have asked for

5    that since June.  But we have never gotten even a hint of

6    that.  We haven't gotten a production of anything, and we

7    didn't get a production of anything after the November 15

8    hearing, Your Honor, when you ordered initially that our

9    motion was premature because the threat of judicial oversight

10   and of an order compelling them to do this was lifted.

11               Then the November 21 order came in, which laid out

12   a schedule for litigating a renewed motion, and the

13   information began to flow.  And I can go through and will go

14   through the specific document requests and the responses that

15   Mr. Mungovan and Mr. Friedman referenced.  But there is a new

16   found, a brand-new found willingness to engage with us.

17               The point I want to make here is that new found

18   willingness is not a reason to deny this motion as

19   unnecessary.  It is precisely the reason why the motion has

20   to be granted.  Because if you say that it is premature or

21   you deny it or you say come back to me another time, while I

22   trust counsel's good faith, the history of this proceeding

23   and this discovery dispute is that nothing happens except

24   under immediate threat that there will be an order compelling

25   it to be done.

1            So that is the first point.  Similarly, to say that
2    the area of dispute is narrow, it has narrowed in the last
3    couple of weeks.  It has narrowed some.  It hasn't gone away.
4    But there's the old saying that being -- a sentence to be
5    hung at dawn clarifies the mind, that is what has happened
6    here.  That is what's happened.
7            The second point that was raised as to why the
8    motion ought to be denied is again this Pending Proceeding
9    Doctrine.  That is a red herring, Judge.  The purpose of that
10   doctrine as we laid out in our briefs is that a party to an
11   adversary proceeding in which discovery is constrained by the
12   bankruptcy version of Rule 26, the Federal Rules of Civil
13   Procedure, should not be circumvented by running into the
14   court in the main bankruptcy case and asking for much broader
15   discovery under 2004.  And by broader I mean mostly
16   procedurally broader.
17           In 2004 discovery you don't generally have a right
18   to have counsel at a deposition.  You don't have a right to
19   object.  And what the cases say is it would be an end run, it
20   would be unfair to allow the looser procedures that apply in
21   a 2004 examination to apply in an adversary proceeding where
22   Congress decided that a different regime should apply.
23           That has nothing in common with what we're talking
24   about here.  We're not trying to circumvent the narrow
25   procedural constraints of discovery in any adversary

1    proceeding.  Indeed some of the parties here are not parties

2    to an adversary proceeding in the Title III case, and the

3    ones who are focus on issues that are discrete and distinct

4    from the financial condition of the debtor issues that we're

5    pursuing here.

6            The last thing I want to say about this is even in

7    some of the cases where courts have held that 2004 discovery

8    should be denied have held that the discovery can take place

9    but pursuant to the procedural constraints of Rule 26.

10           And we've already told the other side and we've

11   agreed that the normal procedural protections of Rule 26 of

12   the Federal Rules of Civil Procedure may apply in the 2004

13   examination we're seeking here.

14           So the idea that they can just point to one or more

15   adversary proceedings, some of which have been dismissed, and

16   say that that is a blanket reason to deny the 2004 discovery

17   that we're otherwise entitled to is, as I said before, is

18   really a red herring.

19           The last, I think, procedural argument that they've

20   made as to why we're not entitled at all I think was

21   presented by Mr. Friedman who said if the purpose for which

22   we're seeking to discover the financial condition of the

23   debtor is so that we can evaluate the plan of adjustment,

24   well then, there's a different vehicle for doing that, and it

25   comes much much later.

1          We've already been through this.  I'm not aware of

2     authority that says that if the purpose or one of the

3     purposes for which the movant is seeking to discover the

4     financial condition of the debtor is to prepare to evaluate a

5     forthcoming plan of adjustment, well then, 2004 is

6     inappropriate.

7          What they're really going for here is simply to put

8     this off and to ask that -- I think it was said quite

9     explicitly that the discovery we're seeking, we'll talk about

10    that down the road, we don't have to deal with it now, we can

11    deal with it later.  And as I said one month ago at the last

12    hearing on this, all that will do is ensure if discovery

13    begins later that this process will take that much longer

14    than it otherwise would have taken.  That is the only thing

15    that that delay will accomplish.

16         The second set of issues I was going to turn to

17    unless you have questions, Judge, are the use points, the

18    issue of the nondisclosure agreement and the mediation

19    agreement and then this Peaje order which the GO's are not a

20    party to that.

