IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In Re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO<br><br>Debtor | PROMESA<br>Title III<br>No. 17 BK 3283-LTS |
| In Re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA")<br><br>Debtor | PROMESA<br>Title III<br>No. 17 BK 3284<br><br>(Joint Administration Requested) |
| CORPORACIÓN DE SERVICIOS INTEGRALES DE SALUD DEL AREA DE BARRANQUITAS, COMERÍO, COROZAL, NARANJITO Y OROCOVIS<br><br>Plaintiff,<br><br>v.<br><br>COMMONWEALTH OF PUERTO RICO<br><br>Defendant | PROMESA<br>Title III<br>Adv. Proc. No. Civil No. 17- |

**ADVERSARY COMPLAINT**

**TO THE HONORABLE COURT:**

COMES NOW the Corporación de Servicios Integrales de Salud del Area de Barranquitas, Comerío, Corozal, Naranjito y Orocovis (Corporación de Servicios) through its attorney and very respectfully states, alleges and prays:

**I. INTRODUCTION**

1. The Corporación de Servicios Integrales is a corporation incorporated in PR with its principal place of business in Naranjito, receives grant funds under Section 330 of the Public Health Service ("PHS") Act, 42 U.S.C. § 254b ("Section 330"), in order to provide care to medically underserved populations in their communities. 42 U.S.C. §§ 254b(e), (k). Hence, it provides essential medical services to the neediest in PR. Federal law requires the Commonwealth to make special payments to the Corporación de Servicios Integrales for certain Medicaid services. It is considered a "Federally-qualified health center" (commonly known as FQHC).

2. In 1997, Congress mandated a two-part payment system for FQHCs in managed care: First, a state's contract with a managed care contractor (or managed care organization, "MCO") must require the MCO to pay an FQHC "not less" than the MCO would pay any other provider for similar services. *See* H. Rep. 105-217, at 869 (2007) (MCO required to "pay the FQHC . . . at least as much as it would pay any other provider for similar services"). Second, states must make supplemental payments (generally referred to as "wraparound payments" and in this Report "WAPs") to each FQHC equal to the amount by which the FQHC's per visit cost-based or PPS rate exceeds the payment the FQHC received from the MCO. States must make these WAPs "in no case less frequently than every 4 months." 42 U.S.C. § 1396a(bb)(5).

3. Every United States Court of Appeals that has considered the issue, including the First Circuit, has concluded that FQHCs have an enforceable right to obtain such payments by suing states under 42 U.S.C. § 1983 for prospective injunctive relief. *See Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 74–75 (1st Cir. 2005); *California Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1011–13 (9th Cir. 2013); *New Jersey Primary Care Ass'n Inc. v. New Jersey Dep't of Human Servs.*, 722 F.3d 527, 539 (3d Cir. 2013); *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 209–12 (4th Cir. 2007); *Cmty. Health Ctr. v. Wilson–Coker*, 311 F.3d 132, 136, 140 (2d Cir. 2002). The Commonwealth since 1989 has largely ignored FQHC payment requirements.

4. Several FQHC, including movant filed for an injunction in federal court against the Commonwealth for future payments and won and filed in Commonwealth Court to recover retroactive payments barred buy the Eleventh Amendment and also won. Corporación de Servicios Integrales has judgments in Commonwealth Court totaling in excess of $51,000,000. To date, the Commonwealth has used dilatory tactics not to pay said judgments.

5. Section 7 of PROMESA, 48 U.S.C. § 2106, states:

> Except as otherwise provided in this Act, nothing in this Act shall be construed as impairing or in any manner relieving a territorial government, or any territorial instrumentality thereof, from compliance with Federal laws or requirements or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory.

