HCKKPUE1 CORRECTED 2

```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF PUERTO RICO
 2   ------------------------------x
     IN RE: THE FINANCIAL OVERSIGHT
 3   AND MANAGEMENT BOARD FOR
     PUERTO RICO,
 4
           as representative of
 5                                    3:17-BK-3283 (LTS)
 6   THE COMMONWEALTH OF PUERTO RICO,
     et al.,
 7                 Debtors.          (Jointly Administrated)
     ------------------------------x
 8   IN RE: THE FINANCIAL OVERSIGHT
     & MANAGEMENT BOARD FOR PUERTO
 9   RICO,
10         as representative of
                                      3:17-BK-4780 (LTS)
11
     PUERTO RICO POWER AUTHORITY,
12
                   Debtor.           (Jointly Administrated)
13   ------------------------------x

14                                    Motion Hearing
                                      December 20, 2017
15                                    8:40 a.m.

16
     Before:
17
                     HON. LAURA TAYLOR SWAIN,
18
                                      District Judge
19                   HON. JUDITH G. DEIN,

20                                    Magistrate Judge

21                        APPEARANCES

22   PROSKAUER ROSE LLP
           Attorneys for FOMB Oversight Board
23   BY:  MARTIN J. BIENENSTOCK
           PAUL V. POSSINGER
24         TIMOTHY W. MUNGOVAN
           STEVEN RATNER
25
```

HCKKPUE1 CORRECTED 2

1                          APPEARANCES (Continued)

2

3    O'NEILL & BORGES LLC
          Attorneys for FOMB Oversight Board
4    BY:  HERMANN D. BAUER-ALVAREZ
          UBALDO M. FERNÁNDEZ-BARRERA

5    PAUL HASTINGS LLP
          Attorneys for Official Committee of Unsecured Creditors
6    BY:  LUC A. DESPINS
          - and -
7    CASILLAS SANTIAGO & TORRES LLC
     BY:  JUAN J. CASILLAS-AYALA

8

9    O'MELVENY & MYERS LLP
          Attorneys for AAFAF
10   BY:  SUZZANNE UHLAND
          PETER FRIEDMAN
          DANIEL L. CANTOR
11        JOHN J. RAPISARDI
          - and -
12   THE LAW OFFICES OF ANDRES W. LOPEZ P.S.C.
     BY:  ANDRES W. LOPEZ

13

14   QUINN EMANUEL URQUHART & SULLIVAN LLP
          Attorneys for COFINA Senior Bondholders
15   BY:  SUSHEEL KIRPALANI

16   KRAMER LEVIN NAFTALIS & FRANKEL LLP
          Attorneys  for Mutual Fund Group
17   BY:  GREGORY A. HOROWITZ
          AMY CATON

18   CADWALADER WICKERSHAM & TAFT LLP
          Attorneys for Assured Guaranty
19   BY:  ELLEN M. HALSTEAD
          HOWARD R. HAWKINS JR.

20

21   WEIL GOTSHAL & MANGES LLP
          Attorneys for National Public Finance Guarantee Corp.
22   BY:  KELLY DiBLASI
          DEBORA HOEHNE
          JARED FRIEDMANN

23

24   MASLON LLP
          Attorneys for U.S. Bank National Association (Trustee)
25   BY:  CLARK T. WHITMORE
          JASON M. REED

HCKKPUE1 CORRECTED 2

1                         APPEARANCES (Continued)

2

3   WHITE & CASE LLP
         Attorneys for Puerto Rico Funds
4   BY:  JOHN K. CUNNINGHAM
         FERNANDO de la HOZ

5   REED SMITH LLP
         Attorneys for The Bank of New York Mellon
6   BY:  ERIC A. SCHAFFER

7   MILBANK TWEED HADLEY & McCLOY LLP
         Attorneys for Ambac Assurance Corp.
8   BY:  DENNIS F. DUNNE
         ATARA MILLER

9
    BUTLER SNOW LLP
10       Attorneys for Financial Guaranty Insurance Company
    ("FGIC")
11  BY:  MARTIN A. SOSLAND

12  JENNER & BLOCK LLP
         Attorneys for Official Committee of Retired Employees
13  BY:  ROBERT D. GORDON
         RICHARD LEVIN

14
    GREENBERG TRAURIG, LLP
15       Attorneys for AAFAF PREPA Matters
    BY:  NATHAN A. HAYNES
16       JOSEPH P. DAVIS III
         NANCY A. MITCHELL
17       KEVIN D. FINGER
         – and –
18  CANCIO NADAL RIVERA & DIAZ PSC
    BY:  KATIUSKA BOLANOS-LUGO

19
    JONES DAY
20       Attorneys for ERS Secured Creditors
    BY:  BENJAMIN ROSENBLUM
21       BRUCE BENNETT

22  PAUL WEISS RIFKIND WHARTON & GARRISON LLP
         Attorneys for the Ad Hoc Group of General Obligation
23  Bondholders (the "GO Group")
    BY:  ANDREW N. ROSENBERG
24       KYLE J. KIMPLER
         KAREN R. ZEITUNI

25

HCKKPUE1 CORRECTED 2

```
1                          APPEARANCES (Continued)

2

3    WILLKIE FARR & GALLAGHER LLP
          Attorneys for COFINA Agent
4    BY:  MATTHEW A. FELDMAN
          ANTONIO YANEZ, JR.
5         – and –
     KLEE TUCHIN BOGDANOFF & STERN LLP
6    BY:  KENNETH N. KLEE
          – and –
7    NAVARRO-CABRER LAW OFFICES
     BY:  NILDA M. NAVARRO-CABRER
8
     DECHERT LLP
9         Attorneys for Peaje Investments LLC ("Peaje")
     BY:  ERIC BRUNSTAD, JR.
10        ROBERT J. JOSSEN
          ANDREW C. HARMEYER
11
     BRACEWELL LLP
12        Attorneys for QTCB Noteholder Group
     BY:  KURT A. MAYR
13        DAVID L. LAWTON

14   ALSO PRESENT:    Chief Judge Barbara J. Houser, Mediation Team
                      United States Bankruptcy Court
15                    Northern District of Texas

16

17

18

19

20

21

22

23

24

25
```

HCKKPUE1 CORRECTED 2

```
1           THE DEPUTY CLERK:  This case is In Re The Financial

2    Oversight and Management Board for Puerto Rico as

3    representatives of The Commonwealth of Puerto Rico, et al.,

4    PROMESA Title III, 17 BK 3283-LTS.

5           JUDGE SWAIN:  Again, good morning.  And welcome to

6    counsel, parties-in-interest, members of the public, and the

7    press, those in San Juan, and those who are observing by

8    telephone.  We continue to have in mind and heart our fellow

9    American citizens who are working to rebuild their lives on the

10   Island of Puerto Rico and to rebuild the Island of Puerto Rico.

11          I remind you that consistent with Court and Judicial

12   Conference policies and the orders that have been issued, there

13   is to be no use of any electronic devices in the courtroom to

14   communicate with any person, source or outside repository of

15   information, nor to report any part of the proceeding.

16          So, all electronic devices must be turned off unless

17   you're using a particular device to take notes or to refer to

18   notes or documents that are already loaded on the device.

19          All audible signals, including vibration features,

20   must be turned off.  No recording or retransmission of the

21   hearing is permitted by any person, including, but not limited

22   to, the parties or the press.  And anyone who is observed or

23   otherwise found to have been texting, emailing, or otherwise

24   communicating or recording with a device during the court

25   proceeding will be subject to sanctions, including, but not
```

HCKKPUE1 CORRECTED 2

1  limited to, confiscation of the device and denial of future

2  requests to bring devices into the courtroom.

3       I would just remind counsel who are presenting to

4  speak from the podium into the microphone and project, so that

5  everything will be clear for everyone in all of the venues.

6       So, I would like to start by inviting Judge Houser,

7  the mediation team leader, to the podium to make a status

8  report.

9       JUDGE HOUSER:  Good morning, Judge Swain.

10      JUDGE SWAIN:  Good morning, Judge Houser.

11      JUDGE HOUSER:  I appreciate the opportunity to update

12  you and the other parties-in-interest on the work of the

13  mediation team on these Title III cases.

14      As I explained --

15      JUDGE SWAIN:  I'm sorry, one minute.

16      JUDGE HOUSER:  No worries.

17      (Pause)

18      JUDGE SWAIN:  Apologies to the people who are

19  listening by phone.  I understand it's a little bit fuzzy, but

20  we're going to continue.

21      And sorry for the interruption, Judge Houser.

22      JUDGE HOUSER:  No worries.

23      As I explained to the parties-in-interest when I last

24  addressed the Court, a key component of our mediation process

25  is that the process is confidential.  This will allow

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1     parties-in-interest to have open and frank conversations with

2     the mediators and with each other. By having these open and

3     frank conversations, I believe we can find common ground that

4     will assist us in the development of confirmable or

5     substantially consensual plans of adjustment.

