## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**Re:  Dkts. 913 & 1929.** |

## REPLY TO THE UNITED STATES IN FURTHER SUPPORT OF OBJECTION AND MOTION OF AURELIUS TO DISMISS TITLE III PETITION

Luis A. Oliver-Fraticelli
Lourdes Arroyo-Portela
Katarina Stipec-Rubio
USDC-PR Bar Nos. 209204,
226501, & 206611
ADSUAR MUÑIZ GOYCO SEDA &
    PÉREZ-OCHOA PSC
208 Ponce de Leon Ave., Suite 1600
San Juan, P.R.  00918
Phone:  (787) 756-9000
Fax:  (787) 756-9010
Email:  loliver@amgprlaw.com

Theodore B. Olson  (*pro hac vice*)
Matthew D. McGill  (*pro hac vice*)
Helgi C. Walker  (*pro hac vice*)
Lucas C. Townsend  (*pro hac vice*)
Lochlan F. Shelfer  (*pro hac vice*)
Jeremy M. Christiansen  (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone:  (202) 955-8500
Fax:  (202) 467-0539
Email:  tolson@gibsondunn.com

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

ARGUMENT ......................................................................................................... 1

    I.     PROMESA's Appointments Scheme Violates The Appointments Clause ............ 2

          A.     The United States Concedes That PROMESA's Appointments
               Mechanism Is Constitutionally Suspect ............................................... 2

          B.     The Appointments Clause Applies Whether Congress Is
               Legislating With Respect To A Territory Or Not ................................. 5

               1.     Congress Is Subject To The Constitution's Structural
                        Provisions When It Acts Pursuant To Article IV ...........................5

               2.     Historical Practice And Supreme Court Precedent Confirm
                        That Structural Provisions Such As The Appointments
                        Clause Apply When Congress Legislates With Respect To
                        A Territory ....................................................................................8

          C.     The Oversight Board Members Are Officers Of The United States ........ 10

    II.    The United States Concedes That If Aurelius Is Correct, It Is Entitled To
          An Appropriate Remedy ............................................................................. 15

CONCLUSION .....................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almendarez-Torres v. United States,*
    523 U.S. 224 (1998)............................................................................3

*Augustine v. Dep't of Veterans Affairs,*
    429 F.3d 1334 (Fed. Cir. 2005)........................................................12

*Buckley v. Valeo,*
    424 U.S. 1 (1976)........................................................................6, 10

*Cincinnati Soap Co. v. United States,*
    301 U.S. 308 (1937)............................................................................7

*Citizens for Abatement of Aircraft Noise, Inc. v. MWAA,*
    917 F.2d 48 (D.C. Cir. 1990).............................................................7

*Clinton v. City of New York,*
    524 U.S. 417 (1998)............................................................................3

*Clinton v. Englebrecht,*
    80 U.S. 434 (1871).............................................................................9

*Cross v. Harrison,*
    57 U.S. 164 (1853).............................................................................9

*Edmond v. United States,*
    520 U.S. 651 (1997)..........................................................................14

*El Paso & N.E. Ry. Co. v. Gutierrez,*
    215 U.S. 87 (1909).............................................................................5

*FEC v. NRA Political Victory Fund,*
    6 F.3d 821 (D.C. Cir. 1993)..............................................................15

*Free Enter. Fund v. PCAOB,*
    561 U.S. 477 (2010)...................................................................3, 5, 10

*Free Enter. Fund v. PCAOB,*
    No. CIVA 06-0217, 2007 WL 891675 (D.D.C. Mar. 21, 2007)..........................4, 5

*Freytag v. C.I.R.,*
    501 U.S. 868 (1991)....................................................................3, 7, 14

*Hechinger v. MWAA,*
    36 F.3d 97 (D.C. Cir. 1994)........................................................4, 12, 14

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

*Hechinger v. MWAA*,
    845 F. Supp. 902 (D.D.C. 1994) .................................................................12

*In re Hennen*,
    38 U.S. (13 Pet.) 230 (1839) ...............................................................14, 15

*Kleppe v. New Mexico*,
    426 U.S. 529 (1976) ..................................................................................5

*Kuretski v. C.I.R.*,
    755 F.3d 929 (D.C. Cir. 2014) .............................................................7, 15

*Lebron v. National Railroad Passenger Corp.*,
    513 U.S. 374 (1995) ................................................................................12

*MWAA v. Citizens for the Abatement of Aircraft Noise, Inc.*,
    501 U.S. 252 (1991) ...............................................................4, 5, 7, 11, 13

*NLRB v. Noel Canning*,
    134 S. Ct. 2550 (2014) ...........................................................................4, 8

*Puerto Rico v. Sanchez Valle*,
    136 S. Ct. 1863 (2016) ............................................................................10

*Ryder v. United States*,
    515 U.S. 177 (1995) ................................................................................15

*Sawtelle v. Farrell*,
    70 F.3d 1381 (1st Cir. 1995) ..................................................................13

*Scott v. Sandford*,
    60 U.S. (19 How.) 393 (1857) ..................................................................8

*United States v. Dorr*,
    195 U.S. 138 (1904) ..............................................................................7, 8

*United States v. Ellison*,
    866 F.3d 32 (1st Cir. 2017) .....................................................................15

*United States v. Ferreira*,
    54 U.S. 40 (1851) ...................................................................................14

*United States v. Gratiot*,
    39 U.S. 526 (1840) ...................................................................................5

## TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

**Statutes**

48 U.S.C. § 2103 ......................................................................................................6

48 U.S.C. § 2121(d) ...............................................................................................14

48 U.S.C. § 2121(e) ...........................................................................................3, 15

48 U.S.C. § 2121(h) ...............................................................................................13

48 U.S.C. § 2124(a) ...............................................................................................11

48 U.S.C. § 2124(f) ..........................................................................................11, 13

48 U.S.C. § 2124(k) ...............................................................................................11

48 U.S.C. § 2124(*l*) ...............................................................................................13

48 U.S.C. § 2127 ....................................................................................................13

48 U.S.C. § 2128 ..........................................................................................6, 11, 13

48 U.S.C. § 2141(a) ...............................................................................................14

48 U.S.C. § 2141(c) ...............................................................................................12

48 U.S.C. § 2141(d) ...............................................................................................12

48 U.S.C. § 2142 ....................................................................................................11

48 U.S.C. § 2142(a) ...............................................................................................14

48 U.S.C. § 2144(a) ...............................................................................................11

48 U.S.C. § 2144(c) ...............................................................................................11

48 U.S.C. § 2146(a) ...............................................................................................14

48 U.S.C. § 2147 ....................................................................................................11

48 U.S.C. § 2149(2) .................................................................................................3

48 U.S.C. 2194 .......................................................................................................11

Pub. L. No. 104-8, § 101(b)(2), 109 Stat. 97 (Apr. 17, 1995) ...............................14

Pub. L. No. 104-8, § 204(c) ...................................................................................14

# TABLE OF AUTHORITIES
### (*continued*)

**Page(s)**

### Other Authorities

Brief for Petitioner, *NLRB v. Noel Canning*,
No. 12-1281, 2013 WL 5172004 (U.S. Sept. 2013) ...................................................8

Brief for the Respondent, *Lucia v. SEC*,
No. 17-130 (U.S. Nov. 2017).....................................................................................11

Brief for United States, *Hechinger v. MWAA*,
No. 94-7036, 1994 WL 16776877 (D.C. Cir. Apr. 15, 1994)................................12

David P. Currie, *The Constitution in Congress: The Jeffersonians,*
*1801–1829* (2001) ....................................................................................................10

H.R. Rep. 114-602 ........................................................................................................11, 13

### Constitutional Provisions

U.S. Const. art. II, § 3 .......................................................................................................6

Const. P.R., Art. I, § 1.....................................................................................................10

## ARGUMENT

The United States fails to show that the Appointments Clause does not apply here.  On the contrary, in footnote 15 of its Memorandum of Law in Support of the Constitutionality of PROMESA, Dkt. 1929 ("U.S. Br."), the United States invokes *constitutional avoidance*, which it could do only if the Constitution's separation-of-powers principles bind Congress when it legislates regarding the territories.  If the Appointments Clause did *not* govern the selection of the Board's members, *there would be no constitutional problem to avoid*.  But as footnote 15 correctly suggests, there is a serious constitutional problem with Congress forcing the President to choose Board members from congressional lists.  And if, as footnote 15 further suggests, the Constitution prohibits Congress from requiring the President to choose *future* Board members from such lists, it must also have prohibited Congress from so constraining the President's selection of *these* Board members.  The United States cannot have it both ways: Either the Appointments Clause applies to all members of the Board, or to none.  Because Article II safeguards the powers of *the Presidency*, not any particular President, the principled answer is that the Clause applies to *all* Board members.

In an effort to explain why the Appointments Clause and separations-of-powers principles vanish from the equation with respect to the sitting Board members' selection, the United States implausibly asserts that every congressional provision for Presidential nomination and Senate confirmation of territorial officers was merely "an exercise of legislative prerogative."  U.S. Br. 16. The United States would have this Court believe that PROMESA is the first time, in over 200 years, that Congress actually reserved for itself the power to appoint territorial officials.  That is absurd on its face, and is also flatly disproven by the President's regular exercise of the *constitutional* power to make recess appointments of territorial officials.  Those recess appointments— including the second civilian governor of Puerto Rico—were authorized not by "legislative prerogative" but by the Appointments Clause.  So to accept the United States' argument, one would have to accept not only that Congress repeatedly and gratuitously granted the President the power to appoint territorial officials subject to Senate confirmation, but also that Congress acquiesced— never breathing a word of objection—in numerous *ultra vires* recess appointments of territorial

officials by the President.  That reading of history is beyond incredible.

Thus, as the United States implicitly concedes, the Appointments Clause and the separation of powers do apply in the territories; nor does the United States seriously contest that, if the Appointments Clause applies, PROMESA violates it.  Indeed, the United States seeks to radically extend the noxious *Insular Cases*, arguing that they allow Congress to do whatever it wants to the territories without any structural constitutional restraint.  Nor does the United States deny that if Aurelius is correct on the merits, the proper remedy is simply to sever the offending appointments language and stay the order so that the President can appoint a new Board with Senate confirmation.  The United States' silence in the face of the Opposing Parties' cries of "chaos" is deafening, and emphasizes the practicality of this narrowly tailored remedy.  The Court should reject the United States' expediency-driven arguments and grant Aurelius's motion to dismiss.

