**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**Re: Dkts. 913 & 2159.** |

**SUR-REPLY IN SUPPORT OF OBJECTION AND MOTION OF AURELIUS TO DISMISS TITLE III PETITION**

Luis A. Oliver-Fraticelli
Katarina Stipec-Rubio
USDC-PR Bar Nos. 209204, 206611
ADSUAR MUÑIZ GOYCO SEDA & PÉREZ-OCHOA PSC
208 Ponce de Leon Ave., Suite 1600
San Juan, P.R. 00918
Phone: (787) 756-9000
Fax: (787) 756-9010
Email: loliver@amgprlaw.com

Theodore B. Olson (*pro hac vice*)
Matthew D. McGill (*pro hac vice*)
Helgi C. Walker (*pro hac vice*)
Lucas C. Townsend (*pro hac vice*)
Lochlan F. Shelfer (*pro hac vice*)
Jeremy M. Christiansen (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539
Email: tolson@gibsondunn.com

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ........ ii

ARGUMENT ........ 1

I. There Is No "Territories" Exception To The Appointments Clause ........ 1

II. The Long History Of Presidential Recess Appointments In The Territories Refutes The Board's Position ........ 3

III. The Board Has No Answer For The Commissioning Of Officers In The Territories ........ 5

IV. Territorial Judges, Like The Board's Members, Are Officers Of The United States Subject To The Appointments Clause ........ 6

V. *Edmond* Provides The Only Test For Distinguishing Principal And Inferior Officers ........ 7

VI. The *Insular Cases* Do Not Hold That The Appointments Clause Is Inapplicable In Unincorporated Territories ........ 8

VII. The Board's Authority Is Not Confined To Purely Local Matters ........ 9

CONCLUSION ........ 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Binns v. United States*,
194 U.S. 486 (1904) ..... 1

*Boumediene v. Bush*,
553 U.S. 723 (2008) ..... 8

*Buckley v. Valeo*,
424 U.S. 1 (1976) ..... 2, 9

*Downes v. Bidwell*,
182 U.S. 244 (1901) ..... 2

*Edmond v. United States*,
520 U.S. 651 (1997) ..... 7, 8

*El Paso & N.E. Ry. Co. v. Gutierrez*,
215 U.S. 87 (1909) ..... 3

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) ..... 7

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
684 F.3d 1332 (D.C. Cir. 2012) ..... 8

*Kleppe v. New Mexico*,
426 U.S. 529 (1976) ..... 3

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995) ..... 10

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ..... 5, 6

*Morrison v. Olson*,
487 U.S. 654 (1988) ..... 7

*MWAA v. Citizens for the Abatement of Aircraft Noise, Inc.*,
501 U.S. 252 (1991) ..... 1, 2, 3, 10

*Myers v. United States*,
272 U.S. 52 (1926) ..... 7

*NLRB v. Noel Canning*,
134 S. Ct. 2550 (2014) ..... 3

**TABLE OF AUTHORITIES**
**(*continued*)**

**Page(s)**

*Parsons v. United States*,
167 U.S. 324 (1897)....................6

*Puerto Rico v. Sanchez Valle*,
136 S. Ct. 1863 (2016)....................8

*Tuaua v. United States*,
788 F.3d 300 (D.C. Cir. 2015)....................9

*United States v. Gratiot*,
39 U.S. 526 (1840)....................3

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)....................5

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 ....................1

U.S. Const. art. II, § 3 ....................5

**Statutes**

48 U.S.C. § 2124(a) ....................9

48 U.S.C. § 2124(f)....................9

48 U.S.C. § 2124(k) ....................9

48 U.S.C. § 2124(*o*) ....................9

48 U.S.C. § 2144(c)(3)(B)(ii) ....................9

Act of Jan. 11, 1805, ch. 5, 2 Stat. 309 ....................4

Act of Mar. 3, 1849, ch. 121, 9 Stat. 403....................4

**Other Authorities**

1 *Official Letter Books of W.C.C. Claiborne, 1801–1816* (1917) ....................5

