# EXHIBIT   C

**NEW ISSUE—FULL BOOK ENTRY**

See "Book-Entry Only System" under *The 1998 Subordinated Bonds*

*In the opinion of Bond Counsel, subject to continuing compliance with certain tax covenants, interest on the 1998 Subordinated Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. However, see "Tax Exemption" for a description of the alternative minimum tax on corporations and certain other federal tax consequences of ownership of the 1998 Subordinated Bonds. Bond Counsel is further of the opinion that the 1998 Subordinated Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

$75,050,000
# Puerto Rico Highway and Transportation Authority
## Subordinated Transportation Revenue Bonds (Series 1998)
### (Puerto Rico State Infrastructure Bank)

Dated: July 15, 1998

Due: July 1, as shown on the inside cover

The Subordinated Transportation Revenue Bonds (Series 1998) (Puerto Rico State Infrastructure Bank) (the "1998 Subordinated Bonds") are issuable as registered bonds without coupons in denominations of $5,000 and any multiple thereof. Interest on the 1998 Subordinated Bonds will be payable on each January 1 and July 1, commencing January 1, 1999. The 1998 Subordinated Bonds are subject to redemption prior to maturity as set forth herein, the earliest possible redemption date being July 1, 2008.

The 1998 Subordinated Bonds will be issued pursuant to Resolution No. 98-06 adopted by the Authority on February 26, 1998, as amended (the "1998 Resolution"). The 1998 Subordinated Bonds, the $1,129,643,740 Puerto Rico Highway and Transportation Authority Transportation Revenue Bonds (Series A) currently outstanding (the "1998 Senior Bonds") and any additional bonds that the Authority may from time to time issue under the 1998 Resolution (collectively, the "Transportation Revenue Bonds") are payable from, and are secured by a pledge of, revenues of the Authority consisting of: (i) the total amount of excise taxes, up to $120 million per fiscal year, imposed by the Commonwealth of Puerto Rico (the "Commonwealth") on certain petroleum products, (ii) tolls and other charges imposed by the Authority for the use of its Toll Facilities (other than Existing Toll Facilities Revenues prior to the repeal of the 1968 Resolution) (as each is defined herein), and (iii) certain investment earnings, as described herein. **The 1998 Subordinated Bonds are subordinated in right of payment to the 1998 Senior Bonds and any additional Transportation Revenue Bonds issued on a parity with the 1998 Senior Bonds.**

The Transportation Revenue Bonds are also payable from, and are secured by a pledge of, certain other revenues of the Authority, which revenues, however, are first pledged to the payment of debt service on the Authority's outstanding Highway Revenue Bonds issued under Resolution No. 68-18 adopted by the Authority on June 13, 1968, as amended (the "1968 Resolution Revenues"). The 1968 Resolution Revenues consist of: (i) all current gasoline taxes, a portion of the current gas oil and diesel oil taxes and a portion of the current motor vehicle license fees allocated to the Authority by the Commonwealth, (ii) all Existing Toll Facilities Revenues, and (iii) certain investment earnings, as described herein. For a description of the revenues of the Authority and their disposition under the 1968 Resolution and 1998 Resolution, see "Security for the Subordinated Transportation Revenue Bonds—Pledged Revenues; Subordination" under *The 1998 Subordinated Bonds* herein.

All of the aforesaid taxes and license fees, which constitute revenues of the Authority, are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that other Commonwealth revenues are not sufficient therefor.

The 1998 Subordinated Bonds are also payable from moneys required to be transferred to the reserve account for the 1998 Subordinated Bonds from an account within the Puerto Rico State Infrastructure Bank Trust Fund (the "SIB Trust Fund"). On the date of issuance of the 1998 Subordinated Bonds, the amount on deposit in said account in the SIB Trust Fund, which amount is derived from federal capitalization grants and Authority matching funds, will equal the reserve requirement for the 1998 Subordinated Bonds fixed by the Authority. Said reserve requirement is the greater of twenty percent (20%) of the principal amount of the 1998 Subordinated Bonds outstanding from time to time and two and one-half (2½) times the amount of the maximum Principal and Interest Requirements (as defined herein) for any fiscal year on account of all 1998 Subordinated Bonds outstanding from time to time. See "Security for the Subordinated Transportation Revenue Bonds—1998 Subordinated Bond Reserve Fund" under *The 1998 Subordinated Bonds.*

**The 1998 Subordinated Bonds are not a debt of the Commonwealth or any of its political subdivisions, other than the Authority, and neither the Commonwealth nor any such subdivision, other than the Authority, shall be liable thereon.**

The 1998 Subordinated Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality by Brown & Wood LLP, New York, New York, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez, San Juan, Puerto Rico. Certain legal matters relating to the SIB Trust Fund will be passed upon for the Authority by Palmer & Dodge LLP, Boston, Massachusetts. It is expected that the 1998 Subordinated Bonds will be available for delivery to The Depository Trust Company in New York, New York, on or about August 6, 1998.

**Merrill Lynch & Co.**

**Bear, Stearns & Co. Inc.**

**Goldman, Sachs & Co.**

**Morgan Stanley Dean Witter**

**PaineWebber Incorporated**

July 23, 1998

**$75,050,000**
**Puerto Rico Highway and Transportation Authority**
**Subordinated Transportation Revenue Bonds (Series 1998)**
**(Puerto Rico State Infrastructure Bank)**

$16,990,000 Serial Bonds

| Maturity (July 1) | Principal Amount | Interest Rate | Yield |
|---|---|---|---|
| 2008* | $2,070,000 | 5.25% | 4.50% |
| 2009* | 2,180,000 | 5.25 | 4.60 |
| 2010* | 2,295,000 | 5.25 | 4.70 |
| 2011* | 2,415,000 | 5.25 | 4.80 |
| 2012* | 2,540,000 | 5.25 | 4.85 |
| 2013* | 2,675,000 | 5.25 | 4.90 |
| 2014* | 2,815,000 | 5.25 | 4.95 |

$12,770,000 5.00% Term Bonds due July 1, 2018* -- Yield 5.08%
$15,520,000 5.00% Term Bonds due July 1, 2022 -- Yield 5.22%
$29,770,000 5.00% Term Bonds due July 1, 2028 -- Yield 5.25%
(plus accrued interest)

---

*Insured by MBIA Insurance Corporation.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or any Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy nor shall there be any sale of the Subordinated Transportation Revenue Bonds (Series 1998) (Puerto Rico State Infrastructure Bank) (the "1998 Subordinated Bonds") by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Authority and other official sources that are believed to be reliable, but is not guaranteed as to accuracy or completeness and is not to be construed as a representation by any Underwriter. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs or condition of the Authority or the Commonwealth since the date hereof.

IN CONNECTION WITH THE OFFERING OF THE 1998 SUBORDINATED BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE 1998 SUBORDINATED BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL ON THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

## TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . 3

FINANCING PLAN . . . . . . . . . . . . . . . . . . . . . . . 4
   Sources and Uses of Funds . . . . . . . . . . . . . . 4

THE 1998 SUBORDINATED BONDS . . . . . . . 4
   Description of the 1998 Subordinated Bonds . 4
     General . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   Redemption Provisions . . . . . . . . . . . . . . . . . 5
     Optional Redemption . . . . . . . . . . . . . . . . 5
     Mandatory Redemption . . . . . . . . . . . . . . 5
     Notice of Redemption . . . . . . . . . . . . . . . 6
     Selection of 1998 Subordinated Bonds
       to be Redeemed . . . . . . . . . . . . . . . . . 6
   Security for the Subordinated Transportation
     Revenue Bonds . . . . . . . . . . . . . . . . . . . . 6
     Pledged Revenues; Subordination . . . . . . 6
     1998 Subordinated Bond Reserve Fund . 10
     Prior Payment of Full Faith and Credit
       Obligations of the Commonwealth . 12
   Additional Bonds . . . . . . . . . . . . . . . . . . . . . 13
   Book-Entry Only System . . . . . . . . . . . . . . . 14
   Payments and Transfers . . . . . . . . . . . . . . . . 15
   Discontinuance of Book-Entry Only System 15
   Bond Insurance . . . . . . . . . . . . . . . . . . . . . . 16
   Concerning the Policy . . . . . . . . . . . . . . . . . 17

RECENT DEVELOPMENTS . . . . . . . . . . . . . . 17
   The Authority . . . . . . . . . . . . . . . . . . . . . . . 17
   The Commonwealth . . . . . . . . . . . . . . . . . . 18

Page

TRANSPORTATION SYSTEM REVENUES
AND EXPENDITURES . . . . . . . . . . . . . . . . . . 18
   Projected 1968 Resolution Revenues and
     1998 Resolution Revenues . . . . . . . . . . 18

DEBT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
   Authority Debt . . . . . . . . . . . . . . . . . . . . . . 20
   Principal and Interest Requirements . . . . . . . 20

SUPPLEMENTAL RESOLUTION . . . . . . . . . . . 22

TAX EXEMPTION . . . . . . . . . . . . . . . . . . . . . 22
   Discount Bonds . . . . . . . . . . . . . . . . . . . . . . 22
   Premium Bonds . . . . . . . . . . . . . . . . . . . . . . 23

UNDERWRITING . . . . . . . . . . . . . . . . . . . . . . 23

LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . 24

LEGAL MATTERS . . . . . . . . . . . . . . . . . . . . . 24

LEGAL INVESTMENT . . . . . . . . . . . . . . . . . . 24

GOVERNMENT DEVELOPMENT BANK
   FOR PUERTO RICO . . . . . . . . . . . . . . . . . 24

RATINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONTINUING DISCLOSURE . . . . . . . . . . . . . . 25

MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . 27

Appendix I -- Form of Opinion of Bond Counsel   I-1
Appendix II -- Specimen of the Policy   . . . . . . . . II-1

[This page intentionally left blank]

# $75,050,000
# PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY
## Subordinated Transportation Revenue Bonds (Series 1998)
### (Puerto Rico State Infrastructure Bank)

This Official Statement sets forth information in connection with the sale by Puerto Rico Highway and Transportation Authority (the "Authority") of $75,050,000 aggregate principal amount of its Puerto Rico Highway and Transportation Authority Subordinated Transportation Revenue Bonds (Series 1998) (Puerto Rico State Infrastructure Bank) (the "1998 Subordinated Bonds"). The 1998 Subordinated Bonds will be issued pursuant to Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended (the "Authority Act"), and Resolution No. 98-06, adopted by the Authority on February 26, 1998, as amended (the "1998 Resolution"), and Resolution No. 98-31, adopted by the Authority on July 23, 1998 ("Resolution 98-31"). The Chase Manhattan Bank has been appointed to act as fiscal agent under the 1998 Resolution (in such capacity, the "1998 Fiscal Agent"). The 1998 Subordinated Bonds, the $1,129,643,740 Puerto Rico Highway and Transportation Authority Transportation Revenue Bonds (Series A) currently outstanding (the "1998 Senior Bonds") and any additional bonds issued under the 1998 Resolution, as described below, are herein collectively referred to as the "Transportation Revenue Bonds."

The principal of and interest on the 1998 Subordinated Bonds maturing July 1 of the years 2008 through 2014, inclusive, and July 1, 2018 (the "Insured Bonds") will be insured by a municipal bond insurance policy (the "Policy") issued to the 1998 Fiscal Agent by MBIA Insurance Corporation (the "Insurer").

This Official Statement includes the cover page, Appendix I hereto and the following documents or portions thereof, which have been filed by the Authority or the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") with each nationally recognized municipal securities information repository ("NRMSIR") listed herein under *Continuing Disclosure* and are incorporated herein by reference:

(1)   the information set forth under the following captions and Appendices in the Official Statement of the Authority, dated February 26, 1998, relating to the sale of $1,129,643,740 Puerto Rico Highway and Transportation Authority Transportation Revenue Bonds (Series A) (the "Series A Official Statement"): "INTRODUCTION," "THE AUTHORITY," "TRANSPORTATION SYSTEM REVENUES AND EXPENDITURES" (excluding "— Revenues — Projected 1968 Resolution Revenues and 1998 Resolution Revenues"), "SUMMARY OF CERTAIN PROVISIONS OF THE 1968 RESOLUTION," "SUMMARY OF CERTAIN PROVISIONS OF THE PROPOSED SUPPLEMENTAL RESOLUTION," "SUMMARY OF CERTAIN PROVISIONS OF THE 1998  RESOLUTION," "LITIGATION," "APPENDIX II - Audited Financial Statements of the Authority, June 30, 1997," and "APPENDIX III - Letter of Traffic Engineers;"

(2)   *Appendix II* to the Official Statement of Puerto Rico Public Finance Corporation, dated June 18, 1998, relating to the sale of $345,370,000 Puerto Rico Public Finance Corporation 1998 Series A Bonds (Commonwealth Appropriation Bonds), which appendix contains financial and other information of the Commonwealth (the "Commonwealth Report"); and

(3)   the general purpose financial statements of the Commonwealth for the fiscal year ended June 30, 1997, together with the independent auditor's report thereon, dated December 15, 1997, of Deloitte & Touche LLP, certified public accountants (the "Commonwealth Financial Statements"), which are part of the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 1997 contained in *Appendix II* to the Official Statement of the Commonwealth, dated January 15, 1998, relating to the sale of $503,963,264.10 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 1998 (General Obligation Bonds).

