```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF PUERTO RICO
 2   ------------------------------x     AMENDED
     IN RE: THE FINANCIAL OVERSIGHT      PROMESA
 3   & MANAGEMENT BOARD FOR PUERTO
     RICO,                               TITLE III
 4
          as representative of
 5                                       No. 17 BK 3283 (LTS)
     THE COMMONWEALTH OF PUERTO RICO,    (Jointly Administered)
 6   et al.,

 7                    Debtors.
     ------------------------------x
 8   UNIÓN DE TRABAJADORES DE LA INDUSTRIA
     ELÉCTRICA Y RIEGO (UTIER),
 9

10                    Plaintiff,         Adv. Proc. No. 17-228 (LTS)
               v.                        Filed in Case No.
11                                       17 BK 4780 (LTS)
     PUERTO RICO ELECTRIC POWER AUTHORITY;
12   THE FINANCIAL OVERSIGHT AND MANAGEMENT
     BOARD FOR PUERTO RICO; JOSÉ B. CARRIÓN III;
13   ANDREW G. BIGGS; CARLOS M. GARCÍA; ARTHUR J.
     GONZÁLEZ; JOSÉ R. GONZÁLEZ; ANA J. MATOSANTOS;
14   DAVID A. SKEEL, JR. and JOHN DOES 1-7,

15                    Defendants.
     ------------------------------x
16                                       Motion Hearing
                                         January 10, 2018
17                                       10:00 a.m.

18   Before:

19                    HON. LAURA TAYLOR SWAIN,

20                                       District Judge

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1

 2                                APPEARANCES

 3

     PROSKAUER ROSE LLP
 4   BY:  MARK D. HARRIS
          MARTIN J. BIENENSTOCK
 5              -AND-
     MUNGER, TOLLES & OLSON LLP
 6   BY:  DONALD B. VERRILLI, JR.
          CHAD I. GOLDER
 7        GINGER D. ANDERS
          Attorneys for The Financial Oversight and Management Board
 8   for Puerto Rico and its related Title III debtors

 9   JENNER & BLOCK LLP
          Attorneys for The Official Committee of Retired Employees
10   BY:  LINDSAY C. HARRISON

11   GIBSON, DUNN & CRUTCHER LLP
          Attorneys for Aurelius
12   BY:  THEODORE B. OLSON
          MATTHEW D. McGILL
13

14   ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
          Attorneys for GO Bondholders
     BY:  MARK T. STANCIL
15        DONALD BURKE

16   ROLANDO EMMANUELLI JIMINEZ
          Attorney for UTIER
17

18   O'MELVENY & MYERS LLP
          Attorneys for AAFAF
     BY:  WALTER DELLINGER
19        WILLIAM J. SUSHON

20   U.S. DEPARTMENT OF JUSTICE CIVIL DIVISION, TORTS BRANCH
          Attorneys for USA
21   BY:  THOMAS G. WARD
          JEAN LIN
22        CESAR A. LOPEZ-MORALES
          MATTHEW J. TROY
23   PAUL HASTINGS LLP
          Attorneys for Creditors' Committee
24   BY:  NEAL D. MOLLEN
          LUC A. DESPINS
25
```

                          APPEARANCES (Cont'd)


COOPER & KIRK
      Attorneys for COFINA Seniors
BY:   CHARLES J. COOPER
      JOHN D. OHLENDORF

MATTHEW STARK BLUMIN
      Attorney for Associate General Counsel AFSCME

1          (Case called)

2          THE COURT:  Again, good morning and welcome to counsel

3     parties in interest members of the public, and members of the

4     press, those in San Juan, and those who are observing by

5     telephone.

6          We have the privilege this morning of being joined by

7     the clerk of the district court of the District of Puerto Rico,

8     Frances Moran, as representative of that court as well as the

9     assistant operations manager for the district court, Gretchen

10    Rodriguez.  As always, our thoughts are with those who are

11    living in Puerto Rico.

12         I remind you that consistent with court and judicial

13    conference policies and the orders that have been issued, there

14    is to be no use of any electronic devices in the courtroom to

15    communicate with any person, source, or outside repository of

16    information, nor to record any part of the proceedings.

17         Thus, all electronic devices must be turned off unless

18    you are using a particular device to take notes or to refer to

19    notes or documents that are already loaded on the device.  All

20    audible signals, including vibration features, must be turned

21    off.

22         As provided in the Court's standing order, no

23    recording or retransmission of the hearing is permitted by any

24    person, including, but not limited to, the parties or the

25    press.

1      Anyone who is observed or otherwise found to have been

2  texting, emailing, or otherwise communicating with a device

3  during the court proceeding will be subject to sanctions,

4  including, but not limited to, confiscation of the device and

5  denial of future requests to bring devices into the courtroom.

6      So this morning's agenda is oral argument in

7  connection with Aurelius' motion to dismiss the Commonwealth's

8  Title III petition, which is case 17 3283; Aurelius' motion for

9  relief from the automatic stay which was also filed in the

10  Commonwealth case, 17 3283; and defendant's motion to dismiss

11  the UTIER v. PREPA adversary proceeding, which is adversary 228

12  in the PREPA Title III case, which is 17 4780.

13      I'd like to express my gratitude to counsel for having

14  organized their argument time, both in terms of allocation and

15  in conceptual division.  That should make everything go

16  smoothly.

17      Before we begin with arguments, I want to remind

18  counsel to speak from the podium and speak directly into the

19  microphone at all times so that you can be heard clearly, not

20  only here in the courtroom but also in the remote observation

21  facilities and by those who are listening on the telephone.

22      So, with that, I would invite Mr. Olson to the podium.

23  Good morning.

24      MR. OLSON:  Good morning, your Honor.  May it please

25  the Court.  Thank you, Judge Swain.

1      My colleague will address the stay issue.  I think

2   that allocation of time was already mentioned to your Honor.

3      THE COURT:  Yes.  We have you for 30 minutes.

4      MR. OLSON:  Yes.  Thank you, your Honor.

5      The issue before the Court today is exceedingly

6   important and its resolution cannot be abated or postponed.

7   Indeed, the earlier this issue, which has to do with the

8   constitutionality of the Oversight Board, the earlier that that

9   is resolved, the better for everyone concerned.

10      The Constitution's separation of powers of which the

11   appointments clause is a fundamental structural component is a

12   central and vital part of our Constitution and whose ultimate

13   purpose the Supreme Court has repeatedly held is to protect

14   liberty and security of the government.

15      That clause, which is found in Article 2, Section 2,

16   Clause 2 of the Constitution provides for the appointment of

17   all officers of the United States.  The members of PROMESA's

18   oversight Board are officers of the United States and not

19   appointed in the manner required by Article 2.  Their

20   appointments are, therefore, void.

21      I will enumerate some of the provisions that apply to

22   the powers and authority of the Oversight Board in order to

23   articulate the fact that they are officers of the

24   United States.

25      THE COURT:  Before you go to that particular point of

1   proof of officer of the United States status, I would like to

2   ask you to address another threshold issue, which is that here,

3   as everyone acknowledges, Congress purported to create the

4   Board as a territorial entity.

5          So, in your view, does Congress have the power under

6   Article 4 to create positions that are positions within

7   territorial entities at all?  If so, does the appointments

8   clause always apply to those positions simply because they're

9   created by Congress?

10         MR. OLSON:  I will address this at this point and also

11  amplify it a little bit later in my presentation.

12         The United States Supreme Court in a recent decision

13  of the Metropolitan Washington Airports Authority case directly

14  addressed the issue of the application of the appointments

15  clause of the Constitution to territories of the United States

16  and with respect to Congress' power under Article 4 to

17  legislate rules and regulations governing the territories of

18  the United States.

19         And the Supreme Court in the Metropolitan Washington

20  Airports Authority case squarely rejected the proposition that

21  was being urged by the parties that the Airports Authority,

22  which was property of the United States and, therefore, covered

23  by Article 4, did not mean that the appointments clause did not

24  apply in that case.

25         Similarly, in other situations, the Supreme Court has

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    held with respect to other provisions of the Constitution,

2    which purport to provide plenary authority to Congress to

3    legislate rules and regulations, the court has held that the

4    exercise of those authorities are still, nonetheless, subject

5    to the appointments clause, which, as I said, is an important

6    structural component of the United States Constitution so that

7    what happens with respect to the territories, yes, Congress has

8    what is said to be plenary authority there.

9         It is said to have plenary authority in the

10   Constitution under Article 1 with respect to the

11   District of Columbia.  It is said to have plenary authority in

12   other contexts as well.

13        In the provision in the Buckley case, which had to do

14   with the Federal Elections Commission, the argument was made

15   there that the appointments clause did not apply to the

16   creation of the Federal Elections Commission because Congress

17   had plenary authority with respect to the regulation of

18   elections.

19        And the Supreme Court flatly and squarely rejected the

20   argument there and specifically said Congress cannot decide for

21   itself the rules and regulations with respect to the

22   application of fundamental provisions of the Constitution.

23        Congress can, if it wishes, create certain authorities

24   or official positions in territories or allow positions in

25   territories to be created by the territories themselves, under

1    for example, with respect to Puerto Rico, the governor of

2    Puerto Rico under the Constitution of Puerto Rico.

3            But here the fundamental test by the United States

4    Supreme Court is does the officer exercise significant

5    authority under the statutes of the United States.  If so, that

6    person is an officer of the United States.

7            There is no territorial exception in the appointments

8    clause itself, and there is no provision in the territorial

9    language of Article 4 that excludes the presentment clause, the

10   powers of vetoes of the president, other separation of powers

11   issues which the Supreme Court specifically says are

12   fundamental to our individual liberties and the structure of

13   our government.

14           The appointments under PROMESA involve the creation of

15   principal officers of the United States because they do

16   unquestionably, I would submit, exercise significant authority

17   pursuant to the laws of the United States.

18           This articulation of the standard, significant

19   authority under the statutes of the United States, appears in

20   many cases, including the Freytag case and the other cases

21   which we've cited in our brief.  And I will enumerate some of

22   those provisions that make it clear, beyond any doubt I would

23   submit, that these individuals exercised significant authority

24   under the laws of the United States.

25           They were created -- the Board was created -- by a

1   federal statute.  Its only function is to enforce federal law,

2   PROMESA.  Its members were appointed by a federal official, the

3   President.  Its members are supervised by and removable by a

4   federal official, the President of the United States.  Its

5   members were presumably commissioned as federal officers.

6       I would suspect that each of the members of the Board

7   have in their offices someplace a commission which is required

8   under the Constitution with respect to officers of the

9   United States, and if they don't have such a commission, then

10  that's an additional problem for those individuals, and maybe

11  we will hear whether they do or not.

12      The President, under Article 2, Section 3, shall

13  commission all officers of the United States.  Its members of

14  the Oversight Board are subject to federal ethics laws.  Its

15  responsibility is to deal with the massive financial crisis

16  affecting millions of United States citizens, both within and

17  without the territory of Puerto Rico.

18      The Board has the power to approve Puerto Rican

19  government contracts, the issuance of Puerto Rican debt, and to

20  nullify Puerto Rican laws inconsistent with its

21  responsibilities.  It enforces public rights, which is another

22  aspect of its responsibility that is very important.

23      Under the Buckley decision, the court was talking

24  about the Federal Election Commission, and it says it has

25  primary responsibility for conducting civil litigation in the

1  courts of the United States.  Here the Board has the

2  responsibility exclusively to enforce the provisions of PROMESA

3  which, as the <u>Buckley</u> court said, is a hallmark of officers of

4  the United States.

5      It can administer oaths, hold hearings, take

6  testimony, receive evidence, and issue and enforce subpoenas --

7  all powers of officers of the United States.

8      The Board wields more power than the Board of review

9  that existed under the <u>Metropolitan Washington Airports</u>

10  <u>Authority</u> case.  That case, as you know, discussed a board of

11  review for that agency which had responsibility to oversee the

12  management of two airports in the vicinity of Washington D.C.

13  Its powers were somewhat great but somewhat limited compared to

14  the powers of the PROMESA Oversight Board.

15      THE COURT:  Mr. Olson, <u>MWA</u> wasn't a core element of

16  the Court's objection to that board.  Its practical function as

17  an agency of Congress and its overstepping of the separation of

18  powers boundaries in putting members of Congress into an

19  executive oversight position -- quite honestly, I haven't

20  memorized all of the cases, but it's my recollection that that

21  was the main focus as opposed to officer of the United States

22  and appointments clause, but I could be completely wrong about

23  that.

24      MR. OLSON:  Well, the fundamental question was the

25  application of the separation of powers and the appointments

1    clause.  The violation in that case was that the Oversight

2    Board was designated to consist of members of Congress

3    themselves, which would have been a separate and independent

4    violation of the appointments clause, and indeed the court

5    found that to be unconstitutional.

6            The statute there specifically said, well, if these

7    members who are going to be members of Congress who function in

8    their individual capacity -- and that's an important aspect of

9    the case.  Congress tried to avoid the appointments clause, the

10   Article 2 appointments clause problem, by saying that they're

11   functioning in their individual capacity, which would have

12   maybe solved the problem of the incompatibility clause which

13   precludes members of Congress from being an officer of the

14   United States.

15           But the fundamental issue was indeed, does the

16   appointments clause and the separation of powers of, which the

17   appointments clause is such an important provision, apply to

18   the property of the United States, the property of the

19   United States.  "Territory" or "property" of the United States

20   are interchangeable terms.

21           So the court squarely held that that defense, that

22   because it was a property or territory of the United States the

23   appointment clause provisions did not apply -- the court

24   squarely rejected that.

25           As I said, that is not the only case where the court

1  has rejected issues such as that.  We have examples of

2  territorial courts.  We have clerks of territorial courts who

3  are officers of the United States.

4          So, in all of the cases -- and we've traced it all the

5  way back to Marbury v. Madison.  Marbury was appointed to be a

6  justice of the peace for the District of Columbia, a property

7  of the United States, and the United States Supreme Court in

8  the famous Marbury v. Madison case, which involved judicial

9  review, explicitly held that that was an officer of the

10  United States.

11          The whole fight there, aside from the judicial review

12  issue, involved the question of whether he had to have

13  delivered to him the commission issued by the President.  The

14  court held that he didn't have to, but the point was he was an

15  officer of the United States, notwithstanding he was the

16  justice of the peace of the District of Columbia.

17          I will add that the court in the Metropolitan

18  Washington Airports case talked about the exercise of

19  significant power in violation of the separation of powers

20  principles, and those are the same things that we're talking

21  about here.

22          Furthermore, in addition to all of the other things

23  that I've said, which seems cumulatively overwhelming evidence

24  that these individuals are officers of the United States, the

25  Board is a federal entity under the test established in Lebron

1    v. The National Railroad Passenger Corp. because it is

2    established -- and I'm using the words of the court in that

3    decision -- established and organized under federal law,

4    pursues federal government objectives, and Congress may repeal,

5    alter, or amend its powers at any time, and its members are

6    directly appointed by the President.  All is true in that case

7    making that a federal agency, and the same is true here.

8           PROMESA's language that the Board is a part of the

9    territorial government -- and you may have been referring to

10   that earlier because the statute itself says this is a Board

11   created under the territorial government -- carries little

12   weight because even when Congress acts under Article 4, under

13   that Metropolitan Washington Airports case, separation of power

14   analysis, the court said, does not turn on the labeling of an

15   activity.  The activity itself is what is important.  Where the

16   authority comes from, federal statute; is it the execution of

17   significant authority under federal law.  Those are the tests,

18   not whatever label Congress decides to put on it.

19          The Board members are principal officers because only

20   the President can supervise them.  They're answerable to no

21   other officer of the United States, not to a subordinate

22   officer of the United States.

23          That test has been repeatedly articulated most

24   recently in the Free Enterprise Fund case.  So the test of

25   whether an individual who is an officer of the United States is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    a principal officer of the United States, requiring advice and

2    consent and approval from the senate, is whether one -- and I'm

3    quoting the Free Enterprise Fund case -- "whether one is an

4    inferior officer depends upon whether his work is directed and

5    supervised at some level by principal officers."

6         These individuals in this Board are not supervised by

7    any other officer of the United States.  Only the President has

8    the power to remove and to supervise them.  In the case, Vagner

9    v. Sign Art case, the Supreme Court said it is the power of

10   removal.  Where that power lies is what the official must obey,

11   fear, and, therefore, obey.  That is the test, the removal

12   power.  The only authority here is the President of the

13   United States.

14        Even if they were inferior officers, if they are

15   principal officers, their appointments manifestly did not

16   comply with the appointments clause because their positions

17   weren't subject to advice and consent by the United States

18   senate.

19        If they're inferior officers, the appointments clause

20   still provides that the provisions for their appointment does

21   not comply with the appointments clause because the Congress

22   gave very little opportunity for the President to control who

23   would be appointed.

24        Between the time when the statute was passed and the

25   time when the President had to act was just a matter of a

 1    couple of months, most of which time the senate was not in

 2    session.

