**Hearing Date:  February 7, 2018 at 9:30 a.m. (Atlantic Standard Time)**
**Objection Deadline: February 1, 2018 at 5:00 p.m. (Eastern Standard Time)**

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*

     Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

PUERTO RICO ELECTRIC POWER AUTHORITY
("PREPA"),

     Debtor.

PROMESA
Title III

No. 17 BK 4780-LTS

**Court Filing Relates Only to PREPA
and Shall Only be Filed in Case No.
17-BK-4780 (LTS)**

------------------------------------------------------------x

## URGENT JOINT MOTION OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO AND THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING POSTPETITION SECURED FINANCING, (B) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) MODIFYING THE AUTOMATIC STAY, (D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF

To The Honorable United States District Court Judge Laura Taylor Swain:

     The Puerto Rico Electric Power Authority ("PREPA" or the "Debtor"), by and through

the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747).

Debtor's representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] and the Puerto Rico Fiscal Agency and Financial Authority ("AAFAF"), as the entity authorized to act on behalf of PREPA pursuant to the authority granted to it under the Enabling Act of the Fiscal Agency and Financial Advisory Authority, Act 2-2017, respectfully submit this joint urgent motion (the "Urgent Motion"), pursuant to PROMESA section 207, sections 105(a), 361, 362, 364(c), 364(d), 503, 507, and 922 of title 11 of the United States Code (the "Bankruptcy Code"), made applicable to the Debtor's title III case pursuant to PROMESA section 301(a), rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this case pursuant to PROMESA section 310, and rule 4001-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Puerto Rico (the "Local Bankruptcy Rules"), made applicable to this case pursuant to the *Order Further Amending Case Management Procedures* [Case No. 17-3283, Docket No. 1512] (the "Case Management Order"), for entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Financing Order") and a final order (the "Final Financing Order,"[3] and together with the Interim Financing Order, the "Financing Orders"), (i) authorizing the Debtor to obtain postpetition financing on terms and conditions set forth herein and such other terms as are agreed to by the Debtor, the Commonwealth of Puerto Rico ("Puerto Rico" or the "Government of Puerto Rico" and in its capacity as lender, the "Lender"), as lender, and the Oversight Board and set forth in the credit agreement (as amended, supplemented or otherwise modified from time to time in accordance with the Financing Orders, the "Credit Agreement") and the other agreements, documents, and instruments executed and delivered in connection therewith (each as hereafter amended,

---

[2]  PROMESA is codified at 48 U.S.C. §§ 2101-2241.
[3]  The Debtor will file the form of Final Financing Order prior to the Final Hearing (as defined herein).

supplemented, or otherwise modified from time to time in accordance with the Financing Orders, and, together with the Credit Agreement, the "Credit Documents"), by and between the Debtor, as borrower, and the Lender,[4] (ii) granting the Lender superpriority expense claims pursuant to Bankruptcy Code section 364(c)(1) and granting priming liens on the Collateral (defined below) pursuant to Bankruptcy Code section 364(d), each subject only to the Carve Out (as defined in the Interim Financing Order) (iii) granting stay relief, and (iv) prescribing the form and manner of notice and setting the time and date for the final hearing (the "Final Hearing") on the Urgent Motion.  In support of this Urgent Motion, the Debtor submits the declaration of Andrew Wolfe, attached hereto as **Exhibit B** (the "Wolfe Declaration"), the declaration of Todd W. Filsinger, attached hereto as **Exhibit C** (the "Filsinger Declaration") and the declaration of Dustin Mondell, attached hereto as **Exhibit D** (the "Mondell Declaration").[5]  In further support of this Urgent Motion, the Debtor respectfully represents as follows:

---

[4]   PREPA anticipates filing a substantially final form of the Credit Agreement with the Court on or prior to January 31, 2018.

[5]   The Wolfe Declaration, the Filsinger Declaration and the Mondell Declaration have been filed simultaneously herewith.

## Table of Contents

**Page**

Bankruptcy Rule 4001 Concise Statement ............................................................................ 1

Jurisdiction and Venue ......................................................................................................... 7

Background ............................................................................................................................ 8

I.      General Background .................................................................................................. 8

II.     The Debtor is Critical to the Recovery and Revitalization of Puerto Rico .................. 9

III.    The Debtor's Historical Challenges .......................................................................... 11

IV.    The Impact of Hurricanes Irma and Maria on the Debtor's Liquidity ....................... 12

V.      The Debtor Has an Immediate Need for Cash ............................................................ 13

VI.    The Structure of the Proposed Transaction Guarantees Adequate Protection ........... 16

VII.   Alternative Sources of Financing are Not Readily Available .................................... 19

Relief Requested .................................................................................................................. 21

Basis for Relief .................................................................................................................... 22

I.      The Debtor Should be Authorized to Obtain Postpetition Financing through the Credit
       Documents ................................................................................................................ 22

     A.     Entering into the Credit Documents Is an Exercise of the Debtor's Sound
           Business Judgment ........................................................................................ 22

     B.     The Debtor Should be Authorized to Grant Superpriority Claims and Priming
           Liens to the Lender ....................................................................................... 26

     C.     The Debtor Will Provide Substantial Information To the Creditors' of PREPA and
           The Lender .................................................................................................... 34

     D.     No Comparable Alternative to the Facility is Reasonably Available ................. 34

II.     The Lender Should be Afforded Good-Faith Protection under Bankruptcy Code Section
       364(e) ...................................................................................................................... 37

III.    The Automatic Stay Should be Modified on a Limited Basis .................................... 38

IV.    Failure to Obtain Immediate Interim Access to the Facility Would Cause Immediate and
       Irreparable Harm ...................................................................................................... 40

Request for Final Hearing .................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anchor Savs. Bank FSB v. Sky Valley, Inc.*,
    99 B.R. 117 (N.D. Ga. 1989) ..........................................................................................40, 46

*Bank of New England v. BWL, Inc.*,
    121 B.R. 413 (D. Me. 1990) .................................................................................................44

*Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*,
    789 F.2d 1085 (4th Cir. 1986) .......................................................................................34, 46

*Confederation Life Ins. Co. v. Beau Rivage Ltd.*,
    126 B.R. 632 (N.D. Ga. 1991) ............................................................................................44

*In re 495 Cent. Park Ave. Corp.*,
    136 B.R. 626 (Bankr. S.D.N.Y. 1992).................................................................................44

*In re Ames Dep't Stores*,
    115 B.R. ...............................................................................................................................47

*In re Ames Dep't Stores, Inc.*,
    115 B.R. 34 (Bankr. S.D.N.Y. 1990)............................................................................34, 39

*In re Autoseis, Inc.*,
    No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) ......................................................51

*In re Beker Indus. Corp.*,
    58 B.R. 725 (Bankr. S.D.N.Y. 1986)...................................................................................41

*In re Broadway 401 LLC*,
    No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) ..........................................................51

*In re Buckingham Oil Interests, Inc.*,
    No. 15-13441 (JNF) (Bankr. D. Mass. Dec. 2, 2015)..........................................................51

*In re Campbell Sod, Inc.*,
    378 B.R. 647 (Bankr. D. Kan. 2007) ...................................................................................44

*In re City of Detroit, Michigan*,
    No. 13-53846 (SWR), Docket No. 4108 (Bankr. E.D. Mich. Apr. 16, 2014) .......................51

*In re Crouse Grp., Inc.*,
    71 B.R. 544 (Bankr. E.D. Pa. 1987) ..............................................................................38, 39

*In re Curlew Valley Assocs.*,
    14 B.R. 506 (Bankr. D. Utah 1981) ...................................................................35

*In re Exide Techs.*,
    340 B.R. 222 (Bankr. D. Del. 2006) .................................................................35

*In re Farmland Indus., Inc.*,
    294 B.R. 855 (Bankr. W.D. Mo. 2003)..............................................................35

*In re Haights Cross Commc'ns, Inc.*,
    No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) ..........................................52

*In re Hamilton Square Assocs.*,
    No. 91-14720S, 1992 WL 98294 (Bankr. E.D. Pa. May 5, 1992)........................44

*In re Hubbard Power & Light*,
    202 B.R. 680 (Bankr. E.D.N.Y. 1996)...............................................................45

*In re Hudson*,
    No. 208-09480, 2011 WL 1004630 (Bankr. M.D. Tenn. Mar. 16, 2011) .............43

*In re Jim Kelley Ford of Dundee, Ltd.*,
    14 B.R. 812 (N.D. Ill. 1981) ............................................................................42

*In re L.A. Dodgers LLC*,
    457 B.R. 308 (Bankr. D. Del. 2011) .................................................................34

*In re Lagoon Breeze Dev. Corp.*,
    No. BR 10-15177-MM11, 2011 WL 939016 (Bankr. S.D. Cal. Mar. 14, 2011)....43

*In re Ledgemere Land Corp.*,
    125 B.R. 58 (Bankr. D. Mass. 1991) ...............................................................44

*In re Mosello*,
    195 B.R. 277 (Bankr. S.D.N.Y. 1996)..............................................................41

*In re Plabell Rubber Prods., Inc.*,
    137 B.R. 897 (Bankr. N.D. Ohio 1992).............................................................46

*In re Ralar Distribs.*,
    166 B.R. 3 (Bankr. D. Mass. 1994) .................................................................44

*In re Realty Sw. Assocs.*,
    140 B.R. 360 (Bankr. S.D.N.Y. 1992)..............................................................41

*In re Salem Plaza Assocs.*,
    135 B.R. 753 (Bankr. S.D.N.Y. 1992)..............................................................42

*In re Simasko Production Co.*,
  47 B.R. 444 (D. Colo. 1985) ..........................................................................35

*In re St. Mary Hosp.*,
  86 B.R. 393 (Bankr. E.D. Pa. 1988) ...............................................................39

*In re Stanley Hotel, Inc.*,
  15 B.R. 660 (D. Colo. 1981) ..........................................................................46

*In re TMP Directional Mktg., LLC*,
  No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) ....................................51

*In re Trans World Airlines, Inc.*,
  163 B.R. 964 (Bankr. D. Del. 1994) ...............................................................34

*In re Yellowstone Mountain Club, LLC*,
  No. 08-61570-11, 2008 WL 5875547 (Bankr. D. Mont. Dec. 17, 2008) ...............43

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
  136 S. Ct. 1938 (2016) ...................................................................................21

*Richmond Leasing Co. v. Capital Bank, NA.*,
  762 F.2d 1303 (5th Cir. 1985) ........................................................................35

*Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In
  re Elingsen McLean Oil Co., Inc.)*,
  65 B.R. 358 (W.D. Mich. 1986) ..............................................................35, 8

