**Hearing Date:** February 7, 2018, at 9:30 a.m. (Atlantic Standard Time)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>      Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY ("PREPA"),<br><br>      Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS<br><br>This document relates to PREPA Title III case only |

[*Caption continued on next page*]

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS'
(I) OBJECTION TO THE URGENT JOINT MOTION OF THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO AND THE PUERTO
RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY FOR ENTRY
OF INTERIM AND FINAL ORDERS (A) AUTHORIZING POSTPETITION SECURED
FINANCING, (B) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (C) MODIFYING THE AUTOMATIC STAY,
(D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF,
<u>AND (II) URGENT CROSS-MOTION, IN THE ALTERNATIVE, TO INTERVENE</u>**

The Ad Hoc Group of General Obligation Bondholders (the "<u>GO Group</u>")[2] hereby (I) submits this objection to the *Urgent Joint Motion of the Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (A) Authorizing Postpetition Secured Financing, (B) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* (Dkt. 549)[3] (the "<u>Loan Motion</u>") filed by the Financial Oversight and Management Board for Puerto Rico (the "<u>Oversight Board</u>") and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("<u>AAFAF</u>"), and (II) in the alternative, solely in the event that Court determines that the GO Group is not a party in interest with respect to the Loan Motion, cross-moves, pursuant to Rule 2018(a) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), made applicable herein by Section 310 of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("<u>PROMESA</u>"),[4] to intervene for the sole purpose of objecting to the Loan Motion.  In support of this objection and cross-motion, the GO Group respectfully states as follows:

---

[2] Members of the GO Group file this objection and cross-motion exclusively on their own behalves and do not assume any fiduciary or other duties to any other creditor or person.

[3] "Dkt." refers to documents filed on the docket of Case No. 17 BK 4780-LTS.

[4] Pub. L. No. 114-187, 130 Stat. 549 (2016), codified at 48 U.S.C. §§ 2101-2241.

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 3

OBJECTION TO LOAN MOTION ............................................................................ 6

I.      THE COURT SHOULD REJECT THE PREJUDICIAL PROVISIONS .......... 6

    A.      The Prejudicial Provisions Lack Any Basis In Law Or Fact ................ 7

        1.      The Proposed Loan Is Not Fair To The Commonwealth ........................ 7

        2.      PREPA Has No Immediate Need For The Proposed Loan ..................... 10

        3.      There Is No Legal Basis To Extinguish The Claims Of Non-
PREPA Parties ...................................................................................... 11

    B.      The Prejudicial Provisions Threaten To Preclude Viable Claims Of
Commonwealth Stakeholders ............................................................... 12

II.     THE GO GROUP HAS STANDING TO OBJECT TO THE LOAN MOTION ............ 15

URGENT CROSS-MOTION, IN THE ALTERNATIVE, TO INTERVENE ............................ 17

    A.      Intervention Is Necessary For The GO Group To Protect Its Interests ................ 17

    B.      Intervention Will Not Result In Undue Delay Or Prejudice ................................. 19

CERTIFICATION PURSUANT TO STANDING ORDER ....................................... 19

CONCLUSION ........................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AT&T Corp. v. F.C.C.*,
    317 F.3d 227 (D.C. Cir. 2003) ..................................................................................16

*Delaware Valley Citizens Council for Clean Air v. Davis*,
    932 F.2d 256 (3d Cir. 1991) ......................................................................................16

*In re Amatex Corp.*,
    755 F.2d 1034 (3d Cir. 1985) ...............................................................................15, 16

*In re Arch Wireless, Inc.*,
    534 F.3d 76 (1st Cir. 2008) .......................................................................................12

*In re Bayless*,
    2006 Bankr. LEXIS 3304 (Bankr. E.D. Tenn. Oct. 18, 2006) ..................................18

*In re City of Stockton, Cal.*,
    486 B.R. 194 (Bankr. E.D. Cal. 2013) ......................................................................14

*In re Johns-Manville Corp.*,
    36 B.R. 743 (Bankr. S.D.N.Y. 1984) ........................................................................15

*In re McGaughey*,
    24 F.3d 904 (7th Cir. 1994) ......................................................................................13

*In re PM Cross, LLC*,
    No. BR 13-11075-BAH, 2013 WL 6048810 (Bankr. D.N.H. Nov. 15, 2013) ...........17

*In re Pub. Serv. Co. of New Hampshire*,
    88 B.R. 546 (Bankr. D.N.H. 1988) .......................................................................15, 16

*Le Sannom Bldg. Corp. v. Nathanson*,
    No. 92 Civ. 8716, 1993 WL 330442 (S.D.N.Y. Aug. 23, 1993) ..............................13

*National Presto Indus., Inc. v. Dazey Corp.*,
    107 F.3d 1576 (Fed. Cir. 1997) ................................................................................16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..................................................................................................16

**Statutes and Rules**

11 U.S.C. § 549 ....................................................................................................................13

11 U.S.C. § 549(a) ...............................................................................................................13

ii

## TABLE OF AUTHORITIES—CONTINUED

**Page(s)**

11 U.S.C. § 926(a) ..........................................................................................................13

11 U.S.C. § 1109(b) ...............................................................................................15, 17, 19

11 U.S.C. § 1129(a)(3) ...................................................................................................14

11 U.S.C. § 1129(b)(1) ....................................................................................................14

PROMESA § 207 ..............................................................................................................9

PROMESA § 301(a) ..................................................................................................13, 14

