# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | PROMESA<br>Title III<br><br><br><br>Case No. 17 BK 4780-LTS |

**OBJECTION OF NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION TO URGENT JOINT MOTION OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD OF PUERTO RICO AND THE PUERTO RICO FISCAL AGENCY & FINANCIAL ADVISORY BOARD FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING POSTPETITION SECURED FINANCING, (B) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) MODIFYING THE AUTOMATIC STAY, (D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF**

---

[1] The Debtors in the jointly-administered Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION AND VENUE.............................................................................2

III.    BACKGROUND ....................................................................................................3

IV.     ARGUMENT ..........................................................................................................7

        A.      Approval of the Facility is Not Subject to Business Judgment Review ................7

        B.      PREPA Has Not Satisfied the Bankruptcy Code's Requirements for
                Receiving Financing on a Superpriority Basis ....................................................8

                (1)     PREPA Has Not Demonstrated it is Unable to Obtain Unsecured
                        Credit .......................................................................................................9

                (2)     PREPA Has Not Demonstrated that the Financing is Necessary to
                        Preserve the Assets of the Estate.............................................................9

                (3)     The Facility Is Not Fair and Reasonable and Should be Reduced by
                        Government Receivables .......................................................................11

        C.      PREPA has Not Satisfied the Bankruptcy Code's Requirements for
                Obtaining Priming Liens ....................................................................................15

                (1)     The Commonwealth Has Not Demonstrated that it was Unable to
                        Obtain Financing Without Priming Liens...............................................15

                (2)     PREPA's Bondholders Are Not Adequately Protected............................16

        D.      The Facility Should be More Favorable to PREPA and its Creditors .................18

        E.      The Commonwealth is Not Entitled to the Protections of Section 364(e)
                Because the Commonwealth Has Not Presented Evidence of Good Faith
                and Arms' Length Negotiations..........................................................................19

V.      RESERVATION OF RIGHTS ...............................................................................21

VI.     CONCLUSION .....................................................................................................22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 495 Cent. Park Ave. Corp.*,
  136 B.R. 626 (Bankr. S.D.N.Y. 1992) ................................................................18

*In re Ames Dep't Stores, Inc.*,
  115 B.R. 34 (Bankr. S.D.N.Y. 1990) ............................................................ 8, 11

*In re Aqua Associates*,
  123 B.R. 192 (Bankr. E.D. Pa.1991) ...................................................................8

*In re Barbara K. Enterprises, Inc.*,
  No. 08-11474 (MG), 2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2008) ...........8

*In re Chevy Devco*,
  78 B.R. 585 (Bankr. C.D. Cal. 1987) ................................................................13

*In re City of Stockton, California*,
  486 B.R. 194 (Bankr. E.D. Cal. 2013) .................................................................9

*In re Crouse Group, Inc.*,
  71 B.R. 544 (Bankr. E.D. Pa. 1987) ...................................................................8

*In re Farmland Industries, Inc.*,
  294 B.R. 855 (Bankr. W.D. Mo. 2003) ......................................................... 19, 20

*In re Fontainebleau Las Vegas Holdings LLC*,
  434 B.R. 716 (S.D. Fla. 2010) ..........................................................................17

*In re L.A. Dodgers LLC*,
  457 B.R. 308 (Bankr. D. Del. 2011) ........................................................... 7, 8, 11

*In re Lehman Bros. Holdings, Inc.*,
  433 B.R. 101 (Bankr. S.D.N.Y. 2010) ................................................................11

*In re Mid-State Raceway, Inc.*,
  323 B.R. 40 (Bankr. N.D.N.Y. 2005) ..................................................................19

*In re Mosello*,
  195 B.R. 277 (Bankr. S.D.N.Y. 1996) ................................................................17

*Norris Square Civic Ass'n v. Saint Mary Hosp.*,
  86 B.R. 393 (Bankr. E.D. Pa. 1988) ..................................................................14

*In re Olde Prairie Block Owner, LLC*,
    448 B.R. 482 (Bankr. N.D. Ill.), *aff'd*, 460 B.R. 500 (N.D. Ill. 2011) .................................. 10

*In re: Puerto Rico Electric Power Authority Rate Review*,
    CEPR-AP-2015-0001, Final Resolution and Order (P.R. Energy Comm'n Jan. 10, 2017) ...... 4

*In re Residential Capital, LLC*,
    No. 12-12020, 2013 Bankr. LEXIS 2601 (Bankr. S.D.N.Y. June 27, 2013) .......................... 7

*In re Roblin Indus.*,
    52 B.R. 241 (Bankr. W.D.N.Y. 1985) .................................................................................... 8

*In re Strug-Division LLC*,
    380 B.R. 505 (Bankr. N.D. Ill. 2008) .................................................................................. 17

*Suntrust Bank v. Den-Mark Const., Inc.*,
    406 B.R. 683 (E.D.N.C. 2009) ............................................................................................. 17

*In re Swedeland Development Group, Inc.*,
    16 F.3d 552 (3d Cir. 1994) ................................................................................................... 17

*In re Tamarack Resort, LLC*,
    No. 09-03911-TLM, 2010 Bankr. LEXIS 3680 (Bankr. D. Idaho Oct. 19, 2010) .................. 9

*In re Tenney Village Co., Inc.*,
    104 B.R. 562 (Bankr. D.N.H. 1989) .................................................................................... 13

*In re WorldCom, Inc.*,
    No. 02-13533, 2002 WL 1732646 (Bankr. S.D.N.Y. July 22, 2002) .................................... 19

*In re YL West 87th Holdings I LLC*,
    423 B.R. 421 (Bankr. S.D.N.Y. 2010) ................................................................................. 17

**Statutes & Rules**

11 U.S.C. § 364 ............................................................................................................... *passim*

11 U.S.C. § 503 ................................................................................................................... 6, 12

11 U.S.C. § 507 ...................................................................................................................... 12

48 U.S.C. §§ 2101-2241 ........................................................................................................... 2

48 U.S.C. § 2166 ...................................................................................................................... 2

48 U.S.C. § 2167 ...................................................................................................................... 2

