Hearing Date:          February 15, 2018 at 9:30 a.m. (Atlantic Standard Time)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>     Debtor. | PROMESA<br>Title III<br><br>Case No. 17 BK 4780-LTS<br><br>Re: ECF Nos. 361, 376, 377, 379, 380, 381, 382, 383, and 390<br><br>**Reply Relates Only to PREPA and Shall Only Be Filed in Case No. 17 BK 4780-LTS** |

*[Caption continued on next page]*

---

[1]   The Debtors in the jointly-administered Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**OMNIBUS OVERSIGHT BOARD REPLY TO RESPONSES TO
URGENT JOINT MOTION OF FINANCIAL OVERSIGHT
AND MANAGEMENT BOARD FOR PUERTO RICO, AS TITLE III PREPA
REPRESENTATIVE, AND PUERTO RICO FISCAL AGENCY AND
FINANCIAL ADVISORY AUTHORITY FOR ENTRY OF INTERIM AND
FINAL ORDERS (A) AUTHORIZING POSTPETITION SECURED FINANCING,
(B) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (C) MODIFYING THE AUTOMATIC STAY,
(D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF**

To the Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Puerto Rico Electric Power Authority ("PREPA") in this Title III case pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits this reply (the "Reply") to the following responses (collectively, the "Responses") to the *Urgent Joint Motion of the Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (a) Authorizing Postpetition Secured Financing, (b) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (c) Modifying the Automatic Stay, (d) Scheduling a Final Hearing, and (e) Granting Related Relief*, filed on January 27, 2018 [ECF No. 549] (the "Postpetition Financing Motion"):[3]

> (a) *Limited Objection by and Reservation of Rights of Arc American, Inc. to the Urgent Joint Motion of the Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (a) Authorizing Postpetition Secured Financing, (b) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (c) Modifying the Automatic Stay, (d) Scheduling a Final Hearing, and (e) Granting Related Relief* [ECF No. 563] (the "Arc Objection"), filed by Arc American, Inc. ("Arc").

---

[2]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[3]   Capitalized terms used but not otherwise defined herein shall have the same meaning given to them in the Postpetition Financing Motion.

(b) *The Ad Hoc Group of General Obligation Bondholders' (i) Objection to the Urgent Joint Motion of the Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (a) Authorizing Postpetition Secured Financing, (b) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (c) Modifying the Automatic Stay, (d) Scheduling a Final Hearing, and (e) Granting Related Relief, and (ii) Urgent Cross-motion, in the Alternative, to Intervene* [ECF No. 566] (the "GO Objection"), filed by the Commonwealth's General Obligation Bondholders.

(c) *Objection and Reservation of Rights of PREPA Bond Trustee to Urgent Motion of the Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (a) Authorizing Postpetition Secured Financing, (b) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (c) Modifying the Automatic Stay, (d) Scheduling a Final Hearing, and (e) Granting Related Relief* [ECF No. 568] (the "Bond Trustee Objection"), filed by the PREPA Bond Trustee.

(d) *Objection of Ad Hoc Group of PREPA Bondholders to Urgent Joint Motion of the Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (a) Authorizing Postpetition Secured Financing, (b) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (c) Modifying the Automatic Stay, (d) Scheduling a Final Hearing, and (e) Granting Related Relief* [ECF No. 570] (the "PREPA Bondholder Objection"), filed by PREPA's Bondholders.

(e) *Limited Objection of Whitefish Energy Holdings, LLC to Urgent Joint Motion of the Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (a) Authorizing Postpetition Secured Financing, (b) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (c) Modifying the Automatic Stay, (d) Scheduling a Final Hearing, and (e) Granting Related Relief* [ECF No. 571] (the "WEH Objection"), filed by Whitefish Energy Holdings, LLC ("WEH").

(f) *Response and Limited Objection of Scotiabank de Puerto Rico, as Administrative Agent, to Urgent Motion for Entry of an Interim Order Authorizing Postpetition Secured Financing* [ECF No. 572] (the "Scotiabank Response"), filed by Scotiabank de Puerto Rico.

(g) *Statement of Solus Alternative Asset Management LP in Response to the Urgent Joint Motion for Postpetition Secured Financing* [ECF No. 576] (the "Solus Statement"), filed by Solus Alternative Asset Management LP.

(h) *Objection of National Public Finance Guarantee Corporation to Urgent Joint Motion of the Financial Oversight and Management Board of Puerto Rico and the Puerto Rico Fiscal Agency & Financial Advisory Board for Entry of Interim and Final Orders (a) Authorizing Postpetition Secured Financing, (b) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (c) Modifying the Automatic Stay, (d) Scheduling a Final Hearing, and (e) Granting Related Relief*

[ECF No. 580] (the "<u>National Objection</u>"), filed by the National Public Finance Guarantee Corporation.

(i) *Ambac Assurance Corporation's (i) Objection to the Urgent Joint Motion of the Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Interim and Final Financing Orders, and (ii) Urgent Cross-Motion, in the Alternative, to Intervene* [ECF No. 582] (the "<u>Ambac Objection</u>"), filed by Ambac Assurance Corporation.

(j) *Objection of Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc. to the Urgent Joint Motion of Financial Oversight and Management Board for Puerto Rico, and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (a) Authorizing Postpetition Secured Financing, (b) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (c) Modifying the Automatic Stay, (d) Scheduling a Final Hearing, and (e) Granting Related Relief* [ECF No. 585] (the "<u>Assured Objection</u>"), filed by Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Syncora Guarantee Inc.

(k) *Statement of Official Committee of Unsecured Creditors in Response to Urgent Joint Motion of the Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (A) Authorizing Postpetition Secured Financing, (B) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* [ECF No. 597], filed by the Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico.

(l) *Joinder of U.S. Bank National Association in its Capacity as PREPA Bond Trustee to Objections to Urgent Joint Motion of the Financial Oversight and Management Board of Puerto Rico and the Puerto Rico Fiscal Agency & Financial Advisory Board For Entry of Interim and Final Orders (A) Authorizing Postpetition Secured Financing, (B) Granting Priming Liens And Providing Superpriority Administrative Expense Claims, (C) Modifying The Automatic Stay, (D) Scheduling A Final Hearing, And (E) Granting Related Relief* [ECF No. 606], filed by U.S. Bank National Association in its Capacity as PREPA Bond Trustee.

(m) *Siemens Transportation Partnership Puerto Rico, S.E.'s Limited Objection With Respect to the Urgent Motion for Postpetition Secured Financing, Priming Liens, and Providing Superpriority Administrative Expense Claims* [ECF No. 2335 in Case No. 17-03282], filed by Siemens Transportation Partnership Puerto Rico, S.E.

