**Hearing Date: February 15, 2018 at 9:30 a.m. (Atlantic Standard Time)**
**Objection Deadline: February 1, 2018 at 5:00 p.m. (Eastern Standard Time)**

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*

     Debtors.[1]

-------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

PUERTO RICO ELECTRIC POWER AUTHORITY
("PREPA"),

     Debtor.

-------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 4780-LTS

**Court Filing Relates Only to PREPA
and Shall Only be Filed in Case No.
17-BK-4780 (LTS) and Main Case
17-BK-3283 (LTS)**

## SUPPLEMENTAL DECLARATION OF TODD W. FILSINGER IN SUPPORT OF URGENT JOINT MOTION OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO AND THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING POSTPETITION SECURED FINANCING, (B) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) MODIFYING THE AUTOMATIC STAY, (D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747).

Pursuant to 28 U.S.C. § 1746, I, Todd W. Filsinger, hereby declare as follows under penalty of perjury under the laws of the United States of America:

1.    I am a Senior Managing Director of Filsinger Energy Partners ("FEP"). I currently serve as the Chief Financial Advisor ("CFA") to the Puerto Rico Electric Power Authority ("PREPA" or the "Debtor"), and I report to its Governing Board.  The scope of my responsibilities for the Debtor is set forth in my Declaration [Dkt. No. 2298-3].

2.    I submit this Supplemental Declaration (the "Supplemental Declaration") in support of the *Reply in Support of the Urgent Joint Motion of the Financial Oversight and Management Board for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority for Entry of Interim and Final Orders (A) Authorizing Postpetition Secured Financing, (B) Granting Priming Liens and Providing Superpriority Administrative Expense Claims, (C) Modifying the Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief* (the "Postpetition Financing Motion")[2] filed by the Oversight Board, as the Debtor's representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[3] and AAFAF, as the entity authorized to act on behalf of PREPA pursuant to the authority granted to it under the *Enabling Act of the Fiscal Agency and Financial Advisory Authority*, Act 2-2017.

3.    Except as otherwise indicated, all facts and opinions set forth herein are based upon: (i) my personal knowledge; (ii) my review of relevant documents provided to me, including documents provided by AAFAF, the Debtor and their respective professionals and employees; (iii) information supplied to me by employees of FEP with whom I work in the

---

[2] Defined terms used but not defined herein shall have the same meanings given to them in the Postpetition Financing Motion.

[3] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

ordinary course of business; and (iv) my experience and knowledge of the Debtor and its financial condition.

### **UPDATED BUDGET**

4.      To comply with the Court's Order, I hereby submit a current and updated budget ("Updated Budget") which projects the Debtor's cash flow for 14 weeks (the "Updated Budget Period").  The Updated Budget, attached hereto as Exhibit A, updates the Weekly Cash Flow Projection submitted in support of the Postpetition Financing Motion.  The Urgent Budget reflects actual results through January 26, 2018 and the receipt of funds received from certain Central Government Agencies on January 29, 2018. These payments include approximately $24 million of past due amounts and a pre-payment of approximately $50 million for estimated electrical service provided to the Central Government Agencies.  The majority of the $50 million pre-payment was included in the Weekly Cash Flow Projection but was spread throughout the projected time period. The Updated Budget reflects the receipt of those funds during the week ending February 2 and further reflects corresponding reductions to the collections line item throughout the Updated Budget Period.  The Debtor does not believe that the Central Government Agencies owe any material amounts to the Debtor for electric services for the current fiscal year.

5.      As a result of these payments by the Central Government Agencies and continued aggressive cash management practices, the Debtor believes it can continue to operate to the week ending February 16, 2018 without an infusion of cash from financing.  The Updated Budget, however, indicates that the Debtor's cash position on February 16, 2018 will be very low and that during the week ending February 23, 2018, the Debtor's cash position will be such that the Debtor will find it difficult to sustain its operations. In addition, in order to maintain sufficient

cash to operate the system, the Debtor will operate the system without customary redundancies thereby making it more vulnerable to outages and service issues.

## ADDITIONAL SOURCES OF RECEIPTS

6.      In response to the Court's Order, I have identified and quantified four additional sources of receipts that are not otherwise identified on the Updated Budget.  The first is potential insurance claims by the Debtor for damage caused by Hurricane Maria.  The Debtor has been engaged in communications with insurers regarding its claims, and the insurers recently sent the Debtor a letter reserving its rights on any claims.  The letter is attached hereto as Exhibit B.  For the reasons identified in Exhibit B and other reasons, the Debtor does not expect to recover any money associated with its claims during the Updated Budget Period.

