SUBSTANTIALLY FINAL FORM

**SECURED SUPERPRIORITY POST-PETITION**

**REVOLVING CREDIT LOAN AND SECURITY AGREEMENT**

**PUERTO RICO ELECTRIC POWER AUTHORITY**
as the Borrower,

and

**THE COMMONWEALTH OF PUERTO RICO**
as Lender,

[_____ __], 2018

## TABLE OF CONTENTS

**Page**

Article 1 - Definitions; Accounting Terms and Principles: ......................................................... 1

Article 2 - The Credit Facilities: .......................................................................................... ~~10~~9

2-1.    Establishment of Revolving Credit Facilities .......................................... ~~10~~9

2-2.    Voluntary Reduction or Termination of the Revolving Credit Commitment ........ 10

2-3.    Revolving Credit Loan Requests ............................................................ ~~11~~10

2-4.    Making of Revolving Credit Loans. ....................................................... ~~12~~11

2-5.    The Notes .......................................................................................... ~~12~~11

2-6.    Payment of the Revolving Credit Loans ................................................. ~~12~~11

2-7.    Interest Rates ..................................................................................... ~~13~~12

2-8.    Lender's and Oversight Board's Discretion ............................................ ~~14~~13

Article 3 - Conditions Precedent: ...................................................................................... ~~14~~13

3-1.    Conditions Precedent to the Effective Date ............................................ ~~14~~13

~~3-2.~~    ~~Conditions Precedent to Fundings on and after the Final Order Entry Date~~ .......... ~~16~~

~~3-3.~~    Conditions Precedent to All Fundings ................................................... ~~16~~15

Article 4 - General Representations, Covenants and Warranties: ............................................. ~~17~~16

4-1.    Payment and Performance of Liabilities ................................................ ~~17~~16

4-2.    Due Organization - Corporate Authorization - No Conflicts ..................... ~~17~~16

4-3.    Title to Assets ................................................................................... ~~18~~16

4-4.    Insurance Policies .............................................................................. ~~18~~17

4-5.    Investments ....................................................................................... ~~18~~17

4-6.    Loans .............................................................................................. ~~18~~17

~~4-7.~~    ~~Protection of Assets~~ .......................................................................... ~~19~~

~~4-8.~~    Line of Business ................................................................................ ~~19~~17

4-~~9~~8.    Additional Assurances ....................................................................... ~~19~~17

4-~~10~~9.  Adequacy of Disclosure ...................................................................... ~~19~~17

4-~~11~~10.                                              Prepayments of Indebtedness ~~19~~18

~~4-12.~~   ~~Other Covenants~~ ............................................................................... ~~19~~

4-~~13~~11.                                                          Receivables ~~19~~18

4-~~14~~12.                                                            Consents ~~19~~18

4-~~15~~13.                                                     Use of Proceeds ~~20~~18

~~4-16.~~   ~~Validity and Priority of Security Interest; Administrative Priority~~ .......... ~~20~~

4-~~17~~14.                                                        Subsidiaries ~~21~~19

4-~~18~~15.                                              Cash Management System ~~21~~19

4-~~19~~16.                                                     Case Matters ~~21~~19

4-~~20~~17.                                       Amendments to ~~Orders~~ ~~21~~19

4-~~21~~18.                                            Operating Reserve Fund ~~21~~19

4-~~22~~19.                                           Refinancing Indebtedness ~~21~~19

~~4-23.~~   ~~Other Accounts~~ ................................................................................ ~~22~~

Article 5 - Financial Reporting and Performance Covenants: ................................................. ~~22~~20

5-1.    Prompt Notice to Lender ~~22~~ and the Oversight Board ................................ 20
5-2.    Weekly Reports ................................................................................ ~~22~~20
5-3.    Monthly Reports ............................................................................... ~~23~~20
5-4.    Fiscal Year ....................................................................................... ~~23~~20
5-5.    ~~Committee Communications~~ ........................................................... ~~23~~
~~5-6.~~    Disbursements, Budget Variance and Proposed Budget ..................... ~~23~~20

Article 6 - Cash Management.  Payment of Liabilities: ...................................... ~~23~~21
6-1.    The ~~Operating Reserve Fund, Blocked,~~ Segregated, Operating and Other
        Accounts .......................................................................................... ~~23~~21
6-2.    ~~Proceeds and Collection of Accounts~~ .............................................. ~~24~~
~~6-3.~~    The Operating Account ...................................................................... ~~24~~21

Article 7 - Grant of Security Interest: .............................................................. ~~24~~22
7-1.    Grant of Security Interest ................................................................. ~~24~~22
7-2.    Extent and Duration of Security Interest ............................................ ~~24~~22
7-3.    Certain Perfection Actions ................................................................ ~~24~~22
7-4.    No Filings Required; Priority ............................................................ ~~25~~22

Article 8 - Events of Default: ......................................................................... ~~25~~22
8-1.    Failure To Make Payments ............................................................... ~~25~~22
8-2.    Failure to Perform Covenant or Liability ............................................ ~~25~~22
8-3.    Termination of Liens ......................................................................... ~~25~~23
8-4.    Case Matters .................................................................................... ~~25~~23
8-5.    Financing Order Modifications; Other Administrative Claims; Other Liens ... ~~25~~23
8-6.    Automatic Stay ................................................................................. ~~25~~23
8-7.    Violation of Financing ~~Orders~~ .................................... ~~26~~Order _____ 23
8-8.    Adversary Proceedings ..................................................................... ~~26~~23
8-9.    Payment of Other Indebtedness ........................................................ ~~26~~23

Article 9 - Rights and Remedies Upon Default: ............................................... ~~26~~23
9-1.    Remedies ......................................................................................... ~~26~~23
9-2.    Application of Proceeds ..................................................................... ~~26~~24

Article 10 - Notices .......................................................................................... ~~27~~24
10-1.   Notice Addresses ............................................................................. ~~27~~24
10-2.   Notice Given .................................................................................... ~~28~~25

Article 11 - Term: ............................................................................................ ~~28~~26
11-1.   Termination of Revolving Credit ....................................................... ~~28~~26
11-2.   Effect of Termination ....................................................................... ~~28~~26

Article 12 - General: ........................................................................................ ~~28~~26
12-1.   ~~Protection of Collateral~~ ................................................................... ~~28~~
~~12-2.~~   Successors ....................................................................................... ~~28~~26
12-2.   Protection of Assets .......................................................................... 26
12-3.   Severability ...................................................................................... ~~29~~26
12-4.   Amendments; Course of Dealing ....................................................... ~~29~~26

12-5.     Application of Proceeds ............................................................. ~~29~~27
12-6.     Copies and Facsimiles ............................................................... ~~29~~27
12-7.     Puerto Rico Law ........................................................................ ~~29~~27
12-8.     Consent to Jurisdiction ............................................................. ~~29~~27
12-9.     Rules of Construction ................................................................ ~~30~~27
12-10.   Intent ........................................................................................... ~~31~~29
12-11.   Maximum Interest Rate .............................................................. ~~31~~29
12-12.   Incorporation of Financing ~~Orders~~Order by Reference ........... ~~31~~29

Article 13 - Consents, Amendments and Waivers: ................................... ~~32~~29
13-1.     Action by Lender, Consents, Amendments, Waivers ................. ~~32~~29

Article 14 - Assignments and Participations: ............................................ ~~32~~30
14-1.     Assignments and Assumptions .................................................. ~~32~~30

EXHIBITS

| | | |
|---|---|---|
| C-1 | : | Term Sheet |
| I-1 | : | ~~Form of Interim~~ Financing Order |
| I-2 | : | Initial Budget |
| 2-4 | : | Borrowing Request Notice |
| 2-5 | : | Revolving Credit Note |

SCHEDULES

| | | |
|---|---|---|
| 6-1 | : | Accounts |

**SECURED SUPERPRIORITY POST-PETITION**

**REVOLVING CREDIT LOAN AND SECURITY AGREEMENT**

[_____ __], 2018

THIS SECURED SUPERPRIORITY POST-PETITION REVOLVING CREDIT LOAN AND SECURITY AGREEMENT (this "**Agreement**") is made between THE COMMONWEALTH OF PUERTO RICO (the "**Commonwealth**" or in its capacity as a lender hereunder, the "**Lender**") and PUERTO RICO ELECTRIC POWER AUTHORITY, a body corporate and politic constituting a public corporation and governmental instrumentality of the Commonwealth in its capacity as the debtor (hereinafter, the "**Borrower**") in a Title III Case (as defined below); in consideration of the mutual covenants contained herein and benefits to be derived herefrom.

WITNESSETH:

WHEREAS, on July 2, 2017 (the "**Petition Date**"), the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**") filed a voluntary petition for relief for the Borrower pursuant to ~~section~~Section 304(a) of the Puerto Rico Oversight, Management and Economic Stability Act ("**PROMESA**"), commencing a case under title III thereof (the "**Title III Case**");

WHEREAS, the Borrower has requested, and the Lender has agreed to make, revolving loans to the Borrower consisting of a superpriority post-petition secured credit facility in an aggregate principal amount not to exceed $~~1,300,000,000.00~~1,300,000,000.00 (subject to further approval by necessary governmental action of the Lender for any amounts in excess of $550,000,000.00), subject to this Agreement and ~~, when entered, the Interim Financing Order and the Final~~ the Financing Order (each as defined herein), as applicable;

WHEREAS, the Lender is willing to extend such credit to the Borrower under this Agreement upon the terms and subject to the conditions set forth in this Agreement and the ~~Interim Financing Order and the Final~~ Financing Order, as applicable.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Lender and the Borrower hereby agree as follows:

**Article 1 - Definitions; Accounting Terms and Principles:**

(a) Definitions: As herein used, the following terms have the following meanings or are defined in the section of this Agreement so indicated:

"**Acceptable Security Interest**": A security interest which (a) exists in favor of the Lender, (b) has superpriority lien status and is superior to all other security interests (other than the Carve-Out), (c) secures the Liabilities, (d) is enforceable against Borrower which created such security interest and (e) is perfected; provided, that perfection by the Financing ~~Orders~~Order shall be sufficient to grant and perfect an Acceptable Security Interest.

~~"**Account Debtor**": Has the meaning given that term in the UCC.~~

"**Aggregate Outstanding**": At any time of determination, the aggregate principal amount of the Revolving Credit Loans outstanding.

"**Agreement**":  Defined in the Preamble.

"**Automatic Stay**": means the automatic stay imposed under Section 362 of the Bankruptcy Code.

"**Availability**":  The then applicable Revolving Credit Commitment <u>minus</u> the Aggregate Outstanding.

"**Bankruptcy Code**": Title 11 of the United State Code, 11 U.S.C. §§ 101 *et seq.* and any amendments or successor statute thereto.  Any reference to any section of the Bankruptcy Code shall refer to the section of the Bankruptcy Code as incorporated into PROMESA.

"**Bankruptcy Rules**": The Federal Rules of Bankruptcy Procedure and local rules of the United States Title III Court for the District of Puerto Rico, each as amended, and applicable to the Title III Case.

"**Borrower**":  Is defined in the Preamble.

"**Budget**": The 13-week cash flow budget of anticipated and forecasted revenues and expenses, including without limitation projected cash receipts, and cash disbursements on a weekly basis for the Borrower, and separately identifying disbursements for Eligible Uses (or permitted reimbursement thereof), Ineligible Uses, and the projected uncommitted balance in the Segregate Account as of the first day of such Budget and, as in effect from time to time, in form and substance satisfactory to the Lender and the Oversight Board, each in their sole discretion, including the Initial Budget, as the same may be updated from time to time by the Borrower with the prior written consent of the Lender and the Oversight Board, each in their sole discretion. Any reference contained herein to compliance with the Budget shall include any permitted variance permitted by Section 5-6.5.

