**Reply Date: February 12, 2018 at 1:00 p.m. (A.S.T.)**
**Hearing Date: February 15, 2018**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>  as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>Debtors.[1] | PROMESA Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br> as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA Title III<br><br>Case No. 17 BK 4780-LTS |

**SUPPLEMENTAL OBJECTION OF ASSURED GUARANTY CORP.
AND ASSURED GUARANTY MUNICIPAL CORP. TO THE URGENT JOINT
MOTION OF FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, AND THE PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY FOR ENTRY OF INTERIM AND
FINAL ORDERS (A) AUTHORIZING POSTPETITION SECURED FINANCING,
(B) GRANTING PRIMING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (C) MODIFYING THE AUTOMATIC STAY,
(D) SCHEDULING A FINAL HEARING, AND (E) GRANTING RELATED RELIEF**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

USActive 41935995.9

## **TABLE OF CONTENTS**

**PAGE**

SUPPLEMENTAL OBJECTION ................................................................................................ 1

I. Movants Must Provide Adequate Protection For PREPA Bondholders' Interests In The Revenues ................................................................................................................ 1

II. The DIP Facility Does Not Leave Bondholders In The Same Position .............................. 5

III. PREPA Has Not Provided Bondholders With Adequate Protection .................................. 7

CONCLUSION ............................................................................................................................... 9

To the Honorable United States District Court Judge Laura Taylor Swain:

Assured respectfully submits this supplemental objection pursuant the Court's Order setting a briefing schedule (ECF No. 636) in further opposition to the DIP Motion (ECF No. 549) and Movants' reply in further support of the DIP Motion (ECF No. 617).[2]

## SUPPLEMENTAL OBJECTION

The plain language of section 364(d) of the Bankruptcy Code is clear: when a debtor seeks a priming lien, the debtor must provide "adequate protection" to the creditor holding a prepetition lien on the same property, and the Movants bear the burden of proof on this issue. 11 U.S.C. § 364(d)(2). Because Movants have not satisfied their evidentiary burden under section 364(d)(2), the DIP Motion should be denied.

**I.     Movants Must Provide Adequate Protection For PREPA Bondholders' Interests In The Revenues**

Movants concede that the Bonds are secured by a pledge of all PREPA's Revenues. See ECF No. 549 at 2 ("[T]he Debtor issued certain [Bonds] . . . ***secured by a lien on all of the Debtor's 'Revenues'***"); accord ECF No. 2, at 3. Indeed, the Trust Agreement explicitly provides in its granting clauses that "**[PREPA] has pledged and does hereby pledge to the Trustee <u>the revenues of the System</u>**" to secure the Bonds. See ECF No. 585-1 at 11-12 (emphasis added); see also id. § 701 ("Revenues are hereby pledged to the payment" of the Bonds). Given Movants' concession that the Bonds are secured by a lien on all Revenues, the relevant interest in the property being primed here is measured against the Revenues, not Revenues net of Current Expenses. The Trust Agreement provides as security ***all*** of the "revenues of the System," without

---

[2]     Capitalized terms used herein shall have meanings given to them in Assured's objection to the DIP Motion. See ECF No. 585 ("Objection"). Unless otherwise noted, docket entries referred to herein are from PREPA's Title III case, Bankruptcy Case No. 17 BK 04780-LTS. Assured incorporates by reference all arguments raised in the Objection, as well by other PREPA bondholders or monoline insurers and the Trustee in objecting to the DIP Motion.

deduction. Thus, PREPA's covenant to pay certain Current Expenses (which are unsecured) under the Trust Agreement on a current basis is merely an agreed application of funds, but it does not remove any Revenues from the scope of the Bondholders' lien.

