Hearing Date:        February 20, 2018 at 9:30 a.m. (EST), if necessary

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>        Debtor. | PROMESA<br>Title III<br><br><br>Case No. 17 BK 4780-LTS<br><br>Re: ECF Nos. 549, 722, 728, 729, 730,<br>731, 732, 733, 734, 735, 736.<br><br>**Reply Relates Only to PREPA and<br>Shall Only Be Filed in Case No.<br>17 BK 4780-LTS** |
| The Financial Oversight and<br>Management Board for Puerto Rico,<br><br>    as representative of | |

---

[1]  The Debtors in the jointly-administered Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Puerto Rico Electric Power Authority,

                              Movant,

v.

WHITEFISH ENERGY HOLDINGS, LLC, *et al.*[2]

                              Respondents,

*[Caption continued on next page]*

---

[2]   The Respondents include: Whitefish Energy Holdings, LLC; Arc American, Inc., the Ad Hoc Group of General
Obligation Bondholders, U.S. Bank National Association in its Capacity as PREPA Bond Trustee, the Ad Hoc
Group of PREPA Bondholders,  Scotiabank de Puerto Rico, Solus Alternative Asset Management LP, National
Public  Finance  Guarantee  Corporation,  Ambac  Assurance  Corporation,  Assured  Guaranty  Corp.,  Assured
Guaranty Municipal Corp., Syncora Guarantee Inc., the Official Committee of Unsecured Creditors, Siemens
Transportation  Partnership  Puerto  Rico,  S.E,  and  Knighthead  Capital  Management,  LLC  (collectively,  the
"Respondents").

**OVERSIGHT BOARD AND AAFAF OMNIBUS
REPLY TO RESPONSES TO OVERSIGHT BOARD AND AAFAF'S
URGENT APPLICATION AND NOTICE OF REVISED PROPOSED
$300 MILLION LOAN FROM COMMONWEALTH TO PREPA**

To the Honorable United States District Court Judge Laura Taylor Swain:

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Puerto Rico Electric Power Authority ("PREPA" or the "Debtor") in this Title III case pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[3] and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" and, together with the Oversight Board, "Movants") respectfully submit this joint omnibus reply (the "Reply") to the limited objection filed by U.S. Bank National Association in its capacity as PREPA bond trustee ("Bond Trustee") [ECF No. 730]; reservation of rights of the Ad Hoc Group of General Obligation Bondholders ("GO Bondholders") [ECF No. 731]; limited response of the Ad Hoc Group of PREPA Bondholders ("Ad Hoc Group") [ECF No. 732]; amended response of National Public Finance Guarantee Corporation ("National") [ECF Nos. 733, 735]; response and reservation of rights of Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured") [ECF No. 734]; joinder of Knighthead Capital Management, LLC ("Knighthead") [ECF No. 736]; and limited reply of Scotiabank de Puerto Rico and Solus Alternative Asset Management LP (together, the "Fuel Line Lenders") [ECF No. 739] (collectively, the "Responses") to *Oversight Board's and AAFAF's Urgent Application and Notice of Revised Proposed $300 Million Loan from Commonwealth to PREPA* [ECF No. 722] (the "Urgent Joint Application") seeking entry of a revised proposed order approving a $300 million credit facility (the "Superpriority Facility")

---

[3]   PROMESA is codified at 48 U.S.C. §§ 2101-2241.

and granting the lender a superpriority administrative expense claim in accordance with a revised

credit agreement.[4]  In support of this Reply, Movants respectfully state as follows:

**Preliminary Statement**

1.      Procedural History.  Since the February 15, 2018 hearing (the "Hearing") on the

Debtor's postpetition financing motion [ECF No. 549] (the "Postpetition Financing Motion"),

PREPA and the Commonwealth made two rounds of substantial and substantive revisions to the

proposed order and credit agreement.  The revisions reflect the Court's oral ruling at the Hearing

and address myriad comments from creditor groups of both debtors.  On February 17, 2018,

another round of material revisions were filed by four different groups of PREPA creditors, and

once again PREPA and the Commonwealth are agreeing to further revisions as explained herein

and attached hereto.  Having gone to great lengths to accommodate the concerns of objecting

creditors, Movants explain herein the changes they adopted and why the revisions they are not

adopting are unwarranted.

2.      Market Indications.  As compared to the third party financing proposals received

by Rothschild (See Supplemental Declaration of Dustin Mondell [ECF No. 620-1]

("Supplemental Mondell Declaration") at ¶ 5) and the offer proffered by the Ad Hoc Group

[ECF No. 707], the instant financing terms are materially more favorable to PREPA and its

creditors.  Thus, on a market-test basis, there is no question the instant financing is both fair to

PREPA and its creditors and assessable on an objective, market standard.  Indeed, the GO

Bondholders are reserving their rights to challenge the financing because they believe it is too

fair to PREPA and its creditors.

---

[4]   Capitalized terms used but not otherwise defined herein shall have the same meaning given to them in the Urgent
Joint Application.

3.     Certain objectors have used the Court's oral ruling as an opportunity to rewrite the proposed financing order in ways that far exceed the Court's comments and directions, going so far as to withhold acknowledgement that new money advanced under this financing shall be a valid, allowable claim against PREPA.  Some objectors misunderstand the reason why a reserve is critical (explained below in paragraph 16(c)) and do not acknowledge the Trust Agreement allows for a 60-day reserve approximating $500 million.  One, National, has used this further supplemental briefing to rehash gratuitous attacks repeated *ad nauseum* in PREPA's Title III case and, without citation to the record, to misstate this Court's oral ruling and to manufacture a legal standard – "entire fairness" – it wrongly asserts the Court held to apply to this and subsequent requests for financing from the Commonwealth.  The Oversight Board and AAFAF ask this Court to approve the updated facility pursuant to the revised order attached hereto as **Exhibit A**.

4.     <u>Urgency is Undisputed</u>.  Approval of the reduced, unsecured superpriority facility is of critical importance for PREPA, the Commonwealth, and all stakeholders.  As the Court found at the Hearing, PREPA is on the brink of a liquidity crisis that will result in operations being sharply curtailed in the near term absent a significant injection of cash.  Hr'g Tr. at 230:12-16.  The Court recognized that PREPA's failure would have a "drastic impact from humanitarian, economic recovery, and debt readjustment perspectives on Puerto Rico and all of her stakeholders."  *Id*. at at 230:17-20.[5]  After last week's hearing, PREPA began preparing customers, employees and other stakeholders for such a reduction in operations including

---

[5]    The GO Bondholders' attacks (GO Bondholders' Response at ¶¶ 4-6) on the Oversight Board and AAFAF are unfounded gratuitous and self-serving statements.  It goes without saying the Postpetition Financing Motion was not part of a "cynical effort" to manipulate the Commonwealth's liquidity to "game" the federal government and the Commonwealth's creditors.  *Id*. at ¶ 6.  To state that argument is to refute it.

beginning reduction of power generation.[6]   PREPA believes that the initial reductions will have limited immediate impact on customers but will further destabilize a power grid that is already vulnerable to outages and equipment failure, such as the February 11th breaker explosion that left more than 175,000 households and businesses in northern Puerto Rico without electricity.[7] Indeed, despite numerous legal objections, none of the parties to this proceeding seriously dispute that PREPA needs liquidity or that the damage from a failure to approve the Superpriority Facility is incalculable.

**<u>Reply</u>**

5.      The Court stated at the Hearing that, although it was not willing to approve a priming facility on the record before it, it would hold the Postpetition Financing Motion in abeyance to consider "a smaller draw-down amount and administrative super-priority" facility if requested by Movants, without prejudice to Movants' ability to seek future financing on a priming basis.  Hr'g Tr. at 232:10-14.  The Court further explained it "would be prepared to entertain favorably in the near term … unsecured administrative expense priority facility of up to $300 million upon a demonstration that the Commonwealth will not lend on ordinary unsecured administrative expense status terms."  *Id.* at 233:22 – 234:1.

