```
 1   UNITED STATES DISTRICT COURT
     DISTRICT OF PUERTO RICO
 2   ------------------------------x
     IN RE: THE FINANCIAL OVERSIGHT
 3                                   PROMESA
     AND MANAGEMENT BOARD FOR PUERTO
 4   RICO,                           TITLE III

 5       as representative of
                                     Case No. 17-BK-3283 (LTS)
 6   THE COMMONWEALTH OF PUERTO RICO,
     et al.,                         (Jointly Administered)
 7            Debtors.
     ------------------------------x
 8   IN RE:                          PROMESA

 9   THE FINANCIAL OVERSIGHT AND     Title III

10   MANAGEMENT BOARD FOR PUERTO RICO,

11      as representative of

12   PUERTO RICO POWER AUTHORITY,
                                     Case No. 17-BK-4780 (LTS)
13            Debtor.
14   ------------------------------x
                                        Trial
15                                   February 15, 2018
                                     9:45 a.m.
16
     Before:
17
                        HON. LAURA TAYLOR SWAIN,
18
                                        District Judge
19

20                            APPEARANCES

21   PROSKAUER ROSE LLP
          Attorneys for Movant FOMB
22   BY:  MARTIN J. BIENENSTOCK
          TIMOTHY MUNGOVAN
23        EHUD BARAK
          PAUL POSSINGER
24

25
```

```
 1

 2                          APPEARANCES (Cont'd)

 3   GREENBERG TRAURIG LLP
     BY:  JOSEPH DAVIS
 4        KEVIN FINGER
             -AND-
 5   O'MELVENY & MYERS LLP
     BY:  PETER FRIEDMAN
 6        SUZANNE UHLAND
          JOHN RAPISARDI
 7   Attorneys for Movant AAFAF

 8   KRAMER LEVIN NAFTALIS & FRANKEL LLP
          Attorneys for Ad Hoc Group of PREPA Bondholders
 9   BY:  THOMAS MOERS MAYER
          DOUGLAS BUCKLEY
10        GREG HOROWITZ

11   WEIL, GOTSHAL & MANGES LLP
          Attorneys for National Public Finance Guarantee
12   Corporation
     BY:  ROBERT BEREZIN
13        EDWARD McCARTHY
          MARCIA GOLDSTEIN
14        DEBORA HOEHNE

15   CADWALADER, WICKERSHAM & TAFT LLP
          Attorneys for Assured Guaranty Corp. and Assured Municipal
16   Corp.
     BY:  MARK ELLENBERG
17        ELLEN HALSTEAD

18   MASLON LLP
          Attorneys for US Bank National Association
19   BY:  CLARK WHITMORE
          WILLIAM PENTELOVITCH
20
     ROBBINS RUSSELL ENGLERT ORSECK UNTEREINER & SAUBER LLP
21        Attorneys for GO Group
     BY:  LAWRENCE ROBBINS
22        DONALD BURKE

23   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          Attorneys for GO Group
24   BY:  ANDREW ROSENBERG

25
```

1

2                          APPEARANCES (Cont'd)

3    MILBANK, TWEED, HADLEY & MCCLOY LLP
          Attorneys for AMBAC Assurance Corporation
4    BY:  DENNIS DUNNE

5    PAUL HASTINGS LLP
          Attorneys for Official Committee of Unsecured Creditors
6    BY:  LUC DESPINS

7    ROPES & GRAY
          Attorneys for Knighthead Capital Management, LLC
8    BY:  KEITH WOFFORD

9    WACHTELL, LIPTON, ROSEN & KATZ
          Attorneys for Scotiabank de Puerto Rico
10   BY:  AMY WOLF

11   C. CONDE & ASSOCIATES
          Attorneys for Whitefish Holdings, LLC
12   LUISA S. VALLE CASTRO

13   CHIESA SHAHINIAN & GIANTOMASI PC,
          Attorneys for Arc American, Inc.
14   BY:  ROBERT NIES

15

16

17

18

19

20

21

22

23

24

25

1          (Case called)

2          THE COURT:  Again, good morning.  Welcome to counsel,

3    parties in interest, members of the public and the press, those

4    in San Juan, and those who are observing by telephone.

5          We continue to have in minds and hearts our fellow

6    American citizens who are working to rebuild their lives and

7    the island of Puerto Rico.

8          I remind you that,consistent with court and judicial

9    conference policies and the orders that have been issued, there

10   is to be no use of any electronic devices in the courtroom to

11   communicate with any person, source, or outside repository of

12   information, nor to record any part of the proceedings.

13         Thus all electronic devices must be turned off, unless

14   you are using a particular device to take notes or to refer to

15   notes or documents that are already loaded on the device.

16         All audible signals, including vibration features,

17   must be turned off.  And as provided in this court's standing

18   order, no recording or retransmission of the hearing is

19   permitted by any person, including but not limited to the

20   parties or the press.

21         Anyone who is observed or otherwise found to have been

22   texting, emailing, or otherwise communicating with a device

23   during the court proceeding will be subject to sanctions,

24   including but not limited to confiscation of the device and a

25   denial of future requests to bring devices into the courtroom.

1          That was my usual friendly greeting.  So, again, good

2    morning.

3          The Court will hear argument and receive evidence

4    today on the joint motion of the Financial Oversight Management

5    Board and the Puerto Rico Fiscal Agency and Financial Advisory

6    Authority for entry of an order authorizing post-petition

7    secured financing.  The original motion is docket entry number

8    549 in the 4780 PREPA bankruptcy Title III case.

9          I have allocated three hours to the proponents of the

10   financing motion and three hours to the opponents for their

11   respective arguments and witness testimony.

12         As I indicated in an order that I filed yesterday,

13   parties may but are not required to make opening statements

14   except that the proponents are required to make clear certain

15   matters at the outset of their presentation.

16         The Court has granted the request for five additional

17   minutes each for ARC and Whitefish for closing argument, and

18   the UCC has requested three minutes for closing argument, and

19   that request is granted as well.

20         I entered this morning the exhibit-related stipulation

21   that was filed, and I hope that that will help to make things

22   go more smoothly.

23         Has there been a decision as to whether witnesses are

24   to be excluded from the courtroom prior to their testimony?  Is

25   there any request for that?

 1             MR. DAVIS:  No, Judge.

 2             THE COURT:  No request.  Very well.  That makes things

 3   easier as well.

 4             In last night's flurry of filings regarding the PREPA

 5   bondholders' proposal, there were some issues raised as to

 6   whether that proposal could or should be considered at all and

 7   whether that's preclusive of the debtor's motion and whether

 8   that is in fact something I may institute or approve.

 9             So I think it helpful for you to have my view that the

10   only motion that is before the Court today is the debtor's

11   motion.  I will consider the existence and terms of the PREPA

12   bondholders' proposal in the context of consideration of

13   whether the debtors' motion should be granted.  I do not

14   consider the PREPA proposal preclusive of consideration of the

15   debtors' motion.  So I think that that takes me through my

16   list.

17             So, Mr. Bienenstock.

18             MR. BIENENSTOCK:  Good morning, Judge Swain.

19             May it please the Court.  My name is Martin

20   Bienenstock with Proskauer Rose LLP, attorney for the Oversight

21   Board for itself and representative of PREPA, Title III debtor.

22   We're not going to provide opening statements, your Honor,

23   beyond what your Honor's order yesterday asked for.

24             I'm going to take your Honor's second request first

25   because I can answer that, and then I'll ask to hand off the

1    first request to someone else, and I'll explain why.

2           In terms of your Honor's second request, whether there

3    are any material changes to the proposed financing order,

4    your Honor, there are two.  One is that in paragraph 2, we've

5    changed the amounts of the proposed financing from $1.3 billion

6    to $1 billion.

7           And in paragraph C, we provided that if there is CDL,

8    Community Disaster Loan, refinancing which requires a step

9    increase in interest rates, we would return to court on a

10   negative notice basis for approval, meaning that if there are

11   no objections, the Court can sign the order.  And if there are,

12   then whatever proceedings the Court deems appropriate.  Those

13   are the only two major changes.  There was other cleanup but

14   nothing substantive.

15          THE COURT:  Thank you.

16          MR. BIENENSTOCK:  In terms of your Honor's first

17   request for a position as to the urgency associated with

18   accessing the loan proceeds, as your Honor knows, the Oversight

19   Board gets numbers through AAFAF and through management of

20   PREPA which we don't control.

21          So, as to avoid the game of telephone or something

22   being repeated through several people and getting garbled,

23   we've asked Mr. Jody Davis of Greenberg Traurig an attorney for

24   AAFAF who concentrates on PREPA, to answer your Honor's first

25   questions, if that's okay with the Court.

 1          THE COURT:  Thank you.

 2          MR. DAVIS:  Good morning, your Honor.

 3          THE COURT:  Good morning.

 4          MR. DAVIS:  May it please the Court.  Joseph Davis,

 5  also known as Jody, counsel for AAFAF in its capacity as fiscal

 6  agent for PREPA.

 7          Your Honor, you directed the parties, actually, you

 8  specifically directed the movant, which would be us, to address

 9  immediately the issue of urgency.  I've taken your direction to

10  heart, and we have taken it very seriously.

11          THE COURT:  I'm going to ask you just to project even

12  a bit more because we have trouble with these microphones

13  sometimes.

14          MR. DAVIS:  Your Honor, this morning, the governing

15  Board of PREPA met to address this very issue and to approve

16  the opening that I am about to give, mindful of your directions

17  that we are to be candid with you and focus on the issue of

18  urgency.

19          Your Honor, today Mr. Todd Filsinger will be prepared

20  to testify -- is prepared to testify -- that PREPA has been

21  stretching its vendors as far as it could and as far as it can.

22          Since the hurricanes, PREPA has been operating with

23  limitedly liquidity and minimal cash reserves.  Critical

24  vendors have been pushed to the breaking point while

25  restoration and recovery vendors have gone with minimal

1    payments, in some cases no payments, for a period of time.

2           Generation has already begun.  The interim relief that

3    we had originally sought we decided to put off until this

4    hearing today which further strained the liquidity requirements

5    of PREPA to operate.

6           The date of this hearing is not a chance one for

7    PREPA.  It is a critical one.  PREPA's reserves will dip below

8    $100 million in the next few business days which will make

9    PREPA incapable of paying for certain critical ongoing

10   operations and will render it incapable of providing power

11   services for anyone other than critical and necessary

12   customers, which is to say hospitals, medical services, law

13   enforcement, gas stations, and fire stations.

14          In the absence of adequately liquidity, the debtor is

15   going to be put in a position where it literally cannot operate

16   in a very short order.  What do I mean by that.  The cost to

17   run PREPA is about $50,000,000 a week.

18          So, if the $100,000,000 reserve is tapped at that

19   rate, PREPA would be out of money in a couple weeks.

20   Mr. Filsinger testified that he is prepared to stretch that

21   out, but he can't stretch it out far.  He can stretch it out

22   maybe three or four weeks, maybe.  But what does that mean.

23          Your Honor, that means that without the financing

24   requested today, PREPA, in order to provide those critical

25   services, is going to have to commence shutting down operations

1    Friday, in other words, tomorrow, in a staged fashion.

2            That will mean initially notice.  It will then mean

3    cutting back on fuel orders.  It will mean initial layoffs.  As

4    a consequence, power generation will have to be shut down in

5    certain places, and very quickly what will result are power

6    shortages and brownouts.

7            These continued cuts will mean that residential and

8    commercial customers will commence losing public power within a

9    very short period, again, on a staged basis.

10           THE COURT:  When you say "a very short period on a

11   staged basis," are you saying that on Monday people are only

12   going to be able to find electricity at the gas station?  Or

13   are you saying that something that will play out and get to

14   this true public impact stage at the end of next week or in the

15   week after?  I would just like you to be as concrete as you

16   can.

17           MR. DAVIS:  Yes, your Honor.  With proper cash

18   management, which is to say stopping payment of certain things

19   and commencing the process of laying off and reducing fuel --

20   and of course, if you don't have fuel, you cannot run a power

21   plant -- Mr. Filsinger is confident that he can keep things

22   limping along for probably three to four weeks.

23           But that means reducing during that process the number

24   of customers that will actually have power.  So initially, as I

25   said, it will be brownouts and shortages as blocks of people

 1    are cut off, meaning commercial and residential customers are

 2    cut off.

 3          So it doesn't happen overnight.  There is a process

 4    that takes place, but it unfolds very quickly.  We're literally

 5    talking within a couple of weeks large bodies of customers not

 6    having access to power to conserve as much as the resources as

 7    possible for those emergency services.

 8          But within three to four weeks, there won't be

 9    reserves to pay for even the critical services.  So that's what

10    I mean.  I don't mean to sound overly dramatic, but that's what

11    we are talking about here.

12          They are running out of money for all of the reasons

13    that you can imagine.  There was a total shutdown of the system

14    for a large period of time.  If you don't have electricity

15    running, you can't bill people for the electricity.  If you

16    don't bill people for the electricity, you can't have the

17    revenues.  If you don't have the revenues, you can't pay for

18    the things you need unless you can borrow.

19          There are other consequences, your Honor, that come

20    from this too.  For example, even if PREPA is up and running

21    again, the failure to pay, for example, the fuel line providers

22    timely results in an approximately a $12-a-barrel penalty on

23    fuel going forward, and after 12 days of unpaid invoices, you

24    get shut off.  With regard to diesel fuel, there isn't even a

25    penalty phase.  They shut you off.  Those consequences even

1    survive the restoration project if we can get it up and

2    running.

3          In essence, your Honor, within a short period, three

4    to four weeks tops maximum, PREPA will cease operations, 6,000

5    people will be out of work, and the island will be plunged back

6    into darkness.

7          The gains that Mr. Filsinger and his team and the

8    PREPA Board and the AAFAF and the Oversight Board have been

9    laying out over the last couple months in improved billing, in

10   improved collections, improved transformational plans will, of

11   course, end.

12         But more importantly, the humanitarian crisis that has

13   been ongoing in Puerto Rico but has begun to seriously improve,

14   if you will, will now reverse itself in the worst of ways.  So

15   what nature brought by way of the wrath of the storms in

16   September, human short sightedness will bring back.  I put it

17   to the Court -- and Mr. Filsinger will testify so much -- that

18   the moment for an infusion of liquidity is now and cannot wait

19   any longer.

20         If I may, your Honor.  We do have a couple of

21   housekeeping matters as we move into the evidentiary phase.

22         THE COURT:  Yes.

23         MR. DAVIS:  You took care of one, the stipulation.

24   Allowing the stipulation of authenticity helps.  There is also

25   a stipulation that you've allowed with regard to Dr. Wolfe's

1    testimony.  So he will not be testifying.

2            With regard to Mr. Filsinger, he will be the first

3    witness.  My partner, Mr. Finger, will be handling it for

4    PREPA.  Obviously, the objectors will be cross-examining first,

5    given this Court's orders as to how the presentation is done.

6            However, there was a copying error in the binders that

7    you have, ironically that we have, but I don't believe it's a

8    problem with the objectors, which is to say Exhibit 16, which

9    in the index is described as the revised updated budget, in

10   your binder is not the revised updated budget.

11           The revised updated budget you actually have as

12   Exhibit A to the second supplemental declaration of

13   Mr. Filsinger.  We fortunately have with us copies of what

14   should have been Exhibit 16, and we intended to introduce that

15   into evidence or to swap it out with the exhibit that's in

16   there by accident.

17           THE COURT:  So is that page 50 of document number 688?

18           MR. DAVIS:  That's a question somebody up there is

19   going to answer.

20           THE COURT:  It was entered on February 12.  I think --

21   I was trying to be helpful.

22           So, if you're prepared to supply the document.

23           MR. DAVIS:  Yes, your Honor.  As it turns out, we,

24   fortunately, brought a lot of copies of the document.  So we do

25   have it in the courtroom.  It's not in a binder that your Honor

1    and the witness have, but we can swap that out as the testimony

2    occurs.

3           THE COURT:  That's fine.  You can just hand it to me

4    as to the witness.

5           Are you going to be using the Elmo to display the

6    documents for the people in the spectator section and in

7    Puerto Rico?

8           MR. DAVIS:  We were strongly encouraged to do so.  So

9    long as the klutzy nature of some of the lawyers doesn't foul

10   it up, we intend to do so so that people in Puerto Rico and,

11   frankly, people in this courtroom can see the documents too.

12   As you can see, I'm at a stage in life where reading glasses

13   are important, and looking at these documents without them is

14   impossible.

15          One last thing.  There is one witness, your Honor --

16   the witnesses who will be testifying live, just so you know,

17   are Mr. Filsinger, whom I've already mentioned; Gerardo Jose

18   Portela.  Mr. Portela is the executive director of AAFAF.

19          He is on his way here from a presentation he had to

20   make that was scheduled long before this session.  So hopefully

21   not in violation of your Honor's orders of that emailing.  We

22   are trying to track him and find out where he is.  We are told

23   he is very close and will be here momentarily.

24          Dustin Mondell from Rothschild.  Mr. Wolfe, as we've

25   already said, will be submitted by stipulation, and then the

 1   objectors, as I understand -- I won't speak for them -- will

 2   have Mr. Stephen Spencer as their witness.

 3       So, with that, your Honor, those are all the

 4   housekeeping matters I have on my list.

 5       THE COURT:  Thank you.

 6       I would just say that when everyone does use the Elmo,

 7   they'll just have to be particularly careful about moving

 8   around the podium, and Ms. Ng will turn it on.  So nobody break

 9   their knees on the shelf.

10       MR. DAVIS:  One of us will trip and fall, and

11   hopefully it is not I.  Thank you, your Honor.

12       THE COURT:  Thank you, Mr. Davis.

13       MR. DAVIS:  So then we would then offer into evidence

14   the declaration of Mr. Filsinger, which would be his direct

15   testimony.

16       THE COURT:  I take it from the stipulation that there

17   is no objection to that proffer.  So that declaration is

18   admitted in evidence.  I'm trying to find my copy of the list

19   because I want the record to be as clear as possible.

20       What's the document number or the exhibit number?

21       MR. DAVIS:  Your Honor, he actually has three

22   declarations.  The objectors did what I wish we had time to do

23   which was to do a consolidated declaration which would be a

24   little easier.  But unfortunately, we couldn't pull that off

25   due to a travel schedule.  So you have three declarations, his

1   original declaration --

2           THE COURT:  Which is Exhibit Number 1.  I see the

3   supplemental is Exhibit Number 11.  The second supplemental is

4   Exhibit number 15, and then exhibits to the supplemental are 12

5   through 14, and 16 was intended to be that exhibit from

6   document 688 that I referred to.

7           MR. DAVIS:  Yes, your Honor.

8           THE COURT:  So do I understand that you are proffering

9   into evidence Movants' Exhibits 1 and 11 through 16?

10          MR. DAVIS:  17.

11          THE COURT:  17, the trust agreement, which is Exhibit

12  8.

13          MR. DAVIS:  Yes, your Honor.

14          THE COURT:  So 1 and 11 through 17 are admitted in

15  evidence.

16          MR. DAVIS:  Yes, your Honor.

17          (Movants' Exhibits 1 and 11 through 17 received in

18  evidence)

19          THE COURT:  Thank you.

20          So is Mr. Filsinger here?  I understand there is a

21  desire to cross-examine him.

22          MR. DAVIS:  Yes, your Honor.  He is in the room.

23          THE COURT:  Mr. Filsinger, would you please come

24  forward to the witness stand.

25  TODD W. FILSINGER,

1        called as a witness by the Movants,

2        having been duly sworn, testified as follows:

3            THE COURT:  Thank you.

4            Please remain standing.  State your name and spell it

5    for the record.

6            THE WITNESS:  Todd W. Filsinger, T-o-d-d, middle

7    initial W., F-i-l-s-i-n-g-e-r.

8            THE COURT:  Thank you.  Please be seated.

9            Please speak into the microphone.

10            THE WITNESS:  Yes, your Honor.

11            THE COURT:  And your examiner is.

12            MR. HOROWITZ:  Good morning, your Honor.  Gregory

13    Horowitz from Kramer Levin Naftalis & Frankel on behalf of the

14    ad hoc PREPA bondholder group.

15            THE COURT:  Good morning, Mr. Horowitz.

16            MR. HOROWITZ:  Your Honor, as another small

17    housekeeping matter, I just want to make sure that the witness

18    has in front of him two binders.  One is the exhibits that were

19    marked by the movants; the other are the joint exhibits that

20    were marked by the objectors, and we've used numbers for the

21    movants' and letters for the objectors' exhibits.

22            THE COURT:  Thank you.

23            Do you want him to verify?

24            MR. HOROWITZ:  Yes.

25    CROSS-EXAMINATION

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    BY MR. HOROWITZ:

 2    Q.  Mr. Filsinger, could you please take a moment to orient

 3    yourself.

 4          Do you have two binders or more than two binders in

 5    front of you?

 6    A.  I have three binders.

 7    Q.  I gather one binder is the movants' exhibits and the other

 8    two binders are the objectors' exhibits?

 9          THE COURT:  I have four binders here.  I have one that

10    says Movants' Volume I, Movants' Volume II, Movants' Volume

11    III, and then objecting parties' exhibits.

12          MR. FILSINGER:  And your Honor, I think I have II and

13    III combined.  So I have Volume I, Volume II and III together,

14    and then I have the objecting parties' exhibit list for hearing

15    in another binder.

16          MR. HOROWITZ:  That's fine.  I also think, your Honor,

17    Exhibit 16, the most recent cash flow forecast -- this is not

18    going to be unique to Exhibit 16 -- is very hard to read, and I

19    believe that the movants kindly prepared large-format copies

20    which I think there is a copy in front of the witness.

21          THE COURT:  Yes.

22          MR. HOROWITZ:  Unfortunately, I can't guarantee that

23    we have similar copies of other exhibits.  We'll do our best.

24          THE COURT:  All right.

25    BY MR. HOROWITZ:

1    Q.  Mr. Filsinger, you are the chief financial advisor to PREPA

2    currently; is that correct?

3    A.  That is correct.

4    Q.  And you were retained on December 7, 2017?

5    A.  That is correct.

6    Q.  So you have been engaged for now slightly in excess of two

7    months; right?

8    A.  That is correct.

9    Q.  In connection with the motion that brings us here today,

10   you have prepared and signed three separate declarations;

11   right?

12   A.  Yes, I did.

13   Q.  And in connection with each of these three successive

14   declarations, you have also submitted a cash flow forecast.  I

15   think we frequently refer to them as 13-week cash flows, but

16   some of them are 15 weeks and some of them are 13; right?

17   A.  Yes.

18   Q.  And the first line on each of these cash flow forecasts

19   refers to customer projections, first actual and then

20   projections of customer collections; is that right?

21   A.  Yes.  Under the heading, under the weeks, yes.

22   Q.  And in each of the revisions to the original cash flow

23   forecast, the projected customer collections have increased

24   during the projection period; right?

25   A.  The actuals have been updated, and then the forecasts in

1   some years -- excuse me.  In some months -- weeks -- has gone

2   up.  Sorry.

3   Q.  The aggregate customer collections that are projected

4   during the projection period has increased; is that correct?

5   A.  I believe that's correct, yes.

6   Q.  And the size of PREPA's potential cash need in each of

7   these successive cash flow forecasts have decreased; correct?

8   A.  The timing of the negative cash position changed.

9   Q.  Well, let me direct your attention to -- I guess I'll start

10  to practice on the Elmo -- to the most recent cash flow

11  forecast, which is Movants' Exhibit 16.  Everyone in the

12  courtroom is now laughing because they're seeing what I was

13  referring to.

14          THE COURT:  I'm also going to challenge you to speak

15  into the microphone, even when you are moving to the Elmo,

16  because we are losing your voice.

17          MR. HOROWITZ:  That will be challenging:  I'm sorry,

18  your Honor.

19          THE COURT:  It might be best to refer to a particular

20  line.

21          MR. HOROWITZ:  Yes.  I'll leave it up on the screen,

22  and we'll all use our hard copies.

23  Q.  So, sir, if I direct your attention to -- let me get my

24  nice, big copy -- to the line on this cash flow forecast, about

25  the third of the way down, referring to -- it's a blue shaded

1    line, operating accounts and operating reserve fund.

2           Do you see that?

3    A.  Yes, I do.

4    Q.  For the actual period, which ends on February 2 in this

5    iteration of cash flow; correct?

6    A.  Correct.

7    Q.  For the actual projection period, the last actual number

8    for the balance in the operating account and operating reserve

9    fund -- let me just stop, sir.

10          The operating account and operating reserve fund

11   refers to the balance that PREPA has in the operating reserve

12   fund; correct?

13   A.  Generally, yes.

14   Q.  Is that a single bank account?

15   A.  I believe so.  I'm not sure if there are more accounts.

16   Q.  So, at the time you prepared this, the most recent balance

17   was $233.2 million; correct?

18   A.  As of this document, yes.

19   Q.  But it was projected to diminish to $144.8 million as of

20   the end of this week, as of tomorrow; correct?

21   A.  That is correct.

22   Q.  Do you know, as we sit here today, what the current balance

23   is?

24   A.  The current balance, taking into account the 2-9, is

25   approximately $194 million.

1   Q.  When you sat for a deposition yesterday, you didn't know

2   what the current balance was; correct?

3   A.  That's correct.

4   Q.  So, since we've sat, you've checked on the current balance;

5   is that right?

6   A.  Thinking of this morning, yes.

7   Q.  But according to your projection at the time you prepared

8   this, you expected that the balance might be as low as

9   $144.8 million as of tomorrow; correct?

10  A.  Just to be clear, the $194 million is as of last Friday.

11  Q.  Oh, it's as of last Friday?

12  A.  Yes.  You should be comparing that number to the

13  $190.4 million.

14  Q.  Okay.  So you don't know what the actual balance is as of

15  the moment.

16  A.  I don't know the balance as of the moment.  I do this on --

17  every Friday I get the numbers -- I get the numbers through

18  Friday the following day.

19  Q.  Thank you.

20          Now, on this current projection -- first of all, this

21  current projection is different in format from the prior two

22  cash flow projections in that this now contemplates the funding

23  of a DIP loan and shows the drawdown of that loan and resulting

24  balances.  Is that right?

25  A.  That is correct.

1    Q.  And on the bottom line, the bottom quadrant of this cash

2    flow forecast entitled loans outstanding, this contemplates

3    that the DIP loan would be approved and would be drawn down

4    during the 15-week period in this projection by $550 million;

5    is that right?

6    A.  Yes.  You would have to the loan, $550 million.

7    Q.  With the drawdown of $550 million, this contemplates that

8    the cash balance, the ending cash balance, would drop to as low

9    as $152 million; right?

10   A.  Yes.  Based on this projection, it would drop to $152

11   million on 5-18, May 18.

12   Q.  Which is not quite as low as you project you might be by

13   tomorrow; right?

14   A.  Tomorrow we're looking at -- we're estimating about

15   $144.8 million.  So it's similar.

16   Q.  Now, the reason that you used $550 million as the draw in

17   this exhibit is because that is the amount that has been

18   authorized by the Puerto Rico legislature; right?

19   A.  For the initial amount, yes.

20   Q.  The Commonwealth has not approved the $1 billion loan;

21   right?

22   A.  I don't believe they have as of yet.

23   Q.  And you understand what it means to have a committed loan;

24   correct?

25   A.  Yes.

1   Q.  And currently you are not aware of any commitment to fund

2   any DIP loan in excess of $550 million; correct?

3   A.  I think currently it's been approved up to $550 million.

4   Q.  And you do not anticipate that FEMA will advance a

5   Community Disaster Loan, a CDL, to the Commonwealth between now

6   and the end of this projection period, May 18.  Correct?

7   A.  No, I do not.

8   Q.  So this cash flow forecast projects -- represents your best

9   estimate of what will happen if this current motion is

10  approved; correct?  During the projection period.

11  A.  Well, we have asked in this motion for approval for a $1

12  billion DIP.  So what this shows is the 550 -- what the 550

13  does but what we're asking for is approval of up to $1 billion.

14  Q.  Let me repeat my question, sir:  This projection shows your

15  best estimate of what will happen during the 15-week period if

16  this motion is approved; correct?

17  A.  It shows -- well, it shows for the 550 but not for the

18  billion.  It helps demonstrate the need for the billion.

19  Q.  But you have no basis to project that the Commonwealth will

20  approve a lending in excess of $550 million between now and the

21  18th; correct?

22  A.  I don't have current approval, but my expectation is that

23  they will approve it.

24  Q.  You have an expectation, as we sit here today, that between

25  now and May 18 the Commonwealth will approve funding for more

 1   than $550 million, sir?

 2   A.  Well, we asked for a billion dollars.  So I certainly

 3   anticipate that.

 4   Q.  You understand that PREPA had requested more than a billion

 5   dollars in financing when the bill was first presented to the

 6   legislature; correct?

 7   A.  Yes.

 8   Q.  And at that time, the legislature only approved $550

 9   million; right?

10   A.  That's my understanding.

11   Q.  Now, the $550 million that's reflected in this 16-week cash

12   flow, according to these projections, would at least provide a

13   $150 million balance in the operating account during the entire

14   projection period; correct?

15   A.  Based on the projections, yes.

16   Q.  And it's only when cash falls below $100 million that you

17   would contemplate implementing the emergency plan that I think

18   Mr. Davis was referring to in his opening statement, the

19   limited shutdown of electricity?

20   A.  Well, let me explain that.  If you have anticipation that

21   you were going to drop below $100 million and you know you

22   don't have the funds coming in on very short order, in this

23   case, probably Wednesday of next week, you have to commence

24   shutdown.

25            There is not a magical number, when you hit 100 and

1   you suddenly hit that.  You have to look forward because what

2   we're doing -- as was explained in the opening, what we're

3   doing is if we don't have this loan and we drop -- next week,

4   if we drop to around $70 million, we have to implement the

5   emergency measures as soon as possible in order to extend that.

6   So, in this case, what we are doing is --

7           MR. HOROWITZ:  Your Honor, I have a limited amount of

8   time.  I don't mean to cut off the witness, but if he doesn't

9   stick to my questions, I'm not going to be able to get through

10  my line of cross.

11          THE COURT:  Mr. Filsinger, please answer specifically

12  the question that was asked.  If the questioner asks you to

13  respond as a yes or no question, you can respond yes or no or I

14  can't answer it that way, and then the questioner will

15  rephrase.  But do keep your answers as directed and short as

16  possible.

17          THE WITNESS:  Yes, your Honor.

18  BY MR. HOROWITZ:

19  Q.  I will repeat and slightly rephrase.

20          Unless you anticipate cash balances falling below $100

21  million, you do not intend to implement the emergency limited

22  shutdown plan that Mr. Davis referred to in his opening;

23  correct?

24  A.  If we don't get the approval of the loan, we are

25  implementing the emergency plan which starts Saturday.

1    Q.  Sir, my question is specifically and I think expressly

2    related to the projection presented in the cash flow in front

3    of you which does contemplate the funding of a $550 million

4    loan.

5           You just agreed with me that on the funding of a $550

6    million loan, your best projection is that the cash balance

7    will not drop below $150 million; correct?

8    A.  I'm sorry.  I'm not following you.

9    Q.  You testified a moment ago that based on the funding of a

10   $550 million DIP loan, your best projection at the moment, as

11   reflected in Movants' Exhibit 16, is the cash balance would not

12   drop below $150 million; correct?

13   A.  It does not show dropping below $150 million in this cash

14   flow.

15   Q.  So, getting back to my question, you do not intend to

16   implement the emergency limited shutdown plan that Mr. Davis

17   referred to unless you anticipate cash balances dropping below

18   $100 million; correct?

19   A.  Well, with the caveat I started to explain.  It depends on

20   what you have and what you see with respect to loan proceeds.

21   If this loan is put in place, no, you would not implement those

22   measures during the term of this cash flow.

23   Q.  That was my question, sir.  Now let's talk about after the

24   term of this cash flow.

25           PREPA also, in addition to a 13- or 15-week cash flow

```
 1   forecast, has also prepared a monthly liquidity model; right?

 2   A.  That is correct.

 3   Q.  Let me direct your attention, if you can find it in the

 4   binders in front of you, to Objectors' Exhibit J.

 5            THE COURT:  Are you offering Objectors' Exhibit J in

 6   evidence?

 7            MR. HOROWITZ:  I am, your Honor.  I believe per the

 8   stipulation, its admissibility has been stipulated.

 9            THE COURT:  Yes.  So Objectors' Exhibit J is received

10   in evidence.

11            (Objectors' Exhibit J received in evidence)

12   BY MR. HOROWITZ:

13   Q.  Exhibit J is a two-page document.

14            Sir, this is a two-page monthly liquidity model;

15   correct?

16   A.  Correct.

17   Q.  And this is a projection of liquidity to the end of fiscal

18   year 2018 on the first page; right?

19   A.  Correct.

20   Q.  And then on the other side, on the second page, for the

21   entire fiscal year 2018.  That's July 2018 through June 2019;

22   right?

23   A.  That is correct.

24   Q.  At our request, PREPA provided an update to this monthly

25   liquidity model during the course of this motion and
```

1    litigation; right?

2    A.   That is correct.

3    Q.   That update is Exhibit DD in your binder.

4            THE COURT:  Shall I deem DD offered and, therefore,

5    admitted?

6            MR. HOROWITZ:  Yes, your Honor.

7            THE COURT:  DD is admitted in evidence.

8            (Objectors' Exhibit DD received in evidence)

9            MR. HOROWITZ:  I'm trying to find my copy to put it up

10   on the screen.  Maybe when I ask questions, somebody will get

11   me a clean copy.

12           THE COURT:  I see your colleagues working on that.

13           MR. HOROWITZ:  Thank you very much.

14   Q.   So Exhibit DD is the updated monthly liquidity forecast;

15   correct?

16   A.   That is correct.

17   Q.   But this update is only prepared through the end of fiscal

18   year 2018; correct?

19   A.   That is correct.

20   Q.   And that's because you felt like you didn't have any

21   information to do any meaningful update for the projections for

22   2019; correct?

23   A.   We did not have the 2019 done yet.  They're working on this

24   as they get more information.  Once it's done, they'll post it.

25   Q.   Now, sir, both the original and the updated monthly

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1  liquidity forecast project that May of 2018, which is the end

 2  period in your weekly cash flow forecast, will be the low point

 3  for PREPA's cash balance; correct?

 4  A.  Is this the one up on the screen now that matches the one?

 5  Q.  The one up on the screen is the update, sir.

 6          THE COURT:  So is that DD or J?

 7          MR. HOROWITZ:  That's DD, your Honor.

 8          I should probably zoom out.

 9          THE WITNESS:  Try and zoom in a little bit.  I'm

10  having a hard time.

11  BY MR. HOROWITZ:

12  Q.  Are you looking at the hard copy?

13  A.  Well --

14  Q.  If you look at the column for May 2018, at the very bottom,

15  you will see a total cash balance, and it's a negative figure.

16  Right, sir?

17  A.  I'm having a hard time seeing it.  I apologize.

18          THE COURT:  This is the portrait format document, and

19  you're talking about the third column in from the

20  right-hand side, the very last number on the bottom?

21          MR. HOROWITZ:  That's right, your Honor.  I don't have

22  my hard copy in front of me, but I believe it's negative 327.7.

23  Q.  Do you see that, sir?  You don't have to confirm the exact

24  figure.

