Hearing Date:  **March 7, 2018 at 9:30 a.m. (AST)**
Reply Deadline:  **March 2, 2018 at 4:00 p.m. (AST)**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

----------------------------------------------------------------------- x

|  |  |
|---|---|
| In re: | : |
|  | : |
|  | : |
| THE FINANCIAL OVERSIGHT AND | : PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | : Title III |
|  | : |
|     as representative of | : Case No. 17-BK-3283 (LTS) |
|  | : |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | : (Jointly Administered) |
|  | : |
|     Debtors.[1] | : |

----------------------------------------------------------------------- x

## PRELIMINARY OBJECTION OF OFFICIAL COMMITTEE OF
## UNSECURED CREDITORS TO MOTION OF PBA FUNDS FOR
## <u>PAYMENT OF RENT DATED FEBRUARY 13, 2018</u>

---

[1]    The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747).

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 4

PRELIMINARY OBJECTION ................................................................................................ 9

    A.    Purported Leases Are Not True Leases ........................................................... 10

    B.    Commonwealth Not Obligated On Certain Purported Leases ........................... 13

    C.    PBA Bonds May Be Invalid ............................................................................ 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re City of Detroit*,
   524 B.R. 147 (Bankr. E.D. Mich. 2014) ........................................................................ 15

*In re Hotel Syracuse*,
   155 B.R. 824 (Bankr. N.D.N.Y 1993) ................................................................... 10, 11

*Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*,
   936 F.2d 744 (2d Cir. 1991) .......................................................................................... 13

*In re KAR Dev. Assocs., L.P.*,
   180 B.R. 629 (Bankr. D. Kan. 1995) ............................................................................. 10

*In re Lefrak*,
   223 B.R. 431 (Bankr. S.D.N.Y. 1998) .......................................................................... 11

*In re Moreggia & Sons, Inc.*,
   852 F.2d 1179 (9th Cir. 1988) ....................................................................................... 10

*In re PCH Assocs.*,
   804 F.2d 193 (2d Cir. 1986) .......................................................................................... 10

*In re Pittsburgh Sports Assocs. Holding Co.*,
   239 B.R. 75, *vacated by stipulation of the parties,* 1999 Bankr. LEXIS 1872
   (Bankr. W.D. Penn. Nov. 23, 1999) ............................................................................. 11

*In re Thomas*,
   No. 13-11653 HRT, 2015 WL 6526899 (Bankr. D. Colo. Oct. 28, 2015) ...................... 13

*In re United Air Lines, Inc.*,
   447 F.3d 504 (7th Cir. 2006) ........................................................................................ 11

**Statutes**

3 L.P.R.A App. § VII ........................................................................................................... 4

22 L.P.R.A. § 904 ................................................................................................................ 4

22 L.P.R.A. § 916 ................................................................................................................ 5

11 U.S.C. § 365(d)(3) ................................................................................................ *passim*

**Other Authorities**

Commonwealth of Puerto Rico Financial Information and Operating Data
Report December 18, 2016, *available at* http://www.gdb-
pur.com/documents/CommonwealthofPuertoRicoFinancialInfoFY201612-
18-16.pdf (last visited Feb. 23, 2018) ................................................................... 14

Local Bankruptcy Rule 1001-1(b) ............................................................................. 1

Local Civil Rule 7(a) .................................................................................................. 1

Puerto Rico Municipal Finance Agency, http://www.gdb-
pur.com/affiliates/municipal-finance-agency.html ............................................ 14

To the Honorable United States District Court Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors of all title III Debtors (other than COFINA) (the "Committee") hereby submits its preliminary objection to the *Motion of the PBA Funds for the Payment of Rent Dated February 13, 2018* [Docket No. 2492] (the "Motion") and *Ambac Assurance Corporation's Joinder to the Motion of the PBA Funds for the Payment of Rent* [Docket No. 2555].[1]  In support of this preliminary objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The PBA Funds claim they are entitled, under section 365(d)(3) of the Bankruptcy Code, to obtain current payment from the Commonwealth under certain PBA leases (the "Purported Leases") as purported third-party beneficiaries of those leases.  The PBA Funds have not, however, substantiated this contention with any evidence whatsoever, not even by providing to the court copies of the Purported Leases at issue.  Nevertheless, assuming without conceding that the PBA Funds have standing to seek the relief they are seeking as third-party beneficiaries, they are still not entitled to any relief under section 365(d)(3) because the Purported Leases (at least those that the Committee has been able to review[2]) are in fact not leases at all: they are instead thinly disguised financing transactions pursuant to which the Commonwealth directed the PBA to issue bonds to third-party investors and agreed to repay those bonds with so-called "rent" payments in amounts equal to the principal and interest due on the bonds.

