**Hearing Date:** April 25, 2018, 9:30 a.m. (Atlantic Standard Time)
**Objection Deadline:** April 10, 2018, 4:00 p.m. (Atlantic Standard Time)

# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

     Debtors.[1]

-------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

### JOINT MOTION BY THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO (AFSCME), AMERICAN FEDERATION OF TEACHERS, AFL-CIO (AFT), INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, AFL-CIO (UAW), AND SERVICE EMPLOYEES INTERNATIONAL UNION (SEIU) FOR AN ORDER AUTHORIZING DISCOVERY UNDER BANKRUPTCY RULE 2004

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT .................................................................................1

JURISDICTION AND VENUE ..................................................................................3

THE UNIONS...............................................................................................................3

FACTS ..........................................................................................................................4

      A.     2017: PROMISES MADE POST-PROMESA ...................................................4

      B.     2018: BROKEN PROMISES REVEALED ......................................................10

RELIEF REQUESTED...............................................................................................13

ARGUMENT ..............................................................................................................13

RESERVATION OF RIGHTS ..................................................................................18

CERTIFICATION OF COMPLIANCE WITH LOCAL BANKRUPTCY RULE 2004-1........18

CONCLUSION...........................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re China Fishery Grp. Ltd.*,
2017 WL 3084397 (Bankr. S.D.N.Y. July 19, 2017) ............................................16

*In re Coffee Cupboard, Inc.*,
128 B.R. 509 (Bankr. E.D.N.Y. 1991) ...................................................................17

*In re Gawker Media LLC*,
2017 WL 2804870 (Bankr. S.D.N.Y. 2017) ..........................................................16

*In re Hughes*,
281 B.R. 224 (Bankr. S.D.N.Y. 2002) ...................................................................15

*In re Ionosphere Clubs, Inc.*,
156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) ........................15

*In re Johns-Manville Corp.*,
36 B.R. 743 (Bankr. S.D.N.Y. 1984) .....................................................................14

*In re Mittco, Inc.*,
44 B.R. 35 (Bankr. D. Wis. 1984) ..........................................................................16

*In re Pub. Serv. Co. of New Hampshire*,
91 B.R. 198 (Bankr. D.N.H. 1988) .........................................................................15

*In re Recoton Corp.*,
307 B.R. 751 (S.D.N.Y. 2004) ..........................................................................14, 17

*In re Summit Corp.*,
891 F.2d 1 (1st Cir. 1989) .......................................................................................14

*In re Teleglobe Commc'ns Corp.*,
493 F.3d 345 (3d Cir. 2007)....................................................................................14

*In re Wash Mutual, Inc.*,
408 B.R. 45 (Bankr. D. Del. 2009) ...................................................................14, 15

*In re Wilcher*,
56 B.R. 428 (Bankr. N.D. Ill. 1985) .......................................................................15

*In re Youk-See*,
450 B.R. 312 (Bankr. D. Mass. 2011) ....................................................................15

**Statutes**

28 U.S.C. § 1331 .............................................................................................................3

28 U.S.C. § 1391(b) .............................................................................................................3

48 U.S.C. § 2170 ...............................................................................................................13

## Other Authorities

Fed. R. Bankr. P. 2004 ............................................................................................ *passim*

Fed. R. Bankr. P. 2004(a) .................................................................................................15

Fed. R. Bankr. P. 2004(b) ...........................................................................................13, 14

Joint Resolution 188 ............................................................................................................5

Law 106 .................................................................................................................. *passim*

Puerto Rico Oversight, Management, and Economic Stability Act...................................... *passim*

ii

Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to the above-captioned Title III proceeding by and through Section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), the American Federation of State, County and Municipal Employees International Union, AFL-CIO ("AFSCME"), American Federation of Teachers, AFL-CIO ("AFT"), International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO (UAW) ("UAW"), and Service Employees International Union ("SEIU"), on behalf of themselves, their local affiliates in Puerto Rico and their members (collectively, the "Unions"), through their undersigned counsel, respectfully submit this motion (the "Motion") for entry of an order: (1) compelling (i) the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Commonwealth of Puerto Rico (the "Commonwealth"), (ii) the Commonwealth, and (iii) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") to produce documents responsive to the requests listed on Schedule A; (2) compelling the depositions of (i) Oversight Board Executive Director Natalie Jaresko and Chairman José B. Carrión III, and (ii) AAFAF Executive Director Gerardo Portela and Chairman Christian Sobrino; and (3) compelling the Commonwealth to designate for deposition a witness or witnesses knowledgeable about the topics described on Schedule A.  In support of this Motion, the Unions respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Unions require information from the Oversight Board, AAFAF, and the Commonwealth (collectively, the "Government Parties") necessary for the Unions to understand whether and how the Commonwealth and AAFAF, with the implicit blessing of the Oversight Board, have violated the rights of tens of thousands of Commonwealth employees by taking money through employee contributions deducted directly and involuntarily from their wages

