UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

-----------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO,
et al.,

         Debtors.[1]

-----------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

NOTICE OF CORRESPONDENCE RECEIVED BY THE COURT

     The Court has received and reviewed the attached correspondence, described below, from interested persons in the above-captioned cases. Although the Court cannot respond individually to all of those who have expressed their thoughts or concerns, the Court is deeply mindful of the impact of the fiscal crisis on lives, institutions, and expectations, and of the importance of the issues that are raised in these unprecedented cases.

1.     Email dated January 26, 2018 from Justin Evans.
2.     Email dated January 26, 2018 from Tim Travis.
3.     Email dated January 30, 2018 from Seema Balwada.
4.     Email dated February 19, 2018 from Justin Evans.

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

     5.       Email dated February 8, 2018 from Luis I. Garcia.

     6.       Email dated February 25, 2018 from Thomas Salese.

     7.       Email dated March 1, 2018 from Richard L. Sigal.

Dated:  March 1, 2018



**Concerns Regarding Puerto Rico and Oversight Board**

Tim Travis   to: swaindprcorresp                                          01/26/2018 10:45 PM

From: ████████████████████████

To:         <swaindprcorresp@nysd.uscourts.gov>

Dear Honorable Judge Swain,

I'm writing you to express my immense concerns regarding the conduct of the government of Puerto Rico and the Oversight Board regarding the restructuring process. The clear goals of Promesa were to instill fiscal discipline and to allow Puerto Rico to regain affordable access to capital markets. Promesa also requires that the process respects the relative lawful priorities or lawful liens, as may be applicable, in the constitution, and other laws. Despite these clear guidelines, the government of PR and the Oversight Board have literally done everything in their power to flout the laws, and instead maintain the same irresponsible fiscal policies that created the need for a debt restructuring in the first place.

In the most recent fiscal plan, the Puerto Rico government assumes a 19.4% population decline in 5 years, yet is assumes an increase in payroll. They say they can't pay a penny of debt service on general obligation bonds, yet the constitution of Puerto Rico states that debt service on GO debt is paid before anything else. How could that be? How could the Oversight Board certify such a plan, which they surely will as they worked hand in hand with the government in creating it? Why are we wasting time and PR citizens money creating these plans based on absurd and abstract economic projections, when we don't even have audited financial statements from 2015, 2016, or 2017? Paying a $60K government salary for a nonproductive employee is not financially prudent to generate maybe $12K in tax revenue. That is what put PR into bankruptcy in the first place. There is absolutely no breakdown between essential and nonessential services. The Oversight Board has put virtually no effort into consensual restructurings and this occurred long before the hurricanes arrived. Instead they actually rejected the RSA for PREPA, which had been approved by two different governments over 3 years of painful and expensive negotiations. If creditors could have exercised their contractual right of appointing a receiver, I highly doubt that we'd have seen the dubious Whitefish contract, or the sheds of unused but needed, equipment found by federal authorities. I also don't believe 35% of the PR would still be without electricity 4 months after the hurricanes.

The last point that I want to mention is how a disastrous precedent set in this case could impact the municipal market and the U.S. economy in general. U.S. citizens bought Puerto Rico debt based on constitutional protections and legal rights, such as revenue pledges. Congress created Promesa to provide a framework for addressing the debt, but requiring that these legal rights were honored. There are a multitude of precedents of these property rights being respected in municipal restructurings where the economic climate was far worse than in Puerto Rico. Detroit is a perfect example. Detroit's population exodus was far worse than Puerto Rico's and its financial collapse peaked during the Great Recession, as the manufacturing sector completely collapsed with the GM and Chrysler bankruptcies. Even during this tumultuous period, Detroit paid 74 cents on the dollar on UTGO debt, which is comparable or arguably inferior to the protections on PR's GO debt. A hurricane can take away a home but it doesn't take away your legal rights. Alarmingly, the Oversight Board's actions long before the hurricanes showed their hand in their treatment of creditors. They have attempted to break pledges and liens that are the fulcrum of the municipal financial markets. If a bad precedent is set in PR, financing municipal governments will be nearly impossible. What would prevent heavily indebted states

such as New Jersey and Illinois from seeking a Promesa-like bankruptcy bailout via Congress? Even if States are still not allowed to declare chapter 9, cities like Chicago might find is politically expedient to penalize creditors in order to keep an irresponsible fiscal framework and to appease voters. I think you should pay close attention to how Puerto Rico acted when they were raising capital and how they are acting now. Below is a quick sample of the hypocrisy and in my opinion fraud that has been perpetrated, especially when you consider how they are acting regarding the Cofina debt. There are numerous more examples. Lastly, I'd greatly appreciate that you read my article that I wrote regarding the Oversight Board: https://seekingalpha.com/article/4132137-puerto-ricos-oversight-board-failing-duties Thank you very much for your consideration and I wish you the best of luck. All U.S. citizens are counting on you to protect the property rights and legal protections, which are indubitably some of the most important foundations of how this great country was built.



Sincerely,

Tim Travis
CEO of T&T Capital Management



Registered Investment Advisor



http://www.ttvalueinvesting.com

Follow Us on Facebook

http://www.ttvalueinvesting.com

Follow Us on Facebook

---

Investing in the financial markets involves risks. Options are not suitable for all investors. Past Performance is not indicative of future results.

To view our Form ADV 2, please click http://www.ttvalueinvesting.com/form-adv-ii/. It is our intention to help our clients and our community understand who we are, how we do business, and the experience we bring to our work.

Your privacy is important to us; please click here to view our Privacy Policy.



