## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **In re** | **PROMESA**<br>**Title III** |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | **No. 17 BK 3283-LTS**<br><br>**(Jointly Administered)** |
| As a representative of | **Re: ECF No. 1416** |
| THE COMMONWEALTH OF PUERTO RICO *et al.*, | **Objection date:** Expired/none filed<br><br>**Hearing date:** March 7, 2018 at 9:30 a.m. (Atlantic Standard Time) |
| Debtors.[1] | |

## FEE EXAMINER'S INITIAL REPORT

    **I.**      **SUMMARY OF UNCONTESTED FEE APPPLICATIONS FOR THE FIRST INTERIM COMPENSATION PERIOD (MAY 3-SEPTEMBER 30, 2017) RECOMMENDED FOR HEARING AND COURT APPROVAL AT THE OMNIBUS HEARING ON MARCH 7, 2018 AT 9:30 A.M. (AST); AND**

    **II.**    **NOTICE OF DEFERRAL OF TEN FIRST INTERIM FEE APPLICATIONS FOR CONSIDERATION AT THE <u>APRIL 25, 2018 OMNIBUS HEARING OR A LATER DATE</u>**

TO:    HON. LAURA TAYLOR SWAIN,
           UNITED STATES DISTRICT JUDGE

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the:  (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and, (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## PRELMINIARY STATEMENT

With this report, the Fee Examiner:

> --Recommends Court approval of the 30 interim fee applications detailed on the first two pages of **Exhibit A**; and

> --Notifies the Court, consistent with paragraphs 2.h and 2.k of the *First Amended Order Setting Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Dkt. No. 1715] (the "Interim Compensation Order"), that the Fee Examiner and the applicants listed on page three of **Exhibit A** are in productive discussions but have agreed—to allow for continued dialogue— to adjourn consideration of their applications to the April 25, 2018 omnibus hearing, or another date convenient to the Court.

## INTRODUCTION

To recover, the Commonwealth of Puerto Rico needs expert assistance—from engineers who restore power, from contractors who restore homes, buildings and roads, from medical personnel who protect public health, and from technicians who provide safe drinking water. In addition, it needs assistance from lawyers and financial advisors, whose expertise is no less critical to the Commonwealth's recovery. The financial and legal infrastructures of the island require repair and restoration no less than the physical infrastructure. The required assistance is expensive, whether to rebuild the power grid or to define and adjust, fairly, the Commonwealth's financial obligations. Congress recognized both needs—most recently when it appropriated more than $16 billion as part of the 2018 budget legislation[2] and, in 2016, in enacting PROMESA to create a mechanism for the island's financial restructuring under a plan being developed by the Financial Oversight and Management Board (the "Oversight Board").

---

[2] *See* Bipartisan Budget Act of 2018, Pub. L. No. 115-123, §§ 21201-21210, 20301 (Division B—Supplemental Appropriations, Tax Relief and Medicaid Changes Related to Certain Disasters and Further Extension of Continuing Appropriations (Puerto Rico)).

PROMESA addresses professional fees and expenses in sections 316 and 317.  *See* Pub. L. No. 114-187, §§ 316, 317, 130 Stat. 549, 584-85 (2016).  Largely incorporating the language of 11 U.S.C. § 330, the statute permits the interim or final award of compensation to a professional employed by the Commonwealth debtors, by the Oversight Board, or by a committee appointed under 11 U.S.C. § 1103.  PROMESA limits the fee awards payable to "reasonable compensation for actual, necessary services" and "reimbursement for actual, necessary expenses."  The statute also provides standards for "determining the amount of reasonable compensation," again echoing the analogous U.S. Bankruptcy Code sections.

As of March 7, 2018, the Court will have before it 40[3] separate and properly-noticed applications for professional compensation from a total of 30 financial firms and law firms, including eight based in the Commonwealth.  The fees requested for the "First Interim Fee Period" from May 3 through September 30, 2017 total $75,040,699.50.  The expenses requested total $2,051,412.42.  Most of the applications were filed in mid-December, and no objections were filed within the timeframe set forth in the Interim Compensation Order.[4]  On or about March 19, 2018, the professionals may file applications for services performed and expenses incurred during the "Second Interim Fee Period," which ran from October 1, 2017 through January 31, 2018.

This initial report describes the fee review process pursuant to the October 6, 2017 *Order Pursuant to PROMESA Sections 316 and 317 and Bankruptcy Code Section 105(A) Appointing a Fee Examiner and Related Relief* (the "Fee Examiner Order") [Dkt. No. 1416], an order expressly limited to "the title III cases."  The Fee Examiner Order complements the original

---

[3] Two of these applications request only expenses for official committee members.

[4] One objection has been made to one monthly application.  *See infra* at 4 & n.5.

interim compensation order, entered on August 23, 2017 [Dkt. No. 1150], and the now amended

Interim Compensation Order.

