1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF PUERTO RICO

3    ------------------------------x
     *In re*
4
     THE FINANCIAL OVERSIGHT AND
5    MANAGEMENT BOARD FOR PUERTO RICO,    PROMESA
                                          Title III
6          as representative of          Case No. 17-BK-3283 (LTS)
                                          (Jointly Administered)
7    THE COMMONWEALTH OF PUERTO
     RICO, et al.,
8
                     Debtors.
9
     ------------------------------x
10   THE OFFICIAL COMMITTEE OF UNSECURED
     CREDITORS OF THE COMMONWEALTH OF
11   PUERTO RICO,

12          as agent of

13   THE FINANCIAL OVERSIGHT AND
     MANAGEMENT BOARD FOR PUERTO RICO
14
            as representative of       Adv. Proc. No. 17-00257-LTS
15
     THE COMMONWEALTH OF PUERTO RICO,
16
            Plaintiff,
17
      v.
18
     BETTINA WHYTE,
19
             as agent of
20
     THE FINANCIAL OVERSIGHT AND
21   MANAGEMENT BOARD FOR PUERTO RICO

22          as representative of

23   THE PUERTO RICO SALES TAX FINANCING
     CORPORATION.
24
                  Defendant.
25   ------------------------------x

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
 1                                          New York, N.Y.
                                            April 10, 2018
 2                                          9:40 a.m.


 3
        Cross Motions for Summary Judgment
 4
        Before:
 5
                            HON. LAURA TAYLOR SWAIN,
 6
                                            District Judge
 7

 8                              APPEARANCES

 9      JENNER & BLOCK LLP
             Attorneys for the Retiree Committee
10      BY:  RICHARD LEVIN
             ROBERT GORDON
11
        PAUL HASTINGS LLP
12           Attorneys for Commonwealth Agent
        BY:  LUC A. DESPINS
13           JAMES BLISS

14      WILLKIE FARR & GALLAGHER LLP
             Attorneys for COFINA Agent
15      BY:  MATTHEW A. FELDMAN
             ANTONIO YANEZ, JR.
16           ALEXANDER CHENEY
               -and-
17      KLEE TUCHIN BOGDANOFF & STERN LLP
        BY:  KENNETH N. KLEE
18
        KRAMER LEVIN NAFTALIS & FRANKEL LLP
19           Attorneys for the Mutual Fund Group
        BY:  THOMAS MOERS MAYER
20           PHILIP BENTLEY

21      MILBANK TWEED HADLEY & McCLOY LLP
             Attorneys for Ambac
22      BY:  ATARA MILLER
             DENNIS DUNNE
23
        QUINN EMANUEL URQUHART & SULLIVAN, LLP
24           Attorneys for the COFINA Senior Bondholders' Coalition
        BY:  SUSHEEL KIRPALANI
25           DAVID COOPER
             ERIC KAY
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1
 2   WHITE & CASE LLP
          Attorneys for Puerto Rico Funds
 3   BY:  JASON N. ZAKIA

 4   ROBBINS RUSSELL ENGLERT ORSECK UNTEREINER & SAUBER LLP
          Attorneys for the GO Group
 5   BY:  MARK T. STANCIL
          DONALD BURKE
 6        JOSHUA S. BOLIAN
          -and-
 7   PAUL WEISS RIFKIND WHARTON & GARRISON LLP
     BY:  ANDREW N. ROSENBERG
 8        KAREN R. ZEITUNI

 9   PROSKAUER ROSE LLP
          Attorneys for the FOMB
10   BY:  EHUD BARAK
          STEPHEN L. RATNER
11
     WEIL GOTSHAL & MANGES LLP
12        Attorneys for National
     BY:  JARED FRIEDMANN
13        MARCIA GOLDSTEIN
          GABRIEL MORGAN
14        JEREMY CAIN

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Case called)

 2              THE COURT:  Again, good morning, everyone.  I welcome

 3    counsel, parties in interest, members of the public, members of

 4    the press, those in San Juan and in the overflow courtroom and

 5    observers by telephone.

 6              As always, we have in mind the people of Puerto Rico

 7    and all of those who are interested in Puerto Rico's future,

 8    including GO and COFINA bondholders on the island and on the

 9    mainland.

10              I remind you that consistent with court and judicial

11    conference policies and the orders that have been issued, there

12    is to be no use of any electronic devices in the courtroom to

13    communicate with any person, source, or outside repository of

14    information, nor to record any part of the proceedings.  Thus,

15    all electronic devices must be turned off unless you are using

16    a particular device to take notes or to refer to notes or

17    documents that are already loaded on the device.  All audible

18    signals, including vibration features, must be turned off.

19              As provided in this Court's standing order, no

20    recording or retransmission of the hearing is permitted by any

21    person, including, but not limited to, the parties or the

22    press.  Anyone who is observed or otherwise found to have been

23    texting, e-mailing, or otherwise communicating with a device in

24    the courtroom during the court proceeding will be subject to

25    sanctions, including, but not limited to, confiscation of the
```

1  device and denial of future requests to bring devices into the

2  courtroom.

3        Please also be mindful of your other possessions and

4  take all of them with you, including any trash, when you leave

5  the courtroom at the conclusion of these proceedings.

6        We are here today for oral argument of the cross

7  motions for summary judgment in the Commonwealth/COFINA

8  dispute, which is adversary proceeding 17-257 in the

9  Commonwealth Title III case.

10       Specifically, the Court will hear argument today on

11  the cross motions filed by the Commonwealth agent, the Official

12  Committee of Retirees, the Ad Hoc Group of General Obligation

13  Bondholders, the COFINA agent, the COFINA Senior Bondholders

14  Coalition, and the Mutual Fund Group and Puerto Rico Funds.  I

15  have reviewed the briefing carefully, so you need not worry

16  about that.

17       And we have divided the time in groups as between

18  COFINA interests and Commonwealth interests and the parties

19  have further subdivided the time allocations that they were

20  given, and we will run timing on our clock with the lights

21  accordingly.

22       Speak from the podium, speak into the microphone so

23  that everyone can hear you in all of the courtrooms and on the

24  telephone, and I appreciate your cooperation with all of these

25  logistical considerations.

1          I understand that the COFINA-related interests are

2    going to go first, beginning with 30 minutes for opening by

3    Mr. Yanez.  Is that correct?

4          MR. YANEZ:  That's correct.

5          THE COURT:  Please come to the podium, sir.

6          MR. YANEZ:  Good morning, your Honor, may it please

7    the Court.  Antonio Yanez of Willkie Farr & Gallagher on behalf

8    of the COFINA agent.

9          Your Honor, summary judgment should be entered for the

10   COFINA agent because it is Puerto Rico law that COFINA owns the

11   pledged sales tax.  Let me begin with some context.  COFINA was

12   created in 2007 to help the Commonwealth emerge from a

13   financial crisis.  The idea was that COFINA would be separate

14   from the Commonwealth, that the pledged sales tax would be

15   transferred to COFINA, and that COFINA would issue bonds

16   secured by the pledged sales tax which it could do on good

17   terms precisely because it would own the pledged sales tax and

18   the pledged sales tax would be there to repay the bonds.

19         THE COURT:  Why is it called the pledged sales tax if

20   the intent was to transfer title to the sales tax from the very

21   beginning?  Why isn't it just COFINA sales tax or the sales

22   tax?

23         MR. YANEZ:  It is referred to as the pledged sales tax

24   in English, your Honor, because it provides security to a

25   COFINA bondholder vis-a-vis COFINA.

1          THE COURT:  So the reference to pledge is to the

2   relationship between COFINA and its bondholders as opposed to

3   the relationship between COFINA and the Commonwealth.

4          MR. YANEZ:  That's correct, your Honor.  And, as I

5   say, the idea was that the pledged sales tax would be separate

6   precisely to establish a stream of revenue that was separate

7   from the Commonwealth to repay the COFINA bonds.  That was the

8   idea.  It is what is reflected in Puerto Rico law in the COFINA

9   enabling legislation.  It's what investors were told repeatedly

10  as these bonds were marketed, and COFINA achieved its purpose.

11  There were $16 billion worth of COFINA bonds sold.  That $16

12  billion went to the Commonwealth and the Commonwealth used the

13  $16 billion to pay down debt and to pay for other expenses.

14          Now, the Commonwealth parties say that in addition to

15  having gotten the $16 billion, the Commonwealth gets the

16  pledged sales tax, too.  They get both.  That's their position.

17  They get the proceeds from the COFINA bonds, which they have

18  already received and have already used, and they get the

19  pledged sales tax that is supposed to be there to repay the

20  bonds.  There is no legal basis for that result, your Honor,

21  none.  The pledged sales tax is COFINA's property for three

22  straightforward reasons.  First, the COFINA enabling

23  legislation transferred the pledged sales tax to COFINA and

24  made it COFINA's property.

25          THE COURT:  As of when?

```
 1            MR. YANEZ:  Upon enactment of Act 56.

 2            THE COURT:  But as of enactment of Act 56 it had not

 3   been collected, to any great extent nobody could take it, spend

 4   it, put it anywhere.  How do you own something that doesn't

 5   exist?

 6            MR. YANEZ:  Because the tax existed, your Honor.  This

 7   notion that future property can't be transferred, which I know

 8   the Commonwealth parties assert, it's a false premise.  The tax

 9   existed.  It gave rise to a stream of revenue and that revenue

10   can be transferred, your Honor, and we cite cases holding that.

11   That's the basis of securitizations around the country.  In the

12   commercial context it has been found that future revenues can

13   be transferred in the form of rents, in the form of properties

14   or in the form of royalties, I should say.  And in those cases,

15   too, Judge, the rents have not been collected, the royalties

16   hadn't been collected.  The sales tax streams that underlying

17   these other securitizations had not been collected.  Yet,

18   courts hold that the stream can be transferred.

19            THE COURT:  In all of those situations you have a

20   tangible thing that can be owned that is potentially

21   transferable that is throwing off a defined stream of revenues.

