ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE PONCE

MUNICIPIO DE PONCE

DEMANDANTE

V.

AUTORIDAD DE CARRETERAS Y
TRANSPORTACION, AUTORIDAD DE
ACUEDUCTOS Y ALCANTARILLA-
DOS, AUTORIDAD DE ENERGIA
ELECTRICA, PTO. RICO TEL.
COMPANY, AUTORIDAD DE LOS
PUERTOS, JUNTA DE PLANIFICA-
CION Y EL ESTADO LIBRE
ASOCIADO DE PUERTO RICO

DEMANDADOS

CIVIL NUM. J AC93-0485

SOBRE:

ACCION CIVIL PARA
EXIGIR CUMPLIMIENTO DE
CONVENIO

González Román, Juez de Apelaciones

SENTENCIA

Nos confrontamos por primera vez con un municipio que suscribe un convenio para el desarrollo de proyectos programados con el Gobierno Central al amparo de las innovadoras disposiciones del Capítulo 13 de la Ley de Municipios Autónomos, 21 L.P.R.A. secciones 4001, et seq, relativas a planes de ordenación territorial. Dicho convenio se otorgó con el propósito de implantar un plan de ordenación que dicha municipalidad elaboró para el uso y aprovechamiento de su suelo. El convenio detalla los proyectos de infraestructura a ser construídos por ciertas instrumentalidades del Gobierno Central en forma programada. Procedemos a trazar las coordenadas decisorias del presente caso haciendo un escrupuloso y desapasionado recuento del trasfondo fáctico del cual surge el presente litigio.

El 28 de octubre de 1993 el Municipio de Ponce presentó la acción civil que nos ocupa con miras a obtener el cumplimiento

SENTENCIA                                          JAC93-0485

específico del referido convenio y en su consecuencia ordenar a seis corporaciones públicas y dos departamentos del Gobierno Central a la construcción de algunos de los proyectos de infraestructura comprendidos en el convenio que no se habían realizado conforme a lo que se programó.  Las instrumentalidades demandadas son la Autoridad de Carreteras y Transportación, la Autoridad de Acueductos y Alcantarillados, la Autoridad de Edificios Públicos, la Autoridad de Energía Eléctrica, la Autoridad de los Puertos, el Departamento de la Vivienda, el Departamento de Recursos Naturales y Ambientales, la Puerto Rico Telephone Company y la Junta de Planificación.

Según alega en su demanda, para mediados del año 1990 el Municipio de Ponce comenzó a recopilar datos para la elaboración de un Plan Maestro dirigido a propiciar un aprovechamiento óptimo de su suelo.  Empero, con la aprobación de la Ley de Municipios Autónomos, _supra_, el municipio redirigió sus esfuerzos y elaboró un Plan de Ordenación Territorial para la ordenación integral y estratégica de su territorio conforme a los novedosos postulados enunciados en dicha legislación.

Se alega que el Plan de ordenación fue elaborado a través de múltiples reuniones entre funcionarios del ayuntamiento y la Junta de Planificación, así como en coordinación con varios jefes de las agencias públicas aquí demandadas.  El referido plan contiene un programa de proyectos de inversión certificados por cada una de las agencias públicas demandadas para llevarse a cabo dentro de un período de cuatro años entre el 1ro. de enero de 1993 y el 31 de diciembre de 1996.

Una vez aprobado el plan por la Asamblea Municipal de Ponce y adoptado por la Junta de Planificación, el Alcalde de Ponce y el Gobernador de Puerto Rico suscribieron el convenio conjuntamente con varios jefes de agencia.  Se alega que una

2

SENTENCIA

JAC93-0485

vez aprobado el plan de ordenación por la Asamblea Municipal de Ponce el 22 de octubre de 1992, la Junta de Planificación lo adoptó el 28 de octubre siguiente. Sostiene que en dicha fecha se suscribió el convenio que recoge el referido plan al cual se le tituló "Convenio para el Desarrollo de Proyectos Programados entre el Gobierno Central y el Municipio de Ponce".

Las entidades demandadas contestaron las alegaciones del Municipio de Ponce y levantaron una serie de defensas afirmativas en común con miras a justificar su incumplimiento con los compromisos que figuran en el convenio. En primer lugar debemos señalar que las agencias demandadas cuestionaron que el convenio pueda utilizarse como fuente de obligación para exigir la realización de obras que reclama el Municipio de Ponce por varias razones. Entre éstas indican que el convenio es nulo por tener causa ilícita, por no haber mediado consentimiento válido al momento de su otorgación, por no estar en concordancia con las políticas públicas, leyes y reglamentos de Gobierno Central y por ser contrario al orden público. Señalan, además, que el acuerdo no contó con el aval de las juntas de gobierno de las agencias y corporaciones públicas que lo suscribieron y que el mismo incide con la discreción reconocida a las agencias públicas de invertir sus fondos de mejoras capitales. Se alega que el convenio está reñido con el bienestar público pues concentra indebidamente un gran número de recursos en un municipio en detrimento de otras regiones del país y que, en su consecuencia, la implantación del mismo violenta los más sanos principios de administración pública. Inclusive, la Autoridad de Acueductos y Alcantarillados y la Puerto Rico Telephone Company formularon reconvenciones contra el Municipio de Ponce reclamando inversiones en los proyectos que habían llevado a cabo bajo el Plan de Ordenación y el convenio.



3

SENTENCIA                                                      JAC93-0485

Las agencias demandadas levantaron, además, defensas
individuales que habremos de señalar más adelante.

Las partes llevaron a cabo un extenso descubrimiento de
prueba que por la importancia y complejidad del litigio,
permitimos se extendiera por más de un año.

Sin embargo, desde una temprana etapa del litigio, el
Municipio desistió de su reclamación contra la Autoridad de los
Puertos. El 20 de julio de 1994, la parte demandante presentó
una solicitud de desestimiento parcial sin perjuicio (sic)
contra la Autoridad de los Puertos en vista de que el único
proyecto cuya ejecución se solicitaba de dicha instrumentalidad
pública, estaba paralizado por razón de un pleito con los
dueños de los terrenos colindantes en donde se había programado
la obra.

El 1ro. de diciembre de 1995 las partes presentaron un
primer informe sobre conferencia preliminar entre abogados que
habían llevado a cabo en preparación para la conferencia con
antelación al juicio. Las partes estipularon los siguientes
hechos:

> 1- A mediados del año 1990 el Municipio
> de Ponce comenzó a recopilar datos carto-
> gráficos y socioeconómicos y a elaborar
> las líneas generales de un Plan Maestro.
>
> 2- El 12 de diciembre de 1990 el Alcalde
> de Ponce, Hon. Rafael Cordero Santiago,
> presentó la idea del Plan Maestro a una
> concurrencia que se dio cita en el Teatro
> La Perla de Ponce.
>
> 3- En enero de 1991 el Municipio creó la
> Oficina del Plan Maestro y en los meses
> siguientes contrató personal técnico espe-
> cializado para la elaboración del Plan
> Maestro.
>
> 4- El 30 de agosto de 1991 entró en
> vigor al Ley Núm. 81, conocida como Ley de
> Municipios Autónomos, la cual ha sido
> objeto de distintas enmiendas desde su
> aprobación.
>
> 5- El Municipio de Ponce se acogió a las
> disposiciones de la Ley de Municipios
> Autónomos para elaborar en lugar del Plan

4

SENTENCIA

JAC93-0485

Maestro, el Plan de Ordenación Territorial contemplado por dicha ley.

6- El Plan de Ordenación Territorial elaborado por el Municipio tiene vigencia de ocho (8) años y está compuesto del Memorial, el Programa y la Reglamentación.

7- El Programa del Plan Territorial del Municipio de Ponce tiene un plazo de (4) años.

8- Con participación ciudadana, el Municipio celebró todas la vistas públicas requeridas por la Ley y notificó dicha celebración a la Junta de Planificación.

9- Para fines de la elaboración del Plan, el Municipio creó las Juntas de Comunidad requeridas por la Ley.

10- Con fecha de 22 de octubre de 1992 la Asamblea Municipal aprobó el Plan de Ordenación para el Municipio de Ponce.

11- Con fecha del 28 de octubre de 1992 la Junta de Planificación adoptó el Plan de Ordenación.

12- El Estado Libre Asociado y todas la agencias públicas aquí demandadas exceptuando la Junta de Planificación, suscribieron un convenio con el Municipio de Ponce que titularon "Convenio para el Desarrollo de Proyectos Programados entre el Gobierno Central y el Municipio de Ponce". Este convenio está fechado el 28 de octubre de 1992, pero algunos de los que lo suscribieron en fechas posteriores al 28 de octubre, recayendo dichas fechas que no pueden identificar con precisión, entre los meses de noviembre a diciembre de 1992.

13- El Plan de Ordenación es administrado hoy día por el Municipio de Ponce, extendiendo éste en una buena medida los permisos de obras de urbanización, la autorización de planos de inscripción y otras autorizaciones en cuanto a proyectos que anteriormente otorgaba la Junta de Planes o la Administración de Reglamentos y Permisos.

Para mediados del mes de diciembre de 1995, varias de las entidades demandadas presentaron solicitudes de sentencia sumaria mediante las cuales solicitaron la desestimación del pleito. La Autoridad de Carreteras y Transportación, el Departamento de Recursos Naturales Ambientales y el Departamento de

SENTENCIA                                                    JAC93-0485

la Vivienda, por un lado, la Autoridad de Edificios Públicos, por otro, y la Autoridad de Acueductos y Alcantarillados presentaron sendas mociones de sentencia sumaria solicitando la desestimación de la acción a tenor con las disposiciones de la Regla 36 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III R. 36. Las mismas fueron denegadas mediante nuestra resolución del 17 de enero de 1996.

Los días 22, 23, 24, 29, 30, 31 de enero y 5, 6, 7, 12, 13, 14, 20, 21, 22 de febrero de 1996, se celebró ante este Tribunal el juicio en su fondo en donde las partes presentaron abudante prueba testifical y documental.[1] En virtud de la evaluación de la prueba presentada, las estipulaciones de las partes y la credibilidad que merecieron los testigos, el Tribunal llega a las siguientes:

### DETERMINACIONES DE HECHOS

1- Para principios de la década de los 90 varios funcionarios del Municipio de Ponce crearon una oficina para la preparación de un Plan Maestro que guiara el desarrollo de dicho municipio. Se contrató al Arq. Javier Bonín como director de dicha oficina conjuntamente con varios consultores en diversas áreas. Dicha oficina se dió a la tarea de recopilar datos cartográficos y socioeconómicos para la elaboración de un plan para guiar el desarrollo ordenado de su territorio con el propósito de promover el bienestar social y económico de los ciudadanos de Ponce.

2- El 30 de agosto de 1991, entró en vigor la Ley Núm. 81 conocida como Ley de Municipios Autónomos, supra, la cual autorizaba a los municipios del Estado Libre Asociado de Puerto Rico a elaborar y adoptar planes de ordenación territorial que



---

[1] Durante el juicio desfilaron un total de cuarenta y tres testigos, entre los cuales se encontraban funcionarios públicos, ex-funcionarios y peritos en varias disciplinas. Además, las partes presentaron prueba documental consistente de diez exhibits con numerosísimas subdivisiones.

SENTENCIA                                              JAC93-0485

contuvieran las estrategias y disposiciones para la organiza-
ción del suelo urbano dentro de una ordenación funcional
estética y compacta.

3- Con la aprobación de dicho estatuto, el Municipio se
acogió a sus disposiciones para la elaboración de un Plan de
Ordenación Territorial que sustituiría el Plan Maestro y creó
una Oficina de Ordenación Territorial. Dicha oficina utilizó
las directrices y metodología de la Ley de Municipios Autó-
nomos, supra, a saber: Memorial, Programa y Reglamento.

4- Con abundante participación ciudadana, el Municipio de
Ponce celebró una serie de vistas públicas para la elaboración
de los Planes de Ordenación. El Municipio notificó a la Junta
de Planificación de dichas vistas según lo requiere la ley.[2]

5- Desde enero de 1991 hasta octubre de 1992 el Municipio
de Ponce, en estrecha cordinación con funcionarios de las
instrumentalidades públicas demandadas, elaboró su Plan de
Ordenación Territorial. Las partes se comunicaron mediante una
serie de reuniones, cartas y consultas que se intensificaron a
partir de abril de 1992. En dichas conversaciones estuvieron
envueltos funcionarios de la Oficina de Ordenación Territorial,
el Alcalde de Ponce, personal técnico de las agencias
concernidas, así como sus Secretarios y Directores, el
Secretario de Estado, ayudantes del gobernador, miembros de la
Junta de Planificación e inclusive el propio Gobernador.

6- A través de la multiplicidad de reuniones y misivas
entre funcionarios del ayuntamiento, por un lado, y del
Gobierno Central, por el otro, se determinaron los proyectos
que cada una de las intrumentalidades habría de ejecutar para
fines del programa de obras del Plan de Ordenación Territorial.
La gran mayoría de los proyectos que se incluyeron en el plan,
se encontraban previamente en los respectivos programas de

[2] Véase estipulación número 8.

SENTENCIA

JAC93-0485

obras permanentes de la entidades públicas demandadas.

7- En los casos de las Corporaciones Públicas demandadas, los proyectos comprendidos en el plan estaban contenidos en sus respectivos programas de Obras Permanentes y, por consiguiente, ya habían sido aprobados por sus respectivas Juntas de Gobierno.

8- Las Corporaciones Públicas demandadas determinaron su propia capacidad financiera para acometer los proyectos dentro del plazo programado.

9- Los departamentos demandados, por su parte, incluyeron los fondos para el financiamiento de los proyectos en el Programa de Inversiones de Cuatro Años (PICA) que la Junta de Planifiación sometió a la Asamblea Legislativa.

10- Los proyectos relativos a facilidades educativas, salud y seguridad, se coordinaron entre funcionarios del Municipio de Ponce y los Departamentos de Salud y Educación así como la Policía de Puerto Rico. Los proyectos que sobre éstas facilidades se incluyeron en el Plan de Ordenación Territorial de Ponce, surgieron de la propia programación de dichas agencias, las cuales representaron a la Autoridad de Edificios Públicos que se proponían llevar a cabo dichos proyectos, y en virtud de ello surgieron las obligaciones que contrajo dicha agencia. De esta forma, se acordó que la Autoridad de Edificios Públicos sería la propietaria constructora de las facilidades y las agencias las ocuparían bajo el régimen de alquiler hasta tanto se pagaran los bonos a emitirse para su construcción. Sólo entonces, sería transferido el dominio de las edificaciones a las instrumentalidades públicas correspondientes.

11- Los proyectos que acordaron las partes fueron incluídos en un listado de proyectos por agencia y se hizo figurar en una tabla para fines del programa. La presentación



8

SENTENCIA                                                    JAC93-0485

de dichas tablas en el Programa del Plan de Ordenación Terri-
torial calificaba las mismas como "los programas de proyectos
de inversión certificados por las agencias púbicas".

12- Mediante la Ordenanza #601, Serie 1992-93, la
Asamblea Municipal del Municipio de Ponce aprobó el 22 de
octubre de 1992 el Plan de Ordenación Territorial. Una vez
aprobado el Plan de Ordenación Territorial, el Municipio elevó
el mismo para la consideración de la Junta de Planifiación.

13- El 23 de octubre de 1992, la Presidenta de la Junta
de Planificación para ese entonces, Ing. Patria Custodio, cursó
una misiva a las instrumentalidades públicas demandadas para
que previo a adoptar el referido plan, cada agencia verificara
la información contenida en el Programa de Proyectos Certifi-
cados y certificaran la información allí contenida como
correcta. Para ello incluyó, en las tablas de proyectos
correspondiente a cada una de las agencias demandadas, una
certificación conteniendo el siguiente lenguaje:[3]

> CERTIFICO: Yo, _____, que
> la presente tabla refleja los acuerdos de
> inversión para los próximos cuatro años
> para la implantación del Plan Territorial
> de Ponce.

_____          _____
     Fecha

El espacio en blanco corresponde al nombre del Secretario o
Director Ejecutivo de la instrumentalidad correspondiente.

15- La Junta de Planificación recibió de vuelta las
certificaciones de cada una de las instrumentalidades públicas
demandadadas. Sin embargo, la Autoridad de Carreteras y
Transportación, la de Acueductos y Alcantarillados y el Depar-
tamento de Recursos Naturales suscribieron las certificaciones
con ciertos cambios en cuanto a los proyectos contenidos en sus

--------

[3]Véanse las ocho tablas que incluyen las respectivas
certificaciones de proyectos en los anejos al final de esta
sentencia correspondientes a las instrumentalidades públicas
aquí demandadas, con excepción de la Junta de Planificación.

9



SENTENCIA

JAC93-0485

tablas.

16- La Autoridad de Carreteras y Transportación varió el lenguaje de la certificación para que el mismo leyera de la siguiente manera:

CERTIFICO: La programación de proyectos aquí incluída está en armonía con nuestro Programa de Construcción de Cinco Años, con excepción del proyecto --Intersección El Tuque (Fase II)". (ver comentarios en la carta que se incluye)."

La carta a la cual hace referencia la certificación antes trascrita, se refiere a una carta dirigida a la Vicepresidenta de la Junta de Planificación, Arq. Lina Dueño, suscrita por los doctores Bigas y Ortíz[4] en la que se le informa que con excepción del proyecto Intersección El Tuque, Fase II, los costos e inversión recomendada estaban a tono con la planificación y disponibilidad de recursos económicos de dicha agencia.

17- Tal y como surge del referido lenguaje, la certificación constata la necesidad de introducir la variación relativa al proyecto de la Intersección de El Tuque (Fase II.)

18- Por su parte, las variaciones introducidas por el Departamento de Recursos Naturales a la tabla de proyectos aprobada por al Asamblea Municipal de Ponce fueron las siguientes:

El proyecto de canalización del Río Portugés y Río Bucaná se redujeron las cantidades a $3,500,000 para los años 94-95 y 95-96 y a $3,400,000 para el 95-96. La asignación de $3,600,000 para el año 92-93, se transfirió para el 93-94. Mientras que la cantidad de $250,000 para el corte de la montaña del Lago Cerrillos se aumentó por la cantidad de $2,200,000 para el año 1993-94. La cantidad de $300,000 para la canalización de los ríos Matilde, Pastillo y Canas para el año fiscal 1993-94 se aumentó a $400,000 y las cantidades de $1,100,000 para el año 1993-94 y para los años 1994-95 y 1995-96 se redujeron a $1,000,000 para cada uno de dichos años.

19- Por otro lado, la variación introducida por la Autoridad de Acueductos y Alcantarillados consistió en eliminar

---

[4]Hermenegildo Ortíz, anterior Secretario del Departamento de Transportación y Obras Públicas, y Jorge L. Bigas.

10

SENTENCIA                                                    JAC93-0485

una serie de proyectos pequeños que aparecen bajo el título de Mejoras al Sistema y dos proyectos relativos al emisario marino de la Planta de Tratamiento.

20- Al efectuar las referidas certificaciones, se presume que las intrumentalidades públicas demandadas estaban conscientes de que el P. de la C. 1626 del 1992 había sido aprobado por ambos cuerpos legislativos y que dichas certificaciones se efectuaron para dar cumplimiento a los requisitos impuestos en dicho proyecto de ley el cual tuvo lugar sólo unos días despúes de que se emitieran las certificaciones. El P. de la C. 1626, que formulaba una serie de enmiendas a la Ley de Municipios Autónomos, supra, y que fuera radicado en la Cámara de Representantes el 14 de abril de 1992, perseguía que las certificaciones de los proyectos de obras contenidos en el Programa del Plan de Ordenación Territorial se efectuaran con carácter obligatorio.

