EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de Ponce
    Peticionario

        v.

Autoridad de Carreteras y
Transportación; Autoridad de
Acueductos y Alcantarillados;
Autoridad de Edificios Públicos;
Autoridad de Energía Eléctrica;
Departamento de la Vivienda;
Departamento de Recursos Naturales
y Ambientales; Puerto Rico Telephone
Company; Junta de Planificación;
Autoridad de los Puertos de P.R.
Estado Libre Asociado de P.R.
    Recurridos

Núm CC-98-241
Cons. CC-98-231
250, 257, 258 y
259

Certiorari

Opinión del Tribunal emitida por el Juez Presidente, señor Andréu García

San Juan, Puerto Rico a 29 de diciembre de 2000

Nos corresponde evaluar, por vez primera en nuestra jurisdicción, un convenio suscrito por un municipio con el Gobierno Central para el desarrollo de proyectos programados al amparo de las innovadoras disposiciones del Capítulo XIII de la Ley de Municipios Autónomos, relativas a planes de ordenación territorial. Luego de analizar ponderadamente los numerosos señalamientos de error que nos hacen todas las partes en este litigio, resolvemos modificar la sentencia del Tribunal de Circuito de Apelaciones.

I.

A principios de 1990, el Municipio de Ponce

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    2

comenzó a recopilar información de diversa índole para elaborar un Plan Maestro que guiara el desarrollo ordenado del territorio de dicho municipio. Para ello, se creó una oficina que dirigía el arquitecto Javier Bonnin, acompañado por el personal técnico necesario para llevar a cabo sus funciones.

El 30 de agosto de 1991, se aprobó la Ley Núm. 81, 21 L.P.R.A. secs. 4001 *et seq*, de vigencia inmediata, conocida como la Ley de Municipios Autónomos. Esta ley autorizó específicamente a los municipios del Estado Libre Asociado de Puerto Rico a elaborar y adoptar planes de ordenación territorial para disponer la política pública sobre el uso del suelo dentro de sus límites territoriales. <u>Véase</u>, Arts. 2.004(g) y 13.004, 21 L.P.R.A. secs. 4054(g) y 4602. <u>El Municipio de Ponce se acogió a las disposiciones de esta ley y preparó un Plan de Ordenación Territorial en sustitución del Plan Maestro previsto originalmente</u>. En consecuencia, creó la Oficina de Ordenación Territorial.



De acuerdo con las determinaciones de hechos del Tribunal de Primera Instancia, <u>el Municipio de Ponce celebró una serie de vistas públicas para la elaboración de los Planes de Ordenación</u>. Además, <u>desde enero de 1991 hasta octubre de 1992, el Municipio, en estrecha coordinación con funcionarios de las instrumentalidades públicas demandadas, elaboró su Plan de Ordenación Territorial</u>. En dichas conversaciones se involucraron funcionarios de la Oficina de Ordenación Territorial, el Alcalde de Ponce, personal técnico de las agencias concernidas, así como sus Secretarios y Directores, el Secretario de Estado, ayudantes del Gobernador, miembros de la Junta de Planificación, e inclusive, el propio Gobernador.

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                3

A través de la multiplicidad de reuniones y misivas entre funcionarios del ayuntamiento, por un lado, y del Gobierno Central, por el otro, se determinaron los proyectos que cada una de las instrumentalidades demandadas habría de realizar para fines del programa de obras del Plan de Ordenación Territorial. El tribunal sentenciador concluyó que <u>la gran mayoría de los proyectos que se incluyeron en el plan, se encontraban previamente en los respectivos programas de obras permanentes de las entidades públicas demandadas.</u>

La redacción del Plan de Ordenación Territorial de Ponce consta de tres partes: el Memorial General, el Programa de Acción y el Reglamento. La parte B.5 del Programa de Acción comprende una sección titulada ``Programa de Proyectos de Inversión Certificados''. En ésta se incluyen varias tablas donde se relacionan los ``proyectos de inversión... programados y certificados por las distintas agencias y corporaciones públicas [del Gobierno Central] en armonía con las políticas y objetivos del... Plan''. 2 Plan Territorial de Ponce sec. B.5, a la pág. 28 (octubre, 1992).[1] Las agencias y corporaciones públicas cuyos proyectos se consignan en las referidas tablas son: la Autoridad de Carreteras y Transportación (ACT), la Autoridad de Acueductos y Alcantarillados (AAA), la Autoridad de Edificios Públicos (AEP), la Autoridad de los Puertos (AP), la Autoridad de Energía Eléctrica (AEE), el Departamento de la Vivienda (DV), el Departamento de Recursos Naturales, actualmente Departamento de Recursos Naturales y Ambientales (DRNA) y la



---

[1] 23 R.P.R. sec. 650.1262.

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    4

Puerto Rico Telephone Company (PRTC).

Mediante ordenanza promulgada el 22 de octubre de 1992, la Asamblea Municipal de Ponce aprobó el Plan de Ordenación Territorial.[2] El alcalde, por su parte, aprobó esta ordenanza y le remitió el Plan a la Junta de Planificación para su consideración.

Durante su proceso de evaluación, la Junta de Planificación les solicitó a las agencias y corporaciones públicas mencionadas que examinaran y certificaran por escrito si los proyectos incluidos en el Plan reflejaban el acuerdo de inversión en el Municipio. <u>La mayoría de estos proyectos ya estaban incluidos en los programas de obras permanentes de dichas entidades</u>. Entre el 23 y el 28 de octubre, éstas suscribieron las certificaciones correspondientes según lo solicitado. No obstante, la ACT, la AAA y el DRNA hicieron algunas modificaciones a los proyectos relacionados en las tablas. El 28 de octubre de 1992, la Junta de Planificación adoptó el Plan, incluyendo las variaciones mencionadas,[3] y el 6 de noviembre siguiente, el gobernador lo aprobó.[4]

El tribunal de instancia concluyó que entre <u>el 28 de octubre</u> y el 15 de diciembre de 1992, el Gobierno Central, el DV, la ACT, la AAA, la AEP, la AP, la AEE, la PRTC y el DRNA suscribieron el acuerdo objeto de análisis en este caso, con



---

[2] <u>Véase</u>, Ordenanza Núm. 601, Serie 1992-93 de 22 de octubre de 1992.

[3] <u>Véase</u>, Resolución Núm. JP-PT-63-1 de 28 de octubre de 1992.

[4] <u>Véase</u>, Boletín Administrativo Núm. OE-1992-66 de 6 de noviembre de 1992.

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259

5

el Municipio, titulado ``Convenio para el desarrollo de proyectos programados entre el Gobierno Central y el Municipio de Ponce'' (en lo sucesivo, el ``Convenio''). En él, las entidades públicas comparecientes se obligaron a desarrollar en el Municipio los proyectos incluidos en el Plan, según fueron certificados posteriormente.  El Municipio, por su parte, se comprometió a ofrecer el apoyo económico que su presupuesto le permitiera para la realización de los proyectos[5]. Según el Convenio, los proyectos se debían desarrollar entre el 1 de enero de 1993 y el 31 de diciembre de 1996. El Municipio presentó el Convenio en el Registro de Contratos del Municipio de Ponce el 15 de septiembre de 1993 y en la Oficina del Contralor al día siguiente.

Por otra parte, en abril de 1993, se celebró una reunión en la Fortaleza en la cual participaron los recién nombrados jefes de los diferentes departamentos del Gobierno Central, directores y secretarios de las instrumentalidades públicas aquí demandadas, el Lcdo. Álvaro Cifuentes -Secretario de la Gobernación- y el Alcalde de Ponce. Según concluyeron los tribunales de instancia e intermedio apelativo, los representantes de las distintas instrumentalidades públicas indicaron cuáles de los proyectos iban a llevar a cabo y cuáles no. Además, unilateralmente, dejaron de cumplir con algunos de los compromisos de inversión establecidos en el Plan de Ordenación Territorial y en el Convenio. Dichas entidades gubernamentales no hicieron uso de los mecanismos dispuestos en la Ley de Municipios Autónomos para solicitar la

---

[5] El texto íntegro del Convenio, sin sus anejos, se incluye como anejo al final de esta opinión.

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259

6

revisión parcial del plan. Véase Art. 13.008, 21 L.P.R.A. sec. 4606.

En consecuencia, el 28 de octubre de 1993, el Municipio instó una acción para exigir el cumplimiento específico de las obligaciones impuestas por el Convenio y la Ley de Municipios Autónomos a las entidades demandadas. Según el Municipio, las demandadas dejaron de cumplir sus obligaciones en relación con varios de los proyectos incluidos en el Convenio y en el Plan. El Municipio solicitó además el resarcimiento de los daños y perjuicios que el alegado incumplimiento le había causado.

Luego de los trámites procesales de rigor, el Tribunal de Primera Instancia resolvió que tanto el Convenio como la Ley de Municipios Autónomos les imponen a las demandadas las obligaciones reclamadas por el Municipio. En consecuencia, declaró con lugar la demanda y condenó a las demandadas resarcir al Municipio los daños sufridos por concepto de pérdidas en los recaudos de arbitrios de construcción, patentes municipales y contribuciones sobre la propiedad como consecuencia del incumplimiento. Por último, el tribunal designó un comisionado especial para llevar a cabo una auditoría del desarrollo de los proyectos hasta la terminación, entrega y aceptación de cada uno de ellos.

Inconformes, las demandadas apelaron ante el Tribunal de Circuito de Apelaciones. Éste modificó la sentencia apelada a los efectos de disponer la manera en que algunas de las demandadas debían cumplir sus obligaciones. Además, por considerar que no eran compensables en ese momento, pospuso la determinación de los daños hasta que todos los proyectos estuvieran terminados y el comisionado especial rindiera su



CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    7

informe.   No obstante, sostuvo la adjudicación que hizo el
tribunal de instancia sobre la responsabilidad de las partes
demandadas por tales daños.

