I59WproFcorrected051118

<pre>
                     UNITED STATES DISTRICT COURT
                       DISTRICT OF PUERTO RICO
------------------------------------x
In re:

THE FINANCIAL OVERSIGHT AND             PROMESA
MANAGEMENT BOARD FOR PUERTO RICO,       Title III

    as representative of            Case No. 17 BK 3283 (LTS)

THE COMMONWEALTH OF PUERTO RICO,
et al.,                                 (Jointly Administered)

    Debtors.
------------------------------------x
THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF THE COMMONWEALTH OF
PUERTO RICO,

    as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

    as representative of         Adv. Proc. No. 17-00257-LTS

THE COMMONWEALTH OF PUERTO RICO,

    Plaintiff,

    -v-                          Oral Argument

BETTINA WHYTE,

    as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

    as representative of

THE PUERTO RICO SALES TAX FINANCING
CORPORATION,

    Defendant.
------------------------------------x
                                    New York, N.Y.
                                    May 9, 2018
                                    9:30 a.m.
</pre>

I59WproFcorrected05LTT8

1

Before:

2
                              HON. LAURA TAYLOR SWAIN,

3
                                                    District Judge

4

5    APPEARANCES:

6    For the Financial
     Oversight and Management
7    Board for Puerto Rico:        Martin J. Bienenstock, Esq.
                                   Salvador Antonetti, Esq.
8
     For the Official Committee
9    of Unsecured Creditors of
     l Title III Debtors
10   (other than COFINA)
     (the "Committee"):            Luc A. Despins, Esq.
11                                 James Bliss, Esq.

12                                 Juan Casillas, Esq.

13   For Creditor Ad Hoc
     Group of General
14   Obligation Bondholders:       Mark T. Stancil, Esq.
                                   Donald Burke, Esq.
15
     For COFINA Agent:             Antonio Yanez, Jr., Esq.
16                                 Alexander Cheney, Esq.
                                   Nilda Navarro-Cabrer, Esq.
17                                 Kenneth N. Klee, Esq.

18   For Creditor COFINA
     Senior Bondholder
19   Coalition:                    Susheel Kirpalani, Esq.
                                   Eric Kay, Esq.
20                                 Rafael Escalera, Esq.

21   For Creditor Ambac
     Assurance Corporation:        Eric Weiss, Esq.
22                                 Atara Miller, Esq.

23   For Creditor National
     Public Finance
24   Guarantee Corporation:        Gregory Silbert, Esq.
                                   Gabriel Morgan, Esq.

25

I59WproFcorrected051118

```
 1    For Creditor Mutual
      Fund Group:                    Philip Bentley, Esq.
 2                                   Philip M. Guffy, Esq.
                                     Thomas Moers Mayer, Esq.
 3
      For the Puerto-Rico
 4    based Mutual Funds:            Jason Zakia, Esq.

 5    Proceedings recorded by stenography.  Transcript produced by
      CAT.
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              (In open court)

2              THE COURT:  Buenos Dias.  Please be seated.

3              (Case called)

4              THE COURT:  Again, good morning.

5              Welcome, counsel, parties of interest, members of the

6       public, press, those in San Juan and observers by telephone.

7              We have in mind the people of Puerto Rico and all

8       those interested in Puerto Rico's future, including GO and

9       COFINA bondholders on the island and on the mainland; and we

10      have in mind the continuing daily challenges faced by those who

11      live in Puerto Rico.

12             I remind you that, consistent with court and Judicial

13      Conference policies, and the orders that have been issued,

14      there is to be no use of any electronic devices in the

15      courtroom to communicate with any person, source, or outside

16      repository of information, nor to record any part of the

17      proceedings.  Thus, all electronic devices must be turned off

18      unless you are using a particular device to take notes or to

19      refer to notes or documents already loaded on the device.  All

20      audible signals, including vibration features, must be turned

21      off.

22             As provided in this court's standing order, no

23      recording or retransmission of the hearing is permitted by any

24      person, including but not limited to the parties or the press.

25             Anyone who is observed or otherwise found to have been

1    texting, e-mailing, or otherwise communicating with a device in

2    the courtroom during the court proceeding will be subject to

3    sanctions, including, but not limited to, confiscation of the

4    device and denial of future requests to bring devices into the

5    courtroom.

6         Please be mindful of your other possessions, and take

7    all of them with you, including any trash, when you leave the

8    courtroom at the conclusion of these proceedings.

9         Today the Court is hearing oral argument in connection

10   with the Commonwealth COFINA dispute, which is Adversary 17-257

11   in the Commonwealth's case.

12        Specifically, today's argument is on the motions filed

13   by the COFINA agent and the Mutual Fund Group to certify

14   certain questions to the Puerto Rico Supreme Court.

15        I note that in their submissions parties have cited

16   Puerto Rico's Supreme Court decisions of which official

17   translations do not appear to be readily available.  Therefore,

18   I am directing all parties who have made submissions to file a

19   joint informative motion compiling certified translations of

20   all such cited decisions by next Friday, which is May 18.

21        In the future, the fact that something may be a link

22   to a Spanish document does not exempt it from the requirement

23   that filings be in the English language, and so please bear

24   that in mind for future briefing submissions.

25        At this point I'm ready to begin with the arguments.

1    The pro certification arguments will of course go first, the

2    movants' arguments, and Mr. Yanez, I have you up for ten

3    minutes.

4              MR. YANEZ:  Good morning, your Honor, and may it

5    please the Court.  For the record, Antonio Yanez on behalf of

6    the COFINA agent.

7              Your Honor, we seek certification to the Puerto Rico

8    Supreme Court because this case, and the questions that we seek

9    to certify, turn entirely on novel issues of Puerto Rico law,

10   and because of the far-reaching consequences this case has for

11   Puerto Rico.  I will start with the consequences, and I will be

12   brief, because no one really disputes the point.

13             Resolution of this case involves defining the taxing

14   and spending powers of the legislative assembly.  That goes to

15   the heart of the legislative function, and it will have

16   long-lasting effects on the operation of the government of

17   Puerto Rico well beyond these Title III cases.

18             This case will also determine whether financing

19   through tax-backed securitization is available to Puerto Rico,

20   which will have a direct and immediate impact on the ongoing

21   recovery efforts in the wake of Hurricane Maria.

22             The significance of the case to Puerto Rico, these

23   factors that I have just mentioned, in themselves are important

24   reasons weighing in favor of having a Puerto Rico court resolve

25   the dispute.

1          Certification is also appropriate because, as I say,

2     the case turns entirely on Puerto Rico law.

3          THE COURT:  Now, it has been argued that there are

4     federal issues that must necessarily be processed in connection

5     with these decisions, and particularly I will just give you

6     one.  On the balanced budget clause arguments there is the

7     language, the translation, as opposed to Spanish language

8     issue, and the arguments on that turn on congressional action.

9     That's a matter of interpreting federal law before you can get

10    to Puerto Rico law; and then of course there are the arguments

11    regarding Section 306 and the arguments regarding disguised

12    loans.  How can you separate those issues from the decision

13    that has to be made to be definitive of the binary Commonwealth

14    COFINA dispute?

15         MR. YANEZ:  So, let me address that, your Honor, and I

16    will begin with the arguments that are based on PROMESA.

17         The objectors, and principally the Oversight Board,

18    say that the case, as your Honor just mentioned, is about

19    whether the pledged sales tax is the property of the estate

20    under PROMESA Section 306 and whether the transfer frustrates

21    PROMESA.  That's wrong, your Honor.  It's incorrect for two

22    reasons.

23         The first is that federal law questions about what is

24    property of the estate and frustration of PROMESA are not

25    controlling here; in fact, they're not even relevant.  No one

1    moved for summary judgment on those grounds.  None of the

2    parties here has ever raised PROMESA Section 306 in connection

3    with summary judgment or otherwise; and those issues are not in

4    scope.

5            Pursuant to this court's scope rulings, what is in

6    dispute here is whether the pledged sales tax is property of

7    the Commonwealth or COFINA and matters antecedent to that

8    issue.  That's what this court ruled.

9            THE COURT:  But for the Title III, at the end of the

10    day I can only approve a plan that distributes assets that are

11    property of the estate within the meaning of PROMESA.

12            The whole purpose of PROMESA and the incorporated

13    bankruptcy provisions is to deal with property of the estate,

14    so at some level I have to make a federal law determination

15    that the property is property of the debtor under PROMESA.  So

16    how could I avoid that?

17            MR. YANEZ:  That is correct, your Honor, but not in

18    this case, not in this adversary proceeding.

19            This adversary proceeding, as commenced by the

20    Commonwealth agent's complaint, and as modified by this court's

21    scope rulings, is about a very narrow set of issues, and those

22    issues turn exclusively on Puerto Rico law.

23            There are, to be sure, issues to be decided afterwards

24    outside of the context of this adversary proceeding, but this

25    case is just about Puerto Rico law; it's about the

1    interpretation of the COFINA enabling legislation and in

2    particular whether it effected a transfer of the pledged sales

3    tax, and it's about the constitutionality under the Puerto Rico

4    Constitution of the transfer that was effected.  That's all

5    that is at issue here.  The other issues will come later.

6            THE COURT:  Thank you.  You may proceed.

7            MR. YANEZ:  Further, to the point that all that is at

8    issue here is Puerto Rico law, I want to emphasize that the

9    issues that I've just mentioned -- the transfer of ownership

10   under the COFINA legislation, and whether the transfer was

11   constitutional -- those are novel issues, Judge.

12           The COFINA enabling legislation has never been

13   interpreted by any court, and the constitutional challenges

14   that are being raised have never been ruled upon.  And those

15   factors make the questions that we seek to have certified

16   particularly appropriate for certification under the

17   controlling precedent here as matters of comity and deference

18   to local construction of local law.  The Supreme Court has held

19   that, so has the First Circuit, and so has the District of

20   Puerto Rico.

21           And I'd like to pause on the subject of deference to

22   local courts, because Puerto Rico is unique in that regard.  In

23   the Fonaris v. Ridge Tool case, where the United States Supreme

24   Court deferred to the Puerto Rico courts, the Supreme Court of

25   the United States explained, and I'm quoting now, "The

1    relations of the federal courts to Puerto Rico have often

2    raised delicate problems.  It is a Spanish-speaking

3    Commonwealth with a set of laws still impregnated with the

4    Spanish tradition."

5           The Supreme Court of the United States made the same

6    point in the Posadas de Puerto Rico case, again quoting, "A

7    rigid rule of deference to interpretations of Puerto Rico

8    courts is particularly appropriate, given the unique cultural

9    and legal history of Puerto Rico."

10          And, Judge, the same factors that the Supreme Court

11   was talking about in the Fonaris case and in the Posadas case

12   are present here.  As the Court knows -- and as the Court

13   mentioned -- there are questions about the proper translation

14   of terms from Spanish to English; there are questions about the

15   applicability of the Puerto Rico Civil Code; there are

16   questions about the interpretation of the Puerto Rico Civil

17   Code.  So, all of these factors -- comity and deference, the

18   fact that these are issues of Puerto Rico law, the fact that

19   they are novel issues, and the significance of this case to the

20   Commonwealth -- all weigh in favor of certification.

21          Your Honor, the objectors have raised arguments about

22   whether the Supreme Court of Puerto Rico would accept

23   certification, and they have raised arguments about delays that

24   supposedly would flow from certification.  Mr. Escalera of

25   Reichard & Escaler is here on behalf of the COFINA senior

