**Hearing Date**: June 6, 2018 at 9:30 a.m. (AST)
**Objection Date**: May 22, 2018 at 4:00 p.m. (AST)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

--------------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | |
|  | : | |
| THE FINANCIAL OVERSIGHT AND | : | PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | : | Title III |
|  | : | |
| as representative of | : | Case No. 17-BK-3283 (LTS) |
|  | : | |
| THE COMMONWEALTH OF PUERTO RICO *et al.,* | : | (Jointly Administered) |
|  | : | |
| Debtors.[1] | : | |

--------------------------------------------------------------------- x

# RENEWED MOTION OF CREDITORS' COMMITTEE SEEKING ENTRY OF ORDER, UNDER BANKRUPTCY RULE 2004, AUTHORIZING DISCOVERY PROGRAM WITH RESPECT TO CERTAIN CAUSES OF PUERTO RICO FINANCIAL CRISIS <u>BEGINNING ON AUGUST 15, 2018</u>

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

To the Honorable United States Magistrate Judge Judith G. Dein:

The Official Committee of Unsecured Creditors of all title III debtors (other than

COFINA) (the "Committee") hereby submits this *Renewed Motion Seeking Entry of Order,*

*Under Bankruptcy Rule 2004, Authorizing Discovery With Respect to Certain Causes of Puerto*

*Rico Financial Crisis Beginning On August 15, 2018* (the "Renewed Motion") seeking to

commence, beginning no later than August 15, 2018, a discovery program seeking discovery of

certain financial institutions (as defined in the Motion referenced below, the "Puerto Rico

Financial Institutions") as contemplated in the *Motion of Official Committee of Unsecured*

*Creditors for Order, Under Bankruptcy Rule 2004, Authorizing Discovery Program With*

*Respect to Certain Causes of Puerto Rico Financial Crisis* [Docket No. 706] (the "Motion").[2]

## Introduction

1.      When the Committee filed the Motion on July 21, 2017, almost one year had

passed without the Oversight Board taking any steps to investigate or audit the validity of Puerto

Rico's public debt.  The Motion outlined a proposed discovery program targeting the most

significant "potential bad actors" that, based on publicly available information, were identified as

profiting from the financial transactions (and potential conflicts of interest) that led to Puerto

Rico's financial crisis.  The Committee's Motion and its subsequent briefing emphasized that

discovery from these institutions could, and should, commence immediately—beginning with the

set of tailored discovery requests proposed by the Committee.  The Motion also reinforced that

this discovery would be of primary importance to the overall administration of the title III cases,

informing whether causes of action should be brought or whether certain parties' claims should

be subordinated or disallowed.   Indeed, the discovery sought by the Committee was central to

---

[2]     Capitalized terms used but not otherwise defined in this Renewed Motion have the meanings set forth in the
Motion.

Congress's overall goal of promoting financial transparency—a lack of which Congress specifically identified as having contributed to Puerto Rico's debt crisis. *See* PROMESA section 405(m)(1) (finding that, among other things, a "lack of financial transparency" helped "create[] a fiscal emergency in Puerto Rico") (codified at 48 U.S.C. § 2194(m)(1)).

2.      Despite the Committee's broad grant of authority to conduct this discovery pursuant to section 1103(c) of the Bankruptcy Code[3] and the need to identify potential claims on an accelerated basis, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") objected to this proposed discovery in its entirety. Instead, the Oversight Board argued that, because it had been granted some limited authority to investigate retail bond selling practices under PROMESA and despite its inaction for almost a year since its appointment, the entire discovery process should be led by its newly-hired "investigator," John Couriel and the law firm of Kobre & Kim (the "Investigator").[4] In support of the Oversight Board's proposed framework, that Investigator represented in an October 30, 2017 "Interim Report" (the "October 30 Report") that his work had begun immediately after being hired by the Oversight Board on September 1, 2017 and that the review could be completed within 200 days of retention—meaning that the investigation **would conclude at the latest by March 20, 2018**.[5]

---

[3]     As the Committee noted in the briefing on the Motion, section 1103 of the Bankruptcy Code has been made applicable to these title III cases by section 301 of PROMESA.

[4]     The Oversight Board's investigation was commenced only **after** the Committee filed its Motion, despite the fact that the Oversight Board existed since at least August 2016. *See* WHITE HOUSE, OFFICE OF PRESS SECRETARY, *President Obama Announces the Appointment of Seven Individuals to the Financial Oversight and Management Board for Puerto Rico* (Aug. 31, 2016) (available at https://obamawhitehouse.archives.gov/the-press-office/2016/08/31/president-obama-announces-appointment-seven-individuals-financial).

