# **Exhibit H**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
                                    :
In re                                 :     Chapter 11 Case No.
                                    :
LEHMAN BROTHERS HOLDINGS INC.,     :     08-13555 (JMP)
*et al.*,                                 :
                                    :     (Jointly Administered)
                        Debtors.        :
---------------------------------------------------------- x

# REPORT OF
# ANTON R. VALUKAS, EXAMINER

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
312-222-9350

919 Third Avenue
37th Floor
New York, NY  10022-3908
212-891-1600

March 11, 2010                              *Counsel to the Examiner*

# VOLUME 1 OF 9

**Sections I & II:  Introduction, Executive Summary & Procedural Background**

**Section III.A.1:  Risk**

# EXAMINER'S REPORT

# TABLE OF CONTENTS

**VOLUME 1**

**Introduction, Sections I & II:  Executive Summary & Procedural Background**

Introduction .................................................................................................................2

I. Executive Summary of The Examiner's Conclusions ....................................................15

  A. Why Did Lehman Fail?  Are There Colorable Causes of Action That Arise From Its Financial Condition and Failure?................................................................15

  B. Are There Administrative Claims or Colorable Claims For Preferences or Voidable Transfers? ...............................................................................................24

  C. Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets to Barclays, or From the Lehman ALI Transaction?......................................................26

II. Procedural Background and Nature of the Examination...............................................28

  A. The Examiner's Authority ....................................................................................28

  B. Document Collection and Review .........................................................................30

  C. Systems Access....................................................................................................33

  D. Witness Interview Process....................................................................................35

  E. Cooperation and Coordination With the Government and Parties .......................37

**Section III.A.1:  Risk**

III. Examiner's Conclusions..............................................................................................43

  A. Why Did Lehman Fail?  Are There Colorable Causes of Action That Arise From Its Financial Condition and Failure?................................................................43

    1. Business and Risk Management .......................................................................43

      a) Executive Summary .................................................................................43

        (1) The Examiner Does Not Find Colorable Claims That Lehman's Senior Officers Breached Their Fiduciary Duty of Care by Failing to Observe Lehman's Risk Management Policies and Procedures.................................................................................................47

(2) The Examiner Does Not Find Colorable Claims That Lehman's Senior Officers Breached Their Fiduciary Duty to Inform the Board of Directors Concerning The Level of Risk Lehman Had Assumed ..................................................................................................52

(3) The Examiner Does Not Find Colorable Claims That Lehman's Directors Breached Their Fiduciary Duty by Failing to Monitor Lehman's Risk-Taking Activities ...............................................................54

b) Facts ...............................................................................................................58

(1) From Moving to Storage:  Lehman Expands Its Principal Investments ...............................................................................................58

(a) Lehman's Changed Business Strategy ...............................................59

(b) The Increased Risk From Lehman's Changed Business Strategy ..............................................................................................62

(c) Application of Risk Controls to Changed Business Strategy ...........65

(i) Stress Testing Exclusions .................................................66

(ii) Risk Appetite Limit Increase For Fiscal 2007 ..............70

(iii) Decision Not To Enforce Single Transaction Limit.....................73

(d) The Board's Approval of Lehman's Growth Strategy ......................76

(2) Lehman Doubles Down: Lehman Continues Its Growth Strategy Despite the Onset of the Subprime Crisis .................................................78

(a) Lehman's Residential Mortgage Business ..........................................82

(i) Lehman Decides to Curtail Subprime Originations but Continues to Pursue "Alt-A" Originations ................................82

(ii) The March 20, 2007 Board Meeting ...............................90

(b) The Explosion in Lehman's Leveraged Loan Business .....................95

(i) Relaxation of Risk Controls to Accommodate Growth of Lehman's Leveraged Loans Business ...........................................97

(c) Internal Opposition to Growth of Leveraged Loans Business .......100

(d) Growth of Lehman's Commercial Real Estate Business at the Start of the Subprime Crisis .................................................................103

(i) Relaxation of Risk Controls to Accommodate Growth of Lehman's Commercial Real Estate Business.............................105

(ii) Internal Opposition to Growth of Commercial Real Estate Business ...............................................................107

(iii) Archstone ..........................................................................108

        a.   Lehman's Commitment............................................................108

        b.   Risk Management of Lehman's Archstone
            Commitment ........................................................................112

   (e) Nagioff's Replacement of Gelband as Head of FID ........................114

   (f) The Board of Directors' Awareness of Lehman's Increasing
      Risk Profile ....................................................................................116

(3) Early Warnings: Risk Limit Overages, Funding Concerns, and
    the Deepening Subprime Crisis ...................................................117

   (a) Nagioff and Kirk Try to Limit Lehman's High Yield Business ......119

   (b) July-August 2007 Concerns Regarding Lehman's Ability to
      Fund Its Commitments .................................................................123

   (c) Lehman Delays the Archstone Closing ............................................128

   (d) Lehman Increases the Risk Appetite Limit to Accommodate
      the Additional Risk Attributable to the Archstone
      Transaction....................................................................................131

   (e) Cash Capital Concerns ...................................................................134

   (f) Lehman's Termination of Its Residential Mortgage
      Originations ..................................................................................138

   (g) September, October, and November 2007 Meetings of Board
      of Directors...................................................................................139

      (i)   Risk Appetite Disclosures................................................139

      (ii)  Leveraged Loan Disclosures ..........................................144

      (iii) Leverage Ratios and Balance Sheet Disclosures........................147

      (iv) Liquidity and Capital Disclosures................................................148

(4) Late Reactions:  Lehman Slowly Exits Its Illiquid Real Estate
    Investments.................................................................................150

   (a) Fiscal 2008 Risk Appetite Limit Increase ...........................................152

   (b) January 2008 Meeting of Board of Directors .....................................154

   (c) Executive Turnover.............................................................................156

   (d) Commercial Real Estate Sell-Off:  Too Little, Too Late .................157

   (e) Lehman's Compensation Practices.....................................................161

c) Analysis ................................................................................................163

(1) The Examiner Does Not Find Colorable Claims That Lehman's
Senior Officers Breached Their Fiduciary Duty of Care by
Failing to Observe Lehman's Risk Management Policies and
Procedures.............................................................................................164

(a) Legal Standard..............................................................................164

(b) Background ...................................................................................166

(i) Countercyclical Growth Strategy with Respect to
Residential Mortgage Origination................................................171

(ii) Lehman's Concentration of Risk in Its Commercial Real
Estate Business ............................................................................172

(iii) Concentrated Investments in Leveraged Loans.......................175

(iv) Firm-Wide Risk Appetite Excesses..........................................179

(v) Firm-Wide Balance Sheet Limits .................................................181

(vi) Stress Testing ................................................................................181

(vii) Summary:  Officers' Duty of Care...............................................182

(2) The Examiner Does Not Find Colorable Claims That Lehman's
Senior Officers Breached Their Fiduciary Duty to Inform the
Board of Directors Concerning the Level of Risk Lehman Had
Assumed................................................................................................183

(3) The Examiner Does Not Find Colorable Claims That Lehman's
Directors Breached Their Fiduciary Duty by Failing to Monitor
Lehman's Risk-Taking Activities.........................................................188

(a) Lehman's Directors are Protected From Duty of Care
Liability by the Exculpatory Clause and the Business
Judgment Rule................................................................................188

(b) Lehman's Directors Did Not Violate Their Duty of Loyalty ..........190

(c) Lehman's Directors Did Not Violate Their Duty to Monitor ........191

(i) Application of *Caremark* to Risk Oversight: *In re Citigroup
Inc.* ................................................................................................191

(ii) Application of *Caremark* and *Citigroup* to Lehman's
Directors .......................................................................................193

**VOLUME 2**

**Section III.A.2:  Valuation**

2. Valuation ...................................................................................................203

    a) Executive Summary ..............................................................................203

        (1) Scope of Examination ..................................................................210

        (2) Summary of Applicable Legal Standards...................................212

        (3) Summary of Findings and Conclusions....................................214

    b) Overview of Valuation of Lehman's Commercial Real Estate
Portfolio ................................................................................................215

        (1) Overview of Lehman's CRE Portfolio......................................217

            (a) Summary of Portfolio ....................................................217

            (b) Overview of Valuation of CRE Portfolio ..........................220

                (i)   GREG Leaders .................................................220

                (ii)  Participants in the Valuation Process .........................220

            (c) Changes in the CRE Portfolio from 2006 through 2008..................223

            (d) "Perfect Storm" Impact on CRE Valuation in 2008.........................227

        (2) Outside Review of Lehman's CRE Valuation Process.........................232

            (a) SEC ................................................................................233

            (b) Ernst & Young ...............................................................237

    c) Senior Management's Involvement in Valuation.........................................241

        (1) Senior Management's General Role With Respect to CRE
Valuation .........................................................................................243

        (2) Senior Management's Involvement in Valuation in the Second
Quarter of 2008 ..............................................................................245

        (3) Senior Management's Involvement in Valuation in the Third
Quarter of 2008 ..............................................................................247

            (a) Senior Management's Account ........................................248

            (b) Paul Hughson's Account ................................................253

            (c) Other Accounts...............................................................254

        (4) Examiner's Findings and Conclusions With Respect to Senior
Management's Involvement in CRE Valuation ...................................265

    d) Examiner's Analysis of the Valuation of Lehman's Commercial
Book .....................................................................................................266

        (1) Executive Summary.......................................................................266

(2) Lehman's Valuation Process for its Commercial Book ........................270

(3) Examiner's Findings and Conclusions as to the Reasonableness
of Lehman's Valuation of Its Commercial Book....................................274

(a) As of the Second Quarter of 2008 ......................................................274

(b) As of the Third Quarter of 2008 ........................................................282

e) Examiner's Analysis of the Valuation of Lehman's Principal
Transactions Group ...........................................................................285

(1) Executive Summary................................................................................285

(2) Overview of Lehman's PTG Portfolio....................................................292

(3) Evolution of Lehman's PTG Portfolio From 2005 Through 2008.........296

(4) Lehman's Valuation Process for Its PTG Portfolio...............................303

(a) The Role of TriMont in the Valuation Process for Lehman's
PTG Portfolio ....................................................................................306

(i) Lehman's Issues with TriMont's Data .........................................311

(ii) Lehman Changed Its Valuation Methodology for Its PTG
Portfolio in Late 2007....................................................................312

(b) The Role of Lehman's PTG Business Desk in the Valuation
Process for Lehman's PTG Portfolio .................................................319

(c) The Role of Lehman's Product Control Group in Price
Testing the Valuation of Lehman's PTG Portfolio ..........................321

(d) The Influence of Lehman's PTG Business Desk upon the
Price Testing Function of Lehman's Product Control Group.........326

(5) The Examiner's Findings and Conclusions as to the
Reasonableness of Lehman's Valuation of PTG Portfolio....................329

(a) Lehman Did Not Mark PTG Assets to Market-Based Yield ..........331

(b) The Effect of Not Marking to Market-Based Yield.........................337

(i) Effect of Cap * 105 Not Marking to Market-Based Yield .........337

(ii) Effect of IRR Models Not Marking to Market-Based
Yield ..............................................................................................342

(iii) Effect of Product Control Price Testing Not Marking to
Market-Based Yield ......................................................................349

(iv) Effect of Modifying TriMont's Data in the Third Quarter
of 2008..........................................................................................351

(c) Examiner's Findings and Conclusions as to the Effect of Not
Marking Lehman's PTG Portfolio to Market-Based Yield.............353

f) Examiner's Analysis of the Valuation of Lehman's Archstone
Positions ...................................................................................356

(1) Executive Summary ...............................................................356

(2) Lehman's Acquisition of Archstone ......................................364

    (a) Background on Archstone ..................................................364

    (b) Acquisition of Archstone .................................................365

        (i)   Analyst Reaction .....................................................367

        (ii)  Lehman's Syndication Efforts ................................370

        (iii) Bridge and Permanent Equity at Closing ...............374

        (iv) Capital Structure at Closing ...................................375

        (v)  Price Flex ................................................................377

        (vi) Standard & Poor's Credit Rating ...........................380

(3) Lehman's Valuation of Archstone .........................................382

    (a) Valuation Between Commitment and Closing ...................386

    (b) Valuation as of the Closing Date .......................................388

    (c) Valuation as of the Fourth Quarter of 2007 ......................390

    (d) Valuation Issues During the First Quarter of 2008............391

        (i)   Barron's Article ......................................................391

            a.   Archstone's Response to the Barron's Article.....392

            b.   Lehman's Response to the Barron's Article ........394

        (ii)  January 2008 Archstone Update ..............................396

        (iii) Valuation as of February 29, 2008...........................399

        (iv) First Quarter 2008 Earnings Call and Lenders'
            Discussion Regarding Modifying the Archstone Strategy ......401

    (e) Valuation Issues During the Second Quarter of 2008....................402

        (i)   March 2008 Archstone Update ..................................402

        (ii)  March 2008 Valuation ..............................................404

        (iii) April 2008 Downgrade by S&P................................407

        (iv) Einhorn Speech in April 2008.................................407

        (v)  May 2008 Valuation ................................................408

        (vi) Second Quarter 2008 Earnings Conference Call.....................411

            a.   Preparation and Lehman's Methods of Analyzing
                Reasonableness of Valuations Prior to the Call ...................411

b.   Discussion During the Second Quarter 2008 Earnings Call ........................................................................412

(vii) Lehman's Revised Plan to Sell Archstone Positions...............414

(f) Valuation Issues During the Third Quarter of 2008........................416

(i)   Discussion Among Lenders in July 2008....................417

(ii) August 2008 Valuation..................................................417

(g) Product Control's Review of Archstone Valuations....................418

(4) Examiner's Analysis of Lehman's Valuation Process for its Archstone Positions ........................................................................419

(a) Discounted Cash Flow Valuation Method .......................................421

(i)   Rent Growth ...............................................................422

a.   Net Operating Income.........................................426

b.   Sensitivity Analysis............................................429

(ii) Exit Capitalization Rate................................................431

(iii) Exit Platform Value .....................................................433

(iv) Discount Rate...............................................................436

(b) Sum of the Parts Method ..............................................................438

(c) Comparable Company Method .......................................................440

(i)   Potential Overvaluation Based on Primary Comparable Companies ..........................................................445

(5) Examiner's Analysis of the Reasonableness of Lehman's Valuation of its Archstone Positions on a Quarterly Basis .................446

(a) Reasonableness as of the Fourth Quarter of 2007............................446

(b) Reasonableness as of the First Quarter of 2008................................449

(i)   Barron's Article .........................................................450

(ii) Discussions Among Archstone, Tishman and Lenders ..........458

(iii) Lehman's Valuation During the First Quarter of 2008............459

(iv) Sum of the Parts .........................................................460

(v) DCF Method ................................................................464

(vi) Examiner's Findings and Conclusions as to the Reasonableness of Lehman's Archstone Valuation as of the End of the First Quarter of 2008 ..............................................466

(c) Reasonableness as of the Second Quarter of 2008............................468

(i) Second Quarter Earnings Call ......................................469

(ii) Sum of the Parts ........................................................................476

(iii) DCF Model ...............................................................................477

(iv) Rent Growth .............................................................................478

(v) Exit Capitalization Rate...........................................................479

(vi) Quantification of Changes in Assumptions ..............................480

(vii) Examiner's Findings and Conclusions as to the
    Reasonableness of Lehman's Archstone Valuation as of
    the End of the Second Quarter of 2008 ....................................481

(d) Reasonableness as of the Third Quarter of 2008.............................484

(i) Sum of the Parts.........................................................................487

(ii) DCF Model................................................................................488

(iii) Rent Growth .............................................................................489

(iv) Exit Capitalization Rate............................................................490

(v) Quantification of Changes in Assumptions ...............................491

(vi) Examiner's Findings and Conclusions as to the
    Reasonableness of Lehman's Archstone Valuation as of
    the End of the Third Quarter of 2008 ......................................492

g) Examiner's Analysis of the Valuation of Lehman's Residential
Whole Loans Portfolio..............................................................................494

(1) Residential Whole Loans Overview ................................................494

(2) Lehman's U.S. Residential Whole Loans in 2008 ..........................497

(3) Lehman's Valuation Process for its Residential Whole Loans.............501

(a) Lehman's May 2008 Price Testing .......................................504

(b) Lehman's August 2008 Price Testing ...................................515

(4) Examiner's Independent Valuation of Lehman's Residential
Whole Loans Portfolio.......................................................................520

(5) Examiner's Findings and Conclusions With Respect to the
Reasonableness of Lehman's Valuation of Its Residential Whole
Loans Portfolio ................................................................................525

(h) Examiner's Analysis of the Valuation of Lehman's RMBS Portfolio ........527

(i) Examiner's Analysis of the Valuation of Lehman's CDOs ......................538

(1) Lehman's Price Testing Process for CDOs ....................................543

(2) Price Testing Results for the Second and Third Quarters 2008............551

(a) Lehman's Price Testing of its Ceago CDOs...........................553

(3) Examiner's Review of Lehman's Largest U.S. ABS/CRE CDO
Positions ....................................................................................562

(4) Examiner's Findings and Conclusions With Respect to the
Reasonableness of Lehman's Valuation of its CDOs ............................567

(j) Examiner's Analysis of the Valuation of Lehman's Derivatives
Positions ....................................................................................568

(1) Overview of Lehman's Derivatives Positions........................................568

(2) Lehman's Use of Credit Support Annexes to Mitigate
Derivatives Risk .......................................................................574

(3) Lehman's Price Testing of its Derivatives Positions .............................578

(k) Examiner's Analysis of the Valuation of Lehman's Corporate Debt
Positions ....................................................................................583

(1) Overview of Lehman's Corporate Debt Positions ................................583

(2) Lehman's Price Testing of its Corporate Debt Positions.......................585

(3) Examiner's Findings and Conclusions With Respect to the
Valuation of Lehman's Corporate Debt Positions................................589

(a) Reliance on Non-Trades..................................................................590

(b) Quality Control Errors – Mismatched Companies ..........................591

(c) No Testing of Internal Credit Rating ...............................................592

(l) Examiner's Analysis of the Valuation of Lehman's Corporate
Equities Positions .......................................................................594

(1) Overview of Lehman's Corporate Equities Positions...........................594

(2) Lehman's Valuation Process for its Corporate Equities Positions.......596

(3) Examiner's Findings and Conclusions With Respect to the
Valuation of Lehman's Corporate Equities Positions...........................599

(a) Impaired Debt with No Equity Mark Down....................................601

(b) Static Marks....................................................................................603

## VOLUME 2 (CONT.)

## Section III.A.3:  Survival

3. Lehman's Survival Strategies and Efforts ...........................................609

a) Introduction to Lehman's Survival Strategies and Efforts........................609

(1) Examiner's Conclusions....................................................................609

(2) Introduction to Lehman's Survival Strategies .......................................612

b) Lehman's Actions in 2008 Prior to the Near Collapse of Bear Stearns......622

(1) Rejection of Capital Investment Inquiries ...............................623

(a) KIA Offer.................................................................624

(b) KDB Makes Its Initial Approach.................................625

(c) ICD's Initial Approach ...............................................626

(2) Divergent Views.............................................................627

(a) Competitors Raise Capital .........................................627

(b) Internal Warnings Regarding Capital.........................629

c) Actions and Efforts Following the Near Collapse of Bear Stearns ...........631

(1) Lehman's Attempt to Increase Liquidity...........................633

(2) Lehman's Attempt to Reduce its Balance Sheet ...................634

(3) Lehman Sells Stock to Private and Public Investors .............638

(4) SpinCo .......................................................................640

(a) Evolution of SpinCo.................................................642

(b) Execution Issues......................................................644

(i)  Equity Hole...................................................645

(ii)  Outside Financing for SpinCo..........................649

(iii) SEC Issues ....................................................653

a.   Auditing and Accounting Issues ...............653

b.   Tax-Free Status ......................................658

(iv) Valuation of Assets ........................................659

(c) Barclays' "SpinCo" ..................................................661

(5) Potential Strategic Partners............................................662

(a) Buffett and Berkshire Hathaway ................................664

(i)  March 2008....................................................664

(ii)  Last-Ditch Effort with Buffett...........................667

(b) KDB ......................................................................668

(i)  Discussions Begin ..........................................668

(ii)  Discussions Resume: Second Round of Talks between
KDB and Lehman.........................................673

(iii) Third Round of Talks between KDB and Lehman..................677

(iv) KDB's September 9, 2008 Announcement..................681

(c) MetLife..................................................................687

(d) ICD ......................................................................691

(e) Bank of America ...................................................694

    (i)  Initial Discussions in the Summer of 2008 .....................694

    (ii)  Talks Resume in September .....................................696

(f) Barclays.................................................................703

(6) Government Communications..................................711

(a) Treasury Dinner .................................................712

(b) Short Sales .........................................................713

(c) Possibility of Federal Assistance........................716

(7) Lehman's Bankruptcy ...............................................718

## VOLUME 3

### Section III.A.4:  Repo 105

4.  Repo 105 .......................................................................732

  a)  Repo 105 – Executive Summary...................................732

  b)  Introduction .................................................................750

  c)  Why the Examiner Investigated Lehman's Use of Repo 105
     Transactions ................................................................764

  d)  A Typical Repo 105 Transaction .................................765

    (1) The Genesis of Lehman's Repo 105 Program in 2001 .................765

    (2) Repo 105 Transactions Versus Ordinary Repo Transactions ..............766

      (a) Lehman's Accounting Treatment of Repo 105 Transactions
         Versus Ordinary Repo Transactions .................................768

      (b) Lehman's Accounting Policy for Repo 105 Transactions...............775

      (c) The Accounting Purpose of the Larger Haircut .............................777

      (d) Lehman Did Not Record a Cash Borrowing but Recorded a
         Derivative Asset in a Repo 105 Transaction....................781

    (3) Anatomy of Repo 105 Transactions and the Linklaters True Sale
      Opinion Letter ....................................................782

    (4) Types of Securities Used in Repo 105 Transactions ....................793

    (5) Product Controllers Manually Booked Repo 105 Transactions ..........797

  e)  Managing Balance Sheet and Leverage ........................800

    (1) Lehman Management's Focus in Late 2007 on Reducing the
      Firm's Reported Leverage.........................................802

      (a) Lehman's Calculation of Net Leverage .............................804

(2) By January 2008, Lehman Decided to Cut its Net Leverage in Half to Win Back the Confidence of the Market, Lenders and Investors ...................................................................................805

   (a) Bart McDade, as Newly Appointed Balance Sheet Czar, Advised the Executive Committee in March 2008 to Cap Lehman's Use of Repo 105 Transactions ...........................809

   (b) McDade Became President and COO on June 12, 2008 and Authorized the Reduction of Repo 105 Usage..................819

(3) The Market's Increased Scrutiny of the Leverage of Investment Banks...............................................................................822

   (a) The Cost of Deleveraging ...........................................825

(4) "Sticky" Inventory and FID's Balance Sheet Breaches Hampered Lehman's Ability to Manage Its Net Leverage.....................828

(5) Deleveraging Resulted in Intense Pressure at Quarter-End to Meet Balance Sheet Targets for Reporting Purposes...........843

(6) Lehman's Earnings Calls and Press Release Statements Regarding Leverage..................................................................845

   (a) Analysts' Statements Regarding Lehman's Leverage ...................850

f) The Purpose of Lehman's Repo 105 Program Was to Reverse Engineer Publicly Reported Financial Results..............................853

(1) Lehman Did Not Disclose Its Accounting Treatment For or Use of Repo 105 Transactions in Its Forms 10-K and 10-Q.........................853

   (a) Lehman's Outside Disclosure Counsel Was Unaware of Lehman's Repo 105 Program ......................................855

(2) Lehman's Repo 105 Practice Improved the Firm's Public Balance Sheet Profile at Quarter-End .................................................856

   (a) Contemporaneous Documents Confirm That Lehman Undertook Repo 105 Transactions to Reduce Its Balance Sheet and Reverse Engineer Its Leverage.........................859

   (b) Witness Statements to the Examiner Regarding the True Purpose of Lehman's Repo 105 Practice..............................867

(3) Quarter-End Spikes in Lehman's Repo 105 Usage Also Suggest the True Purpose of Lehman's Repo 105 Practice Was Balance Sheet Manipulation..................................................................870

(4) Repo 105 Transactions Served No Business Purpose Other Than Balance Sheet Reduction ..........................................................877

(a) Repo 105 Transactions Came at a Higher Cost than Ordinary Repo Transactions.................................................................877

(b) Witnesses Also Stated That Financing Was Not the Real Motive for Undertaking Repo 105 Transactions...............................882

g) The Materiality of Lehman's Repo 105 Practice ...........................................884

(1) The Repo 105 Program Exposed Lehman to Potential "Reputational Risk" ................................................................884

(2) Lehman's Repo 105 Practice Had a Material Impact on Lehman's Net Leverage Ratio ............................................888

(a) Lehman Significantly Expanded Its Repo 105 Practice in Late 2007 and Early 2008 ........................................890

(3) Balance Sheet Targets for FID Businesses Were Unsustainable Without the Use of Repo 105 Transactions .............................899

(4) Rating Agencies Advised the Examiner that Lehman's Accounting Treatment and Use of Repo 105 Transactions to Manage Its Net Leverage Ratio Would Have Been Relevant Information ......................................................................902

(5) Government Regulators Had No Knowledge of Lehman's Repo 105 Program ................................................................910

(a) Officials from the Federal Reserve Bank Would Have Wanted to Know about Lehman's Use of Repo 105 Transactions ......................................................910

(b) Securities and Exchange Commission CSE Monitors Were Unaware of Lehman's Repo 105 Program ...........................913

h) Knowledge of Lehman's Repo 105 Program at the Highest Levels of the Firm ......................................................................914

(1) Richard Fuld, Former Chief Executive Officer ............................917

(2) Lehman's Former Chief Financial Officers ............................921

(a) Chris O'Meara, Former Chief Financial Officer ...........................921

(b) Erin Callan, Former Chief Financial Officer...................................930

(c) Ian Lowitt, Former Chief Financial Officer ...........................937

(3) Lehman's Board of Directors................................................945

i) Ernst & Young's Knowledge of Lehman's Repo 105 Program .................948

(1) Ernst & Young's Comfort with Lehman's Repo 105 Accounting Policy................................................................948

(2) The "Netting Grid" ................................................................951

xiv

(a) Quarterly Review and Audit..................................................................953

(3) Ernst & Young Would Not Opine on the Materiality of
Lehman's Repo 105 Usage ...................................................954

(4) Matthew Lee's Statements Regarding Repo 105 to Ernst &
Young..........................................................................................956

(5) Accounting-Motivated Transactions.....................................962

j)   The Examiner's Conclusions ................................................................962

(1) Materiality .............................................................................963

(a) Whether Lehman's Repo 105 Transactions Technically
Complied with SFAS 140 Does Not Impact Whether a
Colorable Claim Exists .................................................964

(2) Disclosure Requirements and Analysis ..................................967

(a) Disclosure Obligations:  Regulation S-K and the MD&A ..............968

(b) Duty to Disclose ..........................................................972

(c) Lehman's Public Filings ................................................973

(i)   Summary of Lehman's 2000 through 2007 Public Filings........974

(ii)  Lehman's 2007 Form 10-K, First Quarter 2008 Form 10-
Q, and Second Quarter 2008 Form 10-Q...................977

a.   Treatment of Repo Transactions and SFAS 140...................978

b.   Net Leverage..........................................................980

c.   Derivatives ............................................................981

d.   A Reader of Lehman's Forms 10-K and 10-Q Would
Not Have Been Able to Ascertain That Lehman
Engaged in Temporary Sales Using Liquid Securities ........984

(d) Conclusions Regarding Lehman's Failure to Disclose ...................985

(3) Colorable Claims.................................................................990

(4) Fiduciary Duty Claims.........................................................991

(a) Breach of Fiduciary Duty Claims against Board of Directors ........991

(b) Breach of Fiduciary Duty Claims against Specific Lehman
Officers.................................................................992

(i)   Richard Fuld ..........................................................996

a.   There Is Sufficient Evidence to Support a Finding By
the Trier of Fact That Fuld Was at Least Grossly
Negligent in Causing Lehman to File Misleading
Periodic Reports ................................................997

(ii) Chris O'Meara ...................................................................1002

    a.  There Is Sufficient Evidence To Support a Colorable
Claim That O'Meara Was at Least Grossly Negligent
in Allowing Lehman to File Misleading Financial
Statements and Engage in Material Volumes of Repo
105 Transactions ...................................................1007

    b.  There Is Sufficient Evidence To Support a Colorable
Claim That O'Meara Breached His Fiduciary Duties
by Failing to Inform the Board and His Superiors of
Lehman's Repo 105 Practice ................................1009

(iii) Erin Callan ......................................................................1013

    a.  There Is Sufficient Evidence To Support a Finding By
the Trier of Fact That Callan Breached Her Fiduciary
Duties by Causing Lehman to Make Materially
Misleading Statements ........................................1017

    b.  There Is Sufficient Evidence to Support a Colorable
Claim That Callan Breached Her Fiduciary Duty of
Care by Failing to Inform the Board of Directors of
Lehman's Repo 105 Program ...............................1019

(iv) Ian Lowitt ......................................................................1021

(c) Remedies ...........................................................................1024

(5) Malpractice Claims Against Ernst & Young ........................1027

(a) Background and Legal Standards ....................................1028

  (i)  Professional Standards................................................1028

  (ii)  Common Law Standards .............................................1031

(b) There Is Sufficient Evidence to Support a Colorable Claim
That Ernst & Young Was Negligent................................1032

  (i)  Malpractice in Failure to Advise Audit Committee of
Repo 105 Activity and Lee's Allegations...................1033

  (ii)  Lehman's 2008 Forms 10-Q ......................................1040

  (iii)  Lehman's 2007 Form 10-K ........................................1048

  (iv)  Effect on Prior Filings .............................................1050

  (v)  Causation and Damages ...........................................1051

(c) Possible Defenses ...........................................................1053

**VOLUME 4**

**Section III.A.5: Secured Lenders**

5.  Potential Claims Against Lehman's Secured Lenders ................................... 1066

    a)  Introduction and Executive Summary ...................................................... 1066

        (1) JPMorgan ........................................................................................ 1068

        (2) Citibank .......................................................................................... 1073

        (3) HSBC ............................................................................................. 1077

        (4) Other Lenders ................................................................................ 1080

        (5) The Federal Reserve Bank of New York ...................................... 1081

        (6) Lehman's Liquidity Pool ............................................................... 1082

    b)  Lehman's Dealings With JPMorgan ....................................................... 1084

        (1) Facts .............................................................................................. 1084

            (a) Overview of JPMorgan-Lehman Relationship ...................... 1084

            (b) Triparty Repo Prior to 2008 ................................................. 1089

            (c) JPMorgan Restructures Its Approach to Triparty Risk ........ 1094

            (d) Lehman Begins Posting Additional Collateral ...................... 1101

            (e) JPMorgan Concern Over Lehman Collateral in August 2008 ...... 1105

            (f) The August Agreements ........................................................ 1113

            (g) Background to the September 9 Collateral Request and
                September Agreements ........................................................... 1125

            (h) September 9 Calls Between Steven Black and Richard Fuld ........ 1138

            (i) September Agreements .......................................................... 1143

            (j) Daily Liquidity Pool Updates From Lehman to JPMorgan .......... 1156

            (k) September 11 Collateral Request Pursuant to the September
                Agreements ............................................................................ 1158

            (l) Additional Valuation Analyses by JPMorgan Beginning
                September 11 .......................................................................... 1165

            (m) Lehman Requests for Return of Collateral .......................... 1168

        (2) Analysis of Potential Claims ......................................................... 1172

            (a) The Evidence Does Not Support a Colorable Claim Against
                JPMorgan for Economic Duress .............................................. 1173

                (i)  Legal Background: Economic Duress ............................. 1173

(ii) There Is No Available Evidence of an Express Unlawful Threat Made by JPMorgan in Connection With the Formation of the September Agreements ................................1174

(iii) The Available Evidence Suggests JPMorgan Did Not Have an Improper Purpose........................................................1178

(iv) There Was a Degree of Negotiation Over the Terms of the September Agreements ........................................1181

(b) There Is Insufficient Evidence to Support a Colorable Claim That the September Agreements Are Invalid for Lack of Consideration ....................................................................1183

(c) There is Sufficient Evidence to Support the Existence of a Technical, But Not Colorable, Claim That the September Agreements Are Invalid for Lack of Authority ...........................1186

(i) Tonucci May Have Acted With Apparent Authority.............1190

(ii) There Is Substantial Evidence That Lehman Ratified the September Agreements ..............................................1193

(d) There Is Insufficient Evidence to Support a Colorable Claim That JPMorgan Fraudulently Induced the September Agreements ........................................................................1198

(e) There Is Insufficient Evidence to Support a Colorable Claim for Breach of Contract of the September Agreements Based on JPMorgan's Refusal to Return Collateral ...................................1200

(i) Legal Background: Contractual Obligations Under September Agreements ..............................................1200

(ii) There Was No Written Notice for Collateral Return .............1208

(f) There Is Evidence to Support a Colorable, But Not Strong, Claim That JPMorgan Breached the Implied Covenant of Good Faith and Fair Dealing by Demanding Excessive Collateral in September 2008..........................................................1210

(i) Legal Standards Governing Implied Covenant of Good Faith and Fair Dealing................................................1211

(ii) There Is Sufficient Evidence To Support a Colorable, But Not a Strong, Claim That JPMorgan Violated the Implied Covenant by Demanding Excessive Collateral ......................1214

(iii) A Trier of Fact Will Likely Have to Resolve a Waiver Defense ................................................................1220

c) Lehman's Dealings With Citigroup............................................1224

(1) Facts.................................................................................................1224

(a) Citigroup Provided Continuous Linked Settlement Service
and Other Clearing and Settlement Operations to Lehman.........1224

   (i)  Background Information on the Continuous Linked
Settlement Service Citi Provided to Lehman...........................1224

   (ii) Other Clearing and Settlement Services That Citi
Provided to Lehman.................................................................1227

   (iii) Citi's Clearing and Settlement Exposure to Lehman,
Generally..................................................................................1229

   (iv) The Terms of Lehman's CLS Agreement with Citi.................1231

(b) Lehman Provided a $2 Billion Cash Deposit with Citi on
June 12, 2008 To Support its Clearing Needs..................................1233

   (i)  The Market Environment and Other Circumstances
Surrounding Citi's Request for the $2 Billion Cash
Deposit on June 12....................................................................1235

   (ii) The Parties Did Not Share the Same Understanding of
the Terms of the $2 Billion Cash Deposit................................1242

      a.  What Lehman Understood the Terms of the Deposit
To Be..................................................................................1243

      b.  What Citi Understood the Terms of the Deposit To Be.....1245

      c.  The Exact Terms of the "Comfort Deposit" Are
Unknown Because the Terms Were Not Reduced to
Writing...............................................................................1250

   (iii) Citi Knew the "Comfort Deposit" was Included in
Lehman's Liquidity Pool..........................................................1250

(c) Collateral Pledge Discussions Between Lehman and Citi
Began in June 2008 and Continued Until September 2008...........1251

   (i)  The Unexecuted Pledge Agreement:  the Parties Agreed
to Negotiate the Terms but Not Execute the Agreement
Until It Was Needed.................................................................1251

   (ii) Citi Had Difficulty Pricing the Collateral Offered by
Lehman as a Substitute for the Cash Deposit..........................1254

   (iii) The Guaranty Amendment Was Signed in a "Fire Drill"
on September 9, 2008................................................................1261

      a.  Events Prior to the Signing of the September 9
Guaranty Amendment from Citi's Perspective.................1263

b.   Events Prior to the Signing of the September 9
Guaranty Amendment from Lehman's Perspective ..........1265

c.   Negotiations Between Lehman and Citi Personnel
Regarding Which Lehman Entities Were To Be Added
to the Parent Guaranty by the September 9 Guaranty
Amendment ................................................................1268

(iv) September 12, 2008: A Lehman Collateral Account at Citi
was Activated After Two Months of Discussion, and
Lehman Signed an Amendment to the Direct Custodial
Services Agreement ...................................................1273

(d) Lehman's Clearing Environment at Citi During the Week of
September 8, 2008..............................................................1276

(i)  Citi Required Lehman To Operate Under Lower
Daylight Overdraft Limits ..........................................1276

(ii)  Lehman Deposited Amounts in Excess of the $2 Billion
Deposit at Various Times in 2008 With Citi...........................1279

(iii) Citi Endeavored To Help Lehman in September 2008,
Prior to the Bankruptcy Filing ...................................1281

(iv) Lehman's Accounts at Citi Closed on Friday September
12 With Funds in Excess of the $2 Billion Deposit.................1284

(e) Citi's Participation in "Lehman Weekend" Events.......................1285

(f)  Citi's Actions Toward Lehman After Lehman Filed for
Bankruptcy Protection........................................................1287

(i)  Citi Continued to Provide CLS Services for Lehman, But
Not in an Entirely Uninterrupted Manner...............................1287

(ii)  Prior to Lehman's Bankruptcy Filing, Citi Set Off a
Portion of the Cash Deposit ......................................1290

(2) Analysis of Potential Colorable Claims .................................1291

(a) Validity of the September 9 Guaranty Amendment.....................1291

(i)  Economic Duress........................................................1291

a.   Legal Framework ................................................1292

b.   The Evidence Does Not Support the Existence of a
Colorable Claim Against Citi for Economic Duress ..........1293

(ii)  The Failure of Consideration......................................1297

a.   Legal Framework ................................................1298

        b.   The Evidence Does Not Support the Existence of a
Colorable Claim Against Citi for Failure of
Consideration ........................................................................1298

    (b) Breach of the Duty of Good Faith and Fair Dealing in
Connection With the CLS Services Agreement ............................1300

       (i)   The Evidence Does Not Support the Existence of a
Colorable Claim Against Citi for Breach of the Duty of
Good Faith and Fair Dealing in Connection With the
CLS Services Agreement ........................................................1301

d) Lehman's Dealings With HSBC ...........................................................1303

  (1) Overview of HSBC's Relationship With Lehman ................................1305

    (a) HSBC Provided CREST Clearing and Settlement Services to
Lehman ........................................................................................1306

    (b) Overview of the Operative Agreements..........................................1309

  (2) The Examiner's Investigation of Particular Transactions ....................1311

    (a) HSBC Cancelled a $1 Billion Intraday Credit Facility ..................1311

    (b) Lehman Maintained a $1 Billion Segregated Deposit with
HSBC............................................................................................1312

    (c) Lehman Deposited $750 Million with HSBC on June 24..............1314

    (d) Lehman Committed $25 Million on August 15 to HSBC's
Syndicated Lending Facility .........................................................1315

    (e) Lehman Pledged $6 Million to HSBC as Collateral for Letters
of Credit.......................................................................................1317

    (f) Other Significant Exposures ...........................................................1318

  (3) HSBC Required Lehman to Provide Approximately $1 Billion in
Collateral While Quietly Ending Their Relationship...........................1319

    (a) HSBC Determined to End Its Relationship with Lehman.............1319

    (b) HSBC Demanded Collateral for Intraday Credit ..........................1322

    (c) HSBC Agreed To Accommodate Lehman at Quarter End ...........1325

    (d) Lehman Deposited the Cash Collateral With HSBC.....................1326

    (e) Lehman Negotiated New Terms and Executed the Cash
Deeds ...........................................................................................1327

       (i)   Lehman Secured Concessions in the U.K. Cash Deeds..........1327

       (ii)  Lehman Executed the Hong Kong Cash Deed Late on
September 12 ..........................................................................1329

(f) HSBC and LBHI Stipulated To Setoff and Return Some of the
Funds Covered by the U.K. Cash Deeds ...........................................1332

(4) Other Issues Stemming from HSBC's Collateral Demand.................1333

(a) Lehman Included the Deposits Covered by the Cash Deeds
in Its Reported Liquidity Pool............................................................1333

(b) HSBC Considered Withholding Payments or Requiring
Prefunding of Trades in the Asia-Pacific Region Prior to
Lehman's Bankruptcy .........................................................................1336

(5) The Evidence Does Not Support the Existence of Colorable
Claims Arising From HSBC's Demand That Lehman Provide
Cash Collateral and Execute Cash Deeds in Order for HSBC to
Continue Providing Clearing and Settlement Services ......................1336

(a) The Parameters of the Examiner's Analysis....................................1336

(b) The Facts Provide Little to No Support for Invalidating the
U.K. Cash Deeds..................................................................................1339

(i)   Analytical Framework ..............................................................1339

a.   English Law Governs Contract Claims Arising from
the U.K. Cash Deeds...........................................................1339

b.   English Contract Law Treats Deeds Differently from
Other Contracts ..................................................................1340

(ii)  The Evidence Does Not Support the Existence of a
Colorable Claim That the U.K. Cash Deeds Are Invalid
for Want of Consideration ..........................................................1341

(iii) The Evidence Does Not Support the Existence of a
Colorable Claim for Economic Duress Because the
CREST Agreement Allowed HSBC To Cease Clearing
and Settlement at Its Absolute Discretion ...............................1343

a.   Elements of Economic Duress.................................................1343

b.   Application to Lehman Facts .................................................1344

c.   Other Transactions Do Not Give Rise to Economic
Duress Claims.....................................................................1346

(iv) The Evidence Does Not Support the Existence of a
Colorable Claim that HSBC Violated a Duty of Good
Faith and Fair Dealing by Demanding Cash Collateral .........1348

a.   English Law Does Not Recognize a Principle of Good
Faith and Fair Dealing of General Application .................1349

b.    Application to Lehman Facts ...............................................1349

(v)  The Evidence Does Not Support the Existence of a
Colorable Claim that HSBC Violated the Notice
Provision of the CREST Agreement ........................................1352

a.    Construction of Terms.........................................................1352

b.    Application to Lehman Facts ...............................................1353

(vi) The Cash Deeds Were Not Contracts of Adhesion or
Standard Form Contracts..........................................................1355

a.    Characteristics of Standard Form Contracts or
Contracts of Adhesion.........................................................1355

b.    Application to Lehman Facts ...............................................1355

(c) Other Potential Theories of Liability ....................................................1357

(i)   English Law Governs the Remaining Potential Claims
Even Though They Are Not Covered by the Choice-of-
Law Provision of the Cash Deeds.............................................1357

a.    Analytical Framework..........................................................1357

b.    Application to Remaining Potential Claims........................1359

(ii)  The Evidence Does Not Support The Existence Of a
Colorable Claim For Unjust Enrichment Because
Lehman Conveyed a Benefit on HSBC Pursuant to
Lehman's Valid Contractual Obligations.................................1360

a.    Elements of Unjust Enrichment ...........................................1361

b.    Application to Lehman Facts ...............................................1362

(iii) The Evidence Does Not Support a Colorable Claim That
HSBC Breached a Fiduciary Duty to Lehman Because
HSBC and Lehman Were Sophisticated Parties in a
Relationship Governed by an Agreement That Limited
HSBC's Obligations ..................................................................1363

a.    Elements of Breach of Fiduciary Duty and
Misappropriation .................................................................1364

b.    Application to Lehman Facts ...............................................1365

(iv) The Evidence Does Not Support a Colorable Claim that
HSBC's Demand for Collateral Tortiously Interfered
With Lehman's Other Business or Contracts Because
HSBC Was Acting To Protect Its Own Economic
Interests .....................................................................................1367

        a.   Elements of Tortious Interference ........................................1368

        b.   Application to Lehman Facts .............................................1369

   (v)  The Evidence Does Not Support a Finding that HSBC
        Fraudulently or Negligently Misrepresented Its Plan to
        Withdraw ...................................................................................1371

        a.   Elements of Fraud and Misrepresentation .........................1371

        b.   Application to Lehman Facts .............................................1373

e)  Lehman's Dealings With Bank of America .................................................1375

f)  Lehman's Dealings with Bank of New York Mellon ................................1376

   (1) BNYM Demands and Receives a Collateral Deposit ..........................1377

   (2) The Deposit Is Significant Because of Internal Lehman Concerns
       About Including It in Its Pool .................................................................1379

g)  Lehman's Dealings With Standard Bank .....................................................1382

h)  Lehman's Dealings With the Federal Reserve Bank of New York .........1385

   (1) The FRBNY Supervises Deposit-Taking Institutions and Assists
       in Managing Monetary Policy, but Lacks Authority To Regulate
       Investment Bank Holding Companies .....................................................1385

   (2) In Response to the Bear Stearns Near Collapse, the FRBNY
       Created a Variety of Facilities To Backstop the Liquidity of
       Broker-Dealers; Lehman, In Turn, Drew on These Facilities ..............1387

      (a) The Primary Dealer Credit Facility ...................................................1387

      (b) The Market Greeted the Creation of the PDCF as a Positive
          Step Toward Backstopping Broker-Dealer Liquidity, and as
          Shoring Up Lehman's Liquidity ......................................................1390

      (c) In Addition to a Liquidity Backstop, Lehman Viewed the
          PDCF as an Outlet for Its Illiquid Positions ...................................1392

      (d) Lehman Was Reluctant to Draw on the PDCF Because of a
          Perceived "Stigma" Attached to Borrowing from the Facility .....1396

      (e) Lehman Accessed the PDCF Ten Times in 2008; Lehman's
          Use of the PDCF Was Concentrated in Periods Immediately
          After the Bear Stearns Near Collapse, and Immediately After
          LBHI Filed for Bankruptcy .............................................................1398

   (3) Other FRBNY Liquidity Facilities ........................................................1400

      (a) The Term Secured Lending Facility .................................................1400

      (b) Open Markets Operations ................................................................1401

i)  Lehman's Liquidity Pool .................................................................................1401

(1) Introduction and Executive Summary ................................................... 1401

(2) The Importance of Liquidity to Broker-Dealers and Investment
Bank Holding Companies Generally ............................................... 1406

(3) Lehman's Liquidity Pool ............................................................... 1408

    (a) The Purpose and Composition of Lehman's Liquidity Pool ........ 1408

    (b) Lehman Tested Its Liquidity Pool and Shared the Results of
These Tests with Rating Agencies ..................................... 1413

    (c) Market Participants Formed Favorable Opinions of
Lehman's Liquidity on the Basis of Lehman's
Representations About Its Liquidity Pool ...................... 1415

(4) Lehman's Clearing Banks Sought Collateral Pledges and Cash
Deposits To Secure Intraday Credit Risk; Lehman Included This
Collateral in Its Liquidity Pool ................................................. 1417

    (a) Lehman Pledged CLOs and Other Securities to JPMorgan
Throughout the Summer of 2008 to Meet Triparty-Repo
Margin Requirements ............................................... 1417

    (b) The Securities Posted to Meet JPMorgan's Margin
Requirements Were Included in Lehman's Liquidity Pool .......... 1422

    (c) On June 12, 2008, Lehman Transferred $2 Billion to Citi as
"Comfort" for Continuing CLS Settlement ..................... 1424

    (d) The Citi "Comfort Deposit" Was Included in Lehman's
Liquidity Pool .................................................... 1430

    (e) On August 25, 2008, Lehman Executed a Security Agreement
with Bank of America, Granting the Bank a Security Interest
in a $500 Million Deposit ...................................... 1433

    (f) LBHI and JPMorgan Executed an Amendment to the June
2000 Clearance Agreement, a Security Agreement and a
Holding Company Guaranty, all Dated August 26, 2008 ............ 1436

    (g) Lehman Assets Subject to the August Security Agreement
Were Included in Lehman's Liquidity Pool ..................... 1439

    (h) September 2, 2008: Lehman Transferred Just Under $1 Billion
to HSBC to Continue Clearing Operations, and Encumbered
This with "Cash Deeds" Executed on September 9 and
September 12 ...................................................... 1441

    (i) The HSBC Deposit Was Represented as "Liquid" and Was
Included in LBHI's Liquidity Pool ............................. 1446

(j)  Lehman and JPMorgan Executed Another Round of Security
Documentation Dated September 9, 2008; Lehman Made $3.6
Billion and $5 Billion Pledges to JPMorgan Subject to the
Terms of These Agreements ...................................................1446

(k) Lehman Made a Deposit to Bank of New York Mellon to
Cover Intraday Exposure, and Included That Deposit in Its
Liquidity Pool ..........................................................................1448

(l)  The Cumulative Impact of Lehman's Inclusion of Clearing-
Bank Collateral and Deposits in Its Liquidity Pool.....................1450

(5) Disclosures Concerning the Inclusion of Clearing-Bank
Collateral in Lehman's Liquidity Pool....................................1454

(a) Lehman Did Not Disclose on Its June 16, 2008 Second
Quarter Earnings Call That It Was Including the $2 Billion
Citi "Comfort Deposit" in Its Liquidity Pool .................................1454

(b) Lehman Did Not Disclose in Its Second Quarter 2008 10-Q,
Filed July 10, 2008, That It Was Including Both the $2 Billion
Citibank "Comfort Deposit" and Approximately $5.5 Billion
of Securities Collateral Pledged to JPMorgan in Its Liquidity
Pool..........................................................................................1455

(c) Lehman Did Not Disclose On Its September 10, 2008
Earnings Call That a Substantial Portion of Its Liquidity Pool
Was Encumbered by Clearing-Bank Pledges .................................1457

(d) Senior Executives Did Not Disclose to the Board of Directors
at the September 9, 2008 Finance Committee Meeting the
Fact That a Substantial Portion of Its Liquidity Pool Was
Encumbered by Clearing-Bank Pledges ..........................................1460

(e) Lehman Officers Did Not Disclose to the Board of Directors
That Its Liquidity Position Was Substantially Impaired by
Collateral Held at Clearing Banks Until the Evening of
September 14, 2008...................................................................1464

(f)  Lowitt's Views on Including Clearing-Bank Collateral in the
Liquidity Pool ..........................................................................1466

(6) Rating Agencies Were Unaware That Lehman Was Including
Clearing-Bank Collateral in Its Liquidity Pool .....................1467

(a) Fitch.......................................................................................1467

(b) Standard & Poor's..................................................................1468

(c) Moody's.................................................................................1469

(7) The FRBNY Did Not View the Clearing-Bank Collateral in the
Liquidity Pool as "Unencumbered" ....................................................1469

(8) The SEC, Lehman's Primary Regulator, Was Unaware of the
Extent to Which Lehman Was Including Clearing-Bank
Collateral in Its Liquidity Pool; to the Extent It Was Aware, the
SEC Did Not View This Practice as Proper ..........................................1472

(9) Certain Lehman Counsel Were Aware That Agreements with Its
Clearing Banks Were Structured to Include Clearing-Bank
Collateral in Its Liquidity Pool, but Disclaimed Knowledge
Concerning What Assets Were Appropriate or Inappropriate for
the Liquidity Pool ..............................................................................1476

(10) Lehman's Auditors Monitored Lehman's Liquidity Pool, but
Viewed the Composition of the Pool as a Regulatory Issue ...............1478

(11) There Is Insufficient Evidence To Support a Determination
That Any Officer or Director Breached a Fiduciary Duty in
Connection With the Public Disclosure of Lehman's Liquidity
Pool .....................................................................................................1479

## VOLUME 4 (CONT.)

### Section III.A.6:  Government

6.  The Interaction Between Lehman and the Government ...............................1482

a)  Introduction ...........................................................................................1482

b)  The SEC's Oversight of Lehman ............................................................1484

(1) The CSE Program ..............................................................................1484

(2) Lehman's Participation in the CSE Program .....................................1487

(3) The SEC/OIG Findings ......................................................................1490

(4) The View From the Top .....................................................................1492

c)  The FRBNY's Oversight of Lehman .......................................................1494

d)  The Federal Reserve's Oversight of Lehman ..........................................1502

e)  The Treasury Department's Oversight of Lehman ...................................1505

f)  The Relationship of the SEC and FRBNY in Monitoring Lehman's
Liquidity .................................................................................................1507

(1) The SEC Performed Only Limited Monitoring of Lehman's
Liquidity Pool .....................................................................................1508

(2) The SEC and FRBNY Did Not Always Share Information About
Lehman ........................................................................................1511

g)  The Government's Preparation for the "Lehman Weekend"
Meetings at the FRBNY ...............................................................1516

h)  On the Evening of Friday, September 12, 2008, the Government
Convened a Meeting of the Major Wall Street Firms in an Attempt
to Facilitate the Rescue of Lehman ............................................1523

i)   Lehman's Bankruptcy Filing .......................................................1535

**VOLUME 5**

**Section III.B:  Avoidance Actions**

B.  Are There Administrative Claims or Colorable Claims for Preferences or
Voidable Transfers ..............................................................................1544

1.  Executive Summary ...........................................................................1544

2.  Examiner's Investigation of Possible Administrative Claims Against
LBHI (First Bullet)............................................................................1546

a)  Summary .......................................................................................1546

b)  Introduction .................................................................................1547

c)  Lehman's Cash Management System ........................................1549

(1) LBHI's Role as Central Banker ............................................1550

(2) Global Cash and Collateral Management ...........................1551

(3) Lehman's External and Virtual Bank Accounts.................1554

(4) Bank Account Reconciliations..............................................1560

d)  Effect of the Bankruptcy on the Cash Management System....1562

e)  Cash Transfers Giving Rise to Administrative Claims............1564

(1) Cash Transfers from LBHI Affiliates to LBHI....................1565

(2) Cash Received by LBHI on Behalf of LBHI Affiliates.........1566

(3) Other Relevant Transactions ................................................1568

3.  Examiner's Investigation of Possible Avoidance Actions (Third, Fourth
and Eighth Bullets)............................................................................1570

a)  Summary .......................................................................................1570

b)  LBHI Solvency Analysis..............................................................1570

(1) Introduction ...........................................................................1570

(2) Market-Based Valuation Analysis .......................................1573

      (a) Basis for Utilization of a Market-Based Valuation Analysis.........1573

      (b) Market Value of Assets Approach...................................................1577

         (i)   Implied Asset Value .................................................1578

         (ii)  Small Equity Cushion................................................1580

         (iii) Limitations of the Market-Based Approach............................1581

           a.   Application of Retrojection............................1583

           b.   The Application of "Current Awareness" ..........................1584

  (3) Conclusion .................................................................................1587

c)  LBHI Affiliate Solvency Analysis .......................................................1587

  (1) Summary ...................................................................................1587

  (2) Description of the Examiner's Analysis...............................................1595

  (3) Debtor-by-Debtor Analysis ..........................................................1610

      (a) Lehman Commercial Paper Inc......................................................1610

      (b) CES Aviation, CES Aviation V LLC, CES Aviation IX .................1615

      (c) LB Special Financing................................................................1618

      (d) LB Commodity Services...........................................................1622

      (e) Luxembourg Residential Properties Loan Finance S.A.R.L..........1627

      (f)  LB OTC Derivatives ...............................................................1628

      (g) LB 745 LLC..........................................................................1629

      (h) LB Derivative Products ...........................................................1631

      (i)  LB Financial Products..............................................................1633

      (j)  LB Commercial Corporation ....................................................1635

      (k) BNC Mortgage LLC ...............................................................1638

      (l)  East Dover Limited ................................................................1638

      (m) Lehman Scottish Finance .......................................................1640

      (n) PAMI Statler Arms.................................................................1641

d)  Unreasonably Small Capital ...............................................................1642

  (1) Summary ...................................................................................1645

  (2) Analysis of the "Unreasonably Small Capital" Test ...........................1648

      (a) Summary of Legal Standard.....................................................1648

      (b) Lehman's Countercyclical Strategy .................................................1650

      (c) Lehman's Repo Book and Liquidity Risk.......................................1654

         (i)   Bear Stearns Demonstrates the Liquidity Risk Associated
              With Repo Financing..................................................1656

(ii) Quality and Tenor of Lehman's Repo Book............................1658

(d) Deleveraging to "Win Back" Market Confidence ..........................1662

(e) Beginning in the Third Quarter of 2008, Lehman Could Have
Reasonably Anticipated a Loss of Confidence Which Would
Have Triggered Its Liquidity Risk ...................................................1665

(f) Lehman Was Not Sufficiently Prepared to Absorb a
Liquidity Crisis Marked by a Sudden Loss of Non-
Government, Non-Agency Repo Funding .....................................1674

(i) Lehman's Liquidity Pool .........................................................1675

(ii) Liquidity Stress Tests ............................................................1678

(iii) Other Capital Adequacy Metrics............................................1687

a. Cash Capital Surplus ..................................................1687

b. Equity Adequacy Framework .....................................1688

c. CSE Capital Ratio .......................................................1690

(g) LBHI Affiliate "Unreasonably Small Capital" Analysis...............1692

e) Insider Preferences Against LBHI (Third Bullet) ......................................1694

(1) Summary ..............................................................................................1694

(2) Legal Summary ...................................................................................1696

(3) Sources of Potential Preferential Activity.........................................1698

(4) Determinations and Assumptions on Section 547(b) Elements .........1705

(5) Scope of Defenses Under Section 547(c) ...........................................1710

(6) Findings for LBSF................................................................................1713

(7) Findings for LBCS ...............................................................................1718

(8) Findings for LCPI ................................................................................1722

f) Preferences Against Non-LBHI Lehman Affiliates (Fourth Bullet).........1730

g) Avoidance Analysis of LBHI and LBHI Affiliates Against Financial
Participants and Pre-Chapter 11 Lenders (Fourth and Eighth
Bullets) ............................................................................................................1731

(1) Summary ..............................................................................................1731

(2) APB Analysis .......................................................................................1734

(3) Cash Disbursement Analysis ..............................................................1737

(4) Pledged Collateral Accounts Analysis...............................................1738

(5) Avoidance Analysis for Certain Pre-Chapter 11 Lenders and
Financial Participants ......................................................................1739

(a) JPMorgan Avoidance Analysis .......................................1739

(i)   Background...............................................................................1739

(ii)  Avoidability of the September Agreements and
Transfers in Connection with the September Agreements....1742

a.   Avoidability of the September Guaranty as a
Constructive Fraudulent Obligation ...................................1743

1.   There Is Evidence To Support A Finding That
LBHI Incurred an Obligation Within the
Applicable Look-Back Periods When it Executed
the September Guaranty ...................................................1743

2.   There Is Evidence To Support A Finding That
LBHI Received Less Than Reasonably Equivalent
Value or Did Not Receive Fair Consideration in
Exchange for Granting JPMorgan the September
Guaranty...........................................................................1744

3.   Insolvency as of September 10, 2008 ..............................1757

4.   Undercapitalization as of September 10, 2008 ..............1758

b.   Defenses to Avoidability of the September Guaranty .......1758

1.   Applicability of the Good Faith Defense of Section
548(c) of the Bankruptcy Code and Section 279 of
the N.Y. Debtor Creditor Law to the September
Guaranty...........................................................................1758

2.   Applicability of the Safe-Harbor Provisions to the
September Guaranty.........................................................1762

c.   Avoidability of Transfers of Collateral in Connection
with the September Guaranty ................................................1767

1.   LBHI's Collateral Transfers and Post-Petition
Setoffs...............................................................................1767

2.   Application Of The Safe Harbors To The $8.6
Billion Cash Collateral Transfers ...................................1776

3.   There Is Evidence To Support Potential State Law
Claims Available to LBHI Pursuant to Section 541
to Avoid the Transfers In Connection with the
September Guaranty.........................................................1781

4.   To the Extent the September Guaranty Provided
for a Guaranty of Non-Protected Contract
Obligations, Or to the Extent JPMorgan
Liquidated Collateral Pursuant to Non-Protected

Contract Exposure, a Colorable Basis Exists that
the Safe-Harbor Provisions are not Applicable ............1787

(iii) Avoidability of the August Agreements and Transfers in
Connection with the August Agreements................................1794

a.    Avoidability of the August Guaranty as a
Constructive Fraudulent Obligation ....................................1794

1.    LBHI Incurred an Obligation Within the
Applicable Look-Back Periods When it Executed
the August Guaranty ........................................................1794

2.    There Is Evidence That LBHI Received Less Than
Reasonably Equivalent Value or Did Not Receive
Fair Consideration in Exchange for Granting
JPMorgan the August Guaranty .....................................1795

3.    Insolvency as of August 29, 2008 ...................................1797

4.    Undercapitalization and Inability to Pay Debts as
They Come Due as of August 29, 2008 .........................1797

b.    Defenses to Avoidability of the August Guaranty.............1797

c.    Avoidability of Transfers of Collateral in Connection
With the August Guaranty ....................................................1798

(iv) Avoidability of the August and the September Security
Agreements And Collateral Transfers Pursuant to
Section 548(a)(1)(A) .....................................................................1801

(v) Avoidability of the Transfers of Collateral in Connection
with the September Guaranty Pursuant to Section 547(b)
of the Bankruptcy Code ...............................................................1806

(vi) Avoidability of Obligations of LBHI to Funds Managed
by JPMorgan ................................................................................1813

(b) Citi Avoidance Analysis ...................................................................1817

(i)    Background...................................................................................1817

(ii)   Avoidability of the $2 Billion Deposit ......................................1821

(iii)  Avoidability of the Amended Guaranty ....................................1821

(iv)  Avoidability of the $500 Million Transfer From an LBHI
Account to an LBI Account ........................................................1827

(c) FRBNY Avoidance Analysis..............................................................1829

(d) HSBC Avoidance Analysis ................................................................1830

(i)    Background...................................................................................1830

(ii)  The U.K. Cash Deed Transactions ...............................................1832

(iii) The Hong Kong Cash Deposit Transactions ...........................1833

(iv) September 9, 2009 Stipulation .....................................................1834

(v)  Avoidability of the January 4, 2008 Guaranty .........................1835

(vi) Avoidability of the Hong Kong Cash Deed Transactions ......1836

(vii) Avoidability of the U.K. Cash Deed ........................................1836

(viii) Avoidability of the Transfer of the Remaining
Collateral ....................................................................................1837

(e) Standard Bank Avoidance Analysis .................................................1837

(f)  BNYM Avoidance Analysis .............................................................1839

(g) BofA Avoidance Analysis ................................................................1840

(h) CME Avoidance Analysis ................................................................1841

(i)   Summary ..........................................................................................1841

(ii)  Background ......................................................................................1843

a.   Energy Derivatives .......................................................................1851

b.   FX Derivatives ...............................................................................1852

c.   Interest Rate Derivatives ..............................................................1852

d.   Equity Derivatives ........................................................................1853

e.   Agricultural Derivatives ...............................................................1854

(iii) Defenses to Avoidability of Claims ...............................................1855

a.   Applicability of CEA Preemption ...............................................1855

b.   Applicability of Self-Regulatory Organization
Immunity .........................................................................................1862

c.   Applicability of the Safe Harbor Provisions of the
Bankruptcy Code ...........................................................................1870

h)  Avoidance Analysis of LBHI Affiliate Payments to Insider
Employees (Fourth Bullet) .................................................................1871

(1) Summary ............................................................................................1871

(2) Methodology ......................................................................................1873

(3) Applicable Legal Standards ............................................................1874

(4) Findings .............................................................................................1882

(a) LBHI Affiliate Severance Payments ............................................1882

(b) LBHI Affiliate Bonus Payments ..................................................1887

(c) LBHI's Assumptions of Limited Partnership Interests .................1889

4.  Examiner's Investigation of Possible Breaches of Fiduciary Duty by
    LBHI Affiliate Directors and Officers (Fifth Bullet) ..........................................1894

    a)  Fiduciary Duty Standard for a Wholly-Owned Affiliate Subsidiary
        under Delaware Law ...................................................................................1896

    b)  Fiduciary Duty Standard for a Wholly-Owned Affiliate Subsidiary
        under New York Law ...................................................................................1902

        (1)  LCPI's  Background and Officers and Directors ..................................1905

            (a)  Duty of Care...........................................................................1907

            (b)  Duty to Monitor ....................................................................1909

    c)  Breach of Fiduciary Duty for Aiding or Abetting Under Delaware
        Law .............................................................................................................1911

5.  Examiner's Analysis of Lehman's Foreign Exchange Transactions
    (Second Bullet)................................................................................................1912

    a)  Summary ....................................................................................................1912

    b)  Foreign Exchange at Lehman ....................................................................1913

    c)  Foreign Exchange Transactions During the Stub Period ..........................1923

6.  Examiner's Review of Intercompany Transactions Within Thirty Days
    of LBHI's Bankruptcy Filing (Seventh Bullet) .................................................1938

    a)  Summary ....................................................................................................1938

    b)  Discussion .................................................................................................1939

    c)  Analysis .....................................................................................................1942

    d)  Analysis of Overall Net Intercompany Data for the 2007 and 2008
        Periods of Analysis ...................................................................................1942

        (1)  LBHI....................................................................................................1942

        (2)  LBIE.....................................................................................................1945

        (3)  LBSF ...................................................................................................1947

    e)  Analysis of Net Daily Intercompany Data for the 2007 and 2008
        Periods of Analysis ...................................................................................1949

7.  Examiner's Analysis of Lehman's Debt to Freddie Mac ...............................1951

## VOLUME 5 (CONT.)

### Section III.C:  Barclays Transaction

C.  Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets to
Barclays, or From the Lehman ALI Transaction? ................................................. 1961

1.  Executive Summary ............................................................................... 1961

   a)  Purpose of Investigation ............................................................... 1961

      (1) Barclays Sale Transaction ....................................................... 1961

      (2) Lehman ALI Transaction ......................................................... 1963

   b)  Summary of Conclusions ............................................................... 1963

      (1) Barclays Transaction ............................................................... 1963

      (2) Lehman ALI Transaction ......................................................... 1965

2.  Facts ........................................................................................................ 1965

   a)  Lehman Businesses and Assets ..................................................... 1965

      (1) LBHI Affiliate Operating Companies ................................... 1970

         (a) LBCS ............................................................................... 1970

         (b) LBCC ............................................................................... 1972

         (c) LCPI ................................................................................ 1975

         (d) LBSF ............................................................................... 1978

         (e) LOTC .............................................................................. 1980

         (f) LBDP and LBFP ............................................................ 1981

         (g) LBF ................................................................................. 1984

         (h) BNC ............................................................................... 1986

      (2) LBHI Affiliate Single Purpose Entities ................................. 1987

         (a) LB 745 ............................................................................ 1987

         (b) CES Aviation Entities .................................................. 1987

         (c) PAMI Statler .................................................................. 1988

         (d) East Dover ..................................................................... 1988

         (e) Scottish Finance ........................................................... 1989

         (f) Luxembourg S.A.R.L. ................................................... 1989

         (g) Navigator ...................................................................... 1990

      (3) Sale Transaction ....................................................................... 1991

3.  Whether Assets of LBHI Affiliates Were Transferred to Barclays ................. 1997

   a)  Analysis of Securities Transferred to Barclays ........................... 1998

(1) Securities Transferred to Barclays ..........................................................1999

    (a) Lehman's Securities Trading Records and Systems .....................2005

        (i)   General ..............................................................................2005

        (ii)  GFS System Assessment ....................................................2008

           a.   Comparison of GFS Data to Lehman's 10-Q Filings ..........2009

           b.   Comparison of GFS Data to Lehman's General Ledger ....2009

           c.   Reliability of September 12 Data....................................2010

        (iii) GFS Data Extracted by Examiner ............................................2010

(2) Analysis of GFS Data...............................................................................2012

    (a) CUSIPs Not Associated With LBHI Affiliate Entities...................2014

    (b) CUSIPs Associated Solely With an LBHI Affiliate Entity .............2015

    (c) CUSIPs Associated With Both LBI and LBHI Affiliate
        Entities ...........................................................................................2016

        (i)   CUSIPs Associated With Subordinated Entities ....................2016

        (ii)  Securities Financing Transactions ..............................................2021

        (iii) Alternative Analyses ................................................................2024

    (d) 817 CUSIPs With No GFS Data .........................................................2025

        (i)   September 19, 2008 GFS Dataset.....................................2026

        (ii)  Search by ISIN Number and Product ID................................2027

        (iii) TMS Source System .................................................................2027

        (iv) Additional Data Sources.........................................................2028

b)  Analysis of Tangible Asset Transfers.......................................................2030

    (1) LB 745........................................................................................................2033

    (2) LBCS .........................................................................................................2035

    (3) LCPI .........................................................................................................2036

    (4) LBSF ........................................................................................................2038

    (5) CES .........................................................................................................2039

    (6) CES V ......................................................................................................2041

    (7) CES IX ....................................................................................................2042

c)  Analysis of Intangible Asset Transfers ...................................................2044

    (1) Customer Information Assets ...............................................................2045

    (2) Proprietary Software .............................................................................2051

    (3) Assembled Workforce ...........................................................................2054

4.  Lehman ALI Transaction .............................................................................2055

5.  Conclusions ...................................................................................2063

   a)  Summary ..................................................................................2063

   b)  Colorable Claims Arising from Transfer of LBHI Assets.........................2064

       (1)  There Are No Colorable Claims Against Barclays Arising from
            Transfer of LBHI Affiliate Securities .......................................2064

       (2)  There Are Colorable, Limited Claims Against Barclays Arising
            from Transfer of LBHI Affiliate Office Equipment and LBCS
            Customer Information ...........................................................2076

            (a)  Bankruptcy Code Claims .................................................2077

                 (i)   Section 542 ...........................................................2077

                 (ii)  Section 548 ...........................................................2081

            (b)  Common Law Claims .....................................................2083

                 (i)   Recovery of Chattel ................................................2083

                 (ii)  Conversion ...........................................................2086

                 (iii) Unjust Enrichment .................................................2088

                 (iv)  Trade Secret Misappropriation ................................2090

                 (v)   Unfair Competition ................................................2092

                 (vi)  Tortious Interference With Employment Relations.............2094

       (3)  Claims Against LBHI Affiliate Officers and Directors ....................2096

            (a)  Duty of Care ..............................................................2098

            (b)  Duty of Good Faith .....................................................2100

            (c)  Duty to Monitor ..........................................................2101

   c)  Lehman ALI Transaction ............................................................2103

6.  Barclays Transaction ......................................................................2103

   a)  Pre-Bankruptcy Negotiations......................................................2104

       (1)  Barclays' Interest in a Transaction Involving Lehman .....................2104

       (2)  Negotiations Before September 15 .........................................2110

   b)  LBHI Bankruptcy ....................................................................2116

       (1)  LBHI Files Chapter 11 .......................................................2116

       (2)  Post-Petition Clearing and Financing .....................................2116

   c)  Negotiations Leading to APA ......................................................2124

       (1)  Participants ....................................................................2127

       (2)  Structure of Transaction.....................................................2129

(3) Negotiations Regarding Securities Positions to be Purchased by
Barclays.................................................................................................2131

   (a) On September 15 and 16, Lehman and Barclays Review
Lehman's Securities Positions and Marks ......................................2131

   (b) Barclays Agrees to Purchase "Long" Securities Positions
With a Book Value of "Approximately $70 Billion" ....................2138

(4) Negotiations Regarding Contract Cure and Employee
Compensation Liabilities ......................................................................2143

   (a) Contract Cure Costs.....................................................................2143

   (b) Compensation Liabilities ..............................................................2147

d) Consideration and Approval of Transaction Described in APA by
LBHI and LBI Boards of Directors.............................................................2153

e) Transaction Described to the Court on September 17 .............................2155

(1) Sale Motion .............................................................................................2155

(2) September 17 Sale Procedures Hearing ................................................2157

f) Between September 17 and 19, the Securities Positions Being
Acquired by Barclays Change .....................................................................2160

(1) The "Replacement Transaction" ...........................................................2160

(2) $15.8 Billion Repo..................................................................................2170

(3) September 19 Agreement to Transfer Additional Assets....................2175

   (a) Excess 15c3-3 Assets ...................................................................2178

   (b) Additional Securities ...................................................................2182

   (c) OCC Margin.................................................................................2184

g) The Court's Consideration and Approval of the Proposed
Transaction....................................................................................................2188

(1) September 19, 2008 Sale Hearing .........................................................2188

(2) The Sale Order .......................................................................................2192

h) Transaction Closing ....................................................................................2194

(1) JPMorgan/Barclays Disputes.................................................................2194

(2) The Committee's Role ...........................................................................2197

(3) December 2008 Settlement Between Trustee, Barclays and
JPMorgan...............................................................................................2208

**EXAMINER'S REPORT**

**TABLE OF APPENDICES**

**VOLUME 6**

> **Tab 1**    Legal Issues

**VOLUME 7**

> **Tab 2**    Glossary, Acronyms & Abbreviations

> **Tab 3**    Key Individuals

> **Tab 4**    Witness Interview List

> **Tab 5**    Document Collection & Review

> **Tab 6**    Lehman Systems

> **Tab 7**    Bibliography

**VOLUME 8**

> **Tab 8**    Risk Management Organization and Controls

> **Tab 9**    Risk Appetite and VaR Usage Versus Limits Chart

> **Tab 10**    Calculation of Certain Increases in Risk Appetite Limits

> **Tab 11**    Compensation

> **Tab 12**    Valuation - Archstone

> **Tab 13**    Survival Strategies Supplement

> **Tab 14**    Valuation - CDO

> **Tab 15**    Narrative of September 4 Through 15, 2008

> **Tab 16**    Valuation - Residential Whole Loans

**Tab 17**      Repo 105

**Tab 18**      Summary of Lehman Collateral at JPMorgan

**Tab 19**      Lehman's Dealings with Bank of America

**Tab 20**      Knowledge of Senior Lehman Executives Regarding The
                Inclusion of Clearing-Bank Collateral in the Liquidity Pool

**Tab 21**      LBHI Solvency Analysis

**Tab 22**      Preferences Against LBHI and Other Lehman Entities

**VOLUME 9**

**Tab 23**      Analysis of APB, Journal Entry, Cash Disbursement, and
                JPMorgan Collateral

**Tab 24**      Foreign Exchange Transactions

**Tab 25**      Intercompany Transactions Occurring Within Thirty Days Before
                Bankruptcy

**Tab 26**      CUSIPs with Blank Legal Entity Identifiers

**Tab 27**      CUSIPs Not Associated with an LBHI Affiliate

**Tab 28**      CUSIPs Associated Solely with an LBHI Affiliate

**Tab 29**      CUSIPs Associated with Both LBI and LBHI Affiliates

**Tab 30**      CUSIPs Associated with Subordinated Entities

**Tab 31**      CUSIPs Associated with LBHI Affiliates Not Delivered to LBI in a
                Financing Trade

**Tab 32**      September 19, 2008 GFS Dataset

**Tab 33**      Summary Balance Sheets of LBHI Affiliates

**Tab 34**      Tangible Asset Balance Sheet Variations

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x

In re

LEHMAN BROTHERS HOLDINGS INC.,
*et al.,*

                            Debtors.

--------------------------------------------------------- x

:
:    Chapter 11 Case No.
:
:    08-13555 (JMP)
:
:    (Jointly Administered)
:
:


# REPORT OF
# EXAMINER ANTON R. VALUKAS


## Introduction

### Sections I & II:  Executive Summary & Procedural Background

## TABLE OF CONTENTS

Introduction ...............................................................................................................2

I.   Executive Summary of The Examiner's Conclusions.......................................15

    A.   Why Did Lehman Fail?  Are There Colorable Causes of Action That
        Arise From Its Financial Condition and Failure?.....................................15

    B.   Are There Administrative Claims or Colorable Claims For Preferences or
        Voidable Transfers?................................................................................24

    C.   Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets to
        Barclays, or From the Lehman ALI Transaction? ....................................26

II.  Procedural Background and Nature of the Examination ...............................28

    A.   The Examiner's Authority .......................................................................28

    B.   Document Collection and Review...........................................................30

    C.   Systems Access.......................................................................................33

    D.   Witness Interview Process.......................................................................35

    E.   Cooperation and Coordination With the Government and Parties ....................37

## INTRODUCTION

On January 29, 2008, Lehman Brothers Holdings Inc. ("LBHI"[1]) reported record revenues of nearly $60 billion and record earnings in excess of $4 billion for its fiscal year ending November 30, 2007.[2]  During January 2008, Lehman's stock traded as high as $65.73 per share and averaged in the high to mid-fifties,[3] implying a market capitalization of over $30 billion.[4]  Less than eight months later, on September 12, 2008, Lehman's stock closed under $4, a decline of nearly 95% from its January 2008 value.[5]  On September 15, 2008, LBHI sought Chapter 11 protection,[6] in the largest bankruptcy proceeding ever filed.[7]

There are many reasons Lehman failed, and the responsibility is shared.  Lehman was more the consequence than the cause of a deteriorating economic climate.

---

[1] There are a significant number of acronyms, abbreviations and other specialized terms used throughout this Report.  To avoid the necessity of defining terms repeatedly, the Report will generally use them without definition; the reader should consult the Glossary attached as Appendix 2.  Except where the specific identity of an entity is relevant and set out, this Report will use "Lehman" to refer collectively to Lehman Brothers Holdings Inc. ("LBHI") and all of its affiliates and subsidiaries.

[2] Lehman Brothers Holdings Inc. ("LBHI"), Annual Report for 2007 as of Nov. 30, 2007 (Form 10-K) (filed Jan. 29, 2008), at p. 29 ("LBHI 2007 10-K").  LBHI was the holding company for hundreds of individual corporate entities, twenty-two of which are currently Chapter 11 debtors in jointly administered proceedings.

[3] Morningstar Document Research Co., LBHI Historic Stock Prices, Jan. 1, 2008 through Sept. 15, 2008, [LBEX-EXM 000001-14] (printed from www.10kwizard.com) (last visited Feb. 3, 2010).

[4] LBHI, Quarterly Report as of Feb. 29, 2008 (Form 10-Q) (filed on Apr. 9, 2008), at p. 1 ("LBHI 10-Q Apr. 9, 2008") (554 million common equity shares outstanding times $55 = approximately $30 billion).

[5] Morningstar Document Research Co., LBHI Historic Stock Prices (Jan. 1, 2008 through Sept. 15, , 2008) [LBEX-EXM 000001-14] (printed from www.10kwizard.com) (last visited Feb. 3, 2010).

[6] Voluntary Petition (Chapter 11), Docket No. 1, *Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008).

[7] Yalman Onaran & John Helyar, *Fuld Sought Buffet Offer He Refused as Lehman Sank (Update 1)*, Bloomberg.com (Nov. 10, 2008), at p. 2.

Lehman's financial plight, and the consequences to Lehman's creditors and shareholders, was exacerbated by Lehman executives, whose conduct ranged from serious but non-culpable errors of business judgment to actionable balance sheet manipulation; by the investment bank business model, which rewarded excessive risk taking and leverage; and by Government agencies, who by their own admission might better have anticipated or mitigated the outcome.

Lehman's business model was not unique; all of the major investment banks that existed at the time followed some variation of a high-risk, high-leverage model that required the confidence of counterparties to sustain.   Lehman maintained approximately $700 billion of assets, and corresponding liabilities, on capital of approximately $25 billion.[8]   But the assets were predominantly long-term, while the liabilities were largely short-term.[9]   Lehman funded itself through the short-term repo markets and had to borrow tens or hundreds of billions of dollars in those markets each day from counterparties to be able to open for business.[10]   Confidence was critical.   The moment that repo counterparties were to lose confidence in Lehman and decline to roll over its daily funding, Lehman would be unable to fund itself and continue to operate.

---

[8] LBHI 2007 10-K, at p. 29; LBHI 10-Q Apr. 9, 2008, at pp. 5-6.

[9] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 8.

[10] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at pp. 4, 8 (Lehman financed the majority of its balance sheet in the short-term repo market, more than $200 billion a day in 2008; Lehman was reliant on short-term secured financing to conduct its daily operations); Examiner's Interview of Raymond Abary, Mar. 12, 2009.

So too with the other investment banks, had they continued business as usual.  It is no coincidence that no major investment bank still exists with that model.[11]

In 2006, Lehman made the deliberate decision to embark upon an aggressive growth strategy, to take on significantly greater risk, and to substantially increase leverage on its capital.[12]   In 2007, as the sub-prime residential mortgage business progressed from problem to crisis, Lehman was slow to recognize the developing storm and its spillover effect upon commercial real estate and other business lines.  Rather than pull back, Lehman made the conscious decision to "double down," hoping to profit from a counter-cyclical strategy.[13]   As it did so, Lehman significantly and repeatedly exceeded its own internal risk limits and controls.[14]

With the implosion and near collapse of Bear Stearns in March 2008, it became clear that Lehman's growth strategy had been flawed, so much so that its very survival

---

[11] Bank of America, Press Release, Bank of America Buys Merrill Lynch Creating Unique Financial Services Firm (Sept. 15, 2008) (announcing its acquisition of Merrill Lynch); Morgan Stanley, Press Release, Morgan Stanley and Citi to Form Industry-Leading Wealth Management Business Through Joint Venture (Jan. 13, 2009) (announcing joint venture with Citi's Smith Barney Group to form Morgan Stanley Smith Barney); Federal Reserve, Press Release, Sept. 21, 2008 (announcing that the Federal Reserve granted the applications by Goldman Sachs and Morgan Stanley, the last two major investment banks, to become bank holding companies); Goldman Sachs, Press Release, Sept. 21, 2008 (announcing that Goldman Sachs will become a bank holding company and will be regulated by the Federal Reserve).

[12] See David Goldfarb, Lehman, Global Strategy Offsite (Mar. 2006) [LBEX-DOCID 2489987].

[13] Examiner's Interview of Dr. Henry Kaufman, May 19, 2009, at p. 9 (at a March 20, 2007 Board meeting, management advised that "virtually all subprime originators have cut back on their operations or gone out of business," but, despite that fact, it was management's view that "the current distressed environment provides substantial opportunities as in the late 1990s").

[14] Duff & Phelps, High Yield Total - Usage Versus Limits (Nov. 19, 2009), at pp. 4-9 (showing that Lehman's monthly average risk appetite exceeded its limit by $41 million in July 2007, $62 million in August 2007, $608 million in September 2007, $670 million in October 2007, $508 million in November 2007, $562 million in December 2007, $708 million in January 2008, and $578 million in February 2008).

was in jeopardy.[15]  The markets were shaken by Bear's demise, and Lehman was widely

considered to be the next bank that might fail.[16]  Confidence was eroding.  Lehman

pursued a number of strategies to avoid demise.

But to buy itself more time, to maintain that critical confidence, Lehman painted

a misleading picture of its financial condition.

Lehman required favorable ratings from the principal rating agencies to maintain

investor and counterparty confidence; and while the rating agencies looked at many

things in arriving at their conclusions, it was clear – and clear to Lehman – that its net

leverage and liquidity numbers were of critical importance.[17]  Indeed, Lehman's CEO

Richard S. Fuld, Jr., told the Examiner that the rating agencies were particularly focused

on net leverage;[18] Lehman knew it had to report favorable net leverage numbers to

---

[15] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 11 (former Secretary of the Treasury Paulson stated that after Bear Stearns' near-collapse he was less optimistic about Lehman's chances than Fuld, and he informed Fuld that Lehman needed to raise capital, find a strategic partner or sell the firm).

[16] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 2 (former President of the FRBNY and current Treasury Secretary Geithner believed that after Bear Stearns' near-collapse, Lehman was the most vulnerable investment bank); Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 3 (Chairman of the Federal Reserve Bernanke believed that, after Bear Stearns, Lehman was the next most vulnerable bank); Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 2 (Paulson thought Lehman could be next to fail after Bear Stearns); Examiner's Interview of Christopher Cox, Jan. 8, 2010, at p. 8 (former Chairman of the SEC Cox said that after Bear Stearns collapsed Lehman was the SEC's "number one focus."  Lehman had suffered "diminution of value" and had "troubled assets").

[17] Erin M. Callan, Lehman Brothers Leverage Analysis (Apr. 7, 2008), at p. 1 [LBEX-DOCID 1401225] ("Reducing leverage [i]s necessary to remove refinancing risk and win back the confidence of the market, lenders, and investors."); Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 8 (rating agencies looked at net leverage); Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 5 (senior management made a "concerted effort" to manage and reduce the balance sheet with a view towards the rating agencies); Examiner's Interview of Eileen A. Fahey, Fitch, Sept. 17, 2009, at p. 6; Standard & Poor's RatingsDirect, Liquidity Management In Times Of Stress: How The Major Broker-Dealers Fare (Nov. 8, 2007), at p. 3 [LBHI_SEC07940_439424].

[18] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 7.

maintain its ratings and confidence.  So at the end of the second quarter of 2008, as Lehman was forced to announce a quarterly loss of $2.8 billion – resulting from a combination of write-downs on assets, sales of assets at losses, decreasing revenues, and losses on hedges – it sought to cushion the bad news by trumpeting that it had significantly reduced its net leverage ratio to less than 12.5, that it had reduced the net assets on its balance sheet by $60 billion, and that it had a strong and robust liquidity pool.[19]

Lehman did not disclose, however, that it had been using an accounting device (known within Lehman as "Repo 105") to manage its balance sheet – by temporarily removing approximately $50 billion of assets from the balance sheet at the end of the first and second quarters of 2008.[20]  In an ordinary repo, Lehman raised cash by selling assets with a simultaneous obligation to repurchase them the next day or several days later; such transactions were accounted for as financings, and the assets remained on Lehman's balance sheet.  In a Repo 105 transaction, Lehman did exactly the same thing, but because the assets were 105% or more of the cash received, accounting rules permitted the transactions to be treated as sales rather than financings, so that the assets

---

[19] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter Preliminary Earnings Call (June 9, 2008), at pp. 7-8.

[20] LBHI 2007 10-K, at p. 63; LBHI 10-Q Apr. 9, 2008, at p. 72; Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed on July 10, 2008), at p. 88 ("LBHI 10-Q July 10, 2008"); Examiner's Interview of Martin Kelly, Oct. 1, 2009; Examiner's Interview of Ed Grieb, Oct. 2, 2009.

could be removed from the balance sheet.[21]   With Repo 105 transactions, Lehman's

reported net leverage was 12.1 at the end of the second quarter of 2008; but if Lehman

had used ordinary repos, net leverage would have to have been reported at 13.9.[22]

Contemporaneous Lehman e-mails describe the "function called repo 105

whereby you can repo a position for a week and it is regarded as a true sale to get rid of

net balance sheet."[23]   Lehman used Repo 105 for no articulated business purpose except

"to reduce balance sheet at the quarter-end."[24]   Rather than sell assets at a loss, "[a]

Repo 105 increase would help avoid this without negatively impacting our leverage

ratios."[25]   Lehman's Global Financial Controller confirmed that "the only purpose or

motive for [Repo 105] transactions was reduction in the balance sheet" and that "there

was *no substance* to the transactions."[26]

Lehman did not disclose its use – or the significant magnitude of its use – of

Repo 105 to the Government, to the rating agencies, to its investors, or to its own Board

---

[21] See Section III.A.4 (discussing Repo 105).

[22] LBHI 10-Q July 10, 2008, at p. 89; Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 7.  See also Section I.A of this Report, which discusses net leverage.

[23] E-mail from Anthony Jawad, Lehman, to Andrea Leonardelli, Lehman (Feb. 29, 2008) [LBEX-DOCID 224902].

[24] E-mail from Raymond Chan, Lehman, to Paul Mitrokostas, Lehman, *et al.* (Jul. 15, 2008) [LBEX-DOCID 3384937].

[25] Joseph Gentile, Lehman, Proposed Repo 105/108 Target Increase for 2007 (Feb. 10, 2007), at p. 1 [LBEX-DOCID 2489498], attached to e-mail from Joseph Gentile, Lehman, to Ed Grieb, Lehman (Feb. 10, 2007) [LBEX-DOCID 2600714].

[26] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 9.

of Directors.[27]  Lehman's auditors, Ernst & Young, were aware of but did not question

Lehman's use and nondisclosure of the Repo 105 accounting transactions.[28]

In mid-March 2008, after the Bear Stearns near collapse, teams of Government

monitors from the Securities and Exchange Commission ("SEC") and the Federal

Reserve Bank of New York ("FRBNY") were dispatched to and took up residence at

Lehman,[29] to monitor Lehman's financial condition with particular focus on liquidity.[30]

---

[27] Lehman did not disclose its use of Repo 105 in public filings.  Examiner's Interview of Ed Grieb, Oct. 2, 2009, at p. 14; Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 15; Examiner's Interview of Matthew Lee, July 1, 2009, at p. 16.  Lehman did not disclose its use of Repo 105 to rating agencies.  See Lehman, S&P Ratings Q2 2008 Update (June 5, 2008) [S&P-Examiner 000946] (Lehman did not disclose its use of Repo 105 to Standard & Poor's in its ratings presentation); Lehman, Fitch Ratings Q2 2008 Update (June 3, 2008) [LBHI_SEC07940_513239] (Lehman similarly did not disclose its use of Repo 105 to Fitch as part of its presentation where Lehman touted its balance sheet reduction).  The Examiner interviewed representatives from the three leading ratings agencies, Fitch, S&P and Moody's, and none had knowledge of Lehman's use of Repo 105/108 transactions, either by name or by description.  Examiner's Interview of Eileen A. Fahey, Sept. 17, 2009, at p. 7; Examiner's Interview of Diane Hinton, Sept. 22, 2009, at p. 6; Examiner's Interview of Peter E. Nerby, Oct. 8, 2009, at p. 5.  Lehman did not disclose its use of Repo 105 to Government regulators.  Examiner's Interview of Ronald S. Marcus, Nov. 4, 2009, at p. 11; Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 5; Examiner's Interview of Jan H. Voigts, Oct. 1, 2009.  Lehman did not disclose its use of Repo 105 to its Board of Directors.  Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 21; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 10; Examiner's Interview of Roland Hernandez, Oct. 2, 2009; Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at p. 22; Examiner's Interview of Roger Berlind, Dec. 18, 2009, at p. 4.

[28] Examiner's Interview of Ernst & Young, Repo 105 session, Oct. 16, 2009, at pp. 8-9 (statement of William Schlich); Examiner's Interview of Ernst & Young, Nov. 3, 2009, at pp. 14-15 (statement of Hillary Hansen).

[29] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 5 (Eichner told the Examiner that after Bear Stearns nearly collapsed, the SEC had monitors on-site at Lehman "almost all the time."  Eichner also told the Examiner that the FRBNY had people "in residence" with actual offices at Lehman); Examiner's Interview of Jan H. Voigts, Aug. 25, 2009, at p. 1 (Voigts monitored Lehman's liquidity position, embedded on-site with the firm, from March 16, 2008 through mid-September, 2008).

[30] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at p. 4 (after Bear Stearns nearly collapsed, Geithner met with Lehman and other investment banks about moving the banks to a "more conservative place" regarding capital and liquidity.  Geithner indicated that his primary concern was Lehman's funding structure.  He told the Examiner that he was "consumed" with figuring out how to make Lehman "get more conservatively funded").

Lehman publicly asserted throughout 2008 that it had a liquidity pool sufficient to weather any foreseeable economic downturn.[31]

But Lehman did not publicly disclose that by June 2008 significant components of its reported liquidity pool had become difficult to monetize.[32]   As late as September 10, 2008, Lehman publicly announced that its liquidity pool was approximately $40 billion;[33] but a substantial portion of that total was in fact encumbered or otherwise illiquid.[34]   From June on, Lehman continued to include in its reported liquidity substantial amounts of cash and securities it had placed as "comfort" deposits with various clearing banks; Lehman had a technical right to recall those deposits, but its ability to continue its usual clearing business with those banks had it done so was far from clear.[35] By August, substantial amounts of "comfort" deposits had become actual

---

[31] Final Transcript of Lehman Brothers Holdings Inc. Second Quarter 2008 Preliminary Earnings Call (June, 9, 2008), at p. 8 (Lehman's liquidity pool reported at $45 billion); Final Transcript of Lehman Brothers Holdings Inc. Second Quarter 2008 Earnings Call (June 16, 2008), at p. 6 (Lehman's liquidity pool reported at $45 billion); Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008), at p. 10 (Lehman's liquidity pool reported at $42 billion).

[32] Lehman, Liquidity Pool Table Listing Collateral and Ability to Monetize (Sept. 12, 2008) [LBEX-WGM 784607] (listing $30.1 billion of assets as "low ability to monetize").

[33] Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008), at p. 10.

[34] Examiner's Interview of Paolo R. Tonucci, Sept. 16, 2009, at p. 19 (Lehman included $2 billion that it pledged to Citibank as a comfort deposit in its liquidity pool); Security Agreement between LBHI and Bank of America, N.A. (Aug. 25, 2008) [LBEX-DOCID 000584] (providing for a $500 million security deposit from Lehman to BofA); Lehman, Liquidity Pool Table Listing Collateral and Ability to Monetize (Sept. 9, 2008), at p. 2 [LBHI_SEC07940_557815] (showing the $500 million BofA deposit in the liquidity pool); Lehman, Liquidity Update (Sept. 10, 2008), at p. 3 ($1 billion in Lehman's liquidity pool was earmarked to HSBC and listed as "Low ability to monetize.").

[35] See Section III.A.5 (discussing potential claims against secured lenders).

pledges.[36]  By September 12, two days after it publicly reported a $41 billion liquidity

pool, the pool actually contained less than $2 billion of readily monetizable assets.[37]

Months earlier, on June 9, 2008, Lehman pre-announced its second quarter

results and reported a loss of $2.8 billion, its first ever loss since going public in 1994.[38]

Despite that announcement, Lehman was able to raise $6 billion of new capital in a

public offering on June 12, 2008.[39]  But Lehman knew that new capital was not enough.

Treasury Secretary Henry M. Paulson, Jr., privately told Fuld that if Lehman was forced

to report further losses in the third quarter without having a buyer or a definitive

survival plan in place, Lehman's existence would be in jeopardy.[40]

On September 10, 2008, Lehman announced that it was projecting a $3.9 billion

loss for the third quarter of 2008.[41]  Although Lehman had explored options over the

summer, it had no buyer in place; its only announced survival plan was to spin off

---

[36] Id.

[37] See Lehman, Liquidity Pool Table Listing Collateral and Ability to Monetize (Sept. 12, 2008) [LBEX-WGM 784607] (listing $1.4 billion of assets as "high ability to monetize" and $934 million of assets as "mid ability to monetize").

[38] Lehman Brothers Holdings Inc., Press Releases (Mar. 14, 2007, June 12, 2007, Sept. 18, 2007, Dec. 13, 2007, Mar. 18, 2008 and June 9, 2008).

[39] Lehman Brothers Holdings Inc., Press Release (June 12, 2008); Lehman Brothers Holdings Inc., Press Release (June 16, 2008).

[40] Fuld does not recall that warning.  Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 3, but Paulson told the Examiner that he consistently communicated to Fuld how dire Lehman's situation was and that he pointedly urged Fuld to find a buyer after Lehman announced a $2.8 billion loss for the second quarter of 2008, Examiner's Interview of Henry M. Paulson, June 25, 2009, at pp. 11-15.

[41] Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008), at p. 8; Lehman Brothers Holdings Inc., Press Release (Sept. 10, 2008), at p. 1 [LBHI_SEC07940_042866].

troubled assets into a separate entity.  Secretary Paulson's prediction turned out to be

right – it was not enough.

By the close of trading on September 12, 2008, Lehman's stock price had declined

to $3.65 per share, a 94% drop from the $62.19 January 2, 2008 price.[42]



Over the weekend of September 12-14, an intensive series of meetings was

conducted by and among Treasury Secretary Paulson, FRBNY President Timothy F.

Geithner, SEC Chairman Christopher Cox, and the chief executives of leading financial

institutions.[43]   Secretary Paulson began the meetings by stating the Government was

there to do all it could – but that it could not fund a solution.[44]   The Government's

---

[42] Morningstar Document Research Co., LBHI Historic Stock Prices (Jan. 1, 2008 through Sept. 15, 2008)
[LBEX-EXM 000001-14] (printed from www.10kwizard.com) (last visited on Feb. 3, 2010).

[43] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at p. 15; Examiner's Interview of
Christopher Cox, Jan. 8, 2010, at pp. 15-17; Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009 at
p. 9.

[44] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at pp. 15-16 (Paulson told the Examiner
that these meetings were part of the Government's attempt to "pull a rabbit out of a hat" and save
Lehman); Examiner's Interview of Thomas C. Baxter, Jr., May 20, 2009 at pp. 9-10 (FRBNY General
Counsel Baxter told the Examiner that Paulson explained to the group that the purpose of the meeting
was twofold - (1) to attempt to facilitate the acquisition of Lehman; and (2) in the alternative, to resolve
the consequences of Lehman's failure).

analysis was that it did not have the legal authority to make a direct capital investment in Lehman, and Lehman's assets were insufficient to support a loan large enough to avoid Lehman's collapse.[45]

It appeared by early September 14 that a deal had been reached with Barclays which would save Lehman from collapse.[46]  But later that day, the deal fell apart when the parties learned that the Financial Services Authority ("FSA"), the United Kingdom's bank regulator, refused to waive U.K. shareholder-approval requirements.[47]

Lehman no longer had sufficient liquidity to fund its daily operations.[48]  On the evening of September 14, SEC Chairman Cox phoned the Lehman Board and conveyed the Government's strong suggestion that Lehman act before the markets opened in

---

[45] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at pp. 16-17 (Paulson told the Examiner that he concluded that the Federal Government lacked authority to inject capital into Lehman, even via an "exigent circumstances" loan from the Federal Reserve, because Lehman was not an institution "perceived to have capital and able to provide a guarantee."); Chairman of the Federal Reserve Ben S. Bernanke, Speech at the Kansas City Federal Bank Conference in Jackson Hole, Wyoming (Aug. 21, 2009) ("[T]he company's available collateral fell well short of the amount needed to secure a Federal Reserve loan of sufficient size to meet its funding needs."); Examiner's Interview of Ben S. Bernanke, Dec. 22, 2009, at p. 2 (Lehman's assets and securities fell "considerably short of the obligations that would become due").

[46] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 9 (Fuld told the Examiner that on the morning of September 14, 2008, he woke up thinking he had a transaction in place with Barclays); Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 13, 2008), at p. 1 [LBEX-AM 003927-003931] (The Lehman Board met at 5:00 p.m. to discuss a potential deal with Barclays).

[47] Examiner's Interview of Henry M. Paulson, June 25, 2009, at pp. 19-20; Examiner's Interview of Richard Fuld, Jr., Apr. 28, 2009, at 9.   In a written statement to the Examiner, the FSA said that it never received a formal request to waive the shareholder-approval requirement.   According to the FSA's statement, the FSA had serious concerns about the lack of precedent for such waivers.  The FSA was also concerned about Lehman's liquidity and funding.  FSA, Statement of the Financial Services Authority to the Examiner (Jan. 20, 2010), at pp. 8, 10.

[48] Lehman, Liquidity of Lehman Brothers [Draft] (Oct. 7, 2008), at p. 9 [LBHI_SEC07940_844701] (LBIE faced a cash shortage of $4.5 billion on September 15, 2008).

Asia.[49]   On September 15, 2008, at 1:45 a.m., LBHI filed for Chapter 11 bankruptcy

protection.[50]

Sorting out whether and the extent to which the financial upheaval that followed

was the direct result of the Lehman bankruptcy filing is beyond the scope of the

Examiner's investigation.  But those events help put into context the significance of the

Lehman filing.   The Dow Jones index plunged 504 points on September 15.[51]   On

September 16, AIG was on the verge of collapse; the Government intervened with a

financial bailout package that ultimately cost about $182 billion.[52]   On September 16,

2008, the Primary Fund, a $62 billion money market fund, announced that – because of

the loss it suffered on its exposure to Lehman – it had "broken the buck," *i.e.*, its share

---

[49] Examiner's Interview of Christopher Cox, Jan. 8, 2010, at pp. 16-17 (Cox called Lehman's Board to urge that Lehman take whatever action it decided upon as soon as possible, before the markets opened. During the call, Cox related, FRBNY General Counsel Thomas C. Baxter, Jr., added that it had been made clear in the meetings earlier that day that the "action" should be that Lehman declare bankruptcy.  Cox told the Examiner that the SEC was not "offering guidance or trying to influence the fiduciary responsibilities of [Lehman's] directors.").

[50] Voluntary Petition (Chapter 11), Docket No. 1, *Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008); Docket Activity Report, *Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008).

[51] Alexandra Twin, *Stocks Get Pummeled*, CNNMoney.com, Sept. 21, 2008, at p. 1 (stating "Wall Street sees worst day in 7 years with Dow down 504 points . . . "), available at http://money.cnn.com/2008/09/15/markets/markets_newyork2/index.htm (last visited Jan. 28, 2010).

[52] Sewell Chan, *Bernanke Wants an Audit of Fed's Bailout of AIG*, N.Y. Times, Jan. 19, 2010 (stating that the FRBNY and Treasury Department made about $182 billion available to AIG).

price had fallen to less than $1 per share.[53]  On October 3, 2008, Congress passed a $700

billion Troubled Asset Relief Program ("TARP") rescue package.[54]

In his recent reconfirmation hearings, Federal Reserve Chairman Ben Bernanke,

speaking of the overall economic crisis, candidly conceded that "there were mistakes

made all around" and "we should have done more."[55]  Lehman should have done more,

done better.  Some of these failings were simply errors of judgment which do not give

rise to colorable causes of action; some go beyond and are indeed colorable.

\*       \*       \*

Part I of this Report provides an executive summary of the Examiner's findings

and conclusions.

Part II discusses the procedural background of the Examiner's appointment, the

Examiner's authority, and the manner in which the Examiner conducted his

investigation.

Part III details the facts and analysis on the topics assigned by the Court to the

Examiner and contains the Examiner's analysis and conclusions.

---

[53] See Markus K. Brunnermeier, *Deciphering the Liquidity and Credit Crunch 2007-2008*, 23 J. Econ. Perspectives, Winter 2009, at 87 (2009); NewYorkFed.org, Financial Turmoil Timeline, http://www.newyorkfed.org/research/global_economy/Crisis_Timeline.pdf (last visited Jan. 26, 2010).

[54] David M. Herszenhorn, *A  Curious Coalition Opposed Bailout Bill*, N.Y. Times, Oct. 3, 2008, at p. 1.

[55] Edmund L. Andrews, *Bernanke Says Fed "Should Have Done More,"* N.Y. Times, Dec. 4, 2009, at p. 1. The official transcript of Chairman Ben S. Bernanke's Confirmation Hearing Before the Senate Committee on Banking, Housing, and Urban Affairs, Dec. 3, 2009, was not available at the time this Report was released.

## I.   EXECUTIVE SUMMARY OF THE EXAMINER'S CONCLUSIONS

The Order appointing the Examiner (the "Examiner Order") assigns ten specific bulleted topics for the Examiner to investigate; in addition, the Examiner Order directs the Examiner to perform the duties specified in Section 1106(a)(3) and (4) of the Bankruptcy Code, that is, to "file a statement of . . . any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate." [56] Because the ten bulleted topics set out at pages 3-4 of the Examiner Order overlap, the Examiner has grouped them into three substantive areas:  (A) Why Did Lehman Fail? Are There Colorable Causes of Action That Arise From Its Financial Condition and Failure?  (B)  Are There Administrative Claims or Colorable Claims for Preferences or Voidable Transfers?  and (C) Are There Colorable Claims Arising Out of the Barclays Sale Transaction?

### A.   Why Did Lehman Fail?  Are There Colorable Causes of Action That Arise From Its Financial Condition and Failure?

Section (A) addresses the fifth, eighth and tenth bullets of the Examiner Order:

> *[Bullet 10] The events that occurred from September 4, 2008 through September 15, 2008 or prior thereto that may have resulted in commencement of the LBHI Chapter 11 case.*

> *[Bullet 5]  Whether there are colorable claims for breach of fiduciary duties and/or aiding or abetting any such breaches against the officers and directors of LBCC and/or other Debtors arising in connection with the financial condition of the Lehman enterprise prior to the commencement of the LBHI Chapter 11 case on September 15, 2008.*

---

[56] Order Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code, at pp. 3-5, Docket No. 2569, *Lehman Brothers Holdings Inc.*, Case No. 08-13555  (Bankr. S.D.N.Y. Jan. 16, 2009).

> [Bullet 8]  *The transactions and transfers, including but not limited to the pledging or granting of collateral security interest among the debtors and the pre-Chapter 11 lenders and/or financial participants including but not limited to, JPMorgan Chase, Citigroup, Inc., Bank of America, the Federal Reserve Bank of New York and others.*

Lehman failed because it was unable to retain the confidence of its lenders and counterparties and because it did not have sufficient liquidity to meet its current obligations.  Lehman was unable to maintain confidence because a series of business decisions had left it with heavy concentrations of illiquid assets with deteriorating values such as residential and commercial real estate.  Confidence was further eroded when it became public that attempts to form strategic partnerships to bolster its stability had failed.[57]  And confidence plummeted on two consecutive quarters with huge reported losses, $2.8 billion in second quarter 2008[58] and $3.9 billion in third quarter 2008,[59] without news of any definitive survival plan.

The business decisions that brought Lehman to its crisis of confidence may have been in error but were largely within the business judgment rule.  But the decision not to disclose the effects of those judgments does give rise to colorable claims against the

---

[57] See Lehman Brothers Holdings Inc., Minutes of Meeting of the Board of Directors (Mar. 31, 2008) (Lehman approached Warren E. Buffett about a potential $3.5 billion private investment, but discussions were preliminary and did not result in any agreement on terms) [LBEX-AM 003597-604]; Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 11 (Fuld told the Examiner that KDB's press release on Sept. 9, 2008, announcing that negotiations between KDB and Lehman about a strategic partnership had ended, triggered Lehman's decision to announce third quarter earnings early.  According to Fuld, Lehman's stock dropped significantly after KDB's announcement and short-sellers were "kicking the daylights" out of Lehman); Morningstar Document Research Co., LBHI Historic Stock Prices (Jan. 1, 2008 through Sept. 15, 2008) [LBEX-EXM 000001] (printed from www.10kwizard.com) (last visited on Feb. 3, 2010 (Lehman's stock fell 45% after KDB's announcement).

[58] Lehman Brothers Holdings Inc., Press Release (June 9, 2008).

[59] Lehman Brothers Holdings Inc., Press Release (Sept. 10, 2008).

senior officers who oversaw and certified misleading financial statements – Lehman's

CEO Richard S. Fuld, Jr., and its CFOs Christopher O'Meara, Erin M. Callan and Ian T.

Lowitt.  There are colorable claims against Lehman's external auditor Ernst & Young

for, among other things, its failure to question and challenge improper or inadequate

disclosures in those financial statements.

The Examiner Order does not contain a definition of what constitutes a

"colorable" claim.  The Second Circuit has described colorable claims as ones "that on

appropriate proof would support a recovery,"[60] "much the same as that undertaken

when a defendant moves to dismiss a complaint for failure to state a claim."[61]  But

under such a standard, the Examiner would find colorable claims wherever bare

allegations might survive a motion to dismiss.  Because he has conducted an extensive

factual investigation, the Examiner believes it is more appropriate to use a higher

threshold standard, and in this Report a colorable claim is one for which the Examiner

has found that there is sufficient credible evidence to support a finding by a trier of fact.

The Examiner is not the ultimate decision-maker; whether claims are in fact valid will

be for the triers of fact to whom claims are presented.  The identification of a claim by

the Examiner as colorable does not preclude the existence of defenses and is not a

---

[60] *In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985).

[61] *In re KDI Holdings, Inc.*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999) (quoting *In re America's Hobby Center*, 223 B.R. 275, 281 (Bankr. S.D.N.Y. 1998)), *accord In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005).

prediction as to how a court or a jury may resolve any contested legal, factual, or credibility issues.[62]

Although Repo 105 transactions may not have been inherently improper, there is a colorable claim that their sole function as employed by Lehman was balance sheet manipulation.  Lehman's own accounting personnel described Repo 105 transactions as an "accounting gimmick"[63] and a "lazy way of managing the balance sheet as opposed to legitimately meeting balance sheet targets at quarter end."[64]  Lehman used Repo 105 "to reduce balance sheet at the quarter-end."[65]

In 2007-08, Lehman knew that net leverage numbers were critical to the rating agencies and to counterparty confidence.[66]  Its ability to deleverage by selling assets was severely limited by the illiquidity and depressed prices of the assets it had accumulated.[67]   Against this backdrop, Lehman turned to Repo 105 transactions to

---

[62] For a more complete analysis of the law relating to the colorable claim standard, see Appendix 1. The Examiner is not the ultimate decision-maker on any colorable claim; he simply is directed to identify the existence of such claims.  While the Examiner has evaluated the at-times conflicting evidence to make his determinations as to potential colorable claims, it is neither necessary nor appropriate for the Examiner to make credibility assessments or resolve conflicting evidence; that will be the responsibility of a trier of fact when and if those claims are litigated.

[63] Examiner's Interview of Murtaza Bhallo, Sept. 14, 2009, at p. 3.

[64] Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 7.

[65] E-mail from Raymond Chan, Lehman, to Paul Mitrokostas, Lehman, *et al.* (July 15, 2008) [LBEX-DOCID 3384937].

[66] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 8 (rating agencies looked at net leverage); Examiner's Interview of Michael McGarvey, Sept. 11, 2009, at p. 2; Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at pp. 5-6 (Bismal told the Examiner that meeting leverage ratio targets was the most critical issue ("a very hot topic") for senior management by the end of 2007).

[67] Examiner's Interview of Timothy F. Geithner, Nov. 24, 2009, at pp. 7-8 (Starting in mid 2007, many of Lehman's inventory positions had grown increasingly "sticky" – *i.e.*, difficult to sell without incurring

temporarily remove $50 billion of assets from its balance sheet at first and second quarter ends in 2008 so that it could report significantly lower net leverage numbers than reality.[68]  Lehman did so despite its understanding that none of its peers used similar accounting at that time to arrive at their leverage numbers, to which Lehman would be compared.[69]

Lehman defined materiality, for purposes of reopening a closed balance sheet, as "any item individually, or in the aggregate, that moves net leverage by 0.1 or more (typically $1.8 billion)."[70]  Lehman's use of Repo 105 moved net leverage not by tenths but by whole points:

---

substantial losses.  Moreover, selling sticky inventory at reduced prices could also have led to loss of market confidence in Lehman's valuations for inventory remaining on the firm's balance sheet).

[68] Lehman, Spreadsheet Summarizing Total Repo 105 & Repo 108 (May 30, 2008) [LBEX-DOCID 2078195] (total Repo 105 firm-wide on Feb. 29, 2008 was $49.102 billion and on May 30, 2008 was $50.383 billion).

[69] Examiner's Interview of Martin Kelly, Oct. 1, 2009, at p. 8 (Kelly told the Examiner that Lehman was the last of the CSE firms to continue using Repo 105-type transactions to manage its balance sheet by late 2007); Examiner's Interview of Marie Stewart, Sept. 2, 2009, at p. 4 (Stewart believed that Lehman was the last of its peer group using Repo 105 transactions by December 2007).

[70] Ernst & Young, Walkthrough Template: Balance Sheet Close Process (Nov. 30, 2007), at p. 14 [EY-SEC-LBHI-CORP-GAMX-07-033384].

| Date | Repo 105 Usage | Reported Net Leverage | Net Leverage Without Repo 105 | Difference |
|------|----------------|-----------------------|-------------------------------|------------|
| Q4 2007 | $38.6 B[71] | 16.1[72] | 17.8[73] | 1.7 |
| Q1 2008 | $49.1 B[74] | 15.4[75] | 17.3[76] | 1.9 |
| Q2 2008 | $50.4 B[77] | 12.1[78] | 13.9[79] | 1.8 |

Lehman's failure to disclose the use of an accounting device to significantly and temporarily lower leverage, at the same time that it affirmatively represented those "low" leverage numbers to investors as positive news, created a misleading portrayal of Lehman's true financial health.[80]  Colorable claims exist against the senior officers who were responsible for balance sheet management and financial disclosure, who signed and certified Lehman's financial statements and who failed to disclose Lehman's use and extent of Repo 105 transactions to manage its balance sheet.[81]

---

[71] Lehman, Spreadsheet of Total Repo 105/108 Trend [LBHI_SEC07940_1957956] (listing total use of Repo 105/108 for the fourth quarter of 2007 as $38.634 billion).

[72] See LBHI 2007 10-K, at p.29.

[73] See Section III.A.4 (discussing Repo 105/108); Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 8.

[74] Lehman, Spreadsheet of Total Repo 105/108 Trend [LBHI_SEC07940_1658543].

[75] LBHI 10-Q Apr. 9, 2008, at p. 72.

[76] See Section III.A.4 (discussing Repo 105/108); Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 8.

[77] Lehman, Spreadsheet of Total Repo 105/108 Trend [LBHI_SEC07940_1658543].

[78] LBHI 10-Q July 10, 2008, at p. 89.

[79] See Section III.A.4 (discussing Repo 105/108); Duff & Phelps, Repo 105 Balance Sheet Accounting Entry and Leverage Ratios Summary (Oct. 2, 2009), at p. 8.

[80] Examiner's Interview of Matthew Lee, July 1, 2009, at p. 15 ("[Lehman] was telling the public they reduced the balance sheet, but not telling them they were doing so by unartful means." – Lehman "had way more leverage than people thought; it was just out of [the public's] sight").

[81] See Section III.A.4 (discussing Repo 105/108).

In May 2008, a Lehman Senior Vice President, Matthew Lee, wrote a letter to management alleging accounting improprieties;[82] in the course of investigating the allegations, Ernst & Young was advised by Lee on June 12, 2008 that Lehman used $50 billion of Repo 105 transactions to temporarily move assets off balance sheet and quarter end.[83]  The next day - on June 13, 2008 - Ernst & Young met with the Lehman Board Audit Committee but did not advise it about Lee's assertions, despite an express direction from the Committee to advise on all allegations raised by Lee.[84]  Ernst & Young took virtually no action to investigate the Repo 105 allegations.[85]  Ernst & Young took no steps to question or challenge the non-disclosure by Lehman of its use of $50 billion of temporary, off-balance sheet transactions.  Colorable claims exist that Ernst & Young did not meet professional standards, both in investigating Lee's allegations and in connection with its audit and review of Lehman's financial statements.[86]

---

[82] Letter from Matthew Lee, Senior Vice President, Lehman, to Martin Kelly, Controller, Lehman, *et al.*, re: possible accounting improprieties (May 16, 2008), at pp. 1-3 [EY-LE-LBHI-KEYPERS 5826885].

[83] Examiner's Interview of Ernst & Young's Hillary Hansen, Nov. 3, 2009 at p. 14; e-mail from Beth Rudofker, Lehman, to William Schlich, Ernst & Young (June 5, 2008) [EY-SEC-LBHI-ML 000001-000142], forwarding May 21, 2008 e-mail from Matthew Lee regarding second request for balance sheet substantiation.

[84] Examiner's Interview of Roger Berlind, Dec. 18, 2009, at p. 2; Examiner's Interview of Michael L. Ainslie, Dec. 22, 2009, at pp. 2-3; Examiner's Interview of Sir Christopher Gent, Jan. 20, 2010, at p. 2; Examiner's Interview of Thomas Cruikshank, Jan. 20, 2010, at p. 3; Examiner's Interview of Beth Rudofker, Dec. 15, 2009, at pp. 6-7; see also Lehman Brothers Holdings Inc., Minutes of the Audit Committee (June 13, 2008) [LBEX-AM 003759-60].

[85] Examiner's Interview of Ernst & Young's Hillary Hansen, Nov. 3, 2009, at p. 15 (Hansen told the Examiner that she did no further follow up specifically on Repo 105/108 because E&Y was in the midst of collecting all the data, and its investigation was not finalized).

[86] See Section III.A.4 (discussing Repo 105/108).

In the sections that follow, this report will describe in detail the facts and analysis that support the Examiner's conclusions. That detail will include the bases not only for the colorable claims that the Examiner has found, but also for those the Examiner has considered but not found. The Examiner believes it is appropriate to set forth the facts and analysis on colorable claims that he has not found in equal detail, so that the parties can understand the process that led to those conclusions. The issues that the Examiner investigated were framed by the Examiner Order itself, by suggestions made by the parties and Government agencies with whom the Examiner has had extensive coordination, and by the natural course of investigation, where a new path (such as Repo 105) was uncovered in the course of the investigation.

The Report begins with a discussion of the business decisions that Lehman made well before the bankruptcy, and the risk management issues raised by those business decisions. Ultimately, the Examiner concludes that while certain of Lehman's risk decisions can be described in retrospect as poor judgment, they were within the business judgment rule and do not give rise to colorable claims. But those judgments, and the facts related to them, provide important context for the other subjects on which the Examiner has found colorable claims. For example, after saddling itself with an enormous volume of illiquid assets that it could not readily sell, Lehman increasingly turned to Repo 105 to manage its balance sheet and reduce its reported net leverage.

Lehman's acquisition of illiquid assets is also the predicate for the liquidity and valuation issues investigated by the Examiner.

Accordingly, the report will detail the following subjects that the Examiner has explored:

1.  **Business and Risk Management –** The Examiner has explored this subject because it is central to the question of how and why Lehman amassed the assets that ultimately it could not monetize in time to maintain liquidity, acceptable leverage and confidence.  The Examiner explored Lehman's reaction to the subprime lending crisis and other economic events to analyze whether Lehman's officers and directors fulfilled their fiduciary duties.  The Examiner concludes that some of Lehman's management's decisions can be questioned in retrospect, but none fall outside the business judgment rule; the Examiner finds no colorable claims.[87]

2.  **Valuation –** The Examiner has explored this subject because it is central to the question of Lehman's solvency and to whether Lehman's financial statements were accurately stated.  The Examiner concludes that Lehman's valuation procedures may have been wanting and that certain valuations may have been unreasonable for purposes of a bankruptcy solvency analysis.  The Examiner's conclusion that valuations were unreasonable for solvency analysis does not necessarily mean that individuals acted with sufficient scienter to support claims for breach of fiduciary duty, and the Examiner does not find sufficient credible evidence to support colorable claims.[88]

3.  **Survival –** The Examiner has explored this subject because it is central to the question whether the officers and directors discharged their fiduciary duties.  The Examiner finds no colorable claims.[89]

4.  **Repo 105 –** The Examiner has explored this subject after uncovering the issue in the course of his investigation.  The Examiner finds there are colorable claims against Richard Fuld, Jr., Christopher O'Meara, Erin Callan, and Ian Lowitt in connection with their failure to disclose the use of the practice and

---

[87] See Section III.A.1 (discussing Lehman's risk management).
[88] See Section III.A.2 (discussing Lehman's valuation).
[89] See Section III.A.3 (discussing Lehman's survival).

against Ernst & Young for its failure to meet professional standards in connection with that lack of disclosure.[90]

5. **Secured Lenders –** The Examiner has explored this subject because it was specifically assigned as part of the Examiner Order and because the subject was addressed in multiple communications with the parties.  The Examiner finds colorable claims against JPMorgan Chase ("Chase") and CitiBank in connection with modifications of guaranty agreements and demands for collateral in the final days of Lehman's existence.[91]   The demands for collateral by Lehman's Lenders had direct impact on Lehman's liquidity pool; Lehman's available liquidity is central to the question of why Lehman failed.

6. **Lehman's Interaction With Government Agencies –** As part of the Examiner's overall investigation, it was necessary to consider the interaction between Lehman and the Government agencies who regulated and monitored Lehman; for example, Lehman officers suggested to the Examiner that he should consider, in the course of determining whether they had breached any fiduciary duties, the completeness of the disclosures they made to the Government.[92]

## B.   Are There Administrative Claims or Colorable Claims For Preferences or Voidable Transfers?

Section (B) addresses the first, second, third, fourth, seventh and eighth bullets of

the Examiner Order:

*[Bullet 1]   Whether LBCC [Lehman Brothers Commercial Corporation] or any other entity that currently is an LBHI Chapter 11 debtor subsidiary or affiliate ("LBHI Affiliate(s)") has any administrative claims against LBHI resulting from LBHI's cash*

---

[90] See Section III.A.4 (discussing Repo 105/108).  After reaching the tentative conclusion that these claims existed, the Examiner contacted counsel for each, advised them of the basis for the potential finding, and invited each of them to present any additional facts or materials that might bear on the final conclusion. The Examiner had individual, face-to-face meetings with each and carefully considered the materials raised by each.  While the Examiner was directed to credible facts and arguments that might form the basis for successful defenses, the Examiner concluded in all cases that these possible defenses do not change his now final conclusion that there is sufficient credible evidence from which a trier of fact could find a breach of duty after weighing the credible evidence on both sides of the issue.

[91] See Section III.A.5 (discussing potential claims against Lehman's secured lenders).

[92] See Section III.A.6 (discussing the government's role).

*sweeps of cash balances, if any, from September 15, 2008, the commencement date of LBHI's Chapter 11 case, through the date that such applicable LBHI affiliate commenced its Chapter 11 case.*

*[Bullet 2]  All voluntary and involuntary transfers to, and transactions with, affiliates, insiders and creditors of LBCC or its affiliates, in respect of foreign exchange transactions and other assets that were in the possession or control of LBHI Affiliates at any time commencing on September 15, 2008 through the day that each LBHI Affiliate commenced its Chapter 11 case.*

*[Bullet 3]  Whether any LBHI Affiliate has colorable claims against LBHI for potentially insider preferences arising under the Bankruptcy Code or state law.*

*[Bullet 4]  Whether any LBHI Affiliate has colorable claims against LBHI or any other entities for potentially voidable transfers or incurrences of debt, under the Bankruptcy Code or otherwise applicable law.*

*[Bullet 7] The inter-company accounts and transfers among LBHI and its direct and indirect subsidiaries, including but not limited to: LBI, LBIE, Lehman Brothers Special Finance ("LBSF") and LBCC, during the 30-day period preceding the commencement of the Chapter 11 cases by each debtor on September 15, 2008 or thereafter or such longer period as the Examiner deems relevant to the Investigation.*

*[Bullet 8]  The transactions and transfers, including but not limited to the pledging or granting of collateral security interest among the debtors and the pre-Chapter 11 lenders and/or financial participants including but not limited to, JPMorgan Chase, Citigroup, Inc., Bank of America, the Federal Reserve Bank of New York and others*

The  Examiner  has  identified  approximately  $60  million  of  administrative claims.[93]

The Examiner has identified colorable claims that there were a limited number of preferential transfers.[94]

---

[93] See Section III.B.2 (discussing possible administrative claims).
[94] See Section III.B.3 (discussing possible avoidance actions).

The Examiner has determined that there are a limited number of colorable claims for avoidance actions against JPMorgan[95] and Citibank.[96]

### C.   Do Colorable Claims Arise From Transfers of LBHI Affiliate Assets to Barclays, or From the Lehman ALI Transaction?

Section (C) addresses the sixth and ninth bullets of the Examiner Order:

> [Bullet 6]  Whether assets of any LBHI Affiliates (other than Lehman Brothers, Inc.) were transferred to Barclays Capital Inc. as a result of the sale to Barclays Capital Inc. that was approved by order of the Bankruptcy Court entered September 20, 2008, and whether consequences to any LBHI Affiliate as a result of the consummation of the transaction created colorable causes of action that inure to the benefit of the creditors of such LBHI subsidiary or affiliate.

> [Bullet 9]  The transfer of the capital stock of certain subsidiaries of LBI on or about September 19, 2008 to Lehman ALI Inc.

In the course of reviewing whether affiliates other than LBI were adversely impacted by the Barclays sale, the Examiner reviewed the facts related to the transfer of LBI assets in the post-filing sale to Barclays.  Because the issues related to the sale are the subject of active, pending litigation filed by the Debtors, on which discovery is far from complete, the Examiner expresses no view on the merits of that litigation and will limit himself to setting out the factual record he has developed on the issues.[97]

---

[95] The Examiner notified counsel for JPMorgan of his tentative conclusion and counsel made a presentation in response.  The Examiner carefully considered that presentation but concludes that a colorable claim exists.

[96] See Section III.B.3 (discussing possible avoidance actions).

[97] See Section III.C (discussing the Barclays sale transaction).

The Examiner concludes that a limited amount of assets of LBHI Affiliates other than LBI were improperly transferred to Barclays.[98]

The Examiner concludes that the transfer of capital stock to ALI served a legitimate purpose and that there was no impropriety in those transactions.[99]

---

[98] See Section III.C (discussing the Barclays sale transaction).

[99] See Section III.C (discussing the Examiner's conclusions regarding the Lehman ALI transaction).

## II.      PROCEDURAL BACKGROUND AND NATURE OF THE EXAMINATION

### A.  The Examiner's Authority

On January 16, 2009, the United States Bankruptcy Court for the Southern District of New York entered an order directing the U.S. Trustee to nominate an Examiner, and outlining the subject matter of the Examiner's investigation (the "Examiner Order").[100] The Examiner Order lists ten bulleted topics that the Examiner was to investigate and, further, mandates that the "Examiner shall perform the duties specified in sections 1106(a)(3) and (4) of the Bankruptcy Code [unless otherwise ordered.]"[101] Under 11 U.S.C. § 1106(a)(3), the Examiner is to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan [unless ordered otherwise.]" Under 11 U.S.C. § 1106(a)(4), the Examiner must, *inter alia*, "file a statement of any investigation conducted . . . including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate[.]"

---

[100] Order Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code, at pp. 3-5, Docket No. 2569, *In re Lehman Brothers Holding Inc., et al.*, Case No. 08-13555 (Bankr. S.D.N.Y. Jan. 16, 2009).

[101] *Id*. at p. 5.

On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as Examiner.[102] The Court approved the appointment on January 20, 2009.[103]  On February 11, 2009, the Court approved the Examiner's request to employ Jenner & Block LLP as counsel and provided the Examiner with authority to issue subpoenas under Fed. R. Bankr. P. 2004.[104]  On February 17, 2009, the Court approved the Examiner's Preliminary Work Plan.[105]  On February 25, 2009, the Court authorized the Examiner to employ Duff & Phelps, LLC as his financial advisors.[106]

Despite the complexity of Lehman's bankruptcy and the broad scope of the Examiner's investigation, the time available for the examination was limited by the practical needs of the bankruptcy proceeding.  The Examiner initially targeted the week of February 1, 2010 to submit his report to the Court in order to assure that the report would be available prior to the March 15, 2010 deadline of the Debtors' exclusivity

---

[102] Notice of Appointment of Examiner, Docket No. 2570, *In re Lehman Brothers Holdings Inc.*,Case No. 08-13555 (Bankr. S.D.N.Y. Jan. 19, 2009).

[103] Order Approving Appointment of Examiner, Docket No. 2583, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Jan. 20, 2009).

[104] Order Authorizing the Examiner to Retain and Employ Jenner & Block LLP as His Counsel *Nunc Pro Tunc* as of January 19, 2009, Docket No. 2803, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Feb. 11, 2009); and Order Granting Examiner's Motion Directing the Production of Documents and Authorizing the Examinations of the Debtors' Current and Former Officers, Directors and Employees, and Other Persons and Entities, Docket No. 2804, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Feb. 11, 2009).

[105] Order Approving the Preliminary Work Plan of Anton R. Valukas, Examiner, Docket No. 2855, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Feb. 17, 2009).

[106] Order Authorizing the Examiner to Retain and Employ Duff & Phelps LLC as His Financial Advisors *Nunc Pro Tunc* as of February 6, 2009, Docket No. 2924, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Feb. 17, 2009).

period to propose a plan of reorganization.[107]   Even though the Debtors have suggested that they may not file a plan by that date, the Examiner determined that all parties would be better served if he adhered to his self-imposed February 2010 schedule.

## B.  Document Collection and Review

The available universe of Lehman e-mail and other electronically stored documents is estimated at three petabytes of data – roughly the equivalent of 350 billion pages.  The Examiner carefully selected a group of document custodians and search terms designed to cull out the most promising subset of Lehman electronic materials for review.   In addition, the Examiner requested and received hard copy documents from Lehman and both electronic and hard copy documents from numerous third parties and Government agencies, including the Department of the Treasury, the SEC, the Federal Reserve, FRBNY, the Office of Thrift Supervision, the SIPA Trustee, Ernst & Young, JPMorgan, Barclays, Bank of America, HSBC, Citibank, Fitch, Moody's, S&P, and others.[108]

In total, the Examiner collected in excess of five million documents, estimated to comprise more than 40,000,000 pages.  All of these documents have been converted to

---

[107] Order Granting Debtors' Motion, Pursuant to Section 1121(d) of the Bankruptcy Code, Requesting Second Extension of Exclusive Periods for the Filing of and Solicitation of Acceptances for Chapter 11 Plans, Docket No. 4449, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. July 20, 2009).

[108] See Appendix 5 for full details of custodians, search request, search terms and related document metrics.  Although a handful of subpoenas were threatened and in a few cases served, ultimately the Examiner received nearly all requested documents voluntarily.  In the interest of time and efficiency, the Examiner did not, except where significant deficiencies were apparent, challenge the completeness of production or the withholding of documents upon claims of privilege.

electronic form and are maintained on two computerized databases, Stratify and CaseLogistix.  The Stratify database, which is housed and maintained on servers by the Debtors' professionals, Alvarez & Marsal, contains approximately four and a half million unique documents, and consists of collected Lehman e-mails and attachments; the CaseLogistix database, which is housed and maintained by the Examiner's counsel, Jenner & Block, contains approximately seven hundred thousand unique documents, primarily consisting of third-party productions.

Documents were reviewed on at least two levels. First level review was conducted by lawyers trained to identify documents of possible interest and to code the substantive areas to which the documents pertained; those so identified were subjected to further and more careful review by lawyers or financial advisors especially immersed in the earmarked subjects.  In order to reduce the cost of review, the Examiner sought and obtained the Court's approval to retain contract attorneys.[109] A group of more than 70 contract attorneys, supplemented by Jenner & Block attorneys, conducted first level reviews.  All second level (and beyond) reviews were performed by Jenner & Block attorneys or Duff & Phelps professionals.

---

[109] Order Authorizing the Examiner to Retain Certain Contract Attorneys to Perform Specific Document Review Tasks *Nunc Pro Tunc* as of April 15, 2009, Docket No. 3577, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. May 15, 2009); Order Authorizing the Examiner to Retain Additional Contract Attorneys to Perform Specific Document Review Tasks *Nunc Pro Tunc* as of May 11, 2009, Docket No. 3750, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. June 3, 2009); and Order Authorizing the Examiner to Retain Additional Contract Attorneys to Perform Specific Document Review Tasks *Nunc Pro Tunc* as of June 11, 2009, Docket No. 4428, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. July 16, 2009).

The Examiner estimates that he has reviewed approximately 34,000,000 pages of documents in the course of his investigation. The entire body of e-mail in the Stratify database – 4,439,924 documents, approximately 26 million pages – has been reviewed.[110] Approximately 340,000 of the CaseLogistix documents – roughly eight million pages – have been reviewed.[111] Although a large number of the CaseLogistix documents were not reviewed, that database is fully searchable, and the Examiner is reasonably confident that the repeated and focused searches applied against that database have discovered most if not all of the most relevant documents.[112]

In most cases, documents were produced to the Examiner under stipulated protective orders, which are described in Appendix 5. Subject to those orders, the document databases created by the Examiner remain a resource for the estate and the parties. The database includes computerized tagging which will allow persons interested in making their own searches to narrow and focus search requests. The Examiner will work with the parties and the Court to resolve logistical and

---

[110] On January 30, 2010, the Examiner received about 55,500 unique e-mails from the Debtors responsive to long-outstanding requests that had not earlier been produced due to a data transfer issue. Earlier that week, the Examiner received 30,000 pages of documents from Ernst & Young responsive to long-outstanding requests that had not earlier been produced because a single custodian's files had inadvertently not been included. Despite the lateness of the receipt of these documents, the Examiner was able to complete review of them by deploying a team of lawyers to the task.

[111] The Examiner is able to count documents loaded in the two databases with precision, but page numbers are estimates. On average, the e-mail and attachments in the Stratify database are six pages per document; the documents in the CaseLogistix database tend to be larger, averaging 23 pages per document.

[112] A substantial number of additional documents were produced in the pending Barclays sale litigation in the weeks before this Report was due. Given the ongoing nature of that litigation and the Court's concurrence that the Examiner need not express conclusions on these still-in-active-litigation issues, those documents have not been reviewed except on a limited, focused basis.

confidentiality issues so that the databases can become an asset available to all interested parties.

### C.   Systems Access

Answering the questions posed by the Examiner Order necessarily required an extensive investigation and review of Lehman's operating, trading, valuation, financial, accounting and other data systems.   Interrogating those systems proved particularly challenging, first because the vast majority of the systems had been transferred and were under the control of Barclays; by the time of the Examiner's appointment, Barclays had integrated its own proprietary and confidential data into some of the systems, so Barclays had legitimate concerns about granting access to those systems.   Although it took some time, Barclays was cooperative and those issues were for the most part resolved.

The second challenge was more daunting.   At the time of its bankruptcy filing, Lehman maintained a patchwork of over 2,600 software systems and applications.   The Examiner, in consultation with his financial advisors, decided early on that it would not be cost effective to undertake the enormous effort and expense that would be required to learn and access each of these 2,600 systems.   Rather, the Examiner directed his financial advisors to identify and acquire an in-depth understanding of the most promising of the systems.

The Examiner's financial advisors ultimately requested access to 96 of the most relevant systems.[113]  The process of identifying those presented it own challenges.  Many of Lehman's systems were arcane, outdated or non-standard.  Becoming proficient enough to use the systems required training in some cases, study in others, and trial and error experimentation in others.  In numerous instances, the Examiner's professionals would request access to a particular system, expend the time necessary to learn how to use the system and only then discover that access to two or three additional systems was required to answer the necessary questions.  Lehman's systems were highly interdependent, but their relationships were difficult to decipher and not well documented.  It took extraordinary effort to untangle these systems to obtain the necessary information.

Because some systems were in current use by Barclays in its operations, Barclays limited access to 79 of the requested 96 systems to "read-only."  Read-only access made the review and organization of data more difficult.  And in some cases, read-only access was severely restricted.  For some systems, the ability to query the data and search for a particular transaction was limited to certain parameters.  For others, the Examiner was denied direct access altogether, requiring the need to request that searches be done by Barclays's technology personnel, who would then forward findings to the Examiner.

---

[113] *See* Appendix 6.

Finally, the accessibility of data was complicated by the fact that the filing of a bankruptcy petition by Lehman came with virtually no advance preparation.  The filing did not occur at the close of a month or a quarter when Lehman would prepare reconciliations and summaries of its financial data.  Record-keeping quickly fell into disarray upon Lehman's hurried filing.  Reconstructing data during this period has proven a challenge not only for the Examiner but for all who must rely upon this data in Lehman's Chapter 11 proceedings.

In the end, the Examiner's financial advisors were generally able to get sufficient data to inform and support the Examiner's Report, but there may be areas, specifically noted where appropriate in the text below, where data limitations need to be considered.

### D.  Witness Interview Process

Shortly after his appointment, the Examiner spoke with examiners from other large bankruptcy proceedings, including WorldCom, SemCrude and Refco, and obtained their advice on best practices.  One of the suggestions made was that wherever possible interviews be conducted informally, without requiring that the witness be sworn and without transcripts.  There are obvious pros and cons to the use of sworn, transcribed interviews.  On the plus side, oath and transcription make citations to testimony more certain; on the minus side, the formality of oath and transcription inevitably takes more time, creates additional expense and makes some witnesses less

willing to give full cooperation; moreover, the creation of transcribed statements might have impacted pending Government investigations.   Balancing these factors, the Examiner decided to use informal interviews wherever possible – and that turned out to be possible in all cases.   To assure accuracy, all interviews were conducted by at least two attorneys, one of whom was assigned to keep careful notes.   Flash summaries were prepared as soon as possible, usually the day of the interview, and reviewed by all lawyers present while recollections remained sharp; and full summaries were made and reviewed as soon as practical after that.

In the vast majority of cases, the interviewees were represented by counsel. Nevertheless, the Examiner advised each interviewee that he is a neutral fact-finder and that he and his professionals should not be deemed to represent the witness nor any point of view.   Consistent with that neutrality, prior to each interview the Examiner provided advance notice of the topics he intended to cover and advance copies of the documents he anticipated showing the witness.   The Examiner did so in order to make the interview as efficient as possible and to permit the witness to refresh recollection before the interview rather than on the fly.   Each witness was encouraged to advise the Examiner if he or she believed it was appropriate to correct or supplement the information given during the interview.

In all, the Examiner has interviewed more than 250 individuals.   There was only one individual the Examiner sought to interview but could not.   The Examiner

requested an interview with Hector Sants, chief executive of the UK's Financial Services Authority ("FSA"), to discuss the FSA's involvement in the events of Lehman Weekend and the Barclays transaction.  The FSA considered the request, but did not make Mr. Sants available for an interview.  However, the FSA did provide detailed, written answers to specific questions that would have been posed to Mr. Sants.

A full list of the persons interviewed by the Examiner is set out in Appendix 4.

### E.   Cooperation and Coordination With the Government and Parties

The Examiner received extraordinary cooperation, both from parties and non-parties, without which the completion of this Report would have taken far more time.  Although the Debtors' professionals and personnel were and are extremely busy with the day-to-day requirements of Lehman's liquidation, they remained responsive to almost daily requests for information from the Examiner and his professionals.  Many parties, such as the Debtors, provided documents to the Examiner on an expedited basis without taking the time for privilege review, subject to clawback agreements.

Shortly after his appointment, the Examiner met with and established a regular line of contact with the SIPA Trustee to share documents, interview summaries and other information to avoid duplication of effort.  The Examiner met with the SEC and three United States Attorney Offices (New Jersey, Eastern District of New York, Southern District of New York) to establish protocols for clearing proposed interviews

so as not to interfere with any ongoing investigations.  And the Examiner met with interested parties to obtain their guidance and thoughts.

Throughout the course of the investigation, the Examiner conducted regular, weekly calls with the SEC and U.S. Attorneys to update them on developments and to describe significant documents and the results of interviews. The Examiner has likewise made documents and the results of interviews available to the SIPA Trustee.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

The Report now continues with the detail.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

```
------------------------------------------------------- x
                                         :
In re                                    :     Chapter 11 Case No.
                                         :
LEHMAN BROTHERS HOLDINGS INC.,           :     08-13555 (JMP)
et al.,                                  :
                                         :     (Jointly Administered)
                        Debtors.         :
------------------------------------------------------- x
```

**REPORT OF**
**EXAMINER ANTON R. VALUKAS**

**Section III.A.1: Risk**

# TABLE OF CONTENTS

III. Examiner's Conclusions.................................................................43

    A.   Why Did Lehman Fail?  Are There Colorable Causes of Action That
Arise From Its Financial Condition and Failure?..................................43

        1.   Business and Risk Management.................................................43

            a)   Executive Summary .........................................................43

                (1)   The Examiner Does Not Find Colorable Claims That
Lehman's Senior Officers Breached Their Fiduciary Duty of
Care by Failing to Observe Lehman's Risk Management
Policies and Procedures .......................................................47

                (2)   The Examiner Does Not Find Colorable Claims That
Lehman's Senior Officers Breached Their Fiduciary Duty to
Inform the Board of Directors Concerning the Level of Risk
Lehman Had Assumed .........................................................52

                (3)   The Examiner Does Not Find Colorable Claims That
Lehman's Directors Breached Their Fiduciary Duty by
Failing to Monitor Lehman's Risk-Taking Activities........................54

            b)   Facts.............................................................................58

                (1)   From Moving to Storage:  Lehman Expands Its Principal
Investments ....................................................................58

                    (a)  Lehman's Changed Business Strategy .........................59

                    (b)  The Increased Risk From Lehman's Changed Business
Strategy...........................................................................62

                    (c)  Application of Risk Controls to Changed Business
Strategy...........................................................................65

                         (i)   Stress Testing Exclusions ....................................66

                         (ii)   Risk Appetite Limit Increase For Fiscal 2007 ....................70

                         (iii)  Decision Not To Enforce Single Transaction Limit ..........73

                    (d)  The Board's Approval of Lehman's Growth Strategy...............76

                (2)   Lehman Doubles Down: Lehman Continues Its Growth
Strategy Despite the Onset of the Subprime Crisis...........................78

                    (a)  Lehman's Residential Mortgage Business....................82

                        (i)   Lehman Decides to Curtail Subprime Originations
but Continue to Pursue "Alt-A" Originations ................82

                        (ii)   The March 20, 2007 Board Meeting ....................90

(b) The Explosion in Lehman's Leveraged Loan Business ............. 95

   (i) Relaxation of Risk Controls to Accommodate
       Growth of Lehman's Leveraged Loans Business ............. 97

(c) Internal Opposition to Growth of Leveraged Loans
    Business ................................................................ 100

(d) Growth of Lehman's Commercial Real Estate Business at
    The Start of the Subprime Crisis .................................... 103

   (i) Relaxation of Risk Controls to Accommodate
       Growth of Lehman's Commercial Real Estate
       Business ........................................................ 105

   (ii) Internal Opposition to Growth of Commercial Real
        Estate Business ................................................ 107

   (iii) Archstone ..................................................... 108

        a. Lehman's Commitment ................................... 108

        b. Risk Management of Lehman's Archstone
           Commitment ............................................. 112

(e) Nagioff's Replacement of Gelband as Head of FID ................ 114

(f) The Board of Directors' Awareness of Lehman's
    Increasing Risk Profile ............................................. 116

(3) Early Warnings: Risk Limit Overages, Funding Concerns,
    and the Deepening Subprime Crisis ..................................117

(a) Nagioff and Kirk Try to Limit Lehman's High Yield
    Business ............................................................. 119

(b) July-August 2007 Concerns Regarding Lehman's Ability
    to Fund Its Commitments ........................................... 123

(c) Lehman Delays the Archstone Closing .................................... 128

(d) Lehman Increases the Risk Appetite Limit to
    Accommodate the Additional Risk Attributable to the
    Archstone Transaction ............................................... 131

(e) Cash Capital Concerns ................................................... 134

(f) Lehman's Termination of Its Residential Mortgage
    Originations ........................................................ 138

(g) September, October, and November 2007 Meetings of
    Board of Directors ................................................. 139

   (i) Risk Appetite Disclosures ................................... 139

   (ii) Leveraged Loan Disclosures ............................... 144

(iii)  Leverage Ratios and Balance Sheet Disclosures ............. 147

(iv)  Liquidity and Capital Disclosures ................................... 148

(4)  Late Reactions:  Lehman Slowly Exits Its Illiquid Real Estate
Investments .......................................................................... 150

(a)  Fiscal 2008 Risk Appetite Limit Increase ................................... 152

(b)  January 2008 Meeting of Board of Directors ............................. 154

(c)  Executive Turnover ..................................................................... 156

(d)  Commercial Real Estate Sell-Off:  Too Little, Too Late .......... 157

(e)  Lehman's Compensation Practices ............................................. 161

c)  Analysis ........................................................................................... 163

(1)  The Examiner Does Not Find Colorable Claims That
Lehman's Senior Officers Breached Their Fiduciary Duty of
Care by Failing to Observe Lehman's Risk Management
Policies and Procedures ....................................................... 164

(a)  Legal Standard ............................................................................ 164

(b)  Background .................................................................................. 166

(i)  Countercyclical Growth Strategy with Respect to
Residential Mortgage Origination ..................................... 171

(ii)  Lehman's Concentration of Risk in Its Commercial
Real Estate Business ........................................................... 172

(iii)  Concentrated Investments in Leveraged Loans ............ 175

(iv)  Firm-Wide Risk Appetite Excesses ................................... 179

(v)  Firm-Wide Balance Sheet Limits ....................................... 181

(vi)  Stress Testing ..................................................................... 181

(vii)  Summary:  Officers' Duty of Care .................................... 182

(2)  The Examiner Does Not Find Colorable Claims That
Lehman's Senior Officers Breached Their Fiduciary Duty to
Inform the Board of Directors Concerning the Level of Risk
Lehman Had Assumed .......................................................... 183

(3)  The Examiner Does Not Find Colorable Claims That
Lehman's Directors Breached Their Fiduciary Duty by
Failing to Monitor Lehman's Risk-Taking Activities ....................... 188

(a)  Lehman's Directors are Protected From Duty of Care
Liability by the Exculpatory Clause and the Business
Judgment Rule ................................................................ 188

(b)  Lehman's Directors Did Not Violate Their Duty of
Loyalty .............................................................................. 190

(c)  Lehman's Directors Did Not Violate Their Duty to
Monitor ............................................................................. 191

(i)  Application of *Caremark* to Risk Oversight: *In re
Citigroup Inc.* ..................................................... 191

(ii)  Application of *Caremark* and *Citigroup* to Lehman's
Directors ............................................................. 193

III.   **EXAMINER'S CONCLUSIONS**

A.   **Why Did Lehman Fail?  Are There Colorable Causes of Action That Arise From Its Financial Condition and Failure?**

1.   **Business and Risk Management**

a)   **Executive Summary**

In 2006, Lehman adopted a more aggressive business strategy by expanding its investments in potentially highly profitable lines of business that also carried much more risk than Lehman's traditional investment banking activities.  Through the first half of 2007, Lehman focused on making "principal" investments – committing its own capital in commercial real estate ("CRE"), leveraged lending, and private equity-like investments.  These investments were considerably riskier for Lehman than its other business lines because Lehman was acquiring potentially illiquid assets that it might be unable to sell in a downturn.[114]

Lehman continued and even intensified this high-risk strategy after the onset of the subprime residential mortgage crisis in late 2006.  As some Lehman officers described it, Lehman shifted from focusing almost exclusively on the "moving" business – a business strategy of originating assets primarily for securitization or syndication and distribution to others – to the "storage" business – which entailed making longer-term investments using Lehman's own balance sheet.[115]   Lehman

---

[114] *See* Tobias Adrian, Federal Reserve Bank of New York, and Hyun Song Shin, Princeton University, Financial Intermediaries, Financial Stability and Monetary Policy (Aug. 5, 2008), at p. 13.
[115] See Section III.A.1.b of this Report.

continued to pursue commercial real estate and leveraged loan transactions aggressively until July 2007.[116]

While the decision to shift into long-term investments was voluntary, market events pushed Lehman ever further from moving to storage.  Lehman's primary mortgage origination subsidiaries, BNC Mortgage Inc. ("BNC") and Aurora Loan Services, LLC ("Aurora"), continued to originate subprime and other non-prime mortgages to a greater extent than other mortgage originators, many of whom had recently gone out of business, or would soon do so.[117]  BNC's and Aurora's continued mortgage originations increased the volume of illiquid assets on Lehman's balance sheet – albeit unintentionally – because Lehman became unable to securitize and distribute these mortgages to third parties.[118]

Lehman's continued pursuit of this aggressive growth strategy, even in the face of the subprime crisis, was based on two important calculations by Lehman's management.  First, like some other market participants, not to mention governmental officials, Lehman's management believed that the subprime crisis would not spread to

---

[116] See Section III.A.1.b of this Report.

[117] Lehman, Update on Lehman Brothers' Subprime Mortgage Origination Business Presentation to Lehman Board of Directors (Mar. 20, 2007), at p. 5 [LBHI_SEC07940_025839].

[118] Lehman, Securitized Products, MBS: Non Investment Grade Retained Interests (Jan. 16, 2007), at p. 1 [LBEX-DOCID 839039]; Lehman, Update on Lehman Brothers' Subprime Mortgage Origination Business Presentation to Lehman Board of Directors [Draft] (Mar. 18, 2007), at p. 14 [LBEX-DOCID 610173] ("Limited ability to sell below Investment Grade risk profitably in current environment"); Examiner's Interview of Matthew Miller, Sept. 24, 2009, at p. 2.

other markets and to the economy generally.[119]   Second, Lehman's management

believed that while other financial institutions were retrenching and reducing their risk

profile, Lehman had the opportunity to pick up ground and improve its competitive

position.   Lehman had benefited from a similar "countercyclical growth strategy"

during prior market dislocations, and its management believed it could similarly

benefit from the subprime lending crisis.[120]   Lehman miscalculated.   As Lehman's Chief

Executive Officer ("CEO") Richard S. Fuld, Jr. later admitted, Lehman underestimated

both the severity of the subprime crisis and the extent of the contagion to Lehman's

other business lines.[121]

The Examiner investigated Lehman's adoption and implementation of this

aggressive countercyclical business strategy for several reasons.   First, the potentially

illiquid assets Lehman acquired played a significant role in Lehman's ultimate financial

failure.   Lehman's losses were largely concentrated in its commercial real estate

portfolio and in certain less liquid aspects of its residential mortgage origination and

securitization business.   Similarly, Lehman's liquidity was compromised by its

---

[119] *E.g.*, Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 16, 24; Examiner's Interview of Joseph Gregory, Nov. 13, 2009, at p. 7; Examiner's Interview of Treasury Secretary Timothy F. Geithner, Nov. 24, 2009, at p. 3.

[120] *See* Section III.A.1.b of this Report.

[121] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 16, 24; Examiner's Interview of Richard McKinney, Aug. 27, 2009, at pp. 2, 9; Richard S. Fuld, Jr., Lehman, Notes for Senior Management Speech (June 16, 2008), at pp. 5-6 [LBEX-DOCID 529241], attached to e-mail from Taimur Hyat, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (June 25, 2008) [LBEX-DOCID 556064].

accumulation of assets that it could not sell, including not only the commercial and residential real estate assets, but also, to a lesser extent, the leveraged loan positions.

Second, e-mails written by Lehman risk management personnel suggest that Lehman senior management disregarded its risk managers, its risk policies, and its risk limits.[122]  Press reports prior to Lehman's bankruptcy stated that in 2007 Lehman had removed Madelyn Antoncic, Lehman's Chief Risk Officer ("CRO"), and Michael Gelband, head of its Fixed Income Division ("FID"), because of their opposition to management's growing accumulation of risky and illiquid investments.[123]  And external monitors of Lehman's affairs, such as the Office of Thrift Supervision ("OTS") and Moody's Investor Services ("Moody's"), also raised serious questions about Lehman's risk management, particularly with respect to its commercial real estate investments.[124]

_____

[122] *See, e.g.*, e-mail from Kentaro Umezaki, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al.* (Sept. 10, 2008) [LBEX-DOCID 1718043] (noting "history of `end arounds' on risk decisions," risk management's lack of authority and lack of authority over balance sheet and inability to enforce risk limits); e-mail from Vincent DiMassimo, Lehman, to Christopher M. O'Meara, Lehman (Sept. 1, 2008) [LBEX-DOCID 203219] ("whatever risk governance process we had in place was ultimately not effective in protecting the firm [.] Risk Appetite measures were not effective in establishing clear enough warning signals that the Firm was taking on too much risk relative to capital. . . . The [Risk Management] function lacked sufficient authority within the Firm.  Decision-making was dominated by the business. . . ."); e-mail from Satu Parikh, Lehman, to Michael Gelband, Lehman, Sept. 15, 2008 [LBEX-DOCID 882447] ("I am shocked at the poor risk mgmt at the highest levels, and I don't think it started with Archstone.  It is all unbelievable and I think there needs to be an investigation into the broader issue of malfeasance.  Mgmt gambled recklessly with thousands of jobs and shareholder wealth. . . .").

[123] *See, e.g.*, Yalman Onaran, *Lehman Fault-Finding Points to Last Man Fuld as Shares Languish*, Bloomberg.com, July 22, 2008.

[124] *See* Office of Thrift Supervision, Report of Examination, Lehman Brothers Holdings Inc. (as of May 31, 2008), at p. 2 [LBEX-OTS 000392] (finding that Lehman did not employ sound risk management practices in its commercial real estate business); e-mail from Stephen Lax, Lehman, to Erin M. Callan, Lehman, *et al.* (June 9, 2008) [LBEX-DOCID 017840] (forwarding text of Moody's release announcing downgrade of Lehman ratings outlook: "The rating action also reflects Moody's concerns over risk management

Accordingly, the Examiner investigated (1) whether there are colorable claims for breach of the duty of care against Lehman's officers for the manner in which they administered Lehman's risk management system in connection with the acquisition of these illiquid assets; (2) whether there are colorable claims for breach of the duty of good faith and candor against Lehman's officers for failing fully to inform the Board of Directors (the "Board")[125] of the extent of the risk and illiquidity that Lehman assumed through the new strategy; and (3) whether there are colorable claims against Lehman's directors for breach of their duty to monitor Lehman's risk management.

The Examiner concludes that the conduct of Lehman's officers, while subject to question in retrospect, falls within the business judgment rule and does not give rise to colorable claims.  The Examiner concludes that Lehman's directors did not breach their duty to monitor Lehman's risks.

> **(1)  The Examiner Does Not Find Colorable Claims That Lehman's Senior Officers Breached Their Fiduciary Duty of Care by Failing to Observe Lehman's Risk Management Policies and Procedures**

Delaware law, which governs a Delaware corporation such as Lehman, sets a high bar for establishing a breach of the fiduciary duty of care.[126]   Officers' and directors' business decisions are generally protected from personal liability by the

---

decisions that resulted in elevated real estate exposures and the subsequent ineffectiveness of hedges to mitigate these exposures").

[125] References to the "Board" in this Section of the Report refer to Lehman's outside directors, not to Fuld, who was CEO and Chairman of the Board.

[126] For a detailed discussion of  Delaware corporate fiduciary law, see Appendix 1.

business judgment rule, and even if the business judgment rule does not apply, there is no liability unless the officer or director was grossly negligent. "In the duty of care context gross negligence has been defined as 'reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason.'"[127]

The proof necessary to defeat the business judgment rule and establish gross negligence is particularly high with respect to risk management and financial transactions. Banking is inherently risky and prone to financial losses caused by unforeseen changes in the markets.[128] Profitability depends largely on the firm's ability to evaluate the risks of potential investments and balance them against their potential gains.[129] Consequently, to establish a colorable claim that Lehman officers breached their fiduciary duty by mismanaging business risk, the evidence must show that Lehman's senior management was reckless or irrational in managing the risks associated with the principal investment strategy that Lehman pursued during 2006 and 2007.[130]

Lehman had sophisticated policies, procedures, and metrics in place to estimate the risk that the firm could assume without jeopardizing its ability to achieve a target

---

[127] *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) (quoting *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005)).

[128] *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 126 (Del. Ch. 2009).

[129] *See id.*

[130] *See* Appendix 1, Legal Issues.

rate of return, and to apprise management and the Board whether Lehman was within various risk limits.[131]  Lehman also used an array of stress tests to determine the potential financial consequences of an economic shock to its portfolio of assets and investments.[132]  Lehman had an extensive staff that was devoted solely to risk management.[133]

These risk limits and stress tests, however, did not impose legal requirements on management or prevent management and the Board from exceeding those limits if they chose to do so.[134]  The role of the risk limits and stress tests was to cause management to consider whether a particular investment or a broad business strategy was worth the risk it carried.[135]  In addition, Lehman used its risk management system to promote its capabilities to investors, rating agencies, and regulators.[136]  Lehman's management always retained the discretion to use its judgment to decide whether to pursue particular strategies or transactions.[137]

The Examiner did find that in pursuing its aggressive growth strategy, Lehman's management chose to disregard or overrule the firm's risk controls on a regular basis. The question whether there is a colorable claim that Lehman's senior officers breached

---

[131] *See generally* Appendix 1, Legal Issues.
[132] Appendix No. 8, Risk Management Organization and Controls.
[133] *Id.*
[134] *Id.*
[135] *See id.*
[136] *Id.*
[137] *See id.*

their fiduciary duty of care focuses on facts relating to Lehman's acquisition of

potentially illiquid investments in 2007 and the manner in which management used

Lehman's risk management system as part of its process of making investment

decisions:

- Lehman's management decided to exceed risk limits with respect to Lehman's principal investments, namely, the "concentration limits" on Lehman's leveraged loan and commercial real estate businesses, including the "single transaction limits" on the leveraged loans.  These limits were designed to ensure that Lehman's investments were properly limited and diversified by business line and by counterparty.  Lehman took highly concentrated risks in these two business lines, and, partly as a result of market conditions, ultimately exceeded its risk limits by margins of 70% as to commercial real estate and by 100% as to leveraged loans.[138]

- Lehman's management excluded certain risky principal investments from its stress tests.  Although Lehman conducted stress tests on a monthly basis and reported the results of these stress tests periodically to regulators and to its Board of Directors, the stress tests excluded Lehman's commercial real estate investments, its private equity investments, and, for a time, its leveraged loan commitments.  Thus, Lehman's management did not have a regular and systematic means of analyzing the amount of catastrophic loss that the firm could suffer from these increasingly large and illiquid investments.[139]

- Lehman did not strictly apply its balance sheet limits, which were designed to contain the overall risk of the firm and maintain the firm's leverage ratio within the range required by the credit rating agencies, but instead decided to exceed those limits.  To mitigate the apparent effect of these overages, Lehman used Repo 105 transactions to take assets temporarily off the balance sheet before the ends of reporting periods.  (The Repo 105 transactions are discussed in Section III.A.4 of this Report.)[140]

- Lehman's management decided to treat primary firm-wide risk limit – the risk appetite limit – as a "soft" guideline, notwithstanding Lehman's

---

[138] Appendix No. 9, comparing risk appetite and VaR usage versus limits.

[139] *See* Section III.A.1.b of this Report.

[140] *See id.*

representations to the Securities Exchange Commission ("SEC") and the Board that the risk appetite limit was a meaningful constraint on Lehman's risk-taking.[141]   Lehman management's decision not to enforce the risk appetite limit was apparent in several ways:

○   Between December 2006 and December 2007, Lehman raised its firm-wide risk appetite limit three times, going from $2.3 to $4.0 billion.[142]

○   Between May and August 2007, Lehman omitted some of its largest risks from its risk usage calculation.  The primary omitted risk was a $2.3 billion bridge equity position in the Archstone-Smith Real Estate Investment Trust ("Archstone" or "Archstone REIT") real estate transaction, an extraordinarily large and risky commitment.  Had Lehman's management promptly included that risk in its usage calculation, it would have been immediately apparent that Lehman was over its risk limits.[143]

○   After Lehman did include the Archstone risk in the firm's risk appetite usage, Lehman continued to exceed the limit for several more months.  Rather than aggressively reduce Lehman's balance sheet in response to these indicators of excessive risk-taking, Lehman raised its firm-wide risk limit again.[144]

Although these decisions by Lehman's management ultimately proved to be unwise, the Examiner finds insufficient evidence to support a determination that Lehman's senior officers' conduct with respect to risk management was outside the business judgment rule or reckless or irrational.[145]

---

[141] *E.g.*, SEC, Lehman Monthly Risk Review Meeting Notes (July 19, 2007), at p. 5 [LBEX-SEC 007363] ("Jeff [Goodman] told us that . . . VaR is just one measure that Lehman uses, and is more of a speed bump/warning sign that a true, hard limit -- that role falls to RA [(i.e. risk appetite)].  [….]  He said that Madelyn [Antoncic], Dave [Goldfarb], and the executive committee tend to look more at RA.  As an aside, Madelyn came in after Jeff's explanation and gave virtually the same speech"); *see also* Section III.A.1.b of this Report.

[142] *See* Section III.A.1.b of this Report.

[143] *See id.*

[144] *See id.*

[145] *See* Section III.A.1.c of this Report.

Based upon their considerable business experience and successful track record, Lehman's senior managers decided to place a higher priority on increasing profits than on keeping the firm's risk level within the limits arising from its risk management policies and metrics.   Lehman's senior managers were confident making business judgments based on their understanding of the markets, and did not feel constrained by the quantitative metrics generated by Lehman's risk management system.   These decisions raise questions about the role of risk management in a complex financial institution, but they do not give rise to a colorable claim of the breach of the fiduciary duty of care given the high bar to liability established by Delaware law.

> **(2)   The Examiner Does Not Find Colorable Claims That Lehman's Senior Officers Breached Their Fiduciary Duty to Inform the Board of Directors Concerning the Level of Risk Lehman Had Assumed**

The Examiner finds insufficient evidence to support a determination that Lehman's senior managers breached their fiduciary duty of candor, which required them to provide the Board with material reports concerning Lehman's risk and liquidity.[146]

The factual issues relevant to the duty of candor are the same risk management issues relevant to the duty of care.   Lehman's officers did not disclose certain

---

[146] Appendix No. 1, Legal Issues; *In re Amer. Int'l Group, Inc.*, 965 A.2d 763, 806-07 (Del. Ch. 2009) ("In colloquial terms, a fraud on the board has long been a fiduciary violation under our law and typically involves the failure of insiders to come clean to the independent directors about . . . information that the insiders fear will be used by the independent directors to take actions contrary to the insiders' wishes").

information concerning the amount or duration of the firm-wide risk limit overages, their decisions to exceed certain concentration limits, or the limitations in the firm's stress testing.  Nor did Lehman's officers disclose that Lehman's originations of Alt-A mortgages – mortgages that were considered riskier than typical prime mortgages but not so risky as to be categorized as "subprime" – were exposing the firm to subprime mortgage risk, even as Lehman was curtailing originations of loans actually denominated as "subprime."  Lehman's directors generally said that if such risk management issues were significant and long-lasting, they would have liked to have received more information about them, but would not necessarily have taken action as a result.[147]

However, the Examiner found that Lehman's management did inform the Board, clearly and on more than one occasion, that it was taking increased business risk in order to grow the firm aggressively; that the increased business risk resulted in higher risk usage metrics and ultimately firm-wide risk limit overages; and that market conditions after July 2007 were hampering the firm's liquidity.[148]   Lehman's management also informed the Board, accurately, that the subprime mortgage crisis

---

[147] Examiner's Interview of Roger S. Berlind, May 8, 2009, at p. 4; Examiner's Interview of Marsha Johnson Evans, May 22, 2009, at p. 6; Examiner's Interview of Roland A. Hernandez, Oct. 2, 2009, at p. 10; Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 17; Examiner's Interview of Henry Kaufman, May 19, 2009, at p. 17; Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at pp. 14-16; Examiner's Interview of Michael Ainslie, Sept. 22, 2009, at pp. 3-4.  For information concerning the Board meetings where these general topics were discussed, the directors' statements to the Examiner about those meetings, and the directors' statements about the materiality of these facts, see Section III.A.1.b of this Report.

[148] Sections III.A.1.b of this Report.

was constricting profitability and that management was tightening origination standards and taking other steps to address that crisis.[149]

These disclosures were not so incomplete as to lead to the conclusion that Lehman's management misled the Board of Directors.  Nor did Lehman's officers have a legal duty to disclose additional details to the Board.  Lehman's risk limits and controls were designed primarily for management's internal use in making business decisions concerning the core issue faced by any financial institution:  what business risks to take and what business risks to decline.[150]  While the overall risk management of the firm is an appropriate topic for board consideration, the day-to-day decisions are primarily the responsibility of officers, not directors. [151]

### (3)  The Examiner Does Not Find Colorable Claims That Lehman's Directors Breached Their Fiduciary Duty by Failing to Monitor Lehman's Risk-Taking Activities

Lehman's corporate charter and related aspects of Delaware law protect its directors from personal liability based upon their business decisions.  As a result, the directors cannot be held liable for a breach of the duty of care; rather the directors can be liable for inadequately monitoring Lehman's affairs only if their failure to monitor was so egregious as to rise to the level of a breach of the duty of loyalty or the duty of

---

[149] Section III.A.1.b of this Report.

[150] *See* Appendix No. 8, Risk Management Organization and Controls.

[151] *See* 17 C.F.R. §§ 240.15c3-1e & 15c3-4 (2007) (requiring Lehman to submit a comprehensive description of its internal risk management control system to the SEC); NYSE, Inc., Listed Company Manual §303A(7)(c)(iii)(D) & cmt. (2010) (requiring audit committee of board to "discuss policies with respect to risk assessment and risk management" while noting that "it is the job of the CEO and senior management to assess and manage the company's exposure to risk").

good faith.  The Delaware courts have called this type of claim – referred to as a *Caremark* claim – "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[152]

The conduct typically evaluated in *Caremark* claims has been the failure to monitor managers' unlawful conduct.  In contrast here, a claim that the directors failed to satisfy their duty to monitor the extent of risk assumed by management and its compliance with corporate risk policies would require proof that the directors failed to monitor managers' judgment as to internal procedures that were not legally binding.  The business judgment rule applies with particular force to such a claim because the question of how much risk an investment bank can reasonably assume goes to the core of its business.[153]

The Examiner finds insufficient evidence of a breach of fiduciary duty by any Lehman director.  The directors received reports concerning Lehman's business and the level and nature of its risk-taking at every Board meeting.  Although these reports noted the elevated levels of risk to Lehman's business beginning in late 2006, management informed the directors that the increased risk-taking was part of a deliberate strategy to grow the firm.  The directors continued to receive such reports throughout 2007, and were repeatedly informed about developments in the subprime markets and the credit markets generally.  Management assured the directors that it was taking prudent steps

---

[152] *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).
[153] *In re Citigroup Inc. S'holder Litig.*, 964 A.2d 106, 126 (Del. Ch. 2009).

to address these risks but that management saw the unfolding crisis as an opportunity to pursue a countercyclical growth strategy.   Management's reports to the directors did not contain "red flags" imposing on the directors a duty to inquire further.[154]

Delaware law permits directors to rely on management's reports and immunizes the directors from personal liability when they do so.[155]   Consequently, there is insufficient evidence to establish a colorable claim that Lehman's directors breached their duty to monitor Lehman's management of its risks.

* * * * *

Although the Examiner does not find colorable claims against Lehman's senior officers or directors concerning Lehman's risk management, a complete discussion of the facts discovered by the Examiner's investigation of risk management is important in two fundamental respects.   First, the Examiner sets out the facts in detail so that the Court and the parties have the basis for the Examiner's conclusion that Lehman management's decisions with respect to risk and its countercyclical growth strategy do not give rise to colorable claims.

---

[154] *See, e.g.*, Lehman Brothers Holdings Inc., Minutes of Meeting of the Board of Directors (June 19, 2007) [LBHI_SEC07940_026267]; Lehman, Lehman Board of Directors Materials for June 19, 2007 Board Meeting (June 19, 2007) [LBHI_SEC07940_026214]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2007) [LBHI_SEC07940_026364]; Lehman, Lehman Board of Directors Materials for Sept. 11, 2007 Board Meeting (Sept. 7, 2007) [LBHI_SEC07940_026282]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Oct. 15, 2007), at p. 6 [LBHI_SEC07940_026407]; Lehman, Lehman Board of Directors Materials for Oct. 15, 2007 Board Meeting (Oct. 11, 2007) [LBHI_SEC07940_026371].

[155] *See* DEL. CODE ANN. tit. 8, § 141(e) (2009).

Second, these facts show how Lehman's approach to risk ultimately created the conditions that led Lehman's top managers to use Repo 105 transactions as discussed in Section III.A.4 of this Report.   Lehman's aggressive growth strategy also provides context for several other issues discussed in this Report, including issues concerning Lehman's liquidity pool and asset valuations.   Lehman's growth strategy resulted in a dramatic growth of Lehman's balance sheet:

| All figures in ($ Billions) | Q4 06 | Q1 07 | Q2 07 | Q3 07 | Q4 07 | Q1 08 | Q2 08 |
|---|---|---|---|---|---|---|---|
| Reported Net Assets[156] | 268.936 | 300.797 | 337.667 | 357.102 | 372.959 | 396.673 | 327.774 |

Lehman's net assets increased by almost $128 billion or 48% in a little over a year – from the fourth quarter of 2006 through the first quarter of 2008.

This increase in Lehman's net assets was primarily attributable to the accumulation of potentially illiquid assets that could not easily be sold in a downturn. By one measure, Lehman's holdings of "less liquid assets" more than doubled during the same time period – increasing from $86.9 billion at the end of the fourth quarter of 2006 to $174.6 billion at the end of the first quarter of 2008.[157]

---

[156] Lehman defined net assets as total assets excluding: (1) cash and securities segregated and on deposit for regulatory and other purposes; (2) securities received as collateral; (3) securities purchases under agreements to resell; (4) securities borrowed; and (5) identifiable intangible assets and goodwill.  Lehman Brothers Holdings Inc., Annual Report for 2007 10-K as of Nov. 30, 2007 (Form 10-K) (filed on Jan. 29, 2008), at p. 63.

[157] Lehman Brothers Holdings Inc., Lehman Brothers Fact Book Q2 2008 (June 13, 2009), at p. 16 [LBHI_SEC07940_593047].   Lehman's public filings include a different quantification of Lehman's less liquid assets.   According to these sources, Lehman's less liquid asset holdings almost quadrupled from the third quarter of 2006 until the first quarter of 2008, with a particularly sudden spike in the fourth quarter of 2007.  Lehman Brothers Holdings Inc., Quarterly Report as of Aug. 31, 2006 (Form 10-Q) (filed on Oct. 10, 2006), at pp. 16, 71-72 ("LBHI 10-Q (filed Oct 10, 2006)"); Lehman Brothers Holdings Inc.,

To explain the business and risk decisions that led Lehman management down this path, the following portions of this Section of the Report describe:

1. Lehman's decision in 2006 to take more principal risk;

2. The dramatic growth in Lehman's principal investments and in its balance sheet during the first half of Lehman's fiscal 2007, culminating in the acquisition of Archstone, to which Lehman committed in May 2007;

3. It became apparent during 2007 that Lehman's balance sheet had grown too large, and that Lehman had taken on too much risk;

4. How, even after it became apparent that Lehman's growth strategy had exposed the firm to financial peril, Lehman still acted without sufficient urgency to deleverage.

### b) Facts

#### (1) From Moving to Storage:  Lehman Expands Its Principal Investments

During the course of 2006, Lehman's management and Board made the deliberate business decision to increase the firm's risk profile generally, and to take more risk specifically with respect to principal investments with the firm's capital.  This new strategy was directed by Lehman's highest officers – primarily Fuld, Joseph

---

Annual Report for 2006 as of Nov. 30, 2006 (Form 10-K) (filed on Feb. 13, 2007), at pp. 66-67 ("LBHI 2006 10-K"); Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 28, 2007 (Form 10-Q) (filed on Apr. 9, 2007), at pp. 15, 19, 60 ("LBHI 10-Q (filed Apr. 9, 2007)"); Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2007 (Form 10-Q) (filed on July 10, 2007) , at pp. 17, 22, 64 ("LBHI 10-Q (filed July 10, 2007)"); Lehman Brothers Holdings Inc., Quarterly Report as of Aug. 31, 2007 (Form 10-Q) (filed on Oct. 10, 2007), at pp. 18, 23, 67 ("LBHI 10-Q (filed Oct. 10, 2007)"); Lehman Brothers Holdings Inc., Annual Report for 2007 as of Nov. 30, 2007 (Form 10-K) (filed on Jan. 29, 2008), at pp. 61-62, 104 ("LBHI 2007 10-K"); Lehman Brothers Holdings Inc., Quarterly Report as of Feb. 29, 2008 (Form 10-Q) (filed on Apr. 9, 2008), at pp. 21, 27, 55, 71 ("LBHI 10-Q (filed Apr. 9, 2008)"); Lehman Brothers Holdings Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed on July 10, 2008), at pp. 26, 29 ("LBHI 10-Q (filed July 10, 2008)"); see also Section III.A.1.b.4 of this Report.

Gregory (Lehman's President and Chief Operating Officer), and Hugh E. (Skip) McGee III (Global Head of Investment Banking) – after significant internal debate.

This Section of the Report describes the principal investment strategy adopted by Lehman in 2006; explains the risks that this strategy posed to the firm; describes how Lehman's risk controls were applied (or not) to the new strategy; and explains the Board's understanding of, and agreement with, the new strategy.

### (a)  Lehman's Changed Business Strategy

In 2006, Lehman made a significant change in its business strategy from a lower risk brokerage model to a higher risk, capital-intensive banking model.  Historically, Lehman described itself as being primarily in the moving business, not the storage business.[158]  Lehman, for the most part, did not use its balance sheet to acquire assets for its own investment; rather, Lehman acquired assets – such as commercial and residential real estate mortgages – primarily to move them by securitization or syndication and distribution to third parties.

During 2006, Lehman's management decided to emphasize the storage business – using Lehman's balance sheet to acquire assets for longer-term investment.[159]  Fuld believed that other banks were using their balance sheets to make more proprietary investments, that these investments were highly profitable relative to their risk in the

---

[158] Examiner's Interview of Paul Shotton, June 5, 2009, at p. 12.
[159] *Id.* at p. 2.

then-buoyant economic environment, and that Lehman was missing out on significant opportunities to do the same.[160]

Lehman's management primarily focused on expanding three specific areas of principal investment:  commercial real estate; leveraged loans; and private equity.

Commercial real estate investments were considered a strong candidate for expansion because those investments had historically been a strength of the firm.[161] Mark A. Walsh, Lehman's head of the Global Real Estate Group ("GREG"), was one of the most successful and trusted operators at the firm; management believed that Walsh could invest Lehman's capital wisely and could distribute any excess risk to other investors.[162]  The firm was even willing to make commercial real estate bridge equity investments – taking potentially riskier equity pieces of real estate investments – on the theory that the bridge equity, though riskier than the debt, could quickly be resold to third parties at a profit.[163]  Lehman was well paid for bridge equity in the commercial

---

[160] Examiner's Interview of Richard S. Fuld Jr., Sept. 25, 2009, at pp. 10-12 (Fuld said that Lehman expanded into the leveraged lending, bridge equity and principal investing to gain "wallet share."  Fuld wanted to use the "80-20 rule" to get the wallet share of Lehman's top clients.  The 80-20 rule says that the top 20% of the firm's clients will provide 80% of the firm's earnings.); Examiner's Interview of Jeremy M. Isaacs, Oct. 1, 2009, at p. 6.

[161] Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 3.

[162] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 14; Examiner's Interview of Mark Walsh, Oct. 21, 2009, at pp. 4-5; e-mail from Jeffrey Goodman, Lehman, to Mark A. Walsh, Lehman (Sept. 19, 2006) [LBEX-DOCID 1368068].

[163] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 6.

real estate business, and management believed that Walsh's distribution network minimized the risk that the firm would be unable to sell it.[164]

The business strategy to expand the leveraged loan business was somewhat different.  Lehman's management recognized that leveraged loans in their own right, including the bridge equity components of those transactions, were risky relative to their profitability.[165]  But Fuld, Gregory, and McGee in particular believed that if Lehman made loans to private equity sponsors as part of major M&A transactions, Lehman would build long-term client relationships with the sponsors and perhaps with other institutions involved in the transaction.[166] Fuld, Gregory, and McGee believed that every dollar that Lehman made from a leveraged loan would lead to five dollars of follow-on profits in the future.[167]

The firm's aggressive growth strategy was apparent in various firm-wide presentations given by senior management and in certain high-level business and risk-taking decisions made during 2006 and at the outset of the 2007 fiscal year.  As David Goldfarb (then Lehman's Global Head of Strategic Partnerships, Principal Investing,

---

[164] Lehman, FID Offsite Presentation and Notes (Sept. 28, 2006), at p. 10 [LBEX-DOCID 2042292, 2068495], attached to e-mail from Michael Gelband, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Sept. 26, 2006) [LBEX-DOCID 2384245].

[165] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at pp. 10, 13; Examiner's Interview of Michael Gelband, Aug. 12, 2009, at p. 6; Examiner's Interview of Alex Kirk, Jan. 12, 2010, at p. 6.

[166] Examiner's Interview of Hugh E (Skip) McGee III, Aug. 12, 2009, at pp. 7-8; Examiner's Interview of Joseph Gregory, Nov. 13, 2009, at p. 3; *accord* Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 12.

[167] Examiner's Interview of Joseph Gregory, Nov. 13, 2009, at p. 3; Examiner's Interview of Alex Kirk, Jan. 12, 2010, at p. 7.

and Risk) put it, Lehman was pursuing "13% annual growth" in revenues, and "to support this revenue growth [Lehman was] targeting an even faster increase in the firm's balance sheet, total capital base and risk appetite – each of which [was] projected to increase by 15% per year."[168]  Goldfarb noted that Lehman had been "pedal to the metal in growth mode" for the previous two years, but planned to continue that going forward.[169]  That year, Fuld and Gelband (then head of FID) also gave presentations in which they discussed Lehman's aggressive growth strategy.[170]

### (b)  The Increased Risk From Lehman's Changed Business Strategy

The business strategy that Lehman pursued beginning in 2006 was risky in light of the firm's high leverage and small equity base.  Commercial real estate investments, leveraged loans and other principal investments consumed more capital, entailed more risk, and were less liquid than Lehman's traditional lines of business.[171]

The lack of liquidity increased the risk to the firm in several ways.  Having a large volume of illiquid assets made it much more difficult for the firm to accomplish

---

[168] David Goldfarb, Lehman, Global Strategy Offsite Presentation (Mar. 2006), at pp. 30-31 [LBEX-DOCID 1342496], attached to e-mail from Christopher M. O'Meara, Lehman, to Jacqueline Roncagliolo, Lehman (Apr. 3, 2006) [LBEX-DOCID 1357100].

[169] *Id.* at p. 10.

[170] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 11; Lehman, FID Offsite Presentation and Notes (Sept. 28, 2006) [LBEX-DOCID 2042292, 2068495], attached to e-mail from Michael Gelband, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Sept. 26, 2006) [LBEX-DOCID 2384245].

[171] Less liquid investments were "Level 3."  Level 1 assets have readily available markets to provide prices and liquidity, such as exchange-traded equities.  Level 2 assets have observable events to provide pricing, such as comparable sales.  Level 3 assets have no readily available pricing mechanism and therefore are less liquid than Level 1 and 2 assets.

three important goals in a difficult financial environment:  to raise cash; to hedge risks; or to sell assets to reduce the leverage in its balance sheet.

When a financial institution suffers losses, it often needs to raise cash to fund itself.[172]  But illiquid investments are difficult to use for that purpose because they cannot be sold quickly.[173]  When illiquid investments are sold in a difficult market, the seller often takes a much larger loss on the sale than on a liquid asset.[174]  Similarly, illiquid assets are more difficult to use as collateral for borrowing.[175]  They often cannot be used in the repo market, which was a crucial source of funding for investment banks such as Lehman.[176]  If a borrower pledges illiquid assets as collateral, there will be a larger "haircut," that is, a discount from the market value of the pledged collateral, than for liquid assets.[177]

---

[172] *See* Lehman, Capital Adequacy Review (Sept. 11, 2008), at p. 1 [LBEX-DOCID 012124].

[173] *See* Tobias Adrian, Federal Reserve Bank of New York, and Hyun Song Shin, Princeton University, *Financial Intermediaries, Financial Stability and Monetary Policy* (Aug. 5, 2008), at p. 13.

[174] Martin Oehmke, *Putting the Brakes on Collateral Liquidations*, Columbia Business School Ideas at Work, July 28, 2009,
http://www4.gsb.columbia.edu/ideasatwork/feature/731624/Putting+the+Brakes+on+Collateral+Liquidations (last visited on Feb. 1, 2010).

[175] *Id.*; *see also* Moody's Investor Services, Press Release: Moody's Text: Changes Lehman Outlook From Stable To Negative (June 9, 2008).

[176] Examiner's Interview of Anuraj Bismal, Sept. 16, 2009, at p. 10; Lehman, Accounting Policy Manual (Sept. 9, 2006) [LBEX-DOCID 3213287], attached to e-mail from Marie Stewart, Lehman, to Martin Kelly, Lehman, *et al.* (Dec. 5, 2007) [LBEX-DOCID 3223385].

[177] *See* Lehman, Update on Risk, Liquidity and Capital Adequacy Presentation (Aug. 17, 2007), at p. 48 [LBEX-DOCID 2031705] (Lehman's funding framework took account of the inability to fund illiquid assets through the repo market; therefore the firm always funded illiquid holdings with long-term assets and liabilities).

Financial institutions generally engage in transactions designed to hedge their risks.[178]  But illiquid investments are typically more difficult to hedge.[179]  In fact, Lehman decided not to try to hedge its principal investment risks to the same extent as its other exposures for precisely this reason – its senior officers believed that hedges on these investments would not work and could even backfire, aggravating instead of mitigating Lehman's losses in a downturn.[180]  As a result, Lehman acquired a large volume of un-hedged assets that ultimately caused Lehman significant losses.[181]

In a difficult financial environment, it also is important for financial institutions to be able to reduce their leverage and risk profile.[182]  The more highly leveraged the institution is, the more important it is for the institution to begin reducing leverage as soon as market conditions turn against it.  But if the need to reduce leverage forces the sale of illiquid assets at a loss, it has a double impact; in addition to the loss, the

---

[178] *Cf.* Examiner's Interview of Alex Kirk, Jan. 12, 2010, at p. 9; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 3, 13.

[179] *Cf.* Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 3, 13.

[180] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 3, 13; Examiner's Interview of Roger Berlind, May 8, 2009, at p. 7; Examiner's Interview of Fred S. Orlan, Sept. 21, 2009, at p. 6; Examiner's Interview of Paul Shotton, June 5, 2009, at pp. 7-8; Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 17; Lehman, 2nd Quarter 2007 Review: Credit Facilitation Group (June 2007), at pp. 1-2 [LBEX-DOCID 514908]; Lehman, Leveraged Finance Risk Presentation (June 2007), at p. 12 [LBEX-DOCID 3283752]; e-mail from Christopher M. O'Meara, Lehman, to Ian T. Lowitt, Lehman (Sept. 27, 2007) [LBEX-DOCID 193218]; e-mail from Jeffrey Goodman, Lehman, to Christopher M. O'Meara, Lehman (Oct. 1, 2007) [LBEX-DOCID 201866]; e-mail from Jeffrey Goodman, Lehman, to Paul Shotton, Lehman, *et al.* (Mar. 19, 2008) [LBEX-DOCID 335666]; Andrew J. Morton, Lehman, Hedging Fixed Income's Portfolio Presentation (Aug. 8, 2008), at pp. 2, 3, 8, 11 [LBEX-DOCID 011869], attached to e-mail from Thomas Odenthal, Lehman, to Andrew J. Morton, Lehman, *et al.* (Aug. 6, 2008) [LBEX-DOCID 069824].

[181] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 3, 13; Examiner's Interview of Paul Shotton, June 5, 2009, at pp. 7-8.

[182] *Cf.* Examiner's Interview of Treasury Secretary Timothy F. Geithner, Nov. 24, 2009, at pp. 7-8.

perception can be that there is "air" in the valuation of the other illiquid assets that remain on the balance sheet, exacerbating the risk of a loss of confidence in the firm's future.[183]

During the declining market of 2007-08, Lehman suffered from all these problems.  Lehman had difficulty selling "sticky" assets and was unable to reduce its balance sheet quickly through typical means.  Instead, Lehman expanded the volume of Repo 105 transactions that misleadingly and temporarily reduced its balance sheet solely for the purpose of the firm's public financial reports.[184]

### (c)   Application of Risk Controls to Changed Business Strategy

Lehman's principal investments in illiquid assets presented new and increased forms of risk to the firm, but Lehman's management did not recalibrate the firm's pre-existing risk controls to ensure that its new investments were properly evaluated, monitored and limited.  If anything, to facilitate the new investment strategy, Lehman's management relaxed its controls in several ultimately fateful ways, discussed below. Lehman's senior officers took this tack notwithstanding their periodic statements to

---

[183] *Id.*; *see* Moody's Investor Services, Press Release: Moody's Text: Changes Lehman Outlook From Stable To Negative (June 9, 2008).
[184] See Section III.A.4 of this Report.

Lehman's Board, the rating agencies, and the SEC that its risk management system was a rigorous independent check on the risks undertaken by its business lines.[185]

### (i)  Stress Testing Exclusions

One of Lehman's major risk controls was stress testing.  Historically, Lehman's stress testing had not been designed to encompass the risks posed to the firm by principal investments in real estate and private equity, because those positions previously made up a small portion of Lehman's portfolio.[186]  Lehman did not revise its stress testing to address its evolving business strategy.

Lehman was required by the SEC[187] to conduct some form of regular stress testing on its portfolio to quantify the catastrophic loss it could suffer over a defined period of time.[188]  Lehman ran a series of stress tests based on 13 or 14 different scenarios.[189]  Some of the scenarios were historical events, such as the 1987 stock market

---

[185] Madelyn Antoncic, Risk Management Presentation to Standard & Poor's [Draft] (Aug. 17, 2007), at p. 5 [LBEX-DOCID 342851] ("Global Risk Management Division is independent of the trading areas"), attached to e-mail from Lisa Rathgeber, Lehman, to Jeffrey Goodman, Lehman, *et al.* (Aug. 15, 2007) [LBEX-DOCID 305205]; SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (June 2005), at pp. 3-4 [LBEX-DOCID 2125011] (saying Risk Management was "independent of Lehman's business units"), attached to e-mail from Michelle Danis, SEC, to David Oman, Lehman, *et al.* (Apr. 21, 2006) [LBEX-DOCID 2068428]; Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2006), at pp. 5, 8 [LBEX-DOCID 2125293] (saying Lehman's risk approach "applie[d] analytical rigor overlaid with sound practical judgment"; Lehman, Risk Management Update Presentation to Lehman Board of Directors (Apr. 15, 2008), at pp. 1-2 [LBHI_SEC07940_027909-29] (saying Lehman "provided an independent view of risk").

[186] Examiner's Interview of Paul Shotton, Oct. 16, 2009, at p. 2.

[187] *See infra*, Section III.A.6.

[188] Examiner's Interview of the Securities and Exchange Commission, Aug. 24, 2009, at p. 13.

[189] *See, e.g.*, Lehman, Stress Test Report for March 31, 2006 [LBEX-DOCID 2078161], attached to e-mail from Sandeep Garg, Lehman, to Patrick Whalen, Lehman, *et al.* (Apr. 24, 2006) [LBEX-DOCID 2118206]; Lehman, Stress Test Report for February 28, 2007 [LBEX-DOCID 632363], attached to e-mail from Melda

crash or the 1998 Russian financial crisis, while other scenarios were hypothesized by Lehman's risk managers.[190]   Lehman's management represented to its external constituents that regular and comprehensive stress tests "were performed to evaluate the potential P&L impact on the Firm's portfolio of abnormal yet plausible market conditions."[191]  Stress testing was designed to measure "tail risk" – a one in ten year type event.

When Lehman first adopted stress testing in about 2005, it applied the testing only to its tradable instruments such as stocks, bonds, and other securities; it did not include its un-traded assets such as its commercial real estate or private equity investments.[192]  Because these assets did not trade freely, they were not considered susceptible to stress testing over a short-term scenario.[193]   And since Lehman did not then have significant investments in these areas, excluding them from the stress testing

---

Elagoz, Lehman, to Paul Shotton, Lehman, *et al.* (Mar. 9, 2007) [LBEX-DOCID 630356]; Stress Test Report for October 31, 2007 [LBEX-DOCID 632432], attached to e-mail from Jeffrey Goodman, Lehman, to Cherie Gooley, Lehman (Dec. 19, 2007) [LBEX-DOCID 665513]; Stress Test Report for Apr. 30, 2008 [LBEX-DOCID 3296803], attached to e-mail from Mark Weber, Lehman, to Cherie Gooley, Lehman, *et al.* (May 28, 2008) [LBEX-DOCID 3302270].

[190] Lehman, Risk Management Presentation to Fitch (Apr. 7, 2006), at p. 47 [LBEX-DOCID 691768]; Lehman, Risk, Liquidity, Capital, and Balance Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at p. 28 [LBEX-AM 067167].

[191] *E.g.*, Madelyn Antoncic, Lehman, Risk Management Presentation to Standard & Poor's [Draft] (Aug. 17, 2007), at pp. 38-39 [LBEX-DOCID 342851], attached to e-mail from Lisa Rathgeber, Lehman, to Jeffrey Goodman, Lehman, *et al.* (Aug. 15, 2007) [LBEX-DOCID 305205].

[192] Examiner's Interview of Paul Shotton, Oct. 16, 2009, at pp. 5-6; Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009.

[193] Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009.

did not undermine the usefulness of the results.[194]   The SEC was aware of this exclusion.[195]

At various points in 2006 and 2007, Lehman's risk managers considered whether to include principal investments in Lehman's stress testing.[196]  An internal audit advised that Lehman "address the main risks in the Firm's portfolio," including "illiquidity" and "concentration risk."[197] But Lehman did not take significant steps to include these private equity positions in the stress testing until 2008, even though these investments became an increasingly large portion of Lehman's risk profile.[198]

Until late 2007, Lehman's stress testing also excluded its leveraged loan commitments – i.e., the leveraged loans that Lehman had committed to fund in the future, but had not yet closed.[199]  This exclusion appears to have been inadvertent.[200]

---

[194] Examiner's Interview of Paul Shotton, Oct. 16, 2009, at pp. 5-6.

[195] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 12; Examiner's Interview of Paul Shotton, Oct. 16, 2009, at p. 6.

[196] E-mail from Marc Henn, Lehman, to Maria Turner, Lehman, (Mar. 2, 2007) [LBEX-DOCID 264992]; e-mail from Melda Elagoz, Lehman, to Jeffrey Goodman, Lehman, et al. (June 11, 2007) [LBEX-DOCID 384503]; Lehman, 2006 Competitor Analysis - Key Considerations (Dec. 1, 2006) [LBEX-DOCID 2110930], attached to e-mail from Mirey Nadler, Lehman, to Fred Steinberg, Lehman (Dec. 1, 2006) [LBEX-DOCID 2042308]; e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman (May 17, 2006) [LBEX-DOCID 1342418]; e-mail from James Ballentine, Lehman, to Michael Gelband, Lehman, et al. (Jan. 4, 2007) [LBEX-DOCID 384818].

[197] Lehman, Internal VaR Audit Report [Draft] (Feb. 26, 2007), at p. 3 [LBEX-DOCID 232917], attached to e-mail from Lisa Rathgeber, Lehman, to Paul Shotton, Lehman (Feb. 26, 2007) [LBEX-DOCID 232916].

[198] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 25.

[199] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 10-11; Examiner's Interview of Paul Shotton, Oct. 16, 2009, at p. 4; e-mail from Melda Elagoz, Lehman, to Jeffery Goodman, Lehman (July 16, 2007) [LBEX-DOCID 385103]; e-mail from Jeffery Goodman, Lehman, to Stephen Lax, Lehman, et al. (Nov. 14, 2007) [LBEX-DOCID 297400].

[200] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 10-11; Examiner's Interview of Paul Shotton, Oct. 16, 2009, at p. 4.

Because Lehman's stress testing did not include its real estate investments, its private equity investments or, during a crucial time period, its leveraged loan commitments, Lehman's management pursued its transition from the moving business to the storage business without the benefit of regular stress testing on the primary business lines that were the subject of this strategic change.  For example, as described below, Lehman entered into a series of large and risky commercial real estate transactions in the first half of 2007 without stress testing the particular transactions and without conducting regular stress testing on Lehman's aggregate commercial real estate book.[201]

This exclusion was significant.  Experimental stress tests conducted in 2008 showed that a large proportion of Lehman's tail risk – perhaps even a large majority of its overall tail risk – lay with the businesses that were previously excluded from the stress testing.  One stress test posited maximum potential losses of $9.4 billion, including $7.4 billion in losses on the previously excluded real estate and private equity positions, and only $2 billion on the previously included trading positions.[202]  Another stress test showed total losses of $13.4 billion, of which $2.5 billion was attributable to

---

[201] *See* Section III.A.1.b of this Report.

[202] Lehman, Stress Test Report (June 30, 2008), at p. 3 [LBEX-DOCID 3326829], attached to e-mail from Nancy Malik, Lehman, to Paul Shotton, Lehman, *et al*. (June 30, 2008) [LBEX-DOCID 3301915]; Lehman, Private Equity and Real Estate Stresses, Global Market Risk Management presentation (June 30, 2008), at pp. 3-4 [LBEX-DOCID 3301916] attached to e-mail from Nancy Malik, Lehman, to Paul Shotton, Lehman, *et al*. (June 30, 2008) [LBEX-DOCID 3301915].

the firm's included positions, and $10.9 billion was attributable to the excluded positions.[203]

But these stress tests were conducted long after these assets had been acquired, and they were never shared with Lehman's senior management.[204]  For a more detailed discussion of Lehman's stress testing, see Appendix 8, Risk Management Organization and Controls.

### (ii)  Risk Appetite Limit Increase For Fiscal 2007

Lehman had a series of "risk appetite limits" that it considered the "center of its approach to risk."[205]  Risk appetite was a measure that aggregated the market risk, credit risk, and event risk faced by Lehman.[206]  Lehman had an elaborate set of procedures designed to calculate the "risk appetite usage" in each of its business lines, each of its divisions, and for the firm as a whole.[207]  These risk appetite usage figures were calculated every day.[208]

---

[203] Lehman, Stress Test Report (June 30, 2008), at p. 1 [LBEX-DOCID 384227] attached to e-mail from Nancy Malik, Lehman, to Paul Shotton, Lehman, *et al.* (Sept. 2, 2008) [LBEX-DOCID 385413].

[204] Examiner's Interview of  Mark Weber, Aug. 11, 2009, at p. 14; Examiner's Interview of Christopher M. O'Meara, Sept. 23, 2009, at p. 19.

[205] *See, e.g.*, Jared Pedowitz, BMRM-Market Risk Management Walkthrough Template (Nov. 30, 2007), at p. 9 [EY-LE-LBHI-KEYPERS 1015089]; Madelyn Antoncic, Lehman, Risk Management Presentation to Standard & Poor's [Draft] (Aug. 17, 2007), at p. 23 [LBEX-DOCID 342851], attached to e-mail from Lisa Rathgeber, Lehman, to Jeffrey Goodman, Lehman, *et al.* (Aug. 15, 2007) [LBEX-DOCID 305205].

[206] Madelyn Antoncic, Lehman, Risk Management Presentation to Standard & Poor's [Draft] (Aug. 17, 2007), at p. 21 [LBEX-DOCID 342851], attached to e-mail from Lisa Rathgeber, Lehman, to Jeffrey Goodman, Lehman, *et al.* (Aug. 15, 2007) [LBEX-DOCID 305205].

[207] SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at pp. 4-5 [LBEX-DOCID 2125011].

[208] *See, e.g.*, e-mail from Jenny Peng, Lehman, to David Goldfarb, Lehman, *et al.* (Oct. 12, 2007) [LBEX-DOCID 152049] (containing summary "Daily Risk Appetite and VaR Report" for Oct. 10, 2007), and

At the beginning of each year, Lehman set numerical limits on the risk appetite usage it was willing to take for each such business unit and for the firm as a whole.[209] Management presented the firm-wide limit to the Board.[210]

Under Lehman's limit policy, lower-level limits applicable to a single business line or geographic area were relatively "soft" and could be exceeded based on appropriate authority.[211] Lehman's higher-level limits were "harder" and required greater authorization if they were exceeded.[212] The firm-wide risk appetite limit was the "hardest" of all, and if it was exceeded, the "Risk Committee" of the firm was required to consider the proper course of action to take.[213] The Risk Committee was composed of the Executive Committee of the firm, the Chief Risk Officer ("CRO"), and the Chief Financial Officer ("CFO"). While one witness said that the only permissible reaction to

---

attached spreadsheet (Oct. 12, 2007) [LBEX-DOCID 150128] (containing daily risk appetite report, global risk appetite report organized by risk type, and daily VaR report).

[209] SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at pp. 4-5 [LBEX-DOCID 2125011].  *See* Appendix 8, Risk Management Organization and Controls (discussing risk appetite limits).  Risk appetite measured the amount Lehman could lose in a give year and still achieve an acceptable level of net profit.

[210] It is not clear whether the presentation was for ratification and approval or simply for information.  *See e.g.,* Lehman, 2008 Financial Plan Summary Presentation to Lehman Board of Directors (June 29, 2008), at p. 11 [LBHI_SEC07940_027374].

[211] Lehman, Market Risk Management Limit Policy Manual (Oct. 2006), at p. 2 [LBHI_SEC07940_767665], attached to e-mail from Christopher M. O'Meara to Kristi Michelle Reynolds (Apr. 7, 2008) [LBHI_SEC07940_767661].

[212] Lehman Brothers Global Risk Management, Second Quarter 2008 Report (July 21, 2008), at p. 29 [LBEX-DOCID 738522], attached to e-mail from Elizabeth Agosto, Lehman, to Jeffrey Goodman, Lehman, *et al.* (July 21, 2008) [LBEX-DOCID 670132].

[213] *E.g.,* SEC, Lehman Monthly Risk Review Meeting Notes (July 19, 2007), at p. 5 [LBEX-SEC 007363]; SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (2005), at p. 6 [LBEX-DOCID 2125011].

exceeding the firm-wide limit was immediately reducing the risk faced by the firm,[214] most Lehman personnel said that senior management could cure a limit excess by granting a temporary reprieve from the limit or by increasing the limit.[215]  As with the stress tests, management described the risk appetite limits to regulators, rating agencies and the Board as a meaningful control that Lehman used to manage its risk-taking.[216]

At the end of 2006, Lehman dramatically increased its risk appetite limits applicable to fiscal 2007.  The firm-wide limit increased from $2.3 billion to $3.3 billion, and subsidiary limits also increased significantly, particularly insofar as the principal investing businesses were concerned.[217]

These increases in the risk appetite limits were somewhat controversial.  The CRO at the time, Madelyn Antoncic, argued for a significantly lower increase to $2.6 or $2.7 billion, and the much higher $3.3 billion figure was apparently the result of a

---

[214] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 5.

[215] *E.g.,* Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at p. 7; Examiner's Interview with David Goldfarb, Sept. 21, 2009, at p. 5; Examiner's Interview of Paul Shotton, June 5, 2009, at pp. 10-11 (saying that the firm-wide risk appetite limit was a "hard" limit, the breach of which had to be cured by either reducing the firm's overall risk or raising the limit).

[216] Madelyn Antoncic, Risk Management Presentation to Standard & Poor's [Draft] (Aug. 17, 2007), at p. 23 [LBEX-DOCID 342851], attached to e-mail from Lisa Rathgeber, Lehman, to Jeffrey Goodman, Lehman, *et al*. (Aug. 15, 2007) [LBEX-DOCID 305205]; SEC Division of Market Regulation, Lehman Brothers - Consolidated Supervised Entity Market and Credit Risk Review (June 2005), at pp. 4-5 [LBEX-DOCID 2125011], attached to e-mail from Michelle Danis, SEC, to David Oman, Lehman, *et al.* (Apr. 21, 2006) [LBEX-DOCID 2068428]; Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2007), at pp. 11-12 [LBEX-DOCID 2125293].

[217] Lehman Brothers, 2007 Risk Appetite Limit (Jan. 7, 2007), at p. 1 [LBEX-DOCID 158938], attachment to e-mail from Robert Azerad, Lehman, to Madelyn Antoncic, Lehman (Jan. 11, 2007) [LBEX-DOCID 158331].

compromise with other senior managers.[218]  Moreover, to justify the increased limit amount, Lehman changed the way that it calculated the limit; had Lehman used the same method to calculate the 2007 limit that it had used to calculate the 2006 limit, the 2007 limit would have been several hundred million dollars lower.[219]

Increasing the firm-wide limit to $3.3 billion facilitated a rapid expansion of the firm's risk profile between 2006 and 2007.  As described below, within the first few months of fiscal 2007, Lehman quickly used the full amount of the new $3.3 billion risk appetite limit – and then some.  In late 2007 and early 2008, Lehman relaxed its risk appetite limits in several other ways, which are described below.  For a more detailed discussion of Lehman's risk appetite limits, *see* Appendix 8, Risk Management Organization and Controls.

### (iii) Decision Not To Enforce Single Transaction Limit

In 2006, to facilitate the planned expansion of the leveraged loan business, Lehman's Executive Committee decided to be more flexible with respect to the firm's single transaction limit.[220]  The single transaction limit was actually two limits – one limit applicable to the notional amount of the expected leveraged loan and a second

---

[218] Examiner's Interview of Madelyn Antoncic, Mar. 27, 2009, at p. 13; e-mail from David Goldfarb, Lehman, to Madelyn Antoncic, Lehman, *et al.* (Nov. 2, 2006) [LBEX-DOCID 2125677]; e-mail from Madelyn Antoncic, Lehman, to Christopher M. O'Meara, Lehman (Nov. 2, 2006) [LBEX-DOCID 2125679]; e-mail from Christopher M. O'Meara, Lehman, to Madelyn Antoncic, Lehman (Nov. 2, 2006) [LBEX-DOCID 2125680].

[219] Lehman,  2007 Financial Plan Presentation to Finance and Risk Committee of the Board of Directors (Jan. 30, 2007), at pp. 21-22 [LBEX-AM 067099].

[220] Examiner's Interview of Alex Kirk, Jan. 12, 2010, at pp. 7-8.

limit applicable to a calculated amount that Lehman was at risk of losing on the leveraged loan.  The limits were partly a function of Lehman's equity.  Lehman had previously agreed with the rating agencies that it would adopt a single transaction limit akin to limits previously adopted by commercial banks.[221]

Although Lehman's Executive Committee always retained the freedom to waive the single transaction limit as to any individual transaction, Lehman informed its external constituents that this prerogative would be exercised only in "rare circumstances."[222]

In late 2006, Lehman's management decided not to enforce the single transaction limit because it had cost Lehman significant opportunities.[223]  Because Lehman had a dramatically smaller equity base than its commercial banking competitors, and a somewhat smaller equity base even than its investment banking competitors, Lehman had a lower single transaction limit than its competitors, which forced it to forgo or limit its participation in a number of big deals.[224]  Lehman's management decided that

---

[221] Appendix 8, Risk Management Organization and Controls.

[222] Madelyn Antoncic, Lehman, "Standard" Risk Management Presentation (Undated), at p. 21 [LBEX-DOCID 194031], attached to e-mail from Paul Shotton, Lehman, to Christopher M. O'Meara, Lehman (Feb. 20, 2008) [LBEX-DOCID 214223]; Madelyn Antoncic, Lehman, "Standard" Risk Management Presentation, at p. 21 [LBEX-DOCID 194031].

[223] Examiner's Interview of Alex Kirk, Jan. 12, 2010, at pp. 7-8; Lehman, Appendix to Financial Sponsors Strategies (Including Lending Capacity Solutions) Presentation to the Executive Committee (Aug. 3, 2006), at p. 6 [LBEX-DOCID 1343776], attached to e-mail from Blair Sieff, Lehman, to Madelyn Antoncic, Lehman, *et al.* (Aug. 2, 2006) [LBEX-DOCID 1360977].

[224] Lehman, Appendix to Financial Sponsors Strategies (including Lending Capacity Solutions) Presentation to the Executive Committee (Aug. 3, 2006), at pp. 3, 6 [LBEX-DOCID 1343776], attached to e-mail from Blair Sieff, Lehman, to Madelyn Antoncic, Lehman, *et al.* (Aug. 2, 2006) [LBEX-DOCID

in the future, it would participate in such deals without regard to the single transaction limit.[225]  Moreover, Lehman did not apply the single transaction limit to its commercial real estate deals, even though some of its risk managers advocated for this broader application of the limit.[226]

Like the decision to increase the firm-wide risk appetite limit, the decision not to enforce the single transaction limit was controversial within Lehman's management. Alex Kirk, then head of Lehman's Credit Business, had primary responsibility for the leveraged loan business, thought that the single transaction limit was an important method of limiting the firm's risk on its leveraged loans.[227]  Antoncic also thought that the firm should continue to abide by the single transaction limit in part because the substantive terms of the leveraged loans were increasingly lopsided in favor of the private equity sponsors and unfavorable for the lending banks.[228]  Although Antoncic

---

1360977]; Lehman, Financial Sponsors Strategies (including Lending Capacity Solutions) Presentation to the Executive Committee (Aug. 3, 2006), at pp. 10-11 (LBEX-DOCID 1343775], attached to e-mail from Blair Sieff, Lehman, to Madelyn Antoncic, Lehman, *et al.* (Aug. 2, 2006) ([LBEX-DOICD 1360977].

[225] E-mail from Joe Li, Lehman, to Paul Mitrokostas, Lehman (Aug. 30, 2007) [LBEX-DOCID 2547330]; Joe Li, Lehman, STL Backtesting Excel Spreadsheet (July 25, 2007) [LBEX-DOCID 2506462], attached to e-mail from Joe Li, Lehman, to Fred S. Orlan, Lehman, *et al.* (July 25, 2007) [LBEX-DOCID 2563167]; *accord* Examiner's Interview of Alex Kirk, Jan. 12, 2010, at pp. 7-8.

[226] *Cf.* Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at p. 12; e-mail from Jeffrey Goodman, Lehman, to Zev Klasewitz, Lehman (Jan. 17, 2007) [LBEX-DOCID 794864]; e-mail from Jeffrey Goodman, Lehman, to Zev Klasewitz, Lehman (Feb. 12, 2007) [LBEX-DOCID 794879].

[227] Examiner's Interview of Alex Kirk, Jan. 12, 2010, at pp. 7-8.

[228] Examiner's Interview of Madelyn Antoncic, Mar. 27, 2009, at p. 9.

thought the firm should abide by the single transaction limit,[229] Kirk and Antoncic were

overruled by Fuld, Gregory, and McGee.[230]

### (d)  The Board's Approval of Lehman's Growth Strategy

Lehman's Board fully embraced Lehman's growth strategy.  In a January 2007

Board meeting, the directors were informed of the large increase in the risk appetite

limit for fiscal 2007, and of the firm's intention to expand its footprint in principal

investments, and they agreed with Lehman's senior officers that Lehman needed to take

more risk in order to compete.[231]  All of the directors told the Examiner that they agreed

with Lehman's growth strategy at the time it was undertaken.[232.]

Although the periodic materials that the Finance and Risk Committee[233] received

about the firm's stress testing disclosed that tests were conducted on the firm's "trading

portfolio" and "We subject both our trading and our counterparty portfolio to stress

---

[229] *Id.*; Examiner's Interview of Alex Kirk, Jan. 12, 2010, at pp. 6-8.

[230] Examiner's Interview of Alex Kirk, Jan. 12, 2010, at pp. 7-8; Examiner's Interview of Madelyn Antoncic, Mar. 27, 2009, at p. 9.

[231] Examiner's Interview of Sir. Christopher Gent, Oct. 21, 2009, at pp. 7-8; Examiner's Interview of Thomas Cruikshank, Oct. 8, 2009, at pp. 2-3; Examiner's Interview of Roland A. Hernandez, Oct. 2, 2009; Examiner's Interview of John D. Macomber, Sept. 28, 2009, at p. 12; Examiner's Interview of Michael L. Ainslie, Sept. 22, 2009, at p. 8; Examiner's Interview of Marsha Johnson Evans, May 22, 2009, at p. 12; Examiner's Interview of Dr. Henry Kaufman, May 19, 2009, at pp. 7-8, 14; Examiner's Interview of Roger Berlind, May 8, 2009, at pp. 6-7; Examiner's Interview of John F. Akers, Apr. 22, 2009, at p. 9.

[232] *Id.*

[233] The Board had a Finance and Risk Committee that generally met twice a year and received more detailed information than the full Board on these topics.  Dr. Henry Kaufman, former managing director of Salmon Brothers, was the head of the Finance and Risk Committee.

tests,"[234] management did not inform the Finance and Risk Committee that many of the firm's commercial real estate and private equity investments were excluded from the firm's stress tests.[235]

The omission was noted on January 29, 2008, when the Finance and Risk Committee received materials stating that "real estate owned and private equity" were excluded from the stress testing.[236]   No member of the Board who was asked by the Examiner about the issue recalled noticing this revised disclosure, and no member recalled Lehman's officers explaining it or otherwise bringing it to the attention of the Board.[237]   Some directors were not concerned about the exclusion of these investments from the stress testing, saying that the exclusions appeared reasonable at the time.[238]

---

[234] Lehman Brothers Holdings Inc., Risk, Liquidity, Capital and Balance Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at p. 28 [LBEX-AM 067167-233].

[235] Examiner's Interview of Paul Shotton, Oct. 16, 2009, at p. 5; *see also* Lehman Brothers Holdings Inc., Risk, Liquidity, Capital and Balance Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at p. 29 [LBEX-AM 067167-233].

[236]  Lehman, 2008 Financial Plan Presentation to Lehman Finance and Risk Committee of the Board of Directors (Jan. 29, 2008), at p. 19 [LBHI_SEC 07940_068559].

[237] *Cf.* Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 7; Examiner's Interview of Roland A. Hernandez, Oct. 2, 2009; Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 4; Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 11; *contra* Examiner's Interview of Christopher M. O'Meara, Sept. 23, 2009, at p. 18.

[238] Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at pp. 2-3, 10-11 ("Despite [these] exclusions, [Kaufman] was not concerned with the result to the stress tests."); Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 7 (saying the exclusion "looked reasonable and that it would be hard for [Grundhofer] to believe Lehman was not following the standard for conducting stress tests."); *see* Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at pp. 13-14 (saying he did not find stress tests helpful and thought some assets might be excluded).

However, one director said that if the exclusion was material, he would have wanted to know about it.[239]

The Board also was not told that Lehman's management had decided not to apply the single transaction limits to its leveraged loans.   Although the Examiner has found no evidence that before 2008, Lehman's management had represented to the Board that any single transaction limit had been adopted,[240] some directors said that concentration limits were important protections for the firm, and they would have wanted to know about significant excesses above concentration limits.[241]

In sum, during the second half of 2006, Lehman began to pursue a more aggressive principal investment strategy, and it relaxed several risk limits to facilitate that strategy.

### (2) Lehman Doubles Down: Lehman Continues Its Growth Strategy Despite the Onset of the Subprime Crisis

Late in the second half of 2006, the first signs of weakness in the subprime residential mortgage market were apparent.[242]   For example, delinquency rates on subprime loans, which had hovered near 10% in 2004 and 2005, reached 13% by the end

---

[239] Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 11.

[240] *See, e.g.*, Lehman, Risk Update Presentation to Lehman Board of Directors (July 18, 2006) [LBEX-WGM 986315] (not mentioning single transaction limit); *but see* Lehman, Risk Management Update Presentation to Lehman Board of Directors (Apr. 15, 2008), at p. 1 [LBHI_SEC07940_027909] ("We have an overall Risk Appetite limit which is supplemented by . . . single transaction, country and other concentration limits.").

[241] Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 6; Examiner's Interview of John Macomber, Sept. 25, 2009, at pp. 6, 17.

[242] Bank for International Settlements, 77th Annual Report (June 24, 2007), at p. 109.

of 2006.[243]   In addition, after peaking in mid-2006, housing prices began to decline steeply.[244]  This decline in prices threatened the subprime mortgage market because the market's health depended on continued price appreciation in housing.[245]   As a result, beginning in November 2006, significant widening of spreads on non-investment grade tranches of home equity loans was evident.[246]   By the spring of 2007, the crisis had advanced to the point that several major subprime lenders had gone bankrupt or been acquired by stronger partners.[247]

Lehman's management saw the subprime crisis as an opportunity to pick up ground on its competitors.[248]   Lehman's management adopted a "countercyclical growth

---

[243] *Id.*

[244] Standard & Poor's, Press Release: Home Price Declines Worsen As We Enter the Fourth Quarter of 2008 According to the S&P/Case-Shiller Home Price Indices (Dec. 30, 2008), at p. 1 (*available at* http://www2.standardandpoors.com/spf/pdf/index/CSHomePrice_Release_123062.pdf); *see also* Vikas Bajaj, *Home Prices Fall in More Than Half of Nation's Biggest Markets*, N.Y. Times, Feb. 16, 2007, at p. C1.

[245] Gary Gorton, *Information, Liquidity and the (Ongoing) Panic of 2007* 2 (NIBR Working Paper No. w14649, 2009); *see also* Gary Gorton & Andrew Metrick, *Securitized Banking and the Run on Repo* 5 (Yale Int'l Center for Finance, Working Paper No. 09-14, 2009).

[246] Bank for International Settlements, 77th Annual Report (June 24, 2007), at p. 109.

[247] *Id.* at pp. 109-10.

[248] Lehman, 2008 Financial Plan Summary Presentation to Lehman Board of Directors (Jan. 24, 2008), at p. 5 [LBHI_SEC07940_027374] ("Current environment presents a unique long-term growth opportunity for the Firm. . . . The Firm's competitors, with the notable exceptions of Goldman Sachs and JP Morgan Chase, have sustained large losses, weakening their competitive positions. . . . This presents an opportunity for the Firm to pursue a countercyclical growth strategy, similar to what it did during the 2001-2002 downturn, to improve its competitive position and, over time, generate superior returns for our shareholders."); *see also* Lehman, Update on Lehman Brothers' Subprime Mortgage Origination Business Presentation to Lehman Board of Directors (Mar. 20, 2007), at p. 10  [LBHI_SEC07940_025834] ("Most of large subprime independents have gone out of business, have been sold or are selling. . . .  Current distressed environment provides substantial opportunities, as in late 1990's"); Lehman, Notes for Presentation for the Fixed Income Division Offsite Meeting (Sept. 26, 2006), at pp. 10-12 [LBEX-DOCID 1715601] (stating that Lehman viewed the 2006 growth strategy as a countercyclical opportunity to grow business), attached to e-mail from Lesley Oramas-Scala, Lehman, to Michael Gelband, Lehman (Sept. 26, 2006) [LBEX-DOCID 1945744].

strategy."[249]  Lehman's management believed that the subprime crisis would not spread to the economy generally, or even to the commercial real estate market, where Lehman was a major player.[250]  In past recessions and financial crises, Lehman had successfully taken on more risk while its competitors retrenched.[251]

During the first half of 2007, Lehman continued its growth strategy.  Although Lehman's management decided to curtail its residential mortgage origination business, it did so less dramatically than many of its competitors in that business, several of which went out of business.[252]

Lehman, along with other market participants and government regulators, underestimated the severity of the subprime mortgage crisis;[253] the subprime crisis impaired Lehman's ability to securitize and sell residential mortgages and forced the firm to retain an increasingly large volume of residential mortgage-related risk on its

---

[249] *Id.*

[250] *Id.*

[251] *Id.*

[252] Lehman, Update on Lehman Brothers' Subprime Mortgage Origination Business Presentation to Lehman Board of Directors (Mar. 20, 2007), at pp. 5, 10 [LBHI_SEC07940_025834]; e-mail from Dimitrios Kritikos, Lehman, to Jeffrey Goodman, Lehman (Feb. 2, 2007) [LBEX-DOCID 566140] ("While the rest of the industry is tightening credit and increasing prices in these areas, we are moving in the opposite direction.").

[253] Examiner's Interview of Treasury Secretary Timothy F. Geithner, Nov. 24, 2009, at p. 3; Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 16, 24; Examiner's Interview of Richard McKinney, Aug. 27, 2009, at pp. 2, 9; Richard S. Fuld, Jr., Lehman, Notes for Senior Management Speech (June 16, 2008), at pp. 5-6 [LBEX-DOCID 529241], attached to e-mail from Taimur Hyat, Lehman, to Herbert H. McDade III, Lehman, *et al.* (June 25, 2008) [LBEX-DOCID 556064].

own balance sheet.[254]  At the same time, during the first two quarters of 2007, Lehman continued to grow its leveraged loan, commercial real estate, energy, and principal investments businesses.[255]  Lehman's growth strategy culminated in the acquisition of the Archstone REIT in late May 2007.[256]  Together, these transactions continued the ongoing increase in the size of Lehman's balance sheet, with a particularly strong concentration in assets that could not easily be sold in a crisis.   Beginning in the fourth quarter of 2006, FID's businesses consistently exceeded their limits even though returns on assets and earnings were decreasing.[257]  By February 2007, FID had a "serious balance sheet issue."[258]

This Section of the Examiner's Report discusses Lehman's actions with respect to each of these business lines separately below.  This Section also discusses the major personnel move during the first half of 2007 – the replacement of Michael Gelband with Roger Nagioff as the head of FID.  Finally, this section discusses the extent to which

---

[254] Lehman, Securitized Products, MBS: Non Investment Grade Retained Interests (Jan. 16, 2007), at pp. 1, 3 [LBEX-DOCID 839039], attached to e-mail from James Guarino, Lehman, to Richard McKinney, Lehman, *et al.* (Jan. 16, 2007) [LBEX-DOCID 865925].

[255] *See* Section III.A.1.b.1 of this Report.

[256] *See* Section III.A.1.b.2.d of this Report.

[257] Lehman, Fixed Income Division Balance Sheet Management (Apr. 2007), at p. 2 [LBEX-DOCID 787297], attached to e-mail from Kieron Keating, Lehman, to David N. Sherr, Lehman, *et al.* (June 6, 2007) [LBEX-DOCID 808850]; Lehman Balance Sheet and Disclosure Scorecard For Trade Date Apr. 21, 2008 (Apr. 22, 2008), at p. 3 [LBEX-DOCID 3187588], attached to e-mail from Tal Litvin, Lehman, to Herbert H. McDade III, Lehman, *et al.* (Apr. 22, 2008) [LBEX-DOCID 3187333].

[258] E-mail from Joseph Gentile, Lehman, to Michael Gelband, Lehman, *et al.* (Feb. 21, 2007) [LBEX-DOCID 810934].

Lehman's officers informed the Board of Directors of the continuing expansion of Lehman's balance sheet and risk-taking.

### (a)  Lehman's Residential Mortgage Business

### (i)  Lehman Decides to Curtail Subprime Originations but Continue to Pursue "Alt-A" Originations

In the second half of 2006, Lehman began to see the first cracks in the subprime mortgage market.[259]   Lehman reacted to these signs by tightening its origination standards, particularly with respect to subprime mortgages,[260] but Lehman continued to pursue growth in its mortgage origination business generally, particularly through its Alt-A originator, Aurora.[261]   Alt-A loans are a "somewhat loosely defined category between prime and subprime" that are "designed for borrowers with good credit records who do not meet standard guidelines for documentation requirements."[262]

---

[259] Examiner's Interview of Thomas L. Wind, Apr. 21, 2009, at  p. 8; Examiner's Interview of Susan Harrison, Apr. 28, 2009, at pp. 2, 5; Examiner's Interview of Marie Jean Burruel, Apr. 28, 2009, at p. 5; Dimitrios Kritikos, Lehman, BNC Risk Review December 2006 (Jan. 20, 2007), at p. 50 [LBEX-DOCID 251077]; Dimitrios Kritikos, Lehman, Risk Review: Aurora and BNC February 2007 (Mar. 19, 2007), at p. 10 [LBEX-DOCID 188325].

[260] Dimitrios Kritikos, Lehman, BNC Risk Review December 2006 (Jan. 20, 2007), at p. 6 [LBEX-DOCID 251077]; Lehman, Materials Prepared for Office of Thrift Supervision Safety and Soundness/Compliance Examination 2007 (Aug. 13, 2007), at pp. 13-15 [LBEX-DOCID 538654]; Lehman, Presentation to Moody's [Draft] (Oct. 16, 2007), at pp. 12-15 [LEH-FINRA-E-MAIL00088455]; Lehman, Presentation to Radian: Mortgage Operations Review (July 24, 2007), at pp. 15-17 [LBEX-DOCID 839141]; Examiner's Interview of Marie Jean Burruel, Apr. 28, 2009, at pp. 8-10; Examiner's Interview of Dimitrios Kritikos, Apr. 16, 2009, at p. 8.

[261] Dimitrios Kritikos, Lehman, Aurora Loan Services Risk Review January 2008 (Feb. 7, 2008), at pp. 10, 12 [LBEX-DOCID 394711].

[262] Saundra F. Braunstein, Director of Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve, Testimony Before U.S. House of Representatives Committee on Financial Services, Subcommittee on Financial Institutions and Consumer Credit (Mar. 27, 2007); see also Lehman, Product Definitions of Alt-A, Mortgage Maker, and Subprime (Oct. 17, 2007), at p. 1 [LBEX-DOCID 537902];

Although Lehman's Alt-A mortgages were never as risky as subprime mortgages, its Alt-A mortgages became increasingly risky towards the end of 2006 and the beginning of 2007.[263]  This portion of the Report describes those events.

Lehman considered its residential mortgage securitization business to be a distribution business.[264]   Lehman had a vertically integrated residential mortgage business in which BNC originated subprime loans and Aurora originated Alt-A loans, and Lehman itself securitized pools of those mortgages into residential mortgage-backed securities ("RMBS").[265]   BNC and Aurora were part of Lehman's Mortgage Capital Division, which originated residential mortgages, while FID was responsible for securitizing the mortgages.[266]   By selling the RMBS to investors, Lehman shifted the risks of the underlying mortgages to the investors.[267]   Lehman, however, bore the risk that it would not be able to securitize the mortgages or sell the RMBS.[268]   The mortgages

---

Cynthia Angell & Clare D. Rowley, Federal Deposit Insurance Corp., FDIC Outlook (Second Quarter 2006) (last updated Mar. 21, 2007) (http://www.fdic.gov/bank/analytical/regional/ro20062q/na/2006_summer04.html)

[263] E-mail from Dimitrios Kritikos, Lehman, to Jeffrey Goodman, Lehman (Jan. 31, 2007) [LBEX-DOCID 380035]; Dimitrios Kritikos, Lehman, Selected trends from Aurora Risk Review (Feb. 2, 2007), at p. 2 [LBEX-DOCID 537846]; Examiner's Interview of Dimitrios Kritikos, July 29 & 30, 2009, at pp. 12, 14-15.

[264] Madelyn Antoncic, Lehman, 2007 Bondholder Meeting Presentation (Oct. 18, 2007), at p. 6 [LBEX-DOCID 244792]; Lehman, Presentation to Standard and Poor's, Lehman Brothers Securitized Products Business (Oct. 7, 2005), at p. 2 [LBEX-DOCID 095356]; Lehman, Strategic and Financial Review (Jan. 18, 2008), at p. 9 [LBEX-DOCID 1412341]; Examiner's Interview of Richard McKinney, Aug. 27, 2009, at p. 5.

[265] Vikas Shilpiekandula, Lehman, An Overview of the Residential Mortgage Market (Oct. 25, 2007), at p. 2 [LBEX-DOCID 894664].

[266] Examiner's Interview of David N. Sherr, May 6, 2009, at p. 4.

[267] Lehman, Securitized Products, MBS: Non Investment Grade Retained Interests (Jan. 16, 2007), at p. 1 [LBEX-DOCID 839039].

[268] Id.; Lehman, Presentation to Standard and Poor's, Lehman Brothers Securitized Products Business (Oct. 7, 2005), at pp. 9, 10 [LBEX-DOCID 095356].

that Lehman could not shift to third-party investors through securitization were known as "retained interests."[269]

By late 2006, Lehman's non-investment grade retained interests began to increase sharply;  investors were growing increasingly cautious about purchasing RMBS bonds backed by subprime mortgages, "and as a result the [Lehman residential mortgage trading] desk [was] struggling to sell residuals and [non-investment grade] bonds."[270] Lehman's diminished ability to shift the mortgage-based risk to investors meant that the formerly profitable moving business could become a money-losing storage business.[271]

At the same time, Lehman's mortgage business experienced other troubling trends, including sharp increases in repurchase requests, rises in delinquency rates and a spike in first-payment defaults.[272]   By the fourth quarter of 2006, Lehman's internal research reports were suggesting that investors in RMBS bonds, and particularly those backed by subprime mortgages, would become increasingly risk-averse, and subprime-backed RMBS bonds would be at heightened risk of a rating agency downgrade.[273]

---

[269] Lehman, Securitized Products, MBS: Non Investment Grade Retained Interests (Jan. 16, 2007), at p. 25 [LBEX-DOCID 839039]; *see also* LBHI_SEC07940_581174 10-Q (filed Apr. 9, 2008), at pp. 20, 55.

[270] Lehman, Securitized Products, MBS: Non Investment Grade Retained Interests (Jan. 16, 2007), at p. 13 [LBEX-DOCID 839039].

[271] *Id*. at p. 1.

[272] Examiner's Interview of Susan Harrison, Apr. 28, 2009, at pp. 2, 5; Dimitrios Kritikos, Lehman, BNC Risk Review December 2006 (Jan. 20, 2007), at p. 50 [LBEX-DOCID 251077]; Dimitrios Kritikos, Lehman, Risk Review:  Aurora and BNC February 2007 (Mar. 19, 2007), at p. 10 [LBEX-DOCID 188325].

[273] Srinivas Modukuri, Lehman, Securitized Products Outlook for 2007: Bracing for a Credit Downturn (Dec. 2006), at pp. 8, 19 [LBEX-DOCID 245013].

Because of these trends, Lehman tightened its subprime lending operations.  In about August 2006, Lehman replaced BNC's CEO and also created a new executive position (filled by Thomas L. Wind) to oversee both BNC and Aurora operations.[274] Wind and new BNC CEO Steven Skolnik initiated changes to BNC's underwriting guidelines and product mix.[275]  These changes included reduction in the size of one of BNC's leading lending programs, known as "80/20," in which BNC extended two separate loans to bring the borrower's loan-to-value ratio to 100% based only on income data as stated by the borrower.[276]  Production under the 80/20 program dropped by two thirds from 2005 to 2006, and BNC discontinued the program entirely in late March 2007.[277]  Yet even in early 2007, BNC was originating a substantial quantity of subprime mortgages (about $750 million worth during the month of February 2007, for

---

[274] Examiner's Interview of Thomas L. Wind, Apr. 21, 2009, at pp. 3, 8; Examiner's Interview of Dimitrios Kritikos, July 29-30, 2009, at pp. 8-9; Examiner's Interview of Richard McKinney, Aug. 27, 2009, at pp. 5-6; Examiner's Interview of Lana Franks Harber, Sept. 23, 2009, at p. 6; Lehman, Presentation to the Office of Thrift Supervision, Lehman Brothers Bank, FSB: Safety & Soundness/Compliance Examination 2007 (Aug. 7, 2007), at p. 5 [LBEX-DOCID 1693347]; Lehman, Update on Lehman Brothers' Subprime Mortgage Origination Business Presentation to Lehman Board of Directors (Mar. 20, 2007), at p. 6 [LBHI_SEC07940_025834].

[275] Examiner's Interview of Thomas L. Wind, Apr. 21, 2009, at pp. 6, 7-8.

[276] Dimitrios Kritikos, Lehman, BNC Risk Review December 2006 (Jan. 20, 2007), at p. 6 [LBEX-DOCID 251077]; Examiner's Interview of Marie Jean Burruel, Apr. 28, 2009, at pp. 8-10.

[277] Lehman, Materials Prepared for Office of Thrift Supervision Safety and Soundness/Compliance Examination 2007 (Aug. 13, 2007), at p. 13 [LBEX-DOCID 538654]; Lehman, Presentation to Moody's [Draft] (Oct. 16, 2007), at p. 12 [LEH-FINRA-E-MAIL00088444]; Lehman, Presentation to Radian: Mortgage Operations Review (July 24, 2007), at p. 14 [LBEX-DOCID 839141]; Examiner's Interview of Marie Jean Burruel, Apr. 28, 2009, at pp. 8-10; Examiner's Interview of Dimitrios Kritikos, Apr. 16, 2009, at p. 8.

example).[278]  Lehman did not discontinue subprime lending (as Lehman defined it) through BNC until its closure of BNC on August 22, 2007.[279]

Lehman executives had different recollections concerning whether managers within FID had advocated an earlier and more rapid reduction in Lehman's subprime mortgage originations.[280]  Certain FID executives noted that Lehman managers from the Mortgage Capital Division wished to continue aggressive origination and Mortgage Capital's view prevailed, while others in Mortgage Capital did not recall the disagreement or maintained that FID could have reduced originations itself if it wished.[281]

---

[278] Dimitrios Kritikos, Lehman, Risk Review: Aurora and BNC February 2007 (Mar. 19, 2007), at p. 6 [LBEX-DOCID 188325].

[279] Examiner's Interview of Lana Franks Harber, Sept. 23, 2009, at p. 12; Examiner's Interview of Theodore P. Janulis, Sept. 25, 2009, at p. 3; Examiner's Interview of Marie Jean Burruel, Apr. 28, 2009, at p. 10; Lehman Brothers Holdings Inc., Press Release: Lehman Brothers Announces Closure of BNC Mortgage (Aug. 22, 2007) [LBEX-DOCID 880148]; Lehman, Subprime(r) (Sept. 4, 2007), at p. 14 [LBEX-DOCID 894656]; e-mail from Edward Grieb, Lehman, to Christopher M. O'Meara, Lehman (Aug. 22, 2007) [LBEX-DOCID 197143]; e-mail from Tasha Pelio, Lehman, to Jasjit (Jesse) Bhattal, Lehman, *et al.* (Aug. 22, 2007) [LBEX-DOCID 176893].

[280] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at pp. 2, 15; Examiner's Interview of Michael Gelband, Aug. 12, 2009, at pp. 2, 10-12; Examiner's Interview of Lana Franks Harber, Sept. 23, 2009, at pp. 4, 6; Examiner's Interview of Theodore P. Janulis, Sept. 25, 2009, at pp. 3, 5.

[281] *Compare* Examiner's Interview of Kentaro Umezaki, June 25, 2009, at pp. 2, 15 (stating that he, Gelband and Sherr, wanted to scale back originations while Janulis did not); Examiner's Interview of Michael Gelband, Aug. 12, 2009, at p. 11; (recalling that as late as 2007, he recommended managing the residential real estate business more conservatively, and that in general, MCD had an incentive to continue to push for originations because it was rewarded when its origination volumes were high and the risk was shifted to the Securitized Products Group after the mortgages were originated.), *with* Examiner's Interview of David N. Sherr, Sept. 25, 2009, at pp. 2-3, 4-5 (stating that he did not recall a dispute between MCD and FID over any proposed scaling back of originations, but that there was tension between FID and MCD over the control of the residential mortgage origination business,); Examiner's Interview of Theodore P. Janulis, Sept. 25, 2009, at pp. 3, 5 (stating that he did not recall a disagreement about whether originations should be slowed and that FID could have slowed origination volumes if it wished to do so); Examiner's Interview of Lana Franks Harber, Sept. 23, 2009, at p. 6. (stating that she did not recall internal

Even as Lehman was tightening standards on its subprime originations through BNC, Lehman was also using its Aurora subsidiary to expand its Alt-A lending.[282] Moreover, Aurora's Alt-A lending reached borrowers of lesser credit quality than those who historically had been considered Alt-A borrowers.[283]  The vehicle for that aspect of the Aurora business plan was the Mortgage Maker product.[284]  As Mortgage Maker expanded to more than half of Aurora's Alt-A production by February 2007, many of Aurora's loans denominated as Alt-A came more and more to resemble the subprime loans that Lehman was supposedly exiting by tightening origination standards at BNC.[285]

By late January 2007, Lehman's residential mortgage analyst began to notice disturbing trends with respect to Aurora's Mortgage Maker program:

---

presentations by Gelband questioning the continued viability of subprime residential lending); *see also* Examiner's Interview of Joseph Gregory, Nov. 13, 2009, at p. 10 (suggesting that he agreed with MCD's view and approved a strategy of continuing to originate residential mortgages aggressively).

[282] Examiner's Interview of Carl Peterson, May 27, 2009, at pp. 6-8.

[283] *Id.* at pp. 5-7.

[284] *Id.* at p. 5; Examiner's Interview of Diane May, Apr. 16, 2009, at p. 5; Aurora Loan Services, Presentation to Securities and Exchange Commission (Feb. 6-7, 2007), at p. 2 [LBEX-DOCID 357348].

[285] Examiner's Interview of David N. Sherr, May 6, 2009, at p. 8; Examiner's Interview of John Vedra, Apr. 15, 2009, at p. 8; Examiner's Interview of Diane May, Apr. 16, 2009, at p. 5; Dimitrios Kritikos, Lehman, Risk Review: Aurora and BNC February 2007 (Mar. 19, 2007), at p. 4 [LBEX-DOCID 188325]; *see also* e-mail from Dimitrios Kritikos, Lehman, to Ken Linton, Lehman, *et al.* (Mar. 30, 2007) [LBEX-DOCID 286265] (noting that the riskier segments of Mortgage Maker performed three to five times worse than the rest of Aurora's loans); Russell V. Brady, Aurora, Response to LXS Performance Issues (Jan. 24, 2007), at p. 1 [LBEX-DOCID 885450] (suggesting that Aurora needed to "[d]etermine whether a segment of the [Mortgage] Maker population should be serviced similar to subprime"); e-mail from Richard McKinney, Lehman, to Thomas L. Wind, Aurora, *et al.* (Feb. 12, 2007) [LBEX-DOCID 1369758] (noting that the performance of Lehman's LXS securitizations that consisted mostly of Mortgage Maker had worsened versus its largest competitor for 2006 production, and stating "Expected subordination levels are 11.7% to AAA loss coverage. This compares with 20-25% for a typical subprime deal.  That is, we are creating worse performance than subprime, while the rating agencies assume our performance should be substantially better").

> Looking at the trends on originations and linking them to first payment defaults, the story is ugly:  The last four months Aurora has originated the riskiest loans ever, with every month being riskier than the one before - the industry meanwhile has pulled back during that time.[286]

At the same time, other participants in the Alt-A industry were reporting default rates and late payment data that indicated that "[t]he credit deterioration [in Alt-A] has been almost parallel to the one of the subprime market."[287]  Thus, while Aurora's mortgages were not as risky as subprime mortgages, Aurora's risk profile was increasing in much the same way as the risk in subprime mortgages.

As a result of all these factors, Lehman's risk managers sometimes considered the Mortgage Maker loans to be distinct from Alt-A mortgages, and described Mortgage Maker as Alt-B.[288]  While the term Alt-B was not an accepted term or categorization in the business, Lehman's managers occasionally used it as a way of differentiating the riskier mortgages in the Mortgage Maker program from what had more traditionally been considered Alt-A mortgages, though not so risky as to merit the label subprime.[289]

---

[286] E-mail from Dimitrios Kritikos, Lehman, to Jeffrey Goodman, Lehman (Jan. 31, 2007) [LBEX-DOCID 380035].

[287] Dimitrios Kritikos, Lehman, Risk Review: Aurora and BNC February 2007 [Draft] (Mar. 9, 2007), at p. 1 [LBEX-DOCID 538518].

[288] E-mail from Dimitrios Kritikos, Lehman, to Jeffery Goodman, Lehman (Mar. 12, 2007) [LBEX-DOCID 307101] ("Aurora's product is far from Alt-A anymore.  The traditional Alt-A program is only 40% of Aurora's production"); e-mail from Dimitrios Kritikos, Lehman, to Charlie Lu, Lehman (Apr. 12, 2007) [LBEX-DOCID 566105] ("MortgageMaker is NOT Alt-A"); Dimitrios Kritikos, Lehman, Selected trends from Aurora Risk Review February 2007 (Feb. 2, 2007), at p. 2 [LBEX-DOCID 537846] ("The product mix of Aurora production has shifted substantially in the last 6 months from Alt-A to MortgageMaker (Alt-B)").

[289] Dimitrios Kritikos, Lehman, Selected trends from Aurora Risk Review February 2007 (Feb. 2, 2007), at p. 2 [LBEX-DOCID 537846]; Examiner's Interview of Dimitrios Kritikos, July 29-30, 2009, at pp. 3, 18 (stating that Mortgage Maker loans were neither Alt-A nor subprime).

To make matters worse, Lehman's risk managers saw indications that Lehman would not be able to distribute the risk on the mortgages it was originating.  By January 2007, it was apparent that Lehman's holding of non-investment grade retained interests in securitizations had been increasing.[290]  And by March 2007, Lehman was noting sharp declines in securitization revenue,[291] causing the Securitized Products Group within FID to exceed its risk appetite and VaR limits.[292]

To respond to these risks in its Alt-A portfolio, in March 2007 Lehman undertook a series of changes designed to make Mortgage Maker loans less available to borrowers with lower credit scores, or to borrowers who wished to take out loans at 100% of a home's value.[293]  Although the volume of Mortgage Maker loans originated by Lehman

---

[290] Lehman, Securitized Products, MBS: Non Investment Grade Retained Interests (Jan. 16, 2007), at p. 3 [LBEX-DOCID 839039].

[291] Lehman, Mortgage Update 1Q 07, at p. 9 [LBHI_SEC07940_845984].

[292] *See, e.g.,*George Hansman, Lehman, Securitized Products Risk Appetite and VaR limit and overage graphs (May 17, 2007) [LBEX-DOCID 861260]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (Mar. 8, 2007) [LBEX-DOCID 229930]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (Mar. 19, 2007) [LBEX-DOCID 229944]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (Mar. 22, 2007) [LBEX-DOCID 229954]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (Apr. 9, 2007) [LBEX-DOCID 790039]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (Apr.16, 2007) [LBEX-DOCID 790029]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (May 29, 2007) [LBEX-DOCID 790059]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (May 30, 2007) [LBEX-DOCID 790060]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (Sept. 5, 2007) [LBEX-DOCID 230188]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (Oct. 12, 2007) [LBEX-DOCID 230789903]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (Oct. 17, 2007) [LBEX-DOCID 789908]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (Oct. 18, 2007) [LBEX-DOCID 789910]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (Oct. 19, 2007) [LBEX-DOCID 789909]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (Oct. 22, 2007) [LBEX-DOCID 790089]; e-mail from Lehman Risk, to Lehman Risk Limit Excess e-mail group (Oct. 30, 2007) [LBEX-DOCID 789916].

[293] Dimitrios Kritikos, Lehman, Risk Review: Aurora and BNC February 2007 (Mar. 19, 2007), at p. 3 [LBEX-DOCID 188325] (summarizing underwriting guideline changes at BNC and Aurora).

declined following implementation of the March 2007 guideline changes, Lehman continued to originate significant volumes of Alt-A mortgages until August 2007.[294]

### (ii)  The March 20, 2007 Board Meeting

On March 20, 2007, the Mortgage Capital and Fixed Income Divisions gave a presentation to Lehman's Board of Directors about the state of Lehman's residential mortgage origination and securitization business in light of the deepening subprime crisis.[295]   The presentation was given by David N. Sherr, the head of Lehman's Securitized Products Group; Theodore P. Janulis, the head of the Mortgage Capital Division; and Lana Franks Harber, Chief Administrative Officer ("CAO") of the Mortgage Capital Division.[296]

While preparing to give this presentation, Harber e-mailed one of her colleagues to inform him about a conversation that she had with Lehman's President, Joseph Gregory, about the presentation:

> Board is not sophisticated around subprime market – Joe doesn't want too much detail.  He wants to candidly talk about the risks to Lehman but be

---

[294] Dimitrios Kritikos, Lehman, Aurora Loan Services Risk Review January 2008 (Feb. 7, 2008), at p. 12 [LBEX-DOCID 394711].

[295] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Mar. 20, 2007), at pp. 6-7 [LBHI_SEC07940_025779]; Lehman, Update on Lehman Brothers' Subprime Mortgage Origination Business Presentation to Lehman Board of Directors (Mar. 20, 2007) [LBHI_SEC07940_025834].

[296] Lehman, Update on Lehman Brothers' Subprime Mortgage Origination Business Presentation to Lehman Board of Directors (Mar. 20, 2007) [LBHI_SEC07940_025834]; Examiner's Interview of Lana Franks Harber, Sept. 23, 2009, at p. 2; Examiner's Interview of Theodore P. Janulis, Sept. 25, 2009, at p. 2; Examiner's Interview of David N. Sherr, Sept. 25, 2009, at p. 9.

optimistic and constructive – talk about the opportunities that this market creates and how we are uniquely positioned to take advantage of them.[297]

Consistent with this direction, the Board presentation emphasized that Lehman's management considered the crisis an opportunity to pursue a countercyclical strategy.[298] The March 2007 Board presentation first noted the difficulties in the subprime market, including the fact that seven of the top twenty subprime originators had already been sold to stronger partners or gone bankrupt and that the business was significantly less profitable than in past years because of lower origination volumes, lower sale and securitization margins, and increased loan loss reserves.[299]   The presentation further noted that in response to these market events, Lehman had improved BNC's risk and credit profile, tightened its lending criteria, retained new management, and significantly reduced headcount.[300]

The presentation concluded by highlighting management's belief that Lehman had "substantial opportunities, as in late 1990's" to improve its competitive position.[301] This countercyclical strategy was based on several stated premises.  Most important, Lehman's management believed that the subprime crisis would present only a "Limited Contagion To Other Markets" – in particular, Lehman's management did not expect the

---

[297] E-mail from Lana Franks Harber, Lehman, to Steven Skolnik, BNC Mortgage, *et al.* (Mar. 9, 2007) [LBEX-DOCID 306198]; *accord* Examiner's Interview of Lana Franks Harber, Sept. 23, 2009, at pp. 9-10; Examiner's Interview of Theodore P. Janulis, Sept. 25, 2009, at p. 6.

[298] Lehman, Update on Lehman Brothers' Subprime Mortgage Origination Business Presentation to Lehman Board of Directors (Mar. 20, 2007), at pp. 1, 10 [LBHI_SEC07940_025834].

[299] *Id.* at pp. 4-5.

[300] *Id.* at pp. 6-7.

[301] *Id.* at p. 10.

subprime crisis to have a significant impact on the "[b]roader credit markets."[302]

Lehman's management also believed that a "substantial part of [the] subprime market

is here to stay" and that "[p]rofitability will return when environment improves."[303]  In

sum, Lehman management thought that the market was nearing the bottom of the cycle

in spring and summer of 2007, and that Lehman would benefit from preserving the

option to expand the business in the future.[304]  Management informed the Board that the

down cycle in subprime presented "substantial opportunities" for Lehman, and that

management expected Lehman to be better positioned for profitable growth once the

industry cycle turned.[305]

The presentation did not discuss Aurora's Alt-A mortgage originations at all,

notwithstanding the significant concerns that Lehman's residential mortgage analyst

had recently raised about that group of mortgages.[306]  Instead, the presentation grouped

the Alt-A category of mortgages with prime and described "Prime/Alt-A Mortgages" as

follows: "credit performance not problematic - delinquencies are within expected

range."[307]  An earlier draft of the slideshow presented to the Board had used the term

"Alt-A/Alt-B Mortgages" above the words "credit performance not problematic –

---

[302] *Id.* at p. 9.

[303] *Id.* at p. 10.

[304] Examiner's Interview of Lana Franks Harber, Sept. 23, 2009, at p. 2; Examiner's Interview of Theodore P. Janulis, Sept. 25, 2009, at p. 8; Examiner's Interview of David N. Sherr, Sept. 25, 2009, at p. 6.

[305] Lehman, Update on Lehman Brothers' Subprime Origination Business Presentation to Lehman Board of Directors (Mar. 20, 2007), at pp. 1, 10 [LBHI_SEC07940_025834].

[306] *Id.* at pp. 1-10.

[307] *Id.* at p. 9.

delinquencies are within expected range,"[308] but this reference to Alt-B was deleted from the final version of the materials in favor of "Prime/Alt-A Mortgages."[309]

Sherr, Janulis, and Harber told the Examiner that they did not include a specific reference to Mortgage Maker or Alt-B in their presentation because they believed that the loans in the Mortgage Maker program were distinct from subprime mortgages, which were the subject of the presentation.[310]  The Lehman risk analyst who had studied the performance issues in Mortgage Maker told the Examiner that leaving Mortgage Maker out of a presentation on subprime was proper given the differences between what Lehman considered subprime (FICO scores below 620) and Mortgage Maker (average FICO score of 691).[311]

After the Board presentation, Lehman continued to originate subprime and especially Alt-A/Alt-B mortgage loans, thereby pursuing its countercyclical strategy, and likely exacerbating Lehman's residential mortgage losses.  The Examiner's financial advisors have estimated the losses from residential mortgage positions from the first quarter of 2007 through the third quarter of 2008 at $7.4 billion.[312]

---

[308] Lehman, State of Lehman Brothers' Subprime Mortgage Origination Business Presentation to Lehman Board of Directors [Draft] (Mar. 15, 2007), at p. 12 [LBEX-DOCID 2485576].

[309] Lehman, Update on Lehman Brothers' Subprime Origination Business Presentation to Lehman Board of Directors (Mar. 20, 2007), at p. 9 [LBHI_SEC07940_025834].

[310] Examiner's Interview of Lana Franks Harber, Sept. 23, 2009, at p. 3; Examiner's Interview of Theodore P. Janulis, Sept. 25, 2009, at pp. 2, 7; Examiner's Interview of David N. Sherr, Sept. 25, 2009, at p. 7.

[311] Examiner's Interview of Dimitrios Kritikos, July 29-30, 2009, at p. 19.

[312] Lehman, Mortgage Update - 1Q 07 (Apr. 9, 2007) [LBEX-DOCID 540069]; Lehman, Mortgage Update - 2Q 07 (June 8, 2007) [LBEX-DOCID 505835]; Lehman, Mortgage Update - June 07 (Aug. 9, 2007) [LBEX-DOCID 611902]; Lehman, Mortgage Update - August 07 (Sept. 25, 2007) [LBEX-DOCID 505889]; Lehman,

These losses were tempered by effective hedging strategies through at least 2007 and into early 2008.[313]  Between the first quarter of 2007 and the third quarter of 2008, Lehman had a gain of $2.96 billion on its residential mortgage credit hedges.[314]  Of this $2.96 billion gain, $2.623 billion was gained between the first quarter of 2007 and the end of the first quarter of 2008.[315]  For the second and third quarters of 2008, however, Lehman had essentially no gains on its hedges.[316]  As a result, during those quarters, Lehman suffered very substantial losses on its residential mortgage business.[317]

---

Flash - Mortgage Update - November 07 (Dec. 21, 2007) [LBEX-DOCID 505890]; Lehman, Flash - Mortgage Update - January 07 (Feb. 15, 2008) [LBEX-DOCID 3237972];  Lehman, Flash - Mortgage Update - March 07 (Apr. 23, 2008) [LBEX-DOCID 2432630]; Lehman, Flash - Mortgage Update - Apr. 07 (May 15, 2008) [LBEX-DOCID 1362958]; Lehman, Flash - Mortgage Update - May 07 (June 11, 2008) [LBEX-DOCID 3238001]; Lehman, Securitized Products P&L - June 2008  (July 11, 2008) [LBEX-DOCID 505776]; Lehman, Securitized Products P&L - July 2008  (Aug. 14, 2008) [LBEX-DOCID 505778].

[313] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 17; Lehman, Minutes of Meeting of the Board of Directors (Sept. 11. 2007), at p. 6 [LBHI_SEC07940_263264].

[314] Lehman, Mortgage Update - 1Q 07 (Apr. 9, 2007) [LBEX-DOCID 540069]; Lehman, Mortgage Update - 2Q 07 (June 8, 2007) [LBEX-DOCID 505835]; Lehman, Mortgage Update - June 07 (Aug. 9, 2007) [LBEX-DOCID 611902]; Lehman, Mortgage Update - August 07 (Sept. 25, 2007) [LBEX-DOCID 505889]; Lehman, Flash - Mortgage Update - November 07 (Dec. 21, 2007) [LBEX-DOCID 505890]; Lehman, Flash - Mortgage Update - January 07 (Feb. 15, 2008) [LBEX-DOCID 3237972]; Lehman, Flash - Mortgage Update - March 07 (Apr. 23, 2008) [LBEX-DOCID 2432630]; Lehman, Flash - Mortgage Update - Apr. 07 (May 15, 2008) [LBEX-DOCID 1362958]; Lehman, Flash - Mortgage Update - May 07 (June 11, 2008) [LBEX-DOCID 3238001]; Lehman, Securitized Products P&L - June 2008  (July 11, 2008) [LBEX-DOCID 505776]; Lehman, Securitized Products P&L - July 2008  (Aug. 14, 2008) [LBEX-DOCID 505778].

[315] Id.

[316] LBHI 10-Q (July 10, 2008), at p. 67.

[317] The Examiner's financial advisors estimate that Lehman's secured losses from residential mortgages exceeded $1 billion in the second quarter and in excess of $3.5 billion in the third quarter of 2008.

### (b)  The Explosion in Lehman's Leveraged Loan Business

During the first half of fiscal 2007, the high yield market was active, notwithstanding the onset of the crisis in the subprime residential mortgage market.[318] Like other market actors during this period, Lehman participated in more leveraged finance deals than ever before and entered into deals that were generally bigger than the leveraged finance deals it had done in the past.[319]  Compared to its competitors, Lehman was the most aggressive lender per dollar of shareholder equity in the first half of 2007.[320]

Lehman continued down this path despite the fact that the terms of these deals became less and less favorable over time from an investment banking perspective. Because there was so much competition to finance these loans, sponsors were able to negotiate terms that significantly increased the risk to the banks.  For example, according to some estimates, covenant light loans – loans that did not include previously standard covenants requiring the borrower to maintain certain levels of collateral, cash flow, and payment terms – increased from less than 1% of all leveraged

---

[318] E-mail from Roopali Hall, Lehman (Jan. 4, 2008) [LBHI_SEC07940_066187]; Lehman Loan Syndicate, Year-End Recap (Jan. 7, 2008), at p. 1 [LBHI_SEC07940_066190].

[319] E-mail from Evette Saldana, Lehman, to HYCC members, Lehman, *et al.* (June 15, 2007) [LBEX-DOCID 494525]; Lehman Credit Facilitation Group, 2nd Quarter 2007 Review (June 2007), at p. 1 [LBEX-DOCID 514908], attachment to e-mail from Evette Saldana, Lehman, to HYCC members, Lehman, *et al.* (June 15, 2007) [LBEX-DOCID 494525].

[320] E-mail from Evette Saldana, Lehman, to HYCC members, Lehman, *et al.* (June 15, 2007) [LBEX-DOCID 494525]; Lehman Credit Facilitation Group, 2nd Quarter 2007 Review (June 2007), at p. 6 [LBEX-DOCID 514908], attached to e-mail from Evette Saldana, Lehman, to HYCC members, Lehman, *et al.* (June 15, 2007) [LBEX-DOCID 494525].

loans in 2004 to over 18% by 2007 industry-wide.[321]   Lenders such as Lehman also abandoned certain contractual protections (*e.g.*, material adverse change provisions ("MACs"), up-front syndication, and joint liability) that were previously standard in the leveraged loan industry.[322]   In some deals, Lehman was the only party to sign the legal documents, even though other banks were intended to commit to the loans; thus, Lehman initially bore all the risk.[323]   As of March 2007, the rating agencies "perceived loosening of [Lehman's] risk standards – particularly in leveraged lending. . . ."[324]   The Examiner has not investigated whether the contractual terms of Lehman's leveraged lending transactions were more aggressive than those of its competitors.

Between December 2006 and June 2007, Lehman participated in more than 11 leveraged buyout deals that each exceeded $5 billion.[325]   By April 2007, Lehman had approximately 70 high yield contingent commitments in its pipeline – a record number

---

[321] Eric Felder, Lehman, Credit Outlook Presentation (Apr. 16, 2008), at p. 48 [LBHI_SEC07940_393578], attached to e-mail from Christopher Wichenbaugh, Lehman, to DCMNY, Lehman (Apr. 16, 2008) [LBHI_SEC07940_393578]; Standard & Poor's and LSTA, Leveraged Loan Index, August 2008 Review (Sept. 3, 2008), at p. 84 [LBEX-DOCID 4404712], attached to e-mail from Kristen Vigletta, Lehman (Sept. 3, 2008) [LBEX-DOCID 4326914].

[322] Examiner's Interview of Madelyn Antoncic, Feb. 25, 2009, at p. 4.

[323] *Id.*

[324] Lehman, Credit Ratings Strategy Presentation (Mar. 1, 2007), at p. 13 [LBEX-DOCID 618355]; e-mail from Stephen Lax, Lehman, to James P. Seery, Jr. Lehman, *et al.* (Apr. 11, 2008) [LBEX-DOCID 444768].

[325] E-mail from Miriam Oh, Lehman, to Paul Parker, Lehman, *et al.* (July 5, 2007) [LBEX-DOCID 3197652]; Lehman, Big LBO Update (July 3, 2007), at p. 2 [LBEX-DOCID 3183564].

for it.[326]   In June 2007, Lehman's lending pace had already doubled Lehman's 2006 record-setting year for high grade and high yield combined.[327]

When the market started to slow, Lehman suddenly found itself with a huge volume of commitments on its books and a risk profile that was well above its high yield business's risk appetite limits.   At the end of the second quarter of 2007, approximately $36 billion of contingent commitments remained on Lehman's books.[328] FID was almost $20 billion over its net balance sheet limit for the quarter.[329]   Relatedly, as described below, Lehman soon vastly exceeded its risk appetite limits for the high yield business.

### (i)   Relaxation of Risk Controls to Accommodate Growth of Lehman's Leveraged Loans Business

To accommodate the growth of Lehman's high yield lending activities, Lehman's management decided to loosen several of the firm's risk controls that otherwise would have limited the firm's ability to engage in many of these deals.   Most significantly, as discussed above, Lehman's senior management approved a number of deals that exceeded the firm's single transaction limit.

---

[326] E-mail from Stephen Lax, Lehman, to Alex Kirk, Lehman, *et al.* (Apr. 26, 2007) [LBEX-DOCID 259369].

[327] Lehman Credit Facilitation Group, 2nd Quarter 2007 Review (June 2007), at p. 13 [LBEX-DOCID 514908], attached to e-mail from Evette Saldana, Lehman, to HYCC members, Lehman, *et al.* (June 15, 2007) [LBEX-DOCID 494525].

[328] Alex Kirk, Lehman, Leveraged Finance Risk Presentation (June 2007) [LBEX-DOCID 158975], attached to e-mail from Olivia Lua, Lehman, to Christopher M. O'Meara, Lehman (June 21, 2007) [LBEX-DOCID 158975].

[329] Lehman Brothers, Balance Sheet Trend Presentation (Apr. 2007), at pp. 4-6 [LBEX-DOCID 251418], attached to e-mail from Kentaro Umezaki, Lehman, to Rebecca Miller, Lehman (May 3, 2007) [LBEX-DOCID 346520].

Many of the leveraged loans that Lehman funded in 2006 and 2007 were "way over the limit."[330]  By July 2007, Lehman had committed to approximately 30 deals that exceeded the pre-existing $250 million loss threshold, nine deals that would have exceeded a newly proposed loss threshold of $400 million,[331] five deals that violated the notional limit of $3.6 billion, and four deals that would have violated the notional limit of $4.5 billion that was proposed during the fourth quarter of 2007.[332]  Some of Lehman's commitments exceeded the loss threshold limit by a factor of six.[333]  With respect to 24 of the largest high yield deals in which Lehman participated, Lehman committed roughly $10 billion more than the single transaction limit, if enforced, would have allowed.[334]  These figures arguably understate the extent to which Lehman's leveraged loans exceeded the single transaction limit, since Lehman applied the single transaction limit only to the amount of the leveraged loan that Lehman "expected to fund," not the full amount of Lehman's commitment.[335]

To accommodate the growth of the high yield business, Lehman's management also relaxed the high yield business's risk appetite limits.  Despite having increased the

---

[330] E-mail from Joe Li, Lehman, to Paul Mitrokostas, Lehman (Aug. 30, 2007) [LBEX-DOCID 2547330].

[331] Joe Li, Lehman, STL Backtesting Excel Spreadsheet (July 25, 2007) [LBEX-DOCID 2506462], attached to e-mail from Joe Li, Lehman, to Fred S. Orlan, Lehman, *et al.* (July 25, 2007) [LBEX-DOCID 2563167].

[332] *Id.*

[333] *Id.*

[334] Lehman, Fixed Income Business Strategy, Single Transaction Limit Policy Proposed Improvements (Sept. 2007), at p. 3 [LBEX-DOCID 2563444].

[335] Lehman, Presentation to Lehman Executive Committee on Leveraged Finance Risk (Oct. 16, 2007), at p. 12 [LBEX-DOCID 506033], attached to e-mail from Blair Sieff, Lehman, to Steven Berkenfeld, Lehman, *et al.* (Oct. 16, 2007) [LBEX-DOCID 569915].

high yield business's risk appetite limit at the beginning of 2006 and again in early 2007, Lehman's increasing level of high yield commitments caused it to exceed the high yield business's risk appetite limit by significant amounts in 2007 and 2008.[336]  By late April 2007, Lehman had exceeded its newly increased high yield risk appetite limit,[337] and starting in late July,  the high yield business' usage consistently exceeded its limits.[338] As Lehman funded more of its commitments, the leveraged loan exposure soon doubled the limit amount.[339]

Lehman's management made a conscious decision to exceed the risk appetite limits on leveraged loans.[340]  Even though the risk appetite limits were divided into subsidiary limits for the business lines of each division, the limits for each business line were flexible as long as the aggregate numbers "rolled-up" within the divisional limit.[341] One Lehman executive questioned whether the firm even had a high yield limit.  In April 2007, Kentaro Umezaki, Head of Fixed Income Strategy, e-mailed Christopher M. O'Meara, Lehman CFO at the time, and several others, expressing concern that in a

---

[336] Appendix: 9, comparing risk appetite and VaR usage versus limits.

[337] *Id.* at p. 3.

[338] *Id.* at p. 4.

[339] *Id.* at p. 4-9.

[340] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 13; Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009.

[341] Examiner's Interview of Madelyn Antoncic, Mar. 27, 2009, at p. 12; Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at p. 7.

recent firm-wide meeting, Fuld sent "inconsistent messages" by encouraging growth at the same time Lehman was near its risk limits.[342]  Umezaki noted to O'Meara and others:

> the majority of the trading businesses focus is on revenues, with balance sheet, risk limit, capital or cost implications being a secondary concern. The fact that they haven't heard that those items matter [in] public forums from senior management recently reinforces this revenue oriented behavior implicitly. . . .  Example which we've debated for years: was even a topic in [the Turnberry meeting in] FLA: **Do we or don't we have a limit on how much HY LBO related lending/commitment exposure we can have at any given time?**  There has been no real "one firm" outcome to date in my opinion.  I'm not the only one who has this view in FID.[343]

### (c)  Internal Opposition to Growth of Leveraged Loans Business

Lehman's FID, including Gelband, Kirk, and Umezaki, opposed a number of the leveraged loan deals to which Lehman committed during this period, because they believed that these individual deals were too risky to justify their limited returns.[344] Despite the opposition, the Executive Committee decided to proceed with many of the deals.[345]

---

[342] E-mail from Kentaro Umezaki, Lehman, to Scott J. Freidheim, Lehman, *et al.* (Apr. 19, 2007) [LBEX-DOCID 210193].

[343] *Id.* (emphasis added); e-mail from Kentaro Umezaki, Lehman, to Ian T. Lowitt, Lehman (Apr. 18, 2007) [LBEX-DOCID 743931].

[344] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 10; Examiner's Interview of Michael Gelband, Aug. 12, 2009, at pp. 6-9; Examiner's Interview of Alex Kirk, Jan. 12, 2010, at p. 2; e-mail from Eric Felder, Lehman, to Michael Gelband, Lehman, *et al.* (Aug. 28, 2008) [LBEX-DOCID 822513]; *see also* e-mail from Steven Berkenfeld, Lehman, to Scott J. Freidheim, Lehman (May 11, 2007) [LBEX-DOCID 1379290]; e-mail from Bertrand Kan, Lehman, to Richard Atterbury, Lehman (Jan. 30, 2008) [LBEX-DOCID 1379129].

[345] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 3; Examiner's Interview of Michael Gelband, Aug. 12, 2009, at pp. 7-9; Examiner's Interview of Alex Kirk, Jan. 12, 2010, at pp. 2, 7; Examiner's Interview of Paul Shotton, June 5, 2009, at pp. 2, 6-7; Examiner's Interview of Hugh E. (Skip) McGee III, Aug. 12, 2009, at p. 9; Examiner's Interview of Fred S. Orlan, Sept. 21, 2009, at p. 4; e-mail from Eric

Some of the opposition to Lehman's increase in leveraged lending was focused on the bridge equity component of those deals.[346]  Several former members of Lehman's senior management, including Nagioff, Antoncic, and Berkenfeld, expressed reservations regarding the firm's level of engagement in leveraged loan bridge equity activities.[347]  The Examiner, however, also found that sponsors were aggressive in demanding equity bridge components to financing[348] and that the Investment Banking Division ("IBD") was in favor of providing bridge equity because it believed that Lehman needed to do so to stay competitive in the industry.[349]  Despite various discussions among Lehman's management regarding whether the level of leveraged loan bridge equity was acceptable and sustainable, Lehman's management never put any limit on the business's leveraged loan bridge equity commitments.[350]

---

Felder, Lehman, to Michael Gelband, Lehman, *et al.* (Aug. 28, 2008) [LBEX-DOCID 822513]; *see also* e-mail from Steven Berkenfeld, Lehman, to LBEC Member, Lehman, *et al.* (May 11, 2007) [LBEX-DOCID 1379290]; e-mail from Larry Wieseneck, Lehman, to Alex Kirk, Lehman (Jan. 30, 2008) [LBEX-DOCID 1379129].

[346] E-mail from Roger Nagioff, Lehman, to Madelyn Antoncic, Lehman, *et al.* (June 29, 2007) [LBEX-DOCID 1467654]; Examiner's Interview of Fred S. Orlan, Sept. 21, 2009, at p. 7.

[347] E-mail from Roger Nagioff, Lehman, to David Goldfarb, Lehman (June 1, 2007) [LBEX-DOCID 1581523]; e-mail from Madelyn Antoncic, Lehman, to David Goldfarb, Lehman, *et al.* (June 1, 2007).

[348] E-mail from Steven Berkenfeld, Lehman, to Robert D. Redmond, Lehman (Sept. 23, 2007) [LBEX-DOCID 1387569]; e-mail from Alex Kirk, Lehman, to [xxxxxxx]@archwireless.net (May 15, 2007) [LBEX-DOCID 1379297] (phone number redacted); e-mail from Steven Berkenfeld, Lehman, to LBEC Member, Lehman, *et al.* (May 11, 2007) [LBEX-DOCID 1379291].

[349] Examiner's Interview of Fred S. Orlan, Sept. 21, 2009, at p. 7.

[350] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 13; Examiner's Interview of Alex Kirk, Jan. 12, 2010, at p. 8; e-mail from Robert D. Redmond, Lehman, to Steven Berkenfeld, Lehman, *et al.* (May 19, 2007) [LBEX-DOCID 264270]; e-mail from Alex Kirk, Lehman, to Robert D. Redmond, Lehman, *et al.* (May 21, 2007) [LBEX-DOCID 174236]; e-mail from Steven Berkenfeld, Lehman, to David Goldfarb, Lehman, *et al.* (June 15, 2007) [LBEX-DOCID 859026].

By April 2007, the overall size of the firm's leveraged loan commitments became controversial.[351]  Kirk and Gelband became concerned about Lehman's overall exposure. In April 2007, Kirk e-mailed Gelband:

> As a heads up our risk of mandated commits is up to 6mm a bp triple our previous high.  Also the commits are coming in fast and furious I expect us to be well north of 30B this quarter.  This is also unprecedented.  In addition we are now seeing commitments that have crossed the risk tolerance so we may need your help with the bank in saying no to some key clients.[352]

At about the same time, Berkenfeld, who was head of the Commitment Committee that was charged with evaluating individual leveraged loans, noted in an e-mail: "The frenzy of the last month or so concerns me and I don't like being brought in at the very end and expected to make these decisions in less than 48 hours."[353]

Antoncic, the CRO, also opposed many of the transactions and the overall size of the business.  She recalled a conversation in which she told Berkenfeld and Goldfarb that the firm's leveraged loan exposure was getting too large and that limits had to be imposed.[354]  When Berkenfeld replied that he liked all of the deals that Lehman was considering, Antoncic responded that he could like one deal or another, but not all of them at once.[355]

---

[351] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 10.

[352] E-mail from Alex Kirk, Lehman, to Michael Gelband, Lehman (Apr. 20, 2007) [LBEX-DOCID 2763976].

[353] E-mail from Steven Berkenfeld, Lehman, to Jean-Francois Astier, Lehman, *et. al.* (Mar. 30, 2007) [LBEX-DOCID 351370].

[354] Examiner's Interview of Madelyn Antoncic, Mar. 27, 2009, at p. 10.

[355] *Id.*

Fuld believed that FID and Gelband were not opposed to Lehman expanding its leveraged loan business.[356]  Fuld believed that FID simply did not want the leveraged loans on its own balance sheet, because it received credit for only half of the income.[357] In contrast, IBD received credit for half of the income but bore no risk.[358]  Fuld considered Gelband's concerns an "intramural P+L grab," which concerned him.[359]

### (d)  Growth of Lehman's Commercial Real Estate Business at The Start of the Subprime Crisis

At the same time that Lehman was rapidly growing its leveraged loan business, Lehman also dramatically increased its commercial real estate transactions.  Lehman almost doubled GREG's balance sheet limit from $36.5 billion in the first quarter 2007 to $60.5 billion in the first quarter 2008, with GREG regularly exceeding its balance sheet limits.[360]  For instance, GREG exceeded its balance sheet limit by approximately $600 million in the third quarter 2007 ($56.6 billion balance sheet usage); by approximately $3.8 billion in the fourth quarter 2007 ($64.3 billion balance sheet usage); and by approximately $5.2 billion in the first quarter 2008 ($65.7 billion balance sheet usage).[361]

---

[356] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 5, 12, 13.

[357] *Id.* at p. 19.

[358] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 10.

[359] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 19.

[360] Lehman, FID-Balance Sheet Management Presentation (Sept. 2007), at p. 3 [LBEX-DOCID 4553137], attached to e-mail from Janet Marrero, Lehman, to Gerard Reilly, Lehman (Oct. 8, 2007) [LBEX-DOCID 4552976]; Lehman, FID-Balance Sheet Presentation (Jan. 17, 2008), at p. 3 [LBEX-DOCID 3363221], attached to e-mail from Sigrid Stabenow, Lehman, to Erik Addington, Lehman (Jan. 31, 2008) [LBEX-DOCID 3384762]; Lehman, Fixed Income Q3 Balance Sheet Targets [LBEX-DOCID 1742006], attached to e-mail from Kevin Horan, Lehman, to Clement Bernard, Lehman (June 27, 2009) [LBEX-DOCID 1698861].

[361] *Id.*

In addition, between the second quarter of 2006 and the second quarter of 2007, Lehman's real estate bridge equity positions in the United States increased ten-fold, from $116 million to $1.33 billion, and then doubled to more than $3 billion by the end of the second quarter of 2008.[362]

GREG's balance sheet growth was largely the result of a series of large transactions that Lehman concluded between May 2007 and November 2007.  Each of the following deals increased the balance sheet by over $1 billion in the respective months:[363]

- May 2007, $2.0 billion – Lehman financing to Broadway Partners to acquire a sub-portfolio of Beacon Capital Strategic Partners III, LP.[364]

- May 2007, $1.3 billion – Lehman financing to Broadway Real Estate Partners to acquire 237 Park Avenue.[365]

- June 2007, $1.2 billion – Lehman financing to Apollo Investment Corp. for a take private of Innkeepers USA Trust;[366]

- June 2007, $1.1 billion – Lehman financing to Thomas Properties Group to acquire the EOP Austin portfolio;[367]

---

[362] Ari Koutouvides, Lehman, Global Real Estate Group America's Portfolio Summary re the Second Quarter of 2007 (Oct. 24, 2007), at p. 2 [LBEX-DOCID 2501404], attached to e-mail from Jonathan Cohen, Lehman, to Paul Higham, Lehman (Oct. 24, 2007) [LBEX-DOCID 2558146]; Global Real Estate Group Americas Portfolio as of June 30, 2008, at p. 15 [LBEX-DOCID 1419825].

[363] The amounts listed were labeled as "[m]ovements onto the balance sheet" for the respective months. Unless otherwise noted in the source, these amounts are presumed to be amounts funded in that period. *See* Quarterly Real Estate Recap Third Quarter and Year-To-Date Presentation (Nov. 29, 2007), at pp. 118-25 [LBEX-DOCID 3504242], attached to e-mail from Paul Higham, Lehman, to Donald E. Petrow, Lehman (Nov. 29, 2007) [LBEX-DOCID 3625043].

[364] *Id.*

[365] *Id.*

[366] *Id.*

[367] *Id.*

- June 2007, $1.7 billion – Lehman financing for the acquisition of Northern Rock's commercial real estate portfolio;[368]

- July 2007, $1.5 billion – Lehman financing to ProLogis to acquire the Dermody industrial portfolio;[369]

- July 2007, $2.9 billion – Lehman financing for the acquisition of the Coeur Defense office building;[370]

- August 2007, $1.0 billion – Lehman financing for the acquisition of Northern Rock's commercial real estate portfolio;[371]

- October 2007, $1.5 billion – Lehman financing to Blackstone for its acquisition of Hilton Hotels;[372] and

- October 2007, $5.4 billion – Lehman financing for the acquisition of the Archstone Smith Trust.[373]

Because Lehman encountered subsequent difficulties in selling or securitizing portions of these deals, many of the above transactions remained among the largest exposures on Lehman's balance sheet as Lehman's financial condition deteriorated well into 2008.[374]

### (i)   Relaxation of Risk Controls to Accommodate Growth of Lehman's Commercial Real Estate Business

As with the growth of the leveraged loan business, the growth of the commercial real estate business was facilitated first by an increase in the risk limits and then by a decision to exceed those limits.  In a May 9, 2006 e-mail to Umezaki, Paul A. Hughson,

---

[368] *Id.*

[369] *Id.*

[370] *Id.*

[371] *Id.*

[372] Lehman, Commercial mortgages – Q2 2008 (Aug. 6, 2008), at pp. 5-14 [LBEX-DOCID 018868], attached to e-mail from Gerard Reilly, Lehman, to Ian T. Lowitt, Lehman (Aug. 7, 2008) [LBEX-DOCID 011867].

[373] *Id.*

[374] Lehman, Global Real Estate Group Update, at pp. 2-11 [LBEX-DOCID 019080] (listing top 10 risks as of May 31, 2008).

GREG's Head of Credit Distribution, inquired as to how risk limits meshed with GREG's plans to "expand our business in Asia, Europe and our bridge equity business globally.  I specifically wanted to focus on how we can grow Asia and bridge equity, given the risk limits . . . ."[375]  Several months later, in September 2006, in an e-mail to Walsh, Jeffrey Goodman, (senior-most risk manager for FID directly responsible for GREG) stated that he "wanted to followup on a conversation I had with [G]elband a while back concerning a push (from Goldfarb et al) to take on more risk in RE (double your size?) and get your view on what is realistic to expect and where you see this in the approval process internally."[376]

Lehman's risk appetite limit for the real estate business increased from $600 million in 2006 to $720 million in 2007.[377]  But the real estate business quickly felt pressure from management to exceed its recently increased limit.  In a June 2007 e-mail, Goodman told Antoncic that Hughson felt "trapped in that Roger [Nagioff] and other senior folks want[ed] them to keep growing the biz and hitting p/l budgets but on the other hand they [were] over [balance sheet] limits and risk limits."[378]  Goodman advised

---

[375] E-mail from Kentaro Umezaki, Lehman, to Paul A. Hughson, Lehman (May 9, 2006) [LBEX-DOCID 1776281].

[376] E-mail from Jeffrey Goodman, Lehman, to Mark A. Walsh, Lehman (Sept. 19, 2006) [LBEX-DOCID 1368068].

[377] E-mail from Paul A. Hughson, Lehman, to Thomas Pearson, Lehman, *et al.* (May 23, 2006) [LBEX-DOCID 1776282]; Lehman, Real Estate >> Risk Appetite / VaR >> Summary - COB 27 Aug 2007 Monday [LBEX-DOCID 2912096], attached to e-mail from Patricia Luken, Lehman, to Paul Higham, Lehman, *et al.* [LBEX-DOCID 2880146].

[378] E-mail from Jeffrey Goodman, Lehman, to Madelyn Antoncic, Lehman (June 29, 2007) [LBEX-DOCID 155724].

Hughson that Lehman's commercial real estate group "[could not] keep adding deals without a plan to reduce the risk somehow," and that there needed to be a discussion with Nagioff "as [to ask whether he could] cut risk in other areas (HY?) to free up some room or [whether he would] be willing to sit out some opportunities."[379]  Management ultimately decided that GREG would not be held to any risk appetite limits.[380]

### (ii) Internal Opposition to Growth of Commercial Real Estate Business

As with the leveraged loan business, some Lehman executives voiced concerns about the risk associated with Lehman's large concentration of commercial real estate positions on its balance sheet.  But, again as with the leveraged loan business, Lehman's management decided to continue to grow the commercial real estate business notwithstanding those warnings, "because that was the strategic imperative of the firm."[381]  For example, on May 7, 2007, Goodman e-mailed Antoncic about the Archstone transaction discussed below and said that O'Meara, then the CFO, "ha[d] significant concerns regarding overall size of [the real estate] book and how much of the firm's equity [was] tied up in such bridge equity deals."[382]  Lehman's risk managers were also concerned with the real estate bridge equity deals in which Lehman was

---

[379] Id.

[380] Examiner's Interview of Mark Walsh, Oct. 21, 2009, at pp. 4-5.  Walsh told the Examiner that he was told to double the commercial real estate risk.  Id. at p. 5.

[381] Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 3.

[382] E-mail from Jeffrey Goodman, Lehman, to Madelyn Antoncic, Lehman (May 7, 2007) [LBEX-DOCID 154953].

participating.[383]  The bridge equity positions were considered particularly risky because Lehman's balance sheet would be directly affected by the declining market values of the underlying real estate if the firm failed to sell its bridge equity positions as planned.[384]

Nevertheless, by late 2007, Lehman acquired a number of substantial bridge equity positions, both in the United States and overseas, including: $2.3 billion in Archstone;[385] $574 million in ProLogis/Dermody portfolio;[386] €475 million ($655 million) in Coeur Defense;[387] $221 million in EOP Austin;[388] and $195 million in the acquisition of the 200 Fifth Avenue building.[389]  As a result of these acquisitions, real estate bridge equity went from a negligible business to a multi-billion dollar exposure in approximately 18 months.

### (iii) Archstone

#### a.   Lehman's Commitment

The enormous growth of Lehman's commercial real estate balance sheet culminated in Lehman's commitment to participate in an approximately $22 billion

---

[383] *Id.*; Examiner's Interview of Madelyn Antoncic, Mar. 27, 2009, at pp. 8-9; e-mail from Madelyn Antoncic, Lehman, to Roger Nagioff, Lehman, *et al.* (June 29 , 2007) [LBEX-DOCID 1478403]; e-mail from Paul A. Hughson, Lehman, to Thomas Pearson, Lehman, *et al.* (May 23, 2006) [LBEX-DOCID 1776282].

[384] Examiner's Interview of Madelyn Antoncic, Mar. 27, 2009, at pp. 8-9.

[385] Global Real Estate Group, Lehman, Updated Commitment Committee Memorandum for Archstone (May 22, 2007) [LBEX-DOCID 1350952]; Lehman, Lehman Brothers Bridge Equity Pipeline (July 3, 2007) [LBEX-DOCID 638275], attached to e-mail from Jeffrey Goodman, Lehman, to Donald E. Petrow, Lehman, *et al.* (July 11, 2007) [LBEX-DOCID 670845].

[386] Lehman, Top Real Estate Risk Summary (Dec. 12, 2007), at p 2 [LBEX-DOCID 789172].

[387] *Id.*; Quarterly Real Estate Recap Third Quarter and Year-To-Date Presentation (Nov. 29, 2007), at p. 124 [LBEX-DOCID 3504242], attached to e-mail from Paul Higham, Lehman, to Donald E. Petrow, Lehman (Nov. 29, 2007) [LBEX-DOCID 3625043].

[388] *Id.* at p. 3.

[389] *Id.* at p. 4.

joint venture with Tishman Speyer for the acquisition of the publicly-held Archstone REIT.[390]  Including units under construction, Archstone owned over 88,000 apartments, which were spread across more than 340 communities within the United States.[391]  Mark Walsh was the driving force behind this deal, but Fuld and Gregory strongly supported it as well.[392]

On May 2, 2007, Lehman and Tishman Speyer provided a non-binding letter to acquire all outstanding shares of Archstone for $64 per share, subject to confirmatory due diligence.[393]  After negotiating a price of $60.75 per share and executing a plan of merger,[394] the parties announced the deal publicly on May 29, 2007.[395]  The deal was originally scheduled to close before August 31.[396]

Lehman's Executive Committee required Walsh to find partners to reduce Lehman's risk in the deal.  Bank of America Corporation ("BofA") agreed to fund half

---

[390] Lehman, Archstone Q2 2008 Update, at p. 14 [LBEX-DOCID 2929329], attached to e-mail from Leonard Cohen, Lehman, to Paul A. Hughson, Lehman (June 12, 2008) [LBEX-DOCID 2820780].

[391] Archstone-Smith Operating Trust, Annual Report for 2006 as of December 31, 2006 (Form 10-K) (filed on Mar. 1, 2007), at p. 6.

[392] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at pp. 8-10; Examiner's Interview of Joseph Gregory, Nov. 13, 2009, at pp. 7-8; Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 3-4.

[393] James L. Dixson, Lehman, Archstone Transaction Timeline (June 20, 2007), at. p. 2 [LBEX-DOCID 2139993], attached to e-mail from James L. Dixson, Lehman, to Robert Ashmun, Lehman, *et al.* (June 20, 2007) [LBEX-DOCID 2139994].

[394] *Id.* at p. 5; Agreement and Plan of Merger Among Archstone-Smith Trust, Archstone-Smith Operating Trust, River Holding, LP, River Acquisition (MD), LP, and River Trust Acquisition, LP (May 28, 2007) [TSREV00000460-554].

[395] James L. Dixson, Lehman, Archstone Transaction Timeline (June 20, 2007), at. pp. 5, 6 [LBEX-DOCID 2139993], attached to e-mail from James L. Dixson, Lehman, to Robert Ashmun, Lehman, *et al.* (June 20, 2007) [LBEX-DOCID 2139994]; Agreement and Plan of Merger for Archstone-Smith and River Holding (May 28, 2007) [LBEX-DOCID 1759937], attached to e-mail from Kyle Krpata, Weil, Gotshal & Manges LLP, to David E. Shapiro, Wachtell, Lipton, Rosen & Katz, *et al.* (May 29, 2007) [LBEX-DOCID 1870993].

[396] E-mail from Chip Heflin, Lehman, to Loan Sales, Lehman (May 29, 2007) [LBEX-DOCID 1488757].

of the floating rate bank loan and junior mezzanine loan, and to purchase half the bridge equity.[397]  Barclays Capital Inc. ("Barclays") signed a participation agreement to take 15% of the bridge equity and 15% of the debt in the Archstone deal, and then, on July 2, 2007, amended the agreement to take 25% of the debt.[398]  Barclays' commitments came out of BofA's share of the debt and equity, and thus did not affect Lehman's exposure to Archstone.[399]

The Archstone deal was an enormous commitment by Lehman, both in terms of debt financing and equity.  After bringing in BofA and Barclays, Lehman agreed to make a permanent equity investment of $250 million; agreed to purchase bridge equity of approximately $2.3 billion; and also agreed to fund various debt tranches totaling $8.5 billion.[400]

---

[397] *Compare* Memorandum from Mark A. Walsh, Lehman, to Executive Committee of Lehman Board of Directors, Re: Project Easy Living (May 22, 2007) [LBEX-DOCID 1350952], attached to e-mail from Julia Atwood, Lehman, to HYCC Members, Lehman, *et al*. [LBEX-DOCID 1341648] *with* Memorandum from Mark A. Walsh, Lehman, to Exec. Committee of LBHI Board of Directors, re: Project Easy Living (May 7, 2007), at pp. 1, 3 [LBEX-DOCID 147230], attached to e-mail from Mark A. Walsh, Lehman, to Steven Berkenfeld, Lehman, *et al*. (May 8, 2007) [LBEX-DOCID 141217]; Letter from Scott M. Weiner, Barclays Investment Holdings, Inc., to Lehman, *et al*., Red-line Commitment Letter for Archstone (June 11, 2007) [LBEX-DOCID 2073685];  Letter from Scott M. Weiner, Barclays Investment Holdings, Inc., to Lehman, *et al*., Execution Copy of Commitment Letter for Archstone (June 11, 2007) [LBEX-DOCID 1451573].
[398] *Id*.

[399] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009.

[400] Project Easy Living, Term Sheet (Sponsor) (May 28, 2007), at p. 1 [LBEX-DOCID 1624529], attached to e-mail from David Herman, Weil, Gotshal & Manges LLP, to Andrew Dady, Schulte Roth & Zabel LLP, *et al*. [LBEX-DOCID 1383842]; Project Easy Living, Term Sheet (Bridge Equity) (May 28, 2007), at p. 1 [LBEX-DOCID 1324526], attached to e-mail from David Herman, Weil, Gotshal & Manges LLP, to Andrew Dady, Schulte Roth & Zabel LLP, *et al*. [LBEX-DOCID 1383842]; River Holdings LP Senior Secured Facilities Commitment Letter (May 28, 2007), at p. 1 [LBEX-DOCID 2395952], attached to e-mail from Julian Chung, Cadwalader, Wickersham & Taft LLP, *et al*. (May 29, 2007) [LBEX-DOCID 2268458].

At the time the deal was presented to the Executive Committee, Lehman intended to sell all Archstone debt at closing.[401]  Because Lehman had price flex on the Archstone debt, Lehman management was reasonably confident that it could distribute the debt without suffering a loss.[402]  Price flex is a mechanism that facilitates syndication or sale of a loan by the initial lender without taking a loss.[403]  As a mechanical matter, price flex may permit the initial lender to increase the interest rate to attract other lenders (in which case the borrower is required to pay its lenders a higher interest rate), or require the borrower to reimburse the debt holders for any loss they may suffer as a result of syndicating or selling the debt to a third party at a price less than par.[404]  Because of the price flex on the Archstone debt, the risk in the Archstone commitment was heavily concentrated in Lehman's equity and bridge equity commitments.

Lehman planned to sell 50% of its remaining mezzanine debt and bridge equity positions within two to three weeks of closing (Lehman had already had two large financial institutions express an interest), and the rest would be sold off over the six

---

[401] Lehman, Easy Living Talking Points for Executive Committee and Rating Agencies (May 18, 2007), at p. 2 [LBEX-DOCID 200792], attached to e-mail from Paolo R. Tonucci, Lehman, to Christopher M. O'Meara, Lehman, et al. (May 18, 2007) [LBEX-DOCID 215761].

[402] Id.

[403] Standard & Poor's, Guide to the Loan Market (Sept. 2009), at p. 8, http://www2.standardandpoors.com/spf/pdf/fixedincome/LoanMarketGuide_2009_Final.pdf (last visited (last visited on Feb. 1, 2010); Alicia Taylor & Alicia Sansone, THE HANDBOOK OF LOAN SYNDICATIONS AND TRADING 175 (McGraw-Hill 2007); Steven M. Vavaria, Standard & Poor's, *Syndicated Loans--A Rated Market, at Last!* (Feb. 12, 2002), http://leeds-faculty.colorado.edu/madigan/3020/Readings/Syndicated_Loans--A_Rated_Market_At_Last.pdf (last visited on Feb. 1, 2010).

[404] Id.

months following closing.[405]   Insofar as Lehman's potential profits were concerned,
Lehman forecast earning more than $1.3 billion over a ten-year period, including nearly
$1 billion on Lehman's investment and substantial origination and asset management
fees.[406]

### b.   Risk Management of Lehman's Archstone Commitment

Archstone was repeatedly considered by both the Commitment Committee and
Executive Committee.[407]   These committees mandated significant alterations to the deal
structure, including, most importantly, requiring Walsh to bring in at least one partner
– ultimately BofA – to reduce the size of Lehman's commitment.[408]

Notwithstanding Archstone's consideration by the senior management of the
firm, Lehman's risk managers said that they had minimal input in the decision to
acquire Archstone.[409]   As a result, despite the extraordinary size and risk of Lehman's
commitment to the transaction, Lehman's management did not conduct quantitative

---

[405] Lehman, Easy Living Talking Points for Executive Committee and Rating Agencies (May 18, 2007), at p. 2 [LBEX-DOCID 200792], attached to e-mail from Paolo R. Tonucci, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (May 18, 2007) [LBEX-DOCID 215761].

[406] Memorandum from Mark A. Walsh, Lehman, to Executive Committee, Lehman, re Project Easy Living (May 7, 2007), at p. 3 [LBEX-DOCID 147230], attached to e-mail from Mark A. Walsh, Lehman, to Steven Berkenfeld, Lehman, *et al.* (May 8, 2007) [LBEX-DOCID 141217].

[407] Examiner's Interview of David S. Lazarus, Nov. 18, 2009, at pp. 6-7; Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 2; Examiner's Interview of Lisa Beeson, Oct. 23, 2009, at p. 4; Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at pp. 5-6.

[408] Examiner's Interview of Steven Berkenfeld, Oct. 5 & 7, 2009, at pp. 14-15; Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 22-23.

[409] Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009; Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 17; Examiner's Interview of Madelyn Antoncic, Feb. 25, 2009, at p. 5.

analyses of Lehman's exposure in advance of the risk Lehman was undertaking.[410]   For

example, it does not appear that Lehman systematically analyzed the effect that the

commitment would have on the firm's risk appetite levels, or conducted stress testing

on the firm's burgeoning commercial real estate exposures, in advance of committing to

the transaction.   Because of the extraordinary size of the transaction, however –

including especially an unprecedented bridge equity commitment – it was clear from

the beginning that the Archstone commitment would cause Lehman to exceed its risk

appetite limits.[411]

The Office of Thrift Supervision ("OTS") criticized Lehman's decision to enter

into the Archstone transaction in excess of its risk appetite limits.[412]   During OTS's

yearly review of Lehman in 2007, the OTS noticed that Lehman had exceeded its risk

appetite limits and that the Archstone deal was largely responsible for that overage.[413]

As a result, in 2008, OTS decided to conduct a targeted review of Lehman's commercial

real estate business.   After that targeted review, OTS issued a "negative" report,

criticizing Lehman for being "materially overexposed" in the commercial real estate

market and for entering into the Archstone deal without sound risk management

---

[410] Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009; Examiner's Interview of Madelyn Antoncic, Mar. 27, 2009, at p. 11.

[411] Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009.

[412] Office of Thrift Supervision, Report of Examination, Lehman Brothers Holdings Inc. (Exam starting July 7, 2008), at p. 2 [LBEX-OTS 000392].

[413] Examiner's Interview of Ronald Marcus, Nov. 4, 2009, at pp. 7-8.

practices.[414]  The report concluded that Lehman's breach of risk limits, caused largely by the Archstone deal, contributed to "major failings in the risk management process."[415]

By contrast, the SEC told the Examiner that it was aware of the risk appetite limit excesses, and that it did not second-guess Lehman's business decisions so long as the limit excesses were properly escalated within Lehman's management.[416]

### (e)  Nagioff's Replacement of Gelband as Head of FID

On May 1, 2007, Lehman announced that Gelband, the then-acting Global Head of FID, had "decided to leave the Firm to pursue other interests," and that Roger Nagioff would assume the top FID position at Lehman.[417]   Internally, Lehman announced that the change was based on "philosophical differences" among Fuld, Gregory, and Gelband as to the direction to take to grow the business.[418]

Gelband was removed from the position for several reasons, including that he was not aggressive enough in growing the business in accordance with Fuld's long-

---

[414] Examiner's Interview of Ronald S. Marcus, Nov. 4, 2009, at pp. 7-8; *accord* Office of Thrift Supervision, Report of Examination, Lehman Brothers Holdings Inc. (Exam starting July 7, 2008), at p. 2 [LBEX-OTS 000392].

[415] Office of Thrift Supervision, Report of Examination, Lehman Brothers Holdings Inc. (Exam starting July 7, 2008), at p. 2 [LBEX-OTS 000392].

[416] Examiner's Interview of the Securities and Exchange Commission, Aug. 24, 2009, at p. 8.

[417] Lehman Brothers Holdings Inc., Press Release: Lehman Brothers Names Roger B. Nagioff Global Head of Fixed Income (May 2, 2007), at p. 1 [LBEX-DOCID 1470086], attached to e-mail from Monique Wise, Lehman, to Jasjit (Jesse) Bhattal, Lehman, *et al*. (May 1, 2007) [LBEX-DOCID 1605828].

[418] Lehman Brothers, Talking Points & FAQs (May 1, 2007) [LBEX-DOCID 1470087], attached to e-mail from Monique Wise, Lehman, to Jasjit (Jesse) Bhattal, Lehman, *et al*. (May 1, 2007) [LBEX-DOCID 1605828].

term revenue targets.[419]   Fuld and Gregory also clashed with Gelband with respect to

growing the firm's energy business and its leveraged loan business.[420]

Fuld and Gregory chose Nagioff, then the CEO of Lehman Europe, to succeed

Gelband, even though he had no direct experience in the fixed income business, and he

lived in London, not New York.[421]   Nagioff decided to commute from London for a

portion of each month.[422]

---

[419] Examiner's Interview of Joseph Gregory, Nov. 5, 2009; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 5-6 (stating that Gregory informed him that Gelband was forced out because he was not willing to think creatively about growing Lehman's business and sharing his belief that Gelband's opposition to the Eagle Energy deal was the "last straw"); Examiner's Interview of Michael Gelband, Aug. 12, 2009, at pp. 15-16; *contra* Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 18; Examiner's Interview of Herbert H. (Bart) McDade III, Jan. 28, 2010, at p. 9.

[420] Examiner's Interview of Michael Gelband, Aug. 12, 2009, at pp. 2, 7, 15-16; Examiner's Interview of Joseph Gregory, Nov. 5, 2009; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 5-6; Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 18; e-mail from Michael Gelband, Lehman to Richard S. Fuld, Jr., Lehman (Mar. 6, 2007) [LBEX-DOCID 2762454] ("[R]isk/reward is not good here so I'm trying to get out of as much illiquid risk as possible. . . . That is the strategy at the moment that all my managers are following.  I need to have them be in a position to be able to operate and capitalize if we go through a period of stress.").

[421] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 5-6; Examiner's Interview of Hugh E. (Skip) McGee, Aug. 12, 2009, at p. 27 (McGee indicated that replacing Gelband with Nagioff was an unusual idea because Nagioff's experience was with European equities and McDade would have been a more logical choice to replace Gelband.); Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 15 (Umezaki stated that many people, himself included, were surprised at Nagioff's promotion because Nagioff had no background in fixed income and was not located in the United States at a time when Lehman was dealing with an economic crisis located primarily within the United States and further that Alex Kirk or Andrew J. Morton would have been more logical selections but that Gregory had indicated that Nagioff would be good for the job because of his abundance of business experience and a willingness to take risks.).

[422] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 6 (Nagioff's commute would ultimately prove to be an unsustainable arrangement, as the strain it created on Nagioff's family caused him to leave the company in February 2008.).

### (f)   The Board of Directors' Awareness of Lehman's Increasing Risk Profile

In a June 19, 2007 Board meeting, O'Meara presented the second quarter results to the Board.[423]   Lehman's management generally disclosed the firm's increased risk profile as well as the recently concluded Archstone deal.   For example, O'Meara reported that the firm-wide quarterly average risk appetite usage for the second quarter of 2007 was $2.6 billion against a limit of $3.3 billion,[424] and the Board had an extended discussion concerning the fact that the increased risk usage was spread across the firm.[425]   In June 2007, however, Lehman's daily risk systems reflected that the firm was almost at the $3.3 billion risk appetite limit, not including the Archstone transaction – well above the $2.6 billion quarterly average.[426]

The inclusion of the Archstone transaction was certain to put Lehman well over both its firm-wide risk appetite limit and its limit applicable to the real estate business.[427]   While the Archstone transaction was discussed at the June meeting,[428]

---

[423] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (June 19, 2007), at p. 3 [LBHI_SEC07940_026267].

[424] *Id.*; Lehman, Second Quarter 2007 Financial Information Presentation to Lehman Board of Directors (June 19, 2007), at p. 6 [LBHI_SEC07940_026226].

[425] Lehman, Second Quarter 2007 Financial Information Presentation to Lehman Board of Directors with Welikson's notes (June 19, 2007), at p. 6 [WGM_LBEX_01165].

[426] *See, e.g.*, Lehman, Daily Risk Appetite Report (June 19, 2007), at p. 1 [LBEX-DOCID 3296221], attached to e-mail from Rui Li, Lehman, to Manhua Leng, Lehman, *et al.* (June 19, 2007) [LBEX-DOCID 3295251].

[427] *See, e.g.*, *id.*; Mark Weber, Lehman, Chart Showing Risk Appetite Adjustment for Archstone (July 24, 2008) [LBEX-DOCID 425705], attached to e-mail from Mark Weber, Lehman, to PortfolioRisk Support, Lehman, *et al.* (July 24, 2008) [LBEX-DOCID 265567].

[428] Lehman's Board did not consider or approve the Archstone transaction in advance of the commitment. Examiner's Interview of Sir Christopher Gent, Oct. 22, 2009, at p. 3; *but cf.* Examiner's Interview of Michael L. Ainslie, Sept. 22, 2009, at p. 8 (stating that the Board never formally approved the Archstone

Lehman's management did not inform the Board until October 15, 2007 that Lehman had exceeded the firm-wide risk appetite limit for more than four months.

### (3)  Early Warnings: Risk Limit Overages, Funding Concerns, and the Deepening Subprime Crisis

From May to August 2007, the financial crisis that had previously been contained to the subprime residential mortgage market began to spread to other markets, including the commercial real estate and credit markets, where Lehman was particularly active.  These concerns escalated in June and July 2007, when two Bear Stearns hedge funds imploded, leading to panic in the credit markets and concerns more generally that the subprime crisis would spill into the broader economy.[429]  SEC Chairman Christopher Cox commented that "[o]ur concerns are with any potential systemic fallout."[430]

As a consequence of this gathering storm, in the first two weeks of July 2007, S&P placed $7.3 billion of residential mortgage related securities on negative ratings watch and announced a review of collateralized debt obligations ("CDOs") exposed to residential collateral; Moody's downgraded $5 billion of subprime mortgage bonds and

---

[429] acquisition or even discussed the transaction prior to Lehman's commitment to the deal); Examiner's Interview of John F. Akers, Apr. 22, 2009 (same); Examiner's Interview of Roger Berlind, May 8, 2009, at p. 10 (same); Examiner's Interview of Thomas Cruikshank, Oct. 8, 2009, at p. 3 (same); Examiner's Interview of Marsha Johnson Evans, May 22, 2009, at p. 14 (same); Examiner's Interview of Sir Christopher Gent, Oct. 22, 2009, at pp. 12-13 (same); Examiner's Interview of Roland A. Hernandez, Oct. 2, 2009 (same); Examiner's Interview of Dr. Henry Kaufman, May 19, 2009, at p. 15 (same); Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 13 (same).

[429] Mark Pittman, *Bear Stearns Mortgage Fund Collapse Sends Shock Through CDOs (Update 2)*, Bloomberg, June 21, 2007.

[430] *Id*.

placed 184 mortgage backed CDO tranches on downgrade review; and Fitch placed 33 classes of structured finance CDOs on credit watch negative.[431]  By the first week of August 2007, Germany's IKB announced major subprime-related losses and required a bailout, American Home Mortgage filed for Chapter 11 bankruptcy, and the French bank BNP Paribas froze redemptions on three of its funds, citing an inability to value them in the current market.[432]

Despite these events, Lehman went forward with a number of large investments, some previously committed, some new, until August 2007, when it drastically cut back on its leveraged lending, and later in 2007, when it stopped doing new commercial real estate deals.

This Section discusses the concerns of Lehman's managers about the state of the markets as early as April and May 2007 and management's actions with respect to the scale of its leveraged loan business.  This Section also discusses the concerns among some Lehman managers in July and August 2007 that Lehman might be unable to fund all of its leveraged loan and real estate commitments, including Archstone, and Lehman managers' decision during this period not to increase the magnitude of Lehman's "macro hedges" on its leveraged loan and commercial real estate portfolio.  Finally, this Section discusses management's decision to terminate its residential mortgage originations through BNC and Aurora.

---

[431] Bank for International Settlements, 78th Annual Report (June 30, 2008), at p. 95.
[432] *Id.*

### (a) Nagioff and Kirk Try to Limit Lehman's High Yield Business

Nagioff began to discuss rolling back the growth of the firm's leveraged loan business as soon as he became head of FID on May 2, 2007, but this decision was not fully effectuated until August 2007, by which time Lehman's leveraged loan exposure had grown to $35.8 billion as a result of $25.4 billion in new commitments.[433]

Nagioff learned about the size of Lehman's leveraged loan exposures from Kirk, then Head of Global Credit Products.[434]   Lehman's leveraged loan business was "so gargantuan – the exposures jumped out at [him]."[435]   Nagioff and Kirk believed that this was "banker business, not broker business," which Lehman did not have the balance sheet to support.[436]   Nagioff also thought that the chance of a sudden market downturn was high, and that Lehman was making relatively small profits for taking increasingly

---

[433] Lehman, Business and Financial Review Q2 2008 (Aug. 5, 2008), at p. 14 [LBHI_SEC07940_659768]; Lehman, Loan Portfolio Group Weekly Review (June 8, 2007), at pp. 3-8 [LBEX-DOCID 146379]; Lehman, Loan Portfolio Group Weekly Review (June 15, 2007), at pp. 3-8 [LBEX-DOCID 146375]; Lehman, Loan Portfolio Group Weekly Review (June 22, 2007), at pp. 3-8 [LBEX-DOCID 146376]; Lehman, Loan Portfolio Group Weekly Review (June 29, 2007), at pp. 3-8 [LBEX-DOCID 146377]; Lehman, Loan Portfolio Group Weekly Review (July 6, 2007), at pp. 3-8 [LBEX-DOCID 146348]; Lehman, Loan Portfolio Group Weekly Review (July 13, 2007), at pp. 3-8 [LBEX-DOCID 146358]; Lehman, Loan Portfolio Group Weekly Review (July 20, 2007), at p. 7 [LBEX-DOCID 146339]; Lehman, Loan Portfolio Group Weekly Review (July 27, 2007), at pp. 3-8 [LBEX-DOCID 146350]; Lehman, Loan Portfolio Group Weekly Review (Aug. 10, 2007), at pp. 3-8 [LBEX-DOCID 146341]; e-mail from Jeffrey Goodman, Lehman, to David N. Sherr, Lehman, *et al.* (June 22, 2007) [LBEX-DOCID 237094].  There is some evidence of inaccuracies in the LPG reports.  *See, e.g.*, Gary J. Fox, Lehman, Lehman Brothers Top Exposure Report Lehman Papers Compared to LPG Data (June 25, 2007) [LBEX-DOCID 2461202], attached to e-mail from Gary J. Fox, Lehman, to Greg L. Smith, Lehman, *et al.* (June 26, 2009) [LBEX-DOCID 2461203].  The calculation excludes the commitment to TXU.

[434] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 8.

[435] *Id.* at p. 7.

[436] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 7.

large and illiquid risks.[437]   Nagioff was concerned because the tail risk of Lehman's leveraged loan business totaled billions of dollars.[438]

Nagioff also had broader concerns about the state of the credit markets.  These concerns were shared by others outside Lehman and by several of Nagioff's senior colleagues, who believed that Lehman was operating in a "credit bubble."[439]   Months later, Antoncic, for example, reflected back on the general consensus that the markets were in trouble: "every one saw the train wreck coming. 64k question is why didn't anyone get out of the way???"[440]

Although Nagioff's concerns were shared by several others, Nagioff believed that it would be difficult to curtail Lehman's leveraged loan business, because McGee's IBD, which had championed expansion of this business from the start, had to authorize the change.[441]   Moreover, Lehman had many deals in the pipeline, and those deals were supporting "100 bankers."[442]   To make matters worse, Kirk believed that Gelband had been relieved of his position partly as a result of his opposition to the leveraged loan

---

[437] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 8; e-mail from Gary Mandelblatt, Lehman, to Roger Nagioff, Lehman, *et al.* (Nov. 27, 2007) [LBEX-DOCID 156264].

[438] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 10.

[439] E-mail from Steven Berkenfeld, Lehman, to Roger Nagioff, Lehman (May 10, 2007) [LBEX-DOCID 140669]; e-mail from Roger Nagioff, Lehman, to Ian T. Lowitt, Lehman (May 10, 2007) [LBEX-DOCID 140666]; e-mail from Christopher M. O'Meara, Lehman, to Paulo R. Tonucci, Lehman (Apr. 6, 2007) [LBEX-DOCID 1349076]; e-mail from Christopher M. O'Meara, Lehman, to Ian T. Lowitt, Lehman (July 21, 2007) [LBEX-DOCID 211149].

[440] E-mail from Madelyn Antoncic, Lehman, to Jack Malvey, Lehman (Apr. 8, 2008) [LBHI_SEC07940_212356].

[441] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 10.

[442] *Id.*

business; Nagioff believed that he would only get one chance to convince Fuld that this business had to be stopped.[443]

Nagioff spoke to Fuld on May 31, 2007. Nagioff told Fuld that Lehman was too big in the leveraged lending business and could lose a lot of money in the tail risk.[444] Nagioff showed Fuld the numbers, which reflected a possible $3.2 billion loss under a stress scenario that was computed specifically for the purpose of this meeting.[445] Nagioff told Fuld that Lehman needed to reduce its forward commitments from $36 billion to $20 billion, impose rules on the amount of leverage in the deals, and develop a framework for limiting and evaluating this business.[446]

Fuld was surprised and concerned by the tail risk in the leveraged loan positions and authorized Nagioff to present his analysis to the Executive Committee to get authorization to move forward with a plan to limit the firm's leveraged loan exposures.[447]

---

[443] E-mail from Roger Nagioff, Lehman, to Alex Kirk, Lehman (May 31, 2007) [LBEX-DOCID 173414]; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 11; Examiner's Interview of Alex Kirk, Jan. 12, 2010, at p. 11 (Kirk stated that Nagioff thought that Gelband had been fired in part for opposing the leveraged loans business; thus, they had to move very slowly in obtaining authority to halt the business).

[444] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 11; e-mail from Jormen Vallecillo, Lehman, to Roger Nagioff, Lehman, *et al.* (June 8, 2007) [LBEX-DOCID 1620669]; Alex Kirk, Lehman, Leveraged Finance Risk Presentation (June 8, 2007) [LBEX-DOCID 1416503].

[445] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 11-12; e-mail from Jormen Vallecillo, Lehman, to Roger Nagioff, Lehman, *et al.* (June 8, 2007) [LBEX-DOCID 1620669]; Alex Kirk, Lehman, Leveraged Finance Risk Presentation (June 8, 2007), at p. 10 [LBEX-DOCID 1416503].

[446] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 12.

[447] *Id.*

Several weeks later, Nagioff discussed the leveraged loan exposure with the Executive Committee.   After that conversation, on June 28, 2007, Nagioff was authorized by Fuld, Gregory, and McGee to conduct a "cross-firm initiative" to reduce commitments to $20 billion by the end of 2007.[448]   The cross-firm initiative entailed developing more specific and effective limits on Lehman's high yield business (including single transaction limits) and bridge equity, and developing a plan for reducing the existing exposures.[449]

In the two months between Nagioff's conversation with Fuld on May 31 and the slowdown of Lehman's leveraged loan commitments in August 2007, the firm entered into another $25.4 billion in commitments.[450]   For example, Lehman agreed on June 18, 2007 to commit $2.05 billion to the Sequa Corp deal; to commit $3.3 billion to the Home Depot Supply deal on July 19, 2007; to commit $2.4 billion to finance the Houghton Mifflin deal; and to commit $2.14 billion to finance the Applebee's deal on July 16,

---

[448] E-mail from Steven Berkenfeld, Lehman, to Scott J. Freidheim, Lehman (June 26, 2007) [LBEX-DOCID 1819424]; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 13.

[449] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 13.

[450] Lehman, Loan Portfolio Group Weekly Review (June 8, 2007), at pp. 3-8 [LBEX-DOCID 146379]; Lehman, Loan Portfolio Group Weekly Review (June 15, 2007), at pp. 3-8 [LBEX-DOCID 146375]; Lehman, Loan Portfolio Group Weekly Review (June 22, 2007), at pp. 3-8 [LBEX-DOCID 146376]; Lehman, Loan Portfolio Group Weekly Review (July 6, 2007), at pp. 3-8 [LBEX-DOCID 146348]; Lehman, Loan Portfolio Group Weekly Review (July 13, 2007), at pp. 3-8 [LBEX-DOCID 146358]; Lehman, Loan Portfolio Group Weekly Review (July 27, 2007), at pp. 3-8 [LBEX-DOCID 146350]; Lehman, Loan Portfolio Group Weekly Review (Aug. 10, 2007), at pp. 3-8 [LBEX-DOCID 146341].   The calculation excludes Lehman's commitment to TXU.

2007.[451]  As a result, FID ended the quarter roughly $2 billion over its net balance sheet limit.[452]  As Nagioff put it, it took time to "stop the machine;" a lot of deals were in the pipeline or under negotiation, and Lehman did not believe that it could abruptly terminate those deals.[453]

Nagioff was concerned that his efforts were too little too late: "Sadly in spite of killing BCE which was a 5!bn 'KKR disaster I am probably 3 months too late in the job….a big deal got pulled today and others are being restructured down….we are probably going to get punished for our stupidity."[454]  Two days later, Nagioff also wrote: "I now have the thing under control . . . if I had the job 6 months earlier we would not be where we are . . . let's hope it is only scratches."[455]

### (b) July-August 2007 Concerns Regarding Lehman's Ability to Fund Its Commitments

By July 2007, after the Bear Stearns' funds' implosion, some Lehman executives were concerned that Lehman might not be able to fund all of its commitments.[456]  For

---

[451] E-mail from Lehman Risk, Lehman, to Risk Limit Excess, Lehman (July 16, 2007) [LBEX-DOCID 230109]; Lehman, Loan Portfolio Group Weekly Review (July 20, 2007), at p. 7 [LBEX-DOCID 146339]; Lehman, Loan Portfolio Group Weekly Review (July 27, 2007), at pp. 6-7 [LBEX-DOCID 146350]; Appendix: 9, comparing risk appetite and VaR usage versus limits.

[452] Lehman, 2007 Balance Sheet Targets and Usage - Global (Oct. 17, 2007) [LBEX-DOCID 278229].

[453] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 10; Examiner's Interview of Alex Kirk, Jan. 12, 2009, at pp. 2-3; *accord* Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at pp. 10-11, 16-17.

[454] E-mail from Roger Nagioff, Lehman, to David Goldfarb, Lehman (June 26, 2007) [LBEX-DOCID 1585157].  For a fuller discussion of the effort to reduce the firm's high yield exposure, see Sections III.A.1.b.3 and III.A.1.b.4 of this Report.

[455] E-mail from Roger Nagioff, Lehman, to David Goldfarb, Lehman (June 28, 2007) [LBEX-DOCID 1585167].

[456] *See, e.g.*, e-mail from Paolo R. Tonucci, Lehman, to Sigrid M. Stabenow, Lehman (Mar. 14, 2007) [LBEX-DOCID 1342697]; e-mail from Christopher M. O'Meara, Lehman, to Paolo R. Tonucci, Lehman (Apr. 6,

example, Lehman had a maximum cumulative outflow funding model designed to ensure that Lehman had sufficient cash sources to meet the expected cash outflows in a stressed market environment.[457]  Under that model, in July 2007, the firm's "[L]iquidity Pool one year forward position [was] short $(0.4) billion."[458]

The liquidity concerns were the result of several factors.  First, as the credit markets froze, Lehman was unable to distribute its risk in certain leveraged loan and commercial real estate deals, including Archstone, leaving it with more exposure than it had previously anticipated.[459]  In addition, the firm had "effectively been locked out of the capital markets."[460]

When Nagioff learned about these concerns, he wrote Ian T. Lowitt, Lehman's then Co-CAO: "Kirk and Ken [Umezaki] are panicky….  Are they over reacting."[461]

---

2007) [LBEX-DOCID 1349076]; Lehman, Chart Showing High Grade and High Yield Loan Commitments (July 19, 2007) [LBEX-DOCID 375444], attached to e-mail from Nahill Younis, Lehman, to Kentaro Umezaki, Lehman (July 19, 2007) [LBEX-DOCID 297877]; e-mail from Kentaro Umezaki, Lehman, to Ian Lowitt, Lehman (July 20, 2007) [LBEX-DOCID 717108]; e-mail from Ian T. Lowitt, Lehman, to Kentaro Umezaki, Lehman (July 20, 2007) [LBEX-DOCID 717108]; e-mail from Ian T. Lowitt, Lehman, to Paolo Tonucci, Lehman, *et al.* (July 11, 2007) [LBEX-DOCID 1901826].

[457] Lehman, Liquidity Management At Lehman Brothers (July 2008), at p. 13 [LBEX-DOCID 009007], attached to e-mail from Rowena T. Carreon, Lehman, to Robert Azerad, Lehman, *et. al.* (July 31, 2008) [LBEX-DOCID 067762].

[458] 3rd Quarter-to-Date MCO and Cumulative Outflow Analysis (July 11, 2007), at p. 1 [LBEX-DOCID 1681748], attached to e-mail from Nahill Younis, Lehman, to Paolo R. Tonucci, Lehman (July 11, 2007) [LBEX-DOCID 1901826].

[459] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 16; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 9; Examiner's Interview of Alex Kirk, Jan. 12, 2010, at p. 12.

[460] E-mail from Nahill Younis, Lehman, to Paolo R. Tonucci, Lehman (July 11, 2007) [LBEX-DOCID 1901826].

[461] E-mail from Roger Nagioff, Lehman, to Ian T. Lowitt, Lehman (July 20, 2007) [LBEX-DOCID 175649].

Lowitt responded with a detailed explanation of the problem and his view of the root of

the problem:

> If everything goes as badly as it could simultaneously it will be awful, but
> at the moment a lot of people have money they are willing to
> [l]end to us and if we close them quickly it will make a difference.  I do
> think we need to get on a `war footing.'  [James] Merli and the guys on the
> desk are panicky and that is feeding back into fid and outside the firm.
> Need people to be confident.  I would describe my position based on what
> I know today as anxious but not panicky.  *Also the discipline we had post
> 1998 about funding completely dissipated which adds to the alarm.*[462]

Nagioff responded: "Last paragraph applies to firm broadly."[463]

Lowitt traced Lehman's difficulty in funding its commitments directly to its

failure to abide by its risk limits, as Lowitt wrote to O'Meara in a later e-mail on July 20,

2007: "In case we ever forget; this is why one has concentration limits and overall

portfolio limits.  Markets do seize up."[464]

To deal with these concerns on a "war footing," Lowitt, O'Meara, Kirk, Umezaki,

and  Paolo  R.  Tonucci,  (Lehman's  Global  Treasurer),  set  up  an  Asset-Liability

Committee ("ALCO") so that FID and Lehman's Treasury Department could "manage

[the firm's] liquidity on a daily basis."[465]   Prior to the formation of ALCO, Lehman's

---

[462] E-mail from Ian T. Lowitt, Lehman, to Roger Nagioff, Lehman (July 20, 2007) [LBEX-DOCID 175646]
(emphasis supplied).

[463] E-mail from Roger Nagioff, Lehman, to Ian T. Lowitt, Lehman (July 20, 2007) [LBEX-DOCID 175646].

[464] E-mail from Ian Lowitt, Lehman, to Christopher M. O'Meara, Lehman (July 20, 2007) [LBEX-DOCID
194066].

[465] E-mail from Ian Lowitt, Lehman, to Roger Nagioff, Lehman (July 20, 2007) [LBEX-DOCID 175646]; e-
mail from Ian Lowitt, Lehman, to Herbert H. McDade III, Lehman, *et al.* (July 20, 2007) [LBEX-DOCID
175646].

Treasury Department relied on pipeline reports from the businesses.[466]  ALCO convened

frequent meetings from August 2007 through February 2008,[467] and began to track and

monitor more closely the firm's monthly projections for cash capital and maximum

cumulative outflow.

The cash capital model was a pillar of the firm's funding framework.[468]  The

sources of cash capital were equity and debt with a remaining life of greater than one

year.[469]  The firm always funded leveraged loans and commercial real estate with cash

capital.[470]  Although the firm could fund loans and commercial real estate on a secured

basis, it assumed that secured finance would not be available under stressed market

---

[466] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 9.

[467] *See e.g.*, Lehman, LBHI CC Projections (July 30, 2007) [LBEX-DOCID 214312], attached to e-mail from Paolo R. Tonucci, Lehman, to Christopher M. O'Meara, Lehman (July 30, 2007) [LBEX-DOCID 187182]; ALCO Summary Package (Aug. 2, 2007) [LBEX-DOCID 514844]; ALCO Summary Package (Aug. 7, 2007) [LBEX-DOCID 514847]; ALCO Summary Package (Aug. 16, 2007) [LBEX-DOCID 514851]; ALCO Summary Package (Sept. 4, 2007) [LBEX-DOCID 514862]; ALCO Summary Package (Sept. 5, 2007) [LBEX-DOCID 514863]; ALCO Summary Package (Sept. 6, 2007) [LBEX-DOCID 514865]; ALCO Summary Package (Sept. 7, 2007) [LBEX-DOCID 514866]; ALCO Summary Package (Sept. 10, 2007) [LBEX-DOCID 514867]; ALCO Summary Package (Sept. 12, 2007) [LBEX-DOCID 514869]; ALCO Summary Package (Sept. 13, 2007) [LBEX-DOCID 514870]; ALCO Summary Package (Sept. 14, 2007) [LBEX-DOCID 514871]; ALCO Summary Package (Sept. 18, 2007) [LBEX-DOCID 514873]; ALCO Summary Package (Sept. 21, 2007) [LBEX-DOCID 514875]; ALCO Summary Package (Oct. 25, 2007) [LBEX-DOCID 514887]; ALCO Summary Package (Dec. 4, 2007) [LBEX-DOCID 104102]; ALCO Summary Package (Feb. 12, 2008) [LBEX-DOCID 104040].

[468] Lehman, Implications for the Funding Framework (Aug. 6, 2007), at p. 2 [LBEX-DOCID 601971], attached to e-mail from Angelo Bello, Lehman, to Kentaro Umezaki, Lehman (Aug. 6, 2007) [LBEX-DOCID 720559].

[469] Lehman, Update on Risk, Liquidity, and Capital Adequacy Presentation to Standard and Poor's (Aug. 17, 2007), at p. 72 [LBEX-DOCID 2031705], attached to e-mail from Shaun K. Butler, Lehman, to Elizabeth R. Besen, Lehman (Aug. 28, 2007) [LBEX-DOCID 2374876].

[470] *Id.* at p. 67.

conditions.[471]  It was the firm's policy always to have a cash capital surplus of at least $2

billion.[472]

On July 30, 2007, ALCO members exchanged an analysis showing that Lehman

did not project having the usual surplus, and in fact projected large deficits of cash

capital.[473]  More specifically, Lehman's month end cash capital estimates for September,

October, and November of the same year were -$11.4 billion, -$14.5 billion and -$9.4

billion.[474]  This meant that Lehman did not anticipate being able to fund its long-term

obligations with long-term assets.

Faced with this prospect, in early August 2007, Kirk, Lowitt and Nagioff decided

to shut down the leveraged loan and commercial real estate businesses until the end of

the third quarter of 2007.  They convinced McGee and Berkenfeld to "kill everything"

for the rest of the quarter.[475]  Nagioff believed the Executive Committee should not have

approved any large deals before the end of the quarter, saying: "Do not think any large

deal can get thru exec[utive committee] pre qtr end . . . this cannot be expressed

---

[471] *Id.*

[472] Lehman, Risk, Liquidity, Capital and Balance Sheet Update Presentation to the Finance and Risk Committee of Lehman Board of Directors on (Sept. 11, 2007), at p. 31 [LBEX-DOCID 505941], attached to e-mail from Paolo R. Tonucci, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Sept. 9, 2007) [LBEX-DOCID 552383].

[473] LBHI CC Projections (July 30, 2007), at p. 2 [LBEX-DOCID 214312], attached to e-mail from Paolo Tonucci, Lehman, to Christopher M. O'Meara, Lehman (July 30, 2007) [LBEX-DOCID 187182].

[474] *Id.*

[475] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 10.

publicly."[476]  Kirk responded: "Good. We will need skip [McGee] to kill as much stuff as early as possible."[477]

At about the same time, the leveraged loan market generally collapsed, and new issues slowed to a trickle in the third quarter.[478]  Lehman's leveraged loan commitments thus halted in early August 2007, three months after Nagioff first concluded that Lehman's exposure was already "gargantuan," and two months after Nagioff's first conversation with Fuld about the issue.

### (c)   Lehman Delays the Archstone Closing

Because of the funding concerns, Lehman delayed the closing on Archstone from the originally anticipated August 2007 closing date to October 5, 2007.[479]  As the market crisis escalated in June and July 2007, Lehman attempted to syndicate its Archstone debt.  But by late July 2007, the institutional market for commercial real estate was "virtually closed,"[480] and Lehman's attempts at selling Archstone bridge equity largely failed.[481]

---

[476] E-mail from Roger Nagioff, Lehman, to Alex Kirk, Lehman (Aug. 7, 2007) [LBEX-DOCID 173496].

[477] E-mail from Alex Kirk, Lehman, to Roger Nagioff, Lehman (Aug. 7, 2007) [LBEX-DOCID 173496].

[478] Lehman, Loan Syndicate/Year-End Recap (Jan. 4, 2008), at p. 5. [LBHI_SEC07940_066190].

[479] E-mail from Randall B. Whitestone, Lehman, to Steven Berkenfeld, Lehman, *et al.* (Aug. 5, 2007) [LBEX-DOCID 988270]; Archstone-Smith Trust, Press Release: Archstone-Smith Amends Merger Agreement With Tishman Speyer Partnership (Aug. 6, 2007) [LBEX-DOCID 2140354]; e-mail from Chip Heflin, Lehman, to Loan Sales - 4th Floor, Lehman (May 29, 2007) [LBEX-DOCID 1488757].

[480] E-mail from Mark Walsh, Lehman, to Alex Kirk, Lehman, *et al.* (July 27, 2007) [LBEX-DOCID 174304].

[481] *See* Appendix *generally* e-mail from Paul A. Hughson, Lehman, to Mark A. Walsh, Lehman, *et al.*, (July 27, 2007) [LBEX-DOCID 155079] (reflecting the fact that on July 27, 2007, D.E. Shaw informed Lehman that "given the sell-off in the reit market and the volatility of the credit markets" its Risk Committee had rejected the deal); e-mail from Jonathan Cohen, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (July

In the midst of the market deterioration, an analyst at Citigroup issued an analyst report entitled "Archstone Smith Trust (ASN): Could the Buyers Cut Their Losses and Walk Away?"[482]   The report suggested that Lehman, BofA, and Barclays might be better off walking away from the Archstone deal and paying the $1.5 billion breakup fee, rather than closing the deal at a significant loss.[483]

While the report and a Wall Street Journal article discussing it were widely read at Lehman,[484] Lehman never seriously considered walking away from the deal.[485]   One reason Lehman was comfortable proceeding with the deal was that Lehman was ultimately able to sell approximately $2.09 billion in Archstone debt to Freddie Mac,[486] and another $7.1 billion of Archstone debt to Fannie Mae.[487]   During the same time

---

27, 2007) [LBEX-DOCID 1904232] (showing that by July 2007, Lehman began to worry that the market "implosion" might force Lehman to provide $9 billion in funding for the Archstone transaction, rather than the $6.8 billion it had previously assumed would be necessary.).

[482] Jonathan Litt, *Citigroup Global Markets Inc., Archstone Smith Trust (ASN): Could the Buyers Cut Their Losses and Walk Away?* (July 26, 2007) [LBEX-DOCID 1714588].

[483] *Id.* at pp. 1-2.

[484] *See e.g.,* e-mail from Webster Neighbor, Lehman, to Paul A. Hughson, Lehman (July 31, 2007) [LBEX-DOCID 2500559]; e-mail from Gerard Reilly, Lehman, to Christopher M. O'Meara, Lehman (Aug. 1, 2007) [LBEX-DOCID 210156]; e-mail from Stephen F. Rossi, Lehman, to Anna Yu, Lehman, *et al.* (Aug. 1, 2007) [LBEX-DOCID 3271158].

[485] Examiner's Interview of Lisa Beeson, Oct. 23, 2009, at p. 5; Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 9; Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 4; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 3; Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at p. 3; Examiner's Interview of John D. Macomber, Sept. 25, 2009, at pp. 13-14.

[486] Freddie Mac, Holdco Term Sheet (Sept. 5, 2007) [LBEX-DOCID 4452813]; Freddie Mac, Sellco Term Sheet (Sept. 5, 2007) [LBEX-DOCID 4452811]; Lehman, Project Easy Living Debt Funding Detail (Oct. 5, 2007), at p. 1 [LBEX-DOCID 598184].

[487] Examiner's Interview of Mark A. Walsh, Oct. 22, 2009, at p. 9; Examiner's Interview of Lisa Beeson, Oct. 23, 2009, at p. 8; Letter from Lehman Brothers Holdings Inc. to Fannie Mae re: Rate Lock Terms (Sept. 17, 2007), at p. 1. [LBEX-DOCID 2704241].

period, however, Lehman and its partners were able to sell only $71 million of the deal's $4.6 billion in bridge equity.[488]

The Archstone deal closed on October 5, 2007.[489]   As of October 12, 2007, Lehman's total Archstone exposure was approximately $6 billion, $2.39 billion of which was in the riskiest equity portions of the deal (permanent equity and bridge equity portions):[490]

| | |
|---|---|
| Permanent equity | $250 million |
| Bridge equity | $2.14 billion |
| Mezzanine loan | $240 million |
| Term loan | $2.47 billion |
| Senior debt | $850 million |

When Secretary of the Treasury Henry M. Paulson, Jr. learned late in 2007 that Lehman had closed on Archstone, despite the shut-down in the securitization market, he questioned the wisdom of the decision and the direction in which Lehman was heading.[491]

---

[488] Lehman, Archstone Smith Multifamily JV Debt and Equity Redemption Schedule (Jan. 3, 2008), at p. 1 [LBEX-DOCID 2502413], attached to e-mail from Keith Cyrus, Lehman, to Paul A. Hughson, Lehman, *et al.* (Jan. 1, 2008) [LBEX-DOCID 2646616].

[489] Lehman, Acquisition of Archstone-Smith Trust Corporate Closing Documents Table of Contents (Oct. 5, 2007), at p. 2 [LBEX-WGM 960404].

[490] Lehman, Lehman Expected Share of Real Estate Commitments (Oct. 17, 2007), at p. 2 [LBEX-DOCID 624620].

[491] Examiner's Interview of Henry Paulson, June 25, 2009, at p. 9.

### (d) Lehman Increases the Risk Appetite Limit to Accommodate the Additional Risk Attributable to the Archstone Transaction

The risk in Lehman's book was dramatically increasing during 2007.[492]  Lehman's management reacted to the increasing risk appetite usage by increasing its limit amounts.

Although Lehman ordinarily included the risk appetite usage attributable to a transaction immediately after entering into the commitment for the transaction, Lehman did not include the very substantial increase in risk appetite usage attributable to Archstone in the risk appetite calculation for almost three months.[493]  At least one other real estate bridge equity transaction, Dermody/ProLogis, also was not included in risk appetite until that date.[494]

---

[492] Some of the increase in risk usage, of course, was the result of market volatility and its effect upon existing assets; some was the result of decisions to close new deals.  In any event, usage increased dramatically in 2007 and limits were raised accordingly, from $3.3 billion to $3.5 billion to $4.0 billion.  *See* e-mail from Manhua Leng, Lehman, to Mynor Gonzalez, Lehman, *et al.* (Sept. 10, 2007) [LBEX-DOCID 262797]; e-mail from Christopher M. O'Meara, Lehman, to David Goldfarb, Lehman (Aug. 15, 2007) [LBEX-DOCID 211183]; Lehman, Material for Market Risk Control Committee Meeting (Jan. 14, 2008), at p. 33 [LBEX-DOCID 271352], attached to e-mail from Mark Weber, Lehman, to Paul Shotton, Lehman, *et al.* (Jan. 14, 2008) [LBEX-DOCID 223263].  As revenues increased, the capacity for risk increased; management calculated, albeit sometimes by adjusting the formula, that each increase was justified by anticipated revenues.  *See* e-mail from Madelyn Antoncic, Lehman, to David Goldfarb, Lehman, *et al.* (Aug. 28, 2007) [LBEX-DOCID 193203]; *see* Appendix 10, showing the calculation of Lehman's increased $4.0 billion risk appetite limit.

[493] *See* e-mail from Mark Weber, Lehman, to Jeffrey Goodman, Lehman (June 4, 2007) [LBEX-DOCID 247960]; Mark Weber, Lehman, Chart Showing Risk Appetite Adjustment for Archstone (July 24, 2008) [LBEX-DOCID 425705], attached to e-mail from Mark Weber, Lehman, to PortfolioRisk Support, Lehman, *et al.* (July 24, 2008) [LBEX-DOCID 265567]; *see also* e-mail from Mark Weber, Lehman, to Laura M. Vecchio, Lehman (July 31, 2008) [LBEX-DOCID 264849].

[494] Lehman, VaR / Risk Appetite Restatements, (Nov. 12, 2007) at p. 17 [LBEX-DOCID 271334].

If Archstone (and the other transactions) had been included in the firm's risk appetite usage from the Archstone commitment date in late May 2007, consistent with the firm's usual practice, Lehman would have been over the firm-wide risk appetite limit for much of the intervening period.[495]  Lehman would also have been over the risk appetite limits for FID and the real estate business by substantial margins.[496]  As the summer of 2007 wore on, the volatility in the markets began to exacerbate the situation, and Lehman's risk appetite usage increased markedly, even though Lehman generally stopped entering into major new commitments after the third quarter of 2007.[497]

Archstone and Dermody/ProLogis were not included sooner in Lehman's risk appetite usage calculation because Lehman's risk managers were trying to calculate a stable usage amount for these bridge equity transactions.  Initial calculations yielded

---

[495] *Id.*

[496] *Id.*

[497] E-mail from Jeffrey Goodman, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Dec. 4, 2007) [LBEX-DOCID 251204]; e-mail from Paul Shotton, Lehman, to Christopher M. O'Meara, Lehman *et al.* (Dec. 6, 2007) [LBEX-DOCID 251204]; Examiner's Interview of Mark Weber, Aug. 11, 2009, at p. 9; Examiner's Interview of David Goldfarb, Sept. 21, 2009, at p. 8; Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at p. 7; Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 13; *but see* Lehman, September 2007 Financial Information Presentation to Lehman Board of Directors with Christopher M. O'Meara's handwritten notes (Oct. 15, 2007), at p. 6 [LEH_CMO_0000001] (attributing the increase in risk appetite to increased market volatility as well as increased leveraged finance and commercial real estate positions, particularly since the market environment had prevented the firm from selling those assets); e-mail from Joe Li, Lehman, to Madelyn Antoncic, Lehman (Sept. 11, 2007) [LBEX-DOCID 157247] (stating that 50% of the recent VaR increase for Global Capital Products was due to volatility and 50% was from the origination book); *see also* Lehman, Firm-wide Risk Driver (Oct. 22, 2007) [LBEX-DOCID 190147] (attributing the firm's rising risk appetite and VaR usage figures primarily to increased correlation across divisions).

varying risk appetite usage figures that Lehman's risk managers considered unreasonable.[498]

Once these positions were officially included in risk appetite usage in August 2007, it became clear to senior management that the firm had been exceeding the firm-wide risk appetite on a persistent basis for some time.[499]  The firm's risk appetite usage started to be discussed more widely within the firm.[500]

Lehman raised its firm-wide risk appetite limit from $3.3 billion to $3.5 billion on September 7, 2007.[501]  Lehman's risk managers questioned whether Lehman truly had increased risk-taking capacity, however.  Two weeks after the firm first included the

---

[498] Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009; Examiner's Interview of Mark Weber, Aug. 11, 2009, at p. 4; *but cf.* Examiner's Interview of Madelyn Antoncic, Oct. 6, 2009, at p. 11 (reflecting statements that she was unaware that the bridge equity portion of the Archstone deal had been excluded from the firm's risk measurements and that she "hit the roof" when Jeffrey Goodman told her that the bridge equity had not been included in the firm's metrics).

[499] Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009; Examiner's Interview of Paul Shotton, June 5, 2009, at p. 19; Appendix No. 9, comparing risk appetite and VaR usage versus limits; e-mail from Mark Weber, Lehman, to Laura M. Vecchio, Lehman (July 31, 2008) [LBEX-DOCID 264849]; Mark Weber, Lehman, Chart Showing Risk Appetite Adjustment for Archstone (July 24, 2008) [LBEX-DOCID 425705], attached to e-mail from Mark Weber, Lehman, to Portfolio Risk Support, Lehman, *et al.* (July 24, 2008) [LBEX-DOCID 265567]; e-mail from Madelyn Antoncic, Lehman, to David Goldfarb, Lehman, *et al.* (Aug. 14, 2007) [LBEX-DOCID 211183].

[500] *See* Lehman, September 2007 Financial Information Presentation to Lehman Board of Directors (Oct. 15, 2007), at p. 6 [LBHI_SEC07940_026377]; Lehman Brothers Holdings Inc., Minutes of Meeting of the Finance and Risk Committee of the Board of Directors (Sept. 11, 2007), at p. 2 [LBEX-AM 067018]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2007), at p. 3 [LBHI_SEC07940_026364]; e-mail from Madelyn Antoncic, Lehman, to David Goldfarb, Lehman, *et al.* (Aug. 14, 2007) [LBEX-DOCID 211183].

[501] E-mail from Manhua Leng, Lehman, to Mynor Gonzalez, Lehman, *et al.* (Sept. 10, 2007) [LBEX-DOCID 262797]; e-mail from Christopher M. O'Meara, Lehman, to David Goldfarb, Lehman (Aug. 15, 2007) [LBEX-DOCID 211183].  *But see* e-mail from Madelyn Antoncic, Lehman, to David Goldfarb, Lehman, *et al.* (Aug. 28, 2007) [LBEX-DOCID 193203] (showing that Antoncic did not believe that the decision to raise the limit had been made - "we did not close the loop on this.  Robert worked up some numbers but I think we need to revisit the expected rev for Q4 given a slowdown").

Archstone and Dermody/ProLogis bridge equity positions in the firm's risk appetite usage calculation, Goldfarb e-mailed O'Meara and Antoncic: "I thought we increased [risk] appetite to reflect YTD performance?"[502]  Antoncic replied that they "did not close the loop on this" because of concerns related to a fourth-quarter slowdown in revenues.[503]  Under the methodology for calculating the risk appetite limit, a slowdown in revenues would have reduced Lehman's ability to take risk.  Similarly, in an October 2007 CSE meeting, Goodman informed the SEC that Lehman had increased its risk appetite limit, but "admitted that they probably shouldn't have raised the limit to $3.5b when they did, given that they were almost there and there wasn't enough headroom."[504]

### (e)  Cash Capital Concerns

ALCO continued to have serious concerns about Lehman's cash capital and liquidity position.  Until the final week of September 2007, Lehman did not expect its ending cash capital positions for the months of September, October, and November to meet the $2 billion minimum requirement.[505]  The average ending cash capital positions

---

[502] E-mail from David Goldfarb, Lehman, to Madelyn Antoncic, Lehman, *et al.* (Aug. 28, 2007) [LBEX-DOCID 193203].

[503] E-mail from Madelyn Antoncic, Lehman, to David Goldfarb, Lehman, *et al.* (Aug. 28, 2007) [LBEX-DOCID 193203].

[504] SEC, Notes from Lehman's Monthly Risk Review Meeting (Oct. 19, 2007), at p. 6 [LBEX-SEC 007438].

[505] Lehman, ALCO Summary Package (Sept. 4, 2007), at p. 2 [LBEX-DOCID 514862]; Lehman, ALCO Summary Package (Sept. 5, 2007), at p. 2 [LBEX-DOCID 514863]; Lehman, ALCO Summary Package (Sept. 6, 2007), at p. 2 [LBEX-DOCID 514865]; Lehman, ALCO Summary Package (Sept. 7, 2007), at p. 2 [LBEX-DOCID 514866]; Lehman, ALCO Summary Package (Sept. 10, 2007), at p. 2 [LBEX-DOCID 514867]; Lehman, ALCO Summary Package (Sept. 11, 2007), at p. 2 [LBEX-DOCID 514868]; Lehman, ALCO

for September, October, and November 2007 were projected to be $0.05 billion, -$2.15 billion and -$1.75 billion respectively.[506]   The committee projected negative month end cash capital positions for the remainder of the year.[507]

On the day that Archstone closed, Tonucci informed O'Meara that Lehman was "looking at being $1-2 [billion] short [in equity]…should not really be surprised."[508] Moreover, the firm's cash capital projections for the end of October went negative immediately after the firm closed on Archstone.[509]

A draft presentation on the firm's equity adequacy dated October 2007 was prepared for the Executive Committee shortly after the exchange between O'Meara and Tonucci.[510]   O'Meara was slated to be the presenter.[511]   The presentation concluded that the firm's capital adequacy over the last five to six quarters had "materially

---

Summary Package (Sept. 12, 2007), at p. 3 [LBEX-DOCID 514869]; Lehman, ALCO Summary Package (Sept. 13, 2007), at p. 3 [LBEX-DOCID 514870]; Lehman, ALCO Summary Package (Sept. 14, 2007), at p. 3 [LBEX-DOCID 514871]; Lehman, ALCO Summary Package (Sept. 17, 2007), at p. 3 [LBEX-DOCID 514872]; Lehman, ALCO Summary Package (Sept. 18, 2007), at p. 3 [LBEX-DOCID 514873]; Lehman, ALCO Summary Package (Sept. 19, 2007), at p. 3 [LBEX-DOCID 514874]; Lehman, ALCO Summary Package (Sept. 21, 2007), at p. 3 [LBEX-DOCID 514875]; Lehman, ALCO Summary Package (Sept. 24, 2007), at p. 3 [LBEX-DOCID 514876]; Lehman, ALCO Summary Package (Sept. 26, 2007), at p. 3 [LBEX-DOCID 514877].

[506] *Id.*

[507] *Id.*

[508] E-mail from Paolo R. Tonucci, Lehman, to Christopher M. O'Meara, Lehman (Oct. 5, 2007) [LBEX-DOCID 1360792].

[509] Lehman, ALCO Summary Package (Sept. 4, 2007), at p. 2 [LBEX-DOCID 514881].

[510] Lehman, Equity Adequacy Presentation to Executive Committee [Draft] (Oct. 26, 2007) [LBEX-DOCID 1698460], attached to e-mail from Ari Axelrod, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Oct. 26, 2007) [LBEX-DOCID 1912826].

[511] E-mail from Ari Axelrod, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Oct. 26, 2007) [LBEX-DOCID 1902541].

deteriorated."[512] Lehman was at the bottom of its peer range with respect to the regulatory requirement of a minimum 10% total capital ratio imposed by the SEC.[513] The equity adequacy framework illustrated how the firm's capital position decreased from a $7.2 billion surplus in the beginning of 2006 to a $42 million deficit at the end of the third quarter of 2007.[514] The Examiner was unable to find a final version of this presentation, and was unable to determine if the presentation ever was given. Fuld said that he was not aware of the information contained in the presentation, and if he had been, he would have been able to resolve the situation.[515]

The deterioration of Lehman's capital was also apparent from the decline in its total capital ratio from 18.2% in early 2006 to 10.5% in August 2007.[516] The industry high in August 2007 was 18.7%.[517] From August to November 2007, Lehman posted the lowest total capital ratio in the industry.[518] The firm was at or near its SEC-imposed 10%

---

[512] Ari Axelrod, Lehman, Equity Adequacy Presentation Summary Page [Draft] (Oct. 25, 2007), at p. 1 [LBEX-DOCID 1696067], attached to e-mail from Ari Axelrod, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Oct. 26, 2007) [LBEX-DOCID 1902541].

[513] Lehman, Equity Adequacy Presentation to Executive Committee [Draft] (Oct. 26, 2007), at p 1 [LBEX-DOCID 1698460], attached to e-mail from Ari Axelrod, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Oct. 26, 2007) [LBEX-DOCID 1912826].

[514] *Id.*

[515] Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 5.

[516] Lehman, Monthly CSE Capital Reports for SEC (Mar. 2006), at p. 1 [LBEX-SEC 000303]; Lehman, Equity Adequacy Presentation to Executive Committee [Draft] (Oct. 26, 2007), at p. 5 [LBEX-DOCID 1698460], attached to e-mail from Ari Axelrod, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Oct. 26, 2007) [LBEX-DOCID 1912826].

[517] E-mail from Anna Yu, Lehman, to Erin M. Callan, Lehman, *et al.* (Dec. 9, 2007) [LBEX-DOCID 3761740].

[518] Lehman, CSE Methodology Impact Summary (Apr. 4, 2008), at p. 2 [LBEX-DOCID 382980].

requirement for six months in 2007-2008.[519]  On three separate occasions, Lehman had at

least a concern that the total capital ratio would fall below the 10% requirement.[520]

The SEC expected Lehman to notify it if the total capital ratio fell below or was

expected to fall below the 10% requirement, but Lehman did not do so.[521]  Tonucci told

the SEC that Lehman was "comfortable" with landing close to the 10% limit at the end

of the year "given how difficult it is to issue right now."[522]

The dominant cause for the rapid decline in Lehman's equity position was a shift

in the firm's asset mix to illiquid assets, including high yield loans, real estate, and

principal investments.[523]   From November 2006 to August 2007, the firm's illiquid

holdings grew by 72%, while "Tier 1 capital grew by only 26%."[524]

---

[519] Lehman, CSE Methodology Impact Summary (Apr. 4, 2008), at p. 2 [LBEX-DOCID 382980].

[520] E-mail from Anna Yu, Lehman, to Paolo R. Tonucci, Lehman (Oct. 3, 2007) [LBEX-DOCID 1654567]; e-mail from Anna Yu, Lehman, to undisclosed recipients (Nov. 26, 2007) [LBEX-DOCID 638715]; e-mail from Anna Yu, Lehman, to Georges Assi, Lehman, *et al.* (Dec. 7, 2007) [LBEX-DOCID 307968].

[521] 17 C.F.R. § 240.15c3-1g (e) (1) (i); 17 C.F.R. § 240.17i-8 (a) (2) (2007); The Goldman Sachs Group Inc., Quarterly Report as of May 31, 2008 (Form 10-Q) (filed on July 7, 2008), at p. 90 ("Goldman Sachs 10-Q (filed on July 7, 2008)") ("Goldman Sachs is required to notify the SEC in the event that the Total Capital Ratio falls below 10% or is expected to do so within the next month"); Merrill Lynch & Co., Inc., Quarterly Report as of June 27, 2008 (Form 10-Q) (filed on Aug. 5, 2008), at p. 108 ("Merrill Lynch 10-Q (filed on Aug. 5, 2008)") ("Merrill Lynch is required to notify the SEC in the event that the Total Capital Ratio falls or is expected to fall below 10%"); Erik R. Sirri, SEC, *Testimony Concerning Lessons Learned in Risk Management Oversight at Federal Financial Regulators* Before the Subcommittee on Securities, Insurance and Investment Committee on Banking, Housing and Urban Affairs, United States Senate, Mar. 19, 2009 ("CSEs were also required to file an 'early warning' notice with the SEC in the event that certain minimum thresholds, including the 10% capital ratio, were breached or were likely to be breached"); Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 13.

[522] SEC, Notes from Monthly Risk Meeting with Lehman (Nov. 15, 2007), at p. 2 [LBEX-SEC 007467].

[523] Lehman, Equity Adequacy Presentation to Executive Committee [Draft] (Oct. 26, 2007), at p. 7 [LBEX-DOCID 1698460], attached to e-mail from Ari Axelrod, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Oct. 26, 2007) [LBEX-DOCID 1912826].

[524] *Id.* at p. 6.

Thereafter, Lehman's cash capital and equity adequacy position temporarily improved.  The improvement was the result of several factors.  For one thing, the SEC changed the method of calculating the total capital ratio, and, as a result, Lehman picked up several percentage points and saved "roughly $4 billion in capital charges on average every month."[525]  In addition, Lehman was able to sell some of its leveraged loan positions, thereby raising cash capital and reducing its illiquid holdings.[526]

### (f)  Lehman's Termination of Its Residential Mortgage Originations

During this same period, mid-August 2007, Lehman decided to close BNC and cease subprime originations entirely.[527]  The anticipated turn in the residential mortgage market still had not arrived, and management could not justify Lehman's continued exposure to liability on the origination of subprime mortgages.[528]  In January 2008, Lehman's Aurora subsidiary suspended its origination through wholesale and

---

[525] E-mail from Anna Yu, Lehman, to Martin Kelly, Lehman, *et al.* (Feb. 6, 2008) [LBEX-DOCID 2799485].

[526] Lehman, ALCO Summary Package (Jan. 31, 2008), at p. 2 [LBEX-DOCID 527115].

[527] Lehman Brothers Holdings Inc., Press Release: Lehman Brothers Announces Closure of BNC Mortgage (Aug. 22, 2007) [LBEX-DOCID 880148]; Lehman, Subprime(r) (Sept. 6, 2007), at p. 14 [LBEX-DOCID 894656]; e-mail from Edward Grieb, Lehman, to Christopher M. O'Meara, Lehman (Aug. 22, 2007) [LBEX-DOCID 197143]; e-mail from Tasha Pelio, Lehman, to Jasjit (Jesse) Bhattal, Lehman, *et al.* (Aug. 22, 2007) [LBEX-DOCID 176893].

[528] Examiner's Interview of Lana Franks Harber, Sept. 23, 2009, at pp. 2, 10, 11; Examiner's Interview of David N. Sherr, Sept. 25, 2009, at pp. 2, 6, 8.

correspondent channels, which represented the bulk of the program.[529]   Lehman had

curtailed the flow of Mortgage Maker originations approximately five months earlier.[530]

### (g)  September, October, and November 2007 Meetings of Board of Directors

Lehman had a series of Board meetings in the fall of 2007.  At these meetings,

Lehman's management continued to report on the firm's elevated risk profile and

concentration of real estate and leveraged loan risk, but did not present the Board with

additional negative information concerning the firm's risk and liquidity profile.

### (i)  Risk Appetite Disclosures

At the September 11, 2007 Finance and Risk Committee meeting, the Finance and

Risk Committee was shown a presentation disclosing that the firm's average risk

appetite usage rose from $2.12 billion in November 2006 to $3.27 billion in August

2007.[531]  In the presentation, the Committee was informed that while risk appetite usage

had increased, Lehman still remained within its risk appetite limit.[532]   The Committee

---

[529] Lehman Brothers Holdings Inc., Press Release: Lehman Brothers Suspends Wholesale and Correspondent U.S. Residential Mortgage Origination Activities (Jan. 17, 2008) [LBEX-DOCID 156125].

[530] Dimitrios Kritikos, Lehman, Aurora Loan Services Risk Review January 2008 (Feb. 7, 2008), at p. 12 [LBEX-DOCID 394711].

[531] Lehman, Presentation on Risk, Liquidity, Capital and Balance Sheet Update to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at p. 2 [LBEX-AM 067167].

[532] Lehman Brothers Holdings Inc., Minutes of Meeting of Finance and Risk Committee of the Board of Directors (Sept. 11, 2007), at p. 3 [LBEX-AM 067018]; Lehman, Daily Risk Appetite Report (Sept. 6, 2007) [LBEX-DOCID 1340197], attached to e-mail from Christopher M. O'Meara, Lehman, to David Goldfarb, Lehman (Sept. 7, 2007) [LBEX-DOCID 1345985].

was informed of the recent increase in the risk appetite limit from $3.3 billion to $3.5 billion.[533]

Although it was correct that the firm's monthly average risk appetite for August 2007 was within the firm's risk appetite limit, by the time of the meeting, Lehman actually was over its newly increased limit by $97 million.[534]  Additionally, Lehman had been over the $3.5 billion limit each business day that month except for September 3, 2007.[535]  There is no evidence that the Board was informed that Archstone and at least one other bridge equity deal had been excluded from Lehman's risk appetite usage calculation for almost three months, or that Lehman would have been over its risk appetite limit for much of the period since June 1, 2007 if those bridge equity deals had been included in the calculation in a timely manner.

When the full Board met again on October 15, 2007, O'Meara disclosed that Lehman was over its firm-wide risk appetite limit.  But O'Meara did not want the Board to conclude that Lehman was "out of bounds," so O'Meara edited the standard chart provided to the Board at each meeting.[536]  Previously, that chart showed the firm's risk appetite usage and risk appetite limit in close proximity, so that the directors could

[533] Lehman, Risk, Liquidity, Capital and Balance Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors with Welikson's handwritten notes (Sept. 11, 2007), at p. 25 [WGM_LBEX_02248].
[534] Appendix No. 9, comparing risk appetite and VaR usage and limits.
[535] Id.
[536] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 11.

easily see how much below (or above) the usage was compared to the limit.[537]  Before the October 2007 Board meeting, however, O'Meara directed that the limit information be removed from the final version of the chart.[538]  He explained to the Examiner that management was not troubled by being over the limit and he preferred to explain the overage to the Board orally rather than through written materials.[539]

In addition, O'Meara informed the Board that Lehman's average daily risk appetite usage for the prior month was $3.7 billion, $200 million above the new risk appetite limit,[540] but he did not disclose that on the day of the Board meeting, Lehman's daily risk appetite usage was $4.269 billion, 22% (or $769 million) above the new risk appetite limit.[541]  Moreover, at this October meeting, O'Meara also said he told the Board that Lehman had a higher "capacity" – the outside edge of the amount of risk that Lehman could absorb – than its actual risk appetite limit and that the capacity was at least $4.0 billion.[542]

---

[537] Lehman, Second Quarter Financial Information Presentation to Lehman Board of Directors (June 19, 2007), at p. 6 [LBHI_SEC07940_026226]; Lehman, Estimated Third Quarter Financial Information Presentation to Lehman Board of Directors (Sept. 11, 2007), at p. 6 [LBHI_SEC07940_026288].

[538] Lehman, Presentation to Lehman Board of Directors on September 2007 Financial Information [Draft] (Oct. 8, 2007), at p. 6 [LBEX-DOCID 510227]; Lehman, Final Presentation to Lehman Board of Directors on September 2007 Financial Information (Oct. 15, 2007), at p. 6 [LBHI_SEC07940_026377]; Examiner's Interview of Christopher M. O'Meara, Sept. 23, 2009, at p. 4.

[539] *Id.*

[540] Lehman, Presentation to Lehman Board of Directors on September 2007 Financial Information (Oct. 15, 2007), at p. 6 [LBHI_SEC07940_026377].

[541] Lehman, Daily Firm-wide Risk Driver (Oct. 15, 2007) [LBEX-DOCID 147304], attached to e-mail from Jeffrey Goodman, Lehman, to Madelyn Antoncic, Lehman, *et al.* (Oct. 14, 2007) [LBEX-DOCID 155737].

[542] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at pp. 10, 12.

O'Meara did not inform the Board that Lehman generally had been in excess of its firm-wide risk appetite limit since entering into the Archstone transaction in late May 2007; O'Meara attributed Lehman's limit excesses to recent changes in market conditions – specifically, the inability to securitize or syndicate risks that Lehman had previously expected to be able to distribute[543] – but did not mention other factors such as the addition of Archstone and other new deals.[544]

Many of Lehman's directors told the Examiner that this information about the extent and duration of any risk appetite limit excess would have been helpful for them to have received.[545]  Some directors did not recall knowing that Lehman had ever been in breach of its risk appetite limits.[546]  Although none of the directors said that they would have changed their views had they received that information, they did say that

---

[543] Examiner's Interview of Christopher M. O'Meara, Sept. 23, 2009, at pp. 14-15; Lehman, Presentation on Risk, Liquidity, Capital and Balance Sheet Update to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at p. 2 [LBEX-AM 067167]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Oct. 15, 2007), at p. 6 [LBHI_SEC07940_026407].

[544] Lehman, September 2007 Financial Information Presentation to Lehman Board of Directors with Christopher M. O'Meara's handwritten notes (Oct. 15, 2007), at p. 6 [LEH_CMO_0000001]; Lehman, September 2007 Financial Information Presentation to Lehman Board of Directors with Jeffrey A. Welikson's handwritten notes (Oct. 15, 2007), at p. 6 [WGM_LBEX_00540].

[545] Examiner's Interview of Roger Berlind, May 8, 2009, at p. 4; Examiner's Interview of Dr. Henry Kaufman, May 19, 2009, at p. 7; Examiner's Interview of Marsha Johnson Evans, May 22, 2009, at pp. 7-9; Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 3; Examiner's Interview of Roland A. Hernandez, Oct. 2, 2009.

[546] Examiner's Interview of Roger Berlind, May 8, 2009, at p. 4; Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 17; Examiner's Interview of Marsha Johnson Evans, May 22, 2009, at p. 9; Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at p. 14; Examiner's Interview of Roland A. Hernandez, Oct. 2, 2009, at p. 10.

they would have wanted to have a conversation with management about the reason for the limit overages and management's strategy for resolving them.[547]

The following chart illustrates the lag between the beginning of the risk appetite limit overages and the notification of the Board.  The straight dotted line represents the firm-wide risk appetite limit and the jagged solid line represents the firm-wide usage:

---

[547] Examiner's Interview of Roger Berlind, May 8, 2009, at p. 4; Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 13; Examiner's Interview of Marsha Johnson Evans, May 22, 2009, at p. 7; Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at p. 15; Examiner's Interview of Roland A. Hernandez, Oct. 2, 2009, at p. 10; Examiner's Interview of Dr. Henry Kaufman, May 19, 2009, at p. 7.



**(ii) Leveraged Loan Disclosures**

Both the Finance and Risk Committee and the full Board were apprised of

Lehman's risk exposure to high yield bonds and leveraged loan.[548]  O'Meara discussed

---

[548] Lehman Brothers Holdings Inc., Minutes of Meeting of Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at pp. 1-2 [LBEX-AM 067018]; Lehman, Risk, Liquidity, Capital and Balance

with the Committee the "comprehensive risk framework for high-yield debt products" and referred to Lehman's "extensive risk controls," spanning the approval process through post-closing.[549]   O'Meara told the Finance and Risk Committee that Lehman had a disciplined approach to risk mitigation through syndication, outright sales, sale through silent partner participation, and single-name and macro hedging.[550]   A chart that accompanied his presentation shows that Lehman's "macro hedges" reduced Lehman's "HY Closed Loan Net Exposure" by approximately 20%.[551]

The Board was not informed that in 2007 Lehman's managers had decided not to increase the size of its macro hedges on the leveraged loans exposure to cover the remaining 80% of the closed loans or to cover any portion of Lehman's much greater volume of commitments because these exposures were considered potentially not capable of being hedged.[552]   (Relatedly, there is no evidence that management disclosed the extent to which Lehman's commercial real estate investments were unhedged.)[553]

---

Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at p. 13 [LBEX-AM 067167]; Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2007), at p. 6 [LBHI_SEC07940_026364].

[549] Lehman Brothers Holdings Inc., Minutes of Meeting of Finance and Risk Committee of the Board of Directors (Sept. 11, 2007), at pp. 2-3 [LBEX-AM 067018].

[550] Lehman, Risk, Liquidity, Capital and Balance Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at p. 14 [LBEX-AM 067167].

[551] Id.

[552] Examiner's Interview of Paul Shotton, June 5, 2009, at pp. 7-8; Examiner's Interview of Kentaro Umezaki, June 25, 2009, at p. 17; Examiner's Interview of Fred Orlan, Sept. 21, 2009, at p. 6; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 13; Examiner's Interview of Alex Kirk, Jan. 12, 2010, at p. 9; Lehman Brothers Holdings Inc., Minutes of Meeting of Finance and Risk Committee of the Board of Directors (Sept. 11, 2007), at pp. 2-3 [LBEX-AM 067018].

[553] Examiner's Interview of Marsha Johnson Evans, May 22, 2009, at pp. 3, 9-10; Examiner's Interview of Roger Berlind, May 8, 2009, at p. 7.

Some members of Lehman management were concerned that hedging the leveraged loans would be ineffective and could create a "double whammy" – simultaneous losses on the loans and the hedges.[554]

The Board was not informed that the risk appetite usage of Lehman's leveraged loan business was almost double the limit applicable to that business and that the usage had been over the limit almost continuously since July 19, 2007,[555]  or that Lehman's management had approved at least 30 leveraged loans that exceeded Lehman's single transaction limit.[556]  Some directors believed that the decision to exceed Lehman's high yield and single transaction limits should have been disclosed to the Board.[557]

---

[554] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 3, 13; Examiner's Interview of Madelyn Antoncic, Mar. 27, 2009, at p. 10.

[555] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2007), at p. 6 [LBHI_SEC07940_263264]; Lehman, Update on Liquidity, Leveraged Loan Commitments and Mortgage Positions Presentation to Lehman Board of Directors with Welikson's handwritten notes (Sept. 11, 2007) [LBHI_SEC07940_026355]; Mynor Gonzalez, Lehman, Daily Risk Appetite and VaR Report (Sept. 11, 2007) [LBEX-DOCID 3296330], attached to e-mail from Mynor Gonzalez, Lehman, to Mark Weber, Lehman (Sept. 12, 2007) [LBEX-DOCID 3295527]; Appendix No. 9, comparing risk appetite and VaR usage versus limits.

[556] Lehman, Risk, Liquidity, Capital, and Balance Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007) [LBEX-AM 067167]; Lehman Brothers Holdings Inc., Minutes of Meeting of the Finance and Risk Committee of Board of Directors (Sept. 11, 2007) [LBEX-AM 067018]; e-mail from Joe Li, Lehman, to Fred Orlan, Lehman, *et al.* (July 25, 2007) [LBEX-DOCID 2563167].

[557] Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 6 (noting importance of concentration limits); Examiner's Interview of John D. Macomber, Sept. 25, 2009, at pp. 6, 17 (stating that significant excesses ought to have been disclosed).

### (iii) Leverage Ratios and Balance Sheet Disclosures

At these September 11, 2007 meetings, O'Meara also reported to the Finance and Risk Committee that Lehman's net leverage ratio was in line with Lehman's peers.[558]

Management's presentation regarding the net leverage metric noted:

> In the past, leverage was the key measure of equity adequacy. Between 2003 and 2006 we significantly reduced leverage. Low leverage was positively viewed by rating agencies and contributed to our 2005 upgrades. In 2006 and 2007, we worked with the regulatory and rating agencies to implement more accurate adequacy measures. As a result, we are comfortable with allowing our leverage to increase.[559]

The new adequacy measures included a measurement for equity, the CSE capital ratios, and Lehman's internal equity adequacy framework.[560]

O'Meara did not disclose the firm's use of Repo 105 transactions to manage its net leverage ratio at this Board meeting or any other, and no director asked by the Examiner ever was aware of these off-balance sheet transactions.[561]

---

[558] Lehman, Risk, Liquidity, Capital and Balance Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors with Welikson's Handwritten Notes (Sept. 11, 2007), at pp. 2, 30 [WGM_LBEX_02247-02340]; Lehman Brothers Holdings Inc., Finance and Risk Committee Minutes (Sept. 11, 2007), at pp. 2-3 [LBEX-AM 067018].

[559] Lehman, Presentation on Risk, Liquidity, Capital and Balance Sheet Update to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at p. 50 [LBEX-AM 067167].

[560] *Id.* at p. 51.

[561] Examiner's Interview of Roger Berlind, Dec. 18, 2009, at p. 4; Examiner's Interview of Roland A. Hernandez, Oct. 2, 2009, at p. 22; Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 20; Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 21; Examiner's Interview of Michael L. Ainslie, Dec. 22, 2009, at p. 4; Examiner's Interview of Thomas Cruikshank, Oct. 8, 2009, at p. 2; Examiner's Interview of Sir. Christopher Gent, Jan. 20, 2010, at p. 4; Examiner's Interview of Jerry A. Grundhofer, Sept. 16, 2009, at p. 10; Lehman Brothers Holdings Inc., Minutes of the Board of Directors (Sept. 11, 2007), at p. 3 [LBHI_SEC07940_026364]; Lehman, Board of Directors Materials for Sept. 11, 2007 Board Meeting (Sept. 7, 2007) [LBHI_SEC07940-026282]; Lehman Brothers Holdings Inc., Minutes of the Board of Directors (Oct. 15, 2007), at p. 6 [LBHI_SEC07940_026407]; Lehman, Board of Directors Materials for Oct. 15, 2007 Board Meeting (Oct. 11, 2007) [LBHI_SEC07940-026371]; Lehman Brothers Holdings Inc.,

### (iv) Liquidity and Capital Disclosures

Tonucci reported to the Board's Finance and Risk Committee that Lehman had record levels of liquidity and cash capital surplus at the end of the third quarter of 2007.[562]  He also reviewed Lehman's "liquidity pool year-to-date and over the last four years, noting the conservative nature of the firm's liquidity pool as compared to its peers, which [had] been recognized by the leading credit rating agencies."[563]

The materials presented to the Board showed that Lehman had a third quarter "record" liquidity pool of $36 billion (an increase from $25.7 billion at the end of the second quarter 2007) and a cash capital position of $8.1 billion (an increase from $2.5 billion at the end of the second quarter) against a $2 billion policy minimum.[564]  The materials stated that Lehman did not project the need to tap the capital markets because Lehman had "significant liquidity to fund these activities."[565]  Management similarly emphasized to the full Board Lehman's conservative approach to funding its balance

---

Minutes of the Board of Directors (Nov. 8, 2007), at p. 6 [LBHI_SEC07940_026650]; Lehman, Board of Directors Materials for Nov. 8, 2007 Board Meeting (Nov. 2, 2007) [LBHI_SEC07940-026520]; *see also* Section III.A.4 of this Report.

[562] Lehman Brothers Holdings Inc., Minutes of Meeting of Finance and Risk Committee of the Board of Directors (Sept. 11, 2007), at p. 3 [LBEX-AM 067018].

[563] *Id.*

[564] Lehman, Update on Liquidity, Leveraged Loan Commitments and Mortgage Positions Presentation to Lehman Board of Directors with Welikson's handwritten notes (Sept. 11, 2007), at p. 1 [LBHI_SEC07940_026355]; Lehman, Risk, Liquidity, Capital and Balance Sheet Update Presentation to Finance and Risk Committee of Lehman Board of Directors (Sept. 11, 2007), at p. 31 [LBEX-AM 067167].

[565] *Id.*

sheet and strong liquidity pool, but acknowledged that for the last two months liquidity had been more challenging to maintain.[566]

Management did not tell the Board or the Finance and Risk Committee about ALCO's concerns about Lehman's ability to fund its commitments, or that Lehman had nearly stopped entering into new deals in August 2007.[567]  Some directors said that if any of Lehman's senior management had concerns about the firm's funding or capital adequacy, that is "clearly" something they would have wanted to know.[568]

On September 20, 2007, Lehman issued a press release announcing that O'Meara would replace Antoncic as Lehman's Global Head of Risk Management (or CRO) as of December 1, 2007.[569]  The Examiner did not find any evidence to suggest that Antoncic's replacement was related to the risk limit or risk disclosure issues that had occurred during the prior three to four months.  However, the SEC noted its concern that the risk

---

[566] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Sept. 11, 2007), at p. 5 [LBHI_SEC07940_026364].

[567] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at pp. 16-17; Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at pp. 9-10; e-mail from Roger Nagioff, Lehman, to Ian T. Lowitt, Lehman (July 20, 2009) [LBEX-DOCID 175646]; e-mail from Alex Kirk, Lehman, to Roger Nagioff, Lehman (Aug. 6, 2007) [LBEX-DOCID 173492]; e-mail from Alex Kirk, Lehman, to Roger Nagioff, Lehman (Aug. 7, 2007) [LBEX-DOCID 173496].

[568] Examiner's Interview of John D. Macomber, Sept. 28, 2009, at p. 16; Examiner's Interview of Dr. Henry Kaufman, Dec. 22, 2009 (saying it might have been appropriate to disclose liquidity concerns if they were more than short-lived).

[569] Lehman Brothers Holdings Inc., Press Release: Lehman Brothers Announces Management Changes (Sept. 20, 2007) [LBEX-DOCID 533362].

limit excesses occurred during a period when Lehman's CRO position was in transition.[570]

### (4) Late Reactions: Lehman Slowly Exits Its Illiquid Real Estate Investments

The last quarter of 2007 and first quarter of 2008 – from September 2007 through February 2008 – was a crucial juncture for Lehman.  Lehman's overall balance sheet had grown by 37% during 2007,[571] and much of the growth was concentrated in illiquid holdings that Lehman was already unable to sell without incurring significant losses.[572] As a result, without the accounting device of Repo 105 transactions, FID was already well over its balance sheet limit of approximately $230 billion by $18 billion.[573]  Indeed, Lehman had been over its risk limits for the prior six months.[574]  In hindsight, this quarter may have been Lehman's final opportunity to take decisive action to improve its balance sheet before the near collapse of Bear Stearns changed the rules of the road for Lehman and all of its peer investment banks.

Before Bear Stearns' near collapse in March 2008, Lehman had two basic ways of reducing its leverage:  (1) selling assets, to reduce the numerator in the net leverage formula; or (2) raising equity, to increase the denominator in the net leverage formula.

---

[570] SEC, Notes from Lehman's Monthly Risk Review meeting (Oct. 11, 2007), at p. 6 [LBEX-SEC 007438].

[571] Lehman, 2008 Financial Plan Presentation to Finance and Risk Committee of Board of Directors (Jan. 29, 2008), at p. 8 [LBHI_SEC07940_068559].

[572] Examiner's Interview of Herbert H. (Bart) McDade III, Sept. 16, 2009, at p. 3; Examiner's Interview of Treasury Secretary Timothy F. Geithner, Nov. 24, 2009, at p. 7.

[573] Andrew J. Morton, Notes: First Sixty Days (Apr. 7, 2008), at p. 6 [LBEX-DOCID 1734462].

[574] Appendix No. 9, comparing risk appetite and VaR usage versus limits.

But Lehman did not successfully take either of these tacks during the final quarter of 2007 or the first quarter of 2008: Lehman's net balance sheet was $23.7 billion higher at the end of the first quarter of 2008 than at the end of 2007.[575]  Lehman did not raise substantial amounts of equity during this period.[576]

Lehman's failure to sell assets sooner was based partly on its previous decision to pursue a countercyclical growth strategy, which entailed a conscious acceptance of greater risk even while Lehman's peer investment banks were curtailing their risk-taking.[577]  The countercyclical growth strategy continued to be reflected in Lehman's strategy in the first quarter of 2008.[578]

Fuld told the Examiner that he decided after the December 2007 holiday season to instruct his senior managers to reduce the firm's balance sheet.[579]  However, documentary evidence shows that Lehman did not aggressively begin to sell assets until the second quarter of 2008.[580]

---

[575] LBHI 10-Q (filed on Apr. 9, 2008), at p. 70.

[576] Lehman, 2008 Financial Plan Presentation to Finance and Risk Committee of Board of Directors (Jan. 29, 2008), at p. 16 [LBHI_SEC07940_068559]; Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at pp. 25-27.

[577] *See* Lehman, 2008 Financial Plan Presentation to Finance and Risk Committee of Board of Directors (Jan. 29, 2008), at p. 6 [LBHI_SEC07940_068559].

[578] *Id.*

[579] Examiner's Interview of Richard S. Fuld, Jr., Nov. 19, 2009, at p. 2.

[580] Lehman, Commercial Real Estate Update (Mar. 25, 2008), at p. 3 [LBHI_SEC07940_127250]; Lehman, Balance Sheet and Disclosure Scorecard For Trade Date April 21, 2008 (Apr. 22, 2008), at p. 3 [LBEX-DOCID 3187588], attached to e-mail from Tal Litvin, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al*. (Apr. 22, 2008) [LBEX-DOCID 3187333]; e-mail from Gary Mandelblatt, Lehman, to Alex Kirk, Lehman (Jan. 15, 2008) [LBEX-DOCID 1600235]; e-mail from Erin M. Callan, Lehman, to Herbert H. (Bart) McDade III, Lehman, *et al*. (Apr. 3, 2008) [LBEX-DOCID 1538729]; e-mail from Paul A. Hughson, Lehman, to Mark

During the first quarter of 2008, Fuld also decided that Lehman would not raise equity unless it could do so at a premium.[581]  While many of Lehman's competitors entered into strategic transactions to raise equity in late 2007 and early 2008,[582] Lehman did not want to signal weakness by raising equity at a discount,[583] and, unlike its peers, had not yet suffered losses that might have signaled a more urgent need for such action.

### (a)  Fiscal 2008 Risk Appetite Limit Increase

In October 2007, the firm-wide risk appetite usage continued to increase, and for several days was more than $500 million over the limit; the limit excess peaked at almost 22% of the limit amount.[584]  The limit excess was partly the result of Lehman's decision to enter into several significant commercial real estate and leveraged loan transactions in May, June, and July 2007, which were gradually being funded and thus

---

Walsh, Lehman (Apr. 1, 2008) [LBEX-DOCID 1866761]; Lehman, Balance Sheet and Disclosure Scorecard For Trade Date August 12, 2008 (Aug. 13, 2008), at p. 7 [LBEX-SIPA 006539].

[581] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 8; Examiner's Interview of Jeremy Isaacs, Oct. 1, 2009, at p. 3.

[582] *See, e.g.*, Merrill Lynch & Co., Inc., Annual Report for 2007 as of Dec. 28, 2007 (Form 10-K) (filed on Feb. 25, 2008), at p. 23 ("Merrill Lynch 2007 10-K") (stating that Merrill Lynch issued $6.2 billion in common stock during the fourth quarter of 2007, and $6.6 billion of mandatory convertible preferred stock during the first quarter of 2008); Morgan Stanley, Annual Report for 2007 as of Nov. 30, 2007 (Form 10-K) (filed on Jan. 29, 2008), at pp. 178-79 ("Morgan Stanley 2007 10-K") (stating that Morgan Stanley sold equity units to the Chinese Investment Corporation for approximately $5.579 billion in December 2007); Citigroup Inc., Annual Report for 2007 as of Dec. 31, 2007 (Form 10-K) (filed on Feb. 22, 2008), at p. 77 ("Citigroup 2007 10-K") (stating that Citigroup sold $7.5 billion of equity units to the Abu Dhabi Investment Authority on December 3, 2007); UBS AG, Annual Report for 2007 as of Dec. 31, 2007 (Form 20-F) (filed on Mar. 18, 2008), at pp. 276-77 ("UBS AG 2007 20-F") (stating that UBS issued shares corresponding to approximately 13.4% of the then current share capital on February 27, 2008); *see* Section III.A.3 of this Report.

[583] E-mail from David Goldfarb, Lehman, to Richard S. Fuld, Jr., Lehman, *et al.* (Jan. 9, 2008) [LBHI_SEC07940_670045].

[584] Appendix No. 9, comparing risk appetite and VaR usage versus limits.

increasing Lehman's risk appetite usage; partly the result of Lehman's inability to securitize or syndicate those and other transactions; and partly the result of increased volatility in the market.[585]

Lehman increased the firm-wide risk appetite limit for fiscal 2008.  Approval for the increase was given on January 14, 2008, when Lehman raised the limit from $3.5 billion to $4 billion, "with [the] increase [being] backdated to December 3, 2007."[586]  The limit increase had the effect of eliminating any firm-wide limit excesses from that date forward.[587]

To arrive at the $4 billion risk appetite limit figure, Lehman's officers made significant changes to the limit calculation as compared to prior years' calculations.  The Examiner's financial advisors calculate that if the same assumptions used for the 2007 risk appetite limit had been used to determine the limit for 2008, the 2008 limit would have been approximately $2.5 billion rather than $4.0 billion.[588]

The 2008 risk appetite limit also was based on a very aggressive projected revenue figure.  Lehman's projected revenues were the starting point for setting the limit, and perhaps the single most important input to the formula.  Lehman used a $21

---

[585] SEC, Notes from Lehman's Monthly Risk Review Meeting (Aug. 17, 2007), at p. 7 [LBEX-SEC 007383]; e-mail from Jeffrey Goodman, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Dec. 4, 2007) [LBEX-DOCID 251204].

[586] Lehman, Material for Market Risk Control Committee Meeting (Jan. 14, 2008), at p. 33 [LBEX-DOCID 271352], attached to e-mail from Mark Weber, Lehman, to Paul Shotton, Lehman, *et al.* (Jan. 14, 2008) [LBEX-DOCID 223263].

[587] Appendix No. 9, comparing risk appetite and VaR usage versus limits.

[588] For a more detailed explanation of the changes in the risk appetite calculation, *see* Appendix 10, describing calculation of increased $4.0 billion risk appetite limit.

billion projected revenue figure in calculating the $4 billion limit amount.[589]  Despite the difficulties in the market, this amount constituted a 9% increase over 2007 revenues. Contemporaneous external analyst reports projected 2008 revenues of only about $19.2 billion – a figure that would have resulted in a much lower risk appetite limit for the year.[590]

### (b)  January 2008 Meeting of Board of Directors

On January 29, 2008, the Finance and Risk Committee and the entire Board met. During these meetings, management discussed the difficult market, but believed that it presented opportunities for Lehman to grow.[591]  Lehman's senior officers told the Board: "[The market environment] presents an opportunity for the firm to pursue a countercyclical growth strategy, similar to what it did during the 2001-2002 downturn, to improve its competitive position and, over time, generate superior returns for our shareholders."[592]

Management provided the Finance and Risk Committee with an overview of Lehman's net assets and leverage levels and told the Committee that Lehman's balance

---

[589] Paolo R. Tonucci, Lehman, 2008 Financial Plan Presentation (Jan. 29, 2008), at p. 1 [LBHI_SEC07940_068559].

[590] *E.g.*, Douglas Sipkin, Wachovia Capital Markets, L.L.C., Tough Year Ahead - Sowing Seeds for Share Gains (Jan. 15, 2008), at p. 1 [LBEX-DOCID 095883]; Appendix 10, describing calculation of increased $4.0 billion risk appetite limit.

[591] Lehman, 2008 Financial Plan Summary (Jan. 29, 2009), at p. 5 [LBHI_SEC07940_027374].

[592] *Id.*

sheet continued to grow across almost all asset classes and businesses.[593]   At the full

Board meeting, Kaufman reported to the Board on Lehman's balance sheet growth and

Lehman's year end increase in net leverage.[594]   Callan discussed Lehman's target

leverage ratio with the Board and said that it would come back down.[595]

At the Finance and Risk Committee meeting, management reviewed Lehman's

monthly stress tests and scenario analyses.[596]   Stress tests indicated a worst-case loss of

$3.2 billion.[597]   Management did not inform the Committee of a new "Credit Crunch"

scenario that was added to Lehman's portfolio of stress testing scenarios in October

2007 that predicted the worst loss of all the scenarios, with a loss of $3.99 billion

(although early drafts of the presentation did include the scenario).[598]

At these January meetings, Lehman's management also recommended the new

risk appetite limit to the Board.[599]   The directors were generally not aware or did not

---

[593] Lehman Brothers Holdings Inc., Minutes of Meeting of Finance and Risk Committee of the Board of Directors (Jan. 29, 2008), at pp. 2-3 [LBEX-AM 067022]; Lehman, Additional Materials for the Finance and Risk Committee (Jan. 29, 2008), at p. 3 [LBEX-AM 067260].

[594] Lehman Brothers Holdings Inc., Minutes of Meeting of Board of Directors (Jan. 29, 2008), at p. 3 (LBHI_SEC07940_027446].

[595] Id. at p. 8; Lehman, December 2007 Presentation to Lehman Board with Welikson's handwritten notes (Jan. 29, 2008), at p. 6 [WGM_LBEX_00708].

[596] Lehman, 2008 Financial Plan Presentation to Finance and Risk Committee of the Board of Directors (Jan. 29, 2008), at p. 18 [LBHI_SEC07940_068559].

[597] Id. at p. 19.

[598] Lehman, Monthly Risk Review Package (Oct. 11, 2007), at p. 10 [LBEX-SEC 007438] (noting Lehman "added a new stress test, called the Credit Crunch which is essentially Summer 2007"); Lehman, 2008 Financial Plan Presentation to Lehman Board of Directors [Draft] (Jan. 2008), at p. 5 [LBEX-DOCID 384192], attached to e-mail from Mark Weber, Lehman, to Jennifer Bale, Lehman, et al. (Jan. 16, 2008) [LBEX-DOCID 306708].

[599] Lehman, 2008 Financial Plan Summary (Jan. 29, 2008), at p. 11 [LBHI_SEC07940_027374].

recall any discussion regarding the adjustments of the risk appetite calculation.[600]   Two

of the directors said that they would have wanted to know about significant changes in

the methodology.[601]   However, Lehman's managers told the Board that the $21 billion

revenue projection was "very aggressive," and the Board had an extended discussion of

the impact of potentially lower revenues on Lehman's business.[602]

### (c)  Executive Turnover

In January 2008, Nagioff decided for personal reasons to resign as global head of

FID.[603]   In addition, that month, Alex Kirk, co-chief operating officer of FID since

October 2007, left Lehman.   Kirk agreed with Fuld that he would leave Lehman at about

the same time.[604]

---

[600] Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at p. 16; Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 2; Examiner's Interview of Roland A. Hernandez, Oct. 2, 2009, at p. 14; Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 18.

[601] Examiner's Interview of Dr. Henry Kaufman, Sept. 2, 2009, at p. 2; Examiner's Interview of John Macomber, Sept. 25, 2009, at p. 2.

[602] Jeffrey A. Welikson, Lehman, Notes from the 2008 Financial Plan Presentation (Jan. 29, 2008), at p. 1 [WGM_LBEX_03249].

[603] Examiner's Interview of Roger Nagioff, Sept. 30, 2009, at p. 20; Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 22 (Fuld indicated that Nagioff's decision to step down was entirely voluntary and was the result of Nagioff's frustration with his commute from London); Examiner's Interview of Sir Christopher Gent, Oct. 21, 2009, at p. 5 (Gent explained that, based on conversations with Nagioff, he believed Nagioff's resignation was entirely due to the logistical disruption of Nagioff's family life on account of his commute); Examiner's Interview of Hugh E. (Skip) McGee III, Aug. 12, 2009, at p. 13 (McGee denied that Nagioff's resignation had anything to do with Lehman's cessation of residential mortgage originations, and tied Nagioff's decision to the difficulty of Nagioff's commute); Examiner's Interview of John F. Akers, Apr. 22, 2009, at p. 2 (Akers expressed the belief that Nagioff left voluntarily and that his departure was mutual between him and management, but also noted that along with the commute from London, difficulty also arose because Nagioff failed to meet Fuld's expectations); Examiner's Interview of Eric Felder, May 21, 2009, at p. 6 (Felder indicated that Nagioff left Lehman voluntarily).

[604] Transcript of deposition testimony of Alex Kirk, *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555, Bankr. S.D.N.Y., Aug. 31, 2009, at pp. 7-8.

### (d) Commercial Real Estate Sell-Off: Too Little, Too Late

Although Lehman ultimately took aggressive action to reduce its balance sheet and thus its net leverage, Lehman's management did not make a firm-wide decision to reduce these figures until well after the beginning of the risk appetite and balance sheet limit overages in mid-2007. Moreover, even after Lehman's senior officers directed the business lines to reduce their balance sheets, it took several months for the reduction to be effectuated, particularly with respect to Lehman's illiquid holdings of commercial real estate assets.

Although the firm persistently was over its balance sheet limits, and had been over the risk appetite limit since about June 1, 2007, the first written indication that the Risk Committee considered the risk limit overage was in October 2007.[605] On October 2, 2007, O'Meara noted in an e-mail that the Risk Committee agreed to "temporarily approve the Risk Appetite limit overage, due to the unusual circumstances in the marketplace today / recently, especially concerning Leveraged Finance and Real Estate businesses."[606] Thus, Lehman's management decided not to reduce its risk position aggressively at that time.

Later in October, in advance of a planned conversation with the Executive Committee, O'Meara proposed formulating "specific recommendations about where to

---

[605] E-mail from Christopher M. O'Meara, Lehman, to Paul Shotton, Lehman, *et al.* (Oct. 2, 2007) [LBEX-DOCID 155020].
[606] E-mail from Christopher M. O'Meara, Lehman, to Paul Shotton, Lehman, *et al.* (Oct. 2, 2007) [LBEX-DOCID 155020].

make the cuts" to bring down risk appetite.[607]   Goodman expressed a willingness to "take some losses" to achieve this goal.[608]   In a November 2007 presentation to Fuld, the commercial real estate group recommended reducing its global balance sheet by $15 billion.[609]

When Erin M. Callan became CFO on December 1, 2007, one of her objectives was to reduce balance sheet, particularly in the areas of residential and commercial real estate.[610]   Fuld decided during the December 2007 holiday season that it was time to pursue an aggressive reduction of Lehman's risk profile.[611]

Lehman did not aggressively pursue these reductions for several months, however.   According to Callan, she had discussions with Fuld and Gregory about reducing balance sheet in January and February 2008, but "didn't get traction quickly on it."[612]   Between the fourth quarter of 2007 and the first quarter of 2008, Lehman's gross and net assets actually increased from $691 billion to $786 billion, and from $373

---

[607] E-mail from Jeffrey Goodman, Lehman, to Mark Weber, Lehman, *et al.* (Oct. 22, 2007) [LBEX-DOCID 318367].

[608] *Id.*

[609] Global Real Estate Group, Lehman, Global Real Estate Update (Nov. 6, 2007), at pp. 1, 2 [LBEX DOCID 514264], attached to e-mail from Jeffrey Goodman, Lehman, to Madelyn Antoncic, Lehman, *et al.* (Nov. 6, 2007) [LBEX DOCID 531492]; e-mail from Jonathan Cohen, Lehman, to Christopher M. O'Meara, Lehman, *et al.* (Nov. 3, 2007) [LBEX DOCID 523669] (indicating that Fuld was the intended audience of the presentation).

[610] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at pp. 10-13.

[611] Examiner's Interview of Richard S. Fuld, Jr., Dec. 9, 2009, at p. 10.

[612] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at pp. 10-13.

billion to $397 billion, respectively.[613]   In addition, FID exceeded its balance sheet limit in the fourth quarter of 2007 by $11.17 billion, with overages concentrated in securitized products and real estate.[614]   In the first quarter of 2008, FID was over the balance sheet limit by $18 billion with nearly 50% of the overages concentrated in securitized products and real estate.[615]   Lehman's Treasurer at the time, Paolo Tonucci, was comfortable with FID's balance sheet overages in the first quarter of 2008.[616]   At the end of the first quarter of 2008, Tonucci did not require FID to sell off more assets.[617]

It was not until February 26, 2008 that Gregory instructed Walsh to "get balance sheet down quickly,"[618] and GREG set out to reduce its global balance sheet by $5 billion by March 18, 2008.[619]   Even after that, Callan told the Examiner that she pleaded with Fuld and Gregory to reduce the balance sheet and finally persuaded them to add the issue to the Executive Committee's March 20, 2008 agenda after the near collapse of

---

[613] Lehman, Q2 2008 Update (June 18, 2008), at p. 5 [LBEX-DOCID 1302959], attached to e-mail from Anu Jacob, Lehman, to Dennis Rodrigues, Lehman, *et al.* (July 8, 2008) [LBEX-DOCID 1326944].

[614] Andrew J. Morton, Notes: First Sixty Days (Apr. 7, 2008), at p. 6 [LBEX-DOCID 1734462], attached to e-mail from Gary Mandelblatt, Lehman, to Andrew J. Morton, Lehman, *et al.* (Apr. 7, 2008) [LBEX-DOCID 1834937].

[615] *Id.* at p. 4.

[616] E-mail from Clement Bernard, Lehman, to Andrew J. Morton, Lehman, *et al.* (Feb. 27, 2008) [LBEX-DOCID 1849839].

[617] *Id.*

[618] E-mail from Mark A. Walsh, Lehman, to Andrew J. Morton, Lehman (Feb. 26, 2008) [LBHI_SEC07940_115814].

[619] E-mail from Paul A. Hughson, Lehman, to Mark Gabbay, Lehman, *et al.* (Feb. 27, 2008) [LBEX-DOCID 1869265] (discussing the schedule for the $5 billion reduction target); e-mail from Paul A. Hughson, Lehman, to Mark Gabbay, Lehman, *et al.* (Mar. 7, 2008) [LBEX-DOCID 1723168] (Hughson gives update on sales progress and asks for updates from others on their progress towards the $5 billion reduction target).

Bear Stearns.[620]   McDade was made the firm's "balance sheet czar" in mid-March and was given authority to enforce firm-wide balance sheet targets.[621]   Fuld intended to reduce all of Lehman's positions, including commercial real estate and leveraged loans positions.[622]   Balance sheet reduction targets were not sent out to Lehman's businesses until after the Executive Committee meeting on March 20, 2008.[623]

On May 13, 2008, two weeks before the end of the second quarter, Callan urged Gregory and Fuld to "deliver on the balance sheet reduction this quarter" and not give "any room to FID for slippage."[624]   GREG's overseas businesses in particular were slow to reduce their positions in the first and second quarters of 2008,[625] but GREG's U.S. business met its balance sheet reduction targets, despite continuing to engage in some originations.[626]

Some witnesses believed that GREG was not aggressive enough in selling off its portfolio, holding on to positions in a belief that the market would eventually

---

[620] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at pp. 10, 11.

[621] *Id.* at p. 12; Examiner's Interview of Andrew J. Morton, Sept. 21, 2009, at p. 11.

[622] Examiner's Interview of Richard S. Fuld, Jr., Sept. 25, 2009, at p. 26.

[623] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at pp. 11-12.

[624] E-mail from Erin M. Callan, Lehman, to Joseph Gregory, Lehman, *et al.* (May 13, 2008) [LBHI_SEC07940_034732].

[625] Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 5; Lehman, Balance Sheet and Disclosure Scorecard for Trade Date June 23, 2008 (June 24, 2008), at p. 10 [LBEX-DOCID 1742000], attached to e-mail from Michael McGarvey, Lehman, to Paul Mitrokostas, Lehman, *et al.* (June 25, 2008) [LBEX-DOCID 1856557]; e-mail from Paul A. Hughson, Lehman, to Kentaro Umezaki, Lehman, *et al.* (Oct. 2, 2007) [LBEX-DOCID 1809381]; e-mail from Paul A. Hughson, Lehman, to Jonathan Cohen, Lehman (July 20, 2007) [LBEX-DOCID 1426881].

[626] Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at pp. 10-11 (stating that he and Gregory realized at the time that halting originations was not as easy as flipping a switch).

rebound.[627]   In one memorandum, Lehman's Head of Global Strategy expressed the concern that "the team responsible for selling down these positions is the same one that originated them."[628]   But several witnesses denied there was any incentive not to sell down the portfolio because they knew that no one in GREG would be getting a 2008 bonus.[629]

Regardless of the reasons for Lehman's slow reaction to its oversized commercial real estate holdings, the fact remains that Lehman's balance sheet did not decline until the end of the second quarter of 2008, after Bear Stearns had already nearly collapsed.

### (e)  Lehman's Compensation Practices

The Examiner considered, in the course of determining whether the officers and directors of Lehman breached their fiduciary duties, the impact that Lehman's compensation practices may have had on Lehman's conduct such as the expansion into potentially highly profitable, but riskier, lines of business, as discussed above.

Lehman's compensation policy was designed, in theory, to penalize excessive risk taking.   At times, FID businesses that exceeded balance sheet limits and breached

---

[627] Examiner's Interview of Erin M. Callan, Oct. 23, 2009, at p. 13; Examiner's Interview of Mark Weber, Aug. 11, 2009, at pp. 8-9.

[628] Memorandum from Timothy Lyons, Lehman, to David Goldfarb, Lehman, Strategic Imperatives for the Firm (July 3, 2008), at p. 1 [LBEX-DOCID 1377945].

[629] Examiner's Interview of David O'Reilly, Oct. 26, 2009, at p. 3; Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at p. 11; Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at p. 11; Examiner's Interview of Andrew J. Morton, Sept. 21, 2009, at pp. 19-20 (Morton notes that Walsh knew by February 2008 that he would receive only a straight salary for 2008, with no bonus, thus Walsh had no compensation-based incentive to inflate his marks).   For a more detailed discussion of the effect of Lehman's officers' compensation structure on the incentive to take risks, see Appendix 11, Compensation.

risk limits faced diminution of their compensation pool.[630]   At other times, FID used a "Compensation Scorecard" that included risk-weighted metrics such as return on risk equity and return on net balance sheet to determine compensation pool allocations.[631]   The FID Compensation Committee assessed performance against VaR, balance sheet usage, and risk appetite.[632]

But in practice, Lehman rewarded its employees based upon revenue with minimal attention to risk factors in setting compensation.   None of these risk-related adjustments was applied rigorously or consistently.   Ken Umezaki, then Head of FID Strategy, noted after a firm-wide speech by Fuld:

> [T]he majority of the trading businesses focus is on revenues, with balance sheet, risk limit, capital or cost implications being a secondary concern.[633]

To calculate revenue for its compensation pool, Lehman included revenue not yet recognized but recorded based on mark-to-market positions.[634]   In theory, therefore, traders and business units were incented to enter into transactions for short-term profits, even if those transactions created long-term risks for the firm.[635]

---

[630] Examiner's Interview of Kentaro Umezaki, June 25, 2009, at pp. 8-9; Lehman, Global Consolidated Balance Sheet (May 31, 2007) [LBEX-DOCID 276740]; e-mail from Kentaro Umezaki, Lehman, to Kaushik Amin, Lehman, *et al.* (July 10, 2007) [LBEX-DOCID 252873].

[631] Lehman, 2004 Fixed Income Division Compensation Scorecard (Undated) [LBEX-DOCID 1748807].

[632] Lehman, COMPMETRICS Excel Spreadsheet (Undated), at pp. 1-9 [LBEX-LL 1054327]; Lehman, 2007 FID Forecast Budget Support Excel Spreadsheet (Undated), at pp. 1-11 [LBEX-BARCMP 0000001].

[633] E-mail from Kentaro Umezaki, Lehman, to Scott J. Freidheim, Lehman, *et al.* (Apr. 19, 2007) [LBEX-DOCID 318475].

[634] Examiner's Interview of John D. Macomber, Sept. 25, 2009, at pp. 5, 22; Examiner's Interview of James Emmert, Oct. 9, 2009, at p. 2-3.

[635] *See* Section III.A.1.b.1.2 of this Report.   The Examiner finds that Lehman's assumption of ever-increasing business risk did not come from the bottom up but rather from the top down.   Similarly

Lehman's mark-to-market accounting also incented Lehman to value investments at the high end to generate higher net revenues.  Lehman had procedures to control such valuations, however, and in practice, the Examiner found no evidence to support a finding that any improper valuations were taken to affect compensation.

A more detailed description of Lehman's compensation practices may be found at Appendix 11.

### c)   Analysis

The Examiner investigated three potential claims in connection with Lehman's management of its risks:  (1) whether any Lehman officer breached the fiduciary duty of care to the firm by assuming excessive risk with respect to Lehman's investments, or by failing to follow the firm's risk management policies; (2) whether any Lehman officer breached the fiduciary duty of good faith and candor by not providing the Board with material information concerning risk issues; and (3) whether any Lehman director breached the fiduciary duty of good faith to monitor Lehman's risk management.

---

Lehman's senior officers – Fuld and Gregory in particular – had sizeable holdings of Lehman stock and may have been more incented to increase Lehman's long-term stock price than to generate short-term revenues.

(1)   **The Examiner Does Not Find Colorable Claims That Lehman's Senior Officers Breached Their Fiduciary Duty of Care by Failing to Observe Lehman's Risk Management Policies and Procedures**

(a)   **Legal Standard**

To assert a colorable duty of care claim concerning corporate conduct, the plaintiff must first overcome the protection of the business judgment rule.  Under the traditional business judgment rule as it applies to directors, there is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[636]  Thus, "a court will not substitute its judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.'"[637]

The business judgment rule has rarely been applied to officers.  However, based upon a recent decision by the Delaware Supreme Court[638] holding that the fiduciary duties of directors and officers are identical, the Examiner concludes that Delaware courts will likely hold, at a minimum, that officers are protected by the business judgment rule whenever they act under an express delegation of authority from the Board; the Delaware courts are also likely to hold that officers are protected by the rule

---

[636] *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)) (internal quotation marks omitted).

[637] *Id.* (*quoting Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)); *see* the discussion of Delaware corporate fiduciary law in Appendix 1, Legal Issues.

[638] *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009).

whenever they act within the scope of their discretion even if not pursuant to express delegation by the Board.[639]

The Examiner concludes that the Delaware courts are likely to hold that an officer can be stripped of the protection of the business judgment rule only in fairly narrow circumstances not presented here.[640]

If the evidence overcomes the presumption of the business judgment rule, the plaintiff must then prove a violation of the duty of care.[641]  The standard of proof for a duty of care claim for corporate misconduct is generally defined as gross negligence.[642] Gross negligence means "reckless indifference to or a deliberate disregard" of the corporation's interests, or "actions which are without the bounds of reason."[643]

Overcoming the business judgment rule and establishing gross negligence are particularly difficult when a plaintiff is challenging the risk-taking of a financial institution.  As a court applying Delaware law has recently noted, taking risks is at the heart of a financial institution's business, and decisions about what risks to take are

---

[639] *Cf. id.* (holding that the fiduciary duties of officers and directors are identical).

[640] *See, e.g., McMullin v. Beran*, 765 A.2d 910, 922 (Del. 2000); *see also Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985), *overruled on other grounds by Gantler*, 965 A.2d at 713 n.54; *Aronson*, 473 A.2d at 812, *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).  *Ryan v. Gifford*, 918 A.2d 341, 354 (Del. Ch. 2007); *Massaro v. Vernitron Corp*, 559 F. Supp. 1068, 1080 (D. Mass. 1983); *Omnibank of Mantee v. United S. Bank*, 607 So. 2d 76, 84-85 (Miss. 1992)  *Cf. Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1279 (Del. 1989) ("[J]udicial reluctance to assess the merits of a business decision ends in the face of illicit manipulation of a board's deliberative process by self-interested corporate fiduciaries.").

[641] Unlike the directors, Lehman's officers are not immunized by Lehman's articles of incorporation from personal liability for breaching the duty of care.  *See* Lehman Brothers Holdings Inc., Certificate of Incorporation, at § 10.1, *Limitation of Liability of Directors*.

[642] *Van Gorkom*, 488 A.2d at 873.

[643] *Tomczak v. Morton Thiokol, Inc.*, No. 7861, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990).

inherently protected by the business judgment rule from hindsight challenge.[644]
Therefore, a plaintiff asserting a breach of the duty of care by Lehman's senior
managers would face significant burdens.

### (b) Background

The Examiner finds insufficient evidence to support a claim that any Lehman
officer breached the fiduciary duty of care in connection with managing the risks
associated with the more aggressive business strategy Lehman adopted in 2006.

As mentioned above, Lehman's business strategy in 2006 and 2007 was premised
on using more of its balance sheet to increase its principal investments.  In addition to
the risks in the proprietary investments themselves, many of the firm's proprietary
investments entailed a commitment by Lehman to a much larger amount of debt or
equity than Lehman ultimately expected to retain for itself.  Although these bridge
equity and bridge debt transactions were risky, Lehman's management decided to
engage in these transactions because they were profitable in their own right, because
they helped Lehman participate in more and larger deals, and because they helped
Lehman to develop long-term client relationships.

---

[644] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 126 (Del. Ch. 2009) ("The essence of the
business judgment of managers and directors is deciding how the company will evaluate the trade-off
between risk and return. Businesses – and particularly financial institutions – make returns by taking on
risk; a company or investor that is willing to take on more risk can earn a higher return.").

Lehman's officers were entitled under Delaware law to pursue this aggressive high-risk strategy, and the Examiner does not question their business decision to do so; decisions of this type are at the core of the business judgment rule.

Although its management was entitled to pursue a business strategy of increasing its principal investments and engaging in substantial bridge debt and equity transactions, Lehman's own policies required management to consider and analyze the risks of that strategy in a systematic manner.  The Examiner has found evidence that raises questions whether Lehman's senior management disregarded Lehman's risk management framework, including its risk appetite limits, its single transaction limits, its stress testing, its balance sheet limits, and the advice of the risk managers.  As one former risk manager put it, "whatever risk governance process we had in place was ultimately not effective in protecting the Firm. . . . The function lacked sufficient authority within the Firm.  Decision-making was dominated by the business."[645] Indeed, there is substantial evidence that after Lehman adopted a more aggressive business strategy in 2006, its risk management policies and limits were not a major factor in the firm's investment decisions, even though management continued to tell the

---

[645] E-mail from Vincent DiMassimo, Lehman, to Christopher M. O'Meara, Lehman (Sept. 1, 2008) [LBEX-DOCID 203219].

Board, the rating agencies, and regulators that Lehman was prudently managing risk through its risk management system.[646]

The evidence that Lehman disregarded its risk controls is particularly strong with respect to bridge equity and bridge debt.  In several important contexts, Lehman excluded bridge equity and bridge debt commitments entirely from its risk metrics. These exclusions were apparently based on management's assumption that it would be able to distribute the equity and debt successfully to other parties.  When the subprime crisis erupted into the credit markets generally, this expectation proved to be erroneous.

However, the Examiner does not find that the decisions by Lehman's officers were not entitled to the protection of the business judgment rule.  Although Lehman's senior officers chose to disregard indications from Lehman's risk management systems that the firm was undertaking excessive risk, the Examiner did not find evidence that Lehman's management entered into financial transactions without informing themselves of the basic facts of the transactions, as would be necessary to strip them of the business judgment rule's protection and prove gross negligence.  Lehman's officers were entitled to set and decide to exceed risk limits, which were merely tools to assist

---

[646] *E.g.*, SEC, Lehman Monthly Risk Review Meeting Notes (July 19, 2007), at p. 5 [LBEX-SEC 007363] ("Jeff [Goodman] told us that . . . VaR is just one measure that Lehman uses, and is more of a speed bump/warning sign than a true, hard limit -- that role falls to RA [(i.e. risk appetite)].  [....]  He said that Madelyn [Antoncic], Dave [Goldfarb], and the executive committee tend to look more at RA.  As an aside, Madelyn came in after Jeff's explanation and gave virtually the same speech.").

them in their investment decisions, not legal restraints on their authority.  They made considered business decisions to do so because of profit-making opportunities.

Nor does the Examiner find that Lehman's officers exceeded the scope of their authority by pursuing an aggressive countercyclical growth strategy.  Lehman's management was entitled to calculate that the subprime crisis offered Lehman the opportunity to become a dominant residential mortgage originator, to expand its already powerful commercial real estate franchise, and to use large leveraged loans as a means towards developing its investment banking business.  Although management's disclosures to the Board on the risks of this strategy were not as detailed or as objective as they might have been, the Examiner does not find that management's disclosures were so lacking as to deprive the officers of the protection of the business judgment rule.

Even if the business judgment rule did not apply to the officers' pursuit of a countercyclical growth strategy, the Examiner would not find gross negligence sufficient to establish a breach of the duty of care.  Gross negligence requires proof that the officer made decisions that were irrational or reckless.  Lehman's senior officers decided to make business decisions primarily based on their intuitive understanding of the markets and their evaluation of the risks and rewards of entering into certain transactions.  Their decision to use their practical business experience rather than rely

on certain quantitative risk limits and other metrics cannot be considered irrational or reckless.

The decisions by Lehman's management must also be considered in context. In many respects, Lehman's transactions were no different from those conducted by other market participants, and were, in some respects, less aggressive than those of their competitors. For example, several financial institutions suffered catastrophic losses on investments in CDOs and credit default swaps; Lehman prudently limited its exposure in these areas. Lehman's officers would argue that an analysis of their management of Lehman's risks should consider the risks that Lehman prudently avoided along with the risks that Lehman unsuccessfully took.

Moreover, a breach of the duty of care claim would rely heavily on the testimony and e-mail communications of Lehman's risk managers and financial controllers. But risk managers and controllers are by definition more risk-averse than "risk-takers" – the business people who actually make the decisions on behalf of the enterprise. Indeed, risk managers and controllers are naturally inclined to see limits and controls as "harder" and less susceptible to judgment than businesspersons. Lehman's officers would have a compelling argument that the risk managers' opposition to various strategies and transactions must be considered in this context.

### (i)   Countercyclical Growth Strategy with Respect to Residential Mortgage Origination

The Examiner does not find that Lehman's countercyclical growth strategy with respect to its residential mortgage origination gives rise to a colorable duty of care claim.   Lehman's management took significant steps to curtail and control its origination of subprime mortgages, including discontinuing certain mortgage programs, installing improved risk management systems, and replacing management of its subprime originator.   Lehman's management also successfully hedged its subprime mortgage risk, at least until early 2008, and avoided some of the catastrophic investments that other financial institutions made in the mortgage market, for example in CDOs.

Lehman's management can be second-guessed, perhaps, for its decision to continue originating Alt-A mortgages through its Aurora subsidiary even as it was curtailing the origination of subprime mortgages through its BNC subsidiary, and for failing to curtail its subprime mortgage originations more quickly.   As described above, however, these business decisions were part of Lehman's strategy to benefit from a consolidation in the mortgage origination industry.   In 2007, Lehman curtailed origination of riskier segments of its Alt-A production after it became evident that these riskier segments were performing as poorly as subprime loans.

The business judgment rule shields from judicial review the foregoing decisions by Lehman concerning its Alt-A and subprime originations.   The Examiner does not

find that Lehman's management should be deprived of that protection, or that these business decisions were irrational or reckless.

### (ii)  Lehman's Concentration of Risk in Its Commercial Real Estate Business

As described above, Lehman entered into large commercial real estate transactions during the course of 2007, including transactions that left Lehman with a substantial investment in bridge equity.  The most significant of these transactions was Archstone.

Lehman entered into these commercial real estate bridge equity transactions at a precarious time in the financial markets.  After the onset of the subprime mortgage crisis in December 2006 or January 2007, there was a risk of contagion to the commercial real estate market.  Lehman's officers recognized this risk but concluded that it was manageable.[647]  Although in hindsight this conclusion was wrong, the Examiner cannot conclude that at the time it was reckless or irrational.

Lehman's officers exercised judgment to pursue commercial real estate opportunities, and to override indicators from the firm's risk systems.  Before Lehman entered into the Archstone transaction, Lehman's Real Estate group was already near its risk limits.  And the risk in the Archstone commitment and several contemporaneous real estate bridge equity deals was enormous – perhaps as large as or larger than

---

[647] Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at pp. 14-15; Examiner's Interview of Joseph Gregory, Nov. 13, 2009, at pp. 7-8; Examiner's Interview of Mark A. Walsh, Oct. 21, 2009, at pp. 7-9.

Lehman's entire pre-existing real estate book put together.[648]  Thus, it was obvious that

entering into Archstone and these other transactions would put Lehman well over its

real estate risk appetite limit.  Several witnesses, including Jeffrey Goodman, the risk

manager primarily responsible for GREG, said in their interviews that the commercial

real estate group was not subject to its risk appetite limits.[649]  Similarly, Mark Walsh, the

head of GREG, said he was informed that GREG was allocated excess risk appetite from

other business divisions.[650]

The risk appetite limit applicable to an individual business line may be viewed as

a type of concentration limit.  Concentration limits are important to ensure that a firm

does not take too much risk in a single, undiversified business or area.  By exceeding

the concentration limits applicable to Lehman's real estate business, Lehman's officers

took the risk that the firm would over-concentrate its capital in commercial real estate

investments.

---

[648] *See* Mark Weber, Lehman, Chart Showing Risk Appetite Adjustment for Archstone (July 24, 2008) [LBEX-DOCID 425705], attached to e-mail from Mark Weber, Lehman, to PortfolioRisk Support, Lehman, *et al.* (July 24, 2008) [LBEX-DOCID 265567] (showing that as a result of the inclusion of the Archstone positions into the firm's risk measurements, GREG's risk appetite usage increased from $689 million to $1.233 billion); e-mail from Madelyn Antoncic, Lehman, to Roger Nagioff, Lehman, *et al.* (June 29, 2007) [LBEX-DOCID 1478403]; e-mail from Jeffrey Goodman, Lehman, to Mark A. Walsh, Lehman, *et al.* (June 29, 2007) [LBEX-DOCID 2538925] (same).

[649] Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009; Examiner's Interview of David S. Lazarus, Nov. 18, 2009, at p. 4; Examiner's Interview of Paul A. Hughson, Oct. 28, 2009, at p. 4; Examiner's Interview of Kenneth Cohen, Oct. 20, 2009, at p. 6; Examiner's Interview of Mark Weber, Aug. 11, 2009, at p. 3.

[650] Examiner's Interview of Mark Walsh, Oct. 21, 2009, at p. 5.

The risk attributable to Archstone and at least one other bridge equity transaction was excluded from Lehman's risk appetite usage calculation for almost three months after the May 2007 commitment date for Archstone.[651] These two transactions were not included in the firm's risk appetite calculation until August 13, 2007.[652] After the exclusion was acknowledged in August 2007, Lehman retroactively corrected its risk appetite figures to include the previously omitted risks.[653] The retroactive calculation shows that if these transactions had been included in the risk appetite usage, Lehman would have been over its firm-wide and real estate risk appetite limits almost continuously from the date of the Archstone commitment.

Although Lehman's decision to concentrate heavily in real estate bridge equity was unwise in retrospect, and excluding major transactions from Lehman's risk usage calculation was a breach of risk management protocol, the fact remains that Lehman's management seriously considered the risks in the Archstone transaction in a series of

---

[651] Mark Weber, Lehman, Chart Showing Risk Appetite Adjustment for Archstone (July 24, 2008) [LBEX-DOCID 425705], attached to e-mail from Mark Weber, Lehman, to PortfolioRisk Support, Lehman, *et al.* (July 24, 2008) [LBEX-DOCID 265567]; *accord* Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009; e-mail from Mark Weber, Lehman, to Laura Vecchio, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 264849]; Lehman, Market Risk Control Committee Meeting Agenda (Nov. 12, 2007), at p. 17 [LBEX-DOCID 271334], attached to e-mail from Mark Weber, Lehman, to Paul Shotton, Lehman, *et al.* (Nov. 12, 2007) [LBEX-DOCID 265289].

[652] Mark Weber, Lehman, Chart Showing Risk Appetite Adjustment for Archstone (July 24, 2008) [LBEX-DOCID 425705], attached to e-mail from Mark Weber, Lehman, to PortfolioRisk Support, Lehman, *et al.* (July 24, 2008) [LBEX-DOCID 265567]; *see also* e-mail from Mark Weber, Lehman, to Laura Vecchio, Lehman, *et al.* (July 31, 2008) [LBEX-DOCID 264849]; Lehman, Market Risk Control Committee Meeting Agenda (Nov. 12, 2007), at p. 17 [LBEX-DOCID 271334], attached to e-mail from Mark Weber, Lehman, to Paul Shotton, Lehman, *et al.* (Nov. 12, 2007) [LBEX-DOCID 265289].

[653] Mark Weber, Lehman, Chart Showing Risk Appetite Adjustment for Archstone (July 24, 2008) [LBEX-DOCID 425705], attached to e-mail from Mark Weber, Lehman, to PortfolioRisk Support, Lehman, *et al.* (July 24, 2008) [LBEX-DOCID 265567].

Executive Committee and Commitment Committee meetings over a period of weeks, modified the transaction in several important ways to try to manage the risk, and ultimately decided that the rewards from the transaction outweighed the risk. Moreover, Lehman's management plainly was aware of the risk associated with the Archstone transaction during this period.  In fact, Lehman's management was focused on trying to distribute the Archstone debt and equity and reduce the firm's risk in advance of the closing of that transaction.

The Examiner thus concludes that there is no colorable claim of breach of fiduciary duty on the part of Lehman's officers.  Lehman management's decision to exceed its limit for this business and invest heavily in commercial real estate is protected by the business judgment rule.  That rule does not operate retroactively to judge a business decision based on its ultimate failure, but instead focuses on the reasons for making that decision as of the time and in the context in which it was made. The officers' decision not to follow the guidance of its internal and voluntary risk management system does not give rise to a breach of the duty of care.

### (iii) Concentrated Investments in Leveraged Loans

As described above, Lehman's principal investment strategy also included participating in leveraged loan transactions.  This business grew spectacularly in 2006 and the first half of 2007.  Many of these loans were made to private equity firms, or sponsors, who were purchasing companies as part of leveraged buy-outs.  These

transactions were risky for Lehman because they consumed tremendous amounts of capital, were made on terms that strongly favored the borrowers, and often involved bridge equity or bridge debt that Lehman hoped to distribute to other financial institutions (but was committed to keep for itself if it was unable to do so).

The evidence is that during the first eight months of Lehman's fiscal 2007, Lehman's leveraged loan business, like its commercial real estate business, was not subject to any limits.   Between August 2006 and July 2007, Lehman entered into approximately 30 leveraged loans that exceeded the single transaction limit that had previously been adopted for these transactions, often by significant margins.[654]   The chart below demonstrates the magnitude of these overages:

---

[654] Joe Li, Lehman, STL Backtesting Excel Spreadsheet (July 25, 2007) [LBEX-DOCID 2506462], attached to e-mail from Joe Li, Lehman, to Fred S. Orlan, Lehman, *et al.* (July 25, 2007) [LBEX-DOCID 2563167].

**Leveraged Finance Deals with Single Transaction Loss ("STL") in Excess of Limit[1]**
(July 2007 Analysis, Deals between August 2006 and July 2007) ($ in Millions)

| Deal Name | Original Commitment Date[2] | "Old Framework" STL for deals with STL over $250MM[3] | "New Framework" STL for deals with STL over $400MM[3] |
|---|---|---|---|
| Intelsat | - | 2,090 | 1,045 |
| Weatherford | 4/30/2007 | 2,030 | 1,015 |
| Houghton Mifflin Riverdeep Group | 7/16/2007 | 1,389 | 694 |
| TXU Corp | 2/26/2007 | 1,368 | 684 |
| First Data Corporation | 4/2/2007 | 1,203 | 601 |
| Alcoa Inc. | 5/24/2007 | 1,200 | 600 |
| Home Depot Supply | 6/19/2007 | 971 | 486 |
| CDW Corporation | 5/29/2007 | 909 | 455 |
| Dollar General | 3/1/2007 | 882 | 441 |
| Harman International Industries | 4/25/2007 | 692 | 346 |
| US FoodService | - | 651 | 326 |
| CVS | 1/16/2007 | 600 | 300 |
| BCE | 6/29/2007 | 553 | 277 |
| BAWAG PSK | 3/1/2007 | 550 | 275 |
| Tognum AG | - | 515 | 258 |
| ProSiebenSat.1 Media AG | 1/31/2007 | 500 | 250 |
| CBS Corporation | - | 476 | 238 |
| West Corp | - | 465 | 232 |
| IBM International Group BV | - | 440 | 220 |
| Sequa Corp | 6/18/2007 | 431 | 216 |
| Tesoro | 4/10/2007 | 431 | 215 |
| Alliance Data | 5/31/2007 | 424 | 212 |
| Applebee's International, Inc. | 7/16/2007 | 403 | 202 |
| Allison Transmission | 5/21/2007 | 390 | 195 |
| Dockwise | - | 388 | 194 |
| Univision Communications | 7/14/2006 | 387 | 193 |
| PHH Corporation | 3/15/2007 | 386 | 193 |
| Formula One Group | - | 378 | 189 |
| United Rentals, Inc. | 7/22/2007 | 372 | 186 |
| Thermo Electron Corp. | 5/7/2006 | 360 | 180 |
| National Beef Packing Co. | 5/11/2007 | 335 | 168 |
| Bulgarian Telecommunications | 3/28/2007 | 327 | 164 |
| Endemol Holdings | 5/11/2007 | 322 | 161 |
| Linde Material Handling Group | - | 293 | 146 |
| Pinnacle Foods | 2/10/2007 | 277 | 138 |
| The Klockner Pentaplast Group | - | 276 | 138 |
| Guitar Center, Inc. | 6/20/2007 | 263 | 132 |

Note: *Highlighted cells indicate transactions with STL in excess of the limit conditions described below:*

[1] Table includes all deals from August 2006 to July 2007 that are in excess of $900M and also have a calculated STL of > $250M under the loss calculation methodology in place July 2007 (See "Old Framework" STL column). Highlighted deals have an STL in excess of the applied limit stated in column title. Transactions in excess of the Limits would have required Executive Committee approval (LBEX-DOCID 2170674).

[2] "Original commitment" indicates earliest known date on which a deal was committed to by Lehman, as presented in the LPG Weekly Reviews.

[3] All deal data is from an Excel spreadsheet (LBEX-DOCID 2506463) attached to a July 25, 2007 Joe Li email (LBEX-DOCID 2563148) stating: "Previously we have used a loss limit of 250mm to 350mm. We would like to propose a 400mm as the Firm's revenue has increased." In addition to changing the limit, it was proposed that risk factors be adjusted to exclude default risk, leaving only systematic risk as the Single Transaction Loss. This proposed change had the effect of halving the STL (calculated risk of the position), and simultaneously increasing the limit. **Items highlighted in the "Old Framework" column are STL numbers calculated under the methodology in place in July 2007 that exceed the $250M loss limit in place at the time. Highlighted items in the "New Framework" column represent STL numbers calculated under the proposed methodology (which halved the STL amount) that exceed the proposed $400M Limit.** Please note that a September 2007 presentation on STL (LBEX-DOCID 194075) stated that the current limit was $250 and proposed that the limit be increased to $300M. A leveraged finance risk presentation to the Executive Committee one month later recommended that the limit be increased to $400M (LBEX-DOCID 569902).

Lehman's decision to exceed the single transaction limit proved to be unwise. Just as Lehman was entering into a particularly large volume of commitments, Lehman won a huge volume of deals, and the credit markets froze, causing Lehman to be left with tremendous risk on its books.  Before long, Lehman's high yield book showed a risk appetite usage almost double the limit for those exposures – an enormous concentration of risk in a single, illiquid asset class.

As a result of this high volume of commitments, some in Lehman's management became concerned, as early as July 2007, that the firm would not be able to fund all of its commitments.  As Ian Lowitt, then the CAO, wrote in an e-mail dated July 20, 2007:  "In case we ever forget; this is why one has concentration limits and overall portfolio limits. Markets do seize up."[655]

Although Lehman's decision to enter into huge illiquid transactions during a recognized "credit bubble"[656] was unwise, the large leveraged loan transactions were considered and approved by Lehman's Executive Committee, which was entitled to increase or override the single transaction limit, just as it was entitled to increase or override the risk appetite limits.  Such decisions are subject to the business judgment rule.

---

[655] E-mail from Ian T. Lowitt, Lehman, to Christopher M. O'Meara, Lehman (July 20, 2007) [LBEX-DOCID 194066].

[656] E-mail from Christopher M. O'Meara, Lehman, to Paulo R. Tonucci, Lehman (Apr. 6, 2007) [LBEX-DOCID 1349076].

### (iv) Firm-Wide Risk Appetite Excesses

The Examiner also considered whether Lehman's handling of its overall risk limits was a breach of the duty of care.  As described above, Lehman's management decided to treat the firm's risk appetite limit as a soft limit rather than as a meaningful constraint on management's assumption of risk.

Lehman decided to exceed the firm-wide risk appetite limit at several junctures.  First, though Lehman dramatically increased the limit for fiscal 2007, Lehman nevertheless approached the new limit by May 2007.  Lehman entered into Archstone and several other bridge equity transactions notwithstanding the obvious fact that those transactions would immediately put Lehman over its firm-wide risk appetite limits.[657]

Several months later, with Lehman's firm-wide risk usage actually in excess of the limit, Lehman decided to increase the limit again, even as one of its senior risk managers admitted to the SEC that Lehman did not in fact have increased risk-taking capacity.[658]

Then, in early October 2007, when Lehman's risk appetite excesses were at their peak, at least some members of Lehman's senior management discussed the limit breaches and decided to grant a temporary reprieve from the limits based on the difficult conditions in the real estate and leveraged loan markets.  For the most part,

---

[657] Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009.
[658] SEC, Notes from Lehman's Monthly Risk Review meeting (Oct. 11, 2007), at p. 6 [LBEX-SEC 007438].

Lehman did not pursue aggressive risk reduction strategies until sometime in 2008, particularly with respect to commercial real estate.

Rather than reduce its risk usage, Lehman cured its risk appetite overages by increasing the firm-wide risk appetite limit yet again.[659]  There is evidence which raises the question whether Lehman's risk-taking capacity had in fact increased.  The increased limit amount was calculated by substantially changing the assumptions previously used in calculating the risk appetite limit, and by using a very aggressive 2008 budgeted revenue figure.  If Lehman had used the same assumptions as it had previously used for calculating the risk appetite limit, and a more realistic revenue figure, it would likely have concluded that it was necessary to reduce its risk appetite limit to take account of its diminished profitability relative to its equity base.  Such a conclusion might have impelled management more urgently to sell assets, reduce the firm's risk profile, and reduce the firm's leverage.

Although Lehman's risk appetite limits ultimately provided little or no limiting function at all, the Examiner does not find that the decision to exceed or disregard these limits gives rise to a colorable claim of breach of fiduciary duty.  These internal limits were intended only for the guidance of Lehman's own management; they did not put

---

[659] Examiner's Interview of Christopher M. O'Meara, Aug. 14, 2009, at p. 10; Lehman's Material for Market Risk Control Committee Meeting (Jan. 14, 2008), at p. 33 [LBEX-DOCID 271352], attached to e-mail from Mark Weber, Lehman, to Paul Shotton, Lehman, *et al*. (Jan. 14, 2008) [LBEX-DOCID 223263]; Estimated Third Quarter 2007 Financial Information Presentation to Lehman Board of Directors (Sept. 11, 2007), at p. 6 [LBHI_SEC07940_026288].

any legal constraints on the scope of management's authority.  And because business in general and investment banking in particular is an inherently risky enterprise, Lehman's management was entitled to pursue a countercyclical growth strategy based on its evaluation of the markets and of Lehman's business, even if that strategy necessarily posed a risk to the firm.  Moreover, Lehman's risk appetite limit overages were reported to the SEC.  The Examiner does not find that management's decision to increase and then exceed Lehman's risk appetite levels gives rise to a colorable claim for breach of fiduciary duties.

### (v)  Firm-Wide Balance Sheet Limits

Lehman also failed to apply its balance sheet limits in late 2007.  Application of these limits would also have restricted Lehman's risk-taking.  Instead, Lehman dramatically increased the size of its balance sheet, and used increasingly large volumes of Repo 105 transactions to create the appearance that the firm's net leverage ratio remained within a reasonable range of such ratios established by the rating agencies.[660]

### (vi) Stress Testing

As described above, Lehman's stress tests suffered from a significant flaw.  Although Lehman made a strategic decision in 2006 to take more principal risk, Lehman did not modify its stress tests to include the risks arising from many of its principal investments – including its real estate investments other than commercial mortgage-

---

[660] For further detail regarding the Repo 105 transactions, see Section III.A.4 of this Report.

backed securities ("CMBS"), its private equity investments, and, during a crucial period, its leveraged loan commitments.[661]   Thus, Lehman's management pursued its countercyclical growth strategy, including an increasing concentration of risk in illiquid assets, without availing itself of a common risk management technique for evaluating the potential risk to the firm from that strategy.

But stress tests, like risk limits, are an instrument available for use of management as it deems appropriate; Lehman's management was not legally required to make business decisions based on the results of stress testing.[662]   Moreover, the SEC was aware that Lehman's stress tests excluded untraded investments and did not question the exclusion, because historically it had been the norm to limit stress tests only to traded positions.[663]   Based on these facts, the Examiner does not find that Lehman management's use of the stress tests gives rise to a colorable claim for a breach of the duty of care.

### (vii)   Summary:  Officers' Duty of Care

The Examiner reviewed extensive evidence concerning Lehman's senior officers' decision to disregard the guidance provided by Lehman's risk management system as they implemented the firm's aggressive business strategy in 2006 and 2007.   That

---

[661] E-mail from Melda Elagoz, Lehman, to Stephen Lax, Lehman, *et al.* (June 21, 2007) [LBEX-DOCID 2546617]; Examiner's Interview of Paul Shotton, Oct. 16, 2009, at pp. 4-5.

[662] Lehman was required to conduct certain stress testing as part of its participation in the CSE program. *See* 17 C.F.R. 240.15c3-1 (2007).

[663] Examiner's Interview of Matthew Eichner, Nov. 23, 2009, at p. 12; Examiner's Interview of Paul Shotton, Oct. 16, 2009, at pp. 4-5; Examiner's Interview of Jeffrey Goodman, Aug. 28, 2009.

evidence goes to the heart of Lehman's ultimate financial failure because the illiquid investments acquired during that period could not be sold off sufficiently quickly, and Lehman's liquidity and confidence suffered as a result.   When the run on Lehman began in September 2008, Lehman lacked the liquidity to survive.   Thus, Lehman's collapse can be traced in part to Lehman management's adoption of a countercyclical growth strategy in 2006 and 2007.   Although management turned out to be wrong in their business judgments, the evidence does not establish that management's actions and decisions were so reckless and irrational as to give rise to a colorable claim of breach of fiduciary duty.

> [B]usiness failure is an ever-present risk. The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue risky strategies that seem to promise great profit.  If the mere fact that a strategy turned out poorly is in itself sufficient to create an inference that the directors who approved it breached their fiduciary duties, the business judgment rule will have been denuded of much of its utility.[664]

### (2)   The Examiner Does Not Find Colorable Claims That Lehman's Senior Officers Breached Their Fiduciary Duty to Inform the Board of Directors Concerning the Level of Risk Lehman Had Assumed

The Examiner also does not find a colorable claim that, during the period from May 2007 through January 2008, Lehman's senior officers breached their duty of candor with respect to their disclosures to the Board of Directors concerning Lehman's risk

---

[664] *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 193 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007).

management system.   Lehman's management gave the Board regular reports concerning the state of the firm's business, including reports containing quantitative risk, balance sheet, revenue, and other metrics.  Lehman's management also discussed market conditions and their potential impact on the firm with the Board.  The Examiner did not find evidence that managers knowingly made false statements to the Board.

In light of the Board's limited role in supervising the risk management of the enterprise, and the absence of authority mandating greater disclosure to the Board, the Examiner does not believe that the officers had a legal duty to provide the Board with additional negative information.  The Examiner does not find that the evidence gives rise to a colorable claim for a breach of the duty of candor.

Lehman's management repeatedly disclosed to the Board that Lehman intended to grow its business dramatically, increase its risk profile, and embrace risk even in declining markets.  The Board undoubtedly understood and approved of Lehman's growth strategy.

During 2007, there were a number of instances in which management did not provide information to the Board.  For example, management did not disclose its decision to exceed or disregard the various concentration limits applicable to the leveraged loan business and to the commercial real estate businesses, including

especially the single transaction limit, contrary to representations to the Board that management took steps to "avoid [] over-concentration in any one area."[665]

In hindsight, various Board members stated that it would have been helpful to have had more information.  For example, some directors said that if the risk limit breaches were sufficiently large and long-lasting;[666] if management's liquidity concerns were more than a "single incursion";[667] or if the exclusions from the stress testing were sufficiently significant;[668] they would have wanted to know about these facts.[669]

On the other hand, the Board did not explicitly direct management to provide it with this information, and there is no evidence that the Board asked questions that management did not answer, or answered inaccurately.  Moreover, as discussed above, management was not required by any regulatory authority or by Delaware common law to provide such detailed information to the Board of Directors.

Although Lehman's management did not provide the Board with all available information concerning the risks faced by the firm during 2007 and early 2008, that fact is not surprising given the Board's limited role in overseeing the firm's risk management, and the extraordinarily detailed information available to management.

---

[665] David Goldfarb, *et al*, Managing the Firm Presentation to Lehman Board of Directors (May 15, 2007), at p. 20 [LBHI_SEC07940_026136]

[666] Examiner's Interview of Roger Berlind, May 8, 2009, at p. 4; Examiner's Interview of Marsha Johnson Evans, May 22, 2009, at p. 6;    Examiner's Interview of Roland A. Hernandez, Oct. 2, 2009, at p. 10; Examiner's Interview of John D. Macomber, Sept. 25, 2009, at p. 17. Examiner's Interview of Dr. Henry Kaufman, May 19, 2009, at p. 17.

[667] Examiner's Interview of Dr. Henry Kaufman, Dec. 22, 2009.

[668] Examiner's Interview of John D. Macomber, Sept. 25, 2009, at pp. 6, 17.

[669] *See* III.A.1.b of this Report.

After reviewing this evidence, the Examiner finds insufficient evidence to support a colorable claim that Lehman's management was either grossly negligent or intentionally deceptive in providing information to the Board concerning risk management.

First, the Examiner has found no colorable claim that Lehman's senior managers violated their fiduciary duty of care through their handling of risk issues. Management's disclosure of the risk appetite excesses to the SEC supports the view that management did not believe it was acting imprudently, much less violating the law, by taking on a higher level of risk than was consistent with the firm's pre-existing risk policies and limits. Under these circumstances it would take very substantial evidence of management's intent to mislead the Board in order to lay a sufficient foundation for a claim that Lehman's senior officers breached their duty of candor.

Establishing a violation of the duty of candor with respect to risk management is particularly difficult. As the Delaware Chancery Court recently explained in connection with directors' monitoring of risk decisions by management: "It is almost impossible for a court, in hindsight, to determine whether the directors of a company properly evaluated risk and thus made the 'right' business decision. . . . Business decision-makers must operate in the real world, with imperfect information, limited resources, and an uncertain future."[670]

---

[670] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 126 (Del. Ch. 2009).

Management's duty of candor concerning risk management adds another level of complexity beyond the issues raised by the duty of care.  Risk limits, policies, and metrics were designed for use by management, not the board.  Absent express direction from the board as to what information concerning risk management it should be given (and there was no such direction here), management must make the determination of what level of detail the board needs to fulfill its obligation to monitor risk decisions.

Applying the standard of proof requiring at least gross negligence and perhaps intentional deception to establish a breach of the duty of candor means that senior managers may make a good-faith mistake by not providing material information to the board without violating their fiduciary duties.  Although it can be fairly debated whether Lehman's management should have provided its Board with more information and more timely information concerning the firm's risk usage, stress test results, and liquidity, the Examiner does not find that any mistake by management in this regard constituted gross negligence or intentional deception.

**(3)   The Examiner Does Not Find Colorable Claims That Lehman's Directors Breached Their Fiduciary Duty by Failing to Monitor Lehman's Risk-Taking Activities**

**(a)   Lehman's Directors are Protected From Duty of Care Liability by the Exculpatory Clause and the Business Judgment Rule**

Corporate directors' duty of care is a duty of informed decision making.[671]   It involves the process by which directors make business decisions, not the content of those decisions.[672]   However, directors are generally afforded additional protection by the business-judgment rule, a judicial presumption that a court should "not substitute its judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.'"[673]

Lehman, like many Delaware corporations, immunized its directors from claims of breaching the duty of care.   Lehman's certificate of incorporation provides:

> A director shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director; provided that this sentence shall not eliminate or limit the liability of a director (i) for any breach of his duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of [the Delaware General Corporation Law], or (iv)

---

[671] *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985), *overruled on other grounds, Gantler v. Stephens*, 965 A.2d 695, 713 n.54 (Del. 2009).

[672] *In re Caremark Int'l. Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

[673] *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)). For a more detailed discussion of Delaware law governing corporate directors' fiduciary duties, see Appendix 1, Legal Issues.

for any transaction from which the director derives an improper personal benefit.[674]

The wording of this clause is nearly identical to that in Section 102(b)(7) of the Delaware General Corporate Law, which authorizes a corporation to exculpate its directors from personal liability for breaches of fiduciary duties, except in the four exceptions stated in the statute: conduct violating the directors' duty of *loyalty*; acts or omissions *not in good faith*; *intentional misconduct*; and *knowing violations of law*.[675]   Courts uphold such a clause to protect directors from liability provided that the conduct in question does not violate their duty of loyalty.[676]   In addition, Delaware protects directors from personal liability to the extent their decisions are based on information provided to them by management.[677]

Therefore, Delaware has chosen to impose personal liability only on those directors who have handled their responsibility in a reckless or irrational manner:

> Directors' decisions must be reasonable, not perfect. "In the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties." . . .   Only if they knowingly and completely

---

[674] Lehman Brothers Holdings Inc., Certificate of Incorporation, at § 10.1, *Limitation of Liability of Directors.*

[675] *See* DEL. CODE ANN. tit. 8, § 102(b)(7) (2009).

[676] *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 367 (Del. 2006) ("Such a provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty.").

[677] *See* DEL. CODE ANN. tit. 8, § 141(e) (2009); *see also Brehm v. Eisner*, 746 A.2d 244, 261 (Del. 2000); *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 132 & n.86 (Del. Ch. 2009).

failed to undertake their responsibilities would they breach their duty of loyalty.[678]

### (b)  Lehman's Directors Did Not Violate Their Duty of Loyalty

A director's duty of loyalty "[e]ssentially . . . mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[679]  The duty of loyalty chiefly involves situations in which directors utilize their positions to confer special benefits onto themselves or majority stockholders.[680] These situations are frequently referred to as "self-dealing" or "interested" situations.[681] "A director is considered interested when he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."[682]  Directors are also considered interested where their motivations in executing a business decision appear to be subservient to the interests of a majority stockholder.[683]

The Examiner has found no evidence of self-dealing by Lehman's directors, and Lehman did not have a majority stockholding interest.

---

[678] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243-44 (Del. 2009) (quoting *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 654-55 (Del. Ch. 2008)).

[679] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *modified on other grounds*, 636 A.2d 956 (Del. 1994).

[680] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).

[681] *See id.*

[682] *Globis Partners, L.P. v. Plumtree Software, Inc.*, No. 1577-VCP, 2007 WL 4292024, at *5 (Del. Ch. Nov. 30, 2007).

[683] *See, e.g., Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001); *Tooley v. AXA Fin., Inc.*, No. 18414, 2005 WL 1252378, at * 5 (Del. Ch. May 13, 2005).

### (c)   Lehman's Directors Did Not Violate Their Duty to Monitor

Under Delaware law, directors have a fiduciary duty to monitor management's compliance with corporate reporting and control systems.   The Delaware Supreme Court has adopted the *Caremark* standard "for assessing director oversight liability."[684] Under *Caremark*, the fiduciary duty to monitor management is breached if "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[685]   The Delaware Supreme Court stressed, however, that a director can be held liable only for a "conscious" failure to fulfill the oversight function:

> [I]mposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations.   Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.[686]

### (i)   Application of *Caremark* to Risk Oversight: *In re Citigroup Inc.*

In the *Citigroup* case, the Delaware Chancery Court rejected a claim that Citigroup's current and former directors and officers had "breached their fiduciary duties by failing to properly monitor and manage the risks the Company faced from

---

[684] *Stone*, 911 A.2d at 364-65.

[685] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009) (quoting *Stone*, 911 A.2d at 370).

[686] *Stone*, 911 A.2d at 370 (internal citations omitted).

problems in the subprime lending market and for failing to properly disclose

Citigroup's exposure to subprime assets."[687]  The complaint alleged various theories of

liability including a breach of the duty to monitor under *Caremark*.  Plaintiffs based their

claim on several "red flags" that allegedly "should have given defendants notice of the

problems that were brewing in the real estate and credit markets."[688]  Noting that the

supposed red flags "amount[ed] to little more than portions of public documents that

reflected the worsening conditions in the subprime mortgage market and in the

economy generally," the Court found the allegations legally insufficient "to show that

the directors were or should have been aware of any wrongdoing at the Company or

were consciously disregarding a duty somehow to prevent Citigroup from suffering

losses."[689]

The Court also held that a *Caremark* claim involving risk management must be

consistent with the business judgment rule:

> It is almost impossible for a court, in hindsight, to determine whether the
> directors of a company properly evaluated risk and thus made the "right"
> business decision.
>
> . . .
>
> To impose liability on directors for making a 'wrong' business decision
> would cripple their ability to earn returns for investors by taking business
> risks.[690]

---

[687] *Citigroup*, 964 A.2d at 111.

[688] *Id.*

[689] *Id.* at p. 128.

[690] *Id.* at p. 126.

The Court held that plaintiffs had failed to tie the *Caremark* claim to a failure of the corporate risk management system:

> [P]laintiffs' allegations do not even specify how the board's oversight mechanisms were inadequate or how the director defendants knew of these inadequacies and consciously ignored them.  Rather, plaintiffs seem to hope the Court will accept the conclusion that since the Company suffered large losses, and since a properly functioning risk management system would have avoided such losses, the directors must have breached their fiduciary duties in allowing such losses.[691]

The Court emphasized that "red flags" sufficient to state a *Caremark* claim must go beyond "signs in the market that reflected worsening conditions and suggested that conditions may deteriorate even further. . . ."[692]  The Court was protective of directors facing personal liability because the risk assumed by their corporation resulted in losses:

> Oversight duties under Delaware law are not designed to subject directors, even expert directors, to *personal liability* for failure to predict the future and to properly evaluate business risk.[693]

### (ii) Application of *Caremark* and *Citigroup* to Lehman's Directors

The Examiner does not find that Lehman's directors breached their *Caremark* duty to monitor management's compliance with the law.

First, the Examiner does not find that "the directors utterly failed to implement any reporting or information system or controls."[694]  As explained above, the Board

---

[691] *Id.* at 128.

[692] *Id*. at 130.

[693] *Citigroup*, 964 A.2d at 131.

received regular information at every Board meeting concerning the firm's risk, liquidity, and balance sheet situation.   The Board also created a Finance and Risk Committee to receive considerably more detailed information about these topics. Moreover, the Board received regular reports about the firm's risk management systems and controls.   The directors plainly implemented a sufficient reporting system and controls.

Second, the Examiner does not find that the directors "consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[695]   As explained above, the Examiner has not found colorable claims that Lehman's senior officers breached their fiduciary duties through the manner in which they managed risk.   To the contrary, management's conduct is protected from liability by the business judgment rule.   There is also insufficient evidence that Lehman's management violated any legal requirements or obligations relating to risk management.   The risk limits, policies, metrics, and stress tests that Lehman developed were intended to be used internally and did not constitute legal obligations.   Because Lehman management's handling of risk did not violate the law, the directors cannot be liable for a breach of their duty to monitor management to prevent such violations.

---

[694] *Id.* at p. 123.
[695] *Id.*

Moreover, there is no evidence, as Delaware law requires, that Lehman's directors "consciously disregarded" violations by Lehman's senior officers of their fiduciary or other legal duties through their decisions concerning the amount of risk that Lehman assumed and their management of that risk. The directors were not presented with "red flags" of such misconduct. And in monitoring risk issues, the Board justifiably relied entirely on information provided by management. Under Delaware law, the directors are thereby immunized from personal liability.[696]

---

[696] *See* DEL. CODE ANN. tit. 8, § 141(e) (2009).