**C&A, SE v. Puerto Rico Department of Correction and Rehabilitation
K CD2001-0516
Statement Itemizing Interest, Fees, Expenses, Etc.**


| | |
|---|---:|
| Judgment amount for Extended Job Site Overhead & Home Office Overhead | $903,121.00 |
| Penalty Interest at 6% rate since August 26, 2001 | |
| $54,187.26 yearly x 15 yrs. (August 26, 2001 – August 26, 2016) | 812,808.90 |
| $4,515.61 monthly X 10 months (August 27, 2016 – June 27, 2017) | 45,156.10 |
| $148.46 *Per Diem* x 3 days until June 30, 2017 | + 445.38 |
| | $1,761,531.38 |
| (July 1, 2017 – May 1, 2018) $4,515.61 x 10 = | + 45,156.10 |
| | $1,806,687.48 |

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
REGION JUDICIAL DE SAN JUAN

|  |  |
|---|---|
| C & A, S.E. | *    CASO NUM. KLCE201000852 |
| | * |
| | *    SOBRE: CERTIORARI INTERLOCUTORIO CIVIL |
| V. | * |
| RIVERA GONZALEZ, VICTOR | * |

* * * * * * * * * * * * * * * *

LIC. MAGALY RODRIGUEZ QUIÑONES
CONDADO ASTOR 3-A5
1018 ASHFORD AVE
SAN JUAN PR 00907


N O T I F I C A C I O N   D E   S E N T E N C I A

    EL SECRETARIO QUE SUSCRIBE NOTIFICA A USTED QUE ESTE TRIBUNAL HA DICTADO SENTENCIA EN EL CASO DE EPIGRAFE CON FECHA DE 30 DE NOVIEMBRE DE 2012 , QUE HA SIDO DEBIDAMENTE REGISTRADA Y ARCHIVADA EN LOS AUTOS DE ESTE CASO, DONDE  PODRA USTED ENTERARSE DETALLADAMENTE DE LOS TERMINOS DE LA MISMA.

    Y SIENDO O  REPRESENTANDO USTED LA PARTE PERJUDICADA POR LA SENTENCIA, DE LA CUAL  PUEDE ESTABLECERSE  RECURSO DE APELACION, DIRIJO A USTED ESTA NOTIFICACION, HABIENDO ARCHIVADO EN LOS AUTOS DE ESTE CASO COPIA DE ELLA CON FECHA 06 DE DICIEMBRE DE 2012 .

C & A, S.E. -
PO BOX 11427 SAN JUAN PR 00919-2587
VICTOR RIVERA GONZALEZ - ADMINISTRADOR DE CORRECCION
PO BOX 71308 SAN JUAN PR 00936
D DE CORRECCION Y REHABILITACION - DIVISION LEGAL
PO BOX 71308 SAN JUAN PR 00936-8408
SECRETARIO GENERAL SAN JUAN (SUP) -
PO BOX 190887 SAN JUAN PR 00919
SECRETARIO GENERAL SAN JUAN (SUP) - LCDA REBECCA RIVERA TORRES
PO BOX 190887 SAN JUAN PR 00919
PEDRO MENDEZ MORALES -
299 AVE WINSTON CHURCHILL SAN JUAN PR 00926
ADMINISTRACION DE CORRECCION - DIVISION LEGAL
PO BOX 71308 SAN JUAN PR 00936
LIC. MARCOS O VALLS SANCHEZ - PO BOX 363641
SAN JUAN PR 00936-3641
LIC. RAMON L NIEVES PEREZ - PO BOX 363689
SAN JUAN PR 00936-3689
HONORABLE PROCURADOR GENERAL -
PO BOX 9020192 SAN JUAN PR 00902-0192


    SAN JUAN, PUERTO RICO, A 06 DE DICIEMBRE DE 2012 .

CONT. CASO NUM. KLCE201000852

PAG. 02

DIMARIE ALICEA LOZADA
_____
SECRETARIO


POR:   MARIBEL CRUZ CENTENO
_____
SEC. AUX. TRIB.

CASOS CONSOLIDADOS ........    KLAN201000552,

OAT 704-1 - NOTIFICACION DE SENTENCIA-TA
WWW.RAMAJUDICIAL.PR
TELETRIBUNALES:(787)759-1888/ISLA 1-877-759-1888 LIBRE DE COSTO

Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE SAN JUAN
PANEL IV

| | | |
|---|---|---|
| C & A, S.E.<br><br>Demandante-Apelado<br><br>VÍCTOR RIVERA GONZÁLEZ, en su Capacidad de Adm. de la Adm. de Corrección; Departamento de Corrección y Rehabilitación; E.L.A. de Puerto Rico.<br><br>Demandados-Apelantes | KLAN201000552<br>KLCE201000852 | Apelación procedente del Tribunal de Primera Instancia., Sala de San Juan<br><br>Sobre: Cobro de Dinero<br><br>Caso Núm.<br>K CD2001-0516 |



Panel integrado por su presidente, el Juez Vizcarrondo Irizarry, la Jueza Colom García y la Juez Nieves Figueroa.

Nieves Figueroa, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de noviembre de 2012.

Comparece ante nos a través de la Oficina de la Procuradora General, el Departamento de Corrección y Rehabilitación y el Gobierno de Puerto Rico (el ELA o el apelante), mediante los recursos consolidados KLAN201000552 y KLCE201000852. En el caso identificado con el alfanumérico KLAN201000552, el ELA nos solicita que revoquemos la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (el TPI). En dicho dictamen, el TPI declaró Ha Lugar la demanda sobre cobro de dinero presentada por C&A, S.E. (C&A o la apelada) en contra del ELA y condenó a este al pago de $973,121.00 por el incremento en gastos generales (*extended overhead*), un interés por mora de un seis por ciento (6%) sobre dicha

KLAN20100552-KLCE201000852                                                    2

suma y el reembolso de los honorarios de abogado incurridos por C&A.
Por otra parte, en el recurso identificado con el alfanumérico
KLCE201000850, el ELA nos solicita que revisemos la Orden emitida
por el TPI mediante la cual el foro primario declaró Ha Lugar las costas
y los honorarios de abogado reclamados por C&A, por la suma de
$981.80 y $40,507.50 respectivamente.

Examinados cuidadosamente los escritos de las partes así como
el derecho aplicable, modificamos la Sentencia apelada y expedimos el
auto de *certiorari* para modificar la Orden recurrida.

**I.**

El 20 de junio de 2001 C&A presentó una demanda en cobro de
dinero contra Víctor Rivera González, entonces principal ejecutivo de la
Administración de Corrección, el Departamento de Corrección y
Rehabilitación y el Gobierno de Puerto Rico. En su demanda, alegó que
el 5 de marzo de 1999 suscribió un contrato con la Administración de
Corrección (Corrección) para el desarrollo de los llamados *Modular
Detention Units* (MDUs) en los complejos correccionales de Bayamón,
Guerrero (Aguadilla) y Ponce. Adujo que, según acordado en dicho
contrato de obra, Corrección le adeudaba cuatrocientos diecinueve mil
setecientos ochenta y ocho dólares ($419,788.00) por unas
certificaciones parciales que había sometido y que fueron aprobadas
para pago. Sin embargo, Corrección se había negado a pagar una deuda
vencida, líquida y exigible. Además, solicitó el pago de costas,
honorarios de abogado e intereses legales sobre dicha suma,
computados a partir de la fecha en que Corrección incurrió en mora.

KLAN20100552-KLCE201000852                                                3

Posteriormente, C&A enmendó la demanda para reclamar novecientos setenta y tres mil ciento veintiún dólares ($973,121.00) adicionales por los costos directos, indirectos y administrativos incurridos por haber permanecido en la obra más tiempo del pactado en el contrato por motivos imputables a Corrección, o lo que es lo mismo, reclamó dicha suma como partida por incremento de gastos generales o *extended overhead*. Igualmente, reclamó el pago de intereses sobre dicha suma y daños y perjuicios. Asimismo enmendó por segunda ocasión su demanda para corregir la cantidad adeudada por concepto de las certificaciones parciales, para que reflejara quinientos cinco mil ochocientos veintitrés dólares ($505,823.00).

Oportunamente, Corrección contestó la demanda incoada en su contra y esencialmente negó lo alegado por C&A.

El 29 de noviembre de 2004, y luego de realizado el descubrimiento de prueba, Corrección le pagó a C&A el total adeudado por las certificaciones sometidas por esta. Sin embargo, quedó pendiente de adjudicación la reclamación de C&A por el incremento de gastos generales o *extended overhead*. Así, y luego de varios trámites procesales que no creemos necesario pormenorizar, el 18 de diciembre de 2009 se llevó a cabo la vista en su fondo para dilucidar los aspectos todavía en controversia.

En la vista cada parte presentó el testimonio de sus respectivos peritos. Por parte de C&A testificó el Ing. Evelio L. Agustín (Ing. Agustín), quien fue el encargado de la preparación de estimados, supervisión y ejecución del contrato en controversia y socia de C&A,



KLAN20100552-KLCE201000852

4

mientras que por Corrección testificó el Ing. Pedro Méndez Morales (Ing.

Méndez). Además, las partes presentaron evidencia documental.[1]

De la prueba evaluada y creída por el TPI surge que Corrección contrató a Hedges Construction Company (Hedges) como Gerente de Construcción para que contratara a su nombre los contratistas y el personal necesario para la instalación y construcción de las celdas prefabricadas (MDUs). Así el 5 de marzo de 1999 a través de Hedges Corrección contrató los servicios de C&A como contratista para la construcción e instalación de MDUs con seis (6) unidades de vivienda (*housing pods*) de 112 camas cada uno, en los complejos correccionales de Bayamón, Ponce y Guerrero en Aguadilla. En los Artículos 2 y 9 del contrato entre C&A y Corrección, se incorporaron por referencia, entre otros, los siguientes documentos:

> Exhibit A - Contrato entre Hedges y la Administración, "Standard Form of Agreement Between Owner and Construction Manager where the Construction Manager is NOT a Constructor"
>
> Exhibit B - Supplemental Conditions to the "Standard Form of Agreement Between Owner and Contractor Where the Basis of Payment is a Stipulated Sum – Construction Manager – Advisor Edition"
>
> Exhibit C - "Purchase Order" de Hedges a Mark Solutions de 15 de enero de 1999, Purchase Order General Conditions y Specific Provisions
>
> Exhibit D - Specification Index
>
> Exhibit E - Schedule of Values
> Exhibit F - General Conditions of the Contract for Construction, Construction Manager – Adviser Edition AIA Document A201/CMa-1992

---

[1] Parte de la evidencia admitida consistió de la siguiente prueba documental estipulada por las partes: 1) Contrato entre C&A y *Hedges Construction Company*, en representación de la Administración de Corrección; 2) Contrato entre la Administración de Corrección y C&A; y 3) *Curriculum Vitae* del Ing. Evelio Agustín. También se admitieron en evidencia los informes de los peritos. Nótese que el informe pericial del Ing. Agustín consistió de la reclamación "*Modular Detention Units (MDU's) Claim*" que este le dirigiera el 27 de junio de 2001 al Ing. Blás Contreras.

KLAN20100552-KLCE201000852                                                    5

Además, en el contrato entre C&A y Hedges se especificó que se debía considerar que la ejecución de la obra debía comenzar el 3 de marzo de 1999 y que la fecha de terminación sustancial (*substantial completion*) del trabajo debía ser a más tardar del 12 de septiembre de 1999. Se dispuso que el tiempo de construcción era de doscientos cuarenta (240) días calendario, desde la emisión de la orden para ejecutar el contrato (*Notice to Proceed*).[2] El precio acordado para los trabajos contratados fue $5,544,902.00, excluidos los gastos relacionados a la ubicación. Según surge del *Schedule of Values*, el referido contrato no incluía los trabajos relacionados a la ubicación (*site*), porque al momento de la contratación de C&A, Corrección no había determinado aún el sitio específico donde se instalarían los MDUs en Ponce, Bayamón y Guerrero.[3]

El Ing. Agustín testificó en juicio que el contrato con Hedges era para un solo proyecto con tres localizaciones (*sites*) distintas y que tenía una secuencia de construcción. Tomando en cuenta que normalmente se completa una obra dentro de un término de 30-60 días a partir de la terminación sustancial (*substantial completion*), este estimó que el proyecto estaría terminado para noviembre de 1999.

Sin embargo, debido a problemas surgidos con la construcción y envío de los MDUs y relacionados con la ubicación, la fecha de terminación sustancial en Ponce fue el 7 de junio de 2000 y en Bayamón el 29 de enero de 2001. La construcción en Guerrero, Aguadilla, se canceló en agosto de 2000. Conviene mencionar que los




---

[2] Véase "Insert J" en Apéndice del recurso KLAN201000552, pág. 360.
[3] Véase Apéndice del recurso KLAN201000552, pág. 401.

KLAN20100552-KLCE201000852                                                    6

atrasos se le atribuyen o estuvieron bajo el control de Corrección: los
MUDs no fueron fabricados en la secuencia requerida; problemas de
acceso al solar o lugar donde ubicarían las instalaciones; problemas
con el terreno que ocasionaron que hubiera que realizar estudios de
suelo; en la localización de Bayamón hubo que diseñar y construir
pilotes; y, tardanza en la toma de decisiones, entre otros.

Como a finales de 1999 faltaba mucho por completar de las
obras, y al término del contrato con Hedges, Corrección contrató
directamente con C&A, mediante Contrato #2000-000105, con fecha de
efectividad de 22 de enero de 2000 al 22 de diciembre del mismo año. El
contrato entre Hedges y C&A se hizo formar parte del nuevo contrato.[4]
Durante el transcurso del proyecto, se firmaron cinco órdenes de
cambio, cuatro de las cuales se ejecutaron con posterioridad a la fecha
de cumplimiento sustancial de Ponce.[5]

---

[4] Se estableció como remuneración $5,544,902.00 más $16,500.00 por la Orden de
Cambio #1, para un total de $5,561,402.00. A esa cantidad se le descontó
$642,764.99 que ya habían pagado Hedges y Corrección, para un balance a pagar en
el nuevo contrato de $4,918,637.01.
[5] Estas se describen a continuación:

| CHANGE ORDER NO. | FECHA ORDEN | RAZÓN | NATURALEZA CAMBIO [SUMA DE DINERO O EXTENSIÓN DE TIEMPO] |
|---|---|---|---|
| 1 | 8 feb. 00 | Incluir trabajos de site, redireccionar los "utilities" en Ponce | Monto de $366,207.00<br>Tiempo aumentado en Contrato: 12 semanas de aumento |
| 2 | 10 ago. 00 | Eliminar trabajos de Guerrero Aguadilla, con excepción de costos ya incurridos por contratista de estacionamiento temporero , "builders risk" y costos incurridos del desglose original | Monto deductivo de $1,423,221.69<br>Tiempo aumentado en contrato: 0 días calendarios |
| 3 | 10 ago. 00 | Incluir costos de tax municipal, "builders risk" y "water heater room" en Ponce | Monto de $72,774.50<br>Tiempo aumentado en contrato: 0 días calendario de aumento |
| 4 | 14 ago. 00 | Incluir trabajos de "pile foundations", trabajos de "site", "water heater" y póliza de "builders risk" en Bayamón | Monto de $497,486.32<br>Tiempo aumentado en contrato: 0 días calendario de aumento |

KLAN20100552-KLCE201000852         7



El 27 de junio de 2001 el Ing. Agustín le cursó una carta al Ing. Blás Contreras, representante del Program Manager Rosser, donde reclamó los gastos adicionales (*extended overhead*) ocasionados por los retrasos en el proyecto. Esta carta, "Modular Detention Units Claim", constituye el informe pericial del Ing. Agustín como perito de C&A, sobre la reclamación por el incremento en gastos debidos a los retrasos antes mencionados que eran atribuibles a Corrección.

El Ing. Agustín testificó que para preparar dicha reclamación revisó el contrato, el itinerario de la obra, la correspondencia y los documentos del proyecto, y otros documentos relacionados con la contabilidad de C&A y que con la información recopilada computó el *home office overhead* o los gastos de oficina principal atribuidos a los diferentes proyectos. Para calcular el *job site extended overhead*, el perito utilizó como término desde el comienzo del contrato hasta diciembre de 2000. El desglose de gastos en el *Schedule of Values*, Exhibit E del contrato entre C&A y Hedges, mostraba $684,872.00 como "*General Conditions*", cantidad que al dividirse entre el número de días según el contrato (240), resultó en $2,853.63 de gastos diarios. Sin embargo, este estimado de gastos diarios, que incluye lo civil, eléctrico, vehículos y salarios de los empleados (gerenciales y obreros), se redujo a $1,571.00, tomando en consideración que la gerencia del proyecto es solo una y que C&A no estaba reclamando gastos adicionales por los trabajos en Guerrero. El perito de C&A estimó en cuatrocientos setenta

| 5 | 18 oct. 00 | a. Trabajo "manholes" aprobado en cambio del "site" fue eliminado en Ponce<br>b. Incluye aportación de dueño a AEE para mejoras sistema eléctrico en Ponce | Monto deductivo de $1,000.00: deductivo de ($11,000.00) y aditivo de $10,000.00<br><br>Tiempo aumentado en contrato: 0 días semanas |

KLAN20100552-KLCE201000852 8

y cinco (475) los días compensables en exceso del contrato. A base de dicha cantidad de días adicionales, estimó el *job site extended overhead* en $746,225.00 y el *home office overhead* en $156,896.00, para un total de $903,121.00.

Cabe señalar que, según el testimonio de ambos peritos, el término "condiciones generales" se utiliza para los gastos que apoyan la construcción de los componentes fijos de la obra, tales como instalaciones temporeras, vagones de oficina, "utilidades" temporeras, seguros e impuestos, entre otros. Normalmente y según su complejidad, las condiciones generales fluctúan entre 8-12% del valor de la obra. En el caso ante nos, el *Schedule of Values*, Exhibit E, mostraba $684,872.00 para la División 1, *General Conditions*.[6]

Con relación al reclamo de intereses por mora, el Exhibit F – *"General Conditions"* del contrato con Hedges disponía:



> 13.6.1 Payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.[7]

Por su parte, en su Artículo 13.5.2 el contrato establecía:

> ...Amounts unpaid <u>Sixty</u> (<u>60</u>) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Construction Manager. <u>The interest rate permitted by applicable Puerto Rico laws and regulations</u>.[8] (Énfasis en original)

De conformidad con las disposiciones antes mencionadas, el Ing. Agustín utilizó el interés legal de 6% para calcular en sala la cantidad

---

[6] Véase Apéndice del recurso KLAN201000552, pág.401.
[7] Véase Apéndice, pág. 435.
[8] Véase Apéndice, pág. 375.

KLAN20100552-KLCE201000852                                                9

que correspondía a los intereses por mora por el *extended overhead* reclamado, el cual redondeó a $900,000.00[9] (descontándole $70,000.00[10] de intereses reclamados por pago tardío de certificaciones). Determinó que los referidos intereses ascendían a $459,000.00,[11] para una reclamación total de $1,359,000.00.[12]

El Ing. Agustín testificó que no era correcta la posición del Ing. Méndez, perito de Corrección, en cuanto a que el costo diario debía dividirse en tres, porque eran tres *sites* y, por lo tanto, tres proyectos. Sobre el particular, explicó lo siguiente:





> (a) Se trata de un sólo contrato y un sólo proyecto, cuyo concepto era la instalación de los módulos de detención en tres "sites" o lugares distintos en la secuencia previamente mencionada.

> (b) Cuando en su inicio él preparó el estimado de costos del proyecto para Hedges lo hizo partiendo de que se necesitaba una sola gerencia, por lo que no es divisible entre tres (3). Lo contrario hubiese afectado parte de las condiciones generales del contrato, División 1 del "Schedule of Values".

> (c) El contrato disponía claramente que era por una suma global de $5,544,902.00 y no por sumas particulares para cada "site", como lo estimó el ingeniero Méndez. De hecho, se utilizó como contrato el formulario "Standard Form of Agreement Between Owner and Contractor **where the basis of payment is a Stipulated Sum** – Construction Manager-Adviser Edition". (Ennegrecido nuestro).

Por parte de Corrección, el Ing. Méndez testificó que preparó el informe pericial con la ayuda del Ing. William Rosado, quien recopiló la información y recreó lo que pasó durante el desarrollo del proyecto.

---

[9] El "*job site extended overhead*" calculado ascendía a de $903,121.00.
[10] El Ing. Agustín también incluyó en la reclamación original una partida correspondiente a los intereses adeudados por Corrección por el pago tardío de las certificaciones sometidas y aprobadas. Sin embargo, admitió que C&A desistió de dicha reclamación al lograr un acuerdo con la Administración de Corrección para el pago del principal de las certificaciones.
[11] $900,000.00 X 6% X 8.5 años = $459,000.00
[12] $900,000.00 + $459,000.00 = $1,359,000.00

KLAN20100552-KLCE201000852

10

Reconoció que los retrasos en Ponce se debieron a problemas de ubicación y entrega de los módulos; en Bayamón, a situaciones con el subsuelo, ubicación y entrega de las unidades atrasadas; y en Aguadilla, a decisiones atrasadas.

Según el perito de Corrección, las órdenes de cambio resolvieron parte de las situaciones que hubo en Ponce, pero le reconoció a C&A derecho a recibir compensación por ciento setenta y dos (172) días adicionales. En cuanto a Bayamón, el Ing. Méndez estimó que las órdenes de cambio fueron para atender situaciones que afectaban el costo de la obra, pero como no se le concedió tiempo adicional a C&A por los trabajos adicionales le reconoció derecho a cuatrocientos noventa y dos (492) días compensables. Con relación a las instalaciones en Guerrero, el Ing. Méndez manifestó que los gastos correspondientes a ese proyecto se atendieron mediante orden de cambio, por lo que no procedía una reclamación de *extended overhead*. De esa forma, el total de días compensables según el Ing. Méndez ascendieron a seiscientos sesenta y cuatro (664).

En su informe, el Ing. Méndez utilizó como base los costos presentados por el Ing. Agustín para *job site overhead* y para *home office overhead*, y asignó una tercera parte de los mismos a cada proyecto.[13] Luego, calculó separadamente la cantidad de estos gastos que correspondía a Ponce y a Bayamón, de acuerdo a los días de atraso de cada *site*. De esta forma, estimó que la cuantía adeudada a C&A por *extended overhead* era $423,110.27. Esta cantidad se componía de

---

[13] Véase Apéndice del recurso KLAN201000552, pág. 99.



KLAN20100552-KLCE201000852                                          11

$347,714.67 de *job site overhead* y $75,395.60 de *home office overhead*.[14]

De acuerdo al perito de Corrección, la falla del informe preparado por el Ing. Agustín consistía en asumir que era un solo proyecto. Sin embargo, el Ing. Méndez admitió que no revisó el contrato original entre Hedges y C&A ni los contratos que se anejaron a éste, tales como el de la Administración de Corrección y Hedges, la orden de compra y especificaciones de Hedges a Mark Solutions, los cuales establecían las obligaciones asumidas por cada una de las partes y la secuencia de entrega de los MDUs.

Sin embargo, durante el testimonio del Ing. Méndez, se le solicitó que calculara el costo diario del proyecto, al dividir el valor estimado de las condiciones generales del proyecto ($684,872.00) entre el número de días del contrato (240) y que, siguiendo su razonamiento, dividiera esa cuantía entre los tres *sites*. Dicho cálculo resultó que cada localización tendría un costo diario aproximado de $951.21. Dicha cantidad de gastos diarios multiplicada por los ciento setenta y dos (172) días que el Ing. Méndez reconoció como compensables, resultó en un total de $16,608.12 de *extended job site overhead* correspondiente al *site* de Ponce. Igualmente, al multiplicar la suma de $951.21 de gastos diarios por los cuatrocientos noventa y dos (492) días compensables reconocidos por el Ing. Méndez para el *site* de Bayamón, resultó en un *job site overhead* de $467,995.32. A base de lo anterior y al presumir correcta la fórmula utilizada por el ingeniero Méndez, la suma total adeudada a C&A por *job site overhead* en Ponce y Bayamón sería



---

[14] Véase Apéndice del recurso KLAN201000552, pág. 102.

KLAN20100552-KLCE201000852                                                    12

$631,603.44 y no los $347,714.67 calculados por este en su Análisis de Reclamación.[15]

El cálculo de *home office overhead* del Ing. Méndez se realizó al dividir entre tres (3) proyectos la cuantía calculada por el ingeniero Agustín según la fórmula Eichleay: $206.99 por día para el año 1999 y $367.47 por día para el año 2000.[16] De esa forma, el perito de Corrección determinó que el *home office overhead* para el 1999 era $69.00 por día y $122.49 por día para el año 2000. Basándose en esos gastos diarios, determinó que el *home office overhead* era de $55,022.73 y no la suma de $156,896.00 calculada por el Ing. Agustín.

Evaluada y aquilatada la prueba presentada, el foro primario emitió la Sentencia apelada y resolvió que los retrasos en la obra contratada eran atribuibles a Corrección. Por lo tanto C&A tenía derecho a que este le compensara por los costos por la extensión del contrato, según estos fueron calculados por su perito, así como los intereses por mora y honorarios de abogados incurridos por C&A.

No conforme, el ELA presentó ante nos el recurso de apelación identificado con el alfanumérico KLAN201000552 e hizo el siguiente señalamiento de error:

> INCIDIÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA SUPERIOR DE SAN JUAN, AL DISPONER QUE LA CUANTÍA EN CONCEPTO DE *EXTENDED OVERHEAD* ADEUDADA POR LA ADMINISTRACIÓN DE CORRECCIÓN A C & A, SE CORRESPONDE CON LA SUMA RECLAMADA EN LA DEMANDA Y NO CON EL VALOR AJUSTADO DE $423,110.27 MENOS LA PARTIDA DE *HOME OFFICE OVERHEAD*, CONFORME SURGE DEL ANÁLISIS EFECTUADO POR EL PERITO DE DICHA AGENCIA, ING. PEDRO MÉNDEZ MORALES.





---

[15] Véase Apéndice del recurso KLAN201000552, págs. 86-103.
[16] Véase Apéndice del recurso KLAN201000552, págs. 463-464.

KLAN20100552-KLCE201000852                                             13

Estando pendiente este recurso, el foro sentenciador emitió una Orden el 11 de mayo de 2010, notificada el 13 de mayo siguiente, en la que declaró Ha Lugar a la Réplica a Moción en Oposición a Memorando de Costas y al Memorando Sobre Honorarios de Abogado presentados por C&A. Las cantidades concedidas por costas y honorarios de abogado ascendieron a $981.80 y $40,507.50, respectivamente.

Insatisfecho con lo anterior, el ELA presentó ante este Foro el recurso de *certiorari* KLCE201000852, donde nos solicita que revoquemos la referida Orden con el siguiente señalamiento de error:



> INCIDIÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, AL DECLARAR CON LUGAR LAS COSTAS Y LOS HONORARIOS DE ABOGADO SOLICITADOS POR LA PARTE DEMANDANTE-RECURRIDA C&A.

El 15 de diciembre de 2010 el ELA presentó un alegato suplementario para apoyar los fundamentos presentados en su recurso de apelación. Por su parte el 18 de febrero de 2011 C&A fijó su posición a través de un alegato donde discute de forma conjunta los errores señalados en ambos recursos.



Así, y con el beneficio de la comparecencia escrita de ambas partes, procedemos a resolver.



## II

### A

Las obligaciones nacen de la ley, de los contratos y cuasicontratos y de los actos y omisiones ilícitos en que intervenga cualquier género de culpa o negligencia. Art. 1042 del Código Civil, 31 L.P.R.A. sec. 2992. Al pactar un contrato, las partes quedan obligadas al cumplimiento de sus términos como si se tratara de una ley. Respecto a ello, el Art. 1044 del Código Civil, 31 L.P.R.A. sec. 2994 señala: "[l]as obligaciones

KLAN20100552-KLCE201000852                                          14

que nacen de los contratos, tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos." López v. González, 163 D.P.R. 275 (2004); Mercado Quilichini v. U.C.P.R., 143 D.P.R. 610 (1997).

Nuestro ordenamiento contractual está enmarcado en el principio de autonomía contractual entre las partes contratantes. Conforme a ello, estas pueden establecer los pactos, cláusulas y condiciones que tengan por convenientes, siempre que no sean contrarias a las leyes, la moral y el orden público. Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372; López v. González, supra; S.L.G. Irizarry v. S.L.G. García, 155 D.P.R. 713 (2001).




Existe un contrato desde que una o varias personas consienten en obligarse a dar alguna cosa o prestar algún servicio. Art. 1206 del Código Civil, 31 L.P.R.A. sec. 3371; Unisys Puerto Rico, Inc. v. Ramallo Brothers, 128 D.P.R. 842, 852 (1991). Desde entonces las partes se obligan no sólo al cumplimiento de lo expresamente pactado, sino también a todas las circunstancias que sean conforme a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, 31 L.P.R.A. sec. 3375; López v. González, supra; Jarra v. Axxis Corporation, 155 D.P.R. 764 (2001); Colondres v. Bayrón, 114 D.P.R. 833 (1983). Ha expresado el Tribunal Supremo de Puerto Rico que "[e]l principio contractual de *pacta sunt servanda* establece la obligatoriedad del contrato según sus términos y las consecuencias necesarias derivadas de la buena fe." BPPR v. Sucn. Talavera, 174 D.P.R. 686, 693 (2008).

De otro lado, los contratos gubernamentales que requieren la erogación de fondos públicos están revestidos de un alto interés

KLAN20100552-KLCE201000852

15

público. Por estar envueltos bienes o fondos públicos, el proceso de contratación gubernamental se rige por ciertas normas que tienen el fin de proteger el interés público envuelto y de garantizar que el uso de los fondos públicos sea adecuado. Véase De Jesús González v. A.C., 148 D.P.R. 255 (1999). En dicho caso, el Tribunal Supremo expresó:

> Como norma general, para los efectos de la aplicación de las disposiciones y doctrinas referentes a los contratos, el Estado Libre Asociado de Puerto Rico se considera como un contratante privado. Cuando el Estado contrata, la interpretación del contrato debe hacerse como si se tratara de una contratación entre dos personas particulares. Zequeira v. CRUV, 83 D.P.R. 878, 880-881 (1961); Rodríguez v. Municipio, 75 D.P.R. 479, 494 (1953). Ello significa que una vez el Estado suscribe un contrato con una persona privada, ambos están obligados por las normas generales relativas a los contratos, y sus correspondientes interpretaciones a la luz de nuestros pronunciamientos aplicables.




Por otra parte, el Artículo 1485 del Código Civil, 31 L.P.R.A. sec. 4126, dispone:

> El arquitecto o contratista que se encarga por un ajuste alzado de la construcción de un edificio u otra obra en vista de un plano convenido con el propietario del suelo no puede pedir aumento de precio aunque se haya aumentado el de los jornales o materiales, pero podrá hacerlo cuando se haya hecho algún cambio en el plano que produzca aumento de obra, siempre que hubiese dado su autorización el propietario.

El aumento de precio al que se refiere el citado artículo es el que resulta de una orden de cambio o de una exigencia, que produce, a su vez, un aumento en los jornales o materiales. Zequeira v. CRUV, 83 D.P.R. 878, 884 (1961). Respecto al referido artículo del Código Civil, Vélez Torres nos indica:

> A base del principio de obligatoriedad que rige nuestro Derecho encarnado en la frase *pacta sunt servanda*, tan pronto como el contratista y el dueño convienen en la ejecución de una obra por un precio, páguese éste al final de la ejecución o por partes, según que la obra vaya progresando, ya el contratista no puede cambiar unilateralmente la cantidad convenida como precio.

KLAN20100552-KLCE201000852                                          16

> Esto así, aun cuando aumenten los salarios de los
> empleados o el precio de los materiales. La única
> situación que justificaría al contratista modificar el
> precio sería el caso de que luego de otorgado el contrato
> conforme a un plano el dueño pidiera modificaciones al
> plano y estas modificaciones tuvieran el efecto de
> aumentar los trabajos a realizarse.
>
> José Ramón Vélez Torres, Curso de Derecho Civil, Tomo
> IV, Vol. II, Primera Edición, 1990, Universidad
> Interamericana de Puerto Rico, pág. 369.

**B**

Por otro lado, en Levy v. Aut. Edif. Públicos, 135 D.P.R. 382
(1994), el Tribunal Supremo de Puerto Rico se expresó en torno al efecto
de las órdenes de cambio aprobadas por el dueño de una obra de
construcción, sea pública o privada, en la relación contractual entre
este y el contratista, y analizó los intereses de ambas partes en ese
contexto. En ese caso, el Departamento de Transportación y Obras
Públicas adjudicó las subastas para la construcción de los hospitales
regionales de Humacao y Arecibo a Francisco Levy Hijo, Inc. ("Levy").
En el contrato correspondiente a cada obra se pactó un precio alzado y
el plazo dentro del cual se realizaría la obra.[17] Los contratos
incorporaron unas cláusulas que autorizaban, previa notificación a
Levy, modificaciones conocidas como órdenes de cambio (change
orders), ya sea para reducir o aumentar la construcción, lo que conlleva
la reducción o incremento en el precio y ajustes porcentuales en las
partidas de gastos fijos y ganancias lo que se conoce en la industria
como overhead and profit. Levy v. Aut. Edif. Públicos, supra, a la pág.
384. La Autoridad emitió veintidós órdenes de cambio, que enmendaron
los términos contractuales relativos al tiempo, las obras y el costo. El

---

[17] El contrato fue cedido posteriormente a la Autoridad de Edificios Públicos.

KLAN20100552-KLCE201000852                                    17

tiempo se extendió en seiscientos treinta (630) días, es decir un 87.5%,

y aumentaron el costo en trescientos cuarenta y nueve mil catorce

dólares con veinte centavos, equivalente a un 4.22%. Levy solicitó a la

Autoridad que le compensara por el perjuicio monetario debido al

aumento en los gastos fijos generales empresariales (*overhead*) tanto en

su oficina principal como en el proyecto. La Autoridad rechazó la

referida solicitud, razón por la cual Levy presentó demanda a esos

efectos ante el foro judicial. El foro de instancia determinó que aunque

hubo demoras atribuibles a la Autoridad, estas se encontraban dentro

del margen de previsibilidad que según la prueba desfilada era

razonable esperar para esa obra, por lo que debió haberse contemplado

en el contrato de antemano, y que por tal razón, no procedía la

reclamación en los tribunales de esa partida. En particular, el Tribunal

Supremo determinó, al confirmar al TPI, lo siguiente:

> Ciertamente, retrasos en el tiempo pactado
> originalmente en este tipo de obras son comunes en la
> industria de la construcción. "Las partes deben
> anticipar (no esperar) retrasos y contemplarlos en el
> contrato." [ ] B.B. Bramble y M.T. Callahan,
> *Construction Delay Claims,* Nueva York, Ed. John Wiley
> & Sons, 1987, Sec. 2.1, pág. 14. [...].

> [E]s ineludible dictaminar que el contratista, por su
> conocimiento especializado, debió prever los retrasos.
> Como cuestión contractual, no podía ignorar que la
> Cláusula 9.1.4. y las órdenes de cambio podían alterar el
> tiempo. [...].

> Así aclarado, es imperativo concluir que ello no sólo
> afectó el término original de ejecución, sino la cláusula
> expositiva de que el tiempo es esencial. Su inclusión
> revela el interés de cumplir con el término pactado, pero
> que fuera compatible con una extensión en el tiempo de
> activarse la cláusula sobre órdenes de cambio. "Es poco
> probable que la sola presencia o ausencia de una
> cláusula que diga 'el tiempo es de la esencia del contrato'
> sea el factor decisivo, pues los tribunales tienden a mirar
> otras circunstancias y el lenguaje del contrato al buscar
> determinar el efecto a dar una fecha de terminación
> (completion date)." (Traducción nuestra.) S.G.M. Stein,

KLAN20100552-KLCE201000852                                          18

*Construction Law, Nueva york,* Ed. Matthew Bettnder,
1991, Vol. 2, Sec. 6.07.

No erró, pues, el tribunal sentenciador al resolver que el
tiempo pactado originalmente para la construcción de
una obra se puede extender para cubrir situaciones
imprevistas en la etapa de proyección y planos. Esa
práctica quedó implícitamente reconocida cuando se
estipularon las cláusulas de órdenes de cambio, según
aceptado por el perito de Levy. Ello derrota su segundo
planteamiento, a saber, haber el tribunal de instancia
concluido que al momento de la licitación "un contratista
prudente debe prever los atrasos que pueda sufrir la
obra a construirse como resultado de posibles cambios
aditivos o suspensiones parciales por rediseño."
Solicitud de revisión o *certiorari,* pág. 8.  [Énfasis
suplido].

<u>Levy v. Aut. Edif. Públicos,</u> *supra,* págs. 389-390.

Más adelante, el Tribunal Supremo discutió el asunto referente al

pago de *extended overhead* como consecuencia de la aprobación de

órdenes de cambio. A esos efectos, expresó:

En su tercer señalamiento, Levy ataca los por cientos de
previsibilidad de extensión de tiempo en casos de obras
aditivas y paralizaciones. Es justo consignar que en
cuanto a la tardanza, de la cual se queja Levy, surge de
la emisión de órdenes de cambio en una cantidad que
considera irrazonable. Y ciertamente, "[e]l contratista es
acreedor a daños por retrasos cuando el dueño emite
órdenes de cambio excesivos o irrazonables más allá de
aquellas contempladas por las partes en el contrato."
(Traducción nuestra.)  *Construction and Design Law,*
Virginia, National Institute of Construction Law, 1991,
Vol. II, Cap. 8, Sec. 8.4, pág. 30.

En el caso de autos, los contratantes no estipularon
cantidad ni condiciones que deban revestir las órdenes
de cambio a los efectos de determinar su razonabilidad.
El tribunal de instancia expresó que "[s]i bien el dueño
se reservó el derecho a expedir órdenes de cambio, ese
derecho no puede interrumpir más allá de lo previsible y
razonable la secuencia ordenada de los trabajos del
contratista.  Si así lo hace, incurre en un
incumplimiento de contrato que la mera compensación
en tiempo no repara totalmente". [...]  La laguna
contractual lo obligó a fijar la fórmula de compensación.
Se fundamentó en el principio de buena fe en el
cumplimiento de las obligaciones consagrado en el Art.
1210 del Código Civil[...].
[...]

KLAN20100552-KLCE201000852

19

> Evidentemente, en el caso de autos, la negligencia del deudor no se configura automáticamente al finalizar el tiempo pactado originalmente. La naturaleza de la obligación requiere laxitud en el tiempo dentro de unos parámetros. Ya hemos visto que el propio perito de Levy admitió que unas extensiones de tiempo de 2%, 3% y hasta un 5%, en un contrato de construcción, eran previsibles y debían ser tomadas en cuenta por un contratista prudente al licitar. [Notas al calce omitidas].

> *Id.*, supra, págs. 392-394.

En torno al por ciento de previsibilidad fijado por el tribunal de instancia, el Alto Foro expresó:

> La preocupación de Levy, en cuanto a que los por cientos determinados podrían tener consecuencias nefastas para la industria, pasa por alto las diferencias en los hechos. Ni el tribunal de instancia como tampoco nosotros pretendemos establecer una regla general; repetimos, cada uno presenta sus peculiaridades y se resolverá individualmente. Más importante aún, la cuestión puede dejar de ser materia de adjudicación judicial, pues nada impide que sea objeto de estipulación en los contratos.

> *Id.*, a la pág. 398.

Aunque los tribunales utilizan varios métodos para calcular el *extended overhead,* el que más se utiliza es el "Eichleay Formula".[18] Este método plantea que para que exista un caso *prima facie* de *extended overhead* el que reclama deberá probar que existe una demora compensable; que dicha demora creó una incertidumbre; que el reclamante tuvo que estar disponible durante el período de dicha demora; que el reclamante sufrió daños por no poder realizar otros contratos u obras durante dicho período. <u>Interstate General Government Contractors v. West</u>, 12 F.3d 1053, 1056 (Fed. Cir. 1993).[19]

---

[18] Esta fórmula se originó en 1960 en un caso ante el *Armed Services Board of Contract Appeals.* El caso fue <u>Eichleay Corporation</u>, ASBCA 5183, 60-2 BCA 2688, donde se reclamaban costos de "unabsorbed home office overhead" y se utilizó dicha fórmula para calcularlos.

[19] "To establish a prima facie case for recovery under the Eichleay Formula, a plaintiff must demonstrate (1) that there has been some compensable delay, resulting in such uncertainty, that (2) plaintiff had to stand by during the delay, (3) incurring damages when it was unable to take on additional work". *Id.*

KLAN20100552-KLCE201000852                                              20

La fórmula Eichleay   incluye en el total de días de ejecución del

contrato los días de la suspensión de la obra.[20]

## C

Toda parte que obtenga a su favor una sentencia en la cual se

ordene el pago de dinero tiene derecho al interés post-sentencia, aun

cuando el juez no lo hubiese expresado en la sentencia. Montañez v.

U.P.R., supra, a la pág. 426; Municipio de Mayagüez v. Rivera, 113

D.P.R. 467, 469 (1982). El derecho de un litigante victorioso a recobrar

intereses post-sentencia es uno estatutario. Montañez v. U.P.R., supra,

a la pág. 426; Insurance Co. of P.R. v. Tribunal Superior, 100 D.P.R.

405, 409 (1972). La imposición del interés post-sentencia es mandatoria

en todos los casos sin distinción de parte litigante alguna. El interés

post-sentencia se computa sobre la cuantía de la sentencia incluyendo

costas y honorarios de abogado y se fija desde la fecha en que se dicta

la sentencia hasta que se satisface la misma. Malavé v. Oriental supra;

Gutiérrez v. A.A.A., supra; Andrades v. Pizza Hut Mgt. Corp., supra.

El Código Civil de Puerto Rico en su artículo 1061, 31 L.P.R.A.

sec. 3025, permite la imposición de intereses por mora al establecer:

> Si la obligación consistiere en el pago de una cantidad de
> dinero y el deudor incurriere en mora, la indemnización
> de daños y perjuicios, no habiendo pacto en contrario,
> consistirá en el pago de los intereses convenidos, y a
> falta de convenio, en el interés legal.
>
> Mientras que no se fije otro por el Gobierno se
> considerará como legal el interés del seis por ciento (6%)
> al año.

---

[20] Eichleay Corporation, supra. Véase, además, Construction Delays donde se señala
que: "...the allocable overhead is divided by the number of days of contract
performance, including delay". T.J. Trauner, Construction Delays, Massachussets,
Means Company, Inc., 1990, pág. 145.

KLAN20100552-KLCE201000852                                         21

Incurren en mora los obligados a entregar o hacer alguna cosa desde que el acreedor les exija judicial o extrajudicialmente el cumplimiento de su obligación. Art. 1053, 31 L.P.R.A. sec. 3017; Rodríguez Sanabria v. Soler Vargas, 135 D.P.R. 779, 783 (1994). La concesión de los intereses por mora es de naturaleza distinta a los intereses legales dispuestos en la Regla 44.3(a), 32 L.P.R.A. Ap. III R. 44.3, ya que son concedidos conforme lo dispuesto en el Código Civil en el caso del incumplimiento por una parte con su obligación contractual.

**D**

El Tribunal Supremo se ha expresado reiteradamente en cuanto a los límites de nuestra función adjudicativa cuando lo que se cuestiona es la apreciación de la prueba realizada por un Tribunal de Primera Instancia. Está firmemente establecido que un tribunal apelativo, de ordinario, no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que ha hecho el juzgador de los hechos, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto. Serrano Muñiz v. Auxilio Mutuo, 171 D.P.R. 717 (2007); In re Ruiz Rivera, 168 D.P.R. 246 (2006); Álvarez v. Rivera, 165 D.P.R. 1 (2005).

Solamente ante la presencia de estos elementos o cuando la apreciación de la prueba resulte inherentemente imposible o increíble, procederá nuestra intervención con la apreciación hecha por el foro apelado. Pueblo v. Acevedo Estrada, 150 D.P.R. 84 (2000). Es doctrina reiterada que los tribunales apelativos deben prestar la debida deferencia a la apreciación de los hechos y la prueba efectuada por el juzgador, por ser el foro más idóneo para llevar a cabo esa función.

KLAN20100552-KLCE201000852                                            22

McConnell v. Palau, 161 D.P.R. 734 (2004). Nuestro más Alto Foro ha
expresado que la adjudicación de credibilidad de un testimonio vertido
ante el tribunal de instancia "es merecedora de gran deferencia por
parte del tribunal apelativo por cuanto es ese juzgador quien está en
mejor posición para aquilatar la prueba testifical desfilada ya que él fue
quien oyó y vio declarar a los testigos". Pueblo v. Bonilla Romero, 120
D.P.R. 92, 111 (1987). Ha expresado el Tribunal Supremo que los
tribunales  apelativos  no  están  facultados  para  sustituir  las
apreciaciones de prueba y credibilidad de los testigos que realicen los
tribunales de primera instancia por los propios. Rolón García y otros v.
Charlie Car Rental, Inc., 148 D.P.R. 420, 433 (1999). Sin embargo,
cuando del examen de la prueba se desprende que el juzgador descartó
injustificadamente elementos probatorios importantes o fundó su
criterio en testimonios improbables o imposibles, se ha justificado la
intervención del tribunal apelativo con la apreciación de la prueba
realizada por el tribunal sentenciador. C. Brewer P.R., Inc. v. Rodríguez,
100 D.P.R. 826, 830 (1972). "El arbitrio del juzgador de hechos es
respetable, mas no absoluto." Rivera Pérez v. Cruz Corchado, 119
D.P.R. 8 (1987). Por eso una apreciación errónea de la prueba no tiene
credenciales de inmunidad frente a la función revisora de un tribunal
apelativo. Id.

       No obstante, un tribunal apelativo no puede dejar sin efecto una
sentencia cuyas conclusiones encuentran apoyo en la prueba desfilada.
Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 181 (1985).

       Por otro lado, en la apreciación de la prueba pericial, el tribunal
revisor está en la misma posición que el tribunal de primera instancia.

KLAN20100552-KLCE201000852                                                    23

Ortiz Rodríguez v. A.F.F., 94 D.P.R. 546 (1967). Es al Tribunal de

Primera Instancia a quien le corresponde decidir qué valor probatorio

tiene el testimonio del perito ante sí. Hasta el punto de que: "[...]

ningún tribunal está obligado a seguir indefectiblemente la opinión,

juicio, conclusión o determinación de un perito o facultativo, sobre todo

cuando está en conflicto con testimonios de otros peritos y que todo

tribunal está en plena libertad de adoptar su criterio propio en la

apreciación o evaluación de la prueba pericial y hasta descartar la

misma aunque resulte ser técnicamente correcta." Véase, Zambrana v.

Hospital Santo Asilo de Damas, 109 D.P.R. 517, 522 (1980), citando a

Prieto v. Maryland Casualty Co., 98 D.P.R. 594, 623 (1970). Nuestro

Tribunal Supremo ha expresado que ello se debe a que el valor

probatorio del testimonio pericial depende de varios factores, entre los

que se destacan los siguientes: 1) las cualificaciones del perito; 2) la

solidez de los fundamentos de su testimonio; 3) la confiabilidad de la

ciencia o técnica subyacente y; 4) la parcialidad del perito. Dye-Tex

P.R., Inc. v. Royal Ins. Co., P.R., 150 D.P.R. 658, 664 (2000).

**E**

La Regla 44.1(a) de Procedimiento Civil de 1979, vigente al

momento del juicio, 32 L.P.R.A. Ap. III, R. 44.1(a) (2001), establece lo

siguiente:

> Las costas le serán concedidas a la parte a cuyo favor se
> resuelva el pleito o se dicte sentencia en apelación,
> excepto en aquellos casos en que se dispusiera lo
> contrario por ley o por estas reglas. Las costas que podrá
> conceder el tribunal son los gastos incurridos
> necesariamente en la tramitación de un pleito o
> procedimiento que la ley ordena o que el tribunal, en su
> discreción, estima que un litigante debe rembolsar a
> otro.

KLAN20100552-KLCE201000852

24

La regla antes citada tiene una función reparadora. Aponte v. Sears Roebuck de P.R., Inc. 144 D.P.R. 830, 848 (1998); J.T.P. Dev. Corp. v. Majestic Realty Corp., 130 D.P.R. 456, 460 (1992). Tiene como propósito resarcir a la parte victoriosa en los gastos necesarios y razonables en que se vio obligada a incurrir por motivo del pleito. Auto Serv. Inc. v. E.L.A., 142 D.P.R. 321, 326 (1997); Ferrer Delgado v. Tribunal Superior, 101 D.P.R. 516, 517 (1973). En nuestra jurisdicción impera la norma de que, una vez reclamadas por la parte prevaleciente, la imposición de costas es "mandatoria". J.T.P. Dev. Corp. v. Majestic Realty Corp, supra, págs. 460-461; Colondres Vélez v. Bayrón Vélez, 114 D.P.R. 833, 839 (1983).

En Garriga, Jr. v. Tribunal Superior, 88 D.P.R. 245 (1963), el Tribunal Supremo resolvió que las costas no son todos los gastos que ocasiona la litigación, sino los gastos: (a) necesarios, (b) incurridos y (c) razonables. Su razonabilidad se extenderá dentro de la realidad económica de Puerto Rico, y en cuanto a los gastos personales, además, se tendrá en cuenta la condición económica de las personas concernidas (testigos y litigantes). No se aprobarán gastos innecesarios, superfluos o extravagantes. Garriga, Jr. v. Tribunal Superior, supra, págs. 256-257.

Es norma reiterada que no se admiten como costas los gastos ordinarios de las oficinas de abogado, tales como sellos de correo, materiales de oficina y transcripciones de récords de vistas cuando éstas se solicitan por ser convenientes pero no necesarias. Andino Nieves v. A.A.A., 123 D.P.R. 712, 716 (1989); Pereira v. I.B.E.C., supra, pág. 78.

KLAN20100552-KLCE201000852

25

Conforme a lo dispuesto en la Regla 44.1(b) de Procedimiento Civil, *supra,* cualquier parte que no esté conforme con las costas podrá impugnar las mismas, en todo o en parte, dentro del término de 10 días contados a partir de la notificación del memorando de costas.

Apliquemos las normas jurídicas descritas al caso ante nuestra consideración.

### III

### A

Como cuestión de umbral, cabe destacar que el propio ELA reconoce en su recurso de apelación que no existe controversia en cuanto a que la dilación del proyecto le es atribuible a Corrección. Por consiguiente, la controversia en cuanto a dicho recurso se limita a evaluar la cuantía que adeuda Corrección por el *extended overhead.*

El ELA señala, en síntesis, que el TPI erró en la apreciación de la prueba al no acoger la interpretación del perito de Corrección, Ing. Méndez, en cuanto al modo de analizar y computar el *extended overhead.* Particularmente, alega que el contrato entre las partes era para "tres proyectos independientes, con fechas de terminación sustancial y efectiva distintas y cuyo desarrollo fue interrumpido por diferentes eventos imprevistos en cada "site", los cuales ocasionaron la emisión de algunas órdenes de cambio."[21] Aduce que, en vista de lo anterior y de acuerdo al uso y costumbre en la industria de la construcción, procedía dividir los gastos adicionales diarios incurridos por C&A entre los tres proyectos contratados. Argumenta que el foro sentenciador debió tener presente que el Ing. Méndez utilizó para su



---

[21] Véase Apelación, pág. 19.

análisis las mismas cifras recogidas en la reclamación preparada por el perito de la otra parte y, con ellas, estimó el *job site overhead* de $347,714.67 y el *home office overhead* de $75,395.60, para un total de *extended overhead* de $423,110.27. En su alegato suplementario, el ELA explica que la diferencia entre los informes de los peritos en el total de *overhead* adeudado estriba en que el análisis de C&A, acogido por el tribunal, partió de la premisa de que se trataba de un solo proyecto realizado en tres instituciones correccionales diferentes, cuando en realidad se trataba de tres proyectos. No nos convencen sus argumentos.





Recordemos los límites de nuestra función adjudicativa cuando lo que se cuestiona es la apreciación de la prueba realizada por el foro primario. Un tribunal apelativo, de ordinario, no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que ha hecho el juzgador de los hechos, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto. Sólo ante la presencia de estos elementos o cuando la apreciación de la prueba resulte inherentemente imposible o increíble, procederá nuestra intervención con la apreciación hecha por el foro apelado. Es doctrina reiterada que los tribunales apelativos deben prestar la debida deferencia a la apreciación de los hechos y la prueba efectuada por el juzgador, por ser el foro más idóneo para llevar a cabo esa función. No obstante, un tribunal apelativo no puede dejar sin efecto una sentencia cuyas conclusiones encuentran apoyo en la prueba desfilada.



Por su pertinencia al caso ante nos, es importante destacar que cuando se trata de la apreciación de prueba pericial, el tribunal revisor

está en la misma posición que el tribunal de primera instancia. Además, ningún tribunal está obligado a seguir indefectiblemente la opinión, juicio, conclusión o determinación de un perito, sobre todo cuando está en conflicto con testimonios de otros peritos. Todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación o evaluación de la prueba pericial y hasta descartar la misma aunque resulte ser técnicamente correcta.

En el caso ante nos, ambos peritos coincidieron en que hubo atrasos en el contrato atribuibles a Corrección y que C&A merece recibir compensación por el *extended overhead*. Sin embargo, los peritos difieren en la forma de calcular dicha compensación. El Ing. Agustín realizó sus cálculos bajo la premisa de que era un solo proyecto. De esa forma, estimó el *job site extended overhead* en $746,225.00 y el *home office overhead* en $156,896.00, para un total de $903,121.00. El Ing. Méndez, por su parte, consideró que se trataba de tres proyectos distintos y estimó el *job site overhead* en $347,714.67 y el *home office overhead* en $75,395.60, para un total de *extended overhead* de $423,110.27.





Según expusimos anteriormente, el Ing. Agustín realizó sus cálculos considerando que se trataba de un solo proyecto y que hubo 475 días compensables en exceso del contrato. Para determinar la porción del *extended overhead* atribuible al *job site*, el perito de C&A multiplicó el gasto <u>diario</u> estimado por ese concepto por los días compensables, como sigue:

*Gasto diario estimado x Días compensables = **Job Site Extended***

***Overhead***

KLAN20100552-KLCE201000852                                             28

$1,571.00 x 475 = $746,225.00

Para computar el *home office overhead* el Ing. Agustín utilizó la fórmula Eichleay. Basándose en el contrato y en otros documentos de contabilidad, estimó que el gasto <u>diario</u> por ese concepto era $206.99 para el año 1999 y $367.47 para el año 2000. Al multiplicar el gasto diario por los días compensables correspondientes a cada año obtuvo un ***"Home Office Overhead"*** de $156,896.00. Además, el perito de C&A calculó los intereses por mora al 6% sobre el total de *overhead* redondeado de $900,000.00, lo que resultó en $459,000.00 en dicho concepto.[22]

Surge del expediente ante nos que durante la vista se le cuestionó al Ing. Agustín la razón por la que no utilizó la fórmula Eichleay para calcular el *job site overhead*, como lo hizo para el *home office overhead*. Este manifestó que dicha fórmula no se utiliza para los gastos del *site*, como salarios de los empleados asignados al proyecto, alquiler de vagones, etc., los cuales son gastos directamente atribuibles al proyecto. Expresó que esta fórmula se utiliza para determinar el por ciento del *home office overhead* o gastos administrativos asociados a la oficina central que corresponden al proyecto particular. Según testimonio no contradicho del Ing. Agustín y su informe sobre reclamación, para realizar dicho cálculo tuvo que revisar los documentos de contabilidad de C&A y el total de contratos facturado por C&A para esos años, para poder calcular qué por ciento del costo





---

[22] Nótese que en la sentencia apelada el foro sentenciador no determinó la cantidad que Corrección le adeuda a C&A por los intereses sobre el *extended overhead*, sino que solo indicó que debía pagar los intereses por mora de 6% sobre dicha suma, contados a partir del 26 de agosto de 2001. Véase Apéndice del recurso KLAN201000552, pág.28.

KLAN20100552-KLCE201000852                                                                29

anual de la oficina principal correspondía al proyecto del contrato entre

Hedges y C&A. El Ing. Méndez no examinó estos documentos.

Por otro lado, al tribunal sentenciador no le mereció credibilidad

el testimonio del ingeniero Méndez, pues carecía de lógica que el

ingeniero Méndez no revisara el contrato original y sus anejos, a

excepción del Exhibit E. Además, dicho foro determinó que carecía de

fundamento legal el argumento del ingeniero Méndez de que el uso y

costumbre era que un contrato con tres (3) *sites* se consideraba como

tres proyectos separados. Estimó que dicho análisis era contrario a los

términos claros del contrato entre C&A y Hedges y los demás contratos

incluidos como exhibits, los cuales son la ley entre las partes, que

establecían un contrato por un precio global y una secuencia de

instalación específica de los MDUs. Consideró totalmente razonable el

testimonio del Ing. Agustín de que si se interpretara cada *site* como un

proyecto separado, las condiciones generales en el *Schedule of Values*

hubiesen variado, lo que hubiese ocurrido si hubiese estimado cada *site*

independiente.

Coincidimos con la apreciación del foro de instancia. De hecho

luego de analizar las comparecencias de las partes y el expediente ante

nos, opinamos que las determinaciones del TPI están avaladas por la

prueba presentada en el juicio y que fuera apreciada y aquilatada por

dicho tribunal.

No obstante, surge de la transcripción de la prueba oral y de la

propia sentencia, que C&A modificó la cantidad de $973,121.00

reclamada originalmente por *extended overhead*, y le redujo $70,000.00




KLAN20100552-KLCE201000852                                          30

de intereses atribuibles al pago tardío de certificaciones.[23] Sin embargo,

en la sentencia apelada, el foro sentenciador le concedió a C&A la

cantidad reclamada en  la demanda por el *extended job site & home

office overhead,* $973,121.00, en lugar de $903,121.00. Al así hacerlo,

erró el tribunal primario.

A excepción de lo señalado anteriormente respecto a los intereses

incluidos erróneamente en el *extended overhead* concedido, no

encontramos en el expediente alguna indicación de que el juez de

instancia hubiese errado de forma manifiesta en su apreciación de la

prueba, mucho menos que haya actuado con pasión, prejuicio y

parcialidad.  En  ausencia  de  ello,  no  vamos  a  variar  sus

determinaciones. No se cometió el error señalado.

**B**

En su recurso de *certiorari* el ELA alega, en síntesis, que no

procede la totalidad de las costas reclamadas y concedidas por el TPI,

por estas incluir gastos de oficina y atribuibles al ejercicio de la

profesión de abogado. Además, aduce que el foro de instancia no tenía

jurisdicción para aprobar los gastos de abogado, por este ser un asunto

comprendido en el recurso de apelación.

Repasemos la normativa con respecto a las costas. La Regla

44.1(a) de Procedimiento Civil dispone que, como regla general, la parte

vencedora en un pleito tiene derecho a que se le concedan como costas

los gastos incurridos necesariamente en la tramitación del mismo o que

el tribunal, en su discreción, estime que un litigante debe rembolsar a

---

[23] Véase Transcripción de la prueba oral, págs. 63-64. Véase, además, la determinación de hechos número 33 de la Sentencia, a la pág. 15 del Apéndice del recurso KLAN201000552.

KLAN20100552-KLCE201000852                                                31

otro. Esta regla tiene una función reparadora y su propósito es resarcir a la parte victoriosa en los gastos necesarios y razonables en que se vio obligada a incurrir por motivo del pleito. En nuestra jurisdicción impera la norma de que, una vez reclamadas por la parte prevaleciente, la imposición de costas es "mandatoria".

Nuestro Tribunal Supremo ha resuelto que las costas no son todos los gastos que ocasiona la litigación, sino aquellos: (a) necesarios, (b) incurridos y (c) razonables. Además, es norma reiterada que no se admiten como costas los gastos ordinarios de las oficinas de abogado, tales como sellos de correo, materiales de oficina y transcripciones de récords de vistas cuando estas se solicitan por ser convenientes pero no necesarias.

Conforme a lo dispuesto en la Regla 44.1(b) de Procedimiento Civil, *supra,* cualquier parte que no esté conforme con las costas podrá impugnar las mismas, en todo o en parte, dentro del término de 10 días contados a partir de la notificación del memorando de costas.

En el caso ante nos, el TPI dictó sentencia el 5 de febrero de 2010, notificada el 17 del mismo mes y año. El 26 de febrero de 2010, C&A sometió un Memorando de Costas por $1,042.34, que se desglosaba en $164.00 por sellos de rentas internas, $813.80 de fotocopias y $60.54 de franqueo.[24] El ELA se opuso a dicho memorando, y solicitó que se denegaran las costas correspondientes a fotocopias y franqueo por ser gastos ordinarios de oficina. El 14 de abril de 2010, C&A presentó una Réplica donde se allanó a que el foro de instancia dedujera los $60.54




---

[24] Véase Apéndice del recurso KLCE201000852, págs. 50-51.

KLAN20100552-KLCE201000852                                       32

de franqueo.[25] Mediante Orden de 11 de mayo de 2010, notificada el 13 de mayo siguiente, el TPI declaró Con Lugar la mencionada Réplica, aprobando así un total de costas de $981.80, y el Memorando Sobre Honorarios de Abogado por $40,507.50.[26]

Es importante destacar que el contrato entre Hedges y C&A contiene como condición suplementaria, entre otras, que la parte contratante vencedora en un pleito para hacer valer sus derechos y remedios contractuales, tendrá derecho al reembolso de las costas y honorarios de abogado incurridos. Específicamente, el Artículo 2.2 de los *Supplemental Conditions*, que enmienda a su vez el Artículo 4.9.3 de los *General Conditions*, lee como sigue:

> 4.9.3 The prevailing party in any legal proceeding between them regarding rights and remedies under the Agreement shall be entitled to recover all of its actual attorney's fees and costs to the extent not expressly precluded by law incurred in connection with the dispute.[27]

En vista de tal acuerdo y luego de analizar detenidamente el expediente ante nos y los alegatos de las partes, estamos convencidos de que el foro sentenciador no abusó de su discreción al aprobar el memorando de costas por $981.80, pues dicha cuantía es una razonable. Es decir, en vista de que las partes acordaron específicamente que la parte victoriosa tendría derecho a recobrar las costas y los honorarios de abogados incurridos para hacer vales sus obligaciones contractuales, no hemos de intervenir con la determinación del TPI.

---

[25] Véase Apéndice del recurso KLCE201000852, págs. 64-66.
[26] Véase Apéndice del recurso KLCE201000852, págs. 48-49 y 74-75.
[27] Véase Apéndice del recurso KLAN201000552, pág. 390.

KLAN20100552-KLCE201000852                                          33

Pasemos ahora al planteamiento en cuanto a los honorarios de abogado. En el recurso de *certiorari,* el ELA cuestiona que el TPI haya dictado una orden declarado "Ha Lugar" el Memorando de Honorarios de Abogado que presentó C&A, luego de haberse interpuesto una apelación sobre la sentencia dictada en el caso y mientras dicho recurso se encontraba todavía ante nuestra consideración. El ELA arguye que el TPI carecía de jurisdicción para atender dicha moción debido a que la presentación de la apelación tiene el efecto de suspender los procedimientos ante dicho foro.

Por su parte, C&A argumenta que reclamó el rembolso de los honorarios de abogado incurridos para hacer valer sus derechos y remedios conforme al contrato, según lo pactado entre las partes. Destaca que durante el juicio, la C&A comenzó a presentar prueba de los honorarios de abogado pagados a la fecha de la vista, pero la representación legal de Corrección objetó y planteó que esta prueba debía presentarse mediante un Memorando, con posterioridad a que el Tribunal emitiera sentencia.[28] La representación legal de C&A hizo constar que se proponía someter dicha prueba, pero que se allanaba a someter posteriormente la información mediante memorando escrito, en vista del planteamiento de Corrección. Según lo acordado, C&A presentó el Memorando Sobre Honorarios de Abogado el 12 de abril de 2010, previo a la presentación del recurso de apelación. C&A aduce que el TPI trató el asunto igual que las costas del litigio, mantuvo jurisdicción sobre el asunto y su decisión es revisable vía *certiorari.*

---

[28] Véase Transcripción de la prueba oral, pág. 67.

KLAN20100552-KLCE201000852                                          34

También destaca C&A que lo que se cuestiona en el recurso de apelación es la cuantía a la que tiene derecho por el *extended overhead* y no si procede o no dicha compensación. Aduce que, como consecuencia, independientemente de que este Foro confirme o reduzca la cantidad determinada por el TPI, C&A tendría derecho al rembolso de los honorarios de abogado incurridos debido al incumplimiento contractual de Corrección.

La Regla 53.9 de Procedimiento Civil vigente al presentarse el recurso, 32 L.P.R.A. Ap. III, R. 53.9, establece, como norma general, que una vez presentado el escrito de apelación <u>se suspenderán todos los procedimientos en el tribunal apelado respecto a la sentencia o parte de la misma que se apela o a las cuestiones comprendidas en ella.</u> (Énfasis nuestro.) <u>Plaza Las Américas v. N. & H.</u>, 166 D.P.R. 631, 641 (2005). El Tribunal de Primera Instancia podrá proseguir el litigio en cuanto a cualquier cuestión envuelta en el mismo no comprendida en la apelación. Regla 53.9 de Procedimiento Civil, *supra.*



Del mismo modo, la Regla 18 del Reglamento del Tribunal de Apelaciones, 4 L.P.R.A. Ap. XXII-B, R. 18, dispone que una vez presentado el escrito de apelación, se suspenderán todos los procedimientos en el Tribunal de Primera Instancia respecto a la sentencia, o parte de la misma, de la cual se apela, o a las cuestiones comprendidas en ella, salvo orden en contrario, expedida por iniciativa propia o a solicitud de parte por el Tribunal de Apelaciones. Igualmente, la citada Regla 18 de nuestro Reglamento, *supra*, establece que el Tribunal de Primera Instancia sí podrá proseguir el litigio en cuanto a cualquier cuestión no comprendida en la apelación.

KLAN20100552-KLCE201000852                                                    35

En el caso que nos ocupa, el 11 de mayo de 2010 el TPI emitió una Orden en la cual aprobó el Memorando Sobre Honorarios de Abogado, después de presentado el recurso de apelación.  Es decir, al momento de emitir la Orden impugnada, los procedimientos respecto a la sentencia estaban suspendidos en virtud de la apelación presentada oportunamente. Debemos tener presente que la sentencia apelada dispuso: "Además, se ordena el reembolso de los honorarios de abogado incurridos por C&A."[29] Por consiguiente, los honorarios de abogado es una cuestión comprendida en la sentencia cuya determinación estaba suspendida. En tales circunstancias,  procede la revocación de dicha Orden en cuanto a los honorarios de abogado se refiere, por haberse emitido sin jurisdicción.





IV

De conformidad con lo antes expresado, se modifica la Sentencia dictada por el TPI el 5 de febrero de 2010 para que refleje que la compensación por el *extended job site & home office overhead* es de $903,121.00 y, así modificada, se confirma. Además, se expide el auto de *certiorari* y se modifica la Orden del foro sentenciador de 11 de mayo de 2010, a los fines de revocar la aprobación del Memorando Sobre Honorarios de Abogado presentado por C&A.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Dimarie Alicea Lozada
Secretaria del Tribunal de Apelaciones

---

[29] Véase Apéndice del recurso KLAN201000552, pág. 28.