**MASTER LINK CORPORATION v. PREPA**
**Court of First Instance of the Commonwealth of Puerto Rico,**
**San Juan Part, K AC2016-0818**
**Statement Itemizing Interest, Fees, Expenses, Etc.**

| | |
|---|---:|
| Extended overhead, amount illegally retained by PREPA to ML, extra work performed by ML, demobilization and damages caused by PREPA's decision to illegally declare ML on default | $4,607,618.60 |

Penalty Interest at 6% rate since April 3, 2013

| | |
|---|---:|
| $276,457.12 yearly x 4 yrs. (April 3, 2013 – April 2, 2017) | 1,105,828.48 |
| $2,495.53 monthly X 2 months (April 3, 2017 – June 3, 2017) | 4,991.06 |
| $757.42 *Per Diem* x 27 days until June 30, 2017 | + 20,450.34 |
| | $5,738,888.48 |
| (July 1, 2017 – May 1, 2018) $2,495.53 x 10 = | + 24,955.30 |
| | $5,763,883.78 |

Case:17-03283-LTS   Doc#:3069-2   Filed:05/16/18   Entered:05/16/18 00:31:40   Desc:
Exhibit 2 - Supporting documents   Page 2 of 147

ANEJO 1



Puerto Rico Electric Power Authority

Rehabilitation of Culebra
Power Station

**Contract** 0912653

Rehabilitation of Culebra Power Station

000001

Contract 0912653
Rehabilitation of Culebra Power Station
Page 2



## TABLE OF CONTENTS

Page

| Article 1: | Scope of Work | 4 |
|---|---|---|
| Article 2: | Commencement and Completion of Work | 5 |
| Article 3: | Penalty for Delays | 5 |
| Article 4: | Consideration | 6 |
| Article 5: | Notices | 6 |
| Article 6: | Certificate of Eligibility | 7 |
| Article 7: | Transfer of Funds | 7 |
| Article 8: | Governing Law | 9 |
| Article 9: | No Conflict of Interest | 9 |
| Article 10: | Waivers | 10 |
| Article 11: | Complete Agreement | 10 |
| Article 12: | Definitions | 11 |
| Article 13: | Payment to Contractor | 14 |
| Article 14: | Schedule and Superintendence of Work | 18 |
| Article 15: | Submittals | 19 |
| Article 16: | Correlation of Documents | 20 |
| Article 17: | Changes | 20 |
| Article 18: | Periodic Inspections | 22 |
| Article 19: | Other Works at the Site | 22 |
| Article 20: | Office of the Comptroller Filing | 23 |
| Article 21: | Force Majeure | 23 |
| Article 22: | Liabilities | 24 |
| Article 23: | Independent Contractor | 25 |
| Article 24: | Suspension of Work and Termination | 25 |
| Article 25: | Insurance, Bonds and Requirements | 28 |
| Article 26: | Permits and Licenses | 29 |
| Article 27: | Contingent Fees | 29 |
| Article 28: | Liabilities | 29 |
| Article 29: | Officials Not to Benefit | 30 |
| Article 30: | Claims for Labor and Materials | 31 |
| Article 31: | Unfair Labor Practice | 31 |
| Article 32: | Assignment | 31 |
| Article 33: | Subcontractors | 32 |
| Article 34: | Novation | 32 |
| Article 35: | Disputes | 32 |
| Article 36: | Laws to Be Observed | 33 |
| Article 37: | Change in Law | 33 |
| Article 38: | Separability | 34 |
| Article 39: | Warranty | 34 |
| Article 40: | Income Tax Withholding | 38 |

Contract 0912653
Rehabilitation of Culebra Power Station
Page 3

Article 41:    Discrimination..................................................................39
Article 42:    Other Taxes ..................................................................39
Article 43:    Use of Completed Portions.................................................39
Article 44:    Present Site ..................................................................39
Article 45:    Additional Provisions    .....................................................41
Article 46:    Requirements of Contractor's Work Force    ........................41
Article 47:    Working Hours and Job Organization    .............................42
Article 48:    Transportation and Storage of Equipment    .......................42
Article 49:    Vigilance    .....................................................................43
Article 50:    Differing Site Conditions and Site Reports...........................43
Article 51:    Stamps Fee    .................................................................44
Article 52:    Progress Reports    ..........................................................44
Article 53:    Access to Work    ............................................................46
Article 54:    Cleaning Up    ................................................................46
Article 55:    Quality Assurance Clause    ..............................................46
Article 56:    Safety Provisions    .........................................................47
Article 57:    Special Safety Provisions    ...............................................51
Article 58:    Environmental Liabilities    ...............................................51
Article 59:    Standards for Materials    .................................................53
Article 60:    Sworn Statement    .........................................................54
Article 61:    Final Inspection    ...........................................................54

Contract 0912653
Rehabilitation of Culebra Power Station
Page 4



## PUERTO RICO ELECTRIC POWER AUTHORITY
## GENERATION, TRANSMISSION AND DISTRIBUTION DIRECTORATE

CONTRACT 0912653
For Rehabilitation of Culebra Power Station

APPEAR

AS FIRST PARTY: The Puerto Rico Electric Power Authority, hereinafter referred to as "PREPA", a public corporation and government instrumentality of the Commonwealth of Puerto Rico, created by Act 83 of May 2, 1941, as amended, employer's Social Security 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, represented in this act by its Executive Director, mister Miguel Ángel Cordero López, of legal age, married, professional engineer, and resident of Caguas, Puerto Rico.

AS SECOND PARTY: Master Link Corporation, Inc., hereinafter referred to as "the Contractor", a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, authorized to do business in Puerto Rico, Social Security number 66-0629469 represented in this act by its President, Carlos A. Morales Vázquez, of legal age, single, and resident of Bayamón, by virtue of Certificate of Incorporation, dated as of July 3, 2003.

WITNESSETH

IN CONSIDERATION of the mutual covenants hereinafter stated, the Parties agree themselves, their personal representatives, successors, and assignees, as follows:

Article 1.    Scope of Work

The Contractor shall furnish all labor, supervision, equipment, tools, services, engineering, fabrication, construction, testing, Contractor Permits, and startup or other necessary items or services in accordance with the obligations of this Contract, for the rehabilitation of the Culebra Power Station facilities, as per Drawings and Specifications herein (collectively, the "Work").

All provisions of this Contract as a whole should be interpreted to conform to applicable laws, including those regulating the professional practice of engineering, and conforming also to the rules and regulations as established by the Board of Examiners of Engineers, Architects and Surveyors.

Article 2.    Commencement and Completion of Work

The Contractor shall mobilize its work force and the Work shall be commenced within ten (10) Calendar Days of the Notice to Proceed.   The Work required under this

000004

Contract 0912653
Rehabilitation of Culebra Power Station
Page 5

Contract shall be completed within One Hundred and Eighty (180) Calendar Days after issuance of the Notice to Proceed.  The timelines set forth in this Article 2 are subject to extensions permitted or required hereunder, including without limitation pursuant to Article 17, Changes.  The Critical Path Method (CPM) schedule will identify the Notice to Proceed and the Final Completion dates.  The CPM schedule shall be submitted to PREPA for approval before commencement of the Work (the "Approved Schedule").

Article 3.    Penalty for Delays

3.1    It is mutually understood and agreed by and between the Parties hereto that time is of the essence in the performance of this Contract and that PREPA will sustain substantial financial loss and other damages in the event of a failure or delay by the Contractor in the completion of the Work.  It is further understood and agreed upon and made part of this Contract that the Work must be begun, performed, and completed without delay by the Contractor and if the Contractor fails to begin, perform and complete said Work within the Approved Schedule plus any extensions permitted hereunder, including without limitation pursuant to Article 17, Changes (except where the delay is due to Force Majeure events or caused by the acts or omissions of PREPA and/or PREPA's agents), the Contractor may be declared in default of this Contract.

3.2    Delay in Work Completion.  As established in Appendix 2, if the Contractor fails to achieve the Completion of Phase I within Two Hundred and Forty (240) Calendar Days of the Notice to Proceed, (except where the delay is due to Force Majeure events or caused by the acts or omissions of PREPA and/or PREPA's agents), the Contractor shall pay a penalty of five thousand dollars ($5,000) for each Calendar Day of delay until Acceptance of Phase I.  Also, if Contractor fails to achieve the Completion of Phase II within Forty Five (45) Calendar Days after the Acceptance of Phase I (with the exceptions established for Phase I), the Contractor shall pay a penalty of one thousand dollars ($1,000) for each Calendar Day of delay until Acceptance of Phase II.

In case of delay with respect to each Phase Completion, the Contractor shall, within ten (10) days from the beginning of any such delay, notify the Engineer in writing of the causes of delay, who shall (except where the delay is due to Force Majeure events or caused by the acts or omissions of PREPA and/or PREPA's agents), ascertain the facts and the extent of the delay and extend the time for completing the Phase when, in his commercially reasonable judgment, the findings of facts justify such an extension, and his findings of facts thereon shall be final and conclusive on the Parties hereto, subject only to appeal by the Contractor as provided in Article 35, Disputes, hereof.

3.3    Exclusive Remedies for Delay.  The timelines set forth in this Article 3, are subject to extensions permitted hereunder, including without limitation pursuant to Article 17, Changes.  The total maximum penalty for delays will be twenty five percent (25%) of the Contract Price, and the Contractor and its sureties shall be jointly and severally liable for said amounts.  In the event that Contractor, due to its delay, had

*P. H. M.*

Contract 0912653
Rehabilitation of Culebra Power Station
Page 6



paid the total amount of the penalty as above mentioned, and has failed to complete the Work or any part separable thereof, it could be considered a breach of contract, and PREPA may terminate this Contract as set forth in Article 24, <u>Suspension of Work and Termination,</u> and pursue any other remedies under this Contract, law or equity.

The Contractor agrees that the penalties described in this Article 3 shall not be subject to reduction, moderation or modification.

Article 4.      Consideration

PREPA agrees to pay and Contractor agrees to accept, the firm price, subject to Article 42, <u>Other Taxes,</u> of Two Million Five Hundred Eighty One Thousand Five Hundred Eighty Three Dollars and Eighty Seven Cents ($2,581,583.87) ("Contract Price"), for the complete performance of the Work, plus any additional amount to be paid due to extra work ordered by PREPA or requested and accepted by the Parties according to Article 17, <u>Changes.</u>  Payments of the Contract Price are to be made according to the payment schedule, as well as Article 13, <u>Payment to Contractor.</u>  The Contractor shall submit its invoices and supporting documentation as set forth in Article 13, <u>Payment to Contractor.</u>

Article 5.      Notices

PREPA agrees to give Contractor immediate notice of any and all claims for which the Contractor may be liable, and the Contractor agrees to give PREPA immediate notice of all claims for which PREPA may be liable.

Any notice, request, demand or other communications to be given hereunder shall be in writing and will be sufficiently served when delivered in person, or properly mailed to the following addresses:

To PREPA:        Puerto Rico Electric Power Authority

Attention:        Eng. Josué Colón Ortiz
                 Generation Directorate Director
                 NEOM Building, 6th Floor, Office 604
                 Road 8838,   Km 15.1 Monacillos Ward
                 Río Piedras, PR  00926
                 Facsimile No.: (787) 521-5165
                 Telephone No.: (787) 521-6407

Copy to:         Eng. Luis E. Ríos Pérez
                 Head Engineering Subdivision
                 NEOM Building, 4th Floor, Office 403
                 Río Piedras, PR  00926
                 Facsimile No.: (787) 521-6590

Contract 0912653
Rehabilitation of Culebra Power Station
Page 7

Telephone No.: (787) 521-6552

To Contractor:     Master Link Corporation, Inc.
                   Carlos A. Morales Vázquez, President
                   PO Bpx 2186 Barceloneta, PR  00617
Facsimile No.:  -  787-846-7650
Telephone No:      787-846-7655

Attention:         Eng. Jorge L. Rivera Martínez, Project Manager:

All such written communications shall be deemed given upon receipt by the Party to
which it is addressed, which shall be (i) if sent by personal delivery, when received, (ii) if
mailed, three (3) days after mailing, and (iii) if sent by overnight delivery, upon
acceptance by a representative of the receiving Party at such address.

Article 6.    Certificate of Eligibility

Previous to the signing of this Contract, Contractor will have to submit a valid Certificate
of Eligibility issued by the General Service Administration, in accordance with Act 85 of
June 18 of 2002, as amended.

Article 7.  Transfer of Funds

PREPA has no legal obligation to accept Transfer of Funds Agreements between its
contractors and thirds parties by reason of the goods or services rendered under this
Agreement.    However,  the  Contractor  may  request  PREPA,  in  writing,  the
acknowledgment and acceptance of a Transfer Funds Agreement between the
Contractor and a third party, by submitting said Agreement for evaluation pursuant to
the rules and procedures in force at PREPA.  PREPA reserves the right to accept or not
the application for the acknowledgement of the Transfer.  The Assigner will pay PREPA
two hundred dollars ($200) per annum to be discounted from the first payment of the
Transfer, for administrative expenses.

The Contractor accepts that the acknowledgment of the Transfer of Funds by PREPA
will be subject to the following terms and conditions:  (a) PREPA keeps its preferential
right to retain and discount, from all payments owed under this Agreement, all and any
sum owed by the Assigner to PREPA, all and every sum owed by the Assigner to
PREPA, whether under this Agreement or under any other contract or purchase order or
by a right of compensation (set off) that PREPA has against the Assigner, and to apply
the amount of the sum retained and discounted to its claim against the Assigner; (b)
PREPA keeps its preferential right to retain and discount, from all payment due under
the Agreement and payable to the Assignee, all and any sum owed to PREPA by the
Assigner, including, but not limited to, any right of compensation (set off) PREPA may
have against the Assigner, and apply the amount of the retained and discounted sum

Contract 0912653
Rehabilitation of Culebra Power Station
Page 8

from its claim against the Assigner; (c) PREPA keeps its unlimited right to retain the payments in cases where: (i) the Assignee does not comply with all the contractual obligations and responsibilities that it may have toward PREPA; (ii) that there are in existence claims of any kind or nature from PREPA against the Assignee arising in relation to said Contract or purchase order and/or in relation to any other contract between the Assigner and PREPA, including, but not limited to warranty claims of products sold or because of defects or vices on said products and/or of construction and irrespective of whether said obligations of the Assigner toward PREPA may or not be liquid and capable of being demanded.

The Assigner and the Assignee acknowledge and accept that it will be the Assigner's responsibility to pay the Assignee any amount of money object of the Transfer that may be received by PREPA while the debt object of the same is not covered by the Assigner. Moreover, the Assigner and the Assignee release PREPA from any claim related with said payment. The Assigner and the Assignee acknowledge and accept that in order to comply with said acknowledgment, PREPA will issue all the payments, regardless of whether said payments had been transferred or not, to the name of the Assigner and the Assignee.

The Assigner and Assignee acknowledge and accept that PREPA will automatically cease from having any obligation of any nature whatsoever under the transfer, in any of the following circumstances: (i) as soon as the debt of the Assigner in favor of the Assignee has been paid by the Assigner or collected from him, even when it has not been paid in full with the transferred funds; (ii) as soon as PREPA has paid the sums owed under the contract or change of order object of this transfer; (iii) as soon as PREPA has made payments up to the amount owed under the contract or change of order object of this Transfer; (iv) as soon as a year has transpired from the due and/or payment date of any of the accounts receivable transferred by the Assigner to the Assignee, provided that within said year, the Assigner has not formulated a written statement with acknowledge receipt to PREPA claiming the payment.

The Assigner and the Assignee acknowledge and accept that it will be entirely their responsibility to request PREPA, by means of a document signed by both, to discontinue the payments to the Transfer. The Assigner and the Assignee release PREPA from any claim arising from a breach to this obligation.

Article 8.    Governing Law

This Contract shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico. Also, the contracting parties expressly agree that only the courts of Puerto Rico will be the courts of competent and exclusive jurisdiction to decide over the judicial controversies that the appearing parties may have among them regarding the terms and conditions of this Contract.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 9

Article 9.     No Conflict of Interest

Contractor certifies that to the best of its knowledge it has not received payment or benefit of any nature for services rendered regularly through an appointment to a governmental agency, body, public corporation or municipality of Puerto Rico.  The Contractor also certifies that it may have consulting services contracts with other Puerto Rico governmental agencies or bodies, but such condition does not constitute a conflict of interest for the Contractor.

The Contractor acknowledges it has a duty of complete loyalty toward PREPA in rendering its professional services, which includes not having adverse interests to PREPA. Those adverse interests include representation of clients with interests in opposition of those of PREPA.  Subject to the confidentiality obligations of the Parties hereunder, the Contractor shall have the continuous obligation to disclose to PREPA all information and circumstances of its relations with clients and third persons and any interest which could reasonably be expected to influence PREPA when executing this Contract or during its term.

The Contractor represents conflicting interests when on behalf of a client it must contend for that which it is its duty to oppose in order to comply with its obligations with another previous, present or potential client.  Also, the Contractor represents conflicting interests when its conduct is described as such in the canons of ethics applicable to the Contractor and its personnel, or in the laws or regulations of the Commonwealth of Puerto Rico.

In Contracts with partnerships or firms, in the event that any of the partners, directors or employees of the Contractor should incur in the conduct described herein, said conduct shall constitute a violation to the prohibitions provided herein. The Contractor shall avoid even the appearance of the existence of conflicting interests.

The Contractor acknowledges that the Executive Director of PREPA shall have the power to intervene the acts of the Contractor and/or its agents, employees, and Subcontractors regarding the enforcement of the prohibitions contained herein.  In the event that the Executive Director should discover the existence of adverse interests with the Contractor, the Executive Director shall inform the Contractor, in writing, of PREPA's intention to terminate this Contract within a thirty (30) day period.  During said period, the Contractor may request a meeting with the Executive Director to present its arguments regarding the alleged conflict of interests, which meeting shall be granted by PREPA in every case of alleged conflict of interests.  In the event that the Contractor does not request such a meeting during the specified thirty (30) day period or the controversy is not satisfactorily settled during the meeting, this Contract shall be cancelled.

000009

Contract 0912653
Rehabilitation of Culebra Power Station
Page 10

The Contractor certifies that to its knowledge, at the time of award of this Contract, it does not have any other contractual relation that can result in a conflict of interest with this Contract. The Contractor also certifies that to the best of its knowledge, no public employee has any personal or economical interest in this Contract.

Article 10.    Waivers

No waiver of any breach of this Contract shall be held to be a waiver of any other subsequent breach. Except for those remedies identified in this Contract as being sole and exclusive, all remedies afforded to PREPA and Contractor in this Contract shall be taken and construed as cumulative, that is, in addition to every other remedy provided herein or by law. No delay by either Party in the enforcement of any of its rights under this Contract shall be deemed to be a waiver of such rights.

Article 11.    Complete Agreement

The Contract Documents shall constitute the complete agreement between the Parties with respect to the subject matter hereof. The various parts of this Contract are intended to be complementary; however, any conflicts between or among the various documents comprising this Contract shall be resolved as provided in Article 16, Correlation of Documents.

Article 12.    Definitions

Whenever the words defined in this article or pronouns used instead are mentioned in this Contract, they shall have the meanings here given:

12.1.  "Act of God" - an Act of God is construed herein to mean an earthquake, hurricane or other cataclysmic phenomenon of nature not ordinarily occurring. Rains, windstorms, floods or other natural phenomenon of normal intensity for the particular locality as determined by the preceding five (5) year monthly average from records of the nearest National Oceanic and Atmospheric Administration recording station shall not be construed as an Act of God.

12.2.  "Applicable Law" – shall mean any federal, state, or local act, statute, law, code, rule, regulation, or order applicable to Contractor's performance of the Work.

12.3.  "Approved Change Order" – shall have the meaning set forth in Article 17, Changes.

12.4.  "Approved Schedule" - shall be as defined Article 2, Commencement and Completion of Work, and is attached as Exhibit 3.

12.5.  "Authorized Representatives" – shall be as defined in Article 35, Disputes.



Contract 0912653
Rehabilitation of Culebra Power Station
Page 11

12.6. "Calendar Day" – shall mean each and every 24 hours day shown on the calendar, beginning and ending at midnight.

12.7. "Construction Manager" - shall mean the professional appointed by the Contractor to provide the construction management services on the Project. This professional shall be a professional engineer registered in Puerto Rico and an active member of the Puerto Rico College of Engineers and Land Surveyors.

12.8. "Contract" - shall mean, collectively, all the covenants, terms, and stipulations in these articles of agreement, and in all supplementary documents hereto attached which constitute essential parts of the Contract and are hereby made part thereof, to wit

Contract
Invitation to Bid and Advertisement for Bids
Instruction to Bidders
Contractor's Bid Including Bid Data and Schedules
Special Conditions
Technical Specifications and Drawings enumerated therein
Proposal Forms
Bid, Performance, and Payment Bonds
Letter of Award
Appendixes
Owner Controlled Insurance Program (OCIP)
12.9. "Contract Price" – shall have the meaning given in Article 4, Consideration.

12.10. "Contracting Officer" - shall mean the Executive Director of PREPA, acting directly or through his properly authorized representatives as notified in writing to Contractor.

12.11. "Contractor" – shall mean the company that will perform all work as defined in Article 1. Scope of Work, of this Contract and the Special Conditions and Specifications contained in it. Contractor shall perform, with his own labor force or organization, work amounting to not less than 50% of the total Contract cost.

12.12. "Contractor Permits" – shall have the meaning set forth in Article 26, Permits and Licenses.

12.13. "Critical Path Method (CPM)" – shall mean a scheduling technique used to plan and control a project which combines all relevant information into a single plan defining the sequence and duration of operations, and depicting the interrelationship of the work elements to complete the Project. The critical path is defined as the longest sequence of activities in a network which establishes the minimum length to accomplish the final event of the Project.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 12



12.14. "Disputes" - shall have the meaning set forth in Article 35.

12.15. "Dissolution" – shall have the meaning set forth in Article 24.3.2, Termination for Dissolution.

12.16. "Engineer" - shall mean PREPA's Generation, Transmission, and Distribution Director, acting directly or through his properly authorized representatives as notified in writing to Contractor.

12.17. "Final Acceptance" – shall mean written approval by PREPA that the entire Work has been completed and the final cleaning up of the Site has been performed and all Punch List items have been rectified as more particularly described in Article 61, Final Inspection.

12.18. "Force Majeure" – shall mean, any cause or circumstances, whether pertaining to a Party hereto or its agents, representatives, contractors or subcontractors, and which is (i) beyond the control of the Party claiming the "Force Majeure" (claiming Party), and (ii) that the claiming Party cannot reasonably predict and plan its requirements under this Agreement to fulfill its obligations, and (iii) that occurs without the fault or negligence of the claiming Party. "Force Majeure" may include, but is not limited to an Act of God; war (whether declared or not); acts of the public enemy; terrorism; riot; civil commotion; sabotage; federal, state, or municipal action or regulation; general strikes, lockouts unrelated to claiming Party's practices, methods or dispute with labor; fire; floods; epidemics; quarantine restrictions, embargos; and transportation accidents.

12.19 "Hazardous Materials" – shall have the meaning set forth in Article 58, Environmental Liabilities.

12.20. "Notice to Proceed" - a written order sent to the Contractor by the Contracting Officer, or his representative properly designated in writing, notifying the Contractor of the date upon which the Contractor is given authority to begin the Work and all conditions precedent have been fulfilled as set forth in this Contract.

12.21. "Payment Schedule" – shall have the meaning set forth in Article 4, Consideration.

12.22 "Change Order"- A written agreement between the parties that sets out changes in price, time, or scope of work to the Contract, which has been approved by the appropriate official pursuant to the general authorization for approval.

12.23. "Permits" - shall mean, collectively, all PREPA Permits and Contractor Permits.

12.24. "PREPA" – shall mean the Puerto Rico Electric Power Authority.



Contract 0912653
Rehabilitation of Culebra Power Station
Page 13

12.25. "PREPA Permits" – shall have the meaning set forth in Article 26, Permits and Licenses.

12.26. "PREPA Termination Costs" – shall have the meaning set forth in Article 24.3.

12.27. "Progress Report" – shall have the meaning set forth in Article 14.2, Monthly Progress Report.

12.28. "Project" – shall mean the complete construction of the Rehabilitation of Culebra Power Station as more specifically established in Article 1, Scope of Work.

12.29. "Project Manager" - shall be interpreted to mean the PREPA Project Manager.

12.30. "Punch List" - shall mean the list of non-conforming or incomplete Work items that are identified by the Parties as being required for the Acceptance of the Work.

12.31. "Quality Control Program" – shall have the meaning set forth in Article 55, Quality Assurance Clause.

12.32. "Resident Engineer" - shall mean the professional appointed by the Contractor as the manager of the field office responsible for, but not limited to, the administrative issues, quality control, and technical aspects of the Project. This professional shall be a professional engineer registered in Puerto Rico and an active member of the Puerto Rico College of Engineers and Land Surveyors.

12.33. "Site" – shall mean PREPA's Culebra Power Station, located in Culebra, Puerto Rico at which Contractor's Work in connection with the Project will be performed.

12.34. "Site Reports" – shall have the meaning set forth in Article 50, Differing Site Conditions and Site Reports.

12.35. "Specifications" – or Project specifications shall mean the Technical Specifications.

12.36. "Subcontractor" – shall mean any subcontractor, supplier, or vendor of Contractor engaged for the purposes of progressing the Work under a subcontract agreement with the Contractor and in which the Contractor has no equity interest or profit sharing affiliation. Any such entity in which the Contractor owns equity or has a profit sharing affiliation shall be considered to be the Contractor.

12.37. "Substantial Completion" - shall have the meaning set forth in Article 61, Final Inspection.

000013

Contract 0912653
Rehabilitation of Culebra Power Station
Page 14



12.38. "Work" or "Works" - shall have the meaning set forth in Article 1, Scope of Work.

12.39. "Working Day" – shall mean each day Monday through Friday and hours from 7:00 a.m. - 11:30 a.m. and 12:30 p.m. - 5:00 p.m. or as extended as provided herein.

Article 13.    Payment to Contractor

13.1   Schedule of Payments and Invoicing.  All invoices shall be subject to PREPA's approval before being paid and shall include the actualized progress schedule and S-curve graph.  No invoices shall be accepted for evaluation without the required documents.  Its payment shall be done within forty five (45) calendar days after the date of PREPA's approval.

In preparing estimates the material delivered on the site may be taken into consideration; provided that, the Contractor submits evidence as signed receipts or other documentary evidence to prove that the actual costs of the materials or equipments (materials or equipment for now on is referred as materials) for which he is to receive advance payment has been paid in full or, if the materials have not been paid, the invoice shall be accompanied by a release from the materials dealer expressing his agreement with the payment for such materials to the Contractor by PREPA.  Materials shall be properly stored at the job site in a manner which will assure the preservation of their quality and fitness for the work and that the Contractor shall not withdraw said materials for any purpose other than incorporation into the work.  Storage and protection costs, and the cost of replacing lost or damage materials shall be borne by the Contractor.

If at any time after the Contractor has received advance payment for materials on site, the Engineer obtains evidence indicating that said materials, or any part or parts thereof, are defective, or that said materials, or part thereof, do not conform to the specifications, the Engineer will proceed to deduct from any of the succeeding partial payments due to the Contractor for the work actually performed, a sum sufficient to cover the cost of the materials, or parts thereof, found to be defective.

All payments made by PREPA for equipment and/or materials delivered and accepted and/or services rendered and work performed under this Contract will be charged to a construction estimate.  In making such payments, PREPA shall retain ten percent (10%) of each payment until final completion an acceptance of all work covered by the Contract; provided that, on completion an acceptance of each separate structure, building, tank, canal, road, power conduit, tunnel, public work, or other division of the Contract, on which the price is stated separately in the Contract, payment may be made in full, including retained percentages thereon, less corresponding deductions.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 15

No payment of invoices or portions thereof shall at any time constitute approval or acceptance of the work under this Contract, nor be considered to be a waiver by PREPA of any of the terms of this Contract. However, title to all materials and equipment to the extent that payments have been received, whether or not the same have been incorporated in the work, shall vest in PREPA and, in any case, shall not be part of Contractor' property or estate in the event the Contractor is judged a bankrupt or makes a general assignment for the benefit of creditors, or if a receiver is appointed on account of the Contractor's inventory.

After acceptance of the work PREPA will pay to Contractor all retained percentages less the corresponding deductions. The Contractor shall submit with the final certification a Letter of Release ("Carta de Relevo"), which shall be notarized and in which the Contractor shall state that there is no debt with any sub-contractor, manufacturer, services or materials provider.

Upon completion and acceptance of all work required hereunder, the amount due to the Contractor under this Contract will be paid upon the presentation of a properly executed and duly certified voucher therefore, after the Contractor shall have furnished PREPA with a release, if required, or all claims against PREPA arising under and by virtue of this Contract, other than such claims, if any, as may be specifically excepted by the Contractor from the operation of the release in stated amounts to be set forth therein; provided that, the amount of such excepted claims is not included in the voucher for final payment.

The Contractor shall immediately notify PREPA when the billing under the present Contract amounts 75% of the maximum amount under the Contract. In addition, the Contractor shall present an itemized list of the remaining billable works under the Contract.

All payments performed under this Contract will be charged to a PREPA budget account number 01-1071-35201-KE-315-100799.

All invoices submitted by the Contractor shall include the following Certification in order to proceed with its payment. This is an essential requirement and those invoices without this Certification, will not be processed for payment.

No interest Certification:

Under penalty of absolute nullity, I hereby certify that no employee, official or director of PREPA is a party or has any interest in the profits or benefits to be obtained under this Contract, or if any employee, official or director of PREPA has any interest in the profits or benefits under this Contract a waiver has been previously obtained. I, also certify that the only consideration to (furnish the goods) or (provide the services) under this Contract is the payment agreed with PREPA's authorized representative.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 16

*Cll*

*l . A.111.*

The total amount of this invoice is fair and correct.  The (works) were completed, (the products) were delivered or (the services) were provided and no payment has been received for said concept.

_____

Contractor's Signature

13.2    PREPA shall review Contractor's invoice to identify amounts that are correctly invoiced pursuant to the terms of this Contract and amounts that are incorrectly invoiced pursuant to the terms of this Contract, if any.  Within fifteen (15) days of PREPA's receipt of the invoice, PREPA shall either (i) approve the total invoice amount for payment, or (ii) approve that portion of the invoiced amount for payment which has been correctly invoiced pursuant to this Contract and shall notify Contractor in writing stating the specific reason why the remaining portion of the invoice is incorrect according to the terms of this Contract.

In the event of item (i) above, PREPA shall pay the total invoice no later than forty five (45) days after the Engineer approves the certification of payment.  In the event of item (ii) above, PREPA shall pay the approved portion of the invoice, no later than forty five (45) days after the Engineer approves the certification of payment.   Upon written notification from PREPA identifying the reason that a portion of the invoice is incorrect, Contractor shall correct and resubmit the invoice to PREPA during the next monthly invoicing cycle.  Upon PREPA's receipt of Contractor's corrected invoice, the above-specified approval and payment time frames shall be reapplied as it pertains to PREPA's payment for that portion of the invoice which had previously been incorrect.  In the event that PREPA does not provide written notification to Contractor that a portion of the invoice is incorrect pursuant to the requirements herein established, PREPA shall pay the invoice in total within forty five (45) days after the Engineer approves the certification of payment.  For all purposes herein, an invoice will be deemed to have been received by PREPA when delivered in original by hand delivery to the Engineer at the Site or the PREPA representative designated in writing by the Engineer.  The invoice shall be date-stamped by PREPA on such delivery.

13.2.1    If PREPA and Contractor disagree concerning the accuracy of an invoice, or if PREPA performs a subsequent review of an invoice after the fifteen (15) day review period has expired and it is found that an invoice paid in full was incorrect in accordance with the terms of this Contract, PREPA and Contractor shall work together in good faith to resolve the disagreement and reach a mutual agreement concerning the need for an invoice adjustment.  In the event that an agreement is not reached within fifteen (15) working days after notification by either Party of an invoice dispute, the matter may be referred for resolution pursuant to Article 35, <u>Disputes</u>.    PREPA's approval of the Contractor's invoice shall not waive or limit PREPA's rights to identify and resolve incorrect invoices in accordance with the above procedure or PREPA's audit rights as

Contract 0912653
Rehabilitation of Culebra Power Station
Page 17

specified in Article 13.2.2, <u>PREPA's Right to Audit</u>.

13.2.2      PREPA's Right to Audit.  Within thirty (30) days of Contractor's receipt of PREPA's written request, and provided PREPA's auditors are under confidentiality restrictions which Contractor deems reasonably necessary, Contractor shall afford PREPA's auditors access during normal working hours to all records and books (held at its principal offices or at the Site) relating to the milestone payments and/or change order payments paid to Contractor under this Contract.  Records and books shall be made available as described above during normal working hours for one (1) year after Final Acceptance of all Work performed under this Contract.  Any and all such audits shall be performed at PREPA's sole cost and expense.

Article 14.      Schedule and Superintendence of Work

14.1   <u>Notice to Proceed</u>.   PREPA shall issue a Notice to Proceed instructing the Contractor to proceed with the Work within ten (10) days from the signing of this Contract.

14.2   <u>Monthly Progress Report</u>.   The Contractor, within twenty (20) days after execution of this Contract and thereafter on the first day of each month, shall file with the Engineer a time chart or schedule of progress of the Work and the detailed method of carrying on the Work including a full statement of equipment and equipment layout for the Work ("Progress Report"). This Progress Report shall show the dates of commencement and completion of each system of the Work.  This Progress Report shall also include the milestones for the Submittals and material ordering for, and the critical path of the Project. The Progress Report may be adjusted jointly by the Parties to the extent necessary to provide for the use of adequate and sufficient equipment and force and a method of operations, which will assure the completion of the Work within the Approved Schedule.  The Progress Report shall be updated on a monthly basis.

14.3   <u>S-curve Graph</u>.  The Contractor, within twenty (20) days after execution of this Contract and thereafter on the first day of each month, shall file with the Engineer the S-curve Graph.  The S-curve Graph shall be plotted with the percent of Work completed in the Y-axis and the cost in the X-axis.  This S-curve Graph shall be based on the Progress Report.

14.4   <u>Superintendence</u>.   The Contractor shall designate a competent Construction Manager, reasonably satisfactory to the Engineer, with the expertise and resources necessary to provide construction management services to be furnished as part of the Work. The Contractor shall also designate a competent Resident Engineer, reasonably satisfactory to the Engineer, on the Site, at all times, during progress of the Work, with authority to act for him.  Contractor may change the Construction Manager and/or the Resident Engineer by giving at least twenty (20) day prior written notice to PREPA to implement a transition procedure.  The Construction Manager and/or Resident

Contract 0912653
Rehabilitation of Culebra Power Station
Page 18

Engineer, as the case may be, will be responsible for preparing a transition report which describes the Project status and major equipment inventory as of the replacement date. This report must be reviewed and approved by proper PREPA personnel prior to accepting the replacement, such approval not to be unreasonably withheld.

The Resident Engineer shall only be assigned to this Project. The Construction Manager and Resident Engineer shall represent the Contractor in his absence and all directions given to him by the Engineer shall be as binding as if given to the Contractor. The Contractor shall, at all times, enforce strict discipline and good order among his

employees and shall not employ on the Work any unfit person or anyone not skilled in the Work assigned to him. In addition, the Contractor shall be fully responsible for the negligent or wrongful acts or omissions of Subcontractors or of persons both directly or indirectly employed by the Contractor for performance of the Work, and shall be liable to PREPA and/or any affected third parties for such negligent or wrongful acts or omissions.

The Resident Engineer shall work at the Site location to perform duties and responsibilities as specified in writing between the Parties, or as otherwise agreed by the Parties, and as updated from time to time. The Resident Engineer shall inform and communicate with his counterpart who shall be PREPA's Engineer or his engineer designated by PREPA to Contractor in writing. PREPA shall have the right to request in writing Contractor to replace the Resident Engineer in its reasonable discretion based on the misconduct or negligent acts of the Resident Engineer.

Article 15.    Submittals

The Parties recognize that the timely supply of the Submittals by Contractor is important to the completion of the Project and Contractor agrees to cooperate with PREPA in order to fulfill the requirements of the Contract. PREPA agrees to use all commercially reasonable efforts to expedite the approval of Submittals hereunder.

Without limiting the generality of the above paragraph, PREPA shall within fourteen (14) days from the date of submittal thereof approve or furnish comments on each Submittal. PREPA's failure to approve or provide comments within such fourteen (14) day period shall be deemed PREPA's acceptance of such Submittal. "Submittals" shall include but not be limited to those Contractor drawings, specifications, methods, or data required to be furnished to PREPA hereunder for the progression of the Work. The Contractor is responsible to hand in five hard-copy (5) sets of the Submittals at PREPA's office in Monacillo and one at the site office, or one (1) electronic copy. All disapproved Submittals shall be corrected as required and resubmitted for PREPA's evaluation. In case of discrepancy in the Submittals, including Contractor's disagreement with corrections requested by the Engineer or PREPA, the matter shall be immediately

Contract 0912653
Rehabilitation of Culebra Power Station
Page 19

submitted to the Engineer, and the Contractor shall not proceed with the Work so affected until the Parties resolve such discrepancy in good faith.

Review or approval of Contractor's Submittals shall in no way relieve the Contractor from its responsibilities, obligations or liabilities under this Contract. The Contractor shall obtain such reviews or approval in writing from PREPA. The Contractor shall keep at the Site one hard-copy of the Contract Documents, specifications and drawings, and shall, at all times, give the Engineer access thereto. Anything called for in the Specifications and not shown on the drawings, or shown on the drawings and not mentioned in the Specifications shall be of like effect as if called for or shown on both.

Article 16.   Correlation of Documents

The Contract Documents are complementary and what is required by one shall be as binding as if required by all. In the event of conflicts, discrepancies or any inconsistency among the different Contract Documents and other supporting documents, the following order of precedence in descending order shall apply:

Approved Change Order
Contract
Technical Specifications
Drawings

Notwithstanding anything to the contrary in this article or elsewhere in this Contract, the provisions of Article 28, Liabilities, shall govern the liability of Contractor under this Contract.

Article 17.   Changes

17.1   PREPA may, at any time, and without notice to Contractor's sureties, request a change within the scope of Work. Changes requested by PREPA may include, but not be limited to, changes:

In the Work;
In the method or manner of performance of the Work;
In the PREPA furnished facilities, materials, services, or Site; and/or
Acceleration in the performance of the Work.

17.2   Within ten (10) working days after receipt of PREPA's written request for a change in the Work (or such shorter or longer period of time as may be reasonably required as agreed by PREPA and Contractor), Contractor shall advise PREPA of the cost, schedule and other impact(s) Contractor anticipates as a result of the change. If PREPA agrees with Contractor's statement as to the impact of the change, the Parties shall proceed promptly to enter into a written change order ("Approved Change Order")

000019

Contract 0912653
Rehabilitation of Culebra Power Station
Page 20



to equitably adjust the Contract Price, Approved Schedule, and/or other relevant terms of this Contract. If PREPA disagrees with Contractor's statement described above, PREPA shall promptly advise Contractor in writing of the basis for its disagreement and PREPA and Contractor shall thereafter work together promptly and in good faith to resolve any issues in order to, when applicable, enter into an Approved Change Order. Once an Approved Change Order has been signed by the Parties, Contractor shall proceed with the change. In no event will Contractor be obligated to proceed with a change except pursuant to a written Change Order accepted by both Parties in writing. Except as herein provided, and within the time frames stated, no order, statement, or conduct of PREPA shall be treated as an Approved Change Order under this section or entitle the Contractor to an equitable adjustment hereunder.

17.3   If PREPA and Contractor are unable to agree to the extent, if any, of an equitable adjustment to the Work in connection with a PREPA change, the dispute shall be determined as provided in Article 35, Disputes. In the meantime, and at PREPA's sole discretion, Contractor shall proceed or continue with the Work; however, at no time shall PREPA have the right to instruct Contractor to proceed with Work in violation of Applicable Law. Contractor shall submit to PREPA reasonably substantiating documentation of costs and expenses incurred in performing work in connection with an Approved Change Order.

17.4   PREPA reserves the right to withdraw its request for a change in writing at any time prior to Contractor's performance of work under an Approved Change Order. In the event that Contractor has begun performance of work under an Approved Change Order which PREPA has requested withdrawal, Contractor shall cease Work under the Approved Change Order promptly after receipt of PREPA's written notification, and the value of the Approved Change Order shall be mutually adjusted to account for the amount expended by Contractor until the time of Contractor's ceasing Work under the Approved Change Order as described above and any reasonably associated demobilization costs.

17.5   Notwithstanding anything to the contrary contained herein, Contractor may request and PREPA shall promptly review and process, a request from Contractor for a change order to equitably adjust the Contract Price, the Approved Schedule, and/or other relevant terms of this Contract in the event of a change to the Work hereunder, including without limitation, changes arising from Article 1, Scope of Work; Article 2, Commencement and Completion of Work; Article 13, Payment to Contractor; Article 15, Submittals; Article 16, Correlation of Documents; Article 21, Force Majeure; Article 24, Suspension of Work and Termination; Article 26, Permits and Licenses; Article 36, Laws to be Observed; Article 37, Change in Law; Article 39, Warranty; Article 43, Use of Completed Portions; Article 50, Differing Site Conditions and Site Reports; Article 58, Environmental Liabilities; and PREPA's failure to timely perform its obligations

Contract 0912653
Rehabilitation of Culebra Power Station
Page 21

hereunder which failure adversely impacts the Contract Price, the Approved Schedule, and/or other relevant terms of this Contract.

Article 18.   Periodic Inspections

All material and workmanship that is part of the Work performed at Contractor's facilities shall be subject to inspection and examination by PREPA's inspectors, at all reasonable times, during manufacture and/or construction, subject to PREPA complying with Contractor's customary security and safety procedures.   Contractor shall use reasonable efforts to procure a similar right for PREPA with respect to Subcontractors for the purpose of observing and visually inspecting material and workmanship that is part of the Work performed at Subcontractors' facilities.  Any and all such observations and inspections shall be at PREPA's sole cost.  PREPA shall bear the risk of loss as well as liability to itself, its personnel and PREPA's Engineer as well as the facilities, equipment or other property resulting from PREPA's, its personnel and/or PREPA's Engineer's acts or omissions in exercising its rights under this Article.  PREPA shall have the right to reject defective material or workmanship solely to the extent the same fails to meet the requirements of this Agreement, provided such rejection is submitted to Contractor in writing and no later than ten (10) days following PREPA's inspection.

Subject to the previous sentence, rejected workmanship shall be satisfactorily corrected and rejected material and equipment furnished by the Contractor shall be satisfactorily replaced or corrected, at Contractor's discretion, with proper material and equipment, without charge to PREPA.   The Contractor shall promptly furnish all reasonable facilities, labor, materials, and equipment necessary for the safe and timely inspections performed hereunder at Contractor's facilities in such a manner as not to unnecessarily delay the Work.

Final inspection of the Work shall be pursuant to Article 61, <u>Final Inspection</u>.

Article 19.   Other Works at the Site

PREPA reserves the right to perform other work by force account and/or enter into other contracts in connection with this Project or otherwise, to the extent the same does not delay or unreasonably interfere with Contractor's Work.   The Contractor shall afford PREPA and other PREPA contractors reasonable opportunity for the introduction and storage of their materials and the execution of their work and shall reasonably connect and coordinate its Work with theirs to the extent the same does not delay or unreasonably interfere with Contractor's Work.  If any part of the Contractor's Work depends upon proper execution or results of the work of PREPA or of PREPA's contractors, then Contractor shall promptly report to PREPA any defects in such work or any conflicts between such work and that of the Contractor of which it becomes aware.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 22

Wherever work being done by PREPA's own forces, or by other contractors, is contiguous to the Work, the Parties will mutually agree upon the procedures for the carrying out of such other work in advance of their being carried out to secure the completion of the various portions of the work in general harmony with the Work. Whenever, in the commercially reasonable opinion of PREPA, the orderly progress of the entire Project requires the use by PREPA's own forces or by other contractors, of construction equipment installed and operated by the Contractor for its own use, PREPA will arrange with the Contractor for such use, at times, and in locations which will not interfere with the Work being done under this Contract, and Contractor may be entitled to an Approved Change Order pursuant to Article 17, Changes, if applicable.

Contractor shall not be held responsible for loss or damage caused by PREPA, the Engineer or PREPA's agents as a result of the performance of other work as provided under this article.

Article 20.   Office of the Comptroller Filing

The demand of the obligations of either Party under this Contract will be subject to the filing of this Contract at the Office of the Comptroller of the Commonwealth of Puerto Rico, in compliance with Act 18 of October 30, 1975, as amended.

Article 21.   Force Majeure

The Parties hereto shall be excused from performing their respective obligations hereunder and shall not be liable in damages or otherwise for a failure to perform, if and only to the extent that they shall be unable to perform, or are prevented from performing by a Force Majeure event. Within ten (10) days after the occurrence of the alleged Force Majeure event, the claiming Party must give the other Party written notice describing the particulars of the occurrence and its estimated duration. The burden of proof as to whether a Force Majeure event has occurred shall be on the Party claiming the Force Majeure event.

For any Force Majeure event that increases Contractor's cost of performance or delays the Work, or otherwise adversely affects Contractor's rights and/or obligations under this Contract, then Contractor shall be entitled to an equitable adjustment to overcome the adverse effect(s) of any such event on Contractor's rights and/or obligations under this Contract as agreed by the Parties. Contractor shall furnish PREPA with a statement as to the impact and supporting documentation that reasonably demonstrates Contractor's increased costs, schedule delays or other impacts to the Work that Contractor claims. If PREPA agrees with Contractor's statement as to such impact, the Parties shall proceed promptly to enter into an Approved Change Order in connection therewith as provided in Article 17, Changes.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 23

If PREPA disagrees with Contractor's statement as to the impact of any such event, PREPA shall promptly advise Contractor in writing of the basis for its disagreement. PREPA and Contractor shall thereafter work together promptly and in good faith to resolve any dispute with respect to any issues relating to the impact of any such event. Contractor shall use all reasonable efforts to mitigate costs incurred by it in connection with the Force Majeure event and shall reasonably demonstrate that the Contractor is being diligent to remedy its inability to perform and resume in full its performance of the Work.

Article 22.   Liabilities

22.1   Civil Responsibility.   The appearing parties agree that their responsibilities for damages under this Contract will be governed by the Puerto Rico Civil Code and its case law, as dictated by the Supreme Court of Puerto Rico.

22.2   Protection Against the Occurrence of Damages.   The Contractor agrees to make, use, provide, and take all reasonable, necessary and sufficient precautions, safeguards, and protection against the occurrence or happenings of injuries, death and/or damages to any person or property during the progress of the Work.

22.3   Save and Hold Harmless

22.3.1   The Contractor agrees to save and hold harmless and to indemnify PREPA for all expenses and costs of any nature (including attorneys' fees) incurred by PREPA arising out of ordinary claims made by a person for personal injuries, including death, or for property damage, caused by the Contractor, by act or omission, in the performance or nonperformance of its obligations under this Contract.

22.3.2   PREPA agrees to save and hold harmless and to indemnify Contractor for all expenses and costs of any nature (including attorneys' fees) incurred by Contractor arising out of any claim made by any third party for personal injuries, including death, or for property damage, and any damages awarded to such third party in connection with such claim, to the proportionate extent such personal injury or property damage to such third party arose out of or resulted from the negligence or willful misconduct of PREPA and/or PREPA's agents in connection with this Contract.

22.4   Save Harmless for Operation of PREPA's Equipment.   The operation of PREPA's equipment by PREPA at the Site is within the exclusive control of PREPA and PREPA shall indemnify and save harmless the Contractor from loss, expense or liability imposed upon the Contractor for any injury to a person, including death resulting therefrom or damage to any property resulting from the operation of such equipment by PREPA or its agents.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 24

If the Contractor is allowed to operate PREPA's equipment at the Site, the Contractor shall indemnify and save harmless PREPA from loss, expense or liability imposed upon PREPA for any injury to a person, including death or damage to any property resulting from the operation of such equipment by the Contractor.

Article 23.    Independent Contractor

The Contractor shall be considered an independent contractor for all the material purposes under this Contract, and all persons engaged or contracted by the Contractor for the performance of its obligations herein shall be considered as its employees or agents or those of its Subcontractors, and not as employees or agents of PREPA. In consequence, the Contractor is not entitled to any fringe benefits, such as, but not limited to vacations, sick leave, and the like.

Article 24.    Suspension of Work and Termination

24.1   Suspension of Work.  The Contracting Officer or the Engineer may, at any time, by written notice to Contractor, suspend the whole or any portion of the Work under this Contract.   In connection with a suspension, Contractor shall be entitled to actual reasonable and necessary expenses due to delays caused by such suspension which delay is reasonably substantiated by Contractor and for which expenses Contractor has furnished reasonable substantiating documentation, including demobilization and remobilization costs, provided that any suspension ordered by the Contracting Officer or the Engineer on account of a Force Majeure event, and expenses related thereto, shall be pursuant to Article 21, Force Majeure, and not this Article 24.1.  The cause of such suspension shall be put in writing by the Contracting Officer or the Engineer within two (2) working days after the suspension or as soon as practicable.

24.2   Termination for Convenience.  PREPA, by seven-day advance written notice to Contractor, may terminate, cancel or accelerate the expiration of this Contract for its convenience, when it is in the best interest of PREPA.  In the event of PREPA's termination for convenience as described herein, Contractor shall recover from PREPA, as complete settlement for such terminated Work, a sum equal to its actual direct cost for the terminated Work performed as of the effective date of termination, plus an allowance for reasonable overhead and profit on such direct cost.

24.3   Termination for Contractor Default and Termination for Dissolution

24.3. 1  Termination for Contractor Default
PREPA may terminate this Contract if Contractor defaults in its performance of any material obligation under this Contract, and Contractor does not cure such default in performance within a period of thirty (30) Calendar Days after Contractor's receipt of such written notice of default from PREPA, unless such

000024

Contract 0912653
Rehabilitation of Culebra Power Station
Page 25

*C. A. M.*

default is not reasonably capable of being cured within thirty (30) days, in which case such cure period shall be extended as reasonably necessary. Events of default under this Contract include but are not limited to: (i) Contractor's failure to complete the Work within the Approved Schedule; (ii) Contractor is negligent in the performance of its obligations; (iii) Contractor persistently disregard laws, ordinances or the commercially reasonable instructions of the Engineer; (iv) Contractor fails to pay liquidated damages as required hereunder; and (v) Contractor's certification under Article 6, Certificate of Eligibility, is not correct, in whole or in part.

The exercise of its right to terminate, cancel or rescind this Contract shall not be understood as a waiver by PREPA to any other remedy it may have under this Contract or under the law for any breach incurred by the Contractor in the performance of its obligations under this Contract.

In the event of an uncured Contractor default under this Article 24.3.1, PREPA may, after written notice to Contractor, terminate this Contract and the following shall apply:

(a) PREPA may take possession of the Work and may complete any outstanding Work either itself or by engaging other contractors. PREPA may recover from the Contractor or its sureties any direct, reasonable and verifiable costs and expenses incurred by PREPA (inclusive of the additional reasonable cost of PREPA's employees and consultants) to obtain and mobilize a replacement contractor to complete the Work, directly resulting from the termination under this Article 24.3.1 and those direct, reasonable and verifiable costs and expenses incurred by PREPA to perform all activities necessary to solicit, select, contract with and mobilize a replacement contractor to complete such outstanding Work (collectively, "PREPA Termination Costs") as described in clause (c) below. PREPA shall use commercially reasonable efforts to complete any such outstanding Work in such a manner as to mitigate the PREPA Termination Costs.

(b) Contractor shall not be entitled to receive any further payment under the Contract upon Contractor's receipt of PREPA's notice of termination until the PREPA Termination Costs have been ascertained and the adjustment has been made per clause (c) below, if after any such adjustment amounts are due to Contractor.

(c) PREPA shall furnish Contractor with (1) a certification from PREPA that the PREPA Termination Costs are the total expenses incurred by PREPA in connection with taking over the Work as described herein and (2) a statement and reasonable supporting documentation substantiating the PREPA Termination Costs. If the PREPA Termination Costs exceed (i) the balance of the Contract Price unpaid at the time of the default by Contractor plus (ii) any

000025



Contract 0912653
Rehabilitation of Culebra Power Station
Page 26

undisputed amount PREPA would have paid Contractor under this Contract for the Work performed by Contractor prior to the termination date for which Contractor had not been paid, then Contractor shall pay to PREPA the amount of such excess within thirty (30) days following receipt of PREPA's demand for such payment of the PREPA Termination Costs. If the PREPA Termination Costs are less than (i) the balance of the Contract Price unpaid at the time of default by Contractor, plus (ii) any undisputed amount PREPA would have paid Contractor under this Contract for the Work performed by Contractor prior to the termination date for which Contractor had not been paid, then PREPA shall pay to Contractor the amount of such excess within thirty (30) days following receipt of Contractor's demand for such payment.

(d)   Contractor's warranty obligations for the Work, to the extent completed, pursuant to the terms of this Contract, including any re-warranty obligations shall, subject to any limitations in this Contract, survive termination of this Contract. Enforcement of such obligations after such termination shall be determined between the Parties at the time a warranty obligation is triggered and any disputes shall be resolved by the court of competent jurisdiction.

(e)   Contractor shall at no additional charge to PREPA (i) cooperate with PREPA and, upon PREPA's request, shall provide to PREPA any reasonable general Project information or information relating to the ongoing performance, status or management of the Work performed, and promptly provide reasonable information regarding completed Work to the extent such information must be delivered to PREPA to complete Work in process at the time of the termination of this Contract, to the extent Contractor possesses such information, and/or to the extent legally assignable to PREPA, provided, however, in no case shall Contractor be obligated to provide background, technology, design, engineering or proprietary process information; and (ii) upon PREPA's written request, provide and assign any subcontracts, between Contractor and auxiliary equipment Subcontractors and Subcontractors performing services on Site and any permits and third party licenses in Contractor's possession necessary to perform the Work.

In the event of a termination under this Article 24.3.1, PREPA shall use all reasonable efforts to mitigate costs incurred by it in connection with such termination.

24.3.2 Termination for Dissolution
In the event of Dissolution of either Party, the other Party may, by written notice, terminate this Contract, without prejudice to any of such Party's rights hereunder or at law.   As used herein, "Dissolution" means the bankruptcy, insolvency, liquidation, amalgamation, administrative or other receivership, winding up or dissolution of any Party.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 27

*ℓ. A. m.*

Article 25.   Insurance, Bonds and Requirements

Refer to the attached Supplemental General Conditions for the Puerto Rico Electric Power Authority Owner Controlled Insurance Program (OCIP), for the insurance coverage requirements.   The Contractor shall be responsible for enrollment and compliance with all requirements of the OCIP.

25.1   Contractor Provided Insurance

The Contractor shall secure and maintain in full force and effect during the term of this Contract as provided herein, policies of insurance covering all operations engaged in by the Contractor as follows:

25.1.1   Inland Marine Insurance
The Contractor shall provide Inland Marine Insurance to cover equipment in transit by land. The limit of this insurance must be at a minimum the cost of the equipment with the highest value to be transported during the term of the Contract.

25.1. 2   Ocean Marine Insurance
The Contractor shall provide Ocean Marine Insurance to cover equipment in transit in a marine transport. The limit of this insurance must be at a minimum the cost of the equipment with the highest value to be transported during the term of the Contract.

Article 26.   Permits and Licenses

PREPA and/or its agents shall obtain and maintain and pay for all approvals, certificates, permits and licenses in a timely fashion that are required for the Project other than the Contractor Permits (defined below) (collectively, "PREPA Permits") in final form.

Contractor shall obtain and maintain and pay for the construction permit required for the construction of the Project ("Contractor Permits"). PREPA agrees to provide Contractor with any appropriate collaboration reasonably requested by Contractor for Contractor's compliance in obtaining the Contractor Permits.

Should the Contractor find any discrepancy between the drawings and specifications relating to the Work and the Permits and/or Applicable Law, the Contractor shall promptly notify PREPA of the discrepancy following discovery thereof and shall not continue with the Work until there is an Approved Change Order covering changes based on such discrepancy.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 28

Subject to the following sentence, Contractor shall comply with all Permits in performance of the Work. If any requirement of any PREPA Permit necessitates a change to the Work and (i) would not have been otherwise required by any Applicable Law in force as of the date of signing of this Contract, or (ii) would not have been otherwise included within the scope of the Work based upon prudent industry practice in effect as of the date of signing this Contract, then Article 37, Change in Law, shall apply as if that requirement was a change in Applicable Law.

## Article 27.  Contingent Fees

The Contractor warrants that it has not employed any person to solicit or secure this Contract upon any agreement for a commission percentage, brokerage or contingent fee. Breach of this warranty shall give PREPA the right to annul this Contract or, at its discretion, to deduct from the Contract Price the amount of such commission, percentage, brokerage or contingent fees.

## Article 28.     Liabilities

### 28.1   Civil Responsibility

The appearing parties agree that their respective responsibilities for damages under this Contract will be governed by the Puerto Rico Civil Code and its case law, as dictated by the Supreme Court of Puerto Rico. However, the maximum amount of liability under the Contract shall not exceed the limits established under the insurance coverage provided under PREPA's OCIP.

### 28.2   Protection Against the Occurrence of Damages

The Contractor agrees to make, use, provide, and take all proper, reasonably necessary and sufficient precautions, safeguards, and protection against the occurrence or happenings of injuries, death and/or damages to any person or property during the progress of the work.

### 28.3   Save and Hold Harmless

The Contractor agrees to save and hold harmless and to indemnify PREPA for all expenses and costs of any nature (including attorneys' fees) incurred by PREPA arising out of any claim made by any person for personal injuries, including death or for property damage, caused by the Contractor, by act or omission, in the performance or nonperformance of its obligations under the Contract.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 29

28.4   Save Harmless for Operation of PREPA's Equipment

The operation of PREPA's equipment by PREPA at its plant site is within the exclusive control of PREPA and PREPA shall indemnify and save harmless the Contractor from loss, expense or liability imposed upon the Contractor for any injury to a person, including death, resulting there from or damages to any property resulting from the operation of such equipment by PREPA.

If the Contractor is allowed to operate PREPA's equipment at the plant site, the Contractor shall indemnify and save harmless PREPA from loss, expense or liability imposed upon PREPA for any injury to a person, including death or damage to any property resulting from the operation of such equipment by the Contractor.

Article 29.    Officials Not to Benefit

No officer, employee neither agent of PREPA, or of the Government of the Commonwealth of Puerto Rico or Municipal Governments, shall be admitted to any share or part of this Contract or to any benefit that may arise therefrom to the extent prohibited by law.

In addition to the restrictions and limitations established under the provisions of Act 12 of July 24, 1985, as amended, retired or former officers or employees of PREPA, whose work was in any way related to the award or management of contracts, shall in no way benefit from any contract with PREPA for a period of two (2) years after leaving employment with or ceasing services to PREPA.

Article 30.    Claims for Labor and Materials

The Contractor shall, at its own expense, assume the defense of and save harmless PREPA from claims by Subcontractors for labor and materials in connection with the Work and not suffer any mechanics or other liens to remain outstanding against any of the property used in connection with the Work; and shall, on reasonable request, furnish satisfactory evidence that all persons who have done Work or furnished materials hereunder have been fully paid.  If the Contractor fails to comply with its obligations in this respect, PREPA may take actions as entitled to under applicable law.

Article 31.    Unfair Labor Practice

Any declaration by the Puerto Rico Labor Relations Board (JRT) and/or by the National Labor Relation Board (NLRB) stating that the Contractor, its Subcontractors or agents have not complied with an order issued by the JRT or NLRB relating to any unfair labor practice, shall be binding, final, and conclusive unless such order is reversed or set aside by a court of competent jurisdiction.  Contractor agrees to comply and agrees to

000029

Contract 0912653
Rehabilitation of Culebra Power Station
Page 30

use whatever means necessary to bring its Subcontractors and agents into compliance with any such declaration by the JRT or NLRB.  In the event that the Contractor or any of its Subcontractors or agents do not comply with an order issued by the JRT and/or the NLRB imposing a monetary obligation, including but not limited to fines, penalties or wages, upon their finding that the Contractor or any of its Subcontractors or agents have committed an unfair labor practice in relation to the Work, PREPA shall deduct and retain from any payment to be made to Contractor, and shall notify Contractor in writing of such deduction and retention, an amount equivalent to the monetary obligation imposed by the NLRB or JRT.  Such amount will be retained until the Contractor provides to PREPA evidence demonstrating full compliance with such order including satisfaction of the monetary obligation thereunder.

Article 32.    Assignment

This Contract or any interest therein or any monies due or to become due hereunder shall not be assigned, mortgaged or otherwise disposed of by Contractor without the previous consent in writing of the Contracting Officer, which consent shall not be unreasonably withheld or delayed.

PREPA shall not assign this Contract or its rights or obligations hereunder without Contractor's prior written consent, which consent shall not be unreasonably withheld or delayed.

Article 33.    Subcontractors

The Contractor shall not assign nor subcontract its rights and obligations under this Contract, except in the event PREPA gives written authorization for such actions. Provided that no subcontract shall be considered for PREPA's approval, except when the following requirements are met: (1) the Contractor delivers PREPA a copy of the subcontract, not less than thirty (30) days prior to the effective date of the proposed subcontract; (2) the subcontract includes, as a condition for its legal validity and enforceability, a provision whereby PREPA has the right to substitute, subrogate or assume Contractors' rights under the subcontract, in the event that PREPA declares the Contractor in breach or default of any of the Contract terms and conditions; and (3) the subcontract includes, as a condition for its validity and enforceability, a provision establishing for the subcontractor the obligation to comply with all Contractors' obligations under the Contract (*mirror image clause*), except for such obligations, terms and conditions which exclusively related with works or services not included under the subcontract.

Contractor will be fully responsible for the Work despite subcontracting any part of the Work as described above.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 31

## Article 34.   Novation

PREPA and the Contractor expressly agree that no amendment or change order which could be made to this Contract, during its term, shall be understood as a contractual novation or amendment, unless both Parties agree to it, specifically and in writing. The previous provision shall be equally applicable in such other cases where PREPA gives the Contractor a time extension for the compliance of any of its obligations under this Contract or where PREPA dispenses the claim or demand of any of its credits or rights under this Contract.

## Article 35.   Disputes

Except as otherwise specifically provided in this Contract, all disputes concerning questions of fact arising under this Contract shall be decided by the Engineering Director, subject to written appeal by the Contractor within thirty (30) days to the Executive Director. As soon as practicable thereafter, the Executive Director shall inform each party hereto of his decision regarding the dispute, which decision shall be final and conclusive upon the parties hereto, unless such decision is challenged on the basis of being arbitrary, malicious or capricious. If such challenge is made, either party may pursue its remedy at law or equity. In the meantime, the Contractor shall diligently proceed with the work as directed.

## Article 36.   Laws to Be Observed

36.1   Contractor's Compliance.   Subject to Article 37, Change in Law, the Contractor shall observe and comply with any and all Applicable Laws. The Contractor shall save harmless and indemnify PREPA and its representative's officers, agents, and servants against any claim or liability to the extent arising from or based on the violation of any such Applicable Law, by Contractor or its Subcontractors in performance of the Work.

36.2   Code of Ethics.   Contractor agrees to comply with the provisions of Act 84 of June 18, 2002, which establishes a Code of Ethics for the Contractors, Suppliers, and Economic Incentive Applicants of the Executive Agencies of the Commonwealth of Puerto Rico.

36.3   PREPA's Compliance.   In performance of its obligations hereunder, PREPA agrees to observe and comply with any and all applicable laws. PREPA shall save harmless and indemnify Contractor and its representative's officers, agents, and servants against any claim or liability to the extent arising from or based on the violation of any such applicable law by PREPA or its agents in performance of their respective obligations hereunder.

000031

Contract 0912653
Rehabilitation of Culebra Power Station
Page 32

Article 37.    Change in Law

Notwithstanding anything to the contrary contained in this Contract, including without limitation Article 36, Laws to be Observed, and the Special Conditions, if a change in any Applicable Law occurs after the effective date of this Contract which increases Contractor's cost of performance, delays the Work, or otherwise adversely affects Contractor's rights and/or obligations hereunder, then Contractor must within a reasonable period of time and, in any event, within thirty (30) days after Contractor actually became aware of the change in Applicable Law, give written notice to PREPA with details of such change in Applicable Law, the Work affected or to be affected, and its assessment of any delay and the estimated costs that will be incurred in complying with that change in Applicable Law.  Provided Contractor has provided such notice to PREPA, Contractor shall then be entitled to an equitable adjustment to the Contract Price to account for any increased costs of performance, to extend the time for performance of the Work, and/or to otherwise equitably adjust the terms of this Contract as necessary to overcome the adverse effects of such change in Applicable Law on Contractor's rights and/or obligations hereunder.  Such equitable adjustment shall be mutually agreed by the Parties in good faith.  Contractor shall not be obligated to continue with the performance of the Work until such agreement is made.  Contractor shall furnish PREPA with a statement as to the final impact and supporting documentation that reasonably demonstrates Contractor's increased costs, schedule delays or other impacts to the Work that Contractor claims resulting from the change in Applicable Law.  If PREPA disagrees with Contractor's statement as to the final impact thereof, PREPA shall promptly advise Contractor in writing of the basis for its disagreement.  PREPA and Contractor shall thereafter work together promptly and in good faith to resolve any dispute with respect to any issues relating to the final impact of any such change in Applicable Law.  Contractor shall provide PREPA with documentation and Contractor shall use all reasonable efforts to mitigate costs incurred by it in connection with the change in Applicable Law.

Reference to the codes and/or standards of any society, organization, or association in any Contract Document shall mean the standard, code, specification, or tentative standard adopted and published as of the effective date of this Contract; and in the event of any change to any such codes and/or standards after the effective date of this Contract which impacts the Work, then the first paragraph of this Article 37, Change in Law, shall apply as if that change was a change in Applicable Law.

Article 38.  Separability

If a court of competent jurisdiction declares any of the Contract provisions as null or invalid, such holding will not affect the validity and effectiveness of the remaining provisions of this Contract and the Parties agree to comply with their respective obligations under such provisions not included by the judicial declaration.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 33

Article 39.  Warranty

39.1  <u>Contractor warrants to PREPA:</u>

The Contractor warrants that all materials, parts, equipment used, and work performed under this Contract comply in all respect with its terms and conditions; that they are free from any and all latent and patent defects in design, materials, and workmanship; that they are suitable and adequate for the purposes for which they were designed and for such other purposes, if any, as are specified in the Contract, and that the services provided under this Contract will conform with the highest standards of care and practice appropriate to their nature.  The Contractor will, upon written notice by PREPA, fully remedy, free of expense to PREPA, such defects as may develop on said services, materials, parts or equipment, provided that they have been properly stored, installed, maintained, and operated within the specified parameters.  The Performance Bond shall cover and serve as guarantee for this warranty.  For those materials, parts, equipment, which proves defective or deficient during the warranty period, the Contractor shall, at his own expense, repair or replace, transport-in, from Contractor's facilities to PREPA's site, and transport-out, from PREPA's site to Contractor's facilities, such materials, parts, and/or equipment.  The Performance Bond shall cover and serve as guarantee for the Contractor's failure, in whole or in part, to properly perform his obligations under this Contract.

For parts and equipment to be procured by Contractor from other suppliers, and which will be furnished by Contractor to PREPA under this Contract, a written warranty shall be obtained by the Contractor from each supplier and legally tended to PREPA prior to the commencement of work.

39.2  <u>Warranty Period.</u>

The warranty period will begin the date on which PREPA finally accepts the service and/or installation of the contracted product and will continue for a period of one (1) year.

39.3  <u>Warranty Obligations (Materials, Parts or Equipment).</u>

If the materials, parts or equipment provided by Contractor hereunder as part of the Work do not meet the above warranties during the Warranty Period, including without limitation the warranty that all Work be designed and suitable for the intended purpose and comply in all respects with the terms of this Contract, PREPA shall promptly notify Contractor in writing and make the equipment or defective part available to Contractor at the Site promptly for correction.  Contractor shall, subject to the limitations imposed in Article 39.6 below, thereupon correct any defect, noncompliance or unsuitability by, at its option, (i) repairing the defective part of the equipment (freight and insurance paid by Contractor) or (ii) by making available necessary replacement parts, freight prepaid to

000033

Contract 0912653
Rehabilitation of Culebra Power Station
Page 34

the Site at no cost to PREPA.  Contractor shall provide all technical advisory services reasonably necessary for any such repair of the equipment, including all required transport-in and transport-out from PREPA's Site.  The Warranty Bond, or in the absence thereof, any other Performance Bond then in place (at such relevant time as Contractor is notified by PREPA in writing of a nonconformity or warranty-covered defect as described herein), shall cover and serve as guarantee for this warranty remedy.

39.4   Re-warranty period.

Any re-performed service or repaired or replacement material, part or equipment furnished under this warranty during the original Warranty Period, shall carry warranties on the same terms as set forth above, except that the Warranty Period shall be for the same duration as the original Warranty Period from the date of such re-performance, repair or replacement (the "Re-Warranty Period").  Contractor's responsibilities set forth herein for such repaired or replacement part shall terminate, except as to parts or material as specified in Article 39.5.1 below, twelve (12) months after the end of the Warranty Period applicable to the item of equipment in which such repaired or replacement part was installed or in which such service was re-performed.  In the case of warranty extensions for repair or replacement pursuant to this Article 39, the warranties hereunder shall not extend further than twenty-four (24) months from the Substantial Completion Date.

39.4.1. If, however, a part or material warranted under Article 39.1 fails more than two (2) times for the same reason within the Warranty Period, including the Re-Warranty Period, the following criteria shall govern the warranty of such defective part during subsequent failures:

Third Failure:  Upon the third failure of the defective part for the same reason, Contractor shall repair or replace the defective part at Contractor's option; however, if Contractor decides to repair in lieu of replace, Contractor shall provide all reasonable analysis, information and supporting documentation leading to its decision.  Contractor shall additionally re-warrant such part for the same duration as the original warranty period beyond the Re-Warranty Period; provided that such warranty, including any re-warranty and additional re-warranty, shall not endure longer that thirty-six (36) months after the Substantial Completion date.

Fourth Failure:  Upon the fourth failure of the defective part for the same reason, Contractor shall repair or replace the defective part at PREPA's option. Contractor shall additionally re-warrant such part for the same duration as the original warranty period; provided that such warranty shall not endure longer than the Additional Re-Warranty Period.   Contractor shall perform a root cause

Contract 0912653
Rehabilitation of Culebra Power Station
Page 35



analysis of the repetitive failure and provide its analysis and recommendations in writing concerning the ongoing monitoring, maintenance and repair of the part.

39.5    Warranty Conditions.

Contractor does not warrant the equipment or any repaired or replacement parts against damage caused by ordinary wear and tear, or improper maintenance, operation or storage of spare parts by PREPA or by repairs by PREPA or by PREPA's employees or other contractors contrary to Contractor's recommendations or instructions of the Contractor's O&M manuals (including revisions thereto). Subject to the other provisions herein, the Contractor will provide the warranty remedy described herein for those warranty-covered defects as may develop on said services, materials, parts or equipment, provided that they have been properly stored, installed, maintained, and operated in conformance with the aforesaid O&M manuals.

PREPA shall promptly give notice of observed defects with reasonable promptness. PREPA shall not withhold reasonable access for Contractor to perform its warranty obligations.

39.6    Third Party Vendor Warranties in Case of Termination of Contract.

For parts and equipment which are part of the Work procured by Contractor from Subcontractors which are furnished by Contractor to PREPA under this Contract, Contractor shall use commercially reasonable efforts to obtain a warranty from each such Subcontractor running directly to PREPA or assignable by Contractor to PREPA in the event of termination of this Contract and, if so obtained, shall be legally tendered to PREPA upon PREPA's reasonable request. If any such Subcontractor's warranties extend beyond the warranties provided for by Contractor in this Article 39 in time and/or scope, Contractor shall use commercially reasonable efforts, short of litigation, to enforce such extended warranty on PREPA's behalf. Notwithstanding anything herein to the contrary, Contractor shall be solely responsible to administer and enforce any Subcontractor or third party vendor warranties during the Warranty Period.

39.7    Defects, Errors and Omissions

If Contractor fails to discharge its warranty obligations to repair or replace any materials, parts, or equipment that do not conform with the warranty requirements pursuant to Article 39.1, PREPA may issue an invoice to Contractor for any reasonable, necessary and verifiable expenses incurred by PREPA to repair or replace such materials, parts or equipment; provided that PREPA has notified Contractor of such failure in writing and provided Contractor with reasonable opportunity to cure such failure. PREPA shall use reasonable efforts to mitigate expenses incurred by it in connection with any such repair, replacement or re-performance. Contractor's failure to make payment within

Contract 0912653
Rehabilitation of Culebra Power Station
Page 36



thirty (30) days of receipt of such invoice shall entitle PREPA to deduct the corresponding amount due under such invoice from the next progress payment due under the Payment Schedule.

39.8  Correction of Work After Final Payment.

Neither the final payment nor any payment hereunder shall relieve the Contractor of its warranty obligations for Work performed under this Contract as described in this Article 39. Contractor shall remedy such nonconformities or defects, which may appear within the applicable Warranty Period provided that PREPA shall give notice of observed defects with reasonable promptness, but in no case later than thirty (30) days beyond the expiration of the Warranty Period.

39.9  Warranty Disclaimer. The foregoing warranties are exclusive and are given and accepted in lieu of (a) any and all other warranties, express or implied, including, without limitation, the implied warranties of merchantability and fitness for a particular purpose; and (b) any obligation, liability, right, claim, or remedy in statute, contract, tort or strict liability against contractor, its parents or its affiliates, whether or not arising from the negligence, actual or imputed, of contractor, its parents or their affiliates, stockholders, directors, officers, employees, assigns and agents; provided that the limitations in this article shall not alter or otherwise affect contractor's save and hold harmless and indemnity obligations under Article 22.

Notwithstanding the provisions herein above stated, neither Party waives its rights under Article 1483 of the Civil Code of Puerto Rico.

Article 40.     Income Tax Withholding

PREPA will deduct and withhold at source to the Contractor the equivalent of seven percent (7%) from payment for services rendered under this Contract, in compliance with the 1994 Puerto Rico Internal Revenue Code, section 1143, as amended. Notwithstanding, the withholding to be done by PREPA as herein stated could be increased to twenty percent (20%) in the event that the Contractor is a non resident individual, which is a U.S. citizen, as provided by the 1994 Puerto Rico Internal Revenue Code, section 1147; or twenty-nine percent (29%) in the event that the Contractor is a non resident and non U.S. citizen individual; or a foreign corporation or partnership which is not dedicated to industry or business in Puerto Rico, as provided by the 1994 Puerto Rico Internal Revenue Code, sections 1147 and 1150.

If a Release Letter has been issued to the Contractor by the Treasury Department, the Contractor shall be responsible to submit a copy of said Release Letter to PREPA for every calendar year, otherwise, payments under the Contract shall remain subject to withholding at source. All invoices shall be segregated by concepts (services, materials, equipment, etc.), to identify the amounts subject to withholding and avoid

Contract 0912653
Rehabilitation of Culebra Power Station
Page 37

undue deductions.

### Article 41.  Discrimination

The Contractor certifies that it is an employer with equal opportunity employment, and that it complies with all Applicable Laws prohibiting discrimination in employment.

### Article 42.  Other Taxes

All unemployment, retirement, and other Social Security contributions and taxes; all privilege, business and occupational taxes, and, subject to the following sentence, any other taxes or fees payable by the Contractor are and shall be included as part of the Contract Price.   Notwithstanding the foregoing, the Contract Price is exclusive of any excise, sales or other tax that may be assessed for introducing merchandise into Puerto Rico.

### Article 43.  Use of Completed Portions

PREPA, in coordination with Contractor, shall have the right to take possession of and use any completed or partially completed portions of the Work to the extent it is reasonable to do so and is capable of being used safely and for their intended purpose based on their then current state of completion, notwithstanding the fact that the time for completing the entire Work may not have expired.  Taking possession and use of the Work or any portion of Work thereof shall be deemed to be acceptance by PREPA of care, custody and control of the Work and risk of loss thereof, but shall not be deemed Final Acceptance unless all Punch List items have been completed and all terms and conditions of Final Acceptance have been met.  In the event of such taking possession and use of Work as described above, and notwithstanding anything to the contrary contained herein, Substantial Completion shall be deemed achieved, and Contractor's warranty obligations under Article 39, Warranty, shall commence, in each case at the time of PREPA's possession of and use of any completed or partially completed portion of such Work.

### Article 44.  Present Site

44.1   The Contractor shall protect, during its construction operations portion of the Work, to the reasonable satisfaction of the Engineer and as per the Contract Documents, all existing Site structures, piping, conduits, equipment, and facilities indicated to remain against damage.   To the extent necessary to execute the Work under this Contract, all existing underground utilities for which PREPA shall furnish the location thereof to Contractor shall be located by hand excavation and shall be carefully protected.   Damages to those utilities for which PREPA has furnished the location thereof to Contractor to the extent due to the fault or negligence of the Contractor, its agents or Subcontractors shall be immediately repaired by Contractor (with no cost to

Contract 0912653
Rehabilitation of Culebra Power Station
Page 38



PREPA).

44.2   The Contractor shall perform the Work in a manner that in no way endangers the existing Site facilities.  In all cases where connections to existing equipment occur, such connections shall be made under specifications and advance written instructions and authorization by PREPA.  When such advance written instructions and authorization are requested by Contractor, the same shall be furnished promptly thereafter by PREPA.  The Contractor and its Subcontractors shall not use the existing Site facilities such as toilets, showers, compressed air, or shops without PREPA's consent.

44.3   The Contractor shall provide for all labor, water, air, light, power, transportation, materials, appliances, scaffolds, tools, equipment, and field offices for its personnel, warehouses, shops, sanitary facilities, and other facilities and services necessary for the execution and completion of the Work and shall be paid for such items in accordance with the terms and conditions of the Contract Documents, other than those items which are specified as PREPA's responsibility in the Contract Documents.

44.4   The Contractor shall enter the operating area of the Site only for the express purpose of carrying out the Work to be performed under this Contract.  The Contractor shall maintain working conditions within such area so that PREPA's personnel can adequately and safely access the facilities, to the extent such operation is necessary.

44.5   The Contractor shall furnish and install a new office trailer for PREPA which complies with the following conditions:

(a)      It shall have an interior area of at least 12' x 40'.
(b)      It shall include two (2) private offices and one (1) conference area as a minimum. It shall come completely furnished with the following proper office equipment: two (2) desks, one (1) conference table, chairs, two (2) laptop computers of latest model, one (1) printer/fax machine, one (1) telephone line with DSL internet connection, two (2) mobile telephone units with at least 1,000 minutes monthly by unit, one (1) refrigerator, one (1) air conditioner, and all of the reasonably necessary drinking and potable water, electrical and sanitary facilities.

During the course of performance of the Work, the Contractor shall be responsible for the complete installation and maintenance of all the necessary facilities and equipment of the new office trailer, including light, water, septic and telephone facilities, and interior cleaning.  The new office trailer shall be located near the construction area of the Site, which location shall be subject to approval of the Engineer, such approval not to be unreasonably withheld or delayed.  The costs of water, sanitary, electric and telephone services during the course of performance of the Work shall be included as part of the Contract Price.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 39



44.6   If private land is used by the Contractor for temporary field office, construction plant, warehouse, temporary road, and other facilities for construction operation as part of the Work, the Contractor shall make all necessary arrangements with the land owner and shall pay all rentals or other costs connected therewith.

Article 45.    Additional Provisions

The Contractor shall provide the following:

45.1   Sanitary and first aid facilities for its personnel. These arrangements shall be coordinated with and approved by PREPA, such approval not to be unreasonably withheld or delayed.

45.2   Safety equipment, such as helmets, welders, jackets, goggles, gloves, etc.

45.3   Adequate and proper identification of Contractor's personnel working at the Site.

45.4   Adequate field facilities and guard vigilance, to the extent Contractor deems necessary, to keep safe all materials, tools, equipment, and spares used in connection with the Work.

45.5   Change facilities for the Contractor's personnel to the extent necessary for the Work.

45.6   Transportation of components which are part of the Work to and from shop and/or warehouse facility.

45.7   Fabrication and delivery of parts which are part of the Work that were broken in such a way that repair is impossible, and of which there are no replacement spare parts.

Article 46.    Requirements of Contractor's Work Force

46.1   All prospective employees to be utilized by the Contractor or Subcontractors, who are residents of Puerto Rico, shall possess a Good Conduct Certificate issued by the Police Department during the last six (6) months. PREPA reserves the right to conduct a security check of any prospective employees prior to their acceptance to work and also when entering or leaving the Site. For that purpose, the Contractor shall prepare a list of prospective employees with an express authorization from each prospective employee to permit PREPA to perform a background investigation. Such list shall contain the prospective employee's first name, middle name or initial (if any), last name, the Social Security number, date, place of birth, and the residential address.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 40



*l. A.m.*

46.2   Any violation by the Contractor's personnel of the above requirements, the safety programs described herein or any established security measures of which Contractor was made aware will be cause for the individual's immediate suspension from the Project.

Article 47.   Working Hours and Job Organization

47.1   PREPA's normal working hours and days are Monday through Friday: 7:30 a.m. to 11:30 a.m. and 12:30 p.m. – 4:00 p.m.   Contractor's working hours may exceed PREPA's normal working hours per the definition of "Working Day" in Article 12, Definitions.

47.2   For work schedules different from that described herein, Contractor shall submit its proposed working hours for PREPA's approval, which shall not be unreasonably withheld, defining the number of shifts/day, number or hours/shift, and number of days/week with the schedule of Work.

Article 48.   Transportation and Storage of Equipment

48.1   Contractor shall be responsible for picking up and loading the equipment to be used in connection with the Work at the dock of destination and for transporting, unloading, uncrating, and handling the same at the Site. The Contractor shall unload all materials and equipment to be used in connection with the Work within a reasonable period of time after arrival at the Site.  The salvage materials, dunnage, and scrap resulting from such Work shall be disposed of by the Contractor as prescribed in Article 54, Cleaning Up.

48.2   Products to be used in connection with the Work shall be delivered to the Site properly identified with names, model numbers, types, grades, compliance labels, material safety data sheets and other information needed for their identification as per Applicable Law.

48.3   Materials and equipment which are part of the Work shall be stored in a clean and safe place.

48.4   The Contractor shall select the route to be used in transporting the heavy equipment to be used in connection with the Work from the dock and/or warehouse to the Site, and will reinforce, if necessary, the bridges and culverts along that route to make them safe for the passage of such heavy loads.

48.5   For all equipment purchased by the Contractor in connection with the Work for the Project, the Contractor shall report to PREPA in writing, within one (1) week after

Contract 0912653
Rehabilitation of Culebra Power Station
Page 41

receiving such equipment, any damage to equipment upon delivery and off loading of which Contractor is aware or becomes aware.

Article 49.    Vigilance

The Contractor shall be responsible for and provide adequate guard vigilance of the Work areas during non-working periods, to the extent Contractor deems necessary to protect the Work.

Article 50.    Differing Site Conditions and Site Reports

50.1   It is understood and agreed by the Parties that nothing herein shall be interpreted as placing any responsibility or liability on Contractor or its affiliated companies for pre-existing site conditions, including but not limited to pollution, contamination, hazardous waste or toxic material or for the generation, emission, or disposal of such substances; or physical and structural conditions below the ground including any partially completed structures, in-ground Work, piling, and utilities which are not directly attributable to the Contractor's acts or omissions or that of its agents, employees and/or Subcontractors. PREPA shall protect and indemnify Contractor and its affiliated companies, agents and Subcontractors against any and all claims or liabilities based on such pre-existing site conditions.

50.2   PREPA has provided a subsoil study, as-built drawings and other documentation to describe and locate.

Contractor shall within ten (10) business days of discovery of any site condition which materially differs from those indicated in the Site Reports notify PREPA in writing before such site conditions are disturbed (or further disturbed after discovery).   The notice shall describe the site condition and the anticipated actions that must be taken in order to proceed with the Work.   PREPA shall thereafter promptly investigate the site conditions.

Differing site conditions shall include (i) hidden, latent, or subsurface physical conditions at the Site, differing materially from those indicated in the Site Reports; or (ii) physical conditions at the Site unknown by Contractor.

50.3   If any differing site condition, as provided under Article 50.2 above, increases Contractor's cost of performance or delays the Work, or otherwise adversely affects Contractor's rights and/or obligations under the Contract, then Contractor shall be entitled to an equitable adjustment in accordance with Article 17, Changes. If PREPA and Contractor are unable to agree as to the extent, if any, of an adjustment in the Work in connection with a differing site condition, the dispute shall be resolved pursuant to Article 17.3.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 42

50.4   Contractor shall be responsible for having taken the steps reasonably necessary to ascertain the general nature and location of the Work and the general and local conditions concerning the features of the Site, which could reasonably be expected to affect the Work or the cost thereof.   Any failure by the Contractor to have done so will not relieve the Contractor from responsibility for successfully performing the Work in accordance with the requirements of this Contract.

Article 51.   Stamps Fee

The Contractor shall provide for the cancellation of stamps of the College of Engineers and Surveyors of Puerto Rico which are required to be attached to any plan, document or certificate submitted by Contractor for the approval of the Permits and Regulations Administration ("ARPE") or any other body as a PTC to the extent required by Applicable Law.

Article 52.   Progress Reports

A CPM schedule shall be submitted to PREPA for approval before commencement of the Work (the "Approved Schedule").   The Approved Schedule shall be used to measure the progress of the Work, to aid in evaluating time extensions and to provide the basis of all milestone payments under the Payment Schedule.

As required under Article 14.2, Monthly Progress Reports, Contractor shall update the Approved Schedule no less than once per month through Project schedule revisions and shall furnish the same to the Engineer both in hard copy and electronic format.   A narrative report shall be provided with each updated Progress Report.   The Progress Report shall be provided as a basis of the Contractor's request for payment under the Payment Schedule.   The narrative report shall include a description of the activities along the most critical path, a description of current and anticipated problem areas or delaying factors and their anticipated impact.   The scheduling software used for the Progress Reports shall be the latest version of Microsoft Project software or such other software as mutually agreed by the Parties.

At a minimum, the following information shall be clearly delineated for each activity on the Approved Schedule and any changes thereto:

Start and finish dates
All Project milestone dates
Activity Duration
Party Responsible to Execute Activity
Logic links and link type
Float or Slack time

Contractor shall maintain an Approved Schedule baseline that clearly identifies

Contract 0912653
Rehabilitation of Culebra Power Station
Page 43



modifications to activity logic links, durations and changes in time of performance when compared to Approved Schedule updates.

Default progress date disallowed – Actual start and finish dates shall not be automatically updated by a default mechanism that may be included in CPM in the scheduling software system.   Updating the percent completed and the remaining duration of any activity shall be independent functions.   Program features which calculate one of these parameters from the others shall be disabled.

Out of sequence progress – Activities that have posted progress without all preceding logic being satisfied will be allowed in a case-by-case approval of the Engineer, which approval shall not be unreasonably withheld or delayed.  The Contractor shall propose logic corrections to eliminate all out-of-sequence progress or justify not changing the sequencing for approval prior to submitting the updated Project Schedule.

Approved changes verifications – Only project schedule changes that have been previously approved by the Engineer and/or pursuant to an Approved Change Order shall be included in the schedule submission.   The narrative report shall specifically reference, on an activity by activity basis, all changes made since the previous period and relate each change to documented, approved schedule changes.

Time extensions – In the event the Contractor requests an extension of the Final Acceptance date or any interim milestone date, the Contractor shall, in connection with and notwithstanding the provisions in Article 17, _Changes_, furnish the following for determination as to whether or not it is entitled to an extension of time: submission of proof of delay, based on revised activity logic, duration is obligatory to any approvals. The project schedule shall clearly display that the Contractor has used in full all the float time available for the Work involved with the extension request.   The Engineer's determination as to the number of allowable days of contract extension shall be based upon the project schedule updates in effect for the time period in question and other factual information.  Actual delays that are found to be caused by the Contractor's own actions, which result in the extension of the schedule, will not be a cause for time extension to the Final Acceptance date.

Article 53.    Access to Work

The Contractor shall permit all persons appointed or authorized by PREPA to visit and inspect the Work, or any part thereof, at all reasonable times and places during the progress of the Work.  To the extent reasonably practicable, PREPA shall give Contractor advance notice of PREPA's intention to inspect.  Such inspections shall take place at such times and in such a manner as will not unreasonably interfere with, hinder or delay Contractor's performance of the Work.  Any and all such visits and inspections shall be subject to compliance with Contractor's customary security and safety procedures and shall be at PREPA's cost and risk as provided in Article 18, _Periodic_

Contract 0912653
Rehabilitation of Culebra Power Station
Page 44

Inspections.

Article 54.    Cleaning Up

Subject to Article 58, Environmental Liabilities, Contractor shall, from time to time, as reasonably requested by the Engineer, remove from the Site all temporary structures erected by Contractor and/or its Subcontractors which are no longer required for progression of the Work, rubbish, and waste materials resulting from Contractor's Work.

Subject to Article 58, Environmental Liabilities, upon completion of the Work, the Contractor shall remove from the vicinity of the Work all remaining rubbish, unused materials, and other like material, brought onto or generated on the Site by Contractor or its Subcontractors in performance of the Work, and in the event of its failure to do so within twenty (20) days after Contractor's receipt of notice by PREPA of such failure, the same may be removed by PREPA at the Contractor's expense, and its surety or sureties shall be liable therefore, provided that PREPA uses commercially reasonable efforts to mitigate its costs associated therewith and provides documentation substantiating such costs to Contractor.

Article 55.    Quality Assurance Clause

The Contractor shall establish a quality control program adequate to satisfy all Applicable Laws and requirements specified in this Contract, which shall be reasonably satisfactory to PREPA ("Quality Control Program"). The Quality Control Program shall contain all measures reasonably necessary to assure that technical requirements for the Work are fulfilled.

PREPA reserves the right to conduct, at reasonable times during working hours, audits and inspections of the Contractor's facilities, activities, and/or documents related to the Work without previous notification necessary in order to assure that the Quality Control Program is adequate and is being properly implemented. The Contractor shall allow PREPA access to its facilities and documents so that such audits and inspections might be conducted. Notwithstanding the foregoing, such audits and inspections shall take place at such times and in such a manner as will not unreasonably interfere with, hinder or delay Contractor's performance of the Work. Any and all such audits and inspections shall be subject to compliance with Contractor's customary security and safety procedures and shall be at PREPA's cost and risk as provided in Article 18, Periodic Inspections.

In every case in which the materials or services which are part of the Work to be furnished to PREPA are subcontracted partially or totally by the Contractor, the Contractor shall request the Subcontractor to accept and comply with all the requirements of this Quality Assurance Article.

000044

Contract 0912653
Rehabilitation of Culebra Power Station
Page 45



Article 56.    Safety Provisions

56.1   The Contractor shall have an Occupational Safety and Health Program ("OSHA Program").  A copy of the OSHA Program will be delivered by Contractor to the Engineer who shall in turn furnish to PREPA's Occupational Safety Department.  The OSHA Program shall comply with the following minimum requirements:

It shall comply with all Applicable Laws, including those applicable requirements included in 29 CFR.  The OSHA Program shall have been updated as required by Applicable Law.

It shall establish the mechanisms used to update and audit compliance with the OSHA Program.

It shall include an accident or incident investigation procedure.  This procedure will always include the preparation of a report, which will be submitted by Contractor to the Engineer who will in turn submit to the Occupational Safety Department of PREPA.

56.2   The Contractor shall submit to the Engineer, for evaluation by the Occupational Safety Department and Environmental Protection Division of PREPA, a copy of the Site Specific Work Plan.  The Site Specific Work Plan shall include to the extent applicable, but not be limited to, the following aspects:

Objectives of the Site Specific Work Plan
Description of the activities to be performed thereunder.
Occupational safety and health considerations to be addressed before commencement of the Project.

Procedures to be followed during the performance of the Work for achieving compliance with Applicable Law, including, but not limited to the following to the extent applicable:

Occupational Exposure to Lead (29 CFR 1926.62)
Scaffolds (29 CFR 1926 Subpart L)
Confined Spaces (29 CFR 1910.146)
Occupational Exposure to Noise (29 CFR 1910.95)
Hazardous Materials (29 CFR 1910 Subpart H)
Personal Protective Equipment (29 CFR Subpart I)
Hazard Communication (29 CFR 1910.1200)
HAZWOPER (29 CFR 1910.120)
Fire Protection (29 CFR 1910 Subpart L)
Commercial Diving (29 CFR 1910 Subpart T)
Respiratory Protection (29 CFR 1910.134)
Fall Protection (29 CFR 1926 Subpart M)
Electrical (29 CFR 1926 Subpart K)

000045

Contract 0912653
Rehabilitation of Culebra Power Station
Page 46

Welding (29 CFR 1926 Subpart J)
Excavations (29 CFR 1926 Subpart P)
Demolitions (29 CFR 1926 Subpart T)
Blasting & Explosives (29 CFR 1926 Subpart U)
Ventilation (29 CFR 1926.57)
Tools, Hand, and Powered (1926 Subpart I)
Electric Industry (29 CFR 1910.269)
Lockout/Tagout (29 CFR 1910.147)
Asbestos (29 CFR 1910.1001)

Any other regulation or guidelines related to safety and health that could reasonably be expected to be applicable to the scope of Work, and contingency procedures that include how to proceed in an emergency situation, such as fire or chemical spill, among others.

A list of all specialized personnel needed, and a copy of all training certificates, licenses or certifications required, according to the scope of Work (for example: pesticide applicator, electrician, spill responder, refrigeration technician, DOT training for hazardous substances, etc.). All of these certificates and licenses shall be up to date.
Copy of the Material Safety Data Sheets (MSDS) of all chemical products to be used in the course of performing the Work, for evaluation and approval by the Occupational Safety and Health Office at PREPA (Hazard Communication Section).
Certification of compliance with medical surveillance requirements, according to the scope of Work.
Certification of compliance with Fit Test requirements for the use of respirators that make a face seal.
Safety equipment and materials to be used during the performance of the Work.
Procedures to verify the Work area after each work day and at the end of the Project.
Each Contractor/Subcontractor shall adhere to a 100% drug /alcohol free work zone. At minimum, pre-project and post accident testing is required. A positive post accident test or positive pre-project test will result in worker dismissal from the Project. Testing will be performed following closely the NIDA standards.

56.3   Before commencement of the Work, the Contractor shall take part in a coordination meeting with a PREPA Safety Officer and the Project Manager on PREPA's behalf. During this meeting the areas to be worked on will be toured, and the Site Specific Work Plan will be discussed and reviewed.

56.4   If the Work includes demolition activities (as defined per ANSI A10.6 – 1990: Demolition – the dismantling, razing or wrecking of any fixed building or structure or any part thereof) that will be carried out in buildings or structures, that because of their construction date or prior use, are suspected to contain asbestos, lead based paint or other Hazardous Materials, the Contractor will require a certification from PREPA stating that the building or structure is free of such materials. If such certification is not

000046

Contract 0912653
Rehabilitation of Culebra Power Station
Page 47



provided within a mutually agreed time frame, Contractor may after giving advance written notice to PREPA, conduct its own investigation to verify the presence of the above-referenced materials at PREPA's expense.

56.5   Performance of Work inside buildings occupied by working personnel that could reasonably be expected to create a hazard to their safety or health will be conducted after PREPA's working hours.  The Contractor will take all steps necessary to assure the area will be free of nuisance odors or vapors before PREPA personnel is to reoccupy.  All these will be done in coordination with the local supervisor of PREPA.

56.6   The Contractor shall assure that all wastes brought onto the Site by Contractor or its Subcontractors are removed and disposed of in accordance with Article 58, Environmental Liabilities.

56.7   All chemical products to be used in performance of the Work shall be classified as "Approved" or "Conditionally Approved" by PREPA's Hazard Communication Section before entering the Site.
56.8   Welding operations will comply with Applicable Law, including the requirements of OSHA, ANSI and NFPA to the extent applicable.

56.9   If the Work involves the handling of non-asbestos insulation or other dust generating materials, like gypsum board, steps shall be taken to prevent the release of the dust to adjacent areas.

56.10 The Contractor shall comply with all Applicable Laws concerning the safety of persons or property or to protect them from damage, injury or loss, including erecting and maintaining, as required by existing conditions and progress of the Work, all reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent utilities.

The Contractor shall designate a responsible Safety Officer at the Site, whose duty shall be the prevention of accidents and implementing both the OSHA Program and the Site Specific Work Plan in coordination with the Safety Officer from PREPA.    The Contractor's Safety Officer shall have successfully completed the thirty (30) hours Occupational Safety and Health Administration course in occupational safety and health standards for the construction industry.  Contractor shall also have on Site at all times during performance of the Work and available at any time the latest revision of the OSHA Standards for the Construction Industry manual.

56.11 Compliance with all safety provisions by Subcontractors shall be the responsibility of the Contractor.

000047

Contract 0912653
Rehabilitation of Culebra Power Station
Page 48



56.12 Contractor agrees that it shall perform all Work in compliance with applicable federal, state and local occupational safety and health regulations, as described in the Site Specific Work Plan.

56.13 Contractor will obtain and maintain, during the duration of the performance of Work hereunder, all permits from all federal, state and local regulatory authorities or other applicable government agency as required by Applicable Law with respect to discharge, disposal, use, storage, handling and transportation of hazardous chemicals and substances by Contractor and Subcontractors as part of the Work hereunder. If the Work includes the handling of asbestos, lead, or spilled hazardous substances, the notification to EPA or the EQB will be done by the Contractor as required by Applicable Law and in coordination with the Safety Officer and the Environmental Advisor or Officer.

56.14 Contractor, will not bring or permit to be brought by Contractor's Subcontractors or agents any hazardous chemical or product containing a hazardous chemical to the Site except as disclosed to PREPA in the Site Specific Work Plan.

56.15 Contractor will defend, indemnify and hold harmless, Puerto Rico Electric Power Authority, its employees, agents or assignees for any and all direct liabilities and expenses arising out of Contractor noncompliance with this Article 56.

Article 57.    Special Safety Provisions

Further to the provisions stated under Article 56, Safety Provisions, the Contractor shall submit its safety program, including the following:

Accident incident record and investigating procedures
Cutting and welding permit procedure
Emergency plans including hurricane, fire, accidents, etc.

Article 58.    Environmental Liabilities

58.1  Hazardous Materials Definition.  As used herein, "Hazardous Materials" shall mean any "hazardous substance" as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601, et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§ 1801, et seq.), "hazardous wastes" as defined in the Resource Conservation and Recovery Act, as amended (42 U.S.C. §§ 9601, et seq.), "toxic substances" as defined in the Toxic Substance Control Act as amended (15 U.S.C. §§ 2601 et seq.), or in any other applicable laws.

58.2  Notification.  Each Party agrees to notify the other Party as soon as reasonably practicable and in any event within five (5) business days after it becomes aware of any

000048

Contract 0912653
Rehabilitation of Culebra Power Station
Page 49



Hazardous Materials on, in, over or under the Site. The Contractor shall reasonably inform and coordinate with PREPA's Supervisor of the Environmental Section in connection with any Work to be done at the Site to avoid any environmental law violation in connection with the Work.

58.3   Contractor Indemnification.   The Contractor agrees to take the risk of and to defend, indemnify and hold harmless PREPA from and against any and all losses, damages, claims, actions, costs, expenses, fines, penalties and assessments (including but not limited to, reasonable attorneys' fees) arising out of, in connection with, or relating to any Hazardous Materials brought onto or generated on the Site by Contractor or its Subcontractors or agents during the performance or non-performance of its obligations under this Contract. Contractor will have no obligation to handle, remove, remediate or otherwise disturb the Site in respect of any Hazardous Materials which it (and its employees or Subcontractors) does not bring or generate on Site unless otherwise mutually agreed by the Parties in advance in writing.

58.4   PREPA Indemnification.   PREPA agrees to take the risk of and to defend, indemnify and hold harmless Contractor, its officers, directors, agents, employees, successors, assigns, Subcontractors, insurers, and affiliates from and against any and all losses, damages, claims, actions, costs, expenses, fines, penalties and assessments (including but not limited to, reasonable attorneys' fees) arising out of, in connection with, or relating to any Hazardous Materials on, in, over or under the Site, except for any Hazardous Materials brought onto or generated on the Site by Contractor or its Subcontractors. PREPA shall, pursuant to Article 17, Changes, grant the Contractor an extension of time for delay to the Approved Schedule and pay the Contractor its costs incurred or suffered in performing the Work to the extent such delay or costs result from the discovery, existence or infiltration of Hazardous Materials on, in, under or over the Site, except for those Hazardous Materials which Contractor and its Subcontractors brought onto or generated on the Site.

58.5   Equipment and Containers.   The Contractor should have available, and close to the working area of the Site, the necessary equipment to control and pick-up any spills that could occur in connection with Contractor's or its Subcontractors' performance of the Work as required by this Contract. PREPA shall make available at the Site containers for the disposal of any Hazardous Materials brought onto or generated on the Site by Contractor in connection with the Work. Contractor shall handle and place Hazardous Materials brought onto or generated on the Site by Contractor in performance of the Work in the above-described containers in accordance with Applicable Laws. PREPA shall comply with all applicable laws in handling and disposing of Hazardous Materials.

All equipment to be used in performance of the Work at the Site should be free of oil, transmission fluid or hydraulic fluid leakages. If the equipment develops a leakage during the Work process, it should be repaired or replaced immediately.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 50

The use of PREPA's waste disposal equipment by the Contractor is not permitted for waste generated by Contractor or Subcontractor's in connection with the Work.

58.6 <u>Conditions Following Completion of Work</u>. The Contractor, upon completion of the Work, shall leave the Site free of Hazardous Materials brought onto or generated at the Site by Contractor or its Subcontractors in performance of the Work, as shall be substantiated by a laboratory analysis performed by an independent third party and at a laboratory each mutually agreed by the Parties. In no event shall Contractor have any responsibility for removal of Hazardous Materials other than those brought onto or generated at the Site by Contractor or its Subcontractors in performance of the Work. In the event excavated soil or other materials which were present at the Site prior to commencement of the Work or not otherwise brought onto the Site by Contractor or its Subcontractors during performance of the Work, which Contractor or its Subcontractors has moved in connection with the Work and which requires cleaning up as set forth herein, to the extent such excavated soil or other materials contains Hazardous Materials, they shall not be considered Hazardous Materials generated at the Site by Contractor or its Subcontractors, as used herein, and PREPA shall be responsible for removal of the same to an approved landfill.

The disposal of non-hazardous material or waste brought onto or generated at the Site by Contractor or its Subcontractors in the performance of the Work shall be performed by Contractor in a PREPA approved landfill, under PREPA's permit for disposal at such approved landfill. PREPA shall furnish Contractor with reasonably detailed information concerning such permit and approved landfill upon Contractor's request.

PREPA, at its sole cost, will audit the sampling and the disposal of waste material brought onto or generated on the Site by Contractor or its Subcontractors.

The Contractor shall submit evidence of compliance with 49 CFR 72 Sub. Part H (DOT), to the extent applicable to the Work.

Article 59.    Standards for Materials

All materials and equipment furnished by Contractor hereunder as part of the Work shall be new, free from defects in materials, workmanship, manufacture, shall be listed by NEMA, ANSI, IEEE or IEC, or Underwriters Laboratories, Inc., and by the American Water Works Association as conforming to their standards in every case where such standard has been established for the particular type of and is applicable to the material in question and otherwise comply with the terms of this Contract. All materials and equipment shall be inspected by the Engineer to verify compliance with the above quality requirements and the Specifications in a manner so as to not unreasonably interfere with the progress of the Work.

Contract 0912653
Rehabilitation of Culebra Power Station
Page 51



59.2   Equipment and materials furnished by Contractor hereunder as part of the Work shall be properly stored, protected and carefully handled, following the manufacturer's recommendations, to prevent damage before and during installation.

59.3   Materials shall be properly housed or stored at the Site in a manner which will ensure the preservation of their quality and fitness for the Work and that the Contractor shall not withdraw said material for any purpose other than incorporation into the Work. Storage and protection cost, and the cost of replacing lost or damaged materials shall be borne by the Contractor, except to the extent such loss or damage is caused by the negligence of PREPA and/or its agents for which PREPA shall be responsible.

Article 60.     Sworn Statement

Previous to the signing of this Contract, the Contractor will have submitted a sworn statement to the effect that, as of the Effective Date, neither Contractor nor any of its partners or owners, directors, officials, employees, parent company, subsidiaries or any entity that constitutes the alter ego of Contractor have been convicted of, nor have they pled guilty, in Puerto Rico, in the federal jurisdiction, in any state or territory of the United States of America or in any country, to any crime or its equivalent, as enumerated in Article 3 of Public Law 458 of December 29, 2000 of the Commonwealth of Puerto Rico, as amended.   In accordance with Article 6 of Public Law 458 of December 29, 2000 of the Commonwealth of Puerto Rico, as amended, Contractor acknowledges that its conviction or guilty plea for any of the crimes as enumerated in Article 3 of such Act shall entail, in addition to any other applicable penalty, the automatic rescission of this Agreement. In addition, but only to the extent required by Public Law 458, PREPA shall have the right to demand the reimbursement of payments made pursuant to this Agreement that directly result from the committed crime.

Article 61.     Final Inspection

Whenever all the materials have been furnished and all work has been performed, including final cleaning up as contemplated by Article 54.   Cleaning Up, all in accordance with the drawings and specifications, the Contractor shall notify the Engineer that said work is completed and ready for final inspection.   Final inspection shall occur within a ten (10) working days period after the Engineer has received notice from the Contractor of the satisfactory completion of the installation of the equipment. After receipt of notice PREPA will notify Contractor of the exact date and time of the final inspection and Contractor shall accommodate to PREPA's specific time.   If all installation work provided for and contemplated by the Contract is found completed in accordance with the specifications, this inspection shall constitute the final inspection and the date of completion shall be established as the date of receipt of the notice of the Contractor that the work was completed and ready for final inspection.   If, however, upon inspection by the Engineer it is found that any work, in whole or in part, is unsatisfactory, the Engineer shall give the Contractor the necessary instructions as to

Contract 0912653
Rehabilitation of Culebra Power Station
Page 52



replacement of material and performance of work necessary to final completion and acceptance and the Contractor shall immediately comply with and execute such instructions. Upon satisfactory replacement and performance of such work, the Contractor shall notify the Engineer, and another inspection shall be made which will constitute the final inspection if the said material is found to have been acceptably replaced and the work completed satisfactorily. In such event, the date of receipt of this last notice of the Contractor will be established as the date of Final Acceptance of the work or any separable part thereof under the Contract. The date of Final Acceptance, thus established, shall be used in calculating the actual time of performance of the work.

The determination of whether a project is substantially completed is at the discretion of PREPA. A project will normally be considered substantially completed when all the contracted work, except for a few very minor details, has been completed, the required final cleaning up has been performed and the project can be fully and safely opened to traffic or used for the intended purpose.

IN WITNESS WHEREOF, the Parties hereto have executed this Contract this ___3rd___ day of __January 2011___ :

Puerto Rico Electric Power Authority          Master Link Corporation, Inc.
          (PREPA)                                         (Contractor)

BY: _____               BY: _____

Authorized Representative                      Authorized Representative
Miguel Ángel Cordero López                    Carlos A. Morales Vázquez
Executive Director                             President

Q:\Contratos\AJ-00257-CULEBRA POWER STATION CONTRACT 0912653.DOC

000052

ANEJO 2

AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO
DIRECTORADO DE GENERACIÓN
2011- P00067 A
PRIMERA ENMIENDA CONTRATO 0912653
CONTRATO PARA LA REHABILITACIÓN DEL EDIFICIO DE GENERADORES DE
EMERGENCIA DEL MUNICIPIO DE CULEBRA

-------------------------------------------COMPARECEN-------------------------------------------

-----DE UNA PARTE:  La Autoridad de Energía Eléctrica de Puerto Rico, en adelante

denominada "la Autoridad", una corporación pública y entidad gubernamental del

Estado Libre Asociado de Puerto Rico, creada por la Ley Núm. 83 del 2 de mayo

de 1941, según enmendada, Seguro Social patronal 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, representada en

este acto por su Director Ejecutivo, Interino, señor Josué Antonio Colón Ortiz, mayor de

edad, casado, ingeniero y vecino de Caguas, Puerto Rico.-------------------------------------

-----DE LA OTRA PARTE:  Master Link Corporation Inc., en adelante denominada

"el Contratista", una corporación organizada y existente bajo las leyes del Estado Libre

Asociado de Puerto Rico, Seguro Social patronal 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, representada en este

acto por su Presidente, ingeniero Carlos Morales Vázquez, mayor de edad, soltero y

vecino de Bayamón, Puerto Rico, según surge de la Certificación de Resolución

Corporativa del 20 de septiembre de 2011.----------------------------------------------------------

---La Autoridad y el Contratista, con la capacidad legal necesaria para este acto, libre y

voluntariamente:--------------------------------------------------------------------------------------------

-------------------------------------------EXPONEN-------------------------------------------

-----PRIMERO:  La Autoridad y el Contratista otorgaron el 3 de enero de 2011 el

Contrato 0912653 para rehabilitar el edificio de generadores de emergencia que sirve

de resguardo al Municipio de Culebra, por $2,581,583.87 (el Contrato).----------------------

000053

PRIMERA ENMIENDA CONTRATO 0912653
Página 2

-----SEGUNDO:  El Artículo 2, *Commencement and Completion of Work*, dispone que la duración de los trabajos será de 180 días consecutivos a partir de la Orden de Proceder.  No obstante, el inciso 12 del Apéndice Número 2 modificó dicho término en dos fases:--------------------------------------------------------------------------------------------

1. Fase 1-Completar sustancialmente todas las partes del Proyecto, incluyendo 4 de los 5 generadores, en un término de 240 días consecutivos.

2. Fase 2-instalación y conexión de generador de 900 kW dentro del edificio en un término de 45 días.

-----TERCERO:  El 3 de octubre de 2011, la Autoridad le entregó al Contratista una Orden de Proceder con fecha de 27 de septiembre de 2011, disponiendo que los trabajos comenzaran el 17 de octubre de 2011.  No obstante, el 7 de febrero de 2012, la Autoridad le entregó al Contratista una segunda Orden de Proceder con fecha de 1 de febrero de 2012, la cual sustituyó y canceló la del 27 de septiembre de 2011, disponiendo que los trabajos comenzaran el 13 de febrero de 2012, por lo que el término para completar los trabajos vence el 10 de octubre de 2012.-------------------------

-----CUARTO:  Luego de otorgado el Contrato, la Autoridad probó el generador de emergencia de 900 kW que se utilizaría de resguardo durante la construcción del proyecto, el cual resultó defectuoso, por lo que no se pudo movilizar, en esos momentos, a Master Link.  En diciembre de 2011, se adjudicó la Orden de Compra O-061005 para alquilar un generador de emergencia de aproximadamente 2,000 kW.

PRIMERA ENMIENDA CONTRATO 0912653
Página 3

-----QUINTO:  El 3 de octubre de 2011, en consideración al tiempo transcurrido entre el

otorgamiento del Contrato y la entrega de la Orden de Proceder, esto es, 273 días ,el

Contratista solicitó una orden de cambio debido al aumento significativo de los costos

en la materia prima, particularmente el costo del acero y de combustible, además de los

costos de mano de obra y transporte.   La reclamación de aumento en costo se

desglosó en cinco categorías:   diésel, acero, transportación, equipos eléctricos y

materia prima.-------------------------------------------------------------------------------------------

-----SEXTO:   Luego de evaluar los documentos e información presentada por el

Contratista, las partes acordaron un aumento en el costo de materiales ascendente a

$227,696.40, desglosado de la siguiente manera y según se detalla en el Anejo A,

Estimado de costos subasta AEE Q033817 Rehabilitación Planta de Emergencia

Culebra, el cual forma parte de esta enmienda:--------------------------------------------------

a) Para la categoría de diesel, luego de analizar los índices de precio promedios

mensuales, las partes acuerdan un incremento de 31.2% a las partidas

reclamadas para un total de $29,016.

b) Para la categoría de acero, luego de analizar los índices de precio del *carbon

Steel*, las partes acuerdan un incremento de 19.3% a las partidas reclamadas

para un total de $110,605.69.

c) Para la categoría de transportación, luego de analizar la información de costos

de transportación, las partes acuerdan un incremento de 25% de la porción

PRIMERA ENMIENDA CONTRATO 0912653
Página 4

correspondiente al transporte del material o equipo a las partidas reclamadas para un total de $70,232.83.

d) Para la categoría de equipos eléctricos, luego de analizar los índices de precio para servicios de ingeniería en proyectos de generación, las partes acuerdan un incremento de 2.3% a las partidas reclamadas para un total de $6,375.60.

e) Para la categoría de materia prima, luego de analizar los índices de precio para servicios de construcción de edificios industriales, las partes acuerdan un incremento de 4% para las partidas reclamadas para un total de $11,466.28.

----SÉPTIMO: A consecuencia de la Orden de Compra O-061005 para la adquisición de tres generadores nuevos de aproximadamente 2,000 kW, se generaron unos cambios al proyecto los cuales se detallan en el Anejo B, Cambios al proyecto por adquisición de generadores, el cual se hace formar parte de la Enmienda, desglosados en treinta y tres (33) actividades con su respectiva descripción y ajuste, sea ésta un débito o crédito del plan de trabajo original contratado. El Anejo B detalla en la columna titulada "ajustes" el débito o crédito evaluado y aprobado para cada actividad para un crédito neto de $509,681.75.------------------------------------------------------------------

-----OCTAVO: Luego de considerar la evaluación de las dos partes de la reclamación y sumar el incremento de la Parte I de $227,696.40 y el crédito de la Parte II de $509,681.75, el costo total contratado se ajusta por un crédito neto de $281,985.35 para un nuevo total de contrato de $2,299,598.52------------------------------------------------------

PRIMERA ENMIENDA CONTRATO 0912653
Página 5

-----NOVENO:  A consecuencia de los cambios antes indicados los trabajos no han sido

completados y el término para completar los mismos finaliza el 17 de abril de 2012, es

necesario extender dicho término hasta el 31 de enero de 2013.------------------------

-----Conforme con lo que antecede, la Autoridad y el Contratista otorgan la presente

Enmienda al Contrato de acuerdo con las siguientes:-----------------------------------

------------------------------------CLAÚSULAS Y CONDICIONES-----------------------------

-----PRIMERA:  Se enmienda el Artículo 4, *Consideration*, del Contrato para que lea de

la siguiente manera:--------------------------------------------------------------------

> *PREPA agrees to pay and Contractor agrees to accept, the firm price, subject to Article 42, Other Taxes, of Two Million Two Hundred Ninety Nine Thousand Five Hundred Ninety Eight and Fifty Two Cents ($2,299,598.52) ("Contract Price"), for the complete performance of the Work, plus any additional amount to be paid due to extra work ordered by PREPA or requested and accepted by the Parties according to Article 17, Changes.  Payments of the Contract Price are to be made according to the payment schedule, as well as Article 13, Payment to Contractor.  The Contractor shall submit its invoices and supporting documentation as set forth in Article 13, Payment to Contractor.*

-----SEGUNDA:  Se enmiendan los siguientes artículos según se detallan en el Anejo B,

Cambios al Proyecto por Adquisición de Generadores:-------------------------------------

| "Item" | Artículo bajo Contrato 0912653 |
|--------|-------------------------------|
| 1 | Modifica artículo 2 del apéndice No. 2 |
| 2 | Modifica artículo 5 del apéndice No. 2 |
| 3 | Modifica artículo 7 del apéndice No. 2 |
| 4 | Modifica artículo 8 del apéndice No. 2 |
| 5 | Modifica artículo 9 del apéndice No. 2 |
| 6 | Modifica artículo 12 del apéndice No. 2 |
| 7 | Modifica artículo 14 del apéndice No. 2 |
| 8 | Modifica artículo 16 del apéndice No. 2 |
| 9 | Modifica artículo 21 del apéndice No. 2 |
| 10 | Modifica artículo 24 del apéndice No. 2 |
| 11 | Modifica artículo 26 del apéndice No. 2 |
| 12 | Modifica artículo 32 del apéndice No. 2 |

PRIMERA ENMIENDA CONTRATO 0912653
Página 6

| 13 | Modifica artículo 34 del apéndice No. 2 |
|----|------------------------------------------|
| 14 | Modifica artículos 28, 29 y 30 del apéndice No. 2, incorpora las hojas Single Line, Power Conduit y Control Conduit revisadas, según se detalla en los Anejos C, D y E. |
| 15 | Modifica artículos 28, 29 y 30 del apéndice No. 2 |
| 16 | No surge cambio |
| 17 | Modifica artículo 31 del apéndice No. 2 |
| 18 | Modifica artículo 31 del apéndice No. 2 |
| 19 | Modifica artículo 31 del apéndice No. 2 |
| 20 | Modifica artículo 31 del apéndice No. 2 |
| 21 | Modifica artículo 31 del apéndice No. 2 |
| 22 | Modifica artículo 31 del apéndice No. 2 |
| 23 | No surge cambio |
| 24 | Modifica sección 13200 |
| 25 | No surge cambio |
| 26 | Modifica artículos 29 y 30 del apéndice No. 2 |
| 27 | Modifica artículos 29 y 30 del apéndice No. 2 |
| 28 | Modifica artículo 30 del apéndice No. 2 |
| 29 | No surge cambio |
| 30 | No surge cambio |
| 31 | Modifica artículo 29 y30 del apéndice No. 2 |
| 32 | Modifica Layout Plan, Hoja 123.0-A-200.03W |
| 33 | Modifica artículo 39 del apéndice No. 2 |



-----TERCERA:  Se enmienda el Artículo 2 del Contrato para extender la vigencia del Contrato hasta el 31 de enero de 2013 para completar los trabajos.--------------------------

-----CUARTA:  La vigencia de esta Primera Enmienda será a partir de la fecha de firma por la Autoridad y el Contratista.----------------------------------------------------------

-----QUINTA:  La Autoridad y el Contratista acuerdan que, excepto las enmiendas antes indicadas, todas las demás cláusulas del Contrato, las Condiciones Generales y las Condiciones Especiales permanecen iguales y vigentes.-----------------------------------

-----------------------------------------------------------------------------------------------

-----------------------------------------------------------------------------------------------

-----------------------------------------------------------------------------------------------

PRIMERA ENMIENDA CONTRATO 0912653
Página 7

-----POR TODO LO CUAL, las partes comparecientes en este acto manifiestan estar de

acuerdo con todo lo expuesto anteriormente, y por encontrarlo conforme con sus

deseos, lo aceptan en todas sus partes.----------------------------------------------------------------

En San Juan, Puerto Rico, hoy __17__ de _____julio_____ de 2012.----------------------

Josué Antonio Colón Ortiz
Director Ejecutivo, Interino
Autoridad de Energía Eléctrica

Carlos Morales Vázquez
Presidente
Master Link Corporation Inc.

000059

## ANEJO A



**MasterLink** CORPORATION, INC.   ESTIMADO COSTOS SUBASTA ABU Q833817 REHABILITACION PLANTA DE EMERGENCIA CULEBRA

| Item | QTY | Type | Descripcion | Unit Price | Total | Aumento Diesel 31.2% | Aumento Acero 10.3% | Aumento Transporte 25% | Renglones aumento en equipos electricos para generacion 2.5% | Aumento indice materia prima 4% |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | **Construccion General** | | | | | | | |
| 1.1a | 1 | | Hormigon material | $52,459.23 | $52,459.23 | | | | | $2,099.47 |
| 1.1b | 1 | | Hormigon transporte | $13,124.63 | $13,124.63 | | | $3,281.20 | | |
| 1.2a | 1 | | Uso de Bomba material | $9,600.00 | $9,600.00 | | | | | $384.00 |
| 1.2b | 1 | | Uso de Bomba transporte | $2,600.00 | $2,600.00 | | | $650.00 | | |
| 1.3a | 1 | | Concreto Elevacion material | $960.00 | $960.00 | | | | | $38.40 |
| 1.3b | 1 | | Concreto Elevacion transporte | $240.00 | $240.00 | | | $60.00 | | |
| 1.4a | 1 | | Acero Playa material | $720.00 | $720.00 | | | | | $28.80 |
| 1.4b | 1 | | Acero Playa transporte | $180.00 | $180.00 | | | $45.00 | | |
| 1.5a | 1 | | Soldadura (para generadores) material | $8,400.00 | $8,400.00 | | | | | $336.00 |
| 1.5b | 1 | | Soldadura (para generadores) transporte | $2,100.00 | $2,100.00 | | | $525.00 | | |
| 1.6a | 1 | | Vallas material | $15,530.00 | $15,530.00 | $2,595.30 | | | | |
| 1.6b | 1 | | Vallas transporte | $3,880.00 | $3,880.00 | | | $970.00 | | |
| 1.7a | 1 | | Brea material | $720.00 | $720.00 | | | | | $28.80 |
| 1.7b | 1 | | Brea transporte | $180.00 | $180.00 | | | $45.00 | | |
| 1.8a | 1 | | Madera material | $3,840.00 | $3,840.00 | | | | | $153.60 |
| 1.8b | 1 | | Madera transporte | $960.00 | $960.00 | | | $240.00 | | |
| 1.9a | 1 | | Miscelaneos Electricos material | $9,500.00 | $9,500.00 | | | | | $380.00 |
| 1.9b | 1 | | Miscelaneos Electricos transporte | $2,500.00 | $2,500.00 | | | $650.00 | | |
| 1.10a | 1 | | Primer y Pintura material | $14,400.00 | $14,400.00 | | | | | $576.00 |
| 1.10b | 1 | | Primer y Pintura transporte | $3,600.00 | $3,600.00 | | | $900.00 | | |
| 1.11a | 1 | | Pre-Cast material | $518,660.00 | $518,660.00 | $22,997.52 | | | | |
| 1.11b | 1 | | Pre-Cast transporte | $29,460.00 | $29,460.00 | | | $7,456.00 | | |
| 1.12a | 1 | | Losas material | $45,200.00 | $45,200.00 | | $4,327.60 | | | |
| 1.12b | 1 | | Losas transporte | $10,600.00 | $10,600.00 | | | $3,200.00 | | |
| 1.13a | 1 | | Doors, Windows material | $14,400.00 | $14,400.00 | | $3,551.20 | | | |
| 1.13b | 1 | | Doors, Windows transporte | $4,400.00 | $4,400.00 | | | $1,100.00 | | |
| 1.14a | 1 | | Reljas Doors material | $2,900.00 | $2,900.00 | | $345.00 | | | |
| 1.14b | 1 | | Reljas Doors transportacion | $700.00 | $700.00 | | | $175.00 | | |
| 1.15a | 1 | | Tubula de Agua material | $3,660.00 | $3,660.00 | | | | | $147.20 |
| 1.15b | 1 | | Tubula de Agua transporte | $920.00 | $920.00 | | | $335.00 | | |
| 1.16a | 1 | | Estructura y paneles de Techo material | $132,000.00 | $132,000.00 | $35,490.00 | | | | |
| 1.16b | 1 | | Estructura y paneles de Techo transportacion | $32,900.00 | $32,900.00 | | | $8,250.00 | | |
| 1.17a | 1 | | Terminaciones techo material | $33,840.00 | $33,840.00 | | | | | $1,314.00 |
| 1.17b | 1 | | Terminaciones techo transportacion | $8,400.00 | $8,400.00 | | | $2,100.00 | | |
| 1.18a | 1 | | Terminaciones Techo Oficina material | $4,600.00 | $4,600.00 | | | | | $184.00 |
| 1.18b | 1 | | Terminaciones Techo Oficina transportacion | $2,400.00 | $2,400.00 | | | $100.00 | | |
| 1.19 | 1 | | Dryvit material | $18,200.00 | $18,200.00 | $5,618.40 | | | | |
| 1.20a | 1 | | Portones reja material | $6,940.00 | $6,940.00 | | | $1,687.52 | | |
| 1.20b | 1 | | Portones reja transportacion | $2,160.00 | $2,160.00 | | | $540.00 | | |
| 1.21a | 1 | | Railing material | $3,360.00 | $3,360.00 | | $548.48 | | | |
| 1.21b | 1 | | Railing transporte | $840.00 | $840.00 | | | $210.00 | | |
| 1.22a | 1 | | Lego ARE material | $2,820.00 | $2,820.00 | | $555.84 | | | |
| 1.22b | 1 | | Lego ARE transportacion | $720.00 | $720.00 | | | $180.00 | | |
| 1.23a | 1 | | Sistema, bomba aljes, sistema electrico material | $65,400.00 | $65,400.00 | | | | | $3,416.00 |
| 1.23b | 1 | | Sistema, bomba aljes, sistema electrico transportacion | $21,600.00 | $21,600.00 | | | $5,400.00 | | |
| | | | **Total Material** | | $724,310.00 | | | | | |
| 2 | | | **Mechanical** | | | | | | | |
| 2.1a | 1 | | Fire Protection material | $24,160.00 | $24,160.00 | $561.40 | | | | |
| 2.1b | 1 | | Fire Protection transportacion | $1,600.00 | $1,600.00 | | | $232.00 | | |
| 2.2a | 1 | | Generator Exhaust material | $16,900.00 | $16,900.00 | $1,358.00 | | | | |
| 2.2b | 1 | | Generator Exhaust transportacion | $1,500.00 | $1,500.00 | | | $375.00 | | |
| 2.3a | 1 | | Fuel Oil Piping & tank material | $58,640.00 | $58,640.00 | $7,492.52 | | | | |
| 2.3b | 1 | | Fuel Oil Piping & tank transportacion | $9,600.00 | $9,600.00 | | | $2,418.00 | | |
| 2.4a | 1 | | Tanque 25,000 Gal material | $124,000.00 | $124,000.00 | $21,304.00 | | | | |
| 2.4b | 1 | | Tanque 25,000 Gal transportacion | $32,000.00 | $32,000.00 | | | $8,000.00 | | |
| 2.5a | 1 | | Pafla material | $2,000.00 | $10,000.00 | $1,920.00 | | | | |
| 2.5b | 1 | | Pafla transportacion | $500.00 | $2,500.00 | | | $625.00 | | |
| 2.6a | 1 | | Controles y bomba Balanza de Diesel material | $49,644.68 | $49,644.68 | $7,447.27 | | | | |
| 2.6b | 1 | | Controles y bomba Balanza de Diesel transportacion | $10,161.63 | $10,161.63 | | | $2,540.41 | | |
| 2.7 | 25000 | | Combustible Diesel para Tank 25,000 Gal | $3.50 | $125,000.00 | $35,400.00 | | | | |
| | | | **Total Materiales** | | $289,568.10 | | | | | |
| 3 | | | **Electrical** | | | | | | | |
| 3.1 | 60 | | Excavation | $21.10 | $1,994.00 | | | | | $77.76 |
| 3.2 | 60 | | Back Fill | $22.00 | $1,440.00 | | | | | $57.60 |
| 3.3a | 2 | | PA Box material | $780.00 | $1,560.00 | | | | | $62.44 |
| 3.3b | 2 | | PA Box transportacion | $192.00 | $384.00 | | | $96.00 | | |
| 3.4a | 1 | | Poste HLD material | $1,364.00 | $1,364.00 | | | | | $53.76 |
| 3.4b | 1 | | Poste HLD transportacion | $250.00 | $250.00 | | | $64.00 | | |
| 3.5a | 150 | | Cable 750 turn material | $56.78 | $8,416.40 | | | | | $427.74 |
| 3.5b | 150 | | Cable 750 turn transportacion | $20.70 | $1,106.00 | | | $276.15 | | |
| 3.6a | 3000 | | Cable 600 material | $56.41 | $112,050.00 | | | | | $4,602.24 |
| 3.6b | 3000 | | Cable 600 transportacion | $5.11 | $3,735.00 | | | $815.00 | | |
| 3.7a | 1500 | | Cable 250m material | $2.00 | $9,840.00 | | | | | $384.00 |
| 3.7b | 1500 | | Cable 250m transportacion | $1.00 | $2,460.00 | | | $625.00 | | |
| 3.8a | 1500 | | Cable 3/0 material | $1.42 | $2,499.60 | | | | | $59.59 |
| 3.8b | 1500 | | Cable 3/0 transportacion | $1.42 | $774.00 | | | $59.72 | | |
| 3.9a | 360 | | Cable #6 material | $50.78 | $1,310.60 | | | | | $58.76 |
| 3.9b | 360 | | Cable #6 transportacion | $19.76 | $554.72 | | | $63.60 | | |
| 3.10a | 30 | | Tubos 6" Pvc SCH 40 material | $21.00 | $1,584.00 | | | | | $63.36 |
| 3.10b | 30 | | Tubos 6" Pvc SCH 40 transportacion | $3.00 | $90.00 | | | $24.00 | | |
| 3.11a | 8 | | Curvas 6" PVC material | $56.30 | $321.60 | | | | | $10.60 |
| 3.11b | 8 | | Curvas 6" PVC transportacion | $5.29 | $58.58 | | | $18.58 | | |
| 3.12a | 10 | | Tubos 4" Pvc SCH 40/Tubo 10% material | $50.10 | $501.60 | | | | | $22.54 |
| 3.12b | 10 | | Tubos 4" Pvc SCH 40/Tubo 10% transportacion | $6.16 | $165.60 | | | $39.23 | | |
| 3.13a | 20 | | Curvas 4" PVC material | $50.37 | $165.60 | | | | | |
| 3.13b | 20 | | Curvas 4" PVC transportacion | $10.07 | $51.48 | | | $50.37 | | |

## ANEJO A

| | | | Descripción | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3.14a | 116 | | Tubos 6" Pvc SCH 40(Tubo 19) material | $2.93 | $339.00 | | | | | $12.52 |
| 3.14b | 150 | | Tubos 6" Pvc SCH 40(Tubo 19) transportación | $2.93 | $439.50 | | | $19.73 | | | |
| 3.16a | 33 | | Curvas 6" PVC material | $36.74 | $1,226.77 | | | $64.20 | | | $41.15 |
| 3.16b | 35 | | Curvas 6" PVC transportación | $36.74 | $257.18 | | | | $26.31 | | |
| 3.33a | 1 | | Paneles Electra P1 material | $1,147.00 | $1,147.00 | | | $21.10 | | | |
| 3.35b | 1 | | Paneles Electra P1 transportación | $226.00 | $226.00 | | | | $57.65 | | |
| 3.17a | 1 | | Paneles Electra P2 material | $774.00 | $774.00 | | | | | | |
| 3.17b | 1 | | Paneles Electra P2 transportación | $304.00 | $304.00 | | | $48.05 | | | $492.00 |
| 3.18a | 1 | | Lámparas material | $26,000.00 | $4,700.00 | | | | | | |
| 3.18b | 1 | | Lámparas transportación | $3,600.00 | $3,200.00 | | | $550.00 | | | $30.72 |
| 3.19a | 1 | | Lámparas de Emergencia material | $566.00 | $566.00 | | | | | | |
| 3.19b | 1 | | Lámparas de Emergencia transportación | $366.00 | $132.00 | | | $48.05 | | | $492.00 |
| 3.20a | 1 | | Seguridad y sistema electromecánica | $12,600.00 | $2,230.00 | | | | | | |
| 3.20b | 1 | | Seguridad y sistema electro transportación | $3,600.00 | $360.00 | | | $143.00 | | | |
| 3.21a | 2 | | Transformador (PM) material | $273,000.00 | $548,000.00 | | | | | $323.84 | |
| 3.21b | 2 | | Transformador (PM) 60KVA transportación | $3,240.00 | $18,300.00 | | | $2,505.00 | | $7,300.20 | |
| 3.22a | 1 | | Switchgear material | $374,450.00 | $374,450.00 | | | | | | |
| 3.22b | 1 | | Switchgear transportación | $19,600.00 | $19,600.00 | | | $14,900.00 | | | |
| 3.23a | 1 | | Obstetos material | $168,960.00 | $168,960.00 | | | | | $35,924.00 | |
| 3.23b | 1 | | Obstetos transportación | $30,200.00 | $30,200.00 | | | $9,860.00 | | | |
| 3.24a | 1 | | Área Acondicionado Oficina material | $31,900.00 | $4,450.00 | | | | | | $61.44 |
| 3.24b | 1 | | Área Acondicionado Oficina transportación | $31,900.00 | $354.00 | | | $199.00 | | | |
| | | | **Total Materiales** | | $107,133.50 | | | | | | |
| | | | | | | | | | | |
| 4 | | | Site Construction And Infrastructure | | | | | | | |
| 4.1 | 1 | | CEB Plus | $10,000.00 | $10,000.00 | | | | | | $400.00 |
| | | | **Total Materiales** | | $10,050.00 | | | | | | |
| | | | | | | | | | | |
| 5 | Qty | Meses | Estudio | | | | | | | |
| 5.1 | 1 | | Casa | $2,500.00 | $22,500.00 | | | | | | |
| 5.2 | 1 | | Oficina | $450.00 | $4,050.00 | | | | | | |
| | | | **Total Estudio** | | $26,550.00 | | | | | | |
| | | | | | | | | | | |
| 6 | | | Viajes | | | | | | | |
| 6.1 | 10 | | Ferry (Fajardo a Culebra) | $4,500.00 | $42,500.00 | | | | | | |
| 6.2 | 2 | | Ferry (Culebra a Vieques) | $3,500.00 | $7,000.00 | | | | | | |
| 6.3 | 100 | | Avión | $130.00 | $20,059.00 | | | | | | |
| | | | **Total Viajes** | | $67,699.50 | | | | | | |
| | | | | | | | | | | |
| 7 | Qty | Meses | Equipos | | | | | | | |
| 7.1 | 1 | 6 | Excavadora | $4,500.00 | $6,950.00 | | | | | | |
| 7.2 | 1 | 5 | Digger | $3,300.00 | $7,500.00 | | | | | | |
| 7.3 | 1 | 4 | Camión Tumba | $3,100.00 | $14,900.00 | | | | | | |
| 7.4 | 1 | 3 | Camión Grúa (30 Tons) | $18,000.00 | $5,500.00 | | | | | | |
| 7.5 | 1 | 6 | Pickup | $550.00 | $3,300.00 | | | | | | |
| 7.6 | 1 | 6 | Ford Van | $550.00 | $3,300.00 | | | | | | |
| 7.7 | 1 | 6 | Jeep Van | $500.00 | $3,600.00 | | | | | | |
| 7.8 | 1 | 2 | Scissor Lift | $2,600.00 | $5,200.00 | | | | | | |
| 7.9 | 1 | | MANTENIMIENTO EQUIPOS/JJAL | $10,000.00 | $40,600.00 | | | | | | |
| | | | **Total Equipos** | | $61,100.00 | | | | | | |
| | | | | | | | | | | |
| 8 | Personal | Hrs | Días | Personal | $/Hr | | | | | |
| 8.1 | 1 | 566 | | Geólogo/a | $15.00 | $5,580.00 | | | | | |
| 8.2 | 1 | 344 | | Plomero | $16.00 | $5,169.00 | | | | | |
| 8.3 | 2 | 344 | | Ayudante de Electricidad y/o Plomero | $9.00 | $6,192.00 | | | | | |
| 8.4 | 4 | 704 | | Carpintero, albañil (Maestro, etc.) | $10.00 | $26,100.00 | | | | | |
| 8.5 | 2 | 704 | | Ayudante Carpintero | $8.00 | $11,264.00 | | | | | |
| 8.6 | 1 | 704 | | Operador de Equipo | $12.00 | $58,650.00 | | | | | |
| 8.7 | 1 | 1440 | | Encargado Proyecto | $10.00 | $14,400.00 | | | | | |
| | | | | | | | | | | |
| 8.9 | 13 | | | Otro @ $/hora | | $20,269.00 | | | | | |
| | | | | | | | | | | |
| 8.1 | 1 | | 11 | Día de Agrimensor | $1,200.00 | $19,600.00 | | | | | |
| | | | **Total Personal** | | $126,492.00 | | | | | | |
| | | | | | | | | | | |
| | | | **TOTAL** | | $1,793,307.50 | $29,014.03 | $116,095.03 | $20,222.63 | $6,325.49 | $41,606.24 |
| 9 | | % | 10 | Seguros, patentes y abanto | $0.95% | | | | | | |
| 10.00 | | | 5 | Contingencia | $5.00% | | | | | | |
| 11.00 | | | 5 | Overhead | $5.00% | | | | | | |
| 12.00 | | | 12 | Profit | $12.00% | | | | | | |
| | | | **SUBTOTAL** | | | | | | | | |
| | | | **TOTAL** | | | | | | | | |

$227,696.40

# ANEJO B

### REHABILITACIÓN EDIFICIO GENERADORES CULEBRA

### CAMBIOS AL PROYECTO POR ADQUISICIÓN DE GENERADORES

| ITEM | DESCRIPCIÓN | CAMBIO | | | |
|---|---|---|---|---|---|
| | | ADITIVO | DEDUCTIVO | AJUSTES | COMENTARIOS |
| 1 | "El Contratista será responsable de transportar los dos tanques de combustible existentes de 4,000 galones a las facilidades de los generadores de Vieques y de la disposición del tanque existente de 5,000 galones. La Autoridad utilizará uno de los tanques de 4,000 galones para las facilidades temporeras, por lo que éste deberá ser transportado al finalizar la Fase I. El Contratista será responsable de remover cualquier depósito (sludge) que quede en estos tanques y de limpiarlos antes de ser transportados, al igual que en los day tanks de las unidades. PREPA coordinará y realizará el vaciado del diesel almacenado en los tres tanques." | | | $0.00 | Sugerimos llevar los tanques al finalizar el proyecto. Master Link se encargara del acopio mientras se lleva a acabo el proyecto. |
| 2 | "PREPA moverá el transformador de 1500 KVA al área del patio de interruptores para utilizarlo con los generadores temporeros. El Contratista se encargará de instalarlo luego en su localización final una vez estén probados, aceptados y operando al menos tres de los generadores del edificio." | El Contratista entregará el transformador de aceite en la Técnica de Culebra, junto con los de poste. | PREPA se encargará de la entrega del transformador de 1500 KVA. | $0.00 | En un principio el contratista debia volver a instalar el transformador. Ahora se añade que el constratista debe entregar el transformador en la Tecnica. El llevar el transformador conlleva un costo de transportacion y grua no contemplado. Sugerimos no hacer ajuste ya que los costos de la tarea aditiva igualan los de la tarea deductiva. |



## ANEJO B

| | | | | |
|---|---|---|---|---|
| 3 | "Las losas de hormigón de los generadores deben ajustarse al tamaño de cada generador." | | Se reduce de 5 losas a 3 losas de 9' x 21' x 6" con acero #4@12". | $0.00 | Aunque son menos losas son de mayor tamaño. Sugerimos no hacer ajuste ya que los costos de la tarea aditiva igualan los de la tarea deductiva. |
| 4 | "Se instalará un cargador de batería por generador. Se utilizarán los cuatro (4) cargadores de baterías existentes y uno que tienen los generadores de Palo Seco." | | El Contratista instalará sólo 3 cargadores. | ($750.00) | Se otorga credito por tarea deductiva descrita. |
| 5 | "El Contratista llevará dos (2) generadores (405 y 475 KW) de la Central Palo Seco a Culebra, los desmontará de su carretón y los instalará donde se muestran los generadores 1 y 2 existentes. Se modificarán estos carretones para montar los generadores 1 y 2 existentes en Culebra y luego se transportarán éstos a la Central Palo Seco." | | No es necesario transportar los generadores de Palo Seco ni modificar los carretones. | $0.00 | Se otorga credito por tarea deductiva descrita. |
| 6 | "El proyecto se dividirá en dos fases: Fase I & Fase II" | | | ($2,950.00) | Es necesario discutir el tiempo otorgado para realizar el proyecto. |
| 7 | "El contratista es responsable de verificar la longitud necesaria de los *mufflers* y la aislación que haya que reemplazar. También debe verificar la ubicación de éstos previo a la entrega de los *shop drawings* de las paredes, para así dejar las perforaciones necesarias en éstas." | | Los mufflers los suplirá el fabricante de los generadores; el Contratista los instalará. Se reducen de 5 a 3. | ($500.00) | Se otorga credito por instalacion de mufflers. Segun descripcion de este item el contraista es responsable de reemplazar solo la aislacion necesaria. |
| 8 | "...Deberá buscar un lugar de almacenaje seguro (aprobado por PREPA) para ubicarlos y proveer electricidad para los calentadores de éstos…" | | No tiene que almacenar ni proveer electricidad a los generadores. | ($2,000.00) | Master Link tenía planificado guardar estos generadores en una propiedad rentada para el personal de trabajo. El credito otorgado representa el costo de energia que representa mantener los calentadores de los generadores conectados. |



# ANEJO B

| | | | | | |
|---|---|---|---|---|---|
| 9 | "La capacidad del tanque DT-01-02, que se indica en el *DAY TANK SCHEDULE* de la Hoja 123.0-A-300.00W *NOTES, LEGEND ABBREVIATIONS & SCHEDULES*, se aumenta a 150 galones." | | Los day tanks los suplirá el fabricante de los generadores. Se elimina el suplido del material, se reduce la instalación de 4 a 3. | ($15,625.00) | Se otorga credito por tarea deductiva descrita. |
| 10 | "Instalar un contenedor de derrames portátil por cada generador para colocar las baterías de encendido del motor. El contenedor será igual o aprobado igual al modelo 1632 de Eagle Manufacturing Company (Grainger)." | | No se instalarán. | ($839.00) | Se otorga credito por tarea deductiva descrita. |
| 11 | "El Contratista deberá proveer los cables de las baterías de encendido de los motores en caso de que el largo de los existentes no sea suficiente." | | Los suplirá el fabricante de los generadores. | $0.00 | No se otorga credito ya que se tenia programado reutilizar los cables existentes. |
| 12 | "Todos los transformadores deberán conectarse a la nueva malla de puesto a tierra (*ground grid*) con alambre #1/0, según se describe en la hoja 123.0.A.400.09w *GENERATOR ROOM GROUNDING PLAN."* | | No se instalarán transformadores. | ($500.00) | Se otorga credito por tarea deductiva descrita. |
| 13 | "Se demolerán las bases de hormigón de los transformadores existentes. Se fundirán bases de hormigón de 6" de espesor con acero de refuerzo #4@12"; el largo y ancho se ajustarán de acuerdo al tamaño del transformador." | | Se demolerán las bases y se dará terminación; no se construirán las nuevas. | $0.00 | Este item ya esta contemplado en el item No. 3 |
| 14 | Instalar y reinstalar generadores | | Instalación de 5 generadores | ($75,000.00) | Se otorga credito por tarea deductiva descrita. |
| 15 | Instalación de nuevos generadores | 3 generadores | | $140,000.00 | Se establece costo adicional por tarea aditiva descrita. A diferencia de los generadores existentes Master LinK tendra que rentar una grua de aproximadamente 75 tons para instalar estos generadores. |



000064

## ANEJO B

| | | | | | |
|---|---|---|---|---|---|
| 16 | Counterbalanced dampers | Ampliar tamaño de 3 | Se reducen de 5 a 3 | $0.00 | Se otorga credito por tarea deductiva.  Adicional se contempla una ampliacion de los Counterbalanced dampers no mayor del 30% originalmente especificado para tarea aditiva.  Se establece ajuste total. |
| 17 | Switchgear | | Credito por material y por instalación de 2 unidades. | ($228,126.75) | Se otorga credito por tarea deductiva descrita. |
| 18 | Controles | | Crédito por material de 5 unidades | ($162,549.00) | Se otorga credito por tarea deductiva descrita. |
| 19 | Sistema de instrumentación | | Crédito por material de 5 unidades | $0.00 | contemplado en sistema de controles |
| 20 | Sistema de sincronismo | | Crédito por material de 5 unidades | $0.00 | contemplado en sistema de controles |
| 21 | Metal clad switchgear | | Crédito por material de 2 unidades e instalación de 1 | $0.00 | contemplado en switchgear |
| 22 | Transformadores | | Compra de 3 transformadores e instalación de 2 | ($63,000.00) | Se otorga credito por tarea deductiva descrita. |
| 23 | Rolling Doors | Se amplía el tamaño de una a 11'x13' (WxH) | Se elimina una | $0.00 | Aunque se elimina un rolling door la cantidad de pies cuadrados es mayor al agrandar el rolling door.  Por lo tanto es necesario hacer un ajuste a este ítem.  Originalmente eran 112 sq.ft. con el cambio indicado suman 143 sq.ft. |
| 24 | Truck bumper | | Se elimina uno | ($150.00) | Se otorga credito por tarea deductiva descrita. |
| 25 | Pad para RTU | Hacer pad en hormigón para gabinete 30"x30"x90" | | $0.00 | Se otorga credito por tarea deductiva descrita. |



## ANEJO B

| | | | | | |
|---|---|---|---|---|---|
| 26 | Corridas electricas de los generadores al switchgear eléctrico | | Corrida de 5 generadores | ($9,350.00) | Se decidio colocar estas partidas por renglones separados ya que los costos e instalacion del alambrado varía. |
| 27 | Corridas electricas de los generadores al switchgear eléctrico | | Corrida de 3 generadores | $13,500.00 | |
| 28 | Tuberia y alambrado de control | | Corrida de 2 generadores | ($1,000.00) | Se otorga credito por tarea deductiva descrita. |
| 29 | Montar generadores de 600 y 750 kW existentes en trailers con sus respectivos controles.  Contratista deberá proveer dos trailers con ruedas, louvers, mufflers y tablilla. | Adicional por 2 | | $0.00 | Se otorga credito por tarea deductiva descrita. |
| 30 | Instalación de linea de combustible de los generadores | Se aumenta diametro de tuberia. | Se reduce de 5 a 3. | $0.00 | Aunque el total de lineas de combustible es menor, el diametro de las lineas aumenta. Por lo tanto sugerimos no hacer ningun najuste ya que los costos de las tareas aditivas igualan las tareas deductivas. |
| 31 | Cable Tray para alambrado – segun nuevo plano de Power Schedule | Instalacion de aprox. 67' cabla trays | | $2,537.00 | Se establace costo adicional por tarea aditiva descrita. |
| 32 | Combustible diesel para tanque 25,000 galones | | Se elimina diesel | ($98,400.00) | Se otorga credito por material deductivo. |
| 33 | Banco de Baterias | | Se elimina | ($4,979.00) | Se otorga credito por tarea deductiva descrita. |

($509,681.75)





000067



ANEJO D



CULEBRA POWER PLANT
CONTROL CONDUITS

ANEJO 3

AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO
DIRECTORADO DE GENERACIÓN

SEGUNDA ENMIENDA CONTRATO 0912653
CONTRATO PARA LA REHABILITACIÓN DEL EDIFICIO DE GENERADORES DE
EMERGENCIA DEL MUNICIPIO DE CULEBRA

-------------------------------------------COMPARECEN-------------------------------------------

-----DE UNA PARTE: La Autoridad de Energía Eléctrica de Puerto Rico, en adelante

denominada "la Autoridad", una corporación pública y entidad gubernamental del

Estado Libre Asociado de Puerto Rico, creada por la Ley Núm. 83 del 2 de mayo

de 1941, según enmendada, representada en este acto por su Directora Ejecutiva,

Interina, señora Sonia Miranda Vega, mayor de edad, casada, ingeniera y vecina de

Vega Alta, Puerto Rico.-------------------------------------------------------------------

-----DE LA OTRA PARTE:  Master Link Corporation Inc., en adelante denominada

"el Contratista", una corporación organizada y existente bajo las leyes del Estado Libre

Asociado de Puerto Rico, representada en este acto por su Presidente, ingeniero

Carlos Morales Vázquez, mayor de edad, soltero y vecino de Bayamón, Puerto Rico,

según surge de la Certificación de Resolución Corporativa del 20 de septiembre

de 2011.-------------------------------------------------------------------------------

---La Autoridad y el Contratista, con la capacidad legal necesaria para este acto, libre y

voluntariamente:-----------------------------------------------------------------------

-------------------------------------------EXPONEN-------------------------------------------

-----PRIMERO:  La Autoridad y el Contratista otorgaron el 3 de enero de 2011 el

Contrato 0912653 para rehabilitar el edificio de generadores de emergencia que sirve

de resguardo al Municipio de Culebra, por $2,581,583.87 (el Contrato).--------------------

000070

SEGUNDA ENMIENDA CONTRATO MASTER LINK CORPORATION, INC. (0912653)
Página 2

-----SEGUNDO:  La Autoridad y el Contratista otorgaron el 17 de julio de 2012 una Primera Enmienda Contrato 0912653 para reconocer una reducción al costo total del mismo a la cantidad de $2,299,598.52; para enmendar ciertos artículos para integrar cambios al proyecto debido a la adquisición de generadores y para extender la vigencia del Contrato hasta el 31 de enero de 2013. ------------------------------------------------------

-----TERCERO:  El 10 de abril de 2012, personal de la Autoridad tomó muestras del terreno sujeto a las excavaciones necesarias para cumplir con el diseño de construcción del proyecto. Los resultados del muestreo revelaron un nivel alto de *Total Petroleum Hidrocarbons* (TPH), lo que clasifica el terreno a excavarse como contaminado no peligroso.------------------------------------------------------------------------

-----CUARTO:  Para cumplir con las leyes y reglamentaciones aplicables, representantes de la Autoridad consultaron con las agencias gubernamentales pertinentes, incluyendo la Junta de Calidad Ambiental y el Municipio de Culebra para la disposición del terreno mencionado en el vertedero de Culebra. ------------------------------

-----QUINTO:  Contemporáneamente, representantes de la Autoridad y el Contratista entraron en negociaciones para alcanzar un acuerdo para la transportación y disposición del material de excavación contaminado. Estas negociaciones, al igual que las negociaciones con las agencias gubernamentales pertinentes, fueron objeto de interrupciones o dilaciones que resultaron en retrasos en los trabajos objeto del Contrato.------------------------------------------------------------------------------------

000071

SEGUNDA ENMIENDA CONTRATO MASTER LINK CORPORATION, INC. (0912653)
Página 3

-----SEXTO:  Los trabajos de remoción y transportación del material contaminado fueron completados el 20 de noviembre de 2012.---------------------------------------------

----SÉPTIMO:  A consecuencia de las situaciones mencionadas anteriormente, los trabajos no se han completado y el Contrato está vigente hasta el 31 de enero de 2013, por lo que es necesario extender el término para completar los trabajos hasta el 19 de abril de 2013 y la vigencia del Contrato hasta el 31 de julio de 2013.----------------------------

-----OCTAVO:  Que durante el periodo de tiempo descrito anteriormente, la compañía CMA Architects and Engineers, LLP, como diseñadores del proyecto, realizaron modificaciones a diferentes hojas de dibujos.  Estas modificaciones son previas o concurrentes con las extensiones de tiempo solicitadas y, por consiguiente, el Contratista no podrá reclamar extensión de tiempo adicional por las referidas modificaciones. --------------------------------------------------------------------------------

-----Conforme con lo que antecede, la Autoridad y el Contratista otorgan la presente Enmienda al Contrato de acuerdo con las siguientes:------------------------------------------

----------------------------------CLÁUSULAS Y CONDICIONES----------------------------------

-----PRIMERA:  Se enmienda el Artículo 2 del Contrato para extender el término para completar los trabajos hasta el 19 de abril de 2013 y la vigencia del Contrato hasta el 31 de julio de 2013.----------------------------------------------------------------------------------

-----SEGUNDA:  La efectividad de esta Segunda Enmienda será a partir de la fecha de firma por la Autoridad y el Contratista.------------------------------------------------------------

SEGUNDA ENMIENDA CONTRATO MASTER LINK CORPORATION, INC. (0912653)
Página 4

-----TERCERA:  La Autoridad y el Contratista acuerdan que, excepto las enmiendas

antes indicadas, todas las demás cláusulas del Contrato, incluyendo el costo total de

Contrato ($2,299,598.52), las Condiciones Generales y las Condiciones Especiales

permanecen iguales y vigentes.--------------------------------------------------------------------

-----POR TODO LO CUAL, las partes comparecientes en este acto manifiestan estar de

acuerdo con todo lo expuesto anteriormente, y por encontrarlo conforme con sus

deseos, lo aceptan en todas sus partes.----------------------------------------------------------

-----En San Juan, Puerto Rico, hoy 31 de enero de 2013.------------------------------------

Sonia Miranda Vega
Directora Ejecutiva, Interina
Autoridad de Energía Eléctrica
Seguro Social Patronal 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

Carlos Morales Vázquez
Presidente
Master Link Corporation Inc.
Seguro Social Patronal 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

000073

OC-FSA-167

jun 05 (Rev.)
I-FSA-2, Versión 1

Estado Libre Asociado de Puerto Rico
Commonwealth of Puerto Rico
**OFICINA DEL CONTRALOR**
OFFICE OF THE COMPTROLLER OF PUERTO RICO
San Juan, Puerto Rico

## CERTIFICACIÓN
CERTIFICATION

SOBRE OTORGAMIENTO DE CONTRATO, ESCRITURA O DOCUMENTO RELACIONADO
REGARDING THE EXECUTION OF CONTRACTS DEEDS AND OTHER RELATED DOCUMENTS

[1] Código de Entidad     **3   0   7   5**
Entity Code

[2] Número de Contrato     _____
Contract Number

[3] Fecha de Otorgamiento     _____
Date of execution (dd/mm/yy)

[4] Cuantía Total     _____
Total amount

[5] Cuentas

[6] Código del  Tipo del Contrato     _____
Contract Type Code

[7] Exento     _____
Exempt

[8] Orden   (Aprobación o dispensa de algún organismo del Gobierno)     _____
Authorization or waiver from another government entity

[9] Vigencia desde  (dd/mm/aa)     _____     hasta dd/mm/aa     _____
Effective date from  (dd/mm/yy)     to     (dd/mm/yy)

[10] Seguro Social Personal o Patronal     **6   6   0   -   6   2   -   9   4   6   9**
Social Security Number

[11] Contratista(s)     **Master Link Corporation, Inc.**
(Contractor)

[12] Representante(s) de la(s) Entidad(es) Gubernamental(es)     **Ing. Sonia Miranda Vega**
(Government Representative(s)

Se somete la presente certificación en cumplimiento con Carta Circular promulgada por el Contralor de Puerto Rico y en cumplimiento con el Reglamento Núm. 33 Sobre Registro de Contratos, Escrituras y Documentos Relacionados y Envío de Copias a la Oficina del Contralor. Esta debe ser remitida a la Oficina del Contralor.
(This certification is submitted in compliance with the instructions issued by the Comptroller of Puerto Rico and in accordance with Regulation No. 33, regarding the Registration of Contracts, Deeds and Other Related Documents and the Mailing of such Copies to the Comptroller's Office by the government entity.)

Los suscribientes certificamos haber otorgado hoy el contrato descrito en este documento.
The undersigned, certify having that the contract described in this document was executed on this date.

[13] En (ciudad)   **San Juan**_____, Puerto Rico, hoy dd/mm/aa **31** de **enero** de **2013**.
In     , Puerto Rico, today (dd/mm/yy)

[14]. Firma(s) Contratista(s)
Signature of the Contractor(s):

SS:

_____
**Carlos Morales Vázquez**
Letra de molde (print)

_CARLOS A. Morales_

[15]. Firma(s) Funcionario(s) Gubernamental(es):
Signature of the Government Oficial(s):

_____
Firma (Signature)

**Sonia Miranda Vega**
Letra de molde (print)

_Sonia Miranda Vega_

OC-FSA-167     000074

ANEJO 4

**AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO**
**DIRECTORADO DE GENERACIÓN**

**TERCERA ENMIENDA CONTRATO 0912653**
**REHABILITACIÓN DEL EDIFICIO DE GENERADORES DE EMERGENCIA**
**DEL MUNICIPIO DE CULEBRA**

COMPARECEN

DE UNA PARTE:   La Autoridad de Energía Eléctrica, en adelante denominada "la Autoridad", una corporación pública y entidad gubernamental del Estado Libre Asociado de Puerto Rico, creada por la Ley 83 de 2 de mayo de 1941, según enmendada, representada en este acto por su Director Ejecutivo, señor Juan Francisco Alicea Flores, mayor de edad, casado, ingeniero y vecino de Caguas, Puerto Rico.-------

DE LA OTRA PARTE:   Master Link Corporation, Inc. en adelante denominado "el Contratista", una corporación organizada y existente bajo las leyes del Estado Libre Asociado de Puerto Rico, representada en este acto por su Presidente,  señor Carlos Morales Vázquez, mayor de edad, soltero y vecino de Bayamón, Puerto Rico, según Resolución Corporativa del 20 de septiembre de 2011.-------------------------------------------

La Autoridad y el Contratista, con la capacidad legal para este acto, libre y voluntariamente:-------------------------------------------------------------------------------------



EXPONEN

-----PRIMERO:   La Autoridad y el Contratista otorgaron el 3 de enero de 2011 el Contrato 0912653 para rehabilitar el edificio de generadores de emergencia que sirve de   resguardo   al   municipio   de   Culebra   (el   Contrato).   Esto,   por   un   costo de $2,581,583.87.----------------------------------------------------------------------------------------

-----SEGUNDO:   La Autoridad y el Contratista otorgaron el 17 de julio de 2012 una Primera Enmienda al Contrato para reconocer una reducción al costo total del mismo a

TERCERA ENMIENDA CONTRATO 0912653
Página 2

la cantidad de $2,299,598.52; para enmendar ciertos artículos para integrar cambios al alcance del proyecto debido a la adquisición de generadores y para extender la vigencia del Contrato hasta el 31 de enero de 2013.------------------------------------------------

-----TERCERO:   El 31 de enero de 2013 las partes formalizaron una Segunda Enmienda al Contrato para extender hasta el 19 de abril de 2013 el término concedido al Contratista para completar los trabajos contenidos en el Artículo 1 del Contrato. Mediante esta Segunda Enmienda se extendió, además, la vigencia del Contrato hasta el 31 de julio de 2013.   Esto, debido a que se encontró terreno contaminado con hidrocarburos, lo que requirió negociaciones entre las partes y con agencias gubernamentales para el manejo adecuado del mismo, actividades que atrasaron los trabajos objeto del Contrato.---------------------------------------------------------------------

-----CUARTO:   El 2 de julio de 2013 la Autoridad aprobó que se otorgara con el Contratista una Tercera Orden de Cambio para viabilizar la ejecución de varios cambios en la construcción a consecuencia de las revisiones del diseño para el cumplimiento de la operación al instalar tres generadores nuevos de 2,000 kW; cumplir con los requisitos de construcción al tanque de almacenaje de combustible, solicitados por el Departamento de Vida Útil para extender su tiempo de operación; y, la adquisición (diseño, manufactura y transporte a Culebra) de tres (3) transformadores de 3,000 kVA 480/4160 V. ---------------------------------------------------------------------

-----QUINTO:   No obstante, la aprobación emitida el 2 de julio de 2013 por parte de la Autoridad para la Tercera Orden de Cambio y el otorgamiento de la Tercera Enmienda

TERCERA ENMIENDA CONTRATO 0912653
Página 3

al Contrato, ello no se concretó debido a discrepancias con el Contratista con varios de los términos y costos a incluirse en la referida Orden de Cambio y la correspondiente enmienda.----------------------------------------------------------------------------------------------------

-----SEXTO:  Tras un proceso de conversaciones entre las partes, éstas acordaron los términos para enmendar la Tercera Orden de Cambio que se aprobó el 2 de julio de 2013 y, cónsono con la misma, otorgar la Tercera Enmienda al Contrato.  Esto para reflejar los cambios aceptados por ambas partes al momento.----------------------------------

-----SÉPTIMO:  Cónsono con lo anterior, las partes reconocen la Tercera Orden de Cambio, según enmendada, y acuerdan, a su vez, enmendar el Contrato para añadir los siguientes trabajos, necesarios e indispensables para completar el alcance original del proyecto:----------------------------------------------------------------------------------------------

1. Fabricar e instalar platos de refuerzo para el área de contacto de las sillas de anclaje con la pared del tanque (12 piezas), a un costo de $3,500.

2. Cambiar el material de escalera de acero negro a galvanizado, a un costo de $4,200.

3. Fabricar e instalar platos de refuerzo en los *clips* de conexión de la escalera contra la pared del tanque (6 piezas), a un costo de $1,100.

4. Fabricar e instalar platos de refuerzo en los *clips* de conexión de los postes verticales del *roof railing* contra la pared del tanque (12 piezas), a un costo de $2,100.

TERCERA ENMIENDA CONTRATO 0912653
Página  4

5.  Cambiar el *emergency vent* de 4 pulgadas por un respiradero tipo *conservation vent & flame arrester* de 4 pulgadas, a un costo de $7,000.

6.  Los siguientes cambios por revisión en el diseño:

    a.  *Louvers* a un costo de $168,256.07.

    b.  Provisiones especiales para *louvers* en techo (*gravity ventilator*) a un costo de $7,114.

    c.  Soldaduras adicionales en estructura de acero a un costo de $835.

    d.  Sellado de techo a un costo de $3,000.

-----OCTAVO:   Dado el estado de los trabajos pertinentes al proyecto y de las negociaciones entre las partes, éstas acuerdan enmendar el Artículo 2 del Contrato para extender su vigencia hasta el 31 de enero de 2014.----------------------------------------

-----Esta extensión de tiempo no se entenderá como una aceptación de responsabilidad por cualesquiera de las partes en relación a las causas de atraso del proyecto, ni se interpretará como una renuncia por cualesquiera de las partes al cobro de los costos compensables, imposición de penalidades y daños que tal atraso pueda haberles ocasionado.   Los correspondientes ajustes al Contrato, se efectuarán tras la adjudicación de responsabilidad entre las partes por los diferentes eventos de atrasos a los trabajos.   A esos efectos, el Contratista proveerá un itinerario actualizado del Proyecto. -----------------------------------------------------------------------------------

000078

TERCERA ENMIENDA CONTRATO 0912653
Página  5

-----NOVENO:  Las partes acuerdan enmendar el artículo 4 del Contrato para reconocer el costo de los trabajos adicionales antes mencionados los cuales ascienden a $197,105.07, por lo que el precio del Contrato aumenta a $2,496,703.59. ------------------

-----DÉCIMO:  Las partes acuerdan, además, que dentro del término de veinte (20) días laborables contados a partir de la firma de esta Tercera Enmienda, la Autoridad notificará al Contratista su determinación con relación a la reclamación instada por éste por concepto de *extended overhead* para el periodo comprendido desde el 2 de abril de 2012 hasta el 11 de octubre de 2012.---------------------------------------------------------------

-----UNDÉCIMO:  La efectividad de esta Tercera Enmienda será a partir de la fecha de la firma por ambas partes.-----------------------------------------------------------------------------

-----DUODÉCIMO:  Las partes acuerdan que, excepto las enmiendas antes indicada, todos los demás términos y condiciones del Contrato, las Condiciones Generales y Condiciones Especiales permanecen iguales y vigentes.-------------------------------------------

-----POR TODO LO CUAL, los comparecientes en este acto manifiestan estar de acuerdo con todo lo expuesto y, por encontrarlo conforme con sus deseos, lo aceptan en todas sus partes.-------------------------------------------------------------------------------------

-----En San Juan, Puerto Rico hoy, 29 de julio de 2013.------------------------------

Juan Francisco Alicea Flores
Director Ejecutivo
Autoridad de Energía Eléctrica
Seguro Social Patronal 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

Carlos Morales Vázquez
Presidente
Master Link Corporation, Inc.
Seguro Social Patronal 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

000079

**AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO
DIRECTORADO DE GENERACIÓN**

**CUARTA ENMIENDA CONTRATO 2011-P00067
REHABILITACIÓN DEL EDIFICIO DE GENERADORES DE EMERGENCIA
DEL MUNICIPIO DE CULEBRA**

COMPARECEN

DE UNA PARTE: La Autoridad de Energía Eléctrica, en adelante denominada (la Autoridad), una corporación pública y entidad gubernamental del Estado Libre Asociado de Puerto Rico, creada por la Ley 83 de 2 de mayo de 1941, según enmendada, representada en este acto por su Director Ejecutivo, señor Juan Francisco Alicea Flores, mayor de edad, casado, ingeniero y vecino de Caguas, Puerto Rico.-------

DE LA OTRA PARTE: Master Link Corporation, Inc. (Contratista), una corporación organizada y existente bajo las leyes del Estado Libre Asociado de Puerto Rico, representada en este acto por su Presidente, Carlos Morales Vázquez, mayor de edad, soltero y vecino de Bayamón, Puerto Rico, según Resolución Corporativa del 20 de septiembre de 2011.----------------------------------------------------------------------------------

La Autoridad y el Contratista, con la capacidad legal para este acto, libre y voluntariamente:-----------------------------------------------------------------------------------------

EXPONEN

-----PRIMERO: La Autoridad y el Contratista otorgaron el 3 de enero de 2011 el Contrato 2011-P00067 (Contrato) para rehabilitar el edificio de generadores de emergencia que sirve de resguardo al municipio de Culebra por $2,581,583.87.-----------

-----SEGUNDO: La Autoridad y el Contratista otorgaron el 17 de julio de 2012 una Primera Enmienda al Contrato para reconocer una reducción al costo total del mismo a la cantidad de $2,299,598.52; para enmendar ciertos artículos para integrar cambios al

000080

Cuarta Enmienda Contrato 2011-P00067
Página 2

proyecto debido a la adquisición de generadores y para extender la vigencia del Contrato hasta el 31 de enero de 2013.--------------------------------------------------------------

-----TERCERO:   El 31 de enero de 2013 las partes formalizaron una Segunda Enmienda al Contrato para extender el término para completar los trabajos hasta el 19 de abril de 2013 y la vigencia del Contrato hasta el 31 de julio de 2013.  Esto debido a que se encontró terreno contaminado con hidrocarburos y luego de que las negociaciones con las agencias gubernamentales pertinentes, fueran objetos de interrupciones o dilaciones que resultaron en retrasos en los trabajos objeto del Contrato.--------------------------------------------------------------------------------------------

-----CUARTO:  El 29 de julio de 2013 las partes aprobaron una Tercera Enmienda para añadir trabajos adicionales, necesarios e indispensables, para completar el alcance original del proyecto.  Además, se extendió la vigencia del Contrato hasta el 31 de enero de 2014 y se reconoció el costo de los trabajos adicionales, que aumentó la cuantía del Contrato a $2,496,703.59.----------------------------------------------------------------

-----QUINTO:  En esta Cuarta Enmienda las partes acuerdan modificar el Artículo 2 del Contrato para extender la vigencia del mismo hasta el 31 de octubre de 2014.-------------

-----SEXTO:  Las partes acuerdan que, excepto las enmiendas antes indicadas, todos los demás términos y condiciones del Contrato, las Condiciones Generales y Condiciones Especiales permanecen iguales y vigentes.--------------------------------------------

000081

Cuarta Enmienda Contrato 2011-P00067
Página  3


-----POR TODO LO CUAL, los comparecientes en este acto manifiestan estar de

acuerdo con todo lo expuesto y, por encontrarlo conforme con sus deseos, lo aceptan

en todas sus partes.---------------------------------------------------------------------------------

-----En San Juan, Puerto Rico hoy, ___ de _____ de 2014.-------------------------------


_____            _____
Juan Francisco Alicea Flores                      Carlos Morales Vázquez
Director Ejecutivo                                     Presidente
Autoridad de Energía Eléctrica                   Master Link Corporation, Inc.
Seguro Social Patronal 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          Seguro Social Patronal 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

ANEJO 6

CN 078-04479
REV. 06/10

GOBIERNO DE PUERTO RICO
AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO

SAN JUAN, PUERTO RICO



www.aeepr.com

APARTADO 364267
CORREO GENERAL
SAN JUAN, PR  00936-4267

AEE-ML-007

1 de febrero de 2012

Sr. Carlos A. Morales Vázquez, Presidente
Master Link Corporation, Inc.
PO Box 2186
Barceloneta, Puerto Rico  00617

Estimado señor Morales Vázquez:

**Re: Rehabilitación Edificio Generadores - Culebra
Contrato 2011-P00067**

Le autorizamos a proceder con el proyecto de referencia.  Esta autorización
cancela y sustituye la del 27 de septiembre de 2011.  El contratista realizará las
coordinaciones, comunicaciones y tramitación de facturas por medio del ingeniero
Jorge L. Rivera Martínez, superintendente del Departamento Administración de
Proyectos.  Las comunicaciones esenciales se tramitarán con copia al ingeniero
José W. Rivera Cacho, Jefe de la División de Ingeniería y Servicios Técnicos.

La reunión de preconstrucción será el 7 de febrero de 2012 a las 9:00 a.m. en el
Salón de Conferencias A del cuarto piso en el edificio NEOM.  La construcción
comenzará el 13 de febrero de 2012.  Antes de esto, deberá enviar un programa de
progreso del trabajo con las horas/hombre por tarea, evidencia de pago de los arbitrios
municipales y un desglose de pagos para la aprobación de la Autoridad de Energía
Eléctrica.

De necesitar información adicional, puede comunicarse con el ingeniero Rivera
Martínez por el 787-521-5484 o 787-521-6610.

Cordialmente,

Josué A. Colón Ortiz
Director de Generación

"Somos un patrono con igualdad de oportunidades en el empleo y no discriminamos por razón de raza, color, sexo, edad, origen
social o nacional, condición social, afiliación política, ideas políticas o religiosas; por ser víctima o ser percibida(o) como víctima de
violencia doméstica, agresión sexual o acecho; por impedimento físico, mental o ambos, por condición de veterano(a) o por
información genética."

000083

Case:17-03283-LTS   Doc#:3069-2   Filed:05/16/18   Entered:05/16/18 00:31:40   Desc:
Exhibit 2 - Supporting documents   Page 85 of 147

ANEJO 7



ML-AEE 072

3 de marzo de 2014

**Ing. Jorge I. Rivera**
Superintendente
Departamento Administración de Proyectos
Directorado de Generación, Autoridad de Energía Eléctrica

Re:   **ML-AEE 072 Solicitud Desmovilización y Trabajos Sustancialmente Terminados**
Proyecto Rehabilitación Planta Resguardo AEE Culebra
P2011-P00067

**Estimado Ing. Rivera:**

Masterlink estima que para el 15 de marzo de 2014 habrá culminado sobre el **92%** de los trabajos contemplados del contrato en referencia. Quedarán pendientes ciertos trabajos los cuales detallaremos más adelante. Del **8 %** restante, el **2.56%** son trabajos los cuales no se ven afectados de forma alguna por cambios y/o por terceros, mientras que el **5.44%** de los trabajos se ven afectados por cambios y/o terceros por lo que el desarrollo de trabajos libre de controversia son limitados.

Actualmente existen una serie de trabajos adicionales no contemplados en nuestro contrato original que fueron efectuados por Masterlink con el propósito de agilizar el proyecto sometido en nuestro escrito **ML-AEE 070** y que se encuentran en evaluación por su personal para la aprobación de la cuarta enmienda a nuestro contrato.

En adición a estos trabajos, existen otros cambios no contemplados en el contrato original que al momento no han sido realizados pero serán necesarios realizar para culminar el proyecto. Estos cambios de órdenes fueron parcialmente sometidos en nuestro escrito **ML-AEE 071.**

Aún queda por someter varios cambios adicionales, evaluar planos recientemente recibidos el cual impacta trabajos realizados, sustitución de equipos, trabajos adicionales, materiales a ser ordenados el cual demora varias semanas y decisión sobre petición del usuario el cual impacta lo ya contemplado. Estos costos tendrán que ser sometidos como cambios de órdenes para enmendar el contrato, proceso que sabemos tomará bastante tiempo.

Ante esta situación, Masterlink no tendrían labores que realizar eficientemente mientras estos cambios de órdenes son aprobadas y se hayan emitido las respectivas enmiendas al contrato. Al día de hoy no se han adjudicado los transformadores a ninguna compañía y este proceso podría tomar mucho tiempo por lo que la fecha de recibo de los transformadores es incierta. La subasta para la adquisición de los



transformadores en sus especificaciones requiere una entrega de 5 meses y una vez en el proyecto la Autoridad tiene 45 días para realizar las pruebas correspondientes de los equipos.

Si la Autoridad lograse adjudicar esta orden el 30 de marzo 2014, la entrega de los transformadores seria en alguna fecha entre septiembre y octubre. Durante este periodo de tiempo Masterlink estaría en el proyecto sin generar ningún avance de trabajo en espera de resolver los asuntos pendientes. Esta situación podría generar gastos adicionales de "extended overhead" para la Agencia, pérdida de productividad e incrementos en gastos para nuestra empresa.

Cuando analizamos el itinerario de pago ("breakdown for payment") sometido basado en los trabajos originales y las enmiendas 1, 2 &3, vemos lo siguiente:

| | |
|---|---|
| Mobilization | Completado |
| Management | Completado |
| Equipment Removal | Completado |
| Transportation | Completado |
| Demolition | Completado |
| Concrete | Completado |
| Structural Steel Metal | Completado |
| Pre-Cast | Completado |
| Membrane Roofing | Edificio será completado, oficina a ser desarrollada |
| Concrete Tank and Trench | Hormigón y empañetados completados,<br><br>"Epoxy coating" sujeto a los trabajos mecánicos<br><br>"Diesel spill control, skimmer, sediment trap, grate" sujeto a evaluación de cambio de orden |
| Fuel Tank | Completado. Retoque de pintura en algunas áreas. |
| Generator | Sujeto a que Antilles provea el sistema de emisión de gases con sus respectivas bases y realice los trabajos de insulación al sistema de emisión de gases |
| Exterior Building | En proceso de construcción. Estructura de hormigón será completado a mediados de marzo.<br><br>Terminaciones a ser realizado a nuestro regreso. |
| Mechanical Work | Instalados. Falta resolver asunto del color de los equipos. Cambio pendiente. |
| Electrical Work | Alambrado de SG a transformador sujeto a la entrega del transformador y cambio de orden pendiente.<br><br>Alambrado del generador a transformador sujeto a la aprobación del cambio de orden.<br><br>"Cable tray" sujeto a cambio de orden.<br><br>Alimentación de los paneles de control sujeto a la aprobación del cambio del "cable tray". |

**Master Link**
CONSTRUCTION - MARINE - ENERGY

|  |  |
|---|---|
|  | Soportes entre el edificio y los transformadores sujeto a que sometan Información, evaluación y cambio de orden. |
|  | Construcción de las bases de los transformadores sujeto a que brinden información, sea evaluado y aprobado el cambio de orden. |
|  | Calentador para los generadores - Sujeto a cambio de orden. |
|  | Panel P3 – Sujeto a cambio de orden. |
|  | Transformador de 150 Kva a ser suministrado por AEE o cambio de orden. |
|  | Transformador 480V – Sujeto a cambio de orden |
|  | Nuevo "meterbank" – Sujeto a cambio de orden. |
|  | Alambrado luces – Sujeto a cambio de orden. |
|  | "Fire alarm" -- A ser realizados a nuestro regreso. |
|  | "Leak Detector" -- A ser realizados a nuestro regreso |
|  | Conexión de equipos por Antilles. |
|  | Pruebas a realizar por Antilles y AEE. |
| Fuel Pump & Piping | Bomba de suministro instalada. Posible relocalización de bomba en espera de la determinación. Posible cambio de orden. |
|  | Bomba de llenado en obra. Su instalación depende de cambio de orden y construcción en área de transferencia en combustible. |
|  | Tuberías a ser instaladas parcialmente por falta aprobación de equipos, Antilles provea varios accesorios y reemplazo de bomba. |
|  | Diseño evalúe tubería respiraderos de los "day tanks". |
|  | Conexión de líneas de combustibles sujeto a la prueba hidrostática el cual está aún sin coordinar en espera de que la AEE provea del agua. |
| Ornamental Fence and Sidewalk | Trabajos de verja a ser realizado parcialmente. |
|  | Escaleras, "railing", aceras, "topsoil", agregados en varias áreas, zafacones soterrados a ser realizado a nuestro regreso. |
|  | Posibles cambios en la acera, pared colindancia frontal y encintado no determinado, agregados en varias áreas. Posible cambio de orden |

754000086



| Desmobilization | A ser realizado de ser considerado nuestra solicitud. |
|---|---|
| Change Order #2 | Tanque Diesel – Completado.<br><br>"Louvers" – Completado sujeto a pintura a ser evaluado como cambio.<br><br>"Gravity Ventilator" – Instalado sujeto al anclaje final pendiente al sellado del techo. Trabajos deberán concluir con anterioridad a la desmovilización.<br><br>"Roof Waterprofing" – A ser completado.<br><br>"Additional Weld"- En estructura de acero completado |

Cuando proyectamos las actividades a ser realizadas hasta marzo 15, fecha propuesta para la desmovilización, nos refleja una cantidad de obra completada el cual superará el **92%** de nuestro contrato.

Ante lo expuesto, Masterlink sugiere que para el beneficio de las partes seamos desmovilizados, realicemos una certificación de pago hasta la fecha indicada incluyendo el pago por la desmovilización, se nos reembolse el retenido del proyecto y negociemos una nueva movilización y desmovilización. Masterlink estima que las labores para culminar el contrato pudieran ser efectuados con 30 días laborables con antelación a la entrega de los transformadores.

Estamos a su disposición para dialogar sobre los pormenores de nuestra solicitud. Entendemos que esta determinación es una beneficiosa para las partes por lo que debería ser considerada de forma favorable

Cordialmente,

Javier Ramírez, PE-RPA
Gerente de Proyectos

Cc  Ing. Carlos J Castro - Director de Ingeniería
     Ing. Juan Tirado – Jefe División de Ingeniería
     Ing. Miguel del Valle – Ingeniero Supervisor
     Lcdo. Jorge Concepción – Jefe División Legal
     Sr. Carlos Morales – Presidente Master Link

ANEJO 8



ML-AEE 074

19 de marzo de 2014

Ing. Jorge L Rivera
Superintendente
Departamento Administración de Proyectos
Directorado de Generación, Autoridad de Energía Eléctrica

Re:   **Solicitud Reunión – Varios Asuntos**
      **Proyecto Rehabilitación Planta Resguardo AEE Culebra**
      **P2011-P00067**

Estimado Ing. Rivera:

En los pasados días hemos estado bien activo relacionado a la evaluación de los cambios de órdenes y otros asuntos del proyecto por lo que le agradezco todo el tiempo y esfuerzo brindado por usted y su equipo de trabajo. Al presente tenemos una serie de asuntos pendientes que entendemos sería meritorio llevar a cabo una reunión en la cual forme parte el Ing. Juan Tirado y nuestro presidente Sr. Morales.

Los asuntos a ser discutidos serían los siguientes:
1.   Solicitud de pago del retenido por el 10% y no por el 5%
2.   Pago inmediato para únicamente las partidas relacionados a los cambios de órdenes por trabajos realizados.
3.   Pormenores de la desmovilización
4.   Dialogar la posibilidad de incluir en la próxima enmienda una partida tipo contingencia por costo unitario, asignando una cantidad monetaria con el propósito de poder atender cualquier cambio de orden que surgiera en un futuro
5.   Finiquitar los cambios de órdenes
6.   Posibilidad de utilización parcial de la planta generatriz

Le agradeceré podamos coordinar prontamente esta reunión para así poder dar paso a nuestra enmienda al contrato y atender los demás asuntos relacionados al proyecto

Cordialmente,

Javier Ramírez, PE-RPA
Gerente de Proyectos

Cc  Ing Juan Tirado
    Ing. Miguel del Valle – Ingeniero Supervisor
    Sr. Carlos Morales -  Presidente Master Link

1

000088
796

**ANEJO 9**



CONSTRUCTION - MARINE - ENERGY

ML-AEE 075

25 de marzo de 2014

Ing. Carlos J Castro
Director de Ingeniería
Departamento Administración de Proyectos
Directorado de Generación, Autoridad de Energía Eléctrica

Re:   **ML-AEE 075 - Solicitud Reunión**
      **Proyecto Rehabilitación Planta Resguardo AEE Culebra**
      **P2011-P00067**

Estimado Ing. Castro:

Un cordial saludo! Durante el día de hoy de llevó a cabo una reunión entre las partes para poder aclarar ciertos asuntos de interés del proyecto en referencia en la cual participaron el Ing. Juan Tirado, Ing. Jorge Rivera, Ing. Miguel del Valle, Carlos Morales y este servidor.

Debido a ciertas diferencias en criterios, solicitamos respetuosamente llevar a cabo una reunión para poder dialogar sobre los siguientes temas:

1. Solicitud de pago de retenido
2. Pago inmediato para partidas relacionadas a cambio de orden de trabajos realizados
3. Dialogar sobre la posibilidad de incluir en la próxima enmienda al contrato una partida unitaria para atender cualquier posible cambio de orden menos para agilizar el proceso administrativo
4. Atender discrepancias en cambios de órdenes
5. Solicitud de desmovilización

Es nuestro interés que podamos llegar a un acuerdo favorable por el beneficio de las partes ya que al presente tenemos una serie de materiales pendiente a ser entregados sin fecha de su recibo los cuales atrasarán el desarrollo de la obra y pudieran impactar los costos del proyecto.

Esperando su acostumbrada ayuda, queda de usted

Cordialmente,

Javier Ramírez, PE-RPA
Gerente de Proyectos

Cc Ing. Juan Tirado – Jefe División de Ingeniería
   Ing. Jorge L Rivera - Superintendente
   Ing. Miguel del Valle – Ingeniero Supervisor
   Sr. Carlos Morales – Presidente Master Link



ML-AEE 076

9 de mayo de 2014

**Ing. Carlos J Castro**
Director de Ingeniería
Departamento Administración de Proyectos
Directorado de Generación, Autoridad de Energía Eléctrica

Re:   **ML-AEE 076 – Enmienda al Contrato**
      **Proyecto Rehabilitación Planta Resguardo AEE Culebra**
      **P2011-P00067**

Estimado Ing. Castro:

¡Un cordial saludo! El pasado 9 de abril se llevó a cabo una reunión entre las partes para resolver ciertos asuntos en controversia según nuestra solicitud en escrito ML-AEE 075. Al presente no se ha podido resolver los asuntos relacionados a la enmienda #4 por lo que le enumeramos las partidas que tiene que incluir la enmienda:

1. Pago inmediato del 50% del retenido incluyendo la certificación de los trabajos realizados pero no pagados. Y se establecerá que las sub siguientes certificaciones solo se retendrá el 5%.
2. Pago inmediato de los trabajos ya realizados.
3. Los trabajos por realizarse continuaran con los términos y condiciones originales del contrato exceptuando la retención de solo el 5%.
4. Desmovilización efectiva el 16 de mayo 2014 para posterior movilización a negociarse de acuerdo a la fecha de llegada de transformadores y materiales que genera esta enmienda.
5. Se establecerá los nuevos renglones de movilización y desmovilización.
6. Incluir gasto fijo por día por concepto de extended overhead en caso que no acepten la desmovilización.

El firmar la enmienda sin tener los compromisos antes descritos implica atrasos en los pedidos, atrasos en la obra y altos costos no contemplados para Master Link y la AEE. Al presente quedan cambio de órdenes por someter y detalles adicionales a los planos por incorporar los cuales incrementarán los costos de la obra, que a su vez deberán pasar por el proceso de evaluación, aceptación y la preparación de la enmienda #5 para la ejecución de los trabajos.



La compra de ciertos materiales que genera esta enmienda tienen un tiempo de entrega de 12 semanas para su recibo en condiciones normales de entrega desde el momento de su pedido por lo que debemos esperar a la entrega de estos materiales para poder realizar los trabajos de forma simultánea y eficiente.

La enmienda tiene que tomar en consideración los costos asociados de movilización y desmovilización basada en los porcientos ya establecidos en contrato original atemperado a la nueva enmienda. Tomando en consideración los trabajos faltantes a la fecha de nuestra última certificación ($210,737.34) en adición a los cambios de órdenes según nueva enmienda ($607,164.54), se debería incluir las partidas de movilización y desmovilización por la cantidad de $171,759.39.

El pretender que nuestra empresa continúe en la obra realizando trabajos de forma ineficiente, sentaría las bases de incrementos adicionales para la Agencia en gastos relacionados a "extended overhead" por lo que Master Link ha tomado la decisión de desmovilizarse efectivo el 16 de mayo 2014. El impacto de trabajar de forma ineficiente a quedado demostrado con la reclamación de "extended overhead" sometida por nuestra compañía y reconocida parcialmente por la AEE.

Si la AEE desea que continuemos en la obra realizando trabajos de forma ineficiente, se tendrá que incorporar en la enmienda una partida identificada como "extended overhead" como pago mensual basado en los costos sometidos y evidenciados por la cantidad de $108,007 mensual (según informe pericial). Master Link tiene el compromiso de culminar este proyecto y así lo hará pero de la manera más eficiente que se pueda. Hacer lo contrario iría en contra de una sana administración. De no recibir una contestación en los próximos 5 días calendarios comenzaremos con nuestra desmovilización.

Solicitamos respetuosamente una reunión entre las partes para así dialogar sobre los pormenores de estos asuntos.

Cordialmente,

Sr. Carlos Morales
Presidente Master Link

Cc Ing. Juan Tirado – Jefe División de Ingeniería
    Ing. Jorge L Rivera - Superintendente
    Ing. Miguel del Valle – Ingeniero Supervisor
    Ing. Javier Ramírez – Gerente de Proyectos

Anejo 11



ML-AEE 077

20 de mayo de 2014

Ing. Carlos J Castro
Director de Ingeniería
Departamento Administración de Proyectos
Directorado de Generación, Autoridad de Energía Eléctrica

Re:   ML-AEE 076, AEE-ML 051 -- Aclaración Desmovilización del Proyecto
      Proyecto Rehabilitación Planta Resguardo AEE Culebra
      P2011-P00067

Estimado Ing. Castro:

El 9 de mayo fue enviado escrito identificado como ML-AEE 076 (Enmienda al Contrato) dirigido
a las partes con interés en aclarar ciertos asuntos aún en controversia. El 17 de Mayo a la 1:30
A.M. recibimos su contestación a dicho escrito bajo el escrito identificado como AEE-ML 051
(Enmienda al Contrato). A continuación expresamos nuestra posición.

El 15 de mayo 2014 teníamos pautado la reunión de progreso semanal del proyecto donde
nuestra intención, a parte de discutir los asuntos relacionado al proyecto, era expresar en que
forma y por qué estaríamos realizando la desmovilización, situación discutida y aceptada por las
partes faltando solamente establecer la fecha en que comenzaría la actividad descrita y en la
forma que sería realizada.

Sin embargo, cuando arribé a la reunión, nos informa el Ing. Del Valle de forma molesta que la
reunión había sido cancelada sin razón alguna. Posteriormente nos enteramos que la molestia
provenía por el comienzo de la desmovilización que fue iniciado con la remoción del vagón de
oficina ya que la estructura del proyecto provista para estos fines, está operacional. Ante este
hecho, no hay razón de mantener un vagón de oficina alquilado cuando ya el proyecto cuenta
con su propia oficina. Nuestra intención de llevar a cabo la reunión era dialogar sobre los
siguientes puntos:

Asuntos a ser dialogados

1.  **Pago inmediato del 50% del retenido incluyendo la certificación de los trabajos
    realizados pero no pagados y establecer para las subsiguientes certificaciones, la
    retención del 5%.**

PO Box 2186 Barceloneta, PR 00617  Tel: 787-846-7655 Fax: 787-846-7650
e-mail: masterlinkcorp@yahoo.com

000092





Sobre este particular ya se había analizado, dialogado y decidido sobre este asunto. Para poder realizar el cobro por concepto de esta partida, se aclaró que no es necesario que la misma forme parte de la nueva enmienda. Se quedó en hacer gestiones para su pago inmediato pero al presente, no se ha realizado gestión ni hemos sido instruidos para el pago del mismo.

2. **Pago inmediato de los trabajos ya realizados.**

Según compromisos acordados con el Ing. Rivera, la enmienda para poder procesar el pago de estos trabajos realizados muchos de ellos desde el año 2012 hasta diciembre 2013, debió ser realizado en o antes de que finalizara el mes de marzo. A pesar de que presentamos los costos por separados de cambios de órdenes realizados y cambios de órdenes por realizar para no atrasar el proceso, el Ing. Rivera decidió de forma arbitraria y unilateral, unir estos cambios a otros en controversia, causando así atrasos innecesarios y prevenibles en el pago a nuestra compañía por lo que insistimos se realice una enmienda únicamente contemplando los cambio de órdenes de trabajos ya realizados para así agilizar el proceso de cobro.

3. **Cambios de orden por trabajos no realizados pero necesarios para culminar el proyecto.**

Aunque ya fueron aprobados estos cambios de órdenes a nivel administrativo, aún existen ciertas controversias. Estas controversias están centradas en que al ser materiales especializados, se requieren la compra en Estados Unidos y su pago total por adelantado para comenzar con su fabricación aparte de que su entrega es de unas 12 semanas, por lo que es necesario el pago del retenido y el cambio de los trabajos ya realizados para efectuar el pedido correspondiente. Aunque se firme la cuarta enmienda antes del mayo 30 del presente, los materiales estarían llegando para la tercera semana de agosto si ningún evento los atrasa.

4. **Comienzo de la desmovilización efectiva el 16 de mayo 2014 con fecha tentativa de culminación viernes 23 de mayo 2014.**

Este tema había sido previamente dialogado y aceptado por el Ing. Rivera pero no se había establecido una fecha para su efectividad. Al presente tenemos detalles de diseño aún sin resolver e incorporar en los planos, cambios de órdenes por someter, materiales por ordenar, trabajos por ser realizado por Antilles, equipos de la Autoridad interfiriendo áreas de trabajo como lo es la transferencia de combustible por lo que pretender que nuestra empresa permanezca en el proyecto realizando trabajos de forma ineficiente y limitada, sienta las bases para fomentar cargos por concepto de "extended overhead".

000093
801



En su escrito presenta usted su preocupación relacionada a ciertos trabajos como lo es la pared frontal, trabajos de oficina, verja de entrada, zona de carga y descarga y recubrimiento de "louvers" y "dampers".

Estas actividades están siendo llevadas a cabo incluyendo las aceras y escalera por lo que los mismos deberán concluir durante el transcurso de la semana salvo el recubrimiento de "louvers" y "dampers" los cuales serán atendido al momento que la pared de sonido, dique del transformador de 150KV y generador temporero, canal de agua entre transformador y edificio sea construido, actividades sujetos a cambio de orden aún por resolver.

5. Establecer los nuevos renglones de nueva movilización y desmovilización.

Es necesario incorporar para esta enmienda una partida por concepto de movilización y desmovilización el cual sugerimos sea basada tomando en consideración la misma proporción porcentual de gastos previamente establecida al comienzo del proyecto.

Tomando en consideración los trabajos faltantes a la fecha de nuestra última certificación ($210,737.34) en adición a los cambios de órdenes según nuestra nueva enmienda en proceso ($607,164.54), se debería incluir una partida por la cantidad de $171,759.39 por concepto de movilización y desmovilización.

6. Incluir gastos fijos por día por concepto de "extended overhead" en caso que no acepten la desmovilización y nos exijan que permanezcamos en el proyecto operando de manera ineficiente.

De la Agencia insistir que nuestra empresa permanezca en el proyecto realizando trabajos limitados y de forma ineficiente, se tendría que incorporar una partida por concepto de gastos mensuales de "extended overhead". Estos gastos ya han sido evidenciados en nuestro informe pericial el cual asciende a la cantidad de $108,007.00 mensual.

7. Detalles y explicación de la desmovilización propuesta.

Nuestra desmovilización comenzó de forma gradual con la remoción del vagón temporero ya que la oficina del proyecto está operacional. Durante el transcurso de la semana estaremos trabajando las actividades solicitadas exceptuando el recubrimiento de los "louvers" y "dampers" por las razones anteriormente expresadas. A medida que estas actividades sean culminadas, el personal será movilizado para la isla grande.

000094
802



Mientras estas actividades toman su desarrollo, estaremos llevando a cabo una limpieza de los alrededores e interior del edificio, organizando y asegurando el predio en caso de eventos climatológicos. Durante el período de tiempo en que las actividades de construcción estarán en pausa, estaremos trabajando de forma activa a nivel administrativo resolviendo los asuntos en controversia, por lo que la Autoridad podrá incorporar todos los detalles aún pendiente en lo que podría ser la quinta o la sexta enmienda.

### 8.  Otros Asuntos

Aún cuando los asuntos relacionado a la cuarta enmienda sea resuelta, quedan otros detalles los cuales generarán una quinta y posible sexta enmienda por lo que afecta nuestra intención de realizar una construcción de forma concurrente, eficiente y costo efectiva para la Agencia y nuestra empresa.

Por otro lado, la efectividad de la enmienda toma efecto si la misma viene acompañada de los pagos solicitados ya que el recibo de este dinero será utilizado para la compras de materiales. Al presente dependemos de ciertos detalles fuera de nuestro control para establecer un plan de trabajo el cual tome en consideración los elementos en controversia.

En miras de atemperar los asuntos pendiente, hemos preparado un plan de trabajo el cual sugerimos sea utilizado como base para que entre todos establezcamos las actividades a realizar. Estas fueron divididas en 5 categorías:

1.  Trabajos en contrato original
2.  Trabajos a ser realizados por otros (Antilles & AEE)
3.  Cambios atendidos en la enmienda #4 aún en proceso
4.  Cambios por someter
5.  Cambios en espera de detalles a ser suministrado (AEE)

Adjunto incluimos un itinerario de trabajo preliminar el cual trata de recoger asuntos propios de nuestra empresa y asuntos que están fuera de nuestro control. Las actividades identificadas en la categoría 2 & 5 no lo podemos trabajar por la falta de información. Sugerimos que la Autoridad provea la información requerida para poder incorporarla al itinerario de trabajo.

El punto neurálgico para decidir desmovilizarnos es que los materiales que se deberán pedir por concepto de la cuarta enmienda tendrán un periodo de fabricación y entrega no menor de 12 semanas. Los trabajos que el Ing. Rivera quería que termináramos antes de la desmovilización son la pared de sonido y el área de recibo de combustible. Estos trabajos haciéndolos concurrentemente tendrían una duración de 45 días aproximadamente.



Los trabajos que genera la cuarta enmienda como instalación del "mining cable" de los generadores a los transformadores, "cable tray", cable 750 del swithgear a la subestación existente, cable 750 del swithgear a los transformadores y trabajos eléctricos menores tiene un período de instalación de 40 días aproximadamente según cotización de nuestro contratista eléctrico. Estos trabajos eléctricos no se pueden comenzar hasta que lleguen los materiales que en su gran mayoría vendrá de Estados Unidos y llegarán con suerte para la tercera semana de agosto. Siendo el tiempo de los trabajos eléctricos y los trabajos de construcción similares, la manera más eficiente de efectuarlos es concurrentemente para evitar duplicar gasto recurrente en Culebra. La manera en que hacemos nuestro plan de trabajo no puede ser alterada por la Agencia a menos que lleguemos a un acuerdo económico por concepto de "extended overhead".

Para que esta estrategia funcione las enmiendas tienen que ser realizadas, los pagos tienen que ser efectuados, los asuntos en controversia deben ser resueltos y los materiales disponibles en el proyecto tales como y no limitados a transformadores de 3000 KVA, "cable tray", "mining cable", transformadores de 75 y 150 KV, paneles eléctrico y "meter bank", entre otros. Por otro lado, Antilles deberá terminar los trabajos de los que Master Link depende para culminar el proyecto y la AEE tendrá que remover el transformador alquilado para comenzar con los trabajos en área de recibo y transferencia de combustible.

Sugiero llevar a cabo una reunión entre las partes por lo que estoy en la disposición de reunirme a su conveniencia y disponibilidad para entre todos buscar una alternativa.

Cordialmente,

Sr. Carlos Morales
Presidente Master Link

Cc Ing. Juan Tirado – Jefe División de Ingeniería
   Ing. Jorge L Rivera - Superintendente
   Ing. Miguel del Valle – Ingeniero Supervisor
   Ing. Javier Ramírez – Gerente de Proyectos

PO Box 2186 Barceloneta, PR 00617  Tel: 787-846-7655 Fax: 787-846-7650
e-mail: masterlinkcorp@yahoo.com

000096
80P

ANEJO 12

CN 078-04479
REV. 02/14

### ESTADO LIBRE ASOCIADO DE PUERTO RICO
### AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO

SAN JUAN, PUERTO RICO



www.aeepr.com

APARTADO 364267
CORREO GENERAL
SAN JUAN, PR 00936-4267

29 de mayo de 2014

AEE-ML-052

Javier Ramírez
Gerente del Proyecto
Master Link Corporation, Inc.
PO Box 2186
Barceloneta, Puerto Rico  00617

Estimado señor Morales:

**Re: Desmovilización del Proyecto / Reunión de Construcción**
**Contrato 2011-P00067**

En nuestra reunión de construcción de hoy se discutieron varios temas que requieren ser señalado en detalles:

1) Master Link Corporation, Inc. (ML) se desmovilizó del proyecto, retirando el vagón de oficina, equipos de construcción, vagón de almacén eléctrico, materiales de construcción y otros.  Además, en la actualidad no mantiene representante de ML en Culebra.

2) En la carta AEE-ML-0051 la Autoridad le notificó a ML que de concretarse una desmovilización se entendería como abandono del proyecto.

3) El 28 de mayo de 2014 el ingeniero Miguel Del Valle le notificó por correo electrónico lo siguiente: "RT Roofing comenzó el tratamiento de techo de la oficina del proyecto, sin embargo, ningún personal de ML se ha presentado a trabajar al proyecto.  Tenemos que recalcar que todo trabajo que se haga en el proyecto tiene que ser supervisado por ML como contratista general".   A estos efectos, se le notificó hoy a ML que tiene que estar presente mientras tenga trabajando un subcontratista en el proyecto.   No puede haber subcontratista trabajando en el proyecto sin la supervisión de ML.

"Somos un patrono con igualdad de oportunidades en el empleo y no discriminamos por razón de raza, color, sexo, edad, origen social o nacional, condición social, afiliación política, ideas políticas o religiosas; por ser víctima o ser percibida(o) como víctima de violencia doméstica, agresión sexual o acecho, sin importar estado civil, orientación sexual, identidad de género o estatus migratorio; por impedimento físico, mental o ambos, por condición de veterano(a) o por información genética."

264

000097

Javier Ramírez
Página 2
29 de mayo de 2014

4) El 28 de mayo de 2014 el ingeniero Miguel Del Valle le notificó por correo electrónico lo siguiente: "el edificio de los generadores se dejó cerrado y no se dejó copia de las llaves al personal de la Autoridad, inclusive se dejaron dentro del edificio las sillas y mesas, dejando a nuestro personal sin un lugar donde trabajar". A estos efectos, se le solicitó a ML acceso inmediato al edificio de generadores de forma ininterrumpida y por ello copia de la llave para que el personal de la Autoridad tenga acceso. Hacemos referencia al artículo 53 *Access to Work* que lee; *The Contractor shall permit all persons appointed or authorized by PREPA to visit and inspect the Work, or any part thereof, at all reasonable times and places during the progress of the Work..."*

5) ML expresó en su último comunicado que "nuestra desmovilización comenzó de forma gradual con la remoción del vagón temporero, ya que la oficina del proyecto esta operacional". Ante este hecho, le notificamos los requisitos del contrato bajo el artículo 44.5, *The Contractor shall furnish and install a new office trailer for PREPA which complies with the following conditions....",* el cual incluye oficina, salón de conferencia, conexión al internet, agua potable y baños, entre otros. La oficina del proyecto al que hace referencia está asignada al personal de Hidrogas quien trabaja regularmente en Culebra. Las facilidades contratadas son utilizadas por el inspector del proyecto, así como para el personal de Administración de Proyectos que visita regularmente el proyecto.

6) Se le notificó claramente a ML su responsabilidad absoluta sobre los equipos, materiales y facilidades en general del proyecto en Culebra. Hacemos referencia al artículo 45.4 que lee; *Adequate field facilities and guard vigilances, to the extent Contractor Deems necessary, to keep safe all materials, tools, equipment, and spares used in connection with the Work".* También, hacemos referencia al artículo 49 *Vigilance* que lee; *The Contractor shall be responsable for and provide adequate guard vigilance of the work areas during non-working periods, to the extent Contractor deems necessary to protect the Work".*

De necesitar información adicional, puede comunicarse con nosotros por el 787-521-5484 o con Miguel Del Valle, Ingeniero Supervisor Senior, por el 787-521-6616.

Cordialmente,

Jorge L. Rivera Martínez
Superintendente

c  Carlos J. Castro Montalvo
   Juan A. Tirado Chabebe
   Miguel Del Valle Morales
   Carlos Morales



ML-AEE 078

38.

30 de mayo de 2014

**Ing. Jorge L Rivera**
Superintendente
Departamento Administración de Proyectos
Directorado de Generación, Autoridad de Energía Eléctrica

**Re:   AEE-ML 052 Desmovilización del Proyecto**
Proyecto Rehabilitación Planta Resguardo AEE Culebra
P2011-P00067

**Estimado Ing. Rivera:**

Luego de recibir su comunicado identificado como AEE-ML-052 (Desmovilización del Proyecto / Reunión de Construcción), debemos aclarar lo siguiente:

**Asunto #1**
1) Master Link Corporation, Inc. (ML) se desmovilizó del proyecto, retirando el vagón de oficina, equipos de construcción, vagón de almacén eléctrico, materiales de construcción y otros.  Además, en la actualidad no mantiene representante de ML en Culebra.

Nuestra acción ha sido una dialogada entre las partes de forma verbal como escrita según consta en las reuniones realizadas los días 25 de marzo, 9 de mayo, 22 de mayo (reunión semanal del proyecto) 30 de mayo (reunión semanal del proyecto) y comentada en los escritos ML-AEE 075, ML-AEE 076, ML-AEE 077, entre otros. A su vez hemos solicitado infructuosamente llevar a cabo reunión entre las partes para dialogar y aclarar cualquier situación al respecto y la Agencia no ha concedido la audiencia solicitada. Le exhortamos a que fomentemos el dialogo para la búsqueda de soluciones, tal y como establece el contrato en varios de sus artículos donde la buena fe debe imperar entre las partes.

1

000099
505



**Asunto #2**

2) En la carta AEE-ML-0051 la Autoridad le notificó a ML que de concretarse una desmovilización se entendería como abandono del proyecto.

Esta preocupación ha sido dialogada en varias ocasiones y recientemente esbozada en el escrito identificado como AEE-ML 077, inciso 4. De la Agencia desear la permanencia de nuestro personal para continuar trabajando de forma ineficiente y limitada, sería una clara aceptación de gastos a ser reclamados de "extended overhead" por lo que deberíamos pautar los pormenores a ser reclamados para así continuar los trabajos. Adjunto incluyo tracto del escrito.

> "4. Comienzo de la desmovilización efectiva el 16 de mayo 2014 con fecha tentativa de culminación viernes 23 de mayo 2014.
> Este tema había sido previamente dialogado y aceptado por el Ing. Rivera pero no se había establecido una fecha para su efectividad. Al presente tenemos detalles de diseño aún sin resolver e incorporar en los planos, cambios de órdenes por someter, materiales por ordenar, trabajos por ser realizado por Antilles, equipos de la Autoridad interfiriendo áreas de trabajo como lo es la transferencia de combustible por lo que pretender que nuestra empresa permanezca en el proyecto realizando trabajos de forma ineficiente y limitada, sienta las bases para fomentar cargos por concepto de "extended overhead".
>
> En su escrito presenta usted su preocupación relacionada a ciertos trabajos como lo es la pared frontal, trabajos de oficina, verja de entrada, zona de carga y descarga y recubrimiento de "louvers" y "dampers".
>
> Estas actividades están siendo llevadas a cabo incluyendo las aceras y escalera por lo que los mismos deberán concluir durante el transcurso de la semana salvo el recubrimiento de "louvers" y "dampers" los cuales serán atendido al momento que la pared de sonido, dique del transformador de 150KV y generador temporero, canal de agua entre transformador y edificio sea construido, actividades sujetos a cambio de orden aún por resolver."

**Asunto #3**

3) El 28 de mayo de 2014 el ingeniero Miguel Del Valle le notificó por correo electrónico lo siguiente: "RT Roofing comenzó el tratamiento de techo de la oficina del proyecto, sin embargo, ningún personal de ML se ha presentado a trabajar al proyecto. Tenemos que recalcar que todo trabajo que se haga en el proyecto tiene que ser supervisado por ML como contratista general". A estos efectos, se le notificó hoy a ML que tiene que estar presente mientras tenga trabajando un subcontratista en el proyecto. No puede haber subcontratista trabajando en el proyecto sin la supervisión de ML.

000100
806



La compañía RT Roofing está realizando los trabajos de sellado de techo del área de la oficina el cual comprende un 7.7% de los trabajos ya realizados. Esta compañía confrontó problemas para su movilización al proyecto por lo que en miras de continuar los trabajos, nos solicitaron la continuación y finalización de sus trabajos el cual accedimos a ello.

Estos trabajos serán verificados cuando estén próximos a su culminación por nuestra empresa a la vez que la fábrica enviará un personal para asegurarse que los trabajos estén construidos de acuerdo a las exigencias requeridas para la emisión de la garantía por lo que su preocupación sobre la calidad de los trabajos en ningún momento están siendo comprometidos. Por otro lado debemos aclarar que la manera en que nuestra empresa maneje los acuerdos, trabajos y otros asuntos relacionados, son asuntos propios de nuestra empresa.

**Asunto #4**

4) El 28 de mayo de 2014 el ingeniero Miguel Del Valle le notificó por correo electrónico lo siguiente: "el edificio de los generadores se dejó cerrado y no se dejó copia de las llaves al personal de la Autoridad, inclusive se dejaron dentro del edificio las sillas y mesas, dejando a nuestro personal sin un lugar donde trabajar". A estos efectos, se le solicitó a ML acceso inmediato al edificio de generadores de forma ininterrumpida y por ello copia de la llave para que el personal de la Autoridad tenga acceso. Hacemos referencia al artículo 53 *Access to Work* que lee; *The Contractor shall permit all persons appointed or authorized by PREPA to visit and inspect the Work, or any part thereof, at all reasonable times and places during the progress of the Work...*"

Su preocupación sobre este particular será atendido tal y como dispone el artículo 53 por lo que no veo cual es la preocupación sobre este particular. El lunes será enviado un personal para mover las sillas, mesa y escritorio al lugar de la oficina. En cuanto al acceso al edificio, ustedes podrán visitar o accesar tal y como dispone el artículo 53 siempre y cuando seamos notificado con no menos de 3 días laborables para nuestra coordinación. Adjunto le incluimos copia del artículo 53 para su referencia.

3

000101
807



**Article 53.   Access to Work**

The Contractor shall permit all persons appointed or authorized by PREPA to visit and inspect the Work, or any part thereof, at all reasonable times and places during the progress of the Work. To the extent reasonably practicable, PREPA shall give Contractor advance notice of PREPA's intention to inspect. Such inspections shall take place at such times and in such a manner as will not unreasonably interfere with, hinder or delay Contractor's performance of the Work. Any and all such visits and inspections shall be subject to compliance with Contractor's customary security and safety procedures and shall be at PREPA's cost and risk as provided in Article 18, Periodic Inspections.

Sobre el tema de entregar copia de las llaves del proyecto a la Agencia, Master Link ha expresado su sentir pero se ha creado controversia por la postura de intransigencia de la Agencia al querer tomar posesión parcial de ciertas áreas sin asumir la responsabilidad que conlleva su decisión.

El artículo 43 (Uso de Porción Completada) establece claramente que la Agencia en coordinación con el contratista, tendrá derecho a tomar posesión y utilizar cualquier parte completada o parcialmente completada del trabajo en la medida razonable para hacerlo y es capaz de usar con seguridad y para el propósito deseado en base a su entonces actual ejecución. No obstante el hecho de que el tiempo para completar el trabajo en su totalidad no haya vencido. Tomando posesión y uso de la obra o de cualquier parte de los trabajos los mismos deben considerarse aceptados por la Agencia para el cuidado, custodia y control de la obra y el riesgo de pérdida de aquí en delante del mismo, pero no será considerada la aceptación final a menos que todos los artículos enumerados en la lista de deficiencia "punch list" hayan sido completado y todos los términos y condiciones de aceptación final hayan sido alcanzados. En el evento de tomar posesión y uso de los trabajos según lo descrito anteriormente, y no obstante cualquier disposición contraria contenida en este documento, los trabajos terminados sustancialmente deben considerarse logrado y las obligaciones de garantía del contratista bajo el artículo 39, deben comenzar, en cada caso a la Agencia tomar posesión de y utilizar cualquier porción completada o parcialmente completada de dicho trabajo.

000102
808



Durante la semana estaremos haciendo entrega de las llaves solicitadas para el uso de la Agencia. Adjunto le incluyo copia del artículo 43 para su referencia.

> Article 43.   Use of Completed Portions
>
> PREPA, in coordination with Contractor, shall have the right to take possession of and use any completed or partially completed portions of the Work to the extent it is reasonable to do so and is capable of being used safely and for their intended purpose based on their then current state of completion, notwithstanding the fact that the time for completing the entire Work may not have expired.  Taking possession and use of the Work or any portion of Work thereof shall be deemed to be acceptance by PREPA of care, custody and control of the Work and risk of loss thereof, but shall not be deemed Final Acceptance unless all Punch List items have been completed and all terms and conditions of Final Acceptance have been met.  In the event of such taking possession and use of Work as described above, and notwithstanding anything to the contrary contained herein, Substantial Completion shall be deemed achieved, and Contractor's warranty obligations under Article 39, <u>Warranty</u>, shall commence, in each case at the time of PREPA's possession of and use of any completed or partially completed portion of such Work.

**Asunto #5**

5) ML expresó en su último comunicado que "nuestra desmovilización comenzó de forma gradual con la remoción del vagón temporero, ya que la oficina del proyecto esta operacional".  Ante este hecho, le notificamos los requisitos del contrato bajo el artículo 44.5, *The Contractor shall furnish and install a new office trailer for PREPA which complies with the following conditions....*", el cual incluye oficina, salón de conferencia, conexión al internet, agua potable y baños, entre otros.   La oficina del proyecto al que hace referencia está asignada al personal de Hidrogas quien trabaja regularmente en Culebra. Las facilidades contratadas son utilizadas por el inspector del proyecto, así como para el personal de Administración de Proyectos que visita regularmente el proyecto.

Le recordamos que el proyecto contó con una oficina temporera más allá del término contractual. Los servicios de la oficina temporera concluyó en octubre del 2012. Aun así, se ofreció los servicios hasta mayo de 2014, o sea 19 meses adicionales pero la Agencia no reconoce estos gastos por el período mayor de lo estipulado según contrato.

La Agencia con su acción de no atender ni reconocer nuestra reclamación de "extended overhead", tampoco reconoce los gastos que esta oficina temporera envuelve por lo que la Agencia no reconoce ni auspicia la necesidad de una oficina temporera.

5

000103
809



Por otro lado, el proyecto cuenta con una estructura de oficina operacional para estos fines. De la Agencia aun así insistir en estas facilidades, podrá contar con la misma siempre y cuando acepte los gastos relacionados y estos formen parte de la enmienda a ser aprobada.

**Asunto #6**

6) Se le notificó claramente a ML su responsabilidad absoluta sobre los equipos, materiales y facilidades en general del proyecto en Culebra. Hacemos referencia al artículo 45.4 que lee; *Adequate field facilities and guard vigilances, to the extent Contractor Deems necessary, to keep safe all materials, tools, equipment, and spares used in connection with the Work*. También, hacemos referencia al artículo 49 *Vigilance* que lee; *The Contractor shall be responsable for and provide adequate guard vigilance of the work areas during non-working periods, to the extent Contractor deems necessary to protect the Work*.

Los materiales y equipos del proyecto fueron debidamente protegidos al ubicar estos en una estructura para estos fines. Dicha facilidad cuenta con puertas y ventanas de seguridad tipo comercial, el público no tiene acceso a los alrededores salvo el personal de la propia Autoridad por lo que es totalmente innecesario el tener una vigilancia más allá de lo pautado y contratado. Estamos en la disposición de ofrecer alternativas económicas del uso ilimitado del personal de seguridad si la Agencia aún así desea este servicio, sea aprobado y forme parte de la enmienda.

Cordialmente,

Javier Ramírez, PE-RPA
Gerente de Proyectos

Cc  Ing. Carlos J Castro - Director de Ingeniería
Ing. Juan Tirado – Jefe División de Ingeniería
Ing. Miguel del Valle – Ingeniero Supervisor
Sr. Carlos Morales – Presidente Master Link

6

000104
810

Case:17-03283-LTS  Doc#:3069-2  Filed:05/16/18  Entered:05/16/18 00:31:40  Desc:
(2324 no leídos) - masterlinkcorp - Yahoo Mail  Exhibit 2 - Supporting documents  Page 106 of 147

Page 1 of 1

ANEJO 14

**From:** MIGUEL DEL VALLE <MDELVALLE12321@aeepr.com>
**Date:** 28 de mayo de 2014 4:50:16 p.m. GMT-04:00
**To:** "Yahoo (javierramirezpe@yahoo.com)" <javierramirezpe@yahoo.com>,  Javier Ramírez, PE-RPA  <jramirez@masterlinkpr.com>
**Cc:** "JORGE L. RIVERA MARTINEZ" <JRIVERA8518@aeepr.com>, "CARLOS JAVIER VEGA AGOSTO" <CVEGA7434@aeepr.com>
**Subject:** Punchlist 1 Oficina Culebra.pdf

Incluimos el punchlist de la estructura de oficina del Proyecto de Hidro Gas Culebra.

Miguel DelValle, P.E.
Ingeniero Supervisor Senior
Administración de Proyectos
División de Ingeniería
NEOM Oficina 407
Tel. 787.521.6616
Fax 787.521.6590

Verified by Puerto Rico Electric Power Authority McAfee Email and Web Security System (SCM1).

Punchlist... .pdf

000105

21 de mayo de 2014

# PUNCH LIST EDIFICIO OFICINA

1. Repicar pared pintada e instalar losa
2. Instalar mezcladora y ducha
3. ~~Remover y limpiar drenaje de piso~~
4. Arreglar empañetado
5. Puerta no cierra adecuadamente
6. Falta doorstop
7. Fijar lockers
8. Instalar gabinetes
9. Instalar calentador de agua
10. Reparar receptáculos pared
11. Modelo de cerradura erróneo
12. Arreglar hueco de overflow
13. Arreglar empañetado
14. Corregir drenaje el techo
15. Instalar llaves de mezcladora
16. Instalar accesorios de baño
17. Instalar receptáculos
18. Eliminar junction boxes del techo
19. Instalar tapa inodoro
20. Faltan tornillos tapa panel eléctrico
21. Rotular panel eléctrico
22. Falta breaker CU-1
23. Caulking borde gabinete de alarmas
24. Instalar accesorios de ducha
25. Falta número de lockers
26. Falta detector humo
27. Falta receptáculo
28. Falta pileta
29. Corregir cierre de puerta
30. Falta caja para control remoto de sliding gate

Notas Generales
a. Limpieza losa piso y zócalos
b. Retocar pintura
c. Falta tratamiento de techo

000106



000107

000108

Case:17-03283-LTS   Doc#:3069-2   Filed:05/16/18   Entered:05/16/18 00:31:40   Desc:
(2324 no leídos) - masterlinkcorp - Yahoo Mail   Exhibit 2 - Supporting documents   Page 110 of 147

Page 1 of 1

**ANEJO 15**

**De:** "Javier Ramirez, PE-RPA" <javierramirezpe@yahoo.com>
**Para:** Jorge L Rivera AEE Culebra <jlr-rivera@aeepr.com>
**CC:** Miguel Del Valle AEE Culebra <m-delvalle-engd@prepa.com>; "masterlinkcorp@yahoo.com"
<masterlinkcorp@yahoo.com>; "Javier Ramirez, PE-RPA (Master Link Corp)" <jramirez@masterlinkpr.com>
**Enviado:** Lunes, 2 de junio, 2014 17.06:39
**Asunto:** Fwd: Punchlist 1 Oficina - Comentarios - Culebra

Luego de verificar la lista de deficiencia durante el día de hoy 2 de junio, debo comentar lo siguiente:

Inciso 4, 5  Completado
Inciso 6   Puerta 2A no lleva "door stop". De requerir sería un cambio de orden
Inciso 6   Puerta 5A no lleva "door stop". De requerir sería un cambio de orden
Inciso 10 Completado
Inciso 13 Completado
Inciso 14 Parrilla según plano. De requerir sería un cambio de orden
Inciso 15, 16, 19, 28, 29 Completado


Cordialmente,
Javier Ramirez, PE-RPA
(787) 640-6161 Cel

Sent from my iPad

000109



ESTADO LIBRE ASOCIADO DE PUERTO RICO
**Autoridad de Energía Eléctrica de Puerto Rico**

Ing. Juan F. Alicea Flores
Director Ejecutivo

7 de octubre de 2014

Sr. Carlos Morales Vázquez
Presidente
Master Link Corporation, Inc.
PO Box 2186
Barceloneta, PR  00617

Estimado señor Morales:

**Re: Incumplimiento de Master Link Corporation al Contrato 2011-P00067
(Rehabilitación Edificio de Generadores de Culebra)**

El 3 de enero de 2011 la Autoridad de Energía Eléctrica (Autoridad) y Master Link Corporation (Master Link) otorgaron el Contrato 2011-P00067 con el objeto de rehabilitar el edificio de generadores de emergencia que sirve de resguardo al municipio de Culebra (Contrato).  Esto, por un costo de $2,581,583.87.

Conforme con el Artículo 2, *Commencement and Completion of Work,* del Contrato la duración de los trabajos sería de 180 días consecutivos a partir de la orden de proceder.  Según surge de los documentos en el expediente de dicho Contrato, la Autoridad emitió una Primera Orden de Proceder el 27 de septiembre de 2011 mediante la cual se dispuso que los trabajos comenzarían el 17 de octubre de 2011.  No obstante, Master Link no se movilizó en la fecha requerida y reclamó una orden de cambio para aumentar el precio del Contrato por concepto del incremento en los costos en la mano de obra, materia prima y transporte.  El 7 de febrero de 2012 la Autoridad entregó a usted una Segunda Orden de Proceder, la cual canceló y sustituyó la del 27 de septiembre de 2011 y estableció como fecha de comienzo de los trabajos el 13 de febrero de 2012 por lo que el término para completar los trabajos vencía el 10 de octubre de 2012.

El 22 de marzo de 2012 la Autoridad aprobó la Primera Orden de Cambio en la cual reconoció el aumento en los costos por concepto de materia prima, mano de obra y transporte según solicitado por Master Link.  Cónsono con lo anterior, el 17 de julio de 2012, la Autoridad y Master Link otorgaron una Primera Enmienda al Contrato para

APARTADO 364267 SAN JUAN, PUERTO RICO 00936-4267 TELÉFONO: (787) 521-4666 TELEFAX: (787) 521-4665
000110
"Somos un patrono con igualdad de oportunidades en el empleo y no  discriminamos por razón de raza, color, sexo, edad, origen social o nacional, condición social
afiliación política, ideas políticas o religiosas; por ser víctima o ser percibida(o) como víctima de violencia doméstica, agresión sexual o acecho, sin importar estado civil,
orientación sexual, identidad de género o estatus migratorio; por impedimento físico, mental o ambos, por condición de veterano(a) o por información genética."

Sr. Carlos Morales Vázquez
Página 2

reconocer una reducción y ajustar el costo total del Contrato a $2,299,598.52, debido a la eliminación de ciertos elementos del alcance del trabajo, enmendar ciertos artículos con el objeto de integrar cambios al alcance del proyecto debido a la adquisición de tres generadores de 2,000 kW y para extender la vigencia del Contrato hasta el 31 de enero de 2013. En esta Primera Enmienda se incluyó además un crédito a Master Link por el aumento en los costos del Contrato previamente aprobados por la Autoridad en la Primera Orden de Cambio de 22 de marzo de 2012.

El 31 de enero de 2013 se firmó una Segunda Enmienda al Contrato para extender hasta el 19 de abril de 2013 el término concedido a Master Link para completar los trabajos contratados. Mediante esta Segunda Enmienda se extendió, además, la vigencia del Contrato hasta el 31 de julio de 2013. Esto, debido al atraso ocasionado por los eventos de disposición del terreno contaminado con hidrocarburo como resultado de las excavaciones necesarias por el diseño para la construcción de los cimientos y losas de piso del edificio de generadores, del dique de transformadores y del tanque de almacenaje de combustible de diésel.

El 29 de julio de 2013 las partes aprobaron una Tercera Enmienda al Contrato para añadir trabajos adicionales, necesarios e indispensables, para completar el alcance original del proyecto. Mediante dicha enmienda se acordó, además, extender la vigencia del Contrato hasta el 31 de enero de 2014. Así también, mediante la Tercera Enmienda las partes acordaron enmendar el Artículo 4, *Consideration*, del Contrato para reconocer el costo de los trabajos adicionales, por lo que se aumentó la cuantía del Contrato a $ 2,496,703.59.

El 30 de enero de 2014 se aprobó una Cuarta Enmienda al Contrato para modificar el Artículo 2, *Commencement and Completion of Work*, del Contrato para extender la vigencia del mismo hasta el 31 de octubre de 2014.

De otra parte, mediante la carta ML-AEE-070 del 10 de febrero de 2014 dirigida al ingeniero Rivera Martínez, Master Link presentó un total de 19 trabajos realizados por concepto de modificaciones al diseño del proyecto. Además, mediante las cartas ML-AEE-071 del 18 de febrero de 2014 y ML-AEE-073 del 12 de marzo de 2014 dirigidas al ingeniero Rivera Martínez, Master Link solicitó que se aprobaran otros trabajos no realizados y los cuales eran necesarios debido a cambios en el diseño del proyecto. Esto, con el objeto además de que se aprobaran las órdenes de cambio para las referidas modificaciones al alcance del trabajo y a los términos del Contrato original. Luego de una evaluación de los estimados de trabajo, dibujos y data técnica presentados por Master Link, las partes acordaron ajustar el precio del Contrato conforme al costo de los referidos trabajos.

000111

Sr. Carlos Morales Vázquez
Página 3

Posteriormente, Master Link presentó su oposición con respecto al método matemático utilizado por la Autoridad al computar los por cientos de las partidas de seguros, contingencia, *overhead* y ganancia. Esto, dado que, Master Link consideraba el costo total de la orden de cambio al aplicar los por cientos de seguros, contingencia, *overhead* y ganancia, y no así el costo base de la orden. No obstante, con el objeto de resolver dicha discrepancia y continuar los trabajos objeto del Contrato la Autoridad aprobó el pago de $47,187.09. Lo cual se aceptó por Master Link.

El 23 de mayo de 2014, y mediante una determinación unilateral, Master Link se desmovilizó debido, según alegó, a una baja productividad al no tener aprobadas las órdenes de cambio mencionadas anteriormente. En varias ocasiones la Autoridad le advirtió a Master Link en cuanto a que no procedía una desmovilización toda vez que al 16 de mayo de 2014 existían trabajos de construcción pendientes de completar, tales como, la construcción del edificio de oficinas, verja de entrada, zona de carga y descarga, recubrimiento de *louvers* y *dampers*. Por lo que dicha actuación constituyó un abandono del proyecto por parte de Master Link.

El 12 de junio de 2014 la Autoridad aprobó que se otorgara con Master Link una Cuarta Orden de Cambio al Contrato. Ello, para autorizar las solicitudes de órdenes de cambio previamente presentadas por Master Link. La referida orden de cambio atendía los siguientes asuntos: 1) trabajos realizados por Master Link por concepto de modificaciones en el diseño; 2) otros trabajos no realizados requeridos debido a cambios en el diseño y; 3) una reclamación con respecto al método matemático utilizado por la Autoridad al momento de determinar los por cientos de las partidas de seguro, contingencia, *overhead* y ganancia. Dichas partidas, según indicamos anteriormente, son aplicadas por la Autoridad en por ciento sobre el costo base (subtotal) de la orden de cambio y no así el costo total. De acuerdo con lo que se estableció en dicha orden de cambio y conforme a lo que se acordó previamente con Master Link la Autoridad aprobó lo siguiente: 1) 19 trabajos por concepto de cambios en el diseño necesarios para el funcionamiento del proyecto por $202,370.98; 2) incluir otros trabajos necesarios y requeridos debido a cambios en el diseño por $357,606.47; 3) un pago de $47, 187.09 por concepto de los por cientos de seguros, contingencia, *overhead* y ganancia.

Posteriormente, el 30 de junio de 2014 la Autoridad remitió mediante correo electrónico dirigido al ingeniero Javier Ramírez, Gerente de Proyectos de Master Link, una copia del borrador del acuerdo denominado *Quinta Enmienda Contrato 2011-P000067, Rehabilitación del Edificio de Generadores de Emergencia del Municipio de Culebra* (Quinta Enmienda) con el objeto de reconocer y formalizar las modificaciones al alcance del trabajo y los términos del Contrato según lo antes mencionado.

Sr. Carlos Morales Vázquez
Página 4

El 8 de agosto de 2014 se llevó a cabo una reunión en la cual participaron los ingenieros Jorge Rivera Martínez, Superintendente, Departamento de Administración de Proyectos Miguel A. Del Valle Morales, Ingeniero Supervisor Sénior, Departamento de Administración de Proyectos y el señor Leandro Faura Rodríguez, Administrador de Riesgos de la Autoridad, así como, el ingeniero Javier Ramírez Gerente de Proyectos de Master Link, el señor Roberto De Soto, representante de Mapfre Praico Insurance, el señor Ángel Cruz, Corredor de Seguros y usted.  En dicha reunión se discutieron varios asuntos planteados por Master Link mediante carta del 1 de agosto de 2014 suscrita por el ingeniero Ramírez[1].  En la misma las partes acordaron eliminar los ítems #2 y #3 (pasamanos de techo y *stair nosing*) que se incluyeron en el expositivo OCTAVO del borrador de la Quinta Enmienda al Contrato.  Además, en dicha reunión Master Link aceptó lo dispuesto en la Quinta Enmienda y reconoció que no existían discrepancias con respecto a lo establecido en la misma.  Cabe mencionar que la Quinta Enmienda contempla materiales, tales como, los cables desde *switchgear* a transformadores y *cable tray*, los cuales son esenciales para encender los generadores y cuyo plazo de entrega es de doce semanas (12) (*long lead ítems*). No obstante lo anterior, y aun cuando Master Link reconoció de manera expresa la validez de las modificaciones al alcance del trabajo que se incluyeron en la Quinta Enmienda al Contrato, al día de hoy no ha procedido con la firma de la misma, lo cual



---

[1] Mediante dicha carta identificada como ML-AEE 081, Master Link solicitó que se incorporara una cláusula para establecer que el proyecto objeto del Contrato era "prioritario e indispensable" para la Autoridad "considerando así a nuestra compañía [Master Link] como un suplidor indispensable".  Solicitó además: (i) el pago de las certificaciones #16, por $194,031.61, #17 por 39,543.60, #18 por $25,180.23;  (ii) el pago del retenido por $235,069.01 "y no retención del 10% para los pagos subsiguientes"; (iii) pago de los trabajos realizados "y que al momento no se ha hecho una enmienda para poder facturar" por $225,514.39; (iv) "enmendar los términos de pago actual a pago inmediato" [sic]; (v) incluir en esta enmienda los cambios de órdenes debido a cambios en el diseño por $381,650.15; (vi) evaluar los cambios de orden [sic] enviados en la carta identificada como ML-AEE 080; (vii) que la agencia someta todos los planos e información necesaria para cuantificar los cambios de orden adicionales necesarios para culminar este proyecto e incluirlos en esta enmienda; (viii) incluir una partida tipo "*allowance*" para cubrir posibles cambios de órdenes por actividad reconocida para no atrasar la culminación del proyecto; (xi) incluir una partida por concepto de gastos de desmovilización y movilización ; (x) modificar la cláusula de vigencia del Contrato hasta el 31 de diciembre de 2014; (xi) modificar el expositivo Octavo de la Quinta Enmienda propuesta para eliminar los ítems 2 (pasamanos de techo) y 3 (*stair nosing*); (xii) incluir gastos relacionados a *extended overhead* por $108,007 mensual.

Sr. Carlos Morales Vázquez
Página 5

ha ocasionado un retraso significativo en la entrega de la obra[2]. Tras haber reconocido
estar de acuerdo con el contenido de la Quinta Enmienda, Master Link ha condicionado
la firma de la referida enmienda a la aprobación de aspectos externos a la misma.

Posteriormente, el 20 de agosto de 2014 mediante la carta ML-AEE 082 suscrita por el
ingeniero Ramírez dirigida al ingeniero Castro J. Castro Montalvo, Director de
Generación Master Link planteó nuevamente los siguientes asuntos: (i) pago de las
Certificaciones #16, #17, y #18; (ii) pago del retenido por $117,534; (iii) gastos de
movilización y desmovilización por $406, 616.84; (iv) pago inmediato de los trabajos
realizados por $225,514.39; (v) pagos de *extended overhead* por $3,602.65 por día
calendario desde la continuación de los trabajos, a partir de la fecha en que Master
Link, se movilize, hasta la entrega del proyecto; (vi) incremento en costos por concepto
del seguro *Owner Control Insurance Program* (OCIP) por $20,711.48; (vii) extender la
fecha de entrega del proyecto hasta marzo de 2015; (viii) modificar el expositivo
OCTAVO de la Quinta Enmienda propuesta para eliminar los ítems #2 (pasamanos de
techo) y #3 (*stair nosing*); (ix) pago de material puesto en la obra "material on site".

Cabe señalar que las certificaciones #16 y #17 se pagaron a Master Link conforme
aprobadas por el ingeniero Castro Montalvo. No obstante, se exceptuó el pago de la
certificación #18, la cual incluye los costos de desmovilización del proyecto del 23 de
mayo de 2014. En relación con el pago del retenido por los trabajos realizados por
$117,534, se acordó con Master Link que la Autoridad pagaría la mitad de la cantidad
retenida hasta el momento por los trabajos realizados por Master Link los cuales
ascendían a $232,000 dólares aproximadamente. En cuanto a los trabajos
subsiguientes la Autoridad retendrá un 10% conforme a lo dispuesto en el Contrato.
Con respecto al pago por concepto de gastos de movilización y desmovilización por
$406,616.84 por los gastos incurridos como consecuencia de la desmovilización del
proyecto el 23 de mayo de 2014, es importante reiterar, que a dicha fecha la Autoridad
y Master Link habían evaluado y acordado lo relacionado con las 33 órdenes de cambio
aprobadas posteriormente mediante la Cuarta Orden de Cambio el 12 de junio de 2014.
Dado lo cual, la desmovilización llevada a cabo por Master Link constituyó un acto
injustificado y no autorizado por la Autoridad por lo que los costos ocasionados por la
misma no son aceptables para la Autoridad. Con respecto a los pagos por concepto de
*extended overhead* por $3,602.65 por día calendario, cabe señalar que a los fines del
pago de determinada cantidad por dicho concepto, sería responsabilidad de Master
Link demostrar los costos reales incurridos por el contratista debido a un retraso
atribuible a la Autoridad con posterioridad a la fecha de continuación de los trabajos.

---

[2] De haberse firmado la Quinta Enmienda al Contrato para finales de junio, "nos hubiera
puesto en posición de que las órdenes de los *long lead items* [ítems #5, #10 y #12]
estarían en sitio para finales de septiembre de 2014". La posición de Master Link al no
firmar la enmienda propuesta proyecta la entrega de estos materiales para finales de
noviembre de 2014.

Sr. Carlos Morales Vázquez
Página 6

En cuanto al incremento en costo por concepto del seguro OCIP por $20,711.48, los mismos se incluyeron como parte de las propuestas presentadas por Master Link por lo que la Autoridad retendrá el por ciento que corresponda conforme a lo establecido por la Autoridad.

Según indicamos anteriormente, la Autoridad remitió a Master Link desde el 30 de junio de 2014 el borrador de la Quinta Enmienda propuesta al Contrato para atender las 33 solicitudes de órdenes de cambio presentadas por Master Link. No obstante, al día de hoy Master Link no ha procedido con la firma de la misma, ocasionando retrasos significativos en el proyecto y en perjuicio de los intereses de la Autoridad. Dado lo cual, y cónsono con la totalidad de los hechos antes mencionados, la Autoridad procederá a dar por terminado el Contrato y a ejecutar la fianza de cumplimiento en conformidad con lo dispuesto en el Contrato.

De otra parte, el Reglamento de Subasta de la Autoridad, Artículo G, Suspensión o Eliminación del Registro de Suplidores de la Autoridad, dispone en su parte pertinente lo siguiente:

1. Un suplidor registrado podrá suspenderse del Registro de Suplidores de la Autoridad, entre otras, por las siguientes razones:

   a. [...]
   b. [...]
   c. Incumplimiento de Contrato

El licitador que no cumpla con las disposiciones de un contrato con la Autoridad puede estar sujeto a una o varias de las siguientes sanciones:

1) Ejecutar la Fianza de Ejecución (Performance Bond), la Fianza de Pago (Payment Bond), o la Fianza de Suplidor (Supply Bond), según sea el caso;

2) Suspensión de su nombre del Registro de Suplidores de la Autoridad por un término no menor de tres meses, de acuerdo con los méritos del caso;

3) Con dos reclamaciones de incumplimiento éste queda suspendido del Registro de Suplidores de la Autoridad por un término no menor de un año.

Por lo que conforme a los hechos anteriormente expuestos, la Autoridad procederá con el trámite correspondiente para suspender a Master Link del Registro de Suplidores de la Autoridad en conformidad con lo dispuesto en el referido Reglamento.

000115

Sr. Carlos Morales Vázquez
Página 7

Finalmente, lo anterior no constituye una aceptación por parte de la Autoridad de responsabilidad ni constituye una renuncia de su derecho de reclamar o ejecutar cualquier acción contractual o legal que aplique como consecuencia del incumplimiento por parte de Master Link con respecto a los términos del Contrato.

Atentamente,

Juan F. Alicea Flores
Director Ejecutivo

000116

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA DE SAN JUAN



| | |
|---|---|
| MASTER LINK CORPORATION | CASO NÚM. |
| **Parte Demandante** | SALA: AC 2 0 1 6 - 0 8 1 8 |
| v. | |
| AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO | SOBRE: INCUMPLIMIENTO DE CONTRATO; DAÑOS Y PERJUICIOS |
| **Parte Demandada** | |

### DEMANDA

AL HONORABLE TRIBUNAL:

COMPARECE la demandante Master Link Corporation, representada por el abogado que suscribe, y muy respetuosamente, expone, alega y solicita:

*I. PARTES*

1.      La demandante Master Link Corporation, en lo sucesivo ML, es una corporación debidamente organizada conforme a las leyes del Estado Libre Asociado de Puerto Rico, y certificada bajo la legislación y reglamentación aplicable a Pequeñas y Medianas Empresas (PYMES).  A continuación se provee la información requerida por las Reglas de Administración del Tribunal de Primera Instancia:

Dirección física: Carr. 2, Km 56.5, Bo. Palenque, Barceloneta, PR 00617

Dirección postal: PO Box 2186, Barceloneta PR 00617

Número de teléfono: (787) 846-7654 • (787) 846-7655

Número de fax: (787) 846-7650

2.      La demandada Autoridad de Energía Eléctrica de Puerto Rico, en lo sucesivo AEE, es un cuerpo corporativo y político que constituye una corporación pública e instrumentalidad gubernamental autónoma del Estado Libre Asociado de Puerto Rico, sujeta al control de su Junta de Gobierno. Véase, Sección 3, Ley Núm. 83, 2 de mayo de 1941, según enmendada, 22 L.P.R.A. §193.

Dirección física: Edificio NEOS, 1110 Ave. Ponce De León, San Juan, PR

Dirección postal: PO Box 364267, San Juan PR  00936-4267

Número de teléfono: (787) 521-3434

Número de fax: (787) 521-4120

Página 2 de 30

3.    La AEE tiene facultad para demandar y ser demandada ante los tribunales. Además, tiene facultad para hacer contratos y formalizar todos los instrumentos que fueren necesarios o convenientes en el ejercicio de cualquiera de sus poderes. Véase, Sección 6 (e) y (f) Ley Núm. 83, 2 de mayo de 1941, según enmendada, 22 L.P.R.A. §196.

## II. HECHOS

### A. El Contrato de Obra

4.    El 3 de enero de 2011, la AEE y ML suscribieron el contrato 2011-P00067 (0912653) en lo sucesivo denominado el Contrato de Obra, para la construcción de un edificio con el fin de establecer una planta de energía eléctrica de resguardo en el Municipio de Culebra. El precio de la obra era de $2,581,583.87.

5.    En síntesis, el proyecto comprendía la integración de 5 generadores existentes a un sistema de sincronismo; demolición de la actual estructura para albergar los equipos en un nuevo edificio; construcción de una oficina, tanque diésel y mejoras en los alrededores. ML era responsable de adquirir los materiales y equipos; ofrecía el diseño, compra e integración del sistema de sincronismo; realizaba toda la coordinación necesaria para la construcción de la obra; y, realizaba las pruebas necesarias para la aceptación de la obra.

6.    Este concepto original fue modificado radicalmente cuando la AEE decidió adquirir 3 nuevos generadores y prescindir de los 5 generadores existentes, lo que conllevó cambios en la dimensión de la estructura; modificación en paredes y techo; y, cambio completo del sistema de alimentación primaria. Estos cambios eran necesarios para adaptar estos nuevos generadores, que tenían una capacidad de generación de casi el triple de los originales. El diseño, adquisición, entrega, pruebas e integración de estos generadores, debían ser realizados en coordinación con terceros contratados por la AEE. Las actuaciones de esos terceros, sobre los que ML no tenía control, afectaban la entrega de la obra y alteraban totalmente el plan de trabajo que ML utilizo para cotizar el proyecto.

7.    Luego de varios trámites administrativos, el 1° de febrero de 2012, se emitió la orden de proceder disponiendo el comienzo de los trabajos para el 13 de

febrero de 2012, y otorgando un tiempo de construcción de 240 días calendario. Se estableció la fecha de terminación de la obra para el 10 de octubre de 2012.

8.      El Contrato de Obra sufrió las siguientes cuatro enmiendas:

(a)      La primera enmienda fue otorgada el 17 de julio de 2012, por cambios al proyecto por la adquisición de 3 nuevos generadores, lo que generó treinta y tres (33) cambios de órdenes, disminuyendo el costo del proyecto de $2,581,583.87 de costo inicial a $2,299,598.52. Originalmente el Proyecto consistía de la integración de 5 generadores existentes a unos paneles de control que ML debía comprar, diseñar e instalar. Tras la enmienda, la AEE contrató los servicios de un tercero para la compra y diseño de ese sistema que incluía la compra de los 3 nuevos generadores, aunque éste compartía con ML la instalación. A pesar de que ML no tenía control ni autoridad alguna sobre dicho tercero, la AEE penalizaba a ML por los atrasos ocasionados por ese tercero;

(b)      La segunda enmienda fue otorgada el 31 de enero de 2013, con el propósito de extender el término para completar los trabajos hasta el 19 de abril de 2013 y la vigencia del Contrato de Obra hasta el 31 de julio de 2013. Esta enmienda se debió a que el 1º de abril de 2012 la obra tuvo que ser paralizada cuando, luego de terminada la etapa de demolición de las estructuras existentes, ML descubrió la presencia de terreno contaminado con hidrocarburos. El terreno contaminado fue descubierto en esa etapa del proyecto, debido a que por su culpa o negligencia la AEE no realizó un estudio ambiental de suelo durante la etapa de diseño, a pesar de que en el Apéndice 4, inciso 1, del Contrato de Obra se estableció un procedimiento para disponer del terreno contaminado que fuera encontrado durante el proceso de construcción del proyecto;

(c)      La tercera enmienda fue otorgada en 29 de julio de 2013 para extender la vigencia del Contrato de Obra hasta el 31 de enero de 2014 e incluir 9 órdenes de cambio, las cuales consistieron en mejoras al diseño del tanque diésel, mejoras al refuerzo estructural, sellado de techo, e incrementar la ventilación en la estructura para adaptar los nuevos generadores;

(d)      La cuarta enmienda fue otorgada el 30 de enero de 2014 para extender la vigencia del Contrato de Obra hasta el 31 de octubre de 2014.

Página 4 de 30

9.     Los representantes de la AEE con autoridad sobre el proyecto (en lo sucesivo denominados colectivamente como representantes de la AEE) eran los siguientes: (a) Ingeniero licenciado Jorge L. Rivera Martínez era el Administrador del proyecto, como Superintendente del Departamento de Administración de Proyectos en el Directorado de Generación; (b) Ingeniero licenciado Miguel Del Valle era el Asistente de Rivera Martínez en la administración del proyecto, como Ingeniero Supervisor Senior en el Departamento de Administración de Proyectos; (c) Ingeniero en entrenamiento Juan A. Tirado Chabebe, como Jefe de la División de Ingeniería, era el superior de Rivera Martínez y, como tal, estaba informado, participaba, y avalaba la conducta de Rivera Martínez y de Del Valle; y, (d) Señor Víctor De Castro era el Supervisor de la Sección Ambiental de la División de Generación.

*B. Hallazgo y Disposición de Terreno Contaminado*

10.     El 1º de abril de 2012, al finalizar la fase de demolición de la obra, ML determinó y le notificó a la AEE la presencia de un fuerte olor a diésel en el terreno. Al día siguiente, personal de la AEE confirmó la existencia de dicho olor, por lo que detuvo el proceso de construcción para realizar las pruebas de rigor.

11.     El 10 de abril de 2012, la AEE realizó pruebas aleatorias del terreno, las cuales resultaron positivas a la presencia de material contaminado con hidrocarburo.

12.     En la reunión semanal de 25 de abril de 2012, la AEE le informó a ML que alegadamente coordinó con la Junta de Calidad Ambiental (en adelante JCA) la aceptación del terreno contaminado en el vertedero municipal de Culebra, por lo que instruyó a ML a coordinar con el vertedero la disposición del terreno contaminado. A pesar de esas instrucciones, en esa reunión la AEE le solicitó a ML una propuesta para la disposición del terreno en un vertedero industrial en la "Isla Grande".

13.     El inciso 1 del Apéndice 4 del Contrato de Obra establece que si durante el proceso de construcción se encuentra terreno contaminado, y "…el material no puede ser dispuesto en Culebra, el Contratista será responsable de transportar el material contaminado a la isla grande y depositarlo en un vertedero industrial, en cuyo caso la Autoridad pagará la diferencia en costo por esta disposición."

14.     El 1º de mayo de 2012, ML le entregó a AEE una propuesta económica para la remoción del material contaminado con hidrocarburo, tomando como criterio la

Página 5 de 30

disminución de los riesgos de retrasos en la terminación de la obra. La propuesta contemplaba la realización de los trabajos en turnos de 24 horas por 14 días consecutivos, rentando una embarcación de la Autoridad de Transporte Marítimo (ATM) por el término de los 14 días y embarcación privada, para poder realizar la remoción del material sin dilación alguna.

15.　　En cartas con fechas del 3, 7, 10, 14 y 18 de mayo de 2012, en reuniones semanales del proyecto y varias llamadas telefónicas, ML aclaró todas las consideraciones y pormenores de su propuesta e inclusive, ajustó su propuesta, pero la AEE las rechazó sin realizar contraofertas, y meramente indicando que "no puede justificarse el precio indicado."

16.　　El 9 de mayo de 2012, el Municipio de Culebra no autorizó la disposición de material contaminado en su vertedero.

17.　　En carta del 15 de mayo d 2012, la AEE ratifica la disposición contractual que establece que de surgir material contaminado ML sería responsable de transportar el material y depositarlo en un vertedero industrial.

18.　　El 24 de mayo de 2012 las partes se reúnen nuevamente en un último esfuerzo para llegar a un acuerdo en el precio ajustado.

19.　　El 1º de junio de 2012, ML le notificó a la AEE otra carta explicativa de todos los pormenores de la propuesta, pero esa carta no fue contestada.

20.　　En junio de 2012, ML consultó con la JCA y EPA sobre la forma en que debía proceder para disponer del terreno contaminado, para no incurrir en riesgos de violaciones a las leyes y reglamentos ambientales aplicables.

21.　　La JCA le aclaró a ML los procedimientos a seguir e instruyó a ML orientar a la AEE.

22.　　El 20 de junio de 2012 Ml le informó a la AEE sobre la consulta realizada a la JCA, lo que generó serias confrontaciones con la AEE y acciones perjudiciales contra ML.

23.　　La AEE insistía en proponer un plan de disposición del terreno contaminado, en violación a lo instruido por la JCA. Dicho plan incluía que ML dispusiera del terreno contaminado en el vertedero de Culebra, el cual no es un vertedero industrial.

24.    El 10 de agosto 2012 la AEE le entregó a ML un plan de trabajo para la disposición de material en el vertedero de Culebra y le requiere que proceda conforme a sus directrices. ML consideraba que dicho plan de trabajo era contrario a los reglamentos de la JCA, por lo que para evitar riesgos de violaciones a dichos reglamentos y daños ambientales, el 13 de agosto de 2012 ML le solicitó a la JCA que evaluara el plan de trabajo propuesto por la AEE.

25.    Esta situación propicia a una reunión de construcción el 15 de agosto de 2012, en la cual participó el Sr. Víctor de Castro indicando entre otras cosas que los planteamientos de ML eran incorrectos; que el propio Ing. Jorge Rivera gestionó las aprobaciones del vertedero de Culebra para la disposición de material contaminado; y, que la AEE se encargará de almacenar el material contaminado con  hidrocarburo en un área asignada en el vertedero. "A su vez el ing. Rivera enfatizó en preguntar a ML si continuará sin mayor dilación, con los trabajos de remoción y disposición luego de estas aclaraciones y el ingeniero Ramírez (ingeniero de proyecto de ML) contestó en la afirmativa".

26.    El 24 de agosto de 2012, la Sra. María V. Rodríguez, Gerente de Área de Control de Contaminación de Terrenos de JCA, notificó el resultado de la consulta realizada sobre el plan propuesto por la AEE. En síntesis, la JCA confirma la opinión de ML sobre violaciones a reglamentos ambientales del plan de trabajo preparado por la AEE, y dispone: "que no se autoriza la disposición de terreno a excavarse en el vertedero del Municipio de Culebra. Se le solicita además que la disposición de estos se haga de acuerdo a lo establecido por la señora Segarra [Especialista en Calidad Ambiental II de la JCA]".

27.    El 28 de agosto de 2012, el jefe de la División de Protección Ambiental de la AEE se reunió con la JCA, quien le prohíbe el depósito de cualquier material en el vertedero.

28.    Si ML hubiera actuado como pretendían los representantes antes mencionados de la AEE, hubiera ocasionado graves daños ambientales y a la ciudadanía del Municipio de Culebras.

Case:17-03283-LTS  Doc#:3069-2  Filed:05/16/18  Entered:05/16/18 00:31:40  Desc:
Exhibit 2 - Supporting documents  Page 124 of 147

Página 7 de 30

29.    En violación a las disposiciones del inciso 1 del Apéndice 4 del Contrato de Obra la AEE contrató a un tercero para que realizara los trabajos de remoción del terreno contaminado.

30.    En 27 de octubre de 2012, la AEE comenzó a hacer el trabajo de disposición del terreno contaminado con otro suplidor, sin haber desmovilizado a ML del proyecto el cual se encontraba paralizado desde el 1º de abril de 2012 cuando ML descubrió el terreno contaminado. Esta acción afectó drásticamente el plan de trabajo de ML, más aún cuando ML fue instruido por la AEE a que todo material contaminado que no pudiera remover el nuevo suplidor por sus limitados recursos, se mantuviera en el área de trabajo de ML, lo que imposibilitaba la construcción de la obra, según planificada.

31.    La remoción del terreno contaminado demoró desde su detención en 2 de abril de 2012 hasta el 3 de marzo de 2014, cuando fue removido el último material contaminado (700 días), a pesar de que en la propuesta sometida por ML para dichos trabajos ML se comprometía a remover el terreno contaminado en tan sólo catorce (14) días calendario. Para ML era posible efectuar el trabajo en tan corto tiempo, debido a que su propuesta contemplaba la renta de un Ferrys de carga de la Autoridad de Transporte Marítimo para uso exclusivo por el periodo de los 14 días. El contratista a quien la AEE le adjudicó la disposición del terreno solamente trasportaba material contaminado cuando conseguía al espacio en la agenda normal de los ferrys de la Autoridad de Transporte Marítimo, siendo ésta una de las razones para la demora de 700 días en completar la disposición.

32.    A partir de estos incidentes y como represalia, los aludidos representantes de la AEE generaron un patrón de conducta arbitraria y maliciosa contra ML utilizando como arma los múltiples asuntos concernientes a la administración del Contrato, llegando al grado de lograr que ML fuera suspendida del registro de proveedores de servicio de la AEE.

### C. Quinta Enmienda al Contrato de Obra Pendiente de Otorgamiento

33.    Los planos en un proyecto son esenciales para el desarrollo de la obra. El dueño debe asegurarse de que los planos y demás documentos de construcción estén

de acuerdo con los estándares de la profesión, con la reglamentación vigente y que se realicen con un nivel de competencia adecuado y que estén razonablemente correctos.

34. En nuestro caso, durante el proceso de construcción se generaron un total de 18 revisiones a los planos, las cuales propiciaron una cantidad excesiva de órdenes de cambio, por planos deficientes debido a la negligencia de los funcionarios de la AEE al no evaluar los planos entregados por el diseñador antes de comenzar un proceso de subastas.

35. A principios del año 2014, ML sometió 31 órdenes de cambio, que fueron negociadas y aprobadas por la AEE, y darían paso a una quinta enmienda al contrato. Estas 31 órdenes de cambio son adicionales a las 42 aprobadas en la primera, tercera y cuarta enmienda, para un total de 73 cambios de órdenes. Esas 31 órdenes de cambio no incluyen órdenes de cambio adicionales que ML ha identificado, pero que no podido cuantificarlas debido a falta de información por deficiencias en los planos, según se le ha advertido a la AEE.

36. La AEE, en escrito de 29 de enero 2014, se comprometió a evaluar estos cambios en o antes de la última semana de marzo de 2014, debido a que conocía que después de esa fecha se paralizaría la obra por falta de taller.

37. El día 30 de junio de 2014, ML recibió el borrador de la quinta enmienda al Contrato de Obra. En ese borrador la AEE no incluyó los cambios de órdenes por concepto de *extended overhead*, por lo que si ML hubiese firmado esa enmienda hubiera renunciado a su reclamación. Esto provocó que no se llegara a un acuerdo para el otorgamiento de la quinta enmienda. Cabe señalar que en 26 de febrero de 2015, la AEE sometió su última oferta por concepto de *extended overhead* número 1, reduciendo su oferta en comparación con las dos ofertas anteriores. Esta partida será discutida más adelante en la Sexta Causa de Acción.

### D. Solicitud de Desmovilización del Proyecto

38. Anticipando la probable demora de la AEE en notificar el borrador de Quinta Enmienda de Contrato, mediante carta de 3 de marzo del 2014, ML le expuso a la AEE las razones y conveniencias mutuas de llevar a cabo una desmovilización, y solicitó una reunión para dialogar sobre el tema.

39.    En resumen, la desmovilización procedía debido a que faltaban una serie de órdenes de cambio que a esa fecha no habían sido aprobados por la AEE y detalles adicionales pendientes de ser recibidos para ser cuantificados, lo que impedía la continuación de la obra con un plan de trabajo eficiente.

40.    El propósito de la desmovilización era economizar gastos a la AEE y a ML, para determinar todos los cambios de órdenes restantes y que fueran plasmados en una sola orden de cambio, lo que permitiría elaborar un plan de trabajo de manera más eficiente y continua hasta su culminación.

41.    Mediante carta de 4 de marzo de 2014, la AEE acogió la propuesta de ML de llevar a cabo la desmovilización, pero le impuso como condición la construcción de trabajos no contratados, en violación al artículo 17 del Contrato, sobre órdenes de cambio. Más tarde, la AEE reconoció que ML podría llevar a cabo una desmovilización del proyecto siempre y cuando realizara cuatro (4) actividades especificadas, que sí estaban en el contrato. Estas actividades fueron realizadas, aceptadas y pagadas, salvo pintar unos "louvers" (equivalente a un 0.44% de la obra), ya que este requerimiento meramente estético debía ser realizado en las postrimerías del proyecto.

42.    En 19 de marzo de 2014, ML solicitó, entre otras cosas, el pago de ciertas partidas adeudadas, tales como pago de retenido, de trabajos realizados y desmovilización.

43.    En 25 de marzo y 9 de mayo de 2014, ML reiteró su solicitud de audiencia a la AEE para discutir los asuntos pendientes. Ante la inacción de la AEE, el 20 de mayo de 2014 ML le notificó carta detallando los asuntos que quería discutir. Sin embargo, la AEE tampoco concedió la audiencia.

44.    Del 23 al 30 de mayo de 2014, ML llevó a cabo la desmovilización física del proyecto, aunque continuó en comunicación con la AEE para buscar soluciones a los impasses que existían, y continuó trabajando los demás aspectos del proyecto desde la oficina central, para economizar dinero a la AEE y a ML.

*E. Terminación del Contrato de Obra
por Declaración de Incumplimiento (Default)*

45.    En 28 de mayo de 2014, la AEE le envía vía correo electrónico a ML el "punch list" sobre los detalles pendientes en el proyecto con fecha de 21 de mayo de

2014. El 29 de mayo de 2014 se discute el "Punch List" en la reunión semanal número 61 (minuta) del proyecto. El 2 de junio de 2014, ML le contesta a la AEE que de los 30 renglones de trabajos misceláneos sometidos en el "punch list" 10 ya habían sido culminados. Personal de la AEE comenzó a laborar, y al presente continúa laborando, desde la oficina que ML construyó como parte del proyecto, en clara aceptación de que éste se encontraba sustancialmente terminado.

46.    El 8 de agosto 2014, se efectuó una reunión citada por el Ing. Leandro Faura, Jefe de la División de Riesgo de la AEE, donde estuvieron presentes representantes de MAPFRE, la fiadora de ML para el proyecto, y donde se llegaron a unos acuerdos preliminares, incluyendo que la AEE aceptó negociar cargos de *extended overhead*, movilización y desmovilización, entre otros.

47.    Mediante carta de 20 de agosto de 2014, ML confirmó los preacuerdos para la firma de la Quinta Enmienda, según discutidos en dicha reunión.

48.    Contrario a lo acordado en la referida reunión de 20 de agosto de 2014, el 16 de octubre de 2014, ML recibió una carta con fecha de 7 de octubre 2014 del Director Ejecutivo de la AEE, declarando en incumplimiento de contrato a ML y dando por terminado el Contrato de Obra.

49.    Mediante carta de 22 de octubre 2014, ML solicitó una vista de argumentación ante la AEE; detalló en orden cronológico una serie de eventos de atrasos atribuibles exclusivamente a la AEE; y, solicitó una reconsideración a la determinación de declararla en incumplimiento de Contrato. La AEE a través de su director ejecutivo contestó la carta el 9 de diciembre de 2014, reiterándose en su posición y negándole a ML la solicitud de una vista de argumentación, privando a ML de cualquier defensa.

50.    El 30 de octubre de 2014, ML envió una carta de seguimiento a la carta de 22 de octubre de 2014, reiterando su solicitud de vista de argumentación y reconsideración, a la vez que recomendó que las partes resolvieran la disputa vía arbitraje y que se extendiera la vigencia del Contrato hasta que las partes llegaran a un acuerdo. En esta última carta, ML incluyó un análisis del proyecto que nuevamente demuestra que la obra está sustancialmente completada. Esta carta jamás fue contestada por la AEE o cualquiera de sus personas autorizadas.

51.     La AEE declaró en incumplimiento a ML de manera unilateral y contraria a la evidencia en el expediente administrativo. La AEE obvió las objeciones de ML y, sin fundamentos válidos para su decisión, optó por descartar toda posibilidad de comunicación, la cual hubiera podido aclarar todas las controversias.

*F. Trámites Judiciales Previos*

52.     Ante el fracaso de las negociaciones para resolver las controversias entre las partes, en 20 de noviembre de 2014 ML presentó ante el Tribunal de Primera Instancia, Sala de San Juan, el caso Civil Núm. SJ2014CV00230, *Master Link, Corp., v. AEE, et als.*, sobre Petición de *Injunction* por incumplimiento de contrato, el cual fue archivado sin perjuicio a solicitud de ML en 16 de marzo de 2015.

53.     ML continuó sus intentos de negociar extrajudicialmente con la AEE, en ánimo de resolver las controversias de manera rápida y económica, disminuir los daños de naturaleza continua que ML estaba sufriendo, y los atrasos en el proyecto. Sin embargo, las negociaciones resultaron infructuosas, por lo que en 14 de junio de 2015, ML presentó ante el Tribunal de Federal para el Distrito de Puerto Rico, el caso Civil Núm. 15-1805 (GAG), *Master Link, Corp., v. Puerto Rico Electric Power Authority, et als.*, sobre *Injunction* por incumplimiento de contrato.

54.     En 3 de agosto de 2015, el Dr. Javier Quintana asume la posición de Director Ejecutivo de la AEE, sustituyendo al Ing. Juan Alicea, quien había declarado en incumplimiento a ML.

55.     El 27 de agosto de 2015, ML le solicitó al Dr. Quintana retomar las negociaciones para la culminación del proyecto objeto del Contrato de Obra.

56.     El 9 de septiembre 2015, ML le envió al Dr. Quintana un seguimiento para retomar las negociaciones del proyecto.

57.     El 29 de septiembre de 2015, el Sr. Carlos Morales, Presidente de ML, se reunió con el nuevo Director Ejecutivo de la AEE, Dr. Javier Quintana, y le explicó con detalles la situación por la que estaba pasando ML, buscando una posible solución. Al finalizar la reunión, el Dr. Quintana le indicó al señor Morales que le brindara 14 días para darle una contestación sobre sus reclamaciones. Posteriormente, mediante conversación telefónica el Dr. Quintana le solicitó al Sr. Morales que le enviara una propuesta con diferentes alternativas para resolver las controversias.

Case:17-03283-LTS   Doc#:3069-2   Filed:05/16/18   Entered:05/16/18 00:31:40   Desc:
Exhibit 2 - Supporting documents   Page 129 of 147

Página 12 de 30

58.    El 17 de Diciembre 2015, ML le envía una carta al Dr. Quintana agradeciéndole por solicitarle una propuesta transaccional; y le informó que le estaría sometiendo la propuesta en poco tiempo. Además, ML le solicitó que pospusiera la Pre-Subasta compulsoria del RFP 000768, proceso que había comenzado la AEE para culminar los trabajos restantes del proyecto 2001-P00067 objeto de este pleito. La petición de ML buscaba era retrasar el proceso de subasta hasta tanto el nuevo Director Ejecutivo pudiera evaluar la propuesta transaccional que se le sometería próximamente, ya que ML tiene la intención de culminar las labores restantes del Contrato de Obra. Sin embargo, esta carta nunca fue contestada.

59.    El 23 de Diciembre 2015, el señor Morales le envía la propuesta transaccional al Dr. Quintana,  brindándole cuatro alternativas para resolver la controversia.

60.    Luego de varios seguimientos de parte de ML, en conversación telefónica el Dr. Quintana le indicó al Sr. Morales que estaría dispuesto a someterse a la alternativa número 3 de la propuesta transaccional sometida por ML. Esta alternativa contemplaba someterse a un proceso de Arbitraje para resolver la controversia. Éste confirmó en más de una ocasión, vía telefónica, su disposición de acogerse a arbitraje para resolver la controversia, pero nunca se formalizó dicha disposición.

61.    En 2 de marzo de 2016, el caso de *Master Link, Corp., v. Puerto Rico Electric Power Authority, et als.*, Civil Núm. 15-1805 (GAG), ante el Tribunal de Federal para el Distrito de Puerto Rico, fue archivado sin perjuicio, por falta de jurisdicción, por lo que ML se ha visto obligada a presentar la demanda de epígrafe.

### III. CAUSAS DE ACCIÓN

*Primera Causa de Acción:*
*Ilegalidad de la Declaración de Incumplimiento*

*(a) La declaración de incumplimiento constituye una violación al artículo 24.3, inciso 1, del Contrato de Obra.*

62.    Se incorporan por referencia a la presente causa de acción las alegaciones antes expuestas.

63.    El Contrato en su artículo 24.3, inciso 1, establece claramente que la AEE sólo puede declarar en incumplimiento al contratista si éste incumple alguna de sus obligaciones materiales bajo el contrato y no remedia el incumplimiento dentro de un

Case:17-03283-LTS  Doc#:3069-2  Filed:05/16/18  Entered:05/16/18 00:31:40  Desc:
Exhibit 2 - Supporting documents  Page 130 of 147

Página 13 de 30

período de 30 días calendario, después de haber sido apercibido por escrito sobre el alegado incumplimiento, a menos que tal incumplimiento no pueda razonablemente ser subsanado dentro de ese término en cuyo caso el periodo será prorrogado por un periodo razonable.

64.     Sin embargo, en patente violación al referido artículo 24.3, inciso 1, mediante la carta de 7 de octubre de 2014, la AEE declaró en incumplimiento a ML alegando frívolamente que el proyecto se atrasó supuestamente porque ML no había aceptado los términos contenidos en el borrador de quinta enmienda al Contrato de Obra. La realidad es que la AEE, en claro abuso del derecho, utilizó dicho artículo como un mecanismo de presión para obligar a ML a firmar ese borrador, el cual no incluía los cambios de órdenes por concepto de *extended overhead*, de manera que ML renunciara a su reclamación.

65.     El borrador de quinta enmienda al Contrato de Obra que la AEE pretendía imponerle a ML, ni siquiera contenía la partida de *extended overhead* por la suma de $186,127.82, reconocida por la AEE en su carta de 23 de agosto de 2013, ni la suma de $190,254.12 reconocida en su carta de 8 de enero de 2014, a pesar de que éstas representan una suma ridículamente ínfima a la realmente adeudada. El monto de la deuda por *extended overhead* será discutida más adelante en la Sexta Causa de Acción.

*(b) La declaración de incumplimiento constituye una violación a los procedimientos establecidos por la AEE.*

66.     El 26 de julio del 2013, la AEE, a través del entonces Director Ejecutivo, Ing. Juan Alicea, aprobó un nuevo procedimiento revisado para reclamaciones a compañías de seguro por incumplimiento de contratistas (en adelante el procedimiento). Éste "…tiene el propósito de establecer el proceso a realizar reclamaciones a compañías de seguro que proveen fianzas para proyectos, cuando el contratista incumpla los términos y condiciones con la Autoridad." El procedimiento establece detalladamente las funciones que tendrá cada empleado de la AEE en el proceso y en el momento en que se llevará a cabo esa función.

67.     La AEE incumplió las siguientes disposiciones de dicho procedimiento:

Case:17-03283-LTS Doc#:3069-2 Filed:05/16/18 Entered:05/16/18 00:31:40 Desc:
Exhibit 2 - Supporting documents Page 131 of 147

Página 14 de 30

(a)     El inciso J de la Sección III, sobre Disposiciones Generales, establece que "El formulario informe de progreso (AEE-700.0-429 General Status Inquiry) se utiliza para informar el progreso del proyecto y debe ser cumplimentado periódicamente por el encargado del proyecto. Éste envía el original a la compañía fiadora y copia al Jefe de Suministros, al Tesorero y a la Oficina de Administración de Riesgos durante cuatro etapas del proyecto: al completarse el 20%, 50%, 75% y el 100%. En los proyectos con implicación ambiental deben incluirse las recomendaciones del Oficial de Seguridad Laboral y/o de la División de Protección Ambiental y Confiabilidad de Calidad". Sin embargo, la AEE nunca le envió a la compañía de fianzas los informes que requiere este inciso.

(b)     En la Sección IV, inciso 3, se establece que el encargado del proyecto se reunirá con el contratista para completar el informe de progreso requerido en el inciso J, Sección III de las Disposiciones Generales. Sin embargo, los administradores del proyecto nunca se reunieron con personal de ML para complementar el informe de progreso requerido en este inciso.

(c)     En la Sección IV, inciso 7, se establece que el encargado del proyecto "solicitará al Jefe de la División de Suministros que coordine las reuniones con el contratista en las que se discutan incumplimientos con los términos y condiciones del contrato." Tampoco los administradores del proyecto, Jorge Rivera Martínez y Miguel Del Valle, se quisieron ni permitieron reunión alguna con ML y el Jefe de Suministros, a pesar de ML habérselo solicitado en múltiples ocasiones a ellos y a la División de Suministros.

(d)     En la Sección IV, incisos 3, 9, 13, 14, 15, 19, 20 y 21, se establecen las funciones que tenía que llevar a cabo el Jefe de la División de Suministros para determinar finalmente si se declaraba en incumplimiento a ML. Sin embargo, el Jefe de la División de Suministros no pudo ejercitar sus funciones establecido en dichos incisos, debido a que el administrador del proyecto nunca le notificó situación alguna respecto a ML.

68.     En conclusión, los administradores del proyecto nunca cumplieron con el procedimiento para declarar en incumplimiento a un contratista, a pesar de que la AEE requiere a todo el personal supervisor "el fiel cumplimiento del Procedimiento".

Página 15 de 30

(c) *La terminación del Contrato de Obra viola las doctrinas establecidas por nuestro Tribunal Supremo.*

69.　En *Constructora Bauzá v. García López*, 129 DPR 579 (1971) nuestro Tribunal Supremo estableció que a todos los efectos prácticos una obra está sustancialmente terminada y puede ser ocupada por el dueño de obra cuando ésta ha sido certificada y aprobada para pago por el dueño de obra, en exceso del 90% del monto total de la obra, luego de una inspección realizada por un perito.

70.　En *Master Concrete v. Fraya SE*, 152 DPR 616, pág. 629 (2000) el Tribunal estableció que:

> "El logro de la conclusión sustancial de una obra tiene efectos jurídicos significativos entre las partes. *Cuando la obra se concluye sustancialmente, el contratista tiene derecho a que se le pague el balance de lo adeudado según el contrato, menos las sumas retenidas para corregir las deficiencias que la obra pueda tener. Además, hay otros efectos*: termina el periodo del contrato; comienza la vigencia de las garantías a favor del dueño; el dueño corre entonces con los riesgos por la pérdida de la obra y tiene la responsabilidad de darle mantenimiento; el peso para probar defectos en la obra lo tiene el dueño; y *la resolución del contrato ya no está disponible como remedio*. Véase Foster y otros, <u>Construction and Design Law</u>, § 18.1 (1991). *Para que entren en vigor los aludidos efectos jurídicos de la conclusión sustancial de la obra*, **no es necesario que ésta haya sido aceptada**, *ya que dicha conclusión sustancial constituye una etapa previa a la de la conclusión final*". Itálicas nuestro.

71.　La obra se encontraba terminada en un 92.25%, desde el 22 de abril de 2014, cuando conforme al artículo 13.2 del Contrato de Obra se considera aprobada la certificación sometida en 7 de abril de 2014, la cual comprendía trabajos realizados entre el 16 de enero al 15 de marzo de 2014. Para esa fecha, la obra había sido inspeccionada los peritos de la AEE (los representantes de la AEE), por lo que como cuestión de derecho la obra estaba sustancialmente terminada y la AEE no podía declarar a ML en incumplimiento.

72.　Para el 7 de octubre de 2014, fecha de la carta de declaración de incumplimiento, la AEE había certificado y pagado el 93.14% del monto total de la obra, luego de ésta ser inspeccionada por sus peritos. Este por ciento no contempla la certificación número 18 que corresponde a la desmovilización del proyecto, que aunque estaba reconocida por las partes en el desglose de pago la AEE se ha negado a recocer y pagarla, lo que aumentaría el porcinito de trabajo culminado a 94.36%. Este porcinito de trabajo completado tampoco incluye una serie de trabajos que la AEE le

exigió a ML que realizara y que al momento no ha firmado una enmienda para poderlos cobrar, aunque fueron reconocidos por las partes. De ser reconocidos los trabajos realizados, aumentaría aún más el por ciento de trabajo completado. Por lo tanto, como cuestión de derecho, la obra estaba sustancialmente terminada y ML no podía ser declarada en incumplimiento.

73.    En consecuencia, respetuosamente se solicita de este Honorable Tribunal que dicte Sentencia concediendo los siguientes remedios: determine que la declaración de incumplimiento notificada por la AEE constituye una violación de contrato por parte de la AEE, y la deje sin efecto; restablezca la validez del Contrato de Obra; y, le ordene a la AEE que le permita a ML culminar las labores restantes del proyecto.

*Segunda Causa de Acción:*
*Daños Sufridos por Ejecución de la Fianza*

74.    Se incorporan por referencia a la presente causa de acción las alegaciones antes expuestas.

75.    El 5 de noviembre de 2014, la AEE le notificó a MAPFRE, en su carácter de fiadora de ML, sobre el alegado incumplimiento de ML y le requirió comenzara el proceso de ejecución de la fianza del proyecto. Cuando MAPFRE recibió la reclamación, inició una investigación que ha conllevado la contratación de peritos y abogados para evaluar la reclamación, cuyos costos serían cobrados a ML, según lo estipula el contrato de fianza entre ML y MAPFRE.

76.    Por otra parte, si la AEE decidiera sub-contratar los trabajos a otra compañía, los gastos de culminar el proyecto también serían cargados a ML.

77.    Todavía se encuentra pendiente de resolverse si MAPFRE adjudica la terminación de la obra a ML, a un tercero o deniega la reclamación. De adjudicarse la terminación de la obra a un tercero, las pérdidas económicas de ML aumentarían. Evidentemente, costaría una cantidad mucho menor terminar el proyecto con ML que con un contratista nuevo, debido a que ML conoce las particularidades de la obra y tiene motivación económica de terminarla en el menor tiempo, al menor costo posible.

78.    Mientras MAPFRE evalúa la reclamación de la AEE contra la fianza del proyecto, ésta decidió suspender totalmente el acceso de ML a fianzas para futuros

Case:17-03283-LTS Doc#:3069-2 Filed:05/16/18 Entered:05/16/18 00:31:40 Desc:
Exhibit 2 - Supporting documents Page 134 of 147

Página 17 de 30

proyectos. Previo a este incidente, ML tenía una capacidad de fianza con MAPFRE de $15,000,000.00, pero en estos momentos se niega a dar cualquier tipo de fianza.

79.     La activación de la liquidación de la fianza ha sido ocasionada por la actuación ilegal y nula de la AEE de declarar en incumplimiento a ML.

80.     En consecuencia, respetuosamente se solicita de este Honorable Tribunal que dicte sentencia declarando ilegal y nulo el requerimiento de la AEE para la ejecución de la fianza; y, condene a la AEE a indemnizar a ML por los daños que sufra por dicho concepto. Al presente se desconoce el monto total de los daños sufridos y que puede sufrir en el futuro inmediato ML como consecuencia de la ejecución de la fianza, pero se estiman en una suma no menor de $500,000.00.

*Tercera Causa De Acción:*
*Ilegalidad de la Suspensión de ML del Registro de Suplidores*

81.     Se incorporan por referencia a la presente causa de acción las alegaciones antes expuestas.

82.     Mediante carta fechada 22 de octubre 2014, del Sr. Lloel Muñoz, Jefe de la División de Suministros de la AEE, se le notificó a ML su suspensión del Registro de Suplidores de la AEE por un período de seis (6) meses, basándose en la referida carta fechada 7 de octubre de 2014, del Director Ejecutivo de la AEE, notificando la terminación del Contrato de obra por alegado incumplimiento de contrato.

83.     El Reglamento de Subastas, en la Sección 2 (Disposiciones Generales), inciso d (Incumplimiento de Contrato), sub-inciso 2, establece que la suspensión de un contratista del Registro de Suplidores de la Autoridad podrá ser por un término no menor de tres (3) meses, de acuerdo con los méritos del caso.

84.     ML siempre ha ofrecido un servicio de excelencia a la AEE, sin que se le haya declarado en incumplimiento en ninguno de los contratos que a través de los años ha ejecutado para la AEE. Sin embargo, la AEE arbitrariamente y como parte del plan de represalias de sus representantes antes mencionados optó por suspender a ML por un período de seis (6) meses, el doble del tiempo mínimo establecido en el Reglamento.

85.     Mediante carta fechada 4 de noviembre de 2014, dirigida a Lloel Muñoz, ML solicitó la reconsideración de la decisión de suspenderla del Registro de suplidores.

Página 18 de 30

El 22 de octubre 2014, Lloel Muñoz denegó dicha petición de reconsideración, y se reafirmó en su posición de suspender a ML del registro de suplidores de la AEE.

86.    La referida suspensión del Registro de Suplidores le ha ocasionado a ML graves daños a su reputación comercial y pérdidas económicas que se estiman en una suma no menor de $800,000.00.

87.    Respetuosamente se solicita de este Honorable Tribunal que dicte Sentencia declarando ilegal y nula la suspensión de ML del Registro de Suplidores de la AEE; y, condene a la AEE a pagarle a ML una suma no menor de $800,000.00 por concepto de daños a su reputación comercial y pérdidas económicas sufridas como consecuencia de dicha suspensión ilegal.

*Cuarta Causa de Acción:*
*Reclamación por Pago de Retenido por Estar la Obra Sustancialmente Terminada*

88.    Se incorporan por referencia a la presente causa de acción las alegaciones antes expuestas.

89.    A tenor con lo resuelto en *Constructora Bauzá v. García López*, *supra*, una obra está sustancialmente terminada y puede ser ocupada por el dueño de obra cuando ésta ha sido certificada y aprobada para pago por el dueño de obra, en exceso del 90% del monto total de la obra, luego de una inspección realizada por un perito.

90.    En el caso de epígrafe, la obra se encontraba sustancialmente terminada en un 92.25% hasta el 22 de abril de 2014, y en un 93.14 % hasta el 7 de octubre de 2014, fecha de la carta de la AEE declarando  a ML en alegado  incumplimiento. Estos por cientos no incluyen la desmovilización que fue completada y trabajos adicionales que ML realizó por instrucciones de la AEE, que fueron negociados entre las partes pero no se firmó la enmienda que ratificaría su pago. De ser aprobada la enmienda el por ciento de trabajo completado aumentaría aún más.

91.    Cuando la obra se concluye sustancialmente el contratista tiene derecho a que se le pague el balance de lo adeudado según el contrato, menos las sumas retenidas para corregir las deficiencias que la obra pueda tener. Para que entre en vigor este derecho no es necesario que la obra haya sido aceptada, ya que la conclusión sustancial constituye una etapa previa a la de la conclusión final. *Master Concrete v. Fraya, SE*, *supra*.

92.    Al presente, la AEE le adeuda a ML por concepto retenido del Contrato de obra  la suma de $235,069.08. Dicha deuda acumula intereses anuales por mora computados a razón de 9.45%.

93.    En consecuencia, respetuosamente se solicita de este Honorable Tribunal que condene a la AEE a pagarle a ML la suma de $235,069.08, por concepto de retenido del Contrato de obra; más $51,832.70 de intereses por mora calculados a razón de 9.45% desde el 7 de octubre 2014, fecha en la que la AEE declaró a ML en incumplimiento, hasta el 24 de febrero de 2017. Dicha suma principal continúa acumulando intereses por mora a razón de 9.45%, hasta su saldo.

Quinta *Causa de Acción:*
*Intereses por Mora en el Pago de las Certificaciones*

94.    Se incorporan por referencia a la presente causa de acción las alegaciones antes expuestas.

95.    La AEE comenzó a incumplir sus obligaciones contractuales desde el inicio de la obra, al no pagar las certificaciones dentro del término estipulado.

96.    El Contrato de Obra dispone que las certificaciones deberán ser pagadas en un término no mayor de 60 días a partir de que éstas sean sometidas. Sin embargo, el promedio de pago fue de 108.5 días, a pesar de las múltiples gestiones de cobro. A continuación, una tabla que detalla el tiempo en que se emitieron los pagos de las certificaciones.

97.    Respetuosamente se solicita de este Honorable Tribunal que condene a la AEE a pagarle a ML la suma de $35,810.00 por concepto de intereses por mora en el pago de las certificaciones, computados desde la fecha que se emitió el pago de cada certificación hasta el 24 de febrero de 2017. Dicha suma de principal continúa acumulando intereses por mora a razón de 9.45% hasta su saldo. Se acompaña e incorpora por referencia como **Anejo 1**, tabla con los cómputos de dichos cargos.

*Sexta Causa de Acción: Reclamación por "Extended Overhead"*

98.    Se incorporan por referencia a la presente causa de acción las alegaciones antes expuestas.

99.    La figura de *extended overhead* o daños por demora tiene sus raíces en el "common law" y se ha definido como:

> "…those costs which are expended for the benefit of the business as a whole and which usually accrue over time (*Wickham Contracting Co. v. Fischer,* 12 F.3d 1574, 1578 (Fed.Cir.1994)). **Overhead costs are therefore not directly attributable to specific contracts, for if they were, they would constitute direct costs**. (*Id.*)" *Aircraft Gear Corporation v. Kaman Aerospace Corporation*, 875 F.Supp. 485, 495 (N.D.Ill.1995).  (Ennegrecido nuestro).

100.    La compensación por *extended overhead* incluye las demoras causadas por órdenes de cambio ("change orders") y cualquier otra razón que surja durante el desarrollo del proyecto, atribuible al dueño de la obra. *Levy v. Autoridad de Edificios Públicos*, 135 D.P.R. 382 (1994).  Sobre la justificación para esto, en *Aircraft Gear Corporation v. Kaman Aerospace Corporation*, 875 F.Supp. 485, págs. 495-496 (N.D.Ill.1995) el Tribunal expresó:

> "In the event of contract changes or other unforeseen developments resulting in delay, however, **a contractor's usual method of allocating overhead costs to projects may no longer adequately reflect the overhead costs properly allocable to a specific project** (2 John McBride et al., *Government Contracts* § 23.110[11], at 23-116 (1994)).  **If a project is delayed, the contractor may not be able to take on new contracts that would otherwise help absorb the overhead expenses accruing during the delay, thus giving rise to 'unabsorbed overhead'**. (*id.;* Darbyshire, 17 Ga.L.Rev. at 768-70)."  (Ennegrecido nuestro).

101.    Bajo el "common law", los gastos de "extended home office" no eran compensables sin prueba de causa directa, la cual tenía que ser de razonable certeza. Con el propósito de simplificar y uniformar la medida del daño para "unabsorbed overhead" en contratos federales, por muchos años el gobierno federal ha permitido a los contratistas calcular los daños de "extended home office overhead" utilizando la "Fórmula Eichleay".  Ésta fue establecida por el Armed Services Board of Contracts Appeal en *Appeal of Eichleay Corp.*, 60-2 B.C.A. (CCH) ¶2688, 1960 WL 538 (Armed Serv. B.C.A. 1960), confirmada en reconsideración en 61-1 B.C.A. (CCH) ¶2894, 1960 WL 684 (Armed Serv. B.C.A. 1960).  Esta fórmula requiere que el contratista demuestre 1) que hubo retrasos en la ejecución del contrato ocasionados por el gobierno, 2) lo que ocasionó que el tiempo de ejecución del contrato se extendiera, 3) por lo que tuvo que estar en "stand by" por un periodo de tiempo indeterminado o que el trabajo fue realizado fuera de secuencia e interrumpido sustancialmente. Véase, *Appeal of Eichleay Corp.*, supra, 6 *Bruner & O'Connor Construction Law* § 19:85 e *In re Appeal of*

Página 21 de 30

*Roy McGinnis & Co., Inc.*, 1-2 B.C.A. (CCH) ¶31622, 2001 WL 1187051 (Armed Serv. B.C.A. 2001).

102.  En *Levy v. Autoridad de Edif. Públicos*, *supra*, nuestro Tribunal Supremo se enfrentó a una controversia similar a la del caso de epígrafe.  *Levy*, *supra*, trataba de un contrato para la construcción de hospitales. Durante el proceso de la construcción, la Autoridad emitió órdenes de cambio y de trabajo extra que ocasionaron que la duración de los trabajos de construcción se extendiera más allá del tiempo originalmente contratado.  Levy solicitó, y le fue concedida, una extensión al tiempo de ejecución.  Posteriormente solicitó se le compensara por los daños que le acarreó la extensión de tiempo. Expresó el Tribunal que "[e]l obstaculizar directa o indirectamente, la ejecución del contrato por parte del contratista, con demoras extraordinarias sin importar cuán necesarias éstas sean, desorganizando así su trabajo y haciéndolo más difícil, constituye incumplimiento de contrato que da derecho a la correspondiente indemnización." *Levy*, *supra*, página 401.  Asimismo, el Tribunal Supremo reconoció el derecho del contratista a ser compensado por el aumento en los gastos fijos generales empresariales, tanto en su oficina principal como en el proyecto.

103.  Durante el desarrollo del proyecto, surgieron varios eventos no atribuibles a ML, que ocasionaron que la duración de los trabajos de construcción se extendiera más allá del tiempo originalmente contratado, y que ML tuviera que estar "stand by" por un periodo de tiempo y/o que el trabajo fuera realizado fuera de secuencia e interrumpido sustancialmente. Conforme al Contrato de Obra y la jurisprudencia antes citada, los eventos de atraso constituyen incumplimiento de contrato que da le derecho a ML a ser compensado por el aumento en los gastos fijos generales empresariales, tanto en su oficina principal como en el proyecto. *Levy*, *supra*, página 401.

104.  Durante el desarrollo de la obra, ML contrató a la firma de ingenieros, arquitectos y planificadores, ROV Engineering Services, PSC, para que preparara un informe pericial sobre el impacto de los eventos de atraso en la duración del proyecto, con el propósito de resolver las controversias que existían entre las partes sobre este particular.

105.  En su informe de 30 de noviembre de 2012, titulado "Análisis de Impacto de Tiempo #01", (en lo sucesivo denominado Informe de Análisis de Impacto de

Tiempo #01) los peritos ROV Engineering Services, PSC, concluyeron que los eventos de atraso detallados en dicho informe, ocurridos hasta el 28 de septiembre de 2012, impactaron la ruta crítica, desplazando la fecha de terminación del proyecto 198 días calendario, de los cuales 4 días calendario son atribuibles a ML y 194 días calendario a la AEE. Por lo tanto, concluyeron que ML tiene derecho a solicitar una extensión de tiempo del Contrato de Obra por 194 días calendario. El Informe de Análisis de Impacto de Tiempo #01 se acompaña e incorpora por referencia como **Anejo 2** de la Demanda.

106. El 21 de diciembre 2012 la AEE luego de analizar el Informe de Análisis de Impacto de Tiempo #01, le concedió 192 días de extensión de tiempo. Dicha extensión de tiempo fue reconocida e incluida en la Segunda Enmienda al Contrato de Obra, otorgada en 31 de enero de 2016.

107. Luego de que la AEE aceptó la extensión de tiempo de 192 días calendario, el 3 de abril 2013 ML le notificó a la AEE el informe titulado "Reclamación de "Extended Overhead"", preparado por el perito CPA Vicente García (en lo sucesivo Reclamación de *Extended Overhead* #1). En dicho informe el perito CPA concluye que el periodo adicional de 192 días al proyecto original le representó a ML gastos por concepto de *extended overhead* ascendentes a $742,841.50. A pesar de que la AEE aceptó la extensión de tiempo número 1 por 192 días, temerariamente se ha negado a compensar a ML por dicha cuantía. El Informe del CPA se acompaña e incorpora por referencia como **Anejo 3** de la Demanda.

108. Posteriormente, continuaron las controversias entre las partes de epígrafe por varios eventos no atribuibles a ML, que continuaron ocasionado que la duración de los trabajos de construcción se extendiera más allá del tiempo originalmente contratado, y que ML tuviera que estar "stand by" por un periodo de tiempo y/o que el trabajo fuera realizado fuera de secuencia e interrumpido sustancialmente.

109. Habiendo transcurrido 11 meses desde que se sometió el Análisis de Impacto de Tiempo #01 del proyecto y 7 meses desde que se sometió el informe de Reclamación de *Extended Overhead* 1, sin que la agencia hubiese tomado decisión alguna, ML decide contratar nuevamente los servicios de los peritos ROV Engineering Services, PSC para que prepararan un informe pericial sobre el impacto en la duración

Case:17-03283-LTS Doc#:3069-2 Filed:05/16/18 Entered:05/16/18 00:31:40 Desc:
Exhibit 2 - Supporting documents Page 140 of 147

Página 23 de 30

del proyecto de los eventos de atraso ocurridos con posterioridad a su Informe de Análisis de Impacto de Tiempo #01.

110.  Con tal propósito, los peritos ROV Engineering Services, PSC prepararon su informe de 13 de octubre de 2014, titulado "Análisis de Impacto de Tiempo Número 2", (en lo sucesivo denominado Informe de Análisis de Impacto de Tiempo #02), en el cual concluyeron que los eventos de atraso detallados en dicho informe, impactaron la ruta crítica, desplazando la fecha de terminación del proyecto 710 días calendario. Por lo tanto, concluyeron que ML tiene derecho a solicitar una extensión de tiempo del Contrato de Obra por 710 días calendarios adicionales a los calculados en su Informe de Análisis de Impacto de Tiempo #01. El Informe de Análisis de Impacto de Tiempo #02 se acompaña e incorpora por referencia como **Anejo 4** de la Demanda.

111.  En 29 de octubre de 2014, ML le notificó a la AEE el Informe de Análisis de Impacto de Tiempo #02. Sin embargo, temerariamente la AEE se negó a aceptarlo, a pesar de que ML utilizó a los mismos peritos que efectuaron el primer informe de Análisis de Impacto de Tiempo #01, y que la AEE aceptó y reconoció al conceder 192 días adicionales al proyecto. La AEE le devolvió a ML dicho informe, mediante carta de 20 de noviembre de 2014, alegando que se negaba a aceptarlo.

112.  Ante la negativa de la AEE en evaluar el informe de Análisis de Impacto de Tiempo #02, el 27 de enero de 2015 ML le entregó a la AEE informe preparado por el perito CPA Vicente García, en el cual concluye que el periodo adicional de 710 días al proyecto original le representó a ML gastos por concepto de *extended overhead* ascendentes a $1, 779,013.40. La AEE temerariamente se ha negado a compensar a ML por dicha cuantía. El Informe del CPA se acompaña e incorpora por referencia como **Anejo 5** de la Demanda.

113.  Ese mismo día, 27 de enero 2015, ML le notificó carta al Director de la División Legal, Lcdo. Jorge Concepción, solicitando su intervención para resolver las controversias y estancamiento en las negociaciones con los administradores del proyecto, quienes se negaban a evaluara el informe de Análisis de Impacto de Tiempo #02. Sin embargo, esa carta nunca fue contestada.

114.  Posteriormente, mediante carta de 27 de marzo 2015, la AEE reiteró su negativa a evaluar el informe de Análisis de Impacto de Tiempo #02, aún cuando las

Case:17-03283-LTS  Doc#:3069-2  Filed:05/16/18  Entered:05/16/18 00:31:40  Desc:
Exhibit 2 - Supporting documents  Page 141 of 147

Página 24 de 30

enmiendas realizadas al contrato exceden los 750 días adicionales a los pactados originalmente, esto sin incluir el tiempo adicional que establecería la quinta enmienda.

115. Respetuosamente se solicita de este Honorable Tribunal que condene a la AEE a pagarle a ML las siguientes sumas por concepto de *extended overhead*:

a. La suma de por lo menos $742,841.50, por concepto de *extended overhead* de 192 días calendario adicionales a lo pactado en el contrato original; más $269,092.00 de intereses por mora, calculados a razón de 9.45% desde el 3 de abril 2013, fecha en la que se sometió el informe, hasta el 24 de febrero de 2017, cuya suma continúa acumulando intereses por mora a razón de 9.45%, hasta su saldo;

b. La suma de por lo menos $1,779,013.40, por concepto de *extended overhead* de 710 días calendario adicionales a lo pactado en el contrato original; más $392,270.00 de intereses por mora, calculados a razón de 9.45% desde el 13 de octubre 2014, fecha en la que se sometió el informe, hasta el 24 de febrero de 2017, cuya suma continúa acumulando intereses por mora a razón de 9.45%, hasta su saldo.

*Séptima Causa de Acción:*
*Deuda por Trabajos Acordados y no Pagados por la AEE,*
*al Retrasar la Firma de la Quinta Enmienda al Contrato de Obra*

116. Se incorporan por referencia a la presente causa de acción las alegaciones antes expuestas.

117. Según se expuso anteriormente, a principios del año 2014, ML sometió 31 órdenes de cambio, que fueron negociadas y aprobadas por la AEE, y eventualmente serían objeto de una quinta enmienda al Contrato de Obra.

118. La AEE, en escrito de 29 de enero 2014, se comprometió a evaluar estos cambios en o antes de la última semana de marzo de 2014, debido a que conocía que después de esa fecha se paralizaría la obra por falta de taller. Sin embargo, no fue hasta el día 30 de junio de 2014, que ML recibió el borrador de Quinta Enmienda al Contrato, la cual aún está pendiente de ser otorgada.

119. Al presente, ML ha realizado trabajos acordados por las partes, pero no ha podido cobrarlos debido a que la AEE ha retrasado intencional e injustificadamente el otorgamiento de la referida quinta enmienda al Contrato de Obra.

Página 25 de 30

120.   Respetuosamente se solicita de este Honorable Tribunal que condene a la AEE a pagarle a ML una suma no menor de $225,514.39, por concepto de principal de los referidos trabajos realizados pero aún pendientes del otorgamiento de la quinta enmienda al Contrato de Obra, más $87,019.92 de intereses por mora calculados a razón de 9.45% desde el 1 de enero de 2013, fecha en que se culminaron las labores hasta el 24 de febrero de 2017. Dicha suma principal continúa acumulando intereses por mora a razón de 9.45%, hasta su saldo.

*Octava Causa de Acción:*
*Gastos por Desmovilización por Paralización de los Trabajos*

121.   Se incorporan por referencia a la presente causa de acción las alegaciones antes expuestas.

122.   Del 23 al 30 de mayo de 2014, ML procedió con la desmovilización, debido a que faltaban una serie de órdenes de cambio que a esa fecha no habían sido aprobadas por la AEE y detalles adicionales pendientes de ser recibidos para ser cuantificados, lo que impedía la continuación de la obra.

123.   En la Certificación número 18, las partes pactaron la suma de $25,180.13 para gastos de desmovilización del proyecto.

124.   En consecuencia, respetuosamente se solicita de este Honorable Tribunal que condene a la AEE a pagarle a ML una suma no menor de $25,180.23, por concepto de gastos por desmovilización del proyecto; más $6,542.00 de intereses por mora, calculados a razón de 9.45% desde el 31 de mayo de 2014, fecha en la que se completó la desmovilización, hasta el 24 de febrero de 2017. Dicha suma principal continúa acumulando intereses por mora a razón de 9.45%, hasta su saldo.

*Novena Causa de Acción:*
*Daños por Incumplimiento Doloso*

125.   Se incorporan por referencia a la presente causa de acción las alegaciones antes expuestas.

126.   El incumplimiento de las obligaciones contractuales tiene diversas consecuencias dependiendo de los hechos que concurran en cada caso.   Cuando la obligación consiste en el pago de una cantidad de dinero el Artículo 1061 del Código Civil, 31 LPRA §3025, limita la indemnización por daños y perjuicios al recobro del principal e intereses.   Este Artículo dispone:

> "**Si la obligación consistiere en el pago de una cantidad de dinero** y el deudor incurriere en mora, la indemnización de daños y perjuicios, no habiendo pacto en contrario, consistirá en el pago de los intereses convenidos, y a falta de convenio, en el interés legal." (Ennegrecido nuestro).

127. Este Artículo aplica solamente a las obligaciones pecuniarias, que son "... aquellas en que la prestación consiste en entregar una suma de dinero...". Véase, José Ramón Vélez Torres, *Derecho de Obligaciones*, Ed. UIA, 2ª ed., San Juan, p. 123 (1997); y, Puig Brutau, *Fundamentos de Derecho Civil, Derecho General de las Obligaciones*, T. I, V. II, Ed. Bosch, 2ª ed., p. 369 (1976).

128. Cuando se trata de contratos que no se limitan a obligaciones pecuniarias son de aplicación los artículos 1054, 1059 y 1060 del Código Civil, 31 LPRA §§3018, 3023 y 3024, los cuales disponen:

> "§3018. Dolo, negligencia o morosidad en el cumplimiento de la obligación
>
> Quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieron al tenor de aquellas.
>
> §3023. Indemnización por daños y perjuicios
>
> La indemnización por daños y perjuicios comprende, no sólo el valor de la pérdida que haya sufrido, sino también el de la ganancia que haya dejado de obtener el acreedor, salvas las disposiciones contenidas en las secciones siguientes.
>
> §3024. Daños y perjuicios de que responde el deudor
>
> Los daños y perjuicios de que responde el deudor de buena fe son los previstos o que se hayan podido prever al tiempo de constituirse la obligación y que sean consecuencia necesaria de su falta de cumplimiento.
>
> En caso de dolo responderá el deudor de todos los que conocidamente se deriven de la falta de cumplimiento de la obligación."

129. Los artículos antes transcritos establecen claramente la obligación del que incumple un contrato de indemnizar a la otra parte contratante por los daños y perjuicios que su incumplimiento le ocasione, incluyendo las pérdidas de ganancia. El deudor de buena fe responde de los daños que haya podido prever al tiempo del incumplimiento de la obligación y que sean consecuencia necesaria de su falta de incumplimiento. El deudor que hubiese incumplido mediando dolo, responderá de todos los daños que conocidamente se deriven de su incumplimiento.

Case:17-03283-LTS   Doc#:3069-2   Filed:05/16/18   Entered:05/16/18 00:31:40   Desc:
Exhibit 2 - Supporting documents   Page 144 of 147

Página 27 de 30

130.  Sobre el concepto de dolo Castán Tobeñas explica:

"...[E]l dolo presupone un elemento *intelectual* (conciencia) y un elemento *volitivo* (voluntad de violar el derecho de crédito); mas no requiere la intención de perjudicar al acreedor.

Existe dolo, escribe Barassi, cuando la falta de prudencia o celo –a diferencia de la culpa– sea consciente, es decir, cuando el deudor conozca las consecuencias que de su conducta resultarán respecto al cumplimiento de la obligación...
...

Certeramente resume Cossío el estado de la cuestión en los siguientes términos: "Lo que convierte en doloso un acto no es la mayor o menor conciencia de sus resultados, sino el conocimiento previo de su ilegalidad, el saber que puede ser dañoso para los demás, aunque no se hayan previsto ni podido prever todos y cada uno de sus posibles efectos."
...

... Como observa Díaz Pairó, en dicho precepto se contrapone el deudor de buena fe y el deudor por dolo, resultando así que este último es el deudor de mala fe, y para la existencia de ésta no hace falta la intención de perjudicar o de dañar, bastando infringir de modo voluntario el deber jurídico que pesa sobre el deudor a sabiendas, es decir, conscientemente.  Esta voluntariedad y consciencia tornan doloso el incumplimiento, aunque, como es posible, el deudor no haya tenido intención de perjudicar o de dañar al acreedor, contando, lo que no es raro, con que sobrevengan hechos que le permitan satisfacer más tarde su obligación.

131.  De conformidad con estos puntos de vista, el Tribunal Supremo tiene declarado que dolo significa malicia, mala intención, añadiendo ésta a la mera voluntariedad (sentencia de 28 de noviembre de 1961), caracterizándose, así, por la voluntad consciente de realizar un acto contrario al Derecho (sentencia de 19 de diciembre de 1961), y que, a diferencia del dolo penal, el dolo civil no se basa en la intención de dañar, sino que equivale a mala fe, para cuya existencia no hace falta esa intención, bastando infringir de modo voluntario el deber jurídico a sabiendas, es decir, con la conciencia de que se realiza un acto antijurídico (sentencia de 9 de marzo de 1962).  En el mismo sentido las sentencias de 27 de abril y 19 de mayo de 1973." José Castán Tobeñas, Derecho Civil Español, Común y Foral, Derecho de Obligaciones, T. III, Ed. Reus, 16ª ed., pp. 253-254 (1992). Véase, además, Jaime Santos Briz, Comentario del Código Civil, coordinado por Ignacio Sierra Gil de la Cuesta, T. VI, Ed. Bosch, p. 145 (2000).

132.  En el caso de epígrafe, los hechos antes expuestos establecen claramente que la AEE incumplió intencionalmente sus obligaciones contractuales, por

Página 28 de 30

lo que tiene el deber de indemnizar a ML por todos los daños que ésta haya sufrido como consecuencia de dicho incumplimiento.

133. Los incumplimientos de la AEE le han ocasionado y continúan ocasionándole a ML grandes problemas económicos, al reducir sustancialmente el flujo en caja hasta el punto de que ML ha tenido que tomar un préstamo por la cantidad de $925,600.00, al 9.49% de interés, a la compañía Commercial Equipment Finance (CEFI) principalmente para cubrir el déficit no contemplado e innecesario causado por la AEE, y poder cumplirle a materialistas y suplidores para la continuación de la obra. Además, ha incurrido he incurrirá en gastos y honorarios de abogado ocasionados por los incumplimientos de la AEE. Dichas pérdidas económicas se estiman en una suma no menor de $300,000.00.

134. En consecuencia, respetuosamente se solicita de este Honorable Tribunal que condene a la AEE a pagarle a ML una suma no menor de $300,000.00 por los daños sufridos como consecuencia de su incumplimiento doloso e intencional con los términos del Contrato de Obra, incluyendo el reembolso de los honorarios de abogado incurridos como consecuencia de dicho incumplimiento.

*IV. SÚPLICA*

**POR TODO LO CUAL**, respetuosamente se solicita de este Honorable Tribunal que declare con lugar la presente demanda y dicte sentencia concediendo los siguientes remedios:

a. Determine que la declaración de incumplimiento notificada por la AEE constituye una violación de contrato por parte de la AEE, y la deje sin efecto;

b. Restablezca la validez del Contrato de Obra y le ordene a la AEE que le permita a ML culminar las labores restantes del proyecto;

c. Declare ilegal y nulo el requerimiento de la AEE para la ejecución de la fianza;

d. Condene a la AEE a indemnizar a ML por los daños sufridos y que puede sufrir en el futuro por concepto de la ejecución de la fianza, los cuales se estiman en una suma no menor de $500,000.00;

e. Declare ilegal y nula la suspensión de ML del Registro de Suplidores de la AEE;

Página 29 de 30

f.      Condene a la AEE a pagarle a ML una suma no menor de $800,000.00, por concepto de daños a su reputación comercial y pérdidas económicas sufridas como consecuencia de su suspensión ilegal del Registro de Suplidores;

g.      Condene a la AEE a pagarle a ML la suma de $235,069.08, por concepto de retenido del Contrato de obra; más $40,046.00 de intereses por mora, calculados a razón de 9.45% desde el 7 de octubre 2014 hasta el 24 de febrero de 2017, cuya suma continúa acumulando intereses por mora a razón de 9.45%, hasta su saldo;

h.      Condene a la AEE a pagarle a ML la suma de $35,810.07 por concepto de intereses por mora en el pago de las certificaciones, computados desde la fecha que se emitió el pago de cada certificación hasta el 24 de febrero de 2017, cuya suma continúa acumulando intereses por mora a razón de 9.45% anual hasta su saldo;

i.      Condene a la AEE a pagarle a ML la suma de por lo menos $742,841.50, por concepto de *extended overhead* de 192 días calendario adicionales a lo pactado en el contrato original; más $269,092.00 de intereses por mora, calculados a razón de 9.45% desde el 3 de abril 2013, fecha en la que se sometió el informe, hasta el 24 de febrero de 2017, cuya suma continúa acumulando intereses por mora a razón de 9.45%, hasta su saldo;

j.      Condene a la AEE a pagarle a ML la suma de por lo menos $1,779,013.40, por concepto de *extended overhead* de 710 días calendario adicionales a lo pactado en el contrato original; más $392,270.00 de intereses por mora, calculados a razón de 9.45% desde el 13 de octubre 2014, fecha en la que se sometió el informe, hasta el 24 de febrero de 2017, cuya suma continúa acumulando intereses por mora a razón de 9.45%, hasta su saldo;

k.      Condene a la AEE a pagarle a ML la suma de por lo menos $225,514.39, por concepto de principal de trabajos realizados y que no han sido pagados por estar pendiente el otorgamiento de la quinta enmienda al Contrato de Obra; más $87,019.00 de intereses por mora, calculados a razón de 9.45% desde el 1 de enero 2013, fecha en que se culminaron las labores, hasta el 24 de febrero de 2017, cuya suma continúa acumulando intereses por mora a razón de 9.45%, hasta su saldo;

l.      Condene a la AEE a pagarle a ML una suma no menor de $25,180.23, por concepto de gastos por desmovilización del proyecto; más $6,542.00 de intereses

Página 30 de 30

por mora, calculados a razón de 9.45% desde el 31 de mayo 2014, fecha en la que se completó la desmovilización, hasta el 24 de febrero de 2017, cuya suma continúa acumulando intereses por mora a razón de 9.45%, hasta su saldo;

m.      Condene a la AEE a pagarle a ML una suma no menor de$300,000.00 por los daños sufridos como consecuencia de su incumplimiento doloso e intencional con los términos del Contrato de Obra, incluyendo el reembolso de los honorarios de abogado incurridos como consecuencia de dicho incumplimiento;

n.      Condene a la AEE al pago de costas y honorarios de abogado por temeridad.

**RESPETUOSAMENTE SOMETIDA**.

En Carolina, Puerto Rico, a 25 de agosto de 2016.

**HENRY VÁZQUEZ IRIZARRY**
Tribunal Supremo Núm. 8723
**BUFETE VÁZQUEZ IRIZARRY, C.S.P.**
Urb. Villa Fontana Park
Calle Parque Luis M. Rivera 5 HH6
Carolina, PR 00983
Tel. (787) 724-7514 - (787) 645-2241
**hvilaw@gmail.com**