**Hearing Date:** June 6, 2018 at 9:30 a.m. (AST)

# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

-----------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

    Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

-----------------------------------------------------------------x

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF PUERTO RICO

    Movant,

v.

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

    as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

    Respondents.

PROMESA
Title III

**Re: ECF No. 3066**

-----------------------------------------------------------------x

## OBJECTION OF DEBTORS TO RENEWED MOTION
## OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## FOR ENTRY OF ORDER, UNDER BANKRUPTCY RULE 2004,
## AUTHORIZING DISCOVERY PROGRAM WITH RESPECT TO CERTAIN
## CAUSES OF PUERTO RICO FINANCIAL CRISIS BEGINNING ON AUGUST 15, 2018

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK- 3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT …………………………………………………………….....2

BACKGROUND …………………………………………………………………………….....5

ARGUMENT …………………………………………………………………………………….8

    I.    THE INDEPENDENT INVESTIGATOR'S FINAL REPORT IS
EXPECTED BY JULY 31, 2018 …………………………………………………..9

    II.    THE UCC HAS HAD EXTENSIVE VISIBILITY AND
PARTICIPATION RIGHTS IN THE INVESTIGATION …………………….11

    III.    THE INDEPENDENT INVESTIGATOR IS BEST SITUATED TO
CONDUCT A COST-EFFECTIVE, EFFICIENT AND THOROUGH
INVESTIGATION ………………………………………………………………..13

    IV.    THE RENEWED MOTION IS PREMATURE AT BEST …………………….16

CONCLUSION …………………………………………………………………………...17

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Countrywide Home Loans, Inc.*,
  384 B.R. 373 (W.D. Pa. 2008) ...................................................................................................8

*In re Millennium Lab Holdings, LLC*,
  562 B.R. 614 (Bankr. D. Del. 2016) ..........................................................................................8

*In re Texaco, Inc.*,
  79 B.R. 551 (Bankr. S.D.N.Y.1987) ..........................................................................................8

*Matter of Educators Grp. Health Tr.*,
  25 F.3d 1281 (5th Cir. 1994) ...................................................................................................16

*Matter of S.I. Acquisition, Inc.*,
  817 F.2d 1142 (5th Cir.1987) ..................................................................................................16

**STATUTES**

48 U.S.C. §§ 2101–2241 ................................................................................................................2

PROMESA § 104 ..........................................................................................................................15

PROMESA § 104(c)(1) .................................................................................................................12

PROMESA § 104(p) .................................................................................................................8, 15

PROMESA § 104(o) ..........................................................................................................6, 14, 15

PROMESA § 301(c)(7) .................................................................................................................14

PROMESA § 305 .......................................................................................................................5, 16

PROMESA § 315(b) .......................................................................................................................2

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 2004 .............................................................................................................8, 15

To the Honorable United States Magistrate Judge Judith G. Dein:

The Commonwealth of Puerto Rico (the "Commonwealth"), the Puerto Rico Sales Tax Financing Corporation ("COFINA"), the Puerto Rico Highways and Transportation Authority ("HTA"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Electric Power Authority ("PREPA," and together with the Commonwealth, COFINA, and HTA, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Debtors' representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submit this objection to the *Renewed Motion of Creditors' Committee Seeking Entry of Order, Under Bankruptcy Rule 2004, Authorizing Discovery Program With Respect to Certain Causes of Puerto Rico Financial Crisis Beginning on August 15, 2018* [ECF. No. 3066] (the "Renewed Motion") in which the Official Committee of Unsecured Creditors (the "UCC") seeks to commence, by August 15, 2018 discovery of certain financial institutions (as defined in the Motion referenced below, the "Puerto Rico Financial Institutions") as originally sought in the *Motion of Official Committee of Unsecured Creditors for Order, Under Bankruptcy Rule 2004, Authorizing Discovery Program With Respect to Certain Causes of Puerto Rico Financial Crisis* [Docket No. 706] (the "Motion").[3]

## PRELIMINARY STATEMENT

1. Through its Renewed Motion, the UCC seeks authorization *now* to embark on an extensive discovery program that would commence *after* the Independent Investigator (defined below) releases its final report (the "Final Report"), or on August 15, 2018, whichever comes

---

[2] PROMESA has been codified in 48 U.S.C. §§ 2101–2241.

[3] Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

first. This renewed request is premature at best. The Independent Investigator's investigation, which has made substantial progress in the six months since the Court denied the UCC's initial Motion, is in its final stages. In light of the considerable financial burden a parallel investigation would have on the Commonwealth, among other things, the UCC has failed to show good cause why the Court should decide *today* whether the discovery program requested by the UCC is warranted in the future. The Court should deny the Renewed Motion so all parties can review the Independent Investigator's Final Report, at which time each party can evaluate whether there is good cause for further discovery on this topic.

2. *First,* the Independent Investigator's Final Report is forthcoming. The Independent Investigator anticipates its Final Report will be published on or before August 15, 2018, subject to adjustment in light of any issues related to confidentiality concerns and objections to production and interviews. Indeed, the Independent Investigator communicated this to counsel for the UCC on May 4, 2018. The Final Report will address the topics the UCC claims it needs to investigate itself, including an assessment of the implications of the alleged "revolving door" among GDB, Popular, and Santander, a review of retail selling practices, and an identification of potential claims against third parties and matters for regulatory attention. While the Independent Investigator anticipates the Final Report should satisfy the UCC's concerns, if, after reviewing the Final Report, material open fact questions remain, then the UCC can submit a motion for discovery with a limited and targeted scope. With the benefit of the Final Report, the Court can better determine whether additional investigation is truly warranted.

3. *Second*, the UCC has failed to comply with the Court's November 17, 2017 order denying its Motion (the "November Order"). ECF No. 1827. Despite entering into a

3

Cooperation Agreement (defined below) with the Independent Investigator four months after the Court ordered it to, the UCC infrequently has exercised its extensive rights of participation and review. The UCC's Renewed Motion does not identify the "targeted discovery requests for information," *id.*, it submitted to the Independent Investigator, nor does the Renewed Motion acknowledge that, consistent with the November Order, the Independent Investigator in large part accepted and followed through on the UCC's proposed requests to the Puerto Rico Financial Institutions, as this Court ordered. Contrary to the UCC's mischaracterizations of the investigation, the Independent Investigator has been committed to a thorough, transparent process in cooperation with the UCC, to the extent it can without compromising its investigation, as demonstrated below.

4. *Third*, premature authorization of the UCC's requested discovery program would be unduly burdensome to Puerto Rico. The UCC has had access to over 14,000 documents (hundreds of thousands of pages, including electronic communications) in a shared repository, and is invited to participate in weekly consultations with and receive oral reports from the Independent Investigator. In addition, the UCC's Renewed Motion fails to acknowledge that the Independent Investigator, consistent with the November Order, accepted and followed through on 22 of the UCC's 24 proposed document requests to Popular and Santander. Despite this, the UCC now seeks to pursue a full-blown and duplicative discovery program *identical* in scope to the program in their original Motion, filed on July 21, 2017, and has made no effort to tailor its proposed investigation in light of requests already propounded and evidence collected. This is unacceptable in light of both this Court's prior order and the fact that the costs of such a fishing expedition would be borne by the people of Puerto Rico.

5. *Finally*, the UCC's stated purpose is to identify causes of action to be brought against third parties on behalf of the Debtors, presumably by the UCC itself, to "grow the pie." Neither the UCC nor any other third party has any authority to pursue causes of action on behalf of the Debtors. That authority rests solely with the Oversight Board, unless it consents to pursuit of any action by others under PROMESA section 305. The Oversight Board has no intention of ceding that authority to the UCC, and certainly not before issuance of the Final Report, which will help inform the Oversight Board's own views as to what actions should be pursued.

## BACKGROUND

6. On September 1, 2017, the Oversight Board, acting by and through the Special Investigation Committee of the Oversight Board and pursuant to its powers under PROMESA, retained Kobre & Kim LLP (the "Independent Investigator") to investigate the factors contributing to Puerto Rico's fiscal crisis and to examine Puerto Rico's debt and its debt issuance, including disclosure and selling practices related thereto. *See* Kobre & Kim LLP Engagement Letter, September 6, 2017, *available at* https://juntasupervision.pr.gov/wp-content/uploads/wpfd/50/59dff8956bf6f.pdf.

7. Since its retention, the Independent Investigator has received and reviewed document productions from dozens of separate entities, interviewed scores of witnesses, issued subpoenas where required to secure information,[4] and has been preparing its Final Report in

---

[4] As noted in the Independent Investigator's Second Interim Report, the "Investigation relies upon, and has been made possible by, the voluntary cooperation of over 100 witnesses and stakeholders—including former and current senior government officers, underwriters, rating agencies, outside professionals, and advisors—who have actively cooperated with us in order to conserve resources and avoid litigation over subpoenas, all with the goal of concluding this independent review of the facts to renew Puerto Rico's access to the capital markets." Independent Investigator's Second Interim Report, Renewed Motion, Ex. D. ¶ 2.

5

tandem with those efforts—despite significant difficulties in coordinating its investigation in the aftermath of Hurricanes Irma and Maria.

8. Because the Independent Investigator's work obviated the need for the UCC's duplicative inquiry, the Court, in its November Order, denied the UCC's original Motion without prejudice. Rather, the Court directed the parties to cooperate by "work[ing] together to develop a protocol whereby the UCC is to have meaningful input into the investigation," and directed the UCC "to be much more targeted in its requests." Renewed Motion, Ex. C, 82:21-24.

9. Notwithstanding the Court's expectation that the parties would enter into a cooperation agreement "something like in the next week," Renewed Motion, Ex. C, 73:6-8, the UCC spent *four months* negotiating a Confidentiality, Cooperation and Non-Disclosure Agreement (the "Cooperation Agreement") with the Independent Investigator. The Cooperation Agreement, which provides the UCC with extensive rights to participate in and remain informed about the progress of the investigation, was not executed until March 5, 2018. Renewed Motion, Ex. F. The Cooperation Agreement largely mirrors the agreement between the Independent Investigator and the Official Committee of Retirees ("the Retiree Committee"), pursuant to which the Retiree Committee was also given extensive rights to participate in and remain informed about the progress of the investigation. The Independent Investigator and the Retiree Committee reached their agreement on November 3, 2017, after only a few weeks of negotiations and prior to being ordered to do so by this Court.

10. Pursuant to its Cooperation Agreement with the UCC, the Independent Investigator conducts weekly investigation update calls, during which it provides, *inter alia*, information regarding the witnesses to be interviewed the following week. Although the

6

Independent Investigator solicits input from the UCC during these weekly calls, the UCC has suggested only a handful of general questions—all of which have been posed as requested.

11. On its weekly calls, the Independent Investigator has consulted with the UCC on areas of inquiry for upcoming interviews for all witnesses, not just those from Government Development Bank of Puerto Rico ("GDB"), Popular, and Santander. As an example, on May 18, 2018, the Independent Investigator provided counsel to the UCC with the names of 18 individuals from 11 of the investment banks and other entities that would be interviewed during the week of May 21, 2018, for the UCC's input. The Independent Investigator took input from the UCC's counsel on the proposed areas of inquiry and has and will continue to ask the questions that UCC's counsel has posed.

12. The UCC's Renewed Motion comes as an additional 29 witnesses are scheduled to be interviewed over the coming weeks, including individuals at all the investment banks that played significant roles in underwriting and placing the bond offerings that are the subject of the Independent Investigator's work. The Independent Investigator has interviewed over 30 witnesses who worked at GDB in management, finance, and in-house legal roles, and as members of the board of directors over the past 6 administrations. The Independent Investigator also has interviewed over 10 witnesses who work or worked at Popular and Santander, and is scheduled to interview an additional 8 witnesses from GDB, Popular, and Santander, as well as the Puerto Rico Ethics Office, in San Juan this week. Additionally, the Independent Investigator has interviewed multiple witnesses from the Puerto Rico Department of Treasury and each of the ratings agencies that covered Puerto Rico bond issuances, as well as 3 former governors. And by the end of this month, the Independent Investigator will have completed witness interviews of representatives from virtually all of the financial institutions that served as lead underwriters for

7

Puerto Rico debt issuances, as well as principal bond counsel for those issuances. The witnesses reflect a selection of personnel responsible for pricing, selling, and giving critical legal counsel about the bonds, as well as the government personnel who negotiated their terms.

13. At the same time the Independent Investigator is taking witness interviews, the Independent Investigator is also moving forward with drafting the Final Report. As such, the Independent Investigator will be in a position to complete its Final Report within a reasonable time period after the conclusion of witness interviews.

14. After the investigation, the Oversight Board will make public its Final Report pursuant to PROMESA § 104(p), which requires the Oversight Board to publish the findings of the investigations described in section 104(o). In contrast, findings of statutory committee investigations are not required to be publicized and virtually never are. Because the Independent Investigator occupies the unique role of conducting a statutorily-mandated independent investigation on behalf of an oversight board, as distinguished from that of a court-appointed examiner operating pursuant to a court order to find claims on behalf of certain interested parties, the Independent Investigator's intention is to present the evidence uncovered through its investigation in a way that will be useful for all interested parties in assessing the viability of claims and available defenses.

## ARGUMENT

15. As the party seeking to conduct a rule 2004 examination, the UCC has the burden of showing good cause for the examination it seeks. *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 627–28 (Bankr. D. Del. 2016). The level of good cause to be demonstrated increases based on the disruptiveness, cost, and intrusiveness involved in the examination. *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 393 (W.D. Pa. 2008) ("the level of good cause

8

required . . . will vary depending on the potential intrusiveness involved."); *In re Texaco, Inc.*, 79 B.R. 551, 556 (Bankr. S.D.N.Y.1987) (finding that Rule 2004 examinations "should not be so broad as to be more disruptive and costly to the debtor than beneficial to the creditor."). Not only has the UCC failed to comply with the Court's November Order regarding a renewed Rule 2004 request, it cannot demonstrate good cause for authority to incur the cost of ramping up its own discovery on matters already covered by the Independent Investigator, at least not until the final result of the Independent Investigator's work is published.

**I. The Independent Investigator's Final Report Is Expected On or Before August 15, 2018**

16. The investigation has entered its final stages and the Final Report is forthcoming. The Independent Investigator's drafting of the Final Report is, in fact, far along and has progressed in parallel with witness interviews. As the Independent Investigator has reported publicly and conveyed to the UCC on May 4, 2017, the Independent Investigator anticipates releasing its Final Report on or before August 15, 2018, subject to adjustment in light of any issues related to confidentiality concerns and objections to production and interviews. It is premature for the UCC to file its Renewed Motion now, when publication of the Final Report is approaching.

17. In the six months since the Court denied the UCC's Motion, the Independent Investigator has made significant progress in its investigation in an efficient and cost-effective manner and according to an ambitious timeline. In doing so, the Independent Investigator propounded all of its initial requests promptly upon identification of witnesses. As explained above, those requests have produced significant results: the Independent Investigator has obtained the voluntary cooperation of over 100 witnesses and stakeholders, many of whom have produced documents, and scores of whom have sat for interviews.

9

18. The UCC premises its Renewed Motion on the mischaracterization that the Independent Investigator has somehow "blown" a hard-and-fast deadline of March 20, 2018 for the completion of its Final Report. But no such firm deadline was ever established. Rather, the Independent Investigator's First Interim Report states only that it "believe[d] a realistic *time frame* for the preparation of a final investigation report is 200 days from the [Independent Investigator's] retention." Renewed Motion, Ex. B, at ¶ 3 (emphasis added). The First Interim Report was clear, however, that that timeframe was "subject to adjustment if after ongoing due diligence, or in light of document-recovery issues that have arisen in the aftermath of Hurricanes Irma and Maria, a different time period appears to be more reasonable." *Id*. As the Independent Investigator noted at the outset, the "proposed 200-day timeframe [is] an ambitious one." *Id.* The UCC's apparent displeasure that the ambitious timeline was not achieved is unwarranted, particularly in light of the significant challenges that have arisen as a result of Puerto Rico's ongoing hurricane recovery.

19. The UCC also complains that the Oversight Board's counsel committed that the investigation would be completed by April 2018 "at the latest." Renewed Motion at ¶ 3. Not so. In fact, counsel for the Oversight Board signaled at the November 2017 hearing that the timeline for the investigation was subject to change, noting that the investigation could "go[] a little longer" than the 200-day initial timeframe. Renewed Motion, Ex. C, 60:21-24.

20. The UCC has actually known for some time that the estimated 200-day time frame would be adjusted and has said nothing prior to filing the Renewed Motion. The Independent Investigator's Second Interim Report, dated April 5, 2018, made clear that the estimated publication date for the final report was the "summer of 2018." Renewed Motion, Ex. D, ¶ 6. Over a month and a half has passed since that Second Interim Report was released.

10

During that time, the UCC has never expressed concern over an anticipated publication date of the summer of 2018. And since counsel for the UCC participates in weekly update calls on the progress of the investigation, the UCC has had ample opportunity to express such concerns.

## II. The UCC Has Had Extensive Visibility and Participation Rights in the Investigation

21. The UCC complains that it may never receive "meaningful" discovery information as a result of the investigation. That is manifestly untrue.

22. Under the Cooperation Agreement, the UCC enjoys ample opportunities to participate actively in the investigation:

- a. **Witness Interviews**: The Independent Investigator must notify the UCC of any voluntary witness interviews and must consult with the UCC about areas of inquiry. Renewed Motion, Ex. F, at ¶ 5.

    With respect to interviews of the Santander entities, the Popular entities, and the GDB, or any of their current or former employees or representatives, the UCC has the right to consult with the Independent Investigator about areas of inquiry. Renewed Motion, Ex. F, at ¶ 5. To the extent these entities' witnesses are deposed, the UCC also may request the right to attend and ask questions at such depositions. *Id.* at ¶ 6.

- b. **Document Requests**: The UCC has access to a centralized document depository that gives it access to materials produced in response to a subpoena, as well as non-confidential materials that have been voluntarily produced. ECF 3066, Ex. F, at ¶ 3. At present, the depository contains over 14,000 documents.

    The UCC has the right to propose document requests as to the Santander entities, the Popular entities, and the GDB. Renewed Motion, Ex. F, at ¶ 7. The Cooperation Agreement also provides that documents obtained via subpoena from the Santander entities and the Popular entities will be fully accessible to the UCC. As a result, the UCC has access to all documents of Popular and Santander that have been produced to the Independent Investigator.

23. Mindful of the Court's admonition that the parties cooperate in the investigation, as soon as the UCC executed the Cooperation Agreement, the Independent Investigator solicited input from the UCC and implemented that input in its investigation, and has continued to do so:

- a. **Witness Interviews**: The Independent Investigator has regularly provided the UCC with a schedule of the witnesses to be interviewed each week, along with

11

biographical information regarding those witnesses and an extensive briefing on the Independent Investigator's proposed areas of inquiry. The Independent Investigator also actively solicited the UCC's input on additional areas of inquiry for each witness. In the limited circumstances when the UCC has requested that additional areas be explored with a witness, the Independent Investigator has explored those additional areas.

b. **Document Requests**: The Independent Investigator solicited the UCC's input into the document requests that would be served upon the Santander and Popular entities, and it included nearly all of the UCC's requests in the subpoenas ultimately served upon those entities.[5] In fact, the document requests the UCC proposes in connection with the Renewed Motion *are nearly identical* to the Independent Investigator's subpoenas to the Santander and Popular entities. And while the UCC did not propose document requests in a form specific for GDB, the Independent Investigator made requests to GDB tracking the topics covered in the UCC's proposed requests in their Motion.[6]

And, contrary to the assertions made in the UCC's Renewed Motion, [REDACTED]

c. **Other Voluntary Cooperation**: The Independent Investigator has also voluntarily shared other information regarding the investigation with the UCC. Although the Cooperation Agreement does not obligate the Independent Investigator to obtain such consents from additional witnesses, the Independent Investigator has nevertheless attempted to negotiate such consents for each and every witness it has spoken with. The Independent Investigator has also voluntarily supplied counsel for the UCC with oral reports regarding the Independent Investigator's interim findings on certain issues. The UCC has never previously expressed concerns over the substance of those reports.

24. To the extent the UCC is unsatisfied with its insight into the investigation, the blame for that lies squarely on the UCC itself for not fully exercising its rights to participate under the Cooperation Agreement. For example, with respect to preparation for witness

---

[5] The subpoenas served by the Independent Investigator did not include requests for communications between Banco Popular or Santander, on the one hand, and regulators, on the other hand, because, among other reasons, Section 104(c)(1) of PROMESA already provides a mechanism for the Independent Investigator to obtain independent access to information from United States regulators.

[6] Notably, the Renewed Motion only attaches a proposed request to Popular, and not one specifically targeted to GDB. Given the differences between GDB, on the one hand, and Popular and Santander, on the other hand, the UCC's proposed request (styled as requests to Popular) cannot simply be "cut and pasted" in a form that would be suitable for GDB.

12

interviews, the UCC frequently has not asked the Independent Investigator to pursue additional areas of inquiry beyond those already identified. It can only be presumed that the UCC's failure to suggest additional topics is because the UCC is satisfied with the areas that the Independent Investigator proposes to cover.

25. Accordingly, under the Cooperation Agreement, the Independent Investigator has pursued many, if not all, of the topics of interest to the UCC, directing requests to the Santander entities and the Popular entities that are virtually identical to the UCC's requests in the Renewed Motion (and in the case of GDB, as noted above, making requests that overlap with the topics covered in the UCC's proposed request)[7] ; specifically requesting the emails of ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ from Santander; and pursuing any areas of inquiry recommended by the UCC. The Independent Investigator's Final Report, coupled with the extensive discovery to which the UCC already has access, should therefore address many, if not all, of the UCC's information requests, including with respect to actual and potential conflicts of interests surrounding the issuance of debt, selling practices with respect to debt, accounting and auditing practices, and structural political drivers of Puerto Rico's debt. Authorizing the UCC today to open *another* investigation in the near future in order to re-tread these same issues would be an unnecessary and inappropriate drain on the Commonwealth's scarce resources.

### III. The Independent Investigator Is Best Situated to Conduct a Cost-Effective, Efficient and Thorough Investigation

26. Contrary to the UCC's assertion in the Renewed Motion, the Oversight Board does not and has not "acknowledged the UCC could, and should be permitted to commence its own discovery program if it determined that the materials identified by the Independent Investigator were insufficient or incomplete." Renewed Motion ¶ 17. Indeed, the very statement

---

[7] *See* note 6, *supra*.

13

of the Oversight Board the UCC cites in support belies this assertion, stating only that "if the UCC is not satisfied….**they can come back here and renew their 2004 motion**." Renewed Motion ¶ 17 (emphasis in original), citing Ex. C, 60:10-14. Should the Court be inclined to entertain the UCC's discovery request now or in the future, the Oversight Board maintains that it, and not the UCC, is the appropriate party to conduct any further investigation and is best situated to conduct a cost-effective and efficient investigation.

27. *First,* as established in the Oversight Board's objection to the Motion (ECF No. 859), the Oversight Board, and not the UCC, is expressly equipped, authorized, and empowered by Congress to conduct an investigation into the causes of the Puerto Rico fiscal crisis, specifically including, without limitation, selling practices and conflicts of brokers, dealers, and investment advisors.[8] This investigatory role is consistent with the fact that the Oversight Board was established by Congress to exercise the rights the Bankruptcy Code assigns to trustees. *See* PROMESA 301(c)(7) (defining the term "trustee," when used in the Bankruptcy Code, as "Oversight Board" for purposes of Title III). By appointing the Special Investigation Committee and retaining the Independent Investigator, the Oversight Board has taken meaningful steps in carrying out its statutory responsibilities under PROMESA. The Oversight Board stands ready to conduct further investigation, if the Oversight Board determines such investigation is warranted.

---

[8] PROMESA section 104(o) provides:

> INVESTIGATION OF DISCLOSURE AND SELLING PRACTICES.— The Oversight Board may investigate the disclosure and selling practices in connection with the purchase of bonds issued by a covered territory for or on behalf of any retail investors including any underrepresentation of risk for such investors and any relationships or conflicts of interest maintained by such broker, dealer, or investment adviser is as provided in applicable laws and regulations.

14

28. *Second,* in entrusting the Oversight Board with its important investigatory role, Congress exclusively provided the Oversight Board with a number of tools to conduct such an investigation, including the power to obtain official data from federal authorities, obtain information from the Commonwealth and its instrumentalities, "hold hearings, . . . take testimony, and receive evidence as the Oversight Board considers appropriate," issue subpoenas requiring the attendance and testimony of witnesses and the production of documents relating to any matter under investigation, and penalize and/or prosecute any Commonwealth officer or employee who provides false or misleading information. *See* PROMESA § 104. The Independent Investigator has been authorized by the Oversight Board to exercise these investigatory powers and has done so by issuing investigative subpoenas on the Santander and Popular entities – precisely the entities the UCC seeks to examine. Moreover, it has an investigatory infrastructure in place, including signed agreements with numerous parties in interest that would enable it to quickly explore further issues. The UCC, by contrast, would have to commence the process from step one.

29. *Third*, an Oversight Board-led investigation better serves the public's interest. Unlike a UCC investigation under Rule 2004, the Oversight Board's broad investigatory mandate under PROMESA is not limited to causes of actions that it can assert in its capacity as "trustee." To the extent the UCC seeks to use a Rule 2004 investigation to identify or attempt to assert bondholders' or other creditors' direct claims against third parties for misconduct in connection with the issuance of bond debt, the UCC does not have the authority to assert such claims. The Oversight Board, on the other hand, is expressly empowered to investigate claims "on behalf of retail investors" under PROMESA § 104(o). Upon concluding its investigation,

15

the Oversight Board is required by PROMESA section 104(p) to make its findings public. The UCC, by contrast, is under no such obligation.

30. *Finally,* even if a further investigation leads to the identification of claims or causes of action, such claims would be owned by the Debtors, not the UCC. Even if the UCC were to seek derivative standing to pursue such actions,[9] the Court could not grant derivative standing without the Oversight Board's consent under PROMESA section 305, which provides only the Oversight Board can consent to any stay, order or decree of the Court that interferes with the power of the Commonwealth to exercise its political and governmental powers or any of its property or revenues. PROMESA § 305.

### IV. The Renewed Motion Is Premature at Best

31. As the Court recognized at the November 15 hearing, "the 2004 [motion] is premature at this point. The independent investigator should be given the opportunity to conduct this investigation, and it's not a joint investigation. It's their investigation at this point, though with input from the UCC." Renewed Motion, Ex. C, 72:21-73:4. The Court's statement is even more compelling with respect to the Renewed Motion.

32. As outlined above, rather than take advantage of its extensive participation and visibility rights per the terms of the Cooperation Agreement it negotiated, the UCC has renewed its request for a full-blown discovery program unaltered from what it requested ten months ago. Even at that stage, the requests were vastly overboard and unduly burdensome,[10] and would

---

[9] It is well settled that causes of action are property of a debtor's estate and the trustee has exclusive standing to assert such claims. *See Matter of Educators Grp. Health Tr.,* 25 F.3d 1281, 1284 (5th Cir. 1994) (citing *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1153-54 (5th Cir.1987)).

[10] Illustrative examples of the overbreadth of the Committee's discovery program include:

- Eleven years of *all* communications between (i) GDB and the Santander Entities and (ii) GDB and the Popular Entities. *See* Motion Ex. H, Request No. 14.

16

likely necessitate the incurrence of millions of dollars of unnecessary professional fees while diverting the resources of the Commonwealth and its instrumentalities at a critical time. Such requests are especially inappropriate now that the Independent Investigator has itself obtained volumes of discovery materials and made significant materials available to the UCC.

33. With the Final Report forthcoming, it is inefficient and unreasonable for the UCC to seek authorization to commence a duplicative examination from step one. The UCC already expressed a willingness to wait until after the Final Report is released to commence its discovery (assuming the Court authorizes it). What it should do is wait until the release of the Final Report and reassess *at that time* whether additional discovery is necessary. Until that time, if the UCC has concerns about the investigation or Final Report, it should work with the Independent Investigator within the investigatory framework that has been established and the Cooperation Agreement it spent months finalizing,to address them.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that the Court deny the Renewed Motion.

Dated: May 22, 2018  
      San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock  
Paul V. Possinger  
Ehud Barak  
Timothy W. Mungovan

---

- "All Documents or Communications concerning the risks of the purchase, sale, or holding of Commonwealth Municipal Bonds or Puerto Rico Bond Funds, whether by the GDB or by any other person, entity or financial institution (including, without limitation, Santander or Banco Popular)." Motion Ex. H, Request No. 11.
- "All Documents or Communications concerning COFINA and the Commonwealth Constitutional Debt Limit." Motion Ex. H, Request No. 3.

17

Margaret A. Dale
Maja Zerjal
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors*