# EXHIBIT 4A

(P. de la C. 938)

# LEY

Para crear la "Ley de Cumplimiento con el Plan Fiscal", a los fines de tomar las medidas necesarias para atemperar el marco legal y jurídico existente para dar el más fiel cumplimiento al Plan Fiscal aprobado por la Junta de Supervisión Fiscal creada al amparo de la Ley Federal PROMESA; establecer un sistema uniforme de beneficios marginales, incluyendo el bono de navidad y aportación al plan médico, para todos los funcionarios y empleados públicos de las agencias, instrumentalidades y corporaciones públicas del Gobierno de Puerto Rico, con excepción de la Universidad de Puerto Rico; enmendar la Sección 4.3 inciso 2 (a) (e) (m) del Artículo 4, la Sección 5.2 del Artículo 5, la Sección 6.4 inciso 1 (d) y 4 (1) , 6.8 inciso 2 (b) y 6.9 del Artículo 6, la Sección 7.2 inciso 3 y 5 del Artículo 7, se añade un nuevo Artículo  2.11(a) a los fines de enmendar el Artículo 3 de la Ley 125 de 10 de junio de 1967, según enmendada, suspender la vigencia del Artículo 9 y Sección 10.2 de la Ley 8–2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico"; reenumerar los actuales Artículos 10 al 20 como Artículos 9 al 19; derogar la Ley 89-2016, conocida como "Ley de Empleo Temporal en el Servicio Público"; enmendar los Artículos 3, 6 y 7 de la Ley 253-1995, según enmendada, conocida como la "Ley de Seguro de Responsabilidad Obligatorio para Vehículos de Motor"; a los fines de ampliar la cubierta del seguro de responsabilidad obligatorio de cuatro mil dólares ($4,000) a cuatro mil quinientos dólares ($4,500); facultar para la revisión de las primas antes del 30 de junio de 2017; permitir la declaración de un dividendo extraordinario a los miembros de la Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio, así como la aplicación de una contribución incentivada a dicho dividendo; disponer la distribución de los ingresos obtenidos a través de la contribución incentivada y el ajuste en la prima para que entre al Fondo General; autorizar al Gobierno a utilizar sobrantes de las corporaciones públicas como "fondos disponibles" para contribuir al Fondo General; autorizar a un Comité compuesto por los directivos de la Autoridad de Asesoría Financiera y Agencia Fiscal, la Oficina de Gerencia y Presupuesto y el Departamento de Hacienda a modificar las tarifas de las corporaciones públicas para cumplir con las métricas del Plan Fiscal; establecer las normas y principios que deben regir el proceso de venta de propiedades inmuebles del Gobierno de Puerto Rico; crear el Comité de Evaluación y Disposición de Propiedades Inmuebles; para declarar la política pública relacionada a la venta de propiedades inmuebles; enmendar los Artículos 3, 7 y 8 de la Ley Núm. 230 de 23 de julio de 1974, según enmendada y conocida como "Ley de Contabilidad del Gobierno de Puerto Rico"; a los fines de establecer que las asignaciones y los fondos sin año económico determinado, que hayan permanecido en los libros sin movimiento de desembolso u obligación por un (1) año se considerarán como que han cumplido

2

sus propósitos, por lo que se cerrarán e ingresarán al Fondo General; disponer que aquellos fondos especiales creados por Ley para fines específicos se acreditarán al Fondo General del Tesoro Estatal y se depositarán en la cuenta bancaria corriente del Secretario de Hacienda para que éste tenga pleno dominio de los mismos; enmendar los Artículos 2 y 6 de la Ley 129-2005, según enmendada, conocida como "Ley de Reservas en las Compras del Gobierno del Estado Libre Asociado de Puerto Rico"; a fin de disponer que el aumento escalonado en la partida asignada a compras del presupuesto general para ser otorgado a microempresas, pequeñas y medianas empresas se dará si la situación fiscal del Gobierno así lo permite; añadir una nueva Sección 3020.05A y Sección 3020.15, y enmendar la Sección 3020.05, Sección 3020.13, Sección 3020.14, Sección 3030.14, Sección 3030.18, Sección 3050.01, Sección 6042.08 y Sección 6042.15 de la Ley 1-2011, según enmendada, mejor conocida como "Código de Rentas Internas para un Nuevo Puerto Rico", a los fines de modificar el arbitrio aplicable a cigarrillos y productos derivados del tabaco para obtener mayor liquidez, atajar la crisis económica y fiscal que enfrenta Puerto Rico, y evitar que los sectores más vulnerables se afecten, así como para desalentar el uso de cigarrillos; enmendar el Artículo 2 de la Ley Núm. 91 de 21 de junio de 1966, según enmendada, para disponer que hasta el Año Fiscal 2020-2021 la aportación anual al Fondo de Emergencia será por la cantidad de diez millones de dólares ($10,000,000) y que a partir del Año Fiscal 2020-2021, dicha aportación será no menor de cero punto cinco por ciento (0.5%) del estimado de rentas netas sometido por el Departamento de Hacienda para la preparación del Presupuesto Recomendado con cargo al Fondo General; y para otros fines relacionados.

EXPOSICIÓN DE MOTIVOS

Introducción

Al presente, Puerto Rico atraviesa una crisis fiscal y social monumental sin precedentes históricos. Dicha crisis fue causada, en parte, porque faltaron controles sobre el gasto, medidas de desarrollo sustentable y sistemas de información gerencial que promuevan claridad y transparencia en la gestión gubernamental.

Según datos provistos por el Departamento del Tesoro Federal, Puerto Rico sufre una contracción económica cumulativa de 14.6% en el Producto Estatal Bruto (PEB real) con una predicción de una contracción adicional de 3% para los próximos dos años. Por años, el Gobierno de Puerto Rico ha operado con un déficit estructural el cual ha sido financiado con emisiones de bonos y préstamos al Banco Gubernamental de Fomento. Hace más de un año que el Gobierno de Puerto Rico carece de liquidez y se utilizaron los reintegros, pagos de los contratistas, el dinero de los pensionados y préstamos intragubernamentales para sustituir las fuentes de liquidez y gastar más dinero que los fondos disponibles. El Banco Gubernamental de Fomento incumplió sus obligaciones con los bonistas desde el 1 de mayo de 2016 y ya no cumple su rol de proveer liquidez ni tampoco

3

contamos con acceso al mercado debido a las políticas de la administración pasada que le restó credibilidad al Gobierno de Puerto Rico. Los sistemas de retiro están insolventes.

Como un ejemplo de las políticas que nos trajeron aquí, puede observarse que desde el 2001 al 2008 ocurrió un aumento de 64% en los gastos de nómina y, luego de una reducción de 33% entre 2009 y 2012, hubo otro aumento sustancial en el cuatrienio 2013-2016. Para financiar ese gasto desmedido, entre 2000 y 2008 la deuda pública aumentó en 134%. Por otro lado, el cuatrienio pasado se implementaron medidas bajo la filosofía de "primero impago, luego impuestos y después recortes". Esta filosofía propició la continuación del gasto desmedido y el rechazo a políticas públicas que hubiesen permitido manejar eficientemente los asuntos fiscales del Gobierno de Puerto Rico. Esto, sin haberse concretado las acciones necesarias para lograr una mayor eficiencia operacional en el Gobierno, ni recortes al excesivo gasto gubernamental. Además, mientras se precipitaban los valores y la debacle económica, el Gobierno Central fue incapaz de generar la información financiera necesaria para comprender la profundidad del problema y presentar información certera ante el Congreso, y ante otras entidades con interés en el asunto. A raíz de todo lo antes expuesto, se materializaron varias degradaciones de las clasificaciones de la deuda del Gobierno de Puerto Rico y se ha desencadenado un impacto adverso a través de todos los sectores de la economía.

Esta crisis ha golpeado muy fuerte a las familias puertorriqueñas. Los sacrificios más severos han recaído sobre los más vulnerables en nuestra sociedad y ha provocado que miles de puertorriqueños abandonen la Isla buscando mejores oportunidades. La consecuente reducción poblacional se convierte en uno de los retos para encaminarnos hacia la recuperación.

<u>La Situación Colonial en Puerto Rico</u>

La situación colonial ha afectado nuestra capacidad para afrontar y resolver esta crisis pues carecemos de los poderes soberanos que tiene un estado para regular sus asuntos locales bajo la Enmienda X de la Constitución de los Estados Unidos. "[P]ara el Tribunal Supremo federal, la adopción de la Constitución no representó un cambio en la base fundamental de las relaciones constitucionales entre Puerto Rico y Estados Unidos. El Tribunal Supremo siguió tratando a Puerto Rico como un ente político sujeto a la cláusula territorial de la Constitución federal." Véase <u>Pueblo v. Sánchez Valle y otros</u>, 192 D.P.R. 594, 631 (2015). "[N]unca hubo una cesión de soberanía, lo que hubo fue una delegación de poderes." *Id.* a la pág. 635. "Esa delegación de poder no constituye una renuncia irrevocable ni una terminación del poder del Congreso. El Pueblo de Estados Unidos le otorgó al Congreso, por medio de la Constitución, un poder amplio para administrar los territorios. Por esa razón, el Congreso no puede renunciar de manera irrevocable a un poder que le fue conferido por el Pueblo de Estados Unidos". *Id.* a la pág. 638.

4

Así pues, "el Congreso puede permitir que el Estado Libre Asociado permanezca como sistema político de forma indefinida, o por el contrario, tiene la autoridad constitucional para enmendar o revocar los poderes de administración interna que ejerce el Gobierno de Puerto Rico. Dicho de otro modo, el sistema de gobierno que rige internamente en Puerto Rico está sujeto por completo a la voluntad política y la autoridad legal del Congreso." *Id.* a la pág. 641.

La triste realidad es que la situación colonial nos coloca en un estado de indefensión tal que ni la ciudadanía americana que hemos atesorado desde 1917 está garantizada. El Congreso tiene la discreción legislativa para conceder privilegios a los ciudadanos nacidos en los territorios, incluyendo la ciudadanía americana, pero ese derecho puede ser revocado en cualquier momento. De hecho, el Gobierno Federal ha sostenido ante los tribunales que en los territorios no existe un derecho a la ciudadanía sino que se trata, más bien, de una gracia legislativa del Congreso. Véase, *por ejemplo*, Tuaua v. United States, 788 F.3d 300, (D.C. Cir. 2015).

En cuanto al asunto particular que nos ocupa, como ejemplo de las limitaciones que la situación colonial nos impone, tenemos que señalar que los estados pueden obtener las protecciones de la Ley federal de quiebras pero Puerto Rico fue excluido de dichas protecciones y, por no tener representación plena en el Congreso, es poco o nada lo que podemos hacer al respecto. Tampoco podemos legislar una quiebra local pues la misma ley federal que no nos protege ocupa el campo y previene la legislación local. *Véase* Puerto Rico v. Franklin Cal. Tax-Free Tr., 136 S. Ct. 1938 (2016) (declarando inconstitucional la "Ley para el Cumplimiento con las Deudas y para la Recuperación de las Corporaciones Públicas de Puerto Rico", Ley 71-2014, mejor conocida como la "Ley de Quiebra Criolla").

<u>El resultado directo de nuestra situación colonial: PROMESA</u>

Las políticas del pasado, junto a nuestra indefensión colonial, llevaron al Congreso de los Estados Unidos a promulgar la ley denominada *Puerto Rico Oversight, Management, and Economic Stability Act*, conocida como PROMESA (por sus siglas en inglés), Pub. L. 114-187, y delegó amplísimos poderes en una Junta de Supervisión Fiscal (en adelante "Junta de Supervisión"). Nuevamente, por no tener representación plena en el Congreso, dicha Ley se aprobó sin una verdadera participación de nuestro Pueblo. Conforme a PROMESA, las continuas acciones de planificación fiscal, las acciones presupuestarias, legislativas y ejecutivas de Puerto Rico, así como las reestructuraciones de deuda, consensuales o no, y la emisión, garantía, intercambio, modificación, recompra o redención de deuda están sujetas a supervisión.

En su Sección 4 PROMESA dispone claramente que sus disposiciones "prevalecerán sobre cualquier disposición específica o general de las leyes territoriales, estatales o reglamentos territoriales o estatales que sea incompatible con esta Ley." De

5

esta manera, el Congreso de forma expresa hizo manifiesta su intención de que dicha Ley desplazaría cualquier legislación estatal que choque con PROMESA. Esto queda igualmente reconocido en la Sección 8 (2) que establece que el Gobierno de Puerto Rico no puede adoptar, implementar o hacer cumplir cualquier estatuto, resolución, política o regla que pueda menoscabar o anular los propósitos de PROMESA, según lo determine la Junta de Supervisión. Así pues, estamos imposibilitados de promulgar legislación que deje sin efecto a PROMESA o que menoscabe sus disposiciones y su alcance.

En esta coyuntura, precisa resaltar que bajo la décima enmienda, el Gobierno Federal, no puede imponerle a un estado lo que la ley federal PROMESA permite para los territorios. El Congreso le impuso una Junta a Washington DC que no es estado y que está bajo la jurisdicción directa del Congreso. La Junta de la ciudad de New York fue una creación de su propia legislatura estatal y no del Congreso. Detroit, que es una ciudad y no un estado, participó de un proceso voluntario de quiebra. En fin, no puede perderse de vista que la situación que atravesamos y la imposición de la Junta de Supervisión es otra de las consecuencias del colonialismo que ha limitado nuestro desarrollo por los pasados 119 años.

Lamentablemente, nuestra situación colonial y consustancial carencia de poderes políticos, exacerba la realidad de que nos han impuesto una Ley Federal en el Congreso que es suprema a toda legislación local, incluso nuestra Constitución, sin que tuviéramos la oportunidad de votar sobre la misma ni votar por el Presidente que la aprobó. Esto pone de manifiesto que para poder salir del atolladero económico en el que nos encontramos es imprescindible solucionar el problema del estatus político. Sin embargo, también es un hecho irrefutable que tenemos que trabajar dentro de los parámetros de PROMESA para iniciar la recuperación económica y fiscal de Puerto Rico.

El 30 de octubre de 2016, la Junta de Supervisión designó al Gobierno de Puerto Rico, al Sistema de Retiro de los Empleados del Gobierno, al Sistema de Retiro de la Judicatura, al Sistema de Retiro para Maestros, a la Universidad de Puerto Rico y 21 corporaciones públicas de Puerto Rico como "entidades cubiertas" sujetas a supervisión fiscal a tenor con PROMESA. La Sección 405(b) de PROMESA impone además una paralización temporera de los litigios y las reclamaciones contra Puerto Rico y sus instrumentalidades sobre distintos asuntos, con la esperanza de que el Gobierno de Puerto Rico, a nombre propio y a nombre de sus instrumentalidades, entable negociaciones voluntarias con sus acreedores para reorganizar y transigir el repago de sus obligaciones de deuda y simultáneamente emprenda una reestructuración responsable del Gobierno de Puerto Rico y sus instrumentalidades que reajuste los servicios esenciales requeridos para la salud, seguridad y bienestar de los residentes de Puerto Rico con el repago puntual de sus obligaciones de deuda.

Luego de invertir millones de dólares en consultores especializados, la pasada administración presentó un plan fiscal deficiente que fue rechazado por la Junta de

Case:17-03283-LTS   Doc#:3126-4   Filed:05/23/18   Entered:05/23/18 11:45:37   Desc:
Exhibit Law 26 of 2017 (4A Spanish 4B English)   Page 7 of 200

6

Supervisión de forma inmediata pues no resolvía los problemas fiscales provocados por la pasada administración.

Esta Ley, dividida en Capítulos, dispone diferentes medidas que esta Administración está tomando para cumplir con el Plan Fiscal impuesto conforme a las disposiciones de PROMESA. Los asuntos atendidos en esta Ley son germanos entre sí, toda vez que todos van dirigidos a dar cumplimiento al Plan Fiscal.

La Sección 17 del Artículo III de la Constitución de Puerto Rico, dispone en lo pertinente que "[n]o se aprobará ningún proyecto de ley ...que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula. Dicha citada sección establece la regla de un solo asunto que exige que toda ley aprobada por la Legislatura regule un solo asunto o materia. Sobre este particular el Tribunal Supremo de Puerto Rico ha señalado que dicha disposición "no requiere que el título constituya un índice detallado del contenido de la ley, sino meramente que sea un hito indicador del asunto cubierto por la misma." Herrero v. Emmanuelli, 179 D.P.R. 277, 295 (2010); Rodríguez v. Corte, 60 D.P.R. 919, 922 (1942).

Además, la jurisprudencia ha sido consistente al establecer que sólo ante un caso claro y terminante se justifica anular una ley por violar dicha disposición constitucional. Dorante v. Wrangler of P.R., 145 D.P.R. 408, 429-431 (1998) y casos allí citados. Nuestro máximo foro judicial ha "adoptado una postura comprensiblemente laxa para no maniatar al legislador". Herrero v. Emmanuelli, supra. Véase también J.J. Álvarez González, Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos, Bogotá, Editorial Temis S.A., 2009, pág. 244. En ese sentido, el Tribunal Supremo ha acotado que "una interpretación estricta de la disposición constitucional podría impedir y obstaculizar el proceso legislativo, pues obligaría al legislador a aprobar múltiples leyes para regular un sólo asunto o materia general." Herrero v. Emmanuelli, supra. (Énfasis nuestro.) Véase además M.H. Ruud, No Law Shall Embrace More Than One Subject, 42 Minn. L. Rev. 389, 393-394 (1958). Es decir, "el requerimiento no está diseñado como subterfugio para destruir legislación válida, sino como garantía de que el proceso legislativo se realice de forma transparente, de manera que cada proyecto de ley se discuta y se analice a cabalidad antes de ser aprobado." Herrero v. Emmanuelli, supra, págs. 295-296.

Por lo tanto, al examinarse la validez de una ley a la luz de la regla de un sólo asunto, es necesario auscultar todas sus disposiciones para determinar si éstas se relacionan entre sí y son afines con el asunto que se expresa en su título. Id. Lo que comprende "un solo asunto" se interpreta liberalmente, sin dejar de lado el propósito y objetivo de la exigencia constitucional. En ese tenor, "un estatuto puede comprender todas las materias afines al asunto principal y todos los medios que puedan ser justamente considerados como accesorios y necesarios o apropiados para llevar a cabo

7

los fines que están propiamente comprendidos dentro del asunto general". Id. Véase además R.E. Bernier & J.A. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, Segunda Edición, San Juan, Publicaciones JTS, 1987, pág. 81.

Esta Ley persigue un solo asunto: dar fiel cumplimiento al Plan Fiscal certificado por la Junta. Por tal razón, promulgamos esta Ley, que atiende varios temas dirigidos a cumplir con el Plan Fiscal.

<u>Un Nuevo Gobierno: Responsabilidad ante la Junta de Supervisión</u>

Como resultado de todo lo anterior, cuando asumimos las riendas del Gobierno, nos encontramos con un déficit en caja de más de $7,600 millones según certificado por el Tesoro Federal y la Junta de Supervisión. Se trataba de un gobierno sin acceso a los mercados de capital, con un crédito de categoría chatarra, sin liquidez, sin transparencia en las finanzas públicas, con un gasto gubernamental inflado y con deudas de miles de millones de dólares. Además, el Gobernador enfrentaba la titánica tarea de recuperar la credibilidad ante el mercado y ante la Junta de Supervisión. Debemos garantizar un Gobierno donde los gastos respondan a la realidad de los ingresos.

Desde el 2 de enero hemos estado implementando un plan concertado para controlar el gasto gubernamental, reactivar nuestra economía y facilitar las condiciones para la creación de más y mejores empleos en el sector privado. Estamos demostrándole al mundo que Puerto Rico está abierto para hacer negocios en un ambiente de seguridad y estabilidad gubernamental.

Las medidas presentadas por el Gobernador y aprobadas por esta Asamblea Legislativa durante estos primeros tres (3) meses de mandato han cambiado el rumbo de Puerto Rico a uno de responsabilidad fiscal.

El pasado 28 de febrero de 2017, el Gobernador presentó un Plan Fiscal completo, abarcador, real y, a la misma vez, sensible a las necesidades de nuestro Pueblo y de los más vulnerables. Luego de semanas de incertidumbre, la razón y la sensatez prevalecieron. El 13 de marzo de 2017, la Junta de Supervisión aceptó y certificó nuestro Plan Fiscal acompañado de una serie de contingencias que garantizan que no habrá despidos de empleados públicos, sin afectar la jornada laboral, manteniendo el acceso a servicios de salud a nuestro Pueblo y protegiendo las pensiones de los más vulnerables. Este Plan Fiscal es la única alternativa para evitar el despido de empleados públicos, la eliminación del derecho a la salud y mantener la solvencia de nuestros sistemas de retiro manteniendo un gobierno operacional y que cumpla con los parámetros para evitar medidas más severas que son parte de las contingencias del Plan aprobadas por la Junta de Supervisión Fiscal como la eliminación total del bono de navidad a todos los empleados públicos y decretar una reducción de jornada laboral que haría inoperante al Gobierno.

8

Las medidas del Plan Fiscal aprobadas están enmarcadas en cumplir con los objetivos fiscales; pero también en promover el desarrollo económico, en nuestra capacidad de restablecer la credibilidad; en que el cambio se traduzca no tan solo en un mero recorte, si no en un beneficio a largo plazo, y, sobre todo, en velar que los sectores más vulnerables y los que trabajan duro, día a día, tengan una mejor calidad de vida.

La validación del Plan Fiscal representa un reconocimiento a la credibilidad del nuevo Gobierno. Demostramos que pasamos de los tiempos de la incoherencia e improvisación, a los tiempos de trabajar en equipo, y tener resultados por el bien de Puerto Rico. Pasamos del "me vale" y la falta de credibilidad; a tener un Plan Fiscal y de desarrollo socioeconómico que cumple con el objetivo de reducción de gasto, pero más importante que ello, que nos permita edificar una mejor sociedad.

Los cambios que estamos encaminando no serán fáciles y tomarán tiempo, pero también tendrán sus resultados en los primeros dos años. Bajo el Plan Fiscal certificado, lograremos balancear los ingresos con los egresos para el Año Fiscal 2019. Ahora nos compete ejecutar. Las contingencias que acompañan al Plan Fiscal le requieren al Gobierno cumplir. Debemos asegurar que tengamos el dinero líquido para no afectar el salario de los empleados públicos, la salud del Pueblo y los ingresos de los pensionados.

Esta Ley, se promulga para atemperar el marco legal y jurídico para poder cumplir con las exigencias que nos hiciera la Junta de Supervisión en el Plan Fiscal aprobado en virtud de la Ley Federal PROMESA. En atención a lo anterior, en virtud del poder de razón de Estado y de conformidad con el Artículo II, Secciones 18-19, y el Artículo VI, Secciones 7-8, de la Constitución de Puerto Rico, ante la existencia de una situación de urgencia económica y fiscal grave en Puerto Rico se hace necesaria la aprobación de la presente Ley para que el Estado pueda contar con la liquidez suficiente para poder pagar la nómina de los empleados públicos y sufragar los servicios esenciales que ofrece a sus ciudadanos. Ejercemos este poder de razón de Estado para tomar las medidas necesarias para dar cumplimiento al Plan Fiscal y colocar a Puerto Rico en el camino de la recuperación económica. Cumplir con este Plan constituye un interés apremiante del Estado para mantener sus operaciones y proteger a los más vulnerables.

Según definido por el Tribunal Supremo de Puerto Rico, el poder de razón de Estado es "aquel poder inherente al Estado que es utilizado por la Legislatura para prohibir o reglamentar ciertas actividades con el propósito de fomentar o proteger la paz pública, moral, salud y bienestar general de la comunidad, el cual puede delegarse a los municipios". Domínguez Castro v. E.L.A., 178, D.P.R. 1, 36 (2010).

Nuestro más Alto Foro recientemente dispuso que eran válidas las medidas tomadas para atender una emergencia que sean necesarias y razonables para adelantar el interés gubernamental importante. Véase, Trinidad v. E.L.A., 188 D.P.R. 828 (2013) y Domínguez Castro v. E.L.A., supra, págs. 88-89. De igual forma, el Tribunal Supremo

9

reconoció "la precariedad de la economía como una realidad que necesariamente pesa
en la definición del ámbito de la acción gubernamental bajo el poder de razón de Estado"
y que en el ejercicio de dicho poder, "la Legislatura goza de amplia facultad para aprobar
reglamentación económica dirigida a promover el bienestar de la comunidad".
Domínguez Castro v. E.L.A., supra, pág. 37. Por voz del Juez Asociado, señor Kolthoff
Caraballo, el Tribunal llamó la atención a que tanto nuestra jurisdicción como el resto del
mundo "vive momentos muy convulsos en el aspecto económico y financiero. Parecería
que las economías de los países del mundo se encuentran entrelazadas y atadas al rabo
de una chiringa que no consigue finalmente elevarse." Domínguez Castro et al. v. E.L.A.
I, 178 D.P.R. 1, 415 (2010) certiorari denegado, Domínguez Castro v. Puerto Rico, 131 S.Ct.
152 (2010). De ese modo, este Tribunal reconoció que debía ser consciente que existía una
realidad que describió como "dura y antipática". Confrontado con tal escenario histórico,
este Tribunal estimó que resultaba necesario aspirar a un interés altruista en el que se
persiguió el "bienestar económico colectivo, a expensas del bienestar individual."
Además, este Tribunal reiteró el reconocimiento en torno a una crisis económica en
nuestra jurisdicción en el caso Herrero y otros v. E.L.A., 179 D.P.R. 277 (2010) y destacó,
en el contexto de la provisión de un remedio que implicaba desembolso de fondos
públicos a fin de restituir dinero a contribuyentes, que no estaba "ajeno al difícil estado
de las finanzas públicas en nuestro país". Id. a la pág. 309.

El Tribunal Supremo validó la Ley 3-2013 sobre el Sistema de Retiro de los
Empleados Públicos en el caso Trinidad Hernández v. E.L.A., supra, entendiendo que la
Legislatura había ejercido el poder de razón de Estado para detener la insolvencia del
Sistema de Retiro de Empleados Públicos. El Tribunal Supremo razonó que "de la
exposición de motivos... se desprende que las medidas adoptadas son necesarias y
razonables para atender de forma adecuada la crisis financiera que atenta contra la
solvencia actuarial de este sistema". Añadió que, "ello ciertamente constituye un interés
público importante pues, al garantizar la solvencia económica del sistema, se beneficia a
todos sus participantes y se atiende, en parte, la crisis fiscal que enfrenta el País en
protección del bienestar de todos los puertorriqueños". Trinidad Hernández v. E.L.A.,
supra, pág. 837. Concluyó que la norma es constitucional "porque, a pesar de que existe
un menoscabo sustancial de las obligaciones contractuales en controversia, las medidas
implantadas son razonables y necesarias para salvaguardar la solvencia actuarial del
Sistema de Retiro, y no existen medidas menos onerosas para lograr ese fin". Íd., pág.
839.

Del mismo modo, recientemente, en el caso Asociación de Maestros de Puerto Rico
v. Sistema de Retiro de Maestros de Puerto Rico, 190 D.P.R. 854 (2014), el Tribunal
Supremo pasó juicio sobre las medidas aprobadas mediante la Ley 160-2013 para
solventar la crisis del Sistema de Retiro de Maestros y determinó que la ley no adelantaba
el interés estatal importante requerido por nuestro ordenamiento constitucional en casos
de reformas de sistemas de retiro: garantizar la solvencia del mismo sistema. Por ello,
resolvió que la Ley 160–2013, en lo que respecta al menoscabo de obligaciones

10

contractuales, es irrazonable y, por lo tanto, inconstitucional. Íd., pág. 12. En esa ocasión, el Tribunal fue enfático al destacar que las medidas aprobadas serán constitucionales si son razonables y necesarias "para adelantar su solvencia actuarial y no existen medidas menos onerosas para lograr ese fin". Íd., pág. 8.

Usando como base el marco legal antes discutido, esta Asamblea Legislativa entiende que las medidas que se toman en esta Ley, son necesarias y razonables para atender de forma adecuada la crisis fiscal, económica y presupuestaria por la que atraviesa Puerto Rico. Así mismo, se trata de unas medidas exigidas para lograr implementar el Plan Fiscal certificado por la Junta de Supervisión de conformidad con la Ley federal PROMESA. Dicho Plan establece ajustes de índole fiscal para estabilizar las finanzas del Gobierno en tiempos que no existe acceso al mercado financiero. De no implementar estas medidas, el bienestar social y económico de Puerto Rico sufrirá daños irreparables por lo que implementar el Plan Fiscal constituye un interés apremiante del Estado para velar por el bienestar del interés público.

## Reestructuración Gubernamental

Por otro lado, el Plan para Puerto Rico que impulsa esta Administración y que fue refrendado por el pueblo de Puerto Rico en las pasadas elecciones generales por medio del ejercicio democrático del voto, propone implementar una nueva estructura de gobierno que baje significativamente el gasto público y mejore sustancialmente sus funciones. Para lograr esto, se requiere la evaluación concienzuda de los servicios que provee el gobierno, a fin de determinar cuáles pueden ser consolidados, delegados al sector privado o eliminados porque ya no son necesarios. Todo ello, sin que conlleve despidos de empleados públicos, sino la movilización de los mismos acorde con la necesidad de servicios de nuestros ciudadanos.

Cónsono con lo anterior y, como parte de las primeras medidas tomadas por esta Administración para atajar la crisis fiscal mediante la reingeniería de la estructura gubernamental, se aprobó la Ley 8-2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico". Esta Ley, convierte al Gobierno en un Empleador Único para que los funcionarios públicos pasen a ser empleados del Gobierno y no de sus diferentes entidades, permitiendo así la mejor utilización de los recursos humanos donde exista una necesidad apremiante mediante el mecanismo de movilidad, sin que el empleado tenga que renunciar al puesto que ocupa y comenzar de nuevo en otra instrumentalidad gubernamental. Mediante la movilidad, se pretende reforzar el entendimiento de lo que significa el equilibrio entre la fuerza laboral y la prestación de servicios públicos. De esta manera, obtenemos una distribución eficiente del recurso humano del Gobierno y creamos una estructura gubernamental ágil, basada en la evaluación continua de necesidades y ayudando a los servidores públicos a realizar los ajustes y adaptaciones requeridas por la actual crisis fiscal y los retos futuros.

11

Durante el pasado cuatrienio, se aprobó la Ley 89-2016, conocida como la "Ley de Empleo Temporal en el Servicio Público", bajo el supuesto de corregir la disparidad en el trato de los empleados con carácter temporal en el servicio público y forzar a las agencias a ser diligentes en la creación o solicitud de creación de puestos. También, se promulgó la misma bajo el razonamiento de que clasificar correctamente a los empleados ayudaría en la administración de los recursos humanos del servicio público y evitará la erogación de fondos innecesarios. Asimismo, mediante dicha Ley, se le concedió estatus de empleado regular a aquellos empleados transitorios que llevaban dos (2) años o más realizando funciones de necesidad permanente, sujeto a ciertos requisitos de elegibilidad.

No obstante, dicha Ley ha tenido el efecto de acrecentar la nómina gubernamental en momentos donde las finanzas públicas atraviesan una crisis fiscal sin precedentes. El reclutamiento de empleados temporales, fueran estos catalogados como: irregulares, transitorios o por contrato, no debe utilizarse como subterfugio para la posterior creación de puestos regulares de necesidad permanente sobrecargando así los fondos del Estado y sin medir la efectividad de esos recursos en la prestación de los servicios que merece el Pueblo.

Por lo cual, encaminar a Puerto Rico hacia la ruta correcta requiere un cambio de paradigma, como el que propone esta Administración a través del Modelo para la Transformación Socioeconómica de Puerto Rico, expuesto en el Plan para Puerto Rico. La misión es establecer un nuevo gobierno que facilite el desarrollo económico y cuya visión sea la de un gobierno basado en un modelo científico, donde la evidencia y los resultados importen y la colaboración ciudadana sea el eje principal de su validación. Para lograr esta meta el gobierno debe convertirse en un facilitador del desarrollo económico, implementando reformas reales y contundentes; la estructura gubernamental debe ser costo-efectiva, eficiente y transparente y; el servicio público debe estar fundamentado en la integridad, excelencia, responsabilidad y rendición de cuentas.

Equidad en Beneficios Marginales para Todos los Empleados Públicos

De otra parte, como hemos indicado y es de todos conocidos, nuestra Isla atraviesa por una severa crisis fiscal y los recursos son limitados para atender todos los compromisos del gobierno.  En medio de una situación novel como lo es la imposición de una Junta de Supervisión Fiscal y ante el impago de las deudas contraídas, el Gobierno de Puerto Rico se encuentra forzado a reestructurar todo el componente gubernamental y dirigir los recursos a aquellas áreas que más lo ameriten.

Puerto Rico enfrenta un momento histórico en el que necesita la colaboración de todos los sectores en la adopción de soluciones inmediatas que contribuyan en su restauración económica. La presente Ley atiende de manera responsable y justa la ausencia de uniformidad entre nuestros empleados públicos en cuanto a los beneficios marginales de los que podrán disfrutar durante este periodo crítico de la economía local.

12

No existe justificación alguna para mantener, durante estos próximos años previos a la recuperación fiscal, una brecha tan profunda entre los beneficios marginales que disfrutan los empleados públicos de algunas agencias del gobierno y los que disfrutan los empleados públicos de las corporaciones públicas. En algunas corporaciones públicas sus empleados se benefician del doble y del triple de los beneficios que ostentan los empleados del gobierno central sin que ello responda a la realidad económica que vive Puerto Rico. Peor aún, al así actuar se crea una desigualdad entre los empleados públicos beneficiando a unos pocos al costo de otros muchos. Además, los costos de estas medidas dispares hacen insostenible su cumplimiento en este periodo y el mantenimiento de los empleos públicos. Por ello, esta Legislatura entiende prudente tomar acciones que conlleven ahorros y nos permitan mantener a todos los empleados públicos sin despidos.

Para que tengamos una idea de los gastos que se generan en las Corporaciones Públicas por el pago de todos los beneficios marginales, incluyendo el bono de navidad y aportaciones de salud, el presupuesto recomendado para el Año Fiscal 2017 presentado ante la Junta de Supervisión establece que estas partidas tendrían un gasto presupuestado ascendente a $171.877 millones de dólares, esto sin contar a la Universidad de Puerto Rico, la Autoridad de Energía Eléctrica de Puerto Rico y la Autoridad de Acueductos y Alcantarillados. En cuanto al pago de horas extras, se presupuestó la cantidad de $23.618 millones de dólares y en la liquidación de días por enfermedad y vacaciones la cantidad de $9.906 millones de dólares. El efecto de esto, es una disparidad entre los beneficios marginales que reciben los empleados del Gobierno Central vis a vis los empleados o funcionarios de las instrumentalidades o corporaciones públicas. En las Corporaciones Públicas se gasta en beneficios marginales un promedio de $10,840 por empleado, mientras que en el Gobierno Central se gasta en promedio $2,523 por empleado. Mientras no se recupere la economía local, no se puede justificar dicha disparidad.

De igual forma, según estadísticas provistas por el Banco Gubernamental de Fomento y la Junta de Planificación de Puerto Rico, en el Año Fiscal 2016, las corporaciones públicas fueron responsables de una deuda de $46,861.6 millones lo que representó 72.9% de la deuda pública total del Gobierno de Puerto Rico, la cual se estimó en $64,254 millones. Las corporaciones públicas han aumentado su participación en la deuda de un 68.9% en el Año Fiscal 2004 a un 72.9% en el Año Fiscal 2016. En términos absolutos, el aumento de la deuda pública total de las corporaciones públicas fue de $23,484 millones lo que, a su vez, representó un aumento de 100.5%. De esta forma, en el Año Fiscal 2016, la deuda de las corporaciones públicas se estimó en más del doble de lo que era en el año fiscal 2004.

La realidad que ha imperado por años en las corporaciones públicas es que las cláusulas económicas negociadas en algunos convenios colectivos sobrepasaron por mucho lo que por ley estaba establecido, comprometiendo de esta forma la estabilidad fiscal del gobierno y a su vez poniendo en riesgo los empleos de los servidores públicos al crear una inestabilidad fiscal insostenible en este momento crítico fiscal. Por ejemplo,

13

muchas corporaciones se comprometieron, aun sin contar los recursos para ello, al pago de horas extras a razón del doble y del triple del sueldo de sus empleados. De igual forma, muchas bajaron la cantidad de horas que debían ser acumuladas para poder recibir compensación económica y no de tiempo compensatorio.

En Puerto Rico, el derecho a compensación por horas extras de trabajo está contemplado en la Sección 16 del Artículo II, Carta de Derechos de la Constitución. Allí se expresa que:

> "Se reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella, a recibir igual paga por igual trabajo, a un salario mínimo razonable, a protección contra riesgos para su salud o integridad personal en su trabajo o empleo, y a una jornada ordinaria que no exceda de ocho horas de trabajo. Sólo podrá trabajarse en exceso de este límite diario, mediante compensación extraordinaria que nunca será menor de una vez y media el tipo de salario ordinario, según disponga por ley."

Mediante la presente Ley derogamos la sección 10.2 de la Ley 8-2017, que establece el método de remuneración del trabajo en exceso que será aplicable a los empleados públicos, para integrarla en esta Ley y extender su aplicación a las corporaciones públicas. El método establecido para la remuneración del trabajo en exceso establecido en la presente ley establece que los empleados tendrán derecho a recibir el pago de horas extras a razón de tiempo y medio. De esta forma, se cumple cabalmente con lo establecido en nuestra Constitución y con la Ley Federal que rige el pago de horas extras.

Por otra parte, la Ley Federal de Normas Razonables del Trabajo (FLSA), 29 U.S.C.S. secs. 201-219, regula entre otros asuntos el pago de horas extras y aplica a los empleados públicos del Gobierno de Puerto Rico. Nuestro Tribunal Supremo ha resuelto que, en tanto y en cuanto una ley estatal sea más beneficiosa para el empleado que las disposiciones del FLSA, la ley federal no impide la aplicación de aquélla por no estar en conflicto. Los propósitos de ambas leyes son, en dichas circunstancias, perfectamente armonizables. Vega v. Yiyi Motos, Inc., 146 D.P.R. 373 (1998).

La FLSA, estableció que a los empleados se les paga a razón de tiempo y medio (1.5) de la tasa regular por el periodo trabajado en exceso de las cuarenta (40) horas semanales. La FLSA, asimismo, provee para que los empleados de una agencia pública reciban tiempo compensatorio a tiempo y medio (1.5) de la tasa regular en lugar del pago de horas extras.

La presente Ley tiene como parte de sus propósitos lograr que el gasto operacional de las corporaciones públicas se realice de manera eficiente, responsable y prudente, con la finalidad de reducir gastos de manera permanente. El Gobierno de Puerto Rico tiene un interés apremiante en controlar los gastos de nóminas para salvaguardar los empleos,

Case:17-03283-LTS   Doc#:3126-4   Filed:05/23/18   Entered:05/23/18 11:45:37   Desc:
Exhibit Law 26 of 2017 (4A Spanish 4B English)   Page 15 of 200

14

la viabilidad de las corporaciones públicas así como sus finanzas. La situación fiscal precaria del Gobierno, su Fondo General y sus Corporaciones Públicas obliga a establecer controles en el gasto en nómina en exceso a lo presupuestado para salvaguardar la viabilidad de las corporaciones públicas y a su vez la jornada laboral de los empleados públicos y el salario de los mismos.

De igual forma, a través de la presente Ley se establecen cuáles serán los beneficios marginales que disfrutarán todos los empleados públicos durante el periodo de crisis fiscal irrespectivamente de la agencia o corporación pública donde trabajen. De esta forma, se igualan los beneficios marginales que reciben los empleados públicos de las diferentes agencias del Gobierno y los que reciben los empleados públicos que trabajan en las diferentes corporaciones públicas, quienes dependiendo de la corporación en que estén, actualmente disfrutan diferentes beneficios marginales. Asimismo, los empleados públicos unionados en las diferentes agencias y corporaciones públicas, dependiendo del convenio colectivo, ostentan diferentes beneficios marginales aun estando en la misma agencia o corporación pública. No existe razón alguna que justifique mientras se mantenga de la crisis fiscal que vive Puerto Rico y ante la amenaza por parte de la Junta de Supervisión de eliminar el bono de navidad de todos los empleados públicos y reducirles la jornada laboral; perpetuar la desigualdad desproporcionada e irrazonable de beneficios marginales pactados en momentos en que la situación fiscal de Puerto Rico era otra y no se encontraba en una crisis de las proporciones que hoy tenemos.

Tal como indicamos anteriormente, en el pasado, nuestro ilustre Tribunal Supremo ha sostenido la validez de estatutos de naturaleza económica aprobados para lidiar con momentos de crisis o urgencia en Puerto Rico y ha reconocido "la posibilidad de que, en circunstancias de emergencia relacionadas con aspectos económicos, la Asamblea Legislativa puede hacer uso de sus amplios poderes". Domínguez Castro, supra, a la pág. 49 (2010) (citas omitidas). Recientemente, ese Honorable Tribunal también fue consciente de la crisis estructural del Sistema de Retiro de los Empleados Públicos y sostuvo la validez constitucional del estatuto que, para atender dicha crisis, enmendó la Ley de Retiro de los Empleados Públicos, Ley Núm. 3-2013. Véase Trinidad Hernández v. ELA, supra.

Por su parte, el Artículo II, Sección 7, de nuestra Constitución dispone que: "No se aprobarán leyes que menoscaben las obligaciones contractuales". Art. II, Sec. 7, Const. E.L.A., L.P.R.A. Tomo 1. Dicha cláusula no establece una prohibición absoluta que impida el poder de reglamentación del Estado en beneficio del interés público. Bayrón Toro, 119 D.P.R. a la pág. 619.

La garantía constitucional contra el menoscabo de obligaciones contractuales sólo se activa cuando la modificación afecta adversamente los términos o condiciones esenciales del contrato que principalmente dieron motivo a la celebración del mismo, de modo que se frustren las expectativas razonables de las partes. Domínguez Castro, supra.

15

Véase además Allied Structural Steel Co. v. Spannaus, 438 U.S. 234 (1978); El Paso v. Simmons, 379 U.S. 497 (1965). La razonabilidad de la ley se determina considerando principalmente la sustancialidad del interés público promovido por el estatuto y la magnitud del menoscabo causado por su aplicación retroactiva. Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 396 (1973). Si el menoscabo ocurre como consecuencia de una modificación razonable y necesaria para adelantar un interés público, el tribunal sostendrá su validez. Bayrón Toro, supra.

Aún si el menoscabo es sustancial, la prohibición constitucional no es absoluta. La misma tiene que acomodarse al poder de razón de estado. Bayrón Toro, supra. Al considerar la validez de estatutos bajo la cláusula de menoscabo, el criterio aplicable es de razonabilidad. Warner Lambert v. Tribunal Superior, supra. Por consiguiente, la función del tribunal consiste en establecer un balance razonable entre el interés social de promover el bien común y el interés, también social, de proteger las transacciones contractuales contra la aplicación arbitraria e irrazonable de las leyes. Id.

Una vez se determina que el menoscabo es sustancial, entonces procede auscultar si la modificación persigue adelantar un interés importante en beneficio del bienestar general. Si el menoscabo surge como consecuencia de una modificación razonable y necesaria dirigida a adelantar un interés público significativo y legítimo, se sostendrá la validez de la ley. Bayrón Toro, supra.

En Buffalo Teachers Union v Tobe, 464 F.3d 362, 365 (2do Cir. 2006), el Segundo Circuito expresó lo siguiente en torno al examen que debe realizar un foro adjudicativo al adentrarse a justipreciar una demanda en que se invoque la cláusula constitucional sobre el menoscabo de relaciones contractuales:

> When a state is sued for allegedly impairing the contractual obligations . . . the state will not be held liable for violating the Contracts Clause of the United States Constitution unless plaintiffs produce evidence that the state's self-interest rather than the general welfare of the public motivated the state's conduct. On this issue, plaintiffs have the burden of proof because the record of what and why the state has acted is laid out in committee hearings, public reports, and legislation, making what motivated the state not difficult to discern. (Subrayado nuestro).

Por otra parte, como corolario a la doctrina de separación de poderes, al evaluar la necesidad o razonabilidad de la medida para efectos de la cláusula sobre el menoscabo de obligaciones contractuales, el Tribunal Supremo de Puerto Rico ha establecido que, a pesar de que no procede dar completa deferencia al Legislador, "esto no significa que el foro judicial no deba dar alguna deferencia a la determinación de necesidad y razonabilidad que hizo el legislador en el ejercicio de su poder constitucional, especialmente cuando se trata de regulaciones socioeconómicas." Domínguez, supra.

16

Tampoco corresponde realizar una determinación "*de novo* sobre la existencia de otras alternativas para la solución del problema" *Id*, a la pág. 89. Recientemente, este Tribunal reiteró que se debe "dar deferencia a la determinación de la Asamblea Legislativa respecto a la necesidad y razonabilidad de la medida." Trinidad Hernández v. ELA, *supra*. Además, respecto a la razonabilidad de la medida "es norma establecida que no corresponde a los tribunales hacer una determinación *de novo* sobre la existencia de otras alternativas para solucionar el problema. La determinación de la Asamblea Legislativa en torno a las medidas aprobadas constituye un ejercicio de política pública que merece [...] deferencia en este sistema de separación de poderes." Trinidad Hernández v. ELA, *supra*.

Recordemos que, de entender que existe un menoscabo a una relación contractual, un tribunal debe analizar si la legislación en cuestión sirve un interés público legítimo. Home Bldg. & Loan Ass'n, *supra*, U.S. Trust, 431 U.S. at 25. Se ha definido el concepto de *legitimate public purpose* como uno cuyo fin sea remediar "an important general, social or economic problem rather than providing a benefit to special interests." Buffalo Teacher's Federation, *supra*. Nótese que se ha sostenido que la salud económica y financiera de un estado es un interés legítimo de importancia pública. Véase, Baltimore Teacher's Union v. City Council of Baltimore et al., 6 F.3d 1012, 1017 (4to Cir. 1993) (resolviendo que no violaba la cláusula de menoscabo contractual una legislación que redujo salarios para cuadrar las finanzas estatales); In re Subway-Surface Supervisors Ass'n v. New York City Transit Auth., 375 N.E.2d 384 (1978) (sosteniendo la validez constitucional de un estatuto que congeló los salarios municipales en vista de la emergencia fiscal que aquejaba el estado de Nueva York); Buffalo Teachers, *supra* (se sostuvo la congelación de salarios de maestros ante una crisis fiscal).

Ante esta situación, el Gobierno de Puerto Rico tuvo que comprometerse mediante el Plan Fiscal aprobado por la Junta de Supervisión con implementar ciertas medidas en aras de poder salvaguardar el trabajo de miles de puertorriqueños, que no se les reduzca la jornada laboral a nuestros empleados con la consecuencia de tener una reducción en su sueldo mensual de hasta un veinte (20%) por ciento y la eliminación total del bono de navidad. Entre las medidas que el Gobierno se comprometió a implementar se encuentra, como hemos indicado, el uniformar los beneficios marginales de todos los empleados públicos; uniformar el pago de horas extras de las Corporaciones Públicas al Gobierno Central, igualar los beneficios marginales de los empleados del Gobierno Central y los de las Corporaciones Públicas; eliminar la liquidación de los excesos de días acumulados por vacaciones y enfermedad; y equiparar específicamente la licencia de vacaciones de los empleados públicos a lo que actualmente tienen los empleados en el sector privado.

En aras de lograr la consecución de los objetivos de la presente Ley y hacerlo de la forma menos onerosa para nuestros empleados públicos, se establece que las disposiciones aplicables a licencias y beneficios marginales serán de duración temporera.

17

Se restituirán los mismos conforme sea certificado por los miembros del Comité de Cumplimiento con el Plan Fiscal.

Para poder cumplir con el Plan Fiscal certificado, mediante la presente Ley se derogan las disposiciones de beneficios marginales establecidas en la Ley 8-2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", y se incorporan en esta Ley, extendiendo su aplicación a los empleados de las Corporaciones Públicas. De esta forma, según anteriormente dispuesto se igualan los beneficios marginales y la remuneración del trabajo en exceso de la jornada regular que podrán disfrutar todos los empleados públicos, independiente de donde laboren. De igual forma, se reducen los días que se podrán acumular al mes por concepto de vacaciones y se equiparan a los que actualmente tienen los trabajadores en el sector privado, bajando la licencia de vacaciones a quince (15) días. Por último, se elimina el pago por concepto del exceso de días vacaciones y enfermedad. No obstante, se establece de forma obligatoria la implementación de medidas por parte de los supervisores para asegurar que nuestros empleados no pierdan los días acumulados y puedan disfrutar los mismos.

No podemos pasar por alto que, de haber entrado de inmediato en vigor el recorte a la jornada laboral como propuso la Junta de Supervisión, la economía de Puerto Rico hubiese sufrido un golpe devastador al eliminarse el bono de navidad y reducírsele en un 20% el sueldo de todos los empleados públicos. Ante esta situación fue que se establecieron las vías alternas antes indicadas para poder obtener los fondos requeridos sin trastocar la jornada laboral de los empleados y el salario de los mismos.

PROMESA y la Cláusula de Supremacía

Por otra parte, es importante recalcar la aplicación y el mandato que el Congreso de los Estados Unidos de América, en virtud de sus poderes plenarios sobre el Territorio de Puerto Rico, nos impuso cuando aprobó la Ley PROMESA que crea una Junta de Supervisión a quien, dentro de una serie de encomiendas, le confirió la de aprobar y supervisar de la ejecución un Plan Fiscal para la estabilización económica de Puerto Rico.

Dicha norma aprobada el 4 de mayo de 2016 establece una cláusula de supremacía que citamos:

Sec. 1 "Puerto Rico Oversight, Management, and Economic Stability Act" or "PROMESA". (SEC. 4. SUPREMACY. **The provisions of this Act shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act.** (Énfasis nuestro).

Conforme el Art. 101 de la Ley PROMESA, la Junta de Supervisión, a su plena discreción, en el momento que considere apropiado, podrá designar a cualquier

instrumentalidad territorial como una instrumentalidad territorial cubierta y sujeta a las obligaciones de la referida Ley. A este momento, la Junta de Supervisión ha designado todas las corporaciones públicas como entidades cubiertas. Por otro lado, conforme al Artículo 205 de PROMESA, la Junta de Supervisión podrá someter en cualquier momento recomendaciones al Gobernador o a la Legislatura sobre acciones que el gobierno territorial deba tomar para garantizar el cumplimiento del plan fiscal o para promover de alguna otra manera la estabilidad financiera, el crecimiento económico, la responsabilidad administrativa y la eficiencia en la prestación de servicios. Hechas las recomendaciones, el Gobernador tendrá que someter una declaración indicando si el gobierno adoptará la recomendación. Si no la adopta, el Gobernador deberá explicar al Presidente de los Estados Unidos y al Congreso sus razones para no adoptarlas.

Siendo así, debemos repasar las encomiendas que se le asignan a la Junta de Supervisión Fiscal para fiscalizar y asegurar que las disposiciones del Plan Fiscal aprobado se cumplan.

Recordemos que PROMESA goza de supremacía sobre cualquier legislación del territorio de Puerto Rico incompatible con los motivos, responsabilidades, encomiendas y objetivos que tiene la norma federal y la Junta de Supervisión como ente encargado de su ejecución. En lo que respecta a la presente Ley, la Junta estableció que si el gobierno no logra mediante la implantación de otras medidas reducciones en los gastos que generen los fondos suficientes y una reserva de efectivo adicional de $200 millones, para el 30 de junio de 2017 entrará en vigor, efectivo el 1 de julio de 2017, un programa de reducción de jornada laboral para todos los empleados públicos, lo que representaría una disminución en el sueldo de nuestros empleados de hasta un veinte (20%) por ciento del sueldo mensual. De igual forma, establecen que se implementaría la eliminación total del bono de navidad para todos los empleados públicos. La alternativa de la Junta de Supervisión para reducir la jornada laboral en el gobierno es equivalente a cuatro (4) días al mes para la mayoría de los empleados de la Rama Ejecutiva y dos (2) días al mes para maestros y personal de primera línea en instituciones que operan 24 horas al día. De igual forma, la Junta de Supervisión ha establecido que podrían darse reducciones comparables a estos ahorros por reducción parcial de jornada de la Rama Ejecutiva para otras entidades a través de todo el gobierno, incluyendo las corporaciones e instrumentalidades públicas y las ramas Legislativa y Judicial. Tal y como nuestro Gobernador ha mencionado en múltiples foros, la reducción de jornada laboral NO es una opción. Por tal razón, estamos tomando estas medidas cautelares para no tener que llegar a esa contingencia impuesta por la Junta de Supervisión.

Usando como base este marco legal, esta Asamblea Legislativa está convencida que las medidas que se toman en esta Ley son necesarias y razonables para atender de forma adecuada la crisis fiscal, económica y presupuestaria que atraviesa Puerto Rico y representan un ejercicio legislativo válido.

19

Las acciones que se toman en la presente Ley y su aplicación a todos los empleados públicos unionados o no unionados que laboran en el Gobierno Central y en las Corporaciones Públicas no se toman de forma liviana. Al realizar un balance de intereses, en estos momentos de crisis entendemos que los beneficios marginales tienen que ser atemperados a las necesidades de los tiempos y a la crisis fiscal y estructural que enfrenta el Gobierno de Puerto Rico. Ante el nuevo estado de Derecho creado por la aprobación de la Ley PROMESA y la llegada de la Junta de Supervisión, la presente Ley constituye un medio razonable, equitativo, uniforme y necesario para afrontar la crisis actual y es la única opción que tiene el Gobierno de Puerto Rico para poder cumplir con el Plan Fiscal certificado por la Junta de Supervisión y evitar que se imponga una reducción de jornada laboral a nuestros empleados públicos que equivaldría a reducirles el veinte (20%) por ciento de su sueldo mensual y a su vez la eliminación total del bono de navidad. Esta Ley se promulga al amparo de la facultad de esta Asamblea Legislativa para aprobar y promulgar legislación económica dirigida a promover el bienestar de la comunidad puertorriqueña.

### Dividendo Extraordinario a la Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio

La Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio (ASC) fue creada mediante la Ley 253-1995, según enmendada, como parte del sistema de seguro de responsabilidad obligatorio para vehículos de motor que se estableció desde entonces en Puerto Rico. El propósito de dicho seguro fue viabilizar una solución al problema de daños causados a vehículos de motor de terceros como resultado de un accidente de tránsito, conforme a los requisitos de reclamación aplicables.

En su origen, la cubierta del seguro obligatorio que estableció dicha ley tenía un tope de tres mil dólares ($3,000). Dicho tope fue aumentado en el año 2009 por virtud de la Ley 201-2009, a cuatro mil dólares ($4,000). Cabe destacar que a pesar de este aumento en cubierta de un treinta y tres por ciento (33%), las primas del seguro, que tiene un valor de noventa y nueve dólares ($99) para vehículos privados de pasajeros y ciento cuarenta y ocho dólares ($148) para vehículos comerciales, continuaron inalteradas.

Desde el aumento en cubierta en el año 2009, el costo de los bienes y servicios en general ha continuado aumentando y la industria automotriz no ha estado exenta de estos aumentos. Por eso, el costo de las piezas y reparaciones de vehículos hoy es mayor que hace ocho (8) años. Es por ello que esta administración entiende pertinente que la cubierta del seguro obligatorio se aumente a cuatro mil quinientos dólares ($4,500). Consistentemente con este aumento, se autoriza a la ASC a revisar el costo de las primas en o antes del 30 de junio de 2017.

Por otro lado, las condiciones bajo las cuales operaba la ASC desde su creación, conllevó un incremento sustancial en su capital. Dado que la ASC era el único proveedor

20

de seguro de responsabilidad obligatorio para vehículos de motor, era necesario que mantuviese una reserva de capital significativa para cubrir sus operaciones y cumplir con la reserva requerida por el Código de Seguros. Por ello, mediante la Ley 60-2013 se autorizó la declaración de un dividendo extraordinario, acompañada de una contribución incentivada, lo que permitió generar ingresos adicionales de cien millones de dólares ($100,000,000). Del mismo modo, por virtud de la Ley 157-2015 se autorizó la declaración de otro dividendo extraordinario de cuarenta y dos millones de dólares ($42,000,000), igualmente acompañada de una contribución especial. Sin embargo, como resultado de la apertura del mercado a competencia para que otras compañías de seguro pudieran ofrecer el servicio, a elección del conductor, resulta innecesario que la ASC mantenga una cantidad tan alta de capital en reserva y a la cual no pueden acceder los miembros de la ASC, quienes son las mismas compañías que compiten con esta entidad para ofrecer el servicio de seguro obligatorio.

Mediante esta Ley se autoriza la declaración de un dividendo extraordinario, acompañado de la correspondiente contribución incentivada. Una vez declarado el dividendo por los miembros de la ASC, el gobierno recibiría la cantidad de setenta millones de dólares ($70,000,000).

A diferencia de la pasada administración, que utilizó los fondos obtenidos mediante leyes similares a la presente para distribuir entre algunas entidades que, aunque muchas perseguían fines loables otras conllevaban un malgasto innecesario de fondos, mediante esta Ley pretendemos atender la falta de liquidez del Gobierno de Puerto Rico para proteger los servicios que se ofrecen a la ciudadanía, los empleos en el sector público, los ingresos de los miembros de los sistemas de retiro, entre otros fines similares.

Por todo lo anterior, esta Asamblea legislativa autoriza a la ASC a declarar un dividendo extraordinario de setenta millones de dólares ($70,000,000) de su reserva de capital acompañado de una contribución especial de un cincuenta por ciento (50%). De este modo, la ASC remitirá la suma de treinta y cinco millones de dólares ($35,000,000) que nutrirán el Fondo General del Gobierno de Puerto Rico.

Transferencia de ganancias de las corporaciones públicas al fondo general

Una de las medidas de mayor trascendencia que esta administración ha logrado aprobar es la "Ley de Emergencia Financiera y Responsabilidad Fiscal de Puerto Rico", Ley 5-2017. La misma declara como política pública del Gobierno de Puerto Rico "tomar todas las medidas requeridas para Puerto Rico establecer la responsabilidad fiscal necesaria dentro del Gobierno y sus instrumentalidades para satisfacer sus obligaciones y garantizar que se provean aquellos servicios gubernamentales esenciales para la salud, seguridad y bienestar de los residentes de Puerto Rico." Del mismo modo, la citada Ley declara que el gobierno podrá "ejercer su poder de razón de Estado de una manera que

21

reconozca la responsabilidad de satisfacer las obligaciones financieras del Gobierno de Puerto Rico y sus instrumentalidades, mientras continúa proveyendo servicios gubernamentales esenciales para la salud, seguridad y bienestar de los residentes de Puerto Rico a la luz de los limitados recursos disponibles del Gobierno de Puerto Rico y sus instrumentalidades". Dicho de otro modo, el gobierno tomará todas las medidas necesarias para asegurarse que las necesidades de la gente sean debidamente atendidas.

La Ley 5-2017 puntualiza que como resultado de la continua emergencia financiera y de la aprobación de PROMESA, la Asamblea Legislativa tiene a su haber la responsabilidad de ejercer su poder de razón de estado. En ese sentido, señala que se tiene que reconocer la responsabilidad de satisfacer las obligaciones financieras del Gobierno de Puerto Rico y sus instrumentalidades, mientras se continúan proveyendo servicios gubernamentales esenciales para salvaguardar la salud, seguridad y el bienestar de los residentes de Puerto Rico dados los limitados recursos disponibles del Gobierno de Puerto Rico y sus instrumentalidades, todo esto de manera congruente con PROMESA.

En atención a lo anterior, la Ley 5-2017 faculta al Gobernador a emitir órdenes ejecutivas para requerir el uso de los recursos disponibles para pagar por servicios esenciales según el Gobernador estime necesario para proteger la salud, seguridad y bienestar de los residentes de Puerto Rico y establecer normas de prioridad para el desembolso de fondos públicos cuando los recursos disponibles para el año fiscal sean insuficientes para cubrir las asignaciones hechas para ese año fiscal, entre otras medidas. Esto, en atención a la limitación de recursos que posee el Estado.

Ante la situación fiscal y económica antes indicada, resulta evidente que el Gobierno de Puerto Rico tiene que tomar medidas para cumplir con el Plan Fiscal sin afectar los servicios esenciales que recibe la ciudadanía. Esto requiere maximizar el uso de los recursos disponibles del Estado, incluyendo los recursos que tienen las corporaciones públicas. Es por ello que la presente legislación ordena a las corporaciones públicas e instrumentalidades del Gobierno de Puerto Rico a transferir al Departamento de Hacienda los fondos necesarios para garantizar la liquidez del gobierno.

La determinación de la cantidad que será aportada por cada una de las corporaciones públicas será determinada por un comité compuesto por el Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF), el Secretario del Departamento de Hacienda (Hacienda) y el Director Ejecutivo de la Oficina de Gerencia y Presupuesto (OGP). Para ello, el comité tomará en consideración los sobrantes con los que cuente cada corporación luego de haber sido cubiertos sus gastos operacionales y que los servicios que ofrecen estas entidades no se afecten. Dichos fondos serán depositados en el Fondo General del Gobierno de Puerto Rico para así contar con la liquidez requerida en el Plan Fiscal.

22

Por todo lo anterior, en atención a la situación de emergencia fiscal y económica que atraviesa Puerto Rico, en el ejercicio de su poder de razón de estado, esta Asamblea Legislativa reconoce la necesidad de remediar la emergencia financiera por lo que promueve los mecanismos que se establecen en la presente Ley para asegurar la liquidez del Gobierno de Puerto Rico, utilizando los recursos disponibles en las corporaciones públicas, sin que esto represente una carga desproporcional para los ciudadanos, ni afecte los servicios esenciales que el gobierno provee.

<u>Disposición de Propiedades Inmuebles de la Rama Ejecutiva</u>

Por otra parte, la crisis económica y fiscal que afronta el Gobierno ha repercutido en todo el espectro de nuestra infraestructura, incluyendo nuestra propiedad inmueble. La Rama Ejecutiva compuesta por sus agencias, entidades y corporaciones públicas tiene un sin número de propiedades inmuebles en desuso que pueden venderse al sector privado para diversos propósitos. Muchas de las propiedades llevan años sin ninguna utilidad pública. Sin embargo, cuentan con espacios amplios en lugares estratégicos que muy bien pueden ser maximizadas por la industria o comercio privado para desarrollar sus actividades. Incluso, algunas propiedades podrían servir para construir o habilitar una residencia o para entidades sin fines de lucro.

Lamentablemente en Puerto Rico no existe una política pública coherente y uniforme que fomente la venta eficiente, eficaz y coordinada de los bienes inmuebles del Estado. En ese tenor, es necesario establecer un marco jurídico que facilite mover el mercado de bienes raíces estatales y le dé certeza a las transacciones de estos activos. El beneficio sería uno múltiple: por un lado el Gobierno podrá allegar mayor dinero producto de la disposición del inventario de bienes inmuebles y disponer de mayor liquidez para paliar la crisis fiscal que enfrenta; inyectar al mercado un ingrediente de actividad económica al permitir que el sector privado se envuelva en la adquisición de propiedades del Estado para usos comerciales o residenciales y pueda fungir como generador de empleos; fomentar el bienestar social ante la posibilidad de que las propiedades puedan ser adquiridas por entidades sin fines de lucro para ofrecer servicios sociales, etc. En fin, las posibilidades son infinitas.

Por eso, es importante tener un paradigma adecuado que propicie la disposición de la propiedad inmueble dentro de un marco de competencia justa donde se coloque el bienestar y el interés público como portaestandarte de cada transacción. Por eso, esta Ley crea el Comité de Evaluación y Disposición de Propiedades Inmuebles y le faculta a llevar a cabo todas las acciones necesarias para lograr la disposición de los bienes inmuebles. Esto en balance con los mejores intereses del Estado como vendedor, el comprador y la ciudadanía en general. Por medio de esta Ley se establecen los preceptos generales que guiarán la aprobación de reglamentos y normas que uniformen los procesos de venta de inmueble y le den mayor certeza a las transacciones.

23

Esta medida representa un paso más en la dirección del rescate de nuestro Pueblo y de superar las malas decisiones del pasado. Tenemos un compromiso inquebrantable por fortalecer el componente de la actividad económica. Estamos seguros que con el esquema aquí establecido se proveen los mecanismos necesarios para fortalecer el mercado de bienes raíces y proveerle más recursos al Estado en aras de afrontar la crisis y cumplir con el Plan Fiscal. Ese es nuestro norte y nada nos detendrá.

## Ley de Contabilidad del Gobierno y Fondos Especiales

La política financiera del Gobierno de Puerto Rico establecida en la Ley Núm. 230 de 23 de julio de 1974, según enmendada y conocida como "Ley de Contabilidad del Gobierno de Puerto Rico", en relación con el control y la contabilidad de los fondos y propiedad pública requiere que la contabilidad del Gobierno de Puerto Rico refleje claramente los resultados de sus operaciones financieras, provea la información financiera necesaria para la administración de las operaciones gubernamentales y para la preparación y ejecución del presupuesto, y constituya un control efectivo sobre los ingresos, desembolsos, fondos, propiedad y otros activos del gobierno. De igual forma, se establece como política pública que no se establezcan fondos especiales o fuentes de repagos exclusivas para unos fines particulares sin considerar el bienestar público. Esto nos permitirá llevar a cabo programas de gobierno examinando los servicios esenciales, que las asignaciones de fondos para los diferentes programas del gobierno se limiten a las atenciones de un sólo año económico; y que todas las recaudaciones del Gobierno ingresen al fondo general del tesoro estatal para con ellas costear los programas del Gobierno en la medida y alcance en que la Asamblea Legislativa lo estime necesario y conforme a las partidas establecidas en el Plan Fiscal aprobado. Desafortunadamente, a través de los años, se han adoptado una serie de medidas que han pasado por alto lo anterior y han creado múltiples fondos especiales para distintos programas desvirtuándose el mandato de la Ley de Contabilidad.

Es el compromiso de esta Administración tomar todas las acciones necesarias para que el Gobierno pueda atender sus obligaciones y cumplir con esta política pública. La situación fiscal por la que nos encontramos atravesando requiere que ejerzamos una mayor transparencia y responsabilidad fiscal en nuestros gastos, de forma tal que logremos la estabilidad fiscal y un presupuesto balanceado, todo lo cual nos llevará hacia nuestra recuperación económica.

Dentro del análisis de las finanzas del Gobierno se han encontrado asignaciones especiales para determinado propósito o actividad y para las cuales se ha excedido el periodo de tiempo de más de un (1) año sin hacerse uso de las mismas. También se han identificado asignaciones sin designación de año determinado, pero con recurrencia anual sin una base legal. Esto conduce a que los gastos que se carguen contra esas asignaciones en futuros años fiscales, se desestabilice el flujo de la caja del Departamento de Hacienda, sin que se tenga un control sobre el momento y uso que se le confiere a tales

24

asignaciones y, además, está en contravención con la política pública establecida en la Ley Núm. 230, antes citada.

Ante la grave situación fiscal que confronta el gobierno, es fundamental implementar una nueva metodología para el desarrollo, preparación y ejecución del presupuesto gubernamental, que permita reducir notablemente el gasto del Estado sin disminuir la cantidad y calidad de los servicios prestados, eliminando servicios ineficaces y programas inadecuados u obsoletos. En este sentido, el Presupuesto Base Cero es una estrategia presupuestaria y de política fiscal, cuyo objetivo fundamental es lograr que un gobierno no pueda gastar más de lo que recauda, limitando así el incremento de la deuda pública y garantizando la sostenibilidad de las finanzas públicas a corto y largo plazo. Con el Presupuesto Base Cero implantado por esta Administración, cada departamento, agencia o instrumentalidad del Gobierno de Puerto Rico tiene que documentar y justificar cada programa que se vaya a incorporar y nutrir del presupuesto del Gobierno, a base del beneficio social y económico y en consideración de los recursos disponibles. Este mecanismo conlleva revisar anualmente todos los programas y gastos de los departamentos, agencias o instrumentalidades del Gobierno partiendo de cero sin tomar en consideración las asignaciones de años anteriores. Esto facilita la búsqueda de nuevas formas de ofrecer servicios más eficientes y efectivos que permitan una mejora en la calidad de los servicios, la eliminación de duplicidad en los ofrecimientos de servicios y una reducción en los gastos.

De igual forma, existen un sinnúmero de fondos especiales creados por Ley para fines particulares. Dichos fondos, se encuentran desorganizados y bajo el control de las dependencias gubernamentales a las que se les asignaron. Ante este marco, el Secretario de Hacienda en la actualidad tiene acceso directo a solo 65% de los fondos del Gobierno de Puerto Rico, toda vez que los demás fondos especiales están en cuentas en cada dependencia ejecutiva sin pasar por la supervisión fiscal del Secretario de Hacienda. Esta falta de claridad, redunda en una pobre supervisión por parte de las agencias fiscales del Gobierno para tener pleno dominio del Tesoro. Con esta Ley, disponemos que los fondos especiales pasan al Tesoro General y no a cuentas individuales para unos fines particulares, para así tener un mejor dominio y fiscalización por parte de Secretario de Hacienda y poder aplicar la prioridad de pago que comienza con los servicios esenciales a nuestro Pueblo.

Conforme todo lo anterior, esta Asamblea Legislativa considera necesario enmendar la Ley Núm. 230 de 23 de julio de 1974, según enmendada y conocida como "Ley de Contabilidad del Gobierno de Puerto Rico" con el propósito de atemperar la misma a las mejores prácticas fiscales que se han desarrollado en los pasados años en los Estados Unidos continentales y en el resto del mundo. A esos efectos, entendemos importante aclarar el significado de una asignación especial y limitar el uso de las mismas al periodo de un (1) año. Una vez que esta cumpla su propósito, o si no fuese reclamada durante su periodo de vigencia, esta asignación revertirá al Fondo General. De esta

25

manera, logramos continuar mejorando los servicios a nuestra ciudadanía y revitalizar la economía de Puerto Rico mientras cumplimos con los mecanismos de control fiscal requeridos por el Plan Fiscal Certificado.

## Ley de Reservas en las Compras del Gobierno

En reconocimiento de que el fortalecimiento de nuestra economía y la creación de empleos son objetivos fundamentales de la política pública del Gobierno de Puerto Rico, se han aprobado diferentes piezas legislativas dirigidas a estimular el desarrollo de la economía local. Como parte de dicha legislación, se encuentra la Ley 129-2005, que creó la Ley de Reservas en las Compras del Gobierno, la cual se adoptó como un mecanismo para que los componentes de la economía local puedan participar efectivamente en el mercado de compras del gobierno y para estimular la creación de empleos y la inversión local. Esta Ley, procura patrocinar de manera preferencial en las compras del Gobierno, al importantísimo sector de las pequeñas y medianas empresas ("Pymes") ayudando a estas a aumentar sus ventas como una estrategia eficaz de desarrollo económico y creación de empleos.

No obstante, ante la grave situación fiscal que confronta el gobierno, entendemos fundamental hacer ajustes en el desarrollo, preparación y ejecución del presupuesto gubernamental, que permita reducir notablemente el gasto del Estado sin disminuir la cantidad y calidad de los servicios prestados. Con esto en mente, hemos evaluado toda la legislación económica que tiene impacto en el presupuesto general de las agencias de la Rama Ejecutiva, a fin de establecer las medidas necesarias para atemperar la misma a nuestra actual realidad económica.

A tales efectos, esta Asamblea Legislativa considera necesario enmendar la Ley 129-2015 con el propósito de atemperar la misma a la situación fiscal que atraviesan las finanzas públicas. A esos efectos, debemos fijar en un veinte por ciento (20%) la partida del presupuesto general de las instrumentalidades del Gobierno de Puerto Rico asignada a compras para compras a microempresas, pequeñas y medianas empresas, hasta que la situación fiscal de Puerto Rico permita que se aplique el aumento. Nuestro propósito es seguir contribuyendo con este importante sector al mismo tiempo que afrontamos de forma responsable nuestra realidad fiscal y cumplimos con las metas establecidas en el Plan Fiscal aprobado por la Junta de manera que podamos encaminarnos hacia la recuperación económica.

## Arbitrios a cigarrillos y productos del tabaco

Ante la necesidad de allegar más ingresos con miras a cumplir con el Plan Fiscal, proteger los empleos públicos y a nuestros sectores más vulnerables, proponemos una reconfiguración de los arbitrios aplicables a los cigarrillos, tabaco sin humo, productos derivados del tabaco, así como cigarrillos electrónicos. Con esta reconfiguración de los

26

arbitrios aplicables a estos productos se aumenta la base sujeta a arbitrios y se aumentan las tasas actuales para cumplir con un propósito dual: además de allegar fondos para lograr balancear el presupuesto y cumplir con los parámetros consignados en el Plan Fiscal, también logramos desalentar el consumo de cigarrillos y la compra de tabaco, lo cual, como es conocido, resulta en detrimento a la salud pública y está asociado al incremento en la incidencia de enfermedades en las vías respiratorias y de distintos tipos de cáncer.

Una de las causas más preocupantes de muerte entre la población se debe al uso de tabaco. Sin embargo, esta causal es altamente prevenible. El informe del Cirujano General de los Estados Unidos sobre "Las Consecuencias de Fumar en la Salud" confirma que el fumar está relacionado a veintinueve (29) enfermedades crónicas tales como: cáncer en la vesícula, cervical, esófago, riñones, laringe, pulmones, oral, páncreas, estómago, leucemia, enfermedades cardiovasculares, entre muchas otras. Asimismo se indica que el humo del tabaco puede producir coágulos sanguíneos, ataques cardiacos y accidentes cerebrovasculares repentinos. Recientemente se han encontrado más enfermedades causadas por el uso de cigarrillos tales como cáncer de hígado y color rectal, diabetes, artritis, inflamación y deterioro de la función inmunitaria. Véase Resumen Ejecutivo del Informe de la Dirección General de Servicios de Salud de los Estados Unidos, Las Consecuencias del Tabaquismo en la Salud - 50 años de Progreso, pág. 2 (2014).

De hecho, en el período 2005-2009, el tabaquismo fue el causante de más de 480,000 muertes prematuras anuales en personas de 35 años de edad o más en los Estados Unidos. A su vez, más del 87% de las muertes por cáncer de pulmón, 61% de las muertes por enfermedad pulmonar y 32% de las muertes por enfermedad coronaria, fueron atribuibles al tabaquismo y a la exposición al humo de segunda mano. Id., pág. 3.

Por su parte el Center for Disease Control and Prevention (CDC) señala que para el 2016, la mayor causa de muerte, discapacidades y de enfermedades prevenibles en Estados Unidos es a consecuencia del uso del tabaco. Cada año casi medio millón de americanos muere prematuramente por fumar o por estar expuesto al humo del cigarrillo, y otros 16 millones viven con enfermedades serias causadas por fumar cigarrillos. Además, los fumadores de cigarrillos se tienen que ausentar más a sus trabajos, visitar más a sus doctores, ser hospitalizados con mayor frecuencia, y mueren 10 o 12 años antes que las personas que no son fumadores. Lo anterior sin contar que para tratar enfermedades relacionadas al uso del cigarrillo, los Estados Unidos gastan casi 170 millones de dólares anualmente. Véase https://www.cdc.gov/chronicdisease/ resources/publications/aag/tobacco-use.htm.

El impacto indirecto del cigarrillo también es altamente detrimental para la salud. En específico, la exposición al humo de segunda mano tiene un efecto nocivo en los niños. Se ha relacionado con el síndrome de la muerte repentina de infantes (sudden infant

Case:17-03283-LTS   Doc#:3126-4   Filed:05/23/18   Entered:05/23/18 11:45:37   Desc:
Exhibit Law 26 of 2017 (4A Spanish 4B English)   Page 28 of 200

27

death syndrome), enfermedades respiratorias agudas, infecciones de oído y ataques de asma. Lo más inquietante es que alrededor del 25% de las personas que no fuman en Estados Unidos, (58 millones aproximadamente) están expuestos el humo de segunda mano, incluyendo 15 millones de niños entre las edades de 3 a 11 años. *Id*.

Según los datos del CDC, para el 2015 en Estados Unidos cerca de 15.1% de la población mayor de 18 años de edad fumaba cigarrillos, lo que se estima en 36.5 millones de personas. De estos, 16.7% son hombres y 13.6% mujeres. En Puerto Rico, aunque el porciento es menor, todavía sobre pasa el doble dígito. Las estadísticas del Departamento de Salud de Puerto Rico demuestran que para el 2015 el 10.7% de la población general de 18 años o más fuman cigarrillos con regularidad. De estos, 15.7% son hombres y 7.4% mujeres. Se trata de un porciento significativo si tomamos en consideración el efecto que tiene el humo de segunda mano. A lo anterior hay que añadir que el gobierno tiene que incurrir en costos significativos producidos por las consecuencias a la salud que conlleva fumar.

Al presente, cada cajetilla de cigarrillos paga $3.40 en arbitrios, lo que, para el Año Fiscal 2014-2015, se tradujo en un recaudo de $156 millones por concepto de dicho arbitrio. Sin embargo, nuestro gobierno gasta $19.16 en costos de salud y pérdida de productividad por cada cajetilla de cigarrillos consumida, lo que se traduce en $924 millones. Es decir, el Gobierno gasta $15.76 más de lo que recauda, por cada cajetilla de cigarrillo vendida para atender las consecuencias que ocasiona el uso de cigarrillos, lo que significa una diferencia global de $768 millones. Como resultado, el aumento a los impuestos sobre el tabaco se considera como una medida sumamente costo-efectiva para mejorar la salud pública y para obtener recaudos fiscales a corto y largo plazo.

Por otro lado, el Comité Científico de Asesoramiento sobre la Reglamentación de los Productos del Tabaco de la Organización Mundial de la Salud ha dicho que el consumo de tabaco no fumable es una parte importante del problema general del tabaco en el mundo. En su informe sobre el tabaco sin humo expresa que existen los siguientes daños potenciales: a) el uso puede alentar a los individuos a consumir dichos productos, además de seguir fumando; b) el consumo de productos no fumables del tabaco incrementa la posibilidad de iniciarse posteriormente en el consumo de tabaco fumado; c) los niños que aún no han comenzado a fumar podrían empezar a consumir tabaco mediante el fácil acceso al tabaco no fumable; d) no se descarta la posibilidad de que el "smokeless tobacco" produzca daños considerables a largo plazo en la salud de sus consumidores como el aumento del riesgo a desarrollar cáncer oral; y e) los riesgos de crear adicción son considerables ya que en su mayoría tienen componentes peligrosos como la nicotina y las nitrosaminas. Asimismo, el Cirujano General de Estados Unidos de América ha determinado que el uso del "tabaco sin humo" puede ocasionar, además del cáncer oral, enfermedades y condiciones relacionadas a la encía. Según el reporte titulado The Health Consequences of Using Smokeless Tobacco: A Report of the Advisory Committee to the Surgeon General, el uso prolongado del "tabaco sin humo" resulta en

28

un riesgo mayor de padecer lesiones orales como la leukoplakias tanto en adolecentes como en adultos.

Es y ha sido la política pública del Gobierno de Puerto Rico tomar medidas para promover la prevención y la cesación del uso del tabaco. Una de las modalidades que propician la prevención y la cesación del uso del tabaco son las medidas relacionadas con la implantación de impuestos a productos derivados del tabaco, sea fumable o no.

A tono con lo anteriormente expuesto, esta Asamblea Legislativa entiende meritorio que por la lucha contra la adicción a la nicotina, por los gastos de servicios médicos a pacientes por enfermedades relacionadas y creadas por la adicción a productos derivados del tabaco, por el evidente costo y pérdidas en la productividad laboral y en la economía en general y por la necesidad de hacer llegar más ingresos al erario para cumplir con el Plan Fiscal y evitar recortes que puedan afectar a nuestros sectores más vulnerables, se aumente el arbitrio actual al tabaco sin humo y a los cigarrillos.

Fondo de Emergencia

La Ley Núm. 91 de 21 de junio de 1966, según enmendada, crea el Fondo de Emergencia, con el propósito de reunir los recursos necesarios para afrontar las necesidades públicas inesperadas e imprevistas, causadas por calamidades, tales como guerras, huracanes, terremotos, sequías, inundaciones, plagas, y con el fin de proteger las vidas y propiedades de las gentes, y el crédito público.

Entre otras disposiciones, la Ley Núm. 91, ante citada, establece que con los recursos asignados al Fondo de Emergencia podrían financiarse los gastos de funcionamiento de la Agencia Estatal para el Manejo de Emergencias y Administración de Desastres; que el mencionado Fondo será capitalizado anualmente por una cantidad no menor de un quinto del uno por ciento (0.2%) del total de la Resolución Conjunta del Presupuesto; que la referida aportación será de una cantidad no menor del uno por ciento (1%) del total de las rentas netas del año fiscal anterior; y que el balance del mismo nunca exceda de ciento cincuenta millones (150,000,000) de dólares, lo que sea mayor. Sin embargo, en esta última década reiteradamente se ha legislado para que el Fondo de Emergencia no se nutra durante determinados años fiscales. Lo que comenzó como una medida de carácter transitorio iniciada en el Año Fiscal 2006-2007, se convirtió en una medida que desde entonces se ha repetido de forma continua en la mayoría de los años fiscales.

Esta Administración reconoce que, ante la grave situación fiscal que confronta el gobierno, es fundamental implementar una nueva metodología para el desarrollo, preparación y ejecución del presupuesto gubernamental, que permita reducir notablemente el gasto del Estado sin disminuir la cantidad y calidad de los servicios prestados, eliminando servicios ineficaces y programas inadecuados u obsoletos. En este

29

sentido, es importante establecer y mantener una reserva líquida para atender necesidades públicas inesperadas e imprevistas, como las inicialmente descritas, pero considerando que la aportación a dicho Fondo debe realizarse acorde la situación fiscal. Ante ello, se establece que la aportación al Fondo de Emergencia por la cantidad de diez millones de dólares ($10,000,000) se mantendrá fija hasta el Año Fiscal 2020-2021. Además, a partir del Año Fiscal 2020-2021, dicha aportación será no menor de cero punto cinco por ciento (0.5%) del estimado de rentas netas sometido por el Departamento de Hacienda para la preparación del Presupuesto Recomendado con cargo al Fondo General.

Conforme a lo anterior, esta Asamblea Legislativa considera necesario enmendar la Ley Núm. 91 de 21 de julio de 1966, según enmendada y conocida como "Fondo de Emergencia" para alcanzar un uso más eficiente de los recursos disponibles y garantizar la disponibilidad de los mismos para atender situaciones de emergencia o desastre que afecten a la Isla durante este período de años.

<u>El camino a la recuperación comenzó</u>

Aunque son muchos los obstáculos que debemos superar en el camino hacia la recuperación definitiva, hay esperanza y optimismo en nuestra gente. Hay un nuevo amanecer en nuestra patria y no podemos defraudar a Puerto Rico. Tenemos que aprovechar este momento para enfrentar los retos, y procurar los grandes cambios que Puerto Rico necesita. Debemos enfrentar la crisis como un gran reto, que podemos traducir en grandes oportunidades. Ese es el desafío que nos puede llevar a edificar una sociedad más justa, digna y progresista. Por ello, la Ley 7-2017 realiza el más importante paso para la recuperación económica, social y política de Puerto Rico al encaminar un proceso de descolonización inmediata de la Isla.

Ahora damos inicio a un proceso para transformar el Gobierno en uno más eficiente, rehabilitando sus finanzas y recobrando la confianza y la credibilidad perdida. Nos encaminamos a tener un Gobierno que elimine los gastos perdidosos. Un gobierno más ágil, que te pueda rendir cuentas. Un gobierno donde cada dólar de contribución se vea en acción y servicios al Pueblo. Ahora nos levantamos con más fuerza que nunca, para vivir en una sociedad donde las oportunidades estén accesibles para cada hijo de esta tierra y donde todos estemos orgullosos de haber cumplido con nuestra patria.

*DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

CAPÍTULO 1.-DISPOSICIONES INICIALES

Artículo 1.01.-Título.

30

Esta Ley se conocerá y podrá ser citada como "Ley de Cumplimiento con el Plan Fiscal".

Artículo 1.02.-Primacía de esta Ley

Esta Ley en su totalidad se aprueba en el ejercicio del poder de razón del Estado, así como en la facultad constitucional que tiene la Asamblea Legislativa, reconocida en el Artículo II, Secciones 18 y 19 de la Constitución de Puerto Rico, de aprobar leyes en protección de la vida, la salud y el bienestar del pueblo, así como en casos de grave emergencia cuando estén claramente en peligro la salud, la seguridad pública o los servicios gubernamentales esenciales, así como al amparo de la Secciones 7 y 8 del Artículo VI de la Constitución de Puerto Rico. De igual forma, esta Ley se aprueba en virtud de las acciones que se le requieren a Puerto Rico como territorio de los Estados Unidos bajo el palio de la Ley Federal *Puerto Rico Oversight Management and Economic Stability Act* (PROMESA) y del Plan Fiscal aprobado por la Junta de Supervisión Fiscal. Por esta razón, esta Ley tendrá primacía sobre cualquier otra ley.

A partir de la fecha de aprobación de esta Ley, se deja sin efecto toda ley orgánica, ley general o especial, artículo o sección de ley, normativa, cláusulas y/o disposiciones de convenios colectivos, acuerdos, acuerdos suplementarios, órdenes administrativas, políticas, manuales de empleo, cartas circulares, certificaciones, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasificación o retribución, cartas contractuales, y/o disposiciones aplicables exclusivamente a los beneficios marginales que podrán disfrutar los funcionarios o empleados públicos unionados o no unionados del Gobierno de Puerto Rico, incluyendo a todo empleado unionado o no unionado de las Corporaciones Públicas del Gobierno de Puerto Rico, que vaya en contra de las disposiciones de esta Ley. Esto no elimina el derecho de los sindicatos de negociar condiciones de trabajo, salarios y otras condiciones no económicas no contenidas en la presente legislación conforme al ordenamiento jurídico vigente.

Artículo 1.03.-Terminación de las medidas fiscales

Se autoriza al Comité de Cumplimiento con el Plan Fiscal, tras hacer una determinación de que la situación fiscal se ha estabilizado y que la condición del fisco lo permite, a aumentar los beneficios en esta Ley concedidos y dejar sin efecto medidas de responsabilidad fiscal contenidas en el Capítulo 2.

## CAPÍTULO 2.-BENEFICIOS MARGINALES DE LOS FUNCIONARIOS O EMPLEADOS PÚBLICOS DEL GOBIERNO DE PUERTO RICO

Artículo 2.01.-Aplicabilidad

31

Todas las disposiciones contenidas en esta Ley, serán aplicables a las Entidades de la Rama Ejecutiva del Gobierno de Puerto Rico, excepto cuando alguna disposición particular excluya expresamente a una entidad. Para propósitos de esta Ley, se entenderá que el término "Entidad de la Rama Ejecutiva" incluye a todas sus agencias, así como a las instrumentalidades y corporaciones públicas del Gobierno de Puerto Rico, irrespectivo del grado de autonomía fiscal o presupuestaria que de otra forma le confiriere su ley orgánica u otra legislación aplicable. La Universidad de Puerto Rico estará exenta de la aplicación de la presente Ley.

Artículo 2.02.-Municipios

Los municipios estarán exentos de la aplicación de este Capítulo. No obstante, quedan facultados para acogerse a sus disposiciones mediante previa aprobación de una Ordenanza Municipal a esos efectos.

Artículo 2.03.-Declaración de Política Pública

Por la presente se reafirma la Declaración de Política Pública de la Ley 3-2017, conocida como "Ley para Atender la Crisis Económica, Fiscal y Presupuestaria para Garantizar el Funcionamiento del Gobierno de Puerto Rico", en donde se establece que la responsabilidad fiscal es la clave para que Puerto Rico recupere su credibilidad ante los inversionistas y mercados financieros, restablezca su crédito y regrese al camino del manejo responsable de la deuda y de sus finanzas, logrando una eficiente restructuración de la misma.

Se establece como política pública del Gobierno de Puerto Rico la disciplina, control y reducción de gastos en las agencias, instrumentalidades, departamentos y corporaciones públicas del Gobierno de Puerto Rico.

El Gobierno de Puerto Rico reconoce la disparidad que existe entre los beneficios marginales que reciben los empleados del Gobierno Central con aquellos que laboran en corporaciones públicas. Para mantener los empleos públicos sin despidos es necesario hacer ajustes en gastos de beneficios marginales, mientras Puerto Rico se encuentre inmerso en la crisis fiscal que lo aqueja. A tales efectos, mediante esta Ley se promueve la igualdad y uniformidad de los beneficios marginales que podrán disfrutar todos los funcionarios y empleados públicos. Todas las agencias e instrumentalidades comprendidas en el Gobierno de Puerto Rico tienen la responsabilidad de procurar que el disfrute de los beneficios marginales responda al interés legislativo que justificó su concesión y que se lleva a cabo conforme a un adecuado balance entre las necesidades del empleado y la óptima utilización de los recursos disponibles, atendiendo el momento histórico en que nos encontramos.

La política pública adoptada por la presente Ley garantiza la continuidad de la gestión pública en áreas esenciales de salud, seguridad, educación, trabajo social y desarrollo, entre otros, así como la prestación de los servicios necesarios e indispensables para la ciudadanía y protege el trabajo de miles de funcionarios y empleados públicos del Gobierno de Puerto Rico, mientras se protege a los ciudadanos más vulnerables. Por tal razón, y en cumplimiento con el Plan Fiscal aprobado conforme a la Ley Federal PROMESA, se uniforman los beneficios marginales de los empleados públicos con fines a lograr economías adicionales.

En aras de lograr la consecución de los objetivos de la presente Ley y hacerlo de la forma menos onerosa para nuestros empleados públicos, se establece que las disposiciones de los Artículos 2.04, 2.05, 2.08 al 2.11 y 2.18 serán de duración temporera y su vigencia cesará durante el próximo año fiscal luego de que el Gobierno de Puerto Rico haya logrado un presupuesto balanceado y superado la crisis económica. Esta consideración entendemos crea el justo balance entre los objetivos de cumplir con el Plan Fiscal certificado y el interés de preservar la justicia social que enmarcan la protección de los beneficios que reciben nuestros trabajadores del sector público. Se restituirán los mismos conforme sea certificado por los miembros del Comité de Cumplimiento con el Plan Fiscal.

Para propósito de esta Ley el Comité de Cumplimiento con el Plan Fiscal estará compuesto por un representante nombrado por el Gobernador, un representante nombrado por el Presidente de la Cámara de Representantes y un representante nombrado por el Presidente del Senado de Puerto Rico. Dicho Comité establecerá mediante reglamento sus normas y funcionamiento interno.

Artículo 2.04.-Beneficios Marginales

El Gobierno de Puerto Rico es responsable de velar por el disfrute de los beneficios marginales que se les otorgan a los empleados y que los mismos se disfruten conforme a un plan que mantenga un adecuado balance entre las necesidades de servicio, las necesidades del empleado y la utilización responsable de los recursos disponibles. A fin de mantener una administración de recursos humanos uniforme, responsable, razonable, equitativa y justa, se establecen a continuación los beneficios marginales que podrán disfrutar los funcionarios o empleados públicos, unionados o no unionados, del Gobierno de Puerto Rico, incluyendo las corporaciones públicas, sujeto a lo dispuesto en el Artículo 2.03 de esta Ley.

Los beneficios marginales de los empleados de la Rama Ejecutiva serán los siguientes:

1.    Licencia de vacaciones

33

a.    A partir de la vigencia de esta Ley, todo empleado público tendrá derecho a acumular licencia de vacaciones, a razón de uno y un cuarto (1 1/4) días por cada mes de servicio. Por estar excluidos del sistema de Empleador Único creado conforme a la Ley 8-2017, esta disposición no será de aplicación a los empleados docentes y directores escolares, a excepción del personal gerencial y administrativo del Departamento de Educación, a los empleados docentes de cualquier entidad educativa del Gobierno de Puerto Rico y a los agentes del orden público de la Policía de Puerto Rico que seguirán acumulando la licencia por vacaciones que disfrutaban antes de aprobarse la presente ley.

b.    La licencia por vacaciones se comenzará a acumular una vez el empleado cumpla los tres (3) meses en el empleo y será retroactiva a la fecha de comienzo del empleo. Los empleados a jornada regular reducida o a jornada parcial acumularán licencia de vacaciones de forma proporcional al número de horas en que presten servicios regularmente.

c.    La licencia por vacaciones se podrá acumular hasta un máximo de sesenta (60) días laborables al finalizar cualquier año natural.

d.    La licencia de vacaciones se concede al empleado para proporcionarle un período razonable de descanso anual. Como norma general, deberá ser disfrutada durante el año natural en que fue acumulada. Cada agencia o instrumentalidad pública viene obligada a formular un plan de vacaciones, por cada año natural, en coordinación con los supervisores y los empleados, que establezca el período dentro del cual cada empleado disfrutará de sus vacaciones, en la forma más compatible con las necesidades del servicio. Dicho plan deberá establecerse no más tarde del 31 de diciembre de cada año para que entre en vigor el primero de enero de cada año siguiente. Será responsabilidad de las agencias, instrumentalidades públicas y de todos los empleados dar cumplimiento estricto al referido plan. Sólo podrá hacerse excepción por necesidad clara e inaplazable del servicio, debidamente certificada.

e.    La agencia o instrumentalidad pública viene obligada a, de forma diligente y con estricto cumplimiento de lo establecido en la presente Ley, formular y administrar el plan de vacaciones de modo que los empleados no pierdan licencia de vacaciones al

34

finalizar el año natural y disfruten de su licencia regular de vacaciones.

f.      Todo empleado tendrá derecho a disfrutar de su licencia de vacaciones por un período de quince (15) días laborables durante cada año natural de los cuales no menos de diez (10) días deberán ser disfrutados de manera consecutiva.

g.      Los empleados que no puedan disfrutar de licencia de vacaciones durante determinado año natural por necesidades del servicio, evidenciada de forma escrita y a requerimiento de la agencia o instrumentalidad pública, están exceptuados de las disposiciones del inciso (e) de este Artículo. En este caso, la agencia o instrumentalidad pública viene obligada a realizar los ajustes necesarios para que el empleado disfrute de por lo menos, el exceso de licencia acumulada sobre el límite de sesenta (60) días, en la fecha más próxima posible, dentro del término de los primeros tres (3) meses del siguiente año natural.

h.      La agencia o instrumentalidad pública vendrá obligada a proveer para el disfrute de la licencia de vacaciones acumulada, previo al trámite de cualquier separación que constituya una desvinculación total y absoluta del servicio y al trámite de un cambio para pasar a prestar servicios en otra agencia o instrumentalidad pública.

i.      Normalmente, no se concederá licencia de vacaciones por un período mayor de quince (15) días laborables por cada año natural. No obstante, la agencia o instrumentalidad pública podrá conceder licencia de vacaciones en exceso de quince (15) días laborables, hasta un máximo de cincuenta (50) días, en cualquier año natural, a aquellos empleados que tengan licencia acumulada. Al conceder dicha licencia, se tomarán en consideración las necesidades del servicio y otros factores tales como los siguientes:

1.      la utilización de dicha licencia para actividades de mejoramiento personal del empleado, tales como viajes, estudios, etc.;

2.      enfermedad prolongada del empleado después de haber agotado el balance de licencia de enfermedad;

3.      problemas personales del empleado que requieran su atención personal;

35

4.   si ha existido cancelación del disfrute de licencia por necesidades del servicio y a requerimiento de la agencia;

5.   total de licencia acumulado que tiene el empleado.

j.   Por circunstancias especiales, se podrá anticipar licencia de vacaciones a los empleados regulares que hayan prestado servicios al Gobierno de Puerto Rico por más de un (1) año, cuando se tenga la certeza de que el empleado se reintegrará al servicio. La licencia de vacaciones así anticipada no excederá de quince (15) días laborables. La concesión de licencia de vacaciones anticipada requerirá en todo caso aprobación previa por escrito de la Autoridad Nominadora. Todo empleado a quien se le hubiere anticipado licencia de vacaciones y se separe del servicio, voluntaria o involuntariamente, antes de prestar servicios por el período necesario requerido para acumular la totalidad de la licencia que le fue anticipada, vendrá obligado a reembolsar al Gobierno de Puerto Rico cualquier suma de dinero que le haya sido pagada por concepto del tal licencia anticipada.

k.   En el caso en que a un empleado se le conceda una licencia sin sueldo, no será menester que éste agote la licencia de vacaciones que tenga acumulada antes de comenzar a utilizar la licencia sin sueldo.

l.   Cuando se autorice el disfrute de licencia de vacaciones acumulada o anticipada a un empleado, se podrá autorizar el pago por adelantado de los sueldos correspondientes al período de licencia, siempre que el empleado lo solicite con suficiente anticipación. Tal autorización deberá hacerse inmediatamente después de la aprobación de la licencia.

m.   Uno o más empleados públicos podrán ceder, excepcionalmente, a otro empleado público que trabaje en la misma entidad gubernamental días acumulados de vacaciones, hasta un máximo de cinco (5) días, según lo dispuesto en la Ley 44-1996, según enmendada, conocida como "Ley de Cesión de Licencia por Vacaciones", cuando:

1.   El empleado cesionario haya trabajado continuamente, el mínimo de un (1) año, con cualquier entidad gubernamental;

36

2.    El empleado cesionario no haya incurrido en un patrón de ausencias injustificadas, faltando a las normas de la entidad gubernamental;

3.    El empleado cesionario hubiere agotado la totalidad de las licencias a que tiene derecho, como consecuencia de una emergencia;

4.    El empleado cesionario o su representante evidencie, fehacientemente, la emergencia y la necesidad de ausentarse por días en exceso a las licencias ya agotadas;

5.    El empleado cedente haya acumulado un mínimo de quince (15) días de licencias por vacaciones en exceso de la cantidad de días de licencia a cederse;

6.    El empleado cedente haya sometido por escrito a la entidad gubernamental, en la cual trabaja, una autorización accediendo a la cesión, especificando el nombre del cesionario;

7.    El empleado cesionario o su representante acepte, por escrito, la cesión propuesta.

2.    Licencia por enfermedad

a.    Todo empleado que haya sido contratado en el Gobierno de Puerto Rico antes de entrar en vigor la Ley 8-2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico" tendrá derecho a acumular licencia por enfermedad a razón de un día y medio (1 1/2) por cada mes de servicio.

b.    Todo empleado que haya sido contratado en el Gobierno de Puerto Rico después de entrar en vigor la Ley 8-2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico" tendrá derecho a acumular licencia por enfermedad a razón de un (1) día por cada mes de servicio.

c.    Los empleados a jornada regular reducida o a jornada parcial acumularán licencia por enfermedad en forma proporcional al número de horas que presten servicios regularmente.

37

d.    La licencia por enfermedad se utilizará cuando el empleado se encuentre enfermo, incapacitado o expuesto a una enfermedad contagiosa que requiera su ausencia del trabajo para la protección de su salud o la de otras personas.

e.    Todo empleado podrá disponer de hasta un máximo de cinco (5) días al año de los días acumulados por enfermedad, siempre y cuando mantenga un balance mínimo de doce (12) días, para solicitar una licencia especial con el fin de utilizar la misma en:

1.    El cuidado y atención por razón de enfermedad de sus hijos o hijas.

2.    Enfermedad o gestiones de personas de edad avanzada o con impedimentos dentro del núcleo familiar, entiéndase cuarto grado de consanguinidad, segundo de afinidad, o personas que vivan bajo el mismo techo o personas sobre las que se tenga custodia o tutela legal.

Disponiéndose que las gestiones a realizarse deberán ser cónsonas con el propósito de la licencia de enfermedad; es decir, al cuidado y la atención relacionada a la salud de las personas aquí comprendidas.

a)    "Persona de edad avanzada" significará toda aquella persona que tenga sesenta (60) años o más;

b)    "Personas con impedimentos" significará toda persona que tiene un impedimento físico, mental o sensorial que limita sustancialmente una o más actividades esenciales de su vida.

3.    Primera comparecencia de toda parte peticionaria, víctima o querellante en procedimientos administrativos y/o judiciales ante todo Departamento, Agencia, Corporación o Instrumentalidad Pública del Gobierno de Puerto Rico, en casos de peticiones de pensiones alimentarias, violencia doméstica, hostigamiento sexual en el empleo o discrimen por razón de género. El empleado presentará evidencia expedida por la autoridad competente acreditativa de tal comparecencia.

38

f.    La licencia por enfermedad se podrá acumular hasta un máximo de noventa (90) días laborables al finalizar cualquier año natural. La licencia por enfermedad se comenzará a acumular una vez el empleado cumpla los tres (3) meses en el empleo y será retroactiva a la fecha de comienzo del empleo.

g.    La agencia o instrumentalidad pública viene obligada a, de forma diligente y con estricto cumplimiento de lo establecido en la presente Ley, realizar todos los ajustes necesarios para que el empleado pueda hacer uso de la totalidad de la licencia por enfermedad que tenga acumulada durante cualquier año natural en el momento en que la necesite. El empleado podrá hacer uso de toda la licencia por enfermedad que tenga acumulada durante cualquier año natural.

h.    Cuando un empleado se ausente del trabajo por enfermedad por más de tres (3) días, se le podrá exigir un certificado médico, acreditativo:

1.    que estaba realmente enfermo, expuesto a una enfermedad contagiosa o impedido para trabajar durante el periodo de ausencia;

2.    sobre la enfermedad de sus hijos o hijas;

3.    sobre la enfermedad de personas de edad avanzada o con impedimentos dentro del núcleo familiar, entiéndase cuarto grado de consanguinidad, segundo de afinidad, o personas que vivan bajo el mismo techo o personas sobre las que se tenga custodia o tutela legal.

Además del certificado médico, se podrá corroborar la inhabilidad del empleado para asistir al trabajo por razones de enfermedad por cualquier otro medio apropiado. Lo anterior no se aplicará o interpretará de forma que se vulnere la Ley ADA ni la "Ley de Licencia Familiar y Médica de 1993" (LLFM).

i.    En casos de enfermedad en que el empleado no tenga licencia por enfermedad acumulada, se le podrá anticipar hasta un máximo de dieciocho (18) días laborables, a cualquier empleado regular que hubiere prestado servicios al Gobierno de Puerto Rico por un periodo no menor de un (1) año, cuando exista certeza razonable de que éste se reintegrará al servicio. Cualquier empleado a quien se

39

le hubiera anticipando licencia por enfermedad y se separe del servicio, voluntaria o involuntariamente, antes de haber prestado servicios por el periodo necesario requerido para acumular la totalidad de la licencia que le fue anticipada, vendrá obligado a reembolsar al Gobierno de Puerto Rico cualquier suma de dinero que quedare al descubierto que le haya sido pagada por concepto de dicha licencia.

j.  En casos de enfermedad prolongada, una vez agotada la licencia por enfermedad, los empleados podrán hacer uso de toda licencia de vacaciones que tuvieren acumulada, previa autorización del supervisor inmediato. Si el empleado agotase ambas licencias y continuare enfermo, se le podrá conceder licencia sin sueldo.

3.  Licencia de maternidad

a.  La licencia de maternidad comprenderá el periodo de descanso prenatal y *post-partum* a que tiene derecho toda empleada embarazada. Igualmente comprenderá el periodo a que tiene derecho una empleada que adopte un menor, de conformidad con la legislación aplicable.

b.  Toda empleada en estado grávido tendrá derecho a un periodo de descanso de cuatro (4) semanas antes del alumbramiento y cuatro (4) semanas después. Disponiéndose que la empleada podrá disfrutar consecutivamente de cuatro (4) semanas adicionales para la atención y el cuido del menor.

Alumbramiento significará el acto mediante el cual la criatura concebida es expelida del cuerpo materno por vía natural, o extraída legalmente de éste mediante procedimientos quirúrgicos-obstétricos. Comprenderá asimismo, cualquier alumbramiento prematuro, el malparto o aborto involuntario, inclusive en este último caso, aquellos inducidos legalmente por facultativos médicos, que sufriere la madre en cualquier momento durante el embarazo.

c.  La empleada podrá optar por tomar hasta sólo una (1) semana de descanso prenatal y extender hasta siete (7) las semanas de descanso *post-partum* a que tiene derecho o hasta once (11) semanas, de incluirse las cuatro (4) semanas adicionales para el cuido y atención del menor. En estos casos, la empleada deberá someter a la agencia una certificación médica acreditativa de que está en

40

condiciones de prestar servicios hasta una semana antes del alumbramiento.

d.    Durante el periodo de la licencia de maternidad la empleada devengará la totalidad de su sueldo.

e.    En el caso de una empleada con status transitorio, la licencia de maternidad no excederá del periodo de nombramiento.

f.    De producirse el alumbramiento antes de transcurrir las cuatro (4) semanas de haber comenzado la empleada embarazada a disfrutar de su descanso prenatal, o sin que hubiere comenzado a disfrutar éste, la empleada podrá optar por extender el descanso posterior al parto por un periodo de tiempo equivalente al que dejó de disfrutar de descanso prenatal.

g.    Cuando se estime erróneamente la fecha probable del alumbramiento y la mujer haya disfrutado de las cuatro (4) semanas de descanso prenatal, sin sobrevenirle el alumbramiento, tendrá derecho a que se extienda el periodo de descanso prenatal, a sueldo completo, hasta que sobrevenga el parto. En este caso, la empleada conservará su derecho a disfrutar de las cuatro (4) semanas de descanso posterior al parto a partir de la fecha del alumbramiento y las cuatro (4) semanas adicionales para el cuido y atención del menor.

h.    En casos de parto prematuro, la empleada tendrá derecho a disfrutar de las ocho (8) semanas de licencia de maternidad a partir de la fecha del parto prematuro y las cuatro (4) semanas adicionales para el cuido y atención del menor.

i.    La empleada que sufra un aborto podrá reclamar hasta un máximo de cuatro (4) semanas de licencia de maternidad. Sin embargo, para ser acreedora a tales beneficios, el aborto debe ser de tal naturaleza que le produzca los mismos efectos fisiológicos que regularmente surgen como consecuencia del parto, de acuerdo al dictamen y certificación del médico que la atiende durante el aborto.

j.    En el caso que a la empleada le sobrevenga alguna complicación posterior al parto (post-partum) que le impida regresar al trabajo al terminar el disfrute del periodo de descanso *post-partum* y las cuatro (4) semanas adicionales para el cuido y la atención del menor, la agencia deberá concederle licencia por enfermedad.

41

En estos casos, se requerirá certificación médica indicativa de la condición de la empleada y del tiempo que se estime durará dicha condición. De ésta no tener licencia por enfermedad acumulada, se le concederá licencia de vacaciones. En el caso de que no tenga acumulada la licencia por enfermedad o de vacaciones, se le podrá conceder licencia sin sueldo por el término que recomiende su médico.

k.      La empleada que adopte a un menor de edad preescolar, entiéndase un menor de cinco (5) años o menos, que no esté matriculado en una institución escolar, a tenor con la legislación y procedimientos legales vigentes en Puerto Rico o cualquier jurisdicción de los Estados Unidos, tendrá derecho a los mismos beneficios de licencia de maternidad a sueldo completo de que goza la empleada que tiene un alumbramiento. En el caso que adopte a un menor de seis (6) años en adelante, tendrá derecho a la licencia de maternidad a sueldo completo por el término de quince (15) días. Esta licencia comenzará a contar a partir de la fecha en que se reciba al menor en el núcleo familiar, lo cual deberá acreditarse por escrito.

l.      La licencia de maternidad no se concederá a empleadas que estén en disfrute de cualquier otro tipo de licencia, con o sin sueldo. Se exceptúa de esta disposición a las empleadas a quienes se les haya autorizado licencia de vacaciones o licencias por enfermedad y a las empleadas que estén en licencia sin sueldo por efecto de complicaciones previas al alumbramiento.

m.      La empleada embarazada o que adopte un menor tiene la obligación de notificar con anticipación a la agencia sobre sus planes para el disfrute de su licencia de maternidad y sus planes de reintegrarse al trabajo.

n.      La agencia podrá autorizar el pago por adelantado de los sueldos correspondientes al periodo de licencia de maternidad, siempre que la empleada lo solicite con anticipación correspondiente. De la empleada reintegrarse al trabajo antes de expirar el período de descanso posterior al parto, vendrá obligada a efectuar el reembolso del balance correspondiente a la licencia de maternidad no disfrutada.

o.      En caso de muerte del recién nacido previo a finalizar el periodo de licencia de maternidad, la empleada tendrá derecho a reclamar

42

exclusivamente aquella parte del periodo *post-partum* que complete las primeras ocho (8) semanas de licencia de maternidad no utilizada. Disponiéndose que el beneficio de las cuatro (4) semanas adicionales para el cuido del menor, cesará a la fecha de ocurrencia del fallecimiento del (de la) niño(a). En estos casos, la empleada podrá acogerse a cualquier otra licencia a la cual tenga derecho.

p.   La empleada podrá solicitar que se le reintegre a su trabajo antes de expirar el periodo de descanso *post-partum*, siempre y cuando presente a la agencia certificación médica acreditativa de que está en condiciones de ejercer sus funciones. En este caso se entenderá que la empleada renuncia al balance correspondiente de licencia de maternidad sin disfrutar al que tendría derecho.

4.   Licencia de paternidad

a.   La licencia por paternidad comprenderá el periodo de quince (15) días laborables a partir de la fecha del nacimiento del hijo o hija.

b.   Al reclamar este derecho, el empleado certificará que está legalmente casado o que cohabita con la madre del menor y que no ha incurrido en violencia doméstica. Dicha certificación se realizará mediante la presentación del formulario requerido por la agencia a tales fines, el cual contendrá además, la firma de la madre del menor.

c.   El empleado solicitará la licencia por paternidad y a la mayor brevedad posible someterá el certificado de nacimiento.

d.   Durante el periodo de la licencia por paternidad, el empleado devengará la totalidad de su sueldo.

e.   En el caso de un empleado con status transitorio, la licencia por paternidad no excederá del periodo de nombramiento.

f.   La licencia por paternidad no se concederá a empleados que estén en disfrute de cualquier otro tipo de licencia, con o sin sueldo. Se exceptúa de esta disposición a los empleados a quienes se les haya autorizado licencia de vacaciones o licencia por enfermedad.

g.   El empleado que, junto a su cónyuge o persona con quien cohabita, adopte a un menor de edad, a tenor con la legislación y procedimientos legales vigentes en Puerto Rico o cualquier

43

jurisdicción de los Estados Unidos, tendrá derecho a una licencia de paternidad que comprenderá el periodo de quince (15) días, a contar a partir de la fecha en que reciba al menor en el núcleo familiar, lo cual debe acreditarse por escrito. Al reclamar este derecho, el empleado certificará que está legalmente casado, en los casos en que aplique, y que no ha incurrido en violencia doméstica, delito de naturaleza sexual o maltrato de menores. Dicha certificación se realizará mediante la presentación del formulario requerido por la agencia a tales fines, el cual contendrá, además, la firma de su cónyuge.

Aquel empleado que individualmente adopte a un menor de edad preescolar, entiéndase un menor de cinco (5) años o menos que no esté matriculado en una institución escolar, a tenor con la legislación y procedimientos legales vigentes en Puerto Rico o cualquier jurisdicción de los Estados Unidos, tendrá derecho a una licencia de paternidad que comprenderá el periodo de ocho (8) semanas, a contar a partir de la fecha en que se reciba al menor en el núcleo familiar, lo cual debe acreditarse por escrito. En el caso que adopte a un menor de seis (6) años en adelante, tendrá derecho a la licencia de paternidad a sueldo completo por el término de quince (15) días.

Al reclamar este derecho el empleado certificará que no ha incurrido en violencia doméstica, ni delito de naturaleza sexual, ni maltrato de menores.

Los subincisos (d), (e) y (f) del presente inciso serán de igual aplicación en los casos en que el empleado solicite los beneficios de la licencia establecida en los párrafos anteriores.

h.   El empleado podrá solicitar que se le reintegre a su trabajo antes de expirar el periodo de licencia de paternidad a la que tiene derecho. En este caso, se entenderá que el empleado renuncia al balance correspondiente de licencia de paternidad sin disfrutar al que tendría derecho.

5.   Licencia especial con paga para la lactancia

a.   Se concederá tiempo a las madres lactantes para que después de disfrutar su licencia de maternidad tengan oportunidad para lactar a sus criaturas, durante una (1) hora dentro de cada jornada de tiempo completo, que podrá ser distribuida en dos (2) periodos de

44

treinta (30) minutos cada uno o en tres (3) periodos de veinte (20) minutos, para acudir al lugar en donde se encuentra la criatura a lactarla, en aquellos casos en que la empresa o el patrono tenga un centro de cuido en sus facilidades o para extraerse la leche materna en el lugar habilitado a estos efectos en su taller de trabajo. Dichos lugares deberán garantizar a la madre lactante privacidad, seguridad e higiene. El lugar debe contar con tomas de energía eléctrica y ventilación. Si la empleada está trabajando una jornada de tiempo parcial y la jornada diaria sobrepasa las cuatro (4) horas, el periodo concedido será de treinta (30) minutos por cada periodo de cuatro (4) horas consecutivas de trabajo.

b.      Dentro del taller de trabajo, el periodo de lactancia tendrá una duración máxima de doce (12) meses, contados a partir de la reincorporación de la empleada a sus funciones.

c.      Las empleadas que deseen hacer uso de este beneficio deberán presentar al patrono una certificación médica, durante el periodo correspondiente al cuarto (4to.) y octavo (8vo.) mes de edad del infante, donde se acredite y certifique que está lactando a su bebé. Dicha certificación deberá presentarse no más tarde de cinco (5) días antes de cada periodo. Disponiéndose que el patrono designará un área o espacio físico que garantice a la madre lactante privacidad, seguridad e higiene, sin que ello conlleve la creación o construcción de estructuras físicas u organizacionales, supeditado a la disponibilidad de recursos de las entidades gubernamentales. Las agencias, instrumentalidades, departamentos y corporaciones públicas del Gobierno de Puerto Rico deberán establecer un reglamento sobre la operación de estos espacios para la lactancia.

6.    Licencias sin paga

a.      En el caso que cese la causa por la cual se concedió la licencia, el empleado deberá reintegrarse inmediatamente a su empleo o notificar a la agencia o instrumentalidad pública sobre las razones por las que no está disponible, o su decisión de no reintegrarse al empleo que ocupaba.

b.      Además de las licencias sin paga que puedan otorgarse por cada agencia o instrumentalidad pública mediante reglamento, se podrán conceder las siguientes:

45

1. A empleados de carrera con status regular, para prestar servicios en otras agencias del Gobierno de Puerto Rico o entidad privada.

2. A empleados de carrera con status regular, para proteger el status o los derechos a que pueden ser acreedores en casos de:

   a) Una reclamación de incapacidad ante el Sistema de Retiro del Gobierno de Puerto Rico u otra entidad, y el empleado hubiere agotado su licencia por enfermedad y de vacaciones.

   b) Haber sufrido el empleado un accidente de trabajo y estar bajo tratamiento médico con la Corporación del Fondo del Seguro del Estado o pendiente de cualquier determinación final respecto a su accidente, y éste hubiere agotado su licencia por enfermedad y licencia de vacaciones.

3. A empleados que así lo soliciten luego del nacimiento de un(a) hijo(a). Disponiéndose que ese tipo de licencia sin paga podrá concederse por un periodo de tiempo que no excederá de seis (6) meses, a partir de que ésta sea autorizada.

4. A empleados con status regular que pasen a prestar servicios como empleado de confianza en la Oficina del Gobernador o en la Asamblea Legislativa, mientras estuviese prestando dichos servicios.

5. A empleados con status regular que han sido electos en las elecciones generales o sean seleccionados para cubrir las vacantes de un cargo público electivo en la Rama Ejecutiva o Legislativa, incluyendo los cargos de Comisionado Residente en los Estados Unidos y Alcalde, mientras estuviere prestando dichos servicios.

7. Licencias especiales

Se concederán a los funcionarios o empleados públicos, sean unionados o no unionados, las siguientes licencias especiales por causa justificada, con o sin paga, según fuera el caso. Disponiéndose que las referidas licencias se regirán por las leyes especiales que las otorgan.

46

a.    licencia para servir como testigo- Se prohíbe a todo patrono que pueda descontar del salario o de la licencia de vacaciones o por enfermedad de sus empleados, los días y horas que un empleado debidamente citado por el Ministerio Fiscal o por un tribunal, emplee en comparecer como testigo en un caso criminal.

b.    licencia para servicio de jurado - Toda empleado que sea citado a comparecer como jurado tendrá derecho a disfrutar de una licencia con paga y a recibir compensación de su patrono por alimentación y millaje, conforme a la reglamentación establecida en cada agencia, instrumentalidad o corporación pública, como si se tratara de una gestión oficial de tal empleado o funcionario.

c.    fines judiciales - Todo empleado citado oficialmente para comparecer ante cualquier Tribunal de Justicia, Fiscalía, organismo administrativo, gubernamental o agencias de gobierno, tendrá derecho a disfrutar de licencia con paga, por el tiempo que estuviese ausente de su trabajo con motivo de tales citaciones.

d.    licencia para donar sangre – Se concede una licencia con paga, por un periodo de cuatro (4) horas al año para acudir a donar sangre, a todo empleado del Gobierno de Puerto Rico, sus instrumentalidad y corporaciones públicas.

e.    licencia para asistir a la escuela de sus hijos(as) – Todo empleado del Gobierno de Puerto Rico, sus intrumentalidades y corporaciones públicas, tendrá derecho a cuatro (4) horas laborables, sin reducción de paga ni de sus balances de licencias, durante el comienzo de cada semestre escolar y cuatro (4) horas laborables al final de cada semestre escolar para comparecer a las instituciones educativas donde cursan estudios sus hijos y conocer sobre el aprovechamiento escolar de éstos.  No obstante a lo anterior, todo empleado cuyos hijos se encuentren registrados en el Programa de Educación Especial del Departamento de Educación tendrá hasta diez (10) horas por semestre para que puedan acudir a realizar gestiones relacionadas con sus hijos.

f.    licencia deportiva sin sueldo – Se concede una licencia deportiva sin sueldo para todo empleado público que esté debidamente seleccionado y certificado por la Junta para el Desarrollo del Atleta Puertorriqueño de Alto Rendimiento a Tiempo Completo como atleta en entrenamiento y entrenador para juegos Olímpicos, Paralímpicos, Panamericanos, Centroamericanos y Campeonatos

47

Regionales o Mundiales. Esta licencia tendrá una duración de hasta un (1) año con derecho a renovación siempre y cuando tenga la aprobación de la Junta y le sea notificado al patrono en o antes de treinta (30) días de su vencimiento. Mediante esta licencia los atletas y entrenadores elegibles podrán ausentarse de sus empleos sin pérdida de tiempo y garantizándole el empleo sin que se le afecten los beneficios y derechos adquiridos durante el periodo en que estuviera participando en dichos entrenamientos y/o competencias.

Durante el periodo de la licencia la Junta será responsable de los salarios de los participantes. Por lo tanto, vendrá obligada a hacer llegar al patrono aquella cantidad correspondiente a las deducciones legales que hasta ese momento se le hacía al empleado de manera que el patrono pueda continuar cubriendo los pagos correspondientes a dichas aportaciones.

g.      licencia deportiva especial - Se establece una licencia especial para todo empleado público que esté debidamente certificado por el Comité Olímpico de Puerto Rico como deportista para representar a Puerto Rico en Juegos Olímpicos, Juegos Paralímpicos, Juegos Panamericanos, Centroamericanos o en campeonatos regionales o mundiales.  La licencia deportiva especial tendrá una duración acumulativa que no será mayor de treinta (30) días laborables por año natural.

h.      licencia para renovar la licencia de conducir – todo empleado podrá utilizar hasta dos (2) horas de su jornada de trabajo, sin cargo a licencia alguna y con paga, para renovar su licencia de conducir, siempre que la posesión de ésta sea indispensable para su trabajo por la naturaleza del mismo.

i.      licencia voluntaria de servicios de emergencia – Todo empleado que sea un voluntario certificado en servicios de desastres de la Cruz Roja Americana, podrá ausentarse de su trabajo con una licencia con paga por un período que no exceda treinta (30) días calendario en un período de doce (12) meses para participar en funciones especializadas de servicios de desastre de la Cruz Roja Americana.

La Licencia se otorgará siempre y cuando los servicios del funcionario sean solicitados por la Cruz Roja Americana y luego de la aprobación de la agencia, instrumentalidad o corporación

Case:17-03283-LTS  Doc#:3126-4  Filed:05/23/18  Entered:05/23/18 11:45:37  Desc:
Exhibit Law 26 of 2017 (4A Spanish 4B English)  Page 49 of 200

48

pública donde se desempeñe el funcionario. La Cruz Roja Americana expedirá al empleado una certificación de los servicios prestados y el tiempo de duración de esa prestación. Esa certificación la presentará el empleado a la agencia, instrumentalidad o corporación pública donde trabaja.

j.  licencia militar - Todo empleado que pertenezca a la Guardia Nacional de Puerto Rico o a las Reservas Organizadas de las Fuerzas Armadas de los Estados Unidos tendrá derecho a que se le conceda hasta un máximo de treinta (30) días de licencia con sueldo cada año cuando estuvieren prestando servicio militar, como parte de entrenamiento o para que asista a los campamentos y ejercicios que le sean requeridos.

k.  licencia para vacunar a sus hijos - Se concede hasta un máximo de dos (2) horas a todo(a) empleado(a) que así lo solicite, para vacunar a sus hijos(as) en una institución gubernamental o privada, cada vez que sea necesaria la vacunación, según se indica en la tarjeta de inmunización del (de la) hijo(a). El (la) empleado(a) debe presentar una certificación del lugar, fecha y hora en que sus hijos(as) fueron vacunados, con el fin de justificar el tiempo utilizado, según se establece para este tipo de licencia. De lo contrario, el tiempo utilizado se cargará a tiempo compensatorio, licencia de vacaciones o se descontará del sueldo.

l.  Nada de lo dispuesto en esta Ley afectará los derechos del *Federal and Medical Leave Act* (FMLA) de los empleados públicos que por ley federal estén cobijados por sus disposiciones en la actualidad.

Artículo 2.05.-Días Feriados.

Todo funcionario o empleado público del Gobierno de Puerto Rico tendrá derecho sólo a los días feriados declarados como tales por el (la) Gobernador(a) de Puerto Rico o por Ley. Los días que se enumeran a continuación serán los días feriados que disfrutarán todos los empleados públicos:

1.  Día de Año Nuevo, que se celebrará el 1 de enero.

2.  Día de Reyes, que se celebrará el 6 de enero.

3.  Natalicio de Martin Luther King, Jr., que se celebrará el tercer lunes de enero.

49

4.   Día de Jorge Washington, Día de los Presidentes y el Día de los Próceres Puertorriqueños: Eugenio María de Hostos, José de Diego, Luis Muñoz Rivera, José Celso Barbosa, Ramón Emeterio Betances, Román Baldorioty de Castro, Luis Muñoz Marín, Ernesto Ramos Antonini y Luis A. Ferré, que se celebrará el tercer lunes de febrero.

5.   Día de la Ciudadanía Americana, que se celebrará el 2 de marzo.

6.   Día de Abolición de la Esclavitud, que se celebrará el 22 de marzo.

7.   Viernes Santo, cuya celebración es en fechas movibles.

8.   Día de la Conmemoración de los Muertos en la Guerra (Memorial Day) que se celebrará el último lunes de mayo.

9.   Día de la Independencia de los Estados Unidos, que se celebrará el 4 de julio.

10.   Día del Trabajo, que se celebrará el primer lunes de septiembre.

11.   Día de la Raza (Descubrimiento de América), que se celebrará el segundo lunes de octubre.

12.   Día del Veterano, que se celebrará el día 11 de noviembre.

13.   Día de la Cultura Puertorriqueña y el Descubrimiento de Puerto Rico, que se celebrará el 19 de noviembre.

14.   Día de Acción de Gracias, que se celebrará el cuarto jueves de noviembre.

15.   Día de Navidad, que se celebrará el 25 de diciembre.

Artículo 2.06.-Centros de Cuidado Diurno:

Todo funcionario o empleado del Gobierno de Puerto Rico, sus intrumentalidades y corporaciones públicas donde existan áreas que estén debidamente habilitadas para operar como Centro de Cuidado Diurno y/o ser utilizado para cuido de niños en edades preescolares, tendrá derecho a la utilización de las mismas. Los usuarios del servicio aportarán económicamente para el mejor funcionamiento del Centro; disponiéndose, que cada agencia, instrumentalidad o corporación pública determinará cual será el pago razonable por el uso de tales facilidades y servicios.

50

Artículo 2.07.-Aportación patronal uniforme para plan médico para los empleados de las corporaciones públicas:

Las Ramas Ejecutiva y Legislativa identificarán ahorros y recursos adicionales para evitar afectar las aportaciones de los empleados para el pago de los planes médicos. De no poder llegar a los ahorros proyectados en el Plan Fiscal, la diferencia se logrará mediante un programa para igualar las aportaciones del Gobierno al plan médico. Solo entonces, a partir del 1 de julio de 2018, todo funcionario o empleado público, unionado o no unionado, que trabaje para alguna Corporación Pública, excluyendo a la Universidad de Puerto Rico, tendrá derecho a una aportación patronal que será determinada por el Comité de Cumplimiento con el Plan Fiscal utilizando como base las métricas establecidas en el Plan Fiscal, pero que nunca será menor de la aportación patronal mínima de cien dólares ($100) establecida por Ley para los empleados del Gobierno Central. AAFAF podrá negociar y acordar cubiertas de seguros más económicas con aseguradoras privadas o bajo cubierta pública para la elección del empleado en el Gobierno como Empleador Único o por agencia o grupos de agencias. Cualquier reducción a la aportación patronal del plan médico requerirá que AAFAF ofrezca una cubierta de plan médico más económica a esos empleados públicos. No obstante, todo empleado de corporación pública o dependiente que actualmente se encuentre inscrito en el plan médico y que padezca de una enfermedad catastrófica, crónica o terminal prexistente mantendrá la aportación patronal vigente para su seguro médico de manera inalterada, durante todo el tiempo que permanezca vinculado en el servicio público.

Artículo 2.08.-Bonificaciones.

A partir de la vigencia de esta Ley, la única bonificación económica que se le otorgará a los empleados públicos del Gobierno Central y sus corporaciones públicas será por concepto del bono de navidad. La cantidad que los empleados tendrán derecho a recibir será de seiscientos dólares ($600.00) en cada año en que haya prestado servicios al Gobierno de Puerto Rico durante por lo menos seis (6) meses.

Artículo 2.09.-Remuneración del Trabajo en Exceso a la Jornada Regular:

1.  El programa de trabajo de cada agencia o instrumentalidad pública se formulará de tal manera que se reduzca al mínimo la necesidad de trabajo en exceso de jornada regular establecida en la agencia o instrumentalidad pública para los empleados. No obstante, por razón de la naturaleza especial de los servicios a prestarse, la necesidad de los servicios para proteger y preservar la vida y propiedad de los ciudadanos, por cualquier situación de emergencia, por eventos de fuerza mayor, disturbios atmosféricos, situaciones imprevistas o de mantenimiento necesarias para dar continuidad a un servicio esencial, se podrá requerir a los empleados

51

que presten servicios en exceso de su jornada de trabajo, diaria o semanal, o en cualquier día en que se suspendan los servicios sin cargo a licencia por el Gobernador. En estos casos, deberá mediar una autorización previa del supervisor del empleado, la cual deberá ser aprobada por la autoridad nominadora o por aquel funcionario en quien éste delegue. Los supervisores deberán tomar medidas para que cuando un empleado permanezca trabajando sea siempre a virtud de una autorización expresa.

2.    Los empleados tendrán derecho a recibir tiempo compensatorio, a razón de tiempo y medio, por los servicios prestados en exceso de su jornada regular, diaria o semanal, hora de tomar alimentos y por los servicios prestados en los días feriados, en los días de descanso, o en los días en que se suspendan los servicios sin cargo a licencia por el Gobernador. El tiempo compensatorio deberá ser disfrutado por el empleado dentro del período de seis (6) meses a partir de la fecha en que haya realizado el trabajo extra. Si por necesidad del servicio esto no fuera posible, se le podrá acumular el tiempo compensatorio hasta un máximo de doscientas cuarenta (240) horas.  En los casos de empleados que ejerzan funciones de seguridad pública, respuestas a emergencia o actividades de temporadas, según estos términos se definen en la "Ley Federal de Normas Razonables del Trabajo", salvo por lo dispuesto en el Artículo 10 de la Ley 53-1996 y el Artículo 2.09 de la Ley 20-2017, se podrán acumular hasta cuatrocientas ochenta (480) horas. La compensación de tiempo extra en tiempo compensatorio no procede para las horas que el empleado acumule en exceso de los límites mencionados. No obstante, en el caso de los policías, según dispone el Artículo 2.09 de la Ley 20-2017, a estos se les pagará a tiempo y medio y tendrán la opción de escoger la paga de estas horas sin tener que acumularla como tiempo compensatorio y dicho pago por horas extras no estará incluido en el ingreso bruto y no tributará. Esto no aplicará a los empleados de las corporaciones públicas quienes tendrán derecho al pago de horas extras a razón de tiempo y medio desde la primera hora acumulada al tiempo establecido en esta Ley, salvo el convenio colectivo aplicable disponga para la acumulación de tiempo compensatorio.

3.    Está excluido de las disposiciones del apartado (2) precedente cualquier empleado que realice funciones de naturaleza administrativa, ejecutiva o profesional, conforme estos términos se definen en la "Ley Federal de Normas Razonables del Trabajo".

Artículo 2.10.-Liquidación de días en exceso de vacaciones y licencia por enfermedad:

52

Cada agencia, instrumentalidad o corporación pública tiene que reconocerle a todo empleado público, unionado y no unionado, los balances de licencias por vacaciones y enfermedad acumuladas a la fecha de vigencia de esta Ley pero no podrá liquidar en efectivo los excesos acumulados antes de la vigencia de esta Ley.

Las agencias o instrumentalidades públicas están obligadas a establecer de forma inmediata un plan para agotar el exceso de los balances acumulados para los empleados, tanto unionados como no unionados, de manera tal, que al 31 de diciembre del 2017, no hayan acumulaciones en exceso de lo permitido en licencias de enfermedad o vacaciones; disponiéndose además, que después de esa fecha se perderá el balance en exceso que no haya sido utilizado.

A partir de la vigencia de esta Ley, ningún empleado público, sea unionado o no unionado, que trabaje para el Gobierno de Puerto Rico en alguna de sus agencias, instrumentalidades o corporaciones públicas tendrá derecho al pago de la liquidación de días en exceso por concepto de vacaciones o enfermedad.

Artículo 2.11.-Liquidación final de licencia de vacaciones acumulada en caso de desvinculación del empleado del servicio público:

A partir de la vigencia de esta Ley, cualquier empleado público, sea unionado o no unionado, solamente tendrá derecho al pago de una liquidación final de los días que tenga disponibles en concepto de licencia de vacaciones al momento del cese de servicios, lo cual nunca podrá ser mayor de sesenta (60) días. El empleado podrá autorizar para que se destine dicho balance y/o exceso preexistente a la aprobación de esta Ley a su Sistema de Retiro para que cotice como tiempo trabajado.

Artículo 2.11(a).-Se enmienda el Artículo 3 de la Ley Núm. 125 de 10 de junio de 1967, según enmendada, para que lea como sigue:

"El Gobernador reglamentará todo lo relativo a la concesión y disfrute de licencias y la cuantía del pago de compensación final, incluyendo el pago a los beneficiarios en caso de muerte, a los funcionarios nombrados por él, con excepción de los miembros de la Judicatura, los fiscales, procuradores y registradores de la propiedad. A los efectos del pago de compensación final, que en ningún caso excederá el equivalente a dos (2) meses de sueldo, el Gobernador tomará en consideración, entre otros, factores tales como las necesidades del servicio, tiempo durante el cual ejerció el cargo y situación fiscal de la agencia o entidad gubernamental, la naturaleza de las funciones desempeñadas y los créditos de licencia de vacaciones acumuladas en empleos anteriores en el Gobierno y no disfrutada al pasar a ocupar puestos de nombramiento por el Gobernador. Aquellas personas que hayan recibido el pago por una compensación final, según las disposiciones de esta Ley, vendrán obligadas a devolver la

53

cantidad recibida si, por actos que acontecieron durante el ejercicio de su función pública, son convictas por los delitos de apropiación ilegal, malversación o robo, de fondos públicos; delitos contra el erario o la función pública, según tipificados en el Código Penal de Puerto Rico.

...″

Artículo 2.12.-Se enmienda la Sección 4.3 del Artículo 4 de la Ley 8–2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", para que lea como sigue:

"Sección 4.3.-Funciones y Facultades de la Oficina y del (de la) Director(a)

Además de las funciones y facultades que se confieren en otras disposiciones de esta Ley, la Oficina y el (la) Director(a) tendrán las siguientes:

1.      ...

2.      Funciones y facultades de la Oficina:

    a.      Centralizar aquellas funciones del Sistema de Administración y Transformación de Recursos Humanos del Gobierno de Puerto Rico que sean compatibles con lo que se ordena en la presente Ley.

    b.      ...

    c.      ...

    d.      ...

    e.      Asesorar en el área laboral a las agencias de la Rama Ejecutiva, en todo lo relacionado con los procedimientos de elección y certificación de organizaciones sindicales, en cuanto a la negociación y administración de convenios colectivos y en todas aquellas áreas relacionadas con los asuntos laborales que dispone la Ley 45-1998 de las agencias. En el descargo de las funciones de asesoramiento en torno a la negociación colectiva conforme a la Ley 45-1998, la Oficina coordinará y supervisará la creación y funcionamiento de un Comité de Negociación compuesto por su personal y aquel que designe la Oficina de Gerencia y Presupuesto. La Oficina realizará estudios comparativos de convenios colectivos y

54

ofrecerá adiestramientos en el área laboral a aquellas agencias que lo soliciten.

f.      ...

g.      ...

h.      ...

i.      ...

j.      ...

k.      ...

l.      ...

m.     Administrar y mantener actualizado el Registro Central de Convocatorias para Reclutamiento, Ascenso y Adiestramiento en el Servicio Público. De igual manera, se mantendrá un registro en línea; disponiéndose que las agencias, instrumentalidades públicas, así como las corporaciones públicas, con excepción de la Oficina propia del Gobernador, de los Municipios, del Tribunal Supremo, de las Oficinas del Juez Presidente y del Administrador de los Tribunales, de las Cámaras Legislativas, y de las Legislaturas Municipales, deberán cumplir con la obligación de remitir mensualmente a la Oficina de Administración y Transformación de los Recursos los Humanos del Gobierno de Puerto Rico las oportunidades de reclutamiento y ascenso. La Oficina remitirá para entrevista candidatos del listado que mantendrá dicha Oficina. Todas las solicitudes para adiestramiento serán referidas a la Oficina de Administración y Transformación de los Recursos Humanos del Gobierno de Puerto Rico, con por lo menos treinta (30) días de anticipación a la fecha del adiestramiento. La Oficina evaluará la necesidad y conveniencia del adiestramiento y procederá a aprobar o rechazar el mismo.

n.      ...

o.      ...

55

p.      ...

q.      ...

r.      ...

s.      ...

t.      ...

...″

Artículo 2.13.-Se enmienda la Sección 5.2 del Artículo 5, de la Ley 8–2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", para que lea como sigue:

"Artículo 5.-Sistema de Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico

Sección 5.1.-  ...

Sección 5.2.-Exclusiones

Las disposiciones de esta Ley no le serán aplicables a las siguientes agencias del Gobierno e instrumentalidades gubernamentales:

1.      ...

...

5.      Oficina Propia del Gobernador.

...

8.      ...

No obstante, en el caso de las corporaciones públicas o público privadas, éstas deberán adoptar reglamentos de personal que incorporen el principio de mérito a la administración de sus recursos humanos, conforme lo dispone esta Ley y someterán copia de los mismos a la Oficina. La Oficina queda facultada para realizar auditorías de cumplimiento en cuanto a las áreas esenciales al principio de mérito.

56

De igual forma, el concepto de la movilidad y el mecanismo establecido por la Oficina para implementar el movimiento de los empleados públicos aplicará en las corporaciones públicas o público privadas, agencias que funcionan como empresas o negocios privados como las Alianzas Público Privadas Participativas (APP+P) y los municipios."

Artículo 2.14.-Se enmienda la Sección 6.4, inciso 1 (d) e inciso 4 (1), y se añade un inciso 5 al Artículo 6 de la Ley 8-2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", para que lea como sigue:

"Sección 6.4.-Disposiciones sobre Ascensos, Traslados, Descensos y Movilidad

...

1.      ...

        a.      ...

        b.      ...

        c.      ...

        d.      ...

                Por otro lado, por las cualificaciones especiales de los empleados se entenderá la experiencia adicional; los estudios académicos adicionales a los requisitos mínimos y los resultados obtenidos del Sistema de Evaluación adoptado por las Agencias y desarrollado por la Oficina.

        e.      ...

2.      ...

3.      ...

4.      Movilidad

        ...

        1.      La Oficina de Administración y Transformación de los Recursos Humanos del Gobierno de Puerto Rico, en conjunto

57

con la Oficina de Gerencia y Presupuesto tendrán un (1) año a partir de la aprobación de la presente Ley para crear los planes de movilidad, los cuales deben corresponder a las necesidades inmediatas en la prestación de servicios en el Gobierno de Puerto Rico.

2.    ...

3.    ...

4.    ...

5.    ...

6.    ...

7.    ...

8.    ...

9.    ...

10.   ...

11.   ...

12.   ...

13.   ...

5.    Otras Acciones

   (a)    Destaque – se autoriza la asignación temporal de un funcionario o empleado de una agencia de la Rama Ejecutiva o municipio y viceversa, para brindar servicios mutuos en alguna de dichas jurisdicciones. El funcionario o empleado destacado continuará ocupando el mismo puesto y conservará todos sus derechos como funcionario o empleado de dicha agencia. El destaque es una acción administrativa que permite la maximización en la utilización de los recursos humanos de una manera costo efectiva y en atención al Principio de Mérito. Bajo circunstancias excepcionales, es permisible el uso de este mecanismo entre funcionarios y

58

empleados de la Rama Ejecutiva y demás Ramas de Gobierno, siempre que se restituya la retribución pagada al funcionario en destaque por la Rama que lo utiliza conforme a las directrices que a esos efectos emita la Oficina de Gerencia y Presupuesto.  El destaque podrá ser utilizado por el término de un (1) año el cual podrá ser prorrogable de existir la necesidad.

(b)     Designación o Asignación Administrativa – es la designación formal y temporal que hace una autoridad nominadora a un empleado para que brinde servicios de igual naturaleza o similar, en otra dependencia de la misma agencia."

Artículo 2.15.-Se enmienda la Sección 6.8 inciso 2 (b) del Artículo 6 de la Ley 8–2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", para que lea como sigue:

"Sección 6.8.-Habilitación en el Servicio Público

...

1.     ...

2.     ...

        a     ...

        b.     Todo empleado público convicto a quien se le conceda una sentencia suspendida o el beneficio de libertad bajo palabra que cumpla su sentencia en la libre comunidad bajo aquellas limitaciones impuestas por los organismos del Sistema Correccional Gubernamental, podrá someter su solicitud de habilitación en cualquier momento al Departamento del Trabajo y Recursos Humanos o en su defecto, la Agencia para la cual presta servicios vendrá obligada a someterla. El empleado continuará desempeñándose en su puesto hasta tanto el Secretario del Trabajo y Recursos Humanos determine lo contrario.

        c.     ...

        d.     ..."

59

Artículo 2.16.-Se enmienda la Sección 6.9 del Artículo 6 de la Ley 8-2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", para que lea como sigue:

"Sección 6.9.-Prohibición

A los fines de asegurar la fiel aplicación del Principio de Mérito en el Servicio Público durante períodos pre y post eleccionarios, las Autoridades Nominadoras de las agencias, instrumentalidades y corporaciones públicas del Gobierno de Puerto Rico se abstendrán de efectuar cualquier transacción de personal que incluya las áreas esenciales al Principio de Mérito, tales como nombramientos, ascensos, descensos, traslados; tampoco podrán efectuar cambios o acciones de retribución, ni cambios de categoría de puestos, ni se utilizará la movilidad de empleado durante la veda electoral. Disponiéndose que durante dicho período tampoco pueda tramitarse ni registrarse en los expedientes de personal cambios o acciones de personal de ninguna índole con efecto retroactivo. Se exceptúan de la veda los cambios como resultado de la terminación del período probatorio y la imposición de medidas disciplinarias. El incumplimiento de esta disposición conllevará la nulidad de la transacción efectuada. Esta prohibición comprenderá el período de dos (2) meses antes y dos (2) meses después de la celebración de las Elecciones Generales de Puerto Rico.

Previa aprobación de la Oficina, se podrá hacer excepción de esta prohibición por necesidades urgentes e inaplazables del servicio debidamente evidenciado y certificado conforme a las normas que sobre este particular emita la Oficina. Para efectos de este Artículo, necesidad urgente e inaplazable se entiende como aquellas acciones esenciales o indispensables que son menester efectuar en forma apremiante para cumplir con las funciones de la agencia, instrumentalidad o corporación pública.   No incluye aquellas acciones que resulten meramente convenientes o ventajosas, cuya solución puede aplazarse hasta que se realice el trámite ordinario."

Artículo 2.17.-Se enmienda la Sección 7.2 incisos 3 y 5 del Artículo 7 de la Ley 8-2017, conocida como "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", para que lea como sigue:

"Sección 7.2.-Normas Generales de Retribución

Las siguientes guías son aplicables a todas las agencias gubernamentales bajo esta Ley:

1.      ...

60

2.      ...

3.      La Oficina administrará el plan de retribución en relación con las áreas
        esenciales al principio de mérito. Estas no podrán efectuar ninguna acción
        que atente o sea contraria al principio de mérito en las transacciones de
        personal en el servicio público de carrera.

4.      ...

5.      Ninguna enmienda o modificación al sistema de evaluación o valoración
        de puestos podrá afectar negativamente el salario base del empleado.

                ..."

        Artículo 2.18.-Se suspende la vigencia del Artículo 9 y la Sección 10.2 del Artículo
10 de la Ley 8–2017, conocida como "Ley para la Administración y Transformación de los
Recursos Humanos en el Gobierno de Puerto Rico", sujeto a las disposiciones establecidas
en el Artículo 2.03 de esta Ley.

        Artículo 2.19.-Nulidad

        A partir de la vigencia de la presente Ley será nulo e ineficaz toda cláusula o
disposición de un convenio colectivo, acuerdo, acuerdo suplementario, reglamento,
orden administrativa, carta circular y/o carta contractual, en las disposiciones en que
otorgue a los funcionarios o empleados públicos unionados o no unionados del Gobierno,
incluyendo a todo empleado unionado o no unionado de las Corporaciones Públicas del
Gobierno de Puerto Rico, mayores beneficios marginales a los autorizados en la presente
Ley. La adopción de cualquier medida autorizada para cumplir con lo anterior por
cualquier agencia o corporación pública del Gobierno de Puerto Rico no constituirá una
violación a los convenios colectivos existentes. Tampoco constituirá una práctica ilícita.

        Artículo 2.20.-Relación con otras leyes

        Se mantienen en pleno vigor las siguientes leyes en relación a las disposiciones
que no entren en conflicto con la presente Ley:

a.      Ley 62 de 23 de junio de 1969, según enmendada, conocida como "Código
        Militar de Puerto Rico".

b.      Ley 122-1996, según enmendada, conocida como "Ley de comparecencia de
        empleados como testigos en casos criminales".

61

c.   Ley 44-1996, según enmendada, conocida como "Ley de Cesión de Licencias por Vacaciones".

d.   Ley 203-2007, según enmendada, conocida como "Carta de Derechos del Veterano Puertorriqueño del Siglo XXI".

e.   Ley 58-1994, según enmendada, conocida como "Ley de Licencia Voluntaria de Servicios de Emergencias".

f.   Ley 122 del 12 de julio de 1986, según enmendada, conocida como "Ley de comparecencia de empleados como testigos en casos criminales".

g.   Ley 281-2003, según enmendada, conocida como "Ley para la Administración del Servicio de Jurado de Puerto Rico".

h.   Ley 24-2002, según enmendada.

i.   Ley 49 de 27 de junio de 1987, según enmendada.

j.   Ley 134-1998, según enmendada.

k.   Ley 154-2000, según enmendada.

l.   En lo relativo a los Municipios, continúa en pleno vigor y sin menoscabo alguno las disposiciones de la Ley 81-1991, según enmendada, conocida como "Ley de Municipios Autónomos de Puerto Rico". Las disposiciones de la presente Ley le aplicarán a cualquier Municipio que así lo determine al aprobar una Ordenanza Municipal a esos efectos.

Artículo 2.21.-Derogación

Se deroga la Ley 89-2016, mejor conocida como "Ley de Empleo Temporal en el Servicio Público".

CAPÍTULO 3.-ASOCIACIÓN DE SUSCRIPCIÓN CONJUNTA DEL SEGURO DE RESPONSABILIDAD OBLIGATORIO

Artículo 3.01.-Se enmienda el inciso (m) del Artículo 3 de la Ley 253-1995, según enmendada, para que lea como sigue:

"Artículo 3.-Definiciones.

62

Para fines de esta Ley, los siguientes términos y frases tendrán el significado que se expresa a continuación:

(a)    ...

...

(m)    Seguro de responsabilidad obligatorio. — Significa el seguro que exige esta Ley y que responde por los daños causados a vehículos de motor de terceros como resultado de un accidente de tránsito, por los cuales es legalmente responsable el dueño del vehículo asegurado por este seguro, y a causa de cuyo uso se ocasionan dichos daños, conforme al sistema para la determinación inicial de responsabilidad creado al amparo de esta Ley. El seguro tendrá un límite de cubierta de cuatro mil quinientos dólares ($4,500) por accidente. El Comisionado, a solicitud de los aseguradores que proveen el seguro de responsabilidad obligatorio o *motu proprio*, podrá revisar y modificar el límite y la tarifa del seguro de responsabilidad obligatorio cada dos (2) años, conforme a las disposiciones aplicables del Capítulo 12 del Código, que tomen en consideración a todo asegurador en el mercado del Seguro de Responsabilidad Obligatorio. No obstante, el límite de la cubierta nunca será menor de tres mil quinientos dólares ($3,500).

...″

Artículo 3.02.-Se enmiendan los incisos (f) y (h) del Artículo 6 de la Ley 253-1995, según enmendada, mejor conocida como "Ley de Seguro de Responsabilidad Obligatoria para Vehículos de Motor", para que lean como sigue:

"Artículo 6.-Asociación de Suscripción Conjunta — Creación.

(a)    ...

...

(f)    Las aseguradoras que suscriban el seguro de responsabilidad obligatorio, incluyendo a la Asociación de Suscripción Conjunta, una vez reciban las primas que les correspondan luego de deducido el cargo establecido en el Artículo 7(b)(1), descontarán el cinco por ciento (5%) de las mismas, según establecido en el Artículo 7(b)(2). Cada aseguradora y la Asociación de Suscripción Conjunta será responsable de remitir al Departamento de Hacienda la cantidad que corresponda al cargo sobre el total de primas suscritas durante un mes, no más tarde del día cinco (5) del mes siguiente.

63

El Departamento de Hacienda establecerá mediante reglamento la manera en que se realizará este pago y podrá diseñar y acordar otros métodos para el cobro por este concepto, siempre que el cambio redunde en un recaudo efectivo y constante. En la misma fecha, cada aseguradora y la Asociación de Suscripción Conjunta será responsable de remitir al Departamento de Hacienda la cantidad que corresponda al cargo establecido en el Artículo 7(b)(3). El Departamento de Hacienda establecerá mediante reglamento la manera en que se realizará este pago y podrá diseñar y acordar otros métodos para el cobro por este concepto, siempre que el cambio redunde en un recaudo efectivo y constante.

...

(h)     Todos los miembros de la Asociación de Suscripción Conjunta participarán anualmente en las ganancias y pérdidas de ésta, determinadas conforme al Estado Anual requerido a tenor con el Artículo 3.310 del Código, en el porciento que las primas netas directas suscritas en Puerto Rico durante el año anterior por cada uno de dichos aseguradores, para el seguro contra cualquier pérdida, gastos o responsabilidad por la pérdida o los daños causados a personas o la propiedad, resultantes de la posesión, conservación o uso de cualquier vehículo terrestre, aeronave o animales de tiro o de montura, o incidentales a los mismos, todo ello de conformidad con el Artículo 4.070 del Código, represente del total de las primas netas directas suscritas en Puerto Rico durante dicho año para esa clase de seguro.

(1)     ...

(2)     ...

(3)     Dividendo Extraordinario y Pago Especial 2017:

(i)     Se autoriza a la Asociación de Suscripción Conjunta a declarar un dividendo extraordinario antes del 30 de junio de 2017 a sus miembros, sujeto a las disposiciones de este inciso, de una cantidad de setenta millones (70,000,000) de dólares sujeto a la imposición de una contribución especial y única de cincuenta por ciento (50%). Los dividendos que reciban los aseguradores privados miembros de la Asociación de Suscripción Conjunta no estarán sujetos a ninguna otra contribución. Los recaudos obtenidos a través de la contribución especial y única aquí dispuesta, no serán considerados como parte del cómputo de ninguna de las fórmulas existentes para el cálculo de asignaciones

64

presupuestarias a ser consignadas como parte del proceso presupuestario constitucional.

(ii) En un término que no excederá de quince (15) días de aprobada esta Ley, la Junta convocará una asamblea y someterá para aprobación de todos los miembros de la Asociación de Suscripción Conjunta la declaración del dividendo extraordinario autorizado. Se dispone que el dividendo podrá ser aprobado con el voto de los miembros con una participación proporcional combinada de más de cincuenta por ciento (50%) conforme a la más reciente determinación hecha por la Oficina del Comisionado de Seguros. La determinación de la Asamblea será vinculante.

(iii) En consideración al beneficio público de esta medida y su autorización legislativa, aplicará aquí lo dispuesto en el inciso (j) de este Artículo a las acciones tomadas por la Junta, miembros y personal de la Asociación.

(iv) De avalarse la declaración del dividendo en la asamblea, la Asociación de Suscripción Conjunta, en un término que no excederá de noventa (90) días, realizará un pago especial de treinta y cinco millones de dólares ($35,000,000) al Departamento de Hacienda, quien depositará los fondos en el Fondo General del Gobierno de Puerto Rico. Durante ese mismo término la Asociación de Suscripción Conjunta desembolsará a sus miembros los dividendos autorizados a tenor con la participación proporcional de cada miembro.

..."

Artículo 3.03.-Se enmiendan los incisos (a), (b) y (d) del Artículo 7 de la Ley Núm. 253 de 27 de diciembre de 1995, según enmendada, para que lean como sigue:

"Artículo 7.-Primas.-

(a) La prima uniforme inicial del seguro de responsabilidad obligatorio será noventa y nueve dólares ($99) por cada vehículo privado de pasajeros y ciento cuarenta y ocho dólares ($148) por cada vehículo comercial. Se autoriza la revisión y ajuste de la prima en o antes del 30 de junio de 2017, conforme lo dispuesto en el inciso (e) de este Artículo.

65

El Comisionado podrá fijar una prima diferente a las establecidas en este inciso para el seguro de responsabilidad obligatorio de aquellos vehículos a los cuales el Departamento de Transportación y Obras Públicas les emita licencias transitorias o provisionales.

(b)   Cargos por Servicios

1)   ...

2)   ...

3)   Se establece un cargo administrativo adicional que será proporcional al incremento en ganancias por concepto de ajustes en la prima uniforme, conforme lo dispuesto en los incisos (a) y (e) de este Artículo. El por ciento aplicable para determinar la cuantía correspondiente en los casos de incremento de la prima será calculado dividiendo el incremento neto de la prima conforme la cantidad establecida en el inciso (a) de este Artículo, entre el costo total ajustado de la prima. El por ciento resultante será aplicado a los ingresos generados por las aseguradoras, incluyendo la Asociación de Suscripción Conjunta, luego de descontados los gastos administrativos y costos relacionados a la producción de la prima. El balance que resulte al aplicar el por ciento según establecido en esta fórmula será transferido al Fondo General del Gobierno de Puerto Rico. Este cargo no constituye una contribución sobre prima.

4)   Estos cargos no aplicarán a aquellas pólizas emitidas mediante el seguro tradicional y se considerarán parte de la prima del seguro de responsabilidad obligatorio y deberán garantizarse dentro de la distribución del dólar prima.

(c)   ...

(d)   Todo asegurador del seguro de responsabilidad obligatorio podrá presentar para la aprobación del Comisionado reglas y planes de tarifas que contengan normas para la aplicación de recargos a la prima uniforme de los vehículos privados de pasajeros o de los vehículos comerciales que se aseguren con estos, según corresponda, sujeto a las disposiciones del Capítulo 12 del Código tomando como base la frecuencia y severidad de pérdidas de sus asegurados.

(e)   ...

66

..."..

CAPÍTULO 4.- TRANSFERENCIA DE CORPORACIONES PÚBLICAS, AGENCIAS E
INSTRUMENTALIDADES AL FONDO GENERAL; CREACIÓN DEL COMITÉ Y
AJUSTES DE CARGOS, DERECHOS Y TARIFAS.

Artículo 4.01.-Transferencia de Sobrantes

Se ordena a las corporaciones públicas, agencias e instrumentalidades del
Gobierno de Puerto Rico a transferir al Departamento de Hacienda los sobrantes de los
ingresos generados. Dichos fondos serán considerados como recursos disponibles del
Estado y depositados por el Departamento de Hacienda en el Fondo General del
Gobierno de Puerto Rico para cumplir con los requerimientos de liquidez contemplados
en el Plan Fiscal adoptado al amparo de las disposiciones de *Puerto Rico Oversight,
Management and Economic Stability Act of 2016*, Public Law 114-187, también conocida
como PROMESA.

Artículo 4.02.-Comité

La cantidad de fondos que aportará cada una de las corporaciones e
instrumentalidades será determinado por un comité compuesto por el Director Ejecutivo
de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico, el Secretario del
Departamento de Hacienda y el Director Ejecutivo de la Oficina de Gerencia y
Presupuesto que podrán establecer las tarifas necesarias para cumplir con lo dispuesto
en el Plan Fiscal aprobado para el Gobierno de Puerto Rico y el que rija a sus
corporaciones. Este comité velará porque la transferencia de los fondos según se dispone
en el Artículo 4.01 de la presente Ley no afecten los servicios que ofrecen las
corporaciones públicas e instrumentalidades y que sean los sobrantes disponibles luego
de haber sido cubiertos los gastos operacionales y obligaciones de dichas entidades,
conforme con el presupuesto de gastos recomendado por la Oficina de Gerencia y
Presupuesto para cada año fiscal.

Además, se faculta a este Comité a revisar las fuentes de ingresos de las
corporaciones públicas, agencias e instrumentalidades y ajustar, aumentar o disminuir,
cualquier cargo, derecho, tarifa, arancel, honorario, prima o cualquier ingreso de similar
naturaleza, con el fin de cumplir con las métricas dispuestas en el Plan Fiscal del Gobierno
de Puerto Rico. Además, el Comité podrá imponer un cargo administrativo adicional a
aquellas contribuciones que entienda necesaria que podrá ser de cinco por ciento (5%)
hasta un diez por ciento (10%), para cumplir con las métricas del Plan Fiscal certificado
por la Junta de Supervisión Fiscal.

Esta Ley tendrá supremacía sobre cualquier ley que establezca cualquier cargo,
derecho, tarifa, arancel, honorario, prima o cualquier ingreso de similar naturaleza y se

Case:17-03283-LTS   Doc#:3126-4   Filed:05/23/18   Entered:05/23/18 11:45:37   Desc:
Exhibit Law 26 of 2017 (4A Spanish 4B English)   Page 68 of 200

67

le autoriza al comité a revisar, aumentar o disminuir la cuantía aun cuando la misma esté dispuesta en Ley. El comité tendrá facultad de revisar, aumentar o disminuir estos ingresos sin sujeción a las disposiciones de cualquier Ley, reglamento u orden administrativa que establezca una cuantía particular a estos ingresos.

Cualquier disposición de ley, reglamento, orden administrativa, resolución corporativa, o cualquier otro documento de similar naturaleza, que restrinja o reduzca los fondos que puedan ser transferidos por una corporación pública, agencia o instrumentalidad del Gobierno de Puerto Rico al Fondo General según dispuesto en este Capítulo queda suspendida.

Se faculta al comité a promover cualquier orden administrativa, carta circular o reglamento necesario para su operación y para el cumplimiento con las disposiciones de la presente Ley.

Artículo 4.03.-Exclusiones

Se excluyen de las disposiciones de este Capítulo a la Universidad de Puerto Rico, creada por virtud de la Ley Núm. 1 de 20 de enero de 1966, según enmendada, conocida como "Ley de la Universidad de Puerto Rico", y a la Corporación Pública para la Supervisión y Seguro de Cooperativas de Puerto Rico, creada por virtud de la Ley 114-2001, según enmendada, mejor conocida como "Ley de la Corporación Pública para la Supervisión y Seguro de Cooperativas de Puerto Rico", "Ley de la Corporación de Financiamiento Municipal", mejor conocida como COFIM, Ley 19-2014, según enmendada, "Ley de la Comisión Especial Sobre Fondos Legislativos para Impacto Comunitario", Ley 20-2015 y "Ley de la Comisión Conjunta Sobre Informe especiales del Contralor", Ley Núm. 83 de 23 de junio de 1954, según enmendada. Se excluye de la aplicación de este Capítulo los fondos de las entidades y corporaciones públicas con fines comunitarios, que sean fondos recibidos por entidades privadas.

En cuanto a la "Ley del Fondo de Interés Apremiante", mejor conocida como COFINA, Ley 9-2006, según enmendada, el Ejecutivo quedará autorizado para utilizar los Fondos de COFINA, de manera ocasional, únicamente como última alternativa y sujeto a la presentación de una certificación juramentada sometida a la Asamblea Legislativa. No se entenderá por la presentación de dicha certificación que el Ejecutivo tendrá uso indefinido de los fondos de COFINA. Dicha certificación tendrá que establecer la necesidad, término y la cantidad de fondos a utilizarse, para cubrir una deficiencia significativa ocasional en el flujo de caja para cumplir con el Plan Fiscal del Gobierno de Puerto Rico. Dicha certificación será firmada y juramentada por el Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal (AAFAF) y por el Director de la Oficina de Gerencia y Presupuesto. La firma y el juramento de estos funcionarios en la certificación será indelegable. En dicha certificación los funcionarios

Case:17-03283-LTS   Doc#:3126-4   Filed:05/23/18   Entered:05/23/18 11:45:37   Desc:
Exhibit Law 26 of 2017 (4A Spanish 4B English)   Page 69 of 200

acreditarán que la información es correcta, exacta y verídica conforme a la realidad fiscal del Gobierno de Puerto Rico.

Artículo 4.04.-Cláusula de Cumplimiento

Todas las transferencias realizadas en virtud de la disposiciones de este Capítulo estarán sujeta a los requisitos de la Sección 201(b)(1) (M) de la Ley Pública  114-187 conocida como *Puerto Rico Oversight,Management and Economic Stability Act or PROMESA*.

CAPÍTULO 5.-DISPOSICIÓN DE BIENES INMUEBLES DEL GOBIERNO.

Artículo 5.01.-Política Pública.

Se declara como política pública del Gobierno de Puerto Rico la mejor utilización de las propiedades inmuebles que no se estén utilizando por el Estado, con el propósito de hacerle llegar mayores recursos al erario. Además, se propicia que aquellas propiedades inmuebles que en la actualidad están en total desuso, puedan dedicarse a actividades para el bienestar común, ya sean para usos sin fines de lucro, comerciales o residenciales que promuevan la activación del mercado de bienes inmuebles y la economía en general.

Para cumplir con esta política pública, se autoriza el diseño de un procedimiento eficiente y eficaz de venta de propiedades inmuebles, donde imperen los principios de competencia, transparencia, desarrollo económico, creación de empleo, bienestar e interés público.

Artículo 5.02.-Definiciones.

Para fines de este Capítulo las siguientes palabras tendrán los siguientes significados:

A. Bienes Inmuebles – Aquellos que no pueden moverse por sí mismos ni ser trasladados de un lugar a otro como la tierra, los edificios, etcétera; así como todos los que estén unidos a un inmueble de una manera fija, de suerte que no pueda separarse de éste sin quebrantamiento de la materia o deterioro del objeto; y que pertenezcan a las agencias, dependencias, instrumentalidades y corporaciones públicas de la Rama Ejecutiva del Gobierno de Puerto Rico.

B. Comité – Se refiere al Comité de Evaluación y Disposición de Propiedades Inmuebles.

69

C. Disposición – Proceso mediante el cual, el Gobierno de Puerto Rico cede el título de propiedad, posesión, uso o disfrute de bienes inmuebles para su mejor utilización.

D. Subasta Pública a Viva Voz – Proceso donde se reúnen físicamente varios licitadores en un lugar y hora previamente acordada a hacer oferta directa por determinada bien inmueble anunciada previa a la subasta. La oferta se hace a viva voz, donde los restantes licitadores escuchan y conocen las ofertas.

E. Subasta Pública en Sobre Sellado – Proceso de subasta donde los licitadores hacen su oferta secreta en un sobre sellado, cuyo procedimiento se establecerá por reglamento.

F. Venta Directa – Proceso para disponer de una propiedad con una parte que ha cumplido con los criterios que se establezcan por reglamento.

Artículo 5.03.-Comité de Evaluación y Disposición de Bienes Inmuebles.

Se crea el Comité de Evaluación y Disposición de Bienes Inmuebles a los fines de que ejerza todas las facultades necesarias, que no sean contrarias a esta o cualquier otra ley, para la disposición de bienes inmuebles de la Rama Ejecutiva del Gobierno de Puerto Rico.

El Comité estará compuesto por los siguientes funcionarios públicos:

a. El Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF).

b. El Director de la Oficina de Gerencia y Presupuesto.

c. El Secretario del Departamento de Desarrollo Económico y Comercio.

El Director de Ejecutivo de la AAFAF presidirá el Comité.

El Comité se reunirá, por lo menos, una vez al mes, y cuanto sea necesario de tiempo en tiempo para agilizar los trabajos, en el lugar y la hora que estimen conveniente. Disponiéndose que los miembros del Comité no devengarán salario alguno ni compensación por concepto de dietas por el ejercicio de los deberes y facultades que le impone esta Ley. Disponiéndose además, que nada de lo aquí establecido aplicará a bienes inmuebles de la Compañía de Fomento Industrial, el Banco Gubernamental de Fomento, la Administración de Terrenos, la Autoridad del Distrito del Centro Convenciones y sus respectivas subsidiarias, en tanto y en cuanto tengan ya establecido

70

a la fecha de vigencia de esta Ley un proceso de venta de bienes inmuebles cónsono con este Capítulo.

Artículo 5.04.-Director Ejecutivo.

Constituido el Comité, éste designará un Director Ejecutivo, quien tendrá todos aquellos poderes que le delegue el Comité relacionados con la implantación de la política pública establecida en esta Ley. El Director Ejecutivo recomendará al Comité gestionar traslados interagenciales para integrar recursos humanos a la consecución de los objetivos de esta Ley, de conformidad con la Ley 8-2017. La Oficina del Director Ejecutivo estará ubicada en el lugar que el Comité designe para ello.

Artículo 5.05.-Facultades del Comité.

El Comité tendrá las siguientes facultades:

a.  Aprobar las reglas, reglamentos, cartas circulares y normas que sean necesarias para el ejercicio de sus funciones y deberes.

b.  Adoptar un sello oficial y alterar el mismo a su conveniencia.

c.  Demandar y ser demandado bajo su propio nombre.

d.  Negociar, otorgar contratos, tramitar la disposición de propiedad inmueble de la Rama Ejecutiva del Gobierno de Puerto Rico y todos aquellos otros instrumentos y acuerdos con cualquier persona natural o jurídica necesarios o convenientes para ejercer los poderes y funciones conferidas en esta Ley.

e.  Entablar cualquier acción judicial para proteger o poner en vigor la política pública establecida en esta Ley.

f.  Nombrar aquellos oficiales, agentes y empleados que sean necesarios para el adecuado cumplimiento de los fines y propósitos para los cuales se ha creado y para fijar sus poderes, facultades y deberes y los términos y condiciones de trabajo que establece esta Ley. Disponiéndose que los nombramientos deberán realizarse de conformidad con lo dispuesto en la Ley 8-2017.

g.  Contratar para llevar a cabo las subastas públicas a viva voz, conforme a las disposiciones de este Capítulo y los reglamentos a esos fines.

71

h.  Crear fideicomisos de inversión en bienes raíces de naturaleza similar a los fideicomisos definidos en la Sección 1082.01(a) de la Ley 1-2011, según enmendada, conocida como "Código de Rentas Internas para un Nuevo Puerto Rico".

i.  Aportar bienes inmuebles a cualquier fideicomiso de inversión en bienes raíces creado a tenor con el Artículo 5.05 (h) de esta Ley. La empresa que aporte conforme a este inciso el Gobierno tendrá participación en el desarrollo que realice.

Artículo 5.06.-Deberes y Obligaciones del Comité.

Con el fin de ejecutar la política pública aquí establecida, el Comité tendrá los siguientes deberes:

a.  Deberá establecer mediante reglamento un procedimiento uniforme, eficiente y efectivo para la disposición y transferencias de los bienes inmuebles de la Rama Ejecutiva del Gobierno de Puerto Rico, ya sea mediante subasta pública a viva voz, subasta pública en sobre sellado o mediante venta directa. Dicho procedimiento deberá proveer un sistema justo de competencia que garantice el interés público. El Comité deberá disponer claramente cuándo se podrá hacer una venta directa.

b.  Deberá coordinar, junto con la Junta Revisora de Propiedad Inmueble creada en virtud de la Ley 235-2014, la preparación y/o actualización de un inventario oficial de todas las propiedades inmuebles de todas las agencias, dependencias, instrumentalidades, y corporaciones públicas de la Rama Ejecutiva del Gobierno de Puerto Rico, excluyendo las propiedades de la Universidad de Puerto Rico.

c.  Deberá obtener por parte de la Junta Revisora de Propiedad Inmueble, una certificación en la que se incluyan todas las propiedades inmuebles que están disponibles para su disposición por razón de no ser necesitadas para ser habilitadas por alguna agencia, dependencia, instrumentalidad o corporación pública de la Rama Ejecutiva del Gobierno de Puerto Rico.

d.  Deberá evaluar toda solicitud de compraventa, arrendamiento, u otra forma de traspaso de posesión, de propiedad inmueble que le sea sometida por cualquier persona natural o jurídica, con o sin fines de lucro, incluyendo municipios, y asegurarse que cumpla con esta Ley y todas las normas y reglamentos que sean aprobados por el Comité.

72

e.  Realizar cualquier tipo de estudio, inspección, análisis, u otra gestión sobre las propiedades inmuebles, incluyendo el asegurarse que estén debidamente inscritas en el Registro de la Propiedad y que tengan el título y cualquier otro requerimiento exigido por ley al corriente.

f.  Tasar los bienes inmuebles objeto de disposición. Para ello podrá requerir y utilizar el personal necesario, utilizando el mecanismo establecido en la Ley 8-2017.

Artículo 5.07.-Disposición de Bienes Inmuebles.

La disposición de bienes inmuebles de la Rama Ejecutiva del Gobierno de Puerto Rico se regirá por un proceso que sea justo y transparente en el que se les brinden las mismas oportunidades a todos los participantes, salvaguardando siempre el interés y bienestar público. En ese tenor, toda disposición debe estar enmarcada en la consecución de los propósitos establecidos en esta Ley, manteniendo un balance entre la necesidad de allegar mayores recursos al estado, fomentar el desarrollo económico, procurar el bienestar de la sociedad y/o crear empleo.

El Comité dispondrá de los bienes inmuebles utilizando como base el justo valor en el mercado a ser determinado mediante el correspondiente procedimiento de evaluación y tasación o velando por la utilización de la propiedad para el beneficio del interés público.

El Director Ejecutivo del Comité o su representante podrán fungir como agente autorizado para llevar a cabo cualquier transacción relacionada al título del bien inmueble.

Artículo 5.08.-Conflicto de Interés.

Cualquier conflicto de interés que pueda surgir en los miembros de la Junta durante el desempeño de sus funciones al amparo de esta Ley, será atendido de conformidad a lo dispuesto en la Ley 1-2012, según enmendada, conocida como la "Ley de Ética Gubernamental de Puerto Rico de 2011".

Artículo 5.09.-Cláusula de Salvedad.

No se podrá disponer de ningún inmueble de la Rama Ejecutiva del Gobierno de Puerto Rico que esté siendo utilizado en usufructo de vivienda por cualquier persona.

CAPÍTULO 6.-LEY DE CONTABILIDAD DEL GOBIERNO DE PUERTO RICO.

73

Artículo 6.01.-Se enmienda el Artículo 3 de la Ley Núm. 230 de 23 de julio de 1974, según enmendada y conocida como "Ley de Contabilidad del Gobierno de Puerto Rico", a fin de añadir un nuevo inciso (o) que lea como sigue:

"Artículo 3.-Definiciones.

Cuando se usen en esta Ley, los siguientes términos significarán:

(a)      ...

...

(o)      Asignaciones Especiales – Asignaciones aprobadas mediante Resoluciones Conjuntas que limitan el uso de los fondos asignados."

Artículo 6.02.-Se enmienda el inciso (b) y se añade un nuevo inciso (e) al Artículo 7 de la Ley Núm. 230 de 23 de julio de 1974, según enmendada, conocida como "Ley de Contabilidad del Gobierno de Puerto Rico", para que lean como sigue:

"Artículo 7.-Ingresos de fondos públicos.

a)      ...

          Todos los fondos públicos de las dependencias que no estén destinados por ley a un fin específico se acreditarán al Fondo General del Tesoro Estatal y se depositarán en su totalidad en la cuenta bancaria corriente del Secretario o en cualquier otra cuenta bancaria que él crea conveniente establecer. Asimismo, se dispone que a partir del 1ro de julio de 2017, todos los fondos especiales estatales y otros ingresos de las dependencias y corporaciones públicas se depositarán en su totalidad en el Tesoro Estatal, bajo la custodia del Secretario de Hacienda o de la entidad bancaria que este determine adecuada. El Secretario de Hacienda así también, queda facultado a determinar el orden de prioridad de los desembolsos de pagos con cargo a los fondos especiales estatales y otros ingresos, conforme con el presupuesto aprobado y el Plan Fiscal, sin que esto se entienda como una limitación a los poderes conferidos al Gobernador y a la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico en virtud de las disposiciones de la Ley 5-2017. Esta disposición tendrá supremacía sobre cualquier otra que contravenga o sea inconsistente con lo aquí establecido. Para cada año fiscal, cualquier cantidad en exceso de la presupuestada y autorizada por la Oficina de Gerencia y Presupuesto a las dependencias y corporaciones públicas provenientes de fondos especiales estatales ingresarán al Fondo Presupuestario creado en virtud de

74

la Ley Núm. 147 del 18 de junio de 1980, según enmendada. Esta disposición no será de aplicación a aquellos fondos que son asignados a los municipios en virtud del Impuesto sobre Ventas y Uso. Esta disposición no será aplicable a los fondos provenientes de donativos privados que reciben entidades de gobierno con fines sociales.

...

e)    A partir del 1ro. de julio de 2017, todos aquellos fondos especiales estatales creados por Ley para fines específicos seguirán siendo utilizados para aquellos propósitos para el cual fueron asignados por Ley, conforme con el Presupuesto Recomendado por la Oficina de Gerencia y Presupuesto y con el Plan Fiscal. Asimismo, se faculta a la Oficina de Gerencia y Presupuesto a crear una reserva bajo su custodia, según establezca mediante normativa, la cual permita el control presupuestario de toda partida de gastos con cargo a los fondos especiales estatales y otros ingresos. De existir alguna inconsistencia entre la ley y el uso de los fondos con el Plan Fiscal, prevalecerá el propósito dispuesto en el Plan Fiscal aprobado conforme a las disposiciones de la Ley Federal PROMESA."

Artículo 6.03.-Se enmiendan los incisos (h), (l) y (m) del Artículo 8 de la Ley Núm. 230 de 23 de julio de 1974, según enmendada, conocida como "Ley de Contabilidad del Gobierno de Puerto Rico", para que lean como sigue:

"Artículo 8.-Asignaciones de fondos públicos.

(a)      ...

...

(h)    Las asignaciones y los fondos sin año económico determinado, que hayan permanecido en los libros sin movimiento de desembolso u obligación por un (1) año, se considerarán para los efectos de esta Ley, como que han cumplido sus propósitos por lo que se cerrarán e ingresarán inmediatamente al Fondo General, excepto las asignaciones y los fondos sin año económico determinado asignados para llevar a cabo mejoras permanentes que hayan sido contabilizadas y llevadas a los libros. Estos tendrán un término de tres (3) años a partir de la fecha de vigencia legal de la asignación para ser desembolsados y cumplir con los propósitos para los cuales fueron asignados. Transcurrido el término de tres (3) años, los saldos obligados y no obligados de los fondos de mejoras permanentes se cerrarán e ingresarán al Fondo 301. Esta disposición solo será de aplicación a las asignaciones hechas previo al Año Fiscal 2017-2018 y no será de aplicación

75

a aquellas asignaciones hechas por la Asamblea Legislativa mediante Donativos Legislativos o asignaciones en virtud del Impuesto Sobre Ventas y Uso.

En aquellos casos en los cuales la agencia u organismo receptor de los fondos de mejoras permanentes entienda que debe extenderse el término de la asignación por un término mayor a tres (3) años, podrá solicitarlo justificando la necesidad de mantener estos recursos a la Oficina de Gerencia y Presupuesto por lo menos tres (3) meses antes de que se venza el referido término. Durante este período, la Oficina de Gerencia y Presupuesto analizará la petición y determinará la necesidad de mantener vigente la asignación, el término por el cual se extenderá la misma y la cantidad. Dichos recursos serán reprogramados por la Asamblea Legislativa.

(i)      ...

...

(l)      Cualquier asignación que permanezca un (1) año sin llevarse a los libros se considerará, como regla general, cancelada automáticamente y se requerirá nueva acción legislativa para usar los dineros así cancelados.  En casos excepcionales en los que se demuestre que han mediado causas justificadas para no llevar a los libros una asignación durante el período de un (1) año estipulado, tales como la tardanza en la resolución de litigios en los tribunales y la imposibilidad de llevar a cabo una obra pública debido a dificultades fiscales, técnicas o legales, podrá contabilizarse una asignación aún después de transcurrido el mencionado período de un (1) año.

El Secretario notificará a la Asamblea Legislativa de la acción cancelando asignaciones en las circunstancias que contempla este inciso, durante los treinta (30) días subsiguientes a la fecha en que se dispuso dicha cancelación.

(m)     Periódicamente, el Secretario transferirá al sobrante del Fondo General del Tesoro Estatal, de acuerdo con la ley, los balances de cuentas de depósitos que hayan permanecido sin uso o movimiento alguno en los libros de contabilidad por un (1) año y que, de acuerdo con su opinión, no fueren necesarios o no cumplan los fines para los cuales fueron creados. Disponiéndose, que cualquier reclamación que viniese el Secretario obligado a pagar con respecto a dichos balances, después de haber sido las mismas transferidas del modo antes dispuesto, será pagada de cualesquiera fondos disponibles no destinados a otras atenciones."

76

CAPÍTULO 7.-LEY DE RESERVAS EN LAS COMPRAS DEL GOBIERNO.

Artículo 7.01.-Se enmienda el Artículo 2 de la Ley 129-2005, según enmendada, conocida como "Ley de Reservas en las Compras del Gobierno del Estado Libre Asociado de Puerto Rico", para que lea como sigue:

"Artículo 2.-Declaración de Política Pública.

Será política pública del Gobierno de Puerto Rico, establecer un Programa de Reservas que requiera al Gobierno de Puerto Rico y sus instrumentalidades, asignar un veinte por ciento (20%) del total de la partida asignada a compras de su presupuesto general para ser otorgado a microempresas, pequeñas y medianas empresas, siempre que la situación fiscal así lo permita o produzca ahorros al fisco.

Disponiéndose que en aras de continuar fortaleciendo al sector de las microempresas, pequeñas y medianas empresas, se establece que el por ciento de reserva a esos fines continuará en aumento de forma escalonada de la siguiente forma:

1.      Un treinta por ciento (30%) para el año fiscal 2016-2017;

2.      Un treinta y dos por ciento (32%) para el año fiscal 2017-2018;

3.      Un treinta y cinco por ciento (35%) para el año fiscal 2018-2019;

4.      Un treinta y ocho por ciento (38%) para el año fiscal 2019-2020;

5. ·    Un cuarenta por ciento (40%) para el año fiscal 2020-2021;

Este aumento escalonado se aplicará si la Oficina de Gerencia y Presupuesto establece que la situación fiscal permite el aumento o si produce un ahorro al fisco. Además, el Secretario de Hacienda estará obligado a reservar al menos un tres por ciento (3%) del flujo de efectivo que recibe para el pago de la partida de compra de materiales a las micro, pequeñas y medianas empresas cuyas facturas se hayan procesado correctamente por parte de los departamentos, agencias, instrumentalidades, dependencias, municipios y corporaciones públicas del Gobierno a las cuales le aplica esta Ley."

Artículo 7.02.-Se enmienda el inciso (1) del Artículo 6 de la Ley 129-2005, según enmendada, conocida como "Ley de Reservas en las Compras del Gobierno del Estado Libre Asociado de Puerto Rico", para que lea como sigue:

77

"Artículo 6.-Programa de Reservas

(1)     Se creará un nuevo objeto de gastos para colocar el veinte por ciento (20%) del presupuesto de las partidas de compra de cada agencia. Disponiéndose que el objeto de gastos del presupuesto de las partidas de compra de cada agencia aumentará a treinta por ciento (30%) para el Año Fiscal 2016-2017, a un treinta y dos por ciento (32%) para el Año Fiscal 2017-2018, a un treinta y cinco por ciento (35%) para el Año Fiscal 2018-2019, a un treinta y ocho por ciento (38%) para el Año Fiscal 2019-2020 y a un cuarenta por ciento (40%) para el Año Fiscal 2020-2021, siempre que la situación fiscal lo permita. La OGP establecerá por reglamento los requisitos para el cumplimiento con el referido por ciento de reserva.

...".

## CAPÍTULO 8.-ARBITRIOS A LOS CIGARRILLOS Y PRODUCTOS DERIVADOS DEL TABACO.

Artículo 8.01.-Se enmienda la Sección 3020.05 de la Ley 1-2011, según enmendada, para que lea como sigue:

"Sección 3020.05.-Cigarrillos

(a)     Se impondrá, pagará y cobrará, un arbitrio de diecisiete dólares (17.00) sobre cada ciento o fracción de cien (100) cigarrillos. A los fines de este Código, el término "cigarrillo" significará cualquier producto que contenga nicotina, y que esté diseñado para ser quemado o calentado bajo condiciones normales de uso, y consista de, o contenga:

(1)     cualquier rollo de picadura de tabaco natural o sintético, o picadura de cualquier materia vegetal natural o sintética, o cualquier mezcla de los mismos, o picadura de cualquier otra materia o sustancia sólida, envuelto en papel o en cualquier sustancia o material que no contenga tabaco, el cual por su apariencia, el tipo de tabaco usado en el relleno, su envoltura o rotulación, sea susceptible de ser usado, ofrecido o comprado como un cigarrillo; y

(2)     cuya longitud, circunferencia y peso no exceda de la longitud, circunferencia y peso máximo que establezca el Secretario mediante reglamento, carta circular, u otra determinación administrativa de carácter general.

78

(b)     Los cigarrillos que se fabriquen, introduzcan, vendan, traspasen, usen o consuman en Puerto Rico llevarán adherido en las cajas, paquetes o cajetillas en que fueren empaquetados una etiqueta con la información y características que por reglamento se disponga. Cada caja, paquete o cajetilla de cigarrillos deberá tener estampada en sitio visible y en forma clara y legible la palabra "tributable" o "taxable". Estas disposiciones no aplicarán a los cigarrillos exentos conforme a la Sección 3030.18 de este Código."

Artículo 8.02.-Se añade una nueva Sección 3020.05A a la Ley 1-2011, según enmendada, para que lea como sigue:

"Sección 3020.05A.-Cigarrillos, Cigarros, Tabaco Suelto, Papel de Cigarrillo y Tubos de Cigarrillo

(a)     Además de cualquier otro arbitrio fijado en este Subtítulo, se impondrá, cobrará y pagará, un arbitrio que podrá ser hasta de ocho dólares y cincuenta centavos ($8.50) sobre cada ciento o fracción de cien (100) cigarrillos.

(b)     Se impondrá, cobrará, y pagará sobre todo cigarro, tabaco suelto, papel y tubos de cigarrillo, el arbitrio que se dispone a continuación:

(1)     Cigarros:  Veinticinco dólares con cincuenta centavos ($25.50) por cada libra o fracción de libra.

(2)     Tabaco Suelto: Veinticinco dólares con cincuenta centavos ($25.50) por cada libra o fracción de libra.

(3)     Papel de cigarrillo: tres dólares ($3.00) por cada cincuenta papeles o fracción que no exceda las seis pulgadas y media (6 ½"). De exceder las seis pulgadas y media (6 ½"), cada dos y tres cuartos (2 ¾) de pulgadas, o fracción, se considerará un (1) papel de cigarrillo.

(4)     Tubos de cigarrillos:  tres dólares ($3.00) por cada cincuenta tubos de cigarrillos o fracción que no exceda las seis pulgadas y media (6 ½"). De exceder las seis pulgadas y media (6 ½"), cada dos y tres cuartos (2 ¾) de pulgadas, o fracción, se considerará como un tubo de cigarrillo.

(c)     Definiciones.- A los efectos de esta Sección y de cualesquiera otras disposiciones aplicables de este Subtítulo, los siguientes términos tendrán el significado que a continuación se indica:

79

(1)  Cigarros.- Significará cualquier producto que contenga
nicotina, y que esté diseñado para ser quemado o calentado
bajo condiciones normales de uso, y consista de, o contenga:

    (i)  cualquier rollo de picadura de tabaco natural o
sintético, o picadura de cualquier materia vegetal
natural o sintética, o cualquier mezcla de las mismas, o
picadura de cualquier otra materia o sustancia sólida,
envuelto en papel, hoja de tabaco o en cualquier
sustancia o material, el cual por su apariencia, el tipo
de tabaco usado en el relleno, su envoltura o
rotulación, sea susceptible de ser usado, ofrecido o
comprado como un cigarro, cigarrito, "little cigar",
tabaquitos, o cualquier otro producto; y

    (ii)  que no sea un cigarrillo, según este término se define
en la Sección 3020.05 de este Código.

(2)  Tabaco suelto.- Significará cualquier tipo de tabaco, mezclado
o no con cualquier otra sustancia, que no esté envuelto en
material alguno y que por su apariencia, características
intrínsecas, empaque o rotulación, se preste a ser utilizado y
pueda ser ofrecido o comprado por los consumidores, como
tabaco para hacer cigarrillos "roll your own" o para ser
fumado en una pipa. Este término también incluye las hojas
tersas de tabaco.

(3)  Papel de cigarrillo.- Significará cualquier papel, o cualquier
otro material excepto tabaco, que sea utilizado para enrollar
cigarrillos o cigarros.

(4)  Tubo de cigarrillo.- Significará papel de cigarrillo preparado
como un cilindro hueco para utilizarse en la confección de
cigarrillos o cigarros.

(d)  Los cigarros, tabaco suelto, papel de cigarrillo, y tubos de cigarrillo que se
fabriquen, introduzcan, vendan, traspasen, usen o consuman en Puerto
Rico llevarán adherido en las cajas, paquetes o cajetillas en que fueren
empaquetados una etiqueta con la información y características que por
reglamento se disponga. Cada caja, paquete, envoltura o cajetilla de
cigarros, tabaco suelto, papel de cigarrillo o tubos de cigarrillo deberá tener
estampada en sitio visible y en forma clara y legible la palabra "tributable"
o "taxable". En aquellos casos donde el artículo sea vendido de forma

80

individual, el mismo deberá tener estampado en sitio visible y en forma clara y legible la palabra "tributable" o "taxable" en la forma y manera que establezca el Secretario. Estas disposiciones no aplicarán a los artículos exentos conforme a la Sección 3030.18 de este Código."

Artículo 8.03.-Se enmienda la Sección 3020.13 de la Ley 1-2011, según enmendada, para que lea como sigue:

"Sección 3020.13.-Tabaco Sin Humo

(a)     Se impondrá, pagará y cobrará, un arbitrio al "tabaco sin humo", o "smokeless tobacco", manufacturado en o importado a Puerto Rico. A los fines de este subtítulo el término "tabaco sin humo" o "smokeless tobacco" significará cualquier producto derivado del tabaco que:

(1)     Se pretenda consumir sin crear combustión o sin ser quemado, y

(2)     Se encuentra o se vende en empaques de aluminio, en bolsas sueltas y/o en pequeñas unidades o en "discrete single-use units" en formas de pastillas, tabletas, bolsas, cinta disoluble, entre otros.

(b)     El arbitrio impuesto por esta Sección se establecerá de la siguiente manera:

(1)     Tabaco de mascar: un dólar ($1.00) por cada libra o fracción de libra. A partir del 1ro. de mayo de 2017, el arbitrio será de cinco dólares ($5.00) por cada libra o fracción de libra.

(2)     Tabaco en polvo (snuff) o cualquier otro derivado del tabaco: tres dólares con dos centavos ($3.02) por cada libra o fracción de libra. A partir del 1ro. de mayo de 2017, el arbitrio será de cuatro dólares con cincuenta y tres centavos ($4.53) por cada libra o fracción de libra.

(c)     Los productos derivados del tabaco que se fabriquen, introduzcan, vendan, traspasen, usen o consuman en Puerto Rico llevarán adherido en las cajas, paquetes o cajetillas en que fueren envasados y/o empaquetados una etiqueta con la información y características que por reglamento se disponga. Cada caja, paquete, envoltura o cajetilla deberá tener estampada en sitio visible y en forma clara y legible la palabra "tributable" o "taxable". Estas disposiciones no aplicarán a los artículos exentos conforme a la Sección 3030.18 de este Código."

Artículo 8.04.-Se enmienda la Sección 3020.14 de la Ley 1-2011, según enmendada, para que lea como sigue:

81

"Sección 3020.14.-Asignación de Fondos

El Secretario de Hacienda ingresará lo recaudado producto de la Sección 3020.05, la Sección 3020.05A, la Sección 3020.13 y la Sección 3020.15, directamente al Fondo General."

Artículo 8.05.-Se añade una nueva Sección 3020.15 a la Ley 1-2011, según enmendada, para que lea como sigue:

"Sección 3020.15.-Cigarrillos Electrónicos, Cartuchos de Nicotina y Vaporizadores

(a)    Definiciones.- A los efectos de esta Sección y de cualesquiera otras disposiciones aplicables de este Subtítulo, los siguientes términos tendrán el significado que a continuación se indica:

(1)    Cigarrillo electrónico.- Significará cualquier tipo de producto incombustible que utilice un elemento de calefacción, fuente de energía, circuito electrónico o algún medio electrónico, químico o mecánico, que puede ser utilizado para producir vapor de nicotina o cualquier otra sustancia como solución o cualquier otra forma, el cual por su apariencia, tamaño, su envoltura o rotulación, sea susceptible de ser usado, ofrecido o comprado como un cigarrillo electrónico, cigarro electrónico o pipa electrónica.

(2)    Cartucho de nicotina.- Significará un cartucho de vapor o cualquier otro contenedor de nicotina en una solución líquida que esté diseñado para ser utilizado con o en un cigarrillo electrónico o vaporizador.

(3)    Vaporizador.- Significará cualquier tipo de producto incombustible que utilice un elemento de calefacción, fuente de energía, circuito electrónico o algún medio electrónico, químico o mecánico, que puede ser utilizado para producir vapor de nicotina o cualquier otra sustancia como solución o cualquier otra forma, y que no pueda ser considerado cigarrillo electrónico conforme a la definición del inciso (1) anterior. Este término incluirá, sin que se entienda como una limitación, el producto comúnmente conocido como "hookah" y los vaporizadores utilizados para el suministro de medicamentos que no estén aprobados por el *Food and Drug Administration* (FDA).

(b)    Se impondrá, pagará y cobrará, el arbitrio que a continuación se indica sobre los cigarrillos electrónicos, cartuchos de nicotina y vaporizadores:

82

    (1)    Cigarrillo electrónico: tres dólares ($3.00) por cada cigarrillo electrónico.

    (2)    Cartuchos de Nicotina: cinco centavos (5¢) por cada mililitro de solución de nicotina, o de cualquier sustancia, contenga o no nicotina, en cada cartucho de nicotina. Este arbitrio no será prorrateado.

    (3)    Vaporizador: seis dólares ($6.00) por cada unidad.

(c)    Los cigarrillos electrónicos, cartuchos de nicotina y vaporizadores que se fabriquen, introduzcan, vendan, traspasen, usen o consuman en Puerto Rico llevarán adherido en las cajas, paquetes, envolturas en que fueren envasados, envueltos, o empaquetados, una etiqueta con la información y características que por reglamento se establezca, disponiéndose que en el caso de los cartuchos de nicotina estos deberán contener los mililitros actuales de solución de nicotina en la forma y manera que establezca el Secretario. Cada caja, paquete, envoltura o cajetilla deberá tener estampada en sitio visible y en forma clara y legible la palabra "tributable" o "taxable". En aquellos casos donde el artículo sea vendido de forma individual, el mismo deberá tener estampado en sitio visible y en forma clara y legible la palabra "tributable" o "taxable" en la forma y manera que establezca el Secretario. Estas disposiciones no aplicarán a los artículos exentos conforme a la Sección 3030.18 de este Código."

Artículo 8.06.-Se enmienda la Sección 3030.18 de la Ley 1-2011, según enmendada, para que lea como sigue:

"Sección 3030.18.-Exención sobre Cigarrillos, Cigarros, Tabaco Suelto, Papel de Cigarrillo, Tubos de Cigarrillo, Tabaco de Mascar, Tabaco en Polvo, Cigarrillos Electrónicos, Cartuchos de Nicotina y Vaporizadores

(a)    Estarán exentos del impuesto fijado en este Subtítulo, los cigarrillos, cigarros, tabaco suelto, papel de cigarrillo, tubos de cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos electrónicos, cartuchos de nicotina y vaporizadores, vendidos o traspasados a los barcos de matrícula extranjera y de los Estados Unidos de América y los vendidos a los barcos de guerra de países extranjeros y a los buques de países extranjeros en visita de cortesía en Puerto Rico. Esta exención solamente se concederá cuando la entrega de cigarrillos, cigarros, tabaco suelto, papel de cigarrillo, tubos de cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos electrónicos, cartuchos de nicotina y vaporizadores, se haga de acuerdo a las reglas y

83

procedimientos que establezca el Secretario y su violación conllevará la obligación del pago de los arbitrios que correspondan de parte del introductor o del distribuidor, según sea el caso. Todo introductor o distribuidor que desee acogerse a esta exención deberá prestar una fianza para responder por el pago de dichos arbitrios.

(b)   Asimismo, estarán exentos del pago de arbitrios los cigarrillos, cigarros, tabaco suelto, papel de cigarrillo, tubos de cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos electrónicos, cartuchos de nicotina y vaporizadores que, después de haber sido retirados de las fábricas o de los puertos, sean sacados del mercado por razón de encontrarse impropios para el consumo normal, siempre y cuando sean destruidos bajo la supervisión del Secretario. En tal caso, el Secretario reintegrará o acreditará el impuesto a la persona que lo haya pagado.

(c)   Además, estarán exentos del impuesto fijado en este Subtítulo los cigarrillos, cigarros, tabaco suelto, papel de cigarrillo, tubos de cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos electrónicos, cartuchos de nicotina y vaporizadores, cuando los mismos sean vendidos o traspasados a los usuarios, según definido en la Ley 23-1991, según enmendada, de las tiendas militares, cantinas u otras facilidades operadas por el Fideicomiso Institucional de la Guardia Nacional de Puerto Rico o su Concesionario.

(d)   Se eximen del arbitrio fijado en este Subtítulo los cigarrillos, cigarros, tabaco suelto, papel de cigarrillo, tubos de cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos electrónicos, cartuchos de nicotina y vaporizadores introducidos o fabricados en Puerto Rico para exportación, sujeto a aquellos requisitos o condiciones que imponga el Secretario por reglamento, disponiéndose que esta exención no será de aplicación a los cigarrillos, cigarros, tabaco suelto, tabaco de mascar, tabaco en polvo, papel de cigarrillo, tubos de cigarrillo, cigarrillos electrónicos, cartuchos de nicotina y vaporizadores que se vendan en Tiendas y Terminales Aéreos o Marítimos a personas que no salgan del territorio aduanero de los Estados Unidos."

Artículo 8.07.-Se enmienda el apartado (a) de la Sección 3050.01 de la Ley 1-2011, según enmendada, para que lea como sigue:

"Sección 3050.01.-Derechos de Licencia de Traficante al Por Mayor o al Detalle de Ciertos Artículos

(a)   Todo traficante al por mayor o al detalle, en sitio fijo o ambulante, de cualesquiera de los artículos que se detallan a continuación, deberá pagar

84

un impuesto anual por concepto de derechos de licencia según se establece en la siguiente tabla:

| TRAFICANTES | DERECHOS | |
|---|---|---|
| Cigarrillos- Mayoristas | | $750 |
| Cigarrillos- Detallistas Sitio Fijo, Ambulante y por cada máquina expendedora de cigarrillos | | $300 |
| Ventas al Por Mayor desde Vehículos de Motor de Cigarrillos – por vehículo | | $300 |
| Gasolina- Mayorista | Clase A | $6,000 |
| | Clase B | $2,500 |
| Gasolina- Detallista | Clase A | $900 |
| | Clase B | $100 |
| Detallista– Venta de Bebidas Alcohólicas, Cigarrillos y Partes y Accesorios de Vehículos - por local | | $200 |
| Vehículos de Motor- Traficantes | Clase A | $1,000 |
| | Clase B | $200 |
| Vehículos Partes y Accesorios al Por Mayor y al Detalle | Clase A | $2,000 |
| | Clase B | $800 |
| | Clase C | $100 |
| Traficantes al Detalle en Cigarrillos y Bebidas Alcohólicas por Tiempo Limitado (15 días) | | $25 |
| Traficantes al Detalle- "Shows Vehículos de Motor" por Tiempo Limitado (Vehículos, Partes y Accesorios) (15 días) | | $100 |
| Cemento-Fabricante o Traficante al Por Mayor | Clase A | $250,000 |
| | Clase B | $200,000 |
| | Clase C | $80,000 |
| Armeros-Traficantes en Armas y Municiones | | $200 |

(1)     ...

...".

Artículo 8.08.-Se añade un nuevo apartado (d) a la Sección 6042.08 de la Ley 1-2011, según enmendada, para que lea como sigue:

"Sección 6042.08.-Delitos Relacionados con Cigarrillos

(a)     ...

(b)     ...

85

(c)      ...

(d)      Incurrirá en delito menos grave que será sancionado con  multa de cinco
mil (5,000) dólares toda persona que:

(1)      adquiera cigarrillos, cigarros, tabaco suelto, papel de cigarrillo, tubos
de cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos
electrónicos, cartuchos de nicotina o vaporizadores en calidad de
usuario, según definido en la Ley 23-1991, según enmendada, de las
tiendas militares, cantinas u otras facilidades operadas por el
Fideicomiso Institucional de la Guardia Nacional de Puerto Rico o
su Concesionario, y que posteriormente venda o traspase los
cigarrillos, cigarros, tabaco suelto, papel de cigarrillo, tubos de
cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos electrónicos,
cartuchos de nicotina o vaporizadores así adquiridos a personas que
no tengan derecho a la exención del apartado (c) de la Sección
3030.18 de este Código; o

(2)      adquiera cigarrillos, cigarros, tabaco suelto, papel de cigarrillo, tubos
de cigarrillo, tabaco de mascar, tabaco en polvo, cigarrillos
electrónicos, cartuchos de nicotina o vaporizadores en las tiendas
denominadas "Post Exchanges" instaladas en establecimientos
militares de los Estados Unidos de América en Puerto Rico, y que
posteriormente venda o traspase los cigarrillos, cigarros, tabaco
suelto, papel de cigarrillo, tubos de cigarrillo, tabaco de mascar,
tabaco en polvo, cigarrillos electrónicos, cartuchos de nicotina o
vaporizadores así adquiridos a personas que no tenga derecho a
adquirir estos artículos en dichos establecimientos."

Artículo 8.09.-Se enmienda el apartado (a) de la Sección 6042.15 de la Ley 1-2011,
según enmendada, para que lea como sigue:

"Sección 6042.15.-Penalidad por Dejar de Rendir la Declaración de Arbitrios
y Planilla Mensual de Arbitrios

(a)      A toda persona obligada a rendir la Declaración de Arbitrios, la Planilla
Mensual de Arbitrios o la Declaración de Venta que dejare de rendir dicha
planilla requerida por las Secciones 3020.08(c)(8), 3020.09(c), y 3020.10, en
la forma, fecha y manera allí establecidas, se le impondrá una penalidad de
cien (100) dólares o del diez (10) por ciento de la obligación contributiva
establecida en dicha planilla o declaración, lo que sea mayor.

86

(b)      ...".

Artículo 8.10.-Disposiciones transitorias

(a)      Toda persona sujeta al impuesto anual por concepto de derechos de licencia
de la Sección 3050.01 de la Ley 1-2011 que al 1ro. de mayo de 2017 ostente
una Licencia de Traficante al Por mayor o al Detalle vigente, estará sujeto a
las nuevas tarifas dispuestas en el Artículo 8.07 de esta Ley a partir de la
fecha de vencimiento del pago de los derechos de licencias correspondiente
conforme al apartado (b) de la Sección 3060.08 de la Ley 1-2011.

(b)      El Secretario de Hacienda establecerá mediante reglamento, carta circular,
u otra determinación administrativa de carácter general, las normas
necesarias para la aplicación de estas disposiciones transitorias.

CAPÍTULO 9.-FONDO DE EMERGENCIA

Artículo 9.01.-Se enmienda el Artículo 2 de la Ley Núm. 91 de 21 de julio de 1966,
según enmendada, para que lea como sigue:

"Artículo 2.-

Comenzando en el Año Fiscal 1995-96, el Fondo de Emergencia será
capitalizado anualmente por una cantidad no menor de un quinto del uno por
ciento (0.2%) del total de la Resolución Conjunta del Presupuesto. A partir del Año
Fiscal 1998-99, dicha aportación será de una cantidad no menor del uno por ciento
(1%) del total de las rentas netas del año fiscal anterior. Disponiéndose que hasta
el Año Fiscal 2020-2021, dicha aportación será por la cantidad de al menos diez
millones de dólares ($10,000,000). A partir del Año Fiscal 2020-2021, dicha
aportación será no menor de cero punto cinco por ciento (0.5%) del estimado de
rentas netas sometido por el Departamento de Hacienda para la preparación del
Presupuesto Recomendado con cargo al Fondo General. El Gobernador de Puerto
Rico y el Director de la Oficina de Gerencia y Presupuesto, por delegación de este
último, podrá ordenar el ingreso de cualesquiera fuentes de ingreso en el Fondo
de una cantidad mayor a la aquí fijada cuando así lo creyere conveniente. El
balance de dicho Fondo de Emergencia nunca excederá de ciento cincuenta
millones de dólares ($150,000,000)."

87

## CAPÍTULO 10.- DISPOSICIONES FINALES

Artículo 10.01.-Inmunidad en cuanto a pleitos y foros.

Esta Ley no afecta la inmunidad que en cuanto a pleitos y foros tiene el Estado y sus funcionarios u oficiales. Nada de lo dispuesto en esta Ley autoriza las acciones por daños y perjuicio contra el Estado, sus funcionarios o empleados por actos u omisiones de éstos últimos, resultante del cumplimiento de esta Ley. Nada de lo aquí provisto se interpretará que constituye una renuncia de la inmunidad soberana del Gobierno de Puerto Rico.

Artículo 10.02.-Normas de Interpretación.

Las palabras y frases usadas en esta Ley se interpretarán según el contexto y el significado sancionado por el uso común y corriente y las reglas de hermenéutica reconocidas por nuestro ordenamiento jurídico.

Artículo 10.03.-Incompatibilidad.

Por la presente se deroga cualquier ley orgánica, general o especial, artículo o sección de ley, normativa, convenios colectivos, acuerdos, acuerdos suplementarios, órdenes administrativas, políticas, manuales de empleo, cartas circulares, certificaciones, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasificación o retribución, cartas contractuales, y/o disposiciones aplicables que vayan en contra de las disposiciones de esta Ley.

Artículo 10.04.-Supremacía.

Las disposiciones de esta Ley y los reglamentos o normas que se adopten de conformidad con la misma, prevalecerán sobre cualquier otra disposición de ley, reglamento o norma que no estuviere en armonía con los primeros.

Artículo 10.05.-Separabilidad

Si cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera anulada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha sentencia quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo,

88

acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas personas o circunstancias en que se pueda aplicar válidamente. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las disposiciones y la aplicación de esta Ley en la mayor medida posible, aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a alguna persona o circunstancia. Esta Asamblea Legislativa hubiera aprobado esta Ley sin importar la determinación de separabilidad que el Tribunal pueda hacer.

Artículo 10.06.-Vigencia

Esta Ley comenzará a regir inmediatamente después de su aprobación.

DEPARTAMENTO DE ESTADO
Certificaciones, Reglamentos, Registro
de Notarios y Venta de Leyes
Certifico que es copia fiel y exacta del original
Fecha: 4 de mayo de 2017

Firma

Eduardo Arosemena Muñoz
Secretario Auxiliar
Departamento de Estado
Gobierno de Puerto Rico



GOBERNADOR DE PUERTO RICO

Ricardo Rosselló Nevares

DECLARACION EXPLICATIVA DEL GOBERNADOR DE PUERTO RICO AL FIRMAR EL PROYECTO DE LA CAMARA 938

29 de abril de 2017

Hoy convertí en ley el Proyecto de la Cámara 938, mediante el cual se adopta la "Ley de Cumplimiento con el Plan Fiscal", a los fines de tomar las medidas necesarias para atemperar el marco legal y jurídico existente para dar el más fiel cumplimiento al Plan Fiscal aprobado por la Junta de Supervisión Fiscal creada al amparo de la Ley Federal PROMESA y para otros fines relacionados.

Esta Ley permitirá al Gobierno operar y brindar los servicios esenciales al Pueblo conforme al Plan Fiscal sin despedir empleados públicos. Por ello, esta legislación en su capítulo VI permite al Gobierno utilizar todos los fondos estatales especiales a partir del 1 de julio de 2017 para que se depositen en el Tesoro Estatal bajo la custodia del Secretario de Hacienda o de la entidad bancaria que éste determine. Ello, para poder aplicar a todos estos ingresos las normas de prioridad de pago con los ingresos de fondos estatales especiales no excluidos. Ese es el alcance del Capítulo VI de esta Ley.

Por su parte, el Capítulo IV de esta legislación se limita a sobrantes de algunas dependencias y corporaciones según determinado por el Plan Fiscal para allegar fondos adicionales al fondo general que provienen de los ajustes tarifarios a ciertos servicios según se establezcan en los planes fiscales certificados por la Junta de Supervisión Fiscal. Ello, no se refiere a otros ingresos de las corporaciones públicas salvo los determinados por ajustes tarifarios de corporaciones específicamente contenidas en los planes fiscales. Aunque se realiza en este capítulo una excepción para COFINA, la realidad es que esta corporación pública no genera sobrantes por lo que este capítulo no es de aplicabilidad para dicha entidad.

Cordialmente,

Ricardo Rosselló Nevares

# EXHIBIT 4B

(H. B. 938)

**(No. 26-2017)**

(Approved April 29, 2017)

# AN ACT

To   create the "Fiscal Plan Compliance Act," in order to take measures as
necessary to adjust the existing legal and juridical framework so as to allow
the fullest compliance with the Fiscal Plan approved by the Financial
Oversight Board, created by virtue of the Federal Law PROMESA; establish
a uniform fringe benefit system, which includes the Christmas bonus and the
healthcare plan contribution, for all the government employees and officials
of the agencies, instrumentalities, and public corporations of the Government
of Puerto Rico, except for the University of Puerto Rico; amend paragraphs
(a), (e), and (m) of subsection 2 of Section 4.3 of Article 4, Section 5.2 of
Article 5, subsections 1(d) and 4(1) of Section 6.4, subsection 2(b) of Section
6.8, Section 6.9 of Article 6, and subsections 3 and 5 of Section 7.2 of Article
7, add a new Section 2.11(a) to amend Section 3 of Act No. 125 of June 10,
1967, as amended, suspend the effectiveness of Article 9 and Section 10.2 of
Act No. 8-2017, known as the "Government of Puerto Rico Human Resources
Administration and Transformation Act"; renumber current Sections 10
through 20, as Sections 9 through 19; repeal Act No. 89-2016, known as the
"Public Service Temporary Employment"; amend Sections 3, 6, and 7 of Act
No. 253-1995, as amended, known as the "Compulsory Motor Vehicle
Liability Insurance Act," in order to broaden the compulsory motor vehicle
liability insurance coverage from four thousand dollars ($4,000) to four
thousand five hundred dollars ($4,500); to authorize the review of premiums
before June 30, 2017; to allow the members of the Joint Underwriting
Association of the Compulsory Motor Vehicle Liability Insurance to report a
special dividend as well as apply an incentivized tax to such dividend; provide
for the distribution of the revenues collected on account of the incentivized
tax and the premium adjustment to be covered into the General Fund;
authorize the Government to use the surplus of public corporations as
"available funds" to contribute to the General Fund; authorize a Committee
composed of the heads of the Fiscal Agency and Financial Advisory
Authority, the Office of Management and Budget, and the Department of the
Treasury to modify the rates of public corporations in order to comply with

the metrics of the Fiscal Plan; establish the rules and principles that shall govern the sale process of real property of the Government of Puerto Rico; create a Real Property Evaluation and Disposal Committee; establish the public policy on the sale of real property; amend Sections 3, 7, and 8 of Act No. 230 of July 23, 1974, as amended, known as the "Puerto Rico Government Accounting Act," in order to establish that appropriations and funds without specific fiscal year that have remained in the books without being disbursed or set aside for one (1) year shall be deemed to have fulfilled their purposes, and therefore, shall be closed and covered into the General Fund; provide that any special funds created by law for specific purposes shall be credited to the General Fund of the Commonwealth Fund and shall be deposited in the regular bank account of the Secretary of the Treasury for him to have full control thereof; amend Sections 2 and 6 of Act No. 129-2005, as amended, known as the "Government of the Commonwealth of Puerto Rico Procurement Reserves Act," in order to provide that the gradual increase in the general budget's item allocated to procurement for micro-, small-, and medium-sized businesses shall be granted if the fiscal situation of the Government so allows; to add a new Section 3020.05A and 3020.15, and amend Section 3020.05, Section 3020.13, Section 3020.14, Section 3030.14, Section 3030.18, Section 3050.01, Section 6042.08, and Section 6042.15 of Act No. 1-2011, as amended, better known as the "Internal Revenue Code for a New Puerto Rico," in order to modify the excise tax applicable to cigarettes and tobacco byproducts to increase the liquidity, address the economic and fiscal crisis that Puerto Rico is undergoing, and to prevent any impact on the most vulnerable sectors, as well as to discourage cigarette consumption; amend Section 2 of Act No. 91 of June 21, 1966, as amended, to provide that until Fiscal Year 2020-2021 the annual contribution to the Emergency Fund shall be in the amount of ten million dollars ($10,000,000), and that beginning in Fiscal Year 2020-2021 said contribution shall not be less than zero point five percent (0.5%) of the estimated net revenues submitted by the Department of the Treasury to prepare the Recommended Budget chargeable to the General Fund; and for other related purposes.

## STATEMENT OF MOTIVES

### Introduction

Puerto Rico is currently undergoing a serious, historically unprecedented fiscal and social crisis. Said crisis was caused, in part, by a lack of expenditure controls, sustainable development measures, as well as management information systems that promote clarity and transparency in government affairs.

According to data provided by the U.S. Department of the Treasury, Puerto Rico is suffering a 14.6% cumulative economic contraction in the Gross State Product (actual GSP) with a forecast of an additional 3% contraction in the next two years. For years, the Government of Puerto Rico has operated with a structural deficit that has been financed with bond issues and loans from the Government Development Bank. The Government of Puerto Rico has been lacking liquidity for over a year, and the tax refunds, the payments to contractors, pensioners' funds, and intra-governmental loans have been used to substitute sources of liquidity and to spend over the available funds. The Government Development Bank has failed to meet its obligations to bondholders since May 1, 2016, and is no longer fulfilling its duty to provide liquidity. Moreover, we have no access to the market since the policies of past administrations have lessened the credibility of the Government of Puerto Rico. The retirement systems are insolvent.

As an example of the policies that brought us to this point, there was a 64%-increase in payroll expenditures from 2001 to 2008; and after a 33%-decrease between 2009 and 2012, another substantial increase followed between 2013 and 2016. To finance this excessive spending, the public debt increased 134% between 2000 and 2008. Moreover, under the philosophy of "primero impago, luego impuestos y después recortes" [first default, then taxes, and finally cuts] various measures were implemented during the previous four (4)-year term. This philosophy contributed to prolonging the excessive spending and the rejection of public policies

that would have allowed for the efficient administration of the fiscal affairs of the Government of Puerto Rico. Meanwhile, the necessary actions to achieve more efficient Government operations and cutback on government spending were not taken. Furthermore, even while the securities were plummeting and the economic debacle was underway, the Central Government was unable to produce the necessary financial information to understand the severity of the issue, and to submit accurate information to the Congress and other entities concerned with the issue. Consequently, the debt of the Government of Puerto Rico experienced several downgrades resulting in an adverse impact on all the sectors of the economy.

This crisis has greatly affected Puerto Rican families. The most vulnerable people within our society have been forced to make the greatest sacrifices, thus prompting thousands of Puerto Ricans to abandon the Island in search of better opportunities. The consequent decrease in the population has become one of the challenges to overcome in our path toward recovery.

Puerto Rico's Colonial Status

The colonial status has impaired our capacity to face and solve this crisis, since we lack the sovereign powers of a state to regulate local affairs, which powers are conferred under the Tenth Amendment to the Constitution of the United States.

> For the U.S. Supreme Court, the adoption of the Constitution did not represent a change to the fundamental basis of the constitutional relationship between Puerto Rico and the United States. The Supreme Court continued to treat Puerto Rico as a political entity subject to the territory clause of the U.S. Constitution. [Our translation].

*See Pueblo v. Sánchez-Valle, et seq*. 192 D.P.R. 594, 631 (2015).

"There never was a transfer of sovereignty, but rather a delegation of powers." [Our translation] *Id*., p. 635.

This delegation of power does not constitute an irrevocable relinquishment nor a termination of the power of the Congress. The people of the United States granted the Congress vast powers to administrate the territories through the Constitution of United States of America. For such reason, the Congress cannot irrevocably yield a power that was not conferred upon it by the People of United States. [Our translation].

*Id*., p. 638.

Hence,

The Congress may allow the Commonwealth to remain as a political system indefinitely or, on the contrary, has the constitutional power to amend or revoke the internal administration powers exercised by the Government of Puerto Rico. In other words, Puerto Rico's internal government system is subject in its entirety to the political will and legal authority of the Congress. [Our translation]

*Id*., p. 641.

The sad truth is that the colonial status leaves us so defenseless that not even the U.S. citizenship that we have treasured since 1917 is guaranteed. The Congress has legislative discretion to grant privileges to citizens born in the territories, including the U.S. citizenship, but said right may be revoked at any time. In fact, the Federal Government has argued before the courts that territories do not have a right to citizenship, but that it is rather an act of legislative grace from the Congress. *See*, for example, *Tuaua v. United States*, 788 F.3d 300, (D.C. Cir. 2015).

Regarding the issue at hand, to illustrate the limitations resulting from the colonial status, it is worth noting that the states can claim the protections of the Federal bankruptcy law from which Puerto Rico was excluded and, since we do not have full representation in the Congress, there is little to nothing we can do about it.

We are also unable to enact our own legislation due to the express preemption provision of said Federal bankruptcy law, even when it leaves us unprotected. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.,* 136 S. Ct 1938 (2016) (declaring unconstitutional the "Puerto Rico Public Corporation Debt Enforcement and Recovery Act," Act No. 71-2014, better known as the "Commonwealth Bankruptcy Act."

<u>The Direct Result of our Colonial Status: PROMESA</u>

The policies of the past together with our defenselessness as a colony led the United States Congress to promulgate the Puerto Rico Oversight, Management, and Economic Stability Act, known as PROMESA, Public Law 114-187, which delegated vast powers to the Financial Oversight Board (hereinafter the "Oversight Board"). Once again, our lack of representation in the Congress resulted in the approval of said Act without the actual involvement of our People. Pursuant to PROMESA, any ongoing fiscal, budget, Legislative, or Executive actions taken in Puerto Rico, as well as any debt restructuring, whether consensual or not, issuance, guarantee, exchange, modification, repurchase, or redemption is subject to oversight.

Section 4 of PROMESA clearly provides that, "The provisions of this Act shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act." In this manner, the Congress expressly stated that said Act shall supersede any state legislation that is in conflict with PROMESA. Section 8(2) reasserts this provision by providing that the Government of Puerto Rico may not enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of PROMESA, as determined by the Oversight Board. Hence, we cannot promulgate legislation to defeat or impair PROMESA, its provisions, and its scope.

At this juncture, it is worth mentioning that under the Tenth Amendment, the Federal Government cannot impose on a state what PROMESA allows for territories. The Congress imposed a Board on Washington, D.C., which is not a state and is under the direct jurisdiction of the Congress. The Board in New York was created by the State Legislature, not the Congress. Detroit, which is a city and not a state, participated in a volunteer bankruptcy process. In sum, we must bear in mind that our current situation as well as the imposition of the Oversight Board are further consequences of a colonialism that has limited our development for the past 119 years.

Unfortunately, our colonial status and the lack of political power that is inherent thereto exacerbate the reality that has been imposed on us by the Congress through a Federal Law. This Law has supremacy over any local legislation, even our Constitution, and we were not afforded an opportunity to vote either on said law or for the President that approved it. Therefore, it is evident that in order to get out of this financial predicament it is crucial for us to solve the status issue. However, it is also an undeniable fact that we must work within PROMESA's parameters to set in motion the financial and fiscal recovery of Puerto Rico.

On October 30, 2016, the Oversight Board designated the Government of Puerto Rico, the Employees Retirement System and Judiciary Retirement System, the Teachers' Retirement System, the University of Puerto Rico, and 21 public corporations of Puerto Rico as "covered entities" subject to financial oversight pursuant to PROMESA. Section 405(b) of PROMESA further imposes a temporary stay on lawsuits and complaints against Puerto Rico and its instrumentalities on various matters hoping that the Government of Puerto Rico, on its own behalf and on behalf of its instrumentalities, may initiate voluntary negotiations with its creditors in order to reorganize and settle the repayment of the Government's debt obligations and, simultaneously, begin a responsible restructuring of the

Case:17-03283-LTS   Doc#:3126-4   Filed:05/23/18   Entered:05/23/18 11:45:37   Desc:
Exhibit Law 26 of 2017 (4A Spanish 4B English)   Page 99 of 200

8

Government of Puerto Rico and its instrumentalities geared to readjusting the essential services that the health, safety, and wellbeing of the residents of Puerto Rico warrant with the timely repayment of its debt obligations.

After investing millions of dollars in specialized consultants, the previous administration submitted a fiscal plan that was faulty and, thus, rejected by the Oversight Board forthwith for it did not solve the fiscal issues that said administration caused.

This Act, divided into Chapters, provides for different measures that this Administration is taking in order to comply with the Fiscal Plan imposed under the provisions of PROMESA. The matters addressed in this Act are related among themselves since they are all geared toward complying with the Fiscal Plan.

In this regard, Section 17 of Article III of the Constitution of Puerto Rico provides that: "Every bill, […] shall be confined to one subject, which shall be clearly expressed in its title, and any part of an act whose subject has not been expressed in the title shall be void." Said Section establishes the rule of only one subject, which requires that every law approved by the Legislative Assembly embraces no more than one subject. On this matter, the Supreme Court of Puerto Rico has held that said provision "does not require the title to be a detailed account of the contents of the law, but rather a mere indicator of the subject matter covered thereunder." [Translation supplied]. *Herrero v. Emmanuelli*, 179 D.P.R. 277, 295 (2010); *Rodríguez v. Corte*, 60 D.P.R. 919, 922 (1942).

Moreover, the case law has been consistent in establishing that only when a case is clear and conclusive it is thus warranted to void a law that violates said constitutional provision. *Dorante v. Wrangler of P.R.,* 145 D.P.R. 408, 429-431 (1998) and cases cited therein. Our highest court has "adopted a *stance* understandably lax not to curtail lawmakers." [Translation Supplied]. *Herrero v. Emmanuelli, supra. See also*, J.J. Álvarez-González, *Derecho Constitucional de*

*Puerto Rico y Relaciones Constitucionales con los Estados Unidos* [Constitutional Law of Puerto Rico and Constitutional Relationships with the United States], Bogotá, Editorial Temis, S.A., 2009, p. 244. In this sense, the Supreme Court has held that "**a strict interpretation of the constitutional provision may impair and hinder the legislative process, since it will compel the lawmaker to enact multiple laws to regulate one general subject or matter**." *Herrero v. Emmanuelli*, *supra*, [Emphasis added]. *See also*, M. H. Ruud, No Law Shall Embrace More Than One Subject, 42 Minn. L. Rev. 389,393-394 (1958). That is,

> The requirement is not intended as a subterfuge to destroy valid legislation, but rather as a guarantee that the legislative process is to be carried out with transparency and that each bill is to be discussed and analyzed in depth before it is approved.

*Herrero v. Emmanuelli, supra*, pp. 295-296.

Therefore, upon examining the validity of an act in light of the one subject rule, it is necessary to consider all of the provisions of a law in order to determine whether these have a correlation or not and if they pertain to the subject expressed in the title. *Id*. What constitutes "only one subject" is construed liberally without neglecting the purpose and objective of the constitutional requirement. In this regard, "a statute may address all the topics related to the subject matter and all of the means that may be fairly considered to be supplementary and necessary or appropriate to fulfill the purposes inherent to the general subject." [Translation supplied]. *Id. See also*, R. E. Bernier & J.A. Cuevas Segarra, *Aprobación e Interpretación de las Leyes en Puerto Rico* [Approval and Interpretation of the Laws of Puerto Rico], Segunda Edición, San Juan, Publicaciones JTS, 1987, p. 81.

This Act addresses one subject: to achieve full compliance with the Fiscal Plan certified by the Board. For such reason, we promulgate this Act, which addresses several topics geared to complying with the Fiscal Plan.

<u>A New Government: Our Responsibility Before the Oversight Board</u>

Due to the foregoing, at the beginning of our administration, we found a cash deficit of over $7.6 billion as certified by the Federal Treasury and the Oversight Board. The Government had no access to capital markets, had a "junk" credit rating, had no liquidity and no transparency in public finances, public spending was excessive, and the public debt amounted to billions of dollars. Furthermore, the Governor had the enormous task of recovering the credibility of the Island in the market and before the Oversight Board. We must guarantee a Government that spends in accordance with the actual revenues generated.

Since January 2nd, we have been implementing a systematic plan to control government spending, reactivate our economy, and allow for the conditions to create more and better jobs in the private sector. We are showing the world that Puerto Rico is open to do business in a safe and stable governmental environment.

The measures submitted by the Governor and approved by this Legislative Assembly during these first three (3) months of this administration have changed the course of Puerto Rico and have set it on a path of fiscal responsibility.

On February 28, 2017, the Governor submitted a Fiscal Plan that is complete, thorough, real, and also sensible to the needs of our People and those who are most vulnerable. After weeks of uncertainty, reason and sound judgment prevailed. On March 13, 2017, the Oversight Board accepted and certified our Fiscal Plan together with a series of contingencies to guarantee that government employees shall not be dismissed, the workweek shall not be affected, the People's access to healthcare services shall be maintained, and the pensions of those who are most vulnerable shall be protected. This Fiscal Plan is the only option available to avoid dismissing government employees, eliminating the right to healthcare, and to maintain the solvency of our retirement systems while the government continues to operate as usual and complies with the parameters in order to avoid the imposition of more

stringent measures which are part of the contingencies of the Plan as approved by the Financial Oversight Board. Some of these contingencies are: the full elimination of the Christmas bonus for all government employees, and the imposition of furloughs which shall render the Government inoperative.

The Fiscal Plan's approved measures are geared toward achieving the fiscal goals, promoting the economic development and our capacity to reestablish our credibility, allowing the change to translate into a long-term benefit rather than a mere cutback and, most of all, ensuring that those who are most vulnerable and those who work hard every day have a better quality of life.

The validation of the Fiscal Plan represents the recognition of the credibility of the new Government administration. We have shown that the times of incoherence and improvisation are over to give way to working as a team and obtaining results that inure to the benefit of Puerto Rico. We went from the "me vale" and the lack of credibility to having a Fiscal Plan that also addresses our socioeconomic development and meets the objective of cutting back on spending, but most importantly allows us to build a better society.

The changes we are implementing are not easy and will take time, but they will also yield results within the first two years. Under the certified Fiscal Plan, we shall be able to strike a balance between revenues and expenditures by Fiscal Year 2019. Now is the time to execute these changes. The contingencies of the Fiscal Plan require the Government's compliance. Liquidity must be ensured in order to avoid any impact on the salary of government employees, the health of the People, and the income of pensioners.

This Act is promulgated in order to adjust the legal framework and the case law to meet the requirements that the Oversight Board made in connection with the Fiscal Plan approved by virtue of PROMESA. To achieve this and in view of the serious economic and fiscal emergency situation of Puerto Rico, it is necessary to

approve this Act by virtue of the power of Police Power and in accordance with Sections 18 and 19 of Article II and Sections 7 and 8 of Article VI of the Constitution of Puerto Rico, in order to provide the Government with the sufficient liquidity to defray the payroll of government employees and the essential services offered to the People. We exercise this Police Power to take the necessary measures in order to comply with the Fiscal Plan and to set Puerto Rico into a path of financial recovery. Complying with this Plan constitutes a compelling interest of the Commonwealth in order to maintain its operations and protect those who are most vulnerable.

> As defined by the Supreme Court of Puerto Rico, the Police Power is, That power inherent to the State which is used by the Legislature to prohibit or regulate certain activities for the purpose of furthering or protecting the public peace, morals, health, and general welfare of the community, which may be delegated to municipalities." [Our translation]

*Domínguez Castro v. E.L.A.*, 178, D.P.R. 1, 36 (2010).

Our Highest Court recently held that the measures taken to address an emergency are valid insofar as these are necessary and reasonable to further a profound government interest. *See Trinidad v. E.L.A.*, 188 D.P.R. 828 (2013) and *Domínguez Castro v. E.L.A.*, *supra*, pp. 88-89. Likewise, the Supreme Court recognized "the precariousness of the economy as a reality that actually matters in the definition of the scope of government action under the Police Power" and that, in the exercise of said power, "the Legislature has a broad authority to approve economic regulation geared to promoting the welfare of the community." [Translation supplied]. *Domínguez Castro v. E.L.A.*, *supra*, p. 37. Associate Justice Kolthoff-Caraballo, on behalf of the Supreme Court, stressed that both our jurisdiction and the rest of the world "are living times that are very convoluted financially and economically. It would seem as if the economy of countries around

the world are intertwined and tangled with the tail of a kite that is unable to finally take off." [Translation supplied]. *Domínguez Castro et al. v. E.L.A. I*, 178, D.P.R. 1, 415 (2010), certiorari denied, *Domínguez Castro v. Puerto Rico*, 131 S. Ct. 152 (2010). In this manner, the Court recognized that it must be aware that there was a reality which it described as "hard and unpleasant." [Translation supplied]. In view of this historic reality, the Court deemed it necessary to try and aim for an altruistic interest in the pursuit of the "collective economic wellbeing at the expense of the individual wellbeing." [Translation supplied]. Furthermore, in *Herrero y otros v. E.L.A.,* 179 D.P.R. 277 (2010), the Court reasserted its recognition of the economic crisis in our jurisdiction and stated that, in the context of providing a remedy that entailed the disbursement of public funds in order to redress taxpayers, it was not "unaware of the difficult condition of the public finances of the Island." [Translation supplied]. *Id*. in p. 309.

In *Trinidad Hernandez v. E.L.A.*, *supra*, the Supreme Court validated Act No. 3-2013, on the Retirement System of Public Employees, for understanding that the Legislative Assembly had exercised its Police Power to stop the insolvency of the Retirement System of Public Employees. The Supreme Court held that "from the statement of motives […] it can be ascertained that the measures adopted are necessary and reasonable to properly address the financial crisis that threatens the actuarial solvency of this system." [Translation supplied]. The Court added that "this certainly constitutes a serious public interest since, guaranteeing the economic solvency of the system benefits all of the participants therein and partially addresses the fiscal crisis of the Island, thus protecting the welfare of all Puerto Ricans." [Translation supplied]. *Trinidad Hernandez v. E.L.A.*, *supra*, p. 837. It concluded that the provisions of said Act are constitutional "since, notwithstanding the substantial impairment to the contractual obligations in question, the measures implemented are reasonable and necessary to safeguard the actuarial solvency of the

Retirement System, and there are no less burdensome measures to achieve this purpose." [Translation supplied]. *Id.*, p. 839.

Likewise, in *Asociación de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de Puerto Rico*, 190 D.P.R. 854 (2014), the Court recently passed judgment on the measures approved under Act No. 160-2013 to solve the crisis of the Teachers' Retirement System and determined that the law did not further a serious public interest as required in our Constitution in the case of retirement system reforms, that is, to guarantee the solvency of the system itself. For such reason, the Court held that Act No. 160-2013, in what pertains to the impairment of contractual obligations, was unreasonable and therefore unconstitutional. *Id*, p. 12. At that time, the Court was emphatic in stressing that, should those measures be reasonable and necessary to "further the actuarial solvency, and should there be no less burdensome measures to achieve these purposes" then the measures approved would be held to be constitutional. [Translation supplied]. *Id.*, p. 8.

Based on the aforementioned legal framework, this Legislative Assembly believes that the measures taken in this Act are necessary and reasonable to properly address the fiscal, economic, and budget crisis of Puerto Rico. Moreover, these measures are required in order to effectively implement the Fiscal Plan certified by the Oversight Board in accordance with PROMESA. Said Plan establishes fiscal adjustments to stabilize Government finances at a time where there is no access to the financial market. If these measures are not implemented, the social and economic welfare of Puerto Rico shall suffer irreparable damages. Hence, the implementation of the Fiscal Plan constitutes a compelling interest of the State in order to guarantee the public interest.

## Government Restructuring

The Plan for Puerto Rico promoted by this Administration, and which was supported by the People of Puerto Rico in the last general election through the democratic exercise of their right to vote, proposes the implementation of a new government structure that reduces public spending significantly and substantially improves the duties thereof. To achieve this, it is necessary to carefully evaluate the services rendered by the government in order to determine which of these services may be consolidated, delegated to the private sector, or eliminated because they are no longer necessary. To achieve this, the dismissal of government employees shall not be necessary, but rather a mobilization of said employees in accordance with the needs for service of our people.

Consistent with the foregoing, and as part of the first measures taken by this Administration in order to address the fiscal crisis through a government restructuring, Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," was approved. Said Act transforms the Government into a Sole Employer in order for public officials to become Government employees rather than employees of the different entities, thus allowing for a better use of the human resources, wherever there is a pressing need, through the mobility mechanism without requiring the employee to resign from the office he currently holds in order to start all over again at a new government instrumentality. The mobility mechanism seeks to reinforce the notion of what it means to strike a balance between the workforce and the rendering of public services. In doing so, the Government's human resources are distributed efficiently and a swift government structure is thus created, based on an ongoing evaluation of the needs. Moreover, we shall assist government employees in making the required adjustments and modifications to face the current fiscal crisis as well as any future challenges.

Act No. 89-2016, known as the "Temporary Jobs in the Public Service Act," was approved during the previous four (4)-year term presumably to correct the disparity in the treatment of temporary employees in the public service, and to require agencies to be diligent in the creation of jobs or the request for job creation. Said law was also enacted on the basis that the adequate classification of employees shall assist in the administration of human resources in the public service and prevent unnecessary expenditures. Moreover, under said Act, transitory employees who had been working for two (2) or more years discharging duties of a permanent need were granted a regular employee status, subject to certain eligibility criteria.

Notwithstanding, said Act has had the effect of increasing the government's payroll at a time when the public finances are undergoing an unprecedented crisis. The recruitment of temporary employees, whether they are classified as irregular, transitory, or contract employees, must not be used as a subterfuge for the subsequent creation of regular positions of permanent need, thus encumbering the State's funds without gauging the effectiveness of these resources in the rendering of services that the People warrant.

For such reason, setting Puerto Rico on the right path requires a paradigm shift such as the one proposed by this Administration under the Puerto Rico Socioeconomic Transformation Model included in the Plan for Puerto Rico. The mission is to establish a new government that enables economic development and whose vision is that of a government based on the scientific model, where evidence and results matter and citizen involvement constitute the main source of validation. To achieve this, the government must become a facilitator of economic development by implementing actual and conclusive reforms. Moreover, the government structure must be cost-effective, efficient, and transparent, and the public service must be based on integrity, excellence, responsibility, and accountability.

<u>Fringe Benefits Equality for all Government Employees</u>

Furthermore, as we have mentioned, it is common knowledge that our Island is undergoing a serious fiscal crisis and that the resources to meet the all of the government's obligations are limited. In the midst of such a new situation as the imposition of the Financial Oversight Board as well as the default on the debt incurred, the Government of Puerto Rico is compelled to restructure the government apparatus and direct resources to the areas that need them the most.

Puerto Rico is at a historical juncture where it needs the collaboration of all the sectors to adopt immediate solutions that contribute to the economic restoration of the Island. This Act addresses in a responsible and fair manner the lack of uniformity among government employee in terms of the fringe benefits they shall enjoy during this critical period in the local economy. During these next few years prior to the fiscal recovery of the Island, there is no justification to keep such a wide gap between the fringe benefits of the government employees of a few government agencies and those of the government employees of public corporations. In some public corporations, the employees have double or triple the amount of benefits that the employees of the central government have, which is not consistent with the current economic reality of Puerto Rico. Even worse, this creates a disparity among government employees by benefiting a few at the expense of many others. Moreover, the costs entailed by these unequal measures renders it unsustainable to comply with them at this time while keeping all government employees. For such reason, this Legislative Assembly deems it prudent to take actions to achieve savings and to enable us to keep all government employees thus avoiding their dismissal.

To provide a ballpark figure of the expenditures of the Public Corporations on account of fringe benefits, including the Christmas bonus and healthcare insurance contributions, the recommended budget for Fiscal Year 2017 submitted to the Oversight Board showed projected expenditures on these items in the amount of

$171.877 million. This amount does not include the University of Puerto Rico, the Puerto Rico Electric Power Authority, and the Aqueduct and Sewer Authority. Regarding the payment of overtime, the budgeted amount was $23.618 million dollars, and for sick and vacation leave liquidations the budgeted amount was $9.906 million dollars. This causes a disparity between the fringe benefits of the employees of the Central Government and the employees or officials of public instrumentalities or corporations. Public Corporations spend an average of $10,840 per employee on fringe benefits, while the Central Government spends an average of $2,523 per employee. Said disparity cannot be justified until the local economy recovers.

Moreover, according to statistics furnished by the Government Development Bank and the Puerto Rico Planning Board, in Fiscal Year 2016, public corporations were responsible for a debt amounting to $46,861.6 billion which represents 72.9% of the total public debt of the Government of Puerto Rico, which was estimated in $64.254 billion. The public corporations have increased their share in the debt from 68.9% in Fiscal Year 2004 to 72.9% in Fiscal Year 2016. In specific terms, the increase in the total public debt with respect to public corporations amounted to $23.484 billion which constitutes a 100.5%-increase. As a result, the debt of the public corporations for Fiscal Year 2016 was estimated at more than double the amount of Fiscal Year 2004.

For years, the situation at the public corporations has been that the financial clauses negotiated under certain collective bargaining agreements exceed to a great extent the provisions of law. This situation compromises the government's fiscal stability and jeopardizes the jobs of government employees given that this fiscal instability is unsustainable at these critical times. For instance, many corporation committed to the payment of overtime, even when they lack the funds therefor, at a rate of double or triple the amount of the salary of the employees. Likewise, they

reduced the number of accrued hours required in order to receive monetary compensation, in lieu of compensatory time-off.

In Puerto Rico, the right to overtime pay is provided for in Section 16 of Article II of the Bill of Rights of the Constitution, which sets forth that:

> The right of every employee to choose his occupation freely and to resign therefrom is recognized, as is his right to equal pay for equal work, to a reasonable minimum salary, to protection against risks to his health or person in his work or employment, and to an ordinary workday which shall not exceed eight hours. An employee may work in excess of this daily limit only if he is paid extra compensation as provided by law, at a rate never less than one and one-half times the regular rate at which he is employed.

This Act repeals Section 10.2 of Act No. 8-2017, which establishes the mechanism for overtime pay to be applicable to government employees. Said mechanism is to be integrated into this Act in order to extend its applicability to public corporations. The overtime pay method established in this Act provides that the employees shall be compensated at a rate of one and a half times. In doing so, the provisions set forth in the Constitution and the Federal Law that governs the payment of overtime are fully complied with.

Moreover, the Fair Labor Standards Act (FLSA), 29 U.S.C. §201-209, regulates the payment of overtime, among other matters, and is applicable to the government employees of the Government of Puerto Rico. The Supreme Court of Puerto Rico has held that, insofar as the state law is more beneficial for the employee than the FLSA, the federal law does not preclude the application of the state law for it is not in conflict therewith. The purposes of laws are, in said circumstances, perfectly reconcilable. *Vega v. Yiyi Motors, Inc.*, 146 D.P.R. 373 (1998).

The FLSA established that employees must receive overtime pay for hours worked over forty (40) in a workweek at a rate not less than time and one-half (1.5) their regular rates of pay. The FLSA also provides that public agency employees may receive compensatory time off, at a rate of not less than one and one-half (1.5) hours for each overtime hour worked, instead of cash overtime pay.

One of the purposes of this Act is to achieve that the operating expenses of the public corporations are incurred efficiently, responsibly, and cautiously to permanently reduce expenditures. The Government of Puerto Rico has a compelling interest in controlling the payroll expenses to safeguard the jobs, the feasibility of public corporations, as well as their finances. The precarious fiscal situation of the Government, its General Fund, and its Public Corporations compels us to establish controls on payroll expenses in excess of the amount budgeted in order to safeguard the feasibility of the public corporations and, in turn, the workweek and salaries of government employees.

Likewise, this Act establishes the fringe benefits to which all government employees shall be entitled during this fiscal crisis period, regardless of the agency or public corporation where they work. In doing so, the government employees of the different Government agencies shall receive the same benefits as the government employees of the different public corporations, whose current fringe benefits vary depending on the public corporation where they work. The union employees of the different agencies and public corporations are also entitled to different fringe benefits even when they work at the same agency or public corporation depending on the collective bargaining agreement under which they are covered. At a time when Puerto Rico is still undergoing a fiscal crisis and when the Oversight Board has threaten to eliminate the Christmas bonus of and implement furloughs for government employees, there is no justifiable reason for maintaining such a disproportionate and unreasonable disparity in fringe benefits which were agreed

upon at a time when the fiscal situation of Puerto Rico was different and there was no crisis as the one we have today.

As previously stated, in the past, our illustrious Supreme Court has upheld the validity of the economic statutes approved to take action at a time of crisis and urgency in Puerto Rico, and has recognized the "possibility that, in circumstances related to economic aspects, the Legislative Assembly may exercise its broad powers." *Domínguez Castro*, *supra*, p. 49 (2010) (omitted citation). Aware of the structural crisis of the Retirement System of Public Employees, said Honorable Court recently upheld the constitutional validity of the statute that amended the Public Employees Retirement Act, Act No. 3-2013, in order to address said crisis. *Trinidad Hernández v. ELA*, *supra*.

Article II, Section 7 of our Constitution states that: "No laws impairing the obligation of contracts shall be enacted." Art. II, Sec. 7, Commonwealth Const., L.P.R.A., Title 1. Said Contracts Clause does not establish an absolute prohibition on the rulemaking authority of the State in benefit of the public interest. *Bayrón Toro*, 119 D.P.R., p. 619.

The constitutional guarantee against the impairment of contractual obligations is only applicable when the modification adversely affects the fundamental terms and conditions of the contract which caused the execution thereof thus frustrating the expectations of the parties thereto. *Domínguez Castro*, *supra*. See also, *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978); *El Paso v. Simmons*, 379 U.S. 497 (1965). The reasonableness of the Act is determined by mainly considering the substantiality of the public interest furthered by the statute and the extent of the impairment caused by the retrospective application thereof. *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 396 (1973). If the impairment is caused as a result of a reasonable and necessary modification to further the public interest, the court shall uphold its validity. *Bayrón Toro*, *supra*.

Even if the impairment is substantial, the constitutional prohibition is not absolute. The constitutional prohibition has to conform to the Police Power. *Bayrón Toro*, *supra*. When considering the validity of the statutes under the Contracts Clause, the applicable criterion is reasonableness. *Warner Lambert Co. v. Tribunal Superior*, *supra*. Hence, the function of the court is to strike a reasonable balance between the social interest of promoting the common good and the, also social, interest of protecting contractual transactions against the arbitrary and unreasonable application of the laws. *Id*.

Upon determining that the impairment is substantial, the evaluation of whether the modification seeks to further an important interest in benefit of the general welfare is thus warranted. If the impairment arises as a consequence of a reasonable and necessary modification geared to furthering a significant and lawful public interest, the validity of the law shall be upheld. *Bayrón Toro*, *supra*.

In *Buffalo Teachers Union[sic] v. Tobe*, 464 F.3d 362, 365 (2nd Cir. 2006), the Second Circuit held the following in regards to the evaluation that an adjudicatory forum shall conduct when assessing a complaint where the Contracts Clause is invoked:

> When a state is sued for allegedly impairing the contractual obligations […] the state will not be held liable for violating the Contracts Clause of the United States Constitution unless plaintiffs produce evidence that the state's self-interest rather than the general welfare of the public motivated the state's conduct.  On this issue, plaintiffs have the burden of proof because the record of what and why the state has acted is laid out in committee hearings, public reports, and legislation, making what motivated the state not difficult to discern. (Emphasis added).

As an affirmation of the separation of powers doctrine, when assessing the reasonableness or necessity of the measure for purposes of the Contracts Clause, the Supreme Court of Puerto Rico has held that even though complete deference to a legislative assessment of reasonableness and necessity is not appropriate "this does not mean that the judicial forum is not compelled to show some deference to the determination of reasonableness and necessity made by the legislator in the exercise of his constitutional power, especially when socioeconomic regulations are at issue." *Domínguez*, *supra*. It is not appropriate either "to make a *de novo* determination whether another alternative would have constituted a better statutory solution to a given problem." *Id*., p. 89. Said Court recently reasserted that "deference to the assessment of the Legislative Assembly of the reasonableness and necessity of the measure is called for." *Trinidad Hernández v. ELA*, *supra*. Furthermore, regarding the reasonableness of the measure "it is an established rule that it is not appropriate for courts to make a *de novo* determination whether another alternative exists to solve the problem. The determination made by the Legislative Assembly regarding the approved measures constitute a public policy exercise that calls for […] deference in this separation of powers system." [Translation supplied]. *Trinidad Hernández v. ELA*, *supra*.

We must keep in mind that, if it is deemed that there is an impairment of a contractual relationship, a court must analyze whether the legislation in question serves a legitimate public purpose. *Home Building & Loan Ass'n*., *supra*, *U.S. Trust*, 431 U.S. at 25. The legitimate public purpose is defined as one "aimed at remedying an important general, social, or economic problem rather than providing a benefit to special interests." *Buffalo Teacher's Federation*, *supra*. Be it noted that it has been held that the economic and financial health of a state constitutes a legitimate public purpose. See, *Baltimore Teachers Union v. City Council of Baltimore et. al*., 6 F.3d 1012, 1017 (4th Cir. 1993) (holding that a legislation enacted to reduce salaries and

address the state's grave fiscal crisis did not violate the contracts clause); *In re Subway-Surface Supervisors Ass'n v. New York City Transit Auth.* 375 N.E.2d 384 (1978) (statute freezing municipal wages held to be constitutional given the fiscal emergency afflicting New York City); *Buffalo Teachers, supra* (the freezing of teachers' wages amidst a fiscal crisis was upheld).

In view of this situation, the Government of Puerto Rico was compelled by the Fiscal Plan approved by the Oversight Board to implement certain measures so as to be able to guarantee the jobs of thousands of Puerto Ricans, prevent the use of furloughs that would result in a reduction of up to twenty percent (20%) in their monthly salaries, and the full elimination of the Christmas bonus. As mentioned before, some of the measures that the Government committed to implement are: standardizing the fringe benefits of all the government employees, offering equal overtime pay in both the Public Corporations and the Central Government, standardizing the fringe benefits offered to the employees of both the Central Government and Public Corporations; eliminating the liquidation of vacation and sick leave accrued in excess; and offering government employees a vacation leave accrual rate equal to that of the employees of the private sector.

To achieve the objectives of this Act in the least burdensome manner for our government employees, it is hereby established that the provisions applicable to the leaves and the fringe benefits shall be temporary. Said leaves and benefits shall be restored as certified by the members of the Fiscal Plan Compliance Committee.

In order to comply with the certified Fiscal Plan, the provisions pertaining to fringe benefits established in Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," are hereby repealed and included in this Act and the application thereof is extended to the employees of Public Corporations. In doing so, the fringe benefits and overtime pay to which government employees are entitled shall be uniform regardless of their

workplace. Likewise, the monthly vacation leave accrual rate allowed is reduced, thus offering government employees the same vacation leave accrual rate of employees in the private sector, which is fifteen (15) days. Lastly, the payment of vacation and sick leave accrued in excess is also eliminated. It is provided, however, that supervisors are required to implement measures to ensure that government employees are able to use said leaves so that these are not forfeited.

We cannot overlook the fact that if the furlough program had taken effect immediately as proposed by the Oversight Board, Puerto Rico's economy would have suffered a devastating blow with the elimination of the Christmas bonus and a twenty percent (20%)-salary reduction for government employees. This situation prompted the establishment of the alternative measures stated above in order to procure the required funds without altering the workweek and salary of government employees.

<u>PROMESA and the Supremacy Clause</u>

Furthermore, it is important to stress the application and the mandate that the Congress of the United States of America, by virtue of its plenary powers over the Territory of Puerto Rico, imposed on the Island upon the enactment of PROMESA. Said Federal Act created the Oversight Board which was entrusted with the task of approving and supervising the execution of a Fiscal Plan for the economic stabilization of Puerto Rico, among a series of other tasks.

Said statute was approved on May 4, 2016, and includes a supremacy clause that states:

SECTION 1. […]

This Act may be cited as the "Puerto Rico Oversight, Management, and Economic Stability Act" or "PROMESA." […]

SEC. 4. SUPREMACY.

**The provisions of this Act shall prevail over any general or specific provisions of territory law**, State law, **or regulation that is inconsistent with this Act**.[Emphasis added].

Pursuant to Section 101 of PROMESA, the Oversight Board, in its sole discretion at such time as the Oversight Board determines to be appropriate, may designate any territorial instrumentality as a covered territorial instrumentality that is subject to the requirements of this Act. At this time, the Oversight Board has designated all of the public corporations as covered entities. Moreover, pursuant to Section 205 of PROMESA, the Oversight Board may at any time submit recommendations to the Governor or the Legislature on actions the territorial government may take to ensure compliance with the Fiscal Plan, or to otherwise promote the financial stability, economic growth, management responsibility, and service delivery efficiency. In the case of any recommendations submitted, the Governor shall submit a statement to the Oversight Board that provides notice as to whether the territorial government will adopt the recommendations. If the Governor notifies that the territorial government will not adopt any recommendations submitted, the Governor shall include in the statement explanations for the rejection of the recommendations, and the Governor shall submit such statement of explanations to the President and Congress of the United States.

In view of this, we must review the tasks with which the Oversight Board has been entrusted in order to oversee and guarantee compliance with the provisions of the approved Fiscal Plan.

We must bear in mind that PROMESA has supremacy over any legislation of the territory of Puerto Rico that is inconsistent with the motives, responsibilities, tasks, and objectives provided for in the federal statute, and the Oversight Board is the entity in charge of the execution thereof. Regarding this Act, the Board established that if the government, through the implementation of other measures,

fails to cut back on spending to achieve sufficient funds and establish an additional $200 million cash reserve by June 30, 2017, a furlough program for all government employees shall take effect on July 1st, 2017. This furlough program shall represent a reduction of up to twenty percent (20%) in the monthly salaries of our government employees. Likewise, the Board established that the full elimination of the Christmas bonus would be implemented for all government employees. The furlough alternative proposed by the Oversight Board shall be equivalent to four (4) days per month for most Executive Branch government personnel and two (2) days per month for teachers and frontline personnel at 24-hour institutions. The Oversight Board has also stated that there may be implemented reductions comparable to the Executive Branch furlough savings described above for other entities across the government, including public corporations and instrumentalities and the Legislative and Judicial Branches. Just as our Governor has mentioned in many forums, a furlough program is NOT an option. For such reason, we are taking precautionary measures in order to avoid having to resort to this contingency imposed by the Oversight Board.

Using this legal framework as a basis, this Legislative Assembly believes that the measures taken in this Act are necessary and reasonable to properly address the fiscal, economic, and budgetary crisis that Puerto Rico is undergoing, and constitute a valid legislative exercise.

The measures taken in this Act and the application thereof to all public union and nonunion employees who work at the Central Government and the Public Corporations are not taken lightly. To strike a balance of interests, we deem that the fringe benefits must be tempered with the current needs and the structural and fiscal crisis faced by the Government of Puerto Rico. In view of the new code of Law created as a result of the enactment of PROMESA and the arrival of the Oversight Board, this Act constitutes a reasonable, equitable, uniform, and necessary means to face the current crisis and is the only option available to the Government of Puerto

Rico to comply with the Fiscal Plan certified by the Oversight Board. This will enable us to avoid the imposition of a furlough on our government employees, which shall entail a twenty percent (20%)-reduction in their monthly salary, and the full elimination of the Christmas bonus. This Act is promulgated under the authority of this Legislative Assembly to approve and enact economic legislation geared to promoting the wellbeing of the People of Puerto Rico.

Special Dividend of the Joint Underwriting Association

of the Compulsory Liability Insurance

Act No. 253-1995, as amended, created the Joint Underwriting Association of the Compulsory Liability Insurance (ASC, Spanish acronym) as part of the compulsory liability insurance system for motor vehicles that was established in Puerto Rico at the time. Said insurance sought to find a solution to the damages caused to third-party motor vehicles as a result of a traffic accident, in accordance with the applicable claim requirements.

Originally, the liability insurance established under said Act provided for a three thousand dollar ($3,000)-cap. Act No. 201-2009 increased said cap to four thousand dollars ($4,000). It is worth mentioning that, regardless of said thirty-three percent (33%)-increase in the coverage, the cost of insurance premiums remained unchanged: ninety-nine dollars ($99) for private passenger vehicles, and one hundred forty-eight dollars ($148) for commercial vehicles.

Since said increase in coverage in 2009, the cost of goods and services in general has continued on the rise and the automotive industry was not the exception. Hence, the cost of vehicle parts and repairs is higher today than eight (8) years ago. For such reason, this Administration deems it pertinent to increase the compulsory liability insurance coverage to four thousand five hundred dollars ($4,500). Consistent with this increase, the ASC is hereby empowered to revise the cost of premiums on or before June 30, 2017.

Furthermore, the conditions under which the ASC was operating since its creation entailed a substantial increase in its capital. Since the ASC was the only provider of compulsory liability insurance for motor vehicles, it was necessary for the ASC to have a significant capital reserve to cover its operations and to satisfy the reserve requirement under the Insurance Code. Thus, Act No. 60-2013 authorized the report of a special dividend included with an incentivized tax which enabled the generation of additional revenues in the amount of one hundred million dollars ($100,000,000). Likewise, the report of another special dividend in the amount of forty-two million dollars ($42,000,000) was authorized under Act No. 157-2015, which included a special tax. However, after the market was open to competition to allow other insurance companies to offer their services at the option of the driver, it was deemed unnecessary for the ASC to maintain such a high capital reserve to which the members of the ASC have no access, since these members are the same companies that are competing against this entity as providers of liability insurance coverage services.

This Act authorizes the report of a special dividend enclosed with the corresponding incentivized tax. Once said dividend is reported to the ASC members, the Government would receive the amount of seventy million dollars ($70,000,000).

Contrary to the previous administration, which used the funds collected by virtue of laws similar to this one to distribute said funds among various entities, some of which had good intentions whereas others entailed an unnecessary waste of funds, this administration seeks address the lack of liquidity in order to protect the services offered to the people, the jobs in the public sector, and the income of the retirement system beneficiaries, among other similar purposes set forth in this Act.

For all of the foregoing, this Legislative Assembly authorizes the ASC to report a special dividend in the amount of seventy million dollars ($70,000,000) from its capital reserve with the corresponding fifty percent (50%)-special

contribution. In doing so, the ASC shall remit thirty five million dollars ($35,000,000) to the General Fund of the Government of Puerto Rico.

<u>Transfer of the Profits of Public Corporations to the General Fund</u>

One of the most transcendental measures approved by this administration is the enactment of Act No. 5-2017, known as the "Puerto Rico Financial Emergency and Fiscal Responsibility Act of 2017." Said Act sets forth as the public policy of the Government of Puerto Rico: "[…] to take all the required measures for Puerto Rico to establish fiscal responsibility within the Government and its instrumentalities necessary to satisfy its obligations and to assure the provision of those governmental services essential to the public health, safety, and welfare of the residents of Puerto Rico." It also states that the government may "exercise its Police Powers in a manner that recognizes the responsibility to meet the financial obligations of the Government of Puerto Rico and its instrumentalities, while continuing to provide governmental services essential to the health, safety, and welfare of the residents of Puerto Rico given the limited available resources of the Government of Puerto Rico and its instrumentalities." In other words, the government shall take all the necessary measures to ensure that the needs of its people are satisfied.

Act No. 5-2017 provides that as a result of the ongoing financial emergency and the enactment of PROMESA, the Legislative Assembly is responsible for exercising its Police Power. In this sense, said Act provides that the responsibility to meet the financial obligations of the Government of Puerto Rico and its instrumentalities must be recognized and that the essential Government services shall continue to be provided in order to guarantee the health, safety, and welfare of the residents of Puerto Rico given the limited resources available of the Government of Puerto Rico and its instrumentalities, all of which shall be consistent with the provisions of PROMESA.

Case:17-03283-LTS   Doc#:3126-4   Filed:05/23/18   Entered:05/23/18 11:45:37   Desc:
Exhibit Law 26 of 2017 (4A Spanish 4B English)   Page 122 of 200

31

In accordance with the foregoing, Act No. 5-2017 empowers the Governor to issue executive orders requiring the use of available resources to pay for essential services as the Governor deems necessary to protect the health, safety, and welfare of the residents of Puerto Rico, and establishing priority rules for the disbursement of public funds when resources available for a fiscal year are insufficient to cover the appropriations made for that fiscal year, among other measures, due to the limited resources of the Government.

In view of the aforementioned fiscal and economic situation, it seems evident that the Government of Puerto Rico is compelled to take measures in order to comply with the Fiscal Plan without hindering the essential services rendered to the people. To achieve this, the use of the State's available resources must be maximized, including the resources available to public corporations. For such reason, this legislation directs the public corporations and instrumentalities of the Government of Puerto Rico to transfer to the Department of the Treasury any funds necessary to guarantee the liquidity of the government.

The amount to be contributed by each of the public corporations shall be determined by a committee composed of the Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA), the Secretary of the Department of the Treasury, and the Executive Director of the Office of Management and Budget (OMB). For such determination, the committee shall take into account the surpluses of each corporation after covering their operating expenditures, and ensure that the services offered by these entities are not affected. Such funds shall be deposited in the General Fund of the Government of Puerto Rico to have available the liquidity required in the Fiscal Plan.

For all of the foregoing, and in view of the fiscal and economic emergency situation faced by Puerto Rico which must be addressed, this Legislative Assembly in the exercise of its Police Power, acknowledges the need to remedy the fiscal

emergency and thus promotes the mechanisms provided for in this Act to guarantee the liquidity of the Government of Puerto Rico, by using the resources available to the public corporations without it constituting a disproportionate burden to the people nor an adverse impact on the essential services rendered by the Government.

<u>Disposal of Real Property of the Executive Branch</u>

Furthermore, the economic and fiscal crisis of the Government has affected the full spectrum of our infrastructure, including our real property. The agencies, entities, and public corporations comprising the Executive Branch have countless unused real property that could be sold to the private sector for various purposes. For years, many of these properties have had no public use. However, their ample spaces and strategic location may be maximized by any trade or business to conduct their commercial activities. Some of these properties may even be repurposed and devoted to housing or nonprofit entities.

Puerto Rico unfortunately lacks a coherent and uniform public policy that furthers the efficient, effective, and coordinated sale of real property owned by the Government. For such reason, it is necessary to establish a legal framework that promotes a government real estate market and renders the transactions conducted in connection with these assets reliable. This shall yield multiple benefits: the Government shall increase the revenues generated from the disposal of the real property inventory as well as the liquidity, thus being able to mitigate the fiscal crisis; contribute a mechanism of economic activity to the market by allowing the private sector to become involved in the acquisition of the State's properties for commercial or residential purposes, while contributing to the creation of jobs; and fostering the social wellbeing given the possibility that said properties may be acquired by nonprofit entities to provide social services, etc. In sum, the possibilities are endless.

For such reason, it is important to have an appropriate model that promotes the disposal of real property within a framework of fair competition where the wellbeing and the public interest are the standard in each transaction. Hence, this Act creates the Real Property Evaluation and Disposal Committee and empowers it to take action as necessary to dispose of the real property, while maintaining a balance between the interests of the State as the seller, the buyer, and the citizens in general. This Act establishes the general guidelines for the approval of rules and regulations that shall standardize the sale of real property and provide more certainty to the transactions conducted in connection therewith.

This measure constitutes an additional step toward rescuing our People and overcoming the bad decisions made in the past. We have the unwavering commitment to strengthening the economic activity component. We are certain that the structure established herein provides for the mechanisms needed to strengthen the real estate market and procures more resources for the State in order to face the crisis and comply with the Fiscal Plan. That is our goal and nothing will stop us.

<u>Government Accounting Act and Special Funds</u>

The financial policy of the Government of Puerto Rico set forth in Act No. 230 of July 23, 1974, as amended, known as the "Puerto Rico Government Accounting Act," relating to the control and accounting of public funds and property requires the books of the Government of Puerto Rico to clearly show the results of its financial operations, provide the financial information as necessary to manage the government's operations and to prepare and implement the budget, and constitute an effective control over the income, disbursements, funds, property, and other assets of the government. Likewise, it was established as public policy that no special funds or exclusive sources of repayment shall be established for specific purposes without taking into account the public wellbeing. This shall enable us to conduct government programs while overseeing the essential services, that fund appropriations for the

different government programs are limited to one specific year, and that all government revenues are covered into the general fund of the state treasury in order to defray government programs insofar as the Legislative Assembly deems it necessary, and in accordance with the items established in the Fiscal Plan approved. Unfortunately, throughout the years, a series of measures have been approved which have circumvented the foregoing and thus created multiple special funds for different programs. This situation has somehow distorted the mandate of the Accounting Act.

This Administration is committed to take any actions necessary to enable the Government to meet its obligations and comply with this public policy. The fiscal situation we are currently facing compels us to be more transparent and to assume more fiscal responsibility in our spending in order to achieve fiscal stability and a balanced budget, which shall make our economic recovery possible.

Upon analysis of the Government finances, various special appropriations for specific purposes or activities have been identified whose funds have remained unused for over one (1) year. In addition, appropriations without specific year limitation but with an annual recurrence have been identified for which there is no legal basis. Consequently, any expenditures chargeable to said funds for future fiscal years destabilize the cash flow of the Department of the Treasury since there is no control over the timing and the use given to said appropriations, all of which is in contravention of the public policy established in Act No. 230, *supra*.

In view of the grave fiscal situation faced by the Government, it becomes essential to implement a new methodology for the development, preparation, and execution of a government budget that allows for a substantial reduction of the State's spending without decreasing the amount and quality of the services it renders, yet eliminating inefficient services as well as inappropriate and obsolete programs. In this sense, the Zero-based Budgeting is a fiscal policy and budget strategy whose

main objective is to prevent the government from spending in excess of its revenues and, in turn, avoid an increase in the debt, and guarantee the sustainability of the public finances in the short- and long-term. The Zero-based Budgeting implemented by this Administration requires each department, agency, or instrumentality of the Government of Puerto Rico to document and justify each program to be included in and nourished from the Government's budget, based on the social and economic benefit of the programs, and according to the available resources. This mechanism entails an annual review of all of the programs and expenditures of the departments, agencies, or instrumentalities of the Government starting from zero and without taking into account the appropriations made in previous years. This facilitates the search for new ways to offer more efficient and effective services that contribute to improving the quality thereof, eliminating duplicity in the rendering of services, and cutting back on spending.

Likewise, there are countless special funds created by law for specific purposes. Said funds are disorganized and under the control of the government entities to which they were allocated. For such reason, the Secretary of the Treasury currently has direct access to only 65% of the funds of the Government of Puerto Rico, since all other special funds are on the accounts of their respective agency without any fiscal oversight from the Secretary of the Treasury. This lack of clarity results in a deficient oversight by the fiscal agencies of the Government which are prevented from having full control over the Treasury. This Act provides that special funds shall be transferred to the General Fund rather than to individual accounts for specific purposes. In doing so, the Secretary of the Treasury shall be able to keep better control and oversight, and establish payment priorities, which shall begin with the payment of the essential services rendered to our People.

In accordance with the foregoing, this Legislative Assembly deems it necessary to amend Act No. 230 of July 23, 1974, as amended, and known as the "Puerto Rico Government Accounting Act," for the purpose of adjusting said Act to the best fiscal practices that have been developed in the last few years in the continental U.S. and worldwide. For such purposes, we deem it important to clarify the meaning of special appropriations and limit the use thereof to one (1) year. Once the purpose of these special appropriations is fulfilled or if they were not claimed during the effectiveness thereof, these appropriations shall be reverted to the General Fund. In this manner, we will be able to continue improving the services rendered to our people and revitalize Puerto Rico's economy while complying with the fiscal control mechanisms required by the Certified Fiscal Plan.

<u>Government of the Commonwealth of Puerto Rico Procurement Reserves Act</u>

To recognize that strengthening our economy and creating jobs are the fundamental objectives of the public policy of the Government of Puerto Rico, different legislative pieces have been approved geared to boosting the local economy. One of them is Act No. 129-2005, which created the Government of the Commonwealth of Puerto Rico Procurement Reserves Act. Said Act was adopted to enable the components of the local economy to participate in the government procurement market to stimulate job creation and local investment. This Act seeks to sponsor small- and medium-sized businesses (Pymes) preferentially to contribute to increasing their sales as an efficient strategy for economic development and job creation.

However, in view of the grave fiscal situation faced by the Government, it becomes essential to implement a new methodology for the development, preparation, and execution of a government budget that allows for a substantial reduction of the State's spending without decreasing the amount and quality of the services it renders. Hence, we have evaluated all of the economic legislation that has

an impact on the general budget of the agencies of the Executive Branch in order to establish the necessary measures to adjust said legislation to the current economic reality of the Island.

For such purposes, this Legislative Assembly deems it necessary to amend Act No. 129-2015 for the purpose of tempering said Act to the fiscal situation of our public finances. To achieve this, we must fix at twenty percent (20%) the general budget's item allocated to the instrumentalities of the Government of Puerto Rico for purchases from micro-, small-, and medium-sized business until the fiscal situation of Puerto Rico allows for an increase thereto. Our goal is to continue contributing to such an important sector while responsibly addressing our fiscal reality and achieving the milestones set in the Fiscal Plan approved by the Board, in order to begin our journey towards economic recovery.

<u>Excise Taxes on Cigarettes and Tobacco Products</u>

In view of the need to procure more revenues to be able to comply with the Fiscal Plan, protect the jobs of government employees as well as protect the most vulnerable sectors, we introduced a reconfiguration of the applicable taxes on cigarettes, smokeless tobacco, tobacco-derived products, and electronic cigarettes. This reconfiguration of the applicable excise taxes on said products shall increase the basis subject to excise taxes as well as the current rates, thus fulfilling a dual purpose: to procure more funds to achieve a balanced budget and meet the parameters established in the Fiscal Plan, as well as to discourage cigarette consumption and tobacco purchase, which, as we all know, is detrimental to the public health, and is associated with the increase in respiratory diseases and different types of cancer.

The use of tobacco is one of the most concerning death causes among the population. However, it is highly preventable. The report of the Surgeon General of the United States entitled "The Health Consequences of Smoking" confirms that

twenty nine (29) chronic diseases are linked to smoking, namely, gallbladder, cervical, esophagus, kidney, laryngeal, lung, oral, pancreatic, and stomach cancer, leukemia, and cardiovascular diseases, among many others. Likewise, the report indicates that tobacco smoke can cause blood clots, sudden heart attacks, and cerebrovascular events. It was recently found that there are more diseases linked to the use of cigarettes, such as liver and colon cancer, diabetes, arthritis, inflammation, and immune function damage. *See*, Executive Summary of the Report, U.S. Public Health Service, *The Consequences of Smoking – 50 Years of Progress* (2014), p. 2.

In fact, between 2005 and 2009, smoking was responsible for more than 480,000 premature deaths annually among Americans 35 years of age and older. In addition, more than 87% of lung cancer deaths, 61% of all pulmonary disease deaths, and 32% of all deaths from coronary heart disease were attributable to smoking and exposure to secondhand smoke. *Id.*, p. 3.

Furthermore, the Centers for Disease Control and Prevention (CDC) indicate that in 2016 tobacco use was the leading cause of preventable disease, disability, and death in the United States. Each year, nearly half a million Americans die prematurely of smoking or exposure to secondhand smoke; another 16 million live with a serious illness caused by smoking. Smokers miss more work, visit a doctor more often, are hospitalized more often, and die 10 to 12 years earlier than nonsmokers. Each year, the United States spends nearly $170 billion on medical care to treat smoking-related disease in adults. See, https://www.cdc.gov/chronicdisease/resources/publications/aag/tobacco-use.htm.

The indirect impact of smoking is also highly detrimental to the health. In children, secondhand smoke has been linked to sudden infant death syndrome, acute respiratory infections, ear infections, and asthma attacks. It is disturbing that about 25% of nonsmoking Americans (58 million people) are exposed to secondhand smoke, including 15 million children aged 3 to 11 years. *Id.*

According to CDC's data, in the United States, nearly 15.1% of the population over the age of 18 smoked cigarettes in 2015, which is an estimated 36.5 million people–16.7% were men, and 13.6% were women. In Puerto Rico, even though the percentage is lower, the number is still a double digit. The statistics of the Department of Health of Puerto Rico show that by 2015 10.7% of the general population age 18 or over smoked cigarettes regularly–15.7% were men and 7.4% were women. These are significant percentages if we take into account the effects of secondhand smoke. In addition, the government has to incur considerable expenditures in connection with the health consequences entailed by smoking.

Currently, the excise tax per each cigarette pack is $3.40. This excise tax translated into $156 million in revenues for Fiscal Year 2014-2015. However, our government spends $19.16 per pack of cigarette consumed in healthcare costs and the loss of productivity, which constitutes $924 million. That is to say, the Government spends $15.76 more than it collects per pack of cigarette sold to take care of the health issues caused by smoking, which represents a global difference of $768 million. As a result, the increase in tobacco taxes is deemed to be a very cost-effective measure to improve public health and to generate fiscal revenues in the short- and long-term.

On the other hand, the Scientific Advisory Committee on Tobacco Product Regulation of the World Health Organization has stated that smokeless tobacco use is a significant part of the overall world tobacco problem. The Committee's report on smokeless tobacco includes the following potential harms: (a) promoting smokeless tobacco products may encourage individuals to adopt smokeless tobacco use in addition to continuing smoking; (b) use of smokeless tobacco products has been reported to increase the chances of subsequent initiation of smoking; (c) children who might not have started smoking may start smokeless tobacco use due to its ease of access; (d) the potential for long term harm caused by smokeless

tobacco products cannot be ruled out, such as the increased risk of developing oral cancer; and (e) all smokeless tobacco products are potentially addictive, since most of them have constituents that are known to be hazardous, such as tobacco-specific nitrosamines, and nicotine. Likewise, the Surgeon General of the United States of America has determined that the use of smokeless tobacco can cause other gum-related conditions and diseases in addition to oral cancer. According to the report entitled *Health Consequences of Using Smokeless Tobacco: A Report of the Advisory Committee to the Surgeon General*, the prolonged use of "smokeless tobacco" can also lead to the development of oral conditions, particularly leukoplakia, both in teenagers and adults.

The public policy of the Government of Puerto Rico is and has been to take measures in order to promote the prevention and cessation of tobacco use. One way to promote the prevention and cessation of tobacco use is to implement measures related to the imposition of taxes on tobacco byproducts, whether smoked or not.

In accordance with the foregoing, this Legislative Assembly deems it meritorious to increase the current tax on smokeless tobacco and cigarettes. This increase shall contribute to the fight against nicotine addiction, the cost of healthcare services in connection with patients who suffer from diseases related to or caused by their addiction to tobacco-byproducts, the evident cost and the loss of productivity in the workplace and the economy in general, and the need to generate more revenues for the treasury to comply with the Fiscal Plan and avoid reductions that could affect our most vulnerable sectors.

Emergency Fund

Act No. 91 of June 21, 1966, as amended, created the Emergency Fund for the purpose of having available the necessary funds to address unforeseen and unexpected public needs caused by calamities such as wars, hurricanes, earthquakes,

droughts, floods, and plagues, and for the purpose of protecting the life and property of the people, and the public credit.

The provisions of Act No. 91, *supra*, established that the operating expenses of the Commonwealth Emergency Management and Disaster Administration Agency may be financed with the resources appropriated to said Fund; that said Fund shall be capitalized annually by an amount not less than one-fifth (0.2%) of one percent of the total of the Joint Resolution for the Budget; said contribution shall be not less than one percent (1%) of the total net revenues for the previous fiscal year; and that the balance thereof shall never exceed one hundred fifty million dollars ($150,000,000), whichever is greater. However, legislation has been approved in the last decade to prevent any revenues from being covered into the Emergency Fund during specific fiscal years. What began as a transitory measure in Fiscal Year 2006-2007, since then, has become an ongoing practice in most fiscal years.

This Administration recognizes that in view of the grave fiscal situation faced by the Government, it becomes essential to implement a new methodology for the development, preparation, and execution of a government budget that allows for a substantial reduction of the State's spending without decreasing the amount and quality of the services it renders by eliminating inefficient services as well as inappropriate and obsolete programs. In this sense, it is important to establish and maintain a cash reserve to address unforeseen and unexpected public needs, such as the ones previously described, while taking into account that the contribution to said Fund must be made in accordance with the fiscal situation. For such reason, it is hereby established that a fixed contribution in the amount of ten million dollars ($10,000,000) shall be made until Fiscal Year 2020-2021. Furthermore, beginning with Fiscal Year 2020-2021, said contribution shall not be less than cero point five percent (0.5%) of the estimated net revenues submitted by the Department of the Treasury to draft the Recommended Budget chargeable to the General Fund.

In accordance with the foregoing, this Legislative Assembly deems it necessary to amend Act No. 91 of June 21, 1966, as amended, known as the "Emergency Fund," in order to provide for a more efficient use of the resources available to address any emergency situations or disasters that affect the Island during the following years.

### The Journey Toward Recovery Has Begun

Even though there are many obstacles that we must overcome in our journey toward a definite recovery, there is hope and optimism among our people. There is a new dawn for our Island and we cannot let Puerto Rico down. We must seize this moment and rise to the challenge to achieve the significant changes that Puerto Rico needs. We must face the crisis as a great challenge that we can transform into great opportunities. This challenge can lead us to build a fairer, worthier, and more progressive society. Hence, Act No. 7-2017 takes the most important step towards Puerto Rico's economic, social, and political recovery by setting in motion a process of immediate decolonization for the Island.

Now, we begin a process to transform the Government and render it more efficient by rehabilitating its finances and restoring the trust and credibility that we had lost. We strive for a Government that eliminates any wasteful expenditures, is more agile, and more accountable. This government shall be able to translate every tax dollar into action and services for the People. Now, we shall rise stronger than ever to live in a society where opportunities are accessible to every Puerto Rican and where everyone feels proud of having honored their commitment to our homeland.

***BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:***

CHAPTER 1.- INITIAL PROVISIONS

Section 1.01- Title

This Act shall be known and cited as the "Fiscal Plan Compliance Act."

Section 1.02.- Supremacy of this Act

This Act and all the provisions thereof are approved in the exercise of the Police Power, as well as the constitutional power conferred unto the Legislative Assembly in Sections 18 and 19 of Article II of the Constitution of Puerto Rico, to enact laws for the protection of the life, health, and general welfare of the people, as well as to enact laws in order to deal with grave emergencies that clearly jeopardizes the public health or safety or essential public services; and by virtue of Sections 7 and 8 of Article VI of the Constitution of Puerto Rico. Likewise, this Act was approved by virtue of the actions that Puerto Rico is required to take as a territory of the United States under the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) and the Fiscal Plan approved by the Financial Oversight Board. For such reason, this Act shall have supremacy over any other Act.

As of the date of approval of this Act, any organic, general, or special Act, article or section, guideline, clause and/or provision of any collective bargaining agreement, agreement, supplementary agreement, administrative order, policy, employment manual, circular letter, certification, regulation, rule, and employment condition, policy letter, classification or pay plan, contract letter, and/or provision which provides for fringe benefits that apply exclusively to union or nonunion employees or officials of the Government of Puerto Rico, including union or nonunion employees of the Public Corporations of the Government of Puerto Rico, shall be rendered ineffective, insofar as these are in contravention with the provisions of this Act. The foregoing does not preclude the right of labor unions to

negotiate employment conditions, salaries, and other nonfinancial clauses not included in this legislation, in accordance with the body of laws in effect.

Section 1.03.- Termination of Fiscal Measures

The Fiscal Plan Compliance Committee is hereby empowered to increase the benefits granted under this Act and to render ineffective any fiscal responsibility measures provided for in Chapter 2, upon determining that the fiscal situation has been stabilized and that it so allows.

CHAPTER 2.- FRINGE BENEFITS OF PUBLIC OFFICIALS OR EMPLOYEES OF THE GOVERNMENT OF PUERTO RICO

Section 2.01.- Applicability

All of the provisions of this Act shall apply to the Entities of the Executive Branch of the Government of Puerto Rico, except as expressly excluded under this Act. For purposes of this Act, the term "Entity of the Executive Branch" includes all of the agencies, as well as the instrumentalities and public corporations of the Government of Puerto Rico regardless of the degree of fiscal and budgetary autonomy otherwise granted under their respective organic acts or any applicable legislation. The University of Puerto Rico shall be exempt from the application of this Act.

Section 2.02.- Municipalities

The municipalities shall be exempt from the application of this Chapter. However, the municipalities are hereby empowered to avail themselves of these provisions upon previous approval of a Municipal Ordinance to such effects.

Section 2.03.- Declaration of Public Policy

It is hereby reaffirmed the Declaration of Public Policy of Act No. 3-2017, known as the "Act to Address the Economic, Fiscal, and Budget Crisis to Guarantee the Operations of the Government of Puerto Rico," which sets forth that fiscal responsibility is critical for Puerto Rico to restore its credibility among investors and

financial markets, as well as its credit, and to return to a path of responsible management of its debt and finances, thus achieving the efficient restructuring thereof.

It is hereby declared as the public policy of the Government of Puerto Rico to establish discipline, control, and expenditure cutbacks in the agencies, instrumentalities, departments, and public corporations of the Government of Puerto Rico.

The Government of Puerto Rico recognizes the existing disparity between the fringe benefits granted to the employees of the Central Government and their counterparts in public corporations. To avoid laying off government employees, it is necessary to make adjustments in fringe benefit expenditures, while Puerto Rico remains stuck in the fiscal crisis. For such purpose, this Act promotes equality and uniformity in the fringe benefits available to all government employees and officials. All agencies and instrumentalities of the Government of Puerto Rico have the responsibility of assuring that the fringe benefits offered are consistent with the legislative intent that warranted the granting thereof, while striking a proper balance between the needs of employees and the optimum use of the resources available at this historical  juncture.

The public policy herein adopted guarantees the continuity of the public endeavor in critical areas such as health, security, education, social work, and development, among others, as well as the rendering of essential and indispensable services to the People. Moreover, this public policy seeks to protect not only the jobs of thousands of public officials and employees of the Government of Puerto Rico, but also our most vulnerable citizens. For such reason, and in compliance with the Fiscal Plan approved in accordance with PROMESA, the fringe benefits of government employees are herein uniformed in order to achieve additional savings.

In order to attain the objectives of this Act in the least burdensome manner for our government employees, it is hereby established that the provisions of Sections 2.04, 2.05, 2.08 through 2.11, and 2.18 shall be implemented temporarily and the effectiveness thereof shall expire the following fiscal year after the Government of Puerto Rico has achieved a balanced budget and the fiscal crisis has been overcome. We believe that this consideration strikes a fair balance between the objective of complying with the certified Fiscal Plan and the interest of preserving social justice, which are the bases for the protection of the benefits granted to our government employees. Said benefits shall be restored upon certification by the members of the Fiscal Plan Compliance Committee.

For purposes of this Act, the Fiscal Plan Compliance Committee shall be composed of one representative appointed by the Governor, one representative appointed by the Speaker of the House of Representatives, and one representative appointed by the President of the Senate of Puerto Rico. Said Committee shall adopt bylaws to govern its internal operations.

Section 2.04.- Fringe Benefits

The Government of Puerto Rico shall be responsible for ensuring that employees are able to enjoy the fringe benefits granted to them, and overseeing that they do so in accordance with a plan that maintains a proper balance between the needs for service, the employees' needs, and the responsible use of the available resources. In order to manage human resources uniformly, responsibly, reasonably, equitably, and fairly, the following fringe benefits shall be available to union or nonunion employees or officials of the Government of Puerto Rico, including public corporations, subject to the provisions of Section 2.03 of this Act.

Case:17-03283-LTS   Doc#:3126-4   Filed:05/23/18   Entered:05/23/18 11:45:37   Desc:
Exhibit Law 26 of 2017 (4A Spanish 4B English)   Page 138 of 200

47

The fringe benefits of the employees of the Executive Branch shall be:

1.    Vacation Leave

a.    As of the effectiveness of this Act, every government employee shall be entitled to accrue one and one-fourth (1 ¼) day of vacation leave for every month of service. This provision shall not apply to teaching personnel and school principals, except for the administrative and managerial personnel of the Department of Education, nor to teaching personnel of any educational institution of the Government of Puerto Rico, and law enforcement officers of the Puerto Rico Police, who shall continue to accrue vacation leave as they did prior to the approval of this Act for being excluded from the Sole Employer system created under Act No. 8-2017.

b.    The employees shall begin to accrue the vacation leave upon completion of a three (3)-month period and said leave shall be retroactive to the employment commencement date. Furloughed or part-time employees shall accrue vacation leave proportionately to the number of hours regularly worked.

c.    The vacation leave may be accrued up to a maximum of sixty (60) workdays at the end of any calendar year.

d.    Vacation leave is granted to employees in order to allow them a reasonable annual rest period. As a general rule, said leave shall be used during the calendar year in which it was accrued. Every agency or public instrumentality is required to devise a vacation plan for every calendar year, in collaboration with supervisors and employees, establishing the period during which employees shall enjoy their vacation time in the manner that is more compatible with the needs for service. Said plan shall be completed no later than on December 31st of every year, so that it takes effect on January 1st of the following year. The agencies, public instrumentalities, and all employees shall be responsible for the strict enforcement

of said plan. Exceptions shall only be made when there is a clear, unavoidable, and duly certified need for service.

e.     The agency or public instrumentality is required to devise and implement a vacation plan diligently and in strict compliance with the provisions of this Act in order to prevent employees from having their vacation leave forfeited at the end of the calendar year and allow them to use it.

f.     All employees shall be entitled to enjoy their vacation leave for a period of fifteen (15) workdays during each calendar year, of which not less than ten (10) days shall be enjoyed consecutively.

g.     Employees who are unable to enjoy their vacation leave during a specific calendar year due to need for service evidenced in writing and as required by the agency or public instrumentality shall be exempt from the provisions of subsection (e) of this Section. In this case, the agency or public instrumentality is required to make the necessary adjustments so that the employee is able to enjoy at least any leave accrued in excess of the sixty (60)-day limit at the earliest date possible within the first three (3) months of the following calendar year.

h.     The agency or public instrumentality shall be required to provide for the granting of the accrued vacation leave prior to a definite and permanent separation from service, and prior to a transfer to render services at a different public agency or instrumentality.

i.     Typically, no vacation leave shall be granted for a period longer than fifteen (15) workdays per calendar year. However, the agency or public instrumentality may grant vacation leave in excess of fifteen (15) days up to a maximum of fifty (50) days, during any calendar year, to those employees who have accrued leave. When granting said leave, the following factors shall be considered together with the need for service:

1.      The use of said leave for the employee's self-betterment, such as travel, and education, etc.;

2.      Long-term illness of an employee after having exhausted the sick leave balance;

3.      Personal issues of the employee requiring his attention;

4.      If a leave of absence has been cancelled due to a need for service and as required by the agency;

5.      The total leave accrued by the employee.

j.      Due to extraordinary circumstances, advanced vacation leave may be granted to regular employees who have rendered services in the Government of Puerto Rico for over one (1) year, if there is certainty that the employee shall return to duty. The advanced vacation leave shall not exceed fifteen (15) workdays. The granting of advanced vacation leave shall require in all cases the previous written approval from the Appointing Authority. Any employee who has been granted advanced vacation leave and separates from service, voluntarily or involuntarily, before rendering services for the period needed to accrue the full amount of unearned advanced leave thus granted shall be required to refund the Government of Puerto Rico any amount paid to him for said advanced leave.

k.      In the event that an employee is granted a leave without pay, said employee shall not be required to exhaust the accrued vacation leave in order to use said leave without pay.

l.      If vacation leave or advanced vacation leave is authorized, the advanced payment of the wages pertaining to said leave period may be also authorized, insofar as it is requested sufficiently in advance. Such authorization shall be made upon the leave's approval.

m.      One or more employees may donate, as an exception, up to a maximum of five (5) days of accrued vacation leave to another government employee who works in the same government entity, as provided in Act No. 44-1996, as amended, known as the "Act for the Ceding of Vacation Leave," when:

1.      The leave recipient has worked uninterruptedly for at least one (1) year in any government agency;

2.      The leave recipient has not shown a pattern of unscheduled absences, which constitutes noncompliance with the rules of the government entity;

3.      The leave recipient has exhausted all the leave to which he is entitled due to an emergency;

4.      The leave recipient or his representative has shown attesting evidence of the emergency and the need to be absent in excess of the leave accrued and already exhausted;

5.      The leave donor has accrued at least fifteen (15) days of vacation leave in excess of the amount of leave to be donated;

6.      The leave donor has submitted to the government entity where he is employed a written authorization consenting to the leave donation, including the name of the leave recipient;

7.      The leave recipient or his representative has accepted the proposed donation in writing.

2.      Sick Leave

a.      Every employee hired by the Government of Puerto Rico before the effective date of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," shall be entitled to accrue one and a half (1½) days of sick leave for every month of service.

b.      Every employee hired by the Government of Puerto Rico after the effective date of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," shall be entitled to accrue one (1) day of sick leave for every month of service.

c.      Furloughed or part-time employees shall accrue sick leave proportionately to the number of hours regularly worked.

d.      The sick leave shall be used when the employee is sick, has a disability, or is suffering from a contagious disease which requires him to be absent from work in order to protect his health or the health of others.

e.      All employees shall use up to a maximum of five (5) days per year of the accrued sick leave, insofar as they maintain a balance of at least twelve (12) days, for the purpose of requesting a special leave to be used:

1.      To care and tend to their sick children.

2.      To conduct any transactions relating to, or to care for, sick elderly persons or persons with disabilities within their family circle, that is, up to the fourth degree of consanguinity, second degree of affinity, persons living under the same roof, or persons of whom an employee is a legal guardian or has legal custody.

Provided, that the transactions to be conducted are consistent with the purposes for which the sick leave was granted, that is to say, that are related to the health care and attention of the persons mentioned herein.

a)      "Elderly persons" shall mean any person who is sixty (60) years of age or older.

b)      "Persons with disabilities" shall mean any person who has a physical, mental, or sensory disability that substantially limits one or more essential activities in his life.

3.      For the first appearance of any petitioner, victim, or claimant in any administrative and/or judicial proceedings before any Department, Agency, Public Corporation, or Instrumentality of the Government of Puerto Rico in any actions related to child support, domestic abuse, sexual harassment in the workplace, or gender discrimination. The employee shall furnish attesting evidence of said appearance as issued by the concerned authority.

f.      The sick leave shall be accrued up to a maximum of ninety (90) workdays at the end of any calendar year. The sick leave shall begin to accrue upon completion of a three (3)-month period of continuous employment and said leave shall be retroactive to the employment commencement date.

g.      The agency or public instrumentality is required to make all the necessary adjustments, diligently and in strict compliance with the provisions of this Act, in order to allow employees to use all the sick leave accrued during any calendar year whenever they so need. The employee may exhaust the sick leave accrued during any calendar year.

h.      If an employee were absent for over three (3) days due to an illness, a medical certificate may be required attesting to:

1.      The employee actually being ill, suffering from a contagious disease, or being unable to work during the period he was absent;

2.      The illness of the employee's children;

3.      The illness of elderly persons or persons with disability within his family circle, that is, up to the fourth degree of consanguinity, second degree of affinity, persons living under the same roof, or persons of whom the employee is the legal guardian or has legal custody.

In addition to the medical certificate, the inability of the employee to attend work due to an illness may be ascertained by any other appropriate means. The foregoing shall not be applied or construed in violation of the provisions of ADA nor of the "Family and Medical Leave Act of 1993" (FMLA).

i.      In the event that an employee is sick and has no sick leave accrued, up to a maximum of eighteen (18) workdays of advanced sick leave may be granted to any employee who has served in the Government of Puerto Rico for not less than one (1) year, if there is reasonable certainty that the employee shall return to duty. Any employee who has been granted advanced sick leave and separates from service, voluntarily or involuntarily, before rendering services for the period needed to accrue the full amount of unearned sick leave thus granted shall be required to refund the Government of Puerto Rico any amount paid to him for said advanced leave.

j.      In the event of a long-term illness, once the sick leave is exhausted, an employee may exhaust his accrued vacation leave upon authorization from his immediate supervisor. Should the employee exhaust both leaves and he were still sick, a leave without pay may be authorized.

3.      Maternity Leave

a.      The maternity leave shall comprise the prenatal and postpartum rest period to which expectant employees are entitled. Likewise, it shall comprise the period to which an employee who has adopted a child is entitled, in accordance with the applicable legislation.

b.      Every expectant employee shall be entitled to a four (4)-week rest period before childbirth, and a four (4)-week rest period after childbirth. Provided that the employee may enjoy four (4) additional weeks to care and tend to the child.

Childbirth shall mean the act of giving birth to a child whether naturally or through lawful surgical obstetrics procedures. It shall likewise include any premature childbirth or involuntary abortion, even if the latter was legally induced by a medical specialist and takes place at any time during the pregnancy.

c.     The employee may choose to enjoy only one (1) week of prenatal rest, and extend up to seven (7) weeks the postpartum rest period to which she is entitled, or up to eleven (11) weeks if the four (4) additional weeks to care and tend to the child are included. In these cases, the employee shall submit to the agency a medical certificate attesting to the fact that she is able to work up to one week before childbirth.

d.     During the maternity leave, the employee shall earn her full wages.

e.     In the case of an employee with a provisional appointment, the maternity leave of said employee shall not exceed the appointment period.

f.     If childbirth occurs before the four (4)-week prenatal rest period elapses or before the employee began to enjoy her prenatal rest period, said employee may choose to extend the postpartum rest period for a period of time equivalent to that which she did not enjoy before childbirth.

g.     When the estimated date of delivery was wrongly calculated and the employee has enjoyed her four (4) weeks of prenatal rest period without going into labor, said employee shall be entitled to an extension of the prenatal rest period with full pay until childbirth. In this case, the employee shall be entitled still to enjoy the four (4)-week postpartum rest period from the date of delivery as well as the four (4) additional weeks to care and tend to the child.

h.     In the event of premature birth, the employee shall be entitled to enjoy the eight (8) weeks of maternity leave from the date of premature birth as well as the four (4) additional weeks to care and tend to the child.

       i.      Any employee who suffers a miscarriage may claim up to a maximum of four (4) weeks of maternity leave. However, in order to avail herself of said benefit, the miscarriage shall produce the same physiological effects that usually arise as a result of childbirth, according to the determination and certification of the attending physician during the miscarriage.

       j.      In the event that an employee suffers any postpartum complications that prevents her from returning to work once the postpartum rest period and the four (4) additional weeks to care and tend to the child have elapsed, the agency shall grant a sick leave to said employee.

       In these cases, there shall be required a medical certificate stating the condition of the employee and the estimated duration thereof. If the employee has exhausted her sick leave, vacation leave shall be granted. In the event that the employee has exhausted both the sick and the vacation leaves, a leave without pay may be authorized for the period recommended by the physician.

       k.      Any employee who adopts a preschooler, that is, a minor who is five (5) years of age or younger, who is not enrolled in any school, in accordance with the legislation and legal procedures in effect in Puerto Rico or any U.S. jurisdiction shall be entitled to the same full pay maternity leave benefits as an employee who gives birth. In the event that an employee adopts a minor who is six (6) years of age or older, said employee shall be granted maternity leave with full pay for a term of fifteen (15) days. This leave shall begin from the date on which the child is officially placed with the employee, which shall be certified in writing.

       l.      The maternity leave shall not be granted to employees who are enjoying any other leave with or without pay. Any employees who are enjoying sick or vacation leave, or leave without pay due to pregnancy complications shall be exempt from this provision.

m.     Any expectant employee or employee who has adopted a minor is required to notify the agency in advance of her plan to enjoy maternity leave and to return to duty.

n.     The agency may authorize the advanced payment of any wages corresponding to the maternity leave period, insofar as the employee so requests in advance, as appropriate. If the employee returns to duty before the postpartum rest period ends, such employee shall be required to refund the balance pertaining to the unused maternity leave.

o.     In the event that the newborn dies before the maternity leave period ends, the employee shall be entitled to claim only the portion of the postpartum rest period up to the first eight (8) weeks of unused maternity leave. Provided, that the four (4)-week additional period benefit to care for and tend to the child shall cease as of the date on which the child died. In this case, the employee may avail herself of any other leave to which she is entitled.

p.     The employee may request to return to duty before the postpartum rest period ends, insofar as the employee submits to the agency a medical certificate attesting to her ability to return to duty. In this case, it shall be understood that the employee is relinquishing the balance of unused maternity leave to which she is entitled.

4.     Paternity Leave

a.     The paternity leave shall comprise a period of fifteen (15) workdays from the date of birth of a child.

b.     When claiming this right, the employee shall certify that he is legally married or cohabitates with the mother of the child and that he has not committed domestic abuse. Said certification shall be made by submitting the form required by the agency for such purposes, which shall also include the signature of the mother of the child.

c.      The employee shall request the paternity leave and submit the birth certificate as soon as possible.

d.      The employee shall earn full wages during the paternity leave period.

e.      In the case of an employee with a provisional appointment, the paternity leave shall not exceed the appointment period.

f.      The paternity leave shall not be granted to employees who are enjoying any other type of leave with or without pay. The employees who have been granted vacation or sick leave shall be exempt from this provision.

g.      Any employee who adopts a child, together with his spouse or domestic partner, in accordance with the legislation and legal procedures in effect in Puerto Rico or any U.S. jurisdiction shall be entitled to a paternity leave that shall comprise a fifteen (15)-day period to be counted from the date on which the child is officially placed with the employee, which shall be certified in writing. When claiming this right, the employee shall certify that he is legally married, if applicable, and that he has not committed domestic abuse, or a sexual- or child abuse-related offense. Said certification shall be made by submitting the form required by the agency for such purposes, which shall also include the signature of his spouse.

Any employee who individually adopts a preschooler, that is, a minor who is five (5) years of age or younger, who is not enrolled in any school, in accordance with the legislation and legal procedures in effect in Puerto Rico or any U.S. jurisdiction shall be entitled to eight (8) weeks of paternity leave which shall begin to count from the date on which the child is officially placed with the employee, which shall be certified in writing. In the event that an employee adopts a minor who is six (6) years of age or older, said employee shall be entitled to paternity leave with full pay for a term of fifteen (15) days.

When claiming this right, the employee shall certify that he has not committed domestic abuse, nor a sexual- or child abuse-related offense.

Paragraphs (d), (e), and (f) of this subsection shall apply equally in the event that an employee requests the leave benefits set forth in the previous paragraphs.

h.    The employee may request to return to duty before the paternity leave period to which he is entitled ends. In this case, it shall be understood that the employee is relinquishing the balance of unused paternity leave to which he is entitled.

5.    Special Breastfeeding Leave with Pay

a.    Breastfeeding mothers who return to work after enjoying maternity leave shall be granted the opportunity to nurse their children for a period of one (1) hour during each full-time work day, which may be divided into two (2) thirty (30)-minute sessions or three (3) twenty (20)-minute sessions, to go where the child to be breastfed is being cared for, should the company or employer have a child care center in its facilities, or to express breast milk at the place provided for such purposes in the workplace. Said places shall guarantee nursing mothers privacy, safety, and hygiene. Said place must have electrical outlets and ventilation. If the employee is working on a part-time basis and the workday exceeds four (4) hours, the period granted shall be thirty (30) minutes for every consecutive four (4)-hour working period.

b.    Within the workplace, the breastfeeding period shall have a maximum duration of twelve (12) months, to be counted as of the date the employee returns to duty.

c.    Employees who wish to avail themselves of this benefit shall submit to the employer a medical certificate, during the period corresponding to the fourth (4th) and the eighth (8th) months of age of the infant, attesting to the fact and

certifying that she is breastfeeding her baby. Said certificate shall be submitted not later than five (5) days before each period. Provided, that the employer shall designate an area or physical space that guarantees the privacy of the breastfeeding mother, as well as her safety and hygiene, without this entailing the creation or construction of physical or organizational structures, contingent upon the availability of resources of the government entities. The agencies, instrumentalities, departments, and public corporations of the Government of Puerto Rico shall adopt regulations on the operation of said breastfeeding areas.

6.     Leave Without Pay

a.     If the cause for which the leave was granted ceases, the employee shall report for duty immediately or notify the public agency or instrumentality of the reasons why he is unavailable, or of his decision not to return to work.

b.     In addition to the leaves without pay that each agency or public instrumentality may grant by regulations, the following may be granted:

1.     To career employees with regular status, to render services in other agencies of the Government of Puerto Rico or in a private entity.

2.     To career employees with regular status, to protect their status or the rights to which they may be entitled in cases of:

a)     A disability claim before the Retirement System of the Government of Puerto Rico or other entity, and the employee has exhausted his sick and vacation leaves.

b)     Having suffered a work-related accident and undergoing medical treatment with the State Insurance Fund Corporation or pending a final determination concerning the employee's accident, and the employee has exhausted his sick and vacation leaves.

3.     To employees who so request after the birth of their child. Provided, that this type of leave without pay may be granted for a period of time which shall not exceed six (6) months as of the date on which it is authorized.

4.     To employees with regular status who are transferred to positions of trust in the Office of the Governor or in the Legislative Assembly, while rendering said services.

5.     To employees with regular status who have been elected in the general elections or have been selected to fill a vacancy of an elective public office within the Executive or Legislative Branch, including the offices of Resident Commissioner in the United States and Mayor, while rendering said services.

7.     Special Leaves

A special leave for a justified cause shall be granted, with or without pay, as the case may be, to union or nonunion government employees or officials. Provided, that said leaves shall be governed by the special laws that provide therefor.

a.     Court leave to serve as witness – Any employer is hereby prohibited from making deductions from the employee's salary or vacation or sick leave for the days and time spent by an employee duly summoned by the Department of Justice or a court, serving as a witness in a criminal action.

b.     Court leave for jury duty – Any employee summoned for jury duty shall be entitled to a leave with pay and to receive compensation from his employer on account of meals and mileage, in accordance with the regulations adopted by each agency, instrumentality, or public corporation, as if it were an official duty of said employee or official.

c.     Official duty – Every employee summoned in an official capacity to appear before any Court of Justice, the State Attorney's office, or administrative or government body, or government agency shall be entitled to a leave with pay for the period he was absent from work as a result of said summons.

     d.     Blood donation leave – Every employee of the Government of Puerto Rico, its instrumentalities, and public corporations shall be granted a blood donation leave with pay for a period of four (4) hours per year.

     e.     Parental involvement leave – Every employee of the Government of Puerto Rico, its instrumentalities, and public corporations shall be entitled to four (4) work hours without making any deductions from the employee's pay or any leave, at the beginning of each school semester and four (4) work hours at the end of each school semester to visit their children's school in order to learn about their academic achievements. The foregoing notwithstanding, any employee whose children are enrolled in the Special Education Program of the Department of Education shall have up to ten (10) hours per semester to conduct any transaction relating to their children.

     f.     Leave without pay to participate in sports – A leave without pay shall be granted to every government employee who was duly selected and certified by the Board for the Development of Full-Time High Performance Puerto Rican Athletes as an elite athlete or high-performance trainer for the Olympic, Paralympic, Pan-American, and Central America and the Caribbean Games, and Regional or World Championships. This leave shall have a term of up to one (1) year with the right to renewal, insofar as the Board approves it and it is so notified to the employer on or before thirty (30) days from its expiration. This leave allows eligible athletes and trainers to be absent from work without losing leave, with a job guaranteed, and without affecting any of the benefits and vested rights during the time these are participating in said trainings and/or competitions.

     During the leave period, the Board shall be responsible for the participants' wages. Therefore, the Board shall be required to remit to the employer the amount pertaining to the legal deductions made to the employees so as to allow the employer to continue making the payments pertaining to said contributions.

g.      Special leave to participate in sports - A special leave is hereby established to be granted to every government employee duly certified by the Puerto Rico Olympic Committee as an athlete to represent Puerto Rico in the Olympic Games, Paralympic Games, Pan-American Games, and Central America and the Caribbean Games, and Regional or World Championships. This leave shall be cumulative and shall not exceed thirty (30) workdays per calendar year.

h.      Leave of absence to renew driver's license – Every employee may use up to two (2) hours from his workday, without charge to any leave and with pay, to renew his driver's license, insofar as the holding of said license is an essential requirement to perform his job given the nature thereof.

i.      Leave of absence for volunteer emergency service – Every employee who is a disaster service certified volunteer of the American Red Cross may be granted a leave of absence with pay for a period not to exceed thirty (30) calendar days within a twelve (12)-month period in order to render special disaster services for the American Red Cross.

This leave shall be granted insofar as the American Red Cross requests the services of the official and upon approval of the agency, instrumentality, or public corporation where the official works. The American Red Cross shall issue a certificate to the employee for the services rendered and the duration thereof. The employee shall submit said certificate to the agency, instrumentality, or public corporation where he works.

j.      Military leave – Every employee who is a member of the Puerto Rico National Guard or of the Reserve components of the United States Armed Forces shall be entitled to a leave with pay for a maximum of thirty (30) days every year when on military service, as part of a training, or to attend drills or camp, as required.

      k.      Leave of absence for child immunization – Every employee who so requests may be granted up to two (2) hours to take his children to a government or private institution for immunization, every time a vaccine is required, as established in the immunization card of his children. The employee must submit a certification of the place, time, and date were the vaccines where administered to his children for the purpose of justifying the time used, as established for this type of leave. Otherwise, the time used shall be charged to compensatory time off, vacation leave, or it shall be deducted from the employee's wages.

      l.      None of the provisions of this Act shall impair the rights granted to government employees under the provisions in effect of the Federal Medical Leave Act (FMLA).

Section 2.05.- Holidays

Every government employee or official of the Government of Puerto Rico shall only be entitled to the holidays declared as such by the Governor of Puerto Rico or by law. The holidays to be observed by government employees are the following:

1.      New Year's Day, January 1st.

2.      Three Wise Men Day, January 6.

3.      Birthday of Martin Luther King Jr., the third Monday in January.

4.      George Washington's Birthday, Presidents' Day, and the Puerto Rican Illustrious Persons Day: Eugenio María de Hostos, José de Diego, Luis Muñoz-Rivera, José Celso Barbosa, Ramón Emeterio Betances, Román Baldorioty-de Castro, Luis Muñoz-Marín, Ernesto Ramos-Antonini, and Luis A. Ferré, the third Monday in February.

5.      U. S. Citizenship Day, March 2.

6.      Abolition Day, March 22.

7.      Good Friday, according to the date on which it occurs every year.

8.      Memorial Day, the last Monday in May.

9.      Independence Day, July 4.

10.    Labor Day, the first Monday in September.

11.    Columbus Day, the second Monday in October.

12.    Veterans Day, November 11.

13.    Discovery of Puerto Rico and Puerto Rican Culture Day, November 19.

14.    Thanksgiving Day, the fourth Thursday in November.

15.    Christmas Day, December 25.

Section 2.06.-  Day Care Centers

Every official or employee of the Government of Puerto Rico, its instrumentalities, and public corporations, where there are areas duly set up to operate as Day Care Centers and/or to be used as care centers for preschoolers, shall be entitled to the use thereof. The users of this service shall make a financial contribution geared to improving the operations of the Center; provided, that each agency, instrumentality, or public corporation shall determine a reasonable amount to be paid for using said facilities and services.

Section 2.07.- Uniform Employer Contribution to the Healthcare Plan of the Employees of Public Corporations.

The Executive and Legislative Branches shall identify additional savings and resources to prevent adversely affecting the employees' contributions to the payment of the healthcare plan. If the projected savings of the Fiscal Plan are not achieved, the difference shall be offset through a program to match the Government's contributions to the healthcare plan. Only then, as of July 1st, 2018, every official or government employee, whether union or nonunion, who works for any Public Corporation, except for the University of Puerto Rico, shall be entitled to an employer contribution to be determined by the Fiscal Plan Compliance Committee using as a basis the metrics established in the Fiscal Plan, but in no case said

contribution shall be less than the one hundred dollar ($100)-employer contribution established by law for Central Government employees. FAFAA may negotiate and reach agreements on an insurance coverage that is less expensive with private insurers or public coverage to be selected by the employees of the Government as Sole Employer or by agency or groups of agencies. Any reduction in the employer contribution to the healthcare plan shall require FAFAA to offer a less expensive insurance coverage to said government employees. However, every employee, or dependent thereof, of a public corporation who is currently enrolled in the healthcare plan and who suffers from a preexisting catastrophic, chronic, or terminal illness shall continue to receive the employer contribution in effect for his healthcare plan, without any change, for the term he remains in the public service.

Section 2.08.-  Bonus

As of the effective date of this Act, the only financial bonus to be granted to government employees of the Central Government and the public corporations thereof shall be the Christmas Bonus. The employees shall be entitled to a bonus in the amount of six hundred dollars ($600) for every year said employee has rendered services in the Government of Puerto Rico for at least six (6) months.

Section 2.09.- Compensation for Work in Excess of the Regular Work Schedule

1.    The work schedule of each agency or public instrumentality shall be designed so that the need to work beyond the regular work schedule established for employees by the agency or public instrumentality is reduced to a minimum. However, employees may be required to render services beyond their daily or weekly work schedule, or on any other day when services are suspended by the Governor without charge to any leave, due to the special nature of the services to be rendered; the need for service to protect and preserve the life and property of citizens; any emergency situation; an event of force majeure; any weather

disturbances; and unforeseen or maintenance situations as necessary to continue offering essential services. In these cases, the supervisor of the employee shall issue a previous authorization therefor, to be approved by the appointing authority or by the official to whom it delegates. Supervisors shall take measures to ensure that when an employee remains working, the employee is doing so by virtue of an express authorization.

2.     Employees shall be entitled to receive a compensatory time off, at the rate of one and one-half time, for services rendered beyond their regular daily or weekly work schedule, or during their meal break, and for services rendered during holidays, days off, or days on which the Governor suspends services without charge to any leave. The compensatory time off shall be enjoyed by the employee within six (6) months as of the date on which the employee has worked overtime. If due to the need for the service, this were not possible, compensatory time off may be accrued for up to a maximum of two hundred and forty (240) hours. In the case of employees who discharge duties related to public safety, emergency response, or seasonal activities, as these terms are defined in the Fair Labor Standards Act, except for the provisions of Section 10 of Act No. 53-1996, and Section 2.09 of Act No. 20-2017, said employees may accrue up to four hundred and eighty (480) hours. Overtime compensation through compensatory time off shall not be allowed for hours accrued by the employee in excess of the aforementioned limits. However, police officers, as provided in Section 2.09 of Act No. 20-2017, shall be paid at the rate of one and one-half time and shall have the option to choose the payment of these hours without the need to accrue them as compensatory time off, and said overtime pay shall not be included in their gross income and shall be exempt from taxation. This shall not apply to employees of public corporations who shall be entitled to overtime pay at a rate of one and one-half time from the first hour accrued

as provided in this Act, except when the applicable collective bargaining agreement provides for the accrual of compensatory time off.

3.    Any employee who discharges administrative, executive, or professional duties, as these terms are defined in the Fair Labor Standards Act shall be exempt from the provisions of subsection (2) above.

Section 2.10.-  Liquidation of Vacation and Sick Leave Accrued in Excess

Every agency, instrumentality, or public corporation must recognize to every government employee, whether union or nonunion, any vacation and sick leave accrued as of the effective date of this Act; however, no leave accrued before the effective date of this Act shall be liquidated in cash.

Every agency or public instrumentality shall be required to immediately outline a plan whereby union or nonunion employees shall exhaust any leaves accrued in excess so that, by December 31st, 2017, there are no sick or vacation leave accrued in excess of the ceilings. Provided, further, that any accrued leave in excess of the ceilings shall be forfeited if unused after said date.

As of the effective date of this Act, no government employee, whether union or nonunion, who works for the Government of Puerto Rico, in any of its agencies, instrumentalities, or public corporations shall be entitled to receive a payment on account of the liquidation of vacation or sick leave accrued in excess.

Section 2.11.- Lump-Sum Payments for Vacation Leave Upon Separation from Public Service

As of the effective date of this Act, any government employee, whether union or nonunion, shall only be entitled to a lump-sum payment for accrued vacation leave as of the date of separation from service, which shall in no case exceed sixty (60) days. The employee may authorize the transfer of said balance and/or excess existing prior to the approval of this Act to the Retirement System to be credited as time worked.

Section 2.11(a).- Section 3 of Act No. 125 of June 10, 1967, as amended, is hereby amended to read as follows:

"The Governor shall regulate all that pertains to the granting and enjoyment of leaves and the amount of the final compensation payments, including the payment of the death benefit, in connection with the officials designated by the Governor, except for the members of the Judiciary, ombudsmen, prosecutors, and property registrars. For purposes of the final compensation payment, which shall in no case exceed an amount equal to two (2) month's salary, the Governor shall take into consideration factors such as the need for service, the term during which the employee held office, and the fiscal status of the government agency or entity, the nature of the duties discharged, and the credits for any accrued and unused vacation leave from previous Government employment upon transfer to hold an office appointed by the Governor, among others. Those persons who receive a final compensation payment, pursuant to the provisions of this Act, shall be required to refund the amount thus received if, as a result of acts that occurred while discharging their public duty, such persons are convicted of misappropriation, embezzlement, or theft of public funds; crimes against the public treasury or public duty, as classified in the Penal Code of Puerto Rico.

…"

Section 2.12.- Section 4.3 of Article 4 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby amended to read as follows:

"Section 4.3.-  Powers and Duties of the Office and the Director

In addition to any other powers and duties conferred under this Act, the Office and the Director shall have the following:

1.      …

2.      Powers and Duties of the Office.-

a.      To centralize the duties of the Government of Puerto Rico Human Resources Administration and Transformation Office that are compatible with the provisions of this Act.

b.      …

c.      …

d.      …

e.      To provide advice on labor-related matters to the agencies of the Executive Branch in all that pertains to the procedures for election and certification of labor unions; the negotiation and administration of collective bargaining agreements; and any other labor-related areas of the agencies, as provided in Act No. 45-1998. While discharging its advisory duties relating to collective bargaining pursuant to Act No. 45-1998, the Office shall coordinate and supervise the creation and operation of a Bargaining Committee, composed of its staff as well as the staff designated by the Office of Management and Budget. The Office shall conduct comparative studies on collective bargaining agreements and shall provide training in the field of labor to those agencies that so request.

f.      …

g.      …

h.      …

i.      …

j.      …

k.      …

l.      …

m.      To manage the Central Job Posting Register for Recruitment, Promotion, and Training in the Government and keep it up to date. Likewise, it shall keep an online register; provided, that public agencies and instrumentalities as well

as public corporations, except for the Office of the Governor proper, the Municipalities, the Supreme Court, the Office of the Chief Justice, the Office of the Court Administrator, the Legislative Assembly, and the Municipal Legislatures, carry out their duty of forwarding, on a monthly basis, any recruitment and promotion opportunities to the Government of Puerto Rico Human Resources Administration and Transformation Office. The Office shall call for interview candidates from the list maintained by said Office. All applications for training shall be forwarded to the Government of Puerto Rico Human Resources Administration and Transformation Office within at least thirty (30) days before the training date. The Office shall evaluate the need and convenience of the training and shall approve or deny the same.

      n.     …

      o.     …

      p.     …

      q.     …

      r.     …

      s.     …

      t.     …

…"

Section 2.13.- Section 5.2 of Article 5 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby amended to read as follows:

"Article 5.- The Government of Puerto Rico Human Resources Administration and Transformation System.-

Section 5.1.-  …

Section 5.2.-  Exclusions.-

The provisions of this Act shall not apply to the following Government agencies and instrumentalities:

1.      …

…

5.      The Office of the Governor proper.

…

8.      …

However, public corporations or public-private partnerships shall adopt personnel regulations incorporating the merit system in the administration of their human resources, as provided in this Act, and submit a copy thereof to the Office. The Office is hereby empowered to conduct compliance audits of the essential areas of the merit system.

Likewise, the concept of mobility and the mechanism established by the Office to implement the movement of government employees shall apply to public corporations or public-private partnerships, agencies that operate as private companies or businesses such as the Participatory Public-Private Partnerships (APP+P), and to the municipalities."

Section 2.14.- Subsections 1(d) and 4(1) of Section 6.4 are hereby amended, and a new subsection 5 is hereby added to Article 6 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby amended to read as follows:

"Section 6.4.- Provisions on Promotions, Transfers, Demotions, and Mobility.-

…

1.      …

a.      …

Case:17-03283-LTS   Doc#:3126-4   Filed:05/23/18   Entered:05/23/18 11:45:37   Desc:
Exhibit Law 26 of 2017 (4A Spanish 4B English)   Page 163 of 200

72

          b.     …

          c.     …

          d.     …

Furthermore, special qualifications of the employees shall be understood to be additional experience; academic education beyond minimum requirements; and the results obtained in the Evaluation System adopted by the Agencies and developed by the Office.

          e.     …

2.    …

3.    …

4.    Mobility

…

1.    The Government of Puerto Rico Human Resources Administration and Transformation Office in conjunction with the Office of Management and Budget shall have one (1) year as of the approval of this Act to devise mobility plans, which shall address the immediate needs for rendering services in the Government of Puerto Rico.

          2.    …

          3.    …

          4.    …

          5.    …

          6.    …

          7.    …

          8.    …

          9.    …

          10.    …

          11.    …

12. …

13. …

5.     Other Actions

(a)     Detail – The temporary assignment of a public official or employee from an agency of the Executive Branch or municipality, and vice versa, is hereby authorized in order to render mutual services at any other of said jurisdictions. Detailed employee or officials shall continue to hold the same office and shall keep all of their rights as officials or employees of said agency. Detail is an administrative action that allows for the maximization of the use of human resources in a cost-effective manner according to the Merit System. Under extraordinary circumstances, the use of this mechanism between officials and employees of the Executive Branch and other Government Branches, shall be allowed insofar as the detailed official receives his wages from the Branch for which he works, in accordance with the rules established therefor by the Office of Management and Budget. Detail may be used for a one (1)-year term, which may be extended as necessary.

(b)     Administrative Designation or Assignment – Is the formal and temporary designation made by an appointing authority to an employee in order for said employee to render services of the same or similar nature in another office of the same agency."

Section 2.15.- Subsection 2(b) of Section 6.8 of Article 6 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby amended to read as follows:

"Section 6.8.-  Habilitation in the Public Service

…

1.     …

2.     …

a.      …

b.      Any convicted government employee who has been granted a suspended sentence or parole and is serving his sentence in the community under those limitations imposed by the entities of the Government's Corrections System, may file a request for habilitation at any time with the Department of Labor and Human Resources or, in default thereof, the Agency where he is employed, shall be required to file it. The employee shall continue to hold office until the Secretary of the Department of Labor and Human Resources determines otherwise.

c.      …

d.      …"

Section 2.16.- Section 6.9 of Article 6 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby amended to read as follows:

"Section 6.9.-  Prohibition

In order to ensure the faithful application of the Merit System in the Public Service during pre- and post-electoral periods, the Appointing Authorities of the agencies, instrumentalities, and public corporations of the Government of Puerto Rico shall refrain from making any personnel transaction relating to the essential areas of the Merit System, such as appointments, promotions, demotions, or transfers; nor shall they be able to make changes to position categories, nor shall they use  the employee's mobility during the election prohibition period. Provided, that during said period, no personnel actions or changes whatsoever with a retroactive effect may be processed or recorded in the employee's personnel folder. Any changes resulting from the completion of a probationary period and the imposition of disciplinary measures shall be exempt from this prohibition. Noncompliance with this provision shall render any transaction thus carried out null.

This prohibition shall comprise the period of two (2) months before and two (2) months after the holding of the General Elections of Puerto Rico.

Upon the Office's approval, exceptions from this prohibition may be made in the event of urgent and unavoidable needs for service duly evinced and certified pursuant to the rules issued by the Office to such effect. For purposes of this Section, urgent or unavoidable needs shall be understood as any essential or crucial actions for which there is a pressing need to carry them out in order to discharge the functions of the agency, instrumentality, or public corporation. It shall not include actions that are deemed merely convenient or beneficial, whose solution may be extendable until the regular process therefor is concluded."

Section 2.17.-  Subsections 3 and 5 of Section 7.2 of Article 7 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby amended to read as follows:

"Section 7.2.-  General Pay Rules

The following guidelines shall apply to all government agencies under this Act:

1.      …

2.      …

3.      The Office shall administer their pay plan in connection with the essential areas of the merit system. When conducting transactions relating to public service career employees, none of these[sic] shall take an action that attempts against or that is contrary to the merit system.

4.      …

5.      No amendment or modification to the position classification and evaluation plan may negatively affect the base salary of the employee.

…"

Section 2.18.- The effectiveness of Article 9 and Section 10.2 of Article 10 of Act No. 8-2017, known as the "Government of Puerto Rico Human Resources Administration and Transformation Act," is hereby suspended, subject to the provisions of Section 2.03 of this Act.

Section 2.19.- Nullity

As of the effective date of this Act, any clauses or provisions of a collective bargaining agreement, covenant, supplementary agreement, regulations, administrative order, circular letter and/or contract letter, whereby union or nonunion government employees or officials of the Government, including union or nonunion employees of the Public Corporations of the Government of Puerto Rico, are granted more fringe benefits than those authorized herein shall be null and ineffective. The adoption of any authorized measure to comply with the foregoing provisions by any agency or public corporation of the Government of Puerto Rico shall not constitute a violation of the existing collective bargaining agreements. It shall neither constitute an unlawful practice.

Section 2.20.- Relation to other Laws

The following laws shall remain in full force to the extent the provisions thereof are not in conflict with this Act:

a.      Act No. 62 of June 23, 1969, as amended known as the "Military Code of Puerto Rico."

b.      Act No. 122-1996, as amended, known as the "Employees Summoned as Witnesses in Criminal Cases Act."[sic]

c.      Act No. 44-1996, as amended, known as the "Act for the Ceding of Vacation Leave."

d.      Act No. 203-2007, as amended, known as the "Bill of Rights of the Puerto Rican Veteran for the 21st Century."

e.      Act No. 58-1994, as amended, known as the "Emergency Service Voluntary Leave Act."

f.      Act No. 122 of July 12, 1986, as amended, known as the "Employees Summoned as Witnesses in Criminal Cases Act."

g.      Act No. 281-2003, as amended, known as the "Puerto Rico Jury Service Administration Act."

h.      Act No. 24-2002, as amended.

i.      Act No. 49 of June 27, 1987, as amended.

j.      Act No. 134-1998, as amended.

k.      Act No. 154-2000, as amended.

l.      Regarding the Municipalities, the provisions of Act No. 81-1991, as amended, known as the "Autonomous Municipalities Act of the Commonwealth of Puerto Rico of 1991," shall remain in full force without any impairment. The provisions of this Act shall apply to any Municipality that so determines upon approving a Municipal Ordinance to such effect.

Section 2.21.- Repeal

Act No. 89-2016, better known as the "Public Service Temporary Employment Act," is hereby repealed.

CHAPTER 3.-  JOINT UNDERWRITING ASSOCIATION OF THE COMPULSORY LIABILITY INSURANCE

Section 3.01.-  Subsection (m) of Section 3 of Act No. 253-1995, as amended, is hereby amended to read as follows:

"Section 3.- Definitions

For purposes of this Act, the following terms and phrases shall have the meaning stated below:

(a)      …

…

(m)     Compulsory Liability Insurance.- Means the insurance required by this Act and that responds for damages caused to third party motor vehicles as a result of a traffic accident, for which the owner of the vehicle covered by this insurance is legally liable, and through the use of which said damages were caused, according to the system for the initial determination of liability created pursuant to this Act. Said insurance shall have coverage limit of four thousand five hundred dollars ($4,500) per accident. The Commissioner, upon request of insurance companies that offer the compulsory liability insurance, or *motu proprio*, may review and modify the limits and rate of the compulsory liability insurance every two (2) years, in accordance with the applicable provisions of Chapter 12 of the Code, which take into account every insurer in the Compulsory Liability Insurance market. However, the coverage limits shall never be less than three thousand five hundred dollars ($3,500). …"

Section 3.02.-  Subsections (f) and (h) of Section 6 of Act No. 253-1995, as amended, better known as the "Compulsory Motor Vehicle Liability Insurance Act," are hereby amended to read as follows:

"Section 6.-  Joint Underwriting Association—Creation

(a)     …

…

(f)     Insurers that underwrite the compulsory liability insurance, including the Joint Underwriting Association, upon receipt of their respective premiums after deducting the fee established in Section 7(b)(1), shall deduct five percent (5%) of said premiums, as provided in Section 7(b)(2). Every insurer and the Joint Underwriting Association shall be responsible for remitting to the Department of the Treasury the amount pertaining to the fee collected on the total premiums underwritten during a month, not later than the fifth (5th) day of the following month. The Department of the Treasury shall prescribe by regulations the manner in which

this payment shall be made and may design and agree on other methods for the collection of this fee, insofar as said change results in the effective and continuous collection thereof. On the same date, every insurer and the Joint Underwriting Association shall be responsible for remitting to the Department of the Treasury the amount pertaining to the fee established in Section 7(b)(3). The Department of the Treasury shall prescribe by regulations the manner in which this payment shall be made and may design and agree on other methods for the collection of this fee, insofar as said change results in the effective and continuous collection thereof.

…

(h)     All members of the Joint Underwriting Association shall share in the annual profits and losses thereof, as determined in accordance with the Annual Statement required under Section 3.310 of the Code, in the percentage that the direct net premiums underwritten in Puerto Rico during the previous year for each one of the insurers, for insurance against any loss, expense, or liability for the loss or the damage caused to persons or property, resulting from the possession, conservation, or use of a land vehicle, aircraft, or draft animal or mount, or incidental thereto, all of which in accordance with Section 4.070 of the Code, represented by the total of the direct net premiums underwritten in Puerto Rico during said year for that type of insurance.

(1)     …

(2)     …

(3)     Special Dividend and Special Payment 2017:

(i)     The Joint Underwriting Association is hereby empowered to report to its members a special dividend before June 30th, 2017, subject to the provisions of this subsection, in the amount of seventy million dollars ($70,000,000) subject to the imposition of a one-time special tax of fifty percent (50%). Dividends received by private insurers that are members of the Joint Underwriting Association

shall not be subject to any other tax. Any revenues on account of the one-time special tax herein established shall not be considered for purposes of the computation of any of the existing formulas used to determine budget appropriations to be earmarked during the constitutional budget process.

(ii)     Within a term that shall not exceed fifteen (15) days as of the approval of this Act, the Board shall call a meeting and shall submit for the approval of all of the members of the Joint Underwriting Association the declaration of the authorized special dividend. It is hereby provided that the dividend may be approved by the vote of members who have a combined proportional share of over fifty percent (50%), in accordance with the most recent determination made by the Office of the Insurance Commissioner. The determination made at the Meeting shall be binding.

(iii)     Considering the public benefit of this measure, and its authorization by the Legislative Assembly, the provisions of subsection (j) of this Section shall apply to the actions taken by the Board, the members, and the personnel of the Association.

(iv)     If the dividend statement is approved at the meeting, the Joint Underwriting Association shall make a special payment in the amount of thirty-five million dollars ($35,000,000) within a term that shall not exceed ninety (90) days, to the Department of the Treasury, which shall deposit said funds in the General Fund of the Government of Puerto Rico. During said term, the Joint Underwriting Association shall pay to the members thereof the authorized dividends, pursuant to the proportional share of each member.

…"

Section 3.03.- Subsections (a), (b), and (d) of Section 7 of Act No. 253 of December 27, 1995, as amended, are hereby amended to read as follows:

"Section 7.- Premiums

(a)      The initial uniform premium of the compulsory liability insurance shall be ninety-nine dollars ($99) for each private passenger vehicle and one hundred forty-eight dollars ($148) for each commercial vehicle. The review and adjustment of the premium on or before June 30, 2017, in accordance with the provisions of subsection (e) of this Section, is hereby authorized.

The Commissioner may fix a premium other than that established herein for the compulsory liability insurance of those vehicles to which the Department of Transportation and Public Works has issued transitory or provisional licenses.

(b)      Service Fees

1)      …

2)      …

3)      An additional administrative fee is hereby established which shall be proportional to the increase in revenues on account of adjustments to the uniform premium, in accordance with the provisions of subsections (a) and (e) of this Section. The applicable percentage to determine the appropriate amount in the event of increase of the premium shall be computed by dividing the net increase of the premium pursuant to the amount established in subsection (a) of this Section, by the adjusted total cost of the premium. The resulting percentage shall be applied to the income generated by the insurers, including the Joint Underwriting Association after the administrative costs and any production costs related to the premium are deducted. The remaining balance after applying the percentage as established in this formula shall be transferred to the General Fund of the Government of Puerto Rico. This fee does not constitute a tax on a premium.

4)     These fees shall not apply to policies issued through a traditional insurance, but rather shall be deemed to be part of the compulsory liability insurance premium and shall be guaranteed within the premium dollar distribution.

(c)     …

(d)     Every insurer of the compulsory liability insurance may submit to the Commissioner for his approval any rate rules and schedules that include guidelines for the application of late fees to the uniform premium for private passenger and commercial vehicles that are insured under this premium, as the case may be, subject to the provisions of Chapter 12 of the Code, taking as a basis the frequency and seriousness of the losses of the insured.

(e)     …

…"

## CHAPTER 4.- TRANSFER OF PUBLIC CORPORATIONS, AGENCIES, AND INSTRUMENTALITIES  TO THE GENERAL FUND; CREATION OF THE COMMITTEE AND ADJUSTMENTS TO FEES, DUTIES, AND RATES

Section 4.01.- Transfer of Surplus

The public corporations, agencies, and instrumentalities of the Government of Puerto Rico are hereby directed to transfer to the Department of the Treasury any surplus of the revenues generated. Said funds shall be deemed to be available resources of the State and shall be deposited by the Department of the Treasury in the General Fund of the Government of Puerto Rico in order to meet the liquidity requirements provided for in the Fiscal Plan adopted by virtue of the provisions of the Puerto Rico Oversight, Management, and Economic Stability Act of 2016, Public Law 114-187, better known as PROMESA.

Section 4.02.- Committee

The amount of funds to be contributed by each of corporation and instrumentality shall be determined by a committee composed of the Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority, the Secretary of the Department of the Treasury, and the Executive Director of the Office of Management and Budget, which committee may establish the rates needed to comply with the provisions of the Fiscal Plan approved for the Government of Puerto Rico, and that which governs the corporations. This committee shall ensure that the fund transfer provided in Section 4.01 of this Act does not affect the services offered by public corporations and instrumentalities, and that the surplus consists of the balance available after the operating costs and obligations of said entities are covered, in accordance with the expenditures budget recommended by the Office of Management and Budget for each fiscal year.

Moreover, this committee is hereby empowered to review the sources of income of the public corporations, agencies, and instrumentalities, and to adjust, increase, or decrease any fee, duty, rate, tariff, cost, premium, or any revenue of similar nature, for the purpose of complying with the metrics provided in the Fiscal Plan of the Government of Puerto Rico. The committee may also impose an additional administrative fee on those contributions it deems necessary, which fee may range from five (5) to ten (10) percent, in order to comply with the metrics of the Fiscal Plan certified by the Financial Oversight Board.

This Act shall have supremacy over any law whereby any fee, duty, rate, tariff, cost, premium, or any revenue of similar nature is thus established, and the committee is hereby empowered to review, increase, or decrease the amount thereof even when said amount is provided by law. The committee shall be empowered to review, increase, or decrease these revenues notwithstanding the provisions of any

other law, regulations, or administrative order that establishes a specific amount for these revenues.

Any provisions of laws, regulations, administrative orders, corporate resolution, or any other documents of similar nature that limit or reduce the funds that may be transferred by a public corporation, agency, or instrumentality of the Government of Puerto Rico to the General Fund as provided in this Chapter are hereby suspended.

The committee is hereby empowered to promulgate any other administrative order, circular letter, or regulations as are necessary for its operation and compliance with the provisions of this Act.

Section 4.03.- Exclusions

The University of Puerto Rico, created by virtue of Act No. 1 of January 20, 1966, as amended, known as the "University of Puerto Rico Act," and the Public Corporation for the Supervision and Insurance of Cooperatives in Puerto Rico created by virtue of Act No. 114-2001, as amended, better known as the "Public Corporation for the Supervision and Insurance of Cooperatives in Puerto Rico Act," the "Municipal Finance Corporation Act," Act No. 19-2014, as amended, better known as COFIM (Spanish acronym), the "Special Joint Committee on Legislative Donations Act"[sic], Act No. 20-2015, and the "Standing Committee on the Comptroller's Special Reports," Act No. 83 of June 23, 1954, as amended, are hereby excluded from the provisions of this Chapter. Any funds held by community-based organizations and public corporations that constitute funds received from private entities are hereby excluded from the application of this Chapter.

Regarding the "Dedicated Sales Tax Act," Act No. 9[sic]-2006, as amended, better known as COFINA (Spanish acronym), the Executive Branch is hereby empowered to use COFINA funds occasionally, only as the last resort, and subject to the filing of a sworn certification with the Legislative Assembly. The filing of said

certification shall not be construed as implying that the Executive Branch shall have unlimited access to COFINA funds. Said certification shall state the need, term, and amount of funds to be used to cover a significant occasional deficiency in the cash flow to comply with the Fiscal Plan of the Government of Puerto Rico. Said certification shall be signed and sworn by the Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA), and the Executive Director of the Office of Management and Budget. These officials shall sign the certification under oath, which task shall be nontransferable. In said certification, the officials shall attest to the correctness, accuracy, and veracity of the information, pursuant to the fiscal reality of the Government of Puerto Rico.

Section 4.04.- Compliance Clause

All transfers made by virtue of the provisions of this Chapter shall be subject to the requirements of Section 201(b)(1) (M) of Public Law 114-187, known as the Puerto Rico Oversight, Management, and Economic Stability Act or PROMESA.

CHAPTER 5.- DISPOSAL OF REAL PROPERTY OF THE GOVERNMENT

Section 5.01.- Public Policy

In order to provide more resources to the Treasury, it is hereby declared as the public policy of the Government of Puerto Rico to make better use of the State's currently unutilized real property. It is hereby further promoted that any currently unutilized real property be devoted to activities, whether for nonprofit, commercial, or residential, geared toward advancing the general welfare and, in turn, fostering the activation of the real estate market and the economy in general.

To comply with this public policy, the design of a new efficient and effective procedure for the sale of real property based on the principles of competition, transparency, economic development, job creation, wellbeing, and the public interest is hereby authorized.

Section 5.02.-  Definitions

For purposes of this Chapter, the following terms shall have the meaning stated below:

A.      Real Property - Those that cannot be moved or transferred from one place to another, such as land, buildings, etc., as well as everything attached to an immovable in a fixed manner, in such a way that it cannot be separated therefrom without breaking the matter or damaging the object; and that belong to the agencies, entities, instrumentalities, and public corporations of the Executive Branch of the Government of Puerto Rico.

B.      Committee – The Real Property Evaluation and Disposal Committee.

C.      Disposal – The process whereby the Government of Puerto Rico assigns the title of ownership, possession, use, or enjoyment of real property for the better use thereof.

D.      Live Outcry Auction – The auction process whereby bidders physically meet at a previously agreed time and venue to place their bids for a specific real property that was disclosed prior to the public bid. Bidders bid openly against each other.

E.      Sealed Bid – The auction process whereby bidders submit their secret bids in a sealed envelope. The process for this type of auction shall be prescribed by regulations.

F.      Direct Sale – The process to dispose of a property to a party that has met the criteria to be prescribed by regulations.

Section 5.03.-  Real Estate Evaluation and Disposal Committee

The Real Estate Evaluation and Disposal Committee is hereby created in order to exercise all the necessary powers, which are not contrary to this or any other Act, for the disposal of the real property of the Executive Branch of the Government of Puerto Rico.

The Committee shall be composed of the following public officials:

a.      The Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority (FAFAA).

b.      The Director of the Office of Management and Budget.

c.      The Secretary of the Department of Economic Development and Commerce.

The Executive Director of FAFAA shall chair the Committee.

The Committee shall meet at least once every month and as necessary from time to time in order to expedite the works, and at the time and place deemed convenient. Provided, that the members of the Committee shall not earn any wages whatsoever nor receive per diems for discharging the duties and authorities entrusted to them under this Act. Provided, further, that none of the provisions herein shall apply to real property of the Industrial Development Company, the Government Development Bank, the Land Administration, the Convention Center District Authority and the subsidiaries thereof, respectively, insofar as these have established as of the effective date of this Act, a process for the sale of real property that is consistent with this Chapter.

Section 5.04.-  Executive Director

Once the Committee is constituted, it shall designate an Executive Director who shall have all the powers delegated by the Committee relating to the implementation of the public policy set forth herein. The Executive Director shall recommend the Committee any interagency personnel transfers in order to designate human resources to achieve the objectives of this Act in accordance with Act No. 8-2017. The Committee shall designate the location of the Office of the Executive Director.

Section 5.05.-  Powers of the Committee

The Committee shall have the following powers:

a.      To approve rules, regulations, circular letters, and guidelines as are necessary to discharge their duties and functions.

b.      To adopt an official seal and alter it as convenient.

c.      To sue and be sued in its own name.

d.      To negotiate and execute contracts, process the disposal of real property of the Executive Branch of the Government of Puerto Rico as well as any instruments and agreements, with natural or juridical persons, as are necessary or convenient to exercise the powers and discharge the functions herein conferred.

e.      To bring any judicial action to protect or enforce the public policy established in this Act.

f.      To appoint officials, agents, and employees as are necessary to properly achieve the objectives and purposes for which the Committee was created, and establish the powers, faculties, and duties, as well as the terms and conditions of employment as provided in this Act. Provided, that appointments shall be made in accordance with the provisions of Act No. 8-2017.

g.      To contract personnel to conduct live outcry auctions, in accordance with the provisions of this Chapter and the regulations adopted for such purposes.

h.      To establish real estate investment trusts similar in nature to the trusts defined in Section 1082.01(a) of Act No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico."

i.      To contribute real property to any real estate investment trust created pursuant to Section 5.05(h) of this Act. The Government shall participate in any development carried out by the companies making contributions in accordance with this subsection.

Section 5.06.- Duties and Obligations of the Committee

For the purpose of implementing the public policy herein set forth, the Committee shall have the following duties:

a.      To prescribe by regulations a uniform, efficient, and effective procedure for the disposal and transfer of the real property of the Executive Branch of the Government of Puerto Rico, whether through live outcry auction, sealed bid, or direct sales. Such procedure shall provide for a fair competition system that guarantees the public interest. The Committee shall clearly provide the circumstances under which a direct sales shall be conducted.

b.      To coordinate, in conjunction with the Real Property Reviewing Board created by virtue of Act No. 235-2014, the preparation and/or update of an official inventory of all the real property of every agency, entity, instrumentality, and public corporation of the Executive Branch of the Government of Puerto Rico, excluding the property of the University of Puerto Rico.

c.      To obtain from the Real Property Reviewing Board a certification including every surplus real property available for disposal to be outfitted by any agency, entity, instrumentality, or public corporation of the Executive Branch of the Government of Puerto Rico.

d.      To evaluate every request for purchase, lease, or other conveyance of ownership of real property submitted by any natural or juridical person, whether for profit or not, including municipalities, and to ensure compliance with this Act and any rules and regulations approved by the Committee.

e.      To conduct any type of study, inspection, analysis, or other transaction relating to real property, including to ensure that such property is properly recorded in the Property Registry and have the title and meet any other requirement established by the laws in effect.

f.      To appraise any real property subject to disposal. To conduct such appraisal, the Committee may require and use personnel as needed, by virtue of the mechanism provided therefor under Act No. 8-2017.

Section 5.07.-  Real Property Disposal

The disposal of real property of the Executive Branch of the Government of Puerto Rico shall be governed by a fair and transparent process whereby participants are afforded equal opportunities, always safeguarding the public interest and welfare. For such purposes, any disposal shall be conducted in accordance with the purposes established in this Act while maintaining a balance between the need to increase the State's revenues, promote economic development, ensure the wellbeing of the society, and/or create jobs.

The Committee shall dispose of real property using as a basis the fair market value to be determined by the appropriate evaluation and appraisal procedure, or by assuring that the property is used for the benefit of the public interest.

The Executive Director of the Committee or his representative may serve as an authorized agent to carry out any transaction related to the title of the real property.

Section 5.08.-  Conflict of Interests

Any conflict of interest that may arise among the members of the Board while discharging their functions under this Act shall be addressed in accordance with the provisions of Act No. 1-2012, as amended, known as the "Puerto Rico Government Ethics Act of 2011."

Section 5.09.-  Savings Clause

No real property of the Executive Branch of the Government of Puerto Rico used as housing by any person having the usufruct thereof shall be disposed of.

CHAPTER 6.-  PUERTO RICO GOVERNMENT ACCOUNTING ACT

Section 6.01.-  A new subsection (o) is hereby added to Section 3 of Act No. 230 of July 23, 1974, as amended, known as the "Puerto Rico Government Accounting Act," to read as follows:

"Section 3.-  Definitions

When used in this Act, the following terms shall mean:

(a)     …

…

(o)     Special Appropriations – Appropriations approved through Joint Resolutions that limit the use of the allocated funds."

Section 6.02.- Subsection (b) is hereby amended and a new subsection (e) is hereby added to Section 7 of Act No. 230 of July 23, 1974, as amended, known as the "Puerto Rico Government Accounting Act," to read as follows:

"Section 7.-  Deposit of Public Funds

a)     …

All public funds of the agencies which are not allocated by law for a specific purpose, shall be credited to the General Fund of the Commonwealth Treasury and shall be deposited entirely in the Secretary's checking account or in any other bank account he may deem convenient to establish. Likewise, it is hereby provided, that as of July 1st, 2017, any special State fund and any other income of the agencies and public corporations shall be deposited entirely in the State Treasury, under the custody of the Secretary of the Treasury or the banking entity it deems appropriate. The Secretary of the Treasury is further empowered to determine the order of priority of the payments to be disbursed chargeable to special State funds and other income, in accordance with the budget approved and the Fiscal Plan without it being construed as a limitation on the powers conferred to the Governor and the Puerto Rico Fiscal Agency and Financial Advisory Authority by virtue of

the provisions of Act No. 5-2017. This provision shall have supremacy over any other provision that is in contravention of or inconsistent with the provisions of this Act. For each fiscal year, any amount in excess of the budgeted amount authorized by the Office of Management and Budget to the agencies and public corporations originating from special State funds shall be covered into the Budget Fund created by virtue of Act No. 147 of June 18, 1980, as amended. This provision shall not apply to funds allocated to municipalities on account of the Sales and Use Tax. This provision shall not apply to funds originating from private donations received by government entities with a social welfare function.

> …

> (e)      As of July 1st, 2017, any special State funds created by law for specific purposes shall continue to be used for the purposes for which they were allocated by law, in accordance with the Recommended Budget of the Office of Management and Budget and the Fiscal Plan. Likewise, the Office of Management and Budget is hereby empowered to create a reserve under its custody, as prescribed by regulations, which allows budget control for any item of expenditures chargeable to special State funds and other income. Should there be any inconsistency between the law and the use of the funds with the Fiscal Plan, the purpose provided for in the Fiscal Plan approved in accordance with PROMESA shall prevail."

Section 6.03.-  Subsections (h), (l), and (m) of Section 8 of Act No. 230 of July 23, 1974, as amended, known as the "Puerto Rico Government Accounting Act," are hereby amended to read as follows:

"Section 8.-  Public Fund Appropriations.

(a)      …

…

(h)     Appropriations and funds without fiscal year limitation that have remained in the books without movement of disbursement or obligation for one (1) year shall be deemed, for purposes of this Act, as if they had achieved their purposes; therefore, the same shall be closed and deposited immediately in the General Fund, except for appropriations and funds without fiscal year limitation appropriated for carrying out the capital improvements that have been accounted for and entered in the books. These funds shall have a term of three (3) years as of the legal effectiveness of the appropriation, to be disbursed and to achieve the purposes for which they were appropriated. Once said three (3)-year term elapses, any encumbered and unencumbered balances of capital improvement funds shall be closed and covered into Fund 301. This provision shall only apply to appropriations made prior to Fiscal Year 2017-2018, and shall not apply to appropriations made by the Legislative Assembly through Legislative Donations or appropriations on account of the Sales and Use Tax.

If the agency or body receiving the capital improvements funds deems that the term of the appropriation should be extended for a period greater than three (3) years, said agency or body may request such an extension to the Office of Management and Budget stating the need to keep such resources within at least three (3) months prior to the expiration of said term. During said period, the Office of Management and Budget shall analyze the request and determine the need to keep the appropriation in effect, the extension term for said appropriation, and the amount thereof. Said resources shall be rescheduled by the Legislative Assembly.

(i)     …

…

(l)     As a general rule, any appropriation that remains one (1) year without being entered in the books shall be deemed to be automatically cancelled, and new legislative action shall be required to use the moneys thus cancelled. In exceptional

cases where grounds for failure to enter an appropriation in the books during said one (1)-year term are shown, such as the delay in court determination of lawsuits, and the impossibility of carrying out a public work due to physical, technical, or legal difficulties, an appropriation may be accounted for even after the lapse of the aforementioned one (1)-year term.

The Secretary shall notify the Legislative Assembly of the action cancelling appropriations under the circumstances described in this subsection, within thirty (30) days following the date on which said cancellation was made.

(m)    The Secretary shall transfer periodically to the surplus of the General Fund of the State Treasury, in accordance with the law, the balances of deposit accounts that have remained unused or without movement in the accounting books for one (1) year, and which, in his opinion, are not necessary or do not meet the purposes for which they were created. Provided, that any claim that the Secretary may be required to pay with respect to said balances, after they have been transferred as provided above, shall be paid from any available funds not otherwise appropriated."

CHAPTER 7.- GOVERNMENT PROCUREMENT RESERVES ACT

Section 7.01.- Section 2 of Act No. 129-2005, as amended, known as the "Government of the Commonwealth of Puerto Rico Procurement Reserves Act," is hereby amended to read as follows:

"Section 2.-  Declaration of Public Policy

It shall be the public policy of the Government of Puerto Rico to establish a Reserves Program which requires the Government of Puerto Rico and its instrumentalities to set aside at least twenty percent (20%) of the total of the item allocated for procurement in their general budget to be allocated to micro-, small- and medium-size businesses; provided, that the fiscal situation so allows or that it generates savings to the Treasury.

Provided, that in an effort to continue strengthening the micro-, small-, and medium-sized business sector, it is hereby established that the reserve percentage for such purposes shall continue to increase gradually as follows:

1.      Thirty percent (30%) for fiscal year 2016-2017;

2.      Thirty-two percent (32%) for fiscal year 2017-2018;

3.      Thirty-five percent (35%) for fiscal year 2018-2019;

4.      Thirty-eight percent (38%) for fiscal year 2019-2020;

5.      Forty percent (40%) for fiscal year 2020-2021;

This gradual increase shall be applied if the Office of Management and Budget establishes that the fiscal situation allows for said increase or if savings for the treasury are generated. Moreover, the Secretary of the Treasury shall be required to set aside at least three percent (3%) of the cash flow received to pay the item allocated for the procurement of supplies from micro-, small-, and medium-sized businesses whole invoices have been processed correctly by the departments, agencies, instrumentalities, entities, municipalities, and public corporations of the Government to which this Act applies."

Section 7.02.-  Subsection (1) of Section 6 of Act No. 129-2005, as amended, known as the "Government of the Commonwealth of Puerto Rico Procurement Reserves Act," is hereby amended to read as follows:

"Section 6.-  Reserves Program

(1)      A new expense item shall be created to which twenty percent (20%) of the procurement budget item of each agency shall be allocated. Provided, that the procurement budget item of each agency shall increase thirty percent (30%) for Fiscal Year 2016-2017; thirty-two percent (32%) for Fiscal Year 2017-2018; thirty-five percent (35%) for Fiscal Year 2018-2019; thirty-eight percent (38%) for Fiscal Year 2019-2020; and forty percent (40%) for Fiscal Year 2020-2021; provided, that

the fiscal situation so allows. The OMB shall prescribe by regulations the requirements to comply with said reserve percentage.

  …"

## CHAPTER 8.- EXCISE TAX ON CIGARETTES AND TOBACCO-DERIVED PRODUCTS

  Section 8.01.- Section 3020.05 of Act No. 1-2011, as amended, is hereby amended to read as follows:

  "Section 3020.05.- Cigarettes

  (a)  An excise tax of seventeen dollars ($17.00) shall be imposed, paid, and collected on each hundred or fraction of one hundred (100) cigarettes. For purposes of this Code, the term 'cigarette' shall mean any product that contains nicotine and is intended to be burnt or heated under ordinary conditions of use, and which consist of or contains:

    (1)  Any roll of finely cut natural or synthetic tobacco or any other finely cut natural vegetable or synthetic matter, or any mixture thereof, or any other finely cut solid matter or substance wrapped in paper or in any substance or material not containing tobacco which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling, is likely to be used, offered to, or purchased by, consumers as a cigarette; and

    (2)  whose length, circumference, and weight does not exceed the maximum length, circumference, and weight prescribed by the Secretary through regulations, circular letter, or other administrative determination of general nature.

  (b)  Cigarettes manufactured, introduced, sold, conveyed, used, or consumed in Puerto Rico shall have affixed on the boxes, packages, or packs in which they are packed, a label with the information and characteristics as prescribed by regulations. Each cigarette box, package, or pack must bear the word '*tributable*'

or 'taxable' stamped on a visible place and in clear and legible form. These provisions shall not apply to exempt cigarettes under Section 3030.18 of this Code."

Section 8.02.- A new Section 3020.05A is hereby added to Act No. 1-2011, as amended, to read as follows:

"Section 3020.05A.-  Cigarettes, Cigars, Snuff, Cigarette Paper, and Cigarette Tubes

(a)      In addition to any other excise tax imposed under this Subtitle, an excise tax of up to eight dollars and fifty cents ($8.50) shall be imposed, paid, and collected on each hundred or fraction of one hundred (100) cigarettes.

(b)      An excise tax shall be imposed, paid, and collected on any cigarette, snuff, cigarette paper, and tube, as provided below:

(1)      Cigars: Twenty-five dollars and fifty cents ($25.50) for every pound or fraction thereof.

(2)      Loose Tobacco: Twenty-five dollars and fifty cents ($25.50) for every pound or fraction thereof.

(3)      Cigarette Paper: Three dollars ($3.00) for every fifty papers or fraction thereof that does not exceed six and a half inches (6½"). If cigarette papers measure more than six and a half inches (6½") in length, every two and three quarters of an inch (2¾"), or fraction thereof, shall be considered one (1) cigarette paper.

(4)      Cigarette Tubes: Three dollars ($3.00) for every fifty cigarette tubes or fraction thereof that does not measure more than six and a half inches (6½"). If cigarette tubes measure more than six and a half inches (6½") in length, every two and three quarters of an inch (2¾"), or fraction thereof, shall be considered one (1) cigarette tube.

(c)    Definitions – For purposes of this Section and of any applicable provision of this Subtitle, the following terms shall have the meaning stated below:

(1)    Cigar – Shall mean any product that contains nicotine and is intended to be burnt or heated under ordinary conditions of use, and which consist of or contains:

(i)    Any roll of finely cut natural or synthetic tobacco or any other finely cut natural vegetable or synthetic matter, or any mixture thereof, or any other finely cut solid matter or substance wrapped in paper, leaf tobacco, or in any substance or material which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling, is likely to be used, offered to, or purchased by, consumers as a cigar, cigarillos, little cigar or any other product; and

(ii)    other than a cigarette, as such term is defined in Section 3020.05 of this Code.

(2)    Loose Tobacco – Shall mean any type of tobacco whether or not mixed with any other substance, which is not wrapped in any material, and that because of its appearance, the type of tobacco used in the filler, or its packaging or labeling, is likely to be used, offered to, or purchased by, consumers as roll-your-own tobacco or pipe tobacco. This term also includes whole tobacco leaves.

(3)    Cigarette Paper – Shall mean any paper, or any other material other than tobacco used to roll cigarettes or cigars.

(4)    Cigarette Tube – Shall mean a cigarette made into a hollow cylinder for use in making cigarettes or cigars.

(d)    The cigars, loose tobacco, cigarette wrappers, and cigarette tubes that are manufactured, introduced, sold, conveyed, used, or consumed in Puerto Rico shall have affixed on the boxes, packages, or packs in which they are packed, a label with the information and characteristics as prescribed by regulations. Each box, package, or pack of cigars, loose tobacco, cigarette wrappers, and cigarette tubes

must bear the word '*tributable'* or 'taxable' stamped on a visible place and in clear and legible form. In those cases in which the good is sold individually, it shall bear the word '*tributable'* or 'taxable' stamped on a visible place and in clear and legible form as prescribed by the Secretary. These provisions shall not apply to exempt goods under Section 3030.18 of this Code."

Section 8.03.- Section 3020.13 of Act No. 1-2011, as amended, is hereby amended to read as follows:

"Section 3020.13.- Smokeless Tobacco

(a)     An excise tax shall be imposed, paid, and collected on smokeless tobacco manufactured in or imported into Puerto Rico. For purposes of this subtitle, the term 'smokeless tobacco' shall mean any tobacco-derived product that:

(1)     Is intended to be consumed without creating combustion or burning, and

(2)     Is found or sold in foil packages, pouches, and/or in discrete single-use unit, in the form of lozenges, tablets, pouches, and dissolvable strips, among others.

(b)     The excise tax provided in this Section shall be imposed as follows:

(1)     Chewing Tobacco: One dollar ($1.00) for every pound or fraction thereof. From May 1st, 2017, the excise tax shall be five dollars ($5.00) for every pound or fraction thereof.

(2)     Snuff or any other tobacco-derived product: Three dollars and two cents ($3.02) for every pound or fraction thereof. From May 1st, 2017, the excise tax shall be four dollars and fifty-three cents ($4.53) for every pound or fractions thereof.

(c)     Tobacco-derived products manufactured, introduced, sold, conveyed, used, or consumed in Puerto Rico shall have affixed upon the boxes, packages, or packs in which they are packed, a label with the information and characteristics as

are prescribed by regulation. Every cigarette box, package, or pack must bear the word '*tributable*' or 'taxable' stamped on a visible place and in clear and legible form. These provisions shall not apply to goods exempt under Section 3030.18 of this Code."

Section 8.04.- Section 3020.14 of Act No. 1-2011, as amended, is hereby amended to read as follows:

"Section 3020.14.- Appropriation of Funds

The Secretary of the Treasury shall deposit any revenues collected by virtue of Sections 3020.05, 3020.05A, 3020.13, and 3020.15 directly in the General Fund."

Section 8.05.-  A new Section 3020.15 is hereby added to Act No. 1-2011, as amended, to read as follows:

"Section 3020.15.- Electronic Cigarettes, Nicotine Cartridges, and Vaporizers

(a)     Definitions.- For purposes of this Section and of any applicable provisions of this Subtitle, the following terms shall have the meaning stated below:

(1)     Electronic Cigarette.- Shall mean any noncombustible product that employs a heating element, power source, electronic circuit, or other electronic, chemical, or mechanical means that can be used to produce vapor from nicotine in a solution or other form, which because of its appearance, size, or its packaging and labeling, is likely to be used, offered to, or purchased by, consumers as an electronic cigarette, vaporizer, or electronic pipe.

(2)     Nicotine Cartridge.- Shall mean a vapor cartridge or any other container holding liquid nicotine that is intended to be used with or in an electronic cigarette or vaporizer.

(3)     Vaporizer.- Shall mean any noncombustible product that employs a heating element, power source, electronic circuit, or other electronic, chemical, or mechanical means that can be used to produce vapor from nicotine in a solution or other form, which cannot be considered an electronic cigarette according

to the definition of preceding paragraph (1). This term shall include, without it being understood as a limitation, hookas and vaporizers used to administer drugs not approved by the Food and Drug Administration (FDA).

(b)      An excise tax shall be imposed, paid, and collected on electronic cigarettes, nicotine cartridges, and vaporizers as follows:

(1)      Electronic Cigarette: Three dollars ($3.00) for every electronic cigarette.

(2)      Nicotine Cartridges: Five cents ($0.05) for every millimeter of nicotine solution or any other substance, whether it contains nicotine or not, in each nicotine cartridge. This excise tax shall not be prorated.

(3)      Vaporizers: Six dollars ($6.00) for every unit.

(c)      Electronic cigarettes, nicotine cartridges, and vaporizers manufactured, introduced, sold, conveyed, used, or consumed in Puerto Rico shall have affixed upon the boxes, packages, or packs in which they are packed, a label with the information and characteristics as prescribed by regulation; provided, that nicotine cartridges shall indicate in their boxes, packages, or packs the actual milliliters of nicotine solution, as prescribed by the Secretary. Every box, package, or pack must bear the word '*tributable*' or 'taxable' stamped on a visible place and in clear and legible form. In those cases in which the good is sold individually, it shall bear the word '*tributable*' or 'taxable' stamped on a visible place and in clear and legible form as prescribed by the Secretary. These provisions shall not apply to exempt goods under Section 3030.18 of this Code."

Section 8.06.- Section 3030.18 of Act No. 1-2011, as amended, is hereby amended to read as follows:

"Section 3030.18.- Exemption on Cigarettes, Cigars, Loose Tobacco, Cigarette Paper, Cigarette Tubes, Chewing Tobacco, Snuff, Electronic Cigarettes, Nicotine Cartridges, and Vaporizers

(a)     Cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers sold or transferred to foreign-flag and United States ships and those sold to foreign warships and to ships of a foreign country on courtesy visits to Puerto Rico, shall be exempt from the tax imposed in this Subtitle. This exemption shall only be allowed when the cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers are delivered in accordance with the rules and procedures established by the Secretary, and the violation thereof shall entail the obligation of the importer or the distributor, as the case may be, to pay the corresponding excise taxes. Any importer or distributor who wishes to avail himself of this exemption shall post a bond to respond for the payment of said excise taxes.

(b)     Likewise, cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers which, having been withdrawn from the factories or ports, are removed from the market because they are unsuitable for regular consumption, shall be exempt from the payment of excise taxes; provided, they are destroyed under the supervision of the Secretary. In such case, the Secretary shall refund or credit the tax to the person who paid it.

(c)     Furthermore, cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers shall be exempt from the excise tax imposed in this Subtitle when these are sold or transferred to users, as defined in Act No. 23-1991, as amended, of post exchanges, canteens, or other facilities operated by the Puerto Rico National Guard Institutional Trust or the Concessionaire thereof.

(d)     Cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers manufactured in or introduced into Puerto Rico for export shall be exempt from the excise tax imposed in this Subtitle subject to the requirements or conditions prescribed by the Secretary through regulations; provided, that said exemption shall not apply to cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, and vaporizers sold in Shops and Air or Maritime Terminals to persons who remain within the United States customs territory."

Section 8.07.- Subsection (a) of Section 3050.01 of Act No. 1-2011, as amended, is hereby amended to read as follows:

"Section 3050.01.-  License Fees for Wholesale or Retail Dealers of Certain Goods

(a)     Any wholesale or retail dealer of any of the goods listed hereinafter, who sells the goods at a fixed place or as an itinerant merchant, shall pay an annual tax as a license fee at the rate established in the following table:

| DEALERS | FEES | |
|---|---|---|
| Cigarettes – Wholesaler | | $750 |
| Cigarettes – Retailer Fixed Place, Itinerant Merchant and for each Cigarette Vending Machine | | $300 |
| Cigarette Wholesales from Motor Vehicles – per vehicle | | $300 |
| Fuel – Wholesaler | Class A | $6,000 |
| | Class B | $2,500 |
| Fuel – Retailer | Class A | $900 |
| | Class B | $100 |
| Retailer – Sale of Alcoholic Beverages, Cigarettes, and Vehicle Parts and Accessories – per venue | | $200 |
| Motor Vehicles – Dealers | Class A | $1,000 |
| | Class B | $200 |

| Vehicle Parts and Accessories Retail and Wholesale | Class A | $2,000 |
| | Class B | $800 |
| | Class C | $100 |
| Retail Dealers in Cigarettes and Alcoholic Beverages for a Limited Time (15 days) | | $25 |
| Retail Dealers – Auto Shows for a Limited Time (Vehicles, Parts, and Accessories) (15 days) | | $100 |
| Concrete – Manufacturer or Wholesale Dealer | Class A | $250,000 |
| | Class B | $200,000 |
| | Class C | $80,000 |
| Gunsmith – Dealer in Weapons and Ammunition | | $200 |

(1)    …

…"

Section 8.08.- A new subsection (d) is hereby added to Section 6042.08 of Act No. 1-2011, as amended, to read as follows:

"Section 6042.08.-  Cigarette-related Crimes

(a)    …

(b)    …

(c)    …

(d)    Any person shall be guilty of a misdemeanor and shall be punished by a five thousand dollar ($5,000)-fine if:

(1)    He acquires cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers as a user, as defined in Act No. 23-1991, as amended, in post exchanges, canteen, or other facilities operated by the Puerto Rico National Guard Institutional Trust or the Concessionaire thereof, and subsequently sells or transfers the cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers thus acquired to any person who is not entitled to the exemption provided in subsection (c) of Section 3030.18 of this Code; or

Case:17-03283-LTS   Doc#:3126-4   Filed:05/23/18   Entered:05/23/18 11:45:37   Desc:
Exhibit Law 26 of 2017 (4A Spanish 4B English)   Page 196 of 200

105

(2)    He acquires cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers at Post Exchanges located in military facilities of the United States of America in Puerto Rico, and subsequently sells or transfers the cigarettes, cigars, loose tobacco, cigarette paper, cigarette tubes, chewing tobacco, snuff, electronic cigarettes, nicotine cartridges, or vaporizers thus acquired to any person who is not entitled to acquire said goods from said establishments."

Section 8.09.- Subsection (a) of Section 6042.15 of Act No. 1-2011, as amended, is hereby amended to read as follows:

"Section 6042.15.- Penalty for Failure to File Excise Tax Declaration and Monthly Excise Tax Return

(a)    Any person required to file the Excise Tax Declaration, the Monthly Excise Tax Return, or the Bill of Sale that fails to file such return as required in Sections 3020.08(c)(8), 3020.09(c), and 3020.10, in the form, date, and manner prescribed therein, shall be imposed a penalty of one hundred dollars ($100) or ten percent (10%) of the tax obligation established in said declaration or return, whichever is higher.

(b)    …"

Section 8.10.-  Transitory Provisions

(a)    Any person subject to the annual tax on account of license fee under Section 3050.01 of Act No. 1-2011 that, as of May 1st, 2017, holds a Retail or Wholesale Dealer License in effect shall be subject to the new rates provided in Section 8.07 of this Act after the due date to pay the appropriate license fee in accordance with subsection (b) of Section 3060.08 of Act No. 1-2011.

(b)    The Secretary of the Treasury shall prescribe by regulations, circular letter, or other administrative determination of general nature, the necessary rules for the application of these transitory provisions.

## CHAPTER 9.- EMERGENCY FUND

Section 9.01.- Section 2 of Act No. 91 of July[sic] 21, 1966, as amended, is hereby amended to read as follows:

"Section 2.-

Beginning Fiscal Year 1995-96, the Emergency Fund shall be capitalized annually by an amount not less than one-fifth of one percent (0.2%) of the total of the Joint Resolution for the Budget. Beginning Fiscal Year 1998-99, said contribution shall be not less than one percent (1%) of the total net revenues for the previous fiscal year. Provided, that, through Fiscal Year 2020-2021, said contribution shall be at least ten million dollars ($10,000,000). From Fiscal Year 2020-2021 and thereafter, said contribution shall not be less than zero point five percent (0.5%) of the estimated net revenues submitted by the Department of the Treasury to prepare the Recommended Budget chargeable to the General Fund. The Governor of Puerto Rico and the Director of the Office of Management and Budget, by delegation of the latter, may direct that any amount in excess of the amount herein fixed from any source of income be deposited in the Fund, when deemed convenient. The balance of said Emergency Fund shall never exceed one hundred fifty million dollars ($150,000,000)."

## CHAPTER 10.- FINAL PROVISIONS

Section 10.01.-  Immunity Relating to Lawsuits and Forums

This Act shall not affect the immunity of the State and the officials and officers thereof in connection with lawsuits and forums. None of the provisions of this Act authorizes tort claims against the State, its officials or employees for actions or omissions of the latter resulting from the enforcement of this Act. None of the provisions herein constitute a waiver of the sovereign immunity of the Government of Puerto Rico.

Section 10.02.- Rules of Interpretation

The words and phrases used in this Act shall be construed within the context and meaning approved for common and ordinary use, and the rules of interpretation recognized under our code of laws.

Section 10.03.- Incompatibility

Any organic, general, or special law, article, or section of any Act, guidelines, collective bargaining agreements, agreements, supplementary agreements, administrative orders, policies, employment manuals, circular letters, certifications, regulations, rules and employment conditions, policy letters, job classification or pay plans, contract letters, and/or applicable provisions that are in contravention of the provisions of this Act are hereby repealed.

Section 10.04.-  Supremacy

The provisions of this Act and the regulations or rules adopted thereunder shall prevail over any other provision of law, regulations, or rules that are inconsistent with the former.

Section 10.05.-  Severability

If any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act were held to be null or unconstitutional, the ruling, holding, or judgment to such effect shall not affect, impair, or invalidate the remainder of this Act. The effect of said holding shall be limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act thus held to be null or unconstitutional. If the application to one person or circumstance of any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Act were held to be null or unconstitutional, the ruling, holding, or judgment to such effect shall not affect or invalidate the application of the remainder

of this Act to such persons or circumstances where it may be validly applied. It is the express and unequivocal will of this Legislative Assembly that the courts enforce the provisions and application thereof to the greatest extent possible, even if it renders ineffective, nullifies, invalidates, impairs, or holds to be unconstitutional any part thereof, or even if it renders ineffective, invalidates, or holds to be unconstitutional the application thereof to any person or circumstance. This Legislative Assembly would have approved this Act regardless of any determination of severability that the Court may make.

Section 10.06.-  Effectiveness

This Act shall take effect immediately after its approval.

# CERTIFICATION

I hereby certify to the Secretary of State that the following **Act No. 26-2017 (H. B. 938)**

of the **1st Regular Session** of the **18th Legislative Assembly of Puerto Rico:**

**AN ACT**      to create the "Fiscal Plan Compliance Act," in order to take measures as
necessary to adjust the existing legal and juridical framework so as to allow
the fullest compliance with the Fiscal Plan approved by the Financial
Oversight Board, created by virtue of the Federal Law PROMESA; establish
a uniform fringe benefit system, which includes the Christmas bonus and
the healthcare plan contribution, for all the government employees and
officials of the agencies, instrumentalities, and public corporations of the
Government of Puerto Rico, except for the University of Puerto Rico; […]

has been translated from Spanish to English and that the English version is correct.

In San Juan, Puerto Rico, on this 13th day of December, 2017.


Orlando Pagán-Ramírez
Acting Director