**EXHIBIT 21**

# Committee on Natural Resources
## Rob Bishop Chairman
## Markup Memorandum

May 23, 2016

To:   All Natural Resources Committee Members

From:  Majority Committee Staff (x5-2761)

Mark-Up: H.R. 5278 (Rep. Sean Duffy), To establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes
**May 24 & 25, 2016; 1324 Longworth HOB**

---

### H.R. 5278 (Rep. Sean Duffy), *Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA)*

**Summary of the Bill**

H.R. 5278, sponsored by Congressman Duffy, is the second iteration of legislation with the express purpose of bringing fiscal responsibility and access to capital markets to the territory of Puerto Rico. The bill establishes an Oversight Board to supervise the development of Fiscal Plans, which act as roadmaps to revitalize Puerto Rico's economy, and budgets. Furthermore, the Oversight Board will work to ensure transparency and efficiency in the island's finances, as well as facilitate private capital to invest in the island's infrastructure.

PROMESA provides Puerto Rico with potential access to debt restructuring overseen by a district court and driven by the Oversight Board acting in place of the debtor. Such restructuring access, however, is conditioned on the Oversight Board's determination that the debtor has met specific criteria, including whether the debtor has undertaken good-faith voluntary negotiations to reach a consensual restructuring agreement.

To ensure the bill's debt restructuring provisions meet the constitutional requirement for the uniform application of bankruptcy laws, PROMESA provides identical debt restructuring for any other U.S. territory (i.e., Guam, American Samoa, U.S. Virgin Islands, Commonwealth of the Northern Mariana Islands) but <u>only</u> if the territory adopts a resolution signed by its governor requesting the establishment of an Oversight Board in accordance with PROMESA.

**Cosponsors**

Chairman Bishop
Rep. Sensenbrenner

**Background**

The economic outlook for Puerto Rico is grim. The island has accumulated over $110 billion in combined debt and unfunded pension liabilities, and has seen a 10% decline in

population over the past decade.[1] Puerto Rico's local politicians have only accelerated the fiscal crisis on the island through the passage of harmful legislation, including the recent debt moratorium.[2] Due to the realities facing the island, and the inability of its local politicians to bring order and transparency, immediate and bold congressional action is required. Indeed, as a United States territory, Congress has the responsibility and authority to make all needful rules and regulations for Puerto Rico. The relationship of the Congress to a territory is analogous to that of a state to one of its municipal subdivisions.

Puerto Rico's situation underscores the necessity for Congressional action, and highlights the purpose of the Committee on Natural Resources' (Committee) efforts to address the crisis. Over the past few months, the Committee has held four hearings and a markup on legislation to address the situation in Puerto Rico. The hearings focused on: the need for energy and infrastructure development;[3] the outline for an oversight board;[4] why Puerto Rico needs access to debt restructuring;[5] and H.R. 4900, the first legislative draft of PROMESA. On May 18, 2016, Rep. Duffy introduced a modified version of PROMESA as H.R. 5278. In addition to incorporating the testimony received during the Committee's hearings, the new PROMESA responds to concerns raised by Members and stakeholders since the legislative hearing on H.R. 4900.

*Creating an Oversight Board to Ensure Fiscal Responsibility*

Puerto Rico has enabled poor fiscal decisions due to limited oversight and transparency within its governmental structures. Highlighting these realities is the failure to provide any audited financials for the past two fiscal years.[6] This lack of institutional control illustrates why credit rating agencies have compared Puerto Rico to Greece.[7] As such, there is a demonstrable need for an independent body to oversee Puerto Rico's fiscal activity. Titles I and II of PROMESA remedy the deteriorating health of Puerto Rico's finances and economy – at no net cost to the U.S. taxpayer – through the establishment of an Oversight Board (Board) for territory.

The Board will be comprised of seven members appointed under procedures that ensure Republican Leaders in Congress effectively determine or confirm a voting majority of the entire Board. .[8] First, if the President fails to select a member from a list provided by a congressional leader, such appointment must occur with the advice and consent of the Senate. Second, if any Board member is not appointed from lists or by Senate confirmation on or before September 30, 2016, then the President must select Board members from the respective list for which there exists a vacancy and such appointment must occur by December 1, 2016. Because the Speaker

---

[1] See: http://naturalresources.house.gov/uploadedfiles/testimony_weiss.pdf , p. 2, Testimony of Antonio Weiss, February 25, 2016.
[2] Puerto Rico Senate Act P. del S. 1591, April 5, 2016.
[3] Committee on Natural Resources, Subcommittee on Energy and Mineral Resources, Oversight Hearing on "Exploring Energy Challenges and Opportunities Facing Puerto Rico," January 12, 2016.
[4] Committee on Natural Resources, Subcommittee on Indian, Insular and Alaska Native Affairs, Oversight Hearing on "The Need for the Establishment of a Puerto Rico Financial Stability and Economic Growth Authority," February 2, 2016.
[5] Committee on Natural Resources, Oversight Hearing on "The U.S. Department of the Treasury's Analysis of the Situation in Puerto Rico," January 12, 2016.
[6] Megan Davies and Nick Brown, Puerto Rico may issue delayed audited 2014 statements in April, Feb. 22, 2016, *available at* http://www.reuters.com/article/us-usa-puertorico-accounts-idUSKCN0VV2A0.
[7] Trading Economics, Puerto Rico | Credit Rating, *available at* http://www.tradingeconomics.com/puerto-rico/rating.
[8] *See* H.R. 5278, § 101(e).

of the House and Majority Leader of the Senate shall each provide lists from which four of the seven Members are selected by the President, these provisions effectively ensure a majority of the Board will be Republican nominees.

Once a Board has been appointed, it will begin to fulfill two of its key duties, which are the development of budgets and fiscal plans for Puerto Rico. The development of these documents will require Puerto Rico to balance its budgets, incorporate pro-growth reforms, and ensure legislative acts advance Puerto Rico towards the goal of fiscal responsibility and regaining access to the capital markets. The Board's broad powers include: the imposition of legislative or executive recommendations,[9] the requirement that Puerto Rico "score" (estimate the costs of) its legislative acts, and the authority to review and veto new contracts, rules, regulations, or executive orders that are inconsistent with the fiscal plans and budgets.[10]

The fiscal plans represent the cornerstone to the Board's powers. Not only are budgets based on these documents, but any debt restructuring plan authorized under Title III must comply with them as well.[11] The fiscal plans will outline the five upcoming economic years for Puerto Rico and will be revised each year to account for changes in the island's finances and economy. Each fiscal plan must provide a "method to achieve fiscal responsibility and access to the capital markets" as well as incorporate a number of specific provisions that will assist Puerto Rico in achieving economic and structural reform.[12] If Puerto Rico's government fails to comply with a fiscal plan, then the Oversight Board may impose mandatory cuts on Puerto Rico's government and instrumentalities – a power far beyond that exercised by the Control Board established for the District of Columbia, to which PROMESA's Board has been compared, as the DC Control Board's power was exercised mainly by cutting federal funding for the city government.[13]

Two new provisions found in H.R. 5278 require fiscal plans to: 1) prohibit the unlawful transfer of assets, funds, or resources between instrumentalities,[14] and to 2) "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered instrumentality".[15] Both of these new provisions will ensure fiscal plans keep intact the structural hierarchy of prioritized debt, and that funds are not illicitly funneled to other instrumentality accounts.

The Oversight Board model that has been used elsewhere (e.g., for the District of Columbia by Congress, or for a municipality by a state) has been effective in ensuring the pertinent government entity returned to fiscal responsibility.[16] As such, the Board proposed by H.R. 5278 will only terminate after Puerto Rico has produced audited financials and a balanced budget for four consecutive years.

---

[9] *See* H.R. 5278, § 205.
[10] *See* H.R. 5278, § 204.
[11] *See* H.R. 5278, §§ 202, 314(b)(7).
[12] *See* H.R. 5278, § 201(b)(1).
[13] Pub. L. 104-8, § 206 (d).
[14] *See* H.R. 5278, § 201(b)(1)(M).
[15] *See* H.R. 5278, § 201(b)(1)(N).
[16] *See* Testimony of James E. Spiotto before the Subcommittee on Indian, Insular and Alaska Native Affairs, Oversight Hearing on "The Need for the Establishment of a Puerto Rico Financial Stability and Economic Growth Authority."

*Ensuring Order Prevails after Enactment*

H.R. 5278 provides for a stay on litigation relating to defaults by Puerto Rico while the Board develops its bylaws and procedures during its infancy.[17] This stay lasts until the later of February 15, 2017, or six months after the enactment of PROMESA. It is a critical component of the legislation as it preempts a rush to court, if and when Puerto Rico defaults on upcoming bond payments, between the date of enactment of this bill and the time when the Oversight Board can fully implement the bill's fiscal and debt restructuring measures.

Critics of the stay argue it would give Puerto Rico's government an opportunity to shuffle money around, and that it acts as a federal taking through the impairment of a contract. However, H.R. 5278 responds to these claims in two ways. First, multiple sections of the bill prohibit the transfer of funds between debtors and provide creditors with a right to sue if any such unlawful transfers do occur.[18] Once full appointment of the Oversight Board occurs, it will have the express authority to review and reverse any movement of funds or assets that occurred before such appointment. Second, H.R. 5278 authorizes aggrieved parties to be excused from the stay in order to prevent irreparable damage to their interest, and the bill permits the Board to authorize interest payments during the stay if such payments are feasible.[19]

These provisions reinforce the purpose of the stay, which is to allow the Board the opportunity to begin its monumental role, and to ensure there is no chaotic rush to the courts if Puerto Rico defaults during the timeframe of the stay. A chaotic rush to the courts by creditors before the Board is set up could increase the impact of and accelerate Puerto Rico's debt crisis.

*Allowing for an Orderly Restructuring of Debts if Necessary*

Consistently, the Committee has been told of the unsustainability of Puerto Rico's debt, and that an avenue for debt restructuring must be made available to assist Puerto Rico in managing debt levels. In response to these calls, Titles III and VI of PROMESA provide Puerto Rico the opportunity to restructure its debts in a fair and equitable manner for debtor and creditor. However, access to this restructuring is contingent on three "gating" requirements to ensure that only truly unsustainable debt is allowed to be restructured through the Title III process.

First, the entity (i.e., the government of Puerto Rico or one of its instrumentalities) must have "made good-faith efforts to reach a consensual restructuring with creditors."[20] Such consensual efforts may be made through the Title VI collective action process, or some other voluntary mechanism negotiated between the parties. The good faith standard is a legal standard, which has been defined as "acting with a sincere belief that the accomplishment intended is not unlawful or harmful to another."[21]

---

[17] *See* H.R. 5278, § 405.
[18] *See* H.R. 5278, §§ 201(b)(1)(M), 303(3), 204(c)(3), 407.
[19] *See* H.R. 5278, § 405(g) and (l).
[20] H.R. 5278, § 206(a)(1).
[21] *Smith v. Indiana*, 13 N.E.2d 562.

Page 4 of 11

Second, the entity must have "adopted procedures necessary to deliver timely audited financial statements" and "made public draft financial statements and other information sufficient for any interested person to make an informed decision with respect to a possible restructuring."[22]  As discussed, Puerto Rico's fiscal house is in chaos – it has not produced audited financials for two years, while taxes and utility payments go uncollected.[23]  Before any restructuring is to occur, the Oversight Board must have an understanding of the finances of the entity seeking restructuring to determine whether the entity actually needs restructuring.

Third, the entity must have adopted a fiscal plan.[24]  Again, fiscal plans are the foundations that will ensure Puerto Rico returns to fiscal solvency.  Each entity seeking access to restructuring, including municipalities such as the Puerto Rico Electric Power Authority, must have a fiscal plan in place.

If an entity meets these criteria, it can then be restructured only if five of the seven board members agree that such restructuring should proceed.  Therefore, a creditor's gate to gain access to Title III ensures voluntary negotiations have occurred and that any entity capable of paying its bills will not get restructured.

Once in Title III, a host of provisions ensure creditors are protected, and that any restructuring is in their best interests.  Importantly, and unlike the situation in Detroit, the Board – rather than the debtor – controls the restructuring process, and as such files the petition as well as any final plan of adjustment to be used to restructure debts.

Title VI provides a means for voluntary debt restructuring outside of Title III.  Upon supermajority votes in each pool of creditors for a debtor, a mechanism is provided for the supermajorities to seek an order of a court to bind the non-consenting minority of creditors in each pool for a debtor, thereby avoiding Title III.

*Promoting Economic Development in Puerto Rico*

Development of infrastructure in Puerto Rico is hampered both by the fiscal crisis, and by permitting inefficiencies.  In fact, the World Bank has identified Puerto Rico as 135th out of 189 countries for ease of "Dealing with Construction Permits."[25] PROMESA addresses both the bureaucratic processes that hinder development on the island, and promotes the infusion of private capital to spur economic development.

Title V addresses the infrastructure and permitting problems by providing the Oversight Board an opportunity to fast-track infrastructure projects through the co-opting of Puerto Rico Act 76-2000 (Act 76).  That act allows for the fast-track of projects that address emergencies on Puerto Rico.  Title V replicates the Act 76 process by establishing the position of "Revitalization

---

[22] H.R. 5278, § 206(a)(2).
[23] *See* Michelle Kaske, Puerto Rico Utility Averts Default After Deal with Creditors, July 1, 2015, *available at* http://www.bloomberg.com/news/articles/2015-07-01/puerto-rico-s-prepa-says-it-has-made-bond-payments-due-today.
[24] H.R. 5278, § 206(a)(3).
[25] World Bank Group, Doing Business 2016 data for Puerto Rico, *available at* http://www.doingbusiness.org/data/exploreeconomies/puerto-rico/.

Coordinator," who, in consultation with the Governor and various agencies of Puerto Rico, can designate infrastructure projects as "Critical Projects." Once a project is designated as a "Critical Project," it will gain access to the expedited permitting process envisioned by Act 76. Furthermore, Title V seeks to encourage quick resolution of federal processes, by designating points of contact for federal agencies, and encouraging the rapid discharge of federal duties for designated critical projects within Puerto Rico.

In addition to Title V, other pro-growth provisions exist within the bill, primarily in Title IV. PROMESA provides for an exemption to the prescribed minimum wage provisions of the Fair Standards Labor Act for certain types of workers, as well as an exemption from the recently finalized Department of Labor overtime rule. Two new provisions studying the effectiveness of the "HUBZone" program and the creation of a congressional task force to study Puerto Rico's economic situation further add to the pro-growth purposes of H.R. 5278.

**Cost**

TBA

**Section-By-Section**

**Administration Position**

Secretary of the Treasury Jack Lew Statement in support of H.R. 5278:

> We are pleased the bill reintroduced in the House last night includes restructuring tools for Puerto Rico that are comprehensive and workable. The legislation would allow the Commonwealth to restructure all of its liabilities, provide no bailouts for any creditors, and enable an orderly resolution to Puerto Rico's worsening crisis. These critical tools paired with independent fiscal oversight will help put an end to Puerto Rico's debt crisis, which is already showing signs of becoming a humanitarian crisis.[26]

**Effect on Current Law (Ramseyer)**

**Showing Current Law as Amended by H.R. 5278, PROMESA (5/12/16)**
[new text highlighted in yellow; text to be deleted in brackets and highlighted in blue]

**Section 6 of the Fair Labor Standards Act of 1938 (29 U.S.C. 206)**
§206. Minimum wage.
    (a) Employees engaged in commerce; home workers in Puerto Rico and Virgin Islands; employees in American Samoa; seamen on American vessels; agricultural employees.
Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:
    (1) except as otherwise provided in this section, not less than-

---

[26] U.S. Dep't of the Treasury, Statement from Secretary Lew on Puerto Rico Legislation, May 19, 2016, *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0461.aspx.

Page 6 of 11

    (A) $5.85 an hour, beginning on the 60th day after May 25, 2007;
    (B) $6.55 an hour, beginning 12 months after that 60th day; and
    (C) $7.25 an hour, beginning 24 months after that 60th day;
   (2) if such employee is a home worker in Puerto Rico or the Virgin Islands, not less than the minimum piece rate prescribed by regulation or order; or, if no such minimum piece rate is in effect, any piece rate adopted by such employer which shall yield, to the proportion or class of employees prescribed by regulation or order, not less than the applicable minimum hourly wage rate. Such minimum piece rates or employer piece rates shall be commensurate with, and shall be paid in lieu of, the minimum hourly wage rate applicable under the provisions of this section. The Administrator, or his authorized representative, shall have power to make such regulations or orders as are necessary or appropriate to carry out any of the provisions of this paragraph, including the power without limiting the generality of the foregoing, to define any operation or occupation which is performed by such home work employees in Puerto Rico or the Virgin Islands; to establish minimum piece rates for any operation or occupation so defined; to prescribe the method and procedure for ascertaining and promulgating minimum piece rates; to prescribe standards for employer piece rates, including the proportion or class of employees who shall receive not less than the minimum hourly wage rate; to define the term "home worker"; and to prescribe the conditions under which employers, agents, contractors, and subcontractors shall cause goods to be produced by home workers;
   (3) if such employee is employed as a seaman on an American vessel, not less than the rate which will provide to the employee, for the period covered by the wage payment, wages equal to compensation at the hourly rate prescribed by paragraph (1) of this subsection for all hours during such period when he was actually on duty (including periods aboard ship when the employee was on watch or was, at the direction of a superior officer, performing work or standing by, but not including off-duty periods which are provided pursuant to the employment agreement); or
   (4) if such employee is employed in agriculture, not less than the minimum wage rate in effect under paragraph (1) after December 31, 1977.
  (b) Additional applicability to employees pursuant to subsequent amendatory provisions. Every employer shall pay to each of his employees (other than an employee to whom subsection (a)(5) applies) who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this section by the amendments made to this chapter by the Fair Labor Standards Amendments of 1966, title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], or the Fair Labor Standards Amendments of 1974, wages at the following rate: Effective after December 31, 1977, not less than the minimum wage rate in effect under subsection (a)(1).
  (c) Repealed. Pub. L. 104–188, [title II], §2104(c), Aug. 20, 1996, 110 Stat. 1929
  (d) Prohibition of sex discrimination.
   (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system;

(iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

(2) No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of paragraph (1) of this subsection.

(3) For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter.

(4) As used in this subsection, the term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(e) Employees of employers providing contract services to United States.

(1) Notwithstanding the provisions of section 213 of this title (except subsections (a)(1) and (f) thereof), every employer providing any contract services (other than linen supply services) under a contract with the United States or any subcontract thereunder shall pay to each of his employees whose rate of pay is not governed by chapter 67 of title 41 or to whom subsection (a)(1) of this section is not applicable, wages at rates not less than the rates provided for in subsection (b) of this section.

(2) Notwithstanding the provisions of section 213 of this title (except subsections (a)(1) and (f) thereof) and the provisions of chapter 67 of title 41, every employer in an establishment providing linen supply services to the United States under a contract with the United States or any subcontract thereunder shall pay to each of his employees in such establishment wages at rates not less than those prescribed in subsection (b), except that if more than 50 per centum of the gross annual dollar volume of sales made or business done by such establishment is derived from providing such linen supply services under any such contracts or subcontracts, such employer shall pay to each of his employees in such establishment wages at rates not less than those prescribed in subsection (a)(1) of this section.

(f) Employees in domestic service.

Any employee-

(1) who in any workweek is employed in domestic service in a household shall be paid wages at a rate not less than the wage rate in effect under subsection (b) unless such employee's compensation for such service would not because of section 209(a)(6) of the Social Security Act [42 U.S.C. 409(a)(6)] constitute wages for the purposes of title II of such Act [42 U.S.C. 401 et seq.], or

(2) who in any workweek-

(A) is employed in domestic service in one or more households, and
(B) is so employed for more than 8 hours in the aggregate,

shall be paid wages for such employment in such workweek at a rate not less than the wage rate in effect under subsection (b).

(g) Newly hired employees who are less than 20 years old.

(1) In lieu of the rate prescribed by subsection (a)(1), any employer may pay any employee of such employer, during the first 90 consecutive calendar days after such employee is initially employed by such employer, a wage which is not less than $4.25 an hour.

(2) In lieu of the rate prescribed by subsection (a)(1), the Governor of Puerto Rico, subject to the approval of the Financial Oversight and Management Board established pursuant to section 101 of the Puerto Rico Oversight, Management, and Economic Stability Act, may designate a time period not to exceed four years during which employers in Puerto Rico may pay employees who are initially employed after the date of enactment of such Act a wage which is not less than the wage described in paragraph (1). Notwithstanding the time period designated, such wage shall not continue in effect after such Board terminates in accordance with section 209 of such Act.

[(2)](3) No employer may take any action to displace employees (including partial displacements such as reduction in hours, wages, or employment benefits) for purposes of hiring individuals at the wage authorized in paragraph (1) or (2).

[(3)](4) Any employer who violates this subsection shall be considered to have violated section 15(a)(3).

[(4)](5) This subsection shall only apply to an employee who has not attained the age of 20 years, except in the case of the wage applicable in Puerto Rico, 25 years, until such time as the Board described in paragraph (2) terminates in accordance with section 209 of the Act described in such paragraph.

## Section 1492a of title 48, United States Code

§1492a. Study of electric rates in the insular areas

### (a) Definitions

In this section:

### (1) Comprehensive energy plan

The term "comprehensive energy plan" means a comprehensive energy plan prepared and updated under subsections (c) and (e) of section 1492 of this title.

### (2) Energy action plan

The term "energy action plan" means the plan required by subsection (d).

### (3) Freely Associated States

The term "Freely Associated States" means the Federated States of Micronesia, the Republic of the Marshall Islands, and the Republic of Palau.

### (4) Insular areas

The term "insular areas" means American Samoa, the Commonwealth of the Northern Mariana Islands, Puerto Rico, Guam, and the Virgin Islands.

### (5) Secretary

The term "Secretary" means the Secretary of the Interior, except that, with respect to Puerto Rico, the term means, the Secretary of Energy.

### (6) Team

The term "team" means the team established by the Secretary under subsection (b).

**(b) Establishment**

Not later than 180 days after December 16, 2014 (except in the case of Puerto Rico, in which case not later than 270 days after the date of enactment of the Puerto Rico Oversight, Management, and Economic Stability Act), the Secretary shall, within the Empowering Insular Communities activity (except in the case of Puerto Rico), establish a team of technical, policy, and financial experts-

    (1) to develop an energy action plan addressing the energy needs of each of the insular areas and Freely Associated States; and

    (2) to assist each of the insular areas and Freely Associated States in implementing such plan.

**(c) Participation of regional utility organizations**

In establishing the team, the Secretary shall consider including regional utility organizations.

**(d) Energy action plan**

In accordance with subsection (b), the energy action plan shall include-

    (1) recommendations, based on the comprehensive energy plan where applicable, to-

      (A) reduce reliance and expenditures on fuel shipped to the insular areas and Freely Associated States from ports outside the United States;

      (B) develop and utilize domestic fuel energy sources; and

      (C) improve performance of energy infrastructure and overall energy efficiency;

    (2) a schedule for implementation of such recommendations and identification and prioritization of specific projects;

    (3) a financial and engineering plan for implementing and sustaining projects; and

    (4) benchmarks for measuring progress toward implementation.

**(e) Reports to Secretary**

Not later than 1 year after the date on which the Secretary establishes the team and annually thereafter, the team shall submit to the Secretary a report detailing progress made in fulfilling its charge and in implementing the energy action plan.

**(f) Annual reports to Congress**

Not later than 30 days after the date on which the Secretary receives a report submitted by the team under subsection (e), the Secretary shall submit to the appropriate committees of Congress a summary of the report of the team.

**(g) Approval of Secretary required**

The energy action plan shall not be implemented until the Secretary approves the energy action plan.

**Section 1469e of title 48, United States Code**
§1469e. Insular government purchases.
[The Governments of American Samoa, Guam, the Northern Mariana Islands, the Trust Territory of the Pacific Islands, and the Virgin Islands are authorized to make purchases through the General Services Administration.]
The Governments of the Commonwealth of Puerto Rico, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the United States Virgin Islands are authorized to make purchases through the General Services Administration.

**Section 15 of the Small Business Act (15 U.S.C. 644)**
Section 644. Award of Contracts.

\* \* \* \* \*

(t) GAO REPORT ON SMALL BUSINESS ADMINISTRATION PROGRAMS IN PUERTO RICO.—Not later than 180 days after the date of enactment of this subsection, the Comptroller General of the United States shall submit to the Committee on Small Business of the House of Representatives and the Committee on Small Business and Entrepreneurship of the Senate a report on the application and utilization of contracting activities of the Administration (including contracting activities relating to HUBZone small business concerns) in Puerto Rico. The report shall also identify any provisions of Federal law that may create an obstacle to the efficient implementation of such contracting activities.