IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO


In Re:                                 )
                                       )
THE FINANCIAL OVERSIGHT AND            )
MANAGEMENT BOARD FOR PUERTO RICO,      )
                                       )   No. 17 BK 3283-LTS
    as representatives of              )
                                       )
THE COMMONWEALTH OF PUERTO RICO,       )
et al.,                                )
                                       )   Pages 1 - 79
            Debtors                    )
                                       )


**HEARING**


BEFORE THE HONORABLE JUDITH GAIL DEIN
UNITED STATES MAGISTRATE JUDGE



United States District Court
1 Courthouse Way, Courtroom 18
Boston, Massachusetts  02210
May 21, 2018
1:39 p.m.



KELLY MORTELLITE, RMR, CRR
United States District Court
1 Courthouse Way, Room 7200
Boston, Massachusetts  02210
mortellite@gmail.com

1    A P P E A R A N C E S:

2        KATHERYN ZECCA, ESQ. and DONALD BURKE, ESQ., Robbins
     Russell, for GO Bondholders
3
         ELIZABETH L. MCKEEN, ESQ., and ASHLEY PAVEL, ESQ.,
4    O'Melveny & Myers, for AAFAF

5        ELLEN HALSTEAD, ESQ. and ELLEN HOLLOMAN, ESQ., Cadwalader,
     Wickersham & Taft, for Assured
6
         TIMOTHY W. MUNGOVAN, ESQ. and GREGG MASHBERG, ESQ.,
7    Proskauer Rose, for the Financial Oversight and Management
     Board for Puerto Rico (FOMB)
8
         GRANT R. MAINLAND, ESQ., Milbank, Tweed, Hadle & McCloy
9    LLP, for Ambac Assurance Corp.

10       GREG HOROWITZ, ESQ. and ALICE J. BYOWITZ, Kramer Levin
     Naftails & Frankel, for The Mutual Fund Group
11
         ADAM BOOKMAN, ESQ., Weil, Gotshal & Manges, for National
12   Public Finance

13       JOSEPH P. DAVIS, III, ESQ., Greenberg Traurig, LLP, for
     FOMB as Rep of PREPA and AFAAF
14
         NICHOLAS BASSETT, ESQ., Paul Hastings LLP, for Interested
15   Party, Unsecured Creditors

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2          COURTROOM CLERK:  The United States District Court for

 3   the District of Puerto Rico is now in session on May 21, the

 4   year 2018, in the matter of the Financial Oversight and

 5   Management Board for Puerto Rico as representative of the

 6   Commonwealth of Puerto Rico, et al.  Case number 17-BK-3283.

 7   The Honorable Judge Dein presiding.

 8          THE COURT:  Good afternoon, everyone.  I'm here in

 9   Boston.  To the attorneys, representatives of the party, I

10   don't know if anyone of the public has made it into the

11   courthouse as opposed to outside, but welcome here, welcome in

12   Puerto Rico and welcome in New York.  Hopefully we're going to

13   accomplish a lot today.  That's my goal, all right?  Don't make

14   me a liar first thing on a Monday.

15          So what I'd like to do today is I want to start off

16   with the motion to compel compliance with the order.  And we'll

17   start off with the moving parties and then the joined parties,

18   and then we'll deal with the issues on remand, okay?  Does that

19   work for everybody?

20          All right.  Who is starting on the motion to compel?

21          MS. ZECCA:  Good afternoon, Your Honor.  Katheryn

22   Zecca on behalf of the Ad Hoc Group of GO bondholders.  I'll be

23   taking the lead on the Commonwealth's motion to compel.

24          THE COURT:  All right.  What I'd like to do is not

25   spend a whole lot of time on dissecting the words of the order,
```

1   okay?  I think the ultimate goal of the order was that there

2   would be a specific identification of certain documents, and

3   then the fight would center on those documents; you know,

4   should they be removed from the room; should they be

5   privileged, whatever that process is.  So I think we're there.

6   I mean, I think we sort of have -- the moving parties have

7   identified a group of documents that I think are the key issues

8   right now, and let's assume that that is the documents that

9   you're seeking to have removed from the room and disclosed and

10  proceed with that.

11          MS. ZECCA:  Would you like me here or at the podium?

12          THE COURT:  I think it's probably easier if you go to

13  the podium just for recording purposes.

14          MS. ZECCA:  Is that microphone working?

15          So I'm actually happy to report that what I was

16  originally going to talk about last was the protective order.

17  Shortly before the hearing I believe we've mostly resolved our

18  differences on that, and we'll be able to submit a stipulated

19  protective order to the court hopefully within a week.

20          What the parties have discussed, I'll just put it on

21  the record, and if I've gotten anything here wrong, other

22  co-movants or respondents will let me know.  We are effectively

23  going to do the protective order that was entered in the PREPA

24  case.  There's a stipulated order in connection with the motion

25  for financing that this court had a little involvement in and

1    was argued in front of Judge Swain.  I think in all material

2    respects it is identical to the protective orders that each

3    side produced, but it has a Paragraph 8, which I think was the

4    one paragraph we were disputing.  We are going to use Paragraph

5    8 in the PREPA order with two changes, one of which I think we

6    all agreed to.  There's a sentence at the last paragraph of

7    Paragraph 8 that says, "Respondents may designate any material

8    in the data room as confidential material subject to this order

9    by written notice to the movants without the need to affix any

10   additional marking or designation."

11          As a prefatory clause to that sentence in the PREPA

12   order, we've agreed to add this language, "If any data room

13   material is made subject to this protective order, whether by

14   agreement of the parties or by court order, respondents may

15   designate," and so on.  The only thing we have left to work out

16   is in the PREPA order there's no time within which --

17          THE COURT:  I'm going to ask you to hold for a minute.

18   I understand that Puerto Rico cannot hear.  Are they on?

19          LAW CLERK:  They are on but had some issues so we need

20   to reconnect them.

21          THE COURT:  Okay.  We need to reconnect.

22          (Pause.)

23          I'm going to step down until this gets straightened

24   out.  I apologize.

25          COURTROOM CLERK:  All rise.

```
 1                (Recess taken 1:43 p.m. - 2:02 p.m.)

 2           THE COURT:  All right.  So now that I've given you an

 3      opportunity to resolve all outstanding issues --

 4           MS. ZECCA:  You know, we tried.  I don't know if we

 5      made any progress.

 6           I believe where we left off was I was explaining where

 7      we are in the protective order.

 8           THE COURT:  Yes.

 9           MS. ZECCA:  I think there's one thing we have left to

10      discuss, which is in Paragraph 8, in the last sentence, it says

11      that, "Respondents may designate any material in the data room

12      as confidential material subject to this order by written

13      notice to the movants."  We would like a time period upon which

14      that written notice must be given.  We had proposed five days.

15      Respondents have told me that's too fast.  That's fine.  We can

16      negotiate.

17           We're happy to try to agree on a reasonable time

18      period, but from the movants' side we do not want it to be

19      indefinite.  That's the one thing we were not able to resolve

20      in the courtroom today, but I think we're committed to try to

21      talk about it in the next few days, get something, and get the

22      court a stipulated protective order.

23           THE COURT:  Okay.  Why don't you do that.  And then if

24      you can't resolve it, if you submit a status report with your

25      different positions, I'll probably split the difference.
```

1        MR. MASHBERG:  Your Honor, Gregg Mashberg from

2   Proskauer Rose on behalf of the Oversight Board.  Ms. Zecca

3   accurately accounted for our conversations.  I just wanted to

4   add we need to go back to our client and confirm that, but I

5   think we're certainly in the right direction here, and

6   hopefully we'll have a resolution.

7        THE COURT:  Great.

8        MS. ZECCA:  Okay.  So Your Honor, what respondents --

9   we are movants -- what movants are looking for is an order

10  stating that documents, what we've called fiscal plan

11  development materials, but they're documents responsive to

12  Requests 8, 16 and 17, are to be produced in discovery as

13  opposed to subject to I believe what the parties are calling

14  data room restrictions.

15       And we'd like an order with respect to the documents

16  in the data room now and any documents that may be produced in

17  the future because what we'd like is an orderly process by

18  which, when documents come in, we know they're discovery, we

19  know who we can use them with, we know who we can show them to

20  and under what circumstances.

21       I want to be clear on the narrow scope of what we're

22  looking for here.  It will be under a protective order, so

23  respondents will have a chance, obviously, to designate them as

24  confidential, and there will be a procedure where, if we don't

25  agree with the confidentiality designation, we can try to meet

 1    and confer and come to the court.

 2          We also don't think that producing it in discovery

 3    means it necessarily is admissible or usable in a court

 4    proceeding.  Just like discovery in every litigation I've done,

 5    producing it in discovery is one thing.  If you want to use it

 6    in a court proceeding, the other side always has the chance to

 7    say, No, it's not relevant; no, it's hearsay; no, the standard

 8    for a plan adjustment should be X, not Y, and therefore it's

 9    not relevant.

10          But what we movants feel is necessary here is a broad

11    order governing what's been produced and anything that will be

12    produced in the future going forward so we don't have to

13    constantly keep coming back to the court.  Even since we filed

14    our motion, new fiscal plan development materials have been

15    posted to the data room.  I saw an announcement this morning

16    that there's going to be revisions to the fiscal plan and it's

17    going to be recertified.  There will be, I assume, a new model

18    and maybe other materials underlying that plan, so we need an

19    order to let this proceed in an orderly way.

20          I don't think we've had too much trouble with the

21    other side about what the fiscal plan development material is.

22    We just think these are discovery materials, and we need an

23    order, broad order so we're not fighting document-by-document

24    all the time, because that's just not workable in this

25    litigation.

1          THE COURT:  Let me ask you this, though.  Because you

2     did come up with this Exhibit B, which had 47 documents, which

3     seemed to me -- now, I have never seen the data room,

4     obviously.

5          MS. ZECCA:  Correct.

6          THE COURT:  So I don't really have a sense of whether

7     these are clearly documents that you would have agreed upon or

8     not.  I felt that it was helpful for me at least to have you

9     identify the documents that you thought were at issue and then

10    be able to have a conversation with the other side to say, how

11    are these going to be designated with the burden being -- let's

12    assume for now that the burden would be on the respondents to

13    say, I'm designating them confidential or not.

14         Is it helpful, though, to have you identify what

15    documents you're talking about so that we don't get up in this

16    cycle of talking past each other about some of the documents?

17         MS. ZECCA:  Perhaps, but I want to step back with what

18    I think the court -- I'm just not sure I follow the court's

19    question.

20         THE COURT:  You're saying you want a blanket order

21    that says everything comes out of the room, subject to the

22    protective order.

23         MS. ZECCA:  Correct.

24         THE COURT:  But it seemed to me that part of the way

25    this whole thing started was there were groups of documents

1    that went in that were for mediation only, which are covered by

2    the protective order as mediation only, but that there was a

3    broader range of documents in the data room that went beyond

4    the fiscal plan material, and that it was helpful, I thought,

5    to have you identify specifically what you were talking about

6    so that we at least eliminated that initial dispute as to what

7    documents do we mean.

8         MS. ZECCA:  So I think a little bit of yes and no.

9    There's four categories of documents in the data room, to my

10   mind, but they're not filed by these four categories.  So there

11   are things that I think the parties can and have agreed are

12   factual data information, things like that that they have

13   already told us, We will deem these produced under 2004 once we

14   get a protective order.  We're all good there.

15        There's documents that have been produced in other

16   litigation, in other adversary proceedings, COFINA proceedings,

17   et cetera.  Those are actually in one place in the mediation

18   room again produced here.  There's the fiscal plan development

19   materials, and then there are mediation materials.

20        Part of the -- one of the issues, though, is within

21   the mediation folder of the data room, they have filed things

22   that are fiscal plan development materials, not say a deck

23   created for a mediation session.  So that makes it a little bit

24   confusing.

25        So the way Exhibit B came up is, because we went

1   through the data room after your order and said, Here is what
2   we think has been ordered produced, could be considered a
3   fiscal plan development material.  A chunk of that they said,
4   Actually, we consider that factual information and data, so
5   there's no dispute here.  I think a little bit of it they said,
6   That actually isn't a Commonwealth document.  That's a
7   different Title III, so it's not covered by the 2004 order.  We
8   agree with that.

9        And then there's the middle piece which are the fiscal
10  plan development materials.  That's what's here.  They didn't
11  agree to produce any of it pursuant to Rule 2004.  But our
12  problem is, even since this, new materials are being posted to
13  the data room constantly.  So we want a process -- so I think
14  we tried to do this to be helpful as to what was there in that
15  snapshot in time, but it's a growing room.  They add documents
16  to the Commonwealth piece of it on a regular basis, and it's
17  unworkable for us to have to come to them every time something
18  gets posted and say, Will you agree to let us use this in
19  discovery or not?

20       We don't -- we haven't had trouble agreeing what
21  rubric it falls under; is it factual data, fiscal plan
22  development material, and we can say to them, This has been
23  posted, we think it's a factual, we think it's fiscal plan
24  development material, we think we should use it.  But we do
25  need, we think, guidance from this court if it is a fiscal plan

1   development material, it falls within discovery and not under

2   the NDA or mediation instructions, or else we're going to be

3   constantly disagreeing and constantly back before you.  I know

4   that in every fiscal plan development material we asked them to

5   produce, they said no.

6        I think that's going to be the case in the future,

7   with the one exception that they have told us that with respect

8   to the model underlying the certified fiscal plan, they'll

9   produce that in discovery.  Although I will say that model is

10  currently sitting in a mediation folder, and without an order

11  of this court or consent from them, we can't use it in

12  discovery.

13        THE COURT:  Is the dispute, though, whether or not

14  documents that are fiscal plan material documents need to be

15  produced absent a showing of good cause or -- I guess good

16  cause, or is the dispute that these are materials that are not

17  fiscal plan development materials?

18        MS. ZECCA:  I think, unless there's an exception that

19  I'm not recalling, we agree that what's on Exhibit B are fiscal

20  plan development materials, and we also agree that, for

21  example, the model that's been posted to the data room, since

22  we filed, is also a fiscal plan development material.

23        I think the central question and the way the parties

24  each read the court's order differently is if it's a fiscal

25  plan development material, is it in discovery, subject to

1    protective order, you can designate it confidential, and

2    whether it gets used in court is different, you always have

3    your right to object to that, or whether, as they say, we have

4    to go to them on each material every time and ask if they'll

5    produce it and then when we disagree, come to the court,

6    because we're going to be back here and back here and back here

7    if that's the case.

8            THE COURT:  Well, I don't know whether you'll be back

9    here or back here.  I don't know whether or not designating the

10   materials gives you a concrete basis for discussion or not.

11   But go ahead.

12           MS. ZECCA:  So as we see it, the Board has announced

13   that it wants to propose a plan adjustment for the Commonwealth

14   in 2019.  I've read many government parties saying they want to

15   have the plan confirmed quickly.  And that's why we're saying

16   we want a court-supervised process whereby these materials are

17   in discovery, and we can be working now to understand these

18   materials, to work with our own experts on these materials, and

19   to have a process whereby, instead of under the NDA where

20   everything is presumptively confidential and we have no ability

21   to challenge that, there's a dialogue, iterative process where

22   they designate and we can challenge.

23           I don't know if the court needs me to -- I'll start

24   with this.  In respondents', I believe it's AAFAF's response,

25   they say that they've provided many materials to us and they

1    say that's basically the same as -- they intimate that's the

2    same as discovery, and it's not, for two really big reasons in

3    our mind.

4          One is, the use in litigation, and the NDA and the

5    mediation agreement are pretty clear.  You can't use these in

6    discovery.  You can't even attempt to use them in litigation.

7    So if it's sitting under the data room restrictions, as I'll

8    call it, the NDA or the mediation agreement, it's in a sealed

9    box as far as we're concerned.  I can't even come to this court

10   and say, I think we should be able to use this and have them

11   say, We object, we think it's not admissible.  It's just in a

12   black box.  We think in a protective order situation, if it's

13   under the 2004 order, it's in discovery.  We can attempt to use

14   it; they can object.

15         And second is the confidentiality designation process.

16   The court knows what a protective order does.  Under the NDA

17   and the mediation agreement, it is confidential, and I have no

18   ability to challenge that confidentiality.  Movants have no

19   ability to bring any issues about confidentiality to the court.

20   So it's exceptionally restrictive, and as we see it, it's

21   unnecessary.

22         We haven't heard any coherent -- any legal rationale

23   or any policy rationale for saying, This should not be subject

24   to discovery.  Remember, there is a protective order.  That

25   doesn't mean it's showing up publicly if they've designated it

1    confidential.  Just because it's produced in discovery, that

2    doesn't mean it's admissible.  But we do think we need a

3    process whereby it's in discovery.

4         THE COURT:  In the process that you envision, would

5    they make the designation before they put it in the room or

6    after?  When does that happen if you don't actually designate

7    the information that you're asking about?

8         MS. ZECCA:  Designate it as a fiscal plan development

9    material?

10        THE COURT:  Right.

11        MS. ZECCA:  I think in my ideal world, if the court

12   ordered fiscal plan development materials produced under 2004,

13   there would be a folder in the data room for that production,

14   and they'd put it up in that folder so I'd know by virtue of

15   where they post it, that's how they see it.  And that would

16   also, I suppose, allow if they put something instead in a

17   mediation folder that we think wasn't fairly mediation

18   material, we can have a meet-and-confer about that.  But it

19   hasn't really -- that's not really been what the fight has been

20   about.  The fight has been about are these discovery or not.

21        One thing we wanted to say, Your Honor, is that in

22   this case we've already seen multiple expedited proceedings.

23   The PREPA proceeding was one such proceeding.  The movants --

24   not the movants.  The Board originally asked for $1.3 billion

25   of financing, I believe.  The hearing was supposed to be just a

1    little bit, a week or two later.  That eventually stretched out

2    to three or four weeks after the initial motion.  I'm looking

3    at Mr. Horowitz because he has a more vivid memory of this than

4    I do.  But it was a super-expedited discovery process and

5    deposition process, and I believe we did have one telephonic

6    motion with this court in the middle of a deposition.

7         The reason that worked is because those documents on

8    PREPA were all produced pursuant to a protective order.  If

9    they had just been sitting in the black box of the data room, I

10   don't know how any of that works.  And that's why in this case

11   where expedited proceedings happen, and they're going to pop

12   up, and they are going to need to be quick, we can't be

13   fighting about pulling fiscal plan development materials out of

14   the black box and into discovery.  They need to be in discovery

15   so that we can have an orderly process to handle the expedited

16   proceeding and to prepare for the confirmation proceeding.

17        I think the confirmation proceeding may come upon us

18   very quickly.  And when it does, right now, I'm not sure

19   whether under the black box restrictions it's okay to share a

20   fiscal plan development material, such as a model underlying a

21   draft plan or the old fiscal plan, the prior certified fiscal

22   plan, with a testifying expert because my testifying experts of

23   course are there for litigation.  And the NDA says you can't

24   even attempt to use it for litigation.  So that creates a

25   problem for movants as we try to prepare our case going

1    forward.  And that's why we want it in discovery.

2         Another thing we set out in our brief is if we have

3    to, as they say, go to them on a case-by-case,

4    document-by-document basis, we're giving them some insight into

5    our internal deliberations and thought processes about what we

6    think is important.  That's not normally your setup in

7    litigation.  Normally the documents are produced and you don't

8    have to provide -- you don't have to provide a justification or

9    anything like that to your opposing party about why it comes in

10   in discovery.

11        THE COURT:  As of the procedure that you're using now,

12   how do you know when something new is added to the room?

13        MS. ZECCA:  There is an email alert that comes out

14   every time I think a document is added or once a day.  It's one

15   of the two.  I think that's what I had on why we want this

16   order, and I had a lot to tell you about the protective order

17   but now I don't have to.

18        What I do want to say, add one more thing, this is

19   just to be clear with the court.  In the court's February 26

20   order, the court said -- I want to get your words right, it's

21   at page 7 -- the court assumed that production of 2018 fiscal

22   plan materials to the data room will mirror the types of

23   documents produced regarding the 2017 plan and that the

24   production will be sufficient to respond to the outstanding

25   request in the renewed motion.

1            At the time we were filing these papers, we had not

2    had a chance to fully study the models underlying the 2018

3    plan.  We've done that.  We are compiling, in consultation with

4    our financial advisors and our co-movants, we're compiling a

5    list of additional materials we think we need.  We're obviously

6    going to get that to respondents and meet and confer with them

7    before bringing any disputes before the court.  I hope we don't

8    have any.  But I did want to let the court know that currently

9    we believe there are materials outstanding, but we haven't had

10   a chance to make that complete list and get that to respondents

11   to meet and confer about that yet.

12            THE COURT:  Okay.

13            MR. HOROWITZ:  Good afternoon, Your Honor.  Gregory

14   Horowitz from Kramer Levin.  I'm getting up today on behalf of

15   the PREPA movants on what was captioned a motion for joinder,

16   but I think Your Honor very appropriately and pragmatically

17   recharacterized it as a motion to compel.  I think Your Honor

18   recognized we were just looking for the most judicially

19   efficient way of presenting essentially the same issue with

20   regard to the PREPA movants in the PREPA case.

21            I think just for context, Your Honor, so you

22   understand, the PREPA creditors sought 2004 discovery and

23   negotiated with the PREPA debtor a consensual stipulation and

24   order authorizing the 2004 discovery which Your Honor entered

25   on January 17 of this year.  That order, that stipulation and

1   order contemplated a similar procedure to what was followed in

2   the Commonwealth case.  We were allowed to serve discovery, our

3   document requests, and there was to be a meet-and-confer,

4   discussion of what disputes would be presented to Your Honor.

5        When we actually had the meet-and-confer scheduled,

6   the day I think we had the meet-and-confer scheduled was when

7   the debtors filed -- the PREPA debtor filed its urgent DIP

8   motion, and everything got sidetracked, Your Honor, in the DIP

9   discovery.  And a substantial amount of material was produced

10  in connection with that contested matter.  But as a result, we

11  are only just now revisiting the meet-and-confer process on the

12  2004 discovery, and to date in the PREPA case, there has been

13  no production pursuant to 2004.

14       We are negotiating with the debtors' counsel, and I'm

15  hopeful that we will resolve most, if not all, of our issues on

16  that, but it's possible we will be back before this court on

17  that.

18       In the meantime, we filed what was originally

19  captioned the Motion For Joinder so that we could get the same

20  material, which was a subset of the material we sought in our

21  2004 requests, the fiscal plan development material with regard

22  to the PREPA fiscal plan.  I don't believe, Your Honor, there's

23  any dispute about what constitutes fiscal plan development

24  material, at least with regard to what has been posted in the

25  data room.

1          I think one dispute that I hope we can move past is

2    over the argument that creditors should have no need for 2004

3    discovery of these materials at this time because they've

4    received similar materials in the mediation in the data room.

5    I hoped that was a contention and an issue that had been

6    resolved when the mediators in connection with the Commonwealth

7    2004 motion issued their notice of breach of mediation

8    confidentiality, basically saying it's inappropriate to refer

9    to material, to refer to disclosure that's occurred in

10   connection with the mediation and that whatever is going on in

11   mediation, that's no substitute for the parties' rights in the

12   litigation and in the bankruptcy process.  In other words,

13   mediation disclosure is not a substitute for 2004 discovery.

14         So in a way, the fact that there is material that's

15   been posted in the data room while, you know, in one respect

16   it's been very helpful, in another respect it's very confusing

17   because it should be irrelevant to whether or not the debtor

18   has complied with its obligations under 2004 or whether the

19   creditors have received the information that they're entitled

20   to under 2004.

21         Here again, Your Honor, I say I don't believe there's

22   any dispute as to what is fiscal plan material with regard to

23   the PREPA side.  We're just asking in this regard, I simply

24   join in Ms. Zecca's arguments.  We're just asking that that

25   material be ordered to be produced, not to be -- I don't like

1    the expression, with all due respect, Your Honor, released from

2    the room.  It's being produced in the case pursuant to 2004.

3    It's just that, as a logistical matter, releasing it from the

4    room, de-designating it might be an easier way of doing it, but

5    I think as a logical matter, we should pretend that that room

6    doesn't exist and just say this material needs to be produced.

7            And we already have a protective order in place, Your

8    Honor, our protective order.  I think all of the language that

9    was negotiated with regard to the Commonwealth order is simply

10   a clarification of what was always intended in our protective

11   order.  I'm perfectly happy to have that clarification deemed

12   to be a gloss on the protective order that's already been

13   entered by Your Honor in the PREPA matter.

14           THE COURT:  In the PREPA, though, why do you think

15   materials haven't been produced?

16           MR. HOROWITZ:  There hasn't been any 2004 production.

17           THE COURT:  You've got everything in connection with

18   the disputed motion?

19           MR. HOROWITZ:  Well, we got a significant amount of

20   material in connection with the contested matter, the DIP

21   matter.  We're still seeking -- and some of it, I think we

22   should be able to resolve a lot of it -- some other material

23   that we need in connection with our 2004 requests.  That hasn't

24   been produced yet, but that hasn't been produced outside of the

25   data room, outside of mediation yet, but I'm hopeful that we'll

1    be able to resolve those issues.

2         The DIP motion was decided, it all feels like one long

3    day to me, Your Honor, but a couple of months ago at least.

4    And there's been some significant new material, including a new

5    PREPA fiscal plan.  So there is more material out there that

6    has not been produced, except to the extent that it's been

7    provided in mediation, which again I submit is not production.

8         THE COURT:  Under your confidentiality agreement, if

9    it's in the mediation folder, you have the right to contest

10   that?

11        MR. HOROWITZ:  No, Your Honor.  If it's in the

12   mediation folder, it's been produced in connection with

13   mediation.

14        THE COURT:  And you don't have the opportunity then to

15   say it shouldn't be limited to that, or you do have the --

16        MR. HOROWITZ:  Well, the only opportunity we have is

17   the opportunity we're taking advantage of today, Your Honor,

18   which is moving to compel the production of that material or

19   some subset of that material in 2004.

20        THE COURT:  Right.  But your confidentiality agreement

21   allows for that?  The PREPA is the one that allowed to contest

22   the designations, correct?

23        MR. HOROWITZ:  The PREPA protective order, which Your

24   Honor has entered, does not address and does not cover material

25   that's been produced in connection with the mediation.

 1          THE COURT:  Period, the end.  And you don't have the

 2   right in that one to either challenge that or not?

 3          MR. HOROWITZ:  No.  That's simply a mediation

 4   confidentiality.  As far as I'm concerned, that is, to use

 5   Ms. Zecca's phrase, a black box.

 6          The only reason -- I shouldn't say the only reason, I

 7   don't want to speak for the debtor, for the PREPA debtor.  The

 8   PREPA debtor has not gotten out ahead of the Commonwealth and

 9   the Oversight Board and AAFAF on producing fiscal plan

10   development material pursuant to 2004 in our case, and I

11   believe they will not do so until Your Honor orders it in

12   connection with these motions.

13          THE COURT:  Okay.

14          MR. HOROWITZ:  Thank you, Your Honor.

15          THE COURT:  Who is next?  Who is opposing this,

16   anybody?

17          MS. McKEEN:  Good afternoon, Your Honor.  Liz McKeen

18   on behalf of AAFAF and respondents.  I think in thinking about

19   these issues today, it's appropriate to focus on several

20   things.  One is the good cause framework that your February 26

21   order teed up with respect to the fiscal plan development

22   materials.

23          Another thing I would like to focus on is the fact

24   that the way these conversations have developed, they've been

25   focused on the specific set of documents that were identified

1    in the motion to compel.  And so in response to the question

2    that you posed of Ms. Zecca earlier, I think we view the

3    analysis and the question of whether it makes sense to continue

4    to have a document-by-document framework for these

5    conversations as being very helpful.

6          I think for a lot of the reasons you identified in

7    your original order, it helps to be granular and specific about

8    what documents are we talking about and what purpose they're

9    being used for and in what context.  And so to the extent today

10   movants are talking about seeking a broad order with respect to

11   three really potentially large categories as opposed to

12   focussing on the 40 or so documents that are at issue in their

13   motion, I think it makes sense to resist that approach and to

14   really focus on what are the actual documents that we thought

15   we were coming here to talk about today.

16         And I think that I would agree that we share the

17   movants' view that these are in fact fiscal plan development

18   materials.  I disagree that there haven't been any other fiscal

19   plan development materials produced.  And in fact, part of what

20   we did after the court referenced the February 26 order as

21   Ms. Zecca referenced, we met and conferred and identified a

22   host of materials that we did agree to make available under the

23   protective order that were fiscal plan development materials,

24   including various models, debt slides, reconciliations of

25   expenditures, revenue comparisons, expense reports and the

1    like, and as we have just reconfirmed today, in connection with

2    the new plan that the Board recently certified and with any

3    plans that are certified in the future, have agreed to make

4    available all the models and data supporting those plans, not

5    only in the data room but subject to the terms of the

6    protective order so that they can be used in litigation and for

7    litigation purposes.

8            And I appreciate Ms. Zecca's observation that nothing

9    about producing something pursuant to a protective order would

10   waive our right to do things like challenge admissibility down

11   the road, but that doesn't really help us with respect to some

12   of the burden that would be associated with too broadly

13   interpreting what there has been good cause to conclude should

14   come under the protective order rather than being in the data

15   room.

16           And with respect to these 40 documents, I think what's

17   important is the extent to which these documents relate

18   exclusively to fiscal plans that are obsolete and no longer

19   operative.  I think that is a big part of how we look at this

20   issue and the reason why we don't believe the movants have

21   demonstrated good cause at this point in the proceeding.

22           And let me say something about that.  I think the way

23   we look at these documents, about 32 of the 40 or so relate

24   exclusively to what I'll call fiscal plan 1.0, which was the

25   version that was certified prior to the hurricanes.  The other

1    eight or so support interim drafts of the post-hurricane fiscal

2    plans that were never certified.  And from our perspective,

3    whatever else you think about these documents, which have been

4    made available to the movants under the data room restrictions,

5    we don't see that at this point in time when there hasn't been

6    a plan of adjustment proposed.  And when there isn't any

7    pending litigation to which these old and obsolete materials

8    relate, that there really isn't good cause to take them out of

9    these restrictions.

10           And part of that is because of the burden that would

11   be associated with having to do things like prepare our own

12   witnesses and experts to then deal with how to explain these

13   documents when I think what we believe everybody ought to be

14   focused on is what is the fiscal plan that's actually going to

15   form the basis for the plan of adjustment.  And it's a question

16   in our minds of where you draw that line in terms of allowing

17   this discovery to proceed.  Because one thing that one could

18   very reasonably conclude is that at the time a plan of

19   adjustment is proposed, the movants may be able to come in and

20   say, Aha, there's something about the fiscal plan 1.0 material

21   that we think actually is relevant to an issue that's going to

22   be litigated here.  It ties into this specific reason.  But we

23   don't have that right now because plan adjustment is not on the

24   table, and we're sort of in the hypothetical universe of this

25   old obsolete stuff might be relevant in the future to some

1    unspecified litigation that's not happening right now.  So we

2    don't think that constitutes the kind of good cause you were

3    contemplating under the order.

4          THE COURT:  Let me just -- help me out here, okay?

5    Because I think when you first came in first couple of times --

6    and it's wonderful that some things get resolved by

7    stipulation, but that takes me out of the discussion, so I tend

8    to get this in bits and pieces.

9          At the beginning it seemed like we were talking about

10   an unbelievable burden of endless kinds of documents, all

11   right?  So it made a lot of sense to me to say, Let's not waste

12   time with trying to sort through all of these documents and

13   figure out where they're going if most people aren't going to

14   be using them, right?  That was my very practical thought

15   process.  Here, though, I'm dealing with a list, which is down

16   to 40 documents, that everybody -- I think it's 40 by the time

17   you're done with the mediation room.

18         MS. McKEEN:  Given or take.

19         THE COURT:  Or even if I take 47, I'm talking about 47

20   documents out of a much larger group.  To the extent that

21   they're historical, this is the world, right?  I mean, this is

22   the 47 documents.  From now on we're not dealing with the

23   historical 1.0 model.  We're dealing with what happens in the

24   future.  So why is it important to have this fight over these

25   47 documents and to not let them be part of the

1    confidentiality, if you believe they're confidential, not have

2    them be part of the production?

3           MS. McKEEN:  Well, it's a good question, and I think

4    it's for precisely the reason you identified, which is, we do

5    want to be focused on, moving forward, what the actual fiscal

6    plan is and not what was underlying fiscal plan 1.0 because I

7    think if you were to conclude that good cause existed to

8    release, for example, the 32 documents that relate exclusively

9    to fiscal plan 1.0 from the data room restrictions, the

10   question would be okay, what other documents in the data room

11   might one make the same argument about.

12          I don't know that this fight would be happening if

13   anybody thought it was really just about these 40 documents and

14   then we're done.  I think it's a question of are we going to

15   decide that even if something relates exclusively to a fiscal

16   plan that has been long since obsolete, is it fair game every

17   time an expert or a financial advisor is going to get deposed

18   in this case to have to ask that witness questions about that

19   document to prep the person to be deposed about those

20   documents.  When we're in a universe where we're trying to

21   allocate scarce resources and there is no plan of adjustment on

22   the table, I think you could say, Look, without prejudice to

23   you raising this later, the good cause for these old documents

24   isn't here today, you have the backup for the current fiscal

25   plan, you will have the backup for any future certified fiscal

 1   plan, why can't we focus on that for now, instead of hopping in

 2   the Wayback Machine to fiscal plan 1.0.  That's how we view it.

 3        THE COURT:  So it seems to me, since I don't know what

 4   these documents are, other than their category number, there

 5   certainly is an argument that says there's information there

 6   that gives the movants information that they feel they can

 7   compare, contrast, things change, whatever, but it did relate

 8   to the fiscal condition of the Commonwealth.  It's not like

 9   they're irrelevant documents.

10        The way I'm kind of seeing it is if these 47 documents

11   are the world of historical documents that are in dispute, and

12   it seems to me that that's been the representation to me in

13   these pleadings, is that these are the world that we're

14   fighting about right now, if we deal with those as the

15   historical and say, Produce those as of 2004, and then in the

16   future documents are put in, I like that suggestion that the

17   documents be put in a folder that says fiscal plan development,

18   which gives you the right, the control over what documents you

19   believe are fiscal plan development documents.  It gives the

20   movants here the right to challenge that in some form later,

21   and it seems to me a very practical way of moving forward while

22   you have control over where the documents go.

23        MS. McKEEN:  I certainly think that's workable

24   prospectively.  I don't think it alleviates our concern over

25   opening the door to discovery and sort of needless work around

1    old versions of the plan that are obsolete because the kinds of

2    -- I think one of the things that's important to recognize is

3    to the extent the plans and the models are based on things like

4    historical data and just, for an example, what were toll

5    revenues back in 2009, how does that work into the model.  That

6    historical data is going to roll up to the current version of

7    the model and the current version of the plan.  So it's not

8    like the old fiscal plan 1.0 documents are going to be

9    necessary to capture that same information.

10           It's not like there is historical data that's going to

11    be lost to the sands of time because we're not focused on the

12    other aspects of the plan that have been superseded, for

13    example, things like how we've changed our assumptions about

14    growth and out-migration as a result of the hurricane.  That's

15    not about historical data.  The historical data that forms the

16    basis of the plan is still going to be there.  It's more about

17    how have our assumptions changed in light of all of the

18    developments.  And that's not the same thing as hard data, like

19    what actually happened five years ago.

20           And to us, the comprehensive nature of the information

21    that's going to be in the model that supports the current

22    certified version of the fiscal plan I think warrants

23    continuing to place the burden on movants to say, Look, if you

24    have identified something specific that underlies this old

25    fiscal plan stuff that you do think you need, come forward,

1    let's talk about it in the context of the plan of adjustment

2    when we can be concrete about why you think it's necessary, as

3    opposed to the sort of hypothetical inchoate conversation

4    about, Oh, in theory it's all numbers, and maybe there's

5    something in here that's relevant, let's throw it in the pile

6    and see what happens.  We don't think that constitutes good

7    cause just because it's another version of something that

8    happened a while ago.

9         THE COURT:  No, but I feel like you're asking me to

10   make a distinction and I'm missing some nuances.  There's going

11   to be a lot of facts out here.  Some are going to be more

12   relevant than others.  There will be fights over different

13   things.  If we really are talking about 47 documents, do they

14   really change the presentation so dramatically?

15        MS. McKEEN:  Well, some of the documents are in and of

16   themselves one document, the entire fiscal plan model, so it's

17   not like a document equals a sheet of paper in this.  One

18   document could represent an Excel spreadsheet with 500 tabs.

19   So I think to call them 47 documents is to narrow the universe

20   and be specific about what we're talking about, but I would not

21   want you to get the impression that we're talking about a

22   necessarily narrow set of data information because some of

23   these documents themselves are extremely voluminous.

24        And to be fair, I think if we were really just talking

25   about these 47 documents, Ms. Zecca wouldn't have been so

 1    careful to insist that she really doesn't want to talk about

 2    the 47 documents, she really wants an order from of you as to

 3    these three specific categories of discovery, which is the

 4    first thing she brought up today.  So I wish I could believe

 5    that that fight is about 40 documents, but I think we're all

 6    worried that it's not, on this side of the table.

 7         THE COURT:  Okay.  What if it was, though, these 47

 8    documents were the historical information and that in the

 9    future you have the right to designate things that go into the

10    fiscal plan development folder, which would automatically be

11    subject to the protective order?  And then I understand that

12    the movants would be able -- they have information about what

13    else you're putting in the data room, right?  So there can be a

14    mechanism where that designation is challenged, right?  You're

15    not including enough or whatever, and then we're fighting over

16    specific documents.  Does that sound workable?

17         MS. McKEEN:  So here is what I'll say about that.  I

18    think on a prospective basis it sounds workable.  Obviously,

19    subject to the views of my co-counsel on that, I think it

20    doesn't alleviate my concern about having potentially

21    unnecessary litigation and discovery around completely

22    superseded models.  Again, the 47 documents, to the extent they

23    include voluminous models, it would be our preference to not

24    have those come out from under the restrictions at this time

25    without the kind of showing of good cause that the court

1    previously held was lacking, but I certainly think if movants

2    would say there is nothing related to a prior or now no longer

3    operative version of an old fiscal plan that we're going to

4    seek besides the 47 documents that we've already sought in this

5    motion, we could have a conversation about that, but I don't

6    think they've made any such representation.  And I think what's

7    clear is that the set will only become larger and larger and

8    larger as we move forward.

9         I think if we were to start thinking about the

10   universe in terms of what's currently certified and what will

11   be certified in the future and let's focus on that rather than

12   focusing on the past, that would be the most helpful framework

13   subject to movants' ability to always come in and say, There is

14   something in these documents that relates to an old fiscal plan

15   that there is good cause for us to use, here is what it is, as

16   opposed to saying it relates to fiscal plan stuff, because

17   that's all we have now.

18        THE COURT:  So I think things have changed, and I

19   think that given the unpredictability of the way issues arise

20   that things have changed about whether there's good cause to

21   have these documents produced under 2004, okay?  I do think

22   that we're now in the 2004 world of production.  And I do have

23   a better sense, maybe, that we're talking about at least a

24   category of documents that the parties can generally agree upon

25   and that you've been able to work together to identify those

1    documents at least from the present moving forward.  So I am

2    prepared to order that the fiscal plan development documents at

3    least in the future, or present to the future, plan are being

4    produced under 2004 but subject to the protective order.

5         MS. McKEEN:  Your Honor, as part of that ruling, I

6    think what we would want, if it makes sense to you in terms of

7    trying to be practical, is some mechanism by which we can then

8    seek a protective order or some other form of relief.  For

9    example, if some of these old fiscal plan materials seem like

10   they're being used in a way that isn't relevant, isn't

11   constructive, isn't within the bounds of appropriate

12   discovery --

13        THE COURT:  Let me just put those aside for the

14   minute.  Let's deal with the new, moving forward.

15        MS. McKEEN:  Okay.

16        THE COURT:  Okay.  If we create a system where you

17   have control over what you designate as fiscal plan

18   development, recognizing that if you so designated it, it will

19   be produced under 2004 subject to the confidentiality

20   agreement, your agreement provides for a mechanism where the

21   movants can challenge whether other materials should also be

22   included, and we can have that on a more specific basis.  Does

23   that work?  And then set up a time period where you can

24   designate the level of restriction of the fiscal plan

25   development documents, right, because some of those will be

1    confidential and some won't.

2            MS. McKEEN:  I think that's right, Your Honor.

3            THE COURT:  So if we set up a period of time for you

4    to be able to do that, does that take care of the future?

5            MS. McKEEN:  I think that takes care of the future.

6            THE COURT:  Okay.  So then I'll hear from other

7    people, but I'm sort of getting -- nobody's throwing anything,

8    so I'm sort of assuming that people are generally on the same

9    wavelength.  So let's assume that's going on in the future.

10           Now let me hear from Mrs. Zecca on -- I'm going to

11   call them the 47 historical documents.  And I do think that it

12   may be appropriate -- okay.  Maybe not you?

13           MR. MASHBERG:  Can I just go?  I'm going to be very

14   brief, Your Honor.

15           THE COURT:  I do think it may be appropriate for us to

16   think about, once depositions happen, if there's a way to make

17   sure that we're going forward efficiently on those.  Maybe

18   there's a way to predesignate documents and have a fight about

19   it in that way.  We've certainly done than in a number of

20   cases.

21           I don't know because I don't really have a sense of

22   how the depositions are going to come up because I don't know

23   if they're going to come up in the context of a specific fight

24   over a motion or if they're going to come up with the plan.  I

25   just don't have that sense.  Sir.

1          MR. MASHBERG:  Your Honor, again, Gregg Mashberg from

2     Proskauer on behalf of the Oversight Board.  I'm not going to

3     repeat anything Ms. McKeen said, which I agree and adopt.  I

4     want to make a couple of points.  First of all, on the issue of

5     the applicability of Rule 2004, the fiscal plan development

6     documents, Your Honor of course already ruled on that on

7     February 26 on page 7 of your order, and you made it very

8     clear, and that is that matter is behind us.

9          THE COURT:  I thought I made it clear but nobody

10    agrees on what I said.

11         MR. MASHBERG:  Well, we actually did, Your Honor.  I

12    think we agreed, but there was also a caveat in your order

13    which Ms. McKeen discussed and I think we're moving beyond a

14    bit and I'm not going to reiterate that.  But in terms of going

15    forward, we are in the context of a motion to compel that was

16    pretty narrowly focused on the Exhibit B to 47, 46, 30, we have

17    a lot of ways of slicing and dicing the number of documents,

18    those are the documents that are before the court in this

19    motion to compel.

20         And now I'm hearing movants wanting this much broader

21    order covering the universe of documents without even

22    mentioning the 47.  That's fine.  And I understand the point

23    that Your Honor is making, is that we really should -- things

24    have changed, the world is moving on, and we should find a

25    mechanism to avoid having to come back in a piecemeal fashion,

1   but I think the parties should now be put in the position of

2   negotiating that in the first instance, that we should be

3   meeting and conferring on how to go forward.

4            I want it to be clear that the fiscal plan for 2018,

5   the certified fiscal plan is public, the model is in the data

6   room, all the tabs are there, and those will all be made

7   available pursuant to the protective order.  That's really

8   going to be the nuts and the bolts of the 2018 fiscal plan

9   materials, the development materials.  It's going to be there.

10  The questions are going to be answered by what is going to be

11  now subject to the protective order once we have that entered.

12           To the extent that we have other issues, I don't think

13  they're properly before the court.  I think they're amorphous,

14  and I think the parties should have the opportunity for us to

15  sit down between ourselves and come up with a proposal for the

16  court, and to the extent we can agree, we'll do that; and where

17  we can't agree, then we'll let the court know, but I feel I'm

18  in kind of like in an ether here as to exactly what the court

19  is being asked to do beyond this motion to compel.

20           THE COURT:  Well, the way I read the motion to compel

21  was these 47 documents but a request for a broader order for

22  the future.  But I read it as the 47 were the extent of the

23  historical information.  Maybe I'm wrong.  Sir.

24           MR. DAVIS:  Good afternoon.  Joe Davis of Greenberg

25  Traurig on behalf of AAFAF --

 1              THE COURT:  I'm sorry?

 2              MR. DAVIS:  It's a pleasure to be able to walk to

 3      court instead of getting on an airplane.

 4              Your Honor, we hear you as to how you would like to

 5      handle the existing documents, the historical documents if you

 6      will.  With regard to PREPA, I believe it was seven documents.

 7      It was approximately 40 with regard to the Commonwealth.  But

 8      to reiterate something that Mr. Mashberg raised and Ms. McKeen

 9      was alluding to, we've gotten through the portion of the motion

10      that was articulated with some level of specificity so we would

11      know what we are doing.  If I were in your shoes, what I would

12      be wondering is what is it that people want next.

13              The February 26 order is a prospective order.  It sets

14      forth a process by which documents are to be evaluated for

15      purposes of whether they should be produced, and there's no

16      reason to suggest that that mechanism is working wrong.

17      There's certainly no evidence before you that it's working

18      improperly.  We have a motion here of 47 documents.  We're

19      dealing with that.  There's a protective order in the PREPA

20      case already in place.  It's functioning just fine with regard

21      to the existing Rule 2004s that were referenced by

22      Mr. Horowitz.  An enormous amount of material was produced in

23      connection with the DIP fight.  The Rule 2004 request largely

24      focused on the anticipated DIP fight because we all knew that

25      PREPA was going to at some point run out of money for all the

1    obvious reasons.  I typically teach my associates to use

2    metaphors in their arguments, but the thing about the PREPA

3    situation, Puerto Rico in general and PREPA particularly is

4    there is no metaphor that is more dramatic or compelling than

5    what happened with the hurricanes.  So everybody knew PREPA was

6    going to run out of money.  And we produced documents

7    consistent with that.

8         Approximately a week ago we received a letter that has

9    started up the balance of the Rule 2004 process, so there's no

10   suggestion that isn't working the way it should.  And I'm

11   worried now that there's some request for some sort of

12   broad-based relief from you that is in the absence of the

13   parties' experience and certainly in the absence of any

14   meet-and-confer.  If you look carefully at the motion papers

15   with regard to PREPA, the only meet-and-confer that we had was

16   over the procedural mechanism to get this before you.  We

17   didn't have a substantive meet-and-confer even though it was

18   seven documents.  So I'm okay with dealing with the seven

19   documents in the context of the existing protective order, and

20   my prediction is we will all be back in front of you to deal

21   with whether they're confidential, but hopefully that doesn't

22   turn out to be the case.

23         THE COURT:  But why are you here at all?  Just because

24   you can walk over.  Because on the one hand you tell me that

25   you have a process that's working, and then I get a filing that

1    says nothing has been produced.  So there's a disconnect here

2    that has a nuance to it that I'm not picking up.  I apologize.

3              MR. DAVIS:  We didn't draft the motions.

4              THE COURT:  It got filed, so not everybody thinks it's

5    working.

6              MR. DAVIS:  But it's not as if there's a lack of

7    documentation that's been provided.  In fact, in terms of

8    transparency, because of the data room process, all of the

9    movants have the information.  In the ordinary course there is

10   a motion to compel filed because there's a body of documents

11   out there nobody has seen.

12             This is an unusual situation.  They've got the

13   documents.  We have all seen the documents.  The question is

14   whether they're now being produced.  And Your Honor has been

15   very clear that you wouldn't treat those under the terms of the

16   protective order at which point they will be deemed produced,

17   is my expectation of your order.  And if we're talking about

18   the 47 documents in question, that's something all of us can

19   handle.

20             I am concerned that there is now an abstraction being

21   introduced into the proceeding that is not so precise because

22   it hasn't been dealt with.  That's my concern, is that whatever

23   we're going to do hereafter in this hearing, it's going to be

24   going down the path of some sort of an order that's divorced,

25   if you will, from the actual litigation.  Because as Your Honor

1    knows, this is an unusual state in that among other things

2    there's no contested matter pending, there's no adversary

3    proceeding that this emanates out of.  There's no plan of

4    arrangement on file.  We're dealing with this somewhat in the

5    abstract.  And it would be a preference of the respondents that

6    we not have to deal with orders that produce -- that provide or

7    require further behavioral limitations that are also going to

8    be issued in the abstract.

9         THE COURT:  So under the PREPA order, how do you

10   handle the new documents that are going in the room?  Where do

11   they fall into the disclosure?

12        MR. DAVIS:  We're literally dealing with it for the

13   first time, in that -- well, actually PREPA is a good example

14   because PREPA is an operating entity in addition to being a

15   governmental entity.  So PREPA has weekly reporting under the

16   DIP order that goes into the data room.  So there's a constant

17   flow of data in the data room.

18        The first time we were asked to deal with any

19   documents outside the mediation and NDAs that are attendant to

20   the data room are the seven documents that we're fighting about

21   now, except back in February.  And back in February we worked

22   it all out.  Evidence was put on.  Depositions took place.  It

23   worked pretty seamlessly.  There were not motions to compel

24   additional documents or designation fights.

25        THE COURT:  How did it work?

```
 1          MR. DAVIS:  How did it work in February?

 2          THE COURT:  Yes.

 3          MR. DAVIS:  Very pragmatically.  I would receive

 4   requests from movants that they want to produce a certain

 5   amount of documents.  We would make them available as fast as

 6   we could to the extent they weren't already available, but

 7   obviously there were additional documents that were produced.

 8   They were then used under a confidentiality designation --

 9   confidential designation in the various depositions and at the

10   hearing.  And I honestly don't remember anybody calling and

11   fighting over the designation of any document.

12          THE COURT:  All right.  So what the movants are saying

13   to me now is that when things like this happen, it's too

14   compressed and too crazy to be doing it on an item-by-item

15   basis because they can't predict when the next motion is coming

16   or when the next analysis needs to be done.  I think that's

17   what I'm hearing.  So they're saying, Can we come up with a

18   process that makes it go more smoothly.  It seems to me

19   everybody is sort of past the fight of are these documents

20   appropriate in the 2004 context now that we're dealing with the

21   certified plans.  So we're past that.

22          My concern in February was that I didn't know if we

23   were talking about rooms full of documents or categorized

24   documents.  The process that I had envisioned is actually what

25   happened, which was, you know, the movants say these are the 47
```

1    we're talking about, what's the fight?  So that all worked.  I

2    know we're still talking about the 47, but those worked.  But I

3    think it's legitimate, and I'm not prepared to -- I'm prepared

4    to give you the opportunity to work on the way it should

5    happen.  But conceptually, if we agree that these documents are

6    appropriately 2004 documents, if there are -- I like the idea

7    and you all need to think about it more, but I think the idea

8    of having the initial designation come from the respondents to

9    say, We're all agreeing that these are the fiscal plan

10   development documents and they're going to be subject to the

11   protective order.  I like the idea of it being a separate

12   folder where you don't need my involvement in that.  That

13   happens.  All right?  So I certainly will give you an

14   opportunity to work out the details of that, but I'm not sure

15   we're really fighting about a whole lot here.

16        MR. DAVIS:  I would hope that we're not.  But as I

17   said, movants have made comments in this hearing that would

18   indicate that they're looking for something more, and it's the

19   more that we are concerned about.  Managing the existing data,

20   if you will, is something we can all get our arms around

21   because we know what it is.

22        Here is an example, Your Honor.  Emergencies happen in

23   bankruptcies.  They happen in every one.  Sometimes you can

24   anticipate it coming up.  Sometimes you can't.  It's like

25   injunctions, very much like injunctions.  Sometimes you can see

1   it coming, but oftentimes you can't.  And so there's a flurry

2   of activity.  The nature of restructurings is filled with

3   emergencies because everyone shows up harmed.  Everybody is in

4   an impaired state in a bankruptcy.  So in the context of trying

5   to avoid rapid activity, if you will, and quick e-discovery,

6   you can only anticipate what is obvious, which is to say yes,

7   at some point a planned arrangement will be filed.  Clearly

8   that's going to happen.  And so if we're talking about

9   discovery that ultimately related to that process, at least we

10   as the parties understand then roughly at least what the

11   parameters of that would look like.

12          But in terms of anticipating fights that we cannot

13   project, whether it's a financing fight, whether it's some sort

14   of regulatory -- whatever it is, we're not soothsayers, and

15   discovery wasn't set forth for situations where there isn't a

16   definitive structure in place, a procedure in place in order to

17   go forward.

18          THE COURT:  So do you agree or not that the fiscal

19   plan development documents that are being generated I guess now

20   and for the plan that will be certified are producible under

21   2004?

22          MR. DAVIS:  Going forward?

23          THE COURT:  Yes.

24          MR. DAVIS:  I can only speak for PREPA.  And in terms

25   of certified fiscal plans, it's always our intention to be

1    transparent and produce those, so yes would be the answer.

2         THE COURT:  Is there any problem for them to be

3    produced sooner rather than later?  Because I just remember

4    from the first hearing us having a discussion that said we

5    don't want to end up at the end and starting all over with

6    discovery.

7         MR. DAVIS:  To be fair, Your Honor, first of all, just

8    in full disclosure, PREPA wasn't a party to the first hearing.

9         THE COURT:  I'm not holding you to -- it wasn't a

10   court ruling.  It was just a sense of, if everybody is working

11   together to make sure that appropriate things are disclosed.

12        MR. DAVIS:  Correct.  We think it's a manageable

13   process.  We are certainly committed to being transparent about

14   it.  And I don't think we will have fights over that part of

15   it, which is why I don't think there's a necessity for any

16   additional orders with regard to them because I think everybody

17   knows how to act, other than the protective order, but again in

18   the PREPA case, we already have the protective order and

19   there's about to be one in the Commonwealth case.  It's the

20   past part that we have a discussion today about, and again,

21   that's a classic discovery dispute, and that was one that we

22   could articulate.

23        THE COURT:  All right.  So for the seven documents,

24   what's your position?

25        MR. DAVIS:  We would prefer that they not be deemed

1    producible now.  We hear Your Honor's message, and I'm not

2    going to swim against the stream if I don't have to.  We have a

3    protective order in place, and we will treat them in accordance

4    with the protective order.

5           THE COURT:  Thank you.  I think it's back in your

6    court, Ms. Zecca.

7           MS. ZECCA:  So going forward, I think we understand

8    what the court is inclined to do as a process.  And I just

9    wanted to note that the fiscal plan development materials,

10   that's a shorthand the parties developed for documents

11   responsive to requests 8, 16 and 17 of our initial requests, so

12   that's what we're talking about.  And if there are responsive

13   documents, they go in that folder.  And if it is something

14   created especially for mediation, it's a mediation material.  I

15   think that's the dynamic.

16          THE COURT:  And the process that you will develop will

17   allow for a challenge to specific documents, and the court can

18   resolve that?

19          This is my problem.  This is why I don't want to write

20   the words as to say which are the fiscal plan development

21   documents because everybody nods at me and everybody says they

22   agree on the words and then they don't all agree on a specific

23   document.  So I'm envisioning a process where that happens,

24   where you're able to eliminate the ones that are just not in

25   dispute.  You know, the producing party has so designated them,

1    it moves forward.  And then there's a mechanism when you turn

2    around and if you say, Look, I think this should fall into that

3    category and they say no, there's a way to resolve that.

4          MS. ZECCA:  We agree with that, Your Honor.  I was

5    just pointing out that's a shorthand for three specific

6    document requests, so it's not a -- it's not a limitless

7    conceptual concept.  We have three requests.  That was our

8    shorthand description for those three requests.  That's what

9    we're talking about.

10         THE COURT:  Okay.

11         MS. ZECCA:  I think that takes care of going forward.

12   Historical, I can represent that the 47 documents in our motion

13   were everything in the data room that movants considered a

14   fiscal plan development material as of the date we filed, which

15   is I think April 9.  So we're not going to go back and say, Oh,

16   there's this other thing that went up last August that --

17   that's our list of what was there as of the time of the motion.

18         I think there's a couple of documents that have been

19   posted in the interim, and my recollection is they are only

20   models, certainly the model underlying the current certified

21   fiscal plan, which respondents I think agree to produce

22   pursuant to Rule 2004.  There might be one other model that was

23   posted for one of the Commonwealth draft fiscal plans, but

24   that's it.  But it's not -- Your Honor, the court is right this

25   is not a huge volume of documents of what's in the data room.

1          As for the 47, we think those should be produced.

2     It's not a lot of documents.  In fact, I think six or seven of

3     them they said in their opposition are factual materials and

4     will be produced anyway.  And we don't believe we should have

5     to make the kind of specialized good cause showing that I heard

6     respondents' counsel articulate.  That essentially requires us

7     to say why we need to use the documents or why they're relevant

8     to this specific time.  That's really revealing our litigation

9     strategy.

10          The fact is the court has already found, correctly so,

11     these display the historical, present and future financial

12     condition of the debtor.  Therefore, that should be sufficient

13     for them to be produced under Rule 2004.  It's not that many

14     documents.  The only burden argument I heard is them saying we

15     don't want to have to prepare witnesses on these because we

16     think the only thing that's relevant is the certified plan

17     going forward.

18          I think the court actually articulated our position,

19     which is, the certified plan, you have a certified plan.  You

20     might want to compare and contrast what was done in the past.

21     That is something parties typically do in discovery.  That's

22     something we may want to do here.  And that's why the

23     historical documents need to be shown in discovery and analyzed

24     for these purposes, and it's really, we're talking about the 40

25     to 47 documents.  It's not that many documents.

1        And I would say respondents may not think that's

2   important or where they want to focus, but it's relevant to the

3   financial condition of the debtor.  And movants may think it's

4   important to focus on that.  Movants' plan of adjustment may

5   want to say we need to look back at what happened in the 2017

6   certified fiscal plan because there's an important element of

7   that that's been jettisoned here that shouldn't have been.

8   Respondents may not want to do that but movants may, and that

9   should be our choice to do it.  And given the limited number of

10  documents, there's no reason not to enter that order now.

11       I will also say I heard Ms. McKeen say that you don't

12  need to produce the old documents because some of that same

13  information is getting rolled up into newer documents.  Then

14  fine, that just reduces the burden on them.  If they're going

15  to be preparing their witnesses on new documents anyway, then

16  they'll be comparing them on the same materials.  But for 40

17  documents that are clearly relevant to the financial condition

18  of the debtor, we think there's no reason not to have those

19  produced right now.

20       THE COURT:  So Ms. McKeen, let me just confirm,

21  though, we all agree that these documents do relate to the

22  financial condition of the debtor.  It's just a question of

23  whether it's relevant data because the certified plan is no

24  longer operative?  Are there documents within these that you

25  want to challenge as being covered by 2004, or is it just

1    easier to say, we'll live with 47, but we hear that this is the

2    end of the historical data?

3        MS. McKEEN:  Like Mr. Davis said, I don't want to swim

4    upstream here.  I think that sort of intellectual tussle we

5    have with it is the idea that these old historical plans and

6    models I think don't necessarily shed light on the current

7    financial condition of the debtor.  Of course when movants

8    filed their 2004 papers, what they represented that they were

9    seeking was information that they said was directly relevant to

10   the current and projected financial condition of the

11   Commonwealth.  And now what I hear is sneaking in this word

12   "historical" when of course that's not actually the purpose of

13   Rule 2004 discovery.  But again, we just have kind of a tussle

14   over the relevance of things that are now obsolete.

15       THE COURT:  So I'm not -- you may be 100 percent right

16   that they're irrelevant, but I'm not prepared to make that

17   ruling in an abstract.  So I think it is fair to say that we

18   have a representation that is binding that these 47 documents

19   are the remaining documents that the movants believe are fiscal

20   plan development documents through April 8 or --

21       MS. ZECCA:  I think 9th is the date we filed, Your

22   Honor.

23       THE COURT:  -- April 9 of what has been produced

24   that's in the data room.  All right.  Those will be deemed

25   produced subject to the protective order that you're all about

1    to agree on.  And if you don't agree it on it, you'll let me

2    know.  Sir?

3          MR. HOROWITZ:  Thank you, Your Honor.  Greg Horowitz

4    on behalf of the PREPA movants again.  Just closing the loop,

5    I'm hoping that the court is ready to also give an order with

6    regard to the seven PREPA documents.

7          THE COURT:  Yes.

8          MR. HOROWITZ:  What we didn't hear or address and get

9    is a commitment along the lines of the Commonwealth commitment

10   to produce future fiscal plan development materials with regard

11   to PREPA in a PREPA folder along the same lines.  There are

12   subsequent materials, there's a new model in connection with

13   the new PREPA plan that's not included, for example, in those

14   seven documents to my understanding.

15         THE COURT:  So the only disconnect I'm hearing is

16   whether or not you need that order or whether you believe it's

17   covered by your confidentiality agreement already.  Like, if

18   I'm hearing that it's working --

19         MR. HOROWITZ:  Your Honor, I think I need to be a

20   little clearer on this.  There has been material produced in

21   several different contexts.  One is that material was produced

22   into a data room.  "Data room" is unfortunately an ambiguous

23   term in this case.  It's used for a lot of different things.

24   In connection with the DIP motion as a contested matter, that

25   was real produced material, and it was produced subject to a

1    protective order like ordinary litigation.  There was also, as

2    Mr. Davis correctly referred to, when there was a final

3    conceptual DIP order entered, there were certain reporting

4    requirements that were imposed on that, that material had to be

5    produced, which would be available to the PREPA creditors.  And

6    that has also been produced, I believe in the data room.  That

7    is not -- that's not produced in mediation.  That's not subject

8    to the mediation confidentiality agreement, so that's a

9    separate set of information.

10          And then there is material that has been produced only

11   in connection with mediation, the material that I said people

12   really shouldn't be properly be referring to.  The seven PREPA

13   fiscal plan development materials we referenced in the letter

14   have been produced, have been put into a mediation data room in

15   that context, and that's what we're seeking an order that they

16   will be deemed produced on.  That was lousy syntax, but I think

17   you understood what I was saying.

18          THE COURT:  So was the concern again on the number,

19   that it was opening the door, or is this -- this is the

20   swimming upstream.  Can we just say that these seven documents

21   are produced subject to 2004, subject to the confidentiality

22   agreement?

23          MR. DAVIS:  Subject to the protective order, yes, Your

24   Honor.

25          THE COURT:  Yes.  I'm sorry.  Subject to the

1    protective order.

2            MR. HOROWITZ:  I was just extending that, Your Honor.

3    There has subsequently been additional information, a model

4    supporting the new PREPA fiscal plan that's also been produced

5    in the context of mediation we need to also have included in

6    that commitment and then --

7            THE COURT:  So I'm not going to do that, right?  I'm

8    going to do this is historical as of April 10 or 8 or whatever

9    date it is as of the filing of the motions.  I think I need to

10   give you all a little time to come up with what happens in the

11   future, but the expectation is that what you come up with is a

12   way to get these types of financial plan development material

13   put into a format without me having to vote on every document,

14   where they will be produced subject to the protective orders

15   that you've agreed on both in PREPA and otherwise, and that

16   there be a mechanism for disputing of whether additional

17   material should be put into that category.  And there needs to

18   be -- do I need to rule on when it gets designated?  I leave it

19   to you.  See if you can work out at what point the designation

20   of confidential or not --

21           MR. HOROWITZ:  I think the parties were going to pick

22   out --

23           THE COURT:  The expectation is it would be sooner

24   rather than later.

25           MR. DAVIS:  Yes, Your Honor.

```
 1              THE COURT:  So if I say -- how much time do you think
 2       it will take, reasonably?
 3              MR. HOROWITZ:  To work out a mechanism for the parties
 4       to agree?
 5              THE COURT:  To move forward.
 6              MS. McKEEN:  Two weeks.
 7              MS. ZECCA:  Two weeks.
 8              THE COURT:  Two days?  Oh, two weeks.  I thought you
 9       said two days.  Two weeks.  You have two weeks.  All right.  So
10       that's both PREPA and other.  Okay?
11              MR. HOROWITZ:  To be clear, Your Honor, that's two
12       weeks for the mechanism going forward, not for the material
13       that's already been identified?
14              THE COURT:  Well, you're still -- I'm expecting within
15       the two weeks -- I don't see that there's a crisis within these
16       two weeks to have these documents, is there, that I'm missing?
17              MR. DAVIS:  No, Your Honor.
18              THE COURT:  Because you still have to finalize the
19       confidentiality agreement, right?  There is, I guess my order
20       will say that I've accepted and is binding absent an act of God
21       that these are the documents that are in dispute historically,
22       have been identified in connection with these motions, all
23       right, and that going forward that's the mechanism that you'll
24       come up with.
25              I keep thinking I'm really clear, and then everybody
```

1    tells me that I say things differently, so I don't know.  Okay?

2         MR. HOROWITZ:  Thank you.

3         THE COURT:  Everybody is sort of nodding at me.  All

4    right.  Sir?

5         MR. BASSETT:  Very briefly, Your Honor.  Nicholas

6    Bassett from Paul Hastings on behalf of unsecured creditors.

7    We did not file a motion to compel today, but we did file

8    joinders in the original Rule 2004 motion and the renewed

9    motion.  And I would just like to say that as a joinder in

10   those motions, we would expect to have the benefit of the

11   court's ruling today and have access to any information that is

12   produced, and of course we are willing to sign any protective

13   order that the parties agree to.  Thank you, Your Honor.

14        THE COURT:  Does that raise any issues that anybody

15   needs to respond to?

16        MR. DAVIS:  No, Your Honor.

17        THE COURT:  Okay.  So you have two weeks to come up

18   with the future.  In the past, what I've ruled on is that these

19   documents will be subject -- will be deemed produced subject to

20   the protective orders that you're negotiating.  And that's the

21   47 and 7 or 40 and 7.  I don't even know how many I should say.

22   Whatever has been identified in your motions.

23        MR. HOROWITZ:  Just for clarity for the record, Your

24   Honor, in PREPA we actually do have an agreed and entered

25   protective order.

```
 1              THE COURT:  Right.  But I thought you were going to
 2    change some of the words to make them consistent?
 3              MR. HOROWITZ:  I don't know that anybody thought there
 4    was any need for that, Your Honor.
 5              THE COURT:  Okay.  So then you're subject to it.  And
 6    you know which seven documents you're talking about?  Everybody
 7    knows which ones you're talking about?
 8              MR. DAVIS:  Yes, Your Honor.
 9              THE COURT:  Everybody but me.  There you go.  Okay.
10    Does that deal with the motion to compel?  Good.
11              Now my favorite subject, the motion to remand.  Here
12    you are back at where I thought you would be without a detour.
13    Welcome.
14              MS. HALSTEAD:  Thank you.  Good afternoon, Your Honor.
15    Ellen Halstead of Cadwalader, Wickersham & Taft, for Assured
16    Guaranty.  I guess, Your Honor, you can let me know how you
17    want to proceed.  I was planning just to go through the issues
18    of the parties and identify in joinder for threshold legal
19    issues.
20              THE COURT:  So part of my issue with your threshold
21    legal issues is they're very fact-specific, so I think that we
22    need to deal with those kind of issues in the context of the
23    chart, the privilege log.  Like, how do -- I'm not sure how
24    these issues get presented to me in the context of the log, but
25    I'm hoping it's easier.
```

1           I mean, I'm hoping, like when you say to me there are

2   differences between, if it goes to the Oversight Board, that's

3   a waiver of privilege.  Can we do that sort of categorically

4   based on the descriptions in the log?  I'm open to suggestions.

5           MS. HALSTEAD:  Well, quite frankly, Your Honor, the

6   movants' thinking was that we would select documents for in

7   camera review to you.  And the protocol that we proposed was

8   taking about approximately 12 categories on the logs, having

9   the respondents collect those documents from those categories

10  and submitting those documents to you in camera.  Then Your

11  Honor can decide if you want to view two documents in a

12  category or 50.  It would certainly be up to the court.

13          When we brought that proposal to the other side, they

14  said they couldn't do that because they had never collected the

15  documents.  And so having identified the documents, having

16  reviewed the documents and don't have them in some sort of data

17  room where you could easily say, if we cited 12 categories for

18  in camera review, they apparently can't do that right now.  So

19  I think that's a problem.

20          And we do, we do recognize that the threshold legal

21  issues must might be easier to resolve if you are able to see

22  the documents.  We think that the court, though, could also

23  give guidance on legal issues that may allow us to move forward

24  on disputing various categories in the logs.

25          THE COURT:  I'm happy to talk about it in that

1    context, but it seems to me that everybody sort of knows the

2    law, and you're all citing the same cases about the law.  So it

3    really does become a very practical ruling, you know.  Maybe.

4    I guess the ruling is maybe, sometimes, it depends.  You know,

5    there is an issue on sort of should there be a universal ruling

6    that nothing should be privileged because of the balance --

7              MS. HALSTEAD:  Yes, yes, that is an issue, yes.

8              THE COURT:  And maybe that we need to set up a process

9    for how do we show that.  But my guess is that there's a more

10   practical argument because even that's going to come out as

11   sometimes.  My guess is that there are some documents that

12   maybe really are privileged that really shouldn't be disclosed.

13   I don't know.  I want the case where there's only one document,

14   and then the judges get to write a decision about the one

15   document on whether it's privileged or not.  I can do that.

16             So I'm trying to figure out really what the most

17   efficient way is forward with this.  I do think that it is

18   problematic that there aren't folders of documents.  I mean, it

19   does alter the discussion.

20             MS. HALSTEAD:  Yes.

21             THE COURT:  I don't have an easy answer.  But when you

22   say 12 categories, maybe that's the beginning of your

23   conversation with the other side that says these are really the

24   categories that we're looking at.  You know, how do we go

25   forward with that?  It seems to me some of these are more

1    clearly privileged than others.  Some of your concerns maybe

2    need to be refined.  Are there specific consultants that you're

3    really challenging?

4         MS. HALSTEAD:  Well, that is one issue with the

5    consultants.  Part of what I wanted to say today is they do

6    list about 20 consultants, and all they say is they played the

7    same role as the Commonwealth or the Oversight Board.  That's

8    all they say.  I don't even know what roles these various

9    consultants did.  And to essentially assert a blanket privilege

10   in all the communications, and in some cases there are

11   categories in the log where just the consultants -- there's no

12   officials from the Commonwealth or AAFAF or the Board.  And

13   also when we were meeting and conferring regarding the

14   privilege logs, even in the categories where there are people

15   from the Commonwealth listed or the Board listed, if DEFTEC is

16   also listed, there may be communications with DEFTEC, which is

17   one of the consultants, just internal communications.

18        So there probably are a lot of communications like

19   that, and I would submit, Your Honor, that is a really far

20   extension of the deliberative process privilege.  The

21   deliberative process privilege is supposed to cover policy

22   decisions of the government.  It's not supposed to cover, you

23   know, communications regarding advisors and, you know,

24   discussions about models and what projects and assumptions and

25   inputs to put in.  It shouldn't even be covering even drafts of

1    models.

2          Yes, we just had a long time discussing that there's

3    models in the data room, but they were likely exchanging

4    several versions of the model in these communications.  I think

5    if you asked them they would say that's clearly covered by the

6    deliberative process privilege.  I would say it's clearly not.

7    An Excel sheet with numbers and assumptions and some formulas,

8    that's not what the deliberative process is supposed to cover.

9    In Bhatia, Bhatia found a draft budget, just data and numbers.

10   And both the Supreme Court of Puerto Rico and then the superior

11   court addressing that specific document found that that was not

12   covered by the deliberative process privilege.

13         THE COURT:  But "draft," I think there, was used in a

14   different way than creating the document that was being

15   submitted.  I mean, I think the court used "draft" there as it

16   hadn't been adopted by the Oversight Board, but it was the

17   final version of what went to the Oversight Board.

18         MS. HALSTEAD:  Yeah, but I think that -- it's true

19   that that's a document they were looking at.  But why is the

20   last version -- that's the version that's not protected by

21   deliberative process and version 5 is protected.  I mean, it

22   just seems like data and numbers and projections and

23   assumptions, this is not the stuff that the deliberative

24   process privilege was intended to protect.  And if you look at

25   their privilege log, it looks to me they're withholding a lot

1    of documents on this basis, a lot.  And we really question how

2    they're not properly withholding these documents based on

3    Bhatia.

4         THE COURT:  So how -- do you have a suggestion as to

5    the most efficient way to present that to the court?

6         MS. HALSTEAD:  Well, we thought our suggestion was

7    that the court would address these threshold legal issues, and

8    we thought that that would provide guidance going forward.  It

9    seems to me from Your Honor's questions that you think that you

10   may need some more context from going beyond the legal issues,

11   perhaps additional briefing -- if any co-counsel want to speak

12   up -- perhaps additional briefing with us discussing the

13   various categories of documents.  Perhaps that might put some

14   context on these legal issues.

15        Again, I will say, though, we do have concerns with

16   the logs, we do.  And I just don't understand how they were

17   able to come up with these logs without reviewing any

18   documents.  That just sort of boggles our minds, that they've

19   really -- they could very well be withholding documents that

20   are not privileged at all, but they don't know because they

21   haven't looked.

22        THE COURT:  Let's address how the log was made first.

23   I think this is going to have to unfortunately take a multistep

24   process.

25        MS. McKEEN:  Your Honor, Liz McKeen for AAFAF.  I

1    think Your Honor is kind of keying in on what we think some of

2    the key issues are and how we think it makes sense to move

3    forward here.

4          With respect to the log itself, the movants actually

5    referenced these apparently 12 categories that they take issue

6    with in a meet-and-confer call with us on May 10 that we

7    conducted in preparation to file the joint report with the

8    court.  And we said to them, Okay, will you tell us what the 12

9    categories are so we can talk about it?  And it's now almost --

10   you know, it's over ten days later, and we're still waiting for

11   them to even identify those 12 categories.

12         I don't think the idea of an in camera review makes

13   any sense, precisely because part of the point of the

14   categorical log is to avoid the burden of having to go collect

15   every single document in a particular category, which we have

16   not done and which we specifically advised the movants that we

17   had not done in our transmittal letter that we sent back on, I

18   believe it was April 6.

19         THE COURT:  But how did you do the log?

20         MS. McKEEN:  How we did the log, I'm glad you asked.

21   They characterized it as it's a hypothetical process that we

22   sat around thinking of communications that occurred.  Nothing

23   could be farther from the truth.  There were detailed

24   conversations -- and I want to be careful about work product

25   issues and waiver issues.  But there were detailed

1    conversations that occurred between and among AAFAF, its

2    lawyers, its financial advisors and all of the various

3    custodians that are listed on this log to identify, Okay, who

4    did you talk to about particular issues.  We see these

5    categories of work streams relating to buckets in the fiscal

6    plan.  Who was involved in those conversations?  Were they just

7    internal, or did they involve external people?  Was it just,

8    for example, within DEFTEC, or was it between and among DEFTEC,

9    AAFAF and other advisors?

10            So there were very granular conversations.  This is

11   not a hypothetical exercise.  It was not a document-by-document

12   exercise, but it was highly fact-intensive and involved

13   hundreds of hours of attorney time and I think produced what

14   was lodged with the court, which is a very detailed document.

15   And I think that document should be the touchstone of how we

16   move forward.  I think they need to look at specific

17   categories.  And for example, if there's a category where they

18   think the privilege isn't properly being asserted because it

19   includes the Board and they think that's just legally not

20   appropriate, we should be talking about that category.  And if

21   there are other categories where they think we haven't given

22   them enough information to substantiate the claim of privilege,

23   an in camera review I think is a wrong tool to solve that

24   problem.

25            I think the appropriate tool to solve that problem

1    would be for us to provide declarations that would substantiate

2    why the privilege is being claimed with respect to that

3    category of information.  Here is what these advisors were

4    doing.  Here is what they were talking about.  Here is why that

5    was important to the process of developing the fiscal plan and

6    why, under the case law, that means the deliberative process

7    privilege should apply to these conversations.  And I think

8    that specificity would allow you to make a ruling.

9         But right now we're in this vacuum, where we've done

10   all this work and created the log.  They've said they have

11   issues and won't tell us what they are, and they've agreed to a

12   protocol where they were supposed to give us objections within

13   seven days and they're silent for over a month.

14        So I think the ball is kind of in their court to

15   respond with some specificity to our log, and I think that's

16   the right way to move forward here.

17        MR. MASHBERG:  Again, Your Honor, Gregg Mashberg on

18   behalf of the Oversight Board.  Very briefly, on behalf of the

19   Oversight Board, we conducted a very similar process with our

20   clients, with our colleagues and with our financial advisors in

21   order to come up with a categorical log that we presented and

22   is actually being updated again today pursuant to agreement.

23        There was a very significant back and forth on a daily

24   basis.  There were times when our advisors actually had a

25   document in front of them when they were explaining to us and

1    answering our questions regarding the establishment of these

2    categories and whose communications would fit within those

3    categories.  So I can tell you, as Ms. McKeen has just done,

4    that there was a very extensive process we went through.  We

5    did not go document by document.  We never thought that we had

6    to do that or that that made sense in the context of what we

7    were doing, including within the language of Your Honor's

8    February 26 order in terms of what we understood the

9    categorical log to be.

10        To go document by document, if that's what movants are

11   requesting, would cast this into an entirely different domain

12   and it would cost an absolute fortune, and it would take a

13   great, great deal of time and resources.  And I certainly

14   didn't read Your Honor's prior order to require that, nor do I

15   hope that Your Honor will order that at this point.

16        THE COURT:  No.  I agree that document by document is

17   not what I ordered and I am not ordering it.  But I want to

18   make sure -- I think that it's fair to have a question as to

19   whether you've covered all of the categories of documents, and

20   if they don't fit within this category, are the documents being

21   produced.  And I'm not sure how you do that without having

22   actually put your hands on a group of documents.

23        MR. MASHBERG:  Well, the client and the advisors did

24   have documents and their notes in front of them.  They didn't

25   go through all the documents, that's for sure, but they

1   understood and they discussed what it was that they were --

2   what documents that they did exchange with each other and with

3   their clients.  So this wasn't just done sitting around in a

4   room.  I mean, this was done with people looking at their

5   computers, looking at their notes, looking at their documents.

6            MS. McKEEN:  Just on behalf of AAFAF, with respect to

7   the same question because we did create our logs separately on

8   behalf of each of our own clients, because we were engaged in

9   this categorical process, rather than the process being about,

10  okay, let's look at individual documents and make sure we've

11  gotten them all, the process was focused on the categories of

12  activity that had been and the tasks that had been performed by

13  each of the relevant entities in terms of the creation of the

14  fiscal plan.  When we're talking about these deliberations that

15  are the very reason we're invoking the privilege and these

16  conversations with interim drafts and development of these

17  models, part of the touchstone of the analysis was what were

18  you doing, why were you doing it, who were you doing it with,

19  who did you talk to about it, and what documents would you have

20  exchanged as part of that process.

21           And so the effort was to be as comprehensive as

22  possible, precisely to make sure there weren't categories of

23  documents or things we were missing.  Of course we don't want

24  there to be an argument that we waived something because we

25  missed it.  Every effort was made to be as comprehensive as

1    possible as part of this process.

2         MS. HALSTEAD:  Just to address a few things they said,

3    then I have a suggestion of perhaps a way to resolve this

4    without discussing with the other counsel.

5         But one thing is, if you look at their cover letters,

6    they do not disclose this.  We learned how they put these logs

7    together for the first time on May 10.  We also aren't trying

8    to hide objections we have with the logs.  We didn't talk to

9    them -- after we raised the 12 categories, on the same call we

10   learned how they prepared their logs.  And quite frankly, that

11   really threw us for a loop, and we realized we had to go back

12   to the basics, that we had some real issues with how they put

13   the logs together, and it really didn't make sense for us to

14   identify 12 categories where we had some far more basic

15   concerns about the logs.  That's why we didn't do it.

16        We do -- just to be clear, we do have other objections

17   with the logs.  We weren't trying to delay or anything like

18   that.  It's just that these deliberative process privilege

19   issues were being briefed.  We put in the papers that we've

20   reserved all of our objections regarding the logs.  And quite

21   frankly, Your Honor, every single entry in the log has a claim

22   of deliberative process privilege, every single one.

23        THE COURT:  Well, I think that was the point of the

24   log.

25        MS. HALSTEAD:  Right, yeah.  But other objections, for

 1   instance, they assert common interest privilege between the

 2   Board and the Commonwealth.  You know, I think there are some

 3   questions whether the common interest privilege exists when

 4   they're having disputes regarding the fiscal plans.  So there

 5   are other issues we have with the logs.  We also have issues

 6   with the descriptions.  A lot of them are very general.

 7         But putting all that aside, I think, you know, they're

 8   saying there's this massive burden for them to, you know,

 9   review documents and that sort of thing.  I think we could come

10   to an agreement for them to search specific custodians for a

11   certain date range with certain search terms and we could come

12   up with a narrow universe, and then that universe could

13   either -- could be submitted to Your Honor for in camera

14   review.  I think that's the way to go about it.  And again, you

15   know, they have produced emails in other cases in the

16   Commonwealth/COFINA adversary, they produced 40,000 documents.

17   I mean, it's not unusual.

18         THE COURT:  The question is whether I'm doing that in

19   in camera review.

20         MS. HALSTEAD:  I'm not suggesting that at all, Your

21   Honor, but I'm suggesting a more limited subset that I think we

22   could come up with something, some limited universe for an in

23   camera review.

24         THE COURT:  Let's try that second, all right?  And

25   mostly because I have found that even in cases that are much

1    more finite, an in camera review by the court that doesn't

2    really know all the players and all the intricacies makes it

3    difficult to come up with a fair ruling.  So I'm not ducking

4    the work.  I'm just not sure it's the most efficient use of

5    everybody's time.  But I do think the burden is on the party

6    claiming the privilege, and they have to justify it.

7            MS. HALSTEAD:  Yes.

8            THE COURT:  And I do think that the idea of an

9    affidavit or declaration by someone with knowledge makes sense.

10   I do think linking it to the privilege log at least to start

11   makes sense.  Maybe this is where you start with categories.

12   Do you say, Look, we're not buying all of these consultants, or

13   we don't know, we don't know, and if you're going to claim

14   privilege on -- and you don't need to give them every single

15   document in here, but you can give them categories and say, I'm

16   having a real hard time figuring out how these people can all

17   be privileged; you need to prove it to me.  Or you can say to

18   them, Look, on this date, you submitted a draft to the

19   Oversight Board.  After that date, you know, I don't see how

20   you claim a privilege.  I mean, is 12 really a number, or is

21   everybody just --

22           MS. HALSTEAD:  That was -- we just -- again, it was

23   supposed to be, intended to be a sample of categories that we

24   saw as problematic as we saw that didn't appear to have a real

25   basis, but it was just supposed to be a kind of a sampling.  It

1    wasn't supposed to be all of our objections, absolutely not.

2    It was sort of to try to narrow the universe to try to agree on

3    something to submit for an in camera review when we suggested

4    that.

5          THE COURT:  So instead of doing that as in camera

6    review as the next step -- and maybe it's not 12, maybe we try

7    it with five and see how that works -- but that you submit

8    those objections, those categories to whichever entity is

9    claiming the privilege, have them have the burden of arguing

10    why they think it is privileged.  And then if that's not

11    persuasive to you, then it comes to me in a context that I can

12    look at.

13          I'm happy to do it sooner rather than later, but I

14    think I need to at least give it a shot to see if that kind of

15    process will work here.  I don't have a whole lot of creative

16    ideas at the moment.  If I sit here long enough, God knows what

17    I'll come up with, but I think something like that.

18          MS. HALSTEAD:  Are you envisioning, Your Honor, like

19    we would do this in letters first and then if we were unable to

20    resolve the disputes, then we would bring them before Your

21    Honor?

22          THE COURT:  Yes.  Then I will have a sense of what it

23    looks like.  I will have a sense of what they're claiming as

24    the privilege.  And I assume it's going -- they have to

25    convince you that it's privileged.  And if they haven't, then

1    you should be able to identify what component part -- which of

2    their arguments are you not buying?  Are you not buying the

3    factual argument, or you're not buying a legal argument, and

4    that way I can make a ruling.  I think something like that

5    would at least give us something more concrete to talk about.

6    I don't want this to drag on for the entire history of PROMESA,

7    but I feel like if there are certain very clear categories that

8    you think will generate that issue of law that you want me to

9    decide, that's a way to crystalize it.

10          MS. HALSTEAD:  Yeah.  I think one suggestion in order

11   not to drag this on, I think you suggested five categories.

12   Quite frankly, I think we should bring as many objections as we

13   can as part of this.  Otherwise, we're just doing it piecemeal,

14   and I'm afraid the process will drag out.

15          THE COURT:  I'm okay if you're okay.  I think they

16   wrote a book like that.  I'm just trying to figure out how to

17   see if the process is working.  So why don't I not set the

18   limit.  Why don't you see if you can agree on it.  But the idea

19   would be that it's without waiver.  And what I would like to

20   see is a way to determine whether this type of process where

21   the party claiming the privilege has the burden, if producing

22   those types of declarations are a good way to crystalize the

23   issue that the court needs to decide.

24          If you think doing 12 or however many you want, I'm

25   not intending to limit your claims of objections.  I'm trying

1   to develop, if we try it that way and it's not working that way

2   but maybe one deposition will solve the problem.

3          MS. HALSTEAD:  I was going to suggest if they're

4   putting in declarations, we may need some way to rebut that

5   testimony, and we're obviously --

6          THE COURT:  They need to present -- they need to

7   convince you.  I mean, that's the point, right?  They're

8   claiming a privilege.  You need to look at it and say, I'm

9   either accepting it, it's either persuasive, or I need more

10  information.  You can try to work it out.  Or we're just not

11  accepting this as true, or we have a legal issue that says you

12  can declare this all you want, we've now got the facts, but we

13  don't agree with you as a matter of law.

14          But you're all quoting me the same cases on what the

15  standards are.  We're not fighting on the standards of

16  deliberative process.  What we're fighting on is how does that

17  relate to what's actually going on in this case.  And I'm just

18  trying to figure out the most efficient way to get to that very

19  concrete ruling.  I think the questions that you phrased in the

20  joint status report were too general for me to rule on anything

21  other than saying maybe, sometimes.  That doesn't move it

22  forward.

23          So I'm going to let you work on a process that you

24  identify the categories, the parties claiming the privilege

25  need to submit a declaration to you, and you then, if that

1     doesn't work, present it to the court.  You can talk about how

2     to present it.  If you can't agree on how to present it, file a

3     status report that tells me these are the different options

4     that we're proposing, or we need another hearing, you know, we

5     just need to talk about this.  But I think we need to anchor

6     the legal issues into some facts.

7              MS. HALSTEAD:  Okay.

8              MR. MUNGOVAN:  Your Honor, Timothy Mungovan for the

9     Oversight Board.  Could I be heard just briefly?

10             THE COURT:  Yes.

11             MR. MUNGOVAN:  Thank you.  Again, Timothy Mungovan for

12    the Oversight Board, Your Honor.  Just briefly, the Oversight

13    Board's privilege log currently has 59 categories, the copy

14    that I have in front of me, that's as of today, so this is an

15    updated version of it.  It's not the version that was filed

16    with the court.

17             The Oversight Board is fine in working through a

18    process with the claimholders, and we think you're right, Your

19    Honor, that there seems to be some type of fundamental

20    disagreement between the parties as to what is privileged.

21    What I want to address is what I think is the most efficient

22    path forward to get to a resolution from the court.  What I

23    would say is if we leave it to the claimholders to designate X

24    number, 12, 15, 20 of these separate categories, it will create

25    a lot of work potentially and needlessly.

1          What I might suggest is they pick their top five or

2     six, the ones that they think they doubt the most, and we can

3     then be put to the test of establishing the applicability of

4     the privilege that we have asserted.  And the process may drive

5     a resolution more efficiently.  If the parties have a

6     fundamental disagreement about the interpretation of the

7     relevant case law, which I think we may, once we get a decision

8     from the court, it may resolve the remaining 30, 40, 50

9     some-odd categories, rather than to force the parties to go

10    through the effort of defending a position on an evidentiary

11    basis, if you will, and then have the court decide one or two

12    or three, which ultimately ends up resolving all 30 or 40

13    challenged categories.

14          THE COURT:  So where do you think -- let me ask you,

15    do you agree that we need more facts for these legal issues?

16          MR. MUNGOVAN:  I do.  And I agree with the court that

17    having a process whereby the claimholders identify specific

18    categories that they want to challenge makes sense.  I agree

19    that the burden should then shift to the Oversight Board and

20    AAFAF and the instrumentalities to establish the validity of

21    the privilege that they're asserting.

22          What I would like to do, though, Your Honor, is to

23    focus on test cases.  Let's have five, let's have six, pick a

24    number of test cases.  Rationally the claimholders should pick

25    what they perceive to be the most important categories that

1   they believe we are weakest on, and then let's tee those up and

2   make the respondents be put to the proof of demonstrating the

3   applicability of the privilege.  And then if we can't

4   demonstrate it to the movants' satisfaction, then we have a

5   live issue that the court can join and adjudicate.  Thank you.

6           THE COURT:  So I think it shouldn't be an endless

7   number.  It should be somewhere between one and 12.  I don't

8   know if you want me to designate a number.  I agree that I

9   think we need to do it in a test case just to see if the

10  process works.

11          MS. HALSTEAD:  Yes, yeah, yes.

12          THE COURT:  Can you live with six?

13          MS. HALSTEAD:  We would prefer 12.

14          THE COURT:  Why don't I say not to exceed 12, all

15  right?

16          MS. HALSTEAD:  Okay.

17          THE COURT:  But you need to -- you're not waiving

18  anything.

19          MS. HALSTEAD:  Yeah, just so we're clear.

20          THE COURT:  You really want to deal with it in a

21  fashion so we can at least see if the process is going to work.

22          MS. HALSTEAD:  Yes.

23          THE COURT:  I'm not leaving out the ultimate question

24  of whether there should be any claim, but I also don't know how

25  to do that on an abstract basis.  So that's sort of in the back

1   scene and you can bring it up where you think it's appropriate.

2   I think it's easier to bring it up in a concrete manner if you

3   want to take a blanket argument that says, Okay, we see

4   everything that they've given us but the bottom line, the

5   balancing comes out to disclosure no matter what, you can argue

6   that.

7       MS. HALSTEAD:  Thank you, Your Honor.  Can we propose

8   some sort of schedule while we're all here?

9       MS. McKEEN:  Before we do that, one thing that might

10  make sense in terms of teeing up, as Mr. Mungovan said, test

11  cases and ways to sort of crystalize the issues.  To the extent

12  the court is willing to hear argument and consider the law and

13  facts as to 12 different categories, it might make sense to

14  have the movants select the six categories as to which they

15  feel they're strongest, best exemplify where the privilege

16  shouldn't apply and that we pick six categories as to which we

17  think the case for the privilege is obviously the strongest to

18  help, again, kind of get some test case rulings that will be as

19  broadly applicable to all the remaining categories moving

20  forward.  I think that might be the best way to divide up the

21  12 test cases so that you're getting the most illustrative

22  cross-section of what's in the logs.

23      MS. HALSTEAD:  I object to that.  I mean, every

24  document they're withholding should be privileged.  That's

25  their burden.  Like, we're just trying to contest what we're

1    seeing as not privileged documents.  For them to say, to show

2    their best cases, I don't see where that gets us anywhere.

3    Because quite frankly, all the documents -- they should all

4    have a basis for withholding documents as privileged.

5        THE COURT:  I think I'd like to leave that to the

6    second round.  I think maybe once we've come up with these sort

7    of parameters on some concrete documents there may be

8    categories that easily get knocked out, which I think is what

9    you're saying, right?  There are categories that you feel are

10   so obviously privileged that you shouldn't have to do anything.

11       MS. McKEEN:  That's right, Your Honor.  There are some

12   categories that are so core that I think your consideration of

13   both the law and maybe a declaration around that category would

14   not only tend to knock out that category but might give a

15   useful framework for other categories as well.

16       THE COURT:  I'm going to have the movants be able to

17   designate up to 12.  If you think I'm missing something, when

18   you see those categories, if you think that there are other

19   issues that really need to be decided first or whatever, I

20   mean, you need to start this conversation somewhere, right?  So

21   if the movants start with the 12, you take a look at it.  If

22   you think this is missing something, if you think this is

23   really not a smart way to do it, just file a motion.  Come

24   back, we'll talk about it, we'll figure it out.  But I think we

25   need to do this in a test-case scenario.  I ask you also to

 1  think about whether you need all 12.

 2          MS. HALSTEAD:  Yes, Your Honor.

 3          THE COURT:  Because if you do 12, they're going to

 4  spend time coming up with the declarations, and it's going to

 5  be delayed.

 6          MS. HALSTEAD:  Yes.

 7          THE COURT:  All right.  So it's going to be up to 12

 8  categories.  See if it works.  If you don't think it's working,

 9  just ask for a conference and we'll come back in and we'll

10  figure out why it's not working.  All right?  But I think those

11  were good suggestions of ways to deal with at least getting to

12  crystalize what the issues are that you need me to decide, and

13  I can't do it without some factual basis, okay?  And I don't

14  speak Spanish, so if the documents are all going to have to be

15  translated, we have another issue.  All right?

16          MS. HALSTEAD:  I assume we can work out a schedule.

17          THE COURT:  Do you want to do that now?  Do you want

18  to take a minute?

19          MS. McKEEN:  I think it would be best if we met and

20  conferred and maybe file something with the court.

21          THE COURT:  You need to report to me within a week

22  what your schedule is going to be.  How is that?

23          MS. HALSTEAD:  Thank you.  That works.  Thank you.

24          THE COURT:  Should I ask my favorite, is there

25  anything else, or should I just excuse you all?  All right.

 1    There's nothing else.  I don't see anybody jumping up and down.

 2    Thank you, all.

 3              COURTROOM CLERK:  Court is in recess.

 4              (Adjourned, 3:56 p.m.)

 5

 6              CERTIFICATE OF OFFICIAL REPORTER

 7         I, Kelly Mortellite, Registered Merit Reporter and

 8    Certified Realtime Reporter, in and for the United States

 9    District Court for the District of Massachusetts, do hereby

10    certify that pursuant to Section 753, Title 28, United States

11    Code that the foregoing is a true and correct transcript of the

12    stenographically reported proceedings held in the

13    above-entitled matter and that the transcript page format is in

14    conformance with the regulations of the Judicial Conference of

15    the United States.

16                        Dated this 24th day of May, 2018.

17

18                        /s/ Kelly Mortellite

19                        _____

20                        Kelly Mortellite, RMR, CRR

21                        Official Court Reporter

22

23

24

25