**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF PUERTO RICO**

-----------------------------------------------------------------x

**In re:**

**THE FINANCIAL OVERSIGHT MANAGEMENT BOARD FOR PUERTO RICO**

**as representative of**

**THE COMMONWEALTH OF PUERTO RICO, ET ALS.**
**DEBTORS**

-----------------------------------------------------------------x

**In re:**

**THE FINANCIAL OVERSIGHT MANAGEMENT BOARD FOR PUERTO RICO**

**as representative of**

**PUERTO RICO ELECTRIC POWER AUTHORITY.**

**DEBTORS**

-----------------------------------------------------------------x

**PROMESA TITLE III**

**NO. 17 BKT 3283-LTS**

**PROMESA TITLE III**

**NO. 17 BKT 4780-LTS**

**MOTION FOR RELIEF FROM AUTOMATIC STAY**

**TO THE HONORABLE DISTRICT COURT JUDGE LAURA TAYLOR SWAIN:**

**COME NOW, Antonio Fuentes-Gonzalez, Maria Ivonne Viguié-Fernandez, and the conjugal partnership constituted by them** (hereinafter referred as "Fuentes-Viguié"), through the undersigned attorneys and very respectfully state, allege and pray as follows:

**INTRODUCTION**

1.     This Honorable Court should vacate the PROMESA[1] automatic stay with regards to Fuentes-Viguié in the prepetition State Court Expropriation Case No. KEF 2012-0039, due to the fact,

---

[1] Acronym for the *Puerto Rico Oversight Management and Economic Stability Act*, Public Law 114-187.

among other reasons, that the continuation of the constitutional violations and/or irreparable harm against the rights of Fuentes-Viguié to receive the just compensation for the temporary taking of their property outweighs the detriment that the Puerto Rico Electric Power Authority (hereinafter referred as "PREPA") would suffer if the stay were vacated to address them.

## FACTUAL & PROCEDURAL BACKGROUND

2.      On February 29, 2012, PREPA filed a taking petition under Civil Case KEF 2012-0039, to acquire a right-of-way easement on the property owned by Fuentes-Viguié for the purpose of constructing the project known as the "South Utilities Corridor"[2], hereinafter referred as "The Corridor." Said case was filed before the Court of First Instance, San Juan Part, to obtain the right-of-way easement of 1,175.9715 square meters[3].

3.      "The Corridor" was a taking filed by PREPA acting in the furtherance of public health, safety and for the greater good of the public.

4.      Through the process of condemnation, PREPA kept the title of the property taken for easement, depriving Fuentes-Viguié of the total use of their property from February 29, 2012 to February 24, 2016, when the Court of First Instance, San Juan Part, granted the Motion for Withdrawal petitioned by PREPA. Said taking for the time of one year, ten months and twenty-five days by PREPA constituted a temporary taking for which PREPA is obligated constitutionally to pay Fuentes-Viguié for the just compensation.

5.      According to the Eminent Domain Law of Puerto Rico, the cause of action for the payment of just compensation for the temporary taking created after the withdrawal, can be exercised, like it was

---

[2] In Spanish, the name of the project is: "Corredor de Utilidades del Sur."
[3] Equivalent to 0.2904852 acres.

2

done in this case, within the same action as the taking. After all, this just compensation is the product of the withdrawal, and this, at the same time, is the result of the taking[4].

6.      After years of litigation, a judgment was rendered in which the Court understood that the just compensation owed to Fuentes-Viguié for the temporary taking of their property was the amount of $630,470.65[5], this amount includes interest until May 13, 2015. See Exhibit II. This is a firm and final judgment and accrues interest in the amount of eighty-six dollars and ninety-two cents ($86.92) daily, starting from the date of May 14, 2015, until the date of the total judgment payment.

7.      On August 14, 2017, PREPA presented a motion titled "Notice of Automatic Stay for PREPA Procedures under 48 U.S.C. Secs. 2101 et seq."[6]  In said motion, the Court of First Instance, San Juan Part, was notified that on July 2, 2017, the Financial Oversight and Management Board for Puerto Rico, hereinafter referred as Oversight Board, had presented a Bankruptcy Petition, hereinafter referred to as Petition, in the name of PREPA to the United States District Court for the District of Puerto Rico. This Petition was submitted in accordance with Public Law 114-187, known as the Puerto Rico Oversight Management and Economic Stability Act, hereinafter referred as PROMESA.

8.      In their motion, PREPA states that to the aforementioned petition applies, by express provision of PROMESA, the provisions of Chapter 9 of the Bankruptcy Code, 11 U.S.C Sec. 303, 901 (a) et seq. That pursuant to sections 362 and 922 of the Bankruptcy Code, the filing of the Petition has the automatic, immediate and direct effect of stopping any civil action that any natural or legal person has initiated, has tried to continue or for which the execution of a judgment has been requested against the government, while the bankruptcy proceedings are pending before the Court. For these purposes PREPA cites 11 U.S.C. Secs. 362 (a), 922 (a); 48 U.S.C. Sec. 2161 (a).

---

[4] Cynthia Torres Torres, *La Expropiación Forzosa en Puerto Rico: Ley, jurisprudencia, estudio y guía práctica, ed.*, San Juan 2002, p. 205.
[5] See copy of the judgment granted by the Court of First Instance, San Juan Part, in Spanish and the English translation, Exhibit I and IA.
[6] In Spanish titled, "Aviso de Paralización de los Procedimientos de la AEE bajo 48 U.S.C. Secs 2101 et seq".

9.      On August 21, 2017, the Court of First Instance, San Juan Part, granted the motion filed by PREPA and issued an Administrative Judgment in the case, paralyzing the proceedings in the takings case. This situation has forced Fuentes-Viguié to file this motion to lift the stay in this case, since this is the only remedy available to continue with the process to collect the just compensation that was awarded by the judgment for damages caused by the temporary taking of the property and guaranteed by the Fifth Amendment to the U.S. Constitution[7] and Art II, Sec. 9 of the Constitution for the Commonwealth of Puerto Rico[8].

10.     Although PREPA requested the stay in the Condemnation Proceedings pursuant to Title III of PROMESA, it has not disclosed before this Honorable Court the constitutional debt that is still, to this date, owed to Fuentes-Viguié, for the just compensation that resulted from the taking of their property.

11.     This constitutional debt has not been disclosed to this Honorable Court and was not included when PREPA filed in the case at bar a motion titled "Notice of Filing of Creditor List for "The Puerto Rico Electric Power Authority" on December 22, 2017, (See Docket 520) and is not included in any notices made to this court available to the public.

12.     Fuentes-Viguié is faced with no other option than to request immediate relief from the Automatic Stay from this court in order to protect their constitutional rights to just compensation for the temporary taking of their private property by PREPA, a right that is guaranteed by the Fifth Amendment to the Constitution of the United States.

13.     In view of the facts stated above, as a party of interest, Fuentes-Viguié must use all efforts to legally protect their constitutional rights so that they are not adversely affected by the Title III filing by PREPA.

---

[7] U.S. Const., amend. V.
[8] Art. II, Sec. 9 Const. ELA, 1 LPRA.

14.     Furthermore, at the present time PREPA has not filed any motion or written statement recognizing the claim of just compensation owed to Fuentes-Viguié as non-dischargable, and PREPA has not even included Fuentes-Viguié as a creditor on the Creditor List (See Docket (520).

**APPLICABLE LAW**

**BANKRUPTCY AND THE FIFTH AMENDMENT**

15.     The Takings Clause of the Fifth Amendment to the Constitution of the United States mandates that "private property [shall not] be taken for public use, without just compensation." U.S. Const., amend. V. This amendment is made applicable to the states, and thus to municipalities, through the Fourteenth Amendment. U.S. Const. amend. XIV; *Dolan DA v. City of Tigard*, 512 U.S. 374, 383 (1994); *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 122 (1978).

16.     The Supreme Court of the United States has explained that "because the Fifth Amendment proscribes takings without just compensation, no constitutional violation occurs until just compensation has been denied." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194 n.13 (1985). The Supreme Court further stated, "Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a 'reasonable, certain and adequate provision for obtaining compensation exist at the time of the taking." *Id*. at 194 (citation omitted). "[T]he property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure [for seeking just compensation] and been denied . . . ." *Id*. at 195.

17.     Thus, a Takings Clause violation is defined by two elements: (1) the public taking of private property, and (2) the subsequent denial of just compensation for that taking. See *Williamson,* 473 U.S. at 195 n.13.

18.     The Supreme Court has consistently held that bankruptcy laws are subject to the prohibition against governmental taking of private property without just compensation.  *Louisville Joint*

*Stock Land Bank v. Radford*, 295 U.S. 555, 55 S. Ct. 854, 79 L. Ed. 1593 (1935), *Blanchette v. Connecticut General Insurance Corps.*, 419 U.S. 102, 95 S. Ct. 335, 42 L. Ed. 2d 320 (1974).

19.     The Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during the period of the taking. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 318 (1987) Cf *United States v. Causby*, 328 U.S. 256,261 (1946).

20.     Temporary takings that deny a landowner all use of his property are no different in kind from permanent takings, for which the Constitution clearly requires compensation. *English Evangelical Lutheran Church v. County of Los Angeles*,482 U.S. at 318 Cf. *San Diego Gas & Electric Co.*. 450 U.S. 621,657 (1981).

21.     Where the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period which the taking was effective. *Berman v. Parker* 348 U.S. 26,33 (1954).

**PROMESA AND THE AUTOMATIC STAY PROVISION**

22.     The President of the United States signed PROMESA into law on June 30, 2016. Said legislation seeks to tackle the disastrous fiscal emergency in Puerto Rico and is designed to institute a "comprehensive approach to [Puerto Rico's] fiscal, management and structural problems and adjustments... involving independent oversight and a Federal statutory authority for the Government of Puerto Rico to restructure debts in a fair and orderly process." PROMESA 405(m)(4). The statute established a seven-member Oversight Board for Puerto Rico, which also includes an eighth member chosen by the Governor, with the purpose of providing a method for the island to achieve fiscal responsibility and access to the capital markets. *Id*. at §§ 101(b)(1).

23.      In relevant part, among PROMESA's provisions is an automatic stay of all liability-related litigation against the Commonwealth, which is applicable once the Board files a Title III petition to commence debt-adjustment proceedings under the legal framework set forth in the statute. *Id*. at § 405(d). Under PROMESA, the Honorable Court may, however, grant relief from the stay to a "party in interest" either "for cause shown", or "to prevent irreparable damage" to the party's interest in their property.

24.      In the recent case of *Brigade Leveraged Capital Structures Fund Ltd. v. Alejandro García-Padilla et al.*, 217 F. Supp. 3d 508, 517 (1st Cir. 2016), and in view of the fact that PROMESA does not define what constitutes cause for purposes of prevailing in a request for relief from the automatic stay, the First Circuit Court of Appeals established the governing standard for vacating the automatic stay "for cause" in the context of PROMESA. Specifically, the First Circuit held that, notwithstanding the actual necessity of the stay to address an imminent fiscal crisis, Congress anticipated that "certain circumstances might justify relief from the stay's significant and rigid effects. It therefore included a form of safety valve in section 405(e) of PROMESA to allow certain holders of liability claims against the Government of Puerto Rico to proceed with their actions, provided that they could effectively demonstrate "cause" for doing so". (Emphasis Added).

25.      Section 362 (d)(1) of the Bankruptcy Code, 11 USC § 362(d)(1), states as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—(1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

26.      In defining what constitutes "cause" for relief from the automatic stay in the context of PROMESA, the First Circuit took into account the (i) judicial interpretations of the term within the context

of section 362 of the United States Bankruptcy Code, 11 USC § 3621, and also, (ii) additional considerations related to the particular circumstances of the PROMESA legal framework. The Court began by noting that section of the Bankruptcy Code provides that courts may grant relief from the automatic stay to a party in interest for "cause", but the statute also fails to expressly define how the term must be construed and applied. 11 USC § 362(d) (1); *Brigade Leveraged Capital Structures Fund Ltd. v. Alejandro García-Padilla et al.*, 217 F. Supp. 3d 508, 517 (1st Cir. 2016).

27.     In *Brigade Leveraged*, the First Circuit reiterated the discretionary nature of the decision to grant relief on a case-by-case basis. See *Claughton v. Mixson*, 33 F. 3d. 4, 5 (4th Cir. 1994) (noting that Congress "has granted broad discretion to bankruptcy courts to lift the automatic stay and the courts must determine when discretionary relief is appropriate on a case-by-case basis".) The Court established that "the process of evaluating whether there is sufficient "cause" to vacate the automatic stay requires the court to engage in an equitable, case-by-case balancing of the various harms at stake. *Brigade Leveraged Capital Structures Fund Ltd. v. Alejandro García-Padilla et al.,* 217 F. Supp. 3d 508, 518 (1st Cir.2016); See, e.g., *Peerless Ins. Co v. Rivera*, 208 B.R. 313, 315 (D.R.I. 1997) (suggesting that cause generally exists "when the harm that would result from the continuation of the stay would outweigh any harm that might be suffered by the debtor…if the stay is lifted."); *In re Turner*, 161 B.R. 1, 3 (Bankr. D. Me. 1993) ("Cause may exist for lifting the stay whenever the stay harms the creditor and lifting the stay will not unduly harm the debtor."); *In re Harris*, 85 BR 858, 860 (Bankr. D. Colo. 1998) (holding that vacating the automatic stay is appropriate where "no great prejudice will result to the debtor" and the "hardship to the creditor resulting by continuing the stay considerably outweighs the hardship to the debtor by modification of the stay."). (Emphasis Added).

28.     In view of the foregoing, the First Circuit held that the Court's "ultimate task is to perform a careful balancing of the equities involved. It must assess the hardships realistically borne by plaintiffs if their requested relief is denied and determine whether those outweigh the harm likely to be visited upon

8

the Commonwealth defendants if that relief is granted". *Brigade Leveraged Capital Structures Fund Ltd.*

*v. Alejandro García-Padilla et al.,* 217 F. Supp. 3d 508, 518-519 (1st Cir. 2016).

29.     Even though the First Circuit held that the PROMESA stay is interpreted according to the

case law arising under section 362 of the Code, it stated that "the concept of "cause" embraced by the

Court for purposes of the PROMESA stay need not precisely mirror that adopted in the bankruptcy

context". *Id* at 520.

30.     In the case of *In re City of Detroit*, 524 BR 147 (Bankr. E.D. Mich. 2014), although a non-

binding decision, it is a persuasive decision that should be taken into account by this Honorable Court.

After wasting an extended amount of time submitting various amended plans of adjustment, the *In re City*

*of Detroit* court deemed that any claims that arise under the Fifth Amendment Takings Clause should be

excepted from discharge pursuant to Section 944 (c) (1) of the Bankruptcy Code. This Court decision was

availed and recommended by the Attorney General of the United States.

31.     In the aforementioned case, the Bankruptcy Court agreed with the Attorney General of

the United States in determining that in interest of avoiding a finding of unconstitutionality, the

Bankruptcy Court should use its discretion under Section 944 (c) (1) of the Bankruptcy Code to order the

nondischargeability of Fifth Amendment Takings Clause claims. *Id*. at 306-307.

32.     In particular, Section 944 (c) (1) of the Bankruptcy Code states that "the debtor is

not discharged under subsection (b) of this section for any debt – (1) excepted from discharge by the plan

or order confirming the plan," 11 USC sec. 944.

33.     This Honorable Court should avoid "interpreting [a statute] in a manner that would render

it clearly unconstitutional . . . if there is another reasonable interpretation available." *Edmond v. United*

*States*, 520 U.S. 651, 658, 117 S. Ct. 1573, 137 L. Ed. 2d 917 (1997); see *Lorillard v. Pons*, 434 U.S. 575, 577,

98 S. Ct. 866, 55 L. Ed. 2d 40 (1978) ("[I]t is a cardinal principle that this Court will first ascertain

whether a construction of the statute is fairly possible by which the constitutional question may be avoided.").

34.     Therefore, if the Constitution requires a money damage award, pursuant to the Fifth Amendment Takings Clause, the Bankruptcy Court should except the takings claims from Bankruptcy Proceedings. *In re City of Detroit*, supra. at 306-307.

35.     Additionally, "the Automatic Stay does not apply to the Condemnation Proceedings because they are proceedings initiated by (and not against) the Debtor". *In re City of Detroit Michigan*, Debtor Case 13-53846, Doc 5146, May 29, 2014, page 3, paragraph 6, Ordered Doc 5451, June 19, 2014.(Emphasis Added)

36.     In *Bevelle v. Jefferson County* (*In re Bevelle),* 348 B.R 812,819 (2016), the court found that the exception to the automatic stay established in sec. 362(b)(4) of the Bankruptcy Code would apply to eminent-domain condemnation when the government was acting "in furtherance of public health, safety or warfare."

## ARGUMENT

37.     At the present time PREPA owes Fuentes-Viguié, the amount of $630,470.65, this amount includes interest until May 13, 2015, for the just compensation for the damages caused by the temporary taking of their property. The principal amount accrues interest of eighty six dollars and ninety two cents ($86.92) daily, starting from May 14, 2015 until the amount is fully paid for. As of February 28, 2018, the total amount due, for the principal and accrued interest, is $719,236.62.

38.     Although PREPA has filed a list of Creditors (See Docket 520). In said list, PREPA does not include the constitutional debt owed to Fuentes-Viguié as a Creditor.

39.     Because PREPA has not recognized the debt owed to Fuentes-Viguié in the case at bar, it is denying Fuentes-Viguié the just compensation for the taking of their private property for public use, according to the Fifth Amendment Takings Clause. See *Williamson*, 473 U.S. at 195 n.13.

40.     This Honorable Court should evaluate PREPA's lack of recognition of Fuentes-Viguié's constitutional debt as "cause" for relief from the automatic stay in the context of PROMESA. *Brigade Leveraged*, *supra*, at 517.

41.     This constitutional debt granted by judgment originated from an expropriation proceeding from 2012 filed by debtor (PREPA), against Fuentes-Viguié. Such obligation was overdue prior to PREPA submitting their Petition under PROMESA (2017).

42.     Furthermore, this constitutional debt cannot be discharged in the case at bar, especially when such taking was done for the benefit of public use and in the furtherance of public health and safety.

43.     Although Courts have concluded that a debt's nondischargeability alone may not constitute "cause" for justifying relief from the automatic stay, said Courts recognize that if there are other factors involved the lift of stay may be allowed. *Disciplinary Bd. V. Feingold (In re Feingold)*, 730 F.3d 1268, 1277-1278 (2nd Cir. 2013).

44.     In *Feingold*, the Court stated the following:

> "We agree with these courts that nondischargeability alone cannot supply the cause contemplated by § 362(d)(1), otherwise the statutory automatic exceptions for the enumerated nondischargeable debts—like domestic support obligations—found in § 362(b) would be meaningless. *In re Mu'min*, 374 B.R. at 161 … **This is not to say that nondischargeability cannot be a factor, or even a weighty factor, in a bankruptcy court's evaluation of "cause,"** but the Disciplinary Board's possession of a nondischargeable judgment against Feingold, without more, is insufficient to warrant relief from the automatic stay." (omission and emphasis added).

45.     A review of *Feingold, supra*, will show that the *Feingold* Court remanded the case to the Bankruptcy Court so that it could gather more information and better evaluate, under the totality of the circumstances, if a party was entitled to relief from the automatic stay of a non-dischargeable debt, so long as it had other factors.

46.     In this present case, extraordinary circumstances exist. For **one**, a constitutional violation is imminent if PREPA indeed seeks to discharge its constitutional obligation. **Two**, PREPA has not even identified Fuentes-Viguié as a creditor, when a constitutional taking has occurred. **Three**, no taking cases are considered in the Fiscal Plan submitted by the Government, thus depriving any person with the right to just compensation who has been affected by the taking of their private property, in this instance Fuentes-Viguié. **Four**, the Automatic Stay does not apply to the Condemnation Proceedings because they are proceedings initiated by (and not against) the Debtor and such proceedings were for public use and in the furtherance of public health, safety and welfare. (Emphases Added )

47.     Even though the Courts recognize that an analysis of whether to enforce or vacate the stay usually relies upon a laundry list of assorted factors, said factors are not exhaustive. See, e.g., *Sonnax Industries, Inc. v. Tri Component Prods. Corp.* (*In re Sonnax Industries, Inc.),* 907 F.2d 1280, 1286 (2d Cir. 1990).

48.     This Honorable Court should pay special heed to the following Sonnax factors: **1)** whether relief would result in a partial or complete resolution of the issues, **2)** the interests of judicial economy and the expeditious and economical resolution of litigation; and **3)** impact of the stay on the parties and the balance of harms. See *id.* at 799-800. *Sonnax*, *supra*, at 1286.

49.     Regarding the first factor, lifting the stay will completely resolve the constitutional challenge that a constitutional creditor like Fuentes-Viguié may be able to exercise if their just compensation is denied. Just like in *In re Detroit*, this Honorable Court should avoid "interpreting [a statute] in a manner that would render it clearly unconstitutional . . . if there is another reasonable interpretation available." *In re City of Detroit*, 524 BR 147 (Bankr. E.D. Mich. 2014).

50.     Regarding the second factor, lifting the stay will protect the interests of judicial economy and economical resolution of litigation within these PROMESA Title III proceedings. This Honorable Court should note that if PREPA continues to ignore the Fifth Amendment creditors or

subjecting Fifth Amendment creditors to their Adjustment Plan or Fiscal Plan with the risk of being discharged, it will continue to delay time in the proceedings in later stages. These plans will be in danger of being constitutionally challenged in every crossroads by the Fifth Amendment creditors, subjecting this Honorable Court to keep seeking ways to avoid interpreting the PROMESA statute in a manner that will not render it unconstitutional.

51.     Regarding the third factor, lifting the stay will do less harm in the end for PREPA and Fuentes-Viguié because the Adjustment Plan or Fiscal Plan will not be in danger of being challenged on constitutional grounds. In our opinion, PREPA refuses to disclose information as to its Fifth Amendment Creditors to this Honorable Court because PREPA knows that the lift of the stay should be granted.

52.     If this Honorable Court seeks any other case law, it will see that not a single case has been found in which a government or Municipality has violated the Fifth Amendment rights of a party by denying just compensation during a bankruptcy proceeding. This is so because if just compensation is denied, the entire bankruptcy proceeding would be questioned for its constitutionality.

53.     PREPA will not be damaged by the lift of stay against the constitutionally protected right of Fuentes-Viguié to receive just compensation for the temporary taking of its property.   In fact, the lift of stay will allow PREPA to comply with its constitutional requirements of paying the just compensation established in the Fifth Amendment and guaranteed to Fuentes-Viguié.

54.     If the lift of the automatic stay is granted, there will be no litigation involved, there will be no opening of a floodgate for similar cases or litigation, and there will be no additional expenses incurred, only the payment of the judgment owed to Fuentes-Viguié.

55.     In this case, the balance of harm clearly favors lifting the automatic stay and obligating PREPA to honor its constitutional obligation.

56.     Finally, it is important to bring to this Honorable Court that, as has been stated before, the condemnation proceeding is a process initiated by the State against the interested party to deprive it

of its property against its will, in exchange for the payment of just compensation as it is so ordered by the Fifth Amendment to the U.S. Constitution.

57.     In cases where the State uses their power of eminent domain for the taking of private property for public use or "in the furtherance of public health, safety, or warfare, the automatic stay does not apply." *Bevelle v. Jefferson County (In re Bevelle),* 348 B.R. 812, 819 (2006). From this, it is clearly visible that the State does not have the authority to do a taking of private property and not pay the just compensation by petitioning for an automatic stay in a bankruptcy court.

58.     We understand that, in accordance with the due process clause, established constitutionally in the Fifth Amendment, the party with interest in a takings case must have the same right to be able to lift the automatic stay as to collect the just compensation for the damages caused by the taking carried out by the State.

59.     If this is not allowed, it will cause irreparable damage to the party with interest and would allow the State to deprive a person of their property through the mechanism of a taking, then file for bankruptcy and discharge the debt of just compensation owed as payment for the taking. Understandably, this would be unconstitutional and could constitute an injustice and a clear violation of the Takings Clause of the Fifth Amendment and the Due Process Clause contained in both the Fifth and Fourteenth Amendments to the U.S. Constitution.

60.     Art. II, Sec. 9, of the Constitution of the Commonwealth of Puerto Rico, establishes that "[p]rivate property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law". Art. II, Sec. 9, Const. ELA, 1 LPRA. The requirements established by Section 9 have the purpose of imposing a limit on the power of eminent domain of the State and, at the same time, safeguard citizens from unreasonable actions and unjust or no compensation from a taking. *A. Matos Rivera*, Vivienda, Propiedad y Justicia, 86 Rev.Jur. UPR 969,983 (2017). [*A. Matos*

*Rivera*, Housing, Property and Justice, 86 Rev.Jur. UPR 969,983 (2017)] citing, *Cynthia Torres Torres*, *La Expropiacion Forzosa en Puerto Rico: Ley, jurisprudencia, estudio y guía práctica*, ed., San Juan 2002, p. 4.

61.    With regard to just compensation, the Supreme Court of Puerto Rico has indicated that the payment is intended to "place the owner of the property in an economic situation equivalent to that in which he was, prior to the taking of his property." *Amador Roberts v. ELA,* 191 DPR 268,278-279 (2014).

62.    In the same manner, the Fifth Amendment to the Constitution of the United States mandates that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

63.    It is important to bring to the attention of this Honorable Court that PROMESA, aside from incorporating sections 362 and 922 of the Bankruptcy Code, states that: "(…)*nothing in this chapter shall be construed as impairing or in any manner relieving a territorial government, or any territorial instrumentality thereof, from compliance with Federal laws or requirements*(…)." 48 USC Sec. 2106.

64.    That is, the statute itself recognizes that the Title III process does not exempt the territorial government of Puerto Rico  from the duty to comply with the Federal Constitution, including the Fifth Amendment. Therefore, by not lifting the stay on the taking case that PREPA filed against Fuentes-Viguié in the Court of First Instance, San Juan Part, Fuentes-Viguie's right to just compensation would be undermine. Postponing such payment would violate the constitutional right held by Fuentes-Viguié and would be contrary to the protection given by said statutes and a detriment to justice.

65.    Not allowing the stay to be lifted would allow PREPA to have enjoyed the property of Fuentes-Viguié for the time of 1 year, 10 months and 25 days, without the obligation to fulfill its constitutional duty to pay the just compensation. Consequently, this would allow the State to exercise its right of eminent domain, obtain possession and even ownership of a property and then cause a stay on the case, so as not to disburse the just compensation guaranteed by the Constitution, the Supreme Law

of the Land. In other words, it would allow the State to take private property for public use without having to pay just compensation.

66.     When analyzing the exceptional situation that takes place in a takings case, we must bear in mind that it is not a case of damages or a breach of contract where the citizen submits a claim to the State to recover money. Here, it is the State itself that takes and deprives a person of their property and it must not be allowed to use the automatic stay procedure provided by the Bankruptcy Code as a subterfuge for not paying.

67.     For all of the reasons previously mentioned in this motion, we respectfully ask this Honorable Court to vacate the automatic stay in regards to Fuentes-Viguié in the State Court takings Case KEF 2012-0039, since violation of Fuentes-Viguié's constitutional rights is an irreparable harm and injustice that should be avoided.

68.     Attached as Exhibit I is a copy of the Unsworn Statement Under Penalty of Perjury certifying that the Lift of Stay Notice was sent to the counsels.

**WHEREFORE**, Fuentes-Viguié respectfully requests that this Honorable Court (1) take notice of the foregoing, (2) after notice and hearing, enter Order vacating the automatic stay arising under PROMESA, and allow the proceedings to continue in the present Case KEF 2012-0039 in the Court of First Instance, San Juan Part, so that Fuentes-Viguié is paid the just compensation for the taking of their property, as it is stated in the judgment issued by said Court, and (3) grant any other additional relief that may be deemed just and proper.

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that on this same date, the foregoing Motion was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

**RESPECTFULLY SUBMITTED**:  In Ponce, Puerto Rico on this  25$^{th}$day of   May, 2018.

*/s/Antonio Fuentes-González*
ANTONIO FUENTES-GONZÁLEZ
USDC BAR NUMBER 118902
G.P.O. BOX 7764
PONCE, P.R. 00732-7764
TELEPHONE: (787) 409-7980
FACSIMILE: (866) 908-7044
E-MAIL: antoniofuentesgonzalez@yahoo.com


*/s/María E. Vicéns Rivera*
MARÍA E. VICÉNS RIVERA LAW OFFICE
USDC BAR NUMBER 226711
9140 MARINA ST.,SUITE 801
PONCE, P.R. 00717
TEL./FAX. (787) 259-1999
EMAIL: mevicens@yahoo.com

## UNSWORN STATEMENT UNDER PENALTY OF PERJURY

Comes now Antonio Fuentes-González as counsel for Antonio Fuentes-González, María Ivonne Viguié-Fernández and the conjugal partnership constituted by them, under penalty of perjury and respectfully declares that the foregoing is true and correct:

1-On March 26, 2018 I sent an email to Mr. Herman Bauer, Esq., Mr. Ubaldo Fernández, Esq. and Mr. Kelvin Finger, Esq. containing the Lift of Stay Notice with the information requested in Paragraph III.U, in compliance with the Operative Case Management Order of Title III Bankruptcy case no. 17-03283, as amended by the Order Further Amending Case Procedures (docket no. 1512) regarding the prepetition case of *Puerto Rico Electric Power Authority v. Antonio Fuentes González et al*, Case No. KEF 2012-0039, pending at the Puerto Rico Court of First Instance, San Juan Part. A reply was never received.

2-On April 6, 2018, I called the office of Mr. Ubaldo Fernández, Esq., and spoke to his secretary,named Rebecca, but the attorney was not there at that time. I left a message with the secretary asking if Mr. Fernández could please call me in regards to the Lift of Stay Notice for the case of *Puerto Rico Electric Power Authority v. Antonio Fuentes González et al*, Case No. KEF 2012-0039, pending at the Puerto Rico Court of First Instance, San Juan Part. A reply was never received.

3-On April 10, 2018 a second email was sent to counsels and a reply was never received.

4-On April 13, 2018 I spoke to counsel Ubaldo Fernández about the Lift of Stay Notice for the case of *Puerto Rico Electric Power Authority v. Antonio Fuentes González et al*, Case No. KEF 2012-0039. The purpose of this call was to set up a conference meeting between all counsels so that we could speak about the case. Mr. Fernández agreed to contact me but I never received a call regarding this matter.

5- On April 23, 2018, as a last attempt to get a reaction from counsels a third email was sent. In the email, I mentioned that I was willing to have a conference meeting on Thursday, May 3, 2018. From 10:00-12:00 noon or from 2:00- 4:00 p.m. A reply was never received. I also spent that entire Thursday waiting to receive a call or an email but did not receive any type of response from any of the counsels

6-On May 11, 2018 I received an email from the Puerto Rico Electric Power Authority (PREPA) Counsel notifying that PREPA does not agree to modify the automatic stay to allow movants to continue with the execution of judgement.

By signing this unsworn statement under penalty of perjury, I certify that all the statements are true and correct.

Executed on May  25th , of the year 2018. In Ponce, Puerto Rico.


*/s/Antonio Fuentes González*
ANTONIO FUENTES GONZÁLEZ


D Ser/ D Fed AEE

PAG. 01

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA DE SAN JUAN

A E E DE PR
    DEMANDANTE
    VS.
FUENTES GONZALEZ, ANTONIO
    DEMANDADO

CASO:K EF2012-0039
SALON:1002

EXPROPIACION FORZOSA
EXPROPIACION FORZOSA
CAUSAL/DELITO

LIC. FUENTES GONZALEZ ANTONIO
PO BOX 7764
PONCE,PR 00732-7764

NOTIFICACION DE SENTENCIA ENMENDADA

    EL SECRETARIO QUE SUSCRIBE NOTIFICA A USTED QUE ESTE TRIBUNAL HA DICTADO SENTENCIA EN EL CASO DE EPIGRAFE CON FECHA 14 DE JULIO DE 2016 , QUE HA SIDO DEBIDAMENTE REGISTRADA Y ARCHIVADA EN LOS AUTOS DE ESTE CASO, DONDE PODRA USTED ENTERARSE DETALLADAMENTE DE LOS TERMINOS DE LA MISMA.

    Y, SIENDO O REPRESENTANDO USTED LA PARTE PERJUDICADA POR LA SENTENCIA, DE LA CUAL PUEDE ESTABLECERSE RECURSO DE APELACION, DIRIJO A USTED ESTA NOTIFICACION, HABIENDO ARCHIVADO EN LOS AUTOS DE ESTE CASO COPIA DE ELLA CON FECHA DE 26 DE JULIO DE 2016 .

STORER BELLO MARIA M
PMB 512
1353 CARR 19
GUAYNABO,PR 00966

EN SAN JUAN, PUERTO RICO, A 26 DE JULIO DE 2016.

          GRISELDA RODRIGUEZ COLLADO
          -----------------------------------------
                    SECRETARIO
POR: AMMI E. MORALES DE JESUS
          -----------------------------------------
              SECRETARIO AUXILIAR

O.A.T.704-NOTIFICACION DE SENTENCIA

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
**TRIBUNAL DE PRIMERA INSTANCIA**
**SALA SUPERIOR DE SAN JUAN**

| | |
|---|---|
| **AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO** PETICIONARIO | CASO NÚM. KEF 2012-0039 |
| v. | SALÓN NÚM. **1002** |
| **ANTONIO FUENTES GONZÁLEZ** PARTE CON INTERÉS | ACCIÓN CIVIL DE: **EXPROPIACIÓN FORZOSA** |

### SENTENCIA ENMENDADA[1]

Nos toca resolver la controversia sobre una reclamación de daños al amparo de la Sección 5(d) de la *Ley de Expropiación Forzosa* de 12 de marzo de 1903 (32 L.P.R.A. § 2910) por el desistimiento de la adquisición de una servidumbre para la construcción del *Proyecto Corredor de Utilidades del Sur*.

-I-

El 29 de febrero de 2012 la Autoridad de Energía Eléctrica de Puerto Rico (AEE) presentó la *Petición* de expropiación forzosa de epígrafe. En esta solicitó la adquisición del derecho real y perpetuo de servidumbre a constituirse sobre la finca número 25,105. En el *Exhibit "A"* que acompañó el legajo de expropiación, la AEE identificó el derecho adquirido como: *Servidumbre 20-A*, con cabida superficial de 0.2992 cuerdas, equivalentes a 1,175.9715m/c, propiedad de Antonio Fuentes González, María Ivonne Viguié Fernández y la sociedad legal de gananciales compuesta por ambos (todos, la parte con interés), y la finalidad de la expropiación como "Proyecto Corredor de Utilidades del Sur - Líneas de energía eléctrica, fibra óptica, transportación de recursos hídricos, consistente con los negocios que realiza la Autoridad de

---

[1] Se enmienda la *Sentencia* dictada el 13 de mayo de 2015 con el único fin de consignar separadamente los hechos que constituyen los fundamentos del dictamen, anteriormente incluidos en la relación de hechos relacionada en la primera parte del dictamen enmendado.

Energía Eléctrica o cualquiera de sus entidades jurídicas subsidiarias".

Depositada la suma de $88,000.00 como estimado de justa compensación por la adquisición del derecho peticionado, el 4 de abril de 2012 el Tribunal emitió una *Resolución* invistiendo a favor de la AEE la *Servidumbre 20-A* y ordenando al Registrador de la Propiedad inscribir el derecho a favor de la parte peticionaria.

Luego de ser emplazada, la parte con interés compareció por derecho propio. Su contestación a la *Petición* de expropiación fue presentada el 18 de julio de 2012. En ésta la parte: 1) solicitó la desestimación de la causa, por carecer la peticionaria de una consulta de ubicación aprobada para el proyecto; 2) impugnó el estimado de valor del derecho peticionado, y; 3) reclamó daños al remanente de la propiedad. Sometida por las partes la controversia sobre la ausencia de la consulta, el 28 de agosto de 2012 el Tribunal emitió una *Resolución* cuya parte dispositiva lee:

> Si la peticionaria desea continuar el procedimiento de expropiación de autos es indispensable y, a partir de la adopción de las *Reglas de Procedimiento Civil de 2009*, mandatorio que presente una consulta de ubicación, como parte del legajo de expropiación que acompaña la demanda. Cumpla esta parte con lo dispuesto en un término de 45 días de la notificación, o se procederá a la desestimación, sin perjuicio, de esta causa.

Notificada la *Resolución* el 31 de agosto de 2012, la AEE presentó el 27 de septiembre de ese año una solicitud para desistir de la acción de expropiación. A lo anterior se allanó la parte con interés, mediante *Réplica a Moción Solicitando Se Autorice Desistimiento Radicada por la Peticionaria y Otros Extremos*, presentado el 17 de octubre de 2012, en el que notificó su reclamación de daños por desistimiento.

Concedido a solicitud de parte un término para reunirse y discutir la posibilidad de una transacción, el **18 de julio de 2013** compareció la parte con interés mediante moción en la que informó haber enviado a la peticionaria un interrogatorio y un requerimiento de admisiones, para ser contestados de acuerdo a los términos establecidos en las Reglas de Procedimiento Civil. El 22

de agosto de 2013 la AEE compareció informando haber recibido ambos documentos el 16 de julio de 2013, no obstante solicitó un término adicional de 20 días para contestarlos. Aunque no se presentó oportunamente la moción de prórroga, el Tribunal le concedió el término solicitado mediante *Resolución* emitida el 6 de septiembre de 2013, notificada a las partes cuatro días después. Transcurrido en exceso el nuevo plazo para contestar, el 8 de octubre de 2013 la parte con interés solicitó al Tribunal que se diera por admitido el requerimiento de admisiones. Concedido un término de 20 días para reaccionar a lo peticionado, el 20 de noviembre de 2013 la peticionaria compareció mediante *Moción En Oposición A Moción Solicitando Se Dé Por Admitido El Requerimiento De Admisiones*, presentada por la Lcda. Dayanara Mejías Hilerio, quien asumió la representación legal de la AEE el 8 de octubre de 2013. En su escrito, al que no la acompañó con algún documento, la abogada alegó como razón para no contestar requerimiento de admisiones que éste se trataba en su mayoría de materia no pertinente a la controversia pendiente. El asunto quedó señalado para discutirse durante la vista del 29 de abril de 2014.

Autorizado el desistimiento de la adquisición, mediante *Sentencia Parcial* dictada el 24 de enero de 2014,[2] las partes comparecieron a la vista del 29 de abril de 2014. En ésta, tras considerar otros asuntos procesales del caso, el Tribunal resolvió: "[e]n cuanto a la objeción de la peticionaria sobre los requerimientos de admisión cursados por la parte con interés, este Tribunal señala que si las partes no llegan a un acuerdo, la atenderá". Sin embargo, lo anterior no fue necesario, ya que el 2 de septiembre de 2014 la parte con interés compareció mediante *Moción Informativa* en la que desistió del

---

[2] En ésta ordenamos al Registrador de la Propiedad practicar las operaciones correspondientes para la cancelación de la inscripción del derecho de servidumbre a favor de la AEE y que el mismo revirtiera a sus dueños originales. Pese a lo anterior, en la sentencia no dispusimos la devolución de la suma original, la que permanece consignada a esta fecha, pues quedó pendiente ante nuestra consideración la adjudicación de los posibles daños ocasionados por la adquisición y el consiguiente desistimiento total de la expropiación.

KEF2012-0039    4

requerimiento aun pendiente por contestar e incluyó un *Segundo Requerimiento de Admisiones*. En su escrito alegó que:

4. [E]n el día de hoy, 2 de septiembre de 2014, como parte del descubrimiento de prueba, le estamos enviando a la Peticionaria por conducto de su representante legal, Lcda. Dayanara Mejías Hilerio, un Segundo Requerimiento de Admisiones para que sea contestado de acuerdo a los términos establecidos en la Regla 33 de las Reglas de Procedimiento Civil vigentes. (Copia se acompaña con esta moción.)

5. [...]

6. A pesar de que las objeciones hechas por la Peticionaria al Primer Requerimiento de Admisiones son contrarias a Derecho y no cumplen con los requisitos de la Regla 33 de la de Procedimiento Civil vigentes; este Segundo Requerimiento de Admisiones notificado a la Peticionaria hace innecesario el que este Honorable Tribunal resuelva la objeción de la Peticionaria a que no se dé por admitido el Primer Requerimiento de Admisiones. Además le permite contestar este Segundo Requerimiento de Admisiones según lo requiere la Regla 33 de Procedimiento Civil Vigentes y la jurisprudencia.

Una vez más, transcurrido en exceso el término de veinte (20) días de haber sido notificado del requerimiento, la AEE no cumplió en notificar a la parte con interés su contestación. Por tanto, el 7 de octubre de 2014 la parte con interés compareció mediante moción en la que solicitó se tuviera por admitido lo requerido. Pendiente un plazo concedido a la parte peticionaria para reaccionar, a vencer el 27 de octubre de 2014, las partes comparecieron mediante *Informe Preliminar entre Abogados y Abogadas* presentado el 15 de octubre de 2014.

Ante la imposibilidad de un acuerdo, el 20 de octubre de 2014 celebramos la conferencia con antelación a juicio sobre la reclamación de daños. En ésta la parte con interés reiteró su petición de que se dieran por admitidos los requerimientos. A preguntas del Tribunal la Lcda. Dayanara Mejías Hilerio, representante legal de la AEE, informó haber tramitado el requerimiento, mas alegó no haber recibido las contestaciones; por lo que solicitó un término adicional de cinco (5) días para contestar. **Apercibida la peticionaria de la consecuencia por su falta de cumplimiento**, el Tribunal le concedió el término solicitado, a vencer el 27 de octubre de 2014.

KEF2012-0039                                                                                    5

Ante el incumplimiento de la AEE con la orden del Tribunal, el 3 de noviembre de 2014 la parte con interés solicitó nuevamente que se dieran por admitidos los requerimientos. La peticionaria no presentó oposición, por lo que finalmente el 1 de diciembre de 2014 el Tribunal emitió *Orden* según lo solicitado por la parte con interés. **Transcurrido el término para recurrir sin que la AEE solicitara la reconsideración del antedicho dictamen, notificado el 4 de diciembre de 2014, sobrevino la aceptación tácita de las cuestiones sobre las que se solicitó admisión.**

Amparándose en que **el segundo requerimiento de admisiones dirigido a la AEE se dio por admitido desde el 1 de diciembre de 2014,** la parte con interés compareció el 27 de enero de 2015 mediante una solicitud de sentencia sumaria parcial. Junto a la moción la parte unió los siguientes documentos: 1) Anejo A- *Segundo Requerimiento de Admisiones* con anejos; 2) Anejo B– *Declaración Jurada* otorgada el 8 de enero de 2015 por el agrimensor licenciado Rafael Mojica Torres; 3) Anejo C– *Plano de Mensura* del proyecto *Mensura de Parcela "A" y Remanente del Lote 1*, certificado por el agrimensor licenciado Rafael Mojica Torres, y; 4) Anejo C-1– copia reducida del Anejo C.

En su escrito la parte con interés identificó los asuntos litigiosos o en controversia como sigue:

1. <u>Primera controversia</u>: Si procede o no el pago por la justa compensación por la pérdida del uso y disfrute del predio sobre el que se constituyó la servidumbre de paso del corredor, que tiene una la (sic) cabida 1,175.9715 metros cuadrado, por el término que duró la expropiación temporal.

2. <u>Segunda controversia</u>: Si procede o no el pago por la justa compensación por la pérdida de uso y disfrute total de la propiedad con una cabida 11,750.0797 de metros cuadrados por el término de la expropiación temporal. (sic) como consecuencia de que algunas de las limitaciones restrictivas impuesta (sic) a la servidumbre de paso del Corredor, que no podían variarse, hacía (sic) la propiedad inservible para su uso.

3. <u>Tercera controversia</u>: Si procede o no el pago de es (sic) la justa compensación por la pérdida del uso y disfrute de la Parcela rotulada con la letra A, con una cabida de 971.6771 metros cuadrados por el término de la expropiación temporal, como consecuencia de que algunas de las limitaciones restrictivas impuesta (sic) a la servidumbre de paso del corredor que no podían variarse, dividían físicamente la

6

propiedad en dos Parcelas, convirtiendo la Parcela A en inservible para su uso por su tamaño y configuración.

4. **Cuarta controversia:** Si procede o no el pago de la justa compensación por la pérdida del uso y disfrute de la Parcela rotulada con (sic) Remanente, con una cabida de 10,778.4026 metros cuadrados por el término de la expropiación temporal como consecuencia de que algunas de las limitaciones restrictivas impuestas a la servidumbre de paso del Corredor, que no podían variarse, la dejaba enclavada, sin acceso a vía pública y sin poderse conectar a las facilidades de agua potable, sanitaria y eléctricas lo que la hacía inservible para el uso a que se destina.

5. · **Quinta controversia:** Si procede o no la reclamación de daños por concepto de la paralización del desarrollo comercial de la parte con interés como consecuencia de que algunas de las limitaciones de la servidumbre del Corredor eran tan restrictivas e irrazonablemente onerosas que dejando la propiedad enclavada, sin su derecho de acceso a vía pública y sin poderse conectar al sistema de agua potable y sanitario. Además porque la AAE le denegó el endoso ha (sic) dicho proyecto por estar afectado por la servidumbre del Corredor de Utilidades del Sur sin el cual el proyecto no podía aprobarse finalmente ni construirse.

Asimismo, la parte con interés identificó los siguientes hechos como esenciales y alegó que sobre ellos no hay controversia sustancial:

A. Que la parte demandante es dueña en pleno dominio de la totalidad de la finca número 25,105 la cual adquirió en virtud del (sic) escritura número 22 sobre Adjudicación de Participación otorgada en Ponce Puerto Rico, el 3 de agosto de 2004 ante notario público Héctor Vargas Díaz, la cual se encuentra inscrita al folio 133 del tomo 1115 el (sic) término municipal de Ponce, inscripción segunda.

B. Que la cabida de la propiedad de la parte con interés es de 11,750.0790 metros cuadrados, según surge del Plano de Mensura Certificado por el Agrimensor Licenciado Rafael Mojica Torres [...].

C. Que el día 28 de febrero de 2012 la peticionaria radicó la presente petición de expropiación para adquirir el predio identificado como Parcela #20A para una servidumbre de paso sobre la propiedad antes descrita en el acápite A de la Parte V de este escrito perteneciente a la parte con interés para el proyecto conocido como Corredor de Utilidades del Sur, en adelante el Corredor.

D. Que la servidumbre de paso del Corredor de Utilidades del Sur discurre de Este a Oeste sobre la propiedad de la parte con interés.

E. Que dicha servidumbre de paso del Corredor de Utilidades del Sur divide físicamente la propiedad de la parte con interés en dos Parcelas o predios dejando al Remanente sin su único acceso a vía pública por su colindancia Norte.

F. Que la cabida de los [sic] dos Parcelas o predios, según el Plano de Mensura del agrimensor Licenciado Rafael Mojica Torres, Anejo B de este escrito, son la (sic) siguientes: (sic) Parcela "A" de 971.6771 metros

cuadrados y Remanente de 10,778.4026 metros cuadrados, para un total de 11,750.0790 metros cuadrados.

G. Que dicha servidumbre de paso del Corredor estaba sujeta a las limitaciones establecidas en el Exhibit "B" del legajo de expropiación titulado Limitaciones Establecidas Sobre la Servidumbre Identificada en el Exhibit "A".

H. Que en el segundo párrafo de la primera página del Exhibit "B" del legajo de expropiación se indica, en parte, lo siguiente: "En la franja de terreno a ser expropiada se instalarán estructuras, líneas, equipos y otros artefactos que pertenecen a la Autoridad". Esta es una de las limitaciones que no puede variarse, pues las únicas que puede (sic) variarse son las limitaciones 1, 2 y 3 de la página cuarta y quinta (sic) <u>Uso, disfrute y limitaciones de la servidumbre,</u> Parte B Nivel y Elevación del Terreno, las limitaciones 4 y 5 de la página quinta y sexta Parte C Actividades Agrícolas, la limitación 5 de la página sexta Parte D Estructuras y Edificaciones y en la (sic) limitaciones 1 y 2 de la página séptima Parte E Uso de la/s Servidumbres como Estacionamiento del Exhibit B del legajo de expropiación.

I. Que en el tercer párrafo de la primera página del Exhibit "B" del legajo de expropiación indica, en parte, lo siguiente: "<u>*Incluye, además, la prohibición expresa de construir edificación alguna en la faja de terreno anteriormente descrita y a sembrar árboles y/o plantas que crezcan a tal altura que queden a una distancia vertical de por lo menos quince (15) pies desde la parte más alta de dichos árboles y/o plantas hasta los conductores más bajos de dichas instalaciones eléctricas*</u>". Esta es una de las limitaciones que no puede variarse, pues las únicas que puede (sic) variarse son las limitaciones 1, 2 y 3 de la página cuarta y quinta (sic) <u>Uso, disfrute y limitaciones de la servidumbre,</u> Parte B Nivel y Elevación del Terreno, las limitaciones 4, (sic) y 5 de la página quinta y sexta Parte C Actividades Agrícolas, la limitación 5 de la página sexta Parte D Estructuras y Edificaciones y en la (sic) limitaciones 1 y 2 de la página séptima Parte E Uso de la/s Servidumbres como Estacionamiento del Exhibit B del legajo de expropiación.

J. Que estas limitaciones establecidas en la primera página de (sic) Exhibit "B" del legajo de expropiación no indican que pueden variarse, eliminarse, obviarse previa autorización de la Autoridad o previo consentimiento por escrito de la Autoridad o con permiso condicionado de la Autoridad. Las únicas que puede (sic) variarse son las limitaciones 1, 2, (sic) y 3 de la página cuarta y quinta (sic) <u>Uso, disfrute y limitaciones de la servidumbre,</u> Parte B Nivel y Elevación del Terreno, las limitaciones 4, (sic) y 5 de la página quinta y sexta Parte C Actividades Agrícolas, la limitación 5 de la página sexta Parte D Estructuras y Edificaciones y en la (sic) limitaciones 1 y 2 de la página séptima Parte E Uso de la/s Servidumbres como Estacionamiento del Exhibit B del legajo de expropiación.

K. Que en el acápite tres (3) de la tercera página <u>DERECHOS QUE ADQUIERE LA AUTORIDAD EN LA SERVIDUMBRE</u> del Exhibit "B" del presente caso de Expropiación Forzosa establece lo siguiente: "*La Autoridad tiene derecho a acceso a la/s servidumbres para efectuar trabajos de operación, conservación, modificación, mejoras o reparación de las instalaciones. El acceso a la/s servidumbre/s tiene que permitir a la autoridad (sic) utilizar el equipo necesario para realizar los trabajos*". Esta es una de las limitaciones que no puede variarse, pues las únicas que puede (sic)

8

variarse son las limitaciones 1, 2, (sic) y 3 de la página cuarta y quinta (sic) **Uso, disfrute y limitaciones de la servidumbre,** Parte B Nivel y Elevación del Terreno, las limitaciones 4, (sic) y 5 de la página quinta y sexta Parte C Actividades Agrícolas, la limitación 5 de la página sexta Parte D Estructuras y Edificaciones y en la (sic) limitaciones 1y 2 de la página séptima Parte E Uso de la/s Servidumbres como Estacionamiento del Exhibit B del legajo de expropiación.

L. Que en el acápite seis (6) de la cuarta página <u>DERECHOS QUE ADQUIERE LA AUTORIDAD EN LA SERVIDUMBRE</u> del Exhibit "B" del presente caso de Expropiación Forzosa establece lo siguiente: "*La Autoridad, por medio de sus oficiales, representantes, empleados y agentes y contratistas, tiene derecho a acceder a la servidumbre y a instalar, construir, modificar, conservar y retirar dentro de la/s servidumbre/s constituida todos los accesorios inherentes al sistema eléctrico o cualquier otra estructura necesaria para el desarrollo de cualquier empresa de la Autoridad*". Esta es una de las limitaciones que no puede variarse, pues las únicas que puede (sic) variarse son las limitaciones 1, 2, (sic) y 3 de la página cuarta y quinta (sic) <u>Uso, disfrute y limitaciones de la servidumbre,</u> Parte B Nivel y Elevación del Terreno, las limitaciones 4, (sic) y 5 de la página quinta y sexta Parte C Actividades Agrícolas, la limitación 5 de la página sexta Parte D Estructuras y Edificaciones y en la (sic) limitaciones 1y 2 de la página séptima Parte E Uso de la/s Servidumbres como Estacionamiento del Exhibit B del legajo de expropiación.

M. Que en el acápite uno y dos (1 y 2) de la sexta página <u>USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE,</u> Parte D Estructuras o Edificaciones del Exhibit "B" del legajo de expropiación se establece lo siguiente:
"1. *Sujeto a lo que adelante se especifica, se prohíbe la construcción, instalación o ubicación de estructura o edificación permanente o temporal en la/s servidumbre/s por lo que se mantendrán libre de éstas, tanto sobre o bajo el terreno. Una acción en contra constituye una violación a los derechos de servidumbre de la Autoridad.*
2. *Se prohíbe la construcción de estructuras que incluye entre otros, pero sin limitarse a: edificios, columnas, vigas, estacionamientos multinivel, tanques sépticos, almacenes, miradores, canchas de baloncesto*".
Énfasis suplido.
Esta son unas de las limitaciones que no pueden variarse, pues las únicas que puede (sic) variarse son las limitaciones 1, 2, (sic) y 3 de la página cuarta y quinta (sic) <u>Uso, disfrute y limitaciones de la servidumbre,</u> Parte B Nivel y Elevación del Terreno, las limitaciones 4, (sic) y 5 de la página quinta y sexta Parte C Actividades Agrícolas, la limitación 5 de la página sexta Parte D Estructuras y Edificaciones y en la (sic) limitaciones 1y 2 de la página séptima Parte E Uso de la/s Servidumbres como Estacionamiento del Exhibit B del legajo de expropiación.

N. Que estas limitaciones del acápite uno y dos (1 y 2) de la sexta página <u>USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE,</u> Parte D Estructuras o Edificaciones del Exhibit "B" del legajo de expropiación no indican que pueden variarse, eliminarse u obviarse previa autorización de la Autoridad o previo consentimiento por escrito de la Autoridad o con permiso condicionado de la Autoridad. Estas son de las limitaciones que no pueden variarse, pues las únicas que puede (sic) variarse son las limitaciones 1, 2, (sic) y 3 de la página cuarta y quinta (sic) <u>Uso, disfrute y limitaciones de la servidumbre,</u> Parte B Nivel y Elevación del Terreno, las limitaciones 4, (sic) y 5 de la página quinta y sexta Parte C Actividades Agrícolas, la limitación 5 de la página sexta Parte D Estructuras y Edificaciones y en la (sic) limitaciones 1y 2 de la página séptima Parte E

KEF2012-0039                                                                                    9

Uso de la/s Servidumbres como Estacionamiento del Exhibit B del legajo de expropiación.

O. Que las *únicas limitaciones* incluidas limitaciones incluidas en el Exhibit "B" del legajo de expropiación que pueden variarse, eliminarse, obviarse o realizarse previa autorización de la Autoridad o previo consentimiento por escrito de la Autoridad o con permiso condicionado de la Autoridad son las siguientes.·

a) Cuarta y quinta página USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE, Parte B Nivel y Elevación del Terreno del Exhibit "B" que dice lo siguiente:

1. Se prohíbe rellenar, rebajar, socavar o en forma alguna a alterar el nivel o elevación de la franja de terreno que constituye la/s servidumbre/s, *sin el previo consentimiento escrito de la Autoridad.*

2. Se prohíbe efectuar cualquier tipo de excavación, hincar pilotes, u otros objetos, o introducir artefactos u objetos de clase alguna en la franja de terreno que constituye la/s servidumbre/s **si** (sic) **el previo consentimiento escrito de la Autoridad.**

3. Se prohíbe el uso de excavadoras en la servidumbre **sin la previa autorización de la Autoridad** y del procedimiento o reglamento aprobado para tales fines, según se determine caso a caso.

b) Quinta y sexta página USO, DISFRUTE · Y LIMITACIONES DE LA SERVIDUMBRE, Parte C Actividades Agrícolas del Exhibit "B" que dice lo siguiente:

4. Se permite la creación de diseños paisajistas o jardines a diez pies de la tubería soterrada. **El diseño propuesto tiene que radicarse y aprobarse previamente por la Autoridad [...]**

5. Se permite la instalación de nuevos sistemas de riego **con la previa aprobación de la Autoridad.**

c) Sexta página USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE, Parte D Estructuras o Edificaciones del Exhibit "B" que dice lo siguiente:

4. Se permite la instalación de verjas temporeras **en aquellos casos que cuente con una aprobación previa de la Autoridad. [...]**

d) Séptima página USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE, Parte E Uso de la/s Servidumbres como Estacionamiento del Exhibit "B" que dice lo siguiente:

1. Como regla general, la Autoridad no permite el uso de sus servidumbres como estacionamiento. No obstante, en casos de interés social y cuando no existan otras alternativas para el desarrollo de un proyecto, **la Autoridad puede otorgar un permiso condicionado para este uso, siempre y cuando se provea el diseño que cumpla con los parámetros de seguridad que requiera la Autoridad.**

2. Para los permisos condicionados, debe considerarse, donde sea posible, los estacionamientos sin asfalto. Los trabajos de mantenimiento en los estacionamientos se harán coordinados con el dueño poseedor de la propiedad, a excepción de casos de emergencias. La Autoridad requiere que se obtenga una póliza de seguro de responsabilidad a favor de ella, como una de las condiciones para el uso de la/s servidumbre/s como estacionamiento.

P. Que estas limitaciones impuestas en el acápite uno y dos (1 y 2) de la sexta página USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE, Parte D Estructuras o Edificaciones del Exhibit "B" del legajo de expropiación no permiten a la parte con interés la construcción permanente sobre la servidumbre de una calla asfaltada compuesta de dos o más carriles para darle acceso al Remanente de la propiedad o la construcción de cualquier otra estructura sobre la servidumbre.

KEF2012-0039

10

Q. Que las limitaciones impuestas en el acápite uno y dos (1 y 2) de la sexta página **USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE**, Parte **D** Estructuras o Edificaciones del Exhibit "B" del legajo de expropiación no permiten la construcción permanente por debajo de la servidumbre de las facilidades eléctricas, del sistema sanitario y agua potable para darle servicio al Remanente de la propiedad. Además tampoco le permiten la construcción permanente sobre o por debajo (sic) la servidumbre.

R. Que las limitaciones impuestas en el acápite uno y dos (1 y 2) de la sexta página **USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE**, Parte **D** Estructuras o Edificaciones del Exhibit "B" del legajo de expropiación dejaban enclavado y sin acceso el Remanente de la propiedad y la hacía (sic) inservible para su uso, incluyendo el comercia por su zonificación EV-4 porque no se podía construir, instalar o ubicar estructuras o edificaciones permanente o temporal tanto sobre cómo (sic) debajo de la servidumbre.

S. Que la (sic) limitaciones de la servidumbre del Corredor de Utilidades del Sur dividió físicamente la propiedad de la parte con interés en dos Parcelas, dejo (sic) sin acceso a (sic) Remanente de la finca, la jedo (sic) enclavada y la hizo inservible para el uso a que se destina.

T. Que al momento de radicarse la expropiación forzosa en el presente caso, la parte con interés tenía aprobado preliminarmente la construcción de un proyecto consistente de varias edificaciones para operar restaurantes y oficinas, proyecto comercial número AP 2001-0002 (08-0002230) Oficina de Permisos, Gobierno Municipal Autónomo de Ponce.

U. Que las limitaciones impuestas en el acápite uno y dos (1 y 2) de la sexta página **USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE**, Parte **D** Estructuras o Edificaciones del Exhibit "B" del legajo de expropiación no permiten la construcción permanente de las estructuras del proyecto comercial AP 2011-0002 (08-0002230) según se ilustra en el plano de situación para el proyecto comercial AP 2011-0002 (08-0002230), que aparece en la página 5, Exhibit B, del Informe de Valoración.

V. Que la Autoridad de Energía Eléctrica no endosó el proyecto comercial AP 2011-0002 (08-0002230) porque el mismo estaba afectado por la servidumbre del Corredor de Utilidades del Sur.

W. Que toda construcción de líneas de distribución en el desarrollo de nuevas urbanizaciones, centros y áreas comerciales, industriales y toda lotificación deberá realizarse de forma soterrada y constituyen una construcción permanente.

X. Que sin el endoso de la Autoridad de Energía Eléctrica el proyecto comercial AP 2011-0002 (08-0002230) no podía aprobarse finalmente y no podía ser construido.

Y. Que el valor unitario de la propiedad es de $295.00 el metro cuadrado, que el término de la expropiación temporal se extendió por un (1) año, diez (10) meses y veinticinco (25) días (696 días) y que el interés para determinar la justa compensación por la expropiación temporal en concepto de canon de arrendamiento, será el ocho por ciento (8%) anual del valor del predio afectado.

Transcurrido en exceso el término de vente (20) días que dispone la Regla 36.3 de Procedimiento Civil de 2009 para presentar una contestación a la moción de sentencia sumaria, ausente de trámite alguno de parte de la AEE, el 27 de febrero de 2015 el Tribunal dictó *Orden* concediendo un plazo de vente (20) días adicionales a la parte peticionaria para reaccionar a lo solicitado. Así, por conducto de la Lcda. Dayanara Mejías Hilerio, el 24 de marzo de 2015 la AEE presentó una moción oponiéndose parcialmente a la solicitud de sentencia sumaria. El escrito no fue acompañado por documento alguno. En el mismo la peticionaria se allanó a que se dictase sentencia sumaria respecto a tres asuntos: 1) el período de la adquisición temporal; 2) el por ciento de compensación que procede por la adquisición temporal, y; 3) el valor unitario por metro cuadrado de terreno. Por el contrario, la AEE manifestó que no debía ser dictada la sentencia para compensar a la parte con interés por: 1) la alegada adquisición temporal de la totalidad de la finca, y; 2) los daños relacionados a la supuesta paralización del desarrollo comercial de la propiedad. Alegó que la solución de estas controversias no es una de estricto derecho, ya que "depende de otros hechos que sólo pueden dirimirse con apreciación de la prueba en una vista en su fondo que permita a la juzgadora tener un cuadro fáctico completo de los hechos". Al respecto, la parte enumeró diez (10) hechos esenciales y pertinentes que dijo están realmente y de buena fe controvertidos, a saber:

1. Cabida de la finca. [...]

2. Si la servidumbre dividió en dos partes la finca de la parte con interés, lo cual depende en parte de corroborar la alegación de que la parte norte también pertenece a la parte con interés y no a la Autoridad de Carreteras y Transportación.

3. Si desde el "Remanente" (porción sur de la finca) no se podía lograr acceso a la Marginal de la Carretera PR-2, que es el único acceso de la finca hacia una vía pública; o sea, si quedaba sin acceso o "enclavado", como le llama la parte con interés.

4. Cuáles de las restricciones incluidas en el Exhibit B podían variarse con anuencia de la AEE y cuáles no, lo cual no solo depende del texto literal allí escrito, sino también de la reglamentación aplicable y las concesiones que

KEF2012-0039                                                        12

podría haber hecho la agencia si se le hubiese solicitado dentro del marco fáctico de este caso.

5. Cuáles usos le podía dar la parte con interés a la porción gravada con la servidumbre y al resto de su finca.

6. Si la servidumbre limitó todo uso del "Remanente" (parte de sur de la finca).

7. Si al momento de radicarse la petición de expropiación, la parte con interés tenía o no aprobado preliminarmente un proyecto de varias edificaciones para operar restaurantes y oficinas.

8. Si las limitaciones incluidas en el Exhibit "B" no permitieron la construcción de las estructuras del proyecto comercial; es decir, si fue la causa próxima.

9. Si la falta de endoso de la AEE al anteproyecto de la parte con interés fue la única causa o la más próxima para que no se construyera el mismo.

10. Si las restricciones establecidas en el Exhibit "B" eran lo suficientemente restrictivas como para impedir todo uso de la finca en su totalidad.

De otra parte, en un desacertado intento que contraviene lo dispuesto en la Regla 33 de Procedimiento Civil de 2009, en su oposición parcial a la solicitud de sentencia sumaria la AEE trató de contestar tardíamente el *Segundo Requerimiento de Admisiones*, que le fue cursado desde el 2 de septiembre de 2014. Esto lo hizo negando brevemente dieciocho (18) de los veinticinco (25) hechos enumerados en la parte quinta de la solicitud de sentencia sumaria, titulada *Relación Concisa De Todos Los Hechos Esenciales Y Pertinentes Sobre Los Cuales No Hay Controversia Sustancial*, y **no presentando la alegación responsiva y bajo juramento de cada uno de los cincuenta y cuatro (54) requerimientos sobre los que se le solicitó una admisión.** Asimismo, los hechos controvertidos no fueron elaborados con indicación de párrafos o páginas de documentos en el expediente del Tribunal donde se estableciera una genuina controversia sobre los hechos y tampoco se unieron declaraciones juradas o documentos admisibles en evidencia con ese fin.

Por su parte, el 9 de abril de 2015 la parte con interés presentó una réplica a la moción de la AEE. En ésta impugnó de forma detallada la relación de hechos controvertidos enumerados por la peticionaria en su contestación a la moción de sentencia sumaria, haciendo referencia específica a las

admisiones y otra evidencia en el expediente del Tribunal donde se manifiesta la ausencia de controversia.

-II-

Los hechos que constituyen los fundamentos de este dictamen son:

A - Las estipulaciones de hechos (inciso C-1) y asuntos (inciso C-3) no controvertidos enumeradas por las partes en el *Informe Preliminar entre Abogados y Abogadas*, presentado el 15 de octubre de 2014, a saber:

1. La parte con interés radicó un anteproyecto ante la Oficina de Permisos del Municipio Autónomo de Ponce el 28 de abril de 2011, el cual está vigente.

2. Titularidad del predio sobre el cual se constituyó la servidumbre es de las partes con interés.

3. Que el único acceso a la vía pública de la propiedad es por su colindancia Norte.

4. Que la configuración física de la servidumbre discurre desde su colindancia Este a la Oeste.

5. Que las restricciones impuestas sobre la servidumbre son las que surgen del Exhibit B del legajo de expropiación.

6. Que la Autoridad de Energía Eléctrica no endosó el anteproyecto 2012-054002-ERC-28801, Plaza Tanamá, sometido por el proponente hasta el 16 de enero de 2014 y se le notificó a éste el 21 de enero de 2014.

7. Fecha de presentación de la petición: 29 de febrero de 2012.

8. Fecha de desistimiento: 24 de enero de 2014.

9. Tiempo de expropiación temporal: 1 año, 10 meses y 25 días. (Énfasis suplido.)

10. Precio unitario por metro cuadrado: $295.00. (Énfasis suplido.)

11. Por ciento para computar arrendamiento: 8% a tenor con la Ley Núm. 12 de 10 diciembre de 1975. (Énfasis suplido.)

B - Las cuestiones sobre las que la parte con interés solicitó admisión, mediante *Segundo Requerimiento de Admisiones* presentado el 2 de septiembre de 2014, las cuales fueron adoptadas por el Tribunal en la *Orden* emitida el 1 de diciembre de 2014, a saber:

12. El propósito u objeto de la expropiación en el Caso Núm. KEF2012-0039 es para la adquisición de un derecho real y perpetuo de servidumbre a constituirse sobre la parcela 20-A con una cabida de 1,175.9715m/c que se describe en el *Exhibit "A"* y que se ilustra en el *Plano de Adquisición de*

*Servidumbre de Paso* que se acompaña para el *Proyecto Corredor de Utilidades del Sur.*

13. En el *Exhibit "A"* del legajo de expropiación, en su segunda página indica lo siguiente:
    **FINALIDAD DE LA EXPROPIACIÓN** Proyecto Corredor de Utilidades del Sur - Líneas de energía eléctrica, fibra óptica, transportación de recursos hídricos, consistente con los negocios que realiza la Autoridad de Energía Eléctrica o cualquiera de sus entidades jurídicas subsidiarias.

14. La Autoridad de Energía Eléctrica podía pasar sobre o debajo de la servidumbre tuberías de agua.

15. La Autoridad Energía Eléctrica podía utilizar la servidumbre para los negocios que realiza la Autoridad de Energía Eléctrica o cualquiera de sus entidades subsidiarias.

16. La servidumbre de paso discurre de Este a Oeste de la propiedad.

17. La servidumbre deja al remanente de la propiedad perteneciente a la parte con interés sin su único acceso a vía pública. (Énfasis suplido.)

18. La servidumbre divide la propiedad de la parte con interés en dos parcelas.

19. En el segundo párrafo de la primera página del *Exhibit "B"* titulado *LIMITACIONES ESTABLECIDAS SOBRE LA SERVIDUMBRE IDENTIFICADA EN EXHIBIT "A"* se indica, en parte, lo siguiente: "[e]n la franja de terreno a ser expropiada se instalarán estructuras, líneas, equipos y otros artefactos que pertenecen a la Autoridad".

20. En el tercer párrafo de la primera página del *Exhibit "B"* titulado *LIMITACIONES ESTABLECIDAS SOBRE LA SERVIDUMBRE IDENTIFICADA EN EXHIBIT "A* establece, en parte, lo siguiente:
    La servidumbre aquí expropiada incluye además, el derecho de la Autoridad de Energía Eléctrica de Puerto Rico a penetrar en la finca de la cual se forma parte la antes descrita faja de terreno, por el sitio menos gravoso para llegar hasta dicha franja y emplazar en ellas los conductores, estructuras, equipos y aditamentos necesarios a la realización del fin público que motiva la presente expropiación. Incluye, también el derecho a efectuar en ellas las reparaciones necesarias para el funcionamiento, operación y mantenimiento de dichas instalaciones eléctricas, de la fibra óptica e agua.

21. En el tercer párrafo de la primera página del *Exhibit "B"* titulado *LIMITACIONES ESTABLECIDAS SOBRE LA SERVIDUMBRE IDENTIFICADA EN EXHIBIT "A"* indica, en parte, lo siguiente:
    Incluye, además, la prohibición expresa de construir edificación alguna en la faja de terreno anteriormente descrita y a sembrar árboles y/o plantas que crezcan a tal altura que queden a una distancia vertical de por lo menos quince (15) pies desde la parte más alta de dichos árboles y/o plantas, hasta los conductores más bajos de dichas instalaciones eléctricas.

22. Las limitaciones incluidas en los requerimientos de admisión números 8, 9 y 10 no indican que pueden variarse, eliminarse u obviarse previa autorización de la Autoridad o previo el consentimiento por escrito de la Autoridad o con permiso condicionado de la Autoridad.

KEF2012-0039

**15**

23. En el acápite uno (1) de la segunda y tercera página *DERECHOS QUE ADQUIERE LA AUTORIDAD EN LA SERVIDUMBRE* del *Exhibit "B"* establece lo siguiente:

[L]a constitución de esta servidumbre le concede a la Autoridad todos los derechos inherentes al ejercicio de la servidumbre, según dispone los Artículos 280, 281 y 284 del Código Civil, 31 L.P.R.A. Secciones 1111, 1112 y 1115, y los Artículos 485, 486 y 487 del Código Civil de Puerto Rico, 31 L.P.R.A. Secciones 1701 y siguientes, y de las siguientes leyes enmendadas:
- Ley Núm. 83 del 2 de mayo de 1941, Ley Orgánica de la Autoridad de Energía Eléctrica, según enmendada, 22 L.P.R.A. Sección 191 y siguientes.
- Ley Núm. 143 del 20 julio de 1979, según enmendada, 27 L.P.R.A. Sección 2151 y siguientes, la cual establece las servidumbres legales.
- Ley Núm. 170 del 12 de agosto de 1988, Ley de Procedimiento Administrativo Uniforme para el Estado Libre Asociado de Puerto Rico según enmendada, 3 L.P.R.A. Sección 2101 y siguientes.
- Ley 162 del 7 de diciembre de 2009, que permite a la Autoridad de Energía Eléctrica la imposición de multas hasta la cuantía de $10,000 por la violación a los reglamentos promulgados por la Autoridad.

24. En el acápite tres (3) de la tercera página *DERECHOS QUE ADQUIERE LA AUTORIDAD EN LA SERVIDUMBRE* del *Exhibit "B"* establece lo siguiente:

La Autoridad tiene derecho a acceso a la/s servidumbre/s para efectuar trabajos de operación, conservación, modificación, mejoras o reparación de las instalaciones. El acceso a la/s servidumbre/s tiene que permitir a la autoridad utilizar el equipo necesario para realizar los trabajos.

25. En el acápite seis (6) de la cuarta página *DERECHOS QUE ADQUIERE LA AUTORIDAD EN LA SERVIDUMBRE* del *Exhibit "B"* dice lo siguiente:

*La Autoridad, por medio de sus oficiales, representantes, empleados y agentes y contratistas, tiene derecho a acceder a la servidumbre y a instalar, construir, modificar, conservar y retirar dentro de la/s servidumbre/s constituida, todos los accesorios inherentes al sistema eléctrico o cualquier otra estructura necesaria para el desarrollo de cualquier empresa de la Autoridad.*

26. En el acápite cuatro (4) de la cuarta página *USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE*, parte *A. Prohibiciones Generales* del *Exhibit "B"* establece que a esta servidumbre le "[s]erá de aplicación las limitaciones establecidas en el Reglamento Número 7282 sobre Reglamento de Servidumbres para la Autoridad de Energía Eléctrica".

27. A tenor con el Reglamento de Servidumbres para la Autoridad de Energía Eléctrica Núm. 7282 del 24 de febrero de 2007, que aplica a las servidumbres de paso del *Proyecto del Corredor de Utilidades del Sur*, en su *Artículo D. ESTRUCTURAS O EDIFICACIONES* acápite dos (2) página 25 establece lo siguiente:

2. Las servidumbres se tienen que mantener libres de estructuras o edificaciones tanto sobre o bajo el terreno. No se pueden construir estructuras o edificaciones sobre las servidumbres, ya que esto es una violación a los derechos de servidumbre de la Autoridad.

KEF2012-0039

16

28. En el acápite uno y dos (1 y 2) de la sexta página *USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE*, parte *D. Estructuras o Edificaciones* del *Exhibit "B"* establece lo siguiente:

1. Sujeto a lo que adelante se especifica, se prohíbe la construcción, instalación o ubicación de estructura o edificación permanente o temporal en la/s servidumbre/s por lo que se mantendrán libre de éstas, tanto sobre o bajo el terreno. Una acción en contra constituye una violación a los derechos de servidumbre de la Autoridad.

2. Se prohíbe la construcción de estructuras que incluye entre otros, pero sin limitarse a: edificios, columnas, vigas, estacionamientos multinivel, tanques sépticos, almacenes, miradores, canchas de baloncesto.

29. Las limitaciones incluidas en el requerimiento de admisión núm. 17 no indican que pueden variarse, eliminarse u obviarse previa autorización de la Autoridad o previo consentimiento por escrito de la Autoridad o con permiso condicionado de la Autoridad.

30. El Capítulo 4, *DEFINICIONES* del *Reglamento Conjunto de Permisos para Obras de Construcción y Uso de Terrenos*, Junta de Planificación del 29 de noviembre de 2010, define **Edificación** como: "[o]bra construida por el ser humano que incluye edificios y estructuras".

31. El Capítulo 4, *DEFINICIONES* del *Reglamento Conjunto de Permisos para Obras de Construcción y Uso de Terrenos*, Junta de Planificación del 29 de noviembre de 2010, define **Estructura** como:

Aquello que se erige, construye, fija o sitúa por la mano del ser humano en, sobre o bajo el terreno o agua e incluye sin limitarse a, edificios, torres, chimeneas, líneas de transmisión aéreas y tubería soterrada, tanque de almacenaje de gas o líquido que está principalmente sobre el terreno, así como también las casas pre- fabricadas. El término estructura será interpretado como si fuera seguido de la frase "o parte de las mismas".

32. El Capítulo 4, *DEFINICIONES* del *Reglamento Conjunto de Permisos para Obras de Construcción y Uso de Terrenos*, Junta de Planificación del 29 de noviembre de 2010, define **Obra** como: "[e]structuras, incluyendo las mejoras y trabajos que se realicen al terreno para facilitar o complementar la construcción de estos, así como las mejoras e instalaciones necesarias para el uso, segregación, subdivisión o desarrollo de terrenos".

33. **Las limitaciones indicadas en el requerimiento de admisión núm. 17 anterior no permiten a la parte con interés la construcción permanente sobre la servidumbre de una calle asfaltada compuesta de dos o más carriles para darle acceso al remanente de la propiedad.** (Énfasis suplido.)

34. Las limitaciones indicadas en el requerimiento de admisión núm. 17 anterior no permiten a la parte con interés la construcción permanente de cualquier estructura sobre la servidumbre.

35. Las limitaciones indicadas en el requerimiento de admisión núm. 17 anterior no permiten la construcción permanente por debajo de la servidumbre de las facilidades del sistema sanitario y agua potable para darle servicio al remanente de la propiedad.

KEF2012-0039

36. Las limitaciones indicadas en el requerimiento de admisión núm. 17 anterior no permiten la construcción permanente por debajo la servidumbre de las facilidades eléctricas para darle servicio al remanente de la propiedad.

37. Las limitaciones indicadas en el requerimiento de admisión núm. 17 anterior no permiten la construcción permanente sobre o por debajo la servidumbre.

38. **Las limitaciones indicadas en el requerimiento de admisión núm. 17 dejaban sin acceso al remanente de la propiedad y la hacía inservible para su uso, porque no se podía construir instalar o ubicar estructuras o edificación permanente o temporal tanto sobre cómo debajo de la servidumbre. (Énfasis suplido.)**

39. **Las limitaciones indicadas en el requerimiento de admisión núm. 17 dejaban sin acceso al remanente de la propiedad y la hacían inservible para su uso, por su zonificación que es comercial (EV-4). (Énfasis suplido.)**

40. Las limitaciones de la servidumbre dividieron la propiedad de la parte con interés en dos parcelas.

41. **Las limitaciones de la servidumbre dejan sin acceso al remanente de la finca propiedad de la parte con interés. (Énfasis suplido.)**

42. **Las limitaciones de la servidumbre dejan sin acceso al remanente de la finca propiedad de la parte con interés, por lo que la hace inservible para el uso al que se destina. (Énfasis suplido.)**

43. **Las limitaciones de la servidumbre dejan enclavada sin acceso al remanente de la finca propiedad de la parte con interés. (Énfasis suplido.)**

44. **La cabida de la propiedad de la parte con interés es de 11,750.0790m/c, según surge del plano de mensura certificado por el agrimensor licenciado Rafael Mojica Torres. (Énfasis suplido.)**

45. En el plano que se acompaña en el requerimiento de admisión núm. 33 anterior se ilustra la servidumbre del *Proyecto del Corredor de Utilidades del Sur* (Parcela 20-A).

46. **En el plano que se acompaña en el requerimiento de admisión núm.33 anterior, donde se ilustra la servidumbre del *Proyecto del Corredor de Utilidades del Sur* (Parcela 20-A), se puede apreciar que el remanente de la propiedad de la parte con interés queda enclavada y sin acceso a vía pública. (Énfasis suplido.)**

47. Al momento de radicarse la expropiación forzosa en el presente caso, la parte con interés tenía aprobado preliminarmente la construcción de un proyecto consistente de varias edificaciones para operar restaurantes y oficinas, proyecto comercial número AP 2011-0002 (08-0002230) Oficina de Permisos, Gobierno Municipal Autónomo de Ponce.

48. La parte con interés le entregó a la peticionaria, por conducto de su representante legal Lcda. Dayanara Mejías, copia de la resolución de dicho proyecto y de que el mismo está vigente.

49. La parte con interés le envió a la peticionaria, por conducto de su representante legal Lcda. Dayanara Mejías, copia del *Informe de Valoración* preparado por el evaluador profesional Ing. Isidro Martínez, por

correo electrónico el 9 de diciembre del 2013, que incluye: el plano de proyecto aprobado preliminarmente y las resoluciones de que está vigente.

50. La página 4 del *Exhibit B* del *Informe de Valoración* tiene el plano de situación para el proyecto comercial AP 2011-0002 (08-0002230).

51. Las limitaciones indicadas en el requerimiento de admisión núm. 17 anterior no permiten la construcción permanente de las estructuras del proyecto comercial AP 2011-0002 (08-0002230), según se ilustran en el plano de situación para el proyecto comercial AP 2011-0002 (08-0002230), que aparece en la página 5, *Exhibit B*, del *Informe de Valoración*.

52. La Autoridad de Energía Eléctrica no endosó el proyecto comercial AP 2011-0002 (08-0002230) porque el mismo estaba afectado por la servidumbre del *Proyecto del Corredor de Utilidades del Sur.*

53. Toda construcción de líneas de distribución en el desarrollo de nuevas urbanizaciones, centros y áreas comerciales, industriales y toda lotificación deberá realizarse de forma soterrada.

54. Lo expresado en el requerimiento de admisión núm. 42 anterior es correcto según lo estipula el comunicado 12-01 de la Autoridad de Energía Eléctrica.

55. Toda construcción de líneas de distribución en el desarrollo de nuevas urbanizaciones, centros y áreas comerciales, industriales y toda lotificación debe realizarse de forma soterrada y constituyen una construcción permanente.

56. Sin el endoso de la Autoridad de Energía Eléctrica el proyecto comercial AP 2011-0002 (08-0002230) no podía aprobarse finalmente.

57. Sin el endoso de la Autoridad de Energía Eléctrica el proyecto comercial AP 2011-0002 (08-0002230) no podía ser construido.

58. Las resoluciones autorizando prórrogas al caso del proyecto comercial AP 2011-0002 (08-0002230) están incluidas en el *Informe de Valoración* del Ing. Isidro Martínez, páginas 6 a la 14, enviado a la AEE por correo electrónico el 9 de diciembre del 2013.

59. El acápite tres y cuatro (3 y 4) de la sexta página *USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE*, parte *D. Estructuras o Edificaciones* del *Exhibit "B"* establece lo siguiente:

    3. Tampoco se permite en el espacio aéreo y de la/s servidumbre/s las estructuras en voladizo con balcones o terrazas.

    4. [...] No se permitirá en la/s servidumbre/s la construcción de verjas de roca, cemento, bloques, ladrillos o cualquier otro material de carácter permanente.

60. Las limitaciones incluidas en el requerimiento de admisión núm. 47 anterior no indican que pueden variarse, eliminarse u obviarse previa autorización de la Autoridad o. previo consentimiento por escrito de la Autoridad o con permiso condicionado de la Autoridad.

61. Las limitaciones que pueden variarse, eliminarse, obviarse o realizarse previa autorización de la Autoridad o previo consentimiento por escrito de la Autoridad o con permiso condicionado de la Autoridad son las siguientes:

KEF2012-0039                                                                    19

a) Cuarta y quinta página *USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE*, parte *B. Nivel y Elevación del Terreno* del *Exhibit "B"* que dice lo siguiente:

   1. Se prohíbe rellenar, rebajar, socavar o en forma alguna a alterar el nivel o elevación de la franja de terreno que constituye la/s servidumbre/s, sin el previo consentimiento escrito de la Autoridad.

   2. Se prohíbe efectuar cualquier tipo de excavación, hincar pilotes, u otros objetos, o introducir artefactos u objetos de clase alguna en la franja de terreno que constituye la/s servidumbre/s sin el previo consentimiento escrito de la Autoridad.

   3. Se prohíbe el uso de excavadoras en la servidumbre sin la previa autorización de la Autoridad y del procedimiento o reglamento aprobado para tales fines, según se determine caso a caso.

b) Quinta y sexta página *USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE*, parte *C. Actividades Agrícolas* del *Exhibit "B"* que dice lo siguiente:

   4. Se permite la creación de diseños paisajistas o jardines a diez pies de la tubería soterrada. El diseño propuesto tiene que radicarse y aprobarse previamente por la Autoridad. [...]

   5. Se permite la instalación de nuevos sistemas de riego con la previa aprobación de la Autoridad.

c) Sexta página *USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE*, parte *D. Estructuras o Edificaciones* del *Exhibit "B"* que dice lo siguiente:

   4. Se permite la instalación de verjas temporeras en aquellos casos que cuente con una aprobación previa de la Autoridad. [...]

d) Séptima página *USO, DISFRUTE Y LIMITACIONES DE LA SERVIDUMBRE*, parte *E. Uso de la/s Servidumbres como Estacionamiento* del *Exhibit "B"* que dice lo siguiente:

   1. Como regla general, la Autoridad no permite el uso de sus servidumbres como estacionamiento. No obstante, en casos de interés social y cuando no existan otras alternativas para el desarrollo de un proyecto, la Autoridad puede otorgar un permiso condicionado para este uso, siempre y cuando se provea el diseño que cumpla con los parámetros de seguridad que requiera la Autoridad.

   2. Para los permisos condicionados, debe considerarse, donde sea posible, los estacionamientos sin asfalto. Los trabajos de mantenimiento en los estacionamientos se harán coordinados con el dueño poseedor de la propiedad, a excepción de casos de emergencias. La Autoridad requiere que se obtenga una póliza de seguro de responsabilidad a favor de ella, como una de las condiciones para el uso de la/s servidumbre/s como estacionamiento.

62. **Las limitaciones incluidas en el requerimiento de admisión núm. 49 anterior son las únicas limitaciones incluidas en el *Exhibit "B"* del legajo de expropiación que pueden variarse, eliminarse, obviarse o realizarse previa autorización de la Autoridad o previo consentimiento por escrito de la Autoridad o con permiso condicionado de la Autoridad. (Énfasis suplido.)**

63. **En reunión celebrada entre las partes y sus tasadores se llegaron a las siguientes estipulaciones:**

a) **Que el valor unitario de la propiedad es de $295.00 el metro cuadrado.**

b) **Que el término de la expropiación temporal se extendió por un (1) año, diez (10) meses y veinticinco (25) días.**

c) **Que el interés para determinar la justa compensación por la expropiación temporal en concepto de canon de arrendamiento, será el ocho por ciento (8%) del valor de la propiedad. (Énfasis suplido.)**

64. El Artículo 14 del Código Civil de Puerto Rico indica lo siguiente: "[c]uando la ley es clara libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu".

65. La Opinión del Secretario de Justicia Núm. 1979-9 indica que es un principio de derecho, firmemente establecido, que para la interpretación de las reglas y reglamentos debe recurrirse a los principios de interpretación de las leyes.

66. La Opinión del Secretario de Justicia Núm. 1979-9 establece que los principios de hermenéutica también son de aplicación a la interpretación de las reglas y reglamentos administrativos.

-III-

El Artículo II, Sección 9, de nuestra Constitución, 1 L.P.R.A. Tomo I, dispone que el poder del Estado para expropiar propiedad privada está limitado por la exigencia del pago de una justa compensación, que la cosa sea dedicada a un fin público y que se siga el procedimiento establecido por ley. Véase también, López v. A.E.E., 151 D.P.R. 701 (2000); Culebra Enterprises Corp. v. E.L.A., 143 D.P.R. 935 (1997); Adm. de Terrenos v. Nerashford Dev. Corp., 136 D.P.R. 801 (1994); Culebra Enterprises Corp. v. E.L.A., 127 D.P.R. 943 (1991); E.L.A. v. Rosso, 95 D.P.R. 501 (1967).

Así pues, al ejercer este poder inherente de expropiar propiedad privada el Estado tiene la obligación de actuar conforme al procedimiento provisto por la *Ley de Expropiación Forzosa de 12 de marzo de 1903 (Ley de Expropiación Forzosa)*, 32 L.P.R.A. § 2901 *et seq.* En particular, la sección 5(d) de este estatuto, adicionada mediante la Ley Núm. 286 de 12 de mayo de 1949, dispone que:

> En cualquier procedimiento entablado o que se entable por y a nombre y bajo la autoridad del Estado Libre Asociado de Puerto Rico o Gobierno Estadual, bien actúe en tales procedimientos el Estado Libre Asociado de Puerto Rico o Gobierno Estadual por propia iniciativa y para su propio uso, o bien a requerimiento y para fines de cualquier agencia o instrumentalidad del Estado Libre

Asociado de Puerto Rico; [...], quedan autorizados para desistir total o parcialmente, [...], de la adquisición de cualquier propiedad o parte de la misma o cualquier interés que en la misma haya sido o sea expropiado por o para la entidad expropiante por declaración de adquisición o de otro modo, y el título de dicha propiedad revertirá total o parcialmente, según sea el caso de desistimiento, a sus antiguos dueños; Disponiéndose, que los antiguos dueños de dichas propiedades podrán reclamar en el mismo procedimiento por el cual se hubiera adquirido título sobre las mismas, cualesquiera daños que se les hubiesen ocasionado por dicha adquisición y el consiguiente desistimiento total o parcial de dicha adquisición. La cantidad que el tribunal determinare que deba ser pagada como daños por la parte actora en el procedimiento de expropiación que motivó la adquisición devengará intereses al seis por ciento (6%) anual desde la fecha de la adquisición por la entidad expropiante hasta el pago total de la suma determinada por tal concepto. [...]

En caso de que la adquisición de una propiedad hubiere sido hecha mediante la declaración de adquisición provista por la sec. 2907 de este título y conforme a la misma se hubiera depositado en el tribunal la cantidad estimada por la entidad expropiante como justa compensación por la propiedad objeto de expropiación, en los casos de desistimiento total o parcial, regirán las siguientes reglas:

(a)  Si la sentencia que se dictare en la reclamación de daños por desistimiento total o parcial de la adquisición excediera la suma consignada y el antiguo dueño de la propiedad hubiese retirado la misma, la entidad expropiante sólo pagará intereses sobre la diferencia entre una y otra suma [...].

(b)  Si la cantidad determinada por concepto de daños por el desistimiento total o parcial de la adquisición fuese menor que la suma consignada y el antiguo dueño de la propiedad adquirida hubiera retirado la suma así consignada, vendrá éste obligado a la devolución, a la entidad expropiante, del exceso retenido sobre la suma determinada por concepto de daños y no se devengarán intereses algunos sobre la misma. 32 L.P.R.A. § 2910. (Énfasis suplido.)

Es decir, la sección 5(d) de la *Ley de Expropiación Forzosa, supra,* dispone que a la parte actora en un procedimiento de expropiación le asiste el derecho a retirarse del trámite adquisitivo. 32 L.P.R.A. § 2910. Sin embargo, ejercida esta facultad del Estado de desistir de proyectos que no son convenientes al interés público, la misma disposición reconoce al antiguo dueño de la propiedad una causa de acción contra la parte que inició el procedimiento, con el fin de ser remunerado económicamente por los daños que la adquisición y el consiguiente desistimiento le haya ocasionado a la etapa en que se verificó el abandono de la acción procesal de expropiación. 32 L.P.R.A. § 2910. De otra parte, surge claramente la amplitud y el carácter

inclusivo de los daños por desistimiento, siendo las únicas limitaciones impuestas por el estatuto: 1) que el daño sea ocasionado por la expropiación de un interés en la propiedad y el ulterior desistimiento de la adquisición, y; 2) que la reclamación sea ·hecha por el antiguo dueño de la propiedad, dentro del procedimiento de expropiación.

Sobre el particular, la licenciada Cynthia Torres Torres, en su libro *La Expropiación Forzosa en Puerto Rico: ley, jurisprudencia, estudio y guía práctica,* San Juan, First Book Publishing of P.R., 2002, págs. 202-203, comenta que:

> [E]l hecho de que el Estado decida descontinuar un procedimiento de expropiación, no significa que no tenga que indemnizar en algunos casos por la adquisición temporal de la propiedad o los daños que el desistimiento ocasione. El tribunal dentro de su facultad puede condicionar el desistimiento al pago de estos conceptos. En ese aspecto la ley crea una causa de acción en daños contra el Estado, que de acuerdo con sus términos es más abarcadora que la que ordinariamente existe cuando es la expropiación la que los ha ocasionado. Los daños causados por una expropiación generalmente se limitan a la propiedad en sí, mientras que respecto a los provocados por un desistimiento la ley nos indica que "...los antiguos dueños de dichas propiedades podrán reclamar en el mismo procedimiento por el cual se hubieran adquirido título sobre las mismas, cualesquiera daños que se les hubiesen ocasionado por dicha adquisición."
>
> Como se puede apreciar, la ley se refiere únicamente a los daños que el Estado puede quedar obligado a pagar por un desistimiento, si adquirió el título de la propiedad. Estos son los casos donde se radica la Declaración para la Adquisición de la Propiedad, y se deposita la justa compensación. **Así, en términos generales el Estado está sujeto a indemnizar por dos partidas, la primera es por la adquisición de la propiedad que luego se desiste y la otra por los daños que el desistimiento ocasione.** (Énfasis nuestro.)

De acuerdo con el análisis previo, tras el desistimiento de una adquisición, el Estado viene llamado a indemnizar por la posesión del derecho adquirido sobre la propiedad objeto de expropiación por el término de su tenencia (32 L.P.R.A. Ap. V R. 58.8.), así como por "cualesquiera daños que se les hubiesen ocasionado por dicha adquisición y el consiguiente desistimiento total o parcial de [ésta]" (32 L.P.R.A. § 2910). En consecuencia, como resultado del desistimiento se pueden entender comprendidos entre los daños a ser

valorados el restablecimiento y la pérdida de uso de la propiedad, así como los

honorarios de abogados y peritos.

Al determinar el importe de la compensación a pagar por el término de

la tenencia del Estado sobre el sujeto adquirido, ante el vacío legislativo y la

ausencia de jurisprudencia aplicable, adoptamos por analogía el canon que

habría exigido el gobierno en el arrendamiento de terrenos o edificios

propiedad del Estado. En lo pertinente, el Art. 133 del Código Político dispone,

que:

> El Secretario de Transportación y Obras Públicas vigilará todas las
> obras públicas estaduales, y tendrá a su cargo todas las
> propiedades estaduales, incluyendo los edificios, caminos y
> puentes públicos, las fuerzas hidráulicas, los ríos no navegables y sus
> cauces, las aguas subterráneas, minas y minerales debajo de la
> superficie de terrenos particulares, los terrenos públicos y las tierras
> públicas, los registros y archivos públicos y terrenos saneados;
> excepto todas las propiedades adjudicadas al Estado Libre
> Asociado de Puerto Rico en cobro de contribuciones en o antes de
> la fecha de efectividad de esta ley, que no se utilicen para fines
> públicos. 3 L.P.R.A. § 411.

En conformidad con la referida disposición, el Art. 2, inciso (b), de la Ley

Núm. 12 de 10 de diciembre de 1975 (Ley Núm. 12) faculta al Secretario de

Transportación y Obras Públicas para "disponer el arrendamiento de terrenos,

edificios o espacio en edificios bajo su custodia propiedad del Estado Libre

Asociado de Puerto Rico cuando fuere necesario o beneficioso para el interés

público". 28 L.P.R.A. § 31.

El procedimiento aplicable a la disposición de bienes o edificios públicos

mediante arrendamiento se rige por lo dispuesto en el Art. 9, inciso (e) de la Ley

Núm. 12, que establece que el canon será el ocho por ciento (8%) del valor de

la propiedad en el mercado a la fecha del otorgamiento del contrato de

arrendamiento. 28 L.P.R.A. § 31h. Nos parece razonable aplicar igual criterio

para ajustar el valor del daño causado por la posesión temporal de un derecho

adquirido sobre un sujeto expropiado, tras el desistimiento de su adquisición.

-IV-

24

La reclamación de daños de la parte con interés se fundamenta en que la limitación impuesta por la servidumbre *constituida y luego desistida* sobre la *Parcela AEE 20-A* le privó de todo uso productivo a: 1) el predio de 1,175.9715m/c sobre el cual se estableció el gravamen, y; 2) la totalidad de la finca a que pertenece el predio sobre el que se constituyó el gravamen, finca número 25,105 de 11,750.0790m/c. La parte valoró los daños a la finca completa en $528,772.00 (sin intereses), teniendo en cuenta que el periodo de vigencia del gravamen fue del 29 de febrero de 2012, fecha de la presentación del caso, al 24 de enero de 2014, cuando se dictó la *Sentencia Parcial* por desistimiento.[3] Por su parte, la peticionaria AEE alega que los daños por desistimiento se limitan al canon de arrendamiento por el derecho de servidumbre adquirido y desistido sobre la *Parcela AEE 20-A* de 1,175.9715m/c y no sobre la totalidad de la finca número 25,105. Esta parte valoró los daños por desistimiento por el mismo periodo de afectación en la cantidad de $26,012.47 (sin intereses). Es importante destacar que en sus cómputos ambas partes coinciden en que: 1) el periodo de afectación por la expropiación es del 29 de febrero de 2012 al 24 de enero de 2014; 2) el valor unitario por metro cuadrado de terreno es de $295.00, y; 3) el canon por la posesión temporal del derecho expropiado y luego desistido es el ocho por ciento (8%) anual del valor de mercado de la propiedad.

Como hemos expresado, los daños que el Estado queda obligado a pagar por el desistimiento del derecho adquirido sobre una propiedad se limita a dos partidas: 1) el pago por la adquisición de la propiedad que luego fue desistida, y; 2) los daños que el desistimiento de la acción de expropiación le haya ocasionado, como son: a) los gastos para restablecer la propiedad a su

[3] El cómputo del daño, según consignado en el *Informe de la Conferencia Preliminar entre Abogados*, es el siguiente:
Valor de la finca: 11,750.0797 m/c x $295.00= $3,466,273.51
Renta anual: $3,466,273.51 x 8% = $277,301.88
Renta diaria: $277,301.88/ 365 = $759.73
Periodo de vigencia de la servidumbre: 29 de febrero de 2012 a 24 de enero de 2014 (1 año, 10 meses y 25 días = 696 días)
Renta por el periodo vigencia de la servidumbre: $528,772.08

condición previo a la incautación, y; b) los gastos por representación legal y peritos incurridos para enfrentar el litigio, cuyo trabajo no tiene ulterior valor luego del desistimiento.[4]

La parte con interés sostiene que las limitaciones impuestas por el *Proyecto Corredor de Utilidades del Sur* destruyó todo uso productivo de la *Parcela AEE 20-A* de 1,175.9715m/c afectada por la servidumbre expropiada y que el remanente de la finca número 25,105, donde sitúa el terreno gravado por el derecho adquirido y luego desistido, quedó enclavada por el término del gravamen.

Reiteradamente el Tribunal Supremo de Puerto Rico ha resuelto que dentro del trámite de expropiación forzosa "no corresponde a los tribunales revisar las determinaciones sobre la naturaleza o **extensión del derecho a adquirirse, la cantidad de terreno a expropiarse**, la necesidad o lo adecuado del sitio en particular, porque ésta es una función que ejerce la legislatura bien directamente o delegándola en agencias y funcionarios". Aut. Tierras v. Moreno & Ruiz Dev. Corp., 174 D.P.R. 409 (2008); Aut. Carreteras v. 8,554.741 m/c J, 172 D.P.R. 278 (2007); E.L.A. v. Soc. Civil Agrícola e Industrial, 104 D.P.R. 392 (1975); M. Mercado e Hijos v. Tribl. Superior, 85 D.P.R. 370 (1962).

En este caso, en el ejercicio de su poder de dominio eminente, la AEE optó por expropiar únicamente la *Parcela AEE 20-A* de 1,175.9715m/c para el establecimiento del *Proyecto Corredor de Utilidades del Sur* y consignó el pago de la compensación estimada por el valor del gravamen de servidumbre sobre el terreno que juzgó necesario para instalar, operar y mantener la obra pública programada. No obstante, el *Proyecto Corredor de Utilidades del Sur* no se construyó y tampoco se llegó a realizar trabajo alguno en el sujeto expropiado,

---

[4] Según consignado en la *Moción Solicitando Se Dicte Sentencia Sumaria Parcial Interlocutoria A Favor De La Parte Con Interés A Tenor Con La Regla 36 De Las Reglas De Procedimiento Civil Vigentes* "aparte de las controversias aquí mencionadas no existen ningunos otros asuntos litigiosos o en controversia". De lo anterior se desprende que la reclamación de daños por desistimiento de la parte con interés no incluye partida alguna por gastos para restablecer la propiedad a su condición previa a la incautación o gastos por representación legal y peritos incurridos para enfrentar el litigio.

por lo que, a solicitud de la AEE, el Tribunal permitió el desistimiento del pleito de expropiación en cuanto a la propiedad adquirida.

Sin embargo, aunque abandonado el fin público y revertido el título de la propiedad expropiada a su antiguo dueño previo a que porción alguna del terreno fuese ocupado o utilizado por la AEE, con su renuncia a confrontar efectivamente el requerimiento de admisiones, ya que no interpuso reparo alguno de impropiedad al contenido o a la redacción de los requerimientos, la peticionaria reconoció que: 1) la cabida de la propiedad de la parte con interés es de 11,750.0790m/c; 2) las restricciones manifestadas en el *Exhibit B* de la *Petición* (titulado: *Limitaciones Establecidas Sobre la Servidumbre Identificada en El Exhibit "A"*) fueron absolutas e imposibilitaron todo uso productivo del predio gravado; y, 3) la servidumbre dejó al remanente de la propiedad perteneciente a la parte con interés sin su único acceso a vía pública y, ya que una propiedad enclavada pierde su valor económico, el dueño debe ser compensado. **La veracidad de estos hechos, así como la aplicación de la ley a los mismos, no sólo quedó admitida tácitamente por virtud del transcurso del término que conceden las Reglas de Procedimiento Civil para contestar u objetar un requerimiento, sino que fue específicamente admitida mediante la *Orden* emitida el 1 de diciembre de 2014, de la que la parte peticionaria no recurrió.[5]**

Las disposiciones de la Regla 33 de Procedimiento Civil, 32 L.P.R.A. Ap. V, son mandatorias, no meramente directivas, lo que requiere que haya un cumplimiento sustancial con las mismas. <u>Audiovisual Lang. v. Sist. Est. Natal Hnos.</u>, 144 D.P.R. 563 (1997). Por tanto, la admisión tácita, o sea, por no haberse contestado un requerimiento al amparo de la Regla 33, *supra*, dentro del término establecido para ello, conlleva que las cuestiones sobre las cuales se solicita la admisión se tengan por admitidas automáticamente. Aún más, la

---

[5] La parte peticionaria AEE aún no ha contestado u objetado el requerimiento de admisiones que le fue solicitado el 2 de septiembre de 2014. Su esfuerzo por refutarlo en su moción en oposición a que se dicte sentencia sumaria ni siquiera hace referencia a las 54 cuestiones sobre las cuales se le solicitó admisión.

KEF2012-0039                                                                    27

figura procesal del requerimiento de admisiones puede utilizarse como base

para la presentación de una moción solicitando sentencia sumaria bajo la

Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. V, Audiovisual Lang. v. Sist. Est.

Natal Hnos., *supra*, a la pág. 573. En consecuencia, consignada en el tracto

procesal del caso la indiferencia a los múltiples esfuerzos del Tribunal y de la

parte con interés para que la parte peticionaria cumpliera con admitir, negar u

objetar lo requerido, **ausente de moción que permita su retiro o enmienda, se**

**considera como definitiva la veracidad de las cuestiones de hechos sobre los**

**que se le solicitó la admisión a la AEE, así como la aplicación de la ley a esos**

**hechos.** Sobre este asunto, véase también Rivera Prudencio v. Mun. de San

Juan,170 D.P.R. 149 (2007).

Por tanto, disuelta la controversia de que a virtud de la obra proyectada

la parte con interés estuvo impedida de utilizar o dedicar a cualquier uso u

obtener beneficio alguno de la *Parcela ÁEE 20-A* de 1,175.9715m/c y del

remanente de la finca número 25,105, procede la imposición de una

compensación por la incautación temporal del pleno dominio de la cabida

total de la propiedad de la parte con interés de 11,750.0790m/c, por la

vigencia de la adquisición.

La valoración es la siguiente:

Valor de la *Finca 25,105* = $3,466,273.30 (11,750.0790m/c x $295.00 unitario)

Compensación anual = $277,301.86 ($3,466,273.30 x 0.08 o tasa capitalización 8%)

### CÓMPUTO DE LA COMPENSACIÓN DE DAÑOS POR DESISTIMIENTO

| PERIODO | VALOR | TASA ANUAL | COMPENSACIÓN |
|---|---|---|---|
| 29/02/2012 a 31/12/2012 | $3,466,273.30 | 8% | $233,237.11 (307 días) |
| 1/01/2013 a 31/12/2013 | $3,466,273.30 | 8% | $277,301.86 |
| 1/01/2014 a 24/01/2014 | $3,466,273.30 | 8% | $18,233.52 (24 días) |
| | | TOTAL | $528,772.49 |

No habiendo retirado la parte con interés la suma consignada a la

presentación del caso ($88,000.00), la cantidad a ser pagada en daños por

desistimiento devenga intereses al seis por ciento (6%) anual (interés simple),

desde la fecha de la adquisición hasta el pago total de la suma determinada

por tal concepto.[6]

| COMPENSACIÓN | PERIODO | INTERÉS ANUAL | COMPENSACIÓN |
|---|---|---|---|
| $528,772.49 | 29/02/2012 a 31/12/2012 | 6% | $26,684.44 (307 días) |
| $528,772.49 | 1/01/2013 a 31/12/2013 | 6% | $31,726.35 |
| $528,772.49 | 1/01/2014 a 31/12/2014 | 6% | $31,726.35 |
| $528,772.49 | 1/01/2015 a 13/05/2015 | 6% | $13,124.92 (133 días) |
| | | | TOTAL    $101,698.16 |

Por todo lo dicho, la AEE deberá compensar a la parte con interés en la

cantidad de $630,470.65, que incluye intereses hasta el 13 de mayo de 2015, y

en la suma de $86.92 por cada día adicional que tarde en completar el pago.

Por último, para disponer finalmente de la causa de epígrafe, nos queda

por resolver la quinta controversia formulada por la parte con interés, a saber: si

procede o no la reclamación de daños por concepto de la paralización del

desarrollo comercial del remanente de la propiedad de la parte con interés.

[6] Así lo prevé la sección 5(d) de la Ley de Expropiación Forzosa, 32 L.P.R.A. § 2910, al disponer que:
> La cantidad que el tribunal determinare que deba ser pagada como daños por la parte actora en el procedimiento de expropiación que motivó la adquisición devengará intereses al seis por ciento (6%) anual desde la fecha de la adquisición por la entidad expropiante hasta el pago total de la suma determinada por tal concepto. [...]
> En caso de que la adquisición de una propiedad hubiere sido hecha mediante la declaración de adquisición provista por la sec. 2907 de este título y conforme a la misma se hubiera depositado en el tribunal la cantidad estimada por la entidad expropiante como justa compensación por la propiedad objeto de expropiación, en los casos de desistimiento total o parcial, regirán las siguientes reglas:
> (a) Si la sentencia que se dictare en la reclamación de daños por desistimiento total o parcial de la adquisición excediera la suma consignada y el antiguo dueño de la propiedad hubiese retirado la misma, la entidad expropiante sólo pagará intereses sobre la diferencia entre una y otra suma y con sujeción a lo antes dispuesto con respecto a apelaciones.

En el caso que nos ocupa, la adquisición de la propiedad se hizo mediante la declaración de adquisición provista por la sección 2907 de la Ley de Expropiación Forzosa, supra, y la sentencia que se dicta en daños por desistimiento excede la suma consignada. Sin embargo, el antiguo dueño de la propiedad no llegó a retirar la cantidad estimada como justa compensación por el sujeto, por lo que la cantidad a ser pagada como daños devenga intereses al seis por ciento (6%) anual desde la fecha de la adquisición hasta el pago total de la suma determinada.

KEF2012-0039

29

Sobre este asunto se alegó en la *Moción Solicitando Se Dicte Sentencia Sumaria Parcial Interlocutoria A Favor De La Parte Con Interés A Tenor Con La Regla 36 De Las Reglas De Procedimiento Civil Vigentes* que:

> La parte con interés entiende que la peticionaria le debe pagar por todos los daños que esta pruebe incluyendo la paralización del desarrollo comercial de la parte con interés como consecuencia de las limitaciones de la servidumbre del Corredor. Además porque la AEE le denegó el endoso ha (sic) dicho proyecto por estar afectado por la servidumbre del Corredor Utilidades del Sur sin el cual el proyecto no podía aprobarse finalmente ni construirse.

No tiene razón. Como hemos reconocido, la peticionaria debe compensar a la parte con interés por la privación temporera de todos los usos productivos de su propiedad por el término de la expropiación, tiempo durante el cual la parte con interés estuvo impedida del libre uso y disposición de toda la finca 25,105 para fin alguno. Sin embargo, la compensación a la que tiene derecho es aquella suma de dinero que representa el valor de la propiedad por el término de la afectación y las pérdidas comerciales durante ese periodo no constituyen un elemento de valor de la propiedad, por lo que no se pueden recuperar como daños consecuentes a la expropiación temporal.

Se ordena la eliminación de John Doe y Richard Roe por carecer de interés en estos procedimientos.

**REGÍSTRESE Y NOTIFÍQUESE.**

En San Juan, Puerto Rico a 14 de julio de 2016.

**MABEL RAMÓN MILLIÁN**
**JUEZ SUPERIOR**

*CERTIFICO:*

_____
Griselda Rodríguez Collado
Secretaria General Regional

Por: _____
Ammi Morales De Jesus
Secretaria Auxiliar