**Hearing Date**: June 6, 2018 at 9:30 a.m. (AST)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

----------------------------------------------------------------------- x

|  |  |
|---|---|
| In re: | : |
|  | : |
| THE FINANCIAL OVERSIGHT AND | : PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | : Title III |
|  | : |
| as representative of | : Case No. 17-BK-3283 (LTS) |
|  | : |
| THE COMMONWEALTH OF PUERTO RICO *et al.,* | : (Jointly Administered) |
|  | : |
| Debtors.[1] | : |

----------------------------------------------------------------------- x

### OMNIBUS REPLY IN SUPPORT OF RENEWED MOTION OF CREDITORS' COMMITTEE SEEKING ENTRY OF ORDER, UNDER BANKRUPTCY RULE 2004, AUTHORIZING DISCOVERY PROGRAM WITH RESPECT TO CERTAIN CAUSES OF PUERTO RICO FINANCIAL CRISIS BEGINNING ON AUGUST 15, 2018

---

[1]  The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and  (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## <u>TABLE OF CONTENTS</u>

**Page**

I.     OVERSIGHT BOARD LIMITED COMMITTEE'S INVOLVEMENT BY
       DESIGN ................................................................................................................ 5

II.    INVESTIGATOR'S PRESENT WORK REVEALS NEED FOR FOLLOW-UP,
       AS "INTERVIEWS" ARE MERELY FIRESIDE CHATS WITHOUT
       DOCUMENTS ...................................................................................................... 7

III.   COMMITTEE HAS STATUTORY AUTHORITY TO INVESTIGATE THESE
       ISSUES, AND HAS DIFFERENT AIMS ..................................................... 10

IV.    TIME FOR AUTHORIZATION IS NOW – AUGUST 15, 2018 REMAINS
       APPROPRIATE START DATE ...................................................................... 15

V.     DUPLICATION AND BURDEN CONCERNS ARE EASILY ADDRESSED –
       PRODUCE IN AUGUST, DISPUTE LATER ............................................... 17

VI.    AAFAF SHOULD CONSENT TO SHARE MATERIALS PROMPTLY .................... 18

VII.   CONCLUSION ................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ritchie Capital Mgmt., L.L.C. v. Kelley*,
  785 F.3d 273 (8th Cir. 2015) ................................................13

*In re W. Pac. Airlines, Inc.*,
  219 B.R. 575 (Bankr. D. Colo. 1998) ................................................13

**Statutes**

11 U.S.C.
  § 546................................................3
  § 926(a)................................................12
  § 1103(c)................................................10, 12, 13
  § 1103(c)(2)................................................12
  § 1106................................................12

48 U.S.C. § 2194(m)(1)................................................15

PROMESA
  § 104(o)................................................10, 12, 16
  § 405(m)(1)................................................15

**Other Authorities**

Brad Setser, Council on Foreign Relations, Puerto Rico's "Voluntary"
  Restructuring of GDB Bonds (July 26, 2017) (available at
  https://www.cfr.org/blog/puerto-ricos-voluntary-restructuring-gdb-bonds) ................................20

Fed. R. Bankr. P.
  R 2004................................................10, 12, 13, 20
  R 2004(b)................................................12

Fed. R. Civ. Pr. Rule 26................................................20

OMNY Radio, *Sobre la Mesa,* May 18, 2018 (available at
  https://omny.fm/shows/sobre-la-mesa/sobre-la-mesa-viernes-18-de-mayo-de-
  2018)................................................2

Summary of Bank Account Balances for Puerto Rico Governmental
  Instrumentalities, Released Dec. 18, 2017 (available at
  http://www.aafaf.pr.gov/assets/aafaf-pres-summarybankaccounts.pdf )................................15

To the Honorable United States Magistrate Judge Judith G. Dein:

The Official Committee of Unsecured Creditors of all title III debtors (other than COFINA) (the "<u>Committee</u>") hereby submits this omnibus reply in support of the *Renewed Motion Seeking Entry of Order, Under Bankruptcy Rule 2004, Authorizing Discovery With Respect to Certain Causes of Puerto Rico Financial Crisis Beginning On August 15, 2018* [Docket No. 3066 (sealed version at Docket No. 3101)] (the "<u>Renewed Motion</u>") seeking to commence, beginning no later than August 15, 2018, a discovery program seeking discovery of certain financial institutions (as defined in the Motion referenced below, the "<u>Puerto Rico Financial Institutions</u>") as contemplated in the *Motion of Official Committee of Unsecured Creditors for Order, Under Bankruptcy Rule 2004, Authorizing Discovery Program With Respect to Certain Causes of Puerto Rico Financial Crisis* [Docket No. 706] (the "<u>Motion</u>").[1]

## <u>Introduction</u>

1.     The responses to the Committee's Renewed Motion[2] all take the same refrain— just keep waiting and trust that the Investigator will solve everything.  However, not a single party has contested the central problem: the Investigator has far different aims, and timelines, than the Committee.  The Investigator has stated repeatedly that he is above the fray and unconcerned with potential claims against third parties, and that he aims only to offer future policy fixes.  Indeed, since the filing of the Renewed Motion, it was revealed that the Investigator made the same representations even to the individuals his team interviewed— individuals who, in some instances, could very well have been targets of the investigation. According to former governor Aníbal Acevedo Vilá, when the Investigator's team interviewed

---

[1]     Capitalized terms used but not otherwise defined in this Renewed Motion have the meanings set forth in the Motion.

[2]     Responses were filed by (1) the Oversight Board [Docket No. 3117]; (2) the Retiree Committee [Docket No. 3119]; (3) the Santander entities [Docket No. 3120]; (4) AAFAF/GDB [Docket No. 3125]; and (5) Popular [Docket No. 3128].

him they reassured him by stating that they were not "doing any sort of investigation to say

who's to blame":

> "[T]hey interviewed or are interviewing all former governors, and the first thing
> they said to us [was], "**Look, this is a conversation, but we're not doing any
> kind of investigation to say who's to blame or anything.** We're making an
> analysis, well, to make recommendations [so] that, in the future, Puerto Rico will
> not make certain mistakes like the ones it made'. . . . **but I can confirm what the
> Committee says in the [renewed] motion**."[3]

2.      Again, the Committee takes no issue with the Investigator's stated aim of

restoring Puerto Rico's access to the capital markets.  However, the Committee has additional

aims, and the "wait for the report" approach cannot satisfy those aims.  The Committee knows **at

this very moment** that more work will be necessary.  Unless the Oversight Board takes the

position that there are not **any** claims to be considered or brought at all, then it will be necessary

for the Committee to dig deeper and explore issues, questions, or parties that the Investigator did

not address or reviewed with only a prospective focus.[4]  Because the report itself will be devoid

of any claim identification (or "finger pointing," as the Investigator puts it), the only way for the

Committee to meaningfully assess potential claims is through the underlying internal documents

from entities like the Puerto Rico Financial Institutions.   But, even if the Investigator were to

investigate and fully evaluate claims, the Nondisclosure Agreement imposed by the Investigator

means that any "source material" undergirding its report will **never** be made available for the

Committee's use.  Under the current framework, the Investigator has chosen only to share

materials from Santander and Popular, leaving the Committee in the dark as to productions from

---

[3]   OMNY Radio, *Sobre la Mesa,* May 18, 2018 (available at https://omny.fm/shows/sobre-la-mesa/sobre-la-mesa-
viernes-18-de-mayo-de-2018).  A certified translation of the relevant section of the interview, which begins at 42:14,
is available at Ex. 1.

[4]   The Oversight Board states in its Objection that the final report will "address the topics" raised by the Committee,
including an "identification of potential claims against third parties and matters for regulatory attention."  Oversight
Board Objection, ¶ 2.  However, this runs contrary to every statement made by the Investigator and the
Investigator's own "work plan" which removes references to claim identification.  *See* Renewed Motion, ¶ 25.

other entities.[5]  Indeed, the Investigator has been unable to secure the consent of AAFAF to share

GDB documents—one of the primary requests of the Committee's original Motion.  ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████  In other

words, no matter what kind of report the Investigator prepares, the Committee knows now that

additional work will be required, and there is no need to defer decision on this Renewed Motion.

3.      The wait-and-see approach also misses the timing concerns here.  Unlike the

Investigator's free-floating "let's offer fixes" report which has no expiration date, avoidance

actions **must** be filed no later than May 2019 before they run the risk of expiring under section

546 of the Bankruptcy Code.  Realistically, this means that the Committee's Discovery Program

must be well underway at the start of the fourth quarter of 2018, or ideally earlier.  And

avoidance actions are just the tip of the iceberg.  There are real issues regarding the validity of

guarantees or bonds (and the potential liability of underwriters with respect to such bonds) which

must be addressed in the context of plan negotiations.  Only the Committee has offered a

framework which makes that possible.  The Oversight Board states in its objection that it

"anticipates" that the Investigator's report will be finished by August 15, 2018 (just as it

anticipated earlier that the report would be finished by March 2018) and argues that the

Committee should just wait until that point when "each party can evaluate whether there is good

---

[5]      ████████████████████████████████████████████████████████████████

██████████████████████████████████████████████  While the
Retiree Committee vaguely mentions an "exit plan" that the Investigator proffered, *see* Retiree Committee
Objection, ¶ 3, the Investigator has not offered the same proposal to the Committee.  Moreover, the Oversight
Board's objection does not discuss any "exit plan."  Indeed, the Committee fully expects that the Investigator has
likely entered into NDAs or confidentiality agreements with those producing parties which would require the
Investigator to oppose (or potentially remain silent as to) any request to make those materials available.

cause for further discovery on this topic."   This argument ignores the nature of the Committee's request: that is almost exactly what is sought in the Renewed Motion, which contemplates meet-and-confer discussions beginning on August 15, 2018 with the aim of reporting back to the court at the September 12, 2018 omnibus hearing.  The Committee certainly hopes that the Investigator's report is thorough and that the Investigator has collected much of the necessary discovery to inform the Committee's claims identification process.  If that were the case (and there are indications it is not), the meet-and-confer discussions that the Committee has requested could be very short: the producing parties can simply reproduce the materials they already gave the Investigator and the Committee can immediately move to the next phase of its investigation.  Nevertheless, waiting until August or September to **brief** these issues means that the Committee will not obtain meaningful discovery until November or December, and even minor production disputes would put the May 2019 deadline at risk.  Of course, the Puerto Rico Financial Institutions know this, and would be happy with that result.

4.      In sum, and as discussed in greater detail below, a number of other factors indicate that authorization of the Committee's discovery program is appropriate here:

- While the Oversight Board complains that the Committee "infrequently" exercised its "extensive rights of participation," the Oversight Board does not mention that its Investigator created this situation by insisting on a Nondisclosure Agreement that had the practical effect of locking the Committee out of the Investigation permanentl ███████████████████████
███████████████████████████████████████████████████

- As it now appears, the Investigator's work will almost certainly require follow-up by the Committee. ████████████████████████████████████████
████████████████████████████████████████████

- The court already rejected the objectors' arguments that the Oversight Board is the **only** party to investigate, and the myriad issues that could be faced in the (hopefully) fast-moving title III cases reveal why the Committee should be permitted to commence discovery now.

- The Committee's framework—providing for meet-and-confer discussions in August 2018 and a report to the court by the September 2018 omnibus hearing—more than adequately addresses the duplication and burden concerns raised by the objecting parties. The Committee has no interest in duplicating anything.

- The Investigator has failed to secure AAFAF's consent to share GDB documents with the Committee or the Retiree Committee, again reflecting on the failure of the Investigator's structure to meaningfully allow the stakeholders in the title III cases to benefit from the Investigator's work on a real-time basis. Although AAFAF promises to resolve these issues by the hearing date, if that does not occur the court should order AAFAF to produce to the committees all the documents it has or will produce to the Investigator.

## I.   OVERSIGHT BOARD LIMITED COMMITTEE'S INVOLVEMENT BY DESIGN

5.    The Oversight Board complains that the Committee "failed to comply with the

Court's November 17, 2017 order," because the Committee assented to the Oversight Board's

Nondisclosure Agreement "four months after the Court ordered it to"[6] and then "infrequently []

exercised its extensive rights of participation and review." Oversight Board Objection, ¶ 3. The

Oversight Board can hardly be heard on this point, as its Investigator worked diligently to put the

Committee into this corner. Indeed, the Investigator spent the immediate months following the

court's ruling playing hardball with the Committee over the terms of its Nondisclosure

Agreement, insisting on a number of provisions that would, and did, have the practical effect of

sidelining the Committee permanently:

- <u>Review of discovery materials</u>: As mentioned in the Renewed Motion, the Investigator insisted on a framework that shielded from the Committee's view **any** materials voluntarily produced by third parties.[7] The Committee objected vigorously to this framework, yet ultimately conceded to an arrangement where it would be permitted to review materials from Santander and Popular, the two private institutions most central to the Committee's Motion.

---

[6]    The Oversight Board makes it sound as if its Investigator was making significant progress in those months—
neglecting to mention ████████████████████████████ In other words, the
failure to reach the terms of a Nondisclosure Agreement did not impede anything.

[7]    *See* Ex. 2, Dec. 22, 2017 email from D. Saval to S. Cooper (reiterating that the Investigator did not intend to share
voluntary discovery materials with the Committee).

Consistent with the Investigator's design, ████████████████████

- Use of discovery in court filings: The Investigator insisted for weeks that it had an unreviewable veto over the Committee's use of or reference to discovery materials in any court filing.[8]  This veto did not simply require that materials be filed under seal.  **Rather, if the Oversight Board objected to the Committee's proposed pleading, that pleading could never be filed with the court—period.**  Nor was there an end date on this veto power, which would last long after the Investigator's work ended.  The Investigator relented on this position only when the Oversight Board's counsel at Proskauer became involved.[9]

- Materials from AAFAF: Because the Investigator's authorized structure required third parties' consent before materials would be shared with the committees, those third parties have felt no pressure to cooperate.  That situation is shown most clearly by the status of GDB documents.  As the Retiree Committee has noted, AAFAF has been unwilling to share **any** GDB documents with either committee absent (a) the complete discretion to withhold entire categories of documents they deem to be "sensitive" (a concept unheard of prior to this point); and (b) an absolute prohibition on the committees' ability to use those documents in court filings.  *See also infra*, section VI.  This situation alone—and the Investigator's insistence that the Committee agree to AAFAF's framework—slowed the negotiation of the Nondisclosure Agreement.

- Interviews:  As mentioned in the Renewed Motion, the discretionary structure of the Nondisclosure Agreement means that the Committee has not been able to participate in or observe witness interviews, nor has it been provided with detailed summaries or downloads.  In any event, even if the Committee **could** participate, the Oversight Board's statement that the "UCC has suggested only a handful of general questions" misses the point of the Committee's concerns.  Even if the Investigator is asking the right questions or discussing the right topics with interviewees, those discussions will only be marginally useful without the ability to confront witnesses with documents, *see infra*, section II, and the Investigator has had practically none of the critical documents to date.

6.     The Committee is not simply airing grievances here.  Rather, a full picture of the negotiations surrounding the Nondisclosure Agreement—and the resulting end product—is necessary to understand why the report produced by the Investigator is unlikely to offer the transparency needed for the Committee's efforts.  Indeed, the issue is portrayed most clearly by the two differing strategies used by the Retiree Committee and the Committee.  Had the

---

[8]     Ex. 2, Jan. 25, 2018 Email from S. Cooper to D. Saval.

[9]     *See* Ex. 2, Jan. 27, 2018 Email from T. Mungovan to L. Despins.

Committee taken the Retiree Committee's approach and signed the Nondisclosure Agreement in

November 2017 under the then-proposed framework, it would **never** have received any

documents from Santander or Popular without court intervention.  Only because of the credible

threat of litigation did those parties consent to sharing materials with the Committee.  In the

same vein, absent the filing of this Renewed Motion authorizing the Committee to verify the

Investigator's work, the Committee will likely never see the most meaningful "source material"

from the Puerto Rico Financial Institutions—or would see that material too late.

## II.     INVESTIGATOR'S PRESENT WORK REVEALS NEED FOR FOLLOW-UP, AS "INTERVIEWS" ARE MERELY FIRESIDE CHATS WITHOUT DOCUMENTS

7.     To understand why the Committee is concerned about the vigor of the

Investigator's efforts, one need look only to the objections from Popular, Santander, and

AAFAF.  As before, the "targets" of the Committee's Motion have heaped praise on the

Investigator.  *See* Popular Objection, ¶ 3 ("In fact, it is the Popular Entities' understanding that

the Independent Investigator is diligently and thoroughly conducting its investigation[.]");

Santander Objection, ¶ 1 ("the prudent, efficient, and appropriate process is for the Oversight

Board to conclude its thorough investigation and publish its final report").

8.     Their satisfaction makes sense in light of the slow pace of document production

and the possibility that the May 2019 deadline could pass with their actions unexamined.  The

Oversight Board claims that the Committee "has had access to over 14,000 documents (hundreds

of thousands of pages, including electronic communications) in a shared repository."  Oversight

Board Objection, ¶ 4. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ And, while the Investigator has "followed through on 22 of the UCC's 24 proposed document requests to Popular and Santander," *see* Oversight Board Objection ¶ 4, merely forwarding document requests is not enough. Rather, a vigorous discovery effort involves negotiation over search terms, identification of relevant custodians, and back-end analysis of a producing party's review efforts to confirm that relevant documents were, in fact, produced. On that front, the Investigator has offered the Committee little comfort:

- Search terms: 

- Custodians: 

- Key documents: 



11 ███████████████████████████████████████████████████

12 *See* Renewed Motion, ¶ 17.

13 ███████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████

9.      The Committee earnestly hopes that its concerns are misplaced, and the

Investigator's document production efforts will, in fact, be thorough and require very little

follow-up by the Committee.  However, the evidence to date suggests the contrary, and the

Committee is unwilling to simply sit back and hope for that prospect while the title III cases

progress and while a May 2019 deadline for filing avoidance actions rapidly approaches.

10.     The interview situation suffers from the same deficiencies.  The Oversight Board

spends paragraphs parading the dozens of interviews that the Investigator has conducted.

However, the Oversight Board does **not** mention that—as far as the Committee can tell, at

least—these interviews are being conducted without the benefit of **any** meaningful documents or

emails.  Indeed, the Oversight Board claims that the Investigator has interviewed "over 10

witnesses who worked at Popular and Santander, and is scheduled to interview an additional 8

witnesses from GDB, Popular, and Santander, as well as the Puerto Rico Ethics Office, in San

Juan this week."  Oversight Board Objection, ¶ 12.  The Investigator apparently also intends to

complete these interviews "by the end of this month [May]."  Oversight Board Objection, ¶ 12.

11.     ████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████  ███████████████████████

█████████████████████████████████████████████████████

14    ████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

12.     In other words, the Investigator has spent the last months conducting unsworn

"fireside chats" with some of the most prominent individuals who were highlighted in the

Committee's Motion without the benefit of those individuals' emails, meaning that:

- Besides the voluntary nature of the unsworn interviews, the Investigator has no means to
  probe further and challenge or refresh a witness's recollection.  As is always the case with
  deposition testimony or investigation interviews, deponents regularly show more candor
  when there is an understanding that they will be challenged on the spot (not months later)
  with emails providing a more fulsome view of—or directly contradicting—what was said.

- While the Investigator may hit the right topics of discussion and generic questions, the
  Investigator's ability to drill down on narrower issues or ask about specific interactions is
  extremely limited—particularly given the lack of any meaningful **internal** documents from
  the Puerto Rico Financial Institutions.

13.     Whatever the value of these "fireside chats," they cannot substitute for the

discovery sought by the Committee: testimony under oath pursuant to Bankruptcy Rule 2004 that

is appropriately targeted, tailored, and backed up by the Committee's prior review of meaningful

internal documents.

## III.    COMMITTEE HAS STATUTORY AUTHORITY TO INVESTIGATE THESE ISSUES, AND HAS DIFFERENT AIMS

14.     The Oversight Board and AAFAF repeat *ad nauseam* the "trustee" and

PROMESA 104(o) arguments that they made last August to contend that the Oversight Board is

the "exclusive" party to conduct an investigation here.  To defeat these contentions, the

Committee need only rest on the arguments made in its reply to the original Motion—namely,

that the Oversight Board and AAFAF do not, and cannot, cite authority for the proposition that

the Committee should be denied its right to conduct an investigation pursuant to its authority

under 11 U.S.C. § 1103(c) simply because a separate investigation may be ongoing (or, in this

case, supposedly nearing completion).  *See* Committee's Reply in Support of 2004 Motion

[Docket No. 1080], ¶¶ 15-16 (citing *Enron, Lehman¸ New Century*, *Friedman's¸ Caesars*, and other cases in which creditors' committees were permitted to conduct investigations alongside a bankruptcy examiner).

15.    Although that should be the end of the question, the objecting parties' "exclusivity" arguments ignore a number of recent developments since the briefing last August. First, the court has **already** dismissed these arguments and recognized the Committee's statutory authority to investigate.  At the August hearing, the court indicated that it was not denying the Committee's right to investigate at all, but merely abating the Committee's request to investigate **right now—**and recognized that PROMESA authorized the Committee to investigate these issues within the court's discretion:

> I guess my underlying order is that **I don't see anything in PROMESA that makes the investigation mandatorily exclusive**.  I think we all agree with that, and **I think we all agree that the UCC 2004 investigation is authorized by PROMESA, within my discretion; okay**?

Ex. 3, Transcript of August 22, 2017 Hearing ("August 22 Transcript"), p. 72; 18-24.

16.    Months later, the court repeated that determination at the November hearing:

> Though I do think that the concerns that the UCC has raised about investigating potential other claims are significant concerns **and that they have the authority to do so and that we should all know exactly what was going on**.

Ex. 4, Transcript of November 15, 2017 Hearing (the "November 15 Transcript"), p. 72: 21-25.

17.    Second, even in other aspects of these PROMESA cases, Judge Swain has rejected the Oversight Board's argument that its supposed status as "trustee" for some purposes grants it *carte blanche* to assume all of the powers given to trustees in chapter 11 cases.  In the November 16, 2017 *Opinion and Order Denying Urgent Motion of FOMB to Confirm Appointment of a Chief Transformation Officer* [Docket No. 471 in PREPA Docket 17-BK-4780], Judge Swain determined that the Oversight Board could not command operational authority over

11

PREPA, holding among other things that the "trustee and representative status provided to the FOMB by Title III are granted **in relation to the Bankruptcy Code provisions specifically adopted by PROMESA**." *Id*. p. 17 (emphasis added).  In other words, the Oversight Board must point specifically to enumerated provisions in PROMESA for its authority to take certain actions.  Here, nothing in PROMESA section 104(o) dictates that the Oversight Board would be the **exclusive** party to conduct any investigation, nor does it strip the Committee of its authority under section 1103(c) of the Bankruptcy Code, which itself was also specifically incorporated into PROMESA.  Because section 1106 of the Bankruptcy Code was **not** incorporated into PROMESA, the Oversight Board does not hold the broad powers typically granted to a trustee to "investigate the [debtor's] acts, conduct . . . and any other matter relevant to the case or to the formulation of the plan." 11 U.S.C. § 1106(a)(2).  In contrast, PROMESA section 104(o)—a brand new provision of legislation—is quite narrow, and is limited to "disclosure and selling practices in connection with the purchase of bonds issued by a covered territory."  Thus, for example, the Oversight Board has no express statutory authority to investigate whether bonds issued by the Commonwealth were valid or invalid.

18.     The Oversight Board's argument that it "owns" all affirmative claims (or the right to investigate those claims) is another red herring.  For one, that bridge will be crossed later and it is unnecessary to dispute now whether the Committee could obtain derivative standing to pursue claims or, alternatively, successfully request that a litigation trustee be appointed pursuant to section 926(a) of the Bankruptcy Code.  In any event, the "derivative standing" hurdle is present in **every** chapter 11 case, and courts do not use it as justification for refusing a Committee's request to commence discovery under section 1103(c) of the Bankruptcy Code.

19.    Likewise, the "ownership" arguments rest on the false premise that discovery can only be relevant for the purposes of bringing **affirmative** claims.  That is not the case, and Bankruptcy Rule 2004 allows examination of the "acts, conduct, or property [] of the debtor, or to **any matter which may affect the administration of the debtor's estate**."  Fed. R. Bankr. P. 2004(b); *see also* 11 U.S.C. § 1103(c)(2) (Committee may investigate "any other matter relevant to the case or to the formulation of a plan").  Indeed, as the Committee has stated before, discovery from the Puerto Rico Financial Institutions may be used for a number of other purposes, including:

- Evaluating or objecting to the potential claims asserted by the Puerto Rico Financial Institutions (or other entities which are affiliated or have acquired claims through the Puerto Rico Financial Institutions) against the Commonwealth;

- Placing a value on the likelihood of success of potential claims against individuals or entities for the purposes of plan formulation or other negotiations—i.e., as is currently ongoing in the negotiations over the GDB's Restructuring Support Agreement under title VI of PROMESA.  *See* Renewed Motion, ¶ 20 (noting that GDB has attempted to release directors and officers from liability);

- Evaluating whether certain bonds issued with the assistance of the Puerto Rico Financial Institutions were valid or, instead, violated the Puerto Rico constitution.

- Ensuring that creditors who "re-invest" in the Commonwealth as part of a plan of adjustment understand whether any culpable individuals or entities would remain involved in Commonwealth financial affairs going forward.

20.    These varied aims are entirely consistent with Bankruptcy Rule 2004, section 1103(c) of the Bankruptcy Code, and the Committee's role as a guardian for the interests of its creditor constituency and as a party uniquely positioned to have an interest in "growing the pie." *See In re W. Pac. Airlines, Inc.,* 219 B.R. 575, 578 (Bankr. D. Colo. 1998) ("Thus, a creditors committee serves something of a 'watchdog' function in bankruptcy and enjoys unique rights and responsibilities under the Code."); *see also Ritchie Capital Mgmt., L.L.C. v. Kelley*, 785 F.3d 273, 280–81 (8th Cir. 2015) ("[I]n essence, the function of a creditors' committee is to act as a

13

watchdog on behalf of the larger body of creditors which it represents."). AAFAF seems to believe that the Committee should not play a role in **any** of the title III cases, noting for example that "any defenses to creditor claims can be asserted by the Oversight Board or AAFAF." AAFAF Objection, ¶ 7. While the Oversight Board and AAFAF **could** certainly take any number of actions—and the parties may indeed share common interests in many areas—the fact of the matter is that debtors often do not always take actions that are in their creditors' best interests. That is especially true where certain parties are rife with conflicts, such that they cannot plausibly be taken seriously when they claim that they should take the lead as to those entities. The Committee raised these issues at length in its briefing on the Original Motion, but it bears repeating that these agencies are personally led by individuals associated with potential "targets" of the Committee's discovery:

- AAFAF is led by an investment banker who spent eight years at Santander (including in the municipal finance field) before joining the government and could have participated in many of the transactions that have given rise to the Committee's concerns.

- At least three members of the Oversight Board are deeply enmeshed with the Puerto Rico Financial Institutions. Two of the Oversight Board's members, Carlos Garcia and José R. González, were directly employed by Santander and worked on the transactions at issue here. In addition, Oversight Board Chairman José Carrión III is a scion of the family that founded Banco Popular, the son of a former Popular Inc. board member, a relative of the current Executive Chairman of the Board of Popular Inc., and the founder of an insurance firm which has received millions per year in commissions from Popular Inc.[15]

21. As the Committee then observed, and perhaps as a result of these conflicts, the Oversight Board commenced its investigation only **after** the Committee filed its original Motion—even though it had the authority to do so for more than a year.[16] Conflicts like these,

---

[15] *See* Reply in Support of Original Motion, Dkt. No. 1080, ¶ ¶ 2 and 24.

[16] As the court observed during the November hearing, almost every action taken by the Oversight Board has been at the urging of the Committee. *See* Ex. 4, Nov. 15 Transcript, at 61:15 – 61:20 ("**There is legitimacy to the argument that the status reports seem to come out very close to court hearings, and they're general.**").

and the need for an outside view by a party most incentivized to "grow the pie," are part of the

reason that Congress has not given debtors a monopoly over any investigation.  In fact, the

importance of the Committee's "watchdog" role has already played out in these title III cases,

even outside the public eye or its efforts in prompting this investigation.  For weeks, AAFAF

questioned the Committee's requests for lists of any bank accounts containing over $2 million in

deposits, questioning "the purpose of the bank account request."  *See* Ex. 5, September 14, 2017

email chain between counsel for Committee and counsel for AAFAF.  **Interestingly enough, a

short time after the Committee's request, AAFAF announced that it "discovered" nearly

$6.9 billion in hundreds of previously "missing" cash accounts**.[17]  There are likely many

other unforeseen examples in which the Committee—equipped with the discovery it now

seeks—can advance the overall goals of PROMESA, including the aim of promoting financial

transparency.  *See* PROMESA section 405(m)(1) (finding that, among other things, a "lack of

financial transparency" helped "create[] a fiscal emergency in Puerto Rico") (codified at 48

U.S.C. § 2194(m)(1)).  While the Committee may have taken a back seat for the time being, by

August 2018 the clock will have run on the Oversight Board's "exclusivity."

IV.   **TIME FOR AUTHORIZATION IS NOW – AUGUST 15, 2018 REMAINS
      APPROPRIATE START DATE**

        22.     At the outset, it is worth addressing the Oversight Board's statement that "no such

firm deadline [of March 2018] was ever established."  Oversight Board Objection, ¶ 18.  The

Committee never argued that the Oversight legally bound itself to meeting a certain deadline.

Rather, counsel for the Oversight Board represented to the court that it was permissible to

temporarily sideline the Committee because the Investigator's work would conclude by no later

---

[17]   *See* Summary of Bank Account Balances for Puerto Rico Governmental Instrumentalities, Released Dec. 18, 2017
(available at http://www.aafaf.pr.gov/assets/aafaf-pres-summarybankaccounts.pdf )

than March 2018 or, at the very latest, "**into April**."  Ex. 4, November 15, 2017 Transcript, pp.

59: 22-60:2.  That statement became part of the mix of information considered by the court when

it originally denied the Motion without prejudice, and it is now no longer accurate.

Reconsideration of the Committee's request is appropriate on that basis alone.

23.     It is not as if the Oversight Board's delay is a slight one, either.  While the

Oversight Board and objectors reference the "six months" since the Committee's Motion was

denied in November (minimizing the total delay), **the real starting point here was two years**

**ago in August 2016**, when the Oversight Board was appointed and authorized pursuant to

PROMESA section 104(o) to begin pursuing these issues.  Of course, the Oversight Board did

nothing until the Committee filed its Motion and brought its concerns to the forefront.  And, even

taking a generous view of the matter and looking only to the Investigator's work (not the

Oversight Board's year of inaction), the investigation should be judged not based off the court's

ultimate ruling in November 2017, but by the Investigator's retention on September 1, 2017.

24.     The objectors nevertheless suggest that the Committee's Renewed Motion should

be deferred until September 2018, or later.  These suggestions are all based on the belief that the

Investigator will, in fact, be completed by August 15, 2018—a hopeful assumption given the

Investigator's past timing and the preliminary nature of the document productions from the

Puerto Rico Financial Institutions.[18]  In any event, the objectors' "wait for the report" argument

misses the fundamental nature of the relief sought by the Committee.  The Committee will

happily review and digest whatever report the Investigator prepares, and the Committee hopes

---

[18]     The Oversight Board claims that it reassured Committee counsel of its anticipated completion date during a call on May 4, 2018.  *See* Oversight Board Objection, ¶ 2 ("Indeed, the Independent Investigator communicated this to counsel for the UCC on May 4, 2018.")  ██████████████████████████████████████ ██████████████████████████████████████████████████████████  The Oversight Board is correct when it reiterates that it has never presented a 'hard-and-fast deadline," *see* Oversight Board Objection, ¶ 18, which is precisely why the Committee remains so concerned.

that it will have the opportunity to do so sooner rather than later.  Whenever that happens, the

information contained in the report (or undergirding the report) will almost certainly form the

starting point for any subsequent meet-and-confer discussions with the Puerto Rico Financial

Institutions.  The Committee hopes that those discussions could be brief and limited in nature

because of the starting point that the Investigator has provided.  Hope is not enough, though.

What the Committee needs is an end date to the waiting period, and a framework by which all of

the relevant stakeholders can advance these title III cases without delay after delay.

25.     None of the objectors contend with the most pressing issue here—the May 2019

deadline for avoidance actions.  Only the Committee has posed a framework for ensuring that

meaningful discovery can be secured and analyzed before that date.  Imagine, for example, the

predicament faced by the Committee if these issues were briefed in September 2018 or later.

The briefing alone would take weeks, taking into account the need to have the matter heard at an

omnibus hearing.  Only then, in November or December, would the Committee finally obtain the

"source material" (e.g. documents, search terms and custodians) to meaningfully confer with the

Puerto Rico Financial Institutions.  This does not even take into account the possibility that the

Committee may need to obtain discovery from **other** actors, possibly necessitating further court

intervention depending on the circumstances.  Ultimately, any disputes about the burden of

production could push the Committee into 2019 and right up against the May 2019 deadline—

something which is remarkable, and unacceptable, given that the Motion was filed in July 2017.

## V.     <u>DUPLICATION AND BURDEN CONCERNS ARE EASILY ADDRESSED – PRODUCE IN AUGUST, DISPUTE LATER</u>

26.     Santander, AAFAF, and Popular all predictably complain about the possible

burden of the Committee's proposed document requests and the prospect that the Committee's

work would "duplicate" work performed by the Investigator.  These complaints are baseless.  For

one, the risk of "duplication" is minimal, and perhaps nonexistent.  As every party has

acknowledged, the Committee will not be starting from square one.  Indeed, the producing

parties can simply reproduce their previous productions and give those materials to the

Committee, along with lists of search terms and custodians.  **Moreover, the "duplication" of**

**the nature discussed last summer—when the Committee and the Oversight Board's**

**investigations would proceed in parallel—could occur only if the Investigator were**

**somehow unable to complete its work by August 15, 2018.  Because none of the parties**

**claim to believe that is possible, then the Committee's proposed framework should not**

**present those concerns.**  However, even if the Investigator is not finished by August 2018, the

cost-benefit calculus starts to change significantly.  By that time, any risk of duplication (which,

again, should be minor because producing parties could begin by reproducing materials

previously shared with the Investigator) pales against the possibility that the Commonwealth of

Puerto Rico could miss out on tens or hundreds of millions, or potentially billions, of dollars in

avoidance actions which could expire in May 2019.

27.     For the same reasons, the complaints about "burden" are likewise premature and

fail to acknowledge that the Committee has, and will, continue to tailor its requests to the need

for discovery and in light of whatever materials are received by the Committee.  *See* Santander

Objection, ¶ 7.  In fact, the Committee's proposed framework sets forth the time and place for

resolving these exact issues.  Immediately after August 15, 2018, producing parties like

Santander can raise their specific concerns directly with the Committee, and the parties can all

report back to the court on September 12, 2018 at the scheduled omnibus hearing.

VI.     **AAFAF SHOULD CONSENT TO SHARE MATERIALS PROMPTLY**

28.     Like the Retiree Committee, the Committee is frustrated by the notion that

AAFAF has **still** refused to share with the committees the exact same GDB documents that it

gives the Investigator.  As the Committee mentioned in its Renewed Motion, the GDB continues

to be identified as one of the primary "bad actors" within the Puerto Rico government, featuring

prominently in a GAO report as an enabler of Puerto Rico's borrowing.  *See* Renewed Motion, ¶

20.  Thus, it makes sense that AAFAF may not wish for the Committee to review GDB

materials.   As the Committee noted in the Renewed Motion, the Committee has made repeated

requests over several months for AAFAF to share materials with the Committee.[19]   Yet AAFAF

continued to offer a series of shifting justifications for its refusal, first arguing that it took issue

with the Committee's ability to use documents in court proceedings and later contending that it

could, at its complete discretion, withhold entire categories of documents as "sensitive" without

defining what materials would count as sensitive.  The Committee raised this issue on multiple

occasions with the Investigator, and reached out to AAFAF's counsel on numerous occasions.

Counsel for AAFAF never resolved the issue.

29.     Now, only with the prospect of court intervention does AAFAF explain its

silence, stating that it has "been working with the non-AAFAF entities within the elected

Government to negotiate an appropriate blanket non-disclosure agreement with the Investigator .

. . ."  AAFAF Objection, ¶ 3.  AAFAF also claims that it "believes that [these issues] will be

resolved before the hearing on the Committee's Renewed Motion."  *Id.*  While the Committee

certainly hopes that AAFAF will indeed produce GDB materials before the hearing date—and

AAFAF appears to acknowledge that its refusal is without basis—if no resolution is reached by

the time of the hearing, the court should order that AAFAF immediately produce to the

[19] ███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

Committee and the Retiree Committee all of the non-privileged[20] documents that it has or will produce to the Investigator, as well as detailed, document-by-document logs of all privileged materials identified during the course of its review.  The urgency of this discovery cannot be overstated.  At this very moment, the Committee is in active negotiations with AAFAF regarding the GDB's restructuring under title VI of PROMESA.  The draft Restructuring Support Agreement attempts to provide for broad releases of all claims against the GDB's directors and officers—highlighting the need for the Committee to understand what really occurred at GDB.[21] Moreover, recent adversary proceedings highlight additional potential GDB misconduct, including the prospect that the GDB and related entities utilized their control over regulatory agencies to foist upon local "cooperativas" (credit unions) bonds which "created a systemic risk" for those cooperativas.[22]  These issues are precisely the kinds of areas where discovery from the GDB could provide the transparency necessary for the functioning of these title III cases.

## VII.   **CONCLUSION**

For the foregoing reasons, the Committee's Renewed Motion should be granted and the Committee should be permitted to commence its discovery program beginning on August 15, 2018.  The Committee should be authorized to commence meet-and-confer discussions with the Puerto Rico Financial Institutions with the aim of reporting back to the court on the status of those discussions during the September 12, 2018 omnibus hearing.

---

[20] The Committee understands that the Investigator may have attempted to obtain privileged documents from the government under some joint defense or other theory.  The Committee has not taken a position on whether those documents do, indeed, remain privileged.

[21] *See* Renewed Motion, ¶ 20 (citing proposed releases in RSA).

[22] *See* Complaint in *Cooperativa de Ahorro v. Commonwealth of Puerto Rico*¸ Adv. Proc. 18-00028.  The Committee is not stating that Bankruptcy Rule 2004 discovery would be used as an attempt to circumvent the ordinary Rule 26 procedures under the Federal Rules of Civil Procedure.  Rather, the specific allegations and issues presented by this adversary proceeding, if true, could already be in play as part of the GDB's restructuring.  *See* Brad Setser, Council on Foreign Relations, Puerto Rico's "Voluntary" Restructuring of GDB Bonds (July 26, 2017) (available at https://www.cfr.org/blog/puerto-ricos-voluntary-restructuring-gdb-bonds) (discussing GDB's restructuring and how, "as a practical matter the government will need to step in [] to protect the cooperativas' depositors from losses").

Dated:  May 30, 2018                    /s/ Luc A. Despins, Esq.

                                        PAUL HASTINGS LLP
                                        Luc. A. Despins, Esq. (Pro Hac Vice)
                                        James R. Bliss, Esq. (Pro Hac Vice)
                                        James B. Worthington, Esq. (Pro Hac Vice)
                                        G. Alexander Bongartz, Esq. (Pro Hac Vice)
                                        200 Park Avenue
                                        New York, New York 10166
                                        Telephone:  (212) 318-6000
                                        lucdespins@paulhastings.com
                                        jamesbliss@paulhastings.com
                                        jamesworthington@paulhastings.com
                                        alexbongartz@paulhastings.com

                                        Counsel to the Official Committee of Unsecured
                                        Creditors

                                        - and –

                                        /s/ Juan J. Casillas Ayala, Esq.

                                        CASILLAS, SANTIAGO & TORRES LLC
                                        Juan J. Casillas Ayala, Esq., USDC - PR 218312
                                        Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
                                        Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
                                        Ericka C. Montull-Novoa, Esq., USDC - PR 230601
                                        El Caribe Office Building
                                        53 Palmeras Street, Ste. 1601
                                        San Juan, Puerto Rico 00901-2419
                                        Telephone: (787) 523-3434
                                        jcasillas@cstlawpr.com
                                        dbatlle@cstlawpr.com
                                        aaneses@cstlawpr.com
                                        emontull@cstlawpr.com

                                        Local Counsel to the Official Committee of Unsecured
                                        Creditors