21         THE COURT:  Before you get there, as I'm

22    envisioning it, and it is I recognize a different situation

23    than a lot of 2004 exams which start at the beginning and are

24    sort of the fishing expedition which you've all quoted to me

25    one way or the other, I view the 2004 in this case as an

1    opportunity to have control over the production of

2    information.  And without me having to evaluate whether or

3    not the information comes voluntarily or not, it is a way and

4    I have the discretion under 2004 to limit the discovery.

5            So if I allowed the 2004 today, it would be limited

6    to the 17 categories of documents that have been requested

7    subject to objections as we work out; and that any new

8    requests for additional information would be in the form of

9    another request -- I guess another 2004 motion for additional

10   discovery.

11           Does that comport with your understanding of what

12   we're talking about here?

13           MR. ORSECK:  It certainly does.  And there is no

14   doubt that the Court has the very discretion you just

15   described.  And I think your November 21 order was an

16   expression of that and an implementation of that, and the

17   parties have proceeded accordingly.  You're making my point.

18           In fact, the idea that the movants are trying to

19   marshal 2004 as a way to just run roughshod and take

20   uncontrolled discovery over things that are relevant and not

21   relevant is just not the way it works and not the way it

22   needs to work before Your Honor.

23           THE COURT:  So the way I see it is that -- I don't

24   believe that the prior pending is a bar to this 2004.  I

25   don't think there's a direct enough conflict between the

1   pending actions and the requests for information and the

2   information here.  I also think that 2004 is an appropriate

3   way to get information about the financial condition of the

4   debtor.

5        I am seeing it, though, as a way to specifically

6   identify the categories of information that will be produced

7   in the context of the 2004 without waiving any rights that

8   AAFAF or the Oversight Board have to saying that the

9   documents should not be produced.

10        And I think that works into the categories that Mr.

11   Friedman just described.  You know, the two general

12   categories that would be usable for anything; the mediation,

13   which I do see as a separate category with some way of, as

14   you said, identifying information that should be removed from

15   that category.  And then there's an issue of whether or not

16   it should be in a 2004 or whether or not you're just claiming

17   a privilege, and consequently it shouldn't be produced, but

18   that group of documents, that the Court would then have the

19   opportunity to rule on whether or not they should be

20   produced.

21        MR. ORSECK:  Let me speak to that because we had a

22   conversation ten minutes before you took the bench, Your

23   Honor, and some of this was shared with us then.  To just

24   back up for a moment.  The data room contains materials that

25   are governed by or subject to an NDA or a mediation agreement

1    by and large.  And without saying anything about what's in

2    there, the terms of both of those instruments prohibit us

3    from using those materials in any way in the litigation.

4    They're drafted very carefully by lawyers.  We can't use

5    them.  We can't admit them in evidence.  We can't refer to

6    them.  We can't use them to cross-examine a witness at a

7    deposition.  They're there for us to see, but they are of no

8    use for purposes of a contested hearing, an adversary

9    proceeding or anything else.

10              One point that the Mr. Mungovan mentioned at the

11   outset is that we don't mention all this wealth of material

12   that has been put in the data room.  Well, there is material

13   in the data room, not everything we're looking for, but it is

14   as though a party to litigation said we will produce our

15   books and records, we'll provide the usual documentation

16   discovery provided, however, that you can never breathe a

17   word of it to the Court or the jury or anybody else.

18              So that has been our use objection and what we

19   asked in the motion and in our reply brief is that if the

20   respondents want to direct you to materials and say we have

21   produced X, Y, or Z to satisfy our obligation, but it's in

22   the data room, well, that's not fair for them to be able to

23   say that they can satisfy their obligation without allowing

24   us to use it.

25              So I think it's very clear that under 2004, if

1    you're going to grant the 2004 motion, as we urge you to,

2    that the materials to be produced have to be produced in a

3    way that we can use them.  Which brings me to Mr. Friedman's

4    four categories, but I don't want to forget to touch upon

5    some of the 17 requests because they have a few unique issues

6    of their own.

7            We are happy to hear that in category 1 that the

8    Oversight Board reporting packages, financial information of

9    various types will be produced; or to the extent they have

10   already been produced in the data room, they will be deemed

11   to have been produced subject to the 2004 order, if you enter

12   a 2004 order.  What they're proposing is we'll remove them

13   from the ambit of the NDA or the mediation agreement, and

14   we'll produce them to you voluntarily.  I'm urging you let's

15   not rely on voluntarily anymore.  Let's meet and confer and

16   be cordial and cooperative, but under the auspices of a 2004

17   order.

18           But as far as category 1 goes, we're in agreement

19   with that, reserving all our rights as to whether they've

20   produced everything we think they should produce, and they

21   get to reserve their right as to whether there are any

22   privileges or other types of objections that they may raise.

23           Same goes for the second category of materials.

24   Those are documents produced in another proceeding, an

25   adversary proceeding.  That's specifically one of our 17

1    requests.  And if they are agreeing to remove those as well

2    from the ambit of the data room and whatever protections

3    apply, that's great.

4         The third category is as it was described

5    "materials created for the purpose of mediation and in this

6    mediation folder" within the data room.  And as Mr. Friedman

7    explained it to me, what he had in mind are materials, for

8    example, where our advisors put questions to the respondents

9    or the respondents advisors in the context of mediation and

10   were provided answers in written form.  I think that's the

11   quintessential example.  And they want to maintain that those

12   should remain subject to the agreement.

13        We don't object to that either.  If it's something

14   that was created for purposes of the mediation, then it's for

15   purposes of the mediation.  And we don't wish to admit it

16   into evidence or cross-examine somebody on it.  I suspect the

17   only disputes there if they're not worked out are going to be

18   something that falls into the gray area of whether it was

19   preexisting, whether it was only attached to something

20   created for purposes of mediation.  But the one point I want

21   to make on this is again if they are going to cite such a

22   document as evidence to Your Honor of their compliance with a

23   2004 order, well then we need to be able to use it.  Because

24   if we can't use it, it's by definition useless.

25        THE COURT:  I don't think that's what they're

1  saying.  I think they're saying there's a separate category

2  of documents that are created for mediation and that are only

3  going to be used in the mediation.  And if you have a dispute

4  about whether or not that should be used broader, there will

5  be a mechanism for resolving that.

6          MR. ORSECK:  And we agree with that in principle.

7  We don't object as you described it.

8          THE COURT:  We're three for four.

9          MR. ORSECK:  The fourth is with respect to

10  materials that underlie the March 2017 fiscal plan, or as

11  they put it, the 2017 fiscal plans and materials that will

12  underlie the forthcoming fiscal plan.  We disagree with them

13  on that.  There's no doubt.  The presentation here was

14  referred to a fiscal plan in the event or insofar as one is

15  certified.  Well, one is going to be certified.  That's the

16  only way this case can end.  So there's no speculativeness

17  about what we're talking about.

18          What we're asking for now are the materials,

19  factual materials that underlie the already certified fiscal

20  plan and the to-be-certified fiscal plan because those

21  materials reflect the financial condition of the debtor.  And

22  to go to where this fits into the litigation, under PROMESA a

23  plan of adjustment must be consistent with the fiscal plan.

24  And, of course, the plan of adjustment must be fair and

25  equitable.

1          So we have a right if we are going to be able to

2     evaluate a plan of adjustment and decide whether we are going

3     to contest it, whether we agree with it, we have to assess

4     whether it is fair and equitable, which in turn raises the

5     question whether the fiscal plan on which it is based and

6     on -- and with which it must be as a statutory matter

7     consistent reflects the financial condition of the debtor in

8     a fair way.

9          THE COURT:  It seems to me though that this is the

10    area where we really need to deal with the privilege.  That

11    there's going to be included in various of your categories

12    ongoing data that's going to be produced.  And I think that

13    everybody's agreed to that.  Then you're going to have the

14    deliberative process effect -- until the fiscal plan is done,

15    I guess you're not going to know how much of this is actually

16    deliberative process or not.  But there is going to be a

17    category of documents that are going to be communications

18    relating to the formulation of this plan that are internal

19    analyses.

20         And it seems to me that that is the category that

21    we need to have a privilege log in some form, a description

22    of the document, the categories of documents being withheld.

23    And if you want to fight about it now, we can fight about it

24    once that's all teed up.

25         MR. ORSECK:  We agree in principle with that, too,

1    Judge.  I thought that they were proposing a broader

2    protection, which is to say, I'm pretty sure they've said,

3    that any material, be it factual or deliberative that

4    underlies the forthcoming fiscal plan shall not be produced

5    until after that fiscal plan is certified.

6           We understand how the deliberative process

7    privilege works.  If they want to create a log and say that

8    there was a sensitive conversation or a memorandum advising

9    one party by another that ought to be withheld, they can log

10   it.  We'll evaluate it.  We'll meet and confer with them, and

11   you can resolve any disputes.

12          But what I think they can't do is take the

13   categorical position that as a matter of law until the new

14   fiscal plan comes out, when it's introduced, when it's

15   certified, that prior to that time any underlying factual

16   information is deliberative.  That makes no sense.  It's not

17   consistent with the nature of the privilege.

18          THE COURT:  I'm not hearing that.  What I'm hearing

19   is something that says, while our consultants are working it

20   through and figuring out which is the underlying data that

21   they're actually using, and that's the process that we're

22   talking about, that's deliberative.

23          To the extent that we have facts about what is

24   actually happening and what the data is actual events, that's

25   being produced.  I have some nods at me and some blank

1     stares.

2          MR. ORSECK:  I just think it has to be addressed in

3     the context of a log because we can't tell what they're

4     putting in one category or another.

5          THE COURT:  I do think that there are two issues,

6     and I'm sorry.  But I think you have raised two issues with

7     respect to it.  Some of it is deliberative process.  And

8     another that I'm not clear on is whether you're saying

9     regardless of deliberative process I shouldn't be allowed to

10    order that under a 2004.

11         I don't know if that's a distinction with a real

12    difference given what the intent is for voluntary disclosure

13    or not.  I don't know if that's worth actually addressing.

14    Or maybe we just reserve it until the documents -- one of the

15    objections can be one, we're withholding it under

16    deliberative process; and two, we don't think we should have

17    to produce it under 2004.

18         MR. FRIEDMAN:  Your Honor, may I just try to

19    clarify?  I couldn't tell if you were asking me a specific

20    question in real time or not.

21         THE COURT:  Yes.

22         MR. FRIEDMAN:  So, Your Honor, Peter Friedman from

23    O'Melveny.  There are, I guess a variety of issues.  First of

24    all, with respect to data, some of the data is going to be

25    produced in that first category already, right?  Some of the

1    information that's being used in the fiscal plan will

2    obviously overlap with budgetary issues, will be driven by

3    financial information that's going to be in the very

4    reporting information that we're already providing.

5              We're not going to restrict the amount of data

6    we're providing because it also is related to the fiscal

7    plan.  What we don't think we have to produce certainly while

8    it's being developed are -- and shouldn't have to log because

9    I think in the history of bankruptcy, people don't get to

10   take discovery into ongoing plans of reorganization, for

11   example, in a typical case like telling us how you think

12   you're developing your plan of reorganization while we're in

13   that process of putting together models or putting together

14   analysis or having communications, we shouldn't have a

15   production obligation.

16             Let the process be finished.  And then at that

17   point if there's litigation over the fiscal plan or a plan of

18   adjustment, they can either start with voluntary requests

19   like we've provided them information in the past.  And if

20   they're entitled to it at that point, then we will also

21   categorically log information that's responsive to requests

22   that are allowed by the Court that we're seeking to withhold.

23   But it should not be an ongoing process pre certification in

24   addition to the other burdens that the Commonwealth is

25   dealing with and putting together where people get like real

1    time or quasi real time obligations to log or get documents

2    apart from the general financial reporting obligations which

3    I think people will see are quite robust.

4            MR. ORSECK:  Judge, our position is they have an

5    obligation, I don't know whether real time is every day, but

6    on a reasonable basis to update their production.  And that

7    is both with respect to the forthcoming fiscal plan but also

8    as to the old fiscal plan.  And they've told us today they've

9    reinforced that there is a model that underlies the existing

10   fiscal plan from DevTech that they have provided some of

11   voluntarily.  But we've had additional questions about it for

12   inputs into it that are not clear from the model, and we've

13   had our experts look at it.  They have told us that they will

14   not produce those materials.  I am not at liberty to describe

15   them because that is subject to their confidentiality

16   restrictions.

17           But there's no reason that those materials should

18   be withheld either on an argument that they're not the proper

19   subject of a 2004 discovery or that they are deliberative.

20   So I think they can log -- we can work out whether those logs

21   can be done on a categorical basis as opposed to some massive

22   log that goes through every particular document.  Experienced

23   counsel can work these things out.  But kicking this out

24   again until after a fiscal plan is certified as a practical

25   matter is going to impede the process.

1              THE COURT:  I'm having a very hard time visualizing

2     what documents we're talking about that would not be covered

3     by the deliberative process.  If they're giving out the data

4     and have not made a determination as to which model they're

5     actually using, then why isn't that protected at the moment?

6              MR. ORSECK:  Because that's factual material.  A

7     deliberative process protects policy discussions about what

8     they ought to do, what policy to pursue, the purpose being

9     that you don't want to chill open and candid conversations

10    about that.

11             But if they are developing factual information,

12    whether it's in the form of a model or a list of inputs, that

13    should be produced.

14             THE COURT:  But isn't it like a draft expert

15    report?  I'm really just trying to visualize what we're

16    talking about here.  They're taking data and trying to figure

17    out what data they take and what percentages and what

18    economic models they're going to use, and it's not done yet.

19    So I understand that we shouldn't be withholding the data.

20    There shouldn't be a dump on February 24 or whatever the day

21    is that this model comes out.

22             MR. ORSECK:  Our position is they should -- we're

23    talking about two different things.  There's the material

24    underlying the as-yet-to-be-produced fiscal plan.  If they

25    are withholding material on deliberative process grounds on a

1    reasonably timely basis, they should provide a log of what

2    that is.  There may be areas, there may be documents that are

3    quintessentially deliberative.  Discussions among board

4    members would be an obvious example where they want to put

5    that into a privilege log.  But they should log it.  They

6    shouldn't just get to say we're not producing material to you

7    until after the fiscal plan is certified.  And they've even

8    told us that to the extent these materials they view as

9    deliberative they won't produce them after the fiscal plan is

10   certified either.

11          But the second category that I'm talking about and

12   is the specific subject of a request is our request number 8,

13   which I mentioned a moment ago, and that is a model the

14   purpose of which I will not describe.  But it is to generate

15   inputs into the existing fiscal plan.  It is to generate

16   numbers that inform the fiscal plan.  That has been produced

17   voluntarily.

18          But there are pieces of it that we don't see that

19   are just inputs that come from somewhere else and that are

20   not explained.  They are withholding that material, or they

21   assert an objection to producing that material.  We sent them

22   a list of what we want, and they have declined to do that.

23          MR. FRIEDMAN:  That's not true.

24          THE COURT:  Isn't this the one though that you just

25   said that you have produced additional information and

1    there's a deposition or something?

2            MR. ORSECK:  No.  That's different.  That's

3    Dr. Wolfe which they have produced.  Excuse me.

4            The materials that I'm talking about they have

5    placed in category four which is to say we would not be able

6    to use it, which to me is the same point.

7            So on the use issue, Judge, to circle back, we are

8    in agreement in principle on the first two categories.  On

9    the third category we're also in agreement in principle so

10   long as what they are holding within the mediation folder in

11   the data room are materials that relate only to the mediation

12   and are in the underlying factual materials.

13           Where we disagree are as to materials that underlie

14   the old fiscal plan and the new fiscal plan.  We think that

15   they are both discoverable under 2004.  And to the extent

16   they want to assert deliberative process privilege, they

17   should just go ahead and assert it.

18           The last thing I want to do is touch on a couple of

19   the specific requests that are outstanding.  Most of these

20   they've said that they will continue to look for materials.

21   We've asked for a response in a week as to where they stand

22   on these.  They've asked to do it a bit later than that.  But

23   the one I want to raise --

24           We had a request that asked for all documents that

25   identify what they have defined as essential services.  Under

1    PROMESA there is a requirement to fund essential services.

2    And they have at times taken the position that essential

3    services come before payment of the debt to GO Bondholders.

4    So we have asked them identify what the essential services

5    are in the fiscal plan or any other discussion or

6    identification of what are essential services.

7         We were told in a meet and confer, and if counsel

8    will confirm this, we will deem request number 12 to be

9    satisfied, but we were told that they are unaware of any such

10   documents that identify essential services or define

11   essential services either that were provided to the Oversight

12   Board or that have been used or relied upon in connection

13   with the formulation of any draft or final fiscal plan.

14        If they will make that representation, then we deem

15   that request satisfied.  I think the rest remain to be worked

16   out as to what they will and won't produce as to by when and

17   the question of use and whether deliberative process must be

18   logged or not.

19        MR. FRIEDMAN:  Peter Friedman from AAFAF, Your

20   Honor.  I will say with respect to the last issue, number 12,

21   that is my understanding with respect to essential services.

22   We will continue to look.  If we identify something that

23   falls into the category of -- so I view it as part of a

24   continuing obligation on our part to look to see if there are

25   documents about essential services that have been provided to

1   the FOMB by AAFAF or used or relied upon in connection with
2   the formulation of a fiscal plan.  I'm not aware of it.
3   We've made inquiries.  We will keep looking.  And if it turns
4   out, I understand we have an obligation to produce.  I have
5   made a representation based on my current understanding and
6   our firm's understanding based on reasonable increase, we'll
7   keep looking.
8           THE COURT:  So as I understand, I have a decision
9   as between December 22 and January 5 on when you're
10  reporting?
11          MR. ORSECK:  I think that's right.
12          THE COURT:  I'll give you January 5 if you want to
13  wreck your holidays.  I don't have a problem with that.
14          MR. MUNGOVAN:  Your Honor, can I just be heard at
15  the podium with respect to one item?
16          THE COURT:  Yes.
17          MR. MUNGOVAN:  Your Honor, Timothy Mungovan for the
18  Oversight Board.  What is it specifically that we're supposed
19  to be reporting on for January 5?
20          THE COURT:  Are you asking me?  As I understood it
21  from the papers, that was your agreement as to when you were
22  going to report on what you had been searching for, and they
23  wanted you to give them a status report as of December 22.
24  You wanted to give a status report as of January 5.
25          MR. MUNGOVAN:  That's right, Your Honor.

```
 1              THE COURT:  I see that January 5 is acceptable.

 2              MR. MUNGOVAN:  Thank you, Your Honor.  To the

 3      extent that the Court wants to hear further discussion

 4      specifically with respect to Mr. Orseck's and the movants'

 5      request for what we'll call contemporaneous logging of what

 6      we would consider to be core deliberative process and

 7      communications.

 8              THE COURT:  Let me sum up.  Have a seat for a

 9      moment and let me figure out where we're going.  As I see it,

10      I am going to allow a 2004 exam as a way to control the

11      discovery in this case.  All right?  I don't see it as a

12      penalty, and I'm not making an evaluation as to whether

13      things have been provided in a timely manner or not.  That's

14      not my intent.  But I do think that the 2004 is an

15      appropriate way to proceed.

16              The 2004 that I'm allowing is limited to these 17

17      categories subject to the objections that we're going to be

18      dealing with.  All right?  So by allowing it I am not making

19      a ruling on any of the objections that have been raised to

20      date.  Okay?  If there are additional requests, and if there

21      are additional methods of discovery, there have to be new

22      2004 motions.

23              So in other words, I'm not allowing depositions

24      right now.  I'm not allowing interrogatories right now.  I am

25      just dealing with these 17 categories of documents.
```

1          To the extent that people have moved to join in the

2    motion, I haven't seen any objections.  But it's limited

3    again to this -- to what I'm allowing today.  So I know, for

4    example, the UCC requested broader involvement.  I'm not

5    allowing it broader right now.  At least your motion referred

6    to roles in depositions and the like.  I'm not allowing that

7    discovery right now, so I'm not making a ruling one way or

8    the other on the role of any other parties.  Okay?

9          There's a proposal floating about this usage, and

10   I'm wondering whether we need to let you have some time to

11   hammer it out and see what it looks like.  I don't know the

12   answer to that.  And the second thing that I'd like to talk

13   to on timing is that you had a proposal in -- the movants

14   have had a proposal about how to resolve specific objections

15   that might come along, and they were all linked to dates

16   relating to OMNI hearings.  And I'm wondering whether we want

17   to go on that route.

18         I'm wondering if these kinds of issues need to be

19   brought up at the Omnibus hearings or whether it's not more

20   efficient to do it in hearings that are just related to

21   discovery provided you can get to Massachusetts, which is

22   apparently a big if.

23         MR. MUNGOVAN:  Your Honor, for the Oversight Board,

24   we think it's more efficient to do it specifically in a

25   hearing before Your Honor in this courtroom.

1          MR. FRIEDMAN:  That's because he lives here.

2          MR. ORSECK:  We have no objection to that.  Our

3    only purpose was to make sure that this remains under your

4    supervision on a periodic scheduled basis.

5          THE COURT:  I think it would just be easier to not

6    have it on the docket for the bigger hearings.  All right.

7    So whatever schedule we set up we'll be assuming that the

8    discovery issues will be dealt with separately here.  Either

9    here or -- we can do it in New York, but we'll do it as

10   separate hearings.  Okay.

11         What do I do with the usage right now?  Do I ask

12   you to further explain what's being withheld, on what basis,

13   or do you want to argue it further now?  I think I'm hearing

14   agreement on categories I'll call them one, two, three.  It's

15   the fourth that's the problem.  To the extent that I'm having

16   a hard time sort of conceptualizing where the argument is.

17   And I don't know if I need to see it in writing or if I want

18   to just keep letting you talk.

19         MR. ORSECK:  Gary Orseck for the GO's.  What I

20   would propose is that you enter an order with respect to

21   categories one, two and three on which there seems to be

22   agreement.  And I think we can take a short period of time

23   since this was just raised with us today to see if we can

24   reach an agreement to present to you on category four.

25         THE COURT:  So what I would say then is that the

1    parties have agreed to a process whereby documents produced

2    subject to the NDA and the other litigation, I think it's

3    more than one, other litigation restrictions can be used for

4    all purposes, reserving objections to the introduction of

5    specific documents.  I'm not making a ruling on admissibility

6    or anything like that.

7            MR. MUNGOVAN:  And purpose, Your Honor.  Timothy

8    Mungovan for the Oversight Board.  The Oversight Board isn't

9    waiving, for example, an argument that they may have that

10   their intended use of the document is an impermissible attack

11   on a fiscal plan, for example.  What we're essentially

12   agreeing is that the restriction that's in place in an NDA,

13   for example, covering the data room or covering documents

14   produced in another adversary proceeding, the movants can

15   attempt to use those documents in a separate proceeding in

16   some way, whether to challenge the plan of adjustment or

17   otherwise.  We're reserving all of our rights to challenge

18   that future use of the document.

19           THE COURT:  And I think everybody agrees on that.

20   Why don't I give you ten days or two weeks to draft this.

21   Okay?  And I'll take a look.

22           MR. MUNGOVAN:  That's fine, Your Honor.

23           MR. ORSECK:  Yes, Your Honor.

24           THE COURT:  I don't know.  Where are we?  On

25   Christmas day?

 1              MR. ORSECK:  Ten days would bring us to before
 2      Christmas.
 3              MR. MUNGOVAN:  It would actually take us to
 4      Christmas Eve, Your Honor.
 5              THE COURT:  What do you want?  Do you want to do it
 6      before?
 7              MR. ORSECK:  I'd rather do it before Christmas.
 8              THE COURT:  All right.  Submit to me either a joint
 9      proposal on all four categories or identify -- are you okay?
10              MR. FRIEDMAN:  Yes.
11              THE COURT:  I see a lot of heads, yes or no.  I'm
12      trying to figure out what you're saying.
13              MR. FRIEDMAN:  Sorry, Your Honor.  Is this on the
14      four categories or is this on the protective order that we're
15      supposed to be submitting?
16              THE COURT:  Let me do it in two stages.  Before
17      Christmas you shall submit a joint proposal as to usage.
18      Period.  If you can agree on four categories, that's fine.
19      If you can't agree on the fourth, agree on a schedule and a
20      way to present it to me.  Okay?  And we will deal with it
21      promptly.  Okay?
22              But I don't expect you to file your legal briefs --
23      if the fourth category is not resolved, just present to me
24      what schedule you want and the manner in which you want to do
25      it, and it will be done soon.  Okay?  Does that work?

1           MR. FRIEDMAN:  That's fine for AAFAF, Your Honor.

2           MR. DiPOMPEO:  Thank you, Your Honor.  Christopher

3    DiPompeo of Jones Day.  We represent the U.S. Secured

4    Creditors.  I did want to raise one issue with respect to

5    what I think is category two, the documents from other

6    adversary proceedings.  The Oversight Board indicated in its

7    objection that it would produce documents it received from

8    the U.S. Bondholders in discovery in the *ERS v. Altair*

9    litigation which I know the Court is all too familiar with.

10          We would like to preserve our opportunity to object

11   to that.  We don't think those documents which pertain to --

12   as the Court will remember the perfection and enforceability

13   of the U.S. Bondholders liens against the ERS property are

14   relevant to the Commonwealth's fiscal situation.  Many of

15   them are also subject to a protective order.  We actually

16   don't think that the movants are really interested in those

17   documents.  Their motion was more focused on the need for all

18   creditors to have access to all documents produced by the

19   debtors which wouldn't apply to documents produced by the

20   bondholders.

21          I spoke about this very briefly with

22   Mr. Orseck.  I think we'll be able to work it out.  We

23   haven't had the time to do it, but we'd ask to be given the

24   opportunity to work that out and except the U.S. Bondholders

25   from that category or if not preserve opportunity to move for

1    a protective order or some other relief to prevent disclosure

2    of that information.

3           THE COURT:  I think it's appropriate for you to

4    bring it up, but I think we're only talking about the

5    documents that are being produced by AAFAF who are the

6    debtors.  Does that work?

7           MR. MUNGOVAN:  Yes, Your Honor.  This is Timothy

8    Mungovan over for the Oversight Board.  It was never the

9    Oversight Board's suggestion to suggest it was planning to

10   produce documents produced by a plaintiff or a petitioner in

11   an adversary proceeding.  We're talking about producing

12   documents that either AAFAF or the Oversight Board produced.

13          So, for example, we were not intending to produce

14   the ERS bondholders' documents.  We don't think that we have

15   the authority to do that.  The same goes for Peaje and the

16   Peaje movants' documents and the Peaje adversary proceeding

17   in the HTA Title III case.  To the extent that the movants

18   here are looking for the documents either from Mr. DiPompeo's

19   clients, the ERS bondholders or from Peaje, they would have

20   to take that up directly with those parties in interest.

21          THE COURT:  Mr. Orseck, are you okay with that?

22          MR. ORSECK:  We're okay.  And our 17 requests

23   didn't call for those documents.

24          MR. FRIEDMAN:  Your Honor, Peter Friedman for

25   AAFAF.  One thing it may necessitate us doing is, for

```
1    example, with respect to deposition transcripts or deposition
2    exhibits, we just have to check to see if any of the exhibits
3    for witnesses are documents that were provided to AAFAF or
4    the Oversight Board by, for example, Peaje.  And we'll just
5    need to remove those so that you don't have them -- counsel
6    for GO Bondholders or other bondholders don't inappropriately
7    have them.  So I want to make clear that we're going to honor
8    that across the board.
9            THE COURT:  If it becomes a problem, we'll deal
10   with it.
11           MR. DiPOMPEO:  Thank you, Your Honor.
12           THE COURT:  Before I keep rambling, does anybody
13   else want to be heard?  We're good.  All right.  So if I say
14   yes on the 2004 subject to the limitations I have explained,
15   do I have to write that or do you all understand it?  I'll
16   write it short.  And then what date do you want for
17   production of the proposed usage order?
18           MR. MUNGOVAN:  Next Friday, Your Honor?
19           MR. ORSECK:  Yes.
20           MR. LEVIN:  Your Honor, Richard Levin for the
21   Retiree Committee.  Just to clarify one point.  You noted
22   there were no objections to any of the joinders.  But in
23   describing the order that you were seeking, you didn't
24   mention that.  So I just wanted to make sure that was
25   included in the order.
```

1              THE COURT:  It will be to the joinders are allowed

2      as I stated, though, limited to whatever discovery I've

3      allowed now.  I didn't hear any objections that sharing with

4      the movants here should be limited to the movants.  So I'm

5      going to assume it's going to everybody who joined in.  Okay.

6      The proposed usage order only needs to be okayed by the

7      movants and the respondents.  Okay?  Are there other issues

8      that I missed?

9              MR. ORSECK:  I don't think so.

10              THE COURT:  No?  Wow.  Okay.  Then I should let you

11      go.

12              MR. MUNGOVAN:  Thank, Your Honor.

13              MR. ORSECK:  Thank you.

14              THE CLERK:  Court is in recess.

15              THE COURT:  We also need the plan for resolving

16      disputes.  That should be included in the usage order.  You

17      know how you had raised a dispute three weeks before, two

18      weeks before, one week before, include that in your proposal

19      for the usage.  All right.  Thank you.

20              (Court recessed at 2:35 p.m.)

21

22

23

24

25

```
1                  - - - - - - - - - - -

2                       CERTIFICATION

3

4          I certify that the foregoing is a correct

5     transcript of the record of proceedings in the above-entitled

6     matter to the best of my skill and ability.

7

8

9

10    /s/ Joan M. Daly                    December 15, 2017

11    _____                _____

12    Joan M. Daly, RMR, CRR              Date
      Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25
```