6. In addition, section 204(d) of PROMESA, 48 U.S.C. § 2144(d), states, *inter alia*, as follows:

> IMPLEMENTATION OF FEDERAL PROGRAMS.—In taking actions under this Act, the Oversight Board shall not exercise applicable authorities to impede territorial actions taken to—
> (1) comply with a court-issued consent decree or injunction, or an administrative order or settlement with a Federal agency, with respect to Federal programs;

3

(2) implement a federally authorized or federally delegated program;

7. Also, section 304(h) of PROMESA, 48 U.S.C. § 2144(h), states:

PUBLIC SAFETY.—This Act may not be construed to permit the discharge of obligations arising under Federal police or regulatory laws, including laws relating to the environment, public health or safety, or territorial laws implementing such Federal legal provisions. **This includes compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties.** (Bold added)

8. Plaintiff seeks declaratory judgment relief determining that Plaintiffs' claims for all supplemental payments for Medicaid services owed by the Commonwealth for the period between 1997, onward, and that are object of Adversary Proceeding 17-0227 (LTS), are non-dischargeable and unimpaired by the Commonwealth's filing of a Title III proceeding due to the above.

**II. JURISDICTION AND VENUE**

9. The Honorable Court's jurisdiction is based on 28 U.S.C. § 1331 since PROMESA is a federal statute. The Court also has jurisdiction pursuant to 48 U.S.C. § 2166 because this action arises in and relates to a Title III proceeding under PROMESA. Jurisdiction is also based on 42 U.S.C. § 1983. Venue is proper in this District under 28 U.S.C. § 1391(b). Venue is also proper under 48 U.S.C. § 2167 because this adversary proceeding is brought in a case filed under Title III of PROMESA.

10. The declaratory relief is sought under under 28 U.S.C. §§ 2201 and 2202 and 11 U.S.C. § 105(a) and 42 U.S.C. § 1983.

**III. THE FACTS**

11. Plaintiff is a federally funded health center that participates in two distinct, but complementary federal healthcare grant programs: Grants to States for Medical Assistance

4

Programs ("Medicaid"), 42 U.S.C. § 1396-1(1), and Section 330 of the Public Health Service ("PHS") Act ("Section 330"), 42 U.S.C. § 254b.

12. Medicaid and Section 330 are different in several ways. Medicaid makes health care services available to needy individuals and families whose resources are insufficient to meet the costs of necessary medical services. *See* 42 U.S.C. § 1396-1(1). Section 330, on the other hand, supports health care services for patients in medically underserved communities who do not qualify for public assistance, like Medicaid, and cannot afford to purchase private insurance or pay out of pocket for healthcare. 42 U.S.C. § 254b.

13. Under Medicaid, the federal government gives grants to states (PR is state for purposes of the Medicaid statute, see, 42 U.S.C. § 1301(a)(1)) to make medical assistance available to eligible beneficiaries. Section 330, however, authorizes grants to private health centers which provide ambulatory healthcare services to all individuals who reside in the health center's catchment area. Despite these differences, Medicaid and Section 330 are two types of the same species – federal grants – and grantees of Medicaid and Section 330 are both subject to certain requirements applicable to federal grants. For one, both the Commonwealth (as a Medicaid grantee) and Plaintiff (as a Section 330 grantee), agree, in exchange for federal funding, to abide by federal law governing the federal grant program in which they participate.

14. In addition, both the Commonwealth and Plaintiff must use federal grant funds in furtherance of the specific purpose for which Congress appropriated the funds. Also, the Commonwealth and Plaintiff must comply with the federal government's detailed cost principles about which costs a grantee may – and may not – incur in furtherance of the grant program. *See* 45 C.F.R. § 74.27 (2007). For these reasons, courts have held that federal grantees do not own grant funds but rather grantees hold such funds in trust for the benefit of

5

program beneficiaries. The trustee relationship is not limited to federal funds. In exchange for federal funds, the Commonwealth and Plaintiff dedicate certain non-federal funds to the specific purpose for which Congress appropriated the federal funds, and they follow the same detailed cost principles in spending those non-federal funds.

15. Under Medicaid states agree to provide certain mandatory services. 42 U.S.C. § 1396a. States accept federal funds to support these mandatory services, but agree to finance the rest with non-federal funds in an amount "equal to all of such non-Federal share." 42 U.S.C. § 1396(a)(2). With regard to these non-federal funds, states agree to follow the same cost principles that they follow in expending federal grant funds. Under Section 330, any income a grantee generates must be used to further the objectives of Section 330 and may not be used for any purpose specifically prohibited by Section 330. 42 U.S.C. § 254b(e)(5)(D).

16. Health centers receive Section 330 grants to provide healthcare services to uninsured and underinsured patients located in medically underserved areas. 42 U.S.C. § 254b(e)(1)(a). Congress also requires health centers that receive Section 330 grants to serve as Medicaid providers. 42 U.S.C. §§ 254b(a)(1) and 254b(k)(3)(G).

17. From the outset of the health center program, the Ford Administration raised concerns that state Medicaid programs would under-reimburse health centers and divert the money appropriated under Section 330 to subsidize Medicaid. S. Rep. No. 94-29, at 5 (1975), reprinted in 1975 U.S.C.C.A.N. 469. To address this concern, Congress added special provisions to Section 330. *See* S. Rep. 94-29 (1975). First, each health center grantee must establish "a schedule of fees or payments for . . . its services consistent with locally prevailing rates . . . and designed to cover its reasonable costs of operation . . ." 42 U.S.C. § 254b(k)(3)(G)(i). Although federal law requires health centers to discount services for patients

6

who cannot afford the fees, *id.*; *see also* § 254b(k)(3)(G)(iii)(I), it prohibits health centers from discounting services provided to beneficiaries of Medicaid, Medicare and "any other public assistance program or private health insurance program." 42 U.S.C. § 254b(k)(3)(G)(ii)(II). This provision ensures that the Medicaid program will be charged its fair share of the costs of providing covered services to Medicaid beneficiaries.

18. Second, health center grantees must make "every reasonable effort" to collect reimbursement for services provided to patients who have public or private health insurance. 42 U.S.C. § 254b(k)(3)(G)(ii). This provision ensures that health centers collect amounts charged to the Medicaid program.

19. By entrusting the health centers with federal funds and delegating to them the responsibility to safeguard these funds, Congress made health centers "bailees" for federal. At the same time, Congress recognized that these provisions alone would not stop the unlawful subsidy: "[B]ecause of varying state Medicaid programs, and restrictive regulations with respect to both Medicare and Medicaid, most centers are not able to collect more than a small percentage of their costs from these public programs." S. Rep. No. 94-29, at 6. As a result, Congress suggested certain legislative changes to Medicaid. *Id.* at 7 ("[T]he Committee believes…that public and private health insurance coverages should be modified so as to cover the services of these centers.").

20. In 1988 Congress once again confronted the reality that the subsidy the Ford Administration had predicted was ever-present. Congress has this to say:

> The Committee also wishes to stress that Federal grant funds are "last dollar" to other funds available to health centers for the provision of comprehensive health services to medically underserved populations. The Committee finds totally unacceptable the position apparently taken by some states that, because health centers are obligated to serve everyone, grant funds are available to reduce the level of reimbursement paid for services to Medicaid

recipients." S. Rep. No. 100-343, at 20, 1988 U.S.C.C.A.N. 1165, 1178.

In 1989, Congress amended the Medicaid Act, designating health centers that receive Section 330 funds as "Federally-qualified health centers" (commonly known as "FQHCs") for Medicaid payment purposes and requiring states to offer and cover FQHC services in their Medicaid programs.

21. The amendment required that states pay FQHCs 100 percent of the FQHC's costs that are reasonable and related to providing FQHC services to Medicaid beneficiaries. Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, Title VI, Section 6404; 42 U.S.C. § 1396a(a)(13)(E), later reclassified at 42 U.S.C. § 1396a(a)(13)(C). Congress's explicit motive for passing the new payment requirement was to avoid having Section 330 grants diverted to fund Medicaid services:

> The Subcommittee on Health and the Environment heard testimony that, on average, Medicaid payment levels to Federally-funded health centers cover less than 70 percent of the costs incurred by the centers in serving Medicaid patients … To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is compromising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.
> ***
> To ensure that Federal [Public Health Service] Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries, States would be required to make payment for these [FQHC] services at 100 percent of the costs which are reasonable
> and related to the cost of furnishing those services….
> H.R. Rep. No. 101-247, at 392-393, reprinted in 1989 U.S.C.C.A.N. 2118-19.

22. From 1989 until 2000, the Medicaid FQHC payment provision remained at 100 percent of a health center's reasonable costs in furnishing FQHC services. In December 2000, Congress changed the FQHC payment provision to a cost-related prospective payment system ("PPS") methodology, which requires states to reimburse FQHCs at a prospective, or predetermined, rate per patient visit (also known as an "encounter"). 42 U.S.C. § 1396a(bb).

23. When states began to experiment with managed care[2] to deliver Medicaid services, Congress again carefully calibrated state payment responsibility to ensure that Medicaid paid its fair share of the costs of providing Medicaid services to Medicaid beneficiaries. Congress first required the MCOs to reimburse FQHCs at 100 percent of those FQHCs' reasonable costs. H.R. Rep. 105-217, at 868 (July 30, 1997).

24. After concerns that MCOs were not fully paying FQHCs for Medicaid services, Congress mandated a two-part payment system for FQHCs in managed care: First, a state's contract with an MCO must require the MCO to pay FQHCs "not less" than the MCO would pay any other provider for similar services. *See* H. Rep. 105-217, at 869 (2007) (MCO required to "pay the FQHC . . . at least as much as it would pay any other provider for similar services"). Second, states must make supplemental payments to FQHCs equal to the amount by which the FQHC's cost-based or PPS rate exceeds the payment the FQHC received from the MCO. *See id*. ("[s]tates would be required to make supplemental payments to the FQHCs" and "[s]uch payments would be equal to the difference between the contracted amount and the cost-based amount")[1]. States must make these supplemental payments "in no case less frequently than every 4 months." 42 U.S.C. § 1396a(bb)(5).

25. Since the mid-1990s, the Commonwealth has elected to participate in Medicaid. The Commonwealth's Medicaid program is jointly financed by the federal government and the Commonwealth. In general, where the Medicaid program is concerned, there are no upward limits on the total amount the federal government will pay. As long as the costs being charged are "allowable" and the state pays its share, the federal match must be made.

26. The federal share of the Commonwealth's Medicaid program, however, is different. The federal government pays fifty-five cents for every dollar spent by the Commonwealth up to

9

an annual ceiling established by 42 U.S.C. § 1308(g). The ceiling was temporarily eased under the Patient Protection and Affordable Care Act, Pub.L. 111-148 § 2005, 124 Stat. 119, 283 (2010), but the federal share is being gradually returned to its pre-ACA limit. The Commonwealth, for its part, is obligated to contribute any remaining funds necessary to fulfill its obligations under Medicaid.

27. The Commonwealth implements its Medicaid program through managed care. In the past, Puerto Rico was divided into ten (10) regions. For each region, a single MCO was responsible for Medicaid services. All providers of Medicaid services, including Section 330 grantees, were forced to contract with the MCO that has exclusive responsibility for the region in which the providers were located.

28. From 1989 through 2010, the Commonwealth has failed to pay Plaintiffs for Medicaid services as required by law. Among other things, the Commonwealth has:

a. neglected to calculate federally-required rates for any Health Centers;

b. failed to implement any process for Health Centers to claim supplemental payments from its Medicaid program when MCOs paid the Centers less than the Medicaid Act's required amounts; and

c. refused to make supplemental payments to Health Centers to make up the

difference between the Health Centers' required rates and the amounts paid by the MCOs.

29. The MCOs participating in the Commonwealth's Medicaid program systematically paid Health Centers significantly less than their costs for providing Medicaid services. Because of the chronic underpayment, Section 330 grantees were forced to use their Section 330 grant funds to pay for Medicaid services provided to residents of the Commonwealth– the precise result Congress intended to avoid. Consequently, the Commonwealth failed to meet its

---

[1] These supplemental payments are generally referred to as "wraparound."

requirement to contribute matching funds to the Medicaid project and in the process appropriated federal money for an unlawful purpose.

30. In 2002, the Associate Administrator for Primary Health Care of the Health Resources and Services Administration ("HRSA"), the HHS agency responsible for administering Section 330 PHS Act grants, advised all Puerto Rico health centers to take measures to prevent the unlawful Medicaid subsidy:

> We are . . . concerned that the [PHS Act Section] 330 grant dollars may be paying for services to the health care reform population that are beyond the scope of services for which the funds are intended... [T]he health centers should consider not renewing any future contracts since the MCOs have structured a program that essentially transfers financial risk for most health center costs to the federally funded health centers in Puerto Rico.

31. In 2002, Plaintiffs initiated a lawsuit against the Commonwealth in the Puerto Rico Court of First Instance, San Juan Part. *See Asociación de Salud Primaria de Puerto Rico, Inc., et. al. v. Estado Libre Asociado de Puerto Rico, et. al.*, Civil No. KPE02-1037. Plaintiffs sought an order compelling the Commonwealth to make supplemental payments for Medicaid services. The Court of First Instance has entered partial final judgments amounting to over $51,000,000, plus post-judgment interest, in supplemental payments for Medicaid services owed to plaintiff.

32. The Court of First Instance, however, has yet to consider Plaintiffs' claims for supplemental payments for Medicaid services owed for the period between 1997 to 2000, which are covered by the predecessor FQHC payment statute and methodology. See, 42 U.S.C. § 1396a(a)(13)(E), later reclassified at 42 U.S.C. § 1396a(a)(13)(C).

33. The state court litigation is ongoing and Plaintiff alleges that the Commonwealth owes them a significant amount for Medicaid services in excess of the amounts already awarded in the prior Judgments. Plaintiff's claims were removed to this Court pursuant to 48

11

U.S.C. § 2166(d). *See*, *Asociacion de Salud Primaria de Puerto Rico, Inc., et. al. v. Commonwealth of Puerto Rico*, *et. al.*; Case No. 17-00227-LTS (D.P.R. Aug. 2, 2017).

34. Plaintiff joined others in federal court to request payment by the Commonwealth. After some litigation and in view that the Commonwealth was not paying what was owed, Federal Court issued a prospective injunction. It also held that the 11th Amendment barred a retroactive injunction and sent that controversy to the Commonwealth Courts, *supra*.

**IV. CLAIMS FOR RELIEF**

35. Plaintiff realleges paragraphs 1-34.

36. PROMESA prohibits the "impairing or in any manner relieving a territorial government, or any territorial instrumentality thereof, from compliance with Federal laws or requirements or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory." 48 U.S.C. § 2106. Both the Medicaid and Section 330 programs are the type of federally authorized or federally delegated programs protecting the health and safety of persons in the Commonwealth referenced in 48 U.S.C. § 2106.

37. PROMESA also prohibits "the discharge of obligations under Federal police or regulatory laws, including laws relating to the environment, public health or safety, or territorial laws, implementing such Federal legal provisions. This includes compliance obligations, requirements under consent decrees or judicial orders and obligations to pay associated administrative, civil or other penalties." 48 U.S.C. § 2164(h).

38. The Removed Claims seek to enforce precisely the type of obligations under Federal police or regulatory laws, including laws relating to the environment, public health or safety, or territorial laws" referenced in 48 U.S.C. § 2164(h). Moreover, even if the removed claims were

sent back to Commonwealth court via abstention, as the Commonwealth avers, the judgments already entered and any future judgment would be subject to the same PROMESA restrictions cited herein.

84. Given the above, Plaintiff is entitled to declaratory judgment determining that the Removed Claims and any future judgments entered in that litigation by a federal or Commonwealth Court, are non-dischargeable under PROMESA and that those claims may not otherwise be impaired in any manner.

WHEREFORE: the Corporación de Servicios Integrales de Salud del Area de Barranquitas, Comerío, Corozal, Naranjito y Orocovis respectfully requests from the Honorable Court that it enter declaratory judgment determining that Plaintiffs' claims to payment under the Medicaid Act (1) are non-dischargeable under PROMESA; and (2) they are otherwise unimpaired by PROMESA or the Commonwealth's filing of Title III proceedings under such Act.

Respectfully submitted on this   day of December, 2017.

CERTIFY: That on this same day, the ECF system sent a copy of this motion to all parties in this litigation.

/s John E. Mudd
John E. Mudd
Bar Number: 201102
Attorney for Plaintiffs
LAW OFFICES JOHN E. MUDD
P. O. BOX 194134
SAN JUAN, P.R. 00919
(787) 413-1673
Fax. (787) 753-2202
jemudd@yahoo.com

13