6           We have scheduled formal mediation sessions on certain

7     of these disputed legal issues throughout the first quarter of

8     2018. Since the last time of these hearings, the mediation

9     team has worked diligently to assist the parties in identifying

10     these critical disputed legal issues that are in dispute among

11     them, the resolution of which we hope, through settlement, will

12     assist the parties in developing confirmable plans of

13     adjustment in these cases.

14           As the parties know, the oversight board and AAFAF are

15     in the process of developing new five-year fiscal plans for the

16     commonwealth and certain other instrumentalities. Because the

17     development of these new fiscal plans is important to all

18     stakeholders in these cases, the mediation team is working with

19     the parties to facilitate the development of these fiscal plans

20     in as collaborative a process as possible prior to their

21     anticipated certification by the oversight board in early 2018.

22           As I just mentioned, the mediation team will resume

23     formal mediation sessions on critical disputed legal issues in

24     dispute among the parties shortly after the new year. Parties

25     have either submitted, or will be submitting, confidential

1  merits mediation statements to the mediators.  These

2  confidential merits mediation statements will allow the members

3  of the mediation team to better understand the parties'

4  positions on the legal and factual issues in dispute among

5  them, so that we may assist them in attempting to negotiate a

6  consensual resolution of these issues.

7          I have assigned various members of my mediation team

8  to be responsible for particular issues based upon the various

9  factors, including availability and expertise of a particular

10 member or members of the mediation team.

11         To be sure, prehurricane, these cases presented

12 enormously challenging debt restructures that I believe would

13 require the cooperation, ingenuity, and diligence of all

14 involved to accomplish.  Hurricane Maria has added layers of

15 complexity to the development of confirmable plans of

16 adjustment in these cases.  However, I remain highly confident

17 that if the parties and the mediators continue to work

18 together, and perhaps work together even more cooperatively in

19 the new year, we will able be restructure the prepetition debt

20 on a consensual or substantially consensual basis.  The

21 mediators remain committed to this goal.

22         As a point of personal privilege, I will share that

23 Judge Ambro sent me a holiday card this year, and as you all

24 know, Judge Ambro is a critical member of the mediation team.

25 And within that holiday card, his wishes for me -- I'm going to

1   expand because I know his wishes for all of us -- are

2   confirmable plans of adjustment in 2018.

3           You heard it here first.  That is certainly the goal

4   of the mediation team, and who better to express it than our

5   Third Circuit Court of Appeals judge member of that team.

6           Judge Swain, thank you for the opportunity to update

7   you and other parties-in-interest on the work of the mediation

8   team in these cases.

9           JUDGE SWAIN:  Thank you, Judge Houser.

10          And thanks to all of us for the dedicated work that

11  you and your team members are bringing to this effort.

12          JUDGE HOUSER:  You're welcome.

13          JUDGE SWAIN:  I would now invite the oversight board,

14  Mr. Bienenstock, to make a status report and just one moment.

15  One moment.

16          (Pause)

17          JUDGE SWAIN:  The A/V specialist is here, so perhaps

18  we can have a little sound test before you get into the body of

19  the report.  We're having that buzzing again.

20          (Pause)

21          JUDGE SWAIN:  Thank you for your patience,

22  Mr. Bienenstock.

23          MR. BIENENSTOCK:  Good morning, Judge Swain.  Martin

24  Bienenstock, of Proskauer Rose LLP, as attorneys for the

25  Oversight Board for itself as Title III representative.

HCKKPUE1 CORRECTED 2

1          Our understanding is that the Court requested a status

2     report on the bar date motion, which I will give, and I'm happy

3     to answer any other questions that your Honor might have.

4          In respect of the bar date motion, on September 12,

5     2017, the oversight board filed it, and it was scheduled to be

6     heard October 4.  In the interim, between filing and the

7     scheduled hearing, the board received comments from various

8     parties having differing concerns turning on the types of their

9     constituents, the mechanics, the need, et cetera.

10          Then on September 20, 2017, Hurricane Maria landed.

11     On September 26th, the Court adjourned the October 4 omnibus

12     hearing.  And then on October 13, 2017, after consultation with

13     AAFAF, and in consideration of the feedback from attorneys for

14     the retiree committee, various unions, and other parties, and

15     taking into account the conditions in the commonwealth, the

16     oversight board determined it was in the best interests of all

17     parties not to attempt to serve bar date notice and impose the

18     burden on parties to complete the materials and have proofs of

19     claims filed by what had been the proposed bar date.  So the

20     oversight board withdrew the bar date motion without prejudice.

21          Since withdrawing the motion, the oversight board

22     continued to monitor conditions on the island.  Now, our

23     understanding, as of two days ago, is basically as follows:

24     The U.S. Postal Service is receiving mail and making deliveries

25     directly to residences and businesses on the island where it is

1    safe to do so, and that's approximately 95 percent of the

2    island.  Where USPS is unable to make -- the U.S. Postal

3    Service is unable to make direct deliveries, the residents and

4    businesses must collect mail at local post offices.  However,

5    the postal service is not providing notification to residents

6    and businesses of pending mail in those instances.  In four

7    towns, residents must travel to a different town to collect

8    mail at the nearest U.S. postal office.

9              JUDGE SWAIN:  Mr. Bienenstock, it seems the phone has

10   gotten disconnected, so we have to reconnect.

11             MR. BIENENSTOCK:  Sure.

12             (Pause)

13             JUDGE SWAIN:  Ms. Ng, are we reconnected yet?

14             THE DEPUTY CLERK:  Not just yet.

15             We're good.

16             JUDGE SWAIN:  All right.

17             I understand that the Court Solutions line is now

18   reconnected.  Mr. Brown, do you have someone --

19             MR. BROWN:  I'm waiting for a response.

20             JUDGE SWAIN:  All right.  So should we wait to begin

21   until you get that response?

22             MR. BROWN:  Yes, I think we should wait a little bit

23   until we get a response.

24             JUDGE SWAIN:  Okay.

25             MR. BROWN:  We're good.

1          JUDGE SWAIN:  All right, we're good.

2          I understand that the call dropped shortly after you

3     began speaking, and, so, Mr. Bienenstock, I'm afraid I'm going

4     to ask you to start from the top.

5          MR. BIENENSTOCK:  Okay.  Sure.

6          Your Honor, our understanding was that the Court

7     desired a report on the bar date motion and -- which I will

8     provide and certainly answer all other questions the Court

9     might have.

10         Originally, the oversight board had filed the bar date

11    motion on September 12th, and it was scheduled to be heard on

12    October 4, 2017.  The oversight board received comments from

13    numerous groups of stakeholders in respect of the mechanics of

14    bar date, the need for it, and methods of complying with filing

15    proofs of claims by deadlines from different types of

16    constituents.  It went from retirees, on the one hand, having

17    their particular issues, to holders of pieces of debt where

18    there were agents, or indentured trustees or others who might

19    be able to file on behalf of all holders.

20         So, we tried to take all of that into account and

21    resolved, I think, mostly all the issues to our knowledge.

22         Then, on September 20, Hurricane Maria hit the

23    commonwealth.  On September 26, 2017, the Court adjourned the

24    October 4 omnibus hearing for obvious reasons, and the bar date

25    motion was also adjourned to November 15 by the Court's order

1    of September 29.

2               On October 13, after consultation with AAFAF and

3    consideration of feedback from attorneys for the retiree

4    committee, various unions, and other stakeholders, the

5    oversight board determined it was in the best interests of all

6    parties-in-interest not to attempt to serve the bar date notice

7    and impose the burden on parties to complete the materials and

8    have the proofs of claims filed by the proposed bar date.

9    Accordingly, the oversight board withdrew the bar date motion

10   without prejudice.

11              Since then, the oversight board has continued for that

12   reason, and many other reasons, to monitor conditions on the

13   island, and our understanding, as of December 18, is that the

14   U.S. Postal Service is receiving mail and making deliveries

15   directly to residences and businesses on the island where it is

16   safe to do so, and that now comprises approximately 95 percent

17   of the island.

18              Where the postal service is unable to make direct

19   deliveries, the residences and businesses must collect mail at

20   local post offices.  However, they do not get prior

21   notification from the postal service that they have mail to

22   pick up.  In four towns, residents must still travel to a

23   different town to collect mail at the nearest postal office,

24   which could be up to approximately five miles away.

25              Taking all of that into account, and, also, the

1    oversight board is 100 percent in accord with Judge Ambro's

2    wishes to Judge Houser and everyone else, that we reach

3    confirmable plans, hopefully consensual ones, in 2018.

4            The oversight board currently contemplates the

5    following timeline and procedures for what would be its second

6    bar date motion:

7            We would file a new bar date motion that could be

8    heard on February 7, 2018, at a scheduled omnibus hearing, with

9    the bar date -- the proposed bar date to occur several months

10   thereafter.  It is -- we believe, based on what we know now,

11   that that time frame will address all of the logistical hurdles

12   that still remain.

13           The specifics are as follows:  We would file the

14   motion on January 16 or on or before January 16.  On

15   February 26, there would be a -- if the Court grants the bar

16   date motion, February 26 would be a deadline to serve the bar

17   date notice, proof of claim form, and additional notices

18   specified in the proposed order.  May 28, 2018, would be the

19   general bar date.

20           The proof of claim form will have Spanish translations

21   on instructions.  The proofs of claim may be filed in English

22   or Spanish.  And the methods of filing the proofs of claims

23   would include the customary methods, first class mail,

24   overnight courier, hand delivery, and electronic filing on

25   Prime Clerk's website, and the oversight board is exploring

1    additional methods of filing with AAFAF and Prime Clerk to ease

2    the burden on those creditors who would otherwise have problems

3    doing it.

4         I wanted to emphasize that this is not a case where a

5    bar date motion is being requested out of any type of gotcha

6    game where if someone doesn't file, they don't get a

7    distribution.  It's being urged because it's very important,

8    together with all the financial data, that we have an idea of

9    the universe of claims and want to be sure that what we believe

10   is the universe of claims is actually the universe of claims.

11        Your Honor, that's the end of my report.  As I said,

12   I'm happy to answer any other questions your Honor might have.

13        JUDGE SWAIN:  I thank you for that report.  And I

14   asked you to make it at this time because people have been sort

15   of doing do-it-yourself claim filings, and I am concerned that

16   there be some accessible regularity of process, and that Prime

17   Clerk be able to correlate claims filed through the Prime Clerk

18   process with claims that are filed on the court website, and

19   so -- the ECF system, and so I am glad to hear that you are

20   continuing to refine the process, and that it will be a process

21   that is navigable in English and in Spanish.

22        And by way of comment as to the proposed bar date, I

23   am glad to hear that you are contemplating leaving a

24   substantial period of time.  While we are all hopeful and

25   encouraging of the plans for restoration of electricity to the

HCKKPUE1  CORRECTED 2

1    island and everything else, if it turns out that it's longer

2    than currently expected before telecommunications, and Internet

3    access, and mail access truly become easily navigable for

4    individuals, I will expect that you will think about whether

5    that period needs to be lengthened a bit longer --

6         MR. BIENENSTOCK:  Absolutely.

7         JUDGE SWAIN:  -- and whether, even after the first

8    general distribution of notices, there are some other reminder

9    noticing procedures to make sure that people who might not have

10   been in communications at the time of the first wave of

11   noticing went out are made aware of what to do.

12        MR. BIENENSTOCK:  Thank you, your Honor.  We will add

13   reminder notices.  I think that's a great idea.

14        JUDGE SWAIN:  Thank you.

15        Are the timetables that have been announced for

16   revisitation of the physical plans still the relevant

17   timetables?

18        MR. BIENENSTOCK:  They are the relevant timetables.

19   There have been requests for some modest extensions, and the

20   board is considering them.

21        JUDGE SWAIN:  Thank you.

22        Those were my only further specific questions.  If

23   there's anything else you'd like to share, it's your podium.

24        MR. BIENENSTOCK:  Not at this time, your Honor.  I

25   think other things will come up in the course of today's

 1   hearing.  I don't want to duplicate.

 2           JUDGE SWAIN:  Thank you, Mr. Bienenstock.

 3           So, the next matter on the agenda is the uncontested

 4   matters section, which is cued up to begin with the GAM Realty

 5   lift stay motion, and as to that, who is the speaker?

 6           Who is speaking to the GAM lift stay motion as to

 7   which there is a proposed consensual order?

 8           Well, I don't need a presentation.  The presentment

 9   notice provided for objections by yesterday or the day before.

10   There have been none.  I would have simply entered it, but it

11   was on the agenda, so the opportunity has been given.  I will

12   simply take it on presentment and enter it.

13           Then I understand that one of the matters that had

14   been noticed up as a contested matter, the joint insurance

15   proceeds motion, has been resolved.  So, shall we address that

16   now?

17           MR. HAYNES:  Yes, your Honor.

18           JUDGE SWAIN:  Please come to the podium.

19           MR. HAYNES:  Good morning, your Honor.  Nathan Haynes,

20   from Greenberg Traurig, for AAFAF, as fiscal agent for PREPA.

21           JUDGE SWAIN:  Good morning, Mr. Haynes.

22           MR. HAYNES:  Good morning.

23           Your Honor, this is a now uncontested joint motion

24   concerning the receipt of PREPA's insurance proceeds.  The

25   motion was filed jointly by AAFAF and the oversight board.  The

```
 1    purpose of the motion is to provide PREPA -- PREPA's property

 2    insurance carriers with some comfort that they will not be

 3    subject to double payment by making an advance under the

 4    policy.

 5             JUDGE SWAIN:  Would you project just a bit more.

 6             MR. HAYNES:  Yes, your Honor.  Thank you.

 7             JUDGE SWAIN:  Thank you.

 8             MR. HAYNES:  Your Honor, I do have a short

 9    presentation, but if your Honor has had the opportunity to

10    review the revised proposed order, I'm happy to be seated

11    unless you have questions.  I'm also happy to run through it

12    shortly or quickly for you.

13             JUDGE SWAIN:  I have reviewed all of the papers and

14    the revised proposed order.  I have no particular questions or

15    concerns about the revised proposed order, and I understand how

16    you got there and the concerns to which the revisions meant to

17    respond.  And so, since you've confirmed now that there is no

18    further opposition to the order as proposed, I will take it on

19    submission and enter it after this hearing.

20             MR. HAYNES:  Thank you, your Honor.

21             JUDGE SWAIN:  Thank you, Mr. Haynes.

22             I will now turn the bench over to Judge Dein for the

23    2004 motion.

24             JUDGE DEIN:  Good morning, everyone here and in Puerto

25    Rico.  I'm happy to have no one appear to argue this motion.
```

1          Am I that lucky, or are people actually going to argue

2     this motion?

3          MS. MILLER:  Good morning, Judge Dein.  It's Atara

4     Miller, from Milbank Tweed Hadley & McCloy, on behalf of Ambac

5     Assurance Corporation.

6          I want to make a few brief comments, but I do hope

7     that AAFAF will agree, at the end of this presentation, that

8     we're going to continue to meet and confer, and, so, while I

9     will make a very brief presentation, there may not be --

10         JUDGE DEIN:  Half my wishes.  Okay.

11         MS. MILLER:  Your Honor, just this week, in response

12    to AAFAF's disclosure on Monday morning of almost $7 billion of

13    cash of various government accounts, many of which cash

14    balances were previously unknown to the public or inconsistent

15    with numbers that had previously been disclosed, Jose Carrion,

16    the chairman of the oversight board, said -- and I want to

17    quote this because I think it should be the guiding principle

18    in these cases, and particularly on these 2004 motions -- "It

19    is essential that we improve the transparency and

20    accountability of public finances to put Puerto Rico on the

21    road to economic recovery, regain access to the capital

22    markets, and restructure its immense debts."

23         Your Honor, we have been before you many times now on

24    2004 discovery motions where there has been consistent

25    objection by both the commonwealth and the oversight board to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    pretty much anything the creditors are asking for. And, so,

2    I'm quite pleased to be able to stand before you this morning

3    and report that, as we were coming into court, AAFAF -- we, and

4    AAFAF, and the oversight board had a very brief meet-and-confer

5    where I think that the commonwealth has agreed to produce to

6    Ambac many of the core pieces of data and financial information

7    that we requested in this motion and that really are essential

8    to understand not just what the current existing SUT cash

9    position is, but what is really -- you know, what the breakdown

10   of those numbers are, what the underlying basis is. There are

11   some concerns about specific retailer information, which AAFAF

12   can't provide pursuant to Puerto Rico law, and we're trying to

13   figure out ways to get that information, so that creditors can

14   really understand what the economic drivers on the SUT are and

15   how to use that information and the numbers that we get to be

16   able to project forward five years, ten years, fifteen years,

17   and much longer out pursuant to the COFINA bonds.

18          So, I think that the best -- we haven't agreed on

19   everything yet, and so I think our suggested proposal would be

20   that we continue to meet and confer, and to the extent that the

21   parties can't agree, or that there are outstanding disputes,

22   that we raise them with your Honor outside -- in a conference

23   outside of the omnibus hearings by motion. And we would like

24   to target having a hearing, if possible, either in person in

25   Boston or telephonically sometime in the first two weeks of

1    January, so that we can make sure that things are moving

2    forward.

3              JUDGE DEIN:  Do you want a date for a status report to

4    me?  Does that make sense?

5              MS. MILLER:  I think that makes sense.  January 3rd or

6    January 5th probably makes sense.

7              JUDGE DEIN:  You have to write it, so I don't care

8    whether it's the 3rd or the 5th, but why don't I just say the

9    5th and submit a status report.  You can say you're still

10   talking, but at least I'll have some idea what's going on

11   there.

12             MS. MILLER:  Great.

13             JUDGE DEIN:  And I expect that we can certainly make

14   time for a hearing sometime in that time frame, in the

15   beginning of January.

16             Do you want to be heard?

17             MS. MILLER:  Thank you, your Honor.

18             MR. CANTOR:  Thank you, your Honor.  Daniel Cantor,

19   O'Melveny & Myers, on behalf of AAFAF.

20             I'm pleased to hear Ms. Miller's approach.  We think

21   it's the right approach.  We think it's, quite frankly, the

22   approach that should have been taken all along rather than

23   going forward with the motion.

24             But in the spirit of cooperation, I will limit my

25   remarks to saying that we look forward to meeting and

1   conferring with Ambac and any other interested parties to try

2   and reach a consensual resolution.  Transparency is a good

3   thing, but it is not such an overriding interest, that it

4   strips the government of its rightful powers and

5   responsibilities.

6             Thank you, your Honor.

7             JUDGE DEIN:  I'll accept those dates on a status

8   report, and then I'll be available for hearing, if necessary.

9             The process, it seems to me, is starting to really

10  work, and I think that's great.  I think the requests should be

11  more specific, I think the responses need to be more directly

12  responsive, and we all have our legal positions, and now we

13  have to deal with more concrete requests and production of

14  documents.  So, I think that's terrific.

15            Before I get into any more trouble, I will sit down

16  unless anybody has anything else to say.

17            There we go.

18            JUDGE SWAIN:  Thank you, Judge Dein.  I'm back.

19            The final action item on our agenda is the contested

20  stipulation enforcement motion of the Puerto Rico funds.  And,

21  so, I understand that Mr. Cunningham intends to open with 12

22  minutes of argument?

23            MR. CUNNINGHAM:  Yes.

24            Good morning, your Honor.

25            JUDGE SWAIN:  Good morning.

1            MR. CUNNINGHAM:  John Cunningham, of White & Case, on

2       behalf of the Puerto Rico funds.

3            Your Honor, we are here this morning on the motion of

4       Puerto Rico funds to condition ERS's automatic stay on a

5       continuation of adequate protection for ERS's bondholders or,

6       alternatively, to enforce the parties' July 14 joint

7       stipulation approved by this Court.

8            One housekeeping matter, your Honor:  The agenda

9       letter filed by the oversight board and AAFAF did not include

10      listing our reply that we did file on December 16th.  That's

11      Docket No. 28.  I alerted them to that.  I just make note of

12      that, your Honor.

13           JUDGE SWAIN:  Thank you.  And I have reviewed all of

14      the filings.

15           MR. CUNNINGHAM:  Thank you.

16           So, by way of background, your Honor, my clients, the

17      Puerto Rico funds, hold approximately 720 million of the

18      3 billion of ERS bonds.  The Puerto Rico funds, your Honor, are

19      also Puerto Rico-based funds with on-island resident

20      shareholders, many of whom are retirees and other individuals

21      who rely on the fund's monthly dividends to meet their basic

22      living expenses.

23           Last Wednesday, your Honor held a hearing on summary

24      judgment regarding the ERS bondholders' liens.  We were

25      jointly -- joint parties with Jones Day and their clients on

1    that matter.  Mr. Bennett argued that.  Your Honor took the

2    matter under advisement.  We have absolutely no issue with

3    that, your Honor.

4          The issue today with this motion is interim adequate

5    protection.  My clients in the ERS bondholder group,

6    represented by Mr. Bennett, argued for certain interim adequate

7    protection in the joint stipulation.  As the Court will recall,

8    that bargain was hard-fought.  The fight between the ERS

9    bondholders, and the commonwealth, and AAFAF over adequate

10   protection date back over a year ago before Judge Besosa and,

11   ultimately, before the United States Court of Appeals for the

12   First Circuit.  The First Circuit earlier this year recognized

13   rights of ERS bondholders to adequate protection, which led to

14   the joint stipulated orders entered by Judge Besosa.

15         When this Title III case was filed, AAFAF again

16   refused adequate protection to ERS bondholders.  The original

17   adequate protection motion was filed which the ERS bondholders

18   in May.  Your Honor held a June 28th hearing on that motion in

19   San Juan and urged the parties to negotiate, and, ultimately,

20   that led to the joint stipulation.

21         Your Honor, the joint stipulation has two key

22   features.  First is a path forward procedurally to resolve

23   AAFAF's lien challenges that led to a declaratory relief action

24   by ERS, agreed discovery and briefing schedule on summary

25   judgment motions, and an October 31st summary judgment hearing

HCKKPUE1 CORRECTED 2

1    scheduled, but subjected to the Court's schedule, but most

2    important for today's purposes, it provided adequate protection

3    for -- for ERS bondholders in two forms.  The first is monthly

4    deposits of 18-1/2 million dollars from June to October and a

5    postpetition segregated account for the benefit of ERS

6    bondholders; and, two, the continued payment of monthly

7    interest to ERS bondholders from the prepetition segregated

8    account established by Judge Besosa's orders.

9         Equally important, your Honor, the joint stipulation

10   had two express safety valves for ERS bondholders.  The first

11   was even though the 18-1/2 million postpetition costs ended on

12   October 1st, paragraph (c) provided rights of the ERS

13   bondholders to renew their request for adequate protection with

14   this Court, quote, on or after October 31st, 2017.

15        And secondly, paragraph (f) provided that monthly

16   deposits to the fiscal agent for the payment of interest on the

17   ERS bonds in accordance with the ERS bond resolutions would

18   continue until this Court's ruling on the summary judgment

19   motions.

20        Fast forward from the Court's approval of the July

21   joint stipulation to today.  Puerto Rico is hit with Hurricanes

22   Maria and Irma in September.  The parties were embroiled in

23   discovery disputes in the adversary proceeding, and the Court,

24   this Court, rescheduled a summary judgment hearing from

25   October 31st to December 13th.  But that schedule triggered the

1  two safety valves in paragraphs (c) and (f) of the joint

2  stipulation.

3          First, it was optional for ERS bondholders at that

4  time to seek and renew further adequate protection requests as

5  to the $18-1/2 million deposits, which did end on October 31,

6  but, secondly, there was a mandatory provision that ERS was

7  required to continue depositing monthly interest from the

8  prepetition segregated account, quote, for payment of interest

9  on the ERS bonds until the Court's summary judgment ruling.

10 That means November interest gets paid, and it was, and

11 December interest is to get paid, and that has not happened

12 because ERS failed to comply with paragraph (f) and deposit

13 those monies, so that the interest could be paid.

14         Your Honor, after the November interest was paid and

15 just three days prior to paragraph (f)'s November 20th deadline

16 for ERS to deposit its December interest payment, AAFAF sent a

17 stay violation notice to the Fiscal Agent Bank of New York on

18 November 20 demanding return of the November interest payment,

19 which it had already paid to BONY, which BONY had already paid

20 the bondholders in accordance with paragraph (f) and the ERS

21 bond resolutions.

22         AAFAF also failed to, as I pointed out, make the

23 November 20th payment of the December interest with the fiscal

24 agent as required by paragraph (f).  So, faced with no

25 continuing 18-1/2 million monthly deposits and no further

1   interest payments, your Honor, we were left with no choice but

2   to file this motion.  Every attempt and offer to AAFAF and the

3   board to resolve this motion has been flatly rejected.

4         In opposing the motion, AAFAF and the board failed to

5   meet their burden of showing adequate protection of the ERS

6   bondholders' liens and engaged in a contorted reading of the

7   joint stipulation that simply ignores its plain language.

8         First, as set forth in the original adequate

9   protection motion, Section 362(d) does apply in this Title III

10  case, and, specifically, it provides a court shall grant relief

11  from the automatic stay, including conditioning such stay, if

12  cause exists, including lack of adequate protection.  Section

13  362(g) places the burden of proof on adequate protection

14  squarely on AAFAF and the board, and they failed to meet that

15  burden.  They claim that the interest payments from June to

16  October, plus 92 million in the postpetition segregated

17  account, are sufficient adequate protection.  They state at

18  paragraph 1 of their opposition, "No additional payments are

19  necessary to ensure the bondholders' purported security

20  interests are adequately protected pending the Court's decision

21  on summary judgment."

22        But they intentionally ignore the continuing harm to

23  ERS bondholders caused by the diversion of employer

24  contributions away from ERS to a new PayGo system established

25  by the commonwealth as of June 1st.  Providing us no continuing

1    adequate protection is, per se, lack of adequate protection.

2    Paragraph (f) of the joint stipulation provided for continued

3    monthly payments until the Court's summary judgment ruling.

4    That much is clear.

5        In short, the diminution of value of the bondholders'

6    pledged properties by continuing to divert employer

7    contributions away from ERS to the commonwealth's PayGo system

8    is the harm that we are apparently suffering, and it requires

9    continued adequate protection under Section 362(d).

10       Second, your Honor, AAFAF and the board argue that

11   paragraph (d) of the joint stipulation overrides paragraph (f)

12   when it provides interest on the ERS bonds shall be paid

13   through the interest payment date on October 1st, 2017.  They

14   argue at paragraph 4 of the opposition that paragraph (f) does

15   not require or authorize any payments to the bondholders and,

16   instead, stayed the procedure for how ERS must transfer funds

17   to BONY for a specified period of time.  That's clearly wrong.

18   It ignores the plain language of paragraph (f) that says that

19   the monthly deposits with BONY until the summary judgment

20   ruling by this Court is for the payment of interest on the ERS

21   bonds in accordance with the ERS bond resolutions.  Notably,

22   paragraph (f) is virtually identical to language borrowed from

23   Judge Besosa's April stipulated order, pursuant to which

24   monthly interest was being deposited and paid by BONY to ERS

25   bondholders, and AAFAF and the board have never argued that

1    such language was a procedural language that didn't authorize

2    payment to the bondholders.

3            Also, as BONY points out in their response letter to

4    AAFAF's state violation letter, ERS bond resolution expressly

5    referenced in paragraph (f) requires BONY to pay out interest

6    once those interest payments are received, not to hold it

7    awaiting further instruction from ERS.

8            Finally, their reading of paragraph (f) makes no

9    logical sense since it would simply transfer funds from one

10   restricted segregated account into another account that's

11   restricted being held at BONY.  There's no benefit to the ERS

12   bondholders with that type of arrangement.

13           So, your Honor, why -- we ask, also, if this was a

14   payment procedure, why was the November interest payment

15   deposited, but the December interest payment wasn't deposited.

16   They talked out of both sides of their mouth.

17           JUDGE SWAIN:  May I?

18           MR. CUNNINGHAM:  Yes.

19           JUDGE SWAIN:  Since time is getting short, I would

20   like you to address whether you have a different view of the

21   contractual commitment with respect to the 18 million five as

22   to which there were specific payment dates, and there is a

23   sentence at the end of paragraph 4.

24           (Continued on next page)

25

HCKJPUE2

1          MR. CUNNINGHAM:  No dispute, your Honor.  It ended,

2     those payments, deposits ended October 31, and we would have

3     to, similar to this motion, come back and request your Honor to

4     resume that.

5          JUDGE SWAIN:  And do you consider yourselves to have

6     requested that or be requesting that by way of queuing this as

7     a renewal of the adequate protection motion?

8          MR. CUNNINGHAM:  Correct, correct.

9          JUDGE SWAIN:  And do you have any comments as to the

10     interaction between Section 305 of PROMESA and 362 (d), to the

11     extent you are asking me to impose a non-consensual requirement

12     of payment of funds?

13          MR. CUNNINGHAM:  Understood, your Honor.  I recognize

14     that your Honor's not likely to require them to make the

15     payment, but then the stay should be lifted.

16          JUDGE SWAIN:  The stay should be lifted to allow what?

17          MR. CUNNINGHAM:  To allow us to exercise whatever our

18     rights are to enforce our claims.  If they're going to get the

19     benefit of the stay, they need to provide adequate protection.

20     If they're not going to provide adequate protection, the stay

21     should be lifted.  It is the same position we were in when we

22     were before your Honor on June 28th.

23          JUDGE SWAIN:  We didn't talk too specifically about

24     305 on June 28th, and so that issue did come into sharper focus

25     later with the PREPA bondholders' motion to lift the stay, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HCKJPUE2

```
 1  305 does have very broad language about direct and indirect

 2  interference with revenues and with the exercise of

 3  governmental powers, and we also talked at that time about 306

 4  and exclusive jurisdiction over debtor property.

 5         So that is why I am pressing you on what it would mean

 6  to lift the automatic stay and why that wouldn't be a 305

 7  problem, too?

 8         MR. CUNNINGHAM:  I understand.  I do not expect your

 9  Honor will force them to pay the 18 and a half million dollars.

10  Instead, you can condition the stay on them doing it if they

11  don't lift the stay.

12         Alternatively, your Honor, going to your point, we did

13  ask if your Honor was not inclined to do that, if you could at

14  least enforce the joint stipulation which your Honor did

15  approve and retain jurisdiction to enforce, and that would be

16  continued monthly interest payments.

17         JUDGE SWAIN:  Thank you.  Before you sit down, I have

18  a couple of other questions.

19         So in your most recent revised proposed order, you

20  incorporated some nomenclature changes requested by Bank of New

21  York.  You also incorporated a specific, I gather, composite

22  interest number and an exculpatory provision for the Bank of

23  New York.  So, first, as to the number, is it your

24  representation, are you making a representation as to the

25  derivation of that number, please?
```

HCKJPUE2

```
1          MR. CUNNINGHAM:  First of all, by way of background,

2     your response which is pari passu with each other so it is not

3     subordinated in senior.  We do have 85 percent of the mark

4     current interest bonds, and 15 percent of them are capital

5     depreciation or zero percent interest bonds.

6          This was an issue a raised with the Jones Day group

7     with us with respect to our motion because interest was being

8     paid out with current interest bondholders.  There was a

9     concern about the effect of that on holders of capital

10    depreciation bonds which are not entitled to current interest.

11         For the purposes of adequate protection, our request

12    was to not increase the interest payment, but to allow a

13    sharing of that payment to go radically between holders of

14    current interest bonds and capital depreciation bonds based on

15    a decretal value for capital depreciation bonds.  We had our

16    respective financial advisories and BONY work out that

17    schedule, so that is kind of the math that was put together and

18    is the result of that proposed form of order.

19         JUDGE SWAIN:  And so the payments up to now had only

20    been distributed to the CIB --

21         MR. CUNNINGHAM:  Yes.

22         JUDGE SWAIN:  -- bondholders, and so --

23         MR. CUNNINGHAM:  That's correct.

24         JUDGE SWAIN:  -- so it would be spread among all the

25    bondholders?
```

HCKJPUE2

1         MR. CUNNINGHAM:  Yes, going forward, for whatever

2    payments beginning with the December payment, yes, your Honor.

3         JUDGE SWAIN:  And the 27 million and change number for

4    I think you called it December-January was calculated by

5    reference to the interest rates that are on the schedule that

6    you attached to the proposed order?

7         MR. CUNNINGHAM:  Correct.  It was the same 13.9

8    million that was always going to be paid.  We are not asking

9    for more interest to come out of the segregated account.

10        JUDGE SWAIN:  What is the legal authority for the

11   proposed release of the fiscal agent and whom did you intend to

12   bind by that?

13        MR. CUNNINGHAM:  We borrowed that language from your

14   Honor's interpleader BONY decision when they interpleaded

15   COFINA monies and they wanted protection.  This is an adequate

16   protection payment as opposed to actual payments being made

17   pursuant to the ERS bond resolutions or dictated by those terms

18   because right now the caps are not entitled to be paid current

19   interest.

20        The fact they would be sharing certain interest

21   payments on board, that is an adequate protection feature, and

22   they want a recognition they're complying with your Honor's

23   order and that is being deemed adequate protection as opposed

24   to payments directly under the bond resolution.  They don't

25   provide for payment of current interest right now to the caps.

HCKJPUE2

1          JUDGE SWAIN:  So that's intended to protect she bank

2     as against the universe of bondholders particularly CIB

3     bondholders who might have an issue with that and between you

4     and Mr. Bennett's firm, who represents some substantial portion

5     of those bondholders, but not all of them, I assume.

6          MR. CUNNINGHAM:  Yes, we have clearly more than a

7     majority, but we don't have a hundred percent of those.

8          JUDGE SWAIN:  And it is also intended to preclude the

9     debtor from any further contention that the November payment or

10    about irregularity of whatever payment arrangements are made

11    with respect to the distributions to the bondholders?

12         MR. CUNNINGHAM:  Yes.  If your Honor grants our

13    interpretation of the joint stipulation, we believe there is no

14    stay violation.

15         JUDGE SWAIN:  Thank you.

16         MR. CUNNINGHAM:  Thank you.

17         JUDGE SWAIN:  Mr. Friedman.

18         MR. FRIEDMAN:  Good morning, your Honor, Peter

19    Friedman from O'Melvany & Myers.  So I wanted to mention Luis

20    Galasso, administrator of ERS, is in the San Juan courtroom.

21         Your Honor, so we think as an initial matter we argued

22    all along adequate protection is not appropriate at all aside

23    from the stipulation.  I will get to the stipulation in a

24    moment.  Under cases like Hunts Pier and rights, there is a

25    serious dispute as to the validity of means.

HCKJPUE2

1          The court doesn't need to grant adequate protection,

2     and we believe after all the arguments you have heard at least

3     at this time, the motion should be denied without prejudice, on

4     the grounds there remain continuing issues with respect to the

5     validity of the liens; and, therefore, no adequate protection

6     is necessary right now until the summary judgment determination

7     is made.

8          We also continue to believe the combination of 305 and

9     the bar on the court issuing orders with respect to government

10    property as well as the 305 decision impacted by the

11    government's PREPA ruling would also bar relief from the

12    automatic stay.

13         As a practical matter, we're still a little bit

14    perplexed as to how cash payments, putting aside the

15    stipulation, are actually adequate protection.  Adequate

16    protection is supposed to protect payers against diminution in

17    the value of their collateral.  The collateral isn't diminution

18    in value; it is a segregated account that can't be touched.

19    ERS is not using that collateral; therefore, that collateral

20    can't be diminishing in value.  To us paying it out doesn't add

21    to their adequate protection.  It is nice to have a cash

22    payment, but there is no reason to compel a cash payment.

23         With respect to the $18.5 million monthly deposits, it

24    is conceded or not impacted by the stipulation.  First of all,

25    as the retiree committee noted, all of this relates to the

HCKJPUE2

1   PayGo issue and whether it is appropriate for the commonwealth

2   to have implemented the PayGo matter.  Frankly, therefore, we

3   don't think payments or dealing with adequate protection --

4   dealing with payments, adequate protection payments regarding

5   PayGo is appropriate.  There is a completely separate adversary

6   proceeding with respect to PayGo, where Altair is the

7   plaintiff.

8           We submitted a motion to dismiss.  An opposition is

9   due this week.  That will be argued at some point.  That deals

10  with PayGo and whether the conversion to PayGo is appropriate.

11  Taking by conversion of PayGo, the automatic stay bars the

12  commonwealth from implementing PayGo.

13          Those issues are dealt with there.  It is not

14  appropriate to deal with a remedy for PayGo in this context.

15  Now, we also think -- and if we're actually right about PayGo,

16  they're not entitled to any adequate protection because none of

17  the employer contributions actually belong to them.

18          In addition, your Honor, we point to the segregated

19  $92 million post-petition is providing ample adequate

20  protection for the time period before the summary judgment

21  motion is determined.

22          I want to focus on the stipulation because I think

23  that is where a lot of the discussion we just heard was focused

24  on.  What you don't hear is as important as what you do hear.

25  What you didn't hear is that Paragraph C of the stipulation

1    defines the term "briefing period" to which payments are

2    supposed to be made by reference to a schedule.  That language

3    was not referenced in the presentation you just heard.

4          The language, "briefing period" shall mean the date

5    hereof include, and including the date the court renders a

6    ruling with respect to the parties' motions for summary

7    judgment on the declaratory relief action in accordance with

8    Schedule 1, defined term the briefing period.

9          When you look at Schedule 1, Schedule 1 actually has a

10   specific date.

11         JUDGE SWAIN:  It doesn't have a specific date for the

12   court to resolve the summary judgment motions.  It has a

13   specific target date for argument on the summary judgment

14   motions, but the definition of "briefing period" includes the

15   resolution of the summary judgment motion, so how do the

16   specific dates in Schedule 1 help you to constrain the date on

17   which I decide, and obviously I think everyone understands it

18   is not my practice to let grass grow under my feet, but I also

19   won't be bound by a specific resolution.

20         MR. FRIEDMAN:  No, your Honor.

21         I think the parties were bound with the decision being

22   keyed off an argument on 10-31-2017.  When that didn't -- not

23   an open-ended -- if the briefing period runs through 2018 or

24   2019 that we have to keep paying adequate protection, that we

25   agreed to an adequate protection payment based on an

HCKJPUE2

1   understanding of when everything that the parties had under

2   their control would end, and that is why a reference to

3   Schedule 1 is in there.

4           If it were solely the end of the briefing period and

5   then the point in which the point the court reached a decision,

6   there would be no reason to reference Schedule 1.  It would say

7   Schedule 1 or any dates extended by the parties thereafter, or

8   it wouldn't just say Schedule 1.  The word "Schedule 1" and the

9   dates of a highly compressed schedule have to be meaningful,

10  and what I proposed is to provide understanding what the

11  parties agreed to.  We would pay adequate protection for the

12  parties to do everything they could on 10-31.

13          Your Honor, we also think that our reading of the

14  stipulation gives full meaning to Paragraph D.  The opposing

15  side's reading of the stipulation just completely eviscerates

16  Paragraph D, it renders it complete surplusage, which I think

17  we cited statutory canons, the contractual interpretation

18  canons you're not supposed to do that.  There is literally no

19  meaning to that paragraph if Paragraph F requires continued

20  payments to go on forever.  That is not an appropriate way to

21  read a court stipulation which I think really should be

22  interpreted as a contract.

23          JUDGE SWAIN:  Well, isn't it logical to read Paragraph

24  D as recognizing that in view of the schedule in Schedule 1,

25  there was certainty absent some other global settlement, that

HCKJPUE2

1    the interest payments for the period through October 1 would

2    have to be made because the briefing schedule would still be

3    going on, and then Paragraph F has the more conceptual,

4    open-ended mechanism tied to the briefing schedule as being the

5    ultimate determinant of the length of time for which additional

6    payments would have to be made.

7           So it doesn't seem to me that the reading of F as

8    giving content to an ongoing obligation necessarily subsumes or

9    de-voids of meaning Paragraph D.

10          MR. FRIEDMAN:  Your Honor, I think for that to be the

11    right reading, you would just have the provisions in Paragraph

12    F in Paragraph D.  Paragraph D would say payment shall be made

13    through the end of the briefing period as opposed to having a

14    date certain on which they ended, and another provision which

15    says something, which says, I think directly interpreted, that

16    you need to make a subsequent monthly payment because if you

17    make the October 1st payment and then you tee up money to give

18    to BNY in case it is necessary.

19           One potential interpretation of the stipulation, the

20    right stipulation, but at least one potential stipulation,

21    reading of the stipulation if the court were to conclude we are

22    not a hundred percent right, you have a continuing obligation

23    to make transfers of money to BNY under Paragraph F, but we

24    don't need to make the payments because payments are governed

25    by Paragraph D.  That would make sense.

HCKJPUE2

```
 1              JUDGE SWAIN:  The language of Paragraph F as to
 2    pre-October 31 interest transfers and the quote-unquote
 3    briefing period interest transfers is the same.  In both cases
 4    they're barely parallel sentences with slight difference in
 5    wording, but the key wording seems to be the same that ERS
 6    shall cause money to be transferred, "for the payment of
 7    interest on the ERS bonds in amounts necessary to pay
 8    interest," and so if one was meant to be optional and just
 9    moving a debt chair from one side of the book to the other, but
10    leaving the debt chairs in that protected environment, why
11    would there be the "shall" and "for the payment of interest"
12    and necessary language in both of those sentences?
13              MR. FRIEDMAN:  Your Honor, again I think it is there
14    to at most permit or require the ERS to make the payments to
15    BNY so that if the court, say, goes into overtime, right,
16    post-October 31, and then issues an order, that order can be
17    complied with immediately.
18              If the court were to order we must continue to pay
19    adequate protection under some theory, whether it is
20    contractual or noncontractual, what would happen is ERS
21    wouldn't have to take intermediate steps.  BNY would
22    immediately comply with that rather having to go through a
23    multi-step process to avoid the situation where money continues
24    to go out the door after the time period in which we
25    contractually agreed and have to go chasing after bondholders
```

HCKJPUE2

1   because interest payments are made after those set forth in

2   Paragraph D, the best way to harmonize the obligations under

3   Paragraphs D and F.

4          JUDGE SWAIN:  I have a couple of -- well, finish your

5   presentation and I will ask questions.

6          MR. FRIEDMAN:  Your Honor refreshed my recollection.

7          Paragraph F is a requirement to make very specific

8   deals with the requirement to make the payment to BNY on the

9   20th of the month rather than specific payment to bondholders

10  that come due the first of the month.  That is why it really is

11  a mechanical provision of transfer, and that is why you have to

12  have a separate paragraph as opposed to Paragraph D which deals

13  solely with the payment of the monies transferred to F.

14         Sequentially, it might make sense to make Paragraph F

15  to D so you have the mechanics of getting the money out to BNY

16  first and the money out the door later.  That is why we think

17  Paragraph F is mechanical.

18         I don't know if you want me to address any of the

19  questions you addressed to Mr. Cunningham.  Look, if we are

20  wrong and BNY was authorized to make payments, it is a little

21  hard for me to argue it, that we should set up a cause of

22  action to BNY for having done something presently permitted to

23  do under the court order.

24         Likewise, if my understanding of the stipulation is

25  correct, under the revised order is correct, it does not

HCKJPUE2

1   increase our obligation, I don't think I have an issue.  I

2   probably would like to have a chance to look at it in more

3   detail in the revised form of order to see if in any way, by

4   making a smaller interest payment to current, people currently

5   entitled to payments and making a larger payment to CABS

6   somehow changes the calculation of people's claims; for

7   example, people can assert because they got paid less interest,

8   now they have interest on top of interest in terms of

9   calculating the size of their claim, I don't know the answer to

10  that.

11       I want to be able to speak to our financial advisers

12  if the court is inclined to go down that road through requiring

13  payments.  I don't think it is appropriate for the parties to

14  stipulate to something that increases ERS's liability.  If it

15  is purely an issue that relates to inter-creditor allocations

16  and will have no impact on the overall liability of ERS, we

17  would not have an objection.  If it in any way increases the

18  liability by deferring interest payments made to people

19  required to receive current interest payments, we are not okay

20  with that.  Is that clear?

21       JUDGE SWAIN:  Yes.  Thank you.  So that subsumes both

22  the inclusion of the CABS and any nomenclature issues with the

23  revised proposed order.  If I decide that that contractual

24  obligation to pay interest is ongoing, you're asking for an

25  opportunity to review and consult on fine-tuning the proposed

HCKJPUE2

```
 1    order?
 2            MR. FRIEDMAN:  Yes, or perhaps the other side will
 3    agree no way that increases the size of anybody's claim, it has
 4    no impact on the size of their claims, that would also be an
 5    acceptable resolution.  Thank your Honor.
 6            JUDGE SWAIN:  Thank you.
 7            JUDGE SWAIN:  Mr. Gordon.
 8            MR. GORDON:  Good morning, your Honor.  Robert Gordon
 9    of Jenner & Block.
10            JUDGE SWAIN:  Good morning.
11            MR. GORDON:  Adequate protection is obtainable in
12    bankruptcy only under limited circumstances, and that makes
13    sense because a creditor seeking adequate protection payments
14    essentially is seeking to jump ahead of other creditors and
15    carve out monies from the debtor's precious cash flows ahead of
16    other creditors.
17            The bondholders referred to two pre-Title III adequate
18    protection stipulations, and I would submit it was completely
19    irrelevant.  Those were not entered by this Court in a Title
20    III case.  They were not entered through a bankruptcy regime.
21    They were not entered with participation of the collective
22    interest of creditors.  The only thing that is relevant is
23    whether the parties are entitled to adequate protection under
24    the -- (inaudible) -- I would say they are not at least to
25    date.
```

HCKJPUE2

1          To be entitled to adequate protection, the creditor

2     must, there must be at least two things that are established:

3          One is that the creditor has a lien in an asset of the

4     debtor; and, number two, the asset is diminishing in value as a

5     result of the automatic stay.  Neither of those elements have

6     been established to date.  The bondholders would have this

7     court treat them as if it already established both things, and

8     that is not appropriate.

9          If the alleged collateral we are focusing on is, for

10    example, pre-petition account, both ERS and the retiree

11    committee have disputed that the bondholders have a lien in

12    that cash, and that was the subject of the arguments last week

13    before this Court.  So it has not yet been established they

14    even have a lien in that cash.

15          In addition, there is no ability to establish that

16    that cash is diminishing, as Mr. Friedman in his papers has

17    indicated, that account remains intact.  To the extent monies

18    have been taken out of that account, they have only been

19    transferred to the bondholders.

20          If the collateral in question is the post-petition

21    account, as Mr. Friedman has indicated in his papers, that

22    account has not been disturbed at all.  In fact, it has grown

23    to 92 and a half million dollars over time, so it is not

24    diminishing in value.

25          The bondholders also argue throughout their papers

HCKJPUE2

1     that they have a lien in post-petition payments by municipal

2     entities central government under the PayGo system.  Both the

3     retiree committee and the ERS strongly dispute that issue, and

4     as Mr. Friedman has indicated, that is a matter being dealt

5     with in a separate adversary proceeding.

6            But if the bondholders are correct on that argument,

7     they are essentially saying they have a lien in a perpetual,

8     recurring, robust revenue stream, which leads to intellectual

9     conclusions.  One, there can be no meaningful diminishing in

10    the value of the collateral.  It is recurring.  Two, if it is

11    true, the bondholders are over-secured.  Under the bankruptcy

12    code, an over-secured creditor is not entitled to adequate

13    protection payments at all.

14           Pending a determination of the bondholders' lien

15    rights, the normal course of action in a bankruptcy case would

16    be to escrow any adequate protection payments, and that was

17    essentially what this Court suggested in the June 28th hearing.

18    For reasons unknown to the retiree committee, however, a joint

19    stipulation was submitted to the court without being passed by

20    the retiree committee that actually provided for payments,

21    outright payments to the bondholders pending this

22    determination.

23           The retiree committee filed the reservation of rights

24    without any determination of predicates for adequate

25    protection.  The bondholders actually received $55.5 million.

HCKJPUE2

1  They were receiving adequate protection payments before it has

2  been determined they're even entitled to adequate protection

3  payments.

4          I guess we are here today to say that enough is

5  enough.  As to the November 1 interest payment that is being

6  argued about here, I would say this:  It is a red herring.  The

7  bottom line is that both ERS and BNY acted erroneously.  ERS

8  should never have transferred the money to BNY Mellon on

9  October 20th because the stipulation clearly indicates that

10 they're only entitled to interest payments through October, and

11 BNY Mellon should have asked, when it received the payment with

12 the transferred monies, whether there was supposed to be an

13 interest payment on November 1 because they clearly under the

14 stipulation are not entitled to interest payment on November 1.

15 They both acted erroneously, in my opinion.

16         That does not create rights that don't exist under the

17 stipulation, to argue that the stipulation by any plain reading

18 does not, is not perpetually, not self-executing after October

19 31.  Arguments to the contrary lift partial language segments

20 and quote them out of context, as Mr. Friedman also indicated.

21 The stipulation itself does not provide a basis for adequate

22 protection payments beyond October.

23         For the reasons I have already stated, the factual

24 circumstances in law do not provide a basis for continuing

25 adequate protection payments.  There simply is no established

HCKJPUE2

1    basis at this time.  Accordingly, your Honor, we ask that the

2    bondholder motion be denied.  Thank you.

3         JUDGE SWAIN:  Our specialist is coming back again, so

4    let's take -- here he is.  The buzzing came back again over

5    while the last speaker was speaking.

6         (Pause)

7         JUDGE SWAIN:  The phone line is clear.  Is the court

8    reporter able to do his job when the buzzing is audible in

9    here?

10        THE REPORTER:  Sometimes.

11        JUDGE SWAIN:  Let's all be as clear as we can in

12   speaking.  Mr. Court Reporter, if you need to stop the speaker

13   and ask for something to be repeated, please do so.  I

14   understand everybody else.

15        LAW CLERK:  The phone line just cut out.

16        JUDGE SWAIN:  Let's just take, I'll call it a

17   five-minute break, which is a break that people come back from

18   as quickly as possible while the phone is being sorted out and

19   I'll continue.

20        (Recess)

21        JUDGE SWAIN:  Please be seated.

22        I understand that Mr. Schaffer from Bank of New York

23   wishes to be heard.

24        MR. SCHAFFER:  Your Honor, Eric Schaffer from Reed

25   Smith for Bank of New York Mellon.  There are three points I

HCKJPUE2

1    would like to make quickly:

2              First, we are the fiscal agent under the resolution

3    that binds ERS as well as us, and we have a limited

4    administrative role.  We receive funds from ERS, and on the

5    dates determined by the resolution, we are required to make

6    payments to the bond owners.  Consistent with the resolution,

7    we have no liability for performing that duty.  Absent

8    direction from the court, we would perform our limited duties

9    solely under the resolution in the ordinary course;

10             The second point is a response to adequate protection.

11             JUDGE SWAIN:  Please project into the microphone.

12             Thank you.

13             MR. SCHAFFER:  Yes, your Honor.

14             Second, with regard to adequate protection, following

15   up on some of the court's questions, the resolution does not

16   provide for payments on the capital appreciation bonds, the

17   CABS but, of course, the court could order that as adequate

18   protection.  If the court does do so, we would need clear

19   direction with regard to our role and responsibility, clarity

20   with regard to each security.  The revised form of order would

21   do just that.

22             Of course, the form of order would depart from the

23   terms of the resolution, and that's why it is important to have

24   what you referred to as the exculpatory language.  That ensures

25   that we are not exposed to liability, whether to CABS or anyone

1   else, for complying for the court's order on adequate

2   protection.

3          The last point, your Honor, is responding to what I

4   believe are misstatements that have been made in the papers or

5   in arguments.  We are not a party to the stipulation.  I think

6   that since the opposition was filed by ERS, counsel for FOMB

7   has confirmed that it was negotiated without our involvement

8   and it was presented without our knowledge.

9          Consistent with the resolution, your Honor, we

10  received funds on October 18th.  We made a distribution on

11  November 1.  There was no requirement that we receive or

12  request some sort of second confirmation.  Again, we are not

13  party to the stipulation and we don't have a duty to police the

14  ERS or to ask do you really, really want to make this payment.

15         What happened is that on November 17, 30 days after we

16  received the payment, 16 days after it was distributed as

17  required under the resolution, we received a letter telling us

18  that ERS thought distribution was improper.  We understand that

19  ERS may regret having sent the monies, but there is no basis to

20  blame the fiscal agent for acting in accordance with the

21  resolution.  There is no basis to impose additional duties.

22         Your Honor, I believe you have seen the letter that we

23  sent?

24         JUDGE SWAIN:  Yes, I have.

25         MR. SCHAFFER:  I don't think I have to add anything to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HCKJPUE2

1   that.  I just conclude we simply performed our administrative

2   functions in accordance with the resolution.

3         Thank you, your Honor.

4         JUDGE SWAIN:  Thank you, Mr. Schaffer.  And now,

5   Mr. Cunningham, you're back.

6         MR. CUNNINGHAM:  Thank you, your Honor.

7         In brief reply, the first thing I would like to say is

8   during the break I had a chance to talk with my client.  I want

9   to clarify one thing.  Your Honor, if your Honor were to

10  enforce the joint stipulation on the monthly interest payments

11  the way we ask your Honor to do, we would withdraw our request

12  without prejudice as to the 18 and a half million dollar

13  post-petition deposits so we don't have to get into the 305

14  arguments.  Basically our alternative relief would be the leave

15  we are asking for today if your Honor were to grant it.

16        With respect to FOMB arguments, the first is one how

17  can cash payments constitute adequate protection.  I would note

18  Bankruptcy Code Section 361 entitled, "Adequate protection in

19  Subsection 1," specifically says cash payments or periodic cash

20  payments can be adequate protection.

21        Secondly, on the Schedule 1 point, your Honor was

22  spot-on.  Schedule 1, which I have in front of me, says as to

23  deadline, the last deadline of October 31, 2017 was with

24  respect to a hearing on the motion for summary judgment, but

25  specifically says subject to the court's schedule.  So there

HCKJPUE2

1   was no firm deadline either as to the October 31 hearing or

2   certainly this Court's summary judgment ruling which no party

3   would know when your Honor would render that ruling.  There is

4   no firm deadline, as they argue in their papers.

5          The last point about Paragraph F being mechanical

6   because it requires monthly interest deposits with BONY on the

7   20th of each month preceding the payment date, this is

8   mechanical only because it helps BONY to actually get ready to

9   make the payment on the 1st of each month.  This is, as I said,

10  carryover language identically from Judge Besosa's order

11  entered in April of 2017.

12         So this isn't something new we invented.  This is a

13  mechanical feature to address the feature when BONY receives

14  the payment, it needs to prepare and transfer and make the

15  interest payments on the 1st.  Otherwise, the language was

16  always consistent, they still needed to make the payment.

17         If, as the retiree committee, your Honor, counsel

18  suggested we're right in our arguments, then we are

19  over-secured creditors not entitled to adequate protection.

20  Your Honor, the Commonwealth of FOMB and the oversight board

21  argued that very point to the First Circuit in January, and the

22  First Circuit found we were entitled to adequate protection and

23  remanded this back to Judge Besosa which, of course, led to the

24  stipulated orders we had through Title III which are, of

25  course, relevant to the issue of adequate protection because it

HCKJPUE2

1  framed the issue starting with the first circumstance, Judge

2  Besosa leading up to the Title III cases.  That framed the

3  joint stipulation, and that is where the mechanism of continued

4  monthly payments arises, and we ask it just continue as

5  provided in the stipulation.

6      JUDGE SWAIN:  Thank you.

7      MR. CUNNINGHAM:  Thank your Honor.

8      JUDGE SWAIN:  If you will all bear with me for just a

9  moment while I reflect, I will rule on this.  (Pause)

10     I have reviewed carefully the written submissions of

11  all of the parties and listened carefully to the arguments made

12  in court today.  The court will now rule on the bondholders'

13  motion.  This oral opinion constitutes the court's findings of

14  fact and conclusions of law for the purposes of Federal Rule of

15  Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure

16  52.

17     The court has jurisdiction of this contested matter

18  pursuant to Section 306 of PROMESA.  The bondholders have

19  acknowledged with respect to the obligations of ERS under the

20  stipulation that the contractual obligation relating to

21  additional payments of $18.5 million per month expired, and the

22  bondholders have withdrawn their request for continuation of

23  that payment schedule further as a matter of adequate

24  protection, and so I turn to the provisions of the joint

25  stipulation regarding interest-related transfers of

HCKJPUE2

1    pre-petition funds.

2              As to that, the court finds that the joint stipulation

3    is more open-ended and that reading Paragraphs C, D and F of

4    the stipulation together, the court concludes that ERS agreed

5    to continue to make such transfers in accordance with the

6    schedule and mechanics set forth in Paragraph F through the

7    briefing period as defined in the stipulation which ends upon

8    the court's resolution of the summary judgment motions.

9              The court rejects as unfounded in the text of the

10   joint stipulation ERS's contention that such transfers and/or

11   distributions to bondholders of amounts transferred after

12   October 1, 2017 were optional.  Rather, ERS remains obligated

13   through the briefing period to transfer to BNY Mellon as fiscal

14   agent "for the payment of interest on the ERS bonds," and then

15   I again quote, "the amount necessary to pay interest on the ERS

16   bonds due and payable on the first day of the next succeeding

17   month in accordance with the ERS bond resolutions."

18             And so it is an obligation to transfer the monies in

19   aid of distribution of those interest payments to bondholders.

20   One moment.  (Pause)

21             So all arguments and objections having been considered

22   and either withdrawn or overruled, to the extent consistent

23   with this oral ruling, the ERS bondholders' motion is granted

24   to the extent that ERS must continue to transfer monies

25   calculated by reference to interest payments in accordance with

HCKJPUE2

1  Paragraph F of the joint stipulation during the briefing

2  period, and BNY Mellon is to distribute such monies to

3  bondholders.  The motion is denied in all other respects.

4       I am directing the parties to confer regarding the

5  form of order since there are issues with respect to recipients

6  of the distributions, the nomenclature and the issues that BNY

7  Mellon has raised, and those I think require some further

8  processing and exploration on at least FOMB's part.

9       So I would like you to confer and present to me by the

10  27th of December an agreed form of order, or if no agreed form

11  of order is achieved, then a further revised proposed order

12  with objections accompanying that submission of the order so

13  that I can consider and then determine the form of order to

14  enter.  Are there any questions about that procedure?

15       Very well, then.  Thank you all very much.

16       There are several matters that have been carried over

17  for the February Omni, and we will be reconvening for oral

18  argument on January 10th of pending motions.  Is there anything

19  further that we need to take up together this morning?

20       Seeing no hands raised, I thank you all and I wish you

21  happy and safe holidays and safe travels for those who are

22  traveling, and again our best wishes and thoughts are with our

23  colleagues and the people of Puerto Rico on the island.

24       Good morning.

25       (Court adjourned)

HCKJPUE2

```
 1   UNITED STATES DISTRICT COURT)
                                ) ss.
 2   OF PUERTO RICO             )

 3

 4

 5

 6                    REPORTERS' CERTIFICATE

 7

 8         We, Andrew Walker and Jerome Harrison, do hereby

 9   certify that the above and foregoing, consisting of the

10   preceding 54 pages, constitutes a true and accurate transcript

11   of our stenographic notes and is a full, true and complete

12   transcript of the proceedings to the best of our ability.

13         Dated this 20th day of December, 2017.

14         S/Andrew Walker _____

15         S/Jerome Harrison _____

16         Andrew Walker, RMR, CSR, RPR, CRR

17         Jerome Harrison, CP, CM, CSR, CRR

18         Official Court Reporters

19         500 Pearl Street

20         New York, NY 10007

21         212-805-0320

22

23

24

25
```