## I.      PROMESA's Appointments Scheme Violates The Appointments Clause.

As Aurelius demonstrated in its Objection and Motion to Dismiss, Dkt. 913 at 10–33 ("Mot."), and its Reply to the Opposing Parties, Dkt. 1833 at 5–28 ("Reply"), PROMESA's mechanism for appointing Board members violates the Appointments Clause and the separation of powers.  Nothing that the United States now asserts changes that.  If anything, the United States' brief underscores that PROMESA is a bald usurpation of Presidential powers, that the Appointments Clause and the separation of powers apply even when Congress invokes Article IV, and that the Board members are officers of the United States whose appointments were unconstitutional.

### A.      The United States Concedes That PROMESA's Appointments Mechanism Is Constitutionally Suspect.

Notwithstanding the artfully cabined defense of PROMESA's appointments provisions "in this instance," U.S. Br. 25, the United States concedes that the list mechanism raises such "serious constitutional doubts" that this Court should resort to the canon of constitutional avoidance and "read" PROMESA's provisions regarding mandatory lists, lack of Senate confirmation, appointment deadline, and vacancy provisions as "not hav[ing] any constraining effect on the President's authority going forward," U.S. Br. 34 n.15 (internal quotation marks omitted).  The United States

thus admits both that PROMESA suffers from constitutional flaws, and that the Appointments Clause and the separation of powers are not irrelevant when Congress legislates with regard to the territories.[2]

"[T]hose who invoke the doctrine [of constitutional avoidance] must believe that the alternative is a serious likelihood that the statute will be held unconstitutional." *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998). It is not hard to understand why the United States stakes out this position. The Title III proceedings will continue well beyond the expiration of the current Board members' appointments on August 31, 2019. 48 U.S.C. § 2121(e)(5)(A). The Board will exist at least until it can certify, among other things, that the Commonwealth's expenditures "d[o] not exceed . . . revenues" "for at least 4 consecutive fiscal years." *Id.* § 2149(2). Thus, the United States refuses to support the Constitution *now* while attempting to preserve Senate confirmation and avoid the mandatory list-mechanism for *future* vacancies filled by this President. But "[t]he Constitution's structure requires a stability which transcends the convenience of the moment." *Clinton v. City of New York*, 524 U.S. 417, 449 (1998) (Kennedy, J., concurring). The Supreme Court has not hesitated to uphold the Executive Branch's constitutional powers even when a particular administration declines to defend them. *See, e.g.*, *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 502 (2010) (rejecting Solicitor General's position that dual-layer of removal insulation did not infringe on the Executive Branch); *Freytag v. C.I.R.*, 501 U.S. 868, 879–80 (1991) (declining to "defer to the Executive Branch's decision that there has been no legislative encroachment on Presidential prerogatives under the Appointments Clause"). This Court should do the same.

The United States relies on *pro forma* sessions to speculate that "the Senate might well have confirmed the President's nominations in time to meet the statutory deadline." U.S. Br. 33.

---

[2] PROMESA cannot be construed (let alone "most naturally") not to impose future limits on the President's appointments power. U.S. Br. 34 n.15. The statute says that any vacancy "*shall* be filled in the same manner in which *the original member was appointed*." 48 U.S.C. § 2121(e)(6) (emphases added). All "original member[s]" were "appointed" by the President from the congressional lists and *without Senate confirmation*, which PROMESA permits only where the list mechanism is used. *Id.* § 2121(e)(2)(E). This manner of appointment cannot be avoided going forward through such an utterly atextual reading of the statute.

This faint assurance cannot overcome PROMESA's constitutional deficiencies.  The decision in *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014), to defer to the Senate about whether it is in session says nothing about whether PROMESA violates the Appointments Clause and the separation of powers by imposing a mandatory deadline on the President either to appoint Congress's chosen officers or to obtain expedited Senate confirmation of the President's choices at the risk of being forced to use the congressional lists if the Senate does not meet the deadline.  Suppose Congress gave the President the "choice" either to appoint the Deputy Attorney General with Senate confirmation or to pick from congressional lists, providing that if confirmation did not occur within 60 days the President *must* choose from the list.  Such an approach would be unconstitutional because it shifts the balance of appointment power into the hands of members of Congress, whether the Senate is in session during those sixty days or not.  *See MWAA v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 269 (1991).  That is no less so for PROMESA.  The United States argues that the President was "not require[d]" to choose from the congressional lists and could request that the congressional leaders, in their discretion, supplement their lists.  U.S. Br. 32.  The D.C. Circuit has rejected this reasoning, expressing "little doubt [about] who would win a test of wills."  *Hechinger v. MWAA*, 36 F.3d 97, 101 (D.C. Cir. 1994).

In any event, the United States distorts *Noel Canning*, which made clear that courts' "deference to the Senate cannot be absolute":  "if the Senate [leaves] the Capitol and effectively give[s] up the business of legislating," it is "unable" to act and is "not in session even if it so declares." 134 S. Ct. at 2575 (internal quotation marks omitted).  The *pro forma* sessions cited by the United States, U.S. Br. 33, generally lasted all of twenty or thirty seconds and, unsurprisingly, involved none of "the business of legislating."  *Noel Canning*,  134 S. Ct. at 2575.  The United States' speculation that the Senate "might well have" convened to confirm the President's nominees during this time, U.S. Br. 33—after the President rejected Congress's choices—is fanciful.[3]

---

[3]  The United States argues that an Appointments Clause challenge is not justiciable unless the plaintiff can adduce "evidence" that the appointments would have been different absent the constitutional violation.  U.S. Br. 33 n.14.  The district court in *Free Enterprise Fund* came to the same conclusion.  *Free Enter. Fund v. PCAOB*, No. CIVA 06-0217, 2007 WL 891675, at *5

4

### B.    The Appointments Clause Applies Whether Congress Is Legislating With Respect To A Territory Or Not.

#### 1.    Congress Is Subject To The Constitution's Structural Provisions When It Acts Pursuant To Article IV.

Like the Opposing Parties, the United States conflates Congress's power to arrange *territorial governments* in different ways with the entirely distinct question of whether, in doing so, *Congress itself* is free from the Constitution's structural restrictions. It is not. The Supreme Court has long recognized that Congress's "plenary" Article IV power is still subject to the Constitution's structural restrictions, as the United States' clipped quotations conceal. *See, e.g.*, *El Paso & N.E. Ry. Co. v. Gutierrez*, 215 U.S. 87, 93 (1909) (Congress's "plenary" power over territories still "subject" to constitutional "limitations and prohibitions"); *compare* U.S. Br. 8–9, *with* Reply 5–6.

The United States attempts (at 18) to split Article IV's Property Clause into two separate clauses dealing with territories and property, each with a separate standard. But the reason these "clauses" "share[] the same text" (*id.*) is that there is *only one clause*. "It is the Property Clause . . . that provides the basis for governing the Territories of the United States." *Kleppe v. New Mexico*, 426 U.S. 529, 539–40 (1976). "The term territory, as here used, is merely descriptive of one kind of property," and "Congress has the same power over it as over any other property belonging to the United States." *United States v. Gratiot*, 39 U.S. 526, 537 (1840). That makes *MWAA* critical here. Congress's acts are not "immune from scrutiny for constitutional defects" just because they were taken "in the course of Congress' exercise of its power" under "Art. IV, § 3, cl. 2." *MWAA*, 501 U.S. at 270. This is the *key* insight of *MWAA* that the United States never addresses in its brief, choosing instead to create supposedly different standards for "Territory" and "Property." But as the United States' attempt to invoke constitutional avoidance establishes, Congress is subject to the Appointments Clause and the separation of powers *whenever* it legislates.

---

(D.D.C. Mar. 21, 2007); *see id.* at *3 ("restrictions on the Commission's appointment authority may be raised only by the restricted officer, not a private party") (citation omitted). But, as Aurelius already argued, *see* Reply 25 n.8, the Supreme Court rejected this position: Standing to bring an Appointments Clause challenge cannot be defeated by the lack of "precise proof" about whether the appointer "would have made the same appointments" in the "counterfactual world." *Free Enter. Fund*, 561 U.S. at 512 n.12. The United States ignores that holding.

5

The arbitrariness of the United States' position is further illustrated by its agreement that Congress must abide by the Constitution's presentment requirements when it legislates with respect to the territories. U.S. Br. 18–19. The reason, according to the United States, is that this "is the only way for Congress to act." U.S. Br. 19. But "Congress's power" is equally "bounded" by the Appointments Clause. *Buckley v. Valeo*, 424 U.S. 1, 138–40 (1976).

And in yet another unprincipled inconsistency, the United States concedes that the Supremacy Clause applies in the territories. U.S. Br. 4. In fact, PROMESA repeatedly invokes federal supremacy, *see*, *e.g.*, 48 U.S.C. §§ 2103, 2128(a), but the United States fails to explain why Congress would create an entity "to pursue purely territorial objectives" (at 21) but vest it with federal power to preempt territorial law. The Supremacy Clause says that "This Constitution . . . shall be the supreme Law of the Land," meaning *the whole Constitution*.

Indeed, the United States' brief defending the constitutionality of PROMESA itself reflects the President's Article II duty to "take Care that the Laws be faithfully executed" in Puerto Rico (U.S. Const. art. II, § 3)—a structural constitutional provision. The United States' very decision to defend PROMESA belies its claim that Congress's power in the territories is "plenary."

The United States gives no reason why some, but not all, of the Constitution's structural provisions apply when Congress legislates with respect to the territories, or what makes the Appointments Clause different. The Opposing Parties offer a flawed theory on this score—that the Appointments Clause is not "fundamental," *see*, *e.g.*, Board Opp. 23—and the United States properly avoids such an absurd position. Yet the United States arbitrarily picks and chooses which parts of the Constitution it wants to apply "in this instance" (U.S. Br. 25) and which it does not.

And where is the stopping point? Can Congress give a territorial governor the power to make treaties with foreign nations that affect only that territory? And if the Appointments Clause does not apply to the territories, what stops Congress from letting territorial governors appoint Article III judges or U.S. attorneys whose jurisdiction is limited to the territory, or from appointing them itself? The United States offers no reason why its theory would not allow Congress to do any of these things. Just as the United States cannot selectively argue that the Appointments

6

Clause applies to some Board members but not all, it cannot cherry-pick the parts of the Constitution that apply to Puerto Rico.

Nor is congressional *ipse dixit* dispositive when Congress invokes Article IV. Again, *MWAA* refutes the United States' position. There, Congress tried to exercise its Article IV power to insist that the Board was not an agent of Congress because the Board members "act 'in their individual capacities,'" but the Court felt entirely unconstrained by this "*ipse dixit*," since it was "belie[d]" by the "facts." *MWAA*, 501 U.S. at 267. Even when Congress acts under Article IV, "separation-of-powers analysis does not turn on the labelling of an activity," but rather on the statutory details and "practical consequences." *Citizens for Abatement of Aircraft Noise, Inc. v. MWAA*, 917 F.2d 48, 54 (D.C. Cir. 1990), *aff'd*, 501 U.S. 252. The "separation-of-powers principles apply" so long as the Board's authority is "derived from a federal source," *id.*, as it is here.

The United States relies on the distinction between Article III and Article IV courts, U.S. Br. 11–12, 29, but the distinction fails. As Aurelius argued, Reply 10–11, *Freytag* made clear that territorial courts and the Article I Tax Court are similarly subject to the Appointments Clause; the exercise of Article III power is irrelevant to the application of the Appointments Clause. *Kuretski v. C.I.R.*, 755 F.3d 929, 941 (D.C. Cir. 2014) (citing *Freytag*, 501 U.S. at 889–90). The United States has no answer to this accepted view of *Freytag*; it simply ignores this controlling precedent.

Like the Opposing Parties, the United States (at 8 & n.5) also seeks to radically *extend* the noxious *Insular Cases* beyond their rule that certain non-fundamental individual rights are inapplicable in unincorporated territories, and argues that those cases allow Congress to do whatever it wants to territories without any structural constitutional limits at all, a far more extreme position than even the *Insular Cases* Supreme Court ever envisioned.

Finally, the United States argues that Congress's territorial authority "'is not subject to the same restrictions'"—such as the non-delegation doctrine—as when the government acts "'as a political body of states in union.'" U.S. Br. 11 (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 323 (1937)). But *Cincinnati Soap* relied on *United States v. Dorr*, 195 U.S. 138, 142 (1904) for this proposition, which in turn relied on Justice Curtis's stirring dissent in *Dred Scott*,

7

stating that the Constitution's "'express prohibitions'" remain as "'limits'" of congressional "'power.'" *Id.* (quoting *Scott v. Sandford*, 60 U.S. (19 How.) 393, 614 (1857) (Curtis, J., dissenting)). As Justice Curtis noted, those restrictions included the Appointments Clause. Congress amended the Northwest Ordinance because "officers to be appointed for the Northwestern Territory, after the adoption of the Constitution, must necessarily be officers of the United States," who are "appointed and commissioned by the President," and "exercis[e] powers derived from the United States under the Constitution." 60 U.S. at 606 (Curtis, J., dissenting). Thus, the Appointments Clause limits congressional action even in the territories.

### 2. Historical Practice And Supreme Court Precedent Confirm That Structural Provisions Such As The Appointments Clause Apply When Congress Legislates With Respect To A Territory.

As Aurelius demonstrated in its Motion (at 19–22) and Reply (at 8–14), the historical evidence is overwhelming that, ever since the founding, principal territorial officials have been appointed by the President and confirmed by the Senate as required by the Appointments Clause. The United States does not deny that all "civilian territorial governors" until 1947 were President-appointed and Senate-confirmed, but claims that this was "merely an exercise of legislative prerogative." U.S. Br. 16. But Congress has not subjected itself to the President's territorial nominees for more than two centuries out of sheer politeness. Rather, the overwhelming historical evidence is of constitutionally "*significant weight*." *Noel Canning*, 134 S. Ct. at 2559.

The United States' contention is also disproven by the President's repeated exercise of his constitutional power to make recess appointments of territorial officials. *See* Reply 12–14. The President's power to make recess appointments flows directly from the Appointments Clause, and the United States has no explanation for how a President could exercise his power to recess-appoint territorial officials—repeatedly, and without objection—if the Appointments Clause did not apply. Nor does the United States contest that it invoked recess appointments in the territories in order to defend the President's constitutional recess appointment authority in *Noel Canning*. *See* Br. for Pet. 3a, 4a, 15a, 67a, *NLRB v. Noel Canning*, No. 12-1281, 2013 WL 5172004 (U.S.) (citing recess

appointments made in the Territories).  And the United States ignores the fact that recess appointments pursuant to constitutional authority were specifically made in Puerto Rico.  *See* Reply 12; *id*. at Ex. B.  Does the United States really believe that Congress, a jealous guardian of its institutional prerogatives, would have stood idly by while President after President usurped its supposedly plenary control over territories through recess appointments not provided for by statute, without a word of objection?  These officers were appointed by the President and confirmed by the Senate, or otherwise recess-appointed, because they are officers of the United States.  That is further demonstrated by their Commissions, which the Constitution provides only for officers of the United States.  *See* Reply 14; *id.* at Ex. A.

The historical examples adduced by the United States of appointments of territorial officers all conform to the Appointments Clause.  Either they were appointed by the President and confirmed by the Senate (or appointed by someone so appointed), or were elected (or appointed by someone elected).  *See* Reply 15–16.  In fact, the United States' own citation confirms that these are the two permissible means of choosing territorial officials, who may be "either 'appointed by the President under an act of Congress,' or 'elected by the people of the Territory.'"  U.S. Br. 10 (quoting *Clinton v. Englebrecht*, 80 U.S. 434, 447 (1871)).  There is no third option; Congress cannot usurp this power for itself.[4]

And the United States is simply wrong to argue that Congress amended the Northwest Ordinance to transfer the appointment power from Congress to the President simply because it was "removing references to the Confederation Congress."  U.S. Br. 16.  The Northwest Ordinance did not refer to the "Continental Congress"; it referred simply to "Congress," a body that undeniably existed in 1789.  Under the United States' reading of Article IV, there is no reason why Congress could not have continued to exercise that appointment power, or why it felt "constitution[ally]"

---

[4]  The United States argues (at 15 n.8) that military territorial governments also did not conform to the Appointments Clause, but those governments were incident to the President's temporary war powers.  *See* Reply 11–12.  Interim military governments continued only "until Congress legislated for" them, at which point Congress was subject to all of the Constitution's structural restrictions.  *Cross v. Harrison*, 57 U.S. 164, 195 (1853).

compelled to transfer that power to the President.  The real reason for the Northwest Ordinance's change, as historians have recognized, was "to bring the Ordinance itself into conformity with Article II's requirement that federal officers be appointed by the President with Senate consent." David P. Currie, *The Constitution in Congress: The Jeffersonians, 1801–1829*, at 113 (2001).

Finally, the United States misreads *Sanchez Valle*.  That case drew a key distinction between the federal government as the "ultimate" source of sovereignty, and local democracy as the Commonwealth's "most immediate source" of "sovereign[ty]" in the "ordinary" sense that the island has "a measure of autonomy comparable to that possessed by the States," with the authority to enact and enforce laws.  *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1867–75 (2016).  Certainly Congress could not make Article III judges popularly elected for the same reason Congress could not empower a territorial governor to appoint them:  Like other officers of the United States, they exercise the sovereignty of the United States.  But popularly elected Puerto Rico officials, with jurisdiction over Puerto Rico laws, not federal statutes, derive their authority from the "'sovereignty of the people of Puerto Rico,'" which allows the populace to "set[] its own political course."  *Id.* at 1867, 1869 (quoting  P.R. Const., Art. I, § 1).  The people of Puerto Rico are "sovereign" in the "ordinary" sense because they "exercise[] self-governance" and can "enact and enforce [their] own" laws.  *Id.* at 1870.  As the Supreme Court recognized, "the Puerto Rican populace" is "the most immediate source of such authority."  *Id.* at 1875.

### C.   The Oversight Board Members Are Officers Of The United States.

As Aurelius has shown (Mot. 11–16; Reply 19–24), the Board members are officers (indeed, principal officers) of the United States subject to the Appointments Clause.[5]  The United States never addresses, let alone refutes, the most important hallmark of an officer: "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights."  *Buckley*, 424 U.S. at 140.  Yet the Board has independent litigating authority and can

---

[5]  The United States correctly notes that the sole criterion for determining whether an officer is an inferior officer is whether he or she "'is directed and supervised at some level by'" principal officers.  U.S. Br. 8 (quoting *Free Enter. Fund*, 561 U.S. at 477, 510); *see* Reply 24.  The United States thus implicitly rejects the Opposing Parties' contrary position.  *Cf.* Dkt. 27–28 (Board Opp.).

enforce its statutory powers in federal court.  48 U.S.C. §§ 2124(k), 2128(b).  The United States similarly stands silent on the Board's vast investigative powers, which authorize the Board to administer oaths, hold hearings, take testimony, receive evidence, and issue subpoenas.  *Id.* § 2124(a), (f).  The United States recently admitted that these exact powers make someone an officer of the United States.  Br. for the Respondent 14–15, *Lucia v. SEC*, No. 17-130 (U.S. Nov. 2017) (SEC ALJs are officers because they "are authorized, among other things, to administer oaths, hold hearings, take testimony and admit evidence, and issue . . . subpoenas").

The United States cannot wish away the Board's powers, so instead it insists that the other powers the Board exercises are really some form of "intra-territorial solution to address a predominantly local, intra-territorial problem."  U.S. Br. 22.  That is wrong for several reasons.

*First*, the Board is tasked with a quintessentially federal role: a federal overseer of one of the federal government's insolvent possessions charged with bringing it back into fiscal health.  *See* 48 U.S.C. § 2194(m)–(n) (congressional findings and purposes, highlighting Puerto Rico's insolvency and the need to "benefit the lives of 3.5 million *American citizens* living in Puerto Rico") (emphases added); *see also* H.R. Rep. 114-602, at 40 ("Because Puerto Rico is a United States territory and its residents are United States citizens, Congress has the responsibility and authority to make all needful rules and regulations for Puerto Rico.").  This is at least as much of "an acknowledged federal interest" as the "continuing but limited interest in the operation of two federally owned airports" in *MWAA*.  501 U.S. at 266 n.14, 269 (internal quotation marks omitted).

The United States tries to distinguish *MWAA* as involving a "federal entity wielding federal power," U.S. Br. 19, but that simply proves Aurelius's point:  The Oversight Board here has *more* federal power than the Board of Review in *MWAA*.  The Board of Review could veto the "adoption of a budget, authorization of bonds, promulgation of regulations, endorsement of a master plan, and appointment of the chief executive officer of the Authority."  *MWAA*, 501 U.S. at 260.  The Oversight Board can veto the Commonwealth's adoption of budgets, 48 U.S.C. § 2142, authorization of bonds, *id.* § 2147, and legislation, § 2144(a)(1), (5).  But it can also unilaterally preempt and rescind Puerto Rico laws, *id.* §§ 2128(a), 2144(c)(3)(B), rule that a fiscal plan proposed by the

11

Commonwealth is deficient, *id*. § 2141(c)(3), and issue its own fiscal plan, *id*. § 2141(d)(2).

Even after Congress amended MWAA's Board of Review to make it no longer "restricted to congressional officials, but rather to those selected by congressional officials," and replaced its "veto power" with "the power to make 'recommendations,'" it was still a federal entity exercising federal power because it was "created at the initiative of Congress," Congress had "delineated" its powers, and it "protect[ed] an acknowledged federal interest." *Hechinger*, 36 F.3d at 100 (internal quotation marks omitted). The Board's power to force the Authority to "accommodate" the Board's wishes was "a sufficient exercise of federal power to violate the doctrine of the separation of powers." *Id.* at 105. Moreover, the District Court *and the United States* both concluded that, because the Board exercised "federal power," its members were "selected in violation of the Appointments Clause." *Hechinger v. MWAA*, 845 F. Supp. 902, 905, 909 (D.D.C. 1994), *aff'd*, 36 F.3d 97; *see* Br. for United States, *Hechinger v. MWAA*, No. 94-7036, 1994 WL 16776877 (D.C. Cir. Apr. 15, 1994), at 23, 25–26 (because the Board existed as a result of "federal law" and played a "key role in the execution and administration of the [federal] statutory scheme," it "wields federal authority"; and because the "Board of Review has power to engage in outcome-altering action" that "is highly discretionary," its members "may not, therefore, exercise such authority without being appointed in accordance with the Appointments Clause") (internal quotation marks omitted).

Just like the Board of Review, PROMESA's Board can force the Puerto Rico government to "accommodate" its wishes, it was "created at the initiative of Congress," and Congress "delineated" its powers. The Board is also a federal entity under the standard articulated in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), which asks: (1) was the entity "established and organized under federal law"; (2) was it established "for the very purpose of pursuing federal governmental objectives"; (3) does the federal government have continuing control of its operations, *i.e.*, may Congress "repeal, alter, or amend" the statute "at any time"; and (4) are its members appointed "by the President." *Id.* at 397–98 (internal quotation marks omitted); *see Augustine v. Dep't of Veterans Affairs*, 429 F.3d 1334, 1339 n.3 (Fed. Cir. 2005) (listing the factors). The Board here was created by a federal statute, which Congress may amend at any time. Its

members are appointed by the President from congressional lists, as in *Lebron*.  And it was created to effect the federal objective of making Puerto Rico, a federal possession populated by United States citizens, fiscally solvent.  It is thus a federal entity under any standard.[6]

That Congress has chosen not to preempt Puerto Rico laws regarding misrepresentations made to the Board, U.S. Br. 22 (citing 48 U.S.C. § 2124(*l*)), or that the Board may choose to incorporate procedural aspects of Puerto Rico's laws into its bylaws (U.S. Br. 22–23 (citing 48 U.S.C. § 2121(h)(3)), says nothing about the Board's essentially federal nature.  Similarly, reliance on state personal jurisdictional statutes to enforce a subpoena, U.S. Br. 22 (citing 48 U.S.C. § 2124(f)), does not transform the Board into a non-federal entity any more than it transforms federal courts when they are "governed by the [state] forum's long-arm statute" in establishing personal jurisdiction over a nonresident, *Sawtelle v. Farrell*, 70 F.3d 1381, 1387 (1st Cir. 1995).[7]

*Second*, the Board's budget, contrary to the United States' argument, U.S. Br. 23, strengthens the case that it is a federal entity.  As noted in Aurelius's Stay Relief Reply, Dkt. 1834 at 4—a point to which the United States does not respond—the Board's funding is expressly distinguished  from "the Territory Budget," *id.* § 2127(b), and those funds are "not subject to subsequent legislative appropriations" by the Commonwealth, *id.* § 2127(b)(1)–(2).  The funds are returned to "the territorial government"—if at all—only in the Board's "sole discretion." *Id.* § 2127(b)(3).

*Third*, the United States tries to compare the Oversight Board to the D.C. Control Board. U.S. Br. 22 n.11.  But after twice having review boards struck down as unconstitutional, *MWAA*,

---

[6]  Contrary to the suggestion of the United States (at 28), the presence of members of Congress on the Board of Review in *MWAA* was not the only—or even the primary—constitutional defect.  The core problem was that Congress had "effective control over appointments" on the Board.  *MWAA*, 501 U.S. at 269.  And that is what Congress intended and accomplished in PROMESA: to "ensure[] that a majority of [the Board's] members are effectively chosen by Republican congressional leaders on an expedited timeframe."  H.R. Rep. 114-602, pt. 1, at 42.

[7]  The United States' reliance on "reporting" requirements to "the Governor and the [Puerto Rico] Legislature" to indicate a lack of federal control over the Board is belied by the fact that "[n]either the Governor nor the Legislature may . . . exercise *any* control" whatsoever over the Board, 48 U.S.C. § 2128(a) (emphasis added), or its budget, *see id.* § 2127.

501 U.S. at 274; *Hechinger*, 36 F.3d at 101, Congress provided that the President merely "consult[]" with Congress before appointing Control Board members, *without* restricting the President's discretion.  Pub. L. No. 104-8, § 101(b)(2), 109 Stat. 97 (Apr. 17, 1995).  Congress also subjected the Control Board members to "some level" of "supervis[ion]" by the Treasury Secretary, *Edmond v. United States*, 520 U.S. 651, 663 (1997), making them inferior officers.  For example, after the Control Board made "certifications" to the President and the Treasury Secretary to allow the District of Columbia to receive important requisitions, the Treasury Secretary would review these requests and had ultimate discretion to authorize these funds.  *See, e.g.*, Pub. L. No. 104-8, § 204(c) (incorporating § 602(b)(7)(1)–(7) of the D.C. Revenue Act of 1939).  Under PROMESA, by contrast, no officer reviews the Board's decisions, and the Board has "sole discretion" for nearly all of its acts.  *See, e.g.*, 48 U.S.C. §§ 2121(d)(1)(A)–(E); 2141(a); 2142(a); 2146(a).  Nor does the Board have less power than the Control Board.  U.S. Br. 22 n.11.  The Control Board was *required* to invalidate certain D.C. laws, whereas the Board here has *discretion* to invalidate similar laws.  Dkt. 1820 at 13–14.  Discretion is more power, not less.

*Fourth*, the United States contests Aurelius's reliance on *United States v. Ferreira*, 54 U.S. 40 (1851) and *Freytag*.  U.S. Br. 20.  But the United States is wrong that the Supreme Court in *Ferreira* was simply speculating that "*if* [officers in the territories] [were] to be regarded as officers" of the United States, their appointments were unconstitutional.  U.S. Br. 20 (quoting *Ferreira*, 54 U.S. at 51) (emphasis added).  The Court, *sua sponte*, raised the constitutional question and declined to reach it only because of lack of jurisdiction.  Indeed, *Ferreira* makes little sense in light of the United States' theory that there has never been "doubt throughout history" that officers in the territories are not officers of the United States.  U.S. Br. 15.  Similarly unavailing is the United States' attempt to label *Freytag*'s analysis "mere dicta" based on a misreading of *In re Hennen*, 38 U.S. (13 Pet.) 230 (1839).  U.S. Br. 20.  *Freytag*'s conclusion that clerks of territorial courts were inferior officers under the Appointments Clause was a *central* premise the Court relied on in reaching its conclusion regarding the Tax Court's status.  501 U.S. at 892.  *Hennen* relied on both the statute establishing the territorial government and the statute making Louisiana a state in

14

reaching its conclusion, 38 U.S. at 258, which is why other courts have relied on *Freytag*'s con-

clusion that officers in the territories are officers of the United States, *see*, *e.g.*, *Kuretski*, 755 F.3d

at 941 (noting that "[t]he *Freytag* Court . . . repeatedly compared the Tax Court to the non-Article

III territorial courts"); Reply 22–23. The United States does not even try to respond to these cases.[8]

## II.    The United States Concedes That If Aurelius Is Correct, It Is Entitled To An Appropriate Remedy.

The United States does not dispute, and thus concedes, that Aurelius "is entitled to a deci-

sion on the merits of the question and whatever relief may be appropriate." *Ryder v. United States*,

515 U.S. 177, 182–83 (1995); *accord FEC v. NRA Political Victory Fund*, 6 F.3d 821, 828 (D.C.

Cir. 1993). In *all* cases where the Supreme Court has found an Appointments Clause violation,

the Court has granted "the declaratory and injunctive relief" sought, *Ryder*, 515 U.S. at 183–84 &

n.3, and this Court should follow suit. Similarly, the United States does not dispute that, if the

Board's appointment mechanism is unconstitutional, the Court should sever the language from 48

U.S.C. § 2121(e) that permits the appointment of Board members without Senate confirmation, as

well as the statutory deadlines requiring the list mechanism, *id.* § 2121(e)(2)(G), and the vacancy

provision, *id.* § 2121(e)(6). Indeed, the United States apparently agrees that the list mechanism's

plain text unconstitutionally constrains the President. U.S. Br. 34 n.15. The United States also

never suggests that invalidating the Board's appointment mechanisms would result in

"catastroph[e]" or "massive disruption," as certain Opposing Parties claimed. *See*, *e.g.*, Board

Opp. 2, 34. Nor could it, because that false narrative is contradicted by the fact that every party to

have addressed remedies agrees that the Court can dismiss the Title III petition, declare the Board

unlawful, and stay its order pending appeal with little to no disruption. *See* Reply 29.

### CONCLUSION

Aurelius's Objection and Motion to Dismiss should be granted.

---

[8]  In any event, "courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when, as here, a dictum is of recent vintage and not enfeebled by any subsequent statement." *United States v. Ellison*, 866 F.3d 32, 39 (1st Cir. 2017).

Dated:  December 23, 2017

 /s/ Lourdes Arroyo-Portela

Luis A. Oliver-Fraticelli
Lourdes Arroyo-Portela
Katarina Stipec-Rubio
USDC-PR Bar Nos. 209204,
226501, & 206611
ADSUAR MUÑIZ GOYCO SEDA &
    PÉREZ-OCHOA PSC
208 Ponce de Leon Ave., Suite 1600
San Juan, P.R.  00918
Phone:  (787) 756-9000
Fax:  (787) 756-9010
Email:  loliver@amgprlaw.com
larroyo@amgprlaw.com
kstipec@amgprlaw.com

Respectfully submitted,

 /s/ Theodore B. Olson

Theodore B. Olson  (*pro hac vice*)
Matthew D. McGill  (*pro hac vice*)
Helgi C. Walker  (*pro hac vice*)
Lucas C. Townsend  (*pro hac vice*)
Lochlan F. Shelfer  (*pro hac vice*)
Jeremy M. Christiansen  (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone:  (202) 955-8500
Fax:  (202) 467-0539
Email:  tolson@gibsondunn.com
mmcgill@gibsondunn.com
hwalker@gibsondunn.com
ltownsend@gibsondunn.com
lshelfer@gibsondunn.com
jchristiansen@gibsondunn.com