4 Sen. Exec. J. 447 (Dec. 10, 1834)....................4

8 Sen. Exec. J. 98 (Dec. 21, 1849)....................4

**TABLE OF AUTHORITIES**
**(*continued*)**

**Page(s)**

1 *The Territorial Papers of the United States* (1934) ....................4

10 *The Territorial Papers of the United States* (1942) ....................4

12 *The Territorial Papers of the United States* (1945) ....................4

14 *The Territorial Papers of the United States* (1949) ....................5

*Annual Report of the Governor of Puerto Rico to the Secretary of War: 1915* (1915) ....................4

Brief for Petitioner, *NLRB v. Noel Canning*, No. 12-1281, 2013 WL 5172004 (U.S. Sept. 2013) ....................4

*Executive Authority to Remove the Chief Justice of Minnesota*, 5 U.S. Op. Att'y Gen. 288 (1851) ....................6, 7

Gary Lawson & Robert D. Sloane, *The Constitutionality of Decolonization by Associated Statehood: Puerto Rico's Legal Status Reconsidered*, 50 B.C. L. Rev. 1123 (2009) ....................9

Office of Management and Budget, *Appendix, Budget of the U.S. Government, Fiscal Year 2018* ....................10

*Territorial Judges Not Liable to Impeachment*, 3 Op. Att'y Gen. 409 (1839) ....................6

## ARGUMENT

The Board's "reply" to the United States embraces the same dangerous brand of congressional supremacy that animated the infamous and racist *Insular Cases* on which the Board astoundingly relies. Fortunately for our democracy, neither the Constitution nor history supports the Board's radical position that Congress is exempt from the Appointments Clause—and the Constitution's other structural protections—when it legislates with respect to the territories. Indeed, the unbroken history of Presidential recess appointments and commissions in the territories can mean only one thing: The Appointments Clause applies with full force to territorial officers.

The Board mischaracterizes the test for principal officers of the United States and attempts to breathe new life into the *Insular Cases*, ignoring the many pages of Aurelius's briefing showing that the Board exercises significant *federal*—not *local*—power. The Board also strains to show that there is a "territorial" exception to the Appointments Clause. But *MWAA v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252 (1991), squarely rejected the argument that the Constitution's structural protections do not apply to the governance of the territories. This Court should therefore reject the Board's stunning position that Puerto Rico is not entitled to the structural protections of the Constitution.

### I. There Is No "Territories" Exception To The Appointments Clause.

In its latest filing, the Board admits, as it must, that "the Constitution" "surely" "applies when Congress exercises its Article IV authority." Dkt. 2159 ("Board Reply") at 5 (citing *Binns v. United States*, 194 U.S. 486, 491 (1904)). But the Board nevertheless argues that the Appointments Clause "does not *control*" when Congress deems itself to be "legislating for territorial officials." *Id.* (emphasis added). This position finds no support in the Constitution's text, and the Supreme Court has squarely *rejected* this argument.

By its plain terms the Appointments Clause controls the appointment of "all" officers of the United States whose offices are "established by Law." U.S. Const. art. II, § 2, cl. 2. Accordingly, any office created by Congress to directly enforce federal law (and thus, to exercise

significant federal authority) must be filled through the Constitution's appointment procedures. That is why the Supreme Court has never adopted the "radical and mischievous" position of "legislative absolutism" urged by the Board. *Downes v. Bidwell*, 182 U.S. 244, 379 (1901) (Harlan, J., dissenting). Indeed, the Court has rejected the Board's position time and again.

In *Buckley v. Valeo*, 424 U.S. 1 (1976), the Federal Election Commission ("FEC"), like the Board here, argued that because Congress has "extraordinary authority" "to regulate elections," under Article I, § 4, Congress was not bound by the Appointments Clause when acting under Article I, § 4. *Id.* at 131. The Supreme Court acknowledged that "Congress has *plenary* authority" to regulate congressional elections but still rejected the FEC's argument. *Id.* at 132 (emphasis added). The Court held that the idea that Congress was unconstrained by the Appointments Clause due to "explicit and plenary authority to regulate a field of activity" was "both novel and contrary to the language of the Appointments Clause." *Id.* Congress's supposedly "plenary" authority to regulate the territories pursuant to Article IV is no different.

The Supreme Court likewise made clear in *MWAA* that the structural provisions of the Constitution bind Congress when it acts under Article IV. There, the petitioners argued that "the Board of Review should . . . be immune from scrutiny for constitutional defects because it was created in the course of Congress' exercise of its power to dispose of federal property" under "Art. IV, § 3, cl. 2." 501 U.S. at 270. The Court rejected that argument, holding that the Board of Review's structure and powers violated the separation of powers. *Id.* at 274–77. The Board tries to distinguish *MWAA* on the question-begging ground that Congress in *MWAA* created a "federal entity wielding federal power." Board Reply 4. But in *MWAA*, the Review Board was established by *state* laws, and its members were selected by a *regional* authority rather than by the President; yet the Supreme Court still deemed the Review Board a federal entity. 501 U.S. at 266. Moreover, the powers of the Review Board in *MWAA* and the powers of the Board here are materially indistinguishable, *see* Dkt. 913 ("Aurelius Mot.") at 6–8, 13–15; Dkt. 1833 ("Aurelius Reply") at

19–21; Dkt. 2169 ("Aurelius Reply to U.S.") at 10–14, and in both cases those powers were administered *directly* under a federal statute.[2]

Thus, it is simply no answer to the Appointments Clause issue that Congress has "*plenary* power . . . under the Constitution over the territories of the United States." *El Paso & N.E. Ry. Co. v. Gutierrez*, 215 U.S. 87, 93 (1909) (emphasis added). The Board recognizes as much by agreeing with the United States's constitutional-avoidance argument. Board Reply 14. But the Board's position that there are "constitutional concerns with the list mechanism" because it does not "permit the President to exercise" his "discretion," *id.*, necessarily presumes that the Appointments Clause *does* apply to Congress when it legislates with regard to the territories. *See* Aurelius Reply to U.S. 2–4. The invitation by the Board and the United States to avoid PROMESA's constitutional problems only underscores that the Appointments Clause applies to Puerto Rico. Otherwise, there would be no constitutional "problem" to avoid.

## II. The Long History Of Presidential Recess Appointments In The Territories Refutes The Board's Position.

"[T]he Recess Appointments Clause" is a "method for appointing officers of the United States," *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2558 (2014), and its historical use by Presidents is given "significant weight," *id.* at 2559. The Board urges this Court not to give "outsized weight to" the history of recess appointments in the territories, Board Reply 8, but that history can only mean that the Appointments Clause governs the appointment of territorial officials.

*First*, the Board insists that there are just a "few instances" of recess appointments in the territories. Board Reply 9. That is wrong, and it is the Board, not Aurelius, who is "cherry

---

[2] To the extent the Board insinuates that *MWAA* differs because it "involve[ed] Congress's authority under Article IV's *Property Clause*," Board Reply 4 (emphasis added), its argument fails. There is no basis to distinguish *MWAA* from this case on the ground that the former involved "property" and PROMESA involved "territory": "It is the Property Clause . . . that provides the basis for governing the Territories of the United States." *Kleppe v. New Mexico*, 426 U.S. 529, 539–40 (1976). "The term territory, as here used, is merely descriptive of one kind of property," and "Congress has the same power over it as over any other property belonging to the United States." *United States v. Gratiot*, 39 U.S. 526, 537 (1840).

pick[ing]" history. Board Reply 7. In fact, there are *numerous* invocations of recess appointment power by the President in the territories, stretching from the Founding up to the earliest days of Puerto Rico's history as a territory, even when the President possessed no statutory recess appointment authority. For instance, Michigan's territorial statute did not provide for recess appointments. Act of Jan. 11, 1805, ch. 5, 2 Stat. 309, 309. Nevertheless, Presidents appointed numerous officials during recesses of the Senate, including territorial judges and governors.[3] The recess appointments in Puerto Rico, too, were made pursuant to constitutional, not statutory, authority. *See* Aurelius Reply 13 & Ex. B. The President similarly recess-appointed the Attorney General of Puerto Rico in 1914, *see Annual Report of the Governor of Puerto Rico to the Secretary of War: 1915*, at 409 (1915), even though the Foraker Act provided no such authority. The Minnesota Territory's organic act also did not provide for recess appointments, *see* Act of Mar. 3, 1849, ch. 121, §§ 1–20, 9 Stat. 403, 403–09, yet Minnesota's first governor was a recess appointment, as was one of its first territorial judges, *see* 1 *Territorial Papers* 17 (1934); *see also* 8 Sen. Exec. J. 98 (Dec. 21, 1849).

Because there was no statutory authorization of these recess appointments, they must have been exercises of the President's *constitutional* recess appointment power, which stems from the Appointments Clause itself. Indeed, although the Board argues otherwise, the Solicitor General relied in part on the recess appointment of a territorial judge in Hawaii as evidence that the President wields a constitutional recess appointment power. Br. for Pet. 15a, *NLRB v. Noel Canning*, No. 12-1281, 2013 WL 5172004 (U.S. Sept. 2013).

*Second*, the Board suggests that Presidents invoking their constitutional recess appointment power in the absence of statutory authority may have erroneously believed that they had implicit statutory authority to do so. Board Reply 9. The Board cites no authority for this speculation, and

[3] *See* 10 *The Territorial Papers of the United States* 12 n.19 (1942) (recess appointment of territorial judge in Michigan on June 28, 1805) ("*Territorial Papers*"); *id.* at 453 (recess appointment of Michigan governor on October 29, 1813); 12 *Territorial Papers* 321 (1945) (recess appointment of Michigan governor on August 6, 1831); 4 Sen. Exec. J. 447 (Dec. 10, 1834) (recess appointment of Michigan governor on December 3, 1834).

it makes little sense in light of the Board's theory that the President's participation in territorial governance is nothing more than "legislative grace." Board Reply 7. "The President's power" to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *see also id.* at 636–37 (Jackson, J., concurring). Since Congress has provided for recess appointment in some statutes, but not in others, Aurelius Reply 12–14, on what basis could the President divine statutory authority to appoint an officer in all cases? In reality, the President had constitutional power to appoint these officers during recesses because they were officers of the United States subject to the Appointments and Recess Appointments Clauses. Unable to answer this evidence, the Board flippantly asserts that the appointment of these territorial officers may have been "*ultra vires*." Board Reply 9. This argument shows that it is the Board, not Aurelius, who seeks to change the long-held understanding of the Appointments Clause in the territories.

**III. The Board Has No Answer For The Commissioning Of Officers In The Territories.**

The Commissions Clause applies when Congress creates federal offices in the territories, as the plain text of the Constitution, *see* U.S. Const. art. II, § 3, the landmark opinion of Chief Justice Marshall in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 156 (1803), and centuries of history, *see* Aurelius Reply 14 & Ex. A, all confirm. This, too, shows that the Constitution's structural checks bind Congress when it legislates with regard to the territories. In response, the Board suggests that presidential commissions for officers in the territories were created merely for record-keeping purposes, not compliance with the Constitution. Board Reply 9 n.7. The Board cites no authority for this position, and there is none.

Commissions are the evidence of the bearer's entitlement to hold office, to let "all who shall see" them know that they were "issued *in consequence of the Senate's confirmation of [the officer's] appointment*." 1 *Official Letter Books of W.C.C. Claiborne, 1801–1816*, at 115 (1917) (emphasis added); *see also*, *e.g.*, 14 *Territorial Papers* 428 (1949) (commission of Secretary for Louisiana Territory "authoriz[ing] and empower[ing] him to execute and fulfil the duties of that

office"). The Secretary of State must affix the "seal of the United States" to "all civil commissions" of "*officers of the United States*." *Marbury*, 5 U.S. at 159 (emphasis added). The President's signing of the commission is the "last act" under the Appointments Clause, and without a signed commission, "the constitutional power of appointment has [not] been exercised." *Id.* at 158. Thus, the issuance of a Commission has constitutional significance, and the history of commissioned officers in the territories shows that the Constitution's structural provisions and the separation of powers bind Congress when it creates federal offices in the territories.[4]

## IV. Territorial Judges, Like The Board's Members, Are Officers Of The United States Subject To The Appointments Clause.

The Board attempts to resurrect the 1839 opinion of Attorney General Grundy that summarily opined that territorial judges may not be impeached. Board Reply 6 n.5 (citing *Territorial Judges Not Liable to Impeachment*, 3 Op. Att'y Gen. 409 (1839)). But twelve years after that terse opinion was issued, Attorney General John J. Crittenden, in direct disagreement with the Grundy opinion, presumed that one "mode of removing [territorial judges] from office" is "by impeachment by the House of Representatives for, and conviction by the Senate of treason, bribery, or other high crimes and misdemeanors." *Executive Authority to Remove the Chief Justice of Minnesota*, 5 U.S. Op. Att'y Gen. 288, 289–90 (1851). The opinion referred three times to the constitutional "power[] of impeachment" possessed by "the House of Representatives" over these "civil officers." *Id.* It would be "in conflict with the Constitution," the opinion concluded, if Congress were to try to "preclude[]" this impeachment power. *Id.* And the Supreme Court has relied on this same language. *Parsons v. United States*, 167 U.S. 324, 333–34 (1897). Neither Attorney General Crittenden nor the Supreme Court ever mentioned the 1839 opinion.

The Board argues that the President's inherent constitutional power to remove "civil officers" like territorial judges "has nothing to do with" the application of the Appointments Clause. Board Reply 6 n.5. But the President's constitutional "power of removal of executive

---

[4] Aurelius has made a request under the Freedom of Information Act for the Board members' commissions, but has yet to receive a response.

officers [i]s *incident to*"—not independent of—"the power of appointment." *Myers v. United States*, 272 U.S. 52, 119 (1926). Thus, the President's removal power is far more relevant to his appointment power than is Congress's impeachment authority. The Crittenden opinion states that the President possesses an inherent constitutional power to remove territorial judges. 5 U.S. Op. Att'y Gen. at 290. Because territorial judges are "civil officers," therefore "they are not exempted from that executive power which, by the constitution, is vested in the President of the United States over all civil officers appointed by him." *Id.* The President's "constitution[al] . . . power of removing civil officers" stems directly from the fact that the President "appointed and commissioned" them. *Id.* In fact, Presidents have repeatedly exercised this inherent constitutional power to remove "territorial judges appointed for terms of years before the ends of their terms." *Myers*, 272 U.S. at 155–56. This removal authority is essential to the President's ability to oversee federal officers and flows from the President's appointment power. 5 U.S. Op. Att'y Gen. at 290; *see also Free Enter. Fund v. PCAOB*, 561 U.S. 477, 492–93 (2010) (constitutional power of removal of "executive officers" follows the constitutional appointment power). Because territorial judges are "civil officers, appointed by the President, by and with the advice and consent of the Senate, and commissioned by the President," the President is constitutionally "invested with authority to remove" them. 5 U.S. Op. Att'y Gen. at 289, 290. Thus, federal territorial officials, such as territorial judges and the members of the Board, are subject to the Appointments Clause.

## V. *Edmond* Provides The Only Test For Distinguishing Principal And Inferior Officers.

The Board argues that the test set forth in *Morrison v. Olson*, 487 U.S. 654 (1988) for distinguishing between principal and inferior officers remains a viable test, even though neither *Edmond v. United States*, 520 U.S. 651 (1997), nor *Free Enterprise Fund* applied that test. The Board's position is further undermined by the United States, which acknowledges only one test: "Whether one is an inferior officer depends on whether [his work] is directed and supervised at some level by [principal officers]." U.S. Statement 8 (quoting *Free Enter. Fund*, 561 U.S. at 510). As the D.C. Circuit recently explained in a case post-dating *Free Enterprise Fund*, even though

*Morrison* focused on the question whether the independent counsel exercised significant authority to determine that she was an inferior officer, *Edmond* held that "the exercise of significant authority 'marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather . . . the line between officer and nonofficer.'" *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1337 (D.C. Cir. 2012) (quoting *Edmond*, 520 U.S. at 662). And "in *Edmond* the Court, once satisfied that the persons in question exercised significant authority and were thus officers, went on to discuss only direction and supervision." *Id.* (citation omitted). The Board members unquestionably are officers who exercise significant authority; and as they have no supervisor save the President, they are plainly principal officers.

**VI. The *Insular Cases* Do Not Hold That The Appointments Clause Is Inapplicable In Unincorporated Territories.**

The Board argues that cases such as *Boumediene v. Bush*, 553 U.S. 723 (2008), establish that the Constitution applies only partially in the territories, and that the Appointments Clause "is not a 'fundamental right' that applies to unincorporated territories." Board Reply 11. In making that argument, however, the Board seeks to *extend* the notorious *Insular Cases* to deprive Puerto Rico of our Constitution's most basic structural protections.

Aurelius has repeatedly argued that the *Insular Cases* held only that certain non-fundamental *individual rights* do not apply in the territories, and that the Board and the other Opposing Parties radically seek to extend those cases to eliminate *structural* constitutional protections for the territories. *See* Aurelius Reply 17–18; Aurelius Reply to U.S. 7. Moreover, in *Boumediene*, the Supreme Court held that Congress's powers under "Article IV" "to acquire, dispose of, and govern territory" do *not* include "the power to decide when and where [the Constitution's] terms apply." 553 U.S. at 755, 765. The Court was clear that in no context, "[e]ven when the United States acts outside its borders," does Congress have "absolute and unlimited" powers; instead, its powers "are subject to such restrictions as are expressed in the Constitution." *Id.* at 765. And just last year, the Supreme Court held that the Double Jeopardy Clause applies in full to Puerto Rico. *See generally Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863 (2016).

But even if the *Insular Cases* did stand for the proposition that Congress is constrained only by "fundamental" *structural* provisions when it legislates with regard to unincorporated territories, the Appointments Clause would qualify. "It is hard to think of provisions more 'fundamental' than the Constitution's core provisions for allocating governmental power" such as the Appointments Clause. Gary Lawson & Robert D. Sloane, *The Constitutionality of Decolonization by Associated Statehood: Puerto Rico's Legal Status Reconsidered*, 50 B.C. L. Rev. 1123, 1175 (2009). In any event, even under the Board's selected case law, the Appointments Clause still applies to Puerto Rico so long as it is not "impracticable and anomalous." *Tuaua v. United States*, 788 F.3d 300, 309 (D.C. Cir. 2015). Given that the federal government has obeyed the Appointments Clause in the territories for centuries, the provision is neither impracticable nor anomalous. The *Insular Cases* present no impediment.

**VII. The Board's Authority Is Not Confined To Purely Local Matters.**

Bafflingly, the Board asserts that Aurelius has not "bother[ed] discussing" how the Board's authority is "confined to purely local matters." Board Reply 10. But Aurelius has devoted many pages to demonstrating that the Board exercises not merely local authority, but significant federal authority. *See* Aurelius Mot. 13–16; Aurelius Reply 19–21; Aurelius Reply to U.S. 10–15. In its initial brief, Aurelius argued that the Board "possesses the ability to bind those outside" of Puerto Rico. Aurelius Mot. 14. To name just a few statutory provisions, the Board can "rescind certain laws enacted by the Commonwealth that 'alter[] pre-existing priorities of creditors,'" *id*. 14–15 (quoting 48 U.S.C. § 2144(c)(3)(B)(ii)), the Board "exercises wide investigative and enforcement powers," and it may "deploy these investigative powers to police 'the disclosure and selling practices' of Commonwealth and instrumentality bonds, including any 'conflicts of interest maintained by' brokers, dealers, or investment advisers, a power which extends the Board's regulatory scope far beyond Puerto Rico's borders," *id*. at 15 (citing 48 U.S.C. § 2124(a), (f), (*o*)). Importantly, the Board also "has the power to initiate civil actions in federal court," *id.* (citing 48 U.S.C. § 2124(k)), a hallmark of officers of the United States, *see Buckley*, 424 U.S. at 140, and

one that the Opposing Parties and the United States conspicuously fail to address.

Aurelius elaborated on this argument in its reply to the Opposing Parties, explaining that the Board has exercised its power to enforce federal law in federal court, Aurelius Reply 19, and demonstrating that the Board exercised even more federal power than the Review Board in *MWAA*, which the Supreme Court concluded was a federal entity exercising federal power, *id.* at 20 (citing *MWAA*, 501 U.S. at 255, 260). Importantly, the Review Board in *MWAA* did one thing—it oversaw the operations of Reagan and Dulles airports. If anything, such a purview was far more local than overseeing the economy of a United States territory with some 3.5 million American citizens inhabiting it. Yet the Court squarely held that the Review Board was federal in nature and was serving "an acknowledged federal interest." 501 U.S. at 269.

Moreover, in its reply to the United States, Aurelius also explained how the Board is a federal entity under the standard articulated in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), because the Board was "established and organized under federal law," it was "established 'for the very purpose of pursuing federal governmental objectives,'" Congress can "repeal, alter, or amend" the statute "at any time," and the Board's members are "appointed 'by the President.'" Aurelius Reply to U.S. 12 (quoting *Lebron*, 513 U.S. at 397–98). The Board's assertion that Aurelius has not addressed the Board's sweeping federal authority is empty rhetoric.

The Board argues that it must not be federal because it is not federally "funded." Board Reply 11. No authority holds that funding by the federal government is a hallmark of a federal agency, much less a dispositive factor. At any rate, the Board's funding is mandated by federal law and itemized in the federal budget—unlike any other supposedly "territorial" entity. *See* Office of Management and Budget, *Appendix, Budget of the U.S. Government, Fiscal Year 2018*, at 1211 ("Payment to Puerto Rico Oversight Board"). Thus, it is the Board, the other Opposing Parties, and the United States that have failed to respond to Aurelius's repeated demonstrations that the Board, far from exercising purely local authority, wields substantial federal power.

**CONCLUSION**

Aurelius's Objection and Motion to Dismiss should be granted.

Dated: January 2, 2018

*/s/ Luis A. Oliver-Fraticelli*

Luis A. Oliver-Fraticelli
Katarina Stipec-Rubio
USDC-PR Bar Nos. 209204, 206611
ADSUAR MUÑIZ GOYCO SEDA & PÉREZ-OCHOA PSC
208 Ponce de Leon Ave., Suite 1600
San Juan, P.R. 00918
Phone: (787) 756-9000
Fax: (787) 756-9010
Email: loliver@amgprlaw.com
kstipec@amgprlaw.com

Respectfully submitted,

*/s/ Theodore B. Olson*

Theodore B. Olson (*pro hac vice*)
Matthew D. McGill (*pro hac vice*)
Helgi C. Walker (*pro hac vice*)
Lucas C. Townsend (*pro hac vice*)
Lochlan F. Shelfer (*pro hac vice*)
Jeremy M. Christiansen (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539
Email: tolson@gibsondunn.com
mmcgill@gibsondunn.com
hwalker@gibsondunn.com
ltownsend@gibsondunn.com
lshelfer@gibsondunn.com
jchristiansen@gibsondunn.com