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth filed with each NRMSIR and the Municipal Securities Rulemaking Board (the "MSRB") or any other document containing the same information as the Commonwealth Report or the Commonwealth Financial Statements filed with each NRMSIR after

the date hereof and prior to the termination of the offering of the 1998 Subordinated Bonds shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained herein or in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of any or all of the foregoing documents incorporated herein by reference. Requests for such documents should be directed to Director-New York Office, Government Development Bank for Puerto Rico, 140 Broadway, 38th Floor, New York, NY 10005, telephone number (212) 422-6420, or to Public and Private Finance Director, Government Development Bank for Puerto Rico, PO Box 42001, San Juan, PR 00940, telephone number (787) 722-2525.

A copy of the Series A Official Statement, the Commonwealth Report and the Commonwealth Financial Statements may also be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in *Continuing Disclosure* below.

The Authority is issuing the 1998 Subordinated Bonds to finance or refinance a portion of the costs of any Transportation Facilities (as defined in the 1998 Resolution) falling within the definition of "Federal-aid highway" or "capital projects" under federal legislation. See *Financing Plan*.

As described more fully below, the 1998 Resolution permits the Authority to issue Transportation Revenue Bonds senior in right of payment to the 1998 Subordinated Bonds (and any additional Transportation Revenue Bonds issued on a parity with the 1998 Subordinated Bonds) (such senior Transportation Revenue Bonds being herein called the "Senior Transportation Revenue Bonds") for any lawful purpose of the Authority and for the purpose of refunding any bonds issued by the Authority under the 1998 Resolution and any other obligations of the Authority, including outstanding Highway Revenue Bonds and outstanding Subordinated Transportation Revenue Bonds. See "Additional Bonds-Senior Transportation Revenue Bonds" under *The 1998 Subordinated Bonds*. The 1998 Subordinated Bonds and all Transportation Revenue Bonds subordinated to the Senior Transportation Revenue Bonds are hereinafter referred to as the "Subordinated Transportation Revenue Bonds". All Senior Transportation Revenue Bonds will be secured equally and ratably under the 1998 Resolution. All Subordinated Transportation Revenue Bonds will be secured equally and ratably under the 1998 Resolution (except for differences in any debt service reserve requirements related thereto as permitted by the 1998 Resolution) and will be payable from 1998 Resolution Revenues (as defined below) remaining after providing for the payment of debt service on Senior Transportation Revenue Bonds and providing the required debt service reserve therefor.

The Authority has heretofore issued pursuant to Resolution No. 68-18, adopted by the Authority on June 13, 1968, as amended (the "1968 Resolution"), Puerto Rico Highway and Transportation Authority Highway Revenue Bonds, of which $2,272,365,000 principal amount was outstanding as of July 2, 1998 (said bonds, and any additional bonds that may be issued under the 1968 Resolution (subject to the limitations as to the issuance of such additional bonds contained in the 1998 Resolution, as hereinafter described) are herein collectively called the "Highway Revenue Bonds"). The Authority has determined to finance its future capital requirements, after applying other available funds, through the issuance of Transportation Revenue Bonds under the terms and conditions of the 1998 Resolution and has covenanted in the 1998 Resolution not to issue additional bonds under the 1968 Resolution, other than bonds whose maturity does not extend beyond July 1, 2036 and which are issued (i) to refund outstanding Highway Revenue Bonds to achieve debt service savings, or (ii) in exchange for all outstanding Puerto Rico Highway and Transportation Authority Special Facility Revenue Bonds issued under a separate trust agreement to finance the Teodoro Moscoso Bridge. See "Additional Bonds-Highway Revenue Bonds" under *The 1998 Subordinated Bonds* and "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* in the Series A Official Statement.

Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them under *Summary of Certain Provisions of the 1968 Resolution* and *Summary of Certain Provisions of the 1998 Resolution* in the Series A Official Statement.

2

## INTRODUCTION

The 1998 Subordinated Bonds, together with any additional Transportation Revenue Bonds issued by the Authority, are payable from, and are secured by a pledge of, the Authority's 1998 Resolution Revenues (as defined below), including 1968 Resolution Revenues (as defined below) remaining after their application to pay debt service on the Authority's outstanding Highway Revenue Bonds and providing a reserve therefor. Under certain circumstances relating to the termination of the Authority's private concession agreement for the Teodoro Moscoso Bridge, such remaining 1968 Resolution Revenues would be applied to the payment of debt service on the Authority's Special Facility Revenue Bonds issued to finance the Teodoro Moscoso Bridge prior to the application of such revenues to the payment of debt service on the Transportation Revenue Bonds. See the fifth paragraph in "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* in the Series A Official Statement. The 1998 Subordinated Bonds and any other Subordinated Transportation Revenue Bonds issued by the Authority will be payable from 1998 Resolution Revenues remaining after their application to pay debt service on the Senior Transportation Revenue Bonds and to provide a reserve therefor. See "Security for the Subordinated Transportation Revenue Bonds" under *The 1998 Subordinated Bonds*.

The 1998 Subordinated Bonds are also payable from moneys required to be transferred to an account established in the 1998 Subordinated Bond Reserve Fund from an account within the Puerto Rico State Infrastructure Bank Trust Fund (the "SIB Trust Fund"). On the date of issuance of the 1998 Subordinated Bonds, the amount on deposit in said account in the SIB Trust Fund, which amount is derived from federal capitalization grants and Authority matching funds, will equal the "Subordinated Reserve Requirement for the 1998 Subordinated Bonds" fixed by the Authority in Resolution 98-31. Said Subordinated Reserve Requirement is the greater of twenty percent (20%) of the principal amount of the 1998 Subordinated Bonds outstanding from time to time and two and one-half (2½) times the amount of the maximum Principal and Interest Requirements for any fiscal year on account of all 1998 Subordinated Bonds outstanding from time to time. On the date of issuance of the 1998 Subordinated Bonds, the Subordinated Reserve Requirement will be $15,010,000. See "Security for the Subordinated Transportation Revenue Bonds - 1998 Subordinated Bond Reserve Fund" under *The 1998 Subordinated Bonds*.

The 1998 Resolution Revenues consist of:  (i) the total amount of excise taxes, up to $120 million per fiscal year, imposed by Puerto Rico on certain petroleum products (as defined herein), (ii) the tolls and other charges imposed by the Authority for the use of Toll Facilities (other than Existing Toll Facilities Revenues (as defined below) prior to the repeal and cancellation of the 1968 Resolution), (iii) certain investment earnings, all as described more fully below, and (iv) until the Highway Revenue Bonds are paid or defeased and the 1968 Resolution is repealed and canceled, Excess 1968 Resolution Revenues (as defined below) and, after the repeal and cancellation of the 1968 Resolution, all 1968 Resolution Revenues. See "Security for the Subordinated Transportation Revenue Bonds-Pledged Revenues; Subordination-1998 Resolution Revenues" under *The 1998 Subordinated Bonds*.

The 1968 Resolution Revenues consist of:  (i) all current gasoline taxes, a portion of the current gas oil and diesel oil taxes and a portion of the current motor vehicle license fees allocated to the Authority by the Commonwealth, (ii) all toll revenues of the Traffic Facilities (as defined in the 1968 Resolution) financed with Highway Revenue Bonds and any extensions, improvements or betterments thereto however financed (the "Existing Toll Facilities Revenues"), and (iii) certain investment earnings, all as described more fully below. See "Security for the Subordinated Transportation Revenue Bonds" under *The 1998 Subordinated Bonds*.

All of the aforesaid taxes and license fees constituting revenues of the Authority pledged under the 1968 Resolution or the 1998 Resolution are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that all other Commonwealth revenues are not sufficient therefor. See "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" under *The 1998 Subordinated Bonds* and "Debt" in the Commonwealth Report. The Commonwealth has never applied the taxes or license fees allocated to the Authority to the payment of such Commonwealth debt.

**Neither the credit of the Commonwealth nor that of any of its political subdivisions, other than the Authority, is pledged for the payment of the 1998 Subordinated Bonds.**

3

The financial condition of the Commonwealth and economic conditions in Puerto Rico, including gasoline and oil prices and automobile usage, affect the level of revenues available to the Authority. In addition, Commonwealth appropriations for the Department of Transportation and Public Works (the "Department") affect the level of maintenance for the portion of the Puerto Rico highway system which is the responsibility of the Department. Certain information regarding the Commonwealth is set forth in the Commonwealth Report incorporated herein by reference.   The Commonwealth Financial Statements are also incorporated herein by reference.

This Official Statement includes or incorporates by reference brief descriptions of the Authority, the Commonwealth and the Authority's transportation system, revenues and expenditures and its five-year priorities construction program (the "Priorities Construction Program"), together with other information, including summaries of the terms of the 1998 Subordinated Bonds, the 1998 Resolution, the 1968 Resolution, and the various statutes affecting the Authority. Such summaries and the references to all documents referred to or incorporated by reference herein do not purport to be complete, and each summary and reference is qualified in its entirety by reference to each such document, copies of which are available from the Authority. All references to the 1998 Subordinated Bonds are qualified in their entirety by reference to the definitive form thereof and the information with respect thereto contained in the 1998 Resolution and Resolution 98-31.

## FINANCING PLAN

The Authority is issuing the 1998 Subordinated Bonds to finance or refinance a portion of the costs of various Transportation Facilities included in the Authority's current Priorities Construction Program that are eligible for financial assistance under federal legislation. See "Operating Expenses and Capital Expenditures-Priorities Construction Program" under *Transportation System Revenues and Expenditures* in the Series A Official Statement.

**Sources and Uses of Funds**

> **Sources**:
>
> | | |
> |---|---|
> | Principal Amount of 1998 Subordinated Bonds . . . . . . . . . . . . | $75,050,000 |
> | Net original issue discount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,006,198) |
> | Accrued Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 221,374 |
> | Total Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $74,265,176 |
>
> **Uses**:
>
> | | |
> |---|---|
> | Deposit into 1998 Construction Fund . . . . . . . . . . . . . . . . . . . . . | $72,960,000 |
> | Deposit to 1998 Subordinated Bond Service Account . . . . . . . . . | 221,374 |
> | Underwriting discount, municipal bond insurance premium, and legal, printing and financing expenses . . . . . . . . . . . . . . . . . . . . . . | 1,083,802 |
> | Total Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $74,265,176 |

## THE 1998 SUBORDINATED BONDS

**Description of the 1998 Subordinated Bonds**

*General*

The 1998 Subordinated Bonds will be issued as registered bonds without coupons, will be dated, will bear interest at the rates, will be payable at the times, and will mature on the dates and in the principal amounts set forth on the inside cover of this Official Statement. Principal of and premium, if any, and interest on the 1998 Subordinated Bonds will be

4

payable in the manner described below in "Book-Entry Only System" under *The 1998 Subordinated Bonds*. The 1998 Subordinated Bonds are subject to redemption as described below under "Redemption Provisions".

**Redemption Provisions**

*Optional Redemption*

The 1998 Subordinated Bonds at the time outstanding maturing after July 1, 2008 may be redeemed on or after July 1, 2008 at the option of the Authority from any available moneys (other than moneys deposited in the 1998 Senior or Subordinated Bond Sinking Fund in respect of an Amortization Requirement) on July 1, 2008 and on any January 1 or July 1 thereafter either in whole or, as the Authority may direct, in part at the following prices (expressed as percentages of the principal amount) plus accrued interest to the redemption date:

| Redemption Date | Redemption Price |
|---|---|
| July 1, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . | 101% |
| January 1, 2009 . . . . . . . . . . . . . . . . . . . . . | 100¾ |
| July 1, 2009 . . . . . . . . . . . . . . . . . . . . . . . | 100½ |
| January 1, 2010 . . . . . . . . . . . . . . . . . . . . | 100¼ |
| July 1, 2010 and thereafter . . . . . . . . . . . . . | 100 |

*Mandatory Redemption*

The 1998 Subordinated Bonds issued as term bonds are subject to redemption on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the respective Amortization Requirements for said 1998 Subordinated Bonds (less the amount of moneys in the 1998 Subordinated Bond Sinking Fund used to retire bonds by purchase) from moneys in the 1998 Subordinated Bond Sinking Fund at par plus accrued interest in the years and amounts set forth below:

| Year | Amortization Requirements for 1998 Subordinated Bonds due July 1, | | |
|---|---|---|---|
| | 2018 ($12,770,000 term bond) | 2022 ($15,520,000 term bond) | 2028 ($29,770,000 term bond) |
| 2015 . . . . . . . . . . . . . | $2,965,000 | | |
| 2016 . . . . . . . . . . . . . | 3,110,000 | | |
| 2017 . . . . . . . . . . . . . | 3,265,000 | | |
| 2018 . . . . . . . . . . . . . | 3,430,000* | | |
| 2019 . . . . . . . . . . . . . | | $3,600,000 | |
| 2020 . . . . . . . . . . . . . | | 3,780,000 | |
| 2021 . . . . . . . . . . . . . | | 3,970,000 | |
| 2022 . . . . . . . . . . . . . | | 4,170,000* | |
| 2023 . . . . . . . . . . . . . | | | $4,380,000 |
| 2024 . . . . . . . . . . . . . | | | 4,595,000 |
| 2025 . . . . . . . . . . . . . | | | 4,825,000 |
| 2026 . . . . . . . . . . . . . | | | 5,065,000 |
| 2027 . . . . . . . . . . . . . | | | 5,320,000 |
| 2028 . . . . . . . . . . . . . | | | 5,585,000* |
| Average life (years) | 18.46 | 22.46 | 27.54 |

\*    Maturity.

5

*Notice of Redemption*

Notice of redemption of the 1998 Subordinated Bonds shall be given not less than 30 days prior to the redemption date by first-class mail, postage prepaid, to The Depository Trust Company ("DTC"), New York, New York (or if the book-entry only system has been discontinued as described below, to the registered owners of the 1998 Subordinated Bonds or portions thereof to be redeemed at their addresses appearing upon the registration books, but failure to mail such notice to the registered owner of any 1998 Subordinated Bond or any defect in such notice will not affect the redemption of any other 1998 Subordinated Bonds as to which proper notice shall have been duly mailed). If notice of redemption shall have been duly mailed as aforesaid, and if on the redemption date moneys or Government Obligations which will provide moneys sufficient for the redemption of all 1998 Subordinated Bonds or portions thereof to be redeemed, together with interest to the redemption date, shall be held by the 1998 Fiscal Agent for such payment, then interest on such 1998 Subordinated Bonds or portions thereof shall cease to accrue.

*Selection of 1998 Subordinated Bonds to be Redeemed*

If less than all of the 1998 Subordinated Bonds of any one maturity shall be called for redemption, the particular 1998 Subordinated Bonds or portions thereof to be redeemed shall be selected by the 1998 Fiscal Agent in such manner as it in its discretion may determine to be appropriate and fair. If during any fiscal year the total principal amount of term 1998 Subordinated Bonds of a particular maturity retired by purchase or redemption exceeds the Amortization Requirement for such term 1998 Subordinated Bonds for such year, the Amortization Requirements for such term 1998 Subordinated Bonds shall be reduced for subsequent fiscal years in amounts aggregating such excess as shall be determined by the Authority.

## Security for the Subordinated Transportation Revenue Bonds

*Pledged Revenues; Subordination*

The 1998 Subordinated Bonds and any additional Subordinated Transportation Revenue Bonds issued under the 1998 Resolution are payable from, and secured by a pledge of, the 1998 Resolution Revenues remaining after providing for the payment of debt service on Senior Transportation Revenue Bonds and providing the required debt service reserve therefor and all other moneys held for the credit of the 1998 Subordinated Bond Sinking Fund, which includes the 1998 Subordinated Bond Service Account and the 1998 Subordinated Bond Redemption Account, and the account in the 1998 Subordinated Bond Reserve Fund corresponding to the 1998 Subordinated Bonds (the "1998 Subordinated Bonds Reserve Account"). Under certain circumstances described below, moneys in the 1998 Construction Fund or the 1998 Subordinated Bond Sinking Fund may be used to pay debt service on the Senior Transportation Revenue Bonds, if moneys in the 1998 Senior Bond Service Account or the 1998 Senior Bond Redemption Account are insufficient therefor, prior to applying moneys in the 1998 Senior Bond Reserve Account.

*1998 Resolution Revenues.* The 1998 Resolution Revenues consist of: (i) all excise taxes on crude oil, unfinished oil and derivative products ("petroleum products"), up to $120 million per fiscal year, imposed by Puerto Rico and allocated to the Authority by Act No. 34 of the Legislature of Puerto Rico approved July 16, 1997, as amended ("Act No. 34"), which amended Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended (the "1994 Code"); (ii) the tolls and other charges imposed by the Authority for the use of Toll Facilities (other than Existing Toll Facilities Revenues prior to the repeal and cancellation of the 1968 Resolution); (iii) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico allocates to the Authority in the future and which the Authority pledges to the payment of Transportation Revenue Bonds; (iv) investment earnings on deposits to the credit of funds and accounts established under the 1998 Resolution, except for the 1998 Construction Fund; and (v) prior to the repeal and cancellation of the 1968 Resolution, any unencumbered 1968 Resolution Revenues (as described below) remaining on deposit in the 1968 Construction Fund after payment or provision for payment of debt service and required reserves on the outstanding Highway Revenue Bonds (the "Excess 1968 Resolution Revenues") and, after said repeal and cancellation, all 1968 Resolution Revenues. 1998 Resolution Revenues do not include excise taxes on petroleum products which may be levied or collected from time to time other than the amount of such taxes described in this paragraph unless allocated to the Authority and pledged by the Authority to the payment of Transportation Revenue Bonds. The excise tax on petroleum

6

products imposed by the 1994 Code and allocated to the Authority by Act No. 34 is a different tax from the excise tax on gasoline and gas oil and diesel oil imposed by the 1994 Code and allocated to the Authority, as discussed below.

Under certain circumstances relating to the termination of the Authority's private concession agreement for the Teodoro Moscoso Bridge, the Excess 1968 Resolution Revenues would be encumbered for the benefit of the holders of the Authority's Special Facility Revenue Bonds issued to finance the Teodoro Moscoso Bridge and would be required to be applied to the payment of debt service on such bonds prior to the application of such revenues to the payment of debt service on the Transportation Revenue Bonds. See the fifth paragraph in "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* in the Series A Official Statement. Under the 1998 Resolution, the Authority has covenanted not to encumber, withdraw or pledge any Excess 1968 Resolution Revenues deposited in the 1968 Construction Fund except in the limited circumstance of the Authority's taking over operation of the Teodoro Moscoso Bridge.

*1968 Resolution Revenues.* The 1968 Resolution Revenues consist of: (i) the gross receipts of the current $0.16 per gallon excise tax on gasoline and $0.04 of the current $0.08 per gallon excise tax on gas oil and diesel oil imposed by Puerto Rico and allocated to the Authority (after any deductions for taxes on fuels used in sea and air transportation that are required to be reimbursed under certain circumstances) by the 1994 Code (the remaining $0.04 per gallon excise tax has been allocated to the Metropolitan Bus Authority by Act No. 39 of July 19, 1997); (ii) the gross receipts derived from the $15 per vehicle increase of annual motor vehicle license fees imposed by Puerto Rico and allocated to the Authority by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 ("Act No. 9"); (iii) Existing Toll Facilities Revenues; and (iv) investment earnings on deposits to the credit of funds and accounts established under the 1968 Resolution, except for the 1968 Construction Fund. 1968 Resolution Revenues do not include gasoline taxes, gas oil and diesel oil taxes, and motor vehicle license fees which may be levied or collected from time to time other than the amounts of the taxes and fees described in this paragraph unless allocated to the Authority and pledged by the Authority to the payment of Highway Revenue Bonds or Transportation Revenue Bonds, as the case may be.

# Flow of Funds Under 1968 Resolution and 1998 Resolution



**1968 Resolution Revenues***
Gasoline Tax
Gas Oil and Diesel Oil Tax
Motor Vehicle License Fees
Tolls on Traffic Facilities

**1998 Resolution Revenues***
Petroleum Products Tax
Pledged Tolls and Charges
on Transportation Facilities
Unencumbered Excess 1968 Resolution Revenues

1998 Revenue Fund

*1998 Senior Bond Sinking Fund*
1998 Senior Bond Service Account
1998 Senior Bond Redemption Account
1998 Senior Bond Reserve Account

*1998 Subordinated Bond Sinking Fund*
1998 Subordinated Bond Service Account
1998 Subordinated Bond Redemption Account

1998 Subordinated Bond Reserve Fund**

1998 Construction Fund

*1968 Sinking Fund*
1968 Bond Service Account
1968 Redemption Account
1968 Reserve Account

1968 Construction Fund

Unencumbered Excess 1968 Resolution Revenues

*Not shown are the investment earnings on moneys deposited in the various Funds and Accounts established under the respective Resolutions.

**Under the 1998 Resolution, separate accounts in the Subordinated Bond Reserve Fund may be established for Series of Subordinated Bonds with different Subordinated Reserve Requirements.

8

*Commitment Not to Reduce Taxes and Fees.* The Commonwealth has agreed and committed in the 1994 Code that it will not reduce the gasoline tax below $0.16 per gallon, the tax on gas oil and diesel oil below $0.04 per gallon or the tax on petroleum products below the tax rates in effect on July 16, 1997 (as described under *Transportation System Revenues and Expenditures* in the Series A Official Statement), and that it will not reduce the amount of any such taxes allocated to the Authority until all obligations of the Authority, including the Highway Revenue Bonds and the Transportation Revenue Bonds, secured by the pledge thereof are fully paid. The Commonwealth has also agreed and pledged in Act No. 9 that it will not reduce the motor vehicle license fees allocated and pledged to the payment of obligations of the Authority, including the Highway Revenue Bonds and the Transportation Revenue Bonds, so long as the proceeds of such increase in fees remain pledged to the payment of such obligations. See "The Authority" under *Recent Developments* for a description of a recent amendment to the 1994 Code which grants the industrial fishing industry an exemption from the excise tax imposed on petroleum products.

*Special Fund.* Under the 1994 Code and Act No. 9, the proceeds of the taxes and license fee increase allocated to the Authority are deposited by the Department of the Treasury in a special fund (the "Special Fund") in favor of the Authority. In accordance with the Constitution of Puerto Rico, the proceeds of such taxes and license fee increase are subject to being applied first to the payment of general obligation debt and debt guaranteed by the Commonwealth, if and to the extent that other Commonwealth revenues are insufficient therefor. The Commonwealth has never applied the proceeds of such taxes or license fee increase allocated to the Authority to the payment of such debt nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of such debt. For information with respect to Commonwealth debt and the economic and financial condition of the Commonwealth, see "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" below and "Debt" in the Commonwealth Report.

*Flow of Funds.* Moneys in the Special Fund are transferred by the Department of the Treasury to the Authority at least monthly. Upon receipt of such moneys, the Authority makes the deposits described below. The chart on page 8 illustrates the flow of such moneys into the various funds and accounts established under the 1968 Resolution and the 1998 Resolution. The chart is provided only as a summary of the flow of funds under the 1968 Resolution and the 1998 Resolution, and does not purport to be complete. Reference is made to *Summary of Certain Provisions of the 1968 Resolution* and *Summary of Certain Provisions of the 1998 Resolution* in the Series A Official Statement, which should be read in conjunction herewith.

Upon receipt from the Department of the Treasury of any moneys in the Special Fund constituting 1998 Resolution Revenues, the Authority is required under the 1998 Resolution to deposit such moneys, together with any other moneys constituting 1998 Resolution Revenues (other than investment earnings), into the 1998 Revenue Fund. In addition, the Authority is required to deposit monthly into the 1998 Revenue Fund all unencumbered Excess 1968 Resolution Revenues. The Authority is required to withdraw monthly from the 1998 Revenue Fund and deposit into the 1998 Senior Bond Service Account and the 1998 Senior Bond Redemption Account the respective equal monthly amounts necessary to provide for the payment of principal of and interest and premium, if any, on the Senior Transportation Revenue Bonds and the amount necessary for required deposits to the 1998 Senior Bond Reserve Account. Any remaining 1998 Resolution Revenues (other than investment earnings) are then required to be deposited monthly (in the respective equal monthly amounts) into the 1998 Subordinated Bond Service Account and the 1998 Subordinated Bond Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Subordinated Transportation Revenue Bonds, including the 1998 Subordinated Bonds, and thereafter, into the 1998 Subordinated Bond Reserve Fund, as required. Any remaining 1998 Resolution Revenues are then deposited into the 1998 Construction Fund and are available to the Authority for any of the authorized purposes of the Authority, but subject to the payment of certain operation and maintenance expenses and repair, renewal and replacement costs, as required by the 1998 Resolution. See *Summary of Certain Provisions of the 1998 Resolution* in the Series A Official Statement. Once all outstanding Highway Revenue Bonds are paid or defeased and the 1968 Resolution is repealed and canceled, all revenues of the Authority formerly constituting 1968 Resolution Revenues will be deposited upon receipt by the Authority into the 1998 Revenue Fund for application as described above.

Upon receipt from the Department of the Treasury of any moneys in the Special Fund constituting 1968 Resolution Revenues, the Authority is required under the 1968 Resolution to deposit such moneys, together with all Existing Toll Facilities Revenues, in equal monthly amounts into the 1968 Bond Service Account and the 1968 Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Highway Revenue Bonds and in the amounts necessary for the required deposits to the 1968 Reserve Account. Any remaining 1968 Resolution Revenues (other

9

than investment earnings) are deposited into the 1968 Construction Fund to be applied to authorized purposes of the Authority. See *Summary of Certain Provisions of the 1968 Resolution* in the Series A Official Statement. Pursuant to the 1998 Resolution, all such Excess 1968 Resolution Revenues deposited in the 1968 Construction Fund, to the extent not encumbered by the Authority, must be withdrawn monthly and transferred to the 1998 Revenue Fund for application as described above. See *Summary of Certain Provisions of the 1998 Resolution* in the Series A Official Statement. Under certain circumstances relating to the termination of the concession agreement for the Teodoro Moscoso Bridge, such Excess 1968 Resolution Revenues would be encumbered for the benefit of the holders of the Authority's Special Facility Revenue Bonds issued to finance the Teodoro Moscoso Bridge and would have to be applied by the Authority for the payment of debt service on such bonds. See the fifth paragraph in "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* in the Series A Official Statement. Under the 1998 Resolution, the Authority has agreed not to encumber or withdraw or pledge any Excess 1968 Resolution Revenues deposited in the 1968 Construction Fund except in the limited circumstance of the Authority's taking over operation of the Teodoro Moscoso Bridge and except for the monthly withdrawals of unencumbered Excess 1968 Resolution Revenues for transfer to the 1998 Revenue Fund.

*Replenishment of Reserve Accounts.* Under the 1994 Code, if moneys in the 1968 Reserve Account, 1998 Senior Bond Reserve Account or any accounts established in the 1998 Subordinated Bond Reserve Fund (collectively, the "Reserve Accounts") are applied to cover a deficiency in the amounts necessary for payment of the principal of and interest on the Highway Revenue Bonds, Senior Transportation Revenue Bonds or Subordinated Transportation Revenue Bonds, respectively, the amounts used from any of the applicable Reserve Accounts to cover said deficiency shall be reimbursed to the Authority from the first amounts received in the next fiscal year or subsequent years by the Commonwealth derived from (i) any other taxes which may then be in effect on any other fuel or propellant which is used, among other purposes, to propel highway vehicles, and (ii) any remaining portion of the gasoline tax and petroleum products tax then in effect. The proceeds of said other taxes and the remainder of the gasoline tax and petroleum products tax to be used to reimburse the applicable Reserve Accounts are not deposited in the General Fund of the Commonwealth when collected, but are deposited instead in the Special Fund for the benefit of the Authority, and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, used to reimburse said Reserve Accounts. In the 1998 Resolution, the Authority covenants to apply any such reimbursement received first to replenish the 1968 Reserve Account, then to replenish the 1998 Senior Bond Reserve Account, and finally to replenish any accounts in the 1998 Subordinated Bond Reserve Fund.

**The 1998 Subordinated Bonds are not a debt of the Commonwealth or any of its political subdivisions (other than the Authority), and neither the Commonwealth nor any such subdivisions (other than the Authority) shall be liable thereon.**

**Neither the 1968 Resolution nor the 1998 Resolution contains events of default or provides for the acceleration of the maturities of the Highway Revenue Bonds or the Transportation Revenue Bonds.**

*1998 Subordinated Bond Reserve Fund*

The 1998 Resolution establishes a 1998 Subordinated Bond Reserve Fund, in which the Authority may establish one or more accounts to correspond to Series of Subordinated Transportation Revenue Bonds with different Subordinated Reserve Requirements. The moneys held for the credit of each account in the 1998 Subordinated Bond Reserve Fund are to be applied to the payment of interest on each Series of Subordinated Transportation Revenue Bonds, and maturing principal of serial Subordinated Transportation Revenue Bonds of each such Series to which such account relates whenever moneys in the 1998 Subordinated Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1998 Subordinated Bond Redemption Account to satisfy any Amortization Requirements for the term Subordinated Transportation Revenue Bonds whenever 1998 Resolution Revenues are insufficient for such purpose. In Resolution No. 98-31, the Authority has fixed the Subordinated Reserve Requirement for the 1998 Subordinated Bonds at the amount set forth in the second paragraph of *Introduction*.

The 1998 Resolution provides that the Authority may deposit into any account in the 1998 Subordinated Bond Reserve Fund a Reserve Account Letter of Credit or a Reserve Account Insurance Policy (including any agreement referred to in the next sentence) in an amount equal to all or a portion of the applicable reserve requirement. The 1998 Resolution also provides that for purposes of determining the amount on deposit to the credit of any such separate account, any agreement between the 1998 Fiscal Agent and a financial institution serving as the depository institution of a

10

Commonwealth state infrastructure bank (or other similar fund) created by virtue of Section 350 of the National Highway System Designation Act of 1995, as amended (23 U.S.C. Section 101), or any similar federal legislation, pursuant to which agreement such depository institution irrevocably agrees to provide funds to the 1998 Fiscal Agent for deposit to the credit of any separate account in the Subordinated Bond Reserve Fund shall be treated as satisfying the applicable Subordinated Reserve Requirement to the extent of the maximum amount of funds so available to be provided to the 1998 Fiscal Agent for deposit to the credit of such separate account.

In December 1997, the Authority entered into a Cooperative Agreement with the Federal Highway Administration, the Federal Transit Administration and the Department providing for the establishment of a State Infrastructure Bank under the provisions of Section 350 of the National Highway System Designation Act of 1995, which bank can be used to provide various forms of financial assistance, other than grants, to the Authority to finance eligible highway and transit projects. Pursuant to a Puerto Rico Infrastructure Bank Agreement (the "Bank Agreement"), dated as of June 12, 1998, among the Department, the Authority and Government Development Bank for Puerto Rico ("Government Development Bank"), as trustee of the SIB Trust Fund (in such capacity, the "SIB Trustee"), the SIB Trust Fund was established. Within the SIB Trust Fund a "Highway Account" and a "Transit Account" were created, and a special subaccount designated "Puerto Rico Highway and Transportation Authority Subordinated Transportation Revenue Bonds (Series 1998) Highway Subaccount" (the "1998 Subordinated Bonds Highway Subaccount") was established within the Highway Account. The Series 1998 Bonds Highway Subaccount of the SIB Trust Fund was subsequently capitalized by federal capitalization grants and Commonwealth matching funds in the amount of $15,010,735. Amounts in the 1998 Subordinated Bonds Highway Subaccount may be invested pursuant to the written directions of the Secretary of the Department of Transportation and Public Works in (i) direct obligations of the United States Government, (ii) time deposits, certificates of deposit or similar arrangements with Government Development Bank or any bank or trust company which is a member of the Federal Deposit Insurance Corporation, having a combined capital and surplus of not less than $100,000,000, or (iii) such other financing instruments as the United States Secretary of Transportation may approve, all in accordance with applicable federal legislation and guidelines, that are rated by Standard & Poor's Ratings Services and by Moody's Investors Service (or their respective successors) in one of the three highest rating categories (without regard to any gradations within such categories).

In Resolution No. 98-31, the Authority has established the 1998 Subordinated Bonds Reserve Account as security for the 1998 Subordinated Bonds, which account will have the benefit of the following agreement constituting a Reserve Account Letter of Credit. The agreement, among the Department, the Authority, the 1998 Fiscal Agent and the SIB Trustee, enables the 1998 Fiscal Agent to request funds from the SIB Trustee, up to the full amount on deposit in the 1998 Subordinated Bonds Highway Subaccount of the SIB Trust Fund, in the event it is necessary to apply moneys in the 1998 Subordinated Bonds Reserve Account to pay debt service on the 1998 Subordinated Bonds. For so long as the 1998 Subordinated Bonds shall be outstanding, the SIB Trustee will make no withdrawals and expenditures, pledges or other encumbrances of amounts held to the credit of the 1998 Subordinated Bonds Highway Subaccount, other than to make deposits to the credit of the 1998 Subordinated Bonds Reserve Account. The Authority's obligation to repay any amounts drawn under such agreement are secured by a lien on 1998 Resolution Revenues subordinate to the lien securing the Senior Transportation Revenue Bonds. See "Sinking Fund" under *Summary of Certain Provisions of the 1998 Resolution* in the Series A Official Statement.

If the moneys in any account established in the 1998 Subordinated Bond Reserve Fund (including the 1998 Subordinated Bonds Reserve Account) are used to cover any deficiency in the 1998 Subordinated Bond Service Account or the 1998 Subordinated Bond Redemption Account, the 1994 Code provides that the 1998 Subordinated Bond Reserve Fund shall be reimbursed, subject to the provisions of the Constitution of Puerto Rico relating to payment of Commonwealth debt and to the prior reimbursement of the 1968 Reserve Account and the 1998 Senior Bond Reserve Account, as discussed above under "Pledged Revenues-Replenishment of Reserve Accounts", from the first proceeds received by the Commonwealth in the next fiscal year or years derived from (i) any remaining portion of the gasoline tax and petroleum products tax then in effect and (ii) any other taxes which may then be in effect on any other fuels or propellants which are used, among other purposes, to propel highway vehicles.

*Prior Payment of Full Faith and Credit Obligations of the Commonwealth*

*Provision for Prior Payment.* The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions heretofore rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The 1998 Subordinated Bonds do not constitute public debt.

The proceeds of the gasoline tax, the gas oil and diesel oil tax, the petroleum products tax and the motor vehicle license fees allocated to the Authority by the 1994 Code and Act No. 9 are available Commonwealth taxes and revenues under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth but, under the 1994 Code and Act No. 9, such taxes and license fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose. Tolls and other fees and charges collected by the Authority and investment earnings are not available Commonwealth taxes and revenues.

The Commonwealth has never applied taxes or license fees allocated to the Authority to the payment of its public debt nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of its public debt. See *Debt* in *Appendix I* of the Series A Official Statement.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended ("Act No. 39"), the Secretary of the Treasury of Puerto Rico is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by monthly deposits into the Special Fund for the Amortization of General Obligations Evidenced by Bonds and Promissory Notes (the "Commonwealth Redemption Fund"). On June 30, 1998, the amount on deposit in the Commonwealth Redemption Fund was $288,529,860, as required. Moneys in the Commonwealth Redemption Fund may also be applied to payment of other Commonwealth guaranteed obligations outstanding prior to adoption of Act No. 39. Such moneys are not available to pay the 1998 Subordinated Bonds.

*Debt Limitation.* Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual internal revenues of the Commonwealth for the two preceding fiscal years. The Constitution of Puerto Rico does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded. Internal revenues (that is, revenues raised under the provisions of Commonwealth legislation) consist principally of income taxes, excise taxes, property taxes, licenses and miscellaneous non-tax revenues. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Department of the Treasury, and motor vehicle fuel taxes, petroleum products taxes and license fees, which are allocated to the Authority as described above, are not included as internal revenues for the purpose of calculating the debt limit, although they are available for the payment of debt service.

On December 21, 1995, Puerto Rico Aqueduct and Sewer Authority issued $400,340,000 Puerto Rico Aqueduct and Sewer Authority Refunding Bonds, guaranteed by the Commonwealth (the "PRASA Guaranteed Bonds"). On January 1, 1997, the Commonwealth began to make payments of debt service on the PRASA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. The amount paid by the Commonwealth is being taken into account as an additional amount of debt service on the Commonwealth's general obligation debt for purposes of computing the above described 15% constitutional debt limitation.

Future maximum annual debt service for the Commonwealth's currently outstanding general obligation debt will be $467,765,000 in the fiscal year ending June 30, 2000. See "Debt Service Requirements for Commonwealth General Obligation Bonds" under *Debt* in *Appendix I* of the Series A Official Statement. Debt service for the PRASA Guaranteed

12

Bonds paid during fiscal 1998 (including for this purpose debt service payments due July 1, 1998) was $21,143,012. The sum of those amounts ($488,908,012) is equal to 8.986% of $5,440,939,500, which is the average of the sum of the adjusted internal revenues for the fiscal year ended June 30, 1997 and the estimated adjusted internal revenues for the fiscal year ended June 30, 1998.

## Additional Bonds

*Highway Revenue Bonds.* The Authority has covenanted in the 1998 Resolution that it will not issue additional Highway Revenue Bonds except bonds maturing no later than July 1, 2036, which are issued (i) to refund outstanding Highway Revenue Bonds in order to achieve debt service savings or (ii) in exchange for the outstanding $116,752,769 Special Facility Revenue Bonds issued by the Authority under a separate trust agreement to finance the construction of the Teodoro Moscoso Bridge, as required under the concession agreement relating to such Bridge. See the last paragraph in "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* in the Series A Official Statement. The issuance of such Highway Revenue Bonds must meet the tests for the issuance of such bonds under the 1968 Resolution, which tests are more fully described in "Issuance of Additional Bonds" under *Summary of Certain Provisions of the 1968 Resolution* in the Series A Official Statement.

*Senior Transportation Revenue Bonds.* The Authority may issue additional Senior Transportation Revenue Bonds under the 1998 Resolution to provide funds for any lawful purpose of the Authority, including the payment of all or any part of the cost of Transportation Facilities (including the payment of any outstanding notes of the Authority issued for the purpose of paying all or a part of such cost); provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Senior Transportation Revenue Bonds (adjusted to take into account for such entire 12 months moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted or toll rate revisions made effective on or prior to the date of delivery of such bonds and tolls from Toll Facilities to be financed from the proceeds of such bonds) are not less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Senior Transportation Revenue Bonds and the additional Senior Transportation Revenue Bonds then to be issued and not less than 100% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds (including Subordinated Transportation Revenue Bonds) and the additional Senior Transportation Revenue Bonds then to be issued.

The Authority may also issue additional Senior Transportation Revenue Bonds to refund all or any part of the outstanding Senior Transportation Revenue Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum annual Principal and Interest Requirements on the Senior Transportation Revenue Bonds to be outstanding after the issuance of such additional Senior Transportation Revenue Bonds will be equal to or less than the maximum annual Principal and Interest Requirements on the Senior Transportation Revenue Bonds outstanding prior to the issuance of the additional Senior Transportation Revenue Bonds. See "Issuance of Additional Bonds" under *Summary of Certain Provisions of the 1998 Resolution* in the Series A Official Statement.

Any additional Senior Transportation Revenue Bonds issued under the 1998 Resolution will be on a parity with the outstanding Senior Transportation Revenue Bonds and will be entitled to the equal benefit, protection and security of the provisions, covenants and agreements of the 1998 Resolution.

*Subordinated Transportation Revenue Bonds.* The Authority may issue Subordinated Transportation Revenue Bonds under the 1998 Resolution to pay all or any part of the cost of any highway project or transit project eligible for financial assistance under federal legislation, provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Subordinated Transportation Revenue Bonds (adjusted to take into account for such entire 12 months moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted or toll rate changes made effective on or prior to delivery of such bonds and tolls from Toll Facilities to be financed from the proceeds of such bonds) are not less than 125% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds and the Subordinated Transportation Revenue Bonds then to be issued.

For the twelve months ended May 31, 1998, the ratio of 1998 Resolution Revenues (adjusted as provided in the preceding paragraph) ($274.1 million) to the maximum annual Principal and Interest Requirements for all currently outstanding Transportation Revenue Bonds (including the 1998 Subordinated Bonds) ($70,701,038) is 3.88. See "Projected 1968 Resolution Revenues and 1998 Resolution Revenues" under *Transportation System Revenues and Expenditures*.

The Authority may also issue Subordinated Transportation Revenue Bonds to refund all or any part of the outstanding Subordinated Transportation Revenue Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum Principal and Interest Requirements on the Subordinated Transportation Revenue Bonds to be outstanding after the issuance of such additional Subordinated Transportation Revenue Bonds will be equal to or less than the maximum annual Principal and Interest Requirements on the Subordinated Transportation Revenue Bonds outstanding prior to the issuance of the additional Subordinated Transportation Revenue Bonds. See "Issuance of Additional Bonds" under *Summary of Certain Provisions of the 1998 Resolution* in the Series A Official Statement.

**Book-Entry Only System**

The following information concerning DTC and DTC's book-entry system has been obtained from DTC and neither the Authority nor the Underwriters take any responsibility for the accuracy thereof.

DTC will act as securities depository for the 1998 Subordinated Bonds. The 1998 Subordinated Bonds will be issued as fully registered bonds in the name of Cede & Co. (DTC's partnership nominee). One fully registered 1998 Subordinated Bond will be issued for each maturity of each series of the 1998 Subordinated Bonds in the aggregate principal amount of such maturity and will be deposited with DTC.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds securities that its participants (the "Participants") deposit with DTC. DTC also facilitates the settlement among Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic computerized book-entry changes in Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct Participants include securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations (the "Direct Participants"). DTC is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc. and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as securities brokers and dealers, banks and trust companies that clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly (the "Indirect Participants"). The Rules applicable to DTC and its Participants are on file with the Securities and Exchange Commission.

Purchases of the 1998 Subordinated Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the 1998 Subordinated Bonds on DTC's records. The ownership interest of each actual purchaser of a 1998 Subordinated Bond (under this caption, a "Beneficial Owner") will in turn be recorded in the Direct or Indirect Participants' records. Beneficial Owners will not receive written confirmations from DTC of their purchases, but Beneficial Owners are expected to receive written confirmation providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the 1998 Subordinated Bonds will be accomplished by entries made on the books of Participants acting on behalf of the Beneficial Owners. Beneficial Owners will not receive definitive 1998 Subordinated Bonds except in the event that use of the book-entry system for the 1998 Subordinated Bonds is discontinued.

To facilitate subsequent transfers, all 1998 Subordinated Bonds deposited by Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. The deposit of 1998 Subordinated Bonds with DTC and their registration in the name of Cede & Co. effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the 1998 Subordinated Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such 1998 Subordinated Bonds are credited, which may not be the Beneficial Owners. The Participants will remain responsible for keeping account of their holdings on behalf of their customers.

14

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices will be sent to Cede & Co. If less than all of the 1998 Subordinated Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in the 1998 Subordinated Bonds to be redeemed.

Neither DTC nor Cede & Co. will consent or vote with respect to the 1998 Subordinated Bonds. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the 1998 Subordinated Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the 1998 Subordinated Bonds will be made to DTC. DTC's practice is to credit Direct Participants' accounts on the payable date in accordance with their respective holdings shown on DTC's records unless DTC has reason to believe that it will not receive payment on the payable date. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name", and will be the responsibility of such Participant and not of DTC, the Authority, or the 1998 Fiscal Agent, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to DTC is the responsibility of the Authority or the 1998 Fiscal Agent, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the 1998 Subordinated Bonds at any time by giving reasonable notice to the Authority or the 1998 Fiscal Agent. Under such circumstances, in the event that a successor securities depository is not obtained, definitive 1998 Subordinated Bonds are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, definitive 1998 Subordinated Bonds will also be printed and delivered.

**Payments and Transfers**

No assurance can be given by the Authority that DTC will make prompt transfer of payments to the Participants or that Participants will make prompt transfer of payments to Indirect Participants or to Beneficial Owners. The Authority is not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising or reviewing records maintained by DTC or Participants.

*The Authority and the 1998 Fiscal Agent will have no responsibility or obligation to such DTC Participants, Indirect Participants, or the persons for whom they act as nominees with respect to the payments to or the providing of notice for the DTC Participants, the Indirect Participants, or the Beneficial Owners. Payments made to DTC or its nominee shall satisfy the obligations of the Authority to the extent of such payments.*

For every transfer of the 1998 Subordinated Bonds, the Beneficial Owner may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

**Discontinuance of Book-Entry Only System**

In the event that such book-entry only system is discontinued for the 1998 Subordinated Bonds, the following provisions will apply to the 1998 Subordinated Bonds: principal of the 1998 Subordinated Bonds and redemption premium, if any, thereon will be payable in lawful money of the United States of America at the principal corporate trust office of the 1998 Fiscal Agent in New York, New York. Interest on the 1998 Subordinated Bonds will be payable on each January 1 and July 1, by check mailed to the respective addresses of the registered owners thereof as shown on the registration books

of the Authority maintained by the Fiscal Agent as of the close of business on the record date therefor as set forth in the 1998 Resolution. The 1998 Subordinated Bonds will be issued only as registered bonds without coupons in authorized denominations. The transfer of the 1998 Subordinated Bonds will be registrable and the 1998 Subordinated Bonds may be exchanged at the principal corporate trust office of the 1998 Fiscal Agent in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Bond Insurance**

The following information has been furnished by the Insurer for use in this Official Statement.  Reference is made to *Appendix II* for a specimen of the Policy.

The Policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the Authority to the 1998 Fiscal Agent or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment) and interest on the Insured Bonds as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the Policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner of the Insured Bonds pursuant to a final judgement by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law (a "Preference").

The Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Insured Bond.  The Policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of Insured Bonds upon tender by an owner thereof; or (iv) any Preference relating to (i) through (iii) above.  The Policy also does not insure against nonpayment of principal of or interest on the Insured Bonds resulting from the insolvency, negligence or any other act or omission of the 1998 Fiscal Agent or any other paying agent for the Insured Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the 1998 Fiscal Agent or any owner of an Insured Bond the payment of an insured amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such an Insured Bonds or presentment of such other proof of ownership of the Insured Bonds, together with any appropriate instruments of assignment to evidence the assignment of the insured amounts due on the Insured Bonds as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Insured Bonds in any legal proceeding related to payment of insured amounts on the Insured Bonds, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners or the 1998 Fiscal Agent payment of the insured amounts due on such Insured Bonds, less any amount held by the 1998 Fiscal Agent for the payment of such insured amounts and legally available therefor.

The Insurer is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company (the "Company").  The Company is not obligated to pay the debts of or claims against the Insurer.  The Insurer is domiciled in the State of New York and licensed to do business in, and subject to regulation under the laws of, all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the Virgin Islands of the United States and the Territory of Guam.  The Insurer has two European branches, one  in the Republic of France and the other in the Kingdom of Spain.  New York has laws prescribing minimum capital requirements, limiting classes and concentrations of investments and requiring the approval of policy rates and forms.  State laws also regulate the amount of both the aggregate and individual risks that may be insured, the payment of dividends by the Insurer, changes in control

16

and transactions among affiliates. Additionally, the Insurer is required to maintain contingency reserves on its liabilities in certain amounts and for certain periods of time.

Effective February 17, 1998, the Company acquired all the outstanding stock of Capital Markets Assurance Corporation ("CMAC") through a merger with its parent CapMAC Holdings Inc. Pursuant to a reinsurance agreement, CMAC has ceded all of its net insured risks (including any amounts due but unpaid from third party reinsurers), as well as its unearned premiums and contingency reserves to the Insurer. The Company is not obligated to pay the debts of or claims against CMAC.

As of December 31, 1997 the Insurer had admitted assets of $5.3 billion (audited), total liabilities of $3.5 billion (audited), and total capital and surplus of $1.8 billion (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of March 31, 1998, the Insurer had admitted assets of $5.4 billion (unaudited), total liabilities of $3.6 billion (unaudited), and total capital and surplus of $1.8 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

Copies of the Insurer's year end financial statements prepared in accordance with statutory accounting practices are available without charge from the Insurer. A copy of the Annual Report on Form 10K of the Company is available from the Insurer or the Securities and Exchange Commission. The address of the Insurer is 113 King Street, Armonk, New York 10504. The telephone number of the Insurer is (914) 273-4545.

Moody's Investors Service ("Moody's") rates the claims paying ability of the Insurer "Aaa".

Standard & Poor's Rating Services, a division of The McGraw Hill Companies, Inc. ("Standard & Poor's") rates the claims paying ability of the Insurer "AAA".

Fitch IBCA, Inc. (formerly known as Fitch Investors Service, L.P.), rates the claims paying ability of the Insurer "AAA".

Each rating of the Insurer should be evaluated independently. The ratings reflect the respective rating agency's current assessment of the creditworthiness of the Insurer and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the Insured Bonds, and such ratings may be subject to revisions or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market prices of the Insured Bonds. The Insurer does not guaranty the market price of the Insured Bonds nor does it guaranty that the ratings on the Insured Bonds will not be revised or withdrawn.

**Concerning the Policy**

As provided in Resolution 98-31, the consent of the Insurer shall be required instead of the consent of the beneficial owners of the Insured Bonds, when required, to the adoption of any resolution supplemental to the 1998 Resolution, and the Insurer shall be deemed to be the owner of the Insured Bonds instead of the beneficial owners thereof for purposes of directing remedies and making requests to the 1998 Fiscal Agent to take remedial action under the 1998 Resolution.

## RECENT DEVELOPMENTS

**The Authority**

In July 1998, the Authority signed two of the three design/build contracts for the PR-66 Project. The amounts of these contracts were within the Authority's estimates as reflected in the Priorities Construction Program described in the Series A Official Statement. In June 1998, the federal Transportation Equity Act for the 21st Century ("TEA 21") was enacted into law, reauthorizing the federal-aid highway and transit programs. In TEA 21, the Authority is authorized to receive funding for its highway programs in the amount of $110 million annually for the next seven federal fiscal years

covered by TEA 21. In addition, Tren Urbano was authorized in TEA 21, although no specific funding level has been specified. Additional funding for the Authority's transit programs in the aggregate amount of approximately $292 million was also authorized.

As authorized by the 1994 Code, the Authority has pledged the petroleum products tax receipts allocated to the Authority (not to exceed $120 million in any fiscal year) to the holders of the Transportation Revenue Bonds. See "Security for the Senior Transportation Revenue Bonds-Pledged Revenues; Subordination" under *The 1998 Subordinated Bonds*. The Commonwealth has agreed and committed in the 1994 Code not to eliminate or reduce the rates of excise tax on petroleum products in effect on July 16, 1997 (as set forth in the Series A Official Statement in "Revenues - Sources of 1998 Resolution Revenues" under *Transportation System Revenues and Expenditures*) and the amount of such taxes allocated to the Authority until all obligations of the Authority secured by the pledge thereof (including the 1998 Subordinated Bonds), together with the interest thereon, are fully paid. Effective May 31, 1998, however, the 1994 Code was amended by Act No. 78 to provide an exemption from the excise taxes on petroleum products imposed by the 1994 Code for petroleum products used in the cooking, canning or sterilization of raw materials derived from industrial fishing. This amendment was intended to reduce the costs of the tuna processing companies operating in Puerto Rico in order to make them more competitive and help retain the employment generated by this industry. In the statement of motives to Act No. 78, the Legislature of Puerto Rico concluded that since this amendment is expected to reduce the annual collection of excise taxes on petroleum products by approximately $680,000, it would not affect the petroleum products tax receipts pledged to the holders of the Transportation Revenue Bonds. Based on historical and expected collections of such excise taxes, the Authority does not expect its receipt of the $120 million annual allocation of Act No. 34 to be adversely affected by such exemption. See "Collections of Petroleum Products Tax" table on page 22 of the Series A Official Statement.

**The Commonwealth**

On June 24, 1998, legislation approving the sale of a controlling interest in the Puerto Rico Telephone Company, a subsidiary of the Puerto Rico Telephone Authority, to a consortium led by GTE International Telecommunications Incorporated was enacted. The sale is subject to certain conditions precedent to closing.

## TRANSPORTATION SYSTEM REVENUES AND EXPENDITURES

**Projected 1968 Resolution Revenues and 1998 Resolution Revenues**

The following table presents the Authority's estimates of 1968 Resolution Revenues for each of the five fiscal years ending June 30, 1998 to June 30, 2002 and its estimates of 1998 Resolution Revenues expected to be available for the payment of debt service on the Transportation Revenue Bonds, including the 1998 Subordinated Bonds, together with debt service coverage for each of the five fiscal years ending June 30, 1998 to 2002, inclusive, after taking into account the issuance of the 1998 Subordinated Bonds. The projected 1968 Resolution Revenues and 1998 Resolution Revenues shown below are based on tax rates and allocations to the Authority now in effect and debt service on Highway Revenue Bonds currently outstanding. Such projections are subject to periodic review and may be adjusted to reflect such factors as changes in economic conditions, in the demand for gasoline and other petroleum products and in the levels of automobile registration and usage. The estimates of 1998 Resolution Revenues expected to be available for the payment of debt service on Transportation Revenue Bonds assumes that the Excess 1968 Resolution Revenues will not be applied to the payment of debt service on the Authority's Special Facility Revenue Bonds issued to finance the Teodoro Moscoso Bridge. See the fifth paragraph in "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* in the Series A Official Statement. The projections are based on assumptions which the Authority believes to be reasonable; however, there is no assurance that the projections will prove to be accurate.

## PROJECTED REVENUES AND DEBT SERVICE COVERAGE

### Fiscal Year Ending June 30

| | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| | | | (dollars in thousands) | | |
| **1968 Resolution Revenues:** | | | | | |
| Gasoline taxes . . . . . . . . . . . . . . . . . | $171,900 | $177,600 | $183,100 | $188,700 | $194,300 |
| Gas oil and diesel oil taxes . . . . . . . . | 17,200 | 17,300 | 18,400 | 20,300 | 22,400 |
| Subtotal . . . . . . . . . . . . . . . . . | **$189,100** | **$194,900** | **$201,500** | **$209,000** | **$216,700** |
| Motor vehicle license fees . . . . . . . . | 27,600 | 28,100 | 29,000 | 29,800 | 30,600 |
| Subtotal . . . . . . . . . . . . . . . . . | **$216,700** | **$223,000** | **$230,500** | **$238,800** | **$247,300** |
| Toll receipts . . . . . . . . . . . . . . . . . . | 105,500 | 112,700 | 118,900 | 125,400 | 132,300 |
| Investment income . . . . . . . . . . . . . . | 14,940 | 15,400 | 15,600 | 15,800 | 15,900 |
| **Total 1968 Resolution Revenues** | **$337,140** | **$351,100** | **$365,000** | **$380,000** | **$395,500** |
| Debt Service on Highway Revenue Bonds . | $183,433 | $180,787 | $181,988 | $181,727 | $181,359 |
| Excess 1968 Resolution Revenues . . . . . . . . | **$153,707** | **$170,313** | **$183,012** | **$198,273** | **$214,141** |
| **1998 Resolution Revenues:** | | | | | |
| Petroleum Products Tax . . . . . . . . . . | $108,860 | $120,000 | $120,000 | $120,000 | $120,000 |
| PR-66 Toll Receipts[1] . . . . . . . . . . . . | - | - | - | 14,000 | 17,000 |
| Excess 1968 Resolution Revenues . . | 153,707 | 170,313 | 183,012 | 198,273 | 214,141 |
| Investment Income . . . . . . . . . . . . . . | 900 | 3,660 | 4,800 | 6,100 | 6,100 |
| **Total 1998 Resolution Revenues** | **$263,467** | **$293,973** | **$307,812** | **$338,373** | **$357,241** |
| Debt service on the Senior Transportation Revenue Bonds[2] . . . . . . . . . . . . . . . . . . | $19,087 | $64,832 | $76,500 | $105,125 | $105,127 |
| Coverage ratio[3] . . . . . . . . . . . . . . . . . . . . . . | 13.80 | 4.53 | 4.02 | 3.22 | 3.40 |
| Additional bonds test, Senior Transportation Revenue Bonds [4] | 4.06 | 4.53 | 2.93 | 3.22 | 3.40 |
| **Total 1998 Resolution Revenues available to pay Subordinated Transportation Revenue Bonds**[5] | **$244,380** | **$229,141** | **$231,312** | **$233,248** | **$252,114** |
| Debt Service on the Subordinated Transportation Revenue Bonds[6] . . . . . . . . | | $3,426 | $3,795 | $3,795 | $3,795 |
| Coverage Ratio[7] . . . . . . . . . . . . . . . . . . . . . | | 66.88 | 60.95 | 61.46 | 66.43 |
| Additional bonds test, Subordinated Transportation Revenue Bonds[8] . . . . . . . | | 4.16 | 2.77 | 3.05 | 3.22 |
| Aggregate Revenues[9] . . . . . . . . . . . . . . . . . | $446,900 | $474,760 | $489,800 | $520,100 | $538,600 |
| Aggregate Debt Service[10] . . . . . . . . . . . . . . | $202,520 | $249,045 | $262,283 | $290,647 | $290,281 |
| Aggregate Coverage Ratio[11] . . . . . . . . . . . | 2.21 | 1.91 | 1.87 | 1.79 | 1.86 |

[1]   Projected PR-66 toll receipts for each of the fiscal years in question were estimated by Steer Davies Gleave, Traffic Consultants, in their report dated December 1995, updated in December 1997.
[2]   Reflects the issuance of the 1998 Senior Bonds and assumes the issuance of additional Transportation Revenue Bonds in 2000 in the principal amount of $490 million at an average interest rate of 7% per annum with a 30-year final maturity.
[3]   Equals ratio of Total 1998 Resolution Revenues to debt service on the Senior Transportation Revenue Bonds in the fiscal year in question.
[4]   This test uses as its denominator maximum annual debt service on all Senior Transportation Revenue Bonds outstanding under the 1998 Resolution (including the Senior Transportation Revenue Bonds then proposed to be issued) and as its numerator the 1998 Resolution Revenues of the Authority for the fiscal year in question.
[5]   Represents Total 1998 Resolution Revenues less Debt Service on Senior Transportation Revenue Bonds.
[6]   Reflects issuance of 1998 Subordinated Bonds.
[7]   Equals ratio of Total 1998 Resolution Revenues available to pay Subordinated Transportation Revenue Bonds to debt service on the Subordinated Transportation Revenue Bonds in the fiscal year in question.
[8]   This test uses as its denominator maximum annual debt service on all Transportation Revenue Bonds outstanding under the 1998 Resolution (including the Subordinated Transportation Revenue Bonds then proposed to be issued) and as its numerator the Total 1998 Resolution Revenues of the Authority for the fiscal year in question.
[9]   Represents the sum of Total 1968 Resolution Revenues and Total 1998 Resolution Revenues (less Excess 1968 Resolution Revenues) for the fiscal year in question.
[10]   Represents the sum of Highway Revenue Bonds debt service and Transportation Revenue Bonds debt service for the fiscal year in question.
[11]   Aggregate Revenues divided by Aggregate Debt Service.

Total 1968 Resolution Revenues and 1998 Resolution Revenues for the period from fiscal 1998 through fiscal 2002 are projected by the Authority to grow at a compound annual rate of 4.1% and 7.8%, respectively. The projected growth in gasoline tax revenues is based on econometric models prepared for the Authority which project increases in disposable income in Puerto Rico. The Authority has found such projections to be the most reliable indicator of future growth in

gasoline tax receipts. The Authority's projections of growth in its other revenues is based on historic trends and, in the case of toll revenues, on the additional receipts expected from the growth in traffic and the opening of new toll plazas.

In 1993 the Authority projected that total 1968 Resolution Revenues would grow during the period from fiscal 1993 through fiscal 1997 at a compound annual rate of 4.3%. The actual compound growth rate for those years was 8.2%.

## DEBT

### Authority Debt

The outstanding debt of the Authority as of July 2, 1998 and as adjusted for the issuance of the 1998 Subordinated Bonds is as follows:

|  | As of July 2, 1998 | As Adjusted |
|---|---|---|
|  | (in thousands) | |
| Highway Revenue Bonds[1] | $ 2,272,365 | $ 2,272,365 |
| Senior Transportation Revenue Bonds | 1,129,644 | 1,129,644 |
| Subordinated Transportation Revenue Bonds | 0 | 75,050 |
| **Total** | **$ 3,402,009** | **$ 3,477,059** |

---

[1]     Includes $4,510,000 Highway Revenue Bonds sold to the Farmers Home Administration, of which $3,510,000 is currently outstanding. Does not include the Special Facility Bonds issued by the Authority in April 1992 to finance the Teodoro Moscoso Bridge. See "Teodoro Moscoso Bridge" under *Highway System Revenues and Expenditures* in the Series A Official Statement.

### Principal and Interest Requirements

The Principal and Interest Requirements for the outstanding Highway Revenue Bonds and Transportation Revenue Bonds and the 1998 Subordinated Bonds as of the date hereof are set forth in the following table:

**Principal and Interest Requirements***

| Year Ending June 30 | Outstanding Highway Revenue Bonds and Transportation Revenue Bonds[1] Debt Service | 1998 Subordinated Bonds | | | Total Debt Service |
|---|---|---|---|---|---|
| | | Principal | Interest | Total | |
| 1999 | $ 245,618,783 | | $3,426,019[2] | $3,426,019 | $249,044,802 |
| 2000 | 246,821,283 | | 3,794,975 | 3,794,975 | 250,616,258 |
| 2001 | 246,558,983 | | 3,794,975 | 3,794,975 | 250,353,958 |
| 2002 | 246,192,903 | | 3,794,975 | 3,794,975 | 249,987,878 |
| 2003 | 223,307,553 | | 3,794,975 | 3,794,975 | 227,102,528 |
| 2004 | 233,660,748 | | 3,794,975 | 3,794,975 | 237,455,723 |
| 2005 | 233,700,763 | | 3,794,975 | 3,794,975 | 237,495,738 |
| 2006 | 221,767,773 | | 3,794,975 | 3,794,975 | 225,562,748 |
| 2007 | 221,740,173 | | 3,794,975 | 3,794,975 | 225,535,148 |
| 2008 | 221,743,413 | $2,070,000 | 3,794,975 | 5,864,975 | 227,608,388 |
| 2009 | 221,730,713 | 2,180,000 | 3,686,300 | 5,866,300 | 227,597,013 |
| 2010 | 221,781,863 | 2,295,000 | 3,571,850 | 5,866,850 | 227,648,713 |
| 2011 | 221,627,363 | 2,415,000 | 3,451,363 | 5,866,363 | 227,493,726 |
| 2012 | 221,638,763 | 2,540,000 | 3,324,575 | 5,864,575 | 227,503,338 |
| 2013 | 221,638,063 | 2,675,000 | 3,191,225 | 5,866,225 | 227,504,288 |
| 2014 | 221,640,688 | 2,815,000 | 3,050,788 | 5,865,788 | 227,506,476 |
| 2015 | 221,639,538 | 2,965,000 | 2,903,000 | 5,868,000 | 227,507,538 |
| 2016 | 221,646,338 | 3,110,000 | 2,754,750 | 5,864,750 | 227,511,088 |
| 2017 | 221,639,138 | 3,265,000 | 2,599,250 | 5,864,250 | 227,503,388 |
| 2018 | 218,024,738 | 3,430,000 | 2,436,000 | 5,866,000 | 223,890,738 |
| 2019 | 209,805,838 | 3,600,000 | 2,264,500 | 5,864,500 | 215,670,338 |
| 2020 | 209,787,346 | 3,780,000 | 2,084,500 | 5,864,500 | 215,651,846 |
| 2021 | 187,456,424 | 3,970,000 | 1,895,500 | 5,865,500 | 193,321,924 |
| 2022 | 167,433,393 | 4,170,000 | 1,697,000 | 5,867,000 | 173,300,393 |
| 2023 | 120,197,188 | 4,380,000 | 1,488,500 | 5,868,500 | 126,065,688 |
| 2024 | 120,195,860 | 4,595,000 | 1,269,500 | 5,864,500 | 126,060,360 |
| 2025 | 120,193,803 | 4,825,000 | 1,039,750 | 5,864,750 | 126,058,553 |
| 2026 | 120,198,255 | 5,065,000 | 798,500 | 5,863,500 | 126,061,755 |
| 2027 | 120,195,695 | 5,320,000 | 545,250 | 5,865,250 | 126,060,945 |
| 2028 | 120,197,299 | 5,585,000 | 279,250 | 5,864,250 | 126,061,549 |
| 2029 | 120,193,718 | | | | 120,193,718 |
| 2030 | 120,194,805 | | | | 120,194,805 |
| 2031 | 120,199,138 | | | | 120,199,138 |
| 2032 | 120,196,538 | | | | 120,196,538 |
| 2033 | 120,196,868 | | | | 120,196,868 |
| 2034 | 120,193,913 | | | | 120,193,913 |
| 2035 | 120,201,318 | | | | 120,201,318 |
| 2036 | 120,196,375 | | | | 120,196,375 |
| 2037 | 64,831,900 | | | | 64,831,900 |
| 2038 | 64,833,575 | | | | 64,833,575 |

---

*Debt service totals may not add up due to rounding.
[1] Includes $4,510,000 Highway Revenue Bonds sold to the Farmers Home Administration, of which $3,510,000 is currently outstanding, which mature in the year 2020. Does not include the Special Facility Bonds issued by the Authority in April 1992 to finance the Teodoro Moscoso Bridge. See "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* in the Series A Official Statement. The interest on certain variable rate Highway Revenue Bonds (Series W), issued in August 1993 has been calculated on the basis of the fixed interest rate payable by the Authority under a related interest rate swap agreement as permitted by the 1968 Resolution. The interest on certain variable rate Transportation Revenue Bonds (Series A) has been calculated on the basis of the fixed interest rate payable by the Authority under a related interest rate swap agreement as permitted by the 1998 Resolution.
[2] Net of accrued interest.

Upon the issuance of the 1998 Subordinated Bonds, the remaining average life of the Highway Revenue Bonds and the Transportation Revenue Bonds will be approximately 21.2 years.

## SUPPLEMENTAL RESOLUTION

On July 23, 1998, the Authority, without bondholder consent, adopted a resolution supplemental to the 1998 Resolution to clarify that the term Reserve Account Letter of Credit includes any agreement between the 1998 Fiscal Agent and a financial institution serving as the depository institution of any Commonwealth state infrastructure bank (or other similar fund) created by virtue of Section 350 of the National Highway System Designation Act of 1995, as amended, or any similar federal legislation. See "Security for the Subordinated Transportation Revenue Bonds - 1998 Subordinated Bond Reserve Fund" under *The 1998 Subordinated Bonds*.

## TAX EXEMPTION

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the Authority must continue to meet after the issuance of the 1998 Subordinated Bonds in order that interest on the 1998 Subordinated Bonds not be included in gross income for federal income tax purposes. The Authority's failure to meet these requirements may cause interest on the 1998 Subordinated Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance. The Authority has covenanted to comply to the extent permitted by the Constitution and the laws of Puerto Rico with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the 1998 Subordinated Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of Puerto Rico which would prevent the Authority from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Authority with the tax covenant referred to above, under existing statutes, regulations, rulings and court decisions, interest on the 1998 Subordinated Bonds is not includable in gross income for federal income tax purposes. Interest on the 1998 Subordinated Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the 1998 Subordinated Bonds will be includable in the computation of the alternative minimum tax on corporations imposed by the Code. Bond Counsel is further of the opinion that the 1998 Subordinated Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the 1998 Subordinated Bonds should consult their tax advisors as to applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the 1998 Subordinated Bonds will not have an adverse effect on the economic value of tax exemption or the market prices of the 1998 Subordinated Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market prices of the 1998 Subordinated Bonds.

### Discount Bonds

The excess, if any, of the amount payable at maturity of 1998 Subordinated Bonds maturing July 1 of the years 2018, 2022 and 2028 over the corresponding initial public offering price to the public (excluding bond houses, brokers or similar persons acting in the capacity of underwriters or wholesalers) at which price a substantial amount of each such maturity is sold constitutes original issue discount. The amount of original issue discount accrues in accordance with a

constant yield method based on the compounding of interest. Original issue discount accruing pursuant to the constant yield method described above will not be includable in gross income to the same extent as interest on the 1998 Subordinated Bonds for federal income tax purposes. A portion of the original issue discount that accrues in each year to an owner of the 1998 Subordinated Bonds with original issue discount (the "Discount Bonds") that is a corporation will, however, be included in the calculation of the corporation's federal alternative minimum tax liability. In addition, original issue discount that accrues in each year to an owner of a Discount Bond is included in the calculation of the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences discussed above. Consequently, owners of any Discount Bond should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral federal income tax consequences although the owners of such Discount Bond have not received cash attributable to such original issue discount in such year.

A purchaser in the initial offering who acquires a Discount Bond at an issue price equal to the initial offering price thereof as set forth or derived from information set forth on the inside cover page hereof will be treated as receiving an amount of interest not includable in gross income for federal income tax purposes equal to the original issue discount accruing during the period he holds such Discount Bond and will increase his adjusted basis in such Discount Bond by the amount of such accruing discount for purposes of determining taxable gain or loss on the redemption, sale or other disposition of such Discount Bond for federal income tax purposes. The accrual of original issue discount and its effect on redemption, sale or other disposition of a Discount Bond that is not purchased in the initial offering at its initial offering price may be determined according to rules that differ from those described above.

Owners of Discount Bonds should consult their tax advisors with respect to the determination for federal income tax purposes of the amount of original issue discount or interest properly accruable with respect to such Discount Bonds and with respect to Commonwealth, state and local income tax consequences of owning and disposing of Discount Bonds.

**Premium Bonds**

The difference between the amount payable at maturity of any 1998 Subordinated Bonds maturing July 1 of the years 2008 through 2014, and the tax basis of such 1998 Subordinated Bonds to a purchaser (other than a purchaser who holds such 1998 Subordinated Bonds as inventory, stock in trade or for sale to customers in the ordinary course of business) who purchases any such 1998 Subordinated Bonds at its initial offering price is "bond premium." Bond premium is amortized over the term of such 1998 Subordinated Bonds for federal income tax purposes. Owners of such 1998 Subordinated Bonds are required to decrease their adjusted bases in such 1998 Subordinated Bonds by the amount of amortizable bond premium attributable to each taxable year such 1998 Subordinated Bonds are held. The amortizable bond premium on such 1998 Subordinated Bonds attributable to a taxable year is not deductible for federal income tax purposes. Owners of such 1998 Subordinated Bonds should consult their tax advisors with respect to the precise determination for federal income tax purposes of the treatment of bond premium upon redemption, sale or other disposition of such 1998 Subordinated Bonds and with respect to the Commonwealth, state and local income tax consequences of owning and disposing of such 1998 Subordinated Bonds.

# UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the 1998 Subordinated Bonds from the Authority at an aggregate discount of $528,357 from the initial offering prices of the 1998 Subordinated Bonds set forth or derived from information set forth on the inside cover page hereof. The obligations of the Underwriters are subject to certain conditions precedent, and they will be obligated to purchase all the 1998 Subordinated Bonds if any 1998 Subordinated Bonds are purchased. The 1998 Subordinated Bonds may be offered and sold to certain dealers (including dealers depositing 1998 Subordinated Bonds into investment trusts) and institutional purchasers at prices lower than such public offering prices and such offering prices may be changed, from time to time, by the Underwriters.

Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), a managing underwriter, has entered into a written agreement with Santander Securities Corporation of Puerto Rico ("Santander Securities"), a subsidiary of Banco Santander, S.A., pursuant to which Santander Securities has agreed to cooperate in connection with Merrill Lynch's

provision of underwriting and investment banking services to the Authority with respect to the 1998 Subordinated Bonds. Pursuant to these arrangements, the existence of which has been disclosed to the Authority and Government Development Bank, Santander Securities will be entitled to receive a portion of Merrill Lynch's actual net profits, if any, in connection with the underwriting of the 1998 Subordinated Bonds.

Morgan Stanley & Co. Incorporated ("Morgan Stanley"), a managing underwriter, has entered into a written agreement with Popular Securities, Inc. ("Popular Securities"), a subsidiary of Popular Inc., pursuant to which Popular Securities has agreed to cooperate in connection with Morgan Stanley's provision of underwriting and investment banking services to the Authority with respect to the 1998 Subordinated Bonds. Pursuant to these arrangements, the existence of which has been disclosed to the Authority and Government Development Bank, Popular Securities will be entitled to receive a portion of Morgan Stanley's actual net profits, if any, in connection with the underwriting of the 1998 Subordinated Bonds.

## LITIGATION

There is no pending litigation of any nature restraining or enjoining or seeking to restrain or enjoin the issuance, sale or delivery of the 1998 Subordinated Bonds or in any way contesting or affecting the validity of the 1998 Subordinated Bonds, the resolutions or the proceedings of the Authority taken with respect to the authorization, issuance or sale thereof, or the pledge or application of any moneys under the 1998 Resolution or the existence or powers of the Authority.

## LEGAL MATTERS

The form of opinion of Brown & Wood LLP, New York, New York, Bond Counsel, is set forth in *Appendix I* to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez, San Juan, Puerto Rico. Certain legal matters relating to the SIB Trust Fund will be passed upon for the Authority by Palmer & Dodge LLP, Boston, Massachusetts.

## LEGAL INVESTMENT

The 1998 Subordinated Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico, as required by law.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the 1998 Subordinated Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the 1998 Subordinated Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

Moody's and Standard & Poor's have given the 1998 Subordinated Bonds ratings of Baa1 and A-, respectively. These ratings do not reflect the Policy. Moody's and Standard & Poor's have given the Insured Bonds ratings of Aaa and AAA, respectively. The ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency.

Such rating agencies were provided with materials relating to the Authority, the Commonwealth and the 1998 Subordinated Bonds and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the 1998 Subordinated Bonds.

There can be no assurance that such ratings will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies, if in the judgment of either or both, circumstances so warrant. Any such downward revision or withdrawal of such ratings, or either of them, may have an adverse effect on the market prices of the 1998 Subordinated Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Commonwealth (acting through the Secretary of the Treasury of Puerto Rico) and the Authority, as specifically stated hereinbelow, will agree to the following:

1. Each of the Authority and the Commonwealth will agree to file within 305 days after the end of each fiscal year beginning with its fiscal year ending on June 30, 1998, with each NRMSIR and with any Commonwealth state information depository ("SID"), core financial information and operating data for the prior fiscal year, including (i) its audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Authority and the Commonwealth, as the case may be, and information as to revenues, expenditures, financial operations and indebtedness of the Authority and the Commonwealth, as the case may be, generally found or incorporated by reference in this Official Statement; and

2. The Authority will agree to file, in a timely manner, with each NRMSIR or with the MSRB and with any SID, notice of any failure to comply with paragraph 1 above and of the occurrence of any of the following events with respect to the 1998 Subordinated Bonds if, in the judgment of the Authority or its agent, such event is material:

    a. principal and interest payment delinquencies;
    b. non-payment related defaults;
    c. unscheduled draws on debt service reserves reflecting financial difficulties;
    d. unscheduled draws on credit enhancements reflecting financial difficulties;
    e. substitution of credit or liquidity providers, or their failure to perform;
    f. adverse opinions or events affecting the tax-exempt status of the 1998 Subordinated Bonds;
    g. modifications to rights of the holders (including Beneficial Owners) of the 1998 Subordinated Bonds;
    h. bond calls;
    i. defeasances;
    j. release, substitution, or sale of property securing repayment of the Series 1998 Subordinated Bonds; and
    k. rating changes.

With respect to the following events:

Events (d) and (e). The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the 1998 Subordinated Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (f). For information on the tax status of the 1998 Subordinated Bonds, see *Tax Exemption*.

Event (h). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "Description of the 1998 Subordinated Bonds -- Redemption Provisions -- Mandatory Redemption" under *The 1998 Subordinated Bonds*, (ii) the only open issue is which 1998 Subordinated Bonds will be redeemed in the case of a partial redemption,

(iii) notice of redemption is given to the Bondholders as required under the terms of the 1998 Subordinated Bonds and the 1998 Resolution, and (iv) public notice of redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of 1998 Subordinated Bonds.

The Commonwealth expects to provide the information described in clause (1) above by delivering its first bond official statement that includes its financial statements for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by delivering its Comprehensive Annual Financial Report by such deadline and a supplemental report containing other information to the extent necessary to provide the information described in paragraph 1 by such deadline.

As of July 23, 1998, there is no Commonwealth SID, and the nationally recognized municipal securities information repositories are: Bloomberg Municipal Repository, P.O. Box 840, Princeton, New Jersey 08542-0840; Kenny Information Systems, Inc., Attn: Kenny Repository Service, 65 Broadway, New York, New York 10006; Thomson NRMSIR, 395 Hudson Street, New York, New York 10004, Attn: Municipal Disclosure; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other events are material with respect to the 1998 Subordinated Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event, except those events listed above.

The Commonwealth and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the 1998 Subordinated Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of their respective undertakings shall be limited to a right to obtain specific enforcement of the Authority's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such beneficial owner shall have filed with the Authority and the Commonwealth written notice of any request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan for the equal benefit of all beneficial owners of the outstanding 1998 Subordinated Bonds benefitted by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Sections 2 and 2A of Act No. 104, approved June 29, 1955, as amended (32 L.P.R.A. §3077 and §3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the 1998 Subordinated Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by parties unaffiliated with the Authority or the Commonwealth; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

The Authority and the Commonwealth have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

These Covenants have been made in order to assist the Underwriters in complying with the Rule.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the 1968 Resolution, 1998 Resolution, the various acts and the 1998 Subordinated Bonds are made subject to all the detailed provisions thereof, to which reference is hereby made for further information, and do not purport to be complete statements of any or all of such provisions.

There are appended to this Official Statement the proposed form of opinion of Bond Counsel *(Appendix I)* and a specimen of the Policy *(Appendix II)*.

The financial statements of the Authority included in *Appendix II* of the Series A Official Statement and the Commonwealth Financial Statements have been audited by  Ernst & Young LLP and Deloitte & Touche LLP, San Juan, Puerto Rico, respectively, as set forth in their respective reports therein. The information set forth in the Commonwealth Report was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively. The information pertaining to DTC was supplied by DTC.  The information in "Bond Insurance" under *The 1998 Subordinated Bonds* and *Appendix II* was supplied by the Insurer.  The remaining information set forth or incorporated by reference in this Official Statement, except the information appearing in *Underwriting* and in *Appendix III* of the Series A Official Statement, was supplied by the Executive Director of the Authority in his official capacity as such Executive Director and is included in this Official Statement on his authority.

This Official Statement will be filed with each NRMSIR and with the MSRB.

PUERTO RICO HIGHWAY AND
TRANSPORTATION AUTHORITY


By: _____/s/ Sergio González_____
*Executive Director*

27

[This page intentionally left blank]

**B R O W N  &  W O O D  LLP**

ONE WORLD TRADE CENTER
NEW YORK, N.Y. 10048-0557

TELEPHONE: 212-839-5300
FACSIMILE: 212-839-5599

**Appendix I**

August ___, 1998

Hon. Dr. Carlos I. Pesquera Morales
Secretary of Transportation and Public Works
San Juan, Puerto Rico

Dear Sir:

We have examined (a) Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended ("Act No. 74"), creating Puerto Rico Highways and Transportation Authority (hereinafter sometimes called the "Authority"), as a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico, (b) the Puerto Rico Internal Revenue Code of 1994 (Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended in particular by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended), which allocated (1) the proceeds of the sixteen cents per gallon tax imposed on gasoline and four cents of the eight cents per gallon tax on gas oil and diesel oil (the "Allocated Gasoline Tax Proceeds") and (2) the proceeds (up to $120 million per fiscal year) of the tax imposed on crude oil, unfinished oil and derivative products (the "Allocated Crude Oil Tax Proceeds") to the Authority for use for its corporate purposes, (c) the Vehicle and Traffic Law of Puerto Rico (Act No. 141 of the Legislature of Puerto Rico, approved July 20, 1960, as amended), which allocated the proceeds of the fifteen dollar increase in the motor vehicle license fees for public and private service automobiles imposed by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 (the "Allocated Additional License Fees"), to the Authority for use for its corporate purposes and (d)  Reorganization Plan No. 6 of 1971 (Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968), which attached the Authority to the Department of Transportation and Public Works.

We have also examined certified copies of the proceedings of the Authority, including (I) Resolution No. 68-18, adopted on June 13, 1968, as amended by Resolution No. 72-08, adopted on February 17, 1972, Resolution No. 90-42, adopted on October 29, 1990, Resolution No. 92-42, adopted on June 23, 1992, Resolution No. 93-25, adopted on July 15, 1993 (effective September 8, 1993), and Resolution No. 93-30, adopted on August 10, 1993 (collectively, the "1968 Resolution"), with respect to the Highway Revenue Bonds (hereinafter mentioned), and (II) Resolution No. 98-06, adopted on February 26, 1998, as amended by Resolution No. 98 - 30, adopted on July 23, 1998 (said Resolution No. 98-06, as the same may be amended as therein permitted, being herein called the

415116/3

I-1

LOS ANGELES • SAN FRANCISCO • WASHINGTON • BEIJING • TOKYO REPRESENTATIVE OFFICE
AFFILIATED WITH BROWN & WOOD, A MULTINATIONAL PARTNERSHIP WITH OFFICES IN LONDON AND HONG KONG

"1998 Resolution"), together with a resolution adopted on July 23, 1998, with respect to the Series 1998 Bonds described below (the "authorizing resolution") and other proofs submitted relative to the authorization, sale and issuance of

**$75,050,000**

## PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY SUBORDINATED TRANSPORTATION REVENUE BONDS (SERIES 1998) (PUERTO RICO STATE INFRASTRUCTURE BANK)

### Dated: July 15, 1998.

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, and subject to redemption prior to maturity, all as set forth in the authorizing resolution.

We have also examined one of said Series 1998 Bonds as executed and authenticated.

From such examination we are of the opinion that:

1. Act No. 74, the Puerto Rico Internal Revenue Code of 1994, the Vehicle and Traffic Law of Puerto Rico and Reorganization Plan No. 6 of 1971 are valid.

2. Said proceedings have been validly and legally taken.

3. Said Series 1998 Bonds have been duly authorized and issued to pay the cost of constructing highways and other transportation facilities.

4. The Authority has heretofore issued various series of Highway Revenue Bonds under and in compliance with the provisions of the 1968 Resolution. The 1968 Resolution provides for the issuance of additional Highway Revenue Bonds under the conditions and limitations therein set forth, and the Authority has covenanted in the 1998 Resolution to limit the issuance of such additional Highway Revenue Bonds.

5. The 1998 Resolution provides for the issuance of additional bonds on a parity with said Series 1998 Bonds under the conditions, limitations and restrictions therein set forth (said Series 1998 Bonds and such additional parity bonds being herein called the "Subordinated Transportation Revenue Bonds") for the purpose of paying the cost of certain limited highway and other transportation projects and for refunding any outstanding Subordinated Transportation Revenue Bonds. In addition, the 1998 Resolution provides for the issuance of bonds superior to the Subordinated Transportation Revenue Bonds as to their claim on the revenues and other moneys of the Authority, as described below (said bonds being herein called the "Senior Transportation Revenue Bonds") under the conditions, limitations and restrictions set forth therein for any lawful purpose of the Authority and for the purpose of refunding any bonds issued by the Authority under the 1998 Resolution and any other obligations of the Authority, including outstanding Highway Revenue Bonds and outstanding Subordinated Transportation Revenue Bonds (the Subordinated Transportation Revenue Bonds and such Senior Transportation Revenue Bonds being herein collectively called the "Transportation Revenue Bonds").

I-2

6.     The 1998 Resolution provides for the creation of a special fund designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Fund" (the "Revenue Fund"), and, subject to the limitations of the next two paragraphs, for the deposit to the credit of said special fund of all moneys received by the Authority (a) from the Allocated Crude Oil Tax Proceeds, (b) from the Allocated Gasoline Tax Proceeds, (c) from the Allocated Additional License Fees, (d) from any tolls or other charges imposed by the Authority for the use of any Toll Facilities (other than Existing Toll Facilities Revenues received by the Authority prior to the repeal and cancellation of the 1968 Resolution) (as such terms are defined in the 1998 Resolution) and (e) from the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority and expressly authorizes the Authority to pledge to the payment of the principal of and interest on bonds or other obligations issued by the Authority and which are pledged by the Authority to the payment of the principal of and interest on Transportation Revenue Bonds issued under the provisions of the 1998 Resolution.

The Allocated Gasoline Tax Proceeds, the Allocated Crude Oil Tax Proceeds and the Allocated Additional License Fees, and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority, are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of, and to the extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose.

The 1968 Resolution provides for the prior deposit to the credit of a special fund designated "Puerto Rico Highways and Transportation Authority Construction Fund" (herein called the "1968 Construction Fund") of the Allocated Gasoline Tax Revenues, the Allocated Additional License Fees and all Existing Toll Facilities Revenues, after the required deposits of such moneys have been made to the credit of the Puerto Rico Highways and Transportation Authority Highway Revenue Bonds Interest and Sinking Fund. In the 1998 Resolution, the Authority has covenanted (i) monthly to withdraw from the 1968 Construction Fund and deposit to the credit of the Revenue Fund until the outstanding Highway Revenue Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, all unencumbered moneys held to the credit of the 1968 Construction Fund and (ii) except for the foregoing withdrawal and any encumbrances on the moneys in the 1968 Construction Fund existing on the date of adoption of and as provided in the 1998 Resolution, not further to encumber or otherwise withdraw or pledge any such available moneys in the 1968 Construction Fund.

7.     Said Series 1998 Bonds are valid and binding special obligations of the Authority payable solely from the special fund created by the 1998 Resolution and designated "Puerto Rico Highways and Transportation Authority Subordinated Transportation Revenue Bonds Interest and Sinking Fund". Said Subordinated Transportation Revenue Bonds Interest and Sinking Fund is pledged to and charged with the payment of the principal of and the interest on all Subordinated Transportation Revenue Bonds (including said Series 1998 Bonds) issued by the Authority under the provisions of the 1998 Resolution.

8.     The Authority has covenanted to deposit to the credit of said Subordinated Transportation Revenue Bonds Interest and Sinking Fund a sufficient amount of the moneys held to the credit of the Revenue Fund, together with any other funds of the Commonwealth of Puerto Rico allocated to the Authority and available under the 1998 Resolution for the payment of principal of and interest on the Transportation Revenue Bonds, to pay the principal of and interest on all Subordinated Transportation Revenue Bonds (including said Series 1998 Bonds) issued under the

provisions of the 1998 Resolution as the same may become due and payable and to create and maintain a reserve therefor, subject, however, to the prior deposit of such moneys and other allocated funds to a special fund created by the 1998 Resolution and designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund," which fund is pledged to and charged with the payment of the principal of and premium, if any, and interest on the Senior Transportation Revenue Bonds and the maintaining of a reserve therefor.

9.     Said Series 1998 Bonds do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and said Series 1998 Bonds are payable only out of the revenues and other moneys of or allocated to the Authority, to the extent provided in the 1998 Resolution.

10.     Under the provisions of the Acts of Congress now in force and under existing regulations and judicial decisions, (i) subject to continuing compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), and the 1998 Resolution regarding the use, expenditure and investment of Series 1998 Bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on said Series 1998 Bonds is not includable in gross income for federal income tax purposes, and (ii) said Series 1998 Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on said Series 1998 Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of said Series 1998 Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

The Authority has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on said Series 1998 Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the said Series 1998 Bonds. We are not aware of any provisions of the Constitution and laws of the Commonwealth of Puerto Rico which would prevent such compliance.

Respectfully submitted,


[To be signed by "Brown & Wood LLP"]

I-4

# MBIA

## FINANCIAL GUARANTY INSURANCE POLICY

### MBIA Insurance Corporation
### Armonk, New York 10504

**Appendix II**

Policy No. [NUMBER]

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to [PAYING AGENT/TRUSTEE] or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

[PAR]
[LEGAL NAME OF ISSUE]

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank and Trust Company, N.A. shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this                day of

COUNTERSIGNED:

**MBIA Insurance Corporation**

_____

_____
Resident Licensed Agent

President

_____

_____
City, State

Attest: _____
Assistant Secretary

SPECIMEN

STD-RCS-6
4/95

[This page intentionally left blank]