 3          So there were only eight days when the senate was in

 4    session during which appointments could be submitted to the

 5    senate for advice and consent.  There were only eight days

 6    there.  There was no time for the President.

 7          If the President didn't act subject to using the

 8    advice and consent provisions within that period of time, once

 9    that window closed, the President must appoint from the list

10    submitted by Congress.

11          And Congress was very clear about this.  The

12    legislative history, which we've quoted in the briefs and I'm

13    sure you've read, is that -- this is the words of the committee

14    report -- "PROMESA's purpose was to ensure that a majority of

15    the Board's members were effectively chosen by republican

16    congressional leaders," not by the President of the

17    United States but by republican congressional leaders.

18          So, even if they were inferior officers -- and they

19    most manifestly are not inferior officers -- those provisions,

20    the way it was set up, was designed to ensure that Congress

21    would make the appointments.  The President had to choose from

22    the list, and Congress cannot put the President of the

23    United States in that kind of a box.

24          In a sense, in a very real sense, the United States

25    has conceded this point.  If you look at their brief at page

1    34, the brief of the United States, note 15, the United States

2    says that PROMESA's provisions for future appointees in case of

3    vacancies can essentially be ignored.  The President can go

4    ahead and make these appointments with the advice and consent

5    of the senate, despite what the provision says.

6         What the United States says at that point is to avoid

7    serious constitutional problems.  There wouldn't be any serious

8    constitutional problems if the appointments clause did not

9    apply to these individuals as officers of the United States.

10        So, in a sense, the United States has said, well,

11   don't worry about that because in the future, we'll just ignore

12   those provisions in order to construe the statute as ignoring

13   those provisions and avoid the serious constitutional

14   questions.

15        I think it comes back to the question that you raised

16   at the very beginning about the territories and the persons

17   that hold authority in territorial jurisdictions.  The source

18   of the official's power determines whether he's an officer of

19   the United States.

20        With respect to the governor of Puerto Rico as it

21   currently establishes, the source of that individual's power is

22   the Constitution and the statutes and the citizens of

23   Puerto Rico.

24        The source of the authority of PROMESA Board members

25   is PROMESA itself.  It's a federal statute.

1      THE COURT:  So do you read <u>Sanchez Valle's</u> analysis of

2   the fundamental origin of governmental power in Puerto Rico as

3   driving from Congress as limited to the formulation of criminal

4   laws and prosecution of criminal laws?

5      MR. OLSON:  That case, which --

6      THE COURT:  <u>Puerto Rico v. Sanchez</u>, the double

7   jeopardy case.  My question is that you were indicating that

8   the authority of the governor of Puerto Rico, now popular

9   election, stems from the people of Puerto Rico.

10      In the double jeopardy case in <u>Sanchez Valle</u>, the

11   court looked past the congressional grant of authority to

12   Puerto Rico to establish a Constitution to ultimately hold, as

13   I read it, that the power to make and prosecute criminal law

14   goes back to Congress so that both the federal law and the

15   local Puerto Rico law derived from the same sovereign, and that

16   drove the resolution of the double jeopardy question.

17      So do you read that case as only applying in that

18   criminal law context?  If not, how do you square that with the

19   motion that the governor's position and authority derived from

20   the people rather than ultimately from the Congress that

21   permitted the adoption of the Constitution and also passed the

22   earlier laws permitting popular elections?

23      MR. OLSON:  We would submit that it's clear from the

24   context, the double jeopardy context, and the language of

25   course of the decision itself was focused on the fact of

1  separate sovereigns.

2       And the court determined that Puerto Rican territory

3  was not a separate sovereign as a state would be because

4  ultimately the authority of its existence and its Constitution

5  and so forth ultimately came from the United States, the

6  Constitution of the United States.

7       That's peculiar to separate sovereign issues for the

8  same reason the 10th Amendment wouldn't apply and certain other

9  clauses that are pertinent to the states as separate sovereigns

10 wouldn't apply.

11      Here the test is do the officials exercise authority,

12 immediate authority; what is their source of immediate

13 authority; to whom are they accountable.  From the beginning of

14 our history, the courts have acknowledged in fact that there

15 may be territories, and that those officers in those

16 territories, including even clerks of Article 1 courts, are

17 officers of the United States in territories.  That's another

18 authority for what we're arguing to you today.

19      Also Congress can permit in the territories a

20 Constitution or bylaws or organizations pursuant to which local

21 officials are responsible to that local authority and to the

22 people there.  They're accountable.  That's the source of their

23 immediate authority.  So that's the big difference between that

24 case and the case that we're talking about.

25      These Board members are not accountable to anyone in

1    Puerto Rico.  They are accountable to the President.  By

2    contrast in connection with your point, the Puerto Rican

3    governor is accountable to the island's electorate.

4            These are the words of the United States

5    Supreme Court:  "Congress cannot create a board whose officers

6    enforce only federal law and are appointed, overseen, and

7    removable only by the President yet label that board a

8    territorial entity and require the President to select its

9    members from lists created by individual members of Congress."

10           The Free Enterprise Fund case is an interesting

11   example because the language of the Supreme Court there said

12   this is so novel and so unusual, it comes with a heavy

13   presumption of maybe violating the Constitution.

14           As Chief Justice Marshall explained three years after

15   Marbury v. Madison in connection with a D.C. justice of the

16   peace appointment by the federal government, the court said --

17   this is the language of Justice Marshall -- "He must be an

18   officer under the government of the United States driving all

19   of his authority from the legislature and President of the

20   United States.  He is certainly not the officer of any other

21   government."  That goes back to 1806.

22           As the Supreme Court stated in the Freytag case, since

23   the early 1800's, Congress regularly granted non Article III

24   territorial courts the authority to appoint their own clerks of

25   court who, as of at least 1838, were inferior officers of the

1   United States within the meaning of the appointments clause.

2   That is the language of the Freytag court.

3         Now, if clerks of territorial courts are officers of

4   the United States within the meaning of the appointments

5   clause, so then must other officials whose officers are created

6   by federal statute, are appointed by a federal official, and

7   serve even in territories.

8         So it is quite clear that there is no intended

9   exception or no acceptable exception to the separation of

10  powers constraints which could not be more fundamental.

11        Every time the Supreme Court talks about

12  an appointments clause -- you can see this language in Buckley.

13  You can see it in other cases -- the court talks about how

14  fundamental these separation of powers and the appointments

15  clause in particular is to the structure of our government.

16        That is a basic fundamental principle, and that was

17  something that was thought out and discussed at great length at

18  the constitutional convention, how people will be appointed.

19        In one of the cases, the court talks about that was a

20  great concern.  Abuse of the appointment authority by the

21  executive at the time of the revolution and the creation of the

22  new government was something that was exceedingly important.

23        So, when Congress wrote that provision into Article 2

24  of the Constitution, it was something that was exceedingly

25  important to the structure and the separation of powers because

1    the structure and the separation of powers and the confinement

2    of the appointment authority was fundamental to liberty and the

3    security of our government.

4         The appointments clause and the separation of powers

5    invariably apply and govern all officers of the United States.

6    Congress is not immune from scrutiny of constitutional defects

7    just because it invokes Article 4.

8         No case has ever held that those provisions of the

9    Constitution do not apply to the territories, and numerous

10   other constitutional provisions that are part of the structure

11   of our Constitution apply in the territories.

12        Now, I will say one more thing before stopping and

13   reserving the balance of my time for rebuttal.  I think all the

14   parties agree that whatever decision is made by you, this

15   Court, with respect to this issue, A, it's very important that

16   this issue get resolved as quickly as possible.  I think

17   everyone would agree with that.

18        There is a lot of uncertainty which even Congress

19   recognized.  One member of the United States senate said, you

20   know there's going to be a challenge in court to this structure

21   of the Constitution.  Let's not do it this way.  But Congress

22   went ahead and did it this way anyway.

23        As long as this cloud, which we regard as a very, very

24   serious cloud, hangs over the authority of this Board, every

25   decision that it makes may potentially be void.  If a decision

1   is finally made six months from now or even six weeks from now,

2   that's less good, in terms of the ultimate benefit of everyone

3   concerned, than to have it resolved.

4       Hopefully Congress will go back and do it right.  It

5   can be done quickly.  The appointments clause can be factored

6   in.  Those provisions can be severed, and Congress can rewrite

7   it.

8       The President can make new appointments, and the

9   effect of your decision -- you can stay your decision.  The

10  Supreme Court did that in the <u>Northern Pipeline</u> case.  It did

11  it in other contexts with respect to separation of powers

12  challenges.  The effects of the decision can be stayed to avoid

13  all of the dislocation and parade-of-horribles that we've been

14  hearing about in the briefs that oppose our position.

15      So, while it's important that it be decided soon so

16  that the problem can be corrected -- and it can be corrected

17  relatively easily.  It's not going to be difficult to do -- it

18  is important that it be done soon, and the effect of that

19  decision can be stayed while the problem is fixed.

20      THE COURT:  Thank you, Mr. Olson.

21      Mr. Emmanuellei.

22      MR. EMMANUELLEI:  Good morning, your Honor.

23      THE COURT:  Good morning.  We have you down for 20

24  minutes.

25      MR. EMMANUELLEI:  Yes.  May it please the Court.

1       The central issue in this case is if the members of

2  the Financial Oversight and Management Board of Puerto Rico are

3  federal officers or not.  Any discussion regarding the power of

4  Congress over Article 4 could be material if this Court finds

5  that the Board members are federal officers, meaning that they

6  exercise significant federal authority according to Buckley v.

7  Valeo.

8       On the other hand, if this Court finds that the

9  condemn insular cases are the foundation for this Court to rule

10  that the appointments clause is not applicable to the

11  territories, in such instance, UTIER argues that the insular

12  cases should be overturned.

13       These cases stand at par with Plessy v. Ferguson in

14  permitting disparate treatment by the government of a discrete

15  group of citizens solely based on race.  In the words of

16  Honorable Judge Juan Torruella of the First Circuit, the

17  redeeming difference is that Plessy is longer the law of the

18  land, while the Supreme Court remains aloof about the

19  repercussions of its action in deciding the insular cases as it

20  did, including the fact that these cases are responsible for

21  the establishment of a regime of de facto political apartheid

22  which continues in full vigor.

23       THE COURT:  I'm sorry.  If I were to determine that I

24  should make an argument recommending that at the end of the day

25  when this gets to the Supreme Court the Supreme Court should

1   repudiate the insular cases, what do you see as the practical

2   result or a default position in the absence of the insular

3   cases?

4          Would all territories automatically have all of the

5   status, rights, privileges and be subject to all provisions of

6   the Constitution just like states?  Or is there some other set

7   of principles that would apply to congressional action under

8   Article 4 with respect to the territories?

9          MR. EMMANUELLEI:  We believe that there is an issue

10  for Congress to address because there are some scholars that

11  argue that Puerto Rico will become an incorporated territory.

12  So we would have access to all the rights and protections of

13  the U.S. Constitution, your Honor.

14         THE COURT:  Thank you.

15         That's not something that the Court could declare.

16  Congress would have to go back.

17         MR. EMMANUELLEI:  Yes, your Honor.  I believe so.

18         It is not necessary to address that issue if this

19  Court decided that the federal officers of the Board are

20  subject to the appointments clause, your Honor.

21         Justice Torruella also stated that the insular cases

22  were wrongly decided because, at the time of the ruling, they

23  squarely contradicted longstanding constitutional precedent.

24  Their skewed outcome was strongly influenced by racially

25  motivated biases and by colonial governance theories that were

1    contrary to American territorial practice and experience.

2          The reliance of the opposing parties in the insular

3    cases and the doctrine of discriminatory incorporation of

4    fundamental constitutional rights accolade that Puerto Rico

5    continues to be a colony inhabited by 3.4 million second-class

6    American citizens who do not have political or economic rights

7    as do the resident citizens of the other states.

8          The opposing parties seek to radically outspread the

9    insular cases to further deprive Puerto Rico's citizens of not

10   only the Bill of Rights' individual protections but also of the

11   Constitution's structural protections.

12         None of the insular cases involved the appointments

13   clause or any other structural constitutional provision or

14   principle.  And even if the insular cases had comprehended

15   certain structural provisions of the new colonial regime, these

16   cases also recognize restrictions of so fundamental a nature

17   that they cannot be transgressed.  Thus they apply to the

18   territories.

19         Certainly the appointments clause is among the

20   significant structural safeguards of the constitutional scheme.

21   But if in any way the insular cases preclude this challenge,

22   UTIER affirmatively argues that the insular cases should be

23   overturned.

24         In their motions to dismiss, some of the opposing

25   parties stated that UTIER lacks constitutional and prudential

1    standing upon the incorrect premise that the complaint never

2    explains how the actions of the Board adversely affected its

3    members' collective bargaining agreement.

4            On the other hand, regarding prudential standing, the

5    Board stated that UTIER and its members lack prudential

6    standing to complain about the certifications, because PROMESA

7    Section 106(e) deprived the district courts of subject matter

8    jurisdiction to hear the challenges to the fiscal plan

9    certifications.

10           These allegations are a gross mischaracterization of

11   the facts alleged by UTIER in the first amended adversary

12   complaint at docket 75.  As stated in paragraph 29, UTIER, as

13   PREPA's primary workers' union representing 3,600 workers, is a

14   creditor in this case, and figures as such, in the creditor

15   matrix of this Title III case.

16           The result of thousands of pending judicial and

17   administrative proceedings and the recovery of unappealable

18   judgments, in actions brought by UTIER against PREPA, are at

19   stake in the Title III case.  Thus UTIER has a large pecuniary

20   interest in the outcome of this case.

21           Moreover, UTIER, as a creditor, has a right to

22   question the validity of the filing of this Title III petition

23   under Section 930 of the bankruptcy code and Section 304 of

24   PROMESA.

25           UTIER has standing to fight this adversary proceeding,

1  as creditor and party in interest, according to Section 301 of

2  PROMESA which incorporates Section 1109 of the bankruptcy code.

3        UTIER negotiates and enforces the collective

4  bargaining agreement which is currently valid and binding and

5  which governs the terms and conditions of employment of its

6  members.

7        Its members suffered an invasion of a legally

8  protected interests such as employment, salaries, bonuses,

9  pensions, and health plans, that is concrete and

10 particularized, actual or imminent, not conjectural or

11 hypothetical, and fairly traceable to the challenged conduct of

12 defendants and likely to be redressed by a favorable judicial

13 decision.

14        That Board alleges that section 1109(b) of the code

15 does not automatically satisfy the zone of interest test

16 required to demonstrate standing.  But the Board omits that the

17 First Circuit decided that Article III standing is almost

18 always satisfied with respect to any party in interest in a

19 Chapter 11 case.

20        With regard to standing, the amended complaint is

21 sufficient to satisfy the legal standards required by the

22 Supreme Court in Bell Atlantic Corp. v. Twombly, and Ashcroft

23 v. Iqbal.

24        In paragraphs 11 through 29 of the amended complaint,

25 UTIER alleges with detail that the actions of the unlawfully

1    appointed Oversight Board members have substantially impaired

2    the collective bargaining agreement, entered upon by PREPA and

3    UTIER on behalf of its members; 37 out of 50 clauses were

4    impaired by certain statutes enacted by the government.

5         Those laws substantially affected the entitlements and

6    fiduciary duties of UTIER to negotiate and defend the

7    collective bargaining agreement that protects its members.

8    These laws were adopted by the members of the Board in the

9    Commonwealth's fiscal plan and in PREPA's fiscal plan and

10   budget, while being improperly appointed as members of the

11   Oversight Board.

12        Constitutional standing requires a showing of an

13   injury in fact that is concrete, distinct, and palpable, and

14   actual and imminent.  Any monetary loss suffered by the

15   plaintiff dissatisfies this element.  Even a small financial

16   loss suffices.  An allegation of future injury is sufficient,

17   so long as the threatened injury is certainly impending or

18   there is a substantial risk that the harm will occur.

19        The Board claims that neither the fiscal plans nor the

20   budgets discharges any claims and that no motion to that effect

21   has been filed, but it also asserts that the fiscal plan is an

22   operative blueprint for financial management and the plan of

23   adjustment of debt.

24        However, a collective bargaining agreement is an

25   executory contract within the meaning of Section 365(a) of the

1    bankruptcy code and is, therefore, subject to rejection by the

2    debtor, at any moment, under appropriate circumstances.

3           Also the filing of a plan of adjustment is the sole

4    purpose of this Title III petition.  Eventually, the Board will

5    fight the plan of adjustment and will further impair the rights

6    of UTIER, which at the very least, represents an imminent

7    injury and a monetary loss for its members.

8           In terms of prudential standing, UTIER authorized to

9    sue on behalf of its members since it is its exclusive

10   representative regarding their labor rights under the

11   collective bargaining agreement.  UTIER's members, as employees

12   of PREPA, are creditors with pecuniary interest in the outcome

13   of this Title III case and have standing to sue in their own

14   right.

15          This is so, particularly because their accrued fringe

16   benefit, salaries, vested rights, and pension benefits are at

17   stake in this Title III case.  Therefore, their interests are

18   germane to UTIER's purpose.  In addition, neither the claim

19   asserted by UTIER in this adversary proceeding, nor the relief

20   requested, requires the participation of the members in this

21   lawsuit.

22          With regard to prudential standing, Lexmark

23   International, Inc. v. Static Control Components, Inc.,

24   questioned the continued validity of prudential concerns as

25   grounds for dismissal.

1      MR. ROLANDO:  First, the court concluded that the zone

2   of interest's test concerns whether congress has authorized a

3   plaintiff to sue.  Second, the court held that its limitations

4   on generalized grievances suits are based on constitutional

5   Article III standing requirements and not the prudential

6   standing principles relied in some of the court's previous

7   decisions.

8         In Lexmark, even Justice Antonin Scalia, writing for a

9   unanimous court, partially abolished the prudential standing

10  doctrine when he expressed that a court cannot limit a cause of

11  action merely because prudence dictates.

12        Section 106(e) of PROMESA appears to deprive this

13  court of jurisdiction to review challenges to the Oversight

14  Board certifications.  However, Section 106(a) of PROMESA

15  clearly created a jurisdictional basis for this court to

16  entertain against the Oversight Board.  The apparent

17  contradictory language between both provisions of the act

18  oblige this court to entertain the matter and construe the law

19  according to the U.S. Constitution.

20        Plaintiff is neither asking this court to reverse or

21  enjoin the certification process.  Rather, its aim is for this

22  court to prevent illegally appointed board members from

23  pursuing this and any Title III cases, or the exercise of any

24  other power or authority provided by PROMESA, until they are

25  recast to comply with the appointments clause of the U.S.

1    Constitution.  Thus, there is no doubt that the Oversight

2    Board's actions are susceptible of court review.

3            For the reasons already stated, UTIER has

4    constitutional and prudential standing to bring this action.

5            But moving on to the discussion of the appointments

6    clause, we hereby adopt the arguments already stated by

7    Aurelius in their oral argument on their briefs.

8            The U.S. Government states that:  Crucial to the

9    solution of this controversy is the fact that the Oversight

10   Board does not exercise federal authority.  On the other hand,

11   the opposing parties defend inapplicability of the appointments

12   clause claiming that the board members' authority is rather

13   limited, since they clearly exercise authority only within the

14   territory of Puerto Rico.  Not so.

15           Under Article IV, congress can govern the territories

16   with few restrictions, but this broad power ceases when it

17   creates a federal office.  None of the opposing parties have

18   argued that the appointments clause does not apply to a federal

19   officer.  A person is a federal officer when he or she complies

20   with the constitutional definition, regardless if the office is

21   created for a state or a territory.  What the opposing parties

22   are arguing is that the board's members are not federal

23   officers, but territorial.  Therefore, our analysis should be

24   the applicability of <u>Buckley v. Valeo</u> to the members of the

25   board.

1          In Buckley, the Supreme Court stated that an officer

2    of the United States is every official whose position is

3    established by law and who exercises significant authority

4    pursuant to the laws of the United States.  Only those public

5    officials who are properly characterized as mere employees fall

6    outside the appointments clause's scope.

7          This case, just a simple analysis of the board's task

8    and powers, as mandated by PROMESA, lead to the conclusion that

9    they, in fact, exercise significant authority under federal

10   sovereignty.  The fatal loophole in the opposing parties'

11   argument regarding the alleged nature of the board as

12   territorial is that, among the other powers, the board

13   exercises the exclusive federal power of pursuing the

14   territory's adjustment of debt.  Particularly, of debt owed to

15   bondholders in the mainland, such as Aurelius.  That is

16   irrefutable evidence of the significant federal authority that

17   the board members are exercising under PROMESA.

18         As we mentioned at page ten of our reply in opposition

19   to the statement of the United States, PROMESA allows the board

20   to file on behalf of its territory for the protection of

21   Title III, and to be able to submit a plan of adjustment of

22   debt; thus, impairing the obligations to bondholders, hedge

23   funds, insurers, and other creditors that are based and do

24   business globally.

25         Adjustment of debt is an exclusive federal power

1   according to Article I, Section 8, Clause 4 of the

2   Constitution.  See <u>Puerto Rico v. Franklin California Tax-Free</u>

3   <u>Trust</u>, holding that the preemption provision of Section 903(1)

4   of the bankruptcy code bars states and their territories from

5   enacting municipal bankruptcy laws.  Thus, bankruptcy is

6   strictly federal because the Constitution empowers congress to

7   establish uniform laws on the subject of bankruptcies

8   throughout the United States.

9       THE COURT:  In jurisdictions that are subject to the

10  bankruptcy code where there is no special PROMESA and there is

11  no Oversight Board so that the municipality, with the

12  permission of the state, can propose a plan of adjustment or in

13  a chapter 11, say, where the debtor in possession or the

14  creditor proposes a plan of adjustment, is that the exercise of

15  an exclusively federal power by that debtor?

16      If not, why does it make a difference that here it

17  is the Oversight Board that makes that filing, makes that

18  structural proposal, as opposed to the municipal entity or the

19  private entity?

20      MR. ROLANDO:  The bankruptcy code allows the debtor to

21  file a chapter 9 case if it is authorized by the state to do

22  so.  Here, congress approved a law, enacted a law, authorizing

23  just the board to file for the protection of Title III.  So

24  they are vesting the board with the power of Article I of the

25  bankruptcy clause to pursue a plan of adjustment in a territory

1    or in another state, if the congress authorizes that.  So it is

2    not the same.

3            The bankruptcy law authorizes a municipality to pursue

4    a Title III case, but here, they are creating this entity with

5    the specific power vested from congress to pursue a case, even

6    though in a territory, that will affect all creditors

7    notwithstanding the fact that they live in Puerto Rico or they

8    live outside.  Therefore, the only power that sustained that

9    authority is the power of the Constitution to establish

10   bankruptcy laws.

11           THE COURT:  Thank you.

12           MR. ROLANDO:  Bankruptcy is strictly federal because

13   the Constitution empowers congress to establish uniform laws on

14   the subject of bankruptcies throughout the United States.

15   Although state law continued to govern most debtor-creditor

16   relations, congress has the authority to overwrite state laws

17   dealing with insolvency.

18           In fact, in 2006, the Supreme Court surprised many by

19   holding that the bankruptcy clause overrode state sovereign

20   immunity, at least with respect to matters ancillary to the

21   central jurisdiction of the bankruptcy court, over the debtor's

22   estate.  Obviously, when congress can affect the prerogatives

23   of the states, it is not exercising a territorial power under

24   Article IV.

25           There should be no doubt that PROMESA is imposing

1   exclusive bankruptcy federal power of Article I of the

2   Constitution under the provisions of the federal rules of

3   bankruptcy procedure.  Thus, the members of the board are

4   exercising significant federal authority.  If PROMESA is a

5   laser focused Article IV territorial statute, as the opposing

6   parties claim, how could it impair in any way the rights of

7   creditors of the municipal market of the United States without

8   enforcing the exclusive federal power under the bankruptcy

9   clause of the Constitution?

10          THE COURT:  Thank you.

11          Your time expired, and so if you want to sum up very

12  briefly, you may, or if you're done.

13          MR. ROMANELLO:  I'm done.

14          THE COURT:  Thank you so much.  Next we'll hear from

15  Mr. McGill for five minutes.

16          MR. MCGILL:  Thank you, your Honor.

17          I am hear to address Aurelius' motion concerning the

18  automatic stay, and I'll be very brief.

19          Aurelius filed this motion simply to ensure that it

20  could obtain promptly all of the injunctive relief that it is

21  entitled to if we are to prevail on our appointments clause

22  challenge.  This court has held that it lacks jurisdiction over

23  a claim that does not arise under or is not related to Title

24  III itself.

25          THE COURT:  In the two decisions that you cited, those

1    were both motions to remand cases that had been removed from

2    the local courts invoking the Section 306, Title III related

3    jurisdiction.  There was no federal claim asserted in those

4    cases.  The right to information was asserted under local law.

5         Here, you're asserting a constitutional claim, and so

6    why wouldn't we be in 1331 land, since I am an Article III

7    judge and I don't have <u>Stern v. Marshall</u> problems.  It doesn't

8    seem to me to quite map onto the cases that you're citing.

9         MR. MCGILL:  You're exactly correct, your Honor.  If

10   this court were to hold that it has authority to provide us all

11   of the injunctive relief that we would seek in that alternative

12   in that additional suit, we would be happy to hear that.  But

13   our good faith reading of the statute and of your appointment

14   as designated as the judge for this Title III case, we read

15   that not to permit you also to issue an injunction that would

16   prohibit the board for, for instance, carrying out its Title II

17   functions.

18        I haven't heard the board say that that is incorrect

19   yet.  If the board agrees that this court does, in fact, have

20   jurisdiction to provide us such relief, then we would act

21   accordingly.

22        THE COURT:  Has there been an objection to the Title

23   I, Title II related claims in the UTIER and PREPA adversary?

24        MR. MCGILL:  I'm not aware of that.

25        The key point I wanted to make to your Honor is that

1    we did not file this to engender duplicative litigation.  That

2    is not what we're trying to do.  We just want to make sure that

3    we have the opportunity to get all of the injunctive relief to

4    which we would be entitled.

5         If our other lawsuit ever did go forward, we would

6    anticipate that your ruling on the substantive appointments

7    clause issue would be dispositive of any subsequent lawsuit,

8    and certainly if your ruling were appealed to the First

9    Circuit, the First Circuit's decision certainly would be

10   dispositive of that as well.

11        That's all I need to say at this time.  Thank you,

12   your Honor.

13        THE COURT:  Thank you, Mr. McGill.

14        We will now turn to the arguments of the defenders of

15   the constitutionality of PROMESA.  My intention is to hear

16   Mr. Verrilli and Mr. Ward, and then have a break.  Looks like

17   that works for everyone.

18        Mr. Verrilli.

19        MR. VERRILLI:  Good morning, your Honor.  May it

20   please the court.

21        The board is constitutional.  That is so for a very

22   straightforward reason.  Board members are territorial

23   officials who serve in the government of the Commonwealth of

24   Puerto Rico.  They are not officers of the United States who

25   serve in federal government, and that is dispositive.

1    Officers of the United States do have to be appointed

2    by the methods set out in the appointments clause, but

3    territorial officers do not have to be appointed that way, so

4    there is no constitutional problem with the method PROMESA

5    established for appointing board members.

6         What I would like to do, if I could, is walk through

7    what I think are the four key points that substantiate what I

8    just described in summary fashion and that I think lead in a

9    very straightforward way to the conclusion that congress'

10   action here is constitutional.

11        I think a good place to start, we already have spent a

12   lot of time discussing it, what test does the court apply to

13   decide whether these are territorial officers or officers of

14   the United States.

15        What I would like to do is first tell your Honor what

16   we think the right test is, then explain why we think the test

17   Mr. Olson has offered you is an incorrect way to think about

18   this.

19        We think the test is as follows.  What the court needs

20   to do to determine whether these are territorial officers or

21   officers of the United States is to examine the structural

22   relationship between the board and the government of the

23   Commonwealth of Puerto Rico on the one hand and the government

24   of the United States on the other and to examine the nature and

25   scope of the authority that the board has to determine whether

1   it is territorial or federal in nature.  We think that if you

2   apply that test, it is quite clear that the answer here is that

3   the board members are territorial officers.

4        Starting with the structural relationship.  Key fact,

5   which we haven't heard any discussion of so far, is that the

6   board is funded 100 percent out of the treasury of Puerto Rico,

7   not out of the United States Treasury.  Therefore, the United

8   States Congress, the United States Government, does not have

9   the power that it would have over federal officers.  In

10  addition, numerous key laws that would apply.  The board of

11  federal officers don't apply.  FOIA doesn't apply.  The

12  Administrative Procedure Act doesn't apply.  The Inspector

13  General Act doesn't apply.  The board's employees are not

14  subject to civil service protections.  There are many, many

15  more.

16       When you look at it that way, this is clearly not a

17  federal entity.  At the same time, this is not an entity that

18  is within any part of the executive branch of the federal

19  government, it is not in any cabinet department, it is not even

20  an independent agency.  In fact, congress said quite expressly

21  in the statute that this board is a part of the government of

22  the Commonwealth of Puerto Rico and is not a federal agency or

23  department.

24       Then if you turn to the nature and scope of the

25  board's authority, it is clearly delineated as authority that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    is territorial in scope.  PROMESA's substantive provisions

2    apply only to Puerto Rico and the fiscal crisis in Puerto Rico.

3    The court's authority is limited only to implementing the

4    provisions of PROMESA that is charged with implementing

5    100 percent entirely territorial.  They set no national

6    authority.  They set no national policy.  They can't do

7    anything outside of the territory of Puerto Rico.  We think

8    that that is the right way to look at this.  We think that is

9    the way that cases like the Comidor case tell the court you

10   should look at this question.

11        Now, if I may, let me turn to why I think the test, as

12   you heard from my friends on the other side, is just wrong.

13   The test they proposed to you derived from Buckley is whether

14   the official is exercising significant authority.  But you look

15   at Buckley and you look at the other cases my friends have

16   cited, what you will see is that not a single one of them

17   involved the question of whether it was an exercise of

18   territorial authority versus federal authority.  They all

19   involved the question of whether it was an exercise of

20   significant authority versus insignificant authority.  The

21   point was on all of those cases, that the authority was

22   significant enough to trigger the requirements of the

23   appointments clause.

24        That is really vitally important.  Their test doesn't

25   get you anywhere near answering the questions you need to

1   answer in order to determine whether this is a constitutional

2   appointment structure, and that is because, of course, it is

3   absolutely clear, and the Supreme Court has said it from Chief

4   Justice Marshall in Canter in the early 19th Century, to

5   Justice Kagan in the Sanchez Valle case just two years ago,

6   that when congress is legislating under its Article IV

7   territorial powers, it has extremely broad authority, not only

8   national authority, but the authority of a local legislature,

9   the authority to enact laws in manners that are not constrained

10  by the normal separation of powers, structural requirements

11  that would apply if congress was legislating the structure of

12  the national government.  The Supreme Court has said that over

13  and over and over again.

14        So it is vital to determine which kind of power is

15  being exercised here:  Territorial power or the structure of

16  the territorial government or federal power structured to the

17  national government.  That is why the test we proposed, I

18  respectfully suggest, gets to the heart of the matter and

19  answers the question in a clear way.

20        THE COURT:  I believe I perceive your opponents as

21  arguing that the act of congress is defined by the

22  Constitution, and so even if congress can establish structures

23  at the territorial level that are not strictly compliant with

24  the constitutional structures for states and the federal

25  government, that congress' ability to act in the methods by

1      which it acts are not a free-for-all.

2            So congress always has to color within the lines that

3      the Constitution sets for congress, including appointments

4      clause, presentment bicameralism, that congress couldn't just

5      unilaterally, without a presidential signature, establish a law

6      governing a territory.

7            Do you agree that the nature of congress and the

8      powers of congress are always cabined by the Constitution, and

9      if so, where do you start drawing lines?

10           MR. VERRILLI:  That is the key question, I agree, your

11     Honor.  We certainly agree that congress is cabined by the

12     Constitution.  We certainly agree that congress, in enacting

13     laws and the exercises of Article IV power over territories,

14     has to comply with bicameralism and presentment.  That is the

15     only way the congress can act with the Constitution.

16           What those provisions of the Constitution go to is the

17     way in which congress acts as a national legislature exercising

18     its authority under the Constitution.  But the question here

19     is, once you have established that congress is acting in a way

20     that the Constitution prescribes is appropriate and congress is

21     legislating under Article IV to establish a territorial

22     government, what constitutional constraints apply.

23           What the Supreme Court has said over and over again is

24     that the structural separation of powers constraints don't

25     apply to the judgment about what the territorial government

 1  should be structured to operate as.  That is what is going on

 2  here.  That is what is at issue here.

 3       The appointments clause doesn't apply any more than

 4  any of the other separation of powers provisions.  I mean, if

 5  my friend on the other side's theory were correct and the whole

 6  territorial judge structure would have been unconstitutional

 7  right from the get-go in the 18th Century, because territorial

 8  judges were certainly appointed -- nominated by the president

 9  and confirmed through the Senate, but only had four-year terms

10  and the didn't get diminution of salaries.  So the core

11  separation of powers protections that Article III provides for

12  the federal judiciary weren't there.

13       THE COURT:  I think your opponents respond to that,

14  well, that is an Article I court, so it didn't have to be there

15  and so it is not inconsistent with the general notion that the

16  structural provisions apply.

17       MR. VERRILLI:  Well, but what I think that what it

18  shows you is that you need to figure out which provisions apply

19  and which don't, based on the nature of the power being

20  exercised.  They conceded that that is the case, they just want

21  to put the appointments clause on the other side of the line.

22  But it is exactly the same kind of structural separation of

23  powers provision that the Supreme Court has said over and over

24  again doesn't apply.

25       If you walk through the history -- I do think each

1  side has thrown a lot of history at you, I realize that -- but

2  a couple of key points here with respect to that. One is that

3  you just can't swear so much of our historical practice with

4  their theory about the appointments clause applying. Even with

5  respect to territorial officers below the level of a

6  territorial governor, it has been the case for hundreds of

7  years that the authority to appoint inferior officers, cabin

8  head, departments in the territories, have been delegated by

9  congress to the territorial governor. That doesn't comply with

10 the appointments clause.

11       The appointments clause said territorial officers have

12 to be appointed by the president, the courts, and the head of

13 the department. So you can't square that. You can't square

14 territorial judges. You can't square the way congress has

15 historically treated the District of Columbia. That is an

16 Article I power, but it has been understood to be parallel to

17 the Article IV territorial power. You just can't square up of

18 the history. You can't square up their position with the

19 Supreme Court precedent. You can't square it up with the

20 history.

21       I do want to turn to what I think is the key piece of

22 history, which your Honor discussed a little bit with

23 Mr. Olson, and that is congress' decision in 1947 and

24 thereafter to empower the people of Puerto Rico to elect a

25 governor by popular election as opposed to a federal

1    appointment.  That was in 1947.  It was 70 years ago.

2           Now, it can't be the case that -- it just can't be the

3    case that the position of the governor of Puerto Rico in 1946

4    was an officer of the United States who had to be nominated by

5    the president and confirmed by the Senate.  But that in 1947,

6    that position with exactly the same duties, is no longer an

7    officer of the United States, even though it is exercising the

8    same significant authority, because the congress has decided

9    that the people of Puerto Rico should elect the governor

10   through a popular election.

11          I think another key point to remember about that is

12   that the great constitutional reforms, the granting of

13   discretion to the people of Puerto Rico to have their own

14   constitution and set up their own form of government delegated

15   by congress doesn't occur until several years after 1947

16   judgment.  So you can't even defend that 1947 judgment on the

17   theory that my friends on the other side have provided to you.

18   And that is why their theory is so deeply threatening to the

19   self-governance that congress has supported to Puerto Rico and

20   other territories.

21          I do think your Honor had a dialogue with Mr. Orson

22   about Sanchez Valle.  If you don't mind, I think there is a key

23   passage here that I do think answers the question that your

24   Honor posed.  If you don't mind, I would like to just read if,

25   if I could.

47

1              THE COURT:  Yes.

2              MR. VERRILLI:  It is towards the end of the Justice

3    Kagan's opinion to the court.  The opinion says:  We agree that

4    congress has broad latitude to develop invasive approaches to

5    territorial government, as we do here.  That congress may thus

6    enable a territory's people to make large-scale choices about

7    their own political institutions and congress did exactly that

8    enacting public law and approving the Puerto Rico Constitution.

9              But one power congress does not have, just in the

10   nature of things, it has no capacity, no magic wand or airbrush

11   to erase or otherwise rewrite its own foundational role in

12   conferring political authority or otherwise said the delegator

13   cannot make itself any less so no matter how much authority it

14   opts to hand over.

15             So what the court is saying here, it certainly is

16   answering a question in the double jeopardy context, but if the

17   court is answering it on the basis of a fundamental principle,

18   which is that the congress retains what the court said was the

19   foundational role in conferring federal political authority,

20   that authority is delegated to the people of Puerto Rico

21   through their 1950 Constitution and the governmental structure

22   enacted under it.  But it is the authority of the United States

23   Congress at the end of the day.  That is the source of the

24   authority.

25             So when a popularly elected governor, legislature,

 1    members of the government in the Commonwealth of Puerto Rico

 2    are exercising their authority, the ultimate source of that

 3    authority is the authority of the United States Congress that

 4    was conferred on them.

 5        So if their theory is right, then that whole structure

 6    has to be unconstitutional because they are all exercising

 7    significant federal authority, and none of them were in

 8    compliance with the appointments clause.  It just can't be

 9    right.  It cannot be right.

10        I would like, if I could, to turn to the MWAA case

11    that my friends have put so much weight on.  Your Honor asked,

12    I think, exactly the right question about it at the outset of

13    the argument.  For one thing, you can read that opinion over

14    and over again, as we all have, I'm sure, in this courtroom.

15    You will not find the phrase appointments clause in there.  It

16    wasn't a case about the appointments clause.

17        But also, I think of particular importance here, what

18    the court said in that case was that it was undeniable that

19    what congress was doing when it set up the structure that it

20    did was exercising federal authority.  In fact, the court said

21    congress was acting under the commerce power as well as the

22    property clause, and it said that it did so because it was an

23    undeniable national interest in the flow of air traffic in and

24    out of Washington's national airport.  On top of that, it

25    involved two states adjacent to the airport.  That was the

1    reason why the separation of powers restrictions were triggered

2    in that case.  The predicate was the court's finding that this

3    was an exercise of federal power.

4           Now, Mr. Olson said at one point that for purposes of

5    Article IV, territorial power and power over property are

6    interchangeable.  Whatever power congress has over property, it

7    has over territories too.  But there is no case that says that.

8    There is a very well developed body of authority that I went

9    over in the earlier part of my argument that, under the

10   territories clause, congress has the plenary authority to act

11   as both a state or local legislature as well as a national

12   legislature, and separation of the power constraints don't

13   apply when congress was doing that because they can't.

14   Congress needs that flexibility to engage in that kind of

15   greater statesmanship that Justice Kagan was talking about to

16   ensure effective governance of the territories given the

17   different circumstances they present.

18          The Supreme Court has never said anything like that

19   about the property clause.  So drawing that analogy, I think,

20   it just doesn't work.  Then when you get to the last part of

21   the opinion, where the Supreme Court did certainly find a

22   separation of powers problem with the way that board was

23   structured, this case is distinctly different from that.  There

24   was a list mechanism there, but there were two key features to

25   it that made the court decide that it was unconstitutional.

1   The first key feature was that the president had to choose off

2   the list, and the second key feature was that the statute

3   didn't require any additional -- more names than there were

4   available slots.  So the statute gave congress the ability

5   essentially to give no discretion, no authority to the

6   president at all.

7        Of course, now I want to transition, if I could, to my

8   fourth point on this subject, which is the question of whether,

9   once you have concluded that the board members are territorial

10  officers and not officers of the United States and therefore

11  don't have any issue under the appointments clause, is there

12  any residual separation of powers problem at the margin about

13  the way in which the congress provided for the appointment of

14  these board members.

15       The short and clean and clear answer to that is no.  I

16  think it is critical to look at the structure here of the way

17  in which that mechanism works.  Now, it is true that before

18  congress leaders provide a list from which the president is

19  asked to choose the board members, but the statute doesn't say,

20  unlike the MWAA statute that says "shall choose," this statute

21  said "should choose."  The president isn't obligated to choose

22  off the list.  The statute also says that the president has the

23  right to ask for more names if he doesn't like the names on

24  list.  And the statute also says that the president has the

25  authority to pick whomever the president wants to nominate,

1    even if the nominees aren't on the list, and then those people

2    go through the normal by consent procedures.

3         So the president clearly has very substantial

4    discretion to pick whomever the president wants.  The one

5    question arises as a result of this, after 60 days, then the

6    statute imposes limits on the president.  Several things about

7    that.

8         First, Mr. Olson says, well, the Senate was only in

9    eight days over that period of time.  That is up to the Senate

10   whether they are in recess or not.  There is no constitutional

11   requirement that they not work in July or August.  They can

12   decide whether to be in recess or not, and if this is important

13   enough, they can come in and vote.  Certainly 60 days is plenty

14   of time.  You don't have to have a hearing before you vote to

15   confirm a nominee.  You have plenty of federal officers.  There

16   is no confirmation hearing, just as you provide to the United

17   States Attorneys.  They proceed right to a vote, no hearing.

18   That is something that could easily be accomplished within

19   60 days.

20        There is no evidence in the record that President

21   Obama, making those choices, felt any constraint, practical or

22   otherwise, for making the choices.  Quite the contrary.

23   Pleasure was consistent.  Pleasure with the options available

24   to him.

25        Really what my friends on the other side are making is

1  exactly the kind of argument that the Supreme Court rejected in

2  the <u>Mulcanon</u> cases with respect to recess appointments.  It

3  said, let's look at the way the system operates as a formal

4  matter.  You don't assess the particular circumstances in a

5  political biplate that's going on in the here and now and

6  decide whether this is allocating power unfairly to one branch

7  or the other.  You look at it as a formal matter.  You do that

8  here and the answer is clear.

9       Even if your Honor thinks there is any problem, this

10  really is a fail-safe here, which is that the president felt

11  constrained in the president's ability to make an appointment

12  by the structure.  The president could have simply decided to

13  let the 60 days go by and not nominate somebody off the list,

14  nominate somebody else, then it would have been up to the

15  Senate to decide whether to confirm those people.

16       So the president had that ability to do it, to do it

17  that way, and I would certainly think that given the way the

18  stakes here, if that were the issue, I don't think it is for

19  all the reasons I have given you already, I think that you

20  really don't need to get that far down the line to decide that

21  this is a constitutional structure here, given that we are not

22  talking about officers of the United States.  But even if you

23  did, then I would certainly think that principles of

24  constitutional avoidance were justified interpreting the

25  statute to allow the court to operate in that way.  I really

1    don't think you can find a separation of powers problem here.

2         A few more points.  Mr. Olson talked about the

3    commission and the importance of a commission and that

4    commission indicating that you are an officer of the United

5    States.  Well, when I worked in the White House counsel's

6    office.  I had a really nice commission signed by the

7    president, framed, hanging on the wall behind my desk.  I was

8    not an officer of the United States.  I was an employee.  The

9    fact is that many, many employees in the executive branch are

10   given commissions and many interior officers who don't have to

11   be confirmed by the Senate to take office are given

12   commissions.  I really don't think you can read anything of

13   significance into that.

14        Then a couple more points of Mr. Olson with respect to

15   the <u>Valsia</u> case.  We talked about the critical significance of

16   the removal power as showing federal control.  Well, of course,

17   that was removable without cause.  Its certainly true that the

18   executive branch officer can be removed without cause, does

19   have to make sure that he or she is carrying out their duties

20   in conformity with the wishes of the president.  This is a

21   clause standard, a completely different thing.

22        If I could, I would like to just spend a minute

23   thinking about the way this whole thing is set up because I do

24   think it is something that gets to the heart of it and is

25   really important.

1        Basically what my friends on the other side are saying

2   is, look, this board is set up as a federal overseer of the

3   common law government.  But that is just not right.  First of

4   all, the congress said it is part of the Commonwealth

5   government, not a federal overseer.  What it is is an

6   independent board embedded within the structure of the

7   Commonwealth government.

8        Now, the board needed independence because it had to

9   make some very difficult political decisions and choices that

10  the governor wasn't going to like and the legislature wasn't

11  going to like, so they needed independence.  But independence

12  is not the same thing as superintendence.  I do think, not to

13  be presumptuous, I do think your Honor's opinion, recent

14  opinion about the transformation officer issue really

15  recognizes that that is exactly what the structure is here.  Of

16  course, it makes sense that congress would think about it that

17  way, because you now have a very strongly embedded legislative

18  policy, judgment and commitment, to autonomy and

19  self-governance within the territorial structure for the people

20  of the Commonwealth of Puerto Rico.  This way of approaching

21  it, this way of doing it is consistent with that commitment.

22  They are embedded in the government of Puerto Rico.  They are

23  an independent board.

24       Now, removal of power does remain with the president,

25  but the reason that it remains with the president is because

1   you've got to have can some check in case there is malfeasance

2   by board members.  Somebody has to have the authority to remove

3   in the case of that situation.  You can't really give that to

4   the governor or the legislature of Puerto Rico, for the reasons

5   that we talked about before, independence in the way that could

6   impair the mission.

7        If they give it to the president, I think that is a

8   very practical reason.  But I do think really, their whole

9   argument about control comes down to the fact that the

10  president has four clause rule power.  There really isn't any

11  other control.  There is no other supervision.  The board

12  doesn't report to the secretary of the treasury or anybody

13  else.  It is not in the chain of command.  They are an

14  independent entity within the government of Puerto Rico.

15       I think I have exhausted what I want to say, your

16  Honor.  I probably exhausted you as well.  If you have any

17  other questions.

18       THE COURT:  Thank you.  You have been quite clear and

19  comprehensible.

20       MR. VERRILLI:  Thank you.

21       THE COURT:  Now Mr. Ward for the United States.  I

22  have you down for 20 minutes.

23       MR. WARD:  Yes.  Thank you, your Honor.  May it please

24  the court.

25       My name is Thomas Ward from the U.S. Department of

 1   Justice.  I have the privilege of arguing on behalf of the

 2   United States.  So that I don't bury the lead, it is the view

 3   of the United States that PROMESA is unquestionably

 4   constitutional despite all the foreign generals in the room

 5   today, we don't think that this one is that close.

 6        It is also the view of the United States that if

 7   Aurelius and UTIER are correct, that the appointments clause

 8   applies here, that not just the Oversight Board, but the entire

 9   territorial government of Puerto Rico is unconstitutional.  So

10   if Aurelius wins, Puerto Rico has bigger problems than just

11   losing the Oversight Board.  There is a good argument that

12   their self-governance and their constitution are also

13   unconstitutional.

14        Jumping to the appointments clause, as you know, the

15   appointments clause prescribes the method of appointment for

16   all officers of the United States whose appointments are not

17   otherwise provided for in the Constitution.  Officers of those

18   persons hold federal offices and exercise significant authority

19   pursuant to the laws of the United States.  Central to

20   PROMESA's statutory scheme is a creation of the Oversight Board

21   within Puerto Rico's territorial government.  Congress

22   explicitly stated in this PROMESA that the Oversight Board is

23   an entity within the territorial government of Puerto Rico

24   making an expressed designation consistent with the board's

25   authority --

1          THE COURT:  Mr. Ward, I'm sorry.  I have to ask you to

2    project more.  They are having trouble hearing you in San Juan.

3          MR. WARD:  Sure.

4          THE COURT:  Make that a little more vertical and speak

5    out, please.  Thank you.

6          MR. WARD:  Sure.  Glad to do so.

7          THE COURT:  Much better.

8          MR. WARD:  The Oversight Board is an Article IV entity

9    to which the appointments clause does not apply.  We know the

10   appointments clause doesn't apply to Article IV territorial

11   entries because if it did, as I noted and we will discuss in

12   more detail, Puerto Rico's self-governance statute would be

13   unconstitutional.  Aurelius has conceded that territorial

14   self-governance is constitutional, and as a result, their

15   appointments clause argument can't be right.

16          The territory clause of Article IV is congress has

17   plenary authority over the territories, and as the Supreme

18   Court recently reiterated, pursuant to that plenary authority,

19   congress has broad latitude to develop innovative approaches to

20   territorial governance.  That is the Sanchez Valle case that

21   your Honor is familiar with.

22          The Supreme Court has also held that congress may

23   legislate the territory in a manner that would exceed its

24   powers or at least be very unusual in the context of national

25   legislation enacted under other powers delegated to it under

1   Article I Section 8.   That is the <u>Palmore</u> case from 1973.

2            To address the crisis in Puerto Rico, congress

3   provided for the creation of the Oversight Board as an entity

4   within Puerto Rico's territorial government to work with the

5   existing territorial government to get Puerto Rico back on

6   sound financial footing.   In PROMESA, congress used some of the

7   elements that were successful from the DC control board

8   structure, which was used to get DC's financial house back in

9   order.

10           The president approved PROMESA and the structure of

11  the Oversight Board by signing it into law on June 30, 2016.

12  By August 31, 2016, two months later, President Obama populated

13  the Oversight Board, choosing from the list, and also

14  appointing his own person.   He could have sought to supplement

15  the list with additional names, and he did not have to appoint

16  the people recommended by the congressional leaders.   He could

17  have appointed other individuals who would then be subject to

18  Senate confirmation.   President Obama chose to go with the

19  names listed in the recommended list.   As he stated publicly,

20  he was happy to do so.   In fact, he praised the board members

21  as the right people to help Puerto Rico over the challenges it

22  faced.

23           While PROMESA's Oversight Board may be innovative or

24  unusual in some respects, even though it is close to the DC

25  control board, it was in congress' plenary authority over the

1    territories to enact that.  Beyond that, it was within the

2    president's authority to sign it rather than veto it and

3    populate it without delay.

4         Turning to Aurelius' arguments, which are also made by

5    UTIER, they say the appointments clause does not apply because,

6    in part -- the appointments clause does apply in part because

7    history is replete with examples where the president has

8    appointed, with Senate confirmation, officials in the

9    territories, such as territorial governors.  But as we make

10   clear in our papers, history is also replete with examples of

11   territory officials being appointed by some method other than

12   presidential appointment with Senate confirmation.  We also

13   included examples of territorial officials being elected by the

14   people of the territory or the territorial legislature.

15        What the history actually shows is that congress has

16   long exercised its broad latitude to develop innovative

17   approaches to territorial governor.  Again, <u>Sanchez Valle</u>.  In

18   our brief, we give several examples of different types of

19   appointments and elections, territorial legislatures, attorneys

20   general and other.  Puerto Rico's history alone, there have

21   been elected territorial officials since the Foraker Act.

22   There have been territory officials appointed by the governor

23   under the Jones Act.  And Puerto Rico's governor has been

24   elected since 1947.

25        What the history shows is that congress is allowed to

1    be innovative with regard to the territories and has not felt

2    itself to be bound by the appointments clause.  So Aurelius is,

3    what really disproves the argument here is, I think what

4    Mr. Verrilli touched on, their acknowledgment that the election

5    structure of Puerto Rico's governor is constitutional.  Nothing

6    changed between the time when the governor was appointed and

7    the governor was elected in terms of the United States

8    Constitution.  That is a real problem for them.

9           The appointments clause, where it applies, provides

10   the exclusive procedure for selecting federal officers.  An

11   election is not one of them.  If the appointments clause

12   applies to a territorial officer, an election of that same

13   official would be a violation of the Constitution.  Yet

14   territorial officials have long been elected by the people or

15   by territorial legislatures, and territorial legislatures, in

16   turn, have been elected since the founding of the nation.  For

17   example, as we note in our brief, throughout the 19th Century,

18   territorial attorney generals and district attorneys were

19   elected by territorial legislatures.  More to the point,

20   congress frequently provided for the election of territorial

21   offices that had previously been appointed by the president

22   with the advice and the consent in the Senate.  That is

23   happening in Guam, in the Virgin Islands, in American Samoa.

24          All the arguments made by Aurelius whether the board

25   should be appointed in the appointments clause applied with

1    equal force to these territorial officers, but they have

2    conceded that self-governance in the territories is

3    constitutional, and that has to be right because the clause

4    does not govern the appointment of territorial officers.

5         Faced with this reality, Aurelius has tried to invent

6    an election exception to the appointment clause, or as

7    Mr. Olson said, the immediate authority exception to the

8    appointments clause.  Those don't exist.  The Constitution's

9    text structure history provide no such exceptions, nor does

10   the appointments clause provide an on/off switch for its

11   application, depending on whether the selection is made by

12   territorial residents or federal appointment or whether it is

13   made of immediate authority, as Mr. Olson stated.

14        Aurelius suggests that this is a constitutional

15   significance, the election point.  It is not.  This is made up

16   out of whole cloth.  Aurelius also suggests that it is of

17   constitutional significance that the Oversight Board owes its

18   existence to a federal law.  Again, because of Sanchez Valle,

19   it does not.  That is of no constitutional significance in

20   terms of application of the appointment clause.  That would be

21   the case with regard to every territorial government or entity

22   within a territorial government.  They all go back to the

23   congress.  They all owe their existence to federal legislation,

24   even those which are elected.  Therefore, what they argue

25   cannot be the law.

1          Look, they also spend a fair amount of time in their

2    brief on recess appointments, which nobody has touched on

3    today.  They tried to argue that the fact that the president

4    has made recess appointments over time, where he appointed and

5    the Senate confirmed officers is evidence that the appointment

6    clause applies.  That is quite a leap.  The right to make a

7    recess appointment doesn't turn someone into a federal officer

8    or grant them federal powers.

9          The simple answer is that congress is permitted to

10   legislate in any number of ways in the territories.  One way is

11   to give the president the ability to appoint officers with

12   Senate confirmation.  If congress does that, the recess

13   appointment power can go with it.  That is all it shows.

14         Looking at the text of the recess appointment power,

15   it is not expressly limited to the appointment of

16   constitutional officers, that is, the text plainly permits the

17   president to recess appoint of a territorial official, if the

18   officer is designated by congress, to require Senate

19   confirmation and the Senate is in recess.  That is all it is.

20   There is no magic to the recess appointments.  It proves way

21   too much to say that the president's exercise of that power

22   demonstrates a territorial official a federal officer.

23         Also, Aurelius brings up a number of grab-bag reasons

24   why these are federal officials, and I am going to try to knock

25   them down quick.  They say it is significant the Oversight

1   Board is mentioned in the federal budget.  I don't know why

2   they mention that because it doesn't help them.  What that

3   shows in the federal budget is that it has zero impact on the

4   federal balance sheet.  It receives no federal funding and

5   makes no contribution to the federal coffers.  Rather, the

6   federal budget makes clear that the board's financing is

7   derived entirely from the territorial government.

8          They also argue that the Oversight Board being able to

9   initiate litigation in federal court is of some importance.

10  Again, it is not.  The territorial government of Puerto Rico

11  has the same right, but that doesn't make that a federal

12  entity, and nobody would argue otherwise.

13         They also talked about the ability to get GSA,

14  government facilities.  What they don't say is that there is

15  actually a federal statute that allows the provision of

16  government facilities to all the territories on a reimbursable

17  basis.  Again, that means nothing.

18         They talk about federal ethics being applied.  That is

19  just good governance.  It doesn't turn somebody into a federal

20  officer.

21         They also talk about being able to serve subpoenas

22  outside of Puerto Rico.  Again, that doesn't make it a federal

23  entity.  Territorial entities have the authority to issue

24  subpoenas, and the board's subpoena authority is governed by

25  Puerto Rico's statute defining the scope of personal

1    jurisdiction.

2           Then, I think, as the people have touched on, the

3    existence of bicameralism and presentment is also, that is the

4    price of admission for congress doing business.  That has to be

5    present.  So the fact that those two are present doesn't mean

6    that every other structural constitutional protection just gets

7    incorporated automatically.  Those are the two minimum ones.

8           Then they say that the board makes annual reports to

9    the president and congress, so that must mean it is a federal

10   entity.  They make an annual report, but they also give to the

11   governor and legislature of Puerto Rico.  This is just so

12   people know what they're doing.  That would be quite a stretch

13   to say that that was something that turned you into a federal

14   officer.

15          Going to their separation of powers, which is kind of

16   a subset of their appointments clause argument, any separation

17   of powers analyst here has to account for the context in which

18   congress is exercising its power, which here is the plenary

19   Article IV territory power.  The flexible balancing that courts

20   engage in when conducting separation of powers of analysis

21   accounts for that greater authority vis-a-vis the other

22   branches.  Congress has plenary authority when it legislates

23   under Article IV that is greater than its authority to act

24   under Article I.

25          For example, with legislative territories, congress

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   can cut the president out entirely by providing for a direct

2   election.  The balance of power, and thus the separation of

3   powers analysis, is likely different in other context.  For

4   example, in enacting a military or foreign religions, the

5   president's power under Article II is at its height and the

6   separation of powers analysis for those instances would reflect

7   that type of balance of power.

8        Against the backdrop of the plenary Article IV power,

9   PROMESA's selection procedures do not amount to

10  unconstitutional environment because the statute permits the

11  president to ignore the list.  The president has the ability

12  under the statute to request supplementation of the list or to

13  appoint his own candidates with Senate confirmation.  Moreover,

14  it would be particularly odd to find the separation of powers

15  problem here in light of the fact that the plaintiffs have

16  failed to demonstrate that the president was, in fact,

17  constrained.

18       In fact, all evidence including the president's public

19  statement goes the other way.  He did not ask for

20  supplementation of the list, nor did he select his own

21  appointees and ask the Senate to confirm them.

22       To the extent that Aurelius is arguing that the

23  statute objectivity provides the president with a number of

24  means to effect his choices, that subjectively the president

25  was, in fact, constrained, that is not the role of the courts

1    to adjudicate that kind of dispute, because it is impossible to

2    determine whether the statute actually limited the president's

3    selection.   Thus, PROMESA's provisions enacted in the context

4    where congress' power is at its apex, governance of the

5    territories do not defend constitutional separation of powers.

6         Turning to footnote 15, which apparently Aurelius'

7    attorney is very excited.   I wish I could get so excited about

8    nothing.   We conceded nothing in that footnote.   The point in

9    footnote 15 was only to make clear how far Aurelius was

10   overreaching in its deal to strike down the statute.

11        As we understand their argument, they think the

12   statute must be read to compel the president to pick future

13   board members in the same expedited manner that applied under

14   the special provision for picking initial board members.   That

15   is an untenable reading of the statute on its own terms and

16   that should resolve the issue.   That was our point in footnote

17   15.   If there is any ambiguity on that point, principles of

18   constitutional avoidance would resolve it going forward.   That

19   is all.

20        I would also like to touch on the remedy point because

21   Aurelius says that the government concedes and agrees that bad

22   things would not happen if the court strikes down the board and

23   the Title III proceeding is dismissed or stayed.   That is not

24   the government's proceeding.   That is not our position.

25        If the court concludes that it is going to sever the

1   Oversight Board and going to stay the proceedings for whatever

2   remedy the court would seek to impose, the government would

3   ask, given the importance of this issue, to have the

4   opportunity to brief what our position would be. But it is not

5   accurate to say that we agree that bad things would not happen.

6           THE COURT: Just so that I understand you procedurally

7   and logistically, you're asking that if I would determine that

8   this appointment mechanism for the Oversight Board is

9   unconstitutional, you would have me announce that decision, but

10  entertain further briefing on the remedy point?

11          MR. WARD: Absolutely, given the importance here, and

12  we can do it quickly.

13          But we think that given the gravity of what is

14  involved here, and that even what a short stay could entail,

15  that we should be able to brief this.

16          Now, if Puerto Rico, for example, if a stay is not put

17  in place in the Title III proceeding, we don't know what would

18  happen to the Title III proceeding then. For example, Puerto

19  Rico may have payments on its debt due. What we understand

20  currently is Puerto Rico owes $2 billion in debt payments out

21  of a $9 billion budget. That is quite a bite out of what they

22  would have to spend for this year, not to mention what they

23  owed from last year, 2017.

24          So we would like the opportunity to really sharpen

25  the pencils, put out the numbers, and come up with our

1    recommendation on the remedy or our position on a remedy.

2              THE COURT:  Pursuing this a bit with you, because

3    eventually there will be rebuttal, and those that are asking

4    for that remedy will have further chance to speak about it.

5              My understanding of what was said was that they would

6    be asking me to stay any decision that would imply invalidation

7    of what has gone forward.  It was unclear to me whether they

8    were asking for a complete standstill of further activity until

9    the Title III, but leaving the Title III and therefore the

10   automatic stay and everything else in place or something else.

11             What is your understanding of what they are asking?

12             MR. WARD:  That is also my understanding, which is I

13   am not quite sure what they are seeking.  But anything that

14   involves the significant delay, even a stay in the Title III

15   proceeding, will have negative consequences for Puerto Rico,

16   and we would like the ability to submit something in writing of

17   our position on that.

18             THE COURT:  Thank you.

19             MR. WARD:  I'll reserve my two seconds.

20             THE COURT:  Fair enough.

21             At this point, I promised everybody, including myself,

22   a break.

23             If you don't mind, Mr. Dellinger.

24             MR. DELLINGER:  I'm happy.

25             THE COURT:  We will take a ten-minute break, and then

1    everyone please return to your seats in ten minutes.

2              Thank you.

3              (Recess)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  Good afternoon.  Please be seated.

2        Mr. Dellinger.

3        MR. DELLINGER:  Thank you, Judge Swain, and may it

4   please the Court.

5        Let me address a question that you raised at the

6   outset of the hearing about the relevance of the insular cases

7   to the propositions that we put forward.

8        We have two propositions under the appointments

9   clause, and neither of them is dependent upon the insular

10  cases.  In fact, we have no occasion to disagree with the

11  powerful dissenting statement of the first Justice Harlan in

12  the insular cases that the Constitution is supreme over every

13  foot of territory, wherever situated, under the jurisdiction of

14  the United States.

15       As my colleague, Mr. Olson, suggests, we do not

16  believe that Congress' power under the territories clause is

17  "immune from constitutional scrutiny."  We believe that it

18  passes that constitutional scrutiny.

19       Our two propositions are that properly interpreted,

20  the phrase in the appointments clause, officers of the

21  United States, does not include officials of the

22  District of Columbia, like the mayor and the city council, or

23  territorial officials.

24       Our second proposition is that the Oversight Board

25  members are territorial officials.  And I know both

1    Mr. Verrilli and Mr. Ward touched on this, but I wanted to add

2    a bit more detail to what I think is a critical point in this

3    case about whether these are or are not territorial officials.

4         Mr. Olson talks about the significance of the powers,

5    but, as this Court noted in your November 16 opinion, the

6    important responsibilities are shared by the Board and by the

7    government of the Commonwealth.

8         Those are all territorial powers, and when Congress

9    says -- and you wonder what weight to give to Congress'

10   declaration that this is an entity within the territorial

11   government.

12        Congress can't declare something to be true by ipse

13   dixit, but when Congress says that and when Congress carries

14   through on that, as it did throughout PROMESA, Congress

15   provided that the Board cannot contract on behalf of the

16   United States.  It can't sue on behalf of the United States.

17   It can't draw upon the federal fisc.  It can't obligate the

18   full faith in credit, but that's not all.  And this is

19   critical.  There are federal powers under PROMESA, but where

20   those powers exist, they are not conferred upon the Board.

21        For example, there is power under PROMESA to waive

22   federal wage and overtime regulations.  That's Section 404, but

23   that power is not placed with the Oversight Board.  It's placed

24   with the Secretary of Labor and the Controller General of the

25   United States.

1        Mr. Olson notes that the Board has subpoena powers,

2   but it's precisely delineated as subpoena power under

3   Puerto Rican law, not U.S. law.  And to pick out just one of

4   many, 204(d), the Board is expressly given no power over the

5   Commonwealth's implementation of federal programs so that if

6   you go through PROMESA, you see that there is a consistent

7   operating principle that territorial authority only is given to

8   the Board and that, along with the declaration on the part of

9   Congress, is what makes it clear.

10       Ask this question.  If the Board ceased to exist,

11  where would its powers go.  None of its powers would go to

12  federal agencies.  They would all revert to officials of the

13  Puerto Rican government.

14       Now, I think Mr. Olson has a very difficult problem

15  with the fact that we have elected since 1947 in Puerto Rico

16  the governor and other officials.  We've elected the mayor and

17  city council of the District of Columbia.  We have no problem

18  with that under the text of the appointments clause because of

19  the history that suggests that they are not officers of the

20  United States.

21       He has to create an unnoted, unwritten elections

22  exception, and even that doesn't do the trick because there are

23  other people who are not appointed in accordance with the

24  appointments clause, people who since 1917 and 1947 in

25  Puerto Rico have been appointed by officials of Puerto Rico and

1    not by the President.

2         There is nothing in text history or logic that would

3    create this elections exception, and I think to hold that

4    territorial officers are officers of the United States would

5    imperil the democratic government.

6         It's somewhat ironic that in their brief Aurelius says

7    Puerto Rico should enjoy the benefits of the Constitution's

8    structural safeguards, but if those supposed benefits include a

9    loss of the right of self-governments through elected

10   officials, I think that is a benefit that the Commonwealth

11   could do without.

12        There is one other way to think about this.  If

13   Congress did not violate the appointments clause when it

14   provided for popular election, why is it that all of a sudden

15   Congress becomes under the constraints of the appointments

16   clause if it adds to democratic government an element that the

17   U.S. has, in part with the Federal Reserve Board, which D.C.

18   had with the control Board, an element of insulation partially

19   for some fiscal and budgetary matters from immediate popular

20   election.  It makes no sense to say that there is an election

21   exception but that the full weight of the clause applies.

22        So I think what we have at the end of the day is what

23   Aurelius is seeking is the mere opposite of that broad latitude

24   for innovative approaches of which the Supreme Court spoke just

25   last year.

1          Because I think there were 62 days in which Congress

2    could have acted, there was plenty of time for the President to

3    have his choices met.  Congress was able to pass an entire

4    revision of the Internal Revenue Code through the House and

5    Senate in fewer days than that.

6          So I think it's not surprising that, given the amount

7    of authority that remains with the President to make these

8    choices, it's not surprising that two successive and somewhat

9    different presidential administrations have not found this to

10   unduly constrain any authority of the President.

11         If you have no questions, your Honor.

12         THE COURT:  Thank you, Mr. Dellinger.

13         Mr. Cooper for five minutes.

14         MR. COOPER:  Yes, your Honor.  Good morning, Judge

15   Swain.  Charles Cooper for the COFINA senior bondholders.

16         I simply want to punctuate really a point that's made

17   by all of the very fine lawyers who have preceded me on my side

18   of the case, and it deals with this proposition advanced by

19   Aurelius that the way you sort out federal officers from

20   territorial officers is whether they have been appointed

21   federally or whether they've been elected.

22         Counsel puts it in their brief this way at page 21 of

23   their opening brief:  "Officials who are elected by the people

24   of a territory or appointed by such elected representatives are

25   not officers of the federal government.  While those installed

1    by the federal government are federal officers."

2              This is essentially the fulcrum of their argument.

3    It is an essential pivot.  And, your Honor, it seems clearly

4    framed in order to produce two very convenient results for

5    Aurelius.  Number one, it renders the Oversight Board

6    unconstitutional, but it saves all of the elected officials --

7    governors, legislators, etc -- of the Commonwealth from any

8    harm.

9              So, with surgical precision, Aurelius has, again,

10   produced a result that only applies to the targets of their

11   lawsuit here but leaves standing everybody else in the

12   Commonwealth.  That's simply a result that the Constitution

13   cannot sustain.

14             If you step back for a minute and just assess this

15   argument, it produces results that are, on their face, I would

16   submit, strange and counterintuitive.  Congress can give no

17   role, when it acts under its Article 4 powers to make all need

18   for rules, can give no role in the selection of territorial

19   officers to the President of the United States, for if they do,

20   if the President is involved in that appointment process,

21   he essentially has what's analogous to the Midas Touch.  He

22   creates only federal officers if he's involved in that process.

23   But Congress can give the entire selection or appointment

24   process to the voters of the Commonwealth.

25             Your Honor, that just strikes my ear anyway -- and I

1  would submit it should yours as well -- as a very strange type

2  of constitutional interpretation, one that because it is such

3  an odd result, ought to be driven by constitutional text that

4  leaves very little doubt that that's the result the

5  Constitution requires.

6       You can search the text of the Constitution and

7  nowhere find anything suggesting in any way that that is the

8  line determining whether an officer is an officer of the

9  United States versus a territorial officer.

10       Another seemingly odd result of Aurelius' theory here

11  is that it would seem to me that Congress could call for the

12  election of officers that are in every respect clearly and

13  undeniably federal officers, officers of the United States,

14  such as the U.S. Attorney, so long as Congress placed the

15  appointment power in the hands of the voters.  That would seem

16  to square with Aurelius' argument.

17       So, your Honor, I will yield back the balance of my

18  time, but I simply wanted, again, to bring into sharp focus the

19  problem of Aurelius' argument.  Thank you.

20       THE COURT:  Thank you, Mr. Cooper.

21       Now Mr. Gershengorn.

22       MR. GERSHENGORN:  Thank you, your Honor.  May it

23  please the Court.

24       I represent the Retired Employees of Puerto Rico,

25  160,000 police officers, fire fighters, teachers, judges, and

1    other government workers who collectively have the largest

2    claim in these proceedings of roughly $50 billion.

3           I'd like to make three points this morning,

4    your Honor.  First is that history makes clear that Congress

5    can generally legislate for the territories free from the

6    appointments clause and similar separation of powers

7    constraints, and all three branches have believed that.

8           The Supreme Court held, as you heard in <u>Canter</u>, that

9    Article III doesn't apply to territorial judges.  The

10   Supreme Court held in the Heisen case that when Congress

11   legislates for the territories, separation of powers arguments

12   don't apply in the same way.  And as you heard from

13   Mr. Dellinger and others, courts have held that the

14   appointments clause doesn't apply to the D.C. counsel.

15          Second, Congress has made the same judgment.  You

16   heard about elections.  Elections have been part of territorial

17   governments from the start of our republic.  I won't belabor

18   that, but I did want to touch on the events following the

19   Louisiana Purchase.  Congress provided that all the powers of

20   the existing government "shall be vested in such person and

21   persons as the President of the United States shall direct," no

22   use of the advice and consent.

23          Congress debated the very appointments clause issue

24   that Mr. Olson is raising here today, and Congress decisively

25   rejected it.  In addition, for the next hundred years, Congress

1    used that exact same language, so not just for Louisiana but

2    for Florida and the Philippines and for Panama.

3          Not just Congress, the third branch, the executive

4    branch has had the same view for nearly two centuries from

5    Attorney General Grundy's opinion that territorial officers are

6    not officers of the United States in 1839.

7          Attorney General Cushing made the same point to the

8    Supreme Court in <u>Goodrich</u> in 1854.  The solicitor general told

9    the Supreme Court in 2003 that the appointments clause doesn't

10   apply in the territories, and then of course you've heard the

11   United States arguments and seen their briefs today.  The

12   history is clear.

13         That brings me to my second point.  Aurelius' efforts

14   to explain away each historical example just don't work.  Just

15   to pick the Heisen example, for instance, Aurelius dismisses

16   that in a footnote as just a case about statutory ratification.

17   That is simply not the case.

18         I urge the Court to read pages 384 and 385 of the

19   opinion.  The court makes clear its view that Congress can

20   delegate legislative authority to the President when

21   legislating for the territories even though it could not do so

22   constitutionally when legislating for the states.

23         The same is true for their distinction of the statutes

24   following the Louisiana Purchase.  They suggest, for example,

25   that the first governor of Louisiana had been subject to advice

1   and consent because he was governor of Mississippi.  That is

2   true, but that misses the point, which is that no officer was

3   subject to advice and consent but that many others that were

4   appointed by the President did not receive advice and consent.

5          Even today with respect to the Washington Airports

6   case, your Honor, you asked the question about the appointments

7   clause.  It was not at issue.  Footnote 23 says, "We express no

8   opinion on whether the appointment process of the board of

9   review contravened the appointment clause."  So I hope that

10  gets you what your Honor was asking earlier.

11         All of that brings me then to my final point which is

12  that Aurelius' effort to provide ad hoc explanations and

13  distinctions for each of these historical examples I think

14  really misses the forest through the trees.

15         I think what has to happen is the Court should step

16  back and consider the broader import of the territories clause.

17  The framers recognized that they couldn't possibly anticipate

18  the unique local needs and mysteries of all the territories the

19  new nation might acquire.

20         Some territories were going to be destined for state

21  hood; some not.  Some would be geographically close to existing

22  states, some not.  Some received emergency or temporary

23  governments; some not.  And some, like Puerto Rico, have faced

24  emergency fiscal crisis, at least in part as a result of their

25  territorial status; and some not.

1           All three branches have realized that the appointments

2    clause gives Congress the freedom to tailor individual

3    solutions to individual territorial needs, apart, freed from,

4    constraints like the appointments clause.

5           You've heard a number of times today the language from

6    Sanchez Valle, and I'll repeat it as well.  The Supreme Court

7    said, Congress has "broad latitude to develop innovative

8    approaches to territorial governance," consistent with the need

9    for what the Supreme Court called "inventive statesmanship for

10   the territories."

11          The enactment of PROMESA by Congress to meet the

12   emergency conditions in Puerto Rico shows very clearly the

13   wisdom of the framers' approach.

14          If the Court has no further questions, Aurelius'

15   motion to dismiss should be denied.

16          THE COURT:  Thank you.

17          MR. GERSHENGORN:  Thank you.

18          THE COURT:  Now Mr. Mollen.

19          MR. MOLLEN:  Good afternoon, your Honor.

20          THE COURT:  Good afternoon.

21          MR. MOLLEN:  Thank you for your patience and hearing

22   us today.

23          The lawyers who have preceded me have done a fantastic

24   job of going over most of the territory.  I'd like to focus the

25   Court on four quick points that I think illuminate in further

1     detail why this notion that the structural provisions of the

2     Constitution constrained Congress when it legislates for the

3     territories can't be right.

4          I'd like to start with the Heinszen case that

5     Mr. Gershengorn just mentioned because I think there is

6     actually an aspect of that case that's even more directly

7     applicable here.

8          In that case, Congress had delegated a non-delegable

9     responsibility, that is, the duty or the power to lay duties

10    under Article 1, Section 8, clearly unconstitutional if

11    Congress was legislating for the United States, but it wasn't.

12    It was legislating for the territory of the Philippines, and

13    the Supreme Court said that the notion that is fully

14    dispositive here is that when legislating for the territories,

15    Congress can delegate its power of governance to such agencies

16    as it determines  appropriate.

17         In this case, the Oversight Board is the agency that

18    Congress determined was appropriate.  We believe that Heinszen

19    is actually fully dispositive of this question whether the

20    structural provisions of the Constitution apply.

21         The Supreme Court has also said on a number of

22    occasions that Congress' authority in structuring the

23    governmental affairs of the territories under Article 4 is as

24    extensive as the states' power to order their own affairs or

25    the affairs of the municipalities within the states.

1        We only have to look around the country, your Honor,

2    and you see many examples where states have adopted structures

3    of government that are incompatible, facially incompatible,

4    with the structural provisions of the Constitution.

5        We list a number of them in our brief.  Just to name

6    one, the attorney general in New Hampshire takes office, not

7    after being confirmed or appointed by the governor and then

8    confirmed by any legislative body, but confirmed by or approved

9    by a five-member, elected board, incompatible with the

10    structures of the Constitution.

11        If what the Supreme Court said in <u>Cincinnati Soap</u> and

12    in other cases is true, that is, that Congress' authority is

13    equal to the authority of the states in ordering their own

14    affairs, then obviously the structural provisions of the

15    Constitution cannot apply.

16        Third, we know that those structural provisions don't

17    apply because of history.  We've heard an awful lot about

18    territorial judges and the appointment of governors and those

19    sorts of things.

20        Your Honor, the executive officers of the Virgin

21    Islands today -- there is no legislative consent given.  It

22    never goes to a Senate or a House of Representatives for

23    consent to the appointments made by the governor.

24        Guam has a unicameral legislature, your Honor.  If the

25    structural provisions of the Constitution applied when Congress

1   legislates the form of government for the territories, Guam

2   could not have a unicameral legislature.

3          Finally, your Honor, the discussion here has avoided,

4   it seems to me, any real examination of the line of demarcation

5   between those rights that do and those rights that do not

6   constrain Congress when it legislates for the territories.

7          We have 115/116 years worth of history here,

8   your Honor.  It does go back to the insular cases, but the

9   Supreme Court reaffirmed that line of cases in 2008.  We don't

10  have to rely on ancient case law in order to establish it.

11         What is that line of demarcation?  Congress is

12  constrained only where the legislation it's considering creates

13  personal rights that are essential to free government.  That's

14  the standard that has survived for over a century.

15         It is obvious, your Honor, that the appointments

16  clause, that is, appointment by the President and confirmation

17  by the Senate, is not essential to all free government.

18         It doesn't exist in the states as I just described, it

19  doesn't exist in some of the other territories, and it doesn't

20  exist with our allies who somehow manage to provide free

21  government to their people without having a president at all, a

22  senate at all, or anything like the sort of structural

23  provisions that we have in our Constitution.

24         One example -- we have others in our brief --

25  Great Britain.  Your Honor, the members of the prime minister's

1    cabinet are selected by the prime minister, appointed by the

2    queen or the king, and they have to be, by law, serving both in

3    the house of parliament and in the administration.  That is,

4    it's a disqualification for office if -- it seems I've run out

5    of time, your Honor.  May I finish this sentence?

6            THE COURT:  Yes.

7            MR. MOLLEN:  It's a disqualification in the British

8    system for the individual appointed by the queen to serve in

9    the minister's cabinet if that individual is not in the house

10   of parliament.

11           In the united States, it's exactly the reverse, and

12   yet somehow, Great Britain manages to provide free government

13   to the subjects of the country.

14           Thank you, your Honor, for hearing me.

15           THE COURT:  Thank you.

16           Mr. Blumin.

17           MR. BLUMIN:  Thank you, your Honor.  Matt Blumin for

18   the American Federation of State, County, and Municipal

19   Employees, AFSCME.  AFSCME Stands today on behalf of the tens

20   of thousands of active and retired Commonwealth public

21   employees it represents.

22           The average salary of a Commonwealth central

23   government employee is less than $28,000 per year.  The average

24   pension is less than $15,000 per year.  And these modest

25   resources are being used every day to support entire families

1    as they recover and rebuild after devastating hurricanes.

2           AFSCME public servants, like the Commonwealth they

3    serve, cannot afford a single moment of delay in Puerto Rico's

4    recovery.  It is for this reason that AFSCME opposes dismissal

5    of these Title III cases.

6           Nevertheless, AFSCME's members are offended by the

7    current state of Supreme Court jurisprudence with respect to

8    the territories.  In particular, AFSCME rejects the racist

9    insular cases and the doctrine of territorial incorporation

10   adopted conclusively by the Supreme Court in 1922 and

11   unfortunately reaffirmed by the courts since.

12          Under this offensive doctrine, it is only that narrow

13   category of fundamental constitutional provisions which are the

14   basis of all free government that must define U.S. territories

15   deemed unincorporated into the United States.

16          This doctrine has been deployed by the Supreme Court

17   to deny the constitutional right to trial by jury.  It has also

18   been used to justify discrimination against Puerto Rico in

19   federal programs, such as the exclusion of elderly and disabled

20   Puerto Ricans from receiving SSI benefits on Puerto Rican soil.

21          These basic injustices cut much more deeply at the

22   fundamental nature of free government than rejecting Aurelius'

23   request to formalistically apply the appointments clause to

24   Puerto Rico solely in order to advance Aurelius' interests as

25   an investor/creditor.

 1          To be clear, AFSCME believes that the insular cases

 2     and the doctrine of territorial incorporation must be

 3     overruled.  They are based on racist and false assumptions,

 4     were meant to be temporary but have endured for more than a

 5     century, and do not reflect the evolution of self-government

 6     in Puerto Rico.

 7          But only the Supreme Court can overrule its own

 8     decisions.  Therefore, unless and until the insular cases are

 9     overruled by the Supreme Court with respect to Puerto Rico,

10     AFSCME absolutely opposes Aurelius' effort to derail

11     Puerto Rico's recovery.

12          Aurelius' impractical demand that, contrary to the

13     Supreme Court's guidance, Aurelius is somehow entitled to have

14     the judicial branch overrule the form of territorial government

15     chosen by Congress simply pales in comparison to the basic

16     rights that everyday Puerto Ricans are denied under the insular

17     cases.

18          Furthermore, AFSCME agrees with the governor and

19     others that Aurelius' theory, which is that the appointments

20     clause applies to territorial officials, could call into doubt

21     the governor of Puerto Rico's popular election.

22          The democratic rights to self-governance which

23     Puerto Ricans have fought so hard to win should not be called

24     into question so lightly.  For this reason, AFSCME acknowledges

25     that these appointments clause challenges can be resolved under

1  Supreme Court case law which long predates the insular cases

2  and which supports the conclusion that the Oversight Board

3  members are not officers of the United States within the

4  textural meaning of the appointments clause.

5      However, for the Court not to reach that conclusion

6  and to rule in favor of Aurelius, it must overrule the insular

7  cases and the doctrine of territorial incorporation entirely.

8      To merely distinguish those cases and hold for

9  Aurelius would distort the law to benefit off-island

10 investor/creditors while leaving in place a grave injustice to

11 the civil rights of the Puerto Rican people.

12     If Aurelius were to succeed here in bending the

13 Constitution to its will only to harm Puerto Rico by

14 threatening the Commonwealth's ability to serve its citizens

15 and those citizens' right to elect their own self-government,

16 it would be a tragic act of colonial oppression in the

17 tradition of the insular cases themselves.  Thank you.

18     THE COURT:  Thank you.

19     Mr. Bienenstock.  I have you down for eight minutes.

20     MR. BIENENSTOCK:  Thank you, your Honor.  Good

21 afternoon, Judge Swain.  Martin Bienstock from Proskauer Rose

22 for the Financial Oversight Board, both for itself and as

23 representatives.

24     Your Honor, my mission is to address the motion for

25 stay relief.  There are two main points I want to make, and

1   then I will double back to the jurisdictional issue that was

2   raised in your Honor's colloquy with my adversary here earlier.

3           First, I want to set the table with some undisputed

4   facts.  I say they're undisputed because I'm taking them from

5   Aurelius' pleadings.  Aurelius is a plaintiff in a case

6   your Honor has sub judice where it's the ACP complaint.

7           In paragraph 10, it asserts that it's entitled as a

8   constitutional debt holder, that is, a general obligation debt

9   holder, is entitled to be paid before all other expenses.

10          In paragraph 11, it complains that the Commonwealth's

11  budget spends some money on recreation and art for the

12  Commonwealth people and children who are growing up.  And in

13  paragraphs 6 and 7 of that complaint, Aurelius contends that it

14  has a lien against the property taxes and clawback revenues in

15  the Commonwealth.

16          Moving over to the request that Aurelius is making

17  here in its motion for stay relief, it leaves us a little bit

18  in mystery as to what it wants to do because it doesn't file a

19  proposed pleading, but it does say in its motion that whatever

20  pleading it files would include two requests for relief, one

21  that all the Board's acts be deemed void and; two, that the

22  Board be enjoined from any further actions under PROMESA.  That

23  can be found on pages 2 and 25 of Aurelius' stay relief motion.

24          So what's the impact of that.  The impact, number one,

25  addresses Aurelius' first contention that it should get stay

1    relief if the stay applies because it is not trying to recover

2    on a claim.

3         Your Honor, under Section 362(a)(6) of the bankruptcy

4    code incorporated in PROMESA by its Section 301(a), any act to

5    recover on a claim is automatically stayed.  It is impossible,

6    given Aurelius' pending complaint where it is asserting its

7    secured and other rights to the Commonwealth's revenues, its

8    request for dismissal of the Title III petition, and for all

9    acts of the Board to be deemed void, which would include its

10   certification of the restructuring cases, the Title III cases.

11   If those go away, the automatic stay goes away.

12        So it is impossible, given the relief that Aurelius

13   has on file with this Court as requesting and what it wants to

14   file, it is impossible that it is not asking to do an act to

15   recover on a claim.

16        Even if in Aurelius' personal mind process it is

17   thinking that maybe it wouldn't take immediate action to

18   recover on a claim, what it is doing is an act to recover on a

19   claim.

20        And more importantly, your Honor, if the relief it's

21   requesting were to be granted such as all its acts deemed void,

22   including its restructuring certifications, then even if

23   Aurelius were kind enough out of the goodness of its heart not

24   to go forward to seize assets, to engage in the race to the

25   courthouse, all the other thousands of creditors in the

1    Commonwealth would be free to do so.  And it's really hard to

2    believe that Aurelius would stand by and let everyone else try

3    to get paid while it was silent.

4         So, whether or not it personally wants to go forward

5    and grab assets, it's asking for relief, the essence of which

6    is to enable itself and all other creditors to recover on

7    claims.

8         So the notion that the stay doesn't apply is just

9    wrong because it applies to any act to recover on a claim, and

10   this is not, as Aurelius argues in its reply, an overbroad

11   reading of the word "any act to recover" in 362(a)(6).

12        One can't imagine an any more direct connection

13   between the relief it's asking for, its position in the case,

14   and recovering on a claim.  Anyone wanting to recover on the

15   claims Aurelius owns would want to get rid of the automatic

16   stay, which is exactly what it's asking to do.

17        So, number two, it says, if the stay applies, which we

18   contend it does, it should clearly be granted relief.  And why?

19   Because it contends that it's being hurt.  And how is it being

20   hurt?  It says on page 24 of its brief, it says the harm it's

21   suffering arises from the Board's unlawful certifications of

22   the fiscal plan, the budget, and the restructuring.

23        Your Honor, it is truly ironic that a litigant who

24   comes to this Court today to enforce constitutional rights in

25   this motion believes it can make three conclusory legal

1    allegations that it's being harmed by unlawful certifications,

2    without showing any subject matter jurisdiction to the Court to

3    do that in view of Section 106(e) without putting in an iota of

4    evidence, and assuming the Court can simply take its legal

5    conclusory obligation as proof in evidence that it's being

6    harmed, and therefore, should get stay relief.  The bottom line

7    is it has failed to state a claim.

8          Finally on the jurisdictional issue, your Honor, the

9    relief Aurelius requests in its motion to dismiss the Title III

10   petition that the Court has heard this morning, in paragraph 5

11   on its proposed order, it wants the Court to say that the Board

12   was unconstitutionally appointed.  Its acts were void ab

13   initio.

14         In paragraph 6, it acts for a dismissal of the Title

15   III petition.  That is identical to what it wants permission to

16   file with another district court or a court in the same

17   district but perhaps with a different judge assigned, or

18   perhaps your Honor would be assigned.  It's unclear.

19         The bottom line, it's asking for the same relief

20   twice.  Now, it will probably come back and say, well, it has

21   some question as to whether the acts it wants to declare void

22   could go beyond its Title III acts and affect Title II.

23         Well, your Honor, under Section 306 of PROMESA, it's

24   the same construct for your Honor's subject matter jurisdiction

25   as in Title 11, namely, anything arising under PROMESA arising

 1   in the case or related to -- related to affects the

 2   administration of the case -- and anything that adds or

 3   subtracts to the assets and liabilities.

 4        So, while we can't say because it hasn't filed a

 5   complaint that all of the relief it's asking for it's not

 6   already asking for, clearly some of it is, but it's left that

 7   to a mystery because it didn't give us a draft complaint.

 8        Unless your Honor has questions.

 9        THE COURT:  I do.

10        Given your position as to the applicability of the

11   stay to the broader conceptual purpose of this litigation,

12   which is also mirrored in substantial part in the UTIER

13   complaint, is there a principled reason why there was no

14   objection to what has been initiated as violative of the

15   automatic stay or needing some relief in advance that I should

16   consider in connection with this motion?

17        MR. BIENENSTOCK:  Your Honor, it's a matter of I think

18   history and custom that people can always come to the

19   restructuring court and ask for relief that if they would go

20   into any other court for they would need stay relief.

21        To be sure, because your Honor is perfectly positioned

22   to take into account how to grant any remedy without

23   obstructing things that the Court and the law wouldn't want

24   obstructed, I would point out in that regard that Aurelius'

25   proposed order in the motion to dismiss does not include a stay

 1    pending appeal.

 2            THE COURT:  Thank you.

 3            Mr. Harris.

 4            MR. HARRIS:  Thank you, your Honor.  May it please the

 5    Court.  Mark Harris for the Oversight Board.

 6            I'm here to address the Board's motion to dismiss

 7    UTIER's adversary proceeding.  I'm planning only to address the

 8    standing issues as the appointments clause issues have been

 9    dealt with already by others.

10            So I have two quick points to make, your Honor,

11    concerning standing.  One concerns constitutional standing; the

12    other one concerns prudential standing.  On constitutional

13    standing, UTIER has not shown that it complies with the

14    requirements of Article III.

15            As the Court is aware, Article III requires three

16    showings for constitutional standing -- injury in fact,

17    traceability, and redressability.  That's the basic requirement

18    for every lawsuit that's brought under Article III.

19            UTIER needs to be able to show that it suffered

20    injuries in fact, and it needs to be able to put those injuries

21    at the doorstep of the Board in order to proceed with its

22    filing.

23            The trouble here is that it's quite clear from UTIER's

24    filing that its complaint is really with the Commonwealth, not

25    with anything that the Board has done.  When it describes its

1   injuries, it describes some number of impairments concerning

2   its collective bargaining agreement and says that it suffered

3   various harms.

4        It doesn't cite the provisions of the CBA itself.  The

5   real problem is that each of the impairments it's complaining

6   about was caused allegedly by something that the Commonwealth

7   did, not the Board at all.

8        It refers to four statutes.  Three of these statutes

9   were passed by the Commonwealth before any fiscal plan was

10  certified by the Board.  In fact, one of them was passed in

11  2014.  So that's years ago.

12       The last one, which is the Fiscal Plan Compliance

13  Act -- that was passed after the Board approved, certified, a

14  fiscal plan.  But, again, it's the Commonwealth's action, not

15  the Board's action, that it's complaining about.

16       Now, I think that UTIER explains somehow that it

17  believes that the acts incorporated something that the Board

18  did, but that's not what happened at all.  The Commonwealth

19  passed its own laws, and if it has complaints about those laws

20  or thinks that those laws somehow harmed it, its claims are

21  against the Commonwealth, not against the Board at all.

22       This is a problem, as I said, your Honor, that goes

23  both to traceability, that the injury that it alleges it can't

24  blame the Board for.  It also relates to redressability because

25  the key takeaway from all this is that even if UTIER received

1    the relief it's asking for, which was the invalidation of the

2    Board, these four statutes would still be on the books.  It

3    wouldn't affect anything.  It wouldn't change the impairments.

4    That's the reason why they don't have Article III standing.

5          I want to very briefly address prudential standing.

6    This is a problem for their third and fourth prayers for

7    relief.  In those prayers for relief, UTIER has asked for

8    declarations or orders declaring that all of the Board's

9    actions up until this point are null and void and also an

10   injunction, that any actions that the Board takes in the future

11   will be either preventing them or declaring those to be null

12   and void.

13         Our position is that those are both nullified and

14   blocked by Section 106(e) which basically says that there is no

15   jurisdiction in this Court to review challenges to the

16   Oversight Board, certification determinations.  That's really

17   what those prayers for relief were getting at.

18         Again, going back to the injuries that they're

19   claiming, the injuries, as they've alleged them, they believe

20   all go back to the certification of the fiscal plans.  Again,

21   as I've explained, really the harm is caused by statutes.  It's

22   not caused by the fiscal plans.

23         Even on their theory which is that somehow the fiscal

24   plans influence somehow the passage of acts, that was blocked

25   by 106(e).  They can't go forward with a challenge to certify

1   fiscal plans. 106(e) says there is no jurisdiction for those

2   to be considered. For that reason, UTIER is not able to bring

3   those claims.

4          If the Court has no questions.

5          THE COURT: Thank you.

6          MR. HARRIS: Thank you.

7          THE COURT: Now we will turn to the rebuttal

8   arguments, beginning with Mr. McGill.

9          MR. McGILL: Thank you, your Honor.

10         I want to start just by being very clear about what

11  Aurelius is seeking here today because there seems to be a

12  little bit of confusion about that. So, of course, we are

13  seeking dismissal of the Title III proceeding. That is the

14  relief sought by our motion to dismiss. We have further said

15  that we would consent to a stay pending appeal of that if this

16  Court were inclined to enter an order dismissing the Title III

17  petition.

18         As Mr. Bienstock said, we did not include that in our

19  proposed order, but I think we've made clear -- and I'm making

20  clear right now -- that we would not object to a stay pending

21  appeal if one were sought by the Oversight Board or others.

22         We also filed this motion seeking relief from the stay

23  because it was, in our view, not clear whether this Court had

24  jurisdiction as the Court overseeing the Title III proceeding

25  to issue the full measure of injunctive and declaratory relief

1    that we sought.

2            I did not hear counsel for the Board state a position

3    on that.  So, for that reason, I think we would continue to say

4    that we should get relief from the stay.  We think the stay

5    does not apply because the contemplated lawsuit is one for

6    declaratory and injunctive relief against the Board, not the

7    debtor.

8            It rides solely on this appointments clause issue.

9    This is not, in any sense, an action to enforce one of

10   Aurelius' claims against the Commonwealth.  So, for that

11   reason, we think the stay does not apply.

12           I do want to be clear.  We have no interest in

13   duplicative litigation.  If we filed such a lawsuit and it were

14   assigned to your Honor, we would have no objection to that.  As

15   I said before, we expect your ruling here to be dispositive of

16   any lawsuit that we filed seeking additional injunctive relief.

17           Certainly if this case goes to the Court of Appeals --

18   and you suggested that it might -- that appellate ruling

19   certainly would be dispositive of not only the motion to

20   dismiss filed by Aurelius here today but also any other lawsuit

21   seeking additional injunctive relief.

22           We also think that there is good cause to grant us

23   relief from the stay, even if the stay applied, because if

24   we're correct that the appointments clause here has been

25   violated and Aurelius is suffering a constitutional harm by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  virtue of the fact that it is being made part of a bankruptcy

2  proceeding that was initiated by and is being administered by

3  persons who do not have authority under federal law to hold the

4  offices that they are holding.  We think that's clear

5  constitutional harm.  It counts as irreparable, and that would

6  be adequate grounds for relief from the stay.

7      So we do think that the motion for relief from the

8  stay should be granted or that the stay should be clarified to

9  make clear that it does not apply to an action seeking relief

10  against the Board for an appointments clause challenge, but

11  another way that the Court could handle this is if the Court is

12  going to grant our motion to dismiss, I would expect that would

13  be appealed expeditiously by the Board.

14      If the Court is going to deny our motion to dismiss,

15  we would ask that the Court then enter an order under Section

16  1292(b) that would certify it for interlocutory appeal.  We

17  think that there are plenty of good arguments that we could

18  appeal it as of right, that that would resolve any issue of

19  appellate jurisdiction in the First Circuit.

20      That way, as we stated and as Mr. Olson stated at the

21  outset of his argument, our interest is getting an expeditious

22  resolution of this issue so that this proceeding can move

23  forward.  That is what our client wants, and that is what we're

24  here trying to achieve.  Thank you, your Honor.

25      THE COURT:  Thank you.

1          Mr. Emmanuellei.

2          MR. EMMANUELLEI:  Thank you, your Honor.

3          The opposing parties have raised some fear about the

4   legality of the internally elected territorial officers.

5          The government and the other opposing parties assert

6   that recognizing the constitutional flaws in PROMESA's

7   appointments mechanisms would necessarily entail that the

8   internal elected governments are unconstitutional.  That is

9   incorrect, your Honor.

10         Federal officers can coexist with territorial

11  officers.  As recently as 2016 in Sanchez Valle, the

12  Supreme Court distinguished officers who report to the federal

13  government from those who reflect the idea of self-government

14  stating that -- this is Sanchez Valle -- while the federal

15  government remains the ultimate source of all sovereignty in

16  Puerto Rico, local democracy makes the Commonwealth sovereign

17  in the ordinary sense that the island has a measure of autonomy

18  comparable to that process by the states, and the most

19  immediate source of Puerto Rico's authority to act and enforce

20  law is the Puerto Rico populace.

21         UTIER is not contending that the democratic election

22  of territorial officers violates the appointments clause.  On

23  the contrary.  When authority is derived directly from the

24  consent of the governor as opposed to remedially from Congress,

25  the character of the office is fundamentally changed.

1          That authority is ultimately delegated by the people

2     of the state, and the local electorate of state officers who

3     appoint them are accountable for their actions.

4          On the issue of the laws that affected UTIER, I should

5     say that those laws substantially affected the entitlement and

6     fiduciary duties of UTIER to negotiate and defend the

7     collective bargaining agreement that protects its members.

8          These laws were adopted by the members of the Board in

9     the Commonwealth fiscal plan and in PREPA's fiscal plan and

10    budget while being improperly appointed as members of the

11    Oversight Board.

12         The Board claims that neither the fiscal plan nor the

13    budgets discharges any claim and that no motion to that effect

14    has been filed, but it's also said that the fiscal plan is an

15    operative blueprint for financial management and the plan of

16    adjustment of debt.

17         The filing of a plan of adjustment of debt is the sole

18    purpose of this Title III proceeding.  Eventually, the Board

19    will file the plan of adjustment and will further impair

20    UTIER's rights, which at the very least, represent an imminent

21    injury and a monetary loss for its members.  That is standing

22    for UTIER.  Thank you, your Honor.

23         THE COURT:  Thank you.

24         Mr. Olson.

25         MR. OLSON:  Thank you, your Honor, for your attention

1    and for your patience.  You heard a lot of different voices

2    today, and I will take this opportunity, as briefly as I can,

3    to respond to some of the arguments made by our opponents with

4    respect to this motion.

5            The fundamental question before you is whether or not

6    members of this Oversight Board are officers of the

7    United States.  And if they are officers of the United States,

8    were they appointed under the statute in a manner consistent

9    with the Constitution of the United States with respect to the

10   appointment of officers of the United States.

11           Starting with Mr. Verrilli, our opponents have

12   challenged our assertion with respect to what the test is that

13   you must apply to determine whether these individuals, these

14   appointees, are officers of the United States.  And we've heard

15   various different iterations of alternative tests, but they are

16   clearly stated in many Supreme Court decisions.

17           I will quote the Freytag case, "Any appointee

18   exercising significant authority pursuant to the laws of the

19   United States is an officer of the United States and must,

20   therefore, be appointed in the manner prescribed by Section 2,

21   Clause 2, of Article 2."  That's the Freytag case.

22           In the Metropolitan Washington Airports case, the

23   court said, "An entity created at the initiative of Congress,

24   the powers of which Congress has delineated, the purpose of

25   which is to protect and acknowledge federal interest, and

1   membership of which is limited to officials are officers of the

2   United States."  The court has stated that several times.

3           It isn't how big an area the official has dominion

4   over.  There is no limitation if the official of the

5   United States is a clerk of a tax court or a clerk of a

6   territorial court or a trustee that is given limited

7   jurisdiction over space or a marshal of the United States that

8   has a limited territorial jurisdiction.  It's whether that

9   authority is exercising significant authority, that official is

10  exercising significant authority under the statutes of the

11  United States.

12          Now, what happened here.  What was intended.  What was

13  intended was to create a federal board of federal officials to

14  oversee what was happening with the financial affairs of

15  Puerto Rico.

16          Congress wasn't interested in vesting authority in

17  Puerto Rican officials to act pursuant to Puerto Rican law to

18  deal with the financial problems in Puerto Rico.  They were

19  creating a federal board because that other solution had not

20  been working out.

21          There were serious financial problems.  Congress

22  decided it must intervene, and it must create an agency that

23  would protect millions of citizens in Puerto Rico and the

24  millions of citizens who are affected by the financial affairs

25  of Puerto Rico, millions of citizens who are outside the

1    territory of Puerto Rico to whom money was owed or financial

2    obligations are owed.

3           So it was intended to be a federal board of federal

4    officials to deal with what was perceived as a major federal

5    problem affecting millions of United States citizens.

6           THE COURT:  So then why did Congress say specifically

7    that it was being created as a territorial Board?

8           MR. OLSON:  I think because Congress was concerned

9    about the very appointment clause provisions.  They did the

10   same thing with respect to the Metropolitan Washington Airports

11   Authority by saying these congressional members were going to

12   be acting in their individual capacity.

13          And what the Supreme Court said is that a label given

14   by Congress is not dispositive.  What the Supreme Court or the

15   courts must do with respect to facing these questions is look

16   at what's really happening.

17          There is no question what Congress intended with

18   respect to the Board.  It was created by a federal statute.

19   That's federal authority under a federal statute.  Its only

20   function is to enforce a federal statute.  Its members were

21   appointed by a federal official.

22          I've said these things before.  So I beg your

23   indulgence with respect to that, but all of these

24   manifestations are simply manifestations indeed of the fact

25   that it is a federal job that was being done with federal

1    parameters, federal authorities created in order to exercise

2    that federal responsibility.

3             With respect to the appointment -- I read this

4    before -- but Congress was fairly forthright about it.  "The

5    section for the appointment of several of the individuals

6    through a process that ensures a majority of its members are

7    effectively chosen by republican congressional leaders."

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. OLSON:  Congress was forthright in terms of the

2  problem it was trying to solve and it was forthright with

3  respect to the mechanism by which it would put officials there

4  to solve that problem.

5      One of my colleagues here today said, well, what would

6  happen if the board were to disappear?  All that authority

7  would be exercised by Puerto Rican officials.  Well, that is

8  not true, because congress created this agency because it was

9  not satisfied with what was happening by Puerto Rican officials

10  with respect to the finances of Puerto Rico.  So congress would

11  have to move further to create another board, if for some

12  reason this board disappeared.  And there is no reason this

13  board would need to disappear and there is no reason really to

14  go back to congress.  Because if the unconstitutional

15  provisions are stricken by you or by a higher court with

16  respect to the difficult constitutional problems that exist,

17  the board may go forward and exercise its authority in a

18  constitutional way.

19      Now, with respect --

20      THE COURT:  Given your view of the effect of elections

21  on the source of power, if congress had in this statute

22  provided for popular election of the members of the Oversight

23  Board from a slate prepared by congress, would there still be

24  an appointments clause problem?

25      MR. OLSON:  Yes, there would because it would be a

1    federal statute creating federal authorities.  All these

2    authorities that are being exercised at the board are pursuant

3    to a federal statute.  So if it is a substantial federal

4    authority created by a federal statute, then the appointment

5    clause must be complied with, and you can't give that authority

6    away.

7          With respect to the territorial limitations, I'll

8    refer again to the U.S. Marshals, U.S. Trustee's commission,

9    such as the Presidio Commission out in California which is

10   taking care of the former Army base in San Francisco, and the

11   Metropolitan Air Force Authority of the Tennessee Valley

12   Authority.  Congress constantly is creating agencies,

13   officials, and so forth, with limited territorial scope, with

14   limited territorial responsibility.

15         If a clerk of a territorial court is an officer of the

16   United States, which the Supreme Court has said, then certainly

17   these individuals who exercise such substantial power are

18   officers of the United States.

19         THE COURT:  What changed about the governor of Puerto

20   Rico between 1946 and 1947?

21         MR. OLSON:  That's a very good question, because we

22   hear that repeatedly from our opponents.  Actually, that kind

23   of authority delegating to the authoritarian territory itself

24   wants power to enact laws or a constitution for self-governance

25   is permissible and it has been since the foundation of the

1    country.

2            Because the very first statute that congress was

3    dealing with, one of the very first statutes that congress was

4    dealing with, was the Northwest Territory enactment.  And in

5    that respect, when the Articles of Confederation set up an

6    appointment power that was vested differently when the

7    Constitution was adopted, congress really realized that it had

8    to change that and amended the Northwest Territory statute or

9    the treaty with respect to change the appointment power, but

10   still, legislative officials in the territory were local

11   officials.

12           On and off during history, congress has decided that

13   we will best authority in a territory to elect its own local

14   regional municipal type of government.  And then the

15   substantial difference the court has made clear is that then

16   when those officials are acting, they are acting pursuant to

17   the authority that is given to them by their own officials in

18   their own territory.

19           But when this board is acting, it is not acting

20   pursuant to any law of Puerto Rico or the Constitution of

21   Puerto Rico, it is acting pursuant to and restricted by the

22   federal statute itself.  So the source of the authority is what

23   the Supreme Court has repeatedly talked about.  That is what

24   the language that I quoted to you with respect to the various

25   cases.  It is whether substantial federal authority is being

1    executed.

2        There isn't any question.  No action by this board is

3    constrained or dictated by Puerto Rican law or Puerto Rican

4    officials or Puerto Rican citizens.  They owe their

5    responsibility to the president and who can remove them and

6    their appointment by the president if it is done in a

7    constitutional way.

8        The _Buckley_ case --

9        THE COURT:  Do you have any specific case law

10   recognizing direct election as something that moots or

11   obviates, specifically recognizing direct election as some

12   popular election or something that moots or obviates the

13   seemingly absolute language of the appointments clause?

14       MR. OLSON:  I don't have a specific authority that

15   says that, but what we do have is the authority that says the

16   source of the power pursuant to which the official acts is the

17   determinative factor as to whether that officer is an officer

18   of the United States or an officer of a local agency.

19       Congress has -- history is the guide to this -- the

20   Supreme Court talked in the _Noel Canning_ case about how

21   important history is with respect to the interpretation of the

22   recess clause.  We cite that in our briefs.  The fact is that

23   congress has been doing this from the beginning of time with

24   respect to vesting certain authority in territories or other

25   places to local officials, and that is not a violation of the

1    appointments clause because the authority then to which the

2    individual has to respond is the local authority rather than

3    the statutory authority.

4            The Buckley case is another case with respect to what

5    the source of the authority is.  Congress there and the

6    arguments there in support of the Federal Election Commission

7    appointments was said to be acting pursuant to its authority in

8    the Constitution explicitly in Article I to control the manner

9    and time and so forth of elections.

10           The Supreme Court says, yes, the authority of congress

11   is plenary with respect to the elections clause, but that

12   doesn't immunize congress from complying with the structural

13   constraints of the Constitution.

14           We have heard much about territorial courts and how

15   that somehow is a response to the arguments that we have been

16   making.  But those cases allowing territorial courts talk in

17   terms of Article I courts, territorial courts, tax courts,

18   military courts, and other authorities.  The courts have

19   repeatedly said that all judicial power need not be vested in

20   Article III bodies.  A member of the judiciary can be appointed

21   with respect to the authority to create inferior courts,

22   specifically set forth in Article III and also in Article I,

23   and those cases involve various different Article I type

24   courts.  That does not change anything.

25           In fact, those Article I courts are also officers of

1   the United States because they are exercising substantial

2   authority under the statutes of the United States and, indeed,

3   their clerks are officers of the United States, according to

4   the Supreme Court.

5          THE COURT:  Now, if congress passed a statute

6   requiring the president to compile a list of candidates for a

7   governor of Puerto Rico and submit that list to popular

8   election as opposed to a selection to Senate advice and

9   consent, would that be constitutional?

10         MR. OLSON:  I think your question was that if the

11  president compiles a list, which is then submitted to Puerto

12  Rico officials, you can elect your governor?

13         THE COURT:  Then submit it to the Puerto Rican people,

14  that is what goes on the ballot?

15         MR. OLSON:  You can elect your governor, but the

16  governor that you elect must be from this list.

17         THE COURT:  Yes.

18         MR. OLSON:  I think that would be a more difficult

19  question, but to the extent that congress is then taking the

20  responsibility under a federal statute to limit the persons who

21  will be the head of the executive branch in Puerto Rico, it

22  would raise substantial questions under the appointments clause

23  because the president -- neither the president nor congress can

24  give this authority away.

25         We cited the Boumediene case involving Guantanamo

1    detainees and so forth.  The Supreme Court said congress may

2    have full authority in the territories of the United States,

3    but it cannot contract away fundamental structural provisions

4    of the Constitution.  One of the things that we heard today was

5    that there was somehow a difference between a territory and

6    property under Article IV.

7          THE COURT:  Before you go there, would the governor in

8    this scenario be a territorial officer or a federal officer?

9          MR. OLSON:  He would be an officer of the United

10    States if his authority is derived from federal statute.  The

11    hypothetical that you're giving me doesn't completely cover

12    what kind of laws are being enforced, what limitations on the

13    power, how the individual must act.  But to the extent that the

14    authority being exercised is created by a federal statute in a

15    hypothetical you give, then that person would be an officer of

16    the United States.

17          THE COURT:  In 1946, you have a governor who is

18    appointed by the federal government with the set of powers that

19    presumably congress has structured.

20          1947, that person prior to the adoption of a

21    constitution is popularly elected, and I think you tell me

22    there is no appointments clause problem there, no obvious

23    change in substance of authority, perhaps source of authority.

24          So let's say in 1946 and a half, the president

25    provides this list and it wasn't an open.  Anybody in Puerto

1    Rico wants to nominate, but it was an election.

2         Does the character of the governor change from a U.S.

3    office to a territorial office, and at what point and why?

4         MR. OLSON:  I think it is difficult to parse exact

5    lines with respect to this, but what the court is basically

6    saying is if congress passes a statute which delineates the

7    authority pursuant to which the appointee is acting, then that

8    person must be appointed in a manner consistent with the

9    Article II appointment clause provisions.

10         THE COURT:  So there is a question about whether the

11    change to popular elections in 1947 was actually compliant with

12    the Constitution, where there was no separate Puerto Rican

13    Constitution at that point?

14         MR. OLSON:  No.  I think because the municipal laws

15    that were governing the activity of the governor at that

16    particular point in time -- and I haven't studied this, so I'm

17    not sure of what I am saying here with respect to that -- but

18    to the extent that the decision-making, the scope of authority,

19    the relationship between the official and the legislative

20    branch is determined by some municipal instrument or a

21    territorial instrument that delineates those authorities, then

22    that official, over history, has permitted on the Constitution

23    permits that authority to be exercised by someone who hasn't

24    gone through the advice of consent provisions.

25         THE COURT:  But if the key points were in the Jones

1    Act or carried over from the Foraker Act and hadn't yet been

2    instantiated in the Constitution for Puerto Rico, then it might

3    be a problem?

4           MR. OLSON:  It might be a problem to the extent that

5    the authority being exercised is pursuant to that federal

6    statute, whichever statute it might be.  There might be

7    differences at various different times, but it is clear that

8    what has happened over time is that under certain

9    circumstances, congress, pursuant to its authority under

10   Article IV, can define the rules and regulations.  And when it

11   continues to exercise authority over those areas, then those

12   are federal officials.  But it may delegate that authority to

13   local officials under certain circumstances, which it has done

14   from the beginning of our constitution.

15          The idea that the board cannot -- the central fact is

16   with respect to this case -- there might be closer cases, there

17   might be different types of cases -- but with respect to this

18   case, it is clear that congress was intending to create a

19   federal Oversight Board.  It may have called it a territorial

20   board.  But the effect of it, what the court did, what the

21   congress did was create a federal Oversight Board.  It decided

22   when and under what circumstances actions by the governor or

23   the legislature of Puerto Rico bonds other provisions would

24   have to be run through and secure the consent or non-objection

25   of the Oversight Board.

1          And those individuals, when they need to look at

2    whether they can act on something, whether they can exercise

3    some authority or not, where do they look?  They do not look to

4    the Constitution of Puerto Rico.  They look to the

5    responsibilities given to them by the federal statute.

6          Now, we have heard a little bit about how this is a

7    very ingenious creative method, and Article IV allows congress

8    a lot of flexibility to create innovative solutions to

9    problems.  But those are the same arguments that were made in

10   the <u>Chadha</u> case.  The same arguments that were made in the

11   <u>Northern Pipeline</u> case, and in other cases where the Supreme

12   Court of the United States looked upon its responsibilities and

13   said, well -- especially in the <u>Chadha</u> case.  In the <u>Chadha</u>

14   case, the legislative veto cases, congress was looking -- I

15   mean, the court was looking at overturning some 200 statutes

16   that had been passed by congress, signed by the president from

17   the Roosevelt administration all the way up through the Carter

18   administration.  And the Supreme Court said, it is fine to have

19   these innovative creative approaches by congress, but they all

20   must comply with the structural limits of the Constitution of

21   the United States.

22         These provisions about the appointments clause and

23   other structural separation of powers provisions are designed

24   to protect all citizens of the United States.  I heard one of

25   my opponents say, well, the citizens of Puerto Rico will be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    just fine without your federal interference with the

2    appointment of our authorities.  But the point is that for the

3    long term and for the liberty of our citizens throughout our

4    nation, those structural provisions protect the liberty and

5    protect the structure of government and provide for

6    accountability so people will know who is responsible for

7    making the decisions.  These lists were actually secret lists

8    that were sent to the president.  There wasn't any publication

9    of who sent what names to the president.  So this

10   accountability is dissipated when people are appointed in that

11   particular fashion.

12          THE COURT:  But the president had to own the names

13   that were chosen and that was published, so that is no secret.

14   The president said, These are the people I am choosing, and he

15   did it at least two weeks before the deadline.

16          MR. OLSON:  Right, he did.  Because his pressure, if

17   he didn't act that way and he didn't have time to have the

18   advice of the consent of the Senate, I think it was

19   Mr. Verrilli who said it was the Senate decided, the Senate

20   could decide whether to confirm through an advice of consent

21   process or not.

22          Had the Senate, if it had had time for the president

23   to submit names to the Senate that the president came up with

24   as opposed to names that came up from legislative leaders, if

25   the president had had time to do that, which he didn't, there

1   is no opportunity to go through that process.  Had he had time,

2   the Senate could have said, well, we are busy or we're not in

3   session or we are having pro forma sessions and not going to

4   come back into full session to conduct an advice and consent

5   process.  If the Senate hadn't done that by that deadline, this

6   is the power created by the statute.  It isn't what actually

7   happened.  It is the power created by the statute.

8           The ultimate control was in the branches of the

9   congress to decide who could be appointed.  If that hadn't been

10  done, the statute specifically provides that the names have to

11  come from the congressional list.

12          I also heard one of our opponents saying, well, the

13  president can't ignore that and wait and just submit names and

14  maybe they will be approved by congress.  But the statute said

15  says that the president cannot do that, that the president,

16  after that deadline, must appoint officials from the lists.

17          This is a very, very important structural provision

18  that is intended to protect all citizens of the United States.

19  And at the end of the Metropolitan Washington Airport Authority

20  case, the Supreme Court has a paragraph where it says, if

21  congress can do this, there is no limit to what congress can do

22  in terms of constraining the appointment process and creating

23  all manner of ingenious techniques to rest power from the

24  president of the United States.

25          So the Supreme Court is very much aware, if you break

```
 1    the line and allow these kind of changes to take place,

 2    congress will continue to pursue them.  It is clear in the

 3    federalist papers that that impetuous vortex, which is what

 4    Hamilton referred to, is something -- was attempting to move

 5    greater power to itself and reduce power from the president or

 6    the other branches of government, and that is what must be

 7    guarded against, and that is the authority given to the

 8    judiciary beginning with Marbury v. Madison.

 9              THE COURT:  Thank you, Mr. Olson.

10              This has indeed been not only a long day, but an

11    extraordinary and extraordinarily important day.  I thank all

12    of the advocates here for their thoughtful, detailed arguments

13    and for engaging my various questions and hypotheticals.

14              I take these matters under advisement, and you'll know

15    when I have reached a decision from the ECF system.

16              We have scheduled another argument to begin at two.

17    We will begin that at 2:10.

18              Thank you, all.

19              (Adjourned)

20

21

22

23

24

25
```

1    UNITED STATES DISTRICT COURT)
                                )  ss.
2    OF PUERTO RICO             )

3

4

5

6                        REPORTERS' CERTIFICATE

7

8              I, Kelly Surina and Lisa Picciano Fellis, do hereby

9    certify that the above and foregoing, consisting of the

10   preceding 117 pages, constitutes a true and accurate transcript

11   of my stenographic notes and is a full, true and complete

12   transcript of the proceedings to the best of our ability.

13             Dated this 10th day of January, 2018.

14             S/Kelly Surina_____

15             Kelly Surina, RMR, CSR, RPR, CRR

16             S/Lisa Picciano Fellis_____

17             Lisa Picciano Fellis, RMR, CSR, RPR

18             Official Court Reporters

19             500 Pearl Street

20             New York, NY 10007

21             212-805-0320

22

23

24

25