**STATUTES**

11 U.S.C. § 105 ..............................................................................................11

11 U.S.C. § 361 ..............................................................................................17

11 U.S.C. § 362 ........................................................................................ passim

11 U.S.C. § 363 ..............................................................................................34

11 U.S.C. § 364 ........................................................................................ passim

11 U.S.C. § 503 ..................................................................................4, 36, 37

11 U.S.C. § 507 ..............................................................................................11

11 U.S.C. § 922 ..............................................................................................31

28 U.S.C. § 1930 ............................................................................................10

*Additional Supplemental Appropriations for Disaster Relief Requirements Act of
2017*, Pub. L. No. 115-27, 131 Stat. 1224 (enacted Oct. 26, 2017).........................................26

Clean Air Act .................................................................................................................23

Stafford Act (42 U.S.C. § 5121 *et seq.,*) ......................................................................12

**OTHER AUTHORITIES**

Bankruptcy Rules 2002..................................................................................................14

Bankruptcy Rule 4001 ...........................................................................................  passim

Bankruptcy Rule 6004 ...................................................................................................14

Bankruptcy Rule 7052 .....................................................................................................3

Bankruptcy Rule 7062 ...................................................................................................14

Bankruptcy Rule 9014 ...................................................................................................14

https://obamawhitehouse.archives.gov/blog/2016/06/07/puerto-ricos-fiscalcrisis-
what-you-need-know ...............................................................................................21

Jeffrey Zients, *Puerto Rico's Fiscal Crisis: What You Need to Know* ...........................20

Letter from Richard Blumenthal et al. to Charles Grassley, Chair, S. Judiciary
Comm. (Sept. 30, 2015), http://www.puertoricoreport.com/wp-
content/uploads/2015/10/Letter-to-Grassley-re- Puerto-Rico-9-30-15.pdf ............21

Local Bankruptcy Rule 4001-2 ......................................................................................12

Local Bankruptcy Rule 4002-1 ......................................................................................19

Local Bankruptcy Rule 9013-1 ......................................................................................53

*Opinion and Order Denying Motion for Preliminary Injunction and Motion for
Relief from the Automatic Stay* ...............................................................................42

## **Bankruptcy Rule 4001 Concise Statement**

1.      In accordance with Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2, below

is a summary of selected terms of the Facility (defined below), together with references to the

applicable sections and provisions of the Interim Financing Order and the Credit Documents.[1]

| Material Term | Summary |
|---|---|
| **Borrower** | The Puerto Rico Electric Power Authority, Title III debtor |
| **Lender** | The Commonwealth of Puerto Rico, Title III debtor |
| **Revolving Facility** | Up to $1.3 billion revolver.<br><br>A senior secured priming super-priority revolving credit facility in an aggregate amount at any one time outstanding of not in excess of $1.3 billion (the "Facility"), subject at any time to the then applicable Commitment of the Lender. |
| **Commitment of the Lender** | The Commitment of the Lender shall initially be $550 million (the "Commitment", which Commitment may be increased (a) only if subsequently approved by the Lender and the Oversight Board (defined below), (b) only in increments of $250 million each, up to a maximum Commitment amount of $1.3 billion (each, a "Step Increase"), (c) only after entry of the Final Financing Order, and (d) to the extent approved by necessary governmental action of the Lender.  For the avoidance of doubt, each Step Increase will require the approval of the Lender and the Oversight Board, but will not require the approval of the Title III Court. |
| **Availability** | Prior to Final Hearing:  up to $550 million<br>After Final Hearing:  up to $1.3 billion<br><br>Until the Maturity Date (as defined below) and so long as no default or event of default exists under the Facility that has not been cured or waived, upon satisfaction or waiver of the conditions precedent to loans as set forth in the final documentation for the Facility, revolving loans under the Facility ("Loans") shall be available to the Debtor; provided that the Loans in the aggregate at any one time outstanding shall not exceed  the  then  applicable  Commitment  (the  "Availability")  as |

---

[1]    The summaries contained in this Urgent Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this Urgent Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in the summary chart but not otherwise defined have the meanings given to them in the Interim Financing Order or the Credit Documents, as applicable.

| Material Term | Summary |
|---|---|
| | approved by the Lender and the Oversight Board as set forth above (including any then-approved Step Increase); provided, however, upon 60 days' notice to the Debtor, if cash in the Puerto Rico Department of Treasury Treasury Single Account is projected to fall below $800 million during such 60-day period and no third-party source of capital (e.g. a community disaster loan under the Stafford Act (42 U.S.C. § 5121 *et seq.,*) ("CDL")) is available to the Lender (a "Commonwealth Financing"), no further Loans shall be available under the Facility unless otherwise agreed to by the Lender with the consent of the Oversight Board.<br><br>Subject to the terms and conditions of the final documentation for the Facility, the Loans may be borrowed, repaid and borrowed and shall be available as follows:<br><br>(i) upon entry of an the Interim Financing Order confirming the provisions set forth in "Security and Priority" below, including granting to the Lender a perfected first priority priming lien on all Revenues for the full amount of all obligations under the Facility and otherwise in form and substance satisfactory to the Lender, the Oversight Board, and the Debtor, the amounts available under the Facility shall not exceed $550 million; and<br><br>(ii) upon entry of the Final Financing Order confirming the provisions set forth in "Security and Priority" below, including granting to the Lender a perfected first priority priming lien on all Revenues for the full amount of all obligations under the Facility and otherwise in form and substance satisfactory to the Lender, the Oversight Board, and the Debtor, the remaining Loans (the "Full Availability") shall become available to the Debtor under the Facility subject to the then applicable Commitment as approved by the Oversight Board. |
| **Existing Trust Agreement** | That certain Trust Agreement, dated as of January 1, 1974, between the Debtor and State Street Bank and Trust Company, N.A., as amended, restated or otherwise modified from time to time (the "Trust Agreement"), pursuant to which, among other things, the Debtor issued certain bonds (the "Power Revenue Bonds") secured by a lien on all the Debtor's "Revenues" (as defined in the Trust Agreement). |
| **Segregated Account** | Proceeds of the Loans shall be maintained in a segregated account (the "Segregated Account") and the Financing Orders shall provide that such proceeds are not subject to any lien of any creditor other than the Lender and shall be used solely as permitted herein. |
| **Security and Priority** | Superpriority claim |

2

| Material Term | Summary |
|---|---|
| | First priming lien <br><br> All obligations under the Facility shall constitute a superpriority administrative claim in the Title III Case pursuant to 11 U.S.C. § 364(c)(1) and shall be secured by a perfected first priority priming security interest in all Revenues (as defined in the Trust Agreement) pursuant to 11 U.S.C. § 364(d). For the avoidance of doubt, the liens and security interests of the Lender in the Revenues shall prime the liens securing the Power Revenue Bonds. <br><br> All payments under the Facility shall be payable from the General Fund at the level of Current Expenses under the Trust Agreement and, upon confirmation of a plan of adjustment, as a superpriority administrative claim and, subject to the Carve Out (as defined below) before payment or distribution on other administrative claims and pre-petition claims (including those for Current Expenses) and senior to the repayment of the Power Revenue Bonds. <br><br> The security interests, liens and superpriority administrative claim will be subject only to a carve-out for professional fees and costs of administration incurred during the Title III Case (defined below) of the Debtor (as approved by the Court), any state matching requirements of Federal grants and loans and certain fees due and owing to the Office of the United States Trustee as set forth in the Title III Order (collectively the "Carve Out"). |
| **Required Consents** | Prior to the Closing (defined below) and Interim Borrowing, the Facility shall have been approved (a) by (i) the Oversight Board (ii) the Puerto Rico Fiscal Agency & Financial Advisory Authority ("AAFAF"), and (iii) the PREPA Board of Directors and (b) through (i) appropriate governmental action of the Lender approving the making of the Loans and (ii) entry of the Financing Orders by the Court. |
| **Use of Proceeds** | The proceeds of the Loans shall be used to make expenditures and disbursements: (i) for the Debtor's operations including, without limitation, employee payroll and benefits, facilities maintenance costs that are not capital expenditures or infrastructure improvements, and normal operational materials, supplies, fuel and power supplies, vendor, and services payments (collectively, "Eligible Uses") and (ii) for reimbursement of amounts expended for Eligible Uses from September 6, 2017 until the funding of the Loans. |
| **Ineligible Uses** | Unless otherwise specifically consented to in writing by the Lender and the Oversight Board, the proceeds of the Loans shall not be used for debt service; capital improvements; repair or restoration of damaged |

3

| Material Term | Summary |
|---|---|
|  | public facilities; paying the non-federal share of any Federal program; tax refunds; lobbying; Title III costs including but not limited to judgments arising from Title III cases and related cases, and legal or advisory fees; deposits, transfers, or payments to accrual accounts, reserve funds, or contingency accounts that do not represent an actual, immediate cash disbursement to continue current government operations for essential services; administrative costs of Federal disaster assistance grants and loans; or disaster related expenditures eligible for reimbursement from the Federal Government; or any expense that is not a "Current Expense" under the Trust Agreement (collectively, the "Ineligible Uses"). |
| **Budget** | Subject to the limitations on use of proceeds set forth herein, the Loans shall be available to fund disbursements consistent with the Debtor's initial 13-week cash-flow budget setting forth all projected cash receipts and cash disbursements on a weekly basis for the Debtor as approved by the Lender and the Oversight Board (the "Initial 13-Week Budget," attached hereto as **Exhibit E**[2] and together with any updated 13-Week Budget approved by the Lender, the "13-Week Budget") and thereafter the 13-Week Budget.<br><br>The 13-Week Budget shall separately identify disbursements for Eligible Uses (or permitted reimbursement thereof) and Ineligible Uses. The 13-Week Budget shall also identify the uncommitted balance in the Segregated Account.<br><br>Disbursements for Eligible Uses (other than disbursements that are to be paid from Federal funds that have been obligated, which shall not be subject to the test or limited by the 13-Week Budget) may exceed those set forth in the applicable 13-Week Budget for any cumulative four-week period (beginning with the period ending after the first full four-week period after the Facility is entered into) for Eligible Uses by 15% in the aggregate (the "Eligible Use Variance").<br><br>All disbursements for Ineligible Uses (other than Ineligible Uses that are subject to the Carve Out or any FEMA reimbursable expense for contracts that have been obligated by FEMA and approved by the Oversight Board, which uses shall not be subject to the test or limited by the 13-Week Budget) may exceed those set forth in the applicable 13-Week Budget for any cumulative four week period (beginning with the period ending after the first full four week period after the Facility is entered into) for Ineligible Uses by 15% in the aggregate (the |

---

[2] Exhibit E, attached hereto, includes a proposed Initial 13-Week Budget.

| Material Term | Summary |
|---|---|
| | "Ineligible Use Variance"). |
| | The Debtor shall update the Initial 13-Week Budget no later than the second week after the Initial Draw and every four weeks thereafter (the "Regular Updates") and submit such updated 13-Week Budget to the Lender and the Oversight Board.  Unless objected to by the Lender and the Oversight Board pursuant to the following provision, such updated 13-Week Budget pursuant to a Regular Update shall be the 13-Week Budget for all purposes under the Facility commencing on the first day of the period set forth in such updated 13-Week Budget.  The Lender and the Oversight Board shall have 14 calendar days to approve or object to a Regular Update.  If either the Lender or the Oversight Board objects, the prior 13-Week Budget shall remain in effect until the end of the 13-week period, or the Debtor submits a revised budget that is not objected to by the Lender or the Oversight Board. |
| | With the Regular Updates, and as otherwise reasonably requested by the Lender or the Oversight Board, the Debtor shall provide reasonable financial information and supporting data requested by Lender and the Oversight Board. |
| **Voluntary Prepayments** | The Loans shall be prepayable by the Debtor in whole or in part at any time without premium or penalty. |
| **Mandatory Prepayments** | Promptly upon the receipt of any Revenues, the Debtor shall apply such Revenues to the repayment of the outstanding Loans; provided, that the Debtor may retain Revenues sufficient to (i) pay budgeted expenses for Ineligible Uses provided for in the 13-Week Budget, expenses for Ineligible Uses that are subject to the Carve Out, or any FEMA reimbursable expense for contracts that have been obligated by FEMA and approved by the Oversight Board and (ii) maintain an operating reserve of up to $300 million (which funds can be used at the discretion of the Debtor for expenses for Eligible Uses provided for in the 13-Week Budget or for expenses for Ineligible Uses provided for in the 13-Week Budget, expenses for Ineligible Uses that are subject to the Carve Out, or any FEMA reimbursable expense for contracts that have been obligated by FEMA and approved by the Oversight Board). |
| **Refinancing** | If CDLs become available directly to the Debtor (on the same or better terms) and under the definitive documentation of the CDL refinancing is permitted, the Debtor shall refinance the Facility with the CDL. |
| | In addition, after entry of the Interim Financing Order, the Debtor shall publicly post a term sheet setting forth the terms of the Facility on EMMA and the Debtor (through AAFAF) shall reasonably consider all proposals submitted to the Debtor to refinance the Facility.   In |

5

| Material Term | Summary |
|---|---|
| | considering such proposals the Debtor shall take into account all economic terms and other terms and conditions of such proposal and shall consult with the Oversight Board with respect to any such proposals.  Any alternative financing shall be subject to Oversight Board approval under PROMESA section 207. |
| **Maturity Date** | The outstanding balance of the Loans will mature (in any event, the "Maturity Date") on the earlier of (i) the 30th anniversary of the Closing Date (defined below) or (ii) the Termination Date (defined below). |
| **Closing** | The date on which the closing occurs (the "Closing Date"). |
| **Termination Date** | The Termination Date shall occur on the earliest of (i) the date on which all the Loans and other obligations thereunder have been indefeasibly repaid in full in cash (and the Commitment has been terminated), (ii) the effective date of a confirmed plan of adjustment in the Title III Case (unless an alternative treatment is agreed to by the Lender and consented to by the Oversight Board), and (iii) the date of termination of the Commitment and/or acceleration of any outstanding extensions of credit under the Facility following the occurrence and during the continuance of an Event of Default (as defined below). |
| **Interest Rate** | Each Loan shall bear interest in the following amounts on the following schedule commencing for each Loan on the date of funding of such loan: <br><br> Interest Period    Interest Rate <br> First Semi-Annual Period  0.00% <br> Second Semi-Annual Period 0.50% <br> Third Semi-Annual Period  1.00% <br> Fourth Semi-Annual Period 1.50% <br> Fifth Semi-Annual Period  2.00% <br> Sixth Semi-Annual Period  2.50% <br> Thereafter      3.00% <br><br> In addition, in the event the Lender funds any Loans with proceeds of a Commonwealth Financing, the interest rate on such Loans shall automatically step-up to be equal to the interest rate on such Commonwealth Financing (the "Step-Up").  In the event of a Step-Up, interest shall be payable on the same interest payment dates provided for in the Commonwealth Financing. |
| **Loan Forgiveness** | If all or any portion of any Commonwealth Financing is forgiven by its lender from time to time, the Facility shall be forgiven in an amount equal to the amount of the third-party source of capital that is forgiven. |
| **Other Terms and** | The Facility will contain, in addition to those items set forth in this |

6

| Material Term | Summary |
|---|---|
| **Conditions** | Urgent Motion, representations and warranties, financial, affirmative and negative covenants, conditions precedent and such other terms and conditions as may be agreed to between the Lender, the Oversight Board, and the Debtor; provided, however, that there shall be no terms and conditions that provide for restrictions on the transformation of the energy sector or on the transfer of the Debtor's assets. |
| **Reporting Covenants** | The affirmative covenants shall include that the Debtor shall provide the following reporting to the Lender and the Oversight Board (with copies provided to the creditors of the Lender and Debtor who are party to the mediation agreement) updated on a weekly basis:<br><br>(i) Cash balance;<br>(ii) Statement of cash flows;<br>(iii) Total accounts payable and, if available, accounts payable aging schedule;<br>(iv) Total accounts receivable and, if available, accounts receivable aging schedule;<br>(v) Grid restoration report while the restoration activities are ongoing; and<br>(vi) Generation status report while the restoration activities are ongoing. |
| **Event of Default** | "Events of Default" under the Loan Documents shall include (i) the failure by the Debtor to pay, when due and payable, all or any portion of the obligations consisting of principal, interest, fees, or charges due to the Lender under the Facility, and (ii) after 30-days' written notice, any breach of material covenants that have not been cured or waived.<br><br>Upon an Event of Default, the Lender shall have the right to declare the Commitment terminated and/or to accelerate the repayment obligations under the Facility (the "Acceleration").<br><br>The loan documents shall provide that, upon Acceleration, Revenues shall be applied on an ongoing basis first, to the payment of expenses that constitute the Carve Out; second, to the payment of Eligible Uses in accordance with the 13 Week Budget; third, unless consented to by the Lender and the Oversight Board, to the repayment of any outstanding Loans under the Facility; forth, to the payment of any Current Expenses or necessary operating expenses that do not constitute Eligible Uses, and fifth, to the extent not covered by one of the proceeding categories, in accordance with Article 5 of the Trust Agreement. |

**Jurisdiction and Venue**

2.      The Court has subject matter jurisdiction over this Urgent Motion pursuant to PROMESA section 306(a).

3.      Venue is proper in this district pursuant to PROMESA section 307(a).

4.      The statutory bases for the relief requested herein are PROMESA section 207, Bankruptcy Code sections 105(a), 361, 362, 364(c), 364(d), 503, 507, and 922 made applicable to this case pursuant to PROMESA section 301(a), Bankruptcy Rule 4001, made applicable to this case pursuant to PROMESA section 310, and Local Bankruptcy Rule 4002-1, made applicable to this case pursuant to the Case Management Order.

5.      Prior to filing this Urgent Motion, certain holders of general obligation ("GO") debt of Puerto Rico advised the Oversight Board in writing that they oppose any lending from the Government of Puerto Rico to the Debtor without court approval, and that they oppose the concept of the Government of Puerto Rico borrowing from the federal government to lend to the Debtor.  While the Government of Puerto Rico and the Debtor never intended to enter into this loan transaction without court approval in the PREPA Title III case, the Government of Puerto Rico cannot necessarily assuage the GO debtholders' general opposition or their statements that they might seek stay relief and oppose any plan of adjustment.  The terms of the Facility provide Puerto Rico with the best protections allowed under the statutes.  Additionally, Puerto Rico and the Debtor must be recognized as integral components of one economy where they must act in the best interests of the territory, and not act as lone rangers.  The Government of Puerto Rico created the Debtor for the benefit of the territory and they rely on each other to safeguard and foster health, safety, and commerce for the benefit of all the people, businesses, and creditors.

8

## Background

### I.    General Background

6.      On June 30, 2016, the Oversight Board was established under PROMESA section
101(b).  On August 31, 2016, President Obama appointed the Oversight Board's seven voting
members.

7.      Pursuant to PROMESA section 315, "[t]he Oversight Board in a case under this
title is the representative of the debtor" and "may take any action necessary on behalf of the
debtor to prosecute the case of the debtor, including filing a petition under section 304 of
[PROMESA] . . . or otherwise generally submitting filings in relation to the case with the court."

8.      On September 30, 2016, the Oversight Board designated the Debtor as a covered
entity under PROMESA section 101(d).

9.      On June 29, 2017, the Oversight Board issued a restructuring certification
pursuant to PROMESA sections 104(j) and 206.  On July 2, 2017 (the "Petition Date"), the
Oversight Board filed a voluntary petition for relief for the Debtor pursuant to section 304(a) of
PROMESA, commencing a case under title III thereof (the "Title III Case").

10.     Background information regarding the Debtor and the commencement of the
Debtor's Title III Case is contained in the *Notice of Statement of Oversight Board Regarding
PREPA's Title III Case* [Case No. 17-4780, Docket No. 2].

### II.    The Debtor is Critical to the Recovery and Revitalization of Puerto Rico

11.     Puerto Rico is in the midst of an unprecedented economic and humanitarian
crisis[3] exacerbated by Hurricanes Irma and Maria.  Complicating Puerto Rico's ability to service

---

[3]    Before Congress enacted PROMESA, the Obama Administration and a dozen U.S. Senators concluded Puerto
Rico faced a humanitarian crisis.  *See* Jeffrey Zients, *Puerto Rico's Fiscal Crisis: What You Need to Know*, THE

9

its debt is the reality that, prior to the passage of Hurricanes Irma and Maria, Puerto Rico was already on the verge of being unable to provide its citizens with the most basic services, such as police and fire protection, education, sewer and water services, medical care, and critically, electricity.[4]   Indeed, Puerto Rico has declared a state of fiscal emergency in which it has acknowledged that it does not have sufficient resources to protect the health, safety, and welfare of the people of Puerto Rico.[5]

12.    As was true before Hurricanes Irma and Maria, and what has become more evident after them, the Debtor is the linchpin in Puerto Rico's overall recovery and revitalization. The Debtor was created in 1941 as a public corporation and governmental instrumentality of Puerto Rico by Act No. 83 of the Legislative Assembly of Puerto Rico, approved May 2, 1941 (the "Authority Act").   Pursuant to the Authority Act, the Debtor is charged with the conservation, development, and utilization of the energy resources of Puerto Rico to promote the general welfare of Puerto Rico's inhabitants and to increase commerce and prosperity.   Authority Act § 6.   The Debtor generates, transmits, and distributes substantially all the electric power used in Puerto Rico.   *See* Docket No. 1, at 7.   The Debtor is one of the largest municipal utilities in the United States, ranking first in number of clients and revenues.[6]   *See* Debtor's Fiscal Plan at 8. The Debtor has issued approximately $8.3 billion in Power Revenue Bonds under the Trust

---

WHITE HOUSE (June 7, 2016, 1:40 PM), https://obamawhitehouse.archives.gov/blog/2016/06/07/puerto-ricos-fiscalcrisis-what-you-need-know; Letter from Richard Blumenthal et al. to Charles Grassley, Chair, S. Judiciary Comm. (Sept. 30, 2015), http://www.puertoricoreport.com/wp-content/uploads/2015/10/Letter-to-Grassley-re-Puerto-Rico-9-30-15.pdf. *See, e.g, Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1942 (2016).

[4]    *See* PROMESA § 405(m).

[5]    *See* Act No. 21-2016 and Act No. 3-2017.

[6]    *Puerto Rico Electric Power Authority Fiscal Plan* at 8, Apr. 28, 2017, *available at* https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/590a2c5d7d41d.pdf (hereinafter, the "Debtor's Fiscal Plan").

Agreement, which are purportedly secured by security interests on the Debtor's Revenues (as defined in the Trust Agreement)

13.     Because economic growth in Puerto Rico is highly sensitive to electricity prices, the Debtor's reconstruction and ultimate ability to provide reliable power at reasonable rates is essential not only to the Debtor's recovery, but also to that of Puerto Rico and its other instrumentalities.[7]   The Debtor's recovery efforts in the coming months will set the stage for providing reliable and safe electrical service to Puerto Rico at rates consistent with the Debtor's and Puerto Rico's economic recovery and revitalization efforts.

### III.    The Debtor's Historical Challenges

14.     Prior to the devastation of Hurricanes Irma and Maria and over the past several decades, the Debtor faced challenges that have degraded its financial and operating condition.[8] Those challenges include: a prolonged recession leading to a significant drop in energy sales; inadequate reinvestment leading to old, inefficient, and unreliable transmission, distribution, and generation facilities and outdated information and technology systems; a high dependence on expensive fuel oil; relatively high levels of electricity theft and non-technical losses; and a disorganized customer service infrastructure.[9]   Those challenges were compounded by the fact that the Debtor operates in a challenging terrain and in an environment prone to natural

---

[7]   See *Declaration of Andrew Wolfe in Support of Opposition of the Financial Oversight and Management Board for Puerto Rico to the Motion of the Ad Hoc Group of PREPA Bondholders, National Public Finance Guaranty Municipal Corp., Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. for Relief from the Automatic Stay to Allow Movants to Enforce their Statutory Right to Have a Receiver Appointed* [Case No. 17-4780, Docket No. 149-2] (the "Wolfe Receiver Declaration") at ¶¶ 48–59.

[8]   Debtor's Fiscal Plan at 9.

[9]   *Id.*

11

disasters.[10]   Lower demand due to outmigration was a challenge even before Hurricane Maria exacerbated the situation.[11]

15.     As a result of those challenges, the condition of the Debtor's facilities has fallen significantly below industry standards.[12]   It has been estimated that, prior to the devastation of Hurricanes Irma and Maria, it would take approximately $6 billion in infrastructure improvements to stabilize and improve the Debtor's operational efficiency, safety, reliability, environmental compliance, and conversion to clean energy.[13]   Further, the Debtor historically has suffered from above-industry-average outages, which significantly affect the energy grid, the economy, and its residents.[14]   The environmental health cliff facing the Debtor under revised federal Clean Air Act emission standards is an additional fiscal challenge.[15]   Moreover, the Debtor has historically had difficulty meeting its operating expenses and has been forced to use proceeds from bond issuances to cover operational shortfalls.[16]   All of these factors have resulted in years of underinvestment, infrastructure that is unsafe and unreliable, and an unsustainable debt structure.

16.     In 2014, the Debtor's financial situation became so dire that the capital markets were no longer available.[17]   With no access to liquidity and insufficient revenues to cover both operating costs and debt service, the Debtor faced a serious likelihood of default.[18]   The Debtor's

---

[10]   *Id.* at 10.
[11]   *Id.* at 26.
[12]   *Id.*
[13]   *Id.* at 9.
[14]   *Id.* at 14.
[15]   *Id.* at 19.
[16]   *Id.* at 15.
[17]   *Id.* at 9.
[18]   *Id.* at 16.

liabilities currently exceed $14 billion,[19] which, in addition to rebuilding its infrastructure damaged by Hurricanes Irma and Maria, it must restructure to remain a viable business entity.[20]

## IV.   The Impact of Hurricanes Irma and Maria on the Debtor's Liquidity

17.   The Debtor's already fragile infrastructure was devastated by  the combined impacts of Hurricanes Irma and Maria.  Filsinger Declaration ¶ 7.  The hurricanes caused catastrophic damage to the transmission and distribution system, impacted certain of the generation assets, and took down critical communications and control infrastructure.  *Id*.  The Debtor's generation plants, though still standing, suffered structural and water damage.  Damage from the hurricanes resulted in the longest power outage in U.S. history, and the power outage continues to this day for a material number of the Debtor's customers.  *Id*.  Repairs to Puerto Rico's electric system and infrastructure are ongoing.  At this time, approximately 60-70% of customers have access to lines that have been energized.  Filsinger Declaration ¶ 8.

18.   Ancillary to the devastation to the island's power grid was the Debtor's inability to continue pre-storm cash collection levels.  In the immediate aftermath of Hurricane Maria, the Debtor's collections ground to a trickle, and they have remained low because the Debtor is still transmitting electricity at levels that are materially less than full capacity and critical equipment has not yet been repaired.  *Id*. ¶ 9.  Moreover, beyond the physical damage to transmission and distribution lines, customers' metering equipment and the accompanying communication pathways that utilize fiber optic cable or repeating stations were also damaged.  *Id*.  The process of converting customer power usage into billings relies on these communication pathways, and the repairs to the communications systems continue to this day.  *Id*.  Numerous customers also

---

[19]   *Id.* at 8, 20.
[20]   *Id.* at 8, 20.

suffered damaged "weatherheads," which prevent customers from drawing from the grid even if power has been restored to the distribution lines servicing their homes.  *Id.*

19.    Currently, the Debtor has restored the capability of billing approximately 35–40% of its customers.  Based on its regular collection cycle, the Debtor expects to resume collections before March 31, 2018, but does not expect to achieve a pre-hurricanes level of collections until power is fully restored to customers in mid-2018.  *Id.* ¶ 10.  Further, the Debtor estimates that the total loss of revenues collected (measured as budgeted revenue collections less actual and projected cash collections) for the first six months after the hurricanes will be approximately $1.2 billion.  *Id.* ¶ 14.  In addition to the loss of revenue, the Debtor has made substantial emergency expenditures necessitated by the storms.  *Id.*  While some of the emergency expenditures already incurred by the Debtor are being reimbursed by the FEMA, the timing and amount of the reimbursements remain uncertain.  *Id.*

## V.    The Debtor Has an Immediate Need for Cash

20.    The devastation wrought by Hurricanes Irma and Maria exponentially worsened the Debtor's already difficult financial situation.  The Debtor's General Fund cash balance as of January 19, 2018 had fallen to approximately $187 million and is projected to be negative by the week ending February 16, 2018.  *Id.* ¶ 11.  Taking into account a sixty-day operating reserve, by April 6, 2018, the Debtor projects a funding gap of approximately $1 billion.  *Id* ¶ 14.  Indeed, without implementing cash conservation measures, the General Fund cash balance would already be negative.  *Id.* ¶ 11.  Without an immediate infusion of liquidity, the Debtor may be forced to cease operations within the coming month.  *Id.*  This setback would further weaken and

14

destabilize Puerto Rico's economy and compound the problem of demonstrating to its residents
and industry that Puerto Rico has a reliable energy source.  Wolfe Declaration ¶ 26.

21.      The Government of Puerto Rico has agreed to provide the Facility to the Debtor
to ensure that the Debtor can continue to operate.[21]  Further, the Oversight Board has authorized
and approved the Commitment pursuant to PROMESA section 207.  The impact of a Debtor
shutdown would be catastrophic, leaving substantially all of the Island without access to
electricity.[22]  The shutdown would have a cascading effect on infrastructure and services that
rely on electric power to operate (such as airports, seaports, hospitals, water systems,
communication networks, hotels, traffic and street lights, etc.), plunge homes and businesses
across the island into darkness, impair residents in need of power for medical operations,
dialysis, and other patient needs, and impair Puerto Rico's fragile economy.  The shutdown
would also cause incalculable damage to Puerto Rico's ongoing restructuring efforts and
jeopardize creditor recoveries across all Puerto Rico agencies and instrumentalities.

22.      The requested relief for the use of funds from the Government of Puerto Rico to
fund the Facility is intended to be an interim, stop-gap funding measure pending availability of
federal loan proceeds the Government of Puerto Rico is attempting to negotiate.  A portion of
such proceeds would be lent by the Government of Puerto Rico to the Debtor through the
Facility.  In that regard, on October 26, 2017, Congress enacted the *Additional Supplemental
Appropriations for Disaster Relief Requirements Act*, which authorized $36.5 billion of disaster

---

[21]  On January 26, 2018, the Puerto Rico Legislature passed a joint resolution authorizing the Government of Puerto
Rico to provide financing for PREPA (the "Joint Resolution").  The Joint Resolution provides that the Facility
must be approved by the Puerto Rico Secretary of the Treasury. In addition, without further legislative authority,
the Facility is capped at $550 million and does not authorize loans to be drawn after June 30, 2018.
[22]  Filsinger Declaration ¶ 21.

relief funds to support recovery efforts in the aftermath of Hurricanes Harvey, Irma, and Maria.[23]
The disaster relief package included approximately $4.9 billion in loans under the Community
Disaster Loan ("CDL") Program, for which Puerto Rico, the U.S. Virgin Islands, and local
governments of Florida and Texas are eligible.   AAFAF and the Debtor have been actively
engaged in discussions with the United States Department of the Treasury and FEMA about the
possibility of a CDL loan directly to the Debtor or for the central government of Puerto Rico.

23.    While AAFAF, the Oversight Board, and the Debtor strongly believe that a CDL
loan is necessary to provide the needed level of funding for the Debtor, there is little confidence
that a CDL loan will be forthcoming in time to address the Debtor's immediate liquidity needs.
The Facility, however, is structured to allow for it to be refinanced by a future CDL loan or,
more likely, to allow the Government of Puerto Rico to downstream CDL loan proceeds
advanced to it under a Commonwealth Financing to the Debtor through the Facility. While the
Oversight Board, AAFAF, the Government of Puerto Rico, and the Debtor would prefer a loan
be made directly from the U.S. Treasury to the Debtor (and have made that preference clear in
discussions with the U.S. Treasury), the current position of the U.S. Treasury is that any CDL
provided to the public corporations, like the Debtor, will be done through the Government of
Puerto Rico.[24]

24.    The Debtor's cash on hand and projected revenues are simply insufficient to cover
the utility's upcoming operational expenses.[25]  Without the requested postpetition financing from
the Lender, the Debtor will soon have insufficient funds to maintain its operations, which will

---

[23]    *See* Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017, Pub. L. No. 115-27,
131 Stat. 1224 (enacted Oct. 26, 2017).
[24]    FEMA letter to AAFAF, dated January 9, 2018, a copy of which is attached hereto as **Exhibit F.**
[25]    Filsinger Declaration ¶ 22.

lead to a reduction or even the elimination of electricity services altogether for the island of Puerto Rico.[26]  As described above, the consequences of the Debtor's shutdown to the population of Puerto Rico and restructuring efforts would obviously be dire and must be avoided.

**VI.      The Structure of the Proposed Transaction Guarantees Adequate Protection**

25.      As explained below, the existing lien securing bonds under the Trust Agreement already provides for "Current Expenses" (including a sixty-day operating reserve) to be paid from revenues.  Because the Lender's loan to the Debtor can only be used to pay Current Expenses, the existing lien is not diminished or impaired by the first lien to be granted to the Lender because Current Expenses already have a prior right to be paid from the Debtor's revenues before any positive net revenues exist that could go to creditors.  This situation is unique because the priming lien the Lender is requesting, does not subordinate the existing creditors' lien to anything to which it is not already subordinated.  For example, in the ordinary course, if the Debtor had $1 billion of revenue and $1 billion of current expenses, the revenues would pay the Current Expenses, not creditors.  If instead, the Debtor has $200 million of revenues and $1 billion of Current Expenses, the $200 million of revenues and the next $800 million of revenues would be paid to cover Current Expenses before there would be collateral available to creditors.  The instant loan is simply bridging the gap and supplying temporary funds to pay the Current Expenses before additional revenues are collected.

26.      All amounts borrowed under the Facility will be senior in right of payment to the Power Revenue Bonds issued by the Debtor under the Trust Agreement.  Specifically, the Debtor's repayment obligations for the amounts borrowed under the Facility will be (i) secured by a perfected first priority priming lien on all the Debtor's revenues and (ii) treated as a

---

[26]  Filsinger Declaration ¶¶ 15, 22.

superpriority administrative claim in the Debtor's Title III Case, in each case subject only to the Carve Out.

27.     The Lender's priming lien, which can be granted pursuant to Bankruptcy Code section 364(d), as incorporated by PROMESA, which lien would be senior in all respects to the existing liens securing the Power Revenue Bonds and any other existing secured claims against the Debtor (and subordinate only to the Carve Out).   The secured claims under the Power Revenue Bonds, as required under Bankruptcy Code section 364, will be adequately protected because, among other things, (a) all loan proceeds will be used only for Current Expenses that under the Trust Agreement are already allowed to be paid out of the revenues that secure the bonds, (b) without the loans the Debtor would have to shut down, creating extra expenses of bringing it back up, (c) a further shutdown can only increase outmigration which would diminish the Debtor's future revenue stream, and (d) the collateral for the secured claims is a pledge of the net revenues (revenues minus expenses) and there can be no positive net revenues in the near and medium terms so there is no collateral value to protect in the near and medium terms.   Indeed, without the Facility, the Debtor will not be able to generate positive net revenues.

28.     As mentioned above, the Debtor's use of funds borrowed under the Facility will be limited to payment of essential operating costs of the utility, including payroll, benefits, facility maintenance expenses that are not capital expenditures or infrastructure improvements, and normal operational materials, supplies, vendor, and services payments that fall squarely within the definition of "Current Expenses" under the Trust Agreement (indeed, there are several categories of "Current Expenses" that are not even included as Eligible Uses for the loan, such as the Debtor's professional fees).   As such, all expenses to be paid with advances under the

Facility would otherwise have been prioritized and paid from the Debtor's "Revenues" ahead of debt service payments on the Power Revenue Bonds. Specifically, pursuant to the Trust Agreement, the holders of the Power Revenue Bonds are entitled to payment of "Net Revenues" after the payment of "Current Expenses."[27] "Net Revenues" are defined as the difference between the Debtor's revenues and its "Current Expenses."[28] The term "Current Expenses" is defined as:

> [The Debtor's] reasonable and necessary current expenses of maintaining, repairing and operating the System and shall include, without limiting the generality of the foregoing, all administrative expenses, insurance premiums, expenses of preliminary surveys not chargeable to Capital Expenditures, engineering expenses relating to operation and maintenance, fees and expenses of the Trustee, the 1947 Trustee, the Paying Agents and of the paying agents under the 1947 Indenture, legal expenses, any payment to pension or retirement funds, and all other expenses required to be paid by the Authority under the provisions of the 1947 Indenture, this Agreement or by law, or permitted by standard practices for public utility systems, similar to the properties and business of the Authority and applicable in the circumstances but shall not include any deposits to the credit of the Sinking Fund, the Reserve Maintenance Fund, the Subordinate Obligations Fund, the Self-insurance Fund and the Capital Improvement Fund or the 1947 Sinking Fund or deposits under the provisions of Sections 511, 512 and 513 of the 1947 Indenture.

Trust Agreement, at 18. As the Debtor's "Revenues" are presently insufficient, these expenses will be paid from advances from the Facility. Thus, neither the holders of the Power Revenue Bonds nor their asserted security interests in the "Revenues" under the Trust Agreement will be diminished by the Facility.

29.     Importantly, in light of the Lender's own financial situation, the Lender expects that the net amount of the advances under the Facility from its funds on hand will not exceed $550 million, and that the balance of the Commitment amount of $1.3 billion will be funded, if

---

[27]   Trust Agreement § 505.
[28]   Trust Agreement § 505.

required, from proceeds of CDLs to be provided by the federal government to the Government of Puerto Rico.[29] All advances to the Debtor under the Facility that are made by the Lender from proceeds of CDLs will bear the same interest rate as the CDLs. Moreover, in the event that any or all of the CDLs are subsequently forgiven by the federal government, the amount of CDLs that were subsequently advanced to the Debtor under the Facility will also be forgiven by the Lender. In essence, the Lender expects that a significant portion, if not the majority, of the Facility will be a pass-through of CDLs to the Debtor.

**VII.    Alternative Sources of Financing are Not Readily Available**

30.     Congress established the Oversight Board with the purpose of providing Puerto Rico with a method to achieve fiscal responsibility and access to the capital markets. PROMESA § 101(a). By doing so, Congress recognized that Puerto Rico and its instrumentalities have been cut off from normal market access. *See* PROMESA § 405(m)(6) ("the ability of the Government of Puerto Rico to obtain funds from capital markets in the future will be severely diminished without congressional action to restore its financial accountability and stability."); *see also* ANNE O. KRUEGER ET AL., PUERTO RICO – A WAY FORWARD (2015) (the "Krueger Report") at 1 ("Structural problems, economic shocks and weak public finances have yielded a decade of stagnation, outmigration and debt. Financial markets once looked past these realities but have since cut off the Commonwealth from normal market access.").

31.     That Puerto Rico and its instrumentalities lack access to the capital markets is uncontroversial.

---

[29]   As noted above, at present, the Debtor and the Commonwealth believe the federal government will not lend CDLs directly to the Debtor, and thus the Facility will need to be kept in place to advance CDL proceeds to the Debtor.

20

32.     Despite the Debtor's publicly-disclosed liquidity crisis, no financing of the magnitude required is readily available and committed other than the attractive financing offered by Puerto Rico.  Shortly after Hurricanes Irma and Maria, the Debtor received an unsolicited, publicly announced offer for financing from a group of holders of its Power Revenue Bonds. Mondell Declaration ¶ 7.  That offer was for $1 billion of financing, but was tied to a roll-up of $1 billion in existing bonds into an additional $850 million of post-petition financing (which would have resulted in a senior credit facility of $1.85 billion, out of which $1 billion of cash would have been available for advancement to the Debtor).  *Id.*  The offer carried a stated per annum interest rate of LIBOR plus 4.5% and a two-year maturity date.  *Id.*  In addition, the interest rate would have increased to LIBOR plus 6.5% upon the one year anniversary of initial borrowing.  *Id.*  The roll-up feature also provided investors in the loan facility with enhanced security provisions on a portion of their pre-petition claims.  *Id.*  The proposal also required the appointment of a receiver and had the potential to limit the future transformation of the electric grid.  *Id.*  For reasons that were publicly stated by AAFAF at the time, the proposal therefore was turned down.

33.     Beginning on January 21, 2018, the Debtor, through Rothschild, initiated a marketing effort to obtain alternative financing.  Mondell Declaration ¶ 11.  As part of that process, Rothschild, with the assistance of advisors for the Debtor and AAFAF, prepared marketing materials and assembled a data room populated with relevant diligence information. *Id.*  In consultation with the advisors to the Oversight Board, professionals from Rothschild have been in contact with ten potential funding providers, which consisted of four existing PREPA, Commonwealth, and COFINA bondholders and bondholder groups, and six third-parties capable

21

of providing financing of this magnitude. *Id.* As set forth in the Mondell Declaration, the contacted parties included all of parties that had previously expressed to either Rothschild or the Oversight Board's financial advisor interest in providing such financing to the Debtor. *Id.* ¶ 12. To date, seven of these prospective lenders have signed non-disclosure agreements ("NDAs") (or are operating under existing NDAs) and have been provided access to the data room maintained by Rothschild containing relevant information on the current financial conditions of the Debtor. *Id.* Rothschild has requested interested parties to submit initial indications of interest by February 2, 2018. The Debtor will submit an updated Mondell Declaration to the Court after proposals have been submitted and reviewed.

34.     The Debtor, through Rothschild, will continue the solicitation process until the Final Hearing to determine whether a superior financing proposal can be obtained. Mondell Declaration ¶ 13. Importantly, because the terms of the financing contemplated in the Urgent Motion include a zero percent interest rate for the first six months, no closing fees, and no prepayment penalty, the Debtor can refinance the Facility if desired (to the extent of available financing in the future), without the Debtor having incurred costs on the Facility even following approval of the Urgent Motion. *Id.*

35.     Further, despite the efforts of the Debtor's advisors, the Debtor could not obtain a commitment for the financing sought through this Urgent Motion on an unsecured basis, on a junior lien basis, or on a *pari passu* lien basis. Mondell Declaration ¶ 15. Lastly, and critically, no party has offered to extend a loan that has the potential to be cancelled or forgiven.

## **Relief Requested**

36.     The Debtor requests that the Court:

a.  authorize the Debtor to obtain the Facility consisting of $1.3 billion in the form of a senior secured priming super-priority revolving credit facility, with authority to borrow up to $550 million available on an interim basis pending entry of the Final Financing Order (the "Initial Borrowing"), subject to and pursuant to the terms and conditions set forth in the Interim Financing Order, the Final Financing Order, and the Credit Documents;

b.  grant first priority priming liens on the Collateral to the Lender, and grant superpriority administrative expense claims to the Lender, in each case subject to the Carve Out;

c.  schedule the Final Hearing to consider entry of the Final Financing Order authorizing the borrowings under, and the Debtor's entry into, the Credit Documents on a final basis; and

d.  modify the automatic stay imposed by Bankruptcy Code sections 362 and 922 to the extent necessary to implement and effectuate the terms of the Financing Orders.

## Basis for Relief

## I.  The Debtor Should be Authorized to Obtain Postpetition Financing through the Credit Documents

### A.  Entering into the Credit Documents Is an Exercise of the Debtor's Sound Business Judgment

37.    The Debtor seeks authority to obtain access to the Facility immediately because a cash shortage may arise at any time.  Bankruptcy Code sections 364(c) and (d)[30] authorize a debtor to obtain secured financing under certain circumstances discussed in detail below.  Courts grant a debtor considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *Bray v.*

---

[30]  Pursuant to PROMESA section 301(a), subsections (c), (d), and (e) of Bankruptcy Code section 364 are incorporated into PROMESA but subsections (a) and (b) (authorizing the incurrence of administrative priority, unsecured debt) are not.  As the Facility will be secured by priming liens on the Debtor's "Revenues" (as defined in the Trust Agreement), subsections (a) and (b) are not implicated by this Urgent Motion.  Further, section 363 of the Bankruptcy Code is not incorporated into PROMESA.  Thus, the Urgent Motion is predicated on sections 364(c) and (d) alone.

23

*Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986);
*In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that interim financing was approved because it "[r]eflected sound and prudent business judgment on the part of [the debtor] . . . reasonable under the circumstances and in the best interest of [the debtor] and its creditors."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Simasko Production Co.*, 47 B.R. 444, 448–49 (D. Colo. 1985) (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate).

38.     To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

39.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor

24

and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo.
2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.
(In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a
debtor may have to enter into "hard bargains" to acquire funds for its reorganization); *Richmond
Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny
[of the debtor's business decisions] would slow the administration of the debtor's estate and
increase its cost, interfere with the Bankruptcy Code's provision for private control of
administration of the estate, and threaten the court's ability to control a case impartially."); *In re
Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of
postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business
judgment."):

> The Court should interfere with the Debtor's management decisions only if
> it is made clear that those decisions are, *inter alia*, clearly erroneous, made
> arbitrarily, are in breach of the officers' and directors' fiduciary duty to the
> corporation, are made on the basis of inadequate information or study, are
> made in bad faith, or are in violation of the Bankruptcy Code. *See In re
> United Artists Theatre Co.*, 315 F.3d 217, 233 (3rd Cir. 2003); *Richmond
> Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985); *In
> re Defender Drug Stores, Inc.*, 145 B.R. 312 at 317 (B.A.P. 9th Cir. 1992).

40.     The Debtor's determination to move forward with the Facility is an exercise of its
sound business judgment following a careful evaluation of alternatives. Given the Debtor's
nearly-exhausted cash reserves exacerbated by the passage of Hurricanes Irma and Maria and
resulting delay in collection of "Revenues," the Debtor and its advisors, together with the
Oversight Board, determined that the Debtor would require significant postpetition financing to
continue operations (including addressing its post-hurricane recovery efforts) and to fully
reestablish, maintain, and improve electricity services for the citizens of Puerto Rico.

25

41.     More specifically, the Debtor's General Fund cash balance as of January 19, 2018 had fallen to approximately $187 million and is projected to be negative by the week ending February 16, 2018.  Filsinger Declaration ¶11.  Without an immediate infusion of liquidity, the Debtor may be forced to cease operations within the coming month.  As described further above, the impact of a Debtor shutdown would be catastrophic, leaving the entire Island without access to electricity.   Without power, Puerto Rico's businesses cannot operate, citizens who have evacuated the Island have little reason to return, and those who have remained have greater reason to leave—exacerbating the loss of the Government of Puerto Rico's and the Debtor's revenues.  As a consequence, the Government of Puerto Rico's ability to actually collect, and its citizens' ability to actually pay, taxes will be hampered.  Wolfe Declaration ¶ 28.  Absent an infusion of additional funds into the Debtor, the Government of Puerto Rico cannot realistically continue to operate, recover, and rebuild the Island's basic infrastructure and stabilize the economy.

42.     Given the devastation caused by Hurricanes Irma and Maria, the Debtor's projected near-term liquidity shortfall, the delays in obtaining federal funding, and the devastating impact of any interruption to Puerto Rico's power supply or delay in restoration efforts, the Debtor believes the Facility is amply justified and should be approved.  Moreover, the Facility is being provided at a highly competitive interest rate (subject to step-up in certain circumstances), and as shown in the Mondell Declaration, it is superior to any similar financing for which the Debtor has yet received a proposal from a third-party lender, though the Debtor continues to diligently seek competing offers.  Mondell Declaration ¶ 13, 15.

26

43.     As described further below, from the standpoint of the Lender (itself a Title III debtor), it reasonably requires the protections of a superpriority administrative claim pursuant to Bankruptcy Code section 364(c)(1) and priming liens on the Debtor's "Revenues" pursuant to section 364(d).  Without such protections, the Lender would be placing a significant amount of its own liquidity at material risk of not being repaid to the obvious detriment of its restructuring effort and its mission to serve the population of Puerto Rico and interests of its creditors.  The Lender has agreed to provide the Facility at minimal interest cost to the Debtor (and no interest for the first six months), and with the possibility of forgiving some or all of the Facility indebtedness based on future circumstances (subject to the forgiveness of the CDLs), but in the interest of preserving its own liquidity, it has required the superpriority claims and priming liens sought hereby.  The Lender is providing the only lifeline reasonably available to save its primary power utility and with it Puerto Rico's own prospects for financial recovery.  The Debtor, the Lender, and the Oversight Board assert and agree that the Facility appropriately balances the interests of the Debtor and Puerto Rico.

44.     The Facility will enable the Debtor to continue the long road back to viability and prosperity.  To this end, the Debtor negotiated the Credit Documents with the Commonwealth in good faith and with the assistance of its advisors and the Oversight Board, and the Debtor believes it has obtained the best financing available.  Further, after conducting a rigorous diligence process, the Oversight Board has authorized and approved the Commitment pursuant to PROMESA section 207.  Accordingly, the Court should authorize the Debtor's entry into the Credit Documents as it is a reasonable exercise of the Debtor's business judgment.

**B.  The Debtor Should be Authorized to Grant Superpriority Claims and Priming
Liens to the Lender**

45.     The Debtor proposes to obtain financing under the Facility by providing
superpriority expense claims and first priority priming liens on the Collateral as set forth in the
Credit Documents pursuant to Bankruptcy Code subsections 364(c) and (d).

i.     *Bankruptcy Code Section 364(c)*

46.     The statutory requirement for obtaining postpetition credit under Bankruptcy
Code section 364(c) is that a debtor is "unable to obtain unsecured credit allowable under
Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*,
71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy
Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be
obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to
financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a)     the debtor is unable to obtain unsecured credit under section 364(b) of the
Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b)     the credit transaction is necessary to preserve the assets of the estate; and

c)     the terms of the transaction are fair, reasonable, and adequate, given the
circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary
Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

47.     Regarding the first *Ames* factor, if a debtor is unable to obtain unsecured credit
allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section
364(c) provides a court "may authorize the obtaining of credit or the incurring of debt (1) with

28

priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."[31] As described further in the Mondell Declaration and the Background Section of this Urgent Motion, the Debtor is unable to obtain unsecured credit.

48.     Regarding the second and third *Ames* factors, as described above and as set forth in the Filsinger Declaration, the Debtor is in need of an immediate capital infusion to stem the devastating effects of Hurricane Maria on the Debtor's existing dire economic situation.  Absent the availability of such funds being used for the Debtor's recovery, the Debtor may be forced to cease operations within the coming month.  Filsinger Declaration ¶ 15.  Should the Debtor cease operations for three to six months, the impact on Puerto Rico's economy would be catastrophic—resulting in an estimated decline in real economic growth of 15-20% and outmigration of 300,000 to 365,000 individuals in fiscal year 2018 alone.     *See* Wolfe Declaration ¶ 25.  The outmigration, in turn, would lead to a substantially lower tax base, loss of customers for existing businesses, and an erosion of faith in Puerto Rico as a stable environment to conduct business.  *Id. ¶* 26.  With such a loss, the Government of Puerto Rico would not have sufficient funds to provide the most basic services to its people, let alone service any debt.  Without the reestablishment of basic services, Puerto Rico's outmigration will accelerate, further depressing the Government of Puerto Rico's and the Debtor's revenues.  *Id.* ¶ 26.

49.     Accordingly, approving a superpriority claim in favor of the Lender is reasonable and appropriate.  Indeed, this Court has recently granted similar relief for the United States in the event any federal funding becomes de-obligated.  *See* FEMA Order ¶ 9.

---

[31]   11 U.S.C. § 364(c).

ii.  *Bankruptcy Code Section 364(d)*

50.  Bankruptcy Code section 364(d) provides a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  Consent by the secured claimholders to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtor may incur priming liens under the Facility if it is unable to obtain unsecured or junior secured credit and either (a) the Debtor's secured claimholders have consented or (b) such secured claimholders' interests in the Collateral are adequately protected.

51.  Here, adequate protection is objectively demonstrated in Section VI above because the Trust Agreement already provides the bondholders' lien is subordinate to payment of Current Expenses, and the Facility can only be used for Current Expenses.  Thus, while what constitutes adequate protection is decided on a case-by-case basis, *see, e.g., In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case . . . ."); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the

30

reorganization process" (citations omitted)), the determination of adequate protection in this case

is clear and straight forward.  Moreover, "adequate protection, not absolute protection, is the

statutory standard." *In re Beker Indus. Corp.*, 58 B.R. 725, 741 (Bankr. S.D.N.Y. 1986) (citing *In*

*re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)).

52.     Here, the interests of the secured claimholders' (*i.e.*, the holders of the Power

Revenue Bonds) in the Collateral are adequately protected.  Significant outmigration exacerbated

by Hurricane Maria is projected to be on the magnitude of 300,000 to 365,000 individuals in

fiscal year 2018 if the current conditions on the island are left unabated and the Debtor is forced

to cease operations for three to six months.[32]  Absent a material improvement in the Debtor's

current operations, its "Revenues" would suffer immense depletion from the loss of its customer

base even if it does not shut down entirely, and would be insufficient to cover operating expenses

in the long term.[33]  The Facility thus represents the bondholders' best chance of realizing any

value from their collateral, which may have no value at present.

53.     This Court has held maintenance of infrastructure and assets generating revenue is

sufficient adequate protection to ensure that any encumbered revenues will be available in the

future (*i.e.*, that there will be no diminution in the value of the collateral).[34]  Other courts have

also recognized that a debtor's ability to maintain business value by operating in the ordinary

course is itself a significant source of adequate protection. *See In re Salem Plaza Assocs.*, 135

B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding a debtor's use of cash collateral to pay operating

expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate

---

[32] *See* Wolfe Declaration ¶ 25.
[33] *See* Filsinger Declaration ¶ 11, 20.
[34] *See Opinion and Order Denying Motion for Preliminary Injunction and Motion for Relief from the Automatic Stay* at 15–16, Sept. 8, 2017, Case No. 17-03567, Docket No. 260.

protection to the secured claimholder).  As a general matter, continued operations are far more likely to maintain or increase underlying collateral values compared with the catastrophic loss of value that could result from a debtor's inability to operate in the ordinary course. *See, e.g., In re Jim Kelley Ford of Dundee, Ltd.*, 14 B.R. 812 (N.D. Ill. 1981) (finding lender was adequately protected and debtor was authorized to use cash collateral to fund operations where lender benefited from the difference between the average sale price of a car sold at retail and the average sale price if the same vehicle were sold at a wholesale auction).

54.     Here, the critical funds the Debtor will receive under the Facility will be used for funding the Debtor's functions under its 2018-2019 budgets, and will thereby make all parties, including its bondholders, better off.  The Debtor estimates such funds will help stem the outmigration experienced by Puerto Rico to approximately 255,000 in fiscal year 2018 and 62,000 in fiscal year 2019.[35]  Specifically, the Facility is designed to give the Debtor the ability to: (a) provide and improve electricity services to the people of Puerto Rico; (b) reestablish the necessary conditions in Puerto Rico to maximize the collection of taxes and fees; and (c) allow for larger creditor recoveries under the Debtor's plan of adjustment.  Without covering the Debtor's operational needs in the wake of Hurricanes Irma and Maria, the Debtor's and Puerto Rico's recovery and, ultimately their revitalization, are not possible.  Fully reestablishing the Debtor's electricity services and funding its 2018-2019 budgets are a critical first step in rebuilding the Debtor and Puerto Rico.

55.     Because the value of the secured claimholders' Collateral is tied to the Revenues of the Debtor, if the Debtor were to cease operating, the value of the Collateral would

---

[35]   Wolfe Declaration ¶ 19.

evaporate.[36]   Even if the Debtor were eventually to come back online, the shuttering of

businesses and outmigration that would have taken place in the intervening period would cut

significantly into the Debtor's customer base and thereby diminish its future revenue streams.[37]

Therefore, the Debtor's secured claimholders' interests in their Collateral are adequately

protected because the value of the Collateral would be preserved or increase by granting Debtor

access to funding under the Facility.  *See In re Lagoon Breeze Dev. Corp.*, No. BR 10-15177-

MM11, 2011 WL 939016, at *1 (Bankr. S.D. Cal. Mar. 14, 2011) (finding that prepetition lender

was adequately protected because "the value of [its] collateral [would] increase by approximately

$4 million . . . double the amount of the approximately $2 million priming loan"); *In re Hudson*,

No. 208-09480, 2011 WL 1004630, at *9-10 (Bankr. M.D. Tenn. Mar. 16, 2011); *In re*

*Yellowstone Mountain Club, LLC*, No. 08-61570-11, 2008 WL 5875547, at *17 (Bankr. D.

Mont. Dec. 17, 2008) (approving priming loan that would maximize the going concern value of

the debtor to the benefit of the creditor and maximize the overall return to the lender); *In re*

*Campbell Sod, Inc.*, 378 B.R. 647, 655 (Bankr. D. Kan. 2007) ("The record supports a

conclusion that the working capital infusion will result in increased asset value that will

adequately protect the [prepetition lender]"); *In re Hamilton Square Assocs.*, No. 91-14720S,

1992 WL 98294, at *1 (Bankr. E.D. Pa. May 5, 1992) (finding the improvement of the debtor's

financial condition as a result of the postpetition loan and the replacement of the debtor's anchor

tenant constituted adequate protection for the priming of the creditor's lien); *Bank of New*

*England v. BWL, Inc.*, 121 B.R. 413, 418 (D. Me. 1990); *In re 495 Cent. Park Ave. Corp.*, 136

B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (in the context of a Bankruptcy Code section 364(d)

---

[36]   Wolfe Declaration ¶ 27.
[37]   *Id.*

priming lien, "there is no question that the property would be improved by the proposed renovations and that an increase in value will result.  In effect, a substitution occurs in that the money spent for improvements will be transferred into value.  This value will serve as adequate protection for [the creditor's] secured claim."); *In re Ralar Distribs.*, 166 B.R. 3, 6 (Bankr. D. Mass. 1994) ("[a]ctivities of a debtor can enhance collateral value and thereby provide adequate protection"); *In re Ledgemere Land Corp.*, 125 B.R. 58, 62 (Bankr. D. Mass. 1991) (holding "chance of a decline in the value of the property is more than offset by the likelihood of enhancement in value due to the Debtor's construction and marketing plans.  Completion of the building will increase its value by more than the requested $500,000" of priming indebtedness to complete the construction); *see also Confederation Life Ins. Co. v. Beau Rivage Ltd.*, 126 B.R. 632, 639 (N.D. Ga. 1991) (in the context of a debtor's use of cash collateral, "[s]ince the rents were used for structural and cosmetic repairs, thereby increasing the occupancy and income of the apartments and making the property more valuable, [the creditor's] security was not depleted."); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) (holding county's lien on debtor's property would be adequately protected as substantial portion of postpetition priming loan funds would go to cleaning up environmental damage on the encumbered property):

> There is no question in this Court's mind that the property will be improved by the clean-up since it is presently either unsaleable or has a nominal value at best, because of the restraint imposed by the DEC regulations.  Without this investment and improvement to Debtor's property, the County itself may have to invest the cost of the clean-up if it wishes to have any benefit from its collateral.  It is further clear to this Court that the investment made to clean-up the property will result in a benefit not only to the Debtor and its estate, but to all secured creditors and parties-in-interest.

56.      As supported by the Wolfe Declaration, the use of the funds sought by this Urgent

Motion will ensure that the Collateral (*i.e.*, the Debtor's "Revenues" net of "Current Expenses"

under the Trust Agreement) does not decrease in value by preventing the catastrophic

consequences that would result from a shutdown of the Debtor.  All stakeholders will have a far

better chance of recovery on account of claims against the Debtor if the postpetition financing

sought pursuant to this Urgent Motion is expeditiously authorized.[38]   Indeed, all stakeholders

will fare better in a scenario where electricity services are fully restored as "a rising tide lifts all

boats."  Further, the use of the funds advanced under the Facility will be limited to Eligible Uses

(all of which are "Current Expenses" under the Trust Agreement) and restricted by the 13-Week

Budget which will require the approval of the Oversight Board pursuant to its authority under

PROMESA section 207 and the Credit Documents.  Therefore, the relief requested pursuant to

Bankruptcy Code section 364(d)(1) is appropriate.

### C.  The Debtor Will Provide Substantial Information To the Creditors' of PREPA and The Lender

57.      Prior to the filing of this Motion, the Debtor began providing periodic reporting to

its creditors who are party to the Mediation Agreement.  Likewise, the Credit Documents require

substantial information be provided to these creditors, including the Debtor's: (i) cash balance;

(ii) statement of cash flows; (iii) total accounts payable and, if available, accounts payable aging

schedule; (iv) total accounts receivable and, if available, accounts receivable aging schedule; (v)

grid restoration report while the restoration activities are ongoing; and (vi) generation status

report while the restoration activities are ongoing.

---

[38]   *See* Wolfe Declaration ¶ 27-28.

**D.  No Comparable Alternative to the Facility is Reasonably Available**

58.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and 364(d) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

59.     Despite the Debtor's very public need for emergency financing, no financing of the magnitude required to address the Debtor's pending liquidity crisis has been earnestly offered by any parties other than the financing sought through this Urgent Motion.  Congress recognized as much when it established the Oversight Board with the purpose of providing Puerto Rico and its instrumentalities with a method to achieve fiscal responsibility and access to the capital markets:  "Structural problems, economic shocks and weak public finances have yielded a decade of stagnation, outmigration and debt.  Financial markets once looked past these realities

36

but have since cut off the Commonwealth from normal market access."  Krueger Report, at 1.
The impact of the hurricanes on the Debtor's already fragile circumstances has been devastating.

60.     Shortly after Hurricanes Irma and Maria, the Debtor received an unsolicited,
publicly announced offer for financing from a group of holders of its Power Revenue Bonds.
Mondell Declaration ¶ 7.  That offer was for $1 billion of financing, but was tied to a roll-up of
$1 billion in existing bonds into an additional $850 million of post-petition financing (which
would have resulted in a senior credit facility of $1.85 billion, out of which $1 billion of cash
would have been available for advancement to the Debtor).  *Id.*  The offer carried a stated per
annum interest rate of LIBOR plus 4.5% and a two-year maturity date.  *Id.*  In addition, the
interest rate would have increased to LIBOR plus 6.5% upon the one year anniversary of initial
borrowing.  *Id.*  The roll-up feature also provided investors in the loan facility with enhanced
security provisions on a portion of their pre-petition claims.  *Id.*  The proposal also required the
appointment of a receiver and had the potential to limit the future transformation of the electric
grid.  *Id.*  For reasons that were publicly stated by AAFAF at the time, the proposal therefore was
turned down.

61.     Beginning on January 21, 2018, the Debtor, through Rothschild, initiated a
marketing effort to obtain alternative financing.  Mondell Declaration ¶ 11.  As part of that
process, Rothschild, with the assistance of advisors for the Debtor and AAFAF, prepared
marketing materials and assembled a data room populated with relevant diligence information.
*Id.*  In consultation with the advisors to the Oversight Board, professionals from Rothschild have
been in contact with ten potential funding providers, which consisted of four existing PREPA,
Commonwealth, and COFINA bondholders and bondholder groups, and six third-parties capable

37

of providing financing of this magnitude.  *Id.* As set forth in the Mondell Declaration, the contacted parties included all of parties that had previously expressed to either Rothschild or the Oversight Board's financial advisor interest in providing such financing to the Debtor.  *Id.* ¶ 12. To date, seven of these prospective lenders have signed non-disclosure agreements ("NDAs") (or are operating under existing NDAs) and have been provided access to the data room maintained by Rothschild containing relevant information on the current financial conditions of the Debtor. *Id*.  Rothschild has requested interested parties to submit initial indications of interest by February 2, 2018.  The Debtor will submit an updated Mondell Declaration to the Court after proposals have been submitted and reviewed.

62.     The Debtor, through Rothschild, will continue the solicitation process until the Final Hearing to determine whether a superior financing proposal can be obtained.  Mondell Declaration ¶ 13.  Importantly, because the terms of the financing contemplated in the Urgent Motion include a zero percent interest rate for the first six months, no closing fees, and no prepayment penalty, the Debtor can refinance the Facility if desired (to the extent of available financing in the future), without the Debtor having incurred costs on the Facility even following approval of the Urgent Motion.  *Id.*

63.     Further, despite the efforts of the Debtor's advisors, the Debtor could not obtain a commitment for the financing sought through this Urgent Motion on an unsecured basis, on a junior lien basis, or on a *pari passu* lien basis.  Mondell Declaration ¶ 15.  Lastly, and critically, no party has offered to extend a loan that has the potential to be cancelled or forgiven.

## II.     The Lender Should be Afforded Good-Faith Protection under Bankruptcy Code Section 364(e)

64.     Bankruptcy Code section 364(e) protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.[39]

65.     As explained herein, the Credit Documents are a result of (i) the Debtor's reasonable and informed determination that the Lender, over all, offered the most suitable terms on which to obtain sufficient and vital postpetition financing, and (ii) extensive good-faith negotiations between the Debtor and the Lender.  Importantly, the Lender is not charging any interest or fees, and has merely insisted on protections contemplated by Bankruptcy Code section 364(c), (d), and (e) to preserve its own liquidity in the interest of its own restructuring.  The Debtor submits the terms and conditions of the Credit Documents are reasonable and appropriate under the circumstances, and the proceeds of the Facility will be used only for purposes (i) approved by the Oversight Board and (ii) permissible under PROMESA and the Bankruptcy Code as incorporated by PROMESA section 301.  Accordingly, the Court should find that the obligations under the Facility and other financial accommodations made to the Debtor have been

---

[39]   In addition to Bankruptcy Code section 364(e), the Commonwealth is protected by PROMESA section 304(e), which provides that "[t]he reversal on appeal of a finding of jurisdiction shall not affect the validity of any debt incurred that is authorized by the court under section 364(c) or 364(d) of title 11, United States Code."

extended by the Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the Lender is entitled to all protections afforded by that section.

### III.    The Automatic Stay Should be Modified on a Limited Basis

66.    The Credit Documents contemplate the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the Lender to exercise, upon the occurrence and during the continuation of any Event of Default, but subject to any applicable motion requirements in the Financing Orders, all rights and remedies provided for in the Credit Documents, without further order of or application to the Court.

67.    Whether or not a default or an Event of Default under the Credit Documents or a default by the Debtor of any of its obligations under the Financing Orders has occurred, the Credit Documents contemplate the automatic stay will be further vacated or modified to (A) require all cash, checks or other collections or proceeds from Collateral received by the Debtor to be deposited in accordance with the requirements of the Credit Documents, and to apply any amounts so deposited and other amounts paid to or received by the Lender under the Credit Documents in accordance with any requirements of the Credit Documents, (B) file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the Collateral in accordance with the Credit Documents, (C) charge and collect any interest, fees, costs and other expenses accruing at any time under the Credit Documents as provided therein, and (D) give the Debtor any notice provided for in or contemplated by any of the Credit Documents or this Interim Financing Order.

68.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtor's business judgment, are reasonable and

fair under the circumstances of this Title III case.  *See, e.g.*, *In re City of Detroit, Michigan*, No. 13-53846 (SWR), Docket No. 4108 (Bankr. E.D. Mich. Apr. 16, 2014) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Buckingham Oil Interests, Inc.*, No. 15-13441 (JNF) (Bankr. D. Mass. Dec. 2, 2015); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (same); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (same); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## IV.   Failure to Obtain Immediate Interim Access to the Facility Would Cause Immediate and Irreparable Harm

69.     Bankruptcy Rules 4001(b) and 4001(c) provide a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor.

70.     The Debtor requests that the Court hold an emergency hearing to consider entry of the Interim Financing Order authorizing the Debtor, from and after entry of the Interim Financing Order until the Final Hearing, to receive the Initial Borrowing under the Facility.  The Debtor requires the Initial Borrowing prior to the Final Hearing and entry of the Final Financing Order to continue its post-hurricane recovery efforts to safeguard the health, safety, and welfare of the people of Puerto Rico.  Without borrowed funds on an immediate basis, there is a material risk the Debtor would have to substantially reduce the pace of its recovery efforts, and the Debtor's ability to fully reestablish electricity services would continue to be hamstrung and

imperiled by the Island's post-hurricane conditions and on-going financial constraints. Critically, the Debtor's suboptimal state, if allowed to continue, will negatively impact Puerto Rico's broader recovery. Without the contemplated funds, the Debtor may be forced to cease operations.[40] Should PREPA shutdown persist for three to six months, Puerto Rico is projected to experience outmigration of approximately 300,000 to 365,000 individuals in fiscal year 2018, further depressing revenues that the Government of Puerto Rico can collect and shrinking the Debtor's customer base.[41] A fast response to ensure the availability of liquidity so that electricity services can be fully restored may reduce massive emigration from the island. The requested relief will enable the Debtor to continue its post-hurricane recovery efforts and reestablish electricity services for the citizens of Puerto Rico,[42] and preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to its property and all parties in interest, pending the Final Hearing.[43]

## Request for Final Hearing

71.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Urgent Motion.

## Urgent Motion Certification

72.     Pursuant to Local Bankruptcy Rule 9013-1 and the Case Management Order, the Debtor makes the following certifications. First, the Debtor has carefully examined the matter and concluded that there is a true need for an urgent hearing to approve the Debtor obtaining the

---

[40] Filsinger Declaration ¶ 15.
[41] Wolfe Declaration ¶ 25.
[42] Filsinger Declaration ¶ 22.
[43] Wolfe Declaration ¶ 27-28.

Facility so that the Debtor can address its immediate liquidity needs and begin the process of rebuilding its infrastructure.  Second, as described above, for several months the Government of Puerto Rico has been negotiating with U.S. Treasury over the terms of the CDLs for itself and the Debtor, but CDLs are not yet available. In the meantime, the Debtor's liquidity crisis has become dire; the Debtor's cash on hand and projected revenues are insufficient to cover the utility's operational expenses beyond February.  Thus, the Debtor urgently needs financing from the Government of Puerto Rico, the only source currently available.  Since January 21, 2018, AAFAF's financial advisor has contacted, among other potential funding sources, bond creditors of both the Debtor and the Government of Puerto Rico to determine their interest in providing financing.  This Urgent Motion and the Debtor's urgent need for financing should not come as a surprise.  Although certain of the Debtor's creditors have indicated they are planning to object to the relief sought in Urgent Motion, the Oversight Board and AAFAF will continue to work and negotiate in good faith to resolve any objection prior to the Interim Hearing.

### Notice

73.     The Debtor has provided notice of this Urgent Motion to: (a) the Office of the United States Trustee for the District of Puerto Rico; (b) the indenture trustees and/or agents, as applicable, for the Debtor's bonds; (c) any party that has requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; (d) counsel to the statutory committee appointed in the Title III Case; (e) the Office of the United States Attorney for the District of Puerto Rico; (f) counsel to AAFAF; (g) the Puerto Rico Department of Justice; the Puerto Rico Treasury

43

Department; (h) the Other Interested Parties;[44] and (i) all parties filing a notice of appearance in this Title III Case.  The Debtor submits that, in light of the nature of the relief requested herein, no other or further notice need be given.

## **Reservation of Rights**

74.    The Oversight Board, as representative of the Commonwealth of Puerto Rico and the Debtor, has consented to the Commonwealth of Puerto Rico providing and the Debtor incurring the Facility, subject to the Oversight Board's rights under the Facility as described herein and in the Credit Documents.  The Debtor files this Urgent Motion without prejudice to or waiver of its rights pursuant to PROMESA section 305.[45]

## **No Prior Request**

75.    No prior request for the relief sought in this Urgent Motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

---

[44]   The "Other Interested Parties" include the following: (i) counsel to certain of the insurers and trustees of the bonds issued or guaranteed by the Debtor and (ii) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the Debtor.

[45]   PROMESA section 305 provides:

LIMITATION ON JURISDICTION AND POWERS OF COURT.
Subject to the limitations set forth in titles I and II of this Act, notwithstanding any power of the court, unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with—
(1) any of the political or governmental powers of the debtor;
(2) any of the property or revenues of the debtor; or
(3) the use or enjoyment by the debtor of any income producing property.

WHEREFORE the Debtor respectfully requests the Court to enter the Financing Orders, granting the relief requested herein and granting the Debtor any other relief as is just and proper.

Dated: January 27, 2018
      San Juan, Puerto Rico

Respectfully submitted,

*/s/* Martin J. Bienenstock

Martin J. Bienenstock (*pro hac vice*)
Paul V. Possinger (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Maja Zerjal (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtor*

THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, as Fiscal agent for PREPA

By its attorneys,

*/s/* Nancy A. Mitchell
Nancy A. Mitchell (*admitted pro hac vice*)
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
Phone: 212.801.9200
Fax : 212.801.6400
Email: mitchelln@gtlaw.com

David D. Cleary (*admitted pro hac vice*)
Kevin D. Finger (*admitted pro hac vice*)
Greenberg Traurig, LLP
77 West Wacker Drive
Suite 3100

45

Chicago, IL 60601
Phone: 312.456.8400
Fax : 312.456.8435
Email: clearyd@gtlaw.com
        fingerk@gtlaw.com


*/s/* Hermann D. Bauer

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtor*

46