PROMESA § 301(c)(7) ...................................................................................................13

Act 4 of 2016, sec. 8, § 6(o) ...........................................................................................8

Fed. R. Bankr. P. 2018(a) .........................................................................................17, 19

**Other Authorities**

*Collier on Bankruptcy* ...................................................................................................18

## <u>INTRODUCTION</u>

The GO Group objects to the nature and terms of the debtor-in-possession ("<u>DIP</u>") financing sought by the Oversight Board and AAFAF (the "<u>Proposed Loan</u>"), which contemplates the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") extending a DIP loan to the Puerto Rico Electric Power Authority ("<u>PREPA</u>").  Let us be clear, the GO Group *does not* object to PREPA obtaining financing to meet a demonstrated need, from an appropriate source, and on commercially reasonable terms.  But the Proposed Loan meets none of those criteria.  Rather, the Proposed Loan reflects a unilateral decision by the Oversight Board to use the resources of the Commonwealth—itself a Title III debtor that claims to be unable to pay its own creditors—to subsidize a legally separate instrumentality that has its own Title III case, its own creditors, and its own assets.  Worse still, the Oversight Board's maneuvering seeks to displace the legitimate path for seeking such funding for PREPA, which would involve a reasonable market process and adequate disclosures of the debtor's finances.  The Oversight Board, which serves as representative of both the would-be borrower and the would-be lender, has simply determined for itself that this unprecedented transaction is best for all involved.

It is not.  To the contrary, the Proposed Loan is a massive windfall to PREPA, a severe and unnecessary financial blow to the Commonwealth, and a startling arrogation of power by the Oversight Board.  The Proposed Loan seeks immediate authorization for $550 million, even though the movants' own (unsupported) numbers justify only a small fraction of that amount in the near term.  The terms of the loan do not resemble a reasonable, arms-length transaction.  For example:  Interest begins at zero and stays substantially below market (for an unheard-of DIP maturity of up to 30 years); the proffered security is incomplete and invites further uncertainty and litigation; and there is no explanation how any of this will be squared with the stated goal of

privatizing PREPA in connection with a restructuring.  The economic reality is that the Proposed

Loan transfers hundreds of millions of the Commonwealth's dollars to PREPA.  And even the

minimal constraints in the Proposed Loan are illusory.  Most notably, while the Proposed Loan

purports to define certain Eligible and Ineligible Uses of the loan proceeds, it vests in the

Oversight Board and AAFAF discretion to *approve* any desired level of disbursements for

*Ineligible* Uses.  In sum, the Loan Motion seeks approval to borrow $550 million immediately

(and up to $1.3 billion eventually) from the supposedly cash-strapped Commonwealth to spend

on whatever the Oversight Board and AAFAF deem fit.

What is more, the Proposed Order seeks factual findings and legal conclusions intended

to insulate this transaction from challenge in the Commonwealth's case.  The Proposed Order

goes far beyond a declaration that the Proposed Loan is good for PREPA.  Rather, it includes

various statements claiming that this transaction is good for the Commonwealth too, and

asserting that the transaction is supported by reasonably equivalent value, not subject to

avoidance, and fair to both sides.  These sorts of exculpating statements have no place in an

order that should apply only to the transaction from PREPA's perspective.  If the Oversight

Board and AAFAF seek a determination that the Proposed Loan is actually a fair deal for the

Commonwealth, they must subject that to testing in the Commonwealth's case before the full

scope of the Commonwealth's stakeholders.  But the movants apparently do not intend to subject

this transaction to such scrutiny, no doubt because this deal is demonstrably *unfair* to the

Commonwealth.

Because the movants have effectively decided to solve PREPA's problems with the

Commonwealth's money *and* have sought to insulate their actions from legal challenge, the GO

Group has no choice but to object directly in PREPA's case to this transaction.  Particularly

given the overreach of the Proposed Order, there can be little doubt that the GO Group members are parties in interest here.  Even if that were not the case, intervention would be warranted to, at the very least, prevent this attempt to imbue this transaction with court approval in such a way as to prevent scrutiny in the Commonwealth's case.

## BACKGROUND

PREPA is the electric utility for the Commonwealth of Puerto Rico.  Loan Motion ¶ 12. It filed a petition for relief under Title III of PROMESA in July 2017.  *Id.* ¶ 9.  Following Hurricanes Irma and Maria, some market participants speculated that PREPA might seek to borrow additional funds while it remains a Title III debtor.  *E.g.*, *id.* ¶ 32.  As a result, certain creditors of PREPA offered it financing, but AAFAF rejected their proposal.  *Id.*

By January 2018, reports surfaced that the Commonwealth might seek to serve as a debtor-in-possession lender to PREPA.  Remarkably, the Commonwealth had not made any attempts to obtain debtor-in-possession financing from third-party lenders.  The January reports prompted Commonwealth stakeholders to urge that any loan be on terms that were fair and reasonable to the Commonwealth.  For example, on January 16, the GO Group wrote a letter to the Oversight Board and AAFAF explaining that any lending should be done directly by the federal government (which was anticipated to be the ultimate source of the funds).  Even if the Commonwealth were the lender, the letter urged, at a minimum "the Commonwealth must receive a secured claim that is senior to all other obligations of" PREPA and should receive "a market rate of interest appropriate to the transaction."   Ex. A at 3.   Otherwise, "the Commonwealth would, in effect, be risking Commonwealth revenues to prop up instrumentalities that have their own creditors, solely for the sake of convenience or expediency."  *Id.*

The reports' confirmation that PREPA was, in fact, searching for a lender prompted private parties to seek to help.  Ten private parties, including the GO Group, have begun negotiations with the Debtors' advisors concerning the provision of significant financing to PREPA.  See Loan Motion ¶ 33; Ex. A at 5 (GO Group proposing on January 16 "to discuss these issues with you and arrive at a solution that reasonably addresses the concerns and legal rights of all parties in interest"); Ex. B (GO Group writing to PREPA on January 18 noting GO Group's interest "in offering a 'debtor in possession' financing loan . . . to PREPA on agreed upon market terms").

Meanwhile, on January 24, AAFAF released a draft Amended & Restated Fiscal Plan for PREPA.  See http://www.aafaf.pr.gov/assets/prepa-revisedfiscalplan-01-24-18.pdf (the "PREPA Fiscal Plan").  The PREPA Fiscal Plan confirmed prior statements by officials that PREPA would be privatized in connection with a plan of adjustment under Title III.  See id. at 8 (stating that the Fiscal Plan "assumes as a base case the transfer or concession of certain assets" to private institutions).  This self-proclaimed "Transformation" of PREPA—which could produce billions of dollars in proceeds from asset sales—posed additional issues that would need to be resolved in any financing.

Two days later, the Oversight Board signaled that it wished to short-circuit the nascent private-party negotiations.  Specifically, the Board filed the *Urgent Motion for Extension of Deadlines and Leave to File Excess Pages in Connection with Third Amended Notice, Case Management and Administrative Procedures* (Dkt. 547).  That motion stated that PREPA, through the Board, planned to seek the Court's permission to accept financing from the Commonwealth.  *Id.* ¶ 3.  And it proposed that any objections to the contemplated financing

motion be filed by February 1, with the motion to be heard at the omnibus hearing on February 7. *Id.* ¶ 5. The Court granted the deadline-extension motion. Dkt. 548.

The next day, January 27, the Oversight Board and AAFAF filed the Loan Motion, which proposed that the Commonwealth make the Proposed Loan to PREPA. Nominally, the Loan Motion allowed negotiations with private parties to continue. Loan Motion ¶ 34. For any private party to succeed, however, it would have to offer terms that were "superior" from PREPA's perspective to the terms of the Proposed Loan. *Id.* The Loan Motion effectively defeats negotiations because no private market participant could ever do that.

The terms of the Proposed Loan are woefully unfair to the lender, the Commonwealth. Despite PREPA's financial condition, which the Loan Motion calls "dire" (*id.* ¶ 16), the Proposed Loan offers terms including:

- up to *$550 million* available immediately, with up to *$1.3 billion* available after a final hearing (*id.* at 1), despite an utter lack of support for such lavish amounts (to the contrary, their own—unverified—projections demonstrate that only a fraction of that amount is needed over the next 15 weeks);

- almost *no meaningful restrictions* on the use of the proceeds; PREPA may exceed budgeted expenditure amounts by up to 15% without approval from the Oversight Board (*id.* at 4), and it may even (with the consent of the Board and Commonwealth) use the proceeds for Ineligible Uses, *including to pay its own creditors* (*id.* at 3);

- *zero interest* for six months, with rates slowly rising thereafter to a modest *three percent* over three years (*id.* at 6);

- a lien limited to PREPA's "Revenues," as defined in its Trust Agreement with current PREPA bondholders (*id.* at 3), even though PREPA's impending privatization could imperil those Revenues and with no explanation of how that proposed transaction would affect the Proposed Loan;

- a "Carve Out" from that lien covering uncapped administrative expenses, matching requirements of federal funding, and fees owed to the United States Trustee (*id.*);

- no obligation to repay until PREPA has amassed a *$300 million* operating reserve plus over *$500 million* in funds to pay budgeted expenses, including those Ineligible Uses included in the budget (*id.* at 5); and

- a term of up to 30 years, an absurdly long maturity for debtor-in-possession financing (*id.* at 6).

These are not market terms, and the Loan Motion nowhere contends that they are.

Although the Loan Motion discusses only how the Proposed Loan affects PREPA and its creditors, ¶¶ 37-63, its proposed order (Dkt. 549-1) (the "Proposed Order") sweeps much broader. More particularly, the Proposed Order contains four provisions that directly prejudice the *Commonwealth* and *its* creditors:

- "[T]he terms of the [Proposed Loan] are *fair to the [Commonwealth]* and [PREPA]." Proposed Order ¶ D (emphasis added).

- "The terms of the [Proposed Loan] are *fair and reasonable* . . . and are supported by *reasonably equivalent value* and fair consideration." *Id.* ¶ E (emphasis added).

- "[PREPA] has an immediate need to obtain the financing under the [Proposed Loan]." *Id.* ¶ A.

- "*[N]o obligation*, payment, transfer, or grant of a lien or security interest under the [Proposed Loan] or this [Proposed Order] *shall be* stayed, restrained, voidable, or recoverable under PROMESA, the Bankruptcy Code, or any applicable law or *subject to any avoidance*, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under PROMESA, the Bankruptcy Code, *or any applicable law or regulation by any person or entity*." *Id.* ¶ 4 (emphasis added).

We call these four provisions the "Prejudicial Provisions" because they are unnecessary to the relief the Loan Motion seeks and serve only to prejudice the Commonwealth and its creditors.

## OBJECTION TO LOAN MOTION

### I. THE COURT SHOULD REJECT THE PREJUDICIAL PROVISIONS

At present, the GO Group objects to the Loan Motion insofar as granting that motion entails inclusion of the Prejudicial Provisions in an order. To the extent that it does, the Court should deny the Loan Motion. In addition, any order granting the Loan Motion should contain a provision stating that the Court's approval of the Proposed Loan *from PREPA's perspective* will not in any way prejudice or affect any rights or remedies that creditors of the Commonwealth

may assert in connection with the Commonwealth's decision to enter into the Proposed Loan or the implementation thereof.

### A.    The Prejudicial Provisions Lack Any Basis In Law Or Fact

The Court should reject the Prejudicial Provisions because they are invalid.  The Loan Motion provides no basis for them.

### 1.    The Proposed Loan Is Not Fair To The Commonwealth

Among the Prejudicial Provisions are proposed factual findings that "the terms of the [Proposed Loan] are fair to the [Commonwealth]," Proposed Order ¶ D, and that those terms "are fair and reasonable . . . and are supported by reasonably equivalent value," *id.* ¶ E.  These proposed findings are baseless.  The terms of the Proposed Loan are more akin to a gift from the Commonwealth to PREPA than to anything that could be called a fair financing.

For starters, unlike a traditional debtor-in-possession loan, the Proposed Loan does not actually limit the use of its proceeds to expenditures that protect the loan's collateral.  To the contrary, although the Proposed Loan defines certain "Eligible Uses" and "Ineligible Uses," it immediately eviscerates that distinction by providing that Ineligible Uses are entirely permissible at the discretion of "the Lender [Commonwealth] and the Oversight Board."  Loan Motion at 3. The Proposed Loan thus contemplates that PREPA may, at the whim of the Oversight Board and the Commonwealth, use the loan's proceeds to do anything, including *to pay PREPA bondholders.  Id.*  Paying bondholders does not keep PREPA operating.  It does not protect the Proposed Loan's collateral.  And it does nothing whatsoever to benefit the Commonwealth.  In short, the Proposed Loan has no limitation at all on the use of proceeds; rather, the Commonwealth and the Oversight Board seek authorization to spend the loan proceeds however they see fit, without any oversight or scrutiny by this Court, much less any creditor of PREPA or the Commonwealth.

7

Those illusory limitations on the use of proceeds are doubly offensive because the Proposed Loan fails to guarantee the Commonwealth a reasonable return or reasonable security. Initially, the Proposed Loan offers the Commonwealth no return at all.  The interest rate for the first six months is zero percent.  Loan Motion at 6.  Over the course of three years, that rate slowly rises, but only to three percent, which is a decidedly below-market rate.  *Id.*  The Commonwealth could invest its money in virtually anything else and assure higher returns for its creditors and its people, or at the very least avoid the enormous risks this financing presents. Instead, it is just giving the money to PREPA.

Nor does the Proposed Loan provide the Commonwealth reasonable security.  The problems with the security begin with the scope of the lien.  The lien encompasses only "Revenues," as defined by PREPA's existing Trust Agreement with its current bondholders. Loan Motion at 3.  However broad that might be—and it is clear that PREPA and its creditors do not currently agree as to what the Trust Agreement provides—it falls well short of all of PREPA's property that might be pledged.  *E.g.*, *id.* ¶ 12 (noting that PREPA "generates, transmits, and distributes substantially all the electric power used in Puerto Rico").[5]  This limitation in scope is especially problematic because the Loan Motion does not explain how a lien on PREPA's "Revenues" would survive the contemplated privatization of PREPA.  Indeed, the Loan Motion (at 7) forecloses any "terms and conditions that provide for restrictions on the transformation of the energy sector or on the transfer of the Debtor's assets," which is how

---

[5] PREPA's enabling legislation provides that PREPA generally may secure debt by "pledging or placing a lien on all or any of its contracts, revenues, and income only."  Act 4 of 2016, sec. 8, § 6(o).  But there is no reason that legislation could not be amended to permit PREPA to grant a broader lien on all of its assets in favor of the Commonwealth.  Indeed, in February 2016, the legislation was amended to allow PREPA to "place liens on real or personal property as necessary to comply with federal regulations" that govern financing extended through federal programs.  *Id.*  A similar amendment could presumably be obtained to address liens in favor of the Commonwealth if the Commonwealth were to require more robust protections.

PREPA describes its future privatization.  See PREPA Fiscal Plan at 8.  So the Proposed Loan offers uncertain security in the near term, and merely invites guesses as to how that security will be treated in the privatization transaction that PREPA intends to pursue.

The problems with the proposed security do not end with its scope.  Despite its "[s]uperpriority" status, Loan Motion at 2, the Proposed Loan's lien would functionally be subordinate to numerous expenditures.  By its terms, the Proposed Loan would be subject to a "Carve Out," which includes apparently unlimited professional fees, state matching requirements for federal funds, and fees owed to the United States Trustee.  *Id.* at 3.  The Loan Motion does not even attempt to justify the Carve Out's expanse.  What is more, PREPA need not prepay the Proposed Loan until it has retained over *$800 million*.  *Id.* at 5 (providing that, before prepayment, PREPA may retain "Revenues" up to an operating reserve of $300 million, a number never explained, and "budgeted expenses for Ineligible Uses provided for in the 13-Week Budget"); *id.* Ex. E (budgeting over $500 million for the latter item).  There could be little left for payments on the Proposed Loan, especially because these figures merely represent the estimates contained in the current 13-Week Budget and could rise significantly in the future.

Tellingly, the Oversight Board does not explain how the Proposed Loan is in the interest of the Commonwealth, even though its own policy and PROMESA require it to do so.  Under PROMESA, "no territorial government may, without the prior approval of the Oversight Board, issue debt."  PROMESA § 207.  Pursuant to that provision, the Oversight Board has established a policy requiring that "[e]ach Debt Transaction must be advisable for the entity entering into it and for Puerto Rico."  Ex. C at 1.  The Oversight Board maintains that it has reached that conclusion regarding the Proposed Loan "after conducting a rigorous diligence process."  Loan

Motion ¶ 44.  Such conclusory say-so should hardly pass muster in the face of loan terms so patently unfair to the Commonwealth.

The terms of the Proposed Loan assure that it would blow a hole through the Commonwealth's resources.  And, with expected advances of $550 million, and a balance of up to $1.3 billion, the Proposed Loan would leave a very large hole indeed.[6]  The Proposed Loan is a massive transfer of resources from the Commonwealth to PREPA.

### 2.    PREPA Has No Immediate Need For The Proposed Loan

There is another proposed factual finding in the Prejudicial Provisions, namely, that "[PREPA] has an immediate need to obtain the financing under the [Proposed Loan]."  Proposed Order ¶ A.  This proposed finding, like the first two, is devoid of support.  The Court should not accept it.

To the extent that the Oversight Board and AAFAF attempt to justify this proposed finding, they do so (as usual) by invoking generalized statements of emergency (*e.g.*, Loan Motion ¶¶ 41, 48, 54, 56)—but there is none.  The Loan Motion's own projections indicate that PREPA will run out of cash following the week of February 16.  *Id.* Ex. E.  Typically, a debtor-in-possession loan would be limited prior to a final hearing to the minimum amount required. The Proposed Loan, by contrast, exceeds the projected minimum amount, and even its projections do not withstand scrutiny.

---

[6] Although the Oversight Board asserts that the Commonwealth "expects" that the amount extended to PREPA from the Commonwealth's own cash reserves will not exceed $550 million, and that the remainder of the contemplated $1.3 billion will be funded from federal loans (Loan Motion at 19-20), the higher amount is not in fact linked to the Commonwealth's receipt of federal loan funding.  Thus, the Commonwealth could extend up to $1.3 billion from its own cash reserves.

Schedule E sets forth PREPA's supposed cash flow deficits over 15 weeks. But the document is riddled with flaws, inaccuracies, and unexplained assumptions. To take the most prominent examples:

- The schedule does not begin to justify why $550 million should be borrowed immediately. According to the schedule, PREPA will have sufficient cash until the week of February 23, when it needs $26.9 million, and a total of $254.6 million though the end of March. Yet the Proposed Loan seeks to borrow more than twice that amount from the Commonwealth's coffers, with no stated reason.

- Even across the entire 15-week period covered by the schedule, the numbers cannot possibly justify $550 million. Among the $480.9 million claimed to be needed, $124.5 million is for concededly *Ineligible Uses*. This includes $28 million in Estimated Gross Overtime, $26.8 million in Contract Labor – Title III, and $69.7 million in net Emergency Expenditures. Stripped of those expenditures, the schedule sets forth only $356.4 million in needed cash across the 15-week period.

- The schedule assumes Emergency Expenditures the week of April 6 of $93 million that will not be reimbursed by FEMA. There is no explanation as to what this is, much less why PREPA would incur such significant unreimbursable liability.

- The schedule assumes that zero dollars in insurance proceeds will be recovered over the period, which is wildly out of whack with the "catastrophic damage to the transmission and distribution system" (Loan Motion ¶ 17) and with PREPA's coverage for up to $550 million in losses, of which it has received or will receive at least $50 million (Dkts. 491, 514). This money has apparently vanished.

In short, the Proposed Loan raids the Commonwealth's funds far beyond any serious demonstrated need, even assuming the basic validity of the unverified numbers in the Schedule.

### 3.    There Is No Legal Basis To Extinguish The Claims Of Non-PREPA Parties

The Proposed Order includes not only findings of fact but also sweeping legal holdings that affect the rights of numerous parties. Prominent among them is the final Prejudicial Provision, which would extinguish *any* claim by *any* person at *any* time seeking to avoid or otherwise challenge the Proposed Loan. Proposed Order ¶ 4 ("[N]o obligation, payment, transfer, or grant of a lien or security interest under the [Proposed Loan] or this [Proposed Order]

shall be stayed, restrained, voidable, or recoverable under PROMESA, the Bankruptcy Code, or any applicable law or subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under PROMESA, the Bankruptcy Code, or any applicable law or regulation by any person or entity.").

The Loan Motion never mentions this provision, much less attempts to justify it—because it cannot. To extinguish a person's claims, a debtor must, at a bare minimum, provide notice to that person and a meaningful opportunity to be heard. *E.g.*, *In re Arch Wireless, Inc.*, 534 F.3d 76, 83 (1st Cir. 2008) ("[D]ue process requires . . . notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." (quotation marks omitted)). The claim-extinguishing Prejudicial Provision fails even this most basic test. PREPA provided notice only to *its* creditors and parties that have requested notice in *its* Title III case. Loan Motion ¶ 73. Yet, the parties most likely to want to avoid the Proposed Loan are the *Commonwealth's* stakeholders. Without notice to those stakeholders and a corresponding opportunity for them to be heard, their claims cannot be extinguished—but this Prejudicial Provision purports to extinguish their claims anyway. Even more remarkable is the Oversight Board's most recent motion (Dkt. 557) seeking to *prohibit* any party from objecting to the effect of the Proposed Loan on the Commonwealth. We are responding directly to that motion under separate cover, but suffice it to say that the Oversight Board's gambit turns due process on its head.

## B. The Prejudicial Provisions Threaten To Preclude Viable Claims Of Commonwealth Stakeholders

Regardless whether the Prejudicial Provisions have merit, the Court should not entertain them in *PREPA's* Title III case. That is because the Prejudicial Provisions threaten claim or

issue preclusion of causes of action held by *Commonwealth* stakeholders.  Consequently, if the
Oversight Board and AAFAF want this Court to so-order the Prejudicial Provisions, they should
move in the Commonwealth's Title III case and subject those assertions to proper scrutiny.

To illustrate the potential preclusive effect on Commonwealth stakeholders, consider an
avoidance action pursuant to 11 U.S.C. § 549.   That provision, made applicable here by
PROMESA § 301(a), allows avoidance of postpetition transfers that are not authorized by
PROMESA or by court order.[7]  Relying on that provision, Commonwealth creditors could seek
avoidance of the Proposed Loan to PREPA.   (No statute authorizes the Commonwealth to
provide such a sweetheart loan, and the Court in the Commonwealth's case would not have
authorized it, either.)   Were the Court to adopt the Prejudicial Provisions, however,
Commonwealth creditors could find the Oversight Board and AAFAF arguing that this cause of
action is blocked.  The Proposed Order (¶ 4) would purportedly bar any "avoidance" of any
"transfer" pursuant to the Proposed Loan.  Moreover, the Court would have found in the
Proposed Order (¶ D) that the Proposed Loan is "fair to the [Commonwealth]."  This finding,
arguably, could compel the Court to authorize the Proposed Loan in the Commonwealth's case,
thus preventing avoidance under Section 549.

Another example of the potential prejudice would be a motion for relief from the
automatic stay.  Such relief is warranted where a debtor is attempting to "dissipate [its] assets."
*In re McGaughey*, 24 F.3d 904, 907 (7th Cir. 1994); see also, *e.g.*, *Le Sannom Bldg. Corp. v.
Nathanson*, No. 92 Civ. 8716, 1993 WL 330442, at *4 (S.D.N.Y. Aug. 23, 1993) (upholding the

---

[7] PROMESA provides that the Oversight Board controls exercise of this avoidance power.
See 11 U.S.C. § 549(a) (authorizing "the trustee" to avoid certain transfers); PROMESA
§ 301(c)(7) ("The term 'trustee,' when used in a section of title 11, United States Code, made
applicable in a case under this title by subsection (a), means the Oversight Board.").  However,
should the Oversight Board refuse to pursue an avoidance action, the Court may appoint a
separate trustee to do so.  11 U.S.C. § 926(a) (made applicable here by PROMESA § 301(a)).

bankruptcy court's decision to lift the stay on the grounds that "the Debtor had mismanaged the Building to such an extent that the interest of creditors were being jeopardized").  Here, as explained above, the Proposed Loan amounts to dissipation of assets.  But a Commonwealth creditor seeking relief from the stay would have to confront the findings in the Prejudicial Provisions that the Proposed Loan is "fair to the [Commonwealth]," Proposed Order ¶ D, and that its terms are "fair and reasonable," *id.* ¶ E.  Such findings could stand in the way of a finding that, through the Proposed Loan, the Commonwealth was dissipating its assets.

Finally, the Prejudicial Provisions could even be invoked in an attempt to thwart arguments that Commonwealth creditors may raise in objecting to the Commonwealth's plan of adjustment.  The Oversight Board, as the plan's proponent, must establish that any plan is "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3) (incorporated by PROMESA § 301(a)).  And, if the plan impairs creditors, the Board must also prove that the plan is "fair and equitable."  *Id.* § 1129(b)(1) (incorporated by PROMESA § 301(a)).  A post-petition, pre-confirmation giveaway like the Proposed Loan could prevent the Board from satisfying those requirements.  See *In re City of Stockton, Cal.*, 486 B.R. 194, 200 (Bankr. E.D. Cal. 2013).  But, if the Court in PREPA's case had concluded that the Proposed Loan was "fair to the [Commonwealth]," Proposed Order ¶ D, and that PREPA needed the Proposed Loan, *id.* ¶ A, the Oversight Board would argue that those findings suggest that the Proposed Loan was not "overreaching."  See *Stockton*, 486 B.R. at 199.

*        *        *

For all of these reasons, the Court should reject the Proposed Order insofar as it includes the Prejudicial Provisions.  Moreover any order granting approval for PREPA to enter into the Proposed Loan should state, for the avoidance of doubt, that the Court's approval of the transaction *from PREPA's perspective* will not in any way prejudice or affect any rights or

remedies that creditors of the Commonwealth may assert in connection with the Commonwealth's decision to enter into the Proposed Loan or the implementation thereof. Such language, which is a logical consequence of the Oversight Board's decision not to seek authorization for the Commonwealth to enter into the Proposed Loan, would serve the salutary purpose of avoiding any potential for ambiguity or confusion as to the effect of the Court's order.

## II.    THE GO GROUP HAS STANDING TO OBJECT TO THE LOAN MOTION

In correspondence among the parties following the filing of the Loan Motion, the Oversight Board has suggested that the GO Group lacks standing to object to the Loan Motion because the Loan Motion was filed in PREPA's Title III case, rather than the Commonwealth's. That contention is incorrect and should be rejected.

A.  As an initial matter, the GO Group is a "party in interest" within the meaning of 11 U.S.C. § 1109(b), and therefore has a statutory right to be heard in PREPA's Title III case. The phrase "party in interest," while left undefined by the Bankruptcy Code, "is to be construed broadly, in order to allow parties affected by a [bankruptcy] case to appear and be heard." *In re Pub. Serv. Co. of New Hampshire*, 88 B.R. 546, 550 (Bankr. D.N.H. 1988); see also, *e.g.*, *In re Johns-Manville Corp.*, 36 B.R. 743, 754 (Bankr. S.D.N.Y. 1984) ("[T]he concept of 'party in interest' is an elastic and broad one designed to give the Court great latitude to insure fair representation of all constituencies impacted in any significant way by a [bankruptcy] case."). The basic test under Section 1109(b) is thus "whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so as to require representation." *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985).

The GO Group plainly qualifies to participate in PREPA's Title III case under that "elastic and broad" standard. *In re Johns-Manville Corp.*, 36 B.R. at 754. As we have explained above, see pp. 12-14, *supra*, although the Oversight Board has not sought authorization for the

15

Commonwealth to enter into the Proposed Loan, the relief sought in the Loan Motion could prejudice the GO Group's rights by potentially extinguishing claims and arguments the GO Group may wish to pursue in the Commonwealth's Title III case.  At a fundamental level, the GO Group's rights may be "affected" by the disposition of the Loan Motion, *In re Pub. Serv. Co. of New Hampshire*, 88 B.R. at 550, and basic fairness therefore requires that the GO Group be afforded representation.  See *In re Amatex Corp.*, 755 F.2d at 1042.

B.    The same considerations also demonstrate that the GO Group has constitutional standing to object to the Loan Motion.  The Proposed Order's Prejudicial Provisions threaten the GO Group with "concrete and particularized" injury, *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009), because they may extinguish or prejudice claims and arguments that the GO Group may wish to pursue in the Commonwealth's Title III case.  In analogous circumstances, courts have routinely held that this sort of injury—*viz.*, a possibility that a judgment will have preclusive effect in subsequent proceedings—is sufficient to confer standing on a litigant.  See, *e.g.*, *AT&T Corp. v. F.C.C.*, 317 F.3d 227, 238 (D.C. Cir. 2003) ("preclusive effect" of administrative decision gave litigant "a stake in this appeal sufficient to support its standing to petition for review"); *National Presto Indus., Inc. v. Dazey Corp.*, 107 F.3d 1576, 1579 (Fed. Cir. 1997) (holding that the "threat of an unfavorable determination in future litigation due to the res judicata effect of an adverse judicial determination may be . . . an injury" supporting standing); *Delaware Valley Citizens Council for Clean Air v. Davis*, 932 F.2d 256, 263 n.6 (3d Cir. 1991) (EPA had standing to appeal judgment where adverse party "could use the judgment to collaterally estop the EPA" in a separate proceeding).  These principles apply here.  The GO Group therefore has standing to object to the Loan Motion.

## URGENT CROSS-MOTION, IN THE ALTERNATIVE, TO INTERVENE

For the reasons set forth above, the GO Group has a statutory right to participate in the PREPA Title III case pursuant to 11 U.S.C. § 1109(b) as a "party in interest."  See pp. 15-16, *supra*.  If the Court rejects that submission, however, the GO Group respectfully requests that it be granted intervention pursuant to Bankruptcy Rule 2018(a) for the limited purpose of filing its objection to the Loan Motion and participating in all hearings on the Loan Motion.

Rule 2018(a) provides that, "after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter." Fed. R. Bankr. P. 2018(a).  Under Rule 2018(a), permissive intervention is "warranted upon a demonstration that the intervenor's participation is necessary to protect his or her interest in the matter and that other parties to the proceeding do not adequately represent the intervenor's interest." *In re PM Cross, LLC*, No. BR 13-11075-BAH, 2013 WL 6048810, at *3 (Bankr. D.N.H. Nov. 15, 2013).  In considering whether to grant intervention, a court may also consider "whether intervention would result in undue delay or prejudice to the original parties." *Id.* Here, each of these factors counsel in favor of intervention.

### A.    Intervention Is Necessary For The GO Group To Protect Its Interests

1. For essentially the same reasons set forth above, see pp. 12-16, *supra*, the GO Group's intervention is necessary to protect its interests.  The Proposed Order's Prejudicial Provisions threaten to thwart arguments and claims that the GO Group may seek to pursue in the Commonwealth's Title III case.  That is a direct threat to the GO Group's legal interests that justifies the GO Group's participation here.  As a matter of basic fairness, there is no justification for adjudicating the legal interests of the GO Group without allowing the GO Group to be heard.

In other cases, courts have granted intervention based on threats to a litigant's interests that were far less direct and concrete than those at stake here.  For example, intervention may "be

17

permitted to an entity based on that entity's concern with *precedential* ramifications of an aspect of a case." *Collier on Bankruptcy* ¶ 2018.01[3] (emphasis added) (citing *In re Bayless*, 2006 Bankr. LEXIS 3304 (Bankr. E.D. Tenn. Oct. 18, 2006)). The GO Group, by contrast, objects to provisions of the Proposed Order that would bless the Proposed Loan and could potentially be invoked to immunize it from certain legal challenges by Commonwealth creditors in the future. The need for intervention is all the more clear in light of the direct nature of the harm threatened here.

2.  Intervention is also appropriate because the existing parties to PREPA's Title III case do not adequately represent the GO Group's interests. To state the obvious, the Oversight Board has *proposed* the Loan Motion. It therefore cannot be expected to object to it on the ground that the Proposed Loan's terms are insufficiently protective of the interests of the Commonwealth and its creditors. Moreover, the Oversight Board is the representative of both the Commonwealth *and* PREPA. Because the Proposed Loan's terms that prejudice the Commonwealth's interests inure to PREPA's benefit, the Oversight Board faces a palpable conflict of interest and is not an adequate representative of the interests of Commonwealth creditors in this context. See pp. 7-10, *supra*.

While PREPA's creditors may well object to the Loan Motion, their incentive is to claim only that the Proposed Loan's terms are too *favorable* to the Commonwealth. Like PREPA itself, PREPA's creditors are beneficiaries of the Commonwealth's largesse. They therefore lack any incentive to argue that the Proposed Loan's non-market terms are unfair to the Commonwealth and fail to responsibly protect its interests. Under these circumstances, intervention by the GO Group is necessary to ensure that the GO Group's legal interests receive adequate representation.

18

### B.     Intervention Will Not Result In Undue Delay Or Prejudice

The GO Group's intervention would not present any risk of undue delay or prejudice to the existing parties in the PREPA Title III case.   The GO Group has moved to intervene promptly following the Oversight Board's filing of the Loan Motion, and the GO Group's objection is being filed on the schedule established by the Court for resolving the Loan Motion. As a consequence, no extension or other accommodation is required to permit the GO Group's participation with respect to this issue.   There is accordingly no sound basis to deny the GO Group an opportunity to be heard on this dispute.

## CERTIFICATION PURSUANT TO STANDING ORDER

The GO Group certifies that it has attempted in good faith to resolve with the Oversight Board the issues raised in the Urgent Cross-Motion, in the Alternative, to Intervene.   The Oversight Board opposes this cross-motion.

## CONCLUSION

The Court should deny the Loan Motion to the extent that any order granting the Loan Motion contains the Prejudicial Provisions.   Should the Court determine that the GO Group is not a party in interest with standing pursuant to 11 U.S.C. § 1109(b), the Court should grant the GO Group leave to intervene, pursuant to Bankruptcy Rule 2018(a), for the purpose of objecting to the Loan Motion.

19

Dated: February 1, 2018

/s/ Ramón Rivera Morales
J. Ramón Rivera Morales
USDC-PR Bar No. 200701
Andrés F. Picó Ramírez
USDC-PR Bar No. 302114
JIMÉNEZ, GRAFFAM & LAUSELL
P.O. Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com

Respectfully submitted,

/s/ Mark T. Stancil
Lawrence S. Robbins (admitted *pro hac vice*)
Gary A. Orseck (admitted *pro hac vice*)
Kathryn S. Zecca (admitted *pro hac vice*)
Mark T. Stancil (admitted *pro hac vice*)
Ariel N. Lavinbuk (admitted *pro hac vice*)
Donald Burke (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411-L
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
Email: mstancil@robbinsrussell.com

/s/ Andrew N. Rosenberg
Andrew N. Rosenberg (admitted *pro hac vice*)
Richard A. Rosen (admitted *pro hac vice*)
Walter Rieman (admitted *pro hac vice*)
Kyle J. Kimpler (admitted *pro hac vice*)
Karen R. Zeituni (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: arosenberg@paulweiss.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*

### **CERTIFICATE OF SERVICE**

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notifications of such filing to all

CM/ECF participants in this case.

/s/ Mark T. Stancil            
Mark T. Stancil

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[8] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY<br>("PREPA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS<br><br>This document relates to<br>PREPA Title III case only |

**[PROPOSED] ORDER GRANTING THE
AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS'
<u>URGENT CROSS-MOTION, IN THE ALTERNATIVE, TO INTERVENE</u>**

Upon consideration of the *Ad Hoc Group of General Obligation Bondholders' Urgent*

*Cross-Motion, in the Alternative, To Intervene* (the "Intervention Motion"), the Court hereby

---

[8] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

FINDS AND DETERMINES that (i) the Court has jurisdiction to consider the Intervention Motion and the relief requested therein pursuant to PROMESA section 306(a);[9] (ii) venue is proper before this Court pursuant to PROMESA section 307(a); (iii) pursuant to Federal Rule of Bankruptcy Procedure 2018(a), made applicable by PROMESA section 310, cause exists to permit the Ad Hoc Group of General Obligation Bondholders to intervene; and (iv) proper notice of the Intervention Motion has been provided under the circumstances and no other or further notice need be provided. Accordingly,

IT IS HEREBY ORDERED:

1.       The Intervention Motion is GRANTED as set forth herein.

2.       The Ad Hoc Group of General Obligation Bondholders may intervene as a party in Case Number 17 BK 4780-LTS with respect to proceedings relating to the *Urgent Joint Motion of the Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (A) Authorizing Postpetition Secured Financing, (B) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* (Dkt. 549).

Dated:  February __, 2018

_____
LAURA TAYLOR SWAIN
United States District Judge

---

[9]  The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016) (codified at 48 U.S.C. §§ 2101-2241).

2