PROMESA § 301 ...................................................................................................................... 6

PROMESA § 314 ........................................................................................ 12, 13

31 L.P.R.A. § 3221 ........................................................................................ 12

P.R. Laws Ann. Tit. 22 §§ 191, *et seq.* ............................................................ 3

Fed. R. Bankr. P. 4001 .................................................................................. 10

D.P.R. Bankr. R. 4001-2 ............................................................................... 11

**Other Authorities**

Joint Resolution No. 16 of January 26, 2018 .......................................... 12

*Armed Federal Agents Enter Warehouse in Puerto Rico to Seize Hoarded Electric Equipment*,
THE INTERCEPT, January 10, 2018 ...................................................................... 5

*Governor Rosselló Refers to the Puerto Rico Department of Justice Issue of PREPA Materials
Found in a Warehouse*, LA FORTALEZA, January 11, 2018 .................................. 5

*Pepino Power Authority restaura el servicio eléctrico a 2,000 casas*, www.elnuevodia.com,
December 28, 2017 ........................................................................................ 5

*Puerto Rico Electric Power Authority Amended & Restated Fiscal Plan*, AAFAF.PR.GOV,
January 24, 2018 ........................................................................................... 4

*Puerto Rico Energy Authority Investigates Dozens of Post-Maria Bribery Cases*,
PBS NEWS HOUR, January 14, 2018 ................................................................. 5

*Puerto Rico power utility's insurance claim for hurricane damage yet to be filed, governor says*,
CARIBBEAN NEWS, Jan. 27, 2018 ...................................................................... 5

*¿Qué hacer si recibe una facture estimaa de la AEE?*, SinComillas.com, Oct. 18, 2017 ............. 4

National Public Finance Guarantee Corporation ("**National**") respectfully submits this objection (the "**Objection**") to the Financing Motion,[2] dated January 27, 2018.

## I.  INTRODUCTION

1.     It is beyond dispute that PREPA is in the midst of a financial crisis. Mismanagement, hurricane damage and lack of collections have taken their toll.  While PREPA may need a capital infusion to get back on its feet, it should be a capital infusion that is negotiated at arms' length with terms that do not harm PREPA's existing secured creditors.  The Facility is not the solution.

2.     PREPA has failed to demonstrate that the Facility meets the entire fairness standard for insider transactions and the Bankruptcy Code's and PROMESA's requirements for postpetition financing, or that the Commonwealth should be entitled to the good faith protections for a postpetition lender under the Bankruptcy Code.  First, PREPA has not shown it was unable to obtain financing on an unsecured basis.  The Commonwealth could easily have provided PREPA with ample liquidity simply by paying—or causing its instrumentalities to pay—some or all of the outstanding electricity bills owed to PREPA.  Second, PREPA has not demonstrated that the $550 million requested on an interim basis and $1.3 billion requested on a final basis are commensurate with PREPA's *actual* needs.  In fact, given the unpaid electric bills that the Commonwealth has accrued, there is little doubt that any immediate and irreparable harm could be avoided by payment of even some of these outstanding amounts.   Third, the Facility is not fair and reasonable because the payment obligations are not offset or reduced by the Commonwealth's unpaid bills.  In addition, granting an administrative expense claim to the

---

[2] *Urgent Joint Motion of the Financial Oversight and Management Board of Puerto Rico and the Puerto Rico Fiscal Agency & Financial Advisory Board for Entry of Interim and Final Orders (A) Authorizing Postpetition Secured Financing, (B) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* [Docket No. 2298]. Capitalized terms not defined herein shall have the meaning ascribed to them in the Financing Motion.

Commonwealth would effectively permit the Commonwealth to exercise control over PREPA's plan of adjustment process, to the further detriment of PREPA's creditors.  Fourth, to grant priming liens to the Commonwealth, PREPA must ensure that bondholders' liens are adequately protected.  The FOMB's insistence that bondholders are adequately protected because proceeds of the Loans will be utilized to preserve PREPA's assets is entirely speculative and therefore wholly insufficient to provide adequate protection.

3.      Finally, given the role of the FOMB and AAFAF in negotiating the Facility for both borrower and lender, and the Commonwealth's overreaching in requesting a superpriority claim and priming lien, PREPA has not shown that the Facility was negotiated at arms' length and in good faith.  Instead, the Financing Motion leaves open many questions regarding the circumstances and process followed to develop the proposed Facility.

4.      For these reasons and the reasons stated herein, PREPA has failed to demonstrate that its proposed postpetition financing is necessary, reasonable, or fair under the circumstances and it should not be approved under its proposed terms.  Accordingly, the Financing Motion should be denied.

## II.      JURISDICTION AND VENUE

5.      The United States District Court for the District of Puerto Rico has jurisdiction to consider this matter pursuant to Section 306 of the Puerto Rico Oversight, Management, and Economic Stability Act ("**PROMESA**").[3]  48 U.S.C. § 2166.  Venue is proper pursuant to Section 307 of PROMESA.  48 U.S.C. § 2167.

---

[3] PROMESA has been codified at 48 U.S.C. §§ 2101-2241.

### III.   BACKGROUND

6.      The Puerto Rico Electric Power Authority ("**PREPA**") is a public corporation established under the Puerto Rico Electric Power Authority Act, Act No. 83 of May 2, 1941, P.R. Laws Ann. Tit. 22 § 191, *et seq.* (as amended, the "**Authority Act**"), to provide electricity to customers in Puerto Rico.  PREPA functions as a utility company and is obligated to charge and collect specified rates for providing electrical service to its customers.

7.      On July 2, 2017, the Federal Oversight and Management Board for Puerto Rico ("**FOMB**") filed a Title III petition on behalf of PREPA.  National insures approximately $1.15 billion, and owns approximately $139 million (exclusive of accrued and accreted interest), of revenue bonds issued by PREPA.  The revenue bonds are secured by the receipts and income that PREPA receives through the sale of electricity to customers and by virtue of PREPA's operation of its system, including receipts to be collected from various governmental entities.

8.      As a Title III debtor, PREPA acts at the direction of the FOMB, as well as the Puerto Rico Fiscal Agency & Financial Advisory Board ("**AAFAF**").  Both FOMB and AAFAF, however, simultaneously act as representatives on behalf of other Title III debtors, including the Commonwealth.  Therefore, the same entities that represent PREPA as borrower under the Facility act as representatives of the Commonwealth, as lender under the Facility.

9.      Various governmental entities are delinquent in paying PREPA for electric power. See Case No. 17-03567, Dkt. No. 1 (May 22, 2017), Schedule B.  For example, HTA listed PREPA as its largest unsecured creditor, holding a $46 million claim.  *See id.* at Schedule B. PREPA's liquidity issues stem, at least in part, from the ongoing nonpayment of bills by various Commonwealth governmental entities, including HTA, and municipalities.[4]  This has resulted in

---

[4] PREPA's regulator, the Puerto Rico Energy Commission, has issued an order requiring PREPA to "provide to the Commission a report describing its efforts to bill and collect from municipalities in regard to the consumption of

PREPA effectively providing free power to HTA and other delinquent governmental entities. Providing free power, in turn, has resulted in decreased revenues for PREPA, which has exacerbated its liquidity position and continues to prejudice its stakeholders, including revenue bondholders.

10.     PREPA's lack of postpetition billing and collections has also reduced its revenues and adversely impacted its liquidity, to its own detriment and that of revenue bondholders. Although PREPA continues to repair and restore the System after the damage wrought by Hurricanes Irma and María, power has been restored to over 60% of its active customers. *See* Financing Motion ¶ 17; Filsinger Declaration ¶ 8.  Where PREPA has restored power, it largely has failed to bill and collect the payments for electricity service it has provided to active customers—in fact, the Financing Motion states that "PREPA has restored the *capability* of billing approximately 35–40% of its customers." Filsinger Declaration ¶ 10 (emphasis added).  It is unclear from this statement in the Financing Motion whether PREPA is actually billing commensurate with its current capabilities.

11.     In addition, Governor Rosselló's administration has impeded PREPA's efforts to collect revenues for electricity services that PREPA has provided post-hurricane to its customers. For example, PREPA's revised Fiscal Plan states Governor Rosselló has requested that PREPA not issue estimated bills.[5]  On October 18, the director of Puerto Rico's Consumer Protection Agency followed suit and suggested that customers not pay PREPA for estimated bills.[6]

---

electricity at for-profit businesses affiliated with such municipalities", as to which PREPA has failed to comply.  *In re: Puerto Rico Electric Power Authority Rate Review*, CEPR-AP-2015-0001, Final Resolution and Order (Jan. 10, 2017) at 176.

[5] *Puerto Rico Electric Power Authority Amended & Restated Fiscal Plan*, AAFAF.PR.GOV, January 24, 2018, available at http://www.aafaf.pr.gov/assets/prepa-revisedfiscalplan-01-24-18.pdf.

[6] *¿Qué hacer si recibe una facture estimaa de la AEE?*, SinComillas.com, Oct. 18, 2017, available at http://sincomillas.com/que-hacer-si-recibe-una-factura-estimada-de-la-aee/.

Moreover, the Governor recently reported that PREPA has not yet submitted insurance claims for property damage as a result of the hurricanes.[7]

12.     PREPA's mismanagement of recovery efforts also undoubtedly has impacted its liquidity position and contributed to its request for postpetition financing from the Commonwealth.  Recovery efforts have not progressed as quickly as they should have.  The pace of recovery is so slow that municipalities have begun recruiting volunteer repair crews to take over the repair of local grids from PREPA.[8]  Moreover, federal government agents recently seized a PREPA warehouse housing materials critical to restoration of the power grid.[9]  Governor Rosselló called for an investigation into wrongdoing, tacitly acknowledging the lack of accountability and oversight at the utility.[10]  Though ultimately cleared of wrongdoing, the incident raised public outcry and called PREPA's credibility into question.[11]  Along similar lines, PREPA has initiated investigations into at least twenty five cases of potential bribery in the wake of Hurricane Maria.[12]

13.     Against this backdrop of mismanagement and attempts to frustrate liquidity at PREPA, the FOMB and AAFAF have filed the Financing Motion.  The Financing Motion seeks

---

[7] *Puerto Rico power utility's insurance claim for hurricane damage yet to be filed, governor says*, CARIBBEAN NEWS, Jan. 27, 2018, available at http://caribbeanbusiness.com/puerto-rico-power-utilitys-insurance-claim-for-hurricane-damage-yet-to-be-filed-governor-says/.

[8] *Pepino Power Authority restaura el servicio eléctrico a 2,000 casas*, www.elnuevodia.com, December 28, 2017, available at
https://www.elnuevodia.com/noticias/locales/nota/pepinopowerauthorityrestauraelservicioelectricoa2000casas-2385897/.

[9] *Armed Federal Agents Enter Warehouse in Puerto Rico to Seize Hoarded Electric Equipment*, THE INTERCEPT, January 10, 2018, available at https://theintercept.com/2018/01/10/puerto-rico-electricity-prepa-hurricane-maria/.

[10] *Governor Rosselló Refers to the Puerto Rico Department of Justice Issue of PREPA Materials Found in a Warehouse*, LA FORTALEZA, January 11, 2018, available at *http://www.fortaleza.pr.gov/content/governor-rossell-refers-puerto-rico-department-justice-issue-prepa-materials-found-warehouse*.

[11] *See id.*

[12] *Puerto Rico Energy Authority Investigates Dozens of Post-Maria Bribery Cases*, PBS NEWS HOUR, January 14, 2018, available at https://www.pbs.org/newshour/nation/puerto-rico-energy-authority-investigates-dozens-of-post-maria-bribery-cases.

authorization for PREPA to obtain a $1.3 billion senior secured priming superpriority revolving credit facility (the "**Facility**") from the Commonwealth of Puerto Rico (the "**Commonwealth**") with authority to borrow up to $550 million on an urgent interim basis.

14.     PREPA claims that the Facility is the only viable financing option available to provide it with the necessary liquidity to cover operational expenses during the Title III case and that PREPA could not obtain a financing commitment from the Commonwealth on an unsecured basis, on a junior lien basis, or on a *pari passu* lien basis.  Financing Motion ¶¶ 30-35, 63; *see also* Mondell Declaration ¶ 15 ("Based on the market response to date, PREPA has not been able to obtain committed financing on an unsecured basis pursuant to section 503(b)(1) of the Bankruptcy Code, applicable in the Title III Case pursuant to section 301(a) of PROMESA, or even on a superpriority basis under section 364(c)(1) of the Bankruptcy Code, on terms more favorable than those of the Facility.").

15.     While it would be expected that PREPA would encounter difficulty in procuring postpetition financing from third-party lenders given its history of mismanagement, lack of progress repairing and restoring the power grid, and inadequate billing and collections, the Financing Motion reveals that PREPA did not make a meaningful attempt to do so.  PREPA's "marketing" process commenced on January 21, 2018, a mere six (6) days before it filed the Financing Motion. *See* Financing Motion ¶ 33; Mondell Declaration ¶ 9  Yet PREPA knew for months that it was in need of funding, and, at least as of January 9, 2018, that such funding was unlikely to come from the U.S. government. Financing Motion ¶ 23; Ex. F.  Furthermore, the marketing process, controlled by Rothschild, which is also financial advisor to the Commonwealth, is still ongoing and third parties may still submit superior financing proposals. Financing Motion ¶¶ 33-35; Mondell Declaration ¶¶ 11-13.

16.     Notably, the Financing Motion excludes adequate information regarding the negotiations around the terms of the Facility, including who negotiated on behalf of each entity. In particular, PREPA alleges, based on the Mondell Declaration, that the terms of the Facility are fair and reasonable; however, the Financing Motion fails to describe why the Commonwealth cannot otherwise provide funding to PREPA without the strings of postpetition financing.  For example, the Motion does not explain why the Commonwealth cannot fund PREPA by simply requiring governmental entities to pay their past due bills to PREPA and ensuring all steps are taken to pay any bills that have been or have yet to be issued for post-hurricane electricity service, including estimated bills.  Instead, the Financing Motion contains only a vague reference to Facility negotiations between the Commonwealth and PREPA "with the assistance of its advisors and the Oversight Board." Financing Motion ¶ 44.  At the same time, the FOMB portrays PREPA as an entity run by—and for the benefit of—the Commonwealth, strongly suggesting a lack of separateness between the two.  *Id.* ¶ 5.  If indeed this is the view of the FOMB, it has utterly failed to explain why it needs a priming lien and superpriority claim on a loan for the Commonwealth's benefit.

## IV.     <u>ARGUMENT</u>

### A.     Approval of the Facility is Not Subject to Business Judgment Review

17.     Undeterred, PREPA insists that its decision to obtain the Facility is a sound exercise of its business judgment.  The applicable standard of review, however, is not business judgment.  In analyzing transactions that involve interested parties, courts apply the more stringent "entire fairness" standard.  *See In re Residential Capital, LLC*, No. 12-12020, 2013 Bankr. LEXIS 2601, at *64 (Bankr. S.D.N.Y. June 27, 2013) ("[I]n interested party transactions, an entire fairness/heightened scrutiny analysis applies").  The entire fairness test requires proof of fair dealing and fair price and terms.  *See In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr.

D. Del. 2011). Here, the Commonwealth readily admits that PREPA and the Commonwealth are "integral components of one economy" and the government of Puerto Rico created PREPA for the Commonwealth's benefit. Financing Motion ¶ 5. The same financial advisor—Rothschild—negotiated the Facility on behalf of both PREPA and the Commonwealth. Financing Motion ¶ 33; Mondell Declaration ¶ 11. Accordingly, the Facility is a transaction among interested parties and should be reviewed under the more stringent "entire fairness" standard. As set forth more fully below, the transaction does not meet this more stringent entire fairness standard and the Financing Motion should be denied.

**B.     PREPA Has Not Satisfied the Bankruptcy Code's Requirements for Receiving Financing on a Superpriority Basis**

18.     Section 364(c) of the Bankruptcy Code provides that a debtor may only obtain financing on a superpriority basis if: (i) it was unable to obtain unsecured credit only as an administrative expense claim; (ii) the financing is necessary to preserve the assets of its estate; and (iii) the terms of the transaction are fair, reasonable, and adequate under the circumstances. *See In re L.A. Dodgers LLC*, 457 B.R. at 312; *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (court should focus on terms of proposed financing to ascertain whether they are reasonable); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa.1991) (citing *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtors must show "terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender")). A court may approve postpetition financing only to the extent its terms are "in the best interests of the general creditor body." *In re Roblin Indus.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (citations omitted); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *13 (Bankr. S.D.N.Y. June 16, 2008) (denying debtor's motion for postpetition financing due to imposing undue risk on creditors).

8

19.     PREPA bears the burden of showing that the requirements of section 364(c) have been met.  *See In re Tamarack Resort, LLC*, No. 09-03911-TLM, 2010 Bankr. LEXIS 3680, at *35 (Bankr. D. Idaho Oct. 19, 2010) ("The [debtor-in-possession] has the burden of showing that it was unable to obtain financing other than on a superpriority or priming basis.").   As discussed further below, PREPA has not carried its burden and the Facility should not be approved.

(1)     PREPA Has Not Demonstrated it is Unable to Obtain Unsecured Credit

20.     The most evident source of unsecured financing for PREPA is its outstanding receivables owed it by the Commonwealth and other governmental entities.  Instead of extending a loan that would result in a superpriority claim and primes all of PREPA's creditors, the Commonwealth should provide liquidity to PREPA by paying—and causing its instrumentalities to pay—hundreds of millions of dollars of unpaid prepetition and postpetition electric bills.[13] Unlike chapter 11 of the Bankruptcy Code, there is no provision in chapter 9 or PROMESA that prohibits the Commonwealth or other government instrumentalities that are Title III debtors from paying prepetition obligations, such as electricity bills.  *See, e.g.*, *In re City of Stockton, Cal.*, 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013).  PREPA has not explained why, in light of the immense benefits the Commonwealth is receiving from maintaining electricity services on the island, and the large amount of unpaid bills from Commonwealth customers, the Commonwealth is only willing to fund PREPA with the incentives of sections 364(c) and (d).

(2)     PREPA Has Not Demonstrated that the Financing is Necessary to Preserve the Assets of the Estate

21.     PREPA seeks approval of a $1.3 billion Facility, including access to $550 million of loans on an emergency, interim basis.   It has failed to demonstrate, however, that the

---

[13] On January 25, 2017, during a session of the Senate of Puerto Rico, Thomas Rivera-Schatz, the President of the Senate, stated that ten Commonwealth agencies themselves owe in excess of $200 million to PREPA.  A partial transcript of the Senate session, along with a non-certified translation, are annexed hereto as **Exhibit A**.

requested financing amount corresponds to PREPA's actual needs.  The FOMB provides no support for its projection of a funding gap of approximately $1 billion by April 2018, or why the projected loss of revenues leading up to that time period cannot be remedied by collections efforts.  Moreover, PREPA's purported urgent need for such a large Facility is called into question by its request for authorization to utilize Revenues to maintain a $300 million operating reserve (the "**Operating Reserve**").  *See* Financing Motion at 5.  PREPA will have broad discretion over how to use the funds in the Operating Reserve—including for Ineligible Uses— but the Financing Motion offers little insight in to how PREPA actually intends to utilize the Revenues set aside in the Operating Reserve.  PREPA's assertion that it needs funds on an urgent basis to keep customers' lights on is plainly inconsistent with the notion that it needs $300 million to deposit into a slush fund for unspecified uses.  The Revenues that PREPA proposes to deposit into the Operating Reserve should instead be used to pay Current Expenses and, in turn, reduce the borrowing amount under the Facility.

22.    PREPA also seeks $550 million as an "interim, stop-gap funding measure." Financing Motion ¶ 22.  Courts typically approve interim DIP financing to fund a debtor's urgent liquidity needs for a few weeks until a final hearing.  PREPA has not presented any evidence that it needs such a large sum to reach a final hearing, or why it requires funds on an emergency basis to pay past amounts expended for Current Expenses—especially without identifying what those expenses are or what entities are actually being reimbursed.  Financing Motion at 3; *see In re Olde Prairie Block Owner, LLC*, 448 B.R. 482 (Bankr. N.D. Ill.), aff'd, 460 B.R. 500 (N.D. Ill. 2011) (holding debtor could not obtain credit from postpetition lender in exchange for priming lien on its property to pay past due expenses).  To approve the interim Facility, the Court must determine how much cash PREPA actually needs to operate during the interim period and

approve only the amount necessary to avoid immediate and irreparable harm. Fed. R. Bankr. P. 4001(c) (stating the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing); Local Bankr. R. 4001-2(d).

23.     The Financing Motion should be denied unless PREPA demonstrates that the amount of financing sought on both an interim and final basis is commensurate with PREPA's urgent liquidity needs. At a minimum, any interim borrowing should be reduced to match PREPA's short-term operating needs.

> (3)     The Facility Is Not Fair and Reasonable and Should be Reduced by Government Receivables

24.     Pursuant to section 364(c) of the Bankruptcy Code, a debtor may only obtain financing on a superpriority basis if the terms of the transaction are fair, reasonable, and adequate under the circumstances. *See In re L.A. Dodgers LLC*, 457 B.R. at 312; *see also In re Ames Dep't Stores, Inc.*, 115 B.R. at 39. Based on the record before the Court, the terms of the proposed Facility are not fair or reasonable.

> a.     The Size of the Proposed Facility is Unreasonable and Should be Reduced by PREPA's Outstanding Receivables from the Commonwealth

25.     As discussed above, because the Commonwealth and its instrumentalities have failed to pay their electricity bills, and PREPA has failed to collect such bills, PREPA maintains it is now in a financial crisis. It is only fair that PREPA's obligations under the Facility should be offset and reduced by PREPA's outstanding receivables on account of the unpaid electricity bills of the Commonwealth and its instrumentalities.

26.     The proposed Interim Financing Order includes a finding that the Facility is not subject to setoff. Interim Financing Order ¶ 4. The Bankruptcy Code explicitly preserves setoff

rights available to creditors under Puerto Rico law.  *See In re Lehman Bros. Holdings, Inc.*, 433 B.R. 101, 107 (Bankr. S.D.N.Y. 2010) ("The Bankruptcy Code does not establish an independent right of setoff, but section 553 does preserve any right of setoff that may exist under applicable non-bankruptcy law."); *see also* 31 LPRA § 3221 (setting forth requirements for setoff under Puerto Rico law).  Moreover, the legislative measure authorizing the Commonwealth to extend financing to PREPA specifically preserves PREPA's right of "compensation," or setoff, against loan repayment obligations. Joint Resolution No. 16 of January 26, 2018.  There is no reason the Commonwealth should withhold money to PREPA as payment for its outstanding bills.

27.     Additionally, the utilities order entered in the Commonwealth's Title III case granted PREPA an allowed administrative expense claim under Bankruptcy Code sections 503(b) and 507(a)(2) for postpetition unpaid services as adequate assurance (an "**Adequate Assurance Claim**"), which PREPA can (and should) require to be paid in full in cash under any plan of adjustment pursuant to section 314(b)(4) of PROMESA.  *See* Case No. 17 BK 3283-LTS, Dkt. No. 1016 ¶ 5.  The utilities order also provides that PREPA can make an additional adequate assurance request if it is not satisfied with the Adequate Assurance Claim, which could include cash deposits, prepayments, letters of creditor or other forms of security.  *Id.* ¶¶ 6, 8.  If a Commonwealth debtor defaults on its obligations to PREPA, then PREPA can seek by motion the enforcement of any contractual or state law remedies, including immediate payment of an Adequate Assurance Claim.  *Id.* ¶ 14.  Consequently, under the utilities order, PREPA has the ability to demand payment in full of unpaid postpetition electricity services provided to other Commonwealth Title III debtors.  Given PREPA's liquidity needs, PREPA should aggressively pursue these rights.

28.     Accordingly, as a condition to approval of the Facility, the Court should require PREPA to provide a full accounting of all outstanding receivables for the Commonwealth and its instrumentalities, and explain the amounts it expects to receive from the Commonwealth and its instrumentalities when PREPA resumes billing and collections at pre-hurricane levels.  At a minimum, PREPA and the Commonwealth should agree that any amounts owed by governmental entities will be credited against the outstanding amount of any Facility payment obligations.

                  b.      The Facility Gives the Commonwealth Excessive Control Over
                          PREPA's Title III Case and is Not Fair and Reasonable

29.     Courts have held that postpetition financing should not be approved where it gives a single creditor the ability to dictate plan confirmation.  *See, e.g.*, *In re Tenney Village Co., Inc.*, 104 B.R. 562, 567 – 68 (Bankr. D.N.H. 1989) (denying DIP financing that gave lender right to unilaterally prevent confirmation of a plan because the DIP "[ran] roughshod over numerous sections of the Bankruptcy Code," including section 1129); *In re Chevy Devco*, 78 B.R. 585, 589 – 90 (Bankr. C.D. Cal. 1987) (denying DIP financing where the DIP proposal was "equivalent to [the debtor's] plan of reorganization").  As the court explained in *Tenney Village*, DIP financing should not enable the debtor to "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of [specific creditors]." *In re Tenney Village*, 104 B.R. at 568.

30.     The proposed Facility would result in precisely the type of perversion of the reorganization process that this Court is tasked with preventing.  The proposed postpetition financing upends the purpose of chapter 11 by giving the Commonwealth unnecessary protections and excessive control over a plan of adjustment.  Granting the Financing Motion will give the Commonwealth an up to $1.3 billion superpriority administrative expense.  Pursuant to

section 314 of PROMESA, a plan can be confirmed only if, among other things, "the plan provides that on the effective date of the plan each holder of a [administrative expense claim] will receive on account of such claim cash equal to the allowed amount of such claim." PROMESA § 314(b)(4).  Given that the Commonwealth would have to consent to a settlement of its superpriority claim, it would effectively control the plan confirmation process.  Such a unilateral grant of power to a DIP lender to dictate the ultimate path of PREPA's Title III case is not fair and reasonable.

31.     Plainly, therefore, PREPA cannot meet the standard under section 364(c) of the Bankruptcy Code unless it resolves this concern.  A potential resolution could be to disregard any claim for administrative expense of the Commonwealth for purposes of voting on a plan of adjustment only, so that the Commonwealth does not exercise undue control over the plan process.

        c.      PREPA's Creditors Have Provided Substantial Benefit to the Commonwealth

32.     As discussed above, the Commonwealth has received—and continues to receive—millions of dollars in free electricity service from PREPA, to the detriment of PREPA's bondholders.  All revenues forgone by PREPA through neglecting its statutory and contractual obligations to collect electricity bills prepetition and postpetition, including from governmental entities, should have properly flowed to PREPA's bondholders.  It is both unfair and unreasonable for the Commonwealth to obtain the protections of section 364(c) while it receives such a significant benefit at the expense of PREPA's current creditors.  *See, e.g.*, *Norris Square Civic Ass'n v. Saint Mary Hosp.*, 86 B.R. 393, 402 (Bankr. E.D. Pa. 1988) (denying proposed DIP financing as not fair, reasonable, and adequate, holding that "[w]e believe that we can and should look beyond the Debtor's immediate financial circumstances to determine who is

responsible for creating those circumstances.  Here, we are compelled to conclude that the
immediate crisis was largely created by [the DIP lender].").

### C.  PREPA has Not Satisfied the Bankruptcy Code's Requirements for Obtaining Priming Liens

33.     Section 364(d) of the Bankruptcy Code provides that to prime existing creditors'
liens through debtor-in-in possession financing, a debtor must establish that (i) it was unable to
obtain similar financing without priming existing liens, and (ii) the holders of the primed lien are
adequately protected.  11 U.S.C. § 364(d).

(1)     The Commonwealth Has Not Demonstrated that it was Unable to Obtain Financing Without Priming Liens

34.     PREPA has not demonstrated that it was unable to secure financing without
priming liens.  Financing Motion ¶¶ 32, 59 – 63.  PREPA's "marketing" process commenced *a
mere six (6) days* before it filed the Financing Motion despite having known for months that it
was in need of substantial liquidity.  *See id.* ¶ 33; Mondell Declaration ¶ 9.  Additionally, while
PREPA may have discussed financing with certain parties in interest, it did not engage its largest
creditors—for example, the monoline insurers—in discussions over potential financing.  Thus,
PREPA's eleventh-hour "marketing" process lacked meaningful engagement with creditors and
is still ongoing.  PREPA's conclusion that it must grant priming liens to obtain financing is, at
best, premature and, at worst, an overt attempt to subvert PREPA's bondholders' liens.

35.     Moreover, as discussed above, the simplest method by which PREPA can obtain
liquidity to pay Current Expenses is by collecting electricity bills from customers.  PREPA has
neglected—and continues to neglect—its statutory and contractual obligations to collect
electricity bills from its customers, including from the Commonwealth and its instrumentalities,
and the Commonwealth and its instrumentalities continue to withhold payment from PREPA.
Now that PREPA finds itself in financial distress because of its own irresponsibility and the

Commonwealth's conduct, the Court should not authorize PREPA to grant a lien to the Commonwealth that primes bondholders who have been subsidizing the Commonwealth and its instrumentalities to the tune of millions of dollars in electricity service.

36.     The FOMB candidly acknowledges that, from its viewpoint, the Commonwealth created PREPA for the Commonwealth's benefit, and it asserts that there is little to no separateness between the two.  *See* Financing Motion ¶ 5.  The Commonwealth and PREPA share the common goal of turning the lights back on in Puerto Rico.  With that aligned incentive, it is wholly illogical why the Commonwealth will not extend credit to PREPA without a priming lien.  Rather, to continue to obtain the benefits that PREPA provides to the Commonwealth, the Commonwealth should be incentivized to fund PREPA, even on an equity or subordinated basis, as a parent would fund a subsidiary where there is a corporate benefit to doing so, or, at most, with the protection of a junior lien.

37.     Despite its label as a credit financing, the Facility is more properly characterized as a contribution or support from the Commonwealth to PREPA to provide a benefit to the entire island of Puerto Rico until the federal government can extend CDL financing to PREPA and/or the Commonwealth.  Accordingly, any liens or claims granted as part of the financing should be junior to those of PREPA's existing bondholders.[14]

### (2)   PREPA's Bondholders Are Not Adequately Protected

38.     The FOMB contends that PREPA may secure the Facility with priming liens because the PREPA bondholders' claims will be adequately protected.  The FOMB's rationale is that absent material improvements in PREPA's current operations, PREPA's revenues would be insufficient to cover operating expenses in the long term due to expected outmigration. Financing

---

[14] At the very least, if the Court is not inclined to address this issue at this juncture, the Interim Financing Order and the Final Financing Order should provide that creditors' rights are reserved to seek recharacterization of the Facility at a later date.

Motion ¶ 20, Wolfe Declaration ¶¶ 21-26.  The FOMB argues that the Facility will enable PREPA to maintain its infrastructure and assets to generate future revenues.  *See* Financing Motion ¶ 52.  This argument fails.

39.     First, the preservation and enhancement of a Debtor's assets does not in and of itself prove adequate protection to creditors.  *See In re Swedeland Development Group, Inc*., 16 F.3d 552, 556-57 (3d Cir. 1994) (holding that future potential value was not sufficient to afford adequate protection); *In re Fontainebleau Las Vegas Holdings LLC*, 434 B.R. 716, 751 (S.D. Fla. 2010) (denying a debtor-in-possession financing in part because the fact that "DIP financing was necessary to preserve, and possibly even enhance, the value of the Debtors' assets" did not provide adequate protection to existing creditors).

40.     Second, the benefits that the FOMB claims will be achieved through the Facility are entirely speculative in nature and do not provide adequate protection.  *See In re Mosello,* 195 B.R. 277, 288-290 (Bankr. S.D.N.Y. 1996) (holding that use of proposed DIP to develop property did not provide adequate protection where the "future of the debtors' development scheme is beset by uncertainty and risk, and the ultimate outcome of the project is a matter of speculation based upon assumptions which cannot be quantified or verified by objective evidence").  There is no guarantee that PREPA will actually use the Loans for the purposes that it says it will, especially in light of PREPA's history of gross mismanagement and politicization. Given the uncertainty surrounding the Commonwealth, it cannot be said with any degree of confidence that investment in PREPA's infrastructure will curb outmigration and result in increased revenues for PREPA's bondholders.  *See also In re Strug-Division LLC*, 380 B.R. 505, 514-15 (Bankr. N.D. Ill. 2008) (holding debtor had failed to provide adequate protection based on increase in value that would result from applying DIP loan to rehabilitation work because the

risk of being primed would be shifted entirely to secured creditor); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 442-43 (Bankr. S.D.N.Y. 2010) (denying DIP loan because future value of completing construction was too speculative and did not provide adequate protection); *Suntrust Bank v. Den-Mark Const., Inc.*, 406 B.R. 683, 697-702 (E.D.N.C. 2009) (reversing bankruptcy court's finding of adequate protection because future value was speculative); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 629-31 (Bankr. S.D.N.Y. 1992) (approving adequate protection based on future value only because all parties agreed that property would increase in value based on borrower having already obtained lessee for the improved premises).

41.     Accordingly, because PREPA has not provided adequate protection to its bondholders, it has failed to satisfy the requirements of section 364(d) of the Bankruptcy Code and the Court should deny PREPA's request to grant priming liens to secure the Facility.

### D.     The Facility Should be More Favorable to PREPA and its Creditors

42.     In addition to the superpriority claim and priming lien, the Facility contains numerous terms that should be revised or eliminated to be more favorable to PREPA and its creditors in these circumstances, such as:

- the interim financing of $550 million is not subject to forgiveness if the Commonwealth secures a CDL from the federal government in respect of that amount, even if such federal loan is forgiven, Financing Motion ¶ 29;

- the terms of the Facility can be modified based on unknown terms that may be agreed upon in the future between the Commonwealth and PREPA (again, represented on both sides by the FOMB and AAFAF) without notice and a hearing and the Court's approval, Financing Motion at 4-5 (limiting uses of Facility only to budget requiring approval only from AAFAF and the FOMB every 13 weeks);

- the automatic stay would be modified without further order of the Court to permit the Commonwealth to accelerate its loans upon an event of default and have its loan proceeds repaid out of Revenues ahead of bondholders, Financing Motion at 7; and

- PREPA would provide a copy of its reporting package—which notably omits access to PREPA's 13-Week Budget and contains no detailed information regarding billing and collection efforts—only to creditors party to the Mediation Agreement, effectively denying the protections of a secured creditor to any party that does not engage in mediation, Financing Motion ¶ 57.

43.     In addition, PREPA's bondholders should be provided with other protections that are typically granted to secured creditors as adequate protection in connection with postpetition financing:

- Bondholders should receive a more robust reporting package that includes copies of PREPA's 13-Week Budget when submitted to AAFAF and FOMB and detailed reports of PREPA's billing and collections efforts;

- Bondholders should have weekly cash flow calls with PREPA's advisors;

- Bondholders should, with reasonable notice, have access to PREPA's facilities and premises and the ability to periodically inspect PREPA's books and records;

- Milestones should be incorporated into the Interim and Final DIP Orders for PREPA to complete restoration and repair of the power grid and send bills to 100% of its active customer base; and

- An independent monitor should ensure that the loan proceeds are spent in accordance with the 13-Week Budget.

44.     Absent the modifications described herein, the Facility is neither fair nor reasonable and it should not be approved under its proposed terms.

**E.    The Commonwealth is Not Entitled to the Protections of Section 364(e) Because the Commonwealth Has Not Presented Evidence of Good Faith and Arms' Length Negotiations**

45.     Courts have regularly held that good faith and arm's length negotiations are important factors to be considered in granting or denying postpetition financing under sections 364(c) and (d) of the Bankruptcy Code. *See, e.g.*, *In re WorldCom, Inc.*, No. 02-13533, 2002 WL 1732646 at *3 (Bankr. S.D.N.Y. July 22, 2002) (approving DIP financing only after finding of good faith and arm's length negotiations between debtors and lenders); *In re Farmland*

*Industries, Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (listing factors courts should consider in connection with DIP financing, including "that the financing agreement was negotiated in good faith and at arm's length"); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005) (citing *Farmland* DIP financing factors, including good faith and arm's length negotiations). Moreover, section 364(e) of the Bankruptcy Code only provides a DIP lender protection against reversal on appeal if it negotiated the original loan in good faith. § 11 U.S.C. 364(e).

46.     As discussed above, movants have failed to present evidence indicating that the Facility was negotiated in good faith and at arms' length. The only sentence addressing this point in the Financing Motion states, "the Debtor negotiated the Credit Documents with the Commonwealth in good faith and with the assistance of its advisors and the Oversight Board, and the Debtor believes it has obtained the best financing available." Financing Motion ¶ 44. There is no factual support for this statement in the Financing Motion or in the attached declarations.

47.     Accordingly, there is little basis to support a finding in the Interim Financing Order that the Facility was negotiated in good faith and at arm's length. Instead, the Financing Motion raises numerous questions: What were the alternatives considered? Why does the Commonwealth require a superpriority administrative claim and priming lien on Revenues, effectively subordinating existing bondholders? What are the sources of funds in the Commonwealth's treasury account that will be loaned to PREPA under the Facility? Did PREPA seek payment of overdue receivables from governmental entities to reduce the size of the Facility? Why should the Commonwealth be making a secured priming loan to PREPA when the same funds could be used to pay or cause to be paid overdue electric bills owed to PREPA by

the Commonwealth or its instrumentalities?  Is there meaningful separateness between PREPA and the Commonwealth given the Oversight Board's representation that PREPA is run for the Commonwealth's benefit?  Movants should produce adequate evidence of PREPA's negotiations on the Facility terms before the Court can determine whether there were arms' length negotiations and if they were made in good faith.

48.     The lack of evidence of good faith and arm's length negotiations weighs heavily against the Court approving the Facility even on an interim basis.  To be certain, it makes it nearly impossible to make a section 364(e) finding of good faith at the interim hearing.  Without proof of actual negotiations, there is nothing but the lender's conclusory statement to support such a finding.  At a minimum, the Court should defer granting the Commonwealth section 364(e) protection until the final hearing on the Financing Motion, after the parties have had an opportunity to conduct discovery and the Court can assess whether there is evidence to support AAFAF's and the FOMB's good faith assertion.

## V.     <u>RESERVATION OF RIGHTS</u>

49.     As of the date of this Objection, National has not received documentation from movants and their professionals regarding the Facility.  National, along with other creditors, has served certain document requests on PREPA, which remain outstanding, and are taking depositions that will not all conclude before the objection deadline.  Accordingly, National expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement this Objection, to raise further and other objections to the Financing Motion and the form of Interim and Final DIP Orders, and to introduce evidence prior to or at any hearing regarding the Financing Motion in the event the National's Objection is not resolved prior to such hearing.

## VI.   <u>CONCLUSION</u>

50.     The Facility, as currently proposed by the FOMB and AAFAF in the Financing Motion, benefits the Commonwealth at the expense of PREPA and its existing creditors.  Any Facility must include appropriate protections for PREPA's bondholders, such as sizing the Facility to account for alternative sources of revenue, decreasing the amount of any DIP repayment obligations for the amount of any unpaid receivables for Commonwealth entities as and when such receivables mature, denying a priming lien to the Commonwealth, and ensuring that the Facility does not create a situation where the Commonwealth by virtue of a large superpriority administrative expense obtains a veto right over any proposed plan of adjustment. Therefore, National respectfully requests that the Court deny the Financing Motion unless the Interim and Final Financing Orders remedy the numerous issues outlined in National's Objection.

**RESPECTFULLY SUBMITTED**, in San Juan, Puerto Rico, this 1st day of February, 2018.

**WE HEREBY CERTIFY** that on this same date a true and exact copy of this objection was filed with the Clerk of Court using the CM/ECF system, which will notify a copy to counsel of record. Also, copy of this document will be notified via electronic mail to all case participants.

Dated: **February 1, 2018**
        San Juan, Puerto Rico

**ADSUAR MUÑIZ GOYCO**
**SEDA & PÉREZ-OCHOA, P.S.C.**
208 Ponce de León Avenue, Suite 1600
San Juan, PR 00936
Telephone: 787.756.9000
Facsimile: 787.756.9010
Email: epo@amgprlaw.com
        acasellas@amgprlaw.com
        larroyo@amgprlaw.com

By:   */s/ Eric Pérez-Ochoa*
Eric Pérez-Ochoa
USDC-PR No. 206314

*/s/ Alexandra Casellas-Cabrera*
Alexandra Casellas-Cabrera
USDC-PR No. 301010

*/s/ Lourdes Arroyo Portela*
Lourdes Arroyo Portela
USDC-PR No. 226501

**WEIL, GOTSHAL & MANGES LLP**

*/s/ Marcia Goldstein*
Marcia Goldstein*
Jonathan Polkes*
Gregory Silbert*
Robert Berezin**
767 Fifth Avenue
New York, New York 10153
Tel.: (212) 310-8000
Fax: (212) 310-8007

Stephen A. Youngman*
200 Crescent Court, Suite 300
Dallas, Texas  75201-6950
Tel.: (214) 746-7700
Fax: (214) 746-7777
Email: marcia.goldstein@weil.com
        jonathan.polkes@weil.com
        gregory.silbert@weil.com
        robert.berezin@weil.com
        stephen.youngman@weil.com

*admitted *pro hac vice*
**pro hac vice* pending

*Counsel for National Public Finance*
*Guarantee Corp.*