In support of this Reply, the Oversight Board respectfully states as follows:

## TABLE OF CONTENTS

Page

WITHDRAWAL OF REQUEST FOR INTERIM RELIEF ......................................................... 1

INTRODUCTION ................................................................................................ 1

REPLY ........................................................................................................... 3

I.    PREPA HAS SATISFIED THE REQUIREMENTS OF SECTION 364. ....................... 3

      A.    PREPA is Unable to Obtain Credit with More Favorable Terms. ......................... 3

      B.    Holders of PREPA's Power Revenue Bonds are Adequately Protected. .............. 9

II.   THE OBJECTORS' OTHER ARGUMENTS FAIL. ...................................................... 17

      A.    The Entire Fairness Standard Does Not Apply. ................................................. 17

      B.    PREPA Would Satisfy the Entire Fairness Standard ............................................ 20

      C.    The Facility is in the Best Interest of PREPA and its Creditors ........................... 22

      D.    The Facility is Necessary to Preserve PREPA's Assets ...................................... 22

      E.    The Facility Terms are Fair and Reasonable ....................................................... 23

III.  ADDITIONAL ARGUMENTS RAISED IN THE RESPONSES. ................................. 24

REVISED PROPOSED ORDER ............................................................................... 26

## **WITHDRAWAL OF REQUEST FOR INTERIM RELIEF**

1.      The Oversight Board, as PREPA's Title III representative, very much appreciates the Court's having scheduled the final hearing for February 15, 2018.   Because that date is only eight days after the date for the interim hearing, PREPA is able to and does withdraw its request for interim relief.

2.      In addition to any modifications discussed herein, the Commonwealth and PREPA have agreed to make the following revisions to the Final Financing Order: (i) clarify that material amendments must be approved by the Court after notice and a hearing; (ii) for creditors who wish to obtain information that do not participate in mediation, PREPA will address requests for information as received; and (iii) clarify that the Final Financing Order does not alter any setoff rights PREPA or any other party has, and all setoff rights are reserved.

## **INTRODUCTION**

3.      The financial recovery of PREPA and the Commonwealth, as well as the health and welfare of Puerto Rico's residents, is at stake.   The undisputed evidence shows PREPA is running out of money and that without an injection of liquidity in the near term there will be insufficient cash to continue to provide power to Puerto Rico.   If PREPA were to cease operating, the restoration efforts of the Commonwealth and all its instrumentalities would be upended.   Outmigration of residents and business would accelerate.   Revenues would fall. Human hardship would be exacerbated as potable water, power for medical procedures, communications, and open schools would disappear again.   The cost of restoration would increase.

4.      Because the foregoing is unassailable commonsense corroborated by the Hurricane Maria experience we just suffered, no one has responded that PREPA does not need

money urgently and must continue to generate power.  Rather, PREPA creditors contend PREPA should find other sources of cash and/or ameliorate the lending terms, while Commonwealth creditors demand more lucrative terms.

5. The requested Facility provides PREPA with the liquidity it needs.  The terms offered by the Commonwealth are fair and reasonable:  As explained in the Postpetition Financing Motion, the Facility provides an initial interest rate of zero percent that gradually increases to a maximum of three percent, with no prepayment penalties, and the possibility of forgiveness.  It also restricts PREPA to using the financing for Eligible Uses (a term defined in the Facility), which is a subset of Current Expenses (defined in the PREPA Trust Agreement). Since Current Expenses are already afforded priority over payment on the Power Revenue Bonds, this structure ensures PREPA can access the liquidity it needs to continue to operate and rebuild without prejudicing the rights of the bondholders.

6. The Responses raise numerous objections to the Facility.  As set forth herein, however, none shows PREPA could obtain similar or better financing in the near term without providing to the Commonwealth a priming lien and superpriority claim, or that PREPA's bondholders, asserting a security interest in PREPA's Revenue net of Current Expenses, are not adequately protected.  Accordingly, the requested financing should be granted.

7. PREPA originally sought interim emergency financing because it believed the final hearing might not occur until late February or early March.  The Court has now scheduled a Final Hearing on the Facility for February 15.  *See Order Denying the Urgent Motion of the Oversight Board to Clarify the Scope of the Interim Financing Hearing*, ECF. No. 616.  As a result, PREPA withdraws its request for interim emergency financing.

## **REPLY**

### I.     **PREPA HAS SATISFIED THE REQUIREMENTS OF SECTION 364.**

8.     Bankruptcy Code section 364(c)(1) provides a debtor may incur debt "over any or all administrative expenses of the kind specified in section 503(b) or 507(b)" of the Bankruptcy Code if the debtor cannot obtain credit on an unsecured basis.  Bankruptcy Code section 364(d) provides a debtor may obtain credit secured by a senior or equal lien on property already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  PREPA has satisfied all requirements under Bankruptcy Code section 364 to obtain access to the Facility on a final basis.

#### A.     **PREPA is Unable to Obtain Credit with More Favorable Terms.**

9.     PREPA has demonstrated it is unable to obtain credit on terms better than the Facility.  Moreover, PREPA has negotiated the Facility to enable it to refinance the Facility at no charge if better financing becomes available.  The only other offer PREPA received prior to the Postpetition Financing Motion was on more onerous terms from creditors now objecting to the Facility.   Declaration of Dustin Mondell ("Mondell Declaration"), ECF No. 549-4 at ¶ 7.  PREPA's advisors initiated a marketing and solicitation process (which is ongoing) that to date has not yielded a better offer.  *See* Supplemental Declaration of Dustin Mondell at ¶ 5, attached hereto as **Exhibit A** ("Supp. Mondell Declaration").[1]

10.     Although there is "no duty to seek credit from every possible lender before concluding that such credit is unavailable," section 364 obligates a debtor to show "by a good faith effort that credit is not available without a senior lien."  *Bay v. Shenandoah Sav. & Loan Assoc. (In re Snowshoe Co., Inc.*), 789 F.2d 1085, 1088 (9th Cir. 1986); *see also In re YL W. 87th*

---

[1] Due to the number of declarations and other exhibits, all exhibits will be filed separately.

*Holdings I LLC*, 423 B.R. 421, 441 n.44 (Bankr. S.D.N.Y. 2010) (noting that courts require only a showing of "reasonable efforts" to obtain credit otherwise).

11.      Where few lenders are likely to be willing and able to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd* 99 B.R. 117 (N.D. Ga. 1989). This fact holds true here. The Commonwealth and its instrumentalities have been cut off from normal access to the capital markets. *See* PROMESA § 405(m)(6) ("the ability of the Government of Puerto Rico to obtain funds from the capital markets in the future will be severely diminished without Congressional action to restore its financial accountability and stability"). While PREPA sought to receive CDLs (community disaster loans) from the U.S. Treasury, these efforts have not yielded success (so far), and PREPA is left with no other option than the Facility.

12.      This does not mean PREPA is not trying. As detailed in the Mondell Declaration, PREPA's advisors have undertaken a marketing effort to find alternative financing. Mondell Declaration ¶ 11. PREPA's advisors have prepared marketing materials, assembled a data room, and solicited potential lenders. *Id*. at ¶¶ 11-12. Seven prospective lenders have signed non-disclosure agreements and are exploring potential loans with PREPA. *Id*. at ¶ 12.

13.      Since the filing of the Postpetition Financing Motion, three parties have submitted indications of interest regarding a proposed loan. Supp. Mondell Declaration at ¶ 5. Two of these soft proposals require priming liens and superpriority administrative expense status, and the third is unclear on the extent of protections requested. *Id*. Based on the foregoing, no party has been willing to provide credit on an unsecured basis. Each of the submissions are subject to a variety of additional terms and conditions, including resolution of certain litigation, market

syndication, negotiation of definitive documentation, and other similar requirements. *Id.* That effort will continue until the date of the Final Hearing.

14.     Accordingly, as of the filing of this Reply, PREPA has not been able to obtain a commitment for financing on terms more favorable within the parameters of Bankruptcy Code section 364 than offered under the Facility.  As described above, PREPA has undertaken a reasonable marketing effort given its current situation.[2]  Based on the foregoing, PREPA has satisfied is burden under Bankruptcy Code sections 364(c)(1) and (d)(1).

15.     The PREPA Bondholder Objection questions the reasonableness of the marketing effort given the proposed credit agreement was only recently filed [ECF No. 586] (the "Credit Agreement")[3] and competing bids were due February 2, 2018.  As explained in the Declaration of Gerardo Portela Franco ("Portela Declaration"), attached hereto as **Exhibit C**, the timing of PREPA's solicitation process was delayed due to ongoing discussions with the United States Treasury Department and the Federal Emergency Management Agency ("FEMA") over a possible CDL.  Portela Declaration at ¶¶ 9-10.  PREPA's advisors preferred borrowing under a CDL because such loans are often made on favorable terms to borrowers and are often forgiven depending upon the circumstances. *Id.* at ¶ 8.  Contrary to assertions raised in certain Responses, it was the United States Treasury Department and FEMA, not the Commonwealth, that wanted any loan to go through the Commonwealth. *Id.* at ¶ 9.  Indeed, PREPA and the Commonwealth prefer a direct CDL to PREPA (i*d.* at ¶ 8), and because of the benefits of a CDL over traditional financing, PREPA believed focusing all its efforts on obtaining a CDL was the most prudent

---

[2] The cases cited by objectors in which debtors failed to make a reasonable effort to secure alternative financing are therefore inapposite. *See, e.g.*, *In re Phase-I Molecular Toxicology*, 285 B.R. 494, 496 (Bankr. D. New Mex. 2002); *In re Stacy Farms*, 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987); *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (cited to in Assured Objection at 18); *In re Los Angeles Dodgers*, 457 B.R. 308 (Bankr. D. Del. 2011) (cited in PREPA Bondholders Objection at 23).

[3] A revised Credit Agreement is being filed contemporaneously with this Reply.  In accordance with Bankruptcy Rule 4001(c)(1)(B), attached hereto as **Exhibit B** is a revised concise statement of the terms.

5

course (*id*. at ¶ 10).  Once it became clear a CDL would not happen in time, PREPA forged

ahead in its search for financing.  *Id*. at ¶ 10.

16.     As demonstrated by the Supplemental Mondell Declaration, the timeline has not

deterred interest.  In any event, the February 2 deadline is not a hard deadline, and PREPA will

consider bids received after that date.  At the Final Hearing, PREPA will have to show no better

terms are available.  And if better terms become available after the Final Hearing, PREPA can

refinance any borrowings authorized because PREPA will have incurred no interest, lender fees,

or other prepayment fees or penalties. In fact, AAFAF and the Oversight Board continue to work

with the U.S. Treasury to obtain CDLs and will continue to do so.

17.     Multiple Responses argue PREPA could obtain liquidity from another source that

would obviate the need for the Facility, namely its outstanding accounts receivable with the

Commonwealth and other government instrumentalities.   But whether a debtor could obtain

liquidity by changing its business practices is not relevant under Bankruptcy Code section 364(c)

or (d).  Further, it is illogical to assume government entities can come up with the necessary

funding (up to $1.3 billion) in the timeframe PREPA requires the money.  The Oversight Board

agrees the government entities should pay their bills timely to PREPA.  But, the Oversight Board

cannot manufacture extra liquidity for these entities so they can pay their bills faster, without

resolving more fundamental structural problems, which is in progress but not possible in the

short term.

18.     Importantly, contrary to the assertions in the Responses, the Commonwealth does

not owe PREPA significant amounts for electricity services.  Quite the contrary!  On January 29,

2018, the Commonwealth paid $23.7 million to PREPA, reflecting undisputed amounts owed to

PREPA for services rendered between July and December of 2017.  Portela Declaration at ¶ 13.

6

In addition, PREPA and the Commonwealth entered into a memorandum of understanding pursuant to which the Commonwealth agreed to prepay its estimated future energy liabilities to the Commonwealth, covering the period of January 1, 2018 to June 30, 2018, in exchange for a 1% discount. *Id*. On January 29, 2018, the Commonwealth made this payment, which totaled approximately $50.9 million.[4] The Commonwealth's payments, along with continued aggressive cash management practices, have yielded a cash level that PREPA believes is sufficient to cover expenses through the date of the Final Hearing without the need to obtain interim financing. Supplemental Declaration of Todd Filsinger ("Supp. Filsinger Declaration") at ¶ 4, attached hereto as **Exhibit D**.

19.      Other independent governmental instrumentalities and municipalities[5] may owe PREPA money. Based on a review of PREPA's books and records, there is approximately $233 million owed by other public corporations to PREPA, of which $169 million are receivables over 120 days. *Id*. at ¶ 8. Historically, however, receivables over 120 days are extremely difficult to collect, and collections are further impaired by the fact many public corporations face their own liquidity problems. *Id*.

20.      Notwithstanding the low probability of success, PREPA has scheduled meetings on February 5 and 6, 2018 with the nine public corporations which owe PREPA the most money in an attempt to collect funds.[6] In addition, AAFAF has assisted PREPA in its collection efforts

---

[4] For this reason, the citations to *In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2008), and *Los Angeles Dodgers*, 457 B.R. at 312, in the PREPA Bondholders Objection are off point. Unlike those cases, there are no overdue bills that can provide PREPA with the amount of liquidity it needs.

[5] Municipalities operate under the contribution in lieu of taxes ("CILT") system, pursuant to which PREPA provides electricity to municipalities, but the municipalities do not pay PREPA for the electricity. Supp. Filsinger Declaration at ¶ 11. In exchange, PREPA does not pay otherwise applicable taxes to the municipalities. *Id*. PREPA recoups the costs of the electricity through an 11% surcharge on fuel costs. Due to accounting reasons, a receivable may still be entered in PREPA's books along with a corresponding tax liability. *Id*. Accordingly, those book amounts do not reflect actual collectible receivables.

[6] Certain objectors identified the Puerto Rico Aqueducts and Sewers Authority ("PRASA"), the Puerto Rico

7

by encouraging government entities to pay their bills owed to PREPA. Specifically, beginning in December 2017 AAFAF sent letters to certain public corporations instructing them to take steps to pay undisputed amounts due to PREPA and to foster reconciliation efforts. Portela Declaration at ¶ 14. AAFAF also is working with PREPA to meet with other public corporations to reconcile past due amounts and facilitate payments. *Id.*

21.     Even though there are governmental entities with outstanding amounts owed to PREPA, the Commonwealth cannot force independent instrumentalities to make payments to PREPA. Indeed, these entities maintain separate treasury accounts from the Commonwealth's control. Supp. Filsinger Declaration at ¶ 8. Even if the Commonwealth could compel payment, material changes to a financially distressed instrumentality's budget require time to plan for a sudden decrease in liquidity prior to implementation. By the time any instrumentality would be in a position to pay its bills, PREPA would have already run out of money. Declaration of Todd Filsinger ("Filsinger Declaration"), ECF No. 549-3 at ¶ 15.

22.     Nor is the genesis of PREPA's liquidity crisis relevant to whether PREPA has satisfied the requirements under the Bankruptcy Code section 364 to obtain financing. PREPA's financial situation is the result of the confluence of decades of historical challenges culminating in the devastation to PREPA's system caused by Hurricanes Irma and Maria, which made it impossible for PREPA to provide services and bill and collect its revenues in the ordinary course. *See* Postpetition Financing Motion ¶¶ 18-20. Certain objectors believe PREPA should

---

Highways and Transportation Authority ("HTA"), and the Government Development Bank for Puerto Rico (the "GDB") as owing money to PREPA. As explained in the Portela Declaration, (i) PRASA may be able to assert a right of setoff against PREPA which may result in a reduction in amount owed, but that PREPA also is facing its own liquidity issues which could hamper payment (Portela Declaration at ¶ 15); (ii) receivables from HTA are "extremely aged" and, because toll revenue has been severely reduced as a result of Hurricane Maria, HTA does not have the liquidity to pay such aged receivables (*id.* at 16); and (iii) GDB is an insolvent public instrumentality in the process of winding down its operations and resolving creditor claims through a PROMESA Title VI process, and is currently operating pursuant to various laws and executive orders which limit disbursements by GDB and prohibit deposit withdrawals (Supp. Filsinger Declaration at ¶ 6).

have been sending out estimated bills to bolster collections.  But the fact certain objectors believe PREPA could be better managed is irrelevant under Bankruptcy Code section 364(d).  Notably, most of these same objectors opposed the Oversight Board's prior motion to install a new chief executive officer at PREPA.[7]  And, as the Court has previously noted, Bankruptcy Code section 1104 (trustee appointment) is inapplicable to PREPA's Title III case.  The only relevant instant inquiry is simply whether better terms are available within the parameters of Bankruptcy Code section 364, not a subjective inquiry into the debtor's past business practices.  Converting a hearing on borrowing money into a 'he said, she said' contest over historic fault for the present cash shortfall serves no purpose whatsoever and, most importantly, would not help the Court determine whether to allow PREPA to borrow money so it can avoid turning off power to the Commonwealth.

### B.   Holders of PREPA's Power Revenue Bonds are Adequately Protected.

23.   PREPA has likewise shown that its bondholders are adequately protected.  As explained in the Postpetition Financing Motion, the holders of Power Revenue Bonds have a security interest in Revenues.  But under the terms of the Trust Agreement, debt service is subordinated to the payment of Current Expenses.  *See* Trust Agreement § 505.  Because

---

[7] *See Objection of Ad Hoc Group of PREPA Bondholders, to Urgent Motion of Financial Oversight and Management Board for Puerto Rico for Entry of Order Confirming Appointment and Authority of Chief Transformation Officer* [ECF No. 377]; *Limited Objection of National Public Finance Guarantee Corporation to Urgent Motion of Financial Oversight and Management Board for Puerto Rico for Entry of Order Confirming Appointment and Authority of Chief Transformation Officer* [ECF No. 379]; *Response of Scotiabank de Puerto Rico, as Administrative Agent, to Urgent Motion of Financial Oversight and Management Board of Puerto Rico for Entry of Order Confirming Appointment and Authority of Chief Transformation Officer* [ECF No. 380]; *Joinder of U.S. Bank National Association as PREPA Bond Trustee to the Objection of Ad hoc Group of PREPA Bondholders, to Urgent Motion of Financial Oversight and Management Board for Puerto Rico for Entry of Order Confirming Appointment and Authority of Chief Transformation Officer* [ECF No. 382]; *Assured Guaranty Corp., Assured Guaranty Municipal Corp. and Syncora Guarantee Inc.'s (i) Joinder to National Public Finance Guarantee Corporation's Limited Objection to Urgent Motion of Financial Oversight and Management Board for Entry of Order Confirming Appointment and Authority of Chief Transformation Officer and (ii) Limited Objection to Urgent Motion of Financial Oversight and Management Board for Entry of Order Confirming Appointment and Authority of Chief Transformation Officer* [ECF No. 390].

proceeds of the Facility can be used only for Eligible Uses (defined in the Facility), which is a subset of Current Expenses, the existing lien is not diminished or impaired by the senior lien to be granted to the Commonwealth because Current Expenses already have a prior right to be paid from PREPA's revenues before any positive net revenues exist that could go to creditors.[8]

24.    That PREPA's bondholders are adequately protected is easily demonstrated. Let's suppose that PREPA simply incurs Current Expenses, but does not pay for them.  When revenues are next collected, PREPA is already allowed to use them to pay for the Current Expenses before any revenues can be paid to PREPA bondholders.  As a practical matter, PREPA's vendors will not continue to supply fuel and other goods and services if they are not paid.  Therefore, the Facility is needed to pay for the Current Expenses.  When PREPA collects revenues, those revenues will repay the Facility the same as the revenues could otherwise be used to pay the Current Expenses directly.  Either way, the revenues get applied to Current Expenses, directly or indirectly, before they can be available to PREPA bondholders.  We provided a similar example in the Postpetition Financing Motion and no one has refuted it.

25.    Importantly, adequate protection only protects a secured claimholder from the diminution in the value of its collateral.  Bankruptcy Code section 361 expressly imposes that standard.  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988).  As shown above, nothing about the Facility's priming lien or superpriority diminishes the value of the PREPA bondholders' lien because Current Expenses come ahead of debt service under the Trust Agreement.  Moreover, PREPA needs the money because it is operating at a deficit.  When Current Expenses exceed revenues, as they do now, the bondholders' security

---

[8] The Credit Agreement recognizes PREPA has the inherent authority to spend collections for valid business purposes.  But the Credit Agreement does not authorize PREPA to pay anything more than what it could pay before its Title III case.  PREPA can continue to pay Ineligible Expenses from its revenues as it did pre-financing.  PREPA can only pay Eligible Uses (*i.e.*, Current Expenses) from Facility proceeds.

interest has no value and is not entitled to adequate protection because there is nothing to protect. *See In re 620 Church St. Bldg. Corp.*, 299 U.S. 24, 27 (1936); *In re Fontainebleau Las Vegas Holdings LLC*, 434 B.R. 716, 732 (S.D. Fla. 2010); *see also In re Dulgerian*, No. 06-10203, 2008 Bankr. LEXIS 248, at *16 (Bankr. E.D. Pa. Jan. 25, 2008) ("In this case, [the creditor] is not entitled to adequate protection. There is no value in the Easement."); *In re Levitt & Sons, LLC*, 384 B.R. 630, 640 (Bankr. S.D. Fla. 2008) ("[T]he junior lien claimants are not entitled to adequate protection pursuant to 11 U.S.C. § 364(d) because at best they have a zero value lien."). Ironically, PREPA and the Oversight Board are attempting to restore value to the bondholders' collateral, notwithstanding the bondholders' opposition to the Facility.

26.     In the highways situation, this Court held maintenance of infrastructure and assets generating revenue is sufficient adequate protection to ensure any encumbered revenues will be available in the future. *See Opinion and Order Denying Motion for Preliminary Injunction and Motion for Relief from the Automatic Stay* at 15–16, Sept. 8, 2017, Case No. 17-03567, Docket No. 260 ("[T]he Court concludes that the Defendants have established that Peaje's interests are adequately protected by Defendants' efforts to maintain the Commonwealth's toll roads in working condition to ensure that the Toll Revenues will be available in the future. . . . The Commonwealth and HTA's efforts to maintain those roads preserves the future availability of the revenue stream that Peaje argues secures the 1968 Bonds."). Other courts have recognized a debtor's ability to maintain value by operating in the ordinary course of business is a form of adequate protection. *See In re 499 W. Warren St.*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (secured claimholder's interest in collateral is adequately protected where cash flow subject to security interest is applied to operations and maintenance); *see also* Postpetition Financing Motion ¶ 53 (citing cases).

11

27.     The National Objection and Assured Objection both argue the preservation and enhancement of collateral is not adequate protection.  But the two decisions those objections cite for support, *In re Swedeland Development Group, Inc.*, 16 F.3d 552 (3d Cir. 1994) and *In re Fontainebleau Las Vegas Holdings LLC*, 434 B.R. 716 (S.D. Fla. 2010) are inapposite.  In *Swedeland*, the postpetition facility, among other things, required the primed lender to release its collateral for less than its loan agreement had required.  The debtor could sell lots and obtain releases of the preexisting lien for $28,000 per lot instead of $42,000 per lot.  *Swedeland* at 565. In *Fontainebleau* the court overturned a priming lien because the trial court never inquired or found the primed lien was adequately protected. *Fontainebleau Las Vegas Holdings LLC*, 434 B.R. at 752.  Unlike here, in both cases the secured party held a security interest in hard assets of the debtor that was being subordinated.  Here, the bondholders' only collateral is Revenues net of Current Expenses.  As demonstrated above, (i) there are no positive net revenues present; (ii) the bondholders' security interest is already subordinated to Current Expenses; and (iii) preserving operations to create future revenues constitutes adequate protection.  Accordingly, far from destroying the value of the bondholders' liens, the Facility will preserve it.  *Contra* PREPA Bondholders Objection at 18 (*citing Armstrong v. United States*, 364 U.S. 40, 48 (1960)).

28.     The National Objection also relies on *In re Tenney Village Co., Inc.*, 104 B.R. 562 (Bankr. D.N.H. 1989), which it contends denied a priming lien because the credit agreement dictated the chapter 11 plan.  *Tenney* has no application here.  There, among other things, the credit agreement granted the lender a priming lien for its pre-bankruptcy debt (*i.e.*, cross-collateralization), allowed the lender's lien and released all avoidance actions, and provided the automatic stay would terminate automatically if the court confirmed a plan the lender opposed. *Tenney*, 104 B.R. at 568-570.  Indeed, *Tenney* demonstrates how the Facility transgresses none

12

of *Tenney's* concerns.  Likewise, National's citation to *In re Chevy Devco*, 78 B.R. 585 (Bankr. C.D. Cal. 1987), only highlights how the Facility here transgresses no valid concern.  In *Chevy Devco* the debtor admitted its proposed priming lien substituted for an unconfirmable chapter 11 plan.  There, the lender's lien was priming an existing first mortgage lien and past and future property tax liens, and the justification was a speculation that a new $1.2 million loan would create $2.6 million of new value.  *Chevy Devco* at 588-590.  None of those features exist here.

29.     The National Objection and Assured Objection also argue adequate protection is not provided when the form of protection offered is too speculative.  But both objections merely state PREPA's proposed adequate protection is speculative without providing any analysis.  *See* National Objection ¶ 40; Assured Objection at 28.   Neither Response explains how their collateral is diminished by a loan that only pays Current Expenses that their Trust Agreement has always allowed to be paid ahead of debt service.  The objections also fail to explain what is speculative about maintaining PREPA's operations and productions of power to prevent a shutdown.[9]  In the absence of the Facility, the damage to the Commonwealth and future PREPA revenues is assured.  Declaration of Andrew Wolfe ("Wolfe Declaration"), ECF No. 549-2 at ¶¶ 21-24.  Thus, the National Objection and Assured Objection are effectively arguing certain harm to PREPA and the Commonwealth is better than avoiding the harm.

30.     Moreover, the Bond Trustee Objection and the PREPA Bondholder Objection recycle prior arguments that the bondholders' collateral package includes various covenants to

---

[9] In contrast, the cases cited in the National Objection and Assured Objection did not involve the level of evidence provided by PREPA.  *See, e.g.*, *In re Mosello*, 195 B.R. 277 (Bankr. S.D.N.Y. 1996) (denying DIP to fund a "highly speculative" real estate development scheme subject to litigation and where the purpose of the loan was to resurrect the equity in the property); *In re Strug-Division, LLC*, 380 B.R. 505 (Bankr. N.D. Ill. 2008) (debtor failed to show proposed DIP loan to fund rehabilitation of dilapidated apartment building would raise the value of the property more than the loan); *In re YL West 87th Holdings I LLC*, 423 B.R. 421 (S.D.N.Y. 2010) (debtor could not rely on projected value of developing an apartment building for adequate protection where development was already disapproved by state regulator and there was little likelihood it would get approved); *Suntrust Bank v. Den-Mark Constr., Inc.*, 406 B.R. 683 (E.D.N.C. 2009) (evidence showed collateral would decline, not appreciate).

operate PREPA in a certain manner, including the obligation to raise rates to a level necessary to service the bond debt (the "Rate Covenant"), which covenants are not adequately protected. This is wrong. PREPA's covenant to raise rates is a promise, no different than PREPA's promise to pay its debts. Secured claimholders are entitled to adequate protection of collateral value, not PREPA's promises and covenants. *See*, *e.g.*, *United States v. Sec. Indus. Bank.*, 459 U.S. 70, 75 (1982) ("[T]he contractual right of a secured creditor to obtain repayment of his debt may be quite different in legal contemplation from the property right of the same creditor in the collateral."). Therefore, the request for adequate protection of PREPA's covenants fail as a matter of law.

31.     The concept of adequate protection "is derived from the fifth amendment protection of property interests." *Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 511 (1st Cir. 2017) (quoting H.R. Rep. No. 95-595, at 339 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6295). As the Supreme Court has explained, not all promises to and remedies of a secured creditor are protected under the Fifth Amendment. In *Louisville Joint Stock Land Bank v. Radford*, the Court identified five rights that a secured creditor possesses:

1.     The right to retain the lien until the indebtedness thereby secured is paid.

2.     The right to realize upon the security by a judicial public sale.

3.     The right to determine when such sale shall be held, subject only to the discretion of the court.

4.     The right to protect its interest in the property by bidding at such sale whenever held, and thus to assure having the mortgaged property devoted primarily to the satisfaction of the debt, either through receipt of the proceeds of a fair competitive sale or by taking the property itself.

5.     The right to control meanwhile the property during the period of default, subject only to the discretion of the court, and to have the rents and profits collected by a receiver for the satisfaction of the debt.

14

295 U.S. 555, 594-95 (U.S 1935).  Two years after *Radford* was decided, the Court held that an amendment to the Bankruptcy Act of 1898 that impaired rights 3 and 5 identified in *Radford* did not render the amendment unconstitutional on Fifth Amendment grounds.  *See Wright v. Vinton Branch of Mountain Trust Bank*, 300 U.S. 440, 460-62 (U.S. 1937).  *Vinton Branch* demonstrates that not every right held by a secured creditor is entitled to protection.  A few years after *Vinton Branch*, the Supreme Court held in *Wright v. Union Central Life Insurance Co.* that the same amendment to the Bankruptcy Act did not violate the Fifth Amendment by enabling a debtor to pay the mortgagee the appraised value of its collateral without holding a public auction or providing the mortgagee the right to credit bid.  311 U.S. 273, 280-81 (U.S. 1940).  Thus, *Union Central* allowed impairment of rights 2 and 4 identified in *Radford* without running afoul of the Constitution.

32.      Accordingly, the Supreme Court established a secured creditor has a constitutionally protected property interest in the value of its collateral, but other rights are contractual rights not constitutionally protected.  *Id.* at 278 ("Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property.  There is no constitutional claim of the creditor to more than that.").  A secured creditor is entitled to adequate protection for the value of its collateral but is ***not entitled*** to adequate protection of contractual rights to performance and related remedies.  *See In re Marion St. P'ship*, 108 B.R. 218, 224 (Bankr. D. Minn. 1989) ("The interest in property that is to be protected by section 361 of the Bankruptcy Code is the value of the collateral, not contractual or legal rights such as receiving interest or being permitted to foreclose on default."); *In re Elmore*, 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988) ("A creditor's contract rights are not entitled to adequate protection under the Bankruptcy Code."); *In re Booth*, 19 B.R. 53, 61 n.18 (Bankr. D.

15

Utah 1982) ("[Adequate protection] protects against any decrease in value of the lien, [but] it does not guarantee performance of the contract.").

33.     The Rate Covenant is a contractual right and remedy, not an interest in property. *See, e.g., In re Markos Gurnee P'ship*, 252 B.R. 712, 716 (Bankr. N.D. Ill. 1997) (distinguishing between property rights—which are entitled to adequate protection—and the "ability to pursue nonbankruptcy remedies (like foreclosure) against the property," which is not).   At bottom, contractual rights and remedies are not property rights, and they are not entitled to adequate protection.[10]

34.     Certain objectors argue adequate protection to the bondholders should include the appointment of a monitor along with a rate increase. This has nothing to do with adequate protection.  Responders are trying to leverage the Postpetition Financing Motion to end run this Court's decision denying their prior request for a receiver.   *See Opinion and Order Denying Motion of Ad Hoc Group of PREPA Bondholders, et al., for Relief from the Automatic Stay*, ECF No. 299.   Moreover, they are currently appealing the order, thereby depriving this court of jurisdiction to revisit it.   *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) ("[t]he filing of a notice of appeal is an event of jurisdiction [sic] significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal"); *Spound v. Mohasco Indus.*, 534 F.2d 404, 411 (1st Cir. 1976) ("after the original appeal had been filed, the case remained in the district court only for procedures in aid of the appeal.") (internal quotes and citations omitted).

---

[10] *Duquesne Light Co. v. Barasch*, 448 U.S. 299, 315 (1989) (cited in PREPA Bondholders Objection at 4 n.7, 18) has no bearing on this case because it involved a claim brought by a utility claiming that rates set by state law were confiscatory.  In any event, that case did not hold that the Fifth Amendment required higher rates and therefore does not support the claim that PREPA is required to raise its rates.

## II.    THE OBJECTORS' OTHER ARGUMENTS FAIL.

35.    Certain objectors argue that the Court cannot approve the Facility unless it first weighs five factors, namely:  (1) whether the proposed financing is an exercise of the debtor's sound and reasonable business judgment; (2) whether the financing is in the best interest of the estate and its creditors; (3) whether financing is necessary to preserve the assets of the estate; (4) whether the terms are fair and reasonable given the circumstances of the debtor and proposed lender; and (5) whether the financing agreement was negotiated in good faith and at arm's length.  *See e.g. Objection of Assured Guaranty Corp.* [ECF No. 585 at 4].  PREPA has satisfied the five factors.

36.    At the outset, factor number 1 is equivalent to imposing Bankruptcy Code section 363 into Title III, which Congress did not do.  Governmental units have multiple concerns that differ from and transcend "business judgment."  As to factors numbers 2 and 4, there cannot be any valid objection by PREPA creditors to a loan priced between zero and three percent interest without fees.  That PREPA cannot shut down makes factor number 3 academic.  Finally, factor number 5 is clearly affected by several factors.  First, Congress rendered the Oversight Board the representative of both the Commonwealth and PREPA.  Second, unlike corporate governance in which two separate corporations are supposed to negotiate to profit at the expense of the other, the Commonwealth and PREPA are integral components of one territory.

### A.    The Entire Fairness Standard Does Not Apply.

37.    As explained in the Postpetition Financing Motion, courts grant a debtor considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  Postpetition Financing Motion at ¶ 37.  Multiple Responses assert this Court should analyze the Facility under a heightened

17

standard—the entire fairness standard—because the Facility is essentially an insider transaction. This heightened standard is applied to transactions between separate business entities where each is expected to maximize its entitlements at the expense of the other. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710-11 (Del. 1983). But that is not the relationship between the Commonwealth and PREPA. The Commonwealth and PREPA are both integral components of the territory, and they share an overarching common interest in working towards the betterment of the residents of Puerto Rico and its stakeholders. There is no such binding principle, and the creditors cite none, that components of the same territory must act commercially to maximize profit as opposed to act as their government determines in the best interests of residents and stakeholders. That Congress did not render Bankruptcy Code section 363 applicable in Title III speaks volumes. This is compounded by PROMESA section 305 that instructs the Court not to interfere in governmental and political powers.

38.     Applying heightened scrutiny is wrong for many reasons. First, the whole notion of applying Delaware's business judgment rule in reorganization cases is based on a word coincidence between Delaware's business judgment rule and the Second Circuit's ruling that Bankruptcy Code section 363 transactions turn on the debtor's business judgment. *In re Minges*, 602 F.2d 38 (2d Cir. 1979); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983). Delaware's business judgment rule governs a totally different concern than section 363. Section 363's implied business judgment requirement requires that the debtor show a plausible reason why a transaction is good for its estate. Conversely, Delaware's business judgment rule protects officers and directors from personal liability for even stupid decisions if they are made on an informed basis in good faith after adequate deliberation of independent directors. E. Norman Veasey, "What Happened in Delaware Corporate Law and Governance from 1992–2004? A

Retrospective on Some Key Developments," 153 U. of Pa. L. Rev. 1399, 1425 (May 2005).  In turn, the entire fairness standard is also a defense against personal liability for officers or directors, but requires heightened showings (such as fair process and fair price) and does not result in dismissal of claims on the pleadings when the directors are not independent or the business judgment rule does not apply for other reasons.  *See Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del. 1983).   Here, the issue has nothing to do with personal liability of officials of the Commonwealth or PREPA.

39.     Congress appointed the Oversight Board as the representative for all Title III debtors in the covered territory.  And, Congress exculpated and protected the Board pursuant to PROMESA section 105.  This is another reason the entire fairness standard and business judgment rule have no application.  People are not being sued.  PREPA is requesting approval of a loan.  Congress implemented this structure notwithstanding it was self-evident the Title III debtors conduct thousands of transactions among themselves, creating significant claims among them.

40.     Unlike a corporate chapter 11 case, the concept of a traditional conflict does not exist because the Commonwealth and PREPA have an overall common goal of obtaining fiscal integrity and servicing the citizens and creditors.  In addition to the role of the Oversight Board, both the Commonwealth and PREPA are tasked with protecting the health, safety, and welfare of the citizens of Puerto Rico.   PREPA was created as an integral component of the Commonwealth, dedicated under Act No. 83-1941 to the conservation, development, and utilization of the energy resources of the Commonwealth to promote the general welfare of the Commonwealth's inhabitants and to increase commerce and prosperity.   PREPA was never

created to be a corporate, commercial entity attempting to profit at the expense of the Commonwealth.

41.     PREPA's situation is completely different from the cases cited by the objectors for the proposition the heightened standard should apply.  Each case cited involved transactions among corporate entities or a corporate entity and an individual insider.[11]  No Response cites a case applying the entire fairness standard to governmental entities in or outside of Puerto Rico. And given the Commonwealth and PREPA have an overall common goal of obtaining fiscal integrity and servicing the citizens and stakeholders, the jurisprudence cited by the objectors has simply no bearing on the instant issue.  *See VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3rd Cir. 2007) (holding where "[t]here is only one substantive interest to be protected, hence [there is] 'no divided loyalty' of the subsidiary's directors and no need for special scrutiny of their actions.").

42.     Significantly, objectors do not object that the federal government treats PREPA and the Commonwealth as municipal instrumentalities entitled to aid.  Their nature does not change into corporate, commercial entities when they provide for financing that benefits the whole territory.

## B.     PREPA Would Satisfy the Entire Fairness Standard

43.     Even if the entire fairness standard applies, PREPA easily meets the test.  PREPA and the Commonwealth have worked together to resolve an urgent issue facing both entities in a fair manner.  Repayment of PREPA debt is dependent on continuing operations to generate

---

[11] *See Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) (shareholder dispute); *In re MSR Hotels & Resorts, Inc.*, 2013 WL 5716897 (Bankr. S.D.N.Y. Oct. 1, 2013) (corporate affiliates); *Los Angeles Dodgers*, 457 B.R. at 313 (corporation and owner); *In re Residential Capital, LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013) (corporate entities); *Gonzalez Turul v. Rogatol Distributors*, Inc., 951 F.2d 1, 3 at n.4 (1st Cir. 1991) (shareholders and corporation); *In re Lafayette Hotel P'ship*, 227 B.R. 445, 454 (S.D.N.Y. 1998), *aff'd*, 198 F.3d 234 (2d Cir. 1999) (partnership and partner); *In re Papercraft Corp.*, 211 B.R. 813, 823 (W.D. Pa. 1997) (company and board member), *aff'd and remanded*, 160 F.3d 982 (3d Cir. 1998).

future revenues.    Wolfe Declaration at ¶ 27.    And the success of the Commonwealth's restructuring is dependent on PREPA providing electricity for Puerto Rico citizens and businesses. *Id.* at 28.  The Facility provides PREPA with needed liquidity while at the same time providing the Commonwealth with protections (*i.e.*, a priming lien and superpriority administrative status) designed to protect its own liquidity from the risk of nonpayment.

44.    The Commonwealth has provided financing on better terms to PREPA than PREPA's own creditors offered. *See* Mondell Declaration at ¶ .  Indeed, as the only option available that does not require payment of prepetition debt at 85 cents on the dollar, the Commonwealth could have sought to leverage its bargaining position for its own benefit.  But it did not do so.  The Commonwealth is not seeking to extract a profit from PREPA, nor is the Lender seeking to control PREPA's case through imposing case milestones or other restrictive covenants.  This is because PREPA is already operating at deficits and attempting to rebuild and restore its business.  The Credit Agreement provides substantial information (including on a weekly basis) will be available to the Lender, the Oversight Board, and creditors, in addition to the Budget (approved by the Oversight Board and the Lender) with which PREPA will need to comply.

45.    The Commonwealth is also not using its loan to gain an advantage over PREPA's creditors.  Contrary to the assertion in the Bond Trustee Objection, the Commonwealth is not loaning money and receiving free electricity.  (Notably, the PREPA Bond Trustee has not objected that PREPA will receive free money for six months.)  PREPA is not waiving any claims it may have against the Commonwealth or any other instrumentality for past due electricity bills.  The Facility permits PREPA to continue to operate.  As the Wolfe Declaration explains, PREPA's operations ensure the Island can continue to operate and creates the best chance the

Island can service its debt.  Wolfe Declaration at ¶¶ 11, 28.  The dueling accusations in the Responses among the different parties are perhaps the best evidence of the fairness of the Facility.   Parties with an interest in the Commonwealth's restructuring believe the Facility is too generous.  Ambac Objection ¶¶ 10-15; GO Objection ¶¶ 7-10.  In contrast, PREPA's creditors think the Commonwealth is receiving a sweetheart deal.  PREPA Bond Trustee Objection at 5-6; National Objection ¶¶ 25-32; 42-44; Assured Objection at 3.

### C.      The Facility is in the Best Interest of PREPA and its Creditors

46.      The Facility is plainly in the best interest of PREPA and its creditors.  As explained in the Filsinger Declaration, PREPA will need to shut down operations if it does not receive access to the Facility.  Filsinger Declaration at ¶ 15.  A shutdown would not only harm PREPA, but also its creditors, whose collateral consists of PREPA's revenues above operating expenses.  *Id.* at ¶¶ 18-22.  If PREPA cannot generate electricity and collect revenues, then its creditors will never be paid.  *Id.*  Moreover, even a temporary shutdown would lead to businesses shuttering and a large exodus from Puerto Rico, which would make it difficult for PREPA to generate revenues in the future even if it can later resume operations.  Wolfe Declaration at ¶¶ 21-26.  Accordingly, the Facility is in the best interest of all stakeholders—including the people of Puerto Rico, who would otherwise be left in the dark.

### D.      The Facility is Necessary to Preserve PREPA's Assets

47.      For similar reasons, the Facility is necessary to preserve the assets of PREPA.  As explained above, the bondholders' collateral consists of PREPA's Revenues after Current Expenses are paid.  If PREPA does not receive access to the Facility, it will be forced to cease operations, which would cause the creditors' prospects of ever collecting on PREPA's assets to plummet.

### E.   The Facility Terms are Fair and Reasonable

48.   The terms of the Facility are plainly fair and reasonable to PREPA under the circumstances.   The Facility carries a zero percent interest rate for the first six months, no prepayment penalties, and no additional fees.   There is the possibility that the loan could be forgiven (if the federal government refinances it and forgives it), and the amounts being advanced are sufficient to cover PREPA's expected cash-flow needs.   In this time frame, PREPA has been unable to secure the financing necessary to keep itself operational from any other source, never mind on terms as favorable as these.   *See* Mondell Declaration at ¶¶ 7–16; Supp. Mondell Declaration at ¶ 5.   In light of the circumstances, the Facility is fair and reasonable to PREPA.

49.   For purposes of the application of Bankruptcy Code section 364 to the Postpetition Financing Motion, the effect of the Facility on the Commonwealth or its creditors is irrelevant.   Bankruptcy Code section 364 considers only the borrower, not the Lender. Moreover, Congress did not incorporate Bankruptcy Code section 363 into PROMESA, meaning there is no requirement for court approval in the Commonwealth Title III case of the Lender using its assets outside the ordinary course of business.   And PROMESA section 305 prevents the Court from interfering with the Lender's decision to offer financing to save its electric utility from ceasing operations.   For all these reasons, the objectors are wrong that the Court must consider the effect of financing on the Lender and its creditors.   *See e.g. Objection and Reservation of Rights of PREPA Bond Trustees* [ECF No. 568 at 4]; *Ambac Assurance Corporation's Objection* [ECF No. 583 at 4]; *Objection of Assured Guaranty Corp.* [ECF No. 585 at 31].   In any event, the Facility is a fair and reasonable deal for the Lender as well.   For one thing, the Facility provides the Commonwealth with the maximum protections provided under the Bankruptcy Code, namely a priming lien and superpriority administrative expense.

23

Thus, the Facility protects the interests of the Commonwealth's creditors.  While the interest rate goes from zero to 3%, the Commonwealth, like any depositor, cannot earn more than approximately 1% or 2% on the money in today's interest rate environment.  Moreover, as explained in the Wolfe Declaration, PREPA's success is critical to the Lender's ability to recover from its financial crisis and get its financial house in order.  Wolfe Declaration at ¶¶ 21–26.  It is therefore eminently reasonable for the Lender to offer the Facility to PREPA because PREPA's success is a necessary component of the Lender's success.[12]

50.     As discussed above in section II.B and II.C, the Facility represents a good faith solution to a common problem facing the Commonwealth and PREPA.  Various Responses assert there is no good faith because the need for financing is created by the Commonwealth's own defaults in payments owed to PREPA.  PREPA Bondholder Objection at ¶ 5; National Objection at ¶ 47; Assured Objection at 32.  This is wrong.  As discussed above, the Commonwealth has paid amounts owed to PREPA and has prepaid for the next six months.  Regardless, the Facility does not waive any claims PREPA may have against the Commonwealth or other agencies for unpaid electricity bills.  PREPA's receivables are simply not implicated.

## III.     ADDITIONAL ARGUMENTS RAISED IN THE RESPONSES.

51.     <u>The GO Bondholders Lack Standing</u>.  Pursuant to the Court's scheduling order [ECF No. 591], the Oversight Board is filing a separate response objecting to the standing of and intervention by the holders of the Commonwealth's general obligation bonds (the "<u>GO Bondholders</u>").  Even if the GO Bondholders have standing, their Response is without merit.  As

---

[12] This case is therefore nothing like the cases cited in the Assured Objection when courts found proposed financing to be unfair.  In *In re St. Mary Hosp.*, for example, the court found that the controlling entity deliberately manufactured the liquidity crisis at the debtor hospital and therefore the loan offered by controlling entity could not be considered fair.  86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988) (calling the controlling entity "the puppeteer of a marionette-debtor").  Here, by contrast, the liquidity crisis at PREPA is the result of historic challenges and unprecedented natural disasters, and the Commonwealth has offered financing to help PREPA overcome those issues.  *In re Crouse Group, Inc.*, 71 B.R. 544, 551 (Bankr. E.D. Pa. 1987), is inapposite because there (unlike here) the debtor did not conduct a reasonable search for alternative financing.

discussed above, the Commonwealth does not need Court approval to provide the Facility as Bankruptcy Code section 363 is not incorporated into PROMESA.  Further, PROMESA section 305 prevents this Court from entering an order directing or altering how the Commonwealth uses its funds.  *See ACP Master, Ltd. v. Commonwealth of Puerto Rico*, No. 17-00189-LTS, ECF No. 124, slip op. at 18 (January 30, 2018) (decision on motion to dismiss).

52.     The Arc Objection Does Not Implicate Section 364(d).  Arc objects on the basis that (i) the Postpetition Financing Motion strips Arc of administrative priority status, and (ii) the Facility does not expressly provide its expenses are Current Expenses that Facility proceeds can be used to pay.  Both objections fail.  Arc still retains the right to assert an administrative claim, and PREPA's plan of adjustment will provide for treatment of administrative claims.

53.     The WEH Objection Does Not Implicate Section 364(d).  Through the WEH Objection, WEH asks this court to (i) account for payments made from monies originally in an emergency fund, (ii) return transferred funds back to the emergency fund, and (iii) require PREPA to explain how it intends to pay disaster related expenses not reimbursed by the federal government.  All the requests concern WEH's asserted claim against PREPA and have nothing to do with respect to whether PREPA has meet its burden under Bankruptcy Code section 364.

54.     Certain Modifications to the Final Financing Order.  In addition to any modifications discussed above, the Commonwealth and PREPA have agreed to make the following revisions to the Final Financing Order: (i) clarify that material amendments must be approved by the Court after notice and a hearing; (ii) for creditors who wish to obtain information that do not participate in mediation, PREPA will address requests for information as received; and (iii) clarify that the Final Financing Order does not alter any setoff rights PREPA or any other party has, and all setoff rights are reserved.

## REVISED PROPOSED ORDER

55.     In response to the Postpetition Financing Motion objections, the Oversight Board

agreed on certain revisions to the Proposed Order.  These revisions will be incorporated into a

proposed Final Financing Order that PREPA will file in advance of the final hearing on February

15, 2018.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE the Oversight Board, as PREPA's Title III representative, respectfully requests the Court to overrule all objections to the Postpetition Financing Motion, to grant the Postpetition Financing Motion on a final basis by entering the revised proposed Final Financing Order substantially in the form to be filed in advance of the Final Hearing, and to grant the Oversight Board such other and further relief as is just.

Dated:  February 3, 2018
      San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*pro hac vice*)
Paul V. Possinger (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Maja Zerjal (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as Representative for PREPA*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as Representative for PREPA*