7.      The second potential source of receipts relates to additional FEMA reimbursements in excess of the reimbursements already incorporated into the Emergency Related section of the Updated Budget, of which there are four possible reimbursements.

a.      One concerns payments made to XGL for services provided in the Debtor's restoration process.  A project worksheet ("PW") has been submitted to FEMA in the amount of approximately $20 million.  The Debtor and XGL are embroiled in a dispute over payment, and XGL is holding the Debtor's property.  FEMA has informed me that it will not consider reimbursing the Debtor for payments to XGL until the current dispute between the Debtor and XGL is resolved.  The Debtor does not expect to resolve the dispute with XGL and obtain reimbursement from FEMA during the Updated Budget Period.

b.      The second potential reimbursement from FEMA relates to fuel expenditures. The Debtor expects to submit a PW for this potential expenditure within two weeks.

Because the PW is not completed, the Debtor does not know the amount of the possible reimbursement and does not anticipate receiving a reimbursement for this expenditure during the Updated Budget Period.

c.      The third potential reimbursement from FEMA relates to employee overtime expenditures.  The Debtor received a reimbursement of approximately $48 million from FEMA for employee overtime in December 2017.  Since that time, the Debtor has incurred additional employee overtime expenditures, but there is a current dispute with FEMA relating to the employee overtime payment made in December.  The Debtor, therefore, does not expect to submit a PW for additional employee overtime expenses within two weeks.  Because the PW is not completed and the dispute exists over the prior submission to FEMA for these types of expenditures, the Debtor does not know the amount of the possible reimbursement and does not anticipate receiving a reimbursement for this expenditure during the Updated Budget Period.

d.      The fourth potential reimbursement from FEMA relates to the reimbursement of the $25 million deductible amount on the Debtor's property and casualty insurance policy. A PW has been forwarded to FEMA for this amount, but the Debtor does not know the timing of the possible reimbursement and does not currently anticipate receiving a reimbursement for this expenditure during the Updated Budget Period.

8.      The third potential source of receipts relates to collections from public corporations.  Unlike the Central Government Agencies that prepaid for electric services, public corporations maintain separate treasury accounts. According to the Debtor's records as of December 31, 2017 ( the accuracy of which has not been confirmed), public corporations owe the Debtor approximately $233 million, $169 million of which are comprised of receivables over

120 days.  In my experience, receivables aged over 120 days are extremely difficult to collect.  In addition, I understand that many of the public corporations dispute a significant percentage of invoices which form the basis of the receivables.   I also understand that many public corporations (like the Debtor) are experiencing critical liquidity problems which preclude their ability to pay current debts, much less significantly aged debts.  For these reasons, the Debtor does not project to receive any payments on these receivables during the Updated Budget Period.  Notwithstanding the low probability of success, through the significant assistance of AAFAF, the Debtor has scheduled meetings on February 5 and 6, 2018 with the nine public corporations that owe the Debtor the most money in an attempt to collect funds.

9.      The fourth potential source of receipts relates to possible pre-payments by large, primarily industrial, customers.  The Debtor has initiated discussions with a large industrial customer to explore the opportunity to accelerate payments by this customer perhaps in exchange for a significantly large discount in order to ease the Debtor's liquidity crisis.  The Debtor also intends to pursue similar opportunities with other large customers.  Because it is difficult to project whether these efforts will succeed, the Debtor has no way of projecting whether it will receive pre-payments (and, if so, in what amounts), so these are not included in the Updated Budget.

10.     In addition to potential sources of receipts, it is also important to note the significant possibility of negative cash variances which the Debtor might experience during the Updated Budget Period.  Outages and other events may strain the Debtor's already tenuous cash position.  In addition, expenditures will be limited to only those that are absolutely necessary to operate the system, and there will be no cushion for unforeseen increases in fuel expenses, payments that must be made for restoration or service issues, or to address other supplier issues.

Finally, revenue collections may fall short of projections.  None of these factors is projected in the Updated Budget, but all of them pose a risk to the Debtor's cash position during the Updated Budget Period.

<u>**OTHER PROJECTIONS**</u>

11.     The Updated Budget does not reflect any actual collections or future collections from municipalities.  This is because of an arrangement known as contribution in lieu of taxes or "CILT."  The Debtor provides electricity to municipalities, but the municipalities do not pay the Debtor for the electricity.  In exchange, the Debtor does not pay otherwise applicable taxes to the municipalities.  The Debtor recoups the costs of the electricity through an 11% surcharge on fuel costs.  The Debtor's books reflect an asset of $1.4 billion attributed to a purported receivable from municipalities on account of the electricity provided by the Debtor to the municipalities and a corresponding liability of $1.4 billion attributed to the Debtor's tax liability to the municipalities.  My understanding is that the Debtor is not permitted under applicable law to attempt to recover the costs of the electricity it provides to the municipalities for non-commercial use.  Moreover, I do not believe that, even if it could, the municipalities have funds available to pay the Debtor for the electricity the Debtor provides.

12.     With respect to actual and projected fuel costs in the Updated Budget, the Debtor projects to spend $1.7 billion on these costs in fiscal year 2018, compared to a pre-hurricane budgeted amount of $1.9 billion.  During the five-week period from the week ending January 19, 2018, PREPA expended $155.8 million in fuel and power provider payments.  If this amount is used to estimate an annual disbursement for these expenditures, the annual value is $1.6 billion.  The estimated expenditures for fuel and power payments over the Updated Budget Period is $593 million. This projection includes payments of $140 million to fuel and power providers that

had been deferred under the aggressive cash management program that the Debtor implemented to maintain a positive cash position. When the $140 million deferred payment is removed from the Updated Budget, the projected fuel and power costs over the Updated Budget Period confirm that the annual value of the fuel and power provider payments is $1.7 billion, which is below the $1.9 billion budgeted for FY 2018 in the PREPA Fiscal Plan dated April 24, 2017.

*[Space is intentionally left blank.]*

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 3d day of February, 2018 at ___Denver, Colorado_____.

_____
Todd W. Filsinger

**<u>Exhibit A</u>**

**Puerto Rico Electric Power Authority ("PREPA")**

**13 Week Cash Flow Model**

| ($ in millions) Week ending | Actual 12/29 | Actual 01/05 | Actual 01/12 | Actual 01/19 | Actual 01/26 | 1 02/02 | 2 02/09 | 3 02/16 | 4 02/23 | 5 03/02 | 6 03/09 | 7 03/16 | 8 03/23 | 9 03/30 | 10 04/06 | 11 04/13 | 12 04/20 | 13 04/27 | 14 05/04 | 14 Weeks |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | | | | | | | | | | | | | |
| Customer collections | 14.3 | 16.5 | 24.6 | 23.5 | 28.5 | 99.2 | 18.1 | 17.9 | 17.2 | 17.8 | 17.6 | 17.7 | 18.6 | 18.8 | 20.8 | 20.9 | 28.0 | 28.0 | 31.2 | 371.8 |
| Transfers from Emergency Account | | 47.8 | | | | | | | | | | | | | | | | | | |
| Insurance Proceeds | | | | | | | | | | | | | | | | | | | | |
| Other | | | | | | | | | | | | | | | | | | | | |
| **Total Receipts** | 14.3 | 64.2 | 24.6 | 23.5 | 28.5 | 99.2 | 18.1 | 17.9 | 17.2 | 17.8 | 17.6 | 17.7 | 18.6 | 18.8 | 20.8 | 20.9 | 28.0 | 28.0 | 31.2 | 371.8 |
| **Disbursements** | | | | | | | | | | | | | | | | | | | | |
| **Energy Purchases** | | | | | | | | | | | | | | | | | | | | |
| Power purchase - AES | 13.7 | - | - | - | 13.7 | 13.9 | - | 22.6 | 12.5 | 12.5 | - | 12.5 | - | - | 4.8 | 3.6 | 3.6 | - | 7.6 | 93.6 |
| Power purchase - EcoElectrica | | | | | | | 24.1 | | 26.5 | | 28.4 | | 28.8 | | 7.2 | 7.2 | 7.2 | 7.2 | 6.2 | 142.9 |
| Power purchase - Renewable sources | | | | | | | | 11.3 | | | | | | | | | | | | 11.3 |
| Fuel purchase - Fleet and storage | | | 0.4 | 0.1 | | | 3.4 | 1.5 | | | 1.5 | | | 1.5 | | | | | | 7.9 |
| Fuel purchase - Freepoint | | 4.6 | 9.2 | 4.4 | 9.0 | 4.4 | 9.0 | 4.4 | 9.2 | 4.6 | 9.6 | 10.0 | 23.1 | 9.6 | 4.9 | 22.7 | 29.0 | 9.7 | 16.4 | 166.4 |
| Fuel purchase - Puma | 9.6 | 5.6 | 12.0 | 9.8 | 15.9 | 14.2 | 9.4 | 9.1 | 7.6 | 8.7 | 6.6 | 9.5 | 6.8 | 9.1 | 2.3 | 2.3 | 2.3 | 2.3 | 4.6 | 91.6 |
| LNG purchase - Fenosa | | | 13.9 | | | | 16.0 | | | 11.1 | | 15.1 | 4.6 | 4.6 | 4.6 | 4.6 | 6.3 | 6.3 | 6.3 | 79.4 |
| **Subtotal Energy Purchases** | 23.3 | 10.2 | 35.5 | 28.0 | 24.9 | 32.5 | 58.9 | 48.9 | 55.7 | 36.9 | 44.6 | 48.6 | 63.4 | 23.3 | 23.8 | 41.9 | 48.3 | 25.4 | 41.0 | 593.1 |
| **Other Disbursements** | | | | | | | | | | | | | | | | | | | | |
| Estimated Payroll | 7.8 | - | 7.8 | - | 7.8 | - | 7.8 | - | 7.8 | - | 7.8 | - | 7.8 | - | 7.8 | - | 7.8 | - | 7.8 | 54.6 |
| Social security | 2.8 | - | 2.5 | - | 2.4 | - | 2.0 | - | 2.0 | - | 2.0 | - | 2.0 | - | 2.0 | - | 2.0 | - | 2.0 | 14.2 |
| Payroll taxes | 0.6 | - | 0.6 | - | 1.8 | - | 1.1 | - | 1.1 | - | 1.1 | - | 1.1 | - | 1.1 | - | 1.1 | - | 1.1 | 7.7 |
| Contributions to employee benefit programs | 5.0 | - | 5.3 | - | 5.3 | - | 5.5 | - | 5.5 | - | 5.5 | - | 5.5 | - | 5.5 | - | 5.5 | - | 5.5 | 38.5 |
| Medical benefit costs | 1.0 | 3.8 | 9.0 | - | - | 1.8 | 7.2 | - | 1.8 | - | 5.8 | - | - | - | 5.8 | - | - | - | 5.8 | 28.2 |
| Workers compensation / disability funding | - | - | 3.4 | - | - | - | - | - | 6.0 | - | - | - | - | - | - | - | - | - | - | 6.0 |
| Estimated Gross Overtime | 5.6 | - | 4.8 | - | 3.0 | 1.5 | 3.5 | 1.5 | 3.5 | 1.5 | 3.5 | 1.9 | 3.5 | 1.9 | 3.5 | 1.9 | 3.5 | 1.9 | 3.5 | 24.5 |
| Contract Labor - Title III | - | - | 2.0 | - | 0.3 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 | 24.7 |
| Contract Labor - Other | - | - | 0.0 | - | - | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 6.8 |
| **Employee Disbursements & Contract Labor** | 22.8 | 3.8 | 35.4 | - | 20.6 | 3.7 | 29.1 | 1.9 | 29.6 | 1.9 | 28.1 | 2.4 | 22.3 | 2.4 | 28.1 | 2.4 | 22.3 | 2.4 | 28.1 | 205.1 |
| **Other Disbursements** | | | | | | | | | | | | | | | | | | | | |
| Insurance premiums | - | - | 0.9 | - | - | - | - | 0.1 | - | - | - | 1.5 | - | - | - | 0.3 | - | - | - | 2.0 |
| Maintenance Disbursements | - | - | 0.6 | 1.0 | 1.5 | - | 3.2 | 3.2 | 3.2 | 4.5 | 4.5 | 4.5 | 4.5 | 4.5 | 3.9 | 3.9 | 3.9 | 3.9 | 4.3 | 52.0 |
| Employee expense reimbursements | - | - | - | - | - | - | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 | 5.2 |
| Additional accounts payable | - | - | 2.6 | 5.1 | 3.0 | 2.8 | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 | 34.0 |
| Other | 2.3 | 4.2 | (5.3) | (1.1) | 1.2 | 3.2 | - | - | - | - | - | - | - | - | - | - | - | - | - | 3.2 |
| **Subtotal Other Disbursements** | 2.3 | 4.2 | (1.3) | 5.1 | 5.7 | 6.0 | 6.0 | 6.2 | 6.0 | 7.3 | 7.3 | 8.8 | 7.3 | 7.3 | 6.7 | 7.0 | 6.7 | 6.7 | 7.1 | 96.4 |
| **Total Disbursements** | 48.4 | 18.2 | 69.6 | 33.1 | 51.1 | 42.2 | 94.0 | 57.0 | 91.4 | 46.1 | 80.0 | 59.8 | 93.0 | 33.0 | 58.6 | 51.4 | 77.3 | 34.5 | 76.3 | 894.6 |
| **Net Cash Flow** | (34.0) | 46.0 | (45.0) | (9.6) | (22.7) | 57.0 | (75.9) | (39.1) | (74.2) | (28.3) | (62.4) | (42.1) | (74.4) | (14.2) | (37.8) | (30.5) | (49.4) | (6.5) | (45.0) | (522.8) |
| Opening Balance | 242.2 | 208.1 | 259.9 | 219.9 | 187.0 | 187.5 | 233.8 | 157.9 | 118.8 | 44.6 | 16.3 | (46.1) | (88.2) | (162.6) | (176.9) | (214.7) | (245.1) | (294.5) | (301.0) | 187.5 |
| Net Operating Cash Flows | (34.0) | 46.0 | (45.0) | (9.6) | (22.7) | 57.0 | (75.9) | (39.1) | (74.2) | (28.3) | (62.4) | (42.1) | (74.4) | (14.2) | (37.8) | (30.5) | (49.4) | (6.5) | (45.0) | (522.8) |
| Proceeds Transferred to Restricted Accounts | | 5.8 | 5.0 | | | (10.8) | | | | | | | | | | | | | | (10.8) |
| **Ending Balance, before Emergency Related** | 208.1 | 259.9 | 219.9 | 210.3 | 164.3 | 233.8 | 157.9 | 118.8 | 44.6 | 16.3 | (46.1) | (88.2) | (162.6) | (176.9) | (214.7) | (245.1) | (294.5) | (301.0) | (346.1) | (346.1) |
| **Emergency Related** | | | | | | | | | | | | | | | | | | | | |
| Emergency Spend | - | - | (15.4) | (9.7) | (50.3) | - | (51.8) | (25.0) | (12.5) | (44.5) | (44.5) | (44.5) | (44.5) | (12.5) | (12.5) | (44.5) | (32.0) | (32.0) | - | (114.0) | (514.8) |
| FEMA Reimbursements | | | 15.4 | 9.7 | 27.0 | 23.2 | 51.8 | 25.0 | 12.5 | 44.5 | 44.5 | 44.5 | 44.5 | 12.5 | 12.5 | 44.5 | 32.0 | 32.0 | | 21.0 | 421.8 |
| **Subtotal Other Disbursements** | - | - | - | - | (23.3) | 23.2 | - | - | - | - | - | - | - | - | - | - | - | - | (93.0) | (93.0) |
| **Ending Balance** | 208.1 | 259.9 | 219.9 | 187.0 | 187.5 | 233.8 | 157.9 | 118.8 | 44.6 | 16.3 | (46.1) | (88.2) | (162.6) | (176.9) | (214.7) | (245.1) | (294.5) | (301.0) | (439.0) | (439.0) |

**<u>Exhibit B</u>**

**»vericlaim**

a sedgwick company

120 Broadway, Suite 900
New York, NY 10271
T: (212) 267-2700
F: (212) 962-5360

January 23, 2018


Mr. Sammy Rodríguez Ortega
Risk Manager
Puerto Rico Electrical Power Authority
P.O. Box 364267
San Juan, Puerto Rico 00936-4267


Email: Sammy.rodriguez@prepa.com


**Re: Puerto Rico Electrical Power Authority – PREPA**
    **Various Locations**
    **Carrier Policy # - Attachment "A"**
    **VeriClaim# NYC17653660_____**


    **<u>Hurricane Maria – September 20, 2017 (CAT 1745)</u>**


Dear Mr. Ortega:

We write on behalf of all Insurers subscribing to the contracts/slips listed on Attachment "A" ("Insurers"). The Insurers alone make coverage determinations and have approved this letter. The only authorized communications regarding coverage are those that have been expressly approved by Insurers; Vericlaim, Inc. [VCI], RTS International Loss Adjusters, and any consultants retained by them, have no authority to make any coverage determinations on behalf of Insurers.

This letter concerns the claim of the Puerto Rico Electric Power Authority ("PREPA") for loss arising out of Hurricane Maria. We look forward to working with PREPA to cooperatively and expeditiously calculate the amount of loss. Engineers at LIG Consultants recently visited Puerto Rico to inspect damage to PREPA's property, and planned to return this month. Accountants at Matson Driscoll & Damico are in Puerto Rico and have requested certain documents to analyze PREPA's time element loss. In the interim, those Insurers listed on Attachment A subscribing policies with shares up to $50,000,000 excess of the $25,000,000 deductible for Windstorm and the 30-day business interruption waiting period have approved their several and proportionate share of a net payment of $50,000,000 on an unallocated basis.

PREPA
DOL: 9/20/17
Page 2 of 6

As the claim is being further analyzed, Insurers quote below certain provisions of the policies in effect from May 15, 2017 to May 15, 2018 ("Policies") that may affect coverage for PREPA's loss. The quotation of some provisions of the Policies does not constitute a waiver of any other provision.

PUERTO RICO ELECTRIC POWER AUTHORITY

PROPERTY AND BUSINESS INTERRUPTION INSURANCE

### 1. INSURING AGREEMENT

Subject to the Declarations, Limits and Sub-Limits of Liability, Policy period and the following terms and conditions, the Policy insures against All Risk of direct physical loss or damage occurring during the Policy period to Property insured from any external cause except as hereafter excluded and whilst such property is situated in the territorial limits stated in Item 6. of the Declarations.

The policy also insures Business Interruption and Extra Expense, all as detailed in Addendum A of this Policy.

### 4. PROPERTY EXCLUDED

This Policy does NOT cover loss or damage to the following property:

***

    I. Above ground, underground and submarine electrical transmission and distribution lines, poles, and related equipment, including supporting structures, wires, conductors and cables, except where situated within one thousand (1000) feet of the Assured's generating facilities. This exclusion does not apply either to all overhead, underground and submarine fiber optic cables.

### 5. PERILS EXCLUDED

This Insurance does NOT cover loss, damage, or expenses directly or indirectly caused by:

***

    B. Wear and tear, gradual deterioration or rust, mould, wet or dry rot, contamination, erosion, corrosion, improper packing, insects or vermin unless a peril not otherwise excluded ensues, and then only for the physical loss or damage caused by such ensuing peril;

### 6. BASIS OF INDEMNIFICATION

In the event of physical loss or damage to Property Insured hereunder by a peril insured, the amount payable under this Policy shall be calculated on the basis of the reinstatement or replacement of the property lost or damaged, subject to the following provisions:

Reinstatement or replacement shall mean:

> (1) where property is destroyed, the rebuilding of any buildings or the replacement by similar property of any other property, in either case in a condition equal to but not better or more extensive than its condition when new.

> (2) where property is damaged, the repair of the damage and the restoration of the damaged portion of the property to a condition substantially the same as but not better or more extensive than its condition when new.

ADDENDUM A
BUSINESS INTERRUPTION
(GROSS EARNINGS)

## 1. INSURING CLAUSE

Subject to the Limits of Liability stated in the Declarations, this Policy is extended to cover loss resulting from necessary INTERRUPTION OF BUSINESS caused by physical loss or damage, as insured by this Policy, and occurring during the term of this Policy, to the following:

> A. real and/or personal property as insured by this Policy; and

> B. Property of others, provided that such physical loss or damage to such property wholly or partially prevents:

>> i. a supplier of goods, materials, products or services to the Assured from rendering their goods, materials, products and/or services; or

>> ii. a receiver of goods, materials, products and/or services from the Assured from accepting the Assured's goods, materials, products and/or services.

## 3. CONDITIONS

### A. DIRECT DAMAGE

In respect of loss under this Policy resulting from physical loss or damage to real or personal property as Insured by this Policy, no claims shall be sustained under this Extension resulting from the necessary interruption of

business unless and until a loss has been paid, or liability admitted, in respect of such physical loss or damage.

20. MARGIN CLAUSE

As soon as practicable after each anniversary date and/or the expiry date of this Policy, as applicable, the Assured shall file with Insurers a statement of values declaring one hundred percent (100%) of the total value of all property insured by this Policy during the previous annual period.

If the values reported in accordance with the above differ by more than ten percent (10%) from those reported at inception and/or the previous anniversary date, then the premium for the annual period shall be adjusted accordingly, calculated at pro rata of slip rates on the amount of such increase or decrease in values.

If the values reported differ by less than ten percent (10%), there shall be no adjustment in premium.

Insurers presently understand that PREPA has been able to generate sufficient power to meet the Island's demand soon after Hurricane Maria occurred, but that damage to transmission and distribution lines, poles, and related equipment, including support structures, wires, conductors and cables ("T&D Equipment") has prevented adequate electrical transmission and distribution. The Policies exclude damage to T&D Equipment except where situated within one thousand (1000) feet of a generating facility. Further, the Policies do not provide coverage for business interruption loss that results from damage to such T&D Equipment.

The Policies do not provide coverage for, and expressly exclude, loss, damage, or expenses directly or indirectly caused by wear and tear, gradual deterioration or rust, mold, wet or dry rot, contamination, erosion, and corrosion. Further, the Policies provide that covered physical damage will be valued per Clause 6, "Indemnification" ("(1) where property is destroyed... in a condition equal to but not better or more extensive than its condition when new. (2) where property is damaged... to a condition substantially the same as but not better or more extensive than its condition when new."). Additionally, Insurers will seek to allocate damage caused by Hurricane Irma as opposed to Hurricane Maria for the purpose of applying separate deductibles and limits.

Insurers will review the property declarations made during the underwriting, particularly the number and value of facilities/property that may have been under-declared, to evaluate the applicability of, among other things, the Margin Clause.

Concerning the business interruption loss as covered in Addendum A, Section 1(B)(ii), Insurers will seek to understand how damage to T&D equipment and/or the loss of population on the Island, rather than covered physical damage to receivers, has affected demand.

PREPA
DOL: 9/20/17
Page 5 of 6

Insurers reserve all rights to adjust the claim and deny or partially deny portions of it in accordance with the above.

Insurers look forward to working with PREPA to conclude the investigation into PREPA's Hurricane Maria loss, and request that PREPA provide any information pertinent to the issues discussed in this letter, and any other information PREPA believes is relevant to the investigation. Insurers request that PREPA expeditiously respond to any VCI's, RTS's, LIG's, and MD&D's requests for information, which will assist in a timely resolution of the claim adjustment.

The Insurers are investigating the claim while reserving all rights. Any specific reference in this letter to certain provisions of the Policies is not intended to be, and shall not be construed as, a limitation or restriction on the applicability of different or additional provisions in the Policies, or on Insurers' ability to rely on and enforce any provision in the Policies. Insurers specifically reserve the right to rely on and enforce every provision, including without limitation, provisions that have not been specifically referred to in this letter.

Please be advised that this letter and the actions of VCI, RTS, and any consultant retained to assist in the investigation of the claim do not constitute a waiver of any policy provisions or defenses available to Insurers. Insurers continue to reserve the right to assert any and all claims or defenses—whether equitable, legal, or contractual—at any time, waiving none.

Please contact me with any questions.

Sincerely,
**Vericlaim, Inc.**

Paul Sherman
Senior Executive General Adjuster


cc: Edwin I. Rivera - Edwin I Rivera Brokers Corp
            PO Box 270204, San Juan, P. Rico
            Calle 3 SO # 1031, Urb. La Riviera, San Juan Pr.
            erivera@eirseguros.com

    Laura T. Sanchez –  Claims Manager Willis Towers Watson
            1450 Brickell Ave. Suite 1600
            Miami, FL 33191
            laura.t.sanchez@willistowerswatson.com

PREPA
DOL: 9/20/17
Page 6 of 6

## Attachment A

| Lead Insurer | Slip No./UMR |
|---|---|
| Argenta Syndicate 2121 | B0804Q14312F17 |
| General Security Indemnity Co. of America | FA0033264-2017-1 |
| Starstone Syndicate 1301 | B0804Q11038F17 |
| Talbot Syndicate 1183 | B0804Q19672F17 |
| Syndicate 3902 NOA at Lloyd's. | B0804Q19674F17 |
| Ironshore Insurance Ltd. (Bermuda) | 441663717A&B |
| MS Amlin Underwriting | B0804Q19673F17 |
| Cathedral Syndicate 2010 | B0804Q19669F17AAK |
| Aspen UK Insurance Ltd | PWAHAAA17 |
| Starr Technical Risks Agency, Inc. | B0804Q14312F17 |