"**Business Day**":  Any day other than (a) a Saturday or Sunday; (b) any day on which banks in San Juan, Puerto Rico and/or New York, NY, generally are not open to the general public for the purpose of conducting commercial banking business; or (c) a day on which the Lender is not open to the general public to conduct business.

"**Capital Expenditures**":  The expenditure of funds or the incurrence of liabilities which are capitalized in accordance with GAAP.

"**Capital Lease**":  Any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as liabilities on a balance sheet of such Person under GAAP and the amount of which obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve-Out**": Has the meaning ascribed to such term in the ~~Interim~~ Financing Order ~~or, upon entry of the Final Financing Order, in the Final Financing Order, as applicable~~.

"**Cash Management System**": Is defined in Section 4-14.15.

"**Collateral**":  Is defined in Section 7-1.

"**Committee**": The official committee of creditors holding unsecured claims appointed in respect of the Title III Case.

"**Commonwealth**":  Is defined in the Preamble.

"**Commonwealth Financing**":  Any loan, financing or third-party source of capital (including without limitation any community disaster loan issued by the United States Treasury pursuant to the Stafford Act) entered into by the Commonwealth pursuant to which funding is available to make loans, advances or financial accommodations to the Borrower.

"**DDA**":  Any checking or other demand daily depository account maintained by Borrower.

"**Effective Date**":  The date upon which the conditions precedent set forth in Article 3 hereof have been satisfied or waived as determined by the Lender and the Oversight Board and this Agreement has become effective.

"**Eligible Uses**": Is defined in Section 4-~~12.~~13.

"**Eligible Uses Variance**": The amount equal to 15% of the projected amounts for total Eligible Uses disbursements (other than disbursements that are to be paid from funds provided by FEMA or any other federal entity that have been obligated, which shall not be subject to the test or limited by the Budget) set forth in the Budget for the period to be covered by any Revolving Credit Loan requested pursuant to Section 2-3 hereof.

~~"**EMMA**": is the Electronic Municipal Market Access~~

"**Encumbrance**":  Each of the following:

> (a)  Any security interest, mortgage, pledge, hypothecation, lien, attachment, or charge of any kind (including any agreement to give any of the foregoing); the interest of a lessor under a Capital Lease; conditional sale or other title retention agreement; sale (to the extent of recourse) of accounts receivable or chattel paper; or other arrangement pursuant to which any Person is entitled to any preference or priority with respect to the property or assets of another Person or the income or profits of such other Person or which constitutes an interest in property to secure an obligation; each of the foregoing whether consensual or non-consensual and whether arising by way of agreement, operation of law, legal process or otherwise.

> (b)  The filing of any financing statement under the UCC or comparable law of any jurisdiction.

"**End Date**":  The date upon which all of the following events have occurred:  (a) all Liabilities (other than indemnities, not then due and payable, which survive repayment of the Revolving Credit Loans and termination of the Revolving Credit Commitment) have been paid in full in cash, and (b) all obligations of the Lender to make loans and advances and to provide other financial accommodations to the Borrower hereunder shall have been irrevocably terminated.

"**Events of Default**":  Is defined in Article 8 (in the singular, "**Event of Default**").

~~"**Excluded Assets**": The FEMA Account.~~

"**FEMA**": ~~Is the~~The Federal Emergency Management Agency.

3

~~"**FEMA Account**": That segregated deposit account [#_____, located at _____] in the name of and on behalf of the Borrower the purpose of receiving federal disaster relief funds pursuant to the Stafford Act.~~

"**FEMA Flash Report**": ~~Is the~~The Emergency Spend on Reimbursement Flash Report periodically prepared by the Borrower.

"~~**Final Financing Order**": Collectively, the order**Financing Order**": The order, substantially in the form of Exhibit I-1 (except as may otherwise be agreed in writing or on the record by the Lender and the Oversight Board at the final hearing with respect to such order in the Title III Case) of the Title III Court entered in the Title III Case after notice and final hearing pursuant to the Bankruptcy Rules or such other procedures as approved by the Title III Court which, among other matters (but not by way of limitation), authorizes the Borrower to obtain credit and Borrower to incur the Liabilities and grant Liens under the Loan Documents, as the case may be, and provides for the superpriority status of the Lender's claims, as the same shall be approved by, and may be amended, modified or supplemented from time to time after the ~~Final~~ Order Entry Date with the prior written consent of, the Lender and the Oversight Board, each in their sole and absolute discretion.

~~"**Final Order Entry Date**": The date on which the Final Financing Order is entered on the docket of the Title III Court.~~

~~"**Final Revolving Credit Commitment**": On and after the Final Revolving Credit Commitment Effective Date, an amount equal to the lesser of (a) $1,300,000,000.00 and (b) the lesser of such amount as approved by (x) the Title III Court pursuant to the Final Financing Order and (y) the amount permitted under any necessary governmental action by the Commonwealth, and in each case, such amount shall be inclusive of the Interim Revolving Credit Commitment. Notwithstanding the foregoing, any increase in the Revolving Credit Commitment above the Interim Revolving Credit Commitment shall only be permitted in increments not to exceed $250,000,000.00 after the Final Order Entry Date, subject to the (i) maximum Final Revolving Credit Commitment permitted in the foregoing sentence and (ii) the prior written approval of the Lender and the Oversight Board, each in their sole discretion.~~

~~"**Final Revolving Credit Commitment Effective Date**": The date on which the conditions under Sections 3-2 and 3-3 are satisfied or waived as determined by the Lender and the Oversight Board.~~

~~"**Financing Orders**": The Interim Financing Order, the Final Financing Order and any amendment, modification or supplement thereto in form and substance acceptable to the Lender and the Oversight Board, each in their sole discretion.~~

"**Funding Date**": The date any Revolving Credit Loan is made by the Lender to the Borrower pursuant to Section 2-3, 2-4 and Article 3.

"**GAAP**": Principles which are consistent with those promulgated or adopted by the Financial Accounting Standards Board and its predecessors (or successors) in effect and applicable to that accounting period in respect of which reference to GAAP is being made, provided, however, in the event of a Material Accounting Change, then unless otherwise specifically agreed to by the Lender, the Borrower shall include, with its monthly, quarterly, and annual financial statements a schedule, certified by the Borrower's chief financial officer, on which the effect of such Material Accounting Change to the statement with which provided shall be described. Notwithstanding the foregoing, any obligations of a Person under a lease (whether existing now or entered into in the future) that is not (or would not be) a Capitalized Lease Obligation under GAAP as in effect on the Effective Date, shall not be treated as a

Capitalized Lease Obligation solely as a result of the adoption of changes in GAAP outlined by the Financial Accounting Standards Board in its press release dated March 19, 2009.

"**Indebtedness**":  All indebtedness and obligations of or assumed by any Person on account of or in respect to any of the following:

(a)     In respect of money borrowed (including any indebtedness which is non-recourse to the credit of such Person but which is secured by an Encumbrance on any asset of such Person) whether or not evidenced by a promissory note, bond, debenture or other written obligation to pay money.

(b)     In connection with any letter of credit or acceptance transaction (including, without limitation, the face amount of all letters of credit and acceptances issued for the account of such Person or reimbursement on account of which such Person would be obligated).

(c)     In connection with the sale or discount of accounts receivable or chattel paper of such Person other than the sale of retail Accounts (as defined in the UCC) to credit card processors.

(d)     On account of deposits or advances.

(e)     As lessee under Capital Leases.

(f)     On account of net obligations under any swap or hedging contract.

(g)     With respect to obligations to purchase, redeem, retire, defease or otherwise make any payment in respect of any equity interest in such Person or any other Person, or any warrant, right or option to acquire such equity interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends.

(h)     Indebtedness of others secured by an Encumbrance on any asset of such Person, whether or not such Indebtedness is assumed by such Person.

(i)     Any guaranty, endorsement, suretyship or other undertaking pursuant to which that Person may be liable on account of any Indebtedness of any third party, other than endorsements of negotiable instruments for collection in the ordinary course of business consistent with past practices.

(j)     The Indebtedness of a partnership or joint venture in which such Person is a general partner or joint venturer to the extent that the holder of such Indebtedness has recourse to such Person.

"**Ineligible Uses**": Is defined in Section 4-~~15~~.13.

"**Ineligible Uses Variance**": The amount equal to 15% of the projected amounts for total Ineligible Uses disbursements set forth in the Budget for such period; provided, that Ineligible Uses that are subject to the Carve-Out or any FEMA reimbursable expense that has been obligated by FEMA or any other federal entity and is pursuant to a contract that has been approved by the Oversight Board shall not be subject to the budget testing and shall not be included for calculations of the Ineligible ~~Use~~Uses Variance.

"**Initial Budget**": The Budget attached as Exhibit I-2 with such changes as are acceptable to the Lender and the Oversight Board, each in their sole discretion.

"**Interest Payment Date**":  June 30 and December 31 of each year after the Effective Date; the Termination Date; and the End Date.

"**Interim Financing Order**": The order of the Title III Court substantially in the form of Exhibit I-1 (except as may otherwise be agreed in writing or on the record by the Lender and the Oversight Board at the interim hearing with respect to such order in the Title III Case) entered in the Title III Case after an interim hearing pursuant to the Bankruptcy Rules, which, among other matters (but not by way of limitation), authorizes, on an interim basis, the Borrower to obtain credit and Borrower to incur the Liabilities and grant Liens under the Loan Documents, as the case may be, and provides for the superpriority of the Lender's claims, as the same shall be approved by, and may be modified or supplemented from time to time after the Interim Order Entry Date but before the Final Order Entry Date, with the prior written consent of the Lender and Oversight Board, each in their sole and absolute discretion.

"**Interim Order Entry Date**": The date on which the Interim Financing Order is entered on the docket of the Title III Court.

"**Interim Revolving Credit Commitment**": On and after the Effective Date, the commitment of the Lender to make Revolving Credit Loans in an aggregate amount equal to the lesser of (a) $550,000,000.00 and (b) such amount as approved by the Title III Court pursuant to the Interim Financing Order.

"**Joint Resolution**" Joint Resolution 16-2018 of the legislature of Puerto Rico, as may be amended, superseded, or extended from time to time.

"**Lender**":  Defined in the Preamble.

"**Liabilities**" (in the singular, "**Liability**"):  Includes, without limitation, all and each of the following, whether now existing or hereafter arising:

(a)     Any and all direct and indirect liabilities, debts, and obligations of the Borrower to the Lender, of every kind, nature, and description under the Loan Documents.

(b)     Each obligation to repay any loan, advance, indebtedness, note, obligation, or amount now or hereafter owing by the Borrower to the Lender under the Loan Documents, whether or not any of such are allowed or allowable, are liquidated, unliquidated, primary, secondary, secured, unsecured, direct, indirect, absolute, contingent, or of any other type, nature, or description, or by reason of any cause of action which the Lender may hold against the Borrower under the Loan Documents.

(c)     All interest, fees, and charges and other amounts which may be charged by the Lender to the Borrower under the Loan Documents and/or which may be due from the Borrower to the Lender under the Loan Documents from time to time.

"**Loan Documents**":   This Agreement, the Financing OrdersOrder, each instrument and document executed and/or delivered as contemplated by Article 3, and each other instrument, orders or document from time to time executed, issued and/or delivered in connection with the arrangements contemplated hereby, as each may be amended from time to time.

"**Material Accounting Change**":  Any change in GAAP applicable to accounting periods subsequent to the Borrower's fiscal year most recently completed prior to the execution of this Agreement, which change has a material effect on the Borrower's financial condition or operating

results, as reflected on financial statements and reports prepared by or for the Borrower, when compared with such condition or results as if such change had not taken place.

"**Material Adverse Effect**":  A material adverse effect upon (i) the Borrower's business, assets, properties, liabilities (actual or contingent), operations, financial affairs, or condition (financial or otherwise), taken as a whole, or (ii) the Collateral, taken as a whole, or (iii) the ability of Borrower to perform its obligations under this Agreement and the other Loan Documents, or (iv) the validity, enforceability, perfection or priority of this Agreement or the other Loan Documents or of the rights and remedies of the Lender under any Loan Document.  In determining whether any individual event would result in a Material Adverse Effect, (i) notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other than existing events would result in a Material Adverse Effect.  Notwithstanding the foregoing, in no event shall any Material Adverse Effect be deemed to exist as a result of the commencement of the Title III Case or the circumstances and events leading up thereto to the extent that such event(s) would reasonably be expected to result therefrom.

"**Maturity Date**":  The earliest of (1) the 30th anniversary of the Effective Date or (2) the Termination Date.

"**Mediation Agreement**":  The mediation agreement signed by the Honorable Barbara J. Houser, Mediator and Mediation Team Leader, on July 27, 2017 and entered into by parties including the Puerto Rico Fiscal Agency and Financial Advisory Authority, on behalf of the Government of Puerto Rico and its instrumentalities, the Financial Oversight and Management Board for Puerto Rico, as representative of each Title III debtor, and certain creditor parties, in connection with the Order Appointing Mediation Team, In re Commonwealth of Puerto Rico, et al., Case No. 17-3283 [Dkt. No. 430].

"**Operating Account**": ~~Is that~~Those certain deposit ~~account~~accounts in which the Lender shall have an Acceptable Security Interest in the name of and on behalf of the Borrower for the purpose of accepting Revenues (other than the retained Revenues permitted to be held in the Operating Reserve Fund), other deposits in the ordinary course of business, and proceeds of the Revolving Credit Loans from the Segregated Account and for making disbursements in accordance with the Budget.

"**Operating Reserve Fund**": An account maintained by the Borrower of proceeds of retained Revenues not otherwise required to be used to repay the Revolving Credit Loans pursuant to Section 2-6, in an aggregate amount not to exceed $300,000,000.00 at any one time and in which the Lender shall have an Acceptable Security Interest.

"**Order Entry Date**": The date on which the Financing Order is entered on the docket of the Title III Court.

"**Other Accounts**": Those certain deposit accounts in the name of and on behalf of the Borrower in which Revenues are received, deposited or transferred, other than the Operating Account and the Operating Reserve Fund and ~~with respect~~ in which the Lender shall have an Acceptable Security Interest.

"**Oversight Board**": Has the meaning given to such term in the recitals of this Agreement.

"**Permitted Encumbrances**":  Those Encumbrances permitted as provided in Section 4-3~~(a)~~ hereof.

"**Person**":  Any natural person, and any corporation, limited liability company, trust, partnership, joint venture, or other enterprise or entity.

"**Petition Date**": Has the meaning given to such term in the recitals of this Agreement.

"**Plan of Adjustment**": Any Plan of Adjustment submitted by the Borrower to the Title III Court in connection with the Title III Case.

"**Post-Petition Liens**": An Acceptable Security Interest in the Collateral granted to the Lender pursuant to this Agreement, the other Loan Documents and the Financing ~~Orders~~Order.

"**Pre-Petition Bond Credit Parties**": The Pre-Petition Bond Trustee and the Pre-Petition Bondholders, in their capacities as secured creditors with respect to the Pre-Petition Bond Indebtedness.

"**Pre-Petition Bond Indebtedness**": The Liabilities (as defined in the Pre-Petition Trust Agreement) for which the Borrower is indebted to the Pre-Petition Bondholders, in respect of amounts owed by the Borrower under the Pre-Petition Trust Agreement, which Liabilities are secured by the assets of Borrower pursuant to the Loan Documents (under and as defined in the Pre-Petition Trust Agreement).

"**Pre-Petition Bondholders**": The "bondholders" (as defined in the Pre-Petition Trust Agreement as in effect on the date hereof), in their capacities as pre-petition bondholders under the Pre-Petition Trust Agreement.

"**Pre-Petition Bonds**": Means the bonds issued under the Pre-Petition Trust Documents, in the aggregate outstanding principal amount ~~of $[_____]~~as of the Petition Date of $8,258,614,148.00 plus interest that accrued from March 14, 2016 through and including the Petition Date.

"**Pre-Petition Bond Trustee**": U.S. Bank National Association, as successor trustee under the Pre-Petition Trust Agreement.

"**Pre-Petition Trust Agreement**": That certain Trust Agreement dated as of January 1, 1974, by and between the Borrower and the Pre-Petition Bond Trustee, as the same has been amended, restated, supplemented or otherwise modified prior to the Petition Date, as in effect as of such date.

"**Pre-Petition Trust Documents**": The Pre-Petition Trust Agreement and the other documents executed and/or delivered in connection therewith, as such Pre-Petition Trust Documents have been amended, restated, supplemented or otherwise modified prior to the Petition Date, as in effect as of such date.

"**Proceeds**": Includes, without limitation, "Proceeds" as defined in the UCC (defined below), and each type of property described in Section 7-1 hereof.

"**Professional Fees**": All accrued and unpaid claims for fees and expense reimbursements of Professional Persons retained by the Borrower and the Committee.

"**Professional Person**": ~~Means a~~A Person who is an attorney, accountant, appraiser, auctioneer or financial advisor or other professional person who is providing services to the Borrower or the Committee during the pendency of the Title III Case.

"**PROMESA**": Has the meaning given to such term in the recitals of this Agreement.

"**Proposed Budget**": Is defined in Section 5-~~6~~5(b).

8

"**Puerto Rico Department of Treasury Single Account**": Is the Treasury Single Account maintained by the Department of the Treasury of the Commonwealth of Puerto Rico.

"**Refinancing Indebtedness**" Any community disaster loans issued pursuant to the Stafford Act by the United States Treasury or that are provided by a third party source of capital and approved by the Oversight Board pursuant to Section 207 of PROMESA.

"**Responsible Officer**":   The executive director, [_____] and [_____]head of project management office and director of finance of Borrower.  Any document delivered hereunder that is signed by a Responsible Officer of Borrower shall be conclusively presumed to have been authorized by all necessary corporate action on the part of Borrower and such Responsible Officer shall be conclusively presumed to have acted on behalf of Borrower.

"**Revenues**": Has the meaning specified in the Pre-Petition Trust Agreement.

"**Revolving Credit**":  Is defined in Section 2-1.

"**Revolving Credit Commitment**": The Interim Revolving Credit Commitment and/or the Final Revolving Credit Commitment, as the context may require.On and after the Effective Date, an amount equal to the lesser of (a) such amount as approved by the Title III Court pursuant to the Financing Order and (y) $550,000,000, which may be increased to up to $1,300,000,000 subject (i) the Step Increase Requirements, and (ii) approval by necessary governmental action of the Lender.

"**Revolving Credit Loans**":  Has the meaning specified in Section 2-1.

"**Revolving Credit Note**":  Has the meaning specified in Section 2-5.

"**Segregated Account**": Is that certain deposit account in the name of and on behalf of the Borrower [bearing an account number [_____] with [_____],] for the purpose of maintaining the proceeds of any Revolving Credit Loans prior to disbursement by the Borrower in accordance with Section 4-1513 and in which the Lender shall have an Acceptable Security Interest.

"**Stafford Act**": The Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. § 5121 et seq., as amended).

"**Step Increase**": Any increase in the Revolving Credit Commitment, which shall only be permitted to be made in increments not to exceed $250,000,000.00.

"**Step Increase Requirements**": The Revolving Credit Commitment may be increased in excess of $550,000,000.00 in Step Increases; provided that, each Step Increase shall only be permitted if such Step Increase has been approved (a) in writing by the Lender and the Oversight Board, each in their sole discretion, and (b) by necessary governmental action by the Lender; but for the avoidance of doubt, no Step Increase shall require the approval of the Title III Court.

"**Subsidiary**":   As to any Person, any corporation, association, partnership, limited liability company, joint venture or other business entity of which at least fifty percent (50%) or more of the ordinary voting power (or equivalent interests) for the election of a majority of the board of directors (or other equivalent governing body) of such entity is held or controlled by such Person, or by one or more Subsidiaries of such Person, or by such Person and one or more Subsidiaries of such Person; or which is otherwise controlled by such Person, or by one or more Subsidiaries of such Person, or by such Person and one or more Subsidiaries of such Person through the exercise of voting power or otherwise.

9

"**Suspension Event**":  Any occurrence, circumstance, or state of facts which (1) is an Event of Default, which is continuing and has not been waived by the Lender; or (2) is sixty (60) days after written notice by the Lender to the Borrower stating that the aggregate amount of cash held in the Puerto Rico Department of Treasury Single Account is projected to fall below $800,000,000.00 during such sixty (60) day period; provided that and no Commonwealth Financing is otherwise available to fund Revolving Credit Loans.

"**Termination Date**":  The earliest of (a) the date on which all the Revolving Credit Loans and other obligations thereunder have been indefeasibly repaid in full in cash (and the Revolving Credit Commitment has been terminated), (b) the effective date of a confirmed Plan of Adjustment in the Title III Case (unless an alternative treatment is agreed to by the Lender and consented to previously in writing by the Oversight Board), and (c) the date of termination of the Revolving Credit Commitment and/or acceleration of any outstanding extensions of credit under this Agreement following the occurrence and during the continuance of an Event of Default.

"**Term Sheet**": Is that certain term sheet attached hereto as Exhibit C-1.

"**Title III Case**": Has the meaning given to such term in the recitals of this Agreement.

"**Title III Court**": The United States District Court for the District of Puerto Rico.

"**UCC**": The Uniform Commercial Code as it exists now and from time to time in the Commonwealth,

## Article 2 - The Credit Facilities:

2-1.    <u>Establishment of Revolving Credit Facilities</u>.

(a) <u>Revolving Credit</u>.

(i)    Subject to Article 3 and the terms and conditions set forth in this Agreement, the Lender hereby establishes a revolving line of credit (the "**Revolving Credit**") in the Borrower's favor pursuant to which Lender, subject to, and in accordance with, this Agreement, agrees to make loans and advances (the "**Revolving Credit Loans**" and each, a "**Revolving Credit Loan**") to and for the account of the Borrower as provided herein from time to time (subject to any limitations contained within the Interim Financing Order or the Final Financing Order, as applicable), up to the maximum amount of the Revolving Credit Commitment as in effect at such time; <u>provided</u> that the Aggregate Outstanding shall not at any time in the aggregate exceed the aggregate Revolving Credit Commitment then in effect.

(ii)    The proceeds of borrowings under the Revolving Credit shall be used as set forth in Section 4-15.13.

(iii)    Amounts of the Revolving Credit Commitment borrowed and prepaid or repaid may be borrowed or re-borrowed unless such prepayments or repayments are accompanied by a corresponding permanent reduction of the Revolving Credit Commitment.

(b) <u>Commitment to Make Revolving Credit Loans</u>.  The Lender shall make available to the Borrower, as provided herein, the Revolving Credit Commitment.

(c)  Commitment to Make Interim Revolving Credit Loans.  Upon the entry of the Interim Financing Order and subject to Article 3, the Lender shall make available to the Borrower, as provided herein, the Interim Revolving Credit Commitment.(d)  Commitment to Make Final Revolving Credit Loans.  Subject to the occurrence of the Final Revolving Credit Commitment Effective Date, the Lender shall make available to the Borrower, as provided herein, the Final Revolving Credit Commitment.  The Revolving Credit Commitment shall be available to the Borrower until June 30, 2018, at which time such Revolving Credit Commitment shall terminate unless extended by necessary governmental action by the Lender, and any Revolving Credit Loans outstanding at such time shall remain outstanding and be repaid in accordance with this Agreement.

2-2.   Voluntary Reduction or Termination of the Revolving Credit Commitment.  The Borrower may permanently reduce, or terminate, the Lender's Revolving Credit Commitment, in whole or in part from time to time, by furnishing three (3) Business Days' written notice to the Lender.  Upon the effective date of any such reduction, the Borrower shall pay to the Lender any amounts required under Section 2-6(b) hereof as a result of such reduction or termination.  No voluntary reduction or termination of the Revolving Credit Commitment may be reinstated.

2-3.   Revolving Credit Loan Requests.

(a)  Subject to the provisions of this Agreement, Revolving Credit Loans duly and timely requested by the Borrower shall be made pursuant hereto; provided that:

(i)   Such requested Revolving Credit Loans shall not exceed the then applicable Availability.

(ii)   No more than one (1) request for Revolving Credit Loans may be made per four (4) week period after the Effective Date, unless otherwise consented to by the Lender with the prior written approval of the Oversight Board.

(iii)   The Revolving Credit has not been suspended as provided in Section 2-3(e).

(iv)   Such requested Revolving Credit Loans shall be in an amount equal to the amount of Eligible Uses as set forth in the then applicable approved Budget for the four (4) week period beginning two weeks after the Budget is submitted, plus the Eligible Uses Variance for such period, minus the projected aggregate amount, if any, of unrestricted and uncommitted cash remaining in the Segregated Account on the first day of such four (4) week period or such other amount as may be requested by the Borrower and agreed to by the Lender and the Oversight Board, each in their sole discretion; provided that, such other amounts shall be reflected in the subsequent Budget.

(b)  Requests for loans and advances under the Revolving Credit shall be made by an irrevocable written request by a Responsible Officer delivered to the Lender and the Oversight Board.  Such notice must be received by Lender and the Oversight Board in writing (email to suffice) no later than 1:00 p.m. (AST), one (1) Business Day prior to the date that is the requested funding date consistent with the Proposed Budget delivered by the Borrower and approved by the Lender and the Oversight Board pursuant to Section 5-6(b)Funding Date.

(c)  Any request for a Revolving Credit Loan which is made after the applicable deadline therefor, as set forth above, shall be deemed to have been made at the opening of business on the then next Business Day.

(d) The Lender may rely on any request for a loan or advance, or other financial accommodation under the Revolving Credit which the Lender, in good faith, believes to have been made by a Person duly authorized to act on behalf of the Borrower.

(e) Upon the occurrence, and during the continuance, from time to time of any Suspension Event:

(i) The Lender may suspend the Revolving Credit.

(ii) The Lender shall not be obligated, during such suspension, to make any loans or advance, or to provide any financial accommodation hereunder; provided that, solely with respect to clause (2) of the definition of Suspension Event, the Lender may agree, with the prior written consent of the Oversight Board, to fund Revolving Credit Loans notwithstanding the occurrence and continuation of such Suspension Event.

2-4.    Making of Revolving Credit Loans.

(a) The Lender shall make the Revolving Credit Loans available to the Borrower by depositing such amount requested in the Segregated Account on the requested ~~funding date~~Funding Date therefore pursuant to the then-applicable Budget approved in accordance with Section 5-~~6~~5(b); provided, however, that the Lender shall not have the obligation to make the Revolving Credit Loan, and the Lender shall not make the Revolving Credit Loan available to the Borrower unless all applicable conditions precedent set forth in Article 3 have been satisfied in full (or waived by the Lender with the consent of the Oversight Board, each in their sole discretion).

(b) An advance shall be deemed to have been made under the Revolving Credit (and the Borrower shall be indebted to the Lender for the amount thereof immediately) at the Lender's deposit of the proceeds of such loan or advance to the Segregated Account.

2-5.    The Notes.   The obligation to repay ~~loans and advances under~~ the Revolving Credit Loans, with interest as provided herein, may, at the request of Lender, be evidenced by promissory notes (each, a "**Revolving Credit Note**") in the form of **EXHIBIT 2-5**, annexed hereto, executed by the Borrower.   Neither the original nor a copy of a Revolving Credit Note shall be required, however, to establish or prove any Liability.   In the event that a Revolving Credit Note is ever lost, mutilated, or destroyed, upon receipt of an indemnification with respect to the lost Revolving Credit Note from the Lender in form and substance reasonably satisfactory to the Borrower and the Lender, the Borrower shall execute a replacement thereof and deliver such replacement to the Lender.

2-6.    Payment of the Revolving Credit Loans.

(a) The Borrower may repay all or any portion of the principal balance of the Revolving Credit Loans without premium or penalty from time to time (and without any permanent reduction of the Revolving Credit Commitment) until the Termination Date.

(b)    (i)    The Borrower, without notice or demand from the Lender, shall pay the Lender that amount, from time to time, which is necessary so that the unpaid balance of the Revolving Credit Loans does not exceed the Revolving Loan Commitment then in effect.

(ii)    Upon the Borrower's receipt of any Revenues the Borrower shall apply such Revenues to the repayment of the outstanding Revolving Credit Loans; provided, that the Borrower may retain Revenues sufficient to (i) pay budgeted expenses for Ineligible Uses

provided for in the ~~13-Week~~ Budget ~~plus~~(inclusive of the Ineligible ~~Use~~Uses Variance), expenses for Ineligible Uses that are subject to the Carve-Out, or any FEMA reimbursable expense for contracts that have been obligated by FEMA and approved by the Oversight Board and (ii) maintain an operating reserve of up to $300,000,000.00 in the Operating Reserve Fund (which funds can be used at the discretion of the Borrower for expenses for Eligible Uses provided for in the ~~13-Week~~ Budget or for expenses for Ineligible Uses provided for in the ~~13-Week~~ Budget, expenses for Ineligible Uses that are subject to the Carve-Out, or any FEMA reimbursable expense for contracts that have been obligated by FEMA or any other federal entity and approved by the Oversight Board).

(c) The Lender shall endeavor to cause those applications of payments (if any), pursuant to Section 2-6(a) against Revolving Credit Loans then outstanding in such manner as results in the least cost to the Borrower, but shall not have any affirmative obligation to do so nor liability on account of the Lender's failure to have done so.

(d) The Borrower shall repay the then entire unpaid balance (except to the extent any Revolving Credit Loans are forgiven pursuant to Section 2-6(e)) of all Liabilities on the Maturity Date.

(e) Notwithstanding anything to the contrary contained herein, in the event that any proceeds of a Commonwealth Financing are used to fund any loans to the Borrower, and such Commonwealth Financing is subsequently forgiven by the lender under such Commonwealth Financing, the Revolving Credit Loans (including without limitation, any accrued and unpaid interest on such Revolving Credit Loans) shall be forgiven on the same terms and conditions as such Commonwealth Financing is forgiven (and the corresponding Revolving Credit Commitment permanently reduced) in an amount equal to the amount of the Commonwealth Financing that is allocated to be forgiven with respect to any loans to the Borrower.

2-7.    <u>Interest Rates</u>.

(a) All Revolving Credit Loan shall bear interest commencing on the Funding Date of such Revolving Credit Loan according to the following schedule:

| Interest Period | Interest Rate |
| --- | --- |
| Commencing with the Effective Date up to and including the date which is the six (6) month anniversary of the Effective Date. | 0.00% |
| After the date which is the six (6) month anniversary of the Effective Date up to and including the date which is the twelve (12) month anniversary of the Effective Date. | 0.50% |
| After the date which is the twelve (12) month anniversary of such Effective Date up to and including the date which is the eighteen (18) month anniversary of the Effective Date. | 1.00% |
| After the date which is the eighteen (18) month anniversary of the Effective Date up to and including the date which is the twenty-four (24) month anniversary of | 1.50% |

| Interest Period | Interest Rate |
|---|---|
| the Effective Date. | |
| After the date which is the twenty-four (24) month anniversary of the Effective Date up to and including the date which is the thirty (30) month anniversary of the Effective Date. | 2.00% |
| After the date which is the thirty (30) month anniversary of the Effective Date up to and including the date which is the thirty-six (36) month anniversary of the Effective Date. | 2.50% |
| After the date which is the thirty-six (36) month anniversary of the Effective Date. | 3.00% |

Provided that, notwithstanding anything to the contrary contained herein, in the event the Lender funds or refinances any Revolving Credit Loans hereunder with the proceeds of a Commonwealth Financing, the interest rates on all other such funded or refinanced Revolving Credit Loans then outstanding shall automatically, and without any further action by the Lender, accrue interest at the rate equal to the interest rates on the Revolving Credit Loans financed with such Commonwealth Financing. Any amounts of Revolving Credit Loans not funded or refinanced with any Commonwealth Financing shall remain at the above rates.

(b) The Borrower shall pay accrued and unpaid interest on each Revolving Credit Loan in arrears as follows:

(i) On each Interest Payment Date.

(ii) On the Termination Date and on the End Date.

(iii) Following the occurrence, and during the continuance, of any Event of Default, with such frequency as may be determined by the Lender.

Provided that, notwithstanding anything to the contrary contained herein, upon the issuance of any Commonwealth Financing, the Revolving Credit Loans funded or refinanced from such Commonwealth Facility shall hereinafter be payable on the same interest payment dates provided for with respect to the Commonwealth Financing.

(c) Following the occurrence, and during the continuance, of any Event of Default (and whether or not the Lender exercises the Lender's rights on account thereof), all Revolving Credit Loans shall bear interest at a rate which is the aggregate of the interest rate then in effect plus two percent (2.00%) per annum, unless the Lender, with the prior written consent of the Oversight Board, elects not to exercise its rights to increase the interest rate in effect by said two percent (2.00%) per annum.

(d) All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).

2-8.     Lender's and Oversight Board's Discretion.

Each reference in the Loan Documents to the exercise of discretion or the like by the Lender or the Oversight Board shall be to its exercise of such party's judgment, in good faith, based upon such party's consideration of any such factor as such party deems appropriate.

**Article 3 - Conditions Precedent**:

3-1.     Conditions Precedent to the Effective Date.  As a condition to the effectiveness of this Agreement and the availability of ~~Interim~~ Revolving Credit Commitment, each of the following documents (each in form and substance satisfactory to the Lender and the Oversight Board) shall have been delivered to the Lender, and the following conditions shall have been satisfied or waived by the Lender and the Oversight Board:

(a)  Corporate Due Diligence.

(i)     A Certificate of the Secretary of the Borrower's governing board of the due adoption, continued effectiveness, and setting forth the texts of, the ~~resolution~~resolutions (including the resolutions of PREPA's governing board) adopted in connection with the establishment of the loan arrangement contemplated by the Loan Documents and attesting to the true signatures of each Person authorized as a signatory to any of the Loan Documents.

(ii)    The Initial Budget certified by a Responsible Officer of the Borrower, certifying that the projections therein have been prepared in good faith based on reasonable assumptions.

(b)  Representations and Warranties.  Each of the representations made by or on behalf of Borrower in this Agreement or in any of the other Loan Documents shall be true and complete in all material respects as of the date as of which such representation or warranty was made, except in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects.

(c)  No Suspension Event.  No Suspension Event shall then exist.

(d)  Execution and Delivery of Loan Documents.  This Agreement and the other Loan Documents shall have been duly executed and delivered by the parties thereto, and shall be in full force and effect and shall be in form and substance satisfactory to the Lender and the Oversight Board.

(e)  ~~Interim~~ Financing Order.  The ~~Interim~~ Financing Order (i) shall have been entered on the docket of the Title III Court on or before the Effective Date and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Lender and the Oversight Board, each in their sole discretion; and, if the ~~Interim~~ Financing Order is the subject of a pending appeal in any respect, neither the making of the Revolving Credit Loans, nor the performance by Borrower of any of its obligations hereunder, under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.  Such ~~Interim~~ Financing Order shall authorize and approve the Revolving Credit Loans and the Loan Documents contemplated hereby and thereby.  All motions, orders and other documents to be filed with and submitted to the Title III Court in connection therewith shall be in form and substance satisfactory to the Lender and the Oversight Board, each in their sole discretion

(f) <u>Governmental Approvals</u>.  All governmental approvals necessary in connection with the closing of this Agreement and the transactions contemplated hereby and such approvals shall have been received and be in full force and effect.

(g) <u>Other Proceedings</u>.  No unstayed action, suit, investigation or other proceeding (including without limitation, the enactment or promulgation of a statute or rule) by or before any arbitrator or any governmental authority with proper jurisdiction shall be threatened in writing or pending (other than the Title III Case), and no preliminary or permanent injunction or order by a state or federal court shall have been entered, in connection with this Agreement, any other Loan Document, or any transaction contemplated hereby or thereby, excluding any proceedings challenging this Agreement or the Financing ~~Orders~~Order (but only so long as the ~~Interim~~ Financing Order is in effect and has not been stayed, reversed or modified without the prior written consent of the Lender and the Oversight Board).

(h) <u>Consents</u>.  Borrower shall have received any consents, permits, licenses and approvals required in accordance with applicable law, or in accordance with any document, agreement, instrument or arrangement to which Borrower is a party, in connection with the execution, delivery, performance, validity and enforceability of this Agreement and the other Loan Documents, each in form and substance satisfactory to the Lender and the Oversight Board.

A request by the Borrower for a loan or advance, or other financial accommodation under the Revolving Credit shall be irrevocable and shall constitute certification by the Borrower that as of the date of such request, each of the foregoing conditions has been satisfied.

~~3-2.     Conditions Precedent to Fundings on and after the Final Order Entry Date.   As a condition to the availability of Final Revolving Credit Commitment: the Final Financing Order (i) shall have been entered on the docket of the Title III Court on or before the date that is 30 days after the Effective Date and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Lender and the Oversight Board, each in their sole discretion; and, if the Final Financing Order is the subject of a pending appeal in any respect, neither the making of the Revolving Credit Loans on or after the Final Order Entry Date, nor the performance by Borrower of any of its obligations hereunder, under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.   Such Final Financing Order shall authorize and approve the Revolving Credit Loans, this Agreement and the Loan Documents contemplated hereby and thereby.   All motions, orders and other documents to be filed with and submitted to the Title III Court in connection therewith shall be in form and substance satisfactory to the Lender and the Oversight Board, each in their sole discretion.~~

<u>3-2.</u>     ~~3-3.~~ <u>Conditions Precedent to All Fundings</u>.   As a condition to the availability of Revolving Credit Loans, the following conditions shall have been satisfied:

(a) <u>No Suspension Event</u>.  No Suspension Event shall then exist.

(b) <u>Representations and Warranties</u>.  Each of the representations made by or on behalf of Borrower in this Agreement or in any of the other Loan Documents shall be true and complete in all material respects as of the date as of which such representation or warranty was made, except in the case of any representation and warranty qualified by materiality, they shall be true and correct in all respects.

(c) <u>Other Conditions</u>.  The conditions set forth in Section 2-3 shall have been satisfied.

(d) <u>Other Proceedings</u>.   No unstayed action, suit, investigation or other proceeding (including without limitation, the enactment or promulgation of a statute or rule) by or before any arbitrator or any governmental authority with proper jurisdiction shall be threatened in writing or pending (other than the Title III Case), and no preliminary or permanent injunction or order by a state or federal court shall have been entered, in connection with this Agreement, any other Loan Document, or any transaction contemplated hereby or thereby, excluding any proceedings challenging this Agreement or the Financing ~~Orders~~Order  (but only so long as, ~~(x) prior to the Final Revolving Credit Commitment Effective Date, the Interim Financing Order is in effect and has not been stayed, reversed or modified without the prior consent of the Lender and the Oversight Board and (y) on and after the Final Revolving Credit Commitment Effective Date, the Final~~the Financing Order is in effect and has not been stayed, reversed or modified without the prior written consent of the Lender and the Oversight Board).

(e) <u>Financing ~~Orders~~Order</u>.   The ~~applicable~~ Financing Order shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Lender and the Oversight Board, each in their sole discretion.

(f) <u>Borrowing Request Notice</u>.   The Lender and the Oversight Board shall have received a borrowing request in notice in the form of **EXHIBIT 2-4** hereto.

A request by the Borrower for a loan or advance, or other financial accommodation under the Revolving Credit shall be irrevocable and shall constitute certification by the Borrower that as of the date of such request, each of the foregoing conditions has been satisfied.

**Article 4 - General Representations, Covenants and Warranties**:

To induce the Lender to establish the loan arrangement contemplated herein and to make loans and advances and to provide financial accommodations under the Revolving Credit (each of which loans shall be deemed to have been made in reliance thereupon), the Borrower, in addition to all other representations, warranties, and covenants made by the Borrower in any other Loan Document, makes those representations, warranties, and covenants included in this Agreement.

4-1.   <u>Payment and Performance of Liabilities</u>.   The Borrower shall pay each Liability when due and shall promptly, punctually, and faithfully perform each other Liability.

4-2.   <u>Due Organization - Corporate Authorization - No Conflicts</u>.

(a) Borrower has all requisite corporate power and authority to execute and deliver all Loan Documents to which Borrower is a party and has all requisite corporate power to perform all Liabilities.

(b) The execution and delivery by Borrower of each Loan Document to which it is a party; Borrower's consummation of the transactions contemplated by such Loan Documents (including, without limitation, the creation of security interests by Borrower as contemplated hereby); Borrower's performance under those of the Loan Documents to which it is a party; the borrowings hereunder; and the use of the proceeds thereof:

(i)     Have been duly authorized by all necessary corporate action and do not, and will not, contravene in any material respect any provision of the organizational documents of the Borrower.

17

(ii)     Will not result in the creation or imposition of, or the obligation to create or impose, any Encumbrance upon any assets of the Borrower and/or its Subsidiaries pursuant to any obligation, except pursuant to the Loan Documents.

(c) The Loan Documents have been duly executed and delivered by Borrower subject to the entry of the Financing ~~Orders~~Order and the terms thereof, and are the legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject to the Financing ~~Orders~~Order.

4-3.     Title to Assets.

~~(a)~~ The Borrower and its Subsidiaries are, and shall hereafter remain, the owner of, or holder of all rights in and to, the Collateral free and clear of all Encumbrances with the exceptions of the following (the "**Permitted Encumbrances**"):

(i)     Encumbrances in favor of the Lender to secure the Collateral.

(ii)     Encumbrances with respect to the Carve-Out.

(iii)     Encumbrances in favor of the Pre-Petition Bond Credit Parties.

provided, however, that after entry of the Financing ~~Orders~~Order, such Permitted Encumbrances (other than the Carve-Out), while any portion of the Liabilities remain outstanding, shall at all times be junior and subordinate to the Encumbrances granted under the Loan Documents and the Financing ~~Orders~~Order.

4-4.     Insurance Policies.

(a) To the knowledge of the Borrower, each material insurance policy is in full force and effect. None of the issuers (to the Borrower's knowledge) of any such policy, have provided notice that Borrower is in default or violation of any such policy. Borrower shall advise the Lender and the Oversight Board of each material claim made by Borrower or any of its Subsidiaries under any policy of insurance.

(b) Borrower shall have, and shall cause each of its Subsidiaries to have, and maintain at all times insurance covering such risks, in such amounts, containing such terms, in such form, for such periods, and written by such companies as may be satisfactory to the Lender and the Oversight Board (it being understood any agreed that the insurance coverage in place on the Effective Date is reasonably satisfactory to the Lender and the Oversight Board).

4-5.     Investments.   The Borrower shall not make, and shall not permit any of its Subsidiaries to make, any investments in, nor acquire the Indebtedness of, any Person; provided, however, the foregoing does not prohibit any of the following:

(a) The investments in any Subsidiary existing on the Effective Date and/or made in the ordinary course of business and in accordance with the Budget.

(b) ~~Acquire~~Acquiring any assets or equity interests in another Person other than by the making of Capital Expenditures to the extent permitted under the Budget.

4-6.     Loans.   The Borrower shall not make any loans or advances to, nor acquire the Indebtedness of, any Person; provided, however, the foregoing does not prohibit any of the following:

(a)  Any loans existing as of the Effective Date;

(b)  Any loans contemplated in the Budget; and

(c)  The Revolving Credit Loans.

4-7.   <u>Line of Business</u>.  The Borrower shall not engage, and shall not permit any of its Subsidiaries to engage, in any business other than the business in which it is currently engaged.

4-8.   <u>Additional Assurances</u>.  Borrower shall execute and deliver to the Lender such instruments, documents, and papers, and shall do all such things from time to time hereafter as the Lender may request to carry into effect the provisions and intent of this Agreement; to protect and perfect the Lender's security interests in the Collateral; and to comply in all material respects with all applicable statutes and laws.  Borrower shall execute all such instruments as may be reasonably required by the Lender or  the Oversight Board with respect to creation or perfection of the security interests created herein.

4-9.   <u>Adequacy of Disclosure</u>.  To the knowledge of the Responsible Officers, no document, instrument, agreement, or paper provided to the Lender or the Oversight Board by or on behalf of Borrower in connection with the execution of this Agreement or the Loan Documents contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements therein not misleading.

4-10.   <u>Prepayments of Indebtedness</u>.  The Borrower will not make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash securities or other property) of or in respect of principal of or interest on any Indebtedness ((other than the Revolving Credit Loans), including any amounts with respect to the Pre-Petition Bond), except for Eligible Uses in accordance with the approved Budget and Ineligible Uses in accordance with this Agreement and the Financing ~~Orders~~Order.

4-11.   <u>Receivables</u>.    From and after the Effective Date, Borrower agrees that it shall use its commercially reasonable efforts to collect receivables.

4-12.   <u>Consents</u>.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any governmental authority or any other Person is required in connection with the execution, delivery or performance by, or enforcement against, Borrower of this Agreement or any other Loan Document, except for (a) the perfection or maintenance of the liens created hereunder or under any other Loan Document (including the first priority nature thereof) or (b) such as have been obtained or made and are in full force and effect.

4-13.   <u>Use of Proceeds</u>.  The Borrower shall not, nor shall it permit any of its Subsidiaries to use the proceeds of the Revolving Credit Loans for any purposes other than to pay or fund (i)  the Borrower's operations, including, without limitation, employee payroll and benefits, facilities maintenance costs that are not Capital Expenditures or infrastructure improvements, and normal operational materials, supplies, fuel and power supplies, vendor and service payments (collectively "**Eligible Uses**") and (ii) ~~reimbursement of~~in the event Commonwealth Financing becomes available, proceeds of such Commonwealth Financing may be used to reimburse amounts expended for Eligible Uses from September 6, 2017 until the Effective Date, if such Commonwealth financing permits such reimbursement, and with respect to each of the foregoing clauses (i) and (ii), in each case in accordance with the Budget and the Financing ~~Orders~~Order; provided, however, that none of the proceeds of the Revolving Credit Loans and none of the Liabilities, the Collateral or the Carve-Out may be used for any

purpose prohibited by the Title III Court or the Financing ~~Orders~~Order; provided further, that disbursements that have been obligated to be paid from funds provided by FEMA or any other federal entity shall not be subject to the limitation of the Eligible Uses Variance, Ineligible Uses Variance or otherwise limited by the Budget. Notwithstanding anything to the contrary contained herein and unless otherwise specifically consented to previously in writing by the Lender and the Oversight Board, the proceeds of the Revolving Credit Loans shall not be used for (1) debt service (including, for the avoidance of doubt, payment of any Indebtedness existing prior to the Effective Date), (2) capital improvements, (3) repair or restoration of damaged public facilities, (4) paying the non-federal share of any federal program, (5) tax refunds, (6) lobbying, (7) Title III costs (including but not limited to judgments arising from the Title III Case and related cases, and legal or advisory fees), (8) deposits, transfers, or payments to accrual accounts, reserve funds, or contingency accounts that do not represent an actual, immediate cash disbursement to continue government operations for essential services, (9) administrative costs of federal disaster assistance grants and loans, (10) disaster related expenditures eligible for reimbursement from the United States Department of the Treasury, (11) any expense that is not a "Current Expense" as defined under the Pre-Petition Trust Agreement or (12) any expense that is not authorized by the Joint Resolution (the foregoing clauses (1) – (11) collectively, "**Ineligible Uses**"). For the avoidance of doubt none of the proceeds of the Revolving Credit Loans shall be used for the payment of Professional Fees but such Professional Fees may be paid from other sources of funds.

4-14. <u>Subsidiaries</u>. As of the Effective Date none of the Borrower's Subsidiaries own any material assets or other property with a fair market value in excess of $[_____].

4-15. <u>Cash Management System</u>. Borrower shall maintain a cash management system, which shall be the same or substantially similar to their pre-petition cash management system, with any changes or other adjustments made by the Borrower to be satisfactory to the Lender and the Oversight Board, each in their sole discretion (the "**Cash Management System**"); provided that, Borrower may only withdraw or transfer from its accounts (including any draw from the Segregated Account to the Borrower's Operating Account to make disbursements in accordance with Section 4-13) amounts necessary to fund (a) expenses during the four week period as set forth in the relevant Budget, (b) expenses that are subject to the Carve-Out, (c) disbursements that are to be paid from funds provided by FEMA or any other federal entity that have been obligated and (d) payments of any FEMA reimbursable expenses for contracts that have been obligated by FEMA and approved by the Oversight Board in its sole discretion and for the avoidance of doubt .

4-16. <u>Case Matters</u>.

(a) All Professional Fees at any time paid by Borrower shall be paid by Borrower pursuant to procedures established by an order of the Title III Court and shall not be subject to the Budget or tested as part of the Ineligible Uses Variance.

(b) Without the prior written consent of the Lender and the Oversight Board, the Borrower shall not seek or consent to any order (i) dismissing any of the Title III Case under Sections 105 or 930 of the Bankruptcy Code or otherwise or (ii) appointing a receiver for Borrower or a trustee under Section 926 of the Bankruptcy Code for the purpose of pursuing a cause of action related to the transactions contemplated by this Agreement.

4-17. <u>Amendments to ~~Orders~~Financing Order</u>. Borrower shall not amend, modify or waive (or make any payment consistent with an amendment, modification or waiver of), or apply to the Title III Court for authority to make any amendment, modification or waiver of, any provision of the ~~Interim Financing Order or the Final~~ Financing Order without in each case the prior written consent of the Lender and the Oversight Board.

4-18.   <u>Operating Reserve Fund</u>.   The Borrower shall be permitted to maintain and use the Operating Reserve Fund at any time after the delivery of the Budget at the discretion of the Borrower for expenses for (i) Eligible Uses provided for in the Budget, (ii) budgeted expenses for Ineligible Uses provided for in the Budget, (iii) expenses for Ineligible Uses that are subject to the Carve-Out or (iv) any FEMA reimbursable expenses for contracts that have been obligated by FEMA and approved by the Oversight Board in its sole discretion.

4-19.   <u>Refinancing Indebtedness</u>.

(a)  If at any time after the Effective Date any Refinancing Indebtedness is available to the Borrower, the Borrower shall promptly refinance (to the extent the documentation of such Refinancing Indebtedness permits refinancing of the existing Revolving Credit Loans) and prepay the Revolving Credit Loans (and permanently reduce the Revolving Credit Commitment), in an aggregate amount equal to the amount of Refinancing Indebtedness borrowed by the Borrower at such time; <u>provided</u> that, such Refinancing Indebtedness be offered to the Borrower on equal or superior terms as the Revolving Credit Loans then outstanding, as reasonably determined by the Borrower in good faith in consultation the Commonwealth and the Oversight Board; <u>provided further</u>, that the acceptance of any such Refinancing Indebtedness shall be subject to the prior written consent of the Oversight Board as required by PROMESA.

(b)  ~~Upon receipt of the certified copy of the Interim Financing Order, the Borrower shall publically post the Term Sheet on EMMA for the purpose of soliciting~~The Borrower (through Puerto Rico Fiscal Agency & Financial Advisory Authority) shall reasonably consider all proposals submitted to the Borrower with respect to any third-party capital proposed to ~~refinancing~~refinance the Revolving Credit Loans; provided that, in considering such proposals, the Borrower shall take into consideration, in the Borrower's reasonable judgment, all economic terms and other terms and conditions of such refinancing proposal.  The Borrower and the Lender acknowledge and agree that any such proposed refinancing pursuant to this clause (b) of Section 4-19 shall not be permitted unless approved by the Oversight Board.

**Article 5 - Financial Reporting and Performance Covenants**:

5-1.   <u>Prompt Notice to Lender and the Oversight Board</u>.

(a)  The Borrower shall provide the Lender and the Oversight Board with written notice promptly upon the occurrence of any of the following events, which written notice shall be with reasonable particularity as to the facts and circumstances in respect of which such notice is being given (excluding, in each case, any information publicly disclosed in any document filed with the Title III Court):

(i)   Any change in Borrower's executive officers.

(ii)   The occurrence of any Suspension Event pursuant to clause (1) of the definition thereof that has not been cured by Borrower or waived by the Lender and the Oversight Board.

(iii)   Any decision on the part of Borrower to discharge Borrower's present independent accountants or any withdrawal or resignation by such independent accountants from their acting in such capacity.

5-2.    <u>Weekly Reports</u>.  On the Wednesday of each week following the Effective Date, the Borrower shall provide the Lender and the Oversight Board, with copies made available to the Committee and the creditors of the Lender and the Borrower who are party to the Mediation Agreement or a customary non-disclosure agreement with the Borrower, with (i) an update to the Budget (which shall include reconciliation of actual results with the prior Budget), (ii) cash balance, (iii) total accounts payable and, if available, accounts payable aging schedule, (iv) grid restoration report for so long as any restoration activities are ongoing, (v) generation restoration report for so long as any restoration activities are ongoing and (vi) a FEMA Flash Report for so long as applicable.

5-3.    <u>Monthly Reports</u>.  No later than the fifteenth (15th) day of each month following the Effective Date, the Borrower shall provide the Lender and the Oversight Board, with copies made available to the Committee and the creditors of the Lender and the Borrower who are party to the Mediation Agreement or a customary non-disclosure agreement with the Borrower, with an updated schedule of accounts receivable, and, if available, accounts receivables aging schedule.

5-4.    <u>Fiscal Year</u>.  The Borrower shall not change its fiscal year, or the accounting policies or reporting practices of Borrower, except as required by GAAP; <u>provided</u> that, to the extent any such changes are required by GAAP, Borrower shall promptly deliver notice of same to the Lender and the Oversight Board.

5-5.    <u>Disbursements, Budget Variance and Proposed Budget</u>.

(a)  The Borrower and its Subsidiaries may not make any disbursements other than those set forth in the Budget and, disbursements covered by the Carve-Out, disbursements for any FEMA reimbursable expenses for contracts that have been obligated by FEMA and approved by the Oversight Board and disbursements that are to be paid from funds provided by FEMA or any other federal entity that have been obligated.

(b)  On the Friday of the second week after the Effective Date, and every four (4) weeks thereafter, the Borrower shall propose an updated budget (the "**Proposed Budget**") which shall reflect the Borrower's good faith projection of all weekly cash receipts and disbursements in connection with the operation of Borrower's business during the thirteen-week period commencing two (2) weeks after delivery of such Proposed Budget, including but not limited to, collections, payroll, Capital Expenditures, Professional Fees and other cash outlays, in each case, consistent in form substance (other than dollar amounts) with the Initial Budget, and all other reasonable financial information (including, without limitation, demonstrating that total disbursements of (X) Eligible Uses for the immediately preceding Budget period have not exceeded the Eligible Uses Variance for such period and (Y) Ineligible Uses for the immediately preceding Budget period have not exceeded the Ineligible Uses Variance for such period) and supporting data as requested by the Lender or the Oversight Board.  The Lender and the Oversight Board shall have until noon (AST) fourteen (14) days after receipt of such Proposed Budget to provide the Borrower with written approval or objection thereto each in their sole and absolute discretion. Absent a written objection, the Proposed Budget shall become the "Budget" then in effect.  If the Oversight Board or Lenders objectLender objects to such Proposed Budget, then the current Budget will remain in effect until such time as the Borrower submits a Proposed Budget that is approved by both the Oversight Board and the Lender. If at any time there is no approved Budget in effect for the current period, Borrower shall not be entitled to advances hereunder.  Professional Fees shall be included in the Budget for informational purposes only and shall be paid when and as allowed by the Title III Court at any time and shall not be subject to the Budget.

(c)  In connection with the Proposed Budget, and as otherwise reasonably requested by the Lender or the Oversight Board, the Borrower shall provide reasonable financial and operational information and supporting data requested by the Lender and the Oversight Board in connection with the Proposed Budget.

## Article 6 - Cash Management.  Payment of Liabilities:

6-1.    The Segregated, Operating and Other Accounts.

(a)  Schedule 6-1 sets forth the accounts that have been established by the Borrower as of the date of this Agreement, including the Operating Account, Segregated Account, the Operating Reserve Fund and the Other Accounts.

(b)  The contents of the Operating Account, the Operating Reserve Fund, the Other Accounts and the Segregated Account constitute Collateral.

(c)  Borrower shall not establish any DDA other that as contemplated by this Agreement and the Financing ~~Orders~~Order.

(d)  The Revolving Credit Loans shall be deposited in the Segregated Account.

6-2.    The Operating Account.  Except as otherwise specifically provided in, or permitted by, this Agreement and the Financing ~~Orders~~Order, all checks shall be drawn by Borrower upon, and other disbursements shall be made by Borrower solely from, the Operating Account, the Operating Reserve Fund, the Other Accounts and the Segregated Account.

## Article 7 - Grant of Security Interest:

7-1.    Grant of Security Interest.  To secure the prompt, punctual, and faithful performance of all and each of the Liabilities, the Borrower hereby grants to the Lender a continuing first priority security interest in and to (subject in priority only to the Carve-Out), and assigns to the Lender all of the Borrower's right, title and interest in and to any Revenues and any Revolving Credit Loan Proceeds, including each account into which the same are deposited or otherwise received or transferred, including the Segregated Account, the Operating Account, the Operating Reserve Fund, the Other Accounts, in each case whether now owned, or hereafter acquired or arising (all of which, together with any other property in which the Lender may in the future be granted a security interest, is referred to herein as the "**Collateral**") and all liens, guaranties, rights, remedies, and privileges pertaining to, and any of the items described in the foregoing.

7-2.    Extent and Duration of Security Interest.  This grant of a security interest shall continue in full force and effect applicable to all Liabilities, until the End Date and the specific termination in writing by a duly authorized officer of the Lender (which the Lender agrees to do on the End Date) of the security interest granted herein.

7-3.    Certain Perfection Actions.   Notwithstanding the perfection of any security interest granted hereunder pursuant to the order of the Title III Court under the ~~applicable~~ Financing Order, Borrower shall, at Borrower's expense, perform all steps reasonably  requested by the Lender at any time to perfect, maintain, protect, and enforce the Post-Petition Liens.  To the fullest extent permitted by applicable law, the Lender may file one or more financing statements disclosing the Post-Petition  Liens on the Collateral.

7-4.   <u>No Filings Required; Priority</u>.  The Liens and security interests referred to herein shall be deemed valid and perfected by entry of the Financing Order. The Lender shall not be required to file any financing statements,  notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to this Agreement, any other Loan Document or the Financing ~~Orders~~Order.  The Post-Petition  Liens in the Collateral will not be junior in priority to any Lien other than the Carve-Out (to the extent set forth in the Financing ~~Orders~~Order).

**Article 8 - Events of Default**:

The occurrence of any event described in this Article 8 shall constitute an "**Event of Default**" herein.  The occurrence and continuance of any Event of Default shall also constitute, without notice or demand, a default under all other Loan Documents, whether such Loan Documents now exist or hereafter arise.

8-1.   <u>Failure To Make Payments</u>.  The failure by the Borrower to pay when due (or upon demand, if payable on demand) any payment of any Liability, including, without limitation, any such payment obligations under the Financing ~~Orders~~Order.

8-2.   <u>Failure to Perform Covenant or Liability</u>.  The failure by Borrower to promptly, punctually and faithfully perform, discharge, or comply with any covenant not otherwise specified in this Article 8, in each instance within thirty (30) days from written notice from the Lender after the date on which such covenant was to have been performed, discharged or complied with, to the extent that such covenant has not been otherwise waived by the Lender and the Oversight Board or cured by the Borrower.

8-3.   <u>Termination of Liens</u>.  Any Lien with respect to any material portion of the Collateral intended to be secured hereby ceases to be, or is not valid, perfected and prior to all other Liens (other than in respect of the Carve-Out) or is terminated, revoked, or declared void.

8-4.   <u>Case Matters</u>.  Any breach, ~~non compliance~~noncompliance or other violation of Section 4-~~19~~16(b).

8-5.   <u>Financing Order Modifications; Other Administrative Claims; Other Liens</u>.  An order shall be entered with respect to the Title III Case without the prior written consent of the Lender and the Oversight Board, (i) to revoke, reverse, stay, vacate or otherwise modify the Financing ~~Orders~~Order, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of Lender in respect of the Liabilities other than the Carve-Out pursuant to the Financing ~~Orders~~Order or (iii) granting or permitting the grant of a lien that is equal in priority with or senior to the liens securing the Liabilities other than the Carve-Out pursuant to the Financing ~~Orders~~Order.

8-6.   <u>Automatic Stay</u>.  An order shall be entered that is not stayed pending appeal granting relief from the Automatic Stay to any creditor of Borrower (other than the Lender) with respect to any claim against any material portion of the Collateral that, when taken together with all other orders entered on the docket of the Title III Court that are not stayed pending appeal granting relief from the Automatic Stay with respect to any of the Collateral that could reasonably be expected to have a Material Adverse Effect.

8-7.   <u>Violation of Financing ~~Orders~~Order</u>.   A violation by the Borrower of any of the provisions of the Financing ~~Orders~~Order; which continues for thirty (30) days from written notice from the Lender after the date on which such violation occurred.

8-8.   <u>Adversary Proceedings</u>.   Borrower commences, or files a written statement, pleading or declaration in support of any person, in any litigation challenging or seeking to challenge the Post-Petition Liens against the Lender, except as may be permitted under the Financing ~~Orders~~Order.

8-9.   <u>Payment of Other Indebtedness</u>.   Borrower shall make any payment or grant adequate protection with respect to Indebtedness in violation of Section 4-10.

**Article 9 - Rights and Remedies Upon Default**:

In addition to all of the rights, remedies, powers, privileges, and discretions which the Lender is provided prior to the occurrence of an Event of Default, the Lender shall have the following rights and remedies upon the occurrence, and during the continuance, of any Event of Default.

9-1.   <u>Remedies</u>.   If an Event of Default exists, the Lender may at any time or times and in any order, upon notice to the Borrower as set forth herein, restrict the amount of or refuse to make any Revolving Credit Loan.   If an Event of Default exists, the Lender may do one or more of the following, in addition to the action described in the preceding sentence, at any time or times and in any order, under the ~~Interim Financing Order or the Final~~ Financing Order, or required by applicable law: (i) terminate the Revolving Credit Commitment, and thereupon the Revolving Credit Commitment shall terminate immediately, and (ii) upon thirty (30) days written notice, declare the Liabilities then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be immediately due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Revolving Credit Loans so declared to be immediately due and payable, together with accrued interest thereon and all fees and other obligations of Borrower accrued hereunder and under the other Loan Documents, shall become due and payable immediately, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by Borrower.   Except as otherwise provided in the Financing ~~Orders~~Order, the foregoing remedies may be exercised without demand and without further application to or order of the Title III Court.

9-2.   <u>Application of Proceeds</u>.   Notwithstanding anything herein to the contrary, (i) the Lender shall not take any action under this <u>Article 8</u> (or similar provisions of any Loan Document) except after compliance with any applicable notice requirements applicable thereto set forth in accordance with the Financing ~~Orders~~Order, and (ii) following the occurrence and during the continuance of an Event of Default, and the Lender declaring the Revolving Credit Commitment terminated and accelerating the Revolving Credit Loans pursuant to Sections ~~8~~9-1(i) or (ii) any Revenues thereafter received shall be applied on an ongoing basis, first, to pay any expenses that constitute the Carve-Out, second, to the payment of Eligible Uses in accordance with the Budget, third, (unless consented to previously in writing by the Lender and the Oversight Board) to the repayment of any outstanding Revolving Credit Loans under this Agreement, fourth, to the payment of any Current Expenses (as defined in the Pre-Petition Trust Agreement), or necessary operating expenses which do not constitute Eligible Uses and, fifth, the extent not covered by one of the proceeding categories in accordance with Article 5 of the Pre-Petition Trust Agreement.

**Article 10 - Notices**:

   10-1.   <u>Notice Addresses</u>.  All notices, demands, and other communications made in respect of this Agreement to the Lender, the Oversight Board or the Borrower (other than a request for a loan or advance or other financial accommodation) shall be made to the addresses listed below:

   If to the Lender:                    The Commonwealth of Puerto Rico
                                        [address]c/o O'Melveny & Myers LLP
                                        Times Square Tower
                                        7 Times Square
                                        New York, NY  10036
                                        Attention:
                                        Tel:
                                        Suzzanne Uhland
                                        Email:  suhland@omm.com

   With a copy to (which copy shall not constitute notice):

                                        [address]O'Melveny & Myers LLP
                                        Times Square Tower
                                        7 Times Square
                                        New York, NY  10036
                                        Attention:
                                        Fax:  Suzzanne Uhland
                                        Email:  suhland@omm.com

   If to the Borrower:                  Puerto   Rico   Electric   Power   Authority
                                        [address]
                                        Attention:
                                        Fax:
                                        Email:
                                        1110 Ponce de Leon Avenue
                                        San Juan, PR 00907
                                        Attn: Astrid I. Rodríguez Cruz
                                        Email: astrid.rodriguez@prepa.com

   With copies to (which copies shall not constitute notice):

                                        [address]
                                        Attention:
                                        Greenberg Traurig LLP
                                        200 Park Avenue
                                        New York, NY 10166
                                        Attn: Nancy A. Mitchell and Maria J. DiConza
                                        Fax: -
                                        212-801-6400
                                        Email: mitchelln@gtlaw.com and
                                        diconzam@gtlaw.com

   If to the Oversight Board:           The Financial Oversight and Management Board for
                                        Puerto Rico

[address]c/o Proskauer Rose LLP
11 Times Square
New York, NY 10036-8299
Attention:
Fax:
Email: Paul V. Possinger, Ehud Barak & Aaron
Bielenberg
Fax:  (312) 962-3551; (212) 996-2900
Email: ppossinger@proskauer.com;
ebarak@proskauer.com;
aaron_bielenberg@mckinsey.com

With copies to (which copies shall not constitute notice):

Proskauer Rose LLP
11 Times Square
New York, NY 10036-8299
Attention:  Paul V. Possinger &, Ehud Barak &
Aaron Bielenberg
Fax:  (312) 962-3551; (212) 996-2900
Email: ppossinger@proskauer.com;
ebarak@proskauer.com ppossinger@proskauer.com;
ebarak@proskauer.com;
aaron_bielenberg@mckinsey.com

10-2.   Notice Given.

(a)  Except as otherwise specifically provided herein, notices shall be deemed made and correspondence received, as follows (all times being local to the place of delivery or receipt):

(i)   By mail:  the sooner of when actually received or three (3) days following deposit in the United States mail, postage prepaid.

(ii)   By recognized overnight express delivery:  the Business Day following the day when sent.

(iii)   By Hand:  If delivered on a Business Day after 9:00 AM and no later than three (3) hours prior to the close of customary business hours of the recipient, when delivered.  Otherwise, at the opening of the then next Business Day.

(iv)   By Facsimile or electronic transmission, including email (which must include a header on which the party sending such transmission is indicated):  If sent on a Business Day after 9:00 AM and no later than three (3) hours prior to the close of customary business hours of the recipient, one (1) hour after being sent.  Otherwise, at the opening of the then next Business Day.

(b)  Rejection or refusal to accept delivery and inability to deliver because of a changed address or Facsimile Number for which no due notice was given shall each be deemed receipt of the notice sent.

**Article 11 - Term**:

11-1.   <u>Termination of Revolving Credit</u>.   The Revolving Credit (subject to suspension as provided in <u>Section 2-3(e)</u> hereof) shall remain in effect until the ~~Termination~~<u>Maturity</u> Date.

11-2.   <u>Effect of Termination</u>.   On the Termination Date, the Borrower shall pay the Lender (whether or not then due), in immediately available funds, all then Liabilities (other than indemnities, not then due and payable, which survive repayment of the Revolving Credit Loans and  termination of the Revolving Credit Commitment).   Until such payment, all provisions of this Agreement, other than those contained in Article 2 which place an obligation on the Lender to make any loans or advances or to provide financial accommodations under the Revolving Credit or otherwise, shall remain in full force and effect until all Liabilities (other than indemnities, not then due and payable, which survive repayment of the Revolving Credit Loans and termination of the Revolving Credit Commitment) shall have been paid in full.   The release by the Lender of the security and other collateral interests granted the Lender by the Borrower hereunder may be upon such conditions and indemnifications as the Lender may require to protect the Lender against and chargebacks, credits, returned items and any other reversal of payments which had been received by the Lender and applied toward such Liabilities.

**Article 12 - General**:

12-1.   <u>Successors</u> .   This Agreement shall be binding upon the Borrower and the Borrower's representatives and its successors, and shall inure to the benefit of the Lender and its successors; <u>provided</u>, <u>however</u>, no trustee or other fiduciary appointed with respect to the Borrower shall have any rights hereunder.

12-2.   <u>Protection of Assets</u>.   The Lender, in the Lender's discretion, and from time to time, may discharge any tax or Encumbrance on any of the Collateral, or take any other action that the Lender may deem necessary to preserve, collect, or realize upon any of the Collateral.   The Lender shall not have any obligation to undertake any of the foregoing and shall have no liability on account of any action so undertaken except where there is a specific finding in a judicial proceeding (in which the Lender has had an opportunity to be heard), from which finding no further appeal is available, that the Lender had acted in actual bad faith or in a grossly negligent manner.

12-3.   <u>Severability</u>.   Any determination that any provision of this Agreement or any application thereof is invalid, illegal, or unenforceable in any respect in any instance shall not affect the validity, legality, or enforceability of such provision in any other instance, or the validity, legality, or enforceability of any other provision of this Agreement.

12-4.   <u>Amendments; Course of Dealing</u>.

(a)   This Agreement and the other Loan Documents incorporate all discussions and negotiations between the Borrower and the Lender either express or implied, concerning the matters included herein and in such other instruments, any custom, usage, or course of dealings to the contrary notwithstanding.   No such discussions, negotiations, custom, usage,  or course of dealings shall limit, modify, or otherwise affect the provisions thereof.   No failure by the Lender to give notice to the Borrower of the Borrower's having failed to observe and comply with any warranty or covenant included in any Loan Document shall constitute a waiver of such warranty or covenant or the amendment of the subject Loan Document.

(b)   The Borrower may undertake any action otherwise prohibited hereby, and may omit to take any action otherwise required hereby, upon and with the express prior written consent of

28

the Lender and the Oversight Board.  No consent, modification, amendment, or waiver of any provision of any Loan Document shall be effective unless executed in writing by or on behalf of the party to be charged with such modification, amendment, or waiver.  Any modification, amendment, or waiver provided by the Lender or the Oversight Board shall be in reliance upon all representations and warranties theretofore made to the Lender and the Oversight Board by or on behalf of the Borrower (and any guarantor, endorser, or surety of the Liabilities) and consequently may be rescinded in the event that any of such representations or warranties was not true and complete in all material respects when given.

12-5.   Application of Proceeds.  Except as otherwise provided in Sections 6-21(d) and 109-2 hereof, the proceeds of any collection, sale, or disposition of the Collateral, or of any other payments received hereunder, shall be applied towards the Liabilities in such order and manner as the Lender and the Oversight Board determines, each in their sole discretion.  The Borrower shall remain liable for any deficiency remaining following such application.

12-6.   Copies and Facsimiles.  This Agreement and all documents which relate thereto, which have been or may be hereinafter furnished any of Borrower may be reproduced by Borrower by any photographic, microfilm, xerographic, digital imaging, or other process, and Borrower may destroy any document so reproduced.  Any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the regular course of business).  Any facsimile which bears proof of transmission shall be binding on the party which or on whose behalf such transmission was initiated and likewise shall be so admissible in evidence as if the original of such facsimile had been delivered to the party which or on whose behalf such transmission was received.

12-7.   Puerto Rico Law.  Except to the extent governed by the Bankruptcy Code, this Agreement and all rights and obligations hereunder, including matters of construction, validity, and performance, shall be governed by the laws of The Commonwealth of Puerto Rico (without giving effect to the conflicts of laws principles thereof).

12-8.   Consent to Jurisdiction.

The Borrower agrees that any action, proceeding, case, or controversy against the Borrower with respect to any Loan Document, or commenced by the Borrower asserting any claim or counterclaim arising under or in connection with this Agreement or any other Loan Document shall be brought solely in the Title III Court in United States District Court for the District of Puerto Rico, and that such Title III Court shall have exclusive jurisdiction with respect to any such action.

12-9.   Rules of Construction.  The following rules of construction shall be applied in the interpretation, construction, and enforcement of this Agreement and of the other Loan Documents:

(a) Words in the singular include the plural and words in the plural include the singular.

(b) Titles, headings (indicated by being underlined or shown in SMALL CAPITALS) and any Table of Contents are solely for convenience of reference; do not constitute a part of the instrument in which included; and do not affect such instrument's meaning, construction, or effect.

(c) The words "includes" and "including" are not limiting.

(d)  Text which follows the words "including, without limitation" (or similar words) is illustrative and not limiting.

(e)  Except where the context otherwise requires or where the relevant subsections are joined by "or", compliance with any Section or provision of any Loan Document which constitutes a warranty or covenant requires compliance with all subsections (if any) of that Section or provision.  Except where the context otherwise requires, compliance with any warranty or covenant of any Loan Document which includes subsections which are joined by "or" may be accomplished by compliance with any of such subsections.

(f)  Text which is shown in italics, shown in **bold**, shown IN ALL CAPITAL LETTERS, or in any combination of the foregoing, shall be deemed to be conspicuous.

(g)  The words "may not" are prohibitive and not permissive.

(h)  The word "or" is not exclusive.

(i)  Terms which are defined in one section of any Loan Document are used with such definition throughout the instrument in which so defined.

(j)  The symbol "$" or reference to "dollars" refers to United States Dollars.

(k)  Unless limited by reference to a particular Section or provision, any reference to "herein", "hereof", or "within" is to the entire Loan Document in which such reference is made.

(l)  References to "this Agreement" or to any other Loan Document is to the subject instrument as amended to the date on which application of such reference is being made.

(m) Except as otherwise specifically provided, all references to time are to Boston time.

(n)  In the determination of any notice, grace, or other period of time prescribed or allowed hereunder:

(i)  Unless otherwise provided (A) the day of the act, event, or default from which the designated period of time begins to run shall not be included and the last day of the period so computed shall be included unless such last day is not a Business Day, in which event the last day of the relevant period shall be the then next Business Day and (B) the period so computed shall end at 5:00 PM on the relevant Business Day.

(ii)  The word "from" means "from and including".

(iii)  The words "to" and "until" each mean "to, but excluding".

(iv)  The word "through" means "to and including".

(o)  References to "presently", "currently", and other similar expressions mean the Effective Date.

(p)  The term "upon the occurrence, and during the continuance, of" a Suspension Event or an Event of Default and any other similar term means, the occurrence of a Suspension Event or an Event of Default which has not been waived by the Lender in accordance with the terms hereof.

(q)  The Loan Documents shall be construed and interpreted in a harmonious manner and in keeping with the intentions set forth in <u>Section 12-10</u> hereof; <u>provided</u>, <u>however</u>, in the event of any inconsistency between the provisions of this Agreement and any other Loan Document, the provisions of this Agreement shall govern and control.

12-10.  <u>Intent</u>.  It is intended that:

(a)  The scope of the security interests created by this Agreement be broadly construed in favor of the Lender.

(b)  The security interests created by this Agreement secure all Liabilities, whether now existing or hereafter arising.

(c)  Unless otherwise explicitly provided herein, the consent of the Lender to any action of the Borrower which is prohibited unless such consent is given may be given or refused by the Lender in its discretion.

12-11.  <u>Maximum Interest Rate</u>.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").  If Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Revolving Credit Loans, as applicable, or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Liabilities hereunder.

12-12.  <u>Incorporation of Financing ~~Orders~~<u>Order</u> by Reference</u>.  Each of Borrower and the Lender agrees that any reference contained herein to ~~(i)~~ the ~~Interim~~ Financing Order shall include all terms, conditions, and provisions of ~~such Interim~~<u>the</u> Financing Order and that the ~~Interim Financing Order is incorporated herein for all purposes, and (ii) the Final Financing Order shall include all terms, conditions, and provisions of such Final Financing Order and that the Final~~ Financing Order is incorporated herein for all purposes.  To the extent there is any inconsistency between the terms of this Agreement and the terms of ~~either the Interim Financing Order or the Final~~<u>the</u> Financing Order, the terms of the ~~Interim~~ Financing Order ~~and the Final Financing Order, as applicable,~~ shall govern.

**Article 13 - Consents, Amendments and Waivers:**

13-1.  <u>Action by Lender, Consents, Amendments, Waivers</u>.

(a)  No amendment or waiver of any provision of this Agreement, this Agreement, or any other Loan Document, and no consent to any departure by Borrower therefrom, shall be effective unless in writing signed by the Lender and the Borrower (with the prior written consent of the Oversight Board), and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)  Notwithstanding anything to the contrary set forth in this Article 13, ~~each of the Interim Financing Order and the Final~~<u>the</u> Financing Order may be amended in accordance with the

terms thereof, and any such amendments or waivers shall be subject to the satisfaction of the requirements set forth in the ~~Interim~~ Financing Order ~~or the Final Financing Order, as applicable~~.

(c)   To the extent any Commonwealth Financing is provided to the Borrower, this Agreement and the other Loan Documents may be amended and otherwise modified to assign certain rights of the Lender hereunder to the lender under such Commonwealth Financing, as the parties hereto and the United States Treasury shall agree at such time, with the prior written consent of the Oversight Board.

**Article 14 -  Assignments and Participations:**

14-1.   <u>Assignments and Assumptions</u>.   Neither the Lender nor the Borrower may assign or otherwise transfer any of its respective rights or obligations hereunder.

[signature pages follow]

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date above first written.  This Agreement shall take effect as a sealed instrument.

BORROWER:                                    PUERTO RICO ELECTRIC POWER
                                             AUTHORITY, as "**Borrower**"


                                             By: _____
                                             Name:
                                             Title:

<u>LENDER</u>:                                     THE COMMONWEALTH OF PUERTO RICO,
                                                  as "**Lender**"


                                                  By: _____
                                                  Name:
                                                  Title:

Document comparison by Workshare 9 on Tuesday, February 06, 2018 3:10:19 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\9493\Desktop\Puerto Rico - Post-Petition Credit Agreement (Substantially Final Form) (2).DOCX |
| Description | Puerto Rico - Post-Petition Credit Agreement (Substantially Final Form) (2) |
| Document 2 ID | interwovenSite://DMS/CURRENT/95672815/15 |
| Description | #95672815v15<CURRENT> - Puerto Rico - Post-Petition Credit Agreement (2-6-18) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 245 |
| Deletions | 261 |
| Moved from | 6 |
| Moved to | 6 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 518 |