Having conceded that the lien is on Revenues, Movants bear the burden of establishing that the Bondholders' interests in the Revenues are adequately protected. Instead of providing adequate protection, Movants request a finding by the Court that the Bondholders are adequately protected because the proceeds of the DIP will supposedly only be used to fund Current Expenses. ECF No. 640-1 ¶ B. Movants assert that all Current Expenses are payable before debt service on the Bonds, and thus "the bondholders' security interest has no value and is not entitled to adequate protection because there is nothing to protect." ECF No. 617 ¶ 25.[3]

"Revenues" means "all moneys received by the Authority in connection with or as a result of its ownership or operation of the System." ECF No. 585-1 § 101. Based on this broad definition, the Movants' "zero lien" arguments are undercut by just a few examples included within the meager evidence that they proffered:

- PREPA received over $50 million in prepayments made pursuant to the memorandum of understanding with the Commonwealth on January 25, 2018. See ECF No. 620-3 ¶ 13.
- The updated 13-week cash flow model shows the balance of PREPA's General Fund to be $233.8 million (excluding amounts on deposit at GDB). ECF No. 640-1
- The Movants' cash flows (which contain highly questionable assumptions for reasons set

---

[3] The cases cited by Movants are inapposite. See ECF No. 617 ¶ 27. The portion of In re Fontainebleau Las Vegas Holdings LLC cited by Movants was merely a summary of the bankruptcy court's decision and the testimony on which the bankruptcy court relied. 434 B.R. 716, 732 (S.D. Fla. 2010). Notably, the district court in Fontainebleau *reversed* this portion of the bankruptcy court's decision, finding that the bankruptcy court erred in concluding that the assets were worth zero on a stand-alone basis and that the statutory lienholders were entitled to no adequate protection. See id. at 755. In re Dulgerian, 2008 WL 220523, at *5 (Bankr. E.D. Pa. Jan. 25, 2008), dealt with a 363 sale motion, *not* DIP financing, and the creditor's easement had no value because, unlike the PREPA Bondholders' lien on Revenues, it could be extinguished through a state law foreclosure. In re Levitt & Sons, LLC, 384 B.R. 630 (Bankr. S.D. Fla. 2008), dealt with a *junior* lien, noting that if the DIP financing were not approved, the undersecured senior lien creditor could lift the automatic stay to foreclose on the collateral, and "junior lien holders will receive nothing because of the gross discrepancy between the current value of the collateral and the size of the [senior] pre-petition loan." Id. at 639-40. Levitt has no application to a senior lien like that of the PREPA Bondholders.

forth in the Objection) show PREPA will collect at least $371.8 million in Revenues over a 14-week period. See id.

These are all Revenues to which the Bondholders' lien attaches, and thus the value of the lien is surely not zero. Indeed, if the value of the lien were zero, then the Commonwealth would not need a priming lien, because a priming lien on valueless collateral would have no value. This is particularly so given that the DIP Facility is subordinate to Current Expenses upon an event of default. ECF No. 640-2 § 9-2.

Contrary to Movants' assertions, the Trust Agreement does not provide for payment of all Current Expenses prior to debt service on the Bonds. See ECF No. 585 at 25-26. Rather, only a narrow subset of Current Expenses may be paid from the General Fund on a monthly basis under section 505 of the Trust Agreement. These include only operating expenses that are (i) current, (ii) "reasonable and necessary for repairing, maintaining, and operating the System in an efficient and economical manner," and (iii) included in a budget formulated by qualified engineers that are approved by the Trustee. See ECF No. 585-1 §§ 101, 505. Movants' entire theory of adequate protection is thus based on a fundamental misreading of the terms of the Trust Agreement. If, as the Movants suggest, the Bonds are truly subordinate to all Current Expenses, then there would be no need for a priming lien to secure the DIP Facility.

While Movants invoke certain covenants in section 505, Movants paradoxically claim that the Rate Covenant is not a property interest protected under the Fifth Amendment, and is thus irrelevant to the DIP Motion. See ECF No. 617 ¶¶ 30-33. Movants cannot have it both ways: they cannot claim that section 505 of the Trust Agreement must be considered for purposes of adequate protection, but the Rate Covenant and the Enabling Act cannot be considered. To make revenue pledges meaningful in non-recourse municipal utility financings, revenue bond documents routinely include a binding commitment to maintain, charge, and collect rates at a level sufficient to cover debt service and certain current operating expenses.

These commitments are an integral and non-severable component of the revenue pledge.[4] Section 6(l) of the Enabling Act grants PREPA the power to charge rates necessary to service debt, subject to approval by the Energy Commission, but in all circumstances, such rates approved by the Energy Commission must "guarantee that the approved rate will be sufficient to . . . guarantee payment of principal, interest, reserves, and all other requirements of bonds . . . [and] for the benefit of purchasers or holders of any bonds of the Authority and other creditors."

As established in the precedent cited by Movants, the term "property" for purposes of adequate protection "means those rights that cannot be taken for public use without just compensation required by the [F]ifth [A]mendment to the United States Constitution." In re Elmore, 94 B.R. 670, 676 n.8 (Bankr. C.D. Cal. 1988); La. Jt. Stock Land Bank v. Radford, 295 U.S. 555, 601-02 (1935).[5] Notably, the District Court of Puerto Rico held that the statutory and contractual right of PREPA's Bondholders to appoint a receiver is a property right subject to the Takings Clause. See Franklin Cal. Tax-Free Tr. v. P.R., 85 F. Supp. 3d 577, 611-12 (D.P.R.), aff'd, 805 F.3d 322 (1st Cir. 2015), aff'd, 136 S. Ct. 1938 (2016). As the statutory right to appoint a receiver is a property right, so too is the statutory obligation of PREPA to maintain, charge, and collect rates at levels sufficient to cover debt service on the Bonds. None of the cases cited by Movants involved contractual or statutory mandates in revenue bond financings, which

---

[4] See Oswald v. City of Blue Springs, 635 S.W.2d 332, 334 (Mo. 1982) (without a rate covenant, "few if any prospective purchasers would find these revenue bonds a suitable investment."); Rhonda C. Thomas, The Hancock Amendment: The Limits Imposed on Local Governments, 52 UMKC L. Rev. 22, 36 (1984) (noting that "revenue bonds are necessarily and statutorily secured by a rate covenant"); U.C.C. § 9-102, Off. Comm. 5.d.

[5] While Movants state that Radford is important for enumerating "five rights that a secured creditor possesses," the court in Radford explicitly recognized that the right to foreclose was a part of the bundle of property rights conferred on the secured creditor. 295 U.S. at 594-95. The subsequent Supreme Court cases cited by Movants (e.g., Wright v. Vinton Br. of Mtn. Tr. Bank, 300 U.S. 440 (1937)) stand only for the unremarkable proposition that rights may be restricted in bankruptcy only if the full value of secured creditor's collateral is adequately protected, which is not the case here.

the Supreme Court has recognized as "important security provision[s]." U.S. Tr. Co. of N.Y. v. N.J., 431 U.S. 1, 19 (1977).

Courts have recognized that rate covenants are an integral part of revenue bondholders' property interests in the pledged revenue stream. In Dimino v. Sec'y of Commw., the Massachusetts Supreme Court overturned an initiative to reduce, and then eliminate, toll revenues that had been pledged as security to revenue bondholders. 695 N.E.2d 659, 664 (Mass. 1998). As here, both the enabling statute and the trust agreement required tolls to be set at a rate sufficient to cover debt service. Id. at 663-64. Even though these contractual and statutory provisions presumably could not be sold for value, the court had no difficulty concluding that they were a protected property interest: "We consequently conclude that . . . the petition constitutes an appropriation of the bondholders' private property." Id. at 663-64; see also Patterson v. Carey, 363 N.E.2d 2d 1146, 1151-52 (N.Y. 1977) (statute limiting future toll increases impermissibly impaired bondholders' property rights); First Nat'l Bank of Bos. v. Me. Tpk. Auth., 136 A.2d 699, 720-22 (Me. 1957) (where enabling act and trust agreement contained rate covenant to cover debt service and operating expenses, amendment to enabling act to provide for payment of expenses of a separate project was unconstitutional because it would "'transfer a **vested property right** from one person to another by the pure fiat of the Legislature'") (citation omitted). Notably, the court in Dimino also recognized that a freeze on toll rates would "unconstitutionally depriv[e] the bondholders of their security interest," given that it would conflict with the rate covenant securing those bonds. 695 N.E.2d at 663-64.

II.     **The DIP Facility Does Not Leave Bondholders In The Same Position**

Movants contend that the Bondholders are adequately protected because the DIP Facility can allegedly only be used to pay for Current Expenses, and thus, the Bondholders are left in the same position. See ECF No. 617 ¶¶ 27, 29. Such assertions are disingenuous because section 4-

- 5 -

13 of the Credit Agreement explicitly provides that, with the consent of the Oversight Board and the Commonwealth, proceeds of the DIP Facility can be used to cover "Ineligible Uses," which includes expenses that are expressly subordinate to debt service on the Bonds under the plain terms of the Trust Agreement, such as capital improvements, lobbying expenses, and other extraordinary expenses. See ECF No. 585-1 §§ 512, 512A, 512B. These Ineligible Uses are not Current Expenses payable from PREPA's General Fund under section 505, as they are not operating expenses and are not reasonable current expenses needed to maintain the System in an efficient or economical manner. Indeed, the term Current Expenses explicitly excludes capital improvements. Id. §§ 101, 512, 512B.

Further, the proposed DIP order authorizes PREPA to perform under the Credit Agreement, which in turn gives PREPA the right to use Revenues to pay for Ineligible Uses and to fund a $300 million reserve for such Ineligible Uses. This completely rewrites the terms of the Trust Agreement. Movants attempt to justify this result by contending that the Credit Agreement merely gives PREPA the right to pay expenses that it "could pay before its Title III case." ECF No. 617 ¶ 32 & n.8. But PREPA has never had a right to pay capital improvements or other general expenses prior to debt service. Those expenses are explicitly subordinate under the Trust Agreement and are not Current Expenses. See ECF No. 585-1 §§ 101, 512, 512A, 512B. Moreover, nothing in the Trust Agreement gives PREPA the right to create a $300 million fund to pay for capital improvements prior to payment of debt service or to prioritize reimbursement expenses.

To the extent that Movants attempt to rely on PROMESA section 305, that provision is inapplicable when the Oversight Board consents to the Court's jurisdiction. Here, Movants filed a proposed order that expressly authorizes PREPA to perform under the Credit Agreement (DIP Order ¶ 3), which rewrites the terms of Article V of the Trust Agreement. By filing the DIP

Motion requesting relief from the Court, the Oversight Board has provided actual consent to the Court's interference with the debtor's property at issue in the motion. See In re City of Stockton, Cal., 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013) (holding that when a debtor files a Rule 9019 motion, "the municipality 'consents' . . . to judicial interference with the property or revenues of the debtor needed to accomplish the transaction"); H.R. Rep. No. 95-595, at 394-95 (1978) (noting that the court would become involved if the municipal debtor sought to exercise the special bankruptcy power of incurring DIP financing). The Movants cannot hide behind section 305 if they do not like how section 364(d) is applied to the DIP Facility. The Movants came to this Court seeking entry of an order containing findings that PREPA is authorized to perform under the Credit Agreement. If Movants do not want this Court to interfere with PREPA's decisions, then Movants should withdraw the DIP Motion.

### III. PREPA Has Not Provided Bondholders With Adequate Protection

Movants contend that the Bondholders are adequately protected because maintenance of infrastructure generating the Revenue will enhance Bondholders' recoveries by avoiding shutdown. ECF No. 549 ¶¶ 52-55.[6] But the reality of PREPA's 13 week cash position, and the vast hoard of cash held by the Commonwealth, shows that shutdown is an idle self-made threat. To warrant a priming lien, a replacement lien, cash payments, or other compensation must be offered to Bondholders. 11 U.S.C. § 361.

Section 364(d) requires in unequivocal terms that a primed creditor must be adequately protected, and the debtor bears the burden of proof on that issue. As courts have held, the mere promise of enhanced value cannot be recognized as adequate protection in connection with priming DIP facilities, particularly, where, as here, nothing else is offered to the primed creditor.

---

[6] The cases on which Movants rely in support of their argument are irrelevant because they deal with use of cash collateral, not a priming DIP facility. See ECF No. 549 ¶ 53; ECF 617 ¶ 26.

In re Swedeland Dev. Grp., Inc., 16 F.3d 552, 566-67 (3d Cir. 1994); In re Fontainebleau, 434 B.R. at 751-54; ECF No. 585 at 27-29. The Movants brush aside the cases cited in Assured's Objection by contending that these cases dealt with real property. This is a distinction without any relevance. Relying on Swedeland, courts have declined to approve priming DIP facilities on other types of collateral where the financing put the primed creditor's interest at further risk, or where the debtor's cash flow projections were unreasonable and speculative. See In re Barbara K Enters., Inc., 2008 WL 2439649, at *13 (Bankr. S.D.N.Y. June 16, 2008) (finding lack of adequate protection after applying Swedeland to DIP financing facility, which primed prepetition lien on royalties for prepetition patents and trademarks); In re Stoney Creek Tech. LLC, 364 B.R. 882, 892-95 (Bankr. E.D. Pa. 2007).

There is no evidentiary basis for this Court to grant a priming lien or to find that bondholders are adequately protected. Order ¶ B. No compensation was offered here. Nothing was offered to Bondholders for the lien granted on "Other Accounts," which was not disclosed in the DIP Motion and which potentially includes accounts presently holding bond proceeds from which Current Expenses cannot be paid. Movants have produced no evidence that the expenses to be paid by the DIP Facility results in a benefit to the Bonds given that the facility can be used for Ineligible Uses. Movants' promises of a better recovery for the Bonds are purely speculative given that the DIP Facility does not correct why PREPA is purportedly burning cash at a rapid pace, even though its current liquidity position stems in part from barriers placed by the Commonwealth on PREPA's collection efforts. In the interim, PREPA would be saddled with $1.3 billion of additional debt and Bondholders are left in a worse position, given that the Credit Agreement would completely rewrite the terms of the Trust Agreement. See ECF No. 640-2 §§ 4-18, 9-2 (prioritizing upon default payment of "*any* Current Expenses"). This can hardly be considered adequate protection.

## **CONCLUSION**

For the foregoing reasons and the reasons set forth in Assured's Objection, the Court should deny the DIP Motion.

Dated: San Juan, Puerto Rico
February 9, 2018

| CASELLAS ALCOVER & BURGOS P.S.C. | CADWALADER, WICKERSHAM & TAFT LLP |
|---|---|
| By: /s/ *Heriberto Burgos Pérez* <br> Heriberto Burgos Pérez <br> USDC-PR 204809 <br> Ricardo F. Casellas-Sánchez <br> USDC-PR 203114 <br> Diana Pérez-Seda <br> USDC-PR 232014 <br> P.O. Box 364924 <br> San Juan, PR 00936-4924 <br> Telephone: (787) 756-1400 <br> Facsimile: (787) 756-1401 <br> Email: hburgos@cabprlaw.com <br> rcasellas@cabprlaw.com <br> dperez@cabprlaw.com <br><br> *Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.* | By: /s/ *Howard R. Hawkins, Jr.* <br> Howard R. Hawkins, Jr.* <br> Mark C. Ellenberg* <br> Ellen M. Halstead* <br> Thomas J. Curtin* <br> Casey J. Servais* <br> 200 Liberty Street <br> New York, NY 10281 <br> Telephone: (212) 504-6000 <br> Facsimile: (212) 406-6666 <br> Email: howard.hawkins@cwt.com <br> mark.ellenberg@cwt.com <br> ellen.halstead@cwt.com <br> thomas.curtin@cwt.com <br> casey.servais@cwt.com <br><br> * Admitted *pro hac vice* <br><br> *Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.* |

**CERTIFICATE OF SERVICE**

I hereby certify that I filed this document electronically with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all parties of record in the captioned case. Further, I directed that the following counsel of record to be served by U.S. Mail:

Office of the United States Trustee for Region 21
Edificio Ochoa
500 Tanca Street, Suite 301
San Juan, PR 00901-1922

Gerardo J. Portela Franco
Puerto Rico Fiscal Agency and Financial Advisory Authority (AAFAF)
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907

John J. Rapisardi, Esq.
O'Melveny & Myers LLP
7 Times Square
New York, New York 10036

Andrés W. López, Esq.
Law Offices of Andrés W. López
902 Fernández Juncos Ave.
San Jan, PR 00907

Martin J. Bienenstock, Esq.
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036-8299

Hermann D. Bauer, Esq.
O'Neill & Borges LLC
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813

At San Juan, Puerto Rico, this 9th day of February, 2018.

By: */s/ Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    USDC-PR 204809