6.      <u>Steps to Negotiate New Financing</u>.  As established by Movants at the Hearing, PREPA is currently on the brink of a liquidity emergency. Hr'g Tr. at 230:12-20.  Lacking a guaranteed source of funding, PREPA had already formulated a strategic operational emergency plan to guide the shut down of operations.[8]   Understanding the gravity of the situation,

---

[6]     ABC News, Danica Coto, Associated Press, February 16, 2018.

[7]     *Explosion in Puerto Rico knocks out power, emphasizing grid's frailty after Hurricane Maria*, The Washington Post, Arelis R. Hernandez, February 12, 2018.

[8]     *See PREPA Statement Regarding Court Ruling Against Loan From Puerto Rico Treasury Department*, issued February 16, 2018.

immediately after the Hearing AAFAF and the Oversight Board undertook to obtain financing consistent with the Court's directive. Mr. Todd Filsinger, the Chief Financial Advisor to PREPA, contacted the Secretary of Treasury for the Commonwealth of Puerto Rico, Mr. Raul Maldonade Gautier, to inform him of the Court's decision on the Postpetition Financing Motion and to attempt to obtain financing on terms other than requiring a priming lien. *See* ECF No. 722-6 ("Third Supplemental Filsinger Declaration") at ¶¶ 7-8. Secretary Maldonado informed Mr. Filsinger the Commonwealth was prepared to offer $300 million in unsecured financing at five (5%) annual interest and superpriority status. *Id*. at ¶¶ 9-10.

7.    Initial Changes to Proposed Financing Order. Movants' professionals worked through the night to revise the proposed financing order and credit agreement to reflect the new terms of the Superpriority Facility. Specifically, the proposed final order was revised to, among other things: (i) reduce the facility from $1 billion to $300 million; (ii) fix the interest rate at 5% per annum; (iii) eliminate the granting of priming liens; (iv) eliminate the finding of the Commonwealth as a good faith lender under 11 U.S.C. § 364(e); and (v) make clear that Movants will go back to Court for any material amendment, waiver, modification, or consent of the facility's terms. A revised order (the "Superpriority Financing Order") and revised credit agreement (the "Superpriority Credit Agreement"), reflecting the foregoing changes and the new terms of the Superpriority Facility, were filed with the Urgent Joint Application on the morning of Friday, February 16, 2018 at 4:17 am [ECF No. 722].

8.    Call with Creditors. Seven hours later, Movants and the Respondents held a call to discuss the Urgent Joint Application, including comments to the revised proposed Superpriority Financing Order and Superpriority Credit Agreement. The call was productive – providing a path to resolve some, but not all, of the concerns raised by various creditor groups.

Respondents agreed to provide additional comments to Movants later in the day, and Movants agreed to file a further revised proposed order and credit agreement later that evening.[9]

9.      Throughout the afternoon on February 16, Movants received mark ups of the proposed Superpriority Financing Order and/or the Superpriority Credit Agreement from four Respondents, and received specific comments from several other Respondents.  Taking into consideration the comments discussed on the morning's call and the subsequent comments, Movants revised the documents and filed a further revised proposed Superpriority Financing Order (the "Revised Superpriority Financing Order") and a further revised Superpriority Credit Agreement (the "Revised Superpriority Credit Agreement" and, together with the Revised Superpriority Financing Order, the "Revised Documents").  *See* ECF No. 729.  As various Respondents recognize, [10] the Revised Documents addressed many of the Respondent's comments, including:

> a. Preserving Creditor Rights.  Numerous provisions added address concerns that creditor rights could be impaired by the Superpriority Financing, including (i) a provision clarifying the findings in the Revised Superpriority Financing Order would not be binding on the Court in deciding any future requests for financing [ECF 729-2 at ¶ 12]; (ii) language that creditor rights and remedies, if any, in the Commonwealth's Title III case with respect to the Commonwealth's decision to enter into the Superpriority Facility are preserved [*id.* at ¶ 4]; and (iii) providing (unless explicitly stated otherwise) bondholders' rights under the Trust Agreement or applicable law are not altered by the Revised Superpriority Financing Order [*id.* at ¶ 13].

---

[9]     Movants filed an urgent scheduling motion to formalize the process to resolve objections to the terms of the proposed Superpriority Financing Order and Superpriority Credit Agreement.  The Court entered a scheduling order [ECF No. 728] (the "Scheduling Order"), pursuant to which objections were due by 6:00 p.m. (EST) on February 17, and Movants' reply due by 2:00 p.m. (EST) on February 18.  The Scheduling Order states the Court shall determine the Urgent Joint Application on submission without further hearing unless one or more parties requests a hearing and the Court decides to schedule a hearing.

[10]    *See* Bond Trustee Response at 1 ("It appears that PREPA, AAFAF, and the Oversight Board took a number of comments from parties in interest, which is greatly appreciated."); Ad Hoc Group Response at ¶ 2 ("The Ad Hoc Group agrees that the Revised Credit Agreement and New Revised Financing Order are a step in the right direction.").

    b.  <u>Strengthened Procedures to Provide Creditors with Additional Notice and Opportunity to be Heard</u>.  Included provisions requiring the Debtor to seek Court approval for any refinancing of the Superpriority Facility and for any consent by the Oversight Board for PREPA to use proceeds of the Superpriority Facility to fund or otherwise pay Ineligible Uses [*id*. at ¶ 6(a)].

    c.  <u>Additional Access to Information</u>.  Agreed that PREPA will provide the Budget to Respondents, subject to entering into a non-disclosure agreement [*id*. at ¶ 16] and will make public the reports and notices provided to the Lender under Sections 5-1 and 5-2 of the Revised Superpriority Credit Agreement [ECF No. 729-4 at § 5-6].

    d.  <u>Conflict Resolution</u>.  Provided any ambiguity in the Credit Documents will be resolved in a manner to make the Credit Documents consistent with the Revised Superpriority Financing Order [ECF No. 729-2 at ¶ 17].

    e.  <u>Budget</u>.  Prohibited PREPA from using revenues to pay for specific Ineligible Uses identified in Section 4-13 of the Revised Superpriority Credit Agreement during the term of the Superpriority Facility.  [ECF No. 729-4 at § 4-13].

10.    Discussions have continued since the Revised Documents were filed, and Movants have continued to accept further substantive comments raised by Respondents. Movants further analyzed proposed revisions to the Revised Documents based on the requests in the Responses received the night of February 17.  As a result of these efforts, the Revised Documents have been further revised as reflected in the following attachments: (a) a further Revised Superpriority Financing Order is attached hereto as **Exhibit A** (the "<u>Proposed Final Superpriority Financing Order</u>"), with a redline to the Revised Superpriority Financing Order attached hereto as **Exhibit B**; and (b) a further Revised Superpriority Credit Agreement is attached hereto as **Exhibit C** (the "<u>Proposed Final Superpriority Credit Agreement</u>"), with a redline to the Revised Superpriority Credit Agreement attached hereto as **Exhibit D**.  These new revisions (i) provide any ancillary documents entered into in connection with the Superpriority Facility will be consistent with the Proposed Final Superpriority Financing Order (Ex. B at ¶ C); (ii) preserve parties' rights to seek additional briefing on material changes to the Superpriority Facility, however occurring, submitted on presentment (*id*. at ¶ 6(a)-(b)); (iii) preserve creditors'

rights under their underlying agreements (*id*. at ¶¶ 9, 13); (iv) provide more access to information (*id*. at ¶ 15; Ex. D at § 5-6); (v) enhance creditor protections by requiring the Lender and the Oversight Board to consider the rights and interest of *all stakeholders* and the Borrower's statutory duty to the Commonwealth in exercising their discretion (Ex. D at § 2-8); and (vi) address budget concerns by revising the prior changes on limiting payments for Ineligible Uses to only those provided in the Budget, subject to the Carve-Out, or FEMA reimbursable expenses for contracts (*id*. at § 4-13).

11.    The Proposed Final Superpriority Financing Order authorizes PREPA to obtain the Superpriority Facility on terms consistent with the Court's directive. The Superpriority Facility does not provide a priming lien. This alone should have resolved the concerns of Assured (and others) who stated at the Hearing its objections (and the objections of others) would be resolved if the priming liens go away. *See* Hr'g Tr. at 180:20-21; *see also id*. at 180:11-12 (on possibility of Lender foregoing a priming lien, stating "I believe all the creditor objectors would drop their objections."). Nonetheless, Assured and other Respondents have since engaged in two rounds of commentary and negotiating. Movants have made substantial revisions to the documents as reflected in the redlines filed at ECF Nos. 722, 729, and herein. The Proposed Final Superpriority Financing Order is the culmination of Movants' efforts to address as many concerns of Respondents as possible without doing violence to the certainty and protections the Lender and Debtor need to enter into the Superpriority Facility, while ensuring the Debtor meets the standards for superpriority financing under 11 U.S.C. § 364(c), including that "it is unable to obtain unsecured credit allowable under section 503(b)(1)." 11 U.S.C. § 364(c).

12.     The Proposed Final Superpriority Financing Order is also consistent with the Court's directive at the Hearing.  *See* Hr'g Tr. at 233:20-234:1.  The Court's oral ruling at the Hearing (the "<u>Court Oral Ruling</u>") set a roadmap for the "near-term amended" $300 million financing and directed Movants to take certain action for the Court to approve an unsecured super priority administrative expense facility.

13.     The size of the Superpriority Facility has been reduced to $300 million.  Movants have demonstrated pursuant to the Third Supplemental Filsinger Declaration that the Commonwealth would not lend without superpriority status.  The Superpriority Facility also complies with the Court's requests regarding specific provisions of any order.  *First*, the Court requested the modifications raised by the GO Bondholders to eliminate any preclusive provision with respect to actions in the Commonwealth's case.  Hr'g Tr. at 234:15-17.  As demonstrated by paragraph 4 of the Proposed Final Superpriority Financing Order and the statement in the GO Bondholder Response [ECF No. 731 at ¶ 3], the Proposed Final Superpriority Financing Order reflects the Court's comment.  *Second*, paragraph 6 has been revised to clarify any material changes to the facility's terms, regardless of the manner, will require Court approval.  Hr'g Tr. at 234:18-20.  *Third*, the vendor protection for Whitefish Energy Holdings, LLC (Hr'g Tr. at 234:21-23) is included in paragraph 16 of the Proposed Final Superpriority Financing Order. *Fourth*, "all findings that are not essential for 364(c) purposes" (Hr'g Tr. at 234:23-25) have been removed, including the good faith findings for Bankruptcy Code section 364(e).  *Fifth*, Movants consulted with interested parties about a schedule for the application before the Court. (Hr'g Tr. at 234: 1-6).

14.     These facts refute National's assertion that the Proposed Final Superpriority Financing Order is contrary to the Court's ruling.  The Court did not adopt the entire fairness

standard for this or any other financing between the Commonwealth and the Debtor (National Response ¶¶ 1, 7). The Court stated future financing must be viewed in light of the "fairness to the body of PREPA stakeholders and, in particular, the bondholders." Hr'g Tr. at 233:3-4. As explained above, the Proposed Final Superpriority Financing Order clearly meets this standard as it is more favorable to PREPA and its creditors than all market proposals proffered to date. As discussed above, Movants made multiple changes to the terms of the order, including the creditor protections in paragraphs 9, 12, and 13, to ensure bondholders' interests are protected. It should not be lost on the Court that no other creditor has alleged the terms of the proposed order are not fair to the body of PREPA's stakeholders. Importantly, the Court noted three examples of the priming financing facility that appeared "problematic" with respect to fairness to stakeholders: the size of the facility, the size of the "reserve," and relief from the stay. Hr'g Tr. at 233:8-19. But all three have been addressed: (a) stay relief is eliminated; (b) the size of the facility has been reduced; and (c) the reserve, as explained below, is not a rainy day fund built up with loan proceeds—it is an essential cash balance requirement to ensure continuity of operations given unpredictable revenues and limited borrowing capacity.[11]

15.     Moreover, National's argument the Superpriority Facility is not fair because no evidence of arm's length negotiation is present fails. National Response ¶¶ 2-3. The Court implicitly recognized by requiring fairness to the stakeholders that arm's length negotiations, at least in the classical sense of two corporations seeking to extract maximum value from a transaction, is not possible when dealing with governmental entities sharing a common duty to the people of Puerto Rico. But, as the record shows, the solicitation of proposals from market participants and the actual proposals, especially including the proposal of the Ad Hoc Group,

---

[11]     Movants are cognizant the Court stated its concerns were not limited to these three items. However, for the reasons stated above, the remaining terms satisfy the standard.

demonstrate the instant proposed financing is more than fair based on an objective market test. No non-insider has come close to offering PREPA and its creditors financing on terms as favorable as the instant, proposed financing. Nonetheless, the Court was clear in what it wanted shown to approve the $300 million financing: the Commonwealth would not lend on ordinary unsecured administrative expense status terms.    Hr'g Tr. at 233:20-234:1.    The Third Supplemental Filsinger Declaration demonstrates the Commonwealth indicated it would not lend on purely an unsecured basis.[12]  The Superpriority Facility is on better terms than the proposals submitted to PREPA (*See* Supplemental Mondell Declaration at ¶ 5) and at a much lower interest rate than the lender group proposal.   *See* ECF No. 707 at 4.   Movants have demonstrated everything the Court requested.[13]

16.    Set forth below is a chart explaining material comments set forth in the Responses and Movants' response (as reflected in the redlines attached on **Exhibits B and D** hereto), along with an explanation.   Certain comments were reflected in more than one response.   These comments include:

> a.  Budget.  A concern expressed by several Respondents is PREPA's ability to use its revenues to pay Ineligible Uses.  Movants have agreed that spending on Ineligible Uses will be tied to the Budget.  The revisions also provide that Respondents who are party to customary non-disclosure arrangements

---

[12]   National implicitly attacks Mr. Filsinger's motives by criticizing his phone call with the Commonwealth's Treasury Secretary because "[t]he bondholders were neither informed of nor allowed to participate in this call. This lack of transparency does not inspire confidence, nor do the results of the 'negotiation.'"   National Response at ¶ 18.  National is not PREPA's Title III trustee.  A debtor is not required to include prepetition creditors in its borrowing negotiations.  This statement shows how far National feels it must stretch to impugn the Debtor's motives and good faith.  Tellingly, National ignores Movants' extensive discussions with creditors and changes to the proposed financing.

[13]   National's argument that PREPA has not demonstrated it has undertaken steps to reduce or eliminate the need for the Superpriority Facility through increasing collections (National Response at ¶¶ 9-10), and criticizing the Commonwealth's role in causing the liquidity crisis (despite ample evidence to the contrary, *See* ECF Nos. 617, 688), would be laughable if not for the serious consequences facing PREPA.  PREPA is on the verge of a complete shutdown.  The Court recognized granting some form of relief under the Postpetition Financing Motion was required to prevent leaving millions without power.  Hr'g Tr. at 231:4-7.  To state the obvious, PREPA does not have the time to increase collections to satisfy its liquidity needs.  While it appears National is more than prepared to let millions of Americans live in darkness, Movants are not.

(including the Mediation Agreement) will have notice of all proposed Budgets so that they will be able to evaluate and raise concerns regarding any proposed expenditures on Ineligible Uses. Movants believe these revisions are appropriate and should satisfy creditors' concerns. As explained by Movants and Scotiabank de Puerto Rico at the February 15 hearing, PREPA's gross revenues are not collateral in the first place. Even if they were, the Urgent Joint Application is not a motion seeking use of cash collateral, and PREPA can use cash collateral without Court order as Bankruptcy Code section 363 is not incorporated into PROMESA. Further, PROMESA section 305 prevents this Court from directing how PREPA can use its revenues. Movants submit the proposed revisions adequately address Respondents' concerns while maintaining PREPA's freedom to operate under PROMESA.

b.  <u>Creditor Protections/Reservation of Rights</u>. Movants incorporated language in multiple areas in the order protecting creditors' rights under their contracts and applicable law. Of note, the findings of fact are explicitly not binding on the Court in deciding future requests for financing. National's proposed revisions go beyond seeking to preserve its rights and instead creates confusion that could harm the Commonwealth. National wants paragraphs 4, 9, and 14 deleted from the Proposed Final Superpriority Financing Order. The revision to paragraph 9 is agreed to with Assured and the Ad Hoc Group and should resolve any concerns with that paragraph.[14] National's contention paragraph 9 has "no place" in the order is unfounded (National Objection at ¶ 3), as demonstrated by the fact Assured and the Ad Hoc Group have agreed to revisions to paragraph 9 that resolve their objections to that paragraph. The Superpriority Facility can only be used to pay for Current Expenses. Accordingly, providing that repayment of the Superpriority Facility is a Current Expense does not harm the bondholders. Not surprisingly, the bondholders own proposal had a similar requirement. *See* ECF No. 707 at 5 ("All payments of obligations under the Facility shall be payable from the General Fund (as defined in the Trust Agreement) at the level of Current Expenses under the Trust Agreement and, upon confirmation of a plan of adjustment, as a super priority administrative claim and, subject to the Carve Out (as defined in Exhibit A) before payment or distribution on other administrative claims and pre-petition claims (including those for Current Expenses.").

Further, Paragraphs 4 and 14, confirming the validity of the Debtor's obligation to the Lender, are standard in financing orders and only relate to obligations and payments under the Superpriority Facility from PREPA to the Commonwealth. Deleting these provisions will gut the order and would be akin to asking the Commonwealth to advance funds with no certainty as to the validity of the debt, obligations, or status of its superpriority claim—no lender will agree to such terms. Nationals' demand for the deletion of these standard

---

[14]  The Fuel Line Lenders also agree with the revision.

provisions so the Commonwealth would lend subject to the possibility it would not have any valid claim speaks volumes.

c. <u>Reserve</u>.   The Court and certain Respondents expressed concern over the reserve.  Hr'g Tr. at 233:14-15.  The use of the term reserve seems to have caused some confusion.  The "reserve" is essentially a cash balance PREPA needs to maintain above $100 million for reasons explained at length at and after the Hearing, up to a maximum of $300 million.  Retaining cash on hand is important for several reasons.  *First*, under the Proposed Final Superpriority Credit Agreement, PREPA can only borrow every 4 weeks based on projected disbursements (plus the variance) less the beginning cash balance.  Because PREPA's collections remain unpredictable (*see* Declaration of Todd Filsinger [ECF No. 549-3] at ¶ 9), PREPA runs the risk of running low on cash during any four week period before it can borrow again.  *Second*, PREPA may have to pay significant restoration and recovery expenses before FEMA reimbursement money is received.  While FEMA has worked closely with PREPA during its liquidity crisis, applicable law provides that PREPA make payments for these services first and receive reimbursement from FEMA rather than FEMA paying directly or providing PREPA the money to make the payments.   Generally, these expenditures create only a short-term reduction to PREPA's cash on hand.  But, the expenditures can be large and, because loan proceeds may not be used for this purpose and revenues will likely be insufficient, PREPA's cash on hand will likely be the sole source of these payments.  *Third*, if there is another emergency situation, PREPA will need cash.  Finally, the Trust Agreement allows PREPA to maintain a reserve of 60 days (Trust Agreement at § 506), which is historically in excess of $500 million, well above the maximum cash balance permitted under the facility.  See ECF No. 149- 1 at ¶ 10 (prior to the hurricanes, projecting a cash reserve under Trust Agreement of approximate $500 million).

Movants also received a number of minor comments that were in the nature of wordsmithing rather than addressing substantive comments, some of which were accepted and some not.

Those comments are not material and are not included in the chart.

**Order**

| Objection | ¶ | Requested Change | Response & Explanation |
|---|---|---|---|
| Bond Trustee [ECF No. 730] | C | The authorization granted herein to enter into the Credit Agreement and such other necessary documents <u>consistent with the terms of this Order and</u> on substantially ~~similar~~<u>the same</u> terms as the terms of the Credit Agreement ~~and this Order~~ (such documents, as amended or modified as permitted by this Order, together with the Credit Agreement, the "Credit Documents") | Accepted with minor modifications. |

| Objection | ¶ | Requested Change | Response & Explanation |
|---|---|---|---|
| Bond Trustee [ECF No. 730] | 6(a) | Subject to the approval (a) of the Oversight Board, the Debtor may enter into any amendments, consents, waivers, or modifications to the Credit Documents, in accordance with the terms thereof, without the need for further notice and hearing or any order of this Court; provided, however, that to the extent any material amendment, material consent, material waiver or material modification to the Credit Agreement or any other Credit Document, including without limitation Sections 9-2, 4-13, 5-5, and 5-6 of the Credit Agreement, is approved by the Oversight Board…. | Accepted. |
| Bond Trustee [ECF No. 730] | 7 | The Lender's Superpriority Claim.  The Lender is hereby granted an allowed superpriority administrative expense claim (the "Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code in the Debtor's Title III Case for all monetary obligations arising under the Facility, having priority over any and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever to the extent provided in Title III, including, without limitation, all allowed administrative expenses of the kinds specified in or arising or ordered, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed Superpriority Claim shall be considered administrative expenses allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code, and which Superpriority Claim shall, subject to the provisions of Title III, be payable from and have recourse to all pre- and postpetition property of the Debtor and all proceeds thereof. The Superpriority Claim shall be subject and subordinate in priority of payment only to the administrative claims described in the Carve Out (defined below). Except as otherwise provided in this Order, the Superpriority Claim shall be senior in all respects to any and all other superpriority administrative expense claims allowed in this Title III Case. | Rejected. The Superpriority Claim is granted pursuant to section 364(c)(1) of the Bankruptcy Code, which contains no language limiting the superpriority claim to monetary obligations or to claims provided in Title III or the Bankruptcy Code. |
| Bond Trustee [ECF No. 730] | 9 | Current Expense Classification. "Eligible Uses" of the proceeds of the Loans pursuant to this Order and the Credit Documents are limited to "Current Expenses" under the Trust Agreement. As such, the Debtor's repayment obligations to the Lender for amounts borrowed under the Facility shall be treated as "Current Expenses" under the Trust Agreement. | Rejected. The Debtor reached an agreement with Assured and the Ad Hoc Group on the language of paragraph 9.  In addition, the Proposed Final Superpriority Credit Agreement makes clear that the Superpriority Facility can only be used for Eligible Uses (a subset of Current Expenses). Thus it consistent with the |

| Objection | ¶ | Requested Change | Response & Explanation |
|---|---|---|---|
| | | | Proposed Final Superpriority Credit Agreement that the Superpriority Facility be repaid as Current Expenses.  This structure was also a feature of the proposal made by the Ad Hoc Group.  [ECF No. 717-1, ¶ 13.] |
| Bond Trustee [ECF No. 730] | 11 (new) | Repayment of Loans Under Facility. Prior to the Termination Date, the Debtor shall be authorized and directed to pay interest and to repay principal on the Loans made to it under the Facility from its General Fund subject to (a) the limitations set forth in the Budget then in effect; and (b) the payment of the other Eligible Expenses provided therein. On and after the Termination Date the super-priority administrative expense claim shall be paid to the extent, and in the priority, provided by Title III of PROMESA, including under any plan of debt adjustment confirmed thereunder. | Rejected.  The proposed payment suggested by the Bond Trustee is inconsistent with other terms of the Proposed Final Superpriority Credit Agreement and order, specifically with paragraph 9 (which was agreed to by some of the Respondents). This proposed language is unnecessary and inappropriate as it goes beyond the Court's oral ruling.  Further, the provision contemplates treatment under a plan of adjustment, which is irrelevant to the order. |
| Bond Trustee [ECF No. 730] | 12 | Prohibition on Granting of Liens or Additional Superpriority Claims. ~~No~~Without limiting the grant under the Trust Agreement, no liens, claims, interests or priority status, other than the Carve Out, having a lien or administrative priority superior to, *pari passu* with, that of the Superpriority Claim, shall be granted while any portion of the obligations arising under the Facility remains outstanding, or any commitments of the Lender under the Credit Documents remains in effect, without the prior written consent of the Lender. | Accepted with minor modifications to read "No valid, perfected liens, claims, interests or priority status…" |
| National [ECF No. 735] | A | the Debtor has ~~exercised its permissible judgment as a governmental instrumentality in~~ determin~~ing~~ed that the Facility represents the best financing it has been offered at this time. | Rejected.  The Court articulated that requests for larger facilities would be assessed for fairness to the body of PREPA's stakeholders but did not say that the Delaware corporate "entire fairness" standard applies.  This |

| Objection | ¶ | Requested Change | Response & Explanation |
|---|---|---|---|
| | | | finding is otherwise appropriate in the context of authorizing a governmental debtor to borrow under section 364(c). |
| National [ECF No. 735] | B | Good Cause Shown. Good and sufficient cause has been shown for entry of this Order. ~~The ability of the Debtor to obtain sufficient working capital and liquidity under the Credit Documents is vital to the Debtor, its creditors, and its customers.~~ The liquidity to be provided under the Credit Documents will enable the Debtor to continue to operate and preserve the value of the Debtor's assets. ~~Accordingly, this Order is in the best interests of the Debtor and its creditors.~~ | Rejected.  These items are not controversial and have been well substantiated by the evidence.  PREPA needs liquidity and will shut down without it. Indeed, it has already taken steps to curtail power generation. As the Court stated in its oral ruling:

"The Court finds that the movants have established that PREPA is currently on the brink of a severe cash flow crisis and that operations will have to be sharply curtailed and, . . . Such curtailment and shutdown would have a drastic impact from humanitarian, economic recovery, and debt readjustment perspectives on Puerto Rico and all of her stakeholders." Hr'g Tr. at 230:12-20. |
| National [ECF No. 735] | 4 | ~~4. Valid and Binding Obligations. All obligations under the Credit Documents shall constitute valid and binding obligations of the Debtor in accordance with the terms of the Credit Documents and the terms of this Order, and no obligation, payment, or transfer, under the Credit Documents or this Order shall be stayed, restrained, voidable, or recoverable under PROMESA, the Bankruptcy Code, or under any applicable law or subject to any avoidance, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges under PROMESA, the Bankruptcy Code, or any applicable law or regulation by any person or entity except as expressly provided herein.~~ | Rejected.  A lender must have confirmation its loan is a valid, allowable claim. This is a required provision in financing orders, confirming the obligation incurred by the debtor in exchange for financing is valid and binding, a concept that is fundamental to the borrowing relationship.  Eliminating this provision will gut the order because PREPA's obligation to repay $300 |

| Objection | ¶ | Requested Change | Response & Explanation |
|---|---|---|---|
| | | | million to the Commonwealth would remain an open question. No lender would agree to lend without a binding order. Further, nothing in this paragraph contradicts the Court's oral ruling. |
| National [ECF No. 735] | 6 | In the event the Facility is funded through a Commonwealth Financing (b) that results in a material change to ~~the~~or additional economic terms of the Facility or any other transfer or assignment of any rights under the Credit Documents, such change or addition shall not become effective without further Court order, which shall be submitted on presentment with notice to parties in interest in accordance with the case management procedures. | Accepted. |
| National [ECF No. 735] | 9 | ~~Current Expense Classification. "Eligible Uses" of the proceeds of the Loans pursuant to this Order and the Credit Documents are limited to "Current Expenses" under the Trust Agreement. As such, the Debtor's repayment obligations to the Lender for amounts borrowed under the Facility shall be treated as "Current Expenses" under the Trust Agreement.~~ | Rejected . The Debtor reached an agreement with Assured and the Ad Hoc Group on the language of paragraph 9. In addition, the Proposed Final Superpriority Credit Agreement makes clear that the Superpriority Facility can only be used for Eligible Uses (a subset of Current Expenses). Thus it consistent with the Proposed Final Superpriority Credit Agreement that the Superpriority Facility be repaid as Current Expenses. This structure was also a feature of the proposal made by the Ad Hoc Group. [ECF No. 717 ¶ 13] |
| National [ECF No. 735] | 10 | Successors and Assigns. The Credit Documents and the 10. provisions of this Order shall be binding upon the Debtor and the Lender (and each of their respective successors and assigns), and shall inure to the benefit of the Debtor and the Lender (and each of their respective successors and assigns). The ~~terms and provisions of this Order shall also be treated as binding on all of the Debtor's creditors~~ | Rejected. This language was added to address the concern of other creditors that the order could be used to prejudice future financings. The deletion of the last sentence would |

| Objection | ¶ | Requested Change | Response & Explanation |
|---|---|---|---|
| | | ~~and all other parties in interest; provided, however, the~~ findings and determinations set forth in this Order shall not be binding on the Court with respect to the provisions contained in any future order approving additional financing ~~except that the Lender will be afforded the benefits and protections of this Order for all amounts owed under the Facility.~~ | allow a creditor to challenge the superpriority administrative claim, which is not acceptable to the Lender and would contradict the Court's oral ruling allowing for superpriority administrative claim if the Debtor makes the necessary showing for the reduced facility—which it has. |
| National [ECF No. 735] | 11 | <u>11.</u> ~~13.~~ Reservation of Rights. Nothing herein shall alter any setoff rights under applicable nonbankruptcy law of the Debtor, the Lender, or any other party, all of which setoff rights ~~, if any,~~ are hereby reserved; ~~provided, however, nothing in this Order authorizes any setoff between prepetition and postpetition amounts owed. Other than as explicitly provided in this Order, nothing.~~ <u>Nothing</u> in this Order or in the Credit Documents shall alter the rights, ~~if any,~~ of any parties-in-interest under the Trust Agreement or applicable law. For the avoidance of doubt, (i) the Court's approval of the Facility from the Debtor's perspective and (ii) the factual findings made in this Order shall not in any way prejudice or affect any rights or remedies that creditors of the Lender may assert in connection with the Lender's decision to enter into the Facility or the implementation thereof; provided, that the Lender reserves all rights and defenses in connection therewith. | Rejected.  This language was specifically requested by certain creditors, including the Committee. This provision is a mere reservation of rights, it does not create or impair any rights. |
| National [ECF No. 735] | 14 | ~~14. Binding Nature of Agreement. Each of the Credit Documents shall constitute legal, valid, and binding obligations of the Debtor, enforceable in accordance with their terms. Unless otherwise consented to in writing by the Oversight Board and the Lender, the rights, remedies, powers, privileges, and priorities of the Lender provided for in this Order, the Credit Documents, or otherwise shall not be modified, altered, or impaired in any manner by any subsequent order (including a confirmation or sale order), by any plan of adjustment in this Title III Case, by the dismissal of this Title III Case or in any subsequent case under PROMESA unless and until the obligations arising under the Facility have first been indefeasibly paid in full in cash and/or completely satisfied and any commitments of the Lender terminated in accordance with the Credit Documents.~~ | Rejected.  Similar to the confirmations in ¶4, the Commonwealth requires certainty to make a loan. |
| Ad Hoc Group | A. | ~~After considering all alternatives, the Debtor~~ | Rejected for same reason |

| Objection | ¶ | Requested Change | Response & Explanation |
|---|---|---|---|
| [ECF No. 732-2] | | ~~has exercised its permissible judgment as a governmental instrumentality in determining~~ The Debtor has determined that the Facility represents the best financing it has been offered at this time. | National's proposed language was rejected above. |
| Ad Hoc Group [ECF No. 732-2] | 6(a) | (a) Subject to the approval of the Oversight Board, the Debtor may enter into any amendments, consents, waivers, or modifications to the Credit Documents, in accordance with the terms thereof, without the need for further notice and hearing or any order of this Court; provided, however, that to the extent any material amendment, material consent, material waiver or material modification to the Credit Agreement or any other Credit Document, including without limitation Sections 4-13, 5-5, and 5-6 of the Credit Agreement and any modification to the Budget that adds or modifies categories of Ineligible Expenses, is approved by the Oversight Board (for the avoidance of doubt, including any refinancing of the Facility), such material amendment, material consent, material waiver or material modification or any other material change (however accomplished) shall not become effective without further Court order, ~~which shall be submitted on presentment with notice to~~ upon providing parties in interest with notice and sufficient opportunity to object, in each case in accordance with the case management procedures then in effect in the Debtor's Title III case. For the avoidance of doubt, such material amendments, consents, material waivers, or material modifications subject to this paragraph shall include any consent to the use of proceeds of the Facility to fund or otherwise pay for any Ineligible Uses. | Rejected. This language would require PREPA to seek Court approval to spend its revenues. Bankruptcy Code section 363 is inapplicable and under PROMESA section 305 creditors cannot obtain an order restricting PREPA's use of its property. Further, such a requirement would create an overly burdensome regime where even immaterial Budget changes that happen on a weekly if not daily basis would be subject to Court order. |
| Ad Hoc Group [ECF No. 732-2] | 6(b) | In the event the Facility is funded through a Commonwealth Financing that results in a material change to the economic terms of the Facility or any other transfer or assignment of any rights under the Credit Documents, such shall not become effective without further Court order, ~~which shall be submitted on presentment with notice to~~ upon providing parties in interest with notice and sufficient opportunity to object, in each case in accordance with the case management procedures. | Partly rejected. Parties will have notice and sufficient opportunity to object to notices of presentment pursuant to the Case Management Procedures currently in effect. Moreover, language has been included in paragraph 6(b) of the order that would allow parties to request an extended briefing schedule. |
| Ad Hoc Group [ECF No. 732-2] | 9 | Current Expense Classification. "Eligible Uses" of the proceeds of the Loans pursuant to this Order and the Credit Documents are limited to "Current Expenses" under the Trust Agreement. As such, the Debtor's repayment obligations to the Lender for amounts borrowed under the | Accepted. |

21

| Objection | ¶ | Requested Change | Response & Explanation |
|---|---|---|---|
| | | Facility ~~shall be~~ are treated as "Current Expenses" under the Trust Agreement. Nothing in this Order (a) prejudices the right of any party to argue (on the basis of this paragraph 9 or otherwise) that a pre-petition claim is or is not a Current Expense or (b) constitutes a determination of such issue. | |
| Ad Hoc Group [ECF No. 732-2] | 13 | ~~Other than as explicitly provided in this Order, nothing in this Order or in the Credit Documents shall alter the rights, if any, of any parties-in-interest under the Trust Agreement or applicable law~~Except as expressly stated herein, this Order shall not be interpreted to limit any party's rights and, for the avoidance of doubt, shall not be interpreted to prejudice the rights and interests of holders and/or insurers of PREPA's power revenue bonds. | Accepted with minor modification to clarify that (i) this provision does not create or impair rights but merely preserves rights, and (ii) the lender protections afforded by the Proposed Final Superpriority Financing Order (*i.e.*, superpriority administrative claim status) cannot be challenged. |
| Ad Hoc Group [ECF No. 732-2] | 15 | Any written amendment, consent, waiver, or modification to the Credit Documents shall be publicly filed with the Court through an informative motion. | Accepted with minor modification that "Credit Documents" has been replaced with "Credit Agreement." The Credit Agreement is the operative document. Conversely, the Credit Documents are open ended and the proposed language is not clear which documents would be included. This could lead to an accidental violation of the order. To be clear, the Debtor has agreed to provide the Credit Documents under paragraph 5 of the order and Article V of the Proposed Final Superpriority Credit Agreement. Moreover, it would be administratively burdensome to publicly file a document with the Court every time there is any modification to a document. |

| Objection | ¶ | Requested Change | Response & Explanation |
|---|---|---|---|
| Knighthead [ECF No. 736] | N/A | Requested new language:<br><br>"To the extent that Revenues are expended for Ineligible Uses either directly or indirectly (including, without limitation, through financing such Ineligible Uses from the Facility and repayment of the Facility with Revenues), the Trustee, for itself and bondholders, shall be entitled to seek adequate protection to the extent of such use of Revenues." | Rejected.  This language is unnecessary and inappropriate as there is nothing in the order that prevents PREPA's bondholders from seeking stay relief for lack of adequate protection. |

**Credit Agreement**

| Objection | § | Requested Change | Response & Explanation |
|---|---|---|---|
| Bond Trustee [ECF No. 730] | 2-6 | (a) The Borrower may repay all or any portion of the principal balance of the Revolving Credit Loans without premium or penalty from time to time (and without any permanent reduction of the Revolving Credit Commitment) until the Termination Date. Until the Termination Date, the Borrower shall make such principal repayments of the Loan as are provided for in the Budget applicable at that time. On and after the Termination Date, the Loan shall be an allowed super-priority administrative expense claim in the full amount of principal and unpaid interest owing, and shall be paid by the Borrower, subject to the Carve Out, in full immediately unless otherwise consented to by the Lender, but in any case subject to the provisions of Title III of PROMESA and any plan of debt adjustment that may be confirmed. | Rejected.  The proposed payment suggested by the Bond Trustee is inconsistent with other terms of the Revised Superpriority Credit Agreement and the Proposed Final Superpriority Financing Order and is unnecessary and inappropriate as it goes beyond the Court Oral Ruling.  Further, the provision contemplates treatment under a plan of adjustment, which goes beyond the scope of the Proposed Final Superpriority Credit Agreement. |
| Bond Trustee [ECF No. 730] | 2-6(b)(i) | ~~The~~Subject to the Financing Order, the Borrower, without notice or demand from the Lender, shall pay the Lender that amount, from time to time, which is necessary so that the unpaid balance of… | Rejected.  The Proposed Final Superpriority Financing Order provides that it controls making this change unnecessary and superfluous. |
| Bond Trustee [ECF No. 730] | 2-6(b)(ii) | ~~Upon~~Prior to the Termination Date, upon the Borrower's receipt of any Revenues in excess of amounts necessary in the Budget to (i) pay budgeted expenses for Ineligible Uses provided for in the Budget (inclusive of the Ineligible Uses Variance), expenses for Ineligible Uses that are subject to the Carve-Out, or any FEMA reimbursable expense for contracts that have been obligated by FEMA and approved by the Oversight Board | Rejected.  PREPA made other changes to this section requested by creditors. |

| | | | |
|---|---|---|---|
| | | and (ii) maintain a maximum cash ~~balance of up to $300,000,000.00~~ acceptable to the Lender, the Borrower shall apply such Revenues to the repayment of the outstanding Revolving Credit Loans.~~1~~ | |
| Bond Trustee [ECF No. 730] | 2-6(d) | ~~The~~Subject to the Financing Order and the provisions of Title III, the Borrower shall repay the then entire unpaid balance (except to the extent any Revolving Credit Loans are forgiven pursuant to Section 2-6(e)) of all Liabilities on the Maturity Date. | Rejected. The Proposed Final Superpriority Financing Order provides that it controls making this change unnecessary and superfluous. The reference to Title III is also unnecessary "belt and suspenders" language. |
| Bond Trustee [ECF No. 730] | 2-7(b) | ~~The~~Subject to the Financing Order, the Borrower shall pay accrued and unpaid interest on each Revolving Credit Loan in arrears as follows: | Rejected. The Proposed Final Superpriority Financing Order provides that it controls making this change unnecessary and superfluous. |
| Bond Trustee [ECF No. 730] | 2-7(c) | ~~Following~~Subject to the Financing Order, following the occurrence, and during the continuance, of any Event of Default (and whether or not the Lender exercises the Lender's rights on account thereof), all Revolving Credit Loans shall bear interest at a rate which is the aggregate of the interest rate then in effect plus two percent (2.00%) per annum, unless the Lender, with the prior written consent of the Oversight Board, elects not to exercise its rights to increase the interest rate in effect by said two percent (2.00%) per annum. | Rejected. The Proposed Final Superpriority Financing Order provides that it controls making this change unnecessary and superfluous. |
| Bond Trustee [ECF No. 730] | 4-1 | Payment and Performance of Liabilities. ~~The~~Subject to the Financing Order and Title III of PROMESA, the Borrower shall pay each Liability when due and shall promptly, punctually, and faithfully perform each other Liability. | Rejected. The Proposed Final Superpriority Financing Order provides that it controls making this change unnecessary and superfluous. Further, the provision contemplates treatment under a plan of adjustment, which goes beyond the scope of the Proposed Final Superpriority Credit Agreement. |
| Bond Trustee [ECF No. 730] | 4-10 | Prepayments of Indebtedness. ~~The~~Subject to the Financing Order, the Borrower will not make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash securities or other property) of or in respect of principal of or interest any | Rejected. The Proposed Final Superpriority Financing Order provides that it controls making this change unnecessary and |

| | | Indebtedness ((other than the Revolving Credit Loans), including any amounts with respect to the Pre-Petition Bond), except for Eligible Uses in accordance with the approved Budget and Ineligible Uses in accordance with this Agreement and the Financing Order. | superfluous. |
|---|---|---|---|
| Bond Trustee [ECF No. 730] | 4-13 | provided, however, ~~during the term of~~prior to the Termination Date, (subject to the terms of the Financing Order and without limitation of the rights of parties in interest to the Trust Agreement) ~~this Facility~~, no Revenues shall be used to pay | Rejected.  PREPA accepted other changes to this section requested by parties in interest. |
| Bond Trustee [ECF No. 730] | 4-14 | Cash Management System. Subject to the Financing Order and the terms of the Trust Agreement, the Borrower shall maintain a cash management system | Rejected.  The Proposed Final Superpriority Financing Order provides that it controls making a change unnecessary and superfluous. The reference to the Trust Agreement is similarly unnecessary as PREPA is operating under its current cash management system. |
| Bond Trustee [ECF No. 730] | 4-18(a) | the acceptance of any such Refinancing Indebtedness shall be subject to the prior written consent of the Oversight Board as required by PROMESA, and for the avoidance of doubt subject to court approval under Section 364 of Title III of PROMESA. | Rejected.  The language is superfluous. |
| Bond Trustee [ECF No. 730] | 5-2 | Weekly Reports. On the Wednesday of each week following the Effective Date, the Borrower shall provide the Lender and the Oversight Board, with copies made available to the Committee and the creditors of the Lender and the Borrower who are party to the Mediation Agreement or a customary non-disclosure agreement with the Borrower and to the Trustee under the Trust Agreement to the extent required thereby, with (i) an update to the Budget (which shall include reconciliation of actual results with the prior Budget), (ii) cash balance, (iii) total accounts payable and, if available, accounts payable aging schedule, (iv) grid restoration report for so long as any restoration activities are ongoing, (v) generation restoration report for so long as any restoration activities are ongoing and (vi) a FEMA Flash Report for so long as applicable. | Accepted with minor changes to make it clear that the Trustee must be party to the Mediation Agreement or be subject to an appropriate non-disclosure agreement in order to receive such information. |
| Bond Trustee [ECF No. 730] | 5-3 | Monthly Reports. No later than the fifteenth (15th) day of each month following the Effective Date, the Borrower shall provide the Lender and the Oversight Board, with copies made available to the Committee and the creditors of the Lender and the Borrower who are party to the Mediation Agreement or a customary non-disclosure agreement with the Borrower and to the Trustee under the | Accepted with minor changes to make it clear that the Trustee must be party to the Mediation Agreement or be subject to an appropriate non-disclosure agreement in |

| | | | | |
|---|---|---|---|---|
| | | Trust Agreement to the extent required thereby, with an updated schedule of accounts receivable. and, if available, accounts receivables aging schedule. | order to receive such information. |
| Bond Trustee [ECF No. 730] | 9-1 | the principal of the Revolving Credit Loans so declared to be immediately due and payable, together with accrued interest thereon and all fees and other obligations of Borrower accrued hereunder and under the other Loan Documents, shall become due and payable immediately subject to the Financing Order and the provisions of Title III of PROMESA, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by Borrower. Except as otherwise provided in the Financing Order, the foregoing remedies may be exercised without demand and without further application to or order of the Title III Court. | Rejected. The Proposed Final Superpriority Financing Order provides that it controls making this change unnecessary and superfluous. The reference to Title III is also unnecessary "belt and suspenders" language. |
| Bond Trustee [ECF No. 730] | 9-2 | Application of Proceeds. Notwithstanding anything herein to the contrary, (i) the Lender shall not take any action under this Article 8 (or similar provisions of any Loan Document) except after compliance with any applicable notice requirements applicable thereto set forth in accordance with the Financing Order, and (ii) following the occurrence and during the continuance of an Event of Default, and the Lender declaring the Revolving Credit Commitment terminated and accelerating the Revolving Credit Loans pursuant to Sections 9-1(i) or (ii) any Revenues thereafter received shall be applied on an ongoing basis, first, to pay any expenses that constitute the Carve-Out, second, to the payment of Eligible Uses in accordance with the Budget, third, (unless consented to previously in writing by the Lender and the Oversight Board) to the repayment of any outstanding Revolving Credit Loans under this Agreement, and fourth, to the extent not covered by one of the proceeding categories in accordance with Article 5 of the Pre-Petition Trust Agreement1, the Loans shall be repaid in accordance with this Agreement, subject to the Financing Order and the provisions of Title III of PROMESA. | Rejected. The application of proceeds in 9-2 was revised in the last version of the Proposed Final Superpriority Credit Agreement to address comments from creditors and further change is unnecessary. In addition, the Order provides that it controls making this change unnecessary and superfluous. The reference to Title III is also unnecessary "belt and suspenders" language. |
| Bond Trustee [ECF No. 730] | 11-2 | Effect of Termination. OnSubject to the Financing Order and the Provisions of Titlee III of PROMESA, on the Termination Date, the Borrower shall pay the Lender… | The Order provides that it controls making this change unnecessary and superfluous. The reference to Title III is also unnecessary "belt and suspenders" language. |
| Ad Hoc Group [ECF No. 732-2] | Pg. 3 | "**Eligible Uses Variance**": The amount equal to 157.5% of the projected amounts for total Eligible Uses disbursements | Rejected. PREPA's system is unstable and its collections and expenditures are still |

| | | | difficult to project.  As a result, the 15% variance is required.  A 15% variance is within the range of commercially acceptable variances.  Moreover, creditors do not have the right under PROMESA 305 to control expenditures or limit PREPA's expenditures. |
|---|---|---|---|
| Ad Hoc Group [ECF No. 732-2] | Pg. 5 | "**Ineligible Uses Variance**": The amount equal to ~~15~~7.5% of the projected amounts for total Ineligible Uses disbursements set forth in the Budget for such period | Rejected.  PREPA's system is unstable and its collections and expenditures are still difficult to project.  As a result, the 15% variance is required.  A 15% variance is within the range of commercially acceptable variances.  Moreover, creditors do not have the right under PROMESA 305 to control expenditures or limit PREPA's expenditures. |
| Ad Hoc Group [ECF No. 732-2] | Pg. 6 | "**Operating Accounts**": Those certain deposit accounts established in accordance with the Pre- Petition Trust Agreement in the name of and on behalf of the Borrower for the purpose of accepting Revenues, other deposits in the ordinary course of business, and proceeds of the Revolving Credit Loans from the Segregated Account and for making disbursements in accordance with the Budget. | Rejected.  PREPA is operating under its current cash management system. A list of PREPA's accounts has been provided to the Ad Hoc Group. |
| Ad Hoc Group [ECF No. 732-2] | Pg. 6 | "**Other Accounts**": Those certain deposit accounts established in accordance with the Pre- Petition Trust Agreement in the name of and on behalf of the Borrower in which Revenues are received, deposited or transferred, other than the Operating Accounts. | Rejected.  PREPA is operating under its current cash management system. A list of PREPA's accounts has been provided to the Ad Hoc Group. |
| Ad Hoc Group [ECF No. 732-2] | 2-6 | (ii) Upon the Borrower's receipt of any Revenues in excess of amounts necessary to (i) pay budgeted expenses for Ineligible Uses provided for in the Budget (inclusive of the Ineligible Uses Variance), expenses for Ineligible Uses that are subject to the Carve-Out, or any FEMA reimbursable expense for contracts that have been obligated by FEMA and approved by the Oversight Board | Rejected.  Prudent operation of PREPA's business requires that it maintain a level of cash on hand to address collection risk, required expenditures under the Stafford Act and |

| | | | |
|---|---|---|---|
| | | and (ii) maintain a maximum cash balance of up to $~~300,000,000.00~~200,000,000.00 (which cash balance shall be used solely for the payment of FEMA obligated expenses prior to receiving reimbursement for such amounts from FEMA to the extent necessary to continue restoration and recovery services on an uninterrupted basis), the Borrower shall apply such Revenues to the repayment of the outstanding Revolving Credit Loans. | emergency conditions that require expenditures to protect health and safety. In addition, the requested maximum cash balance is materially less than the reserve PREPA is permitted to retain under the terms of the Trust Agreement.  The importance of the reserve is explained in greater detail in ¶16(c) above. |
| Ad Hoc Group [ECF No. 732-2] | 2-8 | Each reference in the Loan Documents to the exercise of discretion or the like by the Lender or the Oversight Board shall be to its exercise of such party's judgment, in good faith, based upon such party's consideration of any such factor as such party deems appropriate; provided that the Lender and the Oversight Board shall consider the rights and interests of the Borrower's other creditors in exercising such discretion. | Accepted concept. Modified recitals to reflect that Borrower has taken into account the rights and interests of all PREPA stakeholders and PREPA's statutory obligations to Puerto Rico as required by PREPA's Enabling Act. No other contractual restrictions on Oversight Board or Lender discretion are necessary, appropriate, or required by the Court Oral Ruling. |
| Ad Hoc Group [ECF No. 732-2] | 4-13 | Use of Proceeds. The Borrower shall not, nor shall it permit any of its Subsidiaries to use the proceeds of the Revolving Credit Loans for any purposes other than to pay or fund the Borrower's operations, including, without limitation, employee payroll and benefits, facilities maintenance costs that are not Capital Expenditures or infrastructure improvements, and normal operational materials, supplies, fuel and power supplies, vendor and service payments (collectively "**Eligible Uses**"); provided, however, that none of the proceeds of the Revolving Credit Loans and none of the Liabilities or the Carve-Out may be used for any purpose prohibited by the Title III Court or the Financing Order; provided further, that disbursements that have been obligated to be paid from funds provided by FEMA or any other federal entity shall not be subject to the limitation of the Eligible Uses Variance, Ineligible Uses Variance or otherwise limited by the Budget. Notwithstanding anything to the contrary contained herein, the proceeds of the Revolving Credit Loans shall not be used for (1) debt service (including, for the avoidance of doubt, payment of any Indebtedness | First change: Accepted.

Second change: Accepted with minor changes to reflect that restriction is on payments for Ineligible Uses.

Third change:  Rejected. PREPA is concerned that FEMA will view these changes unfavorably and that they could interfere with critical FEMA reimbursements. |

28

| | | | |
|---|---|---|---|
| | | existing prior to the Effective Date), (2) capital improvements, (3) repair or restoration of damaged public facilities, (4) paying the non-federal share of any federal program, (5) tax refunds, (6) lobbying, (7) Title III costs (including but not limited to judgments arising from the Title III Case and related cases, and legal or advisory fees), (8) deposits, transfers, or payments to accrual accounts, reserve funds, or contingency accounts that do not represent an actual, immediate cash disbursement to continue ~~Borrower's ordinary course~~ <u>government</u> operations <u>for essential services</u>, (9) administrative costs of federal disaster assistance grants and loans, (10) disaster related expenditures eligible for reimbursement from the United States Department of the Treasury, (11) any expense that is not a "Current Expense" as defined under the Pre-Petition Trust Agreement or (12) any expense that is not authorized by the Joint Resolution (the foregoing clauses (1) – (12) collectively, "**Ineligible Uses**"); provided, however, during the term of this Facility, ~~no Revenues shall be used to pay (1) debt service an Indebtedness on pre-petition debt obligations, (2) tax refunds, (3) lobbying, (4) deposits, transfers, or payments to accrual accounts, reserve funds, or contingency accounts that do not represent an actual, immediate cash disbursement to continue Borrower's ordinary course operations, or (5) any expense that is not authorized by the Joint Resolution~~<u>Revenues shall be used solely to pay budgeted expenses for Ineligible Uses provided for in the Budget (inclusive of the Ineligible Uses Variance), expenses for Ineligible Uses that are subject to the Carve-Out, or any FEMA reimbursable expense for contracts that have been obligated by FEMA and approved by the Oversight Board</u>; and provided, however, that any payment of any Emergency Spend (as defined in the Budget) shall be limited to those specific expenses (a) for which Borrower has received FEMA Reimbursement (as defined in the Budget) or FEMA has obligated funds or (b) to parties that are currently providing goods and services; <u>provided further, Borrower shall use its best efforts to limit payment of any Emergency Spend for expenses for which Borrower has already received FEMA Reimbursement and to parties that are currently providing goods and services to the Borrower and require such payment in order to continue to do so</u>. For the avoidance of doubt none of the proceeds of the Revolving Credit Loans shall be used for the payment of Professional Fees but such Professional Fees may be paid from other sources of funds. | |
| Ad Hoc Group [ECF No. 732- | 5-6 | 5-6. Reports to Motion Respondents. The Borrower shall make public the reports and notices provided to the Lender | Accepted with minor changes to clarify the |

| 2] | | under Section 5-1, 5-2 (other than 5-2(iii)) and 5-4, within three (3) Business Days of delivery to the Lender. The Borrower shall also make available the Proposed Budgets to the Motion Respondents, or their representatives, that have signed customary non-disclosure agreement acceptable to the Borrower promptly after delivery to the Lender; provided however, for the avoidance of doubt, that any Budget that is approved in accordance with Section 5.5(b), and any reconciliation of actual results with such Budget, shall be made public by the Borrower within three (3) Business Days of delivery to the Lender. | timing of making the Budget public within three (3) Business Days of approval and the reconciliation public within three (3) Business Day of delivery to the Lender. |
| Ad Hoc Group [ECF No. 732-2] | 8-9 | Payment of Other Indebtedness. Borrower shall make pay any payment or grant adequate protection with respect to Indebtedness in violation of Section 4-10. | Accepted. |

WHEREFORE the Oversight Board and AAFAF respectfully request the Court to overrule all objections to the Urgent Joint Application and to grant the Urgent Joint Application by entering the Proposed Final Superpriority Financing Order substantially in the form attached hereto as **Exhibit A**, and to grant PREPA such other and further relief as is just.

Dated:  February 18, 2018
        San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*pro hac vice*)
Paul V. Possinger (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Maja Zerjal (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as Representative for PREPA*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
30

USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as Representative for
PREPA*

THE PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY
AUTHORITY, as fiscal agent for PREPA

By its attorneys,
*/s/ Nancy A. Mitchell*

Nancy A. Mitchell (*pro hac vice*)
**Greenberg Traurig LLP**
200 Park Avenue
New York, NY 10166
Tel:  (212) 801-9200
Fax:  (212) 801-6400

David D. Cleary
Kevin D. Finger
**Greenberg Traurig LLP**
77 West Wacker Drive
Suite 1300
Chicago, IL 60601
Tel:  (312) 456-8400
Fax:  (312) 456-8435

## **Exhibit A**

Proposed Final Superpriority Financing Order

## **Exhibit B**

Redline of Proposed Final Superpriority Financing Order

## Exhibit C

Proposed Final Superpriority Credit Agreement

## **Exhibit D**

Redline of Proposed Final Superpriority Credit Agreement