25          What I'm asking you to confirm now is that May of 2018

1  is projected to be the low point for PREPA's cash balance in

2  this revised monthly cash flow forecast.  Right?

3  A.  Again, I'm just trying to find it so I can validate.

4        THE COURT:  This is the number that he's referring to

5  down here.

6        I pointed out to the witness that 327 number on the

7  page.

8        THE WITNESS:  That bottom box includes emergency

9  funds.  That's why I'm struggling.

10       Are you looking at the bottom box?  Which box are you

11  looking at?

12       MR. HOROWITZ:  I am looking at the very bottom line of

13  the total cash, sir.  You're right.  It does include emergency

14  funds, but you can confirm the exact same thing if you can look

15  at general funds under ending balance, which is the fourth box

16  from the bottom.

17       The only question I'm asking, sir, is to confirm that

18  in this forecast, it shows that May 2018 will be the low point

19  in PREPA's projected cash balance.

20  Q.  Can you please confirm that, or I will refer you to your

21  deposition.

22  A.  Yes.  I believe that's correct.

23  Q.  Thank you, sir.

24       I can ask you to look at the top line, the projected

25  customer collections, and ask you to confirm that projections

1   of the customer collections will increase from May to June of

2   2018.

3          THE COURT:  This is the very first line of the chart?

4          MR. HOROWITZ:  It is, your Honor.  It shows a forecast

5   of $329.3 million in customer collections for May 2018 and

6   $325.2 million in June of 2018.

7   Q.  I want you to confirm that it shows that collections will

8   continue to increase.  Correct?

9   A.  It shows the collections increase in June of '18.

10  Q.  Right.  The extended cash flow forecast, which was Exhibit

11  J, it includes a projection -- I lost it on the Elmo, but I'll

12  keep going -- contemplates that monthly collection levels after

13  the hurricane will ultimately reach approximately $250 a month.

14  Right?

15  A.  $250 million.

16  Q.  And that's something in the range of $60 million per week;

17  right?

18  A.  Yes.  Depending on the number of weeks.

19  Q.  The updated monthly forecast -- I'm sorry.  I'm going back

20  to DD.  I'm trying to rush -- projects that there will be

21  positive net cash flows in the month of June, net cash flow --

22  I'm looking at the line that's immediately above the general

23  fund box -- of $75.6 million in June, positive in the cash flow

24  of $75.6 million in June.  Right?

25  A.  Yes.

```
 1   Q.  And your extended cash flow forecast, referring back again

 2   to DD, for 2019 projected a total positive net cash flow in

 3   2019, referring to the second page of DD, of positive

 4   $434.7 million; right?

 5   A.  Where are you referring to on this document?  I'm sorry.

 6          THE COURT:  I don't see a second page of DD.  That's

 7   the portrait?

 8          MR. HOROWITZ:  It is, your Honor.  A double-sided

 9   document.

10          THE COURT:  Not in my book.

11          MR. HOROWITZ:  I'm sorry, your Honor.  I misspoke.  J

12   is the original.

13          THE WITNESS:  We're on J now?

14          MR. HOROWITZ:  Yes.  I apologize.  We're on J, the

15   two-page extended one.

16          THE COURT:  Thank you.

17   BY MR. HOROWITZ:

18   Q.  And I just circled the number I'm pointing to on the Elmo

19   as the total projected cash flow for fiscal year 2019.

20          Do you see that?

21   A.  Looking at the total cash flow from operations?

22   Q.  Yes.

23   A.  Yes.

24   Q.  Thank you.  Sir, you were involved in the DIP loan

25   negotiation process; right?
```

```
 1    A.  I was at times.

 2    Q.  And you don't know what individuals were responsible for

 3    negotiating the DIP on the Commonwealth side, do you?

 4    A.  No.  I relied on Nancy Mitchell for the DIP loan.

 5    Q.  In your limited experience in the negotiations of the terms

 6    of the DIP loan, you don't recall whether the issue of a

 7    priming lien was even brought up as the subject of negotiation;

 8    correct?

 9    A.  Do you mean in my limited participation?

10    Q.  Yes.

11    A.  I'm not aware of all the things that were negotiated.

12    Q.  And you are not aware of there having been any business

13    discussion about whether the Commonwealth would be willing to

14    provide an unsecured loan to PREPA?

15    A.  I wasn't in on those parts of the discussion.

16    Q.  Other than the potential third-party lenders, had you no

17    involvement in the attempts to solicit a DIP loan from a third

18    party; right?

19    A.  Do you mean other than the third parties that were

20    solicited you mean?

21    Q.  I'm saying:  Including the third parties who were

22    solicited, other than providing potential names, you had no

23    involvement in the marketing process of this DIP loan; right?

24    A.  That was not my job.

25    Q.  And you're not aware -- we just looked at some projections.
```

 1  You're not aware of any projections that have been prepared by

 2  PREPA or anyone else that show a repayment, a source of

 3  repayment, for this proposed DIP loan, are you?

 4  A.  It's a 30-year term.  We haven't provided a 30-year

 5  projection, no.

 6  Q.  And you're not aware of any projection that would suggest a

 7  source of repayment for this DIP loan within the next two

 8  years, are you?

 9  A.  We have not prepared that yet.  No.

10          THE COURT:  You're on your red light.

11          MR. HOROWITZ:  I'm out of time?

12          THE COURT:  You're 54 seconds into borrowed time.

13          MR. HOROWITZ:  Your Honor, is this a limit per witness

14  that you're going to enforce, or are you going to allow us to

15  borrow some time from other witnesses?

16          THE COURT:  I am taking the time allocations from the

17  chart that was provided to me which gave you 25 minutes for

18  cross.

19          MR. HOROWITZ:  In that case, can I just have two

20  minutes to finish up my line of questioning, your Honor?  I

21  apologize.

22          THE COURT:  As long as your colleagues will let me

23  take that off the next one.  We just can't be here till 8:00

24  tonight.

25  BY MR. HOROWITZ:

1    Q.  Very quickly.  Sir, you've been involved in efforts to

2    collect more than $200 million in outstanding debts shown on

3    PREPA's books and records from public government corporations

4    in Puerto Rico?

5    A.  We have been involved in the collections of the

6    government's outstanding, yes.

7    Q.  Before I showed it to you at your deposition, you were not

8    aware that the Puerto Rico legislature enacted a law in April

9    of 2016 requiring public work corporations to sit down within

10   the next 45 days and engage in a reconciliation process and

11   then enter into a payment plan with PREPA to satisfy its

12   outstanding obligations.  Correct?

13   A.  I thought the date in the document you showed me was prior

14   to that, but I'll take, subject to check '16.  I thought it was

15   before that.

16   Q.  I'll represent it was April of 2016.  I'll refer the Court

17   to the document on Mr. Portela's cross-examination.

18            (Continued on next page)

19

20

21

22

23

24

25

1    BY MR. HOROWITZ:    (Continued)

2    Q.  Sir, there have been meetings within the last few days with

3    a number of the public corporations that have very large

4    outstanding amounts in an attempt to collect, correct?

5    A.  There were meetings, I think it was last week, it's in my

6    declaration, with several corporations, yes.

7    Q.  Notwithstanding those meetings and notwithstanding the

8    powers granted under Act 22-2016, you feel confident that you

9    will not receive any significant collections of outstanding

10   balances from these public corporations during the 15-week cash

11   flow projection period, right?

12   A.  I don't feel we will be doing -- we will be doing the

13   reconciliation, but I don't believe that that will be resolved

14   within the 13 cash flow projection.

15   Q.  Of course, you're aware if the governor wanted to, he would

16   have the power to compel those entities to pay their

17   outstanding obligations immediately, right?

18   A.  Well, the issue is, there is a dispute as what is actually

19   owed.

20   Q.  My question is:  If the governor willed it, he could compel

21   those entities to pay their outstanding obligations

22   immediately, correct?

23   A.  I don't know.

24   Q.  And it's also true that the Commonwealth could provide

25   loans or other forms of liquidity to the entities that owe

1   money to PREPA so that they could satisfy their obligations,

2   correct?

3   A.  I don't know that.

4          MR. HOROWITZ:  I have no further questions, your

5   Honor.

6          THE COURT:  Thank you, Mr. Horowitz.

7          Mr. Finger, redirect?

8          MR. HOROWITZ:  I think other parties may have provided

9   for a short period of time for cross.

10          THE COURT:  What I have is cross-examination expected

11   to take 25 minutes for the PREPA creditors.  So you've used 29.

12          MR. HOROWITZ:  I think some clarification is in order.

13   The Ad Hoc Bondholder Group, the Monolines and the Trustee, but

14   there is also projecting parties, the GO creditors and Ambac,

15   and I think they may or may not have reserved separate time for

16   cross.

17          THE COURT:  The chart that I have received says with

18   respect to Mr. Filsinger:  Cross expected to take 25 minutes

19   for the PREPA creditors.  Redirect examination expected to

20   take -- oh, this is the 30 minutes -- so sorry.  There is 30

21   floating minutes.  This will go into the 30 floating minutes.

22   So sorry.

23          MR. BURKE:  Donald Burke, Robbins Russell, the Ad Hoc

24   Group of General Obligation Bondholders.

25          THE COURT:  Good morning, Mr. Burke.

1          MR. BURKE:   Good morning, your Honor.

2    CROSS-EXAMINATION

3    BY MR. BURKE:

4    Q.   Good morning, Mr. Filsinger.

5    A.   Good morning.

6    Q.   Do you understand that under the proposed terms of the DIP

7    loan, interest rates begin at zero for a period of six months,

8    then step up a half percent every six months until it reaches a

9    maximum of three percent?

10   A.   I believe that's correct.

11   Q.   And you'd agree that those terms as interest terms are

12   favorable to PREPA, wouldn't you?

13   A.   I think they are good terms for PREPA.

14   Q.   And you are not testifying here today that PREPA requires

15   those favorable terms to maintain operations, are you?

16   A.   No.   PREPA needs to look at the terms to get the best loan,

17   but we looked at it, the Board looked at the terms, and decided

18   they were good for PREPA and that's why they approved it.

19   Q.   You never conducted any analysis as to whether PREPA would

20   be able to afford a higher interest rate and continue to

21   maintain operations, have you?

22   A.   I have not done that analysis.

23   Q.   Has anyone on your team conducted such an analysis?

24   A.   Not that I'm aware of.

25   Q.   Are you aware of anyone else, for example, at the FAFAA or

 1   the oversight board engaging in such an analysis?

 2   A.   They may have.  I don't know.

 3   Q.   But you're not aware of any?

 4   A.   Not that I'm aware.

 5   Q.   Mr. Filsinger, do you understand that the proposed debt

 6   loan provides for a maturity term of 30 years?

 7   A.   Yes.  Yes, I do.

 8   Q.   But you're not testifying that 30-year maturity term is

 9   necessary for PREPA to maintain operations, are you?

10   A.   I'm not testifying to that, no.

11   Q.   You've never conducted any analysis of whether that

12   maturity term is necessary for PREPA to continue operations,

13   have you?

14   A.   I have not done an analysis around the term for that

15   purpose.

16   Q.   And no one on your team has conducted such an analysis,

17   have they?

18   A.   Not that I'm aware.

19   Q.   Are you aware of anyone else, such as the AAFAF or

20   oversight board conducting such an analysis?

21   A.   I do not know what analysis they have conducted.

22   Q.   Mr. Filsinger, do you understand that under the terms of

23   the proposed DIP loan PREPA would grant a lien to the

24   Commonwealth on its revenues but would not grant a lien on

25   other assets, such as its physical properties?

```
 1    A.   That is correct.

 2    Q.   But you're not testifying that PREPA couldn't maintain

 3    operations if it granted a broader lien in favor of the

 4    Commonwealth, are you?

 5    A.   I haven't looked at that or any of the legalities around

 6    any of those issues.

 7    Q.   So you haven't conducted any analysis of whether PREPA

 8    could grant a broader lien and continue to maintain operations?

 9    A.   No, I have not.

10    Q.   And no one on your team has conducted such an analysis,

11    have they?

12    A.   Not that I'm aware.

13    Q.   Are you aware of anybody else, including the oversight

14    board or AAFAF, who's conducted such an analysis?

15    A.   I don't know if they've done the legal analysis or other

16    analysis around that.  I don't know.

17    Q.   You're just not aware?

18    A.   I don't know.

19         MR. BURKE:  Thank you, Mr. Filsinger.  That's all I

20    have.

21         MR. HOROWITZ:  Your Honor, just as a housekeeping

22    matter, Mr. Mayer pointed out, I didn't actually offer Exhibit

23    16, the cash flow forecast, which is the Debtor's Exhibit?

24         THE COURT:  I think I admitted Debtor's 11 through 18.

25         MR. HOROWITZ:  It's all admitted.
```

 1          THE COURT:  Yes.

 2          MR. HOROWITZ:  Thank you, your Honor.  Perfect.

 3          THE COURT:  Yes.  I'm sorry.  11 through 17 was

 4  admitted.  My error.

 5          Anyone else who wishes to cross-examine Mr. Filsinger?

 6          MR. BEREZIN:  Your Honor, is it appropriate for a

 7  PREPA bondholders to cross-examine, continue cross-examine

 8  Mr. Filsinger as our time?

 9          THE COURT:  Your time is up plus four minutes.

10          MR. BEREZIN:  Thank you.  I only ask because there was

11  some time left on the GO bondholders.

12          THE COURT:  As I understand it, there are 30 minutes

13  that can be shared by GO bondholders and some other

14  constituencies for cross-examination of all witnesses because

15  the other creditors will allocate 30 minutes of

16  cross-examination between the Filsinger or Portela and Mondell.

17          And so unless you are all agreed to eat it all up now,

18  I've counted three minutes against that 30 and assume that

19  people will pop up in the course of the day.

20          So what do you want to do?

21          MR. BEREZIN:  We will pass, your Honor.  Unless we are

22  able to continue to use the unused time, we will pass.

23          THE COURT:  I don't know what you mean.  Do you want

24  to use another 27 minutes and then nobody else from your group

25  can cross-examine anybody else?

```
 1              MR. BEREZIN:  No, your Honor.

 2              THE COURT:  If you want to do that, you can do that.

 3              MR. BEREZIN:  No, your Honor.  Sorry to clarify.  We

 4     represent National as one of the largest creditors, but we are

 5     not part of the GO group of bondholders.  So the GO group did

 6     not use all of the 30 minutes.  So what I was requesting is if

 7     we could question the witness using that unallocated time, a

 8     portion of it, but if that is going to eat into the PREPA

 9     creditors' time, then we would pass the witness.

10              THE COURT:  OK.  I am looking now for the definition

11     of "other parties -- other creditors."

12              LAW CLERK:  It's in footnote 4.  GO and Ambac.

13              THE COURT:  So "other creditors" are GO and Ambac.

14              PREPA creditors are Ad Hoc group of PREPA bondholders,

15     National, Assured, Syncora and Knighthead.

16              So the chart that I received or the documents says

17     that the PREPA creditors' group wanted 25 minutes for

18     cross-examination.  Mr. Horowitz used 29.  Then Mr. Burke just

19     used three minutes of the 30 minutes, 30 floating minutes that

20     general obligation bondholders and Ambac had reserved for

21     cross-examining any witnesses.

22              So if you are in the PREPA creditors' group, unless

23     you want to start eating in further to the PREPA creditors'

24     next cross-examination period for the next witness, I would

25     suggest you don't have any time to do it, and what has been
```

1    given to me does not allow you to invade the GO bondholders,

2    Ambac 30 minutes.

3             MR. BEREZIN:  Thank you, your Honor.  We understand

4    and National will pass the witness for those reasons.

5             THE COURT:  Thank you.

6             Mr. Finger, it looks like it is back to you for

7    redirect.

8    REDIRECT EXAMINATION

9    BY MR. FINGER:

10            MR. FINGER:  Thank you, your Honor.  Kevin Finger,

11   Greenberg Traurig on behalf of AAFAF as fiscal agent for PREPA.

12   Q.  Good morning, Mr. Filsinger.

13   A.  Good morning Mr. Finger.

14   Q.  Mr. Filsinger, Mr. Horowitz had asked you about the hundred

15   thousand dollars -- or hundred million dollars point at which

16   you feel it necessary to consider whether emergency measures

17   should be taken.  Would you describe to the Court what the

18   thought process is as PREPA approaches the hundred million

19   dollars of cash reserves?

20   A.  Yes.  As I started to explain is in order to implement the

21   plan and do the emergency plan, you have to try to preserve

22   cash so you can operate as long as you can under those

23   emergency conditions.  So we look at, if we can -- if I maybe

24   can just explain what will happen, it will help.

25            So if we don't have a loan, then on -- we've already

1    contacted FEMA and Carlos Torres who had restoration, and

2    informed them of the plan, so they know how to deal with

3    restoration.

4         Second, we talked to the top customers and let them

5    know that power is going out.  That would happen Friday.

6         Friday night or Saturday, Justo Gonzalez, the

7    executive director and/or myself and/or the chairman of the

8    board would issue a public statement educating the public on

9    how the shutdown is going to take place so it's not a surprise

10   to the community because, as you know, the community has been

11   through a humanitarian crisis, and we want to try to limit the

12   pain as much as possible.

13        We will announce that.  Then generation will start

14   ramping down on the Saturday to Monday timeframe, and then all

15   critical loads will commence being disconnected starting on

16   Monday trying to preserve the hospitals, the fire, the police,

17   grocery stores, gas stations, the critical components.  We have

18   transmission constraints, so we're still refining that piece.

19        But the reason for that, back to your question, is we

20   need to have enough money to operate to pay mainly the fuel

21   providers and the power purchase providers so we can continue

22   to use those assets through the emergency.

23   Q.  What is the current total amount of generation that PREPA

24   is capable of generating?

25   A.  It's several thousand megawatts.  It's 5-, 6,000 megawatts.

1   Q.  What is it currently operating at?

2   A.  The load is below two.

3   Q.  Can you describe how you're going to cut load during the

4   course of these emergency measures?

5   A.  The load will be cut initially to about half, a thousand.

6   And that is again based on the critical loads, and then they

7   will probably as we examine how the generators are running with

8   transmission constraints because there are a lot of lines still

9   down, we will try to drop that into about the 500 megawatt

10  range within a week.

11  Q.  Over what time will you drop from 2,000 megawatts to about

12  1,000 megawatts?

13  A.  That will happen -- it will start on Saturday/Sunday, and

14  hopefully by midweek we'll be in the thousand megawatt range.

15  Q.  What will that do to the residential and industrial

16  customers access to public power?

17  A.  The residential, commercial and industrial customers for

18  the most part will be without power, unless they have a back-up

19  generator or a buy a FEMA generator.

20  Q.  If we could take a look at the cash flow projection, which

21  is Substituted 16.  Do you have that in front of you?

22  A.  Yes, I do.

23  Q.  Mr. Filsinger, do you have Substituted Exhibit 16 in front

24  of you?

25  A.  Yes, I do.

1  Q.  You testified that based on this Exhibit the most recent

2  actual period reported is February 2.  Is that right?

3  A.  Yes, in the yellow, that's the last actuals.

4  Q.  And that cash figure, that 233.2 million in the middle,

5  represents the cash that's available to PREPA as of February 2,

6  2018.  Is that right?

7  A.  That is correct.

8  Q.  And then the projections projected that the cash on hand as

9  of last Friday February 9 is 191.4.  Is that correct?

10  A.  Yes, but that actual number now is out.  It's 194 roughly.

11  Q.  The projection was accurate in this respect.  Is that

12  right?

13  A.  Right.

14  Q.  And what's the projection for cash on hand by tomorrow,

15  February 16?

16  A.  Approximately 145 million, 144.8 million.

17  Q.  Can you tell from this document what projections indicate

18  the cash will be as of next Friday, February 23?

19  A.  Yes.  So the way you do the calculations -- this includes

20  the loan.  If you want a very simple way to do that

21  calculation, you basically take and add the two first blue

22  boxes and subtract the third.

23          So what that is you take your operating account of

24  $158 million, you add the ending balance of the 220.9 under

25  your eligible uses, and then you subtract off the loan,

1   assuming you don't have it, so 307.7.  And that number comes

2   out -- so it's 158 plus 220.9 minus 307.7, and that equals

3   approximately $71 million.

4   Q.  So is it fair to say that between February 2 and February 9

5   PREPA burned through about $40 million worth of cash?

6   A.  Yes.

7   Q.  And then the projections indicate that those burned through

8   another approximately $175 million worth of cash by the

9   following Friday, February 23?

10  A.  Yes, that's roughly correct.

11  Q.  And what that suggests is that PREPA is going to run out of

12  money by what date?

13  A.  You would run out of money, I believe, would be the week of

14  March 2.

15  Q.  What will happen when PREPA completely runs out of money?

16  A.  If we don't implement the emergency measures, then you

17  basically run the system until all, you know, you run out of

18  fuel.  Once you run out of fuel, you can't generate, and then

19  you have an instantaneous, you know, blackout.

20  Q.  Can you describe for the Court the cash management measures

21  that you will undertake upon implementation of the emergency

22  procedures?

23  A.  Yes.  Well, first I want to say we've been doing a severe

24  cash management to now, and you see where we are today.

25          But if you look at, for example, the week of 2/23,

1   next week, you can see your expenses under eligible uses.  We

2   will -- so we have the AES and EchoElectrica of 12.5 and -- AES

3   and EchoElectrica of 12.5 and 26.5 million, respectively.  What

4   we're going -- what we want to do, and we're still confirming

5   this with the technical folks, but our plan right now is to try

6   to run those two units.

7   Q.  Why?

8   A.  Because they're the lowest cost power.  And once you don't

9   make those payments, then you're taking them out of the stack.

10   Part of it is going to be based on transmission and looking at

11   as we start down this process and test it to see how the

12   transmission holds up to get to the critical loads, that may

13   impact that decision.  So that's going to be a realtime

14   decision.

15        We will cut -- we want to cut back on our fuel oil and

16   diesel.  The issue we have there is we have to balance that

17   because right now we are on the maximum -- we are on the

18   outside of the terms.  So we have stretched Echo fuel oil of

19   bunker seed and we've stretched the diesel.  So if we don't

20   make these payments, then diesel just gets cut off, period, and

21   bunker seed moves up to I think it's the $12 a barrel we

22   suggested.

23        So that's the challenge we're having right now.  We're

24   going to decide as we test the transmission that we'll either

25   cut off the diesel and bunker seed or we'll pull back on AES or

1   EchoElectrica.  It's going to depend on that transmission.  Our

2   plan is to try to drop that to about 50 percent in the first

3   week with corresponding load being shut off.

4   Q.  Describe the issues you have with the transmission system

5   and trying to determine what load to cut.

6   A.  Well, the issue is, you know, we've got the generators, but

7   we've got a lot of transmission lines that are still out.  So

8   we have in some cases we're relying on one line, some lines --

9   one line is predicted to come on in the next week or two, it

10  could make a difference but if you end up with a constraint

11  with certain units, you may not be able to get the power up to

12  some of your critical loads.

13  Q.  Upon implementation of emergency measures, how much do you

14  think you can cut PREPA's expenditures per week during those

15  emergency measures?

16  A.  We believe that we will be able to get with the outage and

17  trying to just do the emergency loads we'll be able to get down

18  to in the 20 to 20 mill -- to be able to cut costs about a 25

19  to 30 million range initially, and again, it will get more

20  severe as you move out, and that extends us to several weeks, I

21  think two or three weeks.

22  Q.  What's the total amount of time that PREPA can operate

23  under the emergency measures that will be implemented?

24  A.  I think it's a little uncertain because the one thing you

25  have to consider is if you go up to the collections line, our

1    collections are getting -- are improving and when we do the

2    shut down, the residentials are going -- for the most part are

3    going to be out.  And so there is maybe some impact -- there's

4    going to be a, lag but there's going to be an impact on your

5    collections; but not taking that into account, we think we're

6    going to be able to stretch the system of the emergency loads

7    for three to four weeks.

8    Q.  Is it fair to say that the collections are the only form of

9    free cash that will be available to PREPA over the course of

10   the next few weeks in the absence of a loan?

11   A.  That is correct.

12   Q.  How soon does PREPA need to receive the loan proceeds so

13   that you don't have to implement emergency measures?

14   A.  We have -- we have to receive the loan proceeds next week.

15   Q.  What day?

16   A.  I would say Wednesday, maybe Thursday.

17   Q.  At the latest?

18   A.  Yes.

19   Q.  Mr. Horowitz asked you questions about the available cash

20   that's available to PREPA at the end of the cash flow

21   projection on May 18.  Is that right?

22   A.  That is correct.

23   Q.  And that cash figure is 152 million?

24   A.  Yes.

25   Q.  What is the -- in your experience in the utilities

1    industry, what is a customary figure for operating reserve for

2    an electric utility?

3    A.   Well, it's prudent business practice to have usually two

4    months of working capital, which would be in the $500 million

5    range.

6    Q.   In this proposal under the Commonwealth's loan, what is the

7    maximum operating reserve that PREPA can maintain?

8    A.   That is limited to 300 million.

9    Q.   Will you be able to -- if two months of an operating

10   reserve is optimal, will you be able to operate at 300 million

11   of a reserve?

12   A.   We will be able to operate.  If we end up with any fuel

13   issue, and, you know, this business is not straightforward.

14   You saw that early this week with the switch explosion and what

15   that caused to the load in San Juan and the like.

16        We don't know what's going to happen.  If there's a

17   generation outage, if there's any out sort of outage, that may

18   increase your diesel costs and the like.  It can vary that

19   significantly.  We will make it work, but obviously we prefer

20   to have a full reserve, but we can make it work with 300

21   million.

22   Q.   You mentioned oil prices.  Have they increased over the

23   last 9 to 12 months?

24   A.   Yes, they have increased.

25   Q.   By how much?

1   A.  I think in the -- if you look at this time period, I think

2   the increase is about like $45 million impact on the cash flow

3   based on that increase.

4   Q.  Do you have an estimate of what the percentage is of that?

5   A.  I believe -- well, we are planning for up to a ten percent

6   risk tolerance but I don't know the total number.

7   Q.  When you say plan for a ten percent risk tolerance, what

8   are you referring to?

9   A.  Well, so when we look at the annual fuel costs, I think

10  they're about 1.2 billion, and so we look at a risk variance of

11  about 120 million, around there.

12  Q.  Is that built into the sizing of the DIP facility?

13  A.  Yes, it is, it's built into the $1 billion facility.

14  Q.  Based on your knowledge of PREPA's operations, is PREPA

15  capable of repaying the Commonwealth loan, if it's approved,

16  within 30 years?

17  A.  I think that the -- my belief is it will be paid off in 30

18  years or taken out at the final adjustment or if there's a

19  sale.

20          MR. HOROWITZ:  I have no more questions.

21          THE COURT:  I do have one question that I would like

22  clarified.  Looking at this replacement Exhibit 16, which for

23  the record is document 2473 from the 3283 docket, does this

24  assume draws over the life of the projection period of more

25  than $550 million?  There seems to be three columns in which

1    $550 million appears.

2         THE WITNESS:  No, your Honor.  What this does is it

3    shows three different draws.  The first draw is 307 -- if you

4    go to the bottom of the sheet, you'll see 307.7 is the initial

5    draw, the second is 222.9, and the third is 227.5.  Is that

6    right?

7         THE COURT:  So that would be a total of more than

8    $550 million, wouldn't it?

9         THE WITNESS:  I'm misreading that.  I'm sorry.  I

10   apologize.  You do the 307, and then in week number 3/23, you

11   take the rest of the balance of the 550.

12        Does that make sense?  So you're showing a total of

13   550.  You start off in week number three, 2/23 of the 307.7.

14        THE COURT:  Yes.

15        THE WITNESS:  And then if you go up loans outstanding,

16   you can see you've got the 307.  And then you add in 222.9 in

17   week number seven.

18        THE COURT:  Which would be 529.9?

19        THE WITNESS:  Yes.  And then you have in week 11, the

20   remaining 19.4.

21        THE COURT:  So what does the 227 in the week 11 column

22   refer to?

23        THE WITNESS:  That is your eligible uses in the

24   calculation of what you can take out.  So when you calculate

25   what, you can -- the loan, you look at the four weeks in

1   advance, the four-week projection, and then you multiply that

2   by the 15 percent adder, and that's what you can take out.  If

3   you look at -- you would go to the first column where you have

4   the 267.6, that's your consecutive four weeks of cash needs.

5          THE COURT:  Yes.  So just so they don't use up

6   everybody's time, so even though 307, 222.9 and 227.5 all

7   appear in a line that says "draw amount," 227.5 is not an

8   actual assumed draw amount?

9          THE WITNESS:  Yes, it's not drawn because you reach

10  the 550 cap.

11         THE COURT:  Thank you.

12         MR. HOROWITZ:  Thank you, your Honor.

13         One housekeeping matter, your Honor.  I am not sure if

14  Movant's Exhibit 6, which isn't an exhibit to Mr. Filsinger's

15  declaration has been admitted, and I just wanted to make sure

16  the record is clear.

17         THE COURT:  Movant's Exhibit 6 was not mentioned.  And

18  so you are tendering that?

19         MR. HOROWITZ:  Yes, your Honor, I am.

20         THE COURT:  Movant's Exhibit 6 is admitted in

21  evidence.

22         MR. HOROWITZ:  Thank you.

23         (Exhibit Movant 6 received in evidence)

24         THE COURT:  So Mr. Filsinger, thank you.  Your

25  testimony is concluded.

1          THE WITNESS:  Thank you, your Honor.

2          THE COURT:  You may step down.

3          (Witness excused)

4          THE COURT:  Movants may call their next witness.

5          MR. FRIEDMAN:  Your Honor, Peter Friedman from

6   O'Melveny Myers on behalf of AAFAF.  The Movants next offer the

7   testimony of Gerardo Jose Portela Franco, the executive

8   director of AAFAF.

9          The only housekeeping matter with respect to

10  Mr. Portela tell is with respect to his declaration.

11         THE COURT:  Mr. Portela, you may come up to the

12  witness stand.

13         MR. FRIEDMAN:  The only housekeeping matter with

14  respect to Mr. Portela's declaration is, as you may have seen

15  from the agreement between the parties, that Mr. Portela's

16  declaration would be admitted subject to an objection for

17  admissibility with respect to paragraph 11.

18         After consulting with opposing counsel, we have

19  actually agreed to exclude one sentence from Mr. Portela's

20  declaration, which is exhibit number --

21         THE COURT:  Number 2.

22         MR. FRIEDMAN:  Exhibit number 2 in paragraph 11, the

23  sentence in the ninth line down, in paragraph 11 beginning with

24  the wors "inclusion."

25         THE COURT:  Beginning with which word?

```
 1          MR. FRIEDMAN:  The word "inclusion" and ending in the

 2    word "lender."

 3          THE COURT:  So you are not offering that sentence, and

 4    so after this proceeding you will tender a redacted version of

 5    the declaration that does not include that sentence?

 6          MR. FRIEDMAN:  Yes, your Honor.  We agree that that

 7    resolves all objections to admissibility for Mr. Portela's

 8    declaration, and therefore offer it into evidence.

 9          THE COURT:  Mr. Portela's declaration as edited is

10    admitted in evidence.

11          MR. FRIEDMAN:  Thank you, your Honor.

12          THE COURT:  Thank you.

13          (Exhibit Movant 2 received in evidence)

14          THE COURT:  Mr. Portela, if you would please step up

15    into the witness stand and remain standing.

16     GERARDO JOSE PORTELA FRANCO,

17         called as a witness by the Movant,

18         having been duly sworn, testified as follows:

19    CROSS-EXAMINATION

20    BY MR. HOROWITZ:

21          THE COURT:  Thank you.  Please be seated.

22          Mr. Horowitz.

23          MR. HOROWITZ:  Thank you, your Honor.

24    Q.  Good morning, Mr. Portela.

25    A.  Good morning.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Q.  Mr. Portela, AAFAF is the fiscal agent for PREPA, correct?

2  A.  Correct.

3  Q.  And AAFAF is also the fiscal agent for the Commonwealth,

4  right?

5  A.  Correct.

6  Q.  And AAFAF has served in both of those capacities in

7  connection with the negotiation of the proposed DIP financing

8  facility, right?

9  A.  Correct.

10  Q.  OK.  Rothschild is the financial adviser to AAFAF, right?

11  A.  Correct.

12  Q.  And Rothschild has advised PREPA in his capacity as

13  financial adviser to AAFAF in connection with this DIP

14  facility, right?

15  A.  Can you clarify?

16  Q.  I know that was convoluted.  Let me try it again.

17  A.  Could you clarify that question, please?

18  Q.  Sure.  Rothschild has served as a financial adviser to

19  PREPA in connection with the negotiation of this DIP facility,

20  right?

21  A.  Rothschild is a financial adviser for AAFAF and for PREPA.

22  Q.  And Rothschild has also served as a financial adviser to

23  the Commonwealth.  AAFAF is the fiscal agent for the

24  Commonwealth in connection with this DIP facility, right?

25  A.  Correct.

 1    Q.  Thank you.

 2          Sir, you have had some involvement in attempts to

 3    collect accounts receivable from government entities on PREPA's

 4    behalf, right?

 5    A.  Correct.

 6    Q.  You sent 27 letters to various Commonwealth public

 7    corporations on PREPA's behalf on December 21, 2017, right?

 8    A.  I believe.  I'd better check the exact date.

 9    Q.  You can look on the screen.  I put on the screen Movant's

10    Exhibit K, which I've marked as an exhibit in your deposition.

11    It is copies of the 27 letters that you sent.  You can just see

12    the first one and refer to it.

13          THE COURT:  So are you offering Exhibit K in evidence?

14          MR. HOROWITZ:  I am, your Honor.

15          THE COURT:  Exhibit K is received in evidence.

16          (Exhibit Objector K received in evidence)

17    Q.  So that's correct, sir, you sent these 27 letters seeking

18    collection on PREPA's behalf; is that right?

19    A.  Correct.

20    Q.  You are not aware -- each of these 27 letters has a

21    sentence essentially along the lines of the second paragraph on

22    this letter to Mr. Abreu of the Island Municipal Maritime

23    Transport Authority that says:  "PREPA records show that you

24    owe a balance of" and then there's an amount given, right?

25    A.  Yes.

1  Q.  And you're not aware of how that balance was derived, are

2  you?

3  A.  I received the amounts from PREPA, PREPA advisers.

4  Q.  Sir, I want to show you on the screen what's been marked as

5  movant Exhibit K.

6           MR. HOROWITZ:  And your Honor I am offering it.

7           THE COURT:  Movant's exhibits have numbers.  Your

8  exhibits have letters, and K was the letter that you just put

9  up.

10          MR. HOROWITZ:  You're quite right, your Honor.

11  Objector's Exhibit K.  I apologize.

12          THE COURT:  So that's the letter that you just put up

13  that I admitted.

14          MR. HOROWITZ:  I'm sorry, your Honor.  I misspoke

15  again.  What I've just put up is Objector's Exhibit E.

16          THE COURT:  Objector's Exhibit E is admitted in

17  evidence.  Thank you.

18          (Exhibit Objector E received in evidence)

19  Q.  Sir, do you see Objector's Exhibit E?

20  A.  Yes, sort of.

21  Q.  You can look at it in your binder as well.  I'm just trying

22  to move quickly.

23          THE COURT:  Do you need him to be able to read it?

24  Q.  I'm not going to ask you to read the numbers yet, sir.  I

25  will ask you in a while, so maybe you want to get it in front F

1   you?

2          THE COURT:  You have a binder that has a long caption

3   on it that says Objector's Exhibits, and has tabs with letters,

4   so please turn to Exhibit E in that binder.

5          THE WITNESS:  Thank you, your Honor.

6          THE COURT:  Thank you.

7   Q.  Sir, do you have it there?

8   A.  It's K, right?

9          THE COURT:  E.

10  Q.  E.  K was the exhibit I put up before.  I'm sorry I

11  confused you.

12         Do you see Exhibit E?

13  A.  Yes.

14  Q.  This is a document you've seen showing outstanding amounts

15  owed by government entities to PREPA, right?

16  A.  Yes, I've seen this before.  However, I don't know as of

17  what date it is.

18  Q.  I will represent to you, and hopefully counsel will

19  confirm, that counsel has represented this is as of year end

20  2017, 12/31/2017.  It doesn't have a date on it, you're right,

21  but we've received that representation from movant's counsel.

22  OK?

23         Sir, if you took a look, for example, at the letter to

24  the Puerto Rico and Caribbean Cardiovascular Center

25  Corporation, which is I think the fourth letter in Exhibit K.

```
 1    Let me put it up on the screen so that you don't have to get
 2    that out.  They are double-sided.  That's the problem.  There
 3    we are.
 4             Sir, do you see this letter that I put up on the
 5    screen to Jorge de Jesus Rosa?
 6    A.  Yes.
 7    Q.  I apologize if I'm mispronouncing that.
 8             Do you see that in this letter that you say PREPA's
 9    records show that the Cardiovascular Center Corporation owes
10    PREPA $921,219 and change.  Do you see that?
11    A.  Mmm-hmm.
12             THE COURT:  I need you to answer in words, please.
13             THE WITNESS:  I'm sorry, your Honor.
14    A.  Yes, I do.
15    Q.  And if I ask you to turn back to the document, I hope you
16    still have in front of you?
17    A.  Yes.
18    Q.  Exhibit E.  If you look six lines down, do you see -- I'm
19    not going to try this one, sir, but that's the Spanish for the
20    cardiovascular center.  Is that right?
21    A.  Yes.
22    Q.  That shows that as of year end, the actual balance
23    outstanding was in excess of 12.6 million, right?
24    A.  Yes.
25    Q.  And of that large portion of it is a balance of, in the
```

1  final column, 120 days for older or more, right?

2  A.  Yes.

3  Q.  And you don't know why the letters that were sent out did

4  not include balances that were owed for 120 days or more,

5  right?

6  A.  The letters express that -- recommended all corporations to

7  send out a payment, a minimum payment of 900.  In this case

8  that hundred should be $1 thousand that represents current

9  payments to PREPA.

10  Q.  Sir, the letter says that:  PREPA's record says you owe a

11  balance of 921,000 and change, right?

12  A.  Yes.

13  Q.  And, in fact, PREPA's records showed a balance

14  substantially higher, right?

15  A.  Yes.

16  Q.  And we went through a number of these letters during

17  deposition.  There are many situations in which the letters

18  state a number that is substantially lower than PREPA's records

19  show, right?

20  A.  Yes.

21  Q.  And you don't know why the decision was made only to

22  include the balances of less than 120 days, do you?

23  A.  The decision was, you know, in consultation with advisers

24  and PREPA was to receive as soon as possible liquidity to

25  PREPA, and thus, for public corporations to pay, you know, the

```
 1   most recent payables.  And that's what in the case of

 2   Corporacion de Centro Cardiovascular de Puerto Rico --

 3   Q.  Try the English, if you can, sir.

 4          THE COURT:  We are not quite as bilingual here.

 5   A.  I apologize, your Honor.

 6          So the cardiovascular center will -- you know, as

 7   fiscal act for PREPA and for the public corporations, I advise

 8   to get payments to PREPA as soon as possible, thus, you know,

 9   requesting a minimum payment for the current payables.

10   Q.  Sir, when you sent out these letters, and in fact when you

11   sat for deposition, you were not aware of what I've just put up

12   on the screen, which is movant Exhibit L Puerto Rico Act No.

13   22-2016, right?

14   A.  Right.

15   Q.  OK.  And you were not aware that on April 7, 2016, turning

16   to --

17          THE COURT:  L is offered for admission?

18          MR. HOROWITZ:  L is offered for admission.

19          THE COURT:  L is admitted in evidence.

20          MR. HOROWITZ:  Thank you.

21          (Exhibit Objector L received in evidence)

22   Q.  You were not aware that in this Act, the Puerto Rico

23   legislature had directed all public corporations to immediately

24   sit down and within 45 days come to an agreement as to how much

25   they owed PREPA, right
```

 1    A.   I was not aware?

 2    Q.   And ordered that within the 60 days following that period,

 3    those corporations enter into a payment plan.  You were not

 4    aware of that, right?

 5    A.   I was not aware.

 6    Q.   And to your knowledge, PREPA has never taken any steps to

 7    enforce Act 22-2016, right?

 8    A.   Not to my knowledge.

 9    Q.   Sir, when I asked you at deposition why the Commonwealth

10    wouldn't loan money to public corporations that owed PREPA

11    money so that it could satisfy their obligations rather than

12    seeking to loan money to PREPA to cover the shortfall, at your

13    counsel's instruction, you refused to answer, right?

14    A.   Could you -- I'm sorry, could you repeat your question or

15    rephrase it because I'm not understanding it.

16    Q.   Sure.  Do you recall at your deposition I asked you why the

17    Commonwealth wouldn't loan money directly to public

18    corporations such as the cardiovascular center that owed PREPA

19    money rather than loaning money to PREPA to cover the amount

20    that those parties owed?  When I asked that question, do you

21    recall that at your counsel's instruction, you refused to

22    answer?

23    A.   I don't -- I don't recall.  It was a few days.  It's

24    been -- it was basically six hours.  I don't remember if -- if

25    there's a statement and declaration, I would love to read it.

 1          MR. HOROWITZ:  All right.  May I just ask counsel

 2   whether they would give a similar instruction if the same

 3   question were posed now?

 4          THE COURT:  Mr. Friedman?

 5          MR. FRIEDMAN:  Your Honor, to the extent the question

 6   calls for deliberations about policy or predecisional policy

 7   discussions, yes, I instruct the witness not to answer

 8   questions about any policy discussions prior to making

 9   decisions on whether or not to make loans to other agencies.

10   Those are protected by the deliberative process.

11          THE COURT:  And you construed this question as falling

12   into that category of questions?

13          MR. FRIEDMAN:  Your Honor, I believe the question

14   Mr. Horowitz may be referring to is on page 117 of

15   Mr. Portela's deposition which is:

16   "Q.  So why shouldn't the Commonwealth loan whatever net money

17   is necessary to process so that it can pay its outstanding

18   bills to PREPA instead of forcing PREPA to incur continuing

19   losses to provide subsidized electricity to PROSA."

20          I think that was the specific question in this

21   instance.

22          THE COURT:  So would you then be instructing the

23   witness not to answer that question if it were hypothetically

24   put to him right now on the witness stand?

25          MR. FRIEDMAN:  Yes, I would instruct the witness not

1  to discuss any policy deliberations that the Commonwealth or

2  AAFAF may have been a party to about whether or not to make

3  loans to public corporations.

4          THE COURT:  Thank you.

5          MR. HOROWITZ:  Your Honor, so the record is clear, we

6  do not agree with the Movant's interpretation of the

7  deliberative process privilege because we believe that they

8  have the burden of proof on this issue and the invocation of

9  the privilege to prevent the evidence from coming in, it's our

10 position it is not our obligation to try and force the answer.

11 It simply leads to a lapse --

12         THE COURT:  You have an argument about whether they

13 have met their burden if they are not putting forward evidence

14 recording the process.

15         MR. HOROWITZ:  Exactly, your Honor.

16         THE COURT:  Thank you.

17 BY MR. HOROWITZ:

18 Q.  Sir, you are aware that the legislature has passed an

19 emergency power -- an act giving the governor emergency powers,

20 right?

21 A.  If that's -- to clarify, is that the emergency act, I think

22 it's Act 5?

23 Q.  Yes, you're right, sir.  It is Act 5.  It's entitled -- in

24 the English it is entitled the Puerto Rico Financial Emergency

25 and Fiscal Responsibility Act.  For the record, it is movant --

1   sorry, it is Objector's Exhibit N, and I would offer it, your

2   Honor.

3              THE COURT:  Objector's Exhibit N is admitted.

4              (Exhibit Objector N received in evidence)

5   Q.  You're familiar with that Act, right?

6   A.  Yeah, of course I'm familiar with it as it came through.

7   Q.  Sir, you are aware that currently an emergency period has

8   been declared that will be lasting for at least the next three

9   months that gives the governor emergency powers under this Act?

10  A.  I'm not sure of the extension how many months it is, but I

11  know we are currently on an emergency period, correct.

12  Q.  And you're aware that the Act gives the governors the power

13  to take any action necessary to satisfy the debt obligations of

14  any Commonwealth entity?

15  A.  Again, I mean, I don't know the Act by memory.  If you

16  could show me where --

17  Q.  That's OK, sir.  It's public record I'll move on because I

18  have limited time.

19              Sir, you were engaged -- you are the primary person at

20  AAFAF responsible for negotiations with the federal government

21  over a potential CDL, Community Disaster Loan, right?

22  A.  If you mean for the Commonwealth or for PREPA?

23  Q.  Well, I'm primarily referring, sir, to negotiations between

24  the Commonwealth and FEMA over attempts to get a CDL?

25  A.  Yes, I am.

1   Q.  Thank you.

2         And in connection with those negotiations, at one

3   point FEMA sent you a list of proposed terms and conditions

4   that they would want to see in a CDL, right?

5   A.  I believe there were in -- I think they were sent -- I

6   don't know the exact period, but yes, they were very

7   preliminary.

8   Q.  And one of the terms and conditions in that preliminary

9   list was a rate covenant, right?

10  A.  If --

11  Q.  I can show it to you, sir, but I'm hoping that you remember

12  our discussion.

13  A.  I believe so, and it was in the term sheet.

14  Q.  And you understand that rate covenant clauses are common in

15  municipal finance agreements, right?  This is based on your

16  experience as an investment banker before you took your current

17  role?

18  A.  They could be common, yes.

19  Q.  And when I asked at your deposition if you were aware of

20  any discussions about whether to include a rate covenant in the

21  proposed DIP facility, again at your counsel's instruction, you

22  didn't answer, right?

23  A.  I don't remember my declaration regarding that specific

24  question itself for an answer.

25  Q.  Sir, does the Commonwealth have any -- I want to ask you

1   some questions about the priming lien proposed in the current

2   DIP facility.  You're aware that the current proposed DIP

3   facility was contemplating a priming lien?

4   A.  Yes.

5   Q.  Does the Commonwealth have any motivation in seeking the

6   priming lien other than to try and get assurance of repayment?

7   A.  If you could repeat that question.

8   Q.  Sure.  Does the government have any motives in seeking a

9   priming lien other than ensuring that it will be repaid on this

10  DIP loan?

11  A.  I'm trying to understand.  I don't want to delay this, but

12  if you could rephrase it, it would be great.

13  Q.  Sir, do you recall at a deposition --

14          MR. HOROWITZ:  Your Honor, do you want me to provide

15  the witness with a transcript or put it up on the screen?  I

16  don't know how you want to handle deposition questions.

17          THE COURT:  -- why don't you try reading clearly

18  "question" and then "answer" and ask if he recalls that.

19  Q.  Sir, do you recall at your deposition for the record, this

20  is at page 161 beginning at line 4, I asked you the following

21  question and you gave me the following answer:

22  "Q.  Sir, does the government have any other motives in seeking

23  a priming lien other than ensuring that it will be repaid on

24  the DIP loan?"  And you answered no.

25          Do you recall that, sir?

1   A.  If that's in the declaration, I -- I would agree to it.

2   Q.  And that's accurate testimony, sir, is that not?

3   A.  Yes.

4   Q.  OK.  Let me direct your attention to what's been marked as

5   Objector's Exhibit P, which is an email exchange between

6   yourself and Gary Grippo, who is an official at FEMA, right?

7   A.  Yes.

8           THE COURT:  Objector's P is admitted in evidence.

9           MR. HOROWITZ:  Thank you, your Honor.

10          (Exhibit Objector P received in evidence)

11  Q.  Do you see in this email chain-- first in the email on the

12  bottom of the first page of the document, Mr. Grippo has asked

13  you, "What would be the purpose of the Title III hearing on the

14  week of the 8th?  It's not clear that supporting PREPA from the

15  TSA would require a Title III hearing."

16          Do you see that, sir?

17  A.  Yes.

18  Q.  And you responded to Mr. Grippo, "Gary, if the Commonwealth

19  wants to be repaid, then it needs to go in as either senior to

20  the bondholders on a lien basis or as financing for current

21  expenses."

22          Do you see that, sir?

23  A.  I see it.

24  Q.  Now, sir, you know that yesterday the Ad Hoc Group of

25  Bondholders filed a proposed DIP facility that does not include

1    a priming lien.  You're aware of that?

2    A.  I'm aware that the PREPA bondholders proposed -- offered a

3    proposal to PREPA.

4    Q.  Are you aware that very shortly after that proposal was

5    offered, counsel for AAFAF filed an informative motion that was

6    entitled a Notice of Defect in Competing Non-Prime Position

7    Financial proposal.  Are you aware of that document?

8    A.  I'm aware of that document.

9    Q.  I'm sorry, you are?

10   A.  I am not aware of that document.

11   Q.  Oh, you are not aware of that document.

12          MR. HOROWITZ:  Do we have a copy of it?  Your Honor, I

13   don't know that I need to mark it as an exhibit.  I'm going to

14   refer to it by the docket number.

15          THE COURT:  That's fine.

16          MR. HOROWITZ:  Docket No. 714.

17          THE COURT:  In the 4780 bankruptcy case.

18          MR. HOROWITZ:  Yes.

19   Q.  I want to direct your attention to page 6 of this document

20   which I will put up on the screen.

21          Do you see the Section 7 of this document with the

22   caption in substance:  The competing financing contains a

23   priming lien in three different ways.  Do you see that?

24   A.  Yes, I see it.

25   Q.  If you look down to B, you'll see that it says -- it

```
 1    asserts that the competing -- I'm sorry.

 2            On page 7 of the document sub C says:  One of the

 3    three ways a competing facility has asserted to be equivalent

 4    to a priming lien is "the competing facility is given current

 5    expense priority."

 6            Do you see that, sir?

 7    A.  Yes, I see it.

 8    Q.  And that is the same sort of reference that you were making

 9    to Mr. Grippo when you told him that one of the ways the

10    Commonwealth could get sufficient assurance of being repaid is

11    if it went in as financing for current expenses, right?

12            THE COURT:  Do you have an objection Mr. Friedman?

13            MR. FRIEDMAN:  I do, your Honor, lack of foundation

14    that Mr. Portela could possibly know --

15            THE COURT:  You are going to have to speak up.

16            MR. FRIEDMAN:  I object on a lack of foundation to ask

17    a question of whether something in this document which

18    Mr. Portela said he wasn't familiar with is the same as

19    something he was referring to in an email three months ago.

20            THE COURT:  Sustained.

21            MR. HOROWITZ:  I'll move on, your Honor.

22    Q.  I'll read to you, sir, from this section C.

23            Do you see where it notes that the competing financing

24    provides: "all payments with obligations under the facility

25    shall be payable from the general fund (as defined in the trust
```

```
 1    agreement) at the level of current expenses under the trust

 2    agreement."

 3            Do you see that, sir?

 4    A.  I see it.

 5    Q.  Do you see that it goes on to say that -- I'm going to skip

 6    a sentence.

 7            "The competing facility is thus further granted

 8    payment priority over debt service on the prepetitioned bonds.

 9    Its superpriority claim status provides the same results.

10    Whether or not this payment priority is a lien is immaterial as

11    neither the Commonwealth facility nor the competing facility

12    provides foreclosure remedies."

13            Do you see that?

14    A.  I see it.

15    Q.  Sir, do you agree with the assertion that current expense

16    priority gives the same priority of payment as a priming lien?

17            MR. FRIEDMAN:  I object, your Honor, to the extent

18    that it asks Mr. Portela for a legal conclusion.

19            THE COURT:  Sustained.

20    Q.  Do you agree with the assertion that superpriority claim

21    status functionally provides a priming lien?

22            MR. FRIEDMAN:  Same objection?

23            THE COURT:  Sustained.

24        (Continued on next page)

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              MR. HOROWITZ:  Your Honor, I have no further

 2    questions.  I'm giving back two minutes of the time that I

 3    stole last time.  Thank you.

 4              THE COURT:  Thank you.

 5              Is there further cross-examination for Mr. Portela?

 6              MR. ROBBINS:  Yes.  Briefly, your Honor.

 7    CROSS-EXAMINATION

 8    BY MR. ROBBINS:

 9    Q.  Good morning, Mr. Portela.  My name is Larry Robbins.  We

10    met at your deposition.

11              Do you recall sir?

12    A.  Yes.  Good morning.

13              MR. ROBBINS:  Your Honor, I'm going to work off the

14    one exhibit, and I'm going to offer it at this time.  It's

15    Objectors' Exhibit Q.?

16              THE COURT:  Objectors' Exhibit Q is admitted.

17              (Objectors' Exhibit Q received in evidence)

18    BY MR. ROBBINS:

19    Q.  So do you have Objectors' Exhibit Q in front of you,

20    Mr. Portela?  Take a moment and see if you have it, sir.

21              THE COURT:  Do you want him to turn to it in the book?

22              MR. ROBBINS:  It might be easier because I'm going to

23    use various portions of it.  My facility with the Elmo maybe is

24    a bit limited.

25              THE COURT:  That's fine.  I do also challenge you to
```

```
 1  speak into the microphone while manipulating the Elmo.

 2  Exercise today.

 3          MR. ROBBINS:  I'll do my best.

 4          THE COURT:  Thank you.

 5  BY MR. ROBBINS:

 6  Q.  Mr. Portela, do you have that exhibit in front of you, sir?

 7  A.  Yes.  Do you mind if I take it out of the binder?

 8  Q.  I have no trouble with that at all.  Do whatever works best

 9  for your eyes.

10          Tell me when you have it ready for me.

11  A.  Yes.

12  Q.  Just to lay the groundwork, these are the -- at least as of

13  the 3rd of February, these were the basic terms, the concise

14  statement of the terms of the proposed DIP; correct?

15  A.  I see that it was filed on February 3, 2018.  So I

16  believe --

17  Q.  Just so we're clear, in the process by which these terms

18  were discussed and arrived at, you were at all times the

19  executive director of AAFAF; is that correct?

20  A.  Correct.

21  Q.  And in that capacity of AAFAF, you were an advisor to both

22  the Commonwealth and also to PREPA; correct?

23  A.  Correct.

24  Q.  And you had duties, the same duties, as to each entity in

25  the course of those discussions or negotiations.  Isn't that
```

 1   correct?

 2   A.   That is correct.

 3   Q.   And you had a team of AAFAF personnel who worked on the

 4   negotiation process; correct?

 5   A.   I have to clarify.  I have a team at AAFAF that works on

 6   PREPA, and yes.  They've been involved in conversations,

 7   discussions, etc.

 8   Q.   I believe you testified in your deposition -- correct me if

 9   I'm wrong -- that although you weren't personally involved in

10   all of those discussions, you were, nevertheless, debriefed on

11   the discussions that resulted DIP proposal; correct?

12   A.   Yes.  As executive director of AAFAF, I have a lot of work

13   sheets at AAFAF, and yes.  I tend to ask my team to brief me,

14   you know, as much as possible.

15   Q.   So, with that in mind, I'd like to just review a few of the

16   terms of the proposed DIP and just quickly go through them.

17   You'll see there is a provision on security and priority that

18   is at the bottom of page 2, running over to page 3.

19          Do you have that, sir?

20   A.   Yes.  I'm looking at it right now.

21   Q.   Am I correct, sir, that, as you sit here today, you don't

22   recall whether or not the Commonwealth ever offered a term

23   different from what appears in Exhibit Q?  Correct?

24   A.   I do not.

25   Q.   Now take a look at the section of the proposed DIP called

1   title ineligible uses, and tell me when you're there.

2   A.  I see it.  Thank you.

3   Q.  For the record, that's at the bottom of page 3.  Am I

4   right?

5   A.  Yes.

6   Q.  And once again, sir, in your capacity as executive director

7   of AAFAF and having been debriefed on discussions that you may

8   not have been personally a part of, again, as you sit here

9   today, you can't recall whether or not the Commonwealth ever

10  proposed a different term for ineligible uses than what is

11  reflected in Exhibit Q.  Isn't that correct?

12  A.  Could you try to repeat that question.  It was a long

13  question.  I'm sorry.

14  Q.  Yes.  You're quite right.  I'd be glad to.

15          Once again, with respect to the ineligible uses, you

16  don't remember the Commonwealth ever proposing a different term

17  than what is reflected in Exhibit Q; correct?

18  A.  Again, as I explained before, sir, I have team members that

19  work on a daily basis on PREPA matters.  Myself -- I don't

20  recall that there -- if they changed or not, the ineligible use

21  conditions or provisions.

22  Q.  Now let's take a look at the interest rate provision.  Tell

23  me when you're there.

24  A.  Page 5?

25  Q.  5 of 5 and running over to 6.  Correct?

1    A.   Correct.

2    Q.   When I asked you at your deposition, sir, whether or not

3    you could recall whether the Commonwealth ever proposed a

4    materially different interest rate than what is reflected in

5    Exhibit Q, you told me, not that I am aware of, and that

6    remains your testimony today.  Correct?

7    A.   It does.

8    Q.   Am I right, sir, that as best you recall, neither you nor

9    anyone at AAFAF performed an analysis as to whether PREPA could

10   perform its operations if it had an interest rate above the

11   level reflected in Exhibit Q?  Correct?

12   A.   Again -- and I apologize.  No more delay.  If you could try

13   to rephrase that question, I would be grateful.

14   Q.   Let's start with the interest rate.  The interest rate

15   begins at 0 percent; correct?

16   A.   Correct.

17   Q.   Did you personally ever analyze whether PREPA could perform

18   its operations with an interest rate higher than that?

19   A.   Again, sorry.  I have team members for AAFAF that worked on

20   a daily basis with regard to PREPA matters.  PREPA has their

21   advisors as well.  It's been a collaboration between AAFAF,

22   PREPA, and the Commonwealth.  So at that time I did believe

23   that this was a fair rate for PREPA for the proposed DIP.

24   Q.   Forgive me, sir.  All I asked you was:  Have you performed

25   an analysis as to whether PREPA can operate if it were charged

```
 1   a higher interest?  Have you done so?  Yes or no?

 2   A.  Personally, no.

 3   Q.  Have you seen any analysis done by a PREPA team member?

 4   A.  I'm not aware of their analysis or not.

 5   Q.  Have you seen any analysis performed by anybody on earth?

 6   A.  Sorry.  That was a different question.

 7   Q.  Have you seen any analysis of whether PREPA can do its job

 8   if it were charged a rate higher than Exhibit Q performed by

 9   anybody?

10   A.  With all respect, that's something I couldn't answer

11   because I don't understand your question.  It's very, very

12   broad.

13   Q.  I'll try it once more, and then I'll move on.

14          Have you ever seen an analysis performed by anyone as

15   to whether PREPA could perform its operations if it were

16   charged an interest rate higher than reflected in Exhibit Q?

17   Yes or no?

18   A.  I'm not aware of is there an analysis or not.

19   Q.  And you know that this proposed DIP is for 30 years.  You

20   know that; correct?

21   A.  Sorry.  I have to check.  Yes.

22   Q.  Have you ever seen an analysis performed by anyone as to

23   whether PREPA could do its job if the maturity were less than

24   30 years?

25   A.  I haven't -- I'm not aware of their analysis on the stress
```

 1    of maturity to PREPA.

 2    Q.  Let's just generalize it, and then I'll be done.

 3         Have you seen an analysis done by anyone as to whether

 4    PREPA could continue its operations if the terms contained in

 5    Exhibit Q were more favorable to the Commonwealth and less

 6    favorable to PREPA?  Have you seen any such analysis performed

 7    by anyone?  Yes or no?

 8    A.  It would be great if you could repeat that question.

 9    Q.  Sure.  I'll be glad to, and then I'll stop.

10         With respect to all of the terms and conditions

11    contained in Exhibit Q, the document I put in front of you.

12         Are you with me so far?

13    A.  Yes, I am.

14    Q.  Have you seen any analysis performed by anyone as to

15    whether PREPA could continue its operations if any of the terms

16    and conditions in Exhibit Q were more favorable to the

17    Commonwealth and less favorable to PREPA?  Yes or no?

18    A.  I couldn't answer whether there is an analysis or not.  It

19    would be pretty difficult for me to take a look at the

20    different vast analyses that PREPA may have or may have not

21    done, but personally, I have not seen that.

22         MR. ROBBINS:  I have nothing further for the witness,

23    your Honor.  Thank you.

24         Thank you, Mr. Portela.

25         THE COURT:  Is there any further cross-examination for

 1   Mr. Portela?

 2            Seeing none, Mr. Friedman, redirect.

 3            MR. FRIEDMAN:  I just have a few questions,

 4   Mr. Portela.

 5   REDIRECT EXAMINATION

 6   BY MR. FRIEDMAN:

 7   Q.  Mr. Portela, the funds that are being lent to PREPA -- do

 8   you know where they're currently held by the Commonwealth?

 9   A.  I believe at the TSA.

10   Q.  Do you know in the course of your responsibilities the

11   amount of interest that the Commonwealth earns on cash in the

12   TSA?

13   A.  I'm not aware of the specific interest, if there is.

14   Q.  Are you aware of what kinds of accounts the funds are held

15   in?

16   A.  I believe they're in operational bank accounts, cash

17   accounts.  I don't know if there's a money market fund or not.

18   That's the top of my memory.

19   Q.  So do you have any understanding of the interest rate that

20   the Commonwealth earns on TSA funding?

21   A.  I do not.

22   Q.  Mr. Portela, you were asked some questions about whether

23   the Commonwealth has directed public corporations to make

24   payments of its outstanding bills.

25            Do you recall that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1   A.   Yes.

 2   Q.   Are you aware:  Has the Commonwealth or AAAFAF ever ordered

 3   PREPA to pay outstanding bills or overdue amounts that it may

 4   owe, either public or private corporations?

 5   A.   I believe not.

 6   Q.   You were also asked some questions about various public

 7   corporations.  I think one of the public corporations that was

 8   mentioned was Cardiovascular Center.

 9        Are you aware in your responsibilities what that

10   corporation does?

11   A.   Sure.  I believe it's a large -- it's one of the largest

12   public hospitals in Puerto Rico.

13   Q.   One of the other letters that you sent I believe was to the

14   Elderly Care Advocate's Office.

15        Are you aware of what they do?

16   A.   Yes.  Advocacy for the elderly residents of Puerto Rico.

17   Q.   In your role as director of AAFAF, are you aware of whether

18   these public corporations have the liquidity currently to make

19   all payments that PREPA asserts are outstanding and overdue to

20   them?

21   A.   I would have to check.  As most people are aware,

22   Puerto Rico is undergoing liquidity issues.  So I would have to

23   check their budget and liquidity situation.

24   Q.   As a public servant, what would you have to evaluate in

25   order to assess whether they could pay overdue amounts?
```

1   A.  Sure.  First we would probably have to validate them or

2   validate the amount.  That's part of the reconciliation process

3   that AAFAF is trying to facilitate.  Second, I would try to

4   check the budget that currently has a the liquidity situation.

5           THE COURT:  It's better if you speak directly into the

6   microphone for people to hear.  Thank you.

7           THE WITNESS:  I'm sorry.

8           The liquidity situation and see if they have any other

9   obligations outstanding and then try to get a preliminary

10  information to see if there is any residual or not for that

11  specific corporation and then decide how and when and when to

12  pay.

13  BY MR. FRIEDMAN:

14  Q.  Sir, you were asked some questions about CDL loans.

15          Has the United States Treasury ever told you that it

16  would make a loan directly to PREPA using CDL funds?

17  A.  The federal government has not.

18  Q.  Has it told you that it would not?

19  A.  Let me clarify.  At AAFAF we're trying to get CDL funding

20  directly to PREPA.  The federal government declined that and

21  decided not to lend directly to PREPA.

22  Q.  Have you ever had any discussions with the United States

23  Treasury about whether it would make a loan to the Commonwealth

24  for the purposes of them making a loan to PREPA?

25  A.  We are currently -- there are ongoing efforts right now.

 1   I've been in discussions and negotiations with the federal

 2   government since October 2017.

 3   Q.  When was your last discussion, sir?

 4   A.  I talked to them on Monday this week.

 5   Q.  Did they give you any terms with respect to what a loan to

 6   the Commonwealth would look like?

 7   A.  After a few months, they finally gave me some preliminary

 8   terms and conditions orally.  I have not received a formal term

 9   sheet from them.

10   Q.  What, if anything, did those terms reflect with respect to

11   security, any security interest?

12   A.  Sure.  One of the main asks is a priming lien.

13          MR. FRIEDMAN:  I just want to take one second.  Thank

14   you.

15          (Pause)

16          MR. FRIEDMAN:  Nothing further, your Honor.

17          THE COURT:  Thank you, Mr. Friedman.

18          Thank you, Mr. Portela.  Your testimony is concluded.

19   You may step down.

20          THE WITNESS:  Thank you, your Honor.

21          (Witness excused)

22          THE COURT:  Movants may call their next witness.

23          MR. DAVIS:  Your Honor, movants' next witness is

24          THE COURT:  Thank you.  Is Mr. Mondell in the

25   courtroom?  Yes.  I see him.

 1          Please come forward.  Be careful of that drawer

 2    sticking out of the podium and come up to the witness stand and

 3    remain standing.  Thank you.

 4    DUSTIN L. MONDELL,

 5          called as a witness by the Movants,

 6          having been duly sworn, testified as follows:

 7          THE DEPUTY CLERK:  Please state your full name and

 8    spell it for the record.

 9          THE WITNESS:  Dustin Mondell, spelled D-u-s-t-i-n,

10    middle initial L., last name Mondell, M-o-n-d-e-l-l.

11          THE COURT:  Thank you.  Please be seated, and as you

12    testify, please speak into the microphone.

13          THE WITNESS:  Thank you.

14          MR. DAVIS:  Your Honor, Mr. Mondell's testimony is

15    offered by way of his declaration and his supplemental

16    declaration.  Those would be Movants' Exhibits 3 and 8.

17          THE COURT:  Movants' Exhibits 3 and 8 are admitted

18    into evidence.

19          (Movants' Exhibit 3 and 8 received in evidence)

20          MR. DAVIS:  With reference to those two

21    declarations -- and hopefully I've written them all down

22    correctly -- which I believe would be Movants' 9, 10, 29, 30,

23    31, 32, 33, 42, and your Honor 36, which is in the binder has

24    been previously offered as objectors' Exhibit Q.

25          THE COURT:  I will admit it as 36 as well and will

 1   note that it is the same as Objectors' Q.

 2              (Objector's Exhibits 9, 10, 29, 30, 31, 32, 33, 42,

 3   and 36 received in evidence)

 4              MR. DAVIS:  I believe, your Honor, that's every one of

 5   them.  If I said something wrong, I'm sure someone will flag it

 6   and bring it to my attention.

 7              THE COURT:  All right.  Thank you.  You may proceed.

 8              MR. BEREZIN:  Your Honor, Robert Berezin of Weil,

 9   Gotshal & Manges representing National Financial Guarantee

10   Corporation.

11              THE COURT:  Good morning, Mr. Berezin.

12              MR. BEREZIN:  Good morning, your Honor.

13   CROSS-EXAMINATION

14   BY MR. BEREZIN:

15   Q.  Good morning, Mr. Mondell, almost good afternoon.

16   A.  Good afternoon.

17   Q.  Is it correct that PREPA acts as the sole provider of

18   electricity services to the island of Puerto Rico?

19   A.  That is my understanding, yes.

20   Q.  And indeed PREPA provides 99 percent of the electricity

21   consumed on the island?

22   A.  I'm not sure of the exact percentage, but my understanding

23   is that PREPA is the primary provider.

24   Q.  And would you agree with me as a financial advisor that

25   PREPA has effectively a monopoly providing electric power on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1   the island of Puerto Rico?

 2   A.  I believe PREPA is the sole provider, yes.

 3   Q.  And of course, as the sole provider essentially of electric

 4   power, what PREPA has to offer is extremely valuable.

 5           Do you agree with that?

 6   A.  Valuable.  I think it's important.

 7   Q.  It's extremely important.

 8           THE COURT:  Would you please speak into the microphone

 9   a bit more.

10           THE WITNESS:  Sorry.  Yes.

11           THE COURT:  Thank you.

12   BY MR. BEREZIN:

13   Q.  And you would agree with me that PREPA provides the

14   government of Puerto Rico with all of its power?

15   A.  Yes.

16   Q.  And that includes agencies of the central government?

17   A.  I believe so.

18   Q.  And that would include all of the municipalities on

19   Puerto Rico?

20   A.  As well, yes.

21   Q.  And the instrumentalities, public corporations, that we've

22   heard about today; right?

23   A.  Correct.

24   Q.  And the government has no substitute, of course, for PREPA;

25   is that correct?

 1   A.  Well, the government -- I'm not a power person.  My

 2   understanding is they may have generator capacity to some

 3   extent, but by and large part, PREPA is the option they have.

 4   Q.  So casually speaking, sir, when it comes to the

 5   Commonwealth's supply of power, PREPA was the only game in town

 6   during the negotiations; correct?

 7   A.  As to power, yes.

 8   Q.  Now, you're aware or you were aware that PREPA's records

 9   indicated a substantial amount of receivables were owed by

10   government entities to PREPA; right?

11   A.  I am aware of that, yes.

12   Q.  And you're aware of that during the process of developing

13   the terms of the present proposed DIP; right?

14   A.  Yes.  That's correct.

15   Q.  And if the Commonwealth had agreed as part of the DIP loan

16   to pay down the receivables of these government entities, even

17   those owed more than 180 days, then obviously PREPA would have

18   had to borrow less money; right?

19   A.  I believe that's correct, yes.

20   Q.  And you're aware, aside from the central government, that

21   instrumentalities such as PRASA owed PREPA money during these

22   negotiations; right?

23   A.  PRASA.

24   Q.  I'm sorry.  PRASA.

25   A.  I believe that's correct.

1    Q.  And the same is true as to the Highway Authority?

2    A.  I believe that's correct.

3    Q.  And if the Commonwealth had agreed in the DIP negotiations

4    to lend public authorities and other government entities money

5    to repay PREPA, then PREPA would have had to borrow less money;

6    is that correct?

7    A.  I'm not sure what would be involved in that, but to the

8    extent that those agencies were able to pay their bills, then

9    that would reduce the DIP.

10   Q.  My question is:  If the government had lent the money to

11   those agencies so that the agencies could use that money to pay

12   PREPA, then that obviously would reduce the amount of the DIP

13   loan; right?

14   A.  That makes sense, yes.

15   Q.  And if the Commonwealth had agreed to permit an offset of

16   the amounts owed to PREPA, including amounts that are more than

17   120 days old in lieu of repayment of cash of the loan, that too

18   would have eased PREPA's financial crisis; right?

19   A.  I think we talked about this before.  I think they did

20   include an offset provision.

21   Q.  More than 180 days old, sir?

22   A.  I'm not sure of the specifics, sir, of the dates.

23   Q.  I think if you read the latest briefs from the oversight

24   committee, you will see that a specific -- any proposed order,

25   there is no offset for receivables older than 120 days.

```
 1              So, if you waited long enough to pay, those government

 2    agencies don't have to.  Right?

 3    A.  I have not read that, but if that's what you're telling me,

 4    I understand.

 5    Q.  During the DIP negotiations, there were no discussions

 6    about whether PREPA could repay the loan utilizing an offset

 7    based on receivables that are in its books and records; right?

 8    A.  Not that I recall.

 9    Q.  I'm sorry?

10    A.  Not that I recall.

11    Q.  And there were no discussions during the negotiations about

12    how to treat amounts owed to PREPA by government entities;

13    correct?

14    A.  Not that I'm aware.

15    Q.  And during the negotiations, PREPA also did not request an

16    unsecured loan; isn't that true?

17    A.  That is true.

18    Q.  And PREPA did not request that the secured loan be junior

19    to existing lien holders during the negotiations; right?

20    A.  Are you talking about the TSA loan?

21    Q.  Yes.  I am talking about the current DIP loan that we're

22    here to talk about today.

23    A.  That is correct.

24    Q.  And PREPA did not request that the loan be granted merely

25    administrative priority as opposed to super administrative
```

1   priority; right?  That's not a request that PREPA made during

2   the negotiations.

3   A.  Not that I'm aware.

4   Q.  Now, the proposed loan, DIP loan, grants the Commonwealth a

5   super-priority status.  And what that means, in plain terms, is

6   that at the time of the plan confirmation, PREPA needs to pay

7   back that loan 100 percent in full.  Right?

8   A.  Unless the creditor decides to alter the payment.

9   Q.  So what you're saying is PREPA will have to pay at the time

10  of plan confirmation 100 cents of this billion dollar loan

11  unless the Commonwealth agrees that it doesn't need that

12  treatment?  Is that right?

13  A.  That's my understanding of how super administrative claims

14  function.

15         THE COURT:  I'll need you to speak up a bit more and

16  perhaps a bit slower.  Talk as if you expect Mr. Berezin to

17  hear you without the microphone.

18         THE WITNESS:  To repeat my answer, that's how my

19  understanding of how super-priority claims function.

20  BY MR. BEREZIN:

21  Q.  And the proposed DIP loan does not require the Commonwealth

22  to consent in advance to allow PREPA to avoid having to pay at

23  plan confirmation 100 cents of the entire billion dollars;

24  right?

25  A.  Correct.

 1   Q.   To your knowledge, there have been no discussions where the

 2   Commonwealth has agreed, made a decision to agree, to waive

 3   that right to insist on full payment in cash at the time of the

 4   plan confirmation; correct?

 5   A.   Not to my knowledge.

 6   Q.   And PREPA has told other creditors and potential DIP

 7   lenders in this situation that it was targeting a plan of

 8   adjustment for some time in 2018 or 2019.  Correct?

 9   A.   I am not specifically aware, but that sounds reasonable.

10   Q.   And you would agree with me that the source of repayment of

11   the DIP loan are the revenues of PREPA; right?

12   A.   Yes.

13   Q.   And we've seen these monthly forecasts, including today,

14   which I'm going to spare everyone the requirement of looking at

15   that type.

16        You've seen one that goes out as far as June 2019;

17   right?

18   A.   Yes.

19   Q.   Now, based on the forecasts that you've seen, PREPA does

20   not have the funds to pay this loan back in full and in cash at

21   the time of the estimated plan of adjustment.  Right?

22   A.   The forecast I have seen does not show them being fully

23   repaid by June '19, if that's your question.

24   Q.   Yes.  My question is:  The forecasts you've seen -- there

25   is no cash to pay 800 million of the billion, for example?

1  A.  Not in that timeframe.

2  Q.  The timeframe of the targeted plan of confirmation when

3  PREPA needs to have under a super-priority lien 100 cents fully

4  paid up the entire $1 billion loan; right?

5  A.  I'm sorry.  There was a little confusion between the plan

6  adjustment and the forecast I've seen.  The forecast I've seen

7  is to June '19.  I'm not sure what you're talking about in

8  terms of the plan.

9  Q.  That's fine.  Withdrawn.

10        It's not typical in your experience, is it, for an

11 investor banker with 18 years' experience for a DIP lender to

12 loan without seeing forecasts that show how the DIP loan is

13 going to be paid; right?

14 A.  Yes.  Much of this loan, including that, is not typical.

15 Q.  Now, we've heard talk of a 30-year maturity; right?  You've

16 heard some of that testimony today?

17 A.  Yes.

18 Q.  It confused me because super-priority status means it needs

19 to be paid 100 cents at the time of plan confirmation, unless,

20 as you said, the Commonwealth decides that it won't have that

21 treatment.  Right?

22 A.  Yes.

23 Q.  But you know that under the credit agreement that's been

24 submitted with this motion, that one of the triggers for

25 payment of the entire loan is plan confirmation.  Right?

1    A.  Yes.

2    Q.  So, even if the Commonwealth decides, we're not going to

3    require PREPA to pay 100 cents of the loan at plan

4    confirmation, the loan will become due by its terms, the terms

5    that PREPA agreed to, regardless at plan confirmation; right?

6    A.  Unless the 100 cents are mature.

7    Q.  Yes.  In the negotiations, did PREPA ask the Commonwealth

8    to waive that maturity payment requirement?

9    A.  PREPA did not ask the lender to waive the maturity, no.

10   Q.  Now, we heard today that AAFAF is the fiscal agent for

11   PREPA; right?

12   A.  Yes.

13   Q.  And AAFAF is the fiscal agent to the Commonwealth; correct?

14   A.  Correct.

15   Q.  And during the negotiations, that was also true?

16   A.  Yes.

17   Q.  So AAFAF was acting both for the borrower and the lender?

18   A.  Correct.

19   Q.  And Rothschild was performing financial advisory services

20   to AAFAF and through AAFAF to both the borrower and the lender?

21   A.  Correct.  Rothschild advises AAFAF.

22   Q.  Now, if you had wanted to negotiate with the Commonwealth

23   in an effort to improve its DIP loan, you would have called

24   AAFAF; right?

25   A.  Yes.

 1  Q.  The very same AAFAF that represents PREPA; right?

 2  A.  AAFAF is the fiscal agent for PREPA.

 3  Q.  And the fiscal agent for the Commonwealth?

 4  A.  Yes.

 5  Q.  Now, you have been a financial advisor for 18 years;

 6  correct?

 7  A.  Correct.

 8  Q.  And that includes 18 years in the restructuring field in

 9  particular as well; right?

10  A.  That's correct.

11  Q.  In your career, you've been involved in negotiations of DIP

12  financing agreements; right?

13  A.  Yes.

14  Q.  And so you've been involved in preparing term sheets?

15  A.  Yes.

16  Q.  And in proposing term sheets; right?

17  A.  Yes.

18  Q.  And you've been involved in negotiating economic terms of

19  those term sheets for DIP loans; right?

20  A.  Yes.

21  Q.  But the process of developing this proposed loan was not

22  like the negotiations you've been involved in over your 18-year

23  career; right?

24  A.  It was fairly unique.

25  Q.  Fairly unique?  Okay.  And really, from your perspective,

1   during the negotiations, there weren't really two sides; right?

2   A.  This was a collaborative effort to achieve an agreed-upon

3   goal.

4   Q.  So there weren't two sides to this negotiation; right?

5   A.  Yes.  I would not describe this as a negotiation.

6   Q.  Not a negotiation, and there weren't two sides to the

7   negotiation; correct?

8   A.  This was a unified team.

9   Q.  You've heard of the term "arm's length negotiation;"

10  correct?

11  A.  I have.

12  Q.  That's when two parties negotiate back and forth to reach

13  an eventual settlement of terms.  Right?

14  A.  Right.

15  Q.  And it's thought in that back-and-forth struggle the

16  outcome is something that is legitimate, can be trusted.

17  Right?

18  A.  I'm not sure about that.  Could you clarify what you mean

19  by that.

20  Q.  It's okay.  Withdrawn.

21        So, to be clear though here for the Court, the process

22  to develop the proposed DIP loan was not an arm's length

23  negotiation.  Correct?

24  A.  This was a collaborative process, not an arm's length

25  negotiation.

 1   Q.  Not an arm's length negotiation.  Okay.

 2          Now, after the hurricane, AAFAF started working to

 3   obtain community disaster loans; correct?

 4   A.  Correct.

 5   Q.  And on or about January 9 of 2018, a letter was sent to

 6   AAFAF by the federal government, specifically FEMA and the U.S.

 7   Department of Treasury.  Is that correct?

 8   A.  I believe that's correct, yes.

 9   Q.  Why don't we look at exhibit -- this is Movants' Exhibit 7.

10          THE COURT:  Movants' Exhibit 7 is admitted in

11   evidence.

12          (Movants' Exhibit 7 received in evidence)

13          MR. BEREZIN:  Thank you, your Honor.

14   Q.  Do you have that in front of you, sir?

15   A.  I'm not sure where to find it.

16   Q.  It would be in the movants' exhibits?

17          THE COURT:  So the book that says Movants' Exhibits,

18   Volume I, tab 7.

19          THE WITNESS:  Yes.  I have that now.

20   BY MR. BEREZIN:

21   Q.  So this letter, sir, summarizes the federal government's

22   policy for the Community Disaster Loan program to Puerto Rico

23   in or about January 9; correct?

24   A.  Yes.

25   Q.  And in the letter, the federal government took note that

```
 1    the Commonwealth's treasury single account balance was

 2    approximately $1.7 billion.  Is that correct?

 3    A.  Yes.

 4    Q.  You'll see that in the third paragraph.

 5         It also noted that a report was issued by the

 6    Commonwealth indicating that $6.875 billion in unrestricted and

 7    restricted cash was on deposit across all Commonwealth

 8    governmental entities.  Right?

 9    A.  Yes.

10    Q.  So the government noted there is a $1.7 billion balance in

11    the treasury single account and then another $6.75 spread in

12    other accounts.  Right?

13    A.  In a variety of unrestricted and restricted cash accounts.

14    That's correct.

15    Q.  Could you explain briefly for the Court what the treasury

16    single account is.

17    A.  So my general understanding is that's the account that the

18    Treasury Department of Puerto Rico uses for a variety of

19    primarily daily operational functions.

20    Q.  Thank you.

21         The federal government in this letter informed AAFAF

22    that it was establishing what it called a cash balance policy;

23    right?

24    A.  Yes.

25    Q.  And it stated that it was establishing this cash balance
```

1   policy because the treasury single account had consistently

2   exceeded $1.5 billion even in the months following the

3   hurricane, and in light of the $6.875 billion located in

4   various accounts.  Correct?

5   A.  Yes.

6   Q.  So it announced that the cash balance policy was that the

7   Commonwealth's treasury single account had to fall below a

8   certain level before Community Disaster Loans could be

9   disbursed.

10           Is that your understanding, sir?

11  A.  That is my understanding, yes.

12  Q.  And you understand that the federal government has set that

13  minimum cash balance policy at $800 million?

14  A.  I have been told that.

15  Q.  And AAFAF learned about this minimum cash policy in early

16  January 2018; correct?

17  A.  I think this was the letter, yes.

18  Q.  And at the same time, negotiations began over the loan from

19  the Commonwealth to PREPA; correct?

20  A.  In and around this time, we started to develop the loan.

21  Yes.

22  Q.  Now, in the forecast you've seen of the treasury single

23  account, you have not seen an instance where the balance of

24  that account falls below a billion dollars.  Is that correct?

25  A.  Again, shortly after the hurricane, there were a variety of

1   forecasts that showed amounts going very low, but the most

2   recent forecast I've seen, have been upward, yes.

3   Q.  Okay.  Thank you.

4          So the most recent forecast you've seen the balance of

5   the treasury single account remains somewhere between $1

6   billion and $1.5 billion; correct?

7   A.  Yes.

8   Q.  Now, if that $1.5 billion was reduced in the amount of $1.3

9   billion, obviously, the treasury single account would dip below

10  the 800 million threshold; right?

11  A.  Yes.

12  Q.  And at a billion dollars, the same would be true; correct?

13  A.  Yes.  I think that's correct.

14  Q.  Now, in the process of once the DIP proposal had been

15  formalized, you instituted, on behalf of AAFAF and on behalf of

16  PREPA a third-party marketing process; is that correct?

17  A.  That's correct.

18  Q.  And in that process, you, I think, created a list of ten

19  companies or institutions to contact?

20  A.  Yes.  It was initially nine, and it grew over time.

21  Q.  And of the institutions you contacted, you did not contact

22  my client, National Financial Guarantee Corporation, did you?

23  A.  No.

24  Q.  And you understand that National is the largest single

25  creditor of PREPA.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    A.   I think that's correct.

 2    Q.   And National, as an insurer of bonds, is going to be

 3    holding these bonds for 10, 20, 30, even 40 years.  Right?

 4    A.   I think that might be speculative.

 5    Q.   Withdrawn.

 6           Now, these three proposals from the ten companies --

 7    actually, at this point there are 11; correct?

 8    A.   At this point, there are 12.

 9    Q.   Of the 12 that you have received, have you sought to

10    negotiate for a non-priming lien?

11    A.   We requested all the parties to provide their indications,

12    and in that request, we specifically asked if they were willing

13    to provide the loan on an unsecured, non-priming basis.

14    Q.   Did you seek to negotiate with any of those parties to

15    obtain a non-priming loan?

16    A.   Of the three proposals that we received, all of them

17    required a -- two required a priming.  One was a little bit

18    fake.

19    Q.   For the non-fake one or ones, did you pick up the phone and

20    try to get a non-priming lien for the PREPA?

21    A.   Be we have not yet entered into negotiation with those

22    indications.

23    Q.   You haven't done it yet?

24    A.   Correct.

25    Q.   So it's on your list maybe after today.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1          MR. BEREZIN:  Your Honor, we have nothing further.

 2   Thank you.

 3          THE COURT:  Thank you, Mr. Berezin.

 4          Any further cross-examination?  Mr. Robbins.

 5   CROSS-EXAMINATION

 6   BY MR. ROBBINS:

 7   Q.  Good afternoon, Mr. Mondell.

 8   A.  Good afternoon.

 9   Q.  Could I ask you to put in front of you, sir, Objectors'

10   Exhibit W, which I'm going to offer in evidence at this time,

11   your Honor.

12          THE COURT:  Exhibit W is admitted in evidence.

13          (Objectors' Exhibit W received in evidence)

14   BY MR. ROBBINS:

15   Q.  Let me ask you to put that in front of you, Mr. Mondell.

16   A.  That's the contact log?

17   Q.  Yes.

18   A.  I have it.

19   Q.  This lists a number of other potential lenders to PREPA;

20   correct?

21   A.  Yes.  This is the list of parties that we reached out to

22   contact.

23   Q.  And it's fair to say that not one of them has, at least up

24   until now, offered terms nearly as generous to PREPA as the one

25   the Commonwealth has offered.  Correct?

1   A.   That's correct.

2   Q.   As a matter of fact, one or more of them has indicated to

3   you and to Rothschild -- that's the advisor to AAFAF -- that

4   PREPA was simply too risky to provide terms that were as

5   favorable as the Commonwealth has provided.  One or more of

6   them have told you that; correct?

7   A.   In words to that effect, yes.

8   Q.   As a matter of fact, if you'll take a look at Objectors'

9   Exhibit AA, which I'll offer at this time.

10          THE COURT:  Exhibit AA is admitted in evidence.

11          (Objectors' Exhibit AA received in evidence)

12          MR. ROBBINS:  Your Honor, what I'm going to try and do

13  is put a version in that doesn't have my handwritten notes all

14  over it.

15          THE COURT:  All right.

16  BY MR. ROBBINS:

17  Q.   You recognize this, do you not, sir?

18  A.   I do recognize it.

19  Q.   It was written to you from a potential lender called

20  Carval; correct?

21  A.   Correct.

22  Q.   And they told you, among other things, did they not, in the

23  third full paragraph, Mr. Mondell -- read along with me, if you

24  wouldn't mind:  "However, we are unable to match or approve on

25  the current terms" -- and by that you understood that to mean

 1   the Commonwealth's current terms; correct?

 2   A.  Yes.

 3   Q.  "As we believe they do not compensate for its inherent

 4   risks.  In particular, PREPA's uncertain regulatory framework

 5   and evolving plans for privatization make the transaction

 6   difficult to underwrite."

 7        Do you see that?

 8   A.  Yes.  I see that.

 9   Q.  And you understand the preference to the evolving plans for

10   privatization, that refers to the prospect that PREPA as a

11   whole will be selling off some or all of its assets into the

12   private market; correct?

13   A.  Yes.  I think that involves a transition process which it

14   probably does.

15   Q.  And you would agree with me that that presents some

16   considerable risk for a potential lender looking to get

17   security in assets that may or may not be privatized; correct?

18   A.  I think it creates an uncertainty for them.

19   Q.  Carval went on to say:  "While these issues can be

20   overcome, a viable transaction for us would most likely require

21   additional collateral, stronger protections, and higher rates

22   of return."  Correct?

23   A.  Yes.

24   Q.  And that was the position that actually several potential

25   DIP financiers made known to you; correct?

1   A.  This particular paragraph?

2   Q.  Or words to that effect.  Correct?

3   A.  No.  Actually, I think Carval was singular in this

4   expression.

5   Q.  Well, you understood, for example, that the feds, FEMA,

6   for example, told you that they would not actually lend

7   directly to -- they were not inclined to lend directly to PREPA

8   at all but would do so only through the Commonwealth; correct?

9   A.  Yes.  That's correct.

10  Q.  As a matter of fact, 100 percent of all potential

11  third-party lenders insisted on terms more favorable than the

12  Commonwealth has insisted in this proposed DIP.  Yes or no?

13  A.  No.

14  Q.  As a matter of fact, remember in your deposition I asked

15  you whether if you were an advisor to any of these third

16  parties you would be prepared to advise them to lend on terms

17  similar or identical to the ones from the Commonwealth.

18          Do you remember I asked you that?

19  A.  I recall, yes.

20  Q.  And you said, well, I wouldn't say never, but these are

21  pretty good terms.  Right?

22  A.  Right.

23  Q.  As a matter of fact, you have never seen a DIP loan at

24  0 percent, have you?

25  A.  Not that I recall.

 1   Q.   In fact, the lowest rate you've ever seen in a DIP loan is

 2   about prime.  Correct?

 3   A.   Correct.

 4   Q.   And you certainly have never seen a DIP loan at a 30-year

 5   maturity, have you?

 6   A.   No.

 7   Q.   Or even a 10-year, have you?

 8   A.   No.

 9   Q.   In fact, the longest you've ever seen is about three to

10   five years; right?

11   A.   That is more typical, yes.

12   Q.   And typical is actually 18 to 24 months, isn't it?

13   A.   Yes.

14   Q.   Do you have any analysis that you've done that shows that

15   PREPA could not operate if the terms were any more favorable to

16   the Commonwealth than these?

17   A.   No.

18   Q.   Have you seen any work done by anybody at Rothschild

19   showing that?

20   A.   The operational analysis we rely on -- we don't perform an

21   operational analysis of PREPA.

22   Q.   Have you seen a single scrap of paper that purports to show

23   that PREPA could not operate if the terms of the DIP loan were

24   more favorable than these proposed DIP loans to the

25   Commonwealth?  Yes or no?  Have you seen it?

```
 1   A.  No.

 2   Q.  And if it existed, you would expect to see it, given the

 3   role you played in this transaction.  Yes or no?

 4   A.  If it existed, I would expect to see it?

 5   Q.  Yes.  Would you or would you not?

 6   A.  Yes.

 7   Q.  Have you seen any analysis of the extent, if any, to which

 8   creditors of the Commonwealth are less likely to be paid, in

 9   whole or in part, because of this DIP?  Have you seen any such

10   analysis?

11   A.  Yes.

12   Q.  You have seen it?

13   A.  I'm not sure if I would describe it as an analysis per se,

14   but I have seen various declarations indicating that if the

15   power were to go out, that would have a negative impact on

16   creditor recoveries.

17   Q.  Have you produced such an analysis in the course of this

18   discovery?

19   A.  I have not.

20   Q.  Have you seen one?

21   A.  I think I just stated -- I'm not sure it would be described

22   as an analysis.  I think it's a declaration.

23   Q.  Somebody has asserted it; correct?

24   A.  Yes.

25   Q.  And it's fair to say, as I believe you testified earlier,
```

```
 1   that in fact there weren't really anything called negotiations

 2   around this DIP, were there?

 3   A.  As I stated and I described, this is a collaborative

 4   process.

 5   Q.  By "collaborative," you meant everybody was seeking to

 6   promote the same goal; correct?

 7   A.  Yes.

 8   Q.  And as you think back to these collaborative discussions,

 9   I'm right, sir, you can't think of any respect in which the

10   Commonwealth sought to use its leverage as what we might agree

11   as the only game in town to extract terms more favorable to the

12   Commonwealth; correct?

13   A.  Correct.

14   Q.  You would agree with me, sir, that when a lender is not

15   engaged in a collaborative process and is in fact the only game

16   in town, it's able to exercise what you would call incremental

17   leverage; correct?

18   A.  Yes.  Correct.

19           MR. ROBBINS:  I think that's it.

20           Thank you, Mr. Mondell.

21           THE COURT:  Thank you, Mr. Robbins.

22           Any further cross-examination of Mr. Mondell?

23           Mr. Davis.

24           MR. DAVIS:  Yes, your Honor.

25           THE COURT:  You may proceed.
```

```
 1             MR. DAVIS:  Thank you, your Honor.

 2    REDIRECT EXAMINATION

 3    BY MR. DAVIS:

 4    Q.  Good afternoon, Mr. Mondell.

 5    A.  Good afternoon.

 6    Q.  Mr. Mondell, you were asked several questions about the

 7    extent to which there was a requirement to pay off the entire

 8    obligation at the time that a plan of arrangement would be

 9    approved.

10             And several questions had to do with paying off the

11    entire building by a facility.

12             Do you remember those?

13    A.  Yes.

14    Q.  Is the proposed facility a term loan?

15    A.  No.  It's a revolver.

16    Q.  What does it mean to have a revolver?

17    A.  A revolver is a credit facility that you can borrow and

18    also repay, but to the extent you repay, you are able to

19    reborrow again up until the full length of the facility in

20    terms of time.

21    Q.  So do you have an understanding as to whether the full

22    billion dollars would have to be paid off, or is the amount

23    that has to be paid off is the amount that has been drawn?

24    A.  No.  You only have to pay back once you've drawn.

25    Q.  Now, in terms of repayment, is there anything about this
```

1  loan facility that prohibits another lender from taking the

2  loan out?

3  A.  No.  Just the opposite.  This loan is designed to be

4  refinanced.

5  Q.  Could you take a moment and explain to the Court what it

6  means to take a loan out.

7  A.  So by that I mean I understand you to mean to refinance a

8  loan, and that is to -- with this loan, borrow some amount

9  outstanding -- I'm not sure how much -- have another lender

10  come into play, use the proceeds of that new loan to pay back

11  the Commonwealth and pay back this loan, retire, and assume

12  what the terms of the new loan will be, whatever those are.

13  Q.  You mentioned that this loan doesn't prohibit another

14  lender from refinancing.

15        Does it do anything to encourage another lender to

16  refinance the loan?

17  A.  It actually -- I think the encouragement is from the PREPA,

18  the borrower's perspective.  To the extent PREPA seeks to

19  refinance before the maturity date, you can repay the loan at

20  any time without penalty as well as because there is an

21  extended period of time of 0 percent and with low interest

22  rates, the amount of dollars spent on this loan up until

23  they're ready to refinance is relatively small.

24  Q.  Do you have an understanding as to whether the loan can be

25  refinanced per the CDL from the federal government?

1    A.   I believe it can, yes.  I think that's a provision.

2    Q.   Is there anything about the structure of the proposed

3    facility that would inhibit a CDL from being put in place?

4    A.   No.

5    Q.   Can you elaborate.

6    A.   So, if this loan is designed to be used for I think the

7    term is current expenses and/or eligible uses, which I think

8    are fairly synonymous, and that is language that is used in the

9    CDL context for is disbursements or operating needs that a CDL

10   is qualified to pay.

11        So the CDL itself -- you can't just put in a CDL and

12   have a limitation.  So the idea is this loan will be able to be

13   use this to pay for things that a CDL would also allow us to

14   pay so that there would never be any confusion that as a CDL

15   covering past bills of non-CDL kind of things, the answer is

16   no.  It's a good match.

17   Q.   Now, you've also talked about a process to market this what

18   we've all come to call the DIP financing to prospective

19   alternative lenders, all of which are private entities;

20   correct?

21   A.   Correct, yes.

22   Q.   Is there anything about the existing proposed loan facility

23   that is before the Court today that would inhibit a private

24   lender from going forward with a refinancing loan?

25   A.   No.  Absolutely not.

 1    Q.   Is there anything in it that would encourage or be

 2    complimentary towards such financing by a private lender?

 3    A.   I think for much of the same reasons, the fact that there

 4    is no repayment penalty, that there is very limited financial

 5    risk in this time period, it does facilitate, to the extent one

 6    of these prime financiers is able to reach a committed stage

 7    and actually be approved to fund, it's very well positioned to

 8    accommodate that.

 9    Q.   Have you been in contact with the various parties that

10    submitted proposals that are enumerated in Exhibit 30?

11    A.   Yes, I have.

12    Q.   In those communications, has any one of the prospective

13    lenders indicated that they would not go forward if this loan

14    were to be approved by the Court?

15    A.   No.

16    Q.   Have any additional parties, other than the parties that

17    were described in your declaration and supplemental

18    declaration, shown an interest in possibly providing a future

19    loan to PREPA?

20    A.   Yesterday I reached out to an additional party.  I can't

21    tell you yet if they're going to provide a proposal, but

22    they're starting the process now.

23    Q.   There has been some questioning -- and you gave some

24    testimony -- about the interest rate.

25    A.   Yes.

1    Q.  Is there anything about the structure of the loan facility

2    that would prevent a lender in a refinancing from charging a

3    higher interest rate?

4    A.  No.

5    Q.  Is there anything in the current facility that would cause

6    PREPA to have to pay a prepayment penalty of any sort in the

7    event that this loan were to be refinanced?

8    A.  No.  The prepayment penalty is 0.

9    Q.  You say you've been in this profession for some 18 years;

10   correct?

11   A.  Correct.

12   Q.  And how long have you been at Rothschild?

13   A.  Eighteen years.

14   Q.  In that course of time, you've stated that you found this

15   to be a somewhat unusual proposed loan; correct?

16   A.  Yes.

17   Q.  In what ways is this loan different than the ordinary DIP

18   loan you've experienced in the past?

19   A.  To name a few, the fact that this is a monopoly electrical

20   provider and the risk of not repaying the loan is a blackout to

21   thousands of people; number two is the PROMESA process and all

22   that's involved with the Oversight Board and the government is

23   really unique; and number three, as actually was mentioned,

24   this collaborative process, that everyone involved --

25   oftentimes the goal is to get the loan funded, but there are

1  lots of gives and takes, and people give and take.  This really

2  was -- we just need to find a way to avoid a blackout.  How are

3  we going to do that.  What tools do we have.

4  Q.  Have you ever been involved in a situation before where a

5  central government is making a loan to a public corporation

6  owned by that central of government.

7  A.  No.

8  Q.  Are you aware of any similar situations?

9  A.  This is the first that I'm aware.

10 Q.  You were asked a number of questions about commercial loan

11 term sheets, kinds of benchmarks and terms you would expect to

12 see in a loan.

13     Do you view the loan from the Commonwealth, from the

14 government, to PREPA as akin to a commercial loan term sheet?

15 A.  This is not a commercial financial loan, no.

16 Q.  You were also asked about the collaborative process.

17     Within the context of the process that led to the

18 proposal of the loan that's set forth here today, was AAFAF the

19 only public agency involved in approval of this loan?

20 A.  No.

21 Q.  What other entities were involved in the process of having

22 this loan approved?  I'm not asking for the details of that

23 process.  I'm trying to get into the delivery process.  I'm

24 just asking you who else was involved in that.

25 A.  Sure.  So, to my understanding, there was also the

1    Puerto Rican legislature which needed to approve the

2    legislation to enable the funding of the loan and also at that

3    stage the Treasury Department, local Treasury Department.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. DAVIS:  (Continued)

2  Q.  Outside the Commonwealth, were there other entities -- were

3  there any other entities other than the Commonwealth agencies

4  and Commonwealth officials involved in approval of the loan

5  that is put forth before this Court?

6  A.  Yes, clearly the Oversight Board has the approval process.

7  Q.  Was there a give and take with the Oversight Board as to

8  what the structure of this loan would be?

9  A.  There was, yes.

10  Q.  Do you have an understanding as to whether AAFAF has the

11  authority to actually authorize the credit terms that are set

12  forth in the loan facility before the Court today?

13  A.  Again, I'm not aware, but my understanding is the Treasury

14  Department on the Puerto Rican side needed to approve that and

15  then the Oversight Board.

16  Q.  Do you know whether the governing board of PREPA also

17  approved the terms?

18  A.  Yes, I believe they had.

19  Q.  Is there any expectation as to whether a CDL might some day

20  be presented as an option?

21  A.  As an option in general or as an option with respect to

22  PREPA?

23  Q.  That was a poorly asked question.  Do you have any

24  continuing expectation as to whether the federal government

25  might step up to the plate and provide a CDL to PREPA or to the

1   government on behalf of PREPA so that this loan could be

2   refinanced through that statutory loan process?

3   A.  Yes, I don't have any assurances as to when that is going

4   happen, but we do remain optimistic that it will come to pass.

5   The money that has been authorized and signed by the president.

6   It just hasn't made its way from Washington down to

7   Puerto Rico.

8          MR. DAVIS:  Thank you, Mr. Mondell.  I have no further

9   questions.

10         THE COURT:  Thank you, Mr. Davis.

11         At this point I would propose that we -- actually, let

12  me verify.  There is to be no oral examination regarding the

13  Wolfe stipulated testimony.  Is that correct?

14         MR. MUNGOVAN:  Your Honor, Timothy Mungovan.

15         If I may address the Court at the podium?

16         THE COURT:  Yes.

17         MR. MUNGOVAN:  Good afternoon, your Honor.

18         Timothy Mungovan from Proskauer Rose for the Oversight

19  Board.  What we would propose to do, your Honor, is to read

20  into the record the testimony of Dr. Wolfe, which was the

21  subject of the stipulation and order that the Court entered

22  yesterday.

23         THE COURT:  Very well.

24         MR. MUNGOVAN:  If Andrew Wolfe were called to testify

25  at this hearing, he would testify as follows:

1          If PREPA were to cease operating Puerto Rico's

2    electrical grid for any material period of time, the potential

3    consequences to Puerto Rico's economy would be significantly

4    adverse and potentially irreversible.

5          The government of Puerto Rico's ability to provide

6    basics services would be adversely affected by PREPA's ceasing

7    operations.  It is my opinion that the cessation of PREPA's

8    operations for any material period of time would lead to

9    further out-migration beyond that which was already created by

10   Hurricanes Irma and Maria; and that this further out-migration

11   would result in additional reduction of (A) PREPA's customer

12   base and (B) government of Puerto Rico taxpayers.

13         The Commonwealth and all stakeholders would fare

14   better if PREPA remains operable and completes bringing back

15   power for all customers as soon as possible."

16         Movants request that the Court accept the foregoing

17   evidence in this case as the testimony of Andrew Wolfe.

18         THE COURT:  So accepted.

19         MR. MUNGOVAN:  Thank you, your Honor.

20         THE COURT:  Thank you.

21         And so at this point then the next witness would be

22   the objecting parties' witness, Mr. Spencer, and that is

23   anticipated to be a fairly lengthy examination.  And so unless

24   there is an objection, I will shortly declare the lunch break,

25   and we would resume here at 2:00.

 1          Seeing no objections, I will first thank Mr. Mondell

 2   and invite him to step down from the witness stand.

 3          If someone would just push in the drawer -- I haven't

 4   said adjourned yet.

 5                              (Witness excused)

 6          THE COURT:  Mr. Bienenstock.

 7          MR. BIENENSTOCK:  Your Honor I rise only because we

 8   haven't decided yet on the length of the examination Mr.

 9   Spencer.  It may not be long, and if it is relevant to your

10   Honor's scheduling, we can make that decision if your Honor

11   would give us five minutes.  Otherwise, we'll tell you when we

12   get back.

13          THE COURT:  Well, I think that we should -- we need to

14   take a break, and taking it as a lunch break I think is

15   logical.

16          MR. BIENENSTOCK:  Sure.  OK.

17          THE COURT:  So let's just plan to resume at 2:00.

18          Yes, Mr. Friedman.

19          MR. FRIEDMAN:  Your Honor, with respect to

20   Mr. Portela's declaration, instead of a redacted declaration,

21   which I think might lead to some confusion as to whether

22   something different had been filed under seal, may we just file

23   a revised declaration with a footnote that says:  This, the

24   revised version reflects an agreement on the record with

25   respect to resolving an objection asserted to testimony in Mr.

1

1   Portela's original declaration or something to that effect.  I

2   am worried that if we have something redacted, people might

3   think there is something under seal.

4        THE COURT:  I understand.  So you'd call it something

5   like "trial declaration."

6        MR. FRIEDMAN:  Yes, your Honor.

7        THE COURT:  Yes.  Please do it that way.

8        MR. FRIEDMAN:  Thank you, your Honor.

9        THE COURT:  Now consider yourselves adjourned, and we

10  will resume at 2:00.  Thank you.

11       (Luncheon recess)

12                    AFTERNOON SESSION

13                      2:00 p.m.

14       THE COURT:  I have a just couple of brief housekeeping

15  issues before we continue.

16       First, we noticed that Exhibit E is in Spanish.  As

17  you know, under the local rules, everything has to be

18  translated into English.  And so any exhibit that is in Spanish

19  including, but not limited to, Exhibit E must be filed in

20  English translation with the Court as quickly as possible.

21       Secondly, for the convenience of the people who

22  couldn't read the spreadsheets that were illegible on the

23  screens, I would ask that the proponents of those exhibits file

24  them tonight on the ECF system separately.

25       I thank you for those accommodations.  So we are now

 1    ready for Mr. Spencer's testimony

 2            MR. HOROWITZ:  Yes, your Honor, Gregory Horowitz for

 3    the Ad Hoc PREPA bondholders and we call Stephen Spencer as a

 4    witness.

 5            THE COURT:  Mr. Spencer, would you come up please?

 6            MR. DAVIS:  Your Honor, before we rest if you will as

 7    Movant, we have a couple evidentiary housekeeping matters.  It

 8    will only take a moment.  Just to move in evidentiary exhibits.

 9            THE COURT:  Yes.  Let's let Mr. Davis complete the

10    case for the Movants.  And I apologize for not having spoken

11    specifically to them.

12            MR. DAVIS:  Thank you, your Honor.

13            Movants would like to move into evidence Exhibits 24,

14    25, 26, 27, 28 --

15            THE COURT:  Hold on.  So exhibits 24, 25, 26, 27, 28

16    are admitted.

17            (Exhibit Movant 24, 25, 26, 27, 28 received in

18    evidence)

19            MR. DAVIS:  Yes, your Honor.  And 36.

20            THE COURT:  We've already admitted 36, which is also

21    Objector's Q.

22            MR. DAVIS:  Q, exactly.

23            And 40 and 41.

24            THE COURT:  Exhibits 40 and 41 are admitted in

25    evidence.

1          MR. DAVIS:  Thank you, your Honor.

2          (Exhibit Movant 40 and 41 received in evidence)

3          THE COURT:  Thank you.  Do the Movants now rest?

4          MR. DAVIS:  One second, your Honor.

5          (Pause)

6          MR. DAVIS:  And also 19.

7          THE COURT:  19?

8          MR. DAVIS:  Yes.

9          THE COURT:  Exhibit 19 is admitted in evidence.

10         MR. DAVIS:  Thank you, your Honor.

11         (Exhibit Movant 19 received in evidence)

12         THE COURT:  And so do the Movants now rest on your

13    principal presentation?

14         MR. DAVIS:  Yes, your Honor, we do.

15         THE COURT:  Thank you.

16         MR. DAVIS:  Thank you.

17         THE COURT:  Mr. Horowitz and Mr. Spencer.

18         MR. HOROWITZ:  Mr. Spencer was making his way up to

19    the witness box, your Honor.

20         As he is going up, perhaps I can just recite that we

21    are offering Mr. Spencer's trial declaration as his direct

22    testimony.  That appears as Objector's Exhibit A.

23         THE COURT:  Exhibit A is admitted.

24         (Exhibit Objector A received in evidence)

25         MR. HOROWITZ:  Exhibit A, your Honor, I will note has

1    attached to it its own Exhibits A through E.  Just reciting the

2    Exhibit A to Exhibit A was the redline for the Court's and

3    proponents' convenience showing the changes from Mr. Spencer's

4    original declaration.  So that is omitted.

5          Exhibit B -- I'm sorry.  Excuse me, your Honor Exhibit

6    B is Movant's Exhibit D, and we would move that into evidence.

7          THE COURT:  Exhibit B is admitted in evidence.

8          (Exhibit Objector B received in evidence)

9          THE COURT:  And so just to be clear, so A, the trial

10   declaration as marked as an exhibit includes the exhibits to

11   the trial declaration as filed on ECF for the redline?

12         MR. HOROWITZ:  That is correct, your Honor, but it has

13   its own exhibits.  I'm afraid it was a little awkward the way

14   it was done before we did the exhibit list.

15         Exhibit A has attached to itself its own Exhibits A

16   through E, which are not the same as the actual Objector's

17   Exhibits A through E.  They're the exhibits to the declaration.

18         THE COURT:  Yes.  But so Objector's Exhibit A is

19   docket entry 694 with all of the exhibits that were filed under

20   docket entry 694 except for the redline?

21         MR. HOROWITZ:  That's exactly right, your Honor.

22         THE COURT:  OK.  Good.  I'm following it.

23         MR. HOROWITZ:  I will note that originally Docket No.

24   694 was filed under seal.  Since then, I believe that the

25   debtors -- the Movants have agreed that nothing attached

1   thereto needs to be confidential.  So all of the exhibits that

2   were to Exhibit A are now being offered not under seal that

3   relate, and we will follow your Honor's direction to publish

4   those to the ECF for people's convenience.

5           THE COURT:  Yes, would you just refile an unredacted

6   694 with a cover that says this is an unredacted 694?

7           MR. HOROWITZ:  Of course we will do so, your Honor.

8           THE COURT:  Thank you.

9           MR. HOROWITZ:  Just to continue because it was a

10  little confusing, Exhibit B to the Spencer trial declaration is

11  actually Objector's Exhibit D, and we are moving Objector's

12  Exhibit D into evidence.

13          THE COURT:  Exhibit D is admitted.

14          (Exhibit Objector D received in evidence)

15          MR. HOROWITZ:  Exhibit C to the Spencer declaration is

16  a demonstrative and merely shows some calculations referenced

17  in his declaration so we don't need to move that.

18          Exhibit D to the declaration Spencer declaration has

19  already been admitted as Exhibit 16.

20          Exhibit E to the Spencer declaration has been admitted

21  as Exhibit J.  And with that, your Honor, we tender the

22  witness.

23          THE COURT:  Thank you.

24          So, Mr. Spencer, will you step up to take the oath?

25   STEPHEN J. SPENCER,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   CROSS-EXAMINATION

2   BY MR. FINGER:

3          THE COURT:  Thank you.

4          Who will conduct the cross-examination?

5          MR. FINGER:  Your Honor, the Movants will have no

6   cross-examination for Mr. Spencer.

7          THE COURT:  Good afternoon, Mr. Finger.

8          MR. FINGER:  We will excuse the witness.

9          THE COURT:  I'm sorry?

10         MR. FINGER:  We will excuse the witness.

11         THE COURT:  All right.  So there will be no

12  cross-examination, and therefore no redirect.

13         MR. FINGER:  That's correct, your Honor.

14         THE COURT:  So, thank you, Mr. Spencer.  Your

15  testimony is greatly appreciated.

16         (Witness excused)

17         THE COURT:  All right then.  Are there any further

18  evidentiary proffers from the Objectors?

19         MR. HOROWITZ:  That happened a little quicker than I

20  expected, your Honor.  We might want to take a quick look and

21  see if there are any exhibits that we need to move in, if you

22  would give us a minute.

23         THE COURT:  All right.  I was thinking that I would at

24  the conclusion of the evidence we would take a brief break, so

25  Ms. Ng could be certain of the time left, and you could figure

1    out your time allocations for closing arguments.

2         So perhaps we can use that ten-minute break, which is

3    also happening sooner than I expected, for you to do that, and

4    then when we come back you can offer in the remaining exhibits.

5         Is that acceptable to everybody?  Looks like yes.

6         See you in ten minutes.  Thank you.

7         (Recess)

8         THE COURT:  Mr. Horowitz.

9         MR. HOROWITZ:  Good afternoon, your Honor.

10        Having conferred with the other PREPA creditors, the

11   remaining exhibits that the PREPA creditors would like to offer

12   are Objector's Exhibits C, F, O, U, S.

13        THE COURT:  Just one second.  So Exhibits C and F are

14   admitted in evidence and Exhibit O.

15        (Exhibit Objector C and F received in evidence)

16        MR. HOROWITZ:  U.

17        THE COURT:  Exhibit U is admitted in evidence.

18        (Exhibit Objector U received in evidence)

19        MR. HOROWITZ:  S Exhibit.

20        THE COURT:  Exhibit S is admitted in evidence.

21        (Exhibit Objector S received in evidence)

22        MR. HOROWITZ:  T.

23        THE COURT:  Exhibit T is admitted in evidence.

24        (Exhibit Objector T received in evidence)

25        MR. HOROWITZ:  Y.

```
 1              THE COURT:  Exhibit Y is admitted.

 2              (Exhibit Objector Y received in evidence)

 3              MR. HOROWITZ:  And Exhibit GG.

 4              THE COURT:  Exhibit GG is admitted in evidence.

 5              (Exhibit Objector GG received in evidence)

 6              MR. HOROWITZ:  Your Honor, I will note of those

 7    exhibits, Exhibit F is in Spanish and we will undertake to

 8    provide a translation, and of the exhibits that you previously

 9    admitted in addition to I think you mentioned F -- Exhibit E,

10    we also noted Exhibit D is in Spanish, so we will undertaken to

11    have that translated as well.

12              THE COURT:  Thank you.

13              MR. HOROWITZ:  Unless somebody on my side tells me

14    that I've missed something, your Honor, the PREPA creditors

15    rest.

16              THE COURT:  Do the remaining objectors also rest?

17              MR. ROBBINS:  We do, your Honor.

18              THE COURT:  Thank you.

19              So at this point we will turn to closing arguments.  I

20    have your time allocations and lineup here.

21              So, according to my notes, the first two argue will be

22    counsel for Solus for two minutes.

23                                  Good afternoon.

24              MR. BAKER:  Good afternoon.

25              For the record, Nicholas Baker Simpson Thacher &
```

1    Bartlett on behalf of Solus Alternative Asset Management.

2         Your Honor, Solus is the largest unsecured creditor of

3    PREPA.  They hold over $284 million of fuel oil loans.  Solus

4    would like to state for the record that they are supportive of

5    the DIP.  We had some issues, and we received some changes in

6    the DIP order.  Obviously, like any creditor we don't welcome

7    the idea of having a DIP that comes ahead of pre-petition

8    claims, but Solus also recognized, and we think the evidence

9    shows, that PREPA is in immediate need of liquidity and the

10   Commonwealth DIP is the best financing option available.

11        Your Honor, unless you have any questions, I will cede

12   the podium.

13        THE COURT:  Thank you, Mr. Baker.

14        Next would be Mr. Bienenstock for the Oversight Board

15   for 30 minutes.

16        MR. BIENENSTOCK:  Good afternoon, Judge Swain.

17        Martin Bienenstock of Proskauer Rose LLP for the

18   Oversight Board for itself and as representative for PREPA as a

19   Title III debtor.

20        THE COURT:  I'm going to ask you to project a bit

21   more.  Thank you.

22        MR. BIENENSTOCK:  Yes, your Honor.

23        So I'm starting with the Statute Section 364(d)(1) and

24   (2).

25        There are two tests that the statute says that we're

1  supposed to satisfy as a premise for your Honor's being able to

2  grant our motion.  The motion is the motion we filed

3  January 27, and the relief we seek is entry of the last revised

4  proposed order that we filed where I explained the two recent

5  changes this morning.

6       The first test in 364(d), your Honor, is whether the

7  trustee or debtor is unable to obtain such credit otherwise.

8       Your Honor has the testimony of Dustin Mondell, who

9  ran the process at Rothschild for AAFAF and PREPA to try to

10  obtain such credit otherwise.  And until at least yesterday,

11  his testimony was he received two offers with priming liens

12  that were more expensive.  One offer that he couldn't really

13  tell if it was unclear -- or he didn't say it was an offer.  It

14  was an indication of interest, but it was unclear as to the

15  collateral situation, the lien situation.

16       But it was clear that the proposal made by the

17  Commonwealth was superior to all three because if just look at

18  the obvious, the interest rate goes from zero up to three

19  percent over a period of three years with half percent

20  increases every six months, but it stops at three percent.

21  Yet, it's a 30 year facility.  There is no question it is a

22  below-market interest rate facility.  It is secured by what we

23  said under 364(d)(1) was a priming lien, and as we explained in

24  our now multiple briefs that we filed since the original

25  motion, that, in essence, because the PREPA bondholders who

1   hold liens under the trust agreement hold liens only against

2   the net revenues and net revenues are defined as the revenues

3   minus current expenses, while for safety and because we didn't

4   want to understate what we're asking for, we said we're asking

5   for a priming lien.

6           In effect, because their lien was always behind

7   current expenses, they're not primed in the typical sense.

8   It's not as if they had a first lien on a building and now they

9   have a second lien.  They had a first lien on net revenues

10  which was revenues minus current expenses, and this loan is

11  only -- only can be used for current expenses, and, in fact, a

12  subset of them, as your Honor knows through all the testimony

13  and briefs, we call the subset current expenses the "eligible

14  uses."

15          So I am arguing this as if we have to satisfy

16  364(d)(1) out of an abundance of caution because I think it

17  makes it safer for all concerned including the Court, but I

18  don't want to lose sight of the fact that the secured claim

19  holders at PREPA really are behind current expenses before we

20  ever got here.

21          THE COURT:  Now, you've made that point about current

22  expenses and about the subset of current expenses, but the

23  opposition papers have pointed out the operational reserve

24  provisions that would appear to let monies disburse from this

25  facility and transfer it into the operational account to be

1    used for broader purposes and also the provisions for changing

2    the application of funds' restrictions on agreement of the

3    lender and the Oversight Board.

4          Are they incorrect that those observations can move

5    the application of funds beyond current expenses as defined in

6    the bond financing papers?

7          MR. BIENENSTOCK:  Let me take one at a time, your

8    Honor.

9          On the first issue, our understanding of their

10   argument is such that we do think they're mistaken because what

11   they're confusing is the use of loan proceeds for eligible uses

12   as a subset of current expenses on the one hand with use of

13   revenues of the debtor on the other hand.  And revenues of the

14   debtor can be used for, as we said in our briefs, for

15   ineligible uses.  Some of them are still current expenses, and

16   some of them may not be current expenses.

17         On the second issue as to whether we could agree

18   with -- the Commonwealth could agree with PREPA to change the

19   restrictions on the use of loan proceeds, I think two contract

20   parties do have that power.  It's not a power that we've ever

21   contemplated using, but we have that power simply because we're

22   the two contracting -- the Commonwealth and PREPA are the two

23   contracting powers -- two contracting parties.

24         THE COURT:  Who need the Court's approval to implement

25   the contract?

1          MR. BIENENSTOCK:  That is certainly not a -- that is

2    certainly not something we would have a problem coming back to

3    court if we wanted to change that.  We don't contemplate

4    changing it, but if we ever did need to, we have no problem

5    coming to court to do that.

6          THE COURT:  Thank you.

7          MR. BIENENSTOCK:  Obviously, on appropriate notice.

8          So getting back to 364(d)(1), the evidence largely of

9    Dustin Mondell and his exhibits basically shows no such credit

10   was otherwise available, and certainly not on better terms.

11         Yesterday, as your Honor knows, a competing proposal

12   was filed by a subset of PREPA creditors secured claim holders,

13   and they contend that because they are not a priming lien, our

14   motion cannot be granted.  I think your Honor disposed of that

15   premise early this morning when your Honor said you don't

16   regard that as preclusive of preventing the Court from

17   considering our motion, but I'd like to explain why they're

18   wrong on several grounds from our point of view.

19         First, is that 364(d)(1) says you have to be able to

20   obtain such credit otherwise, and they're not providing such

21   credit.  And the arithmetic is simple, but I think it needs to

22   be carefully looked at because it's crystal clear that they

23   have not provided an adequate facility constituting such credit

24   otherwise, and the reasons are as follows:

25         Their proposal was a $534 million facility, but right

1   off the bat they say they're only providing 98 percent of it,

2   so that takes 534 million down to 523.3 as a way of increasing

3   the interest rate.

4           Then there are closing fees that depending on how

5   large a commitment each lender makes, the closing fees could be

6   zero up to $12 million.  That could take the facility from 523

7   to 511 million.

8           Then the interest expense, which they -- instead of

9   giving us annual interest rates, they give us quarterly rates,

10  but we did the math in the informative motion we filed last

11  night.  I won't repeat it on the record here.  The bottom line

12  is that over two years the interest on that facility is

13  $114.8 million, and at the end of the first year you have to

14  pay $10.86 million to get an extension for the second year.  So

15  when you subtract from 523 or -- from 523 million the

16  12 million closing fees, the 114.8 million interest, the

17  10.68 million extension fee, you end up with a facility of

18  $373.81 million.

19          Even Mr. Spencer's declaration does not say that a

20  $373.81 million facility is adequate.

21          In contrast to that, your Honor has Mr. Filsinger's

22  Exhibit 15, which I think was his -- I forget whether it's

23  his -- it was his trial declaration, where in paragraphs 14 and

24  15 he explains in a fair amount of detail why the billion

25  dollars facility is necessary.

1          I would like to -- at the risk of stating the obvious,

2     I would like to mention that the Commonwealth facility we're

3     talking about, unlike some of the other proposals, is a

4     revolver, which means you draw down what you need.  You can pay

5     back money when you have a surplus, and you're only paying

6     interest on what you need to be borrowing.  It's not a term

7     loan where you take the money and you're stuck paying interest

8     on it regardless, because if you repay it you can't borrow it

9     back again.

10         So, if it turns out that the billion dollar facility

11    that Commonwealth is offering is more than PREPA needs, PREPA

12    will never have to draw the portion that it doesn't need; and

13    if it only needs it only temporarily and then can pay it down,

14    it will have the benefit and all the incentive in the world to

15    do that.  So bottom line, there is no such credit otherwise on

16    this record such that would prevent the Court from approving

17    the proposal that the Commonwealth has made.

18         Now, in order to, I guess, lodge another objection on

19    the such credit otherwise provision, some of the objectors have

20    argued that this was not arm's length negotiated, and that, as

21    your Honor knows from the briefing, some said that because

22    related parties were involved, the Commonwealth of PREPA, that,

23    therefore, heightened scrutiny is required and some kind of

24    entire fairness test has to be applied.

25         We have argued in the briefs, and I won't repeat why

1  the imposition of Delaware law to the Commonwealth of

2  Puerto Rico and PREPA is a non-starter.  The *Dodgers* case that

3  the objectors cite says in very clear language that it applied

4  that in the context of a loan because the *Dodgers* were subject

5  to Delaware law, but I'd like to provide a more common sense

6  rationale to the Court.

7      PREPA is in no position to say that it needs something

8  to be arm's length negotiated.  It got a below-market deal.  If

9  anyone is going to argue that they want arm's length

10  negotiation, and they are arguing it's the GO creditors who say

11  we would get a higher rate of interest if we could get market.

12      So PREPA even if it were right in asking for some kind

13  of entire fairness test, it's got more fairness than it ever

14  deserved from that point of view, and it makes no sense for it

15  to be saying entire fairness.  The interest rate would go in

16  the opposite direction.

17      THE COURT:  I'm sorry, but wouldn't an entire fairness

18  test look holistically at PREPA and PREPA's constituents as

19  opposed to straight business rationality on the part of the

20  PREPA entity?

21      MR. BIENENSTOCK:  Well, I was just going to make that

22  point.

23      THE COURT:  Sorry.

24      MR. BIENENSTOCK:  Well, thanks for the segue.

25      To the extent that the PREPA creditors argue for

1   entire fairness, for the imposition of that standard somehow

2   are saying "you have to look at the effect on us" so now we're

3   talking about the priming lien.  We're not talking about the

4   interest rate because we all like the below-market interest

5   rate, of course.

6        Your Honor from PREPA's viewpoint, it's got to repay

7   the debt no matter what, and it's agnostic among its creditors.

8   So the priming lien issue, I submit, is not an entire fairness

9   issue for consideration under whether such credit is available

10  otherwise.  The priming lien issue comes into 364(d)(2) when

11  the code says you have to look to see whether the lien being

12  primed is adequately protected.

13       So the short answer, your Honor, is because from

14  PREPA's point of view, it's agnostic.  It's not going to take

15  part in an inter-creditor fight.  The entire fairness doesn't

16  reach that far, especially when Congress went to the express

17  length of saying in (d)(2) that the existing lien holder has to

18  be adequately protected.

19       And on that, your Honor, I have already made probably

20  the most important argument, which is that since they were

21  behind current expenses before this ever started, there really

22  is no question as matter of law and fact that they're

23  adequately protected, but there's a lot more in the record of

24  the stipulated facts from Andy Wolfe that if PREPA were to

25  cease operating, Puerto Rico's economy would be significantly

1  adverse in that -- it would suffer potential consequences that

2  would be significantly adverse and potentially irreversible;

3  that the government's ability to provide basic services would

4  be adversely affected by PREPA ceasing operation; that the

5  result would be an additional reduction of PREPA's credit

6  customer base, and government of Puerto Rico taxpayers.

7       And the fourth stipulated fact was that the

8  Commonwealth and all stakeholders would fare better if PREPA

9  remains operable and completes bringing back power to all

10  customers as soon as possible.

11       Your Honor, it is hard, as you know, in this crowd to

12  get a consensus.  But I think we obtained a consensus, and

13  that's why they were stipulated facts because while they come

14  from an expert, they're also obvious in common sense.  We can't

15  turn out the lights.  And the fact that everyone would be hurt

16  from turning out the lights is also obvious.  No business can

17  be done; no revenues can come in, and all the rest.

18       So there is ample evidence, we submit, in the record

19  to show that if the secured claimants at PREPA have any

20  positive value to protect and the Filsinger declaration also

21  shows that net revenues are negative for the foreseeable

22  future, hopefully they will turn positive; that there is really

23  no issue on protection.

24       Your Honor, I'm going to move now to some of the

25  objector's complaints about things that they would like to see

1     done differently.  We understand that from the PREPA

2     creditors's point of view, they wish PREPA collected more debt

3     from its municipalities and instrumentalities.  They wish that

4     PREPA exercised rights of setoff; that PREPA could take money

5     out of GDB.  I'm sure they have a bunch of operational changes

6     they would like as well as evidenced by the fact that the

7     competing proposal that was filed yesterday has a bunch of

8     covenants putting a group of required lenders in charge of

9     virtually all facets of operations from the rates being

10    charged, collection efforts, and the like.

11         I have no doubt that if we all got together, whether

12    ten litigants, ten judges, or ten other people, they'd have ten

13    different ideas as to how PREPA might make itself more

14    efficient and would wish that it did, and the Oversight Board

15    has certainly been working on that and shares the view it's got

16    to be a much more efficient operation and is in concert with

17    the governor that there needs to be a transformation so that

18    PREPA can create energy at an efficient cost in a cleaner way.

19         But that is not what Section 364 turns off.  PREPA,

20    and the governor, and the Commonwealth and the Oversight Board,

21    tried to balance all of the different concerns, and came out

22    where it came out.  And as many judges at 364 hearings have

23    said before, the Court would sometimes like or maybe sometimes

24    not like to rewrite the credit agreement or the covenants, but

25    that's up to the parties, and subject to satisfying the

1    criteria in 364(d)(1) and (d)(2).

2         So as a matter of law we do not believe that the

3    objector's complaints about things that should be done

4    differently carry weight for this purpose.  They certainly

5    carry weight as far as how maybe fiscal plans and budgets and

6    future operations are conducted.

7         But as a for instance, your Honor, your Honor can look

8    at the Wall Street Journal to see what people earn in the money

9    market today.  The Commonwealth creditors are really not worse

10   off than they otherwise would be because you can't earn the

11   three percent the Commonwealth will earn on this loan in a

12   money market today.

13        It's a matter of public record in this case that GDB

14   is attempting to undergo a Title VI restructuring.  It's not a

15   situation where you can simply walk in GDB and say, "I'd like

16   my money."  You can't go to strapped municipalities and say

17   "pay me."  And the other suggestion that's been made that the

18   Commonwealth should led money to municipalities assumes that if

19   we did that, that the municipalities would use the money to pay

20   PREPA.  Well, they have other creditors they might pay.  It's

21   simply not so simple as to tell all these elected officials in

22   all of the 78 municipalities that they have to borrow, which

23   they haven't asked to do, and they have to use the borrowings

24   to pay their PREPA bills.

25        If only we could snap our fingers and make things

1    happen as we'd like, but the Oversight Board has certainly

2    learned it is not one of its powers, and the Commonwealth can't

3    do it either.

4           So it is not that we don't sympathize with some of the

5    efforts to try to make things more efficient, and if we need

6    less money, we'll use less money, and we're heading in the

7    right direction.  But these are business decisions that are all

8    being worked on.  Reasonable people can differ.  And we

9    respectfully submit it's not for this loan to be denied because

10   some creditors would contend that if we manage our business

11   differently, then we'll need less money.

12          I'm not sure if I mentioned it before.  Just in case I

13   didn't, in Mr. Filsinger's Exhibit 1, which was his first

14   declaration, Movant No. 1, on paragraphs 18 through 20, he

15   explains why the effect on the secured claimants at PREPA is a

16   positive one; that they're not hurt by this loan.  Quite the

17   contrary.

18          Your Honor, unless the Court has other questions, I

19   would reserve the rest of my time for rebuttal, except that my

20   colleague wants me to mention something.

21          (Continued on next page)

22

23

24

25

```
 1              MR. BIENENSTOCK:  Your Honor, Mr. Barak reminds me

 2    that there is already a provision in the proposed financing

 3    order in paragraph 6(a) providing that to the extent any

 4    material amendment to the credit agreement is approved by the

 5    Oversight Board, such material amendment shall not become

 6    effective without further Court order which may be submitted on

 7    presentment with notice to parties in interest in accordance

 8    with the case management procedure still in effect in the

 9    debtor's Title III case.

10              THE COURT:  Isn't that paragraph limited to rates --

11              MR. BIENENSTOCK:  It's headed "Amendments, Consents,

12    Waivers and Modifications."

13              MR. BARAK:  Your Honor, 6(b) is limited to PREPA.

14    6(a) is limited to any material changes.

15              THE COURT:  Thank you.

16              So it doesn't define "material," but it does generally

17    provide that material changes would be subject to approval?

18              MR. BIENENSTOCK:  Yes, your Honor.

19              THE COURT:  Thank you.

20              MR. BIENENSTOCK:  And I'd be happy and do stipulate

21    that if we were asked or the Commonwealth were asked to approve

22    use of loan proceeds other than current expenses, we would

23    consider that a material modification invoking paragraph 6(a).

24              Thank you, your Honor.

25              THE COURT:  Thank you, Mr. Bienenstock.
```

1      Next I have Mr. Finger for 15 minutes.

2      MR. FINGER:  Good afternoon, your Honor.

3      THE COURT:  Good afternoon.

4      MR. FINGER:  The evidence has clearly shown that PREPA

5  faces a liquidity crisis.  When a normal commercial enterprise

6  faces a liquidity crisis, employees lose job, investors lose

7  equity, loans are not repaid.

8      Here the word "crisis" truly applies.  PREPA's

9  liquidity crisis present the humanitarian crisis.  The

10  residents of Puerto Rico have suffered a humanitarian crisis

11  caused by the hurricane.

12      Mr. Filsinger testified that because of PREPA's

13  liquidity crisis, he must implement emergency measures to

14  preserve cash so that PREPA can provide power to those who need

15  it most -- hospitals, medical centers, police stations.  And

16  yet under these emergency measures but without the immediate

17  receipt of funds from the Commonwealth loan, PREPA can last at

18  most four to five weeks.

19      But PREPA has a valid, committed loan to provide

20  immediate funds to allay PREPA liquidity crisis and sincerely

21  asks that its motion be granted.  Mr. Filsinger described the

22  cash flow projections which are in corrected Exhibit 16 and how

23  PREPA continues to lose money every week.  In reality, ever

24  since the hurricanes, PREPA's expenditures have exceeded its

25  receipts.

1          Since Mr. Filsinger assumed his role, he has strived

2    to address certain operational issues at PREPA in increasing

3    transparency of PREPA's financial performance.  Indeed, the

4    evidence contains several iterations of cash flow projections

5    and liquidity analyses which have been provided to PREPA's

6    constituents that demonstrate the liquidity need that PREPA

7    has.  Mr. Filsinger continues to refine them, but what it shows

8    irrefutably is that on its current cash burn, PREPA will run

9    out of money by March 9, 2018.

10          Indeed, Mr. Spencer concedes that PREPA needs money

11   but suggests that the size of the facility should be smaller

12   and that PREPA should find the rest of the money it needs

13   elsewhere.  But there are no funds available to PREPA except by

14   way of a loan, and the Commonwealth is the only real option

15   today to provide those funds.

16          Mr. Filsinger reported that as of last Friday,

17   February 9, PREPA's actual cash position was $194 million which

18   was approximately 1 1/2 percent off from its projections as

19   reflected in PREPA Exhibit 16.  The projections show a further

20   net weekly cash burn of $50 million for the week ending

21   tomorrow and $70 million for the week ending February 23.

22          Because it projects to run completely out of money by

23   March 9, PREPA's governing board has authorized Mr. Filsinger

24   to implement the emergency procedures.  As Mr. Filsinger

25   testified, he's contacting FEMA and the 20 largest creditors.

 1    And either Mr. Filsinger or the executive director will make an

 2    announcement to the residents of Puerto Rico on Friday or

 3    Saturday of the implementation of the emergency procedures.

 4            From Saturday through Monday, he will shut down

 5    certain generators to reduce load.  As part of the emergency

 6    procedures, he will cut the total load by about half.

 7            By mid next week, residential, commercial, and

 8    industrial customers will begin to lose power, and by the

 9    following weekend, a majority of customers who are not

10    emergency recipients will not have power.

11            As I stated earlier, under these emergency measures,

12    power to the emergency recipients will last approximately four

13    to five weeks.  Mr. Filsinger testified that he absolutely must

14    obtain funds by Wednesday, and in light of the fact that Monday

15    is a bank holiday, time is truly of the essence.  PREPA's

16    margin for error here is razor thin.

17            Therefore, we ask the Court to grant the motion and

18    enter the order as soon as possible.  Avoiding the emergency

19    procedures will avert another humanitarian crisis on the island

20    and will permit PREPA to continue its restoration efforts, its

21    operational and financial initiatives, and continue on the path

22    to a reliable, efficient source of electric power for the

23    residents of Puerto Rico.

24            Without the loan, PREPA and the residents of

25    Puerto Rico will lose the gains it has been fighting so hard to

 1   obtain since the hurricane.

 2          If the Court has no questions, I will accede the

 3   podium.

 4          THE COURT:  Thank you, Mr. Finger.

 5          MR. FRIEDMAN:  May I use Mr. Finger's time remaining

 6   instead of reserving for rebuttal, your Honor.

 7          THE COURT:  Sure.  What did Mr. Finger have left?

 8          MR. FINGER:  Ten minutes, your Honor.

 9          THE COURT:  Mr. Friedman, I'll put you down for 15

10   minutes.

11          MR. FRIEDMAN:  Thank you.  I think I have far less

12   than that.  Peter Friedman from O'Melveny & Myers on behalf of

13   AAFAF.

14          The first thing I wanted to say in response to a

15   question you asked is in fairness to PREPA.  I think in that

16   context, it's important to keep in mind what PREPA's

17   responsibility is.  It's actually, it turns out, mentioned in

18   Mr. Portela's declaration in paragraph 3 where he cited to Act

19   number 83-1941, the PREPA Enabling Act, Section 6, which

20   reminds that PREPA was created for the purpose of conserving,

21   developing, utilizing, and aiding in the conservation,

22   development, and utilization of water energy resources of

23   Puerto Rico for the purpose of making it available to the

24   inhabitants of the Commonwealth in the widest economic manner

25   that benefits thereof.

 1            When you take into account that that's what PREPA's

 2    mission is, this loan clearly is the most fair opportunity for

 3    PREPA to continue along in its mission.

 4            I have two other points to make about the

 5    Commonwealth's role here and AAFAF's role here.  I'm sure we'll

 6    hear many verbal comebacks.  You've already heard aimed at the

 7    Commonwealth and AAFAF.

 8            In essence, your Honor, no good deed goes unpunished.

 9    First of all, the Commonwealth and AAFAF have tried to be part

10    of PREPA's liquidity solution.  Mr. Portela's declaration makes

11    clear in paragraph 13 that the government prepaid $50.9 million

12    in a prepayment to PREPA in January for services over the next

13    five months.  No one has ever indicated that that was obligated

14    or required.  It was something the Commonwealth chose to do.

15            You heard terrible numbers from Mr. Filsinger about

16    liquidity and the consequences to PREPA of running out of

17    money.  Imagine how much grimmer and worse that would have been

18    if the Commonwealth hadn't stepped up and imparted the $50

19    million in liquidity in January that it didn't have to.  The

20    Commonwealth has been part of the solution here.

21            In addition, your Honor, AAFAF did more and the

22    Commonwealth has done more than give this nearly $51 million

23    prepayment.  It speaks to its good faith and its appropriate

24    conduct.

25            It sent letters to public corporations.  It's convened

1    meetings with public corporations.  But that's not all.  Far

2    from it.  The unrebutted testimony in paragraphs 15 and 16 of

3    Mr. Portela's declaration, which was emphasized on his redirect

4    examination, make clear that to the extent balances are owed

5    and haven't been reconciled, they are owed by organizations

6    like HTA and PRASA and the Elderly Care Advocates Office of

7    Puerto Rico and the Cardiovascular Center, all of which have

8    their own liquidity issues.

9           Mr. Portela's declaration makes clear that PRASA,

10   which is responsible for the entire water system and supply of

11   Puerto Rico, a critical element of public health, safety, and

12   welfare, only had $27 million in its unrestricted accounts as

13   of the date he submitted his declaration.

14          That simply can't just be all entirely directed to pay

15   one bill.  He went through the litany of factors that a public

16   corporation would have to take into account before it simply

17   decided to write a check after it even decided that receivables

18   were due and owing.

19          It's not as simple as the other side is putting

20   forward about being able to write checks to PREPA with no

21   consequence for collateral damage it might inflict on other

22   institutions in Puerto Rico.

23          Let's be clear.  PREPA has been treated very fairly.

24   As Mr. Portela testified and Mr. Filsinger testified together,

25   PREPA itself has many overdue bills.  Has AAFAF walked in and

1 insisted that PREPA pay every single one of those bills?  Has

2 it commandeered that public corporation's bank accounts to

3 insist that they make payments?  It has not.  It has treated

4 PREPA in the way it has treated other public corporations.

5         The final point I would make, your Honor, is with

6 respect to the good faith that is so obviously evident from the

7 terms of this loan that the Commonwealth has extended.  Look at

8 the interest rate.  It's 0 percent for the first six months.

9         Look at the maturity runway that's being given to

10 PREPA and the flexibility and time to maneuver and to come up

11 with the right solution for itself and its creditors.  Look at

12 the lack of fees.  Look at the lack of any restrictions on

13 prepayment.

14         In fact, as you heard from the stand -- and I think

15 this is within the quintessential definition of good faith --

16 the Commonwealth didn't use the leverage it had to extract more

17 onerous terms from the borrower.  What could speak of good

18 faith more than that, than the fact that it did not exercise

19 the leverage it had to take advantage of PREPA.

20         So why did the Commonwealth make the loan, your Honor?

21 Again, look to Mr. Portela's declaration.  Look at the

22 justification.  It's in paragraph 11.  It's really not

23 rebutted.

24         AAFAF, consistent with statutory duties, assisted both

25 the government and PREPA in accordance with their common

1   interest in serving the people of Puerto Rico.  That's the

2   right way to think about this transaction, its goals, and its

3   end.

4        The proposed facility, as Mr. Portela testified,

5   balances PREPA's urgent need for liquidity with the

6   government's considerations regarding its own finances.  That's

7   why this loan was made.  That's the purpose it serves, and for

8   the reasons I've described, that's why it should be approved,

9   your Honor.  Thank you.

10       THE COURT:  Thank you, Mr. Friedman.

11       Now, Mr. Despins, you have three minutes.

12       MR. DESPINS:  Good afternoon, your Honor.  Luc Despins

13  of Paul Hastings on behalf of the official committee of all

14  debtors other than COFINA.  Of course that means that we are

15  the committee for both the Commonwealth and PREPA as well.  So

16  we are on both sides of this issue.

17       There are pure Commonwealth creditors on the

18  committee, and there are pure PREPA creditors on the committee.

19  Notwithstanding that, the committee unanimously resolved to

20  take the following position vis-à-vis this financing:

21       First, that PREPA needs this financing.  There is no

22  doubt.  The evidence is very clear on that.  Two, that the DIP

23  needs to be on a priming basis.  Why?  Because the Commonwealth

24  should take no risk or close to no risk, given that it is the

25  lender's last resort.

1         The federal government won't lend to PREPA.  The

2    evidence is that no third party will lend to PREPA.  I'll come

3    back to the PREPA bondholders and their term sheet in a second.

4    So, therefore, there should be no risk to the Commonwealth.

5         However, the committee, again, unanimously, believed

6    that the terms of this DIP should be on, as much as possible,

7    regular arm's length business terms.  And I'll give just one

8    example to the Court which is the issue of the interest rate.

9         Just to give you a sense, let's not look at what

10   people are saying but really what the market tells you.  We

11   know that based on the PREPA secured bondholders' proposal, if

12   you look at all their built-in costs and fees and original

13   issue discount and all that, that for a period of one year,

14   they're all-built-in interest rate, if you want to look at it

15   that way, would be 14 percent or so as opposed to 0 percent

16   from the Commonwealth.  So that gives you a market data that

17   shows that 0 percent is clearly not market.

18        By the way, nobody is debating that 0 percent is not

19   market.  If you want to look at another data point -- and

20   that's public.  It's not in the record, but the Court can take

21   judicial notice of that because it's a public document -- the

22   federal government is lending to the U.S. Virgin Islands at a

23   rate that is around 3 percent.  So that tells you that clearly

24   this rate is not market.

25        The response of the Oversight Board and AAFAF on that

 1    is that hey, Section 305, which is the favorite section that

 2    they use all the time, but also that we're not seeking approval

 3    in the Commonwealth case.  And, therefore, Judge, put your

 4    blinders on just to look at this PREPA transaction.  Forget

 5    about the fact that the Commonwealth is a debtor, but the

 6    Commonwealth is a debtor, your Honor, and it's not because

 7    approval is not sought in that case that there shouldn't be

 8    close scrutiny paid to this insider transaction.

 9           Your Honor, we're not saying that the Court should

10    tell the Commonwealth or the Oversight Board what the interest

11    rate should be, but plenty of judges approve DIP financings.

12    And they say, I'm approving the DIP, but I'm not comfortable

13    with the following features.

14           And debtors and lenders go back to the drawing board

15    and come back to court saying, we fixed it in the following

16    manner, and we suggest that that's what the Court should do

17    here.  I know I'm out of time, and I'll close very quickly,

18    your Honor.

19           The argument that the Commonwealth is no worse off

20    because the money is sitting in the TSA account is really not a

21    compelling argument, your Honor.  The risk profile is totally

22    different.

23           If you have your money parked at JP Morgan Chase or

24    lending it to me, for example, not the same profile, not the

25    same credit risk.  I'd rather have my money in the JP Morgan

1    account.  So the argument that that money is just sitting there

2    is not compelling.

3            As to the issue of the PREPA bondholders' proposal, I

4    direct your Honor to the Yellowstone Mountain Club case, which

5    is a 2008 case, WL 5875547, where the court rejected what it

6    described as a last-minute attempt to derail good financing.

7            In that case, Credit Suisse came to the table and

8    said, oh, we have a non-priming DIP.  That means the court

9    cannot approve a priming DIP, and the court rejected that as a

10   transparent attempt to derail the process.

11           For all these reasons, your Honor, we believe the

12   Court should approve the DIP financing but should condition its

13   approval on the debtors coming back to the Court with a

14   reasonable market rate for the interest charged by the

15   Commonwealth to PREPA.  Thank you, your Honor.

16           THE COURT:  Thank you.

17           Now counsel for Scotiabank.

18           MS. WOLF:  Your Honor, Amy Wolf on behalf of

19   Scotiabank.  We ask --

20           THE COURT:  I'm sorry.  You're not by a microphone.

21   So I'm going to have to repeat what you say unless you go to a

22   microphone.

23           Thank you, Ms. Wolf.

24           MS. WOLF:  Sorry, your Honor.  Amy Wolf on behalf of

25   Scotiabank as agent for fuel line lenders.

 1          We had wanted to speak -- I'm sorry there was some

 2     confusion -- if necessary in rebuttal.  We'd like to hear what

 3     the bondholders have to say, and then we'd like the few minutes

 4     that were reserved for us at that time.

 5          THE COURT:  So the five minutes will be for rebuttal

 6     if you choose to use it.

 7          MS. WOLF:  Yes.  Thank you very much.

 8          THE COURT:  Thank you for that clarification.

 9          So I think that this takes me to objectors.  Now,

10     there is no other principal in support.

11          First I have the PREPA ad hoc creditors committee.

12     Mr. Mayer for 25 minutes.

13          MR. MAYER:  Thank you, your Honor.  Tom Mayer of

14     Kramer Levin Naftalis & Frankel for the ad hoc PREPA

15     bondholders.

16          I want to talk first about the competing proposal that

17     we made yesterday, and I want to give the Court a little

18     background to put it in perspective because --

19          THE COURT:  Tilt the microphone more up to you.

20          MR. MAYER:  Yes.  A practice that has attracted

21     criticism that, in my view, is wholly unwarranted.

22          A little review of the history.  The Oversight Board

23     moved for approval of the DIP I believe on January 26, and on

24     February 2, they contacted us, and they asked us for a

25     proposal.  And we had been in contact with representatives of

1   AAFAF since February 6.

2           The fact that we are here on the DIP loan today should

3   be of no surprise to anybody who was attending the Mondell

4   deposition where it was mentioned and the deposition of

5   Mr. Filsinger where it was also mentioned.

6           We ended up providing the term sheet yesterday because

7   it's hard to get eight institutions to commit to lend $524

8   million.  That's real money.

9           Incidentally, as our filing last night or very early

10  this morning indicated, it really is $524 million -- the fees,

11  the interest.  That gets added on to the principal amount of

12  the loan which means that the principal amount is higher than

13  $524 million, but there is really $524 million of cash that's

14  available.

15          I've told people to have it ready tomorrow.  We have

16  signed commitment letters.  Mr. Filsinger says he needs money

17  by Wednesday.  That is not a problem.  I have, by my count, six

18  of the eight principals in this courtroom or in the overflow

19  room but comprising north of $400 million of the $524 million

20  that has been offered.

21          One principal is in San Francisco, but we have the

22  signature pages that we need to make the money available.  So

23  this is a real DIP.  It was a DIP that -- I keep saying "DIP."

24  This is really a debtor in possession.

25          THE COURT:  I understand.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    MR. MAYER:  We have real money available.  It's a real

2    credit agreement, and it is not for purposes of just

3    disrespecting the DIP.  We don't want to see the lights go out

4    in Puerto Rico any more than anyone else.  We just don't want

5    to see our collateral taken from us when we can provide an

6    alternative, where in fact the Commonwealth can provide an

7    alternative.

8         So, with that, I appreciate your Honor taking our term

9    sheet into consideration as evidence.  I regret to say I find

10   myself in a position where I must challenge something you said

11   at the beginning of this hearing.  I tried to listen very

12   carefully to what you said, and I think I have a fundamental

13   disagreement that I am compelled to air.

14        You said that the Commonwealth loan is the only loan

15   before you today.  The necessary consequence of that, perhaps,

16   is that well, PREPA needs money on Wednesday, and the

17   Commonwealth loan is the only loan that is available today.  So

18   the Court has no choice but to approve the Commonwealth loan

19   because to do anything else would take more time.

20        Your Honor, I respectfully disagree.  I think that is

21   not the law.  This is an auction.  It was set up as an auction.

22   The Oversight Board ran it as an auction.  People were supposed

23   to come to court with proposals, not as an academic exercise.

24        We didn't spend a week tearing our hair out getting

25   people to sign commitment letters as an academic exercise.  We

1    came to make a bid, and we are here as a bidder.  With respect,

2    your Honor, you have the authority, the power today, to

3    authorize either the Commonwealth loan or our loan.

4         So I respectfully disagree with your statement that

5    there is only one loan before you today.

6         THE COURT:  Doesn't 364 require the debtor to be the

7    proponent of a financing proposal like this?  And even if there

8    could be a 363-type auction situation under 364, I don't recall

9    that the debtor's papers were set up that way.

10        I recall that the debtor's papers said, here is our

11   joint proposal.  We continue to solicit other proposals and

12   look for other things, but I don't see anything in there that

13   says if something walks up that you think is the highest and

14   best, we consent in advance to that, and the Oversight Board

15   does whatever it needs to do under PROMESA Section 207 by the

16   way of consent to other financing based on the Court's

17   independent evaluation.

18        So, if you can just help me textually in the statute

19   and in the motion to understand your position.  The reason I

20   said what I said is that, as I see it, I have a proposal from

21   the debtor and the Oversight Board that I can approve or not.

22        And if I don't, I'll give some explanation as to why I

23   don't.  If I don't, the proponents may have good cause to think

24   about things in some other way and come back to me with another

25   proposal to which the Oversight Board would consent.

1      But I don't see, in the structure of the motion or the

2   structure of the statute, an ability to impose your proposed

3   solution on PREPA.  I'm trying to be as candid with you as I

4   can.  So tell you why I'm not.

5          MR. MAYER:  Your Honor, I agree with everything you

6   said, but it is not an answer, and I'll tell you why.  We have

7   not asked you -- and no one can ask you -- to impose a DIP loan

8   on the debtor.  That doesn't even happen in Chapter 11.

9          You have the authority to deny their motion, and you

10  have the authority to approve our loan if they enter into it.

11  You can't force them to enter into it, but you can say to them,

12  as judges have said in other circumstances, I can't give you X.

13  I can give you Y.

14         THE COURT:  All right.  Then I understand what you're

15  saying.

16         MR. MAYER:  So that's why I said what I said.  And

17  what I am most concerned about is that if your Honor looks at

18  these two proposals, if your Honor looks at 364(d)(1) and if

19  your Honor agrees with us -- and I respectfully submit the

20  statute is clear as day -- if your Honor agrees that if the

21  non-priming facility is available, a priming lien cannot be

22  granted.

23         What I want to avoid is any assumption that that means

24  we have to go back to the drawing board.  There has to be a new

25  motion.  There has to be a new period of notice, and we just

1   don't have time for that.  And therefore, I'm not even going to

2   get to the analysis because I don't think that's right.  This

3   is an auction.  People show up.  That's true.

4        The debtor can't be forced to do a loan it doesn't

5   want, but it can be told that it can't do the loan it wants and

6   there is another alternative available to it, and that is the

7   essence of our argument and the reason that we came to court

8   with another proposal.

9        Your Honor, if the law were otherwise, this facility

10  has been set up from day one to make this hearing basically a

11  nullity because no one could ever come to this Court with an

12  offer that was better than what the Commonwealth was offering

13  because if it required an additional 20 days to approve, if you

14  have to go back to the drawing board, no one was ever going to

15  be able to meet that standard.

16       So I respectfully submit I think you have two

17  proposals before you.  You cannot force the debtor to do either

18  one, but you can do what I have just outlined.  I submit it's

19  something you should do and something, in our view, you must

20  do.

21       I won't spend more time on we're a non-priming loan.

22  They're a priming loan.  That's done.  I want to talk about

23  what's wrong with their facility.

24       We heard a lot about how this is a billion-dollar

25  facility, and they need a billion dollars.  It's 0 percent

1    interest, and isn't that great.  This is a facility that limits

2    what proceeds can be used for.  They can't be used for anything

3    other than current expenses or eligible uses, and we've been

4    told now, well, we'll come back to court if we change that.

5         Your Honor, I'm afraid, from our perspective, this

6    credit agreement is a fake.  It's a fake on a number of

7    grounds.  First, as you've heard, the billion dollars is a fake

8    when you think about elements of good faith, then about the

9    Oversight Board and AAFAF going out to the market and saying,

10   we need you to bid against a billion-dollar loan that we don't

11   have authority to use.

12        It's a fake because that $800 million number -- that

13   isn't just FEMA's number on what has to be in the TSA.  That's

14   in the credit agreement itself.  If the TSA ever drops below

15   $800 million, the Commonwealth doesn't have the money to fund

16   another buck or, more accurately, PREPA has no authority or

17   mobility under the credit agreement to borrow another dollar.

18        So, again, the principal amount, the availability --

19   it's a fake.  I have never been in a case where I've been asked

20   to bid a committed facility against a facility that isn't

21   committed.  So that's number one.

22        Now, number two, there has been a lot of talk about

23   this wonderful 0 percent interest, and 0 percent interest is

24   unheard of.  Who projects 0 percent interest except that's not

25   really what the credit agreement says because what the credit

1   agreement says is that if you approve this loan today, tomorrow

2   one of the ad hoc GOs can lend $500 million to the Commonwealth

3   at 15 percent to refinance our loan and the interest rate

4   adjusts automatically under the terms of the credit agreement.

5          So it's 0 percent today, and it's whatever the

6   Commonwealth wants to charge tomorrow, and there is no

7   provision in the modifying order, in the credit agreement, or

8   anywhere else that requires anyone to come back to court and

9   get that approved.

10          THE COURT:  So you don't agree that that would be a

11   step --

12          MR. MAYER:  No.  Take a look at the order.  The order

13   is very narrow.  The order refers to an increase, a step-up

14   loan.  Incidentally, lest you think this is a gotcha, we've

15   been pounding this drum for weeks, and the changes in the

16   order -- and they just don't address it.

17          Paragraph 6(b):  "In the event a step increase" --

18   that means going from 550 up -- "funded through Commonwealth

19   financing results in a material change to the economic terms of

20   the facility, such material economic terms shall not become

21   effective without further court order."  But the original

22   550 -- that's not a step up.

23          Any money that's already been loaned, that's not a

24   step up.  The interest rate on that can be reset automatically,

25   and no one gets a chance to say who.  Now, maybe that's a

1  mistake.  Maybe that's going to be fixed in the rebuttal, but

2  this is in the drum we've been pounding for a long time, and

3  it's a game of, look.  You still have a problem, and it doesn't

4  get fixed.

5       Then let's look at 6(a).  Mr. Barak commented on that.

6  It says:  "Subject to the approval of the Oversight Board,

7  PREPA may enter into any amendments, consents, waivers, or

8  modifications of the credit documents in accordance with the

9  terms thereof without the need for further notice in a hearing

10  or any order of this Court, provided, however, to the

11  extent" -- look carefully -- "any amendment to the credit

12  agreement is approved by the Oversight Board, such material

13  amendment shall not become effective without further Court

14  order."

15       Even on the terms of this order, the only thing that

16  the court needs to approve is a material amendment.  It's not a

17  consent.  It's not a waiver.  Okay.

18       Now let's go back to the credit agreement.  You've

19  heard about Section 413 which limits the use of proceeds to pay

20  eligible uses unless the parties consent, and you've heard an

21  offer, well, we'll come back and get your approval before we

22  consent.

23       It isn't just 413.  Take a look at Section 12-4(b).

24  It's on page 27.  The credit agreement, by the way, is document

25  640-2.  "The borrower," which is PREPA, "may undertake any

 1   action otherwise prohibited hereby and may omit to take any

 2   objection otherwise required hereby upon and with the express

 3   prior written consent of the lender and the oversight Board."

 4          So every single restriction in this agreement means

 5   nothing for any third party.  Any time anyone says to the ad

 6   hoc bondholders, don't worry.  The credit agreement doesn't

 7   allow X, that's worthless because the credit agreement can be

 8   waived by an amendment, and we may never even know about it,

 9   and the order that's been provided to the Court provides no

10   limitation on that.

11          As Mr. Bienenstock says, well, there are two

12   contracting parties.  There's the Commonwealth, and there's

13   PREPA.  They happen to be run by the same person, but they can

14   change their agreement between themselves any time they want,

15   and no third party has any chance to say anything about it.

16          This is one of the problems of the setup here, and

17   with respect to how PREPA got all these Bennies from the

18   Commonwealth and PREPA is the favorite child, I'm sorry.  The

19   Commonwealth controls PREPA, not the other way around.  PREPA

20   does what the Commonwealth wants it to do.

21          One last thing.  Your Honor has already mentioned

22   this.  Even with a tightening up of Section 413 and even if we

23   tighten up Section 12, your Honor noted our argument that this

24   whole restriction of proceeds is kind of a fake because right

25   now, pledged revenues -- they come in, and they go to pay

1   current expenses.  Okay.  That's cool.

2        Once this agreement gets approved, the revenues don't

3   go to pay current expenses.  The loan proceeds do, and that

4   frees up revenues to pay anything PREPA wants.

5        So the effect is that instead of having operating

6   revenue, operating expenses paid out of operating revenues and

7   our collateral stays right where it is, what happens is the new

8   loan eats into our collateral every day as money is advanced,

9   and the revenues that would ordinarily have just gone to pay

10  operating expenses and would not have eat into our

11  collateral -- they go off to pay something else that doesn't

12  benefit us at all.

13       Incidentally, at deposition, Mr. Mondell testified to

14  that.  That's exactly what this is set up to do.  I'm not

15  making this up.  So, as I said, from the perspective of the

16  PREPA bondholders, this wonderful credit agreement, the

17  wonderful 0 percent, the wonderful billion dollars -- it's a

18  fake.  It's all a fake.

19       Now, I want to talk about adequate protection for a

20  DIP.  Mr. Bienenstock has two basic arguments on adequate

21  protection.  One he seems to have abandoned for purposes of

22  this particular hearing, given, perhaps, time constraints,

23  which is his argument that we don't have any value to protect.

24       Your Honor has heard how everybody other than the

25  PREPA bondholders is just desperate to get that priming lien on

1    collateral that Mr. Bienenstock says has no value.

2         So I'd like to move right past that because I think --

3    I tried to convince my colleagues I could make an estoppel

4    argument.  They said I can't quite get there, but this is

5    really inconsistent, and it simply isn't it true.

6         I want to take one moment to stress something in our

7    papers because it's not a topic that people have talked about

8    very much, but it is very important to us.  Your Honor, we

9    believe that we have the right not just to today's depressed

10   revenues but to tomorrow's better revenues because that's what

11   Section 928 does.  It gives us a lien on those revenues ad

12   infinitum, and we also believe, as you know, that we have a

13   rate covenant that entitles us to have rates increased.  And

14   that's not in today's issue.

15        We did not raise that for today.  We're not asking for

16   it today, but it is part of the value of our collateral, and I

17   would urge the Court, this is not an issue that you need to

18   reach today.  We will raise it in confirmation, and if the

19   First Circuit comes down the way we're asking, we may raise it

20   somewhat earlier.

21        It isn't just that we have a rate covenant as part of

22   our collateral under our documents.  It isn't just that we have

23   a rate covenant under Puerto Rico's statutes.  Under the

24   Constitution of the United States, stockholders in a regulated

25   utility have a constitutional right to have rates set to

1    protect their capital investment.

2         We are better than stockholders.  We have a pledge of

3    revenues.  So I reject the argument that still lingers in the

4    papers that our collateral has no value and is not worthy of

5    adequate protection.

6         Now let's move to current expenses.  Your Honor, there

7    are a lot of loans secured by blanket liens in this country.

8    It's pretty standard.  Blanket UCC liens cover everything --

9    cash, accounts receivable, inventory.  In the loan agreement,

10   there's a provision that says the proceeds can be used to pay

11   ordinary operating expenses.

12        Well, I think a lot of commercial lenders would be

13   very surprised to find out that according to the Oversight

14   Board's argument here, they're subordinated to expenses they've

15   agreed to be paid or that their lien doesn't attach until those

16   expenses are paid or that in a Chapter 11 case, they can always

17   be prime because, after all, pre Chapter 11, they agreed that

18   operating expenses could be paid.

19        None of that is true, and it is the natural

20   consequence of the argument that Mr. Bienenstock is making.  I

21   don't think there is any support for it, and I don't believe

22   that our collateral that needs to be adequately protected is

23   done so simply by the payment of current expenses by a loan

24   that eats into our collateral every day while money is diverted

25   elsewhere.

 1          I've already touched on a number of things that deal

 2     with the issue of good faith.  We do not believe good faith has

 3     been shown.  The essence of a good-faith argument that we're

 4     left with here has nothing to do with process because everybody

 5     agrees process was a bunch of people sitting around the room

 6     and saying, well, let's do what we think is right.  Oh, by the

 7     way, the deliberate process will keep you from finding out what

 8     we talked about which I should think disqualifies any reference

 9     to process as being indicative of good faith.

10          The basic argument on good faith is res ipsa res ipsa

11     loquitur, look at this wonderful loan.  It's so great for PREPA

12     that tells you it was done in good faith.  Well, your Honor, as

13     I indicated in my previous remarks, I think the good-faith

14     argument fails.

15          Let's face it.  We don't want the lights out.  Nobody

16     wants the lights out, but PREPA has $200 million it can collect

17     from the Commonwealth on account of the other

18     instrumentalities, and the Commonwealth has the money.  If

19     they're prepared to lend it, they can be use it to pay the

20     bills.

21          That can be done with a punch of the button.  You

22     heard today the governor has total control.  Mr. Bienenstock is

23     correct that the Oversight Board can't make things happen with

24     a punch of the button, but there are several Puerto Rico

25     statutes that give the governor carte blanche and give AAFAF

1   carte blanche over every governmental corporation.

2         Anything AAFAF and the governor want the governmental

3   corporations to do they have the ability to make happen.

4   They've chosen not to do.  They've chosen not to make the money

5   available except through a transaction that takes that out.  We

6   don't think that's good faith.

7         We've heard a lot of stuff about there's a dispute.

8   Your Honor, all I can say is if you take a careful look at the

9   second Filsinger supplemental declaration -- that's docket

10  688 -- Mr. Filsinger goes through a lot of governmental

11  corporations, and most of them don't say that this is a

12  dispute.

13        They say there needs to be some reconciliation, but

14  what they say is well, we basically just didn't pay anything

15  for electricity for two, three, four years.  They owe the

16  money.  It's not a question of do they owe the money.  They

17  actually owe the money.

18        Also I want to take issue with something Mr. Friedman

19  said.  He referred to testimony today that PREPA owes a lot of

20  money too.  I listened very carefully, and maybe I missed it,

21  but I don't know of anything in the record that says

22  substantial amounts owed by PREPA to other governmental

23  corporations.  PREPA was used as the piggy bank, and we're here

24  in part because of it.

25        Your Honor, you have two loans before you.  I can't

1    force you to take either one, but I can suggest that the

2    Commonwealth's loan is not offered in good faith.  It doesn't

3    provide us with adequate protection.  It is a priming loan, and

4    it can't be approved if there's an alternative available.  Our

5    alternative is available.  If you have questions, I'm happy to

6    answer.

7            THE COURT:  Thank you, Mr. Mayer.

8            Now for National.  I have you down for ten minutes.

9            MR. BEREZIN:  Yes, your Honor.  Thank you.  Robert

10   Berezin from Weil, Gotshal & Mangers on behalf of National

11   Financial Guarantee Corporation.

12           Your Honor, National is a municipal bond insurer.  It

13   is PREPA's largest creditor.  It's one of the largest creditors

14   across these Puerto Rican Title III cases.

15           As a large creditor and as, importantly, the key

16   insurer in the municipal bond market, National has a key role

17   to play to advance PROMESA's goal of facilitating Puerto Rico's

18   access to the capital markets.

19           We are here to say, your Honor, that this priming DIP

20   is a giant step backwards from that goal.  There is, in the

21   first instance, your Honor, no need for a priming DIP under

22   Section 364, and its terms are not fair, reasonable, and the

23   circumstances before this Court.

24           This crisis is entirely manmade.  It is not a natural

25   crisis.  It has been brought on by people.  The Commonwealth,

1    as the record shows, owes PREPA hundreds of millions of

2    dollars.  These receivables go back, the record shows, more

3    than five years.  PREPA has indeed been the piggy bank for many

4    government entities.

5         The Commonwealth could, has the power and could,

6    simply pay its bills tomorrow.  Push a button, pay your bills

7    for the electricity it used in the last five years, and voilà.

8    This Court would not be faced with the dilemma that it's

9    currently faced with, and this Court would not have to make a

10   decision, essentially overnight, over this loan.  It is not a

11   natural crisis.  It is one made by people.

12        Other government agencies, in addition to the

13   Commonwealth, owe PREPA several hundred million dollars, again,

14   going back several years.  That's several years that government

15   entities -- it has nothing to do with the hurricane -- simply

16   were not paying for electricity.

17        Again, the Commonwealth, with the Oversight Board's

18   consent, which can be done with a push of a button, can pay

19   those bills tomorrow.  The immediate crisis will pass, and the

20   natural course of the market can continue without this looming

21   artificial crisis.

22        Municipalities have been getting free power.  This is

23   a well-known problem in Puerto Rico.  The hurricane has been

24   devastating.  It has created a force majeure event under

25   Puerto Rican law.

 1          These payments that have been made in lieu of taxes no

 2   longer need to be paid.  The governor can make that

 3   declaration.  PREPA could make that declaration overnight,

 4   again, easing this manufactured crisis.

 5          The priming lien is also entirely unreasonable, and I

 6   ask the Court to consider what we've heard at the beginning of

 7   today's proceedings and just before from Mr. Bienenstock.

 8          It's a 30-year maturity we're told, lots of runway.

 9   Okay.  Thirty years.  This is a monopoly.  It has monopoly

10   power.  It is the sole source of electricity on Puerto Rico.

11          No one is talking about raising rates in the midst of

12   this hurricane.  We're talking about over 30 years.  This goes

13   to the point about how this collateral has tremendous value and

14   is being primed because there is a regulatory process.

15          Puerto Rico has laws.  It has a regulatory process.

16   That regulatory process is designed by law to ensure that this

17   utility can charge rates sufficient to cover its operating

18   expenses and sufficient to make a provision to satisfy its

19   ongoing debt service.

20          This is not normal.  This is a crisis that has been

21   created.  It will be temporary.  It must be temporary because

22   the laws of economics demand that it be temporary.

23          A public utility, if it needs to collect money

24   immediately because it is in crisis, will do -- maybe not now,

25   but hopefully as this island heals, will do what other

1  utilities do all the time, which is explain to their customers,

2  commercial customers -- by the way, the customers in the

3  municipalities that are for-profit businesses that are using

4  power for free -- those customers can have their power turned

5  off.  It is the ultimate in self-help.

6       It's not going to happen today.  It shouldn't happen

7  today, but it can happen.  Once things return to normal, this

8  crisis will end, and this loan, this priming loan, is

9  completely and utterly unnecessary.

10       In any semblance of a negotiation, it would not exist.

11  The record is crystal clear.  There was no negotiation.  There

12  weren't even sides.  It must be the first DIP loan in history

13  to be negotiated without sides.

14       The other fatal defect, your Honor, with this DIP loan

15  is that it gives a single creditor by design and based on

16  everyone's expectations, all parties to this, unfettered

17  control over the plan of adjustment.

18       We're at the DIP stage.  We have a DIP where every bit

19  of testimony you heard, not the lawyers but from the witnesses,

20  is that PREPA cannot afford to pay this DIP back upon

21  confirmation 100 cents in cash.  It's not going to happen.

22  That's the only evidence this Court has before it.

23       So that renders the estate administratively insolvent

24  or this debtor administratively insolvent.  So there is no

25  confirmation unless the Commonwealth agrees.

1          So we are putting the Commonwealth in control of this

2    case ahead of existing creditors, ahead of the secured

3    creditors by dint of a DIP loan being approved, and all parties

4    to the DIP loan understood that that was the situation, that

5    PREPA didn't have money.

6          And what we've seen is that this DIP loan, which has

7    no obligation -- it's the height of irony.  If you look at the

8    order they put before your Honor, it obligates PREPA to use its

9    best efforts to pay bills.

10         Why in the world wouldn't this DIP loan obligate the

11   government of Puerto Rico, which has all the power -- obviously

12   PREPA doesn't -- to compel its governmental agencies to

13   reconcile and pay PREPA's bills?

14         We're not talking about this year's bills because if

15   you look at Mr. Filsinger's declarations very carefully, it's

16   about this fiscal year.  What about last fiscal year?  What

17   about the year before?  What about the year before and the year

18   before?  Those bills are due and owing.  This crisis was made

19   by people, and they put this Court in a very, very difficult

20   position.

21         One word about priming, Your Honor.  I've mentioned

22   before that if this is a 30-year loan, we see two things.  If

23   you look at the actual loan document, it says that there is a

24   30-year maturity date unless earlier there is a plan of

25   confirmation.  If there is a plan of confirmation, it's all due

1   and payable.  That's putting aside the super-priority status.

2   So I don't know why it's a 30-year loan, but if it is a 30-year

3   loan, then priming is not necessary because it's going to get

4   paid.

5           But they say, in any event, that this loan doesn't

6   prime because the proceeds are only going to be used for

7   current expenses.  Okay.  But at some point, this loan is going

8   to have to be repaid.  It's either going to be repaid at the

9   point of confirmation or it's going to be repaid sometime

10  later.

11          When it is repaid, under the governing documents that

12  govern the bonds at issue, that payment of a loan for past

13  current expenses doesn't make it a current expense.  So they're

14  going to be taking more revenue, revenue that would otherwise

15  go to repay the bondholders, it's going to go instead to pay

16  back this loan, and that is a priming lien for which we have no

17  adequate protection.

18          Now, again, of course the arguments make perfect

19  sense.  If the power goes out, then it's going to be a disaster

20  for Puerto Rico, and when you go down the order of bad

21  consequences, it will be bad for creditors.

22          But, as I've said, this is a crisis made by people,

23  and it can be averted, and it does not need to be averted with

24  a priming DIP, particularly because an alternative has been

25  placed before this Court.

 1              Your Honor, with my 48 seconds, unless you have

 2     questions.

 3              THE COURT:  Actually, your 48 seconds are over 55.

 4     Thank you.

 5              MR. BEREZIN:  I will sit down.

 6              THE COURT:  Next for Assured.

 7              MR. ELLENBERG:  If the Court please, Mark Ellenberg on

 8     behalf of Assured.

 9              THE COURT:  I have you down for ten minutes.

10              MR. ELLENBERG:  Thank you, your Honor.

11              I would just like to emphasize five points.  We joined

12     in the arguments of the ad hoc group, National.  There are a

13     few points I would like to emphasize.

14              THE COURT:  Would you just angle the microphone a bit

15     more toward you and project.  Thank you.

16              MR. ELLENBERG:  Sure.

17              As you just heard, the lack of liquidity at PREPA is

18     clearly a self-fulfilling prophecy.  Not only are there

19     hundreds of millions of dollars of government receivables which

20     could be paid and are not being paid, it's the same dollars.

21              AAFAF and the Commonwealth have been scooping up all

22     of the tax remedies that should be sent down to agencies like

23     HTA.  They're scooping them up, they're keeping them in the TSA

24     account, and they're preventing those agencies from paying

25     their bills.

 1            If the TSA account has sufficient liquidity to make a

 2    loan to PREPA, it has sufficient liquidity to pay those bills.

 3    And not only are they not paying the bills for energy received,

 4    they are lending the money, and they're not just lending it.

 5    They're seeking a priming lien.  So they're turning what should

 6    be a payable, an asset of PREPA, into a liability and a

 7    liability with a priming lien attached to it.

 8            If they did this before the case began, people would

 9    be in here making arguments about equitable subordination, and

10    now they're trying to do it in the light of day.  It is

11    something that should give the Court significant pause.

12            In addition, your Honor, it's not just the payables.

13    The projections have been tarnished with a concern.

14    For example, the DIP motion was filed on January 27.  We've

15    gotten two 13-week cash flow reports since then.

16            Over that two-week period, they collected $141 million

17    from customers.  That is $101.3 million over projection.  So

18    over a two-week period, they collected $141 million.  They were

19    $101 million off.

20            THE COURT:  Don't they say that that includes the

21    undisputed payments from 2017 and the $50 million prepayment by

22    the Commonwealth?  So some $80 million or so of that is a

23    one-off occurrence?

24            MR. ELLENBERG:  All of which they control.  All of

25    which they control, and what will be the one-off occurrence

1  next week and the week after that?  They have consistently

2  underestimated their revenues, consistently.  Even if you

3  adjust for those one-time payments, they were still way over

4  their projections.

5       There's more.  There is $150 million, give or take,

6  sitting in GBD.  That is property of the PREPA estate.  PREPA

7  is a Title III debtor.  GBD is not a Title III debtor.  It does

8  not have the benefit of a stay.

9       If PREPA were really being independently run and was

10  acting as a fiduciary for its creditors, it would be pounding

11  on the doors of GBD demanding its $150 million.  They're not

12  doing that because it's all being managed from the top.

13       In addition, your Honor, $2 billion was just

14  appropriated in the budget signed by the President earmarked

15  essentially for PREPA.  That's not even taken into account in

16  their projections.

17       It certainly questions the need for the DIP, but even

18  more so, it questions the size of the DIP.  It certainly

19  questions the equity of turning what should be an asset into a

20  liability and putting priming on top of that.

21       Now, your Honor, Mr. Bienenstock wanted to start with

22  Section 364.  I think that's a really good place to start.

23  Mr. Mayer addressed how they have failed to meet the first

24  requirement for priming, which is that they have no alternative

25  available to them.  Clearly they do.

1          Let's talk about adequate protection.  364(d)(2) is

2    mandatory.  There must be adequate protection if there is going

3    to be priming.  And that adequate protection is measured not by

4    the value of the collateral but by the amount of dollars that

5    are going to come in on top of the pre-existing collateral,

6    whether it's a dollar-for-dollar replacement lien or some other

7    adequate form of protection, and it is their burden to show

8    that they're providing adequate protection.

9          They are not even pretending to provide adequate

10   intention.  They're saying we are not entitled to it because we

11   were barred by current expenses anyway.  First of all, that's

12   wrong, which I'll get to in a minute.  More importantly,

13   they're wrong as a matter of law.

14         They are obligated to provide adequate protection,

15   dollar for dollar, if they are going to prime us.  They are

16   relying on their briefs on cases where creditors are moving for

17   relief from stay under Section 362(b) for lack of adequate

18   protection.

19         When you are a creditor moving for relief from stay

20   based on lack of adequate protection, yes.  Then you have to

21   prove the diminution of value in your collateral.  That is the

22   wrong standard under 364.  364 has a mandatory requirement to

23   provide affirmative adequate protection dollar for dollar.

24         They're not doing that.  That, as a matter of law,

25   precludes this motion being approved.  It's a show stopper

 1  right there.  They're not even pretending to be providing us

 2  with adequate protection.

 3        Now let's address this notion that we have a net lien

 4  and not a gross lien.  It is simply 100 percent incorrect.  We

 5  have a gross lien on revenues.  In fact, they've conceded that

 6  on page 2 of their original motion, the bonds are secured by a

 7  lien on all of the debtor's revenues.  On page 9 of the reply

 8  brief, as explained in the post-petition financing motion, the

 9  holders of the power in the bonds have a security interest in

10  revenues.

11        The pledge language is clear.  There is no carve-out.

12  We have a lien on revenues, full stop.  There is language in

13  the indenture to which we are a party and PREPA is a party and

14  the indenture trustee is a party that creates a waterfall.

15        And in that waterfall, under certain circumstances,

16  PREPA is authorized to pay current expenses ahead of debt

17  service.  That is a contractual provision in an indenture.  It

18  is not a carve-out from our lien.  Somebody with a priming lien

19  has completely different rights, particularly at the time of

20  confirmation, from someone who merely has contract rights under

21  that indenture.

22        This is really key, your Honor.  There is no carve-out

23  from our lien.  We are not primed in any way by current

24  expenses.  That is an indenture provision.

25        Remarkably, Mr. Bienenstock filed a pleading last

 1   night in which he said the competing DIP is really a priming

 2   lien because it seeks to have an order giving it the status of

 3   current expenses or a super-priority administrative claim.

 4        Your Honor, that is not priming.  It is very different

 5   from priming.  Yes, they have a right to be paid in full before

 6   the plan can be confirmed, but they do not have the right of a

 7   priming lienholder at confirmation or in the event of sale.

 8        If they wanted to limit themselves to what

 9   Mr. Bienenstock says is the equivalent of priming, which is an

10   admin priority claim or the status of current expenses, we

11   would drop our objection.  I believe all the creditor objectors

12   would drop their objections.

13        The entire problem here is that they're seeking

14   priming that they don't really need, and they're not doing it

15   for economic reasons.  They're doing it for tactical reasons.

16   They're doing it for a debtor who is not in control of its own

17   fate, and they're not doing it in their interest as a lender.

18        They're doing it in their interest as the Commonwealth

19   and the Oversight Board for strategic purposes having to do

20   with plan confirmation.  The priming needs to go.  If the

21   priming goes, this trial goes away.  Thank you.

22        (Continued on next page)

23

24

25

1        THE COURT:  Now counsel for Knighthead for five

2   minutes.

3        MR. WOFFORD:  Your Honor, good afternoon.

4        Keith Wofford from Ropes & Gray.  Hopefully, the

5   diminishing time will not be diminishing returns, but I do have

6   some points to join in with my predecessor that I would like to

7   emphasize.

8        First of all, I think everyone stated correctly the

9   two requirements of 364(d), which is adequate protection and

10   inability to obtain the loan without problem.

11        So in order to avoid granting adequate protection,

12   this debtor has argues that our lien on revenues is

13   subordinated to current expenses.  And I know that people have

14   mentioned generally that is not in the trust agreement.  But we

15   want to make sure that for the record the Court is very, very

16   correct, we highlight a few of the particular provisions.  I

17   believe the trust agreement is Exhibit 17 in what you've been

18   handed.

19        First of all, what is pledged under the grant in

20   Section 701 of the trust agreement is Revenues.  That

21   definition, as Mr. Ellenberg stated, does not carve out current

22   expenses, and there is no doubt that that lack of exclusion

23   from revenues of current expenses is intentional.

24        There is a different defined term under the agreement:

25   Net revenues.  That is also in section 101, which is revenues

1    minus current expenses.  So, the debtor seeks to redefine

2    pledge 701 of our grant, which is on Revenues as applied to net

3    revenues which is a defined term in the agreement that was

4    explicitly not used.  So the clear language of the agreement

5    says that our pledge is not a revenue pledge to be stayed.

6         Second, the term revenue in section 502(b) of the

7    trust agreement is recognized also as not being net of current

8    expenses because there is a permission to pay those expenses

9    from the revenues but that permission is not in fact an

10   exclusion from that term or from the pledge.

11        Third, Section 709 of the trust agreement states that

12   gross revenues, those two words "gross revenues" are in quote.

13   Gross revenues of the system will not be used for any other

14   purpose other than is provided under the trust agreement and no

15   action will be taken which would impact the rights of the

16   bondholders under that agreement.  If our pledge wasn't the

17   debtor state, merely a net revenue pledge, then there would be

18   no reason to discuss the gross revenues pledge in Section 709

19   if in fact it was a net revenue pledge

20        THE COURT:  I think I need you to talk a little bit

21   slower and project into the microphone.

22        MR. WOFFORD:  Fair enough.  In you thank you very

23   much.  It's been one of the few times in life I've been accused

24   of not talking loud enough, so my apologies.

25        Fourth and finally, your Honor, Section 705 as far as

1    any liens on revenues is a negative pledge covenant.  Again

2    Revenue is capital R.  Other than that of the bondholders with

3    the exception of a traditional carveout for materials liens

4    that under prevailing law would prime the bondholders lien.  So

5    there is no mention of a carveout for of current expenses or

6    anything of the sort.

7         So the revenues lien that the bondholders have clearly

8    defined, the lien is prospective and extended into the future

9    and it clearly has value.  There is no doubt that we have to be

10   adequately protected if we're going to be primed here, and the

11   debtors, as have been stated, refused to provide any adequate

12   protection.  That is the first question of the 364 as to why

13   this loan cannot be authorized, at least as proposed.

14        The second question is whether the finance would be

15   available from the Commonwealth or others without a priming

16   lien.  Mr. Mayer has talked about the bondholder financing that

17   is now available as an alternative.  But no one has discussed

18   yet the Commonwealth alternative and whether that Commonwealth

19   alternative proposed is the only one that's available.

20        The argument of the Movants is that the priming lien,

21   which was not negotiated at all by the Movants' own testimony,

22   much less negotiated at arm's length, was a non-severable term

23   and that no loan would be made without it.  Your Honor should

24   have reason to doubt that contention.

25        In order to approve this loan in our view, the Movants

1    must admit to this Court that the Commonwealth will refuse to

2    lend leading to the beginning of shutdown of power in

3    Puerto Rico if a priming lien is not given to secure this loan.

4        But we would submit, your Honor, that precisely

5    because of the humanitarian crisis that the movant's cite it's

6    doubtful that the Commonwealth loan is going to go away solely

7    because the Commonwealth doesn't have the ability to prime us.

8        If the Court refuses to approve this loan because the

9    requirements of a priming loan cannot be met, the reasonable

10   inference from the evidence we would submit, your Honor, is

11   that the Commonwealth would immediately pivot and make a

12   non-priming financing available rather than beginning the

13   unfavorable shutdown process that they have described.

14       So, your Honor, since the debtors cannot show that the

15   proposed loan would be unavailable without priming, and since

16   there is no adequate protection proffered, the proposed loan

17   does not comply with 364(d) and therefore on these terms should

18   not be approved.

19       THE COURT:  Thank you, Mr. Wofford.

20       Next for the U.S Bank, five minutes.

21       MR. WHITMORE:  May it please the Court, Clark Whitmore

22   from Maslon LLP representing National U.S. Bank Association as

23   trustee for the $8.3 billion of PREPA bonds.

24       U.S. Bank's position is, like all the other parties,

25   that we need to address this liquidity problem but we come to

1    Court with very, very grave concerns about the "fake DIP" that

2    Mr. Mayer was describing with the completion of almost

3    unlimited powers being conferred upon the combination of the

4    Commonwealth, PREPA, and the Oversight Board and the

5    commensurate reduction of this Court's role in the rights of

6    creditors as we move forward.

7         In my remaining time, what I'd like to do, your Honor,

8    is really address three points that are additional serious

9    problems with the proposed order and the relief that's being

10   requested, and end by asking to have an opportunity to, if the

11   Court is inclined to grant the relief being sought, at least

12   with respect to the direct advances, that we be given an

13   opportunity to provide a markup of the proposed order to

14   address some of the issues that I'm addressing now, Mr. Mayer

15   addressed, as well as some of the issues in our supplemental

16   objection.

17        Point number one is, as indicated in our papers,

18   they're seeking a power of attorney to go out and become -- the

19   Commonwealth is, to become sort of an exclusive agent that can

20   book deals and bind PREPA to those deals and has only put

21   something in the order saying that when they come back with a

22   deal, the only issue will be price.  None of the other terms

23   for any new DIP loan that is a Commonwealth financing is

24   subject to review by the Court.

25        This Court under 364 needs to review actual DIP loans.

1    When there is a loan, when there is a commitment, they need to

2    come to court so we can understand what's going on.

3    Mr. Portela said, oh, the federal government, now they want a

4    priming lien.  Well, that was hearsay, number one.  And, number

5    two, who put that idea into their mind?  All they seemed to

6    need for disobligated funds related to grant money was a

7    priority claim, and we all worked that out in an order earlier

8    after the hurricane.

9            So we need to understand what DIP loans are being kind

10   of brokered by the Commonwealth at the time, and we don't think

11   it's appropriate for the Court to preapprove or delegate as

12   powers under 364 to the Commonwealth to book deals that need

13   court approval.

14           Secondly, there is a real problem with the scope of

15   the priming liens.  The priming liens are in revenues.  And

16   that sounds simple enough, but when you go to the credit

17   agreement -- well, there's a couple problems.  First of all,

18   the credit agreement has priority over this Court's order

19   because of how they've worded it as further described in the

20   credit agreement in the order, so there's a little shifting of

21   the scope of lien from this Court's order into the credit

22   agreement which they can change and modify and waive and do

23   things to.

24           But there is a provision in the credit agreement that

25   grants a priming lien on anything that is characterized as an

1  other account, and there's supposed to be a schedule attached

2  but there's no schedule attached.  I've reached out trying to

3  get a resolution of this.  And I'm in discussions, and there

4  was a helpful implication in the omnibus reply that in seeking

5  a priming lien on anything they designated as an other account,

6  that they're really just trying to -- they're not trying to

7  pull on the lien, but they're trying to make sure they're

8  perfected.

9       But here we are on the day of the hearing when they

10  want the order entered, and as trustee of a trust agreement

11  while of the last of restricted accounts.  There's a

12  construction account, and maintenance reserve accounts, and

13  other accounts created under the trust agreement, and we can't

14  really tell what lien they're really seeking to get.

15       And this really brings up a bigger point.  I know I

16  don't have much time left, but PREPA is violating the trust

17  agreement.  They're doing that because the trustee and our

18  creditors can't get relief of the automatic stay to do anything

19  about it, and the oversight board has taken the position that

20  this Court doesn't have jurisdiction to do anything about that.

21  And they take the position, well, this is -- they're just

22  unsecured obligations, and we can violate whatever we want.  I

23  just wanted to make the point that it's our position and it

24  says in Section 601 of the credit agreement that every penny of

25  revenues that PREPA receives, it holds in trust for application

1    in accordance with the credit agreement.  So we want to make

2    sure that there's nothing in the order that blesses violation.

3         So in paragraphs 2, 3 and 4, they've included language

4    that makes it OK for PREPA to do whatever the Commonwealth says

5    it needs to agree to do in the credit agreement and a lot of

6    that is using money on purposes that are not permitted by the

7    trust agreement.  So there's lots and lots of problems that are

8    subtle.  They're sort of latent problems worked into vague

9    wording.

10        And we would very much appreciate the opportunity if

11   your Honor is inclined to grant the relief to have an

12   opportunity to really put this order in the credit agreement

13   and how they work together through a fair review process with

14   input by the parties.

15        Thank you.

16        THE COURT:  And so, on that last point, I had heard

17   that you had some sort of markup that you wanted to hand around

18   and hand a copy to me.

19        Are you asking for something different, asking for me

20   to send it back for word shopping, if you will, in the event

21   that I'm inclined to?

22        MR. WHITMORE:  I think that would be the best answer.

23   Of course, what we don't want to do is have no opportunity, but

24   rather than for me to presume a universal answers all around, I

25   think it would be better if you were so inclined to enter an

1    order to require input for further discussion.

2             THE COURT:  Thank you.  I now understand the request.

3             So that brings us, I think, to the "other creditors"

4    category, and I have first up in that category Mr. Robbins for

5    23 minutes for the GO Ad Hoc.

6             MR. ROBBINS:  Thank you.  And may it please the Court,

7    for the GO bondholders.

8             Our submission this afternoon, your Honor, is actually

9    pretty modest when all is said and done.  If the Court

10   determines that it is inclined to approve the Commonwealth DIP

11   at all, notwithstanding the submission Mr. Mayer made earlier

12   this afternoon, the Court ought to strike two particular

13   provisions from the proposed DIP order that are absolutely

14   unnecessary to sustain the debtor's burden under 364(d)(1) and

15   (2) as it was articulated by the Oversight Board today.  And

16   the Court should add a proviso that we sought and which is not

17   there.

18            Let me take those in order.  Let's start with the

19   first of the two provisions that we think have to change.

20            Paragraph four of the proposed order asked this Court

21   to order that "all obligations" under the loan shall be immune

22   from any avoidance action or "any other challenges under

23   PROMESA, the bankruptcy code or any applicable law or

24   regulation by any person or entity."

25            On its face, this language could be read to preclude

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   any challenge to this transfer even in the Commonwealth case by

2   us as creditors of the Commonwealth.  There is no warrant for

3   that language.  And the problem, your Honor, is easily remedied

4   by simply adopting the proviso that I referred to at the

5   outset.  And we asked the oversight board to include this

6   language and they declined, and here is the language that we

7   think should be added.

8           "For the avoidance of doubt, the Court's approval of

9   the transaction from PREPA's perspective will not in any way

10  prejudice or affect any rights or remedies that creditors of

11  the Commonwealth may assert in connection with the

12  Commonwealth's decision to enter into the proposed loan or the

13  implementation thereof."

14          Now, oddly enough, the board I think actually agrees

15  with us on this, that paragraph four should not be read as

16  broadly as its plain language seems to suggest because in its

17  intervention reply at page 6, it insisted that paragraph four

18  concerns only "obligations of the debtor" and does not have "

19  preclusive effect" on the Commonwealth's creditors.

20          Now, we think that's what it ought to say, but that's

21  not what it does say, and for whatever reason the Oversight

22  Board has not been willing to add the proviso that would take

23  out any doubt about the otherwise overreaching and potentially

24  preclusive language of paragraph four.  And it is crucial, your

25  Honor, it is crucial to avoid any hint of a preclusive effect

1    on the Commonwealth's creditors because as the evidence showed

2    in response to many of the questions that I asked on

3    cross-examination, there is likely to be a meritorious

4    challenge to this DIP under Sections 549 and 926 of the Code.

5         Now, I fully understand in saying that, and I want to

6    be clear, we understand the Board's rationale that the

7    Commonwealth has an independent interest in PREPA's welfare. I

8    understand that argument. But unless all of the debtors are to

9    be substantively consolidated, which the law forbids, it cannot

10   be that the Commonwealth can fund other entities on whatever

11   terms it chooses, free of potential challenge from the

12   Commonwealth's own creditors.

13        And in this case, this DIP on these terms, there is

14   every reason to anticipate that a future challenge by the

15   Commonwealth's creditors would be compelling because the

16   Commonwealth is effectively giving away resources far in excess

17   of any benefits it purports to receive. It is indeed in many

18   respects analogous to a fraudulent transfer.

19        And that should scarcely be surprising because as the

20   evidence shows, the parties didn't regard the process of

21   arriving at this DIP as any sort of true negotiation. As

22   Mr. Mondell testified, it was more in the nature of a

23   collaborative discussion. No one was looking out only for the

24   position of the Commonwealth, much less its creditors. All of

25   the parties regarded the process as driven by common interest

1  of assisting PREPA.  No analysis.  Not a single scrap of paper

2  was devoted to showing that PREPA could not operate unless

3  these particular terms were provided.  And as a result, the

4  terms are lopsidedly favorable to PREPA at the plain

5  disadvantage of the Commonwealth and its creditors.

6       How so?  Well, first and foremost, the loans can be

7  used for any ineligible use including paying PREPA's creditors

8  so long as the Oversight Board and AAFAF agree.  Now, today we

9  heard perhaps the Oversight Board would think it essential to

10 come back to court for approval.  And that's good news because

11 the terms of the order did not suggest that to us.  And

12 certainly nothing in PROMESA would suggest that the

13 Commonwealth's resources could be used this way.

14      In our view, by the way, this problem would be

15 exacerbated if the Court were to accept the submission of the

16 PREPA bondholders that the Court eliminate the priming lien.

17 That, in substance, in our view would be little more than a

18 thinly veiled means of using the Commonwealth proceeds to pay

19 PREPA bondholders.  No lender in its right mind would proceed

20 on that basis.

21      But the remaining terms of the DIP are equally subject

22 to avoidance and all of this, your Honor, let me just

23 reiterate, is why the proviso needs to be added to the text of

24 paragraph four so that there is no preclusive effect in the

25 Commonwealth case.

1    For example, the definition of the security that the

2    Commonwealth gets is limited only to revenues, and that's a

3    much narrower lien than you would expect given the credit

4    worthiness and the risk of lending to PREPA.  There are all

5    other non-market terms the Court has heard at great length.

6        By PREPA's own admission, the market would demand far

7    more than zero to three percent interest given its current

8    conditions.  This too amounts to a transfer of value from the

9    Commonwealth as lender to PREPA and ultimately its bondholders.

10       I share the view expressed by one of the other

11   Objectors that Mr. Bienenstock in his argument asking you to

12   simply look at what the Commonwealth could earn if it put its

13   money in T-bills is not much of an analogy when you consider

14   the competing risk or putting your money at PREPA.

15       Mr. Mondell candidly acknowledged he's never seen a

16   DIP with a zero percent interest would never advise private

17   clients to lend on that basis provided no analysis of the need

18   for PREPA to receive a loan on that basis in order to operate.

19   So too for the 30-year maturity, Mr. Mondell never seen

20   anything close to a DIP on these terms.

21       All of these reasons, your Honor, which I don't need

22   to rehearse further, are reasons why this order should not have

23   and cannot lawfully have any preclusive effect in the

24   Commonwealth case where there is apt to be avoidance litigation

25   arising from the very DIP you are being asked to approve.  We

1    would ask you to modify paragraph four by striking language

2    that is overbroad and adding the proviso that I have quoted at

3    the outset.

4           All of that brings me, your Honor, to the second of

5    the two offending provisions.  Paragraph A of the proposed

6    order recites that PREPA "requires the financing under the

7    facility to finance operating expenses" and that the financing

8    under the facility is necessary to the continued operation of

9    the debtor.

10          We do not think the evidence supports the proposition

11   that these particular terms are necessary to the continued

12   operation of PREPA.  At most, the evidence you've heard is that

13   PREPA needs financing, and we accept that proposition as an

14   original matter, but the notion that it needs these particular

15   terms has not been proved.  Nobody has done that work.  Nobody

16   has done that analysis, and the negotiation such as it was was

17   not conceived in a way that made those questions germane much

18   less determinative.  And there is no reason to include this

19   finding.  If, as Mr. Bienenstock correctly pointed out, there

20   were only two inquiries under 364(d)(1) and (d)(2) and whether

21   these particular terms are required to run PREPA is not germane

22   to either one of these inquiries.  There is no reason to make

23   that finding and every reason not to, because, again, we will

24   find such -- we will discover that findings along those lines

25   are quoted back to us.

1      Later in this case, whether it's in an avoidance

2  action in the Commonwealth case or whether it's in confirmation

3  where the question is whether the proposed plan of adjustment

4  is fair and equitable under the Code, overlending after all to

5  a distressed instrumentality does not maximize Commonwealth

6  creditor recoveries, and we don't want a finding which is as a

7  matter of law irrelevant to the question under 364 coming back

8  to haunt us or operate as some kind of collateral estoppel or

9  other preclusion in the Commonwealth case.

10      Because neither the language in 4 or in (a) is

11  necessary to the two questions this Court needs to answer, we

12  would ask you not to go beyond it.  I think consistent with

13  this Court's rulings, which at every stage I would respectfully

14  suggest have not sought to answer questions unpresented, have

15  not taken on questions that stray beyond what is fairly

16  presented by the statute.  These are findings that are in a

17  sense dangerous dictum.  They go beyond what 364 requires.

18  They have potential preclusive effect in a proceeding that is

19  not before you today, but which, given the terms of this DIP,

20  are quite apt before you some day.  I'd like to make sure that

21  nothing happens today has any preclusive effect on the

22  Commonwealth Title III case where we have an important stake as

23  GO creditors.

24      So, just to sum up, all you need to do, your Honor, to

25  satisfy our clients on these issues is to see to it that

1   paragraph four is revised to take out preclusive effect, adds

2   the proviso that we asked the Oversight Board to put in, and

3   which they said in their intervention papers they agreed with,

4   and to take out what we think is extraneous language in

5   paragraph A regarding the necessity for these terms and

6   conditions.

7           And with that, I'm happy to yield the balance of my

8   time to counsel for Ambac.

9           THE COURT:  Thank you.

10          Ms. Ng, What was the balance that time?

11          THE DEPUTY CLERK:  9 minutes, 15 seconds.

12          THE COURT:  I had counsel for Ambac down for five

13  minutes, so we'll call it 14 minutes and ten seconds.

14          MS. MILLER:  Good afternoon, your Honor.  Atara

15  Miller, Milbank, Tweed Hadley & McCloy on behalf of Ambac.  I

16  appreciate Mr. Robbins --

17          THE COURT:  You can start talking.

18          MS. MILLER:  I was just going to thank Mr. Robbins for

19  ceding his time, but also say that clearly we've been spending

20  either too much or just the right amount of time speaking to

21  each other because he covered the vast majority of what I

22  wanted to say, so I will need far less than the five minutes

23  that I had allocated.

24          But I want to address one point, which is a comment

25  that the Oversight Board made or Movants made in one of their

1    briefs that I think was kind of highlighted during a lot of

2    what happened today where I at least felt a little bit whipped

3    up by everybody coming up and arguing both sides of "this is

4    terrible for PREPA" and also "this is terrible for the

5    Commonwealth."  And it would seem from most perspectives and

6    most transactions that the deal is either good for one side and

7    bad for the other or vice versa.

8           And so what I want to really highlight here is that

9    this is, as we've heard, not an ordinary transaction, so it is

10   in fact the case I believe that the DIP that's being proposed

11   is bad for both PREPA creditors and also very bad for

12   Commonwealth creditors.  I think Mr. Ellenberg really hit the

13   point where he said and I think it's highlighted that "this DIP

14   is being proposed to achieve strategic goals of the

15   Commonwealth and Oversight Board that are entirely unrelated to

16   the needs of PREPA."  We heard today testimony that the actual

17   amount is divorced what PREPA's actual needs are or will be in

18   the foreseeable future and also the interests of the

19   Commonwealth.

20          What else is going on?  I don't know.  There was a lot

21   of deliberate process privilege asserted and so inquiry into

22   that wasn't permitted.  But what I do know is that contrary to

23   the very broad assertion by the Movant that under Section 305

24   they actually have no need to get any protection from this

25   Court with respect to common law creditors.  As you heard from

1    Mr. Robbins, they in fact seek to preclude subsequent challenge

2    by Commonwealth creditors in paragraph four.

3           Mr. Robbins pointed out that the Oversight Board, and

4    Movant seems to agree with that, and I think in fact in their

5    opposition papers they said "I don't know what the Commonwealth

6    creditors and intervenors are even complaining about.  This

7    provision protects them.  This is intended to ensure that

8    transfers from PREPA are not challenged and the Commonwealth

9    gets the money back.  And I agree that is what it should do.

10   But when a simple drafting change was proposed and in multiple

11   rounds not incorporated, it makes me question whether that's in

12   fact the motive.

13          That takes me back to a comment that was made by

14   Mr. Portela on Exhibit P, which is in evidence, which is his

15   email, at the very beginning at the DIP process right as they

16   were starting to think about -- where it became clear that the

17   CDL was not going to happen directly to PREPA, and they were

18   going to have to come up with an alternative in late December,

19   and in his email to Gary Grippo of the U.S. Treasury, which he

20   was asked about earlier, in the second paragraph, he

21   specifically explains that despite what they believe 305 allows

22   them to do with respect to Commonwealth property, they still

23   want to bring the motion to this Court and get it approved not

24   just to protect themselves from PREPA creditors but

25   specifically "in order to deal with the Commonwealth

1    bondholders who will not favor the loan to PREPA."  That's why

2    paragraph four stays in the proposed order, and there's been a

3    refusal consistently to include a proviso to carve out any

4    subsequent challenge by Commonwealth bondholders.

5          And with that, I rest.  Thank you, your Honor.

6          THE COURT:  Thank you, Ms. Miller.

7          And now counsel for Arc.  Five minutes.

8          MR. NIES:  Thank you, your Honor.

9          Robert Nies from the law firm of Chiesa, Shahinian &

10   Giantomasi on behalf of Arc American.

11         Arc American is a family-owned and operated company

12   headquartered in Indiana.  It was dispatched early in this case

13   in October to Puerto Rico to provide emergency storm

14   restoration services principally to restore and repair the main

15   transmission lines for PREPA, and almost instantly and greatly

16   benefiting both PREPA and the people of Puerto Rico.

17         We are a voice that is not heard in this proceeding

18   today.  We are a subcontractor of Whitefish that provided

19   emergent services that were beneficial and are unpaid for.  Arc

20   American is owed approximately $19 million and is being caught

21   in the middle of this debate for financing because we've heard

22   a lot today, rightfully so, about the concerns of the priming

23   liens of the bondholders.

24         What we haven't heard too much about is the

25   superpriority administrative expense that's granted to the

1    repayment of the Commonwealth loan of a billion dollars.  That

2    billion dollars would be put in place of and in front of all

3    administrative creditors, including Arc.

4          Not surprisingly, from all the attorneys sitting in

5    this room, we have heard virtually nothing about the carveout

6    of professional fees.  That's an unlimited carveout that would

7    be paid.  If I could just put it in perspective.  A creditor

8    today making a decision whether to provide essential services

9    to PREPA has in front of it an opportunity for revenues plus a

10   billion dollar loan to be paid on its administrative expense

11   going forward.  It can make a business decision that that's a

12   pretty good deal.  I'm willing to step up and take the

13   likelihood I'm going to get paid from the financing comes in

14   here.

15         Arc American was denied that right.  Arc America came

16   in and, you know, if anybody advises vendors or contractors in

17   bankruptcy and they ask whether or not you should be providing

18   services to a debtor-in-possession, usually the person's advice

19   is either on a cash payment only or cash on delivery, but then

20   if you get to the point where they are clearly understanding

21   administrate expense, what you advise the client is "don't

22   worry you'll get paid with the professionals in the case."  So

23   if they are going to paid at the end of the case, you're going

24   to get paid at the end of the case.  The way it's structured

25   now with this superiorpriority administrative expense that

 1   carves out an unlimited amount for professionals is that those

 2   professionals are getting paid for services they've already

 3   rendered and that they will render in the future.  Arc

 4   American, who has already put shovels in the ground and

 5   unwillingly extend credit to the tune of about $19 million is

 6   told by the debtor "Don't worry, you can file an administrative

 7   claim, and if we confirm a plan, you'll get paid.

 8         We've also heard a lot of talk today about fairness,

 9   about the Commonwealth stepping up when it didn't have to step

10   up.  Those words apply to Arc American.  That's exactly what it

11   did.  It's caught in a difficult place.  A natural question

12   might be:  What about FEMA?  What about FEMA?  It's been two

13   and a half months, Arc has not been paid for its services for

14   the work that it's done, and the reality is if there is no

15   provision -- I like what was said earlier that your Honor can

16   give a thumbs up or a thumbs down or can suggest that there's a

17   problem with the financing that is being provided that needs to

18   be cured.  And there needs to be some type of remedy provided

19   to the subcontractors, Arc American in particular who provided

20   work, who are unpaid, and who are at risk at the end of this

21   case of not getting paid.

22         The testimony was clear, the only way you're going to

23   get paid in this case is if there is a sale of PREPA.  Not a

24   shred of evidence was admitted to show what the sale of PREPA

25   might result in the way of proceeds to pay claims, particularly

1    administrative claims.  This case is administratively solvent,

2    and to require Arc America to wait until the end is simply

3    unfair.

4            Thank you, your Honor

5            THE COURT:  Thank you.

6            And now I have counsel for Whitefish, and I understand

7    that counsel for Whitefish may be speaking from Puerto Rico.

8    Is there someone in San Juan?

9            MS. VALLE CASTRO:  Good afternoon.  Yes, your Honor,

10   good afternoon.  Luisa Valle-Castro from the firm of Conde &

11   Associate on behalf of Whitefish Energy Holding LLC.

12           If I may proceed?

13           THE COURT:  Yes.  Yes.  I was going to say I don't

14   think you have lights there, so we will set the clock here for

15   five minutes, and when you're one minute away from the five

16   minutes, I'll give you a little warning.  All right?

17           MS. VALLE CASTRO:  That's no problem, your Honor.  I

18   believe it will be less than five minutes.

19           As stated, your Honor, Whitefish and subcontractors

20   were one of the first who came to the island after Hurricane

21   Maria hit.  We are post-petition creditor for PREPA, which is

22   related to the restoration of the backbone of the power grid,

23   which is the transmission lines.

24           We do not oppose or object to the financing.

25   Nevertheless, we have some concerns regarding the terms that

1  were included in the original documents; namely, terms that are

2  related to how the facility was going to be treated.  That's

3  why we filed our limited objection on February 1, which is

4  Docket 571, and thereafter, after having reviewed the credit

5  agreement, we also filed a supplemental objection on Docket 648

6  on February 9.

7      We have considered the omnibus reply, which has

8  addressed at Docket 388 three of our key issues.  We also

9  considered Mr. Filsinger second supplemental declaration as

10 well as the testimony that was provided today by all of the

11 witnesses that have come before the Court.

12     We understand that the three key issues have been

13 addressed in Exhibit A to the omnibus reply, which are, namely,

14 first, to the extent that Whitefish has an administrative

15 expenses, it will be satisfied in accordance with PROMESA.

16     Second, that the payment of expenses that are

17 obligated by FEMA is going to be permitted under credit

18 agreement, and that such payments are not subject to the

19 facility's variance test.

20     And, foremost, that the Commonwealth will only effect

21 PREPA's revenues.  And according to the Court order that was

22 previously entered, it cannot extend to FEMA funds in the

23 segregated FEMA accounts.  I believe with these clarifications

24 that are included in Exhibit A to the omnibus reply and to the

25 testimony that was provided today, our concerns have been

 1   addressed, and we therefore have no objection to the facility

 2   being granted.

 3          THE COURT:  Thank you.

 4          MS. VALLE CASTRO:  Thank you, your Honor.

 5          THE COURT:  I think that takes me through all of the

 6   objectors.

 7          Is there anyone else expected to speak for an

 8   objector?  All right.  So before we -- how much time do you

 9   expect to take for the rebuttal, Mr. Bienenstock.

10          MR. BIENENSTOCK:  I'm not usually a good guesser, but

11   30, 40 minutes.

12          THE COURT:  Then we will take a ten minute break

13   before you start.

14          MR. BIENENSTOCK:  Whatever I have, I have to ask the

15   Court for whatever I have, Mr. Friedman I ceded some time to.

16   Five or ten minutes.

17          MR. FRIEDMAN:  Five minutes.

18          THE COURT:  That's right, Ms. Wolf was going to take

19   her five minutes after that.

20          MR. BIENENSTOCK:  She can start.  It might be best

21   after we come back if she starts.

22          THE COURT:  Why don't you work that out in the break

23   and it's sounding like we're looking at about 50 minutes

24   altogether or thereabouts.  See you all in ten.

25          (Recess)

1          THE COURT:  So we will begin with Ms. Wolf for five

2    minutes.

3          MS. WOLF:  Thank you, your Honor.  My name is Amy Wolf

4    from Wachtell Lipton Rosen & Katz.  Counsel to Scotiabank as

5    agents for the fuel line lenders.

6          The fuel line lenders are a group of banks that lent

7    money to PREPA for petition to buy fuel oil.  In the credit

8    agreement, it was represented and understood and was the basis

9    of the financing that of course financing the purchase of fuel

10   oil was a current expense.  That is not an issue that we are in

11   any way asking the Court to rule on today.

12         I rise because there have been some proclamations made

13   by bondholders counsel about current expenses and gross

14   revenues that I think should be corrected.

15         The first one being counsel for National argued that

16   repayment of a current expense as opposed to the current

17   expense itself, repayment of a current expense or financing of

18   a current expense is not a current expense.  Providing the

19   Court with no citations, I am not aware that there is a such

20   citation.  That is an issue on which we disagree and which will

21   at some point be before the Court.  It is certainly not an

22   issue as to which it was clear in the way it was presented to

23   the Court by bondholders' counsel.

24         (Continued on next page)

25

1          MS. WOLF:  More significantly, all of bondholders'

2     counsel proclaimed that it is undeniable that what they have

3     are gross revenues, not net revenues.  In support of that, they

4     invoke Section 701 of the trust agreement which states:  "Such

5     principal interest and premium will be payable solely from the

6     Revenues, and said revenues are hereby pledged to the payment

7     thereof in the manner and to the extent hereinafter

8     particularly specified."

9          Interestingly, the opinion of counsel that the

10    bondholders receive is page 18 -- the definition of the term

11    opinion of counsel, the term opinion of counsel, dropping down

12    ii's, includes that "This agreement creates a legally valid and

13    effective pledge of the net revenues, subject to the 1947

14    indenture and of the money, securities, and funds held or set

15    aside under this agreement as security for the bonds."

16         So what was held and set aside as security for the

17    bonds.  That is provided on page 51 in Section 507(h), which

18    states that "The monies in the sinking fund shall be held by

19    the trustee in trust," skipping a little bit, "and shall be

20    applied as hereinafter provided with respect to such funds and,

21    pending such application, shall be subject to a lien and charge

22    in favor of the holders of the bonds issued and outstanding of

23    this agreement."

24         So here they get a lien.  What do they get a lien on,

25    the monies in the sinking fund.  So the way the agreement is

1   structured, is that there is this general fund that's been

2   talked about -- and the general fund is the in hands of PREPA.

3   It's not until the current expenses get paid and the funds come

4   out of the general fund and down into this series of funds that

5   will be located at the trustee that the bondholders' lien is a

6   charge on those funds.

7         One word that we never heard from the bondholders

8   today, although they talked about how clear it was, what kind

9   of lien they had -- the word "perfection" never appeared in

10  anyone's remarks, and that's for good reason.

11        Because even if they have some language in which they

12  say, oh, I got a gross revenues lien, they clearly didn't have

13  a perfected gross revenues lien because cash can only be

14  perfected by possession.

15        And until the cash went through this sinking fund and

16  down into the various funds that were present at the trustee,

17  they had no possession.  At best, they had an unperfected gross

18  revenues lien.  We think they got -- as is clear from the

19  opinion of counsel they received, they were getting a net

20  revenues lien, and that's what they perfected.

21        So, again, these are issues that as between the

22  bondholders and the fuel line lenders, we will live to fight

23  another day, but it's important because of the statements that

24  were made to the Court that those things be clarified.  Thank

25  you very much, your Honor.

1          THE COURT:  Thank you, Ms. Wolf.

2          Mr. Friedman, I have you down for eight minutes.

3          MR. FRIEDMAN:  Yes, your Honor.  Good evening,

4  your Honor.  It's Peter Friedman.  Just like I had to correct

5  myself, I'll now have to correct opposing counsel.

6          Your Honor, Ms. Wolf discussed some of the legal

7  misstatements that you've heard.  I'd like to discuss some of

8  the factual misstatements you've heard.

9          So let me say loud and clear that some of the things

10  you heard from counsel are directly contradicted, not by me but

11  by facts in the record.  You heard from counsel for National

12  that the Commonwealth owes hundreds of millions of dollars to

13  PREPA.  Not true.

14          How do we know this.  Let's look at the record,

15  Mr. Filsinger's second supplemental declaration, paragraph 7,

16  under the heading Central Government Agencies and Public

17  Corporations.  It's painful, but I'm going to read it:  "As

18  stated herein, the central government agencies paid virtually

19  all of the past amounts they owed PREPA and prepaid a

20  significant portion of their budgeted amounts for electricity

21  for fiscal year 2018.  The debtor believes that the central

22  government agencies in total have paid substantially all of the

23  receivables owed to PREPA."

24          So who owes the money.  Well, let's look at paragraph

25  8 of Mr. Filsinger's second supplemental declaration:

1    "According to the debtor's records, public corporations owed

2    the debtor approximately $233 million as of December 31, 2017.

3    Of that amount, $169 million represents receivables over 120

4    days past due.  PREPA's records do not clearly indicate which

5    of those receivables are disputed."

6         So what you heard about the Commonwealth creating this

7    situation, that there are these massive pockets of money that

8    can just be paid, isn't true, and it's confirmed by Exhibit 23.

9         Now I know you've asked the opponents to provide a

10   translated copy of that exhibit.  What you'll see when it's

11   translated, under the line "Entity," which indicates who owes

12   the money, it's *corporación*.

13        Your Honor, those are public corporations.  They're

14   the ones that owe $25 million past 120 days due, $29 million,

15   $28 million, $27 million, $15 million when you look at the line

16   items for the money that's owed.

17        So what are the objectors telling you?  What they're

18   telling you is they want the Commonwealth to use its own money

19   to pay somebody else's debts rather than make a loan that has

20   some security.  Why is that justified?

21        Can you imagine what we would hear from the GOs if

22   that was the path that the Commonwealth took.  Instead, the

23   Commonwealth did the prudent thing, which was instead of paying

24   the debts of public corporations for which it's not liable, it

25   made a loan.

1          The other facts I think you need to hear, your Honor,

2     come from the Mondell declaration.  The Mondell declaration

3     addresses the argument that you can simply walk over to --

4     PREPA can simply walk over to GBD and take money out of it.

5          Again, it's painful, but I'm going to read it:  "I

6     understand that certain creditors," Mr. Mondell says in

7     paragraph 6 of his supplemental declaration.

8          He says:  "I understand that certain creditors have

9     asserted that PREPA can increase its short-term liquidity by

10    making immediate or near-term withdrawals from amounts it has

11    on deposit that the government developed for Puerto Rico.  This

12    is not so," he testifies.

13         "GBD is an insolvent public instrumentality in the

14    process of winding down its operations and resolving creditor

15    claims through the recently enacted GBD Restructuring Act, Act

16    number 109-2017, and Title VI process under PROMESA.

17         "In light of its fiscal situation, GBD is currently

18    operating pursuant to various laws and executive orders that

19    limit disbursements by GBD and prohibit deposit withdrawals.

20         "GBD's creditors, of which PREPA is one, are

21    collectively owed more than $7.3 billion.  This includes more

22    than $3.5 billion in deposits almost entirely from public

23    entities such as municipalities, public corporations, and other

24    government entities and more than $3.7 billion in publicly held

25    debt.

1    "As of December 31, 2017, however, GBD's unrestricted

2    cash was less than 5 percent of the $7.3 billion in competing

3    claims.  Moreover, there are multiple competing lawsuits

4    requesting disbursements of GBD deposits which GBD is not able

5    to honor.

6         "Upon completions of GBD's restructuring, PREPA and

7    all other creditors of GBD will be able to obtain recoveries on

8    amounts owed to them by GBD in accordance with the treatment to

9    be given to each pursuant to Act number 109-2017, but such

10   amounts cannot be disbursed to PREPA or to any other creditor

11   of GBD until the resolution of the multiple competing claims,

12   creditor claims, and litigation."

13        That's Mr. Mondell's testimony, and there's nothing in

14   the record beside it.  Your Honor, I have nothing further.

15        THE COURT:  Thank you.

16        Mr. Bienenstock.  I have you down for 40 minutes.

17        MR. BIENENSTOCK:  Thank you, your Honor.

18        Good evening, Judge.  Martin Bienenstock for the

19   Oversight Board and as representative of Title III debtors.

20   I'm going to try and go in order to the objectors.  I'll be as

21   brief as I can be.

22        Initially, Mr. Mayer for the ad hoc PREPA bondholders

23   started by saying that no one contacted them for a

24   counterproposal until February 2.  On the day we filed our

25   motion, which was, I believe, January 27, I had multiple

1    emails, as Mr. Mayer knows, with his partner.  She wanted to

2    know the terms of the loan we had, and I gave them to her and

3    solicited a counterproposal.  So that was back I think it was

4    minutes after we filed our motion.

5         THE COURT:  Would you mind speaking a little bit more

6    directly into the mic.  Thank you.

7         MR. BIENENSTOCK:  Sure.

8         So it was a surprise yesterday morning to receive

9    suddenly the proposal from them that they hadn't communicated

10   with me since I invited it from them.  And it was really --

11   I'll get to this in another context -- the small print in the

12   back where they had -- it seemed like they had a lot of Exhibit

13   As.

14        One was an Exhibit A summary of terms.  Then there was

15   another Exhibit A for covenants that they were going to put in

16   the loan agreement, and the covenants do everything from

17   basically give the required lenders control over PREPA -- they

18   control rates.  They control licenses, sales, assignments,

19   rentals, and virtually everything else.

20        I raise this, Judge, because we've been accused of

21   having some strategy or tactic in mind.  I don't know what that

22   is.  All you have to do is read the competing proposal that the

23   ad hoc bondholder group provided.

24        And their tactic, albeit in small print not elucidated

25   in their motion, is very clear, which is to use a competitive

1    proposal to essentially give themselves the receiver they

2    wanted or trustee and total control.

3            What's problematic about that is that the Oversight

4    Board and the government have both agreed that PREPA needs a

5    transformation.  Whether it's to liquid natural gas or another

6    form of energy generation, it needs a transformation to

7    something efficient that can produce electricity at low cost so

8    doing business and living on the island can be a plus and will

9    generate further interest and development.  That's what's

10   needed most.  Cost savings only go so far.

11           If we had any type of regiment at PREPA, including one

12   through a loan agreement, that bars it and sets up obstacles to

13   doing the right thing in terms of transformation, it could

14   affect literally the success of this entire rehabilitation

15   effort.

16           Second on the competing proposal, Mr. Mayer said that

17   it's really $524 million available.  Now, I don't know, because

18   the documents they filed this morning were filed as I was

19   getting out of the subway to come to court, but even if they

20   made their first 2 percent reduction in their loan something

21   that will be paid back to them later, the $524 million is still

22   carrying the same $114 million of interest payments that don't

23   exist under the Commonwealth proposal which costs about $17

24   million in interest.

25           So you have to deduct from the $524 million the $114

1   million which leaves you with $410 million of availability.

2   That's already too little.  Then I don't believe he said the

3   extension fee, which was about another $12 million, was going

4   to be capitalized.  So now you're under $400 million.  So the

5   notion that it's really a $524 million facility is just not

6   consistent with the record in this case.

7        In terms of our motion having set up an auction, I

8   think your Honor's questions caused Mr. Mayer to backtrack into

9   saying, well, what he really meant was your Honor could deny

10  our financing and then approve theirs.

11       No one has applied for approval of theirs, and we

12  can't for, among other reasons, it's too small and it gives

13  away control to a small group of required lenders which could

14  inhibit or prevent the transformation.

15       Additionally, as Mr. Mayer and everyone else here well

16  knows, when there is an auction in a restructuring case, there

17  is an order, and the order sets bidding procedures and all

18  kinds of protocol of procedures, and there is nothing like that

19  here.  This was just one of several things that came out of

20  whole cloth from the objectors' responses earlier.

21       The next point that the ad hoc group made is that the

22  Commonwealth loan is a fake, their term, not mine.  The billion

23  dollars is a fake because the principal amount availability is

24  fake.

25       Your Honor, there is nothing in the record to support

1     that type of hyperbole and that type of language.  The

2     Commonwealth -- I think it's obvious -- cannot survive unless

3     its people have power.  And if PREPA needs a billion dollars,

4     the Commonwealth is going to make sure that a billion dollars

5     is available.

6              Now, whether it has it sitting in the bank today that

7     it can use or whether it's going to have to get some of it from

8     the federal government, that's another issue.  But to say it's

9     a fake, that it doesn't fully intend to comply with the credit

10    agreement, is nonsense and I guess, for present purposes, is

11    just not supported by this record except that Mr. Mayer said

12    it's a fake, but there's nothing in the record to support that.

13             The notion that we can readjust the financing tomorrow

14    is just all wrong.  Your Honor, I think, as our pleadings have

15    made clear from our first, the Commonwealth did not want to

16    have to make this loan.  The Commonwealth was hoping that the

17    federal government would make the loan directly to PREPA.

18             Barring that, we hoped the federal government would

19    make the loan to the Commonwealth with permission to the

20    Commonwealth to pass it onto PREPA.  Your Honor heard evidence

21    that that is being worked on, and we hope that will come true.

22             If that occurs, we do intend -- and we've made it

23    clear from the outset -- that we do intend to take the loan

24    from the federal government to repay whatever the Commonwealth

25    has extended on the loan and then to extend a new loan to

1    PREPA.

2         That loan may have a higher interest rate, or it may

3    not.  That loan, we believe, also may be subject to

4    forgiveness.  The federal government, unlike the Commonwealth,

5    unlike private lenders and hedge funds, frequently forgives

6    loans to municipalities under the right circumstances, and

7    that's one important reason why we want the loan to come from

8    the federal government, because we may well qualify for

9    forgiveness, and that would benefit both PREPA and the

10   Commonwealth.  In that context, we would be able to pass

11   through a new loan from the federal government.

12        As I agreed before and as I pointed out, 6(a) already

13   says, any material amendment is subject to notice, presentment,

14   etc.  We are willing, your Honor, to add to in paragraph 6(a)

15   of the proposed financing order after the words "material

16   amendment" to add "or material waiver or material modification"

17   so that Mr. Mayer can sleep tonight that we weren't going to

18   call an amendment a waiver and modification and say we didn't

19   agree to come back for that.  So anything material under those

20   headings we're willing to apply the same procedure to.

21        Now on to the issue of adequate protection,

22   your Honor.  We made the case in our briefs that if vendors

23   could survive and would be patient, then this loan wouldn't be

24   necessary because PREPA could simply go on incurring vendor

25   debt and debt for all current expenses, and when revenues come

1    in ultimately, they would then pay off the vendor debt and

2    anything else constituting current expenses.

3         The existing secured claimants at PREPA, the PREPA

4    bondholders who are objecting, would be behind PREPA's right to

5    take revenues, which, as Ms. Wolf pointed out, are not

6    encumbered, but to take them, whether they're encumbered or

7    not, and to use them to pay current expenses because that's

8    what the trust agreement says PREPA can do.  Current expenses

9    come first.

10        Because vendors can't survive without being paid for

11   inordinate times -- and even if they could, they're not all

12   willing to consent to wait forever -- that's why the

13   Commonwealth has needed to make this loan, so that fuel line

14   lenders and others will continue supplying PREPA what it needs

15   to generate power.

16        We challenged all of the objectors in our briefs, tell

17   us why we're wrong.  Tell us why, given that you're already

18   behind all current expenses, our coming in to supply cash on an

19   interim basis so that the vendors don't have to wait makes you

20   any worse off because we will now go first.  Just like before

21   we come in, the vendors go first and all other current expense

22   holders go first.

23        We challenged everyone in this courtroom to tell us

24   why we're wrong.  Your Honor, I don't believe a single objector

25   has provided you a pleading explaining why we're wrong.  So

1    that's reason number one why they are not suffering a

2    diminution in value under Bankruptcy Code Section 361, which is

3    the only basis for adequate protection, to offset a diminution

4    in value.

5           THE COURT:  So I take it you explicitly disagree with

6    the thesis advanced -- I don't know whether it was by Mr. Mayer

7    or one of his colleagues -- that adequate protection under 364

8    is something affirmative and is not merely measured by

9    diminution in value.

10          MR. BIENENSTOCK:  Your Honor, I'm again glad you

11   mentioned it because in my own mind, I was saying, should I go

12   out of order and deal with it or not.  Since your Honor raised

13   it, this is a great time.

14          Your Honor, there is one definition of adequate

15   protection in the bankruptcy code.  It's in Section 361, and

16   there are three subdivisions, and they clearly each provide

17   that adequate protection is to compensate for a diminution in

18   value.

19          The notion your Honor heard this afternoon and that

20   all of us heard this afternoon, that there is one test for

21   Section 362 stay relief motions but there is a special test

22   that Congress kept secret for Section 364, adequate protection

23   test, is made of whole cloth.  There is no authority in the

24   world that said there is one adequate protection under 362 and

25   another under 364.

 1          People can come up here and say all kinds of things,

 2     but citing authority for it is another matter.  And why would

 3     Congress have written a definition of adequate protection into

 4     361, used the term in 362(d), used it again in 364(d), and not

 5     tell anyone that when it used the same term that it defined in

 6     361, that it actually meant that they would have different

 7     meanings each time.  It makes no sense.  This is pretty simple

 8     statutory interpretation.  So that was just again, your Honor,

 9     whole cloth.

10          Mr. Berezin, representing National, argued that the

11     Commonwealth owed PREPA hundreds of millions.  Mr. Friedman

12     answered that and said that the Commonwealth could simply pay

13     the bills tomorrow.

14          I guess it was Mr. Friedman who made the point -- and

15     I'll make it again -- a lot of objectors said things having no

16     basis in the record, in the evidentiary record of this hearing.

17     It was sort of obvious in Mr. Berezin's presentation when he

18     didn't cite to the record that most of what he was saying is

19     not in the record, both law and facts.

20          There is something more basic though I wanted to make

21     about the point he made because National is not the only party

22     and objector to say, oh, just tell the municipalities to pay

23     their bills.  Oh, just tell the Commonwealth to pay their

24     bills.  Tell PREPA to take its money out of GBD.

25          I think collectively all of us here have perhaps the

1    distinction of living at a time when we're at the turning

2    point.  Up until May 10, 20 years ago when any government had a

3    problem, the solution was borrow more money and pay your debts.

4    Your friendly investment banker will arrange it for you.

5        We're at the turning point.  It's regrettable, but

6    we're there.  We're at the time when you can't just say, pay

7    your debts, because none of the objectors who said that pointed

8    to money that the municipalities have, that PREPA has, that GBD

9    has to pay their debts.  If it were that simple, we all

10   wouldn't be here.

11       Congress declared a state of emergency that wrote it

12   into Section 405(d) of PROMESA in Puerto Rico.  Does it have

13   enough to provide essential services.  The answer is not

14   because someone has a legal obligation, just pay it.  You have

15   to show they can pay it.

16       Similarly, someone made the argument, one of the

17   objectors, that, well, PREPA can just raise its rates.  It goes

18   back to the old argument whether their rate covenant is a piece

19   of collateral entitled to adequate protection which we've

20   answered many times and I won't repeat now, but I want to make

21   a different point now.

22       Raising rates when businesses are leaving, when

23   they're comparing how much does it cost to pay taxes and do

24   business in Puerto Rico, especially with the new tax reform

25   that hurt Puerto Rico a lot, it matters what the electric rate

1  is.  Again, we're at the turning point.  You can't just say,

2  raise the price.  You'll raise more revenue.  If it were that

3  easy, we would have done it.  So these vassal notions of look

4  at all the alternatives that PREPA has -- they're not in the

5  record.  They don't exist.

6         Now, Mr. Ellenberg, representing Assured, really

7  harped on the notion that this is a manmade self-fulfilling

8  prophecy.  Your Honor, I guess -- I know the crisis managers in

9  the room -- that they would applaud and cheer because if you

10  ask them what is the cause of any financial distress, it's

11  always management.

12         I don't personally agree with that all the time, but

13  the fact is that all of the restructuring cases in the federal

14  courts today, including this one, are certainly because of

15  mistakes, bad things, misjudgments that happened in the past.

16         That is hardly a reason not to deal with the present,

17  which Mr. Ellenberg seemed to ignore.  It just doesn't make a

18  difference in the context of the instant financing motion that

19  the problem was created by -- even if it was created by bad

20  management.

21         As he knows, there's been a new governor in the last

22  year.  The Oversight Board has only been around since August 31

23  of 2016.  They're not the ones who created these problems.

24         The people in government for the most part today are

25  not the ones that created these problems.  It just has nothing

 1    to do with the notion of whether your Honor should grant the

 2    motion.

 3          Now, a point he made was look at all these claw-back

 4    revenues that the Commonwealth is holding onto.  Well, first of

 5    all, they're no longer appropriating these taxes to HTA and

 6    other municipalities, and clawback only exists under the

 7    Constitution in Puerto Rico when there has been an

 8    appropriation in excess of revenues.

 9          But, when we look at past claw-back revenues and the

10    failure to allocate now, the budget is still getting into

11    balance with the need for substantial cuts in expenses.  So,

12    again, we're at the tipping point.

13          For Mr. Ellenberg to argue, well, if you give HTA some

14    of its claw-back revenues, then it could pay PREPA.  Yes, but

15    where are we going to get that money from?  It's going to come

16    from someone else who needs it to pay welfare, Medicare,

17    electricity, police, teachers, something.  It's not coming out

18    of nowhere.

19          We're at the tipping point where every dollar you take

20    comes from somewhere that hurts.  So you just can't point your

21    finger and say, well, give me my claw-back revenues, and

22    everything will be fine.

23          GBD is a perfect example.  It's insolvent.  It's doing

24    a Title VI restructuring, God willing.  A deposit doesn't mean

25    you have a pot of gold sitting at GBD.  It means you have a

1   claim, like an unsecured creditor.

2          We all have checking accounts.  There is not cash in

3   the bank to satisfy all our checking accounts.  We have claims.

4   Fortunately, entities like JP Morgan can honor those claims

5   when we write checks, but it's not like the cash is sitting

6   there.  In GBD's case, there are more claims than cash.  That's

7   why it's doing a Title VI restructuring.

8          Since that was raised by several objectors,

9   your Honor, they know that PREPA took out of GBD something like

10  $324 million while it was insolvent and has PREPA's exposure

11  back to GBD.  So the notion that even if GBD had the money to

12  honor its deposit, it should pay it is a question.  People are

13  going to litigate those issues.

14         In our informative motion last night, we explained why

15  the competing proposal was really a priming lien.  It took the

16  same monies that a priming lien would take.  So I won't repeat

17  that now.  Since it was challenged by the objectors, I'll just

18  refer the Court, if it's okay, to the informative motion.

19         THE COURT:  And I have reviewed it.

20         MR. BIENENSTOCK:  Thank you.

21         Now, Knighthead took the position that the movants are

22  obligated to show that the loan from the Commonwealth wouldn't

23  be available wrought the priming.  So let's analyze what

24  Knighthead is saying.

25         Let's play a game of dare with the Commonwealth.  The

1    Court should say, I'm not going to approve your loan unless you

2    get rid of priming.  Now what do you want to do.

3           It's an interesting proposition.  The Commonwealth has

4    to make all kinds of governmental decisions, and sometimes I

5    know the GO objectors here don't like this, but sometimes it

6    gives things away.  It gives things to people who need welfare.

7    It gives things to people who need Medicare.  It pays pensions

8    of poor people so they don't starve on the street.

9           It could say, well, we need power, or else we turn out

10   the lights.  So we're going to give PREPA money.  That is a

11   potential decision that the Commonwealth could have made.

12          The Commonwealth also could have said, we're going to

13   provide PREPA money, but we want a market rate of interest.  We

14   want liens, not just priming liens on the net revenues, but we

15   want liens on everything else.  It could have driven a much

16   tougher bargain.

17          So what Knighthead is really putting to the Court is

18   does your Honor want and does your Honor think that Congress

19   intended that you will become the government and decide what

20   governmental decision it should have made and how it should

21   balance all the competing interests.

22          I submit, your Honor, that there is nothing in Section

23   364 that requires you to do that.  It's very clear.  (d)(1)says

24   is the credit otherwise available, is such credit available

25   otherwise.  It doesn't say play a game of dare with the party

 1    who is giving such credit.  It's a matter of will other people

 2    come and do better.

 3         So Knighthead is really asking your Honor to change

 4    the law and say, instead of seeing if other people will do

 5    better, you should say to the person who is doing it, will you

 6    do it on better terms.  We all know no court, no court, has

 7    ever made that ruling, and there is no basis or good reason for

 8    this Court to do it.  Under (d)(2), that's just the adequate

 9    protection argument or standard that I think we've already

10    covered, but it is important.

11         Aside from the current expense argument, which really

12    demonstrates they're in no need of anything special because

13    they were behind current expenses in the first place, we do

14    have the testimony of Andy Wolf and of Mr. Filsinger showing

15    that all stakeholders are better off, and there is nothing in

16    the record, your Honor, rebutting that, absolutely nothing.

17         You can read Mr. Spencer's declarations from cover to

18    cover.  No language about collateral having any value or

19    identifying any diminution.  There is nothing in the record

20    controverting what Mr. Wolf and Mr. Filsinger have put in

21    there.

22         U.S. Bank said the Commonwealth wants the power of

23    attorney to do a new deal and that the Oversight Board and

24    PREPA are violating the trust agreement.

25         I explained that the transaction is set up so that if

1    we're fortunate enough to get a CDL, Community Disaster Loan,

2    from the federal government which may be forgiven, we can pass

3    that on to PREPA, and it may raise or lower the interest rate.

4    It may also and likely would create the prospect of

5    forgiveness.

6        But the notion that maybe U.S. Bank or another

7    objector mentioned that our intention was to refinance with a

8    hedge fund at some much higher rate of interest and to jam that

9    through was never the intention of the Oversight Board.

10       Now, the GO objectors raise an interesting issue.

11   They moved to intervene, your Honor, and we opposed it, and

12   they won, and we lost.  If I remember correctly, your Honor's

13   ruling was that you were allowing them to intervene because the

14   outcome could have a preclusive impact on them.

15       They've put nothing into this record, and yet now they

16   say, thanks for letting us intervene, but we didn't really want

17   to be here.  We want to make sure we can go back to the

18   Commonwealth Title III case and make our points there and try

19   to undo this loan because we may claim that this loan at a

20   below-market interest rate should be avoided.

21       Well, your Honor, I think that's why your Honor let

22   them in here.  If that's the case they want to make, let them

23   make a case.  They didn't.  Now they're saying to your Honor,

24   you know, having looked around, we'd like to go to another

25   ballpark.  It might have the same judge, but it would be a

1  different atmosphere.  We'd like to do it again later.

2  Your Honor, we don't think that's fair.

3       THE COURT:  Well, for the avoidance of doubt, then you

4  don't think that I'm fair because I did not expect to have

5  prospective avoidance arguments litigated in this one-day trial

6  here this afternoon.  I allowed them to intervene to argue that

7  they shouldn't be precluded from doing something else, and

8  that's what they did.

9       MR. BIENENSTOCK:  Okay.  I hadn't understood that.

10  While I think that PROMESA Sections 303 and 305 and the absence

11  of Section 363 of the bankruptcy code makes clear that the

12  Commonwealth is completely within its rights to make this loan

13  and it's not subject to challenge, if your Honor's idea is that

14  they could challenge it, so be it, and the order will be

15  revised accordingly.

16       We believe the argument that the order improperly says

17  that PREPA needs funds on these terms is just wrong.  These

18  were the best terms provided.  And again, this raises the old

19  issue or the issue I covered a few minutes ago that a party is

20  entitled to ask the Court to see if the party making the loan

21  will agree to do it on better terms, even though no one else is

22  there doing it on better terms.

23       That's not the standard, and if the Court agrees with

24  us on that, we believe that there is nothing wrong with

25  paragraph A of the proposed order.

 1              AMBAC argued that the entire Commonwealth loan is for

 2    a strategic goal of the Commonwealth and the Oversight Board.

 3    As your Honor has heard, the PREPA creditors of course would

 4    like to get rid of the priming lien.  The GO creditors would

 5    like us to have a better, more expansive lien and a higher

 6    interest rate.

 7              If there is a strategic goal we had, it was to try to

 8    be fair to everyone.  We knew that we weren't going to satisfy

 9    everyone, but in the best thinking and efforts of the Oversight

10    Board and the government, we thought we reached the right

11    balance.

12              As far as Arc's objection is concerned, it is

13    definitely sympathetic to hear any creditor, especially who

14    came in the aftermath of the hurricane who hasn't been paid --

15    and we hope he does get paid.  But in terms of Arc's having a

16    right to prevent the super-priority and the priming lien here,

17    that's basically necessities to keep things going.

18              Regrettably -- I know they made a comment about how

19    the professionals took care of themselves but not the vendors.

20    The fact is that the professionals get paid relatively on an

21    interim basis as hopefully vendors do here on out.  The

22    carve-out is really for future expenses that may be needed if

23    the worst happens, which we hope will not happen.

24              But Arc is basically identifying the fact that it's

25    painful to deal with the prospect of administrative

1    insolvencies, and a line always has to be drawn, after which

2    new providers of goods and services, money, get priority.

3    That's what's happening here.

4          It's hard, and we acknowledge that, but that's the way

5    the system has to work.  We can't carve-out exceptions for

6    creditors who came along beforehand, and we appreciate

7    Whitefish's support of our motion.

8          Unless the Court has other questions, I guess I'm five

9    minutes short of my allotment.

10         THE COURT:  So you're giving it to me?

11         MR. BIENENSTOCK:  Yes.

12         THE COURT:  Thank you.

13         I am going to take another break of ten minutes and

14   expect to render a ruling when we come back.  Thank you.

15         (Recess)

16         THE COURT:  Please be seated.

17         I will now make an oral ruling.  I reserve the right

18   to make non-substantive corrections in the transcript that's

19   prepared.

20         Before the Court is a motion pursuant to 11 U.S. Code,

21   Section 364(c) and (d) as incorporated into PROMESA in which

22   Joint Movants AAFAF and the Oversight Board seek approval of a

23   $1 billion revolving credit facility to be extended by the

24   Commonwealth to PREPA on a super-priority and priming lien

25   basis with other material feature including, but not limited

1  to, a 0 initial interest rate rising to 3 percent over time, a

2  30-year maturity subject to confirmation payment requirements

3  and an acceleration provision of the credit agreement, term

4  modification, and limited automatic stay relief provisions not

5  requiring additional court approval. That's at least as it was

6  initially proposed.

7      The Court has jurisdiction of this matter pursuant to

8  Section 306(a) of PROMESA, and venue is proper under Section

9  307(a) of PROMESA. The Court has reviewed thoroughly the

10  pre-hearing submissions and has attended carefully to the

11  testimony and evidence introduced here today.

12      The Court finds that the movants have established that

13  PREPA is currently on the brink of a severe cash flow crisis

14  and that operations will have to be sharply curtailed and,

15  within a month or so, shut down in the absence of a significant

16  injection of cash.

17      Such curtailment and shutdown would have a drastic

18  impact from humanitarian, economic recovery, and debt

19  readjustment perspectives on Puerto Rico and all of her

20  stakeholders. Such eventualities must be avoided.

21      At the outset of these cases, I noted that failure was

22  not an option for Puerto Rico. I went on to state that the

23  lights could not be turned off in Puerto Rico. That was well

24  before any of us could imagine that in the then near term a

25  hurricane of unprecedented magnitude would leave Puerto Rico in

1  utter darkness.  Since the hurricane, PREPA has endeavored to

2  restore energy in Puerto Rico, and significant progress has

3  been made.

4         However, today the Court is faced with a question that

5  has grave implications that would jeopardize the electricity in

6  Puerto Rico and leave millions of American citizens in darkness

7  once again.

8         The legal questions in the factual context placed

9  before the Court today are difficult ones, and it is not with

10  any ease or sense of satisfaction that I have come to the

11  conclusion that the movants have not established the need for

12  or even the legality of approval today of a $1 billion facility

13  on the terms that are currently proposed.

14         The most basic predicate for the approval of credit

15  with super-priority administrative status is that the debtor

16  demonstrate that it is unable to obtain unsecured credit

17  allowable as an ordinary administrative expense.

18         Here movants have proffered no evidence of any attempt

19  to negotiate a credit facility with the Commonwealth or any

20  other entity that would provide for unsecured credit allowable

21  as an administrative expense, and so the super-priority aspect

22  of the application should be denied for this reason alone.  Nor

23  have movants demonstrated that there was any effort to

24  negotiate a facility without priming liens.

25         Rather, as Mr. Mondell stated clearly and simply, the

1    construction of the financing proposal before the Court was a

2    collaborative effort in which all participants pursued a single

3    salutary goal.

4           As admirable as such a cooperative approach might be

5    under other circumstances in aid of other aspects of Puerto

6    Rico's renewal and debt adjustment process, it does not meet

7    the threshold requirements of Section 364 and does not provide

8    the required predicate for Court approval of the proposed

9    credit facility.

10          The Court will hold the motion in abeyance without

11   prejudice to an amendment in the short term limited to a

12   smaller draw-dawn amount and administrative super-priority and

13   without prejudice to a possible future request for additional

14   funding and/or priming liens on a more appropriate record.

15          In anticipation of one or both of these eventualities,

16   the Court will speak further briefly on other issues that have

17   been addressed here that will be material to its consideration

18   of such further steps.

19          First, to the extent that the request for a larger

20   facility is to be pursued, the Court will expect a record

21   demonstrating far more robust efforts to solicit third-party

22   financing on terms that do not include super-priority or

23   security provisions.

24          Second, as to the standard of review of an application

25   that does cross the Section 364 threshold, the Court concludes

1   that a business judgment standard focused solely on rationality

2   from a PREPA business point of view is inappropriate and that

3   fairness to the body of PREPA stakeholders and, in particular,

4   the bondholders, must be considered in light of the fact that

5   this is a transaction in which the parties to the proposed

6   credit are closely related and in which the decision-making is

7   intertwined.

8         Provisions of the current proposal that appear

9   problematic from this more holistic perspective include but are

10  not limited to failure to provide sufficient demonstration that

11  the size of the proposed loan is appropriately tailored to

12  PREPA's actual needs and that, particularly given the proposal

13  to draw down hundreds of millions of dollars to create an

14  operating reserve account, the risk of a large outstanding

15  balance on the eve of plan confirmation giving the Commonwealth

16  outsize influence over PREPA's plan of adjustment is justified.

17  The limited relief from the automatic stay has not been

18  demonstrated to be entirely fair to all the PREPA

19  constituencies either.

20        Given the urgency of the financial needs as presented

21  in the declarations and live testimony, the Court would be

22  prepared to entertain favorably in the near term an amended

23  proposal seeking approval of an unsecured administrative

24  expense priority facility of up to $300 million upon a

25  demonstration that the Commonwealth will not lend on ordinary

1    unsecured administrative expense status terms.

2         The notion that this question needs to be asked may be

3    unusual, but this record is devoid of negotiation history, and

4    the evidence is that this proposal was the product of a

5    collaborative process, and that is why I impose this

6    requirement.

7         This near-term provision comes with the expectation of

8    further development of the record concerning the availability

9    of further unsecured financing and facts that would address the

10   fairness issues the Court has identified, all of this in aid of

11   consideration, somewhat further out, of an application for

12   approval of a larger facility with priority and/or priming

13   provisions.

14        For the near-term amendment, I would expect that the

15   proposed order would be modified in several ways:  First, that

16   the modifications proposed by the ad hoc GO group to eliminate

17   the preclusive provisions would be made.

18        Second, that paragraph 6 would be further amended to

19   make clear that any material change in terms, however

20   accomplished, would require Court approval on notice.

21        Third -- and this may already be in there -- but the

22   vendor-protective provisions described by Whitefish should be

23   included.  Generally, the Court expects that all findings that

24   are not essential for 364(c) purposes would be stripped out,

25   and that would include the 364(e) finding.

1        The Oversight Board and AAFAF would be expected to

2   consult with interested parties and work out a schedule for

3   such short- and longer-term applications if they are to be

4   initiated, and I would expect a status report on financing in

5   March if no further long-term financing and motion practice has

6   been initiated before then.

7        So, in part, in order to avoid the need for renewal of

8   a 14-day period and all of the delays that would be inherent in

9   that, the Court will hold the current motion in abeyance

10  pending the anticipated amendment.

11       If the movants decide not to pursue that and want an

12  outright denial, you can let me know, but this seems to be the

13  more expedient course.  That is my ruling.

14       Mr. Bienenstock.

15       MR. BIENENSTOCK:  Your Honor, I might not have heard

16  correctly or not.  But when your Honor was mentioning what the

17  Court would entertain, I wasn't clear as to whether the Court

18  would entertain -- I know it was unsecured, but was it a

19  super-priority?

20       THE COURT:  Unsecured administrative expense

21  super-priority of up to $300 million.

22       MR. BIENENSTOCK:  Thank you.

23       THE COURT:  Thank you, all.  I particularly thank you

24  for your focus and the efficiency with which you presented your

25  evidence and arguments today.  I am sure that I will be hearing

```
 1    from you.  Safe travels.  We're adjourned.

 2              (Adjourned)

 3          (Continued on next page)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                                EXHIBITS

2      Exhibit No.                                    Received

3      1 and 11 through 17  . . . . . . . . . . . .16

4      Q  . . . . . . . . . . . . . . . . . . . . .75

5      9, 10, 29, 30, 31, 32, 33, 42, and 36  . . . .87

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      INDEX OF EXAMINATION

2     Examination of:                                    Page

3     TODD W. FILSINGER

4     Cross By Mr. Horowitz . . . . . . . . . . . .17

5     Cross By Mr. Burke . . . . . . . . . . . . . .39

6     Redirect By Mr. Finger . . . . . . . . . . . .44

7      GERARDO JOSE PORTELA FRANCO

8     Cross By Mr. Horowitz . . . . . . . . . . . .57

9     Cross By Mr. Robbins . . . . . . . . . . . . .75

10    Redirect By Mr. Friedman . . . . . . . . . . .82

11    DUSTIN L. MONDELL

12    Cross By Mr. Berezin . . . . . . . . . . . . .87

13    Cross By Mr. Robbins . . . . . . . . . . . . 103

14    Redirect By Mr. Davis  . . . . . . . . . . . 110

15     STEPHEN J. SPENCER

16    Cross By Mr. Finger  . . . . . . . . . . . . 126

17                          EXHIBITS

18    Exhibit No.                                   Received

19     J  . . . . . . . . . . . . . . . . . . . . .27

20     DD   . . . . . . . . . . . . . . . . . . . .28

21     3 and 8  . . . . . . . . . . . . . . . . . .86

22     7  . . . . . . . . . . . . . . . . . . . . .98

23     W  . . . . . . . . . . . . . . . . . . . . 103

24

25

1

2    AA      . . . . . . . . . . . . . . . . . 104

3    16 . . . . . . . . . . . . . . . . . . . 125

4    O . . . . . . . . . . . . . . . . . . . 127

5    Movant 2                              57

6    Movant 24, 25, 26, 27, 28             122

7    Movant 40 and 41                      123

8    Movant 19                             123

9    Objector K                            59

10   Objector E                            60

11   Objector L                            64

12   Objector N                            68

13   Objector P                            71

14   Objector A                            123

15   Objector B                            124

16   Objector D                            125

17   Objector C and F                      127

18   Objector U                            127

19   Objector S                            127

20   Objector T                            127

21   Objector Y                            128

22   Objector GG                           128

23

24

25

1  UNITED STATES DISTRICT COURT)
                              ) ss.
2  OF PUERTO RICO             )

3

4

5

6                      REPORTERS' CERTIFICATE

7

8          I, Kelly Surina and Alena Lynch, do hereby certify

9  that the above and foregoing, consisting of the preceding 239

10  pages, constitutes a true and accurate transcript of my

11  stenographic notes and is a full, true and complete transcript

12  of the proceedings to the best of our ability.

13          Dated this 15th day of February, 2018.

14          S/Kelly Surina_____

15          Kelly Surina, RMR, CSR, RPR, CRR

16          S/Alena Lynch_____

17          Alena Lynch, RMR, CSR, RPR

18          Official Court Reporters

19          500 Pearl Street

20          New York, NY 10007

21          212-805-0320

22

23

24

25