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[2]     Pursuant to Local Civil Rule 7(a), which applies pursuant to Local Bankruptcy Rule 1001-1(b), a movant is required to "file[] with the motion" all "[a]ffidavits and other documents setting forth the facts on which the motion is based."  L. Civ. R. 7(a).

1

2.      To be clear, the issues presented by the Motion are highly significant to these cases.  As discussed below, the purported "rent" payments called for by the Purported Leases are intended to support the repayment of roughly $4.1 billion in outstanding PBA Bonds.  Even more importantly, the PBA Bonds are part of yet another "structure" created to fund recurring deficits created by the Puerto Rico government and its advisors.  The court has already encountered two such structures in the Employees Retirement System litigation and the COFINA litigation.  Like these other structures, the structure supporting the PBA Bonds begins to unravel upon close inspection.

3.      For starters, each of the Purported Leases that the Committee has reviewed is inextricably tied to the PBA's obligations under the PBA Bonds and bears none of the indicia of a true lease.[3]  For example, each Purported Lease (i) sets rent payments at levels required primarily to service interest and principal payments due on the bonds, (ii) terminates on the date on which the interest and principal due on the bonds have been repaid in full, (iii) provides that the rental payment obligations of the lessees are absolute and unconditional and, therefore, requires the lessee to continuing making rental payments if the leased property is destroyed, even if it is destroyed by the PBA itself, and (iv) is between a "landlord" and a "tenant" that are controlled by the same person: the Governor of Puerto Rico.  Two of the leases, both entered into in 2011, are especially suspect in that they are structured as subleases in which **the PBA, simultaneously with its entry into the subleases, leased the same properties (not previously leased or owned by the PBA) from the Commonwealth for a mere ten dollars in rent payments**.  By contrast, nothing in any of the Purported Leases the Committee has reviewed suggests they are legitimate leases that function independently of the PBA Bonds.

---

[3]    The Committee asked the PBA Funds for copies of all leases in their possession and received only three in response.  The Committee obtained a fourth lease independently.

4.      The Committee further believes that at least some of the Purported Leases are unenforceable against the Commonwealth for another reason:  neither the Commonwealth nor any department or agency of the Commonwealth is the lessee under such leases, and thus the Commonwealth, because it is not a lessee, owes no payment obligation to the PBA under section 365(d)(3) of the Bankruptcy Code.  For example, the lessee under one of the Purported Leases is the Municipal Revenue Collection Center, or "CRIM," which the Committee understands to be a municipal entity that is independent of the Commonwealth and responsible for its own payment obligations.  Indeed, according to the PBA's disclosure documents, leases with rentals paid from the Commonwealth's General Fund represent a significant portion, but not all, of the rentals receivable by the PBA.  Thus, when the PBA Funds assert in the Motion that $289 million remains outstanding across the Purported Leases, they appear to inflate the amount of the Commonwealth's purported obligation under section 365(d)(3) of the Bankruptcy Code, because only a debtor who is a lessee can have obligations under that section.

5.      The Committee is separately investigating whether, under the same set of facts described above, some or all of the PBA Bonds may have been issued in violation of Puerto Rico's constitutional debt limit and therefore are invalid.  As noted above, the PBA Funds assert they are third-party beneficiaries under the Purported Leases, with standing to enforce them against the Commonwealth, solely by virtue of their status as holders of the PBA Bonds.  If the bonds held by the PBA Funds are invalid, then the PBA Funds cannot be third-party beneficiaries of the Purported Leases and thus have no standing to bring the Motion.

6.      For all of these reasons, the Committee believes the Motion should be denied. In the alternative, the Committee would ask the court to defer ruling on the Motion until the

3

Committee can complete its investigation into these issues and present them to the court for final adjudication.  The court should in the meantime treat the upcoming hearing on the Motion as a preliminary hearing and this objection as a preliminary objection.

7.       Proceeding in this manner is appropriate in light of the information vacuum in which the Committee currently operates.  As noted above, despite multiple requests to the PBA Funds, the Committee has to date obtained copies of only four Purported Leases.  A review of **all** Purported Leases, however, is necessary to fully substantiate the rights the PBA Funds claim to hold against the Commonwealth.  The Committee does not know the total number of Purported Leases in existence, but the number could be in the hundreds.  The Committee has also asked the PBA Funds for limited information concerning the nature of their bond holdings to help the Committee determine whether those bonds might be invalid.  The PBA Funds have refused to provide this information.  **The lack of a full record, in and of itself, is sufficient cause to adjourn the Motion.**

## BACKGROUND

8.       The PBA is an instrumentality of the Commonwealth created in June of 1958 by Act No. 56-1958 of the Puerto Rico Legislative Assembly (as amended, the "Enabling Act").  The PBA, which operates as a public corporation, is "attached" to the Commonwealth General Services Administration.  3 L.P.R.A App. § VII.  The PBA is governed by a seven-member board, all of the members of which are (directly or by virtue of their holding positions in the Executive Branch of the Commonwealth) appointed by the Governor of the Commonwealth.  *See* 22 L.P.R.A. § 904.  This means that the Governor, directly or indirectly, controls both the "landlord" and the "tenant" under the Purported Leases.

4

9.       As the PBA Funds acknowledge, the PBA was granted the authority under the

Enabling Act "to finance office buildings and other facilities, which are leased to various

departments, public agencies and instrumentalities of the Commonwealth of Puerto Rico."[4]

The Enabling Act makes clear that the rentals payable under the Purported Leases must be

sufficient to pay, when due, the debt service on the PBA's bonds.  *See* 22 L.P.R.A. § 916 ("The

rent payable to the [PBA] under any such [leases] shall be reasonable and sufficient, taking into

consideration the amounts needed by the [PBA] to (i) pay the interest, principal, and

amortization requirements of the bonds issued by the [PBA] for financing such a building, and

to provide a reserve for such purposes, and (ii) to pay the operating and maintenance expenses

of such a building . . . and to provide a reserve therefor.").

10.      The PBA Board of Directors adopted a number of resolutions and supplemental

resolutions authorizing the issuance of bonds payable from purported lease rentals.  As of

February 2017, the PBA had nearly $4.1 billion in aggregate principal amount of bonds

outstanding under Resolution No. 468, adopted on June 22, 1995 (the "1995 Bond

Resolution"), and Resolution No. 77, adopted on November 16, 1970 (the "1970 Bond

Resolution" and, together with the 1995 Bond Resolution, the "Bond Resolutions").[5]

11.      As the PBA Funds acknowledge, all of the PBA Bonds were "substantially

supported by rental payments made pursuant to the PBA Leases."[6]  Specifically, "[u]nder the

1995 Resolution, the PBA covenanted that 'all Lease Agreements which it enters into for the

leasing of Authority Facilities will . . . require the lessee or lessees of such Facilities to pay

rentals which in the aggregate will be sufficient to provide the sums needed from time to time

---

[4]   Mot. ¶ 10 (internal citations omitted).

[5]   These principal amounts exclude all accretion on outstanding capital appreciation bonds and convertible
      capital appreciation bonds.

[6]   Mot. ¶ 12.

to' timely pay principal, interest, and certain amortization requirements relating to bonds issued by the PBA in connection with such facilities."[7]

12.     Prior to filing this objection, the Committee was able to obtain the following Purported Leases to which the PBA is a party (collectively, the "Reviewed Leases"):[8]  (i) Lease Contract, dated as of October 1, 1992, between the PBA, as lessor, and the Municipal Revenue Collection Center, as lessee (the "CRIM Lease")[9]; (ii) Lease Contract, dated as of August 1, 2009, between the PBA, as lessor, and the South Central Area of Investment in Labor Force, as lessee (the "ASIFAL Lease")[10]; (iii) the Master Sublease Contract, dated as of August 24, 2011, between the PBA, as sublessor, and the Commonwealth Department of Education, as sublessee (the "DOE Series R Lease")[11]; and (iv) the Master Sublease Contract, dated as of December 22, 2011, between the PBA, as sublessor, and the Commonwealth Department of Education, as sublessee (the "DOE Series T Lease").[12]  The Committee asked the PBA Funds for copies of additional Purported Leases, but none were provided.  Instead, the Committee was informed by the PBA Funds that these Purported Leases are representative of all others to which the PBA is a party.

13.     As required by the Enabling Act and the 1995 Bond Resolution, the Reviewed Leases contain provisions making clear that rent payments include amounts designed and sufficient to cover debt service on the bonds.  Specifically, the Reviewed Leases provide for the

---

[7]     Mot. ¶ 12 (citing 1995 Resolution § 701; 22 L.P.R.A. § 916).

[8]     Copies of the Reviewed Leases, with certified translations where necessary, are attached as exhibits to the *Declaration of Nicholas A. Bassett In Support of the Preliminary Objection of Official Committee of Unsecured Creditors to Motion of PBA Funds for Payment of Rent*, attached hereto as **Exhibit A** (the "Bassett Declaration").

[9]     Bassett Decl. Ex. 1.

[10]    Bassett Decl. Ex. 2.

[11]    Bassett Decl. Ex. 3.

[12]    Bassett Decl. Ex. 4.

6

payment of "<u>Debt Service Rentals</u>" comprised of "such annual amount or amounts as shall be determined from time to time by the Authority to be necessary to pay the principal of (including the Amortization Requirements for the term bonds and the premiums, if [any] for the redemption of such term bonds) and the interest on all Bonds under the Bond Resolution as the same becomes due and payable."[13]  In addition, each of the ASIFAL Lease, the DOE Series R Lease and the DOE Series T Lease provides that:  "**<u>No amendment or modification [of this lease] shall in any respect reduce the amounts of the rental payment provided for herein below the required amounts referred to in the Bond Resolution or postpone the times of making such rental payments or otherwise materially and adversely affect the security or interest of the holders of the bond[s] issued under the Bond Resolution</u>**."[14]

14.    The Purported Leases also have a number of other characteristics indicating that they are in the nature of financing mechanisms rather than true leases of property.  For starters, as noted above, both the parties to the Purported Leases are controlled, directly or indirectly, by the same person in the Governor of Puerto Rico.  In addition, each Purported Lease terminates when the bonds issued to finance or refinance the facilities subject to such lease have been paid in full.  Official Statement, page 16.[15]  The Purported Leases also contain so-called "hell or high water" clauses providing that "[t]he [lessee] agrees that its obligation to pay rentals for the full term of [this lease] at the times and in the amounts specified or referred to in [this lease] shall be absolute and unconditional **<u>and shall continue whether or not the [leased facilities] or any part thereof shall be completed or shall be occupied by the [lessee], or be sold,</u>**

---

[13]    *See, e.g.*, Bassett Decl. Ex. 3 (DOE Series R Lease, § 2.01(a)).

[14]    *See, e.g.*, Bassett Decl. Ex. 2 (ASIFAL Lease, § 6.07) (emphasis added).

[15]    *See also* DOE Series R Lease, Article I and DOE Series T Lease, Article I (each stating that such lease is for a term "ending on the date when all of the Bonds issued in connection with the [leased facilities] and all other obligations incurred by the [PBA] under the Bond Resolution in connection with the [leased facilities] or such Bonds and all obligations of the [lessee] under [this lease] have been paid in full or sufficient funds for such payment are held in trust by the Fiscal Agent under the Bond Resolution.") (Bassett Decl. Exs. 3 and 4).

7

**transferred or otherwise disposed of, or be damaged or destroyed from any cause**

**whatsoever or otherwise become unusable by the [lessee] for any period of time and**

**regardless of any other cause of any nature, [including] but not limited to, any default by**

**the [PBA] under this [lease]** (emphasis added)."[16]  To put it bluntly, this means the PBA could

set fire to a leased building and the Commonwealth would still be obligated to make rent

payments.  Finally, none of the Reviewed Leases specifies any events of default on the part of

the lessee or any remedies available to the PBA, or any penalties applicable by reason of any

default or event of default on the part of the lessee.

15.     Two of the Reviewed Leases are even more transparent than the others as

financing mechanisms.  Each of the DOE Series R Lease and the DOE Series T Lease is a

sublease (the "Sublease") by the PBA to the Commonwealth Department of Education of

property leased by the PBA from the Commonwealth Department of Transportation and Public

Works (the "Main Lease") under circumstances in which:  (i) rental payments under the

Sublease support the payment of debt service on a series of bonds issued by the PBA

simultaneously with the execution of the Sublease; (ii) the Sublease was executed

simultaneously with the execution of the Main Lease; (iii) only a nominal rental (*i.e.*, $10) was

paid by the PBA to the Commonwealth under the Main Lease; and (iv) the facilities subleased

and leased were not previously owned or leased by the PBA.[17]  Accordingly, the PBA issued

bonds to finance facilities and/or improvements to facilities that were property of the

Commonwealth.

---

[16]     Bassett Decl. Exs. 3 and 4 (DOE Series R Lease, Art. V; DOE Series T Lease, Art. V).  The "hell or high
water" clause contained in each of the other Reviewed Leases is substantially the same.  *See* Bassett Decl.
Exs. 1 and 2 (CRIM Lease, § 5.01; ASIFAL Lease, § 4.01).

[17]     *See* Bassett Decl. Exs. 3 and 4.

16.     The Committee has not been able to obtain copies of additional leases to determine whether they are structured as "subleases" in the same fashion as the DOE Series R Lease and the DOE Series T Lease.  The Committee requested from the PBA Funds copies of all leases underlying the relief requested in the Motion.  The Committee received in response only three "exemplar" leases and then obtained another lease separately.  The PBA Funds suggested they did not have in their possession any additional leases.

17.     The Committee also requested from the PBA Funds information sufficient to show the series designations of bonds held by the PBA Funds, which would be relevant to the Committee's investigation into the potential invalidity of some or all of those bonds.  The PBA Funds refused to provide this information, despite being unable to articulate any burden associated with its collection or production.

## PRELIMINARY OBJECTION

18.     Section 365(d)(3) of the Bankruptcy Code provides that a trustee must "timely perform all of the obligation of the debtor" under a non-expired lease of nonresidential real property until such lease is assumed or rejected.  *See* 11 U.S.C. § 365(d)(3).  It cannot be disputed that the PBA Funds' attempt to enforce section 365(d)(3) against the Commonwealth as purported third-beneficiaries under the Purported Leases relies on two underlying assumptions: (i) that the Purported Leases they seek to enforce are valid and enforceable leases between the PBA and the Commonwealth; and (ii) that the bonds upon which they base their purported third-party beneficiary status are valid and enforceable bonds.  Accordingly, if either the "leases" or the bonds are invalid or unenforceable, or the "leases" are not entitled to be treated as such under section 365(d)(3) of the Bankruptcy Code, the Motion must be denied.

### A.    Purported Leases Are Not True Leases

19.    Regardless of any status the PBA Funds may have as third-party beneficiaries under the Purported Leases,[18] section 365(d)(3) of the Bankruptcy Code applies "solely to a 'true' or 'bona fide' lease."  *In re PCH Assocs.*, 804 F.2d 193, 194, 198 (2d Cir. 1986) (affirming district court's ruling that "sale-leaseback arrangement [was] not an unexpired nonresidential lease within the contemplation of the Code").  For purposes of the Bankruptcy Code, and any rights asserted in connection with section 365, whether an agreement constitutes a lease is determined by federal bankruptcy law.  *See In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1182 (9th Cir. 1988) ("Our analysis of the Bankruptcy Code and the legislative history and purpose of section 365(d)(4) convinces us that the appropriate focus is on the federal law purposes of Section 365(d)(4) and the economic realities of this particular arrangement."); *see also In re KAR Dev. Assocs., L.P.*, 180 B.R. 629, 636 (Bankr. D. Kan. 1995) ("After reviewing the Code's language and legislative history, this court is persuaded that Congress intended §365(d)(4) to apply only to 'true' or 'bona fide' leases, and that the characterization is not controlled by state law.").  In determining whether the parties intended to enter into a financing transaction as opposed to a lease under federal bankruptcy law, the court looks to the economic realities of the transaction.  *See In re Hotel Syracuse*, 155 B.R. 824, 838, 840-41 (Bankr. N.D.N.Y 1993) (citations omitted) (concluding that "economic substance of the lease belies its true nature as something other than a true lease for purposes of Code § 365(d)(4)").[19]

---

[18]    The Committee joins in the arguments of the Oversight Board that the PBA Funds lack standing to enforce the Purported Leases against the Commonwealth under either Puerto Rico law or the Bankruptcy Code.

[19]    As explained at some length by the Seventh Circuit:

20.     The factors courts consider in an analysis of the economic realities of a purported lease are well-established.  As relevant here, those factors include (i) whether the "rental" payments compensate the lessor for use of the land as opposed to being structured for some other purpose, such as to ensure a particular return on investment, and (ii) whether the transaction is structured as a lease for tax (or other) reasons.  *See, e.g.*, *In re Lefrak*, 223 B.R. 431, 435, 437 (Bankr. S.D.N.Y. 1998) (collecting cases and holding that economic reality of transaction was such that it "should not be treated as a 'true' lease under section 365" regardless of its treatment under applicable non-bankruptcy law).

21.     Courts have also explained that a provision that makes the "rent" under the agreement "subject to upward or downward adjustment" based on debt service for the premises is evidence that the agreement is not a true lease, *In re Hotel Syracuse*, 155 B.R. at 839, as is a provision that effectively guarantees the purported lessor the same stream of income even if the lessee relocates to other premises.  *See In re Pittsburgh Sports Assocs. Holding Co.*, 239 B.R. 75, *vacated by stipulation of the parties,* 1999 Bankr. LEXIS 1872 (Bankr. W.D. Penn. Nov. 23, 1999) (transaction in which party barred from providing financing purchased from and then leased back premises to debtor was disguised financing and not true lease).  This list, of course, is not exhaustive.

---

Agreeing with a number of other circuits' opinions, we concluded that § 365 mandates that the substance of the transaction trumps the form of the transaction. . . . We reasoned: It is unlikely that the Code makes big economic effects turn on the parties' choice of language rather than the substance of their transaction; why bother to distinguish transactions if these distinctions can be obliterated at the drafters' will?. . . Accordingly, we held that, as a matter of federal law, the genuine nature of a transaction will prevail over the titles and terms used.

*In re United Air Lines, Inc.*, 447 F.3d 504, 506 (7th Cir. 2006) (reversing district court and holding that transaction "is a secured loan and not a lease for purposes of § 365") (citations omitted).

22.     Applying these factors to the Purported Leases, it is clear that they are not true leases but rather thinly disguised financing transactions.  As noted above, the "rental" payments under the Purported Leases bear no relationship to a fair market value, but are instead a function of the amounts to be paid under the PBA Bonds.  Indeed, the Purported Leases call for rents to be adjusted as necessary to ensure that sufficient funds exist at all times to service interest and principal obligations due on the PBA Bonds.[20]  Additionally, the Purported Leases are coterminous with the PBA Bonds.  Once the PBA Bonds have been repaid, the Purported Leases, and the Commonwealth's rent obligations thereunder, also expire.[21]  Further signaling that the Purported Leases are in reality designed to service the PBA Bonds, the Purported Leases require rent payments to continue being made even if the leased premises are destroyed and no longer usable.[22]  Moreover, the leases contain no provisions addressing events of default or penalties for default, which one would expect to see in any true lease negotiated at arm's length between a landlord and tenant.[23]  Indeed, it is hard to believe that the Governor would ever allow his appointees to remove the Commonwealth from property it occupies.

23.     Finally, at least two of the Purported Leases embody a sub-lease arrangement that is particularly transparent in existing solely to facilitate repayment of the PBA Bonds.[24]  These leases, both executed in 2011, simply lease back to the Commonwealth property that the Commonwealth already owned (and appears to retain title to) and itself simultaneously leased

---

[20]   *See* Bassett Decl. Exs. 1, 2, 3 and 4 (CRIM Lease §§ 2.02, 2.03; ASIFAL Lease §§ 2.02-2.04; DOE Series R Lease, §§ 2.02, 2.03; DOE Series T Lease, §§ 2.02, 2.03).

[21]   *See* Bassett Decl. Exs. 3 and 4 (DOE Series R Lease, Article I; DOE Series T Lease, Article I).

[22]   *See* Bassett Decl. Exs. 1, 2, 3 and 4 (CRIM Lease § 5.01; ASIFAL Lease § 4.01; DOE Series R Lease, Art. V; DOE Series T Lease, Art. V).

[23]   *See generally* Bassett Decl. Exs. 1, 2, 3 and 4 (CRIM Lease; ASIFAL Lease; DOE Series R Lease; DOE Series T Lease).

[24]   *See generally* Bassett Decl. Exs. 3 and 4. (DOE Series R Lease, at 2;  DOE Series T Lease, at 2.

12

to the PBA for the sum total of $10.[25]  There can be no doubt that these Purported Leases,

which like the other "leases" tied their rent amounts and lease terms directly to the PBA Bonds,

are designed to accomplish a financing.[26]

24.    For all of these reasons, application of the economic realities test to the

Purported Leases demonstrates that they "impose obligations and confer rights significantly

different from those arising from the ordinary landlord/tenant relationship."  *Int'l Trade Admin.

v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 748 (2d Cir. 1991).  Therefore, they are not "true

leases" enforceable against the Commonwealth under section 365(d)(3) of the Bankruptcy

Code.

### B.    Commonwealth Not Obligated On Certain Purported Leases

25.    Section 365(d)(3) imposes obligations **only on debtors who are tenants**; it does

not apply to non-debtors or to debtors who are merely guarantors of unexpired leases.  *See, e.g.,*

*In re Thomas*, No. 13-11653 HRT, 2015 WL 6526899, at *3 (Bankr. D. Colo. Oct. 28, 2015)

(holding that claim of landlord for administrative rent may only be allowed against debtor that

is obligor under lease and that section 365(d)(3) "cannot be stretched to include a debtor's

personal guaranty").  Yet the Motion appears to seek to enforce all Purported Leases between

the PBA and all "Commonwealth departments, agencies, **and instrumentalities**."[27]  By

including within the scope of the Motion Purported Leases with instrumentalities of the

Commonwealth, the PBA Funds appears to seek to have the Commonwealth make rent

payments on behalf of instrumentalities that are neither part of the Commonwealth, such that

their expenses are paid from the General Fund, nor a Debtor in any other title III case.

---

[25]   Bassett Decl. Exs. 3 and 4. (DOE Series R Lease, at 2; DOE Series T Lease, at 2.

[26]   Due to the lack of information the Committee has received from the PBA Funds, the Committee does not
know how many additional Purported Leases may have been similarly structured as a sub-lease.

[27]   Mot. ¶ 9 (emphasis added).

26.     Indeed, as discussed above, one of the four leases that the Committee has been able to review lists the lessee as the "Municipal Revenue Collection Center of the Commonwealth of Puerto Rico," or "CRIM," which is not a title III Debtor.  According to a government website, the Municipal Revenue Collection Center is "an independent municipal entity."[28]  The Commonwealth's December 18, 2016 Financial Information and Operating Data Report similarly describes CRIM as "a municipal corporation" that "is not a component unit of the Commonwealth" (and is therefore excluded from the Commonwealth Basic Financial Statements).[29]  Thus, this is one example of a Purported Lease that the PBA Funds are powerless to enforce in these cases, because the tenant is a non-debtor.

27.     Because some of the Purported Leases are plainly not enforceable against the Commonwealth or any other title III Debtor, the PBA Funds' unsupported assertion that the Debtors have defaulted on $289 million in "rent" payments since the petition date cannot be relied upon.[30]  Although it is unclear at this time what an accurate assessment of the Commonwealth's purported past due rent payments might be, it is worth noting that, according to the PBA's disclosure documents, leases with rentals paid from the Commonwealth's general fund represent a substantial portion, but not all, of the Purported Leases.  It would seem to necessarily follow, then, that the rentals on the remainder of the Purported Leases, even assuming they are past due, are not enforceable in these cases.  The fact that the Motion raises such a significant open question concerning the extent of the Debtors' obligations is reason alone to deny the Motion or, at a minimum, defer ruling on it.

---

[28]   *See* Puerto Rico Municipal Finance Agency, http://www.gdb-pur.com/affiliates/municipal-finance-agency.html ("The [tax] is collected on behalf of the municipalities by the Municipal Revenues Collection Center, an independent municipal entity ("CRIM", by its Spanish acronym)") (last visited Feb. 23, 2018).

[29]   *See* Commonwealth of Puerto Rico Financial Information and Operating Data Report December 18, 2016, at 2, *available at* http://www.gdb-pur.com/documents/CommonwealthofPuertoRicoFinancialInfoFY201612-18-16.pdf (last visited Feb. 23, 2018).

[30]   Mot. ¶ 27.

### C.    PBA Bonds May Be Invalid

28.    Separate from the validity of the Purported Leases, the Committee is also currently investigating whether certain of the PBA Bonds that the PBA Funds purport to hold may be invalid under the Puerto Rico Constitution.  Specifically, the Committee believes that there are valid grounds to conclude that the PBA Bonds are, in economic substance, debt of the Commonwealth that should have been included in the calculation of Puerto Rico's constitutional debt limit.  Indeed, the possibility that the PBA Bonds should have been treated as debt of the Commonwealth for Constitutional debt limit purposes was raised by certain COFINA creditors in the *Lex Claims* litigation.  *See generally* Docket No. 219, *Lex Claims, LLC, et al., v. Padilla, et al.*, No. 16-CV-02374 (FAB) (D.P.R.).[31]

29.    If the PBA Bonds issued in violation of the debt limit are invalidated, then the PBA Funds no longer have a basis for claiming third-party beneficiary status under the Purported Leases by virtue of their status as holders of such bonds.  As a result, they have no standing to enforce the Purported Leases against the Commonwealth.  Furthermore, if the PBA Bonds are no longer valid, then the "rent" obligations under the Purported Leases, which are tied to the amounts due under the PBA Bonds, are likely eliminated.

30.    For all of these reasons, the PBA Funds should not be entitled to assert a $289 million (and growing) administrative expense against the Commonwealth under a novel legal theory for which they have offered no evidentiary or legal support without even establishing

---

[31]    *See also In re City of Detroit*, 524 B.R. 147, 193 (Bankr. E.D. Mich. 2014) ("These arguments have substantial merit.  According to the allegations in the City Complaint, the service corporations have no staff, no budgets, do not hold annual board meetings and have no real ongoing functions.  If these allegations were proven, they would strongly suggest that the service corporations are sham entities.  If the service corporations were shams and could be disregarded, then the City would be left as the sole obligor for payment of the debt service on the COPs.  This would arguably violate the [debt limit].") (citation omitted).

that the "leases" and bonds underlying their theory are valid – especially when that validity is legitimately in question.

31.     Accordingly, the Committee believes it has advanced sufficient arguments to permit the court to deny the Motion outright as failing to demonstrate a valid basis for relief under section 365(d)(3) of the Bankruptcy Code.  In the alternative, the Committee respectfully asks that the Court defer consideration of the Motion until the underlying issues in connection with the validity of the PBA Bonds and the Purported Leases have been resolved.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Committee respectfully requests that the Court deny the Motion or,

in the alternative, defer ruling on the Motion until issues regarding the validity of the PBA

Bonds and/or the Purported Leases have been resolved.

Dated: February 23, 2018
       San Juan, Puerto Rico

*/s/ Luc A. Despins*

PAUL HASTINGS LLP
Luc A. Despins, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
lucdespins@paulhastings.com
alexbongartz@paulhastings.com

Nicholas A. Bassett, Esq. *(Pro Hac Vice*)
875 15th Street, N.W.
Washington, D.C. 20005
Telephone:  (202) 551-1700
nicholasbassett@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors
for all title III Debtors (other than COFINA)*

– and –

*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building, 53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured
Creditors for all title III Debtors (other than COFINA)*