24318020.17 02/26/2018

without, it appears, depositing those funds immediately into individual employee accounts controlled and investable by the employees as *required* by law.  Notably, the draft fiscal plan submitted by the Commonwealth and AAFAF to the Oversight Board on February 12, 2018 (the "February 2018 Draft Fiscal Plan") fails to make any disclosure concerning the status, location, segregation, investment, and management of ongoing mandatory public employee contributions to their individual retirement accounts.  This Motion therefore seeks information necessary to determine whether there has been post-petition wrongdoing with respect to public employees' property and to protect their rights.

2.      It is simply offensive to the Commonwealth's public servants—many of whom have *since 2000* suffered mandatory deductions from their pay which were supposed to be contributed to individual retirement accounts (without any matching employer contribution)— that in July 2017 the Government Parties admitted that those funds were not, in fact, deposited into the employees' segregated accounts, as they should have been, but instead were spent to satisfy other obligations.

3.      It adds insult to injury that, even after the subsequent passage of a Commonwealth pension reform statute, Law 106, on August 23, 2017, and numerous commitments that ongoing employee contributions would be properly segregated into individual 401(k)-style accounts, the Commonwealth (through AAFAF) publically released a report of its 2017 end-of-year bank account balances on January 19, 2018 (the "2017 EOY Bank Account Balances") which states (at pp. 8-9) that approximately $133 million in "employees/participants withholdings . . . for defined contribution retirement accounts" are being commingled with other "Pension Related" assets in a single *government* account, rather than individual employee retirement accounts as is *required* by Law 106.

4.       The 2017 EOY Bank Account Balances raise serious questions about what the Commonwealth has done with its employees' property, and the February 2018 Proposed Fiscal Plan does nothing to answer those questions.  Accordingly, this Motion seeks discovery of all information pertinent to performance (or violation) of the Commonwealth's legal obligation to establish true segregated individual retirement accounts for active Commonwealth employees' ongoing mandatory retirement contributions—*money which is  the employees' own property*— including but not limited to information regarding whether there have been investment gains since the filing of the Title III petition (a period which has coincided with all-time stock market highs).  If the employees' own money has essentially been hidden under a mattress this entire time—and commingled with other money to boot—the employees have a right to know of that dereliction of the Commonwealth's duty immediately.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1331 and PROMESA § 306(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and PROMESA § 307(a).

## THE UNIONS

6.       AFSCME has two affiliated local chapters in Puerto Rico: Servidores Públicos Unidos, AFSCME Council 95 (in English, "United Public Servants") ("SPU"), and Capítulo de Retirados de SPU, the independently-chartered AFSCME chapter for retired employees of the Commonwealth of Puerto Rico.  SPU serves as the exclusive collective bargaining representative under Commonwealth law for approximately 12,000 active Commonwealth employees, ranging from social workers to corrections officers to nurses who care for juvenile wards of the Commonwealth.

3

7.     The AFT, a labor union affiliated with the AFL-CIO that represents over 1.7 million members (primarily teachers) in more than 3,000 local affiliates across the United States, has an affiliated local chapter in Puerto Rico, the Asociación de Maestros de Puerto Rico-Local Sindical ("AMPR").  The AMPR represents over 30,000 active teachers in the Commonwealth's public schools, making it the largest public employee union on the island.

8.     The UAW, with more than 400,000 active members in virtually every sector of the economy, has eight affiliated local chapters in Puerto Rico, the largest of which are UAW Local 2396, which represents school cafeteria employees, and UAW Local 2373, which represents employees of the Commonwealth's Treasury Department.  Approximately 6,800 UAW members are employed by the Commonwealth or its instrumentalities.

9.     The SEIU represents approximately 2 million public service workers throughout North America.  SEIU members employed by the Commonwealth belong to one of two SEIU local chapters: SEIU Local 1996/Sindicato Puertoriqueno de Trabajadores y Trabajadores ("SPT"), and SEIU Local 1199/Union General de Trabajadores ("UGT").  Approximately 16,000 SPT and UGT members are employed by the Commonwealth or its instrumentalities.

## FACTS

### A.     *2017: PROMISES MADE POST-PROMESA*

10.     On March 13, 2017, the Governor submitted a "Fiscal Plan for Puerto Rico" (the "March 2017 Fiscal Plan") to the Oversight Board for certification.  The March 2017 Fiscal Plan stated that it would  "segregate prospective employee contributions" (p. 21).

11.     That same day, clearly viewing as insufficient the Governor's conclusory statement about segregation of funds , the Oversight Board issued a resolution (the "March 2017 Fiscal Plan Certification") stating that it had "determined to approve and certify" the March 2017 Fiscal Plan "as modified by" two amendments, the second of which demanded that the

4

"Commonwealth and the [Oversight] Board" together formulate a pension "system overhaul . . . on or before June 30, 2017," which would, among other things:

> a.    "Enroll all active members and new hires in defined contribution accounts that segregate and protect their contributions to pay for their own future benefits";
>
> b.    "Offer employees diversified, low-cost 'index funds' similar to the federal government's Thrift Savings Plan"; and
>
> c.    "Ensure that employees retain the full return on their contributions[.]"

12.    On June 23, 2017, the Government of Puerto Rico adopted Joint Resolution 188,[3] to take effect July 1, 2017, which "put[] forth the pay-as-you-go system as a new method for safeguarding pensions for Government retirees" as demanded by the March 2017 Fiscal Plan Certification.  Joint Resolution 188 did nothing, however, to enroll active government employees in new individual defined contribution accounts; segregate their ongoing retirement contributions into those accounts; offer them diversified, low-cost index funds (or any other investment options); or ensure that they retained the full return on their contributions, as demanded by the March 2017 Fiscal Plan Certification.

13.    Despite the fact that Joint Resolution 188 did not comply with the Oversight Board's own March 2017 Fiscal Plan Certification—and the Commonwealth failed to otherwise officially propose an alternative plan for such compliance—the Board, on June 28, 2017, approved Joint Resolution 188 as part of the Commonwealth budget for FY 2017-18 to take effect on July 1, 2017.

---

[3] All references to Joint Resolution 188 and Law 106 of 2017 are drawn from certified English translations submitted as attachments to the Amended and Supplemented Adversary Complaint (Docket No. 39, Nov. 8, 2017) in Adversary Proceeding 17-00219.

14.     On August 4, 2017, the Board issued an "Explanatory memorandum on pension reform" (the "August 2017 Pension Reform") which stated definitively (p. 9):

> For all future service, [Commonwealth] employees will participate in true defined contribution accounts funded by employee contributions.   These accounts will be managed and invested separately from the government plans and each account will be the property of its owner. These steps help ensure that employees' contributions are saved to pay for their future retirement benefits.

15.     The August 2017 Pension Reform continued (p. 6): "Going forward, all Commonwealth employees will participate in true defined contribution (DC) retirement accounts.  The most common type of retirement plan today is also a DC plan – the 401(k)."  It specifically promised (p. 10) that "[c]ontributions made to true defined contribution accounts will be in separate, individually-owned accounts and are protected from reduction."

16.     The August 2017 Pension Reform made this further commitment:  (p. 6):

> The DC plan will be professionally managed and invested separately from the existing systems, so that employees can be confident that their contributions are being saved for their future retirement benefits. Each employees' [sic] contributions to the DC plan will be separately invested and managed, being merged neither with funds from the legacy ERS, TRS, and JRS systems, nor with the funds of other DC participants. The DC plan will be designed to keep administrative costs to a minimum while providing employees with a reasonable choice of simple investment options.

17.     The August 2017 Pension Reform further promised (p. 10) that retirement benefits "attributable to contributions after" the "PROMESA effective date of June 30, 2016" would "not be subject to any reduction" whatsoever.

18.     In making the promises set forth at paragraphs 14-17, *supra,* the Oversight Board's August 2017 Pension Reform admitted unequivocally (p. 5) that prior to PROMESA, the Commonwealth, "instead of depositing employee contributions to" individual retirement accounts "to fund future benefits," had in fact "diverted employee contributions to pay benefits

6

for current retirees."  Thus the Board was forced to "require the government" to ensure that, moving forward, "employees' contributions [] be saved in defined contribution accounts to fund their future retirement benefits (as they should have been all along)."

19.     On August 23, 2017, the Commonwealth passed Law 106, which stated among its purposes (pp. 9-10) the "faithful compliance with the Fiscal Plan certified by the Fiscal Oversight Board on March 13, 2017," specifically including "the provisions on pension reform in the Fiscal Plan."

20.     Law 106 promised (pp. 11-12) "to prospectively establish a New Plan for Defined Contributions, to be supported by the contributions made by public servants" which would "safeguard the contributions that they make for their retirement" by "establish[ing] stringent penalties and sanctions on the heads of public agencies or officials who fail to comply with their ministerial duties to promptly remit contributions to the accounts of the Participants."  Law 106 continues:

> Today, more than ever, we cannot allow the poor performance of ministerial duties to jeopardize the dignified retirement of thousands of public employees . . . . [N]o person, whether natural or legal, shall have legal immunity in the face of an intentional or negligent act that puts the future sustenance of thousands of public servants at risk . . . .  [A] new system of defined contributions is created, which will give Participants a cause of action to defend their contributions and in which the requirements of extensive experience and competence will be imposed on the administrators of the investments of our public servants.

21.     Law 106 makes a number of other comprehensive commitments  respecting ongoing individual retirement account contributions by active Commonwealth employees, including the following:

7

a.      "[A]s a corrective measure, contributions by public servants will have to be segregated and a new Defined Contribution Plan established that will secure the future of our public servants." (Section 1.3)

b.      "With this Law, we ensure that [our public servants] will have a retirement that is dignified . . . by segregating their personal contributions, guaranteeing them and establishing a new defined contribution plan, in trusts or a similar instrument, which will allow them to protect and guarantee their contributions in separate accounts." (Section 1.4)

22.      Section 1.6(i) of Law 106 expressly provides for the creation of a "Defined Contribution Account" defined as an "account in trust, separate from general assets and Government Accounts, to be created after July 1, 2017 in the name of each" eligible active employee.  These individual accounts are to be wholly distinct from the "Accumulated Pensions Payment Account" defined by Section 1.6(j) as an independent "account in trust, separate from general assets and Government accounts, designed to pay" legacy pension benefits by the Commonwealth through the "pay as you go system."  Indeed, Section 2.4(d) specifies that "[a]s of July 1, 2017, [active employees] will no longer make any individual contributions or payment to the Accumulated Pensions Payment Account or any additional contributions to their respective Retirement Systems."

23.      Section 3.1 provides: "A New Defined Contribution Plan is hereby created, to consist of the establishment of a trust fund . . . which will contain an individual account for each" eligible active employee.  "Contributions to the made to the New Defined Contribution Plan by each Participant will be credited to the individual accounts, in addition to the return on investment in accordance with Section 3.6 herein."   Section 3.6(a)(2), in turn, entitles participants to a "return on investment" based on "the investments selected by the Participant."

8

24. Section 3.3(a) requires that "[t]he individual contributions made by the Participants shall be funneled to a New Defined Contribution Plan, in which a Defined Contribution Account shall be set up and maintained, in trust, separate from the general assets and accounts of the Government, as an individual account for each Participant." Section 3.3(a) further provides that the "individual contributions and funds in each Defined Contribution Account shall be the exclusive property of the corresponding Participant."

25. Section 3.4 provides that "[a]s of the date this Law takes effect," all Commonwealth employees "will be required to contribute at least 8.5% of their monthly remuneration to their Defined Contribution Account."

26. Section 3.5 provides that it is the obligation of the public employer to withhold those employee "contributions required under Section 3.4 . . . and immediately transfer them to the Defined Contribution Plan for deposit into the Defined Contribution Account" or else be subject to fines and penalties including conviction of a misdemeanor and six months imprisonment.

27. Section 3.6 promises that the entire Defined Contribution Account of each employee—including not only the contribution but also the return on investment—shall be the property of the employee who enjoys "erga omnes ownership of the balances in their Defined Contribution Accounts."

28. Section 4.1 of Law 106 further provides for the creation of a Retirement Board of the Government of Puerto Rico ("Retirement Board") to be appointed within sixty days from approval of the law. Under Law 106, the Retirement Board is to be comprised of thirteen members and must include a representative of the Department of Education who is an active teacher, a representative of the public corporations, and a pensioner from each of Puerto Rico's Teacher Retirement System ("TRS") and Employee Retirement System ("ERS"), respectively.

9

As part of its powers and duties under Law 106, the Retirement Board is to "[e]stablish, implement and oversee the best practices of prudence, integrity, diligence and rules applicable to the New Defined Contribution Plan, with regard to its operation, Participants' rights, administrator responsibilities, fiduciary duties . . . ."

### B.    2018: BROKEN PROMISES REVEALED

29.    In tension with the above—all of which contemplates the immediate creation of individual Defined Contribution Accounts to receive employees' mandatory wage deductions, which employees then have control over as their own property to invest in the financial markets—Section 3.3(c) of Law 106 recognizes a narrow, temporary window of time "[b]etween the time this Law is enacted and the time the Retirement Board contracts the services of an Administrative Entity to manage the New Defined Contribution Plan" during which "the Secretary of the Treasury shall have the authority and power to collect and deposit into a trust fund . . . which will be separated from the general assets and accounts of the Government, with the Individual Contributions made by Participants under his or her supervision."  Soon, "[a]fter the Administrative Entity begins to provide its services, the Secretary of the Treasury will transfer to it the funds from the Individual Contributions to be deposited into each Participant's Defined Contribution Account."

30.    Based on statements made by the Commonwealth, the Commonwealth appears to be in gross violation of Law 106 not only through illegal exploitation of the Section 3.3(c) window period beyond any reasonable interim time period to set up the individual Defined Contribution Accounts as required by statute, but also by not even segregating employees' Individual Contributions separate from other assets and accounts of the Government.

31.    Perhaps to conceal its violation of Law 106, the Commonwealth also appears to have failed to create the Retirement Board mandated by the statute to serve as the fiduciary

watchdog over the Defined Contribution Accounts.  Instead, the Retirement Boards of TRS and

ERS were summarily dismantled in August of 2017, without notice or explanation, presumably

to make way for the formation of this new Retirement Board that was supposed to safeguard the

participants' interests.  But today, nearly six months after enactment of Law 106 and almost four

months after the deadline for doing so, the Commonwealth still has not, to the Unions'

knowledge, appointed a new Retirement Board.  All this time, the public employees of Puerto

Rico have been left in the dark.

32.     Currently, the Unions' public employee members have received no investment

control over—or even specific information about—the individual Defined Contribution

Accounts required by Law 106.

33.     Meanwhile, on January 19, 2018, the Unions learned from the Commonwealth's

2017 EOY Account Bank Balances (p. 9) that the Commonwealth appears to be holding a single

omnibus "Employee Withholding" account containing not only $133 million of "individual

defined contribution retirement account" money, but also other commingled assets including

loan repayments being made to the Commonwealth and perhaps more.

34.     Five days later, on January 24, 2018, the Governor issued a draft fiscal plan (the

"January 2018 Draft Fiscal Plan") which failed to mention  the status of setting up the true

individual Defined Contribution Accounts demanded by the Oversight Board all the way back on

March 13, 2017.

35.     On February 5, 2018, the Oversight Board issued a "notice of violation" to the

Governor (the "February 2018 Notice of Violation") under Section 210(c)(3)(B)(i) of

PROMESA stating that the January 2018 Draft Fiscal Plan required revisions, including that

"[t]he Government should set clear, immediate deadlines to have all employees enrolled in a

defined contribution plan with segregated and self-directed accounts."

11

36.    It is worth reiterating that at the time it issued the February 2018 Notice of Violation, the Oversight Board had already demanded that employees be enrolled in a defined contribution plan with segregated and self-directed accounts as far back as the March 2017 Fiscal Plan Certification—with a deadline of June 30, 2017 which the Commonwealth failed to meet (long before Hurricanes Irma or Maria) and has continued to ignore for more than seven months.

37.    Since July 1, 2017, when employees should have been able to invest their individual retirement accounts in low-cost index funds as stated in the March 2017 Fiscal Plan Certification, the S&P 500 has risen from 2,423.41 at market close on June 30, 2017, to 2,701.33 at market close on February 21, 2018—an increase of 11.4%.   As far as the Commonwealth employees know, their mandatory contributions have essentially been hidden under a mattress by the Commonwealth that entire time.

38.    Shockingly, notwithstanding the Oversight Board's February 2018 Notice of Violation demanding that the Commonwealth set "immediate" deadlines for the creation of the true individual Defined Contribution Accounts, the February 2018 Draft Fiscal Plan subsequently issued by the Governor on February 12, 2018, once again failed to mention this issue even once.

39.    This repeated inaction, which is illegal under both statute and common law, has been perpetrated by the Commonwealth and tolerated by the Oversight Board despite repeated complaints from the Unions.   As a result, with each passing day morale of public employees continues to plummet.   There can be no trust when these ongoing mandatory paycheck deductions go into government accounts over which the employees, contrary to law,  have no control or specific knowledge.

40.    Any fiscal plan must not only correct this problem immediately as a condition of certification, but also make employees whole for their lost investment opportunity since at least

12

July 1, 2017; if employee money has essentially been placed under a mattress during the recent stock market rally, they must be compensated for the illegal misuse and breach of fiduciary duty over their property by the government.

41.     By this Motion, the Unions seek discovery on these issues, including an understanding of exactly what has transpired with regard to the implementation or failure of implementation of these individual employee accounts, including, without limitation, information relevant to whether there has been any breach of fiduciary duty or other act giving rise to personal liability and specifically how and by when will all of the Government Parties' gross misdeeds be corrected.

## RELIEF REQUESTED

42.     By this Motion, the Unions request entry of the proposed order attached hereto as Exhibit A authorizing discovery pursuant to Bankruptcy Rule 2004 and directing the Oversight Board, AAFAF, and the Commonwealth to produce responsive, non-privileged documents requested on Schedule A attached hereto for examination by the Unions and witnesses for deposition testimony.

## ARGUMENT

43.     Pursuant to PROMESA § 310, the Federal Rules of Bankruptcy Procedure apply to Title III proceedings and civil proceedings arising thereunder.   48 U.S.C. § 2170. Accordingly, Rule 2004 of the Bankruptcy Rules is applicable to this Title III Case.

44.     Bankruptcy Rule 2004 provides that, on the motion of any party in interest, the Court may order an examination of, and the production of documentary evidence by, any entity concerning any matter relating "to the acts, conduct, or property or to the liabilities and financial condition of the debtors, or to any matter which may affect the administration of the debtor's estate . . . ."  Fed. R. Bankr. P. 2004(b).  The examination "may also relate to the operation of

13

any business and the desirability of its continuance, the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given or offered therefor, and any matter relevant to the case or to the formulation of a plan." *Id.*

45.    Accordingly, Rule 2004 permits any party with an interest in the bankruptcy estate to conduct an examination of any matter affecting the administration of the estate or the formulation of a plan.  Fed. R. Bankr. P. 2004(b); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 354, n. 6 (3d Cir. 2007).  As the authorized representatives of thousands of creditors and public servants of the Commonwealth and its instrumentalities, and as a party committed to the long-term success of Puerto Rico, the Unions undoubtedly qualify as parties in interest and are thus entitled to information regarding the Commonwealth's finances, and specifically, information related to the whereabouts of the Unions' public employee members' mandatory contributions—specifically information pertinent to implementation by the debtor of the legal requirement that these employee contributions should by law *not* be currently commingled with other assets of the estate.  *See In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989) ("Courts have generally construed the term 'party in interest' as used in 11 U.S.C. § 1109(b) liberally."); *see also In re Johns-Manville Corp.*, 36 B.R. 743, 747-48 (Bankr. S.D.N.Y. 1984) (finding that the term "party in interest" is to be construed broadly).

46.    The goals of Rule 2004 examinations include "discovering assets, examining transactions, and determining whether wrongdoing has occurred."  *In re Wash Mutual, Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (quoting *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002)); *see In re Recoton Corp.*, 307 B.R. 751, 755 (S.D.N.Y. 2004).  This is precisely the type of information the Unions seek by this motion: facts regarding the location and treatment of assets and whether wrongdoing has and continues to occur by the Government

14

Parties.  Rule 2004 provides that any party in interest may move for examination.  Fed. R. Bankr.

P. 2004(a).  Courts have found that basic financial information about the debtor, its assets and

liabilities, and its projected revenues and expenses are appropriate subjects of a Rule 2004

request. *See*, *e.g.*, *In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("Rule 2004 of the

Federal Rules of Bankruptcy Procedure provides courts with the authority to order examinations

with respect to the financial matters of debtors[.]").

47.     Indeed, the broad scope of Rule 2004 has been described as permitting a "fishing

expedition." *See In re Youk-See*, 450 B.R. 312, 319-20 (Bankr. D. Mass. 2011) ("The

examination [] is of necessity to a considerable extent a fishing expedition."); *In re Pub. Serv.*

*Co. of New Hampshire*, 91 B.R. 198, 199 (Bankr. D.N.H. 1988) ("The scope of discovery

afforded under Bankruptcy Rule 2004 is "unfettered and broad."); *In re Washington Mut.*, 408

B.R. at 50 ("The scope of a Rule 2004 examination is unfettered and broad . . . [and] is

commonly recognized as more in the nature of a 'fishing expedition.'") (internal citations

omitted)); *see also In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("[I]t is well settled

that the scope of examination allowed under Rule 2004 is broader than discovery allowed under

the Federal Rules of Civil Procedure and may be in the nature of a 'fishing expedition.'").  The

instant motion must therefore be permissible insofar as it seeks to uncover only a narrow scope

of information about bad acts and problematic financial accounts already suggested by the

extensive factual history detailed above.

48.     This broad scope extends to any third parties who have a relationship with the

debtor. *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d

Cir. 1994) ("Because the purpose of the Rule 2004 investigation is to aid in the discovery of

assets, any third party who can be shown to have a relationship with the debtor can be made

subject to a Rule 2004 investigation."); *In re Wilcher,* 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985)

(Rule 2004 examination "may extend to creditors and third parties who have had dealings with the debtor.") (citations omitted); *see also In re Mittco, Inc.*, 44 B.R. 35, 36 (Bankr. D. Wis. 1984) ("Where there is a showing that the purpose of the examination is to enable a party to probe into matters which may lead to the discovery of assets by examining not only the debtor, but also other witnesses, such inquiry is allowed.").

49.     In determining whether to grant a Rule 2004 motion, courts balance the interests of the parties and weigh the relevancy and "necessity of the information sought by examination." *In re China Fishery Grp. Ltd.*, 2017 WL 3084397, at *5 (Bankr. S.D.N.Y. July 19, 2017).   In addition to balancing competing interested, courts look to whether the party requesting discovery under Rule 2004 has demonstrated good faith.   *In re Gawker Media LLC*, 2017 WL 2804870, at *5 (Bankr. S.D.N.Y. 2017).   One can demonstrate good faith by showing that the requested information is necessary to asserting a claim or that denial of the information requested would result in undue hardship.   *Id*.

50.     Here, the balancing of the parties' interests strongly favors granting the Unions' motion to obtain and examine documents from the Commonwealth, Oversight Board and AAFAF on the topics set forth on Schedule A and to obtain deposition testimony thereabout.

51.     The Unions respectfully submit that good cause exists to grant the Motion and authorize a Rule 2004 investigation.   It is imperative that the authorized representatives of the Commonwealth's public servants have the necessary information concerning the Commonwealth's misappropriation of employee property.   This information is necessary for not only the Unions to understand the factual basis for claims against the Title III debtors and individuals for lost investment opportunity since the employees' accounts should have been set up but also to safeguard the employees' own property going forward.   This information is needed urgently, and the Unions have made good faith efforts to obtain it by other means only to learn

16

through public documents that wrongdoing is apparently continuing every day.  The Unions need to know right now, for their public employee members, exactly what is happening to the public servants' own money at the hands of the Government Parties.

52.    The Unions' information requests are narrowly tailored to the status of the employee contributions.  This is not an effort to disrupt this case.  It is an effort to protect the hard-earned property of public servants at the time they need it most, the recovery of their families and their Island from a devastating natural disaster, a period of deep insecurity and uncertainty when their faith in a secure retirement is more important than ever.

53.    The Unions and their public employee members will continue to suffer if the requested discovery is not granted.  Currently, the Commonwealth's public servants are by law required mandatorily to contribute to their retirement each pay period, but have not received the necessary assurance that said contributions are maintained by the Commonwealth in individual segregated accounts as required by law and are earning a proper return on investment through index funds (which employees should have control over selecting).  Each pay period the injury continues.

54.    While the Commonwealth's conduct was egregious and contrary to law before the commencement of this Title III Case, the continuation of the lack of segregated accounts post-Title III filing is even more offensive since the Government Parties now operate under PROMESA.  Despite not knowing whether individual segregated accounts have actually been established, the Unions and their public servant members continue to live up to their end of the bargain in full support of on-Island recovery efforts, while the Commonwealth skirts on its repeated commitments to live up to its end of the deal.

55.    Discovery of this critical information is the very "purpose of a Rule 2004 examination." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); *see also In re*

17

*Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991). Creditor access to such information is also a fundamental tenet of PROMESA.

56.     Based on the foregoing, the Unions submit that cause exists to grant the Motion.

## RESERVATION OF RIGHTS

57.     The Unions expressly reserves the right to make any additional requests regarding the issues set forth herein or any other issues, as necessary and appropriate, pursuant to Bankruptcy Rule 2004, and also to file any claims or proceedings on these or other issues related to employee retirement benefits without limitation.

## CERTIFICATION OF COMPLIANCE WITH LOCAL BANKRUPTCY RULE 2004-1

58.     Undersigned counsel hereby certify that, prior to filing this Motion, they requested a conference with counsel for the Oversight Board, the Commonwealth, and AAFAF concerning the Unions' intent to conduct an examination of the Commonwealth pursuant to Rule 2004. To the extent the information requested is provided in advance of the hearing on this motion, the Unions reserve the right to narrow their requests or withdraw the Motion.  However, at this time it appears that the information is not forthcoming and the Unions certify that a further meet and confer would not be fruitful based on numerous unsuccessful past efforts to obtain this critically important information from the Government Parties directly.

## CONCLUSION

For all the forgoing reasons, the Unions respectfully request that the Court grant this Motion in all respects and enter an Order authorizing discovery pursuant to Bankruptcy Rule 2004 and granting any further relief as is  just and proper.

24318020.17 02/26/2018

Dated: February 27, 2018        **SAUL EWING ARNSTEIN & LEHR LLP**

      By:    */s/ Sharon L. Levine*
                 Sharon L. Levine *(pro hac vice)*
                 Dipesh Patel *(pro hac vice)*
                 1037 Raymond Blvd.
                 Suite 1520
                 Newark, NJ 07102
                 (973) 286-6713 (Telephone)
                 (973) 286-6821 (Facsimile)

                      -and-

                 */s/ Judith E. Rivlin*
                 **AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES**
                 Judith E. Rivlin (*pro hac vice*)
                 Teague P. Paterson *(pro hac vice)*
                 Matthew S. Blumin *(pro hac vice)*
                 1101 17th Street NW, Suite 900
                 Washington, DC 20011
                 (202) 775-5900 (Telephone)
                 (202) 452-0556 (Facsimile)

                      -and-

                 */s/ Manuel A. Rodriguez Banchs*
                 Manuel A. Rodriguez Banchs
                 P.O. Box 368006
                 San Juan, Puerto Rico 00936-8006
                 (787) 764-8896 (Telephone)
                 (787) 721-0975 (Facsimile)

                 *Attorneys for the American Federation of State,
County and Municipal Employees*

                 **STROOCK & STROOCK & LAVAN LLP**

      By:    */s/Curtis C. Mechling*
                 Curtis C. Mechling *(pro hac vice)*
                 Sherry Millman *(pro hac vice)*
                 180 Maiden Lane
                 New York, New York 10038-4982
                 (212) 806-5400 (Telephone)

                      -and-

José Luis Barrios-Ramos, Esq.
McLeary Ave., Suite #303
San Juan, Puerto Rico 00936-8006
(787) 593-6641

*Co-counsel to the American Federation of
Teachers, AFL-CIO*

**COHEN, WEISS AND SIMON LLP**

By:     */s/ Richard M. Seltzer*
         Richard M. Seltzer *(pro hac vice)*
         Peter D. DeChiara  *(pro hac vice)*
         Hiram M. Arnaud *(pro hac vice)*
         900 Third Avenue
         New York, New York 10022-4869
         (212) 563-4100 (Telephone)

*Counsel to International Union, United Automobile,
Aerospace and Agricultural Implement Workers of
America (UAW) and Service Employees
International Union*

20