**Dear Judge Swain**
Justin Evans    to: swaindprcorresp                    01/26/2018 06:32 PM

From:  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
To:    swaindprcorresp@nysd.uscourts.gov

Dear Judge Swain:  I'm a suffering bondholder and wanted you to see this slide.  It's from a marketing deck the Commonwealth used in 2014 to sell us GO bonds.  It shows how under-leveraged they are compared to the mainland.  Now they are arguing the exact opposite. Slide 42 of their recently published draft fiscal plan conveniently omits the Federal debt burden that mainlanders carry and islanders don't.  It paints the island as wildly in debt relative to the US states, when in fact most of the world carries debt of 50-100% of GDP.  PR GDP is roughly $103bln.



http://www.aafaf.pr.gov/assets/newfiscalplanforpr-01-24-18.pdf

This slide is also very interesting regarding electricity rates on the island:



## Comparison of PREPA rate to other island u

| | Average Rate 2008 to 2014 [1] (cents | | |
|---|---|---|---|
| | US Virgin Islands | Bermuda Electric | Jamaica Public Service |
| | 41.3 | 39.0 | 32.3 |
| MWh/ Customer | 13.2 | 16.5 | 5.4 |
| # of Customers (000s) | ~55 | ~40 | ~590 |

Justin Evans

January 30, 2018

Seema Balwada, CFA

████████████████

Judge Laura Taylor Swain
U.S. District Court for the District of Puerto Rico
Fed. Court of PR Office 150, Fed. Building
San Juan, Puerto Rico 00918

**Your Honor, Court Ruling on Commonwealth-COFINA Dispute Will Be A Landmark For U.S. Financial Markets**

Dear Judge Swain,

I am a native of India, who is now a proud U.S. citizen.  As a Chartered Financial Analyst (CFA) who owns Puerto Rico bonds, I have followed developments related to Puerto Rico bonds for the past several years. World financial leaders understand 'investor confidence' is a valuable hard-earned currency not to be squandered.  Confidence in the U.S. financial markets makes America the most prosperous country in the world: a place of highly productive people who enjoy a high standard of living.

How did that come about?  Americans have confidence in the U.S. financial system. People from around the world invest their savings in debt issued by U.S. local governments and corporations.  Foreign investors are drawn to U.S. financial markets because they know that in the U.S. laws and contracts are strictly enforced. Investor confidence means market access which stems from upholding laws that protect investor rights.  When people and governments can access funding for their needs at competitive interest rates, they become more productive. The system works because borrowers know these loans must be repaid.

Enforcing laws has built the strong foundation that has allowed Americans to prosper.  Many other nations aspire to the high standard of integrity found in the United States of America.  The U.S. judicial system which enforces the U.S. Constitution must be commended for shaping this great nation.

As the overseer of the largest U.S. municipal bankruptcy, history has carved a place for Your Honor.  My appeal is that you differentiate between (i) the legal factual basis on which Puerto Rico bond investors incurred risk for reward and (ii) the deceiving tactics of a misguided elite political class not aligned with the best interests of the people of Puerto Rico.

It is no secret that corruption and mismanagement has taken a toll on Puerto Rico's finances.  Day after day, the Island's public officials are found lacking in their duty of managing public assets.  This fact is no longer hidden from the world.  Americans are getting a first-hand glimpse of how a third world government operates. Instead of earnestly rebuilding a damaged electric grid, stockpiles of useful equipment were found hidden in a warehouse. While addressing members of the U.S. Congress for aid, the Oversight Board kept silent on $6.8 billion of cash in bank accounts. The cash was only revealed after your Court ordered financial discovery.  Both the current Rosselló administration and former Padilla administration have been a group of self-serving elitists pretending to act in the best interest of the people, while all they care about is re-election.

The law does not allow the Island's General Fund to claw back sales and use taxes pledged to COFINA Bonds. COFINA's enabling laws are legal under the U.S. and Puerto Rico Constitutions. They are supported by legal opinions from the Puerto Rico Department of Justice and several prominent bond counsels.

The enabling legislation differs for each of the various Puerto Rico bonds.  Full faith and credit General Obligation Bonds are legally allowed to claw back revenues of certain Puerto Rican government agencies and PREPA bonds are secured by a legal net revenue pledge. However, PREPA has the authority to raise rates as necessary to assure adequate debt coverage. The PREPA situation is turning into a farce and must be put on a sensible path that considers stakeholders and the people of Puerto Rico.

Risk and Reward go hand in hand.  Differences in the collateral pledged to bondholders account for the compensation or yield offered to investors.  Legal precedent has been established for bonds issued by COFINA. Statutory lien bonds have always been respected by local governments, even those in distress. On the other hand are general obligation bonds are unsecured; they are backed by trust and the full faith and credit of the issuer. They are not secured by a specific revenue stream.

In the words of the Puerto Rico administration the revised fiscal plan is *'creditor agnostic'*.  Therefore it cannot fulfil PROMESA's goal of restoring capital access by respecting investor liens and priority of payment.  They have withheld financial information, no audited financials to show since 2014, $6.8 billion cash recently found hidden and no compromise from public pensioners. Puerto Rico is expecting far too much from bondholders, if they expect them to have trust and confidence in the Puerto Rico government.

Even the U.S. Treasury does not believe Puerto Rico's opaque disclosures.  Rightfully, they have put a hold on Congress-approved federal aid until Puerto Rico's politicians clean up their act.  To safeguard U.S. taxpayers' money, the U.S. Treasury is making access to federal funds contingent on specific collateral such as unencumbered sales and use taxes.  The U.S. Treasury's belief in collateral reinforces the significance of liens and investor rights.

The Island cannot have a future without access to capital.  Based on legal facts presented by Puerto Rico, such as a statutory lien a lockbox and a law that states pledged funds are "Unavailable Resources" to the Commonwealth, astute institutional investors and ordinary Americans including many islanders have bought COFINA bonds. There can be no way forward for the Island without a favorable court ruling or consensus with bondholders.

As an analyst I deal with facts and laws that protect investors. I have carefully studied the security on COFINA bonds before I purchased their bonds for myself. COFINA Senor and Subordinate bonds were rated 'AA' and 'A' respectfully when originally issued. Today COFINA revenues are stronger, the statutory lien is in place and the bonds are certainly not impaired. An adverse outcome will make it extremely difficult for financial analysts like me to remain confident in the legal system that made America Great.

Judge Swain, Your decision on Puerto Rico's Commonwealth-COFINA Dispute will set a value on the liens, contracts and promises made to bondholders.  Should your decision not lead Puerto Rico towards policy reform, it will be a step back for the Island.  Should your decision undermine investor confidence in financial markets, it will be recorded as a step backward in economic history and the municipal bond market.

If the strategy of the Puerto Rico government is to disregard the law which includes an unwillingness to honor liens succeeds, there will be no reason for the people of Puerto Rico to feel obligated to pay mortgages, make credit card payments or repay car loans. In other words Puerto Rico will have no future.

Your Honor, I trust that your rulings will uphold statutory liens provided to bondholders, which will restore capital access to the Island, set Puerto Rico on a course of policy reform and create fiscal balance. Judge Swain, DO NOT allow Puerto Rico to ignore bondholder rights.

Sincerely,

*Seema Balwada*

Seema Balwada, CFA

February 8, 2018


Hon. Laura Taylor Swain
United States District Judge
Daniel Patrick Moynihan Building
United States Courthouse
500 Pearl St.
New York, NY 10007-1312


Dear Honorable Judge Taylor Swain:

The purpose of this letter is to write you on behalf of my mother, an 86 year old woman with investment in COFINA Bonds. I am not a lawyer neither a vulture Fund we are common Puerto Rico individuals concerns for the well-being of my mother and the future of Puerto Rico. To share with you our frustration with the current process we have divided the document in the following way **A)** Introduction **B)** Why we invest in COFINA Bonds **C)** COFINA Debt Coverage and Commonwealth Non-Impartment Covenant **D)** COFINA lien **E)** Historical Puerto Rico Commonwealth Official Communications to the Financial Community **F)** COFINA Challenges and Impact on the U.S Municipal Markets **G)** Conclusion


### A. *Introduction*

The municipal bond market, for borrowers and investors alike, is fundamentally changing. In addition, although bankruptcy and default remain minimal, the Detroit bankruptcy case had a profound and sobering impact on the market, leading participants to reevaluate what a general obligation (GO), full faith and credit pledge actually means. Logically, there has been a market shift to bonds secured by a specific revenue stream like COFINA – a securitized loan – as a means for issuers to enhance the attractiveness of their bonds and lower borrowing costs.



1

### B. _Why We Invest in COFINA Bonds_

The Puerto Rico Sales Tax Financing Corporation (COFINA) is an independent instrumentality of the Commonwealth of Puerto Rico, created by Act No. 91 of May 13, 2006, as amended.  The 6% received from the sales tax are, pledged for the exclusive payment of bondholders.  Funds received are legally separated and segregated from the general fund of the Commonwealth of Puerto Rico.

The Puerto Rico legislature established and assigned to COFINA a priority lien on an imposed, island-wide sales and use tax (SUT). Following a summary of the Law:

_"A special fund is hereby created to be known as the Dedicated Sales Tax Fund. The Dedicated Sales Tax Fund and all of the funds deposited therein and all the future funds that must be deposited in the Dedicated Fund pursuant to this law are hereby transferred to, and shall be the property of COFINA.  This transfer is made in exchange for COFINA's commitment to pay, all or part of the extraconstitutional debt outstanding as of June 30, 2006"_

_"The Dedicated Sales Tax Fund shall be funded each fiscal year from the first revenues of the SUT, deposited at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall it constitute resources available to the Commonwealth of Puerto Rico, nor shall be available for use by the Secretary of the Treasury."_

**COFINA – Revenue Analysis:** The Sales and Use Tax (SUT) pledged to COFINA is very strong, as reflected in all but one of the elements credit analysts consider when evaluating a bond.

1. _**Demographics and Economic Base**_ **– Poor**. The island has a declining population, low income levels, and high unemployment relative to the U.S. mainland.
2. _**Nature of the Dedicated Revenue**_ **– Superior**. The SUT applies to a very broad list of services and essential consumer goods, is very stable, and is enforced throughout the entire island.
3. _**Revenue Analysis and Fund Flows**_ **– Superior**. Fiscal year 2017 collections were a record high and double 2013 levels. A priority lien exists on collected taxes, going first to bondholders.

2

4. ***Debt Service Coverage* – Superior**. The ratio of pledged revenue to annual debt service provides proper coverage for the annual interest and payment.

**E. *COFINA Debt Coverage and Commonwealth Non-Impartment Covenant***

As previously mention COFINA continues to have a strong current annual debt service coverage on first-lien bonds and adequate historical coverage of first-lien.  COFINA bonds: debt service is a dedicated source of funds, from a 6% tax on a wide range of goods and services.  The COFINA indenture provides a strong legal structure that separates the revenue stream securing the bonds from the Commonwealth of Puerto Rico.

Also in all COFINA prospectus memorandums the issuer of the COFINA Bonds informed to the bond holders the following:

## *Commonwealth Non-Impairment Covenant*

*"Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bond owners until said Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or  commitment of  the Corporation"*

**F. *COFINA Lien***

COFINA Bonds are backed by statutory liens and have a claim that applies to a very broad list of services and essential consumer goods that arises by force of law as opposed merely to a contract or board resolution.  Bankruptcy headlines in recent years have prompted investors to better understand protections offered to municipal bondholders.  The municipal markets have being growing interest in statutory liens stems almost entirely from their preferred treatment in bankruptcy.  Unlike consensual liens (which spring into existence from a contract) or board resolutions, statutory liens remain in place after a bankruptcy case commences.  As a result, it is generally harder to impair obligations secured by them.



3

The interest by the financial market on the protection of statutory liens, have encourage States including California and Illinois to recently enacted or considered legislation to secure municipal debt with statutory liens in recognition of the investor protections provided. Securing bonds via a statutory lien conveys a strong willingness to prioritize debt payments.

Awareness in statutory liens has heightened, as bankruptcy headlines (Puerto Rico, Detroit, and others) have prompted investors to better understand protections offered to municipal bondholders. Over the past year, municipal investors have grown more aware of the credit protection that statutory liens provide. Rating agencies have pronounced on their security features, and between March and October 2015, at least five states considered or enacted laws to secure debt obligations with them

In late August, the City of Detroit, Michigan earned an A stable rating from S&P on $245 million in income tax bonds, its first debt since exiting Chapter 9. Those bonds have an investment grade rating—nine notches higher than S&P's B GO rating for the City—in part, by securing the bonds with a statutory lien. Also on January 17, 2018 the City of Chicago announce a $898 million bond deal supported by the city Sales Tax Securitization Corp, an government agency set up to sell highly rated debt backed by a first claim the city receive from the estate of Illinois. Bonds are rated AAA by Fitch Rating and AA by S&P Global Rating, several grades above Chicago general obligation bonds that are rated Ba1 by Moody (Junk) and BBB – by Fitch Rating.

### G. *Historical Commonwealth Official Communications to the Financial Community*

For the last 30 years the Government Development Bank for Puerto Rico (GDB), in his role as fiscal agent has been organizing formal investor presentations and conference calls for current bondholders and future investors. In particular since the enactment of Act No. 91 of May 13, 2006 (COFINA) GDB has been keen to expose to the financial community the strong debt service coverage and legal protections regarding any possible claw-back from the Puerto Rico General Obligation Bondholders. In the next couple of pages you will read multiple documents that were presented by GDB in various event and during different political parties' administrations that stress the benefits of COFINA.

✓ **_February 20, 2009 Puerto Rico Credit Conference_**

Puerto Rico Credit Conference: The Road to Fiscal and Economic Reconstruction, Feb. 20, 2009 (presentation by Carlos M. García, Chairman and President of GDB):



## The SUT is a resilient revenue source separate from the Commonwealth's finances

- Over two years of strong performance in spite of recessionary environment. SUT is an "island of stability"
- The gross revenues of the SUT for the first 6-months of FY 2009 remain in line with the historical average monthly revenues
- Excluding the effect of the "Rainy Tax-Holiday" the monthly average collection would have been $96 million

Monthly Trend in Gross Sales and Use Tax Revenues (SUT)*
$ in millions

$93 million
Avg. Monthly SUT Revenues
6M FY 2009

$95 million
Avg. Monthly
SUT
Revenues
Dec06-Jun08

Nov-06    Apr-07    Sep-07    Feb-08    Jul-08    Dec-08
Special "SUT Rainy Tax-Holiday" in September 2008

95    PUERTO RICO **CREDIT CONFERENCE**

## The SUT is a resilient revenue source

- The SUT is a highly diversified revenue source that covers over 20 economic sectors islandwide



FY 2008 SUT Gross Revenues*

Real Estate
Other services 1%   Others 5%
Fees and others 2%   General Merchandise Stores 14%
Auto Parts 4%
Manufacturing 5%
Health and Personal Care Services 5%
Communications 13%
Construction & Landscaping Materials 6%
Restaurants 9%
Other Retail Trade 11%
Clothing & Accessories Stores 10%
Wholesale Trade 11%

Source: Puerto Rico Treasury Department. (Revenues collection by NAICS)
Gross without excluding the assignment to COFINA

96    PUERTO RICO **CREDIT CONFERENCE**

5

## Governor Fortuño's Administration commitment to the SUT

- SUT is a key revenue source **THAT WILL NOT BE REDUCED OR ELIMINATED**.

- Enhancement of collection and enforcement of SUT will further strengthen revenue stream

97

PUERTO RICO **CREDIT CONFERENCE**

*Reproduced text highlighted in* <mark>yellow</mark> *indicates emphasis that does not appear in the original text.*

✓ **February 20, 2009 Puerto Rico Credit Conference**

## COFINA Comparison

- COFINA I has a stronger coverage than comparable programs

| Pgm. | Coverage | Rating | ABT |
|------|----------|--------|-----|
| Massachusetts Bay TA Sales Tax Bonds | 2.0x | Aa2 / AAA | No ABT |
| Massachusetts School Building Authority Bonds | 2.0x | Aa2 / AA / AA | 1.4x |
| California Economic Recovery Bonds | 1.1x | A1 / A+ / A+ | 1.5x |
| Nassau County Interim Finance Authority Sales Tax Secured Bonds | 4.5x | Aa2/ AAA | 3.0x |
| Jacksonville, FL Better Jacksonville Sales Tax Bonds | 1.45x | Aa3 / A A- | 1.35x |
| **COFINA I** | **5.5x** | **A+** | **3.0x** |

98

PUERTO RICO **CREDIT CONFERENCE**

6

✓ **_February 22, 2010 Puerto Rico Credit Conference_**



## **Concluding remarks**

1. The sales tax is Puerto Rico's single strongest tax pledge with the highest credit ratings in Puerto Rico and a stable outlook

2. Sales tax collections show resiliency in the face of the economic downturn with stable year-over-year revenue trends

3. Bonds benefit from first collections of the sales tax in each year, up to the Base Amount of $550 million in FY2010, escalated by 4%/year

4. Protection to bondholders include limits on additional Senior and Subordinate Bonds, strong liquidity and non-impairment provisions

5. Bond coverage is strong even in severe stress scenarios



PUERTO RICO **CREDIT** CONFERENCE **2010**

# Strong dedicated tax structure

1. **Pledge to the bonds of the greater of:**

   – 50% of Puerto Rico's sales tax (2.75% / 5.5%)

   – A fixed annual Base Amount of $550 million in FY 2010 that escalates 4% annually and is capped at $1.85 billion

2. **The first collections of the 5.5% sales tax revenues are directed to the Dedicated Sales Tax Fund until the Base Amount is reached**

3. **In 2006, Law 91 transferred ownership of the Dedicated Sales Tax Fund (including the right to receive future collections) to the Sales Tax Financing Corporation**

4. **The Sales Tax Financing Corporation transferred its right, title and interest in the Dedicated Sales Tax Fund to the Trustee on behalf of the bondholders**

5. **Law continues to provides that no amendment shall impair any obligation to Bondholders and now requires that "like or comparable security" be provided for a future legislature to exercise its constitutional power to limit or restrict the sales tax**

   – Bond Resolution further provides for ratings confirmations and receipt of favorable "clawback" opinions as a condition of the Corporation accepting any such substitution



PUERTO RICO **CREDIT** CONFERENCE **2010**

✓ ***October 15, 2013 Commonwealth of Puerto Rico, Update on Fiscal & Economic Progress Webcast***

## Commonwealth of Puerto Rico, Update on Fiscal & Economic Progress, Oct. 15, 2013 (investor webcast):

## New COFINA Legislation

- With the enactment of Act 116-2013, the Sales and Use Tax percentage allocated to COFINA is increased from 2.75 percent to 3.50 percent, increasing Puerto Rico's financing capacity.

### COFINA's credit is bolstered by strong legal protections for bondholders

**COFINA is secured by a stable stream of revenues that is not subject to "claw-back"**

- Law 91-2006, which created COFINA, transferred ownership of a portion of the Sales Tax to COFINA and provided that any transferred portion was not "available resources" under the Constitutional provisions relating to full faith and credit bonds.

- COFINA will close, by resolution, its Senior and First Subordinate liens (except for refundings that generate savings).

- Law provides that no amendments to the law shall impair any obligation to COFINA bondholders.

- For a future legislature to exercise its constitutional power to limited or restrict the SUT, COFINA's bond documents require written confirmation of all outstanding ratings, taking the substitution into account, and opinions confirming that new revenue would not constitute "available resources".

- US-based Bond Counsel, PR-based Underwriter's Counsel and the PR Secretary of Justice have provided, for each COFINA transaction (13 in total), strong legal opinions that the SUT is not subject to "claw-back" by GO bondholders under the PR Constitution.

- "Claw-back" opinion enjoys broad bipartisan support: four different Secretaries of Justice, serving three different administrations (of alternating political parties), have issued official opinions that the SUT allocated to COFINA is not subject to "claw-back".

- Any new COFINA transaction would again receive "claw-back" opinions from Bond Counsel, Underwriter's Counsel and the PR Secretary of Justice.

- Legal opinions can be made available for review by existing and prospective bondholders

**COFINA is the best rated credit among Puerto Rico issuers and has historically been the most attractive source of financing for the Commonwealth.**

63



✓ **_October 31, 2013, Conference Call About COFINA Legal Opinion_**

  

**CONFERENCE CALL ABOUT COFINA LEGAL OPINIONS**
Hosted by **Government Development Bank for Puerto Rico** through Telspan
Date and Time: 10/31/2013 2pm ET
Length of Call: 45mins
Transcript

\* \* \*

*José Pagán [Interim President of the GDB]*: Good afternoon. The Government
Development Bank for Puerto Rico and the Puerto Rico Sales Tax Financing Corporation,
which most of you know as COFINA, welcome you to this conference call. We truly
appreciate the time everyone has taken to join.

As announced in the investor webcast held by the Commonwealth on October 16, 2013,
GDB is taking affirmative actions to improve its disclosure practices and increase the amount
of information available to investors. . . .

As a further testament to our commitment to transparency, today we take the unprecedented
step of holding a conference call with the outside legal advisors that authored these legal
opinions. We hope that you find this call informative.

As stated during our webcast, COFINA's credit is bolstered by strong legal protections for
bondholders. COFINA is the best-rated credit among Puerto Rico issuers and has historically
been the most attractive and cost-effective source of financing for the Commonwealth. U.S.-
based Bond Counsel, P.R.-based Underwriters' Counsel and the Puerto Rico Secretary of
Justice have provided, for each COFINA transaction (and we count 13 in total), opinions
concluding that the Sales and Use Tax allocated to COFINA is not subject to "claw back" by
GO bondholders under the PR Constitution.

Importantly, the Secretary of Justice opinions enjoy broad bipartisan support, a rare thing in
Puerto Rico: four Secretaries of Justice, serving three different administrations (of alternating
political parties), have issued opinions that the SUT allocated to COFINA is not subject to
"claw back".

While no new COFINA transaction has been announced, I want to emphasize that no such
transaction would be completed unless opinions reaching the same legal conclusion as those
being discussed today are again delivered at closing by the Secretary of Justice and each of
the firms acting as Bond Counsel and Underwriters' Counsel in the particular transaction.

10

*Operator*: Thank you. Our next question is, "Have there been any updates to caselaw or legislative or administrative actions relevant to the cases reviewed or jurisdictions referenced in the opinions? If so, do any of these updates or actions change the opinions of Nixon Peabody, Pietrantoni Méndez & Álvarez or the Secretary of Justice? This comes from Ben Herbert, Lord, Abbett & Co. LLC.

*Manuel Pietrantoni [bond counsel for COFINA bond offering]*: The opinions alluded to address the facts and circumstances surrounding the issuance of the Series 2011C and 2011D bonds and, as stated in the opinion, the firms do not have an obligation to update the opinions. We note however that in April 2013 we issued an opinion reaching the same conclusion in connection with certain junior lien bond anticipation notes sold to Barclays Capital. And there were no updates to the relevant caselaw or legislation that would have changed the opinions.

*Virginia Wong [bond counsel for COFINA bond offering]*: Right, and I think as it was mentioned that Nixon Peabody as bond counsel on that issuance also delivered an opinion... [speaking off the microphone] similar... to the 2011 opinion. We see no reason... we saw no reason at the time that there had been no changes in caselaw around the country that would change the conclusions that we reached in our opinion.

* * *

*Operator*: Thank you. And out next question is, "Some in the market have speculated that a future legislature could theoretically repeal Act 91 and thus the entire COFINA structure. Our understanding is that both parties have been in power at times when COFINA legislation has successfully been passed, and, more importantly, that all of the COFINA bonds were issued with a non-impairment covenant. This covenant stipulates that if the COFINA structure is materially altered, there must be a substituted like or comparable security, which needs to be confirmed by the rating agencies and the various legal opinions. Thus, given seemingly limited alternatives for similarly strong security, are we correct to assume that risk of materially negatively altering the COFINA structure via legislative action is very low? And this comes from Jon Pruchansky, Arrowgrass Capital Partners.

*Virginia Wong [bond counsel for COFINA bond offering]*: The straightforward answer is yes. There's a very low risk to a legislative change to the COFINA act that would be materially adverse to bondholders. Given the Commonwealth non-impairment covenant, any legislative action that takes security away from bondholders without providing a comparable substitute and rating confirmation would violate both the COFINA Resolution and the COFINA Act. Now, there's nothing we can do that would [currently] future legislatures. Future legislatures could take action if deemed appropriate. However, given the strong statutory and resolution covenants, any such action, if it was an impairment, violative of those covenants, would give rise to the exercise of remedies by bondholders under the resolution.

✓ **_February 16, 2016 Draft Statement from Puerto Rico Unaudited Basic Financial Statement and Requires Supplementary Information for Fiscal Year 2014_**

# BASIC FINANCIAL STATEMENTS AND REQUIRED SUPPLEMENTARY INFORMATION

## UNAUDITED

*Fiscal Year Ended June 30, 2014*



## Commonwealth of Puerto Rico

**_Honorable Alejandro García Padilla_**
**_Governor_**

*Prepared by:*

**_Puerto Rico Department of the Treasury_**

**Juan Zaragoza Gómez, CPA**
*Secretary of the Treasury*

**Juan Flores Galarza, CPA**
*Undersecretary of Treasury*

. . .

12

## COMMONWEALTH OF PUERTO RICO

Management Discussion and Analysis (Unaudited)

June 30, 2014

to cover all appropriations, which have already been implemented, additional measures could include a moratorium on the payment of debt service of some or all of the debt obligations. Also, there are certain Commonwealth instrumentalities that offer basic and essential services to the population of Puerto Rico. To the extent that any of these instrumentalities is unable to continue to provide such essential services, the Commonwealth may be required to divert available Commonwealth resources to ensure that such services continue to be provided. Such action would further increase the Commonwealth's insufficiency of revenues to honor its obligations as they become due. Furthermore, because of the importance of GDB's functions to the operation of the Commonwealth, its public corporations and municipalities, if GDB's financial condition deteriorates further, the Commonwealth may amend the Organic Act of GDB or enact new emergency legislation (subject to applicable constitutional limitations), which could include a moratorium on the payment of debt service with respect to outstanding GDB indebtedness or other remedy that affects the rights of creditors. Both houses of U.S. Congress have conducted hearings on Puerto Rico's fiscal crisis and are evaluating various alternatives that include establishing a fiscal oversight board and providing some form of a restructuring regime.

Even though the Commonwealth's management believes that there is substantial doubt as to the Primary Government's ability to continue as a going concern in accordance with GASB Statement No. 56 (including its Governmental Activities carried out by PBA, Puerto Rico Infrastructure Financing Authority, Puerto Rico Maritime Shipping Authority, Special Communities Perpetual Trust and Puerto Rico Medical Service Administration), the financial information contained herein has been presented assuming that it will continue as a going concern. In reaching the determination as to substantial doubt about the Primary Government's ability to continue as a going concern in accordance with GASB Statement No. 56, the Commonwealth's management has considered that these entities and activities show all the indicators to support such a conclusion: (i) negative trends for an extended period of time as evidenced by their significant deficits; (ii) other indicators of financial difficulties (such as the events of nonpayment of Public Finance Corporation bonds, the non-appropriation of funds for the payment of loans to GDB and the activation of the claw-back provisions of the Constitution); (iii) internal matters such as the Primary Government's significant dependency on federal grants and on the tax revenues (Act No.154) from a few corporate sources carrying uncertain continuity and permanence as well as the frequent failure of the Commonwealth to meet its revenue projections; and (iv) external factors such as a contracting economy, contracting population, liquidity sources and debt restructuring alternatives that are currently dependent on US congressional legislation.

There is one Blended Component Unit, the Puerto Rico Sales Tax Financing Corporation ("COFINA"), and an enterprise fund of the Primary Government (the Lotteries Fund), whose financial statements, despite their deficit position, do not contain going concern qualifications in accordance with GASB Statement No. 56.

For similar reasons, the three contributory defined pension plans sponsored by the Commonwealth (collectively, the "Retirement Systems") and the following Component Units carry substantial doubt about their ability to continue as a going concern in accordance with GASB Statement No. 56: GDB, Puerto Rico Electric Power Authority, Puerto Rico Highways and Transportation Authority, Puerto Rico Health Insurance Administration, Agricultural Enterprise Development Administration, Puerto Rico Metropolitan Bus Authority, Puerto Rico and Municipal Island Maritime Transport Authority, Puerto Rico Convention Center District Authority (PRCCDA), Solid Waste Authority (SWA), Company for the Integral Development of the "Peninsula de Cantera" (CIDPC), University of Puerto Rico Comprehensive Cancer Center (UPRCCC), National Parks Company of Puerto Rico (NPCPR), Port of Americas Authority (PAA), Puerto Rico Industrial Development Company (PRIDCO) and Institute of Puerto Rican Culture (IPRC). This is the case even for those Component Units that do not currently

*Reproduced text highlighted in **yellow** indicates emphasis that does not appear in the original text.*

### H. *COFINA Challenges and Impact on the U.S Municipal Markets:*

After the Puerto Rico Government following the law and the set-forth payment mechanism of the sales tax for many years, as well as countless legal opinions attesting to COFINA's property rights, multiple opinions rendered by the Commonwealth's own Department of Justice, year upon year of statements by Governors, Legislators, and the Government Development Bank officials attesting to COFINA's rights to the sales tax, the Commonwealth provided the following statement as part of its complaint filed with the bankruptcy court (Under Title III of PROMESA) on Sept. 8,2017:

*"This adversary proceeding is being commenced to resolve the Commonwealth-COFINA Dispute.  As set forth, in this complaint, the SUT revenues, wherever located and whenever arising, are the exclusive property of the Commonwealth."*

After over 10 years that the Puerto Rico government told the Puerto Rico Bond holders the benefits and legal supports of COFINA now the challenge it.  The financial markets have never witnessed such apparent disregard for property rights and existing statutes/law.  Since July 2015, while remaining current on debt payments, the Commonwealth has increasingly made bondholders uneasy by their actions and inactions with regard to COFINA's rights and priorities.

With this complaint the Commonwealth, however, they essentially deny COFINA's existence altogether.  Even in Title III bankruptcy, the Commonwealth's actions appear almost contemptuous of US Municipal Bankruptcy law as amended in 1988, which had the sole purpose of distinguishing between certain revenue bonds and general obligation (GO) debt.  At least in this matter, it appears that promises, obligations, commitments, liens, contracts, and bargains carry little weight with the Puerto Rico Commonwealth government.

The general **negative impact**, should the Commonwealth of Puerto Rico prevail in its claim will set a catastrophic precedent for Puerto Rico and all the municipal markets participants.  As example:

- Access to the securitized loan market for Puerto Rico will be impossible and could be restricted for all other borrowing municipalities in the US. This would be most damaging to state and local borrowers with weak GO ratings. Over time, this may affect higher-rated issuers as well.

- Local governments and municipalities could be forced to choose between default and austerity.

14

- <u>Future Puerto Rican bonds will require a specific revenue pledge separate from their general fund. Oddly, this is the COFINA bond structure the Commonwealth is arguing against.</u>
- Rating agencies will have the challenge of adjusting up ratings among different securitized bonds.
- An alarming moral hazard would be created if interest rates (borrowing risk) are determined based on the political and judicial landscape – eschewing property rights and collateral.
- Bankruptcy will become a more popular option for politicians as an "easy" short-term solution to more difficult long-term problems.
- If a borrower's ability to repay is in doubt, and complying with the law is optional, that borrower could be forced to pay higher interest rates, which could be a budget-busting proposition for financially fragile municipalities.
- Higher government borrowing costs may crowd-out the ability to provide and maintain essential services. This could lead to higher taxes or a reduction of services, resulting in a U.S. taxpayer bailout nonetheless.
- The rating of some existing revenue bonds may see multiple downgrades
- The Puerto Rico Fiscal Control Board, will be operating for the next 20 years

The ability to raise funds to deliver needed services is one of the most broadly essential functions a government can provide, and the cost of those funds affects all citizens.  Puerto Rico leaders / policymakers and the public have not recognize that bonds are not all structured the same.

Each bond has very separate and unique security features which need to be considered and respected, not just in the case of COFINA, but for the overall health of the municipal bond market. For if all bonds are treated the same, and politics trump property rights and the sound application of bond analysis, then the unintended consequences will be costly and far-reaching.

Has a COFINA bondholders we are rejecting actions taken by the Commonwealth to impair or eliminate its debt. Clearly, this would be devastating for investors, including the Puerto Rican citizens who own approximately $2.8 billion of the bonds.  <u>As previously mention, impairing this debt may also impede, if not eliminate, access to funding via securitized loans to Puerto Rico and to other future bond issuers.</u>



## M. *Conclusion*

The uptick in interest surrounding statutory liens stems from a broader shift in market sentiment away from bonds backed by the same resources that governments use to fund ordinary operating expenses. The insolvencies of Vallejo, California; Stockton; San Bernardino, California; Detroit; and Harrisburg, Pennsylvania have underscored that general obligation and appropriation pledges— though still sturdy in most cases—are more vulnerable to impairment relative to "secured" liens like the COFINA Bonds In distress situations.  Securing municipal bonds with statutory liens in specific revenue streams is one way to ensure that obligations to bondholders are honored in both good times and bad.

In the worst case, Puerto Rico could be compared to New York City ("NYC") in the 1970's high debt, large deficits, and a weak economy.  New York defaulted on short term debt obligations, under what was thought to be a legal "moratorium" law that the state enacted to prevent a run on the City's dwindling cash position.  Last week the Governor of Puerto Rico through the fiscal plan notified that were no funds assign for the debt service.  Puerto Rico isn't the first to try a debt-payment moratorium. New York lawmakers in 1975 allowed the near-bankrupt city to stop making payments on short-term notes for three years. An appeals court declared the measure unconstitutional the next year.

**NYC was eventually rescued by the same lenders who by investing in a newly created conduit borrower (the Municipal Assistance Corporation) with extra legal provisions to protect investors, these lenders returned to lending funds. <u>Puerto Rico has already created a safer conduit borrower (COFINA), which has a first legal claim on Commonwealth sales taxes.</u>**

Like previously said, each bond issue by Puerto Rico has very separate and unique security features which need to be considered and respected, not just in the case of COFINA, but for the overall health of the municipal bond market.  For if all bonds are treated the same, and politics trump property rights and the sound application of bond analysis, then the unintended consequences will be costly and far-reaching to the municipal market has a whole*. **As investors we did our homework  regarding were to invest but what frustrate me the most  is the fact that the Puerto Rico Government lie to Puerto Rico bond investors.**  *It took close to 8 years for New York City to borrow again, imagine how long it will take for Puerto Rico to go back to the municipal markets if the COFINA property lien is not respected and the PR economic recovery will take forever.   ***Wishing you and your family a great 2018,***

Cordially,

Luis I. García

 The reason the PREPA monopoly is broke and broken
Justin Evans
to:
swaindprcorresp
02/19/2018 09:22 AM
Hide Details
From: Justin Evans █████████████████████

To: swaindprcorresp@nysd.uscourts.gov

AGUADILLA, P.R. — To understand how Puerto Rico's power authority has piled up $9 billion in debt, one need only visit this bustling city on the northwest coast.

Twenty years ago, it was just another town with dwindling finances. Then, it went on a development spree, thanks to a generous —some might say ill-considered — gift from the Puerto Rico Electric Power Authority.

Today, Aguadilla has 19 city-owned restaurants and a city-owned hotel, a water park billed as biggest in the Caribbean, a minor-league baseball stadium bathed in floodlights and a waterfront studded with dancing fountains and glimmering streetlights.

Most striking is the ice-skating rink. Unusual in a region where the temperature rarely drops below 70 degrees, the rink is complete with a disco ball and laser lights.

Signs warn skaters not to wear shorts.

"Imagine how much it costs to have an ice-skating rink in the tropics," said Sergio Marxuach, policy director at the Center for a New Economy, a nonpartisan research group in San Juan.

And that is the catch. What most likely would be the biggest recurring expense for these attractions — electricity — costs Aguadilla nothing. It has been provided free for years by the power authority, known as Prepa.



**Puerto Rico Bonds**

**Thomas Salese**   to: swaindprcorresp@nysd.uscourts.gov          02/25/2018 10:24 AM

From:                ████████████████████

To:                  "swaindprcorresp@nysd.uscourts.gov" <swaindprcorresp@nysd.uscourts.gov>


Dear Judge Swain, I am a retiree living in New York State. Because I was
self-employed during my working years, I do not have a pension. So in order to
establish a nest egg for my retirement, I began purchasing municipal bonds ,
through a licensed bond dealer in New York. He recommended, and I bought,
several different issues from both New York and Puerto Rico. I started with
New York bonds back in the 1980s. Later around 2007, he began recommending
various Puerto Rico bonds, primarily Sales Tax, that is, COFINA. Because he
knew that my retirement income would derive primarily from my bond portfolio,
he only recommended bonds which were highly rated by the rating agencies. In
fact, many if not most of my Puerto Rico purchases were done at par, and often
at a premium. As we now know, the rating agencies failed in their
responsibilities to analyse the true financial situation in Puerto Rico. So
what was thought by me and thousands of other investors looking for only a
safe, conservative and unglamorous source of retirement income turned out to
be an ongoing nightmare. Certainly the media can and will heap scorn on what
they term "vulture hedge funds" which did in fact buy a lot of now steeply
discounted bonds in the hope of a high yield and ultimate profit at time of
later sale. But you know that the majority of purchasers over the years have
been average mainland Americans like me and normal hardworking Puerto Ricans,
also Americans, who never hoped or planned to turn a profit on our retirement
nest egg. Perhaps if the time comes to substitute new bonds for those which
Puerto Rico cannot reasonably ever expected to repay, I suggest that a formula
be used to calculate what amount bond holders should get in exchange. For
example, if I paid face value for a particular bond, then I could expect a
replacement bond at say 70 percent. On the other hand, if a hedge fund
purchased a bond at 50 percent, it too should only get a replacement bond of
70 percent of the 50 percent. That way, Puerto Rico can substantially reduce
its long term debt and those of us who bear the loss do so in an equitable
manner. I understand that not all bonds "are created equal." It is of course
necessary to prioritize the dozens of bond debts out there. It would seem that
the COFINA bonds are most secure given the terms of their original approval
and issuance. To divert the sales tax revenue to other bonds or government
expenses would cause all bond holders everywhere to question the integrity of
the overall bond markets. Municipalities at all levels would find it most
difficult and expensive to borrow without the certainty of their buyers faith
in the system. So I thank you for taking the time to read my statement. While
I do not expect a response, I feel confident that you seriously take input
from all sources while you struggle with this most important and crucial
issue. The Island of Puerto Rico and numerous small investors like myself are
relying on you. Respectfully, Thomas P. Salese.



**Puerto Rico general obligation debt**
Richard L Sigal   to: swaindprcorresp                                    03/01/2018 10:13 AM
Cc:  ricky.rossello, daniel.irvin, David.Carnevale

From:        Richard L Sigal ████████████████

To:          swaindprcorresp@nysd.uscourts.gov

Cc:

The Commonwealth pledged its faith and credit as its contract with general
obligation bondholders . That obligation has been interpreted in New York and
elsewhere to require and apply all taxing resources to pay that debt ( See
Court of Appeals NY case holding moratorium on payment of ny city notes an
unconstitutional impairment of the faith and credit pledge ). The Commonwealth
statutes at the time of issuance of its GO bonds and even today authorize the
levy of a island wide Commonwealth real and personal property tax which the
court could order levied as an enforcement of the faith and credit obligation
including on vacant beach front property, casinos , hotels and wealthy homes .
The fact that the assessments of those properties have not been recently
updated is not a legitimate argument against such a levy because only the rate
to raise the debt service requirement will be affected as all property will be
equally treated.  This should be the first revenues raised leaving the COFINA
bonds secured by the 2006 newly imposed sales tax available to pay those bonds
without concern of challenge. The US Treasury was well aware of this case law
and power to tax but property owners such as former Secretary Paulson are
protecting their personal investments and have politically thwarted such a
levy. Yet that tax on all real and personal property, if imposed,to pay GO
debt service coupled with smart current refundings would restore bond market
availability to the Commonwealth.

Sent from my iPhone