Exhibit A, attached to this Report, lists all of the First Interim Fee Period applications

now pending and the amounts of all fees and expenses initially requested.  Of these, the Fee

Examiner has either negotiated consensual adjustments to or verified the accuracy of 30 of the

applications, which now are recommended for Court approval (the "Applications"), subject to

the submission and approval of final fee applications at the conclusion of these proceedings.  The

remaining applications, listed on the third page of the exhibit, will be deferred for consideration

at a subsequent hearing to allow the applicants to continue their discussions with the Fee

Examiner pursuant to paragraph 2.h of the Interim Compensation Order.

## REVIEW PROCEDURE

The fee review process employed in these cases is similar—with some variations—to the

process in other large Chapter 11 cases.  *See*, *e.g.*, *In re Energy Future Holdings Corp*.,

No. 14-10979 (Bankr. D. Del., pending); *In re AMR Corp*., No. 11-15463 (Bankr. S.D.N.Y.);

and, *In re Lehman Brothers Holdings, Inc*., No. 08-13555 (Bankr. S.D.N.Y.).  Here,

professionals may submit monthly fee and expense statements for which they are to be paid

90 percent of the fees requested (with two exceptions) and 100 percent of the expenses

requested.  While the notice parties, including the Fee Examiner, have the right to object to any

monthly statement, this has occurred only once.[5]  The focus of the Fee Examiner's review

process is interim—not monthly—applications filed as often as every four months pursuant to

the Interim Compensation Order.

_____

[5] *See The Puerto Fiscal Agency and Financial Advisory Authority's Objection to the First Monthly Statement of Willkie Farr & Gallagher LLP for Allowance of Compensation and Reimbursement of Expenses as Counsel to Bettina Whyte, as the COFINA Agent for the Period From August 3, 2017 Through August 31, 2017.*  [Dkt. No. 1575].

To comply with PROMESA, the Interim Compensation Order, and the Fee Examiner's standards and guidelines (*see infra* p. 8, and **Exhibit B**), the Applications must be comprehensive both in narrative form and in the detailed electronic records of services provided and expenses incurred.  For the First Interim Fee Period, the Fee Examiner and counsel reviewed more than 100,000 individual time and expense entries, encompassing the services of more than 760 timekeepers—financial professionals, lawyers, paraprofessionals, and staff.

The first applications were filed on or about December 15, 2017—some later.[6]  Some applicants did not immediately submit supporting electronic data for all or a portion of their fees and expenses.  Some applications demonstrated experience with the Chapter 11 compensation process and familiarity with the U.S. Trustee Guidelines, the local bankruptcy rules, and the relevant case law.[7]  Some applicants had neither filed a bankruptcy fee application nor been subject to a fee review process ever before.

### *Procedural Context*

Beginning on May 3, 2017, with the filing of the initial petition, these cases quickly accelerated through four subsequent petitions, more than 30 adversary proceedings, and a series of hearings in San Juan, New York, and beyond.  Even without the catastrophic September 2017 hurricane, these cases faced daunting obstacles.  PROMESA is a new and unique statute.  The issues it raises are profound, constitutional and statutory, involving federal and Commonwealth law, and the U.S. and Puerto Rico constitutions.  The financial and legal professionals working

---

[6] The initial due date for the first interim period applications under the original interim compensation order was November 15, 2017 but, on the Fee Examiner's motion and without objection, the Court moved the initial due date to December 15, 2017. One firm, based in Puerto Rico, filed its first interim application by the initial due date, and the Court approved it on the Fee Examiner's recommendation without a hearing.  [Dkt. No. 1994].

[7] *See* Appendix B—Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under 11 U.S.C. § 330 for Attorneys in Larger Chapter 11 cases (the "Guidelines").

on these cases have confronted massive challenges of time and distance, analysis and advocacy, with little directly applicable precedent.  While there have been municipal bankruptcies under Chapter 9, of course, the Commonwealth's history and status as debtors are unprecedented.

The evaluation of "reasonableness" of professional fees requires at least a general sense of the scope and direction of the proceedings.  Here, that includes the shared or overlapping (or incongruent) responsibilities of the Oversight Board, the Commonwealth's government, their respective agents, and the affiliated agencies—some of which are debtors.  To that end, the Fee Examiner has monitored by telephone selected proceedings and has reviewed a sampling of hearing transcripts and filed pleadings.  He has met with the professionals for the principal parties and, in many instances, the Fee Examiner and counsel have had extended telephone discussions with professionals.

Specifically with respect to the COFINA Dispute, the Fee Examiner has reviewed a series of pleadings, including those filed late last month, to better appreciate the complex constitutional and statutory arguments and the roles of the agents and their professionals.  The Fee Examiner has met with AAFAF's counsel as well as the executive director (by phone) and counsel for the Oversight Board and its advisor on retention and compensation matters.  The Fee Examiner and counsel have been in regular communications with the U.S. Trustee's office, which has its own separate and independent standing under PROMESA section 316(b).  In addition, the Fee Examiner and counsel have scheduled a briefing session on March 7, 2018, in San Juan, following the omnibus hearing, for any professionals—specifically those based in Puerto Rico but not limited to them—interested in sharing their perspective on the proceedings or asking questions about the fee review process.

*Fee Review Process*

With this procedural background, the Fee Examiner's counsel first reviewed the narrative fee requests for an overview of the nature of services for which compensation has been requested. Simultaneously, a specialist imported the supporting electronic data to a platform developed specifically for bankruptcy fee review, performing a series of automated analyses to verify the data and identify inconsistencies. The initial data review was followed by a detailed subjective review of the time and expense records with the Fee Examiner's counsel applying experience and judgment to identify problematic timekeeping practices and other areas of concern.

Counsel, under the direction of the Fee Examiner, then drafted a confidential letter report for each professional (some, more than 500 pages in length including appendices), as the Interim Compensation Order directs, "listing and explaining each reduction to the Professional's fees and disbursements that the Fee Examiner recommends…." The letter reports identified concerns, sought explanation, and recommended adjustments supported, in most cases, by comprehensive exhibits that identified and quantified each problematic time or expense entry. The confidential letter report invited a negotiation and dialogue, including further submissions of data, documentation, and supporting information.

As anticipated by the Fee Examiner Order, that process resulted in either a consensual resolution of the fee and expense request or a deferral of the application to permit additional discussion, as shown on **Exhibit A**. Though the Fee Examiner Order provides authority for the Fee Examiner to file formal objections, he generally disfavors that procedure, especially in the "first round" of fee review. Instead, the Fee Examiner sees the first interim reporting cycle as an opportunity to further inform professionals of the standards and guidelines and to illustrate their application with specificity. While negotiated adjustments have resulted, some professionals—

7

particularly those without Chapter 11 experience—have not been subject to any suggested

deductions.  Instead, this group of professionals has received observations and suggestions for

subsequent fee requests.

The first interim fee period of any reorganization expected to be of significant length is

not the place for lines in the sand or rigid application of rules and guidelines.  Rather, it offers

the Court, the professionals, and the public a renewed awareness of the massive costs of complex

restructuring proceedings and begins the development of case-specific tools to monitor and—

hopefully—control those costs appropriately under the reasonableness standard.  In subsequent

interim periods, the Court can anticipate briefer and more pointed reports, including formal

objections where appropriate, if problematic billing practices persist.

## LEGAL STANDARDS AND JUDICIAL PRECEDENT

Soon after his appointment, the Fee Examiner promulgated a series of standards in a

memorandum to all of the retained professionals.[8]  That memorandum, attached as **Exhibit B**,

outlined the statutory standards imposed by PROMESA and, by reference, the U.S. Bankruptcy

Code and U.S. Trustee Guidelines, as well as some of the Fee Examiner's own requests and

suggestions.  A second memorandum, attached as **Exhibit C**, on January 3, 2018 reflected initial

observations on the filed applications and noted several categorical concerns.  Taken together,

PROMESA, the Bankruptcy Code and Rules, the Guidelines, the memoranda, and the rules

adopted by the Bankruptcy Court for the District of Puerto Rico (*e.g*., LBR 2016-1) provide both

general and specific standards governing professional compensation and reimbursement.

---

[8] Several professional groups, including the COFINA Agent and her representatives, did not receive the first
memorandum immediately because, without a publicly-filed retention application or disclosures, the universe of
professionals subject to review was not readily apparent.

### *Reported Authorities*

While there is no shortage of reported opinions applying sections 328-330 of the Bankruptcy Code, there are relatively few from the First Circuit and even fewer from the bankruptcy court in Puerto Rico.  While not binding or dispositive, the U.S. Court of Appeals made two potentially instructive points recently in a common fund case.  A district court's determination on reasonable fees, the court explained, is reviewable only for an abuse of discretion and only then in the event of a "serious mistake."  *Heien v. Archstone*, 837 F.3d 97, 100 (1st Cir. 2016).  Moreover, a district court's reasoning in its evaluation of fees need not be "infinitely precise, deluged with details…."  *Id.* at 101, quoting *Vicor Corp. v. Vigilant Ins. Co.*, 674 F.3d 1 (1st Cir. 2012).  In a Chapter 13 context, the U.S. Bankruptcy Court for the District of Puerto Rico collected and applied general fee cases and principles.  *In re Parrilla*, 530 B.R. 1 (Bankr. D.P.R. 2015); *see also In re Lopez*, 405 B.R. 24, 33 (B.A.P. 1st Cir. 2009) (reversing bankruptcy court fee decision for emphasis on a single factor rather than the lodestar approach).

Given the concerns expressed in this report about the number of professionals attending hearings, meetings, and mediation sessions, a recent unrelated decision by Judge Houser and one older Delaware decision are also noteworthy.  *See In re Frazin*, No. 08-3021, 2017 WL 7050632 (Bankr. N.D. Texas Dec. 22, 2017); *In re Fleming Cos.*, 304 B.R. 85, 90-91 (Bankr. D. Del. 2003) (Walrath, J.).  Finally, a First Circuit decision more than 30 years ago nonetheless provides a general set of principles and detailed reasonableness analysis in the context of fee shifting in section 1983 litigation.  *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945 (lst Cir. 1984); *see also In re Fruits Int'l, Inc.*, 87 B.R. 769 (Bankr. D.P.R. 1988) (often cited in fee dispute decisions).

*Negotiated Parameters for Fee Review/the Fee Examiner Order*

Other than sections 316 and 317, PROMESA is silent on professional compensation.  The legislative history of the fee provisions is sparse but, at its core, section 316 mirrors section 330 of the Bankruptcy Code, imported almost but not quite verbatim.  (The word "bankruptcy" in 11 U.S.C. § 330(a)(3)(E), for example, has been replaced with the word "restructuring" in section 316(c)(5).)  Given the limited jurisprudential and legislative guidance, the process governing these cases was developed by the principal parties in collaboration with and on the motion of the U.S. Trustee.  The Fee Examiner Order provides standards for "assessing" fee applications that include the Interim Compensation Order [Dkt. No. 1715] and the U.S. Trustee Guidelines, *supra* n.7.  The Fee Examiner Order expressly authorizes the Fee Examiner, subject to the Court's oversight and approval, both to establish procedures for resolving disagreements over compensation and to develop "case-specific guidelines supplementing, but not in conflict with…" the existing standards for reasonableness.  The Fee Examiner did so.  *See* **Exhibits B** and **C**.

## INITIAL OBSERVATIONS/FIRST INTERIM PERIOD PROFESSIONAL FEES

The quality of the professional services provided here is generally not at issue in this report, nor is responsiveness to client needs or the commitment to the well-being of the Commonwealth and its residents.  In reviewing fees and expenses, the Fee Examiner has tried to develop an appreciation for the extraordinary practical and legal circumstances presented by these cases and the formidable tasks facing professionals.  Yet the statutory requirement that professional services be both "reasonable and necessary"—even in an unprecedented case—is not waivable.  The reasonableness requirement should be indifferent to the financial interests of anyone—the debtors, bondholders and other creditors, guarantors, public employees or retirees.

Ultimately, however, ensuring that only reasonable fees are drawn from the debtors' funds
benefits the people of the Commonwealth.

### *Hourly Rate Variations and Discounts*

With the exception of McKinsey & Co., Inc. ("McKinsey") and Andrew Wolfe,
consultants for the Oversight Board, the Applications for interim compensation reflect
engagement letters or agreements based on an hourly rate. For the first interim period, the hourly
rates involved vary widely—indeed, dramatically.

The average attorney hourly rate for applying firms based in Puerto Rico is about $245.
The average attorney hourly rate for firms based outside of Puerto Rico (most, but not all, in
New York City) is just under $775 with the highest reported rate requested at $1,425.00 an hour.
A variety of factors explain the differences, but they are summarized in a phrase: "market rates."
The compensation provisions of the Bankruptcy Code turn on the concept of reasonableness and
market rates for professional services, a distinct departure from the Bankruptcy Act—replaced
by the Code in 1978—which, in effect, had discouraged professionals from representing
distressed corporations. *See, e.g.* 3 *Collier on Bankruptcy* ¶ 330.LH[4] (Richard Levin & Henry
J. Sommer eds., 16th ed. 2017) ("The legislative history of section 330, specifically
acknowledges that '[n]otions of economy of the estate in fixing fees are outdated and have no
place in the bankruptcy code.'"). The rates being charged by Puerto Rico based firms seem to be
at or below the market rate for legal services in Puerto Rico. The rates being charged by firms in
New York or Los Angeles, for example, are at or below the market rates for experienced
Chapter 11 counsel in those cities.

One of the difficulties presented here is not in the market rates but, rather, in the presence
or absence of discounts. Often as part of a competitive process, some firms agreed at the outset
to discounted rates, which are reflected in the Applications. Other firms agreed to apply a

discount at the conclusion of the proceedings but volunteered to accept a higher initial

percentage holdback to account for potential reductions.[9]  Still other firms are providing no

discount at all.  In each instance where discounted fees are charged, the Fee Examiner has noted

it in the confidential letter reports and on **Exhibit A**.

Where a firm has chosen not to offer a discounted rate, or the client entity has not

requested it, the Fee Examiner has suggested that some professionals consider a discount, but he

can do no more than suggest.  At some point in these proceedings, perhaps only at their

conclusion, the Fee Examiner may ask the Court to address the disparity between

similarly-situated and skilled firms in hourly rates, discounted or not.  The disparate rates are too

significant to ignore.  So is the prospect of unreasonable rate increases—usually, though not

always, imposed at the beginning of a calendar year—that could rapidly offset the savings from

voluntary discounts.

### *Duplication of Efforts and Overattendance*

Beyond rates, many of the problems or omissions in the Applications are not uncommon

in major Chapter 11 proceedings, but two are of particular concern:  duplication of effort and,

related, the number of professionals attending hearings and proceedings.  This concern extends

to the extended mediation sessions that many believe present the best chance of an equitable

outcome in the nearer term.  Some duplication is unavoidable, particularly given the sometimes

overlapping and, occasionally, conflicting interests of client entities that otherwise share ends

and means.[10]  Several entities have engaged, for reasons that are obvious, more than one law firm

---

[9] Several firms have offered a discount to be applied, retrospectively, in the firm's "sole discretion."

[10] The continuing dispute over the authority of the Commonwealth and COFINA Agents is an example.  *See, e.g.,*
Dkt. Nos. 544, 996, 1461, and 1612.  So is the dispute over PREPA's management.  PREPA Dkt. No. 471.

or financial advisor.  The justification for multiple professionals in some instances, though, is not yet apparent.

With respect to hearings, many firms are sending too many professionals to attend—by almost any standard—with significant hourly and travel expenses.  The forthcoming mediation sessions provide an opportunity for restraint in this regard and the imposition by the client entities of some prospective limitations.  If not, the problem will recur and the costs compound. To explain multiple attendance, it is not enough to respond, as some professionals have, merely that the issues addressed are of consequence or that the questioned timekeepers are "necessary" or "important."

PROMESA explicitly provides that the "court shall not allow compensation for…unnecessary duplication of services."  § 316(d)(1).  Bankruptcy courts have left no doubt that estate compensation should be limited to professionals who actually participate in the proceeding or directly support that participation.  *See supra* page 9.  It is for the clients here, and no one else, to designate those they wish to represent their interests at hearings and in mediation. But the remarkable number of professionals in attendance, both in the aggregate and from individual firms, cannot be ignored and may lead to formal objection.

The detailed confidential letter report and exhibits sent to each professional invited discussion and explanation on these and many other issues.  In most instances, the professionals have accepted the invitation and the dialogue has been generally productive, with professionals providing explanations and context.  Some professionals have emphasized that it is the client's decision to designate who will represent the client and how.  It *is* the client's decision, of course, but always subject to the reasonableness standard.  It is unreasonable, whether the clients or the

professionals make the staffing decisions, to expect compensation for 12 attorneys from a single

firm to attend an omnibus hearing at which only one or two were expected to speak.

### Pre-Petition and Pre-Appointment Fees

PROMESA did not anticipate all of the challenges professionals would face in these

proceedings, and new challenges seem to arise regularly.  For some issues and professionals,

there is little or no precedent on particular compensation questions.  The timing of pre-petition

and pre-appointment professional fees is one example.  The Fee Examiner Order establishes the

Fee Examiner's authority to evaluate fees for "the title III cases" and those filed by affiliated

debtors.  But because PROMESA did not adopt the section 327 retention provisions of the

Bankruptcy Code, some of the engagement agreements, accordingly, did not provide for the

"*nunc pro tunc*" or retrospective retention authorization common in Chapter 11 proceedings.

While professionals in Chapter 11 cases can never charge pre-petition fees as administrative

expenses, this proceeding does not allow uniformity in this regard.  Nothing prohibits

professionals for the government or the Oversight Board from asking for payment of pre-title III

fees.  The committees, by contrast, cannot hire professionals and incur fees until the U.S. Trustee

appoints them.  The same would seem to be true for the COFINA Agent, who would not even be

a party in interest but for the Oversight Board's delegation of authority and the Court's approval

of it.

Even had the standards for employment and retention been specific and uniform,

moreover, the Fee Examiner Order seems to contain its own intrinsic limitations, suggesting that

the Fee Examiner should review fees charged for services provided only after the

commencement of the individual Title III cases and only after the formal retention of each

professional.  The Interim Compensation Order, in paragraph 9, covers "all Professionals

14

retained in these cases…to the extent the professionals render services in the Title III Cases," but it makes no reference to the timing of retentions.

This issue directly affects some professionals and constituents.  The pre-Title III fees and expenses are significant and, it has been represented, several parties would like the Fee Examiner to evaluate them.  The COFINA Agent and her professionals began work immediately upon the negotiated agreement that resulted in her appointment, though the appointment did not take effect formally until the Court so ordered six weeks later.  Equitable considerations that would justify a less rigid application of bankruptcy standards certainly deserve consideration.  While the Fee Examiner is well-situated to review pre-filing and pre-appointment fees, his authority to do so is less than clear.  Under these unique circumstances, the Fee Examiner seeks direction from the Court on this aspect of the scope of his assignment.  For now, the pre-retention or pre-appointment or pre-petition fees have been reserved for later consideration.

### Professional Expenses

The assessments required by the Fee Examiner Order involve both quantitative and qualitative judgments, objective as well as subjective.  That is less true of expenses, where the standards are well-established and largely objective.  The Fee Examiner initially identified more than $680,000 in apparently excessive or undocumented expenses out of the more than $2 million total sought.  The follow up discussions with professionals provided many explanations and significant additional documentation, but expense reimbursements remain a serious concern—especially those incurred by traveling timekeepers who did not really *need* to travel—especially since the Court's telephone appearance protocol is so accessible.

The Fee Examiner identified several six-figure vendor charges for computer research, which seem challenging to justify—especially without any explicit record of the nature of the

research performed.[11]  In fact, the total charged for vendor-provided research services in the

Applications exceeds $535,000 altogether.  While electronic research can save time and money,

many sources are available at no cost, and some discipline is warranted.  With or without

tempering the overall volume of searches, the Fee Examiner encourages professionals to seek

public service discounts from vendors for these proceedings.  Electronic research services could

easily be categorized as an overhead expense for a law firm, but most firms elect to pass the cost

on to clients.  Some professionals have sought compensation as well for expenses described as

"overhead expenses," which cannot be appropriate.

   While the Guidelines, local rules, and Fee Examiner's expense standards are not

ambiguous or unprecedented, some professionals routinely fail to observe applicable caps and

prohibitions (such as first class airfare), relying on the fee examiner process to cull the excessive

charges, rather than documenting and adjusting them.  Some professionals contend that the

Guidelines themselves are unreasonable and, no matter how uniformly applied, have sought

exceptions and exemptions.  The additional cost of specific expense items noted in the letter

reports should be borne by the professional firms themselves, not the residents of Puerto Rico.

   In a proceeding of this magnitude, it may seem inefficient to call a professional's

attention to inappropriate charges under $50—a hotel charge for personal laundry, for example—

but when the expense rules are as bright as they are and if only for purposes of consistency and

fairness, inappropriate expenses of any kind cannot be overlooked.  The confidential letter

reports consistently identified expenses that amount to relatively little when compared to the

---

[11] Some professionals have asserted that they cannot disclose the subject matter of their research because of
confidentiality concerns.  Those assertions may well be legitimate, but research expenses in particular are very
difficult to assess without some detail.

professional fees that accompany them, but require a great deal more care by the professionals
and their clients before requesting reimbursement.

## INDIVIDUAL PROFESSIONALS

Four professional firms, excluding McKinsey, account for $47.35 million in initially
requested fees and expenses, about 61 percent of the requested total in the first interim period.
While the amounts sought may vary, that relative allocation probably will continue for much of
the balance of the proceedings given the plenary role of the Oversight Board and its
professionals, AAFAF and its professionals, and the official committees.

Every professional firm that submitted a properly substantiated application received a
confidential letter report.[12]  Almost every firm that was asked to do so adjusted their requested
fees and expenses based on the letter report and the dialogue that followed.  Every firm
requesting an interim fee or expense award is listed on **Exhibit A**, though some requests are not
before the Court at this time.  Some of the applications, either quantitatively or qualitatively, do
not warrant extended discussion or the Court's particularized attention.  The Puerto Rico based
firms, for example, have been asked to accept modest, if any, adjustments to their fees,
recognizing that some were unfamiliar with basic billing conventions, were following the
instructions of lead counsel, or were directly affected by the hurricane.  To the extent that the Fee
Examiner identified concerns with local professionals' billing practices, they have either
provided explanations that meet the "reasonableness" test or agreed to remedy deficiencies
prospectively.

PROMESA permits compensation for reasonable professional services and
reimbursement for reasonable expenses only for those professionals "employed by the debtor (in

---

[12] The applications of one firm that did not produce electronic billing records in a timely fashion has been deferred.

the debtor's sole discretion), the Oversight Board (in the Oversight Board's sole discretion),

[and] a committee under section 1103 of Title 11…." Accordingly, the following summary

groups the professionals in that fashion with the cumulative summary of each application

appearing only on **Exhibit A**.

### *Oversight Board Professionals*

Professionals representing or working directly on behalf of the Oversight Board

collectively filed 12 of the interim fee applications. Of those, the applications of Proskauer

Rose, LLP [Dkt. Nos. 2068, 2043, 2045, 2053, 2066]; McKinsey & Company, Inc. [Dkt.

No. 2073], O'Neill & Borges LLC [Dkt. No. 2075], and Andrew Wolfe [Dkt. No. 2259] have

been consensually deferred for the Court's consideration in connection with the April 25, 2018

omnibus hearing or another hearing date to be determined by the Court. The remaining group of

Oversight Board professionals, for which compensation is recommended in this report, includes

two financial advisors—Ernst & Young LLP [Dkt. No. 2036] and Deloitte Financial Advisory

Services [Dkt. Nos. 2061 and 2149]—and two law firms, Cancio, Nadal, Rivera & Diaz, PSC

[Dkt. No. 2135] and Luskin Stern & Eisler LLP [Dkt. No. 2077].

Many, if not all, of the general issues discussed above are relevant with respect to this

group of professionals. In particular, the Fee Examiner remains concerned about the possibility

of duplication and/or overlap of professional roles given the unique statutory foundation for the

Oversight Board, its role in these cases, and the authority delegated to its Agents. The

recommended adjustments to fees and expenses listed on **Exhibit A** do not include significant

deductions for duplication or overlap, but the Fee Examiner will continue to carefully monitor

this issue and, if possible, recommend an approach for limiting duplication to the extent that can

be accomplished consistently with each professional's duties of loyalty and confidentiality to

their clients.

With respect to the two financial advisors for which the Fee Examiner recommends an award of compensation—Ernst & Young and Deloitte Financial Advisory—tasks seem to have been divided appropriately between the two firms with Deloitte focusing on operational issues and fiscal planning and Ernst & Young primarily supporting the debt adjustment plan process, including supporting the Oversight Board in mediation.  Turning to the law firms, Cancio Nadal is a Puerto Rico Firm representing the Oversight Board, and Luskin Stern is a New York-based firm handling discrete litigation matters that generally predate these Title III proceedings and for which the Oversight Board's lead counsel has delegated some portion of its responsibility.

The Fee Examiner has met with the staff of the Oversight Board itself, including its counsel, beginning a dialogue about the costs inherent in multiple representation and the prospect of streamlining efforts.  The Oversight Board has been receptive to these discussions, reflecting its commitment to controlling the cost of these proceedings.

### *The Commonwealth Professionals*

The Commonwealth, through AAFAF and PREPA, employs four professional firms subject to review.  O'Melveny & Myers LLP [Dkt. Nos. 2062, 2063, 2064, 2065] plays a central role, coordinating professional services across the Commonwealth's government.  Greenberg Traurig [Dkt. Nos. 2111 and 2112] brings particular energy regulatory expertise to its representation of AAFAF and PREPA—taking the lead, apparently without significant overlap with O'Melveny, in the PREPA proceedings.  Though AAFAF's professional team is expansive, the working groups appear to have been carefully delineated and tasks allocated to lessen the potential for duplication and overlap.  Both firms' applications contained many of the Guideline issues identified elsewhere in this report but, like the other professionals for whom compensation is recommended, promptly and comprehensively responded to the Fee Examiner's concerns with supplemental and appropriate adjustments.

AAFAF itself, of course, is very concerned about the cost of these proceedings. Its lawyers not only have allowed the Fee Examiner to speak directly to government official clients but have actively encouraged such dialogue. This communication enables the Commonwealth's public employees to observe and monitor professional fee expenditures through the fee review process, as well as on their own, and allows AAFAF to incorporate some of the bankruptcy fee metrics into its internal controls process.

***Official Committee Professionals***

This group includes professionals working for each of the two official committees—the Official Committee of Unsecured Creditors (the "UCC") and the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "Retiree Committee"). Each official committee employs one national law firm, one Puerto Rico law firm,[13] and one financial advisory firm. In addition, the Retiree Committee also employs an actuarial firm and an information agency firm. Most of the Retiree Committee's advisors have had experience with the fee review process in Chapter 11 cases in Delaware and New York. As a result, the Retiree Committee professional fee applications required relatively little comment and adjustment.

The UCC counsel, Paul Hastings LLP [*see* Dkt. No. 2040], and financial advisor, Zolfo Cooper, LLC [*see* Dkt. No. 2041], have unusual retention terms. *See* Dkt. No. 1007 at pp. 18-23 (August 9, 2017 hearing transcript addressing 20 percent holdback and discount). For each of them, with the exception of some erroneous billings identified on **Exhibit A**, all of the agreed deductions are "credited" against those firms' agreed 20 percent fee reduction as part of their final fee application submissions. Neither firm is due any additional fee payments for this first

---

[13] O'Neill & Gilmore Law Office ceased performing legal services and officially withdrew as counsel to the UCC on July 21, 2017 (*see* Dkt. Nos. 698, 1145). The same day, the UCC engaged Casillas, Santiago & Torres, LLC as replacement Puerto Rico counsel (*see* Dkt. No. 701). While O'Neill & Gilmore has requested compensation on a final basis, the firm has agreed with the Fee Examiner to proceed with the application on an interim basis.

interim period, and neither firm is entitled to payment of the holdback that applies to most other professional firms.

Because the UCC stands in the shoes of the Oversight Board for purposes of the COFINA Dispute, *see supra* pp. 6, 14-15, its professionals face similar questions about the appropriate scope of the UCC's agency and the reasonableness and necessity of some of the work performed in the COFINA litigation. The Fee Examiner has not yet drawn any firm conclusions in this regard. Nor is he recommending any adjustments to professional compensation at this time, while reserving the right to revisit that issue and engage in dialogue with the Agents' professionals on unnecessary professional expenses. For all professionals the issue of multiple attendance remains a paramount concern, the subject of continuing dialogue.

### The COFINA Agent Professionals

The Court is all too familiar with the COFINA Dispute, and this report addresses it only in general terms. *See supra* pp. 14-15. For now, the Fee Examiner merely notes that he is following the litigation carefully, discussing with the COFINA Agent and her professionals— two continental law firms and one Puerto Rico firm—concerns about the expense of the COFINA-Commonwealth litigation. That concern extends both to the appropriate scope of the Agents' roles and to the risk of duplication of efforts between Willkie Farr [Dkt. No. 2031], on the one hand, and Klee Tuchin [Dkt. No. 2099], on the other.

The COFINA Dispute and its resolution are obviously central to these proceedings and the just-filed summary judgment and certification materials leave no doubt of that. Last year, the Court limited the definition of the dispute in the Scope Order. Adv. Pro. No. 17-257 [Dkt. No. 167]. It has continued to address the Agents' authority and immunity, [*e.g.* Dkt. No. 1612], without foreclosing any party's ability to challenge them. The subsequent orders addressing the

mediation of the defined issue and related issues affect—and, in some instances, delay—a complete reasonableness assessment for some professionals.

For example, after the COFINA Agent's appointment on August 3, 2017, one of the first issues the Court addressed was the request for a financial advisor [Dkt. No. 1273]. The Court denied the Agent's motion without prejudice [Dkt. No. 1461]. It is black letter law, however, that "reasonableness" is not defined with perfect hindsight but, rather, at the time the services are provided. 1 *Collier Bankruptcy Manual* ¶ 331.02[6][a] (Alan N. Resnick & Henry J. Sommer eds., 4th ed. 2017) ("Thus, the statute itself supports a determination of whether the service was valuable based on what was known when the service was rendered and not based on what might or might not happen later.") PROMESA in section 316(c)(3) reinforces the point.

Here, in initially denying the advisor request, the Court said that the language of the stipulation defining the narrow role of the Agent was "unambiguous," at least raising a question about the reasonableness of the request. Last month, however, the Court expanded the mediation role of the COFINA Agent and professionals [Dkt. No. 284 in AP 17-257]. As a result, the time spent on the advisor request (approximately $887,000) has been provisionally disallowed, but reserving every professional's right to revisit the issue as the COFINA Dispute evolves and—hopefully—resolves.

### McKinsey

The $5.12 million in flat fee compensation sought by McKinsey is one of the largest totals sought in this interim period. At more than $2 million a month, the consulting firm's services are a significant regular recurring obligation of the Oversight Board. Yet this report contains no recommendation with respect to the reasonableness of the amounts sought because, based on the available materials including the Application, no recommendation can be made.

The Fee Examiner met in person with McKinsey's representatives, learning that McKinsey's services are extensive, that it has devoted significant resources to the Oversight Board, and that it may well be indispensable to the Oversight Board's mission.  Though McKinsey affiliates have extensive experience in Chapter 11 proceedings—and in preparing applications for professional fees—the McKinsey governmental team for this assignment stated that it does not track, by individual professional, the time expended—by the hour, by the day, or by the week, nor does it record expenses, all of which are subsumed within its monthly flat fees.  Like its other state and federal contracts, McKinsey reports, this engagement is not based on hours but on "deliverables"—that is, comprehensive project analyses, budgets, and fiscal plans.  While McKinsey continues to articulate the precise contours of its work, without time or expense records of any kind, it is very difficult for anyone to apply PROMESA's standards for reasonableness.

PROMESA did not incorporate by reference section 328 of the Bankruptcy Code, which would have provided flexibility for professional engagements "on any reasonable terms and conditions…including…on a fixed or percentage fee basis…" and subject to adjustment only if, in hindsight, the terms and conditions prove to have been "improvident in light of developments not capable of being anticipated…" at the outset.  Absent that kind of provision, only PROMESA sections 316 and 317 govern compensation, and they practically, if not explicitly, require some sort of quantitative metric as a primary assessment tool.  That leaves few alternatives.

The Court could remove McKinsey from the Fee Examiner's process and, instead, entrust the reasonableness assessment to the Oversight Board itself—establishing and applying unique standards for McKinsey to meet the Court's own mandate for fee review.  Alternatively, the

Court—after consultation and negotiation—could impose a quantitative reporting requirement

that, at the least, has a time and expense-keeping and reporting component.  The compensation

sought by McKinsey is significant today, and it may well increase.  Even were McKinsey's

engagement not to prove one of the Oversight Board's most costly, however well warranted,

PROMESA as drafted does not exempt any professional from a reasonableness review or

provide an alternative for the recommendation or approval of McKinsey's fees.

## CONCLUSION

The Applications vary dramatically in amount and precision, in rates, and in the scope of

services described.  Nevertheless, Congress has mandated that the Court approve as reasonable

the professional fees and expenses indispensable to the success of the PROMESA framework

and the resolution of the legal and financial issues facing the Commonwealth.  The Court, in

turn, has mandated an interim compensation and independent fee review process to provide

accountability and oversight.  The fees and expenses paid by the estates must be both

"reasonable" and "necessary."  Subjective as parts of that standard may be, painstaking and

burdensome as their execution may be, the standards and the process are inescapable.

For the reasons stated above, and in the absence of any objection to any Application, the

Fee Examiner recommends that the Court enter the Order attached to this report approving, on an

interim basis and subject to a final review at the conclusion of these proceedings, the interim fee

requests of the listed professionals in the adjusted amounts that appear in the final two columns

of **Exhibit A**.  In addition, the Fee Examiner requests that the Court adjourn to the April 25,

2018 omnibus hearing—without need for further notice—the Applications noted for deferral on

the Order's exhibit.

Dated:  March 1, 2018.

**WE HEREBY CERTIFY** that on this date, we electronically filed the foregoing motion

with the Clerk of the Court using the CM/ECF system that will send notification of such filing to

all attorneys of record registered in the use of the CM/ECF system.


EDGE LEGAL STRATEGIES, PSC

  *s/Eyck O. Lugo*
Eyck O. Lugo
252 Ponce de León Avenue
Citibank Tower, 12th Floor
San Juan, PR 00918
Telephone:  (787) 522-2000
Facsimile:  (787) 522-2010

*Puerto Rico Counsel for Fee Examiner*

GODFREY & KAHN, S.C.
One East Main Street, Suite 500
Madison, WI 53703
Telephone:  (608) 257-3911
Facsimile:  (608) 257-0609

Brady Williamson (*Pro Hac Vice*)
*Fee Examiner*

Katherine Stadler (*Pro Hac Vice*)
*Counsel for the Fee Examiner*

18553405.3