22   Here, as I understand it, constitutionally, the stream of

23   revenues arises from a taxing power.  The Commonwealth can't

24   alienate its taxing power.  The Commonwealth can't even

25   alienate its collection power.  The only way this can exist is
```

1   for the Commonwealth, to truly exist in the future, the future

2   stream is for the Commonwealth to retain significant rights

3   associated with the taxing power in order for these revenues to

4   be realized.

5            So isn't this more like the cases?  And a couple of

6   them were cited.  There is a patent case, I think, *DDB Tech* and

7   there is a *Tin Pan Alley* songwriting case where rights in

8   musical works to be created or rights in a patent to be created

9   were contractually transferred as of the time before they

10  existed, and then the courts essentially hold that at the time

11  the thing comes into existence, by operation of the prior

12  agreement, it becomes the property of the buyer, but not in a

13  metaphysical sense 10 years before it existed.

14           MR. YANEZ:  Couple of reactions, your Honor.  First,

15  on the notion that in the cases to which I've referred there is

16  an existing tangible asset, there are many cases in which there

17  is not an existing tangible asset.  There are cases that we

18  cite in the municipal finance context in which the asset was

19  the same exact asset we are talking about here, which is a tax

20  that has been imposed that gives rise to a stream of revenue.

21  So too in the royalty cases where the asset could be a song, a

22  composition.

23           THE COURT:  That's a fixed expression that has a value

24  that is sold.

25           MR. YANEZ:  So too is the tax, your Honor.  And the

1  courts hold that with respect to royalties there is title to

2  the composition proper on the one hand and there is the revenue

3  stream on the other.  Both are property, both can be

4  transferred.

5      And I would point out, Judge, that on the subject of

6  collection, we have got two cases, one case, *FS Media* and

7  another case, the *State of Ellington*, in which collection

8  remain in the hands of the transferor.

9      The way it worked in both of those cases was that the

10  future revenue stream associated with musical composition was

11  sold.  The seller retained title to the musical composition.

12  The seller received the royalties that were associated with the

13  musical composition and then passed that along and still the

14  courts held that there was a transfer.

15      THE COURT:  I have to confess, I didn't memorize the

16  facts in every single case you cited.  Did the courts in those

17  cases speak specifically to the effective timing of the

18  transfer and is that something that's important here?  Does it

19  make a difference to you whether COFINA owned it in 2007 or

20  whether COFINA owns it at the moment of collection or at the

21  time of deposit into the DST or some other time?

22      MR. YANEZ:  Your Honor, those cases state expressly

23  that there was a transfer.  Do they get down to the details and

24  say the transfer occurred at this moment?  It's implicit in

25  what they say.  But I can't point the Court to a specific

1   statement.  But it is the upshot of those cases that there was

2   a transfer at that moment and that transfer required the seller

3   in each instance to pass along the revenues as they came in.

4          In terms of the timing of the transfer here, Judge, I

5   do believe that the way to think about this issue, we would

6   urge, is as an issue of statutory interpretation and that the

7   timing of the transfer is reflected in the COFINA enabling

8   legislation.

9          The Court is familiar with the language, but I'd like

10  to quote it just for a moment.  What Act 56 says is that the

11  dedicated sales tax fund and all funds deposited therein on the

12  effective date of this act and all but future funds that must

13  be deposited are hereby transferred to and shall be the

14  property of COFINA.

15         THE COURT:  And you read shall as a present mandate as

16  opposed to speaking to a future state.

17         MR. YANEZ:  I do, your Honor, and I'll tell you why.

18  There are three things in that sentence that I just read.

19  There is the dedicated sales tax fund.  There are the funds

20  already on deposit, and there are the future funds that must be

21  deposited.  That's the pledged sales tax.

22         With respect to the first two items, everyone agrees,

23  the Commonwealth parties concede that with respect to the first

24  two items, they were transferred to and became COFINA's

25  property upon enactment of Act 56.

 1          THE COURT:  Whatever was actually in them at the time.

 2          MR. YANEZ:  Yes, your Honor.  But the issue is with

 3   respect to the pledged sales tax.  They say that those are

 4   different.  There are three items in the same sentence.  All

 5   three items are transferred to and shall be the property of

 6   COFINA.  Everyone agrees that the first two items are

 7   transferred upon the effective date.

 8          But the argument is that there is somehow a difference

 9   with respect to the third item and that's just not there in Act

10   56, Judge.  Act 56 doesn't say that the pledged sales tax is to

11   be treated differently than the other two items.  It doesn't

12   say that there should be some condition that's applied to the

13   transfer.  It doesn't say that the transfer of the pledged

14   sales tax only becomes effective upon the deposit of those

15   funds.

16          What it says with respect to all three, and the

17   pledged sales tax no less than the other two, is that those

18   items are hereby transferred to, meaning that the transfer

19   happens upon enactment.  It's in the present tense, Judge, and

20   from the transfer forward they shall be the property of COFINA.

21   That is, we urge, the straightforward plain meaning

22   interpretation of the statutory language.

23          It is an interpretation, Judge, that respects the

24   legislative assembly's decision to treat the pledged sales tax

25   like the other two items.  It respects the language employed by

1    the legislative assembly, including its use of the present

2    tense, and it respects the legislative assembly's determination

3    not to have imposed a condition, which is really what the

4    Commonwealth parties are arguing for.  Their argument is that

5    the transfer of the pledged sales tax was conditional upon

6    deposit of those funds, that it required deposit of those funds

7    in order for the transfer to become effective.  That is just

8    not what Act 56 says, Judge.

9           THE COURT:  I would just like you to address two other

10   aspects of the question that I asked.

11          So the Commonwealth agent argues deposit, and I think

12   we understand why there is more space between collection and

13   deposit potentially than just a collection.  If the moment of

14   an automatic transfer of title of this happened at collection,

15   let's leave aside deposit, is that something that is

16   potentially consistent with the statutory language?  When it

17   comes into being without anything further having been done,

18   then it comes into being such that it belongs to COFINA.  And

19   does that timing make a legal difference for you that's kind of

20   critical to this ownership issue that I should be focused on?

21          MR. YANEZ:  I think that with respect to the first

22   part of the question, whether a transfer of ownership or

23   transfer of title upon collection, whether that's consistent

24   with the statutory language, there is separate statutory

25   language in Act 56 that requires the funds to be directly

1    deposited when they are collected.  It is certainly consistent

2    with that statutory language.

3            The question is why.  And the reason that direct

4    deposit is required is because there is an effective transfer

5    at the moment Act 56 became effective and it is in that

6    respect, Judge, that I think an automatic transfer as

7    collection happens is not consistent with the statutory

8    language because it doesn't reflect the direction in the

9    statute that the pledged sales taxes are hereby transferred.

10   Not that they are going to be transferred when they are

11   collected.  The stream that's created from the tax is

12   transferred at the moment of enactment.

13           In terms of whether it makes a difference, I think the

14   Commonwealth parties think that it makes a difference.  I think

15   they have asserted that somehow if it is some transfer that

16   happens in the future that that alters the legal landscape.  I

17   will leave that to them to argue.

18           From our perspective, Judge, it doesn't make a

19   difference and the reason it doesn't make a difference is that

20   it is because COFINA owns the property that it is required to

21   be deposited into the dedicated sales tax fund and that it

22   comes to us at the moment of collection.  So the answer to your

23   question is they are all bound up together.

24           THE COURT:  So the Commonwealth has no rights in these

25   future revenues as of 2007?

1              MR. YANEZ:   Correct.

2              THE COURT:   Nonetheless, the taxing power and the

3    collection power exist.   There is no inconsistency in that?

4              MR. YANEZ:   There is not, your Honor.   The

5    antisurrender provision in the Puerto Rico Constitution applies

6    to infringements by the other branches of government on the

7    legislative assembly's ability to tax on.   The legislative

8    assembly has the authority as part of its taxing power both to

9    spend and to allocate tax proceeds, and this is an allocation

10   of tax proceeds and it is an expenditure where they paid over

11   the pledged sales tax in exchange for $16 billion.

12             This dialogue, Judge, highlights the important focus

13   that should be on and that is on the language of the statute.

14   The language of the statute is critical here because, as I've

15   said, this is a case of statutory interpretation first and

16   foremost.   And the Commonwealth parties try to minimize the

17   significance of the statutory language.   Really, they invite

18   the Court to disregard it.   There are two main arguments.   One

19   is that future property can't be transferred.   I've already

20   addressed that.   The other argument is that the Court should

21   look through the form to the economic substance and if the

22   Court does that, it will see that there was no true sale here.

23   The Commonwealth parties argue that ownership wasn't

24   transferred because Puerto Rico retains the right to eliminate

25   the SUT and they point to accounting and other materials

1    outside the statute as further supporting the notion that there

2    was no transfer here.  Those arguments are addressed in our

3    papers.  I am not going to recite everything that we say in our

4    papers on that subject, but I do want to make a few key points.

5          First, the Court cannot look through the words of the

6    COFINA enabling legislation.  The law, as I've said, is that

7    statutes must be interpreted and enforced according to their

8    plain meaning.  That is what I mean when I say that this is a

9    case first and foremost about statutory interpretation.  The

10   law in that regard requiring interpretation and enforcement of

11   the plain meaning of the statute has been articulated by the

12   Supreme Court of the United States.  It's been articulated by

13   the First Circuit.  It has been articulated by the District of

14   Puerto Rico.  All of them repeatedly, your Honor.  In fact, the

15   First Circuit has explained that statutory construction in

16   Puerto Rico begins with the text of the underlying statute and

17   ends there as well.

18         THE COURT:  But the defeasance or the elimination or

19   reduction language and the substitution language are in the

20   statute.  I didn't have to look through or behind the statute

21   to find that the Commonwealth retained the right to eliminate

22   or reduce this thing that you say COFINA owned in 2007 and also

23   retains the right to say, you don't get that thing that you

24   own.  We are going to give you something else.  In focusing on

25   the statute I don't see how I can avoid those issues.

1          MR. YANEZ:  Two responses, your Honor.  With respect

2     to the substitution point, substitution is required to the

3     extent that the Commonwealth wanted either to reduce or to

4     eliminate the pledged sales tax.  Others will speak to that

5     subject in more depth.

6          But even assuming that the Commonwealth has retained

7     the ability to eliminate the pledged sales tax, that is power,

8     Judge, that governments retain at all times with respect to all

9     property.  It doesn't mean that citizens or, in this case,

10    COFINA doesn't own the property until the government takes that

11    action.

12         THE COURT:  And when the government takes that action,

13    what is that?  Is that conversion?  Is it a breach of contract?

14    The Commonwealth says it can't be a constitutional taking

15    because of the relationship between the instrumentality and the

16    territorial government.  What is that?

17         MR. YANEZ:  I think it is potentially all of those

18    things, Judge.  I think that it can be a taking.  I think that

19    it can be a breach of contract.  I think it can be conversion.

20    And I think it can be an action in violation of the statute

21    which should itself give rise to a cause of action on behalf of

22    COFINA or COFINA's bondholders.

23         With respect to true sale, Judge, I won't belabor the

24    point.  True sale, as we have said in our papers, is a contract

25    law concept.  It is not a concept that applies to statutory

1  interpretation.  None of the cases that are relied upon under

2  the true sales cases that are relied upon by the Commonwealth

3  parties apply in the context of statutory interpretation.  And

4  with respect to the threshold question, whether the Court can

5  look through the statutory language to the effect that the

6  pledged sales tax is transferred and is the property shall be

7  the property of COFINA, the Court can't ignore that language on

8  a true sale basis.

9         The same is true with respect to the accounting and

10 the other materials outside of the statute.  To use the

11 accounting materials, to just pause on those for a moment,

12 whether those help the Commonwealth parties, I don't know.

13 They seem to think that they do.  But the accounting materials,

14 like lots of other materials, including the log itself, state

15 explicitly that the COFINA-enabling legislation transferred

16 ownership of the pledged sales tax.  But regardless of how they

17 might be read, the key point is that those and the other

18 materials outside the statute should not be considered by the

19 Court in connection with statutory interpretation.  The Court's

20 decision should be based on the statutory text.

21         THE COURT:  Because your position is that the statute

22 is unambiguous, notwithstanding the simultaneous use of is

23 hereby transferred, shall be in the future and the other things

24 that have been argued as potential heads of ambiguity.

25         MR. YANEZ:  That's correct, your Honor.  I would add

1    one point to that.  What the First Circuit requires and what

2    they have said is an undeniable textual ambiguity is required

3    to move outside the statute.  Our position it is unambiguous.

4    Certainly, there is no undeniable textual ambiguity.

5            Let me turn to the next point, which is that the

6    legislative assembly had the authority to transfer the pledged

7    sales tax.  From our perspective, Judge, it's taking a step

8    back.

9            There are three critical points here.  One is that the

10   pledged sales tax was transferred through Act 56.  Two is that

11   the legislative assembly had the authority to transfer the

12   pledged sales tax.  And third is that the more specific and

13   frankly more limited constitutional provisions that have been

14   relied upon by the Commonwealth parties don't detract from the

15   legislative assembly's power to have transferred the pledged

16   sales tax.

17           Focusing on the power to transfer, that resides in the

18   legislative assembly's taxing and police powers.  The Puerto

19   Rico Constitution gives the legislative assembly broad

20   authority when it comes to matters of taxation.  The Supreme

21   Court of Puerto Rico has confirmed that taxing authority

22   includes within it the power to spend and the power to allocate

23   tax revenues.  The legislative assembly separately has broad

24   police powers to extend to economic matters.

25           Now, the Retirees seem to dispute the extent of the

1   police power, but that's not really where the parties have

2   joined issue.  Where the parties join issue here on

3   constitutionality is really over the separate constitutional

4   provisions, the debt limits, the balanced budget clause, and

5   the debt priority clause.  They argue that those, either

6   together or separately, limit the legislative assembly's power

7   to transfer the pledged sales tax.  None of them do.  I will

8   speak to each individually, Judge, but I want to make a couple

9   of points at the outset.

10        One is that the general obligation bondholders refer

11  to the constitutional provisions at issue here as a series of

12  interlocking protections that work together to have prevented

13  the transfer of the pledged sales tax.  The constitutional

14  provisions can't prohibit the transfer.  They can't have

15  prohibited that transfer collectively if none of them does

16  individually.  And none of them does, as I will come to.

17        The other point is that the Commonwealth parties argue

18  that their constitutional interpretation can involve

19  considerations outside the text of the relevant constitutional

20  provisions.  Whatever that might mean, there has to be some

21  basis in the text of the Constitution to find a constitutional

22  violation and there is not, your Honor.

23        I will begin with the debt limits.  As the Court

24  knows, these are limits on the amount and maturity of debt, and

25  they apply, by their terms, only to full faith and credit debt.

1      There is no dispute about that.  Debt limits apply to direct

2      obligations of the Commonwealth for money borrowed directly by

3      the Commonwealth and backed by its full faith and credit.

4              Separately everyone agrees that COFINA debt is

5      nonrecourse debt and that the legislative assembly had the

6      authority to issue nonrecourse debt.  That should end the

7      analysis, your Honor.  That should be the end of the analysis

8      on the constitutional debt limits.  There is no violation

9      because the legislative assembly's authorization of COFINA

10     debt -- to say it differently, the legislative assembly's

11     authorization of COFINA debt can't have violated the debt limit

12     and does not violate the debt limits because the debt limits

13     don't apply to COFINA debt.

14             THE COURT:  The constitutional convention intended for

15     there to be the potential for the legislative assembly to

16     essentially put the Commonwealth in irretrievable lock up to

17     its eyeballs.  As long as they said it's not a pledge of full

18     faith and credit, they can effectively alienate every valuable

19     asset and potential piece of revenue of the Commonwealth.  As

20     long as they don't say full faith and credit, that's not a

21     violation of this debt limit?

22             MR. YANEZ:  That's correct.  It is not a violation of

23     the debt limit.  There is no constitutional prohibition on the

24     issuance of nonrecourse debt.  That's not to say that there

25     aren't limits.  There are limits from a practical perspective

1    that are imposed by the market and there are limits that are

2    imposed by the democratic process.  As legislators seek

3    reelection, they will articulate or they can articulate their

4    views on these subjects.  They will be called upon to answer

5    for past action and past views that they have held and the

6    people of Puerto Rico can decide.

7            At the end of the day, Judge, the Puerto Rico

8    Constitution places a limit, and it's a very specific limit, on

9    one kind of debt, full faith and credit debt, and it doesn't

10   speak to and, therefore, does not limit other kinds of debt.

11   Instead, it relies upon the discretion of the legislative

12   assembly.

13           Now, it is true that the way in which that discretion

14   has been exercised is now being criticized and it may be true

15   that those criticisms are well taken, but that does not mean

16   that the Constitution didn't grant that discretion to the

17   legislative assembly to begin with or the fact that someone can

18   now legitimately or otherwise second-guess the legislative

19   assembly, meaning that there has to be a constitutional

20   violation.

21           The other point I would add, your Honor, is with

22   respect to the reach of the constitutional debt limits.  The

23   text matters.  The text, as I've said, applies to direct

24   obligations of debt issued directly by the Commonwealth for

25   which its full faith and credit is pledged.  To hold that it

1    extends to debt that is not directly issued by the Commonwealth

2    and is not direct debt of the Commonwealth for which the full

3    faith and credit is not pledged is simply to ignore.  That's

4    not to interpret the constitutional debt limits.  It is to

5    ignore them.

6          Turning to the balance budget clause, there is no

7    violation there either.  All the balance budget clause says is

8    that appropriations for any fiscal year shall not exceed total

9    resources estimated for that year.

10          THE COURT:  That's what it says in Spanish.

11          MR. YANEZ:  It is.

12          THE COURT:  And they argue that the English version

13    that says total revenues is the definitive version.

14          I know that you are on yellow light.  I am going to

15    put another three or four minutes on your clock because unless

16    your colleague is planning to argue the English Spanish issue,

17    I'd like to hear you walk through your interpretation of the

18    process that led to Spanish being definitive.

19          MR. YANEZ:  The process is this, Judge.  The Puerto

20    Rico Constitution was debated, passed, and adopted in Spanish.

21    It is true that as part of that process it had to be approved

22    by the United States Congress.  Law 600, which is what they

23    rely on, and law 447 speaks to that, but those provisions taken

24    together result in the Congress receiving a translation, the

25    Congress approving that translation, and then authorizing the

1    Constitution to be adopted in Puerto Rico, which happened

2    through a combination of legislative and public functions in

3    Puerto Rico, necessarily happened in Spanish.

4              THE COURT:  And so you are saying that once things

5    happened in Washington it had to go back?  I think the statute

6    says to the constitutional convention and then a proclamation

7    by the governor in order to be effective, and both of those

8    things would have happened in Spanish and, therefore, Spanish

9    is the definitive version?

10             MR. YANEZ:  Yes, your Honor.  The governor and the

11   people of Puerto Rico.

12             THE COURT:  Starts and ends in Spanish in Puerto Rico?

13             MR. YANEZ:  Yes.

14             Let me turn to available resources.  The pledged sales

15   tax is not available resources because it was transferred to

16   and is COFINA's property.  It is no more available to the

17   Commonwealth and any other asset that's been transferred.  That

18   is the plain meaning of available, your Honor.  Here, too, the

19   Commonwealth parties read into the debt priority clause

20   restraints that are not just there.  They read substantive

21   constraints on the legislative assembly's taxing and police

22   powers into the debt priority clause by asserting that

23   available means that certain assets cannot be transferred,

24   certain court tax revenues can never be transferred and, that

25   assets can't be rendered unavailable simply by transferring

1   them.

2         The text of the debt priority clause doesn't say

3   anything like that, Judge.  It doesn't say that certain

4   resources have to be available.  It doesn't say that the

5   legislative assembly can't transfer tax proceeds.  It doesn't

6   say that tax proceeds that have been transferred are somehow

7   still available to the Commonwealth.

8         Judge, it doesn't make sense that these kinds of

9   substantive limitations were what was intended.  The whole

10  argument boils down to the word available.  It is, again, that

11  the debt priority clause places significant constraints on the

12  legislative assembly's taxing and police powers, that this was

13  part of a carefully conceived and implemented constitutional

14  framework and that the vehicle for expressing these significant

15  constraints on important powers that are expressly granted

16  elsewhere in the Constitution is the word available and the

17  phrase available resources.  That just makes the word available

18  do too much work, your Honor.

19        The more logical conclusion is that the framers would

20  have been more explicit if a limitation along those lines was

21  intended.  If this was the culmination of a series of

22  interlocking protections, the more logical conclusion is that

23  the framers would have stated clearly that the debt priority

24  clause took back power from the legislative assembly that was

25  granted earlier and elsewhere in the document.  It would have

1    been explicit about what the limitations are.  And if some of

2    the resources had to be available at all times, they would have

3    said that.

4            The other point that I will make here is that the

5    Commonwealth parties' reading places the legislative assembly

6    in an impossible position.  The debt priority clause operates

7    in years where there is a budget shortfall.  That's what it

8    says by its terms.  There was no shortfall in 2007 when the

9    pledged sales tax was transferred, so the debt priority clause

10   didn't restrain the transfer then.  Nothing in the text of the

11   debt priority clause indicates that transfers that have already

12   happened can be invalidated retroactively, and to hold that it

13   does would place the legislative assembly in the impossible

14   position of never knowing what it can transfer because any

15   transfer might be undone if there is a budget shortfall in

16   later years.

17           MR. YANEZ:  Thank you, your Honor.

18           THE COURT:  Mr. Kirpalani for 20 minutes.

19           MR. KIRPALANI:  Good morning, your Honor, may it

20   please the Court, Susheel Kirpalani of Quinn Emanuel Urquhart &

21   Sullivan on behalf of the COFINA Senior Bondholders' Coalition.

22           I think your Honor is aware, my client is owed almost

23   $4 billion in senior and subordinate funds.

24           I am going to do my best not to cover the ground that

25   Mr. Yanez covered, but there were a couple of questions your

1  Honor asked that if I have time, either now or at rebuttal, I'd

2  like to try to address.

3          But for now I'd like to focus on two areas, two

4  discrete areas:  First, whether there is anything in the

5  bankruptcy code or PROMESA that trumps Puerto Rico law in

6  deciding which debtor owns the property in dispute; and,

7  second, whether the Commonwealth's reservation of

8  constitutional power to modify its tax laws means COFINA is not

9  the owner of the dedicated sales tax.

10         First and foremost, what is the source of property

11  rights in a bankruptcy case?  Due to our system of dual

12  government in the United States, the question is not whether

13  federal law could preempt state law, because we know we can.

14  The question is whether Congress intended to do so here or

15  whether it intended to respect state's rights, specifically the

16  rights of Puerto Rico.

17         There is a very clear rule that we must follow when

18  interpreting federal bankruptcy law.  The U.S. Supreme Court

19  has made it crystal clear that in bankruptcy cases there is a

20  presumption against preemption.  You need to have a controlling

21  federal rule of law in order to displace state property law.

22         (Continued on next page)

23

24

25

1        MR. KIRPALANI:  The relevant case law from the Supreme

2    Court is *Nobelman v. American Savings* case, the *Barnhill v.*

3    *Johnson* case.  These cases stand for the proposition that in

4    the absence of an express controlling federal rule of law,

5    property interests and interests in property are creatures of

6    state law.

7        The same was held in the *Jefferson County, Alabama*,

8    case and there, it's important, Judge Bennett noted that in

9    particular, a property interest must be "afforded in federal

10   bankruptcy court the same protection the holder would have

11   under state law if no bankruptcy had ensued."  That's an

12   important concept, because you're going to find it in PROMESA,

13   and we'll get to that.

14       Indeed, Congress and the courts have repeatedly

15   emphasized that the Bankruptcy Code is not intended as a

16   general matter to preempt state law, and they look to other

17   places in the U.S. Code.  They look to Title 28.  Title 28,

18   Section 959(b), even if it doesn't apply to this fact pattern,

19   it doesn't apply to the fact pattern the Supreme Court relied

20   on in *Midlantic National Bank v. New Jersey Department of*

21   *Environmental Protection* either, which is an abandonment case.

22   There, the Supreme Court said the section "nevertheless

23   supports our conclusion that Congress did not intend for the

24   Bankruptcy Code to preempt all state laws that otherwise

25   constrained the exercise of the trustee's power."

1          This is even more so, your Honor, and you know this

2   from your other cases, from other proceedings in these Title

3   III cases, that in the chapter 9 context, where sovereign

4   immunity is sacrosanct, Section 903 of the Bankruptcy Code has

5   been held to be the constitutional mooring for municipal debt

6   adjustment, and that makes clear that nothing in chapter 9

7   should be interpreted to limit a state's power in respect of

8   creating property rights.

9          The court held, in the *New York City Off-track Betting*

10  *Corp.* Southern District bankruptcy case, which is cited in our

11  papers:  "Nothing in Chapter 9 may be interpreted to interfere

12  with the power of a state to control its municipalities."  It

13  necessarily follows that debtors under Chapter 9 must follow

14  state laws, at least those that are not preempted by federal

15  law.  That constitutional mooring principle from Section 903

16  was included by Congress in PROMESA in Section 303.

17         The Supreme Court has expressly held, your Honor, that

18  the Bankruptcy Code does not preempt state law, especially in

19  areas of creating property rights.  The leading case is Justice

20  Scalia's case in *BFP v. Resolution Trust*, from 1994.  Justice

21  Scalia told us, "federal statutes impinging upon important

22  state interests cannot be construed without regard to the

23  implications of our dual system of government," and "to

24  displace traditional state regulation in such a manner, the

25  federal statutory purpose must be clear and manifest."

1   Otherwise, the Bankruptcy Code will be construed to adopt

2   rather than displace preexisting state law.

3          There was a decision by the Eleventh Circuit that came

4   out after this lawsuit was filed, *In Re Northington*, cited in

5   our papers, a late 2017 case, and there, it was a Georgia

6   statute, which the courts below were interpreting to see how

7   they get interpreted in the bankruptcy case, and this is what

8   the Eleventh Circuit had to say "Given the acknowledged

9   background principle at work here -- namely, that property is

10  created and defined by state law -- we should hold that the

11  Bankruptcy Code prevents and counteracts the ordinary operation

12  of Georgia's pawn statute only if we find some clear textual

13  indication that Congress intended that result."

14         No greater jurist than Justice Sotomayor, when she sat

15  in this courthouse, for the Southern District of New York, in

16  the *First Fidelity* case, 1995, cited in our papers, said, "The

17  U.S. Supreme Court has ruled that property interests, including

18  those at issue in bankruptcy actions, are created and defined

19  by state law.  That was a New Jersey case where there was a

20  prepetition assignment of rent.  She said:  I can't decide

21  this.  There's no federal common law here.  There's nothing in

22  the Bankruptcy Code here.  I look to what New Jersey would say.

23         And recently Justice Sotomayor, in the *Merit*

24  *Management* case, cautioned all the federal courts once again,

25  don't invent things that are not in the Bankruptcy Code.  That

1   was in the *Merit Management* case, your Honor, also cited in our

2   papers.

3          Your Honor, when you sat as a bankruptcy court judge

4   in the Eastern District in 2000, in the *In Re President*

5   *Communications Network* case, said the same thing.  This is

6   bedrock bankruptcy principles.  Bankruptcy estate is determined

7   in accordance with the applicable nonbankruptcy law.

8          So, what about Puerto Rico?

9          We found a case, your Honor, in Puerto Rico, written

10  by Judge Tortorella, when he sat in the district court, from

11  Puerto Rico, and his ruling was affirmed by the First Circuit

12  in 1980.  The case is *Segovia Development Corp. v. Constructora*

13  *Maza, Inc.*, 628 F.2d 724.  The First Circuit explained, and I

14  quote:  "The Bankruptcy Act does not undertake to determine

15  what property belongs to the bankrupt as to the date of

16  bankruptcy, or the existence, priority or validity of liens on

17  such property.  Questions of that nature are determined by

18  reference to the laws of the state," and he was referring to

19  Puerto Rico when he said that.  This is in footnote 4 of the

20  decision at page 726.  It's the First Circuit decision.

21         Judge, this case was not cited in any of the papers.

22  We did inform counsel prior to the hearing that we may

23  reference it today.  I apologize for that.

24         The cases cited by the Commonwealth's side really are

25  to the contrary.  They cite not that First Circuit case but

1   some other First Circuit cases, like *Ground Round*.  *Ground*

2   *Round* didn't reject state law.  In *Ground Round*, the First

3   Circuit did their best to try to replicate, What would the

4   state of Pennsylvania say about these particular property

5   rights?  That's exactly what your Honor's being asked to do

6   here as well.

7         They cite other cases, which I will coin the phrase

8   "idiosyncratic cases," where a federal policy or a federal

9   statute was interfered with by some bizarre notions of state

10  law, and in those rare situations, which don't apply here, the

11  court held that federal law is going to preempt the

12  idiosyncratic state law.  There's nothing idiosyncratic about

13  creating a securitization.  There's nothing idiosyncratic about

14  the statute at all.  And most important, there is no competing

15  federal statute, certainly not in the Bankruptcy Code, so let's

16  look at PROMESA, because that would be an important place to

17  start.

18        In PROMESA, there are four specific statutes that I

19  want your Honor to review with me, if you will, please.  What

20  we'd like to mention, to begin with, is we've got, first and

21  foremost, Section 301 of PROMESA.  301 does a couple of things

22  that are directly germane to this issue.  First, it does not

23  include Section 541.  The property of the estate cases,

24  therefore, that are cited by the Commonwealth party are

25  completely irrelevant to the issues here, even though they

1    don't go as far as the Commonwealth parties say they do.

2         Section 201(b)(1)(M) tells the Oversight Board what a

3    fiscal plan must include.  Though we're not here litigating

4    over the fiscal plan, it's important to keep it in mind,

5    because what 201(b)(1)(M) says is that you have to respect what

6    the preexisting state law was in terms of the separateness of

7    different entities within the territory and the territorial

8    instrumentality relationships.

9         Then we've got 201(b)(1)(N).  Here's where Congress

10   says that same fiscal plan must "respect the relative lawful

11   priorities or lawful liens, as may be applicable, in the

12   Constitution, other laws" -- they're referring to Puerto Rico

13   when they say other laws -- "or agreements of a covered

14   territory of covered territorial instrumentality that were in

15   effect prior to the date of enactment of PROMESA."  That's not

16   an indication from Congress that we want to preempt state law.

17   It's the opposite indication.

18        And the best one -- I would say there's two more to

19   come -- Section 407(a) of PROMESA, says, "In order to protect

20   creditors" -- the title of the statute is called protection of

21   creditors -- "while an oversight board for Puerto Rico is in

22   existence, if any property of any territorial instrumentality

23   of Puerto Rico" -- so if any property of COFINA -- "is

24   transferred in violation of applicable law under which any

25   creditor has a valid pledge or lien on such property, or which

1    deprives any such territorial instrumentality" -- again, that's

2    COFINA -- "of property in violation of applicable law" -- the

3    COFINA Enabling Act -- "that assures the transfer of such

4    property to such territorial instrumentality for the benefit of

5    its creditors" -- that's us -- "then the transferee shall be

6    liable for the value of such property."

7           That's not an indication from Congress that they want

8    to preempt state law.  That's an admonition to everyone that

9    we'd better respect Puerto Rico law, or else there's going to

10   be liability.

11          The last point, your Honor, where will this litigation

12   machine previously unknown to man or woman ultimately end up?

13   We hope, and I know your Honor certainly hopes, it will be in a

14   plan of adjustment.

15          Let's look at one of these critical criteria for

16   confirming that plan of adjustment.  Section 314(b)(6) of

17   PROMESA says -- this is the alternative to what your Honor will

18   remember from Chapter 11 cases, the best-interests-of-creditors

19   test -- "The Court shall confirm the plan if the plan is

20   feasible and in the best interests of creditors," and then

21   Congress went on to define that here, "which shall require the

22   court to consider whether available remedies under the

23   nonbankruptcy laws and Constitution of the territory" -- that's

24   Puerto Rico -- "would result in a greater recovery for the

25   creditors than is provided by such plan."

1      We're not here arguing confirmation, your Honor.  What

2   I'm trying to suggest is that Congress in many ways made it

3   abundantly clear, even though Justice Scalia said we didn't

4   have to because there's a presumption against preemption, but

5   just to be very careful, because we're imposing a new law here

6   on a lot of creditors and a lot of property rights that were

7   already granted, and said, We'd better look back and make sure

8   we comply with Puerto Rico law.  That's our answer to the

9   Commonwealth parties in terms of whether the Bankruptcy Code or

10  PROMESA preempt or displace state law.

11      What the Commonwealth agent does, though, your Honor,

12  without citing anything, is he says that, Well, you know,

13  Puerto Rico law is great, but it just provides the raw material

14  for the Court to determine properly.

15      There are two reasons to put something in quotes, your

16  Honor.  One is where a court actually said it, and the other

17  one is when you make up a phrase and you go like that with your

18  hands.  I searched, and I couldn't find a case that supports

19  that quote.

20      Your Honor, what the GO Bondholders suggest is that if

21  you allowed the Commonwealth to define property rights, that

22  would improperly allow the Commonwealth to redefine the

23  bankruptcy framework Congress imposed on it.  Really?  How do

24  you square that with all the Supreme Court case law that says

25  the exact opposite?  There is no bankruptcy framework.  They're

1   just making this up, this tension that they say exists. And in

2   particular here, your Honor, and as you've heard in other

3   contexts, here, we had preexisting claims, property rights,

4   liens and the like. It would have raised patent -- patent --

5   on its face Fifth Amendment issues if Congress had tried to

6   displace all state law that had been created and to pass a

7   bankruptcy law for Puerto Rico mid-swing. They balanced that

8   right by making it abundantly clear, in four or five or six

9   places in PROMESA, to make sure we respect preexisting state

10  law rights.

11          Let me turn next to the Retiree Committee. I hope I

12  can get through all of these.

13          The Retiree Committee's suggestion that the federal

14  interest is the Commonwealth's ability to have a fresh start

15  overlooks the fact that, first of all, fresh start is not the

16  only guiding principle in the Bankruptcy Code or in PROMESA.

17  Respect for state law is also part of the federal policy.

18  Regaining access to the capital markets so that Puerto Rico

19  could one day stand on its own two feet is another federal

20  policy, and frankly, it's one that seems pretty incompatible

21  with the notion that Congress would vitiate property rights

22  that were just created under Puerto Rico law.

23          Plus, your Honor, this argument that the fresh start

24  is the guiding principle that should answer every decision

25  proves too much. Wouldn't it enhance the Commonwealth's

1    ability to have a fresh start, just eliminate all debts for no

2    consideration at all?  Of course it would, but the generic

3    fresh start policy is not how judges answer questions that come

4    up in a bankruptcy case.  The rights of creditors must be

5    balanced.  When the creditor is secured, you have to give an

6    indubitable equivalent.  Why?  Why Put that albatross around

7    the neck of the debtor if the fresh start policy was the

8    guiding principle?

9            But you know what my favorite is?  The biggest flaw in

10   the fresh start motto that's advanced by the Retirees'

11   Committee is the selective application of it.  The Retirees'

12   Committee is asking your Honor to consider a fresh start for

13   their debtor because their debtor is more important than my

14   debtor.  That's an invitation for the Court to show favoritism

15   to one of two competing debtors in a property dispute.  That's

16   not the role of an Article III court.

17           Then the Retirees' Committee pivots and says, Well,

18   it's territory clause argument.  The territory clause requires

19   the COFINA Enabling Act to yield to federal law.  That doesn't

20   work either.

21           Yes, it is true.  U.S. territories have been held to

22   not have the same sovereignty as a state because of the

23   territories clause.  And yes, it's true that Congress, and I'm

24   quoting from their brief, "may thus enable a territory's people

25   to make large-scale choices about their own political

1    institutions and may grant a territory legislative power merely

2    as extensive as those exercised by any state legislature, but

3    it is all subject to Congress's right to revise, alter, or

4    revoke it."

5            That's all great, but it's a nice hypothetical.  The

6    question assumes the answer in trying to decide it.  Congress

7    did not revise, alter, or revoke any rights of Puerto Rico in

8    respect of creating property interests.  We just went through

9    all those statutes.

10           With that general background on federalism, your

11   Honor, I'd like to turn, if I can, to some of the other Retiree

12   Committee arguments.

13           First, they cite, Well, it wouldn't be property of

14   COFINA because -- it would be property of the estate of the

15   Commonwealth.  That's a head scratcher, your Honor.  As you

16   know, Section 541 is not even included in PROMESA.  Certainly

17   the Commonwealth can't be invoking a concept of property of the

18   estate when Congress chose not to do so.

19           The other one they cite is, the Retiree Committee

20   says, Well, there's no present claim under the Bankruptcy Code

21   to future taxes against the hypothetical merchant, or the

22   customer, and thus, there was no asset to transfer, and thus,

23   there's no property right.  This one also leaves me scratching

24   my head.  Property under state law is not limited by what

25   counts as a claim or a right to payment under bankruptcy law.

1    If that's true, if I've got a debtor that owns another company,

2    the equity in that other company is not property of the first

3    debtor, because equity is not a claim.  Equity is not a right

4    to payment.  It's just equity.  State law determines property

5    rights.

6              See, I knew I was going to run short on time.

7              Your Honor, let me pivot quickly to the notion of the

8    Commonwealth's ability to alter, replace, repeal the SUT and

9    why it's irrelevant to ownership.

10             It's irrelevant for the reasons Mr. Yanez said, that

11   ownership is determined by the text of the statute.

12             What the GOs and the Commonwealth agents are doing is

13   they are taking a provision of the COFINA Enabling Act, Section

14   14(c) -- it's a long provision; it starts with the statement,

15   "The Commonwealth of Puerto Rico hereby agrees and assures any

16   person, firm or corporation," and then it goes on, basically

17   that it will not interfere with COFINA's rights.  And then ends

18   with the last sentence of that long passage.  It ends with, "No

19   amendment to this title shall undermine any obligation or

20   commitment of COFINA."

21             So what do they rely on?  They honestly take what I

22   would call the equivalent of a legal tweezers to this provision

23   and try to pull out a proviso that was put in in order to

24   ensure that additional protective language called a

25   nonimpairment covenant would not be rendered unconstitutional,

 1    and by reserving this power back to the Commonwealth, they

 2    claim, therefore, there's no property at all.

 3         The remedies that COFINA and its bondholders will have

 4    against the Commonwealth if they do revoke or repeal the

 5    statute are outside the scope, but they certainly don't

 6    determine the property interest that were granted by statute.

 7         Thank you, your Honor.

 8         THE COURT:  Thank you.

 9         Mr. Dunne.

10         MR. DUNNE:  Good morning, your Honor.  May it please

11    the Court, Dennis Dunne, from Milbank Tweed, on behalf of AMBAC

12    Assurance Corporation.

13         AMBAC is the holder and insurer of approximately $1.35

14    billion in accreted value of senior bonds issued by COFINA.  I

15    was assigned two topics to cover today, and I think I'm about

16    to commit two oral-argument footfaults.  I'm going to call an

17    audible and go off-script and, perhaps more recklessly, try to

18    use Elmo, if that's possible, to try to have a textual

19    analysis.

20         THE COURT:  We are not set up to broadcast visuals

21    outside of the courtroom, and Ms. Ng would have to come over

22    and pull the Elmo out.

23         MR. DUNNE:  I didn't know where he lived either.

24         THE COURT:  He lives in the podium.  You'd have to be

25    describing what's on the Elmo for the benefit of those who

 1    listen.  Do you want it?

 2         MR. DUNNE:  Then I might as well just describe what

 3    I'm talking about.  Everybody has the language in front of

 4    them.  I'm going to pick up basically where Mr. Kirpalani left

 5    with respect to the substitutability point.

 6         THE COURT:  OK.

 7         MR. DUNNE:  We'd like to call everybody's attention to

 8    the proviso in Section 14(c) and want to make, at least

 9    eventually, I hope, a very textual argument as to why the

10    COFINA side's argument is correct.

11         But before I do that, I want to point out what's

12    obvious, and Mr. Kirpalani said this, that this is a right

13    that's reserved to the Commonwealth.  Whatever the scope of

14    that proviso is, it doesn't affect whether or not the property

15    has been effectively transferred.  That's an argument that

16    we've had in other contexts.  What it does is, perhaps, be an

17    inchoate right that's not yet exercised.

18         While we're talking about the property right being

19    transferred, I do want to call the Court's attention to a

20    pleading in a slightly different context, but the oversight

21    board agreed with respect to the effective property transfer

22    when it wrote, and I quote, "The law provides that the

23    Commonwealth doesn't own certain taxes [SUT or substitutive

24    tax] even though the Commonwealth legislates the taxes,

25    collects the taxes and can repeal the taxes."  That's in

 1   paragraph 7 of the oversight board's opposition to the

 2   certification motion.

 3          Turning back to the text of the proviso, your Honor,

 4   I'd say that the Commonwealth parties would like to make an

 5   argument that the beginning of that proviso that says "the

 6   foregoing provisions do not limit the power of the Commonwealth

 7   to limit or restrain the nature of amount of such taxes or

 8   revenues" is a separate thought, and then you pick up

 9   thereafter, where it goes on to say, "or to substitute similar

10   or comparable collateral by other taxes, fees, charges or other

11   income" is a completely different concept.

12          Why do I think that's textually wrong?

13          When you go down two lines, when it says, "If, for the

14   following fiscal years, the revenues projected by the secretary

15   of the treasury from such substitutive tax, income, or

16   collateral is equal or greater than the service of the debt,"

17   and it going on.  The substitutive tax income and collateral

18   refers back to the three components that preceded it.

19          What preceded it?

20          Taxes, other revenues, or collateral.

21          The way the Commonwealth parties read this language

22   would basically render unnecessary and surplusage substitutive

23   tax and substitutive income.  Why?  Because substitutive

24   collateral alone would work, because collateral's already

25   defined two lines up, where it says "collateral by other taxes,

1   fees, charges or income," meaning you can't substitute it with

2   a firehouse.  You've got to have another revenue stream, but

3   they've already defined collateral.  Their argument is they

4   want you to believe they did it again, and it's just

5   surplusage; it's just a referring back solely to the

6   collateral.

7         I'd make one point, and I'm not going to get into the

8   English versus Spanish debate, but I do want to point out this.

9   Here, in my argument, we have taxes, revenues, collateral, and

10  then when you repeat it three, four lines down, it's tax,

11  income, collateral.  If you go to the Spanish translation --

12  and I am not a Spanish speaker -- the original Spanish, I

13  should say, they use the same three words.  "Revenues, income"

14  is denoted by one word, *ingresos*, in both cases.  I don't know

15  whether that means revenues or income, but whatever it is, it's

16  the same, and so there's really no space between that.

17        Lastly, your Honor, I think that your Honor's

18  construction of this proviso has to be read in conjunction with

19  the language that went before it and was informed by the

20  language that preceded it where the whole intent of this was

21  not to hinder or impair the ability to pay the bonds.  Yes, you

22  could reduce it.  Maybe there's excess SUT, but as long as

23  there's a substitutive tax and a dedicated stream to pay it,

24  then you haven't run afoul of the language.  I think the

25  textual reading shows that the Commonwealth's argument is false

```
 1    and I will move on in the minutes I have.

 2              THE COURT:  The Commonwealth argument that you're

 3    refuting here is the argument that the Commonwealth can reduce

 4    or eliminate without having to true up by way of substitution

 5    as the substitution only applies to the specific

 6    substitution-specific subclause of that sentence of 14(c).

 7              MR. DUNNE:  You understand it precisely, your Honor.

 8              THE COURT:  Thank you.

 9              MR. DUNNE:  Moving on quickly, in the remaining time,

10    I wanted to talk about the Commonwealth movants' argument that

11    the COFINA structure is an end run around the debt ceiling, an

12    evasion of the debt ceiling, and therefore, it should be

13    invalidated.

14              Your Honor has ruled that whether any COFINA bond

15    issuance is or is it not violative of debt and without scope,

16    but nevertheless, the Commonwealth movants use the potential

17    for that as a basis for attacking COFINA and the structure.

18              For me, that requires Olympic-level gymnastics.

19              THE COURT:  In this context, I think what I read the

20    Commonwealth to be saying was that if it's a constitutional

21    violation of such magnitude, then COFINA can't exist at all and

22    if COFINA can't exist, it can't own anything, and therefore, it

23    is within the scope as an ownership question.

24              MR. DUNNE:  Correct.  I believe that's right, your

25    Honor.
```

1          The Commonwealth agent argues that Act 91 is

2     unconstitutional not because, and I'll quote from their reply

3     brief, "any particular bond issuance" but because it "allowed

4     the Commonwealth to issue bonds through COFINA without

5     impacting the debt limit."  That's at page 29 of their reply

6     brief.

7          Whether or not COFINA ever, in fact, issued bonds in

8     violation of the debt ceiling is irrelevant, in our view, once

9     they have established a hypothetical possibility that COFINA

10    could have tripped a debt limit were their bonds included in

11    the calculation of Commonwealth debt, inquiry's over, and "the

12    legislation and all transactions thereunder are invalid."

13         For starters, let's talk about what the limits of that

14    principle are.  If the Court adopts that logic, it would be

15    easy to see how numerous acts of a legislature could suffer a

16    similar fate.  Almost any economic legislation enacted by the

17    Puerto Rico legislature could be subjected to that test, and it

18    wouldn't matter how close or not a Commonwealth was to the debt

19    limit at the time, because you could always hypothesize

20    creation of enough debt, issuance of enough debt in the future

21    to exceed the debt limit.  But I think the Commonwealth's agent

22    is actually saying something more categorical and potentially

23    sly, which is the quote from that reply brief indicates it was

24    not any bond issuance that created the infirmity but the simple

25    fact that the structure allowed debt to be removed from the

1    debt limit calculation, regardless of whether the limit was

2    ever subsequently hit.

3          Such a broadside to municipal bond financing is

4    stunning, but I think it's completely mistaken here, and let me

5    point out three reasons in the time I have why I think this

6    argument fails.

7          First of all, COFINA was not created to make an end

8    run around the Commonwealth calculation.  It was created to

9    allow access to cheaper financing, and in some of the briefs,

10   it's clear that they got a lower interest rate than if there

11   was Commonwealth-direct borrowings.  The Commonwealth is not

12   out of capacity to issue debt at the time.  In Exhibit B to the

13   Commonwealth agent's original complaint, they say it was

14   probably 2009 before the debt limit was hit, even if you put

15   all the COFINA debt onto the Commonwealth balance sheet, after

16   three series of COFINA bonds were issued and before nine or ten

17   series of GO bonds were issued.

18         Second, the PR Constitution contains no provision

19   precluding the dedication of future tax revenue streams to

20   particular bonds or public corporations.  Such anti-dedication

21   provisions exist in other state constitutions, such as Alaska

22   and Georgia.  This Court should not rewrite the Puerto Rico

23   Constitution to include one.

24         Third, the Puerto Rico Constitute expressly

25   compensates debt being issued by public corporations and

1   expressly provides such debt shall not be counted against the

2   debt limit.  In the briefs, there's a footnote saying there's

3   actually a senator who argued, We can't do that.  We should

4   count all the public corp. debt as Commonwealth debt so we make

5   sure that we don't have too much aggregate debt.  That did not

6   pass.  It was not adopted.  Your Honor should not move against

7   the will of the framers of that Constitution.

8           THE COURT:  I'm going to give you a couple seconds to

9   answer this and to make your last point.

10          MR. DUNNE:  OK.

11          THE COURT:  That footnote makes that statement about

12  that piece of legislative history that's not pointed to in the

13  footnote, and in my searching through the forest, I couldn't

14  find it as an exhibit.  Do you know offhand where that is, or

15  will somebody write me a letter afterward with the specific

16  citation to that legislative history?

17          Somebody raise your hand if you can undertake to do

18  that.

19          MR. DUNNE:  We can write it.

20          THE COURT:  Thank you.

21          MR. DUNNE:  Your Honor, last point, and this is an

22  ACT-specific point, we cite an Indiana Supreme Court case, the

23  *Hawkins v. City of Greenfield* case, for the notion that you do

24  not look behind the express intent of the legislature.  You do

25  not look through the form to some underlying, platonic

1   conclusion of substance.

2          In response, the Commonwealth agent cites a *Rappaport*

3   decision, also from the Indiana Supreme Court.  The only point

4   I want to make on this is that the *Rappaport* decision predated

5   the decision of the same court, the Indiana Supreme Court, that

6   we cited by 20 years, and the *Hawkins* case notes the criticism

7   of *Rappaport* and says that fortunately, the well-reasoned

8   decisions of most Indiana courts refuse to extend *Rappaport* and

9   the application of the debt limitation to prohibit the creation

10  of new divisions or the financing of public projects through

11  tax assessments.

12         In essence, the case that the Commonwealth movants

13  cite is of no vitality even in the jurisdiction for which they

14  cite it, in Indiana, because 20 years later, the *Hawkins* court

15  cabined it tightly to the facts.  And their facts were

16  reasoned, it's just that that reasoning was overbroad.

17         Thank you, your Honor.

18         THE COURT:  Thank you, Mr. Dunne.

19         Mr. Mayer, for summary judgment.

20         MR. MAYER:  Thank you, your Honor.  Tom Mayer for the

21  Mutual Fund Group.

22         First, with respect to the timing of the transfer,

23  your Honor, the only question is, What does Puerto Rico law

24  provide and what can Puerto Rico law provide?  All of this new

25  tax stuff is an invitation to this Court to create a federal

1    common law issue, which I submit has no place in this

2    proceeding.

3         With respect to any application of PROMESA to the

4    question of when the transfer occurred or what was transferred,

5    I join in the other counsel who say that you cannot

6    retroactively take away COFINA's interest in the SUT that it

7    has in the Commonwealth, and you can't retroactively take away

8    the bondholders' interests in revenues that were pledged to the

9    bonds without violating the Fifth and Fourteenth Amendments,

10   and I note in this connection that the Retirees' Committee, in

11   their reply brief, made reference to Section 552 of the

12   Bankruptcy Code.

13        Your Honor, we moved for declaratory judgment that 552

14   could not apply, and that cause of action was struck as outside

15   the scope, so I submit that any attempt to create a decision

16   today using Section 552 is outside the scope of this hearing.

17   We repeat our observation that 552, like any other provision of

18   PROMESA, cannot be applied retroactively to destroy property

19   rights that were created under Puerto Rican law.  And again,

20   it's only a question of what does Puerto Rico law provide, and

21   what can Puerto Rico law provide?

22        I know that your Honor knows, and this is for, I

23   guess, two weeks from today, we have taken the position that

24   those questions are best answered by the Supreme Court of

25   Puerto Rico, but I will move to a final point.

1          The Retirees' Committee and others make a big deal of

2     the fresh start principle, and Mr. Kirpalani has already

3     addressed that issue.  I want to amplify it with the closing

4     remark of Mr. Yanez.  He said any transfer might be undone.

5     You're putting the legislature in a position where any transfer

6     might be undone.

7          Your Honor, I've looked through PROMESA fairly

8     carefully, and I can't find the words "fresh start," but I can

9     find the words "access to capital markets" in five places.  I

10    can find them in Section 101(a), where it is the first purpose

11    of the Oversight Board, and I can find them in Section 201(a)

12    where it is the first purpose of a fiscal plan, and I can find

13    them in Section 209.  It is the last duty of the Oversight

14    Board, to obtain access to the capital markets.

15         Your Honor, when you fly to Puerto Rico, you land at

16    Luis Munoz Marin International Airport.  That was sold.  That

17    was a transfer.  Revenues from that airport, those were

18    available revenues.  I realize that's a thing, and you have

19    already asked what the difference is between a thing and an

20    inchoate stream of taxes.  Given practice in other states, I

21    don't think there is a difference, and I don't see why there is

22    any federal common law principle that prevents a state

23    legislature or a Commonwealth's legislature from enacting a law

24    to transfer the property.  But if you strike down COFINA on the

25    ground that it couldn't happen, you're putting Puerto Rico in a

1    situation where it will not regain access to the capital

2    markets for probably the professional lifetimes of the people

3    in this court, because nobody's going to lend Puerto Rico money

4    unless it's backed by a stream of revenues that are committed

5    to the repayment of the debt.

6             With that, I reserve the balance of my time.

7             THE COURT:  You're reserving it for rebuttal?

8             MR. MAYER:  Yes, I reserve for rebuttal, and I may

9    very well yield it back to other members of the COFINA side.

10            Thank you, your Honor.

11            THE COURT:  You have two minutes and 45 seconds out

12   there, in the bank.

13            MR. MAYER:  Thank you.

14            THE COURT:  OK.

15            We now turn to the Commonwealth's interest,

16   Mr. Stancil, for 33 minutes.

17            MR. STANCIL:  Yes.

18            Good morning, your Honor, and may it please the Court,

19   my name is Mark Stancil from the firm of Robbins Russell, and I

20   represent the Ad Hoc Group of General Obligation Bondholders.

21   My counsel today are Mr. Luc Despins and James Bliss, from Paul

22   Hastings, and Mr. Rich Levin, from Jenner & Block.

23            With the Court's indulgence, we've divided up the

24   substantive issues to avoid duplication.  I'm going to be

25   addressing what we call the core constitutional issue, which

1   is, assuming for the moment that COFINA's creators intended to

2   transfer the pledged sales taxes, did they have the

3   constitutional authority to do so?

4          Mr. Despins will then address the nonconstitutional

5   issue regarding whether Act 91, in fact, transferred ownership

6   of those revenues to COFINA.

7          Time permitting, Mr. Bliss will address the balanced

8   budget clause issue.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. STANCIL:  Mr. Levin will address the fresh start

2   argument and I believe also the civil code issues that he has

3   raised.

4          So, your Honor, if I may, let me begin by restating

5   the constitutional question.  I think it's fairly clear from

6   the discussion thus far.  Assuming for the moment that the

7   legislature tried to do what the COFINA parties suggest, which

8   is to irrevocably transfer the pledged sales taxes to COFINA,

9   did they have the authority under Puerto Rico's Constitution to

10  do that?  The answer is no.

11         Article 6, section 8 gives the constitutional debt,

12  what we often call the GOs, gives them an absolute first claim

13  on all of the Commonwealth's available resources.  As the

14  COFINA parties would have it, available resources means

15  whatever resources the legislature deems fit to make available.

16  And that's wrong for three main reasons that I'd like to get to

17  today.

18         First, the COFINA position defies the plain text of

19  the available resources provision and the context in which it

20  appears.  I will walk through word by word of the text --

21         THE COURT:  I will look forward to that.

22         MR. STANCIL:  Thank you, your Honor.

23         Second, their position ignores the founder's stated

24  intent to place the constitutional debt in "absolute first

25  term" over "all of the resources of the government."

1          You didn't hear a thing about the drafting history in

2     my colleague's presentation earlier today, but, again, I will

3     walk through that in detail as well.

4          Third, and certainly not least, their position would

5     eviscerate the interlocking protections in article 6.  It

6     attributes a fundamental level of incompetence to the drafters

7     of Puerto Rico's Constitution to suggest that this web of

8     protections for the people of Puerto Rico and constitutional

9     debt holders are evaded with a simple step to the left by

10    saying, whoops, we have transferred these future revenues, and

11    I am going to get into why that would render this entire system

12    effectively meaningless.

13         But, in short, article 6 was supposed to be an

14    absolute commitment to constitutional debt holders.  They want

15    to turn it into an option to withhold resources from

16    constitutional debt holders, and it has these careful

17    limitations on the amount of revenue that can be absolutely

18    committed for debt service.  They turn that into an unlimited

19    license to commit an unlimited amount of resources irrevocably

20    for an unlimited amount of debt.  In short, it turns article 6

21    on its head.

22         I think it's helpful to maybe start by reading the

23    text of article 6, section 8.  That's the centerpiece of the

24    entire constitutional scheme.  It says:  In case the available

25    resources, including surplus, for any fiscal year are

1    insufficient to meet the appropriations paid for that year,

2    interest on the public debt and amortization thereof shall

3    first be paid and other disbursements shall thereafter be made

4    in accordance with the order of priorities established by law.

5                Available resources has meaning under the

6    Constitution.  It can't be just assumed away that available

7    means whatever the legislature says.  And ultimately both the

8    COFINA agent and the Senior Bondholder Coalition, I believe,

9    everybody would reluctantly concede that the legislature

10   doesn't get you to define the constitutional term available

11   resources.  This Court is charged with giving content to that

12   term, as it would any other provision like, what does due

13   process mean?  What does a taking amount to?

14               THE COURT:  Isn't it a fundamental political function

15   of elected leaders to determine what resources are prioritized

16   resources, determine the appropriate application of resources?

17   Unless you are going to say that this first priority means that

18   any time there is a shortfall everybody on the island

19   necessarily starves, everything has to get shut down, and any

20   money that was ever spent before somehow has to be clawed back

21   and that's what a court can understand.  How is the Court in a

22   position to determine whether babies should eat or traffic

23   lights should be on or houses should get to stand up before

24   bondholders get paid?  Those are important political

25   distinctions.

 1          MR. STANCIL:  Your Honor, there are probably three

 2     different answers to that.

 3          Let me start by first saying under the Constitution,

 4     if the Constitution is respected, it will never come to that

 5     precisely because of the debt limit, and we will get to that in

 6     a minute.

 7          Your Honor is exactly right.  It would be crazy, would

 8     it not, to think that you could give bondholders an unlimited

 9     check to come ahead of all other services of the government.

10     But it doesn't follow from that that the bondholders identified

11     in the Constitution do not come ahead of other expenditures.

12          And don't take my word for it.  Take the word of the

13     Puerto Rico legislature for 40, 50 years, until two summers ago

14     when we started throwing out statutes.  This is a statute.  I

15     apologize it is not in our briefs.  It's in our complaint.  I

16     think this answers your Honor's question correctly.  23

17     L.P.R.A. 104(c) is the statutory order of priorities that is

18     directly referenced in the Constitution.  So that addresses

19     your Honor's question, did they really mean to pay

20     constitutional debt before public health, safety, and welfare?

21     Yes, your Honor, they did.

22          If I may, I would read to you a few provisions from

23     104(c).  It begins:  In keeping with section 8, article 6 of

24     the Constitution in Puerto Rico, the governor shall proceed

25     according to the following priority rules in disbursement of

1  public funds when resources available for a fiscal year are

2  insufficient to cover the appropriations made for that year.

3  1. Payment of interest and amortization related to public

4  debt. 2 -- it's a little wordy. I'll paraphrase. 2.

5  Commitments under legal contracts enforced. Court judgments,

6  binding obligations to safeguard credit. 3. Order that

7  disbursements be made for expenses under the allocations for

8  recurrent expenditure related to (A) the preservation of public

9  health (B) protection of persons and property (C) the public

10  education programs (D) the public welfare programs (E) the

11  payment of employer contributions to retirement systems and

12  pension payments to individuals etc., etc.

13       THE COURT: I as a court should respect that

14  legislatively determined list of priorities because you like

15  that and that's not really offensive and you could sleep at

16  night because babies are going to get fed. But, otherwise, I

17  should ignore anything, any other judgment that the legislature

18  made, and come up with some holistic concept of availability

19  that was in the third branch?

20       MR. STANCIL: No, your Honor. That's not how it

21  works. This is what we would say is absolute clear evidence of

22  what the intent of the founding document means. I want to come

23  back to the premise of your question.

24       THE COURT: This is a statute passed by the

25  legislature.

1      MR. STANCIL:  Yes.  I will just come back to the first

2  phrase of Section 23 L.P.R.A. 104(c) which says:  In keeping

3  with section 8, article 6, here is what we do.  They recognize

4  that that's what article 6 means.

5      Your Honor, let me take the premise, which is no one

6  is taking anything out of the mouths of babies because we have

7  a debt limit.  And the reason we are here, in large part or in

8  substantial part, is because COFINA was used as an end run

9  around the debt limit and that's why the Commonwealth is facing

10  choices that it should not have to face.  If it had been

11  respected, the Constitution had been respected and any

12  commitments made for debt, absolute commitments made for debt

13  were limited to 15 percent of their revenues, we would not be

14  here.

15      THE COURT:  But it doesn't say absolute commitments

16  made for debt.  It says absolute commitments made for direct

17  obligations of the Commonwealth backed by the full faith and

18  credit of the Commonwealth.

19      And we know from the cases that have been cited all

20  over the place that there are different kinds of state

21  constitutional provisions and there are constitutional

22  provisions that require referenda or put caps on any kind of

23  debt on the state at all.  Could have been written that way.

24  Wasn't written that way.

25      MR. STANCIL:  Your Honor, I respectfully disagree that

1    available resources is as flexible as COFINA would have it.

2            THE COURT:  You said that we wouldn't be in this

3    problem but for violation of the debt limit, and so I think

4    you've necessarily put the import of the debt limit on the

5    table in that last sentence.

6            MR. STANCIL:  I apologize.  Absolutely.  I think that

7    makes a mockery of the debt limit.  Let's focus on what the

8    purpose of the debt limit was.  So the debt limit implies by

9    its terms the full faith and credit debt because, as I've just

10   described in article 6, section 8, full faith and credit debt

11   gets this absolute first priority.  So, of course, you would

12   want to limit the amount of such promise you can make.

13           The fiction of COFINA is that you can evade the

14   central policy objective of the debt limit by transferring

15   future revenues as opposed to merely promising future revenues.

16   It would make a mockery.  I think it would sort of ascribe an

17   astonishing level of incompetence to the drafters of the

18   constitutional debt limit to say yes, you are going to hold

19   their feet to the fire and limit them to 15 percent if they are

20   going to make this super full faith and credit promise.  We

21   will let you sell revenue before it even gets to the coffers.

22           THE COURT:  I think I perceive the COFINA people, and

23   they can tell me if I'm wrong on rebuttal, as saying that it's

24   not the transfer that's the key magic with respect to the debt

25   limit; it's that the COFINA statute not only doesn't say full

1  faith and credit; it says you look to a particular body of

2  revenues, and there is no commitment to use the taxing powers

3  to get something more to replace those revenues that are taken

4  off the table.  So the COFINA people seem to focus on it not

5  being full faith and credit and not being a direct obligation.

6       MR. STANCIL:  With respect, your Honor, their position

7  is entirely question begging.  They say the debt limit doesn't

8  apply because it's not full faith and credit debt, but that

9  skips over the question of whether the transferring in the

10  first instance is consistent with the idea of the debt limit.

11       If we can take a step back.  If the Commonwealth

12  had -- grant my premise, which I understand your Honor is

13  testing, but grant my premise that GO debt does have what the

14  Constitution says, an absolute first claim on resources.

15       If we were facing only that, in any given year it

16  would no more than 15 percent of their revenues over the

17  average of the last two years when they issued the debt, but

18  roughly 15 percent of the budget go to debt service.  We would

19  be facing --

20       THE COURT:  For full faith and credit debt.

21       MR. STANCIL:  Yes, your Honor.  We would be facing a

22  fraction of the drain on the Commonwealth's resources had they

23  respected that and not done an end run around.

24       Your Honor, if I could explain the way that this makes

25  not just a mockery of section 2 of the debt limit but the rest

1   of article 6, Section 8.  I would like to come back to the text

2   because I promised you that I would deliver what available

3   resources means.

4          Can we back up one section.  Article 6, section 7.

5   And then we will read article 6, Section 8.  I think that will

6   give full content to what available resources means.

7          Section 7 tells the Commonwealth to balance its

8   budget.  It says:  The appropriations made for any fiscal year

9   shall not exceed the total resources, including available

10  surplus estimated for said fiscal year unless the imposition of

11  taxes is sufficient to cover said appropriations provided by

12  law.

13         When they wanted to refer to total resources of the

14  Commonwealth, they are referring there to estimated for the

15  year.  So 7 says, when you do your budget, look at what you

16  expect to come in the door.  And then section 8 says, well, if

17  it turns out what comes in the door are insufficient, the

18  available resources, then I think in context those two

19  provisions made clear when the drafter said available

20  resources, they meant everything that comes in the door.  I am

21  going to tell you what the drafters meant because I can -- you

22  haven't heard anything about it, but they gave us a

23  contemporaneous and retrospective explanation of what they

24  meant.

25         THE COURT:  You're reading the balanced budget clause

1   in its Spanish incarnation, and you are comfortable with that.

2          MR. STANCIL:  In this particular context we have

3   not -- yes is the direct answer to your question.  I'll move

4   on.  We do not raise the UCC's balanced budget clause argument.

5          Section 7 talks about total resources estimated for

6   such a year.  Section 8 says, what do you do if available

7   resources are insufficient?  I think read in tandem those two

8   are very clear what they meant by available resources.

9   Available is every bit that comes in that year through the

10  Commonwealth taxing power.

11         Let me jump back again to section 7 because the word

12  available is there as well.  Total resources including

13  available surplus.  No one is suggesting that when they are

14  budgeting under section 7 that they are looking at some parts

15  of surplus that may be left over.  But they can take part of

16  that out.  This is consistent meaning given to the

17  constitutional term available.  They meant it to apply to what

18  actually comes in the door by virtue of the Commonwealth's

19  activities and taxing power.

20         I promise that we would find out what the drafters

21  meant.  They don't really have an answer to this.  Let's start

22  with former Chief Justice Trias Monge, who is a delegate to the

23  Puerto Rico constitutional convention.  He was a chief justice

24  in the Supreme Court of Puerto Rico.  He was sort of a Madison

25  and Hamilton kind of rolled into one.

1         He wrote in 1982 a report basically saying, here is

2    what went on when we drafted the Constitution, and he talks

3    about article 6.  He says that the purpose of article 6,

4    Section 8 was -- he says:  The provision finally adopted by the

5    convention placed in absolute first term and beyond the scope

6    of the power of the governor the payment of interests and the

7    amortization of the public debt.

8         With respect, your Honor, he did mean exactly what we

9    said when he said, yes, it really is absolutely first.  If you

10   can sell future revenues for future years ahead of time, that's

11   not an absolute first term.

12        Again, in 1961 --

13        THE COURT:  I would just like to go back to

14   Mr. Mayer's airport illustration.  They sold the airport, got a

15   bunch of money for it and, of course, there are landing fees,

16   there are all sorts of things, there are subleases generated by

17   the airport.  Under your theory do we have to undo and look

18   back through that transaction as well?  Commonwealth keeps the

19   money it got through the airport but can go and get the rent

20   from Burger King and the candy stand and the duty free because

21   those should be available resources of the Commonwealth that

22   should have never been alienated?

23        MR. STANCIL:  No, your Honor, we don't need to get

24   into any of that and let me tell you why.  When you are selling

25   a physical asset, there is no question that legislature has the

1    authority to sell a physical asset as opposed to future tax

2    revenues, and we know this in part from, again, Trias Monge.

3    He actually was explaining what recurso, the Spanish term,

4    means in the Jones Act, which predated the Constitution.  The

5    reference was made to ingresos, which it was just translated to

6    mean only taxes or only sort of income stream.

7         He explained that resources is actually a broader

8    concept, but then he clarified and this goes directly to your

9    Honor's question.  He clarified that physical assets and

10   tangible assets are not subject to the claim but if you

11   monetize them, you sell them, then those cash and cash

12   equivalents are.

13        Your Honor, I think this is a very, with respect to

14   Mr. Mayer, easy case.  The tax revenues are at the core of what

15   available resources are.  In fact, I think the corollary of his

16   position is far more untenable.  He would say, well, we can

17   sell anything and everything we need to, and we can hive off

18   every sliver of tax revenue and create a special entity or

19   special fund.

20        The case that we cite from Ohio, *Shkurti*, addresses

21   this directly.  That was an attempt to set up a special fund to

22   take on debt, in effect.  And the Court said, you just can't

23   set up a special fund for this and special fund for that

24   because there is no end to it.  And COFINA is actually a

25   painful illustration of that process.  COFINA started as a

1    little $300 million bridge loan, in effect.  We are now $16

2    billion into this and there is no end in sight.

3            For all of the sort of, we would say, irrelevant

4    equitable arguments about how this was cheap and we needed it

5    and it's easy and we might need it going forward, the worst

6    thing, with respect, your Honor, that could be done for the

7    Commonwealth is to give them a blank check, and that is exactly

8    what COFINA is because it is limitless, absolutely limitless.

9    And we are told that, well, both parties voted for it and

10   everybody seemed to like it.  That's exactly when

11   constitutional provisions are most important.

12           Mr. Yanez referred to the political process being the

13   check.  Not when it comes to the Constitution.  The things that

14   we put into a Constitution are those things primarily that we

15   don't trust the political process to address, and that is I

16   think especially true with respect to debt, because it's very

17   popular to borrow money and push your problems down the road,

18   which is why, for example, back to the interlocking

19   protections, article 6 has a 30-year maturity limit on full

20   faith and credit debt.  COFINA maturities extend out 40 years

21   because you just push out, push out, push out your problems,

22   and you don't ever get the fiscal responsibility that is

23   essential.

24           If I may, can I come back to the drafting history.  In

25   1961, Puerto Rico adopted the debt limit and in the course of

1  that discussion they addressed what they meant by available

2  resources, and when they are referring to available resources,

3  they said, the truth is -- this is Exhibit 1 to our summary

4  judgment motion, which is docket 311 at page 4.  The truth is

5  that per the terms of the referenced constitutional provision,

6  referring to article 6, all of the resources of the government

7  are committed to those obligations that refer to the full faith

8  and credit debt.  And this is critical as well.  They didn't

9  think that was some formalist ruling that could easily be

10 sidestepped.  They said, we are not worried about increasing

11 the debt limit because Puerto Rico has done a good job paying

12 its bills.  The good judgment that it has exercised in

13 contracting the public debt and in not using subterfuges to

14 evade the limits imposed on it, that was responsible for

15 COFINA's good credit.  With respect, your Honor, COFINA is

16 exactly the kind of subterfuge they would not have

17 countenanced.

18      We heard a lot about public corporation debt.  This

19 will spill over into other municipal markets or this will limit

20 the Commonwealth's ability to commit some resources to debt for

21 public corporations.  Your Honor, I'm sure, is well familiar

22 with the clawbacks and everything else that's in this case.  I

23 think the record is crystal clear that that has nothing to do

24 with the available resources pledge.  If I may, your Honor,

25 again, the drafting history is absolutely clear.

1        When they were referring to public corporation debt

2   not counting against the debt limit, there is a reason why and

3   my adversaries don't want to talk about it, if you will indulge

4   me one more time.  This is on page 221 of the 1961 Senate

5   report in connection with the debt limit.  That's also Exhibit

6   1 to our motion for summary judgment.

7        When discussing revenue bonds, it should be clarified

8   that the bonds issued and to be issued by the public

9   corporations of the Commonwealth of Puerto Rico will not be

10  taken into account when calculating the state's borrowing

11  margin.  That's where they want to stop.  I am going to keep

12  going.  Since, for the payment of the same, the good faith of

13  the people of Puerto Rico is not committed, and they will

14  continue to be paid only from the income derived by said

15  corporations.  The reason that they don't count for debt limit

16  purposes is they get their own money.  COFINA tries to take the

17  Commonwealth's money and scoop it into public corporations.  No

18  one thought that made any sense under the debt limit.  There is

19  another provision.

20       THE COURT:  And COFINA relies on the full faith and

21  credit reference and says that the defendant's revenue is sort

22  of surplusage.

23       MR. STANCIL:  The word is and, your Honor.  That is

24  their position, but it's completely untenable with that

25  excerpt.

1          But I've got another one.  When they were adopting the

2     debt limit they had to go to Congress and get permission.  So

3     there is a hearing before the subcommittee on territorial and

4     insular affairs.  This is Exhibit 19 to our summary judgment

5     reply.  It says there:  All the general government investments

6     in schools, roads, everything is done by the Commonwealth and

7     is included in this limitation.  The only other thing are the

8     municipal bonds and they occurred in small amounts, which

9     greets the marketplaces.  They were very limited in scope.

10         Here is the quote.  And the others that we have are

11    the public corporations, but those are revenue bonds.  They are

12    not sustained from taxes.  Again, I think it's very clear.  I

13    think it makes perfect sense.

14         What is essence of COFINA, the reason that they are

15    here saying this is their property?  It's because they believe

16    it to be irrevocably given to them.  They believe it to be

17    theirs and no one can take it away.  Let's assume that it is

18    right.  It's inconsistent to think that the framers put this

19    elaborate framework in place to protect the people from full

20    faith and credit debt, too much good threatened the people of

21    Puerto Rico.  Too much would delay hard financial choices in

22    times of shortfall.  But they left this loophole.  Started at

23    300 million.  It's now 16 billion.  By the time COFINA is paid

24    off, if it is paid off, it will be 50 billion plus more of the

25    Commonwealth's resources gone.  I think it attributes a sudden

1    incompetence to think that he would leave a loophole this big.

2         They say, there is nothing in the text that says we

3    can't do it.  Well, that's not the way courts interpret

4    Constitutions.  Let me give you a couple of examples.  The

5    first is actually from the Puerto Rico Supreme Court itself.

6    This is a provision in the Puerto Rico Constitution that

7    prohibits the government from giving support to private

8    schools.  Well, Puerto Rico tried to get around that by giving

9    support to private school students.  This case is called

10   *Asociacion de Maestros de Puerto Rico v. Torres*, 137 D.P.R. 528

11   (1994).  That case appears in the COFINA agent's motion for

12   summary judgment at page 24 for a different proposition.

13        But the Supreme Court of Puerto Rico rejected this

14   attempt to dodge the prohibition on supporting private schools

15   by supporting private students, and they said that the statute

16   ingeniously tries to sidestep the constitutional obstacles by

17   reframing from schools to students.  It rejected that and said

18   that is inconsistent with the framer's intent.

19        They talk about other states.  Other states reject end

20   runs like this all the time.  The case from Indiana,

21   *Cerajewski*, is a great example.  There was a debt limit on

22   municipalities limited to 2 percent of their property values

23   and a municipality was up against that limit.  So the state

24   created a new district to build a vocational school in that

25   district.  The Indiana Supreme Court rejected that end run and

1    said, that just isn't the way that it works.

2         Your Honor, again to the surrendering of the taxing

3    power, as your Honor has noted, I don't think the COFINA

4    parties can have it both ways.  The Constitution either

5    prevents the Commonwealth from giving away the taxing power or

6    it doesn't.  They want to say, well, it doesn't prevent them

7    from giving us an irrevocable right to the taxes that have to

8    be kept in place forever and ever and ever.  But that doesn't

9    amount to a surrender of the taxing power.  Respectfully, your

10   Honor, I don't think that can be.

11        There is also a lot of attention paid to what they

12   call either the deference or the idea that there is economic

13   legislation so our hands are up.  That's not right.  Mr. Yanez

14   actually referred, I think he said the more specific provisions

15   that we are talking about in article 6 do not limit the more

16   general provisions of the taxing power and authority and police

17   powers.  That's exactly backwards.  This specific does limit

18   the general.  That is 101 statutory and constitutional

19   interpretation.

20        I believe, your Honor, may I add back my extra minutes

21   unless the Court has questions?  May I do the same and put them

22   in for rebuttal?

23        THE COURT:  I do have a question which you may feel

24   you've already answered, but I'd like you to take it up

25   directly, which is, in looking for sort of core fundamentals of

1    the requirements of the various statutes, I'd like to go back

2    to the debt limit.

3          At some point don't we have to be able to tie your

4    core fundamental argument to the language that the framers used

5    in the constitutional provision and in that constitutional

6    provision the framers specifically said, direct debt, full

7    faith and credit, obligation of the Commonwealth.  And if you

8    look through and you look at COFINA, I don't see any of those

9    three things.  How do I find, without rewriting the

10   Constitution or deciding what mistakes I believe the framers

11   should not have made, how do I find a constitutional violation?

12         MR. STANCIL:  Because, your Honor, you read

13   constitutional provisions, like statutory provisions, in

14   harmony.  And the debt limit, when it refers to full faith and

15   credit debt, understands, the premise is that full faith and

16   credit debt owns a first claim on all available resources.

17         So the textual hook, if you will, is the definition

18   and meaning of all available resources, which is why the

19   drafters say all.  When they say in the debt limit, you've

20   promised in your full faith and credit debt, you've promised

21   all available resources, so I am going to limit how much you

22   can issue, it would ignore the commitment of all available

23   resources to assume that they can alienate those resources.

24         THE COURT:  I then have to read into the definition of

25   resource every single tax revenue, every single product of the

```
 1      exercise of the taxing power.
 2              MR. STANCIL:  By the Commonwealth, your Honor.  You
 3      don't have to read that into it.  That's in the drafting
 4      history itself.
 5              THE COURT:  But it's not in the text --
 6              MR. STANCIL:  They didn't have any trouble
 7      interpreting resources when they are budgeting.  They
 8      understand when they are estimating how to do their budget they
 9      look at everything they expect to get from all sources.  So we
10      wouldn't read into the balanced budget provision in section 7,
11      for example, the ability of the legislature to say, well, this
12      doesn't count and that doesn't count and this doesn't count and
13      that doesn't count.  The terms have meaning.  They have
14      consistent meaning across each of these provisions.  So I think
15      it is clear from section 7, section 8.  It pops up again as
16      sort of a distraction, it pops up again in section 19 with
17      respect to delinquents.  And the COFINA senior bondholders seem
18      to think that helps them somehow that section 19 refers to the
19      limits of available resources being a limit on how much
20      provision can be made for delinquents.
21              With respect, your Honor, each time this appears, the
22      word available resources, it means, in context, everything that
23      comes in and that's the only way to honor the intent of the
24      drafters who said, this is an absolute first term.  There is
25      nothing absolute if it depends on the discretion of the
```

1   legislature taken away.  Absolute first term.

2           If we were reading the federalist papers, I think we

3   would be up here making the same exact point and it's exactly

4   the same and it worked for 50 plus years.  In fact, if we go

5   back to the 104(c) statute I was referencing, everybody

6   understood this is how it worked.  First means first and it is

7   strange, very strange, to think that when they read the

8   Constitution from 1952 up through 2006, they understood one

9   category of debt, one and one only, was the head of the central

10  services of public health, safety, and welfare.  But in 2006

11  they decided, there is actually another thing we can do, which

12  is we can sell revenues and now we are going to make that

13  senior to GOs, which are, in turn, senior to everything else.

14  I think that is just not consistent with common sense and

15  obvious intent of the framers.

16          THE COURT:  Your bondholder clients who bought after

17  COFINA was in existence bought under documentation that said

18  and, by the way, on this COFINA stuff it's not going to be

19  available to you.  The proceeds of the COFINA bond offerings

20  went to the Commonwealth.  And if the Commonwealth legislature

21  did overstep its bounds and do something unconstitutional, why

22  is it the right result that people whose claims are against the

23  Commonwealth get the benefit of the old debt having been paid

24  off with the proceeds of that bond offering and the COFINA

25  bondholders who bought something they thought was secure should

```
 1    be the ones who take the hit.

 2              MR. STANCIL:  There is, I think, three different

 3    points.

 4              THE COURT:  Probably.

 5              MR. STANCIL:  No. 1, we are not here today to

 6    determine what kind of hit they take.  Your Honor has ruled

 7    that what kind of post-property claims they may or may not have

 8    against the Commonwealth are beyond the scope of this

 9    proceeding.  That would be my answer if I were allowed to get

10    into it, your Honor.  We could talk about what they may have

11    and what they don't have as property.  They can't create a

12    power for the legislature by relying on something.

13              To that reliance question,, which I think is the

14    second thing embedded in your Honor's question, what they

15    relied on was a gamble, and the opinion letters they rely on

16    say it's a gamble.  They all say, no one knows for sure how

17    this is going to come out.  We think you will win.  This is not

18    the kind of thing where they have an ironclad assurance.  They

19    took this on a bet and betting on something does not make it

20    illegal.  Third, your Honor, it is not correct to assume that

21    all of my clients bought after COFINA.  There is a legacy GO

22    debt --

23              THE COURT:  I said those of your clients who bought

24    after COFINA.

25              MR. STANCIL:  Even those who did, your Honor, doesn't
```

1    change the rights they have under the Constitution.  You cannot

2    by a prospectus or even by legislation change the authority of

3    the legislature.  It didn't have the power to transfer away

4    their tax revenues.

5             Thank you, your Honor

6             MR. DEPSINS:  Your Honor, I'm next.  Is it possible to

7    take a short recess?

8             THE COURT:  All right.  We will resume in 15 minutes.

9             (Recess)

10            THE COURT:  Mr. Despins.

11            MR. DESPINS:  Good morning, your Honor, Luc Despins

12   from Paul Hastings on behalf of The Official Committee of

13   Unsecured Creditors in its capacity as the Commonwealth agent

14   in the Commonwealth COFINA dispute.

15            Your Honor, I will address the nonconstitutional

16   issues that are raised in the summary judgment briefing.  If

17   the time permits, Mr. Bliss, my partner, will address the

18   balanced budget clause.

19            First, a bit of background.  It's important to

20   understand that what's at stake here is billions of dollars of

21   future SUT revenues, and that goes on until at least 2057, if

22   not longer.  That's another thing to understand.  There is no

23   time limit to this.  It goes on until the bonds are paid in

24   full.

25            It's very clear from a bunch of things that I will

1    describe in a second that at the time this law was formulated,

2    proposed, that the GDB and its advisors who were really

3    drafting this were struggling mightily to deal with the

4    constitutional issues raised by this structure.

5            The COFINA statute is really an attempt to reconcile

6    goals that cannot be reconciled.  On the one hand, they wanted

7    to sell bonds badly.  They were running out of cash.  They

8    needed to sell bonds and the only way to really sell bonds was

9    to make or attempt to make this as remote from the Commonwealth

10   as possible.  At the same time, however, they knew that GOs

11   would complain about this, so they attempted to address the

12   GO's future concerns regarding the constitutionality.

13           So they created an entity called COFINA that is

14   purportedly independent of the Commonwealth.  They said, create

15   this.  It's independent.  Does it float in the ether, how does

16   it work?  Well, somebody said, it's attached to the GDB,

17   whatever that means.  And then they say, well, who is going to

18   run this entity?  They said, well, the directors of GDB will be

19   the directors of COFINA.  But of course the directors of GDB

20   are appointed by the governor.  So at the end of the day the

21   governor controls the entire structure.

22           And they drafted language that purports to transfer

23   SUT revenues, including future SUT revenues, until the bonds

24   are paid.  As we show in our papers, the language is not as

25   clear as the other side would want it to be.  I will address

1        that in a minute, your Honor.

2               But the drafter also added a provision stating that

3        Act 91 shall not be interpreted or applied in a manner that

4        would undermine the power of the legislature to impose and

5        collect taxes.  Of course, implicit in that, if you have the

6        power to impose and collect, you have the power to not impose

7        or impose less or substitutive a tax.  That's why they had to

8        add this provision, which we called the "turning off the tap"

9        provision that I will describe in a second.

10              In addition to this language, he put in language

11       purporting to render the SUT revenue unavailable to the

12       Commonwealth.  But then they also added a provision saying that

13       nothing in the statute shall be interpreted in a manner that

14       would undermine the rights of the GO bondholders.  Go figure

15       what they were trying to do other than trying to appease the

16       bondholders somehow so they could point to a section that says,

17       don't worry, this cannot be interpreted in a way that affects

18       you.  Honestly, it did.

19              Obviously, not all these provisions are consistent.

20       There is a push and a pull going on in that statute and that

21       really we call it at the office this Frankenstein statute

22       because it is a compromise where a lot of things could not be

23       compromised.  They attempted to serve two masters and they

24       didn't serve either of them well.  That's the first point.

25              The second point is that the Court needs to confront

1  the fact that Act 91 is not a law that deals generally with a

2  regulation of conduct like highway act or with property

3  interests generally, like a statute of fraud or something like

4  that.  It is a special purpose law that created a financing

5  structure solely to effectuate this transaction through the

6  government and the bondholders.  This is a pure special-purpose

7  statute only to achieve this commercial financing transaction.

8  Therefore, Act 91 is not somehow immune from the Court looking

9  at the entirety of the statute, and we are going to go through

10 that and the same time looking at the substance, economic

11 realities of the transaction that is reflected in the statute

12 and concluding that what was created here was, at best, for the

13 COFINA side of the house a financing.

14         THE COURT:  The legislature has the power to pass laws

15 and, as you say, it passes different types of laws.  And the

16 general principle of statutory construction is that you apply

17 the language of the statute that the legislature used.  Are you

18 saying that this type of statute is entitled to less respect or

19 less deference in that way just because the legislature was

20 making something really special?

21         MR. DEPSINS:  No.  I think the point is that -- and we

22 will get to that in a minute.  In the bankruptcy context it's

23 important to not be stuck on labels.  We have look at the

24 entire statute.  And I think we are going to go through that

25 and I think we are happy to start working on the four corners

1   of the statute and show you how it leads to absurd results if

2   their interpretation of the statute is adopted.

3           The point I wanted to make is that if statutes

4   governing bond issuance was somewhat immune from a review of

5   what is happening there, that would be kind of a nifty trick.

6   Let's use this example.  Your Honor knows me enough at this

7   point that I often use examples that are exaggerated to make a

8   point.  This is one of them.  The point is that let's assume a

9   municipality wanted to borrow money now.  No ownership issue.

10  It's a clear loan, secured by a facility that a municipality

11  owns.  Let's assume that that statute that authorizes this

12  said, in the event of a bankruptcy of this municipality, this

13  collateral shall be the property of the bondholders.  Would the

14  court say, well, that settles it, I guess we can go home?  We

15  have the answer in the statute.  The answer to the question is

16  to answer it of course not.  And that is an extreme example.

17          Let me give you a closer example.  In a case that we

18  don't cite in our papers, but that we circulated to our

19  colleagues yesterday.  The case of Orange County, which the

20  cite is 191 B.R. 1005.  The Court was confronted with the

21  following fact pattern.  Orange County had to receive funds

22  from other governmental entities in California.  Actually,

23  these entities had to give money to Orange County so it could

24  pool the resources and invest it with some brokerage firm, and

25  they did that.

1      And when they filed for bankruptcy, the argument was

2  made by Orange County that, well, these funds were commingled.

3  There is some of my money, there is some of your money.  It's

4  all in a pot and you are an unsecured creditor, speaking of the

5  other entities at this point.

6      The argument that was raised, your Honor, is that a

7  law had been passed, the very clear law in California that said

8  that if a public entity was required by law to deposit funds in

9  a county treasury, like Orange County, when it makes a deposit,

10 those funds shall be deemed to be held in trust by the county.

11 The funds shall not be deemed funds or assets of the county and

12 the relationship of the depositing entity or public official in

13 the county shall not be one of debtor creditor.  Again, very

14 clear statute.  Sounds almost like COFINA.

15     Of course, the Court, in looking at this, the

16 bankruptcy court said, you must be kidding me.  We are not

17 going to allow states to define the priorities in the

18 bankruptcy case in the court that said that basically this

19 statute would be ignored if it led to the result that these

20 other government entities did not have to jump through the

21 hoops that other creditors would have to jump through in a

22 bankruptcy case.

23     So this is really what we are saying, your Honor, is

24 that when the Court applies a similar standard, including the

25 standards that have been applied in the First Circuit, in

1   looking beyond the labels and the beyond the substance, the

2   Court will conclude that, at most, this is a secured financing;

3   again, at most from the point of view from the COFINA side.

4   That means that the SUT is owned by the Commonwealth.

5           To use an overused expression.  If it quacks a

6   financing and walks like a financing, it is a financing.

7           THE COURT:  What Commonwealth obligation is secured by

8   the pledged SUT?  What is the transaction that's being secured?

9   Because you have a payoff of the Commonwealth debt that was

10  outstanding at the time and then there is a relationship

11  between COFINA and the bondholders.  Are you piercing the

12  COFINA veil?  What are you doing?

13          MR. DEPSINS:  I think that's addressed in our brief

14  and I don't have all the details committed to memory.

15          THE COURT:  Neither do I.  That's why I'm asking.

16          MR. DEPSINS:  There is at least two theories and one

17  of them is that this is a dry pledge, essentially, is that we

18  are pledging our SUT to obtain the money that was used to pay

19  our debts.  That's all addressed in the opening brief, and I'll

20  address that when I do the reply, your Honor.

21          Basically, going back to the statute, the only

22  sensible reading of the statute is that the transfer occurs

23  when the color TV, if you will, is sold and the tax is

24  collected.

25          There are many reasons for that.  One is, that's the

 1   earliest.  Practically, our position is that this needs to

 2   happen only when the tax fee is collected and it's put in the

 3   account.  The reason for that is that what happens if the

 4   merchant goes bankrupt or doesn't pay?  Under the statute, if

 5   it were to happen at the moment of sale, that property would be

 6   deemed owned by COFINA.  It makes no sense.  It's only when the

 7   money is put in the account.

 8           THE COURT:  Which account?

 9           MR. DEPSINS:  Until it hits the pure COFINA account, I

10   don't think there is a transfer, your Honor, to COFINA.  You

11   know, and you probably saw this from the Banco Popular

12   declaration, in fact, all the funds, the collected SUT, go

13   first through an account today that is the name of the

14   Commonwealth, and that started a few years ago.

15           THE COURT:  I've read that declaration.  But certainly

16   in the real property context, even with bank accounts and

17   community property, there is a concept that's respected in law

18   of an undivided interest in a pooled asset or a jointly owned

19   asset.  Why isn't COFINA in there for at least whatever it is,

20   5 percent or 3 and a half percent, at the time of collection of

21   the 100 percent of the tax?  Why does it have to wait to be

22   separated out?

23           MR. DEPSINS:  The short answer, your Honor, is, we are

24   not relying on that fact, meaning it's a fact that shows that

25   we continue to have control.  But we are not relying on the

1    mere deposit of an account to say that the ownership doesn't

2    pass through.  It's really one of the factors to show that we

3    continue to have complete control over the SUT tax collection

4    process.

5            But, your Honor, as you stated when the COFINA side

6    was arguing, the concept that you can transfer ownership of an

7    asset that doesn't exist doesn't work, and I want to give you

8    some precise example in this statute of how it leads to absurd

9    results.

10           Remember that there is a dispute between the

11   Commonwealth side and the COFINA side as to whether there is an

12   obligation if you turn off the tap, meaning the SUT tap, to

13   provide substitutive collateral.  You have heard about this

14   before.  Let's assume that they are correct.  We don't believe

15   they are, and I'll go through that in a minute.  Let's assume

16   they are correct.  You know that this substitutive collateral

17   must be deposited in the account, in the COFINA account.  And

18   their argument on the statute, the linchpin of the statute is,

19   anything that must be deposited in that account is owned by

20   COFINA going back to 2007.

21           I want to make sure we go granular on this.  You have

22   other collateral.  Let's call it gold to make it easy that we

23   want to substitutive collateral.  We have to.  Apparently, the

24   Court had ruled that it's required if you want to turn off the

25   tap.  Putting that aside, we assume the most favorable facts to

1    them.  That goal, if you will, would have been deemed owned by

2    the COFINA side since 2007.  That makes no sense whatsoever.

3         THE COURT:  You are saying that they would be saying

4    that not only the revenues but also anything that could

5    potentially be substituted or might be substituted in the

6    future is owned as of 2007, so there is too much.

7         MR. DEPSINS:  That's my point.  It leads to an absurd

8    result.  Their hook in the statute is what must be deposited.

9    Whatever must be deposited in the account, their theory is it's

10   owned by COFINA from day one.  That is their theory and they

11   are embracing it completely.

12        In the example I just gave you, it makes no sense

13   whatsoever.  This may have come from resources that have come

14   up elsewhere and, all of a sudden, it's deemed owned back to

15   2007.  It makes no sense.

16        Let me give you another example on how it leads to

17   absurd results, their interpretation of the statute.  You know

18   that there is a topping-up requirement that if sales and use

19   tax are not sufficient in any given year to pay the debt

20   service on the bonds, the Commonwealth must make that up.  It's

21   a topping-up mechanism.

22        Same thing.  This is coming from the Commonwealth's

23   own seats, its own SUT.  Under that theory, that SUT that it

24   must now transfer is deemed owned retroactively to 2007.  There

25   is a lot that legislatures can put in and indeed transferring

1    and all that.  It makes no sense, your Honor.  These are just

2    two examples of how this leads to an absurd result, if their

3    interpretation is correct.

4         Let's assume for a second that they are right on

5    everything, meaning that you could transfer the tax, that the

6    statute did that, that my arguments are rejected.  Actually

7    this argument that they have, by the way, which is nowhere in

8    the statute, that they have a pledge or a security interest or

9    an ownership right in, quote, the right to receive, you will

10   find that nowhere in the statute.

11        Let's assume they are right on that.  The point is

12   that that was not transferred.  That ownership was not

13   transferred.  Why?  Because the essence of this transaction,

14   your Honor, is that there is no absolute transfer.  And, yes,

15   we are looking at true sale cases.  You might say, I can do

16   that in the statute.

17        The point is, we have made that point.  Other courts

18   have looked at the statutory scheme, have looked at it and

19   said, that's a contractual relationship, and we are going to

20   apply regular bankruptcy principles to that contractual

21   relationship.  The *Seven Counties* case.  In that case the Court

22   found that the statutory scheme created an executory contract

23   which could be rejected.  By the way, that's one of our

24   out-of-scope claims.  We are not going to argue it.  But I want

25   to make sure you recall that.

1       The point there is that it is OK, and they cite no

2   case for the proposition.  Their proposition is that when you

3   have a statute you cannot apply these principles at all.  So if

4   you have a statute that governs the contractual relationship

5   between parties and the example I gave, it's a clear loan.  If

6   it quacks like a loan, it walks like a loan, it's a clear loan,

7   but the statute says it's owned by the other party, that you

8   need to end your inquiry there.  We don't believe that.  We

9   don't believe there is any case that says that.  Then if you

10  look at the merits of the argument, they don't even try to

11  tackle us on that or touch us on that.

12      THE COURT:  I'm sorry.  This may seem elementary to

13  you or elemental, but I'd like to go back to, if it's a loan

14  and we have not blown COFINA into the ether via the

15  constitutional arguments, not saying that won't happen, but

16  hasn't happened yet, who is the borrower?  Who is the lender,

17  since COFINA is there right now and the Commonwealth has got

18  all the money it's going to get out of this --

19      MR. DEPSINS:  The Commonwealth, either through a dry

20  pledge or otherwise, is a borrower and it pledged its SUT for

21  that loan.  That's addressed in our opening brief and I'll

22  address that when we go -- I'll use my time on reply to address

23  that because I know that there are two separate theories under

24  which that works.

25      But the point, your Honor, is that if you look at the

1    statute, the risk, was there an absolute transfer?  There was

2    not.  Why?  Because of that topping-up mechanism.  When you

3    sell an asset, you don't remain liable to pay the difference to

4    the lender.  It's a sale.  It shows that there is no sale here

5    because we remain liable to make up the difference.

6            THE COURT:  Shouldn't there be a sale and then a bonus

7    contractual undertaking?  Why does it have to invalidate all of

8    the sale?

9            MR. DEPSINS:  I am not sure I understand fully.

10           THE COURT:  Why can't there be absolute transfer of

11   the right to the revenues and, in addition, a payment of

12   consideration for some contractual undertaking of the

13   Commonwealth to come in, not committing its full faith and

14   credit, but in some other capacity to do this topping up if

15   there is a shortfall?

16           MR. DEPSINS:  It's inconsistent with an outright

17   transfer because it's not only the topping up, your Honor.

18   It's the fact that we get it back once they get paid, which is

19   another indicia, clear indicia that it's not a sale.

20           THE COURT:  It says that COFINA can give it back once

21   it doesn't need it anymore.  I don't think the statute says

22   COFINA has to give it back.

23           MR. DEPSINS:  Yes, your Honor.  That's technically

24   correct.  But it also says that COFINA has only one role in

25   life, which is to pay the bonds.  It cannot go to Vegas and

1   spend that money.  And, second, that's why it's important, the

2   governor controls this anyway.  Let's assume the bonds have all

3   been paid.  There is no way the Commonwealth is going to keep

4   transferring SUT because there is no purpose in the life of

5   COFINA other than to pay the bonds.  It's a special purpose

6   entity and it can only use the money to pay the bonds or pay

7   its understood expenses.  That's not an issue.  And, therefore,

8   at the end of the day, you see the full picture here.  The SUT

9   is just collateral for a loan.  That's all it is because COFINA

10  cannot get an upside of that.  Let's assume that you only have

11  to transfer SUT until 2055 to pay the bonds in full.  There is

12  no way that the SUT will continue to be paid in 2056 and 2057

13  because COFINA has no role, no existence other than to pay the

14  bonds, and the governor controls it anyway.  So it's really a

15  nonissue.  The point is that shows that the substance of this

16  is that it's a loan.

17       Your Honor, I certainly resent the fact that they

18  argue this is outrageous.  They gave the money.  Of course they

19  gave the money.  In bankruptcy, tons of people have given money

20  and have not recovered on those loans.

21       More importantly, your Honor, is that it was well

22  known to everyone.  They rolled the dice on this.  I want to be

23  very clear about this.  That's all in our brief, so I won't

24  spend a lot of time.

25       But in 2006, there was a memo from the Fiddler law

1   firm that was part of the legislative history that was in that

2   file and that basically says, the bondholders must know that

3   the contractual obligation to them is subject to the fact that

4   the legislature can eliminate the sales tax.  We can turn off

5   the tap.  The bondholders need to know that.

6        By the way, that memo doesn't say, but don't worry,

7   you will get substitutive collateral.  It's completely silent

8   on that.  And we cite four or five of these, your Honor, in our

9   brief, and we also cite to the official statement.  This is the

10  prospectus that was used to sell the COFINA bonds.  It says:

11  The legislative assembly may amend, modify, or repeal act No.

12  117.  That's the statute that imposes the SUT.  And that's

13  listed not in a vacuum somewhere; it's listed under risk

14  factors, your Honor, and this is all in our brief.  These are

15  exhibits to our brief.

16       The point is, everyone knew this.  Nixon Peabody in

17  its opinion says:  Thus, the legislature is free at any time to

18  reduce the rate of sales and use tax or eliminate it entirely.

19  The opinion goes on to say, this has been clearly disclosed to

20  bondholders.  I am not going to go through all of them, but

21  they all say, the bondholders can end up -- if this happens,

22  they will end up with zero.  None of these memos say, oh, by

23  the way, you will get substitutive collateral.

24       Frankly, I have to say, I didn't follow at all the

25  argument about why the substitutive collateral is required.  We

1    addressed that in our brief extensively.  But the word such

2    substitutive collateral obviously refers to the second part of

3    the proviso, not the first part.

4         And if that were not clear enough, your Honor, in the

5    statements, the official statements of the COFINA bond

6    offering -- we cited this at docket 347-18, Exhibit 10, page

7    22 -- they separated the two parts of the proviso so they put a

8    one little I and a two little I.  One little I we can reduce or

9    repeal, whatever the language is, or, comma, two little I,

10   provide substitutive collateral, which makes it crystal clear

11   that the intent at that time was that these provisions had to

12   be read in the disjunctive.

13        THE COURT:  In determining ownership of the SUT for

14   purposes of this proceeding and my scope order, do I need to

15   resolve that issue with respect to the consequences of

16   elimination or reduction of the SUT?  And I am hereby inviting

17   comment from COFINA about this on rebuttal, but first I'll ask

18   you.

19        MR. DEPSINS:  It is part of the crux of our argument

20   that the fact that you can do this, you can just turn off the

21   tap, it's one of the crux of our argument as to why there is no

22   ownership here, because you can't have ownership in something

23   that has some sales and use tax that will occur in 2040 when

24   the legislature could say in 2020, we are turning off the tap.

25   That makes no sense.  Whether you have to decide, whether that

1   can be done with any consequence, I'd like to reflect on that

2   for a few minutes, and I'll come back and I'll reply to address

3   that point.

4        The point, though, your Honor, as I made it before --

5   actually this one I didn't make.  Let's assume that they are

6   right, that you need to provide substitutive collateral.  What

7   does that say about ownership?  I've already covered that.

8   It's impossible for something that we don't even know what a

9   substitutive collateral is.  Could be gold, could be other

10  things, new tax, whatever.  We don't know what it is.  That

11  would be deemed to be owned because it must be deposited in the

12  account.  That's the operative words.  They would be deemed to

13  be owned back in 2007.

14        Then they say, this is bootstrapping to the extreme.

15  Hey, if you are doing that, you will have a constitutional

16  takings claim.  The point is, we cite cases in our brief that

17  basically say, if the statute that grants you a right expressly

18  says, I can take it away from you, that's the end of the

19  inquiry.  There is no constitutional taking.  There is no --

20        THE COURT:  I'm sorry.  We need to stop for a minute

21  because apparently the connection in Puerto Rico has gotten

22  disturbed.  Sorry.  You can collect your thoughts for a minute.

23  We are stopping the clock to find out what's going on.

24        (Pause)

25        THE COURT:  You may continue.

1     MR. DEPSINS:  Your Honor, their interpretation leads

2     to absurd results, and we believe that that is why the Court

3     should find that the transfer only occurs when the fund gets

4     into the account.  Otherwise, you can have this concept, which

5     is unknown in any country, of floating ownership.  It's not a

6     floating lien.  It's floating ownership.  Basically, they have

7     a lien against any asset that is required to pay them and that

8     can't be the law.

9          The next item I want to talk about is the labels

10    issue, the fact that when territory law -- because I might not

11    going to say state law -- the territory law uses labels, that's

12    not dispositive in a bankruptcy context.  And the argument that

13    they make is that that can't be because all the cases you are

14    citing refer to property of the estate.  That has to be so

15    wrong.

16         First, it's wrong because you will see in the Orange

17    County case the Court dispatched that because in chapter 9,

18    same thing as PROMESA, there is no property of the estate

19    concept, and the Court said, there is no way that's

20    controlling.

21         But more importantly, the reason why there is no

22    property of the estate is because if you had property of the

23    estate there would be a section of the code, 363, that would

24    say the debtor cannot use property outside your course of

25    business without your Honor's permission.  That's why there is

1    no property of the estate.

2            The PROMESA statute in 301 says property of the estate

3    in a bankruptcy code shall be substituted for property of the

4    debtor, and there are various provisions of the bankruptcy code

5    that apply.  For example, Section 1123(a)(5) says that a plan

6    must deal with property of the estate.  Of course in our case

7    that means property of the debtor.

8            There is no evidence anywhere that Congress, when it

9    deleted the concept of property estate in municipal cases or in

10   the PROMESA statute, intended for these governments to have

11   less rights than a corporate debtor as to what is property.

12   There is no evidence on that whatsoever.  So that argument

13   needs to be rejected.

14           On the meat of the matter, the First Circuit and many

15   other courts have said, when dealing with property of the

16   estate, that we shall not be detained or we shall not be

17   controlled by labels used by state statutes.  For example, if

18   the state statute says this asset is owned by the government

19   because it's a privilege, it's not a property interest, courts

20   have said no.  It has value.  It can be sold.  It's proper in

21   bankruptcy.  And you've got the *Ground Round* case.  You've got

22   the Third Circuit case in *Christburger*.  You have several other

23   cases that say that.  The First Circuit in *Gull Air*.  And they

24   all say that, your Honor.  And that's what we are asking the

25   Court to do, which is to look at what really is going on in the

1  statute and determine that and not be blinded by the fact that

2  there is one section of the statute that says, we hereby

3  transfer.  By the way, we are not waiving arguments as to why

4  that language doesn't do it for them.  That's in all our

5  briefs.

6          In the couple of points I'd like to make before

7  concluding, your Honor, is, it's really the only legally

8  possible interpretation of the statute that the transfer cannot

9  occur in 2007 because the Commonwealth, who is the collecting

10 party here, has no right under Commonwealth tax law to collect

11 the tax until the transaction has occurred.  That's in our

12 brief.

13         Given that, how can the Commonwealth transfer rights

14 into something that it has no rights in itself?  It can only

15 start doing that when the transaction has occurred, unless they

16 were to pledge their right to receive, which the statute

17 doesn't do and also it couldn't do -- not pledged.  Transfer

18 ownership of the right to receive because that would violate

19 the Constitution.

20         Therefore, your Honor, for these reasons, we believe

21 that the summary judgment should be granted.  I just want to

22 check for two seconds, your Honor.

23         THE COURT:  After you deal with that, I have another

24 question.

25         MR. DEPSINS:  Basically it's on page 18 of our brief,

1    the answer to the question.  I'll address that more fully

2    during the rebuttal.

3         You had a question, your Honor.

4         THE COURT:  Yes.  You've criticized the substitution

5    theories and the concept as undermining the notion of a

6    transfer of property and also takings inconsistent with the

7    constitutional structure.  Mr. Yanez said, well, maybe at the

8    point of substitution, maybe it's damages for conversion, maybe

9    it's damages for breach of contract, maybe it's compensation

10   for a taking.  But because it could be any of those three

11   things it's not inconsistent with the notion that there was

12   actual ownership of the taxes for which it was substituted.

13        Do you have some views on that conceptually and on the

14   specifics of it that you would like to share?

15        MR. DEPSINS:  I just don't see how there can be any

16   claim of taking conversion and all that when the contract says,

17   I'm giving you that right.  And what that right is, we will put

18   aside for a second and I can take it away from you at any time

19   for any reason.

20        The courts are pretty clear on the constitutional

21   takings claim that you have no takings claim in such a context.

22   They rebut that by citing cases where the Court has said, the

23   mere fact that the state has established a process for taking

24   doesn't mean that it can take away the right.  That's not what

25   we are dealing with.  The operative statute says, you don't

1   have that right if I say so.  It is clear.  I don't see how

2   they could have any claim.  If they had a claim for that, we

3   will deal with that in part 2.  Not that we are looking forward

4   to that, but the point is, it shouldn't drive the decision of

5   whether there is ownership here.

6          THE COURT:  Thank you.

7          MR. DEPSINS:  Thank you.

8          THE COURT:  Mr. Levin for 12 minutes.

9          MR. LEVIN:  Good afternoon, your Honor, if it please

10  the Court, Richard Levin, Jenner & Block, for the Official

11  Committee of Retirees.

12          Your Honor, given only limited time, so I am not going

13  to review our entire argument.  I would simply like to point to

14  a few specific matters in our papers and respond to my

15  questions that the Court might have.

16          The COFINA parties' principal argument, your Honor, is

17  the legislature says so and that ends the debate.  Well, as the

18  Commonwealth agent and GOs have shown, the legislature didn't

19  quite say so, and we cover this in our brief.  The Enabling Act

20  itself withholds the commitment that the COFINA parties argue,

21  and the legislature has, in fact, amended the statute several

22  times in a way that is inconsistent with the full transfer

23  argument.  We described that in our motion papers at 3 through

24  8 and 20 through 21.  In other words, we need to watch what the

25  legislature does, not what it says, and here what it did was

```
 1    not transfer the revenues.

 2              THE COURT:  Give me a couple of examples because, as I

 3    said, unfortunately, I don't have a complete photographic

 4    memory of pages 3 through 8 and --

 5              MR. LEVIN:  Mr. Despins had already described how

 6    there was already rights withheld.  But in 2013, rights were

 7    granted and then taken back.  In 2007, actually, the transfer

 8    was redone because they felt the original transfer was somehow

 9    inadequate or improper.  They didn't want it to go the way they

10    said it did, so they moved it to a different entity.

11              THE COURT:  Thank you.  Those are some examples.

12              MR. LEVIN:  They are laid out in our brief in some

13    detail.

14              In addition, the legislation must be interpreted in

15    light of the general principles of Puerto Rico law set forth in

16    Puerto Rico civil code, as we show in our motion.  Again, I'll

17    give you page references for future review since time here is

18    limited.  That's pages 12 through 16 and reply brief at 5

19    through 6.

20              The purported transfer has all of the attributes under

21    the civil code of a pledge, not of a sale.  Your Honor asked

22    Mr. Despins, what obligation is the pledge securing?  Well, the

23    statute, Act 91, says that COFINA will transfer the bond

24    proceeds to pay off the extra constitutional debt and, in

25    exchange, the Commonwealth will transfer the SUT until such
```

1    time as the COFINA bonds are paid off, and then the

2    Commonwealth -- it doesn't specifically say the Commonwealth

3    may recover them.  What it says is the negative.  The

4    Commonwealth may not take them back until the bonds are paid

5    off.  So it looks like the Commonwealth has an obligation to

6    COFINA to give it enough money to pay off the COFINA loans in

7    exchange for COFINA having paid off the extra constitutional

8    debt of the Commonwealth and the Commonwealth they recover is

9    collateral after those COFINA bonds are paid off.

10            Of course, the legislative assembly may amend the

11   civil code and render it inapplicable, but in this case it

12   didn't.  All of the attributes look like the pledge in the

13   civil code.

14            Now, even if the Enabling Act intended to transfer

15   future SUT to COFINA, that transfer is unenforceable in this

16   Title III case.  So the future SUT remains property of the

17   Commonwealth for two principal reasons.

18            The first reason is the bankruptcy law.  As has been

19   discussed, Congress has plenary authority over Puerto Rico

20   under the territory clause.  PROMESA is inactive under the

21   territory clause.  It says so specifically and Title III is a

22   bankruptcy statute.  It incorporates large portions of the

23   bankruptcy law.

24            There is no issue of state sovereignty or of federal

25   law overriding the law of a sovereign state in a federal dual

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   sovereignty system.  This is not a dual sovereignty system

2   here, so congressional dictates are viewed, one as against the

3   other, not as against deference to state sovereignty.

4          But even in those cases where a state statute is

5   involved, Congress can, under the bankruptcy code, under the

6   bankruptcy power, override a transfer that would be valid and

7   enforceable under state law.

8          THE COURT:  As Mr. Kirpalani pointed out, PROMESA,

9   this congressional statute, does very specifically speak to

10  respecting territory law.  It doesn't expressly say that all

11  territory law and labels are out the window.  So I'm hoping

12  that you are going to acknowledge and sort of reconcile that

13  aspect of this particular statute in this argument.

14         MR. LEVIN:  Yes, your Honor, it does say that.  Just

15  as Congress and the Supreme Court have said that state law

16  typically governs in bankruptcy cases.  But even the lead

17  Supreme Court case on that, *Butner*, says state law governs

18  property rights unless some federal interest requires a

19  different result.

20         And in this case there is a very clear federal

21  interest, the fresh start, which I know Mr. Mayer has said

22  nowhere it is in the statute.  It's nowhere in the bankruptcy

23  code either.  But it is in perhaps the leading Supreme Court

24  case on bankruptcy and the discharge and it is important and

25  that is *Local Loan v. Hunt*.  In that case, state law expressly

1  preserved the property right of the transfer of future wages of

2  the wage earner who was in bankruptcy, just as the COFINA

3  parties argue that the COFINA Enabling Act does here, but

4  against the contention that the Court was bound to follow the

5  Illinois decisions since the question of an existence of the

6  lien depended on Illinois law.

7       The Supreme Court ruled that contention, quote, is

8  precluded by the clear and unmistakable policy of the

9  Bankruptcy Act.  And the Court rejected the Illinois decisions,

10  quote, as being destructive of the purpose and spirit of the

11  Bankruptcy Act, and that is a principle that Congress has

12  embodied in all bankruptcy legislation since that time in 1934.

13       This is not the argument that one policy or the other

14  policy is the better policy.  This is an argument from the core

15  of the bankruptcy law which Congress adopted in Title III of

16  PROMESA.

17       Now, I think it was Mr. Kirpalani who said, well, that

18  that's saying the fresh start for Commonwealth is more

19  important for fresh start for COFINA.  I'm not saying that at

20  all.  COFINA's fresh start doesn't provide a basis for

21  overriding applicable law or denying the common law for fresh

22  start.

23       The best way to illustrate this is let's assume when

24  Mr. Hunt was going through the bankruptcy in the 1930s, the

25  Local Loan company was as well.  I don't think the Supreme

1    Court would have countenanced an argument that says, because

2    Local Loan is going through bankruptcy, the wage assignment is

3    effective against Mr. Hunt because Local Loan needs it for its

4    fresh start.  That is gathering property into the estate where

5    the fresh start is about the discharge and the release from

6    commitments that have been made.

7         Your Honor, if creditors could buy or a financing

8    agency could buy all of a municipality's taxes, municipal

9    bankruptcy would simply become unavailable.  As we show when

10   tracing the history of the 1988 municipal bankruptcy amendments

11   which carved out only special remedy bonds, only very limited

12   exception, Congress has not permitted the sale of future

13   reference of a municipality to stand up against a bankruptcy

14   petition or bankruptcy law.

15        The second reason, your Honor, I said that the

16   transfer would be unenforceable is the taxing power itself.

17   The taxing power is so central to the nature of government that

18   even without an express constitutional reprovision it cannot be

19   bartered or sold.  Irrevocably transferring future taxes does

20   that.  The Supreme Court said as much in 1942, Justice

21   Frankfurter in the case of *Faitoute Iron & Steel v. Asbury*

22   *Park*.  It was not based on any state constitutional provision

23   that the Supreme Court ruled but on the very nature of

24   government.  Just as Frankfurter said, quote, the principal

25   asset of a municipal is its taxing power and that, unlike an

1    asset of a private corporation or, I might add, an airport,

2    cannot be available for distribution.

3              THE COURT:  But the Commonwealth hasn't given away its

4    taxing power.  It's given away particular tax revenues and it

5    still has the ability to impose new taxes, to raise taxes, to

6    lower taxes, to do things with taxes.  How is this a surrender

7    of the taxing power?

8              MR. LEVIN:  First, as Justice Frankfurter also

9    recognized, the taxing power is not unlimited.  There is a

10   point at which taxes return less than the rate would imply

11   because people simply can't pay that.  We saw that in the Great

12   Depression and that's why Congress enacted Chapter 9 to begin

13   with.

14             In any event, if the COFINA parties are correct, that

15   the tax cannot be modified without substituting something of

16   equal or greater value, then the Commonwealth has given away

17   that much of the taxing power.  It has surrendered to the

18   COFINA parties or to the COFINA entity and said, we can't touch

19   it; or if you do, we have to replace it with some other tax,

20   and taxing is not unlimited, so it is a surrender.

21             Your Honor, I want to add to that the concept that if

22   the COFINA parties are right, if they are right that no matter

23   what they are entitled to be paid by the SUT, by a substitute

24   tax, by a claim for breach of contract, by a conversion claim,

25   if they are entitled to that money from the Commonwealth, no

1    matter what, then the Commonwealth has pledged its full faith

2    and credit.  If the Commonwealth, as they have argued, has not

3    pledged, then they are not entitled to that.  We cite the

4    Alabama case, the town of Georgiana, in our reply brief which

5    goes through the mechanics of this, and it makes very clear

6    that principal.

7         That is why we believe, your Honor, that the taxes

8    have not been transferred in the way COFINA argues.

9         THE COURT:  Thank you.

10        MR. LEVIN:  Thank you, your Honor.

11        THE COURT:  We will now turn to the rebuttal

12   arguments.  First up to Mr. Yanez for 10 minutes.

13        MR. YANEZ:  Thank you, your Honor.  For the record,

14   Antonio Yanez on behalf of the COFINA agent.

15        Your Honor, Mr. Friedman, on behalf of National, had

16   five minutes on rebuttal that he has just graciously agreed to

17   cede to me.  I think that brings my total to 15.

18        THE COURT:  All right.

19        MR. YANEZ:  Thank you, Judge.

20        Let me begin with the constitutional arguments.  The

21   underlying theme of those arguments which was stated explicitly

22   at different times was that somehow COFINA was taking the

23   Commonwealth's money or the SUT sales tax is the Commonwealth's

24   money.  That's wrong, your Honor.  It is wrong for the

25   straightforward reason that the pledged sales tax is money that

 1   was transferred to COFINA in exchange, again, for $18 billion,

 2   $16 billion that became available resources as soon as they

 3   were passed over.

 4         The General Obligation Bondholders also make the

 5   argument that it would be an act of stunning incompetence for

 6   the legislator to have left what is described by them as a

 7   loophole in the form of a constitutional debt provision that

 8   applies to full faith and credit debt but not to nonrecourse

 9   debt.

10         A response to that, Judge, is that it's not a

11   loophole.  It gives the legislature discretion.  There are

12   alternatives.  There is full faith and credit debt and there is

13   nonrecourse debt, and it leads to the legislature's discretion

14   how those alternatives are going to be deployed.  That is not

15   irrational.  It is not a stunning act of competence.  It

16   recognizes the centrality of the taxing and spending power in

17   the hands of the legislature.  It recognizes the primacy of the

18   legislature with respect to taxation spending and economic

19   matters and is a perfectly rational way to interpret the Puerto

20   Rico Constitution.

21         On that subject, your Honor, in terms of how the

22   analysis should proceed, listening to the General Obligation

23   Bondholders, one would think that the starting point is the

24   available resources clause, the debt priority clause of the

25   Puerto Rico Constitution, that is the first order and that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    everything else in the Puerto Rico Constitution flows from

2    that.

3          That is exactly backwards, Judge.  It's exactly

4    backwards.  The starting point is the taxing power.  That is a

5    broad power.  It is a plenary power and has been recognized to

6    be a plenary power by the Supreme Court of Puerto Rico and that

7    is a power that resides with the legislative assembly.

8          So then the question becomes, given that the

9    legislative assembly possesses this plenary power over

10   taxation, are there specific provisions in the Puerto Rico

11   Constitution that act to override or limit that plenary

12   authority?  That's the framework for analysis.  We have

13   articulated, all of us on the COFINA side, the reasons that we

14   believe that the specific provisions relied upon here don't act

15   to create such a constraint.  I am not going to repeat the

16   entirety of that.

17         I do just want to pause on one point, however, your

18   Honor, and it is this.  The General Obligation Bondholders rely

19   upon the legislative history.  They say that the legislative

20   history is the place to go for the identification of the

21   available resources clause, the debt priority clause, as a

22   substantive constraint on the power of the legislature.

23         Judge, the materials that they rely upon don't say

24   that the debt priority clause acts as a constraint on the power

25   of the legislature.  The materials that they rely upon say that

 1    it acts as a constraint on the power of the governor.  I'll be

 2    specific.

 3         The constitutional history that they rely upon,

 4    including and principally the history of the Puerto Rico

 5    Constitution by Chief Justice Trias Monge, who I think was

 6    described as the combination of Hamilton and Madison, what that

 7    constitutional history says is that the debt priority clause

 8    was adopted to, quote, place in absolute first term and beyond

 9    the scope of the power of the governor, of the power of the

10    governor, the payment of interest and the amortization of

11    general obligation debt.

12         The question becomes, why does the governor's power

13    have to be constrained?  Isn't it the legislature that

14    establishes what is to be spent and then the governor is

15    required to follow that?  The answer to that, Judge, is the

16    dissenting opinion that the General Obligation Bondholders rely

17    on in *Presidente de la Cámara v. Gobernador*.  Again, they rely

18    on that case as articulating a framework within which total

19    resources are estimated at the beginning of the year and then

20    at the end of the year there is consideration of what is

21    available, what actually comes in.

22         What that case describes is in the constitutional

23    budgeting process in Puerto Rico the governor has a line item

24    veto that allows him or her to reduce, eliminate, and

25    reprioritize appropriations.  So the purpose of having a

1  constraint on the governor, at least based on the materials

2  that the General Obligation Bondholders rely upon, is so that

3  when the governor exercises his or her line item veto to ensure

4  that that's done in a way that maintains the priority of

5  general obligation debt.

6          The important point, Judge, is that the debt priority

7  clause as a substantive constraint on the legislative

8  assembly's taxing power is not in the legislative history, at

9  least not what is cited or what is relied upon by the General

10 Obligation Bondholders, and it is not, as I have said in the

11 text of the debt priority clause, which should be the main

12 consideration here.

13         Let me talk about evasion, your Honor.  The General

14 Obligation Bondholders referred to two cases on the subject of

15 evasion and the fact that a constitutional provision can be

16 evaded, even if its plain terms are not violated.  That's not

17 what those cases hold, Judge.

18         Those cases, and I'm talking about *Shkurti* and I'm

19 talking about *Cerajewski*, those cases involved constitutional

20 debt limitations that were much more explicit, much more

21 precise, and much more restrictive than what we have at issue

22 here.

23         I will be specific.  In the *Cerajewski* case, there was

24 a debt limit which prohibited borrowing by political

25 corporations, quote, in the aggregate exceeding 2 percent of

1  the value of the property within that corporation.  The issue

2  there was whether two corporations could own the same property

3  under that provision and not have it be exceeded.

4        So, too, in the *Shkurti* case.  The provision at issue

5  there said that subject to certain exceptions that don't apply

6  here, quote, no debt whatever shall hereafter be created by or

7  on behalf of the state.  No debt whatever shall be created by

8  or on behalf of the state.

9        Contrast that, your Honor, with the debt limitation

10  that's at issue here, which applies, as I've said, only to

11  direct obligations of the Commonwealth for money borrowed

12  directly by the Commonwealth and backed by its full faith and

13  credit.  Those cases don't say that a constitutional provision

14  can be evaded where the terms of the Constitution are not

15  violated.  They don't stand for that proposition, Judge.

16        Turning then to the subject of the transfer of the

17  pledge to sales tax, Mr. Despins, sort of the baseline approach

18  in his argument. he talked about different considerations.  He

19  talked about form versus substance.  He talked about labels.

20  He talked about statements in memoranda that may have been

21  included in the legislative record.

22        What he didn't spend as much time, precious little in

23  fact, was on the words of the statute.  I am not going to

24  belabor it because I know I have repeated them.  But the words

25  matter, Judge.  Statutory interpretation, as I have said, and

 1    as the First Circuit has said, in Puerto Rico begins and ends

 2    with the words of the statute.  And the statute here say that

 3    there was a transfer and that the pledged sales tax shall be

 4    COFINA's property.  Judge, the only way to conclude that there

 5    was not a transfer or that this is something other than

 6    COFINA's property is to ignore those words.  That should not be

 7    the result.  Under the controlling authority here it ought not

 8    be.

 9          Still with respect to the subject of the transfer,

10    Mr. Despins talked about absurd results, that there would be

11    absurd results if the Court were to conclude that implemented

12    sales taxes that have not yet been collected and had not been

13    collected in 2007 were transferred to COFINA.  The underlying

14    premise there, Judge, is there was nothing to transfer.  I

15    mentioned this briefly when I was up here last.

16          That premise fails because there was an existing tax

17    that required money to be remitted and the result was that a

18    stream of revenue was created.  Your Honor, the only way to

19    conclude that there was nothing to transfer when the sales and

20    use tax was implemented is to accept the fiction that nothing

21    was ever going to be sold in Puerto Rico from that point

22    forward because if something was going to be sold, and I would

23    submit that is a fair assumption, if there were going to be

24    sales, then there were going to be taxes collected and there

25    was going to be, and there was, a new stream of revenue.

1          Mr. Despins says in one of his examples, how can you

2    have you taxes collected on the sale of an item that hasn't yet

3    been sold and where the merchant might or might not exist down

4    the road.  The merchant might go bankrupt.  The merchant might

5    not be there.

6          Judge, those same types of criticisms can be leveled

7    in every one of the municipal finance situations that we have

8    cited to and, for that matter, in every one of the commercial

9    situations that we have cited to.  If I sell a stream of rent

10   to someone with respect to a building that has 10 apartments in

11   it, maybe all of those apartments are going to be sold, and

12   that's what my buyer is going to get, or are going to be

13   rented.  Maybe fewer than all of them are going to be rented.

14   Maybe one of them or two of them or three of them are going to

15   be harmed in some way.  Rents might go up.  Rents might go

16   down.  There are a million variables.

17         If the point is that future revenues can be subject to

18   variables, then we will agree with that.  But if the point is

19   that the fact that future revenues being subject to variables

20   somehow makes them incapable of being transferred, that point

21   is contradicted, your Honor, and it's contradicted by case

22   after case after case.

23         And on this point, Judge, I would like to focus, too,

24   on the specific cases that the Commonwealth agent in particular

25   relies upon.  Judge, their cases are about situations where a

```
 1    court held that corn that has not yet been planted can't be

 2    transferred, or where you've got a railroad car that isn't

 3    owned by the seller at the time of the sale, whether that was

 4    transferred, too.  Those are very different situations from

 5    what we are dealing with here, your Honor.

 6           THE COURT:  But you do have a statute here in Puerto

 7    Rico that says, at least for tax purposes, the Commonwealth

 8    isn't the owner of the sales tax revenues until they are

 9    collected.  In 2007, the sales tax revenues that are being

10    collected in 2018 clearly hadn't been collected.  So if there

11    is a transfer, how could it be more than an expectation or a

12    transfer of something when the thing that becomes concrete?

13           MR. YANEZ:  Your Honor, so, too, in my rent example I,

14    as the owner of the apartment building, won't, I suppose, in

15    some sense, own the rent payable next month or the month after

16    until it's handed over to me.  Courts recognize that in

17    addition to the individual instances in which payments are

18    made, those individual instances, together, add up to a stream

19    of revenue that is an asset in itself that can be transferred.

20           THE COURT:  Is there a significance in the

21    constitutional prohibition on the transfer of the right to go

22    and collect?  Couldn't the buyer with the right to the rental

23    stream, either directly in that contract or, if things go

24    south, go and displace the landlord as the collector of the

25    rents and use some self-help there?  It seems to me that the
```

1   Constitution says that the Commonwealth can't let somebody else

2   do that, can't let COFINA go and do that.  Is that a material

3   difference?

4         MR. YANEZ:  I don't believe it is, your Honor.  And

5   this goes back to an answer that I at least meant to give

6   earlier if I didn't.  That is that the antisurrender provisions

7   of the Puerto Rico Constitution don't operate at sort of fine

8   levels that are being conveyed here.  What those provisions

9   mean is that the power to tax cannot be infringed by other

10  branches of the government.

11        In terms of the mechanics of the use, the exercise of

12  the power to tax, including the exercise of that power through

13  the transfer of a stream, I think that the Commonwealth would

14  have some leeway there, but I also think that fundamentally

15  collection doesn't matter.  The reason that collection doesn't

16  matter is that it is possible to collect something that is

17  owned by and has been transferred to someone else.  That's what

18  happened here, Judge.

19        I also want to speak to the notion that this is

20  somehow, if one looks through the substance --

21        THE COURT:  I am going to give you a minute and 30

22  seconds to do that because you're in overtime now, and then I

23  am going to have another question for you as well.

24        MR. YANEZ:  Thank you, Judge.

25        I can be very quick on whether it's financing.  It's

1    not.  The reason it's not is that the words of the statute

2    matter.  Words of the statute are transfer of property of

3    COFINA.  They don't talk about it being a financing.  They

4    don't talk about liens.  They don't talk about anything other

5    than ownership.  And we would submit, Judge, that the terms of

6    the statute should be respected here.

7         Your Honor also asked earlier and invited us to

8    comment on whether the Court needs to resolve the question of

9    substitution in connection with these proceedings.  I can speak

10   to that or hold off and answer your Honor's question.

11        THE COURT:  You can speak to that very briefly.

12        MR. YANEZ:  My answer is that the Court need not

13   resolve the question of substitution because it doesn't detract

14   from the fundamental command of the statute.

15        THE COURT:  Now, the question that I want to ask you

16   is to respond to Mr. Despins' argument that your 2007 theory,

17   once you take into account the mandate to pay over substituted

18   assets, whether that's a forever thing or a particular

19   situational thing, makes your ownership concept completely

20   aspecific and quoting, therefore, absurd that you have a right

21   to the revenues, you have a right to anything that might be

22   substituted by the revenues, and you own it all 20 years before

23   any of it ever happens.

24        Is there a flaw in that reasoning?

25        MR. YANEZ:  There is, Judge.  And the flaw is that we

1   have not asserted that COFINA owns anything that might be

2   substituted for the pledge sales tax.

3            THE COURT:  Thank you.

4            MR. YANEZ:  Thank you, your Honor.

5            THE COURT:  Mr. Kirpalani.

6            MR. KIRPALANI:  Thank you, your Honor.  I wish it said

7   15 minutes, but it's going down to five.

8            For the record, Susheel Kirpalani from Quinn Emanuel.

9   I am going to jump a little bit, but I am going to get within

10  my five minutes.  If you have questions at the end, I would

11  love to hear them.

12           THE COURT:  Just remember the reporter needs to be

13  able to write down what we say.

14           MR. KIRPALANI:  I promise not to do Spanish on you.

15           The thing that's bothered me about the Commonwealth

16  agent's argument from the very, very beginning, this whole

17  concept of natural law, what's possible, what's not possible.

18  The comment that COFINA can't have what doesn't yet exist, it

19  presupposes something that also is wrong.  I think your Honor

20  hit upon it in one of your last questions to Mr. Yanez, which

21  is, if the government -- the statute doesn't say the common

22  law.  It says the government, which includes COFINA -- doesn't

23  own revenue until the revenue is actually delivered or

24  collected, then why is it the right answer that upon collection

25  or upon -- right now it's my money in my pocket.  I go to this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1    the store, I buy the TV, right.  And then the merchant collects

 2    my 7 percent sales tax or 11 and a half percent, with the

 3    surcharge, sales tax.

 4          At that time, right before that transfer from me, the

 5    customer, it was my property, right.  And so why is it correct

 6    to start with the supposition that upon the payment being made

 7    it becomes the Commonwealth's property?  That's just made up.

 8    The statute tells you, when it becomes an actual piece of cash

 9    from the transaction, who owns it.  It's COFINA.

10          I realize baseball season started last week, but there

11    is no tie goes to the Commonwealth here.  You look at the

12    statute to determine who is the owner upon the collection and

13    it's the Commonwealth who imposed that tax, imposed that

14    statute, and told us who is going to be the owner, and it was

15    COFINA.  So that's my answer to the who owns it question.

16          THE COURT:  Is that also your answer to the when

17    whoever owns it owns it question?  If so, is there any

18    significance in the difference between my TV purchase today and

19    2007?

20          MR. KIRPALANI:  No.  Because what was transferred was

21    the right to those revenues.  When and if items are sold in the

22    future, who will be the owner was determined by the legislative

23    assembly in 2007 and it specifically said, it shall not be

24    available resources.

25          We haven't talked at all about that second section.

 1    There is no ambiguity in what the legislative assembly said in

 2    that second paragraph after Section 12(a) of the COFINA

 3    Enabling Act.  The second section says, and this is how it will

 4    be deposited, those future sales, and it shall not be property

 5    of the Commonwealth and shall not be available resources.  It

 6    shall not be given to the Secretary of the Treasury.  All of

 7    that was done in 2007.  So I don't think it changes when the

 8    actual transfer had occurred.

 9         The GO bondholders say the -- this is another point

10    here your Honor, shifting gears.  The core tax revenues can't

11    be transferred, but airport fees, other taxes and fees used for

12    special purposes can be transferred.  But they say it fast in

13    the hope that nobody reads the Constitution.  There is nothing

14    in the Constitution that talks about this distinction, this

15    dichotomy that is being drawn.

16         Let's take a simple example.  How about PREPA?  How

17    about PRASA?  These are the core essential governmental

18    functions of any civilized society to provide clean water, to

19    provide electric power for the people.  Why are the fees and

20    surcharges that are applied to that power generation and that

21    water cleanliness not available resources?  Why aren't the

22    PREPA bonds counted against the debt service limit?  The only

23    reason is because, I would submit, the GO bondholders don't

24    want to go there.  But their argument proves too much.

25         Your Honor, I think, was correct in the questions to

1    Mr. Stancil that the text of the Constitution only applies to

2    debt limit to what it applies it to.  We are not here to

3    redebate whether that's a good thing or not.  It did seem a lot

4    like this is a political question as to whether that's a good

5    way to create a state or not a good way, and we know different

6    states have done it differently.

7         The last thing I'll leave you with, because I'm about

8    out of time, is that a lot of states don't even issue GO bonds.

9    They don't want to give full faith and credit for exactly the

10   reasons that we are here today, because that is when those

11   really tough ugly choices have to be made about whether

12   bondholders should be paid or whether hospitals should be

13   closed when people need medical services.  COFINA is not about

14   that, your Honor.  Thank you.

15        THE COURT:  Thank you.

16        Mr. Mayer.

17        MR. DUNNE:  You are correct.  Mr. Mayer has three

18   minutes left, and I believe Mr. Mayer ceded two of his three

19   minutes to me.

20        I apologize in advance to the court reporter.  I will

21   try not to do speed argument.

22        Couple of quick points and I am going to jump around,

23   your Honor.  The first one is indulge me in a quick thought.

24   Let's assume we are back in '06 for a moment.  Let's assume

25   Mr. Rosenberg and Mr. Stancil are representing a bond group

1    that is coming up for refinancing at that time, and the

2    Commonwealth is encountering some market difficulties with

3    respect to the cost of that capital.  And the Commonwealth

4    decides, I can create a new tax.  Call it the SUT.

5            The GOs would have two choices.  They could wait for

6    that SUT to be collected over time.  And as that SUT gets

7    brought into the Commonwealth, it becomes available resources

8    for the GOs, but they would realize that may take years or

9    decades to accumulate to sufficient size, or they could avail

10   themselves of a standard securitization structure to monetize

11   that stream in exchange for permanent and immediate sale of

12   present and future SUT collections.  That structure itself

13   could then issue bonds.  The proceeds of those bonds would go

14   and pay off the GOs.  They would become available resources of

15   the Commonwealth and pay them off.  They would look at the

16   Puerto Rico Constitution.  They wouldn't see any antidedication

17   of revenue provision, and they would see that this isn't used

18   to calculate the debt limit.  I suspect the GOs would pick door

19   No. 2.  It's an easier way to be repaid.  That's a supposition

20   and beside the point.

21           What matters is they can't have both doors.  What they

22   can't have is both the SUT over time and the proceeds of the

23   bonds.  What the new bond proceeds did was, they ratified the

24   SUT.  It became available resources in another garb.  It wasn't

25   the SUT stream of payments over time.  It was immediate.  But

1  you can't now argue that the SUT is available resources as well

2  for the all reasons we said.

3      Two other quick points, your Honor.  One is, I urge

4  your Honor to read *Hawkins*, the Indiana Supreme Court.  I

5  mentioned it in connection with Mr. Despins' arguments, but it

6  also dealt with Mr. Stancil's *Cerajewski* case because it

7  essentially overruled both of them, and they cite a Law Review

8  article in it that will bring you to the kind of bedrock of

9  modern municipal bond financing, and you don't recast

10  legislative enactments.

11      Lastly, your Honor, on 14(c), I know that the proviso

12  simply said substitutive collateral.  It says substitutive tax

13  income or collateral.  It neatly tracks all three categories

14  that precede it.  Mr. Despins would like you to eliminate, when

15  they are a nullity, the substitutive tax and substitutive

16  income portions of that, and your Honor is counseled by

17  numerous interpretive canons not to do that.  I also agree with

18  Mr. Yanez that you don't have to reach that issue.

19      Thank you.

20      THE COURT:  Put on your wings, Mr. Mayer.

21      MR. MAYER:  First, the language of the statute says,

22  future funds that must be deposited in the account that will be

23  positive.  It says this transfer is made in exchange.  It was

24  the present tense.  Second, I agree with the statement that you

25  don't need to resolve the issue with what happens if they try

1    to remove the taxes.

2          I would point out there are at least three highest

3    court in state cases, starting with *Pierce County v. State of*

4    *Washington* that holds that you can't just repeal a tax once

5    pledged to bondholders, even where your Constitution retains

6    the power to repeal the tax.  And that's 148 P.3d 1002 (2006).

7    If this becomes an issue of importance to the Court, you can

8    ask the parties to brief it.  Thank you.

9          THE COURT:  Now we return to the Commonwealth.

10         MR. STANCIL:  Your Honor, I try to get six minutes.

11   It's very dramatic to watch that ticking away.

12         Let me come back.

13         THE COURT:  Try to keep it exciting.

14         MR. STANCIL:  No one would accuse me for lacking

15   excitement of the subject matter.

16         Let me start with the text.  We alone, we alone, our

17   side alone offers a coherent meaning to the term available

18   resources in section 2, section 7, and section 8 of the

19   Constitution.  They don't like it.  But they have nothing to

20   say that makes that provision make sense in context.

21         Mr. Yanez ends up doing what I think is in fact

22   exactly backwards and says, the general taxing power controls

23   over the specific provisions that control fiscal

24   responsibility, 180 degrees opposite, your Honor.  The specific

25   governs the general.

1          If he were correct, the broad taxing power would be

2    licensed to ignore First Amendment restrictions, the

3    restriction on public school, private school support that I was

4    referencing earlier.  That's not how it works.  It's exactly

5    upside down.

6          The fact that the drafters may not have predicted this

7    exact method of evasion is not an answer.  I encourage the

8    Court to please read the *Maestros* case that we cite.  It goes

9    through exactly the mode of interpretation that we are offering

10   for the text here, which is, it speaks only to support for

11   private schools, should that also reach support for private

12   school students, and the Court had no trouble looking at Trias

13   Monge, looking for the purpose of this provision in concluding

14   yes.  This is exactly what the Puerto Rico Supreme Court has

15   done and will do.

16         Please also read *Cerajewski*, the Indiana case.

17   Mr. Yanez said, well, the debt restriction there this is a

18   little different.  It is a little different, but the mode of

19   interpretation is spot on.  There was no express prohibition in

20   *Cerajewski* of having these overlapping taxation districts.  I

21   won't quote because I get in trouble when I start quoting and

22   reading too fast.  If the Court will look at page 652 of that

23   decision, the Court walks through and says this would be a

24   simple end run around the clear principle that's articulated in

25   their debt limit provision.

1        Mr. Yanez says, well, if it's a loophole, the answer

2   to that, I believe, he said is well the legislature has

3   discretion.  That doesn't work for constitutions.  A

4   constitutional loophole by definition cannot be solved with

5   legislative discretion.  A constitution binds the legislature,

6   even and especially when it doesn't want to be bound.  That is

7   the defined feature of a constitutional restraint.

8        THE COURT:  I think he is saying it's not a loophole.

9   It's a grant of discretion.

10        MR. STANCIL:  I think beauty is in the eye of the

11   beholder on that, your Honor.  I guess I would say it's not a

12   loophole.  How are we where we are?

13        With respect to the drafting history, 100 percent, 100

14   percent of the drafting history supports our interpretation.

15   Mr. Yanez says, well, it applies only to the governor.  That is

16   flat wrong.  Let me explain what he's trying to do.  Trias

17   Monge says that it places these resources, all resources, in

18   absolute first term beyond the power of the governor.

19        The reason he said governor is because under the Jones

20   Act, which preceded the Constitution, the governor had

21   discretion to reorder the priority.  They took that away in the

22   Constitution.  They didn't grant the legislature some power or

23   suggest that there is some legislative exception to the plain

24   text.  He says, and I think I would look also to the text of

25   article 6.  Section 8 says nothing about the legislature shall

1   not.  It says the debt gets paid first.  Moreover, if you look

2   at the subject heading to article 6 it says, general

3   provisions.  It doesn't say executive legislature, like the

4   earlier articles do.

5        Last, and not least, there have been a couple of

6   attempts at tactical effect arguments.  That takes a few

7   different forms.  The first is the double counting argument.

8   Well, he made available resources.  The proceeds can't be

9   available resources and you have the available resources in the

10  SUT going forward.  That's not right.  Any impermissible

11  financing, by definition, yields immediate proceeds, but that

12  doesn't make it permissible.

13       So the fact that they generated available resources in

14  2006 and in subsequent issuances says nothing about whether

15  they had the authority to try to claim the resources that

16  became unavailable.

17       Moreover, we heard Mr. Kirpalani, in particular, says,

18  COFINA is not about taking essential services away.  COFINA is

19  not about that.  With respect, your Honor, he is dead wrong.

20  The Constitution gives us, and I understand that your Honor had

21  pushed on this, but the Constitution I think clearly gives the

22  GOs first priority over all funds, and the statute reconfirms

23  that constitutional demand.

24       Look at what COFINA does.  If the Court is concerned

25  or if Mr. Kirpalani is concerned about bondholders coming ahead

1   of the essential services, ask the COFINAs where is their

2   constitutional authority to take 40 years of tax revenue ahead

3   of any service whatsoever.  There is absolutely no basis for

4   this.  If anyone is concerned about grabbing a head of

5   essential services, it should be the COFINA structure, which

6   takes all that money off the table before it even gets in the

7   door, or at least tries to.

8          This has nothing to with PREPA or PRASA or energy or

9   water.  The drafting history, again, is crystal clear that

10  public corporations that generate their own revenue don't

11  count.  They are outside of the constitutional framework for

12  the reason that revenue bonds everywhere, real revenue bonds,

13  are outside the Constitution.

14         COFINA is not a real revenue bond.  It's an off-book

15  financing scheme designed to evade all of these limits.  With

16  respect, your Honor, the only way forward for Puerto Rico is to

17  go back to the constitutional intent.

18         THE COURT:  Thank you.

19         Mr. Despins.  As you're walking up there, Mr. Despins,

20  I will need to hear from you because I haven't heard from

21  Mr. Stancil or the Retirees how you walk through the English

22  Spanish thing as well.

23         On the balanced budget amendment, because I understand

24  it's your position that it is the English language version that

25  controls, and I haven't had anyone come up to me and point me

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   to definitive documentation other than speculation that

2   Mr. Truman read all of his legislation himself and had no

3   expert assistance ever.

4          MR. DEPSINS:  Your Honor, I am not the right person to

5   answer this, meaning my colleague here can answer it.  I'll try

6   to cover the rebuttal points very quickly, and he will come up

7   to address that.

8          Let me go through this very quickly, because there is

9   not a lot of time, the question about a loan, how does it work

10  and all that.  Page 18, and footnote 6 that goes on page 18,

11  document No. 322 in the adversary proceeding.

12         The next point I want to address is this issue that if

13  you were to rule for the Commonwealth on this, and Mr. Mayer

14  said that's the end of access to capital market, let me just

15  remind everyone and the Court that Argentina, not in this

16  courtroom, in this courthouse, sort of, not literally, but

17  tortured the bondholders for about 10 years here going back and

18  forth three times to the Second Circuit.

19         And at the end of the day they did a century bond

20  offer, century meaning a 100-year term.  It was oversubscribed.

21  This idea that somehow if the Court were to rule that a statute

22  works in one way, not the way they thought -- although,

23  frankly, the way everyone at the time thought it worked -- that

24  somehow it will cut off access to capital markets is just

25  wrong.

1        Your Honor, the points raised by Mr. Kirpalani

2   referring to Section 201407 and also the section regarding

3   confirmation in the PROMESA statute raise the question of

4   advisory opinions.  And built into all these sections, the

5   point is there has to be a valid priority.  There is not a

6   section that says, COFINA gets a pass.  It's whatever the Court

7   determines COFINA to be.

8        The other point is, your Honor, on accounting I want

9   to refer the Court to our briefs on that.  But the reason why

10  accounting is important, your Honor, is not because you are

11  bound by that but because they found that this was a secure

12  transaction, not because of some crazy accounting rule, but

13  because they found that the Commonwealth kept control over the

14  process and that defeated any other type of treatment.  It

15  defeated a true sale treatment and that's not binding on the

16  Court, but it's illustrative of what's going on.

17       Your Honor, on the argument regarding 14(c), these are

18  all fascinating arguments, but at the end of the day you have

19  to look at the various opinions.  In their own bond statement

20  that belie this whole argument that 14(c), the proviso, the

21  first part of the proviso is subject to substitutive

22  collateral.

23       Then the other question you asked Mr. Yanez is, what

24  about the point that if you are right, the transfer of

25  substitutive collateral occurred in 2007.  The response was, we

 1    have never asserted that.

 2              Your Honor, it's nice for them to say that.  That's

 3    not the way the statute works.  We have a principal approach on

 4    this.  They are saying that, no, because they don't care.  They

 5    know there won't be a substitutive lateral.  That's very cute.

 6    But the statute itself calls for a substitutive collateral to

 7    be deposited in that account.  If we are going to follow the

 8    statute, they can't just walk away from that and say, we are

 9    not asserting that.  The statute actually reads that way.

10              At this point I would ask Mr. Bliss to come up to

11    address the Spanish issue.

12              THE COURT:  Thank you.

13              MR. BLISS:  Your Honor, James Bliss of Paul Hastings

14    on behalf of the Commonwealth agent.  I understand I have a

15    minute and that minute is elapsing as I speak.

16              The argument is that under the Federal Relations Act

17    of 1950, Congress authorized the people of Puerto Rico to adopt

18    the Constitution.  That act provided that, quote, upon approval

19    by the Congress, the Constitution shall become effective.

20              THE COURT:  I think it says upon approval by the

21    Congress adoption thereafter by the constitutional convention

22    and proclamation by the governor becomes effective.  It goes

23    back to the island presumably in Spanish if you are going to go

24    by what language people are likely to read.  How does that make

25    English definitive?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. BLISS:  Your Honor, you're referring to law 447,

2     which amended the Federal Relations Act to approve the Puerto

3     Rico Constitution.  That law provided that, quote, the

4     Constitution of the Commonwealth of Puerto Rico, hereby

5     approved, shall become effective when the constitutional

6     convention of Puerto Rico shall have declared in a formal

7     resolution its acceptance in the name of the people of Puerto

8     Rico of the conditions of approval herein contained and when

9     the governor of Puerto Rico, being duly notified by the proper

10    officials of the constitutional convention of Puerto Rico, if

11    such resolution of acceptance has been formally accepted, shall

12    issue a proclamation to that effect.

13          By the plain terms of law 447, it was the version

14    hereby approved.

15          THE COURT:  And do you have a document that you can

16    point me to that shows that the version hereby approved was

17    solely an English version, not an exhibit with an English and a

18    Spanish version, not an English version that says, if this is

19    an English translation of the Spanish version?  Is there

20    something besides the brackets that you all inserted in the

21    quote from 447 that makes it definitive that the English

22    version was the only thing that was ever approved?

23          MR. BLISS:  What we have is President Truman and

24    members of Congress did not speak or read Spanish.

25          THE COURT:  They can't hire people who speak Spanish

 1    and can talk to them about what the Constitution says?

 2         MR. BLISS:  We also have the point that the Congress

 3    conditioned its approval on certain amendments which were

 4    presented in English.

 5         THE COURT:  This provision wasn't amended, correct?

 6    It wasn't sent back in English.  It wasn't specifically

 7    redrafted and sent back in English?

 8         MR. BLISS:  That's correct, your Honor.  Thank you,

 9    your Honor.

10         THE COURT:  I am as ever grateful to you all for the

11    care that you put into your briefs, the arguments today, and

12    for engaging me on these questions, which are obviously very

13    serious, very difficult, and quite consequential for Puerto

14    Rico.  I will equally seriously carry this under advisement.

15         I am looking forward to the arguments on the 25th

16    about who should be deciding the constitutional questions, and

17    we will all be in touch and seeing lots of each other, I'm

18    sure.

19         MR. DEPSINS:  Your Honor, I was asked to raise this

20    point by the litigators of my shop.  This is not a criticism on

21    anyone, but there is a schedule set to resolve this issue,

22    including the potential trial.  I'm not saying we shouldn't,

23    but I'm just saying that there is that.

24         Both Paul Hastings and Willkie Farr are preparing,

25    because they have to prepare because the schedule is so tight,

1    for the potential trial.  That's costly.  It involves expert

2    witnesses, which you may never hear from.

3          The point is, would it make sense to suspend the

4    scheduling for now so that we don't have to incur those costs

5    going forward?  Because it will save money for everyone.  I

6    don't think the COFINA agent would mind that.

7          THE COURT:  That is an application that you all could

8    make that hasn't been made to me yet.  It does seem to me that

9    in all of the briefing and argumentation, no one has certainly

10   taken the global position that there are any material issues of

11   fact that preclude resolution of this question as a matter of

12   law.  There are a few little pockets of things, depending on

13   where one goes in the Venn diagram.  It seems to me that among

14   the people who have briefed these issues who are parties, there

15   is no one saying that there is anything that has to be resolved

16   in a trial.

17         Is there anyone who is a party to this case who would

18   oppose this oral application for a stay of the trial

19   preparation requirements pending determination of the motions

20   for summary judgment?  Raise your hand if you oppose it.

21         The trial preparation requirements are stayed pending

22   further order of the Court.

23         MR. DEPSINS:  Thank you, your Honor.

24         THE COURT:  Thank you.  Good afternoon, everyone.

25                         (Adjourned)

```
1   UNITED STATES DISTRICT COURT)
                                ) ss.
2   OF PUERTO RICO              )

3

4

5

6                        REPORTERS' CERTIFICATE

7

8            We, Steven Greenblum and Carol Ganley, do hereby

9   certify that the above and foregoing, consisting of the

10  preceding 130 pages, constitutes a true and accurate transcript

11  of our stenographic notes and is a full, true and complete

12  transcript of the proceedings, to the best of our ability.

13           Dated this 10th day of April, 2018.

14           S/Steven Greenblum_____

15           S/Carol Ganley_____

16           Steven Greenblum, RMR, CSR, RPR, CRR

17           Carol Ganley, RMR, CSR, RPR, CRR

18           Official Court Reporters

19           500 Pearl Street

20           New York, NY 10007

21           212-805-0320

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300