21- El 28 de octubre de 1992, la Junta de Planificación emitió la Resolución #JP-TP-63-1 adoptando el Plan de Ordenación Territorial del Municipio de Ponce, incluyendo en su expediente las certificaciones que emitieron las instrumentalidades públicas demandadas con las variaciones hechas por la Autoridad de Carreteras y Transportación, el Departamento de Recursos Naturales y la Autoridad de Acueductos y Alcantarillados.

22- El 6 de noviembre de 1992, el Gobernador de Puerto Rico conforme al Boletín Administrativo #OE-1992-66 emitió Orden Ejecutiva aprobando el Plan de Ordenación Territorial de Ponce según había sido adoptado por la Junta de Planificación.

23- El Gobierno Central del Estado Libre Asociado conjuntamente con las agencias públicas demandadas suscribieron el convenio con el Municipio de Ponce entre el 28 de octubre y el 15 de diciembre de 1992. Las corporaciones públicas demandadas fueron representadas por sus respectivos directores



11

SENTENCIA

JAC93-0485

ejecutivos.    Dicho convenio fue presentado al Registro de Contratos del Municipio de Ponce el 15 de septiembre de 1993 y a la Oficina de la Contralor al día siguiente.

24- En sus cláusulas pertinentes, el convenio lee como sigue:

## I. COMPARECENCIA

Por la primera parte, EL GOBIERNO CENTRAL DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, en adelante denominado "EL GOBIERNO CENTRAL", representado por el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Rafael Hernández Colón, la Autoridad de Carreteras representada por su Director, el Ing. Jorge L. Bigas Mulero, Autoridad de Acueductos y Alcantarilllados representada por su Directora, Ing. María Margarita Irizarry, Autoridad de Edificios Públicos representada por su Director, Arq. Luis Rafael Arias Albizu, Autoridad de los Puertos representada por su Director, Gen. José Buitrago, Autoridad de Energía Eléctrica representada por su Director, Sr. José Al del Valle, Departamento de la Vivienda representada por su Administrador, Sr. Rigoberto Figueroa, Departamento de Recursos Naturales representada por su Secretario, Sr. Santos Rohena Betancourt, y Puerto Rico Telephone Company representada por su Director, el Ing. Ramón Arce, en adelante denominado "LAS AGENCIAS".

Por la segunda parte, EL MUNICIPIO DE PONCE, en adelante denominado "EL MUNICIPIO", representado por su Alcalde, Hon. Rafael Cordero Santiago.

Las partes aseguran tener la capaciadad y autoridad en Ley para otorgar este convenio, la cual surge de la Ley Núm. 81 de 30 de agosto de 1991, según enmendada, conocida como Ley de Municipios Autónomos.

## II. PREAMBULO

En este convenio se pone en vigor la política pública del Estado Libre Asociado de Puerto Rico establecida en la Ley de Municipios Autónomos consistente en otorgarle a los municipios el máximo posible de autonomía además de proveerles a estos (sic) los poderes y facultades que sean necesarios para asumir un rol central y fundamental en su desarrollo urbano, social y económico.

El Municipio de Ponce en cumplimiento de lo dispuesto en la Ley de Municipios Autónomos ha invertido considerables recursos económicos y humanos y tiempo en elaborar un Plan de Ordenamiento Territorial para disponer para el mejor uso del suelo dentro de sus límites territoriales y desarrollar proyectos de infraestructura para la promoción mediante la adopción de un Plan de Ordenamiento Territorial.



12

SENTENCIA

JAC93-0485

El Plan de Ordenamiento contiene el Programa de Proyectos de Inversión en el Municipio de Ponce, debidamente certificados por las agencias públicas pertinentes y por el Municipio, según corresponde, como exige la referida Ley Núm. 81, según enmendada.

El análisis regional permite conocer las características sociales y económicas de la población, así como conocer las ventajas, oportunidades y limitaciones que presenta cada región. A su vez permite el tener un diagnóstico de los componentes de infraestructura básica y las necesidades de construcción y rehabilitación de los sistemas.

De esta forma se provee el análisis necesario que permita la indentificación de oportunidades y condiciones para estimular un desarrollo balanceado a nivel regional y se optimice la competitividad interregional.

Entre los proyectos de inversión certificados se encuentran varios a ser desarrollados por las AGENCIAS aquí comparecientes. Los referidos proyectos deben ser desarrollados en su totalidad para poder dar efecto al Plan de Ordenación y efectuar el desarrollo del Municipio conforme a la política pública expuesta en la citada Ley de Municipios Autónomos.

En consideración a las contraprestaciones ante mencionadas, las partes contraen las siguientes OBLIGACIONES:

1. Las AGENCIAS completarán el desarrollo de los siguiente proyectos en el Municipio de Ponce.

   a. Autoridad de Carreteras- Ver Anejo A
   b. Autoridad de Acueductos y Alcantarillados- Ver Anejo B
   c. Autoridad de Edificios Públicos- Ver Anejo C
   d. Autoridad de los Puertos- Ver Anejo D
   e. Autoridad de Energía Eléctrica- Ver Anejo E
   f. Departamento de la Vivienda- Ver Anejo F
   g. Departamento de Recursos Naturales- Ver Anejo G
   h. Puerto Rico Telephone Company- Ver Anejo H

[Los anejos identificados en la sección antes transcrita, se refiere a las tablas de los proyectos que habían certificado las instrumentalidades públicas demandandas a ser incorporados en el Plan de Ordenación Territorial.]

2. El Municipio de Ponce por su parte ofrecerá el apoyo económico que esté dentro de su presupuesto para la consecución de los referidos proyectos.

   D. TERMINO

Este convenio entrará en vigor inmediatamente que sea firmado por las partes comparecientes. Los proyectos aquí descritos, se llevarán a cabo según programados entre el 1 de enero de 1993 y el 31 de diciembre de 1996.

25- A pesar de que los trabajos del soterrado de la zona

13

SENTENCIA                                    JAC93-0485

histórica comenzaron según acordado, para fines del mes de enero de 1993 dichas obras, conjuntamente con otros proyectos, se paralizaron.

26- Durante el mes de abril de 1993, se celebró una reunión en Fortaleza entre los recien nombrados jefes de los departamentos del gobierno central, secretarios y directores ejecutivos de las instrumentalidades públicas demandadas, el Secretario de la Gobernación, Lcdo. Alvaro Cifuentes y el Alcalde de Ponce. En dicha ocasión, este último solicitó el cumplimiento con los compromisos de inversión contraídos. Sin embargo, los representantes de las entidades públicas presentes le indicaron qué proyectos se llevarían a cabo y cuáles no.

27- Las instrumentalidades públicas demandadas no hicieron uso de los mecanismos que contempla la Ley de Municipios Autónomos, _supra_, para solicitar al Municipio una revisión parcial del plan de ordenación territorial, sino que de manera unilateral dejaron de cumplir con varios de los compromisos de inversión contraídos en el Plan de Ordenación Territorial y el convenio objeto del presente litigio.

28- Los proyectos que la Autoridad de Carreteras y Transportación no ha dado cumplimiento son los siguientes:

PR-2

Extensión Ronda de Circunvalación Sur, conector a Expreso (Fase I) y Construcción de las Calles Marginales Norte a Sur, Intersección El Tuque (Fase II-A). Dicho proyecto debió haber comenzado en el año fiscal 1992-93.

PR-9

Desde la Ave. Tito Castro (PR-14) hasta las cercanías de la PR 503 (Fase II-A). Este proyecto debió haber dado comienzo en el año fiscal 1993-94.

Cerca de PR 503 hasta PR-10 existente Fase II-B. PR-10 existente hasta PR-132 y en sección 20.60m desde PR-132 hasta PR-2. El proyecto debió haber dado comienzo en el año fiscal 1992-93.

Mejoras geométricas a la PR-503 desde la salida de la PR-9 hasta Mayor Cantera.

PR-10

14



SENTENCIA

JAC93-0485

Ave. Hostos (PR-10) mejoras habilitar a cuatro carriles y soterrado desde La Abolición hasta la Ave. Las Américas. Este proyecto debió haber comenzado en el año fiscal 1992-93.

PR-14

Construcción Intersección a desnivel entre (PR-14) y (PR-133). Este proyecto debió haber comenzado en el año fiscal 1992-93. Sin embargo, no se comenzó hasta el año fiscal 1994-95.

PR-139

Desde PR-14 hasta PR-139 (cerca de donde se construye la Represa Cerrillos). Este proyecto debió haber comenzado en el año fiscal 1992-93.

28- La ejecución de los anteriores proyectos que fueran aprobados por la Junta de Directores de la Autoridad de Carreteras y Transportación, se encuentran dentro de la capacidad financiera de dicha agencia. Sin embargo, la razón que ahora se aduce para su incumplimiento es que dicha entidad no los considera prioritarios.

29- La no realización de los proyectos a los que nos referimos en los dos apartados previos, representan $70,179,999 que la Autoridad de Carreteras y Transportación dejó de invertir en el Municipio de Ponce.

30- Por su parte, la Autoridad de Acueductos y Alcantarillados no ha dado comienzo dentro del término fijado por el convenio. Estos proyectos son:

Sistema acueductos Sector El Collado, etapa I-PMP-4-06-7050. Este proyecto debió haber comenzado en el año fiscal 1992-93.

Diseño Planta Filtración Cerrillos, 10 MGD - PMP-4-09-6005. Este proyecto de carácter municipal debió haber comenzado en el año fiscal 1992-93.

Adquisición Terrenos Planta Filtración Cerrillos - PMP-4-09-60007. Este proyecto debió haber comenzado en el año fiscal 1992-93.

Línea Transmisión 36 pulgadas a Las Mojitas - PMP-4-09-6020. Este proyecto debió haber comenzado en el año fiscal 1992-93 y comenzó en el año fiscal 1994-95.

Sector La Yuca Y El Paraíso, sistema de acueducto, tuberías y bombas. Este proyecto debió haber comenzado en el año fiscal 1992-93.

Completar soterrado límite de primer orden de la Zona

15

SENTENCIA

JAC93-0485

Histórica de la Playa de Ponce. Este proyecto debió haber comenzado en el año fiscal 1992-93.

Troncal sanitaria Carretera #14 desde Avenida Fagot hasta el Puente de Río Inabón - PMP-4-58-5000. Este proyecto debió haber comenzado en el año fiscal 1992-1993.

31- Los proyectos identificados en el apartado anterior, estaban presupuestados en el programa de Mejoras Permanentes de la Autoridad de Acueductos y Alcatarillados para los años fiscales 1993-97. Por otro lado, con excepción de los proyectos identificados en el Sector La Yuca y El Paraíso y los proyectos de diseño y adquisición de terrenos para la Planta de Filtración Cerrillos, se encuentran aún en el Programa de Mejoras Permanentes para llevarse a cabo para los años 1996-2000.

32- El 13 de septiembre de 1993, el Gobernador de Puerto Rico emitió una Orden Ejecutiva declarando a la Autoridad de Acueductos y Alcantarillados en estado de emergencia.[5] Dicha providencia estaba fundamentada en un informe rendido por un grupo de trabajo presidido por el Dr. Antonio Santiago Vázquez.[6] En el referido informe se indica que la construcción de la Planta de Filtración Cerrillos debe dársele prioridad. La parte pertinente del referido informe lee de la siguiente manera:

En la región de Ponce es urgente la construc-
ción de una planta de filtración que permita maxi-
mizar el uso de la nueva reserva de agua disponible

---

[5] Véase Orden Ejecutiva del Gobernador del Estado Libre Asociado de Puerto Rico para Declarar un Estado de Emergencia en la Autoridad de Acueductos y Alcantarillados y Disponer Medidas Urgentes a Adoptarse. Boletín Administrativo Núm. OE-1993-41.

[6] El Dr. Antonio Santiago Vázquez dirigió un grupo de trabajo designado por el Gobernador Hon. Pedro Roselló González para confeccionar un plan para la rehabilitación de la Autoridad de Acueductos y Alcantarillados. En dicho grupo de trabajo partici-paron el Director de la agencia Dr. Emilio Colón, el Sub-Director Sr. Benjamín Pomales, Ing. Carlos A. Mulero, el economista Nelson Soto Velázquez, Ing. Alfredo Heres González, el profesor Jorge Rivera Santos, Ing. Serafín Acevedo, Ing. Alberto Hernández y el hidrogeólogo Dr. Nicoliho Liberatori.

SENTENCIA

JAC93-0485

en el Lago Cerrillos... A fin de utilizar la riqueza actual del recurso de agua en al Región Sur, se requiere construir una planta de filtración. Esto representa la solución al problema de sobre carga y deterioro del sistema de agua potable, viabilizando la producción y distribución suficiente y eficiente del recurso de agua en al Región Sur.

33- Al no llevar a cabo los proyectos conforme a lo que se programó, la Autoridad de Acueductos y Alcantarillados dejó de invertir en el Municipio de Ponce la suma de $5,500,000.

·34- La Autoridad de Edificios Públicos, por su parte, no ha dado comienzo a los ocho proyectos consignados en su certificación para el Programa del Plan de Ordenación Territorial de Ponce. Estos son:

El Centro de Salud Familiar del Barrio Coto, que debió haber comenzado en el año fiscal 1993-94.

El Centro Pediátrico del Hospital Regional que debió haber comenzado en el año fiscal 1993-94.

El Centro de Rehabilitación Siquiatrica de carácter rigional que debió haber comenzado en el año 1993-94.

La Estación de Patrulla de Tránsido y Depósito de Vehículos Hurtados que debió haber comenzado en el año fiscal 1992-93.

La edificación para la Unidad Marítima que debió haber comenzado en el año fiscal 1994-95.

El Cuartel para la División de Drogas y Narcótico que debió haber comenzado en el año fiscal 1994-95.

La Escuela Superior Rural El Tuque que debió haber comenzado en el año fiscal 1995-96.

La Escuela Elemental de Educación Especial que debió haber comenzado en el año 1995-96.

35- El Municipio de Ponce ha mantenido el proyecto del Centro de Salud Familiar del Barrio Coto en su programación y ha requerido a la Autoridad de Edificios Públicos que comience con las construcción del mismo. Sin embargo, dicha intrumentalidad no ha comenzado la construcción del proyecto.

17

SENTENCIA                                              JAC93-0485

36- El resto de los proyectos, estaban a la fecha de otorgarse la certificación de Proyectos de Inversión de la Autoridad de Edificios Públicos, en la programación de las instrumentalidades que habrían de utilizar los mismos para prestar sus servicios. Sin embargo, estos proyectos fueron unilateralmente reprogramados por los Departamentos de Salud y Educación y por la Policía de Puerto Rico para comenzar la construcción durante el próximo cuatrienio con excepción de los proyectos de la Unidad Marítima y el Cuartel de la División de Drogas y Narcóticos que fueron cancelados por la entidad correspondiente.

37- El no realizar estos proyectos conforme a lo que se programó, la Autoridad de Edificios Públicos dejó de invertir en el municipio demandante la suma de $14,588,100.

38- Los proyectos certificados por el Departamento de la Vivienda en el Plan de Ordenación Territorial no se han realizado. El estado de dichos proyectos es el siguiente:

Iniciar Rehabilitación de 100 unidades. Tal rehabilitación forma parte de donativos o regalías que se le ha conocido como "La Tablita" que la Administración de Desarrollo y Mejoras de Viviendas brinda a familias que habitan en viviendas deterioradas. Para acogerse a este programa y a sus beneficios, los participantes tienen que reunir ciertos requisitos y dirigirse a la oficina regional correspondiente para hacer su solicitud de ayuda de materiales. La persona realiza la obra con materiales y la ADMV[7] le brinda el donativo hasta un máximo de $500 por familia. Este programa debió dársele a conocer a las familias que puedan beneficiarse del mismo desde el año fiscal 1992-93 y separarse para Ponce los fondos correspondientes a 100 unidades.

Continuar construcción calles, encintados, sistemas sanitarios, agua potable y pluvial. Carr. 2, Bo. Canas, Punta Diamante, Ponce. Estas obras fueron paralizadas en el mes de marzo de 1993 y al presente no han sido reanudadas. En 1992 ADMV solicitó $2.5 millones a la Oficina de Presupuesto y Gerencia para la realización de esta obra, pero la misma no fue recomendada por OPG y en consecuencia no fue aprobada por la Legislatura. También se solicitaron fondos a la OPG en el 1993, 1994 y 1995.

_____
[7]Administración de Desarrollo y Mejoras a la Vivienda.

SENTENCIA

JAC93-0485

pero ésta no los recomendó a la Legislatura.

Pagán E.L.A. v. Eileen Mercado, caso #E-88-418. En este caso hay sentencia y el dinero se le ha solicitado reiteradamente a la O.P.G. los años 1992, 1993, 1994 y 1995 sin ésta lo haya recomendado a la Asamblea Legislativa. Dicho pago debió haberse efectuado en el año fiscal 1992-93.

Construcción calles y red interna Com. Paraíso. La ADMV manifestó que una vez haya agua para dicho proyecto, solicitará los fondos para terminarlo. Este proyecto debió haber comenzado en el año fiscal 1992-93.

Rehabilitación y nueva construcción (Ponce en Marcha) - Bo. La Playa, Sector Puerto Viejo, Salistral, Sector Pabellones. Rehabilitación y construcción (Ponce en Marcha) - Arenas Betances, Sector San Felipe. Estos proyectos debieron haber comenzado en el año fiscal 1992-93; la asignación para dicho año es objeto de un litigio JAC-93-0233 entre el Municipio de Ponce y el Gobernador de Puerto Rico Hon. Pedro Roselló.[8]

Asignación para rehabilitación privatizada de 1,000 viviendas bajo el programa "Tu Cuidad Renace". Consiste en la creación de una construcción o reha-bilitación de estructuras en maderas o en materiales mixtos para 1,000 unidades en el Centro Histórico de Ponce, dentro del programa más amplio dirigido a los Centros Tradicionales existentes en el Banco de la Vivienda. El Banco tiene los fondos disponibles pero sólo dos familias habían solicitado el bene-ficio de los fondos a la fecha de 26 de diciembre de 1995.

Relocalización de aprox. 300 viviendas en zonas de alto riesgo y mayor necesidad. No existe partida presupuestaria al presente para llevarla a cabo. Este proyecto debio haber comenzado en el año fiscal 1992-93.

Rehabilitación en sitio de viviendas en áreas econó-micamente deprimidas. Este es un programa en el cual las familias participantes solcitan fondos para la rehabilitación de sus viviendas. Este proyecto no tiene partida presupuestaria asignada para cumplir con el compromiso de certificación. Este proyecto debió haber comenzado en el año fiscal

---

[8]En dicho caso , el Tribunal de Primera Instancia emitió "Sentencia Sumaria Parcial Interlocutoria el 16 de abril de 1996. Mediante dicha sentencia, se decretó la validez de seis convenios de delegación de competencia de varias agencias gubernamentales al Municipio de Ponce, (Civil Núm. JAC93-0233). Dicho decreto se encuentra ante la consideración del Panel I del Circuito Regional de Ponce y Aibonito en el Tribunal de Circuito de Apela-ciones bajo el certiorari KLCE9600559. El 10 de junio de 1996, el Tribunal de Circuito de Apelaciones emitió una resolución denegando la moción en auxilio de jurisdicción que solicitaba la paralización de los procedimientos.

SENTENCIA                                                           JAC93-0485

1992-93.

Las partes formularon las siguientes estipulaciones en cuanto a los residenciales Ponce de León y Lirios:

Remodelación Res. Ponce de León – Para este residencial en el CGP 1993 hay unas asignación de $613,171 (para propósito de la modernización de los residenciales). En el CGP 1995 existe una asignación de $6,398,823 para un total asignado de $7,001,994.

Remodelación Res. Lirios – Para este residencial el CGP 1992 se asignó (para propósito de la modernización de los residenciales) cuatro millones de dólares. En el CGP de 1993 se asignaron $2,533,503. En el CGP de 1994 se asignaron $12,497,062 y en el CGP de 1995 se asignaron $800,000.

En cuanto a la remodelación de los residenciales Dr. Pila, Ramos Antonini, López Nussa, Barriada Caribe y Gándara y la demolición Res. Las Terrazas, éstos proyectos caen bajo la responsabilidad de la Administración de Vivienda Pública, la cual no intervino en las consultas o reuniones para la preparación del Plan de Ordenamiento Territorial ni formuló compromiso de inversión para el programa del Plan de Ordenamiento Territorial, así como tampoco fue parte del convenio.

La remodelación de residenciales se lleva a cabo con fondos federales. A la fecha de incluir el Res. López Nussa en los proyectos certificados no había partida presupuestaria federal asignada par la modernización ni tampoco la hay ahora. El Res. Barriada Caribe tiene asignación federal para el 1995 para diseño y supervisión. La demolición de Las Terrazas tiene fondos federales asignados para el 1995.

39- Al no llevar a cabo los proyectos para la Comunidad el Paraíso, la relocalización de viviendas en zonas de alto riesgo y mayor necesidad así como el de construcción y venta en 200 solares baldíos en zona urbana, el Departamento de la Vivienda dejó de invertir en el Municipio de Ponce la cantidad de $19,000,000.

40- El Departamento de Recursos Naturales no dió comienzo a los proyectos que se desglosan a continuación:

Area recreativa Represa Cerrillos. Este proyecto de carácter regional, debió haber comenzado en el año fiscal 1992-93.

Bucaná Beach Park (Santa Cruz Cabuyones). Este proyecto debió haber comenzado en el año fiscal 1992-93.

SENTENCIA

JAC93-0485

Canalización ríos Matilde, Pastillo y Canas. Este proyecto continuará el año fiscal 1997 con una aportación de $7,000,000.

Rehabilitación Faro Isla de Muertos. Este proyecto continuará el año fiscal 1997 con una aportación de $100,000. En torno a este proyecto, el Departamento de Recursos Naturales transfirió al Municipio de Ponce los fondos necesarios para llevar a cabo el mismo. Dicho municipio no ha comenzado el proyecto porque entiende que necesita las especificaciones de parte de Recursos Naturales para llevarlo a cabo. Sin embargo, el Departamento de Recursos Naturales determinó que era el propio municipio responsable por la preparación de los planos.

Parque Nacional - Vivero. Este proyecto continuará el año fiscal 1997 con una aportación de $140,000.

Parque Lineal en los canales Portugués y Bucaná. Este proyecto debió haber comenzado en el año fiscal 1994-93.

Lagos Cerrillos (Bosque de Caoba).

41- Al no llevar a cabo lo anteriores proyectos, con la excepción de la canalización de los ríos Matilde, Pastillo y Canas, conforme a lo programadado, el Departamento de Recursos Naturales y Ambientales dejó de invertir la suma de $13,787,000.

42- Los proyectos Bucaná Beach Park, Area Recreativa Represa Cerrillos, Lagos Cerrillos Bosque de Caoba, Canalización ríos Matilde, Pastillo y Canas, requieren los permisos y aportaciones de los fondos complementarios del Cuerpo de Ingenieros de los Estados Unidos.

43- El Departamento de Recursos Naturales y Ambientales no gestionó su inclusión de los proyectos Bucaná Beach Park, Area Recreativa Represa Cerrillos y Lagos Cerrillos Bosque de Caoba en el Programa de Inversiones de Cuatro Años (PICA) y no existen fondos en el presupuesto anual del Departamento para llevarlos a cabo.

44- Por su parte, la Autoridad de Energía Eléctria no ha terminado los proyectos que se comprometió a realizar. Aún falta completar el soterrado del límite de primer orden de la Zona Histórica, de la Avenida Hostos y del sector histórico de

21

SENTENCIA                                                    JAC93-0485

la Playa de Ponce. La Autoridad acepta llevar a cabo una parte, pero no todo el soterrado. En cuanto al proyecto relativo a la Playa de Ponce no es propiamente un soterrado total de cables, sino un reordenamiento de postes y líneas del tendido eléctrico combinado con algún soterrado. El trabajo a realizarse entre la Avenida Las Américas y el poblado de la Playa, tampoco contempla el soterrado de la totalidad de las instalaciones del tendido eléctrico de la Autoridad, sino que más bien consiste en un reordenamiento de dichas instalaciones para mejorar el aspecto estético del área. El proyecto, según consignado en el Programa, contemplaba asignaciones anuales comenzando en el año fiscal 1992-93. La Autoridad trabajó en las obras del soterrado de la Zona Histórica durante el primer semestre de año fiscal 1992-93. Es decir, hasta diciembre de 1992. Sin embargo, las obras se detuvieron a principios de enero de 1993.

45- La Autoridad de Energía Eléctrica sostuvo conversaciones con el Municipio de Ponce en las que propuso completar parte de las obras del soterrado que estaban en construcción a finales de 1992 y cuya construcción se paralizó en el mes de enero de 1993. La propuesta de la Autoridad no incluía la totalidad del compromiso recogido en el Plan de Ordenamiento Territorial de soterrar sus instalaciones en la totalidad del límite de primer orden de la Zona Histórica, ni tampoco incluía la instalación de las luminarias ni cumplía con las disposiciones de los reglamentos números 5 y 22 aprobados por la Junta de Planificación para la instalación de la infraestructura en espacios abiertos y zonas históricas. El municipio rechazó la propuesta por entender que era contraria al Programa contenido en su Plan de Ordenación Territorial.

46- En cuanto al soterrado de tres líneas dentro del trébol de la PR-52 con la PR-1, las partes estipularon en corte

22



SENTENCIA                                                    JAC93-0485

abierta que la Autoridad de Energía Eléctrica llevaría a cabo la misma para el mes de julio de este año.

47- El no llevar cabo los proyectos conforme a lo que se programó, la Autoridad de Energía Eléctrica dejó de invertir en el municipio demandante la suma de $20,500,000.

48- Por otro lado, la Puerto Rico Telephone Company tiene los proyectos que se encuentran certificados en el programa del Plan de Ordenación Territorial dentro de su programa de expansión de mejoras. Sin embargo, los proyectos no han podido llevarse a cabo por la paralización de las obras de soterrado, requieren una coordinación del Municipio de Ponce, la Autoridad de Energía Eléctrica y la Autoridad de Acueductos y Alcantarillados.

Programa de soterrado

Centro Histórico; Ave. Hostos desde la Abolición hasta la Ave. Las Américas; Ave. Hostos desde Ave. Las Américas hasta la calle Comercio; La Playa; Calles Mayor Cantera y Acueducto; Puerto de Ponce.

49- El primer Programa de Inversión de Cuatro Años (PICA) que aprobó la Junta de Planificación con posterioridad a haber adoptado el Plan de Ordenación Territorial para el Municipio de Ponce, lo fue para el cuatrienio que da comienzo con el año 1993-94 y se extiende hasta el año 1996-97. A pesar de que el Municipio de Ponce le requirió a la Junta de Planificación que incluyera en dicho PICA todos los proyectos certificados por las intrumentalidades aquí demandadas e incluídos en el Plan de Ordenamiento Territorial del Municipio de Ponce, ésta sólo incluyó los proyectos que las instrumentalidades públicas demandadas le pidieron que incluyera. Los proyectos incluídos en el PICA 1993-2996-97 son:



PR-2, Extensión Ronda de Circunvalación Sur, conector a Expreso (Fase I) y construcción de las calles marginales (norte-sur). Incluído para 1993-94, 1994-95 y 1995-96.

PR-2, Desvío Norte o Ronda de Circunvalación Baldorioty de Castro. Incluídos para 1993-94, 1994-

23

SENTENCIA                                                    JAC93-0485

95 y 1995-96.

PR-9, desde la PR-10 existente hasta la RR-52 y
desde la PR- 132 hasta la PR-2. Incluído para 1993-
94, 1994-95, 1995-96 y 1996-97.

PR-9, desde la PR-14 o Ave. Tito Castro hasta la PR-
503(Fase 1₁-A) y desde la PR 503 hasta la PR-10
existente (Fase II-B). Incluído para 1993-94, 1994-
95, 1995-96 y 1996-97.

PR-10, Ave. Hostos -Mejorar y habilitar a cuatro
carriles el tramo enre Ave. Abolición y la PR-52.
Incluído para 1995-96 y 1996-97.

PR-14 Ave. Malecón- Construcción de intersección a
desnivel con la calle Comercio, PR-133. Incluído
para 1993-94, 1994-95 y 1995-96.

PR-14, Ave. Tito Castro (Fase I) desde la Ave. Fagot
hasta la Int. con PR-9. Incluído para 1994-95 y
1995-96.

Puente La Guadalupe - Terminaciones Arquitectónicas.
Incluído para 1993-94.

PR-139, Desde la PR-14 hasta la antigua PR-139.
Incluído para 1994-95 y 1995-96.

Adquisición de Terrenos Planta de Filtración
Cerrillos. Incluído para 1994-95, 1995-96 y 1996-
97.

Línea de Transmisión 36" a Las Monjitas . Incluído
para 1993-94, 1994-95 y 1995-96.

Troncal Sanitaria 24" Diá., PR-14. Incluído para
1993-94.

Soterrado de la Zona Histórica. Incluído para 1993-
94, 1994-95 y 1995-96.

Expansión de pista hacia el oeste, Aereopuerto de
Ponce. Incluído para 1993-94.

50- Ninguna de las instrumentalidades públicas demandadas
solicitaron la revisión del Plan de Ordenación Territorial del
Municipio de Ponce conforme a los mecanismos que establece la
Ley de Municipios Autónomos, supra.

51- El que no se hayan llevado a cabo los proyectos cuyo
cumplimiento específico se solicita, ha desarticulado la
implantación del Plan de Ordenación Territorial del Municipio
de Ponce e imposiblita el logro de sus objetivos.

52- El Municipio de Ponce ha sufrido daños como conse-
cuencia del incumplimiento de las agencias demandadas con sus

24

SENTENCIA                                                    JAC93-0485

compromisos de inversión acordados en el "Convenio para el Desarrollo de Proyectos Programados entre el Gobierno Central y el Municipio de Ponce".

53- El municipio demandante estableció su prueba en daños mediante el testimonio pericial del economista Dr. Elías R. Gutiérrez Sánchez.

54- El Dr. Gutiérrez estimó las pérdidas sufridas por el Municipio de Ponce en tres renglones de ingresos municipales: arbitrios de construcción, patentes municipales y contribuciones sobre la propiedad.

55- Para estimar la pérdida de los recaudos por concepto de arbitrios de construcción se tomó el costo de construcción de los proyectos demorados o cancelados y se multiplicó por la tasa establecida en la ordenanza municipal que rige este arbitrio y que establece que aquellos proyectos cuyo costo excede de $25,000 se paga un 3% más $300. Se excluyeron de dicho cómputo, las pérdidas por concepto de arbitrios de construcción no recaudados de aquellos proyectos que las agencias realizarían por administración -como, por ejemplo, las obras del soterrado de la Zona Histórica- que están excentos del pago de los referidos arbitrios. En el caso de los proyectos que fueron comenzados con demoras, se descontó el recaudo para tomar en cuenta el efecto del retraso sobre el valor presente de la recaudación. De ahí que el estimado de daños por este concepto se reduce a la pérdida en el valor presente del arbitrio y no a la totalidad del mismo. Es decir, la pérdida por arbitrios de construcción estimada para los proyectos comenzados con retraso se reduce al descuento por el tiempo que el Municipio de Ponce ha tenido que esperar para realizar el recaudo ya que ese tiempo reduce el valor presente de dichos recaudos.

56- El monto de pérdida de arbitrios de construcción de

25

SENTENCIA                                                        JAC93-0485

los proyectos demorados o dejados de construir injustificada-
mente por las agencias demandadas asciende a $3,309,308. El
desgloce por agencias es el siguiente:[9]

| AGENCIA | PROYECTO | INVERSION | PERDIDA NETA EN EL RECAUDO DE ARBITRIOS |
|---|---|---|---|
| Autoridad de Edificios Públicos | Centro de Salud Familiar, Barrio Cotto | $ 4,751,000.30 | $142,239.00 |
| Autoridad de Edificios Públicos | Centro Pediátrico Hospital Regional | 4,700,000.00 | 28,229.00 |
| Autoridad de Edificios Públicos | Centro Rehabilitación Psiquiátrica | 1,802,000.80 | 7,459.00 |
| Autoridad de Edificios Públicos | Estación patrulla de tránsito y depósito de vehículos hurtados | 1,158,000.70 | 4,779.00 |
| Autoridad de Edificios Públicos | Unidad Marítima | 265,000.30 | 551.00 |
| Autoridad de Edificios Públicos | Cuartel de la División Drogas y Narcóticos | 1,789,000.80 | 3,840.00 |
| Autoridad de Edificios Públicos | Escuela Superior Rural El Tuque | 1,419,000.50 | 3,041.00 |
| Autoridad de Edificios Públicos | Escuela Elemental de Educación Especial o Escuela Elemental Ramón Marín | 403,000.30 | 1,636.00 |
| Departamento de la Vivienda | Construcción anillos y red interna Comunidad Paraíso | 1,000,000.00 | 29,700.00 |
| Departamento de la Vivienda | Rehabilitación y nueva construcción (Ponce en Marcha): Barrio La Playa, Sector Puerto Viejo, Salistral | 3,494,000.20 | 104,526.00 |
| Departamento de la Vivienda | Relocalización de aproximadamente 300 viviendas en zonas de alto riesgo y mayor necesidad | 6,000,000.00 | 179,700.00 |

[9]Las tablas incluídas en las determinaciones de hecho 56,
63, 65, 67 y 69 provienen del "Exhibit 7" del Informe Pericial
del Municipio Autónomo de Ponce. Las cifras indicadas en dicho
"exhibit" fueron reducidas en un 10%, pues no se incluyeron en
los cómputos la exhortación de la Orden Ejecutiva del 19 de
mayo de 1986, Boletín Administrativo Número 4686, "Orden
Ejecutiva del Gobernador del Estado Libre Asociado de Puerto
Rico para Establecer las Directrices del Programa de Ponce en
Marcha para las Agencias Gubernamentales y Exhortar a las
Corporaciones Públicas su Adhesión al Mismo".

SENTENCIA                                                                    JAC93-0485

| | | | |
|---|---|---|---|
| Departamento de la Vivienda | Rehabilitación en sitio de viviendas en áreas económicamente deprimidas | 10,770,000.00 | 322,800.00 |
| Departamento de la Vivienda | Modernización de Residenciales López Nussa | 7,000,000.00 | 209,700.00 |
| Departamento de la Vivienda | Modernización de Residenciales: Barriada Caribe | 1,500,000.00 | 44,700.00 |
| Departamento de la Vivienda | Mejoras Residenciales: Residencial Portugués | 1,000,000.00 | 29,700.00 |
| Departamento de la Vivienda | Mejoras Residenciales: José N. Gándara | 1,000,000.00 | 29,700.00 |
| Departamento de la Vivienda | Demolición Residencial Las Terrazas | 1,400,000.00 | 41,700.00 |
| Departamento de Recursos Naturales | Parque Nacional y Vivero | 1,558,000.00 | 46,440.00 |
| Departamento de Recursos Naturales | Reserva Natural La Matilde | 1,670.000.00 | 49,800.00 |
| Departamento de Recursos Naturales | Parques lineales a lo largo de los canales Portugués y Bucaná | 3,300,000.00 | 98,700.00 |
| Autoridad Carreteras y Transportación | Carretera PR-2, Extensión Ronda de Circunvalación Sur, Conector a Expreso (Fase I) | 7,000,000.00 | 209,700.00 |
| Autoridad Carreteras y Transportación | Carretera PR-2, Construcción de las Calles Marginales Norte y Sur, Intersección El Tuque (Fase II) | 7,000,000.00 | 209,700.00 |
| Autoridad Carreteras y Transportación | Carretera PR-9, Desde la Ave. Tito Castro (PR-14) hasta las cercanías de la PR-503. (Fase II-A) | 11,800,000.00 | 353,700.00 |
| Autoridad Carreteras y Transportación | Carretera PR-9, Cerca de PR-503 hasta PR-10 existente (Fase II-B) | 11,900,000.00 | 356,700.00 |
| Autoridad Carreteras y Transportación | Carrerera PR-9, PR-10 existente hasta PR-132 y en sección 20.60m desde PR-132 hasta PR-2 | 17,500,000.00 | 524,700.00 |
| Autoridad Carreteras y Transportación | Carretera PR-10, Ave. Hostos (PR-10) mejoras habilitar cuatro carriles y soterrado desde la Abolición hasta la Ave. Las Amécias | 400,000.00 | 11,700.00 |

27

SENTENCIA                                                          JAC93-0485

| Autoridad Carreteras y Transportación | Carretera PR-14 Construcción intersección a desnivel entre PR-14 y PR-133 | 7,549,000.70 | 31,368.00 |
|---|---|---|---|
| Autoridad Carreteras y Transportación | Carretera PR-14 (Reconstrucción y Paisajismo desde Ave. Fagot hasta PR-9, Fase II | 5,100,000.00 | 52,700.00 |
| Autoridad Carreteras y Transportación | Carretera PR-139, desde la PR-14 hasta la antigua PR-139 (Cerca de donde se construye la Represa Cerrillos) | 2,680,000.00 | 80,100.00 |

57- Para estimar la merma en recaudos por concepto de patentes municipales y contribuciones sobre la propiedad, el perito económico del municipio demandante desarrolló un modelo econométrico basado en la premisa de que compromisos de inversión que tenían que realizar las demandadas conforme al Plan de Ordenamiento Territorial y el convenio hubiera generado unos efectos directos, indirectos e inducidos sobre la economía de la ciudad de Ponce.[10] La actividad económica derivada del conjunto de proyectos no efectuados por las entidades demandadas produjo que no se generaran los gastos, ingresos y ventas por lo que no se realizaron los recaudos municipales.

58- Dicho análisis se hizo utilizando un modelo de insumo-producto mediante la utilización de la matriz de Insumo-Producto elaborada para la economía de Puerto Rico por la Junta de Planificación. Este método de análisis es un mecanismo

---

[10]El Dr. Elías R. Gutiérrez, a preguntas del Lcdo. César Hernández Colón, declaró de la siguiente manera: "Esa dirección de cambios de la inversión al aumento en empleo, al aumento de ingreso, al aumento en consumo y la vuelta que realizan hacia atrás los distintos cambios representan efectos indirectos, e inducidos. Por ejemplo, cuando el empleo aumenta y aumenta, a su vez, el ingreso, el ingreso, a su vez, genera ventas adicionales y esas ventas adicionales producen necesidad de empleo adicional en ciertos sectores de la economía. A eso se le conoce como un efecto indirecto. Pero cuando el consumo, luego que todos estos efectos ocurren, también cambia, ese aumento en consumo es aumento en un componente de la demanda final de la economía, aquella demanda por productos que se usan finalmente, ya sea por consumidores o se exportan. Y genera ingresos adicionales y empleos adicionales y a eso se le conoce como efectos inducidos."



28

SENTENCIA                                                    JAC93-0485

reconocido para analizar los efectos de cambios en distintos sectores de la economía.

59- El Dr. Elías R. Gutiérrez estimó que el coste sufrido por la economía por concepto de la pérdida de producción de ingresos y puestos de trabajo. El estimado del daño fiscal sufrido por el Ayuntamiento del Municipio de Ponce, por concepto del la cancelación o postergación de los proyectos, se midió en términos de los recaudos dejados de percibir.

60- Para estimar la pérdida de recaudos por concepto de patentes municipales y contribuciones sobre la propiedad, se utilizó el empleo promedio anual como instrumento en un modelo econométrico que se desarrolló tomando en consideración los datos del Municipio de Ponce sobre tales recaudos a través de un período de años. Los coeficientes del modelo se estimaron utilizando series de empleo y recaudos por patentes durante el período fiscal 1985-1993. Se estimó el grado con que el empleo anual se ha correlacionado históricamente con la recaudación por concepto de patentes y contribuciones sobre la propiedad.

61- Se encontró más de un 90% de la variación anual en recaudación por concepto de patentes se explica por variaciones en la actividad económica. La relación empírica hallada permite llegar a un estimado de la pérdida de recaudación, derivada de reducciones anticipadas en la actividad económica ocasionada por la cancelación o posposición de los proyectos.

62- Mediante la utilización de los coeficientes derivados de la matriz de Insumo-Producto, se obtuvo el número de puestos de trabajo perdidos al dislocarse el programa de proyectos de inversión.[11] Se estimó, además, el empleo directo requerido y



[11]El perito economista de la Autoridad de Carreteras y Transportación, del Departamento de la Vivienda y del Departamento de Recursos Naturales y Ambientales, Dr. Ramón J. Cao García, concurrió en que el modelo de insumo producto puede utilizarse para analizar los efectos económicos que generaría la inversión en obra de infraestructura. También, expresó su (continúa...)

29

SENTENCIA

JAC93-0485

el empleo indirecto e inducido que la construcción de esas obras generarían. La técnica aplicada para obtener los estimados en dicho caso fue la siguiente:

La pérdida en empleo potencial anticipada se tradujo a un porciento de cambio sobre el nivel de empleo oficial informado para el Municipio de Ponce correspondiente al año fiscal 1993, v.gr., 50,242 personas. Incorporando este dato, y los correspondientes a los años sub-siguientes, se estimó la pérdida para el período fiscal 1993-97.

63- El monto de la pérdida por concepto de patentes municipales que hubiesen generado durante el período de su construcción los proyectos dejados de construir injustificadamente por las agencias demandadas asciende a $10,173,260. El desglose por agencia es el siguiente:

| AGENCIA | PROYECTO | PATENTES NO RECAUDADOS |
|---|---|---|
| Autoridad de Acueductos y Alcantarillados | Instalación de la Troncal Sanitaria de 24" en la Carretera #14 | $ 90,082.00 |
| Autoridad de Acueductos y Alcantarillados ✳ | Completar soterrado límite de primer orden de la zona histórica y proyeco de soterrado de la Ave. Hostos y sector histórico de la Playa de Ponce | 102,951,00 |
| Autoridad de Acueductos y Alcantarillados | Línea de transmision de 36" a las Monjitas | 232,282.00 |
| Autoridad de Edificios Públicos | Centro de Salud Familiar Bo. Cotto | 305,718.00 |
| Autoridad de Edificios Públicos | Centro Pediátrico Hospital Regional | 302,417.00 |



11(...continuación)
conformidad a que las ecuaciones desarrolladas por el Dr. Gutierrez a base de la correlación entre el nivel de empleo y lo recaudos por concepto de patentes y contribuciones sobre la propiedad son correctas. No obstante, el Dr. Cao discrepó en el número de empleos que generarían las obras en el Municipio de Ponce. Más sin embargo, el perito del Municipio de Ponce señaló que según el Dr. Angel Ruíz, quien es probablemente la persona más reconocida en Puerto Rico en el campo del análisis del modelo de insumo producto y quien es consultor de la Junta de Planificación, realizó un trabajo titulado "Un Análisis Sectorial de la Economía del Municipio de Ponce" en el año 1993 y que de dicho informe se desprende que la relación de valor de la construcción a empleo directo es de treinta y dos punto cinco (32.5) personas por millón de dólares de construcción para el año 1987. El estudio arroja un treinta y cinco punto cinco (35.5) personas por millón de dólares para el año 1994.

SENTENCIA

JAC93-0485

| | | |
|---|---|---|
| Autoridad de Edificios Públicos | Centro de Rehabilitación Psiquiátrica | 116,000.00 |
| Autoridad de Edificios Públicos | Estación Patrulla de Tránsito y depósito vehículos hurtados | 74,556.00 |
| Autoridad de Edificios Públicos | Unidad Marítima | 17,070.00 |
| Autoridad de Edificios Públicos | Cuartel de la División de Drogas y Narcóticos | 115,163.00 |
| Autoridad de Edificios Públicos | Escuela Superior Rural El Tuque | 91,336.00 |
| Autoridad de Edificios Públicos | Escuela Elemental de Educación Especial | 25,950.00 |
| Autoridad de Energía Eléctrica | Completar Soterrado Límite de primer orden de la zona histórica, Ave. Hostos y Sector Histórico en la Playa de Ponce; y soterrado de tres líneas dentro del Trébol de la PR52 con la PR1. | 1,582,866.00 |
| Departamento de la Vivienda | Construcción anillos y red Interna Comunidad Paraíso | 64,344.00 |
| Departamento de la Vivienda | Rehabilitación y Nueva Construcción (Ponce en Marcha); Barrio La Playa, Sector Puerto Viejo, Salistral | 224,831.00 |
| Departamento de la Vivienda | Relocalización de aproximadamente 300 viviendas en zonas de alto riesgo y mayor necesidad | 386,065.00 |
| Departamento de la Vivienda | Rehabilitación en sitio de viviendas en áreas económicamente deprimidas | 692,986.00 |
| Departamento de la Vivienda | Modernización de residen- ciales, López Nussa | 450,409.00 |
| Departamento de la Vivienda | Modernización de residen- ciales, Barriada Caribe | 95,516.00 |
| Departamento de la Vivienda | Mejoras residenciales: Residencial Portugués | 64,344.00 |
| Departamento de la Vivienda | Mejoras residenciales: Jose N. Gándara | 64,344.00 |
| Departamento de la Vivienda | Demolición Residencial Las Terrazas | 90,082,00 |
| Departamento de Recursos Naturales | Parque Nacional y Vivero | 100,248.00 |
| Departamento de Recursos Naturales | Reserva Natural La Matilde | 107,455.00 |
| Departamento de Recursos Naturales | Parques Lineales | 212,336.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-2, Extensión Ronda de Circunvalación Sur, Conector a Expreso (Fase I) | 450,409.00 |

SENTENCIA

JAC93-0485

| | | |
|---|---|---|
| Autoridad de Carreteras y Transportación | Carretera PR-2, Construcción de las Calles Marginales Norte y Sur, Intersección El Tuque, (Fase II) | 450,409.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-9, Desde la Ave. Tito Castro (PR-14) hasta las cercanías de la PR-503. (Fase II-A) | 759.261.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-9, Cerca de PR-503 hasta PR-10 existente (Fase II-B) | 765,695.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-9, PR-10 existente hasta PR-132 y en sección 20.60m desde PR-132 hasta PR-2. | 1,126,022.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-10, Ave. Hostos (PR-10) mejoras habilitar a cuatro carriles y soterrado desde la Abolición hasta la Ave. Las Américas | 25,738.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-14, Construcción intersección a desnivel entre PR-14 y PR-133. | 485,778.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-14, (Reconstrucción y Paisajismo desde Ave. Fagot hasta PR-9, Fase II. | 328.155.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-139, desde la PR-14 hasta la antigua PR-139. Cerca de donde se construye la represa Cerrillos. | 172,442.00 |

64- El Dr. Elías R. Gutiérrez estimó el daño fiscal para el Municipio de Ponce en dos períodos respectivamente. El período de construcción y el período de post construcción. El período post construcción comienza a decursar una vez termine el proyecto que más tarda en completarse y se extiende por un período de diez (10) años, esto es hasta el año 2006.[12] Ahora bien, dicho perito fundamentó la pérdida fiscal sufrida por la municipilidad demandante en que sus pérdidas no se limitan a los arbitrios por concepto de construcción no recaudados, ni los ingresos por concepto de patentes perdidas durante el

_____

[12]A preguntas del Lcdo. César Hernández Colón, abogado del Municipio de Ponce, el perito traído por las agencias demandadas, Dr. Ramón Cao García, sostuvo que el término de 10 años como período post construcción seleccionado por el Dr. Gutiérrez no es un período de tiempo irrazonable.

32

SENTENCIA                                                    JAC93-0485

período de construcción que una vez construídas la presencia permanente de las obras de infraestructura comprendidas en el programa habría de incrementar la actividad económica futura a través de los años. De esta forma, se estableció de forma razonable la expectativa de que las instalaciones construídas, operando en conjunto, sostendrían cierto nivel de actividad económica, y por consiguiente, dicha actividad económica se traduce en ingresos, consumo y ventas que a su vez generan ingresos por patentes. Para establecer las recaudaciones futuras por concepto de patentes que el Municipio de Ponce dejó de percibir, se partió del estimado de empleo inducido por las obras. Aplicó el procedimiento utilizado anteriormente para estimar los reacudos perdidos durante el período de construcción programado. Supuso que la recaudación anual se mantiene constante, y se estableció el valor presente del flujo anual, por un período de diez (10) años utilizando como factor de descuento una tasa de 5% anual.

65-   El monto del valor presente de la pérdida por concepto de patentes municipales que hubiesen generado durante el período de 10 años luego de su construcción asciende a $20,132,999. El desgloce por agencia es el siguiente:

| Autoridad de Acueductos y Alcantarillados | Instalación de la troncal sanitaria de 24" diámetro en la Carretera 14 | 163,800.00 |
|---|---|---|
| Autoridad de Acueductos y Alcantarillados | Completar soterrado límite de primer orden de la zona histórica y proyecto e soterrado e la Ave. Hostos y sector histórico de la Playa de Ponce | $ 187,201.00 |
| Autoridad de Acueductos y Alcantarillados | Línea de transmisión de 36" a las Monjitas | 422,371.00 |
| Autoridad de Edificios Públicos | Centro de Salud Familiar, Barrio Cotto | 555,904.00 |
| Autoridad de Edificios Públicos | Centro Pediátrico Hospital Regional | 475,025.00 |
| Autoridad de Edificios Públicos | Centro de Rehabilitación Psiquiátrica | 191,318.00 |
| Autoridad de Edificios Públicos | Estación Patrulla de Tránsito y depósito vehículos hurtados | 122,964.00 |

33

SENTENCIA

JAC93-0485

| Autoridad de Edificios Públicos | Unidad Marítima | 29,562.00 |
|---|---|---|
| Autoridad de Edificios Públicos | Cuartel de la División de Drogas y Narcóticos | 199,435.00 |
| Autoridad de Edificios Públicos | Escuela Superior Rural El Tuque | 158,173.00 |
| Autoridad de Edificios Públicos | Escuela Elemental de Educación o Escuela Elemental Ramón Marín | 42,799.00 |
| Autoridad de Energía Eléctrica | Completar soterrado límite de primer orden de la zona histórica Ave. Hostos, sector histórico en la Playa de Ponce y soterrado de tres líneas dentro del trébol de la PR-52 con la PR-1. | $2,878.208.00 |
| Departamento de la Vivienda | Construcción Anillos y red interna Comunidad Paraíso | 117,000.00 |
| Departamento de la Vivienda | Rehabilitación y nueva construcción (Ponce en Marcha): Barrio La Playa, sector Puerto Viejo, Salistral | 408,823.00 |
| Departamento de la Vivienda | Relocalización de aproximadamente 300 viviendas en zonas de alto riesgo y mayor necesidad | 702,002.00 |
| Departamento de la Vivienda | Rehabilitación en sitio de viviendas en áreas económicamente deprimidas | 1,260,094.00 |
| Departamento de la Vivienda | Modernización de residenciales: López Nussa | 819,002.00 |
| Departamento de la Vivienda | Modernización de residenciales: Barriada Caribe | 175.500.00 |
| Departamento de la Vivienda | Mejoras residenciales: Residencial Portugués | 117,000.00 |
| Departamento de la Vivienda | Mejoras residenciales: José N. Gándara | 117,000.00 |
| Departamento de la Vivienda | Demolición residencial Las Terrazas | 163,800.00 |
| Departamento de Recursos Naturales | Parque Nacional y Vivero | 182,287.00 |
| Departamento de Recursos Naturales | Reserva Natural La Matilde | 195,391.00 |
| Departamento de Recursos Naturales | Parques lineales a lo largo de los canales Portugués y Bucaná | 386,101.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-2, Extensión Ronda de Circunvalación Sur, Conector a Expreso (Fase I) | 819,002.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-2, Construcción de las calles marginales Norte a Sur Intersección El Tuque (Fase II) | 819,002.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-9, Desde la Avenida Tito Castro (PR-14) hasta las cercanías de PR-503 (Fase II-A) | |
| Autoridad de Carreteras y Transportación | Carretera PR-9, Cerca de PR-503 hasta PR-10 existente (Fase II-B) | |

34

SENTENCIA

JAC93-0485

| Autoridad de Carreteras y Transportación | Carretera PR-9, PR-10 existente hasta PR-132 y en sección 20.60m desde PR-132 hasta PR-2 | 2,047.506.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-10, Ave. Hostos (PR-10) mejoras habilitar a cuatro carriles y soterrado desde la Abolición hasta la Ave. Las Américas | 46,800.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-14, Construcción intersección a desnivel entre R-14 y PR-133 | 801,193.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-14, (Reconstrucción y Paisajismo desde Ave. Fagot hasta PR-9, Fase II. | 596,702.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-139, desde la PR-14 hasta la antigua PR-139. Cerca de donde se construye la represa Cerrillos. | 313,561.00 |

66- El procedimiento seguido para estimar la pérdida incurrida por concepto de contribuciones sobre la propiedad por la cancelación o posposición de los proyectos es metodológica- mente similar al utilizado para estimar la pérdida por concepto de patentes. Para ello, es necesario utilizar el nivel de empleo como variable e instrumento en un modelo que estima la pérdida por concepto de contribuciones sobre la propiedad. Indicó el Dr. Elías R. Gutiérrez que el modelo explica el 86.2% de las variaciones porcentuales en los recaudos del Municipio de Ponce provenientes de contribuciones sobre la propiedad mueble e inmueble.

67- El total de la pérdida por concepto de contribuciones sobre la propiedad que hubiese generado durante el período de su construcción los proyectos dejados de construir asciende a $2,936,277. El desgloce por agencia es el siguiente:

| AGENCIA | PROYECTO | CONTRIBUCIONES NO RECAUDADAS |
|---|---|---|
| Autoridad de Acueductos y Alcantarillados | Instalación de la troncal sanitaria de 24" diámetro en la Carretera 14 | |
| Autoridad de Acueductos y Alcantarillados | Completar soterrado límite de primer orden de la zona histórica y proyecto de soterrado de la Ave. Hostos y sector histórico de la Playa de Ponce | 26,916.00 |
| Autoridad de Acueductos y Alcantarillados | Línea de transmisión de 36" a las Monjitas | |

35

SENTENCIA

JAC93-0485

| | | |
|---|---|---|
| Autoridad de Edificios Públicos | Centro de Salud Familiar, Barrio Cotto | 79,928.00 |
| Autoridad de Edificios Públicos | Centro Pediátrico Hospital Regional | 79,065.00 |
| Autoridad de Edificios Públicos | Centro de Rehabilitación Psiquiátrica | 30,327.00 |
| Autoridad de Edificios Públicos | Estación Patrulla de Tránsito y depósito vehículos hurtados | 19,492.00 |
| Autoridad de Edificios Públicos | Unidad Marítima | 4,463.00 |
| Autoridad de Edificios Públicos | Cuartel de la División de Drogas y Narcóticos | 30,108.00 |
| Autoridad de Edificios Públicos | Escuela Superior Rural El Tuque | 23,879.00 |
| Autoridad de Edificios Públicos | Escuela Elemental de Educación o Escuela Elemental Ramón Marín | 6,784.00 |
| Autoridad de Energía Eléctrica | Completar soterrado límite de primer orden de la zona histórica Ave. Hostos, sector histórico en la Playa de Ponce y soterrado de tres líneas dentro del trébol de la PR-52 con la PR-1. | 413,827.00 |
| Departamento de la Vivienda | Construcción Anillos y red interna Comunidad Paraíso | 16,822.00 |
| Departamento de la Vivienda | Rehabilitación y nueva construcción (Ponce en Marcha): Barrio La Playa, sector Puerto Viejo, Salistral | 58,780.00 |
| Departamento de la Vivienda | Relocalización de aproximadamente 300 viviendas en zonas de alto riesgo y mayor necesidad | 100,933.00 |
| Departamento de la Vivienda | Rehabilitación en sitio de viviendas en áreas económicamente deprimidas | 181,176.00 |
| Departamento de la Vivienda | Modernización de residenciales: López Nussa | 117,756.00 |
| Departamento de la Vivienda | Modernización de residenciales: Barriada Caribe | 25,233.00 |
| Departamento de la Vivienda | Mejoras residenciales: Residencial Portugués | 16,822.00 |
| Departamento de la Vivienda | Mejoras residenciales: José N. Gándara | 16,822.00 |
| Departamento de la Vivienda | Demolición residencial Las Terrazas | 23,551.00 |
| Departamento de Recursos Naturales | Parque Nacional y Vivero | 26,209.00 |
| Departamento de Recursos Naturales | Reserva Natural La Matilde | 28,093.00 |
| Departamento de Recursos Naturales | Parques lineales a lo largo de los canales Portugués y Bucaná | 55,513.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-2, Extensión Ronda de Circunvalación Sur, Conector a Expreso (Fase I) | 117,756.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-2, Construcción de las calles marginales Norte a Sur, Intersección El Tuque (Fase II) | 117,756.00 |

SENTENCIA

JAC93-0485

| Autoridad de Carreteras y Transportación | Carretera PR-9, Desde la Avenida Tito Castro (PR-14) hasta las cercanías de la PR-503 (Fase II-A) | 198,502.00 |
|---|---|---|
| Autoridad de Carreteras y Transportación | Carretera PR-9, Cerca de PR-503 hasta PR-10 existente (Fase II-B) | 200,185.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-9, PR-10 existente hasta PR-132 y en sección 20.60m desde PR-132 hasta PR-2 | 294,389.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-10, Ave. Hostos (PR-10) mejoras habilitar a cuatro carriles y soterrado desde la Abolición hasta la Ave. Las Américas | 6,729.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-14, Construcción intersección a desnivel entre R-14 y PR-133 | 127,003.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-14, (Reconstrucción y Paisajismo desde Ave. Fagot hasta PR-9, Fase II. | 85,793.00 |
| Autoridad de Carreteras y Transportación | Carretera PR-139, desde la PR-14 hasta la antigua PR-139. Cerca de donde se construye la represa Cerrillos. | 45,084.00 |

68- Para obtener el estimado de las recaudaciones futuras por concepto de contribución sobre la propiedad, se utilizó el mismo procedimiento que se utilizó para estimar los recaudos perdidos por concepto de patentes. Bajo el supuesto que la recaudación anual mínima se mantiene constante, el valor presente del flujo anual lo obtuvo sumando el valor descontado por un período de diez (10) años. Con el caso anterior, utilizó como factor de descuento una tasa de 5% anual. El estimado tomó en consideración que la construcción de un número de proyectos ha dado comienzo.

69- El monto de valor presente de la pérdida por concepto de contribuciones sobre la propiedad que hubiesen generado durante el perído de 10 años luego de su construción los proyectos dejados de construir por las agencias demandadas asciende a $22,352,193. El desglose por agencia es el siguiente:



| AGENCIA | PROYECTO | CONTRIBUCIONES NO RECAUDADAS |
|---|---|---|
| Autoridad de Acueductos y Alcantarillados | Instalación de la troncal sanitaria de 24" diámetro en la Carretera 14 | 181,856.00 |



37

SENTENCIA

JAC93-0485

| | | |
|---|---|---|
| Autoridad de Acueductos y Alcantarillados | Completar soterrado límite de primer orden de la zona histórica y proyecto de soterrado de la Ave. Hostos y sector histórico de la Playa de Ponce | 207,835.00 |
| Autoridad de Acueductos y Alcantarillados | Línea de transmisión de 36" a las Monjitas | 468,928.00 |
| Autoridad de Edificios Públicos | Centro de Salud Familiar, Barrio Cotto | 617,179.00 |
| Autoridad de Edificios Públicos | Centro Pediátrico Hospital Regional | 527,386.00 |
| Autoridad de Edificios Públicos | Centro de Rehabilitación Psiquiátrica | 212,406.00 |
| Autoridad de Edificios Públicos | Estación Patrulla de Tránsito y depósito vehículos hurtados | 136,518.00 |
| Autoridad de Edificios Públicos | Unidad Marítima | 32,821.00 |
| Autoridad de Edificios Públicos | Cuartel de la División de Drogas y Narcóticos | 221,419.00 |
| Autoridad de Edificios Públicos | Escuela Superior Rural El Tuque | 175,608.00 |
| Autoridad de Edificios Públicos | Escuela Elemental de Educación o Escuela Elemental Ramón Marín | 47,517.00 |
| Autoridad de Energía Eléctrica | Completar soterrado límite de primer orden de la zona histórica Ave. Hostos, sector histórico en la Playa de Ponce y soterrado de tres líneas dentro del trebol de la PR-52 con la PR-1. | $3,195,463.00 |
| Departamento de la Vivienda | Construcción Anillos y red interna Comunidad Paraíso | 129,879.00 |
| Departamento de la Vivienda | Rehabilitación y nueva cons-trucción (Ponce en Marcha): Barrio La Playa, sector Puerto Viejo, Salistral | 453,886.00 |
| Departamento de la Vivienda | Relocalización de aproxi-madamente 300 viviendas en zonas de alto riesgo y mayor necesidad | 779,381.00 |

## CONCLUSIONES DE DERECHO

### EL CONTRATO:

La experiencia aconseja que los tribunales, al momento de pasar juicio sobre la validez de un acuerdo en la que interviene el Estado como parte contratante, debe interpretar tal situación en forma similar a los contratos que se producen entre particulares. Cualquier interpretación sobre la inci-dencia que dicho acuerdo produce sobre el interés público y el

38

SENTENCIA

JAC93-0485

ejercicio de los poderes para su defensa, deben interpretarse sin perjudicar o menoscabar la filosofía íntima de la figura del contrato. De no actuarse con ponderación en este tipo de casos, se esfumaría el concepto del contrato y el Estado perdería un instrumento magnífico para las múltiples finalidades que precisa dicha institución. No existe, pues, fórmula jurídica más eficaz y trasparente para regular las relaciones voluntarias en un convenio en que el Estado comparece como parte, que la figura del contrato.[13] Veamos.

Es un principio firmemente establecido en toda sociedad civilizada la idea que los seres humanos deben poder contar con que aquellos con quienes contratan en el intercambio social actuarán de buena fe y, por tanto, llevarán a cabo las expectativas razonables que sus promesas o su conducta hayan creado razonablemente en los demás. Es también, norma reiterada en nuestra jurisdicción que, conforme a las disposiciones del Artículo 1213 del Código Civil, 31 L.P.R.A. sec. 3391, no existe un contrato sino concurren tres requisitos, a saber: "1) consentimiento de los contratantes; 2) objeto cierto que sea materia del contrato y; 3) causa de obligación que se establezca". Por otro lado, el artículo 1207 del Código Civil, 31 L.P.R.A. 3372, establece ciertas limitaciones a la autonomía de la voluntad consagrando que los contratantes pueden establecer los pactos cláusulas y condiciones que tengan por conveniente siempre que no sean contrarios a las leyes, a la moral ni al orden público. Cumplidas con ambas disposiciones legales, los tribunales no pueden, por regla general, relevar una parte de cumplir con lo que se obligó hacer mediante un acuerdo, cuando dicho contrato es legalmente válido y no contiene vicio que lo



---

[13]En buenos principios jurídicos, el acto contractual, aunque sea administrativo, no puede ser acto de poder, sin atentar a su naturaleza jurídica. En su virtud la contratación de los servicios públicos debe estar sometida al régimen jurídico de los contratos.



39

SENTENCIA                                                    JAC93-0485

invalide.[14]

Como indicáramos al comienzo de esta sentencia, las entidades públicas demandadas sostienen que el convenio es nulo. En apoyo a dicha postura alegan vicios en el consentimiento e imputan ilicitud de causa. Veamos.

Las instrumentalidades públicas envueltas, a pesar de ser parte integrante del Estado, no tienen otra personalidad jurídica que la deducida de su función representativa. Consecuentemente, éstos se nutren de la personalidad de sus representados. El mandato que reciben nuestros funcionarios públicos, les legitima a actuar y se les reconocen atribuciones precisas para la consecución de los fines públicos.

Del lenguaje del propio convenio se desprende que las agencias públicas demandadas contrajeron determinadas obligaciones que se relacionan con la ejecución de los proyectos que aparecen en las tablas que anejaron al referido acuerdo. Los proyectos que se incluyen en dichas tablas son de la entera competencia de las instrumentalidades que se comprometieron a realizarlas, y como tal, son de íntegra responsabilidad de cada agencia en particular. El texto del convenio es diáfano en cuanto a que las agencias correspondientes contraían obligaciones sumamente particularizadas dentro de un término claramente prescrito. Por estar la gran mayoría de los proyectos, contenidos en los respectivos programas de las agencias públicas demandadas, no hace necesario que las respectivas juntas de gobierno presten su aquiescencia en el convenio. Por consiguiente, la comparecencia del jefe de agencia o el secretario del departamento a la otorgación del convenio es suficiente para obligar la instrumentalidades demandadas.

_____

[14]La otorgación de un contrato válido conlleva que los compromisos contenidos en el mismo deben ser inexcusablemente cumplidos entre las partes. Véase García v. World Wide Entertainment, 92 J.T.S. 177; Constructora Bauzá v. García López, 91 J.T.S. 99.

40

SENTENCIA

JAC93-0485

Con relación a la causa del contrato, dicho requisito está gobernado por el artículo 1227 del Código Civil, 31 L.P.R.A. sec. 3432, y establece que "[l]os contratos sin causa, o con causa ilícita, no producen efecto alguno. Es ilícita la causa cuando se opone a las leyes o a la moral". Es decir, nuestro ordenamiento jurídico está asentado en la premisa inexorable de que no existe contrato sin causa o cuando la causa es ilícita. Como regla general, son nulos los actos realizados contra la ley. Bajo este principio, los contratos celebrados en violación de una prescripción o prohibición legal fundada sobre motivos de orden público, son nulos e inexistentes.

En la contratación pública, la causa profunda del negocio jurídico es siempre el interés público. Es menester señalar que en el campo público, los organismos administrativos no pueden realizar actos ni contraer obligaciones que no sean las que autorizan las leyes. En este sentido los funcionarios públicos que contratan no actúan como titulares de los intereses públicos, sino como su representantes y defensores. Por tal razón, sus actuaciones deben ceñirse a lo que las leyes autorizan.

Por otro lado, los principios de buena administración implican una llamada o advertencia a que los órganos guberna- mentales para que no formen sólo su actuar a derecho, sino que, además, procuren una utilidad efectiva para los fines públicos. Por consiguiente, las instrumentalidades públicas no deben bastarles cumplir la norma; es preciso administrar bien, para infundir su finalidad de servicio a los ciudadanos. De nada vale un acto o contrato jurídicamente perfecto si su objeto es inútil o desacertado.

El argumento de que el convenio opera en detrimento y perjuicio del público y el bienestar general de Puerto Rico y sus habitantes en la medida que concentra indebidamente

41

SENTENCIA

JAC93-0485

importantes inversiones y recursos, en un período de cuatro años, en un área determinada del país en perjuicio de otras áreas que tienen necesidades urgentes, no nos convence. Si bien es cierto que los aspectos económicos relacionados con los presupuestos de las diferentes agencias pueden en ocasiones llegar a divorciarse o perturbar las gestión contractual que realiza el Estado, la prueba presentada en apoyo a esta defensa no es suficiente para desvincular jurídicamente a las partes contrantes.

Reconocemos la prominencia que el convenio que nos ocupa otorga al Municipio de Ponce en relación a los demás municipios de la Isla. Sin embargo, el poder judicial no puede estar por encima de una determinación del poder ejecutivo, comprendida dentro del ámbito de sus prerrogativas y facultades constitucionales, que decidió descentralizar el gobierno y desarrollar el área sur utilizando los mecanismos que la Ley de Municipio Autónomos, _supra_, provee.

El acto de aprobación de un acuerdo en el que interviene el Estado como parte contratante se identifica por medio de los programas de proyectos de inversión certificados por entidades gubernamentales contratantes. Por medio de estas certificaciones se evita que por impulso de la negociación contractual queden desbordadas las asignaciones presupuestarias. La importancia de los certificados de inversión para la validez y ejecución del convenio estriba en que la realización de las obras dependen, en muchas ocasiones, en los créditos disponibles. Por consiguiente, al asegurarse de la existencia y disponibilidad de los fondos, se evita que el factor financiero deforme el acuerdo de voluntades que recoge un convenio de esta naturaleza.

Lo cierto es que el convenio, además de cumplir con los referidos certificados de inversión, coincide con

42

SENTENCIA                                      JAC93-0485

importante política pública de nuestro gobierno de descentralización de los servicios que brinda el Estado a sus ciudadadanos y se obtuvo mediante una legislación que recibió el endoso de todos los municipios de la Isla. No se trata de un desplazamiento patrimonial de la entidades contratantes en favor del municipio en forma gratuita. Por el contrario, se trata de la construcción de unos proyectos de competencia estatal los cuales se habrían de realizar en un momento dado. Sin embargo, lo que hace el convenio es fijar un marco de tiempo razonable para la ejecución de los mismos, dentro de un esfuerzo concertado de planificación integral iniciado por un municipio que decidió acogerse a los beneficios que provee nuestro ordenamiento jurídico. La contraprestación del Municipio de Ponce consiste en formular un plan de ordenación territorial para alcanzar ciertas metas y objetivos en su territorio conforme a una política pública de usos de los suelos.

La conveniencia y necesidad de los proyectos de infraestructura en el Municipio de Ponce y en la región en que dicho municipio está enclavado, responde a que se han identificado ciertas deficiencias y necesidades de desarrollo social, económico, físico y ambiental en dicha zona. Estas determinaciones fueron producto de un complejo proceso administrativo que condujeron las propias instrumentalidades públicas aquí demandadas conforme a las necesidades de ciertos municipios y regiones de la Isla y que, inclusive, incluyeron en sus respectivos programas con anterioridad a la vigencia del Plan de Ordenación Territorial del Municipio de Ponce.

La prueba demostró que las propias entidades aquí demandadas pasaron juicio sobre el plan elaborado por la municipalidad de Ponce. Las demandadas certificaron sus respectivos proyectos de inversión y remitieron a la Junta de

43

SENTENCIA

JAC93-0485

Planificación el producto de sus propias determinaciones internas. Al así hacerlo, determinaron factible y prudente que lo que habría de invertirse en Ponce y en su región, conforme a los requerimientos de infraestructura del plan de ordenación territorial, representaba un juicioso balance de política pública y sana administración.

La adopción del plan por la Junta de Planificación y finalmente por el Gobernador de Puerto Rico, culminó el proceso administrativo establecido por ley, oficializando la política pública del Estado.

De esta forma, las determinaciones en cuanto a magnitud de las inversiones en facilidades de infraestructura en el Municipio de Ponce son asuntos que inciden en la sana discreción reconocida al poder ejecutivo dentro del ámbito de las prerrogativas y facultades constitucionales que se le reconoce a dicha rama de gobierno y no está al arbitrio indiscriminado de este Tribunal.

Nada presentado en la prueba de las agencias demandadas demuestra que la construcción de los proyectos contenidos en el Plan de Ordenación Territorial del Municipio de Ponce esten reñidos con el bienestar público. Sino por el contrario, el concurso de voluntades recogidas en el covenio para el desarrollo del referido plan que efectuaron los funcionarios públicos en el presente caso, está revestido de un gran interés público y aspiran promover una sana y recta administración pública, pues está dirigido a dotar al Municipio de Ponce de los instrumentos necesarios para guiar su desarrollo urbano, social y económico.

La importancia de ello estriba en que a pesar de que los problemas que sucitan la expansión desmedida de los centros urbanos representa un problema universal, en Puerto Rico dicha problemática cobra dimensiones alarmantes. Considerando

44

SENTENCIA                                                                 JAC93-0485

nuestra limitada geografía insular, la finalidad y propósito
que persigue el desarrollar un plan de ordenación territorial
juega un importante papel en el futuro de nuestra Isla. Los
peritos en planificación que declararon durante el juicio,
unánimemente señalaron que una de las aportaciones más
importantes que la Ley de Municipios Autónomos, supra, hace al
mejoramiento de planificación en Puerto Rico es el carácter de
obligatoriedad a las certificaciones de obras de infraestruc-
tura incluídas en el plan de ordenamiento territorial. De esta
forma, las medidas que establecen los planificadores sobre el
uso de terreno tomando en cuenta los programas de mejoras
permanentes de las agencias públicas, no constituyen, mera-
mente, declaraciones superfluas para el uso interno de los
funcionarios. Por el contrario, consituyen juiciosas determi-
naciones que han de implementarse con fuerza de ley contrario
a como se ha hecho en el pasado.

Con la implementación de los planes de ordenación
territorial del Municipio de Ponce, se provee para que dicho
ayuntamiento pueda guiar su desarrollo de modo coordinado
conforme a sus necesiadades actuales y futuras. Ello evita la
explotación desenfrenada de sus recursos, produce mejores
resultados de convivencia humana entre los ciudadanos de Ponce
y de los municipios aledaños, y desarrolla en forma ordenada el
área sur de la Isla. Son estas razones que nos mueven a
concluir que el convenio cuyo cumplimiento específico se
solicita, encarna principios fundamentales de política pública
y sana administración de fondos públicos.

LEY DE MUNICIPIOS AUTONOMOS:

Atendidos los aspectos estrictamente contractuales sobre
la nulidad del convenio y antes de pasar a la ley que gobierna
la controversia ante nuestra consideración, es preciso hacer un
breve recuento histórico sobre la institución del municipio en

45

SENTENCIA

JAC93-0485

Puerto Rico. En el 1897, la Corona Española otorgó una cons-
titución autonómica en la cual los puertorriqueños disfrutaban
de amplias facultades de gobierno propio. En el Artículo 52 de
la Carta Autonómica de 1897, la organización municipal era
mandatoria en todo grupo poblacional superior a los mil
habitantes. En dicho articulado se disponía que todo Municipio
legalmente constituído tenía facultad para reglamentar la
instrucción pública, las vías terrestres, fluviales o marí-
timas, la sanidad local, los presupuestos municipales y para
nombrar y separar libremente sus empleados.

Dos cartas orgánicas otorgadas por el Congreso de los
Estados Unidos en 1990 y 1917, respectivamente, confirieron a
la Asamblea Legislativa la facultad para reglamentar todo lo
relacionado a los municipios. La Carta Orgánica de 1900,
conocida como el "Acta Foraker" o "Ley Foraker" aprobada el 12
de abril de 1900, establece la facultadad de la Asamblea
Legislativa para crear y consolidar y reorganizar municipios.
Por otro lado, La Carta Orgánica de 1917, conocida también como
"Ley Jones", amplió la autoridad legislativa sobre asuntos
locales concedida por la Ley Foraker.

A pesar de que en los procedimientos y debates de la
Convención Constituyente de Puerto Rico se discutió la posibi-
lidad de dotar a los municipios de autonomía en sus asuntos
internos, se acordó continuar con el mismo sistema establecido
desde principios de siglo. La proposición de ampliar las
facultades municipales fue rechazada por los miembros de la
Asamblea Constituyente por entender que los municipios no
tenían recursos por lo que debían seguir siendo criaturas
jurídicas de la Asamblea Legislativa. A pesar de que se
expresó que la política del Estado en ese momento histórico era
la centralización del gobierno, se puntualizó que las disposi-
ciones relativas a los municipios no cerraban las puertas a la

46

SENTENCIA                                          JAC93-0485

posibilidad de que en el futuro el Gobierno Central pudiera, por ley, autorizar a los municipios a atender la eliminación de arrabales, el desarrollo urbano planificado, limpiar, reconstruir, rehabilitar y desarrollar su territorio.

Con la aprobación de la Ley de Municipios Autónomos, supra, ocurre un cambio trascendental en la administración pública puertorriqueña. Mediante esta loable legislación, se eleva a precepto jurídico la política de descentralización de las facultades que posee el gobierno a nivel central traspasando esa facultad y competencia a los municipios. Es decir, al ésta legislación reconocer al municipio como la unidad básica de nuestra estructura gubernamental, le otorga el máximo posible de autonomía proveyéndole las herramientas financieras para que asuma un papel central y fundamental en su desarrollo urbano, social y económico. Con esta abarcadora reforma del ordenamiento municipal, la legislatura redimensiona la gestión municipal y convierte al municipio en protagonista[15].

El artículo 13.004 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4602, autoriza a los municipios a adoptar los Planes de Ordenación de conformidad con las directrices que emanan de dicha legislación para la protección de sus suelos, para promover el uso balanceado, provechoso y eficaz y para

---

[15]En el año 1991 la Asamblea Legislativa aprobó varias leyes para reformar integralmente la constitución, administración y fun-cionamiento del régimen del gobierno municipal en Puerto Rico. La ley medular de esta reforma fue la Ley de Municipios Autónomos que sustituye y deroga la Ley Orgánica de los Municipios de Puerto Rico, Ley Núm. 146 de 18 de junio de 1980, así como otras leyes relativas al funcionamiento de los municipios. Como parte de esta reforma también se aprobó la Ley Núm. 80 de 30 de agosto de 1991, conocida como la Ley del Centro de Recaudación de Ingresos Munici-pales; la Ley Núm. 82 de 30 de agosto de 1991, que enmienda la Ley de Patentes Municipales; la Ley Núm. 83 de 30 de agosto de 1991 conocida como la Ley de Contribución Municipal sobre la Propiedad de 1991; y la Ley Núm. 73 de 22 de septiembre de 1992, que creó la Comisión para Fomentar la Autonomía Municipal. Véase Hon. Julio César López Gerena v. Hon. Iris N. Cofresí, ___ D.P.R. ___, 96 J.T.S. 55; Municipio de San Juan v. Banco Gubernamental de Fomento, ___ D.P.R. ___, 96 J.T.S. 73.

SENTENCIA

JAC93-0485

propiciar el desarrollo cabal de cada municipio.

Por otro lado, el artículo el Artículo 13.005, 21 L.P.R.A. sec. 4603; dispone:

> El Plan Territorial será un instrumento de ordenación integral y estratégico de la totalidad del territorio municipal. El Plan definirá los elementos fundamentales de tal ordenación y establecerá el programa para su desarrollo y ejecución así como el plazo de su vigencia. Una de sus funciones será dividir la totalidad del suelo municipal en tres (3) categorías básicas: suelo urbano, suelo urbanizable y suelo rústico. Esta clasificación se utilizará para disponer la ordenación de los usos y las estructuras en estos suelos. La designación de suelo urbanizable, si alguna, se hará de acuerdo a la determinación del plan sobre la demanda por suelo urbano. Una vez el Plan Territorial entre en vigor, toda decisión sobre el uso del suelo se hará de conformidad con el mismo.

El Plan Territorial se desarrollará a través de tres conjuntos de documentos: el Memorial, el Programa, y la Reglamentación.

El Memorial contendrá los siguientes documentos básicos:

(a) Memorial del Plan que incluya, entre otros, una descripción del contenido general del Plan.

(b) Documento de inventario, diagnóstico y recomendaciones sobre el desarrollo social, económico y físico del municipio. El documento incluirá, al menos, los siguientes planos específicos: infraestructura (líneas principales con capacidad actual y residual), uso del suelo urbano, uso y características del suelo rústico y demarcación del suelo urbano, urbanizable y rústico. El documento contendrá un escrito del comportamiento histórico del área y analizará, entre otros, las deficiencias y necesidades del desarrollo social, económico, físico y ambiental actual; el rol del municipio en su región; las necesidades de vivienda; las características y necesidades del suelo rústico; y la indentificación de los reglamentos, si alguno, de la Junta de Planificación o de la Adminsitración de Reglamentos y Permisos que se entienden necesarios revisar para ajustarlos a los requerimiento del Plan. De proponer sustituir o enmendar alguna reglametación, se discutirán los fundamentos para la acción propuesta.

(c) Documento de las políticas del Plan que establezca metas y objetivos, y las recomendaciones de desarrollo social, económico y físico del municipio. Este documento es fundamental al Plan y establecerá e incluirá las determinaciones de política para el Programa y la Reglamentación. Las metas y objetivos relacionadas al uso del suelo se especificarán para cada clasificación del suelo urbano, urbanizable y rústico. Este documento se acompañará de los planos necesarios para ilustrar gráficamente el desarrollo especial propuesto por el Plan.

El Programa contendrá los siguientes documentos básicos:

(a) Programa de proyectos generales que incluya la

48

SENTENCIA

JAC93-0485

indentificación, evaluación económica y financiera, y el
itinerario de proyectos de desarrollo económico, social y
físico para el territorio municipal. Esta identificación de
proyectos vendrá acopañada de los siguientes planos
conceptuales o esquemáticos, entre otros:

(1) Localización y capacidad propuesta de la
infraestructura, excluyendo el sistema vial.

(2) Localización y capacidad propuesta del sistema vial.

(3) Localización y capacidad de nuevas dotaciones
generales, adicionales a la infraestructura.

(b) Programa de vivienda de interés social que incluya los
proyectos y programas para atender estas necesidades.

(c) Programa para apoyar la conservación, protección y
utilización del suelo rústico, libre del proceso urbanizador.

(d) Programa de Ensanche para el suelo urbanizable programado.
Este Programa de Ensanche será requisito para la elaboración
del Plan de Ensanche y para convertir el suelo urbanizable no
programado en suelo urbanizable programado. El Programa de
Ensanche incluirá los siguientes documentos, entre otros:

(e) Programa de Proyectos de Inversión, certificados por las
agencias públicas correspondientes. Esta sección formaliza el
compromiso de inversión acordado, mediante certificación entre
las agencias públicas y el municipio.
     La Reglamentación contendrá los siguientes documentos
básicos:

(a) Plano de Clasificación de Suelo, dividiendo el
territorio municipal del suelo urbano, suelo urbanizable
(programado y no programado), y suelo rústico (común y
especialmente protegido).

(b) Reglamentos y Planos de Ordenación, y otras
determinaciones de ordenación territorial, con señalamientos de
uso, niveles de intensidad y características de las estructuras
y el espacio público. La reglamentación se hará específica
para el suelo urbano, urbanizable y rústico, y podrán incor-
porar normas vigentes de la Junta de Planificación o de la
Administración de Reglamentos y Permisos. Las disposiciones
sustantivas y procesales de las nuevas competencias para
viabilizar la ordenación territorial que se utilicen en los
Planes de Ordenación formarán parte de los Reglamentos y Planos
de Ordenación".

El Artículo 13.011 dispone que los Planes de Ordenación
deben ser compatibles con las leyes, políticas públicas,
reglamentos y otros documentos del Gobierno Central relacio-
nados con la organización territorial y la construcción. Para
garantizar compatibilidad de los planes de ordenación con las
políticas públicas regionales e insulares se retiene para el
Gobierno Central, a través de la Junta de Planificación, la

49

SENTENCIA                                                    JAC93-0485

aprobación inicial de planes de ordenación y la revisión de partes de dichos planes.

Es menester señalar, que las enmiendas realizadas a la Ley de Municipios Autónomos, _supra_, el 29 de octubre de 1992 se hicieron para aclarar el alcance de varias de sus disposiciones y para que los fines y propósitos perseguidos por dicha legislación pudieran cumplirse con mayor efectividad y certeza. En ánimo de oficializar el Plan de Ordenación que cumpla con los requisitos estatutarios antes transcritos, se enmendó el artículo 13.011 para que prescriba de la siguiente manera:

> Una vez aprobado por el Gobernador, el Plan de Ordenación obligará a las agencias públicas al cumplimiento con los programas de obras y proyectos incluidos en la Sección del Programa de Proyectos de Inversión certificados por las agencias públicas. Le (sic) Junta de Planificación le dará consideración prioritaria a dicha sección en la preparación de su Programa de Proyectos de Inversiones de Cuatro Años dispuesto en la secs. 62 et seq. del Título 23, igualmente lo hará la Oficina de Presupuesto y Gerencia en el Presupuesto Anual que se someta a la Asamblea Legislativa. Las corporaciones públicas quedarán obligadas en sus propios presupuestos.

Además de este trasfondo estatutario, creemos importante señalar que el espíritu de la Ley de Municipios Autónomos, _supra_, expresamente dispone que los poderes y facultades conferidos a los municipios por dicha pieza legislativa se deberán interpretar liberalmente, de forma tal, que se propicie el desarrollo e implantación de la política pública enunciada de garantizar a los municipios facultades necesarias en el orden jurídico, fiscal y administrativo para atender eficazmente las necesidades y bienestar de sus habitantes. Véase _Municipio de San Juan v. Banco Gubernamental de Fomento_, D.P.R. ___, 96 J.T.S. 73.

Sin olvidar esta guía de interpretación estatutaria y según podemos colegir de las disposiciones de ley que hemos mencionado anteriormente, los requisitos básicos para la validez del Plan de Ordenación Territorial pueden ser

SENTENCIA                                                    JAC93-0485

enumerados de la siguiente manera: (1) que sean compatibles con las leyes, políticas públicas y reglamentos del Gobierno Central (21 L.P.R.A. secs. 4602, 4609); (2) que sean elaborados en estrecha coordinación con la Junta de Planificación y con las agencias públicas concernidas (21 L.P.R.A. sec. 4606, 4609); (3) que medie participación ciudadana a través de vistas públicas en la elaboración del plan (21 L.P.R.A. sec. 4606); (4) que sean el resultado de la consulta y coordinación entre las agencias públicas y el municipio (21 L.P.R.A. sec. 4609); (5) que sean aprobados por la Junta de Planificación y aprobados por el Gobernador (21 L.P.R.A. sec. 4606); y (6) que contengan un programa de proyectos de inversión debidamente certificados por las agencias correspondientes (21 L.P.R.A. secs. 4603, 4604). Una vez cumplidos con éstos requisitos, el plan adquiere fuerza de ley.

La evidencia presentada en el caso establece que el Plan de Ordenación Territorial del Municipio de Ponce cumple cabalmente con los anteriores requisitos estatutarios. Como expusiéramos anteriormente, el mismo es compatible con las leyes y política pública del Estado Libre Asociado de Puerto Rico puesto que el mismo fue elaborado en estrecha coordinación con las agencias aquí demandadas y tanto la Junta de Planificación, así como la Asamblea Municipal de Ponce, le impartieron su aprobación. Por otro lado, las certificaciones que les impartieron las aquí demandadas al Programa de Proyectos de Inversión, conjuntamente con la aprobación del Primer Ejecutivo, le imparten obligatoriedad a los proyectos contenidos en el mismo.

Más aún, el convenio que recoge el referido plan está regido por disposiciones de ley que determinan la situación jurídica de las instrumentalidades gubernamentales que comparecieron a suscribirlo. Ley de Municipios Autónomos,

51

SENTENCIA

JAC93-0485

supra, reglamenta la posición jurídica de cada una de las partes que comparecieron a otorgar el referido convenio, puesto que establece un procedimiento para la revisión de los proyectos que figuran en el Plan de Ordenación. De esta forma, las partes que interesaran algún cambio en el Plan de Ordenación comprendido en un convenio de esta naturaleza, deben acudir al mismo trámite que requirió la aprobación incial del plan según dispone la sección 4606 de la ley, supra.[16] No surge de la prueba desfilada en el juicio que las instrumentalidades demandadas hicieran uso de dicho mecanismo.

Defensas Especiales de las Agencias Demandadas:

Antes de comenzar a discutir algunas de las defensas especiales que presentaron las agencias demandadas, es menester señalar que las instrumentalidades gubernamentales o corporaciones públicas, como todos los organismos administrativos, dependen por completo de los estatutos que les dan vida, los cuales reglamentan su funcionamiento y establecen y limitan sus facultades, por lo que sólo pueden ejercer aquellos poderes que les han sido conferidos expresamente por los estatutos correspondientes, y que, necesaria y razonablemente, estén implícitos en los mismos. Con este principio doctrinal en mente, veamos algunas de las defensas especiales que infructuosamente sostuvieron las agencias demandadas a lo largo de los procedimientos.

---

[16]El perito de planificación del Municipio de Ponce, Dr. Héctor López Pumarejo, testificó durante el juicio sobre la importancia que representa para la planificación en Puerto Rico que la ley per-mita que los municipios elaboren sus propios planes de ordenación territorial. Sobre la flexibilidad que deben tener dichos planes expresó: "..ningún plan está escrito en piedra..", pero tampoco está para que se le dé "con una piedra". Expresó, además, que cuando se ha elaborado un plan de ordenación territorial, y se establecen uno procedimientos para cambiarlos o modificarlos, se deben seguir dichos procesos, pues la planificación responde a un proceso analítico integrado entre distintos niveles del gobierno. Si se le permite a una instrumentalidad cambiar el plan arbitrariamente, desaparece la planificación.

52

SENTENCIA                                                    JAC93-0485

Autoridad de Edificios Públicos:

El párrafo 29 de la demanda enmendada indica que la Autoridad de Edificios Públicos se comprometió contractualmente a desarrollar un total de nueve proyectos. Ocho de los cuales, correponden a instalaciones físicas para brindar servicios de educación, salud y seguridad que fueron requeridos por las correspondientes agencias que brindan dichos servicios a la comunidad. Sin embargo, el proyecto "Centro de Salud Familiar Barrio Cotto" fue requerido por el propio Municipio de Ponce.

La Autoridad de Edificios Públicos adujo como defensa especial para incumplir con los primeros ocho proyectos que hacemos referencia, que su función gubernamental es la de desarrolladora de proyectos que originan otras agencias de gobierno y que siendo ello así, cuando otras agencias cancelan o reprograman sus proyectos no viene obligada a realizarlos. Discrepamos.

El artículo 2 Ley Orgánica de la Autoridad de Edificios Públicos, 22 L.P.R.A. sec. 903, provee de la siguiente manera:

> La Autoridad hará u ordenará preparar planos y diseños de edificios para escuelas, "Facilidades de Salud y Bienestar Social", según se define dicha frase en las secs. 331 a 333p del Título 24, oficinas, cuarteles, tribunales, almacenes, talleres y cualesquiera otras facilidades físicas relacionadas con servicios gubernamentales en aquellas localidades y en aquella forma que la Autoridad estime necesaria y deseable de tal forma que provea facilidades de alojamiento para las escuelas, "Facilidades de Salud y Bienestar Social", oficinas cuarteles, tribunales, almacenes, talleres y cualesquiera otras facilidades físicas del Estado Libre Asociado, cualquier departamento, agencia, instrumentalidad o municipio y adquirirá, arrendará, construirá, equipará, reparará, financiará y operará tales facilidades, y arrendará o de otra forma contratará el uso de espacio en tales facilidades o parte de ellas, pero de otra forma contratará el uso de espacio en tales facilidades o parte de ellas, pero tales arrendamientos será únicamente a y tales contratos con el Estado Libre Asociado o cualesquiera departamentos, agencias, instrumentalidades o municipios.."

Según se desprende de la propia ley orgánica de la Autoridad de Edificios Públicos, dicha instrumentalidad desempeña múltiples

53

SENTENCIA

JAC93-0485

funciones de carácter gubernamental bajo el ministerio primordial de proveer los edificios o estructuras que el Estado necesita para las múltiples finalidades que precisa.

Por otro lado, el Artículo 13.005 de la Ley de Municipios Autónomos, 21 L.P.R.A. 4603, en la sección relativa al programa que rige los compromisos de inversión acordados mediante certificación entre las agencias públicas, dispone que dicho programa establecerá: "(a) (3) la localización y capacidad de nuevas dotaciones generales adicionales a la infraestructura". Los usos dotacionales se definen en el Artículo 13.003, 21 L.P.R.A. 4601, de la siguiente manera:

> (jj) Uso dotacional significará toda instalación física para proveer a una comunidad de los servicios básicos para su desenvolvimiento y bienestar general. Estas instalaciones podrán comprender, entre otras, establecimientos, planteles o instalaciones educativas, culturales, recreativas deportivas, de salud, seguridad, transporte, mantenimiento de los asentamientos, regido de desperdicios sólidos y limpieza de vías públicas, así como de servicios de infraestructura, tales como agua, alcantarillado, red viaria, teléfono o electricidad. De estos usos dotacionales se distinguen los que atienden las necesidades del municipio en general y que se indentifican como dotaciones generales.

Al armonizar la ley orgánica de la Autoridad de Edificios con la disposición estatutaria antes transcrita, podemos concluir que en base a los compromisos de inversión certificada incluídos en el Programa del Plan de Ordenación Territorial de Ponce y las representaciones que hicieron las distintas agencias que originaron los proyectos, generan un nuevo estado de derecho.

Tal y como surgió de la prueba que desfiló durante el juicio, los Departamentos de Salud y Educación, así como la Policía de Puerto Rico intervinieron conjuntamente con la Autoridad de Edificios Públicos en concierto para elaboración del Plan de Ordenación Territorial del Municipio de Ponce. A pesar de que las certificaiones de los proyectos de las

54

SENTENCIA                                                JAC93-0485

facilidades sólo las hizo la Autoridad de Edificios Públicos, dicha instrumentalidad contaba con que, al momento de suscribir el convenio, dichos proyectos estaban contenidos en la programación de los Departamentos de Salud y Educación y la Policía de Puerto Rico y que dichas instalaciones habrían de ocuparse bajo un régimen de alquiler. Por consiguiente, la responsabilidad de éstas agencias para con la Autoridad de Edificios Públicos era gestionar los fondos para el pago del alquiler con la Oficina de Presupuesto y Gerencia.

No obstante, a pesar de que la Autoridad de Edificios Públicos aduce como alegación exculpatoria que los proyectos fueron reprogramados y cancelados por las agencias que lo orginaron, no utilizó el mecanismo de la Regla 12.1 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III R. 12, para traer a dichas agencias al pleito como terceras demandadas. Entendemos que en el contexto de un plan de ordenación territorial, suscrito al amparo de la Ley de Municipios Autónomos, supra, la referida defensa no es suficiente en derecho en ausencia de las agencias que originaron los proyectos respectivamente, pues la certificación de proyectos para dotaciones generales de educación, salud y seguridad, las hizo la propia Autoridad de Edificios Públicos. Al así hacerlo, compareció, nó sólo como constructora de los proyectos, sino también en su carácter de dueña de las instalaciones y ello la obliga a llevar a cabo los proyectos incluídos en su certificación. Al ser dicha agencia la que le corresponde formular los compromisos de inversión para la edificación de dichos proyectos, el hecho que se reprogramaran o cancelaran no puede utilizarse como pretexto o justificación para incumplir un convenio que tiene fuerza de ley. La presencia de los Departamentos de Salud y Educación y de la Policía de Puerto Rico no es necesaria en la causa de acción

55

SENTENCIA                                                    JAC93-0485

que ejercita el Municipio de Ponce en la presente demanda, puesto que las mencionadas agencias no llevan a cabo inversiones en sus intalaciones físicas y tampoco comparecieron al convenio cuyo cumplimiento específico se solicita. Lo que proveen dichas agencias en sus respectivos presupuestos es la renta para pagar a la Autoridad de Edificios Públicos por el uso de las edificaciones.

No obstante a los anteriores pronunciamientos, entendemos que la Autoridad de Edificios Públicos no está del todo desprovista de remedios. Dicha entidad, luego de que termine la construcción de proyectos que se obligó hacer, podrá exigir que los Departamentos de Salud y Educación y la Policía de Puerto Rico asuman sus responsabilidades legales. Sólo en ese momento podrá ponderarse si dichas intrumentalidades estaban impedidas de reprogramar los referidos proyectos en función del estado de derecho que entraña un Plan de Ordenación Territorial aprobado por el Gobernador de Puerto Rico y la Junta de Planificación.

Por último, en cuanto al proyecto Centro de Salud Familiar Barrio Cotto surge con meridiana claridad de la prueba que dicho proyecto no se efectuó. El mismo no fue ni cancelado ni reprogramado por ninguna agencia, pues se trata de un proyecto del propio Municipio de Ponce.

<u>Autoridad de Carreteras y Transportación, el Departamento de la Vivienda y el Departamento de Recursos Naturales y Ambientales:</u>

Ciertamente, gran parte de las defensas especiales que levantaron estas agencias para justificar su incumplimiento con los proyectos que figuran el convenio, ya han sido adjudicadas por nuestra resolución del 17 de enero de 1996 y por la presente sentencia. No obstante, procedemos hacer unos pronunciamientos en cuanto algunos asuntos adicionales que competen a estas agencias públicas.

Con relación a la certificación formulada por la Autoridad

56

SENTENCIA                                              JAC93-0485

de Carreteras y Transportación la cual transcribimos en la determinación de hecho número 16 y aquilatada la prueba sobre el particular, resolvemos que definitivamente no fue la intención de la Autoridad de Carreteras y Transportación expresar una reserva de poderes de la agencia para reprogramar en el futuro los proyectos de inversión que estaba certificando, tal y como alegó durante el transcurso de los procedimientos. El mero el cambio en el lenguaje de la certificación obedece a lo que realmente prescribe su texto, a saber: la necesidad de introducir una variación relativa al proyecto en la Intersección de El Tuque (Fase II).

En cuanto al planteamiento que imputa la nulidad del convenio por haberse suscrito por los diversos representantes de las partes demandadas en distintas fechas, resolvemos que ello no contraviene precepto legal alguno. A pesar que en nuestra determinación de hechos número 23 hicimos constar que el documento fue suscrito entre el 28 de octubre y el 15 de diciembre de 1992, lo anterior no produce la nulidad del acuerdo de voluntades. El convenio objeto de este litigio no se perfeccionó hasta tanto se produjo la última firma. Mientras los otorgantes mantuvieran su voluntad obligatoria hasta que el último de éstos firmara, el acuerdo es perfecta-mente válido sobre todo cuando se reclama entre las partes que comparecieron a suscribirlo. La unidad de acto es requerida por nuestro ordenamiento en documentos públicos dónde la comparecencia de testigos es indispensable para la validez del negocio jurídico. Véase el Art. 24 de la Ley Notarial, 4 L.P.R.A. 2042.

Con relación al planteamiento de que el convenio se presentó tardíamente en la Oficina del Contralor y en el Registro de Contratos del Municipio, también carece de méritos. La Ley Núm. 18 del 30 de octubre de 1975, 2 L.P.R.A. 97, reza

SENTENCIA
                                          JAC93-0485

en su parte pertinente, de la siguiente manera:

    Los departamentos, agencias, instrumenta-
lidades, oficinas y todo organismo y los municipios
del Estado Libre Asociado de Puerto Rico, sin
exepción alguna, mantendrán un registro de todos los
contratos que otorguen, incluyendo enmiendas a los
mismos, y deberán remitir copia de éstos a la
Oficina del Contralor dentro de los quince (15) días
siguientes a la fecha de otorgamiento del contrato o
la enmienda.

Más adelante dispone:

    El término "instrumentalidad" incluirá a toda
corporación pública, sus subsidiarias o cualesquiera
entidad gubernamental que tenga personalidad jurí-
dica propia, creada por ley o que en el futuro
pudiere crearse, sin excepción alguna.

Surge con meridiana claridad de la anterior disposición de
ley, que las entidades demandadas, al igual que el propio
Municipio de Ponce, tenían igual obligación de ley de radicar
el convenio en la Oficina del Contralor. Por consiguiente, al
ser dicha responsabilidad compartida, entendemos que las
entidades demandadas estan impedidas de levantar dicha defensa.

Más aún, si bien es cierto que el municipio demandante
presentó el contrato tardíamente a la Oficina de la Contralor,
la tardanza no produce la nulidad del convenio. Tomamos
conocimiento de una resolución emitida el 7 de abril de 1995
por el Tribunal Supremo en el caso Departamento de la Vivienda
y otros v. Municipio de Dorado, Núm. RE-95-68. Mediante la
misma, dicha superioridad resuelve que la mera alegación de
nulidad de un convenio predicada en el incumplimiento con las
disposiciones de la Ley de Municipios Autónomos, supra, sobre
la notificación del mismo, no resulta suficiente en derecho
para viciar de nulidad la validez, el consentimiento y la
obligatoriedad de lo pactado.

También carecen de méritos las alegaciones de los
Departamentos de la Vivienda y Recursos Naturales y Ambientales
de que no existía asignación presupuestaria válida para
sufragar los gastos de los proyectos que certificaron. Si bien

58

SENTENCIA                                                          JAC93-0485

es cierto que dichos departamentos no son entidades autónomas presupuestariamente, su obligación conforme a la Ley de Municipios Autónomos, supra, consiste en tener que solicitar los fondos para los proyectos se incluyan en el Programa de Inversión de Cuatro Años (PICA), estando a su vez obligada la Junta de Planificación a someterlos a la Oficina de Gerencia y Presupuesto y a ser presentada a la Asamblea Legislativa.

Tampoco encontramos defensa válida para el incumplimiento con los proyectos que certificaron que la totalidad de fondos provengan de fondos federales o tengan que obtener permiso o colaboración ya sea del Departamento de Transportación o del Cuerpo de Ingenieros o del "Housing and Urban Department" mejor conocido como "HUD". La disponiblidad de tales fondos, permisos o colaboración es materia de asignaciones y política pública federal. La prueba demostró que el caso de los residenciales, los fondos estaban disponibles y la agencia concernida optó por utilizarlos en otros proyectos ajenos a los que aquí se reclaman.

Autoridad de Acueductos y Alcantarillados:

La Autoridad de Acueductos y Alcantarillados sostiene que los procedimientos seguidos por la parte demandante no cumplieron con las disposiciones relativas a costos y procedencia de fondos del Art. 14002 de la Ley de Municipios Autónomos, 21 L.P.R.A. 4652, y que tampoco se cumplió con las disposiciones de la Ley de Contabilidad del Gobierno (Ley Núm. 230 del 23 de julio de 1974), 3 L.P.R.A. 283, con relación a las asignaciones y su preceptividad anual. Sostiene, además, que la crisis financiera por la cual atraviesa, la releva de la realización de los proyectos.

Ambas disposiciones legales que alude la Autoridad de Acueductos no le son aplicables a sus responsabilidades bajo el convenio que nos ocupa. El Art. 14002 de la Ley de Municipios

SENTENCIA                                                    JAC93-0485

Autónomos, _supra_, peternece al Capítulo 14 de la referida ley que reglamenta los contratos de Delegación de Competencias entre un municipio y el gobierno central. Es decir, regula los acuerdos en que los municipios lleven a cabo obras para las agencias del gobierno central o viceversa. En el caso de autos, el convenio cuyo cumpliento se solicita fue efectuádo al amparo del Capítulo 13 de la Ley de Municipios Autónomos, _supra_, y, mediante el mismo, las agencias del gobierno central se comprometieron a llevar a cabo sus propios proyectos, por sí mismas, en un período determinado de tiempo. Por otro lado, la Ley de Contabilidad del Gobierno de Puerto Rico, _supra_, regula aquellas corporaciones públicas en cuyas leyes creadoras se especifique que el Secretario de Hacienda ejerce algún control sobre los fondos y transacciones financieras que realicen. No encontramos en la Ley de Acueductos y Alcantarillados de Puerto Rico, 22 L.P.R.A. sec. 141, _et seq._, disposición alguna al respecto.

La crisis financiera de la Autoridad de Acueductos y Alcantarillados no impide la realización de los proyectos que dicha agencia se comprometió a hacer. La gran mayoría de los proyectos estaban contenidos en el Programa de Obras Permanentes elaborado durante la crisis y, con excepción de la Planta Cerrillos, el resto, representa una fracción del presupuesto con que cuenta dicha instrumentalidad. Con relación a la Planta de Filtración de Cerrillos, según surge de nuestra determinación de hechos número **32**, precisa su construcción para aliviar en gran medida la crisis que la Autoridad atraviesa. La Autoridad de Acueductos y Alcantarillados, al igual que todas las corporaciones públicas aquí demandadas no pueden, evadir el claro mandato del Artículo 13.011 de la Ley de Municipios Autónomos, _supra_, de que las corporaciones públicas quedan obligadas en sus propios

SENTENCIA                                                          JAC93-0485

presupuestos.

Los demás planteamientos de la Autoridad de Acueductos y Alcantarillados no ameritan ulterior discusión.

__Soterrado de la Zona Histórica de Ponce, Autoridad de Acueductos y Alcantarillados, Autoridad de Energía Eléctrica, Puerto Rico Telephone Company y el Municipio de Ponce.__

Según surge de la prueba presentada, el Soterrado del Centro Histórico de Ponce es un proyecto interagencial que consiste en sustituir una infraestructura aérea en el casco histórico y de la zona histórica de la playa de dicho municipio por una soterrada. Luego de que el Municipio de Ponce efectúa el trabajo incial de demolición y remoción del pavimento, el proyecto requiere la acción concertada de las agencias envueltas en el mismo.

Para la realización de dicho proyecto, la Autoridad de Energía Eléctrica y la Puerto Rico Telephone Company habían suscrito un convenio titulado: "Contrato de Obras" mediante el cual ambas instrumentalidades se repartían las tareas del soterrado del área que había sido determinada por el Instituto de Cultura de Puerto Rico. Parte de la labor debía ser prestada por la Administración de Derecho al Trabajo, quien no es parte en este procedimiento.

Ahora bien, de la prueba presentada se estableció que prácticamente todo el soterrado de la zona histórica se ha realizado y que meramente falta realizar ciertos tramos. Tanto la Puerto Rico Telephone Company como la Autoridad de Energía Eléctrica mantuvieron la voluntariedad de finalizar las obras. En vista de ello, resolvemos que las partes deben finalizar el proyecto conforme a lo que se obligaron, y por su parte, el Municipio de Ponce deberá facilitar los trabajos necesarios para que las agencias aquí envueltas puedan terminar el proyecto, incluyendo la colaboración que tuvo el proyecto de la Administración de Derecho al Trabajo.

SENTENCIA                                          JAC93-0485

A pesar de que casi todas las instrumentalidades públicas demandadas desfilaron prueba dirigida a demostrar que el convenio objeto del presente litigio no se discutió en los comités de transición al entrar la nueva administración del Dr. Pedro Roselló González y que, inclusive, testificaron que no encontraron copia del convenio en sus respectivas oficinas administrativas, ello no puede utilizarse como fundamento legal para que incumplieran con sus compromisos contractuales. Un cambio de gobierno no significa necesariamente la desaprobación de los compromisos que hace un gobierno en particular en un momento dado. En cuanto a este particular hacemos eco de las palabras del nuestro Tribunal Supremo: "El Estado es un contratante como caulquiera otro y tiene que cumplir con lo que se comprometió, independientemente de los cambios en administraciones de Gobierno. <u>Municipio de Ponce v. Hon. Pedro Roselló</u>, 138 D.P.R. ____, 94 J.T.S. 112, pág. 72.

Los señalamientos de incompatibilidad que aducen las entidades públicas demandadas que impone la Ley de Municipios Autónomos, <u>supra</u>, a la flexibilidad que le reconocen sus respectivas leyes habilitadoras para disponer de sus fondos carecen de méritos en nuestro ordenamiento jurídico actual. Consabido es que en nuestro estado de derecho los legisladores son cuidadosos en los proyectos de ley que aprueban y los mismos tienen la presunción de ser correctos. Las palabras que usa el legislador no están en la ley por mero azar o por improvisación. Los señalamientos que hace el legislador responden a alguna razón en particular y por ende, a todo lo que expresa se debe darle efecto, haciendo todos los esfuerzos para ello. La declaración de política pública que establece el Poder Legislativo en la Ley de Municipios Autónomos, <u>supra</u>, es díafana y prescribe que nuestro pensamiento político democrático, a estas alturas del Siglo XX, requiere que el

62

SENTENCIA                                                JAC93-0485

poder decisional sobre los asuntos que afectan la vida de los ciudadanos recaigan sobre los funcionarios que más cerca están de la ciudadanía.   Estos són: el alcalde y los asambleístas municipales.   Los poderes y facultades que originalmente residían en el gobierno central respondían a una visión del mundo que concebía el desarrollo económico y social de forma uniforme.   Sin embargo, el alto nivel de control y burocratización de los servicios que brinda el Estado, así como la pobre calidad con que se han prestado los mismos, motivaron esta evolución en nuestro pensamiento político colectivo.   Esta ampliación del marco de acción de los municipios a áreas que hasta el presente le habían sido vedadas, representa una democratización de nuestro proceso político garantizándole a la ciudadanía un gobierno efectivo y responsivo a sus necesidades y aspiraciones.

Existen otras razones de peso que justifican este curso de interpretación estatutaria.   Al aprobar una ley la Asamblea Legislativa, se presupone que dicho cuerpo ha tomado en consideración todos los demás estatutos que se relacionan con la materia que está reglamentando.   Salvo que aparezca claramente que es otra la voluntad legislativa, una ley especial prevalece sobre una general que cubra la misma materia.   Sin embargo, no encontramos que las leyes orgánicas o habilitadoras de las distintas entidades aquí demandadas sean incompatibles con la Ley de Municipios Autónomos, supra, o con el Plan de Ordenación Territorial contenido en el convenio objeto del presente litigio.   Por el contrario, ambos preceptos son armonizables entre sí y pueden ser interpretados en conjunto.

El propósito legislativo de la Ley de Municipios Autónomos, supra, es claro y no deja margen a dudas.   Si bien es cierto que en nuestra función de impartir justicia somos

63

SENTENCIA                                                JAC93-0485

autónomos e independientes, nuestros fallos siempre deben corresponder a un escrupuloso marco de juridicidad. Es precisamente, en atención a esta voluntad legislativa expresa, al procedimiento seguido para la inclusión y aprobación de los proyectos que figuran en el convenio y al consentimiento prestado por los jefes de agencia que, investidos por las propias facultades que les otorgan las respectivas leyes habilitadoras de las entidades a las cuales representan, comparecieron a suscribir el convenio es que reconocemos que el mismo constituye ley entre las partes.[17] Es inconcebible pretender restarle validez a una expresión tan reciente de nuestra Asamblea Legislativa aduciendo que prevalecen las disposiciones generales de leyes orgánicas de las entidades públicas aquí demandadas.

En acuerdos de esta índole que en donde se entre mezclan poderes conferidos a varias ramas de gobierno con diversos intereses públicos, el protagonismo no lo ostentan necesariamente las instrumentalidades públicas envueltas, sino que es el propio legislador quien, a través de los distintos procedimientos gestados a tenor con la Ley de Municipios Autónomos, supra, establece, ejecuta e implementa la política pública del gobierno. El sentido de autodisciplina judicial que impulsa al juzgador a aplicar la voluntad del legislador, desdeñando la propia, es indispensable para que funcione ordenadamente un sistema de organización gubernamental. Convalidar las defensas aducidas por las agencias públicas aquí demandandas representaría trastocar el orden constitucional y encadenaría en forma jurídica ineludible al orden político puertorriqueño una visión arcaica de extrema centralización de los servicios que brinda

---

[17]El Dr. Salvador Padilla Escabí, Secretario de Estado al momento en que se suscribió el convenio cuyo cumplimiento específico se solicita, declaró que a ninguna agencia se le impuso que tenía que hacer determinado proyecto.

SENTENCIA                                              JAC93-0485

el Estado.

Al declarar con lugar la demanda, no solamente reconocemos la eficacia del convenio y su fuerza vinculante entre las partes, sino que reconocemos que dicho acuerdo también comporta y conlleva un deber de observancia por parte de los jueces y tribunales. Al reconocer la validez del mismo, elevamos a categoría de precepto jurídico entre las partes el acuerdo y le dotamos total eficacia legal, pues sus efectos son necesariamente impuestos por ley. De lo contrario, propiciaríamos litigios de esta índole cada vez que ocurre un cambio de gobierno que desaprueba la gestión municipal que logra acogerse a los beneficios de la Ley de Municipios Autónomos, supra.

Al Estado se le reconocen facultades ejecutivas por razón de un acuerdo tácito que existe entre los ciudadanos y los gobernantes que éstos eligen. Por ello, cuando el Estado contrata se entiende que el acuerdo es otorgado por todos los ciudadanos en base a los intereses comunes o públicos de los cuales son ellos mismos los legítimos titulares.

Daños:

La prueba pericial presentada nos ha convencido que en efecto el Municipio de Ponce ha sufrido pérdidas por concepto de merma en los recaudos por arbitrio de construcción, patentes municipales y contribuciones sobre la propiedad, tal y como detalláramos en nuestras determinaciones de hecho. Las discrepancias surgidas entre los peritos que testificaron durante el transcurso del juicio pusieron de manifiesto controversias que afectan la cuantía de las pérdidas, más no así su existencia. El Tribunal Supremo de Puerto Rico ha reiterado que la cuantía a concederse por pérdidas de esta naturaleza no puede depender exlusivamente de ecuaciones matemáticas o fórmulas y cómputos aritméticos ya que dichas ecuasiones o fórmulas son sólo algunos de los factores a

65

SENTENCIA

JAC93-0485

tomarse en consideración, junto a la totalidad de circuns-
tancias del caso para determinar cual debe ser la cuantía
razonable a concederse. Si fueramos a adjudicar los daños
conforme a las formulas racionalmente elaboradas por el perito
del Municipio de Ponce, Dr. Elías R. Gutiérrez, la cantidad
total de la merma en los ingresos fiscales del Municipio
ascendería a $58,904,037. Sin embargo, a la luz de la
totalidad de las circunstancias que mediaron en el caso y en
vista que mediante esta sentencia ordenamos la realización de
los proyectos cuyo cumplimiento específico se solicita, procede
descontar las partidas correspondientes al período de post
construcción y en su consecuencia determinamos que el Municipio
de Ponce debe ser compensado en la suma total de $16,418,845.
Dicha suma deberá ser pagada por todas las instrumentalidades
públicas demandadas en proporción al monto de inversión no
realizada en los proyectos que dejaron de construir. Por su
parte, la Junta de Planificación será solidariamente respon-
sable en proporción a los daños causados por los proyectos que
dejó de incluir en el Programa de Inversión de Cuatro Años
(PICA) de 1993-94 y 1996-97, de los que estaban incluídos en el
convenio, y que no se realizaron conforme a lo que se programó.

La prueba también demostró que un número de proyectos de
inversión privada no pudieron ser construídos debido a la falta
de las obras de infraestructura que las intrumentalidades
demadadas tenían que construir como parte de los compromisos de
inversión que asumieron en el Plan de Ordenación Territorial.
Las deficiencias principales de infraestructura se refieren a
obras que debían haber efectuado las Autoridad de Acueductos y
Alcantarillados y la Autoridad de Carreteras y Transportación
en el sector noreste de la ciudad de Ponce, las cuales, de
haberse construído conforme a lo que se programó, hubiesen
permitido la realización de los siguientes proyectos privados

66

SENTENCIA

JAC93-0485

que estaban en vías de desarrollo: Urbanización y Centro Comercial "la Mallorquina", Urbanización "Mansiones de Ponce", Centro Comercial Arjona y Ensanche "El Bronce". El perito del Municipio de Ponce hizo un estimado de las pérdidas ocasionadas por recaudos dejados de percibir por concepto de arbitrios de construcción, patentes municipales y contribuciones sobre la propiedad por no haberse llevado a cabo los referido proyectos privados. Por otro lado, el perito economista de varias de las entidades demandadas, Dr. Ramón Cao García, sostuvo que estimar dichas pérdidas por separado equivaldría a duplicar los daños ya que las mismas estarían incluídas dentro de los efectos inducidos de las obras públicas. El Tribunal no estima que la prueba presentada por el Municipio de Ponce, sea suficiente para establecer relación de causalidad adecuada entre el incumplimiento por las agencias demandadas y el que no se hayan construído los proyectos privados en cuestión por lo que no se ha de conceder compensación alguna por este renglón.

Disposiciones Generales:

En virtud de la enorme complejidad que plantea el cumplimiento específico de las obligaciones que surgen de esta sentencia, tales como la labor técnica que hay que realizar para precisar los contornos y el contenido de muchos de los proyectos, procesos de permisología que hay que seguir en algunos casos, gestiones gubernamentales que hay que efectuar para la disponibilidad de fondos, procesos de adquisición y realojo, el carácter técnico de los procesos de construcción, el tiempo tomará llevarlos a cabo y las múltiples diferencias que podrían surgir, el Tribunal, al amparo de la Regla 41 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III R. 41,[18]

_____

[18]La Regla 41 de las de Procedimiento Civil, supra, faculta a los Tribunales al nombramiento de un Comisionado Especial cuando los asuntos que se ventilan en un pleito son sumamente técnicos y se necesita de un conocimiento pericial altamente (continúa...)

67

SENTENCIA                                                  JAC93-0485

designará un Comisionado Especial para llevar a cabo una auditoría del desarrollo de los proyectos hasta la terminación, entrega y aceptación de todos y cada uno de éstos.

Los honorarios del Comisionado Especial deberán ser sufragados por cada una de las entidades demandadas en proporción al monto del valor de los proyectos que dejaron de construir en el Municipio de Ponce.

El Comisionado Especial rendirá informes trimestrales al Tribunal con la información pertinente sobre el desarrollo de cada uno de los proyectos siguiendo el procedimiento establecido por la Regla 41 de las Reglas de Procedimiento Civil, supra. El Comisionado podrá someter informes parciales o especiales cuando lo entienda necesario.

El primer informe el Comisionado Especial deberá someter una programación o calendarización de la ejecución de cada proyecto según sus distintas etapas. Dicha programación deberá ser preparada incialmente por cada una de las agencias demandadas dentro de los parámentros establecidos. Si el Comisionado no estuviera de acuerdo con la calendarización que propongan las agencias demandadas o si el Municipio de Ponce así lo objetare, el Comisionado adjudicará la controversia formulando las recomendaciones pertinentes al tribunal para ser consideradas conforme al procedimiento previsto para la sumisión de informe de la Regla 41 de las de Procedimiento Civil, supra.

El Comisionado Especial deberá tomar en consideración que las cantidades consignadas en el Programa del Plan de Ordenación Territorial del Municipio de Ponce son cantidades

---

[18](...continuación)
especializado. Además, el Artículo 2.002 de la Ley de la Judicatura de Puerto Rico(4 L.P.R.A. sec. 22 et seq.), provee que los tribunales tendrán autoridad, inter alia, para hacer cumplir sus sentencias, órdenes y providencias, y para realizar u ordenar cualquier acto que resulte necesario a fin de cumplir a cabalidad sus funciones.

SENTENCIA                                                    JAC93-0485

estimadas y que al llevarse a cabo los proyectos de construcción podrían rebasar las sumas estimadas.

En el primer informe del Comisionado deberá someter al Tribunal y a las partes el presupuesto anual de su oficina para el cumplimiento de la encomienda que le asigna el Tribunal. Dicho presupuesto deberá ser aprobado por el Tribunal una vez las entidades demandadas hayan tenido la oportunidad de expresarse sobre el particular. El presupuesto podrá ser revisable anualmente.

Cada una de las partes envueltas en el presente litigio deberán proponer por lo menos tres nombres que entiendan pudieran descargar en forma diligente e imparcial las responsabilidades que aquí se detallan una vez advenga la presente sentencia final y firme. Las demás directrices que habrán de guiar las funciones del Comisinado Especial se habrán de detallar una vez se designe el mismo.

Por los fundamentos antes expuestos se declara con lugar la demanda y en su consecuencia se ordena a las instrumentalidades públicas aquí demandadas a la construcción de los proyectos que solicita el Municipio de Ponce en forma compatible con las distintas providencias contenidas en esta sentencia. Además, el Tribunal declara no ha lugar las reconvenciones instadas por la Puerto Rico Telephone Company y por la Autoridad de Acueductos y Alcantarillados. Se impone a las demandadas, a prorrata, el pago de las costas del litigio.

REGISTRESE Y NOTIFIQUESE.

En San Juan, para Ponce, Puerto Rico a 24 de junio de 1996.

ANGEL GONZALEZ ROMAN
JUEZ DE APELACIONES

SENTENCIA

JAC93-0485

B.5-1 AUTORIDAD DE CARRETERAS Y TRANSPORTACION (ACT)

| PROYECTOS | COSTO - AÑO FISCAL ($) | | | |
|---|---|---|---|---|
| | 92-93 | 93-94 | 94-95 | 95-96 |
| **PR-2** | | | | |
| -Extensión Ronda de Circunvalación Sur, Conector a Expreso (Fase I) y Construcción de las Calles Marginales (Norte,Sur) | 1,458,333.0 | 3,499,999.0 | 2,041,668.0 | |
| -Intersección El Tuque (Fase II-A) | | 3,500,000.0 | 3,500,000.0 | |
| **PR-9** | | | | |
| -Acceso al Aeropuerto Mercedita (en ejecución) | | | | |
| -Desde PR-52 hasta el Aeropuerto Ronda Norte Baldorioty de Castro | 4,533,710.0 | | | |
| -Ave. Tto Castro(PR-14) hasta Exp. Las Américas (PR-52) Fase I | 850,000.0 | 3,400,000.0 | 3,400,000.0 | 850,000.0 |
| -Desde la Ave. Tto Castro(PR-14) hasta las cercanías de la PR-503 (Fase II-A) (7/93-8/94) | | | | |
| -Cerca de PR-503 hasta PR-10 existente Fase II-B | 330,556.0 | 11,800,000.0 | | |
| PR-10 existente hasta PR-132 y en sección 20.60m desde PR-132 hasta PR-2 | 2,916,667.0 | 3,966,667.0 | 3,966,667.0 | 3,636,110.0 |
| -Mejoras Geométricas a la PR-503 desde la salida de la PR-9 hasta Mayor Cantera | | 5,833,333.0 | 5,833,333.0 | 2,916,667.0 |
| **PR-10** | | | | |
| -Límite Municipal Adjuntas hasta La Hacienda Burenes Ponce | | | 6,866,667.0 | 8,000,000.0 |
| -Desde Tibes PR-503 hasta Int. Camino La Pandura | 4,511,677.0 | 2,460,888.0 | | |
| -Ave. Hostos(PR-10) mejoras-habilitar a cuatro carriles y soterrado desde La Abolición hasta la Ave. Las Américas | 250,000.0 | | | |
| **PR-14** | | | | |
| -Construcción Intersección a desnivel entre (PR-14) y (PR-133) | 583,333.0 | 2,333,333.0 | 2,333,333.0 | 1,750,000.0 |
| -Calle Comercio hasta Calle Obispado Incluye (Viaducto y rampas Sur con Ave. Miguel A. Pou (PR-1)) | 4,606,542.0 | 1,256,330.0 | | |
| -Reconstrucción y Paisajismo desde Ave. Fagot hasta Puente Betances Fase I | 2,390,667.0 | 869,333.0 | | |
| -Desde Ave. Fagot hasta PR-9 Fase II | 1,472,917.0 | 2,525,000.0 | 1,052,083.0 | |
| -Terminaciones Arquitectónicas al puente La Guadalupe | 396,000.0 | 264,000.0 | | |
| -Terminaciones arquitectónicas Puente Ave. Betances | 665,614.0 | | | |
| -Estudio ensanche PR-14 a cuatro carriles desde el puente del Río Bucaná hasta el Coto Laurel | | | | |
| **PR-52** | | | | |
| Ronda Juan Morel Campos Sur | | | | |
| -Desde PR-1 hasta el canal Río Bucaná | | | | |
| "Movimiento de Tierra y Drenaje (Fase I) | 189,946.0 | | | |
| "Estructura y Pavimento (Fase II) | 516,667.0 | 3,100,000.0 | 2,583,333.0 | |
| -Puente sobre el Río Bucaná | 3,954,041.0 | | | |
| -Desde el Río Bucaná hasta Ave. Malecón(nueva) | 5,504,467.0 | 3,002,436.0 | | |
| -Desde Ave. Malecón(nueva) hasta el Río Matilde | 6,219,880.0 | 6,219,880.0 | | |
| -Desde Río Matilde hasta PR-2 con Intersección (12/92 - 12/94) | | 7,440,000.0 | | |
| **PR-133** | | | | |
| -Paisajismo y Mejoramiento, Ampliación al Parque Cuatro Calles | 250,000.0 | | | |
| **PR-139** | | | | |
| -Desde PR-14 hasta PR-139 (cerca de donde se construyó la Represa Cerrillos) | 446,667.0 | 1,786,667.0 | 446,667.0 | |
| **PR-1** | | | | |
| -Reconstrucción y Paisajismo Ave. Miguel A. Pou | 6,120,197.0 | | | |
| -Rebonificación PR-1, desde el Puente del Río Inabón hasta 600m al oeste | 332,496.0 | | | |
| -Por acuerdo con la AEE, aportación para el soterrado de las líneas dentro del tramo de la PR-52 con la PR-1, en ejecución. | | | | |



70

SENTENCIA

JAC93-0485

### B.5-2 AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS (AAA)

| PROYECTOS | COSTO - AÑO FISCAL ($1,000) | | | |
|---|---|---|---|---|
| | 92-93 | 93-94 | 94-95 | 95-96 |
| Mejoras Sistema Acueducto Hogares Seguros x Anón Carmelita (SDWA) - PMP-4-06-7040 | | | | |
| Sistema Acueducto Sector El Coitedo (Etapa I) - PMP-4-06-7050 | 364.6 | 897.4 | | |
| Planta Compacta y Toma Real y Anón (Raíces) (SWDA) - PMP-4-09-7050 | 150.0 | 450.0 | | |
| Diseño Planta Filtración Cerrillos 10 MGD - PMP-4-09-6005 | 2,206.8 | 1,471.2 | | |
| Adquisición Terrenos Planta Filtración Cerrillos - PMP-4-09-6007 | | 450.0 | 750.0 | 300 |
| Línea Transmisión 36 pulgadas a Las Monjitas - PMP-4-09-6020 | 150.0 | 350.0 | | |
| Toma en Planta Filtro Tibes PMP-4-12-6010 | 1,400.0 | 2,600.0 | | |
| Sector La Yuca y El Paraíso sistema de acueducto, tuberías y bombas | 390.0 | 110.0 | | |
| Laterales Sanitarias Comunidad Canas (Sector La Matilde) PMP-4-58-5003 | 300.0 | | | |
| Emisario Marino de la Planta de Tratamiento PMP-4-58-5009 | 610.0 | | | |
| Emisario Terrestre de la Planta de Tratamiento PMP-4-58-5040 | 2,000.0 | 3,000.0 | 5,000.0 | |
| Completar soterrado límite de primer orden de la Zona Histórica, Ave. Hostos y Sector Histórico de la Playa de Ponce | 1,000.0 | 1,500.0 | 2,500.0 | |
| Carretera # 14 desde Avenida Fagot hasta el Puente del Río Inabon PMP-4-58-5000 | 800.0 | 400.0 | 400.0 | |
| Maguayes Planta de Filtros Mejoras Acueducto Quebrada Limón y Marueño PMP-4-24-9270 | 800.0 | 600.0 | | |
| Mejoras al Sistema | 60.0 | 180.0 | | |
| ·Renovación Tuberías y Reemplazo | 150.0 (PMP-4-80-9027) | 190.0 (PMP-4-80-9028) | 190.0 (PMP-4-80-9624) | 190.0 (PMP-4-80-9625) |
| ·Renovación Bombas y Motores | 115.0 (PMP-4-80-9018) | 200.0 (PMP-4-80-9019) | 185.0 (PMP-4-80-9620) | 180.0 (PMP-4-80-9621) |
| ·Instalación y Renovación de Bombas | 35.0 (PMP-4-80-9033) | 90.0 (PMP-4-80-9034) | 80.0 (PMP-4-80-9629) | 90.0 (PMP-4-80-9630) |
| ·Renovación de Acometidas | 100.0 (PMP-4-80-9039) | 95.0 (PMP-4-80-9040) | 95.0 (PMP-4-00-9636) | 100.0 (PMP-4-80-9637) |
| ·Instalación de Acometidas | 70.0 (PMP-4-80-9044) | 70.0 (PMP-4-80-9045) | 75.0 (PMP-4-80-9641) | 75.0 (PMP-4-80-9642) |
| ·Instalación de Contadores | 250.0 (PMP-4-80-9049) | 250.0 (PMP-4-80-9050) | 250.0 (PMP-4-80-9646) | 250.0 (PMP-4-80-9647) |



SENTENCIA

JAC93-0485

B.5-3 AUTORIDAD DE EDIFICIOS PUBLICOS (AEP)

| PROYECTOS | COSTO - AÑO FISCAL ($'1,000) | | | |
|---|---|---|---|---|
| | 92-93 | 93-94 | 94-95 | 95-96 |
| Fase II - Hospital Gandara | 5,283.5 | 6,577.0 | 1,265.5 | |
| Centro de Salud Familiar Las Américas | | 1,005.4 | 2,934.8 | 8? |
| Centro de Salud Familiar Bo. Coto | | 134.6 | 2,061.7 | 2.5 |
| Centro Pediatrico Hospital Regional | | 703.0 | 3,069.3 | 1.12 |
| Centro de Rehabilitación Psiquiátrico | | | 70.9 | 1.7 |
| Inst. Seguridad Mediana Adultos Varones | 9,243.2 | 14,620.7 | 6,576.2 | |
| Estación Patrulla de Transito y Deposito de Vehiculos Hurtados | | | | |
| Unidad Maritima | 110.0 | 1,048.7 | | |
| Cuartel División Drogas y Narcoticos | | | 285.3 | |
| Esc. Sup. Rural El Tuque | | | 318.5 | 147 |
| Esc. Elem Educ. Especial R. Marin | | | | 141 |
| Cuartel de Bomberos Regional, Oficina Defensa Civil, Oficina Turismo Municipal y Estacionamiento | | | | 40? |
| | 2,528.6 | 2,669.7 | 222.5 | |

SENTENCIA

JAC93-0485

B.5-4 AUTORIDAD DE LOS PUERTOS (AP)

| PROYECTOS | COSTO - AÑO FISCAL ($ 1,000) | | | |
|---|---|---|---|---|
| | 92-93 | 93-94 | 94-95 | 95-96 |
| Extensión Antepista 1750' | 500.0 | | | |
| Expansión de Pista y Antepista | 1,307.0 | | | |
| Conexión Líneas Sanitarias a la Troncal de la A.A.A. | 130.0 | | | |
| Construcción Edificio de Mantenimiento | 30.0 | 17.0 | | |
| Extensión Pista hacia el oeste | 2,000.0 | 2,000.0 | | |
| Vehículo de Rescate | 467.0 | | | |
| Expansión Edificio Terminal | 2,500.0 | | | |



73

SENTENCIA

JAC93-0485

B.5-5 AUTORIDAD DE ENERGIA ELECTRICA (AEE)

| PROYECTOS | COSTO - AÑO FISCAL ($'1,000) | | | |
|---|---|---|---|---|
| | 92-93 | 93-94 | 94-95 | 95-96 |
| ·Completar soterrado limite de primer orden de la Zona Histórica, Ave. Hostos y Sector Histórico de la Playa de Ponce | 8,200 | 8,200 | 4,100 | 4,100 |
| ·Por acuerdo con la AC, apoxilación para el soterrado de las líneas del tro del trébol de la PR-52 con la PR-1, en ejecución. | | | | |

SENTENCIA

JAC93-0485

B.5-6 DEPARTAMENTO DE LA VIVIENDA (DV)

| PROYECTOS | COSTO - AÑO FISCAL ($ 1,000) | | | |
|---|---|---|---|---|
| | 92-93 | 93-94 | 94-95 | 95-96 |
| Iniciar Rehabilitación de 100 unidades | 50.0 | 500.0 | | |
| Continuar construcción calles, enchriados, sistemas sanitarios, agua potable y pluvial. Carr. #2 Bo. Canas, Punta Diamante, Ponce | 2,526.7 | 2,673.8 | 2,673.8 | |
| Pagar ELA vs Eileen Mercado y otro caso #E88-418 | 400.0 | | | |
| Construcción calles y red interna Com. Paraíso | | 500.0 | 500.0 | |
| Rehabilitación y nueva construcción (Ponce en Marcha) | | | | |
| -Bo. La Playa, Sector Puerto Viejo, Subsanar | 1,621.0 | 1,747.1 | 1,747.1 | |
| -Sector Pabellones | 500.0 | | | |
| Rehabilitación y construcción (Ponce en Marcha) | | | | |
| -Arenas Betances | 1,895.0 | | | |
| -Sector San Felipe | 1,345.8 | | | |
| Asignación para rehabilitación privatizada de 1,000 viviendas bajo el programa "Tu Ciudad Renace" | 15,000.0 | | | |
| Relocalización de aprox. 300 viviendas en zonas de alto riesgo y mayor necesidad | 6,000.0 | | | |
| Rehabilitación en sitio de viviendas en áreas económicamente deprimidas | 4,300.0 | 2,470.0 | 2,000.0 | 2,000.0 |
| Construcción y venta de 200 unidades de vivienda en solares baldíos en zona urbana | 12,000.0 | | | |
| Modernización de Residenciales | | | | |
| -Remodelación Res. Dr. Pilá | 1,285.3 | 8,355.9 | 8,355.9 | |
| -Remodelación Res. E. Ramos Antonini | 9,270.0 | | | |
| -Remodelación Res. Ponce de León | | 756.0 | 756.0 | 7,912.8 |
| -Remodelación Res. Lirios | 7,000.0 | | | |
| -Remodelación Res. López Nussa | 7,000.0 | | | |
| -Remodelación Res. Bo. Caribe | 1,500.0 | | | |
| Mejoras Residenciales | | | | |
| -Residencial Portugués | 1,000.0 | | | |
| -Residencial José N. Gándara | 1,000.0 | | | |
| Demolición Res. Las Terrazas | 1,400.0 | | | |



SENTENCIA

JAC93-0485

B.5-7 DEPARTAMENTO DE RECURSOS NATURALES (DRN)

| PROYECTOS | COSTO - AÑO FISCAL ($ 1,000) | | | |
|---|---|---|---|---|
| | 92-93 | 93-94 | 94-95 | 95-96 |
| Canalización Río Portugués y Río Bucaná (Cuerpo de Ingenieros) | | 6,000.0 | 7,000.0 | 7,000.0 |
| Área Recreativa Represa Cerrillos | 3,600.0 | | | |
| Bucaná Beach Park (Santa Cruz, Cabuyones) | | | | |
| Cerro Montaña Lago Cerrillos | 220.0 | 3,000.0 | | |
| Represas Colapsables canal Río Portugués | Todos los fondos son asignados en la RC 306.91 | | | |
| Canalización ríos Matilde, Pastillo y Canas | | | | |
| Este proyecto continuará el año fiscal 1997 con una aportación de ($7,000,000.00) | | | | |
| Rehabilitación Faro Isla de Muertos | | 300 | 800 | 8000 |
| Este proyecto continuará el año fiscal 1997 con una aportación de ($100,000.00) | | | | |
| Parque Nacional - Vivero | | 693 | 200 | 100 |
| Este proyecto continuará el año fiscal 1997 con una aportación de ($140,000.00) | | | | |
| Reserva Natural La Matilde | | 700 | 578 | 140 |
| Este proyecto continuará el año fiscal 1997 con una aportación de ($615,000.00) | | | | |
| Parques Lineal en los canales Portugués y Bucaná | | 185 | 295 | 575 |
| Lagos Cerrillos (Bosque de Caoba) | En planificación. | 1100 | 1100 | 1100 |

76

SENTENCIA

JAC93-0485

B.5-8 PUERTO RICO TELEPHONE COMPANY (PRTC)

| PROYECTOS | COSTO - AÑO FISCAL ($'1,000) | | | |
|---|---|---|---|---|
| | 92-93 | 93-94 | 94-95 | 95-96 |
| Programa de Soterrado | En Planificación. | | | |
| -Centro Histórico | | | | |
| -Avenida Hostos desde la Abolición hasta Ave. Las Américas | 77.0 | — | | |
| -Avenida Hostos desde Ave. Las Américas hasta la calle Comercio | — | — | | |
| -La Punya | — | 750.0 | | |
| -Caño Mayor Cantera y Acueducto | — | — | 670.0 | |
| Puerto de Ponce | | | | 780.0 |
| | 50.0 | | | 570.0 |



76 ( ... )