Revisamos, vía *certiorari*, la referida sentencia del
Tribunal de Circuito de Apelaciones.

El Municipio señala en su alegato que el tribunal
apelativo erró al modificar las obligaciones cuyo cumplimiento
específico ordenó el foro de instancia y al dejar sin efecto
la cuantía de daños que éste concedió.

Las demandadas, por su parte, señalan en sus respectivos
alegatos varios errores comunes y algunos particulares[6].   A



---

[6] Los errores particulares son los siguientes.   Señaló la
PRTC que el tribunal apelativo erró:

al resolver que la P.R.T.C. viene obligada a la
realización de determinados proyectos de
infraestructura en virtud de la Ley Núm. 84 de 29
de octubre de 1992 que enmienda el artículo
13.001 de la Ley de Municipios Autónomos y bajo
el Convenio para el desarrollo de proyectos entre
el Gobierno Central y el Municipio de Ponce[;]

al confirmar la determinación del Tribunal de
Primera Instancia de no desestimar la demanda
contra la P.R.T.C. debido a que dicha corporación
no incumplió con el convenio y porque la
alteración y paralización de las obras se debió
exclusivamente a las acciones del Municipio de
Ponce[; y]

al no revocar la imposición de daños a la
P.R.T.C., aun cuando concluyó que la PRTC no tuvo
responsabilidad en el alegado incumplimiento
contractual.

La AEP, por su parte, señaló que el tribunal apelativo erró:

al determinar que una vez firmado el Plan de
Ordenación Territorial la obligación de realizar
los proyectos recae en la AEP y no en las
agencias, quienes para poder reprogramar o
cancelar sus compromisos tienen que solicitarlo a

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    8

través   de   los   señalamientos   comunes   éstas   cuestionan   la

la AEP, y ésta cumplir con el trámite establecido
en la Ley de Municipios Autónomos[;]

al concluir que la AEP tenía que solicitarle a la
Oficina de Presupuesto y Gerencia (OPG) que
certificara y comprometiera el presupuesto de las
agencias concernidas en cuanto a la realización
de los proyectos que fueron certificados por la
AEP en el Plan de Ordenación Territorial[;]

al concluir que los proyectos incluidos en el
Convenio formaban parte del programa de obras
permanentes de la AEP y que ésta obligó su propio
presupuesto para la realización de los mismos[;]

al determinar que no es imposible para la AEP
realizar los proyectos reprogramados o cancelados
por las agencias[; y]

al determinar que la AEP debe compensar al
Municipio de Ponce por los daños alegados por
dicha parte por concepto de los proyectos que
fueron reprogramados o cancelados por las
agencias originadoras de los mismos.

Por último, la AEE le imputó al Tribunal de Circuito la
comisión de los siguientes errores:

confirmar la determinación del Tribunal de
Primera Instancia de no desestimar la demanda
contra la Autoridad de Energía Eléctrica, ya que
quien realmente paralizó las obras fue el propio
Municipio de Ponce, quien alega [que] a falta de
los empleados de la Administración del Derecho al
Trabajo al igual que [d]el Instituto de Cultura
Puertorriqueña, no proveyó empleados en
sustitución para la continuación de las obras[;]

no revocar la imposición de daños a la Autoridad
de Energía Eléctrica de Puerto Rico, aun cuando
concluyó que la Autoridad no tuvo responsabilidad
en el alegado incumplimiento contractual[; y]

sostener la determinación de instancia en cuanto
a las obras en la zona histórica de la Playa de
Ponce, cuando la prueba desfilada demostró que no
hubo un acuerdo final en cuanto a éstas.



CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259

9

validez de la sentencia del tribunal de instancia por falta de parte indispensable, la validez del Plan del Municipio y la validez y obligatoriedad del Convenio. Señalan también que el tribunal apelativo erró al no determinar que las obligaciones alegadamente pactadas en el Convenio resultan extremadamente onerosas y al determinar la existencia de daños monetarios, aun cuando concluyó que éstos eran especulativos.

## II.

### A.



Debido a que la falta de acumular a una parte en un pleito pudiera producir la invalidez de la sentencia que se dicte[7], atendemos primero la alegación que a estos efectos hacen las entidades demandadas. Éstas alegan que la Oficina de Gerencia y Presupuesto (OGP), el Departamento de Renovación Urbana y Vivienda federal (``Department of Housing and Urban Development'', en lo sucesivo, ``HUD'', por sus siglas en inglés) y el Cuerpo de Ingenieros de Estados Unidos, a quienes no se les incluyó en el pleito, son partes indispensables, ya que sin su presencia no se puede dictar un remedio completo y efectivo.

La Regla 16.1 de Procedimiento Civil dispone, al referirse a la acumulación indispensable de partes, lo siguiente:

> Las personas que tuvieren un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas según corresponda. Cuando una persona que deba unirse como demandante rehusare hacerlo, podrá unirse como demandada. 32 L.P.R.A. Ap. III,

---

[7] Véanse, Unisys Puerto Rico, Inc. v. Ramallo Bros. Printing, Inc., 128 D.P.R. 842, 859 (1991); Granados v. Rodríguez Estrada II, 124 D.P.R. 593, 603 (1989).

R. 16.1.

Hemos expresado que, ``[a]l igual que en el ámbito federal, nuestra Regla 16 de Procedimiento Civil... garantiza los valores siguientes: evitar la multiplicidad de litigios, proveer a las partes un remedio final, completo y efectivo en el mismo pleito, y proteger a los ausentes de los efectos nocivos de una decisión sin su presencia''. <u>Granados</u> v. <u>Rodríguez Estrada II</u>, <u>supra</u>, a la pág. 605. Estos valores apuntan esencialmente hacia el objetivo de lograr una adjudicación completa y justa.

En <u>Hernández Agosto</u> v. <u>López Nieves</u>, 114 D.P.R. 601, 606 (1983), resolvimos que la acumulación obligatoria de partes no debe ser producto de una determinación a base de categorías abstractas, desvinculada del contexto particular de cada caso, sino el resultado de ``consideraciones pragmáticas, de la evaluación de los intereses envueltos, lo que obliga a distinguir entre diversos géneros de casos''. Analizamos, además, la Regla 16.1 adoptada en 1979. Al hacerlo, interpretamos y delimitamos su alcance.

Respecto del ``interés común'' al que se refiere la regla expresamos que no se trata de ``cualquier interés en el pleito'', sino de ``un interés de tal orden que impida la confección de un decreto sin afectarlo''. <u>Id</u>. a la pág. 607. ``[E]l interés afectado tiene que ser de índole real e inmediata...''. <u>Id</u>. a las págs. 610-11.

En cuanto a la frase ``sin cuya presencia no pueda adjudicarse la controversia'', expresamos que ésta ``entronca con la antigua doctrina inglesa sobre la indispensabilidad'' y tiene en Puerto Rico un alcance limitado. <u>Id</u>. a la pág. 608.



CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    11

Con ello nos referimos a que, excepto en aquellas circunstancias en las que la adjudicación sin la persona ausente tendría un efecto perjudicial sobre el interés real e inmediato que ésta tiene en el pleito, en raras ocasiones será imposible resolver la controversia sin su presencia. Id. a las págs. 607-08, 610-11.

Por último, consignamos que ``[e]l remedio completo al que se refiere la Regla 16 alude al remedio entre las personas y entidades *que ya son partes en el pleito* y no al obtenible entre una parte y el ausente''. Id. a la pág. 607. Cabe destacar que el texto de la Regla 16.1 no incluye la frase ``remedio completo''. Véase, R. 16.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Ésta se encuentra en la Regla 16.2, referente a la discreción que tiene el tribunal para ``ordenar la comparecencia de aquellas personas sujetas a su jurisdicción, que a pesar de no ser partes indispensables, deban ser acumuladas si se ha de conceder un remedio completo a las personas que ya sean partes en el pleito''. R. 16.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III (énfasis suplido).

B.

Este pleito tiene como objeto determinar cuáles son las obligaciones, si alguna, de las demandadas respecto a la realización de ciertos proyectos. De acuerdo con el Municipio, las demandadas tienen obligaciones específicas en relación con los proyectos en cuestión, las cuales derivan de dos fuentes: la Ley de Municipios Autónomos, por razón de las certificaciones incluidas en el Plan, y el Convenio suscrito entre el Municipio y las entidades demandadas. Por supuesto, en relación con el Convenio, la referencia conjunta a las



CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    12

``demandadas'' no se debe entender inclusiva de la Junta de
Planificación, ya que ésta no es parte otorgante.   Tanto la
validez del Plan como la del Convenio están en controversia.

   Ninguna    de    las    alegadas    ``partes    indispensables''
suscribió el Convenio entre el Municipio y las demandadas.
Por otro lado, ninguna certificó proyecto alguno para su
inclusión en el programa de proyectos de inversión del Plan.

   El resultado de la determinación sobre la validez del
Convenio no tendría consecuencias directas sobre ellas.   Si
resolviéramos    que    el    Convenio    es    nulo    en    nada    se
perjudicarían.   Si, por el contrario, determináramos que es un
contrato válido, su eficacia tampoco las podría afectar, por
razón del principio de eficacia relativa de los contratos.
Sabido es que, como regla general, ``[l]os contratos sólo
producen efecto entre las partes que los otorgan y sus
herederos...''.   Art. 1209 del Código Civil, 31 L.P.R.A. sec.
3374.   Es decir, ``la reglamentación que crea [el contrato],
con su cortejo de derechos, facultades y obligaciones, no le
es aplicable [al tercero], ni en su provecho ni en su
daño...''.   2 Luis Díez-Picazo y Antonio Guillón, Sistema de
derecho civil 91 (7ma ed. 1997).   Así lo reconocimos en Dennis
v. City Federal Savings and Loan Ass'n, 121 D.P.R. 197, 211
(1988), al expresar que ``[l]a regla general es que en
relación con un tercero un contrato es irrelevante, ya que
éste simplemente regula las relaciones entre las partes
contratantes y al tercero ni siquiera le afecta''.   Las
obligaciones que nacen de los contratos, pues, sólo tienen



``fuerza de ley''[8], entre los otorgantes y sus herederos.

En cuanto al programa de proyectos de inversión certificados, el Municipio basa las obligaciones en el Art. 13.011 de la Ley de Municipios Autónomos que establece, en lo pertinente, lo siguiente:

> Una vez aprobado por el Gobernador, el Plan de Ordenación obligará a las agencias públicas al cumplimiento con los programas de obras y proyectos incluidos en la Sección del Programa de Proyectos de Inversión certificados por las agencias públicas. L[a] Junta de Planificación le dará consideración prioritaria a dicha sección en la preparación de su Programa de Inversiones de Cuatro Años dispuesto en... [su ley orgánica], <u>igualmente lo hará la Oficina de... [Gerencia y Presupuesto] en el Presupuesto Anual que someta a la Asamblea Legislativa</u>. Las corporaciones públicas quedarán obligadas en sus propios presupuestos. 21 L.P.R.A. sec. 4609 (énfasis suplido).

En cuanto a HUD y al Cuerpo de Ingenieros, esta disposición no les impone obligación jurídica alguna. En cuanto a la OGP, la obligación que le impone el Art. 13.011 de darle consideración prioritaria al programa de proyectos de inversión en la preparación del presupuesto anual, es una de carácter exclusivamente ministerial. La OGP es ``un organismo asesor y auxiliar para ayudar al Gobernador en el descargo de sus funciones y responsabilidades de dirección y administración''[9], carente de personalidad jurídica.

La sentencia de instancia contempla, desde luego, que OGP, HUD y el Cuerpo de Ingenieros de Estados Unidos tienen funciones que descargar en torno a la realización de los proyectos de los Departamentos recurrentes. Pero estas



---

[8] Art. 1044 del Código Civil, 31 L.P.R.A. sec. 2994.

[9] Ley Orgánica de la Oficina de Gerencia y Presupuesto, Ley Núm. 147 de 18 de junio de 1980, según enmendada, 23 L.P.R.A. sec. 102.

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                  14

funciones son las que se llevan a cabo dentro del curso normal de su desempeño administrativo, y las entidades recurrentes sólo vienen obligadas a efectuar las correspondientes gestiones ante estos organismos, igual que ante otros organismos gubernamentales que tampoco forman parte del pleito. De la parte dispositiva de la sentencia, donde se adjudica y determina la controversia del caso, no surge lo contrario. Es frente a dicha parte dispositiva que se atienden los recursos, no contra los fundamentos o expresiones aisladas en las mismas. Zavala Vázquez v. Municipio de Ponce, res. el 7 de diciembre de 1995; Vélez Rodríguez v. Amaro Cora, 138 D.P.R. 182, 198 (1995); Zorniak Air Servs. V. Cessna Aircraft Co., 132 D.P.R. 170, 182 (1992).

Dicho lo anterior, nos parece prudente recordar, además, que ``cuando el Estado o una de sus agencias o funcionarios es el tercero ausente, la tendencia moderna es a evitar dificultar la labor del demandante con planteamientos sobre partes indispensables. El Estado, sus agencias y funcionarios principales no son litigantes comunes. Su utilización de las Reglas de Procedimiento Civil debe guiarse, ante todo, por el deseo de allanar el camino de la justicia.'' Hernández Agosto v. López Nieves, supra, a la pág. 611.[10]



_____

[10] El Municipio, en su Alegato Único de Réplica, presenta por vez primera el señalamiento de que la ACT, la AEP, la PRTC y el DV y el DRNA, contrario a otras recurrentes, no notificaron a la AP de los recursos que presentaron ante este Foro, por lo que careceremos de jurisdicción sobre sus recursos por falta de parte indispensable.

Surge del expediente que la AP, quien fue demandada también por incumplimiento del Convenio, acordó con el Municipio mediante estipulación transaccional que construirá

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    15

### III.
### A.

Las demandadas alegan que el Plan de Ordenación Territorial y el Convenio son nulos por ser incompatibles con las leyes, la política pública y los reglamentos; que no hubo estrecha consulta ni coordinación entre el Municipio, la Junta de Planificación y las agencias públicas. Básicamente, impugnan las determinaciones de hecho que hizo el Tribunal de Primera Instancia. Alegan que los planes de proyectos de inversión no estuvieron certificados por las agencias correspondientes, que los convenios no son obligatorios, que no son contratos, que son nulos, que su aplicación menoscaba el interés público, y que su cumplimiento resulta en extremo oneroso. Además, impugnan la concesión de daños por considerarlos remotos y especulativos.

Permea, pues, en las agencias demandadas un argumento medular que sirve de eje central a todas sus alegaciones: que estos convenios transgreden el orden público porque fueron hechos a toda prisa, en el ocaso de una administración gubernamental enfrentada a la inminencia del cambio,



---

el proyecto objeto de controversia entre las partes, con independencia del resultado de este litigio. Dicha estipulación transaccional fue aprobada por el Tribunal de Primera Instancia. Nos parece inmeritorio el señalamiento del Municipio. Claramente, la AP ya no es parte indispensable en el litigio, según lo contempla la Regla 53.3 de Procedimiento Civil. Véase, en cuanto a la facultad de los tribunales de dictar sentencias en casos de partes múltiples, la Regla 43.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III; Torres Capeles v. Rivera Alejandro, res. el 30 de mayo de 1997; J. A. Cuevas Segarra, Práctica Procesal Puertorriqueña: Procedimiento Civil, San Juan, J.T.S., 1979, Vol. II, Cap. VII, págs. 231-234.

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                          16

comprometiendo ilegalmente a la próxima administración gubernamental. No tienen razón.

En vista de las alegaciones y los errores que se señalan en el presente caso, conviene precisar brevemente el trasfondo histórico que dio génesis a la Ley de Municipios Autónomos. Ello, con el propósito de comprender mejor y cabalmente lo que fundamentalmente se impugna en este recurso.

Desde el año 1985, la Administración del entonces gobernador, Hon. Rafael Hernández Colón, comenzó a evaluar la situación de los municipios. Se anunciaba desde entonces la gestación de un Plan de Rehabilitación de los Municipios para que pudieran enfrentar exitosamente sus problemas comunes. Rafael Hernández Colón, La Reforma Municipal: Un Proyecto de Democracia, 23-24 Plerus 8 (1995).

Así mismo, la Comisión para la Revisión de la Ley Municipal (en adelante Comisión) fue creada mediante Orden Ejecutiva de 25 de octubre de 1985, con la misión de estudiar el ordenamiento orgánico del municipio, y así poder recomendar los parámetros de una nueva relación autonómica con el Gobierno Central. Carole Acosta Grubb, La Transformación del Municipio en la Reforma Municipal, 23-24 Plerus 28 (1995). En enero de 1987, dicha Comisión sometió un informe sobre la situación socioeconómica y fiscal de los municipios puertorriqueños, documento clave para conocer de lleno los problemas que se intentaban enfrentar. Id.

Para darle continuidad a los esfuerzos mencionados, el Gobernador creó la Oficina para el Desarrollo Autonómico de los Municipios (en adelante ODAM) mediante Orden Ejecutiva de 21 de abril de 1989. Id. Los estudios de la Comisión, unidos



a los realizados por la ODAM, fueron las bases en los cuales se erigió el edificio jurídico de la Reforma Municipal. Ramón Luis Nieves, _La participación ciudadana en la Ley de Municipios Autónomos de 1991: un laboratorio de posibilidades democráticas para Puerto Rico_, 67 Rev. Jur. U.P.R. 467, 483 (1998).

La Ley de Municipios Autónomos es la piedra angular de la Reforma Municipal de 1991. Con esta reforma se pretendió ``iniciar un proceso de renovación político-administrativa del gobierno municipal con la finalidad de fomentar una mayor autonomía y la descentralización gubernamental de Puerto Rico''[11]. Mario Negrón Portillo y Leonardo Santana Rabell, _Introducción a la reforma municipal en Puerto Rico - retos y oportunidades_, 2 (Leonardo Santana Rabell y Mario Negrón Portillo eds., Escuela Graduada de Administración Pública, 1995)[12]. A estos efectos, el Art. 1.002 de la Ley de Municipios Autónomos ``declara como política pública del Estado Libre Asociado de Puerto Rico otorgar[les] a los



---

[11] Las otras leyes aprobadas durante esta época son: (1) la Ley del Centro de Recaudación de Ingresos Municipales, Ley Núm. 80 de 30 de agosto de 1991, 21 L.P.R.A. sec. 5801; (2) la Ley de Contribución Municipal sobre la Propiedad, Ley Núm. 83 de 30 de agosto de 1991, 21 L.P.R.A. sec. 5001; (3) la Ley de Patentes Municipales, Ley Núm. 82 de 30 de agosto de 1991, 21 L.P.R.A. sec. 651; (4) la Ley autorizando al gobierno central a traspasar el equipo a ser utilizado para el sistema uniforme de contabilidad mecanizado, Ley Núm. 75 de 28 de agosto de 1991; y (5) la Ley Núm. 73 de 22 de septiembre de 1992, que creó la Comisión para Fomentar la Autonomía Municipal, derogada por la Ley Núm. 113 de 7 de diciembre de 1993.

[12] _Véase además_, Informe conjunto de las Comisiones de Asuntos Municipales, de Hacienda y de Desarrollo Económico y Planificación de la Cámara de Represéntes y del Senado sobre el sustitutivo del P. de la C. 1296 (20 de agosto 1991).

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                    18

municipios el máximo posible de... autonomía y proveerles las
herramientas financieras y los poderes y facultades necesarias
para asumir un rol central y fundamental en su desarrollo
urbano, social y económico''. <u>Leyes de Puerto Rico - 1991</u>, en
las págs. 459, 461.  Su propósito era, sin duda, propiciar la
gestación de un esquema de descentralización máxima del
gobierno estatal y autonomía máxima para el municipio. Ramón
Luis Nieves, <u>supra</u>.

La Reforma Municipal se impuso las siguientes metas: (1)
La transferencia de poderes, mecanismo de descentralización de
competencias del gobierno central hacia los municipios
mediante el establecimiento de convenios.  Así, el municipio
puede advenir a la autonomía de manera gradual y a su
conveniencia; (2) La reforma administrativa y (3) La autonomía
fiscal, razón por la cual se crea el Centro de Recaudación de
Ingresos Municipales.

Nos parece necesario puntualizar, además, que las leyes
que conforman la Reforma Municipal fueron concebidas por la
Rama Ejecutiva, es decir, constituyeron proyectos de
administración.  El proceso de redacción de los mismos, como
hemos visto, se nutrió de las ideas y la búsqueda de consensos
entre diversos agentes interesados en la Reforma, a saber: la
Asociación de Alcaldes (agrupación de alcaldes del Partido
Popular Democrático); la Federación de Alcaldes (agrupación de
alcaldes del Partido Nuevo Progresista), y diversas agencias
de la Rama Ejecutiva. Carole Acosta Grubb, <u>supra</u>.

Uno de los medios que la Ley de Municipios Autónomos
dispone para la implantación de esta política pública es la
facultad que les confiere a los municipios de adoptar planes



CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    19

de ordenación. Véase, Art. 13.004, 21 L.P.R.A. sec. 4602. Según se hace constar en dicho artículo, los planes de ordenación ``constituirán instrumentos del territorio municipal. Los mismos protegerán los suelos, promoverán el uso balanceado, provechoso y eficaz de los mismos y propiciarán el desarrollo cabal de cada municipio''. Id.

La ley prevé tres tipos de planes de ordenación, cada uno para atender distintos aspectos de la ordenación espacial municipal. Éstos son: el plan territorial, el plan de ensanche y el plan de área. Id. El plan de área está previsto ``para disponer el uso del suelo en áreas del municipio que requieran atención especial'', Id. sec. 4601(o); el plan de ensanche, ``para disponer el uso del suelo urbanizable programado del municipio a convertirse en suelo urbano'', Id. (p); y, el plan territorial, el cual debe comprender toda la extensión espacial municipal, para ``enuncia[r] y dispone[r] la política pública sobre... [el] desarrollo [del municipio] y el uso de[] [su] suelo''. Id. (s).

Ahora bien, la ley limita el ejercicio de la prerrogativa de los municipios de preparar planes de ordenación, al preceptuar que el plan territorial será el primero que se elabore y, además, que su vigencia es un requisito indispensable para la adopción de cualquier otro. Id. sec. 4602. La ley establece también que, ``[a] los fines de propiciar la máxima compatibilidad de los Planes de Ordenación con las políticas públicas regionales y generales de Puerto Rico, el Gobierno Central, a través de la Junta de Planificación, retendrá la facultad de aprobar inicialmente



CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259

los Planes de Ordenación y de revisar cualquier parte de los mismos''. _Id._ Asimismo, la ley le delegó a la Junta de Planificación la facultad de establecer, mediante reglamento, la forma y el contenido de los distintos planes de ordenación. _Id_.

Sin embargo, no fue hasta 1994, luego de que el Plan de Ordenación Territorial del Municipio de Ponce hubiera sido aprobado por el gobernador, que la Junta de Planificación ejerció esta facultad y adoptó el Reglamento sobre Planes de Ordenación Municipal y la Transferencia y Administración de Facultades, Reglamento Núm. 24 de la Junta de Planificación, aprobado el 20 de enero de 1994, 23 R.P.R. secs. 650.551 - _et seq._ Por lo tanto, analizamos la validez del Plan de Ponce de acuerdo con los requisitos establecidos en la Ley de Municipios Autónomos.[13]

La Ley de Municipios Autónomos establece requisitos de aplicación general a todos los planes de ordenación y requisitos de aplicación especial a cada uno de los planes particulares. En cuanto a los requisitos de aplicación general, el Art. 13.008 preceptúa que los planes de ordenación serán elaborados por el municipio ``en estrecha coordinación con la Junta de Planificación y con otras agencias públicas concernidas para asegurar su compatibilidad con planes estatales, regionales y de otros municipios''. 21 L.P.R.A. sec. 4606. Además, según establece el Art. 13.011, los planes



---

[13] Cabe señalar, no obstante, que los requisitos que establece el Reglamento sobre Planes de Ordenación Municipal y la Transferencia y Administración de Facultades para la preparación de planes territoriales son esencialmente un calco de los que establece la Ley de Municipios Autónomos.

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                21

de ordenación deben estar conformes y ser compatibles con ``todas las políticas públicas, leyes, reglamentación u otros documentos del gobierno central relacionados a la ordenación territorial y a la construcción''. Id. sec. 4609. El plan que se adopte, por lo tanto, deberá ser ``el resultado de la consulta y coordinación entre las agencias públicas y el municipio''. Id.

Un municipio que decida elaborar un plan de ordenación tiene que notificarlo a la Junta de Planificación. Id., sec. 4606. La elaboración de estos planes se tiene que hacer en etapas, a través de la preparación secuencial o concurrente de una serie de documentos. Durante este proceso se requiere la participación ciudadana mediante vistas públicas, cuya celebración tiene que ser notificada a la Junta de Planificación conjuntamente con los documentos que en éstas serán presentados. Id. El Art. 13.012 de la ley le ordena asimismo al municipio crear, previo o durante la preparación de cualquier plan de ordenación, una oficina de ordenación territorial. Id. sec. 4611. Por último, el Art. 13.008 condiciona la vigencia de los planes de ordenación a la aprobación de la Asamblea Municipal, la adopción de la Junta de Planificación y la aprobación del gobernador. Id.

Particularmente, en cuanto a los planes de ordenación territorial, el Art. 13.005 dispone que éstos se tienen que desarrollar a base de los siguientes tres conjuntos de documentos, cuyo contenido específico se detalla en la ley: el memorial, el programa y la reglamentación. Id. sec. 4603. Específicamente, el programa del plan territorial debe contener, entre otros documentos básicos, un programa de



proyectos de inversión certificados por las agencias públicas concernidas. Id. El Art. 13.010 de la ley establece, además, que los municipios deberán crear una o varias juntas de comunidad durante la preparación de un plan territorial y previo a la celebración de vistas públicas para la consideración del documento completo. Id. sec. 4608.

A base de la prueba que tuvo ante sí, el foro de instancia llegó a la determinación, avalada por el tribunal apelativo, de que el Plan de Ordenación Territorial de Ponce cumplió con todos los requisitos exigidos por la Ley de Municipios Autónomos.[14]   Las demandadas cuestionan esta determinación a base de los siguiente tres argumentos.



En primer lugar, las demandadas argumentan que nunca hubo una coordinación estrecha entre ellas y el Municipio y la Junta de Planificación. El señalamiento se circunscribe a impugnar la apreciación de los hechos que hizo el tribunal de instancia. Las demandadas señalan que no se presentó prueba documental que sustente el hecho de que existió la coordinación requerida durante la preparación del Plan. Este argumento, además de que no está apoyado por el récord, puesto que en él existen documentos a partir de los cuales se pueden verificar varias de las gestiones entre el Municipio y las demandadas, carece totalmente de méritos, por cuanto la Regla 3 de Evidencia establece como medios de prueba tanto la

---

[14] Esta determinación se basó parcialmente en hechos estipulados por las partes. Véase la Sentencia del Tribunal de Primera Instancia, en las págs. 4-8, contenida en el Anejo V del expediente.

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                           23

evidencia documental como la testifical. <u>Véase</u>, R. 3 de Evidencia, 32 L.P.R.A. Ap. IV.

Pero las demandadas sostienen, además, que ``la prueba testifical... estableció que el proceso para la adopción del plan fue uno apresurado, llevado a cabo mayormente en gestiones... [entre miembros la rama ejecutiva], bajo la dirección del [entonces Secretario de Estado], Dr. [Salvador] Padilla''. Alegato de la ACT, el DRNA y el DV, a la pág. 31.

En cuanto a la rapidez con que se llevaron a cabo las gestiones correspondientes, la propia Ley de Municipios Autónomos, en su Art. 13.011, establece:

> En asuntos de su competencia, el municipio coordinará con otras agencias públicas concernidas un proceso dirigido a armonizar sus planes en el área municipal con los planes y programas de tales agencias públicas de forma mutuamente satisfactoria. <u>Las agencias públicas vendrán obligadas a responder en un proceso razonablemente acelerado, atendiendo en todo lo posible las inquietudes e intereses presentados por el municipio.</u> 21 L.P.R.A. §4609 (1995) (énfasis suplido).

La intervención del ex Secretario de Estado se produjo por razón del cargo que ocupaba simultáneamente como Director de la Oficina de Expeditación de Proyectos de Construcción, creada por el ex Gobernador Rafael Hernández Colón mediante la Orden Ejecutiva Núm. OE-1992-10 de 24 de febrero de 1992.

La apreciación de los hechos que hizo el tribunal de instancia a base de la prueba ofrecida durante el juicio está plenamente justificada en el récord, no denota error manifiesto, pasión, prejuicio o parcialidad y, por lo tanto, no intervendremos con ella. <u>Véanse, e.g.</u>, <u>Aponte Rivera</u> v. <u>Sears Roebuck de P.R., Inc.</u>, res. el 24 de febrero de 1998;



CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    24

Mercado Rivera v. Universidad Católica de P.R., res. el 27 de junio de 1997; López Vicil v. ITT Intermedia, Inc., res. el 4 de abril de 1997; Méndez Rodríguez v. Morales Medina, res. el 15 de noviembre de 1996; Orta v. Padilla, 137 D.P.R. 927 (1995); Rodríguez Oyola v. Machado Díaz, 136 D.P.R. 250 (1994).


                                    B.

    En segundo lugar, las demandadas argumentan que el Plan no está conforme y es incompatible con sus respectivos estatutos habilitadores.  Sostienen que ni la Junta de Planificación ni el Municipio hicieron un estudio de la compatibilidad entre estos estatutos y el Plan.

    El Art. 13.001 de la Ley de Municipios Autónomos preceptúa que los planes de ordenación estarán conformes ``con todas las políticas públicas, leyes, reglamentos u otros documentos del gobierno central relacionados a la ordenación territorial y a la construcción...''.  21 L.P.R.A. sec. 4609 (énfasis suplido).  Como se puede apreciar, esta disposición se refiere propiamente a la compatibilidad de lo dispuesto en los planes de ordenación con las demás fuentes que rigen la planificación en Puerto Rico.  No se refiere a la compatibilidad con todas las leyes que conforman nuestro ordenamiento jurídico.  Es por ello que se requiere que los municipios, durante la elaboración de los planes de ordenación, coordinen ``con otras agencias públicas concernidas un proceso dirigido a armonizar sus planes en el área municipal con los planes y programas de tales agencias públicas de forma mutuamente satisfactoria''.  Id. (énfasis suplido).

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                    25

Asimismo, el Art. 13.008 requiere que las agencias, ``[c]omo instrumento indispensable para la evaluación de los Planes de Ordenación que se sometan a la consideración de la Junta de Planificación,... manten[gan] actualizado y pon[gan] a disposición de dicha agencia un inventario físico que incluya, entre otros, la ubicación de los recursos naturales que se deben proteger, el uso del suelo, las áreas susceptibles a riesgos naturales, las zonas de valor agrícola, histórico, arqueológico o turístico, así como el detalle disponible sobre la infraestructura''. <u>Id</u>. sec. 4606. Al evaluar los planes de ordenación sometidos ante su consideración, la Junta de Planificación debe velar ``por la compatibilidad de lo propuesto con otros Planes de Ordenación y otras políticas públicas relevantes a los asuntos incluidos en el plan bajo estudio...''. <u>Id</u>. sec. 4609.



La Ley de Municipios Autónomos no requiere que la Junta de Planificación haga un estudio de la compatibilidad de lo dispuesto en los planes de ordenación con las leyes orgánicas de cada una de las demás agencias que intervienen en su elaboración e implantación. Tampoco tienen que hacerlo los municipios. Este análisis le corresponde a cada una las agencias concernidas, al determinar cuál y cómo será su intervención en la preparación e implantación de un determinado plan de ordenación. Así lo hicieron las demandadas en este caso, según se desprende de las gestiones habidas entre éstas y el Municipio durante todo el proceso de elaboración del Plan.

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                    26

C.

Por último, las demandadas argumentan que el Plan es inválido porque no contenía un programa de proyectos de inversión debidamente certificados por las agencias correspondientes cuando fue presentado en vistas públicas y al momento de su aprobación por parte de la Asamblea Municipal.

El Art. 13.005 de la Ley de Municipios Autónomos exige que todo plan de ordenación territorial contenga, entre otros documentos básicos, un programa de proyectos de inversión certificados por las agencias públicas concernidas. 21 L.P.R.A. sec. 4603. Por otra parte, el Art. 13.008 requiere que el plan territorial completo sea sometido a evaluación en vistas públicas. Id. sec. 4606.

No obstante, el requisito que establece actualmente el Art. 13.005 respecto de la obligación de incluir un programa de proyectos de inversión certificados en los planes de ordenación territorial no constaba en la Ley de Municipios Autónomos cuando fue aprobada en 1991. Fue añadido posteriormente, mediante enmienda, por la sec. 62 de la Ley Núm. 84 de 29 de octubre de 1992, de vigencia inmediata. Véase, Leyes de Puerto Rico - 1992, a la pág. 489.



El Plan de Ponce fue preparado por el Municipio, aprobado por su Asamblea y adoptado por la Junta de Planificación bajo las disposiciones de la Ley de Municipios Autónomos antes de que fuera enmendada. El único trámite que faltaba para su efectividad cuando ya estaba en vigor la Ley Núm. 84 era la firma del gobernador. Esto, sin embargo, no afecta la validez del Plan, ya que, independientemente de cuál es la eficacia temporal de las enmiendas efectuadas por la Ley Núm. 84, ésta

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259

retuvo la cláusula de reserva contenida en el Art. 13.019 de la Ley de Municipios Autónomos para aquellos planes que se hubieran comenzado a elaborar antes de la vigencia de esta última. El texto original del Art. 13.019 establecía:

> Cualquier Plan Territorial para la ordenación de la totalidad de su área geográfica que esté en proceso de elaboración a la vigencia de esta ley y que cumpla con los requisitos establecidos en este Título podrá ser aprobado por la Asamblea Legislativa, adoptado por la Junta de Planificación y aprobado por el Gobernador.

> Todo procedimiento pendiente ante la Junta de Planificación, la Administración de Reglamentos y Permisos, la Junta de Apelaciones de Construcciones y Lotificaciones o ante cualquier tribunal a la fecha de vigencia de esta ley se continuará tramitando hasta que recaiga una determinación final, de acuerdo con las leyes y reglamentos en vigor a la fecha en que tales procedimientos se iniciaron. Leyes de Puerto Rico - 1991, a las págs. 459, 613.



La sec. 77 de la Ley Núm. 84 eliminó el segundo párrafo del artículo y enmendó el primero para que leyera de la forma siguiente:

> Cualquier Plan Territorial que esté en proceso de elaboración a la vigencia de esta ley [la Ley de Municipios Autónomos] y que cumpla significativamente con los requisitos establecidos en este Capítulo [XIII sobre ordenación territorial] podrá ser aprobado por la Asamblea Municipal, adoptado por la Junta de Planificación y aprobado por el Gobernador. Leyes de Puerto Rico - 1992, a las págs. 442, 514-15, 21 L.P.R.A. sec. 4617 (énfasis suplido).

Así pues, el Plan de Ordenación Territorial del Municipio de Ponce podía no contener un programa de proyectos de inversión certificados y aun así ser aprobado por la Asamblea Municipal si cumplía significativamente, como lo hizo, según hemos discutido, con los requisitos establecidos en la Ley de Municipios Autónomos. Cabe señalar, no obstante, que el Plan

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    28

del Municipio sí contenía una sección de proyectos de inversión cuando fue aprobado por la Asamblea Municipal, lo que faltaba eran las certificaciones de las agencias correspondientes, las cuales fueron suscritas a solicitud de la Junta de Planificación antes de adoptarlo por lo que fueron consideradas por el gobernador al aprobarlo. Por lo tanto, no erró el Tribunal de Circuito al confirmar la determinación que hizo el foro de instancia sobre la validez del Plan.

IV.
A.



Consideramos ahora lo relacionado con la validez del Convenio. El tribunal apelativo confirmó la determinación del foro de instancia de que el Convenio otorgado entre el Municipio y las demandadas es un contrato válido, el cual les impone a éstas la obligación de cumplir con lo acordado, es decir, desarrollar los proyectos en controversia.

Las demandadas argumentan que el Convenio suscrito no es un contrato y que aún siéndolo, es nulo por ser carente de consentimiento y causa. Argumentan, además, que es también nulo porque no cumple con varios de los requisitos establecidos en los artículos 8.016 y 14.002 de la Ley de Municipios Autónomos.

Los primeros señalamientos tratan propiamente sobre la validez del Convenio de acuerdo con la teoría general de los contratos. Sin embargo, por tratarse de una relación entre entidades gubernamentales, y por ello de índole administrativa, regida especialmente por la Ley de Municipios Autónomos, consideramos primero la validez del Convenio a la luz de la mencionada ley. Cf. Plan Bienestar Salud v. Alcalde

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259

<u>Cabo Rojo</u>, 114 D.P.R. 697, 699 (1983) (``Los contratos administrativos se rigen normalmente, en ausencia de régimen especial, por la teoría general de los contratos''.).

B.

El artículo 8.016 de la Ley de Municipios Autónomos dispone:

<u>Todo contrato que se ejecute</u> en contravención a lo dispuesto en est[e]... [artículo] será nulo y sin efecto. Si se han invertido fondos públicos, su importe podrá recobrarse a nombre del municipio mediante la acción correspondiente.

(a) El municipio no podrá otorgar contrato alguno en el que cualquiera de sus asambleístas, funcionarios o empleados tenga, directa o indirectamente, un interés pecuniario, a menos que lo autorice el Gobernador de Puerto Rico, previa recomendación del Secretario de Justicia y del Comisionado [de Asuntos Municipales].

(b) Ningún asambleísta, funcionario o empleado municipal prestará a, ni tomará dinero a préstamo, ni aceptará donativos o regalos de ningún contratista que esté proveyendo servicios o suministros al municipio.

(c) Los contratos para la ejecución de obras y mejoras públicas no se suscribirán hasta tanto:

(1) El contratista evidencie ante el municipio el pago de la póliza correspondiente del Fondo del Seguro del Estado y de la correspondiente patente municipal;

(2) haga entrega de la fianza prestada para garantizar el pago de jornales y materiales que se utilicen en la obra, y

(3) entregue o deposite cualquier otra garantía que le sea requerida por la Junta de Subastas.

(d) Todo contrato de construcción de obra o mejora pública proveerá para la retención de un diez por ciento (10%) de cada pago parcial, hasta que se termine la obra, ésta sea inspeccionada y aceptada por el municipio y hasta tanto el contratista evidencie que ha sido relevado de toda obligación como patrono.

Los municipios mantendrán un registro de



CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259 30

> todos los contratos que otorguen, incluyendo las
> enmiendas a los mismos y enviarán copia de éstos y
> de las escrituras de adquisición y disposición de
> bienes a la Oficina del Contralor de Puerto Rico,
> <u>conforme a la[]... [Ley Núm. 18 de 20 de octubre de</u>
> <u>1975, según enmendada,] y su Reglamento</u>.   21
> L.P.R.A. sec. 4366 (énfasis suplido).

Por su parte, el Art. 1 de la Ley Núm. 18 de 30 de octubre de 1975, a la cual se refiere el último párrafo de la disposición transcrita, establece, en lo pertinente, que ``los departamentos, agencias, instrumentalidades, oficinas y todo otro organismo y los Municipios del Estado Libre Asociado de Puerto Rico, sin excepción alguna, mantendrán un registro de todos los contratos que otorguen, incluyendo las enmiendas a los mismos, y deberán remitir copia de éstos a la Oficina del Contralor dentro de los quince (15) días siguientes a la fecha de otorgamiento del contrato o la enmienda''. 2 L.P.R.A. sec. 97.

Las demandadas sostienen que el Convenio es nulo porque fue remitido a la Oficina del Contralor luego de pasados quince días desde su otorgamiento. No tienen razón. Como correctamente concluyeron los tribunales de Primera Instancia y de Circuito de Apelaciones, los recurrentes tenían la misma obligación que el Municipio de presentar el convenio ante la Oficina del Contralor. No cumplieron con ella en absoluto. El Municipio, no obstante, cumplió, aunque no dentro del término de quince (15) días. Coincidimos con el parecer de los tribunales inferiores, en el sentido de que esto choca con los más elementales principios de equidad que impiden que se vaya contra los actos propios. *NEMO AUDITUR SUAM TURPIDUDINEM ALLEGANS.* Arts. 1257 y 1258 del Código Civil, 31 L.P.R.A.

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                   31

secs. 3516 y 3517; Rubio Sacarello v. Roig, 84 D.P.R. 344, 350-351 (1962). Véase, además, Morales v. Municipio de Toa Baja, 119 D.P.R. 682, 688-689 (1987).

De otro lado, el caso Hatton v. Mun. de Ponce, 134 D.P.R. 1001, 1006 (1994), que citan las agencias demandadas en apoyo de su equivocada tesis, no es de aplicación a la controversia bajo análisis. Allí se declaró nulo un contrato por no haberse celebrado subasta pública, y por no haber partida presupuestaria alguna para los fines del mismo, según exige la Ley de Municipios Autónomos.

Además de lo dicho, una lectura correcta del Art. 8.016 de la Ley de Municipios Autónomos apoya nuestra conclusión. La sanción de nulidad que establece el Art. 8.016, según se hace constar (``[t]odo contrato que se ejecute...''), afecta la ejecución del contrato, entendido el término ``ejecución'', en este contexto, como referente tanto a la celebración como al cumplimiento del contrato. Será nulo, pues, el contrato que se celebre en violación de lo dispuesto en los incisos (a), (c) y (d) del Art. 8.016 y aquél en cuyo cumplimiento se contravenga lo preceptuado en el inciso (b). La prescripción contenida en el último párrafo del artículo 8.016 no rige ni la celebración ni el cumplimiento del contrato, sino que presupone la existencia de un contrato celebrado válidamente. Este último párrafo trata propiamente sobre el trámite de registro y remisión establecido en la Ley Núm. 18 de 30 de octubre de 1975, cuyo propósito es ``crear un mecanismo de cotejo para perpetuar circunstancial y cronológicamente'' los contratos gubernamentales. Ocasio v. Alcalde Mun. de Maunabo, 121 D.P.R. 37, 53-54 (1988).

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                    32

La consecuencia del incumplimiento del requisito de remisión no está prevista, pues, en el Art. 8.016 de la ley, sino en el Art. 8.004, el cual establece que ``[n]o se autorizará desembolso alguno relacionado con contratos sin la constancia de haberse enviado el contrato a la Oficina del Contralor de Puerto Rico...''. 21 L.P.R.A. sec. 4354.

C.

Entienden las agencias demandadas, de otro lado, que erró el Tribunal de Circuito de Apelaciones al no ejercer su ``inherente facultad moderadora para impedir el menoscabo del interés público actual'' y al no determinar que el cumplimiento con las obligaciones contractuales resulta en extremo oneroso. Concretamente, nos piden que en materia de contratación pública no se aplique la doctrina de *pacta sunt servanda*. Pretenden en sus extensas comparecencias persuadirnos para que, a la luz de la prueba que fue presentada en el juicio y que fuera apreciada y aquilatada por el Tribunal de Primera Instancia, lleguemos a una conclusión distinta a aquella alcanzada por dicho tribunal y avalada por el mencionado foro apelativo.

Para ello nos piden que rechacemos las determinaciones de hecho que a tales efectos hizo el ilustrado tribunal sentenciador. No podemos acceder. Nada en el expediente nos presenta alguna indicación de que el juez de instancia haya errado de forma manifiesta en su apreciación de la prueba, mucho menos que haya actuado con pasión, prejuicio y parcialidad. En ausencia de ello, no vamos a variar sus determinaciones. Aponte Rivera v. Sears, supra; Orta v. Padilla, supra.

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                          33

### D.

Sobre la validez del Convenio, en cuanto se impugna que el mismo constituya un contrato, discutiremos en conjunto los señalamientos de error. Las agencias demandadas alegan que el Convenio objeto del presente recurso no es un contrato a tenor con nuestro ordenamiento jurídico, que únicamente constituyó un mero ``negocio jurídico bilateral''; que los convenios son nulos; que propenden al menoscabo del interés público; que las obligaciones contractuales resultan en extremo onerosas. Nuevamente su planteamiento se impregna con las alegadas motivaciones del gobernador de turno antes de dejar el poder y con la cercanía de las elecciones. Resolvemos que no tienen razón. Veamos.

Los municipios, de ordinario, contratan con agencias del Gobierno Central, y estos acuerdos voluntarios se rigen por principios generales de contratos. Antieau, <u>Municipal Corporations Law</u>, sec. 19.12. En materia de contratación gubernamental, ya hemos tenido ocasión de expresar que ``[e]n nuestra jurisdicción el principio rector en materia de contratos es la libertad de contratación entre las partes. Los pactos entre contratantes tienen fuerza de ley y deben ser cumplidos.'' <u>Mun. de Ponce</u> v. <u>Gobernador</u>, 136 D.P.R. 776, 787 (1994). Véase, además, <u>García</u> v. <u>World Wide Entmt. Co.</u>, 132 D.P.R. 378 (1992).

En apoyo a su alegación de la nulidad del contrato, las agencias señalan que su causa es ilícita porque se beneficia una de las partes desproporcionadamente. No vemos tal ilicitud. No estamos ante un típico contrato de compraventa en el que, de ordinario, debe existir cierta correspondencia

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                      34

entre el precio que se paga y el valor de la cosa que se entrega. No procede que se pretenda equilibrar las contraprestaciones en un convenio como el de autos mediante su valor económico para cada una de las instrumentalidades estatales o para el Municipio. El monto de la obligación de cada cual depende, naturalmente, de la naturaleza de sus responsabilidades. Nos encontramos propiamente ante un contrato *sui generis* para descargar conjuntamente, responsabilidades que separadamente ya se tenían por ley. A tenor con el convenio bajo análisis, el patrimonio municipal no acrece en nada con las prestaciones de las recurrentes. Tampoco acrecen los patrimonios de las recurrentes con las prestaciones del Municipio. Véase Morales v. Municipio de Toa Baja, supra. Este contrato está conforme con la ley y la política pública. Su causa es, pues, el interés público. Véase, Casiano, Jr. v. Borintex Mfg. Corp., 133 D.P.R. 127 (1993); Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172 (1985).

Por lo anteriormente expuesto, resolvemos que no tenían los tribunales inferiores que utilizar su facultad moderadora para impedir el menoscabo del interés público, en vista de que nos encontramos ante una causa lícita y racional, que precisamente intenta proteger el interés público. Por ello, estamos ante una situación muy distinta a la que teníamos frente a nos en Levy v. Aut. Edif. Públicos, 135 D.P.R. 382, 395 (1994), donde expresamos que los tribunales pueden atemperar la irracionalidad de la causa del contrato cuando ésta vulnera el principio de la reciprocidad de las prestaciones y la norma de la buena fe.

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                    35

En cuanto a la revisión del contrato al amparo de la llamada cláusula *"rebus sic stantibus"*, claramente ello es improcedente. Para que tal doctrina se aplique, deben estar presente siete requisitos. <u>Casera Foods, Inc.</u> v. <u>E.L.A.</u>, 108 D.P.R. 850, 856 (1979). En cuanto a dichos requisitos, hemos resuelto que deben cumplirse todos, y que esta doctrina trata de un remedio de excepción, para situaciones extraordinarias en las cuales se impone un prudente y escrupuloso discernimiento judicial de moderación. <u>Id</u>. a la pág. 857. El primer requisito es que el hecho o circunstancia que amerite la revisión del contrato sea *imprevisible*. Este requisito claramente no se cumple; la posibilidad de que haya cambios en la administración pública y en las prioridades presupuestarias son previsibles. No vemos la imprevisibilidad.

El segundo requisito exige que se produzca una dificultad extraordinaria, una agravación de las condiciones de la prestación, de manera que resulte mucho más onerosa para el deudor. Resolvemos que tampoco está presente este requisito. La prueba demostró, y los tribunales inferiores así lo determinaron, que las agencias demandadas cuentan con los recursos para llevar a cabo los proyectos, y que no los llevan a cabo porque han cambiado sus prioridades. En vista de que no se han cumplido los primeros dos requisitos, y que el incumplimiento con uno de ellos basta para que no proceda la revisión del convenio mediante la aplicación de la llamada cláusula *rebus sic stantibus*, es innecesario discutir los demás requisitos de la mencionada doctrina.

Resolvemos, además, por los fundamentos que recién hemos expresado, que el Tribunal de Circuito de Apelaciones no debió

Case:17-03283-LTS Doc#:3019-3 Filed:05/04/18 Entered:05/04/18 17:08:03 Desc:
***WITHDRAWN AS PER DE [3271]*** Appendix Supreme Court Judgment Page 36 of 48

modificar, *motu proprio*, algunas de las obligaciones contenidas en el Convenio. El tribunal apelativo, utilizando un análisis flexible, modificó las siguientes obligaciones: la impuesta a la A.A.A. para que lleve a cabo el diseño y adquisición de terrenos para establecer la Planta de Filtración de la Represa Cerrillos e instalar el sistema de acueducto, tuberías y bombas en el sector La Yuca y El Paraíso; y la de que la A.E.P. proceda a construir el Centro de Salud Familiar del Barrio Coto, el Centro Pediátrico del Hospital Regional, y el Centro de Rehabilitación Siquiátrica.



La doctrina de revisión de los contratos, según discutida anteriormente, no autoriza tal curso de acción. El tribunal intermedio apelativo invocó el interés público. No alcanzamos comprender qué razones de interés público pueden propiciar que no se desarrollen los proyectos en beneficio de la población que el Tribunal de Primera Instancia ordenó construir. Somos del criterio que lo que exige el interés público es el cumplimiento específico de las obligaciones contenidas en el Convenio. No se cumplen los requisitos de la doctrina. Erró el Tribunal de Circuito de Apelaciones al modificar algunas de las obligaciones pactadas.

V

A.

La PRTC y la AEE señalan como errores adicionales que debió desestimarse la demanda en su contra porque ellos no incumplieron con el convenio, y porque la alteración y paralización de las obras se debió exclusivamente a acciones del Municipio de Ponce. Lo anterior se refiere a una controversia al momento en que se terminaban unas obras de

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                37

soterrado en la Zona Histórica de Ponce.   El Municipio de
Ponce entendió que no se estaba cumpliendo con los requisitos
que impone la Junta de Planificación y el Municipio para
trabajos que se realizan en zonas históricas.   Sobre esta
controversia, el Juez Superior, Hon. Wilfredo Santos López,
dictó sentencia a favor del Municipio el 12 de abril de 1995.

    Nos parece inmeritorio el señalamiento.   El reclamo de
que las obras se hagan conforme a derecho, no puede
interpretarse como un acto de paralización de las mismas; como
tampoco puede ser dicho reclamo una justificación para el
incumplimiento del deber contractual de realizarlas.


                                B.



    De otro lado, tanto la PRTC como la AEE nos señalan que
erró el tribunal apelativo al no revocar la imposición de
daños que hizo el Tribunal de Primera Instancia en cuanto a
dichas entidades.   Argumentan que ellos realizaron la mayor
parte de las obras que les correspondía bajo el convenio.

    No obstante lo anterior, el Tribunal de Primera Instancia
concluyó que hubo unas obras que no se construyeron, tanto de
la PRTC como de la AEE.   La condena de daños, según ordenó el
juez de instancia, será satisfecha en proporción al
incumplimiento de cada agencia.   De hecho, el Municipio y la
PRTC estipularon los trabajos que no se habían realizado de
acuerdo con el compromiso de inversión certificado.   Tampoco
vemos los méritos de este señalamiento de error.

                                C.

    La AEE nos señala, además, que erró el tribunal apelativo
en sostener la determinación del tribunal de instancia en

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                    38

cuanto a las obras en la Playa de Ponce que la agencia debía completar, pues la prueba alegadamente no demostró que hubiera acuerdo en cuanto a éstas.    Tampoco tiene razón.    El Tribunal de Primera Instancia reconoció tal acuerdo.    Del expediente surge claramente prueba que sustenta tal determinación, específicamente en los testimonios del Ing. Del Valle y del Arq. Bonnin, en el sentido de que hubo tal acuerdo.    El error no fue cometido.

D.



    Por su parte, la AEP presentó varios señalamientos de error, relacionados todos con la conclusión del Tribunal de Primera Instancia, al efecto de que, una vez firmado el convenio, la obligación de realizar los proyectos recae en la AEP y no en las agencias y que los proyectos incluidos en el convenio formaban parte del programa de obras permanentes de la AEP por lo que ésta obligó su presupuesto para la realización de los mismos.    Impugna, además, la imposición por dicho tribunal de responsabilizar así al Municipio por no considerar los proyectos que fueron cancelados o reprogramados por los Departamentos de Educación, de Salud y por la Policía de Puerto Rico.    Se basa, principalmente, en que la Ley de Municipios Autónomos es incompatible con la Ley Orgánica de la AEP.

    La realidad choca con lo que nos expresa la AEP. Incluso, según surge del expediente, dicha entidad se niega a realizar aquellos proyectos en el Municipio en los cuales no intervienen las agencias antes mencionadas.    La prueba que fue presentada en el juicio estableció categóricamente la participación de dichas agencias en el proceso de preparación

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                              39

del Plan de Ordenación Territorial y además, clarificó el rol
de las mismas y de la AEP en cuanto a los compromisos de
inversión asumidos por la certificación de esta última.
(Sentencia T.P.I. pág. 8).

La sentencia de instancia de ninguna manera releva a las
agencias de cumplir las obligaciones que las leyes y los
reglamentos les imponen.   Es por ello que se designa un
monitor para que supervise y dé seguimiento al progreso de las
obras de modo que los proyectos se realicen.

La AEP tendrá, pues, que seguir el procedimiento
ordinario.   No puede plantear aquí cualquier reprogramación
que se haga para pretender liberarse de su obligación.
Enfatizamos, además, que cuando la AEP se comprometió a través
del programa del Plan de Ordenación Territorial y del
Convenio, ésta no estaba comprometiendo a terceros, ni estaba
contratando a nombre de otro.   Por el contrario, se obligó y
comprometió, además, su propio presupuesto. El Art. 13.011 de
la Ley de Municipios Autónomos es claro al disponer que una
vez aprobado el Plan de Ordenación por el gobernador, las
corporaciones públicas quedarían obligadas en sus propios
presupuestos.   Es forzoso concluir, entonces, que tales
errores no se cometieron.



Es por todo lo anterior que no podemos acoger el
planteamiento o tesis central invocado en conjunto por las
entidades demandadas, en el sentido de que estos proyectos -
que forman parte de los convenios- fueron pactados en el ocaso
de una administración, comprometiendo impermisiblemente a una
administración entrante.   Como hemos visto, por el contrario,
todo esto forma parte de la política pública de una

administración que comenzó a implantarse y a estudiarse desde 1985, y que naturalmente aceleró los trámites administrativos para completarlos antes de que los funcionarios cesaran en sus cargos. El Estado es un contratante como cualquier otro y tiene que cumplir con lo que se comprometió independientemente de los cambios en administraciones de gobierno. Esta obligación es independiente del partido político en el poder. Mun. de Ponce v. Gobernador, supra.

### VI

En cuanto a los daños sufridos, las agencias demandadas impugnan la determinación que a tales efectos hizo el Tribunal de Circuito de Apelaciones. Repasemos brevemente. El Tribunal de Primera Instancia, luego de analizar la prueba presentada, así como los informes de los peritos, concluyó que el Municipio de Ponce había sufrido daños debido a la pérdida de ingresos fiscales por concepto de arbitrios de construcción, patentes municipales y contribuciones sobre la propiedad ocasionadas por la cancelación de los proyectos. Concluyó que el Municipio pudo probar mediante el uso de peritos que los daños sufridos ascendieron a $58,904,037. Sin embargo, el tribunal a quo entendió que a la luz de la totalidad de las circunstancias que mediaron en el caso, y en vista de que se ordenó la realización de los proyectos cuyo cumplimiento específico se solicitaba, correspondía compensar al municipio en $16,418,845.00, es decir, menos del 28% del total que reconoció como daños sufridos.

Por su parte, el Tribunal de Circuito de Apelaciones a pesar de reconocer que ``no existe duda alguna de que las actuaciones de las agencias demandadas causaron y causarán

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259     41

daños al Municipio'' decidió posponer la concesión de los daños hasta que el Comisionado que nombró el tribunal sentenciador informara el cumplimiento que las agencias demandadas hayan exhibido con respecto a sus obligaciones. Ello, por que fue el parecer del Tribunal de Circuito de Apelaciones que las cuantías, al momento de resolver, eran ``en algún grado inciertas o producto de la especulación''. El tribunal apelativo entendió que en este momento las únicas cuantías identificables con certeza serían por ejemplo y entre otras, la de intereses. Para llegar a esa conclusión el tribunal apelativo tomó en cuenta que las cantidades desglosadas por el tribunal *a quo* en varias tablas, estableciendo qué agencias y cuáles proyectos debían responder por concepto de cada pérdida, no incluían todas las agencias ni todos los proyectos en controversia en el caso de autos. La sentencia del tribunal apelativo establece que ``en particular se excluyeron del cómputo los proyectos de las agencias que se realizarían por administración ... como [por] ejemplo... las obras de soterrado de la zona histórica del Municipio.'' Por otro lado también evaluó las alegaciones de las partes apelantes en el sentido de que no hubo mitigación de daños de parte del Municipio, alegación que el Municipio rechaza, de que varias obras fueron construidas o adelantadas, y que cada agencia deberá responder por las pérdidas en proporción al monto de la inversión no realizada, además de circunstancias especiales que pudieran resultar en que el incumplimiento de la agencia no de lugar a compensación por daños. A manera de ejemplo, la P.R.T.C. sostiene que la sentencia del Tribunal de Primera Instancia no cuantificó las cantidades por concepto de

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                    42

arbitrios sobre construcción no recaudados, patentes municipales y contribuciones sobre la propiedad por la que dicha agencia debería responder, por lo que no debe ser responsable de manera solidaria con otras agencias por daños que ésta no ocasionó máxime ya que concluirá las obras según las había planificado en su programa de infraestructura.

Como se sabe, los jueces pueden, con la ayuda de peritos en estadísticas y ciencias económicas, hacer un cálculo educado y razonable de los daños patrimoniales. Amadeo Murga, La valorización de los daños, Ed. Esmaco, Vol. I, pág. 31 (1997).

Aunque la ilustrada sala de instancia tuvo ante sí abundante prueba pericial para asistirla en la difícil y angustiosa tarea de la estimación y valoración de los daños, Urrutia v. A.A.A., 103 D.P.R. 643 (1975), no hay duda que la complejidad del asunto ante nos, que no ha finalizado y que involucra tantas agencias distintas con sus particularidades y diversas obras en sus diferentes etapas y presupuestos, conmina a avalar el curso de acción del tribunal apelativo de posponer la adjudicación de daños en este momento. Por un lado, aunque el foro de primera instancia determinó daños sufridos por el Municipio ascendentes a $58,904,037.00 concluyó indemnizarlo sólo por la cantidad de $16,418,845.00. Es nuestro criterio que si el Municipio efectivamente probó que sus daños ascendían a la cantidad mencionada, no debió el foro a quo reducir la suma que logró probar el demandante en el juicio. Por otro lado, el criterio de que son fondos públicos los que llevarán a cabo dichos pagos, nos alertan aun más a la necesidad de escoger un curso de acción intermedio y

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259

43

equilibrado que sopese todos los elementos que nos permitan ejercer con cumplida justicia. Culebra Enterprises Corp. v. E.L.A., res. el 31 de octubre de 1997 ___ D.P.R. ___ (1997). Por ello, contar con el beneficio de las aportaciones que en su día haga el Comisionado asignado, una vez haya finalizado la construcción de los proyectos por cada agencia responsable, pondrá a los tribunales en mejor posición de computar con certeza los daños que las agencias causaron al Municipio.

En resumen, se dictará sentencia modificando la sentencia recurrida a los únicos fines de dejar sin efecto las modificaciones que a su vez le hiciera el Tribunal de Circuito de Apelaciones a la sentencia dictada por el Tribunal de Primera Instancia en armonía a lo expresado en la parte IV C de esta opinión. Así modificada, se confirmará la sentencia recurrida.

José A. Andréu García
Juez Presidente

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    44

**ANEJO**
CONVENIO PARA EL DESARROLLO
DE PROYECTOS PROGRAMADOS ENTRE EL GOBIERNO
CENTRAL Y EL MUNICIPIO DE PONCE

En San Juan de Puerto Rico, hoy día 28 de octubre de 1992.

I.    COMPARECENCIA

Por la primera parte, **EL GOBIERNO CENTRAL DEL ESTADO LIBRE
ASOCIADO DE PUERTO RICO**, en adelante denominado ``**EL GOBIERNO
CENTRAL**'', representado por el Gobernador del Estado Libre
Asociado de Puerto Rico, Hon. Rafael Hernández Colón, la
**Autoridad de Carreteras** representada por su Director, el Ing.
José L. Bigas Mulero, [la] **Autoridad de Acueductos y
Alcantarillados**[,] representada por su Directora, Ing. María
Margarita Irizarry, la **Autoridad de Edificios Públicos**[,]
representada por su Director, Arq. Luis Rafael Arias Albizu,
la **Autoridad de los Puertos**[,] representada por su Director,
Gen. José A. Buitrago, la **Autoridad de Energía Eléctrica**[,]
representada por su Director, José A. Del Valle, el
**Departamento de la Vivienda**[,] representad[o] por su
Administrador, Sr. Rigoberto Figueroa, el **Departamento de
Recursos Naturales**[,] representad[o] por su Secretario, Sr.
Santos Rohena Betancourt, y la **Puerto Rico Telephone
Company**[,] representada por su Director, el Ing. Ramón Arce,
en adelante denominadas ``**LAS AGENCIAS**''.

Por la segunda parte, **EL MUNICIPIO DE PONCE**, en adelante
denominado ``**EL MUNICIPIO**'', representado por su Alcalde, Hon.
Rafael Cordero Santiago.

Las partes aseguran tener la capacidad y autoridad en Ley para
otorgar este convenio, la cual surge de la Ley Núm. 81 de 30
de octubre de 1991, según enmendada, conocida como la Ley de



Municipios Autónomos.

*II.   PREÁMBULO*

En este convenio se pone en vigor la política pública del Estado Libre Asociado de Puerto Rico establecida en la Ley de Municipios Autónomos consistente en otorgarle[s] a los municipios el máximo posible de autonomía[,] además de proveerles a [é]stos los poderes y facultades que sean necesarios para asumir un rol central y fundamental en su desarrollo urbano, social y económico.



El Municipio de Ponce[,] en cumplimiento de dispuesto en la Ley de Municipios Autónomos[,] ha invertido considerables recursos económicos y humanos y tiempo en elaborar un Plan de Ordenamiento Territorial para disponer el mejor uso del suelo dentro de sus límites territoriales y desarrollar proyectos de infraestructura para la promoción del bienestar económico y social de su población mediante la adopción de un Plan de Ordenamiento Territorial.

El Plan de Ordenamiento contiene el Programa de Proyectos de Inversión en el Municipio de Ponce, debidamente certificados por las agencias públicas pertinentes y por el Municipio, según corresponde, como exige la referida Ley Núm. 81, según enmendada.

El análisis regional permite conocer las características sociales y económicas de la población, así como conocer las ventajas, oportunidades y limitaciones que presenta cada región. A su vez permite el tener un diagnóstico de los componentes de infraestructura básica y las necesidades de construcción y rehabilitación de los sistemas.

De esta forma se provee el análisis necesario que permita la

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    46

identificación de oportunidades y condiciones para estimular un desarrollo balanceado a nivel regional y se optimice la competitividad inter-regional.

Entre los proyectos de inversión certificados se encuentran varios a ser desarrollados por las AGENCIAS aquí comparecientes. Los referidos proyectos deben ser desarrollados en su totalidad para poder dar efecto al Plan de Ordenación y efectuar el desarrollo del Municipio conforme a la política pública expuesta en la citada Ley de Municipios Autónomos.

En consideración a las contraprestaciones antes mencionadas, las partes contraen las siguientes OBLIGACIONES:



1. Las AGENCIAS completarán el desarrollo de los siguientes proyectos en el Municipio de Ponce:

   a. Autoridad de Carreteras - Ver Anejo A
   b. Autoridad de Acueductos y Alcantarillados
      Ver Anejo B

   c. Autoridad de Edificios Públicos - Ver Anejo C
   d. Autoridad de los Puertos - Ver Anejo D
   e. Autoridad de Energía Eléctrica - Ver Anejo E
   f. Departamento de la Vivienda - Ver Anejo F
   g. Departamento de Recursos Naturales - Ver Anjo G
   h. Puerto Rico Telepbone Company - Ver Anejo H

2. El Municipio de Ponce[,] por su parte[,] ofrecerá el apoyo económico que esté dentro de su presupuesto para la consecución de los referidos proyectos.

III. DISPOSICIONES GENERALES

A.   SEPARABILIDAD

Si cualesquiera de las disposiciones de este convenio resultara imposible de cumplir o no válida esto no afectará la validez o cumplimiento de cualquier otra disposición de este convenio.

B.   ENMIENDAS

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259

47

Las partes cumplirán estrictamente con los términos y condiciones indicados en este convenio y no se reconocerá ninguna enmienda a los mismos excepto por acuerdo escrito entre las partes.

C. ACCIONES JUDICIALES

Toda acción civil ordinaria o procedimiento legal especial relacionado con la interpretación[,] alcance o cumplimiento de este convenio será de la competencia exclusiva de la Sala de Ponce del Tribunal de Primera Instancia del Estado Libre Asociado de Puerto Rico. Las partes estipulan que todo procedimiento judicial que sea presentado en otra Sala será trasladado a la Sala de Ponce.



D. TÉRMINO

Este convenio entrará en vigor inmediatamente que sea firmado por las partes comparecientes. Los proyectos aquí descritos, se llevarán a cabo según programados entre el 1 de enero de 1993 y el 31 de diciembre de 1996.

[I]V. ACEPTACIÓN

Los comparecientes acepta[mos] el presente documento por hallarlo a nuestra entera satisfacción y contento.

Y PARA QUE ASÍ CONSTE firmamos y otorgamos el presente en San Juan, Puerto Rico a 28 de octubre de 1992.

Fdo.

Hon. Rafael Hernández Colón
Gobernador de Puerto Rico

Hon. Rafael Cordero Santiago
Alcalde de Ponce

Ing. Jorge L. Bigas Mulero
Director
Autoridad de Carreteras

Ing. María Margarita Irizarry
Directora
Autoridad de Acueductos

Arq. Luis Rafael Arias Albizu
Director
Autoridad de Edificios Públicos

Gen. José A. Buitrago
Director
Autoridad de los Puertos

CC-98-241 Cons. CC-98-231, 250, 257, 258 y 259                                    48

Sr. José A. Del Valle Vázquez              Sr. Rigoberto Figueroa
          Director                             Administrador
Autoridad Energía Eléctrica              Departamento de la Vivienda

Sr. Santos Rohena Betancourt
        Secretario                              Ing. Ramón Arce
                                                  Presidente