```
 1    bondholders, and he will speak to those issues.

 2              Before I finish, I do want to address the argument

 3    that it is somehow inconsistent for us to seek certification,

 4    having moved for summary judgment.

 5              Courts hold that summary judgment is in fact the right

 6    point at which to move for certification, because it's at

 7    summary judgment that the issues are defined and the facts are

 8    developed.  So, far from being inconsistent with our summary

 9    judgment motion, it's at this point that a motion for

10    certification is appropriate.

11              And I want to be clear that we believe the pledged

12    sales tax is clearly COFINA's property, and we believe that

13    that's true before this court and it will be true before the

14    Supreme Court of Puerto Rico, if they have the opportunity to

15    decide this issue; but it is that opportunity which is what

16    fundamentally is before the Court today.

17              By that I mean the issue is which court should have

18    the opportunity to rule here, which court should have the

19    opportunity to be the first to construe the COFINA legislation

20    against the backdrop of the significant consequences to Puerto

21    Rico and against the backdrop of those long-lasting

22    consequences, and which court should be the first to evaluate

23    the novel interpretations of the Puerto Rico Constitution that

24    are being advanced.  We submit, Judge, that under the law it

25    should be that the Supreme Court of Puerto Rico that has that
```

1   opportunity.

2            THE COURT:  Thank you, Mr. Yanez.

3            MR. YANEZ:  Thank you, your Honor.

4            THE COURT:  Mr. Bentley?

5            MR. BENTLEY:  Good morning, your Honor.  Philip

6   Bentley of Kramer Levin for the Mutual Fund Group.

7            Your Honor, I adopt Mr. Yanez's arguments; I won't

8   repeat them.  I would like to focus my brief remarks on one

9   topic, namely the standard governing your Honor's decision

10  whether or not to certify.  My key point is the standard is not

11  symmetrical.  In considering the merits, your Honor may

12  conclude that the Constitution is unambiguous and that the

13  plain meaning of the Constitution's text supports sustaining

14  the COFINA statute.

15           If your Honor reached that conclusion, then under the

16  standards set forth by the First Circuit there would be no bar

17  to your Honor making that ruling on the merits instead of

18  certifying.

19           But the key point I'd like to make, your Honor, is the

20  opposite is not true.  There are multiple reasons why if your

21  Honor concluded the text of the Constitution is ambiguous, in

22  that event you should send the resolution of the ambiguity to

23  the Puerto Rico Supreme Court to decide.

24           THE COURT:  Not just because you want an advanced

25  second bite at the apple in the case it's not going your way?

```
 1              MR. BENTLEY:  Correct, your Honor.  This is why I'm

 2     hitting this head on, because it does sound convenient.

 3              There are multiple reasons -- I won't dwell on the

 4     first one, which, as we say, the law is clear for supporting

 5     the statute, whereas it's not sufficiently clear to invalidate

 6     the statute under the First Circuit standards.

 7              I'd like to move on to three additional reasons, each

 8     of which revolves around the point.  In looking at

 9     certification decisions, courts have focused on the need to

10     respect the internal affairs, the self government of the state,

11     and, as Mr. Yanez emphasized, those considerations apply

12     perhaps even more powerfully with respect to Puerto Rico.

13              Now, an order sustaining a statute does not affront

14     the state's internal affairs.  It leaves a statute in place; it

15     doesn't disrupt the status quo.  Striking down the statute does

16     the opposite, which is why the circuit courts have held that

17     courts should strike down a state statute based on the state's

18     Constitution only as a last resort, as an unavoidable matter.

19     In fact, the parties have pointed to not a single case where a

20     federal court has done that, has invalidated a state statute

21     based on the state constitution.

22              Now, in this case there are two additional reasons

23     specific to this case why striking down the Puerto Rico statute

24     would be particularly an affront to self governance.  One is

25     the Court couldn't do that based on the plain text of the
```

1    statute -- sorry -- of the Constitution.  The Court would need

2    to look to the purposes, the supposed purposes of the

3    Constitution -- which our friends in the front row have pointed

4    to -- and, in so doing, the Court would need to make choices

5    between policies:  The policy of giving broad range, broad

6    deference to the legislature of Puerto Rico, versus the

7    no-invasion policy that our friends in the front row are

8    speaking to.  Policy choices like that are uniquely the

9    prerogative of the local court.

10           Finally, a matter of such enormous consequence -- I

11   won't belabor or repeat the arguments the parties have made

12   about the huge financial consequences that a ruling striking

13   down COFINA would have -- I will simply say that a ruling on a

14   matter like that cuts to the heart of the self governance of

15   the Island, and that's a powerful additional reason why that's

16   a decision that shouldn't be made by a federal court; it should

17   be made only by the Puerto Rico Supreme Court.

18           THE COURT:  Thank you, Mr. Bentley.

19           MR. BENTLEY:  Thank you, your Honor.

20           THE COURT:  Mr. Zakia?

21           MR. ZAKIA:  Your Honor, good morning.  Jason Zakia of

22   White & Case on behalf of the Puerto Rico Funds.  I will be

23   extremely brief; my light started red.

24           So, the reason I rise today, your Honor, is we are a

25   little bit different than some of the other creditor parties in

1    that our clients are based in Puerto Rico, and our shareholders

2    are residents of Puerto Rico.  And I agree with everything

3    Mr. Yanez and Mr. Bentley said, but I wanted to add one other

4    point, which is, this is extremely important -- and I know all

5    the matters in these cases are important to everybody -- but

6    extremely important to the Island of Puerto Rico, because my

7    clients aren't the only COFINA bondholders on Puerto Rico.  In

8    fact, the COFINA bonds are the most widely held bond on the

9    Island.  So, when you compare all of the reasons why this is

10   important, that's another one.

11           And you combine it with the fact that the arguments

12   made in opposition to this COFINA regime put in place by the

13   government of Puerto Rico are based on the laws and the

14   Constitution of the Commonwealth, that really does make it the

15   perfect instance in which certification would be appropriate.

16   And, in fact, we would submit, your Honor, if this case isn't

17   the model case for certification, I don't know what would be.

18           Thank you very much.

19           THE COURT:  Thank you, Mr. Zakia.

20           Ms. Miller.

21           MS. MILLER:  Good morning, your Honor.  Atara Miller

22   from Milbank Tweed Hadley & McCloy on behalf of Ambac.

23           Your Honor, I want to go back to a question which I

24   think Mr. Yanez responded to quite well, but I want to add one

25   point.  The question was:  Wouldn't I have to make

1    determinations under federal law about whether or not this is

2    property of the debtor?  This is all happening in the context

3    of a Title III proceeding.  And I want to point out, as we will

4    all recall, that this summary judgment and certification motion

5    comes at the end of quite a long procedural process that led up

6    to it, and it started many, many months ago, almost a full year

7    ago, with the Commonwealth -- with the Oversight Board's motion

8    to set up this procedure.

9             And in that original motion, the protocol motion, they

10   specifically defined the Commonwealth COFINA dispute as "For

11   purposes of the Title III cases" -- and this is a Docket 303 --

12   "whether after considering all the procedural and substantive

13   defenses the pledged sales tax are either, A, property of the

14   Commonwealth within the meaning of PROMESA Section 301(c)(5)

15   or, B, subject to an allowable claim of the Commonwealth,

16   having priority over all claims of COFINA."

17            After many months of negotiation, and a second motion

18   that was ultimately submitted on consent and approved by your

19   Honor, that is not the definition of the issue before this

20   court.  And the Oversight Board then stepped out, and the case

21   was litigated through its agents, and all of the parties to

22   this dispute recognize that the question of potential overlay

23   of PROMESA is not part of what is before the Court on this

24   motion and in this proceeding.  It is quite narrowly defined

25   and limited to what your Honor described as the antecedent

1    question of property.  Let's figure out whose property it is

2    under Commonwealth law, and then we can think about what that

3    means in the context of a Title III.

4              So, I just wanted to --

5              THE COURT:  And so you're comfortable that this is not

6    a proposed request for an advisory opinion to the Puerto Rico

7    Supreme Court, in that there are arguments that property that

8    looks like property under Commonwealth law might not look like

9    property in the same way under PROMESA and bankruptcy law?

10             MS. MILLER:  Your Honor raises quite a fascinating

11   question.  Because I think to the extent that it is an advisory

12   opinion to ask the Puerto Rico Supreme Court to decide these

13   issues, then the questions that have been presented to this

14   court, and the way the scope has been defined in this court,

15   similarly calls for an advisory opinion.

16             THE COURT:  If I understand the scope the way you've

17   parsed the scope.

18             MS. MILLER:  Well, I think we litigated that sort of

19   many times over, and I think it's fairly clear that none of

20   these bankruptcy issues are properly before the Court, and for

21   that reason not a single party moved for summary judgment on

22   that basis.

23             So, I think it's quite clear that the parties at least

24   understand that.  And to the extent that your Honor believes

25   it's broader, quite frankly I think we need a whole new round

1    of summary judgment briefing on that issue, because I don't

2    think it was fully addressed.

3          But I think it's an interesting question whether this

4    is setting up an advisory opinion, but I think if it is before

5    the Puerto Rico Supreme Court, it is equally as much here.  So,

6    to me that's not a bar to certification.  It may raise

7    questions about the protocol as adoptive.

8          I want to make clear that our position, frankly we're

9    standing up on the COFINA side as proponents of certification,

10   but as your Honor I think knows we actually oppose

11   certification because we believe -- similar to Mr. Bentley --

12   that the question is really one of the plain text of the

13   statute and the plain purpose of the statute.

14         Federal courts are well practiced in interpreting and

15   applying state laws, and this is true even if it's a novel

16   question of state law, if the statutory tax purpose and related

17   or analogous case law is sufficiently clear.  So that was

18   consistent with the First Circuit's decision in Armacost v.

19   Amica Mutual Insurance Company, 11 F.3d 267 at 269.

20         I join in Mr. Bentley's arguments about why, if the

21   Court were to find that the constitutional issues raised -- or

22   any of the arguments raised, frankly -- create a basis to

23   strike down, modify, invalidate, declare unconstitutional

24   either all or portions of the COFINA legislation, that that

25   issue should be sent to the Supreme Court.  As Mr. Bentley

1   noted, there is not a single case that the opponents have cited

2   to where a federal court has struck down a state statute based

3   on a conflict with the state constitution rather than a federal

4   constitutional conflict.

5           I want to take my last 30 seconds just to address the

6   questions which, in the alternative, if your Honor is inclined

7   to certify, we proposed alternative questions, and I just want

8   to briefly explain what the heart of our objection is, which

9   is, that the questions as framed by the COFINA agent assume in

10  their language that the COFINA legislation in fact violates

11  certain provisions of the Puerto Rico Constitution.  We believe

12  that that underlying question of whether the statute violates

13  those provisions must also be sent to the Puerto Rico Supreme

14  Court, if you're going to certify the property question.

15          THE COURT:  Thank you.

16          MS. MILLER:  Thank you.

17          THE COURT:  Mr. Silbert?

18          MR. SILBERT:  Good morning, your Honor.  Greg Silbert

19  from Weil for National.

20          We adopt Ms. Miller's and Mr. Bentley's arguments as

21  well.  In the short time that I have available to me, I just

22  want to emphasize that as we read all of these briefs, there is

23  no dispute by any of the parties about the certification

24  standard in at least one respect, and that is that if the path

25  that the Puerto Rico court would follow is reasonably clear,

1   then there is no reason to certify.

2           And we think that with respect to the issues that are

3   on scope, on the issues that are properly before you -- which

4   we understand to be pure questions of Puerto Rico law -- the

5   path is clear, and the path is clear because the COFINA statute

6   says what it says; and we read that statute to say quite

7   clearly that the SUT revenues belong to COFINA and are not

8   available resources of the Commonwealth.

9           We note that at least with respect to the Commonwealth

10  law questions that are in scope, the Oversight Board agrees

11  with us.  It also says that under Puerto Rico law the SUT

12  revenues belong to COFINA and are not available resources.  So,

13  because the outcome is clear, you should not certify.

14          But if you disagree with us and you think that the

15  path is not reasonably clear -- and let me make a distinction

16  which is subtle and important, it's not necessarily that you

17  disagree with us on the merits.  In other words, you don't have

18  to get to the end of writing your decision and find, no, I'm

19  going to strike down the statute and at that point certify.

20  You would look at the question; you would decide essentially,

21  you know, is this an easy case or a hard case.

22          We think it's an easy case because the language is

23  expressly in our favor.  But if you think it's a hard case, you

24  should certify it, and you should certify it because it's a

25  very serious thing for a federal court to strike down a

1    Commonwealth statute under the Commonwealth Constitution,

2    especially a Commonwealth statute as consequential as this one.

3    And it is consequential not only to COFINA bondholders and the

4    stakeholders here but to the future of the Commonwealth and to

5    the Commonwealth's ability to use these kinds of securitization

6    structures in the future.

7           In my 33 seconds that I have left, I just want to

8    respond to your question.  It would not be an advisory opinion

9    issued by the Supreme Court.  I think your Honor raised the

10   question appropriately would you have to apply PROMESA to

11   determine the property of the estate at the time of

12   distribution.  Well, let's say you would.  Nobody is asking the

13   Puerto Rico Supreme Court to make a distribution from the

14   COFINA estate or from the Commonwealth estate.  The question

15   that you would certify, if you believe certification is

16   appropriate, is a question under Commonwealth law as to who

17   owns these revenues -- the SUT revenues -- and whether the

18   COFINA legislation was constitutional.

19          The answer to that question would surely inform your

20   Honor's decisions ultimately about what to do with the property

21   of the estate, but it would not itself order any distribution

22   from the property of the estate, and it would not be an

23   advisory opinion.

24          Thank you.

25          THE COURT:  Thank you.

1           Mr. Kirpalani.

2           MR. KIRPALANI:  Good morning, your Honor.  Susheel

3    Kirpalani of Quinn Emanuel Urquhart & Sullivan for the COFINA

4    Senior Bondholders Coalition.

5           Judge, today I'm joined by my colleague and teacher on

6    a lot of cultural matters, by my friend Rafael Escalera, who

7    will be handling most of this argument.  I just wanted to make

8    a few quick points about PROMESA and federal versus state law,

9    and maybe a little bankruptcy.

10          The last time I was before the Court I was asking your

11   Honor to resist the Commonwealth side's invitation to find an

12   intention by Congress to preempt Puerto Rico law on property

13   rights.  We talked about the presumption against preemption,

14   the BFP v. Resolution Trust Corp. case; we talked about Butner

15   and how state law governs property rights even in bankruptcy

16   cases; we talked about Barnhill v. Johnson that says you need

17   to find that there is some controlling federal principle that

18   would override state law.  And I remember I mentioned Justice

19   Sotomayor's Merit Management's decision from earlier this year

20   which cautioned all jurists not to look for congressional

21   intent that's not there in the text, even if it would be great

22   bankruptcy policy in the judge's mind to do so.

23          And then what I did was I walked through various

24   sections of PROMESA -- and just to refresh, 201(b)(1)(M),

25   201(b)(1)(N), 303, 305, 314(b)(6) and 407(a) -- and I don't

1   think anyone in this courtroom responded to when your Honor

2   asked for an answer to my question as to why Congress would

3   have so thoughtfully, carefully and systematically referred to

4   Puerto Rico law if it was preempting it with some federal

5   interest.

6           And while no litigant in this courtroom grappled with

7   this question, your brother on the bench in San Juan has done

8   so.  Judge Garcia-Gregory did this and issued a decision a few

9   days ago, on May 4, in the civil action 17-1743, a 35-page

10  decision in the Centro de Periodismo Investigativo case, where

11  he went through in great detail the presumption against

12  preemption on whether or not the Oversight Board was right that

13  PROMESA preempted state law on the public access to documents.

14  The reasoning of this case by Judge Garcia-Gregory is highly

15  persuasive on this precise issue of whether there is

16  congressional intent to preempt state law and whether you can

17  find it in PROMESA.  And it's the first case to consider the

18  question.

19          As you may expect from my set-up your Honor, Judge

20  Garcia-Gregory noted Congress' repeated allusions to the

21  Constitution of Puerto Rico and territorial law and cited many

22  of the same provisions that I just went through.

23          I have to say one thing about the bankruptcy questions

24  your Honor asked, because at bottom that's what I do.  I want

25  to highlight that even in the bankruptcy context where there is

```
1    an estate, and there is property of the estate -- which doesn't

2    exist in PROMESA -- the First Circuit has held sua sponte that

3    certification is the appropriate route to determine novel state

4    law property questions.  Property of a debtor is not a federal

5    question.  The Oversight Board cites Section 306(b).  That

6    citation is way off base.  Section 306(b) -- I know your

7    Honor's history with the procedural aspects of bankruptcy, you

8    know this -- it is just tracking the language of 28 U.S.C.

9    1334(e)(1).  It's about jurisdiction; it's not about what is

10   the substantive source of law for determining who owns

11   property.

12           And the First Circuit cases we cited are In Re

13   Hundley; In Re Engage, Inc., and although those involved the

14   First Circuit certifying questions to the Massachusetts Supreme

15   Court and not Puerto Rico's Supreme Court, the Segovia

16   Development Corp. case, 628 F.2d 724, at footnote 4, from 1980,

17   that shows that Puerto Rico should be treated with no less

18   respect than Massachusetts, your Honor.

19           Thank you.

20           THE COURT:  Thank you.

21           Mr. Escalera.

22           MR. ESCALERA:  Good morning, your Honor.  Rafael

23   Escalera on behalf the Senior Bondholders Coalition.

24           Your Honor, I would like to begin by making reference

25   to an argument that I think illustrates what is before the
```

I59WproFcorrected051118

```
1    Court here.  The opponents of certification have said that you
2    shouldn't certify the questions because the Supreme Court of
3    Puerto Rico would not accept the certification, and they make
4    that argument by referring to Rule 25.  I think that argument
5    underlies what we're discussing here.  They are asking you not
6    only to rule on substantive novel questions of Puerto Rico law;
7    they're asking you even to read the regulations of the Supreme
8    Court and construe what the Supreme Court would do reading
9    their own regulations faced with a case of this nature.  I
10   think that is too much to ask from a federal court.
11           Secondly, your Honor, the interpretation of Rule 25 is
12   wrong.  All that Rule 25(a) requires is that the judicial
13   matter that is referred to the Supreme Court may be
14   determinative of the -- the decision may be determinative of
15   that matter that is referred, not of the case.
16           And while I'm talking about Rule 25, your Honor, I
17   want to use the rule to illustrate another point, which is the
18   difficulties and complexities of ruling on a Spanish
19   language-based Puerto Rico issues.  I think Congress was very
20   much aware that the law is cultural and culture cannot be
21   divorced from language.
22           And if you look at the translation of the rule that is
23   part of Docket 437-1, you will see that the translator in
24   subsection B simply made its own contribution.  The phrase "in
25   which case" doesn't appear in the original Spanish language
```

1  translation at all, and that phrase makes possible an

2  interpretation that is not necessarily a reasonable

3  interpretation without the phrase.  And the phrase is simply an

4  addition by the translator, and it's a certified translation.

5         This, your Honor, is not unusual.  For those of us --

6  there are many here -- who have litigated in English in federal

7  courts in Puerto Rico and in Spanish in local courts in Puerto

8  Rico, we face those issues every day, and the Supreme Court of

9  Puerto Rico faces them too.  The correct interpretation cannot

10  be dependent on a faulty translation.  And we have them all

11  over the place in this case.  And that is not saved by simply

12  saying the translation has been certified.

13         For example, your Honor, you had in mind probably when

14  you asked the question of language in the Constitution the use

15  of the word "revenues" in English versus "resources" in

16  Spanish.  Well, your Honor, I cannot speak for the Supreme

17  Court of Puerto Rico, of course, but I have a strong impression

18  that they would say that there is no direct equivalent to the

19  word "revenues" in English in the Spanish language.  And if

20  that is the case, the Supreme Court can say so and determine

21  whether there is a different interpretation in the context of

22  the totality of the Constitution whether you use one term or

23  the other.

24         In terms of the format of the questions to be

25  certified, your Honor, I don't want to spend much time on that,

1    because certification is discretional on your part, of course,

2    but also the way the questions are going to be framed is

3    discretional on your part too; and it is for the Court to

4    decide which way to frame the questions; and it has a lot of

5    materials to work on.  The parties have submitted different

6    versions of the questions to be certified, and the Court can by

7    itself frame whatever it thinks is most appropriate to get the

8    answer the Court needs.

9         I want to pause a minute and make reference, as my

10   colleague Mr. Kirpalani did, to the decision by Judge

11   Garcia-Gregory, because I think that decision recognizes

12   something that is very important in PROMESA.  PROMESA

13   incorporates Puerto Rico law, and Judge Garcia-Gregory

14   recognized very recently as much.  But in incorporating Puerto

15   Rico law, it cannot be reasonably said that it closed the door

16   to the interpretation of that law by the judicial bodies of

17   Puerto Rico.

18        I think that opening the door to Puerto Rico law is

19   not to Puerto Rico law as may be construed by someone else; it

20   is Puerto Rico law as might be construed by Puerto Rico

21   judicial institutions who are in the ultimate case the last

22   word on what those provisions mean.

23        Furthermore, your Honor, I want to address the issue

24   of timeliness of the petition.  I think that the only

25   requirement is that we do so before you rule on the matters

1    that would otherwise be certified.  We have done so.  And, most

2    importantly, your Honor, the timeliness issue cannot override

3    the comity and federalism considerations that are behind any

4    certification.  If that were the case, you would never have a

5    certification like you had in the Fonaris case by the U.S.

6    Supreme Court years after the case had been initiated.

7           In terms of future delays, the situation is similar.

8    The riskiest way of doing this is by having the possibility of

9    a certification on appeal even at the Supreme Court level -- as

10   occurred in the Fonaris case -- lingering over the procedures.

11   Once you certify and the matters are answered, that's it,

12   that's the last word on those matters that you decided to

13   certify, and that would give a very efficient method of

14   resolving these issues.

15          I cannot leave this podium without addressing the

16   issue of how long would it take for the Supreme Court.  I don't

17   think it is at all justified to say that the Supreme Court will

18   not take this matter into consideration quickly.  The judges of

19   the Supreme Court live in Puerto Rico, they face the problems

20   that every Puerto Rican faces, and I know by experience --

21   because we have cited the cases of intra-jurisdictional

22   certification in our briefs, and I have been involved in all of

23   them -- and I know that they take this particular matter of

24   very public importance with all deliberate speed, and that is

25   what I am sure they will do in this case, your Honor.  The

1    averages we have shown in the cases that are cited in our reply

2    brief go from three days to four months.

3           THE COURT:  I did notice that at least some of those

4    cases -- to the extent the substance of them was accessible to

5    me -- dealt with elections and a situation in which there is a

6    fixed timetable, and here with this, you know, multi-part,

7    multi-issue bankruptcy proceeding, which has to move forward as

8    expeditiously as possible, there isn't a particular fixed

9    timetable or target.  So, are you aware of cases that have gone

10   on accelerated schedules at the Puerto Rico Supreme Court that

11   were not working against a particular national event?

12          MR. ESCALERA:  I don't think you can say, for example,

13   in 2004, in Arturio Reyes -- which is a case I was involved

14   in -- had a timetable at the local level.  I mean it was

15   litigated at the same time in federal court, and the Supreme

16   Court took the intra-jurisdictional certification of a similar

17   issue immediately, but it wasn't running against a fixed

18   deadline.  And I think that in a case of this importance, the

19   Supreme Court will pay attention to it very quickly, and the

20   Court can in the certification process make sure that that is

21   the case.

22          Finally, your Honor, I don't want to deal with the

23   impact of this situation; I just want to say that in terms of

24   what would happen in the Supreme Court, the Supreme Court would

25   accept briefing in English; the record of this case can be

```
 1    certified in English; and it would be very easy -- if the Court

 2    doesn't allow an exception to the ruling of format -- to turn

 3    the motions for summary judgment into the briefing that would

 4    be filed before the Supreme Court either in English or in

 5    Spanish.

 6             The difference is that original materials -- because

 7    this is a controversy of law, not a factual case -- the

 8    original materials would be read and studied by the Supreme

 9    Court in their original Spanish language version.

10             Thank you, your Honor.

11             THE COURT:  We now turn to the opponent's arguments,

12    and Mr. Bienenstock, you may start.

13             MR. BIENENSTOCK:  Thank you, and good morning, your

14    Honor.

15             THE COURT:  Good morning.

16             MR. BIENENSTOCK:  Martin Bienenstock of Proskauer Rose

17    LLP for the Oversight Board.

18             Your Honor, the stipulation that started all of this

19    provides the issue is whether the taxes are property of COFINA

20    or the Commonwealth under applicable law.  The COFINA agents in

21    scope cause of action request a declaration that the dedicated

22    sales tax fund are property of COFINA under applicable law.  I

23    plan to cover only the issue of whether federal law is

24    involved, because that impacts whether the issue should be

25    certified to the Puerto Rico Supreme Court.
```

```
 1              Your Honor's very initial questions at the outset of
 2     the hearing covered the first several points I wanted to make.
 3              In brief, neither COFINA nor the Commonwealth can have
 4     a plan of adjustment without the plan proponent, the Board,
 5     knowing what is the property of that debtor, so we need to know
 6     whether the taxes in dispute are property of the Commonwealth
 7     debtor or the COFINA debtor.
 8              Anything that doesn't answer that question makes this
 9     whole exercise useless.  And that was the only reason to have
10     this question decided early on, so that we knew what assets
11     there were to distribute in a COFINA plan and in a Commonwealth
12     plan.
13              Section 1123 of the Bankruptcy Code (a)(5)(A), (B) and
14     (D) and (b) -- all made applicable by PROMESA Section 301(a) --
15     provide that the plan should transfer property of the debtor,
16     with Section 301(c)(5) saying wherever in the bankruptcy code
17     it refers to property of the estate it should be interpreted in
18     PROMESA as property of the debtor.
19              So, there can't be any resolution of these cases
20     without answering that question.  And that question is
21     inherently a federal question as to what is property of the
22     debtor.
23              It's first mentioned in 306(b) -- and Mr. Kirpalani is
24     correct that that's a jurisdictional statute -- but property of
25     the debtor is also mentioned in 1123.  So, we can't distribute
```

 1   it without knowing what it is.

 2          And as for whether PROMESA recognizes Puerto Rico law,

 3   no different than the Bankruptcy Code recognizing every state's

 4   law.  The Bankruptcy Code in PROMESA looked to state law and

 5   territory law for what is property.  There are federal

 6   questions that relate to what is property of the estate or what

 7   is property of the debtor.  That's really the issue I will

 8   spend the balance of my time on.

 9          Some litigants -- including this morning -- have

10   contended that the federal issues were not invoked in these

11   summary judgment motions.  They simply overlook pages 21

12   through 25 of the Commonwealth agent's omnibus opposition to

13   the COFINA agent summary judgment motion, which is docket

14   number 371.  On those pages the Commonwealth agent spells out

15   the federal questions and cites the cases -- some of which the

16   Oversight Board has also cited in its opposition here --

17   primarily In Re Gull Air, Ground Round and Colonial Realty, all

18   First Circuit decisions.

19          Your Honor, we submit that what makes this such an

20   intriguing case is that both the Commonwealth and COFINA have

21   certain indicia of ownership of the taxes.  Normally when you

22   own something you can do whatever you want with it, you own all

23   of it.  Here the Commonwealth has certain indicia of ownership

24   and COFINA has certain indicia of ownership, and that is why in

25   one of our pleadings the Board said the Commonwealth doesn't

1    own it.  Now, National says to your Honor we said that COFINA

2    owns it.  That is a totally incorrect statement.  They can't

3    cite anything where we said COFINA owns it.  COFINA has no more

4    ownership rights -- well, your Honor is going to decide -- but

5    our point is that the Puerto Rico legislature has split up

6    indicia of ownership between the Commonwealth and COFINA.

7            Now, what do I mean by that?  Well, what I mean is

8    this:  The power to Levy the tax, repeal the tax, collect the

9    tax, those are all still with the Commonwealth, and we know

10   that because the COFINA agent cites in its own summary judgment

11   papers the statute in Section 5(d) of Act 56, Docket Number

12   317, where the Commonwealth promises not to interfere with

13   that.  Well, it's a promise like a promise to pay in

14   bankruptcy, it's a claim.  So, they recognize that the

15   Commonwealth has these powers.

16           In addition, the Commonwealth has at a minimum

17   something akin to a remainder interest.  The Commonwealth agent

18   cites the statute where the Commonwealth is entitled to all of

19   the tax proceeds not used to pay the debt.  Normally when you

20   own something you can do what you want with it.  Here the

21   COFINA agent says it owns the taxes, but it's restricted to

22   using them to pay the COFINA debt, and if it has taxes not

23   necessary for that, it has to give them back to the

24   Commonwealth.

25           Now, on the negative side for the Commonwealth, as we

1    all know the legislature passed a law that says that the taxes

2    are not available resources, passed a law purporting to

3    transfer taxes -- and the parties have litigated whether you

4    can transfer something that doesn't exist yet -- but the

5    Commonwealth has the lack of indicia of ownership, which in

6    turn COFINA does have; when it gets them, it can use them to

7    pay its debt.

8             The relevance of the federal jurisprudence -- Gull

9    Air, Ground Round and Colonial Realty -- they're virtually

10   right on point.  In each of those cases the state legislature

11   had given certain indicia of ownership to the debtor but said

12   that the property was really property of a nondebtor.  And it

13   became a federal question as to for purposes of Chapter 11

14   should the property be deemed property of the estate or not.

15   And in virtually each of those cases, when the Court balanced

16   the various indicia of ownership, the Court concluded that it

17   was property of the estate.  And that's the point that the

18   Commonwealth agent made in its papers.

19            To emphasize, we're not urging the Court to come out

20   one way or the other on that.  What we are saying is that is

21   the question that is in front of this court.  Under that

22   jurisprudence, are the indicia of ownership of the Commonwealth

23   sufficient that it become property of that debtor or the

24   reverse?

25            Now, other federal questions could well arise, because

 1    when one looks at the fact that the Puerto Rico legislature

 2    said these taxes are not available resources of the

 3    Commonwealth, they were basically based on the language of the

 4    Commonwealth Constitution, saying, well, OK, then they're not

 5    among the assets that go to creditors when their debt is in

 6    default -- the general obligation creditors -- and they can

 7    tell the Secretary Treasurer to turn over all the available

 8    resources.  They're saying those taxes, since they are not

 9    available resources, aren't available to the GO creditors.

10           There is an obvious question there:  Is that a

11    territory priority that's preempted by the Bankruptcy Code?

12    So, that's yet another federal question in addition to the

13    questions raised in the jurisprudence I mentioned.

14           Also, although --

15           THE COURT:  But the priority question is one that is

16    subsequent to a determination of Commonwealth ownership,

17    correct?

18           MR. BIENENSTOCK:  That would be right.

19           THE COURT:  So that is clearly outside the scope here,

20    because we're only dealing with questions antecedent to the

21    binary ownership question.  Yes?

22           MR. BIENENSTOCK:  OK, your Honor, I'm not going to

23    take more time on something out of scope, that's fine.

24           And a point was made earlier, your Honor --

25    Mr. Kirpalani made it on behalf of the COFINA senior

I59WproFcorrected051118

1    bondholders -- that there is a notion in PROMESA against

2    preempting territory law.  And the point I'd like to make --

3    well, two points.

4                (Continued on next page)

1          MR. BIENENSTOCK:  First, PROMESA, as the Court has

2    cited numerous times, expressly says PROMESA preempts all

3    territory law, but more important --

4          THE COURT:  That is inconsistent.

5          MR. BIENENSTOCK:  Pardon me?

6          THE COURT:  It preempts territory law that's

7    inconsistent with PROMESA.

8          MR. BIENENSTOCK:  Oh, of course.

9          THE COURT:  Not all territory law.

10         MR. BIENENSTOCK:  Right.

11         Well, it wouldn't have to preempt it if it's not

12   inconsistent, but I agree; we're talking about inconsistent

13   territory law.  But my major point on this, your Honor, is

14   we're not talking about preemption.

15         As I said at the outset, all of the Bankruptcy Code,

16   as well as PROMESA, recognizes state law and territory law to

17   establish what is property in the first instance, and the

18   complication here is that the indicia of ownership of that

19   property are basically split between COFINA and the

20   Commonwealth.

21         From the board's point of view, the Court's not being

22   asked to say that anything in PROMESA preempts any statute of

23   the Commonwealth.  The Court is being asked to say, recognizing

24   what the Commonwealth statutes have done, which is to split the

25   indicia of ownership between COFINA and the Commonwealth, whose

1   property is it for purposes of distribution under Section 1123?

2   It's not a matter of preempting or overruling or holding

3   unconstitutional; it's a matter of applying federal

4   jurisprudence to which estate should be distributing that

5   property.

6          Your Honor, unless the Court has any additional

7   questions, I didn't have anything more.

8          THE COURT:  Thank you, Mr. Bienenstock.

9          MR. BIENENSTOCK:  Thank you.

10          THE COURT:  Good morning, Mr. Stancil.

11          MR. STANCIL:  Good morning, your Honor.  Mark Stancil,

12   for the Ad Hoc Group of General Obligation Bondholders.

13          I'm going to try very hard not to repeat points we've

14   covered in Mr. Bienenstock's presentation.  Let me start, if I

15   may, with a point Mr. Yanez and Mr. Bentley both harped on.

16          Their suggestion is that this question should be

17   certified because the considerations here are unique to Puerto

18   Rico or they are special to Puerto Rico, and I think that

19   overlooks a critical point, which is PROMESA speaks to which

20   court should be deciding difficult questions.

21          This is not a garden-variety certification question.

22   This is, I think, by all accounts, an unusual one.  What

23   Congress has said, and it enacted a statute specifically

24   designed to address a very challenging situation, and Congress

25   made a choice and, in turn, the chief justice made a choice,

```
1      your Honor, and that is, by statute, that a district judge

2      selected by the chief justice will decide these questions.  So

3      we have, I think, a unique set of circumstances.  Insofar as

4      PROMESA, we don't need to get into what is preemption as a

5      matter of state law and federal law.  PROMESA, with respect,

6      your Honor, means for you to decide difficult questions.

7             It's been suggested that this has particular

8      consequences for Puerto Rico, and indeed it does, in both

9      directions, but that is also known to Congress.  For example,

10     one of the provisions of PROMESA that Mr. Kirpalani cited, and

11     we will cite many times as well, Section 201(b)(1)(N) requires

12     respect for lawful liens and lawful priorities.  Lawful is the

13     question, right?

14            Well, we're here to determine whether the COFINA claim

15     is a lawful claim, and so Congress was well aware -- in fact,

16     everyone has been well aware -- of the COFINA question in this

17     case since the moment PROMESA, before PROMESA was enacted, and

18     yet Congress determined that the correct court to send these

19     issues to was your Honor through the designation by the chief

20     justice.

21            THE COURT:  But as Mr. Kirpalani, I think it was,

22     pointed out, 306 essentially incorporates 1334, and it

23     incorporates, therefore, nonexclusive jurisdiction of the Title

24     III court for proceedings as opposed to cases.  The fact that

25     it required the designation of someone like me to preside over
```

1    the Title III cases doesn't mean that it excludes other

2    interpretive authority.

3         MR. STANCIL:  First of all, your Honor, we're talking

4    about two different provisions.  Mr. Bienenstock invokes 306.

5    We do not.

6         I'm referring to 308, which is which federal court,

7    which district court, is going to decide this issue.  And it

8    was a determination, it doesn't say that it should be a judge

9    sitting in Puerto Rico.  You sit in the district of Puerto Rico

10   by designation, but it's quite clear in saying it should be any

11   judge, federal district judge that the chief justice selects,

12   and I think if Congress had concerns about --

13        THE COURT:  I thought that it said to preside over the

14   Title III.

15        MR. STANCIL:  Yes.

16        THE COURT:  I'm trying to drill down on your assertion

17   that PROMESA says that every single issue in the Title III,

18   which is what I think I'm hearing you say, every single issue

19   in the Title III, no matter whether its origin is local or

20   federal, has to be decided by the judge designated pursuant to

21   308, and I didn't recall 308 going quite that far.

22        MR. STANCIL:  I agree, your Honor.  It doesn't go that

23   far, but I do think it reflects a judgment by Congress that

24   there are going to be difficult questions affecting Puerto Rico

25   directly that are going to land squarely on your Honor's desk,

1    and that's why I referenced 201(b)(1)(N), which talks about

2    lawful liens and lawful priorities.

3             Everybody's known this was coming, and I do think,

4    your Honor, it is a matter of your discretion at the end of the

5    day, and I think in considering how to exercise that

6    discretion, I think 308, the fact that you are chosen by the

7    chief justice and with awareness that you will be wading into

8    all manner of issues affecting Puerto Rico quite directly, I

9    think that deserves some consideration.

10            I'd like to turn next just to some of the practical

11   considerations.

12            None of us knows, of course, how the Puerto Rico

13   Supreme Court would respond.  We can suppose and we can hope

14   that if it were to certify, it would be decided quickly, but I

15   don't think we can know that in any way, and I think what we

16   have are extremes in a variety of ways.

17            We have some instances involving intra-jurisdictional,

18   largely intra-jurisdictional -- certification up against

19   deadlines in which certification has been accomplished

20   relatively expeditiously.  On the other extreme, we have some

21   very long questions, very long proceedings.

22            With respect, your Honor, this is a very difficult

23   issue on which to gamble.  Mr. Bienenstock, I think, has

24   mentioned claims of adjustment are not going to be filed and

25   submitted and litigated and debated until we know what this

1    issue looks like, and we can't afford for this one to be the

2    18-month, 24-month variety.  I think that would be crippling,

3    in large part, just because of everything else that needs to

4    get done in addition to this issue.

5         We would have the hope that it would be decided

6    expeditiously, but this is a politically very sensitive and

7    charged issue, and I think for all of the reasons that have

8    been offered by the movants that this issue is uniquely of

9    concern to Puerto Rico sort of cut against the assumption that

10   it would necessarily be decided expeditiously.  This is a

11   politically charged issue that COFINA Senior Bondholders are

12   running full-page newspaper ads praising COFINA.  This is not a

13   garden-variety issue that's just going to sort of come up and

14   down, at least I wouldn't expect it to.

15        Moving on to whether this is a purely state law or

16   purely federal question, I think this morning has given your

17   Honor just a taste of the disagreement on that question.

18        There is no question that in the course of the summary

19   judgment proceedings, the COFINA side says this is a question

20   purely of state law and the Commonwealth side has said, No,

21   there are federal principles bound up in that.  We don't agree

22   exactly as to which federal principles, but there's no question

23   that we have all argued that the label affixed to the nature of

24   the COFINA claim is not controlling, and so I think this is a

25   question that is mixed, at bottom.  And I think the suggestion

1     that, well, this has been reduced to a purely state law

2     question in an adversary proceeding is wrong.

3            The COFINA issue, as stated by this Court, the COFINA

4     Commonwealth dispute, as defined in the stipulation, doesn't

5     say whether it shall be the property of the Commonwealth of

6     COFINA under Puerto Rico law.  It says under applicable law.

7     It is not limited to Puerto Rico law, and that's why we're

8     having these debates, and that will continue.

9            I want to briefly touch on the suggestion that the

10    local ownership or the purported local ownership of COFINA

11    bonds has anything to do with this.

12           We think that is absolutely irrelevant whether or

13    where a bond is held, and that is a hotly disputed factual

14    assertion, your Honor.  They've said it many, many times, but

15    it's the kind of thing that no matter how often you repeat it,

16    it doesn't make it so.

17           If your Honor would refer to docket 363, at pages 16

18    to 17, this is our dispute as to supposedly undisputed material

19    facts.  We hotly dispute that question.  It should have no

20    legal bearing on not only how the issue is resolved but

21    certainly over which court decides it, and we think it's wrong,

22    and there's no basis for it.

23           THE COURT:  As I indicated in my opening remarks this

24    morning, I'm aware that there are island and mainland holders

25    of both types of bonds.  This is a situation in which you don't

1    have distinct areas of a venn diagram, and the location of the

2    bondholders can't drive my decision as to the interpretation of

3    the law, for many reasons.

4              MR. STANCIL:  With that, I'll quit while I'm ahead,

5    your Honor.  If the Court has any further questions?

6              THE COURT:  No.  Thank you.

7              MR. STANCIL:  OK.  Thank you.

8              THE COURT:  Good morning, Mr. Despins.

9              MR. DESPINS:  Good morning, your Honor.  Luc Despins,

10   with Paul Hastings, on behalf of the Official Creditors

11   Committee acting as agent for the Oversight Board for

12   Commonwealth.

13             Your Honor, a lot of the points have already been

14   covered, so I will see, but I don't think I will have to use

15   all of my time.

16             The first point I want to address is the timeliness of

17   this.  Mr. Yanez says that it's not inconsistent to seek to

18   summary judgment and to also at the same time want to have

19   these issues certified before the Puerto Rico Supreme Court.

20             We've never said there's been a waiver that's not

21   consistent.  The point, though, is that there is an element of

22   gamesmanship, we believe, here, because when they say the

23   issues are very clear, but if you're thinking of ruling against

24   us, you need to send it over there, that's not determinative in

25   your decision, but since I think this involves your discretion,

I59WproFcorrected051118

1   that is a factor that should be considered.

2           The second point I want to address is the federal law

3   issue.  Your Honor, this has been addressed already, but I want

4   to make sure that we have a complete record on this.

5           Obviously this is relevant to the issue of whether

6   there's a mixed question of local law and federal law.  We

7   believe there is, and we believe that's why this is not

8   appropriate for certification.  This is not an issue of

9   reaching preemption or not, because if you look at the First

10  Circuit cases that we've cited and we argued in the oral

11  argument on summary judgment, these First Circuit decisions,

12  *Colonial Realty*, *Ground Round*, don't refer to preemption but

13  rather to a general principle that we're not going to have

14  local law labels govern what is property of the estate in

15  bankruptcy.  Therefore, even if you don't believe preemption is

16  appropriate, and I don't want to get into that issue, because

17  we don't need to get to that point, it is clearly a mixed issue

18  of local law and federal law here based on these First Circuit

19  cases.

20          The argument that is being made, and I think it's very

21  important to address this, Well, but there's no federal claim

22  left in the Commonwealth agent's complaint, because you've

23  decided that a number of our claims were out of scope -- and

24  you did; there's no debate about that -- but the assumption

25  there is that Counts One and Two of our complaint, where we

1    allege that the SUT, the sales and use tax, is property of the

2    Commonwealth, that somehow that does not trigger the

3    application of these First Circuit cases.  And honestly, it

4    does, because one, the stipulation itself says that it's under

5    applicable law.  It doesn't say Puerto Rico law.  We never

6    said, if you look at our complaint, this is governed by Puerto

7    Rico law.  We said under applicable law.

8         The COFINA agent also refers to applicable law, not

9    purely Puerto Rico law, and in the briefing, from the

10   beginning, and you have this not only the complaint but in the

11   briefs themselves, there are references in the opening briefs

12   to all these issues involving property of the estate, and we

13   explained that property of the estate means property of the

14   debtor, under PROMESA.  So unless the Court were to adopt the

15   rules of pleading that applied before the Federal Rules of

16   Civil Procedure were adopted, where you needed to, in fact,

17   cite to a particular section to get relief, unless the Court

18   were to adopt that, which obviously we think would be wrong,

19   there's no issue that the federal law issue is alive and it's

20   in our complaint.

21        It's in all of our briefing, and I'll just refer your

22   Honor to an old case, *Johnson v. City of Shelby,* 135 S.Ct. 346,

23   which cites to Wright & Miller.  This was a 1983 case, a

24   different case, but basically there the plaintiffs did not make

25   a reference to Section 1983 in the complaint, and the Supreme

1    Court reversed the Fifth Circuit on the basis that it's not

2    necessary to refer to any section of any statute in the

3    complaint as long as you lay out the facts that support the

4    relief you're seeking, which is exactly what we've done in our

5    complaint, and we've done that in detail.  Clearly, we believe

6    that the federal issue is alive in the complaint and in

7    subsequent briefing.

8            As Mr. Bienenstock pointed out, it's not only a

9    reference to the jurisdictional provision of PROMESA.  1123,

10   which is cited in our summary judgment papers, says that the

11   plan of adjustment needs to deal with property of the debtor,

12   or property of the estate, under 1123, but because of PROMESA,

13   that means property of the debtor, and therefore, it's

14   inescapable that that issue is built into the stipulation.  It

15   makes no sense.

16           Then the argument that's made is that, and we need to

17   really address that precisely, is the issue of, well, the

18   concept of property of the estate is not in PROMESA, and

19   therefore -- and therefore what?  The reason why -- and by the

20   way, it's very important, if you have a chance, your Honor, to

21   look at the case we cited at oral argument last time, which is

22   the *Orange County* decision, the court explained there why the

23   fact that the concept of property of the estate is not in

24   chapter 9 doesn't change the analysis that we're dealing with

25   here.  But the point is that there is zero evidence of any

1 congressional intent to give municipal debtors less rights

2 under the property-of-the-debtor concept than corporate debtors

3 would have under property-of-the-estate concept.  There's none

4 of that.

5         The reason why you can't have the concept of property

6 of the estate is because it would be directly in conflict with

7 305 of PROMESA and the equivalent under chapter 9, which

8 basically said the court will respect the political

9 determination of the municipality.  That's why these provisions

10 are not there, but there's zero evidence that because there's a

11 concept of property of the debtor rather than property of the

12 estate means that a municipal debtor has less rights than a

13 corporate debtor, and that the First Circuit line of cases,

14 which refers to other circuits as well, regarding state law

15 labels not being controlling, that those would not apply in a

16 municipal case; there's just zero evidence of that.

17         The point I want to talk about also is losing control

18 of the case.  Mr. Stancil touched on this, and it's true that

19 308 does not say that no other court has jurisdiction.  We're

20 not saying that you are precluded by statute from sending this

21 to the Puerto Rico Supreme Court.

22         What we're saying is that there is a congressional

23 intent here of having this Court, which was selected by the

24 chief justice of the Supreme Court of the United States,

25 pursuant to the statute, deal with the crux of the case, and

1   it's hard to not think of the COFINA issue as one of the top

2   three or four or five issues in the case.  And therefore, it

3   would be counterintuitive to say, OK, we have this whole,

4   elaborate system where we created the statute just for Puerto

5   Rico and we went out of our way to say that venue rules will

6   not apply -- right?  That's what they did.  They created a

7   special provision saying that the chief justice picks, which

8   first of all, cannot be a bankruptcy judge but has to be a

9   district court judge and the chief justice of the Supreme Court

10  judge picks the judge, it would be bizarre, it would be

11  counterintuitive to say, OK, we have all of that, but let's

12  send the top one, two, or three issues to the Puerto Rico

13  Supreme Court.  It is counterintuitive, your Honor.

14          Then the issue of, OK, the risk of losing control.

15  Counsel for the COFINA Seniors said, I'm pretty comfortable

16  that the Supreme Court will handle this with all due, basically

17  will handle it promptly, but we have no assurances of that.  If

18  anything, all the cases that are there, and I think you've

19  pointed that out, that they rely on are in the

20  intra-jurisdictional referral system or certification system

21  all deal with an election, a preliminary injunction or a law

22  that would deprive retirees of their benefits that's coming

23  into effect in two weeks or something like that, all the other

24  cases, and if you look at the appendix to the pleading filed by

25  the Oversight Board that list probably 20, not 20, but at least

1    15 cases, the average is 17 months.

2            Therefore, when they say, Don't worry, the Supreme

3    Court of Puerto Rico will deal with this quickly, I hope so

4    too, but we have no assurance of that.  And this is not

5    something you can reel back, where you send it there and three

6    months down the road, four months down the road, nothing has

7    happened, I don't think you can just say, let's just bring this

8    back here, it was a mistake to send it.  There's no recall on

9    this procedure.

10           I think it's important to look at all the cases they

11   cite.  They all involve preliminary injunction, elections in

12   the middle of an election process, or a law that's about to

13   come into effect.

14           Another point that was made, your Honor, is that this

15   is appropriate to send to the Puerto Rico Supreme Court because

16   there are huge consequences and there will be long-lasting

17   effects.  First of all, there's no evidence of that.  This

18   reminds me, and I know people are sick and tired of me telling

19   the story, but 20 years ago, we challenged financing leases

20   that looked like they were true leases but turned out they were

21   financing leases and the whole lease financing industry was up

22   in arms saying, you're destroying the business, etc., etc.,

23   we'll never be able to fix this again, and courts at the end of

24   the day did rule that they were not true leases, they were

25   financing leases and there were consequences from that.  And

1    did that stop anything?  No.

2          Wall Street is very resourceful.  They will find a way

3    to create another structure that will work even if your Honor

4    decides that this structure does not, so the argument that

5    somehow this is the end of the process, and therefore, the

6    Puerto Rico Supreme Court should be the sole arbiter of that I

7    don't think should be applied here.

8          Then briefly, your Honor, the issue of these other

9    provisions of PROMESA -- Mr. Stancil has already dealt with

10   201; Mr. Kirpalani referred to 407 as well -- beg the question.

11   They say that you can't take property of one debtor to give to

12   another.  Well, nobody's saying that's the case.  We're just

13   saying that it's our property, so the point is the fact that

14   that is being protected begs the question of whose property is

15   it?

16         Your Honor, the cite to the First Circuit decision,

17   *Segovia*, 1980, first -- this is in a footnote to the

18   decision -- it was a diversity case.  The Court was sitting in

19   diversity.  It was not a bankruptcy case, and I don't know why

20   we need to refer to 1980 decisions when we have very clear

21   precedents like *Ground Round*, *Colonial Realty*, etc., and a

22   number of other courts that postdate *Butner* and that say,

23   despite *Butner* that a court sitting in bankruptcy must not be

24   bound by the labels used by state law.  That issue is the crux

25   of the case here, and for that reason, we believe that this

I59WproFcorrected051118

1    case is not appropriate to be certified to the Puerto Rico

2    Supreme Court.

3             Thank you, your Honor.

4             THE COURT:  Thank you, Mr. Despins.

5             Mr. Yanez.

6             MR. YANEZ:  Thank you, your Honor.  For the record,

7    Antonio Yanez, on behalf of the COFINA agent.

8             Your Honor, all of the objectors -- the Oversight

9    Board, the General Obligation Bondholders and the Commonwealth

10   agent -- talked about the relevant federal jurisprudence, and

11   they emphasize the importance of federal questions and federal

12   issues here.  I want to make two points on that subject.

13            The first is that these same parties, and the

14   Oversight Board in particular, argued for a limited scope in

15   this action, and they were successful in achieving a limited

16   scope that resulted in the dismissal of every single claim and

17   every single counterclaim that was premised on federal law.  To

18   the extent they are now arguing that federal law is central

19   here, it is inconsistent with what they argued earlier, and it

20   is inconsistent with the Court's ruling on what the scope of

21   this dispute is.

22            THE COURT:  Since I am the one who made the scope

23   ruling, I would observe that the principle on which scope was

24   determined was temporal, was based on the sequence of

25   decisions, and so it was a question of antecedent as opposed to

1    subsequent.  The causes of action that were excluded invoked

2    particular provisions of the Bankruptcy Code that would only

3    apply after a decision as to ownership, and that's why they

4    were knocked out, not because they were federal as opposed to

5    state.  To the extent there are federal issues bound up in the

6    antecedent question as to ownership, there is nothing in my

7    scope decision that categorically knocked those out.

8            MR. YANEZ:  Let me speak to that in particular, Judge.

9        The issues that are being raised here -- the

10   frustration of PROMESA, the notion that this is somehow

11   property of the estate, the assertion that the case is pursuant

12   to Bankruptcy Code Section 541 -- each of those arguments

13   similarly assumes that COFINA owns a property under Puerto Rico

14   law.  It only frustrates a scheme established by PROMESA, or

15   there's only frustration of the scheme established by PROMESA

16   to the extent that under Puerto Rico law it is determined that

17   COFINA owns the pledged sales tax.  That's when the frustration

18   issue comes up.

19       So, too, the analysis in the Section 541 cases, which

20   by the way, is not relevant here, because Section 541 was not

21   incorporated by PROMESA, but the analysis in the 541 cases

22   begins with the state law question and then goes to the

23   subsequent question of whether or not what state law holds is

24   or is not inconsistent with federal bankruptcy law.  And that's

25   a central point for two reasons.

1          One is that it's not antecedent and therefore is not

2     within scope.  The second is that the notion that federal law

3     here can somehow control assumes that there is some

4     inconsistency between federal law and state law, that there is

5     some overriding federal law.  That's what the cases require,

6     and none has been identified here.  None has been identified.

7          THE COURT:  Even if it turns out to be a frivolous

8     question, it seems to me territory that I'm going to have to

9     drive through in order to determine, in the words of the

10    stipulation, who the owner is under applicable law.

11         It doesn't say Commonwealth law.  It says applicable

12    law.

13         MR. YANEZ:  Your Honor, the question is whether the

14    assertion of these federal law issues, which are not supported

15    by the law and do not have merit, whether the simple assertion

16    of those issues should be sufficient to deny certification, and

17    I would point out, Judge, that when Mr. Bienenstock got up here

18    and he talked about the summary judgment briefing, what he

19    referred to was pages 21 through 25 of the omnibus opposition

20    filed by the Commonwealth.  That is significant because the

21    Commonwealth's opening brief does not rely on federal law.

22    They only raised the federal law questions, they only made

23    those supposedly central here after we, on the COFINA side,

24    filed our briefs and we, on behalf of the COFINA agent,

25    indicated an intention to seek certification before this Court.

```
1              THE COURT:  Thank you, Mr. Yanez.  You're in overtime.

2              MR. YANEZ:  Thank you, your Honor.

3              THE COURT:  Ms. Miller.

4              MS. MILLER:  Good afternoon.

5         For the record, Atara Miller, Milbank Tweed Hadley &

6    McCloy, on behalf of AMBAC.

7              I'm going to speak slowly but move quickly so I don't

8    go into overtime here.  I want to start with one point which is

9    fundamental for our position, which is that none of the

10   purported federal overlay questions that have been discussed

11   relate in any manner to the constitutional questions that have

12   been raised in this case, and there's no doubt that certain

13   questions can be certified while others are not certified.  To

14   the extent that the Court believes that it has to reach any of

15   the constitutional questions under the Puerto Rico

16   constitution, those issues are plainly not mixed questions of

17   federal and state law but purely state law questions that

18   should be certified.

19             Next, I want to say that there's been a lot about this

20   notion of what governs and whether there's any significance to

21   the exclusion of the property-of-the-estate concept and whether

22   the 541 cases cited by the Commonwealth agent and others are

23   relevant here.  I heard Mr. Despins get up and say that it's

24   not included in chapter 11 and in PROMESA not because there's a

25   suggestion that municipalities have fewer rights than corporate
```

1    debtors would, but it's just so that it doesn't interfere with

2    municipal control of property.  That is exactly the point here.

3          The point is that when you're dealing with things in a

4    municipal context, you have to recognize that the municipality

5    has to retain some element of control of its property, and that

6    is effectuated, in part, through legislation, as recognized in

7    Section 303 of PROMESA, and I want to highlight something which

8    we haven't really touched on before in these cases, which is

9    that this case is unique and distinct not only from the chapter

10   9 cases but also from the chapter 11 cases, because what we

11   have here is not the bankruptcy and restructuring of the

12   municipality, which is subject to the laws of the state, but

13   what we have here is the restructuring of the state itself.

14         This is the Title III restructuring bankruptcy

15   proceedings of the Commonwealth, and there is no question that

16   Section 303 is intended to give the Commonwealth respect of its

17   own laws and its own determinations.  To suggest that we

18   should, by analogy, take chapter 9 cases, which deal with

19   corporate entities, and somehow disregard the Commonwealth's

20   own laws in this context, frankly, I think is borderline

21   offensive.

22         I also want to add that, in my last 11 seconds, your

23   Honor asked about recharacterization being a federal issue.  On

24   the recharacterization of a transaction as a financing, I want

25   to make two quick points.  One is that there's no federal

1  common law that answers that question.  Even recharacterization

2  is an effort to determine whether the state law would reflect

3  the form of the transaction or not, and I would also close in

4  my overtime by noting that that issue is out of scope.

5          Thank you.

6          THE COURT:  Thank you.

7          Finally, Mr. Escalera.

8          MR. ESCALERA:  Your Honor, I think it would sound

9  ironic to many in Puerto Rico that the representatives of the

10 government of Puerto Rico do not want to involve the Puerto

11 Rico institutions in this process, but I think that that

12 attitude goes to the heart of what we're discussing.

13         As Professor Bickel said, the judicial branch is the

14 least dangerous branch simply because its power lies in the

15 power of persuasion.  But persuasion is the result of trust,

16 your Honor.

17         In your opening remarks in Puerto Rico, you said

18 failure, frankly, is not an option -- that's a quote that I'm

19 sure you remember -- and you have shown awareness of these

20 issues in your remarks this morning.  That trust, which is the

21 basis of persuasion, is the basis also of uniting all Puerto

22 Ricans behind this process.  It's the only way the process is

23 going to succeed.  If failure is not an option, this

24 possibility of success lies in trust, and that trust depends on

25 involving Puerto Rican institutions in the decision of Puerto

1    Rico's future.  And this is the best opportunity that probably

2    the Court will have to do that.

3              Thank you, your Honor.

4              THE COURT:  Thank you, Mr. Escalera.

5              Counsel, as always, I thank you for your vigorous and

6    insightful arguments and for engaging with my questions.  I

7    will take this matter under advisement.

8              I also want to take this opportunity to thank the

9    staff of the court in Puerto Rico and also of the Southern

10   District for supporting these proceedings and enabling us to be

11   able to effectively proceed in both jurisdictions.  These

12   matters are extraordinary for many reasons, one of them being

13   logistical, so I wanted to give credit in that regard where

14   credit is due.

15             I understand the importance of this issue as well as

16   the merits issues that were argued, and I will, as always, seek

17   to expedite determinations in a way that is consistent with

18   making appropriate determinations.  That continues to be my

19   undertaking.

20             I think we are next scheduled to see each other in San

21   Juan the first week of June, and when I issue decisions they're

22   posted on ECF and you all know about them right away.

23             I don't think there's anything further we need to take

24   up together, so we're adjourned.  Be well, everyone.

25             (Adjourned)

I59WproFcorrected051118

```
 1  UNITED STATES DISTRICT COURT)
                                ) ss.
 2  OF PUERTO RICO              )

 3

 4

 5                        REPORTERS' CERTIFICATE

 6

 7          I, Steven Griffing and Carol Ganley, do hereby certify

 8  that the above and foregoing, consisting of the preceding 58

 9  pages, constitutes a true and accurate transcript of our

10  stenographic notes and is a full, true and complete transcript

11  of the proceedings to the best of our ability.

12          Dated this 9th day of May, 2018.

13          S/Steven Griffing _____

14          Steven Griffing, RDR, CSR, CRR

15          Official Court Reporter

16          500 Pearl Street

17          New York, NY 10007

18          212-805-0300

19

20          S/Carol Ganley _____

21          Carol Ganley, RMR, CSR, CRR

22          Official Court Reporter

23          500 Pearl Street

24          New York, NY 10007

25          212-805-0300
```