[5]     *See* Ex. B,  Independent Investigator's First Interim Report (Oct. 30, 2017), ¶ 3 available at https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/59f751d7658d2.pdf  (the "October 30 Report") ("At this time, based upon discussions with the Special Investigative Committee and the General Counsel, the Independent Investigator believes that a realistic time frame for the preparation of a final investigation report is 200 days from the Independent Investigator's retention, subject to adjustment if after ongoing due diligence, or in light of document-recovery issues that have arisen in the aftermath of Hurricanes Irma and Maria, a different time period appears to be more reasonable.").

That report and those predictions were made almost six weeks **after** Hurricanes Irma and Maria (and thus the occurrence of the hurricanes cannot be used now as a reason for delay), and the October 30 Report even claimed that many of the relevant sources of material and counsel responsible for key discussions were located on the mainland United States.[6]

3.   Indeed, at the hearing on the Committee's Motion, counsel for the Oversight Board stated that the investigation would be completed, at the latest, by April 2018 and that the Committee could join the Retiree Committee in "rid[ing] along" with the investigation:

> From September 1, 200 days takes us into late March.  **Let's assume that it goes a little longer than that into April.  By April, the investigation, at least based on current projections, will be completed and a report will be produced.**  At this point in time, the retirees have the ability to ride along, if you will, with the investigation.

Ex. C, November 15, 2017 Transcript, (the "November 15 Transcript"), pp. 59: 22-60: 2.

4.   Informed by this proposed timeline and these representations, on November 17, 2017 the court denied the Committee's Motion without prejudice.  *See November 17, 2017 Order Denying Committee's Rule 2004 Motion Without Prejudice* [Docket No. 1827] (the "November 17 Order").   However, the court also stated that the Committee could renew its request for discovery if it confirmed that, among other things, the Investigator "has otherwise been unable to obtain [discovery from the Puerto Rico Financial Institutions] **within a reasonable time**." November 17 Order, at 2 (emphasis added).

5.   The Investigator's proposed March 20, 2018 deadline has now passed and the Committee is left in largely the same position, which is unacceptable in light of the scale of the

---

[6]   *See* Ex. B,  October 30 Report, ¶ 26 (the "Investigator has prioritized obtaining copies of materials from off-island sources while taking all measures available to preserve records likely to exist in Puerto Rico").  The October 30 Report reflected a revision to the Investigator's earlier, pre-Maria estimate that a report could be completed within "180 days of this submission," or by no later than March 11, 2018.  *See* Initial Work Plan of Kobre & Kim LLP, attached as Exhibit A to Oversight Board's September 12, 2017 Status Report on Bankruptcy Rule 2004 Motion [Docket No. 1289].

potential claims and causes of action the Committee seeks to evaluate.[7]  This problem is

evidenced most prominently by the "Second Interim Report" report filed on April 5, 2018 (the

"April 5 Report").[8]  The April 5 Report says little, except that the Investigator's original March

20, 2018 target would obviously not be met.  Instead, the Investigator now states only that it

continues to receive "rolling productions" and that a "realistic time frame for the preparation and

delivery of a final investigation report is **during the summer of 2018**."  *See* Ex. D, April 5

Report, ¶ 6 (emphasis added).

6.      Just as with the expected timing for the completion of the investigation, the April

5 Report offers few details on the information already gathered by the Investigator.  The April 5

Report states that the Investigator has commenced witness interviews and begun receiving

rolling productions from certain financial institutions.  Ex. D, April 5 Report, ¶¶ 18-19.

However, it does not provide initial findings or recommendations for the stakeholders in the title

III cases, and instead offers only a number of potential areas of inquiry that the Investigator may

choose to include in the report at the Investigator's discretion.  Ex. D, April 5 Report, ¶ 12

(stating that the final report will include "findings about how the following issues may have

contributed to the fiscal crisis").[9]  And, troublingly for the Committee's purposes, there is no

focus on identifying bad actors or potential causes of action.  The final report instead will at most

---

[7]    Setting aside the potential **affirmative** claims against these parties, the information sought in the Motion is
necessary for the purpose of evaluating the validity of the potential claims asserted by the Puerto Rico Financial
Institutions (or other entities which are affiliated or have acquired claims through the Puerto Rico Financial
Institutions) against the Commonwealth.  As the Committee has previously mentioned, both Santander and
Popular are listed in the Commonwealth's creditor list, indicating that those entities are presumed to have
claims until they are contested by the Commonwealth or the other parties in this case.  *See Notice of Filing of
Creditor List for the Commonwealth of Puerto Rico,* filed August 30, 2017 [Docket No. 1215].

[8]    *See* Ex. D, Independent Investigator's Second Interim Report (April 5, 2018), available at
https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/5ac62e3f939fc.pdf.

[9]    The April 5 Report contains an ambiguous statement concerning a goal of assisting "stakeholders [to] identify
potential claims or matters for regulatory and legislative attention." *See* Ex. D, ¶ 1.  Of course, the Investigator's
later statements—stating that the focus is **not** on a "finger-pointing" exercise—highlight that the report will
likely not incorporate an in-depth analysis of potential claims and bad actors.  *See infra,* n. 11.

offer policy fixes or suggestions regarding future practices.  That should not be surprising, given

the views of the Oversight Board's Chairman, José Carrión, who has referred to an investigation

of the island's public debt as a "**waste of time**."[10]  Indeed, in a public conference call on April 9,

2018, the Investigator stated that "we are not focused on a finger-pointing exercise":

> I think an overarching goal of ours through which I would propose the report be
> read, is that we really take seriously the goal of restoring Puerto Rico's access to
> the capital markets.  **That means we are not focused on a finger-pointing
> exercise and we have no claims of our own to articulate**.  We really have no
> interest other than finding facts and deducing from what we find ways that Puerto
> Rico might restores its access to the capital markets if it takes certain constructive
> measures.  And so our final report will include findings about those measures.[11]

7.     In the meantime, the Committee has been forced to sit patiently on the sidelines

for the last eight months with limited visibility into the Investigator's efforts, and could now be

forced to sit even longer while the Investigator continues its work.  The Committee has held

these concerns since the Investigator's appointment in September 2017, yet refrained from filing

this Renewed Motion until now out of respect for the court's order and in reliance on the

Investigator's commitment that its work would be completed by March 2018.  Now that the

---

[10]  NOTICEL, *Carrión sobre la auditoría: "es una pérdida de tiempo,"* June 24, 2017 (available at
http://www.noticel.com/noticia/204703/carrion-sobre-la-auditoria-es-una-perdida-de-tiempo-video.html)
(linking to video of interview with *Carrión*) ("Si alguien quiere auditar la deuda la puede hacer el sector privado
. . .  Yo pienso que es una pérdida de tiempo.").  A certified translation of this article is attached as Ex. E.
Although Carrión was removed from the Oversight Board's Special Investigative Committee at the Creditors'
Committee's request, the Investigator's previously-submitted reports indicate that the full Oversight Board will
remain involved in the Investigator's efforts.  *See* Ex. B, October 30 Report, ¶ 4 (setting forth that Mr. Couriel's
team will regularly update the Oversight Board's general counsel regarding continued progress); *id.* ¶ 9
(requiring the Oversight Board's general counsel to authorize any "informal investigation" as to any specific
parties); *id.* ¶ 11 (requiring that the Oversight Board's general counsel and its outside counsel must first
determine whether to request Oversight Board  approval of a "formal investigation" before any entity may be
subpoenaed.

[11]  *See* Website of Financial Oversight Management and Oversight Board, Recording of April 9, 2018 Conference
Call with John Couriel (available at https://juntasupervision.pr.gov/index.php/en/home/) (last visited April 26,
2018) (relevant portion beginning at 10:25).  This statement is entirely consistent with the "work plan"
formulated by the Oversight Board, which expressly removed any reference to the identification of potential
claims.  *See* Redline to Investigator's Work Plan, attached as Exhibit B to Creditors' Committee's Status Report
on 2004 Motion [Docket No. 1284-2] (Oversight Board's redline of draft work plan removing language
regarding the regarding the Investigator's responsibility to identify "whether there was any misconduct relating
to disclosure, selling practices, or use of proceeds in connection with the issuance of debt . . . including the
identification of any potential claims . . . as well as the targets of those claims").

deadline is in the rear view mirror, though, the picture is abundantly clear.  Whatever the

ultimate value of the Investigator's report and its forward-looking recommendations, the current

situation has prevented the Committee from fulfilling its important statutory role of identifying

causes of action or entities whose claims should be subordinated or disallowed.

8.      All the while, the same concerns that motivated the original Motion persist, and

recent news reports continue to identify additional potential misconduct by financial actors in the

lead-up to Puerto Rico's debt crisis.[12]   The seriousness of these reports is even undergirded by

the statements of Judge Juan Torruella of the First Circuit Court of Appeals, who has implied in

public appearances that potential financial misconduct associated with the issuance of Puerto

Rico's debt could merit a criminal grand jury investigation.[13]   These news stories and the indicia

of misconduct—as illustrated by Judge Torruella's comments—could have a material impact on

the perceived legitimacy of the administration and resolution of the title III cases, unless the

Puerto Rico Financial Institutions' potential liability is vigorously analyzed by a party like the

Committee with the aim of "growing the pie."  And, although the Investigator claims to promote

Puerto Rico's ability to regain access to the capital markets, that effort will not be taken seriously

---

[12]   *See* PUBLIC BROADCASTING SERVICE, FRONTLINE, *How Banks Responded to "Blackout in Puerto Rico"* (May 1, 2018) (available at https://www.pbs.org/wgbh/frontline/article/how-banks-responded-to-blackout-in-puerto-rico/); *see also* Laura Sullivan, NATIONAL PUBLIC RADIO, *How Puerto Rico's Debt Created A Perfect Storm Before The Storm* (May 2, 2018) (available at https://www.npr.org/2018/05/02/607032585/how-puerto-ricos-debt-created-a-perfect-storm-before-the-storm).

[13]   *See* Damaris Suárez, NOTICEL, *Judge Torruella Requests a Grand Jury Investigation Against Those Responsible for the Crisis* (Feb. 20, 2018) (available at http://www.noticel.com/english/judge-torruella-requests-a-grand-jury-investigation-against-those-responsible-for-the-crisis/704697153) ("'I am asking the federal grand jury to lead an investigation to determine whether there is a criminal case against the individuals and organizations, **inside and outside Puerto Rico**, in relation to the economic crisis the island is facing,' Torruella said during his participation in a panel during the celebration of the 120th anniversary of the birth of Luis Muñoz Marín.") (emphasis added).

by the market unless the full story is told in a timely manner.  Involvement by the Committee is

imperative to that goal, which remains an important purpose behind PROMESA.[14]

9.      Indeed, various parties have already started to question the legitimacy of title III

cases on just these grounds.  While the Committee has not yet taken a position with respect to the

claims asserted in *Lugo et al. v. United States* (Adv. Proc. 18-00041-LTS, filed on Apr. 24,

2018), the Committee notes that the complaint in that action—which was brought by unions,

associations, and creditors—alleges among other things that the title III cases are marred because

there has not been an assessment of the "legality of the public debt and the liabilities of third

parties for any and all illegal acts in the issuance and sale of that public debt."  *See* Dkt. No. 1 in

Adv. Proc. 18-00041, p. 72.  Accordingly, the plaintiffs in that case have asked the court to

terminate two members of the Oversight Board and to stay the title III cases until an audit of the

public debt takes place.  *See id.* p. 68 & 80 ("Fourth Cause of Action: The Termination of Two

of the Members of the Board Due to Conflicts of Interest and the Urgent Need for an Integral,

Legal and Forensic Audit of the Public Debt").  Concerns like these, expressed either in court or

in the market, will not go away unless the Committee is authorized to thoroughly investigate

these issues.  Unlike those other parties, though, the Committee **has** already been granted the

ability to investigate through section 1103(c) of the Bankruptcy Code, and the Committee is thus

the proper party to conduct any such analysis.

---

[14]   PROMESA section 101(a) ("The purpose of the Oversight Board is to provide a method for a covered territory
to achieve fiscal responsibility and access to the capital markets."); PROMESA section 201(b)(1) ("A Fiscal
Plan developed under this section shall, with respect to the territorial government or covered territorial
instrumentality, provide a method to achieve fiscal responsibility and access to the capital markets . . . ");
PROMESA section 209 ("An Oversight Board shall terminate upon certification by the Oversight Board that . .
. the applicable territorial government has adequate access to short-term and long-term credit markets at
reasonable interest rates to meet the borrowing needs of the territorial government. . . ."); PROMESA section
405(m)(6) ("Finally, the ability of the Government of Puerto Rico to obtain funds from capital markets in the
future will be severely diminished without congressional action to restore its financial accountability and
stability.").

10.     The Investigator's supposed mandate under PROMESA and its ongoing "investigation" can thus no longer be used as justification for blocking the discovery program sought by the Committee's Motion.   Instead, a simple solution exists.  Beginning on the earlier of (1) the release of the Investigator's final report, or (2) August 15, 2018, the court should grant the Motion and the Committee should be permitted to exercise its rights under section 1103 of the Bankruptcy Code and Bankruptcy Rule 2004 to commence its own discovery from the Puerto Rico Institutions.  That relief is more than appropriate here for the following reasons:

- The Committee's claims identification and evaluation process is crucial to the administration of these title III cases, and must be advanced as quickly as possible.  Yet, the Investigator's April 5 Report provides no explanation for the failure to meet the original March 2018 deadline that was offered to the court, and even acknowledges that **the revised summer 2018 estimate is merely a guess**.

- Nor is it the case that the Committee will necessarily receive complete information on the Investigator's discovery efforts, even after the finalization of any report.  Instead, the Investigator imposed upon the Committee a nondisclosure agreement which, by its very structure, creates the real possibility that the Committee will never see many of the relevant documents the Investigator collects or review transcripts or notes from witness interviews.  This "source material" is precisely the kind of information to which the Committee is entitled under section 1103 of the Bankruptcy Code and Bankruptcy Rule 2004—material which the Committee will not obtain absent court intervention allowing the Committee to approach those parties directly.

- The April 5 Report and the Investigator's previous statements indicate that any final report will be unlikely to meaningfully aid the Committee's efforts, because the goals of the Committee and the Investigator contrast sharply.  While the Investigator promises not to "finger-point" and will instead offer suggestions on improved practices in the future, the Committee's main goal in this narrow dispute is to maximize the estate by pursuing affirmative causes of action against third parties or defend against claims brought by those parties.

- The proposed August 15, 2018 start date, which is almost a year from the Investigator's retention and two years after the Oversight Board's appointment, offers the Investigator more than enough time to publish a report or share relevant materials with the Committee.  As such, there is no risk that the Committee's Discovery Program would duplicate the work performed by the Investigator.

## I.   INVESTIGATOR'S TIMING ESTIMATES ARE MERELY GUESSWORK

11.     As the Committee argued in its Motion, discovery from the Puerto Rico Financial

Institutions is crucial to the administration of the title III cases, potentially shedding light on

significant causes of action or giving rise to the subordination or disallowance of hundreds of

millions or potentially billions of dollars in claims.  Yet this process of identifying bad actors and

claims against them has been stalled indefinitely while the Investigator continues to generate its

report with the aim of finishing by "summer of 2018."  *See* Ex. D, April 5 Report, ¶ 6.

12.     There is no guarantee for the stakeholders in the title III cases that the

Investigator's new deadline to issue his final report by summer of 2018 will be met.  Indeed, the

April 5 Report offers little explanation for the failure to meet the **original** March 20, 2018

deadline, stating only that "[g]iven the scope of the investigation, the ongoing effects of

Hurricanes Irma and Maria, the volume of data collected, and the number of potential witnesses,

it is taking significant time to assemble, review, and analyze the documents and related

information." Ex. D, April 5 Report, ¶ 26.  The April 5 Report says nothing about the **specific**

justification for this missed target.[15]

13.     Moreover, the Investigator acknowledges that the "summer of 2018" target is just

a guess.  The April 5 Report states that this estimate is "based upon the response rate of

witnesses' document productions and availability for interviews," and could therefore be

"subject to adjustment in light of evidence-recovery and review issues that have arisen in the

aftermath of Hurricanes Irma and Maria, as well as issues related to litigation, invocation of

---

[15]   In fact, while the April 5 Report mentions the challenges imposed by Hurricanes Maria and Irma, the March
2018 deadline was proposed nearly six weeks **after** the hurricanes, and the Investigator has previously indicated
that much of the material and the counsel for many of the Puerto Rico Financial Institutions were located on the
mainland United States.  Ex. B, October 30 Report, ¶ 26 (the "Investigator has prioritized obtaining copies of
materials from off-island sources while taking all measures available to preserve records likely to exist in Puerto
Rico").

attorney-client privilege and other confidentiality protections, and various witnesses' objections

to production." Ex. D, April 5 Report, ¶ 6. These are not new or recent concerns. Thus, the

same reasons that apparently led the Investigator to miss the March deadline will exist between

now and the end of the summer of 2018, thereby leading to yet another extension. And, while

the Investigator has not provided specifics, the April 5 Report states that certain unidentified

government entities are refusing to "provide consents [to providing information] or [have] taken

positions contrary to the directives of PROMESA." Ex. D, April 5 Report, ¶ 17. In other words,

there exists the possibility that extensive negotiations with these government entities or any

number of other issues could delay the process even further.

14.      Importantly, the question of delay should not be examined solely by looking at the

Investigator's progress since September 2017. Rather, the Oversight Board was ten steps behind

at the start of the race, having waited until **after** the Committee filed its Motion to begin any

serious work on these issues. As the Committee noted in its briefing on the Motion, the

Oversight Board had the authority to commence an investigation at the time it was created in

August 2016, and did not need to wait until May 2017 when the title III cases were

commenced—much less until August 2017 when the Oversight Board was prodded by the

Committee. August 2018 will mark two years since the Oversight Board's appointment, which

is more than enough time for the Oversight Board to have examined these issues.

15.      In sum, the events of the past two years leave the Committee in an untenable

position—left waiting for the Investigator's "report," with no indication of whether it will

ultimately provide any information useful to the Committee's investigation of wrongdoing by, or

claims against, the Puerto Rico Financial Institutions. The Oversight Board and its Investigator

have had an ample opportunity to discharge their responsibilities, and no further delay past

August 2018 is warranted.  The Committee should not continue to remain sidelined waiting for

the Investigator's eventual report.

**II.** **COMMITTEE MAY NEVER RECEIVE MEANINGFUL DISCOVERY
INFORMATION FROM INVESTIGATOR**

16.     Just as problematic as the Investigator's indefinite timeline is the possibility that

the Committee may never obtain the meaningful discovery information sought by the

Committee's Motion.  ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

█████████████████

17.     Of course, the most probative evidence concerning whether duties were breached

or whether affirmative claims exist is not likely to be found in a prospectus.  Rather, this

information will be identified through a review of internal emails, memoranda, and other

documents created by the Puerto Rico Financial Institutions at the time of the relevant financial

activities and bond issuances.  As is customary, that review will involve analysis of the emails

and documents held by key individuals who played a role in various transactions.  It is unclear

that the Investigator has been, or will be, pressing the Puerto Rico Financial Institutions to

collect all of those pertinent materials.  █████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

11

██████████████████████████████████████████████████

████████ [16]

18.     Even if the Investigator ultimately obtains meaningful documents and emails, the structure of the Nondisclosure Agreement still means that the Committee may never view this source material at all.  With regard to documents, the agreement provides that, aside from the materials received from the Santander and Popular entities, the Investigator could withhold information voluntarily provided from other third parties where (i) the Investigator determines in its discretion that withholding this information would be helpful to its investigatory efforts; or (ii) it is unable to secure the third party's consent to share such materials with the Committee. *See* Ex. F, *Nondisclosure Agreement Between UCC and Investigator, dated March 5, 2018* (the "Nondisclosure Agreement"), ¶ 4 (stating that the Investigator could withhold information where it believes that "doing so would interfere with the Special Investigative Committee's ability to conduct an objective, independent, and thorough investigation"); *id.* ¶¶ 3(a) & 4 (providing that the Committee's access to documents would be predicated on the willingness of third parties to share such materials with the Committee).  ████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

19.     Most strikingly, despite months of requests, the Investigator has been unable to secure AAFAF's consent to a nondisclosure agreement that would permit the Committee to review documents produced by government entities like the GDB.  Of course, discovery from the

---

[16] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

GDB—the government entity directly responsible for Puerto Rico's borrowing binge and which sat on the other side of the revolving door from institutions like Santander and Popular—was one of the central requests of the Committee's Motion.  **As a result, the Committee has yet to see one document from the GDB with respect to the discovery subjects sought by the Motion.**

20.     This is particularly concerning given that the GDB continues to be identified as one of the most critical drivers behind the unsustainable piling-on of Puerto Rico debt.  As recently as May 9, 2018, a United States Government Accountability Office ("GAO") report commissioned by Congress found that "the [GDB] facilitating rising debt levels enabled Puerto Rico to continue to use debt to finance operations."[17]  That GAO report also found that the GDB's use of intragovernmental loans to other governmental entities—which "[i]n general, [] did not fulfill the terms of their borrowing agreements with GDB"—was not transparently documented in its audited financial statements and that the loan losses were "a main reason for the creation of [COFINA]."[18]  The importance of this discovery is further highlighted by the GDB's ongoing attempts at restructuring under title VI of PROMESA.  The latest amendment to the GDB's proposed Restructuring and Support Agreement ("RSA") **even provides for broad releases of all claims against the GDB's directors and officers**—something that cannot reasonably be valued or understood during negotiations without discovery pertaining to the GDB's past activities.[19]

---

[17]   GOVERNMENT ACCOUNTABILITY OFFICE, *Puerto Rico – Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them* (May 9, 2018), available at https://www.gao.gov/assets/700/691675.pdf, pp. 33-34.  While the GAO report offers a number of observations and prospective recommendations, it was not intended to (and does not) identify claims or causes of action and, like the Investigator's similar undertaking, cannot supplant the Committee's important statutory responsibilities under section 1103 of the Bankruptcy Code.

[18]   *Id.* pp. 35-37.

[19]   The latest iteration of the GDB's RSA was released on March 27, 2018 via a filing with the Municipal Securities Rulemaking Board.  *See* PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY, *Fourth Amendment to Restructuring Support Agreement*, (filed March 27, 2018; effective April 6, 2018), at 21,

21.     This troubling reality conflicts directly with the assurances provided by the

Oversight Board's counsel at the November 15 hearing:

> **And the ability to ride shotgun, if you will, should obviate any of Mr. Despins' concerns.**  And to the extent that those concerns remain after an NDA and after some effort at a dialogue with the independent investigator, then I expect that the UCC, if they're not satisfied, will come back here . . . . What I would suggest [about the NDA] is, based on the terms that are set forth, there are conditions under which counsel can see the documents, **but my understanding is they will have a significant ability to review documents**.

Ex. C, November 15 Transcript, p. 62, lines 4-9 and 21-24 (emphasis added).

22.     Likewise, with regard to interviews, the discretionary structure of the

Nondisclosure Agreement means that detailed summaries or downloads may never be provided

to the Committee.[20]  Of course, the entire purpose of Bankruptcy Rule 2004—and the aim of the

Committee's Motion—is to test through live and sworn testimony whether certain individual

actors participated in wrongdoing or damaged the estate, such that claims could be brought

against those actors or other parties.  Whatever the merits of the Investigator's final report, it will

not provide the same value as the live and sworn testimony and discussions to which the

Committee is entitled pursuant to Bankruptcy Rule 2004 and section 1103(c) of the Bankruptcy

Code.

---

available at https://emma.msrb.org/ES1125696-ES880621-ES1281908.pdf  (in the "Releases" section, providing for "**releases from GDB, AAFAF, and the Holders** (solely in their capacity as creditors of GDB and not in their capacity as creditors of any other entity) for the benefit of each other **and each of their respective current directors, managers, officers**, affiliates, partners, subsidiaries, principals, employees, agents, managed funds, representatives, attorneys, and advisors, together with their successors and assigns").

[20]  ███████████████████████████████████████████████████████████

### III.   COMMITTEE'S MANDATE DIFFERS FROM INVESTIGATOR'S, AND IS FOCUSED ON RECOVERIES FOR CREDITOR CONSTITUENCY AND SUBORDINATION OR DISALLOWANCE OF CLAIMS

23.     This delay is all the worse, because it appears highly likely that the final work product prepared by the Investigator will not significantly aid the Committee in its efforts to identify claims or bad actors.  Those efforts are essential for the purpose of generating claims that may benefit the Commonwealth's creditor constituency or serve to subordinate claims brought by potentially culpable parties such as the Puerto Rico Financial Institutions.  In fact, the task of determining whether claims are viable or not is one of the more prominent responsibilities assigned to examiners, and examiner's reports are routinely focused on the likelihood of success of potential claims against individuals or entities—even using percentages of the likelihood of success or specific dollar amounts for potential damages.[21]  *See, e.g.*, Ex. G, *In re Caesars Entm't Operating Co.*, Final Report of Examiner Richard J. Davis (Volume I – Introduction and Executive Summary), No. 15-01145 (Bankr. N.D. Ill. March 15, 2016) ECF No. 3401 (highlighting that "claims of varying strength arise out of these transactions for constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary dut[ies]" and assessing that the "**potential damages from those claims considered reasonable or strong range from \$3.6 billion to \$5.1 billion**"); *see also* Ex. H, *In re Lehman Bros. Holdings Inc*., Report of Anton Valukas (Volume I), No. 08-13555 (Bankr. S.D.N.Y. March 11, 2010) ECF No. 7531, at 24-26 (stating, for example, that

---

[21]   The Committee recognizes that 11 U.S.C. § 1106 was not incorporated into PROMESA, and in fact noted in its briefing on the original Motion that this would be a reason that the Investigator's report would ultimately be an imperfect substitute for the Committee's role.  *See* Docket No. 1080, Committee's Reply in Support of 2004 Motion, ¶ 10 n. 12 (highlighting that 11 U.S.C. §1106 was not incorporated into PROMESA, unlike section 1103 of the Bankruptcy Code which grants the Committee authority to investigate).  The Committee's prediction turned out to be right.  The Investigator's scholarly focus—which contrasts starkly with the pragmatic reports issued by examiners in Chapter 11 cases—highlights why the Committee's role remains crucial here and why the Committee's Discovery Program should be authorized.

"[t]he Examiner has identified colorable claims that there were a limited number of preferential transfers").

24.    In stark contrast to these examples, the April 5 Report reinforces that the Investigator's sole intent is to provide a scholarly "Reader's Digest"-style report on certain "policies" and "historical practices" without developing conclusions on the question of whether duties were breached or claims exist against any of the Puerto Rico Financial Institutions and identifying specific targets.  The April 5 Report indicates only that it will include "findings about how the following issues may have contributed to the fiscal crisis," before going on to list a range of generic topics including, as examples, "GDB's independence or lack thereof from the administration," "[p]olitical unwillingness to address and resolve operational deficits," "[p]ossible conflicts of interest," and "[h]istorical practices regarding the calculation of the constitutional debt limit"  *See* Ex. D, April 5 Report, ¶ 12.

25.    **This prescriptive, high-level focus was by design.**  As the Investigator has acknowledged on multiple occasions, his aim is not to advance any particular claims or causes of action.  *See, e.g.,* Ex. B, October 30 Report, ¶ 4 ("The Independent Investigator understands its mandate to include maintaining the thematic focus of the investigation on the issues identified by the Special Investigative Committee and statute, and maintaining the independence of the investigation from biases that may arise from participating as a litigant in this or any other litigation involving the matters under investigation.").  **For example, the Investigator's original "Work Plan" was specifically edited to remove a mandate to identify claims, leaving the focus on policy fixes or suggestions for the Commonwealth's future issuances in the capital markets.**  *See* Redline to Investigator's Work Plan, attached as Exhibit B to Creditors' Committee's Status Report on 2004 Motion [Docket No. 1284-2] (Oversight Board's redline of

draft work plan removing language regarding the regarding the Investigator's responsibility to identify "whether there was any misconduct relating to disclosure, selling practices, or use of proceeds in connection with the issuance of debt . . . including the identification of any potential claims . . . as well as the targets of those claims").

26.     It is certainly a possibility that some of this information could be useful for the Committee to begin its investigation and evaluation of potential claims.  However, the Committee should not be forced to wait indefinitely—with extension after extension—based only on this mere hope.

## IV.   <u>AUGUST 15, 2018 START DATE IS APPROPRIATE</u>

27.     The Committee's proposal to commence discovery beginning no later than August 15, 2018 (or immediately after the publication of the Investigator's report, if it is released earlier) is entirely consistent with what was contemplated at the time the court ruled on the Motion.  At that time, even counsel for the Oversight Board acknowledged that the Committee could, and should, be permitted to commence its own discovery program if it determined that the materials identified by the Investigator were insufficient or incomplete:

> At the end, in March, if the UCC is not satisfied—as we all said in August before your Honor in Boston, if the UCC is not satisfied with the scope, depth, intensity, or what have you, with respect to that investigation, **they can come back here and renew their 2004 motion**.

Ex. C, November 15 Transcript, at p. 60, lines 10-14.

28.     More than two months have passed since the promised March deadline, and nearly two years have gone by since the Oversight Board's appointment in August 2016.  The crucial task of identifying bad actors has been delayed long enough, and an August 15, 2018 start date for the Committee's Discovery Program is more than appropriate.  Indeed, a delay of even a few additional months could significantly hinder the Committee's claims identification work—

17

as, for example, certain avoidance actions could expire in May 2019, two years after the commencement of the title III cases.  *See* 11 U.S.C. § 546(a)(1)(A) (certain actions must be commenced within "2 years after the entry of the order for relief").

29.     Of course, the Committee remains committed to avoiding duplication of effort and will happily utilize any information or materials already obtained by the Investigator.[22] Additionally, as indicated in the briefing surrounding the Motion, the Committee also remains willing to share any information that it receives with the Oversight Board's Investigator.  In fact, the August 15, 2018 start date provides ample incentive for such information-sharing to take place, and the targets of the Committee's discovery program can, of course, simply share with the Committee any materials they previously produced to the Investigator.  However, at this stage and in light of the need to jump-start the claims evaluation process, it is unacceptable for the Committee to take a back seat with regard to the discovery taken from the Puerto Rico Financial Institutions, and the Committee should be entitled to commence independent discovery as to those entities beginning on August 15, 2018.

## V.     CONCLUSION AND REQUEST FOR BANKRUPTCY RULE 2004 AUTHORIZATION

30.     Given the risk of continuing to delay the claims evaluation process, the Creditors' Committee respectfully requests that the court grant the Creditors' Committee's original Motion and enter a ruling directing that the Creditors' Committee may commence the discovery program as to the Puerto Rico Financial Institutions beginning on August 15, 2018.

---

[22]   The Committee remains willing to meet-and-confer regarding the scope of any discovery requests issued to the Puerto Rico Financial Institutions. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ To that end, the proposed order attached as Ex. A provides that meet-and-confer discussions would commence on August 15, 2018 and that the parties would report back to the court at the Omnibus Hearing scheduled for September 12, 2018 to resolve any issues that arise.

## <u>CERTIFICATION OF CONFERRAL</u>

Pursuant to Local Rule 2004-1 of the Local Rules for the United States Bankruptcy Court for the District of Puerto Rico and the Fourth Amended Case Management Procedures, the undersigned counsel hereby certifies that prior to filing this motion, Paul Hastings LLP conferred with counsel for AAFAF and GDB, who indicated that they were opposed to the relief sought in the Renewed Motion.  Paul Hastings LLP further made several attempts to contact counsel for the Oversight Board and, while those attempts were unsuccessful, understands that the Oversight Board is opposed to the relief sought in the Renewed Motion.

Dated:  May 15, 2018

*/s/ Luc A. Despins, Esq.*

PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
James B. Worthington, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone:  (212) 318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors*

- and –

*/s/ Juan J. Casillas Ayala, Esq.*

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors*